# EXHIBIT 13



1

```
 1                    Pages 1 - 161
 2           UNITED STATES DISTRICT COURT
 3          NORTHERN DISTRICT OF CALIFORNIA
 4     BEFORE THE HONORABLE JOSEPH C. SPERO, MAGIST
 5  IN RE:                  )
                            )  Case No. C01-0988 MJJ
 6  ORACLE SECURITIES LITIGATION    )
                            )  Tuesday
 7  _____)  March 1, 2005
                    11:00 a.m.
 8
 9          TRANSCRIPT OF PROCEEDINGS
10
11  APPEARANCES:
12  For Plaintiff:    LERACH, COUGHLIN, STOIA, GELLER
                      Rudman & Robbins LLP
13                    100 Pine Street
                      Suite 2600
14                    San Francisco, California 94111
                 BY:  MARK SOLOMON, ESQ.
15                    SHAWN A. WILLIAMS, ESQ.
                      MONIQUE WINKLER, ESQ.
16                    WILLOW RADCLIFFE, ESQ.
17
18        (APPEARANCES CONTINUED ON FOLLOWING PAGE)
19
20
21
22
23
24  Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR
                    Official Reporter - US District Court
25                  Computerized Transcription By Eclipse
```

2

```
 1  APPEARANCES:  (CONTINUED)
 2
 3  For Defendant:    MAYER, BROWN, ROWE & MAW
                      190 South LaSalle Street
 4                    Chicago, Illinois 60603-3441
                 BY:  ALAN N. SALPETER, ESQ.
 5                    JAVIER H. RUBINSTEIN, ESQ.
                      LEE H. RUBIN, ESQ.
 6                    ELI GREENSTEIN, ESQ.
                      SHIRISH GUPTA, ESQ.
 7
 8
 9  Also Present:    James C. Maroulis, Esq.
                     Senior Corporate Counsel
10                   Oracle Corporation
11
12                   Andy Rudolph
                     Forensic Accountant
13                   Lerach, Coughlin, Stoia, Geller,
                     Rudman & Robbins, LLP
14
15
16              -  -  -  -
17
18
19
20
21
22
23
24
25
```

3

```
 1            P R O C E E D I N G S
 2  MARCH 1, 2005              11:00 a.m.
 3
 4        THE CLERK:  Calling Case C01-0988, In Re Oracle
 5  Securities Litigation.  Counsel --
 6        THE COURT:  Do you have the sheet?  Do you have a
 7  sheet with these people's names on it, the cards?
 8        THE CLERK:  Yes.  I will print it out.
 9        THE COURT:  All right.  Why don't you all state your
10  appearances, please?
11        MR. SOLOMON:  Mark Solomon, your Honor, appearing or
12  behalf of plaintiffs.
13        MR. WILLIAMS:  Shawn Williams on behalf of plaintiff.
14  Good morning, your Honor.
15        THE COURT:  Good morning.
16        MR. GREENSTEIN:  Good morning, your Honor.  Eli
17  Greenstein on behalf of the plaintiffs.
18        MS. WINKLER:  Monique Winkler on behalf of the
19  plaintiffs.
20        MS. RADCLIFFE:  And Willow Radcliffe on behalf of the
21  plaintiffs.
22        THE COURT:  Welcome.
23        MR. SALPETER:  Good morning, your Honor.  I'm Alan
24  Salpeter from Mayer, Brown in Chicago for Oracle.
25        THE COURT:  Welcome.
```

4

```
 1        MR. RUBINSTEIN:  Good morning, your Honor.  Javier
 2  Rubinstein on behalf of Oracle also from Mayer, Brown.
 3        THE COURT:  Welcome.
 4        MR. RUBINSTEIN:  Thank you.
 5        MR. MAROULIS:  Good morning, your Honor.  James
 6  Maroulis from Oracle Corporation for Oracle.
 7        MR. RUBIN:  And Lee Rubin also from Mayer, Brown.
 8        THE COURT:  All right.
 9        MR. SOLOMON:  Can we also just add we also have Andy
10  Rudolph with us, who is our in-house forensic accountant.
11        THE COURT:  Welcome.  Good.  All right.  We are here
12  pursuant to Judge Jenkins' order of February 7th referring us
13  in the matter of preparation of a discovery plan.
14        I have reviewed in detail the parties' submissions.
15  I take as my text for the preparation of the plan the outline
16  presented in your February 23rd joint letter as supplemented by
17  the Mayer, Brown letter clarifying certain aspects of their
18  position.
19        And what I want to do is I want to go through in the
20  order you have presented them the issues and come up with an
21  order that I will ask you all to draft reflecting whatever
22  agreements or rulings we come to today.
23        We don't have endless amounts of time today so we are
24  going to try to move pretty quickly, but let's start on Page 1
25  with the -- or Page 1, 2, and 3, which is the whose files
```

 

5

1    issue.
2         I guess what I need to understand is the difference
3    between the two proposals. I don't understand Oracle's
4    proposal. The -- I can't say that. Let me withdraw that.
5         I guess I don't understand the dimensions of the
6    plaintiff's proposal. As I understand the plaintiff's
7    proposal, that the plaintiff's propose that with respect to the
8    documents that are relevant, in other words the subject matters
9    that we define later in the form that we define later, they
10   would like the five executives files to be searched, all of
11   area vice-presidents in the sales -- and I don't even know
12   whether that's a department in Oracle or not, but in sales, the
13   regional managers in the three divisions that they set forth to
14   be -- to be searched for files. And then they may come up with
15   some others at some point that they want to be filed.
16        Is that correct as I understand it? Is my
17   understanding correct, Mr. Solomon?
18        MR. SOLOMON: Your Honor, that's a sort of at least
19   we need that stuff, but we also need to approach this in an
20   organizational way.
21        In other words, there are divisions within Oracle.
22   We don't have an organizational chart, unfortunately, that
23   details out in a sort of tree fashion the divisions. We would
24   like that and, apparently, one doesn't exist and one didn't
25   exist or, apparently, if one did exist, it's not there now.

6

1         And so we can't do it -- we can't approach this at
2    least at this stage in the way that ideally we would with an
3    organizational chart.
4         Having said that, we do need the files of these
5    layers of people within divisions of Oracle, including sales,
6    including service, as we have set out in our letter.
7         Ideally we wouldn't go on this main basis because we
8    think that it unduly restricts what would be available.
9         Having said that, we want it on an at least basis.
10   Why do we go beyond the second level than they resist? We go
11   to that level because the manager level, that's where you are
12   going to find a wealth of documents --
13        THE COURT: I don't want to get there yet. I don't
14   want to get there yet because I don't -- I want to figure out
15   whose files you are going to search today. So I'm not going to
16   go with some sort of generalized description of anything here.
17   It is going to be very specific because I want you to know what
18   you are going to get and I want them to know what to look for.
19        Now, it is possible that there will be other files
20   searched later on. I'm sure depositions will be quite
21   illuminating in some ways and in that way in particular, but I
22   want to be very specific now.
23        So I guess I don't understand precisely what you are
24   asking.
25        MR. SOLOMON: Okay --

7

1         MR. RUBINSTEIN: Your Honor?
2         THE COURT: Yes.
3         MR. RUBINSTEIN: We prepared a chart that would,
4    based on the letter --
5         THE COURT: What is that?
6         MR. RUBINSTEIN: To identify the positions of both
7    parties.
8         THE COURT: I have got the letter. I just don't
9    understand what it says.
10        MR. SOLOMON: Okay. Let me try and help, your Honor.
11   If you look at Page 3 of our letter, you will see we talk about
12   the --
13        THE COURT: At least, the speakers group. Okay.
14   That's the five named executives, is that right?
15        MR. SOLOMON: Right. Go ahead.
16        MR. WILLIAMS: If I may, your Honor?
17        THE COURT: Yes. Sure.
18        MR. WILLIAMS: The speakers group is a group that was
19   initially defined by defendants and they ultimately expanded it
20   to go beyond the, you know, Larry Ellison, Jeff Henley, Ed
21   Sanderson and a couple of other individuals. It ultimately
22   expanded to about 40 people.
23        THE COURT: So what you are talking about there is
24   who?
25        MR. WILLIAMS: We are talking about a list that they

8

1    provided, and a list is attached as the very last exhibit of
2    the letter.
3         THE COURT: So you are talking about everybody that
4    they listed as the files to be searched.
5         MR. WILLIAMS: Exactly. Exactly. And we had no
6    input in that.
7         THE COURT: Fine.
8         MR. WILLIAMS: Now, we have asked for more than that.
9         THE COURT: Right.
10        MR. WILLIAMS: And the basis of that is because we
11   have no organizational charts, but we do have some documents
12   that they have produced thus far.
13        Now, some of those documents which appear to be for
14   only one organization, I think it's O.S.I. -- I'm sorry,
15   O.P.I., it does indicate that on a weekly basis there were
16   e-mails with forecast packages.
17        THE COURT: I understand. I understand. I'm not
18   there yet. I'm not there yet.
19        I just want to know who the people are you are
20   talking about. You are talking about the area -- I understand
21   now what you mean by speakers. You mean people who they wa
22   to search.
23        THE COURT: Sure. Plus, so this is the difference,
24   area vice-presidents and regional managers in each of the three
25   sales and consulting.




9

1    MR. WILLIAMS:  That's right.
2    THE COURT:  How many people is that, the plus?
3    MR. RUBINSTEIN:  When we add up the number -- we have
4    attempted to calculate the number of people that they have
5    within the categories listed here on Page 2 of their letter,
6    all of the various designations --
7    THE COURT:  I don't want you to do that.  On Page 3
8    it says, "and the area vice-presidents and regional managers in
9    O.P.I., O.S.I. and N.A.S."  How many is that?
10    MR. RUBINSTEIN:  I don't think we have a precise
11    number on that, but, I mean, it's going to be -- hold on one
12    second, your Honor.
13    (Brief pause.)
14    THE COURT:  How many area vice-presidents are there
15    in this organization?
16    MR. RUBINSTEIN:  According to what I have here 33.
17    THE COURT:  33 total?
18    MR. RUBIN:  Yes, your Honor, but this is an
19    approximation.
20    THE COURT:  About 33 AVP's?
21    MR. RUBIN:  Right.  And regional managers,
22    approximately 134.
23    THE COURT:  Okay.
24    MR. RUBIN:  And each of the sales, and it appears
25    they identify regional -- yes.  So those are the two.

10

1    And then they have -- plaintiffs have at various
2    times made mention of sales reps.
3    THE COURT:  I want to just deal with what they are
4    actually asking for.
5    MR. RUBIN:  144 and 33, would be an additional 168
6    people in addition to the 53 that we have offered.
7    THE COURT:  All right.  And the -- okay.  And now you
8    can explain to me the substance.  Why do you need to get beyond
9    what they have offered?
10    MR. WILLIAMS:  Well, first reason is that the list of
11    people that they offered, we have know idea who they are and
12    what information is likely to be found in their files.  And
13    that's because we have no organizational chart, and I'm not
14    sure --
15    THE COURT:  You don't know nothing -- you know
16    something about them.  You know that --
17    MR. WILLIAMS:  Titles.
18    THE COURT:  Well, and they are all of the direct
19    reports to the people charged in the complaint, right?
20    MR. WILLIAMS:  At least.  That's --
21    THE COURT:  And I guess the forecasting department,
22    is included in that list, okay.
23    MR. WILLIAMS:  Well, the --
24    THE COURT:  What you are saying is you don't know
25    exactly who.  Okay.  Fine.

11

1    MR. WILLIAMS:  I can add just a little bit to that.
2    When you say or they say these are all the people in the
3    forecasting department, that's not accurate because we do know
4    that --
5    THE COURT:  I didn't think it was all, but I assumed
6    it was some group.
7    Okay.  But why is information from the area
8    vice-presidents important to you?
9    MR. WILLIAMS:  Okay.  Now, and we have just learned
10    this over the last couple weeks and I have talked to defendants
11    about this.  The area vice-presidents are on the documents that
12    they have produced thus far that have communication with
13    customers.  And the communications that we have with the
14    customers, at least on the surface level which we have seen
15    thus far, is whether or not -- what are the chances that this
16    customer is going to buy?
17    What are the problems, if any, that a customer or
18    potential customer is having with a product or with a potential
19    sale?
20    And those area vice-presidents, the communications
21    are coming through the regional managers.  Now, that's what we
22    have gleaned thus far based on a very narrow set of documents
23    and that's what our proposal was based on.
24    THE COURT:  So your view is that in order to get at
25    the customer communications which will indicate the things that

12

1    you want to prove as a matter of liability, you need to search
2    AVP files because they come through the regional managers to
3    the area vice-presidents.
4    MR. WILLIAMS:  That's what it appears, your Honor,
5    yes.
6    THE COURT:  Let me ask you two questions about that.
7    Why do you need the regional managers then?
8    MR. WILLIAMS:  Because the regional managers, again,
9    based on the same documents were in weekly meetings during
10    which each regional manager had to report -- I guess conference
11    call.  I don't know if it ever ended up on paper, but in a
12    conference call what the status of certain sales were.  And
13    that's on the face of the documents that we have seen thus far,
14    although the document we have seen thus far are just e-mails
15    stating things like, "Be prepared" -- these are e-mails to the
16    regional managers.  "Be prepared to talk about all sales or
17    potential sales at this amount."
18    THE COURT:  E-mails from who?
19    MR. WILLIAMS:  E-mails from what it appears to be
20    members of maybe the area vice-presidents or their assistants
21    setting up conference calls.
22    THE COURT:  I see.  Okay.  And what about the
23    argument that, you know, when you get down to a certain level,
24    you may find information about customers in particular
25    instances, but you won't find anything about anything that got

 

13

1  to any of the people who spoke.
2       MR. WILLIAMS: I recognize that that's an argument
3  that's going to be made, but until we are able to see those
4  documents, we don't even know what the information is that
5  could have, should have or would have been known by the people
6  that spoke in the company.
7       And you will probably remember that Mr. Ellison
8  during the entire class period represented that he knew
9  everything about every level of the company saying that he
10  choreographed the --
11       THE COURT: I understand that. I have got to tell
12  you that doesn't get very far with me. I'm sure he is a
13  hands-on manager, but the difference between being a hands-on
14  manager and knowing everything that 40,000 people are doing is
15  a long way.
16       MR. WILLIAMS: I think that's right, but we are not
17  asking for 40,000 people. I think the number that we are
18  talking about here is -- what did you say 168?
19       THE COURT: It's going to end up being a couple
20  hundred.
21       MR. WILLIAMS: A couple hundred people.
22       THE COURT: Yeah. Well, that's a couple hundred
23  people. Okay. All right. Thank you.
24       Well, let me -- I want to give Oracle on chance to
25  respond because I'm inclined to give them the area

14

1  vice-presidents in the group and have their files searched.
2  What do you think about that?
3       MR. RUBINSTEIN: Your Honor, the area
4  vice-presidents -- to the extent that the area vice-presidents
5  would have communicated to the direct reports which -- of the
6  speakers which are within, encompassed within the group that we
7  are talking about, the plaintiffs would get those documents to
8  the extent that they are otherwise responsive.
9       And the purpose of limiting, of going one level below
10  the speakers is precisely to give the plaintiffs the
11  opportunity to argue that there was information that perhaps
12  was reported to the speakers orally.
13       But there is -- it serves another threshold, being a
14  relevance screen, to screening information that was of such
15  significance that it might have been communicated to the
16  speakers.
17       THE COURT: I understand. That's my problem, is I
18  don't really know how to draw that line.
19       MR. SALPETER: Well, I think at a minimum what would
20  make sense, we are offering to produce documents. We have
21  given them the exact names of the people that are within the
22  scope that we are proposing. It's 53 individuals.
23       It seems to us that it is at a minimum reasonable for
24  the plaintiffs to review the documents that are produced within
25  that scope and then if the plaintiffs want to come back and say

15

1  that that information is insufficient, well, they can make that
2  argument. We don't think it is.
3       And, in fact, I think it's also important to point
4  out that this issue was already litigated once, admittedly not
5  in a way that would be binding on this Court, but in the
6  related shareholder derivative litigation this exact issue was
7  litigated and the California and Delaware courts agree to the
8  same speakers minus, what? In other words, the direct reports.
9       And we think that that is -- it properly balances the
10  needs of discovery, what the plaintiffs really needs to be able
11  to prove their case, and at the same time takes into account
12  the burden. There is, obviously, a significant burden shift
13  from 53 to, you know, a couple hundred or even more.
14       THE COURT: I'm not saying that. I asked you about
15  33 additional people, the AVPs.
16       MR. RUBINSTEIN: Well, again, the AVP documents --
17  for instance, it seems to us that one way to perceive this --
18  again the AVP communicates to their superior. And then if the
19  plaintiffs want to say, well, that document then gives me a
20  reason why I need to see the documents from this particular
21  AVP, I think that would be a more reasonable way to proceed.
22       It just seems to me that when you get two layers
23  down, that the marginal cost or the marginal benefit is more
24  than outweighed by the incremental burden of having to do the
25  additional searching.

16

1       THE COURT: All right. I understand that. Let me
2  say this. I always think these discovery disputes are put in
3  the hands of the person least qualified to resolve them when
4  they are put in the hands of a judge because I can't -- there
5  is no way that I know any one-tenth of what anyone in this room
6  knows about exactly what you are talking about, where the
7  marginal utility of the additional search is insignificant as
8  compared to the main liability issues in the case.
9       Nonetheless, I have to make some rather gross calls
10  and so I'm going to do that. It seems to me that the issue is
11  not just things that were communicated, but the underlying
12  facts on the ground that are separate and apart from -- that
13  are a separate element from exactly what the speakers knew, and
14  so I'm inclined to have some measured discovery beyond the
15  speakers group.
16       So my preliminary and first ruling will be that the
17  files to be searched are the -- did you say 53 individuals?
18       MR. RUBINSTEIN: That's correct, your Honor.
19       THE COURT: The 53 individuals that the defendants
20  have identified, plus the area vice-presidents' files in the
21  three sales and consulting divisions listed in the letter.
22  Okay.
23       MR. WILLIAMS: Can I add just one more point, your
24  Honor?
25       THE COURT: Yes.

 

17

1     MR. WILLIAMS: Only that I think that that's a fair
2  place to begin.
3       Starting with the list that they have provided, there
4  are a number of people who are not on that list who are clearly
5  -- whose files are clearly relevant to the forecasting issues.
6       I think beginning with the 53 that they have provided
7  to the Court is -- it's not really a fair position to begin
8  because it's a group that is -- was chosen -- I don't know why
9  they chose this group.
10      THE COURT: I know why they chose this group. They
11  chose this group because this is a securities fraud case and
12  you have to prove the knowledge of the people who actually
13  spoke, and these are the people from whom they get their
14  information. That's why they chose this group.
15      If you have an additional forecaster that's
16  important, tell me. We will talk about it. Who is it?
17      MR. WILLIAMS: Well, his -- for instance, John
18  Nugent. Okay. John Nugent is --
19      THE COURT: How do you spell Mr. Nugent's name?
20      MR. WILLIAMS: N-U-G-E-N-T.
21      THE COURT: Okay.
22      MR. WILLIAMS: He's not on that list. He was a
23  person who defendants relied on or at least was a significant
24  individual in the derivative action going directly to the
25  forecasting issue.

18

1     THE COURT: Who is he?
2     MR. WILLIAMS: I don't know his position, your Honor,
3  but he did have --
4     THE COURT: Well, what did he do? Why was he
5  important?
6     MR. WILLIAMS: I think he either worked on pipeline
7  reports or provided information regarding forecasts to either
8  Jennifer Minton, Larry Ellison or Jeff Henley. And I think
9  defendants are in a much better position to answer that
10  question, but he's an important individual.
11     THE COURT: Okay. Who else?
12     MR. WILLIAMS: Do you know what position Brett Fuller
13  is? He's on the list that you gave us, although you say that
14  he's vice-president of IT and ERP applications.
15     So he goes directly to the products that are at issue
16  in the case and it appears that he was a direct report to -- I
17  wish I could understand --
18     THE COURT: Right. You will eventually. I'm sure.
19  You know, it gets unpacked slowly, but there is no hiding it.
20     Okay. Wait. Fuller, Nugent. Anyone else? Let's
21  get the list.
22     MR. WILLIAMS: I should say that my list of people
23  who aren't on their list goes into the product issues, and I
24  don't know if you want to address that now because I think what
25  we are talking about with O.S.I., O.P.I. and N.A.S. is really

19

1  the forecasting and sales portion. It doesn't touch
2  necessarily on the product problems that are another area of
3  the case which the list that they have provided does not
4  address at all.
5     THE COURT: Okay. Who have you got?
6     MR. WILLIAMS: Well, we have got Charles Rozwat. We
7  have got Gary Roberts.
8     THE COURT: Wait, wait. I'm going to write these
9  down. Charles Rozwat.
10     MR. RUBINSTEIN: They are on our list.
11     MR. WILLIAMS: Rozwat is on your list?
12     MR. RUBINSTEIN: Sure.
13     MR. WILLIAMS: Show me where he is on the list.
14  Sergio Giacolletto.
15     THE COURT: Spell that for me.
16     MR. WILLIAMS: G-I-A-C-O-L-L-E-T-T-O.
17     MR. RUBINSTEIN: Rozwatt reports to Ellison.
18     THE COURT: Okay. Sergio Giacolletto.
19     MR. WILLIAMS: Giacolletto.
20     THE COURT: Okay.
21     MR. WILLIAMS: John Wheeler, who is a person that is
22  named in the complaint isn't on their list at all.
23     MR. RUBINSTEIN: And Jack Wheeler wasn't included
24  because he's Europe.
25     MR. WILLIAMS: So?

20

1     MR. RUBINSTEIN: I thought that we -- what we are
2  talking about is the three U.S. organizations. What this
3  letter encompasses are the direct reports from the three,
4  O.P.I., O.S.I. and N.A.S.
5     MR. WILLIAMS: My last comment to the Court was that
6  my list goes beyond those people who were involved necessarily
7  in the forecast, but also in to the product problems.
8     And, certainly, Sergio Giacolletto was a person who
9  had information about the product problems and the limitation
10  problems with the software.
11     THE COURT: Okay. Who else?
12     MR. WILLIAMS: I said John Wheeler, who is a person
13  that's named in the complaint.
14     THE COURT: Who is he?
15     MR. WILLIAMS: John Wheeler is a senior
16  vice-president of -- I don't know the area, but he's a person
17  that's named in the complaint who is responsible for handling
18  the Bell South CRM implementation issues and he's a guy name i
19  the complaint.
20     THE COURT: Okay.
21     MR. WILLIAMS: I have Greg Meyers and Neil Menon,
22  both individuals named in the complaint who were participants
23  in what we allege to be the improper revenue recognition on the
24  debit memos. These are people that are named specifically in
25  the complaint.

 

21

1  THE COURT: Okay.
2  MR. WILLIAMS: We have got Gary Roberts. Gary
3  Roberts appears to be the senior vice-president of global IT.
4  Again, directly related to the product issues.
5  Now, again, I have to say, your Honor, a lot of what
6  we have been able to glean thus far is based on our
7  investigation and the documents that they have given us, which
8  were documents that they produced in the derivative action, and
9  in the derivative action the product integration and
10  implementation issues were not at issue.
11  Therefore, our knowledge is very limited when it
12  comes to that. Because we don't have any real organizational
13  charts, it's difficult to make a reasonable and comprehensive
14  suggestion to the Court on those issues.
15  MR. RUBIN: Your Honor --
16  THE COURT: Wait, wait. I just want to make sure
17  he's done with his list.
18  MR. WILLIAMS: Brad Scott, another person named
19  directly in the complaint, not on their list. And he was, I
20  think, director of global CRM. Forgive me if I don't have the
21  title exactly right because they didn't supply it for us.
22  Michael Quinn, not on their list and he's another
23  person who was a participant in what we allege to be the
24  improper revenue recognition related to the debit memos that
25  were created on November 17th.

22

1  THE COURT: Okay.
2  MR. WILLIAMS: Michael Rocha, R-O-C-H-A, senior
3  vice-president of platform technologies, you know, another
4  person responsible or at least was in a position to know facts
5  regarding the implementation and integration of 11i at customer
6  sites.
7  Again, these are just not random people that we have
8  chosen. These are --
9  THE COURT: I didn't think they were.
10  MR. WILLIAMS: -- people whose names appear on
11  documents that are on, that show certain problems with
12  integration, implementation or on forecasting issues.
13  Ray Lane, Ray Lane and Ron Cuneo. Ray Lane, at least
14  at the time, was -- I guess they called him Ellison's number
15  two, but I don't know what his exact title was.
16  There is just -- there are a whole host of people who
17  appear to have responsive information that are not on the list.
18  So, really, if we understood how the list was created
19  and what, you know, direct reports were flowed from those, from
20  this list that they have created, it might be a little bit
21  easier.
22  THE COURT: Okay. I don't -- you know, I understand
23  you don't understand their organization. I don't understand
24  that last comment. I know exactly how this list was prepared.
25  Okay.

23

1  MR. RUBIN: Your Honor?
2  THE COURT: Any problem with these additional dozen
3  files?
4  MR. RUBIN: Your Honor, perhaps with some no, but
5  perhaps with others yes just based upon on just conferring
6  after hearing the names.
7  I just want to back up for a moment. When we met a
8  week ago that Friday, the 18th I believe it was, we -- the
9  defendants said to the plaintiffs, these are our categorical
10  cuts, these speakers group. Then if there are individuals --
11  and we had already identified some -- come to us. It doesn't
12  have to be a detailed proffer. Just tell us. What is your
13  interest in these individuals? We will confer. We may not
14  agree to some of them. On some we may say, you know, this
15  person is just too far afield. This is one off e-mail and we
16  are not prepared to search entire files, but come to us and
17  identify names. All we asked for was some showing, some
18  proffer of why you would want this additional name.
19  At the time the plaintiffs oddly resisted that kind
20  of dialogue. So we have always envisioned exactly what the
21  Court said. We would have a categorical cut in which we would
22  identify groups of employees, speakers group and now the Court
23  has ruled that the Court wants area vice-presidents included.
24  But in terms of these individual names, we haven't
25  even gone through the first step and we, frankly, are just not

24

1  prepared to respond on an individual basis as to each of these
2  names of who we would be prepared to agree to and who not.
3  And we just think that that process that we propose
4  of coming to us, sending us a list and here already based on
5  the discovery we have gotten are the people that we have
6  identified as additional individuals whose files we want to
7  search, come to us, give us that list. We will analyze it,
8  look at who they are, what role they play. And we will come
9  back and my strong suspicion is we would agree on some, perhaps
10  most, but we may not agree on all. Then at that point if we
11  needed a short intervention from this Court, we would, but,
12  hopefully, we wouldn't.
13  So this is not the time or the place. We have always
14  envisioned that process taking place, but it doesn't make sense
15  to put the Court in the position and, frankly, to put the
16  defendants in the position of responding now in these
17  individual requests.
18  THE COURT: Can you respond to any of the
19  individuals?
20  MR. RUBINSTEIN: Well, one, I can say Ray Lane was
21  not employed by Oracle in the third quarter of 01. So that, I
22  can respond to that right now.
23  MR. WILLIAMS: I will reply. Well, he was there in
24  the second quarter of 01 and that is clearly relevant to our
25  case.

---

 

25

1 THE COURT: We are getting second quarter 01
2 documents, so.
3 MR. RUBINSTEIN: Your Honor, also let me respond on
4 the question of work charts. When he -- I'm sorry?
5 THE COURT: He was completely rebutted your argument
6 and you are just going to rest?
7 MR. RUBINSTEIN: He was not employed by the company
8 in the third quarter. I cannot give the precise termination
9 date.
10 THE COURT: Were you listening to what he was saying?
11 MR. RUBINSTEIN: I can't give the Court the exact --
12 THE COURT: Then your answer is "I don't know."
13 MR. RUBIN: And that's just my point, your Honor. We
14 are not saying categorically --
15 THE COURT: Okay. Well, I will tell you. I don't
16 want fights about this. I wanted this resolved today. I
17 expected you people to know your company and for this dialogue
18 to happen now if it didn't happen before. It should have
19 happened before.
20 MR. RUBIN: Frankly, your Honor --
21 THE COURT: Hey, forget it. You know, you both --
22 both sides have been unreasonable in this process, as I said.
23 The last time I thought both sides had taken an unnecessarily
24 harsh and adversarial view and I expect it to stop.
25 So I blame you both. You are never going to convince

26

1 me it's all their fault because you didn't -- you said give me
2 the names and they said no. I won't believe that. I simply
3 won't believe that, and I'm sure that that's not precisely the
4 way it happened.
5 In any event, in any event, I wanted to get rid of
6 this mess now. I want to have as few disputes as possible. I
7 don't want them -- how many people are on your laundry list?
8 MR. WILLIAMS: We don't have a laundry list, your
9 Honor.
10 THE COURT: How many people are on your list?
11 MR. WILLIAMS: It's precisely about the 160 that
12 defendants represented to you, and we got that list from the
13 documents they provided to us. That's our universe of
14 knowledge on who is there.
15 THE COURT: Well, I'm not giving you all the regional
16 managers, but who is your list of people who obviously will
17 have knowledge that you need?
18 MR. WILLIAMS: Oh, this list is -- at least 13 of --
19 14 people that obviously have information.
20 THE COURT: All right. When we are done today, you
21 can all stay and talk about those 13.
22 MR. SOLOMON: Your Honor, may I just interject?
23 THE COURT: Yes.
24 MR. SOLOMON: As you can imagine, that is an ongoing
25 process, a review of production.

27

1 THE COURT: Yes.
2 MR. SOLOMON: And I just want to add, this is the
3 first time today I have ever heard a suggestion that the people
4 that are relevant in this case should be limited to employees
5 during the class period. I have never heard that before.
6 THE COURT: I don't even know that that was the
7 import of his comment, but in any event it certainly won't be
8 the limitation.
9 All right. The area according to the files to be
10 searched is the 53 individuals identified by the defendants,
11 plus the area vice-presidents' files in all three sales
12 consulting divisions identified in the letter.
13 The parties are directed to -- with respect to any
14 other individual files that in addition to these may, based on
15 specific information learned by plaintiff's counsel, have
16 discoverable information to meet-and-confer on those requests
17 for file reviews.
18 And, obviously, we are going to have to have some
19 kind of a process for if, I would love to say or when, that
20 process breaks down and we will get to that at the end.
21 Okay. Second, the second area is discovery to be
22 taken from defendants under economy and the impact on sales ar
23 the -- sales revenue and earnings.
24 It seems to me you have got an agreement on the
25 subject matter, okay, and now we have an order to the times to

28

1 be searched, right?
2 Product functionality. This is the question of the
3 scope of the discovery on the bugs essentially with 11i or any
4 customers or problems with 11i.
5 It seems to me that just my initial reaction to this
6 is that on one level defendants are correct. This is not a
7 case about were there bugs in the software. On another level
8 if the number of problems, even if there weren't integration
9 problems, rose to some level, it would make those statements
10 which are focused on integration false in yet another respect.
11 And that is to say, the product doesn't really work in a
12 material way.
13 I mean, because embedded in those statements, and
14 some of them directly, is this is a good product. It works and
15 some of its features are that it doesn't have integration or
16 interoperability problems.
17 I think most of the discovery has to focus on those
18 last couple of issues, but some level of investigation into
19 more generally. What were the dimensions of the other sorts of
20 problems with the software I think is appropriate.
21 Given that view it has to -- it probably is at a
22 pretty high level, not on the ground. Because it's going to
23 have to rise to a very high level to directly implicate these
24 statements.
25 I don't think by learning every defect that any




29

1   customer found with the product advances the ball.  So I don't
2   -- I don't think we can go quite that broadly.
3       Part of -- I guess I wanted to talk about whether or
4   not some of the problems with the dimensions of the search for
5   just general bugs in the software is solved by the fact that we
6   have limited the number of file we are going into.
7       MR. RUBINSTEIN:  Your Honor --
8       THE COURT:  In other words, if I asked you to produce
9   every document in the files of the people that you are
10  searching related to any bugs in the software, is that much
11  different a project than searching these files for anything
12  else?
13      MR. RUBINSTEIN:  Your Honor, I think it would
14  because, obviously, this was a massive and complex piece of
15  software and so to expand to all bugs for any purpose I think
16  would dramatically expand the discovery inquiry.  I think that
17  the way --
18      THE COURT:  Why is that?  Wait.  You go to an area
19  vice-president and you search his files.  How does it change
20  that search if you are also looking for any comments in there
21  about bugs and patches?
22      MR. RUBINSTEIN:  Because there may be hundreds of
23  thousands of bugs, many of which are not of any significance.
24  So what we are proposing is --
25      THE COURT:  I don't want to get -- you are not

30

1   answering my question.  You are definitely not answering my
2   question.
3       It seems to me, and I am ignorant on the subject,
4   that if you go and have to search through the guy's files for
5   documents, it doesn't add much to also pull out all the bug
6   files especially when you are only going down two levels.
7       I'm not asking you to go down to the customer rep
8   level who had daily interactions with the customers to get the
9   bug files.  I'm not asking you for -- you know, you have
10  offered some high level bug reports, and I think that's fine,
11  but, you know, within the context of the files that I'm talking
12  about does it add very much to say, just produce the bug files?
13  Maybe it does.
14      MR. RUBINSTEIN:  I think it does, but it depends on
15  who you are talking about.
16      THE COURT:  They are talking about the 80-some-odd
17  people that --
18      MR. RUBINSTEIN:  If you are talking about people who
19  are within the product development organization and we expand
20  to all bugs, I feel confident in saying that the scope would be
21  dramatic.  It would be massive.
22      THE COURT:  Okay.  So included in the group that we
23  are now going to search are folks who you think that, you know,
24  they have a certain amount of information that you can search
25  for the things other than that, the bug problems.

31

1      MR. RUBINSTEIN:  Yes.
2      THE COURT:  But they will have a dramatic amount of
3  information different --
4      MR. RUBINSTEIN:  That's correct.
5      THE COURT:  -- if you expand it to all bugs.
6      MR. RUBIN:  And just to refine what Mr. Rubinstein
7   said further, I think the additional category that you have
8   included today, AVPs would probably implicate that in the
9   greatest fashion.
10      THE COURT:  I assumed that that's what he was talking ..
11  about.
12      Yes, sir?
13      MR. WILLIAMS:  If I may, your Honor, and it's really
14  a question for defendants.
15      We know that the CRM module was one of the primary
16  modules that was problematic in implementation and integration.
17      Now, I think, it appears to me that there was a CRM
18  consulting organization and their files or people from those
19  files would necessarily have even high level -- you know, if
20  you want to call them bug reports for purposes of this
21  discussion regarding the implementation at customer sites where
22  we allege that even demonstrations for sales purposes were
23  being faked.
24      Now, I don't know if the N.A.S., O.P.I. and O.S.I.
25  are going to include that organization.  I don't have the

32

1   answer to that, but the CRM consulting organization would be --
2   would have a good amount of responsive and relevant documents
3   on that issue.
4       MR. RUBINSTEIN:  I can respond to that.
5       THE COURT:  Yes, please.
6       MR. RUBINSTEIN:  Included within our group of
7   speakers are the people who had development responsibility for
8   the modules such as CRM, and so those people would have
9   responsibility in the areas that Mr. Williams just commented
10  on.
11      THE COURT:  Let me ask you a different question.  Is
12  there a way at getting a -- on a fairly high level the
13  plaintiffs an idea of the dimensions of the bug problems not
14  related to integration or interoperability?
15      Are there, you know, high level reports that would
16  have gone to senior management about those subjects?
17      I mean, that's my -- you know, I want them to get, in
18  the first instance, documents related to the dimensions and
19  scope of the problem so that if it's of a certain dimension and
20  scope will allow some further discovery.
21      MR. RUBINSTEIN:  I think the answer is that there
22  would be, although I think that the key will be to -- and this
23  is what I need to go back and look at, is being able to
24  segregate or distinguish the bugs that had -- that were
25  significant and those -- from those that were minor.

 

33

1    But I think the answer to your question, your Honor,
2  is I believe yes.
3        THE COURT: I don't know that it is even segregating.
4  It may just be that at some level there are high level reports
5  about the dimensions of the problem that executive
6  vice-presidents that are in charge of the areas received
7  telling them about the dimensions of the problem, you know.
8  And if those say, "This is a catastrophe. This software
9  doesn't work. We have got to get the development guys back
10 in," is one thing.
11       If they say, "Eh, there are minor problems," then
12 it's something else.
13       MR. RUBINSTEIN: I also just wanted to reiterate that
14 one of the categories of documents that we are willing to
15 produce regardless of the type of bug is any bugs in which
16 there was a connection drawn by a customer saying that as a
17 result of whatever the problem was --
18       THE COURT: With any product.
19       MR. RUBINSTEIN: Well, with respect to 11i, that --
20       THE COURT: It didn't say that in the letter.
21       MR. RUBINSTEIN: That they were going to return or
22 that they wanted to defer their purchase of the software.
23       That is not restricted in terms of the type of bug,
24 but the only restriction there would be that it would have to
25 be a document that talked about a bug that was of such

34

1  magnitude that a customer was saying that they were going to
2  defer the purchase or they were going to want to return the
3  product.
4        THE COURT: Or they wanted a refund or rebate or they
5  wanted to you spend X money or had to spend X money fixing it.
6  How do you -- my question -- yeah, go ahead.
7        MR. SOLOMON: That would be nice, but I think you
8  already indicated that isn't the case or that's not all of the
9  case.
10       I just want to remind everybody, including in
11 particular you, your Honor, of what the Ninth Circuit said.
12 And that is, "Plaintiffs allege that Oracle released the 11i
13 Suite in May 2000 without sufficient technical development and
14 the numerous defects in the program soon became apparent.
15 Around that same time the national economy began to decline.
16 Plaintiffs allege the growing customer awareness of the defects
17 in the 11i Suite and the declining economy had hurt Oracle's
18 sales by the second quarter of Oracle's fiscal year,
19 September 1 to November 30 year 2000."
20       THE COURT: Yeah, I have got to tell you. I take as
21 my text the Revised Second Amended Complaint, not the Ninth
22 Circuit's casual language about it.
23       It's fine, but so I also understand that. You made
24 your point and I'm going to give you some eye level inquiries
25 into dimensions of the problem, but the focus of the discovery

35

1  in terms of problems is going to be into the integration, the
2  specific things that were represented.
3        It seems to me that at some level if it gets -- if
4  you can find information that suggests the bug problem was so
5  great that it, in effect, is an integration problem, you can't
6  work the software, you can't integrate properly, you can't
7  visit operate with other perhaps, other data bases or even with
8  other Oracle modules, then it becomes a serious problem, but we
9  are not there yet.
10       MR. WILLIAMS: I have one additional comment very
11 quickly, your Honor.
12       It appears that internally at the company there were,
13 you know, CRM customer escalations. And what it appears to be
14 is when a customer had a problem and as the problem grew more
15 significant and escalated through Oracle, and it appears that
16 they may have even had what's called daily work lists and
17 communications with customers in the CRM escalations process.
18 So that might be a beginning to get --
19       THE COURT: No, that's an end. You know, this is a
20 software company that has customers who they communicate with
21 I'm sure -- you know, frankly, we are a federal government and
22 we are a software customer and we have bugs and our staff is in
23 daily communication with the providers, and I'm sure those
24 things get recorded and escalated all through, you know, but
25 that's not what we are going to go through here. That actually

36

1  is on the ground. What I mean by on the ground is those.
2        What I want to get is something that shows you the
3  dimensions of the problem as it is important to the securities
4  fraud allegations and if it turns out that it is -- it is of
5  the sort that you think it is, well, then fine. You are going
6  to get further down the chain. There is no question about
7  that.
8        MR. WILLIAMS: I was trying to address your Honor's
9  question.
10       THE COURT: I got it.
11       Question for Oracle: What is -- I guess, I mean, I
12 want to solve this problem right now at least in some measure.
13 I don't quite know what the proposal is.
14       It says: "Documents regarding any lost or deferred
15 sales or with respect to which there was a material expense of
16 any product" -- and it said "any product." Didn't even say
17 11i, but I assumed you went 11i -- "in the third quarter of
18 01."
19       Now, my two questions are these. One is: How are we
20 going to deal with the level of materiality?
21       MR. RUBINSTEIN: With regard to expense.
22       THE COURT: Expense. I mean, presumably there is
23 a loss or deferred sales, that's material in this world. It
24 may or may not ultimately be material, but with respect to the
25 documents if it's a loss or a deferred sale in that quarter,

 

37

1  you are going to -- get tied to a bug -- well, actually, yours
2  isn't even tied to a bug.  Your proposal was any documents
3  regarding lost or deferred sales period during the third
4  quarter, is that right?
5      MR. RUBINSTEIN:  As to 11i, correct.
6      THE COURT:  As to 11i.  And any material -- or any
7  material expenses with respect to any such product.
8      MR. RUBINSTEIN:  Your Honor, with regard to the
9  question as to how should we define the level of materiality, I
10  can give the Court a -- the answer I could give which actually
11  would correspond to the company's definition as well in certain
12  reports to be $500,000.
13      Toward the end of every quarter Oracle would begin to
14  track what it termed "big deals" and it -- the dividing line
15  was $500,000, and we think that that would be an appropriate
16  dividing line as well.
17      THE COURT:  And I've got to say that your letter
18  says, "Lost or deferred sales of any Oracle product including
19  11i."
20      Are you trying to -- that's what you are sticking
21  with, right?
22      MR. RUBINSTEIN:  Yes.
23      THE COURT:  Okay.
24      MR. WILLIAMS:  Your Honor, just to --
25      THE COURT:  I see the term expenditures -- no, no.

38

1  That's right.  Okay.  Why the third quarter?  Why not for the
2  entire period that whatever we decide is the relevant time
3  period?
4      MR. RUBINSTEIN:  With respect to lost or deferred
5  sales?
6      THE COURT:  Yes.  Why not documents regarding lost or
7  deferred sales of any product during the relevant time period
8  or any material expenses with such product during the period of
9  time.
10      MR. RUBINSTEIN:  Because the only -- the relevance of
11  the lost or deferred sales would be to tying it to the forecast
12  case, which the plaintiffs are asserting.  And the only
13  forecast case that has been made is with respect to the third
14  quarter.
15      THE COURT:  I see.  So they can't show the trend
16  beginning in the three months before?
17      MR. RUBINSTEIN:  Correct.
18      THE COURT:  They can't.  You don't -- your
19  forecasting is narrow?  It just focuses on exactly what's
20  happening there?
21      MR. RUBINSTEIN:  Compared to the prior year.
22      THE COURT:  It has nothing to do with what happened
23  in the previous quarter?
24      MR. RUBINSTEIN:  Correct.
25      THE COURT:  They don't take it into account?

39

1      MR. RUBINSTEIN:  There is a seasonality in Oracle's
2  business --
3      THE COURT:  I'm sure that there is, but there's also
4  other things than seasonality, isn't there?
5      MR. RUBINSTEIN:  The forecast documents themselves,
6  the forecast reports themselves that were given to the speakers
7  would provide -- and, in fact, the forecasts themselves that
8  were given to the street, the guidance, was year on year
9  growth.
10      THE COURT:  I appreciate that, but I don't think you
11  can say to me with a straight face that the sophisticated
12  forecasters at Oracle ignored the previous quarters' sales.
13      MR. RUBINSTEIN:  I wouldn't say they ignored them,
14  but because of the seasonality of the business --
15      THE COURT:  They are less relevant.
16      MR. RUBINSTEIN:  Yeah.  The sequential quarter
17  comparisons were less relevant than the year-on-year
18  comparisons.
19      THE COURT:  I got it.  Any other comments on this
20  area?
21      MR. WILLIAMS:  There is an important area of that,
22  your Honor, because even if they were comparing the third
23  quarter of --
24      THE COURT:  You have already won that issue.  Don't
25  worry about it.

40

1      MR. RUBIN:  May I say one more thing, your Honor?
2      THE COURT:  No.  I'm done with this.
3      With respect to the documents concerning product
4  functionality, I'm going to adopt the defendant's version of
5  the subject matter, which was with some modifications.
6      The defendants are going to produce, as I understand
7  it, all of the versions of 11i.  And by "all of the versions" I
8  mean the code, is that right, for all the versions?
9      MR. RUBINSTEIN:  Through Version 3, correct.
10      THE COURT:  Through Version 3.
11      MR. WILLIAMS:  Through Version 3?
12      MR. RUBINSTEIN:  Including.
13      THE COURT:  Through and through.
14      MR. RUBINSTEIN:  Yes, through and including Version
15  3.
16      THE COURT:  Right.  And you are also going to produce
17  high level design documents.  Is that a term of art?
18      MR. RUBINSTEIN:  Yes, as well as the technical
19  manuals.
20      THE COURT:  And technical manuals for the 11i.
21      MR. RUBINSTEIN:  Correct.
22      THE COURT:  In addition, you are going to produce
23  documents regarding any lost or deferred sales of any product
24  or any material expense with respect to any product such as
25  rebates, refunds, or other expense for the period -- for the




41

1  relevant period of time.  And we will get to the relevant
2  period of time later.
3      Revenue earnings and forecastings is agreed to,
4  right?
5      MR. RUBINSTEIN:  Generally.
6      MR. WILLIAMS:  Generally, yes.
7      THE COURT:  Agreed to as to the subject matter, the
8  issue is to be the search.
9      MR. WILLIAMS:  That was the open issue.
10     THE COURT:  Right.
11     MR. RUBINSTEIN:  Your Honor, with respect to the
12 previous ruling, with respect to the materiality threshold?
13     THE COURT:  It's $500,000.  500k materiality.  My
14 mistake.  I meant to insert that.
15     MR. SOLOMON:  Your Honor, I guess all I would say to
16 that is, you know, with what -- potentially revisit that as we
17 go along, but based on the information now I understand.
18     THE COURT:  Sure.  It takes a showing to revisit it
19 obviously, but I don't -- you know, this is a learning process
20 for me, too.
21     So revenue and earnings forecasting is an agreed to
22 subject matter, and I have made a ruling as to the search and
23 that will have whatever indications it has.
24     The accounting allegations.  I guess I don't
25 understand why the plaintiffs think they need all of these

42

1  accounting documents.  The accounting allegations -- this is
2  only in one very small respect, and not an unimportant respect,
3  but in one very small respect an accounting allegation in the
4  case.
5      This isn't, you know, broad based revenue recognition
6  problems in a variety of areas.  This is, on November 17th you
7  executed 46,000 false invoices from the -- you know, to convert
8  revenue from unapplied to revenue, convert money from unapplie
9  to revenue in the amount of $228 million.
10     I don't understand why you need all of their
11 accounting documents.
12     MR. WILLIAMS:  Well, I think that we had reached an
13 agreement at least or close to an agreement -- and correct me
14 if I'm wrong, defendants -- with regard to the work papers for
15 the entire year of fiscal 2001.
16     And that's really an integration issue not with the
17 product, but with the work papers themselves and being able to
18 understand the work papers.
19     THE COURT:  Is that right?
20     MR. RUBINSTEIN:  No.
21     MR. WILLIAMS:  I thought that we had come very close
22 to an agreement on that at least.  If your position is
23 different, maybe it is. . .
24     MR. RUBINSTEIN:  We agreed to produce work papers as
25 they relate to this debit memo issue.

43

1  MR. WILLIAMS:  I don't think that that's correct and
2  I don't think that the law supports that.
3      I think it's just generally being able to understand
4  the work papers for the year, you need the full set of work
5  papers.  I understood that we were close to an agreement on
6  that.
7      THE COURT:  I guess not.  So you are going to have to
8  justify yourself.
9      MR. WILLIAMS:  With regard to the integration of the
10 work papers?
11     THE COURT:  Yeah.  Well, we are not -- the work
12 papers, we haven't even gotten to the accountants yet, but I
13 was talking about the accounting allegations in general.  You
14 have asked for all their policies, documents, system documents,
15 general ledger, monthly credit memos, miscellaneous reports,
16 accounting reserves, not to mention the 2002 internal.
17     MR. WILLIAMS:  I will begin with the general ledger,
18 your Honor.
19     We need the general ledger because it's clearly -- as
20 we allege, these debit memos were created and money was taken
21 from this unapplied cash account and taken down to revenue.
22     The general ledger is, that's the beginning of
23 understanding these transactions.  And where they -- I guess
24 all the T's of the transaction; where the money -- where the
25 money came from, where it went, and the accounts in which it

44

1  spread through.  Now --
2      THE COURT:  Well, if you get every piece of paper or
3  every record that is on these 46,000 debit memos or any piece
4  of paper that is related to those 46,000 debit memos, why isn't
5  that enough?
6      MR. WILLIAMS:  I didn't understand that to be the
7  position.
8      MR. RUBINSTEIN:  That is our position.  That's
9  exactly what we are offering.
10     MR. RUBIN:  There has never been a dispute about
11 that.
12     MR. WILLIAMS:  So that includes the general ledger?
13     THE COURT:  It includes pieces of the general ledger.
14 Can you imagine what Oracle's general ledger looks like?
15     MR. WILLIAMS:  I'm sure that --
16     THE COURT:  You are not going to read it.  You are
17 going to want 46,000 out of two trillion entries, something
18 like that.  I mean, it's a tiny little bit.
19     MR. SOLOMON:  Your Honor, obviously, we have to trace
20 this up to the financial statements.  If they can meaningfully
21 or usefully segregate out revenue items, A/R out items and
22 reserves, that would be meaningful and that has to include the
23 unapplied cash accounts.
24     If they can meaningfully do that, that wouldn't be
25 easy for them I don't think.




45

1    THE COURT: I'm not saying that it's easy.  But it
2  may be easier -- preferable, I don't know that it's easier than
3  just loading up a truck with them.  It may be preferable.
4    But what they have to do -- and I use different
5  language than the one you did, and I do it on purpose.  With
6  respect to the 46,000 debit memos that are alleged in the
7  complaint, I would want them to produce every piece of paper or
8  every computer record that relates to that.  And that means if
9  they -- all the changes that occurred for them, the
10  transactions that they arise from, if they go up a level or
11  down a level, they have to trace those transactions so you have
12  a complete history of those transactions.
13    That's what you are talking about, right?
14    MR. WILLIAMS: That is what I'm talking about and,
15  again, we understand that --
16    THE COURT: Okay.
17    MR. WILLIAMS: -- it touches other accounts.  So the
18  debit memos, it's just not one transaction that hit -- that
19  touched the debit memo and was created.  There were other
20  accounts which were implicated by the creation of the debit
21  memos and the application or the movement of that money to
22  revenues, and I would expect that we are going to --
23    THE COURT: Well, I don't know.  You will see what it
24  is.  You will get all the documents about it.  It will touch
25  other accounts.  It won't.  But whatever has to do with --

46

1  okay.  So the other things other than that, you are going to
2  produce all documents of the so-called on account clean up, all
3  right?
4    MR. RUBINSTEIN: That is what these debit memos are.
5  It's going to be all the audit trail and which is, obviously,
6  related to these 46,000.
7    THE COURT: And, obviously, any documents regarding
8  the accounting treatment by any of the memos including all
9  policy documents on such -- on those accounting treatments.
10  You know, there may be internal systems on the kind of
11  accounting treatment they were given.  There may be internal
12  policies, et cetera, et cetera.
13    Anything that touches on the accounting treatment of
14  those debit memos, is that what you are intending?
15    MR. RUBINSTEIN: Yes, yes.
16    THE COURT: Let's talk a little bit about the 2002
17  internal investigation.  I guess my concern is this, and this
18  is again for you.
19    At the end of the day the motion was denied.  It
20  seems to me that the reason the motion was denied was because
21  of the things that are contained in the declarations which said,
22  respect to that investigation which basically said, it doesn't
23  have anything to do with the 46,000 debit memos.
24    And as I understand your response, it's limited to,
25  well, it had to do with stuff during the class period.

47

1  I'm not sure why I care what happened during the
2  class period if it's not actually on the 46,000 debit memos.
3    MR. WILLIAMS: I'm not sure if you mean not actually
4  on the 46,000 debit memos, but I understand their position to
5  be that whatever happened in late 2002 had absolutely nothing
6  to do with the creation and whatever happened to those debit
7  memos, and I think that that's just wrong.  And on the face of
8  the declarations that they submitted in support of their
9  opposition it shows that it's wrong.
10    If you just look at that one e-mail from Michael
11  Quinn --
12    THE COURT: Let's see it.  Tell me where it is.
13  Point me to an exhibit tab.
14    MR. WILLIAMS: Exhibit number or letter C.
15    THE COURT: Okay.
16    MR. WILLIAMS: That's the declaration itself.  And
17  then the document that I'm referring to now is directly behind
18  it.
19    THE COURT: Got it.
20    MR. WILLIAMS: Well, if you just begin with the
21  declaration, if you look at Paragraph 4 of the declaration, he
22  says: "In 2000 my staff participated in the conversion of" --
23    THE COURT: Paragraph 4, there are numbers?
24    MR. WILLIAMS: Yes.  Paragraph 4 of the declaration
25  of Michael Quinn.

48

1    THE COURT: I see.
2    MR. WILLIAMS: I don't need to read it out loud if
3  your Honor wants to just take a look at it.
4    (Brief pause.)
5    THE COURT: Okay.  Yes.
6    MR. WILLIAMS: That's directly related to the 25005
7  on account.  That is the -- those are the -- that's the account
8  from which we allege the unapplied cash which was applied to
9  the debit memos during our class period came from.
10    The next paragraph he explains this, I guess, other
11  project which related directly again to the same unassigned
12  cash receipts.
13    THE COURT: Yeah, and they are still doing it.
14    MR. WILLIAMS: Right, and it goes to this account,
15  12601.
16    THE COURT: Well, but he says that that
17  investigation, the 2000 and whatever this is, 2, 3, 4, 5
18  investigation has nothing to do with the debit memos, the
19  transactions that occurred on the 17th of November in 2000.
20    MR. WILLIAMS: That's right.  He says that, but then
21  if you look at the e-mail that is attached to it --
22    THE COURT: Okay.  Now, look at the e-mail, which is
23  an e-mail dated in 2002.  Got it.
24    MR. WILLIAMS: It's right behind it.  And now Michael
25  Quinn is the same person, your Honor, we allege in the

 

49

1 complaint directed or was a participant in the direction of
2 this on account clean up that resulted in the creation of these
3 debit memos, okay?
4     THE COURT: Which are you going to get. You are
5 going to get that bit, right? You are going to get the on
6 account clean up.
7     MR. WILLIAMS: At least for that period, and I know
8 your Honor hasn't discussed the relevant period yet.
9     But when you get down into these bullet points here,
10 he says, "We need to provide an update to the audit committee
11 to" --
12     THE COURT: You have to read slowly.
13     MR. WILLIAMS: "We need to provide an update to the
14 audit committee in regards to what revenue impact this process
15 of taking unapplied cash receipts to the reserve," which is the
16 unapplied cash from the 25005 account, "which we allege the
17 debit memos were satisfied from those funds in that unapplied
18 cash account. In addition, we need to provide what impact this
19 process has had on revenue in each of the last eight quarters,"
20 which goes right back to our class period, "including the
21 second quarter of fiscal 01 during which we allege that the
22 overstatement of revenue occurred."
23     Then he goes on to say, "Well, we need to establish
24 new policies and procedures to ensure that this never happens
25 again."

50

1     Now, the timing of this as it was back in 02 when we
2 filed it was extremely suspicious in that we had filed our
3 complaint alleging these allegations, these accounting
4 allegations about 11 days before this particular e-mail. And
5 we have -- about 11 days before this particular e-mail.
6     And one of our confidential witnesses told us that
7 once that complaint was filed, this was the type of action that
8 was being taken to address what we had alleged and alter
9 documents that would have touched upon the facts that we
10 allege.
11     THE COURT: I know, but that's already been
12 litigated.
13     MR. WILLIAMS: It really hasn't, your Honor.
14     THE COURT: He denied it.
15     MR. WILLIAMS: Well, okay. But it hasn't been
16 litigated because I think he denied it -- If I recall correctly
17 in a footnote when he denied -- when he dismissed our complaint
18 saying that, you know, because he was dismissing the complaint,
19 that these -- discovery into these facts was no longer
20 necessary. I think he just said it was moot.
21     We never addressed it or talked about it at all. And
22 so we think that it's -- now that we are entitled to discovery,
23 it's the proper time to discuss the details of it and why
24 either the documents are there or the documents that we think
25 will help us to prove our case are no longer there.

51

1     THE COURT: Well, I have got to tell you. Reading
2 the declarations it was not my impression that any documents
3 were altered or destroyed, and I don't want to go into that.
4     The only question is whether or not in my mind
5 information on the current investigation, that is to say --
6 obviously, there is the 2000 investigation and that you are
7 getting. That's the on account clean up and they are going to
8 produce that.
9     The question is whether or not the ongoing
10 investigation, which is reflected in Mr. Quinn's declaration,
11 which has the account number of 12601, has documents in it that
12 in any way refer or relate to the 46,000 debit memos.
13     And it does seem to me that there might be documents
14 there because he does talk about impact of revenue on the last
15 eight quarters, so that goes back into the relevant period.
16     It seems to me that if you establish new policies and
17 procedures that it never happens again, that may be relevant.
18 Why isn't that stuff relevant?
19     MR. RUBINSTEIN: The reason it is not relevant is
20 because the November 17, 2000 transaction had nothing to do
21 with the 12601. It had nothing to do with the movement of
22 unapplied cash to the bad debt reserve account. The 12601
23 investigation involved the --
24     THE COURT: You know, you say that, but look at the
25 e-mail. The e-mail says exactly the opposite of that.

52

1     MR. RUBINSTEIN: No, no. It has nothing to do with
2 the debit memo transactions which they say were used to
3 recognize revenue. It involves two entirely distinct
4 inquiries.
5     THE COURT: I see. The on account clean-up process
6 and the debit memos were not taking unapplied cash receipts --
7     MR. RUBINSTEIN: To the bad debt reserve account.
8     THE COURT: To the bad debt reserve account.
9     MR. RUBINSTEIN: Correct. The on account clean-up
10 involved offsetting transactions entirely within 25005. It
11 never moved anywhere else. That's why the two are totally
12 unrelated.
13     Now, it turns out that the investigation regarding
14 the bad debt reserve account happened to be going on when the
15 plaintiffs amended their complaint with respect to the 25005,
16 but there is no connection whatsoever between those two events.
17     In other words, the 12601 investigation, the bad debt
18 reserve account, the investigation that looked at the practice
19 of moving unapplied cash into that bad debt reserve account had
20 nothing to do with the November 17 debit memo at all and the
21 claims in this case are tied exclusively to the recognition or
22 the alleged recognition of revenue from those debit memos.
23     And, again, the plaintiffs are going to get all the
24 documents that relate to the debit memos and audit trail, but
25 the 12601 -- and as the Quinn and there's also -- the

 

53

1  declaration establishes that the two have nothing to do with
2  each other.
3      MR. WILLIAMS: Well, the one point there that I would
4  like to address is that it appears the 12601 account is the bad
5  debt reserve account and that --
6      MR. RUBINSTEIN: We agree.
7      THE COURT: Well, that's right, but he's saying that
8  the bad debt reserve account has nothing to do with the debit
9  memos.
10     MR. WILLIAMS: Well, but our investigation thus far,
11 and even a review of these documents show that bad debt reserv
12 -- withdrawn.
13     The monies that were applied to the debit memos came
14 from the bad debt reserve, which is where the unapplied cash
15 went to when it came in.
16     And I have to admit, your Honor, that the information
17 that we have is limited, but we do have people who have said
18 that's what it is.
19     The documents show on their face that the accounts,
20 the 25005 account and the 12601 account are, indeed, related.
21     MR. SOLOMON: In fact, your Honor, they have been
22 described as slush funds, cookie jars.
23     MR. RUBINSTEIN: Your Honor, they are going to get
24 the audit trial for all these debit memos. They will be able
25 to see for themselves.

54

1      THE COURT: Right. That's right. You will find out,
2  but not by going into the 2002, 3, 4, 5 investigation directly.
3  You are going to look at every piece of paper that has to do
4  with these debit memos up and down and if it goes through the
5  accounts that you suspect it is going through, well, then, that
6  will be one thing. If it isn't, then it isn't. Isn't that the
7  answer? Why isn't that the answer?
8      I mean, if it turns out that none of this money
9  passes through the 12601 account, why isn't that the answer?
10     MR. WILLIAMS: If it gives -- if they give us
11 everything on the 25005 account, then very --
12     THE COURT: They are not going to give you everything
13 on the 2500. They are giving you 46,000 debit memos and the
14 entire audit trail of them. Why doesn't that give you what you
15 need?
16     MR. WILLIAMS: I hope it gives us what we need, but I
17 don't know what it is.
18     THE COURT: Okay. We will find out. Okay. I
19 understand. I understand. We will find out.
20     So with respect to the accounting allegations, the
21 subject matter is all of the documents regarding the on account
22 clean up in the 2000 -- in the relevant time period, all the
23 documents regarding or related to the 46,000 debit memos and
24 all documents related to the accounting treatment of those
25 memos.

55

1      Okay. Insider trading, you have got an agreement on
2  the subject matter.
3      The special litigation committee. You know,
4  obviously that's an issue -- it strikes me as an issue that we
5  are not going to resolve here today if you are really going to
6  pursue it.
7      So my suggestion on that is that the issue is
8  reserved. I'm obviously not going to allow you to have
9  discovery into it over their objection at the moment. You need
10 to decide whether it's useful to bring a motion on that
11 subject.
12     The one thing I would ask is whether or not the
13 defendants intend to produce all of the underlying documents
14 that the special litigation committee reviewed from whatever
15 source. And I'm not saying you produce them as a package,
16 saying these are the SLC documents, but are all of those
17 underlying documents going to be produced?
18     MR. RUBINSTEIN: I can tell your Honor this, and I
19 hope this is responsive: That we are not -- all of the
20 documents that they have requested and that are responsive to
21 their request are being produced, including the documents that
22 were seen by the SLC.
23     And so, in other words, where I disagree -- where we
24 would object to is tying the relevance of a document to simply
25 the fact that the SLC may have asked for it whether it has

56

1  anything to do with the case or not. I mean, we are not saying
2  that just because the SLC got an underlying record from Oracle
3  means they don't get it. Of course not.
4      THE COURT: Why not produce them all?
5      MR. RUBINSTEIN: I'm sorry?
6      THE COURT: Why not produce them all?
7      MR. RUBINSTEIN: I'm not saying there are any that we
8  are withholding.
9      THE COURT: I understand. I'm asking you the
10 question. Are there any you are withholding?
11     MR. RUBINSTEIN: I'm not aware of any --
12     THE COURT: How about if I say you can't withhold
13 any. What's wrong with that?
14     MR. RUBINSTEIN: Because if, for instance, there were
15 document that the SLC saw that they haven't asked for or that
16 the Court rules is beyond the scope of discovery --
17     THE COURT: Well, that's an issue, but what is it?
18     MR. RUBINSTEIN: I'm not in a position to say. I
19 don't have anything in my mind right now where I'm saying, oh,
20 there is a document --
21     THE COURT: I understand. This is too technical. We
22 need to get practical here. It's a relevance screen.
23     The Special Litigation Committee was investigating
24 the allegations of the complaint, right?
25     MR. RUBINSTEIN: Correct.

 

57

1    THE COURT: Okay. Good. I expect you to produce
2  every piece of paper -- every underlying document that they
3  reviewed. That's what I want you to produce.
4    You don't have to segregate them as SLC documents,
5  because that would impinge on the issues that you are concerned
6  about, but that's a fair relevance screen, what your SLC
7  thought was relevant. You know, that may be the best relevance
8  screen.
9    I want to use it as a tool for practically getting at
10  important things in the case without impinging on the issue of
11  whether or not there are protections for the work of the
12  committee.
13    MR. RUBINSTEIN: One objection, though, that we would
14  want to preserve, obviously, is the privilege and work product
15  objections that we have asserted.
16    THE COURT: Of course. That's why I used the word
17  "underlying documents." You are not waiving your privilege to
18  any work product documents. I don't want you to produce any
19  privileged or work product documents.
20    The underlying documents are not privileged and they
21  are not work product.
22    And so what I would say with respect to the Special
23  Litigation Committee is that the issue of whether or not the
24  work of the committee and the documents produced by the
25  committee or the memos to the committee regarding its work are

58

1  protected by privilege or by work product is reserved and you
2  can fight about it or not fight about it. We will see what's
3  important.
4    But to the extent that preexisting -- maybe that's
5  the way to use the term. To the extent that there were
6  preexisting Oracle documents reviewed by the committee in
7  connection with their work -- in other words, documents are not
8  generated for the committee, preexisting Oracle documents.
9    And, you know, with computer records that may mean
10  they ran a program and produced it. That's a preexisting
11  document in my view. If there are preexisting documents, why
12  don't we have all those produced and then -- you know, that
13  will get the underlying information out, you know, whether or
14  not somebody on the committee thought it was an important
15  thought to have about this problem and the dimensions of the
16  problem, you know. I don't know that that's very useful in the
17  securities case, maybe it is, but we will reserve that.
18    Is this making sense? Is that a distinction we can
19  draw?
20    MR. RUBINSTEIN: I think so, your Honor, yes.
21    MR. SOLOMON: And, your Honor, I would just add, we
22  will, I would imagine, make a motion, an appropriate motion for
23  the report in that we believe that the privilege was clearly
24  waived by the parties in the Delaware action, but that's
25  something likely to sway the defendants.

59

1    THE COURT: And, also, you may or may not find it
2  useful. Do you have a copy of it?
3    MR. SOLOMON: No. We don't have a copy of it, but we
4  believe that there was express waiver.
5    THE COURT: But it may or may not be ultimately
6  particularly useful evidence.
7    MR. SOLOMON: Given how conflicted they were, I'm
8  sure that's the case, your Honor.
9    THE COURT: So reserve on the Special Litigation
10  Committee except produce all the underlying preexisting
11  documents that were reviewed by the committee. That will not
12  constitute a waiver of any attorney-client privilege or work
13  product objections and those are preserved.
14    Okay. I guess I had two questions: The first is for
15  the plaintiff.
16    Why do you need all of the material that goes into a
17  native electronic document?
18    And, second, with respect to the defendants, why not
19  produce all of the future documents you are going to produce in
20  native form? I mean, presumably you have collected a certain
21  amount and you are producing them, but you are going to go back
22  and review files. I assume they are just not paper files.
23  They are electronic files. Why not produce those in native
24  form?
25    Okay. Those are my two questions. Okay. Let me

60

1  start with plaintiff.
2    MR. WILLIAMS: It appears that based on their
3  representations we can probably reach an agreement on those
4  issues. I think that in their letter for the first time they
5  gave a detailed position on some of that stuff.
6    And with regard to at least the e-mail, I think that
7  we can agree to accept e-mail in TIF format so long as the
8  necessary metadata is included in there. I know they listed
9  several items of metadata that would be included in there, but
10  we would want to make sure we added to that list the and time
11  that an e-mail was opened, whether or not it was -- date and
12  time that it was deleted, and forwarded. I think they may have
13  had the forwarding information in there.
14    THE COURT: Okay. E-mails. How are we doing on
15  e-mails?
16    MR. RUBIN: That's correct, your Honor. We have
17  agreed on a going forward basis for documents that we are going
18  to be producing pursuant to the search that the Court has
19  outlined today; that we will agree to produce those in
20  searchable format.
21    In terms of metadata, the only -- the only unresolved
22  issue that I believe can be worked out is that we have said for
23  that -- for what we understand to be the common realm of
24  metadata we are, obviously, not going to strip it of things
25  that are usually in.



61

1     The only question is we had understood there were
2  some additional item of metadata that we, based upon our
3  electronic discovery experience, didn't regard as within that
4  common universe.  And if they wanted that data, we would have
5  to talk to our vendors and experts about how -- whether there's
6  additional costs that would attend that and, frankly, in the
7  first instance why they need it.
8     And so I think we have an agreement in principle
9  essentially that would produce electronic documents in
10 searchable format.  We are not going to strip it of anything
11 that typically accompanies it in terms of the information that
12 Mr. Williams described.
13    So the only issue that I had understood come out of
14 our meeting on the 18th was whether additional types of
15 metadata above and beyond the sort of typical categories that
16 are imported when you do a TIF file that they would want.  And
17 we would want to know, number one, why they wanted it and if
18 they wanted it, we would probably ask them to pay for it.
19    THE COURT:  Let's get precise here.  You are going to
20 produce all e-mails that are within the scope of the search.
21    MR. RUBINSTEIN:  Correct.
22    THE COURT:  And you are going to have -- you are
23 going to have it in searchable electronic format.  And it's
24 going to include sender, recipient, blind and carbon copies,
25 date the e-mail was sent, e-mail box from whom the document wa

62

1  produced, information about whether it was forwarded or
2  responded to.
3     In addition, are you going to have the date and time
4  the e-mail was opened, deleted or forwarded?
5     MR. RUBIN:  Your Honor, my understanding is that that
6  would be within the common realm of metadata.
7     And so the only -- the only point I would make today
8  is that only if we were told that takes some additional
9  substantial cost to include that I would say we would want to
10 talk to the plaintiffs about it, but I believe that information
11 typically would be included.
12    THE COURT:  Okay.
13    MR. WILLIAMS:  With regard to the e-mails, your
14 Honor.  The only other issue there is the attachments.
15    Many times, almost all times, if you produce
16 documents or e-mails in TIF format, when they have attachments
17 to them you aren't able to click on them and open them.  And
18 that's part of the reason why we wanted this -- some of these
19 in native format.
20    I'm not sure how we resolve that today, but, for
21 instance --
22    THE COURT:  Well, they have got to be able to open
23 the attachment.
24    MR. RUBIN:  Just as with a paper file, my experience
25 with discovery is if there is an e-mail that's relevant and has

63

1  an attachment, then the attachment is also produced.  And so we
2  would also produce the --
3     THE COURT:  Good.  You have to produce the
4  attachment --
5     MR. WILLIAMS:  The thing is --
6     THE COURT:  -- in electronic format attached to the
7  e-mail.
8     MR. WILLIAMS:  Right behind the e-mail.
9     THE COURT:  Right.
10    MR. RUBIN:  I know that we can accomplish that.
11    THE COURT:  Good.
12    MR. WILLIAMS:  With regard to some of the
13 spreadsheets in native format, I think we had come close to
14 reaching an agreement on that.
15    And correct me if I'm wrong, but one reason is that
16 those spreadsheets have formulas embedded in them that if you
17 produce them in TIF format or hard copy, you just can't see
18 them or understand them.
19    And I think their agreement was they would do that so
20 long as we agreed on some way to lock the information so that
21 there would be no chance of alteration, right?
22    MR. RUBIN:  That's correct.  This is the one category
23 that we said as to documents we had already gathered and
24 produced in paper format, there were some concerns about the
25 readability of the paper.  And we said we would go back and do

64

1  what we could to get the Excel spreadsheets in searchable
2  format with the agreement that they can't be altered.
3     THE COURT:  Yes, yes.  Of course.  So you are going
4  to produce spreadsheets in electronic format and the parties
5  are going to agree on a method for locking and protecting to
6  prevent alteration.
7     MR. WILLIAMS:  Just with regard to the documents that
8  have already been produced, we talked about this with
9  defendants.  Lots of them are illegible.  Lots of them.
10    I wouldn't say nearly all, but a vast -- a high
11 percentage of the spreadsheets not only are they not in native
12 format, but they are illegible.
13    I don't know if it makes sense for us to -- I think
14 they should produce them in electronic forms if they have them
15 because I don't know if it makes sense for us to go through
16 everybody single document.  Give them every single Bates numbe
17 and then let them produce it again.  Then we have to go
18 through every single one of those documents again.
19    They have those in electronic format--
20    THE COURT:  I don't understand that it's limited to
21 the future.  They are going to produce any spreadsheets in
22 electronic format, right?
23    MR. RUBIN:  Spreadsheets, exactly.
24    THE COURT:  Past the ones you have already got paper
25 copies of.  The ones you haven't got paper copies of yet, those

 

65

1  will be produced in electronic format, the spreadsheets.
2      MR. RUBIN:  Right.
3      MR. WILLIAMS:  And just -- go ahead, I'm sorry.  If
4  there are spreadsheets attached to an e-mail, hopefully, you
5  will attach the e-mail so we don't have to figure out which
6  spreadsheet this pertains to.
7      THE COURT:  Attachments go with the e-mail.  Okay.
8      E-mails, spreadsheets, obviously they are producing a
9  fair amount of paper.  Is that it?
10      MR. WILLIAMS:  I'm sorry, your Honor.  I apologize.
11      THE COURT:  The balance of them, the e-mail and
12  spreadsheets is going to be produced in paper?  Or are we still
13  in this area of disagreement?
14      MR. WILLIAMS:  The balance being on paper?
15      THE COURT:  There are spreadsheets, right?  Okay.
16  Those are electronic.  There are e-mails.  Those are also
17  electronic.
18      What about -- are there any other documents being
19  produced other than e-mails and spreadsheets I suspect?
20      MR. WILLIAMS:  Well, Word documents, for example.
21  You know, memoranda in Word document.  We would want that in
22  native format because we can see when it was last modified and
23  last changed.
24      Again, that's -- that's held in native format, so I
25  don't know what kind of burden would be associated with that.

66

1      MR. RUBIN:  To the extent that there have been Word
2  documents and e-mails have already been collected and produce
3  in paper format, our position is they have them and that's
4  where we should stand unless they have an individual question
5  of illegality and we will talk to them about that.
6      In terms of a going-forward basis as to Word
7  documents, if there are Word documents when we search files, w
8  would take the same position.  We will produce it
9  electronically.
10      THE COURT:  Why not produce any documents you find in
11  the search from now until the end of the case in native format.
12      MR. RUBIN:  That's our position.
13      THE COURT:  Okay.
14      MR. RUBIN:  From here on out.  The only --
15      THE COURT:  Got it.  Got it.  I got it.
16      MR. RUBIN:  But for e-mails and Word documents
17  already produced in paper other than the spreadsheets, we are
18  keeping in paper.
19      THE COURT:  When you say "already produced," have you
20  produced all the documents that you have searched?  I mean,
21  have you produced all the documents that are the subject of
22  that limitation?
23      MR. RUBIN:  We produced 50,000 pages of documents.
24  Those were documents that were produced to the plaintiffs in
25  the derivative action, plus documents that were used in summary

67

1  judgment or that were otherwise responsive to our Rule 26
2  disclosure.
3      And then in addition, your Honor, based upon the
4  prior ruling of the Court concerning all documents produced to
5  SLC.
6      Simpson Thacher gathered all documents in hard copy.
7  So our position is as to all of that --
8      THE COURT:  That's been produced.
9      MR. RUBIN:  To comply with Court order, we will
10  produce the additional underlying documents that were gathered
11  by the SLC and we will produce those in paper because they were
12  already gathered in paper and the cost would be enormous to go
13  back and try to produce those electronically.
14      However, responding to their document requests on a
15  going-forward basis, when we do the searches of the 80, 90
16  files and if there are any individual requests, those we will
17  produce electronically.
18      THE COURT:  So to spit that back to make sure I
19  understand that.  If you produce anything in the future, it's
20  all going to be in native format or these other formats for
21  spreadsheets or e-mails that we have talked about, except for
22  the documents that Simpson Thacher gathered that were viewed
23  the Special Litigation Committee, which will be produced in
24  paper.
25      MR. RUBIN:  Right, plus the 50,000 documents --

68

1      THE COURT:  Plus the ones that have already been
2  produced.
3      MR. RUBIN:  We are not going to reproduce those
4  electronically, other than spreadsheets.
5      MR. SOLOMON:  E-mails?
6      MR. WILLIAMS:  With the e-mails attached to the
7  spreadsheets.
8      MR. SOLOMON:  Why not?  Why not e-mails?
9      MR. RUBIN:  Let me put it this way.  If their was an
10  e-mail that wasn't attached in our hard copy production, we
11  would certainly -- if there is an one off e-mail, we can
12  through that into the electronic mix.
13      But as a general matter we are not going back -- our
14  position is we shouldn't have to go back to the 50,000 pages we
15  produced and produce every e-mail electronically.
16      THE COURT:  Well, you are not going to go back and
17  produce past e-mails electronically even in the TIF format?
18  You are going to in the TIF format?
19      MR. RUBIN:  Let me give you an example.
20      THE COURT:  I have got an e-mail that you have
21  already produced to them.  You are going to go back and give
22  them an electronic copy of that?
23      MR. RUBIN:  No.  That's what we don't think we should
24  be required to do because in those cases it would be an
25  enormous burden.

 

69

1    The search has already been done. We have already
2    extracted the document. The SLC in the derivative litigation
3    the decision was made to only deal with paper. So the document
4    has been copied, and only a paper copy has been provided.
5         So what we would have to do --
6         THE COURT: You don't have an audit trail for your
7    document productions? You don't know where the electronic file
8    is?
9         MR. RUBIN: Well, the electronic files are there, but
10   what it would require us to do is to go back into those
11   electronic files and then pinpoint the documents that have
12   already been produced.
13        The search of it would be a substantial undertaking
14   and, frankly, it would not, in our view, materially advance the
15   ball given where we are.
16        We have just taken a practical view that, they say
17   they want searchable documents. Now that we are sort of at the
18   starting gate in terms of new documents, we said, sure, we will
19   produce those in searchable format.
20        But we believe it's an unfair burden, your Honor,
21   given that -- you know, the decision was made by derivative
22   plaintiffs and the --
23        THE COURT: What do I care about that?
24        MR. RUBIN: No, no. I'm saying in terms of our
25   burden, because I just --

70

1         THE COURT: Just because you made a mistake --
2    putting it from the way they will say it. Just because you
3    made a mistake and the derivative plaintiffs made a mistake in
4    figuring out how to prosecute an action, does that mean they
5    should --
6         MR. RUBIN: No, I'm just asking the Court to weigh
7    the burdens, that's all. We have 50,000 documents already
8    produced, probably another 20,000 or 30,000. So there may be
9    80,000 documents that come from the derivative case that the
10   Court has now ordered all those to be produced. That's how I
11   understand the Court's ruling.
12        THE COURT: Essentially.
13        MR. RUBIN: What we would have to do then is take
14   that entire, all those 80,000 documents.
15        THE COURT: I understand. But you are going to
16   search 90 people's files, electronic files, and you are going
17   to produce many hundreds of thousands, probably millions of
18   pieces of paper, don't you think?
19        MR. RUBIN: Some of it may well overlap with the hard
20   copies.
21        THE COURT: And you are trying to argue with me that
22   searching for the 50,000 pages -- it's not 50,000 pages. It's
23   the e-mails and spreads sheets.
24        Searching for the e-mails and spreadsheets in the
25   50,000 pages is such an enormous burden?

71

1         MR. RUBIN: Well, it's also all the forecast reports,
2    the --
3         THE COURT: It's 50,000 pages?
4         MR. RUBIN: In other words, it would be a different
5    process than searching.
6         THE COURT: Of course, it's a different process than
7    searching, but it seems to me it's dwarfed by what you are
8    going to undertake to comply with this order anyway. If it
9    adds ten percent, I don't think it's a big deal.
10        MR. RUBIN: Well, it's a big deal -- all I'm saying
11   is it's a big deal in terms of it -- in terms of it being time
12   consuming. I actually also think the documents may be more
13   than what the Court may believe.
14        But certainly in terms of time, if you have to go
15   back and identify each individual document that we produced by
16   paper and try to find that document to be sure we cover the
17   landscape, that's a very time-consuming process.
18        When we search in the future, what we are going to
19   do, as the Court, I'm sure, is aware are going to come up
20   with some search terms, interoperability integration, forecast,
21   sales, loss --
22        THE COURT: Sure, I know.
23        MR. RUBIN: And that is a process that fortunately in
24   the world of electronics we can get a read. We can get a list
25   and then we pick from that what is responsive.

72

1         The prior process would require matching up each
2    paper document that's already been provided and trying to go
3    become into the electronic files and pinpoint it and find it.
4    I think the cost may be more than what the Court is conceiving.
5         MR. WILLIAMS: Very quickly, your Honor --
6         THE COURT: No. Nothing more on that.
7         Here is what you are going to produce. You are going
8    to produce, on a going-forward basis all documents will be
9    produced in native format that you uncover.
10        And the only exception to that is with respect to the
11   documents reviewed by the Special Litigation Committee, those
12   are going to be produced in paper.
13        Okay. Now, with respect to those documents reviewed
14   by the Special Litigation Committee and with respect to the
15   paper that's already been produced, you are going to go back
16   through them and you are going to produce e-mails in an
17   appropriate electronic searchable format we have been
18   discussing.
19        And you are going to produce the spreadsheets also in
20   electronic format that we have been discussing. Obviously, the
21   parties are going to need to meet-and-confer and agree upon a
22   method for locking those spreadsheets so that they can't be
23   altered, the electronic versions of those.
24        MR. RUBIN: Your Honor, in light of the costs that
25   could attend the retrieval of electronic e-mail searches, we

 

73

1  would ask that the Court consider some sharing of costs on
2  that, at least on that portion. Because the electronic
3  retrieval for going forward we are not asking for any, we are
4  not asking for any cost sharing --
5      THE COURT: How many e-mails are there?
6      MR. RUBIN: I think the fair number of the documents
7  are e-mails.
8      THE COURT: What's a fair number?
9      MR. RUBIN: I'm turning to my colleague. 25 to
10  30,000.
11      THE COURT: Pages of e-mails?
12      MR. RUBIN: That was a fair -- that was a substantial
13  bulk of the production between the reports --
14      THE COURT: No, no, no. It's a fair point.
15      MR. SOLOMON: Your Honor, my position would be really
16  to reiterate what you said. I don't think that we should be
17  penalized or punished --
18      THE COURT: All right. I was being devil's advocate.
19  I want you to actually argue the point though.
20      Why isn't it fair policy that there be some -- they
21  are not asking you to share the cost of the searching for any
22  documents going forward, which is going to be the vast bulk of
23  those documents.
24      They are just saying with respect to the ones that
25  they have already produced in paper format, if you want another

74

1  copy why not split the cost.
2      MR. SOLOMON: Your Honor, the minute this suit was
3  filed, they were on ample notice that this sort of information
4  ought to be preserved and that it would be required to be
5  produced. The PSLRA itself requires for the preservation of
6  electronic as well as other evidence.
7      THE COURT: It is preserved. The searching for it.
8      MR. SOLOMON: And, undoubtedly, if it is their
9  position that going forward they ought to be producing that
10  sort of information at no cost to plaintiffs, I don't
11  understand logically how it can be that we are not entitled to
12  that -- to the electronic evidence that has not been produced
13  but ought to have been produced.
14      THE COURT: The PSLRA did not eliminate the Federal
15  Rules of Civil Procedure.
16      MR. SOLOMON: Your Honor, the document request did
17  request the electronic information. It was their decision,
18  independent decision not to produce it in the first place.
19      We are being asked.to now go back and share the costs
20  of repairing, that I think is unfair.
21      THE COURT: Well, no, no, no, no. That's not right.
22  That's not right, is it?
23      MR. RUBIN: No.
24      THE COURT: Isn't it the case -- it may be very well
25  that they decided to produce it in paper format. They decided

75

1  to produce in paper format because it was less expensive
2  because they already collected it, all right? That's
3  presumably why they did it. I guess I'm not hearing anything
4  differently for that per you, right?
5      MR. SOLOMON: They elected to do it, correct, your
6  Honor. It's not the way we asked for it.
7      THE COURT: Before you asked for it, it had already
8  been collected in paper format.
9      MR. SOLOMON: Correct.
10      THE COURT: So once you asked for it, you got it in
11  paper format.
12      MR. SOLOMON: Once we asked for it in both electronic
13  and paper formats --
14      THE COURT: They gave it to you in paper format.
15      MR. SOLOMON: That's correct.
16      THE COURT: They are saying we don't want to also
17  give it to you in electronic format because it's too expensive
18  unless you want to share the costs.
19      MR. SOLOMON: That's right. That's exactly what they
20  are saying and we disagree. We think that it's unfair and it's
21  inappropriate. If it's not called for in future requests, we
22  don't see why should it be for documents already produced.
23      I actually want to -- your Honor, do you mind if I
24  make one other point --
25      THE COURT: I mind a great deal. I want to finish

76

1  ruling on this piece and then you can say something.
2      I'm not sure on the cost sharing. I'm not sure. It
3  sort of depends on what you are talking about. So I would
4  undertake letter briefing, okay, and you can make a proposal if
5  you want. Defendants can make a proposal on that and you can
6  respond by letter and then I will decide it, okay? So you can
7  also put that in the order in terms of cost sharing.
8      MR. SOLOMON: If I may, your Honor? If I could go
9  back --
10      THE COURT: One second. Let me write it down so I
11  don't lose my place here.
12      (Brief pause.)
13      Okay. Go ahead.
14      MR. SOLOMON: Thank you, your Honor. I just want to
15  be absolutely clear that with respect to the electronic
16  production that is going to be forthcoming in any event, that
17  that is understood to include the electronic documentation
18  concerning our accounting allegations.
19      In other words, the debit, the 46,000. I want to be
20  absolutely sure that that is included.
21      MR. RUBIN: I guess I'm not understanding the
22  question. In terms of a going-forward production?
23      MR. SOLOMON: Yes.
24      THE COURT: Yes, yes, yes. Okay.
25      MR. SOLOMON: Okay. Thank you.

 

77

1     THE COURT: All right.  Is anybody hungry?  How about
2   we take a quick break just so our blood sugar doesn't get too
3   low.  We are making reasonably good progress.
4       You have got by my count only a couple of more
5   difficult issues to go through.  There are lots of -- there are
6   a dozen or so more issues, but only a few that are complicated.
7       But what I would like to do is take a half hour, get
8   a quick bite.  Come back here at 1:15.  How does that sound?
9       (Whereupon at 12:45 p.m. proceedings
10      were adjourned for noon recess.)
11      THE CLERK: We are back on the record in Case
12   C01-0988, In Re Oracle Securities Litigation.
13      THE COURT: Okay.  We were at timing of document
14   production.
15      I guess I don't understand there to be much of a
16   dispute on this.  The date for production of plaintiff's
17   documents and defendant's -- plaintiff's non-class
18   certification documents and defendant's documents of March 21,
19   05.
20      MR. RUBINSTEIN: The only issue there is the
21   documents we have, obviously, gathered.  And I think we could
22   add to that the documents that we referred to concerning the
23   SLC, that we can get by March 21st.
24      The issue is that, obviously, with respect to new
25   documents that we have talked about here today, obviously, it's

78

1   hard for us to give a precise time as far as production, but we
2   will do that on a rolling basis.
3      THE COURT: I won't do that.  I need a date.
4      MR. RUBINSTEIN: For completion of all document
5   production?
6      THE COURT: Well, for completion of the documents
7   that are being allowed to be produced under this discovery
8   plan, yes.
9      MR. RUBINSTEIN: Judge, could we get rolling
10   production and all to be completed by May 1?
11      THE COURT: Where are we at?  March 1?  So that's 60
12   days?
13      MR. RUBINSTEIN: Yes.
14      THE COURT: Any problem with that?
15      MR. WILLIAMS: If that's as fast as they can do it, I
16   don't know if there is much of a problem.
17      MR. RUBINSTEIN: We are not saying we are going to
18   wait until May 1.  Obviously, it's going to be rolling.
19      THE COURT: Okay.
20      MR. WILLIAMS: The only issue, that will probably
21   affect deposition schedules and things going --
22      THE COURT: Okay.  But we got a little time
23   presumably and we will get to the implications of that when we
24   get to the deposition time limits.
25      Production by defendants to be concluded with respect

79

1   to the documents within the scope of this order by May 1.
2   That's fine.  Plaintiffs by -- well, you have got a smaller
3   issue, and, also, you have the class cert, but you can conclude
4   yours by March 21.
5      MR. WILLIAMS: I think we can, your Honor.
6      THE COURT: Okay.  Expert discovery.  Why don't we
7   set a date for certain -- I mean, you have a trial date, right?
8   Do you have a trial date?
9      MR. RUBINSTEIN: I believe we do.  Isn't it September
10   11th.
11      MR. WILLIAMS: I don't think he gave us a specific
12   trial date, did he?  I think he said --
13      MR. RUBINSTEIN: I thought it was September 11, 06.
14      THE COURT: He set it on 9/11?
15      MR. RUBINSTEIN: I think he did.  Okay.
16      THE COURT: Well, you know, that's -- I guess it --
17   my preference has always been to get everything lined up, but
18   is there any reason not to set expert discovery deadlines?
19      MR. WILLIAMS: No reason not to, your Honor.  And it
20   wasn't a real contentious issue between us.  I think we can
21   probably agree on expert --
22      THE COURT: Those dates that they have suggested,
23   they are all 2006 dates obviously.
24      March for opening reports.  Rebuttal reports on
25   April 3rd.  And then a month and a half to complete the

80

1   discovery.
2      Do those seem rational for now?
3      MS. RADCLIFFE: Only with the opening reports due
4   about a week after the close of discovery based on their
5   schedule being a little tight.
6      THE COURT: Well, that just means you have to conduct
7   your discovery earlier.
8      Okay.  Experts.  We will adopt the schedule in the
9   letter.
10      Production source log.  I don't understand why this
11   is --
12      MR. WILLIAMS: It looks like we may have agreed.
13      THE COURT: Oh, great.  Do you agree?
14      MR. RUBIN: That's our position on a going-forward
15   basis.  We are prepared to identify sources.
16      THE COURT: So you haven't agreed.  It's the past.
17      MR. WILLIAMS: It's the past.
18      THE COURT: Okay.  You have to produce a production
19   source log for all documents.
20      Privileged log, it sounds like there's an agreement
21   more or less.  30 versus 45, right?
22      MR. WILLIAMS: 45 is fine.  Privilege.  45 days after
23   the production where the documents are withheld.
24      Authentication, I'm not even going to address, but I
25   assume by the time it matters everybody is not going to want to

 

81

1  spend a lot of time in trial having Judge Jenkins yell at them
2  for not having stipulated to authentication.
3       Depositions. Okay, you have your lists and I propose
4  that the lists of the authorized depositions be the ones you
5  want right now. Everything that everybody has asked for, they
6  are within the numbers that he asked for? Why not?
7       MR. RUBINSTEIN: Judge, the only concern we had is
8  that maybe we miscounted, but I believe that the number that
9  the plaintiffs have exceeds the number that Judge Jenkins
10  permitted.
11       THE COURT: Oh, does it?
12       MR. RUBINSTEIN: Correct me if I'm wrong.
13       MR. WILLIAMS: I haven't counted them, your Honor,
14  but if it exceeds that number, we obviously can't go above
15  the number that Judge Jenkins has already given us and if we
16  have to go back to him then, or to you, then we can do that at
17  that time.
18       MR. RUBINSTEIN: In addition, the plaintiff's
19  position does say that this is a non-exclusive list. So it
20  seems to us that they get 65, and they will tell us who their
21  65 are.
22       THE COURT: Take your 65. We will put them in the
23  order. Okay? And, obviously, if you need more, that issue
24  will get addressed.
25       MR. WILLIAMS: Okay.

82

1       THE COURT: So everybody put their 65 witnesses in
2  the order.
3       MR. RUBIN: Your Honor, I just wanted to go back on
4  the production source log for a moment.
5       THE COURT: Yes, sir.
6       MR. RUBIN: I assume that the Court intends to order
7  that to be reciprocal.
8       THE COURT: Absolutely.
9       MR. WILLIAMS: With the deponents, your Honor, one of
10  the things that -- a lot of these deponents, we just want to be
11  able to get documents from their files at Oracle prior to us
12  having to take their deposition.
13       So, for instance, if there is an individual that's
14  not on the list, the initial list we agree on, we want to take
15  the deposition of this person, they are a former employee, we
16  want to be able to ask Oracle for the responsive documents from
17  that person's files.
18       THE COURT: Let's talk about that because it comes in
19  to with the timing.
20       Under timing, you have got 30(b)(6) depositions, and
21  I didn't actually see an issue in that.
22       Everybody agrees that there is going to be
23  depositions regarding preservation, accounting, forecasting and
24  Suite 11i. I don't know what you mean by electronic systems,
25  but from the clarifying letter it sounded like there wasn't a

83

1  disagreement on the subject matter on the 30(b)(6) depositions
2  or when they were going to be taken.
3       MR. WILLIAMS: We have actually been working well
4  together on that. The problematic issues were related to scope
5  which, hopefully, we will resolve today.
6       THE COURT: Okay. So the 30(b)6 motion -- the 30(b)6
7  depositions timing is not an issue, is that right? Everybody
8  agree with that?
9       MR. WILLIAMS: I think we were able to work on
10  timing, your Honor.
11       THE COURT: Okay.
12       MR. WILLIAMS: Mr. Rubin just raised an issue, I
13  guess to me, and maybe we should raise it to the Court.
14       With regard to the accounting on 30(b)6, I guess it's
15  his impression now that that's been resolved. I don't think
16  so.
17       I think even though the Court has ordered them to
18  produce a certain amount of accounting documents, we certainly
19  are able to have a 30(b)6 witness to discuss the accounting
20  procedures and policies within the realm that the Court has
21  ordered.
22       THE COURT: Okay. Well, let's talk about timing
23  first. 30(b)6 depositions are going to be concluded by
24  March 30th, all right?
25       The scope of the 30(b)6 depositions now --

84

1       MR. RUBIN: Your Honor?
2       THE COURT: Yes, sir.
3       MR. RUBIN: Let me go back in a moment of sober
4  reality. March 30th we think might be a little optimistic or
5  aggressive. So we would propose April 15, a couple of
6  additional weeks just to be sure that we get in all the Rule
7  30(b)6 witnesses with scheduling.
8       We don't actually know all of them, who the witnesses
9  are going to be. We have identified most of them, but not all.
10       MR. WILLIAMS: We are not going to object, your
11  Honor.
12       THE COURT: Great. April 15th. Admirable
13  cooperation going on here.
14       The scope -- I figured I beat a dead horse so many
15  times, every time I can say the opposite, I always say it.
16  30(b)(6). Scope. Okay. Accounting is one of them,
17  preservation -- what's preservation, is that electronic
18  systems?
19       MR. WILLIAMS: Yeah, that's part of that, your Honor.
20  And I think we made some headway there.
21       What the agreement initially was, they were going to
22  produce documents relating to the manner in which -- the manner
23  in which Oracle preserved the documents and then we would do a
24  30(b)6 off of that, off of that production if there was
25  anything we didn't understand about the preservation of



85

1  documents.
2      And correct me if that's not your understanding.
3      MR. RUBIN: We had indicated to plaintiffs that we
4  thought that our document protection policies and other written
5  material would provide the information they were looking for.
6  But if they choose, we are certainly prepared to offer an
7  organizational representative if they want to inquire --
8      THE COURT: On document preservation, that's fine.
9      On the accounting issues. Is there an issue on the
10  accounting issues?
11      MR. RUBIN: I just was making the point to
12  Mr. Williams in a side bar moment that the scope that the Court
13  has already ruled upon related to the accounting will control
14  the 30(b)6 depositions.
15      THE COURT: Of course. Of course. The subject
16  matter is for discovery, right not just for documents. That's
17  right.
18      Okay. And then there is forecasting. No issue on
19  that, right? There will be a 30(b)6 on forecasting. I mean, I
20  guess that's a reasonably broad subject, but it will be how you
21  do your forecasting and how you came up with the numbers that
22  are the forecasts in this case.
23      Is there any issue on forecasting?
24      MR. WILLIAMS: I don't think we ever had an issue on
25  that.

86

1      THE COURT: Okay. Now, 11i. 11i interoperability.
2      MR. WILLIAMS: And if I may interrupt, your Honor?
3      THE COURT: Please.
4      MR. WILLIAMS: I think that the interoperability
5  there is -- you know, it's accurate, but probably too narrow.
6      THE COURT: I thought you might say that.
7      MR. WILLIAMS: If I may, your Honor. I don't want to
8  kind of go down a road that we have already been around, but as
9  we were talking over the lunch hour or lunch 20 minutes, we
10  were kind of talking about what your order was earlier on that
11  issue, and I don't know if anyone recalled it specifically
12  enough to have a definitive conclusion.
13      But I understood your Honor to have a long discussion
14  about the integration and interoperability and how even if
15  there are bugs that don't necessarily relate directly to
16  integration and interoperability, that those bugs at some point
17  do -- do rise to a level that the product does not work.
18      And, indeed, we have statements, false statements in
19  the complaint where, I think it was either Sandy Sanderson or
20  George Roberts who said that both the supply chain management
21  SCM, and the CRM are working, and I think your Honor picked
22  occupy that as well.
23      But as you went further down into your, quote,
24  unquote, order on the subject, your order sounded much narrower
25  than your earlier commentary on it and I don't want the parties

87

1  later to fight about what you meant.
2      THE COURT: Okay. Let's go back to what I said and
3  what I should have said.
4      The documents that are being produced on the
5  functionality are as follows, and it should guide the scope of
6  the 30(b)6 depositions.
7      Obviously, you are going to produce the three
8  versions of 11i in the code so that plaintiff can contest it
9  anyway they want.
10      They are going to -- you are going to produce the
11  design documents and technical memos.
12      Okay. You are going to produce bug reports that in
13  any way reference integration and interoperability, right?
14  That's included in your things. So that certainly is within
15  the scope.
16      In addition, you are going to produce documents
17  regarding any lost, deferred sales or sales with respects to
18  which there was a material expense with respect to any product
19  before the relevant time period. Materiality being defined as
20  we stated.
21      In addition, I guess the piece that is missing is you
22  did say that we could come up with a high level, some kind of
23  high level documents which are relevant to the scope of
24  problems with the program and I'm not -- you know, without
25  characterizing them, problems with the program on a more global

88

1  basis that got to the folks in, for example, what you say is
2  the original speakers group, but some way of capturing the bug
3  problem other than integration issues.
4      I guess I had never -- I have neglected to get
5  closure on what that is.
6      MR. RUBINSTEIN: Well, I think what I would like to
7  do, and with the Court's permission, is to basically try to
8  craft an order that reflects what your Honor just said because
9  I don't -- I can't identify what the actual document would be,
10  but I think I understand what the Court's order is and I don't
11  know whether the Court is comfortable proceeding with an order
12  in which the category is described that way.
13      THE COURT: That's not a bad idea. What you are
14  talking about is an order that says, you are going to produce
15  documents that describe the scope and dimension of the bug
16  problems with the program other than, sufficient to, that kind
17  of language.
18      MR. RUBINSTEIN: Okay.
19      THE COURT: Sufficient to describe the scope and
20  dimension of the bug problems with the program other than
21  integration and interoperability.
22      And, obviously, with respect to each of these things,
23  you have the opportunity to have an examination of someone on
24  them.
25      MR. WILLIAMS: Maybe what we will have to do is see

 

89

1   if we can hammer out an agreement on what that should be and if
2   we can't agree, we will just submit something separate and have
3   the Court iron it out.
4        I do want to address one more issue, your Honor --
5        THE COURT:  Yes.
6        MR. WILLIAMS:  -- with regard to the materiality.
7        We talked about materiality and I guess a materiality
8   cut-off of $500,000 and I really think that that might narrow
9   things too much.
10        The $500,000 deals -- I can't stand here and say that
11   I know which ones they are, but one of the arguments that they
12   have made is that Oracle has thousands and thousands of
13   customers and that's probably true.  It is true.
14        How many of those are above 500,000 we don't know.
15   They did have, quote, unquote, big deal reports, but they were
16   a small number and those don't encompass all the customers who
17   were buying the product whose businesses were impacted by the
18   fact that the product didn't work.
19        And I think if we just use that $500,000 number,
20   which is a big number, it's a big sale, we are not going to get
21   what we are looking for.
22        And, finally --
23        THE COURT:  Of course, you won't get what you are
24   looking for, but, okay, but let's talk about what you need.
25        I mean, you are trying to get enough information

90

1   about, frankly, issues with customers other than integration,
2   right?
3        MR. WILLIAMS:  Sure.
4        THE COURT:  And trying to prove that those problems
5   with the customers are so large that notwithstanding the fact
6   that there isn't an actionable representation that there are no
7   bugs in this, or that there are insignificant bugs in it, or
8   trivial bugs or anything like that, that by virtue of the fact
9   that the program has so many flaws, that that means that when
10   you say this is a program that you can buy off the shelf and
11   you don't have to have any integration programming involved,
12   you are really violating that.  You are really making that a
13   false statement.
14        MR. WILLIAMS:  I think you are, right.
15        THE COURT:  That's a pretty high level of problem and
16   I'm wondering how we get into that.
17        One of the ways I'm thinking about getting into it is
18   you say, well, what are the problems that the big players are
19   having with this program?  I mean, aren't you going to capture
20   -- you aren't going to get -- you are right.  You are not going
21   to get every customer, but aren't you going to capture in the
22   machinations between Oracle and one of its bigger customers or
23   50 of its bigger customers are whatever they are, maybe it's
24   not a thousand, but aren't you going to capture in that the
25   dimensions of the bug problem?

91

1        Those are the people who are going to be all over the
2   program, right?  They are the people -- the big consumers of
3   the product are the ones who are going to have giant in-house
4   technical staff all over the product and all over Oracle.  They
5   are the people who are going to be the ones for whom Oracle is
6   going to have to spend money and time and who are going to
7   have, frankly, their own records and we will get to that.
8        But isn't -- aren't you going to capture the most
9   important problems that way?
10        MR. WILLIAMS:  The answer is maybe.  The answer is
11   maybe.  And that's because some of those big customers were
12   buying, say, the entire 11i Suite.  Some of the smaller
13   customers were buying only certain modules.  And let's say, for
14   example, CRM.
15        Now, a $500,000 threshold might be interesting for
16   the forecast, but with regard to customers, some of these
17   customers were buying just the CRM.  And I don't know how much
18   it costs.  I don't think it was a half million dollars, but we
19   know that just the implementation of this -- of the attempted
20   implementation of the CRM shut down entire businesses.
21        And I don't know -- so the impact to that business
22   might be greater than $500,000 even though they didn't pay
23   $500,000 for the software.
24        So to begin, it's difficult to say let's have this
25   $500,000 cut-off because a lot of the problems -- I mean, this

92

1   was a brand new software.  They were trying to sell it to
2   anybody, not just the big companies.  And what we allege in the
3   complaint is that the big companies were afraid to buy it
4   because they may have heard of some of the smaller companies
5   that had big problems with it.
6        So when we get to that $500,000 cut-off, we may only
7   get a small sliver of what is important for the case.  And
8   maybe we should just come with -- agree on a number that's
9   lower than $500,000.  I'm not saying I want everything --
10        THE COURT:  Why don't I do this?  Let's leave it the
11   way it is.  If it turns out you are right, well, then you are
12   going to be back here.  If you are right that you are not
13   getting a good sense of the dimensions of this problem by what
14   we have ordered, well, then, it was the wrong order and we will
15   fix it.
16        MR. WILLIAMS:  Okay.
17        THE COURT:  We will fix it.  I think that's right.
18        Okay.  So substantive witness depositions, meaning
19   other depositions other than 30(b)6, will start in May I guess.
20        With respect to the files that Oracle has regarding
21   any current or former Oracle employee, that's going to be on
22   the list of 65.  That's the issue you were raising, I think,
23   and those you want to have before you begin the depositions,
24   and they may or may not be within the scope of the files we
25   have ordered reviewed.

 

93

1       What do you think about that?
2       MR. RUBINSTEIN: I think what we would have to do is
3  take it on a -- as the depositions are noticed and as
4  plaintiffs give us the list of documents that they want, we
5  would, obviously --
6       THE COURT: The list of documents they want is here.
7  All right. This is the scope of what they get. They will
8  flesh it out in demands, but it will be within the scope.
9       MR. RUBINSTEIN: If it's within the scope and they
10 want the documents in advance, I think -- I don't think we have
11 a problem with that.
12      THE COURT: You may ask for something else and they
13 may agree or disagree. You will come to somebody, me or Judge
14 Jenkins, if there is a problem.
15      But the question is timing. You know, will you --
16 leaving aside the scope, okay. Leaving aside the scope because
17 the Court approved scope is in this order. There may be other
18 things that may work. Maybe other things that don't work, but
19 the timing is that you will agree to search those files and
20 produce them on 30 days' notice as long as they are on the
21 witness list that's going to be deposed. They are going to
22 have a list of 65 people.
23      MR. RUBINSTEIN: I just want to make sure I
24 understand. So once the plaintiffs identify who they want to
25 depose --

94

1       THE COURT: It's going to be in the order.
2       MR. RUBINSTEIN: It will be in the order. Then we
3  will be required to produce the documents in the files of those
4  people.
5       THE COURT: Yes, yes.
6       MR. RUBINSTEIN: Within 30 days, although I don't
7  know --
8       THE COURT: Within 30 days of a request for them.
9  There may be some period of time in advance of their
10 depositions.
11      MR. RUBINSTEIN: That's actually what I was thinking.
12 What if we agreed to produce them at least seven days in
13 advance of the deposition itself.
14      MR. WILLIAMS: Well, sure, that's fine. I mean, if
15 it turns out to be 20 boxes of documents, we might have an
16 issue, but I think seven days is fair.
17      THE COURT: It won't be. It won't be seven boxes of
18 documents.
19      MR. WILLIAMS: I think that's fair, if we had seven
20 days.
21      On the same issue, defendants have indicated that
22 they want to depose some of -- well, maybe all of the
23 confidential witnesses and, obviously, that's fine, but we
24 should get -- any of those confidential witnesses who are
25 former employees of the company, we should get all of the

95

1  responsive documents from those people's files as well. We
2  shouldn't have to wait until they notice the deposition.
3       THE COURT: Well, what about seven days in advance of
4  the deposition? Okay? Why not? Okay.
5       So with respect to any witnesses, either side, that
6  are current or former Oracle employees, seven days in advance
7  of their deposition Oracle will produce documents from their
8  files.
9       Now, the scope of the production will be what you
10 have requested that's within the scope the Court permits or
11 whatever else you can agree to or whatever else you can
12 convince some good natured judge of.
13      Okay. The open issues on this, I'm not sure I
14 understand. You don't get to -- can't you work out how long
15 the depositions are going to be?
16      MR. WILLIAMS: I think we can work that out, your
17 Honor. Just with the basic understanding that some of them,
18 obviously, are going to require more than seven hours.
19      MR. RUBINSTEIN: What we would suggest is that,
20 obviously, the presumptive limit of the federal rules would
21 apply and if on a witness-by-witness basis if the plaintiffs
22 believe they need more than that or if we feel we need more
23 than that as to any witness, we will meet-and-confer.
24      THE COURT: Don't mess around on this issue. This is
25 one that's particularly irritating to the Court. Both sides,

96

1  asking too much or offering too little. It is a no win
2  situation.
3       MR. WILLIAMS: Your Honor, there is an issue that
4  might fit in here that isn't in our letter that I want to
5  address.
6       THE COURT: Okay.
7       MR. WILLIAMS: I know that we have had a dispute
8  recently about 30(b)6 witnesses being deposed in their
9  individual capacity and we don't have a problem with -- with,
10 say, for instance we are going to depose one person and it
11 turns out to be a person that they designate as a 30(b)6
12 witness.
13      We don't have to accept that as the substantive
14 deposition of that witness, but if, you know, they don't want
15 to produce the witness twice, we are happy with that. We can
16 deal with that, but we need the documents from their files at
17 the time of the 30(b)(6) deposition.
18      MR. RUBIN: That's what we said, your Honor.
19      THE COURT: Fine.
20      MR. RUBIN: It came up with one of the 30(b)6
21 witnesses. We said as long as you have this particular
22 deponent's documents, there is no reason that we would need to
23 bring them back twice.
24      THE COURT: Fine. Good. Customer discovery. I'm
25 still. . . I'm not sure --

 

97

1    MR. RUBINSTEIN: Your Honor, we were going to propose
2  maybe one way to cut through this is, we are certainly willing
3  to abide by the Court's scope ruling with respect to
4  third-party discovery as well.
5    I mean, we think that the scope ought to be what the
6  Court has ruled and, really, the only issue that I think then
7  the parties are still at odds about is the number.
8    THE COURT: Let me see if that works. Just thinking
9  out loud. Maybe I won't. Just let me look.
10    That means with regard to the economy, they go to the
11  customers and you define the scope, which is documents related
12  to cancelled sales from Oracle, et cetera, et cetera, that are
13  a result of the down turn in the economy. That's the scope
14  from the economy perspective. That's in here.
15    MR. WILLIAMS: It might be slightly broader than
16  that, your Honor.
17    THE COURT: It says documents concerning the United
18  States economy and its impact or potential impact on Oracle's
19  revenues, earnings and expenses or its potential impact and
20  customer purchasing decisions and services in general,
21  purchasing of products, specifically purchasing of products and
22  services from Oracle.
23    For example, if customers communicated to Oracle that
24  the products in general were -- I guess the products in general
25  weren't being ordered due to tight end budgets or slowing

98

1  economy. I mean, I'm not sure that that's very narrow when it
2  come to going to a customer.
3    You have got to go to a customer -- I guess with
4  respect to Oracle, it's -- I don't know how you interpret that.
5  What does that mean? They get to ask from Oracle any documen
6  that refer to the impact of the economy on customer purchasing
7  decisions.
8    MR. RUBINSTEIN: Well, if the request is coming to
9  Oracle itself or from Oracle, then, clearly, it would only be
10  documents in which a customer is communicating that to Oracle.
11    THE COURT: Right. Or internal memos about that
12  subject or that kind of stuff.
13    MR. RUBINSTEIN: Right.
14    THE COURT: And we have cabined it by having it just
15  these files are being searched.
16    MR. RUBINSTEIN: Sure.
17    THE COURT: So you go out to a customer and you ask
18  that same question, aren't you asking for the world? Every
19  piece of paper on how they made their decisions?
20    MR. RUBINSTEIN: We would suggest that it should be
21  the same type of documents being communications to Oracle abo
22  -- as opposed, I think we have seen from some of the objections
23  that the customers are going to have some problems with purely
24  internal documents that were never communicated.
25    THE COURT: Let me just make sure I understand what

99

1  you are saying.
2    What you are saying is that the scope ought to be
3  with respect to the economy, the subject matter insofar as its
4  contained in the communication to or from Oracle?
5    MR. RUBINSTEIN: Yes.
6    THE COURT: Yes?
7    MR. WILLIAMS: I think that that's too narrow, but I
8  honestly am going to say I'm not sure I quite understand
9  defendant's proposal that it be the same as the request from
10  the company.
11    But we do think that we have substantially narrowed
12  the area that we are seeking discovery from non-parties based
13  on your Honor's comments back on February 4th.
14    Now, with regard to the economy, I would say that we
15  are interested in the -- say, for instance, we take a customer.
16  We want to know whether or not their IT budgets were shrinking
17  during that period for application software products. Not
18  for -- you know, because is that, indeed, was what Oracle said
19  was not going to effect their company.
20    Now, certainly, we want communications as well with
21  Oracle.
22    THE COURT: Why does it matter if it wasn't
23  communicated to Oracle?
24    MR. WILLIAMS: I'm sorry, your Honor?
25    THE COURT: Why does it matter if it wasn't

100

1  communicated to Oracle?
2    MR. WILLIAMS: Because Oracle represented that these
3  -- that their customers were not --
4    THE COURT: But you have to prove that that was made
5  recklessly.
6    MR. WILLIAMS: Exactly.
7    THE COURT: And how are you going to do that if there
8  is no communications from the customers to Oracle suggesting
9  that their IT budgets are shrinking?
10    MR. WILLIAMS: Well, for example, now if internally
11  at a customer members of the, I guess, procurement or IT
12  department are discussing the separate proposals that were
13  given to them, say, either by SAP, IT or Oracle and they are
14  discussing amongst themselves that this is -- we cannot afford
15  what Oracle is selling right now because our budgets are
16  shrinking.
17    Therefore, when Oracle shows up on Tuesday for this
18  presentation, you know, either we have to communicate that to
19  them in one way or another or let's just cancel it all together
20  because we can't afford what they are buying.
21    Now, it's hard for me to anticipate what the
22  documents are going to say and, certainly, the communications
23  to Oracle are important, but I do think that it's important for
24  us to get probably a narrower area of communications within
25  these customers that discuss the limited budgets for IT

 

101

1 purchases, especially because that's exactly what was -- the
2 questions that were raised to Oracle, the Oracle defendants,
3 and their response was, "That will not affect us."  The IT --
4 IT budgets shrinking is not going to affect Oracle because this
5 is a product that's going to help those people save money.
6     THE COURT:  My issue is not that it's entirely
7 irrelevant.  I think it is -- certainly has some peripheral
8 relevance to the question of whether or not the economy was
9 affecting Oracle's sales.
10     But it's a question of degree, right?  It's the Rule
11 26 proportionality question.
12     What you are asking for is if there are -- is
13 internal documents at the customers which make specific
14 reference to their purchasing lest Oracle software because of
15 the financial fortunes of the particular company, you know,
16 that might be reasonably narrow.
17     I mean, those will be memoranda which say, "We are
18 not going to purchase as much software from Oracle this year
19 because the company is experiencing a down turn in sales or
20 revenues or whatever it is."
21     I mean, that might be fairly narrow.  And it is --
22 the other thing I was going to say to you is the fewer
23 customers you bother with this stuff, the more likely I am to
24 give it to you, too.
25     But what's wrong with that?  Having a certain number

102

1 of customers that produce documents which specifically refer to
2 reducing or eliminating purchases from Oracle on the basis of
3 the fortunes of that particular company -- the declining
4 fortunes of the particular company, as well as communications
5 to Oracle on that subject?
6     MR. RUBINSTEIN:  Well, I think, first of all, if we
7 are assuming -- if it's communicated to Oracle, we don't have a
8 problem with that.
9     If it was something that was never communicated to
10 Oracle, then what plaintiffs are really going to be doing is
11 conducting an inquiry into the purchasing decisions and the
12 internal deliberative process of the customer, which I am doing
13 to predict that if it is something that was not issued outside
14 of the company, that there may well be objections which we have
15 seen, in fact, from customers.
16     And, again, I think that the relevance is, I think,
17 very limited in that, again, it's not something that Oracle
18 would have known.  Unless, of course, if it was something that
19 was communicated orally, plaintiffs are going to get that.
20     THE COURT:  Well, or not.  See, the problem here is
21 cart and horse, and to a certain extent it is they want these
22 documents so that they can start investigating communications
23 you are talking about.
24     They want to ask the people at the customer and they
25 want to ask your people, "Weren't you told at some point that

103

1 Company X was reducing its purchases this quarter because the
2 economy was hurting it?"
3     And they want to look at the documents to see that
4 and then they want to ask you the question about it.
5     There may be an oral statement that's not reflected
6 in the documents.  I'm not sure -- I'm not willing to cut it
7 off so completely.  It's just communications, because I think
8 this is discovery and discovery goes more broadly than that.
9 It's an investigation.
10     I am willing to leave -- have it a fairly narrow
11 category of internal documents and I am willing to -- we are
12 not having 200 customers produce that amount of information.
13     But it seems to me there is some relevance and, you
14 know, maybe the plaintiffs have made their bed they are going
15 to lie in it.  They have got 95 subpoenas out.  Maybe that's
16 it.  Maybe they don't get to do any other customer subpoenas.
17     But I think I have to give them some measure of what
18 was the customer thinking.
19     MR. RUBINSTEIN:  Well, again, not to belabor the
20 point, we think that the Court would be doing that by including
21 within the scope communications to and from Oracle addressing
22 those exact issues, and which doesn't strike me as something
23 that would be unreasonable in that presumably at some point if
24 a customer was going to inform Oracle that it was not going to
25 purchase something, that would be something that would be

104

1 communicated.
2     And so I think at a minimum it would be reasonable to
3 start there and only if it turns out that there just aren't any
4 documents like that, that then we would turn and expand that
5 scope.
6     We also, obviously, are very much concerned about the
7 scope as it relates to the number of customers that the
8 plaintiffs are intending to issue these subpoenas to.  We think
9 that even 95 is just far too broad, and that we think that --
10 now, I don't know if the Court wants to address that second?
11     THE COURT:  Not yet.  Not yet.
12     MR. RUBINSTEIN:  Okay.
13     THE COURT:  Let's get the -- I have got it in mind,
14 but I want to talk about subject matter.
15     MR. SALPETER:  Your Honor, can I say one thing about
16 that since I haven't spoken yet today?
17     THE COURT:  I was going to say. . .
18     MR. SALPETER:  Alan Salpeter.
19     THE COURT:  What's your name?
20     MR. SALPETER:  Alan Salpeter.
21     THE COURT:  Just kidding.
22     MR. SALPETER:  All of this discovery that we are
23 talking about today ultimately is going to evolve into a trial
24 of this case or disposition before trial.  And I wonder
25 ultimately whether what a customer says but doesn't communicate

 

105

1  to Oracle is going to have any even marginal relevance at an
2  ultimate trial in this case.
3        THE COURT:  Ultimately?  You are probably correct.
4  You are undoubtedly right.
5        I mean, it seems very unlikely that Judge Jenkins
6  will allow in the trial untethered information about customer
7  experience.  I think that that's right.
8        But the question now is in investigating the customer
9  experience, that may or may not have been communicated to
10  Oracle but was communicated -- but wasn't communicated, wheth
11  or not they are not permitted, to some extent, to start at the
12  back end and say, "There was this problem, was it
13  communicated?"
14        MR. SALPETER:  It just seemed to me so marginal and
15  so on the edge here of what is potentially relevant and
16  ultimately usable at the trial, because ultimately this case is
17  going to come down to what Jeff Henley and Larry Ellison were
18  thinking about when they were speaking publicly.
19        And if you parse through the statements they made, it
20  was that the economy isn't affecting us yet.  Everybody knows
21  what was going on in the economy.  Everybody knew about the
22  bubble bursting and the internet company problems.
23        What they were saying, and they were very careful
24  about what they said, was that we are not seeing it hitting our
25  business yet.

106

1        So the fact that the customer might be saying, you
2  know, we are starting to feel the pain of what's going on in
3  the economy, if that's not communicated to Oracle --
4        THE COURT:  No, no.  We are agreeing.  We are
5  agreeing as a matter of ultimate relevance.
6        I think we are agreeing as a matter of ultimate
7  relevance, but in terms of investigation I need to give them a
8  little more leeway than I would if it was my case for one thing
9  and that I would if it was a trial.
10        You know, I know everybody is going to try security
11  class actions now because defendants are now winning, right?
12  And you won't settle it and we will all go to trial, and Judge
13  Jenkins needs another securities trial.  He hasn't done enough
14  of them, but when you get there, it will be a very focused
15  trial.
16        It's really interesting.  I don't know how much of
17  the Clarent trial you caught, but it's extremely focused
18  inquiry once you get there when they really try the case, and
19  this isn't that.
20        MR. SALPETER:  Is there anything you can do to narrow
21  it beyond simply the customer, you know, discussing the pain of
22  the economy?  I mean, can we put some --
23        THE COURT:  I was going to say, decisions -- here is
24  what I wrote down for discussion purposes.
25        With respect to the economy.  Obviously,

107

1  communications with Oracle regarding increases or decreases in
2  purchases from Oracle due to the economy.  That's the
3  communications.
4        With respect to other documents.  Other documents
5  referring specifically to decisions to purchase or not purchase
6  from Oracle because of the economy.  It's got to specifically
7  refer to a decision that is based on -- to purchase or not
8  purchase from Oracle because of the economy.
9        And you get that in that that may lead places.  It
10  may not lead places, but it gets you some measure and then the
11  only question -- and my guess is that that is something that a
12  customer could more readily search for than every piece of
13  paper on their purchasing decisions and that kind of stuff.
14  That will be a smaller group of folks at least.  Okay.  That's
15  my thought on the economy.
16        In terms of product problems.  I don't want you to go
17  into bugs with the customers.  I don't want you to go into
18  anything bugs other than interoperability and integration,
19  okay?
20        I think that you are going to get these high level in
21  the first instance issues about the dimensions of the problems
22  other than the integrations problems.  If you can convince me
23  that that's such a level that you need customer inquiries, we
24  will get to that.
25        But to start with, I don't want any investigation of

108

1  just sort of everybody's problems with the Oracle software.
2        On the other hand, with respect to integration
3  problems with the software, I don't know, that might be all
4  right as a subject matter.  Documents from customers regarding
5  integration problems with the Oracle software.
6        Yes, sir?
7        MR. WILLIAMS:  I think that that's fine, your Honor,
8  with a couple of caveats.
9        THE COURT:  Yes.
10        MR. WILLIAMS:  For our document requests, I think
11  that we can -- and based on what your Honor is saying, we can
12  eliminate the word "bugs."
13        However, when your Honor uses the term "integration,"
14  I know that that term is going to be one that people latch onto
15  and it's too narrow, especially with the customers because the
16  customers -- what the customers are experiencing is
17  implementation, and the implementation is directly related to
18  the integration and interoperability and problems associated
19  with gaps or bugs.  So I can imagine --
20        THE COURT:  Yes, gaps or bugs, meaning integration,
21  interoperability, gaps and bugs.
22        MR. WILLIAMS:  I can imagine if I ask the customer
23  about its implementation experience, what they are going to
24  respond with is, well, this -- the product had an enormous
25  amount of bugs.  There was no way I could implement it because




109

1  of the bugs that were associated with it.  And it was certainly
2  not integrated and interoperable because the software code was
3  not written yet to make those modules speak to one another.
4       Now, maybe we can fashion a request that is
5  satisfactory to everyone, but I think as soon as you ask these
6  customers about their experience with the implementation of 11i
7  or any of its individual modules, the response is going to be
8  without us asking for it, there were a huge amount of bugs in
9  the software and we couldn't do what Oracle said we could do
10  with it once we bought it.
11       THE COURT:  Yeah.  And, therefore?
12       MR. WILLIAMS:  You are saying you don't want us to
13  ask about bugs, and I'm trying to understand how --
14       THE COURT:  What I want to ask about is a
15  specific category of failings in the software.  That is to say,
16  the failings that, in fact, there were -- I mean, the
17  representations in the complaint are that the -- it requires no
18  integration, right?  You can ask about problems they had with
19  respect to 11i, with respect to integration.
20       MR. RUBINSTEIN:  And, your Honor, with respect to
21  what the meaning of integration, the complaint itself refers to
22  a white paper in -- it's at Paragraph 63 of the Revised Second
23  Amended Complaint.
24       "And the white paper defines what Oracle means by
25  integration in the context of Suite 11i."

110

1       So I agree with the Court that the way to solve the
2  problem is to be precise so that the customer knows what it is
3  being asked to produce.
4       THE COURT:  Okay.  Why doesn't that work?
5       Yes, go ahead.
6       MR. WILLIAMS:  If I may approach, we have actually
7  broken out for you the statements regarding 11i and what can be
8  done with it.
9       THE COURT:  I read it.  I read it.
10       MR. WILLIAMS:  I just want to point out --
11       THE COURT:  I have already decided on the scope.  I
12  have already decided on the scope of the 11i problems that we
13  are investigating.  The question is applying it to the
14  customers.
15       MR. WILLIAMS:  I think that's right.  But what your
16  Honor just said was that what Ellison and Henley said, well,
17  it's preintegrated and interoperable, but they said much more
18  than that.
19       They said that, you know, you can implement it in a
20  certain amount of time.  It's up and running fast and it works.
21  And those are things that if you ask the customer, "Well, did
22  you try to implement it?"  "Yes."  "What happened?"  "Well,
23  there were so many bugs," they might say, "that we couldn't
24  implement it."
25       THE COURT:  And I agree with that.  I know that's

111

1  part of the statement and I'm giving you some level of
2  investigation into that.  It's coming from Oracle.  It's not
3  coming from the customers.
4       I'm not going to bother the third parties with stuff
5  unless you show me that you have -- that this is an important
6  area of investigation where you are really likely to get
7  admissible evidence from the customers and you haven't yet.
8       You may once you get the documents from Oracle, but
9  we are going to start with Oracle and because it's going to
10  have to be a lot more than just "there were lots of bugs."
11  It's going to have to be a lot more than lots of bugs, because
12  there is no -- the thing that rings true to me is that this
13  case was not about that this was a buggy software or there were
14  lots of bugs.  There are lots -- you know, that doesn't make a
15  securities fraud case.  Or that, "This is a good software.  Buy
16  it and it will work."
17       You know, if it was so buggy that it couldn't
18  possibly work, then that would be a false statement to the
19  market.  But just the fact that there are a bunch of bugs or a
20  lot of customers had problems with it, I'm not sure that that
21  proves it.
22       However, however, I'm going to let you investigate
23  the dimensions of it.  I'm going to start with Oracle's
24  documents.  If you come up with evidence that it is of a
25  sufficient level that you can reasonably when you go to the

112

1  customers, we are going to find the kinds of things that are
2  going to help us in an admissible fashion prove our case, then
3  you are going to get it.
4       MR. RUBINSTEIN:  But -- sorry.
5       THE COURT:  Let him finish.
6       MR. WILLIAMS:  Now, two things.
7       One, how would you propose doing that?  And if your
8  Honor would allow me today to make a representation to you
9  based on the documents that we have seen thus far to satisfy
10  you that we may find what I think we are going to find when we
11  go to these customers about this, I would be happy to do that
12  today.
13       We have brought just a couple of the documents we
14  have seen from Oracle.  Obviously, we don't want to violate any
15  protective order that's in place, but I think that we can make
16  that representation right now.
17       THE COURT:  You cannot.  I guarantee you cannot.  You
18  had your chance.  That's what this is.  You wrote me a letter.
19  You gave it in detail.  You gave your positions.  You told me
20  why.  You don't have it.
21       Whatever you have got, it is insufficient.  I suggest
22  you go to Oracle first and only on the level that I have talked
23  about, because I'm very skeptical as to whether or not you can
24  make a securities case out of this.
25       Maybe you can.  I'm going to give you an opportunity

113

1   to try, but right now you are not going to get those documents.
2       Okay, let's keep going.  Documents that refer to
3   integration problems with 11i can be sought from the customers.
4       On the accounting issues I guess this is separate and
5   apart from the documents that are going to be produced by the
6   accountants, which is a separate question from the customers.
7   Any documents relating to those 49,000 debit memos, period.
8       MR. WILLIAMS:  I think that's fair.
9       THE COURT:  Whatever the transactions are that those
10  involve.
11      MR. WILLIAMS:  That's fair.
12      MR. SOLOMON:  That's fair, your Honor.
13      THE COURT:  Okay.  That seems to me the scope of what
14  you are going to get from the customers.
15      The next question is how many.  You know, my sort of
16  -- I want to get you enough customer information so that you
17  will be able to have -- you know this case through customer
18  information, right, because it's not a scientific.  It
19  won't show materiality, right?  It's not an amount that is
20  going to be significant except for the giant people, which you
21  are going to get anyways.
22      But the customer information going out 200, 400
23  customers is not how you are going to prove ultimately that
24  this was of a sufficient quantity that it was reckless to
25  represent otherwise.  You know, 10, 20, 200, 400.  You are

114

1   going to get anecdotal information.  I'm not saying it's
2   irrelevant, but it's anecdotal.
3       How many customers does Oracle have?
4       MR. RUBINSTEIN:  Thousands.
5       THE COURT:  Thousands.  You know, thousands and
6   thousands and thousands.  Pick a number, 10,000 customers.  If
7   you put 200 of them in, 200 out of a 10,000 is relatively a
8   small percentage and by itself is going to be a difficult time
9   proving the dimensions of the problem through the customers.
10      What you get to is investigation the customers to
11  find the kinds of problems that you think are there, and then
12  communications to Oracle that would put -- have some level of
13  notice of the kinds of problems and then the internal documents
14  to Oracle are going to be the key.
15      So this is important, but not as important as the
16  internal documents to Oracle.
17      So it seems to me is that it matters -- that whether
18  it's 50 or 100 or 200 or 300, you know, that extra delta
19  doesn't buy you very much.  Because whatever it is, it's not
20  going to be a scientifically sample of all their customers
21  because it's so small.  Don't you think that?
22      MR. WILLIAMS:  Well, statistically you may be right,
23  your Honor.
24      THE COURT:  That's what we are talking about.
25      MR. WILLIAMS:  They have got thousands of customers.

115

1   We know that their own representations in December of 2000,
2   they said they had 83 customers live on 11i.
3       In January of 2000 they said -- January 2001, I'm
4   sorry, they said they had 160 customers live on 11i.
5       And based on what we have seen thus far, I'm not sure
6   what live means, but even if we -- we don't want 400 customers.
7   We don't want 300.  We probably don't even want 200, but we
8   think that there is something between what we have done already
9   and a few more that we do need.  And that is within what they
10  have said were live on 11i.
11      For example, in February or -- the January and
12  February of 2001 they said they had 2500 companies implementin
13  11i currently.  We obviously don't want that.  Nobody wants
14  that.
15      And so what we -- and I really believe that we have
16  been extremely, extremely reasonable with the cut that we have
17  made as to the documents or non-parties' customers that we
18  ought to get discovery from.  They said 160 live on 11i in
19  January of 2001.
20      THE COURT:  Your 93 you think would capture most of
21  those?
22      MR. WILLIAMS:  I think it would capture most of
23  those.  We were talking about it over the last couple weeks
24  and, in fact, just yesterday.
25      You know, probably 15 more that we haven't subpoenaed

116

1   yet.  And it's not because we thought they were less important.
2   It was because, you know, we just hadn't gotten to do those
3   before, you know, defendants had an opposition in.  We didn't
4   think it was proper to continue sending them out while they had
5   this opposition in front of the Court.  But there are at least,
6   you know, 15 to 20 more that we think that we need to send out.
7       Then if your Honor or -- we can -- we are prepared to
8   say, look, if we want any more that, we will tell you who we
9   want to subpoena.  You let us know what you think, whether or
10  not you think it's relevant.  If we have a dispute, we will go
11  to the Court and you can get a protective order before we send
12  out anything.
13      So I think that we have been very reasonable on that
14  issue.
15      THE COURT:  Okay.  Why not -- let me just put this in
16  your lap, because you won't like it.  No, no.  I do it on
17  purpose so I can figure out whether I'm messing up.
18      Why don't I tell them that they can do these four
19  categories, they can seek documents within these four
20  categories:  From the 93 customers and 7 more and then they are
21  done.  Without some extraordinary showing to the Court, they
22  are done.
23      MR. RUBINSTEIN:  Well, the reason that I guess I have
24  a problem with it is because it ultimately involves a process
25  where customers are being subpoenaed without much inquiry into




117

1  whether or not they really are reasonably likely to lead to
2  discovery of admissible evidence. And I will give the Court an
3  example of what I mean.
4      The Court is already requiring us to produce
5  information regarding communications with customers that fall
6  into the category that the Court has defined to be at least
7  sufficiently relevant to be likely or reasonably likely to lead
8  to the discovery of admissible evidence.
9      It seems to us that if you are going to get that
10 information, that would give them the ability -- it would give
11 plaintiffs the ability to be able to make a good cut at which
12 customers are reasonably likely without at the same time -- and
13 we --
14     THE COURT: I agree with that. I agree with that
15 completely, but when they do that, they are going to come up
16 with 200 people, 200 customers.
17     MR. RUBINSTEIN: Well, I honestly don't know why 30
18 of their choosing is not --
19     THE COURT: What's the difference between 30 and 90?
20     MR. RUBINSTEIN: It makes a big difference to Oracle
21 in terms of the impact that it has on Oracle's relationship
22 with its customers.
23     THE COURT: Because it's 90 instead of 30, right?
24 But there is no -- you haven't given me a principal reason why
25 90 is not a -- why 90 is the right number or 30 is not the

118

1  right number other than, "We like it better. It hurts us
2  less."
3      MR. RUBINSTEIN: Well, it hurts us less and I think
4  that it adopts a view that I think is consistent with the
5  approach the Court has taken in other situations, where after
6  they have subpoenaed 30 customers, which I think is quite a
7  large number, then at that point they ought to be able to -- if
8  they think that's not enough, then at least they will be able
9  to make a showing at that point as to why not.
10     As opposed to now where I think we are in a situation
11 where we are pulling numbers out, I mean, of necessity, and I
12 think that especially after the plaintiffs are going to get
13 whatever documents they are going to get, I think it's going to
14 make the process much more likely to be -- to really to satisfy
15 the objective of discovery here.
16     THE COURT: You know, I disagree. I think it's going
17 to lead to more litigation and delay. I want to get this done
18 now, and I think --
19     MR. RUBINSTEIN: Well, the problem we have is if
20 there is a finite cut-off, I'm almost confident -- I'm rather
21 confident that plaintiffs are going to come back and say, "Your
22 Honor, we need more now."
23     THE COURT: They have to ask and then I can say no.
24 But you have suggested the same thing anyways. You have the
25 exact same proposal, except your number is 30 instead of 90.

119

1  Yours is as every bit as arbitrary as theirs, and their number
2  is nearly 200.
3      So I don't -- you know, I don't know. How did you
4  come up with the particular companies that you have subpoenaed
5  thus far?
6      MR. WILLIAMS: We came up with them through Oracle's
7  representations about who was using live or implementing 11i.
8      Our confidential witnesses who were at Oracle at the
9  time who told us that they were either trying to sell, sold or
10 been rejected by certain customers about 11i. Most of them
11 came from there.
12     We also have some documents that were provided to us
13 that show that during that period Oracle had either tried to
14 through a proposal or a bid to searching customers for, you
15 know, significant amounts of money that were still pending
16 during that quarter or around that quarter. That's how we came
17 up with our group of customers who may have responsive
18 information regarding either implementation or whether or not
19 they were actually going to buy Oracle products in the quarter
20 because of, you know, financial reasons in the economy.
21     We didn't -- it wasn't arbitrary. I should mention
22 that we asked -- in the last couple of weeks we have asked
23 Oracle to tell us which customers were the 160 that you say
24 were live on 11i. We haven't gotten a response. We want to
25 know which ones they were.

120

1      THE COURT: But where does that leave you?
2      MR. WILLIAMS: I'm not saying --
3      THE COURT: Therefore what?
4      MR. WILLIAMS: The reason I'm saying that is because
5  you are asking me whether -- I think you are trying to figure
6  out whether or not it's an arbitrary number and why we
7  subpoenaed these people.
8      THE COURT: It is an arbitrary number. I'm trying to
9  figure out how arbitrary. It is how much information went into
10 the choice.
11     Or whether or not we should just -- because part of
12 my concern is that we are going to end up with another
13 arbitrary number. It will -- I expect it will be three months
14 from now, and it will be -- you know, they will still want more
15 than you will want to give.
16     Why not just narrow the categories of documents as I
17 have, which is very narrow, set a number, say that you have
18 already subpoenaed them and we will be done. That absent som
19 special showing that there is admissible evidence in the hands
20 of these -- of other customers and that I believe that it's
21 fair to require it to be produced, which is unlikely -- and I
22 guess I have said that for the record, and that's what I
23 mean -- that they are done.
24     I mean, it seems to me that we are going to end up
25 with some kind of fairly arbitrary cut-off one way or the other

 

121

1   and the question of whether we should do it now or three months
2   from now just means that it will delay the discovery that much
3   longer and there will be somebody -- I want to get it underway.
4   I want to get it all done with. That's part of my goal here,
5   is to get this lined up so everybody knows what the marching
6   orders are for the next 18 months and we will get it all done.
7        I hear you. I understand the question. I think if I
8   was Oracle I would be very wary of the fact that my customers
9   are being subpoenaed into a securities action over a stock fall
10  of $3 or something, or whatever it was during that -- after the
11  announcement was made. I would be wary of that.
12       On the other hand, I can't say that the customer
13  information isn't relevant and I can't say that they can't get
14  -- that they have to wait. I don't want -- because I don't
15  think it really adds to the problem in any material way or to
16  the exclusion of the problem by waiting.
17       I think that we will end up with another set of
18  arbitrary numbers. Everybody is proposing arbitrary numbers
19  now and we will have arbitrary numbers with extra reasons
20  attached in three months and it will be three months later.
21       I don't want to wait so long. That discovery was
22  served last year. I want to get it underway.
23       MR. SALPETER: Can I suggest another arbitrary
24  number?
25       THE COURT: Yes.

122

1        MR. SALPETER: Fifty. Because I think the
2   disruption, the ultimate disruption to these customers and to
3   the relationship between Oracle and the customer is something
4   that the Court ought to take into account.
5        THE COURT: I do, I do.
6        MR. SALPETER: Particularly given how marginal this
7   is. It has potentially some relevance. We think it's
8   borderline. They are making a case that it's stronger.
9        We would like to see 30. They would like to see 93
10  plus seven. Whatever number we pick is going to be arbitrary,
11  but I would like to try to limit the amount of disruption to
12  the relationships.
13       These are customers who got a product that they said
14  was a buggy, lousy product, maybe defective in design, and now
15  we are going to add insult to injury by dragging them into this
16  securities litigation, having their deposition taken, their
17  documents sought.
18       THE COURT: These are the documents. We are not
19  talking about their depositions yet.
20       MR. SALPETER: Okay. Documents. I stand corrected.
21       THE COURT: But I want to make sure that's right.
22  They are not on the list of witnesses. You are going to have
23  to ask if you want those extra.
24       MR. SOLOMON: We want to see the documents and make
25  reasonable choice before we go around talking to people live.

123

1   Absolutely. We have met and conferred, your Honor, with 73 of
2   these potential witnesses already.
3        MR. SALPETER: Well, they should be able to pick the
4   best 30 or best 50, the ones they think will make their case --
5        THE COURT: Or the best 93.
6        MR. SALPETER: -- out of because --
7        THE COURT: They all seem. I mean, it's hard for me
8   to distinguish. You know, if they had gotten out 200 numbers,
9   you would be out -- 200 subpoenas, you would be out asking for
10  93 or 100.
11       MR. SALPETER: Well, because I -- you know there is
12  an inspector to discovery that is pure infliction of pain and
13  that ought to be limited frankly.
14       THE COURT: I know and I'm trying to limit it.
15       MR. SALPETER: I made my pitch for a different
16  number.
17       THE COURT: Okay. 93 plus seven more. That's it.
18  You better have a very good reason if you want to go beyond
19  that.
20       And the 93 are the ones you have already got out, so
21  and narrow to these subject matters.
22       MR. RUBINSTEIN: Your Honor, I did want to go back to
23  one question.
24       The Court talked about limiting the scope, it was for
25  third parties regarding bugs to integration.

124

1        THE COURT: Yes.
2        MR. RUBINSTEIN: And I think it's important to be
3   clear and for the parties to be clear about what that means.
4        And in particular there is in the plaintiff's letter
5   a suggestion that integration might mean the ability of Oracle
6   products to be integrated with non-Oracle products, which it
7   seemed -- maybe we have reached agreement. I was not there.
8        But with regard to the meet-and-confer that occurred
9   last week, it's my understanding that that is not what is meant
10  and that that is not what the plaintiffs will define
11  integration to mean. I just want to make sure that that is
12  clear.
13       THE COURT: Is it clear?
14       MR. WILLIAMS: Your Honor, until we actually -- I
15  mean, this is the point I was raising earlier about using the
16  words "integration" and "implementation."
17       THE COURT: I understand that, but there is a false
18  representation alleged in this case. It is that these products
19  require no integration.
20       That means a particular thing, does it not? It means
21  that these different modules can be integrated with each other.
22       MR. WILLIAMS: I believe that that is what the
23  representation is.
24       THE COURT: Fine. And that is the scope of the
25  order. That is what we mean by "integration." It is the




125

1  integration of the various parts of the 11i Suite with each
2  other. You know, with the data base part of the suite, you
3  know, with each other, et cetera, et cetera.
4       If that's what you believe the false statement is,
5  that's what you get discovery into.
6       MR. RUBINSTEIN: Again, I think that --
7       THE COURT: Okay. Okay. We have got it. That's
8  done.
9       MR. RUBINSTEIN: Okay.
10      THE COURT: Okay. And then in terms of the timing of
11 the production, you just cooperate with the third parties and
12 work with them. I'm going to be very sensitive to their
13 concerns in terms of that, and so I expect you to cooperate.
14      How about the time period is June 1, 2000 to June 1,
15 2001?
16      MR. WILLIAMS: For non-parties?
17      THE COURT: Everybody. Everything.
18      MR. WILLIAMS: You know, we originally had asked for
19 a much broader period than that and in the meet-and-confers
20 what we said is, look, we are perfectly willing to come down to
21 say when the Form 10K was filed for fiscal year 01, and that
22 was in August, and it makes sense because the fiscal year ended
23 on June 30.
24      So if we stopped production of responsive documents
25 at June 1st, your Honor, we cannot capture even the entire next

126

1  quarter. It would just stop right in the middle.
2       And the defense is going to be -- and we have seen it
3  in the derivative action, in Judge Strine's opinion that there
4  is a hockey stick effect which Oracle relies on on a
5  quarter-to-quarter basis and that happens in the last month of
6  the quarter.
7       So if we are restricting discovery to end before that
8  last month of the quarter --
9       THE COURT: Well, except the quarter that ends
10 June 30, 01 itself isn't at issue in this case. It's the prior
11 quarters.
12      So the only reason I go out is to capture documents
13 that may have additional relevance to what happened before.
14      MR. WILLIAMS: I agree with that, your Honor, but,
15 again, one of the things that Larry Ellison said when the miss
16 in our quarter is that a lot of these deals were pushed out to
17 the next quarter. Not lost, but pushed out to the next
18 quarter. And they also said that a lot of the deals ended up
19 closing in the final month of the quarter.
20      So one could -- one would imagine that, say, for
21 instance --
22      THE COURT: So the miss in the third quarter of 01,
23 which is -- ends in what, March?
24      MR. RUBINSTEIN: The Q3 ended on February 28.
25      THE COURT: So?

127

1       MR. RUBINSTEIN: But the statements that Mr. Ellison
2  made were right at the end of the third quarter. And so what
3  happens later --
4       MR. WILLIAMS: To the end of the fourth quarter it
5  should be.
6       MR. RUBINSTEIN: Doesn't matter. Again, the
7  relevance of any -- of any later created documents would be
8  only with respect to matters that refer back to Q3 itself. I
9  think the Court is right that Q4 is not an issue in this case.
10      THE COURT: What do you think about my time period?
11      MR. RUBINSTEIN: We could accept that.
12      THE COURT: Okay. That's the time period. June 1,
13 2000 to June 1, 2001 and documents that refer to events during
14 that period which may have been generated at a later time.
15      15, analysts and media organization. You have
16 already got that, right?
17      MR. WILLIAMS: Think so, your Honor.
18      THE COURT: On all these ones where I say you have
19 got agreement, make sure you put that scope in the order.
20 Auditors and accountants.
21      MR. RUBINSTEIN: Your Honor, we would suggest that
22 the scope be the same as the scope we have already worked out.
23      THE COURT: Right. Why shouldn't it be that?
24      MR. SOLOMON: Are you talking about the conference,
25 your Honor?

128

1       THE COURT: Yes, sir.
2       MR. SOLOMON: The reason is, your Honor, that -- and
3  I think we have cited a case or there is abundant law to this
4  effect; that is, where you have accounting allegations in a
5  securities fraud case, typically I think this doesn't take us
6  outside of the typical arena, you would need all of the work
7  papers to get an overall understanding and comprehension of
8  just what went on with the financial statements at issue.
9       For example, we have the accounting allegations
10 concerning the end of November 2000 adjustments. They claim
11 that there was no impact on the financial statements. We
12 obviously need to look at what the auditors examined with
13 respect to that issue apart from anything else.
14      Also, there was forecasting allegations in our case.
15 What accountants -- what auditors do when they are auditing
16 companies, as I'm sure you are familiar, is they look at
17 internal controls. They look at management integrity. We need
18 all that stuff. That is clearly relevant to this case. In
19 order to --
20      THE COURT: Indulge me a little bit. Why is that
21 relevant to this case?
22      MR. SOLOMON: Well, there is going to be a defense --
23 there's a number of defenses we know about. One is they don't
24 even hit the financial statements.
25      If it did hit the financial statements, the defense




129

1　would be the defendants didn't know about it for whatever
2　reasons.
3　　　And one of the reasons they will say the defendants
4　didn't know about it was because the auditors passed on it.
5　　　Why did the auditors pass on it? Again, there will
6　be examinations in the audit work papers of what management
7　representations were as to -- in other words, to get a picture
8　of whether or not management knew, whether they should have
9　known, what the accountants thought about the accounting
10　treatment or if they knew about it, how it affected the
11　financial statements ultimately all needs to be examined in the
12　context of Oracle's overall financial statements.
13　　　And our experts and auditors and courts have
14　concluded time and again the only way to do that is to get all
15　of the papers. Is that difficult? No. They are always
16　organized by the auditors.
17　　　Very simply, they are ready to be produced right now,
18　I would anticipate --
19　　　THE COURT: I'm sure they are on a disk.
20　　　MR. SOLOMON: -- or they could be very quickly.
21　　　MR. RUBINSTEIN: Your Honor, going back to a comment
22　I believe you made earlier today.
23　　　This is not an accounting case in which there is some
24　allegation about overarching policies. It's about a particular
25　event that occurred on a particular date involving a finite

130

1　series of transactions.
2　　　We have agreed to have the outside auditors produce
3　documents that relate to the accounting treatment of those
4　debit memos. I don't think there is any disagreement there.
5　　　THE COURT: Right.
6　　　MR. RUBINSTEIN: The rest of it I, frankly, just
7　don't understand.
8　　　And there is no allegation in this complaint about a
9　lack of internal controls as it relates to the forecasting
10　process.
11　　　I mean, I just think that this -- this is just way
12　far afield. And to the extent that there are work papers that
13　relate specifically to this debit memo, I don't have a problem
14　with that. But I think anything else is just a fishing
15　expedition and this is not like every other accounting case.
16　It's a very narrow issue. Either it hit revenue or it didn't.
17　　　And the audit trail we have agreed to produce that
18　and what the accounting treatment was, that's fine. But I
19　think it ought to be restricted to that issue because that's
20　what's went pled.
21　　　MR. SOLOMON: And, your Honor, ultimately the
22　auditors had to sign off on the fiscal year, not just the
23　quarter in question, and how material the events were that we
24　alleged, to what extent they were known and to what extent the
25　auditors signed off on them with knowledge is all relevant to

131

1　our case.
2　　　THE COURT: Well, you get all of that by getting
3　every scrap of paper in that audit that has anything to do with
4　the 49,000 debit memos, isn't it?
5　　　MR. SALPETER: 46.
6　　　THE COURT: Whatever. 2000 debit memos between us
7　friends . . .
8　　　MR. SOLOMON: One element to the case, your Honor.
9　Another elements to the case is the forecasting. Expenses,
10　expenses in relation to 11i are all embraced within those
11　allegations.
12　　　THE COURT: Yes. They didn't audit the forecasts.
13　　　MR. SOLOMON: No, but certainly the auditors would
14　have looked at the quality of their forecasting function.
15　That's a function of the auditors, and they will have done
16　that. They will do that in every case in which they audit.
17　　　THE COURT: Why don't I add that? Okay. Why don't I
18　do that? We will say that the auditors have to produce
19　everything in their files related to the 49,000 -- to the
20　accounting treatment of the 49,000 -- related to the 49,000
21　debit memos and any audit of the forecasting function at
22　Oracle.
23　　　MR. SOLOMON: All right. And what about the
24　expenses?
25　　　THE COURT: Does that work? Does that work? I mean,

132

1　if it did, audit the forecasting function, it's probably
2　relevant.
3　　　MR. SOLOMON: The expenses, your Honor, and their
4　financial function.
5　　　THE COURT: Well, if you -- if the auditors raise
6　that the forecasting function was flawed in the following six
7　ways and you continued to rely on the false forecasting in
8　making these projections, maybe it's relevant. I don't know.
9　　　MR. RUBINSTEIN: Your Honor, the problem I have with
10　that, it's not been pled. There is no theory in this case that
11　there was a failure of control and that there was some
12　fundamental flaw in the forecasting process.
13　　　THE COURT: Well, it's an underlying. The allegation
14　is that you forecast -- well, maybe you are right.
15　　　The allegation is that you forecast -- well, the
16　allegation is that you forecast wrongly, right, is that you
17　made forecasts when, in fact, you knew the forecasts were
18　inaccurate.
19　　　They were inaccurate, you knew, because the economy
20　was, as you knew, was having a greater impact on sales and, in
21　addition, you knew that the 11i wasn't going as well as you
22　were representing in your forecasts it would go.
23　　　If the forecasting function was audited, why wouldn't
24　that audit have something do with -- why wouldn't it -- an
25　auditor looking at that, maybe they came up with it and maybe

 

133

1    they didn't, that there were these failings in your forecasting
2    function. Maybe they brought it to management's attention and
3    said, "You are not properly accounting for this. You are not
4    properly accounting for that," and so -- or you didn't. And
5    you say, "We had it audited. We have got a validated
6    forecasting function and we followed it, and the auditor signed
7    off on it."
8         I don't know. Are we talking about anything? Is
9    there anything --
10        MR. RUBINSTEIN:  No, no, no.
11        MR. SOLOMON:  Your Honor --
12        THE COURT:  Do the auditors do this?
13        MR. SALPETER:  No, because this --
14        MR. SOLOMON:  Your Honor, the --
15        THE COURT:  Stop.  One at a time.
16        MR. SALPETER:  This is way beyond the scope of the
17   audit here. The audit is --
18        THE COURT:  Okay.
19        MR. SALPETER:  -- addressed to the financial
20   statements.
21        THE COURT:  That's fine.  Did the auditors and
22   accountants here not audit the forecasting functions? You tell
23   me that and you don't get discovery into it.
24        MR. RUBINSTEIN:  I'm not aware of any.
25        THE COURT:  That's a little different.

134

1         MR. SOLOMON:  The fact that we are having this
2    discussion, I think, reinforces my point that I think we need
3    all of the work papers.
4         THE COURT:  No, it doesn't.  That is truly the cart
5    before the horse.
6         MR. SALPETER:  Your Honor --
7         MR. SOLOMON:  Thanks for putting it that way.
8         THE COURT:  In any event --
9         MR. SALPETER:  Your Honor, can I make one other
10   point?
11        Their allegation isn't that the forecasting process
12   was flawed. It's that Ellison and Henley knew that the
13   12 cent per share forecast wouldn't be met because of these
14   negative things; the economy, 11i, et cetera, right? That's
15   the core of their case.
16        THE COURT:  Let me ask you this:  What if they can
17   prove the first half and not the second? What if they prove
18   that Ellison knew that the forecast wasn't being met. Okay,
19   just bear with me. I don't expect you to agree with that.
20        And the reason is not because of what they have
21   alleged in the complaint. The reason is because the auditors
22   advised him that his forecasting method was flawed.
23        Can they put on this case?
24        MR. SALPETER:  Not on this complaint.
25        THE COURT:  You can't put that on this complaint.

135

1    There is a knowing misrepresentation of a forecast. He makes a
2    forecast knowing it's false and the reason he knows it's false
3    is not the reason that they give. He can't do that?
4         MR. SALPETER:  That's not their case.
5         THE COURT:  Stop there.
6         MR. SALPETER:  It's a hypothetical that is so far
7    afield from really what we are talking about here.
8         I mean, their case and all these derivative cases
9    have all alleged essentially the same thing. Not that the
10   forecasting process was bad or flawed, but that once the
11   forecast was made of 12 cents a share Henley and Ellison knew
12   they weren't going to meet it.
13        THE COURT:  Okay.
14        MR. SALPETER:  I mean, your hypothetical is
15   interesting, but it's not --
16        THE COURT:  It is.
17        MR. SALPETER:  It's interesting, and I would like to
18   think about it some more before I answer it, but it is not our
19   case. In fact, it's not even a fifth cousin removed to
20   this case.
21        THE COURT:  So you are giving discovery of the --
22   your forecasting methods and what went into the forecastings
23   that were made public and they are going to look at those.
24        MR. SALPETER:  Right.  And then they are going to
25   come back if they find some major flaw that they think should

136

1    be caught by auditors or outsiders, they are going to come back
2    and they will be waving their arms and making an impassioned
3    argument to you about why they should go further.
4         But on the base of this complaint, they really
5    shouldn't be getting into what the auditors have done beyond
6    the narrow scope that has been --
7         THE COURT:  I have got to tell you, my predilection
8    with respect to this is unlike with the customers, where I'm
9    sensitive to the relationship concerns.
10        My general work in the past has been, you know, what
11   do I care about the work papers? Have them.
12        My concern about the work papers is I don't want it
13   to be a fishing expedition. I don't want this to be an excuse
14   to look for 75 other flaws and amend the complaint for 75 other
15   flaws that they haven't yet discovered in the financial records
16   in the company.
17        So I don't want to get into all of the audit. It's
18   not pled and we are not going to get into it.
19        On the other hand, with respect to the auditing of
20   the forecast model, is that a big deal?
21        MR. SALPETER:  I don't think it was done. I don't
22   think it was ever done.
23        THE COURT:  Fine.
24        MR. RUBINSTEIN:  It's a bit academic.
25        THE COURT:  Here is what you do. Here is what you

 

137

1  do.  Okay.
2      MR. WILLIAMS:  Can I say one thing, your Honor,
3  before you rule?
4      THE COURT:  Yes.
5      MR. WILLIAMS:  One of the issues is Andersen.
6  Andersen was the auditors at the time and we have begun the
7  meet-and-confer process with them before we ended up in the
8  position that we are today.
9      Now, I don't know if anyone knows how long those
10  documents will be available, and I think -- what was it?  Just
11  ask if we have got them all, then they could produce them
12  quickly or if they have to go through them, they wouldn't be
13  able to produce them quickly; is that correct?
14      MS. RADCLIFFE:  My understanding is that Andersen
15  themselves have not looked at the work papers.  They are in a
16  warehouse in Redwood City along with all of their other work
17  papers.
18      That they have taken the client -- used to have desk
19  files for the engagement team, but that is now consolidated
20  into a single client file which would be labeled in this case
21  "Oracle" pursuant to numerous preservation orders across the
22  land regarding --
23      THE COURT:  Good.
24      MS. RADCLIFFE:  But how long those particular
25  documents, you know, would be there, I don't know.

138

1      THE COURT:  Would be there?  We can take care of the
2  "would be there."
3      MS. RADCLIFFE:  What's in them and what's there is
4  questionable.
5      THE COURT:  But they are not about to get rid of
6  them.
7      MS. RADCLIFFE:  Well, no.  I believe that they
8  indicated that Ernst & Young, for example, the subsequent
9  auditor, probably looked at them.
10      THE COURT:  My point is you are not saying there is a
11  preservation issue there.
12      MR. WILLIAMS:  I thought there may have been one.
13      THE COURT:  Aren't there court orders in place for
14  the auditors to preserve --
15      MS. RADCLIFFE:  As to this case?
16      THE COURT:  Any case.  As long as they have to
17  preserve them.
18      MS. RADCLIFFE:  I don't know that there is an order
19  that apply to those documents.
20      THE COURT:  Is there anybody that would object during
21  the pendency of this case requiring that the work papers be
22  preserved?
23      MR. RUBINSTEIN:  No, your Honor.
24      THE COURT:  Okay, put that in.  Of course, they are
25  not before me, but put it in anyway.  You can ask them and then

139

1  they have to do it.
2      MS. RADCLIFFE:  One of the issues that's going take
3  arise with the auditors is in addition to the hard copy work
4  papers, will be the work papers in electronic format.
5      THE COURT:  Well, you are going to take that up with
6  them.  I'm not going to get into the details.  I'm going to do
7  scope.
8      MS. RADCLIFFE:  There is also, in addition to the
9  work papers, the desk files or client files that relate to at
10  least the allegations in the complaint.
11      THE COURT:  Well, you are saying it's all in one
12  file?
13      MS. RADCLIFFE:  That's my understanding with respect
14  only as to Arthur Andersen.
15      THE COURT:  Well, we will just say documents -- I
16  want them to preserve all of their work papers with respect to
17  the Oracle engagement -- engagements, probably have more than
18  one, certainly for the relevant period of time.
19      So put it that way.  Preserve all the work papers for
20  the relevant period of time.
21      If there are other documents that they are required
22  to preserve by someone else's order, that's fine, but I
23  don't -- I don't have a good sense that anything beyond that is
24  obviously relevant here, or even marginally relevant.
25      I mean, I guess I could say preserve everything

140

1  relevant to Oracle, but this may go on for quite some time and
2  I don't know, maybe they keep it anyways.
3      Does any of this matter how I say this from your
4  perspective.  Can I just say "preserve documents"?
5      MR. RUBINSTEIN:  We have no problem with the
6  preservation.
7      THE COURT:  All right.  Preserve all documents
8  regarding Oracle for the relevant period.  Fine.
9      What you can get from the auditors is documents
10  regarding or relating to the 46,000 debit memos.  And I guess
11  there was an agreement on documents relating to tax advisory
12  services to the defendants.
13      Okay.  Plaintiffs witnesses and documents --
14      MR. RUBINSTEIN:  Your Honor, with respect to the tax
15  advisory services, it's my understanding what that meant was
16  tax advisory services as to Mr. Ellison or Mr. Henley to the
17  extent that that occurred.
18      THE COURT:  All right.
19      MR. SOLOMON:  Your Honor, are you saying then with
20  respect to expenses associated with 11i problem, costs
21  associated --
22      THE COURT:  No, no.
23      MR. SOLOMON:  And are you saying with respect to
24  forecasting, that we get nothing from the accountants?
25      THE COURT:  Right.  Yes.

 

141

1    Okay.  Confidential witnesses.  You know, why don't
2    we -- can you duplicate Judge Alsup's order, the stipulation in
3    that case?
4        MR. WILLIAMS:  We can go very close, your Honor.  I
5    think that we made an initial proposal and in their letter we
6    saw their kind of cross proposal for the first time.
7        I think the only real issue there is to agree on the
8    fact that if they have to do some investigation internally at
9    Oracle about someone they know to be a confidential witness,
10   that they don't represent to people at Oracle that the person
11   is a confidential witness.
12       They can say that, you know, Joe Blow for example,
13   did you know anything about him?  Is he a credible guy?  Is he
14   somebody that would lie?  That's fine.
15       But I don't think they should be able to say, well,
16   this guy is a person who has made -- you know, has made some
17   sort of factual allegation against Oracle and, therefore, was
18   he a credible guy?  You know, is he somebody that could be -- I
19   don't think that should be problematic.
20       MR. RUBINSTEIN:  Your Honor, we do have a problem
21   with that.
22       Obviously, when -- as we would for any witness, we
23   would want to be able to conduct factual investigation about
24   this person, whoever they are, so that we can actually prepare
25   to take their deposition.

142

1        THE COURT:  Yes.
2        MR. RUBINSTEIN:  And we do have a problem if we are
3    impaired in our ability to conduct a meaningful investigation
4    to be able to depose him.
5        THE COURT:  I guess I don't understand the issue.
6    What you are saying is they can do that investigation, right?
7        MR. WILLIAMS:  Sure.
8        THE COURT:  They can ask about this witness, what
9    they said about particular subject matters, what they didn't
10   say, what they did, what they didn't do, whether they are a
11   good guy, whether they are a bad guy, et cetera, et cetera, but
12   you can't tell anyone that the reason for the investigation is
13   because they are a confidential witness in this case.
14       MR. WILLIAMS:  That's our position.
15       THE COURT:  What's wrong with that?
16       MR. RUBINSTEIN:  My concern is that I'm not sure what
17   the legal predicate is for that.
18       THE COURT:  Okay.  Give my a break.  We are talking
19   practicalities here.
20       MR. RUBINSTEIN:  Well, no.  The concern we have is
21   that the predicate for this is that we are going to be out
22   there harassing and intimidating witnesses and there is
23   absolutely no showing of that.
24       And the Alsup order, I should point out, was
25   agreed order.  So it's not a judicial determination that that

143

1    is --
2        THE COURT:  Of course.  Of course, it's an agreed
3    order.
4        The concern is -- and I'm sure you won't do it.  I
5    have no idea whether you will do it, but I'm not presuming that
6    you will do it, is that their witnesses may be concerned about
7    this subject.  That is, I'm sure, what generates this.  Is that
8    the witness will be concerned.
9        This is some modicum of salve on that so that there
10   won't be any.  It doesn't cost you anything.  Who cares?
11       MR. SALPETER:  Well, let me put a hypothetical
12   together.  I understand the restriction that the plaintiffs are
13   putting.
14       We cannot actually show any Oracle employee the
15   complaint and say this is what they say this person said.  This
16   is the information.  We can't say that.
17       THE COURT:  No.  But you can say, "John Blow has
18   said," and then quote the complaint.
19       MR. RUBINSTEIN:  We just can't refer to --
20       THE COURT:  You can't refer to them as a confidential
21   witness or say they are a confidential witness.  You just can't
22   talk about the fact that they are giving evidence to the
23   plaintiffs which is being used in a complaint.
24       I mean as a practical matter, why does that matter?
25       MR. RUBINSTEIN:  Would we be, for instance, able to

144

1    have in-house counsel at Oracle know who the confidential
2    witnesses are?
3        THE COURT:  Well, I think that's an important issue.
4        MR. RUBINSTEIN:  For us to be able to advise our
5    client and, obviously, the legal department.
6        THE COURT:  Well, so this is part -- I'm trying to
7    focus on your language so I can figure out where it fits in.
8    It fits in, I guess, Condition 3.
9        "Counsel for defendants will not disclose the
10   confidential witness's roll' -- which is what he's talking
11   about, right, their role as a confidential witness -- "to
12   anyone other than" -- and, obviously, you all get to know it.
13   Consultants get to get it.  You have got in-house defendants.
14       By "defendants" I assume you meant -- well --
15       MR. RUBINSTEIN:  It's Item Z.  We would want to be
16   able to provide this to in-house counsel and we also do think
17   to employees.
18       THE COURT:  Well, why?
19       MR. RUBINSTEIN:  But if the Court is ruling we can't,
20   I mean, at a minimum we need to be able to provide that
21   information to the in-house counsel.
22       MR. WILLIAMS:  Your Honor, we accept the fact that
23   their counsel, you know, just as an officer of the court, will
24   not convey that information to the employees and we don't have
25   a major objection to that.

 

145

1    But you are right, the witnesses, you know, do have
2  some concerns about those things.
3    THE COURT:  Then what you should do is -- we will do
4  the defendant's language, except you scratch the word "and
5  Employees" from Z.
6    I think that to be clear you are going to have to
7  scratch the word "defendants" -- or "and their."  Scratch the
8  word "and their" from X.  So you keep talking about defendant's
9  counsel.
10    THE COURT:  Defendant's counsel within Mayer, Brown
11  and Platt -- oh, sorry.  I am dating myself.  I grew up in
12  Chicago, so it's --
13    MR. RUBINSTEIN:  That's all right.  We do it all the
14  time.
15    Now, your Honor, I have a question.  If we are not
16  going to be permitted to communicate the fact of somebody being
17  a confidential witness to another employee, it does seem to me
18  that the undertaking becomes somewhat irrelevant, right,
19  because the person isn't even being told that they are getting
20  information that is protected in the first place.
21    So it seems to me that the undertaking --
22    THE COURT:  Who does the undertaking go to?
23    MR. RUBINSTEIN:  Well, the concept had been that if
24  Oracle employees outside of the law department were going to
25  know that someone was a confidential witness, then there would

146

1  be an undertaking that they would comply with the restrictions
2  of the order.
3    And we can -- we would agree to that if we could
4  convey that information; but if we can't, it seems to me that
5  what -- they go together.
6    THE COURT:  Well, I understand that.  What do you
7  think about that?  Who gets -- the only people that are getting
8  this are outside counsel, in-house counsel, consultants and
9  experts.
10    MR. RUBIN:  And we would propose three individual
11  defendants.
12    THE COURT:  Well, that's the issue.
13    MR. WILLIAMS:  That's just not necessary.
14    MR. RUBIN:  Those are our --
15    THE COURT:  Oh, come on.  They have lawyers.  They
16  have in-house counsel.
17    MR. WILLIAMS:  With regard to the undertaking, your
18  Honor, I think that we can probably address that stipulation
19  and agree on something, but I think --
20    THE COURT:  It seems to me the only person you might
21  think about is for consultants or experts.
22    MR. RUBINSTEIN:  All right.
23    THE COURT:  All right.  So we will limit the
24  undertaking to consultants and experts.
25    MR. RUBINSTEIN:  The other concern that we have is

147

1  the idea that -- of having the confidential witness identity --
2  or documents, any documents that refer to the confidential
3  witnesses file under seal with the Court.
4    THE COURT:  Well, I think the way you put it is
5  correct.  They have to seek an order, and then we will take it
6  on a case-by-case basis.
7    At some point it may be totally irrelevant, so --
8  presumably it will be totally irrelevant eventually.
9    So what I'm saying is we will use the defendant's
10  language generally for the stipulation with those modifications
11  we just made as to the undertaking and the scratching out the
12  two bits for the disclosure of the witnesses.
13    MR. RUBINSTEIN:  And we just wanted to clarify that
14  we would be getting not only the name of the confidential
15  witnesses, but their corresponding number as referred to in the
16  Revised Second Amended Complaint.
17    THE COURT:  They have got to know who is who, right?
18    MR. WILLIAMS:  We agreed to that.
19    MR. RUBINSTEIN:  Fine.  And when -- do we have an
20  agreement as to when we are going to get the names?
21    MR. WILLIAMS:  I don't know if we talked about it,
22  but I imagine after we had this discussion today --
23    THE COURT:  You know, we are going to do this.  What
24  I want to happen -- it is 3:00 o'clock -- is you all go back
25  and get me a proposed form of order that you all agree to based

148

1  on my rulings.  And that will probably take at least the rest
2  of the day, right?  But quickly.
3    I think we need to do this rare rapidly and then, I
4  don't know, 48 hours after I sign an order, give over the
5  numbers, the names.
6    The next issue on here is the class cert discovery.
7  Is there any issue on that?
8    MR. RUBINSTEIN:  I think the parties have agreed to a
9  schedule.
10    MR. WILLIAMS:  We agreed on a schedule.  I think we
11  agreed on everything else.  It was very late in the day.  There
12  was an issue as to whether or not they wanted to absent class
13  member discovery --
14    THE COURT:  They are reserving on it.
15    MR. WILLIAMS:  So there is no issue.
16    THE COURT:  That's fine.  Well, then, put in whatever
17  the agreement is on the class cert discovery.
18    MR. SALPETER:  I just want to clarify, also, I think,
19  as the letter confirms, we are going to be getting the
20  documents from the plaintiffs.  The letter indicates by the
21  7th.  I don't know.  Is that -- I wanted to confirm that that's
22  the case.
23    MR. WILLIAMS:  I think so.
24    MS. RADCLIFFE:  The non-class cert is the 21st.
25    MR. RUBINSTEIN:  Non-class will be the 21st, class

 

149

1  will be by the 7th.
2        THE COURT:  Class will be by the 7th.
3        MR. RUBINSTEIN:  Okay.
4        THE COURT:  Contention interrogatories.  I don't
5  really like contention interrogatories, though I have
6  propounded many of them.
7        I like them at the end because I think it's a very
8  good trial tool, at least in the trial preparation tool.  It
9  confines the case.  But I think at the beginning, especially
10  where you are about to produce 2 million pages of documents,
11  it's a little bit dicey.
12       So my proposal, what I would say is that you can't
13  produce -- have contention interrogatories in general until --
14  without further order of the Court.  And you can apply later
15  on.  But that -- and then eventually, but I wouldn't
16  anticipate, that you would get contention interrogatories for
17  the purpose of defining what you are going to try or move for
18  summary judgment on or whatever the final or penultimate
19  resolution of the case is.
20       Does anyone like to take that up?
21       MR. RUBIN:  We would only note, your Honor, that we
22  have already been served with contention interrogatories and
23  have been provided some response.  And, perhaps, it was our
24  mistake for not objecting.
25       THE COURT:  Well, no, because you wanted answers,

150

1  too.
2        MR. RUBIN:  But, certainly, we would just want, you
3  know, from here on out reciprocity on that issue.  Contention
4  interrogatories from both sides.
5        So to the extent -- let's put it this way:  To the
6  extent that they have any objections to our contention
7  interrogatories, I would think that those will await -- those
8  should await the service of contention interrogatories and
9  response by them.  We should just be reciprocal.  We should
10  move together.
11       THE COURT:  I agree with that, but I'm not sure what
12  it means.
13       MR. WILLIAMS:  I agree with the contention
14  interrogatory issue, and maybe there are interrogatories that
15  defendants are construing as contention interrogatories and we
16  didn't construe them in the same way.
17       For example, there are statements that, you know --
18  like the one I represented to the Court earlier.  They said
19  they had 160 customers live on 11i in January.  So we asked,
20  well --
21       THE COURT:  That's not what he's talking about.
22       MR. RUBIN:  We are talking about, for example,
23  "provide all facts, your factual basis for the statement that,"
24  and then a statement that on March 15th this was -- that our
25  miss was related to, you know, unforeseen facts.

151

1        And that was served on us.  We have attempted to
2  respond.  We don't know if these pages will be sufficient on
3  this.  Sit on them --
4        MR. WILLIAMS:  We can deal with that, your Honor.
5        THE COURT:  You work that out, but nobody gets to get
6  additional answers right now, certainly, to contention
7  interrogatories and I don't want any more served.
8        Now, you know, I have never had to think about the
9  question of exactly what falls within, what doesn't, a
10  contention interrogatory.  Usually it's when they ask about
11  pleadings, it's a contention interrogatory, but I can see how
12  there will be things that aren't within strictly focused on the
13  pleadings that are clearly contention interrogatories.
14       But my guess is if you use your common sense, it
15  won't be a problem.  But no contention interrogatories and
16  further responses without Court order.
17       Absent class members, we have dealt with.  You can
18  come back and seek leave if you think it's appropriate for
19  absent class discovery.
20       Attorney work product.  This is taking the easier one
21  first.  On the documents from confidential witnesses, you have
22  to produce all the documents you are getting from confidential
23  witnesses and you have to identify who they are from.
24       MR. WILLIAMS:  That's fine.
25       THE COURT:  Okay.  On the work product, there must be

152

1  a way through this.  This is the issue of -- you have got a
2  laundry list of witnesses listed in your Rule 26 disclosure.
3  They don't know which ones are really important and which ones
4  are not.
5        I don't think that if you say, "Tell me what this
6  person knows about the case," that impinges necessarily on work
7  product, or "Tell me what this witness has to say in general."
8        This must be a way for you to get to them without
9  risking your mental impressions in any material way why the
10  witnesses are on the list.
11       MR. WILLIAMS:  That may be true, your Honor, and I
12  think maybe the, quote, unquote, work product kind of objection
13  to it, it doesn't fit as nicely as it ought to.
14       Really what they are asking for is something that is
15  very difficult to do at this point.
16       We have been investigating the case for four years.
17  There are a lot of people that we have talked to.  There are a
18  lot of people who have told us there are other people at Oracle
19  who might have this information.  Now, we wanted to provide
20  that to defendants.
21       Now, I don't know --
22       THE COURT:  Well, you wanted to provide that.  You
23  wanted to provide them with the list.
24       MR. WILLIAMS:  The list of people who may have
25  discoverable information.

 

153

1    Now, we can say, well, this person -- well, it will
2  be part of our investigation.  We will say, you know, Jennifer
3  Whoever was somebody that we were told, you know knew about
4  .   But do we know what the information is going to be
5  once we actually get discovery?  We don't know that.
6    THE COURT:  No, no.  They are not asking for that.
7  They are asking for what you know.
8    MS. RADCLIFFE:  Your Honor, we already specified in
9  the initial disclosures what subject matters the person would
10  be.
11    The initial disclosures also break out by category
12  what type of person; for example, the customers, the
13  accountants, the former employees of Oracle.
14    For the former employees of Oracle they have already
15  shown that they could run reports as to what their title is and
16  what department they worked at.
17    And what they want to know is all facts of why we
18  believe these people are likely to have discoverable
19  information and those really go to the mental impressions of
20  counsel.
21    THE COURT:  That's nonsense.  That's a frivolous
22  objection.
23    MS. RADCLIFFE:  I mean, they did --
24    THE COURT:  That is a completely frivolous objection
25  and we are not going to go there.

154

1    You are going to tell me how you are going to get to
2  them.  That's what we are doing here.
3    How are you going to tell them and in what form are
4  you going to tell them what you think these witnesses know.
5    MR. WILLIAMS:  Well, like you said, aside from what
6  we have already provided, your Honor, it's just what I have
7  told you today.
8    So if there is a person that was in -- you know, a
9  customer, say XYZ customer.  How do you know that -- why do you
10  think that customer may have documents that are responsive
11  to a discovery request?
12    THE COURT:  I have got an answer.  Answer the
13  following interrogatory.  With respect to all the people on
14  your 26(a) list, I want you to answer the question:
15    What do these witnesses know that is relevant to the
16  case?
17    Now, I will add the following additional conditions:
18    Number one, is the only remedy for the failure to
19  disclose an adequate amount is a motion to compel further
20  disclosure.  I don't think I would preclude them or suggest
21  that there is a -- any preclusion here, but I want you to
22  get -- tell them what you think this witness knows about the
23  case and do it -- now, the other thing I would think about is I
24  would want some limitation so that this doesn't become a
25  telephone book.

155

1    What level -- what kind of detail are you thinking
2  of?  I mean, what are you looking for?  I mean, do you want two
3  paragraphs on each witness?
4    MR. RUBIN:  Your Honor, the rule -- Rule 26, as you
5  know, says likely to have discoverable information.
6    We want what they know today, what kind of
7  information they have that they think would bear upon this
8  case.  What is it that they know?  What facts do they know that
9  this person has?  And so if that is in a paragraph narrative,
10  that makes sense.
11    I mean, we just simply want --
12    THE COURT:  Fine.  If you are not going to answer my
13  question -- mine is a practical question.  What you just asked
14  for is a telephone book.  He is going --
15    MR. RUBIN:  We just want the facts.  If they learned,
16  for example --
17    THE COURT:  You want everything they learned from
18  these people, that's what you want?
19    MR. RUBIN:  No, no.  If Jennifer Smith was -- this is
20  an example -- somebody, and a consultant who now, you know,
21  works at, you know, another company and they are not a
22  confidential witness but on their list, we want to know what
23  fact do they know, the basic facts they know.  What she would
24  know that would bear upon the complaint.  Does she know
25  that --

156

1    THE COURT:  That's four years of investigation.
2    MR. RUBIN:  Well, cities were falling.  Did she know--
3  that, you know, the software was not working in the manner for
4  a particular customer.
5    THE COURT:  So you want a general description of what
6  they knew?
7    MR. RUBIN:  But if, for example, they knew about a
8  particular customer that was having problems and that's why we
9  were on the list, yes, we would want to know that.
10    If Bell South was having problems with the software
11  and she interacted with Bell South, that's enough for us to get
12  a sense of why they were listed in the case.
13    THE COURT:  Can you do that?
14    MR. WILLIAMS:  I think we can do that, your Honor,
15  but I would like a substantial amount of time to do it.
16    Because I can tell you now that if they are looking
17  for substantive information, they are not going to be terribly
18  excited about what they get here.  Because what we did with our
19  initial disclosures based on our investigation and no documents
20  at all, we listed people who are likely to have discoverable
21  information.
22    Why?  Because Jennifer Smith told us that, "Hey, Mike
23  McCarthy was in that department and, you know, at that time
24  and, you know, maybe he knew something about the CRM."
25    So I think what they are after here is not really




157

1  going to be something that is going to be useful to anybody
2  ultimately.
3      MR. RUBIN: Your Honor, one other thing. I mentioned
4  it would be extremely useful to us, there are, I think, about
5  350, approximately, organizations, businesses listed. And one
6  issue that we had raised early on was that with businesses the
7  rule speaks of potential witnesses. It speaks of individuals,
8  not entities.
9      So if an entity is listed -- if Alcoa is listed, at a
10  minimum we presume Alcoa is listed because a live human being
11  has some relevant evidence of Alcoa, that we believe there is
12  somebody at Alcoa that has relevant evidence. So who is it?
13      THE COURT: You can presume all you want. I know
14  exactly what they did. They wrote down every name off of every
15  document and every witness list that they ever generated and
16  they put it all together and it's the kitchen sink.
17      MR. RUBIN: We agree, your Honor, and we made an
18  objection these were not Rule 26 disclosures and Judge Jenkins
19  said, okay, well, go back and tell them what categories, but
20  then --
21      MR. WILLIAMS: And we did that.
22      MR. RUBIN: Then defendants have a right, then, to
23  seek discovery underneath the disclosures so they can get an
24  idea of which witnesses are important and which aren't.
25      THE COURT: I don't know that that's actually right.

158

1  You have a right to discovery when the Court tells you have
2  the right to discovery.
3      I never liked that argument, we have a right to get
4  something, because the Court is going to give you proportionate
5  discovery. And the important discovery is not coming off the
6  Rule 26 disclosures.
7      So here is what you are going to. Done. Enough
8  discussion. Enough discussion. I'm done. This is not an
9  important enough subject to spend another 30 seconds on.
10      You will answer the interrogatory which is: Describe
11  generally what each of these witnesses know about the case.
12      Okay. Five-minute break. We are almost done.
13      (Brief recess held in the proceedings.)
14      THE COURT: Okay. Call us back, please.
15      THE CLERK: Resumes session in C01-0988, In Re Oracle
16  Securities Litigation.
17      THE COURT: Okay. Are there any other issues with
18  respect to the discovery order that we need -- other than the
19  preparation of the order that we need to address?
20      The only thing I thought of is the dispute resolution
21  mechanism, but what I think you ought to put in is the Court
22  should comply with Judge Jenkins' standing order on that. I
23  don't know yet who those disputes are going to.
24      I think I have invited one application to me for sure
25  and that is the application regarding sharing of costs. And I

159

1  have certainly invited -- you have got to put in a mechanism
2  for modifications to the discovery plan, and I think those
3  should also appropriately come to me since the plan has been
4  referred.
5      And I guess disputes regarding the -- and I think
6  otherwise I would say absent further order of the Court that
7  you will comply with Judge Jenkins' standing order regarding
8  discovery or whatever he said in this case regarding discovery,
9  and then he and I will work out who it actually goes to before
10  you have a dispute. We will figure out who it goes to. Of
11  course, there won't be any, so it's not a problem. So put in
12  those things for the implementation.
13      So you are going to get the transcript, hopefully,
14  tomorrow. How long are -- you better put how soon can you all
15  reasonably get to me an order.
16      MR. RUBINSTEIN: How about Friday?
17      THE COURT: You think you can do it by Friday?
18  That's fine.
19      MR. SALPETER: We thought we would do a draft.
20  Tender it to them and. . .
21      THE COURT: Go back and forth and get it to me by the
22  end of the day Friday maybe?
23      MR. SOLOMON: We will strive for it. I think that's
24  very optimistic, but we will certainly try for it and explain
25  why not if we don't make it.

160

1      MR. SALPETER: Best efforts.
2      THE COURT: Best efforts for Friday or some letter
3  saying what's going to happen, so I will not stay up nights
4  waiting for it.
5      Okay. Is there anything pending in front of Judge
6  Jenkins that we can take care of in light of this order? What
7  do you have got -- are there any discovery issues in front of
8  Judge Jenkins that have been sort of stayed?
9      MR. RUBINSTEIN: I think the only issue that was in
10  front of Judge Jenkins was the CW issue, am I wrong, and Suite
11  11i. I think all discovery issues in front of Judge Jenkins --
12      THE COURT: Is there is a Special Master application,
13  or did I deny that?
14      MR. RUBINSTEIN: I think it's been withdrawn, since
15  it's ours. If not, we withdraw it.
16      MR. SOLOMON: Defendants have moved to disqualify us,
17  but we hope you will see us again; but Judge Jenkins is getting
18  that one.
19      THE COURT: I won't comment on that one. If you
20  would communicate to Judge Jenkins with respect to the matters
21  that he actually has got pending, that they were taken care of
22  by the discovery plan.
23      MR. WILLIAMS: Just a quick question, your Honor.
24  With regard to the non-parties, I don't know if it makes sense
25  to send them the order on the entire discovery plan, but I

 

Hearing before Spero  3/1/2005  10:02:00 AM

161

1    think it would make sense if -- even if we carve out a separate
2    order for the non-parties because it will -- there will be some
3    difficulty getting them to comply without seeing an order from
4    the Court because they were awaiting an order on this issue.
5        THE COURT: I understand that.  Why not?  I mean, I
6    don't know.  There is not going to be anything very secret in
7    this order.  I think you should just have one order, one plan
8    and --
9        MR. WILLIAMS:  Just send him the entire plan.
10       THE COURT:  You are going to have to provide
11    something with respect to them, like the stay is lifted with
12    respect to the ones that are done to the extent of the
13    following subject matters or whatever, however you are going to
14    put it, and then you give them that.  And you work out how you
15    deal with that, okay?
16        Okay.  Anything else I can help you with?
17        (No response.)
18        THE COURT:  You did a very good job.  I enjoyed it.
19    I thought I would never say that about a discovery dispute, but
20    thank you all.
21        (Whereupon, further proceedings in the
22        above matter were adjourned.)
23
24            --oo--
25


162

1
2
3            CERTIFICATE OF REPORTER
4
5        I, DEBRA L. PAS, Official Reporter for the United
6    States Court, Northern District of California, hereby certify
7    that the foregoing proceedings in C01-0988 MJJ, IN RE ORACLE
8    SECURITIES LITIGATION were reported by me, a certified
9    shorthand reporter, and were thereafter transcribed under my
10    direction into typewriting; that the foregoing is a full,
11    complete and true record of said proceedings as bound by me at
12    the time of filing.
13        The validity of the reporter's certification of said
14    transcript may be void upon disassembly and/or removal
15    from the court file.
16
17        _____
18        Debra L. Pas, CSR 11916, CRR, RMR, RPR
19            Wednesday, March 2, 2005
20
21
22
23
24
25

### CERTIFICATE OF REPORTER

I, DEBRA L. PAS, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C01-0988 MJJ, IN RE ORACLE SECURITIES LITIGATION were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_Debra L. Pas_

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, March 2, 2005