# EXHIBIT 14 part 1

1 | LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
2 | MARK SOLOMON (151949)
DOUGLAS R. BRITTON (188769)
3 | VALERIE L. McLAUGHLIN (191916)
GAVIN M. BOWIE (235532)
4 | STACEY M. KAPLAN (241989)
655 West Broadway, Suite 1900
5 | San Diego, CA 92101
Telephone: 619/231-1058
6 | 619/231-7423 (fax)
marks@lerachlaw.com
7 | dougb@lerachlaw.com
valeriem@lerachlaw.com
8 | gbowie@lerachlaw.com
– and –
9 | SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
10 | ELI R. GREENSTEIN (217945)
MONIQUE C. WINKLER (213031)
11 | 100 Pine Street, Suite 2600
San Francisco, CA 94111
12 | Telephone: 415/288-4545
415/288-4534 (fax)
13 | shawnw@lerachlaw.com
willowr@lerachlaw.com
14 | elig@lerachlaw.com
moniquew@lerachlaw.com

15

Lead Counsel for Plaintiffs

16

UNITED STATES DISTRICT COURT

17

NORTHERN DISTRICT OF CALIFORNIA

18

| In re ORACLE CORPORATION SECURITIES LITIGATION | ) ) ) ) | Master File No. C-01-0988-MJJ |
|---|---|---|
| | | CLASS ACTION |
| This Document Relates To: | ) ) ) ) ) | DRIFTON FINANCE CORPORATION'S SECOND SUPPLEMENTAL RESPONSES TO DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS |
| ALL ACTIONS. | | |

1　　　　Pursuant to Fed. R. Civ. P. 26 and 33 as well as Civil L.R. 33-1, plaintiff Drifton Finance

2　Corporation hereby responds and objects to Defendants' Second Set of Interrogatories to Plaintiffs

3　(the "Interrogatories"). All responses contained herein are based only upon such information and

4　documents presently available and specifically known to Drifton Finance Corporation. Further

5　independent discovery, independent investigation, legal research and analysis may supply additional

6　facts and/or add meaning to the known facts. Moreover, the responses below are given without

7　prejudice to Drifton Finance Corporation's right at trial or other proceedings to produce evidence of

8　any subsequently discovered fact or facts that may later develop.

9　**I.　　GENERAL OBJECTIONS**

10　　　　Drifton Finance Corporation generally objects to the Interrogatories on the following

11　grounds, each of which is incorporated by reference in the responses to the individual interrogatories

12　below. All responses set forth herein are subject to and without waiver of any of these General

13　Objections:

14　　　　1.　　　Drifton Finance Corporation objects to the Interrogatories to the extent they seek to

15　impose obligations on Drifton Finance Corporation beyond those imposed by the Federal Rules of

16　Civil Procedure and the Local Civil Rules.

17　　　　2.　　　Drifton Finance Corporation objects to the Interrogatories to the extent that they call

18　for the disclosure of information protected by the attorney-client privilege, the attorney work product

19　doctrine and/or any other applicable privilege or protection. This includes interrogatories that seek

20　disclosure of "all facts" or "all reasons" which would necessarily call for attorney work product.

21　Such responses that may occur pursuant to the Interrogatories shall not include any information

22　protected by such privileges or doctrines. Inadvertent production of any such information is not

23　intended to be, and shall not operate as, a waiver of any applicable privilege, protection, or

24　immunity, in whole or in part.

25　　　　3.　　　Drifton Finance Corporation objects to the Interrogatories to the extent that they

26　impose a duty to seek out information and documents which are not in Drifton Finance

27　Corporation's possession, custody or control.

28

1    4.     Drifton Finance Corporation objects to the Interrogatories on the ground of undue

2  burden to the extent the Interrogatories seek information that is equally available to the Oracle

3  defendants or information that originated in the Oracle defendants' possession, custody or control.

4    5.     Drifton Finance Corporation objects to the Interrogatories to the extent they seek

5  information that can be found in the pleadings in this action.

6    6.     Drifton Finance Corporation objects to the Interrogatories to the extent they are

7  overly broad and unduly burdensome.

8    7.     Drifton Finance Corporation objects to the Interrogatories to the extent that they are

9  vague, ambiguous, complex or confusing as to make a meaningful or complete response impossible.

10    8.     Drifton Finance Corporation objects to the Interrogatories to the extent they

11  prematurely seek information related to expert(s), expert testimony or opinion at a time when no

12  experts have been designated.

13    9.     Drifton Finance Corporation objects to the Interrogatories to the extent they fail to

14  state with sufficient particularity the information to be provided.

15    10.    Drifton Finance Corporation objects to the Interrogatories to the extent that they call

16  for a legal conclusion, a legal argument or constitute a contention discovery request that is premature

17  at this stage of the litigation and is invasive of the attorney work product doctrine.

18    11.    Drifton Finance Corporation objects to the Interrogatories to the extent they seek

19  information that may be protected by the right to privacy recognized under the United States

20  Constitution, or any other federal or state law.

21    12.    Drifton Finance Corporation objects to the Interrogatories to the extent they seek

22  information neither relevant to this litigation nor reasonably calculated to lead to the discovery of

23  admissible evidence.

24    13.    Drifton Finance Corporation objects to the Interrogatories to the extent they seek

25  proprietary or trade-secret information.

26    14.    Drifton Finance Corporation objects to the Interrogatories as overbroad and unduly

27  burdensome to the extent they provide no limitation as to time.

28

1    15.    Drifton Finance Corporation objects to the Definitions to the extent that they are
2  overbroad, vague, ambiguous, compound and render each interrogatory unintelligible.

3    16.    Drifton Finance Corporation objects to the definition of "Lead Plaintiffs" to the extent
4  that it includes any and all of their advisors, accountants, consultants, agents, representatives,
5  attorneys and all other persons acting on their behalf in this matter.

6    17.    Drifton Finance Corporation further objections to the definition of "Lead Plaintiffs"
7  to the extent it includes 1199 SEIU Greater New York Pension Fund, UFCW Local 56 Retail Meat
8  Pension Fund and Robert D. Sawyer, whom Drifton Finance Corporation does not have custody,
9  possession or control of.

10    18.    Drifton Finance Corporation objects to the definition of "You" or "Your" to the
11  extent that it includes any and all of their advisors, accountants, consultants, agents, representatives,
12  attorneys and all other persons acting on their behalf in this matter.

13    19.    Drifton Finance Corporation further objects to the definition of "You" or "Your" to
14  the extent it includes 1199 SEIU Greater New York Pension Fund, UFCW Local 56 Retail Meat
15  Pension Fund and Robert D. Sawyer, whom Drifton Finance Corporation does not have custody,
16  possession or control of.

17    20.    Drifton Finance Corporation objects to the definition of "Defendants" as vague,
18  ambiguous, overbroad and imposing an undue burden on Drifton Finance Corporation in responding
19  to the Interrogatories.

20    21.    Drifton Finance Corporation objects to the definitions of "Oracle Securities" as vague
21  and ambiguous.

22    22.    Drifton Finance Corporation further objects to the definition of "Purported Class
23  Period" as vague, ambiguous and a mischaracterization of the complaint. The Class Period in this
24  action is between December 14, 2000 and March 1, 2001 as set forth in Plaintiffs' Revised Second
25  Amended Complaint for Violations of the Federal Securities Laws ("RSAC").

26    23.    Drifton Finance Corporation generally objects to the Instructions to the extent they
27  seek to impose obligations on Drifton Finance Corporation beyond those imposed by the Federal
28  Rules of Civil Procedure and the Local Civil Rules.

1    24.   Drifton Finance Corporation objects to Instruction No. 1 to the extent that it calls for

2 the disclosure of information protected by the attorney-client privilege and/or the attorney work

3 product doctrine and is unduly burdensome.

4    25.   Drifton Finance Corporation further objects to Instruction No. 1 to the extent it

5 renders the Interrogatories vague, ambiguous, overly broad and unduly burdensome.

6    26.   Drifton Finance Corporation further objects to Instruction No. 1 to the extent that it

7 makes each interrogatory in which it applies compound.

8    27.   Drifton Finance Corporation further objects to Instruction No. 1 to the extent that they

9 impose a duty to seek out information which is not Drifton Finance Corporation's possession,

10 custody or control.

11    28.   Drifton Finance Corporation objects to Instruction No. 2 to the extent that it calls for

12 the disclosure of information protected by the attorney-client privilege and/or the attorney work

13 product doctrine and is unduly burdensome.

14    29.   Drifton Finance Corporation further objects to Instruction No. 2 to the extent it

15 renders the interrogatories vague, ambiguous, overly broad and unduly burdensome.

16    30.   Drifton Finance Corporation further objects to Instruction No. 2 to the extent that it

17 makes each interrogatory in which it applies compound.

18    31.   Drifton Finance Corporation further objects to Instruction No. 2 to the extent that they

19 impose a duty to seek out information which is not in Drifton Finance Corporation's possession,

20 custody or control.

21    32.   Drifton Finance Corporation objects to Instruction No. 3 to the extent that it calls for

22 the disclosure of information protected by the attorney-client privilege and/or the attorney work

23 product doctrine and is unduly burdensome.

24    33.   Drifton Finance Corporation further objects to Instruction No. 3 to the extent it

25 renders the interrogatories vague, ambiguous, overly broad and unduly burdensome.

26    34.   Drifton Finance Corporation further objects to Instruction No. 3 to the extent that it

27 makes each interrogatory in which it applies compound.

28

1    35.    Drifton Finance Corporation further objects to Instruction No. 3 to the extent that it
2  imposes a duty to seek out information which is not in Drifton Finance Corporation's possession,
3  custody or control.

4    36.    Drifton Finance Corporation objects to Instruction No. 4 to the extent that it calls for
5  the disclosure of information protected by the attorney-client privilege and/or the attorney work
6  product doctrine and is unduly burdensome.

7    37.    Drifton Finance Corporation further objects to Instruction No. 4 to the extent it
8  renders the interrogatories vague, ambiguous, overly broad and unduly burdensome.

9    38.    Drifton Finance Corporation further objects to Instruction No. 4 to the extent that it
10  makes each interrogatory in which it applies compound.

11    39.    Drifton Finance Corporation further objects to Instruction No. 4 to the extent that it
12  imposes a duty to seek out information which is not in Drifton Finance Corporation's possession,
13  custody or control.

14    40.    Drifton Finance Corporation objects to Instruction No. 5 as vague and ambiguous.

15    41.    Drifton Finance Corporation generally objects to the Instructions to the extent that
16  they impose a duty to seek out information which is not in Drifton Finance Corporation's possession,
17  custody or control and because they are unduly burdensome.

18    42.    Drifton Finance Corporation's decision to provide information, notwithstanding the
19  objectionable nature of any of the Interrogatories themselves, should not be construed as: (a) an
20  admission that the material is relevant; (b) a waiver of the General Objections or the objections
21  asserted in response to a specific interrogatory; or (c) an agreement that an interrogatory for similar
22  information in this or any other related proceedings will be treated in a similar manner.

23    43.    In responding to the Interrogatories, Drifton Finance Corporation does not in any way
24  waive or intend to waive any privilege or objection, but rather intends to preserve and is preserving
25  the following:

26        (a)    all objections as to the competency, relevancy, materiality and admissibility of
27  any interrogatory, Drifton Finance Corporation's response or the subject matter;

28

1            (b)     all objections as to vagueness, ambiguity or other infirmity in the form of the

2 Interrogatories and any objections based on the undue burden imposed by the Interrogatories;

3            (c)     all rights to object on any ground to the use of any of the responses, or their

4 subject matter, in any subsequent proceedings, including the trial of this or any other action;

5            (d)     all rights to object on any ground to any further document requests or

6 interrogatories or other discovery requests involving or related to the subject matter of the

7 Interrogatories;

8            (e)     the right to supplement responses to the Interrogatories prior to trial; and

9            (f)     any and all privileges and/or rights under the applicable rule under the Federal

10 Rules of Civil Procedure or other statutes, guidelines or common law.

11       44.     The failure to object on a particular ground or grounds shall not be construed as a

12 waiver of Drifton Finance Corporation's right to object on any additional grounds.

13       45.     Drifton Finance Corporation reserves the right to supplement and/or amend the

14 specific objections and responses set forth herein.

15 **II.     SPECIFIC OBJECTIONS AND RESPONSES**

16 INTERROGATORY NO. 5:

17      Identify any Communication made by any Defendant during the purported Class Period that

18 You claim to be materially false or materially misleading.

19 RESPONSE TO INTERROGATORY NO. 5:

20      Drifton Finance Corporation hereby incorporates the General Objections above as if set forth

21 herein.

22      Drifton Finance Corporation further objects to this interrogatory on the grounds that it is

23 compound, vague, ambiguous, harassing, overly broad, unduly burdensome, without reasonable

24 limitation in its scope and seeks information that is neither relevant nor reasonably calculated to lead

25 to the discovery of admissible evidence.

26      Drifton Finance Corporation further objects to this interrogatory on the grounds that the term

27 "claim" is vague and ambiguous.

28

1    Drifton Finance Corporation further objects to this interrogatory to the extent it seeks
2  disclosure of information protected by the attorney-client privilege and/or the attorney work product
3  doctrine.

4    Drifton Finance Corporation further objects to this interrogatory to the extent that it seeks to
5  impose upon Drifton Finance Corporation a duty to seek out information and documents which are
6  not in Drifton Finance Corporation's possession, custody or control.

7    Drifton Finance Corporation further objects to this interrogatory as premature to the extent it
8  seeks facts and/or information that are subject to ongoing or future discovery – including
9  information to be obtained during the depositions of and document production by the Oracle
10  defendants and various third parties – or expert opinion.

11    Drifton Finance Corporation further objects to this interrogatory on the grounds that it
12  constitutes a contention discovery request that is premature at this stage of the litigation.

13    Subject to and without waiving the foregoing specific and general objections, Drifton
14  Finance Corporation directs defendants to the RSAC for statements made by defendants that are
15  materially false and/or misleading.

16  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

17    The defendants disseminated the following false and misleading communications that
18  defendants made during the class period:

19    1.    Oracle's December 5, 2000 press release:

20        (a)    "Using its own suite of e-business applications, Oracle beat the goal set by co-
21  founder and CEO Lawrence J. Ellison – cut one billion in costs in one year – passing the billion
22  dollar savings mark before the year was up."

23    2.    Oracle's December 14, 2000 press release:

24        (a)    Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales Up
25  66%, Database Sales Up 19% . . . .   Today, Oracle Corporation announced that second quarter net
26  income increased 62% to $623 million, or $0.11 per share, while revenue grew to $2.7 billion.

27    3.    Oracle's December 14, 2000 2Q01 earnings conference call:

28

1         (a)    And then lastly . . . [about] the economy . . . [a]t this point, we see no impact
2 or slowing in our business.  We have seen no slowing of our business.

3         (b)    [S]o the numbers I'm going to give you here, for database . . . we're thinking,
4 you know, 15-to-20.  You have to add five points to that, in terms of real (constant) dollar growth, or
5 20-to-25.  Applications, we're thinking 75, or potentially better.  You'd have to add five points to
6 that.

7         (c)    So I would assume, 12 cents would be a reasonable number at this point.  I
8 don't think history is going to be a lot different, here.

9         (d)    The good news about applications, this quarter, is that every part of the little
10 sub-markets that we're in, we're strong.  And every geography, (we're) strong, Europe, Asia, U.S.
11 So there's nothing that we – no weakness in our applications business and the pipelines at every one
12 of these geographies looks astounding for this next quarter.

13         (e)    [Y]ou can buy our complete E-Business Suite, where all the pieces are
14 designed and engineered to fit together, and no systems integration is required.  It's up and running
15 in months.  You get the savings in months.  It costs you less, and it takes less time to install.

16    4.    December 14, 2000 statement by Jeff Henley reported by Bloomberg:

17         (a)    "The economy is slowing . . . .  It's just not having a negative impact on our
18 business."

19    5.    December 15, 2006 Jeff Henley interview with Radio Wall Street:

20         (a)    [T]he economy right now even though it's slowing doesn't seem to be
21 affecting us.  We see no difference in demand for our upcoming third fiscal quarter.

22         (b)    [S]o far we look pretty hard at indicators.  We're seeing no softening in our
23 business.

24         (c)    "If they [Oracle's customers] have to slow down on discretionary spending,
25 it's not going to be on e-business," Henley said.

26         (d)    The margins were continuing to expand nicely and the application business
27 was really picking up steam.  He saw no difference in demand for the upcoming fiscal Q3.

28

1        (e)     The application[s] business was going to be solid and steady. But the real

2 momentum in the much higher growth was going to be in the applications business. . . .

3       6.     December 15, 2000 Ellison statement reported by Bloomberg:

4        (a)     The economic slowdown isn't hurting Oracle, said Oracle Chief Executive

5 Larry Ellison, because the company has spent the past three years updating its product line to focus

6 on software that helps companies use the Internet to cut costs and boost efficiency.

7       "The whole (idea behind Oracle 11i) is to start saving money fast."

8       7.     January 9, 2001 Sanderson statement reported by Salomon Smith Barney:

9        (a)     The suite is pre-integrated and fully interoperable out of the box, helping to

10 lower consulting costs and time-to-value.

11       (b)     Oracle sees robust demand for both its database and applications business.

12 Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and

13 scheduling, CRM, and SCM products are also performing well. Oracle says it is also seeing

14 sustained demand for its database product, despite industry-wide concern over contracting IT

15 budgets. 3,500 copies of applications shipped – pipeline looks strong. Sanderson noted two trends

16 driving demand for databases is demand for the 11i applications that are typically bundled with the

17 database as well as applications of other vendors that rely on the functionality of the Oracle database.

18       8.     January 20, 2001 Sanderson statement reported by RealMoney.com:

19        (a)     "You know, it's a big hill to climb. Every year we climb that hill. I expect

20 we'll do it again. Our pipelines are strong, and we're well-positioned from a products perspective,

21 so it's all about execution."

22       9.     January 11, 2001 statement of Stephanie Aas reported by *Bloomberg*:

23        (a)     Company spokeswoman Stephanie Aas today said Oracle has yet to see any

24 signs that its business is being hurt by the economic slowdown or reported cuts to information-

25 technology budgets. . . . "Obviously the economy is a wild card. So if we went into a recession or

26 there is a sharp downturn [in the economy], we could be impacted . . . . But we're not seeing it

27 now."

28       10.     January 24, 2001 statement by Jennifer Glass as reported by Bloomberg:

1         (a)     "Oracle Corp. Chief Executive Larry Ellison canceled plans to appear on a

2 PBS television program that was to be taped today, because he is suffering from severe laryngitis."

3      11.     February 6, 2001 Technical Whitepaper:

4         (a)     Oracle's CRM suite is both complete and integrated . . . .  No systems

5 integration is required to install the Oracle CRM suite.

6         (b)     In fact, systems integration labor usually runs many times the cost of the

7 software or the hardware needed to run the system – and the customer gets to pay for it.  To install

8 the Oracle CRM suite, no systems integration is required.  And because the CRM suite consists of

9 true Internet applications, every application works in every country, every major language, and every

10 major currency.

11         (c)     Oracle employs more than 7,000 direct sales representatives in 60 countries

12 and in seven global business units.  All Oracle sales reps are using Oracle Sales Online for customer

13 management, pipeline management, forecasting, and external financial reporting. . . .

14         (d)     Oracle's financial organization also uses this application to prepare reports for

15 management and for analyst calls.  The company does business in 25 local currencies, with one

16 reporting currency (U.S. dollars).  After e-mail, Sales Online is the most-used application at Oracle.

17         (e)     Global Sales Forecast:  Can you state your exact global sales forecast, up to

18 the minute? . . . covering all geographies, all lines of business, all products, all services, all

19 customers, all partners – and including all licenses, product renewals, support contracts, Web-based

20 sales, call center telebusiness, direct business, mail catalogs, and business through partners and other

21 channels?  Can the forecast reflect management judgments as well as the estimates of the sales reps?

22 Can you review opportunity data and identify which opportunities your sales organizations are

23 committed to?  Can you see multiple views of that information – one by manager and one by

24 salesperson?

25      12.     February 7, 2001 statement of Jeff Henley reported by First Union Securities, Inc.:

26         (a)     On February 7th, we met with management of Oracle, including CFO Jeff

27 Henley at Oracle Headquarters.  We note the following points regarding our meeting:

28

- Oracle is not seeing the effects of a slowing economy at this point, but next several weeks will be critical.

- Management reiterates guidance of 15-20% y/y database revenue growth and 75% y/y applications revenue growth for FQ301.

13.    February 7, 2001 Company statement/Jeff Henley statements reported by Deutsche Bank Alex Brown:

(a)    Yesterday, we checked in with Oracle for a mid-quarter update with CFO Jeff Henley and VPs in the server and applications development organizations.

(b)    According to management, it has yet to see macro-related weakness in its business. . . .

(c)    . . . Barring a severe economic downturn, management sees continued growth driven by strong demand in key segments such as supply chain, customer relationship management and collaboration.

(d)    Mr. Henley reiterated that the Company's outlook and guidance were unchanged for F3Q'01 (Feb).

14.    February 9, 2001 statement by Oracle's Jennifer Glass reported on Bloomberg:

(a)    "Oracle is still upbeat about its prospects for earnings growth, which will be fueled by a new suite of Internet-friendly business software dubbed Oracle 11i," spokeswoman Jennifer Glass said.

(b)    "We haven't changed our projections at all," Glass said. "This slowdown is going to provide new opportunities for Oracle as companies need to streamline and be more strategic about the technology they buy."

15.    February 13, 2001 statement by Sanderson reported by Street.com:

(a)    As an example, [Sanderson] said one recent deal he's involved in wasn't scheduled to close until Oracle's fourth quarter, which ends in May.  Instead, that deal should now close shortly.

1          (b)    "I met with the COO and he decided he wanted to do it in February [instead of

2    May]," Sanderson said.

3          (c)    Sanderson said its database and application software business are strong.

4          (d)    "Actually, our pipelines around applications and database have never been

5    stronger," Sanderson said.

6        16.    February 13, 2001 Sanderson statements at Goldman Sachs Investor Conference:

7          (a)    "For example, in the sales area, in the sales automation area, I can now –

8    Larry can look at, for example, our forecast on a global basis, our forecast around the world up to the

9    minute at any level of detail that you want to see. . . . And if we go back in five minutes later and

10   look at what our forecast is, it's different. Because some rep around he world has changed the

11   forecast. Now I can see every deal out there that my reps around the world are working."

12       17.    February 13, 2001 statement by defendant Sanderson at Goldman Sachs conference

13   question and answer session:

14         Q.    Sandy, I'm curious about this new sales forecasting you have, how
                 that's working.

15         A.    It's working great.

16         Q.    As you get together every week and sort of roll up your numbers, the

17               economy – what's the sense, what are you hearing from the field in
                 terms of how – the economy and sales cycles, anything changing

18               there?

19         A.    We're actually – I guess I'd start out by saying that our pipelines are
                 – at application and database have never been stronger. And that

20               continues to be the case.

21       18.    February 21, 2001 statement of Jeff Henley reported by Deutsch Bank:

22         (a)    CFO Jeff Henley gave a brief presentation to the financial community, but

23   offered no commentary on the current quarter (Company is in its quiet period) and no change to

24   guidance. Management still expects growth in applications license revenue to accelerate in the

25   second half of fiscal 2001 (May) above the 43% and 66% reported in the first two fiscal quarters.

26       19.    February 21, 2001 statement by the Company reported by First Union Securities:

27         (a)    Our conversations with management continue to indicate that the pipeline is

28   strong both domestically and internationally for applications and database. Management continues

DRIFTON FINANCE CORPORATION'S SECOND SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS - C-01-0988-MJJ    - 12 -

1 | to reiterate their guidance and belief that absent a material downturn in the economy their guidance
2 | will hold up.

3          20.      February 21, 2001 statement by Jeff Henley reported by Robertson Stephens:

4          (a)      At an analyst briefing on Tuesday evening, CFO Jeff Henley maintained his
5 | positive outlook and guidance of 75% year/year growth in applications and 15-20% year/year growth
6 | in database servers for both the February and May quarters. Consistent with recent statements,
7 | Henley does not expect the slowing economy – barring a serious recession – to significantly impact
8 | results over the near-term. . . .

9          21.      February 22, 2001 statement by Jeff Henley reported by William Blair & Co.:

10          (a)      Oracle management was positive during the formal analyst sessions (which
11 | were Web-simulcast due to regulation FD). Specifically, CFO Jeff Henley commented that since
12 | Oracle participates in high ROI software, it is not clear that it will see much impact (negative) on its
13 | business due to the weakening economy. He also said that the economy is a wildcard, but he
14 | suspects that Oracle will not be negatively affected unless there is a serious recession. It also is
15 | important to note that if Oracle management were concerned about the quarter, we believe it would
16 | have used the analyst session as an opportunity to lower estimates. According to Mr. Henley,
17 | business looks good, He was very bullish in the sessions. We want to quote a few things he said. In
18 | regard to applications growth, he said that, "The second half growth will be as good, or better, than
19 | the 69% growth posted in the first half." As for the economy, he commented that, "ORCL is not
20 | seeing an impact."

21          22.      Oracles Sales Online Datasheet:

22          (a)      Oracle Sales Online provides sales professionals with complete customer
23 | overviews at each stage of the sales process.

24          •      Global Forecast Reporting: Oracle Sales Online consolidates divisional
25                  forecasts within multiple currencies to provide sales executives with a global
26                  view of their company revenue forecast. Senior executives can view global
27
28

1             roll-ups of sales forecasts across geographic regions, currencies, sales

2             organizations, and product lines. . . .

3        •    Integration with Oracle Business Intelligence System: Oracle Sales

4             Intelligence provides sales teams with a real-time, enterprise view of sales to

5

6             help them meet quotas, assess current performance, and make continuous

7             improvements.

8    23.     February 13, 2001 Sanderson statement at Goldman Sachs conference:

9            "So not only do we have, you know, for example, an E- business Suite,
            Which I'll tell you more about. But its basically ERP and CRM all integrated

10          together. But its written in 23 different languages , including Spanish and
           Latin American Spanish, Portugal, Portuguese and Brazilian Portuguese as

11          being four different languages but we have also taken care of the localization
           requirements around the world as well."

12

13   24.     February 21, 2001 statement by defendant Ellison at AppsWorld:

          (a)     We were the first Company to use this eBusiness suite and in the very first

14  year we put it in, we saved $1 billion.

15          (b)     In fact, we recommend that you start with, you try a component of the suite

16  and then you add it in. Now the nice thing is it's like Lego blocks. Once you have one piece in, the

17  other pieces just snap together. There's no systems integration required. The key thing is, you can

18  install just one piece and then again install another piece. No systems integration. You just basically

19  turn it on or snap it together. . . . Plug and play. It is absolutely, all the pieces within the suite are

20  literally plug and play.

21    25.     March 1, 2001 Statements by defendant Oracle to BlueStone Capital analyst:

22     "[M]anagement indicated last week that Oracle had not experienced any slowdown in

23  business this quarter" and "Oracle's business continues to grow; the current pipeline is as strong as it

24  has ever been, according to management."

25

26

27

28

1 | INTERROGATORY NO. 6:

2 Identify any material information that You contend was not disclosed by any Defendant
3 during the purported Class Period and Identify the Communication or Communications made by any
4 Defendant that You contend imposed a duty to disclose the omitted information.

5 | RESPONSE TO INTERROGATORY NO. 6:

6 Drifton Finance Corporation hereby incorporates the General Objections above as if set forth
7 herein.

8 Drifton Finance Corporation further objects to this interrogatory on the grounds that it is
9 compound, vague, ambiguous, harassing, overly broad, unduly burdensome, without reasonable
10 limitation in its scope and seeks information that is neither relevant nor reasonably calculated to lead
11 to the discovery of admissible evidence.

12 Drifton Finance Corporation further objects to this interrogatory on the grounds that the
13 phrase "any material information" is vague and ambiguous.

14 Drifton Finance Corporation further objects to this interrogatory on the grounds that it is
15 overly broad in that it seeks information not related to Oracle.

16 Drifton Finance Corporation further objects to this interrogatory to the extent it seeks
17 disclosure of information protected by the attorney-client privilege and/or the attorney work product
18 doctrine.

19 Drifton Finance Corporation further objects to this interrogatory to the extent it calls for a
20 legal conclusion.

21 Drifton Finance Corporation further objects to this interrogatory to the extent that it seeks to
22 impose upon Drifton Finance Corporation a duty to seek out information and documents which are
23 not in Drifton Finance Corporation's possession, custody or control.

24 Drifton Finance Corporation further objects to this interrogatory as premature to the extent it
25 seeks facts and/or information that are subject to ongoing or future discovery – including
26 information to be obtained during the depositions of and document production by the Oracle
27 defendants and various third parties – or expert opinion.

28

1    Drifton Finance Corporation further objects to this interrogatory on the grounds that it

2  constitutes a contention discovery request that is premature at this stage of the litigation.

3    Subject to and without waiving the foregoing specific and general objections, Drifton

4  Finance Corporation directs defendants to the RSAC for examples of material information that was

5  not disclosed by defendants.

6  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:

7    Defendants failed to disclose the following material information:

8    • Oracle customers had rejected/declined to purchase 11i or reduced purchases and

9  implementation commitments modules because the product did not work as represented.

10    • Oracle customers had demanded and Oracle had paid millions in cash or service

11  concessions due to problematic and failed implementations of 11i and its individual modules.

12

13    • Oracle, though publicly stating that customers were "live" on 11i, repeatedly failed to

14  disclose that few, if any, customers were "live" on the full 11i suite software with the ERP and CRM

15  modules working together as represented.

16    • Oracle could not consistently demonstrate a working full integrated suite of software

17  to prospective customers, which cost them millions in lost sales in each U.S. license division.

18  Sanderson moved deals out of his forecast if the demonstration went bad.

19

20    • Defendants' issued guidance to investors based on a forecasting process that failed to

21  take into consideration the macroeconomic environment that Oracle faced entering Q301 and the

22  change to Oracle's forecasting process that Ellison mandated in Q201.

23    • The failure to account for these changes rendered Oracle's forecast inaccurate.

24    • Oracle's internal sales pipeline was knowingly inflated to include deals that were

25  stale or had very low likelihood of materializing in the quarter.

26

27    • Defendants did not believe the pipeline growth rates at the beginning of the quarter

28  because they were too good to be true.

1        •     Oracle sales growth rates during the Class Period were in fact declining for both its

2 database and applications products.

3        •     Oracle's sales pipeline growth was declining during the Class Period. The drop in

4 Oracle's pipeline was unusual as compared to prior quarters both in terms of the timing and size of

5

6 the drop.

7        •     The pipeline coverage ratio dropped consistently and dramatically throughout the

8 quarter while the conversion ratio climbed to as high as 64% of the pipeline for the finance

9 department.

10        •     The "Comfort/Growth Gap" was unusually narrow in Q301, showing that the pipeline

11

12 growth was decelerating in comparison to the forecasted revenue growth when compared to prior

13 quarters.

14        •     Oracle's product based forecasts were inaccurate.

15        •     The field forecasted earnings per share and database growth results below guidance in

16 every week of the Class Period. The field's forecast for applications growth dropped precipitously

17 throughout the Class Period and were below guidance at the beginning of February.

18        •     The 2Q01 Covisint transaction, while the largest in the Company's history, was not

19 indicative of an ongoing increase in growth trends relevant to the future sales of the Company's

20

21 future sales growth trends.

22        •     Oracle's sales staff prior to and during the Class Period had communicated to senior

23 Oracle executives that sales were declining during the Class Period.

24        •     11i was released well before testing had been completed (or in some instances started)

25 on several of its modules including, but not limited to, its CRM module and its Order Management

26 modules.

27

28

- Oracle's 2Q01 financial statements were false and misleading, materially overstating revenue and EPS.

- But for a November 30, 2000 last day of the quarter swap transaction with Hewlett Packard Oracle ("HP"), according to its own methods for reporting EPS, the Company would have reported only $0.10 per share for 2Q01.

- The 2Q01 HP transaction had little economic value in that Oracle was only able to secure the deal with a promise to purchase a substantially equal amount of products from HP with millions in penalties for failure to abide by the agreement.

- The Company had improperly kept money that customers had overpaid or double paid and had not informed customers of the fact nor returned said money. Instead, Oracle used customer overpayments and duplicate payments to improperly adjust the Company's bad debt reserves, for example, and artificially inflate reported earnings.

- During the Class Period, the Company's internal periodic financial results (flash reports, upside reports, pipeline reports) showed material sales growth declines during the Class Period.

- Oracle's own internal attempts to implement the 11i Suite of software in December 2000 and January 2001 had caused substantial delays due to product defects, contributed to reported revenue declines during the Class Period and shut down the Company for weeks.

- 11i, and in particular the CRM module, was not fully developed and riddled with bugs and functionality gaps which made it costly to implement.

- The Company had misrepresented 11i's functional capabilities to customers to convince them to purchase 11i, including conducting sales demonstrations with fake data.

1    • The downturn in the United States economy had affected the Company's ability to

2    increase sales growth of its products in part due to customers spending less on information

3    technology and dot.com customers were going out of business.

4    • During the Class Period, Oracle's internal periodic reports showed that the financial

5    forecast, including earnings forecast for Q301, were declining and reflected that the Company would

6    report earnings below publicly forecasted results.

7

8    • The financial forecast was declining because of reports of bad performance and

9    adverse information in the U.S. license divisions.

10   • Applications customers during the Class Period threatened to cancel, canceled or

11   reduced their purchases or installations of 11i software applications because the Company could not

12   demonstrate that it worked, failing implementations, and or the cost associated with installing the

13   software had skyrocketed.

14

15   • Oracle's implementations partners had experienced substantial difficulty in their

16   attempts to install or implement the software at customer sites and had complained directly to Oracle

17   that the 11i software did not work and communicate demands for refunds to Oracle executives.

18   • Oracle's own consulting organization had before, during and after the Class Period,

19   worked for free at customer sites trying to make 11i software work.

20

21   • Oracle's utilization rates for its consulting organization were below what defendants

22   considered good and had dropped from 74% in Q201 to a forecasted 57% in Q301.  Numerous

23   consultants were on the bench in Q301.

24   • The problems with CRM made Oracle's sales representatives reluctant to sell the

25   product, which cost Oracle millions in applications opportunities.

26

27   • Even though the Company claimed that 11i suite was  designed to be pre-integrated

28   and interoperable and, the development organizations did not develop and design the ERP and CRM

1   software together designed the modules and platforms, but separately which contributed to the

2   failure of the modules to communicate and function in a integrated and interoperable manner as

3   defendants had represented.

4   • 11i, particularly CRM, the patches that were supposed to correct defects were often

5
    not properly tested and they often created more bugs in the software.
6

7   • The Company's largest sales organization NAS, during the Class Period showed

8   significant signs of sales growth declines as a result of the slowing economy and the dot.com bust,

9   among other things.

10  • The dot.com fall out was having a progressively negative impact on Oracle than in

11
    prior quarters and internal reports showed that Oracle could not fill the dot.com void with traditional
12
    brick and mortar sales.
13

14  • NAS reported on January 9, 2000 that the dot.com bubble had burst in the division.

15  • The Company's OPI sales division sales had reported declining-sales growth in

16  periodic reports notwithstanding the 2Q01 Covisint transaction. Oracle analyzed OPI's results

17  without Covisint, which showed negative growth rates throughout Q301 for OPI.

18  • The Company's OSI sales division sales had reported declining sales growth in

19
    periodic reports during the Class Period.
20

21  • Actual results for the first and second month of Q301 were far below prior year

22  results and behind where Oracle needed at the end of each month to meet guidance.

23  • Month end analysis for December and January showed that Oracle was on track to

24  meet the field forecast and not the financial department forecast.

25  • The EVP in the OSI division was advocating special incentives to try to boost Q3

26
    sales.
27

28  • Defendant Sanderson created special programs to build OPI pipeline in Q3 and Q4.

1    • During January 2001, defendants Ellison and Henley were in possession of material

2    nonpublic information at the same time that both individuals exercised options and sold Oracle stock

3    to the public.

4    • Oracle had not and was not using Suite 11i to run its business internally.

5

6    • Key evidence in Oracle's accounting systems concerning debit memo transactions

7    and their accounting history and documents in the files of members of its accounting staff have been

8    admittedly destroyed or altered.

9    • Margins on applications and database sales were deteriorating due to competition

10   from IBM and Microsoft providers and because Oracle's expenses were rising throughout the

11   quarter.

12

13   • Oracle publicly cited customers as 11i references even though those customers were

14   not using 11i.

15   • Oracle had millions in customer overpayments that it kept without the customers'

16   knowledge.

17   • 11i application did not work in every language as Oracle had represented.

18

19   • During 2Q01, Oracle used customer overpayments and unapplied cash by, inter alia,

20   improperly transferring the funds to a bad debt reserve account (which inflated revenue, net income

21   and EPS) and various other revenue and expense accounts (which also inflated revenue, net income

22   and EPS).

23   • Oracle booked hundreds of millions of dollars in adjustments that improperly reduced

24   the account balance of both Accounts receivable and Customer advances and unearned revenue.

25   These adjustments caused Oracle's Days Sales Outstanding ("DSOs") to be understated by at least

26   20%.

27

28

• It had repeatedly violated state escheat laws on hundreds of payments for millions of dollars in funds that Oracle could not or would not return to customers.

• Plaintiff incorporates by reference the information outlined in response to Interrogatory No. 7.

Plaintiff further supplement its responses to Part 2 of Interrogatory No. 6 as follows:

Oracle's December 14, 2000 press release:

(a)    Oracle Net Income Up 62%, Earnings per Share $0.11; Application Sales Up 66%, Database Sales Up 19% . . . . Today, Oracle Corporation announced that second quarter net income increased 62% to $623 million, or $0.11 per share, while revenue grew to $2.7 billion.

26.    Oracle's December 14, 2000 2Q01 earnings conference call:

(a)    And then lastly . . . [about] the economy . . . [a]t this point, we see no impact or slowing in our business.  We have seen no slowing of our business.

(b)    [S]o the numbers I'm going to give you here, for database . . . we're thinking, you know, 15-to-20.  You have to add five points to that, in terms of real (constant) dollar growth, or 20-to-25.  Applications, we're thinking 75, or potentially better.  You'd have to add five points to that.

(c)    So I would assume, 12 cents would be a reasonable number at this point.  I don't think history is going to be a lot different, here.

(d)    The good news about applications, this quarter, is that every part of the little sub-markets that we're in, we're strong.  And every geography, (we're) strong, Europe, Asia, U.S. So there's nothing that we – no weakness in our applications business and the pipelines at every one of these geographies looks astounding for this next quarter.

(e)    [Y]ou can buy our complete E-Business Suite, where all the pieces are designed and engineered to fit together, and no systems integration is required.  It's up and running in months.  You get the savings in months.  It costs you less, and it takes less time to install.

27.    December 14, 2000 statement by Jeff Henley reported by Bloomberg:

1         (a)    "The economy is slowing . . . . It's just not having a negative impact on our

2 business."

3    28.    December 15, 2006 Jeff Henley interview with Radio Wall Street:

4         (a)    [T]he economy right now even though it's slowing doesn't seem to be

5 affecting us. We see no difference in demand for our upcoming third fiscal quarter.

6         (b)    [S]o far we look pretty hard at indicators. We're seeing no softening in our

7 business.

8         (c)    "If they [Oracle's customers] have to slow down on discretionary spending,

9 it's not going to be on e-business," Henley said.

10        (d)    The margins were continuing to expand nicely and the application business

11 was really picking up steam. He saw no difference in demand for the upcoming fiscal Q3.

12        (e)    The application[s] business was going to be solid and steady. But the real

13 momentum in the much higher growth was going to be in the applications business. . . .

14    29.    December 15, 2000 Ellison statement reported by Bloomberg:

15         (a)    The economic slowdown isn't hurting Oracle, said Oracle Chief Executive

16 Larry Ellison, because the company has spent the past three years updating its product line to focus

17 on software that helps companies use the Internet to cut costs and boost efficiency.

18    "The whole (idea behind Oracle 11i) is to start saving money fast."

19    30.    January 9, 2001 Sanderson statement reported by Salomon Smith Barney:

20         (a)    The suite is pre-integrated and fully interoperable out of the box, helping to

21 lower consulting costs and time-to-value.

22         (b)    Oracle sees robust demand for both its database and applications business.

23 Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and

24 scheduling, CRM, and SCM products are also performing well. Oracle says it is also seeing

25 sustained demand for its database product, despite industry-wide concern over contracting IT

26 budgets. 3,500 copies of applications shipped – pipeline looks strong. Sanderson noted two trends

27 driving demand for databases is demand for the 11i applications that are typically bundled with the

28 database as well as applications of other vendors that rely on the functionality of the Oracle database.

31.     January 20, 2001 Sanderson statement reported by RealMoney.com:

(a)     "You know, it's a big hill to climb. Every year we climb that hill. I expect we'll do it again. Our pipelines are strong, and we're well-positioned from a products perspective, so it's all about execution."

32.     January 11, 2001 Statement of Stephanie Aas reported by Bloomberg:

(a)     Company spokeswoman Stephanie Aas today said Oracle has yet to see any signs that its business is being hurt by the economic slowdown or reported cuts to information-technology budgets. . . . "Obviously the economy is a wild card. So if we went into a recession or there is a sharp downturn [in the economy], we could be impacted . . . . But we're not seeing it now."

33.     February 6, 2001 Technical Whitepaper:

(a)     Oracle's CRM suite is both complete and integrated . . . .  No systems integration is required to install the Oracle CRM suite.

(b)     In fact, systems integration labor usually runs many times the cost of the software or the hardware needed to run the system – and the customer gets to pay for it. To install the Oracle CRM suite, no systems integration is required. And because the CRM suite consists of true Internet applications, every application works in every country, every major language, and every major currency.

(c)     Oracle employs more than 7,000 direct sales representatives in 60 countries and in seven global business units. All Oracle sales reps are using Oracle Sales Online for customer management, pipeline management, forecasting, and external financial reporting. . . .

(d)     Oracle's financial organization also uses this application to prepare reports for management and for analyst calls. The company does business in 25 local currencies, with one reporting currency (U.S. dollars). After e-mail, Sales Online is the most-used application at Oracle.

(e)     Global Sales Forecast: Can you state your exact global sales forecast, up to the minute? . . . covering all geographies, all lines of business, all products, all services, all customers, all partners – and including all licenses, product renewals, support contracts, Web-based sales, call center telebusiness, direct business, mail catalogs, and business through partners and other

DRIFTON FINANCE CORPORATION'S SECOND SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS - C-01-0988-MJJ          - 24 -

1  channels? Can the forecast reflect management judgments as well as the estimates of the sales reps?

2  Can you review opportunity data and identify which opportunities your sales organizations are

3  committed to? Can you see multiple views of that information – one by manager and one by

4  salesperson?

5       34.     February 7, 2001 statement of Jeff Henley reported by First Union Securities, Inc.:

6              (a)     On February 7th, we met with management of Oracle, including CFO Jeff

7  Henley at Oracle Headquarters. We note the following points regarding our meeting:

8                    •     Oracle is not seeing the effects of a slowing economy at this point, but next

9                          several weeks will be critical.

10                   •     Management reiterates guidance of 15-20% y/y database revenue growth and

11                         75% y/y applications revenue growth for FQ301.

12

13     35.     February 7, 2001 Company statement/Jeff Henley statements reported by Deutsche

14  Bank Alex Brown:

15             (a)     Yesterday, we checked in with Oracle for a mid-quarter update with CFO Jeff

16  Henley and VPs in the server and applications development organizations.

17             (b)     According to management, it has yet to see macro-related weakness in its

18  business. . . .

19             (c)     . . . Barring a severe economic downturn, management sees continued growth

20  driven by strong demand in key segments such as supply chain, customer relationship management

21  and collaboration.

22             (d)     Mr. Henley reiterated that the Company's outlook and guidance were

23  unchanged for F3Q01 (Feb).

24     36.     February 9, 2001 Statement by Oracle's Jennifer Glass reported on Bloomberg:

25             (a)     "Oracle is still upbeat about its prospects for earnings growth, which will be

26  fueled by a new suite of Internet-friendly business software dubbed Oracle 11i," spokeswoman

27  Jennifer Glass said.

28

1    (b)    "We haven't changed our projections at all," Glass said. "This slowdown is
2  going to provide new opportunities for Oracle as companies need to streamline and be more strategic
3  about the technology they buy."

4    37.    February 13, 2001 statement by Sanderson reported by Street.com:

5    (a)    As an example, [Sanderson] said one recent deal he's involved in wasn't
6  scheduled to close until Oracle's fourth quarter, which ends in May. Instead, that deal should now
7  close shortly.

8    (b)    "I met with the COO and he decided he wanted to do it in February [instead of
9  May]," Sanderson said.

10    (c)    Sanderson said its database and application software business are strong.

11    (d)    "Actually, our pipelines around applications and database have never been
12  stronger," Sanderson said.

13    38.    February 13, 2001 Sanderson statements at Goldman Sachs Investor Conference:

14    (a)    "For example, in the sales area, in the sales automation area, I can now –
15  Larry can look at, for example, our forecast on a global basis, our forecast around the world up to the
16  minute at any level of detail that you want to see. . . . And if we go back in five minutes later and
17  look at what our forecast is, it's different. Because some rep around he world has changed the
18  forecast. Now I can see every deal out there that my reps around the world are working."

19    39.    February 13, 2001 Statement by Defendant Sanderson at Goldman Sachs conference
20  question and answer session:

21    Q.    Sandy, I'm curious about this new sales forecasting you have, how
        that's working.
22
    A.    It's working great.
23
    Q.    As you get together every week and sort of roll up your numbers, the
24        economy – what's the sense, what are you hearing from the field in
        terms of how – the economy and sales cycles, anything changing
25        there?

26    A.    We're actually – I guess I'd start out by saying that our pipelines are
        – at application and database have never been stronger. And that
27        continues to be the case.

28    40.    February 21, 2001 statement of Jeff Henley reported by Deutsch Bank:

1        (a)    CFO Jeff Henley gave a brief presentation to the financial community, but

2 offered no commentary on the current quarter (Company is in its quiet period) and no change to

3 guidance. Management still expects growth in applications license revenue to accelerate in the

4 second half of fiscal 2001 (May) above the 43% and 66% reported in the first two fiscal quarters.

5     41.    February 21, 2001 statement by the Company reported by First Union Securities:

6        (a)    Our conversations with management continue to indicate that the pipeline is

7 strong both domestically and internationally for applications and database. Management continues

8 to reiterate their guidance and belief that absent a material downturn in the economy their guidance

9 will hold up.

10     42.    February 21, 2001 statement by Jeff Henley reported by Robertson Stephens:

11        At an analyst briefing on Tuesday evening, CFO Jeff Henley maintained his positive

12 outlook and guidance of 75% year/year growth in applications and 15-20% year/year growth in

13 database servers for both the February and May quarters. Consistent with recent statements, Henley

14 does not expect the slowing economy – barring a serious recession – to significantly impact results

15 over the near-term. . . .

16     43.    February 22, 2001 statement by Jeff Henley reported by William Blair & Co.:

17        (a)    Oracle management was positive during the formal analyst sessions (which

18 were Web-simulcast due to regulation FD). Specifically, CFO Jeff Henley commented that since

19 Oracle participates in high ROI software, it is not clear that it will see much impact (negative) on its

20 business due to the weakening economy. He also said that the economy is a wildcard, but he

21 suspects that Oracle will not be negatively affected unless there is a serious recession. It also is

22 important to note that if Oracle management were concerned about the quarter, we believe it would

23 have used the analyst session as an opportunity to lower estimates. According to Mr. Henley,

24 business looks good, He was very bullish in the sessions. We want to quote a few things he said. In

25 regard to applications growth, he said that, "The second half growth will be as good, or better, than

26 the 69% growth posted in the first half." As for the economy, he commented that, "ORCL is not

27 seeing an impact."

28     44.    Oracles Sales Online Datasheet:

1              (a)      Oracle Sales Online provides sales professionals with complete customer

2    overviews at each stage of the sales process.

3              •      Global Forecast Reporting: Oracle Sales Online consolidates divisional

4                      forecasts within multiple currencies to provide sales executives with a global

5                      view of their company revenue forecast.  Senior executives can view global

6                      roll-ups of sales forecasts across geographic regions, currencies, sales

7
                       organizations, and product lines. . . .
8

9              •      Integration with Oracle Business Intelligence System: Oracle Sales

10                     Intelligence provides sales teams with a real-time, enterprise view of sales to

11                     help them meet quotas, assess current performance, and make continuous

12                     improvements.

13
        45.      February 13, 2001 Sanderson statement at Goldman Sachs conference:
14
                 "So not only do  we have, you know, for example, an E- business Suite,
15               Which I'll tell you more about.  But its basically ERP and CRM all integrated
                 together.  But its written in 23 different languages , including Spanish and
16               Latin American Spanish, Portugal, Portuguese and Brazilian Portuguese as
                 being four different languages but we have also taken care of the localization
17               requirements around the world as well."

18      46.      February 21, 2001 statement by defendant Ellison at AppsWorld:

19              (a)      We were the first Company to use this eBusiness suite and in the very first

20   year we put it in, we saved $1 billion.

21          In fact, we recommend that you start with, you try a component of the suite and then you add

22   it in.  Now the nice thing is it's like Lego blocks.  Once you have one piece in, the other pieces just

23   snap together.  There's no systems integration required.  The key thing is, you can install just one

24   piece and then again install another piece.  No systems integration.  You just basically turn it on or

25   snap it together. . . .  Plug and play.  It is absolutely, all the pieces within the suite are literally plug

26   and play.

27

28

1  INTERROGATORY NO. 7:

2      Identify all facts that support Your contention in paragraph 16 of the Complaint that
3  "Defendants . . . knew that 3Q01 sales would not meet public revenue and earnings projections,"
4  including the date in 3Q01 on which You allege Defendants knew this fact, and each fact that You
5  allege informed the basis of their knowledge.

6  RESPONSE TO INTERROGATORY NO. 7:

7      Drifton Finance Corporation hereby incorporates the General Objections above as if set forth
8  herein.

9      Drifton Finance Corporation further objects to this interrogatory on the grounds that it is
10 compound, vague, ambiguous, harassing, overly broad, unduly burdensome and without reasonable
11 limitation in its scope.

12     Drifton Finance Corporation further objects to this interrogatory on the basis of the attorney
13 work product doctrine and/or the attorney-client privilege.

14     Drifton Finance Corporation further objects to this interrogatory to the extent it seeks
15 information not in Drifton Finance Corporation's custody, possession or control.

16     Drifton Finance Corporation further objects to this interrogatory to the extent it
17 mischaracterizes the allegations in the RSAC.

18     Drifton Finance Corporation further objects to this interrogatory on the grounds that the
19 phrases "the date in 3Q01 on which You allege Defendants knew this fact" and "each fact that You
20 allege formed the basis of their knowledge" are vague and ambiguous.

21     Drifton Finance Corporation further objects to this interrogatory as premature to the extent it
22 seeks facts and/or information that are subject to ongoing or future discovery – including
23 information to be obtained during the depositions of and document production by the Oracle
24 defendants and various third parties – or expert opinion.

25     Drifton Finance Corporation further objects to this interrogatory on the grounds that it
26 constitutes a contention discovery request that is premature at this stage of the litigation.

27     Subject to and without waiving the foregoing specific and general objections, Drifton
28 Finance Corporation directs defendants to the RSAC.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

• The facts that support the contention in this Interrogatory are listed, in part, in paragraph 16 of the Complaint. Defendants Ellison, Henley, and Sanderson had regular access to critical information about Oracle's business and its ability to meet guidance. Ellison is a hands-on manager who loved getting involved in every detail of the business. Ellison maintained tight control over every aspect of Oracle's operations, including forecasting. Ellison agreed that he was "close to the business, well informed, and very persistent in terms of assembling the facts as to the matters in front of him in which he needs to make decision." Ellison admitted he was a very hands-on CEO who took the initiative to make calls or obtain the necessary information from a variety of sources to be able to make approvals or decide on policies. Oracle promoted 11i and its Oracle Sales Online application as giving senior executives, including each defendant, a global view of sales and revenue forecasts, including the ability to assess current sales performance against targets. Ellison specifically kept track of Oracle sales on a single internal database that covered not only the United States, but the entire world: All of Oracle's information was in one database. Defendants knew exactly how much Oracle had sold in the last hour around the world. OSO was realtime in the sense that every time someone put in a change, you saw it. OSO gave Ellison, Henley, Sanderson and other Oracle executives information about prospective opportunities, dollar amount, probability percentage, the dollar split between applications and technology, and the type of applications that were being projected, among other things. The benefit of OSO was global visibility. As Oracle rolled out OSO, defendants could sit down, go online right at their desks or when they were traveling and go online. Ellison had been using OSO for years and was demanding full compliance as early as September 2000. Part of Ellison's daily routine is a visit to OSO. Oracle purged OSO after the filing of this lawsuit and also destroyed all OSO log-in records for the Class Period. Ellison facilitated the destruction of recorded conversations between himself and Matthew Symonds, the

1  author of the Ellison biography. The defendants would hold forecast meetings on Mondays, where
2  they would look at OSO results up on the screen and talk about what was in OSO.

3          •       Defendants' forecasting process and their reliance on that process to provide guidance
4  to investors in Q301 failed to take into consideration that Ellison had mandated a change to Oracle's
5
6  forecasting process in Q201 (by increasing the risk that Ellison mandated the field include in its
7  forecast) and it ignored the dramatic change in the macroeconomic environment that Oracle faced
8  entering Q301. In October 2000, Ellison intentionally changed the forecasting process to include
9  more risk than in the past. Defendants failed to take this change into consideration when increasing
10 the forecast received from the field in Q301. The forecasting change increased the risk (and
11 therefore the aggressiveness) of the forecast coming from the field. In December 2000 NAS
12
13 followed Ellison's directive by adding $28 million of Judgment at the line of business level and
14 another $39 million at the division level. The other U.S. license divisions also followed Ellison's
15 mandate. The forecasting change caused riskier deals to be included in the pipeline and therefore
16 necessarily increased the size of the pipeline.

17         •       Defendants failed to take into consideration the forecasting change and the severe
18 economic conditions that were then impacting Oracle's business. Q300, the quarter from which
19
20 Oracle used to forecast growth, was the height of the market and the height of an economy that had
21 been described as irrationally exuberant. Ellison himself acknowledged that the strong economy in
22 Q300 and Oracle's performance in that economy set the bar very high (a bar that Ellison demanded
23 to be raised by 30%). The finance director from the NAS division (Oracle's largest sales division)
24 noted at the outset of the quarter that growth comparisons would be tougher in Q301 and Q401
25 because "NAS results took off last year in Q3 and continued into Q4." At the outset of Q301, NAS
26 was seeing a slowdown in large deals and its pipeline was not where it needed to be to meet its
27 $359,977 million quarterly budget. Defendants knew that NAS sales would slow in Q301 and that
28

DRIFTON FINANCE CORPORATION'S SECOND SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS - C-01-0988-MJJ          - 31 -

fact was discussed at the EMC meetings. As of December 8, 2000, NAS had no big deals in the pipeline. As of December 5, 2000, OSO reflected negative 10% per year-over-year growth in the pipeline for OSI while OSI's forecast reflected 50% year-over-year growth. Henley had concerns about each license division before he issued guidance. He knew that NAS had no big deals in the pipeline, that the tech pipeline for OSI was down "a lot," and that the upside for OSI had questions.

• At the outset of Q301, defendants' forecasts effectively double-counted the deals that formed the basis of the field. Sudden growth or shrinkage in the economy would necessarily render Oracle's forecasts unreliable unless accounted for. Defendants deliberately ignored changes in the macro-economic environment to permit the dissemination of inaccurate forecasts. Ellison did not believe Oracle's product forecasts to be accurate. Defendants therefore knew, or recklessly disregarded, as of the date issued, that sales would not meet revenue and earnings protections in Q301.

• Defendants also knew from the beginning of the Class Period that 3Q01 sales would not meet public revenue and earnings projections through Oracle's internal forecasting process and through weekly executive management committee meetings, which all defendants attended every Monday with the EVPs of the U.S. Divisions, Safra Catz and Jennifer Minton for the purpose of discussing their forecasts and how they were performing. Ellison examined any week-to-week changes in the total company and/or division level forecasts and discussed the basis for any such changes. Defendants gave consideration to the historical differences between Q2 and Q3. Defendants were in possession of facts at the beginning of each week in the quarter, informing them that Q3 sales would not meet revenue and earnings protections and that Oracle's business was being adversely affected by the economy. Those dates include, at a minimum, 12/11/00, 12/25/00, 1/15/01, 1/22/01, 1/29/01, 2/5/01, 2/12/01, 2/19/01, 2/26/01, 2/27/01 and 2/28/01. Facts also show that defendants received, and were in possession of, information showing defendants that Oracle

1    would miss guidance and was being adversely affected by the economy at other points in the quarter,

2    as discussed herein.

3        •       Ellison believed that the key intra-quarter forecasting indicators were year-over-year

4    pipeline growth, field sales forecasts, financial department forecasts, actual results for the first and

5    second months of the quarter, and the number and size of the big deals that are potentially going to

6    close in the quarter.  Ellison and Henley claim to have looked at all the performance factors

7    collectively to evaluate the forecasts and to gauge Oracle's intra-quarter performance on an ongoing

8    basis throughout the quarter.  Each of these indicators showed that Oracle's business was being

9    negatively impacted by the downturn in the economy.  Each defendant received reports outlining

10   results for each of these indicators throughout the Class Period, including "Upside Reports," the

11   "Pipeline Reporting Package," and "Americas Forecast Package."[1]

12
13       •       Year-over-year pipeline growth, while as high as 52% in week 1 of the quarter,

14   dropped precipitously in the next few weeks and continued to fall throughout the quarter.  Total

15   Company pipeline growth was 52% on December 11, 2000 and dropped to 34% by December 25,

16   2000.  This represented a $342 million drop in the pipeline in a two week period.  The dramatic

17   decline in the pipeline and pipeline growth so early in the quarter was unusual as compared to the

18   prior quarters, both in terms of the size and the timing of the drop.  Henley did not believe the

19
20   reported pipeline growth at the beginning of Q301.  Henley did not believe that the growth rate was

21   accurate because he felt he was unable to get a good read from people.  Between December 11, 2000

22   and January 22, 2001, Oracle's license pipeline declined $311,900,000 and its pipeline growth rate

23
24   _____

25   [1]     Plaintiffs' allegation that defendants knew that they were going to miss guidance is further
26   supported by Oracle's destruction of numerous documents, including reports that would reveal
     trends and information about Oracle's forecast throughout the quarter.  In fact, Henley reluctantly
27   admitted that Oracle "probably would have" documents that defendants have failed to produce in
     this litigation.

28

declined from 52% to 31%, both of which represent the largest declines occurring at comparable times in any of the previous four quarters. Between December 11, 2000 and January 22, 2001: (a) Oracle's license pipelines for the US Divisions, NAS, OPI, and OSI all declined, individually and collectively, more than they had at comparable times in Q300 and Q201; (b) Oracle's license pipeline growth for the U.S. Divisions combined declined more than it had at comparable times in Q300 and Q201; and (c) Oracle's license pipeline growth for NAS declined more than it had at comparable times in Q300 and Q201. The pipeline growth rates dropped to as low as 29% in February with pipeline itself collapsing nearly $500 million in the month. It dropped $232 million from January 22, 2001 to February 5, 2001, another $121 million by the second week of February, and another $109 million by February 19, 2001. The total pipeline only fell $31 million in the last week of the month. Of the total $800+ million collapse in the pipeline, more than $600 million of it came out of the applications pipeline. In January 2001, the NAS division had only one deal above $5 million in the Q3 pipe. The previous year, NAS had four deals that netted $28 million. There were no other "Covisint" type deals in the pipeline. And the deal cycle was lengthening. The deal cycle (the time it took to close a transaction from beginning to end) for application deals is several months and the cycle for database deals is shorter. When there is an economic downturn Oracle's deal cycle gets longer because deals will take longer to close when companies require more approvals, resulting in slowdowns or cancelled deals. The pipeline is therefore harder to convert in an economic downturn. Oracle was facing an economic downturn in Q301. Defendants knew this at the beginning of the quarter.

•       Ellison reviewed pipeline numbers for the total Company and by geographic divisions. Ellison examined any week-to-week changes in the pipeline figures and discussed the reasons for any such changes at the EMC meetings. Ellison followed the pipeline progress and examined the pipeline closely throughout the quarter and compared changes in pipeline to the prior

year. Ellison is aware that the dynamics of the pipeline are very important. Defendants had access to the information showing that the pipeline had, in fact, fallen rapidly during the first two months of Q301. Defendants knew by December 25, 2000 that Oracle was being adversely impacted by the economy and that the basis for its guidance had changed considerably.

• The decline in Oracle business and in the pipeline had an impact on the conversion and coverage ratios that Oracle utilized to forecast its sales. The Forecast coverage ratio is calculated by dividing the pipeline by the forecast. The Potential coverage ratio is calculating by dividing the pipeline by the Potential. Ellison and others examined the Forecast coverage ratio/Potential coverage ratio to see whether they were reasonable as compared to prior period coverage ratios. If the pipeline coverage ratio was higher than in a prior quarter, defendants would inquire about the quality of the pipeline and have the sales force examine the probability of specific deals closing. Coverage ratios were declining rapidly throughout Q301. The pipeline coverage ratio dropped consistently and dramatically throughout Q301. The behavior of this metric showed each defendant that Oracle was, in fact, feeling the impact of the economic downturn and undermined any belief in Oracle's ability to meet guidance.

• Defendants estimated license revenues by applying the historical pipeline conversion ratio from prior periods to the current pipeline. The historical pipeline conversion ratio is calculated by dividing the pipeline number for a particular point in a prior quarter into the end of quarter actual results for that same quarter. The historical pipeline conversion ratio from prior quarters was applied to the pipeline in the current quarter to project revenues for the current quarter. Ellison and others applied the historical pipeline conversion ratios from previous points in prior quarters and years to determine what a reasonable conversion ratio was based on history. Defendants applied the historical actual conversion rate from the previous two quarters. Although many of the historical comparisons were done year-over-year, defendants applied the historical pipeline conversion ratio

1  from prior quarters, not just the historical pipeline conversion ratio from Q300, to the Q301 pipeline

2  to estimate Q301 license revenue figures.

3       • Ellison applied the historical conversion ratio from multiple quarters, including Q201.

4  The historical actual conversion rates are hard numbers, according to Ellison, a ratio, not a forecast.

5  Defendants claim that they made this assessment at various points in the quarter. Ellison testified in

6  one case that he personally relied on this calculation intra-quarter in Q301. Ellison claims to have

7  performed the calculation at least twice: (i) once at the end of January 2001; and (ii) in December to

8  conclude that Oracle would achieve $0.16 EPS. Ellison changed his story, however, during his

9  September 21, 2006 deposition. When presented with the 20% drop in the pipeline from the

10  beginning of the quarter to the date of his sales, Ellison denied looking much at the pipeline growth

11  and reverted to claiming he relied upon the forecast. Defendants had the tools to analyze conversion

12  rates and trends within particular quarters. The conversion ratio climbed to as high as 64% of the

13  pipeline in Q301. The conversion ratios applied by the finance department were only slightly below

14  those that Oracle achieved in Q300 (one of the strongest quarters in Oracle's history). Given the

15  adverse news from the field, the conversion ratios applied by the finance department were unrealistic

16  and unachievable. The behavior of this metrics showed each defendant that Oracle was, in fact,

17  feeling the impact of the economic downturn and undermined any belief in Oracle's ability to meet

18  guidance.

19       • Historical ratios and analyses were discussed at the EMC meetings. The forecast

20  conversion ratios for total Company license revenue were higher than they were in Q201 or Q300,

21  indicating that a higher percentage of deals would need to be realized out of the pipeline to make the

22  forecasts than was necessary in Q301 or Q300. The forecast conversion ratios for the division-level

23  license forecasts were higher for Q301 than at comparable times in Q201 and Q300, indicating that a

24  higher percentage of deals would need to be realized out of the pipeline to make the forecasts than

was necessary in Q201 or Q300. In fiscal 2000, using the year over year historical pipeline conversion ratio yielded a more accurate forecast. In fiscal 2001, the use of the prior quarter historical conversion rate yielded a more accurate forecast than year-over-year.

• The "Comfort/Growth Gap" was a metric that Oracle used to measure its forecast for the quarter. Oracle Senior executives, including defendants Ellison and Henley, tracked the spread between forecasted license revenue growth rates and the pipeline revenue growth rates, as another tool to assess the achievability of the forecast and the strength of the license business. Ellison compared the difference between the pipeline growth rate and the revenue growth rate as well as "at what rate is the pipeline growing" as compared to "at what rate is the forecast growing." Ellison admitted that he customarily examined the relationship between pipeline growth rates and forecast growth rates. In evaluating Oracle's intra-quarter revenue figures, Ellison analyzed the difference between the forecasted growth and potential growth figures on the one hand and the pipeline growth figures on the other hand. When confronted with a Pipeline Reporting Package with the Comfort/Growth Gap figures penned in his own handwriting, Henley conceded that he analyzed the difference in the Comfort/Growth Gap and requested that it be included in report format. Since both forecasted license revenue growth rates and the pipeline growth rates appear on the face of the Upside Reports used in Q3FY01, the Comfort/Growth Gap was easily discerned.

• The Comfort/Growth Gap showed defendants that Oracle would miss guidance for the quarter. The difference between the rate of the forecasted revenue growth and the rate of pipeline growth, or "Comfort/Growth Gap," was unusually narrow in Q3FY2001, showing that the pipeline growth was decelerating in comparison to the forecasted revenue growth when compared to prior quarters. In the preceding four quarters, the average Comfort/Growth Gap had ranged from 12% to 43%. At the beginning of Q3FY01, there was an average Comfort/Growth Gap of 22%. On December 25, 2000, the average Comfort/Growth Gap narrowed to 4%, which was uncharacteristic

of first month behavior. The average Comfort/Growth Gap remained between 4% and 7% throughout January 2001 and continued to be 7% for most of February. The Potential Comfort/Growth Gap was even more telling. The Comfort/Growth gap between pipeline growth and the Potential growth rate was negative at times in December and in January and dropped as low as 5% in February. The gap between December 25, 2000 and January 29, 2001 never reached higher than 4% and was negative half the time. The financial department forecast, which formed the basis of Oracle's guidance to investors, was therefore forecasting license revenues to grow at a more rapid rate than the pipeline was growing. It had not done this in any of the first two months of a quarter in the prior year. Ellison was concerned that the pipeline was growing only slightly faster than the forecast. Ellison knew that it would be inappropriate to forecast sales growth in the absence of pipeline growth.

• Field sales forecasts put defendants on notice from the beginning of the Class Period that public guidance was unreachable. Ellison testified falsely in the derivative case that the field was forecasting "a great quarter." The field forecasted EPS and database growth substantially below guidance throughout the entire Class Period, and rapidly declining applications growth. The field's forecast also decreased throughout the quarter, which was contrary to the normal behavior of the field forecast. In December 2000 and January 2001, none of the U.S. Divisions increased their forecasts. The U.S. Divisions forecasted EPS of $0.107 on December 11, 2000 (three days before Oracle issued guidance), $0.106 on December 25, 2000, $0.106 on January 15, 2001, $0.107 on January 22, 2001, $0.107 on January 29, 2001, $0.105 on February 5, 2001, $0.109 on February 12, 2001, $0.11 on February 19, 2001, $0.11 on February 26, 2001, $0.11 on February 27, 2001, and $0.107 on February 28, 2001. The field forecast was far below guidance for Oracle database products. They forecasted database growth of 3% on December 11, 2000 (three days before Oracle issued guidance), 3% on December 25, 2000, 5% on January 15, 2001, 8% on January 22, 2001, 8%

on January 29, 2001, 9% on February 5, 2001, 11% on February 12, 2001, 12% on February 19, 2001, 10% on February 26, 2001, 10% on February 27, 2001, and 5% on February 28, 2001. And while the field forecast actually exceeded guidance for applications growth, it only did so in January and February but fell precipitously throughout the Class Period. Defendants forecasted applications growth of 107% on December 11, 2000, 107% on December 25, 2000, 95% on January 15, 2001, 86% on January 22, 2001, 86% on January 29, 2001, 73% on February 5, 2001, 68% on February 12, 2001, 56% on February 19, 2001, 66% on February 26, 2001, 66% on February 27, 2001, and 59% on February 28, 2001. These product-based numbers were provided using budget rates. Given Ellison's mandate to the field to increase the risk in its forecast, defendants knew before December 14, 2000 that guidance was unreachable.

• At the weekly EMC meeting, the Finance Department reported its "Upside" numbers based on each division's forecasts. Ellison examined how the Potential forecasts grew compared to prior year forecasts. The Upside Reports relied heavily upon past trends, and did not take into account current macroeconomic conditions – such as the dot.com implosion. The Upside Reports failed to account for discounts granted to customers at the end of the quarter, even though Oracle historically granted large discounts to those customers comprising its so-called "hockeystick effect." Minton double counted deals when she added $159.5 million in upside to the license forecast at the beginning of the quarter, as the field had already included additional risk/upside in its forecast pursuant to Ellison's instructions. The upside adjustments fell precipitously throughout Q301 with no offsetting increase in the division level forecast. The Upside adjustments fell by $62 million in the first two months of the quarter and dropped below guidance on January 29, 2001. In the January 15, 2001 Upside Report distributed at the EMC meeting of the same date, the Finance Department lowered its total Company License Upside by $64.6 million (from $159.5 million to $94.91 million) and reduced the Potential EPS to $0.1211 (down from the December 25, 2000

Potential EPS of $0.127). The Finance Department also lowered its Upside for NAS by $36 million and eliminated all upside for OSI. By January 22, 2001, the Finance Department's Upside declines reduced the spread between Potential and guidance to $24 million or 1.5%. In the January 29, 2001 Upside Report distributed at the EMC meeting of the same date, the Finance Department lowered its total Company License Upside by $51.5 million (from $94.91 million to $43.41 million) and reduced the Potential EPS to $0.1158 compared to the January 15, 2001 Upside Report. By January 29, 2001, the Finance Department had not only lowered its total Company License Upside revenue by an additional $51.5 million, it had eliminated the Upside for NAS entirely and applied a negative $35 million Upside to OSI. Q301 was the first time in the four quarters prior to Q301 that Oracle had ever applied a negative Upside judgment to a U.S. Division in the first two months of the quarter. By January 29, 2001, the Finance Department's Potential Figures for Total License Revenue, Total License Revenue Growth, Database License Revenue, Database License Revenue Growth, and EPS were all below the guidance. The upside adjustments fell another $22 million in the first two weeks of February.

• Usually, Oracle decreased upside as a result of deals closing or becoming more likely to close – this would cause these deals to be included in the forecast and would remove the necessity of including them in upside. For the upside to decrease without a corresponding increase in the forecast meant that upside deals were dropping out completely. This was the first time there was a decrease in upside without a corresponding increase in forecast. Henley admits that at least by January 29, 2001, he thought that making Oracle's guidance for the quarter was going to be a "horse race." Minton specifically identified a series of e-mails she had received from the Senior Finance Directors of the U.S. Divisions and the December Flash Report as a source for her lowered Upsides. These included information based on e-mails received from David Winton on January 11, 2001, James English on January 17, 2001, Larry Garnick on January 17, 2001 and Sarah Kopp on January

DRIFTON FINANCE CORPORATION'S SECOND SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS - C-01-0988-MJJ          - 40 -

18, 2001. This information was discussed with defendants at the weekly executive committee meetings. Even if defendants were to have relied solely on Minton's upside forecast, they knew by January 29, 2001 that Oracle would not meet guidance and that Oracle was being adversely impacted by the economy much earlier. Ellison did not rely on Minton's projections, but conducted his own analysis to gauge Oracle's performance including quarter-to-date sales information. Ellison conducted analyses using the data contained in OSO, the Upside Reports and Pipeline Reporting Packages (which contained historical pipeline data), actual revenue data contained in Flash Reports and updates provided by the EVPs regarding specific deals and the status of the quarter.

- Actual results for the first and second months of a quarter as well as quarterly contributions to the fiscal year are important indicators to defendants of future performance. Ellison and the other EMC members compared the actual results to the forecasts to see how much revenue they needed to generate in order to make guidance. Henley reviewed analyses based on historical data, including comparing quarter-to-date results to historical performance of prior first months. Defendants compared first month results to historical first month results to forecast and analyze historical contributions of each month to quarterly results to assess performance. Sanderson put a particular emphasis on monthly actuals.

- Each month of a year contributes a generally consistent percentage of revenues for each specific quarter, with December contributing the highest average percentage of first months, and February contributing the lowest average percentage of third months. Oracle's third quarter has, on average, the least pronounced "hockey-stick effect" of any of its quarters. December accounts for, on average, 21 percent of quarterly revenue as compared to June (14 percent), September (13 percent), and March (11 percent). On average, January accounts for 19 percent of total third quarter revenues. On average, the first two months of Oracle's third quarter account for 40 percent of total third quarter revenues. Ellison and Henley received monthly and QTD results through e-mails from

Larry Garnick (the "Garnick Flash Report") summarizing the actual results for the month just ended, which Ellison studied.

• Actual results for the first and second month of Q3-01, including results in Oracle's license divisions, were dramatically below prior year results and far behind where Oracle needed at the end of each month to meet guidance. Ellison received December's results, at the latest, on January 17 or 18, 2001 in an e-mail from Larry Garnick (the January Garnick Flash Report). The very next day he instructed his accountant, for the first time, begin trading on the next trading day. The January Flash Report was sent to all members of the executive committee, including defendants Ellison, Henley and Sanderson. According the January Garnick Flash Report, each of Oracle's U.S. divisions was exhibiting negative trends in their businesses by the end of December 2000. NAS had forecasted division level growth of 12 percent for December 2000 and forecasted potential growth of 28 percent for December 2000. In December 2000, NAS had actual growth of negative 84 percent. OSI division level forecasted growth for December 2000 was 19 percent and forecasted potential growth was 38 percent. OSI's actual growth in December 2000 was negative 84 percent. Excluding Covisint, which Ellison admitted was an outlier that Oracle itself was backing out of its forecast in order to understand current trends in its business, OPI's growth in December was negative 85 percent. These negative trends made it extremely unlikely that Oracle would outperform historical trends in the last two months of the third quarter 2001, as was necessary to meet its guidance. Without Covisint, Oracle's total license revenue growth in December 2000 was 1 percent. Oracle had provided guidance for license revenue growth of 25 percent. Without Covisint, December 2000 contributed only 14 percent of the revenue necessary to meet Oracle's guidance (again, less Covisint) for 3Q01. Even with the Covisint transaction, Oracle was behind where it needed to be to meet guidance. The month end analysis shows that given historical contributions, Oracle was on track to meet the field's forecast of $0.107 cents earnings per share, far below the $0.12 earnings per

share guidance given on December 14, 2000. Applications and database were also down significantly for December 2000 without the one-time Covisint transaction. Applications product growth was 216% (ERP was at 365% and CRM was at negative 58%) while database product growth was 17% (Server was at 21% and Tools was at negative 26%). Excluding Covisint, Applications product growth would have been negative 46% and database product growth would have been 13%.

• Because Covisint was an unrepresentative "outlier," defendants analyzed their business without the transaction and knew that Oracle's business was down significantly from prior year results. Ellison had been informed early in the quarter that large deals had slipped in NAS. Ellison was aware that big deals are the first to go in a down economy, which is exactly what was happening during the Class Period. Defendants were aware that the January Garnick Flash Report showed that Oracle was off to a "slow start" excluding Covisint. The revenue Oracle generated in December 2000, even with Covisint, trailed the percentage contribution December historically made to the quarter. With Covisint, Oracle's total license revenue was $237,787,000 in December 2000. This equals: (a) 18% of the $1,310,556,000 Guidance given on December 15, 2000; (b) 19% of the $1,257,864,000 division-level forecast for January 15, 2001; and (c) 18% of the $1,352,774,000 Potential forecast for January 15, 2001. These figures are all below the average 21% contribution of December to the quarter. Thus, Oracle needed to outperform its historical average in January and February to reach its guidance for license revenue. Adjusting for Covisint shows that Oracle's performance in December 2000 measured against the historical average contribution of Q3 to the quarter was below the historical range. Without Covisint, Oracle's total license revenue was $177,787,000 in December 2000. This equals: (a) 14% of the $1,250,556,000 (the $1,310,556,000 Guidance given on December 14, 2000, less Covisint); (b) 15% of $1,197,864,000 (the $1,257, 864,000 division-level forecast for January 15, 2001, less Covisint); (c) 14% of $1,292,343,000 (the

$1,352,774,000 Potential forecast for January 15, 2001, less Covisint). These figures are well below the average 21% contribution of December to the third quarter. Ellison attempted to minimize the importance of December's results to Oracle's third fiscal quarter but could not dispute that December was the best first month in terms of revenue of any quarter in the year. Dividing Oracle's non-Covisint revenue by 0.21 results in estimated quarterly non-Covisint License revenue of $859,638,095, an amount well short of the projected quarterly non-Covisint revenue of $1,244,000,000. At the end of December 2000, Oracle was not on pace to equal or exceed guidance.

• January's results were even worse than December. The first two months of Oracle's third quarter accounted for, on average, 40 percent of its revenue for the quarter. Ellison received January results, at the latest, on February 8 or 9, 2001 in an e-mail from Garnick (the "February Garnick Flash Report"). The February Garnick Flash Report was sent to all members of the Executive Committee, including each defendant.

• The February Garnick Flash Report showed that Oracle's QTD actual results through January were dismal. OSI showed negative 17% growth, NAS showed negative 33% growth, and without Covisint OPI showed negative 63% growth. Results through January showed that Oracle was at best only on track to meet the field's forecast of $0.109 per share – January QTD license results represented 36% of the total forecast for Q3FY01. The QTD analysis that Ellison, Henley, and Sanderson each received noted that Oracle was not on track to reach the guidance that Oracle gave to investors on December 14, 2000 and then reiterated throughout the class period. Defendants were aware that the analyst community was expecting 23% license revenue growth and 18% overall revenue growth for Q3FY01. To deliver 23% USD license revenue growth Oracle needed $1,341 million in CD license revenue for the quarter, $95 million (8%) more than the current forecast. As of January 15, 2001, NAS had reported only $1.4 million in sales for the month to date, for a total of $31.4 million quarter-to-date. In the last two weeks of January, NAS only booked $24.6 million in

revenue. In December and January 2001, NAS only had total license revenue of $56 million, which was far short of the $80.4 million that NAS had internally forecasted on January 15, 2001, for the first two months of Q3FY01. NAS experienced a combined growth rate for December and January of negative 35%, worse than its December negative 24% growth rate. As of January 9, 2001, OSI forecasted $73,600,000 in license revenue for December 2000 and January 2001. OSI only had sales of $22,747,000 in December 2000 and January 2001. OSI license revenue growth rate for December and January was negative 17%. As of January 26, 2001, OPI had booked no license revenue in January 2001. Thus, at the time that Ellison decided to trade, OPI had not generated a single dollar of license revenue in the month of January 2001. OPI only generated $2.6 million and $4.8 million in license revenue in addition to Covisint in December and January 2001, respectively. The combined license revenue for both December 2000 and January 2001 in addition to the Covisint deal was $7.4 million. The January Flash Report shows that Oracle's total license revenue growth for the combined months of December 2000 and January 2001 was 25% with the benefit of the Covisint transaction. Excluding the Covisint deal, total license revenue grew 8%. The February Garnick Flash Report showed license revenue in the U.S. divisions grew negative 4% in January and 15% in December/January combined even with the Covisint deal. The February Garnick Flash Report showed license revenue in the U.S. Divisions grew negative 32% in December and January 2001 combined adjusted for the Covisint deal. The quarter-to-date figures at the end of January 2001 showed that Oracle needed to beat its average and equal its best February (final month) in the previous five years, which was at the apex of the economy and the stock market in FY00, to make its Q301 guidance of $1,310,556,000 for USD license revenues. The revenue Oracle generated in December 2000 and January 2001, even with Covisint, trailed substantially the percentage contribution December and January historically made to the quarter. With Covisint, Oracle's total license revenue was $434,408,000 for December 2000 and January 2001. This equals: (a) 35% of

the $1,253,433,000 division-level forecast for January 29, 2001; (b) 33% of the $1,296,843,000 Potential forecast for January 29, 2001; and (c) 33% of the $1,310,556,000 Guidance given on December 14, 2000. These figures are all below the average 40% contribution of December and January actual results to the quarter. Thus, Oracle needed to outperform its historical average January and February to reach its guidance for license revenue. Without Covisint, Oracle's total license revenues was $374,408,000 in December 2000 and January 2001. This equals: (a) 31% of $1,193,433,000 (the $1,253,433,000 division-level forecast for January 29, 2001, less Covisint); (b) 30% of $1,236,843,000 (the $1,296,843,000 Potential forecast for January 29, 2001, less Covisint); and (c) 30% of the $1,250,556,000 (the $1,310,556,000 guidance given on December 14, 2000, less Covisint). These figures are far below the average 40% contribution of December and January to the third quarter. At the end of each month, and at the latest 1/17/01 and 2/8/01, Ellison, Henley, and Sanderson each were in possession of material adverse information showing that Oracle would miss guidance and that Oracle's business was being adversely affected by the economy.

• Defendants also knew that Oracle would miss guidance for Q301 because they took illegal steps in Q2 to report revenues to meet guidance for that quarter. Defendants therefore knew at the end of Q2 that Oracle's business was slowing. Specifically, Oracle had to enter into an illegal barter transaction with HP to meet its public guidance for Q201. Ellison negotiated the transaction with Carly Fiorina and delivered from his house a letter that he signed during the last minutes of the last day of Q2-01 memorializing Oracle's transaction with HP. Oracle agreed to buy $30 million in product from HP in exchange for HP committing to purchase $30 million in products and support from Oracle. Oracle sold its product to HP at "very high" discount rates to get the deal done and included product that HP did not need or did not intend to use for long periods of time. Safra Catz signed a non-cancellable letter agreement on Oracle's behalf on November 30, 2000 obligating Oracle to purchase $30 million in product from HP in two separate installments of $15 million each

1  ($15 million by December 28, 2000 and $15 million by September 30, 2001). In the agreement,
2  Oracle committed to move 100 percent of Oracle's production data to HP Unix servers by May 31,
3  2001 and 100% of Oracle's CRM development servers to HP UNIX servers by November 1, 2001.
4  Oracle also agreed to operate all CRM online services, the Oracle store, the Oracle web-based
5  customer interaction database, and the Oracle defect database on HP Unix servers by November 1,
6  2001 and to operate Oracle platinum systems CRM training, education, and consulting
7  implementation pilots on HP Unix servers by November 1, 2001. Defendants delivered the
8  agreement to HP at approximately 11:45 p.m. on the last day of the quarter. Oracle did not receive
9  the signed agreement from HP until the next day. In return, HP placed a $29.8 million order with
10  Oracle at around midnight on November 30, 2001. The order included $21.3 million in license fees
11  that Oracle recognized as revenue in Q2 and support service fees of $8.5 million. Henley was
12  involved in the HP transactions and approved it on the last day of the quarter despite concerns over
13  the barter nature of the transaction. The HP purchase was the subject of a special meeting of the
14  executive committee on the last day of the quarter. The transaction was a swap transaction that was
15  improperly accounted for.
16
17

18  • Defendants took other measures to offset the decline in its business and meet
19  guidance for Q201. Oracle engaged in accounting manipulations to bring in tens of millions of
20  dollars in revenues for the quarter. Plaintiff incorporates herein by reference the discussion of Q201
21  accounting manipulations in response to Interrogatory No. 7. The HP deal and the accounting
22  manipulations reveal that defendants knew as early as Q2 that its business was slowing and feeling
23  the impact of the economy. According to Henley, Oracle's 3Q01 forecast seemed reasonable in part
24  because it was forecasting EPS just one penny higher than it had earned in 2Q01. Thus, to the extent
25  that Oracle's 2Q01 results were the product of improper revenue recognition, the reasonable nature
26  of Oracle's 3Q01 forecast comes into question. They were therefore in possession of adverse
27
28

information undermining their forecast and showing that Oracle's business was showing even before issuing guidance on December 14, 2000.

• When they discussed what guidance to give the market, Henley told Ellison that he was concerned with the economy. Minton "was a bit nervous going entering Q301 because Q201, which was very successful, had been even more back-end loaded than usual." Ellison knew that, by Q3FY01, Oracle's dot.com business had largely disappeared. Ellison acknowledged that, since Oracle had a very strong database quarter a year earlier that was driven by the dot.com there was a "lot of pressure on [Oracle's] database" for Q3FY01. In Q100, dot.coms made up 73.3% of total GB license revenue field sales; 58.9% in Q200; 74.6% in Q300; 68.4% in Q400; and 65% in Q101. However, by Q201, dot.coms made up only 51% of GB's field sales revenue. GB dot.com field revenues totaled $4 million in Q199; $5.5 million in Q299; $24.5 million in Q399; $35.8 million in Q499; $42 million in Q100; $56.5 million in Q200; $111.5 million in Q300; $172.6 million in Q400; and $51.9 million in Q101. As early as April 2000 Oracle's management was being warned that the dot.com business was softening. Defendants also knew by September 2000, that Oracle was experiencing "terrible," in fact, negative applications growth. Ellison understood that Oracle was setting a high bar for year-over-year growth since the dot.com boom had resulted in an exceptionally strong Q300 and the bust had started to impact the Company's database business. Ellison was aware that in times of major recessions, "businesses get very reluctant to spend a lot of money on large new capital projects. And a lot of our software sales were part of an even larger IT development project. So these were large capital items, which are often deferred in times of recession." Ellison knew that "large deals fall out more quickly" in a declining economy. Ellison knew that "when the telecom's bubble got burst or the dot.com bubble burst, I would expect that sales to those industries would decline."

• Oracle started the quarter with news that its license divisions were being negatively impacted by the economy. The finance director from the NAS division (Oracle's largest sales division) noted at the outset of the quarter that growth comparisons would be tougher in Q301 and Q401 because "NAS results took off last year in Q3 and continued into Q4." At the outset of Q301, NAS was seeing a slowdown in large deals and its pipeline was not where it needed to be to meet its $359.977 million quarterly budget. Defendants knew that NAS sales would slow in Q301 and that fact was discussed at the EMC meetings. As of December 8, 2000, NAS had no big deals in the pipeline. As of December 5, 2000, OSO reflected negative 10% per year-over-year growth in the pipeline for OSI while Nussbaum's OSI forecast reflect 50% year-over-year growth. NAS generates, on average, approximately 25 percent of Oracle's annual license revenues. OSI generates, on average, approximately 15 percent of Oracle's annual license revenues. OPI generates, on average, approximately 10 percent of Oracle's annual license revenues.

• As of January 4, 2001, all data since December 14, 2001 pointed to more economic softening and the risk of the deals. From January 9 to 11, 2001, NAS held a meeting for the entire NAS division to evaluate and discuss how its business units were performing and how its forecast looked ("Ops Review"). At this Ops Review, members of NAS discussed the "Sluggish Economic Outlook" where the "Focus in on Profits" and "Reduc[ing] Costs." At this Ops Review, members of NAS discussed numerous problems plaguing NAS including the fact that GB noted that the larger dot.coms had already acquired the Oracle database so Oracle was looking to sell to second and third tier dot.coms, which meant sales would be more difficult. At this Ops Review, members of NAS discussed the fact that they were envisioning a "Mid Teen Technology Growth Rate" for the second half of fiscal 2001 and 2002 because there were no or few million dollar Dot.Com deals and average transactions were going to be smaller than before. At this Ops Review, members of NAS discussed the fact that there was a "Dramatic Decline in DotCom Business, which led to a $40 million database

shortfall in the West division of GB and required a quota reduction for dot.com and trimming of the sales force. At this Ops Review, members of the NAS discussed the fact that the West division of GB was noticing CIOs were on a "shorter leash," that CEOs were more involved in the purchasing decisions," "CEO's meeting with CIO's More Frequently" and that CEOs wanted more return on profit. The problems affecting the dot.com/EC Sector through Q301, included 61,000 Layoffs, 50% of named dot.com list out of business, Trillions lost in market valuation, Pink Slip parties, dot.com's . . . dot.gone, and 100's of VCs turn off Funding Spicket. These were the very facts that Classick alerted George Roberts to in Q2-01. Over 70% of GB's sales were in technology. Technology comprised the bulk of sales to dot.coms, which in turn became a substantial part of GB's business, particularly in the West. Dot.com sales were projected as more than half of GB's technology business for FY01, and comprised almost 2/3 of GB-West's technology business. In Q101, dot.coms generated 75% of GB's technology field sales revenue. NAS' dot.com business in 3Q01 fell 66% from 3Q00, dropping from $111.4 million to only $37.5 million. In 3Q00, dot.com business made up 40% of NAS' total revenues; however, in 3Q01, dot.coms were responsible for only 17.5% of NAS' total revenues.

• As of January 11, 2001, defendants were aware that NAS was reporting a slowdown for Q3 and Q4 and a slowdown in January 2001 from December 2000. NAS was the best indicator of how the economy was doing in the U.S. NAS West had started to see a slowdown in the technology area in Spring 2000 when customers started to indicate that they were not going to spend money until their businesses were profitable and deals started to take longer to close.

• During the first two months of Q3FY01, NAS internal forecasting documents, to which defendants had access, consistently showed negative growth in technology sales of Majors, General Business, and the division as a whole. Defendants had no expectation that the "bricks & mortar" customer base of NAS could fill the increasingly large void created by the dot.com bust. In

Q100, dot.coms made up 73.3% of total GB license revenue field sales; 58.9% in Q200; 74.6% in Q300; 68.4% in Q400; and 65% in Q101. However, by Q201, dot.coms made up only 51% of GB's field sales revenue. GB dot.com field revenues totaled $4 million in Q199; $5.5 million in Q299; $24.5 million in Q399; $35.8 million in Q499; $42 million in Q100; $56.5 million in Q200; $111.5 million in Q300; $172.6 million in Q400; and $51.9 million in Q101. By January 29, 2001, technology sales to NAS' dot.com customers and "brick and mortar" (the non-dot.com) customers showed overall negative growth for Q3FY01 in NAS' technology sales. As of January 29, 2001, Oracle was facing: (a) negative 8% year over year growth in NAS' dot.com and ASP technology revenue in the first half of FY01 and anticipated growth of negative 54% and negative 41% in these lines of business in Q301 and Q401, respectively; (b) while there had been 65% growth in NAS' Brick and Mortar technology license revenue, the growth rate was anticipated to fall to 41% and 29% for this line of business in Q301 and Q401, respectively; (c) in total, while NAS had experienced 38% growth in technology in the first half of fiscal 2001, Oracle projected negative 6% growth in NAS technology in Q301 and only 2% growth in Q4FY01. As of January 29, 2001, defendants were aware that the dot.com fallout was having a progressively more negative impact on Oracle than in prior quarters. The decline in the dot.com revenue stream was a topic of conversation at the EMC meetings during Q2FY01 and Q3FY01.

• Given Oracle's reliance upon historical revenue trends, a year over year comparison of NAS's GB unit put them on notice that Oracle would miss guidance. Notably, GB's pipeline increased during January 2000, but fell from $487 million to $419 million in January 2001. In several quarters prior to 3Q01, GB had experienced a pipeline that grew between the beginning of the quarter and the first week of the last month of the quarter. In the first month of 3Q00, GB closed $24.5 million, but only $13 million in the same period of 3Q01. During the first two months of

1 | 3Q00, GB closed $56.4 million, but in the same period of 3Q01 had only closed $17.7 million out of

2 | a forecast of $168 million – leaving 90% of the quarter's revenue to be pursued in February.

3 |      • OSI was experiencing signs of a slowdown in earnings, apart from the negative 8%
4 | growth rate in December. As of January 18, 2001, defendants were aware that: (a) OSI was only
5 |
6 | standing by its $225 million forecast number so long as none of the very large opportunities dropped
7 | out, many of which were in the deeply troubled telecom industry; (b) OSI was only committing to
8 | $134 million, so there was $91 million in judgment to reach the $225 million forecast; (c) conversion
9 | rates across the board (except state and local) were north of 50% and its pipeline was only $422
10 | million. As of January 18, 2001, conversion rates for OSI and each of its verticals (except state and
11 | local) were over 50 percent. The forecasted conversion rate for Federal was 62 percent. The
12 | forecasted conversion ratio for State and Local was 43 percent. The forecasted conversion ratio for
13 | Higher Education was 54 percent. The forecasted conversion ratio for Healthcare was 54 percent.
14 | The forecasted conversion ratio for Financial Services was 56 percent. The forecasted conversion
15 | ratio for Communications and Utilities was 53 percent. The forecasted conversion ratio for OSI
16 | license was 53 percent. Nussbaum testified that he was only comfortable with a forecasted
17 | conversion ratio of 40 percent or less.
18 |
19 |      • Defendants knew throughout Q301 that OSI was having trouble collecting from
20 | WorldCom and that both WorldCom and Health South were long-shots. There were so many
21 | problems with the CRM product (the 11i Suite) during Q3FY01 that the sales force was reluctant to
22 | sell it until it was more stable. Internally at Oracle it was known that buying the 11i Suite was akin
23 | to purchasing a BMW but receiving one without a steering wheel, an engine or tires and then being
24 | told that it would take more time and money to receive these items. The CRM product problems led
25 | to OSI having to spend $21 to $22 million in labor to address Bell South problems. Oracle had to
26 | reverse $6.7 million license revenue in 3Q01 for Bell South. The revenue had been recognized in
27 |
28 |

December 2000 but was reversed one week after the close of the quarter. OSI experienced a decrease in its margins (as of February 14, 2001, a 4 percent decrease for the year) due to costs associated with the Bell South deal. The OSI Federal vertical was expected to close $50 million in revenue but the field had committed to only $20 million and it had booked only $8.6 million. The OSI State and Local vertical was expected to close $35 million in revenue but the field had committed to only $28 million and it had booked only $5.4 million. The OSI Higher Education vertical was expected to close $10 million in revenue but the field had committed to only $8 million and it had booked only $0.3 million. The OSI Healthcare vertical was expected to close $5 million in revenue but the field had booked only $1.6 million. The OSI Communications and Utilities vertical was expected to close $80 million in revenue but the field had committed to only $48 million and it had booked only $15 million; and the OSI Financial Services vertical was expected to close $30 million in revenue but the field had committed to only $10 million and it had booked only $2.8 million.

• Oracle was also feeling a slowdown in OPI. As of January 17, 2001, defendants were aware that OPI had a "lot of pipe at challenging clients." As of January 17, 2001, defendants were aware that: (a) the best case number for OPI is "a real stretch as several of these deals will be Q4"; (b) one [Area Vice President] talked of starting to see indications of client delays on decisions." In the first two months of Q3FY01, OPI internal forecasting documents showed deals sliding from December 2000 and January 2001 to February 2001. As of January 17, 2001, defendants knew that: (a) OPI was reporting a coverage ratio of 240%; (b) OPI was projecting – 16% growth for Q4FY01, only 65% of target.

• The defendants were alerted to these facts in various documents, including flash reports and by discussions, at the EMC meetings. Ellison and Henley claimed that they grilled the EVPs on all forecasting data, including upside and downside of the forecasts, the EVPs' perspectives

1  and sense of how things were going, and any impact the economy was having on their business.

2  Ellison and Henley discussed the reasons for the decreases in the forecasts or potential figures and

3  Minton relied on the negative information in lowering her Upside figures. Defendants also received

4  information from forecasting calls on Thursdays. Henley, Minton and Catz would ask questions at

5
6  the Thursday forecasting calls they attended and there would be discussions about the numbers in the

7  Americas Forecasting Package including revenue, forecast, pipeline, margin and conversion rate

8  figures and their accuracy and how they compared to prior week, prior quarter, or prior year, budget

9  figures, particular deals and of any problems that might exist. During two January 2001 Thursday

10  Forecasting Calls there were discussions about "concern in the East" division of OPI and the fact

11  that Sanderson was "reluctant" with a "best" forecast of $185 million instead of the listed $225

12
    million at that meeting.
13

14        • Defendants were also seeing the adverse impact the economy was having on Oracle in

15  other ways. Oracle's expenses were rising throughout the quarter. Oracle's projections for expenses

16  and expense growth rates were rising in Q3FY01, in contrast to the declines in prior quarters.

17  Oracle's total operating expenses actually increased in Q3FY01 over Q3FY00 and Q2FY01.

18  Defendants also knew from initial consulting assignments that Oracle was feeling the impact of the

19  economy. Oracle's utilization rate of consultants was down considerably entering Q301. A

20
21  utilization rate at Oracle meant the amount of time that Oracle consultant were engaged in billable

22  projects. The remaining non-billable time was attributable to "vacations, holidays, training,

23  proposals, things of that nature." An optimal utilization rate is anything above 60%. Oracle's

24  utilizations rates for its consultants started the quarter at 57%, which was below the optimal range

25  and dramatically below the 74% utilization rate that Oracle maintained in Q201. The minimum of

26  60% included non-billable time attributable to the holidays and vacations. Numerous were "on the

27  bench" in Q3 and the 57% utilization rate was Oracle's internal forecasted number. EVPs were
28

1   either advocating "special incentives" to drive Q3 numbers or were creating special programs to
2   build pipeline. By December 18, 2000, Jay Nussbaum requested that defendant Ellison approve a
3   "special incentive" for Q3. Sanderson created his own "special program" in early February to try to
4   build his pipeline for the last month of Q3 and for Q4, which he recognized was short in Q4 by $150
5   million and "a big hill to climb."
6

7   • Defendants knew that Oracle's 11i product was costing Oracle millions of dollars,
8   which undermined Oracle's ability to meet guidance. The 11i pipeline was "light" in Oracle's
9   terminology in Q301 because Oracle did not have enough references and because the field was
10  "afraid to sell it." Throughout Q301, worldwide, sales people were reluctant to promote the 11i due
11  to the product problems, lack of references, and local language problems. One EVP stated that he
12  had a simple, internal only, explanation. Given the 11i problems in Q101 and Q201, many of
13  Oracle's salespeople decided to focus on technology to make their quota and were waiting for the
14
15  product to stabilize. Throughout FY01 and beyond, Oracle 11i was plagued with severe product
16  problems which caused loss of confidence by sales, partners, analysts and customers. Morgan
17  Stanley advised Oracle secretly in Q3, 2001 that "a few of the reps I spoke with don't have the
18  confidence to push crm because of the quality issues in the past." Ellison sought Morgan Stanley's
19  help to counter the increasing number of negative comments on the quality of Oracle's applications
20  products.
21

22  • The problems with 11i, in particular Oracle's inability to demonstrate a product,
23  limited Oracle's sales ability for 11i. The inability to demonstrate the product caused a bottleneck
24  preventing Oracle from effectively selling the product. Oracle's inability to demonstrate the 11i
25  negatively impacted Oracle's conversion rate. The list of prospects that were being affected by
26  Oracle's demo problems was described by defendant Henley as "really sickening." The demo issue
27  plagued 11i from its release in May 2000. In July 2000, Oracle was having major problems with the
28

11i demo system and the problems were known by defendants to cost Oracle Q1 business. According to an e-mail received by defendant Sanderson and others, the real complaint was the fact that Oracle released the 11i product in May 2000 and two months later SCs were still unable to show a full suite of CRM live. In January 2001, defendants knew that the 11i Suite remained unstable and demo problems continued to plague the Company. Sanderson admits that a consistent theme throughout FY01 was the 11i's poor performance, Oracle's inability to prove their E-Business Suite integration story and product stability and quality issues. Throughout FY01, Oracle was unable to show a complete integrated CRM demo let alone a complete E-Business Suite, ERM/ERP integrated demo. The demo problems were causing Oracle's SC's to spend half of their time "resolving or working around demo/environment issues" instead of "spending 100 percent of their time around sales" and "zero time around resolving or working around demo environment issues." Throughout Q301, the top three issues for demos remained performance, product quality/stability and the ability to show a complete integrated e-Business suite solution. As of the beginning of February 2001, more than 50 percent of an SC's time was spent resolving or working around demo/environment issues versus sales-related activities.

•     Defendants also knew that as of January 2001, heavy patching due to product instability was impacting Oracle's ability to engage existing clients who were implementing 11i into additional sales cycles. Defendant Sanderson was notified throughout calendar year 2000 that problems with 11i were causing Oracle to lose opportunities for license and consulting sales. As early at October 2000, he heard that Oracle was about to lose another CRM opportunity and a lot of additional ERP business because of severe product problems. Oracle could not even train customers properly. Sanderson learned on October 12, 2000 that Yamaha, one of Oracle's largest clients in the west, had said that they were going to wait until 2002 to upgrade to 11i due to lack of training and product quality. In Q1 alone, Sanderson was told that 1730 days of Oracle consulting had been

provided free to 11i customers, a North America hit of approximately $3 million. Sanderson was informed that due to the bugs and the number of patches required in some cases, field consulting teams had recommended to clients to wait until the new year until the product shakes out. Hudson's Bay also indicated that they would not be too interested in Oracle's CRM and Customer Loyalty solutions and that the decision could potentially cost Oracle $4 million in future business plus anything that it felt it could recover from Oracle. A November 4, 2000 e-mail request for live 11i sites for PR purposes by Roberts was rejected in his own organization because "we need to have a plan to fix the problems before we can address the issue of PR." Sanderson's consulting organization, OCS, had "1700 hours of nonbillable bugs" for one implementation of which Sanderson was certainly aware. Sanderson received a report of non-billable hours. In January 2001, Consulting and Support were being taxed by crises arising in the final stages of many 11i and CRM implementation projects. Sanderson's organizations swallowed $21 million of free consulting services in fiscal 2000 because of the problems with 11i. 11i also cost Oracle significant support revenues.

• Oracle began implementing 11i internally in early December 2000 and negatively impacted all Oracle divisions. Kopp experienced problems with 11i during the internal upgrade. On January 19, 2001, the day after she wrote an e-mail explaining to various colleagues that she had received assurances from Bret Fuller that the system had been fixed, she wrote to Terry Ford saying "fyi . . . of course, for the fourth day in a row, it didn't stay up regardless of the assurances." On January 29, 2001, Kopp sent another e-mail detailing the "most significant issues" with the 11i upgrade, including "The applications (Self Service Time & Self Service Expense) have been down since 10 am today. Operational Impact – not able to enter time in order to calculate labor revenue or to rebill expenses. We risk falling behind like we have the past two weeks." The implementation not only shut Oracle down for two weeks during Q301, but it also caused lost sales and orders in

specific divisions and company-wide.  It caused the Latin America division to lose millions in telesales revenue and also caused Oracle to fall short on its support revenue, which both Henley and Ellison knew at the latest by February 19, 2001 when told that lack of management reporting for the new system, OKS, had crippled management's ability to detect an underlying problem in the renewal rate in a timely fashion and that it seemed like a disaster based on the large drop in support revenue growth for Q3.  Ellison and Henley were reminded that for the past several quarters Oracle had been falling behind and for Q3 it seemed like things were worsening.  Minton would escalate systems problems to Ellison routinely.  He and the other defendants were therefore acutely aware of all of the problems that Oracle was experiencing with 11i and, consequently, the impact that those problems were having on Oracle's Q3 results and its ability to meet guidance.

• Defendants also knew that Oracle's implementation of 11i was adversely impacting other parts of Oracle's operations.  On February 1, 2001, defendant Ellison was told that the education forecast for Q301 was reduced by $7.2 million because of the internal implementation and performance issues with 11i.  The $7.2 million reduction represented nearly 15% of the education forecast for the quarter.  Defendant Ellison admits he was very familiar with these issues.  The reason for these and other problems were spelled out in SOFTWAR:

> "The next really big push was to get in contracting and order management over New Year's.  What happened was one of the most dramatic moments I'd seen during my five years at Oracle.  Everyone except Ron knew that we could not place an order with the new system."[] And Larry, knowing we can't place an order, not knowing when we would be able to place an order, and knowing that once we turned off the old bespoke system that there was no going back, said, 'We're going live anyway.  I need a forcing function, so off we go.'  So we upgraded, and Oracle went down.  We were down for fourteen days.  For fourteen days that January, Oracle could not place a single order.

The following facts also support plaintiff's allegation that defendants knew and recklessly disregarded that Q3 sales would not meet revenue and earnings projections:

• Ellison uses the prices of Cisco and Sun stock as proxies for Oracle's performance.  He wrote, "If you plot the stock price of Cisco, Oracle, and Sun, you will see that all three

companies rose and fell together in perfect synchronization as sentiment about the Internet rose and fell." In the period leading up to Ellison's stock sales, both Cisco and Sun lowered earnings expectations as a result of the economy's effect on their business. Sun pre-announced on January 19, 2001, the very same day that Ellison decided to trade. Cisco pre-announced even earlier, along with other major industry players.

- At his deposition, Ellison admitted under oath that he has lied on several occasions about getting into medical school and about having a degree. He also admitted to exaggerating the capabilities of Oracle's products.

- Ellison lied under oath in this litigation regarding a deal between Oracle and HealthSouth.

- Defendants recently settled a derivative case with similar but fewer claims for over $120 million.

- Ellison is famous for his lies. A Washington Post article titled "The Fog of Deceit" and dedicated entirely to Ellison's lies contains the following examples: "Deceit is a complicated notion with Ellison. He's been accused of practicing it in many forms – exaggerating the capabilities of Oracle's products, embellishing the meanness of his boyhood neighborhood and misleading people about which academic degrees he has earned," "'I care deeply about Larry,' says Karen Rutzky Back, now of Los Angeles. But he lied to her serially, she says. 'I got tired of being a detective about everything he said,'" "'He told me he graduated from an obscure college in Sheffield, England,' Quinn says. 'He told these big, whopping lies, and he stuck to them. He can follow these lies for years.'" The article goes on to discuss, at length, Ellison's lies to relatives, girlfriends, and wives.

- During the period in question, Ellison had only one e-mail address and received more than a hundred e-mails a day, most of which he answered himself or forwarded to the appropriate

1  person. He also visited Oracle Sales Online on a daily basis and left messages questioning the status

2  of particular sales opportunities as a result.

3          • According to Chris Kirkby, responsible for Oracle's Global IT System, Oracle's

4  CRM forecasting tool, Oracle Sales Online (OSO), which Ellison bragged allowed him to view sales

5  up to the minute, was "backed up daily." However, "[a]ny back-up tapes that had been maintained

6  were 'purged' in connection with a system change by the IT Group that took place in July 2001."

7

8          • Oracle keeps logs of everyone who has accessed OSO and when they have accessed

9  it. However, Oracle destroyed its log of OSO log-ins for the period in question.

10          • In the days that immediately followed the October 11, 2002 filing of the Complaint

11  alleging that Oracle was using customer overpayments and unapplied cash in its 25005 account to

12  inflate 2Q01 financial results, Oracle instituted an "action plan" to clean up customer "unapplied

13  cash" and overpayments that were currently "On Account."

14

15          • No documents were produced from the files of Julie Chan, the Senior Accounts

16  Receivable Manager responsible for providing detailed information to Arthur Andersen LLP

17  concerning 2Q01 material declines in the Company's "customer advances and unearned revenues."

18  Chan never received a document retention notice.

19

20          • Oracle failed to preserve and produce documents concerning the SEC's investigation

21  into the allegations of the Complaint (including the refund check to Household Finance Corporation

22  ("Household") demonstrating that Oracle's representations to the SEC were false)

23          • Oracle deleted the hard drives of key individuals in this litigation.

24          • Oracle intentionally altered documents by adjusting up invoices associated with credit

25  memos in order to make it appear as though a customer had actually made a payment to an invoice.

26  This had the effect of creating the appearance that the customer overpayments plaintiffs alleged were

27  used to increase revenue and income would appear as though they were accurately applied.

28

• Oracle intentionally destroyed relevant documents. For example, defendants were unable to produce any relevant documents from the files of Molly Littlefield, whose handwritten notes made clear Oracle's scheme to alter documents relevant to this litigation, because she never received a preservation e-mail and her computer was re-imaged and deleted in 2003.

• Oracle has been and is currently under a Final Judgment of Permanent Injunction and Consent Decree requiring broad and strict adherence to the Securities Exchange Act of 1934 and a multitude of associated statutes. The Company is specifically and permanently enjoined from failing "to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect transactions and disposition of assets. . . ."

• Oracle's records retention schedule provides that certain accounting documents must be retained for several years after their creation. For example, accounting backup Credit Memo Adjustments must be kept for four years. Call Notes from the collections department regarding customer collections must be kept for a minimum of four years. Account Reconciliation to the General Ledger and supporting detail must be kept for four years. Revenue Accounting account reconciliation must be kept for four years. Some documents must be retained indefinitely. Forecasting reports must be kept for three years. Oracle had failed to preserve documents in accordance with the PSLRA, the Federal Rules of Civil Procedure, and even its own document retention policies.

• Defendants have produced just 20 generic, mass-distributed e-mails from Ellison's files, many of which are just duplicates. Just one of these e-mails was sent after the Class Period. The total production of documents from Ellison's files amounts to 123 documents totaling 623 pages (of which hundreds of pages are simply similar drafts of the same document). Plaintiffs have received multiple e-mails from the files of other custodians which were sent to Ellison, both before and even after the filing of this action, which were not produced from Ellison's files. Ellison only

cleaned out his e-mail box once a year. Daniel Cooperman testified that Ellison got information from a variety of different sources, including salesmen in the field. Because Defendants falsely represented to the Court that Ellison only received information from his direct reports, they were only required to search the files of direct reports and at the AVP level and above for responsive documents. Based on these facts, it is extremely likely that many relevant communications between Ellison and sale representatives below the AVP level (for example, regional Vice President who participated in forecasting calls with Ellison and others), other Oracle employees below the AVP level, customers, analysts, or other sources outside of Oracle were not produced in this litigation. Even relevant communications between Ellison and Oracle employees at the AVP level or above are likely to have been lost because of the dearth of materials produced from Ellison's files combined with the fact that only 26 AVPs received preservation notices and some employees above the AVP level did not receive a timely preservation notice. To the extent that Ellison communicated with either an employee within the scope of the discovery plan who did not receive a timely preservation notice or an employee below the AVP level who was not within the scope of the discovery plan (as a result of defendants' false representations) through a method other than e-mail, it is impossible to understand what those persons were experiencing at Oracle at the time (and likely communicating to Ellison) because their files have not been properly preserved.

• The default setting at Oracle during the Class Period was to automatically delete sent e-mails (they had no outboxes). This was Ellison's setting during the relevant period. Oracle did not instruct either its employees generally or Ellison specifically to change this instruction once it became likely that this litigation would be filed. Thus, all e-mails sent by Ellison and others retaining this default setting, even after Defendants had a duty to preserve them, were not preserved.

• Defendants produced 181 documents from Safra Catz's files weeks after the close of discovery.

1    • Two weeks after the close of discovery, defendants produced an additional 50,000

2    pages of documents sourced to 73 different individuals.

3    • Ellison, Cooperman, and Segal all testified that they expected a lawsuit at least as

4    soon as March 1, 2001. Cooperman testified that his concerns were raised when Ellison sold stock

5    in January 2001.

6

7    • Oracle represents that Ellison, Mary Ann Anthony, Valerie Borthwick, Daniel

8    Cooperman, Terry Ford, Mary Ann Gillespie, Jay Nussbaum, Roberta Ronnse, William Roselli,

9    Frank Varasano, Barbara Wallace, and David Winton all either had: (1) no hard drive; (2) no

10    responsive documents on their hard drives; and/or (3) their hard drive was deleted when the

11    employee left Oracle before the filing of the Delaware Derivative action. Only Frank Varasano left

12    before the filing of the Delaware Action and Segal has testified that she has never heard of an Oracle

13    employee not having a hard drive.

14

15    • Defendants destroyed documents in violation of Oracle's document retention policies.

16    • The Special Litigation Committee tasked by Oracle's Board to investigate the

17    allegations in the Delaware Derivative Litigation (with similar, although less, claims than this

18    litigation) was held not to be disinterested.

19

20    • Defendants did not produce to plaintiffs all relevant documents from the derivative

21    litigation.

22    • On December 9, 2004, plaintiffs served their First Set of Requests for Production of

23    Documents to Defendants demanding documents (including electronic documents) from Defendants

24    and all sources within their control.

25    • Despite evidence that such charts exist or existed at the time of that defendants were

26    on notice that litigation was likely, defendants have never produced organizational charts to

27

28    plaintiffs

- Defendants have consistently produced documents directly prior to the depositions of witnesses despite duties on their part to produce such documents pursuant to document requests much earlier in the litigation.

- After the first complaint was filed, on March 13, 2001, Oracle sent a document preservation e-mail to only 29 of 40,000 employees. A few days later, Oracle sent such notice to 14 more employees. Despite the fact that plaintiffs sought discovery of a broader range of employees, the Court, based on defendants misrepresentations about what information was communicated to Defendants, ordered production of documents from just the speakers, their direct reports, and 33 area vice presidents. However, defendants had not even sent preservation notices to this group of individuals although they failed to alert the Court or plaintiffs to this fact. The files of a large portion of the individuals whose files were ordered produced by the Court were not preserved. Of the 33 AVPs, only 26 received preservation notices.

- Evidence suggests that in some instances, Oracle intentionally altered or destroyed relevant evidence.

- Oracle has repeatedly and falsely stated that its production of accounting documents was complete and that plaintiffs were entitled to nothing more. Only upon taking depositions (without key documents) have plaintiffs discovered the breadth of Oracle's discovery violations and its failure to preserve and secure evidence at the outset of this litigation.

- Oracle did not adequately monitor the preservation efforts of those few individuals who did receive preservation notices, instead merely instructing them to forward on the notice as they saw fit.

- Defendants have been unable to adequately answer plaintiffs' interrogatories regarding, among other things, lost deals, as a result of their destruction of the relevant documents. For example, defendants have been unable, in most cases to provide plaintiffs with the names of the

1  sales and purchasing representatives involved in the deals and the reason why the deal did not close,

2  among other things. Defendants have provided plaintiffs with the reasons that eight of the 182 deals

3  lost in February 2001 did not close. From these sparse responses it is clear that defendants are trying

4  to conceal the fact that deals did not close for the reasons alleged by plaintiffs, including the

5  pervasive problems with 11i.

6

7  • Defendants have still not produced in this litigation a copy of SOFTWAR: An

8  Intimate Portrait of Larry Ellison and Oracle, which the Court has found to be clearly relevant and

9  responsive to many of Plaintiffs' document requests.

10  • OSO was purged after this lawsuit was filed. Defendants made little or no effort to

11  ensure that the information on OSO and its backup tapes was preserved for this litigation.

12

13  • The information saved on other databases, for example Metalink, ECMS, or PRP, was

14  not preserved by Oracle.

15  • Of the two attorneys for Oracle who have testified in this case (including the attorney

16  responsible for Oracle's preservation effort), neither has been able to provide detail regarding

17  Oracle's efforts to preserve Ellison's files.

18  • Defendants made no effort to preserve the information contained on Larry

19  Ellison.com.

20

21  • Oracle did not preserve its preservation notices.

22  • Plaintiffs have received a few relevant documents from third parties which were not

23  produced by defendants in this litigation as a result of their lack of preservation effort. It is unclear

24  how much additional relevant material has been lost as a result of defendants' spoliation.

25  • Cooperman testified that Oracle did constant extensive surveys of its customers'

26  opinions and experiences on every topic under the sun. Although Oracle has represented that they

27

28

1 | have produced all such relevant document required under the discovery plan, plaintiffs have received

2 | no such surveys of customer experiences from the relevant time period.

3
4 | • Oracle indicated for the first time that some individuals' files may not have been

5 | preserved in mid-May 2005 (over four years after the lawsuit was filed and after the Court's deadline

6 | for document production had passed).

7 | • Even the direct reports of defendants and executives alleged to have made false and

8 | misleading public statements in this lawsuit did not receive preservation notices.  For example, of

9 | Sanderson's 12 direct reports, eight never received a document retention notice.  The remaining 4

10 | received such notices eight months after the case was filed.  Because Oracle's backup tapes are

11 | recycled every 30 days, unless specifically saved or archived by a witness, documents from the files

12
13 | of those who received late document retention notices are likely gone forever.  Not one of Stephanie

14 | Aas's direct reports received a document retention notice.

15 | • Oracle never preserved the files of confidential witnesses and even people specifically

16 | named in the Complaint, for example Adam Hahn and Brad Scott.

17 | • Many witnesses who never received preservation notices have testified that relevant

18 | documents would have been in their files.

19
20 | • Oracle has produced documents from the files of witnesses or which involve these

21 | witnesses well after their depositions

22 | • Upon an employee's departure from Oracle, that employee's e-mail is purged and

23 | deleted.

24 | • Upon the filing of this lawsuit, Oracle failed to put into place a litigation hold and its

25 | backup tapes continued to be recycled every day.

26
27 | • Oracle executives, including Ellison, Henley, and Sanderson, served as executive

28 | sponsors for sales accounts and owned particular escalated 11i accounts.  As such, had direct contact

1  with all levels of Oracle employees working to assist the relevant customer, not just those employees

2  at the AVP level and above.

3         • Given that there were 54 AVPs and 262 weekdays during the relevant period, Oracle

4
5  preserved on average less than two e-mails per week day per AVP. One AVP testified that he likely

6  sent between 75 and 125 e-mails per day. An SVP who did not receive a timely preservation notice

7  testified that she received hundreds of e-mails per day. Another testified that he would be copied on

8  100 e-mails per day. Many others gave similar testimony.

9         • The senior executives for General Business, to which Oracle attributed much of its

10  miss in 3Q01, received no preservation notices.

11         • Documents created after the filing of this lawsuit have not been preserved. A

12
13  March 19, 2001 e-mail sent from George Roberts to, among others, Ellison, Barrenechea, Sanderson,

14  Nussbaum, Jarvis, and Henley regarding Suite 11i problems at Papa John's, and stating "[t]his

15  situation can no longer wait. I have 3-4 clients where we are about to lose control" was not

16  preserved in the files of any of the recipients.

17         • Although Henley testified that he never reaffirmed guidance during a quarter,

18
19  plaintiffs have identified and defendants have produced multiple documents, both from analysts and

20  from Oracle public and investor relations in which Henley is quoted as reaffirming guidance during a

21  quarter.

22         • Defendants Ellison and Henley, while in possession of adverse material insider

23  information, sold over 32 million shares of Oracle for proceeds of over $900 million during the Class

24  Period.

25         • On December 27, 2000, Ellison exercised 815,000 options, which witnesses have

26  testified were exercised for year end tax planning purchases.

27

28

- Between January 22, 2001 and January 31, 2001, Ellison sold 29,084,576 shares of Oracle stock for proceeds of $894,786,135. Prior to these sales, Ellison had not sold Oracle stock since 1996.

- Until he received the barrage of negative insider information regarding Oracle's business prospects in December 2000 and January 2001, Ellison's original plan was to exercise and sell in either 1Q02 or 4Q01. Employees within Oracle, especially in Oracle's corporate tax department, sought to persuade Ellison to trade during the final trading window of fiscal 2001 (April 2001) instead of 1Q02 for Oracle's own tax planning purposes. As a result, it is clear that Ellison planned to exercise and sell in April 2001. Ellison did not communicate a decision to trade in January 2001 to anyone until January 19, 2001 when he informed Carolyn Balkenhol and Philip Simon.

- Between January 22, 2001 and January 29, 2001, Ellison exercised 22,232,000 options.

- On January 4, 2001, Henley sold 1 million shares of Oracle stock for proceeds of $32,312,500. On January 4, 2001, Henley exercised 1 million options.

- In 1Q00, Oracle repurchased approximately 78,052,000 shares of its own stock for approximately $579,895,000. In 2Q00, Oracle repurchased approximately 76,702,000 shares of its own stock for approximately $791,906,000. In 3Q00, Oracle repurchased approximately 31,098,000 shares of its own stock for approximately $672,732,000. In 4Q00, Oracle repurchased approximately 104,889,854 shares of its own stock for approximately $3,262,238,000. In FY2000, Oracle repurchased approximately 290,741,854 shares of its own stock for approximately $5,306,771,000. In 1Q01 Oracle repurchased approximately 51,807,656 shares of its own stock for approximately $1,995,423,000. In 2Q01 Oracle repurchased approximately 43,600,000 shares of its own stock for approximately $1,425,400,000. In 3Q01, Oracle repurchased approximately

12,600,000 shares of its own stock for approximately $350,900,000. In 4Q01, Oracle repurchased approximately 33,556,604 shares of its own stock for approximately $528,277,000. In FY2001 Oracle repurchased approximately 141,564,260 shares of its own stock for approximately $4,300,000,000. In 1Q02, Oracle repurchased approximately 42,100,000 shares of its own stock for approximately $753,800,000. In 2Q02, Oracle repurchased approximately 82,500,000 shares of its own stock for approximately $1,100,000,000.

•    At the end of 2000, Henley stated: "It's a whole new opportunity. Now, whether we'll do it or not, I have no idea, but it's the thrill of doing something really big with 11i. So I have strong financial incentives to want to stay, and certainly the stock has imploded. I'd like to see it regain, do a double or a triple, and get some of my capital. I want my money back, that sort of thing. I've got a lot of vested options, so a lot of reasons, a lots of reasons that I've stayed."

•    After delaying the release of 11i once, Ellison felt tremendous pressure from customers and analysts not to delay again.

•    Order management was critical to Suite 11i. According to Ellison, "The order management system is the heart of the sell side of our e-business suite. Order management is the funnel that captures the information about the sale. The better your order management system, the more information it captures."

•    According to Ellison, when order management came out it had a lot of bugs.

•    The release of a new order management system in Suite 11i was originally deemed "too risky" but Ellison decided to include it in the Suite anyhow. As a result, order management was released without enough testing.

•    Oracle was acutely aware of customer dissatisfaction with Suite 11i.

•    According to Ellison, the myriad problems with 11i "just kind of got away from us, and that became a very big problem."

1        •     It took longer to fix all of the problems with 11i than Ellison anticipated.

2        •     According to Ellison, he should have delayed the release of 11i for longer than he did.

3
4        •     Ellison has a habit of making false representations about the functionality of Oracle products.

5

6        •     Oracle has had problems with releasing its software too early and without enough

7 testing in the past.

8        •     Ellison on the release of 11i: "We should have done two things: installed it in-house

9 first and engaged with the early implementations at an executive development level. I think if either

10 of those things had happened, we would have rapidly found out that it wasn't done. As it was, it

11 took us until November [2000] to realize we had issues and start to mobilize."

12

13        •     Ellison discussing Oracle's internal implementation of 11i in December 2000 and

14 January 2001: "But I wanted to get all our latest application software installed, up, and running at

15 Oracle, and I wanted to do it fast. We should have done it before we released 11i to customers, but

16 we didn't. Okay, that was my mistake. Now I wanted to remedy that mistake as soon as possible."

17        •     On GE Medical's 11i implementation: "The contract was signed in late October

18
19 [2000] with a clear understanding that if Oracle delivered at Veresegyhaz, GE would start rolling out

20 11i across its thirty or so other turbine plants. Within a month, the project was in trouble."

21        •     On the release of 11i "If Ellison had known what was coming, he might have

22 restrained himself a little more. In October [2000], the first reports from the field described early 11i

23 implementations afflicted with more than usual bugginess. . . . Over the next couple of months,

24 customer complaints poured in. Instead of working on the planned features and functions to flesh

25 out the suite's capabilities as planned, development was increasingly engaged in a feverish attempt

26
27 to produce patches that would fix the bugs that seemed to be flying at them from all sides. . . .

28 Ellison says, '11i was a huge new product, so I knew there would be a lot of bugs, but there was no

way to know how many there were or how long it would take us to fix them. I thought we could fix most of the bugs pretty quickly, during the controlled release phase. I was way too optimistic. It just kind of got away from us, and that became a very big problem."

- SOFTWAR promotional materials on the release of 11i: "Then last spring, Ellison rolled the dice for the second time: Oracle shipped Release 11i. . . . If the first bet was daring, this second bet is even reckless.

- SOFTWAR promotional materials on Ellison: "Ellison says he's only happy when everyone else thinks he's wrong, when he's 'walking way out to the end of the limb, then jumping up and down.'. . . For Ellison, it will always be a matter of 'win or die.' He says, 'Without recklessness, you can't innovate. The rewards of recklessness are enormous.'"

- SOFTWAR promotional materials on Ellison's penchant for lying: (quoting Ellison) "'But I was lying: I had no intention of doing that. I lied because I wanted to appear balanced and reasonable and because I needed time. I never had a problem lying. I knew I was right.'"

- Sergio Giacoletto was concerned that Oracle was losing its credibility as a result of problems with 11i implementations.

- GE felt that 11i had not been properly tested and were upset that specifically had to identify problems to Oracle's development team before that team would begin working on the problem.

- 11i was still not stable long after the Class Period ended.

- Escalated Account Reports received by top Oracle executives detail hundreds of unhappy Oracle 11i customers, many of whom had problems which were not resolved for months or at all.

- There were significant customer escalations as a result of the code quality of 11i releases.

1    • Hewlett Packard was concerned about the quality of the support that they received

2    from Oracle on 11i.

3    • As of the end of August 2000, there were 15 customers live on 11i. None of these

4    customers were live on CRM.

5

6    • 11i CRM and ERP did not integrate. In late August 2000, Oracle executives

7    expressed disbelief that a customer could be live on both CRM and ERP, stating "We have a hard

8    time to believe that they have ERP and CRM running together." The were right. At this time, there

9    were no Oracle customers live on CRM.

10   • In January 2001 Christopher Balkenhol, who had recently taken over CRM customer

11   escalations, was overwhelmed with the number of escalations.

12

13   • 11i was so dysfunctional that Jay Nussbaum refused to forecast it.

14   • Oracle's own User's Group was extremely negative about the quality of 11i.

15   • Oracle employees informed Oracle executives that the myriad of problems with 11i

16   and the resulting failed implementations were putting OSI's State & Local vertical out of business.

17   • Oracle employees felt that troubled implementations were creating a "big quality

18   black eye" for Oracle.

19

20   • Mary Ann Anthony reported that many customers preferred 10.7 or previous versions

21   of Oracle's application suite as a result of "the lengthy and painful patching exercise" of upgrading

22   to Suite 11i.

23   • Mark Barrenechea did not think that CRM was ready to release at the end of May

24   2000.

25

26   • Oracle would have lost credibility in the market if it further delayed the release of 11i.

27   • Oracle was concerned about a possible loss of credibility connected with any failure

28   to timely release a performance fix for the use of 11i on Apple computers.

DRIFTON FINANCE CORPORATION'S SECOND SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS - C-01-0988-MJJ          - 72 -

1  •  Oracle had a difficult time competing with Siebel's CRM products.

2  •  Before, during, and after the Class Period, Oracle had extreme difficulties with

3
4  running 11i in different languages. This was despite Ellison's statements to the contrary in October
   2000.
5

6  •  Oracle's own difficulties in implementing 11i internally included problems in its

7  Education business which resulted in its inability to recognize revenues.

8  •  Oracle delayed its internal implementation of 11i many times because of concerns

9  with the product.

10  •  Customers experienced extreme difficulties with Oracle's NT product during the

11  Class Period.
12

13  •  Oracle had trouble finding references for 11i before, during, and after the class

14  period. E-mails detail their desperate searches for customers to act as references. Ellison was

15  reduced to using companies as references when in fact only a small portion of the company was

16  using 11i and in some cases, was not even live yet. Ellison also refused to remove GE as a reference

17  even after it demanded that it not be used. Oracle went out of its way to ensure that contact

18
19  information for GE was not released so that potential customers and analysts could not contact GE to

20  ascertain its experience with 11i. Oracle offered discounts to customers to persuade them to act as

21  references.

22  •  Oracle internal documents discuss the lack of integration between 11i modules as late

23  as 2002. For example, such documents state that weaknesses in 11i architecture made it more akin

24  to Best of Breed, problems were damaging Oracle's sales campaigns, and the capabilities to integrate

25  were non-existent or broken.
26

27  •  Oracle gave concessions to unhappy customers to induce them to act as references for

28  11i. For example, Select Medical Corporation had previously been a reference for Oracle but asked

DRIFTON FINANCE CORPORATION'S SECOND SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS - C-01-0988-MJJ        - 73 -

that potential customers not contact them because of major problems with their implementation of 11i HR and Financials, including almost coming within 15 minutes of missing a direct deposit pay run as a result of poor system performance and the causation of months of instability in their underlying database. Even a weekly conference call with Oracle development could not quickly solve the problems. An upgrade to 11.5.3 caused even more problems. Oracle offered the customer a renewal of non e-business licenses at 100 percent discount of support cap, approved by Larry Ellison, in order to induce Select Medical to act as a reference for Oracle. Approval for a $450,000 concession to Interlogix, Inc. was requested from Ellison because their implementation of 11i was a disaster. The CEO had lost confidence in the product and the problems cost Interlogix $2.4 million in overruns. Problems with 11i were affecting both Interlogix's financial health and its employees' morale. Oracle recommended approving the $450,000 concession on the condition that Interlogix signed a release and agreed to be a reference.

• Oracle was forced to give concessions to unhappy 11i customers to avoid litigation and bad publicity, among other reasons.

• In October 2000, there were huge problems with the 11i implementation at Xerox. Oracle was putting in hundreds of patches a week and still could not get Contracts to function. According to Todd Allen, "We still can't get contracts to work. We have no idea what awaits us as we implement the rest of CRM! The products do not integrate to the back office, they don't work period." The product was not stable. At that time, Xerox was threatening to write a letter to Ellison to ask for its money back and told Oracle representatives that "your company is two steps away from fraudulent." Ellison testified that "Xerox was implementing fairly standard software" and that ultimately, "Xerox was implemented successfully, very close to on schedule." In actuality, Oracle was forced to pay a large concession to Xerox as a result of problems with 11i. Ellison approved a

$2.7 million concession to Xerox due to significant issues with its implementation resulting from problems with code stability and lack of integration between CRM and Order Management.

- Concessions to unhappy 11i customers impacted Oracle's financial prospects. For example, the negative revenue impact on just NAS and OPI in Q301 was at least $14.6 million.

- According to Ellison, if Oracle upset too many customers in a particular time frame, it could affect Oracle's financial results.

- Paxar experienced extreme hardship while upgrading to 11i. In December 2000, top Oracle executives including Ellison, Henley, Roberts, and Cochran were alerted to these hardships. Paxar claimed that Oracle had guaranteed that 11i Order Management was stable and ready for implementation. Paxar was dissatisfied with Oracle's products and Oracle consulting was forced to give away over 1,700 hours of non-billable time as a result of Paxar's issues. Paxar was threatening to take its negative experience with 11i public and Oracle decided to act quickly to fix the problems so that the problems would not be publicized.

- As of April 13, 2001, 11i product issues had caused a two percent deterioration in fiscal year 2001 margin percentage for Oracle consulting. Oracle made a $2 million concession to Paxar, a $2 million concession to Ingersoll Rand, at least a $1 million concession to Xerox, a $1 million concession to Greenway Medical, a $1 million concession to Honeywell, and a $1 million concession to Franklin Covey, to name a few, as a result of problems with 11i.

- Oracle made a huge concession to BellSouth as a result of its problems implementing 11i.

- The problems with 11i harmed the Oracle customers who attempted to install it. Zapmedia's CFO sent e-mails to Mark Barrenechea and Larry Ellison regarding the company's problems with its implementation of the CRM module. He explained that even after 50 hours of patching by Oracle's consultants the product did not work and that as a result, the company could

not roll out its new product and was losing huge amounts of money. Zapmedia's CFO claimed that Oracle Support could not solve their problems and had limited knowledge of 11i and that the CRM package was extremely unstable. Later, Oracle was forced to grant Zapmedia a concession but by that time that company was on the verge of going out of business and declaring bankruptcy.

• Liberty Mutual met its go live date with 11i in early January 2001 but then experienced "atrocious" performance issues with 11i HR/Payroll. Ellison knew about the problems at Liberty Mutual. As of January 9, 2001, LM felt that the implementation was not complete as a result of performance problems. These problems were having a negative impact on LM's business.

• In August 2000, National Pen claimed that Oracle showed them software features not actually available in 11i, that the software did not have the correct functionality for its business, that software performance caused extreme difficulty processing orders and that the implementation was flawed. NP claimed to be in worse shape after implementing 11i and was extremely upset with the gap between its expectations and the actual business results of the software implemented by Oracle. NP was in extreme financial difficulty, had lost their financial backing, and claimed that the implementation of 11i was a major factor in their business decline. Ellison and Catz were aware of the situation in August 2000.

• In mid-December 2000, the implementation of 11i at Pepsi Cola's Ireland plant was an "unmitigated disaster for [the plant] from both a cost, employee, and relationship perspective." The plant claimed to have spent a fortune trying to get 11i to work but claimed that the software simply didn't work and was defective. The employees at the plant were demoralized as a result and the plant was forced to announce a delay to its customers, thus tarnishing its reputation. The customer was using "vanilla" 11i software and avoiding modifications, yet could still not get the product to work. Ellison was aware of this problem in December 2000.

1     •     By January 2001, Oracle's earliest 11i customers (especially CRM and Order

2 Management) were exhausted from the effort of implementing 11i.

3     •     The problems with 11i affected Oracle's ability to sell to potential customers both

4 directly and indirectly. Oracle customers were refusing to act as references for 11i due to their

5 terrible experiences with the product. Without references, Oracle had a difficult time convincing

6

7 customers to buy their expensive new product. Chipotle removed themselves as an Oracle reference

8 in March 2001 until the "reality meets the hype." Chipotle's problems with 11i negatively affected

9 Oracle's ability to sell to McDonald's Chipotle's parent company.

10     •     Customers were refusing to buy additional products from Oracle as a result of their

11 terrible experience with 11i. TMP Worldwide, a multibillion dollar company implementing Suite

12 11i could not get it working and was threatening to cancel both the 11i project and an additional $3

13

14 million deal as a result. In October 2000 Ingersoll Rand ("IR") had a critical situation with its

15 upgrade to 11i. According to IR, it could not get the software to function and had no confidence in

16 Oracle's ability to provide it with a stable working environment. Its onsite consultants were

17 debugging the software instead of working on the project itself. IR believed that CRM and OM were

18 not ready for deployment in October 2000. IR had already been delayed, expected to be further

19 delayed, and felt that Oracle as an organization had let it down. The Oracle executive sponsors felt

20 that Oracle was failing at attempts to install 11i CRM and ORM at IR and, as a result, were missing

21

22 related revenue opportunities valued at between $10 and $20 million. They referred to the

23 implementation as a "crisis situation." According to the Oracle executive, IR had originally been

24 quite eager to be a reference but later refused to do so as a result of the problems. IR was

25 considering replacing Oracle with Siebel. According to the Oracle consultants on the IR project,

26 there was little 11i documentation, little training, and various other shortcomings and failures which

27 were apparent to their customers. IR was also refusing to buy Oracle database products because of

28

its issues with Oracle's applications even though the sales representative noted that IR had always been a big Oracle supporter and it should have been an easy database sale.  In November 2000, IR was no happier with 11i.  Although Ellison testified that IR was eventually a happy 11i customer, in actuality Oracle was forced to make a $2 million concession to IR as a result of these issues.

• In January 2001, and the period leading up to it, there was an upward trend in "critical accounts" implementing Suite 11i.  Critical accounts are described as "[w]here a situation deteriorates to the point where the relationship with the customer is threatened and/or future business at risk. . . ."  The upward trend was attributed to ERP and CRM issues.

• Oracle never delivered MRO, as promised to General Electric Aircraft Engines. GEAE felt that Oracle had missed every date and commitment for delivery of the product.  This failure on Oracle's part affected its ability to negotiate later transactions with GE involving 11i and prompted GE to request extra assurances that Oracle could deliver on its products and contract for large penalties in the event that it did not.  Oracle felt that it would be difficult to bring in 11i revenues (between $8 to $10 million worth) without delivering on MRO, which it never did.  Ellison was convinced that there would be lost revenue as a result.

• According to Keith Block, Oracle consultants were recommending that potential clients wait to update to 11i based on their negative experiences with the product.  Clients were also making that decision on their own.  Block felt that 11i training and product quality were to blame and Sanderson wrote that "Product quality in Q1 alone impacted profitability by $3 million." According to Ellison, such problems were discussed constantly by the entire management team, including himself.

• At the beginning of January 2001, Barclays was threatening to revisit alternative software providers as a result of problems with 11i – in particular, their "get well plan" had "slipped

significantly." According to a letter from Ellison to Barclays, Oracle was "aware that our UK support and technical operations are inadequate."

- As of January 2001, Oracle's sales representatives felt that "in existing clients who are currently implementing 11i, heavy patching due to product instability is impacting our ability to engage them in additional sales cycles."

- According to Sergio Giacoletto, as of December 2000, his salespeople were reluctant to try to sell 11i due to product problems, lack of references, and local language issues.

- Oracle had few, if any, happy 11i customers during and leading up to the Class Period. The few customers who did act as references for Oracle were often customers who had been bribed to do so through the use of concessions and settlements that required the customer to act as a reference in exchange for the concession or through the use of discounts as an inducement. As a result of this lack of references, Oracle had a difficult time selling 11i during the Class Period and beyond.

- Oracle experienced extreme difficulty trying to demo 11i to potential customers. These difficulties made it difficult for Oracle to sell 11i. The issues which caused the problems were similar to issues customers were experiencing in trying to install the product. Oracle has admitted that at least one large deal did not close in February 2001 as a result of the inability of Oracle to demo 11i. Evidence shows that many additional customers were negatively influenced by their demo experiences.

- Catz, Sanderson, Wohl, Barrenenechea, and Roberts were aware that problems with the 11i demo system were costing Oracle 1Q01 business. The demo system was seen as crucial to the "e-business story" and, as a result of these problems, weekly conference calls were set up to address such problems.

1   • Order Management, CRM and a lack of integration between the two were problems

2   cited as causing demo issues in July 2000.

3   • According to Ellison, without a working product demo including example or

4   demonstration data, it harder to sell the product. Oracle did not have such a working demo during

5   the Class Period nor long after.

6

7   • In October 2000, Oracle's demo problems were affecting its ability to sell 11i. The

8   problems included product integration and stability. Oracle still did not have an integrated demo.

9   Ellison was aware of this in October 2000.

10  • In January 2001, Oracle was still having major problems with its product demos.

11  Ellison was aware that Oracle was getting its "clocks cleaned by Siebel" as a result. In January

12  2001, the CRM and ERP product demos did not integrate and still required separate demonstrations

13

14  and interfaces. Ellison was aware of this issue. According to Oracle employees, a functional live

15  integrated demo was "key to our success in Majors. We can't keep going back to the customers to

16  ask for a "do-over" when it comes to demos. This has been the norm rather than the exception of

17  late."

18  • Ellison testified that many of the demo problems Oracle was experiencing in January

19  2001 were the same sorts of demo issues it was confronting throughout 2000.

20

21  • Ellison and Wohl were executive sponsors for POSCO. In August 2000, POSCO's

22  CIO communicated to Ellison that issues with 11i were putting its go-live date at risk, despite the

23  huge amount of resources POSCO was putting into the project. Oracle's POSCO representative felt

24  that there were substantial issues to which Oracle was not providing a satisfactory reply.

25  • Ellison had monthly calls with GE regarding their implementations. In December

26  2000, GE Power was having problems with its 11i upgrade prompting an Oracle engineering

27  manager to comment that the December 15, 2000 call would be a "rough call."

28

1    • As of December 2000, all of Oracle's partners were facing huge issues in their

2    implementations of 11i as a result of poor product quality. They were not able to implement the

3    product in a reasonable time nor to stabilize the environments.

4    • In October 2000, Hewlett Packard was not happy with the quality of Oracle's CRM

5    products. HP believed that it received an uninstallable product and was asked to pay consulting fees

6    
7    to make it work. As a result, it had withheld payment of such consulting fees.

8    • In December 2000 and January 2001, despite four weeks of trying, GE was unable to

9    upgrade a single instance during its 11i implementation. GE was concerned about the quality of the

10   product and its ability to meet its scheduled go-live date. Ellison was having biweekly calls with the

11   CIO of GE during this time frame.

12   
13   • As of the July 2000, testing of 11i at BellSouth was not going well, causing

14   disappointment to the customer.

15   • Ellison was aware that BellSouth's 11i implementation "did not go well" from "lots

16   of meetings" that he attended about BellSouth. He was personally involved in the implementation.

17   Ellison felt that the BellSouth implementation was an enormously risky project.

18   Numerous other customers, including Papa John's, ValueVision, American Greetings, and

19   Tropicana, to name a few, had negative experiences as a result of problems with 11i.

20   INTERROGATORY NO. 9:

21   Identify all facts that support Your contention in paragraph 14 of the Complaint that Suite 11i

22   was "supposed to drive both 25% database and 75% applications sales growth in 3Q01" and, for

23   each such fact, Identify the source of the fact.

24   RESPONSE TO INTERROGATORY NO. 9:

25   Drifton Finance Corporation hereby incorporates the General Objections above as if set forth

26   herein.

27   

28

1   Drifton Finance Corporation further objects to this interrogatory on the grounds that it is
2   compound, vague, ambiguous, overly broad and unduly burdensome.

3   Drifton Finance Corporation further objects to this interrogatory on the grounds that the term
4   "source" is vague and ambiguous.

5   Drifton Finance Corporation further objects to this interrogatory on the basis of the attorney
6   work product doctrine.

7   Drifton Finance Corporation further objects to this interrogatory to the extent it seeks
8   information not in Drifton Finance Corporation's custody, possession or control.

9   Drifton Finance Corporation further objects to this interrogatory as premature to the extent it
10   seeks facts and/or information that are subject to ongoing or future discovery – including
11   information to be obtained during the depositions of, and document production by the Oracle
12   defendants and various third parties – or expert opinion.

13   Drifton Finance Corporation further objects to this interrogatory on the grounds that it
14   constitutes a contention discovery request that is premature at this stage of the litigation.

15   Drifton Finance Corporation further objects to this interrogatory to the extent it
16   mischaracterizes the allegations in the RSAC.

17   Subject to and without waiving the foregoing specific and general objections, Drifton
18   Finance Corporation directs defendants to the RSAC.

19   SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:

20   Plaintiff supplements his responses as follows:

21   In an interview with Bloomberg News published on December 14, 2000, defendant "Henley
22   said he expects sales growth of Oracle 11i to accelerate in the third quarter, enabling the company to
23   meet its full-year applications sales growth target of 50 percent to 100 percent."

24   47.   During a December 14, 2000 conference call, defendant Henley stated "[S]o the
25   numbers I'm going to give you here, . . . in terms of real (constant) dollar growth . . . [a]pplications,
26   we're thinking 75, or potentially better."

27

28

1    48.    On January 8, 2001, defendant Sanderson visited the offices of Salomon Smith

2   Barney and made the following statements to securities analysts, which were repeated in a report

3   issued by Salomon Smith Barney:

4        (a)    The suite is pre-integrated and fully interoperable out of the box, helping to

5   lower consulting costs and time-to-value.

6        (b)    Oracle sees robust demand for both its database and applications business.

7   Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and

8   scheduling, CRM, and SCM products are also performing well.  Oracle says it is also seeing

9   sustained demand for its database product, despite industry-wide concern over contracting IT

10   budgets.    Sanderson noted two trends driving demand for databases is demand for the 11i

11   applications that are typically bundled with the database as well as applications of other vendors that

12   rely on the functionality of the Oracle database.

13        At the time these statements were made, the "applications" products sold by Oracle were

14   primarily Suite 11i and/or it the modules of Suite 11i.

15   INTERROGATORY NO. 10:

16        Explain how any of the alleged problems with Suite 11i that You identify in the Complaint

17   caused Oracle to fail to meet its 3Q01 revenue and sales forecast.

18   RESPONSE TO INTERROGATORY NO. 10:

19        Drifton Finance Corporation hereby incorporates the General Objections above as if set forth

20   herein.

21        Drifton Finance Corporation further objects to this interrogatory on the grounds that it is

22   compound, vague, ambiguous, harassing, overly broad, unduly burdensome and without reasonable

23   limitation in its scope.

24        Drifton Finance Corporation further objects to this interrogatory on the basis that the terms

25   "explain" and "caused" are vague and ambiguous.

26        Drifton Finance Corporation further objects to this interrogatory on the basis of the attorney

27   work product doctrine and/or the attorney-client privilege.

28

1       Drifton Finance Corporation further objects to this interrogatory to the extent it seeks

2 information not in Drifton Finance Corporation's custody, possession or control.

3       Drifton Finance Corporation further objects to this interrogatory to the extent it

4 mischaracterizes the allegations in the RSAC.

5       Drifton Finance Corporation further objects to this interrogatory as premature to the extent it

6 seeks facts and/or information or information that are subject to ongoing or future discovery –

7 including information to be obtained during the depositions of and document production by the

8 Oracle defendants and various third parties – or expert opinion.

9       Drifton Finance Corporation further objects to this interrogatory on the grounds that it

10 constitutes a contention discovery request that is premature at this stage of the litigation.

11       Drifton Finance Corporation further objects to this interrogatory to the extent it seeks a legal

12 conclusion.

13       Subject to and without waiving the foregoing specific and general objections, Drifton

14 Finance Corporation directs defendants to the RSAC and the Ninth Circuit's Opinion in *Nursing*

15 *Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

16 SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

17       Plaintiff supplements his responses as follows:

18       Problems with Suite 11i identified in the Complaint caused Oracle to fail to meet its 3Q01

19 revenue and sales forecast for the following reasons:

20       ●    Customers and potential customers of defendants declined or deferred purchasing

21 Suite 11i due to the problems with Suite 11i;

22       ●    Customers and potential customers of defendants declined or deferred purchasing

23 products and services sold by defendants in conjunction with sales of Suite 11i due to the problems

24 with Suite 11i;

25

26       ●    Customers and potential customers of defendants declined or deferred purchasing

27 database products due to the problems with Suite 11i;

28

DRIFTON FINANCE CORPORATION'S SECOND SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS - C-01-0988-MJJ      - 84 -

1       •      Customers and potential customers of defendants declined or deferred purchasing

2  products and services sold by defendants in conjunction with sales of database products due to the

3  problems with Suite 11i; and

4

5       Problems with Suite 11i forced Oracle to defer revenue and to incur contra-revenue and

6  expenses associated with concessions, unbillable costs, product returns, "free consulting" and

7  settlements.

INTERROGATORY NO. 11:

8       Identify the "Witnesses" who You allege in paragraph 7 of the Complaint "confirmed" that

9  Oracle was extending "deep discounts in order to fend off emerging database competitor IBM."

10  When Identifying such witnesses, if any were Oracle employees, please include each such witness'

11  title or titles with Oracle and the precise location of that witness' office(s) while employed with

12  Oracle.

13  RESPONSE TO INTERROGATORY NO. 11:

14       Drifton Finance Corporation hereby incorporates the General Objections above as if set forth

15  herein.

16       Drifton Finance Corporation further objects to this interrogatory on the grounds that it is

17  compound, vague, ambiguous, harassing, overly broad, unduly burdensome and without reasonable

18  limitation in its scope.

19       Drifton Finance Corporation further objects to this interrogatory on the basis of the attorney

20  work product doctrine and/or the attorney-client privilege.

21       Drifton Finance Corporation further objects to this interrogatory to the extent it seeks

22  information not in Drifton Finance Corporation's custody, possession or control.

23       Drifton Finance Corporation further objects to this interrogatory to the extent that it seeks

24  information equally or more readily available to defendants.

25       Drifton Finance Corporation further objects to this interrogatory to the extent it

26  mischaracterizes the allegations in the RSAC.

27

28

1      Drifton Finance Corporation further objects to this interrogatory as premature to the extent it

2 seeks facts and/or information that are subject to ongoing or future discovery – including

3 information to be obtained during the depositions of and document production by the Oracle

4 defendants and various third parties.

5      Subject to and without waiving the foregoing specific and general objections, Drifton

6 Finance Corporation directs defendants to the RSAC.

7 SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:

8      Plaintiff supplements his responses as follows:  Jo Ann Chard was an Account Manager with

9 Oracle.  Her office was located in Redwood Shores, California.  Brian Woollacott was a Corporate

10 Account Manager with Oracle.  His office was located in Boston, Massachusetts.

11 INTERROGATORY NO. 12:

12      Identify all facts that support Your contention in paragraph 8 of the Complaint that Oracle

13 withheld overpayments and credits from its customers and improperly recognized revenue from

14 them by creating "phony sales invoices."

15 RESPONSE TO INTERROGATORY NO. 12:

16      Drifton Finance Corporation hereby incorporates the General Objections above as if set forth

17 herein.

18      Drifton Finance Corporation further objects to this interrogatory on the grounds that it is

19 compound, vague, ambiguous, harassing, overly broad, unduly burdensome, without reasonable

20 limitation in its scope and seeks information that is neither relevant nor reasonably calculated to lead

21 to the discovery of admissible evidence.

22      Drifton Finance Corporation further objects to this interrogatory to the extent it seeks

23 disclosure of information protected by the attorney-client privilege and/or the attorney work product

24 doctrine.

25      Drifton Finance Corporation further objects to this interrogatory to the extent it seeks

26 information not in Drifton Finance Corporation's custody, possession or control.

27      Drifton Finance Corporation further objects to this interrogatory to the extent it

28 mischaracterizes the allegations in the RSAC.

1        Drifton Finance Corporation further objects to this interrogatory as premature to the extent it
2 seeks facts and/or information that are subject to ongoing or future discovery – including
3 information to be obtained during the depositions of and document production by the Oracle
4 defendants and various third parties – or expert opinion.

5        Drifton Finance Corporation further objects to this interrogatory on the grounds that it
6 constitutes a contention discovery request that is premature at this stage of the litigation.

7        Subject to and without waiving the foregoing specific and general objections, Drifton
8 Finance Corporation directs defendants to the RSAC.

9 SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:

10        Plaintiff's supplemental response is subject to the following facts. Oracle has still not
11 produced all documents pertaining to plaintiffs' accounting allegations which may contain facts
12 responsive to this Interrogatory. Oracle produced hundreds of thousands of pages of accounting
13 documents on January 17, 2007, and at least 200,000 pages of new accounting documents yesterday,
14 January 30, 2007. Oracle has also indicated that it will produce additional documents after the
15 Court-ordered production deadline of January 31, 2007. Facts responsive to this Interrogatory may
16 arise from those documents directly, or from the analysis of those documents in conjunction with
17 documents and facts already produced. Further, defendants only produced documents relating to 926
18 or less than 1% of the 46,880 debit memos. Much of the information produced by defendants in
19 connection with the 926 debit memos was contained on a "Script Output" which is riddled with
20 errors and inconsistencies. Subject to the foregoing, plaintiff supplements its responses as follows:

21        •     Over the period of many years dating back to at least 1990, thousands of customers
22 inadvertently overpaid invoices or made duplicate payments to Oracle. Overpayments occurred for a
23 variety of reasons. In some instances, Oracle overcharged customers by issuing duplicate invoices
24 and customers paid twice. This happened, for example, when Oracle personnel created "Pro Forma
25 Invoices" or "POEFs" which were essentially sales documents that were created before the actual
26 sale occurred. Sometimes, Oracle sent these Pro Forma Invoices to customers, and also sent a
27

28

legitimate invoice for the same sale, causing the customer to unknowingly pay twice for the same invoice.

• On other occasions, overpayments were the result of a customer paying the full amount for an open invoice that was reduced or adjusted downward by use of a "credit memo," sometimes before, and sometimes after, the payment was made. This happened, for example, when Oracle issued discounts or concessions to customers because of product problems, returns, or complaints by the customer. Sometimes, customer deposits were simply not returned, or refunds would be agreed to, but Oracle failed to execute the refund. Credit memos were also issued when Oracle executed a "credit memo/rebill," to reallocate revenue between license and support. Oracle's policy was to not send copies of credit memos to its customers. Thus, customers unwittingly overpaid millions of dollars on invoices that had been double-billed or reduced due to a credit memo.

• In many instances, Oracle's customers did not realize they overpaid or paid twice for the same invoice. Oracle simply kept the money in Account 25005 on the General Ledger entitled "Customer Overpayments." The overpayments were designated by Oracle as "unapplied cash." Oracle also held customer overpayments in Account 12018.

• Prior to, during, and after the Class Period, Oracle's unapplied cash and customer overpayments accumulated to more than $100 million dollars. Oracle had a policy of not refunding customers for overpayments or duplicate payments unless the customer specifically requested a refund in writing. Because the customers were typically not aware of the overpayment, they rarely requested refunds or credits from Oracle and Oracle kept the money.

• Some customers hired third party audit and recovery firms such as PRG Schultz, Inc. ("PRG") to research and recover overpayments from Oracle. PRG discovered millions of dollars in customer overpayments and duplicate payments that were never refunded to Oracle's customers. Some of the customers that learned of the overpayments from PRG eventually demanded and

received cash refunds from Oracle for their overpayments. Many customer overpayments, however, went undetected by customers. In 2Q01 and other fiscal periods, Oracle used the overpayments for improper purposes to boost its own financial results.

- On or around November 17-19, 2000, Oracle conducted an "On Account Clean Up for U.S.A. Data." Oracle created over 46,000 debit memo invoices for thousands of customers. Oracle created additional debit memos in December 2000. According to Oracle's user guide a "debit memo" is defined as: "Debits that you assign to your customer for additional charges that you want to collect. You may want to charge your customers for unearned discounts taken, additional freight charges, taxes and finance charges."

- For each debit memo created in November 2000, Oracle created a sales invoice with a "550" prefix. For each debit memo, there was a "debit" to Oracle's Accounts Receivable account and a "credit" to Oracle's Revenue account. An Accounting "credit" to the revenue account means an increase in the amount of revenue in that account. The sales invoices created for each debit memo made it look like the debit memos resulted from legitimate sales.

- On November 18, 2000, Oracle created a cash receipt for each debit memo to make it look like a legitimate cash receipt came in on that day. In reality, the cash receipts associated with the debit memos came in prior to November 17, 2000. The creation of the debit memos caused the 46,000+ items of unapplied cash and customer overpayments to be hidden from Oracle's collections department so that Oracle's own staff could not see overpayments. Thus, thousands of customers were never made aware of their overpayments.

- Prior to and during the Class Period, Oracle unlawfully transferred customer overpayments and unapplied cash from Oracle's "Customer Overpayment Account," Account 25005 to Oracle's Bad Debt Reserve account, known as "Account 12601." These improper transfers allowed Oracle to increase their bad debt reserve on Oracle's financial statements. Because Oracle

1   accounted for changes in the bad debt reserve by adjusting revenue, the transfers artificially inflated

2   Oracle's revenues and earnings. Oracle's Upside Reports for 2Q01 confirm that a "bad debt

3   adjustment" was taken which impacted revenue. Many facts related to these bad debt transfers are

4   likely contained in hundreds of thousands of documents that Oracle is producing on January 30-31,

5   2007, pursuant to the Special Master's December 19, 2006 Order Granting Plaintiffs' Motion to

6   Enforce the Special Master's July 17, 2006 Order.

7

8       •       Of the 926 debit memos produced by defendants, at least 180 or approximately 20%

9   involved transfers to Oracle's bad debt reserve or other income-generating accounts. Those

10  improper transfers were later reversed by Oracle after November 17, 2000, mostly during the 2002

11  Clean Up.

12

13      •       Oracle also had a practice of automatically transferring customer overpayments and

14  unapplied cash to the bad debt reserve through an "auto-adjustment" process. The auto-adjustments

15  consisted of smaller amounts of unapplied cash, sometimes as little as $0.01. These smaller items

16  were systematically "swept" from Account 25005 to the bad debt reserve periodically to artificially

17  increase Oracle's earnings. Because the items of unapplied cash were so small, Oracle's customers

18  rarely found out about the overpayments and they were easier to hide.

19

20      •       Beginning in October 2002, immediately following the filing of plaintiffs' complaint

21  on October 11, 2002, Oracle held a series of meetings to discuss how to "clean up" the unapplied

22  cash "problem" to determine the "revenue impact" of the debit memos and the unapplied cash

23  transfers, to put the unapplied cash back into the "proper" buckets, and to ensure that the problem

24  "never happened again" (the "2002 Clean Up"). The clean up was referred to as an "On Account

25  Clean Up for U.S.A. Data" which was the same terms used for the November 2000 Clean Up.

26  During the meetings, Oracle's collections staff was told about plaintiffs' lawsuit and the debit memo

27  allegations and that it was their job to help Oracle fix the problem and figure out how to resolve the

28

thousands of customer overpayments and unapplied cash items. During the meetings it was discussed that what happened in November 2000 with respect to the debit memos caused the problem that was the focus of the 2002 Clean Up. Oracle's collectors were told that they should focus all of their time and attention to fixing the unapplied cash problem on a full time basis.

• During the 2002 Clean Up, Oracle engaged in a systematic process to reverse the November 2000 debit memos and make it look like the debit memo transactions never resulted in fictitious revenue and earnings and never were transferred to Oracle's bad debt reserve. Oracle did this by issuing at least one thousand credit memos to reverse corresponding debit memos and transfers of customer overpayments to Oracle's bad debt reserve. The creation and issuance of a credit memo has the effect of reducing revenue (as does reducing the bad debt reserve). The rate of credit memos issued during 2002 Clean Up was more than 100 times higher than the normal rate of credit memos issued by Oracle. Oracle also tried to disable the ability to move unapplied cash to the bad debt reserve via "on account."

• Further, to "clean up" the debit memos and the massive unapplied cash problem, Oracle issued hundreds of cash refunds to customers for tens of millions of dollars that had been sitting on Oracle's books for years. Oracle tried to hide the impact of some of the improper transfers of unapplied cash to the bad debt reserve by "adjusting up" invoices and applying the unapplied cash to the invoice. Oracle also applied unapplied cash from debit memos to new invoices. This made it look like the unapplied cash receipt (payment) was applied to a legitimate invoice for a legitimate sale. This also allowed Oracle to hide overpayments from its customers and avoid refunding the money. Oracle is still holding millions in customer overpayments from debit memo transactions that are more than six years old.

• The number of unapplied cash items was so large and the amount so great, that Oracle did not have the resources to resolve all of the items, especially the smaller debit memo and

DRIFTON FINANCE CORPORATION'S SECOND SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS - C-01-0988-MJJ          - 91 -

1  unapplied items. As part of the process, Oracle was forced to open and reactivate an old pro forma

2  database to attempt to determine which customer overpayments resulted from customers double

3  paying due to the issuance of two invoices, one pro forma, and one legitimate invoice. In 2003,

4  Oracle announced that it was moving its collections department to India. The unresolved items of

5  unapplied cash and customer overpayments were ultimately transferred to India as well, ensuring

6  that many customer overpayments were never discovered, resolved or refunded.

7

8       •     On October 23, 2003, Oracle made a presentation to the SEC regarding plaintiffs'

9  debit memo allegations. The presentation primarily focused on a few specific debit memos

10  involving customers Eli Lilly & Co. and Household International. Oracle claimed that the unapplied

11  cash and overpayments made by Eli Lilly and Household could not have been improperly recognized

12  as revenue during the Class Period because those overpayments were refunded to Eli Lilly and

13  Household years earlier. This was the basis upon which the SLC found that plaintiffs' accounting

14  allegations had no merit. Oracle failed to disclose to the SEC that Eli Lilly and Household were both

15  refunded for their debit memos years after Oracle said they were refunded. Oracle also failed to tell

16  the SEC that it had improperly transferred millions in unapplied cash to its bad debt reserve to inflate

17  revenue and earnings during the Relevant Time Period. Oracle also failed to tell the SEC that it

18  reversed, credited and refunded hundreds of debit memos for tens of millions of dollars after

19  plaintiffs filed their Complaint in October 2002.

20

21

22       •     Oracle has admitted that Account 25005 entitled "Customer Overpayments" was

23  publicly reported on Oracle's balance sheet as part of the line item "Customer Advances and

24  Unearned Revenue." The money that Oracle kept in its customer overpayments account, however,

25  was not unearned revenue; it was money that belonged to customers due to overpayments and

26  duplicate payments that Oracle never returned and used for improper purposes.

27

28

DRIFTON FINANCE CORPORATION'S SECOND SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS - C-01-0988-MJJ     - 92 -

1        •     Oracle's auditor during the Class Period, Arthur Andersen, did not conduct proper

2  audits or reviews of Oracle's financial statements and was not told that Oracle created the debit

3  memos. As a result, Andersen could not do any substantive analysis of the impact of the debit

4  memos on Oracle's financial statements. Andersen's consulting fees were more than nine times its

5
6  audit fees. After Andersen was replaced as auditor, Ernst & Young ("E&Y") took over and the audit

7  fees surged from $700,000 to $2.45 million, a 250% spike.

8        •     E&Y did not conduct a reasonable or complete investigation of the debit memos and

9  the on account clean up. E&Y relied upon documentation provided by Oracle and only reviewed

10  195 debit memos, less than 1% of the total debit memos. E&Y's investigation did not look at debit

11  memo audit trails or transactions underlying the debit memos. Oracle directed E&Y to confine its

12
13  procedures to a single day, November 17, 2000, even though the debit memo script may have been

14  run after that date, and the transfers and purported funds occurred prior to that date. E&Y never

15  tried to determine whether Oracle's unapplied cash funds belonged to Oracle's customers, or

16  whether the 2Q01 financial statements were materially misstated as a result of Oracle's improper use

17  of customer funds. E&Y claimed it did not know about Oracle's illegal transfers from Customer

18  Overpayments to the bad debt reserve and its documentation confirms this. E&Y did not determine

19  whether the bad debt transfers were legitimate or whether the transfers impacted revenue on days

20
21  other than November 17, 2000, and whether the transfers impacted Oracle's financial statements.

22        •     E&Y, AA and Oracle's Special Litigation Committee never analyzed the impact of

23  Oracle's bad debt transfers on Oracle's 2Q01 financial results. The Special Litigation Committee

24  only analyzed the impact on Oracle's 3Q01 financial statements. Oracle's Accounting Management

25  only analyzed the impact on Oracle's full-year (fiscal 2001) financial statements.

26        •     The financial impact of Oracle's debit memo scheme has been altered, distorted and

27  possibly lost forever by Oracle's improper destruction of key data and evidence during Oracle's

28

2002 Clean Up. As part of Oracle's attempts to resolve the huge amount of unapplied cash related to debit memos, Oracle collectors were told to delete, change and overwrite certain customer notes that had been previously entered into the system to document the history of customer overpayments and/or debit memo transactions. During the 2002 Clean Up, lawyers for Oracle told Jennifer Minton, Oracle's controller and the primary author of Oracle's Upside Reports upon which Oracle's 3Q01 forecasts were based, that she should intentionally keep herself uninvolved in the 2002 Clean Up and investigation.

• Further, plaintiffs believe that information responsive to this interrogatory, including highly relevant e-mails, spreadsheets and other documents were contained on the computer of Oracle collections manager Molly [Littlefield] Venkataramana. That computer was deleted and reimaged in approximately May 2003 after Oracle employees were told to preserve documents, and all information on the computer appears to have been destroyed in violation of the PSLRA. The "script output" produced by Oracle is riddled with inconsistent data.

Plaintiffs incorporate by reference all facts discussed in Response to Interrogatory No. 7 relating to defendants' spoliation of evidence.

INTERROGATORY NO. 13:

Identify the amounts of customer credits or overpayments Oracle allegedly withheld from the 16 customers identified in paragraph 36(b) of the Complaint.

RESPONSE TO INTERROGATORY NO. 13:

Drifton Finance Corporation hereby incorporates the General Objections above as if set forth herein.

Drifton Finance Corporation further objects to this interrogatory on the grounds that it is compound, vague, ambiguous, harassing, overly broad, unduly burdensome and without reasonable limitation in its scope.

Drifton Finance Corporation further objects to this interrogatory on the grounds that it is overly broad because there is no limitation as to time provided.

DRIFTON FINANCE CORPORATION'S SECOND SUPPLEMENTAL RESPONSES TO
DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS - C-01-0988-MJJ          - 94 -

1  Drifton Finance Corporation further objects to this interrogatory to the extent it seeks

2  disclosure of information protected by the attorney-client privilege and/or the attorney work product

3  doctrine.

4  Drifton Finance Corporation further objects to this interrogatory to the extent it seeks

5  information not in Drifton Finance Corporation's custody, possession or control.

6  Drifton Finance Corporation further objects to this interrogatory as seeking information that

7  is equally or more readily available to the defendants in this action.

8  Drifton Finance Corporation further objects to this interrogatory as premature to the extent it

9  seeks facts and/or information that are subject to ongoing or future discovery – including

10  information to be obtained during the depositions of and document production by the Oracle

11  defendants and various third parties – or expert opinion.

12  Drifton Finance Corporation further objects to this interrogatory on the grounds that it

13  constitutes a contention discovery request that is premature at this stage of the litigation.

14  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:

15  Plaintiff's supplemental response is subject to the following facts. Oracle has still not

16  produced all documents pertaining to plaintiffs' accounting allegations which may contain facts

17  responsive to this Interrogatory. Oracle produced hundreds of thousands of pages of accounting

18  documents on January 17, 2007, and at least 200,000 pages of new accounting documents yesterday,

19  January 30, 2007. Oracle has also indicated that it will produce additional documents after the

20  Court-ordered production deadline of January 31, 2007. Facts responsive to this Interrogatory may

21  arise from those documents directly, or from the analysis of those documents in conjunction with

22  documents and facts already produced. Further, defendants only produced documents relating to 926

23  or less than 1% of the 46,880 debit memos. Much of the information produced by defendants in

24  connection with the 926 debit memos was contained on a "Script Output" which is riddled with

25  errors and inconsistencies. Subject to the foregoing, plaintiff supplements its response as follows:

26  For Hewlett Packard, Oracle withheld at least $6,000 and as much as $1,985,000 in customer

27  credits or overpayments.

28

1       For General Motors, Oracle withheld at least $10,000 and as much as $56,000 in customer
2 credits or overpayments.

3       For Cargill, Oracle withheld as much as $69,000 in customer credits or overpayments.

4       For Pharmacia, Oracle withheld as much as $17,000 in customer credits or overpayments.

5       For Household, Oracle withheld at least $178,000 and as much as $179,000 in customer
6 credits or overpayments.

7       For Motorola, Oracle withheld at least $220,000 and as much as $1,407,000 in customer
8 credits or overpayments.

9       For SBC Southwestern Bell & Affiliates, Oracle withheld at least $590,000 and as much as
10 $1,171,000 in customer credits or overpayments.

11       For Dupont, Oracle withheld at least $100,000 and as much as $100,000 in customer credits
12 or overpayments.

13       For Eli Lilly, Oracle withheld at least $15,000 and as much as $61,000 in customer credits or
14 overpayments.

15       For First Hawaiian Bank, Oracle withheld as much as $17,000 in customer credits or
16 overpayments.

17       For Texas Instruments, Oracle withheld as much as $5,385,000 in customer credits or
18 overpayments.

19       For Sprint, Oracle withheld at least $3,000 and as much as $2,801,000 in customer credits or
20 overpayments.

21       For Phillips, Oracle withheld at least $268,000 and as much as $320,000 in customer credits
22 or overpayments.

23       For PacifiCare, Oracle withheld as much as $915,000 in customer credits or overpayments.

24       For Cummings [sic], Oracle withheld as much as $282,000 in customer credits or
25 overpayments.

26       For Kemet Electronics, Oracle withheld at least $85,000 and as much as $85,000 in customer
27 credits or overpayments.

28

1    Plaintiffs incorporate by reference all facts discussed in Response to Interrogatory No. 7

2  relating to defendants' spoliation of evidence.

3  INTERROGATORY NO. 14:

4    Identify all facts that support the contention that Defendants Ellison, Henley and Sanderson

5  were aware of, or authorized, the improper revenue recognition alleged in paragraph 8 of the

6  Complaint.

7  RESPONSE TO INTERROGATORY NO. 14:

8    Drifton Finance Corporation hereby incorporates the General Objections above as if set forth

9  herein.

10    Drifton Finance Corporation further objects to this interrogatory on the grounds that it is

11  compound, vague, ambiguous, harassing, overly broad, unduly burdensome and without reasonable

12  limitation in its scope.

13    Drifton Finance Corporation further objects to this interrogatory on the grounds that the

14  phrase "the contention" is vague and ambiguous.

15    Drifton Finance Corporation further objects to this interrogatory on the grounds that the term

16  "authorized" is vague and ambiguous.

17    Drifton Finance Corporation further objects to this interrogatory to the extent it calls for a

18  legal conclusion.

19    Drifton Finance Corporation further objects to this interrogatory to the extent it seeks

20  disclosure of information protected by the attorney-client privilege and/or the attorney work product

21  doctrine.

22    Drifton Finance Corporation further objects to this interrogatory as premature to the extent it

23  seeks facts and/or information that are subject to ongoing or future discovery – including

24  information to be obtained during the depositions of and document production by the Oracle

25  defendants and various third parties – or expert opinion.

26    Drifton Finance Corporation further objects to this interrogatory on the grounds that it

27  constitutes a contention discovery request that is premature at this stage of the litigation.

28