# EXHIBIT 15



**1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                        —oOo—
 4   In re ORACLE CORPORATION
     SECURITIES LITIGATION
 5
                Master File No. C-01-0988-MJJ
 6
     This Document Relates To:
 7
         ALL ACTIONS.
 8
     _____/
 9
10                        —oOo—
11                    CONFIDENTIAL
12              TRANSCRIPT OF PROCEEDINGS
13                 Monday, July 10, 2006
14                        —oOo—
15
          SHEILA CHASE & ASSOCIATES
16             REPORTING FOR:
             LiveNote World Service
17         221 Main Street, Suite 1250
           San Francisco, California 94105
18           Phone:  (415) 321-2311
             Fax  (415) 321-2301
19
20   Reported by
     LUCY CARRILLO-GRUBBS, CMR, CRR, RPR, CRP, CSR
21   License No. 6766
22
23
24
25
```

**2**

```
 1             A P P E A R A N C E S
 2   Appearing as Special Master:
 3     HONORABLE EDWARD A. INFANTE, (RET.)
       JAMS
 4     Two Embarcadero Center, Suite 1500
       San Francisco, CA 94111
 5     Tel: (415) 774-2603
 6   Appearing as counsel on behalf of Plaintiff:
 7     LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN & ROBBINS
       By:  SHAWN WILLIAMS, ATTORNEY AT LAW
 8 ·    MARK SOLOMON, ATTORNEY AT LAW
       WILLOW E. RADCLIFFE, ATTORNEY AT LAW
 9     VALERIE McLAUGHLIN, ATTORNEY AT LAW
       MONIQUE WINKLER, ATTORNEY AT LAW
10     JENNIE LEE ANDERSON, ATTORNEY AT LAW
       ELI GREENSTEIN, ATTORNEY AT LAW
11     100 Pine Street, Suite 2600
       San Francisco, California 94111
12     Tel: (415) 288-4545
       Email: shawnw@lerachlaw.com
13
     Appearing as counsel on behalf of Defendant:
14
       LAW OFFICES OF LATHAM & WATKINS
15     By:  PETER WALD, ATTORNEY AT LAW
       PATRICK E. GIBBS, ATTORNEY AT LAW
16     JAMIE L. WINE, ATTORNEY AT LAW
       BRIAN T. GLENNON, ATTORNEY AT LAW
17     MICHELE F. KYROUZ, ATTORNEY AT LAW
       140 Scott Drive
18     Menlo Park, California 94025
       Tel: (650) 463-4696
19     Email: Patrick.gibbs@lw.com
20   Appearing as counsel on behalf of Defendant:
21     ORACLE CORPORATION
       By:  JAMES C. MARGULIS, ATTORNEY AT LAW
22     500 Oracle Parkway
       Mail stop 50P7
23     Redwood Shores, CA  94065
       Tel: (650) 506-5200
24
     Also Present:  Riva Eltanal, Keith Mautner, Gerald
25   Fujimoto, Dorian Daley, Deborah Miller, Kamila Mamedova
```

**3**

```
 1              JULY 10, 2006; 1:34 P.M.
 2         SPECIAL MASTER INFANTE:  Good afternoon,
 3   Counsel.
 4         MR. WALD:  Good afternoon, your Honor.
 5         SPECIAL MASTER INFANTE:  I have several motions
 6   that have been submitted to the Special Master, and I'd
 7   like to list them for today's hearing.
 8         Plaintiffs' motion to compel restoration of
 9   backup tapes and for miscellaneous relief regarding the
10   destruction or spoliation of evidence
11         Second motion:  Plaintiffs' motion to compel
12   defendants' production of accounting documents.
13         The third motion is plaintiffs' motion to compel
14   further responses to plaintiffs' third set of
15   interrogatories to Oracle and other defendants.
16         The fourth motion is plaintiffs' motion to amend
17   the December 14, 2004 amended pretrial order to include
18   additional depositions.
19         And the fifth motion is plaintiffs' motion to
20   modify the amended pretrial order to extend the
21   discovery cut-off period, which was June 30th, 2006.
22         I'd like to acknowledge that I've received all
23   the documents you've submitted, boxes of materials, and
24   to the best of my ability have reviewed most of that
25   material.
```

**4**

```
 1         I would like to proceed with the motions in the
 2   order that I called them.  And before we do that, for
 3   the record, I would ask you to enter your appearances,
 4   first for the plaintiffs.
 5         MR. SOLOMON:  Good afternoon, your Honor, Mark
 6   Solomon from Lerach Coughlin representing plaintiffs.
 7         MS. WINKLER:  Monique Winkler from Lerach
 8   Coughlin representing plaintiffs.
 9         MR. WILLIAMS:  Good afternoon, your Honor, Sean
10   Williams with Lerach Coughlin representing the
11   plaintiffs.
12         MS. McLAUGHLIN:  Good afternoon, your Honor,
13   Valerie McLaughlin from Lerach Coughlin representing
14   plaintiffs.
15         MR. MAUTNER:  Keith Mautner also with Lerach
16   Coughlin.
17         MS. RADCLIFFE:  Good afternoon, your Honor.
18   Willow Radcliffe from Lerach Coughlin.  I'm
19   representing plaintiffs.
20         MR. GREENSTEIN:  Good morning, your Honor, Eli
21   Greenstein with Lerach Coughlin also representing
22   plaintiffs.
23         MS. ANDERSON:  Jennie Lee Anderson of Lerach
24   Coughlin on behalf of plaintiffs.
25         MR. WILLIAMS:  Your Honor, for the record, at
```

 

5

1  the end of the table there is a summer law clerk, Riva
2  Eltenal.
3      SPECIAL MASTER INFANTE:  Thank you.
4      For the defendants?
5      MR. WALD:  Your Honor, good afternoon.  Peter
6  Wald with Latham & Watkins for the defendants.
7      MR. MAROULIS:  Good afternoon, your Honor, James
8  Maroulis of Oracle Corporation for Oracle Corporation.
9      MR. GIBBS:  Good afternoon, your Honor, Patrick
10  Gibbs from Latham & Watkins for defendants.
11      MS. WINE:  Good afternoon, your Honor, Jamie
12  Wine of Latham & Watkins on behalf of defendants.
13      MR. GLENNON:  Good afternoon, your Honor, Brian
14  Glennon also with Latham & Watkins.
15      MR. FUJIMOTO:  Gerald Fujimoto with DeLoitte.
16      MS. KYROUZ:  Good afternoon, your Honor, Michele
17  F. Kyrouz on behalf of defendants.
18      MS. DALEY:  Good afternoon, Dorian Daley,
19  associate counsel for Oracle Corporation.
20      SPECIAL MASTER INFANTE:  Thank you.
21      Plaintiff may argue the first motion with
22  respect to restoration of backup tapes and
23  miscellaneous relief for the alleged destruction of
24  evidence.
25      MR. SOLOMON:  Thank you, your Honor.

6

1      We believe that the most appropriate dropping
2  off point for the resolution of this motion is in fact
3  the law itself, which, as you know, is embodied in the
4  Private Securities Litigation Reform Act of 1995.  And
5  that commands that all relevant documents be preserved
6  during the pendency of the statutory stay that is
7  contemplated by that legislation.
8      At the time the legislation was passed, your
9  Honor, I think you'll recall, and my adversaries will
10  recall, that there was a lot of lobbying to the effect
11  that plaintiffs' securities class actions represented,
12  to some extent, unfair strike suits and fishing
13  expeditions that have put corporations to millions of
14  dollars at expense in producing documents prior to the
15  pleadings being determined adequate.
16      And as a result, a bargain was struck.  And the
17  bargain was that, to avoid discovery, immediately while
18  the pleadings were adjudged, and to preserve the ability
19  of the plaintiff ultimately to prove their cases, that
20  there would be a stay of discovery pending the
21  resolution of the motions, but that documents,
22  including electronic materials, all documents be
23  preserved so that, should the pleading ultimately be
24  ruled adequate, the plaintiffs would be fairly able to
25  then go forward and prove their case.

7

1      Now, in this case, it seems to me that the
2  principal defense by the defendants is twofold:  One is
3  their instructions were adequate, and the other is,
4  that even if they were inadequate, we are untimely and,
5  therefore, we are not entitled to relief.
6      I want to start in reverse order, first with the
7  timeliness of this motion.
8      This case was upheld by the Ninth Circuit, as
9  you know, ultimately, and returned to the District
10  Court, and discovery commenced in December of 2004.  It
11  was stayed shortly thereafter pending the initial
12  discovery conference with Judge Spero in March of 2005.
13      And at that discovery conference, or that
14  discovery hearing, a plan was discussed and eventually
15  put in place whereby documents would be produced to us
16  on a timeline, each side would be obligated to do
17  certain things consistent with the discovery plan, and
18  the aim was to be efficient, productive, get the case
19  to trial or summary judgment as soon as we could.
20      After that hearing, the defendants would command
21  that they would produce documents by May 1st of 2005.
22  They did produce some documents, but by no means all.
23  In fact, there have been repeated substantial
24  productions ever since, including, your Honor, as
25  you'll hear later on, and the last production we have

8

1  is dated June 30th, 2006, the date of the discovery
2  cutoff.
3      In the meantime, while they continued to produce
4  documents after the May 1st deadline, the defendants
5  very aggressively pursued their opposition to class
6  certification, took numerous depositions we had to
7  cover, and continued, during the same time, to produce
8  documents.
9      We fought over documents, in particular --
10  particular we fought over the SLC documents.  And
11  eventually they were produced to us for the first time
12  at the end of the summer of 2005.
13      We then had a very large supplemental production
14  of accounting documents based on a hearing of Judge
15  Spero on October 19th, 2005.  And we then had
16  supplemental productions in February, March, April, May
17  and June --
18      We have -- at the same time as pursuing class
19  certification, making sure that discovery was provided
20  to defendants and making sure that -- that we absorbed
21  the documents we were getting, and moved forward to
22  identify gaps in production, we have been extremely
23  diligent.  In fact, I think some of the boxes produced
24  by defendants and by us, when you see the reams of
25  correspondence as we've tried to eke out the documents



9

1  we think we're entitled to, they've been voluminous.
2  And we've been diligent throughout the process in terms
3  of both trying to digest the documents, trying to
4  advance the ball, and at the same time, defend against
5  another of defendants' clear strategies.  And I'm not
6  saying they're not entitled to it, but that was to
7  pursue the depositions of each and every one of our 49
8  confidential witnesses.
9      So to say that after less -- let's say it's been
10  a year of discovery.  It probably has effectively been
11  less, but let's say it's been a year of discovery, we
12  have been on what people would often call in that
13  sense, a rocket docket.  We've done a lot of work,
14  we've certainly done a lot of work in the last three
15  months, pursuant to your command, your Honor, that we
16  be careful just in case a discovery cutoff does hold,
17  and we've concentrated our efforts, and we've continued
18  to seek to be efficient.
19      We don't believe that the fact that it emerged
20  after their production of documents in the fall of
21  2005, and as we progressed into substantive
22  depositions, we don't believe that the fact that it was
23  then that we realized that not only had files not been
24  preserved, but, as a result, relevant documents had
25  been lost, one has to assume, destroyed.  That's -- the

10

1  fact that we discovered that as we went through the
2  productions of documents and crystalized at the end of
3  2005, and raised formally at the end of 2005 and 2006,
4  does not suggest that we've been sitting on our rights,
5  it means that, instead, we've been gathering the facts
6  before we present motions, something the defendants
7  often accuse us of not doing.
8      So we don't believe for a second, your Honor,
9  that the timing of this argument raised by defendants
10  holds any water.
11      As to the adequacy of their preservation
12  instructions, it's hard to believe that a company
13  employing over 40,000 people with the allegations
14  ranged against it, as they are in this case, broad and
15  deep, could then instruct in writing, apparently we now
16  hear, perhaps a total of around 70 people, supposedly
17  orally, we think, a few other people, according to the
18  declaration of Ms. Siegel.  We don't believe that that
19  was adequate.  We believe that that, in fact, was a
20  spoliation tool.
21      We now know that, as a result of their failure
22  to preserve the documents of area vice presidents and
23  people implementing 11i, that those people -- witness
24  after witness are telling us, they have told us and I'm
25  sure they will in the future, that the reason for the

11

1  paucity or the nonexistence of documents in their files
2  is not because they did not have relevant documents.
3  It's because somehow they have disappeared.
4      At the hearing on May -- excuse me, April 25th,
5  Mr. Wald said this to you: "Oracle made no systemic
6  attempt to preserve AVP files, viewing them as being
7  well beyond the scope of what was likely to be viewed
8  as being relevant."  Well, I think on a common sense
9  basis that that is woefully inadequate.  And, in fact,
10  there's no doubt that Oracle knew very well at the end
11  of the third quarter of 2001 that the AVB -- AVPs were,
12  indeed, a highly relevant source for information.
13      And I'd like to show you, for an example, your
14  Honor, they were produced by defendants in this
15  litigation, the following page of a presentation dated
16  April 2, 2001.  What you'll see, your Honor, is that
17  listed among the items being reported as of the month
18  of December the 2000 pipeline to budget reduction, AVPs
19  beginning to voice concern.  Month of January, AVPs
20  reluctant to raise their forecast, deals begin to
21  shrink and get delayed.
22      Your Honor, the appropriate preservation
23  instruction would have been to all employees worldwide
24  to preserve the documents surrounding the forecasts,
25  11i, the economy, and later on, the accounting

12

1  allegations.
2      Even if that e-mail sent to all people worldwide
3  was limited in terms of action to managers and above,
4  at least we'd have that pool of information.  And
5  clearly there's relevant information in that pool
6  available to us.
7      But they didn't go with managers, they didn't go
8  with AVPs, they went with a selection of the very most
9  senior people, many of whom themselves did not heed the
10  instructions.  As you know, Mr. Ellison is to be
11  deposed very shortly, and Mr. Ellison's files, for
12  example, and he received a preservation instruction,
13  contain not one regular typical e-mail person to
14  person.  What Mr. Ellison's files contain are preclass
15  period and a smattering of intraclass period
16  corporate-wide CRM type bulletins, but nothing of the
17  sort of interactive person-to-person exchange of
18  communication that you'd expect.
19      Do we have a smattering of those sort of e-mails
20  pertaining to him with his name and address on?  Yes.
21  But not from his files.  One only wonders how that is
22  possible.  One has to wonder, what's happened to those
23  e-mails.  One has to wonder if it's possible to
24  reconstruct them.  And one has to wonder, is it
25  possible for plaintiffs to be able to take advantage of

 

13

1  such e-mails that clearly must have existed in his
2  file.
3      That applies to all of the principal defendants
4  in this case. As we've told you in our papers, Sandy
5  Sanderson is a defendant. Any of his direct reports
6  weren't even given preservation instruction. We've
7  told you in the papers that we've listed the people
8  that didn't get preservation instruction. And, in
9  fact, on April 25th we showed you a graphic
10  presentation, which I'd like to just allow you to have
11  for reference again, your Honor.
12      Now what defendants will probably tell you is,
13  this is wrong. I'm sure they'll tell you this is
14  wrong. Well, I don't know where it's wrong, except for
15  the fact that Lauren Siegel has testified, apparently,
16  that there were some unknown e-mails that forwarded her
17  instructions that we've never seen, and that she issued
18  oral instructions that we've never heard or seen
19  evidence of. But for that, you'll see that this --
20  this graphic fairly presents to you the problems that
21  we've encountered in this case that we think warrant
22  the most severe penalty against Oracle.
23      Your Honor, as we prepared for Mr. Ellison and
24  other depositions in this case we propounded more
25  discovery. I was concerned that we hadn't received

14

1  discovery of the OSO database which is the single-most
2  important forecasting tool, apparently, at least from
3  Oracle's own words and in Mr. Ellison's own words and
4  others at the company.
5      And in particular, I was concerned that we
6  didn't have snap shots, because it was interesting when
7  Oracle moved to dismiss our case and Judge Jenkins did
8  dismiss it, they argued we couldn't show an OSO snap
9  shot. When the Ninth Circuit revived the case, the
10  Ninth Circuit talked about this global sales database,
11  and the importance of it, and Mr. Ellison's references
12  to it and his utilization of it.
13      So I was concerned. And we looked, and we
14  propounded another request, among others, asking for
15  the database realtime, so that we could go back and
16  recreate. We discovered in that process that a
17  Mr. Kirkby, who was vice president of IT and CRM at
18  Oracle, had told the SLC committee that in July of 2001
19  OSO was purged and that there was no ability,
20  apparently, to get the snap shots that I'm talking
21  about.
22      Now, we raised this in the reply, because that
23  was when we discovered it. And defendants haven't --
24  haven't had an opportunity yet -- at least they haven't
25  taken the opportunity to respond to the OSO issue.

15

1      I submit, the only adequate response is
2  Mr. Solomon is: Wrong. We can recreate it, it is there,
3  it hasn't been destroyed. If it hasn't, I think that
4  is a single instance that warrants default judgment. I
5  think that, even without that, the failure to preserve
6  the documents of the senior vice presidents and area
7  vice presidents of the company and CRM implementers,
8  warrants default judgment. I think the fact that the
9  people who received instructions apparently didn't heed
10  them, and that there are many, many documents
11  inexplicably missing from their files, warrants default
12  judgment.
13      I think the fact that Oracle apparently has
14  conceded that, even if it were to try and restore what
15  we called disaster recovery tapes, even if they were to
16  do that, we'll probably get meaningful information. If
17  that's true, then that warrants default judgment.
18      Your Honor, I believe that it's possible, but
19  who knows, that at some stage there will be assertive
20  authority on what the PSLRA preservation language
21  means. And if it means anything, it has to mean that
22  the plaintiffs, after the discovery stay has been
23  exhausted, are able to get access to the sort of
24  documents that they typically would get access to in a
25  securities fraud case against a massive company. And

16

1  that sort of information certainly is typically
2  obtainable, relevant and warranted at the managerial
3  level and above.
4      Your Honor, if you have any questions, I'm
5  willing to answer them.
6      SPECIAL MASTER INFANTE: Thank you.
7  Mr. Wald.
8      MR. WALD: Thank you, Judge Infante. Let me --
9  let me begin, if I may, with a couple of observations
10  about the last couple of points that Mr. Solomon made,
11  because I think they speak so eloquently and so
12  powerfully to how misguided and how baseless the
13  plaintiffs' current claim is.
14      And I'd like to begin with the document that
15  Mr. Solomon just showed you from the North American
16  Sale General Business Meeting, John Nugent, April 2nd,
17  2001. First of all, let me make a couple of points
18  about this.
19      This document has been in the plaintiffs'
20  possession since May of 2005. This document which, if
21  I understood Mr. Solomon's argument, now becomes the
22  centerpiece of their argument for imposing spoliation
23  sanctions notwithstanding the incredibly high burden
24  that they bear and that governs that kind of -- of an
25  outcome here, which I'll come to.



17

1    This document that they've had since May of
2    2005, which apparently is so important, was not
3    mentioned in their opening, and was not even mentioned
4    in their reply. This was a document which they favored
5    upon us with a supplemental declaration from
6    Mr. Williams a couple of days ago, that's how important
7    this document is.
8        The second point, I think, about the document,
9    is that it's not lost. It was, in fact, produced. And
10   so unlike all of the cases which impose on the
11   plaintiffs the burden of showing specific documents
12   that were lost and extrinsic evidence of the content of
13   those documents, which would prove to a reasonable
14   trier of fact that the content of the documents would
15   have supported their case, the plaintiffs once again
16   point to nothing specific, except the document that
17   they've had since May, and that was, in fact, produced
18   to them.
19       The third point I would make is to take a look
20   at the claim of relevance because, if you look at the
21   page that Mr. Solomon quotes from, what he talks about
22   is the month of January, and in the month of January it
23   says AVPs reluctant to raise their forecast. And there
24   is a lot of evidence that shows that that's exactly
25   right. The -- forecast for North American sales

18

1    and the general business segment stayed the same
2    throughout January, and, in fact, throughout February,
3    until the very end of February, your Honor, and that's
4    really the point.
5        And plaintiffs have been in possession for more
6    than a year of myriad documents establishing over and
7    over again the same point, which is, that the people
8    who were responsible for making forecasts that got to
9    the speakers -- after all, this is a securities fraud
10   case -- those people didn't change their forecast until
11   one or two days before the end of the third quarter of
12   2001. And what this document shows is that that's
13   exactly what happened.
14       Again, a document the plaintiffs actually have,
15   that they've had for a long time, and which now
16   apparently features prominently in their arguments.
17       So in the month of January, what the document
18   proves is that the AVPs were reluctant to raise their
19   forecast.
20       If you go, your Honor to the next page, which
21   Mr. Solomon didn't give you, but let me, the very next
22   page of this document, it says month of February, and
23   what that says in the last bullet point is GB, general
24   business forecast drops precipitously. That's exactly
25   the point of the document, that's exactly what

19

1    happened, that's exactly what all of the documents --
2    the hundreds of thousands of documents that have been
3    produced to the plaintiffs establish. And that is,
4    that at the end of February, at the end of the third
5    quarter of '01, a number of deals that were in the
6    pipeline, that the people who were responsible for
7    fashioning these forecasts believed would close, and
8    continued to report up to the speakers would close,
9    failed to close.
10       And the plaintiffs have had the production of
11   over 700,000 pages of documents in this case from over
12   118 files of people whose documents were preserved and
13   collected and given to them.
14       Now, I -- I -- I want to go, I think, back to
15   the beginning, because I agree with Mr. Solomon. The
16   law is actually quite important here. And I know that
17   there's -- it's been very well covered, your Honor, in
18   the parties' briefs, but let me repeat briefly, if I
19   may. The burden that is imposed on the plaintiffs in
20   connection with the kind of motion that they have now
21   brought is extremely high. They've brought a motion
22   for sanctions for spoliation of evidence. It requires
23   them to establish each of three elements: One, they're
24   required to show that Oracle destroyed evidence at a
25   time when Oracle had control of the evidence and an

20

1    obligation to preserve that evidence. Meaning, at a
2    time when Oracle knew or reasonably should have known
3    the evidence was relevant to a pending or threatened
4    lawsuit.
5        The second element that plaintiffs bear the
6    burden of showing is that Oracle destroyed the evidence
7    with a "culpable state of mind."
8        And third --
9        SPECIAL MASTER INFANTE: That's not necessary
10   for the entire motion.
11       MR. WALD: I'm sorry, your Honor?
12       SPECIAL MASTER INFANTE: That intent is not
13   necessary for the entire motion.
14       MR. WALD: Intent isn't, your Honor, but a
15   culpable state of mind is.
16       SPECIAL MASTER INFANTE: No, it isn't.
17       MR. WALD: Well, your Honor, the way we read the
18   case law --
19       SPECIAL MASTER INFANTE: That's for drastic
20   sanctions.
21       MR. WALD: Correct. But -- but if it's
22   negligence, it could be a culpable state of mind if --
23   but, the third prong of the test then requires them to
24   show through extrinsic evidence that specific documents
25   were lost, not some generalized statement that we've



21

1  talked to people and they've said that they had
2  documents, but, rather, extrinsic evidence --
3       SPECIAL MASTER INFANTE:  I'm just telling you, I
4  don't find a willful state of mind necessary to grant
5  partial relief.  We disagree on that element.
6       MR. WALD:  Your Honor, I don't think we do,
7  because I don't disagree with you that a willful state
8  of mind is not necessary to grant -- to grant relief.
9  But what is necessary --
10      SPECIAL MASTER INFANTE:  But the way you state
11 the element, I take issue with it.  If you want it read
12 back --
13      MR. WALD:  Your Honor, let me see if I can start
14 again.  Let me see if I can find common ground.  Okay?
15      Here's my understanding, your Honor, of the
16 relevant standard.  The relevant standard says culpable
17 state of mind.  That doesn't mean intentional.  It can
18 be negligence if you knew or reasonably should have
19 known of relevant evidence.  I think we agree on that.
20 If it's not intentional, however, the third prong of
21 the test requires the plaintiffs to show, through
22 extrinsic evidence, specific documents that were lost
23 that were relevant, and -- and I think this is very
24 important, your Honor, in our estimation, that that
25 evidence "would have supported" plaintiffs' claims.

22

1  That's a heightened standard that's much more stringent
2  than ordinary relevance under Federal Rule of Evidence
3  401.
4       And if the state of mind is simply negligence as
5  opposed to, as your Honor has it, willfulness, then the
6  plaintiffs are required to make a specific showing.
7       And if you take a look, for example, at Judge
8  James' opinion in the Hamilton case, that's, I think,
9  you know, quite instructive from our point of view,
10 your Honor, because there was no doubt that something
11 had been lost, the parties stipulated to that.
12 Something specific was identified, that last part of
13 the tape.
14      And although I think Judge James, frankly,
15 uncertain exactly how relevant it was, she was willing
16 to conclude, for purposes of that motion, that it was
17 sufficiently relevant that they had -- that they had
18 met the relevance prong.
19      So you had lost evidence that was specifically
20 identified, and, yet, Judge James declined to impose
21 sanctions, precisely because she found that there had
22 been no prejudice, and that there had been no adequate
23 showing that that portion of the tape would have
24 supported the plaintiffs' claims.
25      Now that, your Honor, in our estimation, is a

23

1  far cry from what we have in this case, because in this
2  case we don't have extrinsic evidence of specific
3  documents that are allegedly missing that that --
4  Oracle controlled -- knew or should have known at the
5  time would be relevant.
6       And as we've set forth in our brief, and tried
7  to respond to all of the categories that the plaintiffs
8  have set out, many of the documents that they speculate
9  about and, your Honor, really is speculation.  It's a
10 matter of saying, gosh, there were some documents in so
11 and so's files; therefore, there must have been other
12 documents in other people's files.  We submit that is
13 not a sufficient showing of the existence through
14 extrinsic evidence of documents that would have
15 supported their case, but -- in the category or under
16 the rubric where what is alleged to have happened is
17 that we were negligent, as opposed to willfully
18 destroying evidence.
19      So there's a failure at that level.
20      Second of all, as we set out in our brief, your
21 Honor, the -- the documents that they point to and that
22 they speculate about, are documents which appear to
23 have been created prior to the complaint being
24 filed and being served on March 12 of 2001.  Many of
25 the documents that they -- they cite, and we've gone

24

1  through them at some length, predate the complaint.
2       And so it -- they -- they fail at several
3  different levels.  They fail at the level that it's all
4  speculation.  The documents, they said, are actually
5  documents they have, so it's not the same thing as
6  saying, gosh, here is a document which has been
7  identified that we don't have.
8       And second of all, the documents that they talk
9  about are all documents that predate the complaint.
10      Now that brings us, I think, your Honor, to --
11 to the AVPs.  And I know there's been a lot of
12 discussion about the AVPs, and I know that there's been
13 a lot of writing on it.  And you've looked, you know,
14 closely at the parties' submissions on that.  But what
15 we would say about the AVPs, your Honor, is this, and I
16 think is set forth in Ms. Siegel's declaration.  She
17 worked very hard and immediately to identify the
18 speakers that appeared in the -- in the complaint, and
19 their direct reports, the people who directly reported
20 to them, to the extent that those direct reports had
21 responsibility for the areas that appeared in the
22 complaint.  And I know that your Honor appreciates
23 this, but the complaint obviously evolved over time.
24 The plaintiffs amended several times.  And what is
25 reflected, I believe, fairly read in Ms. Siegel's





25

1  declaration, is her consistently continuing attempts to
2  meet the evolving nature of plaintiffs' claims by
3  sending out additional preservation notices and, more
4  importantly, by going out and talking to people to try
5  to identify what documents they had, and what documents
6  might be possessed by the people that were -- that were
7  thought to have relevant evidence. And that's what her
8  declaration establishes and the record establishes:
9  That, in fact, documents were preserved from 118
10  people, a document preservation and collection effort,
11  your Honor, and production, that was viewed by the
12  Delaware chancery report as being massive, and very
13  full.
14      Now, when you take a look at what Ms. Siegel
15  says about her efforts to preserve documents, what she
16  understood was that this was a securities fraud case,
17  and what was important about a securities fraud case
18  was to understand what was in the speaker's mind at the
19  time that they were making the statements that were
20  being challenged. And so she sent preservation
21  notices, and again, more importantly, went out and
22  spoke directly with those who were alleged to have
23  done -- to have been doing the speaking. And she also
24  collected documents and attempted to preserve documents
25  from those people who were likely to have interacted

26

1  with the speakers around -- around those statements.
2  The area vice presidents, as I know your Honor
3  appreciates, are below the level of the people that
4  were speaking with the speakers.
5      Notwithstanding that, a number of their
6  documents were saved and collected and produced.
7  And I think what the record shows is that the
8  plaintiffs, in fact, have a number of the documents
9  from the area vice presidents that might be relevant
10  to their claims, or at least responsive, precisely
11  because, to the extent that the area vice presidents
12  had interaction with the speakers or the speakers'
13  direct reports, and had -- had documents that fell
14  within the parameters of what was relevant, those
15  documents were produced.
16      There were, I believe, 26,000 documents
17  preserved from the AVPs, and I believe 3,800 of them
18  met the discovery parameters.
19      And so I don't believe it's fair to criticize
20  Ms. Siegel for failing to think through what it was
21  that she was trying to collect when she sent out
22  preservation notices, when she went to speak with
23  individuals, and when she mobilized the efforts of what
24  was a 40,000 person organization at that time, to
25  fairly respond to the allegations of the complaint.

27

1      And nothing that has been raised by the
2  plaintiffs in their briefs points to a document of the
3  kind that was at issue in Hamilton, where they could
4  say, gosh, you know, here's a specific document. We
5  know it existed. We know it existed after the complaint
6  was filed. It should have been collected and preserved
7  and -- and this is important -- we've been prejudiced
8  because it doesn't exist.
9      That's not at all the kind of claim that we --
10  that we are being met with here.
11      So your Honor, I -- I'm -- I -- I'm very
12  anxious -- I mean, I don't want to repeat all the
13  arguments that are in our brief. We have tried -- we
14  didn't obviously have a surrebuttal, but we tried to
15  respond to the categories of documents that the
16  plaintiffs have raised and have said, you know, were
17  not -- were not systematically collected and
18  preserved. And they're just wrong about the statements
19  that they make, because they're all based on documents
20  that they actually have. There has been no
21  identification of documents that they don't have.
22      Certainly nothing that would rise to the level
23  of the kind of sanction that they're asking for here.
24      The restoration of the tapes, your Honor, is a
25  massively severe remedy. As we've set forth in our

28

1  brief, it will derail this litigation for months on
2  end. It will cost millions of dollars if -- if the
3  disaster recovery tapes can be restored at all, there
4  is no showing that the disaster recovery tapes are
5  likely to contain evidence that -- specific evidence
6  that the plaintiffs should have received to date but
7  have not received to date. They have failed in their
8  evidentiary burden to do that.
9      And I really want to talk, your Honor, about
10  the timeliness issue, because that is -- that is quite
11  important. As set forth in our brief, the plaintiffs
12  have known about the AVP, the situation with the AVPs,
13  since April of 2005, and we've cited and submitted to
14  the Court a letter dated May 4th, 2005 from
15  Mr. Williams in which he -- he writes to the lawyers
16  Mayer Brown, and says, among other things, "Instead,
17  you have admitted in no uncertain terms that certain
18  individuals' files, including several of the area vice
19  presidents whose files were recently ordered produced,
20  were not part of the group of individuals whose files
21  were preserved in 2001. Judging from your comments, it
22  appears as though only selected individuals' files were
23  preserved at the time that this case was initiated."
24      So that's -- that's back in -- on May 4th of
25  2005, your Honor, there then ensues, as you know,



correspondence back and forth between the parties. We could -- Mayor Brown confirms that that's correct, that the AVP files were not systematically preserved for precisely the reasons that I indicated, your Honor, because Ms. Siegel's focus was on identifying the speakers, their direct reports, and the people who would have interacted with the speakers on relevant issues.

And so her focus was not on a category in that sense but, rather, on specific individuals.

In any event, your Honor, that was known to the plaintiffs. It was told to the plaintiffs, it was known to the plaintiffs. There was the talks about the July 25th, letter, as you know, but whatever the outcome on that issue, your Honor, clearly by September they knew that that letter existed. They never saw it -- sought to get a copy of it, notwithstanding that correspondence. And moreover, Judge Spero ordered the parties -- basically in that order what he said was, provide a letter to the plaintiffs describing your preservation efforts, and, plaintiffs, if you want more, if you want a deposition covering that issue, come back to me after a meet and confer, and I'll -- and I'll deal with that.

The plaintiffs -- the plaintiffs would now have

the Court believe that notwithstanding the fact that Judge Spero ordered the production of the letter which was supposed to systematically describe the efforts to preserve documents that they, A, never received the letter; B, never complained about the letter; C, never sought to follow up with a deposition that would -- that would vet these issues and would raise these issues; and, D, in response to the September 2005 letter in which we again -- which Mayor Brown again clarifies in notes that the letter exists, and -- and offers to help if -- if the plaintiffs can't find it. There's no letter coming back saying, yes, please send us a copy, or, yes, we can't find this. The obvious assumption was that they did have it and that they did know about it.

So, your Honor, it is built into the rule on a sanctions motion, into Rule 37, as I know you know, having dealt with these issues for many years, that motions for sanctions must be timely. It's -- it's a bedrock rule and it's designed -- that rule is designed, your Honor, to prevent exactly the kind of abuse that -- that is here, where the plaintiffs know about these issues, don't raise them -- not only don't raise them with us, but don't raise them with the Court at the time that they first brought on a motion to

extend the discovery cutoff, and then don't get all of the relief from Judge Jenkins that they want in January of 2006 when a new discovery deadline is set -- is set, and then wait until after that order comes out to begin to vent these issues, your Honor. And that's just not fair. It's not a fair minded way to go about discovery. It's not a fair-minded burden to impose on the defendants after all of this water under the bridge, after the millions of dollars that have been spent, after all of the people that have been deposed.

So, your Honor, I think -- I think I conclude with where I began, we believe that the law strongly favors a finding that the plaintiffs have not carried their burden of establishing a basis for a spoliation sanction here.

The -- Ms. Siegel's affidavit and all of the records in the case, in our submission, your Honor, reflect the conclusion, the only reasonable conclusion, which is that evidence that was known or reasonably thought to be relevant to the securities fraud allegations in the complaint was collected, was preserved, has been produced. And -- and we would submit, your Honor, that the proof of that is in the fact that, even as we sit here today, the plaintiffs still don't point to specific documents that -- that

through extrinsic evidence that were, A, lost, and that, B, would support their claims. Instead, what they -- what they argue from are documents like this post hoc sales analysis from April 2nd, 2001, which is a copy of a document that they do have, and which, in fact, for all the reasons I said previously, your Honor, in our submission, very strongly supports what we've been saying all along: Relevant documents were preserved, have been produced, and in 700,000 documents, the plaintiffs still haven't found evidence that supports their claim.

Thank you, your Honor.

SPECIAL MASTER INFANTE: Thank you.

You may have the last word.

MR. SOLOMON: Thank you, your Honor.

If Mr. Wald is right, then he's driven the coach and horses through the PSRA preservation mandate. It just doesn't work that way. It doesn't work in the way whereby we simply have to be lucky to somehow come across information about a specific document and know its contents in order to get remedies for the breach of law by the failure to preserve what clearly are relevant documents.

Your Honor, the production of clearly relevant documents in the files from other custodians, courts

33

1  have held, supports a finding that documents from those
2  whose files were not preserved would have been
3  favorable to plaintiffs.  And the Zubulake case
4  supports that proposition, 229 FRD at 437, as does the
5  Advanta Care Health Partners case, which is a Lexus
6  case 2004 16835.
7      As to the AVPs.  The AVPs' forecasts were far
8  beneath the reported forecasts of Nussbaum, Roberts and
9  Sanderson, division heads  And there's no question
10  that any reasonable person would have known at the
11  beginning of March 2001 that the files of those types
12  of people at Oracle, as well as CRM implementers, were
13  absolutely required by law to be preserved.  They did
14  not preserve them.
15      Mr. Wald says that we don't have any evidence of
16  any -- of any post class period documents, I think what
17  he was saying, being somehow missing.  We have an
18  Ellison March 23, 2001 e-mail to Barrenechea,
19  Sanderson, Nussbaum, Jarvis and Henley, talking about
20  escalated customers with respect to 11i, and neither
21  Ellison or Barrenechea nor Sanderson nor Nussbaum nor
22  Jarvis nor Henley preserved that response.
23      So even when the preservation order went out,
24  there had been clear and obvious lapses.
25      You didn't hear, your Honor, a word from

34

1  Mr. Wald, and I think the silence was deafening, about
2  the OSO database.  I'd like to hear, because if it has
3  been destroyed, then I think that it's the end of the
4  case.
5      I haven't mentioned, your Honor, and I'll save
6  it for Mr. Williams who is going to talk to you about
7  the accounting allegations and the accounting motion to
8  compel, but it certainly appears that documents were
9  either destroyed or changed in connection with the 2002
10  accounting investigation of the company after our
11  allegations had disclosed those claims.  And I'll leave
12  that for Mr. Williams.  But, yet again, I think that
13  everything you've heard -- and I have some visuals here
14  on OSO, just to hopefully ram the point hom -- there's
15  no question that OSO was something that the defendants
16  talked about, that we were castigated for not being
17  able to reproduce or reflect, and they destroyed it,
18  apparently, in July 2001.
19      Thank you, your Honor.
20      MR. WALD:  Your Honor, if I just may, very
21  briefly, on the OSO:
22      The OSO, again, is an issue which the plaintiffs
23  have raised at the eleventh hour.  Again, it's an issue
24  that they have known about since at least the summer of
25  2005, because they've been in possession of

35

1  Mr. Kirkby's special litigation committee interview
2  since 2005.  It isn't raised in their opening brief.
3  It isn't raised in their reply brief.  It is, once
4  again, something which is the subject of -- well, it
5  wasn't raised in their opening briefs, for sure.  But
6  in any event, here's the sort on the OSO database, your
7  Honor.  It is a database.  It is a dynamic database
8  which is constantly written over.  What is important
9  about the OSO database  It is one of a number of
10  pieces of information that are fed into the forecast
11  documents, and it is those forecast documents, in their
12  final form, which go to the executive management
13  committee and which form the basis for the upside
14  reports which are -- on which judgment is made and
15  which are circulated to the executive management
16  committee, and on which executive judgments are made.
17      It is a dynamic database.  It is written
18  over.  And the output of that database, your Honor,
19  is exactly what is in those reports, which are dated,
20  and -- and which the plaintiffs have complete copies
21  of, and which clearly forms the basis for the
22  judgments that were made by the senior Oracle managers
23  at the time.  If the plaintiffs want to go to those
24  documents which we've produced to a fare-thee-well and
25  demonstrate that the forecasts weren't what they said

36

1  they were or that they were wrong, or that the
2  plaintiffs -- or that the executive management
3  committee should have made a different judgment, they
4  have all of that data.
5      What they don't have is the underlying computer
6  raw data, if you will, which, as I say, is dynamic, and
7  it's written over on -- on a daily basis as those
8  forecasts change.
9      So, your Honor, if -- if -- if the OSO database,
10  you know, now becomes the cause celeb of this entire
11  motion and your Honor would like us to submit additional
12  affidavits on that, we will.  And we will be happy to do
13  that.
14      But that's the short story on it
15      And it doesn't change anything from what we said
16  because it confirms that the OSO database -- these
17  actual data reports and forecast reports that
18  management relied upon and that were fed up through
19  that system.
20      With respect to this, the one e-mail that
21  Mr. Sullivan identifies for Mr. Ellison in late -- in
22  March of 2001, again -- and I think we've covered this
23  to some extent in our brief -- it's an escalated 11i
24  complaint.  I mean, it's exactly what Judge Spero said
25  the case was not about.  It's not about on-the-ground



37

1   customer complaints, and it wasn't responsive to the
2   discovery plan to begin with.
3       So that's our submission on that, your Honor.
4       SPECIAL MASTER INFANTE: That is covered in your
5   brief.
6       You raise this issue in your reply paper for the
7   first time.
8       MR. SOLOMON: We did, your Honor.
9       SPECIAL MASTER INFANTE: I don't recall whether
10  these documents have been submitted as part of the
11  record.
12      MR. SOLOMON: They have not, your Honor.
13      SPECIAL MASTER INFANTE: Have not?
14      MR. SOLOMON: No.
15      SPECIAL MASTER INFANTE: I didn't see them
16  before.
17      MR. SOLOMON: We could bring extra that we
18  hadn't submitted that would be useful for you to see,
19  your Honor.
20      We certainly can follow it up with a formal
21  submission if you'd like us to.
22      MR. WALD: Again, your Honor, Mr. Kirkby talked
23  about this in a document that the plaintiffs have had
24  for over a year.
25      MR. SOLOMON: In fact, Mr. Kirkby's interview

38

1   memo is an exhibit to the reply brief, your Honor, in
2   which, by the way, he says up until then OSO had been
3   backed up daily.
4       SPECIAL MASTER INFANTE: Well, I really don't
5   want to receive the information at the hearing.
6       MR. SOLOMON: I apologize, your Honor.
7       SPECIAL MASTER INFANTE: It's contrary to the
8   motion practice. If this were a motion for summary
9   judgment, I would have to receive it according to the
10  Ninth Circuit law, but it is not a motion for summary
11  judgment and I decline to receive it.
12      I think you differ on the standards to be
13  applied here, so I guess I'll put a question to you,
14  Mr. Solomon.
15      MR. SOLOMON: Yes, sir.
16      SPECIAL MASTER INFANTE: If one were to agree
17  with you that the preservation efforts required under
18  the PSLRA were inadequate, namely, that Ms. Siegel
19  should have gone further, does that in and of itself
20  entitle you to any relief which you're seeking today?
21      MR. SOLOMON: Without more -- I'm going to give
22  you a sort of a schizophrenic answer, your Honor.
23      Without the PSLRA itself and if you're just
24  looking just at the common-law, you'd have to make an
25  additional showing beyond just lack of preservation.

39

1       SPECIAL MASTER INFANTE: Absolutely.
2       MR. SOLOMON: I do believe that it's arguable,
3   and I do believe I may well argue that the PSLRA has
4   added a distinct change to that regiment, in that the
5   bargain was struck, I believe, was so critical and so
6   costly if it were not.
7       SPECIAL MASTER INFANTE: But you cite no law to
8   support it.
9       MR. SOLOMON: I cannot, your Honor, I'd like to
10  create it.
11      SPECIAL MASTER INFANTE: Okay. We understand
12  each other.
13      MR. WALD: Your Honor, on that, if I may --
14      SPECIAL MASTER INFANTE: Yes.
15      MR. WALD: We believe -- and I think this is in
16  the cases that we've cited to you, but we believe that
17  the post-PSLRA cases that deal with this issue are, A,
18  post-PSLRA and, B, set up the analysis as we've
19  discussed.
20      SPECIAL MASTER INFANTE: I think there's -- I
21  think you're absolutely right with respect to a showing
22  of prejudice. That's why the plaintiffs' motion fails
23  at this time.
24      The motion is denied without prejudice in its
25  entirely.

40

1       With respect to the backup tapes, the Court
2   finds that there's not a sufficient showing that the
3   backup tapes are likely to yield additional useful
4   information, considering what you do have in your
5   possession, and it doesn't justify the enormous cost
6   and burden that would be required, indeed, with
7   uncertain results.
8       All other motions for sanctions are denied at
9   this time without prejudice.
10      Let's go to the second motion.
11      MR. WILLIAMS: Thank you, your Honor.
12      I will address plaintiffs' motion to compel the
13  accounting documents that we've submitted to the Court.
14  I won't rehash the history of the litigation, that
15  Mr. Solomon covered that area rather well. But I do
16  think that it makes sense to discuss the complaint a
17  little bit, because I think that that kind of puts the
18  parameters around what we believe are relevant
19  documents with respect to the accounting allegations.
20      I also have brought with me -- I'll give you a
21  copy and whoever on the other side intends to argue the
22  motion. This is a set of documents, your Honor,
23  because I think that they -- this issue kind of
24  requires a little bit of review.
25      MS. WINE: Can we take a break after this



41

1  presentation, your Honor?
2      MR. WILLIAMS: A little bit of review of the
3  documents that are relevant, and I submit to your Honor
4  that most, if not all, of these documents are in the
5  record and already attached to plaintiffs' motion to
6  compel. And I will -- as I go through them, I will let
7  you know what number they are in plaintiffs' motion.
8      SPECIAL MASTER INFANTE: All right. I think --
9  I think most of the documents are probably already in
10  the record.
11      MR. WILLIAMS: Yes.
12      SPECIAL MASTER INFANTE: To the extent there's
13  one or two, you'll have to point that out. And I will
14  give the defendants a recess after your argument,
15  before they have to address the issue.
16      MR. WILLIAMS: That's fine, your Honor, I
17  appreciate that.
18      With respect to the complaint, your Honor,
19  plaintiffs allege that the defendants engaged in a
20  scheme to take customers' overpayments and unapplied
21  cash to revenue and earnings during the second quarter
22  of fiscal 2001. That scheme included several
23  individuals: Jennifer Minton, Tom Williams, Neill
24  Menon, and several other -- other individuals: Michael
25  Quinn, Greg Myers, and many others, who either later

42

1  knew about the debit memo transactions and discussed
2  them with confidential witnesses at great length,
3  including Marisa Christi, Neil Menon, Adam Hehn, Raul
4  Campos. All of those individuals are named in the
5  complaint.
6      With respect to what unapplied cash is,
7  plaintiffs allege that unapplied cash is customer
8  overpayments, payments -- or customer duplicate
9  payments that were not applied to invoices, but held
10  in an account called either "unapplied cash" or the
11  "on account." Plaintiffs allege that that account was
12  labeled 25005 and that, over years, all the way back
13  to 1991, cash had accumulated in that account.
14  And that Tom Williams and Jennifer Minton had ordered
15  Greg Myers and Michael Quinn to clean up the unapplied
16  cash account in the second quarter of 2001.
17      These are facts that are specifically alleged in
18  the complaint.
19      In addition, the complaint describes the "on
20  account." Plaintiffs -- the -- the complaint alleges
21  that the "on account" internally at Oracle represented
22  funds that customers overpaid and had on their records
23  for a customer's use later on, either for a refund or
24  to be applied to another purchase. Again, in -- held
25  in this unapplied cash account which is also called

43

1  customer overpayments, at least alleged in the
2  complaint -- in the complaint.
3      With respect to the customer overpayments,
4  detailed in the complaint as a category of -- a
5  category of unapplied cash representing customer
6  overpayments, the complaint further details that these
7  monies were reported to the market in a specific line
8  item, unearned revenue and customer -- I'm sorry,
9  customer overpayments and -- and unearned revenue.
10      We specifically allege that in the second
11  quarter of 2001, during the process of the detailed
12  scheme alleged in the complaint, that that account
13  dropped precipitously, all detailed in the complaint.
14      I think that that brings us to the March 10th,
15  2001 discovery plan. And, your Honor, I've excerpted
16  the particular section of the discovery plan on page 1,
17  I guess the cover page of the document, which is an
18  exact replica of the discovery plan. And it specifies
19  what plaintiffs are allowed to get in terms of
20  discovery as it relates to the debit memos in the
21  complaint, the on account clean up, and -- and the
22  accounting trail or the audit trail for all of those
23  debit memos.
24      I neglected to discuss the debit memos as part
25  of the complaint, your Honor. I think maybe we all

44

1  understand that to be the prime focus of these issues.
2      It's important to look at the discovery plan,
3  your Honor, because Judge Spero understood that the
4  documents that plaintiffs were entitled to and demanded
5  were indeed broad. And it's broken down into three
6  different sections: First, the on account clean up.
7  And that on account clean up includes all documents
8  related to the clean up, meaning all correspondence
9  before and after the on account clean up. Either
10  communications between Tom Williams, Jennifer Minton,
11  everyone in the collections department, everyone in the
12  accounts receivables department. It includes the
13  reasons for the on account clean up. It includes the
14  reasons why it was done in the second quarter of 2001.
15  It is extremely broad. Judge Spero intended it to be
16  that way. The defendants know that it would be that
17  way, and indeed, offered for it to be extremely broad.
18      And I will get to that a little bit later.
19      The second category is the 46,000 debit memos
20  and all documents relating to them.
21      SPECIAL MASTER INFANTE: Well, it doesn't say
22  that. It says the 46,000 debit memoranda. We're just
23  referring to the March 1, 2005 order at this moment.
24      MR. WILLIAMS: That's correct, your Honor. But
25  the -- the order says defendants shall produce all



45

1  documents relating to, one, the alleged on account
2  clean up, two, the 46,000 debit memoranda. And we
3  understood that to mean all documents related to the
4  debit memoranda in November 2000.
5      And so what does that mean? It means the debit
6  memos themselves, absolutely.
7      It -- it means all documents and communications
8  relating to them, including customer -- customer
9  inquiries about them, why they occur, ultimate refunds,
10  and internal correspondence concerning the debit memos,
11  why they were created, what impact they had on the
12  financial statements, what impact they had on earnings
13  in the second quarter of 2001, and what impact they had
14  on earnings throughout the relevant period as the
15  discovery plan is -- covers June 1 through June of 2001
16  and all documents relating to that period.
17      Third, your Honor, it relates to the -- it --
18  the discovery plan covers the accounting treatment of
19  those debit memoranda, and I think that that's the area
20  that becomes even broader. Because as we -- as we know
21  or -- or as plaintiffs believe, many, if not all,
22  corporate accounting-type scandals or improper revenue
23  recognition is complex, and it's complicated, it's
24  difficult to figure out. It requires an investigation
25  into the history of transactions, and the impact of

46

1  those transactions and, in this case, the future of
2  those transactions, which ultimately resulted in
3  multiple, if not thousands, of refunds which, indeed,
4  reversed revenue.
5      So I think that -- and, finally, the corporate
6  policy, which also -- with respect to the debit memos,
7  which is also alleged in the complaint. We
8  specifically allege that Oracle had an internal policy
9  of never refunding customers, and only doing so as a
10  last resort. And I think that last resort we saw in
11  November of 2002, after we filed the second amended
12  complaint, and thousands of credit memos and credit
13  refunds went out the door.
14      So I think that is -- I know that was
15  long-winded, but I think it's the right place to begin
16  with the breadth of the discovery plan, as it was in
17  two thousand -- in March of 2001.
18      With respect to what we have received from
19  defendants, your Honor, I think that is the next step.
20  And what we -- what we received -- well, it's easier to
21  discuss what we have not received from the defendants.
22  We have not received the correspondence that one would
23  expect to see surrounding the debit memos. The
24  accounting treatment of the debit memos, the on account
25  clean up in the fall of 2000 and -- and later on. We

47

1  have not seen --
2      SPECIAL MASTER INFANTE: Basically, what you have
3  not seen is Exhibit 69.
4      MR. WILLIAMS: That's exactly right, your Honor.
5  And -- and I was going to get there, but you've jumped
6  in front of me, and that's right.
7      I think that it's important to -- maybe we
8  should look at some of the exhibits so I can establish
9  or show your Honor what we haven't received, what we
10  know is there, and what ought to be ordered compelled.
11      With respect to the claims and defenses, Oracle
12  -- under Rule 26 plaintiffs are entitled to all of those
13  documents and all of that information. Oracle has
14  taken the position that the documents or the monies
15  related to the debit memos have been refunded long ago.
16  They took the position -- they took that position with
17  the Securities Exchange Commission, they took that
18  position with the litigation committee, they've taken
19  that position in the 30(b)(6) deposition that I took,
20  your Honor, and we know that that simply is not true.
21      I just wanted to ask your Honor to begin by
22  first taking a look at Exhibit No. 2 here, which is
23  Exhibit No. 25 to the declaration of Eli Greenstein in
24  support of the motion to compel. And that is the
25  presentation -- that is the presentation that Oracle

48

1  made to the Securities and Exchange Commission, which
2  asked for information about the allegations of the
3  complaint. I'll submit, your Honor, we haven't gotten
4  that either. We have not received any communications
5  between -- well, I don't -- not any, because I think
6  this is at least one communication. We have not seen
7  the requests of the Securities and Exchange Commission
8  to Oracle. We have not seen the responses, other than
9  this spreadsheet, this PowerPoint presentation.
10      But what we do know, is that they told the SEC
11  that plaintiffs' allegations, specifically in the
12  complaint that we're discussing today, were unsupported
13  by the documents.
14      If you go to page No. 13, your Honor, it
15  discusses a specific transaction, Household
16  International, specifically alleged in the complaint.
17  And they told the SEC that, in fact, Household was
18  refunded long ago. That wasn't true. And there's no
19  evidence to suggest that Oracle mentioned to the SEC
20  that it wasn't true. There are no documents that
21  Oracle has given us to suggest that they told the SEC
22  that that indeed was not true.
23      And attached to -- as Exhibit No. 3, your Honor,
24  is the check from Oracle to Household for $178,000,
25  after the presentation -- I'm sorry, after the debit




49

1  memo transactions alleged in the complaint, your Honor.
2  We don't have -- we have very little discussion
3  surrounding the Household document or the Household
4  debit memo.
5      Your Honor, if you go to Exhibit No -- I'm
6  sorry, page No. 31, which is a presentation of the
7  revenue by day given to the SEC for Q2 '01. Plaintiffs
8  have not received the revenue by day for 2Q '01 given to
9  the SEC regarding what happened with the debit memos or
10  how much revenue was recorded on each day in November
11  2000.
12      Oracle told the SEC that Eli Lilly was refunded
13  long ago.
14      Your Honor, if you look at Exhibit No. 4, these
15  are documents that we got from nonparties, not Oracle,
16  demonstrating that Oracle issued a check to Eli Lilly
17  in July of 2002. Very little, if any, of any
18  correspondence relating to this refund has been given
19  to plaintiffs.
20      And refunds are very important, your Honor. The
21  reason they're important is because, internally, Oracle
22  creates and maintains -- at least many witnesses have
23  said so, and we have the documents to show it -- refund
24  templates which discuss reasons for and -- reasons for
25  refunds, amounts of refunds, approvals by multiple

50

1  levels of Oracle's administrative and senior staff
2  before a refund goes out the door.
3      We've received maybe two of them, your Honor.
4  And I'll ask you to take a look at Exhibit No. 6, and
5  this is what they look like. At least this is what we
6  believe they look like.
7      This is an e-mail from Kate Schwermann to Raul
8  Campos -- or I'm sorry, to Raul Campos, discussing the
9  research that she did on the Household transaction.
10  She says, "Raul, customer received information
11  regarding their unapplied cash and requested a refund."
12  There should be one of these for every single refund
13  that Oracle made with respect to the debit memos.
14      We know that in November of 2002 or October of
15  2002, when plaintiffs filed their allegations, Oracle
16  issued over a thousand credit memos and refunds related
17  to the debit memos. And the connection between the
18  debit memos and the later refunds is what we've
19  demonstrated. And the link that we have presented to
20  the Court, that allows us all documents relating to
21  activities in 2002.
22      SPECIAL MASTER INFANTE: My understanding is
23  that if you limit it to the $100,000 or more debit
24  memos, there's actually 17 that match. Is that correct?
25      MR. WILLIAMS: No. There's actually many more

51

1  that match, your Honor. We excerpted for you --
2      SPECIAL MASTER INFANTE: Oh.
3      MR. WILLIAMS: -- 17.
4      SPECIAL MASTER INFANTE: I saw an exhibit with
5  17 in them.
6      MR. WILLIAMS: Right.
7      SPECIAL MASTER INFANTE: That's not the complete
8  picture?
9      MR. WILLIAMS: That's not the complete picture, your
10  Honor.
11      SPECIAL MASTER INFANTE: I wasn't sure
12      MR. WILLIAMS: We excerpted that for Your Honor
13  to see that there was, indeed, a connection between the
14  activities in 2002 and the debit memos in 2000. But
15  we've also given you, if you'd take a look at Exhibit
16  No. 14, Your Honor, that is a list of debit memos. And
17  it's actually number 67 to the Eli Greenstein
18  declaration. But that is a list of the debit memo
19  transactions that we have been able to connect.
20      SPECIAL MASTER INFANTE: Right. That's what
21  you're speaking about, the thousand of them?
22      MR. WILLIAMS: Right.
23      SPECIAL MASTER INFANTE: I was confused with the
24  other exhibit that only showed 17.
25      MR. WILLIAMS: The other exhibit that showed 17,

52

1  Your Honor, is the connection to the other account
2  12601, which is the bad debt reserve.
3      SPECIAL MASTER INFANTE: All right.
4      MR. WILLIAMS: Which we have demonstrated that
5  there is a connection between the two.
6      And I think we should talk about that, because
7  the -- the other side does not believe that we're
8  entitled to those documents. And --
9      SPECIAL MASTER INFANTE: I just want to make
10  sure I have my documents correct.
11      This is the document which is 25 pages long and
12  has a thousand credit memos in October of 2002?
13      MR. WILLIAMS: That's right. That's the one
14  that we were just talking about, Exhibit 14 in front of
15  you, and Exhibit No. 67 to the declaration of Eli
16  Greenstein.
17      SPECIAL MASTER INFANTE: Okay. Thank you.
18      MR. WILLIAMS: I'll just finish with this
19  document before I go to the 12601 issue.
20      Your Honor, the credit memos that were issued in
21  November of 2002, weeks after we filed the second
22  amended complaint, are crucial. And we have not gotten
23  any of the documents concerning them. They're crucial
24  because a credit memo is a reversal of revenue.
25  Ms. Minton testified to that on this past Friday. And



53

1  I've attached for Your Honor Exhibit No. 16. If you'd
2  turn to Bates 255, very bottom of the page, a credit
3  memo that has the definition of a credit memo,
4  "Removing a receivable from Oracle's accounting records
5  by recording a reversal to revenues. A credit memo is
6  processed when a receivable is deemed not to be legally
7  collectable."
8      So there's no question, just based on Exhibit
9  No. 14, which lists the November 17th, 2000 debit memo
10  -- it lists the on account clean up, and it also depicts
11  the associated credit memos reversing revenue.
12      With respect to the entire clean up in October
13  of 2002, which is one of the primary areas that Oracle
14  has resisted discovery on, and we presented the issue
15  to Judge Spero in March of 2005. We presented him with
16  some of the documents we had at the time, but not all.
17      Your Honor, once we filed the complaint in
18  November of 2002, Oracle engaged in a flurry of
19  activity in the days and weeks following the amended --
20  the second amended complaint. That flurry of -- of
21  activity surrounded investigation into the debit memo
22  transactions alleged. An investigation -- a related
23  investigation to the history of those transactions,
24  which also included transfers to account 12601, which
25  is a bad debt reserve account. And quickly, let me

54

1  tell you what that is and what we believe it to be, or
2  what we believe it to be.
3      The bad debt reserve, Your Honor, is on the
4  balance sheet. When transfers of customers' unapplied
5  cash or overpayments are moved to the bad debt reserve,
6  it has the effect of reducing bad debt expense. When
7  you reduce bad debt expense, it inflates reported
8  income. Tom Williams has testified to that. He's
9  testified not only to -- not only in this case, but he
10  also told the SLC, special litigation committee, that
11  that would be or could be the impact of transfers to
12  12601 or transfers of customer cash to the bad debt
13  reserve.
14      What we learned very early -- well, soon after
15  we filed the complaint, the second amended complaint,
16  was that Oracle was either altering documents or their
17  investigation into the debit memos would destroy those
18  documents. And we raised it in front of Judge Jenkins
19  who denied our motion. He didn't hear argument about
20  it, but he did deny it.
21      Once we got before Judge Spero -- after the Ninth
22  Circuit reversed Judge Jenkins' dismissal, we raised it
23  in front of Judge Spero again. Well, we raised it for
24  the first time in front of Judge Spero, and we provided
25  him with additional documents. The documents strongly

55

1  suggested, as Judge Spero agreed, that the impact of
2  whatever happened in 2002 was relevant to the claims in
3  the complaint and, indeed, the debit memo transactions.
4  Oracle said no, and was able to persuade the Court that
5  they were not related. And we accepted that for the
6  time being.
7      Now, Your Honor, there is no doubt that what
8  occurred at Oracle after we filed that second amended
9  complaint was entirely related to the debit memo
10  transactions. The bad debt reserve 12601 was entirely
11  related to the debit memo transactions. And,
12  artificially inflated earnings in the second quarter of
13  2000 -- of 2001. And the debit memo transactions were
14  part and parcel of that entire scheme.
15      Oracle has resisted discovery on -- it was
16  called the on account clean up, a second on account
17  clean up. They resisted discovery on it. They said
18  it's not related to any allegations in the complaint.
19  And we have made a substantial connection of the two --
20  of the two on account cleanups, November 2000,
21  October/November 2002. And one of the first things we
22  provided to Your Honor is the handwritten notes of
23  Molly Littlefield -- her last name is now Mollie
24  Venkataramana -- who testified -- well, let me withdraw.
25  Let me backup just a little bit.

56

1      Those handwritten notes, Your Honor, were a
2  result of our own investigation years ago. They were
3  not produced by Oracle, but they have been presented to
4  Ms. Venkataramana, and she has authenticated those
5  notes. And I think they're worth looking at to
6  establish that, indeed, in October of 2002 the on
7  account clean up was specifically related to the debit
8  memos in 2000.
9      And I'll ask you to take a look at Exhibit
10  No. 12, which is Exhibit No. 56 to the declaration of
11  Eli Greenstein.
12      After we filed the second amended complaint,
13  Your Honor, these are the handwritten notes of Mollie
14  Littlefield Venkataramana during several or at least
15  one of the meetings with Michael Quinn, who was
16  accounts receivable manager, and Greg Myers, both of
17  whom are specifically alleged in the complaint as being
18  of -- among those who authorized the debit memo
19  transactions.
20      And what did she write about there? It appears
21  she's writing out the details of what, indeed, happened
22  in November of 2000 as it relates to the debit memos,
23  specifically with respect to account 25005 alleged in
24  the complaint. And she indicates down on the bottom of
25  the page, that on November 17th, 2000, there were many



57

1  debits and credits to 25005. And on the right-hand
2  side just above the stamp there, she indicates that the
3  debits and credits to 25005 apply unapplied cash to the
4  debit memos. Therefore, there's no question that, after
5  we filed the complaint, that these issues were being
6  investigated internally by the collection staff. But
7  it goes on under that to say that on account alleged in
8  the complaint equals 12601.
9      That was not presented before Judge Jenkins, it
10  was not presented to Judge Spero, and we believe it's
11  exactly the type of connection that Judge Spero
12  requested or required before allowing discovery into
13  12601.
14      Your Honor, Oracle makes very little, if any,
15  mention of this connection in their opposing papers. I
16  guess it's a tacit concession that, indeed, they're
17  connected and that we've made the necessary connection
18  between the two cleanups that would authorize discovery
19  into that area.
20      I'm going to ask Your Honor to look at Exhibit
21  No. 9, which is Exhibit K to the reply of Eli --
22  Exhibit K to the declaration of Eli Greenstein in the
23  reply motion. This, Your Honor, is approximately --
24  well, it is 41 transactions that had a history with --
25  through 12601, the bad debt reserve, that ultimately

58

1  resulted in debit memos on November 17th of 2000. And
2  in either -- either in 2001 or 2002 were reversed out
3  of the 12601.
4      The debit memos and the -- the debit memos
5  25005, 12601, they're all related. And we have -- we
6  have to get discovery with respect to those.
7      Your Honor, I want to talk a little bit about
8  Oracle's opposition.
9      SPECIAL MASTER INFANTE: I'm going to stop you
10  there.
11      MR. WILLIAMS: I'm sorry.
12      SPECIAL MASTER INFANTE: I saw this document
13  when I was reviewing the motion because it was in
14  the -- it was attached to the declaration.
15      Who prepared the document?
16      MR. WILLIAMS: Your Honor, the document was
17  prepared by us, one of our forensic accountants
18  extrapolating information from various documents that
19  were produced by Oracle.
20      SPECIAL MASTER INFANTE: I might assume that
21  this correlation has been made for 41 items and that
22  you don't have any showing in addition of the 41 items,
23  as to the -- into 12601 and from 12601 credit memo?
24      MR. WILLIAMS: No, your Honor, you shouldn't
25  assume that. These were the only ones that we were

59

1  able to connect.
2      SPECIAL MASTER INFANTE: I see these partial
3  lists, and I don't know what to make of them.
4      MR. WILLIAMS: Your Honor, these were ones that
5  we were able to put together. But with respect to all
6  of the information, we don't have it. What we do have,
7  which I was going to get to is --
8      SPECIAL MASTER INFANTE: Okay.
9      MR. WILLIAMS: -- Oracle's opposition and what
10  they've submitted to the Court as -- well, as their
11  opposition to plaintiffs' motion. And the excerpt of a
12  script output or what we've called a litigation
13  spreadsheet, that they believe provides the Court or
14  the plaintiffs with the full and complete audit trail,
15  which we say it does not.
16      SPECIAL MASTER INFANTE: I understand.
17      MR. WILLIAMS: With respect to the opposition of
18  the -- Oracle's opposition to our motion to compel:
19      They don't appear to have much of an issue with
20  relevance. Instead, they submit the declaration of
21  Mr. Greg Myers. And Mr. Myers, your Honor, I would
22  submit, that the declaration is -- the value of the
23  declaration is probably less than zero for purposes of
24  discovery.
25      He includes in the declaration multiple ultimate

60

1  facts which are clearly in dispute here and can't be
2  accepted as -- as the end of the analysis with respect
3  to what is on account. He submits that on account has
4  a specific definition, his definition, unsupported by
5  any other -- any documents in the case. He submits
6  that the "on account cleanup" in November of 2000 was
7  to remove the flags from other transactions,
8  unsupported by any of the documents or testimony of
9  other individuals in the case.
10      Your Honor, he submits that the spreadsheet that
11  he provides to the Court is a sample of the full audit
12  trail which was ordered by the Court of all of the
13  debit memos. It clearly is not, your Honor. It does
14  not include any -- it doesn't include original invoice
15  numbers, which would allow the plaintiff to track the
16  original invoice of a debit memo; whether or not a
17  customer overpaid an invoice, and if it did, what was
18  the amount of the overpayment; it does not include
19  remittance information, which is what Oracle employees
20  used to determine whether or not a check is properly
21  applied to an invoice. It's the little information on
22  the top of the check that says this check is for, you
23  know, service, you know, or for 11i. It does not
24  include those facts.
25      He admits that the script output is inaccurate



61

1   and chalks it up to simple idiosyncrasies.

2       Well, it's obviously no substitute for the

3   source documents which we know that they have, and we

4   know that the burden associated with producing the

5   source documents was minimal. And what do I mean?

6   Your Honor, there are several witnesses that have

7   testified that, in order to drill down or get

8   information about any specific debit memo or any

9   invoice, Oracle can simply run a billing history. We've

10  actually got billing histories from -- from

11  confidential witnesses. Oracle has submitted some of

12  them, but not all of them.

13      You can -- several witnesses have testified that

14  you can run receipt registers simply punching in a

15  customer's name, pulling up the entire history of a

16  customer account. At least you're able to put time

17  frames around them, very easy to do.

18      And I'll submit, your Honor, that if you take a

19  look at Exhibit No. 7, which is an e-mail from another

20  individual who is, by the way, named in the complaint,

21  Raul Campos, and Oracle has indicated -- we've taken

22  his deposition already, and Oracle indicated that there

23  were no documents in his files, or no relevant

24  documents in his files. But if you look just at Bates

25  No. 614022, again, that's the -- in the middle of the

62

1   page, that's the refund template that should be there

2   for every single refund that was issued as it relates

3   to the debit memos.

4       If you go back one page, 614021, Mr. Campos

5   writes to Adam Hahn investigating the Household

6   transaction: "I ran a billing history from January '98

7   to current."

8       Easily doing an investigation into the history

9   of the debit memos related to Household.

10      Go back yet another page, your Honor, 614020,

11  Adam Hahn writes to Mike Quinn, another person alleged

12  specifically in the complaint. "Please approve the

13  following, the refund, and forward it to Tom" -- that's

14  Tom Williams, your Honor -- "for final approval prior to

15  sending to Sam Yohannes for processing. The refund is

16  due to the customer for various duplicate and customer

17  overpayments they've made to Oracle out of two accounts

18  payable accounts departments. Raul and I have reviewed

19  their billing history and we have no reason to keep

20  their overpayments. Customer is current with no history

21  of items being written off as bad debt."

22      This is the approval process, Your Honor. If

23  you go back one more page, it was approved by -- I'm

24  sorry, just on the same page, approved by Michael

25  Quinn, and then approved by Tom Williams.

63

1   For every single refund, this type of history

2   and background should be available. It doesn't require

3   someone to extract from a ten-year-old database bits

4   and pieces of information. This is an e-mail. It's

5   easily -- the refund templates are easily run. We

6   don't have them. They have to be produced because, from

7   our perspective, Your Honor, I submit that we've --

8   we've established that the refunds are, indeed, important

9   to the allegations, and supported by the allegations of

10  the complaint.

11      SPECIAL MASTER INFANTE: Okay. We'll take a

12  recess.

13      MR. WILLIAMS: Sure.

14      SPECIAL MASTER INFANTE: Ten minutes.

15      (Recess.)

16      SPECIAL MASTER INFANTE: Mr. Williams.

17      MR. WILLIAMS: Thank you, your Honor.

18      I've been told I've been talking for a long

19  time, but I'm just going to quickly sum up with

20  discussing the October 19th, 2005 order, Judge Spero's

21  October 19th order.

22      Oracle has taken the position that that order

23  has substantially limited the documents and information

24  that it must produce pursuant to the March 10th, 2005

25  discovery plan, and obviously the plaintiffs disagree,

64

1   for a couple of reasons, your Honor.

2       First, if the October 19th order was to be

3   interpreted in the manner in which Oracle interprets

4   the order, plaintiffs would not even get discovery into

5   the debit memo transactions that are alleged

6   specifically in the complaint.

7       The Household transaction, for example, is only

8   $76,000, it's alleged in the complaint. Eli Lilly was

9   only $15,000. We allege at least nine to 12 additional

10  transactions specifically in the complaint. And I

11  don't think that Judge Spero intended at all to

12  preclude the plaintiffs from discovering facts that are

13  directly alleged in the complaint.

14      Indeed, most of the debit memo transactions are

15  short of $100,000, I think it's 98 percent of them are

16  short of $100,000. It's important to get those

17  documents, Your Honor. I think that Oracle's offer

18  early on to -- to give us the -- the debit memo

19  transactions $100,000 or greater is a strategic

20  decision. Indeed, those that are $200, $300, $2,000,

21  are the ones that are most likely to go undetected by

22  investigators and the auditors.

23      Indeed, there -- every single one that we

24  alleged in the complaint is below $100,000. And

25  they've not only limited the debit memo transactions to



65
1  $100,000, but the other categories of the discovery
2  plan, including the on account cleanup, the accounting
3  treatment of the debit memos and policies.
4       And if you look at Exhibit No. 9 -- I'm sorry,
5  Exhibit No. 10, Your Honor, this is an e-mail from Raul
6  Campos, a person directly alleged in the complaint,
7  discussing a person directly alleged in the
8  complaint, DuPont Photo Mask. And at the bottom of the
9  page he's asking Terry Elam about $80,000 worth of
10 debit memos, and he lists them on the next page.
11      There are one, two, three, four, five, six of
12 them -- six debit memos. And he says to Terry Elam,
13 which is -- is very important, "Terry, the debit memos
14 below total $80,871.13. These are DM Susan wants
15 refunded, except I don't see where the funds are
16 located."
17      I submit, Your Honor, the funds aren't there
18 because on November 17th of 2000, prior and afterward,
19 those funds were moved either to revenue or earnings
20 and likely through the bad debt reserve 12601.
21      But notwithstanding that, this is an e-mail
22 created in October of 2002. This is a document that
23 they don't believe is relevant and that they don't
24 think they have to produce pursuant to the discovery
25 plan.

66
1       Certainly Judge Spero did not intend to preclude
2  discovery on the very transactions that are alleged in
3  the complaint. And that's Oracle's interpretation of
4  Judge Spero's order.
5       Finally, Your Honor, I just -- one more -- one
6  more document I'd like you to look at, which is the
7  next document, Exhibit No. 11. Again, another Oracle
8  document, not produced by Oracle, these two documents,
9  Your Honor, 10 and 11, were documents that plaintiffs'
10 investigation uncovered. Oracle has not produced these
11 documents. But, indeed, it relates to the debit memo
12 transactions, and it's specifically alleged in the
13 complaint, where Raul Campos, another person alleged in
14 the complaint, discussing Phillips Petroleum, another
15 customer alleged in the complaint related to the debit
16 memo transactions. He sends a fax -- a fax to
17 Mr. Russo saying that all the invoices starting with
18 $50 are actually debit memos, these are created to
19 clean up our unapplied account.
20      They were more than likely overpayments. And
21 you'll have to look at the remittance information on
22 the check to confirm that.
23      Oracle clearly doesn't believe that this type of
24 document should be produced. And this document itself
25 is interesting because it discusses remittance

67
1  information, which is what we're seeking, discusses the
2  overpayments, discusses the cleanup to the unapplied
3  account, and the debit memos. And they either are just
4  simply withholding the document or it doesn't exist.
5       And we don't think that Judge Spero's October
6  19th order could possibly be interpreted in the fashion
7  in which they're interpreting it, Your Honor.
8       And I'll conclude there, unless Your Honor has
9  any questions for me
10      SPECIAL MASTER INFANTE: Thank you very much.
11      Okay.
12      MS. WINE: Your Honor, I was worried when
13 Mr. Williams started speaking again after the break,
14 but I'm actually glad that he came back to this point
15 because we're all scratching our heads wondering why in
16 his opening presentation he hadn't mentioned the
17 October order  I think Your Honor mentioned it, but he
18 hadn't mentioned it.
19      And as Your Honor knows, that order is clear on
20 its face, that defendants' debit memo production is
21 limited to those debit memo transactions greater than a
22 $100,000  I don't think it's subject to interpretation
23 at all on that score.
24      And I was, you know, listening to the
25 presentation this morning -- this afternoon by

68
1  Mr. Williams and looking at all the exhibits he
2  submitted, and every single debit memo referenced in
3  here is a debit memo less than $100,000.
4       So the reason why defendants have not produced
5  documents related to these debit memos is because they
6  don't fall under the scope of the October order.
7       Mr. Williams just said he can't possibly imagine
8  how we can interpret the order that way and it can't
9  possibly be what Judge Spero meant.
10      Lest there be any confusion on that, I have
11 a brief drafted by plaintiffs shortly after that
12 order came out. This is a motion to compel Arthur
13 Andersen documents from, I think, December of 2005.
14 And if you look at footnote ten on page 10, plaintiffs
15 write: The Court's October 19, 2005 order limiting
16 Oracle's production of source documents regarding debit
17 memo transactions would exclude documentation from
18 Oracle concerning these transactions as they are
19 individually under $100,000.
20      So hopefully we can move past that point and
21 all agree as to what the October order said in terms of
22 Oracle's obligation to produce documents regarding
23 debit memos only above $100,000.
24      SPECIAL MASTER INFANTE: Well, the judge left
25 the door open  He asked it in meet and confer regarding



69

1  sampling of anything under $100,000.
2      MS. WINE: He never --
3      SPECIAL MASTER INFANTE: He never ordered it so
4  you can take the position you're taking and be
5  consistent with the judge's order.
6      MS. WINE: Well, I'm happy to address that, Your
7  Honor. I mean, the fact is that the order as it stands
8  does talk about debit memos only above $100,000. So
9  that's the order that we're operating under. He did
10 suggest that the parties can meet and confer about a
11 sampling of some other debit memos.
12     SPECIAL MASTER INFANTE: That was his
13 expectation.
14     MS. WINE: Yes. We have actually taken --
15 started discussions with plaintiffs about that and have
16 said, okay, he said talk about a sampling. Why don't
17 you propose to us some sort of statistical sampling
18 that we can do, give us some sort of justification for
19 why it would give you some higher degree of confidence,
20 why it would give you something more than the 776 debit
21 memos have not given you already, given the cost, the
22 expense, the burden to Oracle in terms of going back
23 and getting all of the electronic data regarding
24 additional debit memos.
25     Plaintiffs refused. At first they said, well,

70

1  yeah, we'll give you a sampling. We'll tell you what it
2  is and we'll tell you why we want that. Then they came
3  back to us and said, nah, we don't really want a
4  sampling, we just want to pick 600 of our choice.
5  Okay? No justification, no reason why 600. We've
6  given them the audit trail for 776 debit memos, those
7  greater than $100,000.
8      SPECIAL MASTER INFANTE: Well, they actually
9  don't agree with you on your last statement either.
10     MS. WINE: I understand that.
11     SPECIAL MASTER INFANTE: Okay.
12     MS. WINE: I -- let's -- let's address that,
13 Your Honor.
14     SPECIAL MASTER INFANTE: All right.
15     MS. WINE: As you know, we have produced a
16 script output that provides data regarding 776 debit
17 memos at issue, okay? The script output was something
18 that was expressly vetted with Judge Spero in the
19 October hearing. Judge Spero knew the information that
20 was going to be included in the script output.
21 Plaintiffs knew the information that was going to be
22 contained in the script output. It -- it took months
23 of work and millions of dollars to extrapolate a ton of
24 data from Oracle's accounting system and put it into
25 this one document that we believe is the best way to

71

1  cull data from a bunch of area sources.
2      Plaintiffs have asked for a whole variety of
3  other reports that, number one, the Court has expressly
4  rejected already. But more importantly, they've asked
5  for reports that are just different forms of collecting
6  the same data. Okay?
7      And what we've done in the script output is
8  we've actually collected the data that is relevant to
9  each of the 776 debit memo transactions, and we've
10 collected it from various places within Oracle's
11 accounting system and put it in one organized document,
12 chronological order, listed by debit memo. It has, you
13 know, 17 different columns of information regarding,
14 you know, various information, original invoice number,
15 receipt, whether or not there was a refund, whether
16 or not there was a credit memo, it shows the offsetting
17 debit and memo transactions on November 17th. It has
18 all of that information in one place.
19     If we were to, instead, go out and produce a
20 whole bunch of account-wide or customer-wide reports,
21 as plaintiffs have requested, they're going to get a
22 whole host of information that goes well beyond these
23 debit memo transactions, and it's going to be much
24 more difficult. They complained about how difficult
25 the script output is to deal with. It's going to be

72

1  much more difficult to take a sales ledger or a cash
2  receipt report and try and parse through a document
3  that is thousands, sometimes hundreds of thousands of
4  pages long and find the detail that is relevant to the
5  debit memos at issue in this case.
6      SPECIAL MASTER INFANTE: Pieces of ledgers.
7      MS. WINE: Exactly. Which is an exact quote from
8  Judge Spero, as you know.
9      Which is why we arrived at producing the script
10 output. Plaintiffs, you know, they call it the
11 litigation spreadsheet. They say it's doctored. They
12 use all sorts of pejorative terms, when they well know
13 that this was the form of data that is agreed upon and
14 approved by Judge Spero, and it is what the parties are
15 at least -- at least defendants and the Court believed
16 would be the best way to follow this information.
17     SPECIAL MASTER INFANTE: I don't believe Judge
18 Spero approved that method of complying with his
19 order, nor did he disapprove it.
20     MS. WINE: Well --
21     SPECIAL MASTER INFANTE: So I think you're
22 leaping a bit there.
23     MS. WINE: There certainly was an example
24 provided to Judge Spero, so there wasn't -- let me just
25 say, to the extent that plaintiffs are claiming we were




JAMS Hearing 7/10/06  7/10/2006  4:12:00 PM

73

1  hiding the ball or producing something different that
2  the parties were expecting, there was a sample of the
3  script output produced. Judge Spero did look at it and
4  say, okay, this represents a success of your script
5  output. And that was all done, you know, in open
6  Court. Plaintiffs were there. There was nothing
7  hidden here about what is that Oracle was going to
8  produce in response to the October order.
9       You know, just stepping back for a minute, you
10  know, where we are, plaintiffs have pled a very narrow
11  claim here. Okay? They're trying to go back to
12  their -- their complaint and expand it. They're trying
13  to say that they made -- if you'll look in the reply
14  brief, they say that they made a general claim
15  regarding revenue recognition in the second quarter of
16  '01, and that it doesn't matter how revenue was
17  improperly recognized, it just matters that the result
18  was that revenue was improperly recognized. That just
19  absolutely is not the standard for -- for permitting
20  plaintiffs to get license into Oracle's accounting
21  generally. Okay?
22       Judge Jenkins and Judge Spero both have
23  recognized that they cannot do that. What they have
24  pled is a specific allegation regarding the recognition
25  of revenue, $228 million in revenue through the

74

1  creation of 46,000 debit memos on November 17th, 2000.
2  That is the standard of relevance. That's the Rule 26
3  standard which governs what they should be able to
4  get discovery into, and that has guided both Judge
5  Jenkins and Judge Spero.
6       And you see that reflected in the various
7  arguments that we've cited, you see it reflected in the
8  March order, you see it reflected in the October order,
9  and you see it in a whole host of other orders with
10  respect to audit discovery, et cetera.
11       Plaintiffs have not been able to show -- we're
12  at the end or close to the end, whatever, we'll learn
13  today, we're close to the end of fact discovery.
14  Plaintiffs do not have a shred of evidence showing that
15  any -- any revenue was recognized as a result of the
16  creation of the debit memos. They have none.
17       They have documents from Oracle showing that
18  there were offsetting debit memos, accounting entries,
19  debit and credit -- sorry -- accounting entries when the
20  debit memos were created netting to zero, meaning that
21  there's no financial impact. They have sales journal
22  reports showing that the total revenue recognized on
23  November 17th, 2000 was $10 million. If you add up the
24  total of the 45,000 debit memos, it's 692 million
25  dollars. There's not a shred of evidence that that

75

1  amount of revenue was recognized on November 17th for,
2  frankly, all of November, by Oracle.
3       All of the witnesses deposed thus far have
4  said that there was no revenue recognized as a result
5  of the creation of the debit memos. Even plaintiffs'
6  own confidential witnesses have not been able to
7  support this -- as you know, one of them has taken the
8  Fifth, so we don't know what he's going to say, but
9  right now he's not saying anything. They have another
10  one, confidential witness 46, who they trumpeted in
11  their reply. Her deposition just happened a few days
12  ago after these briefs were submitted. She absolutely
13  was not able to support plaintiffs' theory. She said
14  that she never worked at Oracle. She does -- she's not
15  familiar with their accounting policies, and she cannot
16  establish or show in any way that Oracle actually
17  recognized revenue as a result of the creation of the
18  debit memos.
19       So plaintiffs have nothing to support the claim
20  that they actually pled in their complaint.
21       So what are they doing? They're doing what
22  Judge Spero was worried they were going to do, which is
23  they're trying to root around and figure out another
24  accounting claim.
25       So they come in here today and they say, all

76

1  right, we know that other, you know -- this has been
2  passed on before by Judge Jenkins and Judge Spero, but
3  now we've been able to establish a link between the
4  activity in October 2002 and the November 2000 debit
5  memo activity. And as I heard it, the only things they
6  cite are, No. 1, the fact that there's credit memos in
7  2002 that might fall within the same transaction
8  history for an invoice where there's also a debit memo.
9       SPECIAL MASTER INFANTE: Aren't there a thousand
10  of them?
11       MS. WINE: If you look at the universe of 46,000,
12  there's a thousand, that's two percent, by the way.
13  Okay? I know a thousand sounds like a big number. It's
14  two percent. So, really, if there was some big effort
15  here to unwind something that was done by the creation
16  of the debit memo --
17       SPECIAL MASTER INFANTE: And they're all under
18  $100,000.
19       THE WITNESS: I don't know that they're all
20  under a hundred thousand. I think there are 41 that
21  are within the universe of 776.
22       SPECIAL MASTER INFANTE: So that's the
23  correlation?
24       MS. WINE: Yes. So that's the difference, is a
25  thousand out of 46,000, and there's 41 out of 776.





77

1   But, as I was saying, even if you look at the
2   whole universe of 46,000 debit memos, and that two
3   percent of the them have credit memos associated with
4   them, and by the way, not all the credit memos are
5   after, only about half of the credit memos, so about
6   500 happened in 2002. About 500 of them happened
7   before the debit memos. Okay? So we're looking at a
8   really small number there. And they're trying to say
9   this somehow unwound whatever happened with the
10  creation of the debit memos, it's just not true, they
11  don't have that connection.
12      But to the extent that any of these credit memos
13  fall within the history of one of these greater than
14  100,000 debit memos, we have given them that
15  information. That's how they're getting their -- you
16  know, they're making their exhibits from documents we
17  produced. Mr. Williams has said that today. So you can
18  look at the spreadsheet we produced of all 46,000 debit
19  memos, and it shows which ones have credit memos
20  associated with them. And you can look at the script
21  output, and it shows which ones have credit memos
22  associated with them. And it gives a whole host of
23  other information. When the credit memo was issued,
24  what invoice it relates to, what amount it was. And by
25  the way, there are comment fields, and in many of these

78

1   it says why the credit memo was issued, or why a refund
2   was issued later.
3      So they've got that information for the 776.
4      The other thing they point to are Mollie
5   Littlefield's notes. And I'm going to call her Mollie
6   Littlefield because I cannot pronounce her last name.
7   They had these notes at the time of the ex-parte
8   application and at the time -- this issue was argued
9   again before Judge Spero. There's nothing new here.
10  These are -- and, by the way, alot of these other
11  e-mails that they have, as well, were submitted with
12  the ex-parte application in the declaration of --
13      SPECIAL MASTER INFANTE: Well, they just took
14  her deposition a few weeks ago.
15      MS. WINE: They did. And let me talk about her
16  deposition, because they asked her about these notes,
17  which is not surprising. They asked her why there were
18  references to debit memos in these notes that were, you
19  know, the 2002 cleanup, and she had a very logical
20  explanation for it. She said, look, we were going back
21  and doing a cleanup of unapplied cash generally. When
22  we were doing this, we were coming across references to
23  debit memos in some of the histories for these various
24  transactions. A lot of the collectors who were doing
25  this work in 2002 had no idea what debit memos were. A

79

1   lot of them didn't even work at Oracle in 2000. And
2   she said they needed an explanation of what a debit
3   memo was, so that they would understand this.
4      And that's why there are references in her
5   notes
6      She then proceeded to testify that the October
7   2002 cleanup had nothing to do with the November 17th
8   debit memos. And many other witnesses -- they've asked
9   every one of the accounting witnesses, I believe, who
10  has any knowledge on this. They have all said that they
11  are discrete separate events. The creation of the
12  debit memos had no financial impact whatsoever and that
13  it was a discrete separate event from the unapplied
14  cash cleanup that happened in October of 2002.
15      So they don't have anything new here today. And
16  there is no link, there's no reason for them to, you
17  know -- for us to modify the prior orders that have
18  been entered in this case and to now allow them broader
19  discovery into issues beyond the debit memos.
20      SPECIAL MASTER INFANTE: I don't view prior
21  discovery orders as the conclusive determination of
22  discovery forever. Discovery is an evolving process,
23  and I think that you speak as though Judge Spero made a
24  final ruling on every discovery issue presented to him.
25      It's not the case. And many, many cases

80

1   discovery is an ongoing process, and new requests are
2   served and new orders are granted.
3      MS. WINE: I understand that, Your Honor, and
4   respect that. And all I'm trying to say is that I
5   don't see that they've provided the Court with anything
6   new since these issues were argued before and since the
7   prior orders came out that would make us reconsider
8   those or somehow now allow discovery into these other
9   areas. There simply is no connection there.
10      SPECIAL MASTER INFANTE: Let me ask you about a
11  few things. Let me see my notes.
12      These are a couple of items that were briefly
13  referred to in papers. Certain source documents were
14  provided to the SEC with respect to debit memos, among
15  other things.
16      Those have not been provided to plaintiffs,
17  correct?
18      MS. WINE: Your Honor, we have provided the SEC
19  presentation to plaintiffs.
20      SPECIAL MASTER INFANTE: Just the presentation?
21  I'm talking about source documents.
22      MS. WINE: Yes. The source documents have not
23  been, and the reason is that the only debit memo
24  transactions discussed in that SEC presentation are
25  less than a $100,000, and that -- that is why those





JAMS Hearing 7/10/06  7/10/2006  4:12:00 PM

81

1   documents --
2       SPECIAL MASTER INFANTE: How many were
3   discussed?
4       MS. WINE: I would have to go back and look.
5   They were a subset of those debit memos discussed in
6   the complaint.
7       SPECIAL MASTER INFANTE: That's my problem,
8   they're directly relevant to the allegations in the
9   complaint, even as narrowly as you read the complaint.
10  And there's no burden.  Because they've already been
11  produced, there's no burden.  There is a burden with
12  respect to the rest of the debit memos, but those that
13  have already been collected and presented to SEC,
14  there's absolutely no burden.
15      MS. WINE: Your Honor, I think we were just
16  doing a cut to comply with the October order --
17      SPECIAL MASTER INFANTE: Oh, I understand.
18      MS. WINE: -- to produce those that were
19  greater than a $100,000.
20      SPECIAL MASTER INFANTE: That's my question.
21  Do you know how many debit memos were the
22  subject of that presentation with the SEC?  They were
23  all under 100,000, or do you have any idea how many
24  there were?
25      MS. WINE: We can check.  I believe it was --

82

1   there were six or seven?
2       MR. GLENNON: I would say five or six.
3       MS. WINE: Somewhere five to seven.
4       SPECIAL MASTER INFANTE: I'm just trying to
5   close the loop on some of these issues.
6       MS. WINE: Absolutely.
7       SPECIAL MASTER INFANTE: Ernst & Young and
8   Arthur Anderson is -- is essentially a motion for
9   reconsideration.
10      MS. WINE: Yes.
11      SPECIAL MASTER INFANTE: That really is a motion
12  for reconsideration, as you view it, correct?
13      MS. WINE: Yes.
14      SPECIAL MASTER INFANTE: All right
15  I mean, you spoke just a few minutes ago your
16  comments with respect to whether the plaintiffs have
17  made a link to the October/November 2002 one thousand
18  credit memos and whether they had any impact on the
19  accounting issue.
20  And did you speak to the bad debt reserve which
21  is the $20 million potential accounting event in a
22  quarter that would have reduced earnings per share by
23  one cent?  Assuming that's material, would you -- I'm
24  not to make materiality judgments at the discovery
25  level  Would you please comment on that?  Haven't they

83

1   shown a connection by a few things and fragments of
2   evidence that they've shown?
3       MS. WINE: Your Honor, I don't believe they
4   have.  They haven't pled anything in their complaint
5   that talks about these transfers.
6       SPECIAL MASTER INFANTE: They don't have to.
7       MS. WINE: Well, they have to tie it to the
8   debit memo.
9       SPECIAL MASTER INFANTE: The question is whether
10  there's relevant -- no, the question is whether they're
11  relevant.  I've never seen anyone read a complaint like
12  you're reading it.
13      MS. WINE: Okay, Your Honor.
14      SPECIAL MASTER INFANTE: They don't have to
15  plead it in a complaint.  The question is whether it is
16  relevant to what they have pled in the complaint
17  regarding the debit memos.  Okay?
18      MS. WINE: Correct.
19      SPECIAL MASTER INFANTE: And whether those
20  transactions have a history that's connected.  That's
21  the question.
22  I'm under the impression the connection's been
23  shown.
24      MS. WINE: Your Honor, there -- there are some
25  debit memo transactions where, if you look in the

84

1   history of a particular invoice, you will see in that
2   history of the invoice a transfer to 12601.
3       SPECIAL MASTER INFANTE: Yes.
4       MS. WINE: You may also see a debit memo.
5       SPECIAL MASTER INFANTE: Yes.
6       MS. WINE: Your Honor, it is our view that that
7   does not link the bad debt transfer to a debit memo.
8   Okay?  The creation of the debit memo was an isolated
9   event  It had no --
10      SPECIAL MASTER INFANTE: Who's to know that?
11      MS. WINE: -- had no financial impact.
12      SPECIAL MASTER INFANTE: We're in discovery
13  here, not fact finding.  This is not fact finding;
14  this is discovery  Rule 26
15  Rule 26 is our guideline here, not 401 of the
16  Federal Rules of Evidence.  Not even what is sufficient
17  evidence for a finding of fact, but Rule 26
18      MS. WINE: Right
19      SPECIAL MASTER INFANTE: Now my question is
20  this:  Were those transfers -- did they relate to any
21  debit memos that were over $100,000?
22      MS. WINE: They don't related to the debit
23  memos, okay?
24      SPECIAL MASTER INFANTE: They relate to the
25  transaction?



85

1  MS. WINE: Yes.
2  SPECIAL MASTER INFANTE: I'll rephrase the
3  question.
4  Do they have a transaction involved where a
5  debit memo had earlier been issued for $100,000? Do
6  they involve a transaction with a customer where a
7  debit memo has been previously issued that was more
8  than $100,000?
9  MS. WINE: I think you'll find some sales
10  transactions where you will see in the history of that
11  sales transaction.
12  SPECIAL MASTER INFANTE: Yes
13  MS. WINE: A transfer to 12601. And you will
14  also see in that lengthy history, a debit memo. Okay?
15  I guess what -- the difference that -- that
16  I want to articulate is what plaintiffs are alleging:
17  Improper revenue recognition based upon the creation of
18  these debit memos.
19  SPECIAL MASTER INFANTE: Yes, I know
20  MS. WINE: And there's no evidence of that
21  whatsoever. They have not alleged what we believe
22  would be a separate claim of improper revenue
23  recognition based upon inappropriate transfers to bad
24  debt.
25  SPECIAL MASTER INFANTE: Discovery is not that

86

1  tight, in my experience. Pleadings are amended during
2  the course of discovery sometimes.
3  MS. WINE: Your Honor --
4  SPECIAL MASTER INFANTE: The PSLRA does not
5  permit the plaintiffs to come up with other accounting
6  theories other than are as pled. And every judge
7  that's been involved in this case, including myself,
8  have held a line on that.
9  MS. WINE: I guess what concerns us, Your Honor,
10  is that --
11  SPECIAL MASTER INFANTE: I have never seen
12  anyone read a complaint so narrowly as you do.
13  Rule 26 would be turned on its head if we
14  applied your discovery rulings as you wish to make in
15  this case. It's just ridiculous. I'm sorry I have to
16  be so blunt with you.
17  You've answered my questions regarding the
18  20,000 -- I guess it would be 20 million dollars of
19  customer overpayments that were transferred. If you
20  have any other comments to make about them, you may.
21  MS. WINE: I guess, Your Honor, you know, with
22  respect -- I guess what we're worried about -- this is
23  exactly what the parties were worried about at the
24  outset and what Judge Spero was worried about at the
25  outset.

87

1  SPECIAL MASTER INFANTE: Judge Spero gave
2  plaintiffs an open door on that. And I'm tired of you
3  telling me that Judge Spero has decided that issue. He
4  did not decide that issue. He specifically said you're
5  going to get all of the transactional data and you'll
6  find a transfer to that account or you won't. And
7  that's what he said on the bench.
8  Anything further?
9  MR. WALD: May we have one minute, Your Honor?
10  SPECIAL MASTER INFANTE: Yes.
11  (Brief discussion off the record.)
12  MS. WINE: We have nothing further, Your Honor.
13  SPECIAL MASTER INFANTE: Okay.
14  Do you wish to reply?
15  MR. WILLIAMS: Just a couple things, Your Honor.
16  With respect to the script output with the indications
17  that refunds are in that output, in fact, we don't
18  believe that the information surrounding refunds is
19  necessarily in there. In addition, Oracle has taken
20  the position that some of these refunds were made
21  twice, and that certainly isn't in there.
22  With respect to the comment fields in the script
23  output, Your Honor, it's very difficult to tell when
24  those comments were created. Some fields have comments
25  with the same date, some comments appear to have

88

1  different comments but the same date, or vice versa
2  I don't know how deeply Your Honor wants to get
3  into what's actually in that, that spreadsheet.
4  With respect to the Court's comment on the
5  Arthur Anderson documents and being a motion for
6  reconsideration, Judge Spero did make a ruling on what
7  we were able to do with the Anderson documents, and
8  that Oracle was supposed to produce the documents that
9  it believed were responsive. And that plaintiffs were
10  allowed to take a deposition to find out if these were
11  any other documents within that -- within that
12  production that might be responsive.
13  Plaintiffs have taken the deposition of Jason
14  Sevier in the last ten days, Your Honor, and with
15  respect to what remains in the documents, we may come
16  back to the Court, if allowed, to provide Your Honor
17  with that information.
18  Finally, if you look at Exhibit No. 9, that is
19  the -- that exhibit, based on what we have, includes
20  debit memos that are over $100,000, which have a
21  history of going through 12601. We have no idea if
22  these are the only ones, but indeed there are some
23  here.
24  SPECIAL MASTER INFANTE: 41 of the one thousand
25  were over a 100,000. The remainder of the 100,000 were



89

1  under a 100,000.
2      MR. WILLIAMS: Yes. I have nothing further,
3  Your Honor.
4      SPECIAL MASTER INFANTE: And you got this
5  information from the spreadsheet?
6      MR. WILLIAMS: Most of it came from the
7  spreadsheet; is that right, Keith?
8      MR. MAUTNER: Yes. They all came from the --
9  all of it.
10      SPECIAL MASTER INFANTE: Okay.
11      MR. WILLIAMS: Your Honor, if I may be allowed
12  to make one final comment.
13      SPECIAL MASTER INFANTE: (Nods head up and
14  down.)
15      MR. WILLIAMS: What we have learned -- we know
16  that, from the Household debit memos, some customers
17  have multiple debit memos, the total of which may be
18  over a $100,000. But one debit memo may be 20,000.
19  But if you total, you know  25 debit memos for a
20  particular customer, then they raise the dollar value
21  over $100,000.
22      SPECIAL MASTER INFANTE: Okay.
23      All right. The motion is granted in part and
24  denied in part. I'll issue a written order. Just to
25  give you an idea of what the order will be, I'll just

90

1  give you a couple of conclusions I've made.
2      The document that you prepared and produced in
3  May of '05 appears to be a very helpful document. But
4  the plaintiffs are entitled to more than that
5  litigation spreadsheet. They're entitled to all, just
6  as Judge Spero ordered, all electronic information,
7  including electronic images of documents relating to
8  the debit memos at issue in this case and all
9  transactions that underlie those debit memos where the
10  debit memos are in amounts of a $100,000 or more.
11      I don't find this spreadsheet to be a complete
12  performance of that discovery obligation. I'm not
13  critical of your efforts in doing the spreadsheet, but
14  the discovering party has a right to see the
15  transactional documents underlying those debit memos.
16      That was Judge Spero's order. I find that the
17  order has not been fully complied with. I think the
18  defendants have made a good effort with respect to the
19  development of that document.
20      Based on what I've seen, plaintiffs are entitled
21  to all the transactional documents. And that I'll
22  hereby order with respect to those 776 debit memos.
23      The -- with respect to the sampling of debit
24  memos under $100,000, Judge Spero was hopeful that the
25  parties would meet and confer and come up with a

91

1  sampling of -- of those debit memos. And the parties
2  were unable to resolve that.
3      The -- my judgment is that I would give the
4  plaintiffs an opportunity to select no more than 150
5  debit memos that are under the $100,000 level, and
6  defendants shall produce all electronic information
7  relating to the 150 debit memos selected by plaintiffs.
8      With respect to the 2002 cleanup, I'm denying
9  the motion.
10      With respect to the bad debt reserve, I'm
11  granting the motion. I feel a connection has been
12  made, and the relevant -- relevant to the claims and
13  defenses that is currently pled. Moreover, I find that
14  they're relevant to the subject matter of the
15  allegations, and there's good cause to produce them
16  under Rule 26.
17      With respect to the other Arthur Anderson and
18  Ernst & Young information that you seek, the motion is
19  denied.
20      Now, there are a number of underlying documents
21  that you seek, I believe eight categories of documents
22  that you seek, which was in section three of your brief,
23  if I can go through those for a moment.
24      The documents relating to cash receipts that
25  underlie the debit memos are included in my order when

92

1  I say underlying transactional documents.
2      Communications and historical notes related to the
3  debit memo transactions are included in my order.
4      The -- Oracle's AR trial balance ageing reports related
5  to documents concerning AR account receivable reserves
6  and write-offs, is granted. Again, for clarity I'm
7  denying the motion with respect to Oracle's 2002
8  cleanup. I'm granting the motion with respect to SEC
9  source -- source documents produced to the SEC relating
10  to debit memos.
11      I think the written order I issue, which you
12  should have in a few days, will further clarify with a
13  little bit more specificity what I've ordered. But I
14  just wanted to give you sort of a synopsis of it.
15      Okay. The question -- I do have one question,
16  that is, can you comply with an order within 30 days?
17      MS. WINE: Your Honor, could we take a couple
18  minutes?
19      SPECIAL MASTER INFANTE: You can give me an
20  answer to that later today, if you wish. You need to
21  confer on that, and then I'd be glad to hear your
22  answer.
23      All right, let's move to the next motion.
24      This is plaintiffs' motion to compel further
25  responses to the third set of interrogatories to the





93

1   Defendant Oracle and others. These interrogatories
2   were recently served, and I believe it's interrogatory
3   24 through 32, if I recall.
4       MR. GLENNON: That's correct, Your Honor.
5       SPECIAL MASTER INFANTE: I'll hear plaintiffs'
6   comments on this.
7       MS. RADCLIFFE: Good afternoon, Your Honor. If
8   it's okay, I think I'll stay here. Is that okay?
9       SPECIAL MASTER INFANTE: I can hear you.
10      MS. RADCLIFFE: Thank you.
11      I know you just heard a lot about the accounting
12  allegations in the complaint, and you've heard the
13  various parties' positions, and I will try not to rehash
14  those. With respect to the interrogatories, I think we
15  can boil down to a simple issue, and that's really
16  whether or not defendants' responses, where they have
17  asserted Federal Rule of Civil Procedure 33D to comply
18  with that rule, and whether or not plaintiffs are
19  entitled to additional substantive responses
20      The interrogatories at issue mainly go to
21  questions regarding refunds and overpayments. Those
22  interrogatories relate to the allegations in the
23  complaint. Even defendants admit that refund
24  information is relevant to plaintiffs' claim,
25  grudgingly so, but they do admit that.

94

1       SPECIAL MASTER INFANTE: The only issue is
2   burden.
3       MS. RADCLIFFE: Correct. And the question is
4   whether or not plaintiffs' interrogatories as propounded
5   on the defendants should be answered and whether or not
6   they're central to plaintiffs' claims. And that the
7   burden is on the defendants whether or not they've
8   substantiated that that burden is so great that they
9   should not have to answer the interrogatories.
10      And we do not believe that they have
11  demonstrated that.
12      In fact, we don't have any information, really,
13  about the burden on defendants to respond to these
14  interrogatories. We have testimony which, ironically,
15  defendants submitted, that if you wanted to hold
16  information about a refund, you can look on Oracle's
17  internal system. And you look up the number, and it
18  tells you the story of what happened. That's
19  information that defendants can far more readily obtain
20  than plaintiffs. And it doesn't sound like the burden
21  is that substantial from where plaintiffs sit.
22      And we don't have any information regarding the
23  burden that it would take for defendants to come up
24  with those answers. Further, this is a central defense
25  that defendants have asserted to the SEC, that these

95

1   refunds were made long ago. They should be able to
2   tell us which refunds were made long ago, whether or
3   not they were refunds made after the November 17th,
4   2000 debit memos, and readily identify that information
5   for plaintiffs in an interrogatory.
6       They rely on the so-called script output. The
7   problem is the script output doesn't have this
8   information, it's incomplete, it's incomprehensible,
9   and there's no way to ascertain the information from
10  the script output that plaintiffs see.
11      Defendants admit as much.
12      And the burden argument that they've made in
13  the papers is in stark contrast to what they told the
14  SEC, what they told the SLC, and what they told the
15  Court in Delaware. They told the Court that they
16  looked at the 46,000 debit memos; they told the SEC
17  that those debit memos had been refunded long ago.
18  These are central defenses, and we are entitled to that
19  information in order to prosecute the case
20      SPECIAL MASTER INFANTE: Interrogatory No. 25?
21      MS. RADCLIFFE: Yes
22      SPECIAL MASTER INFANTE: It talks about debit
23  memos in December of 2000, which is not within the
24  allegations of your complaint, is it?
25      MS. RADCLIFFE: Well, December 2000 debit memos

96

1   have the same prefix, 550 prefix, that are associated
2   with the November 2000 debit memos, and we believe that
3   they are related
4       SPECIAL MASTER INFANTE: Well, are they included
5   in the 46,000?
6       MS. RADCLIFFE: I believe that these would be
7   additional debit memos beyond the 46,000, but we don't
8   know that information for sure.
9       SPECIAL MASTER INFANTE: All right. I'm just
10  trying to figure out what you're seeking there. So
11  that's over and above the issue we've seen before.
12  They've never been requested before, right?
13      MS. RADCLIFFE: Those specific interrogatories,
14  no, Your Honor
15      SPECIAL MASTER INFANTE: Okay.
16      Well, let me ask you this question: Look
17  at interrogatory No. 24, as an example, it says
18  identify by customer name, date of refund and dollar
19  amount of refund each November 17, 2000 debit memo that
20  you contend had to be — had been refunded prior to
21  November 2000.
22      Just using that as an example, actually, they
23  would have to answer that as to all 46,000 debit memos?
24      MS. RADCLIFFE: Yes, Your Honor. But we believe
25  that they can look up that information in their system

 

97

1  and provide a response to that interrogatory, and that
2  the burden is not that great for them to provide a
3  response that's central to their defense, that these
4  monies were refunded long ago.
5      SPECIAL MASTER INFANTE:  You think it would be
6  easy to answer that quest on in bulk without calling
7  out those that are $100,000 or more?
8      MS. RADCLIFFE:  I -- I think it would be, Your
9  Honor.  I also think that it's the same arguments that
10  go to -- with respect to the debit memos being under
11  100,000 and aggregate for a customer.  May well be well
12  over a 100,000.  Additionally, there's specific
13  customers alleged in the complaint.
14      If you limit that to merely those debit memos
15  over 100,000, not even the customers alleged in the
16  complaint will we receive information regarding with
17  respect to the refunds that were made long ago.  And it
18  also goes to the representations that they've made to
19  the SLC, that they've made to the SEC, and that they've
20  made to the Court in Delaware.
21      SPECIAL MASTER INFANTE:  Okay, thank you.
22      Anything further?
23      MS. RADCLIFFE:  No, Your Honor. unless you have
24  questions.
25      SPECIAL MASTER INFANTE:  I'd like to hear from

98

1  Oracle.
2      MR. GLENNON:  Thank you, Your Honor.  Again,
3  Brian Glennon on behalf of defendants.
4      Your Honor, a moment ago you mentioned that you
5  felt that the issue turned on the issue of burden, and
6  I agree with you.  I think the burden issue itself can
7  be split up into two components, the burden of
8  responding to 46,000 debit memos and the burden of
9  going through and ascertaining or determining answers
10  to the interrogatories based on the documents we cited
11  in our interrogatory response pursuant to Rule 33D.
12  It -- if Your Honor will indulge me, I will approach
13  those burdens in that order.
14      The argument that the October 19th order doesn't
15  limit or curtail Oracle's burden with respect to
16  interrogatories doesn't make any sense.  And here's why
17  I say that:  In the -- in the correspondence, the
18  filings, and then two court hearings, August 12th and
19  then on August 18th, the parties discussed at length,
20  and Judge Spero analyzed in-depth, the burden of
21  responding, going out and obtaining information
22  pertaining to 46,000 debit memos.  He compared that
23  burden with the benefit, and ultimately determined and
24  made a rough cut on this $100,000.
25      Now, that cut, $100,000 and above, represents

99

1  528 of the 692 million dollars contemplated in the
2  complaint, or contemplated by the creation of the
3  46,000 debit memos on November 17th, 2000.
4      That is more debit memos than plaintiffs'
5  experts -- expert relied upon in the complaint to
6  derive the conclusions upon which their accounting
7  allegations are based.
8      It would make no sense for Judge Spero to
9  relieve Oracle of the burden of gathering that data in
10  response to one type of discovery request, but to turn
11  around and impose that same burden in responding to
12  another of this type of discovery request.
13      In addition, the argument that the October 19th
14  order is somehow limited to documents is not supported
15  by the text of the October 19th order, which begins
16  with the phrase, "all electronic information," and that
17  is precisely what they're seeking, as Ms. Winkler said
18  or assumed, that this was somehow available at the push
19  of a button on a computer.
20      Their argument also is unsupported by the
21  transcript at the October 19th order -- the transcript
22  leading up to the October 19th order.  At the beginning
23  of the transcript of the hearing on October 18th, Judge
24  Spero made clear that he had some degree of discomfort
25  revisiting a discovery plan that he had thoroughly

100

1  worked through and the parties had agreed upon just a
2  few months before.  He goes on to say there could be
3  good reasons for, you know, addressing this issue and
4  refining the discovery plan, and ultimately he finds
5  there is good reason.
6      SPECIAL MASTER INFANTE:  To be fair, he also
7  said that he was concerned that at the time you had
8  represented that you were going to give all the debit
9  memo information and that that was part of the
10  trade-off.
11      MR. GLENNON:  That's true, and that's a fair
12  point, Your Honor.  But as you pointed out earlier,
13  discovery is a moving process.  I don't think at the
14  time -- I wasn't there, and I do not think and I submit
15  that Oracle was not cognizant, I think, of the
16  tremendous amount of the burden contemplated in that
17  request at that time.
18      SPECIAL MASTER INFANTE:  Right.
19      MR. GLENNON  The request to expand out the
20  interrogatory responses to encompass all 46,000 debit
21  memos also doesn't make sense from a Rule 26 B 2
22  perspective, and this is the first component of burden
23  that you referenced earlier  What is contemplated by
24  this burden?  Months of work, and a cost somewhere in
25  the ballpark of tens of millions of dollars.  How do we

 

101

1  know that? Because we've gone through and gathered
2  this data for 776 of these debit memos, and now they're
3  seeking to go out and force us to gather data as to
4  46,881. That's 60 times.
5      What's the benefit? Well, plaintiffs
6  characterize the refund as being our primary defense,
7  which is ironic, because if you look at the SEC
8  presentation, you will find that our defense in
9  response to the largest debit memo is a stop check
10  payment. That's why the payment was placed on the
11  account, not because it was previously refunded.
12      So what do you get for the months of work and
13  the tens of millions of dollars in burden? You get
14  evidence potentially to debunk the defense, applicable
15  only to some debit memos, again, in defense to a claim
16  that I would submit they haven't even established a
17  prima facia burden for
18      SPECIAL MASTER INFANTE: My impression is --
19  correct me if I'm wrong  You're much closer to this
20  than I am, but my impression is that that defense might
21  be applicable to about half of the debit memos.
22      MR. GLENNON: I actually think it will play
23  out to less than half, but I can't give you an exact
24  number.
25      SPECIAL MASTER INFANTE: All right.

102

1      MR. GLENNON: I do know, however, that the on
2  account designation was placed on transactions or
3  customer payments before November 17th, 2000, for a
4  variety of reasons. The reason why it was featured in
5  the SEC presentation is because the SEC presentation
6  traces the allegations in the complaint.
7      And it just so happened that Eli Lilly and
8  Household were both -- were both refunded prior to
9  November 17th, 2000. But again, the largest debit
10  memo -- and it is the largest debit memo identified
11  in their complaint, was a stop payment. So to
12  characterize this as a primary defense overstates it.
13  To say there's no burden associated with it when they
14  have no evidence at all, we've submitted a declaration
15  We've at least put evidence before the Court of the
16  burden contemplated, by expanding out this discovery
17  request to 46,000 debit memos. And, again, to come
18  full circle, the rough cut that Judge Spero made at
19  November 19 -- on November 19, 2000 makes sense, when
20  you look at the massive percentage of debit memos --
21  dollar amount contemplated there. If you're not going
22  to find your accounting fraud there, it's not going to
23  be found  At least not with respect to the debit memos
24  and not with respect to the issues contemplated by the
25  third set of interrogatories.

103

1      That, Your Honor, is my presentation on the
2  first portion of the burden.
3      I'd like now to focus specifically on the
4  interrogatories. As you pointed out at the outset,
5  Your Honor, at issue in this particular motion is nine
6  special interrogatories. One of the rogs, No. 25,
7  relates to debit memos that were created in December
8  2000. You asked the question as to whether or not that
9  is included in the 46,881 debit memos contemplated in
10  the complaint. The answer is no. There were 46,881
11  debit memos that were all created on November 17th,
12  2000 as part of the on account cleanup. For that
13  reason, we objected to that interrogatory without
14  providing a substantive response.
15      Now, of the remaining eight, the
16  interrogatories, rogs No. 24, 26, 27, 30, and 31, are
17  overbroad, seeking information, as we've discussed,
18  pertaining to all 46,000 debit memos, notwithstanding
19  the limitations placed on accounting-related discovery
20  by the October 19th order.
21      Many of these interrogatories, Your Honor,
22  accomplish this result by citing to a spreadsheet,
23  specifically NDCA-0RCL 282677, which was produced to
24  plaintiffs last spring. That spreadsheet contains data
25  relating to all 46,000 debit memos.

104

1      There are three interrogatories that are, in our
2  view, appropriately tailored and comply with the
3  October 19th, 2005 order. That's 28, 29 and 32. And in
4  responding to all of these interrogatories, to the
5  extent appropriate, we objected on the breadth where
6  the interrogatories sought information pertaining to
7  all 46,000. But then, with respect to all of these eight
8  that we're now discussing, we pointed plaintiffs to two
9  documents, the script output and a supplemental report.
10  This is not a situation contemplated or
11  analogous to the facts alleged in the cases they cite
12  in their motion to compel, where a responding party
13  simply dumps, you know, hundreds of thousands of
14  documents on a -- on a requesting party or simply hands
15  over the keys to a warehouse and says the answers to
16  your interrogatories are in there. We cited only two
17  documents.
18      Now, Rule 33, as Your Honor knows, provides that,
19  "Where the answer to an interrogatory can be derived or
20  ascertained from the business records, including a
21  compilation or summary of business records, and the
22  burden of deriving or ascertaining the answer is
23  substantially the same, the parties serving the -- same
24  for the parties serving the interrogatory as it is for
25  the party responding to the interrogatory, it is

 

105

1  sufficient to produce or afford an examination of the
2  compilation or summary."
3      Now, if you look at the advisory committee notes,
4  especially those that accompany the 1980 amendments, it
5  provides that, if information sought exists in the form
6  of compilations, abstracts or summaries, then available
7  to the responding parties, those should be made
8  available to the interrogating party.
9      This script output is a compilation, as Ms. Wine
10  pointed out, of the data that comprises the audit trail,
11  or at least we -- it comprises the audit trail at least
12  to the extent called for by the interrogatories.
13      There are at this juncture two questions
14  presented by their motion  One, does the script output
15  contain the information?  Ms. Winkler just said it did
16  not.
17      The second question is whether the burden of
18  deriving or ascertaining those answers is substantially
19  the same for plaintiffs as it is for defendants  And I
20  apologize. I just realized it was Ms. Radcliffe and I
21  called her Ms. Winkler
22      SPECIAL MASTER INFANTE:  Ms. Radcliffe,
23      MR. GLENNON:  So to keep that straight
24      So those are the two issues. And, Your Honor,
25  I'm going to take a couple minutes, and I think I can

106

1  walk you through this in just two minutes -- just five
2  minutes.  But I'll try and move quickly
3      But I will show you conclusively how each of the
4  pieces of information they are seeking is available in
5  the script output, even as it currently exists, and how
6  the burden of ascertaining or deriving the answers to
7  interrogatories that are before Your Honor is
8  substantially the same for plaintiffs as it is for the
9  defendants
10      With respect to the first question, Your Honor,
11  the interrogatories at issue here all turn on four
12  different types of accounting issues, or entries, and
13  those are refunds, invoices, customer payments and
14  credit memos.
15      Now, this actually is part of the record.  It
16  has been produced, I've just blown it up.  This is
17  Exhibit E --
18      SPECIAL MASTER INFANTE:  Yeah.
19      MR. GLENNON:  -- to the Greg Myers declaration.
20      I'm going to walk you through, Your Honor,
21  quickly how you go about identifying refunds, invoices,
22  customer payments and credit memos, and demonstrate to
23  you how plaintiffs can go through, sort this data, and
24  obtain it, and have it available to them to answer
25  their interrogatories just as easily as defendants.

107

1      SPECIAL MASTER INFANTE:  Mr. Myers only really
2  took one item and walked us through it in his
3  declaration.  Is this the same item?
4      MR. GLENNON:  No.  No.  He walked you through
5  the series of transactions -- sequence of transactions
6  that took place on November 17th, 2000.
7      SPECIAL MASTER INFANTE:  That really shows
8  one transaction to exemplify.
9      MR. GLENNON:  Oh, yes.  I am sorry.  I
10  misunderstood your question
11      SPECIAL MASTER INFANTE:  I think it was Applied
12  Materials.
13      MR. GLENNON:  This is it.  If you look at the
14  customer, Your Honor, which is --
15      SPECIAL MASTER INFANTE:  Okay.
16      MR. WALD:  -- ten or so columns over, you'll see
17  this is the same transaction.
18      SPECIAL MASTER INFANTE:  All right.
19      MR. GLENNON  And I'm not going to, you know, go
20  back through and talk about what Greg Myers said in his
21  declaration, as Your Honor has already read that.  But
22  for refunds, for refund information, all you have to do
23  is identify the following two transactions:  A debit to
24  customer overpayments and a credit to accounts payable,
25  and a debit to accounts payable and a -- a debit to

108

1  accounts payable and a credit for Wells Fargo
2  disbursements.  And I'll show you exactly where that is
3  and where it always is.
4      Your Honor, if you look at -- beginning at the
5  seventh row.
6      SPECIAL MASTER INFANTE:  Yes.
7      MR. GLENNON:  If you look at the debit amount,
8  you'll see the $3 million 6,000, it's debited from the
9  customer overpayments, and then it shows up in credit
10  amounts, in accounts payable, right underneath that
11  Are you following me so far?
12      SPECIAL MASTER INFANTE:  Yes.
13      MR. GLENNON:  Then, it's debited from accounts
14  payable in the next row down and credited to Wells
15  Fargo controlled disbursement.  There's one difference
16  that can potentially show up:  Sometimes this says Wells
17  Fargo controlled disbursement; sometimes it says Wells
18  Fargo disbursement.  But every refund that happens in
19  the transactional history of the 776 debit memos
20  contained in the script output follow these sequence of
21  transactions.  This is how a refund appears in the
22  transactional history.
23      And you can actually sort these columns to come
24  up with this data.
25      So if you want to look for a certain situation




109

1  where you've got multiple refunds, which is what one of
2  the interrogatories calls for, you just look for this
3  series of transactions happening on more than one
4  occasion. That is all. Before I move on, just
5  briefly, Your Honor, then if you scroll over to the
6  left, what do you get? You get the debit memo, the
7  receipt number, the effective GL date. You get the
8  dollar amount, both the credit and debit amount. You
9  scroll over to the right, and you get the notes that
10  are contained that relate to that particular refund.
11       And here it points out that the check was sent
12  in error and it was intended for another party. And,
13  in fact, it says in one of the comment fields, Hitachi
14  Credit Corp, which will become relevant later.
15       That information there is all you need to answer
16  rogs 24, 26 and 29.
17       Rog 4 provides: "Identify by customer name,
18  date of refund, and dollar amount of refund, each
19  November 17th, 2000 debit memo that you contend has
20  been refunded prior to November 17th, 2000."
21       All you have to do again, Your Honor, is look
22  for this sequence of transactions before November 17th.
23       Interrogatory No. 26, "Identify by customer
24  name, debit memo number and date of refund each
25  November 17th, 2000 debit memo that was refunded more

110

1  than once."
2       I've already described for Your Honor how you
3  would go about doing that.
4       And in interrogatory No. 29, "For each debit
5  memo listed on the document Bates numbered NDCA-ORCL
6  282677 that is greater than $100,000, identify by
7  customer name and date of refund any payment made after
8  November 17th, 2000 by Oracle to an Oracle customer, to
9  refund the specific amount referred to in the debit
10  memo."
11       All you'd have to do is look for this sequence
12  of transactions after the debit memo in the same dollar
13  amount.
14       Number two, Your Honor, there's a number of
15  questions here about invoices. To locate an invoice, all
16  you have to do is find this initial debit, the accounts
17  receivable. Now, that will show up at the very, very
18  top of the script. There's no invoice associated with
19  this, and it's a point that I'm going to make, and it's
20  a point that Mr. Williams brought up and I can explain.
21       There's going to be no invoices associated with
22  certain payments in two situations: One, where the
23  payment is received in connection with a transaction
24  for which no invoice was issued. This happens when
25  Oracle is reimbursed for a payment. It also happens in

111

1  connection with certain expenses incurred in connection
2  with Oracle Open World. There is a second instance
3  where we were unable to tie an individual invoice to a
4  payment that was later placed on account and cleaned up
5  on November 17th, 2000 as part of the on account
6  cleanup, and that is where the transaction was financed
7  through Oracle -- through Oracle's internal credit
8  division or OFD, Oracle financial division.
9       The reason for that is quite simple. What OFD
10  does is it enters into credit facilities with various
11  potential customers, and then after it inks the
12  deal, it sells the note to third party banks. Then
13  what happens, is the third party banks bill the
14  customer, the customer pays the bank, and then pursuant
15  to the terms of the agreement, Oracle is paid some
16  negotiated-upon cut of that.
17       And that is, in fact, what happened in this
18  transaction, which is why earlier I pointed out Hitachi
19  Credit Corp. Hitachi Credit Corp, which is in the
20  comments column, Your Honor, one -- eleven rows down,
21  is one of the credit facilities that Oracle does its
22  financial arrangements -- provides -- sells its
23  financial notes to. It's easy to tell which of these
24  debit memos relate to an OFD transaction. First of
25  all, there's not going to be an initial debit to

112

1  account receivable. But also what you'll see is the
2  customer will be one party name and the payor will be a
3  bank.
4       But again, in all other instances, it's the very
5  first entry, it's initial debit to accounts receivable,
6  and then what you'll follow is a credit to a refund
7  again -- excuse me -- a credit to a revenue account,
8  which is generally a little bit less, the delta
9  representing sales tax.
10       But all of the information relating to the
11  initial invoices is in the script.
12       We spent a month, Your Honor. We gave -- the
13  highest ranking person with the most visibility and
14  most experience in OFD spent a month trying to link
15  the bank invoices with the payments, the transactions
16  underlying November 17th, 2000, and we can't do it.
17       But, this represents a small minority of the
18  debit memos. And it picks up right when the initial
19  payment is received, and then it follows the payment
20  through Oracle's accounting system.
21       Third, how do you identify customer payments?
22  Customer payments are easy to identify because they
23  show up as debits to cash in one of three accounts, a
24  Wells Fargo operating account, a Wells Fargo purchasing
25  card, or the Harris Bank Lockbox.

 

113

1    And you'll see that's the very first entry here
2    on nonOFD transactions. You'll see that the initial
3    payment, as I mentioned earlier, starts at the very
4    beginning. It -- it shows up, excuse me, at the very
5    top row. You see the debit to cash if you look at
6    cash type, and then it goes to Harris Bank Lockbox.
7    You see a debit to cash, either following on the heels
8    of the invoice or at the top for the OFD transactions.
9    A debit to cash, to one of three accounts.
10    Again, the Wells Fargo operating account, Wells
11    Fargo purchasing card or the Harris Bank Lockbox. This
12    information together allows you to answer rogs 28, 31
13    and 32.
14    Rog 28 provides: "For each debit memo listed on
15    the document Bates number NDCA-ORCL 282677 that is
16    greater than $100,000, identify the dollar amount to
17    the original invoice, and the dollar amount of any and
18    all payments associated with said invoice."
19    I've just walked Your Honor and plaintiffs
20    through how to identify an invoice, and how to identify
21    the payment.
22    Interrogatory No. 31, "For each November 17th,
23    2000 debit memo, state the dollar amount of the
24    original invoice associated with the debit memo and the
25    dollar amount of any overpayment or duplicate payment

114

1    associated with the debit memo."
2    Again, this calls for an analysis of payments
3    versus invoices.
4    If there are multiple payments, you can determine
5    the total amount just by looking at these debits to
6    cash and the three bank accounts I told you about
7    previously, and adding them up. That allows you to
8    answer interrogatory No. 32, which provides, "For each
9    debit memo listed on document Bates numbered NDCA-ORCL
10    282677 that is greater than $100,000, identify the
11    total dollar amount of each payment that was applied to
12    that invoice and the dollar amount of the payment that
13    was not applied to the invoice."
14    Well, that's easy, because if you look, Judge,
15    at the payment, there's an applied column, and it will
16    tell you when it is applied. So all you have to do is
17    be able to identify the payments, and then you can
18    identify -- you just add them up, and you could answer
19    interrogatory 32.
20    The final piece, Your Honor, the final piece
21    which will complete the puzzle is credit memos. They
22    ask about information for credit memos. This is the
23    easiest component to find in the script output because
24    there's a specific column called "credit memo," and it
25    is credit memo number -- it is 1, 2, 3, 4.

115

1    Okay, each credit memo, Your Honor, is assigned
2    a unique identifier number. Okay? And so, when you see
3    an identifier number in the credit memo number row --
4    excuse me, column, then you can simply scroll over,
5    find out the dollar amount, the effective GL amount,
6    the effective GL date, the 550 debit number that it's
7    associated with, the original receipt number. And then
8    you can look over to the right and look at the comments
9    relating to that credit memo and determine why the
10    credit memo was issued in the first place.
11    SPECIAL MASTER INFANTE: And there's none on
12    this customer's.
13    MR. GLENNON: No. There's only -- as you
14    pointed out earlier, there's only a handful of credit
15    memos. But what they'll show up as, Judge, and so
16    plaintiffs certainly know -- they built a table around
17    this -- it shows up as a number. Like I said, they have
18    a unique identifying number. There was no credit memo
19    issued in connection with the Applied Materials debit
20    memo.
21    That allows you to answer the remaining
22    interrogatories.
23    SPECIAL MASTER INFANTE: Is there any
24    interrogatory, putting aside 25 --
25    MR. GLENNON: Yup.

116

1    SPECIAL MASTER INFANTE: -- that can't be answered
2    as you've demonstrated?
3    MR. GLENNON: No. Not in the third set.
4    SPECIAL MASTER INFANTE: Anything else?
5    MR. GLENNON: If you'll give me one moment, Your
6    Honor.
7    SPECIAL MASTER INFANTE: Sure.
8    (Brief discussion off the record.)
9    SPECIAL MASTER INFANTE: I do have one
10    MR. GLENNON: Sure, Your Honor.
11    SPECIAL MASTER INFANTE: One comment. And that
12    is that you take this document, which is -- which is an
13    exemplar from a larger document, and that's not a
14    document that was kept in the ordinary course of
15    business as Rule 33D kind of relates to. It's a
16    document that was created. And to the extent this
17    document was incomplete or inaccurate, then the answer
18    to the interrogatories, whether derived by you or them,
19    will be incomplete or inaccurate. Is that a fair
20    statement?
21    MR. GLENNON: No. I don't know if I can
22    completely agree with that, Your Honor, for this
23    caveat: The case law and the rule and the advisory
24    notes provide that if you're going to do a summary or a
25    compilation -- and, again, the advisory notes encourage

 

117

1  that information as opposed to pointing to 10,000 boxes
2  of documents. Any underlying data comes from records
3  that are kept in the ordinary course of business that
4  will satisfy Rule 33D.
5      SPECIAL MASTER INFANTE: Well, just to bring you
6  up-to-date, a few minutes ago I ordered that you
7  produce the underlying documents --
8      MR. GLENNON: Right. Yes, Your Honor.
9      SPECIAL MASTER INFANTE: -- for the transactions
10  over $100,000. So it seems to me that this, together
11  with those underlying documents, would put them in a
12  position to derive the answers. And you would again
13  cite 33D?
14      MR. GLENNON: I believe that's correct, yes,
15  Your Honor.
16      But -- but let me take a step back. If we're
17  going to be updating the electronic information, and I
18  understand why you expanded out the number of debit
19  memos, but if we're going to produce the same --
20      SPECIAL MASTER INFANTE: How much did you spend?
21  150?
22      MR. GLENNON: Yes.
23      SPECIAL MASTER INFANTE: 150, 146,000 --
24      MR. GLENNON: And if we update the electronic
25  information, that data is still going to be turned from

118

1  here. And let me just take a moment to explain what's
2  here, what this is. This is the result of an
3  incredibly sophisticated computer program that I think
4  you can only attribute to a database company like
5  Oracle.
6      SPECIAL MASTER INFANTE: I would think so.
7      MR. GLENNON: That goes through and pulls, from
8  all of the source documents and source information that
9  plaintiffs have requested, the relevant information and
10  puts it into cells.
11      SPECIAL MASTER INFANTE: Okay. Anything
12  further?
13      MR. GLENNON: No. That's it, Your Honor.
14      SPECIAL MASTER INFANTE: Ms. Radcliffe?
15      MS. RADCLIFFE: Thank you, Your Honor. There
16  are several things I'd like to address.
17      The first thing is I think Mr. Glennon's
18  presentation actually demonstrates that it's not that
19  easy to ascertain the information from the spreadsheet.
20  Secondly, if you actually look at how we see the
21  spreadsheet, as opposed to the format that they've
22  provided you in this nice color copy, and a sample of
23  that is actually attached to --
24      SPECIAL MASTER INFANTE: I've seen it. I've seen
25  it.

119

1      MS. RADCLIFFE: -- Beth Collins-Burgard's
2  deposition, it's far different than what you see here.
3  We actually have to match up the columns, and we have to
4  change the widths. And what Mr. Glennon has proposed,
5  in order for us to supposedly ascertain answers, is to
6  actually alter the data in the spreadsheet to come up
7  with an answer to change the columns, to move the
8  spreadsheets. And I think you hit the nail on the head
9  when you said that if we come up with responses to our
10  interrogatories, assuming that we can,because we don't
11  believe that we can, the answers that we come up with
12  in those interrogatories are going to necessarily --
13  it's not farfetched to say that we're probably not
14  going to come up with the same answers, even with the
15  same litigation spreadsheet.
16      And when we put this information before Oracle's
17  senior executives, they were unable to recognize it.
18  We're unable to depose the witnesses on it because they
19  don't recognize this information. They don't recognize
20  the spreadsheet. And in order to prosecute the case,
21  we need responses to the interrogatories in order to
22  get the answers that relate to their defenses.
23      One of the things we need to know is how you
24  know a refund is a mistake. There's no mistake column
25  in their litigation spreadsheet. There's no way to

120

1  ascertain it.
2      Additionally, Mr. Glennon mentioned that you
3  don't necessarily have the invoice number, because of
4  various reasons. Well, we don't know which reason that
5  was when we look at the litigation spreadsheet.
6      And we don't know what the original invoice
7  number is. We don't know what the amount was. We don't
8  know if the debit memo was a portion of that original
9  invoice with the entire invoice or there are six debit
10  memos that relate to one invoice.
11      That information is not in this spreadsheet.
12      And I think that --
13      SPECIAL MASTER INFANTE: Well, the spreadsheet
14  itself has varying amounts of information for different
15  customers and in different situations. Putting it
16  all together is a challenge, I mean, for any reader.
17      MS. RADCLIFFE: Correct. And I think that
18  basically the Rule 33D and the comments to those
19  basically says that a person who is unfamiliar with the
20  document would be able to ascertain the answer.
21      Senior Oracle people in accounting can't
22  ascertain the answers from these litigation
23  spreadsheets.
24      Additionally, I think I'd like to go over the
25  actual interrogatories and why we need the responses to

 

121

1   those interrogatories.
2       And I think as a backdrop to that, we should
3   mention that, you know, most of the debit memo
4   transactions at issue here are less than 100,000. I
5   believe it's 98 percent of them. So, to the extent that
6   there's representations regarding the amounts refunded,
7   whether there were mistaken payments, whether there were
8   duplicate payments, the majority of those are going to
9   be less than 100,000
10      We're not -- with respect to these
11  interrogatories, it doesn't relate to the documents.
12  We're not asking for the production of the documents;
13  we're asking for answers to the interrogatories.
14      Now, there's been a number thrown out here that
15  it's going to cost them tens of millions of dollars,
16  that's entirely unsupported  In fact, Greg Myers says
17  it's going to cost three million to produce the
18  underlying documents that we ask for in our motion to
19  compel accounting
20      So, with respect to the individual
21  interrogatories, I believe I understood Mr. Glennon to
22  say that there's actually some interrogatories they
23  believe that they might be able to respond to, but
24  their response is going to be the litigation script.
25      We don't believe the litigation script, that

122

1   they attempt to produce under Rule 33D, satisfies Rule
2   33D.
3       And that we will never have a concrete answer
4   to those interrogatories based on this litigation
5   script.
6       First of all, it's incomplete. The Greg Myers
7   declaration shows various examples of why it can be
8   inaccurate. We're not making the representation that
9   Oracle went out to purposely make it inaccurate. It's
10  just the fact of the matter that it is.
11      And with respect to the specific
12  interrogatories, I believe I understood that refunds
13  for debit memos made by Oracle prior to November 2000,
14  that clearly relate to the defenses in this case, we
15  seek that information. We know from documents that
16  Oracle knows -- can pull up the number of records and
17  refunds, the number now, not the exact information we
18  seek, but the number of records and refunds fairly
19  easily.
20      And we seek the information regarding the
21  identity of those refunds, the amount of refunds and
22  when they are made.
23      With respect to interrogatory No. 26, it's:
24  "Identify the debit memo essentially that were refunded
25  more than once."

123

1       Now Greg Myers testified that refunds -- and he
2   was a 30(b)(6) deponent for Oracle.
3       SPECIAL MASTER INFANTE:  Right.
4       MS. RADCLIFFE:  He testified that the refunds
5   were refunded twice because of mistakes. Now, this
6   testimony is inconsistent with their position that they
7   took long ago that -- that refunds were made long ago.
8       And there's a situation where you'll have a
9   refunded amount and you may have another amount that
10  matches up the same exact dollars, but you don't know
11  if they relate to one or another. And we can't tell
12  that from the spreadsheet.
13      I mean, I -- I understand from testimony from
14  Oracle's own accounting people that they can pull up
15  the billing history and that they can ascertain that
16  information and that they can analyze that, but that's
17  not something that we can do from the litigation
18  spreadsheet.
19      Now, we also asked for them to identify the
20  customers who returned to Oracle refunded amounts.
21      Now, if the refunds post-November 2000 were
22  mistakes, then essentially the money we believe should
23  be given back, if it was a mistake, or if Oracle sought
24  the money. We don't know because, as you know, we don't
25  have the underlying source data. And we also are just

124

1   seeking a simple answer to a simple question.
2       And if you'd turn to the other interrogatories,
3   which I believe there is a mention that it's -- that
4   they do relate to items over 100,000  And that's to
5   identify the dollar amount of the original invoices for
6   the debit memos over 100,000. Now, the script output
7   doesn't have invoice histories. Some of the debit memo
8   transactions start with a cash receipt, but you don't
9   have an invoice, so we don't know the dollar amount of
10  the original invoice for all the debit memos or the
11  dollar amount of the payments associated with the
12  invoices. You need that information in order to trace
13  the audit trail.
14      And the situation arises particularly with
15  Mr. Glennon's example with respect to a check received
16  from a finance company that would relate to ten
17  different payments.
18      Now, how that payment is applied is inconsistent
19  with what we can see on the litigation script. So if
20  you have a payment for a check of $10 million and you
21  have a customer, and that customer is only being
22  attributed one million of that ten million, well, our
23  question is, where did that other nine million go? But
24  we can't tell that from the script litigation.
25      One of the other interrogatories, which is

se



125

1  interrogatory No. 29, is for the debit memos of over a
2  100,000: "Identify the payments made after November
3  17th, 2005 Oracle -- to Oracle customers, customers to
4  refund amounts referred to in the debit memos."
5      And this directly correlates with plaintiffs'
6  allegations that the debit memos resulted in inflating
7  financial results, and defendants' defense that they've
8  indicated, that the debit memos were refunded long ago.
9      Now, with respect to  interrogatory No. 30, and
10  that's where credit memos listed on a document which
11  Greg Myers now indicates is not the script output, it's
12  something else, we're not exactly sure what it is. But
13  it's a document or summary that defendants created.
14  And the questions with respect to the credit memos --
15  you've heard before that it's our belief that the
16  credit memos are associated with the debit memos. And
17  we want to know if the refunds were made to establish
18  that the "refunds long ago" statement was in error.
19      With respect to interrogatory No. 31, "State the
20  dollar amount of the original invoice associated with
21  the November 17th, 2000 debit memos and the dollar
22  amount of any duplicate or overpayment associated with
23  the debit memo."
24      So that's essentially what the interrogatory
25  gets at  And, again, we have the same issues with the

126

1  original invoice. You don't know. You don't know what
2  the original invoice was made, particularly whether
3  there's a cash receipt.
4      And you also can't tell from the script whether
5  it's a duplicate or an overpayment. And you need to
6  show, based on the allegations of our complaint, that
7  you have customer overpayments that were then converted
8  to revenue and income. And we've heard a lot of
9  argument of how plaintiffs can't establish that, but
10  one of the things that we need to show is that there
11  were customer overpayments. That's step one in the
12  analysis.
13      And then interrogatory No. 32 is for the debit
14  memos greater than 100,000 listed on the document
15  created by Oracle. "Identify the dollar amount of each
16  payment that was applied to the invoice and the dollar
17  amount of the payment that was not applied to the
18  invoice."
19      And that, again, goes to situations where you
20  might receive a sum of money that was greater than the
21  invoice, and it may reflect in an overpayment. But we
22  need to know how much of that money was actually
23  applied to the invoice.
24      For example, if you received $120 million,
25  whether or not a hundred million of that went to the

127

1  invoice and 20 million was refunded, credited, went to
2  another invoice to be applied, we don't know.  That's
3  why we're asking this information.  And we're trying to
4  make -- point it -- interrogatories in order to get at
5  the heart of the claims and defenses in this
6  litigation.  And a response based on the script output,
7  we believe, doesn't satisfy Rule 33D. It doesn't allow
8  plaintiffs to ascertain an answer as easily as
9  defendants  In fact, we don't believe you can
10  ascertain the answers from the script output.
11      SPECIAL MASTER INFANTE:  Okay, thank you.
12      MR. GLENNON   Judge, may I just have two minutes
13  to respond?
14      SPECIAL MASTER INFANTE:  One minute
15      MR. GLENNON  One minute.  You got it.
16      Judge, obviously the script output coupled with
17  our document production, with those together, we believe
18  we've satisfied Rule 33D. I understand that, when you
19  first glance at the script output and you look at the
20  entries, it's a little bit daunting, but this is an
21  accounting fraud case.  I worked on this and figured
22  this out and was able to explain to you how you can
23  answer those rogs by working with our accountant.  And
24  plaintiffs have an accountant.  He is here.
25      With respect to the overpayments, I described

128

1  earlier how you'd go about determining that  Just
2  compare the invoice with the payments.  There's only a
3  handful of situations where there's no invoice, and
4  those are the OFD transactions
5      Regarding the format that plaintiffs have, we
6  specifically offered to show them how to print this in
7  this format on the record at a deposition, that's
8  Exhibit 15 to the Collins-Burgard declaration at 228,
9  lines -- starting at line 7 to 10  We offered
10  plaintiffs how -- to show them how to print this out,
11  precisely because they were showing it to witnesses in
12  a way that the witnesses had to tear it apart and then
13  reassemble.
14      Their comment that witnesses or Oracle senior
15  executives couldn't testify about the content of the
16  script output is inaccurate.  And I would point you only
17  to the pages 8 and 9 of our reply, where we cite
18  specific testimony where Tom Williams walks through
19  the script output and is able to identify -- identify
20  the various transactions and, in fact, discuss them
21  with plaintiffs throughout the afternoon.
22      The other individuals they referenced were not
23  involved in the creation of the script output, and it
24  was presented to them in a way, Your Honor, which I
25  felt was unfair



129

1    SPECIAL MASTER INFANTE: I understand.
2    MR. GLENNON: Thank you, Your Honor.
3    SPECIAL MASTER INFANTE: I considered the
4    interrogatories themselves, as well as your motion
5    papers. I have reviewed this before. I've reviewed all
6    of the exhibits that pertain to this motion. The
7    information is directly relevant to the allegations in
8    the complaint regarding debit memos. The
9    interrogatories are tailored and are not overbroad.
10   The burden is -- does not outweigh the relevance,
11   particularly when you consider the -- all of the
12   factors under Rule 26.
13   The Rule 33D, I cannot make the finding that you
14   want me to make. I just cannot make that finding, that
15   you're in an equal position.
16   And so, therefore, I'm granting the motion with
17   some limitations. I'm granting the motion to compel
18   further responses to interrogatories 24, 26, 27, 28,
19   29, 30, 31 and 32, but only with respect to debit memos
20   that exceed $100,000.
21   And the answers shall be without reference to or
22   reliance upon Rule 33D.
23   So I would ask you how much time you will need
24   to respond, and I'll include that in the order. So we'll
25   take a short recess.

130

1    (Recess.)
2    (Mr. Meroulis exits proceedings.)
3    SPECIAL MASTER INFANTE: Before we go to the
4    next motion, Mr. Wald, if you'd give me an estimate as
5    to compliance with respect to the two orders we just
6    issued.
7    MR. WALD: I will certainly try, Your Honor.
8    Let's talk it through, because there's some clarity that
9    would be helpful to us. And as I understood your
10   order -- your orders, there are several pieces, so
11   maybe it would help to break it down.
12   With respect to the new sampling of 150 memos
13   under 100,000, as to which the underlying documents
14   have not been produced, we believe -- we would hope
15   that we could get that done in 45 days. It's with a
16   caveat.
17   SPECIAL MASTER INFANTE: It will be 45 days from
18   the time you get a designation from the plaintiffs?
19   MR. WALD: Yes, absolutely. That's the first
20   point. And the second point is, if we need additional
21   time, we'll come back to Your Honor and explain why that
22   is. But we obviously have every interest in getting
23   these as soon as possible.
24   SPECIAL MASTER INFANTE: How soon can the
25   plaintiffs designate 150 debit memo transactions?

131

1    MR. WILLIAMS: Your Honor, we'd have to look at
2    that first spreadsheet and figure out which ones are
3    which and select them. I imagine it would take us at
4    least a week to make such a selection.
5    SPECIAL MASTER INFANTE: Okay. Then, what I
6    will -- anything else?
7    Go ahead.
8    MR. WALD: Sure. Then I think the next piece,
9    Your Honor, that I heard, was the underlying
10   documentation for the 776 debit memos, which are the
11   subject of the script output. And with respect to
12   those materials, Your Honor, I'm going to let Ms. Wine
13   address this in a little more detail, as I think the
14   plaintiffs will agree we have produced substantial
15   underlying documents already for those.
16   SPECIAL MASTER INFANTE: Right.
17   MR. WALD: We'll look to see if we have anything
18   else, but I believe that, in those categories, we
19   produced what we have. There may be additional
20   categories of documents that fall within the definition
21   of underlying transactional documents.
22   SPECIAL MASTER INFANTE: Right.
23   MR. WALD: Which we will look for and produce
24   pursuant to the order. I don't know how long we think
25   that will take, can we also try to do that within the

132

1    45-day period or --
2    MS. WINE: We could. I guess we just wanted
3    some clarity on what underlying transactional documents
4    meant. What we've already looked for with respect to
5    those 776 transactions, and produced where we could find
6    it, are things like the bank statements, invoices,
7    checks that came in. Those are the things that we think
8    are underlying transactional documents. We just want
9    clarity as to whether or not you're looking for us to
10   produce other types of accounting reports or anything
11   like that with respect to these debit memos.
12   SPECIAL MASTER INFANTE: Yeah. I gave you some
13   clarity, but I didn't give you my written order. I
14   think it -- I don't have it in front of me, but it
15   involves most of the items that plaintiffs identified
16   as eight types of underlying information, which I
17   believe was in section 3 of their opening brief.
18   MS. WINE: Okay, Your Honor. And some of that,
19   I think we have produced some.
20   SPECIAL MASTER INFANTE: Some you have.
21   MS. WINE: Some we haven't, like the ageing
22   reports.
23   SPECIAL MASTER INFANTE: The ageing reports are
24   part of it, but it's really those eight categories.
25   MS. WINE: Okay.



133

1    MR. WILLIAMS: If I may, Your Honor, I know your
2  order will clarify things, but is that going to include the
3  correspondence?
4    SPECIAL MASTER INFANTE: Correspondence and
5  notes. It will include the correspondence, the faxes,
6  the notes.
7    MR. WALD: The underlying documents?
8    SPECIAL MASTER INFANTE: Sure.
9    MR. WALD: The transaction documents?
10    SPECIAL MASTER INFANTE: Sure.
11    MS. WINE: Your Honor, I think we can do 45 days
12  for that as well.
13    SPECIAL MASTER INFANTE: Then what I'm -- the
14  rest of it should be easy. Those were the biggest
15  pieces.
16    MR. WALD: I think that's right, Your Honor.
17    MS. WINE: One question on bad debt.
18    I'm sorry. One question on the documents
19  regarding the bad debt transfers.
20    SPECIAL MASTER INFANTE: Yes
21    MS. WINE: We just wanted clarity as to whether
22  that's documents regarding all bad debt transfers or
23  just the bad debt transfers that relate to the 776
24  debit memos created in the 100,000.
25    SPECIAL MASTER INFANTE: I appreciate that

134

1  question. It would be related to the 776 debit memos,
2  plus the debit memos that are additionally designated
3  by the plaintiffs.
4    MS. WINE: Okay. Thank you, Your Honor.
5    MR. WALD: Thank you, Your Honor.
6    With respect to Mr. Glennon's motion, your
7  Honor, on the --
8    SPECIAL MASTER INFANTE: Interrogatories?
9    MR. WALD: Yes, the interrogatories and Rule
10  33D.
11    MR. GLENNON: I think we've got that sorted out.
12  We'll produce that at the same time we do our
13  supplemental production, if that's all right with Your
14  Honor.
15    SPECIAL MASTER INFANTE: I think you can do the
16  interrogatories in 30 days. I think everything else 45
17  days.
18    I'm thinking by August 31st for everything. But
19  let's do an earlier date for the interrogatories. Let's
20  say August 10th.
21    August 10th on the interrogatory order, August
22  31st on the production of accounting documents. And
23  you can begin that now. And that deadline is on the
24  condition that the plaintiff identifies the 130 or less
25  additional debit memos

135

1    MR. SOLOMON: 130? I think it's 150. I think.
2    SPECIAL MASTER INFANTE: 150 or less.
3    And that you do that by July 20th?
4    MR. SOLOMON: Yes.
5    SPECIAL MASTER INFANTE: They don't have to wait
6  for that to get started by July 20th.
7    So that will be the timetable for compliance
8  with the two orders.
9    Okay, let's deal with the motion in which you're
10  seeking to modify the pretrial order seeking additional
11  depositions. This is the pretrial order issued by
12  Judge Jenkins on December 14th, 2004, in which he
13  authorized 65 depositions, and your showing has to be
14  good cause under Rule 16 B.
15    MS. McLAUGHLIN: Yes, Your Honor
16    For time purposes, I'm going to be arguing both
17  of the motions, the extension of discovery cutoff as
18  well, so I'm happy to go through the whole thing.
19    SPECIAL MASTER INFANTE: All right.
20    MS. McLAUGHLIN: Or if you like to, I can break
21  it into two.
22    SPECIAL MASTER INFANTE: Deal with the last two
23  motions together. They're related.
24    MS. McLAUGHLIN: All right.
25    As Your Honor said, under Rule 16B, plaintiffs'

136

1  showing of good cause so the pretrial can be -- order
2  can be modified. We believe we've been extremely
3  diligent and -- in prosecuting this action, we've been
4  through 51 depositions to date. We have six more coming
5  in the next few weeks. We've been through hundreds of
6  thousands of documents as quickly as we possibly could
7  to get into position to start taking the fact
8  depositions that we commenced in more or less January
9  of 2006.
10    The reason we need more than 65 depositions is
11  really -- there's two -- two basic parts to why we need
12  more than 65. The first basic part is that we believe
13  we need depositions that address our substantive
14  allegations in the case. And then, secondly, we'd like
15  to -- we need, we feel now, even more so, given Your
16  Honor's earlier ruling on the preservation motion, we
17  need depositions regarding evidence spoliation.
18    And I'll start with the substantive -- the
19  reasons why we need substantive divisions.
20    SPECIAL MASTER INFANTE: Before you do --
21    MS. McLAUGHLIN: Yes.
22    SPECIAL MASTER INFANTE: -- let's just get the
23  numbers straight, because your motion was filed a couple
24  of weeks ago, and you've taken some depositions since
25  then.





137

1   So, as we sit here today, how many depositions
2   have been taken?  How many are noticed for completion
3   in July?
4        MS. McLAUGHLIN:  We -- we have taken 51, as we
5   sit here today, noticed for completion, which means
6   we've agreed upon dates in July.  We have 57 confirmed.
7   We've -- we have noticed about 80 -- I think 82
8   depositions.  They essentially were -- a lot of those
9   were just, you know, conflicts with people's schedules
10  Some of those were noticed three months ago, and we're
11  still sort of not in meeting of the minds with regard
12  to -- and I can go over those specific witnesses, if
13  you'd like, but it's about 80 that we'd like to, as far
14  as substantive depositions
15       SPECIAL MASTER INFANTE.  So seven have been
16  confirmed in addition to the 51, but you've asked for
17  dates for more?
18       MS. McLAUGHLIN:  Yes.
19       SPECIAL MASTER INFANTE  Okay
20       MS. KYROUZ:  Your Honor, it doesn't quite
21  comport with our numbers.  We've got 54 taken and five
22  confirmed.  We can work that out.
23       MS. McLAUGHLIN:  Yeah.  Okay, I don't know that
24  this is --
25       SPECIAL MASTER INFANTE:  Okay.  Thanks.

138

1        Go ahead.
2        MS. McLAUGHLIN:  And with regards to depositions
3   completed with evidence spoliation, we've identified 55
4   senior personnel, which would range from area vice
5   president to senior vice presidents, to people who were
6   in the finance, responsible for the finances of each
7   business unit that we -- that their documents were not
8   preserved.  And we have a chart.  It's Exhibit 16 to
9   Mr. Solomon's declaration.  But there's, nevertheless,
10  55 individuals that have their -- have not been noticed
11  to preserve documents.  And we really at this point feel
12  that we need to depose these individuals, given the
13  last -- this is the last chance for us to receive
14  any -- to discover any evidence with regard to these
15  witnesses.
16       So, with regard to the substantive -- I'll
17  start with the substantive depositions.  The SLC
18  interviewed 68 people in this case, and that doesn't
19  include depositions for authentication, depositions
20  for -- in our confidential witnesses and third parties.
21  We -- yes, defendants bring up the fact that we've
22  known that all along.  Yes, that's true, but we needed
23  to get through the depositions that we were allotted
24  before we felt we were  n a position to ask for more.
25       And, given the results that have, you know,

139

1   that we've -- the discovery that's been borne out thus
2   far, we believe that we need to take further
3   depositions.
4        And I'm prepared today to talk about specific
5   individuals that we would like to take, or we could
6   talk numbers, however the Court would like to
7   proceed.
8        SPECIAL MASTER INFANTE:  Well, I've read your
9   exhibit, so I know who you want to take.  It would
10  serve no purpose for you to add to that showing
11  orally.  It's in your papers.
12       MS McLAUGHLIN:  Okay.
13       SPECIAL MASTER INFANTE:  Let's hear what
14  Oracle and the defendants have to say.
15       MR. GIBBS:  Thank you, Your Honor.
16       Again, Patrick Gibbs on behalf of defendants.  I
17  will defer to Ms. Kyrouz on the close of discovery
18  motion, which is going to be heard separately now.
19       I've heard Your Honor and understand your point
20  that discovery orders change over time as discovery
21  evolves.  We would submit that a Rule 16 scheduling
22  order is not a typical discovery order.
23       SPECIAL MASTER INFANTE:  It requires good cause,
24  where a discovery request might not.
25       MR. GIBBS.  And we have cited, Your Honor, to

140

1   the Jackson case, which specifically says that the
2   scheduling order should not be lightly disturbed.  The
3   Court there wrote "indeed, a scheduling order is the
4   critical path chosen by the trial judge and the parties
5   to fulfill the mandate of Rule 1 in securing a just,
6   speedy and inexpensive determination of every claim."
7        And I can't help but pause and wonder whether
8   speedy or inexpensive is really in the cards here, but
9   I know we're all hoping for just
10       Among the other things that Judge Jenkins had in
11  front of him when he placed the 65 deposition limit
12  into the scheduling order was the plaintiffs' request
13  for a hundred depositions, which they put in the joint
14  CMC statement in November of 2004.
15       So, to a large degree, we're here on what I
16  think amounts to a motion to reconsider the decision
17  that Judge Jenkins made.
18       In any event, even setting that issue aside, as
19  you know, in order to modify the scheduling order, the
20  plaintiffs need to show good cause.  And that has at
21  least two elements:  They need to show diligence in
22  trying to comply with the existing order and diligence
23  in moving to modify it.
24       Now, the plaintiffs' briefing suggests that
25  prejudice to the nonmoving party need not be



141

1 considered. I think the case law is a little bit
2 different than that. I think what it says is that,
3 although prejudice to the nonmoving party may be an
4 additional reason to deny relief, if the moving party
5 doesn't get passed the diligence good cause prong, then
6 you don't need to show prejudice in order to deny the
7 motion.
8     Now, I want to take the issues in reverse order
9 and talk first about diligence in moving to amend the
10 order.
11     As you noted, the order was entered in December
12 2004. The motion to amend it was filed on June 9th of
13 2006. That's 18 months after the order was entered,
14 three weeks before the then-existing close of fact
15 discovery.
16     I would submit that, on its face, a delay of 18
17 months and a motion filed just three weeks before the
18 close of discovery to expand the number of depositions
19 in the case by almost 140 percent is, by itself, not
20 diligent.
21     We've cited a Sachovia case which ruled that, in
22 that case ,a delay of four months precluded a finding of
23 diligence.
24     Now, going to the specific items the plaintiffs
25 have cited in support of their request, in each case.

142

1 these are either facts that the plaintiffs were aware
2 of before the scheduling order was entered for many,
3 many, many, many months before they filed this motion.
4     Plaintiffs claim, for example, this is a complex
5 case. Plaintiffs have known this is a complex case for
6 a long time, and I would submit that Judge Jenkins was
7 well aware it was a complex case when he gave them 65
8 depositions. This is not a case where a complaint was
9 filed and then nothing happened for four years while
10 the parties argued the pleadings. There was an
11 exhaustive SLC investigation generating a 1,000-page
12 report. There was summary judgment litigation in the
13 Delaware derivative case that resulted in a published
14 decision from Vice Chancellor Strine that runs 55
15 pages. That decision came out a month before the
16 scheduling order in this case was entered. I think
17 everybody knew this was a complex case.
18     The cases the plaintiffs cite in support of this
19 request, there are four of them, and two of those cases
20 the courts allowed 75 or 80 depositions, which is far
21 closer to the number than Judge Jenkins selected than
22 the 190 depositions the plaintiffs want to take here.
23     The Enron and Washington Power Supply cases are
24 nothing like this case. Yes, they're complex. This
25 case is complex. But, bottom line, each of those cases

143

1 involved over 100 different defendants and many
2 different plaintiffs, and many, many different cases.
3 That alone makes them fundamentally different from this
4 one in terms of the number of depositions they should
5 be allowed to take
6     The 182 lost deals that Oracle identified in
7 response to rog 4, all but five of those were
8 identified in March of 2005. The remaining five were
9 identified in June of 2005. If they needed additional
10 depositions to explore those 182 deals, they should
11 have asked a year ago.
12     In any event, of the 57 names on their list,
13 only two of them are identified as customers. Now the
14 plaintiffs' reply says more of them are customers, but
15 they don't say who, and they don't tie them to any of
16 the deals on the interrogatory responses.
17     I'll skip over the SLC report. Ms. McLaughlin
18 discussed that.
19     Plaintiffs also claim that they have identified
20 additional deponents from recently produced documents.
21 They haven't identified a single witness they became
22 aware of from any recently produced documents. And, in
23 fact, many of these witnesses have been known to the
24 plaintiffs for months, if not years. Nineteen of them
25 were mentioned in the complaint, 32 were in plaintiffs

144

1 December 2004 initial disclosures, 19 were in the
2 discovery plan, 34 were in the SLC report that they've
3 had since August of 2005, and two of them are
4 plaintiffs' own confidential witnesses
5     Plaintiffs also suggest they need additional
6 depositions to authenticate documents, and they
7 complain about Oracle's response to a request for
8 admission served back in February.
9     Now, we've cited that to Your Honor that
10 request for admission asked that Oracle admit that
11 every single one of the roughly 700,000 documents that
12 Oracle produced in this case is "genuine and
13 authentic." As Your Honor knows, under Federal Rule
14 of Evidence 901 A, authentication requires proof that
15 the document is what its proponents claimed it to be.
16 Without the plaintiff saying what they want us to
17 authenticate what these documents are, we can't answer
18 that question. We've admitted that these are documents
19 produced from Oracle's files. We can't do more with
20 that request
21     It is certainly not in Oracle's interest to
22 create disputes where there need not be over the
23 authenticity of documents. The plaintiffs have
24 specific documents, and they're going to say what they
25 claim those documents are. We can certainly talk about



145

1    authenticating them without wasting everyone's time
2    with depositions.
3        Finally, just to address the point, the
4    plaintiffs have not demonstrated diligence in complying
5    with the original scheduling order. They could have
6    begun taking fact witness depositions as early as May
7    2005. They didn't take their first fact deposition
8    until September of 2005. That was one of their own
9    confidential witnesses. The first nonconfidential fact
10   witness deposition didn't take place until February
11   24th, 2006, which was actually the original discovery
12   cutoff date.
13       Because plaintiffs waited to start the
14   deposition process until then, we ended up in a
15   situation where dozens and dozens and dozens of
16   depositions have been crammed into the very end of the
17   discovery process. And as with the delay in filing the
18   motion, we think that the delay in beginning in earnest
19   the deposition scheduling process negates any showing
20   that the plaintiffs have diligently tried to comply
21   with the discovery order.
22       And finally, just to touch on the prejudice
23   point here, this case has gone on for a very long time.
24   It has cost Oracle millions of dollars in defense fees.
25   And we think that ought to be taken into account in

146

1    deciding whether the plaintiffs should be entitled to
2    additional depositions and, if so, how many.
3        SPECIAL MASTER INFANTE: I appreciate your
4    comments. It's been going on for a long time, but it
5    really didn't clear the Ninth Circuit and get remanded
6    until December of '04.
7        MR. GIBBS: Understood.
8        SPECIAL MASTER INFANTE: I appreciate your
9    comments.
10       MS. McLAUGHLIN: Your Honor, if I could address
11   what Mr. Gibbs said?
12       SPECIAL MASTER INFANTE: Sure.
13       MS. McLAUGHLIN: It's interesting he brought up
14   the authentication issues, because we have, in fact --
15       SPECIAL MASTER INFANTE: You shouldn't be
16   wasting depositions on authentication.
17       MS. McLAUGHLIN: I agree with you 150 percent.
18       SPECIAL MASTER INFANTE: And you won't have to,
19   because there are a lot of ways to deal with
20   authentication. A wholesale request for admission
21   doesn't work for the reasons stated by Mr. Gibbs,
22   because you have to know for what purpose the document
23   is being offered, namely, its relevance, to determine
24   the basis for its authentication.
25       But there will be a pretrial conference in this

147

1    case, and at the pretrial conference I am sure the
2    trial judge or anyone designated by the trial judge
3    will require each side to list the exhibits they intend
4    to offer at trial.
5        And at that time the expectations will be that
6    the parties will stipulate to the authenticity of every
7    document. And that's the way it's going to be.
8        MS. McLAUGHLIN: Well, if I -- and I --
9        SPECIAL MASTER INFANTE: And that will be at a
10   pretrial conference.
11       MS. McLAUGHLIN: I respect Your Honor's
12   comments. I think there's a little bit of context that
13   Your Honor may not be aware of.
14       Mr. Gibbs stated he described to you some -- in
15   request for admissions that we sent out in February,
16   what's not in front of Your Honor right now, which will
17   be on the 12th of July, which is when we move on our
18   motions to compel the request for admissions, which
19   were in detail with regard to specific documents, why
20   we wanted them authenticated. They were wholesomely
21   denied by defendants. We got -- we received these
22   responses on June 30th, approximately.
23       SPECIAL MASTER INFANTE: I don't want to hear
24   about them.
25       MS. McLAUGHLIN: Okay.

148

1        SPECIAL MASTER INFANTE: And I don't expect you
2    to take one deposition regarding authenticity.
3        Now let's move on.
4        MS. McLAUGHLIN: Okay. Well then, secondly, I
5    believe Mr. Gibbs said that we were requesting 190
6    depositions. That's not true. We're requesting 35
7    additional substantive depositions, and we're requesting
8    55 people we listed in Exhibit 16. Now -- which were
9    the nonpreserved witnesses to depose those individuals.
10       And given that Your Honor just opined earlier
11   that a violation of the PSL document preservation
12   provision may not warrant sanctions, however, we
13   would -- we would submit that, at a minimum, we would
14   request to take these people -- individuals
15   depositions, at least those whose files that we have
16   been -- that have not been preserved and that we have,
17   either through -- by way of other custodians or other
18   testimony, discovered that they may have relevant
19   information.
20       And so I believe that at this point that we
21   wouldn't have been in a position to request such
22   depositions until we were at the end of our discovery
23   process. Defendants' suggestion that we should somehow
24   have known to bring this motion prior to June really
25   perplexes me.



149

1    They state that we could have started taking
2    substantive depositions in May of 2005. That's
3    correct. We could have done that; however, we would
4    have been forced to do so with absolutely no
5    information at all from the documents.
6        As Mr. Gibbs has stated, they have produced over
7    700,000 pages to us; however, they produced probably
8    under half of that at the first -- in May of 2005
9    We've gotten subsequent productions, month after month
10   after month through the past year, up until June 30th,
11   the very last day of the discovery period.
12       And that's going to go to sort of why we need
13   the discovery cutoff moved. But this isn't a stale
14   motion. This is a motion that we brought when we had
15   the information that we needed to gather to determine
16   what new witnesses we need to depose for various
17   different reasons.
18       I could not have known this in February. I
19   couldn't have known this in May. We knew this in June
20   when the last of the documents came in that they said
21   were relevant. It didn't turn out to be what we
22   thought, you know, they were going to produce. They
23   hadn't been -- they've been violating, in fact, the
24   Court's orders to produce documents and producing
25   documents in, quote/unquote, an -- I'm sorry, I have it

150

1    in here "documents which appear in the audit trail for
2    some of the November 17th, 2000 debit memos, documents
3    which technically respond to the discovery plan."
4        This is as late as June 30th, 2006. You know,
5    we really don't believe that we've sat on our, you
6    know, haunches and let this case move, you know -- go
7    without diligently prosecuting it.
8        And at this point we submit we need to take
9    further depositions, as I outlined in the motion
10       SPECIAL MASTER INFANTE: Okay, thank you.
11       The motion is partially granted. I find that
12   there's good cause established by the plaintiff to
13   modify the limitation on depositions from 65 to 72,
14   that's all, seven additional depositions. I'm not
15   limiting those to any particular subject matter. You
16   can take whatever deposition you may choose yourself
17   and decide how you wish to take them.
18       If you wish to take depositions on spoliation
19   issues, go right ahead. If you wish to take
20   depositions on substantive issues, that's your choice.
21       The total is lifted, then, from 65 to 72.
22       To the extent you sought more depositions, you
23   have not shown good cause for them
24       By the way, I don't agree with the defendant
25   that you haven't exercised diligence. Otherwise, you'd

151

1    be getting nothing. Diligence is not the issue here.
2    But what you're asking for is way over the top, and in
3    a case of this nature and a case of this scope, way
4    over the top.
5        And 72 is the most I can bring myself to give
6    you. I think Judge Jenkins got it right at 65, but
7    certain things have occurred here that warrant giving
8    you an extension of that to 72.
9        That's my ruling
10       With respect to moving the discovery cutoff
11   date, of course, we all have to do that. The question
12   is when. It's necessitated by what occurred in the last
13   month or two. It's necessitated by a whole bunch of
14   things. The question is, what's your opinion on each
15   side of the table, now that you know my orders, as to
16   when the discovery cutoff date should be? Do you wish
17   to speak to that?
18       MR. SOLOMON: I can respond, Your Honor, yes
19   I think, based on the rulings I've heard today,
20   September 30th would be appropriate.
21       SPECIAL MASTER INFANTE: That's conservative.
22   That's responsible.
23       MR. WALD: May I have one minute with my client?
24       SPECIAL MASTER INFANTE: Sure, sure.
25       MR. WALD: Thank you.

152

1        (Brief discussion off the record.)
2        SPECIAL MASTER INFANTE: Mr. Wald?
3        MR. WALD: Yes, Your Honor.
4        We're agreeable to September 30th. We're going
5    to work like heck to get those additional documents
6    produced, and we -- we hope that we will get them done.
7    I -- the only caveat is I just don't know exactly what
8    we're going to find when we get into some of this
9    stuff.
10       SPECIAL MASTER INFANTE: Right.
11       MR. WALD: And if we're having problems, we're
12   going to come back to you sooner rather than later. But
13   we're okay with September 30th.
14       MR. SOLOMON: Your Honor, I guess I'd just like
15   to make the following comment, and that is: I don't
16   think that it's warranted that the discovery be just
17   simply wide open for all parties to pursue whatever
18   sort of additional avenues they want to go down. I
19   think the defendants have pretty much completed all the
20   discovery that they want to. I think we've indicated
21   pretty much the discovery that we want. I think it
22   should be within that -- within that -- those
23   parameters the next few months.
24       MR. WALD: Your Honor, we're in agreement with
25   Mr. Solomon, except for one small point, which is,



153

1  there are three CWs who we've had difficulty with.
2      SPECIAL MASTER INFANTE:  I know
3      MR. WALD:  We've been working.  It's not the
4  plaintiffs' fault, but we actually had them subpoenaed
5  and they blew off the subpoena and didn't show up  So,
6  as long as we're extending this to September 30th, we'd
7  like to continue to try to get those depositions.
8      SPECIAL MASTER INFANTE:  Yeah, that's fair.
9  September 29th is actually a Friday, I believe
10     MR. WALD:  Okay.
11     SPECIAL MASTER INFANTE:  So you could make it
12  either September 29th or October 2nd.
13     MR. SOLOMON:  Should we make it October 2nd
14  and not be too conservative, Your Honor?
15     SPECIAL MASTER INFANTE:  October 2nd, okay.
16     MR. SOLOMON:  And I guess, Your Honor, another
17  housekeeping matter would be in terms of a request to
18  take the defendants in the last two weeks of discovery,
19  and have the sequencing that we've argued for  I would
20  like not to have a repeat of what happened over the
21  last month, make sure that the schedules for September
22  are --
23     SPECIAL MASTER INFANTE:  I don't want to disturb
24  any of the depositions that are already calendered for
25  July.

154

1      MR. WALD:  That's what I think, Your Honor.
2      SPECIAL MASTER INFANTE:  They should go forward.
3      MR. SOLOMON:  In that case, I don't have
4  fundamental issues on that, then.  One is, certainly, I
5  would like the opportunity to see the discovery that
6  you've ordered with respect to each of the named
7  defendants whose depositions we're taking.  And I make
8  no qualms about that.  I certainly think that it's
9  particularly appropriate with respect to Messrs  Henley,
10  the CFO, and Messrs. -- Mr. Ellison, who oversaw the CFO
11  and who signed the certification.
12     I think that it's relevant.  I think that I
13  should be entitled to full documentation before I
14  question those witnesses.
15     SPECIAL MASTER INFANTE:  What's your response to
16  that?
17     MR. WALD:  Your Honor, this really does go to
18  the time limits point, I think.  Your Honor has made the
19  rulings that you've made.  We're going to obviously
20  comply with them.  But we have rescheduled -- scheduled
21  and rescheduled the depositions of the senior Oracle
22  executives numerous times  By my count, this may be the
23  third tacit request for reconsideration of your order
24  These are exceptionally busy people which, of course,
25  doesn't put them above the deposition process, but this

155

1  is now an imposition of their time in a way which is
2  not justified.
3      SPECIAL MASTER INFANTE:  Well, I think they
4  should go forward.  It's the only possible thing we could do
5  about it is, if you wanted to do one day of Mr. Ellison
6  instead of two days, and reserve a day, you could do
7  that.  It's kind of one approach.
8      MR. SOLOMON:  That would be a good approach.
9      SPECIAL MASTER INFANTE:  As far as Henley, I
10  think I gave you two days
11     MR. SOLOMON:  You have, Your Honor.
12     SPECIAL MASTER INFANTE:  You could do that.
13  You could do that.  That's one way of dealing with it.
14     MR. SOLOMON:  Just a little wrinkle with
15  Mr. Henley.  Unfortunately, and I don't believe that
16  they've done it intentionally, but they've said the
17  only available dates for Mr. Sanderson as a defendant
18  and Mr. Henley are at the end of July, at least the
19  only dates in July  And, in fact, that they have a
20  collision, in that Mr. Sanderson at the moment is
21  scheduled for, I think, the 25th and the 26th, and
22  Mr. Henley for the 26th and 27th.  So there's some
23  overlap that we'd like relief from  In any event, it's
24  just a wrinkle.
25     MR. WALD:  Again, Your Honor, we -- we have the

156

1  same issue that they have, and we're dealing with it by
2  having different people deal with those depositions.
3  These have -- these are depositions that have been set
4  for some time, and if Your Honor is inclined to grant
5  them, in essence, the ability to split the depositions
6  of Mr. Henley and Mr. Ellison.
7      SPECIAL MASTER INFANTE:  I'd give them that
8  option.
9      MR. WALD:  But if I may request it anyway, your
10  Honor, with respect to the additional accounting
11  documents that are to be produced, we would request
12  that -- not that it's a day and a day, but maybe a half
13  a day on that additional accounting information  It's
14  just the potential for having to go back and --
15     SPECIAL MASTER INFANTE:  True.
16     MR. WALD:  -- reconstitute the whole thing, you
17  know, and get revved up again for deposition is very
18  significant.
19     SPECIAL MASTER INFANTE:  I agree with you, but I
20  don't want to prejudge it.  I just don't know how those
21  depositions are going to go, and I don't know what
22  additional material they're going to gain as a result
23  of today's orders  And it's really wrong to prejudge
24  it.
25     I'm sensitive in that you wouldn't want a second




157

1  day to completely rehash the first day.
2      MR. WALD: Correct.
3      SPECIAL MASTER INFANTE: I can't prejudge that.
4  So I think we're going to have to leave it at
5  that.
6      MR. WALD: Are you granting them that option
7  then, Your Honor, with respect to both?
8      SPECIAL MASTER INFANTE: Yes.
9      MR. WALD: Both witnesses?
10     SPECIAL MASTER INFANTE: I think those two
11  witnesses, but no others, at this point.
12     MR. WALD: So one of the days for each of those
13  witnesses needs to go forward on one of the days that
14  has been scheduled?
15     SPECIAL MASTER INFANTE: That's right.
16     Now, let me just indicate with respect to the
17  order on the accounting documents, I will issue a
18  written order hopefully within the next few days.
19  There is a draft I have  With respect to the
20  interrogatories, I'll issue a written order.
21     With respect to the granting of the modification
22  of the pretrial order to allow seven additional
23  depositions, having found that plaintiffs have pursued
24  their case diligently and there was good cause for that
25  extension, I would like you to prepare the order and

158

1  with -- and include in that order the extension of the
2  discovery cutoff date to October 2nd.  And you may
3  include in that order, also, that you have the option
4  to take Mr. Ellison and Mr. Henley's deposition at two
5  different times, one day at a time.
6      MR. SOLOMON: Thank you, Your Honor.
7      SPECIAL MASTER INFANTE: So long as you notify
8  the defendants.
9      MR. SOLOMON: I will.
10     SPECIAL MASTER INFANTE: In 24 hours of your
11  election.
12     MR. SOLOMON: I can tell you now, Your Honor,
13  it's to start Mr. Ellison on the 13th and to start
14  Mr. Henley on the 26th, I believe.
15     SPECIAL MASTER INFANTE: And reserve your day
16  until later in the discovery period.  Then you may
17  include that in the order
18     So would you prepare that order?
19     MR. SOLOMON: We will, Your Honor.
20     SPECIAL MASTER INFANTE: Now, I'm going to tell
21  you one other thing:  With respect to the first motion
22  we heard today, I've decided to issue a summary bottom
23  line order.  In fact, I think it's prudent not to make
24  any findings or write an opinion on the matter  I'm a
25  special master; I'm not the trial judge.  I suspect

159

1  that there may be future motions for sanctions that can
2  only be ruled upon by a trial judge, and if I were
3  sitting as a trial judge, I wouldn't want some special
4  master's opinion being cited to me, in which I'm locked
5  into certain considerations.
6      Having been there, I've decided to issue a
7  bottom line order.  And the bottom line order is that
8  you have not made the requisite showing, most of the
9  elements of which you've got right
10     MR. WALD: Thank you.
11     SPECIAL MASTER INFANTE: And, therefore, the
12  motion is denied
13     So I'd like you to prepare that order.
14     MR. WALD: Yes, Your Honor, we will
15     SPECIAL MASTER INFANTE: And on much thinking,
16  I decided that was the most prudent way of doing it
17  without getting in the way of somebody else.
18     MR. WALD: Thank you, Your Honor.
19     SPECIAL MASTER INFANTE: And we're done
20     MS. McLAUGHLIN: Your Honor, there is one
21  outstanding thing.  I understand if we don't want to
22  address it today, but we took the deposition of
23  Jennifer Minton on Friday.
24     SPECIAL MASTER INFANTE: Yes.
25     MS. McLAUGHLIN: This was one of the individuals

160

1  that Your Honor granted us -- or denied our motion but
2  said that we had -- it was without prejudice and we
3  could come back.
4      SPECIAL MASTER INFANTE: That's right  I said
5  you hadn't made the showing up front but, if you could
6  make the showing, you could come back.
7      MS. McLAUGHLIN: Right.  And so we took
8  Ms. Minton's deposition on Friday.  We were able to get
9  through the documents and the issues up until January
10  15th.  And at that point in time, I guess that was the
11  seven hours.  Mr. Britton, who is not here with us
12  today, he requested Mr. Wald stipulate to a second day,
13  Mr. Wald declined to do that and just essentially
14  cited that, you know, we had to bring it up with the
15  Judge.
16     So we're just bringing it up with you right now.
17  Just to let the Judge -- to let you know, there are
18  several things that we need to continue with.
19  Obviously, the documents and the occurrences between
20  January 15th and February 28th -- we weren't able to
21  get into the accounting issues to the degree that we
22  wanted to, and the Covizant transactions.
23     And I understand Your Honor doesn't want to hear
24  anything more about authentication, but we wanted to
25  get the reports in there too.

 

JAMS Hearing 7/10/06  7/10/2006  4:12:00 PM

161

1    SPECIAL MASTER INFANTE:  Well, I think you
2    should meet and confer on it.  I think you should meet
3    and confer, and if you haven't resolved it, I think we
4    should do it by telephone conference call within the
5    next couple of days.
6        MS. McLAUGHLIN:  Okay.
7        SPECIAL MASTER INFANTE:  I don't want to hear
8    argument on it.
9        MR. WALD:  May I just say I -- we do have a
10   response, and I will meet and confer with Doug and
11   Valerie and then present it to you.
12       SPECIAL MASTER INFANTE:  Okay.  Thank you.
13       (Whereupon, the proceedings were
14       adjourned at 5:40 p.m.)
15
16
17
18
19
20
21
22
23
24
25

162

1            REPORTER'S CERTIFICATE
2        The hereby certify that the foregoing in the
3    within-entitled cause was taken at the time and place
4    herein named; that the transcript is a true record of
5    the proceedings as reported by me, a duly certified
6    shorthand reporter and a disinterested person, and was
7    thereafter transcribed into typewriting by computer.
8        I further certify that  em not interested in
9    the outcome of the said action, nor connected with, nor
10   related to any of the parties in said action, nor to
11   their respective counsel.
12           IN WITNESS WHEREOF, I have hereunto set
13   my hand this 12th day of July, 2006.
14
15
16
17
18
19       LUCY CARRILLO-GRUBBS, CSR No. 6766
20       STATE OF CALIFORNIA
21
22
23
24
25

# EXHIBIT 16

1    COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
2    MARK SOLOMON (151949)
     DOUGLAS R. BRITTON (188769)
3    655 West Broadway, Suite 1900
     San Diego, CA  92101
4    Telephone:  619/231-1058
     619/231-7423 (fax)
5    marks@csgrr.com
     dougb@csgrr.com
6         – and –
     SHAWN A. WILLIAMS (213113)
7    WILLOW E. RADCLIFFE (200087)
     ELI R. GREENSTEIN (217945)
8    DANIEL J. PFEFFERBAUM (248631)
     100 Pine Street, Suite 2600
9    San Francisco, CA  94111
     Telephone:  415/288-4545
10   415/288-4534 (fax)
     shawnw@csgrr.com
11   willowr@csgrr.com
     elig@csgrr.com
12   dpfefferbaum@csgrr.com

13   Lead Counsel for Plaintiffs

14   [Additional counsel appear on signature page.]

15                    UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17   In re ORACLE CORPORATION          )   Master File No. C-01-0988-SI
     SECURITIES LITIGATION             )
18   _____ )   CLASS ACTION
                                       )
19   This Document Relates To:         )   PLAINTIFFS' NOTICE OF MOTION AND
                                       )   MOTION TO EXCLUDE THE TESTIMONY
20        ALL ACTIONS.                 )   OF DEFENDANTS' ACCOUNTING
                                       )   EXPERT J. DUROSS O'BRYAN;
21   _____ )   MEMORANDUM OF POINTS AND
                                           AUTHORITIES IN SUPPORT THEREOF
22
                                           DATE:          January 9, 2009
23                                         TIME:          9:00 a.m.
                                           COURTROOM:     The Honorable Susan
24                                                        Illston
25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT ........................................................................................................2

    A.    Legal Standard ...........................................................................................2

        1.    Rule 702 ..........................................................................................2

            a.    Testimony Must Be Helpful to the Trier of Fact ............................3

            b.    The Expert Must Be Qualified ........................................................4

            c.    Expert Testimony Must Be Reliable ................................................4

        2.    Rule 403 ..........................................................................................6

    B.    Mr. O'Bryan's Opinions on the Financial Statement Impact of the Debit Memo Transactions Are Based on Unreliable Foundation and a Flawed Methodology .............................................................................................7

        1.    Mr. O'Bryan Failed to Produce All Documents, Calculations and Data that He Relied Upon in Forming His Opinions ...................................7

        2.    Mr. O'Bryan's Opinions Regarding the Debit Memo Customer Overpayments and the $20 million in Transfers to Oracle's Bad Debt Reserve to Inflate Revenue and Earnings in 2Q01 Are Not Based on Reliable Foundation .........................................................8

        3.    Mr. O'Bryan's Opinion That $2 million of the $20 million in Improper Debit Memo Transfers Was Proper Lacks Foundation and Methodology ...............................................................10

            a.    The $700,000 in Purportedly Appropriate Transfers Relating to "Royalty Payments" ..............................................10

            b.    The $800,000 in Purportedly Appropriate Transfers Relating to "The Use of Credit Memos and/or Inclusion in Oracle's General Bad Debt Reserve" ............................................11

            c.    The $500,000 in Purportedly Appropriate Transfers in the "Could Be" Bucket ..............................................................11

        4.    Mr. O'Bryan's Opinion Regarding the Materiality of Oracle's 2Q01 Financial Misstatements Is Speculative and Lacks Reliable Foundation ...............................................13

    C.    Mr. O'Bryan's Opinion on the Propriety of Oracle's Fraudulent Transaction with Hewlett Packard on the Last Day of 2Q01 Is Unreliable and Improper and Should Be Excluded ............................................14

**Page**

        1.     Mr. O'Bryan's Opinion on the HP Transaction Is Not Based on Reliable Foundation or Methodology ..........................................................14

    D.     Mr. O'Bryan's Rebuttal Report on the HP Transaction Improperly Relies Upon Documents Not Produced to Plaintiffs Until *After* Rebuttal Reports Were Exchanged ............................................................................16

    E.     Mr. O'Bryan's Failure to Disclose the Exclusion of His Prior Expert Testimony Evidences a Lack of Candor ................................................17

III.    CONCLUSION.................................................................................................18

# TABLE OF AUTHORITIES

Page

**CASES**

*6816.5 Acres of Land v. United States,*
    411 F.2d 834 (10th Cir. 1969) ...................................................................15

*American Key Corp. v. Cole Nat'l Corp.,*
    762 F.2d 1569 (11th Cir. 1985) ................................................................15

*Atmel Corp. v. Information Storage,*
    189 F.R.D. 410 (N.D. Cal. 1999) ..............................................................17

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.,*
    No. 03 C 7713, 2005 U.S. Dist. LEXIS 10692
    (N.D. Ill. Feb. 22, 2005)...........................................................................17

*Bourjaily v. United States,*
    483 U.S. 171 (1987)...................................................................................3

*Curtis v. M&S Petroleum, Inc.,*
    174 F.3d 661 (5th Cir. 1999) .....................................................................5

*Daubert v. Merrell Dow Pharms.,*
    509 U.S. 579 (1993)......................................................................... *passim*

*Farnham v. Rehwald,*
    No. B170124 2005 Cal. App. Unpub., LEXIS 3107,
    (Cal. App. 2005) .......................................................................17, 18, 21

*GE v. Joiner,*
    522 U.S. 136 (1997)......................................................................... *passim*

*In re Paoli,*
    35 F.3d 717 (3d Cir. 1994)........................................................................4

*In re Paoli R.R. Yard PCB Litig.,*
    916 F.2d 829 (3d Cir. 1990)......................................................................4

*In re Williams Sec. Litig.,*
    496 F. Supp. 2d 1195 (N.D. Okla. 2007)..................................................4

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999)......................................................................... *passim*

*Metabolife Int'l, Inc. v. Wornick,*
    264 F.3d 832 (9th Cir. 2001) .....................................................................5

Page

*Sherrod v. Lingle*,
223 F.3d 605 (7th Cir. 2000) ...........................................................................17

*Taylor v. B. Heller & Co.*,
364 F.2d 608 (6th Cir. 1966) ...........................................................................15

*Trevino v. Gates*,
99 F.3d 911 (9th Cir. 1996) ...............................................................................5

*United States v. Downing*,
753 F.2d 1224 (3d Cir. 1985)..............................................................................4

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) ..........................................................................6

*Viterbo v. Dow Chem. Co.*,
826 F.2d 420 (5th Cir. 1987) ..............................................................................5


**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
Rule 26(a)(2)(B)...............................................................................................15
Rule 26(a)(2) ........................................................................................... *passim*
Rule 30(b)(6)....................................................................................................15

Federal Rules of Evidence
Rule 104(a)..........................................................................................................3
Rule 401 ....................................................................................................1, 2, 4
Rule 403 ....................................................................................................1, 2, 6
Rule 702 ................................................................................................... *passim*
Rule 703 ................................................................................................... *passim*

**SECONDARY AUTHORITIES**

3 J. Weinstein & M. Berger, *Weinstein's Evidence* (1998) ............................................4

4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*
(2d ed. 2005) ...............................................................................3, 5, 6

1    TO:     ALL PARTIES AND THEIR ATTORNEYS OF RECORD

2           PLEASE TAKE NOTICE that plaintiffs will and hereby do move this Court to preclude the

3    testimony of J. Duross O'Bryan ("O'Bryan").  The matter will be heard January 9, 2009 at 9:00 a.m.

4    before the Honorable Susan J. Illston.  This motion is made pursuant to Federal Rules of Evidence

5    401, 403 and 702 on the grounds that Mr. O'Bryan's opinions are unreliable, would serve to mislead

6    and confuse the jury, and will not assist the trier of fact to understand the evidence or determine a

7    fact at issue.  This motion is based upon this notice of motion, the accompanying memorandum of

8    points and authorities, the supporting Declaration of Eli R. Greenstein in Support of Plaintiffs'

9    Motion to Exclude the Testimony of Defendants' Accounting Expert J. Duross O'Bryan

10   ("Greenstein Decl."), filed herewith, the exhibits attached thereto, the pleadings and other papers and

11   records on file, and such further evidence and arguments as may be presented to the Court on reply

12   and at the time of hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

13

**I.     INTRODUCTION**

14

15          Mr. O'Bryan's expert opinion on the accounting issues in this case should be excluded for

16   several reasons.  First, Mr. O'Bryan's opinion concerning the financial statement impact of Oracle's

17   misuse of customer unapplied cash and debit memo transactions to inflate its 2Q01 financial results

18   is based upon unreliable foundation and a flawed methodology.  Most fundamentally, Mr. O'Bryan

19   relied upon documents, facts, data and other information not provided to plaintiffs.  Additionally, in

20   many crucial parts of his opinion on the debit memo transactions, Mr. O'Bryan provided numerous

21   pages of conclusions and speculative inferences without a single footnote or citation to documents,

22   deposition testimony or other information.  *See, e.g.,* Ex. 1[1] at 33-34 (O'Bryan, May 25, 2007

23   Report).

24          Second, Mr. O'Bryan's opinion concerning Oracle's improper "swap" transaction with

25   Hewelett Packard ("HP") on the last day of 2Q01 (the "HP Transaction") lacks any reliable

26   _____

27   [1]       "Ex. ___" refers to Greenstein Decl., unless otherwise stated.

28   PLTFS' NOT OF MTN & MTN TO EXCLUDE TESTIMONY OF DEFS' ACCTG EXPERT J. DUROSS
     O'BRYAN; MEM OF P&A IN SUPPORT THEREOF - C-01-0988-SI                              - 1 -

1   foundation or methodology and consists of a ***single paragraph*** of text in his opening report.  Ex. 1 at

2   41.  Mr. O'Bryan admitted that his opinion was "light" and that he failed to conduct any independent

3   analysis of his own in forming the opinion in his opening report.  Ex. 2 at 56:8-22 ("***And when I say***

4   ***light, it's simply a paragraph.***").

5          On rebuttal, Mr. O'Bryan tried to cure his inadequate one-paragraph opening report with a

6   26-page rebuttal opinion based upon numerous documents, e-mails and other evidence that were

7   never produced to plaintiffs or their experts until June 22, 2007 – the ***same day*** as the deadline for

8   the parties to exchange expert rebuttal reports.   In other words, Mr. O'Bryan and defendants

9   tactically waited to submit a substantive opinion and produce never-before-seen evidence on the HP

10  Transaction until plaintiffs and their accounting expert had no chance to review, analyze or rebut the

11  new documents.  This type of conduct violates both the spirit and letter of Fed. R. Civ. P. 26(a)(2)

12  and Fed. R. Evid. 702.  Mr. O'Bryan's opinions should be excluded.

13  **II.     ARGUMENT**

14         **A.      Legal Standard**

15         The admissibility of expert testimony is governed by Federal Rules of Evidence as well as

16  the U.S. Supreme Court's decisions in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), and

17  its progeny.[2]  Rule 702 addresses an expert's qualifications, the reliability of his/her testimony and

18  its relevance to the issues in dispute.  Rule 703 addresses the situation when expert testimony is

19  based upon inadmissible evidence.  Furthermore, all evidence must be relevant as defined by Rule

20  401.  Finally, under Rule 403, the Court must evaluate the probative value of any evidence proffered

21  against any potential unfair prejudice.

22              **1.      Rule 702**

23         Rule 702, originally enacted in 1975, was amended in 2000 to effectively codify the *Daubert*

24  trilogy –*Daubert*, *Joiner* and *Kumho*.  It states:

25  _____

26  [2]     The "Daubert Trilogy": *Daubert*, 509 U.S. 579; *GE v. Joiner*, 522 U.S. 136 (1997), and

27  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *see* Fed. R. Evid. 702, Advisory Comm.
   Notes, 2000 Amendments.

28

1

2

3

4

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

5   Fed. R. Evid. 702.

6   Whether an expert's opinion satisfies Rule 702 and *Daubert* is a legal determination made by

7   the trial judge. *Daubert*, 509 U.S. at 589-91; *see* Fed. R. Evid. 104(a). The party proffering the

8   expert bears the burden in establishing the pertinent admissibility requirements are met by a

9   preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987). If a

10  proffered expert is to offer testimony on multiple subjects, the court must apply the standards of Rule

11  702 and *Daubert* to each subject. 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal*

12  *Evidence* §702.04[6] (2d ed. 2005). An expert may opine only on the subject(s) on which he has

13  been accepted to testify and opinions outside these topics are inadmissible.

14  The Supreme Court has made it explicitly clear that Rule 702 requires the trial court to

15  perform a "gatekeeping" function to ensure that proffered expert testimony is relevant, reliable and

16  helpful to the finder of fact. *Daubert*, 509 U.S. at 589 n.7; *Joiner*, 522 U.S. at 136, 142; Fed. R.

17  Evid. 702; *Kumho*, 526 U.S. 137. The court's gatekeeping function applies equally to all proffered

18  expert testimony, whether based in scientific, technical or other specialized knowledge. *Kumho*, 526

19  U.S. at 151. The trial court must "make certain that an expert, whether basing testimony upon

20  professional studies or personal experience, employs in the courtroom the same level of intellectual

21  rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

22  **a.    Testimony Must Be Helpful to the Trier of Fact**

23  An expert witness must provide testimony which "will assist the trier of fact to understand

24  the evidence or to determine a fact in issue." Fed. R. Evid. 702. "Expert testimony which does not

25  relate to any issue in the case is not relevant and, ergo, non-helpful."[3] *Daubert*, 509 U.S. at 591

26  _____

27  [3]    All citations and internal quotations and footnotes are omitted and all emphasis is added

28  unless otherwise noted.

1   (citing 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶702[02], at 702-18 (1998), and *United*

2   *States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).  Rule 401 requires that all proffered

3   evidence must be relevant to be admissible.  However, given the greater potential impact of expert

4   testimony on the finder of fact, mere relevance alone will not suffice under Rule 702.  "[T]he

5   'helpfulness' requirement in Rule 702 'implies a quantum of reliability beyond that required to meet

6   a standard of bare logical relevance.'"  *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 857 (3d Cir.

7   1990) (quoting *Downing*, 753 F.2d at 1235).

8        The helpfulness requirement has also been deemed the "fit" requirement.  *Daubert*, 509 U.S.

9   at 591; *Downing*, 753 F.2d at 1242.  The "fit" requirement ensures a "valid scientific connection to

10  the pertinent inquiry as a precondition to admissibility."  *Daubert*, 509 U.S. at 592.  Thus, the

11  testimony of an expert, no matter how qualified, will not be admissible if their expertise does not

12  shed light on an issue in dispute.

13                          **b.      The Expert Must Be Qualified**

14       A witness may be "qualified as an expert by knowledge, skill, experience, training, or

15  education." Fed. R. Evid. 702.  "[R]egardless of the mix of formal credentials and experience that is

16  proffered as establishing the requisite 'qualifications' under the rule, those qualifications must be

17  ***specific*** as well as ***general***."  *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1244 (N.D. Okla.

18  2007) (emphasis in original).  A proffered expert witness, no matter how impressive his credentials

19  may be, will not be considered qualified if he cannot offer testimony, which will assist the trier of

20  fact in his or her decision-making.

21                          **c.      Expert Testimony Must Be Reliable**

22       The test for reliability under Rule 702 is a three-pronged analysis.  Reliability requires expert

23  testimony to be: (1) based upon sufficient facts or data; (2) the product of reliable principles and

24  methods; and (3) the application of the principles and methods reliably to the facts of the case.  Fed.

25  R. Evid. 702.  The focus is the admissibility of the testimony – not its correctness, but each factor

26  must be scrutinized carefully as "any step that renders the analysis unreliable under the Daubert

27  factors renders the expert's testimony inadmissible."  *In re Paoli*, 35 F.3d 717, 745 (3d Cir. 1994).

28

1   An expert's opinion cannot be based upon merely subjective belief or unsupported speculation.

2   *Daubert*, 509 U.S. at 590; *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999).[4]

3          Foundational reliability requires an expert to show that his opinion is supported by an

4   adequate foundation of relevant facts, data or other opinions. *Weinstein's Fed. Evid.* §702.05[2][b].

5   "Where foundational facts demonstrating relevancy . . . are not sufficiently established, exclusion of

6   proffered expert testimony is justified." *Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1996).  The

7   "source upon which an expert's opinion relies is of such little weight that the jury should not be

8   permitted to receive that opinion." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).[5]

9          Methodological reliability requires that expert testimony "have a reliable basis in the

10  knowledge and experience of [the relevant] discipline" and that it is a "product of reliable principle

11  and methods." *Kumho*, 526 U.S. at 148 (citing *Daubert*, 509 U.S. at 592); Fed. R. Evid. 702,

12  Advisory Comm. Notes, 2000 Amendments.  The focus of the inquiry is not on the expert's

13  conclusions, but the means used to derive such conclusions. *Metabolife Int'l, Inc. v. Wornick*, 264

14  F.3d 832, 841 (9th Cir. 2001) (citing *Daubert*, 509 U.S. at 595-96).

15         Where expert testimony is not based in scientific expertise, but rather in technical knowledge,

16  skill or experience, these factors are difficult, if not impossible to apply.  Ultimately, the Court's

17  gatekeeping function must ensure that an expert witness "employs in the courtroom the same level of

18  intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S.

19  at 152.

20         Connective reliability focuses on the reasoning used by the expert to connect data or

21  assumptions to his conclusions or opinions.  It is "not the reasonableness ***in general***" of the

22  ――――――――――――――――――

23  [4]      *Daubert* offers a list of non-exclusive, non-mandatory factors bearing on the determination of
     reliability: (1) whether the theory or technique will be, can be or has been tested; (2) whether the

24  theory or technique has been subjected to peer review and publication; (3) the known or potential
     rate of error experienced in the application of the particular theory or technique; and (4) the degree

25  of acceptance of the theory or technique in the relevant scientific community, *i.e.*, widespread versus
     minimal.  *Daubert*, 509 U.S. at 593-94.

26  [5]      Rule 703 addresses reliance by an expert on inadmissible information.  The sufficiency of the

27  basis for an expert's opinion is determined under Rule 702.  *See* Fed. R. Evid. 702, Advisory Comm.
     Notes, 2000 Amendments.  As a result, Rule 703 is applicable to a "relatively narrow inquiry."  *Id.*

28

1  methodology used by the expert in drawing his conclusion, but "[r]ather, it was the reasonableness of

2  using such an approach, along with [the expert's] particular method of analyzing the data thereby

3  obtained, to draw a conclusion regarding ***the particular matter to which the expert testimony was***

4  ***directly relevant***." *Id*. at 153-54 (emphasis in original).  Connective reliability evaluates whether an

5  analytical gap exists between the data and the expert's conclusions.  *Joiner*, 522 U.S. at 146.  The

6  Court is not required "to admit opinion evidence which is connected to existing data only by the *ipse*

7  *dixit* of the expert." *Id*.[6]

8              **2.      Rule 403**

9          Finally, the Court must perform a balancing test under Rule 403, and exclude relevant

10  evidence "if its probative value is substantially outweighed by the danger of unfair prejudice,

11  confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or

12  needless presentation of cumulative evidence." Fed. R. Evid. 403.  Rule 403 plays an enhanced role

13  for expert witnesses, resulting in the Court exercising more control over an expert than a lay witness.

14  *Daubert*, 509 U.S. at 595.  The reason is practical – expert testimony can be both powerful and quite

15  misleading, due to the difficulty in evaluating it and because such testimony "may be assigned

16  talismanic significance in the eyes of lay jurors" simply because it is given by a person who has been

17  labeled an expert.  *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004).  *See Daubert*, 509

18  U.S. at 595.

19

20

21

22

23

24

---

25  [6]      In making their determination, courts have considered the following factors: Whether the
proposed witness' conclusions represent an unfounded extrapolation from the underlying data;

26  whether the witness has sufficiently connected the proposed testimony with the facts of the case;
whether the witness has adequately accounted for alternative explanations for the effect whose cause

27  is at issue; and whether the witness relied unduly on the temporal proximity between the occurrence
of an event and the onset of illness or injury.  *See Weinstein's Fed. Evid.* §702.05[2][d].

28

B.    **Mr. O'Bryan's Opinions on the Financial Statement Impact of the Debit Memo Transactions Are Based on Unreliable Foundation and a Flawed Methodology**

1.    **Mr. O'Bryan Failed to Produce All Documents, Calculations and Data that He Relied Upon in Forming His Opinions**

Mr. O'Bryan's opinions on the "financial statement impact" of the November 2000 debit memos and the corresponding transfers of customer overpayments to the bad debt reserve to inflate Oracle's 2Q01 financial results should be excluded under Fed. R. Civ. P. 26(a)(2) and Fed. R. Evid. 702 and 703.

Most fundamentally, Mr. O'Bryan violated the spirit and letter of Fed. R. Civ. P. 26(a)(2) and Fed. R. Evid. 702 by relying upon documents, facts, calculations, and data not provided to plaintiffs. For example, one main component of Mr. O'Bryan's opinion is that $2 million of the otherwise undisputed $20 million in improper transfers of customer overpayments to Oracle's revenue and earnings via the bad debt reserve in 2Q01 was purportedly "appropriate." Ex. 1 at 33. As set forth in §II.B.3., *infra*, Mr. O'Bryan's opinion concerning the $2 million in transfers failed to cite a ***single*** document, deposition or reliable fact to support the purported "appropriateness" of the transfers. *Id*.

During his deposition, Mr. O'Bryan was asked to "describe the methodology you used in determining whether those transfers were appropriate." Ex. 2 at 135:6-9. Mr. O'Bryan responded as follows:

> ***There is a binder I brought with me today*** that basically summarizes – what we did was we ran a database that pulled out of the 926 scripts all of those that went from 25005 to 12601…. We then printed out script reports, script output reports on each one of those and ***went through each one of those in detail, and summarized this binder, and as best summarized in a two-page summary in front of that binder is really the findings I've laid out*** with respect to what I believe were appropriately, at least some indication it was appropriate to include those in the [2Q01] as being transferred from 25005 to 12601.

*Id*. at 135:12-136:1. During the deposition it became apparent that most of the foundational facts, data, and "findings" in Mr. O'Bryan's report were based upon documents in his binder that were not produced to plaintiffs. *See, e.g.*, *id.* at 137-142; 167-168. The only opinions contained in his report on the $2 million in transfers are unfounded conclusions. *See* §II.B.3., *infra*.

Plaintiffs' counsel specifically asked Mr. O'Bryan during his deposition if he "relied upon" the data and documents in his "binder" to form his opinions: "***So going back to that binder, that is***

1   ***something obviously you relied upon in doing your calculations in your opening report, correct.***

2   ***A. I did, yes.***" Ex. 2 at 137:21-25; *see also id*. at 141:3-7 ("Q. Did you rely on that binder in front of

3   you?  A.  ***I did rely on the binder in front of me.***").

4         After a lengthy discussion on the record about how Mr. O'Bryan compiled and created the

5   documents and "findings" in the binder, it became clear that he expressly relied almost exclusively

6   on the documents, data calculations and other evidence in the binder in forming his opinions.  *Id*. at

7   138-142.  Accordingly, plaintiffs requested that Mr. O'Bryan turn over the materials.  *Id*. at 162:15-

8   164:2.  Mr. O'Bryan expressly agreed to produce the materials.  *Id*. at 164:1 ("***I'm happy to give you***

9   ***the whole binder.***")  Counsel for defendants, however, expressly forbade Mr. O'Bryan from turning

10  over the materials and overruled his offer.  *Id*. at 162:15-166:9.  This directive is a direct violation of

11  Fed. R. Civ. P. 26(a)(2) and the parties' stipulation regarding the documents required to be produced.

12  Indeed the stipulation requires experts to produce "***copies of all other documents, data, or other***

13  ***information relied upon by each Testifying Expert***."  Ex. 3 at ¶2.  Accordingly, Mr. O'Bryan's

14  testimony on the debit memo issues is improper and should be excluded.

15       **2.**    **Mr. O'Bryan's Opinions Regarding the Debit Memo Customer**
                    **Overpayments and the $20 million in Transfers to Oracle's**

16                  **Bad Debt Reserve to Inflate Revenue and Earnings in 2Q01**
                    **Are Not Based on Reliable Foundation**

17
18        Mr. O'Bryan's opinions on the "financial statement impact" of the debit memo transactions

19  and the debit memo transfers to the bad debt reserve in 2Q01 lack any indicia of reliability of

20  foundation or facts.  For example, Mr. O'Bryan states that of the 46,000+ debit memos created in

21  November 2000,  he reviewed "source documents" for only 60 debit memos and concluded that

22  "[t]he sample size of 60 was sufficient to confirm my understanding of how debit memos were

23  processed."  Ex. 1 at 25 n.73.  His entire opinion regarding the sample of 60 debit memos is as

24  follows:

25        From [the] 926 debit memos, I then randomly chose a subset of 60 debit memos to
          review the actual source documents relating to each transaction.  I found no evidence
26        that revenue was recorded as a result of the November 17, 2000 debit memo project.

27  *Id*. at 25.

28

1      Mr. O'Bryan failed to provide any foundational facts or analysis for the 60 debit memos he

2  reviewed.  *Id*.  He failed to apply any reliable principles to the facts underlying the 60 debit memos.

3  *Id*.  He failed to explain his methodology for analyzing the 60 sample debit memos and failed to cite

4  the "source documents" he reviewed.  *Id*.  In fact, Mr. O'Bryan failed to provide plaintiffs with a

5  simple ***list*** of the 60 debit memo transactions that he purportedly reviewed.  *Id*.  Plaintiffs still have

6  no way of determining which 60 debit memos Mr. O'Bryan relied upon.  Thus, his conclusions

7  drawn from the "sample" 60 debit memos lacks any reliable foundation or fact and would not assist

8  the jury in assessing this case.

9      Similarly, in the seemingly important section of Mr. O'Bryan's Report entitled "Key

10 Procedures Performed Related to Transfers of Unapplied Cash" and "Review of Subset of Unapplied

11 Cash Transfers," Mr. O'Bryan submits two pages of conclusions without a ***single*** citation to

12 documents, testimony, data or evidence.  Ex. 1 at 32-33.  For example, he opines that "within the

13 accounting histories of the transactions relating to the 926 debit memos, I found 121 transfers to the

14 bad debt reserve during the second quarter of fiscal year 2001."  *Id*. at 32.  Mr. O'Bryan failed,

15 however, to provide the list of the 121 debit memos that were transferred and the underlying facts to

16 verify his conclusion.  *Id*.

17     When asked at deposition, Mr. O'Bryan admitted he relied upon a list of the 121 compiled by

18 his staff, but counsel for defendants refused to turn over the list.  *Compare* Ex. 2 at 167:1-170:7 ("Do

19 you have a list of the 121 debit memo items?  A.  I do.  Q.  And rather than ask you to tell me all of

20 them on the record, is there a list you can provide to plaintiffs of these items?"), *with id*. at 168:16-

21 19 ([Counsel for defendants]: "I object to the extent it mischaracterizes testimony and to the extent

22 you're trying to get our expert to do work that you guys can easily do on your own with the materials

23 you have.").

24     In other words, instead of simply providing plaintiffs with the list of 121 debit memos that

25 Mr. O'Bryan clearly relied upon and already compiled (which would doubtless fit on a single sheet

26 of paper), counsel for Oracle refused to produce the most fundamental data upon which Mr. O'Bryan

27 relied.  Such conduct smacks of gamesmanship, especially in light of the parties' joint stipulation

28 that experts provide all documents and calculations "relied upon."  Ex. 3 at ¶2.  Mr. O'Bryan's

refusal to produce the documents, facts, calculations and analyses he relied upon in forming his

opinion renders his testimony unreliable and unfounded.[7]

### 3. Mr. O'Bryan's Opinion That $2 million of the $20 million in Improper Debit Memo Transfers Was Proper Lacks Foundation and Methodology

Mr. O'Bryan provides a conclusory opinion that $2 million of the debit memo bad debt

transfers that inflated Oracle's revenue and earnings in 2Q01 were purportedly "appropriate." Ex. 1

at 32-33. His report addresses the $2 million in three separate opinions and provides a single

paragraph conclusion for each, again without any citations to documents, data, evidence or

deposition testimony. Each of the opinions on the purportedly "appropriate" transfers is discussed

below.

### a. The $700,000 in Purportedly Appropriate Transfers Relating to "Royalty Payments"

Mr. O'Bryan claims that $700,000 in transfers of customer unapplied cash to Oracle's bad

debt reserve in 2Q01 were "appropriate." Ex. 1 at 32. His entire opinion on this $700,000 claim is

as follows:

> Of the $10.6 million in transfers subject to my review, almost $700,000 of unapplied cash transferred to bad debt reserve during the second quarter of fiscal year 2001 related to certain royalties paid to Oracle. These amounts should have been recorded directly to revenue at the time payments were received, but were not. Therefore insofar as the result of the transfer of these amounts had a positive impact on income, that impact was appropriate.

*Id.*

Mr. O'Bryan's opinion that $700,000 in transfers were "appropriate" is entirely conclusory.

He provides no foundation or methodology for how he determined that the items "related to certain

royalties." He provides no explanation of which "certain" royalties he relied upon and how he

determined that the amounts "should have been recorded directly to revenue at the time the payments

were received." He does not cite or rely upon a single accounting principle, rule or standard in

forming his opinion. He simply concluded that (1) the $700,000 were royalties, (2) those royalties

---

[7]     Similarly, counsel for defendants refused to produce the list of 277 debit memos that Mr. O'Bryan claimed were refunded prior to November 17, 2000. Ex. 2 at 207-208.

1    "should have" been recorded as revenue, and (3) "therefore" the transfers were proper.  *Id.*  Such an

2    unsupported opinion, on its face, does not meet the requirements of Fed. R. Civ. P. 26(a)(2) or Fed.

3    R. Evid. 702.  *See Joiner*, 522 U.S. at 146 (The Court is not required "to admit opinion evidence

4    which is connected to the existing data only by the *ipse dixit* of the expert.").

5                              **b.       The $800,000 in Purportedly Appropriate Transfers
                                        Relating to "The Use of Credit Memos and/or Inclusion
6                                       in Oracle's General Bad Debt Reserve"**

7             Mr. O'Bryan opines that $800,000 in customer unapplied cash transfers to the bad debt

8    reserve in 2Q01 were "appropriate."  His entire opinion on these items is reproduced below:

9             [O]ver $800,000 of other transfers to the bad debt reserve during this period were
              appropriate, in that Oracle had already reduced its revenues for certain open and
10            unpaid invoices, either all or in part, through the use of credit memos and/or
              inclusion in Oracle's general bad debt reserve as of the second quarter of fiscal year
11            2001.

12   Ex. 1 at 33.  Similar to his opinion on the $700,000 in "royalty" payments cited above, Mr.

13   O'Bryan's opinion on the $800,000 items fails to cite a single document, deposition or supporting

14   data point upon which he relied to form his opinions.  *Id.*  There are no supporting footnotes citing to

15   evidence, as other parts of his report attempt to do.  *See id.* at 35-36.  He does not provide any data,

16   facts, or dates regarding the "certain" open and unpaid invoices and the "credit memos" that he cites.

17   He fails to provide any facts or foundation to support the conclusion that Oracle had "reduced its

18   revenues" for the "certain" invoices that he cites.  He fails to provide any methodology, let alone a

19   "reliable" one in determining which items were reduced via credit memos, and which items were

20   reduced via "inclusion" in the bad debt reserve.  Simply put, because Mr. O'Bryan does not provide

21   *any* foundational facts or analysis, it is difficult to understand what Mr. O'Bryan's opinion means.

22   This type of conclusory opinion will not help a jury understand the issues – it will only serve to

23   confuse them.  *See Joiner*, 522 U.S. at 146.

24                             **c.       The $500,000 in Purportedly Appropriate Transfers in
                                        the "Could Be" Bucket**

25

26            Mr. O'Bryan's opinion with respect to the final $500,000 of the $2 million total of

27   purportedly "appropriate" transfers of customer unapplied cash in 2Q01 is even less reliable than the

28   other $1.5 million cited above.  His entire opinion on those items is as follows:

"In addition to these above amounts, I found some evidence which suggests that at least another $500,000 of these transfers were appropriate, *although the evidence relating to these transfers is not as complete as the evidence I reviewed in connection with the $1.5 million in transfers noted above.* Thus, I believe there is evidence that at least $2.0 million of the $10.6 million transfers capable of review were appropriate."

*Id*. at 33.  Not only does Mr. O'Bryan admit that his opinion is "not as complete" as the unreliable conclusions on the other $1.5 million, but he also fails to cite any foundational facts, data, or evidence that would allow plaintiffs to test or even understand his conclusions.  He fails to provide any indication of what the "some evidence" is that he relied upon.  He fails to explain how that evidence "suggests" that the $500,000 transfers were appropriate.  He fails to even explain what general types of transactions this $500,000 relates to, other than admitting that the amount relates to 12 debit memos.  Ex. 2 at 203:15-17.  Mr. O'Bryan fails to cite a single footnote of evidence as he attempted to do in other sections of his report.

In fact, during his deposition Mr. O'Bryan admitted that his opinion was not conclusive or grounded in any proper foundation:

[A]. *[t]he notes were not conclusive for me, nor did I see any other type of support. We put that into a bucket of could be.*

Q.  Could be.  So you can't definitively say that $500,000 of transfers was proper; correct?

A.  *That's correct.*

*Id*. at 203:9-14.  Given Mr. O'Bryan's admissions above, his opinion on the $500,000 transfers should be summarily excluded.[8]  *See Joiner*, 522 U.S. at 146.

_____

[8]      In the four-page section of his report entitled "Oracle's Accounts Receivable Procedures," Mr. O'Bryan fails to cite a single document to support his opinion.  He relies almost entirely upon the testimony of the individuals who were involved in the financial misconduct, including Greg Myers and Michael Quinn, both of whom admittedly were involved in the November 2000 debit memo clean up and participated in Oracle's "clean up" project in October 2002.  Relying solely upon the self-serving testimony of a few individuals, without more, is not proper foundation under Fed. R. Evid. 702 and 703.

1       **4.**       **Mr. O'Bryan's Opinion Regarding the Materiality of Oracle's**
                         **2Q01 Financial Misstatements Is Speculative and Lacks**
2                          **Reliable Foundation**

3         Mr. O'Bryan's opinion concerning the materiality of Oracle's financial misstatements in

4 2Q01 boils down to the conclusion that reasonable investors would not have found it material if

5 Oracle reported $0.10 instead of $0.11 per share, and did not beat Wall Street's consensus earnings

6 expectations for 2Q01. Ex. 1 at 36-40. Mr. O'Bryan fails to provide any analysis or consideration in

7 his reports of the stock price reaction following the earnings report for the only other quarter during

8 the prior ten quarters in which Oracle merely met, rather than beat, Wall Street expectations. *Id*.

9         And while Mr. O'Bryan belatedly attempted to conduct a new analysis during his deposition,

10 his materiality opinion is based almost exclusively upon documents relied upon but not produced to

11 plaintiffs. Ex. 2 at 286:17-287:14. Indeed, when plaintiffs asked Mr. O'Bryan to explain the

12 methodology used for analyzing Oracle's historical trends and stock price movements relating to

13 materiality, he again resorted to documents and "work papers" that were never produced to

14 plaintiffs. *Id*. at 286:17-23 ("[D]id I do an analysis of Oracle's previous history of meeting or

15 beating expectations consensus. And my answer was yes. And I was looking for that exhibit. And

16 that's in my workpapers.")

17         In fact, when plaintiffs inquired about the details of his analysis and the documents he relied

18 upon, he could only point to his analyses, calculations and analyst reports that were in his "binder"

19 but were never produced to plaintiffs:

20              We looked on a quarter basis for first Q '99 all the way through second Q of
            '01 the actual consensus, analyst expectation, versus the actual reported amounts.
21             Then we looked at the stock price as it relates to the day that the earnings was
            released, and the day plus one, day plus three, and day plus five. We basically
22             looked at five different days after Oracle had released its earnings.

23 *Id*. at 288:1-14.

24         None of Mr. O'Bryan's "trend" analyses concerning materiality and Oracle's stock price

25 movements in various quarters were cited in either his opening or rebuttal reports. Further, Mr.

26 O'Bryan relied heavily upon numerous analyst reports, stock price "data points" and other

27 "surrounding circumstances" related to materiality:

28         Q. What were the surrounding circumstances that you looked at?

1

> A.   All of the information that was talked about in analyst reports, all of the
> information looked at with respect to meeting or beating in the stock price, four or
> five data points after that, the issue with respect to what's being restated, the
> percentage change in that potential restatement.  There was a multitude of things I
> looked at in the surrounding circumstances as SAB 99 suggests.

2

3

4   *Id.* at 302:12-21.  None of these facts or analyses are contained in Mr. O'Bryan's reports.  Ex. 2 at

5   286:17-289:5.  He did not mention any "data points" for determining the materiality of stock price

6   movements in his reports and failed to explain which analyst reports and "multitude of things" that

7   he relied upon to render his opinion on materiality.  Ex. 1 at 36-40.  His materiality opinions,

8   therefore, are improper and should be excluded.[9]

9       **C.**    **Mr. O'Bryan's Opinion on the Propriety of Oracle's Fraudulent**
                **Transaction with Hewlett Packard on the Last Day of 2Q01 Is**
                **Unreliable and Improper and Should Be Excluded**

10

11           **1.**    **Mr. O'Bryan's Opinion on the HP Transaction Is Not Based**
                **on Reliable Foundation or Methodology**

12

13   Mr. O'Bryan's expert opinion on the propriety of the HP Transaction in his opening report

14   consists of a ***single paragraph***:

15   > In the Supplemental Interrogatory Responses, Plaintiffs suggest that the HP
> transaction, whereby HP purchased software licenses and services from Oracle, had
> "little economic value" and allowed Oracle to achieve earnings per share of $0.11 in
> the second quarter of fiscal year 2001.  Plaintiffs have not offered any evidence to
> support this statement, and instead merely point out that the sale occurred on the last
> day of the quarter and that Oracle had also agreed to purchase product from HP.  I
> understand that HP purchased these additional software licenses so that it could
> complete a global roll-out of Oracle's Customer Relationship Management software.
> I note that AA, Oracle's prior financial statement auditors, specifically looked at the
> HP transaction from a revenue recognition perspective, and even discussed it with
> Oracle's Audit Committee on January 5, 2001.  AA did not recommend that any
> adjustment be made to the accounting for the HP transaction.  ***Based upon the***
> ***foregoing, I do not believe that there was anything improper in Oracle's***
> ***recognition of revenue from the HP transaction.***

16

17

18

19

20

21

22   Ex. 1 at 41-42 (footnotes omitted).

23

24

_____

25   [9]    Notably, when asked whether he considered the macroeconomic environment in forming his

26   opinion on materiality, Mr. O'Bryan stated that he considered the environment to be in "a ***bit*** of a
downturn."  In fact, between August 2000 and November 2000, the NASDAQ crashed over 1300

27   points or approximately 30% of its total market capitalization.  Mr. O'Bryan did not provide any
meaningful analysis or place any weight on those factors.  Ex. 2 at 284-285; Ex. 1 at 36-40.

28

1     During his deposition, Mr. O'Bryan admitted that his opinion on the HP Transaction in his

2 opening report was "light."  Ex. 2 at 56:8-22 (***And when I say light, it's simply a paragraph.***")  He

3 admitted that he never even read or considered the deposition transcript of Tom Rathjens, HP's

4 designated witness under Fed. R. Civ. P. 30(b)(6).  Ex. 2. at 324:24-325:1 ("Yeah I don't think I

5 looked at Mr. Rathjens' deposition prior to the issuance of this initial report.")  Mr. O'Bryan also

6 admitted that he did not review or consider the very documents that he later relied exclusively upon

7 in his rebuttal report (which were never produced to plaintiffs) before providing his expert opinion

8 on May 25, 2007.  Ex. 2 at 319:1-9.

9     Mr. O'Bryan's one-paragraph "opinion light" does not, on its face, meet the most

10 fundamental requirements of Fed. R. Civ. P. 26(a)(2)(B).  Mr. O'Bryan's opinion does not "contain a

11 ***complete*** statement of ***all*** opinions to be expressed and the ***basis and reasons therefor***."  *See id.*  In

12 fact, Mr. O'Bryan's "opinion" is not really his own opinion at all.  His entire opinion in his opening

13 report is based upon speculation about what other parties – specifically, the now defunct Arthur

14 Andersen –may have "looked at" or "discussed" with Oracle's audit committee and revenue team

15 seven years ago.  Ex. 1 at 41-42.

16     An expert's opinion may not, however, be based on the opinion of someone else, since such

17 other opinions do not constitute "facts reasonably relied upon by experts in the particular field."

18 *American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) ("Expert opinions

19 ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or

20 not."); *Taylor v. B. Heller & Co.*, 364 F.2d 608, 613 (6th Cir. 1966) (same); *accord 6816.5 Acres of

21 Land v. United States*, 411 F.2d 834, 839-40 (10th Cir. 1969) (on retrial, "the trial court must take

22 steps to exclude any expert opinion that is predicated upon another opinion").

23     The only evidence Mr. O'Bryan actually cites consists of *six pages* produced by Arthur

24 Andersen that were reviewed and filtered by Oracle's lawyers prior to being produced.  Mr. O'Bryan

25 does not provide any independent analysis of the documents and provides no foundation or

26 methodology for determining the propriety of the HP Transaction on his own.  As mentioned above,

27 Mr. O'Bryan did not even read the deposition transcript of the only HP witness in the entire case

28 prior to submitting his opening report.  Ex. 2 at 324:24-325:1.  Mr. O'Bryan relied solely on Arthur

1    Andersen and a vague reference to a "review" performed by Oracle about which Mr. O'Bryan does

2    not explain or analyze. Ex. 1 at 41. In fact, Mr. O'Bryan readily admits that HP's "person most

3    knowledgeable" and other testifying witnesses involved with the HP transaction were "irrelevant."

4    Ex. 2 at 59:19-22. ("[W]hat others said with respect to that was really, quite frankly, *irrelevant*, and

5    only additive to my opinion that that transaction was booked properly...."). This type of one-sided

6    and speculative analysis is not based on "reliable principle and methods" and therefore should be

7    excluded. *Kumho*, 526 U.S. at 148.

8          **D.    Mr. O'Bryan's Rebuttal Report on the HP Transaction Improperly**
                  **Relies Upon Documents Not Produced to Plaintiffs Until *After***
9                 **Rebuttal Reports Were Exchanged**

10         Realizing that his "light" opinion on the HP transaction was not sufficient under Fed. R. Civ.

11   P. 26(a)(2) and Fed. R. Evid. 702 and 703, Mr. O'Bryan attempted to cure this deficiency by

12   submitting a 26-page section of his rebuttal report on the HP transaction. *Compare* Ex. 1 at 41 *with*

13   Ex. 5 at 25-51. This fact alone demonstrates the deficiency of his initial opinion on the HP

14   Transaction. Most importantly, however, Mr. O'Bryan's 26-page rebuttal is based almost

15   exclusively upon 140 pages of new evidence, including e-mails and contractual documents

16   concerning the HP Transaction that were not produced to plaintiffs or their experts until after rebuttal

17   reports were filed. *See* Ex. 6.

18         Further, the new documents cited by Mr. O'Bryan consist of incomplete e-mails with missing

19   pages, and other documents with handwritten notes having no indicia of reliability. *Id*. Plaintiffs

20   requested all of the missing pages and incomplete information, but defendants expressly refused to

21   provide any further information. Accordingly, plaintiffs and their experts did not have the

22   opportunity to properly rebut Mr. O'Bryan's opinions because his entire opinion on the HP

23   transaction is based almost exclusively upon documents and information hand picked by Oracle ,

24   belatedly produced, and never disclosed to plaintiffs and their experts until ***after*** rebuttal reports

25   were exchanged on June 22, 2007.

26         Courts have held that "[t]he rebuttal expert report is no place for presenting new arguments,

27   unless presenting these arguments is substantially justified and causes no prejudice." *Baldwin*

28   *Graphic Sys., Inc. v. Siebert, Inc.*, No. 03 C 7713, 2005 U.S. Dist. LEXIS 10692, at *5 (N.D. Ill.

1   Feb. 22, 2005).  Additional information contained in an expert's rebuttal report which should have

2   been included in the direct report cannot cure the deficiencies of the expert's direct report.  *Atmel*

3   *Corp. v. Information Storage,* 189 F.R.D. 410, 411 (N.D. Cal. 1999).  Mr. O'Bryan's attempt to

4   present 26 pages of new opinions based on previously undisclosed evidence and information is

5   unfair surprise and violates the fundamental tenets of the expert witness discovery rules which "are

6   designed to aid the court in its fact-finding mission by allowing both sides to prepare their cases

7   adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the

8   case." *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000).  Accordingly, Mr. O'Bryan's opinions

9   on the HP transaction should be excluded.

10   **E.      Mr. O'Bryan's Failure to Disclose the Exclusion of His Prior Expert
              Testimony Evidences a Lack of Candor**

11

12            The reliability of Mr. O'Bryan's testimony is further called into question by his misleading

13   deposition testimony concerning a prior case in which his expert testimony was excluded.  During

14   his deposition, Mr. O'Bryan was asked pointedly about whether his prior testimony had ever been

      excluded in any case:

15
            Q.  *Has your testimony in any case in the past five years ever been excluded by the*
16              *court?*

17          A.  *No.*

18          Q.  *Never?*

19          A.  *No.*

20   Ex. 2 at 35:15-19.

21            This testimony was false.  In fact, Mr. O'Bryan's sworn expert testimony was excluded in

22   2003 by a California state court judge for being "*unduly speculative and therefore insufficient*."

23   *See* Ex. 7 (*Farnham v. Rehwald*, 2005 Cal. App. Unpub. LEXIS 3107, *19 (Cal. App. 2005)).  The

24   lower court's ruling was subsequently upheld by the California Court of Appeals.  Ex. 7 at 5.  ("*The*

25   *trial court's exclusion of O'Bryan's testimony was neither arbitrary nor capricious and certainly*

26   *did not 'exceed the bounds of reason.'*").

27            When confronted with the foregoing evidence, Mr. O'Bryan feigned ignorance about what

28   the phrase "testimony in any case in the past five years" means:

1    Q. Is there a reason you didn't disclose this earlier when I asked you if your
     testimony had been excluded before?

2

3    A. Yeah, because I never testified in court. I gave a deposition, and apparently the
     judge was not – the judge made this ruling without even hearing my testimony, other
     than my deposition. I never testified in court.

4

5    Q. But you testified in a deposition; right?

6    A. Yeah. No. When I heard your question this morning, has any of my testimony
     ever been excluded, I thought you meant as far as trial testimony. I'm aware of the
     fact that I gave a deposition, and this court decided it did not want to hear my
7    testimony.

8    Ex. 2 at 130:7-20.  Mr. O'Bryan's unconvincing explanation of his failure to disclose the exclusion

9    of his testimony in *Farnham* demonstrates a lack of candor and is another reason to exclude his

10   unsupported and unreliable testimony in this case.

11   **III.    CONCLUSION**

12          Based on the foregoing, plaintiffs' motion should be granted.

13   DATED:  October 20, 2008              Respectfully submitted,

14                                         COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
15                                         SHAWN A. WILLIAMS
                                           WILLOW E. RADCLIFFE
16                                         ELI R. GREENSTEIN
                                           DANIEL J. PFEFFERBAUM

17

18
                                                   s/ Eli R. Greenstein
19                                         ELI R. GREENSTEIN

20                                         100 Pine Street, Suite 2600
                                           San Francisco, CA  94111
21                                         Telephone:  415/288-4545
                                           415/288-4534 (fax)

22

23

24

25

26

27

28

1

2          COUGHLIN STOIA GELLER
              RUDMAN & ROBBINS LLP
3          MARK SOLOMON
           DOUGLAS R. BRITTON
4          655 West Broadway, Suite 1900
           San Diego, CA  92101
5          Telephone:  619/231-1058
           619/231-7423 (fax)

6          COUGHLIN STOIA GELLER
              RUDMAN & ROBBINS LLP
7          STACEY M. KAPLAN
           9601 Wilshire Blvd., Suite 510
8          Los Angeles, CA  90210
           Telephone:  310/859-3100
9          310/278-2148 (fax)

10         Lead Counsel for Plaintiffs

11    C:\Program Files\pdfDocs\users\PamelaJ\Import\MTN00054941.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 20, 2008.

 s/ Eli R. Greenstein
ELI R. GREENSTEIN
COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: elig@csgrr.com

## Mailing Information for a Case 3:01-cv-00988-SI

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Doug Britton**
  dougb@csgrr.com,jillk@csgrr.com,ldeem@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Joy Ann Bull**
  JOYB@csgrr.com

- **Dorian Estelle Daley**
  dorian.daley@oracle.com

- **Patrick Edward Gibbs**
  patrick.gibbs@lw.com,svdocket@lw.com,zoila.aurora@lw.com

- **Eli Greenstein**
  Elig@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Tera Marie Heintz**
  theintz@morganlewis.com,eeberline@morganlewis.com

- **Stacey Marie Kaplan**
  SKaplan@csgrr.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com

- **Michele Frances Kyrouz**
  michele.kyrouz@lw.com,#sfdocket@lw.com

- **Nicole Catherine Lavallee**
  nlavallee@bermanesq.com,ysoboleva@bermanesq.com

- **William S. Lerach**
  e_file_sd@lerachlaw.com

- **James C. Maroulis**
  jim.maroulis@oracle.com

- **Caroline McIntyre**
  cmcintyre@be-law.com,swalker@be-law.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Shinyung Oh**
  shinyungoh@paulhastings.com

- **Dawn S. Pittman**
  dpittman@morganlewis.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Mark Solomon**
  marks@csgrr.com,e_file_sf@csgrr.com,sholloway@csgrr.com,e_file_sd@csgrr.com

- **Edward W. Swanson**
  eswanson@swansonmcnamara.com

- **Shawn A. Williams**
  shawnw@csgrr.com,dpfefferbaum@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

- **Jamie Lynne Wine**
  jamie.wine@lw.com,karen.kelly@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Corey D. Holzer**
Holzer Holzer & Cannon LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

**Raymond Lane**
Bergeson LLP
303 Almaden Blvd., Ste. 500
San Jose, CA 95110

**PRG-Schultz USA, Inc.**
Paul Hastings Janofsky & Walker LLP
55 Second Street
24th Floor
San Francisco, CA 94105

**Darren Jay Robbins**
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

**Sanna Rachel Singer**
Sideman & Bancroft LLP
One Embarcadero Center, 8th Floor
San Francisco, CA 94111

**Monique C. Winkler**
Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111