# EXHIBIT 18



Home | Previous Page

## U.S. Securities and Exchange Commission

## SEC Staff Accounting Bulletin:
## No. 99 – Materiality

SECURITIES AND EXCHANGE COMMISSION
17 CFR Part 211
[Release No. SAB 99]
Staff Accounting Bulletin No. 99

**AGENCY:** Securities and Exchange Commission

**ACTION:** Publication of Staff Accounting Bulletin

**SUMMARY:** This staff accounting bulletin expresses the views of the staff that exclusive reliance on certain quantitative benchmarks to assess materiality in preparing financial statements and performing audits of those financial statements is inappropriate; misstatements are not immaterial simply because they fall beneath a numerical threshold.

**DATE:** August 12, 1999

**FOR FURTHER INFORMATION CONTACT:** W. Scott Bayless, Associate Chief Accountant, or Robert E. Burns, Chief Counsel, Office of the Chief Accountant (202-942-4400), or David R. Fredrickson, Office of General Counsel (202-942-0900), Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549-1103; electronic addresses: BaylessWS@sec.gov; BurnsR@sec.gov; FredricksonD@sec.gov.

**SUPPLEMENTARY INFORMATION:** The statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws.

Jonathan G. Katz

Secretary

Date: August 12, 1999

Part 211 - (AMEND) Accordingly, Part 211 of Title 17 of the Code of Federal Regulations is amended by adding Staff Accounting Bulletin No. 99 to the table found in Subpart B.

### STAFF ACCOUNTING BULLETIN NO. 99

The staff hereby adds Section M to Topic 1 of the Staff Accounting Bulletin Series. Section M, entitled "Materiality," provides guidance in applying materiality thresholds to the preparation of financial statements filed with the Commission and the performance of audits of those financial statements.

### STAFF ACCOUNTING BULLETINS

### TOPIC 1: FINANCIAL STATEMENTS

\* \* \* \* \*

M. Materiality

### 1. Assessing Materiality

**Facts**: During the course of preparing or auditing year-end financial statements, financial management or the registrant's independent auditor becomes aware of misstatements in a registrant's financial statements. When combined, the misstatements result in a 4% overstatement of net income and a $.02 (4%) overstatement of earnings per share. Because no item in the registrant's consolidated financial statements is misstated by more than 5%, management and the independent auditor conclude that the deviation from generally accepted accounting principles ("GAAP") is immaterial and that the accounting is permissible.[1]

**Question**: Each Statement of Financial Accounting Standards adopted by the Financial Accounting Standards Board ("FASB") states, "The provisions of this Statement need not be applied to immaterial items." In the staff's view, may a registrant or the auditor of its financial statements assume the immateriality of items that fall below a percentage threshold set by management or the auditor to determine whether amounts and items are material to the financial statements?

**Interpretive Response**: No. The staff is aware that certain registrants, over time, have developed quantitative thresholds as "rules of thumb" to assist in the preparation of their financial statements, and that auditors also have used these thresholds in their evaluation of whether items might be considered material to users of a registrant's financial statements. One rule of thumb in particular suggests that the misstatement or omission[2] of an item that falls under a 5% threshold is not material in the absence of particularly egregious circumstances, such as self-dealing or misappropriation by senior management. The staff reminds registrants and the auditors of their financial statements that exclusive reliance on this or any percentage or numerical threshold has no basis in the accounting literature or the law.

The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material. The staff has no objection to such a "rule of thumb" as an initial step in assessing materiality. But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a

full analysis of all relevant considerations. Materiality concerns the significance of an item to users of a registrant's financial statements. A matter is "material" if there is a substantial likelihood that a reasonable person would consider it important. In its Statement of Financial Accounting Concepts No. 2, the FASB stated the essence of the concept of materiality as follows:

The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.[3]

This formulation in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws. The Supreme Court has held that a fact is material if there is –

a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. [4]

Under the governing principles, an assessment of materiality requires that one views the facts in the context of the "surrounding circumstances," as the accounting literature puts it, or the "total mix" of information, in the words of the Supreme Court. In the context of a misstatement of a financial statement item, while the "total mix" includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item. The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both "quantitative" and "qualitative" factors in assessing an item's materiality.[5] Court decisions, Commission rules and enforcement actions, and accounting and auditing literature[6] have all considered "qualitative" factors in various contexts.

The FASB has long emphasized that materiality cannot be reduced to a numerical formula. In its Concepts Statement No. 2, the FASB noted that some had urged it to promulgate quantitative materiality guides for use in a variety of situations. The FASB rejected such an approach as representing only a "minority view," stating –

The predominant view is that materiality judgments can properly be made only by those who have all the facts. The Board's present position is that no general standards of materiality could be formulated to take into account all the considerations that enter into an experienced human judgment. [7]

The FASB noted that, in certain limited circumstances, the Commission and other authoritative bodies had issued quantitative materiality guidance, citing as examples guidelines ranging from one to ten percent with respect to a variety of disclosures.[8] And it took account of contradictory studies, one showing a lack of uniformity among auditors on materiality judgments, and another suggesting widespread use of a "rule of thumb" of five to ten percent of net income.[9] The FASB also considered whether an evaluation of materiality could be based solely on anticipating the market's reaction to

accounting information.[10]

The FASB rejected a formulaic approach to discharging "the onerous duty of making materiality decisions"[11] in favor of an approach that takes into account all the relevant considerations. In so doing, it made clear that –

[M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.[12]

Evaluation of materiality requires a registrant and its auditor to consider *all* the relevant circumstances, and the staff believes that there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material; as stated in the auditing literature:

As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements.[13]

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

- whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate[14]

- whether the misstatement masks a change in earnings or other trends

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

- whether the misstatement changes a loss into income or vice versa

- whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability

- whether the misstatement affects the registrant's compliance with regulatory requirements

- whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements

- whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation

- whether the misstatement involves concealment of an unlawful transaction.

Case 3:01-cv-00988-SI   Document 1549-16   Filed 11/17/08   Page 6 of 66

SEC Staff Accounting Bulletin. No. 99: Materiality                                    Page 5 of 14

This is not an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement.[15] Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material. Consideration of potential market reaction to disclosure of a misstatement is by itself "too blunt an instrument to be depended on" in considering whether a fact is material.[16] When, however, management or the independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material.[17]

For the reasons noted above, the staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial.[18] While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings. In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.[19] The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings. Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.

The materiality of a misstatement may turn on where it appears in the financial statements. For example, a misstatement may involve a segment of the registrant's operations. In that instance, in assessing materiality of a misstatement to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole.[20] "A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity"[21] is more likely to be material to investors than a misstatement in a segment that management has not identified as especially important. In assessing the materiality of misstatements in segment information - as with materiality generally -

situations may arise in practice where the auditor will conclude that a matter relating to segment information is qualitatively material even though, in his or her judgment, it is quantitatively immaterial to the financial statements taken as a whole.[22]

### *Aggregating and Netting Misstatements*

In determining whether multiple misstatements cause the financial statements to be materially misstated, registrants and the auditors of their financial statements should consider each misstatement separately and the aggregate effect of all misstatements.[23] A registrant and its auditor should

evaluate misstatements in light of quantitative and qualitative factors and "consider whether, in relation to individual line item amounts, subtotals, or totals in the financial statements, they materially misstate the financial statements taken as a whole."[24] This requires consideration of -

the significance of an item to a particular entity (for example, inventories to a manufacturing company), the pervasiveness of the misstatement (such as whether it affects the presentation of numerous financial statement items), and the effect of the misstatement on the financial statements taken as a whole ....[25]

Registrants and their auditors first should consider whether each misstatement is material, irrespective of its effect when combined with other misstatements. The literature notes that the analysis should consider whether the misstatement of "individual amounts" causes a material misstatement of the financial statements taken as a whole. As with materiality generally, this analysis requires consideration of both quantitative and qualitative factors.

If the misstatement of an individual amount causes the financial statements as a whole to be materially misstated, that effect cannot be eliminated by other misstatements whose effect may be to diminish the impact of the misstatement on other financial statement items. To take an obvious example, if a registrant's revenues are a material financial statement item and if they are materially overstated, the financial statements taken as a whole will be materially misleading even if the effect on earnings is completely offset by an equivalent overstatement of expenses.

Even though a misstatement of an individual amount may not cause the financial statements taken as a whole to be materially misstated, it may nonetheless, when aggregated with other misstatements, render the financial statements taken as a whole to be materially misleading. Registrants and the auditors of their financial statements accordingly should consider the effect of the misstatement on subtotals or totals. The auditor should aggregate all misstatements that affect each subtotal or total and consider whether the misstatements in the aggregate affect the subtotal or total in a way that causes the registrant's financial statements taken as a whole to be materially misleading.[26]

The staff believes that, in considering the aggregate effect of multiple misstatements on a subtotal or total, registrants and the auditors of their financial statements should exercise particular care when considering whether to offset (or the appropriateness of offsetting) a misstatement of an estimated amount with a misstatement of an item capable of precise measurement. As noted above, assessments of materiality should never be purely mechanical; given the imprecision inherent in estimates, there is by definition a corresponding imprecision in the aggregation of misstatements involving estimates with those that do not involve an estimate.

Registrants and auditors also should consider the effect of misstatements from prior periods on the current financial statements. For example, the auditing literature states,

Matters underlying adjustments proposed by the auditor but not recorded by the entity could potentially cause future financial statements to be

materially misstated, even though the auditor has concluded that the adjustments are not material to the current financial statements.[27]

This may be particularly the case where immaterial misstatements recur in several years and the cumulative effect becomes material in the current year.

### 2. Immaterial Misstatements That are Intentional

**Facts**: A registrant's management intentionally has made adjustments to various financial statement items in a manner inconsistent with GAAP. In each accounting period in which such actions were taken, none of the individual adjustments is by itself material, nor is the aggregate effect on the financial statements taken as a whole material for the period. The registrant's earnings "management" has been effected at the direction or acquiescence of management in the belief that any deviations from GAAP have been immaterial and that accordingly the accounting is permissible.

**Question**: In the staff's view, may a registrant make intentional immaterial misstatements in its financial statements?

**Interpretive Response**: No. In certain circumstances, intentional immaterial misstatements are unlawful.

### *Considerations of the Books and Records Provisions Under the Exchange Act*

Even If misstatements are immaterial,[28] registrants must comply with Sections 13(b)(2) - (7) of the Securities Exchange Act of 1934 (the "Exchange Act").[29] Under these provisions, each registrant with securities registered pursuant to Section 12 of the Exchange Act,[30] or required to file reports pursuant to Section 15(d),[31] must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.[32] In this context, determinations of what constitutes "reasonable assurance" and "reasonable detail" are based not on a "materiality" analysis but on the level of detail and degree of assurance that would satisfy prudent officials in the conduct of their own affairs.[33] Accordingly, failure to record accurately immaterial items, in some instances, may result in violations of the securities laws.

The staff recognizes that there is limited authoritative guidance[34] regarding the "reasonableness" standard in Section 13(b)(2) of the Exchange Act. A principal statement of the Commission's policy in this area is set forth in an address given in 1981 by then Chairman Harold M. Williams.[35] In his address, Chairman Williams noted that, like materiality, "reasonableness" is not an "absolute standard of exactitude for corporate records."[36] Unlike materiality, however, "reasonableness" is not solely a measure of the significance of a financial statement item to investors. "Reasonableness," in this context, reflects a judgment as to whether an issuer's failure to correct a known misstatement implicates the purposes underlying the accounting

provisions of Sections 13(b)(2) - (7) of the Exchange Act.$\frac{37}{}$

In assessing whether a misstatement results in a violation of a registrant's obligation to keep books and records that are accurate "in reasonable detail," registrants and their auditors should consider, in addition to the factors discussed above concerning an evaluation of a misstatement's potential materiality, the factors set forth below.

- **The significance of the misstatement**. Though the staff does not believe that registrants need to make finely calibrated determinations of significance with respect to immaterial items, plainly it is "reasonable" to treat misstatements whose effects are clearly inconsequential differently than more significant ones.

- **How the misstatement arose**. It is unlikely that it is ever "reasonable" for registrants to record misstatements or not to correct known misstatements – even immaterial ones – as part of an ongoing effort directed by or known to senior management for the purposes of "managing" earnings. On the other hand, insignificant misstatements that arise from the operation of systems or recurring processes in the normal course of business generally will not cause a registrant's books to be inaccurate "in reasonable detail."$\frac{38}{}$

- **The cost of correcting the misstatement**. The books and records provisions of the Exchange Act do not require registrants to make major expenditures to correct small misstatements.$\frac{39}{}$ Conversely, where there is little cost or delay involved in correcting a misstatement, failing to do so is unlikely to be "reasonable."

- **The clarity of authoritative accounting guidance with respect to the misstatement**. Where reasonable minds may differ about the appropriate accounting treatment of a financial statement item, a failure to correct it may not render the registrant's financial statements inaccurate "in reasonable detail." Where, however, there is little ground for reasonable disagreement, the case for leaving a misstatement uncorrected is correspondingly weaker.

There may be other indicators of "reasonableness" that registrants and their auditors may ordinarily consider. Because the judgment is not mechanical, the staff will be inclined to continue to defer to judgments that "allow a business, acting in good faith, to comply with the Act's accounting provisions in an innovative and cost-effective way."$\frac{40}{}$

### The Auditor's Response to Intentional Misstatements

Section 10A(b) of the Exchange Act requires auditors to take certain actions upon discovery of an "illegal act."$\frac{41}{}$ The statute specifies that these obligations are triggered "whether or not [the illegal acts are] perceived to have a material effect on the financial statements of the issuer . . . ." Among other things, Section 10A(b)(1) requires the auditor to inform the appropriate level of management of an illegal act (unless clearly inconsequential) and assure that the registrant's audit committee is "adequately informed" with respect to the illegal act.

As noted, an intentional misstatement of immaterial items in a registrant's financial statements may violate Section 13(b)(2) of the Exchange Act and thus be an illegal act. When such a violation occurs, an auditor must take steps to see that the registrant's audit committee is "adequately informed" about the illegal act. Because Section 10A(b)(1) is triggered regardless of whether an illegal act has a material effect on the registrant's financial statements, where the illegal act consists of a misstatement in the registrant's financial statements, the auditor will be required to report that illegal act to the audit committee irrespective of any "netting" of the misstatements with other financial statement items.

The requirements of Section 10A echo the auditing literature. See, for example, Statement on Auditing Standards No. ("SAS") 54, "Illegal Acts by Clients," and SAS 82, "Consideration of Fraud in a Financial Statement Audit." Pursuant to paragraph 38 of SAS 82, if the auditor determines there is evidence that fraud may exist, the auditor must discuss the matter with the appropriate level of management. The auditor must report directly to the audit committee fraud involving senior management and fraud that causes a material misstatement of the financial statements. Paragraph 4 of SAS 82 states that "misstatements arising from fraudulent financial reporting are intentional misstatements or omissions of amounts or disclosures in financial statements to deceive financial statement users."[42] SAS 82 further states that fraudulent financial reporting may involve falsification or alteration of accounting records; misrepresenting or omitting events, transactions or other information in the financial statements; and the intentional misapplication of accounting principles relating to amounts, classifications, the manner of presentation, or disclosures in the financial statements.[43] The clear implication of SAS 82 is that immaterial misstatements may be fraudulent financial reporting. [44]

Auditors that learn of intentional misstatements may also be required to (1) re-evaluate the degree of audit risk involved in the audit engagement, (2) determine whether to revise the nature, timing, and extent of audit procedures accordingly, and (3) consider whether to resign.[45]

Intentional misstatements also may signal the existence of reportable conditions or material weaknesses in the registrant's system of internal accounting control designed to detect and deter improper accounting and financial reporting.[46] As stated by the National Commission on Fraudulent Financial Reporting, also known as the Treadway Commission, in its 1987 report,

The tone set by top management - the corporate environment or culture within which financial reporting occurs - is the most important factor contributing to the integrity of the financial reporting process. Notwithstanding an impressive set of written rules and procedures, if the tone set by management is lax, fraudulent financial reporting is more likely to occur.[47]

An auditor is required to report to a registrant's audit committee any reportable conditions or material weaknesses in a registrant's system of internal accounting control that the auditor discovers in the course of the examination of the registrant's financial statements. [48]

### *GAAP Precedence Over Industry Practice*

Some have argued to the staff that registrants should be permitted to follow an industry accounting practice even though that practice is inconsistent with authoritative accounting literature. This situation might occur if a practice is developed when there are few transactions and the accounting results are clearly inconsequential, and that practice never changes despite a subsequent growth in the number or materiality of such transactions. The staff disagrees with this argument. Authoritative literature takes precedence over industry practice that is contrary to GAAP.[49]

### General Comments

This SAB is not intended to change current law or guidance in the accounting or auditing literature.[50] This SAB and the authoritative accounting literature cannot specifically address all of the novel and complex business transactions and events that may occur. Accordingly, registrants may account for, and make disclosures about, these transactions and events based on analogies to similar situations or other factors. The staff may not, however, always be persuaded that a registrant's determination is the most appropriate under the circumstances. When disagreements occur after a transaction or an event has been reported, the consequences may be severe for registrants, auditors, and, most importantly, the users of financial statements who have a right to expect consistent accounting and reporting for, and disclosure of, similar transactions and events. The staff, therefore, encourages registrants and auditors to discuss on a timely basis with the staff proposed accounting treatments for, or disclosures about, transactions or events that are not specifically covered by the existing accounting literature.

----

### Footnotes

1  American Institute of Certified Public Accountants ("AICPA"), Codification of Statements on Auditing Standards ("AU") § 312, "Audit Risk and Materiality in Conducting an Audit," states that the auditor should consider audit risk and materiality both in (a) planning and setting the scope for the audit and (b) evaluating whether the financial statements taken as a whole are fairly presented in all material respects in conformity with generally accepted accounting principles. The purpose of this Staff Accounting Bulletin ("SAB") is to provide guidance to financial management and independent auditors with respect to the evaluation of the materiality of misstatements that are identified in the audit process or preparation of the financial statements (i.e., (b) above). This SAB is not intended to provide definitive guidance for assessing "materiality" in other contexts, such as evaluations of auditor independence, as other factors may apply. There may be other rules that address financial presentation. See, e.g., Rule 2a-4, 17 CFR 270.2a-4, under the Investment Company Act of 1940.

2  As used in this SAB, "misstatement" or "omission" refers to a financial statement assertion that would not be in conformity with GAAP.

3  FASB, Statement of Financial Accounting Concepts No. 2, Qualitative Characteristics of Accounting Information ("Concepts Statement No. 2"), 132 (1980). See also Concepts Statement No. 2, Glossary of Terms - Materiality.

4  TSC Industries v. Northway, Inc., 426 U.S. 438, 449 (1976). See also Basic, Inc. v. Levinson, 485 U.S. 224 (1988). As the Supreme Court has noted, determinations of materiality require "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the

significance of those inferences to him . . . ." TSC Industries, 426 U.S. at 450.

5   See, e.g., Concepts Statement No. 2, 123-124; AU § 312.10 (" . . . materiality
    judgments are made in light of surrounding circumstances and necessarily
    involve both quantitative and qualitative considerations."); AU § 312.34
    ("Qualitative considerations also influence the auditor in reaching a conclusion
    as to whether misstatements are material."). As used in the accounting
    literature and in this SAB, "qualitative" materiality refers to the surrounding
    circumstances that inform an investor's evaluation of financial statement
    entries. Whether events may be material to investors for non-financial reasons
    is a matter not addressed by this SAB.

6   See, e.g., Rule 1-02(o) of Regulation S-X, 17 CFR 210.1-02(o), Rule 405 of
    Regulation C, 17 CFR 230.405, and Rule 12b-2, 17 CFR 240.12b-2; AU §§
    312.10 - .11, 317.13, 411.04 n. 1, and 508.36; In re Kidder Peabody
    Securities Litigation, 10 F. Supp. 2d 398 (S.D.N.Y. 1998); Parnes v. Gateway
    2000, Inc., 122 F.3d 539 (8th Cir. 1997); In re Westinghouse Securities
    Litigation, 90 F.3d 696 (3d Cir. 1996); In the Matter of W.R. Grace & Co.,
    Accounting and Auditing Enforcement Release No. ("AAER") 1140 (June 30,
    1999); In the Matter of Eugene Gaughan, AAER 1141 (June 30, 1999); In the
    Matter of Thomas Scanlon, AAER 1142 (June 30, 1999); and In re Sensormatic
    Electronics Corporation, Sec. Act Rel. No. 7518 (March 25, 1998).

7   Concepts Statement No. 2, 131 (1980).

8   Concepts Statement No. 2, 131 and 166.

9   Concepts Statement No. 2, 167.

10  Concepts Statement No. 2, 168-69.

11  Concepts Statement No. 2, 170.

12  Concepts Statement No. 2, 125.

13  AU § 312.11.

14  As stated in Concepts Statement No. 2, 130:
    Another factor in materiality judgments is the degree of precision that is
    attainable in estimating the judgment item. The amount of deviation that is
    considered immaterial may increase as the attainable degree of precision
    decreases. For example, accounts payable usually can be estimated more
    accurately than can contingent liabilities arising from litigation or threats of it,
    and a deviation considered to be material in the first case may be quite trivial
    in the second. This SAB is not intended to change current law or guidance in
    the accounting literature regarding accounting estimates. See, e.g., Accounting
    Principles Board Opinion No. 20, Accounting Changes 10, 11, 31-33 (July
    1971).

15  The staff understands that the Big Five Audit Materiality Task Force ("Task
    Force") was convened in March of 1998 and has made recommendations to the
    Auditing Standards Board including suggestions regarding communications with
    audit committees about unadjusted misstatements. See generally Big Five
    Audit Materiality Task Force, "Materiality in a Financial Statement Audit –
    Considering Qualitative Factors When Evaluating Audit Findings" (August
    1998). The Task Force memorandum is available at www.aicpa.org.

16  See Concepts Statement No. 2, 169.

17  If management does not expect a significant market reaction, a misstatement
    still may be material and should be evaluated under the criteria discussed in
    this SAB.

18  Intentional management of earnings and intentional misstatements, as used in
    this SAB, do not include insignificant errors and omissions that may occur in
    systems and recurring processes in the normal course of business. See notes
    38 and 50 infra.

19  Assessments of materiality should occur not only at year-end, but also during
    the preparation of each quarterly or interim financial statement. See, e.g., In
    the Matter of Venator Group, Inc., AAER 1049 (June 29, 1998).

20 See, e.g., In the Matter of W.R. Grace & Co., AAER 1140 (June 30, 1999).

21 AUI § 326.33.

22 Id.

23 The auditing literature notes that the "concept of materiality recognizes that some matters, either individually or in the aggregate, are important for fair presentation of financial statements in conformity with generally accepted accounting principles." AU § 312.03. See also AU § 312.04.

24 AU § 312.34. Quantitative materiality assessments often are made by comparing adjustments to revenues, gross profit, pretax and net income, total assets, stockholders' equity, or individual line items in the financial statements. The particular items in the financial statements to be considered as a basis for the materiality determination depend on the proposed adjustment to be made and other factors, such as those identified in this SAB. For example, an adjustment to inventory that is immaterial to pretax income or net income may be material to the financial statements because it may affect a working capital ratio or cause the registrant to be in default of loan covenants.

25 AU § 508.36.

26 AU § 312.34

27 AU § 380.09.

28 FASB Statements of Financial Accounting Standards ("Standards" or "Statements") generally provide that "[t]he provisions of this Statement need not be applied to immaterial items." This SAB is consistent with that provision of the Statements. In theory, this language is subject to the interpretation that the registrant is free intentionally to set forth immaterial items in financial statements in a manner that plainly would be contrary to GAAP if the misstatement were material. The staff believes that the FASB did not intend this result.

29 15 U.S.C. §§ 78m(b)(2) - (7).

30 15 U.S.C. § 78l.

31 15 U.S.C. § 78o(d).

32 Criminal liability may be imposed if a person knowingly circumvents or knowingly fails to implement a system of internal accounting controls or knowingly falsifies books, records or accounts. 15 U.S.C. §§ 78m(4) and (5). See also Rule 13b2-1 under the Exchange Act, 17 CFR 240.13b2-1, which states, "No person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act."

33 15 U.S.C. § 78m(b)(7). The books and records provisions of section 13(b) of the Exchange Act originally were passed as part of the Foreign Corrupt Practices Act ("FCPA"). In the conference committee report regarding the 1988 amendments to the FCPA, the committee stated,

The conference committee adopted the prudent man qualification in order to clarify that the current standard does not connote an unrealistic degree of exactitude or precision. The concept of reasonableness of necessity contemplates the weighing of a number of relevant factors, including the costs of compliance.

Cong. Rec. H2116 (daily ed. April 20, 1988).

34 So far as the staff is aware, there is only one judicial decision that discusses Section 13(b)(2) of the Exchange Act in any detail, SEC v. World-Wide Coin Investments, Ltd., 567 F. Supp. 724 (N.D. Ga. 1983), and the courts generally have found that no private right of action exists under the accounting and books and records provisions of the Exchange Act. See e.g., Lamb v. Phillip Morris Inc., 915 F.2d 1024 (6th Cir. 1990) and JS Service Center Corporation v. General Electric Technical Services Company, 937 F. Supp. 216 (S.D.N.Y.

1996).

<u>35</u> The Commission adopted the address as a formal statement of policy in Securities Exchange Act Release No. 17500 (January 29, 1981), 46 FR 11544 (February 9, 1981), 21 SEC Docket 1466 (February 10, 1981).

<u>36</u> Id. at 46 FR 11546.

<u>37</u> Id.

<u>38</u> For example, the conference report regarding the 1988 amendments to the FCPA stated,

The Conferees intend to codify current Securities and Exchange Commission (SEC) enforcement policy that penalties not be imposed for insignificant or technical infractions or inadvertent conduct. The amendment adopted by the Conferees [Section 13(b)(4)] accomplishes this by providing that criminal penalties shall not be imposed for failing to comply with the FCPA's books and records or accounting provisions. This provision [Section 13(b)(5)] is meant to ensure that criminal penalties would be imposed where acts of commission or omission in keeping books or records or administering accounting controls have the purpose of falsifying books, records or accounts, or of circumventing the accounting controls set forth in the Act. This would include the deliberate falsification of books and records and other conduct calculated to evade the internal accounting controls requirement.

Cong. Rec. H2115 (daily ed. April 20, 1988).

<u>39</u> As Chairman Williams noted with respect to the internal control provisions of the FCPA, "[t]housands of dollars ordinarily should not be spent conserving hundreds." 46 FR 11546.

<u>40</u> Id., at 11547.

<u>41</u> Section 10A(f) defines, for purposes of Section 10A, an "illegal act" as "an act or omission that violates any law, or any rule or regulation having the force of law." This is broader than the definition of an "illegal act" in AU § 317.02, which states, "Illegal acts by clients do not include personal misconduct by the entity's personnel unrelated to their business activities."

<u>42</u> AU § 316.04. See also AU § 316.03. An unintentional illegal act triggers the same procedures and considerations by the auditor as a fraudulent misstatement if the illegal act has a direct and material effect on the financial statements. See AU §§ 110 n. 1, 316 n. 1, 317.05 and 317.07. Although distinguishing between intentional and unintentional misstatements is often difficult, the auditor must plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatements in either case. See AU § 316 note 3.

<u>43</u> AU § 316.04. Although the auditor is not required to plan or perform the audit to detect misstatements that are immaterial to the financial statements, SAS 82 requires the auditor to evaluate several fraud "risk factors" that may bring such misstatements to his or her attention. For example, an analysis of fraud risk factors under SAS 82 must include, among other things, consideration of management's interest in maintaining or increasing the registrant's stock price or earnings trend through the use of unusually aggressive accounting practices, whether management has a practice of committing to analysts or others that it will achieve unduly aggressive or clearly unrealistic forecasts, and the existence of assets, liabilities, revenues, or expenses based on significant estimates that involve unusually subjective judgments or uncertainties. See AU §§ 316.17a and .17c.

<u>44</u> AU §§ 316.34 and 316.35, in requiring the auditor to consider whether fraudulent misstatements are material, and in requiring differing responses depending on whether the misstatement is material, make clear that fraud can involve immaterial misstatements. Indeed, a misstatement can be "inconsequential" and still involve fraud.

Case 3:01-cv-0098?-SI Document 1549-16 Filed 11/17/08 Page 15 of 66

SEC Staff Accounting Bulletin 。 99: Materiality                                    Page 14 of 14

Under SAS 82, assessing whether misstatements due to fraud are material to the financial statements is a "cumulative process" that should occur both during and at the completion of the audit. SAS 82 further states that this accumulation is primarily a "qualitative matter" based on the auditor's judgment. AU § 316.33. The staff believes that in making these assessments, management and auditors should refer to the discussion in Part 1 of this SAB.

[45] AU §§ 316.34 and 316.36. Auditors should document their determinations in accordance with AU §§ 316.37, 319.57, 339, and other appropriate sections.

[46] See, e.g., AU § 316.39.

[47] Report of the National Commission on Fraudulent Financial Reporting at 32 (October 1987). See also Report and Recommendations of the Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees (February 8, 1999).

[48] AU § 325.02. See also AU § 380.09, which, in discussing matters to be communicated by the auditor to the audit committee, states,

The auditor should inform the audit committee about adjustments arising from the audit that could, in his judgment, either individually or in the aggregate, have a significant effect on the entity's financial reporting process. For purposes of this section, an audit adjustment, whether or not recorded by the entity, is a proposed correction of the financial statements....

[49] See AU § 411.05.

[50] The FASB Discussion Memorandum, Criteria for Determining Materiality, states that the financial accounting and reporting process considers that "a great deal of the time might be spent during the accounting process considering insignificant matters . . . . If presentations of financial information are to be prepared economically on a timely basis and presented in a concise intelligible form, the concept of materiality is crucial." This SAB is not intended to require that misstatements arising from insignificant errors and omissions (individually and in the aggregate) arising from the normal recurring accounting close processes, such as a clerical error or an adjustment for a missed accounts payable invoice, always be corrected, even if the error is identified in the audit process and known to management. Management and the auditor would need to consider the various factors described elsewhere in this SAB in assessing whether such misstatements are material, need to be corrected to comply with the FCPA, or trigger procedures under Section 10A of the Exchange Act. Because this SAB does not change current law or guidance in the accounting or auditing literature, adherence to the principles described in this SAB should not raise the costs associated with recordkeeping or with audits of financial statements.

*http://www.sec.gov/rules/acctrps/sab99.htm*

# EXHIBIT 19

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

MASTER FILE NO. C-01-0988-SI

LOCAL 144 NURSING HOME PENSION FUND,
UFCW LOCAL 56 RETAIL MEAT PENSION FUND,
DRIFTON FINANCE CORPORATION, AND ROBERT D. SAWYER, et al.

vs.

ORACLE CORPORATION, LAWRENCE J. ELLISON,
JEFFREY O. HENLEY, EDWARD J. SANDERSON

REBUTTAL REPORT

OF

D. PAUL REGAN, CPA, CFE

Initially Submitted:  JUNE 22, 2007
Sworn:  OCTOBER 16, 2008

## The Nature of My Assignment

I have been retained, through my employer, Hemming Morse, Inc., by Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiffs Local 144 Nursing Home Pension Fund, et al., to provide expert testimony regarding whether Oracle's revenue and earnings for the quarterly period ended November 30, 2000 ("2QFY01") were presented in accordance with Generally Accepted Accounting Principles ("GAAP"), and whether Oracle's financial statements were materially misstated.  I submitted my expert report on May 25, 2007.  The defendants' experts also submitted reports at that time.  This rebuttal report responds to specific conclusions reached by J. Duross O'Bryan as quoted or referenced below, and should be reviewed in connection with my May 25, 2007 expert report.  I have incorporated the conclusions and analyses of my prior report into this rebuttal report.

## Summary of My Expert Qualifications

My qualifications and hourly rate are included in my expert report dated May 25, 2007.

## Evidence Considered

The evidence I considered in this case is included in Exhibit B to my expert report dated May 25, 2007.  In addition, new evidence I have considered since that time is included in Exhibit A to this response.  In particular, I have considered the Expert Report of J. Duross O'Bryan ("O'Bryan Report"), which he presented on behalf of Oracle as described further below.

## Summary Response to Mr. O'Bryan's Expert Report

This rebuttal report contains the following principal conclusions, each of which is analyzed in greater detail in a related section of this rebuttal report:

1.    Mr. O'Bryan's conclusion on materiality with respect to Oracle's Q2FY01 financial statements is incorrect and contrary to GAAP, including SAB 99,[1] because:

---

[1]    Securities and Exchange Commission ("SEC") Staff Accounting Bulletin No. 99, Materiality ("SAB 99"), *see* my May 25, 2007 report at ¶ 40.

    a.  His analysis did not properly evaluate each misstatement individually and in the aggregate; and

    b.  He failed to consider certain important factors and evidence.

2.   Mr. O'Bryan's analysis of Oracle's Q2FY01 transfers to the Bad Debt Reserve is flawed in that:

    a.  He did not provide any details underlying his assertion that selected transfers were supportable beyond the two examples in his report.  Further, his conclusions related to the two examples rely on evidence developed by Oracle in 2003 rather than what was documented by Oracle contemporaneous to the transfers; and

    b.  He appears to have incorrectly assumed that Ernst & Young LLP ("E&Y") had developed certain conclusions about the 2QFY01 transfers, however, it does not appear that E&Y ever reviewed the transfers in 2Q01 and never reached those conclusions.

3.   Mr. O'Bryan's conclusion that the November 2000 Debit Memos had no financial statement impact is inaccurate.

## Mr. O'Bryan's Conclusion on Materiality With Respect to Oracle's 2QFY01 Financial Statements is Incorrect and Contrary to GAAP, Including SAB 99

Mr. O'Bryan's conclusion regarding the HP agreement in 2QFY01 is incorrect and lacks an independent and/or reliable analysis.

Mr. O'Bryan asserted that Oracle's $20.1 million transfer of unapplied cash to its Bad Debt Reserve in 2QFY01 was not material with respect to its financial statements.  In doing so, Mr. O'Bryan failed to consider certain relevant evidence, including:

   *1)  Mr. O'Bryan failed to consider appropriate qualitative evidence, required under SAB 99, to properly conclude whether Oracle's 2QFY01 misstatements were material to its financial statements.*

A.  Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision in the estimate.

Mr. O'Bryan concluded that the known misstatements are incapable of precise measurement.[2]  However, it appears that he failed to consider the following:

- The transfer of customer overpayments was not the result of a subjective estimation process but rather a product of exact amounts improperly credited to Oracle's Bad Debt Reserve.  Ultimately these transfers enabled an increase of exactly $20,000,000 to Oracle's revenue and pre-tax earnings in 2QFY01;[3] and

- The improper recognition of revenue related to the HP agreement results from a violation of the accounting rules prescribed under GAAP and is also subject to precise measurement.[4]

Accordingly, the misstatement amounts do not require subjective judgments as each are able to be precisely measured under GAAP.  This factor proved particularly important for Oracle because as 2QFY01 neared completion, its revenues and EPS were just short of beating consensus analyst expectations.[5]  In my opinion, under these circumstances the misstatement was material.

---

[2] O'Bryan Report, p.39.

[3] *See* my report dated May 25, 2007, p.13, footnote 37.

[4] *See* my report dated May 25, 2007, p.34-35.

[5] As noted in my original report in footnote 136, I have reviewed a series of forecast documents that appear to have been prepared by Oracle during the process to finalize its reported financial statements for Q2FY01.  These forecast documents indicate that Oracle identified "potential" revenue of $2,640.5 million and EPS of $0.10 per share.  Ultimately, Oracle reported revenue of $2,659.5 million and EPS of $0.11 per share.  This difference of $19 million closely approximates the revenue related to the HP agreement recorded on the last day of Oracle's quarter [NDCA-ORCL

B.  Whether the misstatement masks a change in earnings or other trends.

Mr. O'Bryan noted "no evidence" of this issue.[6]  Therefore, it appears that he failed to consider the following evidence:

-   Leading up to Q2FY01, Oracle established a trend of beating analysts' estimated EPS consensus.  During the consecutive ten quarters preceding Q2FY01, Oracle announced EPS in excess of analysts' consensus nine times. During the single instance when Oracle merely met earnings (and revenue) consensus, the stock price fell 6%.

-   Oracle's failure to beat analysts' consensus EPS for 2QFY01 was masked from investors as a direct result of the misstatements at issue in this dispute.  Specifically, the known misstatements facilitated Oracle's ability to beat Q2FY01 consensus analysts' expectations by one penny, artificially inflating EPS from $0.10 to $0.11.

---

410399-415].  In addition, the $20,000,000 adjustment that was recorded to reduce Oracle's Bad Debt Reserve was an element of "Corporate Adjustments" that was characterized as "Q2FY01 Upside," and included as an addition to Oracle's 2QFY01 revenue and EPS in Oracle's forecast.

[6] O'Bryan Report, p. 39.

These factors support my conclusion that the misstatement was material because it masked the change in Oracle's earnings trends and Oracle would not have beaten analyst consensus expectations without the misstatements.

C. Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

Mr. O'Bryan concluded that the misstatements impacted all of Oracle's operations, as opposed to a singular segment or other significant portion of the business.[7] In reaching this conclusion, Mr. O'Bryan does not appear to have considered, at least, the following:

- The approximately $20 million misstatement related to the HP agreement distorted the Company's application business growth rates. Several of Oracle's analysts commented on Oracle's reported 66% applications business growth rate in 2Q01 as one of the highlights of the quarter.[8&9]  As growth rate

---

[7] O'Bryan Report, p.40, "The unapplied cash likely resulted from all of Oracle's operations, as opposed to a singular segment or other significant portion of the business."

[8] NDCA-ORCL 308884-85, Goldman Sachs, "*Oracle Reports Robust Apps Growth; Mgmt States Strong Business Outlook,*" December 15, 2000, "Oracle delivered strong earnings, benefiting from: 1) growing traction in the application market fueling applications revenue growth of 66% (or 73% in local currencies). . . . Oracle emphasized that its key differentiation is its fully integrated suite of applications that installs relatively quickly, requiring minimal systems integration."  (Emphasis added.)

[9] NDCA-ORCL 420587-89, Deutsche Banc Alex. Brown, "*Oracle Corporation [ORC] 'Strong Buy' Oracle F2Q Delivers the Goods,*" December 15, 2000, "A key part of Oracle's strong F2Q was the strength of the applications business and, more importantly, marquee customer wins with the 11i e-business suit.  Applications license growth of 66% solidly outpaced Street expectations in the 50%-60% range.  The outperformance should also allay concerns about the viability of Oracle's

expectations appeared to range between 50% - 60%, the incremental revenues improperly recognized under the HP arrangement facilitated Oracle's ability to exceed these estimates. Excluding the improper HP revenues, the Company's applications business growth rate would have dropped to 54%, which would have been 12% below the reported rate; and further, analysts indicated the importance of Oracle's "notable" win at HP to its 11i business.[10&11]

These factors support my conclusion that Mr. O'Bryan's opinion was erroneous and the misstatements at issue were material, using an appropriate SAB 99 based analysis.

D. <u>Whether the misstatement involves concealment of an unlawful transaction.</u>

Mr. O'Bryan concludes, "[f]urthermore, there is no evidence that suggests that Oracle attempted to conceal these transactions."[12] However, he does not appear to consider at least the following:

---

applications business and the relative immaturity of release 11i following last quarter's decent, but slightly disappointing 42% growth." (Emphasis added.)

[10] NDCA-ORCL 420617-19, Thomas Weisel Partners LLC, "*66% Apps Growth Highlights In-Line Q2*," December 15, 2000, "<u>Oracle made up for disappointing applications license sales in Q1 by posting 66% growth in Q2</u>. <u>Notable wins</u> at American General, <u>Hewlett Packard</u>…highlighted solid demand for the company's 11i e-business suite. . . . We project Oracle must hit 60% apps growth over the next five years to justify its current valuation." (Emphasis added.)

[11] NDCA-ORCL 308890-93, Merrill Lynch, "*Oracle Systems: Q201: Steady As She Goes*," December 15, 2000, "Oracle began to show traction again in its applications business, and the company spoke confidently about improving its growth in applications through the remainder of FY01. The company noted 83 live customers on 11i and <u>new wins with HP (thought to be a $20 mil deal)</u>, Qualcomm and Compaq. This will be an important factor for increased sponsorship of ORCL this spring." (Emphasis added.)

[12] O'Bryan Report, p. 40.

-   The November 2000 debit memos concealed the fact that Oracle had a large amount of customer overpayments and unapplied cash that it should have refunded to customers or escheated.  Specifically, as set forth in my May 25, 2007 report, Oracle's creation of the debit memos allowed it to "apply" customer overpayments to the debit memos, making it look like an overpayment was actually applied to a legitimate invoice, which limited the ability of Oracle's customers to obtain refunds.[13]

-   Oracle's usage of the debit memos for concealment purposes is also demonstrated by the fact that Oracle engaged in a "clean up" project beginning in October 2002 in which it reversed the November 2000 debit memos and refunded and escheated millions of dollars of debit memo overpayments that had been used to inflate the bad debt reserve in 2Q01.

These facts support my opinion that Mr. O'Bryan was incorrect when he concluded that "there is no evidence that suggests that Oracle attempted to conceal these transactions."

**2)  Mr. O'Bryan failed to independently analyze, or offer an opinion on, the materiality of the misstatement if the HP agreement also violated GAAP.**

Mr. O'Bryan concluded that the $20.1 million pre-tax earnings impact of Oracle's improper transfers of customer overpayments was quantitatively immaterial to its 2QFY01 financial statements.  In doing so, it appears that he failed to evaluate other known misstatements during Oracle's 2QFY01.  Specifically, it appears that Mr. O'Bryan failed to consider the impact on his materiality analysis of Oracle's $19.9 million overstatement of revenue and pre-tax earnings related to its agreement with Hewlett Packard.[14]  As a result, Mr. O'Bryan appears to have failed to consider that the aggregate

---

[13] *See* my report dated May 25, 2007 beginning at ¶ 26.

[14] While other second quarter misstatements, including the turnaround impact of prior period adjustments, may also impact an assessment of materiality, it is my understanding that Arthur

impact of these items was an overstatement of Oracle's 2QFY01, a) Net Income (after tax) by approximately 4%,[15] and b) application revenues of nearly 8%.  Accordingly, Mr. O'Bryan's assessment of the quantitative impact of Oracle's known misstatements is incomplete.

3) *Mr. O'Bryan failed to opine on whether Oracle's reported EPS of $0.11 was materially different than its actual EPS of $0.10.*

Mr. O'Bryan's analysis of materiality does not address that the misstatement enabled Oracle to increase its reported EPS from $0.10 to $0.11.  This $0.01 increase enabled Oracle to beat consensus analyst expectations for the period.  In this case, the misstatements allowed Oracle to round its reported EPS up to $0.11 instead of rounding it down to $0.10.  However, Mr. O'Bryan limits his opinion to the increment of EPS that facilitated the rounding, rather than the outcome of the rounding (*i.e.*, beating analyst expectations).[16]  Therefore, his materiality analysis is incorrect because it looks at the misstatement in a vacuum, without considering the total reported financial statement impact.  This impact is also considered in my analysis of the SAB 99 factors above.

4) *Mr. O'Bryan failed to acknowledge that the E&Y investigation was limited in scope and did not consider all of the relevant facts.*

Mr. O'Bryan's conclusion that the improper bad debt transfers in 2QFY01 were not material is based in part upon an analysis performed by E&Y, who replaced AA as Oracle's auditors in 2002.  Specifically, Mr. O'Bryan states that:

---

Andersen LLP ("AA") did not produce a complete set of Q2FY01 working papers to enable a determination as to whether any such items existed. Regardless, Mr. O'Bryan failed to consider the possibility of these incremental misstatements in his analysis.

[15] In computing the incremental impact of all known misstatements, I have determined that the impact of any variable expense, such as commissions, related to the HP agreement on net income and EPS percentage changes would not impact the 4% EPS overstatement noted herein.

[16] O'Bryan Report, p.38, "This adjustment would reduce the Earnings Per Share calculation by just two-tenths of a cent. As such, this adjustment is not material from a quantitative sense…."

- "EY had to consider whether the transfers to Oracle's bad debt reserve during second quarter fiscal year 2001 created a material misstatement in Oracle's past financial statements."

- "EY concluded that these transfers from unapplied cash to bad debt reserve did not have a material impact to past financial statements."[17]

However, the evidence does not show that E&Y reached these conclusions. First, there is no evidence that E&Y was asked to perform any procedures that would enable them to reach a conclusion regarding the propriety of the bad debt transfers in 2Q01. Mr. O'Bryan does not cite any evidence that E&Y analyzed or even considered the impact of the bad debt transfers on Oracle's 2QFY01. In fact, E&Y's designated witness under Fed. R. Civ. P. 30(b)(6), Alex Bender, testified that he was not familiar with account 12601, which is the relevant Bad Debt Reserve account, or transfers to this account.[18]

In addition, Mr. Bender testified that the "totality of the procedures performed by Ernst & Young" were documented in their memorandum entitled "Oracle Corporation – Agreed Upon Procedures with Respect to Debit memos to Account #25005 in November 2000."[19] Mr. O'Bryan described this memorandum in detail in his report (*see* p.17). This memorandum does not contain any indication that E&Y performed analyses of Oracle's transfer of customer overpayments to the Bad Debt Reserve.

---

[17] O'Bryan Report, p.41.

[18] Deposition of Alexander Bender, September 21, 2006, 179:18-180:20, including "Q. Do you know if Ernst & Young in the course of its review or engagement related to the debit memo transactions ever looked at the transfers to Account 12601? A. No, I don't recall that specifically. No. Q. Do you recall if they looked at the transfers to the bad-debt reserve? A. For which period? Q. All. A. I don't recall, no." *See also* Bender at 202:12-18, "Q. Do you know when the transfer to Account 12601 happened? [Objection] A. I'm not familiar with the account balance you just referenced and the transfers to that account."

[19]      *Id.* at 51:1-19, 79:1-80:1, and 179:18-180:20, including "Do you know if Ernst & Young would have documented any review of transfers to the bad-debt reserve with respect to its engagement related to the debit memos? [Objection] A. If we would have done something, I believe we would have documented it, yes." *See also* the related E&Y memorandum at E&Y 000143-46.

Further, I considered the possibility that E&Y developed an understanding of the transfer of customer overpayments to the Bad Debt Reserve in 2QFY01 via a review of the Report of Oracle's Special Litigation Committee ("SLC").  However, the SLC only analyzed transfers made to the Bad Debt Reserve in 3QFY01, which totaled $5 million.[20&21] Mr. O'Bryan cites no independent evidence that E&Y or the SLC reviewed the impact of the transfers in 2QFY01.

It is also worthwhile to note that E&Y did not perform a quarterly review of Oracle's financial statements for 2QFY01, and did not issue any opinion with respect to Oracle's fiscal 2001 year.  Further, Mr. Bender testified that E&Y did not know or understand how Oracle recorded customer overpayments in fiscal 2001 because it did not audit Oracle.[22] Therefore, it is not appropriate to assert that E&Y reached <u>any</u> conclusion regarding the propriety or materiality of the improper transfers to the bad debt reserve in 2QFY01. Accordingly, it is unclear how Mr. O'Bryan determined that "E&Y's conclusions were consistent with [his] own" after his review of Mr. Bender's testimony.[23]

Similarly, there is no indication that E&Y performed any procedures related to the HP agreement.  There is also no evidence that AA, Oracle's external auditors in fiscal 2001, was provided with all of the information related to either of these misstatements.  In accordance with the requirements of Generally Accepted Auditing Standards, an auditor is required to evaluate the materiality of known and likely misstatements on an individual

---

[20] *See* SLC Report at NDCA-ORCL 295582.

[21] NDCA-ORCL 296433, "'The Committee discussed with Banker [E&Y Audit partner] that certain transfers from unapplied cash to the bad debt reserve had occurred in Q3 of FY 2001, but that the maximum amount of cash moved to the bad debt reserve in Q3 was approximately $5 million."

[22] Deposition of Alexander Bender, September 21, 2006, 209:6-13, "Q. Do you know if E&Y had an understanding based on its debit memo engagement of how Oracle recorded customer overpayments in fiscal 2001?  A. Not really, no.  We understood that customer repayments (sic) would be one of the items that would potentially go into the 'on account' status as part of 25005.  But since we didn't audit that period, I wouldn't know."

[23] *See* O'Bryan Report, p.31, Section D.

and on an <u>aggregated</u> basis.[24]  Since I am not aware of any evidence to suggest that Oracle's external auditors reviewed all evidence regarding Oracle's misstatements, his reliance on E&Y, AA, or a lack of restatement to conclude that the misstatements were not material is erroneous.[25]

In consideration of the evidence detailed above, I believe that Mr. O'Bryan's conclusions were incorrect.  Mr. O'Bryan failed to perform reasonable procedures and to evaluate appropriate and relevant evidence surrounding the misstatements of Oracle's Q2FY01 financial statements.  As demonstrated in the analyses above (and discussed in my May 25, 2007 report), it is my opinion as an accountant applying SAB 99 and AU 312, that the misstatements at issue in this matter were material.

### Mr. O'Bryan's Analysis of the Q2FY01 Transfers to the Bad Debt Reserve Is Flawed

Mr. O'Bryan acknowledges that Oracle transferred $20.1 million of unapplied cash to its Bad Debt Reserve in 2QFY01.[26]  However, Mr. O'Bryan reviewed only $10.6 million of the 2QFY01 transfers to the Bad Debt reserve.  Within this sample, Mr. O'Bryan identified only $1.5 million of transfers that he believes were supportable.  Nonetheless, other than two examples, Mr.

---

[24] AU 312, "Audit Risk and Materiality in Conducting an Audit," ¶ 34.  AU 312 is explicitly incorporated into SAB 99.

[25] In addition, Mr. O'Bryan stated that it is reasonable to conclude that the SEC was satisfied with Oracle's accounting treatment with respect to the debit memos.  Mr. O'Bryan failed to cite any evidence or perform an independent assessment of the evidence provided to the SEC.  Further, as noted in my report dated May 25, 2007, Oracle failed to provide the SEC with complete information in its presentation (*see* p.31).  In addition, Oracle did not provide the SEC with evidence related to the transfer of customer overpayments to the Bad Debt Reserve or the improper revenue recognition on the HP agreement.  Therefore, it is not possible to conclude that the SEC would have been satisfied that Oracle's misstatements were immaterial.

[26] As discussed in my report, Oracle calculated its 2QFY01 Bad Debt Reserve as of October 31, 2000.  However, Mr. O'Bryan appears to have calculated Oracle's transfers to its Bad Debt Reserve based on the three months ended November 30, 2000.  For purposes of assessing the impact of the transfers to the Bad Debt Reserve on 2QFY01 pre-tax earnings, the transfers to the Bad Debt Reserve for the three months ended October 31, 2000 totaled $19.4 million, and the subsequent $20.0 million adjustment that increased revenue by reducing the reserve.

O'Bryan did not provide any detail of these transfers or the specific documents that he reviewed. Therefore, his conclusion is not supported in his report.

In the two examples of supportable transfers provided by Mr. O'Bryan, it was not until fiscal 2003 that Oracle ascertained that this amount of the transfers in October and November 2000 were appropriate.  The entries Oracle made in 2QFY01, which impacted its financial statements, needed to be based upon appropriate contemporaneous evidence gathered at the time the entries were made, not evidence identified two years later.  Further, even his example related to Caltrans assumes that Oracle did not initiate a second invoice to Caltrans related to the payment of $112,464.  While the collectors' notes state that "too much of concession was given to customer due to the customer sending in a payment," it is not clear from the documents that the original concession was inappropriate or, that the payment of $112,464 did not include a $91,254 customer overpayment.[27]

I also note that Mr. O'Bryan says that he "found some evidence which suggests that at least another $500,000 of the transfers were appropriate."[28]  However, Mr. O'Bryan did not provide any evidence or details concerning those items.  Therefore, Mr. O'Bryan's conclusions regarding this amount are not supported by his report.

Mr. O'Bryan further notes that Oracle took a "precautionary" measure to reverse these transfers.[29]  To be clear, Oracle's "precautionary" measures were taken approximately two years after the Q2FY01 transfers, and after plaintiffs had made their accounting allegations. Furthermore, Oracle's actions as part of a "clean-up" beginning in October-November 2002 involved a blanket reversal of the transfers of customer overpayments to the Bad Debt Reserve as well as the specific reversal of the related November 2000 Debit Memos.  This reversal indicates that during the entire time between the transfer and the reversal, Oracle's Bad Debt Reserve was overstated by the presence of these customer overpayments.  In addition to the $20

---

[27] Amount of the overpayment obtained from O'Bryan Report, p. 35-36.

[28] O'Bryan Report, p. 33.

[29] O'Bryan Report, p. 20.

million transfers in 2QFY01, Oracle transferred nearly $40 million in other periods that were part of the November 2002 blanket reversal.[30]  It does not appear that Mr. O'Bryan considered these facts in their totality.

## Mr. O'Bryan's Conclusion that the November 2000 Debit Memos Had No Financial Statement Impact Is Inaccurate

Mr. O'Bryan's conclusion that the November 2000 debit memos had "no financial impact"[31] is flawed for several reasons.  First, as stated in my May 25, 2007 report, the debit memo transactions did have a financial impact by enabling Oracle to inflate its revenues and pre-tax earnings by at least $20 million in 2QFY01.  Mr. O'Bryan fails to recognize that the unapplied cash receipts which were improperly transferred to Oracle's bad debt reserve during and prior to 2QFY01 were also applied to the November 2000 debit memos.  As a result, Mr. O'Bryan's conclusions appear to be based on what happened on a single date (November 17, 2000), without taking into account the financial transactions that preceded the debit memos (such as the bad debt transfers) and occurred after the November 2000 debit memos (*i.e.*, credit memos and cash refunds), all of which had an impact on Oracle's financial statements.[32]

In reaching these conclusions, Mr. O'Bryan relied, in part, upon the testing performed by E&Y.[33] However, Mr. Bender who, as noted above was designated as E&Y's person-most-knowledgeable, stated that E&Y:

---

[30] *See* ¶ 43 of my report dated May 25, 2007.

[31] O'Bryan Report, p. 3, "Oracle's creation of and accounting for the over 46,000 debit memos processed on November 17, 2000 did not affect its financial statements in the second quarter of fiscal year 2001, or any other accounting period."

[32] As described in my report dated May 25, 2007, Oracle removed approximately $59.6 million that had been transferred into its Bad Debt Reserve (*see* ¶43).  Ultimately, these amounts were refunded, applied to adjusted invoices and amounts previously written-off, kept and escheated.  These funds had previously been maintained in Oracle's Bad Debt Reserve.

[33] O'Byran Report, p. 18, "As noted above, EY found no evidence that any revenue, or any other financial statement impact, was recorded as a result of the November 17, 2000 debit memo project."

- Did not look at the underlying transactions related to the debit memos, including unapplied cash items relating to debit memos that were transferred to the Bad Debt Reserve in 2QFY01.  In fact, E&Y only looked at the debit memo entries themselves.[34]

- Would not necessarily have detected improper prior increases to income related to the debit memos.  Specifically, E&Y did not look at Accounts 12601 or 25005 in 2QFY01, when a majority of the transfers of customer overpayments to the Bad Debt Reserve that effected Oracle's 2QFY01 results occurred.[35&36]

Further, Mr. O'Bryan's conclusions appear to be substantially premised upon testimony of current Oracle employee Greg Myers.  This is notable because many documents contradict and refute testimony made by Mr. Myers in his deposition. For example, Mr. O'Bryan referenced the testimony of Mr. Myers that stated regarding the On Account designation, "from an accounting perspective, there was an offsetting debit that cleared that credit from sitting in Oracle's balance sheet."[37]  However, to the extent that the On Account items had been transferred to the Bad Debt Reserve, the credit continued to be present on Oracle's balance sheet.  As a result, Mr. O'Bryan's reliance on Mr. Myers' testimony is inconsistent with Mr. O'Bryan's conclusion that $20.1 million was transferred to the Bad Debt Reserve in 2QFY01.

---

[34] Deposition of Alexander Bender, September 21, 2006, 182:2-9, including "Q. Do you know if it reviewed the receipts related to the debit memos?  A.  I don't believe we looked at that.  We looked at the journal entries to process the debit memos referred to here."  *See also* 184:1-185:14.

[35] *Id*. at 235:23-236:22, including "Q. And I just want to clarify.  I believe you previously stated Ernst & Young did not look at activity in September or October 2000 related to these debit memo transactions; is that correct?   [Objection] A. These – I'm sorry.  These debit memos were in November.  So did we look at Account 25005 in September and October?  The answer is no." Bender's testimony also shows that E&Y did not review the transfers in August 2000.

[36]      *Id*. at 202:12-18 and 216:6-10, including "Q.  Do you know in connection with Ernst & Young's debit memo engagement whether or not it looked at transfers from accounts 25005 to 12601?  A.  As I indicated earlier, I don't recall doing that, no."

[37] *See* O'Bryan report, p.10, footnote 21.

**Mr. O'Bryan's Conclusion Regarding the HP Agreement in 2QFY01 Is Incorrect and Lacks an Independent and/or Reliable Analysis**

Mr. O'Bryan's Report did not provide an independent analysis of the documents, testimony or evidence surrounding the HP agreement.  He also failed to provide foundational evidence or a reliable methodology for independently assessing the propriety of the HP agreement under GAAP.  His conclusion is based entirely upon an unsupported assumption about what Oracle's auditor AA may have considered in 2001.  This conclusion disregards the fact that AA did not appear to review all information necessary to fully assess the propriety of Oracle's revenue recognition treatment of the HP agreement.  Therefore, Mr. O'Bryan's reliance on AA is misplaced, and his opinion on the HP agreement is incorrect.

Specifically, Mr. O'Bryan failed to perform any independent analysis of the facts and documents surrounding the HP deal, including, but not limited to: (i) the underlying source agreements between Oracle and HP, (ii) testimony of those involved in the negotiations and implementation of software sold to HP, including relevant deposition exhibits, (iii) correspondence within and between Oracle and HP surrounding the negotiated agreements and implementation matters identified (including e-mails and other documents), and (iv) the applicable GAAP standards and related interpretations, in place during Oracle's Q2FY01.  As stated in my May 25, 2007 report, the evidence shows that the HP agreement was improperly recognized in 2QFY01.

<u>Mr. O'Bryan failed to consider evidence indicating AA was not provided with all information by Oracle necessary to conclude on the propriety of its revenue recognition treatment of the HP agreement</u>

It also appears that Mr. O'Bryan failed to consider whether AA reviewed, or had access to, all the evidence necessary to properly conclude on Oracle's recognition of revenue on the HP agreement.  In fact, testimony during Gary Matuszak's[38] deposition demonstrates that certain relevant e-mails and documents surrounding the HP agreement (including negotiations pertaining to the contemporaneous sale of Oracle's software and its purchase of HP hardware) were not

---

[38] Gary Matuszak was AA's lead partner on the Oracle audit.

provided to AA.  In one example, Mr. Matuszak testified that he was unaware of the history of concessions that HP had requested before moving forward with the November 2000 agreement.[39&40]  As the existence of concessions either before or after the execution of a software license calls into question the fixed or determinable nature of fees due under an agreement, evidence such as this would have likely impacted AA's evaluation of revenue recognized under the HP agreement.  Mr. Matuszak also testified that he was not aware of several internal Oracle e-mails discussing the reciprocal nature of the deal and confirming that HP's software purchase was contingent on Oracle's purchase of HP hardware.[41]

In addition, as discussed in my May 25, 2007 report,[42] there were 14 "show stoppers" that HP believed would prevent them from being able to roll out Oracle's product.  Mr. Matuszak was not aware of these "show stoppers."[43]  As matters surrounding the functionality of the software sold to HP would impact an auditor's assessment as to whether Oracle had effectively satisfied the delivery requirement under GAAP to record revenue, this information would also have likely impacted AA's evaluation of revenue recognized under the HP agreement.  Mr. Matuszak

---

[39] Referring to the following excerpt from Deposition of Gary Matuszak, Exhibit 6 (NDCA-ORCL 020845) - an e-mail from Michael DeCesare, Oracle's Vice President of Sales –Western Region to various Oracle executives, including Larry Ellison, Chief Executive Officer, dated November 28, 2000, just two days prior to the purported execution of the HP agreement: "Over the past 8 weeks Oracle (Mike DeCesare) and HP (Phil May, Mike Griffith, Karen Montague, Mike Overly..) have been working on a series of concessions that has been requested by HP before they move forward on the purchase of the additional CRM licenses."

[40] Deposition of Gary Matuszak, August 1, 2000, 336:11-337:16; 338:19-25; 339:19-340:21.  "Q. Were you aware of any concessions that were what's written here, that there were concessions that HP was requesting before they move forward on the purchase in Q2? A. I've not seen this memo before and so…I'm not aware of these concessions."

[41] *See id.* at 328:21-330:5; 332:7-334:1.

[42] *See* my report dated May 25, 2007 beginning at ¶ 103.

[43] Deposition of Gary Matuszak, August 1, 2000, 345:20-25.

appeared to agree with this perspective, but acknowledged that AA did not perform this type of analysis.[44&45]

The evidence, as outlined in my report dated May 25, 2007, demonstrates that Oracle improperly recognized $19.9 million in revenue on November 30, 2000 relating to the HP agreement. Therefore, irrespective of AA's knowledge or consideration of the evidence, AA's conclusions as to the propriety of Oracle's Q2FY01 reported revenue was inaccurate. Accordingly, it continues to be my opinion that Oracle failed to recognize revenue under the HP Agreement in accordance with GAAP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 16th day of October, 2008, at San Francisco, California.

Respectfully submitted:

Signature: _____
D. Paul Regan, CPA, CFE

---

[44] *Id.* at 185:6-14, "Q. Okay.  So – but did you ever perform an analysis with respect to this [HP] deal as to whether the functionality promised to Hewlett-Packard actually worked? [Objection] A. That was not within the scope of our work."; *see also* 171:11-172:15.

[45] *Id.* at 186:6-187:1-10, "Q.  Would it change your analysis at all if you looked -- if the products listed on Oracle's available products list, if some of those hadn't even been developed yet, would that change your analysis if you knew that at the time? [Objection] A.  If there were unavailable products in the license agreement, that certainly would have been a factor we would have considered."

**EXHIBIT A**

<u>DOCUMENTS CONSIDERED</u>
<u>Supplemental to Exhibit B to Expert Report of D. Paul Regan, May 25, 2007</u>

1.      Expert Report of J. Duross O' Bryan

2.      AU 312, Audit Risk and Materiality in Conducting an Audit

# EXHIBIT 20

1  ROBERT H. SINGLETARY
   SHEILA E. O'CALLAGHAN
2
   Attorneys for Plaintiff
3  SECURITIES AND EXCHANGE COMMISSION
   901 Market Street, Suite 470
4  San Francisco, CA  94103
   Telephone:  (415) 744-3140
5



6                                              OCT 0 8 1993

7                                           RICHARD W. WIEKING
                                            CLERK, U.S. DISTRICT COURT
8          UNITED STATES DISTRICT COURT      NORTHERN DISTRICT OF CALIFORNIA

9          NORTHERN DISTRICT OF CALIFORNIA

10  ─────────────────────────── C93   3517   DLJ

11  SECURITIES AND EXCHANGE COMMISSION,:   Civil Action No.
                                        :
12                  Plaintiff,          :
                                        :  FINAL JUDGMENT OF
13          v.                          :  PERMANENT INJUNCTION AND
                                        :  OTHER RELIEF AGAINST
14  ORACLE SYSTEMS CORPORATION,         :  ORACLE SYSTEMS
                                        :  CORPORATION
15                  Defendant.          :
                                        :
16  ───────────────────────────────  ENTERED IN CIVIL DOCKET ___ OCT 8 0, 19__

17       Plaintiff Securities and Exchange Commission ("Commission"),

18  having filed and served upon defendant Oracle Systems Corporation

19  ("Oracle") a Summons and Complaint for Permanent Injunction and

20  Other Relief ("Complaint") in this action; defendant Oracle

21  having admitted service of the Summons and Complaint in this

22  action and the jurisdiction of this Court over it and over the

23  subject matter of this action; having been fully advised and

24  informed of its right to a judicial determination of this matter;

25  having waived findings of fact and conclusions of law as provided

26  by Rule 52 of the Federal Rules of Civil Procedure; having

27  consented to the entry of this Final Judgment of Permanent

28  Injunction and Other Relief Against Oracle Systems Corporation

Δ π EXHIBIT __6__
Deponent _CHEN_
Date _5/19/06_ Rptr. ____
WWW.DEPOBOOK.COM

FINAL JUDGMENT

("Final Judgment"), without admitting or denying the allegations
in the Complaint (except as to jurisdiction which is admitted);
having agreed that no notice of hearing upon the entry of this
Final Judgment need be given; and the Court being fully advised
in the premises and there being no just reason for delay:

I.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendant
Oracle, and its agents, servants, employees, attorneys in fact,
and all persons in active concert and participation with any of
them, who receive actual notice of this Final Judgment by
personal service or otherwise, and each of them, are permanently
restrained and enjoined from, directly or indirectly, in
violation of Section 13(a) of the Securities Exchange Act of 1934
(the "Exchange Act") [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1
and 13a-13 promulgated thereunder [17 C.F.R. §§ 240.12b-20,
240.13a-1 and 240.13a-13] failing or causing the failure to file
with the Commission, such accurate and complete information and
documents as are required to be filed by Oracle with the
Commission pursuant to Section 13(a) of the Exchange Act [15
U.S.C. §78m(a)] and the Commission's rules thereunder, including
but not limited to, Annual Reports on Form 10-K [17 C.F.R.
§249.310] as prescribed by Commission Rule 13a-1 [17 C.F.R.
§240.13a-1] and Quarterly Reports on Form 10-Q [17 C.F.R.
§249.308a] as prescribed by Commission Rule 13a-13 [17 C.F.R.
§240.13a-13], such information and documents to contain, in
addition to such information as is expressly required to be
included in a statement or report to the Commission, such further
material information, if any, as may be necessary to make the

2

FINAL JUDGMENT

1   required statements, in the light of the circumstances under

2   which they are made, not misleading, as prescribed by Commission

3   Rule 12b-20 [17 C.F.R. §240.12b-20].

II.

5       IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendant

6   Oracle, and its agents, servants, employees, attorneys in fact,

7   and all persons in active concert and participation with any of

8   them, who receive actual notice of this Final Judgment by

9   personal service or otherwise, and each of them, are permanently

10  restrained and enjoined from, directly or indirectly, failing or

11  causing the failure to make and keep books, records and accounts

12  which, in reasonable detail, accurately and fairly reflect the

13  transactions and dispositions of the assets of Oracle in

14  violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C.

15  §78m(b)(2)(A)].

16                          III.

17      IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendant

18  Oracle, and its agents, servants, employees, attorneys in fact,

19  and all persons in active concert and participation with any of

20  them, who receive actual notice of this Final Judgment by

21  personal service or otherwise, and each of them, are permanently

22  restrained and enjoined from, directly or indirectly, failing or

23  causing Oracle to fail to devise and maintain a system of

24  internal accounting controls sufficient to provide reasonable

25  assurances that:

26              (A)  transactions are executed in accordance with

27                   management's general or specific authorization;

28  //

                        3                    FINAL JUDGMENT

1      (B)   transactions are recorded as necessary (i) to

2            permit preparation of financial statements in

3            conformity with generally accepted accounting

4            principles or any other criteria applicable to

5            such statements, and (ii) to maintain

6            accountability for assets;

7      (C)   access to assets is permitted only in accordance

8            with management's general or specific

9            authorization; and

10     (D)   the recorded accountability for assets is compared

11           with the existing assets at reasonable intervals

12           and appropriate action is taken with respect to

13           any differences

14   in violation of Section 13(b)(2)(B) of the Exchange Act [15

15   U.S.C. §78m(b)(2)(B)].

16                              IV.

17        IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendant

18   Oracle shall pay within fifteen business days after the entry of

19   this Final Judgment the sum of $100,000, which sum represents a

20   civil penalty, pursuant to Section 21(d)(3) of the Exchange Act

21   [15 U.S.C. §78u(d)(3)].

22                              V.

23        IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the

24   provisions of the Consent of Oracle to Entry of Final Judgment of

25   Permanent Injunction and Other Relief ("Consent") filed

26   concurrently with this Final Judgment are incorporated herein

27   with the same force and effect as if fully set forth herein.

28   //

                              4                    FINAL JUDGMENT

## VI.

IT IS FURTHER ORDERED that this Court shall retain jurisdiction over this action for the purposes of implementing and enforcing this Final Judgment.

DATED: _October 5_ , 1993

_____
United States District Judge

FINAL JUDGMENT

1 | ROBERT H. SINGLETARY
   | SHEILA E. O'CALLAGHAN
2 |
   | Attorneys for Plaintiff
3 | SECURITIES AND EXCHANGE COMMISSION
   | 901 Market Street, Suite 470
4 | San Francisco, CA  94103
   | Telephone:  (415) 744-3140
5 |
6 |
7 |



8 |
   |                UNITED STATES DISTRICT COURT
9 |               NORTHERN DISTRICT OF CALIFORNIA
10 |
   |                                        Civil Action No.
11 | SECURITIES AND EXCHANGE COMMISSION, :
12 |                   Plaintiff,       :     CONSENT OF DEFENDANT
   |                                    :     ORACLE SYSTEMS
13 |           v.                       :     CORPORATION TO ENTRY
   |                                    :     OF FINAL JUDGMENT OF
14 | ORACLE SYSTEMS CORPORATION,        :     PERMANENT INJUNCTION AND
   |                                    :     OTHER RELIEF
15 |                   Defendant.       :
16 |
17 |      Defendant Oracle Systems Corporation ("Oracle"), without
18 | admitting or denying any of the allegations of the Complaint in
19 | this action, except as specifically set forth herein, consents to
20 | the entry of a Final Judgment of Permanent Injunction and Other
21 | Relief ("Final Judgment"), in the form attached hereto as Exhibit
22 | 1, enjoining it from violations of Sections 13(a), 13(b)(2)(A)
23 | and 13(b)(2)(B) of the Securities Exchange Act of 1934 [15 U.S.C.
24 | §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-
25 | 1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13]
26 | promulgated thereunder.
27 | //
28 | //

                                                    CONSENT

For purposes of this Consent to Entry of Final Judgment of Permanent Injunction and Other Relief ("Consent"), defendant Oracle:

1. admits service upon it of the Summons and Complaint for Permanent Injunction and Other Relief in this action;

2. admits the jurisdiction of this Court over it and over the subject matter of this action;

3. acknowledges having been fully advised and informed of its right to a judicial determination of this matter;

4. waives the entry of findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure;

5. voluntarily consents to the entry of the Final Judgment and acknowledges that no agreement, tender, offer, promise or threat of any·kind whatsoever has been made by the Securities and Exchange Commission ("Commission") or any member, officer, agent or representative thereof to induce it to so consent;

6. agrees to pay civil penalties in the amount of $100,000 pursuant to Section 21(d)(3) of the Securities Exchange Act of 1934 [15 U.S.C. §78u(d)(3)];

7. acknowledges and agrees that this proceeding, the payment of the penalty contemplated as part of the resolution thereof, and Oracle's Consent to the entry of the Final Judgment are for the purposes of resolving this civil proceeding only, in conformity with the provisions of 17 C.F.R. §202.5(f), and do not resolve, affect or preclude any other proceeding which may be brought against Oracle;

8. understands that a violation of any provision of the Final Judgment may be punishable by civil or criminal contempt;

2                    CONSENT

9.    waives any right it may have to appeal from the Final Judgment;

10.    agrees that the Final Judgment in the form attached hereto as Exhibit 1 and incorporated herein by reference complies with Rule 65(d) of the Federal Rules of Civil Procedure and may be presented by the Commission to the Court for signature and entry forthwith and without further notice;

11.    hereby acknowledges that it will accept service of a copy of the Final Judgment and will acknowledge receipt thereof in writing;

12.    hereby agrees that this Court shall retain jurisdiction over this action in order to implement and enforce the terms of the Final Judgment; and

13.    hereby agrees that this Consent may be annexed to and made a part of the Final Judgment filed simultaneously herewith.

14.    The undersigned represents that he has read this Consent before signing it and that it is executed in accordance with the authority granted pursuant to the Corporate Resolution attached as Exhibit 2.

DATED: _Sept. 16_ , 1993          ORACLE SYSTEMS CORPORATION

By: _____
     Secretary of the Corporation

3                                             CONSENT

# EXHIBIT 21

http://www.firstcall.com/links/4......9033950839605166217599176270.html

09:22am EST 15-Dec-00 Thomas Weisel Partners LLC (Robert Schwartz 617.488.4625)
ORCL (TWP): 66% Apps Growth Highlights In-Line Q2

December 15, 2000                        Thomas Weisel Partners LLC

B2B e*Commerce/e*Business Applications       Oracle1,3- MARKET PERFORM
NASDAQ: ORCL-$27.50                    66% Apps Growth Highlights In-Line Q2

Robert Schwartz, Ph.D. 617.488.4625 rschwartz@tweisel.com
Kevin McGuire 415.364.2656 kmcguire@tweisel.com
David Gremmels, CFA 617.488.4630 dgremmels@tweisel.com

Executive Summary

*Oracle reports in-line revenue and EPS. Yesterday after the close, Oracle
reported in-line revenue of $2.66bn (+15% Y/Y) and EPS of $0.11 (+68% Y/Y),
compared to our estimates of $2.72bn and $0.11. The strong dollar had a -8%
impact on the top line, but higher-than-forecast operating profitability
offset the negative effect.

*Q2 applications growth at the high end of the Street's range. Oracle made up
for disappointing applications license sales in Q1 by posting 66% growth in
Q2. Notable wins at American General, Hewlett-Packard, JDS Uniphase, QUALCOMM
and others highlighted solid demand for the company's 11i e-business suite.

*Our long-term investment thesis remains intact. We project Oracle must hit
60% apps growth over the next five years to justify its current valuation, a
prospect we find difficult to swallow in the face of stiff competition from
best-of-breed vendors. Despite a solid Q2, we believe Oracle still has a long
row to hoe before establishing the kind of traction for 11i that results in
enterprisewide wins.

*Fine-tuning 2001 revenue estimates, maintaining EPS estimates. We are fine-
tuning our FY01 revenue estimate to $12.0bn from $12.1bn to account for a
slight shift in revenue mix. We maintain our EPS projections going forward
and reiterate our MARKET PERFORM rating.

| Key Data: | | | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Price: | $27.50 | Adjusted EPS | | | |
| 52-Week Range: | $46-$19 | Q1 | $0.04 A | $0.08 A | $0.10 E |
| Market Cap.(bn): | $161.6 | Q2 | $0.06 A | $0.11 A | $0.13 E |
| Shares Out.(mn): | 5,875.0 | Q3 | $0.08 A | $0.12 E | $0.15 E |
| Avg Daily Vol.: | 47,147,600 | Q4 | $0.15 A | $0.20 E | $0.25 E |
| Fiscal Year End: | 31-May | Year | $0.34 A | $0.52 E | $0.63 E |
| | | P/E | 80.1x | 53.3x | 43.6x |
| | | | | | |
| Debt/ Total Capital: | 6% | Revenues ($mn) | | | |
| Mkt Cap/ TTM Sales: | 15.0x | Q1 | $1,985 A | $2,262 A | $2,703 E |
| Net Cash/ Share: | $0.69 | Q2 | $2,322 A | $2,660 A | $3,227 E |
| Book Value/ Share: | $0.84 | Q3 | $2,449 A | $2,943 E | $3,582 E |
| Price/ Book Value: | 32.8x | Q4 | $3,374 A | $4,144 E | $5,077 E |
| | | Year | $10,130A | $12,008E | $14,588E |
| | | Previous Year | | $12,136E | |
| | | TEV/ Sales | 15.5x | 13.1x | 10.8x |

Company Description: Oracle Corporation is the largest database (DBMS) and
second largest independent software company in the world. In addition, the
company provides leading enterprise resource planning (ERP), supply-chain
management (SCM), customer relationship management (CRM) and Internet exchange
software.

Applications License Growth Highlights an In-Line Q2

66% Growth in Apps Beat Our Estimate, But Other Rev Lines Did Not

Oracle delivered an in-line fiscal Q2 highlighted by top-line revenue of
$2.66bn (+15% Y/Y), slightly light of our $2.72bn estimate. License revenue of
$1.1bn registered 24% growth over the year-ago period, meeting our estimate of
$1.1bn. Services revenue of $1.54bn (+9% Y/Y), also essentially met our $1.6bn

1 of 3                                                      12/15/2000 8:09 AM

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    NDCA-ORCL 420617

estimate. The Euro's weakness combined with the dollar's strength was a
challenge in the quarter for Oracle, impacting the top-line by -8%. Using
constant dollar figures for year-over-year comparisons would have resulted in
total license growth of 32%. Better-than-expected operating margins of 36%
resulted in EPS of $0.11, in line with our $0.11 estimate.

The company experienced particular strength in its applications business, as
that segment grew 66% Y/Y overcoming a disappointing start to the fiscal year.
The $279mn in revenue this quarter underscored the company's ability to close
on a "strong" pipeline for its 11i e-business suite that was built earlier in
the year. $775mn in database license sales (+19% Y/Y growth) was 2% below our
$787mn estimate. Using constant dollar figures for each segment, database would
have registered 26% growth and apps license sales would have increased 73%.
All geographies performed well in FQ2, with the Americas and Asia-Pacific
leading the charge with 35% and 43% Y/Y license growth, in local currency
terms, respectively. EMEA continues to be the laggard (+20% Y/Y), but
management indicated that business conditions are improving in Europe after a
slow start to the fiscal year.

Operating Margin Gains Continue in Q2

Again, Oracle witnessed impressive gains in operating profitability. The
company reported an operating margin of 35.6%, 330 basis points ahead of our
32.3% estimate, and a 1,080bps increase over last year's 24.8%. Oracle
recently finished implementing Marketing Online globally and will complete the
rollout of Contracts very soon. The company plans on continuing the global
rollout of the services portion of its CRM platform over the next six to nine
months, specifically the TeleService, Service Online and Customer Intelligence
modules.

Balance Sheet Remains One of the Industry's Strongest, in Our View

Oracle's balance sheet continues to strengthen, in our view, with the company
now possessing over $4.3 billion in cash. Cash declined slightly from Q1, as
the company continued its aggressive stock repurchase program by buying back
$2-3 billion of stock in the quarter. The company continues to manage accounts
receivable well with days sales outstanding (DSOs) falling to 66 days from 67
last quarter. Deferred revenue fell as a percentage of revenue ($1.05bn or 36
days), but we note that it remains in line with historical norms.

Several Notable Wins in the Quarter

The company continues to witness the percentage of large deals increase, as
the figure rose to 45% in Q2 from 36% last quarter (defined as deals greater
than $500,000). Notable wins in the supply-chain management (SCM) area were GE
Power, Hayworth, JDS Uniphase, QUALCOMM and Teradyne. Management noted that
the company won over 20 advanced planning and scheduling (APS) deals in Q2. On
the customer relationship management (CRM) side, American General, BellSouth
and Hewlett-Packard were significant customers in the quarter.

Fine-Tuning 2001 and 2002 Estimates

We have updated our model to reflect fiscal Q2 results, and incorporated the
company's financial guidance provided on the conference call. We made a slight
shift in our  revenue mix, our top-line figures have changed minimally. Our
fiscal 2001 revenue estimate goes from $12.1bn to $12.0bn and fiscal 2002
remains the same at $14.6bn. As illustrated in the following table, our
quarterly revenue estimates change by no more than 1%. Higher operating
profitability picks up for whatever revenue changes we have made, so therefore
our EPS figures remain unchanged.

MARKET PERFORM Rating Based on Long-Term Execution, Not One Quarter's
Performance

Our investment thesis on ORCL is not based on what the company does in any
particular quarter. Certainly, quarterly performance is a meaningful data
point that we incorporate into our thinking, but we prefer to focus on whether
Oracle can deliver value over a longer period of time.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

NDCA-ORCL 420618

In our opinion, the leverage in Oracle's story has to emanate from the
applications side of the business. As we pointed out in our initiation piece
on November 17, Oracle needs to grow its current apps market share of 1.7%
nearly five-fold to justify its current valuation (assuming 19% DBMS growth,
25% services growth and continued operating profitability gains). In fact, at
yesterday's closing price of $27.50, we estimate that Oracle needs to sustain
nearly 60% annual growth from its applications business over the next five
years to justify that price.

Fair Value of ORCL Based on Five-year Applications Revenue Growth

| Fair Value | Five-Year Apps Rev Growth | Apps Market Share |
|---|---|---|
| $22 | 40% | 5.0% |
| $24 | 47% | 6.5% |
| $28 | 59% | 9.5% |
| $30 | 64% | 11.0% |
| $32 | 68% | 12.5% |
| $35 | 73% | 14.5% |
| $40 | 81% | 18% |

Note: Analysis assumes 19% DBMS growth, 25% services growth and continued
operating profitability gains. Source: Thomas Weisel Partners and company data

However, with strong best-of-breed vendors competing on all fronts, we believe
the company may be challenged to sustain Q2's 66% apps Y/Y growth. Although
Oracle's 11i e-business suite is building some solid momentum, we believe FYQ4
(May'01) in particular may present an obstacle to that argument as the company
experienced strong 61% Y/Y growth in that quarter. We reiterate our MARKET
PERFORM rating.

-------------------------
ADDITIONAL INFORMATION AVAILABLE UPON REQUEST.

Please refer to ticker TWPDISC for important Thomas Weisel Partners Disclaimer
information.
First Call Corporation, a Thomson Financial company.
All rights reserved.  888.558.2500
]

EON

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    NDCA-ORCL 420619

# EXHIBIT 22

00:38am EST 15-Dec-00 Merrill Lynch (C.Shilakes (1) 415 676-3520) ORCL
ORACLE SYSTEMS:Q2 01: Steady As She Goes

　　　ML++ML++ML　　　Merrill Lynch Global Securities Research　　　ML++ML++ML
　　　　　　　　　　　　ORACLE SYSTEMS CORP (ORCL/OTC)
　　　　　　　　　　　　Q2 01: Steady As She Goes
　　　　　　　　　　Christopher C. Shilakes (1) 415 676-3520
ACCUMULATE*　　Long Term: BUY

Reason for Report: Analysis of Sales/Earnings

Investment Highlights:
o    Expect ORCL to remain near current levels after solid 2Q 01 results, as
expected.

o    Should calm nerves regarding enterprise software demand after Microsoft
shortfall.

o    Raising FY01 (May) EPS est from $0.51 to $0.52 (+51% YoY) and FY02 EPS est
from $0.62 to $0.63 (+22% YoY).

o    We believe Oracle could appreciate up to 20% from current levels (2.3x PEG
on CY 01 EPS of $0.56).  Our price objective is $33, reflecting moderated
valuations.  Maintain int.-term Accumulate.

Fundamental Highlights:
o    Revs +14.5% to $2.66 bil and EPS +66% to $0.11.  ML ests of $2.68 bil and
EPS of $0.10. Currency translation took 7% off growth, slightly worse than
modeled.

o    Database up 19%, in line with expectations, and Apps better at 66% growth
vs 55% est.

o    Operating margins continue to expand, similar to last Q, up 10.8% points,
to 35.6%.

o    Solid execution and balanced revenue; balance sheet still strong.  More
moderate earnings growth and tempered valuations likely to cap big upside moves
near-term.

ORCL 0000725

|                                              | 2000A   | 2001E   | 2002E   |
|----------------------------------------------|---------|---------|---------|
| Price:                                       |         | $27.50  |         |
| 12 Month Price Objective:                    |         | $33.00  |         |
| Estimates (May)                              | 2000A   | 2001E   | 2002E   |
| EPS:                                         | $0.34   | $0.52   | $0.63   |
| P/E:                                         | 80.9x   | 52.9x   | 43.7x   |
| EPS Change (YoY):                            |         | 51.4%   | 21.7%   |
| Q3 EPS (Feb):                                | $0.08   | $0.12   |         |
| Cash Flow/Share:                             | $0.40   | $0.58   | $0.69   |
| Price/Cash Flow:                             | 68.8x   | 47.4x   | 39.9x   |
| Dividend Rate:                               | Nil     | Nil     | Nil     |
| Dividend Yield:                              | Nil     | Nil     | Nil     |

Opinion & Financial Data

| | |
|---|---|
| Investment Opinion: | C-2-1-9 |
| Mkt. Value / Shares Outstanding (mn): | $160,820 / 5,848 |
| Book Value/Share (Nov-2000): | $0.65 |
| Price/Book Ratio: | 42.3x |
| ROE 2001E Average: | 46.0% |
| LT Liability % of Capital: | 6.1% |
| Est. 5 Year EPS Growth: | 25.0% |

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 308890

```
Stock Data
                        52-Week Range:  $46.47-$21.50
                    Symbol / Exchange:  ORCL / OTC
                             Options:   Chicago
        Institutional Ownership-Vickers:  45.6%
           Brokers Covering (First Call):  31
```
*Intermediate term opinion last changed on 21-Jun-2000.
For full investment opinion definitions, see footnotes.

ORCL 0000726

### Good, Not Great

### Summary

Oracle reported a solid 2Q 01, with database growth in line with expectations, and applications and margin performance better than expected. We believe that ORCL should hold at current levels in the near-term with these results, despite a difficult technology tape. We believe Oracle's current valuation is deserved, as a leader in enterprise software/e-business infrastructure. Given the recent recovery in ORCL, we believe the stock will pause until investors see evidence of sustained performance in e-business applications and more balanced, consistent growth mix across product lines and geographies. Our new price objective of $33 is based on a more tempered overall valuation framework for technology stocks, where we believe Oracle can hold a premium 2.3x PEG on forward earnings.

We are modestly raising our EPS estimates for Oracle following these results, although our revenue estimates remain unchanged. Our FY 01 EPS estimates go from $0.51 to $0.52 and FY 02 EPS estimates go from $0.62 to $0.63. We do not believe these estimate changes will be enough to act as a near-term catalyst in this difficult technology market, although ORCL may see a near-term boost from capital flowing out of MSFT into ORCL as a "safe haven", following Microsoft's disappointing pre-announcement last night.

Oracle began to show traction again in its applications business, and the company spoke confidently about improving its growth in applications through the remainder of FY01. The company noted 83 live customers on 11i and new wins with HP (thought to be a $20 mil deal), Qualcomm and Compaq. This will be an important factor for increased sponsorship of ORCL this spring.

We believe these results should help to calm the nerves of investors looking at the overall demand environment for enterprise software, although higher growth rates will be required before we would recommend more aggressive purchase at current valuations.

### 2Q 01 Highlights

Total license revenues grew 25% to $1.09 billion, besting our $1.07 billion estimate. Database revenues of $775 million (+19%) were in-line with our forecast, while Apps revenues grew a healthy 66% to $279 million. $19 million above our estimate. Overall, large deals ($500K+) as a percentage of revenue increased to 45% from 33% a year ago, indicating traction from 11i. Services revenues were $46 million below our estimates of $1.57 billion (+8%) as the company continues to de-emphasize the services aspect of its business.

By geography, the weak Euro limited Oracle's growth in Europe, up 1% on a dollar basis, 18% in local currency. Americas revenue grew 20% and Asia Pacific grew 28% on a dollar basis, 34% in local currency.

Margin expansion remains a key driver of earnings upside, with operating

http://www.firstcall.com/links/67/67643264164417538825/86176637635527838132/39893... 2/27/2002

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 308891

margins increasing 1,080 basis points to 35.6% versus our 31.6% estimate. Other income of $20 million was lower than our $75 million expectation due to investment losses related to market conditions and more stock buybacks lowering cash and interest income.

On the balance sheet, cash and equivalents dropped $707 million sequentially, A/R DSOs decreased a day sequentially to 66 days and deferred revenues were down 17% to $1.05 billion, a seasonal trend.

ORCL 0000727

Outlook

Oracle management provided a confident outlook into 2H F01, with applications growth moving towards 70%-80% and database remaining in 15-20% growth range. Services growth, which came up short in Q2 01, is now slated for 15-17% growth for the balance of the year.  The company stated that it could still post operating margins of 40% for the year, although that was not a certainty.  The rate of margin growth will slow as tougher prior year margin comparisons appear in 2H F01, but margin expansion should continue into FY 02.

We expect ORCL could gain up to 20% price appreciation over the next 12 months given current fundamentals and maintain our Accumulate, long-term Buy opinion.

(ORCL)  The securities of the company are not listed but trade over-the-counter in the United States.  In the US, retail sales and/or distribution of this report may be made only in states where these securities are exempt from registration or have been qualified for sale.  MLPF&S or its affiliates usually make a market in the securities of this company.
Copyright 2000 Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S).  All rights reserved. Any unauthorized use or disclosure is prohibited. This report has been prepared and issued by MLPF&S and/or one of its affiliates and has been approved for publication in the United Kingdom by Merrill Lynch, Pierce, Fenner & Smith Limited, which is regulated by SFA; has been considered and distributed in Australia by Merrill Lynch Equities (Australia) Limited (ACN 006 276 795), a licensed securities dealer under the Australian Corporations Law; is distributed in Hong Kong by Merrill Lynch (Asia Pacific) Ltd, which is regulated by the Hong Kong SFC; and is distributed in Singapore by Merrill Lynch International Bank Ltd (Merchant Bank) and Merrill Lynch (Singapore) Pte Ltd, which are regulated by the Monetary Authority of Singapore.  The information herein was obtained from various sources; we do not guarantee its accuracy or completeness. Additional information available.
Neither the information nor any opinion expressed constitutes an offer, or an invitation to make an offer, to buy or sell any securities or any options, futures or other derivatives related to such securities ("related investments").  MLPF&S and its affiliates may trade for their own accounts as odd-lot dealer, market maker, block positioner, specialist and/or arbitrageur in any securities of this issuer(s) or in related investments, and may be on the opposite side of public orders.  MLPF&S, its affiliates, directors, officers, employees and employee benefit programs may have a long or short position in any securities of this issuer(s) or in related investments. MLPF&S or its affiliates may from time to time perform investment banking or other services for, or solicit investment banking or other business from, any entity mentioned in this report.
This research report is prepared for general circulation and is circulated for general information only.  It does not have regard to the specific investment objectives, financial situation and the particular needs of any specific person who may receive this report.  Investors should seek financial advice regarding the appropriateness of investing in any securities or investment strategies discussed or recommended in this report and should understand that statements regarding future prospects may not be realized.  Investors should note that

http://www.firstcall.com/links/67/6764326416441753882586176637635527838132/39893... 2/27/2002

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER



income from such securities, if any, may fluctuate and that each security's
price or value may rise or fall. Accordingly, investors may receive back less
than originally invested.  Past performance is not necessarily a guide to
future performance.
Foreign currency rates of exchange may adversely affect the value, price or
income of any security or related investment mentioned in this report.  In
addition, investors in securities such as ADRs, whose values are influenced by
the currency of the underlying security, effectively assume currency risk.
First Call Corporation, a Thomson Financial company.
All rights reserved.  888.558.2500
]

EON

ORCL 0000728

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 308893

# EXHIBIT 23

08:23am EST 15-Dec-00 Goldman Sachs (Rick G. Sherlund) ORCL
Oracle Reports Robust Apps Growth; Mgmt States Strong Business Outlook; RL

Goldman, Sachs & Co. Investment Research

Oracle Reports Robust Apps Growth; Mgmt States Strong Business Outlook; RL

```
*****************************************************************
* Oracle reported strong fiscal 2Q (Nov) results across all geographies *
* with rev gwth of 15%, in line with ests. Despite negative currency, apps*
* gwth was robust at 66%, above our 50% est and database gwth of 19% was *
* also in line with our and Street ests. EPS of $0.11 increased 66% over *
* $0.06 last year. Hosting a bullish conf call, Oracle was optimistic *
* about F3Q, with apps gaining traction with large, referencable *
* customers; company outlook is strong despite broader concerns of *
* potential economic slowdown. We maintain our F2001 rev est of approx *
* $12B and EPS of $0.51 and F2002 rev est of approx $15B and EPS of $0.64.*
* Maintain Buy Rating. *
*****************************************************************
```

```
    Rick G. Sherlund (New York) 1 212-902-6790  -  Investment Research
    Lilly Bahramipour (New York) 1 212-902-4605  -  Investment Research
        Nils Tristan (New York) 1 212-902-4077  -  Investment Research
    Sheng-Sheng Foo (New York) 1 212-357-4172  -  Investment Research
    Patricia Reddington (New York) 1 212-902-1950  -  Investment Research
```

=============== NOTE  8:01 AM  December 15, 2000  ===================

|  | Stk Rtg | Latest Close | 52 Week Range | Mkt Cap (mm) | YTD Pr Change | Cur Yield |
|---|---|---|---|---|---|---|
|  | --- | ------ | ------- | ------- | ------ | ----- |
| Oracle Corp. | RL | 27.50 | 47-19 | 153929. | -2% | 0.0% |

--------------Earnings Per Share---------------

| ORCL (US$) | Aug | Nov | Feb | May | FY | CY |
|---|---|---|---|---|---|---|
| 2002 FY | 0.10 | 0.13 | 0.15 | 0.26 | 0.64 |  |
| 2001 FY | 0.08A | 0.11A | 0.12 | 0.20 | 0.51 | 0.55 |
| 2000 FY(A) | 0.04 | 0.07 | 0.09 | 0.16 | 0.34 | 0.42 |

ORCL 0000672

|  |  | -Abs P/E on-- Cur | Nxt | -Rel P/E on-- Cur | Nxt | EV/NxtFY EBITDA | LT EPS Growth |
|---|---|---|---|---|---|---|---|
|  |  | ----- | ----- | ----- | ----- | -------- | ------ |
| ORCL | FY | 53.9X | 43.0X | 2.3X | 1.9X | NA | 25% |
|  | CY | 50.0 |  | 2.1 |  |  |  |

```
==========================================================
* Oracle delivered strong earnings, benefiting from: 1) growing traction
  in the application market fueling robust applications revenue growth of
  66% (or 73% in local currencies); and 2) solid database growth of 19%
  (or about 26% growth in local currencies); and 3) further operating
  margin expansion. The company reported 83 live customers on its 11i
  applications suite (we estimate about 20% are live on the CRM module and
  30% may be live on SCM) with several hundred expected to be live by the
  end of the February quarter. Oracle emphasized that its key
  differentiation is its fully integrated suite of applications that
  installs relatively quickly, requiring minimal systems integration.

* Oracle management indicated it has seen no effects of a slower economy
  on its business. We note that the company is positioned in a high
  growth market and has new product momentum with the applications Release
```

http://www.firstcall.com/links/43/43034768732190907406/59251642485935761169/39916... 2/27/2002

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 308884

11i. Management expects applications growth of about 75% in the February quarter, but we have modeled only 60% given our view that there may be slower capital spending if the slowing economy continues to broaden the range of sectors that are affected.

=========================================================================

QUARTERLY REVIEW
Oracle continues to use integration as a long-term strategy and competitive advantage. Management seems very bullish on the growth opportunity for its 11i-application suite across all geographies, and has characterized its sales prospect pipeline as 'astounding.'

The company posted an impressive quarter with good key metrics across the geographies and business segments despite a 6.5% negative impact from currency. We would expect currency to have some dampening effects on business for the remainder of fiscal 2001, but not as bad as the November quarter (assuming no change from current levels).

License revenue of $1.1 billion was in line with our estimates. As expected, consulting and education increased slightly (growing one percent over last year in local currencies and declining 4% in reported revenues), which should continue to accelerate. Internationally, Oracle had strong results in North America, Asia/Pacific, and EMEA where EMEA doubled its applications sales for two quarters in a row.

The balance sheet remains healthy, with accounts receivable DSO's declining to 66 days from 69 days. Deferred revenues declined 17% sequentially, in line with the company's normal seasonal pattern.

Oracle continues to evangelize the benefits of an integrated suite of applications versus its more functional best of breed competitors (including i2 and Siebel). We believe this is a more compelling advantage in the mid-market where the tradeoff of functionality for the benefits of ease of implementation is less of an issue than for the high-end customers. Oracle disputes the assertion that it is a mid-market vendor, noting a number of high-end customer wins as well.

We remain bullish on Oracle and believe it has likely seen the worst in its transition to the new 11i suite and estimate accelerating top line growth going forward. We do suspect that a tougher macroeconomic environment for capital spending could have some impact on Oracle's business, including a lengthening of sales cycles, higher accounts receivable days sales outstanding, possibly lower average deal sizes, and less upside to operating results and perhaps less of an increase in deferred revenues. To date, this is not evident and the product cycle momentum is robust.

Important Disclosures (code definitions attached or available upon request)
ORCL        : CS, M, SP1, SP2
First Call Corporation, a Thomson Financial company.
All rights reserved.  888.558.2500
]

EON

ORCL 0000673

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 308885

**EXHIBIT 24**

**Deutsche Banc Alex. Brown**

**Deutsche Bank** 

Moore, James A. 415-617-4269                              12/15/2000
Chen, Charles 415-617-4274
Kong, Seihun 415-617-3323
Kelly, Matthew F 415-617-3344
Deutsche Banc Alex. Brown
----------------------------------------------------------------
            ORACLE CORPORATION [ORCL] "STRONG BUY"
                Oracle F2Q Delivers the Goods
----------------------------------------------------------------

| Date: | 12/14/2000 | EPS |  | 1999A | 2000A | 2001E |
|---|---|---|---|---|---|---|
| Price: | 27.5 | 1Q |  | 0.03 | 0.04 | 0.08 |
| 52-Wk Range: | 46 - 19 | 2Q |  | 0.05 | 0.06 | 0.11A |
| Ann Dividend: | 0.0 | 3Q |  | 0.05 | 0.08 | 0.12 |
| Ann Div Yld: | 0.00% | 4Q |  | 0.09 | 0.15 | 0.20 |
| Mkt Cap (mm): | 161,562 | FY(May) |  | 0.22 | 0.34 | 0.51 |
| 3-Yr Growth: | 25% | FY | P/EPS | NM | 80.9X | 53.9X |
|  |  | CY | EPS | 0.24 | 0.43 | 0.54 |
| Est. Changed | Yes | CY | P/EPS | NM | 64.X | 50.9X |

----------------------------------------------------------------
Industry:        E-TECHNOLOGY
Shares Outstanding(Mil.):  5874.987
Return On Equity (1999) :    48.0%
----------------------------------------------------------------

HIGHLIGHTS:
ORACLE DELIVERS THE GOODS IN F2Q. Oracle delivered a strong F2Q (Nov.) with total revenue
of $2.7B (+15% y/y) in line with our estimate, and EPS of $0.11 (+66% y/y), a penny above
our estimate and Street consensus of $0.10.  Software growth was in line, up a healthy 25%
on 66% applications growth and 19% database growth.

APPLICATIONS 11I GAINING MOMENTUM.  Oracle's new 11i e-business suite appears to be
gaining significant traction.  83 11i customers are live with roughly 100 in late-stage
implementation.  We learned of several large (8-figure), marquee customer wins in the
quarter including JDS Uniphase, Compaq, Sun Microsystems and Agilent Technologies.

MARGIN EXPANSION CONTINUES BUT FUTURE GAINS MAY MODERATE.  Operating margin was 36%, vs.
our 31% estimate and 25% a year ago.  Margin expansion will remain a part of the Oracle
story although future gains may be tempered by a resumption in headcount growth, which
increased sequentially in F2Q for the first time in five quarters.

MANAGEMENT REMAINS BULLISH.  Management maintains a very bullish outlook on healthy sales
pipelines and a strong product cycle including Applications 11i and the new 9i database,
scheduled to ship in Spring 2001.  Barring a significant macroeconomic dislocation, Oracle
sees strong demand continuing throughout 2001.

ESTIMATE REVISIONS.  Forward revenue estimates are fine-tuned with a higher mix of
applications and total software revenue offset by slightly lower database and services
revenue.  FY'01 revenue and EPS estimates are now $11.8B and $0.51 vs. $11.9B and $0.49
previously.  FY'02E revenue is largely unchanged at $14.1B.  FY'02E EPS increases to $0.59
from $0.57.  We reiterate our STRONG BUY rating.

DETAILS:
SOLID F2Q (NOV.) RESULTS
Oracle reported a solid F2Q (Nov) with impressive applications growth of 66%, 36%
operating margin and 66% EPS growth.  EPS of $0.11 beat our estimate and Street consensus
of $0.10.  Total revenue of $2.66B (up 14.5% year/year) was slightly below, but in line
with our $2.7B estimate.  The weak euro resulted in a negative 6.5% impact to revenue
growth.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER                    NDCA-ORCL 420587

Yr/Yr Revenue

|  | F2Q'01 | Our Est. | F2Q'00 |
|---|---|---|---|
| License/Other Revenue | $1,118.2M | $1,115.0M | $902.6M |
| Service Revenue | $1,541.3M | $1,580.0M | $1,419.3M |
| Total Revenue | $2,659.6M | $2,695.0M | $2,321.8M |
| Y/Y Growth | 14.5% | 16.1% | 12.9% |

Source: Company data and Deutsche Banc Alex. Brown estimates

On the license side, applications revenue grew 66% to $279M, handily beating our estimate of $250M (+49% growth). Oracle's 11i e-business suite, in its second full quarter of general release, helped to bolster applications growth. Database licenses grew 19% to $775M, slightly below our estimate of $800M (+23% growth) but a respectable number that provides adequate validation of the health of the database market. Services revenue grew 9% to $1,541.3M a bit below our estimate of $1,580.0M. Maintenance and support growth was 21%, while consulting continued to lag expectations, declining 4.3%.

APPLICATIONS 11I GAINS MOMENTUM
A key part of Oracle's strong F2Q was the strength of the applications business and, more importantly, marquee customer wins with the new 11i e-business suite. Applications license growth of 66% solidly outpaced Street expectations in the 50-60% range. The outperformance should also allay concerns about the viability of Oracle's applications business and the relative immaturity of release 11i following last quarter's decent, but slightly disappointing 42% growth. Management sees 75% growth for the rest of FY'01. Marquee customer wins (see below), in addition to the 83 11i customers now live and 100 or more set to go live in the coming months, should provide important reference customers key to sustainable growth. 3000 Oracle field reps are now fully trained and selling the 11i suite.

11I'S "OPEN ENTERPRISE" CAPABILITIES DRIVE MARQUEE WINS
Oracle's marketing message for the 11i applications suite lauds the merits of tight integration, end-to-end e-business functionality and its thin-client, IP-based architecture. With this positioning, we see Oracle as a key enabler in, what we have termed, the "open enterprise" movement in which organizations are tearing down the corporate four walls to extend information and e-business processes to partners, suppliers and customers (see our September 2000 theme report, "The e-Process Revolution 2"). Oracle's positioning as a key e-business enabler appeared to gain significant traction in F2Q with impressive, 8-figure wins at JDS Uniphase, Compaq, Sun Microsystems, Agilent Technologies and American General.

JDS Uniphase is rolling out the full 11i e-business suite enterprise wide to 14 sites in 5 countries. Demonstrating the rapid deployment capabilities of 11i's IP-based architecture, JDSU is bringing a new site on line every 17 days. Notable 11i CRM wins included Hewlett-Packard and Simplex. 25 new supply chain customers were added including Sony and Boeing. In F3Q'01 (Feb.), Oracle inked a significant licensing deal with Covisint, the automotive B2B vertical marketplace formed by Ford, General Motors, DaimlerChrysler and other major auto makers. Covisint is licensing more than 55 Oracle products including a large portion of the e-business application suite. We believe this deal is in the eight-figure range and will be recognized this quarter (F3Q). Oracle, along with i2 Technologies and SAP, remain in the hunt to provide Covisint's supply chain management capabilities.

MARGIN EXPANSION CONTINUES BUT FUTURE GAINS MAY MODERATE
Operating margins expanded for a sixth consecutive quarter and the fourth straight quarter of double-digit gains. F2Q operating margin was 36%, vs. our 31% estimate and an 1100 basis point improvement over 25% a year ago. Margin expansion will remain a part of the Oracle story although future gains may be tempered by a resumption in headcount growth, which increased sequentially in F2Q for the first time in five quarters. Headcount growth will likely focus on sales, marketing, and service organizations. Our full year FY'01 forecast is now 37%, up from 35% previously. For FY'01, we now forecast operating margin of 38% vs. 36% previously.

Margin Analysis

|  | F2Q'01 | F2Q'00 | Our Est |
|---|---|---|---|
| Gross (aka Service) Margin | 73.9% | 67.6% | 71.0% |
| Sales & Marketing | 24.1% | 27.2% | 25.5% |
| Research & Development | 10.0% | 10.7% | 10.0% |
| General & Administrative | 4.2% | 4.9% | 4.3% |
| Operating Margin | 35.6% | 24.8% | 31.2% |

Source: Company data and Deutsche Banc Alex. Brown estimates

KEY F2Q METRICS
Large deals (over $500K) accounted for 45% of revenues versus 36% last year. This was largely driven by Oracle's strong performance in applications. Currency translation had a -6.5% impact on revenue growth, largely from continued weakness in the euro. Geographically, the Americas represented 57% of revenue and increased 20% y/y. EMEA was 29% of revenue and grew 1% (as reported). Asia/Pacific was 15% of revenue and grew 28%

y/y (as reported).  Applications growth was strong in all regions:  65% in the Americas and 90%-plus in both EMEA and Asia Pacific regions (in local currency).  For the first time in five quarters, Oracle's headcount increased sequentially, growing to 42,002 from 41,170 in F1Q'01, but still below year ago levels of 42,682.

BALANCE SHEET
Oracle ended F2Q'01 with $4.4B in cash and short-term investments, down from $5.1 billion at the end of F1Q.  This largely resulted from the repurchase of more than $1.4 billion in Oracle stock, (44M shares, avg. price of $32-33 a share).  Long-term debt was $301M, flat compared to the previous quarter.  DSO continues to be well managed at 66 days, down slightly from 67 days in F1Q and 69 days in F2Q'00.

ESTIMATE REVISIONS AND OUTLOOK
Management maintains a very bullish outlook on healthy sales pipelines and a strong product cycle including Applications 11i and the new 9i database, scheduled to ship in spring 2001.  Barring a significant macroeconomic dislocation, Oracle sees strong demand continuing throughout 2001.  Management sees revenue growth in the remainder of FY'01 as follows:  15-20% in database, 75% in applications, 23% in maintenance and 5% in consulting.  Management sees moderately higher operating margins going forward as well, though the company may not reach 40% for all of FY'01.

We have fine-tuned our forward revenue estimates with a higher mix of applications and total software revenue offset by slightly lower database and services revenue.  We project full year FY'01 growth of 55% in applications, 20% in database and 11% in services, compared to prior estimates of 40%, 23% and 13%, respectively.  FY'01 revenue and EPS estimates are now $11.84B and $0.51 vs. $11.86B and $0.49 previously.  FY'02 estimates are now $14.08B and $0.59 vs. $14.07B and $0.57 previously.

|          | New F01  | Prior F01 | New F02  | Prior F02 |
|----------|----------|-----------|----------|-----------|
| Revenue  | $11.84B  | $11.86B   | $14.08B  | $14.07B   |
| EPS      | $0.51    | $0.49     | $0.59    | $0.57     |

Source: DB Alex. Brown estimates

REITERATE STRONG BUY-THE QUESTION IS VALUATION
Oracle's fundamentals and positioning support a continued strong outlook barring a significant economic dislocation.  With a strengthening e-business applications story and a dominant database franchise, we believe Oracle will remain a core provider of Internet infrastructure software for the foreseeable future.  At $28.50/share, Oracle trades at 48x our FY'02 EPS estimate of $0.59, 2.5x our top line growth estimate for FY'02 and roughly 2x our secular growth rate estimate of 25%.  In an interest rate-friendly environment with a reasonably stable macroeconomic outlook, this may be a fair or attractive price to pay for a blue chip technology name like Oracle.  That said, Oracle and many other technology names still look expensive by historical standards and thus carry substantial market risk, in our view.  As we remain in uncertain economic times, we believe valuations of even the highest quality companies will continue to be intensely scrutinized and rationalized.

Information herein is believed to be reliable and has been obtained from sources believed to be reliable, but its accuracy and completeness cannot be guaranteed.  Opinions, estimates, and projections constitute our judgement and are subject to change without notice.  This publication is provided to you for information purposes only and is not intended as an offer or solicitation for the sale of any financial instrument.  Deutsche Bank Securities Inc., DB Alex. Brown LLC., and their affiliates worldwide, may hold a position or act as market maker in the financial instruments of any issuer discussed herein or act as advisor or lender to such issuer.  Transactions should be executed through a Deutsche Bank entity in the client's home jurisdiction unless otherwise permitted by law.  Deutsche Bank Securities Inc., and DB Alex. Brown LLC., are members of NYSE and NASD.  Copyright 2000 Deutsche Bank Securities Inc., and DB Alex. Brown LLC.  In the U.S. this report may be distributed either by Deutsche Bank Securities Inc., or DB Alex. Brown LLC.  Interested parties are advised to contact the U.S. entity they currently deal with, or the U.S. entity that has distributed this report to them.

Additional Information Available Upon Request

Deutsche Bank Securities Inc. maintains a net primary market in the common stock of Oracle Corporation.
The following stock(s) is (are) optionable: Oracle Corporation.
One or more authors of this comment have a long position in the common shares of Oracle Corporation.

# EXHIBIT 25

Re: [Fwd: [Fwd: Early Returns: Q2 / CRM update]]

**From: Mike Rosser <Mike.Rosser@oracle.com>**                                          2:59 PM
**Subject: Re: [Fwd: [Fwd: Early Returns: Q2 / CRM update]]**
**To: Stephanie Aas <stephanie.aas@oracle.com>**

I will be in Europe this week......(per Mark's comments on EMEA)..I leave tonight around 11pm EST...I
will try to give you a call from there....you can try me on my cell....312-543-3616....beginning tomorrow
I will be in Geneva....cell should still work there.

I doubt that the customers will be willing to say they are replacing anyone....always difficult as it admits
failure....I do think, however, we can mention these to the analysts as we talk with them one on one.
American General has referenceability in their contract...Heidi Restivo is the AM.. Simplex is willing to
talk as to why they chose Oracle over Siebel....Peter Macpherson is the contact...I suspect
Beckman-Coulter will talk....Beckman, HP, JDSU and Compaq were all initial deals last year with
significant new commitments this fiscal year.....more that the analysts should like to hear.

Mike

Stephanie Aas wrote:

> Let's talk. I will call you.
>
> Stephanie

---

**Subject: [Fwd: Early Returns: Q2 / CRM update]**
**Date: Mon, 04 Dec 2000 11:17:30 -0800**
**From: Jeff Henley <Jeff.Henley@oracle.com>**
**Organization: Oracle Corporation**
**To: saas <saas@us.oracle.com>**

> FYI. I like the replacement stories so contact Rosser to get more
> details on the ones who are willing to be quoted.

---

**Subject: Early Returns: Q2 / CRM update**
**Date: Mon, 04 Dec 2000 09:24:13 -0800**
**From: Mark J Barrenechea <mark.barrenechea@oracle.com>**
**Organization: Applications**
**To: "Ellison,Lawrence" <LARRY.ELLISON@oracle.com>,**
**"Catz,Safra" <SAFRA.CATZ@oracle.com>,**
**"Henley,Jeffrey" <JEFF.HENLEY@oracle.com>**

Do not forward....

## LICENSE ALL CRM PRODUCTS (estimates)

| | | |
|---|---|---|
| FY00-Q2 | 49mil | Note: 2.4mil Configurator |
| FY01-Q2 | 81mil | Note: 6mil Configurator |
| Growth | 66% | |

**[We could be 85/86 or 73/75 % growth]**

| Sequential | | |
|---|---|---|
| FY01-Q1 | 31mil | |
| FY01-Q2 | 81mil | |
| Growth | 161% | |

ORACLE
CONFIDENTIAL

CA-ORCL 018366                    12/04/2000 3:28 PM

Re: [Fwd: [Fwd: Early Returns: Q2 / CRM update]]

**FY01-Q3 Target** <u>125mil, growth 150% [I am working to secure this committment, very</u>
<u>achievable</u>

**TOP 10 WINS**

| Name | License Amount |
|------|----------------|
| Compaq | 5.1mil + 2mil Config |
| American General | 4.8mil +400K Config  (head to head v. Siebel / Siebel replace - SFA) |
| JDSU | 6.4mil |
| HP | 21.5mil |
| Simplex | 4.5mil (head to head v. Siebel - Mobile Field Service) |
| Beckman-Coulter | 2.6mil  (Vantive Service replace) |
| Tyco | 500K  (head to head v. Siebel - Field Service) |
| Canon-Japan | 2.3mil |
| Lucent | 2.4mil |
| Carolina Broadband | 1.8mil |
| Entel Bolivia | 1.0mil |
| ... | |

*(handwritten: 52.704 4401 office #)*

**TOP Apologies (pushed to Q3)**

**NAME**
NCR
Ingersoll Rand
EMC
APPLE
BellSouth
CISCO
UBS Warburg
Americredit
Citigroup
Telia

...

**11i Live Customers**
Value Vision
Papa Johns
Zap Media
Netpliance

**Sample 11i Go-Lives for December**

| Name | Date |
|------|------|
| BellSouth | Dec 15 |
| Franklin Covey implementation) | Dec 8 (Broadvision replace- 3 month |
| Host Centric | Dec 20 |
| CitiGroup | Dec 28 |

**SPECIAL HIGHLIGHTS**
- OSI ... we missed bell south, but the convertable Q3 pipeline looks great.
- OPI ... Without HP, it would have been different.  The East did not bring in any business.  Steve M
has a large Q3 pipeline.
- GB/Majors ... did great.  They exceeded their forecast [though we all should be doing double the quota]
- EMEA ... struggling.  Rosser and myself are sending lots of time here:

ORACLE
CONFIDENTIAL

CA-ORCL 018367

12/04/2000 3:28 PM



Re: [Fwd: [Fwd: Early Returns: Q2 / CRM update]]

        [talent, demos, partner training, translations]
- APAC ... building steam
- Japan ... on the score board big with Canon. NEC in the hooper.

General comments ... we need more account coverage, more smaller deals.

## HALF YEAR REVIEW

|  | FY00 | FY-01Actual | Forecast |
|---|---|---|---|
| FY01-Q1 | 31 | 28 |  |
| FY01-Q2 | 49 |  | 81 |
| FY01-Q3 | 50 |  | 125 |
| FY01-Q4 | 112 |  | 175-225 |
| TOTAL | 242 |  | 409 - 459 |

I will plug in the actual numbers when they are final. Thought you might like to see the early returns.

--mark

---

Mike Rosser <Mike.Rosser@oracle.com>
Vice President, Global Strategic Sales
CRM

---

**ORACLE
CONFIDENTIAL**

CA-ORCL 018368    12/04 2000 3:28 PM



11:20am EST  5-Dec-00 Wit SoundView (Jim Mendelson 203-462-7213) ORCL
Oracle (ORCL) Company Update December 5, 2000

Oracle (ORCL)     Price: $28.19     Strong Buy     December 5, 2000

| (FYE May) | F00 | F01 | F02 | Curr. | Last | Yr. Ago |
|---|---|---|---|---|---|---|
| Revenue ($M) | 10,130 | 11,838 | 14,111 | 2,682 | 2,262 | 2,322 |
| EPS | 0.34 | 0.50 | 0.63 | 0.095 | 0.08 | 0.064 |
| Old Revenue | | | | | | |
| Old EPS | | | | | | |

Oracle's shares have begun a rebound, after hitting a recent low of $23 (50% off
the peak of the year). Our field inputs have been consistently positive
through the quarter, and we are very optimistic Oracle did enjoy very strong
growth in its applications business in Q2. Our price target remains $48.

Recent Evidence in Support of Strong Applications Growth:
* Success with large, strategic deals - Citigroup and GE. We have commented on
the Citigroup deal previously, and although we do not know the exact size, there
is little doubt the value runs comfortably into eight figures. As for GE,
although it is still not clear what the exact status of Oracle's relationship
with the company, we do believe there is a significant deal.

* Strong momentum in the mid-market. Despite indications that product
evaluations are becoming more thorough and detailed, we believe Oracle's
emphasis on product suite integration with its attendant benefits in terms of
costs to deploy and support are particularly compelling to smaller, mid-sized
organizations where economic constraints are a critical issue.

* Field organization was targeted on driving a big applications number. Our
discussions with field sources made it very clear Oracle's internal objectives
are substantially higher than the comments made by management to the investment
community. In addition, field contacts have been very conscious of the
strategic importance of the applications business to the company.

RDBMS Business Remains Very Healthy:
* RDBMS demand has been stimulated by the Internet. Internet applications have
increased demand for data mining, business intelligence, not to mention creating
a broader universe of users (by orders of magnitude) - all of which makes for:
accelerated growth of data in existing databases and the need for new databases.

* Power unit pricing = more consistency, and more linear quarters. Oracle's
recent adoption in the past year of power unit pricing, which was coupled with a
sharp reduction in list prices, and more consistent/standardized discounting
practices, has brought integrity to the company's pricing. Pricing consistency
does not mean lower prices, which has led to customer criticism. Pricing
consistency does mean the ability to do more business over the Internet, which
means less sales time dedicated to pricing negotiation. Pricing consistency
also helps to break the last minute grab for discounts and makes for more linear
business.

Opportunities for Further Margin Expansion:

Net: Although a lot of specific unknowns remain as to how Oracle's Q2 results
will look (business by geography, consulting services and currency), we remain
confident that overall results will be impressive. We continue to believe the
RDBMS business is strong and the applications business will certainly
meet/exceed the low-end of management's comments of "50% to 100% growth."

This document has been prepared by Wit SoundView Corp. Information contained
herein has been obtained from sources believed to be reliable, but the accuracy
and completeness of the information, and that of the opinions based thereon, are
not guaranteed. This report is not an offer to buy or sell or a solicitation
of an offer to buy or sell the securities mentioned or related securities. Wit
SoundView Corp. is a registered broker-dealer and wholly owned subsidiary of Wit
SoundView Group, Inc. Wit SoundView Corp., and entities and persons associated
with it, may have long or short positions in or effect transactions in the
securities of companies mentioned in this report. Wit SoundView Corp. may make

**ORACLE
CONFIDENTIAL**

**CA-ORCL 018369**



http://www.firstcall.com/links/20/...0553421148144111273:395689480.html

a market in the shares of any such company and may have acted as a lead or
co-managing underwriter in one or more of such company's U.S. equity offerings.
Wit SoundView Corp. may perform or seek to perform other investment banking
services for any company referenced in this document.  Do not change or
reproduce this report without the express written consent of Wit SoundView Corp.
c 2000 Wit SoundView Corp.
First Call Corporation, a Thomson Financial company.
All rights reserved.  888.558.2500
]

EON

ORACLE
CONFIDENTIAL

CA-ORCL 018370

12/05/2000 8:21 PM

NDCA-ORCL 021392