# EXHIBIT 40

# REPORT OF THE
# SPECIAL LITIGATION COMMITTEE
# OF THE BOARD OF DIRECTORS
# OF ORACLE CORPORATION

## VOLUME 1

### November 22, 2002

**Professor Hector Garcia-Molina**

**Professor Joseph A. Grundfest**

**CONFIDENTIAL – FILED UNDER SEAL**

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 294503

## XII.   SUITE 11i

### A.   Overview

#### 1.   Allegations

Suite 11i is an Internet-based, integrated applications software product released by Oracle in May 2000. The plaintiffs allege that the market price for Oracle stock was artificially inflated by, *inter alia*, the dissemination by Oracle and certain of the Individual Defendants of false and misleading statements about the quality, performance, and sales of Suite 11i. The plaintiffs also allege that the Trading Defendants were aware of material, adverse non-public information about Suite 11i when they sold their stock. Specifically, the plaintiffs allege that (a) Suite 11i was incomplete and riddled with technical flaws and bugs; (b) Suite 11i was not fully integrated and "interoperable out of the box," as claimed by Oracle; (c) customers had great difficulty in deploying the product; and (d) the market was unaware of this information, which kept the price of Oracle stock artificially high while the Trading Defendants sold their stock. The plaintiffs further allege that the various shortcomings of Suite 11i caused Oracle to miss its revenue and earnings projections for Q3 of FY 2001.

#### 2.   Summary of Conclusions

The Committee finds that the plaintiffs' claims relating to Suite 11i lack merit for the following four distinct and major reasons.

First, none of the public statements about the functionality of Suite 11i referred to in the Derivative Complaints were either false or misleading. Instead, it appears that the plaintiffs are construing certain of these statements in a materially inaccurate manner, and it is clear to the Committee that, taken as whole, the full text of statements cited in the complaints do not support the plaintiffs' construction. Thus, the predicate for the plaintiffs' Suite 11i claims is not established.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 295275

Second, the specific statements about Suite 11i identified in the Derivative Complaints did not cause any statistically significant movement in Oracle's stock price. The alleged statements thus did not artificially inflate the price of Oracle stock. Under the test adopted by a number of federal courts, the absence of such an effect in the market for Oracle's stock is, as a matter of law, dispositive of the plaintiffs' allegations.

Third, the market was well aware of the alleged problems with Suite 11i prior to the time that the Trading Defendants sold their stock. Specifically, the market was aware, from numerous public sources, that Suite 11i had many bugs, that some early adopters had significant difficulty in deploying Suite 11i, and that Oracle might have a hard time finding reference customers due to these difficulties.[1] Thus, this information was not "non-public." As a consequence, the value of that information to investors was already factored into the price of Oracle stock at the time the Trading Defendants sold their stock.

Fourth, Oracle's earnings disappointment in Q3 FY 2001 was not caused by problems with Suite 11i. It was instead principally caused by a precipitous decline in Oracle's

---

[1]    Moreover, the Committee believes that the existence of bugs and implementation difficulties with a product as novel and complex as Suite 11i came as no surprise to anyone with even limited prior exposure to the software industry. Suite 11i was a revolutionary product that attempted to integrate multiple applications on a scale never before undertaken. It was well known in the marketplace that new software products inevitably contain bugs and that the larger and more complex the software program, the greater the anticipated incidence of bugs. It is also common knowledge in the industry that management faces a difficult challenge when launching a new software product. If management waits too long to introduce a product in order to reduce the incidence of bugs and in order to increase the number of features, it risks losing market share to competitors who are already in the market. If management launches too soon, it risks establishing a reputation for a product that has too many bugs and too few features, and that reputation may be expensive to overcome. It was therefore generally understood by the market that an endeavor as ambitious as Suite 11i would result in the launch of a product that would contain "bugs" and would have implementation issues, particularly for early adopters.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 295276

overall license business (both Database and Applications) that occurred at the end of February
2001, as Oracle customers and potential customers (particularly large customers in the United
States) delayed purchasing decisions, reduced deal sizes and/or declined to purchase software.[2]

Additionally, the Committee observes that although Suite 11i clearly
experienced the same sort of "birthing pains" as other significant commercial software
releases, today it is a stable, high-quality, successful product. Moreover, many Suite 11i early
adopters not only successfully implemented the product, but also are now reference customers
for Oracle.

**B.     Background**

Oracle began to expand its product line from relational databases to enterprise
applications in the 1980s. In 1987, Oracle created an internal division to focus on Applications
software development for enterprises.[3] At the beginning of its development of applications,
Oracle had seven employees in the Applications division, and produced two products.[4]

Oracle's early applications products focused on enterprise financial tools. Over
time, Oracle expanded its enterprise applications offerings. By 1997, when Oracle produced
Oracle Applications Release 10.7,[5] it was offering several applications in the field of Enterprise
Resource Planning ("ERP"). ERP applications include not only financial tools, but also tools
for procurement, supply chain management, order management, manufacturing, distribution,

[2]     *See generally* Chapter VIII *supra.*

[3]     *See* Oracle Corporation AppsWorld New Orleans Welcome Kit, Feb. 19-23, ORCL
46205-46, at ORCL 46237, Exhibit 27-51.

[4]     *Id.* at ORCL 46237.

[5]     *Id.* at ORCL 46238.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

and human resource management. Often, ERP applications are known as "back office" applications, because they automate processes that are not usually directly visible to an enterprise's customers.

In 1996, Oracle also began to develop applications for the Customer Relationship Management ("CRM") field. CRM applications are often referred to as "front office" applications. They include tools for marketing, sales, service, customer call centers, online stores, contract management, and self-service customer care. When Oracle shipped Oracle Applications Release 11.0 in 1998, its applications offerings included CRM applications.[6]

### 1.    Best of Breed Approach

Up to and through the development and production of Oracle Applications Release 11.0, Oracle had followed an approach that the enterprise software industry called "best of breed." As of Release 11.0 in 1998, no producer of enterprise applications software, including Oracle, offered a product for every enterprise application need. Companies buying applications software had to pick and choose among software vendors to assemble a package of applications to meet their needs. For example, a company might buy one ERP application from Vendor A, a different ERP application from Vendor B, and a CRM application from Vendor C. The process came to be called "best of breed" because companies would select the best of each type of application from the various software vendors that competed in offering such an application. However, the best of breed approach has inherent problems.

---

[6]    *Id.* at ORCL 46239.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Oracle likened the process to building a car by buying the best components from different manufacturers: the engine from Mercedes, the suspension from Jaguar, the steering system from BMW, the air-conditioning from GM, the brakes from Ford, and so on.[7] While the components individually may be the best in their class, they are not designed to work together. To make a functioning car out of this best of breed mixture would require a substantial amount of engineering work. In the end, a best of breed car may not actually function better than a Honda Accord, which may not have the best of breed part for each part of the car, but the parts it has are all designed to work together.

As in the car analogy, best of breed application programs from various vendors are not engineered to work together. For example, different programs from different vendors may use different schema.[8] In addition, the separate programs may be based upon different and incompatible data structures. Additionally, the programs' application programming interfaces ("APIs") might not work together.[9]

To make these best of breed applications work together, each program has to be stitched together in a process called "systems integration." Consultants, such as IBM, KPMG or Accenture are often called upon to perform the systems integration work, which is a

---

[7]     G. Christian Hill, *Dog Eats Dog Food. And Damn if It Ain't Tasty*, Business 2.0, Nov. 2000, ORCL 63915-24, at 63920, Exhibit 18-43.

[8]     The database schema defines tables and types of fields that make up a database. For example, a schema may indicate that there is an "EMPLOYEE" table containing fields like "NAME," "SALARY" and "DEPARTMENT_NUMBER," and a "DEPARTMENT" table with fields describing how a department is organized, *e.g.*, "MANAGER," "DEPARTMENT_NUMBER," "NUMBER_OF_EMPLOYEES," etc.

[9]     APIs are the external "sockets" that allow different applications to work together by exporting and importing data and instructions.

complex, expensive and time-consuming process. Systems integration costs can be four to seven times more expensive than the software itself.[10]

### 2. Suite 11i Was a Revolutionary Product Offering

The basic premise of Suite 11i is "one-stop shopping." Suite 11i is a set of applications designed to work together without requiring systems integration among the various component parts of the Suite. The components of Suite 11i are designed to share a single data model, with integrated schema and APIs that function across applications. Oracle believed that this approach provided significant cost and functionality benefits to its customers. A principal advantage of Suite 11i over the best of breed approach is that the purchase of a pre-integrated suite of software significantly reduces systems integration costs. This cost reduction is achieved because the time-consuming and expensive process of stitching together various applications is eliminated for all of the application modules of Suite 11i purchased by a customer, as those modules are designed to work together.

It should be noted, however, that even with an integrated application suite, there is still a lot of work a customer must do to integrate the entire suite into the customer's particular environment. The customer often has to change its business practices to be consistent with the suite's operating assumptions. For example, a software suite may assume that only managers can update certain data. If that is not the way the enterprise operates, then the user must: (i) change the way it does business, (ii) request that the software vendor extend functionality (*e.g.*, so that managers *and* their executive assistants can make modifications), or (iii) change the software product themselves. Any of the three alternatives are "painful" to

---

[10]     G. Teagarden, *Oracle EVP Visit to SSB*, Salomon Smith Barney Analyst Report, Jan. 10, 2001, ORCL 605-09, at ORCL 607 (reporting Sanderson comments), Exhibit 21-45.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

carry out and time consuming. Yet, companies are willing to make the effort because in the end (sometimes years later) they end up with a very efficient system that requires little maintenance and provides a considerable return.

Another complication is that customers often have legacy systems that must be integrated with the suite. For example, a particular user may want to use most of the functionality of the suite, but may wish to retain their old financial system. (For instance, it may do business in an unusual way that does not fit in with the standard financial assumptions built into the suite.) In this case, the suite needs to be integrated with the legacy system, *e.g.*, the suite software must somehow communicate with the legacy system when a sale is made, so that total sales can be tallied by the financial system. Because each legacy system has its own idiosyncrasies, deploying the suite will *always* reveal incompatibilities and bugs. The problems may occur either with the legacy system, or with the suite, or with the interface between them, but in any case, the problems are impossible to predict until the legacy system and the suite are integrated and deployed.

The failure to appreciate this aspect of the deployment of an integrated software suite seems to underlie the plaintiffs' claims that Suite 11i was not interoperable out of the box. The components of Suite 11i were designed to be interoperable among themselves. However, interoperability among the components does not eliminate the significant customer and site-specific deployment issues discussed above.

Oracle's offering of Suite 11i as an integrated and comprehensive suite of applications was a radical departure from the "best-of-breed" approach. At the time Oracle introduced Suite 11i in May 2000, no other software company offered the same comprehensive

and integrated set of applications.[11]  Suite 11i facilitates the automation and integration of business processes, resulting in significant improvements to productivity.[12]  Suite 11i also supports multiple languages (currently 30), as well as multiple currencies.  It is thus suitable for use by multinational corporations with operations in multiple countries.

Suite 11i also offered flexibility to users.  They could purchase the entire Suite, or, because its applications were designed as modules that could stand alone, they could purchase individual applications.

The marketplace response to the idea of an integrated suite of applications was positive.  According to the Morgan Stanley Dean Witter Chief Information Officer ("CIO") Survey released on March 6, 2001, 63% of the CIOs surveyed indicated that they would increase their focus on packaged applications, such as Oracle's Suite 11i, instead of assembling a custom best of breed system.[13]  In the same survey, 48% of Oracle application users indicated that they intended to upgrade to Suite 11i, versus only 33% of SAP users who planned to upgrade to mySAP.com.[14]

---

[11]    See Sharon Ward, *Oracle's E-Business Suite 11i*, Hurwitz Balanced View Bulletin, Apr. 11, 2001, ORCL 7943-49, at ORCL 7943 (describing Suite 11i as providing a choice between "best-of-breed" or, "for the first time, a truly comprehensive suite of integrated applications"), Exhibit 20-10.

[12]    See *infra* Chapter XIII for a discussion of Oracle's margin improvements and cost savings accomplished, in part, through the implementation of Suite 11i.

[13]    See *MSDW CIO Survey Series: Release 2.1*, Morgan Stanley Dean Witter CIO Survey, Mar. 6, 2001, ORCL 36609-31, at ORCL 36618, Exhibit 21-68.

[14]    See *id.* at 36622-23.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

### 3.  General Description of Suite 11i

In September 1999, Oracle announced plans to develop Suite 11i. Oracle planned to make the software suite available in the Spring of 2000.[15] Oracle shipped the first commercial versions of Suite 11i on May 24, 2000.[16] Certain ERP components of Suite 11i had been previously available, but the official May 2000 release included CRM applications.

The May 2000 release of Suite 11i spanned 14 major categories of functions, with a total of 68 individual products.[17] The following table shows the components of Suite 11i as of May 2000:

---

[15]   *Oracle Announces Oracle® Applications Release 11i*, Oracle Press Release, Sept. 27, 1999, ORCL 111259-62, at ORCL 111262, Exhibit 17-1.

[16]   *See Oracle Ships 11i, Industry's First Integrated E-Business Suite*, Oracle Press Release, May 24, 2000, ORCL 12938-40, Exhibit 17-6.

[17]   *See* E-mail from Peter Heller to Carol Sato, May 23, 2000, ORCL 32840-44, including E-mail from Dave Mahloy to team, at ORCL 32841 (listing modules of Suite 11i), Exhibit 19-6.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

**Table 12-1**
**Suite 11i Modules As of May 2000 Release**

| Financial Applications | Service Applications | Communications/Utilities Applications |
|---|---|---|
| ➤ Financials<br>➤ Self-Service Expenses<br>➤ Financials Intelligence<br>➤ Treasury<br>➤ Property Manager | ➤ Service<br>➤ Field Service<br>➤ Mobile Field Service<br>➤ Scheduler<br>➤ Depot Repair<br>➤ Contracts | ➤ Service for Communications<br>➤ CRL Network Logistics<br>➤ SDP Provisioning<br>➤ SDP Number Portability |
| **Projects Applications** | **HR Applications** | **eCommerce Applications** |
| ➤ Projects<br>➤ Project Billing<br>➤ Self-Service Time<br>➤ Project Connect for Microsoft Project<br>➤ Project Analysis Collection Pack | ➤ Human Resources<br>➤ Self-Service Human Resources<br>➤ HR Intelligence<br>➤ Payroll<br>➤ Time Management<br>➤ Training Administration<br>➤ Advanced Benefits | ➤ iStore<br>➤ iMarketing<br>➤ iPayment<br>➤ iSupport |
| **Purchasing Applications** | **Other Applications** | **Call Center Applications** |
| ➤ Purchasing<br>➤ Supplier Scheduling<br>➤ Self-Service Purchasing<br>➤ Purchasing Intelligence<br>➤ Self-Service Suppliers<br>➤ Purchasing Connect for TPN Register | ➤ EDI Gateway<br>➤ Report Manager<br>➤ Public Sector and Federal<br>➤ Applications<br>➤ Public Sector Financials<br>➤ Public Sector Purchasing | ➤ Advanced Inbound<br>➤ Advanced Outbound<br>➤ Interaction Blending<br>➤ E-mail Center<br>➤ Scripting |
| **Order Management Applications** | **Manufacturing Applications** | **Market Applications**<br>➤ Marketing Online<br><br>**Architecture and Tools**<br>➤ CRM Foundation<br><br>**Sales Applications**<br>➤ Sales Compensation |
| ➤ Order Management<br>➤ Product Configurator<br>➤ Selling Point<br>➤ Selling Point Internet Edition<br>➤ Selling Point Developer<br>➤ Supply Chain Planning Applications<br>➤ Advanced Supply Chain Planning<br>➤ Constraint Based Optimization<br>➤ Global ATP Server<br>➤ Demand Planning | ➤ Discrete Manufacturing<br>➤ Flow Manufacturing<br>➤ Project Manufacturing<br>➤ Manufacturing Scheduling<br>➤ Operations Intelligence<br>➤ Process Manufacturing<br>➤ Process Manufacturing Regulatory Management<br>➤ Process Manufacturing Intelligence | |

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-11

Suite 11i is now a stable suite of application programs that is successfully being
used at numerous customers, including Alcoa, Boeing, Ford Motor Company, General Electric
and Hewlett-Packard.

     C.     **Analysis Of Allegedly False Or Misleading Statements Concerning Suite 11i Functionality**

Plaintiffs identify four specific statements that they allege were affirmative
misrepresentations about the functionality of Suite 11i:

1.     "No programming systems integration work is necessary to implement the 11i Suite."[18]

2.     "There's no systems integration required.  No software modifications required to use our E-Business Suite.  A very different value proposition on the old style of implementing in business applications and [in] large companies."[19]

3.     Suite 11i was "the first suite of integrated e-business software . . . ."[20]

4.     "Oracle *reiterates* two key value propositions for the suite solution versus a best-of-breed approach:

        •     The suite provides a single view of the customer across the enterprise by incorporating a single data model.

---

[18]     Amended Shareholder Derivative Complaint ("Del. Deriv. Compl."), Oct. 10, 2001, ¶ 98, Exhibit 22-14.  Verified Shareholder Derivative Complaint ("Fed. Deriv. Compl."), Mar. 14, 2002, ¶ 124, Exhibit 22-26.

[19]     Del. Deriv. Compl. ¶ 102, Exhibit 22-14; Fed. Deriv. Compl. ¶ 128, Exhibit 22-26.

[20]     Del. Deriv. Compl. ¶ 104, Exhibit 22-14; Fed. Deriv. Compl. ¶ 130, Exhibit 22-26; Plaintiffs' Consolidated Derivative Complaint ("Cal. Deriv. Compl."), Jan. 28, 2002, ¶ 33, Exhibit 22-148.  The same paragraph of the Complaint also contains statements about expected sales of 11i and savings from Oracle's internal implementation of the applications in the Suite.  Those allegations are separately addressed in this Report; *see generally supra* Chapter VIII (addressing expected sales) and *infra* Chapter XIII.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

- The suite is *"pre-integrated and fully interoperable out of the box"*, helping to lower consulting costs and time to value.[21]

Each of these statements essentially asserts that Suite 11i was "pre-integrated and inter-operable out-of-the-box, needing no programming systems work for implementation."[22] Plaintiffs claim that these statements were false. However, Plaintiffs' complaints do not clearly explain why these statements were false, and the Committee observes that Plaintiffs' allegations can be interpreted in two different ways. Plaintiffs appear at times to be claiming that the statements in question were false because, even though the various Suite 11i modules were integrated, Oracle did not disclose the fact that integration work would be required to integrate the entire Suite 11i package with existing legacy systems and other aspects of the customer's computer network. The Committee concluded that to the extent that the plaintiffs are making such an assertion, they are incorrect for two important reasons. First, the actual statements about interoperability and the context in which they were made demonstrate that Oracle and its executives never stated that the use of Suite 11i would eliminate all integration costs associated with installing the software into a customer's existing computer system. Second, this construction is so far-fetched as a technical matter that no person with even rudimentary knowledge of applications software would, in the view of the Committee, interpret Oracle's statements in this manner.

---

[21]  Del. Deriv. Compl. ¶ 105 (emphasis added), Exhibit 22-14; Fed. Deriv. Compl. ¶ 131, Exhibit 22-26. Plaintiffs do not contend that the statement about the "single view of the customer" was a misrepresentation, and it is therefore not separately considered. Plaintiffs in the Federal Class Action also allege that two statements in February 2001, after the last alleged insider sale, were misrepresentations. The Committee addresses these allegations as well, in Chapter XII.D.1(e), *infra.*

[22]  Del. Deriv. Compl. ¶ 45, Exhibit 22-14. This allegation does not indicate the speaker, the forum, the time, or even the exact words alleged to have been spoken.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Plaintiffs also appear to be claiming at times that the above statements are false because Suite 11i was not designed as a fully integrated and interoperable software suite. The Committee concluded that this assertion by the plaintiffs is also unfounded. The Committee determined that Suite 11i was both integrated and interoperable. The Committee further concluded that while there were bugs that affected certain aspects of the software's interoperability at certain times, this fact did not change the fundamental truth of the assertion that the software was integrated and interoperable.

This chapter of the Report first analyzes the plaintiffs' allegations based on the assumption that the plaintiffs are claiming that Oracle misled the market by claiming that no systems integration of any kind was needed to install Suite 11i. This section then analyzes the plaintiffs' allegations based on the assumption that the plaintiffs are instead (or also) claiming that Suite 11i was not designed as an integrated and interoperable software suite. The Committee then analyzes whether any of the alleged statements by the Individual Defendants or others at Oracle related to Suite 11i had a material effect on Oracle's stock price.

1.    **Plaintiffs' Allegations That Oracle Falsely Stated That Installation of Suite 11i Required No Integration Work of Any Kind**

In certain parts of their complaints, Plaintiffs state that the statements set forth above were false and/or misleading because Oracle did not disclose the fact that the installation of Suite 11i would require integration between Suite 11i and a customer's existing computer systems. For example, Plaintiffs state that Oracle "had advertised 11i Suite being pre-integrated and interoperable out-of-the-box, meaning that the system had the ability to use the parts of another system without conversion."[23] Plaintiffs also allege that Oracle's claims about

---

23    *Id.* ¶ 77.

the interoperability of Suite 11i were false because "Oracle faced integration and compatibility issues integrating 11i Suite with non-Oracle products."[24]

As set forth below, Plaintiffs' allegations confuse and conflate the integration among individual modules of Suite 11i with the process of deploying Suite 11i in its entirety into an existing enterprise IT infrastructure. While Oracle repeatedly stated that Suite 11i itself was integrated and interoperable, it never claimed that Suite 11i could be implemented by a customer without integrating the software into that customer's existing systems. Moreover, the Committee found no evidence to suggest that any industry or securities analysts ever construed Oracle's statements in the manner suggested by Plaintiffs. To the contrary, analysts correctly recognized that the integration Oracle discussed when describing the features of Suite 11i referred to interoperability among the modules of Suite 11i, not between Suite 11i and a customer's legacy IT infrastructure.[25] Finally, the Committee notes that, as a technical matter, anyone with any familiarity with software applications would readily recognize as absurd the proposition that a software product as complex as Suite 11i could be plugged into any existing IT infrastructure with legacy software, hardware and business processes and expected to work without prior systems integration work. To state the proposition is to refute it.

---

[24]     *Id.* ¶ 110. '

[25]     A GartnerGroup researcher praised Oracle for offering "one of the broadest and most tightly integrated suites," and found that Suite 11i had "tight integration between its front-office modules and back-office applications" made possible by use of a "single schema/data model." E. Thompson, *Oracle 11i CRM: Better but Not the Best,* GartnerGroup Research Note, July 10, 2000, ORCL 7368-69, at ORCL 7368, 7369, Exhibit 20-2.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

a.    **Oracle consistently used "interoperable out of the box" to refer to integration among the modules of Suite 11i**

Oracle's statements about the integration benefits of Suite 11i have been consistent from the outset, and none of them are fairly subject to the construction that forms the foundation of the plaintiffs' allegations. As early as September 27, 1999, when Oracle officially announced its plan to release Suite 11i, it stated that it would "encompass[] both Oracle's leading enterprise resource planning (ERP) and customer relationship management (CRM) applications . . . . [and] *provide[] out-of-the-box integration between these application families*."[26] Oracle distinguished the integration of the applications in the Suite from the integration that customers had previously had to achieve across and among best of breed products: "Unlike competitive offerings that entail costly and time-consuming integration *between* ERP systems *and* niche CRM applications, Oracle Applications Release 11i's *tight integration between ERP and CRM applications comes out-of-the-box*."[27] The Committee notes the obvious: none of these statements refer to integration with any program outside of Suite 11i.

In early May 2000, Ellison repeated the same theme of Suite 11i pre-integration versus the best of breed approach. As reported by BusinessWeek Online, "Ellison's vision" for Suite 11i is to have "a single package from Oracle to run . . . e-businesses, rather than buying

---

[26]    *Oracle Announces Oracle® Applications Release 11i*, at ORCL 111259 (emphasis added), Exhibit 17-1. There was no statistically significant stock price movement on the day of this press release or on the following trading day. *See* NERA Report ("NERA"), Nov. 2002, Tabs 5 and 8, Exhibit 27-25.

[27]    *Id.*

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-16

software from a host of competitors and trying to stitch it all together."[28]  When Oracle first

began shipping Suite 11i in May 2000, it again contrasted the "out-of-the-box integration" of

Suite 11i with the expensive and lengthy integration process of the best of breed approach.

Oracle stated that Suite 11i eliminated "all *this* integration expense and risk."[29]

After Oracle began to ship Suite 11i, it continued to note that the advantage of

the product was the pre-existing integration *between* its modules, as opposed to the efforts

required to integrate best of breed solutions from different vendors.  For example, on June 5,

2000, Oracle noted that the "out-of-the-box integration *of the front and back office*

*applications*" for the order management applications of Suite 11i offered a better solution than

the existing choices that "forced companies to cobble together heavily customized solutions."[30]

Oracle continued later that month to repeat the same concept, noting that its "strategy of a

completely integrated suite of applications . . . . [is a] significant shift from point solutions to a

completely integrated e-business suite."[31]

---

[28]   Steve Hamm, *Oracle: Why It's Cool Again*, BusinessWeek Online, May 8, 2000, ORCL
       68150-57, at ORCL 68151, at Exhibit 18-4.

[29]   *Oracle Ships 11i, Industry's First Integrated E-Business Suite*, at ORCL 12938
       (emphasis added), Exhibit 17-6.  There was no statistically significant stock price
       movement on the day of this press release or the following trading day.  *See* NERA at
       Tabs 5 and 8, Exhibit 27-25.

[30]   *Oracle Adds Order to the Internet*, Oracle Press Release, June 5, 2000, ORCL 12936-37,
       at ORCL 12936 (emphasis added), Exhibit 17-7.

[31]   *System Integrators Applaud Oracle E-Business Suite*, Oracle Press Release, June 29,
       2000, ORCL 12931-32, at ORCL 12932 (quoting Oracle executive), Exhibit 17-9.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

As quoted by the plaintiffs, Ellison's statements confirm this context:

> There's no systems integration required. No software modifications required to use our E-Business Suite. A very different value proposition on the old style of implementing in business applications [at] large companies.[32]

Ellison thus distinguished the integrated nature of Suite 11i from the lack of integration in best-of-breed software, which had previously been the norm.

Ellison did not say, however, that installing Suite 11i required no implementation work. In comments omitted by the plaintiffs, Ellison cited GE Power as an example of the benefits of Suite 11i over the best-of-breed approach: "we're going to have their first factory up and running in six months. The whole – all of GE Power, up and running in 18 months. . . . [Suite 11i] goes in very, very fast, matter of months, and you get a return . . . . in savings, very quickly."[33] In holding GE Power up as an example, Ellison was not claiming that Suite 11i's integration obviated the need for a deployment process lasting many months. Rather, Ellison acknowledged that Suite 11i still required time and expense to deploy, but that the process was faster than the alternative, best-of-breed approach because the process of stitching together best-of-breed components was eliminated.

Likewise, in a report from which the plaintiffs quote, Oracle executive Sanderson noted that Suite 11i "is pre-integrated and fully interoperable out of the box, *helping to lower consulting costs and time-to-value.*"[34] Again, the context of Sanderson's remarks was to contrast Suite 11i with the best-of-breed approach, and to note that the integration of

---

[32]   Del. Deriv. Compl. ¶ 102, Exhibit 22-14.

[33]   Transcript of Q2 FY01 Earnings Call, Dec. 14, 2000 ("Dec. 14, 2000 Earnings Call Tr."), ORCL 31699-731, at ORCL 31708-09, Exhibit 17-12.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Suite 11i enabled Oracle's customers to lower the consulting costs necessary to implement the software. Neither Sanderson nor any other Oracle executive ever claimed that Suite 11i eliminated all deployment costs. Indeed, in the portion of the report that the plaintiffs cite, Sanderson explained that Suite 11i lowered deployment costs versus a best-of-breed approach. Those costs had averaged from four to seven times the upfront cost of the software, but Oracle's internal experience was that the deployment costs were reduced to a one-to-one ratio with the software cost.[35]

> **b.    Analysts and Oracle's customers understood that "interoperable out of the box" referred to the integration between the modules of Suite 11i, and did not mean that all implementation work was eliminated**

Even if Plaintiffs may be confused about the distinction between integration among the modules of Suite 11i and the work necessary to deploy Suite 11i in an enterprise environment, others were not. Oracle's customers, with their IT staffs and highly experienced consultants, understood that Oracle's statements related to the integration of Suite 11i's various modules and did not promise that Suite 11i would deploy magically and effortlessly in their businesses without any systems integration work. Likewise, securities analysts were not misled into believing that Oracle had eliminated the entire deployment process.

Analysts understood that the claim of Suite 11i being "interoperable out of the box" was made against the backdrop of best-of-breed systems integration. As one securities analyst noted shortly before Oracle commercially released Suite 11i, the benefit of Suite 11i is to "eliminat[e] the never-ending integration tasks between products. A best of breed approach

---

[34]    Del. Deriv. Compl. ¶ 105 (emphasis added), Exhibit 22-14.

[35]    *Id.*

usually creates an integration project for the customer who is tasked with stitching together products not designed to interoperate."[36]  As another analyst noted, "[a]lthough Oracle's programs are not necessarily the best of breed for each application, they have the advantage of being easily integrated with each other, greatly simplifying the problem of having one application work with another."[37]  Another concluded that "Oracle's end-to-end, integrated product should offer strategic advantages over the long term" versus the best-of-breed approach.[38]  As analysts recognized, it was Oracle's "vision . . . that engineering integration [between applications modules] should be done by the software vendor, rather than after-the-fact software integration being done by each customer."[39]  This integration was described as "[p]erhaps one of the most important elements of Oracle's supply chain product offerings."[40]

Likewise, analysts understood that Suite 11i's integration benefits did not eliminate the difficulties that could be encountered during the implementation of the Suite into a customer's existing business practices, data structure, and legacy systems. Immediately after Oracle released Suite 11i, a securities analyst noted that implementing Suite 11i, even for existing Oracle application users, would be "challenging. Networks and databases have to be

[36]  Charles Phillips, *Oracle — Dinner With Ray Lane*, Morgan Stanley Dean Witter Analyst Report, May 12, 2000, ORCL 5290B-96B, at ORCL 5292B, Exhibit 21-8.

[37]  Jean Orr, *Oracle Corporation: Initiating Coverage With a 2-1*, Bluestone Capital Analyst Report, Aug. 10, 2000, ORCL 1157-58, at ORCL 1158, Exhibit 21-12.

[38]  Rick Sherlund, *Oracle Reported Strong, But Mixed F1Q Results*, Goldman Sachs Analyst Report, Sept. 15, 2000, ORCL 1059-61, at ORCL 1059, Exhibit 21-16.

[39]  Mark Murphy, *It Will Work; Give it Time*, First Albany Analyst Report, Oct. 4, 2000, ORCL 960-63, at ORCL 961, Exhibit 21-18.

[40]  Daniel Stang and Gerald Arcuri, *Oracle Corp. Supply Chain Management Applications*, GartnerGroup Product Report, Oct. 16, 2000, ORCL 7436-47, at ORCL 7447, Exhibit 20-5.

upgraded. Tracking net changes across development, test, staging and production environments for a single application can be complex."[41]  For customers choosing to implement parts of Suite 11i with other, non-Oracle applications, it was reported that "customers currently bear the burden to write their own integration routines to non-Oracle applications."[42]

Indeed, existing Oracle customers looking to upgrade to Suite 11i were warned by GartnerGroup that those with the oldest Oracle systems could face the most difficult and complex implementations.[43]  Other analysts noted that there were doubts about how integrated Suite 11i was, in light of the implementation process.[44]  At least one analyst noted that difficulties in upgrading existing Oracle application users to Suite 11i led him to conclude that "all is not well" at Oracle.[45]

Additionally, analysts understood that Oracle's claims of "interoperability" did not offer Oracle's customers instantaneous implementations.  In the Fall of 2000, an analyst observed that the length of implementation would mean that customers may not "have

---

[41]  Charles Phillips, *Oracle: Get Out of The Way, Oracle Coming Through*, Morgan Stanley Dean Witter Analyst Report, June 8, 2000, ORCL 1316-21, at ORCL 1317, Exhibit 21-11.

[42]  Bob Ferrari, *Oracle Is Ready to Rumble for the Number Two Position in Supply Chain Planning*, AMR Research, Sept. 5, 2000, ORCL 7780-85, at ORCL 7781-82, Exhibit 20-4.

[43]  *See* T. Tow, *The Many Roads to Upgrading to Oracle Applications 11i*, GartnerGroup Research Note, Aug. 23, 2000, ORCL 7396-97, at ORCL 7397, Fig. 2, Exhibit 20-3.

[44]  *See* Melissa Eisenstat, *ORCL: Expect Gradual Adoption of Apps Suite In A Best Of Breed World*, CIBC World Markets Corp. Analyst Report, Nov. 7, 2000, ORCL 46841-44, at ORCL 46841, 46842, Exhibit 21-20.

[45]  *See* John Puricelli, *Oracle Update: Maintain*, A.G. Edwards Analyst Report, Nov. 9, 2000, ST&B 1449-50, at ST&B 1449, Exhibit 21-21.

demonstrated savings ... for another 9 to 12 months.'[46]  Another observed that while customers seeking "quicker implementations" would prefer Suite 11i, even those "quicker" implementations would "take 2 – 3 months."[47]

The difficulties customers faced in deploying Suite 11i and the impact those difficulties might have on purchases of Suite 11i was discussed in an October 2, 2000 article appearing in *eWeek*. The article noted that two Oracle application customers were planning to wait until 2001 to upgrade to Suite 11i, based upon reports of implementation problems at other customers.[48]  In particular, this article noted that a number of companies, including Nantucket Allserve, Inc., a juice company and existing customer for Oracle application version 11.0, would wait until 2001 to upgrade to 11i. As Nantucket Allserve's IT manager noted, "'[i]t's common business sense to let others make the mistakes. Any new product is going to have its sets of glitches.'"[49]  The article also noted that another company, Alliance Coal, had "also heard implementation horror stories and is waiting as long as it can to install 11i."[50]

---

[46]  Charles Wittmann, *Lowering Target Price to $80 from $95 For Short-Term Risk in Growth*, First Union Securities Analyst Report, Oct. 4, 2000, ORCL 993-94, at ORCL 993-94, Exhibit 21-17.

[47]  Rick Sherlund, *Early Checks With Applications Customers*, Goldman Sachs Analyst Report, Nov. 3, 2000, ORCL 896-97, at ORCL 897, Exhibit 21-19.

[48]  Jeffrey Burt, *Oracle: Database Giant is Succeeding in e-Business by Doing Things On its Own, But For How Long?*, eWeek, Oct. 2, 2000, ST&B 8663-66, at ST&B 8663, 8664, Exhibit 18-22.

[49]  *Id.* at ST&B 8663.

[50]  *Id.*

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 295295

Another analyst noted that the "scale of the conversion" required to upgrade to Suite 11i was one reason that some existing Oracle customers had decided to delay their upgrades.[51]

### c.    Agilent Technologies: a case study

The recent experience of Agilent Technologies Inc. ("Agilent") with implementing Suite 11i illustrates how the deployment of a product as complex as Suite 11i can be difficult and costly for reasons unrelated to the software's functionality.  Agilent has three core lines of business:  test, measurement and monitoring devices; semiconductor products; and chemical analysis tools.[52]  Within those three core lines are many subcomponents.  For instance, Agilent stated that it produces 20,000 types of devices for testing, chemical analysis and other technologies.[53]  Given the breadth of its operations, and the range of its legacy computer systems – approximately 2,200 different systems – Agilent decided to simplify its internal management software by implementing Oracle's Suite 11i applications to reduce its number of computer systems down to 20, a reduction scale of more than 100 to 1.[54]

Agilent's switchover to the new Oracle applications, called "going live," occurred on June 12, 2002.  Due to the complexity of the implementation, Agilent encountered initial problems running the applications and, as it announced on August 19, 2002, lost approximately one week's worth of revenue, or $105 million, because of those unexpected

---

[51]    Melissa Eisenstat, *AppWorld — Upbeat Conference but no Cajun Spice*, CIBC World Markets Analyst Report, Feb. 23, 2001, ORCL 457-63, at ORCL 460, Exhibit 21-55.

[52]    *See* Matt Richtel, *A Many-Tentacled Agilent Stumbles Toward Simplicity*, The New York Times, Aug. 26, 2002, C-3, ST&B 8533-35, at ST&B 8534, Exhibit 18-117.

[53]    *Id.*

[54]    *Id.*

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-23

difficulties.[55] The loss contributed to Agilent's missing its forecast for the quarter ending July 31, 2002.[56]

Agilent, however, did not blame Oracle or any problems in the Oracle applications for its loss. "[T]he issue wasn't the quality of the Oracle application, but rather the 'very complex nature of the enterprise resource planning implementation.'"[57] As Agilent noted,

> "Enterprise resource planning implementations are a lot more than software packages . . . . *They are a fundamental transformation of a company's business processes.* People, processes, policies, the company's culture are all factors that should be taken into consideration when implementing a major enterprise system."[58]

Agilent is not alone in recognizing the complexity of the "fundamental transformation" represented by an enterprise-wide applications implementation. Other companies, such as Sun Microsystems, Inc. and Applied Materials, Inc., have also upgraded their software packages and experienced difficulties with the business process transformation for reasons unrelated to the quality of the software deployed.[59]

*        *        *

---

[55]  *See Agilent Technologies reports third quarter results below expectations; drive to profitability continues,* Agilent Press Release, Aug. 19, 2002, ST&B 8609-24, at ST&B 8609, Exhibit 18-116.

[56]  *See* Marc L. Songini, *ERP Effort Sinks Agilent Revenue,* Computerworld, Aug. 26, 2002, ST&B 8528-29, at ST&B 8528, Exhibit 18-118.

[57]  *Id.* (quoting Agilent statement).

[58]  *Id.* at ST&B 8528-29 (quoting Agilent statement) (emphasis added).

[59]  *See A Many-Tentacled Agilent Stumbles Toward Simplicity,* at ST&B 8534, Exhibit 18-117.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

The Committee concludes that the fact that a new product as complex as Suite 11i would require significant work to install was not a surprise to the industry or to the marketplace. The Committee further concludes that the plaintiffs' claim that by promising interoperability, Oracle sought to mislead the market into believing that Suite 11i installation would be instantaneous, painless, and free, is flawed technically, belied by the actual statements made by Oracle executives, based on an unreasonably naïve interpretation of the actual statements made, and overlooks other Oracle statements that unambiguously explain the inherent limits of inter-operability and integration.

2. **Plaintiffs' Allegations That Oracle Falsely Stated That the Various Modules of Suite 11i Were Integrated and Interoperable**

The Committee observed that the various derivative complaints also challenge the veracity of Oracle's claim that Suite 11i was designed as an integrated and interoperable suite of software.[60] The Committee has investigated this allegation and concluded that it lacks merit.

As an initial matter, the Committee notes that Oracle and certain of the Individual Defendants repeatedly stated that Suite 11i was both integrated and interoperable.[61] The Committee reviewed certain contemporaneous Oracle documents relating to the design of Suite 11i and interviewed the Oracle executives responsible for its creation. Based on this investigation, the Committee concluded that the statements made by Oracle and its executives are substantially true and accurate.

---

[60]   Del. Deriv. Compl. ¶¶ 45, 50-51, Exhibit 22-14; Fed. Deriv. Compl. ¶¶ 71, 76-77, Exhibit 22-26; Cal. Deriv. Compl. ¶ 54, Exhibit 22-148.

[61]   *See* Chapter XII.C.I.a *supra*.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

The Committee concluded that the integration and interoperability of Suite 11i was premised upon the design concept of each application module sharing information through the underlying database.[62] As Wohl and Barrenechea, the head developers for Suite 11i, stated, that ability to share information relied upon common schema shared between the ERP and CRM applications.[63] Since the ERP applications had been developed first, the ERP developers defined the schema. Later, the CRM developers wrote their code to match the schema that ERP had defined. The development groups followed the same process for APIs.[64] A presentation slide prepared for Barrenechea in early January 2001 shows the single-schema approach, and distinguishes this integrated approach from the fragmented, multiple-schema system of the best of breed approach.[65]

The Committee further notes that the fact that Suite 11i was integrated and interoperable does not mean that the initial releases of Suite 11i were free from problems in this area. In fact, the Committee concluded that the initial releases of Suite 11i suffered from some bugs and some limits to functionality in this area. A more detailed discussion of these

---

[62]  See Mark Barrenechea, *Customer Relationship Management*, Oracle Corporation Technical White Paper, printed Feb. 6, 2001, ORCL 70235-362, at ORCL 70246 (italics in original), Exhibit 27-26; Chris Balkenhol Interview Memorandum ("C. Balkenhol Int."), Oct. 31, 2001, at 2-3, Exhibit 2-3.

[63]  Ron Wohl Interview Memorandum ("Wohl Int."), Aug. 20, 2002, at 12 (discussing ERP definition of APIs), Exhibit 2-78; Mark Barrenechea Interview Memorandum ("Barrenechea Int."), July 26, 2002, at 4, Exhibit 2-5.

[64]  Wohl Int. at 12 (discussing ERP definition of APIs), Exhibit 2-78; Barrenechea Int. at 4, Exhibit 2-5.

[65]  See E-Mail from Jeremy Burton to Sohaib Sabbasi, Jan. 9, 2001, ORCL 58761-88, including Presentation Slides, at ORCL 58767, Exhibit 19-48. The Committee notes that although the enclosing E-mail is dated January 9, some of the presentation content appears to indicate that it was prepared later.

performance issues is discussed *infra* at XII.F.  However, the existence of such technical problems with the early releases of Suite 11i does not change the fact that the software was an integrated and interoperable suite that constituted a marked departure from the prior best-of-breed solutions available to the market.

> ### 3.    None of the Specific Statements about Suite 11i Functionality Alleged by Plaintiffs Caused a Statistically Significant Movement in the Price or Volume of Oracle Shares

Plaintiffs have alleged that the Individual Defendants wrongfully engaged in insider trading while in possession of material non-public information about the functionality of Suite 11i.[66]  Specifically, the plaintiffs allege that material misrepresentations were made regarding Suite 11i's functionality and that these statements artificially inflated Oracle's stock price.  While the price was artificially inflated, the plaintiffs allege, the Trading Defendants sold Oracle stock.  A threshold issue, then, is whether the statements alleged in the complaints to have been made about Suite 11i caused a statistically significant inflation in the price of Oracle stock.[67]

The Committee sought an objective technique by which it could test the hypothesis that the plaintiffs' allegations were correct and that Oracle's statements regarding Suite 11i were material.  The Committee engaged NERA to conduct an event study and regression analysis of movements in Oracle's stock price for the period from February 1998 through April 2001.  NERA's approach and methodology is set forth in its Report to the

---

[66]    *See, e.g.*, Del. Deriv. Compl. ¶¶ 133, 154, Exhibit 22-14.

[67]    *See In re Seagate Tech. II Sec. Litig.*, 802 F. Supp. 271, 274 (N.D. Cal. 1992).

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Committee.[68] This study identified all statistically significant price movements of Oracle stock over this period.

The Committee then overlaid the allegedly false statements onto this analysis to see if any of the allegedly false and misleading statements regarding Suite 11i were made on days on which there was a statistically significant movement in the price of Oracle stock. Two Federal Circuit Courts of Appeal have adopted the principle underlying this approach in addressing analytically similar allegations. In *Oran v. Stafford*, the Third Circuit held that a drug company's delay in making statements about one of its products was not material because the statements had "no appreciable negative effect" on the market for its stock.[69] In *Nathenson v. Zonagen*, the Fifth Circuit similarly held that the statements at issue were not actionable because they did not affect the stock price.[70] Courts within the Ninth Circuit, and particularly in the Northern District of California, have followed the same approach of determining the materiality of alleged misrepresentations by analyzing whether they had any effect upon the

---

[68]   NERA Report, Exhibit 27-25.

[69]   226 F.3d 275, 283 (3rd. Cir. 2000) (holding that American Home Products' delay in making statements about fen-phen was not material because the statements had "no appreciable negative effect" on the market for its stock).

[70]   *See Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 418 (5th Cir. 2001) (holding that reliance element was absent where alleged misrepresentation had no effect upon the market price of a security).

market price of the stock.[71]  Additionally, the California insider-trading statute endorses the
same approach by prohibiting trading by the insider only when the insider "knows material
information about the issuer . . . which would *significantly affect the market price* of that
security . . . ."[72]

      If Oracle's stock price did not experience a statistically significant increase on
any of the days on which the allegedly false and misleading statements concerning Suite 11i
were made, two things are clear:  (1) the market did not regard those statements as material,
and (2) there was no artificial inflation in the price of Oracle's stock caused by these allegedly
false and misleading statements.

      Pursuant to the efficient market hypothesis, which is the underpinning of the
fraud on the market theory, an efficient market rapidly assimilates information concerning a
security and reflects the value of that information in the market price.[73]  Most empirical data
show that for highly liquid securities, such as Oracle's shares, this assimilation takes place

---

[71]   *See, e.g., In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1479 (N.D. Cal. 1992) (noting that
if misrepresentation "had no effect on the security's market price, the information cannot
have been material."); *In re Seagate Tech. II Sec. Litig.*, 802 F. Supp. 271, 277 (N.D. Cal.
1992) ("[A] significant change in the market price of a security is a necessary element in
a case where a plaintiff alleges a misleading omission, for if there is no difference
between the market price before and after disclosure of the omitted information, that
information cannot be material.") (citation omitted).

[72]   Cal. Corp. Code § 25402 (West 2002) (emphasis added).

[73]   *See Basic, Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988).

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

within minutes or at most hours of the announcement of the material information.[74]  To be
conservative, the Committee looked not only on the day of the allegedly false and misleading
statement, but also on the day following it to see if there was any statistically significant
movement in the price of Oracle stock.

        The following analysis sets forth each of the plaintiffs' specific allegations,
indicates whether there was a statistically significant change in the price or volume of Oracle
stock traded on the day of the statement or the next trading day, and, if so, considers whether
the alleged statement about Suite 11i could have caused the statistically significant movement.

        **a.**    **Alleged misrepresentation on December 14, 2000**

        The first specific affirmative misrepresentation about Suite 11i's functionality
alleged by the plaintiffs occurred on December 14, 2000.  Plaintiffs claim that on that date,
during Oracle's conference call to report the results for Q2 FY 2001, Ellison and Henley stated
that "[n]o programming systems integration work is necessary to implement the 11i Suite."[75]
Neither Ellison nor Henley used those exact words, although Ellison did say, in distinguishing

---

[74]    *See, e.g.*, Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*,
ST&B 9275-309, at ST&B 9286 (5th ed. 1996) (discussing semistrong form of market
efficiency, which suggests that new information is rapidly incorporated into securities
prices: "Researchers have tested this by looking at specific items of news such as
announcements of earnings and dividends, forecasts of company earnings, changes in
accounting practices, and mergers.  Most of this information was rapidly and accurately
incorporated in the price of the stock . . . .  But the opportunity to take advantage of this
information is very limited, for Patell and Wolfson found that most of the price
adjustment occurs within 5 to 10 minutes of the announcement.") (citing J.M. Patell and
M.A. Wolfson, *The Intraday Speed of Adjustment of Stock Prices to Earnings and
Dividend Announcements*, 13 J. Fin. Econ. 223-252 (June 1984)), Exhibit 27-18.

[75]    Del. Deriv. Compl. ¶ 98, Exhibit 22-14.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Suite 11i from the best-of-breed approach, that "there's no systems integration required" between the applications included in Suite 11i.[76]

To the extent the plaintiffs' paraphrase is intended to allege that Ellison and Henley stated that no programming or other work was required to implement Suite 11i into the purchaser's operations, their paraphrase is manifestly misleading and inaccurate. It is misleading and inaccurate because, among other things, it ignores Henley's clear statement during the same conference call that customers "still have to clearly convert [their] data, move [their] data out of the old system and into our system. There is still some labor involved in implementing our applications."[77] Additionally, Ellison did not say that customers of Suite 11i would somehow avoid *all* implementation work, and in fact pointed to examples of customers spending months on implementing Suite 11i.[78] Ellison also noted that the implementation process for Suite 11i was shorter than the best-of-breed approach because "there's no systems integration required" between the various applications included in Suite 11i.[79]

In addition to the simultaneous statements of Henley and Ellison that illuminate the misleading nature of the plaintiffs' paraphrase of the December 14, 2000 earnings call, the statements on the call have to be considered in the context of statements about the integration

---

[76]    Dec. 14, 2000 Earnings Call Tr., at ORCL 31709, Exhibit 17-12.

[77]    *Id.* at ORCL 31721.

[78]    *Id.* at ORCL 31707, 31709 (noting JDSU implementation in 11 months, GE Power in Hungary in five months, and GE Power overall in 18 months).

[79]    *Id.* at ORCL 31709.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-31

of Suite 11i versus the best-of-breed approach that stretch back well over a year prior to the conference call.[80]

Consistent with the fact that what Ellison and Henley said on the December 14, 2000 earnings call about the functionality of Suite 11i was no different than what had been said since the product was first announced in September 1999 and when it was released in May 2000, there was no statistically significant change in Oracle's stock price or volume on either December 14, 2000, the day of the earnings conference call that Plaintiffs allege contained the misrepresentation, or on the next trading day, December 15.[81]  Ellison and Henley added nothing new to the mix of information that had previously been absorbed by the market concerning Suite 11i's functionality.

            b.        Alleged misrepresentation on December 15, 2000

The next specific statement cited by the plaintiffs as a misrepresentation about the functionality of Suite 11i occurred on December 15, 2000.  Plaintiffs quote a statement by Ellison to a reporter for Bloomberg.  In particular, Ellison is quoted as saying of 11i: "There's no systems integration required.  No software modifications required to use our E-Business Suite.  A very different value proposition on the old style of implementing in business applications and [in] large companies."[82]  The words "old style of implementing business applications" is a reference to the best-of-breed approach, which reiterates the consistent theme

---

[80]    *See* Chapter XII.C.1.a *supra.*

[81]    NERA, Tabs 5 and 8, Exhibit 27-25.  The Committee would not expect to see a change on December 14, 2000 because the conference call occurred after the market closed.

[82]    Del. Deriv. Compl. ¶ 102, Exhibit 22-14.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-32

discussed above: unlike a best-of-breed approach, Suite 11i avoids the need for system integration among the various business application modules.

Consistent with the fact that this statement is no different than those made the day before and for many months by Oracle concerning the advantage Suite 11i provided over the best-of-breed approach, there was no statistically significant change in Oracle's stock price or volume on December 15, the date of this statement.[83]

On the next trading day, December 18, 2000, there was a statistically significant positive movement in Oracle's stock price, though not a statistically significant increase in its trading volume.[84] However, this increase occurred at the same that a deluge of positive information about Oracle was published. Many securities analysts published reports on December 15 with a wide range of positive news about Oracle, not least of which was the fact that Oracle's earnings per share ("EPS") for Q2 FY 2001 had exceeded the consensus

---

[83]     NERA, Tabs 5 and 8, Exhibit 27-25.

[84]     *Id.*

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 295306

XII-33

estimate.[85]  At least eleven securities analysts raised their EPS estimates for Oracle going

forward.[86]  In addition, there were positive stories about Oracle's performance in a range of

general media outlets, including The Wall Street Journal, The New York Times, CNN

---

[85]  Bert Hochfeld, *Raising Estimates, Reiterate Buy Rating*, Josephtal & Co. Analyst Report, Dec. 15, 2000, ORCL 619-20, Exhibit 21-38; Jean Orr, *Second Quarter Results in Line With Expectations; Raising Estimates*, Blue Stone Capital Analyst Report, Dec. 15, 2000, ORCL 631-33, Exhibit 21-37; Sanjiv Hingorani, *Fiscal Q2 2001 Results in Line With Expectations; Maintain Hold Rating*, Dresdner Kleinwort Benson Analyst Report, Dec. 15, 2000, ORCL 636-38, Exhibit 21-36; Charles Phillips, *How Suite It Is*, Morgan Stanley Dean Witter Analyst Report, Dec. 15, 2000, ORCL 680-86, Exhibit 21-43; Melissa Eisenstat, *Apps. Fly, Databases Strong, Management Okay For Now*, CIBC World Markets Corp. Analyst Report, Dec. 15, 2000, ORCL 690-96, Exhibit 21-35; Gretchen Teagarden, *ORCL Reports 2Q — Traction in Applications Sooner Than Expected*, Salomon Smith Barney Analyst Report, Dec. 15, 2000, ORCL 697-700, Exhibit 21-45; Wendell Laidley, *Picture Perfect Q2: FY01 Should Even Convert the Skeptics*, Credit Suisse First Boston Analyst Report, Dec. 15, 2000, ORCL 706-09, Exhibit 21-28; Andrew Roskill, *Reports In-Line Q2 Results*, UBS Warburg Analyst Report, Dec. 15, 2000, ORCL 710-12, Exhibit 21-33; Charles Wittmann, *ORCL Reports Apps Growth Above and Database Growth Below Expectations*, First Union Securities Inc. Analyst Report, Dec. 15, 2000, ORCL 713-15, Exhibit 21-30; Christopher Shilakes, *Oracle Systems: Q2 01: Steady as She Goes*, Merrill Lynch Analyst Report, Dec. 15, 2000, ORCL 725-28, Exhibit 21-27; Neil Herman, *Oracle Corp: Oracle's Application Business Leads Solid Quarter*, Lehman Brothers Analyst Report, Dec. 15, 2000, ORCL 722-24, Exhibit 21-31.  *But see* Punk-Ziegel, the one securities firm that downgraded Oracle from a Buy rating to Market Perform.  Gary Abbott, *Oracle-Lowering Rating to Market Performer From Buy*, Punk-Ziegel & Co. Analyst Report, Dec. 15, 2000, ORCL 647-48, Exhibit 21-26.

[86]  *See Raising Estimates, Reiterate Buy Rating*, ORCL 619-20, Exhibit 21-38; *Second Quarter Results in Line With Expectations; Raising Estimates*, ORCL 631-32, Exhibit 21-37; *Fiscal Q2 2001 Results in Line With Expectations; Maintain Hold Rating*, ORCL 636-38, Exhibit 21-36; *How Suite It Is*, ORCL 683-86, Exhibit 21-29; *Apps. Fly, Databases Strong, Management Okay For Now*, ORCL 690-96, Exhibit 21-35; *ORCL Reports 2Q — Traction in Applications Sooner Than Expected*, ORCL 697-700, Exhibit 21-34; *Picture Perfect Q2: FY01 Should Even Convert the Skeptics*, ORCL 706-09, Exhibit 21-28; *Reports In-Line Q2 Results*, ORCL 710-12, Exhibit 21-33; *ORCL Reports Apps Growth Above and Database Growth Below Expectations*, ORCL 713-15, Exhibit 21-30; *Oracle Systems: Q2 01: Steady as She Goes*, ORCL 725-28, Exhibit 21-27; *Oracle Corp: Oracle's Application Business Leads Solid Quarter*, ORCL 722-24, Exhibit 21-31.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-34 goes in header

Headline News, Bloomberg TV, and others.[87]  The Committee concludes that the statistically significant price movement of Oracle stock on December 18 is due to the positive new information about earnings and future prospects of Oracle rather than the repetition of previously disclosed and assimilated information concerning Suite 11i's superiority over the best of breed approach.

To test the reasonableness of this conclusion, the Committee reviewed the market's reaction to Oracle's earnings announcements for each of the preceding four quarters (Q1 FY 2001, Q4 FY 2000, Q3 FY 2000, and Q2 FY 2000).  In each of those quarters, Oracle's EPS exceeded the consensus estimates.[88]  Following each of those announcements, Oracle's stock price either increased in a statistically significant manner or saw a statistically significant increase in volume, or both.[89]  The existence of this trend of statistically significant reactions in the market to news of Oracle exceeding EPS estimates supports the Committee's conclusion that the positive news about Oracle's earnings in Q2 FY 2001 published in various analyst reports and by media outlets caused the statistically significant positive movement in Oracle's share price on December 18, 2000.

---

[87]  *See* E-mail from Jennifer Glass to Larry Ellison et al., Dec. 15, 2000, ORCL 58601-58, at ORCL 58601-02 (summarizing media coverage), Exhibit 19-36.

[88]  *See* Figure 2-5 *supra*.

[89]  *See* NERA Report, Tabs 5 and 8 (showing, in conjunction with earnings announcements, statistically significant positive price movement for Q2 FY 2000, and statistically significant increases in volume for Q2 FY 2000, Q3 FY 2000, Q4 FY 2000, and Q1 FY 2001), Exhibit 27-25.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-35

### c.     Alleged misrepresentation on January 5, 2001

The next specific statement alleged by the plaintiffs to have been a misrepresentation about the functionality of Suite 11i occurred on January 5, 2001.  On that date, Oracle issued a press release that stated, among other things, that Suite 11i was "the first suite of integrated e-business software."[90]  Nothing in that statement concerning Suite 11i functionality is inaccurate.  Furthermore, neither that statement nor anything else in this press release led to any statistically significant movement in the market for Oracle's stock on the date of the press release or the next trading day, January 8, 2001.[91]

### d.     Alleged misrepresentation on January 8 and 10, 2001

The next specific alleged misrepresentation identified by the plaintiffs is a statement in a January 8, 2001 analyst report attributed to Oracle executive Sanderson.[92]  According to the plaintiffs, the securities analyst report noted that:

> Oracle *reiterates* two key value propositions for the suite solution versus a "best-of-breed" approach:
>
> - The suite provides a single view of the customer across the enterprise by incorporating a single data model.

---

[90]    Del. Deriv. Compl. ¶ 104, Exhibit 22-14.  The same paragraph of the Complaint also contains statements about expected sales of 11i and savings from Oracle's internal implementation of the applications in the Suite.  Those allegations are separately addressed in this Report; *see* Chapter VIII *supra* (addressing expected sales) and Chapter XIII *infra*.

[91]    *See* NERA, Tabs 5 and 8, Exhibit 27-25.

[92]    Del. Deriv. Compl. ¶ 105, Exhibit 22-14.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

- The suite is *pre-integrated and fully interoperable out of the box*, helping to lower consulting costs and time to value.[93]

Though not noted by the plaintiffs, the analyst report was not released until January 10, 2001, two days after the meeting.[94] There was no significant movement in the market for Oracle stock on January 8, the day of the meeting, or the trading day following it.[95] Likewise, there was no significant movement in the market for Oracle stock on January 10, the date of the report, or the following trading day.[96] The lack of such movement indicates that the market did not treat Sanderson's statements, or the analyst's reporting of them, as material. This reaction is not surprising because, as the analyst report explicitly notes, Sanderson was *reiterating* the point about integration that Oracle had been making consistently since September 1999. Moreover, Sanderson's comments as reported by the analyst show again how the plaintiffs' interpretation of "interoperable out of the box" as meaning that no integration work would be required to incorporate Suite 11i into a customer's existing computer system is misleading. As Sanderson explained, consulting costs for implementation are lessened, but not eliminated, by the Suite's integration of its application modules.[97]

---

[93]     *Id.* (emphasis added).  Since the plaintiffs do not contend that Sanderson's statement about the "single view of the customer" was a misrepresentation, it is not separately considered.

[94]     *See* Gretchen Teagarden, *Oracle EVP Visit to SSB*, Salomon Smith Barney Analyst Report, Jan. 10, 2001, ORCL 605-09, Exhibit 21-45.

[95]     *See* NERA, Tabs 5 and 8, Exhibit 27-25.

[96]     *See id.*

[97]     *See Oracle EVP Visit to SSB*, at ORCL 607, Exhibit 21-45.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-37

e.    **Alleged misrepresentations after the last insider sale**

In addition to the alleged misrepresentations above, Plaintiffs in the Federal

Class Action identify two statements in February after the last insider sale. Neither caused a

statistically significant movement in the market for Oracle stock. The Committee addresses

these statements below.

(i)    **Alleged misrepresentation on February 6, 2001**

Plaintiffs allege that Oracle executive Barrenechea made a misrepresentation in

a White Paper dated February 6, 2001.[98] According to the plaintiffs' allegations, Barrenechea

made the following statement on or about February 6:

> Oracle's CRM suite is both complete and integrated. . . .  No systems
> integration is required to install the Oracle CRM suite.
>
> In fact, systems integration labor usually runs many times the cost of
> the software or the hardware needed to run the system -- and the
> customer gets to pay for it.  To install the Oracle CRM suite, no
> systems integration is required.  And because the CRM suite consists
> of true Internet applications, every application works in every
> country, every major language, and every major currency.[99]

Plaintiffs allege this statement was misleading because Suite 11i was "fraught with bugs and

instabilities which required hundreds of patches to fix"[100] and "was not *complete and*

*integrated* and could not be installed without any systems integration."[101]

---

[98]    Second Amended Class Action Complaint for Violations of the Federal Securities Laws
("Second Amend. Class Action Compl."), Oct. 11, 2002, ¶ 63, Exhibit 22-145.  This
alleged misrepresentation was added to the Federal Class Action on October 11, 2002.  It
does not appear in the Delaware Derivative Complaint, the California Derivative
Complaint, or the Federal Derivative Complaint.

[99]    Second Amend. Class Action Compl. ¶ 63.

[100]    *Id.* ¶ 64.

[101]    *Id.* ¶ 64(a) (emphasis added).

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Plaintiffs' quotation intentionally omits several important sentences from the original document. These sentences, which belong where the ellipsis indicate missing text in the first line of the quotation above, define the terms "complete," "integrated" and "systems integration." The pertinent sentences that the plaintiffs omitted are as follows:

> By *complete* we mean that every CRM application needed—
> marketing, sales, service, contracts, Web store, etc.—for sales and
> service to customers is included in the Oracle CRM suite. By
> *integrated* we mean that every application in the CRM suite has been
> engineered around a unified global customer and product database.
> All the applications have been designed and built by Oracle to work
> together and share information. . . .
>
> In contrast, some vendors' CRM offerings require systems
> integration—a lot of custom programming and a lot of architectural
> reconstruction—to make the different applications in the suite work
> together. That's because none of those vendors designed and built
> most of the applications it offers . . . . Because the various pieces of
> many competitive offerings have not been engineered to fit together,
> a systems integrator has to glue them together.[102]

Plaintiffs' omission of this text is misleading and troubling. Because the omitted language belies the false inference Plaintiffs attempt to convey, its omission appears to be a deliberate attempt to mislead. The complete statement is, in the Committee's view, accurate. Again, the presence of bugs in early releases of Suite 11i does not undermine the accuracy of the full statement made by Barrenechea.

Moreover, nothing in the statement quoted by Plaintiffs, or in the rest of this 128-page document, led to any statistically significant movement in the market for Oracle's stock on the date of the White Paper or the next trading day, February 7, 2001.[103]

---

[102]    *Customer Relationship Management*, at ORCL 70246-47 (italics in original), Exhibit 27-26.

[103]    *See* NERA, Tabs 5 and 8, Exhibit 27-25.

XII-39

### (ii)   Alleged misrepresentation on February 21, 2001

The next specific statement alleged by the plaintiffs to have been a misrepresentation about the functionality of Suite 11i purportedly occurred on February 21, 2001. Plaintiffs allege that on that date, Ellison made the following statement concerning the implementation and integration of Suite 11i, purportedly to the audience of the AppsWorld conference in New Orleans:

> Once you have one piece in, the other pieces just snap together. There's no systems integration required. The key thing is, you can install just one piece and then again install another piece. No systems integration. You just basically turn it on or snap it together... *Plug and play.* It is absolutely, all the pieces within the suite are literally plug and play.[104]

Plaintiffs have their facts wrong. The statement they quote was taken from a transcript of Ellison's speech at AppsWorld Paris on February 13, 2001. Worse, Plaintiffs take the quotation out of context to make it appear that: (i) Ellison was claiming that a normal implementation of Suite 11i was to "snap" in one piece, then "snap" in another; and that (ii) Ellison first used the term "plug and play." In fact, Ellison's remarks were in response to a questioner who used the words "plug and play" regarding a question as to whether a customer could buy one part of Suite 11i first, implement that one part, and then at some later time buy and implement other parts.[105] The ellipsis added by Plaintiffs misleadingly attributes the entire statement to Ellison, when in fact the questioner spoke the words italicized above. The

---

[104]   Second Amend. Class Action Compl. ¶ 68 (emphasis added), Exhibit 22-145. As with the February 6 allegation, this alleged misrepresentation appears only in the Second Amended Class Action Complaint.

[105]   *See* Transcript of Ellison's Press Conference at AppsWorld Paris ("Ellison Keynote AppsWorld Paris Tr."), Feb. 13, 2001, ORCL 123026-50, at ORCL 123038-39, Exhibit 17-17.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-40

relevant parts of the exchange, with the omitted portions in bold and the speakers identified,

are set forth below:

> **[Questioner:] But what if a company or a firm decides that they
> don't want to spend that whole amount of money for that suite
> and they just want part of it first and then after that they would
> consider the whole e-business suite. Does Oracle offer some
> parts of that car first? Another question is that.**
>
> **[Ellison:] The answer, by the way, is absolutely yes. In fact, we
> recommend that you start with, you try a component of the suite
> and then you add it in. Now the nice thing is it's like Lego
> blocks. Once you have one piece in, the other pieces just snap
> together. There's no systems integration required.** The key thing is,
> you can install just one piece and then again install another piece.
> No systems integration. You just basically turn it on or snap it
> together.
>
> [Questioner:] Oh, okay. Plug and play.[106]

Considered in its entirety, there was nothing inaccurate in Ellison's remarks.

Moreover, nothing in the statement quoted by Plaintiffs, or in the rest of the 59-

page transcript, led to any statistically significant movement in the market for Oracle's stock

on the date Plaintiffs claim the statement was made or the next trading day, February 22, 2001,

or, for that matter, on the date the statement was actually made, February 13, or the following

trading day.[107]

In addition to the specific allegations addressed above, Plaintiffs proffer a

number of unparticularized allegations about purported misrepresentations of the functionality

of Suite 11i.[108] None of these allegations purport to be direct quotes, none identify the date,

---

[106]    *Id.* at ORCL 123038-39.

[107]    *See* NERA, Tabs 5 and 8, Exhibit 27-25.

[108]    *See, e.g.,* Del. Deriv. Compl. ¶¶ 45, 51, 55, 70, 73, 77, 79, 89, 110 and 114, Exhibit 22-
        14.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

and most do not identify the speaker, the forum or the audience. While these generalities make it impossible to respond specifically to any of these allegations, the Committee notes that the essence of the allegations is identical to the six specific alleged affirmative misrepresentations identified above: Plaintiffs allege that statements about the integration of Suite 11i were misleading because the product "required expensive systems integration work to implement."[109]

As with their allegations of specific affirmative misrepresentations, the plaintiffs' generalized allegations suffer from two fatal flaws. First, Plaintiffs' gloss on integration as meaning that Suite 11i would magically work in any environment, without deployment costs, is unsupported by any statements actually made by Oracle or the Individual Defendants. Second, the subject matter of these statements was repeated in statements that Plaintiffs did identify, and none of those resulted in a material movement in the price of Oracle stock.

### D.   The Market Already Knew About The Issues With Suite 11i

Plaintiffs allege that the market was unaware of the issues customers were experiencing in attempting to deploy Suite 11i and that the Trading Defendants, who were aware of these issues, sold their stock while the price was artificially inflated by the concealment of this adverse information. The Committee finds that this claim lacks merit. Before any of the Trading Defendants' sales of stock that are the subject of these suits, the market already was fully aware that Suite 11i had numerous bugs, that its testing before release was less than might be desired, that early adopters had some difficulty in deploying this

---

[109]    Del. Deriv. Compl. ¶ 3, Exhibit 22-14.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

complex product in their respective corporate environments, and that Oracle was finding it difficult to get early adopters to be reference customers. Moreover, with a product as revolutionary and complex as Suite 11i, customers and the marketplace expect issues of this nature in early releases. Thus, the negative value of this information was already factored into the market price for Oracle stock by the time the Trading Defendants sold.

### 1.    The Market Knew That Suite 11i Had Numerous Bugs

Plaintiffs allege that Oracle that Suite 11i was "riddled" with bugs, rendering their statements about the functionality of Suite 11i untrue.[110] A discussion of the nature of bugs and the software deployment process is useful in evaluating this allegation.

#### a.    The nature of bugs and the software deployment process

The basic definition of a bug is a malfunction in a computer program. The term itself comes from the early days of electronic computing, when in 1947 a technician solved a computer malfunction by removing a moth from one of the electrical relays.[111] Bugs can affect any aspect of a software program and can arise from the program itself, from the interface of the program with other programs with which the program must interact, or from the other programs themselves.

In a simple example of a software program designed to add two numbers and display and save the result, a bug might affect any of the following: (1) the user's ability to enter the numbers he wants to add; (2) the summing process, so that the program generates an

---

[110]    *See id.* ¶ 31.

[111]    Free Online Dictionary of Computing ("FOLDOC"), June 29, 1999 (defining "bug"), ST&B 9112-13, Exhibit 27-36. According to this entry, the first use of "bug" in the computing sense was in 1947, though there appears to be some evidence of prior use of the word to refer to technical malfunctions in radar, telephones and telegraphs. *See id.*

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

incorrect answer; (3) the display of the result, so that it is not visible against the background settings of the screen; (4) the saving of the data, so that it is not available for future use; or (5) the transfer of that data to another program with which the summing program has to interact. In each of these cases, mistakes in the programming code, in the summing program or the programs with which it must interact can prevent the software program from performing its intended task.[112]

Bugs (either mistakes or lack of functionality) can arise both in the software product, other commercial products with which it must interact or in the additional customized code the customer writes. That is, a complex software product rarely runs in isolation. It interacts with other software, either written by the customer or by other vendors. When a new product installed by a customer malfunctions, it is often not immediately clear where the fault lies. It could be that the new software is incorrect or lacks functionality, but in many cases, the customer's existing or customized software is at fault. Indeed, the process of deployment of complex software can give rise numerous "bug" claims, only some of which may involve actual problems with the new software product itself. It is this sort of complexity that ensures there will always be numerous bugs reported with new, complex software releases regardless of how much stress testing is done before the product is released. No testing regime can

---

[112]  Bugs should be distinguished, however, from lack of features. In the simple example above of the summing program, the user may want to multiply the two numbers he is entering. The program will not perform this operation. That lack of performance, however, is not a bug; it is the lack of a feature – multiplication – because the program was not designed with that feature. In some situations, users will want or expect programs to have certain functionality that is lacking, and will describe the omission of the feature as a "bug."

simulate the complex, real world interactions that a program will encounter when it is installed in a myriad of different IT environments.[113]

Another aspect of deployment of software as comprehensive and complex as Suite 11i is the need for the customer to decide which business processes it wants to automate through use of the product. If the application does not match the firm's existing business practices, the customer has to modify either its business practices or the software. Modifications to business practices are difficult because of corporate cultures and human nature. One analyst has estimated that 99% of deployment problems are the result of customers' difficulty in specifying their own requirements or implementers' inability to meet the customers' specifications.[114] Alternatively, where a desire to maintain current business practices dictates that the software be modified, it can be time-consuming and expensive to design, rewrite and test new software that adds the functionality to accommodate the existing business practice. In addition, customers may desire specialized functions from the applications that require additional software development. This customization of the software adds complexity and time to the deployment process.

---

[113]   Steve Ballmer, Microsoft's CEO recently addressed the inevitability of bugs in complex software. Specifically, he stated, "'Let's acknowledge a sad truth about software: any code of significant scope and power will have bugs in it…. Even a relatively simple software product today has millions of lines of code that provide many places for bugs to hide. That's why our customers still encounter bugs despite the rigorous and extensive stress testing and beta testing we do.'" John Markoff, *Microsoft Reports Progress in Averting Computer Crashes*, The New York Times, Oct. 3, 2002, ST&B 8669-770, at ST&B 8670. Exhibit 18-121.

[114]   *See ERP Effort Sinks Agilent Revenue*, at ST&B 8529 (quoting analyst from Enterprise Applications Consulting). Exhibit 18-118.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Oracle's customers are often large enterprises with very sophisticated operations. As a consequence, they are well educated and well advised, have their own IT staffs and access to well-trained consultants who can form an objective opinion regarding the risks and benefits of purchasing Oracle software at any stage of its development cycle. Oracle's customers also understand the complexity of the software implementation process and expect that difficulties will be encountered in that process. Those difficulties may arise from business practice issues leading to modifications of the business practices or the software. They also may arise from bugs that could be identified only after the software was placed into and tested in a real-world environment.

Because software developers cannot anticipate and test every configuration and deployment of an application prior to its release to customers, many bugs – regardless of source – become apparent only after release and deployment. As a result, purchasers of complex enterprise software, such as Suite 11i, know that they will encounter bugs, customization issues and business practice issues as a normal part of the deployment process.[115] This is particularly true of brand-new product releases.

**b.    The decision to release new software**

Plaintiffs claim that Oracle prematurely released Suite 11i and that, as a consequence, it was full of bugs. The decision as to when to release a new software product, particularly one as revolutionary, massive and complex as Suite 11i, is complicated and

---

[115]   *See* Simon London, *Battling the Bugs*, Financial Times, Aug. 27, 2002, ST&B 8530-32, at ST&B 8531 ("[S]oftware buyers have also accepted the fact that new software is likely to contain bugs. After all, it always has."), Exhibit 18-119.

warrants some discussion. It is, in many respects, a prototypical case study of the sort of considerations that have led to the adoption of the business judgment rule.

          (i)     **Customer pressure**

On the one hand, there is strong customer pressure on manufacturers to release new software product. Following Oracle's announcement in September 1999 that it would release Suite 11i in the Spring of 2000, a number of Oracle's customers pressured it to release the software. For example, Visa International complained in April 2000 that Oracle had delayed the release of Suite 11i.[116] Visa urged Oracle to deliver Suite 11i "as soon as possible."[117]

Some customers want to be "early adopters" of the software to obtain the competitive advantage the additional functionality of software provides.[118] Offsetting the benefits of being an early adopter is a risk, understood by the early adopters, that they will be implementing software that is not mature because it has not been fully tested in real world applications. Early adopters know that the process of deploying brand new software generally will not be a smooth one due to bugs and other deployment issues. For example, POSCO, a Korean steel company that is the largest producer of steel in the world, was an early adopter of Suite 11i. Though POSCO had problems with the deployment process, through use of the added functionality of Suite 11i, POSCO reduced its time to produce a roll of steel from 30

---

[116]    *See* E-mail from Sandra Adams to Ron Wohl, Apr. 20, 2000, ORCL 22256-58, at ORCL 22256, Exhibit 19-5.

[117]    *Id.*

[118]    *See* Barrenechea Int. at 10, Exhibit 2-5; Jill Strickland Interview Memorandum ("Strickland Int."), Oct. 23, 2002, at 2, Exhibit 2-72.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

days to 14.[119]  POSCO was and remains a strong Suite 11i reference customer for Oracle, notwithstanding a difficult deployment process. Indeed, its CIO noted that Suite 11i "is the best package ever to deal with the various processes that customers demand. . . . [It] provides simultaneous flexibility and integration."[120]

### (ii)  Market pressure

Oracle and other reputable software companies try to reduce the number of bugs before the first commercial release to customers. Oracle, other software developers, and their customers all understand, however, that the product will contain bugs, and that early releases may be "very buggy." The question is always how much testing is enough? If the product is released too early, it can be too buggy, and customers will be upset, and could possibly switch to other products. But if the product is released too late, competitors may take over the market, customers may be upset, and opportunities will be missed. Customers often await new features or functionality with great interest. If their desired product does not appear on the market in a timely fashion, their development efforts will be delayed, and costs may be incurred. And of course, there is always the risk that other vendors will come out with competing products and that customers will tire of waiting and turn to those other vendors.

Once customers are lost, it is extremely difficult to regain them. With consumer software, the situation is not as difficult as with enterprise software because of the difference in switching costs. For example, a consumer buying a video game using a particular game

---

[119]  *See The World's Largest Steel Manufacturer, POSCO, is Live on the Oracle E-Business Suite,* Oracle Press Release, Aug. 20, 2001, ORCL 12741-43, at ORCL 12742, Exhibit 17-28.

[120]  *Id.* at ORCL 12741-42, Exhibit 17-28.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

platform from one vendor can easily buy the next game using the same platform from another. But enterprise customers display far more inertia. Once they buy into one product line, they develop internal applications and business processes that are compatible with that product. Hence, it becomes extremely costly to switch vendors. Thus, in the enterprise software area, there is a definite advantage to releasing new software early, and then working with the customer to resolve problems and add additional functionality.

Several companies, including Microsoft in particular, have followed a strategy of "early release" rather than one of waiting until a product is more stable and the number of bugs has been reduced. These companies, Microsoft in particular, have proven very successful despite their established reputation for releasing buggy code.[121] This strategy also becomes apparent when one realizes that a "highly stable" product is almost impossible to obtain without customers actually using it. As a company tests software internally, it will progressively find fewer and fewer bugs with its tests. So there are diminishing returns in debugging software without help from the customers. Only when a product is tested by customers, with their diverse environments, will more bugs surface and be corrected.

Indeed, some of Oracle's competitors, again most notably Microsoft, have developed a reputation that their early releases of a product tend to have a large number of bugs and feature set omissions, and only in later releases do they actually get the product

---

[121]   Early release of software must be distinguished from the practice of announcing "vaporware," or products that do not exist, for the purpose of delaying sales to competitors. In 1998, Wired magazine presented its top vaporware award to Microsoft for "the year's biggest broken promise," its failure to deliver a new version of Windows. *See* Christopher Jones, *Vaporware 1998: Windows NT Wins*, Wired News, Dec. 29, 1998, ST&B 8660-62, at ST&B 8660, Exhibit 18-9.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

"right."[122] Despite this well-known pattern, Microsoft and other Oracle competitors have been exceedingly successful.

Thus, customer and market demands coupled with the reality that no software can ever be made bug-free and many bugs will be revealed only when the product is used in a real world environment, cause software companies to release products they know will experience bugs. That was true for Oracle's release of Suite 11i. This decision is emblematic of the sort of difficult business decisions that fall within the ambit of the business judgment rule.

### (iii) The process for testing and updating versions of Suite 11i after release

Oracle tested Suite 11i internally to identify and correct bugs.[123] Oracle also conducted a "beta" test with a select set of customers prior to the May 2000 release.[124] This process allowed Oracle to have its customers test the software themselves, and report any problems back to Oracle prior to the commercial release of the Suite. There were 19 Oracle customers that participated in this testing.[125]

Because of the wide range of uses to which and environments in which Oracle's customers will deploy its applications, it was not possible for Oracle to test the software in

---

[122]     See Chapter XII.D.1.a *supra*.

[123]     See Wohl Int. at 4, Exhibit 2-78.

[124]     See *id.* at 4-5. Beta testing is "[t]esting a pre-release (potentially unreliable) version of a piece of software by making it available to selected users." FOLDOC, Nov. 5, 1996 (defining "beta testing"), ST&B 9114, Exhibit 27-34.

[125]     See Bob Ferrari, *Oracle Users Meet and Consider Release 11i*, AMR Research Alert on Supply Chain Management, May 1, 2000, ORCL 7735-39 at ORCL 7737, Exhibit 20-1.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

every possible way that its customers would use it.[126]  At least one scholar has noted that one of the difficulties of software development is "the near impossibility of fully checking all possible interactions of components and operating conditions."[127]  Indeed, introducing completely bug-free software is not practical from a business standpoint.  As noted by a Microsoft executive, "[t]he easiest way to make a system reliable and secure is to reduce the number of devices it interacts with or the number of features it has.  The trouble is that you end up with a product no one wants."[128]

For these reasons, the first commercial customers for a software release understand and expect that they will encounter bugs as they deploy and use the application.  As the customers discover ways in which the application does not function, they bring the bugs to the attention of the software developers.  In Oracle's case, this process is accomplished by means of a Technical Assistance Request ("TAR").[129]  TARs note functional problems with Oracle applications.  Customers can generate a TAR directly, using the MetaLink page available to them on Oracle's website.  Alternatively, other parties, including the Oracle sales force, the Consulting Service, or the customer's third-party implementer, all can generate a TAR.  The TAR goes to Oracle's Support organization for response.  Barrenechea explained

---

[126]    *See* Wohl Int. at 6, Exhibit 2-78.

[127]    Michael A. Cusumano, *Japan's Software Factories:  A Challenge To U.S. Management*, ST&B 9248-74, at ST&B 9252, Oxford Univ., 1991, Exhibit 18-3.

[128]    *Battling the Bugs*, at ST&B 8531, Exhibit 18-119.

[129]    *See* Barrenechea Int. at 11-12, Exhibit 2-5.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

that not all TARs result from bugs. Support determines whether the problem giving rise to the TAR is a bug. According to Barrenechea, less than 20% of all TARs are cataloged as bugs.[130]

If Support determines that the TAR has identified a bug, Oracle programmers fix the bug  If Support determines that the TAR does not involve a bug but identifies additional functionality that a customer would like in the program, Oracle programmers may modify the program to add this additional functionality. The bug fix or additional functionality is disseminated to users in a "patch." A "patch" is a revision in the source code that can be issued to fix bugs or to add new features to the product after release. Thus the release of a patch does not necessarily mean there was a bug to be fixed, and can instead signify the addition of new features.

At the same time as early adopter customers are reporting bugs and requesting additional functionality, Oracle's software developers continue to write product enhancements.[131] As the patches accumulate, Oracle releases a patch set, containing the patches up to that time. The patch sets themselves will begin to accumulate over time. As the patch sets add up, Oracle will roll them into "family packs" and release them together. As with the patches and the patch sets, the family packs will also accumulate over time. Once Oracle judges that the family packs have reached a "critical mass," it will put them together into a new release of the software.[132]

---

[130]    See id. at 12.

[131]    See id. at 5.

[132]    See id.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 295325

Each release is denominated by a suffix. The first release of 11i was 11i.1, in May 2000. The subsequent releases of 11i, following in each instance the accumulation of patches, patch sets, and family packs described above, occurred as follows through Q3 FY 2001: 11i.2 in October 2000, and 11i.3 in January 2001.[133]

### c. Oracle publicly acknowledged bugs in Suite 11i

Despite understanding that there were bugs to be expected in Suite 11i, customers complained to Oracle about the bugs. In response and in public fora, Oracle executives freely and publicly acknowledged the existence of these issues. For example, at a meeting in October 2000 of the Oracle Application User Group ("OAUG"), customers criticized Oracle for flaws in Suite 11i. OAUG is an organization, independent of Oracle, composed of customers who use Oracle's applications software. OAUG's stated purpose is to "increase members' knowledge and understanding of Oracle Applications and to communicate issues and needs to Oracle Corporation."[134]

During a question and answer session with Oracle executives, including Ron Wohl, the Oracle Executive Vice President in charge of ERP applications development for Suite 11i, Oracle application users confronted Oracle executives with a number of issues that the customers had identified by October 2000. This question and answer session was published to the world by being posted on the OAUG website. The customers' complaints addressed issues concerning Suite 11i's functionality and the implementation process. In particular, customers noted the following:

---

[133]   *See* Wohl Int. at 15, Exhibit 2-78. There have been a number of subsequent releases as well, but the Committee has not listed them here.

[134]   *See* http://www.oaug.org/welcome.html.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-53

"11i.1 had a large number of patches . . . and major problems."[135]

"I appreciate that 11i.2 is coming out, but why did we have to live with 5,000 bugs?"[136]

"There's a lot of frustration about the quality of the patches. The number of them, I won't even get into."[137]

"You have buggy software at the beginning."[138]

Oracle executives, and Ron Wohl in particular, acknowledged the concerns. Wohl noted that, in hindsight, "[w]e have too many bugs and too many patches."[139] Wohl also noted that from the 43 customers who were then "live" on Suite 11i, Oracle had learned that the first release of 11i, 11i.1, had taken "too much patching to install."[140] Wohl noted that release 11i.2 would eliminate the need for that patching for ERP customers, and that those customers looking to adopt a revised version for CRM applications should use the upcoming version 11i.3.[141] Wohl cautioned that customers should not be surprised at what seemed to be

---

[135]   E-mail from Tony Kender to George Roberts et al., Feb. 23, 2001, ORCL 17453-83, including Transcript of Oct. 24, 2000 OAUG Fall Conference Q&A Session ("Oct. 24, 2000 Q&A Tr."), at ORCL 17459, Exhibit 19-103.  OAUG also published the transcript on its website, where it is available not only to existing and prospective Oracle applications users, but to the public as well. *See* http://www.oaug.org/fall2000/updates/askoracle.html.

[136]   Oct. 24, 2000 Q&A Tr., at ORCL 17461, Exhibit 19-103.  This comment was from Sun Microsystems.

[137]   *Id.* at ORCL 17464.

[138]   *Id.* at ORCL 17467.

[139]   *Id.*

[140]   *Id.* at ORCL 17459.

[141]   *Id.*

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-54

a high number of patches because there were "patches across every single product and across the entire suite."[142]

Wohl also admitted that, in hindsight, Oracle could have done a better job testing Suite 11i before the initial release, though simulating the real world in a testing environment is difficult because of the range of customer application environments: "This would be very simple if everyone's installation was the same. But we have a wide variety of business practices. We test as many variables as we can. In this case, we didn't test enough."[143]

These statements on October 24, 2000 by high level Oracle executives admitting the presence of bugs in Suite 11i and acknowledging that the product was, in hindsight, released too early without sufficient testing, were made publicly and were posted on the Internet. Furthermore, Computerworld published an article on October 30, 2000 that repeated much of what was discussed at the October 24 OAUG conference, including the prevalence of bugs, the excessive number of patches and the delays and difficulties customers were experiencing in deploying Suite 11i.[144] Thus, this information was available not only to Oracle customers but also to industry and financial analysts and the market at large.

The presence of these issues, which was publicly conceded by senior Oracle executives in October 2000, does not, however, support the conclusion that any executive or director of Oracle violated any fiduciary obligation to the shareholders or to the corporation or

---

[142]    *Id.*

[143]    *Id.* at ORCL 17464.

[144]    Marc L. Songini, *Users Vent Frustration Over Oracle CRM/ERP Upgrades,* Computerworld, Oct. 30, 2000, ST&B 1442-44, at ST&B 1442-43, Exhibit 18-42.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-55

behaved in a negligent or reckless manner.  As already noted, these observations regarding the incidence of bugs were offered in hindsight.  Reasonable managements confronting the difficult question of when to release a new software product must use their best judgment based on available information.  The fact that this judgment, in hindsight, may not have been optimal does not demonstrate any wrongdoing on the part of Oracle or its officers or directors.

### d.   Industry analysts also publicly noted issues with Suite 11i beginning in the summer of 2000

Issues with Suite 11i also were known to and published by widely followed industry analysts such as the GartnerGroup and AMR.

For example, a GartnerGroup study in July 2000 listed challenges that Oracle faced with Suite 11i.  These included Gartner's observation and conclusion that the CRM applications in Suite 11i were not, on a head to head basis, functionally as good as those of the "best-of-breed" vendors.[145]  The GartnerGroup researcher stated that it was unlikely that Oracle's CRM applications would be "leading-edge" for the next five years.[146]  In addition, GartnerGroup observed "functional gaps" in the CRM modules, particularly in the ability to "push Web pages to a customer."[147]

Among the other challenges facing Oracle, GartnerGroup also noted that Oracle could have problems developing customers to use as references for successful 11i implementations.[148]  GartnerGroup also criticized the ERP functions of 11i.  Although it gave

---

[145]   *See Oracle 11i CRM:  Better but Not the Best*, at ORCL 7369, Exhibit 20-2.

[146]   *See id.*

[147]   *See id.*

[148]   *See The Many Roads to Upgrading to Oracle Applications 11i*, at ORCL 7397, Fig. 2, Exhibit 20-3.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Oracle good marks for its vision, GartnerGroup in August 2000 graded Oracle as scoring only a "D+" on its execution of the ERP aspects of Suite 11i.[149]  Oracle's delivery of 11i.1 was described as a "struggle."[150]

As of December 2000, industry analysts still had negative views of the functionality of Suite 11i: GartnerGroup rated it a "C-."[151]  Reports from customers collected by GartnerGroup found that, other than the financial applications, Suite 11i's components "remain[ed] unproven."[152]  Customers reported, and GartnerGroup reported, "quality problems" with the 11i software code.[153]  GartnerGroup predicted that the ERP components of 11i would not be solid until the third quarter of calendar year 2001, and that until that time, they were "suitable primarily for risk-tolerant, early-adopter-oriented enterprises."[154]

Industry analysts also criticized Oracle's testing program for Suite 11i.  In August 2000, META found it "worrisome" that Oracle did not follow a comprehensive external beta testing procedure.[155]  META cautioned that many of the Suite 11i applications

---

[149]  *See* B. Bond, B. Burton, *An Oracle ERP Report Card*, GartnerGroup Research Note, Dec. 4, 2000, ORCL 7469-71, at ORCL 7469 (reporting August grade on execution of D+, later raised to B- in November 2000), Exhibit 20-7.

[150]  *Id.* at ORCL 7470.

[151]  *Id.*

[152]  *Id.* at ORCL 7471.

[153]  *Id.*

[154]  *Id.*

[155]  E-mail from Tony Kender to George Roberts et al., Feb. 23, 2001, ORCL 17453-83, including OAUG document, at ORCL 17457, Exhibit 19-103.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

"have not been field tested in real-world scenarios."[156]  As a consequence, META suggested that customers considering Suite 11i for "mission critical" applications should "wait at least six months after the release of 11i" to implement the new applications.[157]  Likewise, in December 2000, GartnerGroup criticized what it described as Oracle's use of early adopter users to "stress-test[]" the software after commercial release, as opposed to more extensive, pre-release beta testing.[158]

Similar concerns about Oracle's testing of Suite 11i were voiced by AMR Research. AMR criticized Oracle for using early adopters as part of its release testing process.[159]  In addition, AMR found that Suite 11i was "rushed to the market, much later than promised, with many gaps and bugs in the code."[160]

Nonetheless, AMR also concluded that these issues had not caused customer interest to decline.[161]  There were other positive notes from industry analysts. GartnerGroup noted in July 2000 that the CRM modules of 11i "were one of the broadest and most tightly integrated suites."[162]  GartnerGroup also noted that the "tight integration between [11i's] front-office modules [CRM] and back-office applications [ERP]" was made possible by Oracle's use

---

[156]   *Id.*

[157]   *Id.*

[158]   *An Oracle ERP Report Card*, at ORCL 7471, Exhibit 20-7.

[159]   *AMR Outlook: Oracle 11i – There's Pain but Also Some Gain*, AMR Alert, Feb. 27, 2001 ORCL 7869-74, at ORCL 7869, Exhibit 20-8.

[160]   *Id.*

[161]   *Id.* at ORCL 7870.

[162]   See *Oracle 11i CRM: Better but Not the Best*, at ORCL 7368, Exhibit 20-2.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

of "a single schema/data model and . . . a common workflow subsystem." [163]   The researcher

recommended Suite 11i for customers "looking for a commodity front-office solution that is

fully integrated with ERP,"[164] although another GartnerGroup publication suggested that

existing customers of Oracle's ERP applications must "balance the integration benefits [of

Suite 11i] against the functional maturity of "best-of-breed" vendors."[165]

   Thus, by December 2000, significant information was in the public domain

through industry analyst reports concerning the quality of Suite 11i's components, the number

of bugs in the code, the lack of what some considered to be adequate testing before release of

the product, difficulties experienced by early adopters and a likely problem for Oracle in

getting all-important reference accounts to use in selling Suite 11i.

   **e.**  **Securities analysts also were aware of issues with Suite 11i**

   Securities analysts likewise were aware of the allegedly undisclosed issues

concerning Suite 11i. Throughout 2000 and into Oracle's Q3 FY 2001, securities analysts

tracking Oracle discussed Suite 11i's issues and benefits. In addition to those reports

previously noted in Chapter XII.C.1.b *supra*, the Committee sets forth below other relevant

excerpts.

   In November 2000, one analyst noted that widespread customer adoption of the

suite approach would be "unrealistic for most companies in the short and medium term."[166]  As

---

[163] *Id.* at ORCL 7369.

[164] *Id.* at ORCL 7369.

[165] *The Many Roads to Upgrading to Oracle Applications 11i*, at ORCL 7396, Exhibit 20-3.

[166] *ORCL: Expect Gradual Adoption of Apps Suite In A Best Of Breed World*, at ORCL 46842, Exhibit 20-6.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

XII-59

a consequence, investors were warned by this analyst that the "discrepancy between Oracle management's vision and the market reality has caused investor heartburn in the past, even if the vision was eventually realized."[167]

Analysts were also aware that Suite 11i had its share of bugs. According to an analyst from Morgan Stanley Dean Witter, Suite 11i "had the bugs that all new releases of this size usually have."[168] Goldman Sachs concluded, based upon its independent checking with customers and integrators, that Suite 11i, while "ha[ving] some issues with bugs," was "consistent with other major new releases," and there were no "show stopper" issues.[169] Another noted that "Oracle's 11i e-business suite continues to have bugs thereby limiting the number of notable customer references for the new product."[170] Yet another analyst noted the "impression that the first version [of Suite 11i] had considerable bugs."[171]

Another analyst reported that discussions with system integrators "indicated that customer[s] are delaying the upgrade from 10.7 to 11i, due to the scale of the conversion as well as the instability of early releases of 11i."[172]

---

[167]    *Id.*

[168]    *Oracle: How Suite It Is*, at ORCL 685, Exhibit 21-29.

[169]    Rick Sherlund, *Oracle: Early Checks with Applications Customers*, Goldman Sachs & Co. Analyst Report, Nov. 3, 2000, ORCL 896-98, at ORCL 896, Exhibit 21-19.

[170]    William Epifanio II, *Oracle Corporation: Oracle's Second Quarter Earnings*, J.P. Morgan Analyst Report, Dec. 12, 2000, ORCL 758-60, at ORCL 759, Exhibit 21-24.

[171]    Gretchen Teagarden, *ORCL Reports 2Q Traction in Applications Sooner Than Expected*, Salomon Smith Barney Analyst Report, Dec. 15, 2000, ORCL 697-700, at ORCL 698, Exhibit 21-45.

[172]    *AppWorld -- Upbeat Conference, but no Cajun Spice,* at ORCL 460, Exhibit 21-55.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Thus, the investment analysts community was aware of the significant issues with deployment and functionality of Suite 11i.

### f.   The popular press also was aware of Suite 11i issues

The popular press – newspapers, magazines, and online sources – also displayed an awareness of issues with Suite 11i. In May 2000, a Business Week Online article noted concerns that Suite 11i would not have the same depth of functionality as offerings from best-of-breed vendors.[173] The same article also warned, based on GartnerGroup's prediction, that Suite 11i would not be stable enough for corporate customers' most critical applications until the end of 2000.[174]

Other concerns about Suite 11i's functionality were noted in July by an article in the San Francisco Chronicle, along with concerns that Oracle may have promised more than it could deliver.[175] That July article also noted there were functional gaps in Oracle's Suite 11i offering.[176]

In addition, the concerns about Suite 11i functionality and implementation difficulties that had been voiced at the October 2000 OAUG conference (see Chapter XII.F.1.c supra) were amplified by an October 2000 article in the magazine Computerworld. That article quoted an OAUG board member as describing Suite 11i as "not ready for prime

---

[173]   See Oracle: Why It's Cool Again, at ORCL 68152, Exhibit 18-14.

[174]   See id.

[175]   See Kelly Zito, Oracle Takes Some Hits, San Francisco Chronicle, July 17, 2000, ORCL 46774-77, at ORCL 46777, Exhibit 18-18.   .

[176]   See id.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

time."[177]  The article also noted positive experiences from customers who were implementing
Suite 11i as a new installation, as opposed to an upgrade.[178]

Forbes.com noted in mid-November 2000 that building and integrating
applications like Suite 11i was difficult, and that it was an open question as to whether Oracle
could "make it all work together."[179]  The same article noted that customers for Suite 11i had
been focusing on the ERP applications, but not upon CRM.[180]  In addition, this article noted
that, as of November 2000, "Oracle still has a long way to go before it can claim full
integration of its e-business applications."[181]

### g.  The market was aware of the issues with Suite 11i

Based on the foregoing, the Committee concludes that by the time the Trading
Defendants began selling their stock, the market was well aware from various sources that
(i) Suite 11i was quite buggy; (ii) it had been brought to market without as much testing as
might have been possible; (iii) it was an extremely complex product that customers were
having difficulty deploying -- with at least one article characterizing these experiences as
"horror stories"; (iv) Oracle may have difficulty in finding reference customers for use in
selling Suite 11i; (v) Suite 11i would not be stable enough for corporate customers' most
critical applications until, at the earliest, the end of 2000; and (vi) observers had questioned the

---

[177]   *Users Vent Frustration Over Oracle CRM/ERP Upgrades*, at ST&B 1442, Exhibit 18-42.

[178]   *See id.* at ST&B 1443.

[179]   Lisa DiCarlo, *Oracle's Second Act*, Forbes.com, Nov. 16, 2000, ST&B 1551-53, at
ST&B 1551-52, Exhibit 18-46.

[180]   *See id.* at ST&B 1552.

[181]   *Id.* at ST&B 1553.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

integration of Oracle's e-business applications. Although the details of every customer's individual issues may not have been known to the marketplace, the Committee finds that sufficient information was in the marketplace about issues with Suite 11i that this information was not "non-public," and the negative value of this information was already factored into the price of Oracle stock before the Trading Defendants sold.[182] Indeed, the fact that the market did not respond in a statistically significant way to an article highly critical of Suite 11i and Oracle in the Wall Street Journal on August 6, 2001 underscores the fact that this information was not news to the market.

E.    **Statements About Sales Of Oracle Applications**

Plaintiffs also attack as misleading statements made by Oracle executives on December 14, 2000 concerning the expected levels of Suite 11i sales in Q3 FY 2001. Oracle provided projections about its expected levels of applications sales in its earnings conference calls. For example, during Oracle's December 14, 2000 earnings call, Jeff Henley projected that Oracle would experience 75% growth in its applications sales during Q3 FY 2001.[183] As discussed earlier, the Committee has concluded that Henley's statement, when made, was not only accurate, but actually conservative, based on the internal projections for application sales for the quarter extant at the time the statement was made. Moreover, Oracle appeared on track

---

[182]    *See* Lee Gomes, *Painful Birth: For a Big, New Product, Oracle's Pitch Smacks of Wishful Thinking,* The Wall Street Journal, Aug. 6, 2001, ST&B 1401-04, Exhibit 18-107; NERA, Tab 5, Exhibit 27-25; NERA Supplemental Analysis of Abnormal Ln Turnover Following the Publication of the Aug. 6, 2001 Wall Street Journal article on Suite 11i, Exhibit *Id.*

[183]    *See* Dec. 14, 2000 Earnings Call Tr., at ORCL 31705, Exhibit 17-12.

to meet its goal of 75% Applications growth until February 2001, by which time all of the challenged sales of stock already had taken place.

Plaintiffs also claim that problems with Suite 11i caused Oracle's earnings disappointment in Q3 FY 2001. The Committee finds that this allegation lacks merit. As discussed in greater detail in Chapter VIII of this Report, Oracle's earnings disappointment was principally caused by a precipitous decline in Oracle's overall license business (both Database and Applications) that occurred at the end of February 2001, as scores of Oracle customers and potential customers (particularly large customers in the United States) delayed purchasing decisions, reduced deal sizes and/or declined to purchase software.

Moreover, it is the experience of the Committee that if a potential customer has concerns about product quality, a potential deal with that customer will not proceed to the contracting and final approval stage. Instead, the potential customer will reject the company as a potential vendor relatively early in its decision-making process. Thus, the fact that Oracle's Q3 FY 2001 earnings disappointment became evident only late in the quarter strongly suggests that product quality concerns were not the cause. The Committee's experience is consistent with the statements of both Oracle's customers and its sales personnel. As Mary Anne Gillespie, Senior Vice President, NAS, explained, one does not lose a sale at the CIO or CEO approval level at the end of a quarter because of bugs or performance issues with the product. By the time the fully negotiated contract is put before the senior level executive for signature, product performance issues have long been resolved. If product performance is an issue, a prospective sale will drop out long before the contract execution stage. Gillespie is firm in her view that performance issues with Suite 11i had no impact on contracts not closing at the end

of Q3 FY 2001.[184]  In addition, representatives of Gap Inc., one of the Suite 11i deals that did not close in Q3 but did close in Q4 FY 2001, informed the Committee that Suite 11i quality issues played absolutely no role in their decision to defer the closing to Q4.[185]

F.    Particular Allegations And Results Of Factual Investigation

Plaintiffs make a number of factual allegations about the technical aspects of Suite 11i. Because ample information about the functionality of Suite 11i was known in the market, and since there was no correlation between positive statements about Suite 11i and statistically significant movements upward in Oracle's stock price, the Committee does not believe it is necessary even to consider these particular allegations. However, in the interest of conducting a comprehensive investigation, the Committee has reviewed documents produced by Oracle concerning the functionality of Suite 11i, interviewed the developers of the Suite, interviewed current and former Oracle executives and employees concerning their experiences with the Suite, and interviewed Oracle customers about their experiences. The results of that investigation are summarized below, according to the general categories into which Plaintiffs' allegations may be grouped.

1.    Alleged Shortcomings of the CRM Modules

Plaintiffs make a number of allegations about the functionality of the CRM aspects of Suite 11i. The essence of these allegations is that Suite 11i suffered from "giant

---

[184]    See Mary Anne Gillespie Interview Memorandum ("Gillespie Int."), Sept. 16, 2002, at 8. Exhibit 2-26. Ms. Gillespie did note, however, that the sales process for Suite 11i was made difficult by the lack of reference customers, a fact already in the public domain. See also The Many Roads to Upgrading to Oracle Applications 11i, at ORCL 7397, Exhibit 20-3.

[185]    See Ken Harris Interview Memorandum ("Harris Int."), Oct. 17, 2002, at 2, Exhibit 2-31.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

gaps" in the CRM modules.[136] The Committee's investigation of this category of claims showed that there is a wide and strong diversity of opinions as to the quality of the CRM modules, and this difference in opinion is reflected below.

### a. Completeness of the CRM modules when released

Underlying Plaintiffs' allegations about gaps in the CRM modules is the premise that Oracle misled its customers about the functional scope of the CRM applications.[187] However, Oracle disclosed that the CRM modules would not be complete in the initial release *before* the official commercial release of Suite 11i. Oracle made this information public at the April 2000 OAUG meeting.[188] Nor was Oracle less than forthright about the ongoing development of the CRM aspects of Suite 11i. Oracle executive Ron Wohl also told the OAUG in October 2000 that those customers interested in CRM applications should wait and implement release 11i.3, which was still in development and pre-release testing.[189] This release would "be of particular help in CRM."[190]

---

[186]   Del. Deriv. Compl. ¶¶ 48, 53, 56, 65, 69-71, 74, Exhibit 22-14; Fed. Deriv. Compl. ¶¶ 74, 79, 82, 91, 95-97, 100, Exhibit 22-26; Cal. Deriv. Compl. ¶ 43, Exhibit 22-148.

[187]   Del. Deriv. Compl. ¶¶ 48, 53, 56, 65, 71, Exhibit 22-14; Fed. Deriv. Compl. ¶¶ 74, 79, 82, 91, 100, Exhibit 22-26.

[188]   *See Oracle Users Meet and Consider Release 11i*, at ORCL 7736 (reporting on OAUG April 2000 meeting), Exhibit 20-1. Interestingly, a GartnerGroup analyst took the view that Oracle's additional CRM offerings would not be available until at least April 2001. *See Oracle 11i CRM: Better But Not the Best*, at ORCL 7368 (predicting, with a ".6 probability," that a new Suite 11i release with updated CRM functions would not be available until the second quarter of calendar year 2001), Exhibit 20-2.

[189]   Oct. 24, 2000 Q&A Tr., at ORCL 17459, Exhibit 19-103.

[190]   *Id.*

XII-66

In light of these disclosures, the Committee concludes that the market was informed that Oracle's CRM applications were not complete before the release of 11i.3, which occurred in January 2001.[191]

### b.   Allegations of poor integration between CRM modules

A second theme of Plaintiffs' allegations about the CRM modules of Suite 11i is that there were problems with the interfaces between the various CRM modules. These allegations fall into two principal categories. First, Plaintiffs allege that there were no APIs between the modules. Second, Plaintiffs claim that Oracle had not sufficiently tested the integrated suite of applications and that integration patches prolonged customer integrations. Each set of allegations is addressed below.

### (i)   Absence of CRM APIs

Plaintiffs allege that Suite 11i lacked an API, and that this condition continued into January 2001 and prevented components of the CRM modules from communicating with each other.[192] In particular, Plaintiffs allege that customers had "to build . . . 18 – 24+ interfaces across 6 – 12 different applications," that the "lack of the API interface was the cause of the severe delays in implementation at BellSouth," and that "[i]mmediately after integration began in June 2000, BellSouth was complaining about serious quality issues in the 11i Suite base codes."[193]

---

[191]   In addition to Oracle's own acknowledgements, industry analysts noted shortcomings in the CRM aspects of Suite 11i. *See Oracle 11i CRM: Better but Not the Best*, at ORCL 7369, Exhibit 20-2.

[192]   Del. Deriv. Compl. ¶ 74, Exhibit 22-14; Fed. Deriv. Compl. ¶ 100, Exhibit 22-26.

[193]   Del. Deriv. Compl. ¶¶ 51, 74, 75, Exhibit 22-14; Fed. Deriv. Compl. ¶¶ 77, 100, 101, Exhibit 22-26.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Both Wohl and Barrenechea, the head developers responsible for Suite 11i,
disagreed with Plaintiffs' claim that Suite 11i did not have "an API" until at least January
2001; Chris Balkenhol, the developer most involved with BellSouth, called it "categorically
not true."[194] By that time, there were "multiple APIs."[195] Oracle's internal documents confirm
that Oracle's development team was addressing APIs in Suite 11i modules as early as October
1999, when there were already 110 APIs (though some were not fully built) integrating CRM
modules.[196] Indeed, as Wohl explained, the APIs were defined first by the ERP functions.
CRM wrote its code to match the APIs already established by Wohl's team.[197] Accordingly,
Suite 11i had multiple APIs from its first commercial introduction. Moreover, the most
important aspect of Suite 11i's integration transcended the issue of APIs altogether: the
modules were designed to integrate and share information through the database, and were
"engineered around a unified global customer and product database. All the applications have
been designed and built by Oracle to work together and share information."[198]

Concerning BellSouth in particular, Barrenechea admitted that this customer
had experienced a "rough" implementation. However, he did not attribute the difficulties to
the lack of APIs in the CRM modules. Instead, Barrenechea explained that
telecommunications companies like BellSouth are particularly difficult customers. They have

---

[194]   *See* Wohl Int. at 13, Exhibit 2-78; Barrenechea Int. at 18, Exhibit 2-5; Balkenhol Int. at 2,
        Exhibit 2-3.

[195]   Wohl Int. at 13, Exhibit 2-78.

[196]   *See, e.g.*, E-Mail from Fred Voltmer to Mark Barrenechea, Oct. 12, 1999, ORCL 44523-
        24, at ORCL 44523, Exhibit 19-2.

[197]   *See* Wohl Int. at 12, Exhibit 2-78.

[198]   *Customer Relationship Management*, at ORCL 70246, Exhibit 27-26.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

traditionally written their own software and therefore have strong preconceived notions of how software should run. BellSouth was going from 60 – 70 custom applications that it had developed over time to a handful of integrated Oracle products. BellSouth completed this goal in six months, as opposed to the three years Barrenechea estimated it would have taken if they had worked with the separate vendors necessary to achieve the same functionality in a best of breed approach. Thus, Barrenechea stated that while BellSouth may have been unhappy with Oracle for a period of time, they ultimately made a great leap forward in automation and efficiency.[199]

        Other Oracle personnel interviewed by the Committee noted that the issues at BellSouth arose from extensive customization that BellSouth required.[200] The Committee also interviewed BellSouth's Senior IT Director, Jill Strickland, who confirmed that the code development required by BellSouth's customization played a role in delaying BellSouth's go-live date from October 2000 to January 7, 2001.[201] Strickland also noted that BellSouth had to perform development work on the APIs for the Suite 11i CRM modules that it had purchased,

---

[199]    *See* Barrenechea Int. at 15, Exhibit 2-5.

[200]    *See* Sarah Kopp Interview Memorandum ("Kopp Int."), July 30, 2002, at 12-13, Exhibit 2-39; Brad Scott Interview Memorandum ("Scott Int."), Oct. 4, 2002, at 8, Exhibit 2-68.

[201]    *See* Strickland Int. at 3, 4-5, Exhibit 2-72.

to enable them to interact with BellSouth's legacy systems.[202]  Strickland also noted that when

BellSouth began implementing certain of the CRM modules from Suite 11i, BellSouth knew

that the CRM modules were still in the development stage.  Despite knowing that the modules

were not yet commercially available and were not expected to be commercially available until

Release 11i.3 at the end of 2000, BellSouth decided to be an early adopter of the CRM

modules.  BellSouth understood that the applications had not been through beta testing and, in

Strickland's words, were "not out of the box ready to go."[203]  BellSouth noted that Oracle had

"work[ed] diligently" to help BellSouth correct implementation problems.[204]  Nonetheless,

BellSouth claimed in July 2001 that the transition to Oracle's CRM modules had caused "a

negative effect on [its] business.  BellSouth has estimated the impact to date at around

$40,000,000."[205]

      In November 2000, in the middle of the Suite 11i implementation at BellSouth,

the president of BellSouth Technology Services, Debbie Freedman, attended a luncheon with

Oracle and a securities analyst from Morgan Stanley Dean Witter.[206]  Oracle asked

---

[202]    Chris Balkenhol, who was the Oracle Development executive most closely involved with
the BellSouth implementation, noted that while the SDP (Workflow) module that
BellSouth purchased had the appropriate number of APIs, it was not an API-based
technology and did not therefore depend solely upon APIs to interact with other
applications.  *See* C. Balkenhol Int. at 3, Exhibit 2-3. Balkenhol also noted that all of the
modules purchased by BellSouth were integrated and were designed to communicate
with each other by sharing information through the database. *Id.*

[203]    *Id.* at 2.

[204]    Letter from Ralph de la Vega to Jay Nussbaum, July 20, 2001, ORCL 103377-80, at
ORCL 103377, Exhibit 19-126.

[205]    *Id.*

[206]    *See* Charles Phillips, *Lunch with Oracle*, Morgan Stanley Dean Witter Analyst Report,
Nov. 15, 2000, ORCL 19486-98, at ORCL 19486, 19489, Exhibit 21-22.

NDCA-ORCL 295343

Ms. Freedman to attend the lunch in response to the analyst's request to speak with an actual Oracle Suite 11i customer.[207] There was no discussion, according to the analyst's report, of any difficulties with the Suite 11i implementation. Rather, Ms. Freedman described a "growing partnership" with Oracle.[208] According to Ms. Freedman, BellSouth was attracted to Oracle and Suite 11i out of a desire to adopt "a tight, manageable technology infrastructure . . . . with fewer vendors and fewer integration points."[209]

BellSouth is currently running Oracle's Suite 11i applications, and has been a named reference customer.[210] Strickland also noted that at some point after the summer of 2001, BellSouth decided not to implement the CRM modules of Suite 11i in several other business units, and not to upgrade its existing modules to Oracle's most recent release.[211] Strickland explained that while product concerns, such as a concern over the CRM modules' abilities to interact with BellSouth's legacy systems, were involved in this decision, the

---

[207]   *Id.*

[208]   *Id.*

[209]   *Id.*

[210]   *See Oracle Q4 Earnings Per Share $0.15 Operating Margin 40%, FY2001 Revenue $11 Billion, Income up 25%, Operating Margin 35%,* Oracle Press Release, June 18, 2001, ORCL 12700-04, at ORCL 12700, Exhibit 17-27; J. Bonasia, *Oracle Pressing Attack Against Siebel,* Investor's Business Daily, Mar. 14, 2002, ST&B 8667-68, at ST&B 8667, Exhibit 18-113.

[211]   Plaintiffs also allege that another telecommunications firm, the Swedish company Telia AB, delayed purchasing Suite 11i because of the difficulties that BellSouth had experienced. In fact, TeliaNet, a subsidiary of Telia AB, was the first European company to upgrade to Suite 11i. *See Oracle Selects Telia Net as Star of E-Business at Oracle Appsworld Europe Conference in Paris,* Oracle Press Release, Feb. 12, 2001, ORCL 46270-71, at ORCL 46270, Exhibit 17-16. TeliaNet was already "live" on 11i by Dec. 15, 2000, *before* BellSouth went live. *See How Suite It is,* at ORCL 681, Exhibit 21-29.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

decision was also driven by business concerns. With regard to the decision not to upgrade, Strickland observed that the same concerns were present, in addition to the complexities that would be encountered because of the extensive customization that BellSouth had done to the CRM modules to achieve the specialized functions that BellSouth needed them to perform.[212]

### (ii)   Allegations that CRM patches adversely affected interfaces between the modules

Another of the plaintiffs' allegations concerning the CRM applications of Suite 11i is that patches released by Oracle to fix individual applications may have fixed those applications, but at the same time were harmful because they inadvertently broke the interface abilities between modules.[213] Plaintiffs allege that, as a result, "Oracle's development organization had to produce interface fixes for the integration effort at customer sites."[214] In addition, Plaintiffs contend that that Oracle had inadequately tested how the patches would affect the applications interfaces.[215]

The Committee's investigation indicates that some patches did have an adverse impact on other modules. One of Oracle's consultants who had worked on early CRM implementations noted in an internal e-mail that among other issues with 11i.1 and 11i.2, "the patches are not well tested especially with other[] modules to ensure it does not impact the

---

[212]   Strickland Int. at 4-5, Exhibit 2-72.

[213]   *See* Del. Deriv. Compl. ¶ 70, Exhibit 22-14; Fed. Deriv. Compl. ¶ 96, Exhibit 22-26.

[214]   *Id.*

[215]   Del. Deriv. Compl. ¶ 69, Exhibit 22-14; Fed. Deriv. Compl. ¶ 95, Exhibit 22-26.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

system. Very often the patches break a heck of a lot of stuff."[216] The same consultant noted that it appeared to him that "the products have not undergone any form of integration testing and [are] failing in this area."[217] As a consequence, consultants were required in their implementations to "establish complex application development environments and patching structure[s]."[218]

Wohl agreed that, viewed in hindsight, Oracle had not done as good a job as it could have on integration testing of patches.[219] Part of the problem was the structure of the development effort, with Wohl in charge of ERP aspects of the Suite and Barrenechea in charge of the CRM modules, sharing integration responsibility. This division of responsibilities led to disputes between Wohl and Barrenechea during the development process, as indicated by internal Oracle communications.[220] Wohl said that it would have been more effective to have a single executive in charge of integration. Wohl also said that while

---

[216]  E-mail from Kevin Glynn to Valerie Borthwick, Oct. 23, 2000, ORCL 23363-66 including E-mail from Lee Chuan Yew to Heather Williams, at ORCL 23364, Exhibit 19-14.

[217]  Id.

[218]  Id.

[219]  See Wohl Int. at 11, Exhibit 2-78.

[220]  See, e.g., E-mail from Jennifer Minton to Thomas Williams, Nov. 16, 2000, ORCL 98392-94, including E-mail from Mark Barrenechea to Ron Wohl, Nov. 15, 2000, at ORCL 98393 (discussing obstacles to completing 11i.2), Exhibit 19-18; E-mail from Jennifer Minton to Tom Williams, Dec. 4, 2000, ORCL 98406-07, including E-mail from Mark Barrenechea to Ron Wohl, Dec. 1, 2000, ORCL 98406-07 (discussing obstacles to completing Contracts module), Exhibit 19-30. Notwithstanding the disputes encountered along the way, version two of Suite 11i was "a gazillion times better" than 11i.1, according to feedback from the Agility Communications implementation. E-Mail from Ron Wohl to Rob Knapp, Dec. 4, 2000, ORCL 14065-67, at ORCL 14065, Exhibit 19-20.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Oracle had performed testing on the integration of Suite 11i, he now believed that Oracle should have done more integration testing.[221] At the same time, Wohl noted that Oracle did succeed in building a suite of applications that was more integrated than anything else available on the market. From Wohl's perspective, it was not that Suite 11i did not function properly, but that it did not function as well as he had wanted it to.[222]

Nonetheless, and as described at Chapter XII.D.1.d *supra*, criticism of Oracle's testing of Suite 11i was well known outside of Oracle in 2000 and early 2001.

### c.    Allegations of problems with the call center application

A third theme of Plaintiffs' allegations of problems within the CRM modules concerns the call center application. Plaintiffs allege that this application "was so laden with bugs that Oracle sales representatives could not believe that anyone would entertain purchasing such a problematic product."[223]

Call center software is complex, according to Barrenechea. Most of the complexity results from having to install the software application on any of a dozen hardware configurations from different phone and voicemail vendors. Some hardware platforms are easier to deal with than others. Barrenechea believes that the call center implementation at Unilever, which had a very unusual phone platform, may have been the source of those allegations. However, the Unilever hardware platform was an outlier in terms of difficulty, according to Barrenechea, and should not be cited as an example of typical call center

---

[221]     *See* Wohl Int. at 11, Exhibit 2-78.

[222]     *See id.* at 12.

[223]     Del. Deriv. Compl. ¶ 53, Exhibit 22-14; Fed. Deriv. Compl. ¶ 79, Exhibit 22-26.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

implementations.[224] Staff Leasing, Inc. (now known as GevityHR), a large human resources firm that provides payroll, benefits and human resources administration, was an early adopter of the call center application. Staff Leasing commented positively on its experience with the application, noting that it had reduced average call time by 40 – 45 seconds, enabling the call center to handle more calls without additional expense.[225] Staff Leasing also noted that the call center application had a positive impact on its bottom line and had improved its clients' experiences with the company.[226]

Additionally, because the call center allegations relate to a single Oracle product, the Committee reviewed Oracle's Yellow Books to determine the significance of that product to Oracle and the sales experience of that product in FY 2001. The Committee observed that in Q1 and Q2 FY 2001, Oracle sold $6,149,000 in call center CRM software, up 165% from the $2,318,000 in sales Oracle recorded for the first half of FY 2000.[227] Two important conclusions can be drawn from this data. First, call center CRM software represented a tiny fraction of Oracle's business (approximately 0.1%). Second, at the beginning of Q3 FY 2001, this software was experiencing very robust sales growth compared to FY 2000. The Committee further notes that even during the difficult economic environment Oracle experienced in Q3 FY 2001, Oracle's call center application sales were $4,230,000,

---

[224] *See* Barrenechea Int. at 13, Exhibit 2-5.

[225] *See* Companywide E-mail, *Oracle Pushes The Call Center Envelope with New Products*, Mar. 2, 2000, ORCL 69344-47, at ORCL 69346, Exhibit 19-4.

[226] *See id.* at ORCL 69345.

[227] *See* Oracle Q2 FY 2001 Product Revenue Reporting Package ("Yellow Book"). ORCL 48262-359, at ORCL 48345, Exhibit 8-2.

109% higher than in Q3 FY 2000.[228]  These data are inconsistent with the plaintiffs' claim that the software was severely defective.

### d.    Alleged absence of the B2B module

The fourth theme of Plaintiffs' allegations about the shortcomings of the CRM modules is that at the end of 2000 "the entire I-Procurement B2B module was totally missing."[229]  The Committee found that Plaintiffs' allegations lack merit.  If Plaintiffs mean to refer to Oracle's business-to-business ("B2B") exchange product, which was *not* intended to be part of the Suite 11i offering and had been developed as a targeted offering to B2B exchange customers, this product had actually been available as early as January 2000.[230]  If instead Plaintiffs mean to refer to Oracle's I-Procurement application, this software also was available as of January 2000.[231]

### 2.    5,000 Patches in Six Months

Plaintiffs claim that Suite 11i required 5,000 patches in the first six months after its introduction.[232]  It is the Committee's view that the absolute number of patches to a software release is not an especially meaningful way to measure software quality.  First, the term "patches," as used by Oracle, refers to any revision in the code, no matter what the

---

[228]    *See* Q3 FY 2001 Yellow Book, ORCL 9020-102, at ORCL 9086, Exhibit 8-3.

[229]    Del. Deriv. Compl. ¶ 71, Exhibit 22-14; Fed. Deriv. Compl. ¶ 97, Exhibit 22-26.

[230]    *See Online Exchanges: Size Matters,* Oracle Press Release, Jan. 12, 2000, ST&B 8674 (discussing competitive advantages of Oracle Exchange), Exhibit 17-2; Wohl Int. at 14, Exhibit 2-78.

[231]    *See Oracle Likes It On Top (Of Internet Procurement Market),* Oracle Press Release, Jan. 26, 2000, ORCL 24407 (noting that Oracle had largest share of I-Procurement license revenues), Exhibit 17-3.

[232]    Del. Deriv. Compl. ¶ 49, Exhibit 22-14; Fed. Deriv. Compl. ¶ 75, Exhibit 22-26.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

cause.[233] Thus, patches include enhancements and upgrades as well as bug fixes.[234] Accordingly, the number of patches does not correlate directly to the number of bugs. Second, the complexity and breadth of the program also must be considered.

In light of the breadth and complexity of Suite 11i as the industry's first comprehensive suite of enterprise applications, a large number of patches would be expected. The first release of Suite 11i contained 68 separate modules covering 14 major functions.[235] Suite 11i continued to grow in complexity and functional breadth as it progressed through later releases. Given the wide range of processes automated by Suite 11i, it would be expected that Suite 11i would have a higher absolute number of bugs than a standalone application targeted at a single function.

Indeed, there are a number of internal Oracle documents that address the difficulties that early adopters had with Suite 11i in the first six months after its release. For instance, in September 2000, an Oracle sales representative reported that Hostcentric, an early adopter, was experiencing implementation problems because "the 11i and CRM products are extremely unstable . . . ."[236] Another early adopter was Liberty Mutual Group ("Liberty Mutual"), which had purchased the human resources module of Suite 11i in December 1999 – more than six months before the first commercial release. Liberty Mutual executives

---

[233]   *See* Wohl Int. at 7, Exhibit 2-78; Barrenechea Int. at 5, Exhibit 2-5.

[234]   *See* Wohl Int. at 7, Exhibit 2-78; Barrenechea Int. at 5, Exhibit 2-5; *see* Chapter XII.F.1.b(iii) *supra.*

[235]   *See* E-mail from Heller to Sato, including E-mail from Mahloy to team, at ORCL 32841, Exhibit 19-6.

[236]   E-mail from George Roberts to Jon Simmons, Sept. 14, 2000, ORCL 111058-59, included in E-mail, at ORCL 111058, Exhibit 19-11.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

complained to Ellison in November 2000 that they had "encountered multiple software quality problems" with the Suite 11i module, leading them to believe that "we have a product that does not work . . . ."[237] Another internal Oracle e-mail noted that, with regard to two other early adopter customers, Oracle was "being flamed" at one, and "cannot get the [Suite 11i] release to be stable" at the other.[238]

          While some analysts[239] and customers[240] thought that the level of bugs in Suite 11i was not unexpected, Wohl, the senior Oracle executive in charge of developing the ERP applications for Suite 11i, admitted in October 2000, with hindsight, that Suite 11i had "too many bugs and too many patches"[241] and that the first release of 11i, 11i.1, had taken "too much patching to install."[242] This information, including the 5,000 patches number, was publicly disclosed and posted on the Internet. The presence of these publicly acknowledged issues, however, provides no basis to conclude that any Oracle officer or director had any credible or substantial reason to believe in May 2000 that Suite 11i was not ready for

---

[237]    E-mail from Joel Summers to Kurt Larsen et al., Nov. 8, 2000, ORCL 52253-58, including E-mail from Helen Sayles to Larry Ellison, Nov. 7, 2000, at ORCL 52255-56, Exhibit 19-27.

[238]    E-mail from Paul Seminara to George Roberts, Nov. 9, 2000, ORCL 19322-24, at ORCL 19322, Exhibit 19-17.

[239]    *How Suite It Is*, at 685 ("The first version of 11i had the bugs that all new releases of this size usually have, but 11i3 was released in November to resolve those issues."), Exhibit 21-29.

[240]    *See* Harris Int. at 2-3 (noting that bugginess in early releases of Suite 11i was typical for new software releases, and that early adopters would expect to work through such problems), Exhibit 2-31.

[241]    Oct. 24, 2000 Q&A Tr., at ORCL 17467, Exhibit 19-103.

[242]    *Id.* at ORCL 17459.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

commercial release. Indeed, and as noted above, Oracle management's reasonable exercise of its discretion in the decision on the timing of Suite 11i's release did not violate the business judgment rule or constitute fraud or deception upon customers or the securities market, and was consistent with the requests and interests of early adopting customers.

### 3. "Do Not Install" E-mails.

Plaintiffs allege that Oracle sent e-mails to the consulting organization stating that Suite 11i "did not work and it should not be installed. Usually, the e-mails identified dates when 'mega patches' for the identified applications were scheduled to be released, so the consulting groups were on notice to drag their feet and stall however they could until the patch was actually deployed."[243] Based upon the Committee's review of relevant documentation, it has not found any such memos. However, after interviewing members of Oracle's consulting practice, including Brad Scott, whom the Derivative Plaintiffs specifically named in the Delaware Derivative Complaint, it appears that there is a limited factual basis underlying this allegation, although the plaintiffs have mischaracterized Oracle's practice in a manner that creates a false impression of wrongdoing when none was present.

As explained above in the section discussing software releases, patches, patch sets, and family packs, Oracle's software developers would release consolidated sets of patches to be applied at once.[244] As explained by Brad Scott, the software developers would inform the CRM consulting organization of the date when new patch sets or family packs would be released. Since these consolidated sets of patches "rolled up" a series of already existing

---

[243]   Del. Deriv. Compl. ¶ 57, Exhibit 22-14; Fed. Deriv. Compl. ¶ 83, Exhibit 22-26.

[244]   *See* Chapter XII.F.1.b(iii) *supra.*

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

individual patches, it would take less time to apply the patch set than it would to apply all of the individual patches contained in the set.[245] Since applying the consolidated patches was more efficient and effective than installing many smaller patches, Scott explained that consultants had the option either of applying the individual patches, or waiting until the release of the patch set. According to Simler, another Oracle consultant, customers were informed about the use of mega patches and why it was preferable. Customers routinely understood and agreed to delay patch implementation until the next major patch set release. However, if a customer was at a "Stage 1 Escalation" where its go-live date was threatened by any delay, Consulting would not wait for a mega patch and would install the software as planned, applying any necessary smaller patches.[246] Neither Scott, nor Simler, nor any other person interviewed by the Committee was aware of any e-mails instructing consultants not to install Suite 11i.[247]

### 4. Oracle's Use of Multiple Tools and Technologies

Plaintiffs allege that Oracle's use of "multiple tools and technologies" forced customers to go through costly and difficult upgrades.[248] Plaintiffs do not explain this allegation. The Committee's counsel discussed this allegation with Wohl and Barrenechea, the

---

[245]   Scott Int. at 2-3, 5, Exhibit 2-68.

[246]   Simler Interview Memorandum ("Simler Int."), July 26, 2002, at 17, Exhibit 2-69.

[247]   For additional discussion of the consulting organization and its use of patch sets, see Chapter X.D.2 *supra*.

[248]   Del. Deriv. Compl. ¶ 50, Exhibit 22-14; Fed. Deriv. Compl. ¶ 76, Exhibit 22-26.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

head software developers for Suite 11i. Neither Wohl nor Barrenechea understood the plaintiffs' meaning of the phrase "multiple tools and technologies."[249]

If Plaintiffs mean that the existence of earlier versions of Oracle applications releases, such as releases 11.0 and 10.7, made upgrading to Suite 11i costly and difficult, then this fact was well known. In the summer of 2000, industry analyst GartnerGroup cautioned existing Oracle customers that those with the oldest Oracle systems could face the most difficult upgrades to Suite 11i.[250] In addition, internal Oracle documents confirm that customers running on Suite 11.0, like GE Corporate, encountered difficulties upgrading to Suite 11i.[251]

> 5.      Oracle "Pushed Out" a New Version of Suite 11i in Mid-February

Plaintiffs allege that the "Individual Defendants caused Oracle to push out the 'working' version of 11i Suite (the third version) and ship it to its unhappy customers" before the end of Q3 FY 2001 to prevent those customers from flooding Oracle with returns.[252] The Committee notes that its investigation showed that Oracle issued the third release of Suite 11i on January 25, 2001, not mid-February as alleged by Plaintiffs.[253] Furthermore, this simplistic concept of returns is a non-sequitur in the enterprise software business. As opposed to the video-game consumer described earlier who may try to return his "shrink-wrapped" consumer

---

[249]     See Wohl Int. at 13, Exhibit 2-78; Barrenechea Int. at 18, Exhibit 2-5.

[250]     See The Many Roads to Upgrading to Oracle Applications 11i, ORCL 7396-97, at ORCL 7397, Fig. 2, Exhibit 20-3.

[251]     See, e.g., E-mail from Ron Wohl to Kirsten Shaw, Dec. 4, 2000, ORCL 14068-70, (discussing upgrade difficulties of GE Corporate from 11.0 to 11i.2), Exhibit 19-21.

[252]     Del. Deriv. Compl. ¶ 93, Exhibit 22-14; Fed. Deriv. Compl. ¶ 119, Exhibit 22-26.

[253]     See Wohl Int. at 15, Exhibit 2-78; Barrenechea Int. at 6, Exhibit 2-5.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

software, enterprise software customers undergo an implementation process that is fundamentally different in its breadth of scope and length of time.

Secondly, the Committee discussed this allegation with Barrenechea, who it is reasonable to believe would have been aware of any such effort. Barrenechea denied this claim, and stated that he had not felt any pressure to push for an early release of version 11i.3 before the end of the quarter.[254] Even if the allegation were true, it does not state any actionable conduct. A company's seeking to provide its customers with an improved product to avoid returns is nothing more than a sound business practice.

### 6. Issues with Oracle's Internal Implementation of Suite 11i

Plaintiffs allege that Oracle's internal implementation of Suite 11i was "always down."[255] Plaintiffs point to two specific instances, both involving self-service applications: the time and expense ("T&E") billing entry system; and the system for employees to order office supplies.[256]

The Committee's investigation has revealed that Oracle was not immune to implementation issues encountered by its customers, and that there were functional difficulties with Oracle's own internal implementation of Suite 11i. For instance, shortly after Oracle went live internally with Suite 11i in January 2001, Oracle encountered a scalability problem in running the T&E function for the consulting organization. The problem manifested itself during the peak hours in which the system was in use. As a result, Oracle kept the time and

---

[254]  *See* Barrenechea Int. at 7, Exhibit 2-5. The Committee also saw no evidence of pressure to release version 11i.3 in any of the documentation it reviewed.

[255]  Del. Deriv. Compl. ¶ 48, Exhibit 22-14; Fed. Deriv. Compl. ¶ 74, Exhibit 22-26.

[256]  *Id.*

expense report off-line for consulting during peak hours because of a scalability problem. This problem appears to have been solved by January 22, 2001, shortly after Oracle went live internally.[257] Additionally, the Committee has reviewed another internal complaint about Suite 11i that appears to be related to the human resources function. The individual complained that the application was inefficient, did not have required functionality, and needed improvement.[258]

The Committee's investigation revealed additional situations, not alleged by the plaintiffs, in which Oracle's business may have been affected by the internal implementation of Suite 11i. To get a sense of how widespread the internal issues with Suite 11i were, the Committee's counsel made a practice of asking interviewees about their own experiences. Several noted specific issues. First, it is possible that the implementation of the OKS module of Suite 11i contributed to a shortfall in Support revenue in Q3 FY 2001.[259] Second, Oracle's Education business appears to have suffered some difficulty in making training reservations in the initial aftermath of the Suite 11i implementation.[260] Third, it appears that the internal

---

[257]   *See* E-mail from Ron Wohl to Edward Sanderson, Jan. 22, 2001, ORCL 14691-94, including E-mail from Ron Wohl to Edward Sanderson, Jan. 21, 2001, at ORCL 14691, Exhibit 19-63.

[258]   *See* E-mail from Shelley Vosshall to Cathy Keys et al., Jan. 12, 2001, ORCL 27110-11, at ORCL 27110, Exhibit 19-51.

[259]   *See* Chapter VIII.E.3.b *supra*.

[260]   *See* Wohl Int. at 10, Exhibit 2-78; Kopp Int. at 14, Exhibit 2-39. It was not expected that these problems would have an effect upon customers because the software for Education was customized specifically for Oracle.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

implementation caused some contracts specialists to have a backlog of contracts to record in December and January of Q3 FY 2001.[261]

The general view seemed to be that the upgrade to Suite 11i was "no better or worse" than any other new product upgrade.[262]  There were bugs, but they were not unexpected.[263]  Considering these responses, the Committee concludes that while there were some internal implementation issues with Suite 11i, there is no basis for Plaintiffs' allegation that Suite 11i was "always down."

### 7.    Demonstrations Were Rigged

Plaintiffs allege that demonstrations of Suite 11i to customers were "rigged," were "vaporware," and were misleading to customers.[264]

To investigate Plaintiffs' claims, the Committee not only reviewed documents produced by the Company and interviewed Company personnel and customers, but also participated in a demonstration of Suite 11i.  The system that Oracle uses to demonstrate

---

[261]    Mahon Interview Memorandum ("Mahon Int."), July 19, 2002, at 11, Exhibit 2-44.  Mahon noted that although the internal implementation of Suite 11i was "rough," it was not the worst she had experienced.  According to Mahon, the upgrade to Suite 11i was not even in the bottom three or four upgrades she has experienced at Oracle.  Mahon stated that within six weeks of installation, all of the Suite 11i problems were resolved.

[262]    Mayerson Interview Memorandum ("Mayerson Int."), Aug. 13, 2002, at 3, Exhibit 2-45.  See also Guner Interview Memorandum ("Guner Int."), Aug. 1, 2002, at 10 (noting nothing "abnormally difficult"), Exhibit 2-29; Larry Garnick Interview Memorandum ("Garnick Int."), Aug. 16, 2002, at 10, ("smooth"), Exhibit 2-25; Mahon Int. at 18 (rough but not the worst), Exhibit 2-44; Stacey Torman Interview Memorandum ("Torman Int."), July 16, 2002, at 4 (implementation was difficult but software was useful after problems resolved), Exhibit 2-73.

[263]    Simler Interview Memorandum ("Simler Int."), July 26, 2002, at 11, Exhibit 2-69; Mark Jarvis Interview Memorandum ("Jarvis Int."), Aug. 19, 2002, at 4, Exhibit 2-34; Joe Wood Interview Memorandum ("Wood Int."), Aug. 21, 2002, at 6-7, Exhibit 2-79.

[264]    Del. Deriv. Compl. ¶ 64, Exhibit 22-14; Fed. Deriv. Compl. ¶ 90, Exhibit 22-26.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Suite 11i is called the Application Demonstration System ("ADS"). ADS is an actual set of Suite 11i applications, running on the same software code that Oracle sells to its customers. ADS relies upon data that can be modified, changed, or manipulated using the applications. For instance, it is possible within the ADS demonstration environment to create and process an invoice, which then automatically updates the accounts payable application. Thus, ADS is dynamic.

Oracle sometimes used another demonstration method to present Suite 11i to its customers.[265] This method used screenshots – essentially a picture of a Suite 11i application screen. The screenshots were static and could not be manipulated – they did not operate like Suite 11i, but merely illustrated what its various screens looked like. The practice of using screenshots is common in the software industry. Indeed, the members of the Committee have attended numerous demonstrations where screenshots were used. Moreover, as early as April 2000, it was observed by a securities analyst that a review of Suite 11i was based upon "power point slides and canned demos."[266]

The use of screenshots does not indicate any deception at all, and the use of unchanging data screens is obvious even to a casual observer. The Committee finds the idea that sophisticated applications customers, advised by internal IT staffs and working in conjunction with highly trained outside consultants, would be misled by Oracle's use of screenshots, to be without foundation. Indeed, Strickland from BellSouth confirmed the

---

[265]   *See* Rick Gage Interview Memorandum ("Gage Int."), Aug. 27, 2002, at 10, Exhibit 2-23; Wood Int. at 7, Exhibit 2-79.

[266]   Andrew Roskill, *Analyst Meeting*, Warburg Dillon Read Analyst Report, Apr. 5, 2000, ORCL 5374B-76B, at ORCL 5374B, Exhibit 21-6.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

common use of screenshots in software demonstrations.[267] Strickland stated that all software demonstrations are pre-arranged to some extent. She also stated that she knew that Oracle's demonstrations in particular were limited, both in the number of screens being illustrated and in the range of data being manipulated. Strickland observed that it would have been impossible for Oracle to have run a demonstration using BellSouth's real database, and she would not have expected otherwise. Strickland said that she "knew absolutely" the true nature of Oracle's software demonstrations, and was not misled in any way by Oracle about them.[268]

       The Committee's investigation indicated that there were problems with ADS during the second half of 2000 and in Q3 FY 2001, and the Committee addresses these problems below. However, the Committee came across no evidence that Oracle misled customers as to the nature of the demonstrations. According to the interviews conducted by the Committee, and as would be expected, customers could readily distinguish between the dynamic ADS system and the static screenshot approach.[269] Nor did Oracle represent that its demonstrations were using the customers' entire databases, as alleged by the plaintiffs.[270] The ADS demonstrations ran off a small set of data – running a demonstration using a customer's entire data set would essentially have been an implementation of Suite 11i, not a demonstration.[271]

---

[267]    Strickland Int. at 7, Exhibit 2-72.

[268]    *Id.* at 8.

[269]    *See id.* at 8; Wood Int. at 7, Exhibit 2-79; Interview of Valerie Borthwick, Sept. 20, 2002, at 8, Exhibit 2-8; Classick Int. at 10, Exhibit 2-15.

[270]    Del. Deriv. Compl. ¶ 64, Exhibit 22-14; Fed. Deriv. Compl. ¶ 90, Exhibit 22-26.

[271]    *See* Strickland Int. at 7, Exhibit 2-72; Barrenechea Int. at 13-14, Exhibit 2-5.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

The Committee did determine that there were flaws in ADS that resulted in poor demonstrations. These flaws resulted from two primary problems. First, while ADS relied upon the actual Suite 11i code, it usually lagged behind the most recent code version. Thus, while Oracle was installing Suite 11i.3, demonstrations on ADS were still using Suite 11i.2.[272] Though Plaintiffs allege that demonstrations were misleading because they showed functions not present in the software, the lag in the ADS code resulted in the *opposite* problem: demonstrations were unable to showcase the most recent functionality of Suite 11i. Oracle's demonstration of Suite 11i at The Limited exemplified this problem. Oracle had customers up live and running certain applications in Suite 11i, but could not demonstrate these features to The Limited. As noted in an e-mail reporting on the demonstration, the sales consultants "still were unable to show our latest features in 11i, including our latest self-service which we actually have live in some Oracle customers currently."[273] Thus, if anything, the demonstrations failed to show Suite 11i capabilities. In other instances, the demonstrations – since ADS used Suite 11i code – had the same bugs as Suite 11i itself and would fail to perform specific tasks.[274]

The second major problem affecting demonstrations involved network connection speed. Oracle ran ADS from its California headquarters, and sales consultants conducting demonstrations either would use telephone lines to dial-in to ADS or would access

---

[272]   *See* Barrenechea Int. at 14 (ADS lagged actual code by months), Exhibit 2-5.

[273]   E-mail from Julie Randolph to Marina Zago et al., July 14, 2000, ORCL 51822, Exhibit 19-10.

[274]   *See* E-mail from Sandy Sanderson to Ron Wohl and Mark Barrenechea, Feb. 1, 2001, ORCL 22024-26, Exhibit 19-83.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

the Internet through the customer's network. Both means of remote access had problems,
particularly with regard to connection speed and compatibility. These access problems resulted
in slow demonstrations or, worse, disconnections.[275] ADS failures arising from remote access
problems were blamed for the loss of two possible deals in Q3 FY 2001.[276]

While noting these issues with Oracle's ability to demonstrate Suite 11i, the
Committee does not find them to be material to Oracle's missing its earnings estimates in Q3
FY 2001. Moreover, there is no reason to believe that Oracle's demonstrations misled
customers about the functionality of Suite 11i – particularly because of the information about
Suite 11i's functionality that was already in the market and because of the sophisticated nature
of Oracle's customers, their IT staffs, and, often, outside consultants.

### 8.  Additional Specific Customer Issues

Plaintiffs make a number of additional allegations regarding specific customers'
experiences with Suite 11i. The point of these allegations seems to be to illustrate that
Suite 11i had bugs and that implementations were difficult and lengthy. Because those
material facts were publicly known and discussed as early as the Fall of 2000, a detailed
analysis of each customer-specific allegation is unnecessary.

---

[275]  *See id.*; E-mail from Ron Wohl to George or Gary Roberts, Oct. 10, 2000, ORCL 57288-
91, Exhibit 19-13. The Committee notes that this October 2000 e-mail contains a
reference to having to use "fake data." In the context of the e-mail, the Committee
understands this reference to mean the use of a static, as opposed to dynamic, illustration
of the process with manual entry of data, as opposed to automatic update of data between
applications. The Committee also notes that in the plaintiffs' view, every demonstration
would rely upon fake data, inasmuch as the demonstration does not run the applications
upon the customer's existing database. *Id.* at 57289.

[276]  *See* E-mail from Kenneth Hamel to Ron Wohl, Feb. 16, 2001, ORCL 122884-86,
(discussing poor ADS performance at Startek and Research Electro-Optics), Exhibit 19-
95.

However, in the interest of sampling customer experiences with Suite 11i, the Committee interviewed two Oracle customers, including one identified by the plaintiffs: Gap Inc. and BellSouth.[277] The BellSouth interview, as discussed in more detail *supra* at Chapter XII.F.1.b(i), indicated that, among other things, this early adopter's problems with Suite 11i were not entirely unexpected and did not affect its purchasing decisions in Q3 FY 2001. BellSouth knew that the CRM modules were still in the development stage when it purchased them and began their implementation. BellSouth also knew that the applications had not been through beta testing and, in the words of its IT executive, were "not out of the box ready to go."[278]

In addition, both the BellSouth interview and the Gap interview confirmed that these customers did not refrain from closing deals with Oracle during Q3 FY 2001 for reasons related to Suite 11i's functionality. In the case of BellSouth, though it subsequently chose not to implement the CRM modules of Suite 11i in other business units, BellSouth's decision was made after Q3 FY 2001 and rested on factors beyond concerns about Suite 11i functionality.[279] Gap was considering a deal with Oracle, including but not limited to certain Suite 11i modules, during Q3 FY 2001, but ultimately did not finalize the deal until the last day of Q4 FY 2001. As the Gap executive interviewed by the Committee explained, it was Gap's preference to finalize deals on the final day of a quarter and, if possible, in the last quarter of a vendor's

---

[277]   The Committee interviewed a representative of the State of Michigan, an alleged potential customer, but the products involved in that deal did not include Suite 11i. In addition, the Committee also attempted, unsuccessfully, to interview GE Capital, JDS Uniphase, and Motorola. *See* Chapter VII.M *supra*.

[278]   Strickland Int. at 2, Exhibit 2-72.

[279]   *Id.* at 4.

NDCA-ORCL 295362

fiscal year, because Gap believed it could extract better concessions by waiting until such dates.[280] The Gap executive also confirmed that functionality concerns about Suite 11i played no role in not finalizing the deal during Q3 FY 2001. Indeed, he explained that during the January to April 2001 timeframe, Gap became more interested in Suite 11i and decided to purchase Suite 11i to replace Gap's existing software.[281] In addition, the Gap executive noted that although he had heard comments about early bugginess with Suite 11i, such comments did not concern him because new software releases are always buggy and it is expected that early adopters will encounter implementation problems.[282]

### G.    Suite 11i Since Q3 FY 2001

As quoted by the Wall Street Journal on August 6, 2001, Ellison stated that Suite 11i went through a "painful birthing process."[283] The process was not, however, unusual. Oracle, its customers, and the software applications market all expected that Suite 11i would have bugs when it was released. The decision to release Suite 11i to the market appeared at the time to be the right decision, according to the decision makers involved – Ellison, Wohl and Barrenechea. As described above (see Chapter XII.F.1.b supra), it is difficult to determine exactly when to release software. Release it too early, and there are too many bugs. Release it too late, and lose customers.

---

[280]    See Harris Int. at 3, Exhibit 2-31.

[281]    Id. at 2-3.

[282]    Id. at 3-4.

[283]    Painful Birth: For a Big, New Product, Oracle's Pitch Smacks of Wishful Thinking, at ST&B 1402, Exhibit 18-107.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

The actual results of Oracle's initial release of Suite 11i were that it was buggier than anticipated or expected. The Company, however, worked through these problems, releasing patches and then new versions of the software. By the third version, released in January 2001, Suite 11i's stability and functionality had improved significantly.

Today, the software platform is stable and highly regarded by Oracle's customers.[284] There are thousands of customers running all or some modules of Suite 11i and more currently involved in implementations. Oracle's Suite 11i customers are operating in over 100 countries around the world, in thirty languages and multiple currencies. Using Suite 11i, Oracle customers are realizing millions of dollars per year in savings. For example, POSCO expects to save $120 million per year; ViewSonic is saving $2.5 million per year; GevityHR has reduced its annual personnel costs by $3 million; and TeliaNet anticipates saving $24 million annually.[285]

### H.  Conclusion

A principal finding of the Committee's investigation into the Suite 11i allegations is that the general nature of the "problems" alleged by the plaintiffs were in fact expected, known and publicly discussed. Issues relating to Suite 11i bugs, implementation problems and upgrade difficulties, were discussed in public fora and were well ventilated in

---

[284]  *See* Jennifer Kemmeter, *Oracle 11i – Early Users Chart the Course*, AMR Research, May 2002, ORCL 100923-37, at ORCL 100925-26 (noting that 75% of Suite 11i customers surveyed stated that Suite 11i.6 and 11i.7 functionality "has greatly enhanced their software environment to the benefit of business requirements"), Exhibit 20-11.

[285]  *See* Oracle Presentation, *"e-business suite,"* ST&B 8537-76, at ST&B 8565, 8566, 8568, 8570, Exhibit 23-1.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

published reports by third parties. These issues were not hidden by Oracle and were well known by October 2000.

Perhaps more importantly, the Committee finds that any issues with Suite 11i's functionality did not cause the earnings disappointment in Q3 FY 2001. As shown above in Chapter VIII, the earnings shortfall resulted from deals that failed to close at the end of the quarter, the majority of which did not even involve the sale of Suite 11i products. No one interviewed by the Committee believed that Suite 11i quality issues caused those sales to slip. Indeed, as Gillespie noted, "you don't dance with the customer all quarter if they have a quality problem."[286]

Furthermore, the existence of any quality issues in Suite 11i does not indicate that there was any breach of a fiduciary duty or negligence by Oracle executives or directors. The decision of when to release software is a difficult managerial judgment call. The Committee has found no reason to believe that Oracle's decision to release Suite 11i in May 2000 was made in anything other than good faith, on an informed basis, and in the honest belief that it was in the best interests of the Company.

---

[286]    Gillespie Int. at 10, Exhibit 2-26.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

## XVIII. CONCLUSION

Based on the foregoing analysis, the Committee concludes that the claims asserted in the three pending derivative actions lack merit. The Committee therefore concludes that the continued prosecution of those actions is not in the best interests of Oracle or its shareholders. The Committee has determined to seek the dismissal of these actions by all appropriate means.

Professor Hector Garcia-Molina

Professor Joseph A. Grundfest

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 295656

18

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 313984

Report Date: 2002/10/21 11:43

| | |
|---|---|
| Reporting Level | : Operating Unit |
| Reporting Context | : Oracle Corporation |
| | |
| Oracle US Primary | Aging - 7 Buckets Report |
| | |
| Layout Name | : Customer |
| Summary Type | : Invoice Summary |
| Report Format | : Detailed |
| Balance Due | : |
| Type | : To |
| Customer Name | : To |
| Customer Number | : 28851 To 28851 |
| | |
| Bucket Name | : Collections |
| As of Date | : 30-NOV-00 |
| Balancing Segment | : |
| Open Credits | : Age |
| Currency | : |
| Receipts At Risk | : Do Not Show |
| Claims | : Do Not Show |

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

ORCL 0123190
ORACLE CONFIDENTIAL

NDCA-ORCL 313985

Report Date: 2002/10/21 11:43
Page:

Oracle US Primary

Reporting Level:   Operating Unit
Reporting Entity:  Oracle Corporation
Order By:          Customer
Balancing Segment: 001

Aging - 7 Buckets Report
As of 30-NOV-00

| Invoice Number | Type | Due Date | Outstanding Amount | Current | 1-30 Days Overdue | 31-60 Days Overdue | 61-90 Days Overdue | 91-180 Days Overdue | 181-360 Days Overdue | 361+ Days Overdue |
|---|---|---|---|---|---|---|---|---|---|---|
| HOUSEHOLD FINANCE | 28851 | | | PROSPECT HEIGHTS | | | IL | | 847 564-5000 | |
| 40064004 | UN-U | 11-NOV-00 | 18,716.44 | | 18,716.44 | | | | | |
| Total: | | | 18,716.44 | 0.00 0.00% | 18,716.44 100.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% |
| HOUSEHOLD FINANCE | 28851 | | | WOOD DALE | | | IL | | 708 559-2532 | |
| 6114219 | Comm | 30-DEC-00 | 5,434.41 | 5,434.41 | | | | | | |
| Total: | | | 5,434.41 | 5,434.41 100.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% |
| Customer Type Total: | | | 24,150.85 | | | | | | | |
| Company Total: | | | 24,150.85 | | | | | | | |
| Grand Total: | | | 24,150.85 | 5,434.41 22.50% | 18,716.44 77.50% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% |

O  51131
ORACLE CONFIDENTIAL

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 313986

Report Date: 2002/10/21 11:40

| | | |
|---|---|---|
| Reporting Level | : | Operating Unit |
| Reporting Context | : | Oracle Corporation |

Oracle US Primary    '  ·  Aging - 7 Buckets Report

| | | | |
|---|---|---|---|
| Layout Name | : | Customer | |
| Summary Type | : | Invoice Summary | |
| Report Format | : | Detailed | |
| Balance Due | : | | To |
| Type | : | | To |
| Customer Name | : | | To |
| Customer Number | : | 28851 | To    28851 |

| | | | |
|---|---|---|---|
| Bucket Name | : | Collections | |
| As of Date | : | 31-OCT-00 | |
| Balancing Segment | : | | To |
| Open Credits | : | Age | |
| Currency | : | | |
| Receipts At Risk | : | Do Not Show | |
| Claims | : | Do Not Show | |



Unapplied Cash
on Account Credit memos
on Account Credit memos

Vs Do such that
to
Summary

ORCL 0123192
ORACLE CONFIDENTIAL

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 313987

Oracle US Primary

Reporting Level:     Operating Unit
Reporting Entity:    Oracle Corporation
Order By:            Customer

Balancing Segment: 001

Aging - 7 Buckets Report
As of 31-OCT-00

Report Date: 2002/10/21 11:40
Page:                          1

| Invoice Number | Type Due Date | Outstanding Amount | Current | 1-30 Days Overdue | 31-60 Days Overdue | 61-90 Days Overdue | 91-160 Days Overdue | 161-360 Days Overdue | 361+ Days Overdue |
|---|---|---|---|---|---|---|---|---|---|
| HOUSEHOLD FINANCE | | 28851 | PROSPECT HEIGHTS | | | IL | | 847 564-5000 | |
| 40064004 | UN-U 11-NOV-00 | 18,716.44 | 18,716.44 | | | | | | |
| | Total: | 18,716.44 | 18,716.44 100.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% |
| HOUSEHOLD FINANCE | | 28851 | SALINAS | | | CA | | 408 755-7064 | |
| E1436254-1 | UN-U 30-AUG-00 | 1,760.00 | | | | 1,760.00 | | | |
| | Total: | 1,760.00 | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 1,760.00 100.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% |
| HOUSEHOLD FINANCE | | 28851 | | | | | | | |
| 105379 | Paym 30-APR-91 | <3,208.95> | | | | | | | <3,208.95> |
| 106229 | Paym 03-MAY-91 | <3,152.06> | | | | | | | <3,152.06> |
| 106411 | Paym 12-JUL-91 | <12,000.00> | | | | | | | <12,000.00> |
| 113608 | Paym 26-JUL-91 | <1,145.96> | | | | | | | <1,145.96> |
| 124989 | Paym 25-NOV-91 | <191.96> | | | | | | | <191.96> |
| 145734 | Paym 27-JAN-94 | <212.42> | | | | | | | <212.42> |
| 29721 | Paym 22-JAN-91 | <44.92> | | | | | | | <44.92> |
| 31046050 | Paym 29-MAR-93 | <400.95> | | | | | | | <400.95> |
| 48796 | Paym 23-JAN-98 | <3,118.11> | | | | | | | <3,118.11> |
| 67021191 | Paym 17-NOV-94 | <76,645.04> | | | | | | | <76,645.04> |
| 88345 | Paym 06-SEP-90 | <418.91> | | | | | | | <418.91> |
| 89490 | Paym 21-NOV-90 | <25,000.00> | | | | | | | <25,000.00> |
| 94073 | Paym 04-JAN-91 | <45,000.00> | | | | | | | <45,000.00> |
| 94247 | Paym 04-JAN-91 | <418.91> | | | | | | | <418.91> |
| | Total: | <178,346.77> | <157,870.33> | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | 0.00 0.00% | <178,346.77> 100.00% |

Customer Type Total:     <157,870.33>

Company Total:     <157,870.33>

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NDCA-ORCL 313988

Oracle US Primary

Report Date: 2002/10/21 11:40
Page: 2

Aging - 7 Buckets Report
As of 31-OCT-00

Reporting Level:   Operating Unit
Reporting Entity:  Oracle Corporation
Order By:          Customer

| | | | | | | |
|---|---|---|---|---|---|---|
| Grand Total: | <157,870.33> | 18,716.44 | 0.00 | 0.00 | 1,760.00 | 0.00 | 0.00 | <178,346.77> |
| | | -11.86% | 0.00% | 0.00% | -1.11% | 0.00% | 0.00% | 112.97% |

ORCL 0123194
ORACLE CONFIDENTIAL

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER