# EXHIBIT 47

**From:** Molly Littlefield
**Sent:** Fri, 06 Aug 2004 00:16:33 GMT
**To:** John Tazbaz
**CC:** krupesh lathia
**BCC:**
**Subject:** Re: [Fwd: I2 Technologies]

---

It will go to Jennifer Minton.

John Tazbaz wrote:

> Whose upper management?
>
> Molly Littlefield wrote:
>
>> John,
>> We actually have the unapplied cash. We never booked the order but
>> the customer paid. We want to book it or try to get upper management
>> to agree that we should keep this money.
>>
>> John Tazbaz wrote:
>>
>>> Congrats. Now I have a place to stay while visiting India! ;-)
>>>
>>> First line item was a program designed for Independent Software
>>> Vendors. It allowed them access to our E-Business products in order
>>> to build an API between their complimentary app and ours. The only
>>> booking against that membership would have been media pack orders to
>>> get the EB software in hand.
>>>
>>> Second was the partnering fee. This was the umbrella partnering
>>> mechanism. If you were strategic, you might get into a program like
>>> in the first line item.
>>>
>>> Fourth was a secondary membership and it's related to the second
>>> line. Under line two and four, we would have; delivered technology
>>> media packs for development purposes, allowed them to purchase
>>> partner support for their development activities, given them free
>>> Instructor Lead Training units via OU.
>>>
>>> Did they ever book anything against the programs related to the fees
>>> on the po? Probably. Almost all partners order their free
>>> software, about half (back then) ordered support, most took
>>> advantage of the free ILT's.
>>>
>>> Hope this helps. If this isn't enough to close out the po, could it
>>> end up in a fire under mysterious circumstances?
>>>
>>> Thanks,
>>> John
>>>

Confidential - Pursuant to Protective Order                    NDCA-ORCL 1895745

>>> Molly Littlefield wrote:
>>>
>>>> Yes I am in India and yes it was a box. :-) Thanks for your
>>>> help. So what exactly was this program was it something in which we
>>>> gave them access to book other products at a discount. I am trying
>>>> to confirm if the customer ever used what is on this order doc or
>>>> if we never even gave them the service that we should have.
>>>>
>>>> John Tazbaz wrote:
>>>>
>>>>> Hi Molly,
>>>>>
>>>>> Nice to see you're still around. Did you find a position in India?
>>>>> Have you been saving this po in a box, in the ground? Just
>>>>> kidding. Well, the first line item pertains to a program we
>>>>> haven't offered in 3 years. And when it was around, we normally
>>>>> waived the fee. Second line item is a partner membership fee.
>>>>> But our rate is $1995 and has been for 3 years. Can't comment on
>>>>> the third line item as I'm unfamiliar with it. Last line item,
>>>>> it's related to the second line item. We no longer charge a fee
>>>>> for an additional membership site. I'm not sure how these would
>>>>> be booked since 3 of the 4 (that I know of) don't exist. Sorry I
>>>>> could give you an answer that allows you to book this.
>>>>>
>>>>> Thanks,
>>>>> John
>>>>>
>>>>> Molly Littlefield wrote:
>>>>>
>>>>>> Hi John,
>>>>>> You helped me a while ago on this issue for I2. Unfortunately
>>>>>> the issue is still not resolved and I am unsure of who I should
>>>>>> go to in order to get this booked. I apologize for having to
>>>>>> come back to you, but can you review the docs and let me know
>>>>>> your thoughts.
>>>>>> Thanks
>>>>>> Molly
>>>>>>
>>>>>>
>>>>>> -------- Original Message --------
>>>>>> From: Molly Littlefield <molly.littlefield@oracle.com>
>>>>>> Subject: I2 Technologies
>>>>>> To. "Tazbaz,John" <JOHN.TAZBAZ@ORACLE.COM>
>>>>>> CC: "Lathia,Krupesh" <KRUPESH.LATHIA@ORACLE.COM>
>>>>>>
>>>>>> John,
>>>>>> We have a check from I2 Technologies. The check is for $17,985.00,
>>>>>> check # 73849. The customer sent us the documents that they paid
>>>>>> off of
>>>>>> and it is for the CAI membership back in November of 1999. It
>>>>>> does not

NDCA-ORCL 1895746

>>>>>> look like this deal was ever booked. We have all the documents
>>>>>> that the
>>>>>> customer signed and submitted to Oracle. Can you tell me who we
>>>>>> need to
>>>>>> follow up with to get the deal booked?
>>>>>> Thanks
>>>>>> Molly
>>>>>
>>>>>
>>>>>
>>>>>
>>>>>
>>>>>
>>>>>
>>>>
>>>
>>
>

NDCA-ORCL 1895747

# EXHIBIT 48

**From:** Robynne Sisco
**Sent:** Sun, 30 May 2004 03:29:28 GMT
**To:** Molly Littlefield
**CC:**
**BCC:**
**Subject:** [Fwd. Re: [Fwd: REFUND REQUEST/GE Power]]

BTW. Alex AIM'd me with the following:

ASanJuan17 (7:56:08 PM): Robynee ...you there?
ASanJuan17 (7:58:52 PM): Hey I just wanted to tell you that Molly
deserves some Kudos. It is refreshing to see someone articulate there
position in such a logical manner. I love that she has conviction to
stand her ground. I think we need more people like her.

Thought you should know. Even if someone disagrees with you, they still
respect you!

-------- Original Message --------
Subject: Re: [Fwd: REFUND REQUEST/GE Power]
Date: Sun, 30 May 2004 07:05:00 +0530
From: molly littlefield <molly.littlefield@oracle.com>
Organization: Oracle Corporation
To: Alex SanJuan <Alex.SanJuan@oracle.com>
CC: Robynne Sisco <Robynne.Sisco@oracle.com>, Brad Newton
<brad.newton@oracle.com>, "Seixas,Sean" <SEAN.SEIXAS@oracle.com>, Kelvin
Appelman <kelvin.p.appelman@oracle.com>
References: <40AD4C51.20901@oracle.com> <40AE4803.2050102@oracle.com>
<40B4E472.2000409@oracle.com> <40B91984.9090401@oracle.com>
<40B92E46.2060207@oracle.com>


All,
I agree we should not rush into the refund at this point, but I wanted
just to add a couple of points. I believe the research that is provided
on the refund is correct and we owe the customer this money. Also the
refund is on Consulting and from the language below it sounds like the
settlement was only for support. The full aging for the customer is
attached and all of the invoices listed below except for two are for
tax. Invoice 1853971 is not due yet and invoice 1606881 is a huge issue
because Oracle has over charged GE Powers against that specific purchase
order. Until we clear up the errors around that they will not pay the
invoice. The aging that I attached also has several outstanding
invoices for Consulting and the field has confirmed that the customer is
going to pay. Please let me know if there is any more research I can do
to make everyone more comfortable.
Thanks
Molly

Alex SanJuan wrote:

> Brad,
>
> You are correct that both GE Power and GE Aircraft were on the
> litigation review for a number of quarters. In Q3, Safra negotiated a
> settlement with GE . Here are the details of the settlement: Customer
> disputes that Oracle breached their master agreements with the
> customer by failing to deliver the products as described in the
> agreement, delivery of programs and services that lacked the quality
> and functionality that Oracle had promised. Settlement terms includes
> the following: (1) Support credit for standard (not gold) technical
> support for licenses as described in the agreement for the next 3
> renewal years, totaling $3,676,045; and (2) release of Oracle. JE
> Note: Amounts deferred in 2000 to subject deals of settlement totaled
> $3,633,333, which will be applied toward the credits in this
> settlement, with an additional $42,712 JE submitted this quarter to
> account for the shortfall.
>
> I am too very suspicious that we would have 100k overpayment by GE
> Power given all of the scrutiny that has taken place over the last
> year. I do acknowledge that given their size of the accounts ... it
> could very well have happen. However, given where we are in the
> quarter, I would recommend that we move slowly on this matter to
> ensure that all research has been done. It would be quite embarrassing
> if we have to go back and ask for this amount back when we know that
> they currently have o/s receivables. Please see table below. I know
> that we should never hold hostage any overpayment even though the
> customer owes us money...but my concern is that this payment may very
> well be associated with these items contrary to the remittance. Thoughts?
>
>
>
> Aging as of 23 May 04
>
> -Alex
> ------------------------------------------------------------------------
>
> Robynne Sisco wrote:
>
>> Alex - still need a reply. Please take a quick look so we can book
>> this quarter. Thanks.
>>
>> Robynne Sisco wrote:
>>
>>> Alex - I know you're really busy, but we're trying to get this
>>> cleared for QE. Have you had a chance to look into this? Thanks
>>>
>>> Brad Newton wrote:
>>>
>>>> Alex - Confirm for me that GE Power has long been on the

Confidential - Pursuant to Protective Order

>>>> "litigation" spreadsheet? Have we ever had any settlements from
>>>> them? I am not questioning the "chain of events" as described
>>>> below, but seems to me that this has always been a very visible
>>>> account, and that everyone would be well aware if we owed GE Power
>>>> $100k. Maybe the amount is too small (and that it is why it
>>>> doesn't have the attention), but I want to confirm there have been
>>>> NO settlements (maybe at Safra's level) that would suggest that we
>>>> should keep this money based on everyone agreeing to a certain
>>>> settlement (or that the account is "settled").
>>>>
>>>> Robynne Sisco wrote:
>>>>
>>>>> Brad - please approve and forward to Jennifer. Thanks.
>>>>>
>>>>> -------- Original Message --------
>>>>> Subject: REFUND REQUEST/GE Power
>>>>> Date: Fri, 21 May 2004 05:14:28 +0530
>>>>> From: Molly Littlefield <Molly.Littlefield@oracle.com>
>>>>> Organization: Oracle Corporation
>>>>> To: Robynne Sisco <Robynne.Sisco@oracle.com>
>>>>> CC: Molly.littlefield@oracle.com, thammareddy lingareddy
>>>>> <thammareddy.lingareddy@oracle.com>, Vijay Kini
>>>>> <vijay.kini@oracle.com>, "Thakkar,Falguni"
>>>>> <FALGUNI.THAKKAR@oracle.com>
>>>>>
>>>>>
>>>>>
>>>>> Robynne,
>>>>> Please approve.
>>>>> Thanks
>>>>> Molly
>>>>>
>>>>>
>>>>> Template : COLLECTIONS_REFUND_REQUEST
>>>>> Owner : terri.decker
>>>>> To : Molly.littlefield@oracle.com
>>>>> From : Molly.littlefield@oracle.com
>>>>> CC :
>>>>> Subject : REFUND REQUEST/GE Power
>>>>>
>>>>> -------------------------------------------------------------------------
>>>>> Customer Name GENERAL ELECTRIC POWER SYSTEMS
>>>>> Customer # 65277, 57617, 57617
>>>>> Receipt GL Date 4/16/2001, 10/01/02, 5/20/02
>>>>> Receipt # 22020254, ACH 10/01/02, ACH 05/20/02
>>>>> Receipt Amount $141,030.01, $694,859.53, $74,891.59
>>>>> Refund Amount $39,592.98, $43,125.53, $14,994.84 = $97,713.35
>>>>> Reason For Refund Overpayment
>>>>> Details * Receipt #1: GE's ACH 10/01/02 for $40,645.96 referenced
>>>>> inv# 6144761 for $39,592.98 and also invoice 6143768 for
>>>>> $1,052.98. GE's ACH 10/01/02 for $141,030.01 also referenced

>>>>> invoice #6144761 for $39,592.98. Refund amount is $39,592.98
>>>>>
>>>>> * Receipt #2: GE remitted payment for invoice 6116292 in full
>>>>> $694,859.53 on check 22020254. However, the original invoice
>>>>> 6116292 was credit memo'd for $43,125.53. The credit memos were
>>>>> processed because we overcharged the customer hrs "All our CLA's
>>>>> specifically state a 40 hour cap on labor for all consultants and
>>>>> we overcharged GE." This money needs to be refunded to the GE in
>>>>> full due to the credit memo. Refund amount is $43,125.53
>>>>>
>>>>> *Receipt #3: Customer has referred Inv #6138562 for $41,239.89 and
>>>>> Inv # 6138531 for $33,651.70. Invoice # 6138531 was credit memo'd
>>>>> for $33,651.70 ($28,200.00+$5,451.70) with the reason 'Pa credit
>>>>> memo' & it has been rebilled to inv # 6139828 under another PA #
>>>>> 300067218. The rebilled invoice is already closed with the ACH
>>>>> payment ACH 08/07/02 The duplicate payment was applied to invoice
>>>>> 6157312 for $18,355.06 and invoice 6159435 for $301.80. Customer
>>>>> confirmed that these applications can remain on the ACH. Customer
>>>>> has agreed with these amounts. Refund amount is $14,994.84
>>>>> Does The Customer Have Any Outstanding Receivables? YES
>>>>> List Any Past Due Receivables All aged invoices that are
>>>>> outstanding are due to outstanding tax. The customer is tax
>>>>> exempt. Collections will follow up to clear these. All the
>>>>> outstanding consulting invoices are set to pay per the field and
>>>>> they are ok with a refund
>>>>> Refund Address Attn:Krishna Chytanya GE Client Business Services
>>>>> Inc Department 104 PO Box 402378 Atlanta, GA 30384-2378
>>>>> Check Details This refund is on customer check # 22020254 and ACH
>>>>> 10/01/02 and ACH 05/20/02
>>>>>
>>>>> -------------------------------------------------------------------------
>>>>> Oracle Corporation human resources electronic data are held and
>>>>> secured at a global level in the United States. Personal data may
>>>>> be accessed from Oracle Corporation locations worldwide, as
>>>>> required for business purposes, by personnel with appropriate
>>>>> access privileges. Personal data may be shared with external
>>>>> organizations as required to permit the provision of services to
>>>>> those members of the Oracle Corporation workforce who have elected
>>>>> to receive benefits provided by or through them. Your provision of
>>>>> the personal data confirms your consent to this process.
>>>>

Confidential - Pursuant to Protective Order

# EXHIBIT 49

**From:** Molly Littlefield
**Sent:** Tue, 04 Jan 2005 00:23:40 GMT
**To:** Vijay Kini
**CC:** vineet sehgal; Thakke; Smitha
**BCC:**
**Subject:** Re: Details of unapplied cash]]

Vijay,

The research on these items does not look very complete.  Please see my notes.  Also why are there a bunch that say misapplications are done.  If there are misapplications then we need to find out if Verizon ever paid those invoices before we refund.  Who are you working with to resolve this?  They should be providing us the reasons for refunding.  We should not be researching for them.  If they want a refund then make them prove to us why?  Maybe I am missing something here but if they want the money shouldn't they tell us why?
Thanks
Molly

Vijay Kini wrote:

Hi Molly,

I have attached a spreadsheet containing the research we have done for Verizon.
Would request you to take a look at it. The lines shaded in yellow need additional
info. from the client for which I shall be sending out a separate mail.

Thanks,

Vijay

Molly Littlefield wrote:

Hi Vineet,
As long as we have the evidence that the refund is due to Verizon we can refund.  I would
make sure you have the auditor provide the details.  We probably should not have given them
the list of unapplied but since we did we need to make them prove to us that the money is
theirs.  Please let me know if you actually need me to look at the specific examples that are
attached.
Thanks
Molly

vineet sehgal wrote:

Molly,
How are you doing?
Vijay has been interacting with internal auditor of Verizon. They had asked for
details of unapplied cash & attached list gives the details.
These are old receipts that have been escheated. request if you could advise future
course of action in this case.
Also, whether we can initiate refund in case the customer is able to provide
information & asks for it.

rgds..vineet

-------- Original Message --------

Confidential - Pursuant to Protective Order                                    NDCA-ORCL 1865593

**Subject:** [Fwd: Re: Details of unapplied cash]
**Date:** Tue, 28 Dec 2004 21:23:34 +0530
**From:** smitha thakke <smitha.thakke@oracle.com>
**Organization:** Oracle Corporation
**To:** VINEET,SEHGAL <vineet.sehgal@oracle.com>

Hi Vineet,

Please go through the attached spreadsheet for Verizon.

Thanks,
Smitha.

-------- Original Message --------

**Subject:** Re: Details of unapplied cash
**Date:** Thu, 23 Dec 2004 20:41:24 +0530
**From:** Vijay Kini <vijay.kini@oracle.com>
**Organization:** Oracle Corporation
**To:** Cherjuan Martin <cmartin@apexanalytix.com>
**CC:** Thakke,Smitha <SMITHA.THAKKE@oracle.com>, Sehgal,Vineet
      <VINEET.SEHGAL@oracle.com>
**References:** <900F8FC21BCA22419F15C34815B21FE8737D21@mercury.jba.net>


Hi Cherjuan,

We are in the final phase of our research and are awaiting some details from our
AP dept. We shall get back to you at the earliest.

Thanks for your patience.

Vijay

Cherjuan Martin wrote:

> Hi Vijay,
>
> Can you please update me on the status of your research?
>
> -----Original Message-----
> From: Vijay Kini [mailto:vijay.kini@oracle.com]
> Sent: Thursday, December 16, 2004 10:24 AM
> To: Cherjuan Martin
> Subject: Re: Details of unapplied cash
>
> Hi Cherjuan,
>
> Thank you very much for the info. We shall go through the details provided by y
> and give you an update at the earliest.
>
> Thanks,
>
> Vijay
>
> Cherjuan Martin wrote:
>
> > Vijay,
> >

                                    NDCA-ORCL 1865594

```
> > I am attaching the payment details for the checks that I was able to find. I
> >
> > -----Original Message-----
> > From: Vijay Kini [mailto:vijay.kini@oracle.com]
> > Sent: Wednesday, December 15, 2004 8:04 PM
> > To: Cherjuan Martin
> > Subject: Details of unapplied cash
> > Importance: High
> >
> > Hi Cherjuan,
> >
> > At the outset, I am sorry that this has taken a long time to resolve since we
> > swamped with the quarter end activities until November 30th.
> >
> > I have attached a spreadsheet containing the details of the unapplied cash. P
> > note that in a majority of the cases, the unapplied cash was a result of inte
> > misapplication in our system when we need to clean up. In some cases (especi
> > the old cases where we do not have Check copies), we need some remittance inf
> > from you in order to ascertain the application. information provided by you w
> > of immense assistance to us.
> >
> > Thanks for your patience,
> >
> > Vijay
> >
> > ----------------------------------------------------------------------------
> >                             Name: 5101510.pdf
> >                             Type: AcroRd32 File (application/pdf)
> >     5101510.pdf         Encoding: base64
> >                      Description: 5101510.pdf
> >              Download Status: Not downloaded with message
> >
> >                             Name: 5101566.pdf
> >                             Type: AcroRd32 File (application/pdf)
> >     5101566.pdf         Encoding: base64
> >                      Description: 5101566.pdf
> >              Download Status: Not downloaded with message
> >
> >                             Name: 8162930.pdf
> >                             Type: AcroRd32 File (application/pdf)
> >     8162930.pdf         Encoding: base64
> >                      Description: 8162930.pdf
> >              Download Status: Not downloaded with message
> >
> >                             Name: 8341277.pdf
> >                             Type: AcroRd32 File (application/pdf)
> >     8341277.pdf         Encoding: base64
> >                      Description: 8341277.pdf
> >              Download Status: Not downloaded with message
> >
> >                             Name: 8343439.pdf
> >                             Type: AcroRd32 File (application/pdf)
> >     8343439.pdf         Encoding: base64
> >                      Description: 8343439.pdf
> >              Download Status: Not downloaded with message
> >
> >                             Name: 8345644.pdf
> >                             Type: AcroRd32 File (application/pdf)
> >     8345644.pdf         Encoding: base64
> >                      Description: 8345644.pdf
> >              Download Status: Not downloaded with message
> >
> >                             Name: 8348855.pdf
> >                             Type: AcroRd32 File (application/pdf)
> >     8348855.pdf         Encoding: base64
> >                      Description: 8348855.pdf
```

Confidential - Pursuant to Protective Order

```
> >                          Download Status: Not downloaded with message
> >
> >                                    Name: ACH 7-26-02.pdf
> >                                    Type: AcrcRd32 File (application/pdf)
> >    ACH 7-26-02.pdf          Encoding: base64
> >                             Description: ACH 7-26-02.pdf
> >                          Download Status: Not downloaded with message
> >
> >                                    Name: ACH 9-12-02.pdf
> >                                    Type: AcrcRd32 File (application/pdf)
> >    ACH 9-12-02.pdf          Encoding: base64
> >                             Description: ACH 9-12-02.pdf
> >                          Download Status: Not downloaded with message
```

Confidential - Pursuant to Protective Order

NDCA-ORCL 1865596

| Account # | Receipt # | Date | Original Amount | Credits | Our Comments |
|---|---|---|---|---|---|
| 10230443 | 8341277 | 17-Sep-02 | (10.00) | (10.00) | Pls. provide remittance details for application |
|  | 8343439 | 23-Sep-02 | (10.00) | (10.00) | Pls. provide remittance details for application |
|  | 8345844 | 30-Sep-02 | (10.00) | (10.00) | Pls. provide remittance details for application |
|  | 8348655 | 7-Oct-02 | (10.00) | (10.00) | Pls. provide remittance details for application |
|  | 5.47592E+15 | 23-Aug-03 | (3,142.20) | (0.20) | Small balance |
|  |  |  |  |  | This was due to internal misapplication. Hence, this is Oracle's money. |
| 803960 | 256232 | 18-Jan-02 | (2,688.00) | (688.00) | Pls. provide remittance details for application: This has been misapplied to Inv # 1654005 ($20,800.00) and Inv # 1654203 |
|  | ACH 08/12/02 | 12-Sep-02 | (27,546.79) | (43.89) ($8,702.90) | Check references PA # 300070461. Unapplied cash due to CM. |
| 10001501 | 8162830 | 7-Jan-03 | (90,336.30) | (3,423.10) | Check references inv # 356194. This has been misapplied to inv # 1379367 ($884.00), inv # 1378838 ($8,934.75), inv # 1379839 |
|  | 8044353 | 22-Jan-01 | (10,470.95) | (22.91) | ($500.00) and inv # 6146638 ($29.29). |
|  |  |  |  |  | This was due to internal misapplication. Hence, this is Oracle's money |
| 804796 | 14046 | 23-Oct-02 | (54.00) | (54.00) | Check references inv # 1341301 ($2,500.00), Actual inv # 1431301. This is Oracle's money. |
|  | 10101844 | 4-Jun-01 | (28,074.06) | (2,500.00) | Check is correctly applied to the 3 invoices as PO refers Check #. |
| 10243988 | 5101510 | 28-Oct-02 | (2,344.00) | (17.44) | Balance is overpayment made by Verizon Order # 6764962. However, this Order is for $0 since it was cancelled |
|  | 5101566 | 3-Feb-03 | (525.00) | (525.00) | and customer never took the class |
| 801204 | 15386-62 | 27-Nov-00 | (48,114.66) | (519.29) | Pls. provide remittance details for application as we do not have Check copy |
| 7368 | 2366 | 9-Mar-90 | (4,232.07) | (2,732.07) | Pls. provide remittance details for application as we do not have Check copy |
|  |  |  |  |  | Pls. provide remittance details for application. This was misapplied to inv # 1639890 ($1,500.00), inv # 1643297 ($1,500.00) and inv # |
|  | ACH 07/26/02 | 26-Jul-02 | (6,772.45) | (1,183.46) | 1662383 ($2,889.00) |
| 752920 | 1193157 | 20-Feb-01 | (115,810.54) | (206.00) | Credit Memo done by Oracle for $206.00 |
|  | 3722850 | 5-Feb-02 | (584.30) | (584.30) | This was due to internal misapplication. Hence, this is Oracle's |

NDCA-ORCL 1865597

Notes

Correct Inv # 1376397 ($6,143.00); CM'd in
full with reason 'Uncollectable'.

Remittance refers Inv # 1285614; No invoice for          Did the customer only partially pay?
this amount or the date; incorrect invoice

OK
Remittance refers Inv # 356194; No invoice for           Why is this one a refund??
this amount or the date; incorrect invoice

Inv referenced by customer is 1628995
whereas this invoice has been closed with                 Why would this be Oracle's money?
another Check (Check # 3895862)
Correct Inv # 1431301 for $2,500.00;
$2,306.59 has been cm'd with the reason
Bad Debt / Write Off and $193.41 applied to
Check # 8089452.                                          Should we refund the 1193.41???

OK
To be refunded

Check copy not available.

Check copy not available.

Inv # 7038027030002 referred. No invoice for
this amount or the date; incorrect invoice.

Inv # 6113613 is CM'd with reason
'CONCESSION - CUSTOMER GOODS'              The balance on the invoice in not 206.00 this does not make sense

Misapplied to Check # 7989.                                This is not clear that it is Oracle's money

          NDCA-ORCL 1865598

This was due to internal misapplication. Hence, this is Oracle's money

| 3780859 | 6-Mar-02 | (2,254.40) | (133.00) | This was due to internal misapplication. Hence, this is Oracle's money |
|---|---|---|---|---|
| 3813366 | 27-Mar-02 | (75,241.64) | (368.79) | This was due to internal misapplication. Hence, this is Oracle's money |
| 3892702 | 20-May-02 | (10,718.19) | (1,275.00) 1786364 ($7,612.77) | This was due to internal misapplication. Hence, this is Oracle's money. This was misapplied to Inv # 1786327 ($1,830.32) and Inv # |
| 9108'14: | 18-Dec-00: | (37,332.00): | (105.09) copy | Pls. provide remittance details for application as we do not have Check |
| 16570 | 2-Jan-02 | (139,468.80) | (459.00) money | This was due to internal misapplication. Hence, this is Oracle's |
| 10001825 | | | (16,325.97) | |

NDCA-ORCL 1865599

Inv # 1555589 and 1547204 have been CM'd
with reason "CREDIT/REBILL-- ADMIN
ERROR'.

Misapplied to a bunch of invoices          Why is this Oracle's money if it's a rebill?

Inv # 1312697 referred.  No invoice for this          This is not clear that it is Oracle's money
amount or the date; incorrect invoice.

Check copy not available.

Why?

Confidential - Pursuant to Protective Order

NDCA-ORCL 1865600

# EXHIBIT 50

3

#3 Interview Memorandum
of Jeffrey Henley (Interview 3 )
11/18/02

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 313789

## THIRD INTERVIEW OF JEFF HENLEY

On Monday, November 18, 2002, counsel for the Special Litigation Committee (George Newcombe and Harrison Frahn of Simpson Thacher & Bartlett) conducted a further follow-up interview with Jeff Henley, Chief Financial Officer and Executive Vice President for Oracle Corporation, by telephone. The interview lasted approximately 25 minutes. What follows is a summary of the interview, with impressions of counsel. It is not, and does not purport to be, a verbatim account of what was said.

**Plaintiffs' Accounting Fraud Allegations re Debit Memos**

Mr. Newcombe informed Henley that in the Second Amended Class Action Complaint ("SAC") in the purported class action pending in the United States District Court for the Northern District of California, plaintiffs had alleged that Oracle engaged in accounting fraud during Q2 of FY 2001 in connection with the generation of 46,000 debit memos by Oracle on November 17, 2000.

Henley stated that in November 2000, he had no knowledge of the creation of any debit memos. Henley stated that he did not know about these activities during November 2000. He further stated that he would not have expected to have been made aware of them at that time, as the work being performed did not impact Oracle's financial statements and was at a level of detail far below that in which he typically involved himself.

Henley said that he learned of the allegations in the SAC shortly after they were made. Henley stated that he directed Jennifer Minton and Tom Williams to investigate the issue. Henley further stated that he apprised the Audit Committee of the Oracle Board of the allegations.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Henley stated that Williams had reported to him and the Audit Committee the results of his investigation. Henley stated that he understood that the investigation had shown that there was no basis for the allegations. Henley further stated that Williams had reported that the debit memos were part of the changeover in systems in conjunction with the internal implementation of Suite 11i. Henley stated that Williams also reported that the debit memos were part of a global process standardization and "general clean up" of accounting practices. Henley further stated that it was his understanding that these procedures, involving offsetting debits and credits, had absolutely no impact on Oracle's revenue, earnings, financial statements, or balance sheet.

Mr. Newcombe discussed with Henley the mechanics of the process by which the "on account" flags had accumulated, including the purpose of the designation in practice and the steps necessary to redesignate the flags on November 17. Henley said that he had focused on the summary aspects of the investigation, and did not have detailed knowledge of the mechanics. In the course of the discussion about the use of "on account" to designate, among other things, amounts that had been refunded to customers, Henley observed that Oracle's policy with regard to customer refunds had been consistent since he had first arrived at the Company. Henley stated that Oracle had always had a policy of refunding customer overpayments. Henley said that rather than holding on to money once Oracle knows that a customer has made a duplicate payment, it was Oracle's practice to return overpayments.

**Reserve Allegations In the Ex Parte Application**

Mr. Newcombe discussed with Henley the claims in the California Class Action Plaintiffs' *Ex Parte* Application for Discovery filed on November 11, 2002. In particular, Mr.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Newcombe discussed with Henley the plaintiffs' allegation that Oracle had used unapplied cash as a way of reducing its bad debt in order to inflate reported earnings on its income statement.

Henley responded that he had no awareness of any transfers between unapplied cash and the bad debt reserve before learning of the *Ex Parte* Application. Henley also stated that he had no knowledge of any such transfers in Q2 or Q3 FY 2001. Henley further noted that he was not involved in or aware of the details of the investigation into the transfers to the bad debt reserve. Henley stated that it was his understanding that the aggregate numbers involved would not have had any material effect upon the reserve or Oracle's financial statements. Henley additionally said that he expected Minton and Williams to get to the bottom of the issue and take any necessary action to resolve it.

Henley also discussed the process of the reserve calculation. He noted that it was Oracle's practice in the US, because of the size of the subsidiary, to calculate its bad debt reserve on the basis of the account balances as of one month before the quarter close.

### Access To A/R System

Mr. Newcombe inquired into Henley's ability to access the A/R computer system. Henley said that he does not now have access to Oracle's A/R software application, did not have such access during FY 2001, would not know how to use such access if he did have it, and had never logged on to the system. Henley stated that he does not know how Oracle's systems work in detail, and that he primarily works with summary reports generated from the system. He explained that while he was involved at a more granular level of detail with Oracle's accounting systems in the early 1990s, he has been "out of that loop" for at least 8 years.

**CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER**

**NDCA-ORCL 313792**

4

**Alteration or destruction of Oracle documents**

   Mr. Newcombe informed Henley that Plaintiffs had alleged that Oracle was in the process of destroying and/or wrongfully altering documents concerning the practices that Plaintiffs alleged were fraudulent. Henley stated that to his knowledge, no documents related to plaintiffs' allegations were being destroyed or altered. Henley further stated that he had never instructed anyone at Oracle to destroy or modify any documents and had never heard that anyone at Oracle had issued such a directive. Lastly, Henley observed that Oracle's accounting applications and database always maintains a full audit trail of every transaction.

          G.M.N.
          H.J.F IV

**CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER**

**NDCA-ORCL 313793**

# EXHIBIT 51

**From:** Tom Olinger
**Sent:** Fri, 01 Nov 2002 04:58:41 GMT
**To:** Annica Magnusson; Mike Quinn; Myers; Greg; Yogita Parulekar
**CC:**
**BCC:**
**Subject:** Updated AR Cash Collections Memo and To Dos

Confidential - Pursuant To Protective Order

NDCA-ORCL 1727979

Attached is the most recent AR cash collections memo. The memo reflects Annica's and Yogi's changes. Mike and Greg - please review to make sure we have our facts straight. In addition, I also attached a spreadsheet with some examples of AR and Credit Memo journal entries. Greg - can you please review this.

I have also tried to summarize the open questions Jennifer had from our meeting earlier this week  Let me know if I missed anything.

1.   Determine if Wells Fargo and Harris banks can provide electronic images of the checks and remittances. This would assist in storing and potential make India a more attractive option to follow up on unapplied cash.

2.   We need to determine whether the collections group is order entry errors. This can be tied in with the current work being done with trying to reduce the number of credit memos.

3.   Is there an issue with collecting on invoices that do not have a PO (i.e.., POEF). Tom Williams thinks POEF could be causing payment delays.

4.   We need to inquire how the education collections moving to India is going to see what other processes within AR and Collections could be moved as well.

5.   The autoadjustments program has been suspended. We need to reassess the appropriate $s and past due dates before the program can be reinstated.

6.   We need to restrict the access to superuser status of the AR system.

Jennifer has initiated a project to cover our work in this area.  Annica is the Team Leader and we are all participants in addition to Ryan Roberts. The project goals are as follows:

Evaluate global standard processes for AR and Collections, and identify and implement process improvements by December 2002. Project includes:

- Strengthen internal controls and collection practices, and ensure a proper segmentation of duties
- Revise collection write off policies, and eliminate use of 3rd party collection agencies
- Revamp and implement revised global standard processes immediately
- finalize the local vs. central split of responsibilities for various AR and Collection functions

Jennifer would like to meet next week on our progress. Thanks. Tom

Confidential - Pursuant To Protective Order

Attached is the most recent AR cash collections memo. The memo reflects
Annica's and Yogi's changes. Mike and Greg - please review to make sure
we have our facts straight. In addition, I also attached a spreadsheet
with some examples of AR and Credit Memo journal entries. Greg    can
you please review this.

I have also tried to summarize the open questions Jennifer had from our
meeting earlier this week  Let me know if I missed anything.

1.    Determine if Wells Fargo and Harris banks can provide electronic
images of the checks and remittances. This would assist in storing and
potential make India a more attractive option to follow up on unapplied
cash.

2.    We need to determine whether the collections group is order entry
errors. This can be tied in with the current work being done with
trying to reduce the number of credit memos.

3.    Is there an issue with collecting on invoices that do not have a
PO (i.e.., POEF). Tom Williams thinks POEF could be causing payment
delays.

4.    We need to inquire how the education collections moving to India
is going to see what other processes within AR and Collections could be
moved as well.

5.    The autoadjustments program has been suspended. We need to
reassess the appropriate $s and past due dates before the program can be
reinstated.

6.    We need to restrict the access to superuser status of the AR
system.

Jennifer has initiated a project to cover our work in this area. Annica
is the Team Leader and we are all participants in addition to Ryan
Roberts. The project goals are as follows:

Evaluate global standard processes for AR and Collections, and identify
and implement process improvements by December 2002. Project includes:

    * Strengthen internal controls and collection practices, and ensure a
      proper segmentation of duties
    * Revise collection write off policies, and eliminate use of 3rd
      party collection agencies
    * Revamp and implement revised global standard processes immediately
    * finalize the local vs. central split of responsibilities for
      various AR and Collection functions

Jennifer would like to meet next week on our progress. Thanks.  Tom

Confidential - Pursuant To Protective Order

# Memo



**To:**    Jennifer Minton

**CC:**    Tom Williams
           Mike Quinn
           Greg Myers

**From:**  Annica Magnusson
           Tom Olinger
           Yogita Parulekar

**Date:**  October 25, 2002

**Re:**    Review of the US Accounts Receivable Cash Collections Procedures

---

The purpose of this memorandum is to discuss the review of the US accounts receivable cash collections procedures and to consider recommendations for improvement of these procedures.

**Cash Applications – Process**

The majority of all US cash receipts are received via Wells Fargo or Harris Bank lock boxes. The US AR group receives approximately 5,500 to 6,000 receipts per month (275 to 300 per day). The banks record the cash receipts on a daily basis and send an electronic tape of the information (check #, check $, invoice #, invoice $ and customer name) to the US AR Group. The tape is loaded into the AR system. The AR system will automatically apply cash receipts in which the invoice number per the remittance and the AR system agree. An estimated 75% of the cash receipts are automatically applied by the AR system ("autoapplied"). The AR group runs a report for all cash receipts that are not autoapplied on a daily basis, and has one individual who attempts to manually apply the non-autoapplied receipts. AR is typically able to manually apply 15% of the 25% that is not autoapplied. Therefore, approximately 40 to 45 receipts per day are not applied by the AR group. If the AR group cannot manually apply the cash that day, it remains unapplied in the system and the Collections group becomes responsible for resolving the unapplied status. Collections runs a report detailing all unapplied receipts from the AR system on a weekly basis. The Collections group will attempt to resolve the unapplied receipts in addition to their collections responsibilities. Per Ryan Roberts, US Collections Manager, approximately $85 million of unapplied receipts is typically outstanding at any one point in time.

**Cash Applications – Issues and Recommendations**

- The AR group only has one individual who is responsible for resolving unapplied receipts. This individual only has the time to try to resolve the unapplied receipts on the day the cash is received. The Collections groups' first priority is collecting outstanding receivables (and they are measured as such). The Company should consider having the AR group dedicate resources to resolving unapplied cash as the Collections focus is clearly on outstanding AR. This would allow for unapplied receipts being resolved faster and Collections to focus solely on outstanding A/R.

**Collections – Process**

Collections contacts customers regarding any large outstanding invoices (>$100K) typically before they are due (due date –7 days) to ensure the customer has all required information to pay on time. Outstanding receivables are tracked on an aged basis to ensure Collections is continuing to make efforts to obtain payment. Sales reps receive system notifications ("AutoAlerts") after receivables become past due. The sales reps receive the notifications on an accelerated basis as the receivable approaches 90 days past due. Ryan Roberts stated that the AutoAlerts do not go to all sales reps involved in a particular sale (ex. iSD

2



sales). The Collections often tries to determine what other sales reps are involved to enlist their assistance but this is a time consuming process.

**Collection – Issues and Recommendations**

- Have AutoAlerts go to all members of the sales force receiving commissions for each transaction.

- If Collections will not be applying cash, they should not have the ability to apply cash in the AR system.

**Third party Collection Agencies – Process**

Jeff Johnson (Credit Manager) is the key contact between the Company and the third party collections agency. The current process described below has been in place since August 2002.

Oracle used to use 3-4 different collection agencies but is currently only using one firm, AMS. The Company has used this firm for many years; however, the Company does not have a signed contract with AMS. Purchasing is in the final stages of negotiating a contract with AMS

Jeff receives third party collection request packages from Collections on an infrequent basis, sometimes 3 packages/day, and sometimes 3 packages/week. Each package includes the following information:

- Cover sheet
- Copies of the invoices to be sent to the agency
- Copies of all related call notes from the system
- Customer billing history
- Collection manager's approval

Jeff scans through the package to verify that all invoices are older than 90 days and none of them are with any of the Company's major customers. He also verifies that the invoices have not been paid. Most invoices are between $2,000 and $10,000; all are below $100,000. Jeff obtains approval from Legal (Jennifer Gloss) before he forwards the package to AMS. Jeff does not verify that Collections has obtained proper internal approval/notification to forward the invoices to AMS.

Jeff sends a spreadsheet to AR requesting a credit memo to be issued. He also keeps a log in Excel over all invoices sent to AMS.

In addition to the above invoice packages, Jeff also forwards all invoices over $500 that have been "autoadjusted" to AMS. The supporting documentation for these invoices is only a print out of the actual invoice, no call notes, etc. Jeff logs all autoadjusted invoices in his spreadsheet as well.

AMS provides Oracle with weekly and monthly progress reports. The success rate as of September 2002 for the last 18 months is a as follows:

> Education invoices: 50% collected which equals $1.1m
> Autoadjusted invoices: 57% collected which equals $750k
> All other invoices: 28% collected, which equals $4.4m

**Third party Collection Agencies – Issues and Recommendations**

- It was decided at the Global Finance Conference that the Company should no longer use a third party collection agency but rather attempt to collect the invoices internally. Therefore,

3

NDCA-ORCL 1727983



we recommend that the Company not finalize the new agreement with AMS. In addition, the fact that the collection success rate if fairly high for autoadjusted invoices and education invoices further support the decision to move collections in-house.

1. The use of the autoadjustments program should be suspended until the parameters ($s and timing) can be reevaluated.

**Credit Memos - Process**

Only AR has the ability to issue credit memos ("CM") in the system. They receive CM requests from three different sources

1. Request from Collections via Jeff Johnson (see above process for more detail)
   Collections put together a package for the invoices they believe should be sent to a third party collection agency. Collections does not have any formal guidelines for which invoices to forward to a collections agency, but a rule of thumb is that the invoice should be at least 90 days overdue and less than $100k. AR issues CM for these invoices and informs Jeff Johnson that the invoices have been credited. AR does not verify that internal approval has been obtained. Per collections, they "inform" the field that these invoices will be sent to a collection agency.

2. Credit Memo and Rebill (CM and RB)
   AR receives CM and RB requests via a web template. It arrives either via email (to ARINFO) or in hard copy. The main reasons for CM and RB are incorrect payment terms or incorrect PO number. The process is usually initiated by Collections who has identified the issue during their collections effort.

   • Process for License CM and RB

     Collections inform Order Management. Order Management must go into the system (OM) and create a new corrected order and put it in "enter" status. Order Management informs AR about the new order's order number. AR issues the CM and goes into OM and changes the new order status to "booked".

   • Process for Support CM and RB

     OKS has credit memo functionality and the current process is that the support finance personnel can issue a CM directly in OKS, which reduces the workload for AR.

   • Process for Consulting CM and RB
     Gary Becker's group ("AFS") handles about 90% of the CM for consulting directly in OP by using the negative event functionality. OP has credit memo functionality but it is not used. The reason is that if a payment has already been applied to an invoice in AR, and AFS has requested a credit memo via OP, the request would be stuck in the interface table and create an error. By using the negative event in OP, the information will read over to AR and an AR specialist will go in and unapply the cash from this invoice. AR does not inform AFS that there was some cash applied to a credit memo requested invoice; they just assume the cash was incorrectly applied. See further details under section "Data Error Corrections".

3

NDCA-ORCL 1727984



3. <u>Standard Credit Memos</u>

Usually initiated by Collections. Collections sends a spreadsheet every week to the field to obtain approvals to credit memo an invoice. Collections is responsible for ensuring proper internal approvals are obtained, AR does not verify that proper approvals were obtained. Collections uses a negative approval process, i.e. if they have not heard back from the approver within 7 days, it is assumed approved. Some credit memo requests arrive directly from the field using the web template. For these credit memos, AR does verify that proper approvals are obtained. By talking to the AR manager, it did not appear as if he was 100% sure how well they were ensuring the approval policy was followed.

Global reason codes for credit memos were established about two months ago, however, the web template to be used for requesting a credit memo has not yet been updated. In addition, the collections web page still shows the old approval requirements for requesting a credit memo.

**Autoadjustments**

Terri Elam (North America AR Manger) runs a report monthly to "autoadjust" low dollar invoices. The auto adjustments start with small dollar invoices as early as 30 days overdue. Terri enters the approved write-off parameters in a pre-defined report in AR (for example, 30 days overdue and less than $50). The accounting entry is Dr 12601 (reserve) and Cr AR. Note: we need to determine how many people can run this report and what the controls are over this function being misused. Terri forwards this report to Jeff Johnson who sends all autoadjusted invoices over $500 to the collection agency.

**Credit Memos – Issues**

1. The auto sweep function debits 12601 (bad debt reserve) while it should debit revenue.
2. Who verifies that the auto sweep function is not used for non-auto-sweep activity?
3. The audit sweep activity writes off invoices that are less then 60 days overdue. Why start so low?
4. Credit memo approvals: AR does not verify internal approvals are in place prior to issuing a CM. If the request is received from collections, it is assumed the proper approvals are in place. Collection uses a negative approval process, i.e. if no response is received within 7 days, the credit memo request is assumed to be approved by the business. This process does not provide for an audit trail. Also, neither AR nor Jeff Johnson performs any approval verification.
5. The web template used to request credit memos had not been updated to reflect the new global reason codes.
6. The reason code bad debt includes reasons beyond what would traditionally be considered bad debt. In addition, several of the non-discretionary reason codes were used for revenue impacting credit memos. By using a non-discretionary reason codes, field approval is not required and all credit memos can be approved by either Mike Quinn or Ryan Roberts (collections Sr. Manager).
7. The credit and collections web page still has the old approval rules for CM (12 months old). Is Sales aware of the new rules?

**Credit Memos - Recommendations**

Theoretically, proper segregation of duties exists for credit memos since AR is the only function that can issue credit memos. However, since they do not perform any independent verification of approvals obtained for credit memos, the control is not effective. In addition, since Collection uses a negative approval process, there is no audit trail for credit memo approvals. We recommend that AR verify that proper internal approvals have been obtained before issuing a credit memo. The approvals should be filed with the individual credit memo as an attachment in the system. We recommend the iReceivables workflow functionality be implemented for credit memos to enforce the policy and to create an automatic audit trail.

The "autoadjust" functionality allows everybody with access to AR to adjust invoices without revising the original account distribution. We recommend that the use of the autoadjustments program be suspended until the parameters ($s and timing) can be reevaluated and the controls improved.

3

NDCA-ORCL 1727985



Review the new global reason codes for credit memos and tighten up the descriptions to ensure a discretionary credit memo does not get issued circumventing the approval process by being categorized as a non-discretionary credit memo. Can a system control be implemented for this?

Ensure the web information with respect to the approval requirements for credit memos and the web template to be used to request a credit memo is updated timely. Inform all sales reps to ensure no misunderstandings exist regarding the current CM approval requirements.

## System issues

**Accounts Receivable Data security**

There are 9 responsibilities related to the Oracle Receivables application for US users. These are:

| Responsibility name | Number of active users | ART Approver |
|---|---|---|
| 1. US GSI Receivables Inquiry | ? | Terry Elam |
| 2. US GSI Receivables Super User | 80 | Terry Elam |
| 3. US GSI Receivables User | 52 | Terry Elam |
| 4. US GSI Reporting | 19 | Terry Elam |
| 5. US GSI Collections User | 83 | Terry Elam |
| 6. US GSI Journal Entry | 45 | Terry Elam |
| 7. US Global Imaging AR document Inquiry | 69 | Thomas O'Neill |
| 8. US OU Receivables Rebill Inv Entry | 14 | Jim Stein |
| 9. US Tax Group User GUI | 0 | Terry Elam |

Some of these responsibilities seem to be old and should probably be end-dated and not used. Moreover, the number of users that have been granted these responsibilities, especially the US GSI Receivables Super user responsibility, seems to be more than necessary. Two generic user IDs (ARIT HELP and PAINVOICE) has been granted Super user access.

**Accounts Receivable Data security - Recommendations**

A thorough review needs to be done of whether appropriate access has been granted to users. Special attention should be given to users of the US GSI Receivables Super user responsibility. This responsibility grants access to almost all functions in the Oracle Receivables application including application setup and accounting rules. This responsibility should be sparingly granted. The responsibility should be granted to people who are responsible for changes to application setup and accounting rules. Because these changes impact all transactions and are performed on a very infrequent basis only after much discussion and deliberation, we recommend that not more than 5 to 7 users should be granted this responsibility. If required, the responsibility could be broken down into two responsibilities separately for functions required by IT and those required by functional AR users in SSC.

Generic user IDs should not exist and if required should not be granted Super user access. Please evaluate need for all generic ID and their level of access.

Best practice recommends that developers should not be granted any access to the production environment. We found a lot of developers with Super user access to production data and setup. Please find the list of users with US GSI Receivables Super user in Attachment A. We recommend access review to be performed on a quarterly basis by the ART approvers. Further the AR GPO should monitor the number of users with super user access and the number of responsibilities.

*Segregation of duties*

3

NDCA-ORCL 1727986



*Action item* - Walkthrough with Greg Myers/Krithika Bhat (or Greg should do this himself) the access granted by each of these responsibilities and determine whether a.) Adequate segregation of duties is possible and b.) Whether all these responsibilities are needed /used or some can be end dated.

*Other recommendations (key issues only)*

- Currently there are no procedures for changing employee access when they are transferred from one group to another (that when their responsibilities change).
- Currently all access approved through ART is granted automatically by the system. However there are a LOT of users with 'system administration' access who can create users accounts and/or grant any 'responsibility' outside of ART, thereby bypassing the approval workflow in ART. This list needs to be reviewed and cleaned up on a priority basis.

### Data Error Corrections

The Auto Invoice rejection report gives a list of rejections when invoices /credit memos are interfaced from feeder systems into AR. The IT APPS GROUP resolves some of these issues by fixing the data directly in the database, thereby overriding any application controls.

*Action item* - This issue needs further discussion with Mark Field /Lennart Weibahr (OM), Maya Khanna /Mike Moran (OP) and Marion Hodgson (OKS).

In an example case that we are aware of, requests are sent to close projects directly in the database when it is not possible to close them through the application. The application does not allow projects to be closed when revenue does not equal invoice. We need to check this further to determine whether we are leaving money on the table by not invoicing and whether we are inflating revenue when we in fact we haven't invoiced or can't collect.

### Data error corrections - Recommendations

The reasons for need to fix data have to be analyzed. Any process breakdown or product functionality enhancement needs issues should be identified and fixed.

### Credit Memos

Support Finance personnel enter credit memos in OKS for the Support LOB and this seems to be working fine.

Credit memo functionality in Oracle Projects has been disabled in the US about a couple of years back. Negative invoice events functionality is used to generate credit memos. Negative invoice events functionality has the following disadvantages: a.) The credit memos generated do not interface into AR. As a result AR /GL balances do not match OP balances and credit memos have to be re-entered in AR. PA Analyzer information is based on information in OP which will not reflect financial statements generated from GL if credit memos are not re-entered. This will impact management decisions and external reporting. b.) the negative events functionality does not prevent credit memos when cash has been applied to that invoice. Instead these cases are thrown into Auto invoice rejection error logs and have to be corrected.

While on one hand we are trying to ensure credit memos are entered /initiated in feeder systems (OP and OKS), we are trying to implement approval workflow for credit memos entered /initiated in AR directly. This means the credit memo approval workflow will be applicable for all License LOB credit memos which are entered in AR and any other credit memos for Consulting and Support that do not get initiated in the feeder systems, namely, OP and OKS.

*Action item* - Discuss with Lennart Weihbart, GAO, Margaret O'Reilly, GPO and Dan Galia OM ASF about the credit memo (returns) functionality and approval workflow in OM for License orders.

3

NDCA-ORCL 1727987



**Credit Memos - Recommendations**

The credit memo functionality in OP seems to be working well in Canada and should be used in the US (instead of negative invoice events).

We recommend that thought be given to whether we want to implement the approval workflow for credit memos initiated in the feeder systems, namely, OP and OKS.

Until then manual approval process need to be followed (Refer to process description and recommendations above in credit memo section).

**Auto Adjustments and other accounting rules /invoicing rules - system related issues**

This program in AR is used by Terry Elam to adjust low dollar invoices based on corporate policy. This program generates a debit to 12601 Reserve and credit to AR. Original invoice entry is debit to AR and credit Revenue. (Please refer to process description above for auto adjustments.)

**Auto Adjustments Recommendations**

Auto Adjustment Preview of Auto Adjustments Execution report can be viewed to verify appropriateness of auto adjustments. These should be used to monitor adjustments.

***Action item*** - Confirm that the auto adjustment debits in 12601 are taken to Income Statement to properly reflect the write off. Also identify a good report that will provide a dump of all accounting rules /invoicing rules for all Transaction types /Activities (programs) not just auto adjustments. Determine the need to develop it if it does not exist. GPOs should verify this report on a regular basis to ensure all changes are authorized changes.

Because auto adjustment is a powerful functionality, access to this program should be restricted.

***Action item*** - Run Function security reports or walkthrough with Greg Myers/Krithika Bhat to identify the responsibilities that have been granted the 'auto adjustments' functionality.

If a decision is made to cease auto adjustments altogether, we recommend that this functionality be disabled or no longer be made available to any Responsibility (other than maybe Superuser) in the AR application. This will resolve the issue of improper usage of the auto adjustments functionality.

3

Confidential - Pursuant To Protective Order

NDCA-ORCL 1727988

0000312_286821.xls

# Oracle Corporation
## Summary of JE Related to Accounts Receivable Cash Application and Credit Memos
*Attorney Work Product*

**Acct # 12XXX**

Accounts Receivable

| Dr. | Cr. | |
|---|---|---|
| 100 | | 1 |
| | 100 | 4 |
| | 100 | 5 |

**Acct # 25005**

Customer Advances

Applied

| Dr. | Cr. | |
|---|---|---|
| | 100 | 4 |
| | 100 | 5 |
| 100 | | 6 |
| 100 | | 7a |

**Acct # 3XXXX**

Revenue

| Dr. | Cr. | |
|---|---|---|
| | 100 | 1 |

**Acct # 25005**

Customer Advances

Un Applied

| Dr. | Cr. | |
|---|---|---|
| 100 | | 2 |
| 100 | | 3 |

**Acct # 11999**

Cash

| Dr. | Cr. | |
|---|---|---|
| 100 | | 2 |
| 100 | | 3 |
| 70 | | |
| | 100 | 7a |
| | 100 | 8b |
| | 200 | 9 |

**Acct # 25005**

Customer Advances
On Account

| Dr. | Cr. | |
|---|---|---|
| | 100 | 6 |

**Acct # 5XXXX**

Expense

| Dr. | Cr. | |
|---|---|---|
| 100 | | 7b |
| | 70 | |
| | | 8b |

**Acct # 25005**

Customer Advances

Total

| Dr. | Cr. |
|---|---|
| 0 | 100 |
| 0 | 100 |
| 100 | 0 |
| 100 | 0 |
| 100 | 100 |
| 100 | 0 |

**Acct # 2XXXX**

Accounts Payable

| Dr. | Cr. | |
|---|---|---|
| 100 | | |
| | 100 | 8a |

**Acct # 2XXXX**

Deferred Education

| Dr. | Cr. | |
|---|---|---|
| | 200 | 10 |

Sheet1

Confidential - Pursuant To Protective Order

NDCA-ORCL 1727989

0000312_286821.xls

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z | AA | AB | AC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 34 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 35 | | | | | | | | | | | 8a | 100 | | | | | 100 | 0 | | | | | | | | | | | |
| 36 | | | | | | 10 | 200 | 200 | 3 | | | | | | | | 0 | 200 | | | | | | | | | | | |
| 37 | | | | | | | | | | | | | | | | | 200 | 0 | | | | | | | | | | | |
| 38 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 39 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 40 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

1 Sale for $100 for Database
2 Cash received of $100k on Database sale via lock box
3 Cash received of $100k on Database sale - duplicate payment
4 Lockbox sweep (Auroapplied)
5 $100 of cash applied manually
6 Unapplied cash des gnated as "On Account"
7 Receipt references an expense g/l account (ex. Payment for booth at Oracle World)
8 Reimburse customer for duplicate payment (refund/debit memo)
9 Cash received on $200 for Education Prepaid Commitment ("EPPC") (I.e., deposit)
10 Apply reciept related to EPPC

Sheet1

Page 2

Confidential - Pursuant To Protective Order

NDCA-ORCL 1727990

**First Name:** Tom
**Last Name:** Olinger
**Company:** Oracle Corporation
**E-mail:** Tom.Olinger@oracle.com
**Job Title:** Vice President, Corporate Controller
**Address:**

500 Oracle Parkway
Mail Stop 5OP638
Redwood Shores
California
94065

**Full Name:** Tom Olinger

Confidential - Pursuant To Protective Order

# EXHIBIT 52

I am available at 3:00 today.

Greg

Ryan Roberts wrote:

> Greg,
>
> Can we discuss before the call? Sometime tomorrow afternoon perhaps?
>
> Thanks,
>
> Ryan

**Subject:** Status UPdate on AR Project and Proposed con call on Wed Nov 20
**Date:** Sun, 17 Nov 2002 03:31:25 -0800
**From:** annica magnusson <annica.magnusson@oracle.com>
**Organization:** Oracle Corporation
**To:** Jennifer Minton <Jennifer.Minton@oracle.com>
**CC:** tom olinger <tom.olinger@oracle.com>,
   "Quinn,Michael" <MICHAEL.QUINN@oracle.com>,
   "Roberts,Ryan" <RYAN.ROBERTS@oracle.com>,
   GREG_MYERS <GREG.MYERS@oracle.com>,
   "Parulekar,Yogita" <YOGITA.PARULEKAR@oracle.com>,
   "Lunny,Christopher" <CHRIS.LUNNY@oracle.com>,
   "Magnusson,Annica" <ANNICA.MAGNUSSON@oracle.com>
**References:** <3DD4519D.A4425A8@oracle.com>

Jennifer,

Tom, Mike, Greg, Ryan and I had a call last week where we assigned action items to all involved parties. I suggest that the owners of the action items prepare to give a status update on our next call along with an estimated time line for implementation that take into consideration hiring and training needs. Greg and I was also able to obtain some of the EMEA issues this week which will help in developing a global plan. I suggest we set up a call for Wednesday next week to discuss. Both Greg Myers and I will be back in the US by then.

**Chris** - If Jennifer agrees, can you help organize a call with the parties copied on this email - thanks!

BTW - I will not be going to France so I will be back in the US on Tuesday, Nov 19. evening.

These are the main changes we are proposing to implement/have implemented to date:

Cash Applications
Improve the effort expanded in AR to apply unapplied cash to increase the success rate in matching the cash. In the US. the success rate in auto applying the cash is 75%. In EMEA, it is much lower due to the fact that some countries do not use lock boxes. We suggested that EMEA should compare to cost of using a lock box to the expense of the FTE who is currently applying the cash.

Greg has been in contact with the US banks and they have indicated that it would be possible for them to submit imaged copies of the bank remittances which would allow us to staff the cash application function anywhere we like (India for ex).

Also, we suggest that COllections should not be allowed to apply ANY cash, this function should move

Confidential - Pursuant To Protective Order

to AR.

Credit Memos
We recommend that AR must verify that the proper approvals have been obtained before issuing a credit memo. This was currently not the case in the US and after having visited Dublin, it was not the case in the SSC either.

Greg believes the work flow capability within iRecivables could be implemented within the next 6 months which would allow us to have better controls over the approvals process for credit memos. Until then, we will need to rely on manual controls, but I do think they should reside within AR in the SSC.

Auto Adjustments
Has been stopped in globally. Does currently create a problem in EMEA in within Education which we must solve with IT.

Collections
The US has ceased using the 3rd party collections agency. In EMEA, they had received a proposal from PwC/KPMG whereby they would collect for Oracle for a fee of less than 1%. I suggest we obtain more information about this since it seems inexpensive. For ex, the US collection agency received more like 25% of the fees collected.

AR System Access
Greg has reduced the number of super users from 83 to 16 in the US. He is currently defining the various user access rights that should exist and they will roll out the new access rules in December.

Credit Checking
This is currently a SSC function in EMEA and has after some initial set-up issues been pretty successful. We need to evaluate if this should be a SSC or local function.

Annica

Jennifer Minton wrote:

REDACTED

---

**Subject:** Re: follow up to audit committee meeting
**Date:** Thu, 14 Nov 2002 16:37:46 -0800
**From:** Dan Cooperman <daniel.cooperman@oracle.com>
**To:** Jennifer Minton <Jennifer.Minton@oracle.com>
**References:** <3DB6F541.848C013E@oracle.com> <3DB833BD.5389E638@oracle.com>

Jennifer,

REDACTED

   NDCA-ORCL 1733104

Dan

Jennifer Minton wrote:

All--

In addition, Tom Olinger and Annica Magnusson are up in Rocklin this week
analyzing our current processes. They will file a report by next Monday
summarizing the procedural changes we need to implement to improve internal

controls in this area. I will forward you the recommendations once
finalized, and will advise on when the procedures will be implemented on a
global basis.

Jen

Tom Williams wrote:

> during our discussion at last friday's audit committee meeting, i told
> you that i would supply an update on our review of the unapplied cash
> items that had been moved to the reserve account by today.
>
> the collections group has completed a preliminary review of all items
> over $10,000 (approximately 73% of the dollar population), and is
> following up on a number of items to determine if the amounts should be
> moved back to unapplied cash. there is a significant amount of research
> that remains to be completed, and so the exposure is difficult to
> quantify. i do not believe the net exposure is more than $20 million,
> and, thus, it will not be material to our reported results (jennifer has
> included this amount in our current quarter forecast until such time
> that we can better quantify the adjustment).
>
> tom

# EXHIBIT 53

From: Rakesh Kochhar
Sent: Thu, 03 Jun 2004 15:38:53 GMT
To: gfic_cashappsus_ww
CC: Molly littlefield; Mriganka gupta
BCC:
Subject: [Fwd: Re: [Fwd: Incredibly impressive performance by the GFIC US Cash AppsTeam]]

---

Form JM herself, well done!
Molly this congratulations is yours , as much as it is for the team
here, thanks

---------- Original Message ----------
Subject: Re: [Fwd: Incredibly impressive performance by the GFIC US
Cash AppsTeam]
Date: Thu, 03 Jun 2004 08:14:42 -0700
From: Jennifer Minton <Jennifer.Minton@oracle.com>
Organization: Oracle Corporation
To: Rakesh Kochhar <rakesh.kochhar@oracle.com>
CC: Jennifer Birk <jennifer.birk@oracle.com>, Robynne Sisco
<Robynne.Sisco@oracle.com>, Mriganka gupta <Mriganka.gupta@oracle.com>,
"VENKAT,SETLUR" <venkat.setlur@oracle.com>, "ASHOK,RAJARAM"
<ashok.rajaram@oracle.com>, "VINEET,SEHGAL" <vineet.sehgal@oracle.com>,
"Kini,Vijay" <VIJAY.KINI@oracle.com>, "jennifer.birk@oracle.com"
<jennifer.birk@oracle.com>, "jeff.henley" <jeff.henley@oracle.com>
References: <40BF3311.20203@oracle.com>


This is an astonishing result! I am absolutely thrilled with the
success that the cash apps team has had in driving down the unapplied
cash balance. Please extend my gratitude to the team for their hard
work and commitment towards making this happen. With the momentum we
have built up, I am convinced that we will clear the backlog and bring
unapplied cash current sooner than expected. Congratulations!

Jennifer

Rakesh Kochhar wrote:

> The excitement of the Cash Apps team is evident from the mail below on
> achieving these numbers.
> regards
> Rakesh kochhar
>
> -------- Original Message --------
>
>
> Subject: Incredibly impressive performance by the GFIC US Cash Apps
> Team
> Date: Thu, 03 Jun 2004 19:36:16 +0530

Confidential - Pursuant to Protective Order

> From: Vijay Kini <vijay.kini@oracle.com>
> Organization: Oracle Corporation
> To: gfic_cashappsus_ww <gfic_cashappsus_ww@oracle.com>,
> "littlefield,Molly" <MOLLY.LITTLEFIELD@oracle.com>
> CC: Gupta,Mriganka <MRIGANKA.GUPTA@oracle.com>, Kochhar,Rakesh
> <RAKESH.KOCHHAR@oracle.com>, Setlur,Venkat <VENKAT.SETLUR@oracle.com>,
> Rajaram,Ashok <ASHOK.RAJARAM@oracle.com>, GOPALAKRISHNAN,SETHURAMAN
> <gopalakrishnan.sethuraman@oracle.com>, Sehgal,Vineet
> <VINEET.SEHGAL@oracle.com>
>
> Hi All,
>
> We have closed the US Unapplied Cash this year at a truly unexpected and
> stunning amount of $28.48 mio. This has been an "incredibly impressive
> performance" by the team due to their unparalleled commitment and
> team work and dedication.
>
> The snapshot of the unapplied cash levels −
>
> All your hard work and support is highly appreciated.
>
> Thanks all,
>
> Vijay
> ツ
> ツ
>

−−

Regards,
Rakesh Kochhar
Director − GFIC
Oracle Corp. India

Mobile: +91 9845765764

                    NDCA-ORCL 1886330

# EXHIBIT 54

**From:** Molly Littlefield
**Sent:** Fri, 15 Oct 2004 19:59:22 GMT
**To:** Robynne Sisco
**CC:** Vijay Kini; SEHGAL VINEET; Gopalakrishnan Sethuraman
**BCC:**
**Subject:** Re: [Fwd: Re: Possible expansion of PWC Project]

Hi Robynne,
Here is what we need to back out. Detailed report attached.

Dollars Items
Resolved $ 84,451.38 16
REFUND $ 141,836.53 19
Legal $ 136,046.29 13
CREDIT MEMO $ 43,015.08 3
CM/RB $ 63,048.63 6
Booking already sent to OU $ 3,500.00 1
Total $ 471,897.91 58

Please let me know if you have any questions.
Thanks
Molly

Robynne Sisco wrote:

> Guys -
>
> We have Jennifer's approval to expand the scope of the PWC project up
> to $20K. Based on the information you guys sent me, this only leaves
> receipts over $20K (19 + 4 = 23 items; $509,718 + 508,444 =
> $1,018,162) from the worksheet you sent me earlier that you still need
> to investigate. Effective immediately, STOP ALL INVESTIGATION OF THE
> ITEMS ON YOUR LIST (attached) THAT ARE $20K OR BELOW. We need to
> freeze the population to add it to our project. Even if the
> investigation is in process, please stop all efforts. The only
> exception to this is if a customer independently inquires about a
> refund. If that happens, we need to follow up and refund the $$.
> Please keep me in the loop on any such instance so I can be up to
> speed at all times if our population changes.
>
> The good news here is that this decreased the # of items you will have
> to individually investigate and resolve by the end of this quarter.
> See the revised worksheet attached with the plan of attack for the
> rest of the year (Unapplied Proposal_10-14-004.xls). Please let me
> know if you have any questions.
>
> PWC will have to choose another sample for this new population (they
> cannot use ours) so I will pass that to Molly once I have it and you
> guys can work on it as a team. JM wants to try to get this completed

Confidential - Pursuant to Protective Order

> this quarter, which means we will need to turn around the sample
> research as quickly as possible.
>
> -Robynne
>
>
>
> -------- Original Message --------
> Subject: Re: Possible expansion of PWC Project
> Date: Thu, 14 Oct 2004 13:29:22 -0700
> From: jennifer minton <jennifer.minton@oracle.com>
> Organization: Oracle Corporation
> To: Robynne Sisco <Robynne.Sisco@oracle.com>
> CC: Kahler,Robert <ROBERT.KAHLER@oracle.com>, greg myers
> <greg.myers@oracle.com>, Kristen Kimball <kkimball@pacwest.com>, Tom
> Olinger <Tom.Olinger@oracle.com>, Molly Littlefield
> <molly.littlefield@oracle.com>, Birk,Jennifer <JENNIFER.BIRK@oracle.com>
> References: <416EDE01.4040103@oracle.com>
>
>
>
> Agreed. Let's wrap this puppy up asap. Jen
>
> Robynne Sisco wrote:
>
>> Jennifer -
>>
>> Bob and I had a call with PWC earlier this week to discuss the
>> possibility of expanding the scope of the project to include a higher
>> $ threshold. There are two approaches we can take:
>>
>> 1. Expand the project scope and re-sample the entire population
>> 2. Expand the project scope by adding a second population, and
>> sampling that population separately from the original one that has
>> already been sampled.
>>
>> We recommend the 2nd scenario as we believe that the results of the
>> higher $ population will vary from the results of the original
>> population and that we can keep more $ by separating the samples.
>> This is based on the results from the sampling we have already
>> performed as follows:
>>
>>
>>
>>
>> Escheat Retain Total
>> Original Sample 56% 44% 100%
>> Higher $ Sample 41% 59% 100%
>>
>> I believe the difference is due to the significant number of
>> education invoices in the <$3K population that were problematic due

                                     NDCA-ORCL 1885834

\>> to the manual nature of the education process that was in place a
\>> while back. As you can see from our sampling of the higher $
\>> population above, we expect to be able to retain a higher % in this
\>> bucket. While PWC would need to pick their own sample, I can see no
\>> reason why the results would vary significantly from the above,
\>> although it is certainly possible.
\>>
\>> We need to choose a 2nd population where the time frame of receipts
\>> matches the first (receipts prior to 5/31/03). As you will see on
\>> the attached (revised proposal on how the entire balance of unapplied
\>> will get resolved - see "10-14-04 Proposal" tab), I recommend that we
\>> increase the scope of the project to include all receipts $20,000 or
\>> lower. This would incorporate a second sample of $9.3M and 1,615
\>> items. If you feel this is too aggressive, we can move the
\>> population down to all receipts $10,000 or lower, which will reduce
\>> the 2nd population by $1.3M and 93 items.
\>>
\>> Based on the sampling of the populations so far, we would expect the
\>> following overall results from this project:
\>>
\>>
\>>
\>>
\>> Escheat Retain Total
\>> Original Sample $2.9 $2.3 $5.2
\>> Higher $ Sample $3.8 $5.5 $9.3
\>> Total $6.7 $7.8 $14.5
\>>
\>> If we get your approval to move forward, we will submit this new
\>> population to PWC for sampling so we can continue to move this
\>> project toward completion. Please let us know what you would like to
\>> do.
\>>
\>> -Robynne
\>>