# EXHIBIT 55 part 1

1  LERACH COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  MARK SOLOMON (151949)
   DOUGLAS R. BRITTON (188769)
3  VALERIE L. McLAUGHLIN (191916)
   GAVIN M. BOWIE (235532)
4  STACEY M. KAPLAN (241989)
   655 West Broadway, Suite 1900
5  San Diego, CA  92101
   Telephone:  619/231-1058
6  619/231-7423 (fax)
   marks@lerachlaw.com
7  dougb@lerachlaw.com
   valeriem@lerachlaw.com
8  gbowie@lerachlaw.com
   skaplan@lerachlaw.com
9        – and –
   SHAWN A. WILLIAMS (213113)
10  WILLOW E. RADCLIFFE (200087)
   MONIQUE C. WINKLER (213031)
11  ELI R. GREENSTEIN (217945)
   100 Pine Street, Suite 2600
12  San Francisco, CA  94111
   Telephone:  415/288-4545
13  415/288-4534 (fax)
   shawnw@lerachlaw.com
14  willowr@lerachlaw.com
   moniquew@lerachlaw.com
15  elig@lerachlaw.com

16  Lead Counsel for Plaintiffs

17                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
18

19  In re ORACLE CORPORATION          )  Master File No. C-01-0988-MJJ
    SECURITIES LITIGATION             )
20  _____)  CLASS ACTION
                                       )  PLAINTIFFS' NOTICE OF MOTION AND
21  This Document Relates To:          )  SUPPLEMENTAL SUBMISSION
                                       )  REGARDING DEFENDANTS'
                                       )  DESTRUCTION OF EVIDENCE AND
22      ALL ACTIONS.                   )  REQUEST FOR SANCTIONS AND
    _____)  OBJECTIONS TO SPECIAL MASTER'S
23                                         JULY 17, 2006 ORDER DENYING
                                           PLAINTIFFS' MOTION TO COMPEL THE
24          **FILED UNDER SEAL**           RESTORATION OF BACKUP TAPES AND
                                           FOR MISCELLANEOUS RELIEF FOR THE
25                                         DESTRUCTION OF EVIDENCE
                                           DATE:            September 24, 2007
26                                         TIME:            9:30 a.m.
                                           COURTROOM:       The Honorable
27                                                          Martin J. Jenkins

28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................................................................1

II.  RELEVANT PROCEDURAL HISTORY ..........................................................3

III. LEGAL STANDARD............................................................................................4

IV.  DEFENDANTS ALTERED AND WITHHELD KEY EVIDENCE RELATING
     TO A "CLEAN UP" OF ACCOUNTING FILES RELEVANT TO PLAINTIFFS'
     CLAIMS ..............................................................................................................10

     A.   Defendants Made False Representations to the Court Concerning the 2002
          Clean Up to Shield Highly Relevant Documents from Discovery.........................11

          1.   Documents Produced Months After the Discovery Cutoff Reveal
               Defendants' Attempt to Hide Crucial Documents Under the Guise
               of the 2002 Clean Up .................................................................................13

          2.   The Testimony of Key Oracle Accounting Witnesses Confirms that
               Defendants Knowingly Misled the Court When They Asserted that
               There Was No Relationship Between the 2002 Clean Up and the
               November 2000 Debit Memos.....................................................................16

          3.   Oracle Used the 2002 Clean Up to Alter Highly Relevant
               Accounting Records.....................................................................................20

     B.   Defendants' Repeated Violations of the Court's Orders Prevented
          Plaintiffs from Obtaining Relevant Documents Until After the Completion
          of Discovery and Depositions.................................................................................22

          1.   Defendants' Violations of the March 10, 2005 Discovery Plan ................22

          2.   Defendants' Violations of Magistrate Judge Spero's October 19,
               2005 Accounting Order..............................................................................24

          3.   Defendants' Violations of the Special Master's July 17, 2006
               Accounting Order.......................................................................................26

          4.   Defendants' Violation of the December 19, 2006 Order and Other
               Sanctionable Discovery Conduct Thereafter ............................................28

               a.   Defendants' Belated Production of E-mails on April 17,
                    2007 Regarding Plaintiffs' Accounting Allegations.....................28

               b.   Defendants' Belated April 24, 2007 Production of Relevant
                    Board Meeting Memos and E-mails ..............................................30

               c.   Defendants Changed the Source of Documents After the
                    Discovery Cutoff..........................................................................31

     C.   Defendants Electronically Altered Many Accounting Documents Before
          They Were Produced..............................................................................................33

1.    Defendants Altered the Electronic Filenames and Metadata Associated with Documents as Kept in the Ordinary Course of Business ....................................................................................................33

2.    Defendants Electronically Altered and Failed to Preserve Relevant E-mails....................................................................................................34

D.    Defendants Recently Admitted They Were Aware of Plaintiffs' Accounting Allegations in May 2002 at Least Five Months Before Defendants Sent Preservation Notices to a Select Few Accounting Employees........................................................................................................36

V.    DEFENDANTS FAILED TO PROPERLY PRESERVE EVIDENCE IN BAD FAITH...................................................................................................................37

A.    Defendants Expected Litigation Surrounding the March 1, 2001 Disclosures But Did Nothing...............................................................................37

B.    Even After Service of Broad Based Complaint Allegations Defendants Intentionally Excluded the Vast Majority of Oracle Employees from a Document Preservation Instructions......................................................................38

1.    Defendants' Focus on Employees Who Communicated with "Speakers" Was Knowingly Faulty Because Defendants Failed to Determine Who Actually Communicated with the "Speakers" and Employees Admittedly Possessed Relevant Evidence, Regardless of Whether They Communicated Within the "Speakers"..........................39

2.    Defendants Intentionally Excluded Entire Categories of Employees Who Possessed Relevant Documents from the Preservation Instructions............................................................................................44

a.    Defendants Did Not Instruct Employees of Certain Divisions to Preserve Evidence ......................................................44

(1)    Defendants Failed to Instruct Employees in General Business – the Company's Largest Sales Organization – to Preserve Evidence..................................44

(2)    Defendants Failed to Instruct Consulting Employees Who Installed Suite 11i to Preserve Evidence...................45

(3)    Defendants Failed to Instruct Employees of the Support Division Who Supported Suite 11i Customers to Preserve Evidence........................................45

(4)    Defendants Failed to Instruct Escalation Managers to Preserve Evidence.........................................................46

b.    Defendants Impermissibly Relied Upon Oracle's Non-Attorney Employees to Determine Who Should Receive Preservation Instructions and to Communicate the Instructions.................................................................................47

C.   The Scope of Defendants' Preservation Instructions Was Knowingly Deficient.............................................................................................................47

  1.   Defendants Failed to Instruct Employees Regarding the Preservation of Evidence Post-Receipt of Preservation Instructions.........47

  2.   Defendants Failed to Instruct Oracle Employees to Preserve Sent Items/Turn off Autodelete Function in Outboxes.......................................51

  3.   Defendants Failed to Ensure that All Evidence in Ellison's Control and Related to Ellison Was Preserved .........................................................52

       a.   Defendants Failed to Ensure that Ellison Observed the Preservation Instructions..............................................................52

       b.   Defendants Failed to Preserve Ellison's Website larryellison.com ...............................................................................54

D.   At a Company Level, Defendants Failed to Preserve Categories of Information Highly Relevant to This Litigation .......................................................54

  1.   Defendants Failed to Preserve the Oracle Sales Online Database that Included Unique and Highly Relevant Material ...................................54

  2.   Defendants Failed to Preserve Crucial Documents Relating to Oracle's Forecasting Process.......................................................................56

  3.   Defendants Failed to Preserve Group E-mail Boxes ...................................63

  4.   Defendants Failed to Preserve Escalated Customer Reports.....................64

VI.   DEFENDANTS INTENTIONALLY DESTROYED THE HIGHLY RELEVANT *SOFTWAR*-RELATED MATERIALS ...............................................................................64

A.   The *SOFTWAR* Materials are Highly Relevant to this Litigation............................65

  1.   Ellison and Symonds Worked Jointly on *SOFTWAR* .................................65

  2.   *SOFTWAR* is Replete With Information Relevant to this Litigation.........66

  3.   The Scant *SOFTWAR*-Related Materials Produced Illustrate the Relevance of the Destroyed Materials .........................................................68

B.   Defendants Had a Duty to Preserve the *SOFTWAR* Materials and Failed to Do So ........................................................................................................................69

C.   Defendants Withheld the *SOFTWAR* Materials from Plaintiffs in Bad Faith ........................................................................................................................71

  1.   Defendants Acted in Bad Faith By Failing to Produce Any *SOFTWAR*-Related Material Until the Close of Fact Discovery...............71

  2.   Defendants Acted in Bad Faith in Responding to Plaintiffs' Motion

to Compel the Production of the *SOFTWAR* Materials .............................72

D.   Defendants Violated the Court's Order to Produce the *SOFTWAR*
     Materials ...................................................................................................75

     1.   Defendants Failed to Affirmatively Seek Out the Materials
          Ordered Produced and Refused to Provide Plaintiffs with
          Information Necessary for Their Own Efforts to Procure the
          Materials ...................................................................................75

          a.   Defendants Falsely Represented to Plaintiffs that Symonds'
               Computer Problems Led to the Destruction of the Majority
               of the *SOFTWAR* Materials Ordered Produced and
               Continued to Withhold Pertinent Facts in Bad Faith.....................76

          b.   Defendants Represented to Plaintiffs that Their Prior
               Representations Were False and Provided a Second
               Account of the Destruction of the *SOFTWAR* Materials
               Ordered Produced .........................................................................78

     2.   Defendants Misrepresented to this Court and Plaintiffs Ellison's
          and Defendants' Involvement in the Destruction of the *SOFTWAR*
          Materials ...................................................................................79

VII.   DEFENDANTS KNOWINGLY MISREPRESENTED THEIR PRESERVATION
       EFFORTS TO THE COURT...........................................................................87

A.   Oracle's Representations to the Court in Its Request to Stay Discovery in
     Parallel State Court Proceedings Were False.........................................87

B.   Oracle's Representations Regarding Its Non-Destruction of Accounting
     Evidence Made in Response to Plaintiffs *Ex Parte* Application for Relief
     Were False ...................................................................................................87

C.   Statements Made by Defendants to Magistrate Judge Spero at Hearing to
     Determine the Files to Be Searched Were Patently False and Intentionally
     Omitted the True Facts of Defendants' Preservation Efforts................88

VIII.   LESSER SANCTIONS....................................................................................89

IX.   CONCLUSION.................................................................................................91

**TABLE OF AUTHORITIES**

**CASES**                                                                          **Page**

*A. Farber & Ptnrs., Inc. v. Garber*,                                                71
    234 F.R.D. 186 (C.D. Cal. 2006)

*AdvantaCare Health Partners, LP v. Access IV*,                                    *passim*
    Case No. 03-04496 JF, 2004 U.S. Dist. LEXIS 16835
    (N.D. Cal. Aug. 17, 2004)

*Ameripride Servs. Inc. v. Valley Indus. Serv., Inc.*,                             9, 90
    No. CIV. S-00-113 LKK/JFM, 2006 U.S. Dist. LEXIS 59398
    (E.D. Cal. Aug. 9, 2006)

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*,                              5, 6, 8
    69 F.3d 337 (9th Cir. 1995)

*Computer Task Group, Inc. v. Brotby*,                                             *passim*
    364 F.3d 1112 (9th Cir. 2004)

*Halaco Eng'g Co. v. Costle*,                                                      8
    843 F.2d 376 (9th Cir. 1988)

*Hamilton v. Signature Flight Support Corp.*,                                      8, 9
    No. C 05-0490 CW (MEJ), 2005 U.S. Dist. LEXIS 40088 (N.D.
    Cal. Dec. 20, 2005)

*In re Napster, Inc. Copyright Litig.*,                                            *passim*
    462 F. Supp. 2d 1060 (N.D. Cal. 2006)

*In re NTL, Inc. Sec. Litig.*,                                                     *passim*
    No. 02 Civ. 3013 (LAK)

*In re Scholastic Corp. Sec. Litig.*,                                             51
    252 F.3d 63 (2d Cir. 2001)

*In re Telxon Corp. Secs. Litig.*,                                                 7, 8,
    Case No. 5:98CV2876, 2004 U.S. Dist. LEXIS 27296                   13, 16
    (N.D. Ohio July 16, 2004)

*In re United States Aggregates, Inc. Sec. Litig.*,                                51
    235 F. Supp. 2d 1063 (N.D. Cal. 2002)

Juniper Networks, Inc. v. Toshiba America, Inc. et al.,
   Case No. 2:05-CV-0479 (July 11, 2007) ... 7

*Kronisch v. United States,*
   150 F.3d 112 (2d Cir. 1998) ... 9

*Leon v. IDX Sys. Corp.,*
   464 F.3d 951 (9th Cir. 2006) ... *passim*

*Rambus, Inc. v. Infineon Techs. AG,*
   222 F.R.D. 280 (E.D. Va. 2004) ... 51

*Residential Funding Corp. v. DeGeorge Fin. Corp.,*
   306 F.3d 99 (2d Cir. 2002) ... 4, 9, 90

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.,*
   982 F.2d 363 (9th Cir. 1992) ... 4, 5

*Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,*
   593 F. Supp. 1443 (C.D. Cal. 1984) ... 69

*Zubulake v. UBS Warburg LLC,*
   220 F.R.D. 212 (S.D.N.Y. 2003) ... 37, 38

**STATUTES, RULES AND REGULATIONS**     **Page**

15 U.S.C.
   §78m(b)(2)(A) ... 21
   §78u-4(b)(3)(C)(i) ... 38

18 U.S.C.
   § 1512(c) ... 85

Private Securities Litigation Reform Act of 1995 ... *passim*

Federal Rules of Civil Procedure
   Rule 26 ... 25
   Rule 26(b)(1) ... 65
   Rule 34 ... 33, 71
   Rule 30(b)(6) ... 29
   Rule 37 ... *passim*

1   TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD

2       PLEASE TAKE NOTICE that on September 24, 2007 or as soon thereafter as the matter may

3   be heard in the Courtroom of the Honorable Martin J. Jenkins, plaintiffs shall and hereby do move

4   this Court, pursuant to the Court's inherent power and Federal Rule of Civil Procedure 37 for an

5   order of default judgment for failure to preserve and maintain the integrity of evidence and violation

6   of discovery orders. In light of the mounting evidence of spoliation, plaintiffs respectively request

7   that this matter be set for hearing.

8       This motion is based on this Notice and Supplemental Submission; the Declaration of

9   Monique C. Winkler in Support of Plaintiffs' Notice of Motion and Supplemental Submission

10  Regarding Defendants' Destruction of Evidence and Request for Sanctions and Objections to Special

11  Master's July 17, 2006 Order Denying Plaintiffs' Motion to Compel the Restoration of Backup

12  Tapes and for Miscellaneous Relief for the Destruction of Evidence ("Winkler Declaration") filed

13  herewith; Plaintiffs' Corrected Notice of Motion and Motion to Compel the Restoration of Back-up

14  Tapes and For Miscellaneous Relief for the Destruction of Evidence ("Motion to Compel") and all

15  supporting documents; Plaintiffs' Reply in Support of Corrected Notice of Motion and Motion to

16  Compel Restoration of Backup Tapes and for Miscellaneous Relief for the Destruction of Evidence

17  ("Reply") and all supporting documents; Plaintiffs' Notice of Objection and Objection to the Special

18  Master's Order Denying Plaintiffs' Motion to Compel the Restoration of Backup Tapes and for

19  Miscellaneous Relief for the Destruction of Evidence ("Objection") and all supporting documents;

20  all pleadings and papers filed in this action; the arguments of counsel and any other matter that the

21  Court may consider at a hearing on this motion.

22  **I.      INTRODUCTION**

23      Plaintiffs have discovered many additional facts in addition to those already before the Court

24  that further reveal defendants' wanton destruction or withholding of highly relevant evidence. These

25  facts demonstrate, beyond any doubt, that from the date Oracle Corporation ("Oracle" or the

26  "Company") announced its failure to meet its fiscal third quarter 2001 ("3Q01") forecast, defendants

27  have deliberately engaged in a scheme to destroy and withhold evidence relevant to this litigation,

28  including crucial evidence related to plaintiffs' accounting allegations and virtually all evidence

1    related to defendant Lawrence J. Ellison ("Ellison"). The spoliation detailed in plaintiffs' Motion to
2    Compel. while egregious, was merely the tip of the iceberg. Indeed, defendants' conduct has been
3    multifarious in nature, beginning with their failure to issue a preservation instruction to Oracle
4    employees at the time that they reasonably anticipated litigation, and including their deliberate
5    destruction of relevant evidence, and knowing misrepresentations to the Court and plaintiffs
6    regarding compliance with preservation requirements.

7         In addition, defendants withheld hundreds of thousands of pages of accounting evidence until
8    well after the close of discovery by misrepresenting to the Court and plaintiffs the relevance of the
9    evidence and violating multiple Court orders. Moreover, much of the evidence ultimately produced
10   is unreliable because defendants intentionally altered the evidence after plaintiffs filed their
11   accounting allegations and produced evidence in a manner designed to prohibit or obscure plaintiffs'
12   ability to review and analyze the evidence.

13        And if defendants' failure to properly preserve Ellison's documents was not enough,
14   defendants have now admitted to the *outright intentional destruction* of hundreds of hours of tapes
15   and transcripts of interviews with Ellison created in preparation for the book *SOFTWAR: An Intimate*
16   *Portrait of Larry Ellison and Oracle* ("*SOFTWAR*") by Matthew Symonds ("Symonds"). These
17   contemporaneous materials were directly relevant to plaintiffs' allegations of technical problems
18   with Suite 11i and the resulting customer concessions and settlements, Ellison's January 2001 $900
19   million insider sales, Oracle's forecasting process and the effect of the declining economy on
20   Oracle's business, and Oracle's billion dollar savings claims. Indeed, defendants' actions have
21   resulted in the wholesale destruction of evidence that would demonstrate Ellison's knowledge and
22   mental state at all relevant times.

23        And if defendants' evidence destruction, alterations and comprehensive failure to preserve
24   Ellison's material were insufficient, defendants' actions with respect to the accounting materials,
25   Ellison-related evidence including the *SOFTWAR* background materials, and the overall failure to
26   preserve, each taken alone, warrant the most severe sanctions. Collectively, defendants' actions here
27
28

1 | warrant nothing less than terminating sanctions.[1]

2 | **II. RELEVANT PROCEDURAL HISTORY**

3 | On March 15, 2006, the parties submitted joint letter briefs to this Court in order to resolve

4 | outstanding discovery disputes including Oracle's failure to preserve evidence in accordance with

5 | the Private Securities Litigation Reform Act of 1995 ("PSLRA").

6 | On April 6, 2006, the Honorable Magistrate Judge Joseph C. Spero referred all discovery

7 | matters to Special Master Honorable Edward A. Infante (Ret.). The April 6, 2006 Order directed the

8 | parties to submit all reports, findings, and objections and motions in response to the Special Master's

9 | ruling, to Magistrate Judge Spero.

10 | On May 16, 2006, plaintiffs filed their Motion to Compel. Ex. 1.[2]

11 | On June 9, 2006, Oracle and the individual defendants filed their Corrected Opposition to

12 | Plaintiffs' Motion to Compel the Restoration of Back-up Tapes and For Miscellaneous Relief for the

13 | Destruction of Evidence ("Opposition to Motion to Compel").

14 | On June 16, 2006, plaintiffs filed their Reply. Ex. 3.

15 | On July 10, 2006, Special Master Infante heard arguments on plaintiffs' Motion to Compel.

16 | On July 17, 2006, Special Master Infante issued an order denying plaintiffs' Motion to

17 | Compel without prejudice, finding that plaintiffs had not presented sufficient facts to support the

18 | relief that they were seeking. Ex. 4 at 1.

19 | On August 7, 2006, plaintiffs timely filed their Objection. Ex. 5.[3] Defendants have not

20 | responded to plaintiffs' Objection. Plaintiffs' Objection remains pending before this Court.[4]

21 |

22 | [1] In the event this Court does not decide that terminating sanctions are appropriate here,
23 | plaintiffs request that the Court impose the most appropriate lesser sanctions, which plaintiffs submit are adverse inference instructions. *See* §VIII, *infra*.

24 | [2] All "Ex. __" references are to the Winkler Declaration.

25 | [3] Plaintiffs will provide copies of the exhibits to plaintiffs' Motion to Compel, Reply and
26 | Objection should the Court require copies of such exhibits.

27 | [4] The parties included plaintiffs' Objection in the sections titled "Current Motions Pending
Before the Honorable Judge Martin J. Jenkins" in their Joint Status Statements filed on November 2,
28 | 2006 and January 5, 2007. *See* Ex. 6 and Ex. 7.

## III.   LEGAL STANDARD

This Court possesses the inherent power to sanction defendants for their destruction of evidence. *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992). This Court's authority to sanction defendants includes the power to levy terminating sanctions in response to abusive litigation practices. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (imposing dismissal sanction upon a party who destroyed electronic documents). Where a party breaches its duty to preserve evidence as defendants did here, the opposing party may move the court for sanctions. *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1066 (N.D. Cal. 2006). Federal Rule of Civil Procedure 37 ("Rule 37") also provides for sanctions against a party failing to obey an order to provide or permit discovery. *Leon*, 464 F.3d at 958; *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106 (2d Cir. 2002). Rule 37 also permits this Court to enter a default judgment. *Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir. 2004).

> When choosing among possible sanctions, the Court should consider a sanction designed to: (1) penalize those whose conduct may be deemed to warrant such a sanction; (2) deter parties from engaging in the sanctioned conduct; (3) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (4) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

*AdvantaCare Health Partners, LP v. Access IV*, Case No. 03-04496 JF, 2004 U.S. Dist. LEXIS 16835 at *12-*13 (N.D. Cal. Aug. 17, 2004).

While a variety of sanctions are available to the Court, including the issuance of adverse inference instructions at trial and the exclusion of evidence, default judgment is appropriate here based upon defendants' intentional destruction of evidence, calculated withholding of relevant evidence until well after the close of discovery and ongoing efforts to obscure their misconduct including repeated misrepresentations to the Court and plaintiffs. Defendants' knowing and intentional destruction of relevant evidence, deliberate delay and their failure to comply with the PSLRA document preservation provisions and orders of the Court, including the March 10, 2005 Amended Order Setting a Discovery Plan ("March 10, 2005 Discovery Plan" or "Discovery Plan"), justify the entry of default judgment. *Napster*, 462 F. Supp. 2d at 1066; *Brotby*, 364 F.3d at 1115.

1
2
3

> Dismissal is an available sanction when a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings because courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.

4 *Leon*, 464 F.3d at 958; [5] *see also Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337,

5 348 (9th Cir. 1995) ("[C]ourts have inherent power to dismiss an action when a party has willfully

6 deceived the court . . . ."); *AdvantaCare*, 2004 U.S. Dist. LEXIS 16835, at \*11 ("[A] Court may

7 enter a default judgment against the party responsible for destroying evidence.").

8     In order to impose the sanction of default judgment upon defendants here, the Court must

9 make "a finding of willfulness, fault, or bad faith." *Leon*, 464 F.3d at 958; *see also Brotby*, 364 F.3d

10 at 1115 (in order to impose default sanctions under Rule 37, the "party's noncompliance must be due

11 to willfulness, fault, or bad faith"). Bad faith is thus not required. *Napster*, 462 F. Supp. 2d at 1066.

12 Instead, this Court has the power to impose sanctions for the destruction of evidence against a

13 litigant who knew or should have known that the evidence was relevant to litigation or potential

14 litigation. *Unigard*, 982 F.2d at 368. Willfulness is shown if defendants had "some notice that the

15 documents were *potentially* relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at

16 959 (emphasis in original). In any event, this Court can impose sanctions against defendants for

17 their document destruction based upon simple negligence or fault. *Id.*

18     The following factors should be taken into consideration in imposing terminating sanctions

19 where imposed under the Court's inherent power or Rule 37: "(1) the public's interest in expeditious

20 resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the

21 party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5)

22 the availability of less drastic sanctions." [6] *Id.* at 958 (quoting *Anheuser-Busch*, 69 F.3d at 348); *see*

23 *also Brotby*, 364 F.3d at 1115. Where a party has violated a court order, the first two factors favor

24 terminating sanctions. *Leon*, 464 F.3d at 958; *see also Brotby*, 364 F.3d at 1115. Further, where

25

26   [5]     All emphasis is added and citations are omitted unless otherwise noted.

27   [6]     The Court is not required to make explicit findings as to each of the factors. *Id.* at 958.

28

1    there is "ample evidence of [] time and resources [having been] spent in investigating and resolving

2    the spoliation issues," the first two factors support terminating sanctions. *Leon*, 464 F.3d at 958 n.5.

3          With respect to factor number three – the risk of prejudice – the Court should consider

4    "whether the [spoiling party's] actions impaired the [non-spoiling party's] ability to go to trial or

5    threatened to interfere with the rightful decision of the case." *Id.* at 959 (alteration in original).

6    Prejudice sufficient to support sanctions has been found where a party's withholding of evidence

7    forced the opposing party to "rely on incomplete and spotty evidence" at trial (*Anheuser-Busch*, 69

8    F.3d at 354) and where a party produced responsive documents after the opposing party had taken

9    key depositions. *Brotby*, 364 F.3d at 1116-17.

10         In *Leon*, the Ninth Circuit Court of Appeals affirmed the district court's finding of prejudice

11   and dismissal of plaintiff Leon's claims of violations of the False Claims Act, Title VII, the

12   Americans with Disabilities Act and state law, and imposition of monetary sanctions against Leon

13   based upon Leon's spoliation of evidence. 464 F.3d at 955. Leon had deleted 2,200 files from his

14   laptop computer issued by his employer, defendant IDX Systems Corporation ("IDX"). *Id.* The

15   court found that the failure to preserve and indeed destruction of the files "threatened to distort the

16   resolution of the case, because any number of the 2,200 files could have been relevant to IDX's

17   claims or defenses, although it is impossible to identify which files and how they might have been

18   used." *Id.* at 960.

19         The Ninth Circuit also affirmed the imposition of terminating sanctions in *Brotby*, 364 F.3d

20   at 1117. There, the plaintiff sought damages for defendants' alleged breach of a non-disclosure/non-

21   solicitation agreement and a variety of business torts. *Id.* at 1114. Defendant Brotby refused to

22   respond to interrogatories and refused to produce key documents. *Id.* After winning several motions

23   to compel and Brotby's intransigent failure to comply with the magistrate judge's orders to respond

24   to discovery, plaintiff moved for terminating sanctions under Rule 37; the magistrate judge

25   recommended that the motion be granted. *Id.* at 1114-15. The district court affirmed, adopting the

26   magistrate judge's recommendation to dismiss Brotby's counterclaims, strike his answer and enter

27

28

1  default against him on plaintiff's claims, finding that defendant's failure to produce documents as

2  ordered by the Court was sufficient prejudice.[7] *Id.* at 1115-16.

3      Indeed, prejudice can take myriad forms as in *In re Telxon Corp. Secs. Litig.*, Case No.

4  5:98CV2876, 2004 U.S. Dist. LEXIS 27296 (N.D. Ohio July 16, 2004), where the court found that

5  the parties seeking sanctions had been prejudiced from third-party defendant auditor

6  PricewaterhouseCoopers LLP's ("PwC") failure to cooperate in discovery in at least three ways:

7      (1) PwC's failure to produce certain documents during discovery *adversely affected
    Telxon's and plaintiffs' decisions as to whom to depose and which questions to ask*

8      *deponents*; (2) PwC's failure to produce all versions of relevant documents *deprived
    Telxon and plaintiffs of the opportunity to examine how PwC's audit evolved and*

9      *the timing, nature, extent, and purpose of changes in the audit*; and (3) PwC's
    failure to produce documents timely and in the order in which they were kept in the

10      regular course of business *slowed Telxon's and plaintiffs' discovery of relevant
    information and increased the cost of discovery*.

11  *Id.* at *114-*115. In *Telxon*, the court entered default judgment pursuant to Rule 37, specifically

12  rejecting lesser sanctions:[8]

13

14      Lesser sanctions would result in "unwinding" over three years of litigation. This
    would require the re-taking of many depositions and the taking of new depositions,

15      the conduct of additional expert analyses and the production of new reports, and the
    propounding of new interrogatories.

16  *Id.* at *119. Among the considerations that the court found militating against imposing lesser

17  sanctions were the fact that "beginning discovery again would mean additional lengthy delay before

18  the case reaches a resolution" unfairly prejudicing Telxon and plaintiffs who already suffered undue

19

20  _____

21  [7]    In a recent decision in *Juniper Networks, Inc. v. Toshiba America, Inc. et al.*, Case No. 2:05-
CV-0479 (July 11, 2007), United States District Judge T. John Ward of the Eastern District of Texas

22  also imposed severe sanctions for violation of a court order. Ex. 8. In the patent infringement
action, the court found that defendants were in possession of source code ordered produced, but

23  nonetheless misrepresented the existence and availability of the code to the court and failed to
produce the code. *Id.* at 5-6. The court found that defendants had willfully and intentionally

24  violated the court's amended discovery order. *Id.* at 1. Among other trial related sanctions and
monetary sanctions, the court prohibited the defendants "from proffering *any* expert testimony or

25  opinion from *any* source during trial regarding non-infringement . . . ." *Id.* at 7-8 (emphasis in
original). The court did not make a finding of prejudice.

26  [8]    The *Telxon* court gave little weight to the fact that it had not previously warned PwC or its
counsel that failure to cooperate could lead to dismissal in light of the "number of discovery disputes

27  and the magistrate judge's ongoing and active involvement in the disputes." *Id.* at *116.

28

1   delay because of PwC's bad-faith conduct; that PwC's late numerous delayed productions
2   "undercut[] any belief that PwC [had or ever would] produce all relevant material in its possession;"
3   and that "there [was] strong evidence that documents [had] been destroyed, placing plaintiffs and
4   Telxon in a situation which [could not] be remedied." *Id.* at *119-*120. The court concluded that
5   "[b]ecause PwC's conduct has made it impossible to try this case with any confidence in the justice
6   of the outcome, PwC should bear the burden created by its conduct." *Id.* at *120.

7       Other Ninth Circuit decisions and decisions from this district have held that prejudice to the
8   wronged party is an optional consideration when determining the appropriateness of default
9   sanctions. *See, e.g., Anheuser-Busch*, 69 F.3d at 353; *Halaco Eng'g Co. v. Costle*, 843 F.2d 376,
10  382 (9th Cir. 1988); *Napster*, 462 F. Supp. 2d at 1066. In any event, as discussed *infra*, plaintiffs
11  proffer an abundance of evidence of prejudice suffered here by plaintiffs as a result of defendants'
12  misconduct. [9]

13      Defendants' reliance on *Hamilton v. Signature Flight Support Corp.*, No. C 05-0490 CW
14  (MEJ), 2005 U.S. Dist. LEXIS 40088 (N.D. Cal. Dec. 20, 2005), in their Opposition to Motion to
15  Compel as requiring plaintiffs to show through extrinsic evidence that the destroyed evidence would
16  have supported plaintiffs' claims in order to establish prejudice is misplaced. Ex. 2 at 28; *see also*
17  Ex. 9 at 22:7-24. Decisions of the Ninth Circuit Court of Appeals and other courts have clearly not
18  required such a showing prior to imposing spoliation sanctions. *See, e.g., Leon*, 464 F.3d at 959
19  (finding that the relevance of destroyed documents cannot be clearly ascertained because the
20  documents no longer exist); *Napster*, 462 F. Supp. 2d at 1066 ("District courts may impose sanctions
21  against a party that merely had notice that the destroyed evidence was potentially relevant to
22  litigation."). Indeed, to require "concrete" evidence as espoused by *Hamilton* (2005 U.S. Dist.
23  LEXIS 40088 at *25) would be contrary to the premise that "holding the prejudiced party to too
24  strict a standard of proof regarding the likely contents of the destroyed evidence would . . . allow

25

26  9   The *only* basis Special Master Infante found for denying without prejudice plaintiffs' request
27      for sanctions in the Motion to Compel was that plaintiffs failed to make the required showing of
        prejudice. Ex. 9 at 39:20-25.

28

1 parties who have intentionally destroyed evidence to profit from that destruction." *Kronisch v.*
2 *United States*, 150 F.3d 112, 128 (2d Cir. 1998); *see also Residential*, 306 F.3d at 109. In fact, the
3 *Hamilton* decision is internally inconsistent as it cites this very principle. *Hamilton*, 2005 U.S. Dist.
4 LEXIS 40088 at *19.[10]

5     Instead, documents actually preserved and produced by defendants and/or third parties are
6 probative of the relevance of lost documents. *Napster*, 462 F. Supp. 2d at 1076-77. Where a party
7 destroys evidence with knowledge of impending litigation, such behavior suggests "that the evidence
8 would have been threatening to the defense of the case and that it is therefore relevant in an
9 evidentiary sense." *AdvantaCare*, 2004 U.S. Dist. LEXIS 16835, at *22; *Ameripride Servs. Inc. v.*
10 *Valley Indus. Serv., Inc.*, No. CIV. S-00-113 LKK/JFM, 2006 U.S. Dist. LEXIS 59398, at *32 (E.D.
11 Cal. Aug. 9, 2006) ("A party who is on notice that evidence is relevant and then destroys that
12 evidence is 'more likely to have been threatened by that evidence.'").

13     Moreover, where, as here, bad faith destruction is evident, "that bad faith alone is sufficient
14 circumstantial evidence from which a reasonable fact finder could conclude that the missing
15 evidence was unfavorable to that party." *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK)(AJP),
16 2007 U.S. Dist. LEXIS 6198, at *76 (S.D.N.Y. Jan. 30, 2007) (quoting *Residential*, 306 F.3d at 109).
17 The same holds true for evidence destroyed in a grossly negligent manner or the grossly negligent
18 untimely production of evidence. *NTL*, 2007 U.S. Dist. LEXIS 6198, at *76-*77; *Residential*, 306
19 F.3d at 109.

20
21
22

---

23 [10]   *Hamilton* is also factually inapposite. First, as set forth in plaintiffs' Objection, here, the PSLRA codified defendants' preservation responsibilities, but in *Hamilton*, there was no such
24 statute. Ex. 5 at 16. Moreover, in *Hamilton*, the spoliation claim was based only on the alleged destruction of a portion of a surveillance video that recorded an incident between two individuals
25 and, as noted by the court, the plaintiffs had the statements of two witnesses who claimed to have seen the entire incident and the statements "confirm[ed] that the existing video [was] accurate."
26 *Hamilton*, 2005 U.S. Dist. LEXIS 40088, at *24-*25. This evidence was a factor in the court's finding that the "[p]laintiffs [had] failed to establish through 'concrete' evidence that the missing
27 video would have favored their case and that [defendant] destroyed the [video] because the evidence would have been harmful to it." *Id.* at *25.

28

**IV.  DEFENDANTS ALTERED AND WITHHELD KEY EVIDENCE
RELATING TO A "CLEAN UP" OF ACCOUNTING FILES RELEVANT
TO PLAINTIFFS' CLAIMS**

On October 11, 2002, plaintiffs filed their Second Amended Complaint ("SAC"), which included detailed allegations of accounting fraud committed by Oracle in connection with its second fiscal quarter 2001 ("2Q01"). Generally, the SAC alleged that defendants engaged in accounting manipulations to materially inflate Oracle's financial results for 2Q01. More specifically, plaintiffs allege that Oracle misused a large fund of money from customer duplicate payments and overpayments – money that did not belong to Oracle – to generate false revenues and earnings in 2Q01. To carry out this scheme and cover up the accounting manipulations, Oracle engaged in an "On Account Clean Up" in November 2000 (the "November 2000 Clean Up") and created over 46,000 fictitious "debit memo" invoices in order to hide the customer money that had been improperly converted to revenue and earnings in 2Q01.

After plaintiffs filed the SAC on October 11, 2002, plaintiffs learned from a confidential source ("CW49") that Oracle in response immediately initiated a second "Clean Up" beginning in late October 2002 to cover up and "resolve" its misuse of unapplied cash and debit memos (the "2002 Clean Up"). According to CW49, who reported the events surrounding the 2002 Clean Up while they were happening, Oracle personnel altered evidence by changing historical information in the audit trail of the debit memos and "adjusting up" old invoices to make it look like the November 2000 debit memo receipts (customer overpayments) had been applied to legitimate invoices.[11] Defendants do not and cannot now deny these facts.

On November 11, 2002, plaintiffs filed an *Ex Parte* Application seeking to enjoin defendants from altering or destroying evidence, to order defendants to preserve all documents relating to the accounting allegations and to grant plaintiffs particularized discovery ("*Ex Parte* Application"). *See* Ex. 10. That motion was denied, in part because defendants submitted sworn declarations falsely claiming that the ongoing 2002 Clean Up had "nothing to do" with the November 2000 Clean Up or

---

[11]   Information provided by CW49 was ultimately incorporated in the [Proposed] Revised Second Amended Complaint ("RSAC") which was filed on December 9, 2002.

1  the 46,000 debit memos.  Ex. 11.  In fact, defendants stated in their opposition: "***Oracle is not***
2  ***deleting, destroying, or altering any documents or evidence relating to the allegations in this case***
3  – ***period.***"  Ex. 12.  Once the Court ordered discovery into the 2002 Clean Up, the documents
4  ordered produced demonstrate unequivocally that Oracle's representations to the Court regarding the
5  relationship between the 2002 Clean Up and the November 2000 debit memos were false.
6  Moreover, in his December 19, 2006 Order Granting Plaintiffs' Motion to Enforce the Special
7  Master's July 17, 2006 Order and to Compel Additional Accounting Documents Based on Recent
8  Testimony and New Evidence, Special Master Infante specifically found that defendants "***later***
9  ***shifted that position***" referring to the sworn declarations submitted by defendants in opposition to
10  plaintiffs' *Ex Parte* Application. Ex. 13 at 19:19-23. The discovery also corroborates the reports of
11  CW49 and plaintiffs' *ex parte* allegations regarding Oracle's alteration and destruction of
12  documents.

13      A.     **Defendants Made False Representations to the Court Concerning the**
              **2002 Clean Up to Shield Highly Relevant Documents from Discovery**
14

15          Since the accounting allegations were made, and the beginning of discovery in this case,
16  defendants have deliberately misled the Court about the circumstances surrounding the post-Class
17  Period 2002 Clean Up. Evidence has revealed that immediately after plaintiffs filed the debit memo
18  allegations on October 11, 2002, Oracle engaged in a deliberate and systematic plan to cover up and
19  alter the evidence relating to plaintiffs' accounting allegations by (1) altering key accounting
20  documents and data, (2) reversing thousands of accounting transactions, and (3) refunding and
21  escheating to the government millions in customer overpayments and unapplied cash that Oracle had
22  been illegally withholding from its customers for years – more than 10 years in some cases.

23          For most of the litigation, defendants successfully resisted discovery concerning the 2002
24  Clean Up by repeatedly and falsely representing to the Court that there was "***no connection***
25  ***whatsoever***" between the 2002 Clean Up and plaintiffs' debit memo allegations. Ex. 14 at 52:13-16.
26  Defendants falsely claimed that the 2002 Clean Up was "***not related***" to the November 2000 debit
27  memos and had "***nothing to do***" with the approximately 46,000 debit memo transactions that occurred
28  on November 17, 2000." Ex. 11 at 2. The following is a partial chronological list of the

1  representations made by defendants to resist discovery regarding the 2002 Clean Up:

2      **November 14, 2002 Sworn Declaration of Greg Myers in Opposition to Plaintiffs' *Ex***

3  ***Parte* Application:**

4      "Our ongoing investigation into the origin and disposition of cash receipts contained
        in Oracle's Accounts Receivable (A/R) reserve account (known as Account 12601)

5      has ***nothing to do with the approximately 46,000 debit memo transactions that***
        ***occurred on November 17, 2000 . . . .***"

6  Ex. 11 at 2.

7

8      **Defendants' Counsel Javier Rubenstein at the March 1, 2005 Discovery Hearing:**

9      Now, it turns out that the investigation regarding the bad debt reserve account
        ***happened to be going on*** when the plaintiffs amended their complaint with respect to
        the 25005, but there is ***no connection whatsoever between those two events***.

10  Ex. 14 at 52:13-16.

11

12      **June 6, 2006 Sworn Declaration of Greg Myers in Opposition to Plaintiffs' Motion to**

13  **Compel:**

14      "The October 2002 project was ***not related*** to the November 17, 2000 'on account'
        clean up."

15  Ex. 15 at 7, ¶28.

16      **Defendants' Counsel Jamie Wine at the July 10, 2006 Hearing:**

17      The creation of the debit memos had no financial impact whatsoever and that ***it was a***
        ***discrete separate event from the unapplied cash cleanup that happened in October***

18      ***of 2002.***

19      So they don't have anything new here today. And ***there is no link***, there's no reason
        for them to, you know – for us to modify the prior orders that have been entered in

20      this case and to now allow them broader discovery into issues ***beyond the debit***
      ***memos.***

21               *     *     *

22

23      "***There simply is no connection there.***"

24  Ex. 9 at 79:11-19, 80:9.

25      Based upon defendants' unequivocal representations, the Court initially denied plaintiffs

26  discovery into the circumstances surrounding the 2002 Clean Up, but did order defendants to

27  produce "every piece of paper that has to do with these debit memos up and down. . . ." Ex. 14 at

28  54:1-9.  Plaintiffs were forced to take nearly two years of discovery and over 100 depositions

1  without the benefit of the documents and data relating to the 2002 Clean Up.  On December 19,
2  2006, Special Master Infante issued an Order Granting Plaintiffs' Motion to Enforce the Special
3  Master's July 17, 2006 Order and to Compel Additional Accounting Documents Based on Recent
4  Testimony and New Evidence (the "December 19, 2006 Order"), stating that contrary to defendants'
5  prior representations, the evidence provided by plaintiffs "**_raised substantial questions about the_**
6  **_relationship between the November 2000 debit memos and the 2002 Clean Up_**:"  Accordingly,
7  Special Master Infante ordered defendants to produce all documents related to the 2002 Clean Up
8  and Oracle's transfers of unapplied cash to its bad debt reserve in 2Q01.  Ex. 13.

9      The amount of new documents produced by defendants in connection with the 2002 Clean
10 Up was staggering – over 800,000 pages (265 boxes) of new spreadsheets, memos and e-mails
11 (discussed below) expressly referring to the November 2000 events and the impact of the "debit
12 memos" themselves.  Defendants intentionally withheld these crucial documents under the guise of
13 being part of the purportedly "unrelated" 2002 Clean Up for nearly two years – until after the
14 discovery period was closed.  The documents expressly contradict defendants' representations to the
15 Court that there was no relationship between the debit memos and the 2002 Clean Up.

16     In fact, the documents demonstrate that the 2002 Clean Up was an essential part of Oracle's
17 scheme involving Oracle's debit memo transactions and its perennial misuse of customer
18 overpayments and unapplied cash to boost its financial results.  The documents withheld until 2007
19 reveal not only the truth underlying plaintiffs' allegations (that Oracle used customer overpayments
20 and 46,000 debit memos to inflate its 2Q01 revenue and earnings), but that this fraudulent activity
21 had continued until October 2002, when plaintiffs filed the SAC.  Plaintiffs have been severely
22 prejudiced by not having these documents during the entire discovery period to question witnesses
23 and otherwise develop their case in discovery.  *See, e.g., Brotby*, 364 F.3d at 1116-1117; *Telxon*, 2004
24 U.S. Dist. LEXIS 272296 at *119-*120.

25          **I.   Documents Produced Months After the Discovery Cutoff**
                  **Reveal Defendants' Attempt to Hide Crucial Documents Under**
26          **the Guise of the 2002 Clean Up**

27     The documents produced pursuant to the December 19, 2006 Order show a direct connection
28 between the 2002 Clean Up and the November 2000 debit memos.  Many of the 2002 Clean Up

1  documents expressly refer to "11/17 debit memos" and specifically discuss plaintiffs' lawsuit and the

2  events on "November 17, 2000."   The following are a few examples of the documents that

3  defendants improperly withheld for the entire discovery period claiming (falsely) that the documents

4  had "nothing to do" with the debit memos and plaintiffs' allegations:[12]

| Exhibit | Date; To; From | Subject | References to Debit Memos | Date Produced |
|---------|----------------|---------|---------------------------|---------------|
| Ex. 16 | Oct. 22, 2002<br><br>To: Megan Birkler<br>From: Greg Myers | *"Debit Memo Listing"* | *"Attached is the listing of the 47k debit memo's created on November 17, 2000* (Transactions Register). I have also a breakdown of the GL side in the 25005 account (25005)." | January 30, 2007 |
| Ex. 17 | Oct. 15, 2002<br><br>To: Thomas Williams<br>From: Greg Myers | *"DM List"* | "Tom-*List of 11/17 debit memo's.*" | January 30, 2007 |
| Ex. 18 | Date: Oct. 23, 2002<br>To: Thomas Williams<br>From:Greg Myers<br>Cc: Michael Quinn; Lauren Segal | *"DM for Specific Customers"* | "Tom-Attached is the modified list of *debit memos for the customers mentioned in the document.*" | January 30, 2007 |
| Ex. 19 | Dec. 20, 2004<br>To: Molly Littlefield<br>From: Colleen Calandra | *"Unapplied cash word doc attached"* | "Matching remaining debit balances to the *Debit Memo Report for 11/17/00 and the Debit Memo Report for post 11/17/00 activity . . . .Also in some cases on* miscellaneous receipt can relate to a combination of debit memos and vice versa." | February 5, 2007 |

---

[12]   Greg Myers ("Myers"), a declarant on motions submitted to the Court by defendants, and Lauren Segal ("Segal"), Oracle's assistant general counsel at relevant times, knew that the debit memos were connected to the 2002 Clean Up and are specifically named on the documents evidencing the connection.

| Ex. 20 | Oct. 22, 2002 From: Greg Myers To: Michael Quinn | "*Misc. Documents*" | "*DM's reviewed*-Terry and I reviewed all items > $1MM and any item > 10K for customers mentioned in the document. This is the detail. Transactions Register – *A list of all Debit Memo's for November 17.*" | January 30, 2007 |
|---|---|---|---|---|

A chart of additional documents relating directly to debit memos and the November 2000 events is attached hereto as Ex. 21. The documents confirm that the 2002 Clean Up was directly related to the November 2000 debit memos. Importantly, some of the documents belatedly produced in 2007 relating to the 2002 Clean Up directly contradict testimony of top Oracle accounting officers. Because of defendants' failure to timely produce all relevant documents, however, plaintiffs did not have the opportunity to confront these witnesses with the documents.

For example, some of the documents produced belatedly in February 2007 demonstrate that Oracle's former controller and current CFO Jennifer Minton ("Minton") was directly involved in the 2002 Clean Up. *See, e.g.*, Ex. 22 at NDCA-ORCL 1727980 ("I have also tried to summarize the open questions Jennifer had from our meeting earlier this week. . . . Jennifer has initiated a project to cover our work in this area. . . . Jennifer would like to meet next week on our progress"); Ex. 23 at NDCA-ORCL 1895745 ("We actually have the unapplied cash. We never booked the order but the customer paid. We want to book it or try to get [Minton] to agree that we should keep the money."); Ex. 24 at 1733105 (Tom Williams e-mail to Minton: "during our discussion at last friday's audit committee meeting, i told you that i would supply an update on our review of the unapplied cash items that had been moved to the reserve account by today."); *Id.* at NDCA-ORCL 1733103 (November 17, 2002 Annica Magnusson e-mail to Minton with subject "Status UPdate on AR Project and Proposed con callon Wed Nov 20"); Ex. 25 at NDCA-ORCL 1886329 (Minton June 3, 2004 e-mail: "I am absolutely thrilled with the success that the cash apps team has had in driving down the unapplied cash balance."); Ex. 26 at NDCA-ORCL 1892686-87 (e-mail from Minton "approv[ing]" Department of Treasury refund request where overpayment was "misapplied to various other government invoices that [Oracle] had no authorization to apply the payment to."); Ex.

1 | 27 at NDCA-ORCL 1885840-41 (Minton approval regarding scope of 2002 Clean Up). These

2 | documents which corroborate the information provided by defendant Jeffrey O. Henley ("Henley")

3 | to the Company's Special Litigation Committee ("SLC") on November 18, 2002 that "he directed

4 | Jennifer Minton and Tom Williams to investigate [the allegations in the SAC]" (Ex. 28 at NDCA-

5 | ORCL 313790), were essential for Minton's deposition, because she testified unequivocally that she

6 | was *not* involved in the 2002 Clean Up or its corresponding investigations. Ex. 29 at 162:23-163:4

7 | ("*I was not involved in the investigation. . . . I do not know of any details of the investigation.*").

8 | In fact, Minton testified that she was specifically told by counsel to intentionally keep herself in the

9 | dark: "*I was told – I think it was appropriate for legal to keep me uninvolved in the investigation.*"

10 | *Id.* at 174:25-175:19.

11 | In a later deposition, Minton attempted to change her story, testifying that she was in fact told

12 | about the "results" of Oracle's 2002 investigation, but was not involved in the "underlying

13 | investigation itself." Ex. 30 at 279:1-5 ("I just want to clarify what I did know. I knew that there was

14 | an investigation going on. I knew that – *but I was not involved in the actual underlying*

15 | *investigation itself.*"). This testimony is flatly contradicted by numerous e-mails showing that

16 | Minton was personally supervising and directing the investigation. Exs. 22-27. Plaintiffs did not

17 | have these documents to confront Minton at the deposition. Moreover, plaintiffs did not have the

18 | documents in assessing whether to call and question other witnesses who were specifically named in

19 | the Minton e-mails. Simply put, defendants' attempt to withhold critically relevant documents by

20 | misleading the Court about the relationship between the 2002 Clean Up and the November 2000

21 | debit memos severely prejudiced plaintiffs' ability to properly develop their case during discovery.

22 | *See, e.g., Brotby*, 364 F.3d at 1116-17; *Telxon*, 2004 U.S. Dist. LEXIS 272296 at **119-20.

23 |
24 |
25 |

      **2.**    **The Testimony of Key Oracle Accounting Witnesses Confirms that Defendants Knowingly Misled the Court When They Asserted that There Was No Relationship Between the 2002 Clean Up and the November 2000 Debit Memos**

26 |
27 |
28 |

On October 5 and 10, 2006, plaintiffs deposed former Oracle Collections Manager Ian

Hatada ("Hatada"). Hatada was one of six collections managers asked to implement and execute

Oracle senior management's plan associated with the 2002 Clean Up. *See* Ex. 31 at 120:11-17; Ex.

1    32 at 107:22-108:10. In stark contrast to defendants' previous representations to the Court, Hatada

2    testified that the 2002 Clean Up was directly related to plaintiffs' allegations. In fact, the project was

3    initiated "because of the lawsuit" in order to "help" Oracle fix and "clean up" the debit memos and

4    the customer overpayment issues raised in plaintiffs' complaint:

5         From – from what I know from meetings that we had from – with Ryan
          Roberts, *that there was a lawsuit and it was our job to clean up the unapplied plus*
6         *what had been now moved in to the unapplied account from other accounts*
          *because of the lawsuit, so in an effort to – to clean that up, to – to help Oracle with*
7         *this lawsuit.* That was what – my understanding.

8    Ex.33 at 264:12-265:6.

9         Importantly, Hatada testified that defendant Henley was involved in reviewing the results of

10   the 2002 investigation: "I know Jeff Henley was – you know, we were supposed to get this

11   information to Jeff Henley, and the – in the end. I mean, that's where it was supposed to end up."

12   Ex. 33 at 266:10-21.

13        Hatada also testified that during the flurry of meetings held after plaintiffs' accounting

14   allegations were filed on October 11, 2002, Oracle's collections managers were specifically told by

15   senior management that the 2002 Clean Up was initiated to "resolve" debit memo items of unapplied

16   cash as a direct result of plaintiffs' lawsuit:

17        [A.] Well, the first – the first meeting that we had to actually give us a – kind of a
          short overview as to what we were about to get involved with was that the unapplied
18        that we were looking at currently or at that time, there was a lot more in the reserve
          that we were going to have to try to resolve *because of a specific lawsuit that, you*
19        *know, that we had money that we shouldn't have had,* and whether it was in the
          reserve or the unapplied, but the best description would just be that there was money
20        in an account that was, you know, *unapplied money that we had never seen before,*
          *and we were going to all of a sudden see and have to resolve.*
21
          Q. *And were those the items, as far as you know, that resulted from creation of*
22        *debit memos previously?*

23                          *       *       *

24        [A.] *I believe that was one of the reasons that Mike Quinn and Greg Myers had*
          *given us.*
25
     Ex. 32 at 128:8-129:2; 257:24-263.
26
          Hatada further testified that Oracle's collections staff was asked to research and determine
27
     the "revenue impact" of Oracle's misuse of customer overpayments and unapplied cash which is
28
     PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
     SANCTIONS - C-01-0988-MJJ                                                              - 17 -

1   exactly what plaintiffs alleged in the SAC and the RSAC:

2       Q. . . . [W]hat do you recall [] was the explanation of the on account problem?

3       A. Well, I – I mean, like this first item, you know, we were called together to
        explain exactly what it says, that, you know, there's an unapplied account issue,
4       there's – there's a lawsuit that's about to happen, and – and we need to resolve – you
        know, *we're going to have to resolve these unapplied amounts, and, you know,*
5       *there will be a meeting in the near future to explain how we're going to do it.*

6       *And, you know, the bottom line was that they needed to figure out if it was – if we*
        *had recognized revenue on it or we had not, so if it was revenue impacting or not*
7       *revenue impacting.*

8   Ex. 32 at 113:19-114:7.  *See also*, Ex. 33 307:5-9 ("*[R]eally you know, at a bottom line, this is*

9   *really what they wanted to know – from Mike's [Quinn's] point of view, was he wanted to know*

10  *after it's all said and done what's going to be revenue impacting and what's not going to be*

11  *revenue impacting.*").[13]

12      Hatada's testimony is exactly consistent with the evidence submitted to the Court in

13  plaintiffs' *Ex Parte* Application filed in November 2002.  Ex. 10.   Additionally, Hatada

14  authenticated multiple pages of his handwritten notes that were taken contemporaneously with the

15  management meetings discussing the 2002 Clean Up.  Ex. 35.  The handwritten notes confirm that

16  the debit memos and the November 2000 Clean Up were a major part of the discussion and plan for

17  the 2002 project.  Indeed, the notes make multiple references to "debit memos," "on account" and

18  "revenue impact" of the items pertaining to the project.  The notes also refer to a "56m" amount for

19  "2 years" which Hatada testified was the amount of unapplied cash that was transferred to Oracle's

20  reserve during a prior period.  Ex. 33 at 305:13-306:23.  Oracle's own memos confirm that the total

21  amount of customer unapplied cash transferred prior to the 2002 Clean Up was actually larger – 59.6

22  million.  *See* Ex. 36.

23      The testimony of former Oracle Accounts Receivable Manager Terry Elam ("Elam") also

24

25  _____
    [13]     Former Oracle Director of Collections Michael Quinn ("Quinn") testified that Oracle learned
    during 2002 that there was indeed a "revenue impact" of the bad debt transfers.  Ex. 34 at 229:2-8.
26  Hatada testified that the revenue impact was "major."  Ex. 32 at 153:16-154:5.  The documents
    belatedly produced by defendants show that many of the transfers were directly related to debit
27  memos.  However, defendants refused to produce the evidence regarding these issues until after
    discovery closed.

28

1  confirmed that the 2002 Clean Up was directly related to the November 2000 debit memos. Elam

2  testified that in October 2002 he was specifically asked by Myers to research "debit memo" items

3  contained on a "spreadsheet." Ex. 37 at 66:25-67:20. Part of the project was to issue credit memos

4  for debit memo items and "*pull[] out some of the entries into the 12601 account in October-*

5  *November 2002." Id.* at 186:2-11. Elam confessed that the "entries" needing to be reversed were

6  those associated with "*debit memos*:" *Id.*

7      Q. Was there more than one discussion about that, about on-account debit memos
        being credit memoed two years after November 17th, 2000?

8
        A. I don't recall any – how many there were.
9
        Q. Okay. Well, what do you -- just what do you recall about those discussions at
10      all?

11      A. Um, specifically in the – *from Greg Myers about the process related to pulling*
        *out some of the entries into the 12601 account in the October-November of 2002*
12      *time frame*.

13      Q. Okay. So pulling out some of the entries in 12601; is that what you said?

14      A. Yeah. *The associated entries with the debit memos.*

15  *Id.* at 185:23-186:11.

16      Elam also explained that during 2002 there was a specific process for *reversing* debit memo

17  receipts that had been moved into Oracle's bad debt reserve (Account 12601):

18      THE WITNESS: There – it's a – there's a specific process of – *associated with a*
        *debit memo* that you have to follow to, um, pull – there's two – there's a
19      miscellaneous receipt that you need to – to take out or *reverse out of this system,*
        *plus unapply a debit memo to actually process the credit memo on it.*
20
        Q. Right. But why were you – why were you processing credit memos – or why
21      were you reversing entries into 12601 during 2002?

22      THE WITNESS: Well, that's part of the spreadsheet that was given to myself, was
        *there was a number of steps needed to credit memo the debit memo.* And part of
23      that is to reverse out the miscellaneous receipt into 12601.

24  *Id.* at 187:10-188:2.

25      It is clear from Hatada and Elam's first-hand testimony that the 2002 Clean Up was not only

26  related to plaintiffs' debit memo allegations, it was in direct response to plaintiffs' accounting

27  allegations included in the SAC filed on October 11, 2002. Defendants' misleading representations

28  regarding the 2002 Clean Up allowed defendants to shield nearly one half million pages of highly

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                          - 19 -

1   relevant documents from plaintiffs and the Court for the entire two-year discovery period. The

2   documents that have been altered or destroyed are irretrievable. By the time defendants finally

3   produced the documents that remained, nearly 100 depositions had been taken, including many

4   accounting witnesses named on the face of the new documents, such as Myers, Quinn, Tom

5   Williams ("Williams"), Minton, Segal, Daniel Cooperman ("Cooperman"), Ryan Roberts, Sam

6   Yohannes and Elam. Defendants' misrepresentations to the Court and their failure to produce

7   documents regarding the 2002 Clean Up until after discovery closed have severely prejudiced

8   plaintiffs.

9           **3.      Oracle Used the 2002 Clean Up to Alter Highly Relevant
                      Accounting Records**
10

11          Evidence shows that after defendants learned about plaintiffs' lawsuit in October 2002,

12  Oracle personnel altered, overwrote and deleted certain historical electronic "notes" and comments

    that reflected the audit trail and accounting history of customer overpayments relating to debit
13
    memos that had been sitting in Oracle's unapplied cash account for up to 10 years:
14
            Q. Okay. As part of that [2002 Clean Up] research were there ever cases where
15          collectors would find out there were incorrect notes and put the correct notes,
            overwrite the old notes with the new notes?
16
            A. Sure. At times we would see only one note in there on a very old invoice that had
17          an updated date.

18          Q. And did that occur after you learned about the lawsuit in the meeting?

19          A. Correct.

20                          *       *       *

21          Q. So these notes were -- the notes for the items of unapplied cash were changed or
            around October 30th, 2002, around this time period; right?
22
            A. Correct.
23
            Q: And that was after you were told about the lawsuit involving Plaintiffs in this
24          case at the meetings involving the debit memos; right?

25          A: Correct.

26  Ex. 33 at 603:25-604:14; Ex. 32 at 83:24-85:16; 129:4-131:9; 177:4-25; 179:20-180:7; *see als* Ex.

27  33 at 292:12-293:20; 487:9-11 (*"Sometimes it would be fully deleted, and then you'd have just the*

28  *only note – the last note that was there."*); 600:4-601:13 ("The process was to write on top of it or
    PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
    SANCTIONS - C-01-0988-MJJ                                                        - 20 -

1  in front of it to ensure that you had every note that's ever been logged on that item, but at times--

2  sometimes it would get deleted or they would write over it."). In addition to violating the PSLRA,

3  this intentional conduct directly violated the Final Judgment of Permanent Injunction and Other

4  Relief Against Oracle Systems Corporation entered in the United States District Court for the

5  Northern District of California in *Securities and Exchange Commission v. Oracle Systems*

6  *Corporation*, which provided in part that Oracle and its employees:

> 7  are permanently restrained and enjoined from, directly or indirectly, failing or
>    causing the failure to make and keep books, records and accounts which, in
> 8  reasonable detail, accurately and fairly reflect the transactions and dispositions of the
>    assets of Oracle in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C.
> 9  §78m(b)(2)(A)].

10  Ex. 38 at 3

11  Hatada also testified that Oracle collections personnel were never instructed to preserve or

12  save the old or deleted "incorrect" notes relating to the 2002 Clean Up. Ex. 33 at 293:20-294:17.

13  Instead, at one point early in the 2002 Clean Up (after the filing of the SAC), Oracle personnel were

14  told that the new electronic notes that they input into the system for certain items of unapplied cash

15  were "incorrect" and "not good enough" and that they had to go back and rewrite them. Ex. 39,

16  Ex. 33 at 292:18-293:9 ("Q. Were there any notes that were incorrect that were deleted and then

17  other notes put in its place after these meetings? A. Yes, I believe that happened, because the notes

18  weren't correct...in the first place. The first – the first notes that were in there were completely off

19  base or incorrect, so they would go in and put the correct note in of what actually had happened with

20  that unapplied item.").

21  Notably, defendants' counsel claimed in writing in May 2006 that they were not even aware

22  of the *existence* of certain electronic customer notes relating to the debit memos until plaintiffs

23  elicited testimony about the notes during a witness deposition on April 13, 2006, nearly a full year

24  after the May 1, 2005 production deadline under the Discovery Plan. Ex. 40 ("*Defendants became*

25  *aware of these notes only as a result of recent depositions of two former Oracle collections*

26  *personnel.* Defendants immediately took steps to identify *whether this data still existed*, collect

27  relevant data, and supplement their production consistent with their ongoing obligations under

28  Federal Rules of Civil Procedure.").

1        The fact that defendants' counsel claim that they first learned of the existence of crucial

2  electronic evidence during depositions of Oracle employees after nearly a year of discovery (and did

3  not even know if the data "still existed" at that time) demonstrates defendants' failure to preserve

4  key documents and prevent spoliation in this case, as well as defense counsel's lack of veracity.

5  Defendants were made aware of this evidence over three years earlier by the declaration of Ken

6  Keatly filed in support of plaintiffs' *Ex Parte* Application in November 2002 which provides, in

7  relevant part:

8        The current employee further informed CW49 that the Company was in the process
          of defining five approaches it would take on the debit memos issued in November of

9        2000. One of the five methods would be to log onto Oracle's 11i accounts receivable
          "workbench" application and pull up the "receipts/receipts" form and *then to delete*

10      *from the historical receipt notes that describe the last transaction for a particular*
        *entry*.

11

    Ex. 41 at ¶16.[14] Moreover, the notes that were eventually produced nearly a year after the May 1,

12

    2005 deadline are not reliable because of Oracle's systematic attempt to alter and delete notes during

13

    the 2002 Clean Up, after learning of plaintiffs' lawsuit. This conduct was intentional and resulted in

14

    the destruction of relevant evidence.

15        **B.**     **Defendants' Repeated Violations of the Court's Orders Prevented**

16            **Plaintiffs from Obtaining Relevant Documents Until After the**
              **Completion of Discovery and Depositions**

17

        In addition to defendants' intentional effort to withhold documents and mislead the Court

18

    about the relevance of the 2002 Clean Up, defendants also violated every accounting discovery order

19

    in this case by producing documents months after court-imposed deadlines and withholding relevant

20

    documents altogether.

21

           **1.**     **Defendants' Violations of the March 10, 2005 Discovery Plan**

22

        The March 10, 2005 Discovery Plan clearly identified the relevant scope of discovery

23

24

25  [14]    Additionally, Oracle's explanation that it first "became aware" of the electronic notes in
    April 2006 is expressly contradicted by a statement by defendants' counsel; plaintiffs sought

26  discovery of the electronic notes and comments a full year before the depositions took place, and
    Oracle's prior counsel, Mayer Brown Rowe & Maw LLP, expressly represented that all notes would

27  be produced. Ex. 42 ("*comments entered electronically by collections department personnel will*
    *be produced as part of the electronic data production concerning the transactions.*").

28

1  pertaining to the accounting issues. Magistrate Judge Spero ordered that defendants "shall" produce

2  all documents relating to the following:

3      *(i) the alleged "On Account Clean Up" occurring in November 2000; (ii) the*
       *46,000 debit memoranda; and (iii) the accounting treatment of those debit*
4      *memoranda, including any audit trail, and all related accounting policies.*

5  *See* Ex. 43 at 2. The Court-ordered deadline for the production of all accounting documents was

6  May 1, 2005. *Id.* at 3. As set forth in §IV.B.4, *infra*, defendants were still producing highly relevant

7  and responsive documents in April 2007, nearly *two years* after the deadline.

8      During the March 1, 2005 discovery conference, defendants represented to the Court and

9  plaintiffs that all documents relating to the November 2000 Clean Up and 46,000 debit memos

10 would be produced:

11     THE COURT: Well, if you get every piece of paper or every record that is on these
       46,000 debit memos or any piece of paper that is related to those 46,000 debit
12     memos, why isn't that enough?

13     [Plaintiffs]: I didn't understand that to be the position.

14     [Defendants]: *That is our position. That's exactly what we are offering.*

15 Ex. 14 at 44:2-11.

16     On May 1, 2005, instead of producing all responsive documents as ordered, defendants

17 produced a single data file or "script output" purportedly containing the history and audit trail of the

18 46,000 debit memos (the "May 1, 2005 Script Output"). Ex. 44. The May 1, 2005 Script Output

19 was severely incomplete, inconsistent and inaccurate. Indeed, defendants later produced at least five

20 additional versions of script output, all of which were incomplete and had to be replaced or revised.

21 Defendants refused to produce the underlying source documents, transactions, and other accounting

22 information ordered by the Discovery Plan.

23     On October 7, 2005, after defendants refused to produce any additional documents, plaintiffs

24 were forced to file a motion to compel ("Motion #1"). Ex. 45. On October 18, 2005, Magistrate

25 Judge Spero held a hearing on plaintiffs' Motion #1. He expressed concern that defendants' refusal

26 to produce the underlying documents related to the 46,000 debit memos was inconsistent with

27 defendants' previous representations:

28

1      *I'm concerned that during the course of setting up the very detailed discovery plan*
     *in this case, the defendants argued and obtain[ed] a narrower scope of discovery in*
2      *exchange for a commitment that all of the documents regarding all of these debit*
     *memos, including all the underlying documents would be committed.* And that, to
3      my mind, is clear as day in the transcript that that was the position taken at the time.
     *And you are changing your position.*

4 Ex. 46 at 4:13-21.

5      Consequently, on October 19, 2005, Magistrate Judge Spero issued a supplemental order

6 granting plaintiffs' Motion #1. The October 19, 2005 Order required defendants to immediately

7 produce – within 30 days – all relevant accounting documents, including underlying source

8 documents previously ordered, related to the 776 largest debit memo transactions. Ex. 47. The

9 Court also ordered the parties to agree on a "sampling" of smaller debit memo transactions in

10 addition to the 776 largest debit memos. Ex. 46 at 18:11-13. The deadline for production was

11 November 18, 2005.

12            **2.**    **Defendants' Violations of Magistrate Judge Spero's October**

13                    **19, 2005 Accounting Order**

14      Defendants' document productions pursuant to the October 19, 2005 Order were again

15 severely deficient. As an initial matter, defendants' productions were scattershot and untimely –

16 despite the November 18, 2005 deadline, defendants continued to produce documents subject to the

17 Order in February, April, June and August 2006 and into 2007. In fact, defendants' most recent

18 productions in April 2007 admittedly contained documents responsive to the October 19, 2005

19 Order. Ex. 48. Below is a chart of defendants' belated productions in connection with the October

20 19, 2005 Order.

| Date of Production | Approximate Number of Pages |
|---|---|
| November 21, 2005 | 31,444 pages |
| November 23, 2005 | 94,555 pages |
| February 13, 2006 | 4,646 pages |
| February 16, 2006 | 209 pages |
| April 27, 2006 | 2,697 pages |
| June 26, 2006 | 1,357 pages |
| August 3, 2006 | 51 pages |
| September 12, 2006 | 47 pages |
| April 17, 2007 | 9 pages |
| April 24, 2007 | 99 pages |

1    Defendants' document productions were not only untimely, but also substantively deficient.
2  Defendants failed to produce all of the underlying documents relating to the 776 largest debit
3  memos, including entire categories of reports, spreadsheets and underlying source documents
4  relating to the debit memos transactions. Ex. 49.[15]  Defendants also failed to comply with the
5  October 19, 2005 Order by refusing to produce any documents relating to a "sampling" of the
6  smaller debit memo items. Defendants simply disregarded the Court's directive on that point and
7  argued that no further discovery was needed.

8    Defendants' refusal to produce the documents required by the March 10, 2005 Discovery
9  Plan and the supplemental October 19, 2005 Order forced plaintiffs to file a second motion to
10 enforce the prior accounting orders on May 25, 2006 (Motion #2). Motion #2 sought the same
11 documents already ordered to be produced by the Court in the March 10, 2005 Discovery Plan and
12 the supplemental October 19, 2005 Order. Ex. 49.

13   During the July 10, 2006 hearing on Motion #2, defendants asserted that they had complied
14 with all prior accounting orders. Special Master Infante disagreed and admonished defendants for
15 trying to shield discovery from plaintiffs by reading the complaint too narrowly: "*I have never seen*
16 *anyone read a complaint so narrowly as you do. Rule 26 would be turned on its head if we*
17 *applied your discovery rulings as you wish to make in this case. It's just ridiculous. I'm sorry I*
18 *have to be so blunt with you.*" Ex. 9 at 86:11-16

19   On July 17, 2006, Special Master Infante granted plaintiffs' Motion #2 in substantial part and

20

21 [15]   At the July 10, 2006 hearing where these issues were addressed, Special Master Infante
22 opined, "They're entitled to all, just as Judge Spero ordered, all electronic information, including
   electronic images of documents relating to the debit memos at issue in this case and all transactions
23 that underlie those debit memos where the debit memos are in amounts of $100,00 or more. . . . That
   was Judge Spero's order. I find that the order has not been fully complied with." Among the
24 categories of debit memo source documents that defendants failed to produce in response to
   Magistrate Judge Spero's October 19, 2005 Order are: (1) the general ledger audit trail; (2) credit
25 memos and refunds; (3) cash receipts and customer remittance advices; (4) call notes and customer
   notes (from collections, A/R and sales); (5) various customer accounts receivable reports, including
26 A/R Aging Reports and Billing & Receipt Histories; (6) account-level debit memo data, including
   summaries and reconciliations; (7) A/R Reports, Trial Balance Aging and 7-Bucket reports; and (8)
27 documents concerning A/R reserves and write-offs. *See* Ex. 50. Some of these document categories
   were never produced (for example, the general ledger audit trail and customer remittance advices).
28

1  ordered defendants to produce (for the third time) all relevant accounting documents ordered in the

2  March 10, 2005 Discovery Plan and the supplemental October 19, 2005 Order, including summary-

3  level accounting reports and underlying transactional documents that defendants refused to produce.

4  Ex. 50. The deadline for production was August 31, 2006. Special Master Infante also ordered that

5  defendants produce documents relating to 150 smaller amount debit memos selected by plaintiffs.

6  *Id*. at 17. Plaintiffs selected 150 debit memos in a letter dated July 21, 2006. *See* Ex. 51.

7          **3.**     **Defendants' Violations of the Special Master's July 17, 2006**
                   **Accounting Order**

8

9       Despite being faced with a *third* consecutive order requiring the production of all relevant

   accounting documents relating to the debit memos, defendants again attempted to prevent plaintiffs
10
   from obtaining the information ordered by the Court. First, defendants violated the Court's
11
   production deadline of August 31, 2006 by producing documents months after the deadline as
12
   follows:
13

| Date of Production[16]   | Approximate Number of Pages |
| ------------------------ | --------------------------- |
| September 1, 2006        | 2,640 pages                 |
| September 8, 2006        | 137,888 pages               |
| September 15, 2006       | 92,774 pages                |
| October 27, 2006         | 14,809 pages                |
|                          | 69 pages                    |
|                          | 6,507 pages                 |
| November 3, 2006         | 197 pages                   |
| November 9, 2006         | 66,898 pages                |
| December 15, 2006        | 3,636 pages                 |

20       The productions were also substantively deficient. Instead of withholding the documents in

21  their entirety (as defendants did in response to prior accounting orders), defendants tried to obscure

22

23

24  [16]     In fact, nearly all of these documents were improperly redacted (and/or had serious electronic issues that had not been resolved by meeting and conferring with defendants) and Special Master Infante subsequently ordered defendants to reproduce all of the documents again, in unredacted

25  form, by January 17, 2007. *See* Discussion of December 19, 2006 Order, § IV.B.4, *infra*. Notably, these documents were subject to the original March 10, 2005 Discovery Plan, were then ordered

26  produced by no later than November 18, 2005, and again on August 31, 2006. The January 17, 2007 reproduction comprised more than 400,000 documents. Defendants' discovery misconduct deprived

27  plaintiffs of highly relevant data for the entire discovery period.

28

1  the substantive information by heavily redacting thousands of pages of responsive material,
2  including entire spreadsheets, reports and accounting data. The result was thousands of blank and
3  incomplete documents that effectively prevented the usage of the data – even the minimal data that
4  was not redacted.

5  Defendants' improper redactions forced plaintiffs to file a third motion to enforce the Court's
6  prior orders on October 30, 2006 ("Motion #3"). Motion #3 sought unredacted copies of all
7  documents produced pursuant to the previously issued July 17, 2006 Order. Further, as detailed
8  *supra*, plaintiffs also renewed their prior motion to compel documents related to the 2002 Clean Up
9  and Oracle's improper transfers of customer overpayments to its bad debt reserve. This renewed
10 part of the motion was based on new deposition testimony and evidence discovered subsequent to
11 the Court's July 17, 2006 Order. Ex. 52.

12 On December 19, 2006, Special Master Infante granted plaintiffs Motion #3 in its entirety
13 and issued the *fourth* court order requiring the production of all relevant accounting documents. The
14 December 19, 2006 Order required defendants to produce, by no later than January 17, 2007, the
15 following documents: (a) unredacted copies of all documents previously produced pursuant to the
16 July 17, 2006 Order; (b) all documents relating to the 2002 Clean Up; and (c) all documents relating
17 to Oracle's transfer of unapplied cash for its bad debt reserve in connection with 2Q01. Ex. 13.

18 With respect to defendants' heavy redactions, Special Master Infante's order stated:
19 "Defendants' unilateral redaction of information from the supplemental accounting documents on
20 the grounds it is not relevant or is 'non-responsive' is improper." *Id*. at 16. With respect to the 2002
21 Clean Up, Special Master Infante found that the new evidence provided by plaintiffs "raise
22 substantial questions about the relationship between the November 2000 debit memos and the 2002
23 Clean Up." *Id*. at 19. Notably, Special Master Infante also joined in Magistrate Judge Spero's
24 concern that defendants kept changing their position on accounting discovery during the course of
25 the litigation:

26      Judge Spero has already voiced concern that Defendants have made statements to the
        Court regarding discovery of accounting documents and then later changed their
27      position. ***Here, again, Defendants have stated one position (that there is no link
        between the debit memos and the 2002 Clean Up project) and later shifted that
28      position (by claiming that all linked documents have been produced and that the***

*link is not substantial).* Given the Defendants' former position and the new evidence offered by Plaintiffs, the Special Master concludes that information relating to events concerning the October 2002 unapplied cash project are reasonably calculated to lead to discovery of admissible evidence regarding Plaintiffs' accounting allegations and Defendants' scienter during the Class Period.

*Id.*[17]

#### 4.   Defendants' Violation of the December 19, 2006 Order and Other Sanctionable Discovery Conduct Thereafter

Despite the January 17, 2007 production deadline ordered by the Court (which was, in part, extended to January 30, 2007 pursuant to defendants' request), defendants continued to belatedly produce documents in February, March and April 2007. The volume of new documents produced by defendants pursuant to the December 19, 2006 Order was shocking – over 800,000 total pages, (265 boxes) of new accounting documents. As set forth in §IV.A.1, *supra*, hundreds of those new documents expressly reference the November 2000 debit memos and the corresponding "On Account Clean Up," the two most fundamental accounting topics enshrined in the March 10, 2005 Discovery Plan. Defendants' withholding of such fundamentally relevant documents until after discovery closed based on the false assertion that the documents were "not related" to the November 2000 events has severely prejudiced plaintiffs.

#### a.   Defendants' Belated Production of E-mails on April 17, 2007 Regarding Plaintiffs' Accounting Allegations

In addition to the discovery abuses outlined above, defendants recently made some disturbing admissions that they inexplicably withheld highly relevant and never-before-seen (by plaintiffs) e-mails and board of directors meeting memos relating to the fundamental accounting issues in this case. On April 17 and 24, 2007, defendants produced for the first time several key documents that had apparently been sitting in defendants' files for the entire discovery period.

The first production, on April 17, 2007, consisted of several e-mails that were written contemporaneously with the November 2000 Clean Up. The e-mails contained specific discussions

---

[17]   Following the issuance of the December 19, 2006 Order, defendants filed a "motion for modification" seeking to delete the first two sentences quoted above from the December 19, 2006 Order. Defendants' motion was denied on January 12, 2007 and Special Master Infante's findings remain as quoted above. Ex. 53.

1  of Oracle's debit memos and the misuse of customer overpayments and unapplied cash. Ex. 54.

2  One e-mail, dated November 6, 2000 from Oracle's "Unapplied Cash Specialist," Neil Menon

3  ("Menon"), to various Oracle personnel, contains a discussion of Oracle's end-of-the-quarter

4  practice of manipulating its unapplied cash via its bad debt reserve to inflate its financial results.

5   We are currently trying to resolve as many unapplied items before the end of the
    quarter [sic] There are a total of 1826 unapplied items of which 102 are labeled
6   "OCC" and total $16,985,508.87. . . .

7   As you can see, resolving the "OCC" items would help us in achieving our quarter
    goal. Please take a look at this spreadsheet and instruct me how these items should
8   be applied. Since we are approaching the end of the quarter, we would like to
    resolve these items as quickly as possible. If there is no response by **November 20,**
9   **2000**, we will review the items and place them in our reserve account.

10 *Id.* at NDCA-ORCL 3042910 (emphasis in original).

11      Another two e-mails produced for the first time on April 17, 2007 were written by Myers on

12 November 8, 2000, and November 21, 2000. Myers was designated by Oracle as its Federal Rule of

13 Civil Procedure 30(b)(6) witness on the accounting issues in this case, and was deposed on April 12,

14 2005. Ex. 55. The e-mails specifically reference the November 2000 Clean Up and the issues

15 surrounding the 46,000 debit memos. Exs. 56-57. Magistrate Judge Spero expressly ordered

16 defendants to produce these documents more than two years ago as part of the March 10, 2005

17 Discovery Plan. Ex. 43 (ordering production of all documents relating to "(i) the alleged 'On

18 Account Clean Up' occurring in November 2000; (ii) the 46,000 debit memoranda. . . ").

19      The documents produced on April 17, 2007 also should have been produced seven days prior

20 to Myers' deposition on April 12, 2005, as the March 10, 2005 Discovery Plan required. Moreover,

21 both e-mails were sent to CW49, one of the witnesses relied upon by plaintiffs in the RSAC and the

22 November 11, 2002 *Ex Parte* Application, who reported the fraudulent accounting activities

23 occurring at Oracle during 2Q01 and the subsequent clean up in 2002.

24      When asked for an explanation of why the documents produced on April 17, 2007 were not

25 produced earlier, defendants stated: "with respect to the three e-mails produced on April 17, 2007,

26 these documents *mistakenly never were loaded onto our database at the time the documents*

27 *originally were gathered. As a result, we did not know about those documents until the time we*

28 *produced them to Plaintiffs.*" Ex. 58.

Further, when plaintiffs inquired about why these e-mails were sourced to "Oracle Corporation" but were not found in the files of the authors or recipients of the e-mails (*e.g.*, Myers and Menon), defendants admitted that *"[w]e cannot determine with certainty from whose files the two e-mails originally were gathered."* Ex. 59. In other words, defendants claim to have no idea where the documents came from and no explanation for how or why the relevant documents were purportedly "gathered" but then withheld from production until after discovery closed.

### b. Defendants' Belated April 24, 2007 Production of Relevant Board Meeting Memos and E-mails

On April 24, 2007, defendants inexplicably produced another batch of new e-mails and memos reflecting Oracle's board meetings held during 2002. These documents expressly reference plaintiffs' lawsuit, the November 2000 debit memos and other relevant issues pertaining to plaintiffs' lawsuit. These documents were requested by plaintiffs in their first document requests on December 9, 2004 and were ordered produced as part of the March 10, 2005 Discovery Plan. Defendants' purported explanation for why these fundamentally relevant documents were not produced earlier was as follows: *"These documents were not produced earlier in the case because they were not located in the custodian files of any individual who participated in the 2002 'unapplied cash project.'"* Ex. 58.

The problem with defendants' explanation is that regardless of where these documents were kept, Oracle as a corporation knew of their existence but hid them from plaintiffs for years. Further, the board minutes and corresponding e-mails are not exclusively related to the "unapplied cash project" as defendants seem to imply; the board meetings reflected discussions about plaintiffs' lawsuit, the specific debit memo allegations in the SAC, and other issues surrounding the November 2000 Clean Up. Ex. 60. The documents are, on their face, responsive to the March 10, 2005 Discovery Plan and were ordered produced by no later than May 1, 2005.

If defendants really did preserve all documents relating to plaintiffs' lawsuit as represented, the board minutes should still be preserved in the electronic files of the recipients of the minutes (Ellison, Safra Catz, Henley, Minton, Williams, Segal, Cooperman, *et al.*) and the author of the e-mail itself (Linda Leanes ("Leanes")). Defendants have represented that the documents were not

1 found in those individual's files. Incredibly, according to defendants, the only person's files in
2 which the documents were found was Segal – Oracle's in-house lawyer. That fact, in and of itself,
3 confirms that relevant e-mail accounts of important witnesses – even the few to whom defendants
4 claim to have sent preservation instructions – were not preserved. *See* §V.B., *infra*.

5        When plaintiffs inquired about why the new documents sourced to Segal were not produced
6 seven days before her September 26, 2006 deposition as required under the March 10, 2005
7 Discovery Plan, defendants rotely stated that the documents "*were not identified at the time Oracle*
8 *conducted its review of Ms. Segal's files.*" Ex. 59 at 2. It is unclear how documents now sourced to
9 Oracle's corporate lawyer who was responsible for supervising document preservation and collection
10 in this matter "were not identified" before her deposition if they were in fact in her custodian file.
11 Defendants' explanation makes no sense and underscores the fundamental lack of proper
12 preservation efforts in this case along with abusive discovery practices.

13        Defendants have also been unable to explain why a belatedly produced February 7, 2003 e-
14 mail from Leanes which attached board meeting memos and was entitled "F&A Committee
15 Minutes" was not sourced to Leanes herself as the custodian, but rather, was sourced to Oracle's
16 counsel, Segal. Defendants' explanation was again non-responsive. *Id.* at 1 ("[d]efendants have not
17 produced any documents from Ms. Leanes' files. Accordingly, she does not appear as a custodian
18 on the updated consolidated source log."). If defendants had properly preserved all documents
19 related to plaintiffs' lawsuit, the February 7, 2003 e-mail should at least have been found and
20 produced from corporate and board files, as well as the author's files (Leanes). The fact that it was
21 not indicates first, that defendants intentionally withheld it until after the close of discovery and
22 second, that defendants failed to preserve the e-mail from Leanes' files, or it was destroyed. Indeed,
23 the fact that such fundamentally relevant board meeting documents were not produced until April
24 2007 is patently unreasonable, prejudicial and in direct violation of the previous Court orders in this
25 case.

26                 **c.**      **Defendants Changed the Source of Documents After the**
                         **Discovery Cutoff**
27
28        On May 14, 2007, defendants sent plaintiffs a letter asserting that they had updated their

1  "Consolidated Source Log" to reflect the belated productions on April 17, 2007 and April 24, 2007.

2  In their letter, defendants stated the following:

3      "In performing a quality review of the enclosed source log, we discovered that our
       prior consolidated source log, which Defendants produced on March 28,2007,
4      *incorrectly sourced certain documents to a few individuals.* Notably, these
       documents were sourced for the first time on the consolidated source log that
5      Defendants produced on March 28, 2007. We have corrected the issue in the
       enclosed consolidated source log. *However, as a result of this correction, the*
6      *names of nine Oracle employees no longer appear on the updated consolidated*
       *source log because we have not produced documents from their files.*"

7
8  Ex. 61. As an initial matter, despite plaintiffs' immediate request for an explanation that same day,

9  defendants did not provide plaintiffs with the names of the "nine Oracle employees" who were

10 removed from the source log until two weeks later. Ex. 59. Furthermore, the information provided

11 raises serious questions about defendants' preservation efforts. Documents previously sourced to

12 one of Oracle's in-house lawyers, Dorian Daley, are now inexplicably sourced to non-lawyer

13 personnel. *Id.; see also* Ex. 62. Other documents that were originally sourced to witnesses who

14 were not deposed (Lea Erickson; Kerry Fitzpatrick; John Hall; Lori Hayword; Jeff Johnson; Chuck

15 Linn) are now suddenly sourced to witnesses that have already been deposed (Molly Littlefield-

16 Venkataramana; Sohaib Abbasi; Elam). Ex. 59. Defendants have provided no explanation for why

17 the source of documents keeps changing. Nor have defendants explained why the documents were

18 not produced prior to the depositions of the "new" sources.[18] At this late stage, plaintiffs have no

19 way of determining the accuracy of defendants' source logs. This type of discovery abuse leaves

20 plaintiffs with no real remedy save evidentiary sanctions.

21

22

23

24 [18]    Defendants' May 14, 2007 communication was not the first time defendants admitted to
   incorrectly sourcing documents. On November 13, 2006, defendants sent plaintiffs a letter advising
25 that defendants mistakenly sourced 353 documents to Ellison. Ex. 63. Although not expressly
   admitted, defendants letter also indicates that the incorrectly sourced documents were produced and
26 sourced to four witnesses months after their depositions. Id. Defendants state that the documents
   were appropriately sourced to Kirsten Shaw, Gayle Fitzpatrick, Cliff Godwin and Ron Wohl, who
27 had been deposed on September 19, 2006, February 24, 2006, March 3, 2006 and May 31, 2006
   respectively.

28

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                    - 32 -

**C.    Defendants Electronically Altered Many Accounting Documents Before They Were Produced**

**1.    Defendants Altered the Electronic Filenames and Metadata Associated with Documents as Kept in the Ordinary Course of Business**

As plaintiffs and their experts continue to analyze the 265 boxes of new accounting documents produced since January 2007, it has become apparent that defendants have electronically altered documents and e-mails such that the documents no longer appear as they were kept in the ordinary course of business, as Fed. R. Civ. P. 34 requires. This alteration has taken several forms. Defendants have changed the electronic filenames that identified the documents at the time they were created and altered metadata. A filename is a unique identifier created by the author of the document at the time it was created. Filenames often contain valuable descriptive information about the nature and purpose of the document and its contents. Metadata also provides invaluable information about a document including the author(s), creation date and last date modified.

When defendants produced electronic documents, they deleted the original filename of documents and replaced the original name with Bates numbers. Defendants deleted the original filename of virtually every accounting spreadsheet they produced – more than 1,000 in all – and replaced the filename with a Bates number such as "NDCA-ORCL 1472684." The original filenames have not been produced, thus depriving plaintiffs of valuable evidence. For example, in 2002, plaintiffs obtained from a confidential witness the last page of an October 21, 2002 e-mail which showed that a spreadsheet with the filename "Greater_Than_100K in 1260151 Version 3" had been attached to the e-mail. *See* Ex. 64. The first page of the same e-mail references another spreadsheet, "12601_Detail," that was not attached to the e-mail. *See* Ex. 65 at NDCA-ORCL 1609399. Defendants never produced spreadsheets with these filenames.

Also, in ordinary circumstances, filenames and related metadata help corroborate that files represented to be attachments to specific e-mails are in fact, the same files that were actually attached to the original e-mails. However, in this litigation, hundreds of e-mail attachments produced by defendants raise substantial issues about file and data integrity that plaintiffs cannot resolve, and defendants have refused to remedy. For example, according to metadata of e-mail attachments

1    produced by defendants, most accounting filenames and last date saved were materially altered after
2    the e-mails were sent, but *before* they were produced to plaintiffs. These circumstances – and
3    numerous other anomalies, including dozens of missing and corrupted e-mail attachments –
4    combined with defendants' persistent failure to correctly cross-index e-mails with their file
5    attachments, headers and footers, leave substantial doubt regarding the reliability of the e-mail
6    attachments. Defendants' actions constitute fundamental violations of the Federal Rules of Civil
7    Procedure and the March 10, 2005 Discovery Plan.

8              **2.      Defendants Electronically Altered and Failed to Preserve
                         Relevant E-mails**

9
10          Another discovery abuse committed by defendants is the production of identical e-mails that
11    inexplicably have different dates and electronic characteristics. For example, Ex. 66 is a crucial e-
12    mail dated October 21, 2002 that was first obtained by one of plaintiffs' confidential witnesses. The
13    e-mail is from Quinn to Myers and other accounting personnel regarding the 2002 Clean Up and the
14    specific tasks to be completed. This document was first submitted in connection with plaintiffs' *Ex
15    Parte* Application on November 11, 2002. Since that time, defendants have produced at least *17
16    different versions* of this same e-mail in many different forms, with many different dates and
17    electronic characteristics. Some copies of the e-mail are dated in 1970 or other arbitrary dates prior
18    to the actual creation date. *See, e.g.*, Exs. 65, 67-68.

19          Additionally, defendants have not preserved copies of many important e-mails that are
20    "embedded" in other e-mail strings as replies or forwarded copies of the original e-mail. Examples
21    of these e-mails are Exs. 24, 69-73. These e-mails were not produced on their own, and the
22    embedded versions lack fundamental data such as the date and time of the e-mail , the senders,
23    recipients and significantly, whether there were file attachments.

          Defendants' failure to produce e-mails embedded in other e-mail strings is a violation of the
24    March 10, 2005 Discovery Plan. Indeed, Section II.B.a. of the Discovery Plan requires the parties to
25    produce electronic documents and e-mails pursuant to strict formatting parameters as follows:
26
                   (a)      The parties shall produce e-mails in searchable TIFF format. E-mails
27    shall include the following information: sender, recipient, blind and carbon copies,
      date sent, e-mail box from whom the document is produced, and the date and time it
28    was opened, deleted, responded to or forwarded. Furthermore, the parties shall

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                          - 34 -

produce all attachments to or documents embedded in such e-mails in native format, readily accessible from each e-mail.

Ex. 43 at 4.

Defendants have consistently failed to adhere to this production requirement under the Discovery Plan. If defendants had properly preserved all electronic documents as they claim, each e-mail in the strings on Exhibits 24 and 69-73 should have been produced independently, with the proper header, footer, date and other information, as it was kept in the ordinary course of business. In other words, if five people replied to or forwarded a single e-mail at different times, each of those e-mails should have been produced from the replying person's files. But defendants failed to do this; plaintiffs therefore cannot discover some of the most simple facts such as when certain e-mails were sent, when received, and forwarded and whether there were any attachments. This is just another example of the improper and incomplete document productions and failed preservation efforts taken by defendants in this case.

In sum, defendants have repeatedly violated no less than four court orders regarding accounting discovery which has severely prejudiced plaintiffs' ability to develop their accounting allegations. Plaintiffs had to wait nearly *two years* to obtain hundreds of thousands of pages of the most fundamentally relevant accounting discovery ordered by the March 10, 2005 Discovery Plan. Both Magistrate Judge Spero and Special Master Infante have found that defendants have changed their position on accounting discovery during the litigation in order to withhold relevant documents from plaintiffs. Defendants have succeeded in withholding hundreds of thousands of pages of crucial accounting documents until after nearly 100 depositions have already concluded, including witnesses who created and received or were named on documents belatedly produced. Additionally, as set forth above, documents produced by defendants in connection with the 2002 Clean Up reveal an intentional effort by defendants to mislead the Court about the nature of the 2002 Clean Up in order to prevent plaintiffs from obtaining relevant e-mails and documents related to plaintiffs' debit memo allegations. Defendants' violations of the Court's accounting orders and their withholding of relevant documents under false pretenses justify the most severe sanctions.

1

2

3

**D.      Defendants Recently Admitted They Were Aware of Plaintiffs'
           Accounting Allegations in May 2002 at Least Five Months Before
           Defendants Sent Preservation Notices to a Select Few Accounting
           Employees**

On April 23, 2007, plaintiffs requested that defendants explain four entries in their March 16,
2007 privilege log which were dated in May 2002 and included the following description: "E-mail
chain between in-house counsel Lauren Segal, Esq. and Oracle employees analyzing accounting
allegations in the Second Amended Complaint." Ex. 74. Defendants withheld those four documents
pursuant to the Attorney-Client Privilege and the Work Product doctrine. These entries were
erroneous. The communications could not possibly address the "accounting allegations in the
Second Amended Complaint" because that complaint was not filed until October 11, 2002, five
months *after* the e-mails were written. When plaintiffs asked defendants about this discrepancy,
defendants changed their story, stating that "the four entries in the privilege log dated May 2002
reflect confidential communications among members of Oracle's in-house legal department and
other Oracle employees *regarding Plaintiffs' investigation with respect to the debit memo
allegations*." Ex. 75.

In other words, it is clear that defendants' counsel, as well as its top accounting personnel,
were fully aware of, and were indeed communicating about the debit memo issues in May 2002, four
months before plaintiffs filed their accounting allegations on October 11, 2002. *Yet, defendants did
not attempt to preserve documents relating to these allegations until October and November 2002*.
And, even though defendants claim to have sent preservation notices out to a select few of its
accounting personnel involved in the November 2000 events and the 2002 Clean Up after plaintiffs
filed the SAC, defendants inexplicably failed to send a preservation notice to one of the key
participants in the 2002 Clean Up – Molly [Littlefield] Venkataramana – who Oracle itself claimed
was a "Collections Manager who supervised certain aspects of the October 2002 'clean up' effort."
Ex. 76. Despite plaintiffs' specific request for an explanation of this preservation failure, defendants
failed to explain why Venkataramana did not receive a preservation notice. Ex. 77.

V. **DEFENDANTS FAILED TO PROPERLY PRESERVE EVIDENCE IN BAD FAITH**

A. **Defendants Expected Litigation Surrounding the March 1, 2001 Disclosures But Did Nothing**

Defendants' scheme to destroy relevant evidence commenced immediately upon the March 1, 2001 disclosure that Oracle would miss its fiscal 3Q01 financial forecasts. According to Segal, Oracle's in-house counsel responsible for all aspects of securities litigation, including supervising document preservation and collection for this matter, the Company believed that it "*was quite likely*" that Oracle would be sued for securities fraud at that time. Ex. 78 at 276:1-6. Indeed, defendants *expected* that Oracle would be sued as a result of its earnings miss. *Id.* at 277:5-11.

Cooperman, Oracle's general counsel at that time, testified that in 3Q01 the missed earnings forecast and Ellison's massive stock sales raised the risk of litigation. Ex. 79 at 43:23-45:9. Cooperman characterized 3Q01 as "unusual" because the Company "pre-announced results" and "missed our expected results, our guidance," and that those facts raised his concern about the potential for securities lawsuits. *Id.* at 43:23-44:10. Likewise, Cooperman admitted that Ellison's $894 million January 2001 stock sales "raise[d] a risk of litigation," but did nothing in January or February to ensure that potentially relevant information would be preserved. *Id.* at 44:11-45:9. In fact, defendants took no action – not on March 1, 2001 after their announcement, not on March 5, 2001 upon notice that the 3Q01 miss and Ellison's stock sales were being questioned, and not on March 9, 2001 upon receipt of notice of this lawsuit.[19] Defendants should have undertaken efforts to preserve relevant evidence, including the issuance of a litigation hold, at the latest, immediately after their March 1, 2001 announcement, if not January 22, 2001.[20] *Napster*, 462 F. Supp. 2d at 1070; *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("Once a party reasonably

---

[19] Cooperman's files produced by defendants in this case included European press articles questioning Oracle's miss and Ellison's stock sales dated as early as March 5, 2001, and a March 9, 2001 announcement of the filing of this lawsuit. Ex. 79 at 114:17-121:15 and Ex. 80.

[20] The evidence of the Company's scurry to explain Ellison's stock sales to investors, including efforts to convince investors that Ellison still had confidence in the Company's financial condition, suggests there was a growing concern of lawsuits in January 2001. *See, e.g.*, Ex. 81 at 69:24-71:21, 77:5-12; Ex. 82; Ex. 83; Ex. 84.

1 anticipates litigation, it must suspend its routine document retention/destruction policy and put in

2 place a 'litigation hold' to ensure the preservation of relevant documents.").

3       Instead, defendants admittedly waited until March 13, 2001 to issue even a limited

4 preservation instruction to only select employees excluding large swaths of the Company's sales and

5 consulting organizations whose files have proved critical to the litigation.[21] This conduct at a

6 minimum constitutes negligence and most appropriately bad faith, and supports the imposition of

7 sanctions. *Napster*, 462 F. Supp. 2d at 1070; *Zubulake*, 220 F.R.D. at 220. Indeed, as a result of

8 defendants' delay in taking any action at all to preserve relevant evidence, Oracle's employees sent,

9 received and deleted e-mails for almost two weeks – undoubtedly concerning the events surrounding

10 the earnings shortfall and applications miss, including Suite 11i defects, and thus highly relevant to

11 this litigation – while under no internal executive directive to preserve evidence whatsoever. As

12 detailed herein and in the Motion to Compel, the relevance of the destroyed documents is

13 indisputable: "[B]ecause the relevance of . . . [destroyed] documents cannot be clearly ascertained

14 because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to

15 the destroyed documents." *Leon*, 464 F.3d at 959 (alteration in original).

16      **B.**     **Even After Service of Broad Based Complaint Allegations Defendants**
              **Intentionally Excluded the Vast Majority of Oracle Employees from a**
17               **Document Preservation Instructions**

18       Plaintiffs have confirmed with certainty that once defendants were actually served with the

19 securities class action complaint defendants anticipated, defendants began what can only be

20 described as a document preservation ruse. Defendants wholly failed to preserve documents in

21 accordance with the requirements of the Federal Rules of Civil Procedure and the PSLRA, which

22 expressly imposes the duty on defendants involved in securities cases to preserve all evidence:

23       [The parties] shall treat all documents, data compilations (including electronically
        recorded or stored data) . . . that are relevant to the allegations, as if they were the
24       subject of a continuing request for production of documents . . . .

25 15 U.S.C. §78u-4(b)(3)(C)(i). Indeed, notwithstanding the plain language of the statute, defendants

26

27 [21]     When asked why Oracle waited almost two weeks to take action to preserve evidence, Segal
responded dismissively, "because there was no pending litigation." Ex. 78 at 277:12-23.

28

1   ignored the fact that document preservation requirements for lawsuits subject to the PSLRA were
2   more stringent than those for California state court derivative actions and did not make any
3   distinction in their efforts to preserve documents in this case. Ex. 78 at 85:1-89:8; Ex. 85.
4   Defendants in fact acknowledge that Oracle did not carry out the PSLRA preservation requirements.
5   Ex. 2 at 6-9.

6       Nonetheless, defendants admittedly could have complied with the document preservation
7   requirements of the PSLRA with ease. Oracle could have sent out a company wide e-mail. Ex. 78 at
8   222:18-23. But instead, despite the concession that their attorneys could not determine upon receipt
9   of the March 9, 2001 Complaint for Violations of the Federal Securities Laws ("March 9, 2001
10  Complaint") which documents might be relevant or all employees who possessed relevant
11  information, defendants elected to only send the March 13, 2001 preservation notice to 30
12  individuals in a company of more than 40,000 employees, two of whom were senior attorneys who
13  approved the e-mail prior to sending. Ex. 78 at 57:25-58:25; 92:9-93:5; Ex. 85. What ensued was a
14  haphazard, unsupervised and leisurely approach to document preservation – and in provable
15  instances intentional alteration of evidence – that resulted in violation of the PSLRA and the
16  wholesale failure to preserve the relevant files of the majority of employees at Oracle.

17          1.      **Defendants' Focus on Employees Who Communicated with
                    "Speakers" Was Knowingly Faulty Because Defendants Failed
18                  to Determine Who Actually Communicated with the
                    "Speakers" and Employees Admittedly Possessed Relevant
19                  Evidence, Regardless of Whether They Communicated Within
                    the "Speakers"**
20

21          Rather than follow the law and preserve all relevant documents from all potential sources, a
22  task that could have been instigated simply by sending a group e-mail notifying all employees of the
23  preservation requirements, defendants after the fact claim to have focused on the so-called
24  "Speakers," defined by them as Ellison, Henley, Edward J. Sanderson ("Sanderson"), Stephanie Aas,
25  Mark Barrenechea ("Barrenechea") and Jennifer Glass, and those who communicated with the
26  "Speakers." Ex. 9 at 25:14-26:4; Ex. 78 at 117:21-123:25. The flaw in this approach, other than the
27  obvious fact that it could not possibly preserve all relevant documents, was that Segal apparently had
28  no idea which employees communicated with the "Speakers" and made no real effort to determine

1   who did. Ex. 78, *passim*.

2        More importantly, Segal never considered the possibility that an employee more than one
3   level removed from the "Speakers" – for example a vice-president – might communicate with the
4   so-called "Speakers" and even do so on a regular basis. Segal testified that, "I don't believe that
5   some junior salesperson somewhere who had a document that suggested to them one way or the
6   other about closing a deal, if that document did not go up the chain, no, that was not a relevant
7   document." *Id.* at 120:10-14.

8        But during her deposition, Segal later conceded (in order to maintain any level of credibility)
9   that documents located in the files of many employees to whom she did not provide preservation
10  instructions are indeed relevant. These individuals include Paul Seminara, Michael Cochran (*id.* at
11  93:6-104:11; Ex. 86); James McHugh, Gayle Fitzpatrick, Grant Franjione, James Walker, John
12  Reilly (Ex. 78 at 104:12-110:17; Ex. 87); John Boucher, David Handy, Bob Crochetiere, Lisa
13  Cometa, Steven Vakulskas, Keith Block, Ron Bunting, Ken Hamel (Ex. 78 at 149:3-159:21; Ex. 88);
14  Kirsten Shaw, Courtney Shaw (Ex. 78 at 159:25-163:22, 165:11-166:8; Ex. 89); and Julie Thiemann
15  and Steve Miranda (Ex. 78 at 172:2-176:9; Ex. 90). These and innumerable other Oracle employees
16  undoubtedly had many more relevant documents in their files that were not preserved by them or
17  anyone else at Oracle in the three and one-half years between defendants' receipt of the March 9,
18  2001 Complaint and authorized discovery.

19       For example, during the relevant time period,[22] Kirsten Shaw served as either the Director or
20  Senior Director of Triage and her duties included *working on customer issues, specifically for*
21  *customers who were either "in really, really bad shape" or customers who were "very, very*
22  *important, and usually that would be measured by how many millions of dollars they spend on*
23  *Oracle software."* Ex. 91 at 29:2-11; 30:18-31:16. Nonetheless, defendants failed to instruct
24  Kirsten Shaw to preserve evidence. *Id.* at 16:15-18.

25       In a more stark example, during the Company's March 15, 2001 conference call regarding

26

27  [22]  The Discovery Plan provides that the relevant time period shall be from June 1, 2000 to June
    1, 2001. Discovery Plan, §I.A.

28

1   the 3Q01 miss, defendant Henley told investors that "[r]ight up to the end of the quarter, we said we

2   felt pretty good about the quarter – *hadn't seen any indication of an erosion in our internal*

3   *forecast or heard of significant issues in regular conversations with the U.S. sales and*

4   *management*," but defendants made no effort to preserve documents in the possession of the "U.S.

5   sales and management" to whom Henley referred. Ex. 92. Indeed, despite very likely having

6   listened to this call and certainly negligent if she had not, and having document preservation

7   responsibilities in the litigation arising in part from the miss, Segal did not even know to whom

8   Henley was referring, and thus could not have ensured that such individuals preserved all relevant

9   documents given the lack of a company wide or even a sales division wide preservation instruction.

10  Ex. 78 at 182:23-183:7; 184:23-185:1.

11          Defendants did know that the "Speakers" communicated in various methods, including

12  orally, with employees from all levels of the Company as evidenced by the testimony of Cooperman,

13  but did nothing to identify those individuals in order to capture potentially relevant evidence:

14      Q:   Okay. You recognize that Mr. Ellison would have had access to information
             in late 2000/2001 from the sales force itself; is that fair?
15
        A:   Yes.
16
        Q:   From managers in the sales force?
17
        A:   Certainly.
18
        Q:   That Mr. Ellison's sources of information wouldn't be limited simply to the
19           people who directly reported to him formally?

20      A:   Correct.

21      Q:   And that, in fact, Mr. Ellison would speak with people at levels below the
             AVP level on occasion; is that true?
22
        A:   My understanding is that he does, yes.
23
    Ex. 79 at 273:18-274:6.
24
            Defendant Sanderson admitted that he regularly communicated with area vice-presidents
25
    ("AVPs"), regional managers and even account managers. Ex. 93 at 261:8-263:2. When asked
26
    about how he would determine the status of quarterly sales in progress, defendant Sanderson
27
    responded:
28

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                              - 41 -

1

2

3

> *I would talk to the AVPs. I'd talk to the regional managers.* Oftentimes I was talking to the customers. The sales reps like it when you came out and visited their customers, bringing an executive out to the customer. So, *I'd hear it directly from the account managers.* And the fact that I visited the customer, I'd oftentimes get the input of that.

4  Ex. 94 at 565:23-566:5.

5  Nevertheless, despite defendants' knowledge, they made no effort to ensure that regional

6  sales managers, no matter the division, or salespersons in general, preserved evidence. Ex. 78 at

7  120:10-14, 131:10-132:1, 186:24-187:7. Nor did defendants make any effort to communicate

8  preservation instruction to AVPs, a fact about which defendants would later deceive the Court and

9  plaintiffs. *Id.* at 135:5-9; §VII.C, *infra.*

10  Defendants also elected to ignore obvious methods of reaching large groups of employees

11  that communicated with the "Speakers," including a predefined group of e-mail recipients at Oracle

12  that included all of the people in defendant Henley's organization that could have been reached by

13  simply e-mailing henleyorg_us@oracle.com. Ex. 95 at 203:25-204:10. Defendants similarly failed

14  to notify employees on various sales distribution lists that no doubt encompassed the entire sales

15  organization to preserve documents. Ex. 96 at 150:11-151:21. These lists included, for example,

16  allsales_us@oracle.com, sales_us@oracle.com, and ww_sales_us@oracle.com. *Id.*; Ex. 97.

17  The crucial nature of this lost evidence is exemplified by the reports proffered by defendants'

18  proposed expert witnesses. Defendants' proposed expert witnesses relied upon the fact that

19  defendants received information from the Company's sales staff and other lower level employees in

20  reaching their opinions. For example, defendants' proposed forecasting expert R. Glenn Hubbard

21  ("Hubbard") relied on the fact that, in preparation of the Company's Upside Reports,[23] Minton,

22  Sanderson and others, sometimes including defendant Henley, would have weekly Americas

23  conference calls on Thursdays with the "Americas senior sales personnel and their support staff"

24  wherein "senior sales personnel updated call participants on any changes to their forecasts, any

25  significant changes to the status and/or timing of large deals . . . ." Ex. 98 at ¶183. Indeed, Hubbard

26

27  [23]  Hubbard states that "Oracle's forecast and guidance were based primarily on the Upside Report[s]." Ex. 98 at ¶162.

28