# EXHIBIT 55 part 2

1   cited to the testimony of Sanderson referenced above. Ex. 99 at ¶58. Hubbard further relied on the
2   fact that "Minton made adjustments to the forecast based on the information she received on the
3   Thursday calls," and that Ivgen Guner ("Guner"), the member of Minton's staff "who was
4   responsible for preparing underlying forecast analyses for Minton, and Minton would discuss in
5   detail any additional forecast data that was provided in the America's [sic] conference call on
6   Thursdays." Ex. 98 at ¶185. Hubbard also opines that one way "[m]acroeconomic conditions were
7   incorporated in the forecast" was through "sales representatives' estimates of the likely purchasing
8   behavior of their prospective customers." *Id.* at ¶159.[24]

9       Defendants' proposed product expert Edward Yourdon ("Yourdon") also relies on direct
10  evidence from sales personnel or the so-called lack thereof in the record in reaching his opinions.
11  With respect to issues related to demonstrations of Suite 11i, Yourdon opines that "I have not seen
12  anything in the evidentiary record in this case suggesting that any salesperson at Oracle misled a
13  customer by rigging a demonstration or misrepresenting Suite 11i's capabilities." Ex. 100 at ¶213.
14  However, Yourdon fails to acknowledge, or perhaps was not informed, that defendants failed to
15  preserve evidence from sales personnel. Regarding quality problems with Suite 11i during 3Q01,
16  Yourdon concluded that the "product issues" in 3Q01 were not any different from any other quarter
17  at Oracle. *Id.* at ¶231. In reaching this conclusion, Yourdon relied upon the fact that "complaints by
18  the sales force about the products . . . all appeared on the record in other quarters" and were "nothing
19  out of the ordinary." *Id.* Setting aside the inherent problems with such a conclusion given the
20  relevant time period for document production in this case, Yourdon's conclusion fails to consider the
21  distinct possibility that any such evidence would not have been preserved by defendants based upon
22  their preservation strategy.

23       Clearly, because they did not know with whom the "Speakers" communicated, assuming
24  *arguendo* that the "Speakers" strategy was legitimate, defendants should have issued preservation
25

26  [24]   *See also* Ex. 99 at ¶34 (the forecasting process at Oracle involves judgment by salespeople);
27  ¶40 (same); ¶52 (economic information is incorporated into Oracle's forecasting process through information from individual salespeople); ¶55 (same)
28

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ      - 43 -

1  instructions to all employees or, at the very least, defendants should have taken immediate concrete

2  steps to ascertain the identity of *all employees* with whom the defendants communicated in any

3  manner. Defendants' willful failure to do so resulted in the destruction of the files of very likely the

4  majority of individual employees at Oracle with whom defendants communicated, *i.e.*, the

5  destruction of highly relevant evidence. Moreover, based upon Cooperman's knowledge, defendants

6  should have preserved the files of all of the sales force and all AVPs. Defendants' failure to do so

7  clearly constitutes bad faith. Thus the imposition of sanctions is warranted. *See, e.g., Leon,* 464

8  F.3d at 958-59; *AdvantaCare,* 2004 U.S. Dist. LEXIS 16835, at *11.

9          **2.     Defendants Intentionally Excluded Entire Categories of**
               **Employees Who Possessed Relevant Documents from the**
10                 **Preservation Instructions**

11        Defendants failed to communicate preservation instructions to entire categories of

12  employees. The evidence that would have been in the possession of the individuals in these

13  categories is highly relevant to plaintiffs' claims as the individuals would have been in possession of

14  evidence related to defendants' 3Q01 miss and the persistent problems with Suite 11i. Indeed, based

15  upon defendants' omissions with respect to individuals in possession of information related to Suite

16  11i – specifically problems with Suite 11i, it appears that defendants' intent was that no evidence

17  critical of Suite 11i be preserved. In sum, these intentional omissions again inevitably resulted in the

18  destruction of relevant evidence demanding the imposition of sanctions. *See, e.g., Leon,* 464 F.3d at

19  958-59; *Brotby,* 364 F.3d at 1115; *see also NTL,* 2007 U.S. Dist. LEXIS 6198, at *70-*72.

20          **a.     Defendants Did Not Instruct Employees of Certain**
               **Divisions to Preserve Evidence**
21

22              **(1)    Defendants Failed to Instruct Employees in**
                 **General Business – the Company's Largest Sales**
23                   **Organization – to Preserve Evidence**

24        During the March 1, 2001 conference call, during which defendants attempted to explain the

25  revenue and earnings miss, defendant Ellison said that *the general business dot-com mid-market*

26  *forecast went down each of the last four days of the quarter* and defendant Henley repeated this

27  during the Company's March 15, 2001 conference call: "As Larry said on the March 1 conference

28  call, *the crack started to appear in the last four days of the quarter. At first, it showed in our*

1  *general business dot-com mid-market forecast, which came down each of the last four days*."

2  Ex. 92. Remarkably, according to Segal, employees of the North American Sales division (also

3  known as "General Business"), no matter their level, would not necessarily have relevant documents,

4  and thus defendants made no categorical effort to preserve the documents of any level of employee

5  in General Business. Ex. 78 at 132:5-135:9. Nor did defendants make any attempt to talk to all of

6  the General Business employees. *Id.* at 186:9-187:7.

7                              (2)    **Defendants Failed to Instruct Consulting**
                                      **Employees Who Installed Suite 11i to Preserve**
8                                     **Evidence**

9           Although Segal acknowledged that the March 9, 2001 Complaint included specific

10  allegations related to the CRM component of Oracle's Suite 11i software, and that Oracle's

11  consulting division was responsible for CRM implementations, defendants again admittedly made no

12  categorical effort to identify individuals within the consulting organization for preservation efforts.[25]

13  Ex. 78 at 136:3-137:22; *see also* Ex. 101, ¶¶3, 22. Defendants admittedly could have notified the

14  entire consulting staff in North American Sales to preserve documents by e-mail. Nonetheless, the

15  only individual from the consulting organization on the March 13, 2001 preservation e-mail or that

16  Segal recalled notifying of preservation requirements was defendant Sanderson, who himself

17  testified that he relied on and communicated with AVPs and regional managers. Ex. 78 at 136:3-

18  137:22.

19                             (3)    **Defendants Failed to Instruct Employees of the**
                                      **Support Division Who Supported Suite 11i**
20                                    **Customers to Preserve Evidence**

21          The same is true for Oracle's support division. Despite clearly knowing that the March 9,

22  2001 Complaint included specific allegations related to Oracle's Suite 11i software, and that "the

23  support organization had generally the responsibility for providing support services to customers

24  who were using Oracle software," defendants took no action to ensure that evidence in the

25  possession of employees of the support organization was preserved. *Id.* at 71:20-23; 249:22-250:12.

26  ─────────────────

27  [25]    Defendants' March 13, 2001 preservation e-mail specifically referenced documents relating
        to "11i and CRM implementations" as documents to be preserved. Ex. 85.

28

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                              - 45 -

As Richard Sellers, a group vice-president in the support division during the relevant time period testified, employees in the support organization supported Oracle's software and served as the first point of contact at the Company for customers after sales. Ex. 102 at 25:13-17. Nevertheless, the documents evidencing such work were not preserved.

### (4) Defendants Failed to Instruct Escalation Managers to Preserve Evidence

Defendants also failed to preserve the documents of Oracle's escalation managers. Escalation managers coordinated among Oracle departments in order to ensure that customers got the assistance they needed when they were implementing Oracle software. *See, e.g.*, Ex. 103 at 13:8-14:3; Ex. 104, Ex. 105, Ex. 106. Oracle assigned escalation managers to customers who had difficulties implementing Suite 11i. Escalated accounts were identified as hot, warm or cold with hot accounts being described as follows:

- Highly Volatile or visible customer
- Critical negative impact to customer
- Negative public relations or potential for revenue loss to the customer or Oracle
- Pending major sales dependent on Support's performance
- Customer has requested escalation process; and immediate Oracle attention is required

Ex. 104. Thus, the escalation managers had first-hand knowledge of the problems with Oracle's Suite 11i software.

Plaintiffs have identified over 40 escalation managers at Oracle, including individuals who worked with Oracle customers General Electric ("GE") and POSCO, for example, both of which had documented problems with Suite 11i. Not a single one of these escalation managers received a document preservation instruction.[26] This was true even though the escalation managers played

---

[26] The escalation managers identified by plaintiffs include Steve Cox, Beth Ann Ziebarth, Barry Stephens, Julie Thiemann, Tom Vera, Howard Edelstein, Robert Ewbank, Peter Winter, Robert Hunt, Robert Paino, Dave Vandenberg, Tom Zerbe, Ian Barnor, Valerie Milligan, Jim Cairn, Rich Ware, Scott Saunders, Jean Denis, Mona Motz, Gary Kerber, Solie (Stilley) Berg, Jim Hruby, Sherman Terry, Joe Oppelt, Robin Moss, Edwin Wiggins, Scott McCall, Bernadette Aquino, Charlie Freeman, Tim Collier, Cindy Eastwood, Marcia Hill, Linda Lam, Rich Ware, Berna Lowenstein, Phillip Tate, Gerald Horvatz, Anna Gonzalez, Sarina Hasegawa, Angela Scott, Michael Fleck, Rich Pierce and Patricia Sullivan.

1  highly visible and critical roles at the Company. *See, e.g.*, Ex. 105. For example, Steve Cox led the

2  escalation team for implementations. *Id.* Phillip Tate worked on high profile Suite 11i escalations

3  that were escalated to Ellison during the Class Period (December 14, 2000 to March 1, 2001),

4  including those at GE Corporate and Liberty Mutual. Ex. 106; Ex. 107. Moreover, plaintiffs' RSAC

5  specifically identified one of its confidential witnesses as having been an escalation manager at

6  Oracle. Ex. 108, ¶27(dd).

7
                        b.       **Defendants Impermissibly Relied Upon Oracle's Non-**
8                                 **Attorney Employees to Determine Who Should Receive**
                               **Preservation Instructions and to Communicate the**
9                                 **Instructions**

10        In the March 13, 2001 e-mail, defendants asked a certain few employees to forward the

preservation e-mail "to anyone in your organization who may have relevant documents." Ex. 85.
11
This approach constituted a bad faith dereliction of preservation duties -- first because, as Segal
12
admitted, it impermissibly put the relevancy determination on the non-attorney recipients. Ex. 78 at
13
199:22-200:1; *see NTL*, 2007 U.S. Dist. LEXIS 6198, at *70-*72. Indeed, Segal herself admitted
14
that she could not even anticipate what would be relevant in the lawsuit. Ex. 78 at 58:6-25.
15
      Moreover, counsel's delegation of their duties utterly failed. For example, Barrenechea, a
16
recipient of the March 13, 2001 e-mail, one of Ellison's direct reports, and a senior vice-president of
17
applications development and as such the head of Suite 11i CRM development with hundreds of
18
employees reporting to him, testified that he did not request that members of the product
19
development team preserve documents relevant to this litigation. Ex. 109 at 29:18-25; 32:18-23;
20
292:12-20; Ex. 85. In fact, Barrenechea testified, "I think that was a legal function to do that." Ex.
21
109 at 292:12-20. Defendant Sanderson had no recollection of being involved in ensuring that his
22
direct reports preserved documents. Ex. 94 at 58-6-25.
23
          C.      **The Scope of Defendants' Preservation Instructions Was Knowingly**
24                  **Deficient**

25                 1.      **Defendants Failed to Instruct Employees Regarding the**
                        **Preservation of Evidence Post-Receipt of Preservation**
26                          **Instructions**

27        With respect to instructing Oracle employees to preserve documents created after March 1,

28  2001 that were relevant, defendants did nothing. Once again, defendants relied on the lay employee

1  to understand and interpret legal requirements. When asked about her efforts to preserve documents

2  created after the Class Period at her deposition, Segal referred to her so-called preservation e-mail

3  sent to 30 Oracle employees:

4      Well, I asked them to save any documents that talk about that period. I don't tell
       them – I don't put a time limitation on what the date of the document they're
5      preserving, just the date – the date of the class.

6  Ex. 78 at 195:24-196:24.

7      The documents, or lack thereof, produced from Ellison's files confirm defendants' utter

8  failure to preserve post Class Period evidence: "A typical day for Ellison starts when he gets up at

9  about seven o'clock and checks his overnight e-mails. Unlike many CEOs, Ellison has only one e-

10 mail address. He gets more than a hundred e-mails a day, most of which he answers himself or

11 forwards to the appropriate person." Ex. 110 at 286. Nonetheless, less than 15 e-mails have been

12 produced from Ellison's files, only two of which are dated after March 13, 2001.

13     The failure to preserve is shocking. For example, Segal could not explain why an admittedly

14 relevant e-mail from Minton to Ellison with a "Dot.com Revenue Analysis" for 3Q01, sent on March

15 14, 2001 – just days after Segal sent her preservation e-mail to Ellison, was not produced from

16 Ellison's files. Ex. 78 at 326:9-327:16; Ex. 111. Nor could she explain why admittedly relevant e-

17 mails received by Ellison on March 19 and March 29, 2001 discussing ongoing Suite 11i problems

18 at customer Papa Johns and the ramifications of a Forrester Research report critical of Suite 11i,

19 respectively, were not in Ellison's files. Ex. 78 at 270:18-275:5, 329:12-331:25; Exs. 112-113. Nor

20 could she explain why a relevant e-mail sent by Ellison on March 23, 2001 regarding escalated

21 customers and product quality was not produced from his files. Ex. 78 at 327:17-329:11; Ex. 114.

22 Segal's boss, Cooperman, likewise could not explain why these documents sent and/or received by

23 Ellison were not in Ellison's files. Ex. 79 at 145:3-146:9; Ex. 115; Ex. 79 at 146:10-147:17; Ex.

24 116.

25     Numerous additional highly relevant e-mails received by Ellison after the Class Period were

26

27

28

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                        - 48 -

1 | not in his files:[27]

2 | • an e-mail forwarded to him on March 20, 2001 from one of Oracle's
3 | customers that included an article critical of Suite 11i (Ex. 117 at 272:19-24 and Ex. 118);

4 | • a March 23, 2001 e-mail that provided in part:

5 | Mark (Jarvis),

6 | . . *we need your help to counter an increasing number of negative comments on the quality of our applications products.* The latest is
7 | the attached PUBLIC note from Forrester of March 19th. If this continues it will slow down our sales and the migration of existing
8 | customers until 11.5.4 or 11.5.5.

9 | This has just costed [sic] us one loss at a client! Unfortunately many new prospects listen to and believe to analysts [sic].

10 | Ex. 119 and Ex. 117 at 274:10-275:21; *see also id.* at 284:11-18 and Ex. 120.

11 | • an e-mail from the Executive Vice-President of EMEA (Europe, Middle East
12 | and Africa) to the head of Suite 11i CRM development that provided in part:

13 | Mark,

14 | I also disappointed by the results . . . but . . . as you know, we had six-nine months of product issues which caused loss of confidence by
15 | sales, partners, analysts and customers.

16 | *Even as of today, R11.5.4 which is the first stable release is NOT AVAILABLE in local language and we will only get it between July*
17 | *and October 2001.*

18 | This continued delay between the American English release and the local language is hurting us.

19 | Ex. 121 and Ex. 117 at 306:20-308:18;

20 | • an e-mail regarding a "very escalated" situation with Suite 11i customer
21 | Value Vision (Ex. 117 at 293:19-294:17 and Ex. 122);

22 | • an e-mail detailing a behind schedule Suite 11i CRM implementation at
23 | customer Pizza Hut (Ex. 117 at 294:18-295:11 and Ex. 123);

24 | • an e-mail about General Business demo scores that were not "heading in the right direction" because "*[p]erformance and product issues continue to*
25 | *hinder us every day*" (Ex. 117 at 295:12-296:2 and Ex. 124);

26 | • an e-mail describing "growing concerns" surrounding Suite 11i CRM demos

27 | [27] Ellison was unable to explain the absence of these documents.

28 |

1        (Ex. 117 at 297:9-297:23 and Ex. 125);

2    •    an escalated customer management report with over 20 Suite 11i CRM and
         ERP customers listed with a "HOT" escalation status (Ex. 117 at 299:25-
3        301:5 and Ex. 126; *see also* Ex. 117 at 308:19-310:11 and Exs. 127-128);

4    •    an e-mail regarding a delayed Suite 11i ERP implementation at customer
         NCR (Ex. 117 at 330:9-14 and Ex. 129);
5
     •    an e-mail pulling the Company's "#1 in CRM" advertisement because it was
6        not true (Ex. 117 at 331:24-333:12 and Ex. 130).

7    *See also* Ex. 117 at 296:3-17 and Ex. 131; Ex. 117 at 331:18-23 and Ex. 132.

8        Similarly, countless e-mails Ellison sent after March 13, 2001 were not in his files.[28]  For

9    example, the following e-mail Ellison sent on March 23, 2001 was not in his files:

10       OK. I want all escalated customers to belong to development managers. Mark B. will
         own Papa John. Mark, I need daily reports until the customer is happy.
11
         *I need a list of the other escalated customers and I need it now. And I need support*
12       *to resurrect the reports grading whether products are within the agreed quality*
         *parameters.* Mike R. is responsible for delivering the reports.
13
         *We will meet on this on Wednesday to review every escalated customers and every*
14       *product quality rating. Until further notice every Thursday applications meeting*
         *will begin with a review of all escalated customers and application product quality.*
15       *The only allowed topics will be demo status and internal implementation*
         *requirements.*
16
     Ex. 133 and Ex. 117 at 283:16-22.
17
         Also missing from Ellison's files were an e-mail he sent in response to a critical situation at a
18
     customer, Tropicana: "I want a detailed postmortem on why Tropicana was taken down in the
19
     middle of the day. First who [was] responsible for keeping that computer up. I need a name – and I
20
     need it now;" (Ex. 117 at 303:3-305:10 and Ex. 134; *see also* §V.C.2, *infra*); and an e-mail he sent
21
     regarding Suite 11i CRM that stated, "Our top priority is to get Oracle users are 'delighted' [sic]
22
     with - the quality and functionality our CRM products. *Until that happens I doubt we will achieve*
23
     *success in the market.*" Ex. 135 and Ex. 117 at 326:12-329:11; *see also* §V. C.2, *infra*; *see also* Ex.
24
     117 at 301:16-303:2 and Ex. 136.
25

26   _____

27   [28]   Ellison was also unable to provide any plausible explanation as to why the documents he sent
         after the Class Period were not preserved.
28

1   And Ellison is simply just one example. Given defendants' clear *failure to instruct one of*
2   *the individual defendants to preserve evidence sent or received after the issuance of the*
3   *preservation instruction*, the magnitude of the resultant destroyed evidence for the rest of the
4   Company must necessarily be huge and the prejudice to plaintiffs extreme. *See In re United States*
5   *Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1068 n.3 (N.D. Cal. 2002) (finding post-class
6   period information relevant to establishing motivation); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d
7   63, 73 (2d Cir. 2001) ("[P]ost-class period data may be relevant to determining what a defendant
8   knew or should have known during the class period."). Indeed, it is simply fortuitous that another
9   Oracle employee happened not to destroy the examples above.[29]

10              **2.    Defendants Failed to Instruct Oracle Employees to Preserve**
                       **Sent Items/Turn off Autodelete Function in Outboxes**
11

12      Defendants had "a duty to suspend, as to documents that may be relevant . . . any routine

13  document purging system that might be in effect; [the] failure to do so constitutes spoliation."

14  *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280, 288 (E.D. Va. 2004). According to Segal, the

15  default setting on Oracle's e-mail system was set to automatically delete sent e-mails. Ex. 78 at

16  278:21-279:9. In order to save sent items, an affirmative step had to be taken – the default setting

    had to be changed. *Id.* Nonetheless, after the filing of this lawsuit, *defendants did not instruct*
17
    *employees to change their settings so that outgoing mail would be retained. Id.* at 320:20-321:6.
18
    Thus, the result, as Ellison testified, was, "if I didn't send a copy to myself, then it wouldn't be in my
19
    file." Ex. 117 at 304:9-305:10 and Ex. 134; *see also* Ex. 117 at 328:12-329:11 ("Again, I think
20
    because I authored it and didn't send myself a copy, it was never in my file.") and Ex.135. In sum,
21

22  [29]    Defendants apparently had a skewed view of the relevance of documents created after the
    Class Period. For example, when presented with a document produced in this lawsuit by defendants
23  discussing that "*failed implementations are putting [Oracle's] state/local vertical out of business*,"
    and "*[t]here are just too many problems with the software*" dated May 29, 2001, less than two
24  months after the end of the Class Period, Segal, despite being specifically made aware of these
    statements in the document and the recipients, several of whom Segal professed to having some
25  familiarity with, stated that *she could not even say that she would have preserved the document.*
    Ex. 78 at 203:6-210:10, Ex. 137. In so doing, it is apparent that Segal did not even consider the fact
26  that the Company continued to be unable to implement Suite 11i even after the Class Period and that
    Suite 11i was not working even after the Class Period *would be highly probative of whether Suite*
27  *11i worked during the Class Period* or even earlier.

28

1 defendants' failure to instruct employees to change their default settings regarding sent items or
2 better yet, instruct the Company's information systems employees to do so, taken together with the
3 failure to instruct employees to preserve post-Class Period evidence, very likely resulted in the
4 destruction of the majority of relevant evidence created post-Class Period. Such failure could only
5 have been in bad faith; sanctions therefore must be imposed. *Leon*, 464 F.3d at 958.

6
### 3. Defendants Failed to Ensure that All Evidence in Ellison's Control and Related to Ellison Was Preserved

7
8 A striking demonstrative example of the individual results of defendants' document
preservation scheme are the documents sourced to Ellison in this litigation. In addition to the
9
*SOFTWAR* and post-Class Period information discussed herein, defendants failed to ensure that
10
Ellison complied with the preservation instructions and failed to preserve Ellison's website utilized
11
during the Class Period. These actions constitute nothing less than the bad faith destruction of
12
evidence highly relevant to scienter, among other topics. Terminating sanctions are thus appropriate.
13
*Leon*, 464 F.3d at 958.
14

15
### a. Defendants Failed to Ensure that Ellison Observed the Preservation Instructions

16 Although Ellison apparently received a preservation e-mail, the production of documents
17 from Ellison's files demonstrate that he could not possibly have obeyed the instructions. As set forth
18 *supra*, defendants produced less than 15 e-mails from Ellison's files in total. From the time period
19 prior to March 13, 2001, defendants produced only ten e-mails. Ellison could not explain this dearth
20 of documents. Indeed, when presented with numerous relevant documents which he received and/or
21 sent prior to March 13, 2001 that were produced from the files of others, but not from his files,
22 Ellison became duplicitous.

23 Ellison initially explained that his practice with respect to e-mail was generally one time per
24 year to go through and do a cleanup and that such cleanup permanently purged documents from
25 Oracle's servers; but that he did not recall whether he did such cleanups in 2000 and 2001 and was
26 not aware of any available method of ascertaining when he did the cleanups – thus insinuating that
27 perhaps he did a cleanup prior to receiving the March 13, 2001 e-mail from Segal. Ex. 139 at 96:1-
28 13, 98:11-99:10. When presented with a document from January 2001, a version of which was

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                                    - 52 -

1    produced from his files, Ellison offered the following speculation: "Well, I made a point of not
2    throwing away things. During a cleanup period I wouldn't throw away things that I would need later
3    on, that would be useful later on." *Id.* at 179:9-23 and Ex. 140. Ellison's explanation though
4    certainly cannot account for the mere ten e-mails dated prior to March 13, 2001 that were produced
5    from his files. Indeed, given that the few e-mails produced from Ellison's files from prior to March
6    13, 2001 seem mainly to share a theme of being of a self-congratulatory nature, Ellison's explanation
7    rings hollow. *See, e.g.*, Exs. 141-143.

8         Undeniably, Ellison could not explain the absence of the more damaging pre-March 13, 2001
9    documents from his files. For example, a document evidencing that Oracle in fact paid customers to
10   serve as references for Suite 11i was not in his files even though he was the sender of the e-mail
11   message. Ex. 117 at 248:2-251:23 and Ex. 233. A February 1, 2001 e-mail to Ellison regarding a
12   downward revision in the 3Q01 forecast was not in his files. Ex. 117 at 258:10-259:18 and Ex. 234.
13   An e-mail Ellison sent regarding the delay in the internal implementation of a module of Suite 11i
14   was not in his files. Ex. 118 at 470:24-471:4 and Ex. 235. The following January 17, 2001 e-mail
15   summarizing the weak revenue results for the first month of 3Q01 was not in Ellison's files:

16        Summarized below are the December FY01 revenue results for your review. Please
          note:
17
18        •    The license revenues growth rate was 35% in USD, 25 points better than the
               10% growth we experienced in December FY00 over December FY99.
               *However, excluding the $60 million Covisint license deal, the USD growth*
19             *rate would have been only 6%. Excluding Covisint, OPI license revenue*
               *would have been (85%).*
20
                                    *       *       *
21
22        •    Applications product growth was 216% [ERP=365%, CRM=(58%)] while
               database product growth was 17% [Server=21%, Tools=(26%)]. *Excluding*
               *Covisint, Applications product growth would have been (46%) and database*
23             *product growth would have been 13%.*

24   Ex. 144 and Ex. 117 at 440:2-441:1; *see also* Ex. 139 at 96:14-22 and Ex. 145; Ex. 139 at 101:8-22
25   and Ex. 146; Ex. 139 at 101:23-102:12 and Ex. 147; Ex. 139 at 111:23-112:1 and Ex. 148; Ex. 139
26   at 116:9-15 and Ex. 149; Ex. 139 at 141:4-9 and Ex. 150; Ex. 139 at 148:19-25 and Ex. 151; Ex. 139
27   at 155:2-8 and Ex. 152; Ex. 139 at 158:18-22 and Ex. 153; Ex. 139 at 161:16-20 and Ex. 154; Ex.
28   139 at 166:9-15 and Ex. 155; Ex. 139 at 168:1-7 and Ex. 156; Ex. 139 at 171:14-20 and Ex. 157; Ex.

1 | 139 at 177:5-10 and Ex. 158; Ex. 139 at 190:9-20 and Ex. 159; Ex. 139 at 194:7-15 and Ex. 160; Ex.

2 | 139 at 208:19-209:2 and Ex. 161; Ex. 139 at 211:6-12 and Ex. 138; Ex. 139 at 218:4-10 and Ex. 162;

3 | Ex. 139 at 219:3-12 and Ex. 163; Ex. 139 at 222:19-223:1 and Ex. 164; Ex. 117 at 246:8-14 and Ex.

4 | 165; Ex. 117 at 253:10-16 and Ex. 166; Ex. 117 at 256:20-25 and Ex. 167; Ex. 117 at 258:3-9 and

5 | Ex. 168; Ex. 117 at 268:14-20 and Ex. 169; Ex. 117 at 270:7-9 and Ex. 170; Ex. 117 at 416:24-

6 | 417:19 and Ex. 171; Ex. 117 at 464:20-466:3 and Ex. 172; Ex. 117 at 468:19-24 and Ex. 173; Ex.

7 | 117 at 469:21-470:1 and Ex. 174; Ex. 117 at 525:4-526:24 and Ex. 175.

8

**b.    Defendants Failed to Preserve Ellison's Website larryellison.com**

9

10   In addition to the *SOFTWAR* materials discussed *infra*, defendants failed to preserve

11   materials from a website that Ellison maintained during the Class Period – larryellison.com – that

12   admittedly contained "transcripts of interviews and things of that nature." Ex. 176 at 114:12-16; *see*

13   *also* Ex. 177 at NDCA-ORCL 297559; Ex. 178 at NDCA-ORCL 178069. Indeed, the website "*was*

14   *developed for the purpose of posting [Ellison's] interviews and statements.*" Ex. 177 at NDCA-

15   ORCL 297559. Defendants have informed plaintiffs that the website was purged of all information

16   after this lawsuit was filed (destroyed) and defendants cannot retrieve the information that would

17   have been on the website. Ex. 176 at 78:12-79:21; 97:6-14. Ellison unsuccessfully attempted to

18   cover up this destruction by claiming that the website was never used – he simply wanted to reserve

19   the Internet name. Ex. 179 at 597:20-598:10. This is but one more example of intentional spoliation

20   and an attempted cover up warranting the most severe sanctions.

**D.    At a Company Level, Defendants Failed to Preserve Categories of Information Highly Relevant to This Litigation**

22

**1.    Defendants Failed to Preserve the Oracle Sales Online Database that Included Unique and Highly Relevant Material**

23

24   The defendants used Oracle Sales Online ("OSO") during the relevant time period for

25   forecasting and financial reporting purposes – indeed, *it contained critical relevant information.*

26   Ex. 95 at 42:11-19. Both Ellison and Henley described OSO as a "*mission critical system.*" *Id.* at

27   163:24-165:9; 168:23-169: 8; Ex. 180. Oracle's sales force input their pipeline into OSO. Ex. 93 at

28   247:16-21. OSO included information about prospective deals and win probability percentages and

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR SANCTIONS - C-01-0988-MJJ                                                                - 54 -

1  was used to create the Company's forecasts. *Id.* at 248:1-10, 255:12-256:12. OSO was also used by

2  finance employees. Ex. 95 at 166:17-21.

3      OSO provided the individual defendants with real-time forecasting information anywhere

4  and any time. Ex. 117 at 474:2-475:1; Ex. 95 at 43:7-12. As defendant Sanderson testified:

5      One of the things that OSO did is gave global visibility. Larry, for example, could sit
       in his office or at home and go on OSO and see what the pipeline was in OPI. He
6      could see what the pipeline was for a particular account manager. He could do that
       around the world.

7                          *       *       *

8
       And, again, as we rolled out OSO, I could sit down, I could go online right at my
9      desk or when I was traveling and go online. I could go into OSO, and I could see
       what Max Hill, who's one of the regional managers we talked about earlier, I could
10     go see what his deals are. I could see what he's saying is the latest around Bechtel –
       or Beckman, as an example. *And it gave us a lot – all of us a lot more visibility. It*
11     *gave Finance more visibility. It gave Larry more visibility. It gave me more*
       *visibility to my respective areas of responsibility.*

12
    Ex. 93 at 272:4-10; 274:11-23.

13
        Ellison testified that he held meetings where the attendees looked at the output from OSO

14
    and that he looked at the forecast results from OSO. Ex. 117 at 459:16-21. Defendant Henley also

15
    testified that he used the output from OSO that was included in financial reporting and internal

16
    manager reporting and that the Company relied heavily upon OSO for analyst calls. Ex. 95 at 42:20-

17
    43:6; 168:23-169:8. Ellison and Henley were both involved in compelling Oracle sales employees to

18
    input all information into OSO and keep it up to date as early as September 2000. Ex. 117 at

19
    421:15-423:6 and Ex. 181. Moreover, defendants' proposed forecasting experts, Hubbard and

20
    George Foster, relied upon the fact that Oracle sales representatives entered their sales projections,

21
    including deals, potential values and closing probabilities, into OSO. *See, e.g.*, Ex. 98 at ¶¶162, 171;

22
    Ex. 192 at ¶31.

23
        Moreover, OSO contained unique data that was not available from any other infallible

24
    source. Indeed, Ellison has blamed the Company's 3Q01 miss in part on deals that fell off due to the

25
    economy:

26
       It's very disappointing. A bunch of deals were approved at the senior vice president
27     level, but once they got to the CFO and CEO level, they were pushed off. We have a
       lot of nervous executives looking at this economy and being very cautious. They
28     want to wait thirty to sixty days so they can get a better read on this economy.

1   Ex. 183. However, when asked to name any of the customers who were involved in such deals,
2   *Ellison could not, and pointed to OSO as the only certain way to retrieve the information.* Ex. 117
3   at 364:25-367:9; 369:3-21.

4       *But defendants failed to preserve OSO or even the documents in the possession of the*
5   *employees who input data into OSO.* In response to an inquiry as to whether she took steps in
6   March 2001 to preserve OSO, Segal responded that she did not "recall when [she] started to try to
7   preserve Oracle Sales Online." Ex. 78 at 192:15-20. Segal admitted to knowing that "there was a
8   great effort made to transition to using Oracle Sales Online," but nonetheless did not instruct the
9   entire sales organization to preserve documents. *Id.* at 192:22-193:9. Nor did she successfully
10  preserve the backup tapes that contained OSO data from the Class Period. *Id.* at 262:5-264:3.
11  Indeed, OSO was purged in July 2001, a fact that concerned even Ellison. Ex. 117 at 367:10-368:15.

12      Moreover, despite the insurmountable evidence about the *usage of OSO during the Class*
13  *Period*, Ellison attempted to distance himself from OSO –*denying that he used it during the Class*
14  *Period*. Ex. 117 at 461:23-462:6. Here again Ellison's veracity is questionable. *SOFTWAR* author
15  Symonds, who accompanied Ellison throughout his working day over the course of nine months in
16  2001, *reported that Ellison utilized OSO on a daily basis*, and Ellison took no action to correct this
17  statement published in *SOFTWAR* even though it was clearly his prerogative to do so. *Id.* at 461:23-
18  462:10. When faced with this contradiction, Ellison cleverly testified that the Company kept logs,
19  very likely knowing full well that the logs too were destroyed. *Id.* at 461:23-464:5. Indeed, the only
20  conclusive proof as to whether Ellison utilized OSO during the Class Period – the OSO log-in
21  records – have also been destroyed. *Id.*

22            **2.**    **Defendants Failed to Preserve Crucial Documents Relating to**
23                 **Oracle's Forecasting Process**

24      Defendants' spoliation of forecasting materials went much further than the OSO database.
25  The Discovery Plan required defendants to produce documents and communications relating to
26  Oracle's forecasts and Oracle's sales pipeline and pipeline conversion rates/ratios. Ex. 43, § I.C.
27  Said documents were to be produced for the relevant time period, including documents created
28  outside the relevant time period that refer to events within the relevant time period. *Id.*, § I.A. As

1  set forth in the Motion to Compel, as of May 16, 2006, Oracle's production omitted numerous

2  critical forecasting reports and documents that Oracle used every quarter during the relevant time

3  period.[30]  Even though Oracle had taken the position that its production was complete – and the

4  Discovery Plan required defendants to complete their production by *May 1, 2005* (Ex. 43, § II.A.),

5  plaintiffs continued to seek the missing information, including by serving a third set of requests for

6  production on May 31, 2006. Defendants continued to evade the discovery. On August 16, 2006,

7  plaintiffs moved to compel further responses to certain requests, and on September 15, 2006, Special

8  Master Infante ordered defendants to produce by September 29, 2006 "all sales forecast reports

9  (periodic or otherwise) from 1999-2001 and all deal reports from 1999-2001." Ex. 184 at 4.

10     Defendants produced certain documents on October 2 and 16, 2006, but even then, over five

11  months after the original production deadline, defendants' production was extremely deficient.

12  Plaintiffs moved again on October 30, 2006 – this time to enforce Special Master Infante's

13  September 15, 2006 Order, therein detailing numerous deficiencies in defendants' production.

14  Special Master Infante then issued an Order that provided in part:

15         Defendants shall provide Plaintiffs with a sworn declaration from an Oracle
           representative with knowledge clearly indicating whether Defendants have produced
16         all responsive, non-privileged documents in their possession, custody or control. The
           declaration shall address each of the reports [detailed in] Plaintiffs' motion. To the
17         extent that responsive documents are not in Defendants' possession, custody or
18         control, the declaration shall clearly so indicate on a report-by-report basis.

19  Ex. 185 at 8. In response, defendants provided the declaration and amended declaration of James C.

20  Maroulis (the "Maroulis Declarations"). Exs. 186-187. Plaintiffs then challenged the evasive

21  language of the Maroulis Declarations which in essence indicated that missing reports may or may

22  not have existed. Thereafter, Special Master Infante issued an Order requiring that defendants,

23  within seven days:

24         [P]rovide Plaintiffs with a sworn declaration from an Oracle representative (or
           representatives) clearly indicating, on a report-by-report basis, whether the reports
25         identified by Plaintiffs ever existed, which of the reports that existed have been

26  _____

27  [30]  The relevant time period consisted of Oracle's fiscal quarters 3Q00 through 4Q01.

28

1  produced to Plaintiffs and which of the reports that at one time existed were not
2  produced to Plaintiffs because they are no longer in Oracle's possession, custody or
   control.

3  Ex. 188 at 10-11. After requesting an extension, defendants provided the Declaration of Ivgen
4  Guner Regarding Forecasting Reports ("Guner Declaration") to plaintiffs on March 20, 2007.

5      Although the Guner Declaration in part continues to dodge the question of whether the
6  reports identified by plaintiffs ever existed, the Guner Declaration, taken together with what
7  plaintiffs have determined to be an established historical pattern of creating the reports in question,
8  supports what plaintiffs have suspected all along – that defendants failed to preserve the critical
9  relevant forecasting documents detailed in the tables below:[31]

| UPSIDE REPORTS[32] | |
|---|---|
| Fiscal Quarter | Missing Reports |
| Q1'99 | weeks 4, 6, 8 |
| Q2'99 | weeks 2, 6, 8, 11, 12, 13 |
| Q3'99 | weeks 2, 4 |
| Q4'99 | weeks 4, 6, 8 |
| Q1'00 | weeks 2, 4, 11 |
| Q3'00 | week 4 |
| Q4'01 | week 8 |

[31] The Guner Declaration includes language to the effect that after ascertaining Oracle's collective knowledge, defendants still do not know the frequency with which the following reports were created: Deal Reports used during Americas Forecast Calls for fiscal years 2000 and 2001; Garnick Flash Reports for fiscal years 1999 and 2000; Monthly Flash Reports for fiscal years 1999 and 2000; OPI Big Deal Scenarios for fiscal years 1999, 2000 and 2001; OSI Pipeline Reporting Packages for fiscal years 1999, 2000 and 2001; Upside Reports for fiscal years 1999 and 2000; Americas Forecast Packages for 1999, 2000 and April and May of Q4 2001; Executive Committee Worldwide Forecasts for 1999 and Q1 2000; Oracle Support Services USA GAP Analysis for Q3 and Q4 2000; and Pipeline Reporting Packages for fiscal 1999, 2000, Q3 and Q4 2001. Ex. 189.

[32] *Compare* Ex. 189 (Guner Declaration) *with* Ex. 190 (Corporate Forecast Schedule). Further evidencing the problems with defendants' preservation and production of relevant forecasting reports and defendants' refusal to fully comply with the Court orders is the Rebuttal Expert Report of George Foster which identifies numerous upside reports not identified by the Guner Declaration. *See* Ex. 182.

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                        - 58 -

| MONTHLY FINANCIAL REFERENCE BOOKS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| 3Q'00 | December, January |

| AMERICAS FORECAST PACKAGES | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q3'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q1'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'00 | weeks 2, 4, 6, 8, 10, 11, 13 |
| Q3'00 | week 4 |
| Q4'00 | week 10 |
| Q4'01 | weeks 8, 10, 11, 12, 13 |

| GARNICK FLASH REPORTS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | June, July |
| Q2'99 | September, October |
| Q3'99 | December, January |
| Q4'99 | March, April |
| Q1'00 | June, July |
| Q2'00 | September, October |
| Q3'00 | January |
| Q4'00 | March |

| MONTHLY FLASH REPORTS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | August |
| Q2'99 | November |
| Q3'99 | January, February |
| Q4'99 | March, April, May |
| Q1'00 | June, July, August |
| Q2'00 | September, October, November |
| Q3'01 | January, February |
| Q4'01 | March, April |

| PIPELINE REPORTING PACKAGE | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q3'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q1'00 | weeks 2, 4, 6 |
| Q2'00 | weeks 11, 12, 13 |
| Q3'00 | weeks 4, 8, 10, 12, 13 |
| Q4'00 | weeks 4, 8, 11, 12, 13 |
| Q3'01 | weeks 4, 8, 11, 12, 13 |
| Q4'01 | weeks 4, 8, 10, 11, 13 |

| NAS FORECASTS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13, 14 |
| Q2'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13, 14 |
| Q3'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13, 14 |
| Q4'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13, 14 |
| Q1'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13, 14 |
| Q2'00 | weeks 2, 4, 6, 13 |
| Q4'00 | week 14 |
| Q2'01 | week 8 |

| GENERAL BUSINESS FORECASTS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q3'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q1'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q3'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'01 | weeks 2, 4, 6 |
| Q3'01 | weeks 2, 6, 11, 12, 13 |
| Q4'01 | weeks 2, 8, 10, 11, 12, 13 |

| MAJORS FORECASTS | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q3'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'99 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q1'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q2'00 | weeks 2, 4, 6, 8, 10, 11 |
| Q3'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |
| Q4'00 | weeks 2, 4, 6, 8, 10, 11, 12, 13 |

| DEAL REPORTS USED DURING AMERICAS FORECAST CALLS | |
|---|---|
| **Fiscal Year** | **Missing Reports** |
| FY'99 | All |
| FY'00 | All but four |

| AMERICAS REPORTING PACKAGES | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | All |
| Q2'99 | All |
| Q3'99 | All |
| Q4'99 | All |
| Q1'00 | All |

| EXECUTIVE COMMITTEE WORLDWIDE FORECAST | |
|---|---|
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | June 8, 1998<br>June 22, 1998 |
| Q2'99 | September 21, 1998<br>November 16, 1998 |
| Q4'99 | April 5, 1999<br>May 3, 1999 |
| Q2'00 | November 15, 1999 |
| Q3'00 | December 13, 1999<br>December 27, 1999 |
| Q2'01 | November 6, 2000 |

| NAS BIG DEAL SCENARIOS | |
| --- | --- |
| **Fiscal Year** | **Missing Reports** |
| FY '99 | All |
| FY '00 | All |

| BIG DEAL UPDATE | |
| --- | --- |
| **Fiscal Quarter** | **Missing Reports** |
| Q1'00 | All |
| Q2'00 | All |
| Q3'00 | All but three  (should be at least 8 reports) |
| Q1'01 | missing three |
| Q2'01 | missing two |
| Q4'01 | missing four |

| OSI PIPELINE HISTORY REPORT | |
| --- | --- |
| **Fiscal Year** | **Missing Reports** |
| FY'99 | All |
| FY'00 | All |

| OPI FORECAST PACKAGE | |
| --- | --- |
| **Fiscal Quarter** | **Missing Reports** |
| Q1'99 | All |
| Q2'99 | All |
| Q3'99 | All |
| Q4'99 | All |
| Q1'00 | All |
| Q2'00 | All |
| Q3'00 | All |
| Q4'00 | All |
| Q1'01 | weeks 2, 6, 11, 13 |
| Q4'01 | week 10 |

| OSI FORECAST PACKAGE | |
| --- | --- |
| **Fiscal Year** | **Missing Reports** |
| FY'99 | All but one |

| OSI BIG DEAL SCENARIOS | |
| --- | --- |
| **Fiscal Year** | **Missing Reports** |
| FY'99 | All |
| FY'00 | All |

| OPI BIG DEAL SCENARIOS | |
| --- | --- |
| **Fiscal Year** | **Missing Reports** |
| FY'99 | All |
| FY'00 | All |

*See* Ex. 189.

Given that Oracle's records retention schedule required that such forecasting documents be preserved for three years – and thus all of the reports defendants were ordered to produce (dating back to 1999) should have been in existence at the time plaintiffs filed their March 9, 2001 Complaint – the only possible conclusion is spoliation. *See* Ex. 191 (Oracle Approved Records Retention Schedule) at NDCA-ORCL 045874. Indeed, as part of its investigation into events that in part form the basis of this litigation, the SLC requested and received certain documents from Oracle and defendants Ellison and Henley, including many of the same documents requested by plaintiffs, and requested and received the Company's document retention policies to determine whether documents relevant to the allegations against defendants should still exist pursuant to Company policy.[33] *See* Ex. 192 at NDCA-ORCL 294808-23. Based upon the Company's document retention policy, the SLC concluded that "[i]f any documents that should have been retained were not produced, the Committee could reasonably infer either that the documents had been destroyed or that the Company was not cooperating in the Committee's investigation." *Id.* at NDCA-ORCL 294822-23.

### 3.     Defendants Failed to Preserve Group E-mail Boxes

In addition to wholly failing to preserve individual e-mail boxes, defendants also failed to

---

[33]   The SLC specifically investigated the allegations made in the various derivative actions filed against defendants Ellison, Henley and others and the allegations of accounting fraud included in the SAC.

1  preserve group e-mail boxes that were used by groups within Oracle to send and receive relevant
2  information. Indeed, the only such box that Segal claims to have preserved was a box for the
3  organization Headquarters Approvals, and for that box, she could not even recall when it was
4  preserved. Ex. 78 at 267:18-268:22. Other group e-mail boxes used at Oracle included
5  revrec@us.oracle.com (revenue recognition group) and arinfo@oracle.com (accounts receivable
6  group).

7  **4. Defendants Failed to Preserve Escalated Customer Reports**

8  During the relevant time period, Oracle utilized its Escalated Customer Management System
9  ("ECMS") as a reporting tool for the critical accounts division of support. Ex. 91 at 86:4-88:1.
10  When information was entered into ECMS, the system would generate reports that would be
11  distributed via e-mail. *Id.* The ECMS included escalated customers and information on technical
12  assistance requests. Ex. 193. Escalated Customer Reports were generated by the system weekly,
13  and were sorted by hot, warm and cool escalations and by product, including Suite 11i CRM
14  products and Suite 11i ERP products. *See* Ex. 126.

15  Ellison and others received these reports. *Id.* The information included on the reports was
16  also available via the web at Oracle. Ex. 193. Ellison was provided with the URL for the webpage.
17  *Id.* Despite the purpose and the users of this information, defendants have only produced five
18  Escalated Customer Reports dated weekly from May 21, 2001 to June 18, 2001. Not a single
19  Escalated Customer Report was produced from the Class Period.

20  **VI. DEFENDANTS INTENTIONALLY DESTROYED THE HIGHLY**
    **RELEVANT *SOFTWAR*-RELATED MATERIALS**
21

22  Defendants' pattern of spoliation in this litigation is exemplified by their course of conduct
23  with respect to *SOFTWAR*-related materials. *SOFTWAR* is essentially a chronicle of the events
24  relating directly to plaintiffs' allegations, and much of the material underlying *SOFTWAR* was
25  developed contemporaneously with Oracle's 3Q01 earnings miss and the filing of this litigation and
26  reactions to both, as well as during the Class Period.[34] The underlying materials include numerous

27
    _____
28  [34]    Defendants never even produced *SOFTWAR* in this litigation.

1  hours of tapes and transcripts of Symonds' interviews with Ellison on topics such as Suite 11i,

2  insider trading, forecasting, the economy, and Oracle's billion dollar savings claim. Indeed, Special

3  Master Infante ultimately ordered defendants to produce "any and all tape recordings and/or

4  transcripts of interviews with Ellison created in the preparation of the book." Ex. 194 at 4. Special

5  Master Infante specifically found:

6          The book, co-authored by Mr. Ellison, is *clearly relevant* to the issues
        identified in the Discovery Plan. Documents concerning and created for the book
7          appear reasonably calculated to lead to the discovery of admissible evidence. Rule
        26(b)(1).

8
    Ex. 195 at 6.
9
        Nonetheless defendants intentionally spoliated the *SOFTWAR*-related materials. Defendants
10
    both failed to preserve and produce the materials and intentionally destroyed the materials in direct
11
    violation of the PSLRA, the Discovery Plan, the Federal Rules of Civil Procedure and Special
12
    Master Infante's Order, thereby severely prejudicing plaintiffs. Ultimately, defendants produced
13
    only a minute portion of the relevant material well after the close of fact discovery. Just over 200
14
    pages of interview transcripts from 2002 were produced; defendants did not produce a single tape or
15
    a single 2001 transcript.
16
        **A.     The *SOFTWAR* Materials are Highly Relevant to this Litigation**
17
            **1.     Ellison and Symonds Worked Jointly on *SOFTWAR***
18
        As Oracle's 3Q01 earnings announcement was leaving investors reeling, author Symonds
19
    joined Ellison in Hong Kong to begin Symonds' nine months of virtually unlimited access to both
20
    Ellison and Oracle in preparation for the book *SOFTWAR*. Ex. 110 at 11. For ten days each month
21
    from March through November 2001, Symonds accompanied Ellison throughout his working day,
22
    sitting in on both internal Oracle meetings and meetings with current and potential customers. Ex.
23
    196 at NDCA-ORCL 1529371-72. In Symonds' words, he was "present in all parts of [Ellison's]
24
    business." Ex. 197 at NDCA-ORCL 1053575. Symonds' access also included office space near
25
    Ellison at Oracle's headquarters, review of previously confidential Company memoranda and e-mail,
26
    and full access to Oracle's archives. Ex. 196 at NDCA-ORCL 1529371-72.
27
        For those nine months beginning in March 2001, Ellison was also required to make himself
28

1   available for a minimum of ten hours per month of one-on-one interview time with Symonds. *Id.* at

2   NDCA-ORCL 1529372. Thus, Symonds was interviewing Ellison and recording his reactions

3   contemporaneously with Oracle's announcement of its 3Q01 earnings miss and even the filing of

4   this litigation. In addition, for the nine months beginning in December 2001, Ellison was required to

5   make himself available for a minimum of five hours per month of one-on-one interview time with

6   Symonds. *Id.* Thus, over the 18 month period commencing in March 2001, Ellison provided

7   Symonds with a minimum of 135 hours of one-on-one interview time.

8       Moreover, an article written by Symonds to promote *SOFTWAR* reveals that Symonds also

9   interviewed Ellison prior to March 2001 and almost certainly during the Class Period. The article,

10  titled "The Rewards of Recklessness," contains a variety of quotes from Ellison regarding issues

11  directly relevant to this litigation.[35] Clearly, Symonds interviewed Ellison for this promotional

12  article prior to January 5, 2001. As such, *SOFTWAR* is informed by Symonds' intimate access to the

13  highest levels of the Company, including Ellison, both during and directly after the Class Period.

14      In addition to providing Symonds with access and information, Ellison drafted commentary

15  which is footnoted throughout *SOFTWAR*. Ex. 179 at 674:11-25. Although Ellison was restricted

16  from making changes to the portions of *SOFTWAR* written by Symonds, he was able to comment,

17  via footnote, on any portion of the book with which he disagreed or wished to clarify (likewise,

18  Symonds was restricted from making changes to Ellison's commentary).[36] Ex. 196 at NDCA-ORCL

19  1529374.

20          **2.    *SOFTWAR* is Replete With Information Relevant to this
                   Litigation**

21

22      *SOFTWAR* contains hundreds of pages of material directly relevant to plaintiffs' allegations

23  [35]    Despite its obvious relevance, defendants withheld "The Rewards of Recklessness" from

24  production for almost one and one half years after it should have been produced pursuant to the
    Discovery Plan, finally producing it as an attachment to a January 5, 2001 e-mail to Ellison, on

25  October 2, 2006. *See* §VI.C.1, *infra*. In the article, Symonds writes, "I will ride alongside Ellison as
    he makes a high stakes bid for dominance in a war with the rest of an industry that shapes our world.

26  I will narrate from the field the story of how Oracle does battle." Ex. 198 at NDCA-ORCL 1053573.

27  [36]    As a result, *SOFTWAR* is co-authored by Ellison and Symonds and the two hold joint
    copyright. Ex. 196 at NDCA-ORCL 1529374-75.

28

in this case. In particular, the book discusses, in great detail, the release of Suite 11i, the months –

even years – of hardship that accompanied its release (both from Oracle's perspective and from the

perspective of customers affected by the software's shortcomings); sales by insiders, including

Ellison's January 2001 sales; Oracle's forecasting process and the effect of the economic slowdown

on the Company; and Oracle's billion dollar savings claim, just to name a few. *See* Ex. 10. For

example, in Chapter 9, titled "The Laboratory," Symonds writes (and Ellison provides commentary)

on the development of Suite 11i, including information refuting Oracle's marketing mantra

throughout the Class Period that it had saved over a billion dollars implementing Suite 11i. *Id.* at

161-183. Chapter 10, aptly titled "Ready or Not," chronicles the release of Suite 11i and the

problems associated with that release. *Id.* at 184-204. In Chapter 10, Symonds writes in reference to

Oracle's mid-March official earnings announcement regarding applications:

> [A]pplications revenue was slowing at a worrying speed. From the 75 percent growth projected by management on February 14 to the 50 percent expected on March 1 at the time of the profit warnings, the real figure had turned out to be only 25 percent. It didn't take a genius to see that not everything that was going on could be explained by the weakening economy and edgy CEOs waiting for "visibility" to return.

*Id.* at 201. Chapter 11, titled "Taking Stock," discusses Ellison's insider trading binge in January

2001, as well as Oracle's earnings shortfall announcement in March 2001 and the effects of the

macroeconomic climate on Oracle's earnings in late 2000 and early 2001. *Id.* at 205-226. Chapter

12, titled "Hungarian Lessons," details Ellison's relationship with GE and GE Power System's

experience with the Class Period implementation of Suite 11i in a small Hungarian plant (contrary to

Ellison's Class Period representations that all of GE Power Systems was live on Suite 11i). *Id.* at

227-232.

The following excerpts from the book further demonstrate the relevance of the information

contained therein:

> • Over the next couple of months, customer complaints [regarding Suite 11i] poured in. Instead of working on the planned features and functions to flesh out the suite's capabilities as planned, development was increasingly engaged in a feverish attempt to produce patches that would fix all the bugs that seemed to be flying at them from all sides.... (quoting Ellison) "*I was way too optimistic. It just kind of got away from us, and that became a very big problem.*" [*Id.* at 195.]
>
> • We were getting a lot of pressure from our customers to deliver the 11i

1    applications. I made a lot of them mad by delaying the release for several
     months. I should have delayed it even longer. [Ellison footnote. *Id.* at 189.]

2    •    [quoting Roberts] We should have done two things: installed it in-house first and
3         engaged with the early implementations at an executive development level. I
          think that if either of those things had happened, we would have rapidly found
4         out that it wasn't done. As it was, it took us until November [2000] to realize
          that we had issues here and start to mobilize. [*Id.* at 196.]

5    •    Even with the clouds gathering over Silicon Valley as the dot coms imploded one
6         by one and the hype about Internet-driven B2B faded, Ellison was sanguine. Just
          as in 1990, he seemed to think that any economic slowdown might pass Oracle
7         by. His argument was that the E-Business Suite was such an extraordinary "cost-
          cutting engine" that customers were likely to need it all the more to preserve their
8         profits in difficult selling conditions. [*Id.* at 194.]

9    It is beyond dispute that *SOFTWAR* and the underlying materials, including the tapes and

10   transcripts of Symonds' interviews with Ellison, are relevant to this litigation, particularly those

11   materials related to Suite 11i, insider trading, forecasting, the economy, and Oracle's billion dollar

12   savings claim, and should have been preserved and produced to plaintiffs. *See, e.g,*. Ex. 43 at 2-3;

13   Ex. 199 at Request Nos. 1-16, 18-21, 23-27 and 35; Ex. 200 at Request Nos. 10-11 and 21.

14                      **3.    The Scant *SOFTWAR*-Related Materials Produced Illustrate
                               the Relevance of the Destroyed Materials**

15        Although the most relevant transcripts – those created during the Class Period and in the

16   period directly following it – have conveniently been destroyed, the contents of the 2002 transcripts

17   plainly display the relevance of the information which defendants claimed was not discoverable.[37]

18   For example:

19   •    Regarding Suite 11i, Ellison states, "Oh yeah we've had some significant screw
20        ups" and "so no I think that while we have taken longer than we should have and
          we've made our first year screw up, it's still ours to lose. [Ex. 202 at NDCA-
21        ORCL 1529352-53.]

22   •    Ellison states, "No because Oracle and SAP have done such a dismal job in doing

23   _____
     [37]    Despite their obvious relevance and the fact that they contain a plethora of information not
24   contained within *SOFTWAR* itself, defendants have attempted to belittle the relevance and
     importance even of the few transcripts that they have produced. *See* Ex. 201 at 13:14-22 ("We have
25   noted in our brief that there is frankly very little in those transcripts, virtually nothing, that isn't
     already in the book, SOFTWAR, about which they have already questioned Mr. Ellison extensively.
26   But, to the extent that there are two quotes, I think, or three quotes – I am not sure – in the transcripts
     that are different, that clearly is part of the three-and-a-half hours that Your Honor has already
27   ordered and that was previously before the Court.").

28

CR[M]." [*Id.* at NDCA-ORCL 1529354.]

- Ellison states, "And I think there is a general understanding of the people inside of development, in fact some of the problems were fairly serious and needed to be fixed and it is very hard to deny, you know denial is very difficult when the guy across the hall is complaining." [Ex. 203 at NDCA-ORCL 1529171.]

- Symonds states (during a January 2002 interview), "And when I talked to some people this week about when did they think 11i became stable, most of them said three days ago." [*Id.* at NDCA-ORCL 1529171.]

Indeed, the limited materials ultimately produced confirmed what plaintiffs and the Court had previously recognized – the 2002 interview transcripts are replete with relevant information. Plaintiffs' product expert Brooks L. Hilliard ("Hilliard") cited to the transcripts numerous times in his opening report. *See* Ex. 204 at 31, 32, 34, 48, 58, 81. In fact, during his deposition in this matter, Hilliard described one of Ellison's admissions to Symonds during the 2002 interviews as a "*smoking gun*" with respect to Suite 11i. Ex. 205 at 237:23-239:21. One can only imagine – and must in light of defendants' failure to preserve/destruction of the materials – the wealth of relevant information contained in the earlier, more contemporaneous, transcripts.

Nonetheless, despite the relevance to this litigation, had defendants had their way, even this fraction of the materials (and arguably the least relevant) would never have been produced. Indeed, defendants feigned ignorance throughout the meet and confer process and the briefing on plaintiffs' motion to compel as to the responsiveness of the materials. Defendants' position regarding the responsiveness of the materials was completely frivolous from the beginning and was orchestrated for the purpose of preventing plaintiffs from discovering the contents of the materials. Plaintiffs have been severely prejudiced both by defendants' unjustifiable withholding of the materials ultimately produced until January 2007, and more importantly, defendants' destruction of the earlier materials. *Brotby*, 344 F.3d at 1116-17; *Leon*, 464 F.3d at 960.

**B.  Defendants Had a Duty to Preserve the *SOFTWAR* Materials and Failed to Do So**

Given the clear relevance of the *SOFTWAR* materials to this litigation, defendants have been under specific affirmative obligations to preserve the *SOFTWAR* materials under both the Federal Rules of Civil Procedure and the PSLRA since the commencement of this litigation. *See, e.g., Wm.*

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR SANCTIONS - C-01-0988-MJJ - 69 -

1 | *T. Thompson Co. v. General Nutrition Corp., Inc.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984).
2 | Indeed, interviews underlying the materials ordered produced began at the same time that this
3 | litigation commenced.

4 | Defendants were under a preservation obligation during the entire *SOFTWAR* creation
5 | process – from the very first interview Ellison gave to Symonds in 2001, including the Ellison
6 | interviews that continued on into 2002, throughout the time that Ellison read the *SOFTWAR* drafts
7 | and created his own footnotes, to and including publication.[38]  Defendants' duty to preserve
8 | continued through to the time the materials should have been produced in response to plaintiffs'
9 | discovery requests and in response to the Discovery Plan – on May 1, 2005. That preservation duty
10 | continues today as this litigation is ongoing.

11 | Undoubtedly, defendants knew about the materials, their relevance to this litigation and the
12 | corresponding requirement that the materials be preserved. In addition to Ellison, defendant Henley
13 | understood contemporaneously that *SOFTWAR* was in the works; Henley testified that "[Ellison]
14 | told me that he was working with [Symonds], and [asked] would I interview with him . . . ." Ex. 95
15 | at 489:25-490:7. Henley sat for at least two interviews with Symonds prior to the publication of
16 | *SOFTWAR*, and he read a fair amount of the book after it was published. *Id.* at 488:25-489:22.
17 | Oracle's general counsel Cooperman advised Ellison as to whether or not he should engage in the
18 | *SOFTWAR* project and helped negotiate and provide advice regarding the terms of the final
19 | agreement between Ellison and Symonds relating to the book. Ex. 79 at 234:16-236:11. Cooperman
20 | read *SOFTWAR* shortly after publication. *Id.* at 234:3-11. Moreover, *SOFTWAR* was used as an
21 | exhibit in an antitrust case against Oracle before United States District Court Judge Vaughn Walker,
22 | in which defendants' same law firm, Latham & Watkins, represented Oracle. Nonetheless, it is

---

24 | [38]   Despite, or perhaps because of, the incontrovertibly relevant nature of the *SOFTWAR*
25 | materials, Ellison testified that he made no absolutely no effort to preserve the *SOFTWAR* materials
     while he was sitting for the interviews (even when he was discussing this very litigation with
26 | Symonds) because he "didn't even think about it," and it "didn't occur" to him. Ex. 179 at 595:25-
     596:18. Likewise, Ellison testified that he made no effort to preserve his own footnotes or any drafts
27 | of the footnotes he typed, electronically or otherwise, for the same reason – it "[d]id not occur" to
     him. *Id.* at 674:11-675:17.

1    obvious now given the paucity of *SOFTWAR* materials in plaintiffs' possession, that defendants

2    made no effort at any time to preserve the materials.[39]  The failure by the defendants to preserve

3    these materials, *i.e.*, not prevent the destruction of the materials, constitutes at a minimum

4    willfulness, supporting default judgment here. *Leon*, 464 F.3d at 959.  And that is precisely what

5    happened here.

6          **C.**    **Defendants Withheld the *SOFTWAR* Materials from Plaintiffs in Bad Faith**

7

8                **1.**    **Defendants Acted in Bad Faith By Failing to Produce Any *SOFTWAR*-Related Material Until the Close of Fact Discovery**

9          Defendants' obligation to produce the *SOFTWAR* materials in response to plaintiffs'

10   discovery requests and pursuant to the Discovery Plan was obvious, as the materials are plainly

11   relevant and responsive. *See A. Farber & Ptnrs., Inc. v. Garber*, 234 F.R.D. 186, 189 (C.D. Cal.

12   2006) ("[A] party has an obligation to conduct a reasonably [sic] inquiry into the factual basis of his

13   responses to discovery and, based on that inquiry, a party responding to a Rule 34 production request

14   is under an affirmative duty to seek that information reasonably available to it from its employees,

15   agents, or others subject to its control.")(citation and internal punctuation omitted); *see also* §VI.A,

16   *supra.*  Nonetheless, consistent with defendants' pattern of withholding relevant documents in this

17   case, as set forth more fully herein, the only *SOFTWAR* materials voluntarily produced by

18   defendants were produced just days before the very end of the fact discovery period – after two full

19   days of Ellison's deposition and did not even include *SOFTWAR*.

20         On October 2, 2006, just weeks after plaintiffs utilized excerpts from *SOFTWAR* to elicit a

21   stream of incriminating testimony from Ellison at his September 21, 2006 deposition, defendants

22

23   [39]    Moreover, the record suggests that Ellison attempted to willfully spoliate the *SOFTWAR*

24   materials. According to Symonds, instead of seeking to preserve the *SOFTWAR* materials after the completion of the book, Ellison did exactly the opposite, in direct violation of his preservation

25   obligations. *See also* §VI.C.2, *infra*. Symonds has represented that, upon completion of the work, Ellison actually attempted to waive his rights to the *SOFTWAR* materials under the contract between

26   Symonds and Ellison. *See* Ex. 206. Because Ellison's agreement with Symonds provided that Ellison had control of the *SOFTWAR* materials even after the publication of the book, such action by

27   Ellison, while under a duty to preserve the materials based upon this ongoing litigation, constitutes nothing short of willful spoliation warranting the most severe sanctions. *Leon*, 464 F.3d at 960.

28

1   mysteriously produced, for the first time, documents relating to *SOFTWAR*. The documents consist

2   of an e-mail relating to *SOFTWAR* and similarly related attachments. Ex. 198. The e-mail forwards

3   to Ellison, among others, a draft of the contractual agreement between Symonds and Ellison for the

4   book as well as the article titled "The Rewards of Recklessness," which was authored by Symonds to

5   promote *SOFTWAR* to potential publishers. *Id.* Notably, even this belated production did not come

6   from Ellison's files.[40] The October 2, 2006 production was defendants' first production of any

7   *SOFTWAR*-related materials in this litigation despite the fact that Ellison had already been deposed

8   for two full days and, as discussed above, the book and its underlying materials are clearly

9   responsive to the Discovery Plan and to many of plaintiffs' document requests.

10          **2.     Defendants Acted in Bad Faith in Responding to Plaintiffs'
                     Motion to Compel the Production of the *SOFTWAR* Materials**

11

12          The draft contract between Symonds and Ellison made clear to plaintiffs (assuming that the

13   same language was contained in the final agreement), for the first time, that upon completion of

14   *SOFTWAR*, Symonds had a contractual obligation to return the tapes and transcripts of interviews

     conducted in preparation of *SOFTWAR* to Ellison. Plaintiffs immediately requested that defendants
15
     produce all documents and materials concerning and created in preparation for *SOFTWAR*.
16
            Instead, defendants refused to produce the *SOFTWAR* materials requested by plaintiffs –
17
     taking the groundless position that "plaintiffs have provided absolutely no basis for this demand,"
18
     ultimately forcing plaintiffs to move to compel. Ex. 207. Defendants' opposition to plaintiffs'
19
     motion to compel set forth a series of completely frivolous arguments that the materials created in
20
     preparation for *SOFTWAR*, on their face, were not relevant, nor responsive to plaintiffs' document
21
     requests. *See* Ex. 208 at 2 ("Plaintiffs have made absolutely no showing that the documents they
22
     seek here – all documents 'concerning and created in preparation for the book' – would add any
23

24

25   [40]   The documents are sourced to Carolyn Balkenhol ("Balkenhol"). Plaintiffs deposed
     Balkenhol on September 12, 2006. In addition to the fact that these documents should have been
26   produced in response to plaintiffs' discovery requests and the pursuant to the key categories of
     relevant documents set forth in the Discovery Plan, the Discovery Plan also specifically required
27   defendants to produce the documents in Balkenhol's files 7 days before her deposition. Ex. 43 at 5.
     Defendants failed to do so.

28

1   meaningful information to the discovery process . . . ."). In addition, regarding the few pages of
2   *SOFTWAR*-related materials produced on October 2, 2006, defendants argued for the first time that
3   they had produced the 36 page e-mail and attachments *only* because the promotional article attached
4   contained two short sentences about "unnamed industry analysts regarding Suite 11i." *See id.* at 9.
5   That defendants' would argue the *SOFTWAR* materials, including "The Rewards of Recklessness,"
6   were neither relevant nor responsive is tantamount to bad faith.

7         Lastly, defendants argued that, despite the contractual language requiring their return, Ellison
8   was not required to produce the hundreds of hours of interview tapes and transcripts because they
9   were not in his "possession, custody or control" as required by Federal Rule of Civil Procedure 34.
10  On December 29, 2006, Special Master Infante rejected defendants' arguments and ordered the
11  production of the underlying interview tapes and transcripts, holding that the "agreement provides
12  Ellison with 'control' over 'all tapes, transcripts and working papers provided by Ellison.'" Ex. 194
13  at 4. Special Master Infante further held that "[d]efendants' interpretation of the term 'provided' is
14  unduly restrictive. The agreement, read as a whole, gives Ellison the legal right to obtain all tapes
15  and transcripts of interviews with Ellison created in the course of the preparation of the book for
16  publication." *Id.*

17        Defendants appealed Special Master Infante's finding of "control" to Judge Jenkins through
18  their Motion To Reverse Special Master's Order Re: Softwar Materials ("Motion to Reverse"),
19  continuing to set forth frivolous arguments and to claim that the materials were Symonds' "sole
20  property." In a further effort to shield these obviously damaging materials from discovery by
21  plaintiffs, defendants made misrepresentations to the Court regarding both the terms of the
22  agreement (including other portions which belied defendants' "sole property" argument) and the
23  parties' interpretation of the agreement. Most egregiously, defendants represented to the Court that
24  both Ellison and Symonds interpreted the agreement in such a way that it did not grant Ellison a
25  legal right of access to the materials in question. *See* Ex. 209 at 14-15 ("In this case, however, the
26  two contracting parties both agree on the meaning of the contract at issue. Specifically, both Mr.
27  Ellison and Mr. Symonds believe the Agreement does not give Mr. Ellison any legal right to control
28  the tapes and transcripts at issue.").

1    Despite defendants' representation to this Court that Ellison and Symonds both agree
2  regarding the interpretation of the final agreement between them, neither Symonds nor Ellison seems
3  to even recall the content of the agreement.  Ellison testified that he has not looked at the final
4  agreement between himself and Symonds since plaintiffs made their request for the materials.  Ex.
5  179 at 731:21-25.  Indeed, Ellison does not even remember the contents of the final agreement.  *Id.*
6  at 732:1-2.  In addition, as of his March 30, 2007 deposition, Ellison had never seen defendants'
7  opposition to plaintiffs' motion to compel the *SOFTWAR* materials, nor was he aware of its contents.
8  *Id.* at 582:16-25.

9    Because plaintiffs had not yet examined Ellison regarding the destruction of the *SOFTWAR*
10  materials, the Court was not informed at that time that defendants' representations regarding
11  Ellison's "interpretation" of the agreement were necessarily false and misleading given that Ellison
12  had not read the agreement and did not even recall its contents, let alone interpret its provisions.  The
13  Court did, however, comment on defendants' failure to provide sworn testimony of Ellison's
14  interpretation.  Ex. 210 at 8 ("Defendants, however, submit no testimony from Ellison regarding his
15  original interpretation of the contract.").  The reason for that failure is now crystal clear.

16    Additionally, in the January 14, 2007 cover letter of his production of *SOFTWAR* transcripts
17  to counsel for defendants, Symonds represented a completely different interpretation of the
18  agreement than that contained in his declaration.  He wrote, "I would just like to reiterate what I
19  have already said to you over the telephone.... Larry waived all his contractual rights to [the
20  *SOFTWAR* materials] when the work on the book was finished.  He said they were mine to do
21  whatever I wanted with."  Ex. 206.  Symonds continued, "I am providing you with these transcripts
22  purely as a courtesy and because Larry has asked me to do so.  But I repeat, Larry waived all his
23  rights in this regard four years ago."  *Id.*

24    The Court rejected defendants' proffered "interpretation" of the agreement and found, like
25  Special Master Infante, that the agreement did give Ellison control of the materials ordered
26  produced:

27         Reviewing the Agreement as a whole, however, the Court concludes that it was the
          parties' intent in Section 1(b)(iv) to give Ellison the legal right to obtain all tapes and
28         transcripts of interviews conducted with Ellison in the course of preparing the book

1    for publication."

2    Ex. 210 at 4. The Court concluded that plaintiffs' interpretation of the agreement was the most

3    reasonable and found several of the arguments offered by defendants to be "implausible" and

4    unsupported by the parties' course of conduct or the evidentiary record. *Id.* at 6.

5         **D.      Defendants Violated the Court's Order to Produce the *SOFTWAR***
                    **Materials**

6

7                  **1.      Defendants Failed to Affirmatively Seek Out the Materials**
                           **Ordered Produced and Refused to Provide Plaintiffs with**
                           **Information Necessary for Their Own Efforts to Procure the**
8                          **Materials**

9         As discussed *supra*, on December 29, 2006, Special Master Infante issued an order requiring

10   defendants to produce, by January 16, 2007, tapes and transcripts of interviews with Ellison created

11   in the preparation of *SOFTWAR*. Ex. 194. Thereafter, plaintiffs immediately requested information

12   regarding the anticipated size of defendants' production. *See* Ex. 211. During a January 4, 2007

13   conversation between defendants' counsel Patrick Gibbs, and plaintiffs' counsel Mark Solomon and

14   Shawn Williams, Mr. Solomon asked Mr. Gibbs about the status of the *SOFTWAR* materials.

15   xGibbs stated that he did not yet know whether defendants would take the position that Symonds

16   was refusing to turn over the materials or that they no longer existed, revealing that defendants had

17   not, prior to that time made any serious effort to secure the materials. On January 5, 2007, plaintiffs

18   followed up via letter, confirming Gibbs' statements and expressing disbelief at this position. *See*

19   Ex. 212 ("You told us [yesterday] that you were not yet in a position to advise us whether defendants

20   were going to take the position that the materials have been destroyed or that Symonds is refusing to

21   turn them over. Apparently, you plan on taking one of those two positions."). Defendants did not

22   respond to the January 5, 2007 letter.

23        It was not until January 10, 2007, eight days *after* Special Master Infante's Order was served

24   on the parties and three business days prior to the ordered production date, Mr. Gibbs sent Symonds

25   a letter purporting to inform Symonds, *for the first time*, that the *SOFTWAR* materials had been

26   ordered produced and demanding that Symonds produce such materials. The letter attached both of

27

28

1  Special Master Infante's Orders (of December 14, 2006 and December 29, 2006) as well as the final

2  agreement between Ellison and Symonds.[41]  Ex. 213.

3       Defendants' purported failure to seek the *SOFTWAR* materials from Symonds prior to

4  January 10, 2007 is further evidence of their bad faith. Indeed, they must have been fully aware that

5  the materials had been or were about to be destroyed, because had defendants intended to produce

6  the materials, they would have had to procure them in the United Kingdom, review them (including

7  over one hundred hours of tapes of interviews with Ellison and the transcriptions of those tapes), and

8  format them prior to producing them to plaintiffs. Defendants were obligated to produce these

9  materials to plaintiffs by January 16, 2007. It is apparent that defendants, who have been quick to

10  request extensions for such large scale reviews in the past, were not concerned with ensuring time to

11  adequately review the materials prior to production because they were fully aware (at least by

12  January 4, 2007) that the materials either had been or were about to be destroyed.

13       **a.    Defendants Falsely Represented to Plaintiffs that**

14             **Symonds' Computer Problems Led to the Destruction of the Majority of the *SOFTWAR* Materials Ordered**

15             **Produced and Continued to Withhold Pertinent Facts in Bad Faith**

16       On January 11, 2007, defendants informed plaintiffs, for the first time, that most of the

17  *SOFTWAR* materials ordered produced had been destroyed. *See* Ex. 214. Defendants claimed that

18  Symonds had attempted to access the laptop computer containing the materials; that he had not

19  accessed the computer since writing the book; that he found that the computer had become

20  inoperable (he believed due to a virus); that because he was not able to access the materials, he took

21  the laptop to a repair shop which told him that the cost of fixing the computer would be

22  approximately the same as buying a new computer; and that he then instructed the repair shop to

23  dispose of the computer. *Id.* According to defendants, after receiving their request for the materials,

24  Symonds attempted to contact the repair shop, which confirmed that it had disposed of the computer.

25

26       [41]    It is a small wonder that Symonds did not have a copy of the final agreement readily

27  available since he had submitted a declaration purporting to interpret its contents just two months earlier.

28

1  *Id.* Missing from Mr. Gibbs's January 11, 2007 letter, however, were critical information about the
2  alleged destruction, including the name of the unidentified "repair shop" and the dates on which the
3  destruction was to have occurred. Amazingly, to date, defendants still have not provided plaintiffs
4  with the dates on which the materials were destroyed nor any estimate of such.

5      Upon receipt of the letter describing the destruction on January 11, 2007, Mr. Solomon
6  immediately wrote to Mr. Gibbs demanding information. *See* Ex. 215. In particular, Mr. Solomon
7  requested the steps being taken to locate the material and the computer and details concerning the
8  unidentified "repair shop" at which defendants claimed the computer had been disposed. *Id.* In
9  addition, Mr. Solomon requested that Mr. Gibbs contact the publisher of the book immediately to
10 request that it preserve any *SOFTWAR* materials in its possession. *See id.*

11     In a January 16, 2007 letter, five days after plaintiffs' request for such information,
12 defendants finally identified the "repair shop" as PC World in Brentford, UK. Ex. 216. Mr. Gibbs
13 also represented to plaintiffs that PC World had no record of Symonds or his computer, allegedly
14 because Symonds did not pay for any services. *Id.* Mr. Gibbs also confirmed that the only steps that
15 defendants had taken to recover the computer were to contact Symonds and to ask him to confirm
16 that he had attempted to retrieve the computer. *Id.* Defendants' failure to take any affirmative action
17 to recover the materials is telling. Despite clear contradictions in Symonds' story (for example,
18 Mr. Gibbs' January 11, 2007 letter represented that Symonds had contacted the "repair shop" and the
19 shop had confirmed disposal of the computer, while Mr. Gibbs' January 16, 2007 letter represented
20 that the finally identified "repair shop" had absolutely no record of Symonds or his computer),
21 defendants made no efforts to contact PC World or to independently verify Symonds' story.[42]

22     Immediately thereafter, plaintiffs made multiple requests for additional information from
23 defendants, including information regarding Symonds' laptop (make, model, etc) and the dates of the

24 _____

25 [42]    In stark contrast to defendants' complete inaction, on January 17, 2007, the day after
    defendants first identified the "repair shop" where Symonds allegedly disposed of the *SOFTWAR*
26 materials, plaintiffs' investigator was at that shop, attempting to recover the materials. Despite being
    handicapped by defendants' continued refusal to provide information regarding the materials or their
27 destruction, plaintiffs continued to pursue every lead in an attempt to recover the materials ordered
    produced.

28

1   alleged destruction. *See* Exs. 217, 218. On February 9, 2007, defendants finally responded, stating

2   that "we have already relayed to Plaintiffs all of the facts we have been able to gather from Mr.

3   Symonds (or any other source) regarding the audio recordings and transcripts of Mr. Symonds'

4   interviews with Mr. Ellison." Ex. 219. However, defendants have failed to provide the majority of

5   the information requested, including any information regarding Symonds' laptop or the date that the

6   alleged destruction took place, (which begs the question of how they were searching for it).

7   Defendants' utter failure to affirmatively seek out the materials ordered produced or the necessary

8   information regarding those materials is further evidence of their bad faith involvement in the

9   destruction of the *SOFTWAR* materials.

10                        **b.    Defendants Represented to Plaintiffs that Their Prior**
                                  **Representations Were False and Provided a Second**
11                                **Account of the Destruction of the *SOFTWAR* Materials**
                                  **Ordered Produced**
12

13       In their quest for information, plaintiffs sought to depose Symonds, and within hours of

14   receiving a deposition subpoena to testify under oath, Symonds had apparently changed his tune. On

     February 22, 2007 defendants represented that Symonds had informed them that his prior story
15
     regarding the destruction of the *SOFTWAR* materials was false. *See* Ex. 220. According to the new
16
     version of events relayed to plaintiffs, "some time after becoming aware of Plaintiffs' motion to
17
     compel" Symonds attempted to use the laptop computer on which the *SOFTWAR* materials were
18
     stored and, because it was not performing properly, he personally disposed of it at a facility for the
19
     ecological disposal of computers and similar items. *Id.* According to defendants, Symonds did not
20
     identify the facility. *See id.*
21

22       Plaintiffs immediately requested information regarding defendants' new version of events

23   including the identity of the facility and the date that the alleged destruction occurred. *See* Ex. 221.

     Although defendants claimed, in their Motion to Reverse, that their investigation regarding the
24
     *SOFTWAR* materials was "ongoing," defendants have provided plaintiffs with absolutely no
25
     information regarding Symonds' new version of events, despite repeated requests. *See* Ex. 209 at 9.
26

27

28

1

2

   **2. Defendants Misrepresented to this Court and Plaintiffs Ellison's and Defendants' Involvement in the Destruction of the *SOFTWAR* Materials**

3   In their representations to the Court and plaintiffs, defendants consistently omitted the fact of

4 Ellison's involvement in the destruction of the *SOFTWAR* materials and repeatedly represented that

5 defendants had done "everything imaginable" to procure the materials. Despite the fact that Ellison

6 had been communicating with Symonds on this very issue for over four months – since at least early

7 November 2006 (when plaintiffs filed their motion to compel their production), as set forth herein,

8 including several communications with Symonds in the period following Special Master Infante's

9 December 29, 2006 order, defendants repeatedly represented to plaintiffs and to the Court that all

10 communications regarding the materials were between Symonds and counsel for defendants. *See*

11 Ex. 214; Ex. 222 ("As set forth in Mr. Gibbs' January 11, 2007 letter to Mr. Solomon, *Mr. Symonds*

12 *has informed Defendants' counsel* that the materials were stored in files on a laptop computer and

13 that these files were rendered inaccessible due to a virus of some kind.... In a January 12

14 conversation, *Mr. Symonds further informed Defendants' counsel* that when he attempted to have

15 the computer repaired, he was told that even if the computer were repaired successfully... all the data

16 stored on the computer... would be lost."); Ex. 216 ("In any event, as with everything else regarding

17 Mr. Symonds' *Softwar*-related materials, *I can only pass along what Mr. Symonds has told me*

18 ...."). Nowhere in the course of these letters did defendants inform plaintiffs or the Court that

19 Ellison had been and continued to engage in communications with Symonds regarding the

20 destruction of the materials.

21   In their Motion to Reverse, filed January 22, 2007, defendants continued to describe to the

22 Court, in detail, the communications between counsel for defendants and Symonds. *See* Ex. 209 at

23 7-10. Again, however, defendants failed to mention that Ellison had been in consistent

24 communication with Symonds regarding the materials and their destruction. *See id.* Indeed, when

25 referring to their "demand" for the production of the materials following Special Master Infante's

26 order, defendants cited only to a letter from Patrick Gibbs to Symonds and mysteriously failed to

27 mention that Ellison had also apparently sent a letter to Symonds demanding the materials on

28 January 10, 2007. *See id.* at 7 ("In response to the Special Master's Order, Defendants contacted

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR SANCTIONS - C-01-0988-MJJ  - 79 -

1  Mr. Symonds, provided him with a copy of the Order, and demanded that he provide Defendants
2  with copies of any and all tapes and transcripts of interviews with Mr. Ellison."). The existence of
3  Ellison's letter to Symonds was not revealed until almost two months later, in the middle of Ellison's
4  March 30, 2007 deposition (defendants mysteriously withheld Ellison's letter until the middle of his
5  deposition after opposing extra time for that deposition on the basis that Ellison was not involved).
6  Ex. 179 at 578:22-581:22. That defendants were unwilling to reveal to the Court that Ellison had
7  himself "demanded" the materials in a formal letter speaks to the length to which defendants were
8  willing to go to conceal any involvement by Ellison in the destruction of the materials.

9      On February 23, 2007, defendants submitted their first factual supplement in support of their
10 Motion to Reverse. *See* Ex. 223. Again, the supplement was rife with detailed descriptions of
11 communications between Symonds and defense counsel. *See id.* Again, defendants represented that
12 the only "demand" for the materials had been through defense counsel. Again, defendants failed to
13 make any mention of any communications between Ellison and Symonds. *See id.* at 2, 3 ("As
14 before, Defendants have no personal knowledge about the events most recently described by Mr.
15 Symonds. Defendants are supplying this information to the Court (and have already supplied it to
16 Plaintiffs) so that the record on this Motion accurately reflects *what Mr. Symonds has told*
17 *Defendants' counsel*."); ("As demonstrated by Mr. Symonds' conduct, and by *his failure to tell*
18 *Defendants' counsel the truth* about his handling of the materials called for by the Order,
19 Defendants have no control over Mr. Symonds or the interview recordings and transcripts of his
20 interviews with Mr. Ellison. If defendants had control over those materials, they would have
21 produced them in this case. If Defendants had any control over Mr. Symonds' actions, he would
22 have preserved these materials (*as Defendants' counsel asked him to do*); he would have provided
23 all of the materials at issue to Defendants (*as Defendants' counsel asked him to do*); and
24 Defendants would have produced them.").

25     In the meantime, Special Master Infante recommended that plaintiffs' motion to compel
26 discovery of the materials and their destruction from Symonds and PC World through the issuance of
27 a Letter of Request be granted and Magistrate Judge Spero ordered the same. Ex. 224. Plaintiffs
28 also moved to compel additional deposition time with Ellison (in addition to the three and a half

1    hours which they had already been granted) on the basis (among others) that they were entitled to
2    examine him regarding his involvement in the destruction of the *SOFTWAR* materials. *See* Ex. 225.
3    In their opposition, filed March 2, 2007, defendants represented to the Court that Ellison had
4    absolutely no involvement and that, as a result, no time was necessary for examination on the topic.
5    *See* Ex. 226 at 10 ("And, as plainly can be seen from the record with respect to these materials, *Mr.*
6    *Ellison   was   not   personally   involved   in   the   circumstances   surrounding   their*
7    *unavailability. . . .* Plaintiffs' questioning on this topic will be short and fruitless, and in any event
8    can be exhausted in a fraction of the time already permitted by the Court's Order granting in part
9    Plaintiffs' previous request for additional time.").

10       On March 7, 2007, plaintiffs filed their reply in further support of their motion to compel
11   additional deposition time with Ellison. In their reply, plaintiffs pointed to language in a letter from
12   Symonds suggesting that Ellison had, in fact, been in communication regarding the *SOFTWAR*
13   materials. *See* Ex. 227 at 7.

14       Apparently realizing that they could no longer keep up the charade (and with Symonds'
15   deposition just days away) defendants finally informed the Court and plaintiffs that Ellison and
16   Symonds had, in fact, been engaging in secret communications with Symonds regarding the
17   destruction of the evidence all along. In their March 14, 2007 Second Supplement to Motion to
18   Reverse Special Master's Order Re: Softwar Material, defendants stated:

19           We write to make clear that, in addition to conversations between
         Defendants' counsel and Mr. Symonds recounted above, Mr. Ellison also has had
20       conversations with Mr. Symonds regarding the *Softwar*-related materials that are the
         subject of the Special Master's December 29, 2006 Order.
21
     Ex. 228. This was the first time that defendants had informed either plaintiffs or the Court that
22
     Ellison had been communicating with Symonds regarding the *SOFTWAR* materials and their
23
     destruction.
24

25       At Ellison's March 30, 2007 deposition, the extent of defendants' concealment further
26   emerged. Despite their representation that no time would be necessary to examine Ellison because
27   he had no knowledge or involvement with Symonds and the destruction of the *SOFTWAR* material,
28   Ellison testified (for over forty pages) that he had been in consistent communication with Symonds

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                                    - 81 -

1  throughout the entire process. *See, e.g.,* Ex. 179 at 570:25-586:23, 642:14-667:12, 685:5-690:15.
2  Despite the recency of the communications, Ellison was able to remember only vague details of his
3  communications with Symonds regarding the *SOFTWAR* materials. *See id.* Given the lengths to
4  which defendants have gone to conceal those communications, plaintiffs can only speculate as to
5  their likely content.

6      In particular, Ellison testified that he had been in consistent contact with Symonds regarding
7  the *SOFTWAR* materials, beginning in November 2006 and continuing through the end of February.
8  *Id.* at 570:25-586:23. In addition, Ellison testified that his lawyers had been in "continuous contact"
9  with Symonds throughout the "entire process." *Id.* at 649:19-21, 686:24-687:1. According to
10 Ellison, he became aware in November 2006 that plaintiffs were moving for production of the
11 *SOFTWAR* materials and upon learning of that fact, he took absolutely no action. *Id.* at 572:4-20.
12 He did not request the materials from Symonds nor did he make any attempts to ensure their
13 preservation. *Id.* at 572:21-573:15. According to Ellison, Symonds called Ellison in November
14 2006 to express concern that plaintiffs were seeking the *SOFTWAR* materials. *Id.* at 572:21-573:5.
15 Nonetheless, Ellison took absolutely no action to secure or preserve the materials at that time. *Id.* at
16 572:21-573:15. He did not make any request for them nor did he give Symonds any instruction. *Id.*
17 Although Ellison testified that Symonds expressed concern during several conversations about the
18 need to produce the materials, at no time did Symonds refuse to produce the materials to Ellison. *Id.*
19 *passim.*

20     Ellison testified that he called Symonds in early January to inform him that the court had
21 ordered production of the *SOFTWAR* documents and that Ellison would send a follow-up letter
22 requesting their production.[43] *Id.* at 573:22-574:23. Ellison was unsure which phone line he used to
23 make the call or at which number he called Symonds. *Id.* at 574:24-575:10. During this call, when
24 Symonds expressed his opinion that there was nothing in the tapes that would be helpful to plaintiffs,
25

---

26 [43]    As counsel for defendants, Patrick Gibbs, informed plaintiffs during a January 10, 2007
27 telephone conversation that Symonds had not yet been informed of the order and that no request had
   been made from him, plaintiffs assume that this call took place on January 10, 2007.
28

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                                    - 82 -

1   Ellison did not attempt to correct his misconception, instead responding "well, that may be true,
2   Matthew, but they don't know that." *Id.* at 575:11 -24. Ellison did not inform Symonds that the
3   substance of the tapes was relevant to the litigation. *Id.* at 575:23-577:8. Instead, Ellison
4   specifically told Symonds that there were materials on the tapes that he did not want plaintiffs to
5   have. He informed Symonds that plaintiffs would likely use the "personal items" in the materials
6   and try to use them to "attack [Ellison's] character." *Id.*

7       Despite suggesting to Symonds that the materials were irrelevant and that plaintiffs would
8   simply use personal items to attack his character, Ellison admitted in his deposition that the materials
9   are relevant.[44] *Id.* at 652:1-7 ("It certainly discusses 11 – you know, 11i and the products, yes").
10  Ellison testified that even the "personal items" that he was concerned about were relevant to the
11  litigation, because some of them touch on the subject of his honesty. *Id.* at 576:21-577:21. By the
12  end of Ellison's first conversation with Symonds in early January, Ellison somehow had not found
13  out what Symonds planned to do. *Id.* at 577:25-578:2. Moreover, Ellison could not explain why
14  neither he nor his counsel purportedly made any effort to inform Symonds of the order or to request
15  the materials between January 2, 2007 (the day the order was served on the parties) and January 10,
16  2007. *Id.* at 583:7-16.

17      After Ellison's initial call to Symonds in January 2007, Symonds called back within hours or
18  days to again discuss the materials. *Id.* at 578:3-15. Again, according to Ellison, Symonds did not
19  indicate whether he would produce the materials. *Id.* at 578:16-18. Ellison took no affirmative
20  action to demand or secure the materials during that call; instead he simply said, "okay, thank you
21  for calling, Matthew." *Id.* at 578:19-21.

22      Other than the conversations with Symonds that he described, Ellison took no personal
23  efforts to retrieve the *SOFTWAR* materials. *Id.* at 579:10-580:6. Symonds informed Ellison during a
24  phone call in January that he had tried to recover the electronic files, that he had taken the computer

25

26  _____
    [44]   In addition, Ellison was well aware at the time of the conversation that the materials were
27  relevant because plaintiffs examined him regarding *SOFTWAR* at his first day of deposition and, as a
    result, elicited a stream of incriminating testimony.
28

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                              - 83 -

1  containing them to a store, but that there was a virus and he could not get the computer fixed. *Id.* at
2  643:25-645:2. Despite owning one of the largest computer companies in the world, Ellison did not
3  ask specific technical questions about the virus or ask that Symonds send him the computer so that
4  Ellison could try to recover the files. *Id.* at 643:25-645:13. ("Q. Did you ask him to send you the
5  computer, or at least to keep the computer? A. No.").

6  　　　Symonds called Ellison again in mid-February to inform him that he had been contacted by
7  an individual from the transcription service that had initially transcribed the tapes for Symonds, who,
8  according to Symonds, had located all of the electronic files on a server. *Id.* at 645:14-23, 648:17-
9  649:7. Ellison testified that he then told Symonds to get the materials and to produce them to
10 plaintiffs but, by the end of the conversation, he was unsure what Symonds was going to do. *Id.* at
11 646:1-647:11. Despite this knowledge, Ellison made no personal effort to recover the materials from
12 the transcription service. *Id.* at 661:23-662:10. According to Ellison, at the end of February
13 Symonds informed him that he had never taken the computer to a store to attempt to have it fixed.
14 *Id.* at 664:2-665:3. Symonds did not tell Ellison what he had actually done with the computer;
15 Ellison did not ask. *Id.* at 664:21-665:1.

16 　　　Ellison testified that he was not independently aware that his attorneys had represented to the
17 Court that he was completely uninvolved with Symonds regarding the *SOFTWAR* materials. *Id.* at
18 687:20-688:5. When asked if it would concern him that his lawyers were making representations to
19 the Court that are flatly false, Ellison responded that he had "no opinion." *Id.* at 688:8-13.

20 　　　In sum, according to Ellison's own testimony, he made no personal efforts to preserve the
21 *SOFTWAR* materials because it "didn't occur to him." Even upon hearing that plaintiffs were
22 actually seeking the materials in this litigation, Ellison took no affirmative action to ensure their
23 preservation. Instead, he caused his attorneys to oppose the production of the documents based on
24 his understanding of specific contractual terms that he had not read and did not remember. After the
25 materials were ordered produced, Ellison still took no aggressive steps to recover and produce them.
26 Nor did he tell Symonds that the materials were relevant to the litigation. Instead, Ellison suggested
27 to his close friend that the materials were not relevant and would be used to hurt him. Ellison took
28 no affirmative steps to search for or recover the materials even after learning of their apparent

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                                                  - 84 -

1  destruction. Instead, he caused his attorneys to misrepresent to the Court his involvement in the
2  destruction and to appeal Special Master Infante's finding with respect to his contract with Symonds,
3  again, based on his self-serving "interpretation" of a contract that he had not read.

4          Despite Ellison's testimony that he did absolutely nothing to attempt to preserve the
5  *SOFTWAR* materials, in direct violation of the law, defendants told the Court that they were "at a
6  loss" as to what more he "could or should have done." *See* Ex. 222 at 3. Defendants' feigned
7  impotence aside, it is clear that Ellison and defendants could have taken many affirmative steps to
8  preserve the *SOFTWAR* materials. Ellison could have sought to enforce his rights under the contract.
9  He could have simply asked Symonds to hand over the material for preservation instead of asking
10  him to sign a declaration setting forth a completely frivolous position.

11          Moreover, given that Symonds recently turned over the limited January 16, 2007 production
12  of the 2002 *SOFTWAR* transcripts as a courtesy and "because Larry has asked," and in fact, offered
13  to turn over more than was even ordered, it is certainly not implausible that Symonds would have
14  readily agreed to turn over such materials, at least for preservation. *See* Ex. 206 ("I am providing
15  you with these transcripts purely as a courtesy and because Larry has asked me to do so.... I also
16  mentioned to you that I have some notebooks that you are welcome to. But they were only used in
17  meetings such as a CEO roundtables and meetings I attended within Oracle."). Ellison's utter failure
18  to take even this simplest of steps is a direct violation of his preservation obligations. But even more
19  importantly, Symonds' eagerness to respond to Ellison's request by producing a very limited set of
20  materials, combined with the fabrications concocted regarding Symonds' computer and Symonds'
21  repeated invocation of the Fifth Amendment at his deposition regarding the *SOFTWAR* materials,
22  strongly suggest that Symonds and Ellison jointly destroyed the materials, just as they had jointly
23  authored the book.[45]

24

25  [45]    *See* Ex. 229, *passim*. Symonds' invocation of the Fifth Amendment was clearly an effort to
26  protect Ellison. Symonds had no other reason to destroy the materials. Symonds is a close friend
    and colleague of Ellison's. Since the publication of *SOFTWAR*, he has continued to meet with
27  Ellison and has even written another article about Ellison, titled "Absolutely Excessive," (discussing
    the fruits of Ellison's insider trading proceeds) which was published in Vanity Fair in October 2005.
28  According to Symonds, Ellison and Symonds "became friends and developed a relationship of trust"

Defendants also represented to the Court the following:

> We have done everything imaginable, in my estimation, Your Honor, and I believe the record will sustain that we have complied with the orders, and we have made every effort to secure production of these documents, not withstanding our disagreement with the Special Master's order.

Ex. 201 at 21:19- 22:3. Again, the truth is that defendants have done just the opposite. After taking a variety of frivolous positions designed to prevent plaintiffs from discovering the *SOFTWAR* materials and after clearly taking part in the destruction of or plans to destroy the materials, defendants continued their egregious behavior. They misrepresented to plaintiffs and the Court Ellison's involvement in the destruction and subsequent cover up. They made no affirmative efforts to obtain and produce the materials. Meanwhile, according to Ellison's testimony, during this entire process Ellison was in contact with Symonds and counsel for defendants was in "continuous contact" with Symonds. Ex. 179 at 649:19-21. Despite this open line of communication, defendants were able only to obtain the information necessary to attempt to cover their trail. Defendants continuously failed, however, to provide plaintiffs with the information necessary for them to continue their own diligent search.

Indeed, it is too much to ask to believe that one of the world's largest law firms with 140 lawyers in its London offices, one of the most prominent public technology companies, and one of the wealthiest individuals on earth, all were helpless to prevent and did not by their conduct facilitate the destruction of this uniquely pertinent evidence.

Although plaintiffs are convinced that they do not have the full story with respect to the destruction of the *SOFTWAR* materials in light of defendants' failure to act honestly and in good faith throughout this process (throughout this entire litigation, in fact, as more fully *supra*), the evidence in plaintiffs' possession clearly demonstrates that highly relevant evidence under Ellison's control was intentionally destroyed after the commencement of this litigation. Defendants' conduct

---

over the course of their time spent together. *See* Ex. 230 at NDCA-ORCL 1053853. Ellison also testified that Symonds was a close friend. Ex. 179 at 586:6-19. As this Court recognized, Symonds conceded that he faces the possibility of prosecution for his role in the destruction under 18 U.S.C. § 1512(c), and this Court agreed. Ex. 231 at 18-19.

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                                    - 86 -

1  warrants the most severe sanctions.

2  **VII.    DEFENDANTS KNOWINGLY MISREPRESENTED THEIR
        PRESERVATION EFFORTS TO THE COURT**

3

4        Plaintiffs now know with certainty that representations made by defendants to the Court

5  regarding their document preservation efforts were knowingly false when made. And, in fact,

6  defendants made these statements to the Court with the specific purpose of concealing defendants'

7  scheme to destroy evidence both through actual destruction and failure to preserve. Dismissal is the

8  most appropriate sanction. *Leon*, 464 F.3d at 958.

9        **A.    Oracle's Representations to the Court in Its Request to Stay
            Discovery in Parallel State Court Proceedings Were False**

10       As set forth in the Motion to Compel, in June 2002, Oracle filed a motion in this case

11 requesting that the Court invoke its power under the PSLRA to stay discovery in the parallel state

12 court derivative proceedings on behalf of Oracle then pending in San Mateo Superior Court. Ex. 232

13 at 14. In its motion, Oracle falsely assured the Court and plaintiffs that plaintiffs would suffer no

14 prejudice from loss of evidence because "*all defendants must preserve all documents just as if they*

15 *were the subject of a continuing request for production.*" *Id.* Indeed, as detailed in the Motion to

16 Compel and herein, this statement could not have been further from the truth. For example, at the

17 time defendants made this statement, they were fully aware of the minimal extent of their document

18 preservation efforts, including the following confirmed facts: (1) defendants sent the March 13, 2001

19 document preservation e-mail to a mere 30 individuals; (2) defendants failed to preserve evidence in

20 the possession of the majority of individuals who communicated with the individual defendants; (3)

21 the few employees who had received preservation instructions, including Ellison, had not been

22 instructed to retain post-Class Period evidence, nor had they been instructed to change their

23 computer setting in order to retain sent items; (4) neither OSO nor the OSO backup tapes had been

24 preserved – indeed, by that time the OSO backup tapes had been affirmatively destroyed by

25 defendants; and (5) the contents of larryellison.com had not been preserved.

26       **B.    Oracle's Representations Regarding Its Non-Destruction of
            Accounting Evidence Made in Response to Plaintiffs *Ex Parte***

27       **Application for Relief Were False**

28       Additionally, again as set forth in the Motion to Compel and *supra*, plaintiffs moved the

PLTFS' NOT OF MOT & SUPP SUBM RE DEFS' DESTRUCTION OF EVIDENCE AND REQUEST FOR
SANCTIONS - C-01-0988-MJJ                                                                 - 87 -

1  Court for an order enjoining Oracle from destroying evidence and demanding particularized

2  discovery in November 2002, shortly after plaintiffs filed the SAC. Ex. 19. Defendants responded

3  in opposition: "*Oracle is not deleting, destroying, or altering any documents or evidence relating*

4  *to the allegations in this case – period.*" Ex. 12 at 1. In support of their opposition defendants

5  submitted the sworn Declaration of Greg Myers which provided:

6        Our ongoing investigation into the origin and disposition of cash receipts contained
         in Oracle's Accounts Receivable (A/R) reserve account (known as Account 12601)
7        has *nothing to do* with the approximately 46,000 debit memo transactions that
         occurred on November 17, 2000 . . . .
8
   Ex. 11 at 2. The Court denied plaintiffs' motion.
9
        Evidence and an Order of Special Master Infante have confirmed that both of these
10
   representations made by defendants with the stated intent of prohibiting plaintiffs from obtaining
11
   necessary discovery were false. Indeed, in addition to all the other evidence plaintiffs have
12
   discovered that defendants either purposefully destroyed or failed to preserve, former Oracle
13
   employee Hatada confirmed that as part of what Myers referred to as the "investigation" related to
14
   Account 12601, the collectors working on the project were going in and changing and deleting notes
15
   and that *prior versions were not maintained*, as set forth in *supra*. Ex. 32 at 82:15-85:14.
16
   Moreover, in the December 19, 2006 Order, *Special Master Infante specifically found that*
17
   *defendants "later shifted that position"* referring to the sworn statement by Myers. Ex. 13 at 19.
18
           C.    **Statements Made by Defendants to Magistrate Judge Spero at**
19                **Hearing to Determine the Files to Be Searched Were Patently False**
                  **and Intentionally Omitted the True Facts of Defendants' Preservation**
20                **Efforts**

21        Lastly, as plaintiffs detailed in the Motion to Compel, defendants assured the Court that they

22  had preserved electronic evidence during the March 1, 2005 hearing conducted by Magistrate Judge

23  Spero to determine the parameters of the discovery in this case, a statement that was demonstrably

24  false. Ex. 14 at 74. Moreover, at that same hearing, defendants vociferously advocated for the scope

25  of discovery to be based upon and limited by the so-called "Speakers" group fashioned by

26  defendants. *See, e.g., id.* at 7-10, 13-16, 32, 39, 87-88. In so doing, defendants blatantly

27  misrepresented to the Court the sources of Ellison's information – arguing that so-called "Speakers"

28  (including Ellison) received their information only from their direct reports and, as such, all

1  communications with and information received by the "Speakers" would necessarily be captured if

2  the Court were to limit document production to the files of the "Speakers" and their direct reports.

3  *Id.* at 7-10, 13-16. Defendants also argued that in the event someone at a level below the direct

4  reports at the Company communicated with one of the "Speakers," the documents would necessarily

5  be in the possession of the "Speakers" and thus plaintiffs would get such documents. *Id.* at 14.

6       However, defendants failed to inform the Court of the true reason for their pursuit of this

7  limitation – they had not sent preservation notices to any Oracle employees other than the direct

8  reports of the "Speakers." Moreover, defendants did not advise the Court or plaintiffs that

9  defendants had not, in fact, made any effort to determine who did communicate with the "Speakers."

10  Nor did defendants inform the Court of the fact that not even the files of the "Speakers" and their

11  direct reports were properly preserved.

12       Magistrate Judge Spero found defendants' proposal to be too narrow but, based upon

13  defendants' representations about the nature of communications with Oracle's "Speakers," limited

14  the required production to "Speakers," their direct reports, and AVPs – Oracle employees who were

15  generally one rank below direct reports. Despite their duty to do so, however, defendants had sent a

16  preservation notice to less that 25% of the AVPs. Indeed, defendants made no categorical effort to

17  preserve the files of Oracle employees at the AVP level. As such, the files of the AVPs had not been

18  preserved and defendants' production was necessarily limited to any documents which may have, by

19  chance or luck, survived over the four years since the commencement of this litigation. At no time

20  during the hearing did defendants inform Magistrate Judge Spero that the files of the AVPs had not

21  been preserved.

22  **VIII. LESSER SANCTIONS**

23       In the unlikely event this Court finds that defendants' conduct warrants a sanction less than

24  default judgment, an adverse inference instruction and the exclusion of testimony would be

25  appropriate. Plaintiffs have no doubt established that (1) defendants had an obligation to preserve

26  destroyed evidence at the time it was destroyed; (2) defendants destroyed the evidence with a

27  culpable state of mind; and (3) the evidence destroyed by defendants was relevant to plaintiffs'

28  claims such that a reasonable trier of fact could find that the destroyed evidence would support

1 | plaintiffs' claims, warranting the imposition of an adverse inference instruction. *Napster*, 462 F.
2 | Supp. 2d at 1078; *see also NTL*, 2007 U.S. Dist. LEXIS 6198, at *48-*49. Two rationales support
3 | the imposition of an adverse inference instruction, an evidentiary rationale and a
4 | punitive/preventative rationale. *AdvantaCare*, 2004 U.S. Dist. LEXIS 16835, at *21-*22. "The
5 | evidentiary rationale is the common sense observation that a party who has notice that a document is
6 | relevant to litigation and who destroys the document is more likely to have been threatened by the
7 | document than is a party in the same position who does not destroy the document." *Id.* at *21.

8 |     As with terminating sanctions, a finding of bad faith is not necessary – "simple notice of
9 | potential relevance to the litigation" is sufficient to satisfy the culpable state of mind requirement.
10 | *Ameripride*, 2006 U.S. Dist. LEXIS 59398, at *31; *see also Residential*, 306 F.3d at 108 (culpable
11 | state of mind requirement satisfied by demonstrating that destruction of or failure to produce
12 | evidence was negligent); *Napster*, 462 F. Supp. 2d at 1078 (finding gross negligence to be sufficient
13 | culpability to justify an adverse inference); *NTL*, 2007 U.S. Dist. LEXIS 6198, at *70-*72 (culpable
14 | state of mind requirement satisfied where no adequate litigation hold was ever put in place).
15 | Evidence of bad faith or grossly negligent destruction/untimely production will satisfy both the
16 | culpable state of mind requirement and the relevance factor considered in imposing adverse
17 | inference sanctions. *Id.* at *77; *Residential*, 306 F.3d at 109-10. Here there is overwhelming
18 | evidence that defendants destroyed relevant evidence and delayed the production of relevant
19 | evidence in bad faith.

20
21
22
23
24
25
26
27
28

1 **IX. CONCLUSION**

2     Based on the foregoing, plaintiffs respectfully request that the Court enter an order imposing

3 sanctions relating to the destruction of evidence as proposed in the attached [Proposed] Order

4 Granting Plaintiffs' Notice of Motion and Supplemental Submission Regarding Defendants'

5 Destruction of Evidence and Request for Sanctions and Objections to Special Master's July 17, 2006

6 Order Denying Plaintiffs' Motion to Compel the Restoration of Backup Tapes and for Miscellaneous

7 Relief for the Destruction of Evidence.

8 DATED: July 26, 2007                     Respectfully submitted,

9                                   LERACH COUGHLIN STOIA GELLER
10                                     RUDMAN & ROBBINS LLP
    MARK SOLOMON
    DOUGLAS R. BRITTON
11     VALERIE L. McLAUGHLIN
    GAVIN M. BOWIE
12     STACEY M. KAPLAN

13

14                                   SHAWN A. WILLIAMS
15

16     655 West Broadway, Suite 1900
    San Diego, CA 92101
17     Telephone: 619/231-1058
    619/231-7423 (fax)

18     LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
19     SHAWN A. WILLIAMS
    WILLOW E. RADCLIFFE
20     MONIQUE C. WINKLER
    ELI R. GREENSTEIN
21     100 Pine Street, Suite 2600
    San Francisco, CA 94111
22     Telephone: 415/288-4545
    415/288-4534 (fax)
23
    Lead Counsel for Plaintiffs
24 T:\CasesSF\Oracle3\BRF00040502_MoniqueTOAcopy.doc
25
26
27
28