# EXHIBIT 56

**Subject: [Fwd: Re: IMP: CRM content available in latest]]]**
**Date:** Tue, 18 Jul 2000 13:09:40 -0400
**From:** Jay Nussbaum <Jay.Nussbaum@oracle.com>
**Organization:** Oracle Corporation
**To:** "Zecher,Linda" <LZECHER@US.ORACLE.COM>


Linda, thought you should be copied.

```
--------- Original Message --------
Return-Path: <mark.barrenechea@oracle.com>
Received: from mailsun3.us.oracle.com (mailsun3.us.oracle.com
[130.35.62.244])by gmgw02.us.oracle.com (8.8.8+Sun/8.8.8) with ESMTP id
JAA23317;Tue, 18 Jul 2000 09:41:04 -0700 (PDT)
Received: from gmgw01.us.oracle.com (gmgw01.us.oracle.com
[130.35.61.190])by mailsun3.us.oracle.com (8.8.8+Sun/8.8.8) with ESMTP
id JAA10305;Tue, 18 Jul 2000 09:41:47 -0700 (PDT)
Received: from oracle.com (eawinkle-pc-xdsl.us.oracle.com
[152.68.19.170])by gmgw01.us.oracle.com (8.8.8+Sun/8.8.8) with ESMTP id
JAA00667;Tue, 18 Jul 2000 09:41:44 -0700 (PDT)
Message-ID: <3974893A.256B242B@oracle.com>
Date: Tue, 18 Jul 2000 09:43:38 -0700
From: Mark J Barrenechea <mark.barrenechea@oracle.com>
Reply-To: mark.barrenechea@oracle.com
Organization: Applications
X-Mailer: Mozilla 4.61 (Macintosh; I; PPC)
X-Accept-Language: en
MIME-Version: 1.0
To: John Wheeler <John.Wheeler@oracle.com>
CC: jnussbau@us.oracle.com, jawheele@us.oracle.com
Subject: Re: IMP: CRM content available in latest]
References: <39747B6E.51AF3486@oracle.com>
Content-Type:
multipart/mixed;boundary="------------BE5082765352DDBA12B23419"
```

These are produced by brennan's crm consulting team.

John Wheeler wrote:

> Mark
>
> Please review, I appreciate (not to be critical) the direction to the
> CRM materials, however, not much substance to the content.
>
> Thanks
> J.W.
>
>  ---------------------------------   -------------------------------------
>
> Subject: [Fwd: FW: CRM content available in latest!
> Date: Tue, 18 Jul 2000 10:27:17 -0400
> From: Kelly Flesche <Kelly.Flesche@oracle.com>
> Organization: Oracle Corporation
> To: jawheele@us.oracle.com
>
> John,
>
> We found this website and loaded the AIM add-in last week.   The
> deliverable templates for the CPM modules were missing key setup steps
> and the ERP modules weren't in much better shape.  For example, the
> BR.100 for HR release 11 has over 100 pages.  The 11i templates we

**ORACLE**
**CONFIDENTIAL**

i

NDCA-ORCL 055974

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

[Fwd: Re: JMP, CRM content available in latest]

```
> generated had 6 pages.  In every case, we had more information in the
> documents we had already built to support setups than were provided by
> the 11i templates.
>
> Regards,
> Kelly
>
>   -----------------------------------------------------------------
>
> Subject: FW: CRM content available in latest
> Date: Mon, 17 Jul 2000 15:38:00 -0700
> From: "Carl Theobald" <carl.theobald@oracle.com>
> To: "Hirsch,Felicity" <FHIRSCH@US.ORACLE.COM>, <Kelly.Flesche@oracle.com>
>
> i presume you saw this (the new release of CRM BR100 from AIM), but
> since i just saw kelly's mail asking for review on the BR100
> you have written, thought i'd forward just in case.
>
> thanks,
> Carl
>
> -----Original Message-----
> From: Melissa Flaherty Snyder [mailto:Melissa.Snyder@oracle.com]
> Sent: Monday, July 17, 2000 12:59 PM
> To: crmupdate@us.oracle.com
> Subject: CRM content available in latest
>
> Great News!
>
> The Application Implementation Method (AIM) has a new add-in including
> 27 new CRM 11i Application Setup Documents (BR.100s) and updated Process
> Questionnaires (RD.020) with new CRM R11i content.  This new add-in is
> now available for download from iXchange.  See the attached email for
> more information!
>
> Thanks,
> Melissa
>
>   -----------------------------------------------------------  ----
>
>    Part 1.2.1.2.1.2    Type: message/rfc822
>                    Encoding: 7bit
>
>    Melissa Flaherty Snyder <Melissa.Snyder@oracle.com>
>    Practice Director
>    Oracle Consulting
>    Customer Solution Management
>
>    Melissa Flaherty Snyder
>    Practice Director              <Melissa.Snyder@oracle.com>
>    Oracle Consulting
>    Customer Solution Management
>                                   Fax: 650.633.1670
>                                   Work: 650.506.5106
>    Additional Information:
>    Last Name Flaherty Snyder
>    First NameMelissa
>    Version    2.1
>
>   -----------------------------------------------------------------
>
>    Kelly Flesche <Kelly.Flesche@oracle.com>
>    Technical Director
```

ORACLE
CONFIDENTIAL

NDCA-ORCL 055975

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

[Fwd: Re: IMP: CRM content available in la

```
>   Oracle Communications and Utilities Consulting
>
>   Kelly Flesche
>   Technical Director                              <Kelly.Flesche@oracle.com>
>   Oracle Communications and Utilities Consulting
>   8300 Norman Center Drive Suite 575              Cellular: 612-805-9729
>   Bloomington                                     Fax: 612-897-4052
>   Minnesota                                       Home: 612-546-7118
>   55437                                           Work: 612-897-8443
>   US                                              Conference Software Address
>   Additional Information:
>   Last Name    Flesche
>   First Name   Kelly
>   Version      2.1
>
>   --------------------------------------------------------------------------
>
>   John Wheeler <jawheele@us.oracle.com>
>
>   John Wheeler
>     <jawheele@us.oracle.com>
>   Additional Information:
>   Last Name    Wheeler
>   First Name   John
>   Version      2.1
```

ORACLE
CONFIDENTIAL

3

NDCA-ORCL 055976

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

**Subject: [Fwd: SBCC / Oracle Partnership]**
**Date:** Wed, 27 Sep 2000 14:12:51 -0400
**From:** Jay Nussbaum <Jay.Nussbaum@oracle.com>
**Organization:** Oracle Corporation
**To:** "Duffy,Joseph" <JDUFFY@US.ORACLE.COM>,
"Ramsayer,Lee" <LRAMSAYE@US.ORACLE.COM>
**CC:** "Heal,Virginia" <VHEAL@US.ORACLE.COM>


Thought you guys should see this before the conference. I just saw it
now and I know you're probably already in the conference. I'll try to
get Ginny to bring it in.

Paula
-------- Original Message --------
Return Path: <Macdoug@sbcc.net>
Received: from inet-smtp2.oracle.com (inet-smtp2.us.oracle.com
[205.227.43.29])by gmgw01.us.oracle.com (8.8.8+Sun/8.8.8) with ESMTP id
RAA21159for <jay.nussbaum@oracle.com>; Mon, 25 Sep 2000 17:29:33 -0700
(PDT)
Received: from smtp1.sbcc.cc.ca.us (smtp1.sbcc.cc.ca.us
[209.129.47.88])by inet-smtp2.oracle.com (8.9.3/8.9.3) with SMTP id
RAA25858for <jay.nussbaum@oracle.com>; Mon, 25 Sep 2000 17:24:44 -0700
(PDT)
Received: from SBCC_DOM-Message_Server by smtp1.sbcc.cc.ca.uswith
Novell_GroupWise; Mon, 25 Sep 2000 17:29:27 -0700
Message-id: <s9cf8b77.072@smtp1.sbcc.cc.ca.us>
X-Mailer: Novell GroupWise Internet Agent 5.5.3.1
Date: Mon, 25 Sep 2000 17:29:05 -0700
From: "Peter MacDougall" <Macdoug@sbcc.net>
To: <jay.nussbaum@oracle.com>
Subject: SBCC / Oracle Partnership
Mime-Version: 1.0
Content-Type: multipart/mixed; boundary="=_84DC7FF7.B3D2B30B"


September 23, 2000

Mr. Jay Nussbaum, Executive Vice President
Government, Education and Health
Oracle Corporation
1910 Oracle Way
Reston, VA  20190

Dear Jay:

It has been some time since our last phone conversation. I am keenly
aware of the demands on your time and did not want to write unless I
felt a situation of close-to-crisis proportions had been reached. With
the University of Maryland system's decision to withdraw from the Oracle
Student Information System (SIS) Project and substantial changes in the
SIS Implementation Plan, I felt I must write to you concerning the
Oracle Student Information System Project.

I am unable to attend next week's meeting in Reston with the other
partner schools, thus, I am using this letter to convey my concerns.
First, I would like to reinforce Santa Barbara City College's long-term
partnership with Oracle. We have worked with Oracle for more than four
years to implement a comprehensive and integrated set of administrative
applications for higher education. We were the first institution to
sign an agreement as an Oracle SIS development partner. This
partnership has been of great benefit to our organization. In return,
SBCC has contributed much to Oracle in terms of student system

**ORACLE**
**CONFIDENTIAL**

1

**NDCA-ORCL 055977**

**CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER**

[Fwd: SBCC / Oracle Partnership]

requirements definition and systems design. We have been very active over the past several months in working directly with Oracle development staff in identifying SBCC requirements and potential system solutions. Also, we have been a reference site for more than ten potential Oracle customers, including three full-day site visits by institutional teams.

SBCC has a long-term commitment to work with Oracle in this partnership. However, delays in the student system development and delivery of needed functionality have brought our relationship to a critical point.

In May 1999, Oracle and the six partner schools came to an agreement on the functionality to be delivered in the initial production release of the student system. The release was scheduled for November 2000. This agreement was negotiated between Oracle and the partner schools over a four-month period. In reaching this first agreement, most of the functionality desired by the partner schools was delayed to subsequent releases of the SIS product. We were not overjoyed with the delay, but accepted the plan.

Based on our discussions with the Oracle SIS project team, SBCC planned and committed to a May 2001 "go live" date for the student system. In November 1999, the partner schools learned a significant portion of the agreed upon functionality would not be provided within the initial application release, but rather in later releases, campus-specific workflows, or consulting solutions.

In March 2000, Oracle and the partner schools agreed to delay the release date of the production version from November 2000 to February 2001. The clear statement from Oracle at that time was that this delay of the release date would allow the development team to incorporate required functionality into the February 2001 release. SBCC was reluctant to agree to this delay given our planned implementation schedule. However, we agreed with the other partner schools and the Oracle SIS team that the delay was needed for Oracle to complete the necessary, minimum set of functionalities for an institution to go into production and use of the student system.

In August 2000, the partner schools were informed in detailed, design-review sessions that the February 2001 release would not contain much of the functionality required by the partner schools. It was indicated, however, that Oracle would provide development and consulting support to the pilot schools implementing this initial release of the product to make certain all of their essential requirements were met. SBCC began working directly with the Oracle development team to identify and specify these requirements in detail and discuss hosting solutions for us to meet our implementation date. Last week, however, we received information from Oracle that the requirements identified as "show-stoppers" by SBCC and other partner schools were being spread over a four-year development cycle. This simply is not acceptable to SBCC or to the other partner institutions.

Continued development delays and the scaling back of delivered functionality by Oracle has caused SBCC much organizational turmoil and shaken the confidence of the College's administration. As the faculty and staff are updated regarding the project's status, I expect a similar reaction. The Board of Trustees, already quite skeptical regarding our relationship with Oracle, will be most upset when informed of the recent changes in the SBCC/Oracle partnership. The withdrawal of the University of Maryland from the SIS project will increase speculation that Oracle will not be successful in bringing a quality Student Information System into the higher education market. My credibility and that of our CIO, Bill Hamre, could well be diminished because of our advocacy for the Oracle Partnership. The "I told you so's" will be prepared to pounce.

**ORACLE
CONFIDENTIAL**

**NDCA-ORCL 055978**

**CONFIDENTIAL–PURSUANT
TO PROTECTIVE ORDER**

[Fwd: SBCC / Oracle Partnership]

In spite of these institutional concerns, SBCC remains firmly committed
to working with Oracle in the development and integration of the student
system. However, due to these development delays, we are behind
schedule for our May 2001 implementation. We need to reach firm
agreement rapidly among Oracle development, Oracle consulting, and SBCC
on roles, responsibilities and resources to meet our implementation
timeline. It is time to turn around the historical pattern of
over-promising and under-delivering to one of under-promising and
over-delivering. In our previous discussion, you gave your personal
commitment that the required Oracle resources to achieve a successful
and timely student system implementation would support the project. My
assumption is that your commitment remains for Oracle's work with SBCC.

Bill Hamre, Vice President of Information Resources, and Jane Craven,
Project Director of Student Systems Implementation, will represent SBCC
at next week's meeting. There is much to be resolved among the partner
schools and with Oracle if the student system project is to move forward
effectively. Partner institutions' roles and responsibilities need to
be universally understood and agreed upon. Likewise, the roles and
responsibilities of Oracle development and consulting resources need to
be specified clearly. The withdrawal of the University of Maryland from
the partnership will place additional pressure on both the partner
institutions and Oracle in developing the plan for moving forward. Mr.
Hamre will also discuss SBCC concerns regarding the flexibility and
extensibility of the product in its current form. We do not feel the
current system lives up to the design specifications, assurances to the
partners, and Oracle marketing statements in the essential areas of
workflow, business rule management and integration with other Oracle
applications.

Jay, in spite of the concerns expressed here, I remain convinced that
SBCC made the right choice in its partnership with Oracle. My desire is
to have Santa Barbara City College be a flagship institution for Oracle
in the demonstration of how Oracle technology, tools, and applications
can transform higher education administrative systems. I understand
fully that it is a long road toward a comprehensive, integrated system.
SBCC is willing to pursue the course with Oracle, but your continuing
commitment that Oracle will work with SBCC directly to achieve needed
functionality for us to "go live" next Spring is needed.

I look forward to learning of your response to these issues and the
results of the partnership meeting next week. Please feel free to
contact me should you have any question concerning this letter. I hope
we can continue a long and successful partnership.

Sincerely yours,


Peter R. MacDougall
President

PRM:sjc

| | Name: Nussbaum-Jay.doc |
|---|---|
| Nussbaum-Jay.doc | Type: WINWORD File (application/msword) |
| | Encoding: base64 |

ORACLE
CONFIDENTIAL

3

NDCA-ORCL 055979

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

September 23, 2000

Mr. Jay Nussbaum, Executive Vice President
Government, Education and Health
Oracle Corporation
1910 Oracle Way
Reston, VA  20190

Dear Jay:

It has been some time since our last phone conversation. I am keenly aware of the demands on your time and did not want to write unless I felt a situation of close-to-crisis proportions had been reached. With the University of Maryland system's decision to withdraw from the Oracle Student Information System (SIS) Project and substantial changes in the SIS Implementation Plan, I felt I must write to you concerning the Oracle Student Information System Project.

I am unable to attend next week's meeting in Reston with the other partner schools, thus, I am using this letter to convey my concerns. First, I would like to reinforce Santa Barbara City College's long-term partnership with Oracle. We have worked with Oracle for more than four years to implement a comprehensive and integrated set of administrative applications for higher education. We were the first institution to sign an agreement as an Oracle SIS development partner. This partnership has been of great benefit to our organization. In return, SBCC has contributed much to Oracle in terms of student system requirements definition and systems design. We have been very active over the past several months in working directly with Oracle development staff in identifying SBCC requirements and potential system solutions. Also, we have been a reference site for more than ten potential Oracle customers, including three full-day site visits by institutional teams.

SBCC has a long-term commitment to work with Oracle in this partnership. However, delays in the student system development and delivery of needed functionality have brought our relationship to a critical point.

In May 1999, Oracle and the six partner schools came to an agreement on the functionality to be delivered in the initial production release of the student system. The release was scheduled for November 2000. This agreement was negotiated between Oracle and the partner schools over a four-month period. In reaching this first agreement, most of the functionality desired by the partner schools was delayed to subsequent releases of the SIS product. We were not overjoyed with the delay, but accepted the plan.

Based on our discussions with the Oracle SIS project team, SBCC planned and committed to a May 2001 "go live" date for the student system. In November 1999, the partner schools learned a significant portion of the agreed upon functionality would not be provided within the initial application release, but rather in later releases, campus-specific workflows, or consulting solutions.

In March 2000, Oracle and the partner schools agreed to delay the release date of the production version from November 2000 to February 2001. The clear statement from Oracle at that time was that this delay of the release date would allow the development team to incorporate required functionality into the February 2001 release. SBCC was reluctant to agree to this delay given our planned implementation schedule. However, we agreed with the other partner schools and the Oracle SIS team that the delay was needed for Oracle to complete the necessary, minimum set of functionalities for an institution to go into production and use of the student system.

<div align="right">ORACLE<br>CONFIDENTIAL</div>

NDCA-ORCL 055980

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

Mr. Jay Nussbaum
September 25, 2000
Page 2

In August 2000, the partner schools were informed in detailed, design-review sessions that the February 2001 release would not contain much of the functionality required by the partner schools. It was indicated, however, that Oracle would provide development and consulting support to the pilot schools implementing this initial release of the product to make certain all of their essential requirements were met. SBCC began working directly with the Oracle development team to identify and specify these requirements in detail and discuss hosting solutions for us to meet our implementation date. Last week, however, we received information from Oracle that the requirements identified as "show-stoppers" by SBCC and other partner schools were being spread over a four-year development cycle. This simply is not acceptable to SBCC or to the other partner institutions.

Continued development delays and the scaling back of delivered functionality by Oracle has caused SBCC much organizational turmoil and shaken the confidence of the College's administration. As the faculty and staff are updated regarding the project's status, I expect a similar reaction. The Board of Trustees, already quite skeptical regarding our relationship with Oracle, will be most upset when informed of the recent changes in the SBCC/Oracle partnership. The withdrawal of the University of Maryland from the SIS project will increase speculation that Oracle will not be successful in bringing a quality Student Information System into the higher education market. My credibility and that of our CIO, Bill Hamre, could well be diminished because of our advocacy for the Oracle Partnership. The "I told you so's" will be prepared to pounce.

In spite of these institutional concerns, SBCC remains firmly committed to working with Oracle in the development and integration of the student system. However, due to these development delays, we are behind schedule for our May 2001 implementation. We need to reach firm agreement rapidly among Oracle development, Oracle consulting, and SBCC on roles, responsibilities and resources to meet our implementation timeline. It is time to turn around the historical pattern of over-promising and under-delivering to one of under-promising and over-delivering. In our previous discussion, you gave your personal commitment that the required Oracle resources to achieve a successful and timely student system implementation would support the project. My assumption is that your commitment remains for Oracle's work with SBCC.

Bill Hamre, Vice President of Information Resources, and Jane Craven, Project Director of Student Systems Implementation, will represent SBCC at next week's meeting. There is much to be resolved among the partner schools and with Oracle if the student system project is to move forward effectively. Partner institutions' roles and responsibilities need to be universally understood and agreed upon. Likewise, the roles and responsibilities of Oracle development and consulting resources need to be specified clearly. The withdrawal of the University of Maryland from the partnership will place additional pressure on both the partner institutions and Oracle in developing the plan for moving forward. Mr. Hamre will also discuss SBCC concerns regarding the flexibility and extensibility of the product in its current form. We do not feel the current system lives up to the design specifications, assurances to the partners, and Oracle marketing statements in the essential areas of workflow, business rule management and integration with other Oracle applications.

Jay, in spite of the concerns expressed here, I remain convinced that SBCC made the right choice in its partnership with Oracle. My desire is to have Santa Barbara City College be a flagship institution for Oracle in the demonstration of how Oracle technology, tools, and applications can transform higher education administrative systems. I understand fully that it is a long road toward a comprehensive, integrated system. SBCC is willing to pursue the course with Oracle, but your continuing commitment that Oracle will work with SBCC directly to

<div align="center">
ORACLE<br>
CONFIDENTIAL
</div>

NDCA-ORCL 055981

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

Mr. Jay Nussbaum
September 25, 2000
Page 3

achieve needed functionality for us to "go live" next Spring is needed.

I look forward to learning of your response to these issues and the results of the partnership meeting next week.  Please feel free to contact me should you have any question concerning this letter.  I hope we can continue a long and successful partnership.

Sincerely yours,


Peter R. MacDougall
President

PRM:sjc

**ORACLE**
**CONFIDENTIAL**

**CONFIDENTIAL-PURSUANT**
**TO PROTECTIVE ORDER**

# EXHIBIT 57

[Fwd: HP Situation]

Subject: [Fwd: HP Situation]
  Date: Thu, 30 Nov 2000 10:59:29 -0800
From: "Safra A. Catz" <Safra.Catz@oracle.com>
  To: Thomas Williams <TAWILLIA@us.oracle.com>, jminton <jminton@us.oracle.com>

---

Subject: HP Situation
  Date: Thu, 30 Nov 2000 07:13:22 -0800
From: Gary Roberts <gary.roberts@oracle.com>
Organization: Oracle Corporation
  To: "Catz,Safra" <SAFRA.CATZ@oracle.com>

Safra,
I understand Larry and Carly are discussing their purchase of our
products this quarter if we commit to purchase $20M - $30M of their
product over the next 18-24 months.  I've attached a spreadsheet that
Maria has developed that shows the relative cost positions on SUN & HP
product.  We have always hammered HP on price.  The chart shows why.
Let me know if there is more I can do to help.
Gary

| | Name: sunvshpnov.xls |
|---|---|
| sunvshpnov.xls | Type: Microsoft Excel Worksheet (application/vnd.ms-excel) |
| | Encoding: base64 |

Gary Roberts <gary.roberts@oracle.com>
Sr. Vice President
Global Information Technologies

ORACLE CONFIDENTIAL

CA-ORCL 022028

1

WORKSTATION & SERVER BUNDLES
END USER DISCOUNT
SUN - vs - HP

| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Current Discount |
|---|---|---|---|---|---|
| OPTION NO. | SUN | B-Ultra 60 / 1 450 ( A3J-ULD1-M-512AQ ) | $ | 5,900 | 9,449 | 20% |
| OPTION 1 | HP | C-3600 / 512 MB SDRAM, 2D / 3D card, 36 GB int disk | | 12,207 | 15,805 | 11% |
| OPTION NO. | SUN | B-Ultra 60 / 2 450 ( A2J-ULD2-M-512AQ ) | $ | 10,799 | 1,237 | 20% |
| OPTION 1 | HP | C3600 / 1 GB SDRAM, 2D / 3D, 36 GB int disk | | 13,344 | 16,561 | 11% |
| OPTION 2 | HP | J5000 / 1 GB SDRAM, 2D / 3D card, 36 GB int disk | | 20,850 | 24,267 | 11% |
| OPTION 3 | HP | J6000 / 1 GB SDRAM, 2D / 3D card, 36 GB int disk | | 22,782 | 27,230 | 11% |
| OPTION NO. | SUN | B-E420 R / 2 way 450 MHz ( A3J-ULD2-2GFB11 ) | $ | 18,610 | 14,533 | 49% |
| OPTION 1 | HP | A500 / 2 way 440 MHz / 2 GB RAM, 36 GB int disk | | 25,731 | 31,923 | 12% |
| OPTION 2 | HP | J2000 / 2 way 440 MHz / 2 GB RAM, 36 GB int disk | | 39,765 | 50,274 | 49% |
| OPTION NO. | SUN | B-E420R / 4 way 450 MHz ( A3J-ULD4+4GFGB11 ) | $ | 15,710 | 31,048 | 50% |
| OPTION 1 | HP | L2000 / 4 way 440 MHz / 4 GB RAM, 72 GB int disk | | 51,349 | 61,660 | 49% |
| OPTION NO. | SUN | B-E5500 / 1 way 400 MHz disk, 4 GB RAM, w/ A3500 144 GB | $ | 72,100 | 92,785 | 55% |
| OPTION 1 | HP | K2000 / 1 way 440 MHz, 4 GB RAM w/ Auto Raid - 1M GB disk | | 75,407 | 89,561 | 49% |
| OPTION NO. | SUN | B-E4000 / 4 way 400 MHz, 4 GB RAM, w/ Sun storage array 400 GB | $ | 119,060 | 165,276 | 55% |
| OPTION 1 | HP | N4000 / 4 way 440 MHz / 4 GB RAM w/ FC60 - 480 GB disk | | 204,184 | 266,783 | 49% |
| OPTION NO. | SUN | B-E6500, 12 way 400 MHz, 12 GB RAM | $ | 113,550 | 184,478 | 55% |
| OPTION 1 | HP | N4000 / 4 way 500MHz / 12 GB RAM | | 177,118 | 268,761 | 49% |
| OPTION NO. | SUN | B-E6500, 20 way 400 MHz, 24 GB RAM | $ | 113,725 | 264,351 | 55% |
| OPTION 1 | HP | N4000 / 4 way 550 MHz, 20GB RAM | | 184,477 | 302,175 | 60% |
| OPTION NO. | SUN | E450 4x600MHz 2CPU w/4MB cache, 2GB RAM, 18GB internal storage | $ | 520,975 | 835,367 | 10% |
| OPTION 1 | HP | L2000 4 way PA8500 CPU, 440 MHz, 1GB RAM, 18GB internal storage | | 540,744 | 850,443 | 49% |

| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Current Discount |
|---|---|---|---|---|---|
| OPTION 1 | COMPAQ | AlphaServer GS160, 731MHz with 4MB cache, Tru64 UNIX, 8CPU, 16GB RAM, 61GB Disk | | 712,657 | 50% |

Oracle Confidential

1:13 PM

ORACLE CONFIDENTIAL    CA-ORCL 022029

NDCA-ORCL 025019

# EXHIBIT 58

Re: Carly Fiorina Meeting Update

Return-Path: <Larry.Ellison@oracle.com>
Received: from oracle.com (koi-home.us.oracle.com [139.185.70.3])by
    gmgw02.oraclecorp.com (8.8.8□.8.8) with ESMTP id GAA06770for
    <Michael.Rocha@oracle.com>; Thu, 12 Oct 2000 06:04:25 -0700 (PDT)
Message-ID: <39E5B711.A111F2A1@oracle.com>
Date: Thu, 12 Oct 2000 06:05:22 -0700
From: "Lawrence J. Ellison" <Larry.Ellison@oracle.com>
Organization: Oracle Corporation
X-Mailer: Mozilla 4.7 [en]C-CCK-MCD (Win98; U)
X-Accept-Language: en
MIME-Version: 1.0
To: Michael Rocha <Michael.Rocha@oracle.com>
Subject: Re: Carly Fiorina Meeting Update
References: <39E563D1.724571B8@oracle.com>
Content-Type: multipart/mixed;boundary="-----------B9167D2E1B9A43667947C528"
X-Mozilla-Status: 8013
X-Mozilla-Status2: 00000000

Thanks for the update.  I will let you know how it goes.  larry

Michael Rocha wrote:

> Larry,
>
> We understand that you are meeting with Carly Fiorina tomorrow.    In
> spite of their marketing campaign,  this is still the same old HP and
> you need to be prepared for a lot of unproductive complaining.    That
> said, according to Mike DeCesare, we have a 25 million dollar
> opportunity (15m in CRM and 10m in technology).  Anyway,   this is what
> you can expect.
>
> 1.  HP isn't happy with the quality of the CRM products.   While the
> lead sharing system is operational,  HP believes that they received an
> uninstallable  product and were asked to pay consulting fees to make it
> work.    They have withheld payment of consulting fees.  Mark is
> directly involved in the account.  HP will ask that you get involved.
>
> 2.  HP does not believe that Oracle has purchased the hardware that we
> committed to last year.    Our IT organization is purchasing HP
> hardware at a 2:1 rate over Sun.   HP has a great opportunity to promote
> our email implementation.  To date, they have not capitalized.    They
> need to be reminded that we are consolidating data centers and still
> purchasing HP hardware.
>
> 3.  HP expects that we will transition our development environments from
> Sun to HP.    As you are aware, we made remarkable progress this year.
> With 8i and 9i,  not only have we achieved simultaneous release, we
> built sooner and more frequently (right along side Sun).     This means
> that early builds (labels) are available for development and internal
> implementation throughout the development cycle.   In fact, HP has
> unique advantages with 64bit environments that we are starting to
> exploit (i.e.. in memory planning in MRP) -- we build much sooner
> relative to Sun.   In applications and CRM,  we achieved simultaneous
> release with 11i.   No small feat -- we had to convince several 'plug
> in' vendors like Cybercash to support HPUX.
>
> note:  HP will admit progress has been made here.

CA-ORCL 025758

ORACLE
CONFIDENTIAL

NDCA-ORCL 028735

Re: Carly Fiorina Meeting Update

```
>
> 4.   HP expects that we will purchase the hardware required to make our
> build and integration environments comparable to Sun (power unit
> equivalent).   I'm sitting on a 1.7 million dollar request for the 9i
> line (complete with OPS).   My opinion is that based on the Wall Street
> Journal article Bill Russell feels that he was screwed by us.
> Therefore,  he isn't willing to be reasonable on the development
> environments.   Given the size of our software sales opportunity,  you
> may want to agree that we'll purchase the hardware.  We need it.
>
> 5.  HP will probably take issue with our go to market activities.
> Specifically, they were not happy that we included EMC in the CRM
> roadshow.      The bottom line is that our joint investment has paid
> dividends.   HP has 18 wins worth 30 million and a pipeline of 878
> suspects worth ~60 million.
>
> 6.  HP expects a Business Online configuration based on HP. -- we
> should move them to appliances.
>
> HP has profited from this deal.   They have achieved development parity
> in server (when measured by code availability) and simultaneous release
> with 11i.    Our most visible internal implementations (email and CRM)
> are on HP gear.   In addition to, we are buying development hardware
> that we expect vendors to fund (build, test and integration).  And they
> are our reference implementation of CRM.
>
> Mike
```

Lawrence J. Ellison <Larry.Ellison@oracle.com>

CA-ORCL 025759

ORACLE
CONFIDENTIAL

NDCA-ORCL 028736

2

# EXHIBIT 59

LORRIE L. MARCHANT
RPR, CRR, CSR No. 10523
**FOR IDENTIFICATION**

Exhibit: _____3_____
Date: ___2-16-2006___
Witness: ___DeCesare___
No. of Pages: ___6___

HP CRM Close Plan

**Subject: HP CRM Close Plan**
**Date:** Tue, 28 Nov 2000 20:44:56 -0800
**From:** Michael DeCesare <Michael.DeCesare@oracle.com>
**Organization:** Oracle Corporation
**To:** "Ellison,Lawrence" <LARRY.ELLISON@oracle.com>,
"Sanderson,Edward" <SANDY.SANDERSON@oracle.com>,
"Catz,Safra" <SAFRA.CATZ@oracle.com>
**CC:** "Curtis,Shelley" <SHELLEY.CURTIS@oracle.com>,
"Snyder,Conway" <CONWAY.SNYDER@oracle.com>,
"Speck,Kurt" <KSPECK@US.ORACLE.COM>,
"Barrenechea,Mark" <MARK.BARRENECHEA@oracle.com>

I spoke again to Phil May (HP GM of Oracle business unit) tonight and he informed us that Karen
Slatford (HP SVP WW Sales) is gaining support from Dwayne Zitsner to go to Carly tomorrow to try
and get approval to move forward on our deal. If they decide to move forward the following will be
needed by close of business on Thursday: Although several of these issues are not tied to our deal HP
will push for closure on these issues

- Production Spend- Consistant with Larrys conversations with Carly, HP will expect a purchase
  order for the following amounts. They will expect this purchase order to be binding and commit
  Oracle to using the full amounts by the dates we promise. 10M by December 31 (I asked for this
  to give us time to scope out the configurations we currently need), 10M by May 31.

- CRM Development- As a follow up to Larrys conversation with Carly, Mark Barrenechea will be
  sending me a note tonight which will spell out exactly what Oracle will do within our CRM
  development environment to move to HP. Shelly Curtis will then draft this into a binding
  agreement. I will need to deliver this to HP tomorrow so that their legal can review.

- Development Parity- As a follow up to the MOU that was signed last August, Conway Snyder
  (Oracle Director of HP Alliance) has been working with HP and Oracle development over the past
  weeks to create a document that is explicit about what Oracle will do to achieve parity with Sun
  across all Oracle development. Although this is not tied to this deal HP is requesting that this have
  "executive sign off" from Larry.

- CRM Functional Issues- There are 14 show stoppers that HP feels are keeping them from being
  able to achieve their global rollout which is scheduled between April and October. Although this
  has nothing to do with this deal the project manager is using the leverage of this deal to get more
  attention from Oracle development. Consistant with the weekly meetings that Mark Barrenechea
  has been hosting over the past year, Mark is preparing a response that will enable HP to hit their
  internal dates.

**ORACLE**
**CONFIDENTIAL**

**CA-ORCL 017630**

1 of 1

11/29/2000 11:42 AM

NDCA-ORCL 020844

*Copy of old show*

## HP/ORACLE PARTNERSHIP DISCUSSIONS

- Order to Oracle
  - *Background-* Over the past 8 weeks Oracle (Mike DeCesare) and HP (Phil May, Mike Griffith, Karen Montague, Mike Overly..) have been working on a series of concessions that has been requested by HP before they move forward on the purchase of the additional CRM licenses. It has been understood that this would not be executed until all of the HP deliverables (Development Parity Document, CRM Development Document, Hardware Spend Document) are completed.
  - *Documents-*
    - Karen Montague currently has the order document. Highlights include:
      - The scope is all the remaining software needed to complete the global rollout
      - These users will go live between 4/01 and 9/01.
      - The net license fees are 23M Net. Tech support is 22% of net license fees.
      - An additional 921K has been deducted from the support to accommodate all the support related concessions HP raised.
      - (2) onsite analysts have been included in this proposal
      - An additional 828K has been deducted from the consulting services to accommodate all the consulting relates concessions HP raised.
    - Tomorrow by 10:00 am we will be delivering a new version of the Order Documents that have the following changes:
      - The payments have now been moved to an operating lease that will keep the expense for HP out of the current quarter and align the payments and expense recognition of these licenses with when HP will be going live. This will be offered at no additional expense to HP.
        - approximately 10% due Net 30
        - approximately 45% due April 01
        - approximately 45% due Nov 01
    - To complete this transaction Oracle will require the execution of the Order Form and Operating Lease.

*payments aligned deliverables*

- Development Parity Document
  - *Background-* Over the past 8 weeks Conway Snyder (Oracle) and Phil May (HP) have been working on a document that explicitly spells out what will be done to achieve parity between HP and Sun as it relates to the entirety of Oracle's development environments. Both sides have agreed that this is comprehensive and represents what will be done over the upcoming months.
  - *Documents* - No binding agreements will be executed here but HP has requested that an "executive sign off" by Larry be given to this document.

- CRM Development Document
  - *Background-* To incent HP to move on the Oracle Order in November and to get closer to HP as a partner Oracle has committed to move the entirety of our CRM development environment to HP. This is the major breakthrough that HP has been looking for with Oracle over the past years. The highlights of this include:

**ORACLE**
**CONFIDENTIAL**

CA-ORCL 017631

- This is a full, tops down commitment to all CRM development within Oracle. Instead of allowing each group to move to HP based on their owning timing and evaluations all aspects of development will be moved in a comprehensive plan.
- Oracle will do a press release about this commitment
- Given the mutual CRM alliance we formed with HP this will be an excellent sales tool to leverage prospective customers to go HP instead of another Oracle platform.
- *Documents*- We are currently working on a document that will be given to HP tomorrow that explicitly spells out what Oracle will do within our CRM environment. We are prepared to make this binding but should this cause problems from a timing perspective with HP legal than we will get "executive sign off" from Larry.

- Hardware Spend Document
  - *Background*- To further strengthen the relationship with HP Oracle is committed to moving 100% of our production database environment to HP hardware. As an incentive to move on the Oracle Order in November we are prepared to issue a binding commitment for 20M in total hardware. Oracle expects the HP sales force to work aggressively on ensuring demand is created and configurations are finalized prior to these dates expiring. Highlights of this include:
    - Oracle will do a press release about this commitment
    - Instead of allowing each owner within Oracle to purchase HP when the machines they are currently using need to be upgraded, this is a corporate wide commitment to move EVERYTHING to HP according to the schedule we have discussed. This will result in more money and a more rapid sales process than HP would ever be able to achieve selling business unit by business unit.
    - Oracle will work with HP to ensure this equipment is used in high profile areas of Oracle
    - Larry Ellison will issue an internal note to Oracle confirming the commitment to HP (crm development, production...)
    - Oracle will consider Xchange and BOL (Phil I haven't gotten any feedback on this yet)
  - *Documents*- Oracle will issue a binding purchase order with expiration dates for the following amounts. Orders will then be placed against these purchase orders.
    - 10M by December 31, 2000
    - 10M by May 31, 2001

- CRM Functional Issues
  - *Background*- HP has a critical go live in April of 2001. There have been 14 show stoppers that HP has raised of commitments Oracle needs to make to ensure these dates do not slip.
  - *Documents*- We are currently working on a document that will be given to HP tomorrow that explicitly spells out what Oracle will do and in what time frames to meet this concern. On an ongoing basis Mark Barrenchea (SVP CRM Development) participates on a weekly call to ensure all HP related issues are given the top priority within his organization.

<div align="right">

ORACLE
CONFIDENTIAL


CA-ORCL 017632

</div>

WORKSTATION & SERVER BUNDLES
END USER DISCOUNT
SUN - vs - HP

| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Current Discount |
|---|---|---|---|---|---|
| | SUN | B-Ultra 60 / 1 450 (A23-UL D1-9L-512AQ) | $ 5,900 | $ 7,449 | 29% |
| OPTON 1 | HP | C-3600 / 512 MB SDRAM, 2D / 3D card, 36 GB Int.disk | $ 12,707 | $ 15,805 | 12% |
| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Current Discount |
| OPTON1 | SUN | B-Ultra 60 / 2 450 (A23-ULD2-9L-512AQ) | $ 11,790 | $ 14,339 | 29% |
| OPTON 1 | HP | C3600 / 1GB SDRAM, 2D / 3D, 36 GB Int. disk | $ 13,848 | $ 16,945 | 12% |
| OPTON 2 | HP | J5600 / 1GB, SDRAM, 2D / 3D card, 36 GB Int. disk | $ 20,850 | $ 24,367 | 12% |
| OPTON 3 | HP | J6000 / 1GB SDRAM, 2D / 3D card, 36 GB Int. disk | $ 22,598 | $ 27,220 | 12% |
| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Current Discount |
| OPTON1 | SUN | B-E420 R / 2 way 450 Mhz (A33-ULD2-2GFB1) | $ 15,410 | $ 18,533 | 40% |
| OPTON 1 | HP | A500 / 2 way 440 MHz / 2 GB RAM, 36 GB Int. disk | $ 25,731 | $ 31,923 | 12% |
| OPTON 2 | HP | L2000 / 2 way 440 MHz / 2GB RAM, 36 GB Int. disk | $ 39,763 | $ 50,274 | 40% |
| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Current Discount |
| OPTON1 | SUN | B-E420R / 4way 450 Mhz (A33-ULD4-4GBG81) | $ 25,730 | $ 31,018 | 50% |
| OPTON 1 | HP | L 2000 / 4 way 440 MHz / 4 GB RAM, 72 GB Int. disk | $ 51,349 | $ 61,840 | 40% |
| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Current Discount |
| OPTON1 | SUN | B-E3500, 4 way 400 Mhz disk, 4 GB RAM, w/ A3500 164 GB | $ 72,100 | $ 93,786 | 55% |
| OPTON 2 | HP | L2000 / 4 way 440 MHz, 4GB RAM w/ Auto Raid - 164 GB disk | $ 75,407 | $ 89,563 | 40% |
| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Current Discount |
| OPTON1 | SUN | B-E4500, 6 way 400 Mhz, 6 GB RAM, w/ Sun storage array 400 GB | $ 119,860 | $ 168,375 | 55% |
| OPTON 1 | HP | N4000 / 6 way 440 MHz / 6 GB RAM w/FC60 - 436 GB disk | $ 204,109 | $ 240,938 | 40% |
| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Discount |
| OPTON1 | SUN | B-E6500, 12 way 400 Mhz, 12 GB RAM | $113,550 | $134,979 | 55% |
| OPTON1 | HP | N4000 / 6 way 550MGHz / 12 GB RAM | $177,219 | $206,762 | 40% |
| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Current Discount |
| OPTON1 | SUN | B-E6500, 28 way 400 Mhz, 28 GB RAM | $163,729 | $198,351 | 55% |
| OPTON1 | HP | N4000 / 8 way 550 Mhz, 28GB RAM | $264,977 | $302,375 | 40% |
| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Current Discount |
| OPTON1 | SUN | E450 4x450MhzCPU w/ 4MB cache, 2GB RAM, 180GB Internal storage | $30,375 | $35,367 | 20% |
| OPTON1 | HP | L2000 4 way PA8500 CPU, 440 Mhz, 2GB RAM, 180GB Internal storage | $48,744 | $59,643 | 40% |

| OPTION NO. | MFG. NAME | SYSTEM TYPE | COST WITHOUT SUPPORT | COST INCLUDING 3 YR. SUPPORT | Current Discount |
|---|---|---|---|---|---|
| OPTON1 | COMPAQ | Alphaserver GS160, 731MHz with 4MB cache, Tru64 UNIX, 8CPU, 16GB RAM,9.1GB Disk | | $713,487 | 34% |

11:20 AM Oracle Confidential NM

ORACLE CONFIDENTIAL

CA-ORCL 017633

NDCA-ORCL 020847



07/26/2001

ORACLE
CONFIDENTIAL

CA-ORCL 017634

*1.*

**HP/Oracle Executive Summary**

- **Mutual Spend**
  - HP to Oracle
  - Oracle to HP
  - NOTE: HP is 4x the size of Oracle without Agilent, 5x with Agilent. HP's numbers had contained licenses now owned by Agilent

- **Development Issue**
  - In August 1999 we signed an MOU that stated "we would achieve parity between HP and Sun". Oracle feels we have done a great deal to achieve this but HP feels we have not lived up to our obligations.
  - Over the past month Conway Snyder, Juan Jones and Jim Clark have met with HP 2x to create a document that would be far more specific on what Oracle will do to further improve on the issues HP raises. The topics discussed have been:
    - Availability of HP server labels early in the development process
    - Benchmark kit not available on HP/UX
    - CRM Severity 2 bug data
    - Progress of 9i relative to 24 hour development on HP
    - OTN HP code availability
    - Messages coming out of Oracle Support relative to HP and Sun
  - Our end goal here is to generate a document which Larry and Carly can agree to as the game plan both companies will execute against. It will contain What Oracle will do, metrics for measuring success against these goals and an escalation path if either company feels the other is not delivering. Currently this has been reviewed by Jim Clark and Mike Rocha.

-BS-10m
Ir prod
deter
+ devlop
reqts
+ photos
J mess'd
r Middle tin

- **Hardware Requirements to get to 100% database servers on HP**
  - In August 1999 Oracle committed to 50% of all production servers on HP. Since then Larry confirmed to Carly that Oracle would move 100% of our production database servers to HP.
  - Over the past month Conway Snyder has been working with Gary Roberts, Mark Barrenchea, Ron Wohl and others to determine exactly what hardware would be required by Oracle to fulfill this pledge. Attached is where we stand against this so far.
  - Our end goal here is to generate a spreadsheet which we can share with HP. It needs to list every application not currently on HP, when we plan to move it to HP and an estimate of the machine size. HP will then help us size what hardware is required. HP would also like Oracle to consider other things like Laptops, Desktops, Storage... To get them to execute our CRM order in Q2 we will then need to issue a binding PO for the majority of the needed hardware.

- **Q2 CRM Order to HP**
  - HP will not require the additional licenses until Jan 2001- June 2002 but is willing to commit to these licenses in exchange for the above points. The list price on these new licenses is 46M and we are currently in front of them at a 50% discount for a net license deal of 23M.

- We can make happen now, require H/w purchase,
  or wait till they shaing we're delivered

- They gave us a commited f: $46m list salty
  25M at 50% discount, $15m at 70% discount

ORACLE
CONFIDENTIAL

CA-ORCL 017635

NDCA-ORCL 020849

# EXHIBIT 60

[Fwd: HP Q2 Execution Plan Update for November 10 Thursday]

**Subject: [Fwd: HP Q2 Execution Plan Update for November 10 Thursday]**
**Date:** Thu, 09 Nov 2000 20:45:49 -0800
**From:** michael decesare <michael.decesare@oracle.com>
**Organization:** Oracle Corporation
**To:** "Sanderson,Edward" <SANDY.SANDERSON@oracle.com>,
"Varasano,Frank" <FRANK.VARASANO@oracle.com>
**CC:** "Speck,Kurt" <KURT.SPECK@oracle.com>

Sandy/Frank:  HP confirmed today that they will try and pull the CRM
portion of the order off providing we deliver what we have outlined in
Development and Production systems.  Since they don't need ALL the
license users right now they are hedging on how big an order they will
do until they see how much production hardware Oracle comes back with.
If this turns out to be a large number we could get the entire order

Mike

---

**Subject: Re: HP Q2 Execution Plan Update for November 10 Thursday**
**Date:** Thu, 09 Nov 2000 18:28:41 -0800
**From:** Marquesa Lloyd <marquesa.lloyd@oracle.com>
**Organization:** Global Information Technologies
**To:** Conway Snyder <Conway.Snyder@oracle.com>
**CC:** jjones@oracle.com, mlloyd@oracle.com, mrocha@oracle.com,
gary.roberts@oracle.com, sjanicki@oracle.com, mdecesar@oracle.com,
djimenez@oracle.com

Conway -

Just dropped you a voice mail.  Gary can do a call with you tomorrow at 7:30 a.m., pst only.  You can
reach him on his cellular phone at 650/333-7400.

Thanks,
Marquesa

Conway Snyder wrote:

> Juan,
>
> Steve and I were unable to connect this morning at 8:30 due to a traffic
> jam on the road between the Stuttgart airport and the HP facility in
> Boeblingen. I was in traffic on the way to HP until 9:30. At that point
> Steve was in preparing for a meeting with Larry. The soonest we'll be
> able to get together may be next Tuesday. I'll be back in Redwood Shores
> Saturday afternoon.
>
> At Mike Decesare's suggestion, and by cc of this note to Marquessa
> Lloyd, I'm looking if there may be time tomorrow to brief Gary Roberts
> on what we're trying to do with HP and see if there is an alternate path
> to developing the server information required before next Tuesday. Gary
> called Mike DeCesare and would appreciate more details. Given my travel

1

**ORACLE
CONFIDENTIAL**

NDCA-ORCL 055957

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

[Fwd: HP Q2 Execution Plan Update for November 10 Thursday]

schedule. I could use your help in backfilling my availability later in the day, if Gary is available. I will call Marquessa to discuss.

As you'll see in the note below from Kurt Graustein, there is alot of production data that will eventually reside in 11i that may make the HP sizing effort more complex because of the application change.

HP confirmed again today they're willing to do a Q2 CRM deal in some amount if we can pull together machine requirements into a binding PO and resolve the development issues we're working on.

According to Phil May, HP is willing to buy as much CRM from Oracle as we buy in HW, Support and other requirements from HP.

My availability tommorow is good from 8 AM to 6 PM PST.

thanks.

---

**Subject:** Re: Fw: [Fwd: [Fwd: HP Update]]]
**Date:** Wed, 08 Nov 2000 15:36:15 -0800
**From:** Kurt Graustein <Kurt.Graustein@oracle.com>
**Organization:** Oracle Corporation
**To:** "Steven B. Janicki" <Steven.Janicki@oracle.com>
**CC:** Paul Van Amsterdam <paul.van.amsterdam@oracle.com>,
  campbell.webb@oracle.com, conway.snyder@oracle.com,
  "maria.maskiewicz" <maria.maskiewicz@oracle.com>
**References:** <006e01c044fd$b510b6c0$01721990@SJANICKIPC>

Steve,

Sorry for the delay on this.  I have put together the attached table describing all that I know or was able
to extract from others as of today.  I realize that there are gaps, but this is the best information I
have.  I included comments on a few services that are not owned by my group but I had some information on.

Let me know if you have any questions.  I'll keep you posted on any changes or updates I receive.  Please
let me know which of our services absolutely have to move to HP by June and what priority each should be
given.  I'm sure we would have to work with Peter Lee to form a hardware plan for them, as I doubt we want
to stack more databases and applications on the GSI database server cluster.  It sounds like the whole point
is to increase hardware spend with HP anyway, so I doubt that would be the plan.

If you haven't already included Colin Nurse on this discussion, you may want to.

**ORACLE
CONFIDENTIAL**

2

**NDCA-ORCL 055958**

**CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER**

[Fwd: HP Q2 Execution Plan Update for November 10 Thursday]

His group owns the Web
Calendar database.

Kurt

"Steven B. Janicki" wrote:

> Kurt, Paul, Campbell,
>
> Please take a look at the attached list of implementations and provide the
> current migration / implementation schedules for each.
>
> ----- Original Message -----
> From: "Conway Snyder" <conway.snyder@oracle.com>
> To: "Janicki,Steven" <STEVEN.JANICKI@oracle.com>
> Cc: "DeCesare,Michael" <MICHAEL.DECESARE@oracle.com>; "Speck,Kurt"
> <: RT.SPECK@oracle.com>; "Jones,Juan" <JUAN.JONES@oracle.com>;
> "Maskiewicz,Maria" <MARIA.MASKIEWICZ@oracle.com>
> Sent: Thursday, November 02, 2000 6:35 AM
> Subject: [Fwd: [Fwd: [Fwd: HP Update]]]
>
> > Steve,
> >
> > I've attached a spreadsheet with my understanding of the systems that
> > need to be migrated to HP. Appreciate an early assessment of what we
> > need in terms of the number of servers required and when we plan to
> > deploy them so we can fast track a proposal from HP for the HW.
> >
> > You may have had better success with HP, but my experience has been that
> > it takes several days for them to turn around a HW proposal. And there
> > has been some back and forth on what the requirement is. This is
> > relevant because Mike Decesare's team is trying to close a Q2 purchase
> > of Oracle sw by HP. Oracle purchase of HP hw in fulfillment of Larry's
> > commitment is a strong if not decisive bargaining chip, in those
> > negotiations.
> >
> > thanks.
> >
>
> --------------------------------------------------------------------
>                                     Name: [Fwd_ [Fwd_ HP Update]].eml
>    [Fwd_ [Fwd_ HP Update]].eml    Type: Microsoft MHTML Document 4.0
> (message/rfc822)
>                                  Encoding: 7bit
>
>                                      Name: IT Requirements 11-1-00.ppt
>    IT Requirements 11-1-00.ppt    Type: Microsoft PowerPoint Show
> (application/vnd.ms-powerpoint)
>                                  Encoding: base64
>                          Download Status: Not downloaded with message
>

                          3      **ORACLE**
                                 **CONFIDENTIAL**

**NDCA-ORCL 055959**

**CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER**

[Fwd: HP Q2 Execution Plan Update for November 10 Thursday]

# HP Migration Schedule - Production Database Services

| Application | Database | Projected Date on HP | Comments |
|---|---|---|---|
| Consulting Apps: Resource Management System (RMS) | GSIAP | DONE | This is already on HP in the GSIAP database. I don't know why this is currently listed as Sun. There is a RM_SKILLS snapshot on this database where the master is eres.uk.oracle.com. Perhaps it is ERES that we are talking about here (talk to Mark Blaker). |
| Education: Education Registration System (ERS) | ERSPD | 16-DEC-00 | Go-live with GSIAP 11i upgrade (replacing products are OTA, OM, AR and Advanced Pricing). ERSPD retained for 1 year for reporting only. |
| Education: Global Online Education System (GOES) | GOSPD | 16-DEC-00 | Go-live with GSIAP 11i upgrade (replacing products are OTA, OM, AR and Advanced Pricing). |
| Corporate Repository (CR) | CREPAP | | Currently no business sponsor for this application (was Robert Nielsen) or technical staff assigned. In talking to Debbie Field, there are no plans to change this product. The last modifications to the application were for Y2K compliance. The big question is whether or not this is really used. Do we really consider this "production data"? An effort to move this to HP will likely result in either great heartache (including the need to bring in consultance for application support) or the decommissioning of the service. Can this be replaced by iFS (files.us.oracle.com). Keep in mind that iFS is being done on Sun... |
| Oracle Automated Sales Information System (OASIS) | OASIS | 15-JAN-01 | This is incorrectly listed as being on HP. It is currently on DEC (smprod2). This is scheduled to be replaced by the CRM OTS application. We will retain the OASIS database for a couple months beyond that just for reference. |

**ORACLE CONFIDENTIAL**

NDCA-ORCL 055960

CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

[Fwd: HP Q2 Execution Plan Update for November 10 Thursday]

| CRM Applications: OTS, OSC, OMO, Fulfillments, etc. | CRMRLT3i / CRMAP | | This schedule has recently changed and we do not have a revised schedule from CRM. We will get an update from CRM on 15-NOV-00. |
|---|---|---|---|
| ERP Applications: PA, GL, AP, etc. | GSIAP | | Are we listing this as "moving to HP" because it hasn't been completed globally? If so, a completion date for the global consolidation is not yet set (but likely toward the end of CY 2001). |
| iStore / OracleStore | ICSAP | MAR-00 ??? | I think this is incorrectly listed as being on HP already. The ICSAP database is currently on finprod6, which is a Sun Enterprise server. Though expected to be a part of the initial GSIAP 11i implementation, inclusion in GSI has since been pushed out by at least 2-3 months. |
| Internal Support and Information Services (ISIS) | | | Not my group, but I have comments... At least 6-8 months down the road ISIS is planned to be replaced byiSupport and related CRM support products. Campbell and An-Tzu would have to answer as to if/when ISIS will be moved to HP and if iSupport willroll out on HP. |
| Web Calendar | | | Not my group, but I have comments... Database maintained by Messaging Services. This is currently on Sun. They are in the process of moving the database, but to another Sun box. |
| Aria: Address book | | | Not my group, but I have comments... The database behind the Aria web site is maintained by Oracle Consulting Services. The HR data in Aria People is replicated from GSIAP (HP) nightly. Do we really consider Aria to be our "production data"? Contacts for this service are Tim Hoechst and Tom Kyte. |

Marquesa Lloyd <marquesa.lloyd@oracle.com>
Global Information Technologies

ORACLE
CONFIDENTIAL

NDCA-ORCL 055961

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

[Fwd: HP Q2 Execution Plan Update for November 10 Thursday]

michael decesare <michael.decesare@oracle.com>

ORACLE
CONFIDENTIAL

6

NDCA-ORCL 055962

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

# EXHIBIT 61

Return-Path: <mark.barrenechea@oracle.com>
Received: from oracle.com (eawinkle-pc-xdsl.us.oracle.com [152.68.19.170]) by
gmgw01.oraclecorp.com (8.8.8+Sun/8.8.8) with ESMTP id MAA07887; Sat, 11
Nov 2000 12:05:11 -0800 (PST)
Message-ID: <3A0DA735.423EC11D@oracle.com>
Date: Sat, 11 Nov 2000 12:08:21 -0800
From: Mark J Barrenechea <mark.barrenechea@oracle.com>
Reply-To: mark.barrenechea@oracle.com
Organization: Applications
X-Mailer: Mozilla 4.61 (Macintosh; I; PPC)
X-Accept-Language: en
MIME-Version: 1.0
To: michael decesare <michael.decesare@oracle.com>
CC: "Ellison,Lawrence" <LARRY.ELLISON@oracle.com>,
"Sanderson,Edward" <SANDY.SANDERSON@oracle.com>,
"Bloom,Gary" <GARY.BLOOM@oracle.com>,
"Varasano,Frank" <FRANK.VARASANO@oracle.com>,
"Gary,Roberts" <GARY.ROBERTS.OLD@oracle.com>,
"Wohl,Ronald" <RON.WOHL@oracle.com>,
"Snyder,Conway" <CONWAY.SNYDER@oracle.com>,
"Speck,Kurt" <KURT.SPECK@oracle.com>,
"Fletcher,Andrea" <AFLETCHE@US.ORACLE.COM>
Subject: Re: HP Q2 Order Update
References: <3A0D9647.BE718E6@oracle.com>
Content-Type: multipart/mixed; boundary="----------FC2613D7BE36429E264E4FCB"

1. The HP-CRM implementation is continuing with good progress:
   - 1800 Sales Reps live in the US on 11.0.3
   - Major dates for 11i rollout
     - Final 11i, R3 features to be delivered Dec 15th ... On track
     - Global Go live ... March 15th ... month by month new countries are added.

2. I need to review with Larry, but CRM has two categories of need:
   - Platinum and E-Square
   - Moving Development Environments from DOM115 to Local (each major development group).

** Conway - John Holte will be briefing you on Monday.
*** Larry - I need to brief you your requests.

—mark

michael decesare wrote:

We have an opportunity to move a Q3 15M+ CRM order into Q2. For this to occur we will need tight
coordination between all the needed Oracle parties. Because of this I am copying all the Oracle
executives I believe need to be involved to make this happen:

ORACLE CONFIDENTIAL

1 of 2

11/15/00 9:55 PM

CA-ORCL 017636

NDCA-ORCL 020850

Re: HP Q2 Order Update

- **Development Issues:** There is a meeting scheduled next week between members of our development organization and HP. The goal is to be generate a document which is more specific than the MOU from last summer that spells out what Oracle WILL do to further improve on the parity issues that HP perceives exist between Oracle on HP vs. Oracle on Sun. This document will be nonbonding but needs to be bought into from all the stake holders on the Oracle side since HP will expect us to execute against these commitments. Conway Snyder owns this process on the Oracle side.

- **Production Hardware Commitment:** Conway Snyder is currently working with all Oracle organizations to come up with what hardware Oracle will need to purchase to fufill our commitment of 100% of database servers on HP by June. We need to ensure this list is comprehensive and lists what time frame Oracle will need the hardware. We will then need to cut HP a **binding** purchase order for this hardware even though it will be ordered as needed. To ensure we are not rushing at the end I would also like to ask that we begin to work the contract issues with HP now to ensure all documents are in place before November close.

Provided HP has confidence that both companies have a common game plan on the development side AND HP has confidence that Oracle is stepping up to all the hardware they feel we've already commited to purchase they have commited to move forward on the CRM order. I believe we will need Larry to speak to Carly after we have the above needed documentation as a final step.

Thanks in advance for your help. I know we are pushing ourselves to make this happen...Mike

Mark J Barrenechea <mbarrene@us.oracle.com>
SVP

ORACLE
CONFIDENTIAL

2 of 2

11/15/00 9:55 PM

CA-ORCL 017637

NDCA-ORCL 020851

# EXHIBIT 62

| From: | MONTAGUE,KAREN (HP-PaloAlto,ex1) |
|---|---|
| Sent: | Thursday, July 12, 2001 3:26 PM |
| To: | HICKEY,SEAN (HP-Cupertino,ex1); SMITH,DAVE-PLANNING (HP-UnitedKingdom,ex1); ALDECOA,LOU (HP-Boise,ex1); WACH,KEN (HP-Cupertino,ex6); RAFFL,STEFAN (HP-MountainView,ex6) |
| Cc: | COHEN,JOANNE (HP-Cupertino,ex1); STRAUB,HANS-PETER (HP-Germany,ex1); STRAUB,HARALD (HP-Germany,ex1); OVERLY,MIKE (HP-USA,ex1); SOLTERS,MATT (HP-Roseville,ex1); RATHJENS,THOMAS W (HP-USA,ex3); GERICOT,LAURENCE (HP-Cupertino,ex1); SNYDER,STEPHEN (HP-PaloAlto,ex1); KASPRIAN,MARTIN (HP-Sunnyvale,ex1); WHARTENBY,DARCY (HP-MountainView,ex1); HEINING,HEINZ (HP-Germany,ex1) |
| Subject: | RE: CRM Licenses |
| Attachments: | OracleCRMPurchaseSummary07.12.01.doc |



OracleCRMPurchas
eSummary07.12....

          Hello Sean,

As requested, I have attached a summary of HP's Oracle CRM purchase in November 2000
(including the CRM Modules and the number of users purchased). If you need additional
information or have any questions please contact me.

Thanks Dave for the great job summarizing the history, finances, relationship, etc.

Regards,
Karen Montague
Strategic Negotiations Manager
eBusiness Solutions
HP Global IT Procurement

Voice: 650-857-3718
Fax: 650-236-1653


-----Original Message-----
From: HICKEY,SEAN (HP-Cupertino,ex1)
Sent: Thursday, July 12, 2001 12:58 PM
To: SMITH,DAVE-PLANNING (HP-UnitedKingdom,ex1); ALDECOA,LOU (HP-Boise,ex1); WACH,KEN (HP-
Cupertino,ex6); RAFFL,STEFAN
(HP-MountainView,ex6)
Cc: COHEN,JOANNE (HP-Cupertino,ex1); STRAUB,HANS-PETER (HP-Germany,ex1); STRAUB,HARALD
(HP-Germany,ex1); OVERLY,MIKE (HP-USA,ex1); SOLTERS,MATT (HP-Roseville,ex1);
RATHJENS,THOMAS W (HP-USA,ex3); GERICOT,LAURENCE (HP-Cupertino,ex1); SNYDER,STEPHEN (HP-
PaloAlto,ex1); KASPRIAN,MARTIN (HP-Sunnyvale,ex1); WHARTENBY,DARCY (HP-MountainView,ex1);
MONTAGUE,KAREN (HP-PaloAlto,ex1); HEINING,HEINZ (HP-Germany,ex1); HICKEY,SEAN (HP
Cupertino,ex1)
Subject: RE: CRM Licenses
Importance: High


Darcy and Karen,

Could you please review what Dave has put together here in terms of the final analysis you
are driving. Dave provides a good write up here, but I also wnat to ensure we have the
full set of facts.

Here are my inputs:

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

HP 00019

1. There were never any licenses that were purchased in the category of " Expense category. These licenses were bought as an "incentive" for Oracle to help us increase HP's revenue. They are probably most accurately categorized as a Headquarters SG&A expense, not IT." Secondly, this agreement superceded the 1999 agreement, (was not additive). Correct me if I'm wrong.

2. It is critical to view this agreement as a Enterprise License Agreement and not something which is specific to BCO. Also, this needs to be managed in terms of the software products which are available to HP vs. a narrow organization view. Karen Montague will provide as part of this process the list of all the products which are available to HP from Oracle. Overall, this is needs to be look at as an integrated Enterprise System, not a BCSO system, much like the SAP platform for Supply Chain.

3. It is expected that Oracle will be used by HP Consulting for Customer Contact Management, Lead/Funnel Management etc. in addition to using SAP for Engagement Management, (oracle CRM is already being piloted in NA). Between SAP and Oracle, most of the six different Regional HP Consulting legacy systems will be obsoleted. It would defy logic if HPC went with a different application technology that the sales team is using for the same customer facing processes.

4. Secondly, there are at least 12+ solution web sites plus ESP which should use the licenses available under this agreement, (marketing on-line, marketing encyclopedia system) vs. continuing to evaluate other technology which either don't work, (e.g. Adjunta, Short Cycles etc.) or requires costly/unnecessary integration of multiple technologies.

5. It is expected that Oracle compensation will be used, but not until 2H FY02. This is required to retire the multitude of legacy systems in this space plus to add comp plan modeling and pay plan modeling, (something done today with spreadsheets with little ability to measure against results) Also, prior to signing the Oracle Agreement the previous compensation application front runner, Calidas, was thrown out.

6. The mobile licenses are a real possibility especially given the wireless pilot with Journadas now proceeding in NA which is part of the overall CRM rollout on a worldwide basis.

7. Inbound call center implementation to replace Remedy, (now delayed until FY02), will dramatically increase license usage when implemented.

9. Closed loop marketing now runs on Broadbase which has been integrated with Oracle CRM, it logically makes sense to obsolete Broadbase overtime and has a overlay with the PRM requirements.

10. There is real potential for meeting some of/all of the short term PRM requirements vs. introducing another application vendor.

10. There is the ability to exchange up to 20% of the licenses.

In general, my concern is the overall CRM rollout continues to be slowed down for various reasons vs. speeding up the entire implementation, (the current plan will result in the obsolescence of 247+ legacy systems not including items 3-10 above).

In terms of the support costs, there is already a $2.2M support FY01 2H cost reduction request on the table with Oracle.

I fully support that both that all capitlaize/amortized set ups get reviewed at least quarterly as a regular process. This is especially true in this situation where the original plan of record has changed several times since Nov.

Regards,

SEAN

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

HP 00020

```
-----Original Message-----
From: SMITH,DAVE-PLANNING (HP-UnitedKingdom,ex1)
Sent: Thursday, July 12, 2001 8:36 AM
To: ALDECOA,LOU (HP-Boise,ex1); WACH,KEN (HP-Cupertino,ex6);
RAFFL,STEFAN (HP-MountainView,ex6)
Cc: COHEN,JOANNE (HP-Cupertino,ex1); STRAUB,HANS-PETER (HP-Germany,ex1);
HICKEY,SEAN (HP-Cupertino,ex1); STRAUB,HARALD (HP-Germany,ex1);
OVERLY,MIKE (HP-USA,ex1); SOLTERS,MATT (HP-Roseville,ex1);
RATHJENS,THOMAS W (HP-USA,ex3); GERICOT,LAURENCE (HP-Cupertino,ex1);
SNYDER,STEPHEN (HP-PaloAlto,ex1); KASPRIAN,MARTIN (HP-Sunnyvale,ex1);
WHARTENBY,DARCY (HP-MountainView,ex1)
Subject: CRM Licenses
```

Lou, Ken, Stefan,

I thought it would help to brief you on the details behind the Oracle CRM $13m potential write-off. Attached is a one-page summary of background, balance sheet position, and accounting issues/recommendations.

I will be on FTO from today, returning Monday 23rd. If you have questions in the meantime, please contact Matt Solters (tn 748-8504).

Regards,
Dave

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

HP 00021

# EXHIBIT 63

`Dec 01 00 10:40a   Bardwick        415 587 5587        P.1`

`11/30/00  THU 23:45 FAX 415 833 3880   COMM SALE SF REGION`

*[handwritten, highlighted:]* THE REAL STORY...

CONFIDENTIAL

Letter Agreement between Oracle Corporation ("Oracle") and Hewlett-Packard Company ("HP") on November 30, 2000

*[handwritten margin note:]* to demonstrate partnership

This Letter Agreement constitutes the agreement of Oracle, for good and valuable consideration received, to complete the following obligations as a result of Oracle's issuance of a non-cancellable blanket purchase order to HP in the amount of US$30,000,000 (exclusive of taxes, shipping and handling) for HP UNIX servers, associated peripherals and data storage systems ("Hardware") that are available during the term of this Letter Agreement, such as Superdome, and shall otherwise be subject to the terms of Agreement AWC56 ("Production Agreement") or Agreement A39Q9 ("Development Agreement") between HP and Oracle, as applicable ("Agreements"):

*[handwritten margin note:]* I made $30M deal happen... gotten lot... SUN is really unhappy... Is this the way we are going to do deal... Teach him to buy formally!

1) Oracle will complete configuration activity and submit releases from the blanket purchase order to HP no later than December 28, 2000 for the first $15,000,000 (exclusive of taxes, shipping and handling) of HP UNIX servers, associated peripherals and data storage systems.

2) Oracle will schedule delivery dates for these products as follows: $10.0 million of products; that are not later than January 31, 2001; and $5.0 million of products, that are not later than April 30, 2001.

3) Oracle will schedule deliveries only to Oracle locations in the United States of America.

4) If Oracle does not complete the commitments in 1 through 3 above, then, Oracle will pay a cancellation fee of $15,000,000 (less the invoiced amount of products delivered from this blanket purchase order and paid for by June 15, 2001). This cancellation fee shall take the form of a check in the amount of the applicable fee delivered to HP no later than June 30, 2001.

5) Oracle will complete configuration activity and submit releases from the blanket purchase order to HP no later than September 30, 2001 for an additional $15,000,000 (exclusive of, taxes, shipping and handling) of HP UNIX servers, associated peripherals and data storage systems.

6) Oracle will schedule delivery dates for these products that are not later than October 31, 2001.

7) Oracle will schedule deliveries only to Oracle locations in the United States of America.

8) If Oracle does not complete the commitments in 5 through 7 above, then, Oracle will pay a cancellation fee of $15,000,000 (less the invoiced amount of products delivered from this blanket purchase order and paid for by December 15, 2001). This cancellation fee shall take the form of a check in the amount of the applicable fee delivered to HP no later than January 31, 2002.

*[handwritten margin note:]* gives flexibility

Products ordered under the blanket purchase order are for Oracle's internal use only and are not for resale. Product support and consulting services will be in addition to these amounts. Terms and conditions governing the HP products will be those of the Agreements between Oracle and HP, or their successor agreements in effect at the time of shipment by HP, and discounts will be 50% for Hardware purchased for use in a

Page 1 of 3

*[handwritten:]* AP

ORACLE
CONFIDENTIAL

CA-ORCL 017624

Δ π EXHIBIT 34
Deponent Sanderson
Date 7/26/06 Rptr KG
WWW.DEPOBOOK.COM

NDCA-ORCL 020839

00 10:49a      Bardwick                    415 567 5587              P.2

.30/00  THU 23:48 FAX 415 833 3889      COMM SALE SF REGION

CONFIDENTIAL

production environment and 55% for Hardware purchased for a development environment as defined in the Agreements, with the exception of the A and R classes which will be 17% for both the production and the development environments). In the event that the Agreements expire or terminate without replacement, the parties agree that their terms will continue in effect for HP products delivered as a result of this Letter Agreement.

In addition, Oracle commits to the following:

1)  Oracle agrees to move 100% of Oracle's production data to HP UNIX servers by May 31, 2001.

2)  Oracle agrees to move 100% of Oracle's CRM development servers to HP UNIX servers by November 1, 2001.

3)  Oracle will operate all CRM online services, the Oracle Store, the Oracle web-based customer interaction database and the Oracle defect management database on HP UNIX servers by November 1, 2001.

4)  The Oracle Platinum Systems (CRM training, education and consulting implementation pilots) will operate on HP UNIX servers by November 1, 2001.

5)  Following the migrations described in 1 through 4 above, for a period of three (3) years after the date of this Letter Agreement, HP will be the exclusive provider to Oracle for the above uses, so long as HP provides products with the technical and quality standards necessary for the level of Oracle operations in these environments and at prices no higher than offered to similar customers ordering for their own use making similar commitments.

6)  Oracle will commit the necessary funds and resources, and will complete a project plan and schedule together with HP, by January 31, 2001, that will provide support to HP in parity with the support provided to Sun Microsystems in the areas of:

    a.  Production Code.
    b.  Beta code.
    c.  Patch bundles.
    d.  Nightly builds of Oracle applications.
    e.  Code quality, and
    f.  Support quality.

Oracle agrees to maintain this level of support for a minimum of three (3) years after the date of this Letter Agreement.

7)  Oracle agrees to assist HP in producing a press release regarding the commitments in 1 through 4 above to be issued on or before January 31, 2001.

In the event of a conflict between the terms of the Agreements and of this Letter Agreement, the terms of this Letter Agreement will prevail.

Page 2 of 3

ORACLE
CONFIDENTIAL

CA-ORCL 017625

NDCA-ORCL 020840

Dec 01 00 10:45a        Bardwick                415 567 5587              P.3
                                                                          ⊘003
11/30/00  THU 23:48 FAX 415 833 3890     CDEB SALE SF REGION _____        ⊘003

CONFIDENTIAL

The parties agree that the terms and conditions of this Letter Agreement will be
Confidential Information between them and will be protected according to the terms of
the Agreements.

Each party represents that the individual signing below is properly authorized to bind that
party to the commitments contained herein.

Agreed to and accepted this 30th day of November, 2000.


HEWLETT-PACKARD COMPANY        ORACLE CORPORATION

NAME  PHILIP MAY              SAFRA A. CATZ
TITLE  GEN. MGR ORACLE DIV    EXECUTIVE VICE PRESIDENT
ADDRESS                       500 ORACLE PARKWAY, REDWOOD SHORES, CA.


Page 3 of 3


ORACLE
CONFIDENTIAL

CA-ORCL 017626


NDCA-ORCL 020841



# ORACLE

### Oracle/HP Tier 1 Partnership Summary

- Unprecedented Letter of Agreement signed 11/30/00
  - Oracle to place $30M purchase order with HP
  - 100% of Oracle Production Data on HP Servers by 6/01
  - 100% of Oracle CRM Development on HP Servers by 11/01
  - CRM online services, Oracle Store, Oracle web-based customer interaction database, Oracle defect management database on HP Servers by 11/01
  - Oracle Platinum Systems (CRM training, education & consulting implementation on HP Servers by 11/01
  - Oracle to provide parity for HP with Sun for the following:
    - Production code
    - Beta code
    - Patch bundles
    - Nightly builds of Oracle application
- Purchase order placed on 12/28/00 for $17.4M for Platform Technologies, Global IT, and CRM development
  - Purchase order allocation:
    - Platform Technologies          $ 1.2M
      - 13 L3000 Servers
      - Disk Rackmount Cabinets
    - Global IT          $ 3.5M
      - 21 L3000 Servers
      - 2 V2600 Servers
      - 1 DLT Tape Drive
    - CRM Development          $12.1M
      - 26 N4000 Servers
      - 7 L2000 Servers
      - 3 L3000 Servers
      - 3 XP 512 Disk Storage
      - Openview Software
    - Support          $ .6M
      - Total     $17.4M
- Additional $15M in hardware to be configured by 9/01
  - Delivery of hardware by 10/01
  - Need to help validate and create demand
  - Specific additional needs by functional area TBD
  - Various proposals requested & submitted; more to follow
- On-site Support services due for HP hardware valued at approximately $3M
- HP's perceived project list as submitted by HP sales (HP Hardware2.xls-attached)

ORACLE
CONFIDENTIAL

CA-ORCL 017627

HP's Potential Projects w/Oracle

ORACLE

## STORAGE OPPORTUNITIES

| Project Name | Contact | Phone | Roll up | Amount | Oracle Internal Feedback |
|---|---|---|---|---|---|
| Email | Bob Lofton | 719-767-2637 | Roberts | $ 3,330,000 | Valid Project/Prefer HP-waiting on Larry |
| Consolidation Rocky Mt Carrier | Bob Lofton | 719-767-2637 | Roberts | $ 2,100,000 | Valid Project/prefer Network Application, HP #2 Waiting on Larry |
| Internal File System | Suzanne Amman | 650-506-3884 | Rozwals | $ 1,450,000 | Valid/Prefer 1#HP, 2#EMC,3#NA, Datacenter's Team also factoring in decision. Mike Roccat Larry |
| BOL | Steve Huey | 650-506-3084 | Roberts | $ 2,500,000 | No, Larry choose Sun last week |
| Enterprise Sys Eng Dev | Kevin Byrd | 650-506-3548 | Wohl | $ 1,500,000 | Left Message, Cell 280-4656 |
| | | | Total Storage | $ 10,880,000 | |

## SERVER OPPORTUNITIES

| Project Name | Contact | Phone | Roll up | Amount | Oracle Internal Feedback |
|---|---|---|---|---|---|
| Product Family Server Consolidation | Kevin Byrd | 650-506-3548 | Wohl | $ 150,000 | Left Message, Cell 280-4656 |
| | | | | | Valid project, slightly out of budget. If HP can come down slightly on price, would be approved. This is for a support application. |
| OSS Project | Karl Heitz Daday | 407-458-6022 | Rocha | $ 226,000 | |
| Education Servers | Nikki Mehta/Kurt Andes | 650-506-5055 | Roberts | $ 471,000 | Valid Project Oracle WW Education Servers |
| WEBIEP | Peter Lee | 650-833-8652 | Roberts | $ 3,800,000 | Valid Project, want to move with HP 2 v class machines. this would host all 5t apps outside of americas. Waiting on Larry |
| Sale On Line R&D | Hay Ly | 650-506-2767 | Bemmechea | $ 658,000 | Left message |
| Planet Web | Mike Burkett | 650-506-0332 | Bemmechea | $ 375,000 | Not valid, application is up and running on existing HP WW |
| IPB | Suzanne Amman | 650-506-3884 | Rozwals | $ 500,000 | Valid, she believes Requisition already in place to order |
| 111 Implementation of Email | Kurt Andes | 301-407-2745 | Roberts | $ 220,000 | Left message |
| BOL | Steve Huey | 650-506-3084 | Roberts | $ 1,500,000 | No, Larry choose Sun last week |
| | | | Total Servers | $ 7,700,000 | |

831.
461.1411

ORACLE
CONFIDENTIAL

CA-ORCL 017628

Confidential - Page 1

NDCA-ORCL 020843

# EXHIBIT 64



ORACLE

January 8, 2001
Board of Directors

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01178

NDCA-ORCL 044428



ORACLE·

### NOTICE OF THE REGULAR MEETING OF
### THE BOARD OF DIRECTORS
### ORACLE CORPORATION

TO:   Lawrence J. Ellison, Chair      Jack F. Kemp
      Jeffrey Berg                    Kay Koplovitz
      Michael J. Boskin               Donald L. Lucas
      Jeffrey O. Henley               Richard A. McGinn

RE:   January 8, 2001 Board Meeting

   This notice confirms that the Board of Directors of Oracle Corporation will hold its regular meeting on Monday, January 8, 2001, at approximately 9:00 a.m. in the Board Room located on the 11th floor of Oracle Headquarters, 500 Oracle Parkway, Redwood City, California.

   The items to be discussed at the meeting include the matters described in the enclosed agenda. This notice is accompanied by the following enclosures:

   ■ Agenda
   ■ Draft minutes for the October 16, 2000 meeting and written consents adopted since October 16, 2000
   ■ Index of actions taken by the Board and its committees in FY 2001
   ■ Proposed resolutions and supporting information

If you have any questions regarding the Board meeting, please do not hesitate to contact me at (650) 506-5500 or Matthew Ng at (650) 506-5100.

Daniel Cooperman
Senior Vice President, General Counsel & Secretary
December 29, 2000

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD-1 01179

**BOARD MEETING AGENDA**
**ORACLE CORPORATION**

January 8, 2001
9:00 a.m.

<u>Tab</u>

I.   **Approve minutes** from October 16, 2000 meeting and review written consents ·1
adopted since October 16, 2000. Index of FY01 Board and Committee actions
enclosed for reference. (COOPERMAN) 5 min.

II.  **Management Presentation.** No exhibits. Overview of the Status of E-Business Suite
Release 11i. Ronald Wohl, Executive Vice President, Applications Development and
Mark Barrenechea, Senior Vice President, CRM Products. 60 min.

III. **Allocation of Executive Responsibilities following Bloom's Departure.** No
exhibits. (ELLISON) 30 min.

IV.  **Review Second Quarter Financial Results.** Please refer to the Financial Package
delivered separately. (HENLEY) 20 min.

V.   **Executive Items.** Proposed resolutions at referenced tab. (COOPERMAN) 20 min.
total.

   A.   Amendment of Financial Approval Levels.                                  2

   B.   Promotion to Executive Management Committee.                              3

   C.   Security Clearance Exclusions.                                             4

   D.   **REDACTED**                                                               5

VI.  **Report of Finance and Audit Committee.** No exhibits. (LUCAS) 15 min.


**Following the Board Meeting:**

   **Executive Session.** Meeting of outside directors with CEO. 30 min.


CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01180

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01181

NDCA-ORCL 044431

INDEX

**ORACLE CORPORATION**
**Board of Directors Actions**
**June 1, 2000 - May 31, 2001**

| Board Entity | Type | Date | Action(s) Taken |
|---|---|---|---|
| Board of Directors | Regular Meeting | October 16, 2000 | 1. Reduction of Board Size<br>2. Annual Election of Chairman<br>3. Appointment of Corporate Officers<br>4. Election of Members of Board Committee<br>5. Establishment of 2001/2002 Regular Board Meeting Schedule<br>6. Increase Allocation for Investments in Venture Funds |

<p align="center"><strong>REDACTED</strong></p>

| Board Entity | Type | Date | Action(s) Taken |
|---|---|---|---|
| Board of Directors | Written Consent | September 13, 2000 | Stock Split Effected as Dividend |
| Board of Directors | Special Meeting | August 21, 2000 | Discussion of Stockholder Proposal for 2000 Proxy Statement |
| Board of Directors | Regular Meeting | July 17, 2000 | 1. Record Date of Annual Meeting<br>2. Promotions to Executive Management Committee<br>3. Security Clearance Exclusions<br>4. Amendment of 1991 Long-Term Equity Incentive Plan<br>5. Agreement with<br><br>6. Adoption of 2000 Long-Term Equity Incentive Plan<br>7. Adoption of Conflicts of Interesst Policy<br>8. Report of Nominating Committee<br>9. Approval of Fiscal Year 2001 Advertising Budget<br>10. Report of Finance and Audit Committee |
| Board of Directors | Written Consent | June 2, 2000 | Amendment of 1991 Long-Term Equity Incentive Plan |
| Committee on Compensation and Management Development | Written Consent | December 14, 2000 | 1. Amendment and Restatement of 1993 Deferred Compensation Plan<br>2. Conditions of Foreign Grants Under the 2000 Long-Term Equity Incentive Plan |

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01182

| | | | |
|---|---|---|---|
| Committee on Compensation and Management Development | Written Consent | October 18, 2000 | Form of Non-Qualified Stock Option Grant Agreement and Stock Option Exercise Notice and Agreement |
| Committee on Compensation and Management Development | Written Consent | September 29, 2000 | Employee Stock Option Grants |
| Committee on Compensation and Management Development | Written Consent | September 7, 2000 | 1. Compensation Committee Report on Executive Compensation<br>2. Discussion of 2000 Long-Term Equity Incentive Plan |
| Committee on Compensation and Management Development | Written Consent | August 2, 2000 | Interpretation of Oracle 1991 Long-Term Equity Incentive Plan |
| Committee on Compensation and Management Development | Regular Meeting | July 17, 2000 | 1. Review Fiscal Year 2000 Compensation for Outside Directors<br>2. Review Payments Under Fiscal Year 2000 Bonus Plan<br>3. Review Executive Officer and Outside Director Compensation<br>4. Approval of Executive Officers 2001 Base Salaries<br>5. Approval of Fiscal Year 2001 Executive Bonus Plan<br>6. Approval of Cumulative Total Return Graph |
| Committee on Compensation and Management Development | Special Meeting | July 12, 2000 | Interpretation of Oracle 1991 Long-Term Equity Incentive Plan |
| Committee on Compensation and Management Development | Special Meeting | June 30, 2000 | Interpretation of Oracle 1991 Long-Term Equity Incentive Plan |
| Committee on Compensation and Management Development | Written Consent | June 23, 2000 | Form of Non-Qualified Stock Option Grant Agreement and Stock Option Exercise Notice and Agreement |
| Committee on Compensation and Management Development | Special Meeting | June 9, 2000 | 1. EMEA Stock Option Grants<br>2. Discussion of Executive Compensation<br>3. Discussion of Executive Bonus Plan<br>4 Discussion of Outside Director Fees |
| Executive Committee | Written Consent | December 8, 2000 | Approval of · Agreement |
| Executive Committee | Special Meeting | December 7, 2000 | |
| Executive Committee | Written Consent | December 4, 2000 | **REDACTED** |

CONFIDENTIAL –<br>SUBJECT TO PROTECTIVE ORDER

2

CD-1 01183

| Executive Committee | Special Meeting | November 30, 2000 | **REDACTED** |
| Executive Committee | Special Meeting | October 2, 2000 | |
| Executive Committee | Written Consent | June 30, 2000 | 1. Oracle OpenWorld 2000 Budget<br>2. Oracle Approved Education Center Budget |
| **Finance and Audit Committee** | Written Consent | September 5, 2000 | 1. Adoption of Audited Financial Statements for the Fiscal Year Ended May 31, 2000<br>2. Finance and Audit Committee Report |
| Finance and Audit Committee | Regular Meeting | July 14, 2000 | |
| **Independent Committee** | Special Meeting | October 2, 2000 | **REDACTED** |
| Independent Committee | Written Consent | September 15, 2000 | |
| Independent Committee | Special Meeting | July 14, 2000 | Discussion of Conflict of Interest Policy for Executive Officers |
| **Nominating Committee** | Special Meeting | July 14, 2000 | Discussion of the Composition of Oracle Board |
| Stockholder | Annual Meeting | October 16, 2000 | 1. Election of Directors<br>2. Adoption of 2000 Long-Term Equity Incentive Plan |

**REDACTED**

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

**REDACTED**

3

CD- 1 01184



CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01185

**DRAFT**

MINUTES OF THE REGULAR MEETING
OF THE BOARD OF DIRECTORS
ORACLE CORPORATION

October 16, 2000

A Regular Meeting of the Board of Directors (the "Board") of Oracle Corporation, a Delaware corporation (the "Corporation"), was held on Monday, October 16, 2000, beginning at 1:00 p.m. in the Board Room at 500 Oracle Parkway, Redwood Shores, California.

1.    **ATTENDANCE AND QUORUM**

The following directors were present, constituting a majority of the Board and a quorum: Lawrence J. Ellison, Donald L. Lucas, Michael J. Boskin, Jeffrey O. Henley, Jack F. Kemp, Jeffrey Berg and Kay Koplovitz. Richard A. McGinn was not in attendance.

Also present were Safra Catz, Executive Vice President, Gary L. Bloom, Executive Vice President, and Daniel Cooperman, Senior Vice President, General Counsel & Secretary.

Mr. Ellison, Chairman of the Board, called the meeting to order and announced that the meeting was held pursuant to a written notice of meeting which was delivered to all members of the Board. Mr. Cooperman recorded the minutes of the meeting.

2.    **REVIEW AND APPROVAL OF MINUTES**

The Board reviewed the minutes from the previous regular meeting of the Board, draft copies of which had been delivered to each director. Upon motion duly made, seconded and unanimously carried, the Board took action as follows:

RESOLVED THAT:

The minutes of the Regular Meeting of the Board held on July 16 and July 17, 2000 hereby are approved for inclusion in the minute books of the Corporation.

3.    **MANAGEMENT PRESENTATION**

Gary Bloom, Executive Vice President, gave a presentation about Oracle's hosting strategy.

4.    **REVIEW FIRST QUARTER FINANCIAL RESULTS**

Mr. Henley reviewed the financial results for the first quarter of the Corporation's 2001 fiscal year which ended August 31, 2000.

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

**CD- I 01186**

5. **REDUCTION OF BOARD SIZE**

The Board ratified the reduction of the Board size.  Upon motion duly made, seconded and unanimously carried, the Board took action as follows:

WHEREAS:

The Board of Directors elected by the Corporation's Stockholders, at the Annual Meeting of Shareholders held this morning, consists of eight members.

RESOLVED THAT:

Pursuant to Section 2.1 of the Corporation's bylaws, the number of authorized directors of this Corporation hereby is decreased from nine directors to eight directors, effective as of October 16, 2000.

6. **ANNUAL ELECTION OF CHAIRMAN**

The Board elected Mr. Lawrence J. Ellison as Chairman of the Board.  Upon motion duly made, seconded and unanimously carried, the Board took action as follows:

RESOLVED THAT:

Mr. Ellison hereby is elected to serve as Chairman of the Board until his successor is duly elected and qualified or his earlier resignation or removal.

7. **APPOINTMENT OF CORPORATE OFFICERS**

The Board elected the following persons as corporate officers of the Corporation.  Upon motion duly made, seconded and unanimously carried, the Board took action as follows:

RESOLVED THAT:

Each individual listed below hereby is appointed to serve as an officer of the Corporation in the position specified below, until his or her successor is duly appointed and qualified or his or her earlier resignation or removal:

| | |
|---|---|
| Lawrence J. Ellison | Chief Executive Officer |
| Gary L. Bloom | Executive Vice President |
| Safra Catz | Executive Vice President |
| Sergio Giacoletto | Executive Vice President, Oracle Europe, Middle East and Africa |
| Jeffrey O. Henley | Executive Vice President and Chief Financial Officer |

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

2

CD- I 01187

| | |
|---|---|
| Jay Nussbaum | Executive Vice President, Oracle Service Industries |
| George Roberts | Executive Vice President, North American Sales |
| Charles A. Rozwat | Executive Vice President, Database Server |
| Edward J. Sanderson | Executive Vice President, Consulting and Latin America Division |
| Frank Varasano | Executive Vice President, Oracle Products Industries |
| Ron Wohl | Executive Vice President, Applications Development |
| Daniel Cooperman | Senior Vice President, General Counsel and Secretary |
| Jennifer Minton | Senior Vice President and Corporate Controller |
| Bruce M. Lange | Vice President and Corporate Treasurer |
| Deborah A. Lange | Vice President, Taxation |
| Matthew Ng | Assistant General Counsel and Assistant Secretary |
| Susan Hafleigh | Assistant Treasurer |

8.   **ELECTION OF MEMBERS OF BOARD COMMITTEES**

The Board elected the members of the following committees of the Board: Executive Committee, Finance and Audit Committee, Committee on Compensation and Management Development, Nominating Committee, Special Litigation Committee and Independent Committee for Review of Interested Transactions. Upon motion duly made, seconded and unanimously carried, the Board took action as follows:

ELECTION OF EXECUTIVE COMMITTEE

RESOLVED THAT:

1.   The Board hereby elects the following directors to serve on the Executive Committee of the Board:

Donald L. Lucas, Chairman
Lawrence J. Ellison
Jeffrey O. Henley

2.   Each of the foregoing members of the Board shall serve on the Executive Committee until his successor is duly elected.

3.   Any and all previous actions taken by the Executive Committee hereby are ratified, confirmed and approved as the acts and deeds of the Board.

ELECTION OF FINANCE AND AUDIT COMMITTEE

RESOLVED THAT:

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

3

CD- I 01188

NDCA-ORCL 044438



1. The Board hereby elects the following directors to serve on the Finance and Audit Committee of the Board:

> Donald L. Lucas, Chairman
> Michael J. Boskin
> Jeffrey Berg

2. Each of the foregoing members of the Board shall serve on the Finance and Audit Committee until his successor is duly elected.

3. Any and all previous actions taken by the Finance and Audit Committee hereby are ratified, confirmed and approved as the acts and deeds of the Board.

## ELECTION OF COMMITTEE ON COMPENSATION AND MANAGEMENT DEVELOPMENT

RESOLVED THAT:

1. The Board hereby elects the following directors to serve on the Committee on Compensation and Management Development of the Board (the "Committee"):

> Michael J. Boskin, Chairman
> Donald L. Lucas

2. Each of the foregoing members of the Board shall serve on the Committee until his successor is duly elected.

3. Any and all previous actions taken by the Committee hereby are ratified, confirmed and approved as the acts and deeds of the Board.

## ELECTION OF NOMINATING COMMITTEE

RESOLVED THAT:

1. The Board hereby elects the following directors to serve on the Nominating Committee of the Board:

> Michael J. Boskin
> Donald L. Lucas
> Kay Koplovitz

2. Each of the foregoing members of the Board shall serve on the Nominating Committee until his or her successor is duly elected.

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

-4-

CD- I 01189

3.  Any and all previous actions taken by the Nominating Committee hereby are ratified, confirmed and approved as the acts and deeds of the Board.

ELECTION OF SPECIAL LITIGATION COMMITTEE

**REDACTED**

ELECTION OF INDEPENDENT COMMITTEE FOR REVIEW OF INTERESTED TRANSACTIONS

RESOLVED THAT:

1.  The Board hereby elects the following directors to serve on the Independent Committee for Review of Interested Transactions of the Board (the "Independent Committee"):

      Michael J. Boskin
      Donald L. Lucas

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

5

CD-1 01190

except in the case of transactions where either Dr. Boskin or Mr. Lucas will receive a direct or indirect benefit from such transaction, in which case the Board will elect a director to serve in place of each interested Independent Committee member.

2. Each of the foregoing members of the Board shall serve on the Independent Committee until his successor is duly elected.

3. Any and all previous actions taken by the Independent Committee hereby are ratified, confirmed and approved as the acts and deeds of the Board.

9.    **ESTABLISHMENT OF 2001/2002 REGULAR BOARD MEETING SCHEDULE**

The Board confirmed its 2001 calendar year meeting schedule and established its 2002 calendar year meeting schedule. Upon motion duly made, seconded and unanimously carried, the Board took action as follows:

RESOLVED THAT:

1. The Board sets the dates for the 2001 regular Board meetings as follows:

> Monday, January 8, 2001
> Monday, April 23, 2001
> Monday, July 16, 2001
> Monday, October 15, 2001

2. The Board sets the dates for the 2002 regular Board meetings as follows:

> Monday, January 14, 2002
> Monday, April 15, 2002
> Monday, July 15, 2002
> Monday, October 14, 2002

10.    **INCREASE ALLOCATION FOR INVESTMENTS IN VENTURE FUNDS**

REDACTED

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

6

CD- I 01191

**REDACTED**

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

7

CD- I 01192

**LAND PURCHASE**

REDACTED

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

8

## REDACTED

12. **REPORT OF FINANCE AND AUDIT COMMITTEE**

Mr. Lucas reported on the Finance and Audit Committee Meeting held on Friday, October 13, 2000.

13. **ADJOURNMENT**

There being no further business to come before the meeting, it was, upon motion duly made, seconded and unanimously carried, adjourned at 3:20 p.m.

Following adjournment of the Board meeting, the outside members of the Board met with the Chief Executive Officer in executive session.

_____

Daniel Cooperman
Secretary

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

9

CD- I 01194



MINUTES OF THE ANNUAL MEETING
OF STOCKHOLDERS
OF ORACLE CORPORATION

October 16, 2000

The Annual Meeting of the Stockholders of Oracle Corporation, a Delaware corporation (the "Corporation"), was held on October 16, 2000, at 10:15 a.m. in the Oracle Corporation Conference Center, located at 350 Oracle Parkway, Redwood City, California.

1.    ATTENDANCE

The following directors were present: Lawrence J. Ellison, Chairman of the Board and Chief Executive Officer; Jeffrey O. Henley, Executive Vice President and Chief Financial Officer; Donald L. Lucas; Michael J. Boskin; Jack F. Kemp; Jeffrey Berg, and Kay Koplovitz. Neither Richard A. McGinn nor Raymond J. Lane was in attendance.

Also present were Daniel Cooperman, Senior Vice President, General Counsel and Secretary; Gary Matuszak, partner at Arthur Andersen LLP, the Corporation's independent public accountants; certain representatives of Boston Equiserve, the Corporation's transfer agent; and approximately 500 stockholders of the Corporation.

Mr. Ellison, Chairman of the Board, called the meeting to order and announced that the meeting was held pursuant to a written Notice of Meeting which was mailed to all Stockholders on or about September 11, 2000. Mr. Cooperman recorded the minutes of the meeting.

2.    PRESENTATION OF LIST OF STOCKHOLDERS

Mr. Cooperman reported that of the 2,821,650,145 shares of the Corporation's common stock outstanding as of August 21, 2000, the record date for the meeting, based on the tabulation of shares immediately prior to the commencement of the meeting, 2,471,102,000 were present in person or by proxy, representing approximately 87.6% of the outstanding common stock of the Corporation.

Mr. Ellison then declared a quorum present at the meeting.

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01195

3.    ELECTION OF DIRECTORS

The Stockholders considered candidates for election to the Board of Directors of the Corporation. Upon motion duly made, seconded and carried by at least 2,452,094,000 shares of the Corporation's common stock voting for each Director, each individual below was elected by the Stockholders to serve as a Director of the Corporation:

| | |
|---|---|
| Lawrence J. Ellison, Chairman | Jack F. Kemp |
| Jeffrey O. Henley | Jeffrey Berg |
| Donald L. Lucas | Richard A. McGinn |
| Michael J. Boskin | Kay Koplovitz |

4.    ADOPTION OF 2000 LONG-TERM EQUITY INCENTIVE PLAN

The Stockholders considered approval of the adoption of the Company's 2000 Long-Term Equity Incentive Plan. Upon motion duly made, seconded and carried by at least 1,664,378,000 shares of the Corporation's common stock, the adoption of the 2000 Long-Term Equity Incentive Plan was approved by the Stockholders.

5.    RATIFICATION OF THE APPOINTMENT OF ARTHUR ANDERSEN LLP AS INDEPENDENT PUBLIC ACCOUNTANTS

The Stockholders considered approval of the ratification of the appointment of Arthur Andersen LLP as independent public accountants. Upon motion duly made, seconded and carried by at least 2,461,481,000 shares of the Corporation's common stock, the ratification of the appointment of Arthur Andersen LLP as independent public accountants was approved by the stockholders.

6.    STOCKHOLDER PROPOSAL

# REDACTED

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01196

NDCA-ORCL 044446

7.  ADJOURNMENT

There being no further business to come before the meeting, upon motion duly made, seconded and unanimously carried, the meeting was adjourned at 10:40 a.m.

Daniel Cooperman
Secretary

Attached to these minutes are the final Stockholder vote totals as provided by Equiserve.

CONFIDENTIAL --
SUBJECT TO PROTECTIVE
ORDER

3

CD- 1 01197

 EquiServe

October 27, 2000

Susan Hafleigh
Director of Treasury Operations
Oracle Corporation
500 Oracle Parkway
Redwood Shores, CA 94065

### Certificate of Tabulation

Dear Susan:

In connection with the Annual Meeting of Oracle Corporation held on October 16, 2000, we tabulated proxies representing 2,483,060,300 votes, or 88.032% of the outstanding vote as follows:

PROPOSAL I    (Election of Directors)

| For All Nominees | Instructed | Withheld From All Nominees |
|---|---|---|
| 2,464,014,359 | 1,152,484 | 17,893,457 |

| | Total Vote For Each Director | Total Vote Withheld From Each Director |
|---|---|---|
| Lawrence J. Ellison | 2,464,812,097 | 18,248,203 |
| Donald L. Lucas | 2,464,559,460 | 18,500,840 |
| Michael J. Boskin | 2,464,884,562 | 18,175,738 |
| Jeffrey O. Henley | 2,465,166,843 | 17,893,457 |
| Jack F. Kemp | 2,464,014,359 | 19,045,941 |
| Jeffrey Berg | 2,464,671,863 | 18,388,437 |
| Richard McGinn | 2,464,587,098 | 18,473,202 |
| Kay Koplovitz | 2,464,664,162 | 18,396,138 |

PROPOSAL II    (Approval the Adoption of the Company's 2000 Long Term Equity Incentive Plan):

| For | Against | Abstain | Broker Non-Vote |
|---|---|---|---|
| 1,665,940,658 | 808,002,018 | 9,117,624 | -0- |

Proposal III    (Proposal to ratify the appointment of Arthur Andersen LLP as Independent Public Accounts of the Company for the fiscal year ending May 31, 2001):

| For | Against | Abstain | Broker Non-Vote |
|---|---|---|---|
| 2,473,390,110 | 3,251,346 | 6,418,844 | -0- |

As the stockholders of Oracle Corporation have approved Proposal II, we require the following documentation:

i)    Certified copy of the Board of Resolution adopting the above proposal.

ii)   Opinion from counsel attesting to the validity of shares increased with reference to the specific number of shares per plan authorized for issuance. Further, the opinion should state that upon issuance, the shares of the Company are fully paid and non-assessable and whether the reserved shares should bear restrictive legend(s) or if the shares have been registered [i.e. S-8 filing,] and therefore, bear no restrictive legend(s)

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01198

 EQUISERVE

Thank you in advance for your assistance in this matter and please feel free to call me at
(781) 575-2394 if you have any questions.

Sincerely,

Norris Richardson
"Ricky"
*Senior Account Manager*

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01199



WRITTEN CONSENT OF THE
COMPENSATION COMMITTEE
OF THE BOARD OF DIRECTORS
ORACLE CORPORATION

October 18, 2000


Pursuant to Section 141(f) of the Delaware General Corporation Law, the following resolutions
hereby are adopted by the unanimous written consent, without a meeting, of the Committee on
Compensation and Management Development (the "Committee") of the Board of Directors (the
"Board") of Oracle Corporation, a Delaware corporation (the "Corporation"):

## FORM OF NON-QUALIFIED STOCK OPTION GRANT AGREEMENT AND STOCK OPTION EXERCISE NOTICE AND AGREEMENT

WHEREAS:

A. On July 17, 2000 and September 7, 2000, the Board adopted the Corporation's 2000
Long-Term Equity Incentive Plan (the "Plan").

B. On October 16, 2000, the stockholders of the Corporation approved the adoption of
the Plan.

C. Pursuant to the terms of the Plan, the Committee is authorized to approve the forms of
agreement, or other forms for communicating to participants that they have been
granted an award under the Plan, for use under the Plan.

D. The Committee has determined that it is in the best interests of the Corporation and
its stockholders to adopt forms of the Non-Qualified Stock Option Grant Agreement
in the form attached hereto as Exhibit A (the "NQ Grant Agreement") and the Stock
Option Exercise Notice and Agreement in the form attached hereto as Exhibit B (the
"Exercise Agreement").

RESOLVED THAT:

1. The form, terms and provisions of the NQ Grant Agreement and Exercise Agreement
(collectively, the "Agreements") are approved for use in connection with the grant and
the exercise of non-qualified stock options, respectively, pursuant to the Plan in
substantially the forms presented to the Committee;

2. Each of the officers of the Corporation, with full authority to act without the others, is
authorized and empowered to make any revisions in the Agreements which such officer
deems necessary or advisable as long as such revisions do not significantly alter the
substance of the Agreements; and

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01200

 

FROM : TADDEO          PHONE NO. : -14158519601          Oct. 18 2000 11:02AM P1
                                                              @001

3. Any and all prior actions taken by the officers of the Corporation that are within the scope of these resolutions hereby are ratified, confirmed and approved as the actions of the Corporation.

The undersigned, being all the members of the Committee, do hereby approve and consent to the adoption of the foregoing resolutions as of October 18, 2000. This consent may be executed in any number of counterparts, each of which so executed shall be deemed an original and together such counterparts shall constitute one instrument.

_____
Michael J. Boskin

_____
Donald L. Lucas

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD-I 01201



3.  Any and all prior actions taken by the officers of the Corporation that are within the scope of these resolutions hereby are ratified, confirmed and approved as the actions of the Corporation.

The undersigned, being all the members of the Committee, do hereby approve and consent to the adoption of the foregoing resolutions as of October 18, 2000.  This consent may be executed in any number of counterparts, each of which so executed shall be deemed an original and together such counterparts shall constitute one instrument.

_____
Michael J. Boskin

Donald L. Lucas

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01202



EXHIBIT A

## NOTICE OF STOCK OPTION GRANT
## 2000 LONG-TERM EQUITY INCENTIVE PLAN
### NON-QUALIFIED STOCK OPTION

1.  Grant. Oracle Corporation (the "Company") has granted to the optionee ("Optionee") named on the preceding Certificate of Stock Option Grant (the "Certificate") a non-qualified option (the "Option") to purchase the total number of shares of Common Stock set forth on such Certificate (the "Shares") at the exercise price per share set forth therein (the "Exercise Price"). This Option is subject to the terms set forth below and in the Company's 2000 Long-Term Equity Incentive Plan as amended to date (the "Plan"). In the event of a conflict between the terms of the Plan and the terms of this Notice of Stock Option Grant (the "Grant Notice"), the terms of the Plan shall govern. All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

2.  Restrictions on Exercise. Subject to the terms of the Plan and this Grant Notice, the Option may be exercised in increments on or after each vesting date specified on the Certificate, provided that in no event may the Option be exercised after the last date to exercise specified on the Certificate (the "Expiration Date"). In addition, this Option may not be exercised as to fewer than 100 shares unless it is exercised as to all Shares as to which this Option is then exercisable.

3.  Termination of Option.

    a)  This Option shall cease vesting upon termination of Optionee's employment relationship with Optionee's employer. An Optionee's employment relationship shall be considered to have terminated, and the Optionee to have ceased to be employed by the Company or its Parent, Subsidiary or Affiliate, on the earliest of:

        (1) the date on which the Company, or any Parent, Subsidiary or Affiliate of the Company, as appropriate, delivers to the Optionee notice in a form prescribed by the Company that the Company, or such other entity, is thereby terminating the employment relationship (regardless of whether the notice or termination is lawful or unlawful or is in breach of any contract of employment);

        (2) the date on which the Optionee delivers notice in a form prescribed by the Company, to the Company, or any Parent, Subsidiary or Affiliate of the Company, as appropriate, that the Optionee is terminating the employment relationship (regardless of whether the notice or termination is lawful or unlawful or is in breach of any contract of employment);

        (3) the date on which the Optionee ceases to provide services to the Company, or any Parent, Subsidiary or Affiliate of the Company, as appropriate, except where the Optionee is on an authorized leave of absence; or

        (4) the date on which the Optionee ceases to be considered an "employee" under applicable law.

    The committee of the Board of Directors of the Company administering the Plan (the "Committee") shall have discretion to determine whether Optionee has ceased to be employed by the Company or any Parent, Subsidiary or Affiliate of the Company and the effective date on which such employment terminated.

CONFIDENTIAL --
SUBJECT TO PROTECTIVE
ORDER

CD- I 01203

b) If Optionee ceases to be employed by the Company or any Parent, Subsidiary or Affiliate of the Company, as appropriate, for any reason except death or disability, this Option may be exercised to the extent (and only to the extent) that it would have been exercisable upon the date of termination of Optionee's employment, within three (3) months after the date of termination, but in any event no later than the Expiration Date of the Option. If employment ceases because of death or disability, this Option may be exercised to the extent (and only to the extent) specified in the Plan.

c) **FOR UK RESIDENTS ONLY**: Optionee acknowledges and agrees that Optionee shall be liable for all contributions required under the Social Security Contributions and Benefits Act 1992, including both primary and secondary contributions on any gains made by the Optionee, and that liability for the secondary contributions shall be transferred to the Optionee to the fullest extent permited by law. Prior to the earlier of the one year anniversary of the date of the grant of this Option or the first vesting date, the Optionee shall make an election, in the form specified and/or approved for such election by the Inland Revenue, that the liability for the secondary contributions on any gains shall be transferred to the Optionee (the "Election") and that the Optionee shall prior to any exercise of this Option either authorize the Company, Oracle Corporation UK Limited or any subsidiary owned directly or indirectly by the Company (the "Company Group") to withhold such secondary contributions or make payment for such secondary contributions by cash or check to the member of the Company Group who will remit any such contributions to the Inland Revenue. If the Optionee does not make an Election prior to the earlier of the one year anniversary of the date of the grant of this Option or the first vesting date, or shall at any time revoke such Election, this Option shall become null and void without any liability to the Company Group and may not be exercised. Unless expressly revoked, the Election shall apply to all future stock option grants by the Company Group to Optionee.

4. <u>Manner of Exercise; Consideration</u>. The Option may be exercised by delivery to the Company of the stock option exercise agreements in the form then approved by the Committee, stating the number of Shares being purchased, the restrictions imposed on the Shares, if any, and such representations and agreements, as may be required by the Company to comply with applicable laws, together with payment in a form allowed under the Plan. The current forms of Stock Option Exercise Form and Stock Option Exercise Notice and Agreement (the "Exercise Agreement") are available at the Company's web site at:

http://hrweb.us.oracle.com/benefits/option.htm

The Committee may permit the execution of "same day sale" transactions electronically.

5. <u>Compliance with Laws and Regulations</u>. The issuance and transfer of Shares shall be subject to compliance by the Company and Optionee with all applicable requirements of federal, state or local securities laws and with all applicable requirements of any stock exchange or national market system on which the Company's common stock may be listed at the time of such issuance or transfer.

6. <u>Transferability of Option</u>. This Option may not be transferred in any manner other than (i) by will, or (ii) by the laws of descent and distribution.

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01204



7. <u>Tax Consequence.</u> The tax consequences of receipt and exercise and transfer of the Option, as well as upon disposition of the Shares following exercise, are set forth in the Plan Prospectus made available at the Company's web site at:

http://crweb.us.oracle.com/guest/plsql/file_content.download/nowarning/109774.pdf

8. <u>Tax Withholding.</u> Prior to the issuance of the Shares upon exercise of the Option, Optionee must pay or make adequate provision for any federal, state or local withholding obligations of the Company. Optionee agrees that, if necessary to cover any tax withholding obligations of Optionee upon exercise of the Option, the Company may withhold the appropriate amount at or after the time of such exercise. The Company (a) makes no representations nor undertakings regarding treatment of any tax-related items in connection with any aspect of the Option grant, including the grant, vesting or exercise of the Option and the subsequent sale of shares acquired pursuant to such exercise; and (b) does not commit to structure the terms of the grant or any aspect of the Option to reduce or eliminate the Optionee's liability regarding tax-related items.

9. <u>Standard Acknowledgement & Waiver.</u> By entering into this Agreement and accepting the grant of an Option evidenced hereby, Optionee acknowledges that: (i) the Plan is discretionary in nature and may be amended, suspended or terminated by the Company at any time in accordance with its terms; (ii) the grant of the Option is a one-time benefit which does not create any contractual or other right to receive future grants of options, or benefits in lieu of options; (iii) all determinations with respect to any such future grants, including, but not limited to, the times when options shall be granted, the number of shares subject to each option, the option price, and the time or times when each option shall be exercisable, will be at the sole discretion of the Company; (iv) the Optionee's participation in the Plan shall not create a right to further employment with the Optionee's employer and shall not interfere with the ability of the Optionee's employer to terminate the Optionee's employment relationship at any time with or without cause; (v) the Optionee's participation in the Plan is voluntary; (vi) the value of the Option is an extraordinary item of compensation which is outside the scope of the Optionee's employment contract, if any; (vii) the Option is not part of normal or expected compensation for purposes of calculating any severance, resignation, redundancy, end of service payments, bonuses, overtime, long-service awards, pension or retirement benefits (including the 401(k) Savings and Investment Plan and the Deferred Compensation Plan) or similar payments; (viii) the vesting of any Option ceases upon termination of employment for any reason except as may otherwise be explicitly provided in the Plan document; (ix) the future value of the underlying shares is unknown and cannot be predicted with certainty; (x) the Option has been granted to the Optionee in the Optionee's status as an employee of Optionee's employer, and if the Company is not the Optionee's employer, can in no event be understood or interpreted to mean that the Company is the Optionee's employer; and (xi) if the underlying shares do not increase in value prior to the expiration of the Option, the option will have no value.

10. <u>Data Privacy Consent.</u> As a condition of the grant of the Option, the Optionee consents to the collection, use and transfer of personal data as described in this paragraph. The Optionee understands that the Company and any Parent, Subsidiary or Affiliate hold certain personal information about the Optionee, including, but not limited to, the Optionee's name, home address and telephone number, date of birth, social security number of identification number,

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01205

salary, nationality, job title, any shares of stock or directorships held in the Company, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding in the Optionee's favor, for the purpose of managing and administering the Plan ("Data"). The Optionee further understands that recipients of Data including the Company and/or any Parent, Subsidiary or Affiliate will transfer Data amongst themselves as necessary for the purpose of implementation, administration and management of the Optionee's participation in the Plan, and that the Company and/or any Parent, Subsidiary or Affiliate may each further transfer Data to recipients including third parties assisting the Company in the implementation, administration and management of the Plan. The Optionee understands that these recipients may be located in the United States or the European Economic Area. The Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Optionee's participation in the Plan, including any requisite transfer to a broker or other third party with whom the Optionee may elect to deposit any shares of stock acquired upon exercise of the option such Data as may be required for the administration of the Plan and/or the subsequent holding of shares of Stock on Optionee's behalf. The Optionee understands that the Optionee may, at any time, view Data, require any necessary amendments to Data or withdraw the consents herein in writing by contacting Optionee's local Human Resources representative. Withdrawal of consent may, however, affect Optionee's ability to exercise or realize benefits from the Option.

11. Entire Agreement; Interpretation. The Plan made available at the Company's web site at http://crweb.us.oracle.com/guest/plsql/file_content.download/nowarning/109774.pdf is incorporated herein by reference. This Grant Notice and the Plan constitute the entire agreement of the parties and supersede all prior undertakings and agreements with respect to the subject matter hereof. This Grant Notice and the Plan may be amended from time to time by the Committee. Optionee agrees that the terms of the Plan govern the Option and that all interpretations and determinations made by the Company (or its Board of Directors and any committee of the Board administering the Plan) with respect to the Plan and this Grant Notice shall be final and binding on all persons. This Grant Notice is governed by California law except for that body of law pertaining to conflict of laws. Optionee agrees to institute any legal action or legal proceeding relating to the Grant Notice or the Plan in state court in San Mateo County, California or in federal court in San Francisco, California. Optionee agrees to submit to the jurisdiction of and agrees that venue is proper in the aforesaid courts in any such action or proceeding.

12. By clicking "I have Read and Agree" on the button below, Optionee accepts the Option and agrees to be bound by its terms.

Date First Posted: _____ __, 2000

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01206



EXHIBIT B

## ORACLE CORPORATION
## STOCK OPTION EXERCISE NOTICE AND AGREEMENT

1.  Representation of the Optionee.  I acknowledge that I have received, read and understood the 2000 Long-Term Equity Incentive Plan (the "Plan"), the Notice of Stock Option Grant (the "Grant Notice") and the prospectus relating to the Plan and agree to abide by and be bound by their terms and conditions.

2.  Compliance with Securities Laws.  I understand and acknowledge that the exercise of any rights to purchase shares of Common Stock of Oracle Corporation ("Shares") is expressly conditioned upon compliance with the Securities Act of 1933, as amended, and all applicable state securities laws.  I agree to cooperate with Oracle Corporation (the "Company") to ensure compliance with such laws.

3.  Tax Consequences.  I understand that I may suffer adverse tax consequences as a result of my purchase or disposition of the Shares.  I represent that I have consulted with any tax consultant(s) that I deem advisable in connection with the purchase or disposition of the Shares and that I am not relying on the Company for any tax advice. I have made provision for the payment of any federal and state withholding taxes required to be paid or withheld by the Company.

4.  Insider Trading.  I acknowledge that I have received, read and understood the Company's policy against trading in Company stock while in the possession of inside information (i.e., material nonpublic information), as set forth in the Company's Employee Handbook.  I agree to sell or otherwise dispose of the Shares strictly in compliance with this Company policy and all related securities laws.

5.  Entire Agreement.  I acknowledge the following:  The Plan and the Grant Notice are incorporated herein by reference; this Agreement, the Plan and the Grant Notice constitute my entire agreement with the Company and supersede all prior undertakings and agreements between us with respect to the subject matter hereof;  and this Agreement is governed by California law except for that body of law pertaining to conflict of laws.  Optionee agrees to institute any legal action or legal proceeding relating to the Grant Notice, the Plan or this Agreement in state court in San Mateo County, California or in federal court in San Francisco, California.  Optionee agrees to submit to the jurisdiction of and agrees that venue is proper in the aforesaid courts in any such action or proceeding.

CONFIDENTIAL --
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01207

MINUTES OF THE SPECIAL MEETING
OF THE EXECUTIVE COMMITTEE
OF THE BOARD OF DIRECTORS
ORACLE CORPORATION

November 30, 2000

A Special Meeting of the Executive Committee (the "Committee") of the Board of Directors (the "Board") of Oracle Corporation, a Delaware corporation (the "Corporation"), was held by telephone conference on November 30, 2000 at 11:45 a.m. Pacific Daylight Time.

1.      ATTENDANCE AND QUORUM

        The following directors were present, constituting a majority of the Committee and a quorum: Lawrence J. Ellison and Jeffrey O. Henley. Donald L. Lucas was not in attendance.

        Also present was Safra Catz, Executive Vice President, and Daniel Cooperman, Senior Vice President, General Counsel and Secretary.

        Mr. Cooperman called the meeting to order and announced that the meeting was held pursuant to a telephonic notice of meeting delivered to all members of the Committee. Mr. Cooperman confirmed that each participant was able to hear clearly all other participants. Mr. Cooperman recorded the minutes of the meeting.

2.      APPROVAL OF PURCHASE OF HARDWARE AND SERVICES FROM THE
        _____

**REDACTED**

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01208

NDCA-ORCL 044458

**REDACTED**

3.    <u>ADJOURNMENT</u>

      There being no further business to come before the meeting, it was, upon motion duly made, seconded and unanimously carried, adjourned at approximately 12:00 p.m.

                                        _Daniel Cooperman_
                                        Daniel Cooperman
                                        Secretary

CONFIDENTIAL --
SUBJECT TO PROTECTIVE
ORDER

2

CD- I 01209



WRITTEN CONSENT OF THE
EXECUTIVE COMMITTEE OF
THE BOARD OF DIRECTORS
ORACLE CORPORATION

December 4, 2000

Pursuant to Section 141(f) of the Delaware Corporation Law, the following resolutions are hereby adopted by the unanimous written consent, without a meeting, of the Executive Committee (the "Committee") of the Board of Directors (the "Board") of Oracle Corporation, a Delaware corporation (the "Corporation").

1. <u>VALUATION OF INVESTMENT IN</u>

    WHEREAS:

**REDACTED**

The undersigned, being all the members of the Committee, do hereby approve and consent to the adoption of the above resolutions as of December 4, 2000. This consent

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

**CD-1 01210**

may be executed in any number of counterparts, each of which shall be deemed an original, and together the counterparts shall constitue one instrument.

Donald L. Lucas

Jeffrey O. Henley

Lawrence J. Ellison

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01211

NDCA-ORCL 044461

may be executed in any number of counterparts, each of which shall be deemed an original, and together the counterparts shall constitute one instrument.

_____
Donald L. Lucas

_____
Jeffrey O. Henley

Lawrence J. Ellison

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD-1 01212

NDCA-ORCL 044462

may be executed in any number of counterparts, each of which shall be deemed an
original, and together the counterparts shall constitute one instrument.

_____                    _____
Donald L. Lucas                            Jeffry O. Henley

_____
Lawrence J. Ellison

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD-I 01213

MINUTES OF THE SPECIAL MEETING
OF THE EXECUTIVE COMMITTEE
OF THE BOARD OF DIRECTORS
ORACLE CORPORATION

December 7, 2000

A Special Meeting of the Executive Committee (the "Committee") of the Board of Directors (the "Board") of Oracle Corporation, a Delaware corporation (the "Corporation"), was held by telephone conference on December 7, 2000 at 4:35 p.m. Pacific Daylight Time.

1.     ATTENDANCE AND QUORUM

The following directors were present, constituting a majority of the Committee and a quorum: Lawrence J. Ellison and Donald L. Lucas. Jeffrey O. Henley was not in attendance.

Also present was Safra Catz, Executive Vice President, Matthew Ng Assistant General Counsel and Assistant Secretary and George Gucker, Senior Corporate Counsel.

Ms. Catz called the meeting to order and announced that the meeting was held pursuant to a telephonic notice of meeting delivered to all members of the Committee. Ms. Catz confirmed that each participant was able to hear clearly all other participants. Mr. Ng recorded the minutes of the meeting.

2.     APPROVAL OF CAPITAL CONTRIBUTION TO _____

WHEREAS:

**REDACTED**

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01214

**REDACTED**

RESOLVED THAT·

**REDACTED**

3.    ADJOURNMENT

There being no further business to come before the meeting, it was, upon motion duly
made, seconded and unanimously carried, adjourned at approximately 4:40 p.m.

Matthew Ng
Matthew Ng
Assistant Secretary

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

2

CD- 1 01215

NDCA-ORCL 044465

WRITTEN CONSENT OF THE
EXECUTIVE COMMITTEE OF
THE BOARD OF DIRECTORS
ORACLE CORPORATION

December 8, 2000

Pursuant to Section 141(f) of the Delaware Corporation Law, the following resolutions are hereby adopted by the unanimous written consent, without a meeting, of the Executive Committee (the "Committee") of the Board of Directors (the "Board") of Oracle Corporation, a Delaware corporation (the "Corporation").

1. APPROVAL OF : **REDACTED**    AGREEMENT

WHEREAS:

**REDACTED**

RESOLVED THAT:

**REDACTED**

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD-1 01216

NDCA-ORCL 044466

The undersigned, being all the members of the Committee, do hereby approve and consent to the adoption of the above resolutions as of December 8, 2000. This consent may be executed in any number of counterparts, each of which shall be deemed an original, and together the counterparts shall constitute one instrument.

Donald L. Lucas                              Jeffrey O. Henley

Lawrence J. Ellison

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD-I 01217

The undersigned, being all the members of the Committee, do hereby approve and consent to the adoption of the above resolutions as of December 8, 2000. This consent may be executed in any number of counterparts, each of which shall be deemed an original, and together the counterparts shall constitute one instrument.

_____                    _____
Donald L. Lucas                              Jeffrey O. Henley


Lawrence J. Ellison

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD-1 01218

NDCA-ORCL 044468

The undersigned, being all the members of the Committee, do hereby approve and consent to the adoption of the above resolutions as of December 8, 2000. This consent may be executed in any number of counterparts, each of which shall be deemed an original, and together the counterparts shall constitute one instrument.

_____
Donald L. Lucas

_____
Jeffrey O. Henley

_____
Lawrence J. Ellison

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD-I 01219

NDCA-ORCL 044469



WRITTEN CONSENT OF THE
COMMITTEE ON COMPENSATION
AND MANAGEMENT DEVELOPMENT
OF THE BOARD OF DIRECTORS
ORACLE CORPORATION

December 14, 2000

Pursuant to Section 141(f) of the Delaware General Corporation Law, the following resolutions hereby are adopted by the unanimous written consent, without a meeting, of the Committee on Compensation and Management Development (the "Committee") of the Board of Directors (the "Board") of Oracle Corporation, a Delaware corporation (the "Corporation"):

1.   AMENDMENT AND RESTATEMENT OF 1993 DEFERRED COMPENSATION PLAN

WHEREAS:

A.   The Corporation previously adopted the Oracle Corporation 1993 Deferred Compensation Plan (the "1993 Plan") by resolutions dated April 25, 1994 and amended and restated the 1993 Plan by resolutions dated November 21, 1997.

B.   The Committee has determined that it is in the best interests of the Corporation to make certain changes to the 1993 Plan.

C.   The Committee has reviewed the Oracle Corporation 1993 Deferred Compensation Plan in the form attached hereto as Exhibit A (the "Amended Plan") and has determined that it is in the best interests of the Corporation to approve and adopt the Amended Plan.

RESOLVED THAT:

1.   The Amended Plan is approved, adopted and ratified.

2.   Each of the Chief Executive Officer, the Chief Financial Officer, any Executive Vice President, the Treasurer, the Assistant Treasurer, the Secretary and the Assistant Secretary (the "Authorized Officers") is authorized and directed to execute such instruments and to take such other action as he shall deem appropriate to carry out the intent and purposes of these resolutions, except that such actions that were taken prior to the adoption of such resolutions are ratified, confirmed, approved and adopted as actions of the Corporation.

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01220

2.    CONDITIONS OF FOREIGN GRANTS UNDER THE 2000 LONG-TERM EQUITY
      INCENTIVE PLAN

      WHEREAS:

      A.  The Board of Directors and the stockholders of the Corporation have approved the
          2000 Long-Term Equity Incentive Plan.

      B.  The Committee has determined that certain conditions are required or beneficial in
          connection with option grants made to employees in certain countries under the 2000
          Long-Term Equity Incentive Plan, as specifically described in Exhibit B hereto.

      RESOLVED THAT:

      1.  Options granted in the countries set forth in Exhibit B attached hereto shall be subject
          to the conditions described in Exhibit B.

      2.  Each of the Chief Executive Officer, the Chief Financial Officer, any Executive Vice
          President, the Treasurer, the Assistant Treasurer, the Secretary and the Assistant
          Secretary (the "Authorized Officers") is authorized and directed to execute such
          instruments and to take such other actions as he or she shall deem appropriate to carry
          out the intent and purposes of these resolutions, except that such actions that were
          taken prior to the adoption of such resolutions are ratified, confirmed, approved and
          adopted as actions of the Corporation.

The undersigned, being all the members of the Committee, do hereby approve and consent to the
adoption of the foregoing resolutions as of December 14, 2000.


Michael Boskin


Donald Lucas


CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

2

CD- 1 01221

2.   CONDITIONS OF FOREIGN GRANTS UNDER THE 2000 LONG-TERM EQUITY INCENTIVE PLAN

WHEREAS:

A. The Board of Directors and the stockholders of the Corporation have approved the 2000 Long-Term Equity Incentive Plan.

B. The Committee has determined that certain conditions are required or beneficial in connection with option grants made to employees in certain countries under the 2000 Long-Term Equity Incentive Plan, as specifically described in Exhibit B hereto.

RESOLVED THAT:

1. Options granted in the countries set forth in Exhibit B attached hereto shall be subject to the conditions described in Exhibit B.

2. Each of the Chief Executive Officer, the Chief Financial Officer, any Executive Vice President, the Treasurer, the Assistant Treasurer, the Secretary and the Assistant Secretary (the "Authorized Officers") is authorized and directed to execute such instruments and to take such other actions as he or she shall deem appropriate to carry out the intent and purposes of these resolutions, except that such actions that were taken prior to the adoption of such resolutions are ratified, confirmed, approved and adopted as actions of the Corporation.

The undersigned, being all the members of the Committee, do hereby approve and consent to the adoption of the foregoing resolutions as of December 14, 2000.

_____
Michael Boskin

_____
Donald Lucas

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

2

CD- I 01222

CONFIDENTIAL --
SUBJECT TO PROTECTIVE
ORDER

CD- I 01223

NDCA-ORCL 044473

<u>EXHIBIT A</u>

**ORACLE CORPORATION**
**1993 DEFERRED COMPENSATION PLAN**

**(Amended and Restated as of November 15, 2000)**

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01224

## TABLE OF CONTENTS

Plan Provisions                                                          Page

Section 1 –    Definitions                                                  1

Section 2 -    Eligibility                                                  2

Section 3 -    Deferred Compensation                                        3

Section 4 -    Designation of Beneficiary                                   6

Section 5 -    Change in Control                                            6

Section 6 -    Trust Provisions                                             6

Section 7 -    Amendment and Termination                                    7

Section 8 -    Administration                                               7

Section 9 -    General and Miscellaneous                                    7

Appendices

Appendix 1    Distribution Election                                        10

Appendix 2    Beneficiary Designation                                      11

CONFIDENTIAL
SUBJECT TO PROTECTIVE
ORDER

CD- I 01225

## ORACLE CORPORATION
## 1993 DEFERRED COMPENSATION PLAN

### (Amended and Restated as of November 15, 2000)

Oracle Corporation, a Delaware Corporation (referred to hereafter as "Employer") hereby establishes an unfunded plan for the purpose of providing deferred compensation for a select group of management and highly compensated employees.

### RECITALS

WHEREAS, those employees identified by the Compensation Committee of the Board of Directors of Employer or any other committee designated by the Board of Directors of Employer to administer this Plan in accordance with Section 8 hereof (hereinafter referred to as the "Committee") as eligible to participate in this Plan (each of whom are referred to hereafter as the "Employee" or collectively as the "Employees") are employed by Employer;

WHEREAS, Employer desires to adopt an unfunded deferred compensation plan and the Employees desire Employer to pay certain deferred compensation and/or related benefits to or for the benefit of Employees, or a designated Beneficiary, or both; and

NOW THEREFORE, Employer hereby establishes this deferred compensation plan.

### SECTION 1
### DEFINITIONS

1.1    "Account" shall mean the separate account(s) established under this Plan and the Trust for each participating Employee. Statements of a Participant's account balance will be made available electronically.

1.2    "Base Salary" shall mean an Employee's regular compensation without reduction for compensation deferred pursuant to all qualified and non-qualified plans of Employer, but excluding all of the following: bonuses, commissions, overtime, incentive payments, non-monetary awards, and other special compensation.

1.3    "Beneficiary" shall mean the Beneficiary designated by the Employee to receive Employee's deferred compensation benefits in the event of his or her death.

1.4    "Change in Control" shall have the meaning set forth in Section 5.1 hereof.

1.5    "Code" shall mean the Internal Revenue Code of 1986, as it may be amended from time to time, and the rules and regulations promulgated thereunder.

CONFIDENTIAL -
SUBJECT TO PROTECTIVE
ORDER

CD- I 01226

1.6    "Committee" shall mean the Compensation Committee of the Board of Directors of Employer or any other committee designated by the Board of Directors of Employer to administer this Plan in accordance with Section 8 hereof.

1.7    "Employee" shall mean each Employee of Employer designated by Employer to be entitled to deferred compensation pursuant to this Plan; references to Employee herein shall include references to an Employee's Beneficiary where the context so requires.

1.8    "Employer" shall mean Oracle Corporation, a Delaware Corporation, and any successor organization thereto.

1.9    "Hardship" shall have the meaning set forth in Section 3.5 hereof.

1.10   "Plan" shall mean the Oracle Corporation 1993 Deferred Compensation Plan, as amended.

1.11   "Permanent Disability" shall mean that the Employee is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or otherwise meets the definition of "Permanent Disability" as set forth in Employer's Long Term Disability Plan. An Employee will not be considered to have a Permanent Disability unless he or she furnishes proof of such condition sufficient to satisfy Employer, in its sole discretion.

1.12   "Trust" or "Trust Agreement" shall mean the Oracle Corporation 1993 Deferred Compensation Plan Trust Agreement, including any amendments thereto, entered into between Employer and the Trustee to carry out the provisions of the Plan.

1.13   "Trust Fund" shall mean the cash and other properties held and administered by Trustee pursuant to the Trust to carry out the provisions of the Plan.

1.14   "Trustee" shall mean the designated Trustee acting at any time under the Trust.

1.15   "Variable compensation" shall mean bonuses and commissions.

## SECTION 2
## ELIGIBILITY

2.1    Eligibility.  Excepting the first year of the Plan, eligibility to participate in the Plan in a calendar year shall be limited to Employees of Employer who are selected by the Committee (or its designee), in its sole discretion, which Employees generally shall either be Employees (i) whose annualized base salary in United States Dollars determined as of September 30 of the prior calendar year equals or exceeds $150,000, or (ii) who participated in the Plan in the prior calendar year.  The Committee also may

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

2

NDCA-ORCL 044477

select for eligibility an Employee whose base salary reaches $150,000 in a given year. For purposes of this Section 2.1, "base salary" means an Employee's regular compensation without reduction for compensation deferred pursuant to all qualified and non-qualified plans of Employer, but excluding all of the following: bonuses, commissions, overtime, incentive payments, non-monetary awards, and other special compensation.

## SECTION 3
### DEFERRED COMPENSATION

3.1    Deferred Compensation. Participation in the Plan shall commence once the employee has made a deferral election. Deferral of compensation under the Plan shall not commence until the Employee has complied with the election procedures set forth in Section 3.3. Each participating Employee may elect, in accordance with Section 3.3 of this Plan, to defer annually the receipt of a percentage of the base salary and variable compensation otherwise payable to him or her by Employer during each calendar year or portion of a calendar year that the Employee shall be employed by Employer. Any base salary or variable compensation deferred pursuant to this Section shall be recorded by Employer in an Account, maintained in the name of the Employee, which Account shall be credited with a dollar amount equal to the total amount of base salary and/or variable compensation deferred during each calendar year under the Plan together with deemed earnings thereon credited in accordance with Section 3.7. The percentage of base salary and variable compensation that Employee elects to defer under this Section 3.1 will remain constant until suspended or modified by the filing of another election with Employer by the Employee in accordance with Section 3.3 of the Plan.

3.2    Payment Of Account Balances. (a) The Employee shall elect whether he or she will receive distribution(s) from his or her Account (i) upon reaching age 59½, or (ii) upon termination of employment of Employee with Employer. The Employee also shall elect whether distribution(s) of the amounts credited to Employee's Account, including earnings (if any) credited thereto pursuant to Section 3.7, will be in a lump sum, or in installments over a period of five (5) years or ten (10) years. Such elections shall be made at the time that the Employee first elects to defer compensation under the Plan.   The Employee's distribution elections shall be on forms (whether paper or electronic) furnished by the Committee. If no distribution election is made, the amounts credited to a participant's account will be distributed in a lump sum on the first distribution date, as set forth in section 3.2(d), after termination of employment.   A participant may make a total of no more than three changes to his or her distribution election. Any change in distribution election will apply to all amounts in the Employee's Account, whether related to deferrals of compensation for years before or after January 1, 1997.   A change in distribution election shall be made on forms (whether paper or electronic) furnished by the Committee and will be effective only if the change in distribution election has been in effect for at least one year before the occurrence of the

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

3

CD- I 01228

event specified both in the original election and in the change of election as triggering distribution.

(b)  Upon the death of Employee after the date of termination of employment with Employer but before complete distribution to him or her of the entire balance of his or her Account, Employer may, in the sole discretion of the Committee, pay the balance of his or her Account(s) to Employee's designated Beneficiary in the form of one lump sum payment (notwithstanding any election to receive distributions under clause (i) of Section 3.2(a) or in installments).

(c)  Notwithstanding any other provision of this Plan, upon termination of Employee's employment with Employer by reason of death, the Employer shall distribute in a lump sum to Employee or Employee's designated Beneficiary all amounts credited to the Employee's Account.  Notwithstanding any other provision of this Plan, upon termination of Employee's employment with Employer, other than by reason of death, Employer may, in the sole discretion of the Committee, distribute to Employee or Employee's designated Beneficiary all amounts credited to the Employee's Account.

(d)  A distribution shall be made or commence on the seventeenth (17th) day of the month (or the first business day after the seventeenth) following the calendar quarter in which the event triggering a distribution under any of the foregoing subsections of this Section 3.2 occurs.  Subsequent distributions, if any, shall be made on each quarter-annual anniversary date of the date of the first distribution. Each such distribution, if any, shall include interest or other earnings credited to the balance of an Employee's Account remaining unpaid.

3.3     Election To Defer Compensation.  The Employee's election to defer compensation as provided in Section 3.1 of this Plan shall be made on forms (whether paper or electronic) furnished by the Committee. The deferral election must be made at least twenty (20) days prior to January 1 of the calendar year in which the compensation to be deferred is otherwise payable to Employee; provided, however, that the Committee shall have the discretion to designate a different election period in any year so long as such election period expires prior to January 1 of the calendar year in which the compensation to be deferred is otherwise payable to Employee. In the case of a newly eligible Employee, the election must be made within thirty (30) days of the date it is determined that the Employee is eligible. In the case of a newly eligible Employee, the election will be effective for the calendar quarter after the election is made. Such deferral election (and any subsequent election) will continue until suspended or modified on a form (whether paper or electronic) furnished by the Committee, which new election shall only apply to compensation otherwise payable to Employee after the end of the calendar year in which such election is delivered to Employer. Any deferral election made by Employee shall be irrevocable with respect to any compensation covered by such election, including the compensation payable in the calendar year in which the election suspending or modifying the prior deferral election is delivered to Employer. Absent a suspension or modification election, such original election shall remain in effect from

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

4

CD-1 01229



year to year until the date for distribution of the Employee's Account under Section 3.2. Employer shall withhold the percentage of base salary specified to be deferred for each payroll period and shall withhold the percentage of variable compensation specified to be deferred at the time or times such variable compensation is or otherwise would be paid to the Employee.

3.4     Payment Upon Change in Control.  Notwithstanding any other provisions of this Plan, the aggregate balance credited to and held in the Employee's Account shall be distributed to the Employee in a lump sum within thirty (30) days of a Change in Control, as defined in Section 5.1.

3.5     Hardship.  In case of an unforeseeable emergency, a participant may request the Committee, on a form to be provided by the Committee or its delegate, that payment be made earlier than the date to which it was deferred or that there be a cessation of deferrals under the Plan.

For purposes of this section 3.5, an "unforeseeable emergency" shall be limited to a severe financial hardship to the participant resulting from a sudden and unexpected illness or accident of the participant or of a dependent (as defined in section 152(a) of the Code) of the participant, loss of the participant's property due to casualty, or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the participant. The circumstances that will constitute an unforeseeable emergency will depend upon the facts of each case, but, in any case, payment may not be made and a cessation of deferral may not occur to the extent that such hardship is or may be relieved: (i) through reimbursement or compensation by available insurance or otherwise or (ii) by liquidation of the participant's assets, to the extent the liquidation of such assets would not itself cause severe financial hardship. Moreover, payment of a deferred amount may not be made ahead of the date to which the amount was deferred to the extent that such hardship is or may be relieved by cessation of deferrals under the Plan.

The Committee shall consider any requests for payment under this Section 3.5 on a uniform and nondiscriminatory basis and in accordance with the standards of interpretation described in section 457 of the Code and the regulations thereunder. In the event there is a payment or a cessation of deferrals under this Section 3.5, the participant shall be ineligible to make further Deferral Elections for one year from the date of the Committee action approving the payment or cessation of deferral.

3.6     Employee's Rights Unsecured.  The right of the Employee or his or her designated Beneficiary to receive a distribution hereunder shall be an unsecured claim against the general assets of Employer, and neither the Employee nor his or her designated Beneficiary shall have any rights in or against any amount credited to his or her Account or any other specific assets of Employer.  The plan constitutes a mere promise by the Employer to make benefit payments in the future.

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01230

NDCA-ORCL 044480

3.7    Investment of Contribution. All amounts credited to an Account shall be credited throughout the year with the deemed earnings thereon, which may be positive or negative (hereinafter and previously sometimes referred to as "interest or other earnings") pursuant to the Employee's election as to investment return, until the Account has been fully distributed to the Employee or to the Beneficiary designated by the Employee in a writing delivered to Employer.

## SECTION 4
## DESIGNATION OF BENEFICIARY

4.1    Designation of Beneficiary. Employee may designate a Beneficiary to receive any amount due hereunder by Employee via written notice thereof to Employer at any time prior to his or her death and may revoke or change the Beneficiary designated therein by written notice delivered to Employer at any time and from time to time prior to Employee's death, provided that any such designation or change of designation naming a Beneficiary other than the Employee's spouse shall be effective only if spousal consent is provided. If Employee shall have failed to designate a Beneficiary, or if no such Beneficiary shall survive him or her, then such amount shall be paid to the Employee's estate. Designation of Beneficiary shall be in the form attached hereto as Appendix 2.

## SECTION 5
## CHANGE IN CONTROL

5.1    Change in Control. For purposes of this Plan, a Change in Control shall mean (a) the purchase or other acquisition by any person, entity, or group of persons, within the meaning of section 13(d) or 14(d) of the Securities Exchange Act of 1934 ("Act"), or any comparable successor provisions, of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Act) of fifty percent (50%) or more of either the outstanding shares of common stock or the combined voting power of Employer's then outstanding voting securities entitled to vote generally, or (b) the approval by the stockholders of Employer of a reorganization, merger, or consolidation, in each case, with respect to which persons who were stockholders of Employer immediately prior to such reorganization, merger or consolidation do not, immediately thereafter, own more than fifty percent (50%) of the combined voting power entitled to vote generally in the election of directors of the reorganized, merged or consolidated Employer's then outstanding securities, or a liquidation or dissolution of Employer or of the sale of all or substantially all of Employer's assets.

## SECTION 6
## TRUST PROVISIONS

6.1    Trust Agreement. Employer may establish the Trust for the purpose of retaining assets set aside by Employer pursuant to the Trust Agreement for payment of all

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

6

CD- I 01231



or a portion of the amounts payable pursuant to the Plan. Any benefits not paid from the Trust shall be paid from Employer's general funds, and any benefits paid from the Trust shall be credited against and reduce by a corresponding amount Employer's liability to Employees under the Plan. All Trust Funds shall be subject to the claims of general creditors of Employer in the event Employer is Insolvent as defined in Section 3 of the Trust Agreement. The obligations of Employer to pay benefits under the Plan constitute an unfunded, unsecured promise to pay and Employees shall have no greater rights than general creditors of Employer. It is Employer's intention that the arrangements be unfunded for tax purposes and for purposes of Title I of ERISA.

## SECTION 7
## AMENDMENT AND TERMINATION

7.1     Amendment. The Committee shall have the right to amend this Plan at any time and from time to time, including a retroactive amendment. Any such amendment shall become effective upon the date stated therein, and shall be binding on all Employees, except as otherwise provided in such amendment; provided, however, that said amendment shall not affect benefits adversely to the affected Employee without the Employee's written approval. Benefits accruing to an Employee pursuant to any employment agreement in effect between Employer and Employee which entitles the Employee to participate in and to certain rights under this Plan shall not be affected by an amendment of this Plan.

## SECTION 8
## ADMINISTRATION

8.1     Administration.     The Committee shall have complete authority to administer the Plan, interpret the terms of the Plan, determine eligibility of Employees to participate in the Plan, reduce the amount to be deferred under the Plan as to any Employee, and make all other determinations and take all other actions in accordance with the terms of the Plan and the Trust Agreement. Any determination or decision by the Committee shall be conclusive and binding on all persons who at any time have or claim to have any interest whatever under this Plan.

8.2     Liability of Committee, Indemnification. To the extent permitted by law, the Committee shall not be liable to any person for any action taken or omitted in connection with the interpretation and administration of this Plan unless attributable to his or her own bad faith or willful misconduct.

8.3     Expenses. The costs of the establishment of the Plan and the adoption of the Plan by Employer, including but not limited to legal and accounting fees, shall be borne by Employer. The expenses of administering the Plan shall be borne by the Trust; provided, however, that Employer shall bear, and shall not be reimbursed by, the Trust for any tax liability of Employer associated with the investment of assets by the Trust.

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD-101232

NDCA-ORCL 044482

### SECTION 9
### GENERAL AND MISCELLANEOUS

9.1     Rights Against Employer. Except as expressly provided by the Plan, the establishment of this Plan shall not be construed as giving to any Employee or to any person whomsoever, any legal, equitable or other rights against Employer, or against its officers, directors, agents or shareholders, or as giving to any Employee or Beneficiary any equity or other interest in the assets, business or shares of Employer stock or giving any Employee the right to be retained in the employment of Employer. All Employees shall be subject to discharge (with or without cause) to the same extent they would have been if this Plan had never been adopted. The rights of an Employee hereunder shall be solely those of an unsecured general creditor of Employer. Nothing in the Plan should be construed to require any contributions to the Plan on behalf of an Employee by Employer.

9.2     Assignment or Transfer. No right, title or interest of any kind in the Plan shall be transferable or assignable by any Employee or Beneficiary or be subject to alienation, anticipation, sale, pledge, encumbrance, garnishment, attachment, execution or levy of any kind, whether voluntary or involuntary, nor subject to the debts, contracts, liabilities, engagements, or torts of the Employee or Beneficiary. Any attempt to alienate, anticipate, encumber, sell, transfer, assign, pledge, garnish, attach or otherwise subject to legal or equitable process or encumber or dispose of any interest in the Plan shall be void.

9.3     Severability. If any provision of this Plan shall be declared illegal or invalid for any reason, said illegality or invalidity shall not affect the remaining provisions of this Plan but shall be fully severable, and this Plan shall be construed and enforced as if said illegal or invalid provision had never been inserted herein.

9.4     Construction. The article and section headings and numbers are included only for convenience of reference and are not to be taken as limiting or extending the meaning of any of the terms and provisions of this Plan. Whenever appropriate, words used in the singular shall include the plural or the plural may be read as the singular. When used herein, the masculine gender includes the feminine gender.

9.5     Governing Law. The validity and effect of this Plan and the rights and obligations of all persons affected hereby shall be construed and determined in accordance with the laws of the State of California unless superseded by federal law, which shall govern correspondingly.

9.6     Payment Due to Incompetence. If the Committee receives evidence that an Employee or Beneficiary entitled to receive any payment under the Plan is physically or mentally incompetent to receive such payment, the Committee may, in its sole and absolute discretion, direct the payment to any other person or Trust which has been legally appointed by the courts.

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

8

CD- I 01233

9.7     Taxes.  All amounts payable hereunder shall be reduced by any and all federal, state, local, and employment taxes imposed upon Employee or his or her Beneficiary which are required to be paid or withheld by Employer.  Amounts deferred will be taken into account for purposes of any tax or withholding obligation under the Federal Insurance Contribution Act and Federal Unemployment Tax Act, not in the year distributed, but at the later of the year the services are performed or the year in which the rights to the amounts are no longer subject to a substantial risk of forfeiture, as required by sections 3121(v) and 3306(r) of the Code and the regulations thereunder.  Amounts required to be withheld pursuant to sections 3121(v) and 3306(r) of the Code shall be withheld out of other current wages paid by Employer.  The determination of Employer regarding applicable income and employment tax withholding requirements shall be final and binding on Employee.

9.8     Insurance.  In the event that any Employee elects, in his or her sole discretion, to independently purchase an insurance policy covering the inability of the Plan or the Trust to make any payments to which Employee is entitled under the Plan or the Trust, Employer shall use its best efforts to facilitate the payment by Employee of any excise taxes which become due as the result of the payment of premiums under such policy.  Nothing contained herein shall be construed as an endorsement by Employer of the purchase of such a policy or a recommendation by Employer that the purchase of such a policy is necessary or desirable as the result of Employee's participation in the Plan.

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01234

NDCA-ORCL 044484

<div align="right"><u>EXHIBIT A</u></div>

## APPENDIX 1

### DISTRIBUTION ELECTION

Pursuant to Section 3.3 of the Oracle Corporation 1993 Deferred Compensation Plan (the "Plan"), I hereby elect to have all amounts credited to my Account, together with any interest or other earnings credited thereon, distributed to me on the terms elected below:

I.      Check one of the following:
         _____ Initial Distribution Election _____ Change in Distribution Election

II.      I elect to have distributions of all amounts credited to Accounts covered by this Plan paid to me beginning as follows (check one):

         _____ upon reaching age 59 1/2.

         _____ upon termination of employment.

III.      I elect to have distribution of all amounts credited to Accounts covered by this Plan paid to me in the following form (check one):

         _____ a lump sum.

         _____ an annuity of twenty (20) quarter-annual installments determined as of each installment date by dividing the entire amount in my Account (including interest and other earnings) by the number of installments then remaining to be paid.

         _____ an annuity of forty (40) quarter-annual installments determined as of each installment date by dividing the entire amount in my Account (including interest and other earnings) by the number of installments then remaining to be paid.

<u>NOTE</u>: A participant's ability to change his or her distribution election is limited. An Employee's distribution election can be changed a total of only three times. Any change in distribution election will apply to all amounts credited to the Employee's Account and will be effective only if in place for at least one year before the occurrence of the event specified in the change of distribution election as triggering the beginning of the distribution.

<u>NOTE</u>: Under the State Taxation of Pension Act of 1995, California is precluded from taxing amounts deferred under the Oracle Corporation Executive Deferred Compensation Plan (the "Plan") if you (i) elect an annuity of forty (40) quarter-annual installments and (ii) reside in a state other than California when you receive your distributions. Consequently, if you expect to be residing in a state with no individual income tax (such as Washington, Nevada, Florida, New Hampshire), or a low rate of individual income tax, when you receive your distributions, there may be significant state tax saving to you if you elect to receive the distributions in 40 quarter-annual installments.

Signed: _____  Date: _____

Name _____  Employee Number: _____ _____

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

10

CD- I 01235

EXHIBIT A

APPENDIX 2

BENEFICIARY DESIGNATION

In the event I should die prior to the receipt of all money accrued to my credit under this
election, I elect to have the balance paid to the following named individual(s) in the
following percentage(s):

| Percent | Name | Soc. Sec. # | (P)rimary or (S)econdary |
|---------|------|-------------|--------------------------|
|         |      |             |                          |
|         |      |             |                          |
|         |      |             |                          |
|         |      |             |                          |

Signed: _____ Date: _____

Name: _____

To be completed only if I am married and any above named beneficiary is not my spouse:

I, as the spouse of _____, do hereby consent to designation of
any beneficiary that might in any way impair my rights under applicable state law,
including but not limited to, laws relating to Community Property, Wills, Trusts, and
Intestacy.

Signed: _____ Date: _____

Name: _____

Notary: _____ Date: _____

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

11

CD- I 01236

NDCA-ORCL 044486

In France, the following language should be added to Paragraph 2, "Restrictions on Exercise," of the form of option agreement to be executed between Oracle Corporation and each optionee:

> "One half of the total number of options will be exercisable at 2 years after the grant date; the other half of the total number of options will become exercisable by an additional quarter over each of the next two years. Employees will not be able to sell their shares until five years from the date of grant. In the event of the death of an employee who has been granted French qualified options, the vesting of the option will accelerate and the employee's heirs will have six months to exercise the options, after which time the options will be forfeited."

In each of China, India, Indonesia, Korea, Netherlands, Romania, Russia, South Africa, Switzerland, and Ukraine, the following language should be added to Paragraph 4, "Manner of Exercise; Consideration," of the form of option agreement to be executed between Oracle Corporation and each optionee:

> "Due to exchange control regulations restricting the remittance of cash for the purchase of foreign securities or the holding of such securities, or securities law restrictions restricting the offering of foreign securities or the holding of such securities, optionees in [name of country] will be limited to the "full cashless" method of exercise only. The "full cashless" exercise method uses a broker who, upon exercise, will simultaneously sell all of the shares of Oracle stock that the optionee was entitled to upon exercise, use the proceeds to pay the option exercise price (plus any applicable fees or taxes) and remit the balance to the optionee in cash."

In Vietnam, the following language should be added to Paragraph 4, "Manner of Exercise; Consideration," of the form of option agreement to be executed between Oracle Corporation and each optionee:

> "Due to exchange control regulations restricting the remittance of cash for the purchase of foreign securities or the holding of such securities, or securities law restrictions restricting the offering of foreign securities or the holding of such securities, optionees in Vietnam will be limited to the "full cashless" method of exercise only. The "full cashless" exercise method uses a broker who, upon exercise, will simultaneously sell all of the shares of Oracle stock that the optionee was entitled to upon exercise, use the proceeds to pay the option exercise price (plus any applicable fees or taxes) and remit the balance to the optionee in cash. Vietnamese nationals will be required to remit the proceeds to Vietnam."

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01237

In each of Brazil, Croatia, Thailand, and Turkey, the following language should be added to Paragraph 4, "Manner of Exercise; Consideration," of the form of option agreement to be executed between Oracle Corporation and each optionee:

> "Due to exchange control regulations restricting the remittance of cash for the purchase of foreign securities or the holding of such securities, or securities law restrictions restricting the offering of foreign securities or the holding of such securities, optionees in [*name of country*] will be limited to the following exercise methods only:
>
> (a) the "full cashless" exercise method using a broker who, upon exercise, will simultaneously sell all of the shares of Oracle stock that the optionee was entitled to upon exercise, use the proceeds to pay the option exercise price (plus any applicable fees or taxes) and remit the balance to the optionee in cash; and
>
> (b) the "partial cashless" exercise method using a broker who, upon exercise, will sell only enough shares of Oracle stock to cover the option exercise price (plus any applicable fees or taxes) and hold the remaining shares of Oracle stock in an account on the optionee's behalf."

In each of Denmark, Hong Kong, Hungary and Slovenia, the following language should be added to Paragraph 1 "Grant" of the form of option agreement to be executed between Oracle Corporation and each optionee:

> "Due to certain legal issues with respect to the offering of securities in [*name of country*], only treasury shares shall be issued upon the exercise of options granted under the Plan to optionees in [*name of country*]."

In Egypt, the following language should be added to Paragraph 1 "Grant" of the form of option agreement to be executed between Oracle Corporation and each optionee:

> "Due to certain legal issues with respect to the offering of securities in Egypt, only newly issued shares shall be issued upon the exercise of options granted under the Plan to optionees in Egypt."

In Ireland, the following language should be added to Paragraph 1 "Grant" of the form of option agreement to be executed between Oracle Corporation and each optionee:

> "Due to certain legal issues with respect to the offering of securities in Ireland, only newly issued shares shall be issued upon the exercise of options granted under the Plan to optionees who are also directors/shadow directors of an Irish subsidiary in Ireland."

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01238





CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01239

 

## M E M O R A N D U M

TO:   **Oracle Corporation Board of Directors**

FR:   **Daniel Cooperman**
      **Senior Vice President, General Counsel and Secretary**

RE:   **Increase Financial Approval Level for Chief Executive Officer**

DT:   **December 29, 2000**

---

### REDACTED

**ATTORNEY CLIENT PRIVILEGED**
**NOT SUBJECT TO DISCOVERY**

**CONFIDENTIAL –**
**SUBJECT TO PROTECTIVE**
**ORDER**

CD- I 01240

PROPOSED RESOLUTIONS
ORACLE CORPORATION

January 8, 2001

**REDACTED**

**ATTORNEY CLIENT PRIVILEGED**
**NOT SUBJECT TO DISCOVERY**

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01241

NDCA-ORCL 044491

**REDACTED**

ATTORNEY CLIENT PRIVILEGED
NOT SUBJECT TO DISCOVERY

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

3

CD- I 01243

NDCA-ORCL 044493

Exhibit A

ATTORNEY CLIENT PRIVILEGED
NOT SUBJECT TO DISCOVERY

**REDACTED**

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01244

**3**

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01245

MEMORANDUM

TO:   Oracle Corporation Board of Directors

FR:   Daniel Cooperman
      Senior Vice President, General Counsel and Secretary

RE:   Promotion to Executive Management Committee

DT:   December 29, 2000

ATTORNEY CLIENT PRIVILEGED
NOT SUBJECT TO DISCOVERY

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01246

PROPOSED RESOLUTIONS
ORACLE CORPORATION

January 8, 2001

**ATTORNEY CLIENT PRIVILEGED
NOT SUBJECT TO DISCOVERY**

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01247

NDCA-ORCL 044497



CONFIDENTIAL -
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01248

## M E M O R A N D U M

TO:   Oracle Corporation Board of Directors

FR:   Daniel Cooperman
      Senior Vice President, General Counsel and Secretary

RE:   Security Clearance Exclusions

DT:   December 29, 2000

ATTORNEY CLIENT PRIVILEGED
NOT SUBJECT TO DISCOVERY

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01249

PROPOSED RESOLUTIONS
ORACLE CORPORATION

January 8, 2001



ATTORNEY CLIENT PRIVILEGED
NOT SUBJECT TO DISCOVERY

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01250

NDCA-ORCL 044500

ATTORNEY CLIENT PRIVILEGED
NOT SUBJECT TO DISCOVERY

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

2

CD- I 01251

NDCA-ORCL 044501

M E M O R A N D U M

TO:   Oracle Corporation Board of Directors

FR:   Daniel Cooperman
      Senior Vice President, General Counsel and Secretary

RE:   Merger of        **REDACTED**        with and into Oracle

DT:   December 29, 2000

CC:   Matthew Ng

**REDACTED**

ATTORNEY CLIENT PRIVILEGED
NOT SUBJECT TO DISCOVERY

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- 1 01253

PROPOSED RESOLUTIONS
ORACLE CORPORATION

January 8, 2001

**REDACTED**

ATTORNEY CLIENT PRIVILEGED
NOT SUBJECT TO DISCOVERY

CONFIDENTIAL –
SUBJECT TO PROTECTIVE
ORDER

CD- I 01254

**REDACTED**

ATTORNEY CLIENT PRIVILEGED
NOT SUBJECT TO DISCOVERY

CONFIDENTIAL -
SUBJECT TO PROTECTIVE
ORDER

**CD-1 01255**

# EXHIBIT 65

### ORACLE USA
### Q2 - FY01
### TOP 20 LICENSE CONTRACTS
### REVENUE RECOGNITION REVIEW

| CUSTOMER: | *HEWLETT PACKARD COMPANY* | |
|---|---|---|
| REVENUE: | $  21,331,122 | Contract value |
| | (1,740,523) | International revenue transfer |
| | (1,472,341) | Unguaranted payment associated with lease |
| | $  18,118,258 | Revenue recognized in the U.S. |

| | |
|---|---|
| MARKET SEGMENT: | Vertical – Industrial |
| ORDER TYPE: | Ordering Document |
| PAYMENT TERMS: | Financed |
| DISCOUNTS: | 60% |
| FUTURE DISCOUNTS: | N/A |
| PRODUCTS | Applications |
| PLATFORMS/OS: | HP-UX |
| OCS INVOLVEMENT? | No |
| ISSUES: | Issued and signed concurrently with this transaction was a blanket purchase order and Letter Agreement between Oracle and HP for the purchase of $30,000,000 in HP hardware for Oracle's production & development environments. In consideration for this commitment, HP agreed to increase the discounts from our previous purchase agreements from 40% to 50% for production hardware and from 12% to 17% for certain classes of products within the production and development environments. |

*No commitment, only statement of intention*

Also accompanying the transaction was a non-binding letter of understanding that discussed Oracle's intention to move its CRM development environment to HP hardware. The signed agreement and blanket purchase order mentioned above was the result of this letter.

The customer elected to migrate existing licenses to new license types per this Ordering Document. In accordance with our standard technical support policies, $3,250,300 in existing support for migrated licenses is included in this transaction.

The contract includes 400 days of Onsite Technical Support services for a fee of $549,700. This rate is consistent with Oracle's support services standard pricing.

5

AA 001339
CONFIDENTIAL

# ORACLE USA
## Q2 - FY01
## TOP 20 LICENSE CONTRACTS
## REVENUE RECOGNITION REVIEW

The contract includes a one-time option for the customer to exchange the migrated licenses on this Ordering Document at a list price to list price ratio for the same programs. Oracle has no shipment obligation under this option and the customer is not entitled to any refunds or credits as a result of the option.

The customer elected to finance this transaction as a lease through Oracle Financing Division (OFD). The lease grants the customer a smaller payment structure and includes an optional conversion payment that, if paid, would grant the customer perpetual license rights to the software. The customer's payment plan covered the interest associated with the extended payments. The difference between the net present value of the payments and the contract fees represents the unguaranteed payment amount of $1,472,341 which was deferred from license revenue.

*Also, the Company has decided to change their development environment + production environment to support both Sun + HP. This was done to insure that their products worked effectively on both platform + to discuss why their current environment is on the platform.*

- *PDW Tom Williams, the Company agreed to enter into the equipment purchase obligation as the Company believes that it will need this equipment in the near future for its development and production departments. The Company has spent approximately $70M on Sun servers in the last 5 quarters.*
- *AA received written confirmation from Shelly Curtis, Assistant General Counsel (Oracle representative that signed the agreement) that the agreement was signed by both parties prior to cutoff. We requested this as the faxed documents were time stamped Dec. 1, 2000.*
- *The financing has a term of 11 months, but the customer has a bargain purchase option at the end of the term to purchase the licenses. Thus, in reality, this term license will ultimately become a perpetual license as it is unlikely that HP will want to spend so much money for a license to be used 11 months..* (A)
- ~~The agreement contained language regarding a one time option to remix the migrated licenses within the next two years.~~ s.
- *The agreement contained language regarding a one time option to remix the migrated licenses within the next two years. The Company does not believe this to be a concession as this option existed in a previous HP agreement from Q1 00 and this agreement is only extending this term.*

(A) – *The financing was "papered" as a lease at the customer's request with a term of 11 months. However, > 90% of the payment is made in the 11 months and the remaining amount ~~of the payment~~ is deferred. In substance the license is a term as the customer would not forfeit the right to utilize + convert. Also, PCS is priced as a perpetual license*

AA 001340
CONFIDENTIAL

**EXHIBIT 66**

**News**

**Release**

**Contact(s):**

Carol Sato
Oracle Corp.
650/ 633-5551
csato@us.oracle.com

Aimée Brainard
Applied Communications
415/365-0222
abrainard@appliedcom.com

## Oracle Ships 11i, Industry's First Integrated
## E-Business Suite

Built-in Integration in Third-Generation Oracle Internet Applications Suite Completely
Eliminates Largest Cost and Risk Factor Associated with Enterprise Application
Implementations

**REDWOOD SHORES, Calif., May. 24, 2000** (http://www.oracle.com/tellmemore/?205874)
Oracle Corp., the largest provider of software for e-Business, today announced immediate
availability of the Oracle(R) E-Business Suite 11i, the industry's first fully-integrated e-Business
applications suite. The entire E-Business Suite is available today, adding Customer Relationship
Management (CRM) and Order Management components to the already available 11i financials,
human resources, manufacturing, procurement, projects and supply chain offerings. Oracle E-
Business Suite 11i provides out-of-the-box integration of e-Business applications throughout the
extended enterprise from customers and partners to suppliers. This allows companies to
completely automate their e-Businesses from web selling and marketing, all the way through to
Internet supply chain and procurement.

Using other vendors' software, anyone trying to achieve the breadth of functionality offered
by 11i would be forced to undertake expensive and risky custom integrations of several
partial solutions such as Siebel, Ariba, Commerce One or SAP. These integration projects
often cost in the tens or even hundreds of millions of dollars. With Oracle E-Business
Suite 11i, all this integration expense and risk is avoided because the suite comes with out-
of-the-box integration as well as robust functionality in each key business area. This
integration not only eliminates cost and risk but also provides much better information with
which to run a business. Key business processes become much simpler, for example,
turning a sales quote into an order that updates available-to-promise totals in inventory.
This tight integration is also necessary to achieve a complete view of the impact that
customer-related activities have throughout the enterprise. The Oracle E-Business Suite
also gives companies complete information about their customers because all parts of the
suite share the same customer information.

As Oracle's third-generation 100 percent Internet applications solution, Oracle e-Business
Suite 11i, leverages new Internet business practices that allow companies to put their
customer interactions, internal operations and supply chains online. These new business
practices have emerged as the key to e-Business success, allowing companies to leverage
the Internet to expand their markets, retain and strengthen relationships with customers,
and increase business efficiency. Additionally, the E-Business Suite, requires only a
browser on the desktop and features an intuitive browser interface.

ORACLE CONFIDENTIAL

- more -

CA-ORCL 023030

*LORRIE L MARCHANT*
*RPR, CSR No 10523*
FOR IDENTIFICATION

Exhibit: _____3_____
Date: ___A-6-2003___
Witness: ___Fletcher___
No. of Pages: _____3_____

NDCA-ORCL 026005

Today, Oracle is the only vendor to offer a fully integrated and comprehensive suite of e-Business applications.  Specifically, Oracle E-Business Suite 11i, allows companies to:

- sell more at lower cost with integrated web store, telesales and field sales,
- raise customer satisfaction through integrated call center and web-based self-service,
- buy goods and services at lowest cost with Internet Procurement and electronic exchanges,
- lower inventory levels and speed fulfillment through Internet supply chain optimization,
- eliminate administrative costs with comprehensive self-service and
- reduce time to benefit and IT costs with an integrated suite

The Oracle E-Business Suite also supports global operations, multiple languages, multiple currencies and Internet business practices, all from a single global system.  Customer interactions can be synchronized over the web, email, field and call center, enabling businesses to offer their customers greater flexibility -- and ultimately greater satisfaction -- in terms of how they communicate with the company.  Truly global operations can be achieved through real-time business intelligence via a single, centralized information set. Additionally, companies can adopt Oracle E-Business Suite 11i in a matter of days rather than months, by deploying either the modular, integrated offerings, bundled solutions, or Oracle's hosting services.

"Today marks the end of the ERP era and the beginning of the e-Business era," said Ron Wohl, executive vice president, Oracle Applications Division.  "When given the choice, any business would prefer e-Business applications that are already integrated rather than undertake the custom integration effort themselves.  We are pleased to offer state-of-the-art e-Business practices throughout the entire suite, enabling each of our customers to improve their business operations extremely rapidly."

"As the Internet continues to revolutionize traditional business practices, companies are presented with new opportunities to manage their customers and partners, improving customer service while increasing company profitability," said Mark Barrenechea, senior vice president, CRM products division.  "For example, because the Oracle E-Business Suite is the only one that combines tightly integrated ERP and CRM, Oracle can offer its customers the ability to manage key customer processes, such as 'campaign to order, order to cash,' - the ability to design and execute a marketing campaign, ship the order and collect payment, all from the same system.  With the Oracle E-Business Suite, the sales process can be kept 100 percent electronic."

The Oracle E-Business Suite 11i, is available immediately either as a complete suite or on a standalone basis in key business areas.  Key application modules have experienced significant customer acceptance as indicated by consistent growth over the past year.  In Oracle's most recently announced quarter, Oracle Internet Procurement license sales have grown by 231 percent, while growth rates of Oracle's CRM products posted 179 percent growth.

About Oracle

ORACLE CONFIDENTIAL

- more -

CA-ORCL 023031

NDCA-ORCL 026006

Oracle Corporation provides the software that powers the Internet. For more information about Oracle, please call Oracle Public Relations at 650/506-4176.

# # #

Trademarks

Oracle is a registered trademark of Oracle Corporation. Other names may be trademarks of their respective owners.

ORACLE CONFIDENTIAL

CA-ORCL 023032

NDCA-ORCL 026007