# EXHIBIT 168

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In Re ORACLE CORPORATION       )       Master File No. C-01-0988-MJJ
SECURITIES LITIGATION          )
                               )
_____)
                               )
                               )
                               )
                               )
This Document Relates To:      )
                               )
        ALL ACTIONS            )
                               )
_____)

**EXPERT REPORT OF BJORN I. STEINHOLT, CFA**

**May 25, 2007**

## I.    INTRODUCTION AND QUALIFICATIONS

1.    I am a Principal at Financial Markets Analysis, LLC ("FMA"), an economic consulting and valuation firm with offices in San Diego, Princeton and Shanghai. FMA provides financial analyses and related economic consulting services to various clients and has frequently been asked to prepare reports and expert testimony regarding the various economic issues that typically arise in securities class actions.

2.    I received a Master of International Business degree from the University of San Diego and a Bachelor of Science, Computer Science degree from California State University, Long Beach. I have earned the professional designation Chartered Financial Analyst awarded by the CFA Institute. I have been retained on numerous occasions to provide my expert opinions relating to market efficiency, materiality, loss causation and damages in securities class actions similar to this litigation. A summary of my background, and qualifications, as well as prior testimony, is attached as Exhibit A to this report.

3.    My compensation is based on the number of hours worked times my billable rate, currently $450 per hour.

## II.    OVERVIEW OF ASSIGNMENT

4.    I have been retained by plaintiffs' counsel to analyze and provide expert testimony regarding the economic issues related to market efficiency, materiality, loss causation, and the calculation of Section 10(b) damages suffered by purchasers of Oracle Corporation ("Oracle" or the "Company") common stock from December 14, 2000 to March 1, 2001 (the "Class Period"). In addition, I have been asked to analyze defendants' insider sales during the Class Period and calculate the related damages pursuant to Section 20A of the Securities Exchange Act of 1934. My opinions

in this matter are based on my professional experience, as well as my review of a substantial amount of information, including:

    (a)    Plaintiffs' [Proposed] Second Amended Complaint for Violation of the Federal Securitites Laws ("Complaint");

    (b)    Deposition transcripts of defendants Lawrence Ellison and Jeffrey Henley;

    (c)    Declaration of defendants' expert Stefan Boedeker dated July 27, 2005;

    (d)    The public filings by Oracle with the United States Securities and Exchange Commission ("SEC");

    (e)    Press releases issued by the Company and conference call transcripts during the relevant time period;

    (f)    Securities analyst reports regarding Oracle and its industry issued during the relevant time period;

    (g)    Contemporaneous media reports regarding Oracle and its industry issued during the relevant time period;

    (h)    Price and volume data for Oracle common stock, as well as for the industry and market indices;

    (i)    Oracle common stock ownership by reporting institutions during the Class Period from Thomson Financial;

    (j)    Short interest in Oracle common stock during the Class Period from Bloomberg; and

    (k)    Articles, court decisions and other relevant information cited in the text, or in footnotes to the text below.

*See* Appendix to the Expert Report of Bjorn I. Steinholt, CFA ("App.").

5.      This report is based on the evidence I have reviewed to date. Additional information may be added or I may modify my conclusions based upon additional evidence or the opinions expressed by the defendants' experts.

6.      In the paragraphs below I will first discuss plaintiffs' allegations in this matter, and my assumptions regarding these allegations. Second, I will discuss the basis for my opinion that the market for Oracle's common stock was impersonal, open, well developed, and efficient. Third, I will discuss the basis for my opinion that the allegedly false and misleading statements were material (*i.e.*, they contained information that a reasonable investor would have wanted to consider prior to making an investment decision), and that they caused Oracle's common stock to trade at artificially inflated prices during the Class Period. Fourth, I will discuss the basis for my opinion that Class members suffered economic losses as a result of the alleged fraud when the relevant truth was revealed. Fifth, I will calculate the damages per share during the Class Period, also sometimes referred to as the inflation per share. Sixth, I will analyze defendants' insider sales and calculate the related Section 20A damages.

## III.    ASSUMPTIONS

7.      For the purpose of my analysis, I have assumed that plaintiffs' allegations are true. First, plaintiffs allege that Oracle's publicly-reported financial statements for the Second Quarter of fiscal 2001 were false and misleading when made. More specifically, plaintiffs allege that Oracle artificially inflated its revenue and EPS results for the Second Quarter of fiscal 2001. Defendants manipulated Oracle's unapplied cash and customer overpayments accounts in connection with the creation of 46,000 fictitious "debit memo" invoices in November 2000, thereby artificially materially inflating Oracle's revenue and earnings for the Second Quarter of Fiscal 2001. Oracle further artificially materially inflated its revenue and earnings by improperly recognizing revenue on

a transaction with Hewlett Packard on the last day of the quarter, November 30, 2000. As a result of the manipulation of the Company's financials, Oracle reported earnings per share of $0.11 for the Second Quarter 2001 that were inflated by, at least, 1 cent per share, thereby exceeding analysts' consensus expectations of $0.10 cents per share.

8.      Second, plaintiffs allege that defendants misrepresented the quality and capabilities of, and customer demand for Oracle's 11i Application Suite ("Suite 11i"). Among other things, plaintiffs allege that defendants falsely and repeatedly stated that Oracle's Suite 11i, first introduced in May of 2000, worked well and was pre-integrated and interoperable out-of-the-box. Defendants also falsely stated that no systems integration was required, that the components of Suite 11i were literally plug and play, and that Suite 11i would manage all aspects of a customer's business. Plaintiffs also allege that defendants misrepresented that Suite 11i would drive sales growth at Oracle and that customer acceptance of Suite 11i was high. Defendants falsely projected 75% applications sales growth and 25% database sales growth for the Third Quarter of fiscal 2001. In reality, Suite 11i was beset with severe technical problems and defects, including integration problems, and required costly implementations to work. These problems caused customers to delay and/or forego planned purchases from Oracle. Plaintiffs further allege that the misapplication of customer cash and improper revenue recognition in the Second Quarter of fiscal 2001 allowed the Company to hide the slowdown in applications and database sales that resulted from the problems with Suite 11i.

9.      Third, plaintiffs allege that defendants falsely represented that the Company's sales would not be negatively impacted by the general economic slowdown during the Class Period. Instead, defendants falsely made and maintained financial guidance for the Third Quarter of fiscal 2001 – including that Oracle would continue to have sequential earnings per share growth and would report revenue of $2.9 billion based upon projected 75% applications sales growth and 25% database

sales growth – until the very end of the Class Period. Defendants' false representations were made despite a known decline in the United States economy that began in early summer 2000 and impacted Oracle's customers. The economic downturn caused Oracle's customers to cut information technology budgets, which in turn impacted sales at Oracle and caused Oracle to discount its products. Plaintiffs also allege that defendants knew of the impact of the economy on Oracle's business based upon defendants' use of an application to manage worldwide sales which gave defendants up to the minute information on the Company's global forecast and sales. After the Class Period, defendants admitted that the economy had a negative impact on the Third Quarter applications and database sales. Plaintiffs further allege that the improper revenue recognition in the Second Quarter of fiscal 2001 allowed the Company to hide the slowdown in applications and database sales that resulted from the downturn in the economy.

## IV.    MARKET EFFICIENCY

10.    For the past 35 years, the efficient capital market hypothesis ("ECMH") has held an important place in financial and economic theory. The most commonly held form is known as the "semi-strong" form and holds that securities markets incorporate all available public information into the respective securities prices. Consequently, in an efficient market, investors rely on the market price of a security to reflect all the available public information regarding that security. The semi-strong form of the ECMH has been empirically validated in numerous studies.[1]

---

[1]    *See* Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, Vol. 25, Issue 2, at 383 (May 1970) (App. 1); Eugene F. Fama, "Market Efficiency, Long-Term Returns, and Behavioral Finance," *Journal of Financial Economics*, Vol. 49, at 283 (1998) (App. 2).

11.     The relevance of market efficiency for securities class action lawsuits, such as this

one, relates to the fraud-on-the-market theory.  As explained in *Basic Inc. v. Levinson*, 485 U.S. 224

(1988):

> "The fraud on the market theory is based on the hypothesis that, in an open
> and developed securities market, the price of a company's stock is determined by the
> available information regarding the company and its business. . . .   Misleading
> statements will therefore defraud purchasers of stock even if the purchasers do not
> directly rely on the misstatements. . . .   The causal connection between the
> defendants' fraud and the plaintiffs' purchase of stock in such a case is no less
> significant than in a case of direct reliance on misrepresentations."

*Id.* at 241-42 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).  *Basic* goes on to

conclude:

> An investor who buys or sells stock at the price set by the market does so in reliance
> on the integrity of that price. Because most publicly available information is reflected
> in market price, an investor's reliance on any public material misrepresentations,
> therefore, may be presumed for purposes of a Rule 10b-5 action.

*Id.* at 247.

12.     The fraud-on-the market theory relies on what is commonly called informational

efficiency, *i.e.*, that the price of the relevant security reflects the available public information.  This

price is a consensus price reflecting the market participants' consensus regarding fair value given the

available public information.

### The *Cammer* Factors

13.     In *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), the court analyzed the legal

criteria that should be met to show that shares of common stock traded in an efficient market.  First,

the security should trade in an open market in which a large number of investors can buy or sell the

security.  Second, it should trade in a developed market with a relatively high level of activity and

frequency, and for which trading information (*e.g.*, price and volume) is widely available.  It usually,

but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes.)

14.     The *Cammer* Court provided five factors, often referred to as the *Cammer* factors, to test whether the market for a specific security is efficient. The *Cammer* factors are as follows:

        (a)    Whether the security traded at a large weekly volume;

        (b)    Whether analysts followed and reported on the security;

        (c)    Whether the security had market makers and whether there was the potential for arbitrage activity;

        (d)    Whether the company was eligible to file SEC Form S-3; and

        (e)    Whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial information releases, and an immediate response in the security's price.

In the paragraphs below I examine each of the *Cammer* factors individually.

Factor 1: Weekly Volume

15.     Trading volume is a good indicator of a well-developed market. During the Class Period, Oracle had a reported trading volume of more than 2.5 billion shares with a dollar trading volume of more than $71.5 billion. Average reported daily trading volume during the Class Period was almost 49 million shares with an average daily dollar volume of more than $1.3 billion. *See* Exhibit B attached hereto. The large amount of trading in Oracle's common stock during the Class Period supports my opinion that Oracle's common stock traded in an efficient market.

16.     One authority has suggested that "'[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the

security is an efficient one; 1% would justify a substantial presumption.'"[2]  During the Class Period, Oracle had approximately 5.6 billion shares outstanding.  On average, the weekly trading volume during the Class Period was more than 4.3% of the outstanding shares, substantially above the benchmarks used by some courts to justify a strong presumption of market efficiency.  *See* Exhibit C attached hereto.

Factor 2: Analyst Coverage

17.     Analyst coverage of Oracle refers to securities analysts who followed Oracle and wrote research reports on the Company for public consumption.  I have identified 38 different equity analysts covering Oracle during 2000 and 44 during 2001.  *See* Exhibit D attached hereto.  These firms included Goldman Sachs, Merrill Lynch Global Securities, Bear Stearns, Lehman Brothers, Morgan Stanley Dean Witter, and Salomon Smith Barney, among many others.  The importance of analyst coverage, as it relates to market efficiency, is two-fold.  First, it provides definitive evidence that securities analysts in fact did monitor Oracle and provided investors with investment research on the Company.  Second, it shows that there was enough demand from investors for research on Oracle to provide an economic justification for doing the investment research on the Company.  The large number of analysts covering Oracle supports my opinion that Oracle's common stock traded in an efficient market.

---

[2]     *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, §8.6 (Aug. 1988)).

Factor 3: Market Makers and Arbitrage

18.     The third *Cammer* factor relates to the number of firms making a market in Oracle's stock, and the existence of sophisticated investors, or arbitrageurs, who trade in the stock. Below I will discuss the firms making a market in Oracle stock during the Class Period, the importance of the short position in Oracle stock, as well as evidence of a substantial presence of sophisticated investors who owned Oracle stock and would be available to analyze new information, trade on such information, and thereby ensure market efficiency.

19.     Market makers are responsible for matching investors' buy and sell orders. When an order imbalance occurs, market makers can increase demand for a stock by lowering the ask price, or increase supply of a stock by increasing the bid price. As investors react to new information, this mechanism acts to ensure that the price of the security changes to reflect investors' collective interpretation of the new information. Thus, new information becomes reflected in the price of the security. Market makers provide a key function in making the market in a security efficient. Because of the importance of market makers, a company is required to have at least two market makers in order to meet the listing requirements of the Nasdaq National Market System.

20.     During the December 2000 through March 2001 time period, Oracle had more than 475 firms acting as market makers for the Company. *See* Exhibit E attached hereto. A total of 109 of these firms handled orders totaling more than one million shares. The large number of market makers ensured that the market mechanism enabling substantial trading in Oracle stock was available, and supports my opinion that Oracle's common stock traded in an efficient market.

21.     In addition, millions of Oracle's shares were available to be sold short, in other words, borrowed and sold in the hopes that they could be repurchased at a lower price at a later date. Short selling enables investors to act on negative information about a company, even if they do not own shares in the company, and is often used by arbitrageurs. In other words, short selling enables a

balance between positive and negative information to become reflected into the stock price. During the Class Period, the short interest in Oracle's stock ranged from about 32.8 million shares to almost 56.2 million shares. *See* Exhibit F attached hereto. The large number of shares sold short also supports my opinion that Oracle's common stock traded in an efficient market.

22. *Cammer* factor three specifically references the importance of investors who "would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level," in other words, so-called sophisticated investors. 711 F. Supp. at 1287. Sophisticated investors are able to quickly evaluate new information and understand its potential impact on the value of a security. They can then take appropriate investment actions to profit from the information, which also changes the demand or supply for the security, thereby causing the new information to become reflected in the price of the security. Institutional investors generally are considered to be sophisticated investors. Consequently, I examined available information on institutional ownership of Oracle common stock during the Class Period. This information is only available for certain large institutions on a quarterly basis, and is therefore not a complete list of all sophisticated investors who may have owned Oracle common stock during the Class Period. However, evidence that the reporting institutions held a large number of shares is strong support that the market for that security is efficient. At least 925 institutions owned Oracle common stock during the Class Period. *See* Exhibit G attached hereto. Specifically, as of December 31, 2000, these reporting institutions owned 2.2 billion shares, or approximately 40% of the Company's shares outstanding. The large number of shares owned by sophisticated institutions also supports my opinion that Oracle's common stock traded in an efficient market.

Factor 4: Eligibility to File on Form S-3

23.    To be eligible to file Form S-3, a company has to be an SEC reporting company for 12 months, and have $75 million in voting stock held by non-affiliates. Oracle easily met these benchmarks during the Class Period, and was eligible to file Form S-3. Eligibility to file on Form S-3 is one factor the *Cammer* Court considered indicative of market efficiency.

Factor 5: Price Reaction to New Material Information

24.    The ultimate test of market efficiency is a stock's actual price reaction to unexpected new material information. This test can be conducted by identifying a day when there was new material information disclosed about a company that investors would view as significantly negative or positive about the company's future prospects, and then examining the price movement following the announcement to determine whether or not the new information quickly became reflected in the company's common stock price.

25.    To test how Oracle's stock price responded to new, material information, I examined its stock price reaction following the Company's unexpected pre-announcement on March 1, 2001, that the Third Quarter 2001 results would come in below previous guidance and analysts' expectations. This information was new, material and clearly negative, so one would expect that in an efficient market, Oracle's stock price would decline quickly to reflect the new negative information. Following the pre-announcement, Oracle's stock price declined to a closing price of $16.88 per share on March 2, 2001, from a closing price of $21.38 per share on March 1, 2001, a price decline of $4.50 per share or more than 21% on volume of almost 225 million shares or almost 5 times the median volume during the Class Period.

26.    To test this price decline, I conducted an event analysis. The objective of the event analysis was primarily to determine if the decline in Oracle's stock price on March 2, 2001, was

likely to have occurred as a result of the new information disclosed by the Company, rather than by chance. Based on this event analysis, the March 2nd price decline was highly statistically significant at the 99% level of confidence.[3] *See* Exhibit H attached hereto. The quick response to new material information is strong evidence of market efficiency, and supports my opinion that Oracle's common stock traded in an efficient market.

27.    Based on the above, it is my opinion that the market in which Oracle common stock traded during the Class Period was impersonal, open, well developed, and efficient.

## V.    MATERIALITY

28.    Material information is often defined as information that a reasonable investor would want to consider prior to making an investment decision. In *Basic*, the Supreme Court quoted *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976), which stated that a fact is material "'if there is a substantial likelihood that a reasonable shareholder would consider it important'" in making an investment decision or if it would have "'significantly altered the "total mix" of information made available'" to the shareholder.[4] The issues that are important to investors, *i.e.*, the information that reasonable investors would want to consider prior to making an investment decision, are usually factors that impact the value of an investment. In general, the value of an investment is based on the expected future cash flows of that investment, including the timing and associated risk of such cash flows. Securities analysts typically look at the earnings of a company as an indication of that

---

[3]    In statistics, a result is considered significant if it is unlikely to have occurred by chance only. A stock price decrease (or increase) is defined as being statistically significant at the 90%, 95% or 99% level of confidence if it is greater than 90%, 95% or 99% of the price decrease (or increase) in a random sample, respectively, after adjusting for market factors.

[4]    *Basic*, 485 U.S. at 231-32 (quoting *TSC*, 426 U.S. at 449).

company's cash flows. Consequently, a company's earnings and earnings growth are important factors considered when valuing the company.

29.     The future earnings, or cash flows, of a company are not known, and therefore they have to be estimated. A key factor considered by reasonable investors estimating future earnings is a company's historical earnings.[5] When a company reports new earnings, investors analyze these earnings and, if necessary, make adjustments to their forecasts of future earnings. If a company reports earnings below expectations, investors will generally lower their forecasts of future earnings, reducing the value of the company, resulting in a decline in the stock price. If a company reports earnings above expectations, investors will generally raise their forecasts of future earnings, increasing the value of the company, resulting in an increase in the stock price.

30.     In assessing what information a reasonable investor of Oracle would consider important it is helpful to have an understanding of the Company and its overall operation. During the relevant time period, Oracle represented itself as the second largest software company in the world, with annual revenues exceeding $10 billion. These revenues were derived from sales of application licenses, database licenses, and from services (including support, consulting and education). The fastest growing segment, by far, was application revenues, and critical to the continued revenue growth was the success of Oracle's new Suite 11i. At the beginning of the Class Period, a December 14, 2000 Bloomberg article (written prior to the announcement of Oracle's Second Quarter 2001 results later that day) noted that "[i]nvestors are looking to Oracle 11i, a suite

---

[5]     As explained by Nobel Laureate William F. Sharpe and Dr. Gordon J. Alexander, "[s]ince security analysis typically involves forecasting earnings per share, it is useful to examine the historical record to see how earnings per share have changed over time." William F. Sharpe and Gordon J. Alexander, *Investments*, 515 (4th ed. Prentice Hall 1990) (App. 3).

of more than 100 programs, to fuel sales as Oracle's main database software matures and growth

slows." The article also noted the following:

> Oracle Corp., the world's second-largest computer-software maker, is expected to report higher fiscal second-quarter earnings, buoyed by sales of a new Internet-friendly suite of software for corporations.
>
> Net income for the quarter ended Nov. 30 is forecast to be 10 cents a share on sales of $2.7 billion, the average estimate of analysts polled by First Call/Thomson Financial. In the year-ago quarter, Oracle's profit was a split-adjusted 7 cents a share on sales of $2.3 billion.
>
> Investors are watching for signs that the Oracle 11i software suite, introduced in May, has taken off with customers.  Chief Executive Larry Ellison has been pushing the package to companies looking to automate business tasks using the Web. Sales of Oracle 11i, which competes with products from Siebel Systems Inc. and SAP AG, disappointed investors in the quarter ended Aug. 31.
>
> .            *   *   *
>
> Oracle shareholders are hoping to hear some good news after a string of technology companies have reduced their forecasts for the current quarter and next year. Compaq Computer Corp., Intel Corp. and Gateway Inc. all have said sales will fall short of expectations.
>
> *   *   *
>
> The disappointing sales in that period, Oracle 11i's first full quarter on the market, raised concern that the product wasn't catching on and that full-year application sales wouldn't meet company targets of 50 percent to 100 percent growth.
>
> In the past month, Oracle executives including Ellison and Chief Financial Officer Jeffrey Henley have told investors that they expect applications to meet that goal, though they've declined to specifically discuss how Oracle 11i did during the November quarter.
>
> "We're having and going to have a great year," Ellison said on Monday. When asked about Oracle 11i sales during the quarter, he said, "a surprising number of companies have adopted the suite.  And the suite is accelerating."
>
> *   *   *
>
> Ellison has said that Oracle 11i can run virtually every important business function from processing payroll and completing human resources paperwork to running customer-call centers. Oracle was able to make its own business more

- 14 -



efficient by using the suite to run operations, generating more than $1 billion in cost savings.

App. 4.

31.　　In my opinion, Oracle's Second Quarter 2001 earnings and growth, customer acceptance of its new Suite 11i, and the impact on Oracle of the slowing economy hurting so many other major technology firms, were key issues reasonable investors would look for in the earnings announcement and assess prior to making investment decisions regarding Oracle. Each of these factors relates to the ability of Oracle to generate positive cash flows in future period, particularly the growth of Oracle's new Suite 11i, which in turn relates directly to the value of the Company. Below I will discuss the allegedly false and misleading Second Quarter 2001 earnings announcement at the beginning of the Class Period.

32.　　On December 14, 2000, after the market closed, Oracle announced in a press release its Second Quarter 2001 results for the quarter ending November 30, 2000. A Bloomberg news report, also dated December 14, 2000, stated:

> Oracle 2nd Qtr Net Rises 62%; Applications Sales Jump (Update 2)
>
> . . . Oracle Corp., the world's No. 2 independent computer-software maker, said fiscal second-quarter earnings rose 62 percent, buoyed by sales of a new Internet-friendly suite of business programs.
>
> Net income for the quarter ended Nov. 30 rose to $622.8 million, or 11 cents a share, from $384.5 million, or 6 cents, a year earlier. Sales jumped 15 percent to $2.66 billion from $2.32 billion.
>
> Oracle, run by billionaire Larry Ellison, posted the better-than-expected results about 15 minutes before archrival Microsoft Corp., the No. 1 software maker, said sales and earnings will fall short of forecasts in the December quarter because of a slowdown in the personal-computer market. Intel Corp., Compaq Computer Corp. and Gateway Inc. have also said results will suffer.
>
> Executives said the economic slump isn't affecting Oracle and is unlikely to do so in the future because most customers buy the software to help them use the Internet to cut costs and boost efficiency.

- 15 -

> "When people are concerned about their expenses, we are an obvious
> alternative," Ellison said on a conference call. "The whole (idea behind Oracle 11i)
> is to start saving money fast."

> Sales of the new Web-based Oracle 11i software suite reached $279 million
> for the quarter, jumping 66 percent from year-earlier applications sales. Sales of
> Oracle's database software, the company's best-selling product, rose 19 percent to
> $775 million.

App. 5.

33.     Also on December 14, 2000, Oracle held a conference call with analysts and investors

to discuss the results.  During this conference call, Oracle's Chief Financial Officer Jeff Henley

provided the following guidance for Oracle's Third Quarter 2001:

> In terms of the – I guess, the outlook of the – for the coming quarter.  We
> have decided to continue to be a little more specific, in accordance with the new
> ideas, here, in the Full Disclosure.  So let me kind of go through some of the key
> assumptions.  The currency, at the current rates, will continue to be negative,
> although not as much.  So the rate that we estimate would be negative five percent in
> the third quarter, and negative three percent in the fourth quarter.  The – so the
> numbers I'm going to give you here, for database and applications include these
> negative amounts.  So for instance, in database, we're thinking, you know, 15-to-20.
> You have to add five points to that, in terms of real (constant) dollar growth, or 20-
> to-25.  Applications, we're thinking 75, or potentially better.  You'd have to add five
> points to that.  So clearly, we think there's an opportunity to do better in the third
> quarter, based on the pipeline and a belief that we'll see growing momentum in our
> applications business, now that we're through this first six months.

> \* \* \*

> In the area of per share, we think it would be 12 cents.  Now, again, that's based on
> some models, and I think most of the people's estimates are around that.  And also,
> just historically, the third quarter is slightly better than the second quarter.  That's the
> way, sequentially, it's worked, here.  And if you look back at the last three years,
> sequentially, the third quarter, split adjusted, has been one cent a share better than the
> second quarter.  So we did 11 cents in the second quarter.  So I would assume, 12
> cents would be a reasonable number at this point.  I don't think history is going to be
> a lot different here.

App. 6 at 7-8.  Asked about the impact of corporate capital budgets on Oracle's business,

Larry Ellison stated the following:

> We're at the very high end of what they care about.  So my assumption is that that's
> why we're not seeing any [decrease] in our demand right now, is because we're

selling the kind of stuff that people need. And they're not going to cut back on it, short of a crisis, I mean, we've definitely seen some slowdown in the dot-com space. But, again, that's being dwarfed by the traditional companies buying more this year than they were buying last year.

*Id.* at 19.

34.    On December 15, 2000, an analyst report by First Union Securities summarized Oracle's results as follows:

ORCL Reports Apps Growth Above and Database Growth Below Expectations

\* \* \*

Oracle reported F2Q EPS $0.01 above $0.10 consensus estimate with year over year applications license revenue growth of 66% versus our estimate of 43%.

Database license revenue growth was lower than expected at 19% versus our forecast for 20%, while deferred revenue declined to $1.05 billion versus $1.27 billion in F1Q due to seasonality in maintenance contracts.

App. 7 at 1. Furthermore, a December 15, 2000 Bear Stearns' analyst report summarized Oracle's results relating to applications as follows:

As we had hoped, applications growth came in between 60% and 70%, beating our official estimate of 50% which we believe was close to the street consensus. The reason applications growth was so vital this quarter is that Oracle needs to establish some high-end reference accounts besides itself and establish a track record for getting 11i deployed in a timely manner. We believe Oracle has made significant progress on both fronts and this should ensure a strong second half of FY-01.

App. 8 at 2.

35.    Following the earnings announcement, Oracle's common stock increased to a closing price of $28.56 per share on December 15, 2000, from a closing price of $27.50 per share the prior day, an increase of $1.06 per share or approximately 3.9% on volume of more than 120 million shares or almost 2.5 times the median volume during the Class Period. This price increase was statistically significant at the 95% level of confidence. *See* Exhibit H attached hereto. In my opinion, absent the allegedly inflated earnings reported and false Third Quarter 2001 guidance, Oracle's stock

- 17 -

price would not have increased as it did on December 15, 2001, following the Second Quarter earnings announcement.

36.     Following the December 14, 2000 earnings announcement, Oracle made numerous statements maintaining its guidance and asserting that the general economic slowdown was not negatively impacting its business, as demonstrated by the examples below. According to a January 11, 2001, Bloomberg article, Company spokeswoman Stephanie Aas claimed that "Oracle has yet to see any signs that its business is being hurt by the economic slowdown or reported cuts to information-technology budgets." App. 9 at 1. On February 7, 2001, First Union Securities reported in an analyst report that, according to CFO Jeff Henley, "Oracle is not seeing the effects of a slowing economy at this point," and that "[m]anagement reiterates guidance of 15-20% y/y database revenue growth and 75% y/y applications revenue growth for FQ301." App. 10 at 1. On February 13, 2001, MarketWatch reported that an Oracle executive vice president, Sandy Sanderson, stated that Oracle's "pipeline around the database and applications business have never been stronger . . . [v]ery few customers are canceling contracts," and that "[i]n some ways . . . the tougher environment in technology may even be increasing sales at Oracle." App. 11. On February 21, 2001, Deutsche Bank Alex. Brown issued an analyst report stating that Oracle's "management still expects growth in applications license revenue to accelerate in the second half of fiscal 2001 (May) above the 43% and 66% reported in the first two fiscal quarters." App. 12 at 2. Even as late as March 1, 2001, the last day of the Class Period, BlueStone Capital issued an analyst report that stated that "[m]anagement indicated last week that Oracle had not experienced any slowdown in business this quarter," and that "Oracle's business continues to grow; the current pipeline is as strong as it has ever been, according to management." App. 13 at 1.

37.     In particular, on February 21, 2001, following a presentation by defendant Jeff Henley at the AppsWorld Conference, William Blair & Company issued an analyst report. It stated:

- 18 -

According to Mr. Henley, business looks good. He was very bullish in the sessions. We want to quote a few of the things he said. In regard to applications growth, he said that, "The second half growth will be as good, or better, than the 69% growth posted in the first half." As for the economy, he commented that, "ORCL is not seeing an impact." He also stated that, "We are in spaces that are high ROI and it's not clear if we'll see much of an impact in our business due to the economy." In a related statement, he said, "The economy is a wild card, but unless there is a serious recession, we are not sure we'll see much of an impact." Clearly, his statements are bullish in regard to ORCL's current business.

App. 14.

38.     The above statements during the Class Period are examples of the types of representations made by the Company reaffirming its previous guidance regarding the Third Quarter 2001. In my opinion, these statements acted to maintain the inflation in Oracle's stock price.

39.     According to plaintiffs' allegations, the revenues and earnings reported by Oracle for the Second Quarter 2001 were inflated. Earnings per share, for example, were inflated by at least $0.01 per share, resulting in the Company beating analysts' consensus of $0.10 per share by reporting $0.11 per share. Furthermore, plaintiffs allege that Oracle's guidance for the Third Quarter of 2001 was false and misleading because the Company was, in fact, being impacted by the general economic slowdown, and because the Company's Suite 11i was experiencing severe development defects and integration problems resulting in delays, implementations costs and cancellations. In my opinion, the above alleged misrepresentations and omissions contained information that a reasonable investor would have wanted to consider prior to making an investment decision in Oracle common stock. Furthermore, it is my opinion that the alleged false financial results and the alleged misrepresentations and omissions caused Oracle's common stock to trade at artificially inflated prices during the Class Period.

## VI.    LOSS CAUSATION

40.    Loss causation relates to the question of whether an alleged fraud caused plaintiffs to suffer economic losses.  A key issue in determining loss causation in securities fraud cases, therefore, is whether the alleged misrepresentations and/or omissions were material, and, as a result, caused the price of the security to trade at artificially inflated levels during a class period.  Last year, in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court considered the issue of loss causation in securities cases.  The *Dura* opinion stated that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss," because "if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."[6]  One academic article provides the following, post-*Dura*, definition of loss causation:[7]

> Loss causation exists whenever fraud leads the stock price to be higher than it should be, the buyer pays "too much" for the stock, and the buyer is unable to recover that overpayment in the marketplace.

41.    It is commonly known that false and misleading information can artificially inflate investors' expectations regarding the future prospects of a company, thereby inflating that company's stock price.  The inflated expectations (as well as the price inflation) are then, generally, reduced, either by: (a) the company failing to meet the inflated expectations, or (b) a specific disclosure of the falsehood or misleading nature of the information at issue.  In this case, the relevant truth alleged by plaintiffs was revealed when the Company, after the market closed on March 1,

---

[6]     *Dura*, 544 U.S. at 343.

[7]     Madge S. Thorsen, Richard A. Kaplan and Scott Hakala, "Rediscovering the Economics of Loss Causation," *Journal of Business and Securities Law*, Vol. 6, Issues 1 & 2, Spring 2006, at 93, 95 (App. 15).

2001, admitted that it would not meet its previously stated Third Quarter 2001 guidance. The March

1, 2001 disclosure is discussed in greater detail below.

42.     On March 1, 2001, after the market had closed, Oracle finally admitted that its results

for the Third Quarter 2001 would fall far short of investors' expectations and prior guidance.

Specifically, Oracle stated that it now expected earnings per share for the Third Quarter 2001 of

$0.10 per share, rather than the Company's prior guidance of $0.12 per share, and blamed the U.S.

economy for the shortfall.  The Company's press release stated:

> Oracle Announces Preliminary Third Quarter Earnings Results
>
> Oracle Earnings per share expected to be $0.10
>
> REDWOOD SHORES, Calif., March 1, 2001 -- Today, Oracle Corporation announced estimated earnings for its fiscal third quarter ended February 28, 2001, based upon preliminary financial results for the quarter.  Preliminary third quarter results indicate earnings per share grew over 20% to $0.10 per share, up from $0.08 per share in Q3 last year (excluding investment gains).  Operating margins improved to 33%, up from 31% in Q3 last year.
>
> Current estimates for the quarter, including a 4% negative currency impact, show license revenue grew approximately 6% and total revenue grew approximately 9%.  Applications revenue growth is estimated at approximately 50%, and database revenue growth is estimated to be flat to slightly negative.
>
> "License growth was strong in the first two months of Q3, and our internal sales forecast looked good up until the last few days of the quarter," said Oracle CEO Larry Ellison.  "However, a substantial number of our customers decided to delay their IT spending based on the economic slowdown in the United States.  Sales growth for Oracle products in Europe and Asia Pacific remained strong.  The problem is the US economy."
>
> "Oracle will provide more detailed fourth quarter financial guidance on the regularly scheduled conference call on March 15, 2001," said Oracle CFO Jeffrey O. Henley.

App 16.

43.     Following the Company's pre-announcement of its Third Quarter 2001 results,

Oracle's stock price declined to a closing price of $16.88 per share on March 2, 2001, from a closing

price of $21.38 per share on March 1, 2001, a price decline of $4.50 per share or more than 21% on

volume of almost 225 million shares or almost 5 times the median volume during the Class Period.

This price decline was highly statistically significant at the 99% level of confidence. *See* Exhibit H

attached hereto.

44.     The March 1, 2001 event substantially revealed the relevant truth regarding Oracle's

true performance, as alleged in the Complaint, and therefore ends the Class Period. However, on

March 15, 2001, Oracle officially reported its Third Quarter 2001 earnings and provided further

details about the earnings miss. Specifically, the Company admitted that Suite 11i applications sales

were substantially lower and database sales greater than that originally reported on March 1, 2001.

The Company press release stated:

> Oracle Net Income Up 16%, Earnings Per Share $0.10
>
> Applications Sales Up 25%, Database Sales Up 6%
>
> 3,000 Customers Implementing 11i E-business Suite
>
> Today, Oracle Corporation announced that third quarter income increased 16% to $583 million or $0.10 per share, while revenue grew to $2.7 billion. This compares to $2.4 billion in revenue, $503 million in net income, and $0.08 per share in Q3 last year, excluding extraordinary investment gains. Application software sales increased 25% to $249 million while database software sales grew 6% to $823 million. Service revenue increased 12% to $1.5 billion for the quarter.

App. 17 at 1.

45.     On March 16, 2001, CIBC World Markets issued an analyst report discussing

Oracle's Third Quarter 2001 earnings miss. It stated:

> On March 16, 2001, we are downgrading the shares of Oracle to Hold due to 1) the impact of the US economy, 2) concerns over acceptance of its e-business applications, and 3) management's lack of a proactive plan to get back on track. We believe that the economy is only a partial explanation for their shortfall.
>
> Oracle reported 3QFY01 results in line with those pre-announced by management on 3/1/01 with revenues of $2.7B and EPS of $0.10. License revenues of $1.13B were in line with our model, but databases were stronger than expected and applications were weaker than expected. The 25% growth in applications revenues was particularly disappointing as applications were expected to be a major growth driver for the company.

> Management's lack of explanation and our conversations with customers and salespeople lead us to believe that the economy is not the only reason for the shortfall. From our conversations, customers still desire best of breed solutions designed with the customer in mind versus a suite that may not be customizable or offering specific industry centric features.

App. 18 at 1.

46.     Given the highly statistically significant price decline associated with the revelation of the alleged truth disclosed after the market closed on March 1, 2001, it is my opinion that this disclosure reduced and/or eliminated the inflation in Oracle's common stock resulting from the alleged false and misleading statements and omissions.

## VII.   QUANTIFICATION OF DAMAGES PER SHARE

47.     In this section, I will first discuss the out-of-pocket methodology used to measure damages under Section 10(b) of the Securities Exchange Act of 1934. Second, I will apply the out-of-pocket methodology to the facts in this case, and calculate the per-share damages.

### Section 10(b): Out-of-Pocket Methodology

48.     Damages in securities class actions are usually calculated using the out-of-pocket measure. As noted in one frequently referenced academic article:[8]

> The most common method of calculating damages in Rule 10b-5 cases is the out-of-pocket measure. This test fixes recovery as the difference between the purchase price and the value of the security at the date of purchase less the difference between the sale price and the value of the security at the date of sale.

---

[8]     Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA L. Rev.*, 883, 885 (June 1990) (App. 19).

49.    The procedure for calculating out-of-pocket damages is also discussed in *Green v.*

*Occidental Petroleum Corp.*, 541 F.2d 1335 (9th Cir. 1976) (Sneed, J., concurring).  It explains the

process as follows:

> [I]t becomes necessary to establish, for the period between the date of the
> misrepresentations and the date of disclosure, data which when arranged on a chart
> will form, on the one hand, a "price line" and, on the other, a "value line." The price
> line will reflect, among other things, the effect of the corporate defendant's wrongful
> conduct.  The establishment of these two lines will enable each class member
> purchaser who has not disposed of his stock prior to disclosure of the
> misrepresentations to compute his damages by simply subtracting the true value of
> his stock on the date of his purchase from the price he paid therefor.

*Id.* at 1344.

50.    As noted above, the key to calculating out-of-pocket damages is to determine the

price at which the security would have traded absent the alleged fraud, also known as the value line.

The difference between the actual stock price and the value is commonly referred to as the inflation

per share, or damages per share.  A commonly accepted methodology for calculating the value line is

to use an event analysis to predict the stock price returns (% change in price) on fraud-related

disclosure days.   The value line in fraud on the market cases is generally calculated using

backcasting, *i.e.*, working backwards replacing the stock's actual return on the fraud-related

disclosure days with the predicted returns, while using the stock's actual returns on all other days.

This methodology is described in one commonly used reference text as follows:[9]

> On disclosure dates only, this approach replaces actual returns with returns estimated
> from a market model.  The declines on the disclosure dates are thereby limited to
> those attributable to the fraud.

*  *  *

---

[9]    Nicholas I. Crew, Patrick G. Goshtigian, Marnie A. Moore and Atulya Sarin, "Securities Act
Violations: Estimation of Damages," *Litigation Services Handbook: The Role of the Financial
Expert*, Ch. 17, at 12-13 (3rd ed. 2001) (App. 20).

With backcasting, the true-value line results from working backwards using the true returns and the security's actual price on the day after the class period ends. This price contains no effect of fraud and misrepresentations because the class period, by definition, ends with full disclosure.

51.     Below I apply my analysis of the evidence in this case to calculate out-of-pocket damages on a per share basis using the event study methodology discussed above.

### Section 10(b): Per Share Damage Analysis

52.     The out-of-pocket measure of damages requires the calculation of the value line, *i.e.,* the price at which Oracle's stock would have traded during the Class Period absent the alleged fraud. The difference between the actual share price and the value line is the damages per share, often referred to as the inflation per share.  In this case, the value line is the price that Oracle's common stock would have traded at if the Company had reported its true financial results for the Second Quarter 2001, truthfully disclosed customer dissatisfaction with its Suite 11i as a result of the product defects and integration problems, and truthfully revealed the true impact of the economic slowdown on Oracle's revenues and earnings.  Had defendants provided complete and truthful disclosures during the Class Period, this would have been incorporated into Oracle's stock price from the very beginning of the Class Period, and Oracle's stock price would not have declined as it did when the relevant truth was revealed on March 1, 2001, as discussed above.  Also, had Oracle reported its true earnings per share for the Second Quarter 2001 of no more than $0.10 per share, this would, at best, have been in-line with investors' expectation, and Oracle's stock price would not have increased as it did on December 15, 2000.

53.     Using my event analysis, I calculated Oracle's predicted return on both December 15, 2000 and March 2, 2001.  For the purpose of measuring the market effect, I used the NASDAQ-100

index.[10]  The NASDAQ-100 index is a capitalization-weighted index of the 100 largest and most

active non-financial domestic and international issues listed on the NASDAQ.  The value line was

then calculated using the predicted returns for the fraud-related days (December 15, 2000 through

March 2, 2001), and the actual returns for all other days, as discussed above.  My calculation of the

value line is attached as Exhibit I.[11]  Below is a graph that shows Oracle's closing prices versus the

value line, *i.e.*, the price at which Oracle would have traded absent the alleged fraud.



_____

[10]     This is the same index used by defendants' expert Stefan Boedeker to assess Oracle's price
movements during the Class Period.  *See* Declaration of Stefan Boedeker in Support of Defendants'
Motion for Class Certification, dated July 27, 2005 (App. 21).

[11]     It should be noted that the recoverable per share damages in Exhibit I is also limited by
Section 21D(e) of the Securities Litigation Reform Act of 1995.

## VIII.   ANALYSIS OF DEFENDANTS' INSIDER SALES

54.     Plaintiffs' counsel has asked me to analyze the sale of Oracle shares by defendants Ellison and Henley, and to calculate the related Section 20A damages. Based on my discussion with plaintiffs' counsel, it is my understanding that Section 20A damages are either calculated based on: a) the inflation/damages per share that existed on the date of the insider sales, or b) the losses avoided by the defendants by selling the shares during the Class Period, as opposed to selling the shares following the Third Quarter 2001 earnings announcement. For the purpose of determining the sales price following the Third Quarter 2001 earnings announcement, I calculated the average closing price from March 16, 2001 through April 30, 2001 of $15.80 per share. The first measure of Section 20A damages is therefore simply calculated as the number of shares sold multiplied with the inflation or damages per share on the day the shares were sold. The second measure of damages is calculated as the difference between the actual sales price and $15.80 per share (average closing price from March 16, 2001 through April 30, 2001) on the day the shares were sold multiplied with the number of shares sold.

55.     During the Class Period, defendant Larry Ellison sold 29,084,576 Oracle shares for total proceeds of approximately $895 million. Based on my calculation of damages per share in Exhibit J, public investors who purchased the Oracle shares from defendant Ellison overpaid for their shares by approximately $155 million. By selling his shares in January of 2001, as opposed to waiting until after the Company reported its Third Quarter 2001 results, defendant Ellison avoided losses of approximately $435 million.[12]  Similarly, defendant Jeff Henley sold 1,000,000 Oracle shares for total proceeds of approximately $32.3 million.  Again, based on my calculation of

---

[12]     Loss avoided was calculated as the difference between the actual price per share received for the Oracle shares sold in January of 2001, less Oracle's average closing price following the Third Quarter 2001 announcement from March 16, 2001 through April 30, 2001.

damages per share in Exhibit J, public investors who purchased the Oracle shares from defendant Henley overpaid for their shares by almost $5.7 million. By selling his shares in January of 2001, as opposed to waiting until after the Company reported its Third Quarter 2001 results, defendant Henley avoided losses of more than $16.5 million. In total, public investors overpaid defendant Ellison and defendant Henley more than $160 million for their Oracle shares in January 2001. Furthermore, by selling their shares in January of 2001, as opposed to waiting until after the Company reported its Third Quarter 2001 results, defendant Ellison and defendant Henley avoided losses of approximately $451.8 million.

## VIII.  CONCLUSION

56.     Based on my review and analysis of the available information, as well as my professional experience, it is my opinion that:

- The market in which Oracle common stock traded during the Class Period was impersonal, open, well developed, and efficient.

- The allegedly false and misleading statements contained information that a reasonable investor would have wanted to consider prior to making an investment decision and caused Oracle's common stock to trade at artificially inflated prices during the Class Period.

- When the truth was disclosed, at least partially, on March 1, 2001, Oracle's stock price declined, causing Class members to suffer economic damages.

- I have quantified the damages per share associated with the alleged fraud during the Class Period, ranging from $3.11 per share to $6.03 per share, as shown in Exhibit I.

- I have calculated damages associated with the Oracle shares sold by defendants Ellison and Henley during the Class Period totaling more than $160 million, and losses avoided totaling approximately $451.8 million, as shown in Exhibit J.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 25th day of May, 2007, at San Diego, California.

Respectfully submitted,

_____
BJORN I. STEINHOLT, CFA