# EXHIBIT 194



Hon. Edward A. Infante (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA  94111
415-774-2611
415-982-5287 (fax)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ORACLE CORPORATION SECURITIES LITIGATION | Case No. C-01-09888-MJJ (JCS) |
| | **ORDER GRANTING PLAINTIFFS' MOTION TO ENFORCE THE SPECIAL MASTER'S JULY 17, 2006 ORDER AND TO COMPEL ADDITIONAL ACCOUNTING DOCUMENTS BASED ON RECENT TESTIMONY AND NEW EVIDENCE** |

On October 30, 2006, Plaintiffs submitted a motion to compel Defendants' production of accounting documents.  Defendants' opposition to the motion was submitted on November 13, 2006.  Plaintiffs' reply was submitted on November 20, 2006.  The Special Master has considered the papers and the arguments of counsel and rules as follows:

Background

*The Revised Second Amended Complaint for Violation of the Federal Securities Laws*

On March 9, 2001, Plaintiff Local 144 Nursing Home Pension Fund, on behalf of itself and all persons who publicly traded securities of Oracle Corporation between December 15, 2000 and March 1, 2001 ("the Class period"), filed a complaint for violation of the federal securities laws (Section 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder) against Defendants Oracle Corporation ("Oracle" or "the Company") and Lawrence J. Ellison ("Ellison") arising out of Defendants' dissemination of false and misleading statements concerning Oracle's operations and prospects for Q3 2001.

On October 11, 2002, Plaintiffs filed a second amended complaint.  The complaint included, for the first time, allegations concerning Oracle's accounting during the second quarter



of fiscal year 2001. Plaintiffs' Second Amended Complaint at ¶¶ 8, 35-44. On December 9,
2002, Plaintiffs filed a Revised Second Amended Complaint ("RSAC"), which added additional
facts and witnesses relating to the accounting allegations. Plaintiffs allege that in order to mask
the fact that sales of Suite 11i were not growing as expected in the second quarter of 2001 and to
give investors the impression that sales were accelerating, Defendants created phony sales
invoices and improperly recognized revenue from past customer credits and overpayments that
Oracle had held in reserve (its "unapplied account") without informing its customers between
1991 and 2000. *Id.*, ¶¶ 8, 36(c). Plaintiffs allege that on November 17, 2000, Oracle executed
more than 46,000 sham invoice transactions (debit memos) in order to "clean up" the account,
converting the reserved overpayments to revenue totaling approximately $228 million.[1] *Id.*, ¶¶ 8,
37. As a result of Oracle's improper conversion of customer credits to revenue, on December 14,
2000, Oracle falsely reported 2Q01 revenues, causing the Company's stock price to increase.[2]
*Id.*, ¶¶ 8, 43. Plaintiffs allege that Oracle's recognition of $228 million as revenue was a
violation of Generally Accepted Accounting Principles ("GAAP"), because Oracle had not earned
the revenue it was reporting and was not entitled to retain the overpayments it had previously
received from its customers. *Id.*, ¶ 42. "Oracle owed its customers refunds for that amount." *Id.*

<em>Plaintiffs' Requests for Production of Accounting Documents</em>

On December 9, 2004, after the stay on discovery was lifted, Plaintiffs propounded upon
Defendants their first set of requests for production of documents. The requests sought, *inter alia*,
all documents relating to:  credit or debit memos created in November 2000 (request 32); the
disposition of unassigned cash receipts assigned to any Oracle reserve account, including but not
limited to account 12601 and/or customer overpayments (request 36); any effort or actions
reconcile Oracle's "On Account" or "unapplied cash," including unapplied cash account 25005
(request 39); any measures taken from October 2002 to the present relating to refunding
customers, adjusting or reconciling invoices, or adjusting credit analyst notes for all customers

---

[1] "Debit memos" are essentially fake invoices that were created by Oracle to make it look like the customer overpayments were actually payments for legitimate invoices. RSAC, ¶ 37(c). "Each of the debit memos lists a 'credit' in the amount of the overpayment and clearly states 'Revenue' at the start of the line item." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004). "Each of the credit line items offsets a debit of the same amount that is identified as a 'Receivable,' which reveals that the funds apparently moved from the receivable to the revenue account … [i]n other words, the amounts were improperly recognized as revenue." *Id.*
[2] Plaintiffs allege that a witness, Confidential Witness ("CW") 76, reported that Oracle's 2Q01 reported revenues and earnings were false when made and were the result of the improper conversion of more than $228 million of customer cash "On Account" to revenue in 2Q01. RSAC, ¶¶ 36-38. Additional corroboration of is provided by CW 49. *Id.*, ¶ 41



(request 40); the November 17, 2001 debit memos and/or unapplied cash (request 42); transactions in Oracle's 25005 account occurring between November 1, 2000 and November 30, 2000 and between October 11, 2002 and March 31, 2003 (request 43); and any "On Account" clean up or reconciliation of Oracle's "On Account" during the relevant time period and/or between October 2001 and March 31, 2003 (request 44).

On January 18, 2005, Defendants provided Plaintiffs with responses to the requests. Subject to and without waiving numerous objections, Defendants agreed to produce "responsive, non-privileged documents for the period June 1, 2000 to March 1, 2001 that relate to debit memoranda identified in the [RSAC] as occurring November 17, 2000." *Id.* On February 17, 2005, Oracle produced a number of documents in response to Plaintiffs' requests.[3]

*The March 10, 2005 Discovery Plan*

On March 1, 2005, Judge Spero held a day-long discovery conference with the parties regarding the Discovery Plan. During the discovery conference, Judge Spero limited production of accounting documents in two ways. First, the Discovery Plan limited production of accounting documents to only those pertaining to the November 17, 2000 account clean up, the 46,000 debit memoranda created at that time, and all documents related to the accounting treatment of those debit memoranda. Second, Judge Spero denied Plaintiffs' request for discovery into the 2002 clean up project. Judge Spero balanced both these limitations on Plaintiffs' discovery, however, by recognizing Plaintiffs' entitlement to: (1) an audit trail and complete history of account transactions for all of the debit memoranda, and (2) the opportunity to reassert a request for discovery relating to the 2002 clean up project if the documents produced in response to the Discovery Plan demonstrated a connection between the debit memos and the 2002 clean up. Specifically, Judge Spero stated to Plaintiffs' counsel:

> You are going to look at every piece of paper that has to do with these debit memos up and down and if it goes through the accounts that you suspect it is going through, well, then, that will be one thing. If it isn't, then it isn't... if it turns out that none of this money passes through the 12601 account, then why isn't that the answer? ... Okay. We will find out.

---

[3] As part of its production, Oracle produced accounting documents, including: (1) internal and external e-mail communications regarding the creation of the computer program that effected the debit memo project, refunds to customers, and the "on account" clean up generally; (2) screenshots from Oracle's accounts receivable program showing the offsetting debits, credits, refunds and payments for a variety of customers; (3) a variety of reports, including Billing Histories, Summary Trial Balance sheets, Segment Values Listing, Sales Journals, Receipt Histories and the Invoice Register; (4) copies of refund checks; (5) accounts payable check request forms; and (6) a copy of Oracle's presentation to the SEC.


*Id.* Judge Spero concluded by stating that:

> So with respect to the accounting allegations, the subject matter is all of the documents regarding the on account clean up in 2000 – in the relevant time period, all the documents regarding or related to the 46,000 debit memos and all documents related to the accounting treatment of those memos.

*Id.*, Ex. 3 at 44:20-25. On March 10, 2005, Judge Spero issued an Amended Order Setting a Discovery Plan ("the Discovery Plan"). The Court ordered Defendants to produce by May 1, 2005:

> all documents relating to (i) the alleged 'On Account Cleanup' occurring in November 2000; (ii) the 46,000 debit memoranda; and (iii) the accounting treatment of those debit memoranda, including any audit trail, and all related accounting policies.

*Id.*, §§ I.C.4 and II.A.

On May 10, 2005, Defendants produced additional documents in response to the Discovery Plan. Defendants' production included a spreadsheet containing information for each of the 46,000 debit memos, including the debit memo amount and the corresponding credit amount. Myers Decl., ¶ 11.

### The October 19, 2005 Order

On August 5, 2005, Plaintiffs sent a letter to Judge Spero requesting an order compelling Defendants to produce all documents relating to the 46,000 debit memos. Plaintiffs took issue with the spreadsheet produced by Oracle and asserted that Defendants had failed to produce underlying or supporting documents relating to the debit memos, including, invoices, all journal entries and correspondence with customers regarding overpayments. In response, Defendants asserted that they had produced all of the documents contemplated by the Discovery Plan. On August 12, 2005, the parties participated in another conference with Judge Spero. Further meet and confer efforts failed to resolve the parties' dispute. On October 7, 2005, the parties submitted a joint letter to the Court regarding Defendants' production of accounting documents in response to the Discovery Plan.

A hearing regarding the dispute was held before Judge Spero on October 18, 2005. Judge Spero began the hearing by stating:

> I'm concerned that during the course of setting up the very detailed discovery plan in this case, the defendants argued and obtain[ed] a narrower scope of discovery in exchange for a commitment that all of the documents regarding all of these debit memos,


including all the underlying documents would be committed. And that, to my mind, is clear as day in the transcript that that [sic] was the position taken at that time. And you are changing your position.

Now, there may be good reasons to change your position, maybe I'll buy that, but one of the things that occurs to me is … why shouldn't I just hold you to your position?

Judge Spero further stated that:

I'm never going to believe that every canceled check, that every canceled check on 10,000 debit memos are relevant to this case . . . You are never going to be able to convince me of that. So doesn't that mean that that we need some dramatic compromise? You both have to answer those questions.

Prior to hearing oral argument, Judge Spero proposed the following order, which accorded the Plaintiffs the right to seek additional production of documents upon an adequate showing of good cause:

That the defendants would produce all information stored in electronic form regarding all [46,000] debit memos in all underlying transactions …; that the defendants produce all documents [not in electronic form] regarding the … debit memos in the underlying transactions only for debit memos over $ 1 million …; and that lastly, if after reviewing all this evidence the plaintiffs can convince me that there is a good reason why they should get more of the hard documentation regarding … the underlying transactions … then we'll take that up at that time.

Addressing the possibility of a further request for accounting documents by Plaintiffs, Judge Spero observed that:

Well, it depends on your showing. You are welcome if you make a good showing, you are unwelcome if you make a bad showing. Seriously, at some point it becomes such minutia. And I'm not reluctant to have them spend a thousand hours preparing what the Court has suggested in terms of the electronic data, I am reluctant to have them spend 45,000 hours or 25,000 hours preparing. It would take some more significant showing to do that.

After hearing further argument by the parties, Judge Spero ordered that Oracle must produce within 30 days:

1.    All electronic information, including electronic images of documents, relating to the debit memos at issue in this case and all transactions that underlie those debit memos, where the debit memos are in amounts of $100,000 or greater.
2.    All paper documents relating to the debit memos at issue in this case and all transactions that underlie those debit memos, where the debit memos are in amounts of $1,000,000 or greater.



There are 776 debit memos in excess of $100,000; these debit memos account for $528 million of the $692 million total of the debit memos created on November 17, 2000. July 17, 2006 Order, citing Myers Decl., ¶ 8. The October 19, 2005 Order was made "without prejudice to Plaintiffs' right to come to this Court and seek additional production of documents and electronic information related to the debit memos, upon a showing of good cause." With respect to the remaining debit memos, Judge Spero stated that "if you guys can work out a sampling on them, that would be great," and that "I think you proposed a sampling at some point."

In November 2005, Defendants produced more than 100 boxes of hard copy documents relating to the transactions underlying the debit memos worth $1 million or more. Defendants also produced an Excel spreadsheet, in native format, containing electronic-stored data regarding the 776 debit memos (that have a dollar amount in excess of $100,000). The spreadsheet or "script output" provided a complete accounting history for the debit memos, organized according to debit memo and their underlying transactions, contemplated by the October 19, 2005 Order. On February 13, 2006 and February 16, 2006, Defendants produced additional accounting documents. On April 27, 2006, Defendants produced thousands of pages of additional spreadsheets, including "call notes" related to customer overpayments and unapplied cash items.

*The July 17, 2006 Order*

On May 25, 2006, Plaintiffs submitted a motion to compel Defendants' production of accounting documents. Specifically, Plaintiffs asked the Special Master to: (1) enforce the Court's March 10, 2005, and October 19, 2005 Orders by compelling Defendants to produce all documents relating to the 46,000 debit memos and the underlying transactions as previously agreed upon by Defendants on March 1, 2005, including eight specific categories of documents; (2) issue an order permitting discovery into Oracle's improper transfers of tens of millions of dollars in customer overpayments and unapplied cash to its bad debt reserve and other accounts (including $20 million in transfers in 2Q01) to inflate Oracle's earnings; and (3) compel defendants to produce documents related to Oracle's 2002 Clean Up and investigation regarding customer overpayments and unapplied cash.

On July 17, 2006, the Special Master issued an order granting in part and denying in part Plaintiffs' motion. *See* July 17, 2006 Order. Plaintiffs' motion to compel production of all documents relating to the 46,000 debit memo transactions was denied. The Special Master, however, found that Defendants' production of a spreadsheet was insufficient to comply with the


October 19, 2005 Order and ordered Defendants to produce *all* electronic information relating to the 776 debit memo transactions that exceed $100,000 and *all* paper documents relating to the debit memo transactions that exceed $1 million. With respect to Plaintiffs' request that Defendants be compelled to produce documents related to a sample of debit memos valued at under $100,000, the motion was granted in part. Defendants were ordered to produce a sampling documents valued at less than $100,000 (up to 150 debit memos to be selected by Plaintiffs), and to all transactions that underlie those debit memos. Defendants were also ordered to produce all documents and communications relating to Oracle Corporation's transfers of customer overpayments (Account 25005) and unapplied cash (Account 12018) to Oracle's bad debt reserve write off accounts, including Account 12601, which could also be linked to the November 17, 2000 debit memos valued at more than $100,000. Finally, Plaintiffs' request for production of documents related to Oracle's 2002 Clean Up was denied, on the grounds that:

> Plaintiffs' accounting allegations are focused upon the November 17, 2000 debit memos, not Oracle's 2002 Clean Up. As previously stated, documents related to credit memos and refunds that were issued to customers in connection with debit memos are relevant to Plaintiffs' accounting claims and must be produced. Documents related to bad transfers that can be connected to debit memos in excess of $100,000 also must be produced. Plaintiffs' request for production of all documents related to Oracle's 2002 Clean Up, however, is overbroad.

*See* July 17, 2006 at 16. Defendants were ordered to produce the above information and documents no later than August 31, 2006.

### *Oracle's Response to the July 17, 2006 Order*

On August 31, 2006 and September 8, 2006, Defendants produced approximately 350,000 pages of new accounting documents pursuant to the Court's July 17, 2006 Order. Most of the documents are accounting reports, spreadsheets and emails purporting to reflect information relating to 776 debit memos greater than $100,000, and the 150 smaller debit memos selected by Plaintiffs (the "926 debit memos").[4]  These documents, however, were heavily redacted by

---

[4] Defendants have produced the following eight types of documents or information pursuant to the Special Master's July 17, 2006 Order: (1) all accounting-related correspondence, with redactions of information unrelated to one of the 926 debit memos, (2) several accounting reports, including a Billing and Receipt History Report, which "provides a comprehensive list of all billings and payment transactions...for each of the customers related to the 926 debit memos...[beginning] on the earliest date on which there is any accounting transaction...with that particular customer, and ends on the last date...", a Receipt Register Report with similar parameters, a Seven Bucket Aging By Customer Report for each of the thirteen months of the relevant time period, and an Unapplied, Unidentified , On Account Payment Report, with parameters similar to those used in the Aging Report, (3) all electronic "notes" and "comments" fields  regarding cash receipts and unapplied receipts, related to accounts payable invoices, and related



Defendants. Plaintiffs assert that: "Some of the reports have been redacted in their entirety, leaving hundreds of pages and thousands of lines of blank spreadsheets. These redactions completely distort the relevant information contained in the reports and obscure the relevant information contained in the documents." Plaintiffs Motion at 3; *see* Greenstein Decl., Exs. 2-8 (examples of Defendants' redactions).

*New Evidence Concerning the 2002 Clean Up Project*

Plaintiffs assert that since the entry of the July 17, 2006 Order, they have discovered new evidence which they believe confirms that the events beginning in October 2002 were directly related to, and used as a cover up for, the November 2000 Clean Up and Defendants' fraudulent use of debit memos and customer overpayments. Plaintiffs offer the following new evidence to support this claim.

1. Testimony of Ian Hatada

On October 5 and 10, 2006, Plaintiffs deposed Ian Hatada, a former Oracle Collections Manager who was involved in the 2002 clean up project and attended meetings held to discuss and implement the project. Mr. Hatada's testimony addressed the relationship between the 2002 clean up project, the debit memos created during the November 17, 2000 account clean up and the present lawsuit. Specifically, Mr. Hatada testified about a series of meetings in late October 2002 to discuss an "on account problem" and a significant amount of customer overpayments and unapplied cash that was several years old and that had previously been moved to different accounts by Oracle's creation of debit memos in November 2000 as follows:

> A.     Well, the first—the first meeting that we had to actually give us a—kind of a short overview as to what we were about to get involved with was that the unapplied that we were looking at currently or at that time, there was a lot more in the reserve that we were going to have to try to resolve because of a specific lawsuit that, you know, that we had money that we shouldn't have had, and whether it was in the reserve or the unapplied, but the best description would just be that there was money in an account that was, you know, unapplied money that we had never seen before, and we were going to all of a sudden see and have to resolve.

to credit memos and debit memos, as well as Special Instruction and Notes Relating to Invoices, Credit Memos, and Debit Memos and Dispute Notes Relating to Invoices, (4) electronic data and documents relating to refunds, (5) electronic data, documents, and communications showing any transfers of money from unapplied cash into Oracle's bad debt reserve accounts that could be linked to one of the 926 debit memos, (6) two separate reports related to all accounts receivable "write offs" linked to the 926 debit memos, (7) miscellaneous documents such as a complete copy of the presentation Oracle made to the SEC, and (8) a supplemental Script Output that contains the complete accounting trail for the 926 debit memos. *See* Opposition at 4-10.


Q: And were those the items, as far as you know, that resulted from creation of debit memos previously?

A: I believe that was one of the reasons that Mike Quinn and Greg Myers had given us. Greenstein Decl., Ex. 1 (Hatada Tr. at 128:8-129:2; 257:24-263).

Q: ... [w]hat do you recall was the explanation of the on account problem?

A. Well, I—I mean, like this first item, you know, we were called together to explain exactly what it says, that you know, there's an unapplied account issue, there's—there's a lawsuit that's about to happen, and—and we need to resolve—you know, we're going to have to resolve these unapplied amounts, and, you know, there will be a meeting in the near future to explain how we're going to do it. And you know, the bottom line was that they need to figure out if it was—if we had recognized revenue on it or we had not, so if it was revenue impacting or not revenue impacting. *Id.* (Hatada Tr. at 113:19-114:7).

A. From—from what I know from meetings that we had from—with Ryan Roberts, that there was a lawsuit and it was our job to clean up the unapplied plus what had been now moved in to the unapplied account from other accounts because the lawsuit, so in an effort to—to clean that up, to—to help Oracle with this lawsuit. That was what—my understanding. *Id.* (Hatada Tr. at 264:12-265:6).

Additionally, Hatada testified that he was instructed to research and determine the "revenue impact" of Oracles' misuse of customer overpayments, told by Mike Quinn that the results of the investigation were to go to Jeff Henley, and that the revenue impact was "major." *Id.* (Hatada Tr. at 307:5-9, 266:10-21 and 153:16-154:6)  Handwritten notes taken by Mr. Hatada contemporaneously with the meetings discussing the events in 2002 also contain multiple references to "debit memos," "on account" and "revenue impact" of the items pertaining to the project. The notes also refer to a "56m" amount for "2 years" which Mr. Hatada testified was the amount of unapplied cash that was transferred to Oracle's reserve during a two year period. *Id.* (Hatada Tr. 305:13-306:21).

2. Testimony of Terry Elam

On September 28, 2006, Plaintiffs deposed Terry Elam, a current Oracle manager and former Accounts Receivable Manager involved in the unapplied cash project in 2002. Mr. Elam was one of the few individuals that Greg Myers named as having helped him prepare Oracle's presentation to the SEC on the debit memo issue. Greenstein Decl., Ex. 14 (Myers Tr. at 322:20-323:10). Mr. Elam gave the following testimony:

Q. Was there more than one discussion about that, about on-account debit memos being credit memoed two years after November 17th, 2000?

A. I don't recall any—how many there were.

Q. Okay. Well, what do you—just what do you recall about those discussions at all?

A. Um, specifically in the—from Greg Myers about the process related to pulling out some of the entries into the 12601 account in the October-November of 2002 time frame.

Q. Okay. So pulling out some of the entries in 12601; is that what you said?

A. Yeah. The associated entries with the debit memos. Greenstein Decl., Ex. 15 (Elam Tr. at 185:23-186:11).

...

A: There—it's a—there's a specific process of—associated with a debit memo that you have to follow to, um, pull—there's two—there's a miscellaneous receipt that you need to—to take out or reverse out of this system, plus unapply a debit memo to actually process the credit memo on it.

Q. Right. But why were you—why were you processing credit memos—or why were you reversing entries into 12601 during 2002?

A: Well, that's part of the spreadsheet that was given to myself, was there was a number of steps needed to credit memo the debit memo. And part of that is to reverse out the miscellaneous receipt into 12601. *Id.* (Elam Tr. at 187: 10-188:2).

### 3.  Testimony of Jennifer Minton

Plaintiffs also cite as significant, the contradictory testimony by Oracle's current CFO and former Vice President of Global Finance during the Class Period, Jennifer Minton. On July 7, 2006, during the first day of her deposition, Ms. Minton testified that she had not been involved in the 2002 investigation into Oracle's unapplied cash problem, and had been told by Oracle's legal department to keep herself uninvolved from the 2002 investigation and that she did not know the results of the investigation. On September 25, 2006, the second day of her deposition, Ms. Minton clarified her testimony, stating that she was aware that there was an investigation going on, and she became aware of the results of the investigation and did discuss the financial results of the investigation with Tom Williams. Greenstein Decl., Ex. 17 (Minton Tr. at 278:15-279:20).

### 4.  New Documents



Plaintiffs additionally cite several documents produced in response to the Special Master's July 17, 2006 Order as new evidence of a connection between the 2002 clean up project and the debit memos created on November 17, 2000. A key document is a 318 page spreadsheet dated April 23, 2003 with 2 tabs that includes the column headings "Total amounts to adjust up & apply," "Explanation," "Debit Memo Number if app.," "Reason for Credit Memo," "Ok to refund per Telam [Terry Elam]," "PA Reason for Credit Memo" and "Refund/Adjust." (NDCA-ORCL 274340-793547). All but 34 of over 4,500 rows of this spreadsheet, however, have been redacted by Defendants. Greenstein Decl., Ex. 20. NDCA-ORCL 835639-835763 is a 125 page spreadsheet dated May 28, 2003 with two tabs, including the column headings "Revenue Reversed?," "Amount CM'd," "Amount Paid," "Amount Adj[uste]d," "Amount in Dispute," "Scrubbed Amount," "In Dispute" and "Reason Code." All but seven of over 3,000 rows of data have been redacted. *Id.*, Ex. 21.

Finally, Plaintiffs state that after analyzing the information produced regarding the 926 debit memos, 180 of the 926 debit memos (almost 20%) were reversed and at least 68 were refunded as part of the 2002 unapplied cash project. *Id.*, Ex. 16. "Of the 150 smaller debit memos selected by Plaintiffs pursuant to the Court's July 17, 2006 Order, approximately 27% of those debit memos were reversed and/or refunded as part of the unapplied cash project in 2002. Reply at 7 (citing ex. 16).

### New Evidence Concerning Transfers to Account 12601

Plaintiffs also offer new evidence relating to Oracle's transfers of unapplied cash to Oracle's bad debt reserve in 2Q01. Plaintiffs assert that analysis of the documents Defendants have produced in response to the July 17, 2006 Order reveal that "some of the more than $20 million in customer overpayments from Account 25005 that were transferred to Account 12601, thereby inflating Oracle's 2Q01 results, were made in connection with smaller debit memos that Oracle refuses to produce." Motion at 17. Plaintiffs assert that "evidence reveals that Oracle frequently performed an 'auto-adjustment' or 'sweep' of unapplied cash to Oracle's bad debt reserve that transferred extremely small dollar amounts, in some cases as little as $0.01. Greenstein Decl., Ex. 24." *Id.* Oracle representative Tom Williams had testified that the auto-adjustment only occurred once in January 2002. Mr. Hatada testified during his deposition that from his understanding "this is something that was ran either—you know, I don't know how


often, but I know it wasn't something that wasn't ran once." Greenstein Decl., Ex. 1 (Hatada Tr. at 348:18-349:20).

Legal Standard

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1). "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." *Id.* "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* "Whether material is relevant is … a function of the relationship of the data to the central accusations of [the] lawsuit." *U.S. ex rel. Fisher v. Network Software Associates,* 217 F.R.D. 240, 245 (D.D.C. 2003) (citation omitted).

"All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii)." Fed. R. Civ. Proc. 26(b)(1). "Rule 26(b)(2)(iii) expressly limits discovery where the burden or expense of the proposed discovery outweighs its likely benefit." *Jackson v. Montgomery Ward & Co., Inc.,* 173 F.R.D. 524, 528 (D.Nev. 1997). "The party claiming that a discovery request is unduly burdensome must allege specific facts which indicate the nature and extent of the burden, usually by affidavit or other reliable evidence. *Id.* at 528-529 (citations omitted). "Just because complying with a discovery request will involve expense or may be time consuming, does not make it unduly burdensome." *Id.* at 529 (citations omitted).

In *Seafirst Corp. v. Jenkins,* 644 F.Supp. 1160 (W.D.Wash. 1986), the Comptroller of the Currency asserted that the subpoenas seeking copies of specific reports were overbroad in that much of the information contained in the reports was irrelevant to the litigation. The court stated that:

> The court believes that disclosure of some possibly irrelevant material will cause no harm. In contrast, partial disclosure may tend to distort the tenor of the reports. *See Franklin Nat'l Bank,* 478 F.Supp. at 585. The court observes that the redacted versions of [the] reports the Comptroller supplied to class plaintiffs two years ago are incoherent and virtually useless.
>
> The court concludes that the best course of action is to require production of whole reports. This approach eliminates any burden on OCC to separate relevant and irrelevant portions of the reports. It also protects the litigants from possible nondisclosure of information they might consider significant.

*Id.* at 1165.



In *In re Atlantic Financial Federal Securities Litigation*, 1991 WL 153075 (E.D.Pa. August 6, 1991), a class action securities fraud case, the plaintiffs filed a motion to compel production of *inter alia* minutes of and reports to the board of directors and unredacted copies of documents previously produced. The plaintiffs asserted that the defendants had deleted and withheld highly relevant pages from the documents it produced, and that the defendants had redacted other documents to such an extent that they had been rendered meaningless. Defendants responded "that the vast majority of the documentation would be provided in unredacted form," but noted that "only those documents containing irrelevant information ... were ... redacted." After noting the plaintiffs' reliance upon *Seafirst*, the court stated that:

> In the present case, no privileges are asserted by [the defendants] and the only objection made is that the redacted information is irrelevant. Given that relevancy is broadly construed for discovery purposes ... and that plaintiffs have indicated the possibility of additional relevant information within the redacted documents, it is within this Court's discretion to order the documents produced in unredacted form. Moreover, defendants are already well-protected from improper disclosure by the confidentiality order. Therefore, in the event that there are documents yet unproduced or produced in redacted form, defendants are ordered to produce those to plaintiffs.

*Id.* at *4.

In *In re Medeva Securities Litigation*, 1995 WL 943468 (C.D.Cal. May 30, 1995), the plaintiff filed a motion for an order compelling further production of documents. The plaintiff complained that the defendants had redacted at least some material from "thousands" of documents, and that in some cases, the documents have been redacted so severely that they are unusable or devoid of context. Defendants responded that they have redacted the documents based upon a number of principles, including: (i) privilege; (ii) descriptions of pending litigation; and (iii) outside the relevant time period. The court stated that:

> The problem is less the principles than the procedure. The Court does not welcome unilateral editing of documents by the producing party. Even when implemented with restraint and in good faith, the practice frequently gives rise to suspicion that relevant material harmful to the producing party has been obscured. It also tends to make documents confusing or difficult to use. All too often, the practice results in litigation of collateral issues and *in camera* review of documents by the Court, with the result that the time of both counsel and the Court is wasted. These drawbacks ordinarily outweigh the minimal harm that may result from disclosure of some irrelevant material. Infrequently, where a document contains a paragraph of privileged or very sensitive material, redaction is a sensible solution. Under those circumstances, however, the party requesting production should be given a document-by-document indication, such as plaintiffs

received with respect to allegedly privileged documents in this case, as to the nature of the material redacted and the basis for the redaction.

*Id.* at *3. The court found that with respect to documents redacted for reasons other than privilege, corrective measures were warranted, and granted the plaintiffs' motion to compel the defendants to produce unredacted copies of documents redacted on a basis other than privilege. *Id.*

Discussion

*Oracle's Redactions of Documents Produced Pursuant to the July 17, 2006 Order*

Plaintiffs contend that Defendants improperly redacted hundreds of thousands of pages of documents related to the 926 debit memos. Plaintiffs assert that Defendants "have redacted all information that cannot be specifically traced to one of the 926 debit memos, even if that information contains information on other debit memos and account-level reconciliations that consolidate other smaller debit memo items. Plaintiffs object that these redactions "completely distort the relevant information contained in the reports and obscure the relevant information contained in the documents, and that Defendants' unilateral redaction for relevance or 'non-responsiveness' is improper. Plaintiffs assert that Defendants are not redacting the information based upon the attorney-client privilege, work product doctrine, trade secret or right to privacy grounds. Plaintiffs assert that "the July 17, 2006 order was premised on defendants' argument that producing information on the other 45,000+ debit memos was unduly burdensome and would cost 'millions' of dollars to produce." Plaintiffs contend that: (1) Defendants' burden argument does not apply to documents and reports already produced and (2) "the burden of searching, analyzing and redacting thousands of lines of data from reports, spreadsheets and emails…is far greater than the minimal burden of merely producing the documents in unredacted form."

Defendants contend that the redacted information has "nothing to do with the 926 debit memos" and does not relate to the 926 debit memos. Defendants assert that given the nature of the documents and the parameters of the reports produced as part of the supplemental accounting production, Defendants believe that much of the redacted information has nothing to do with any of the 46,000 debit memos." Opposition at 12. Defendants assert that given the information they have produced, the argument that the redactions distort the accounting history of the 926 debit memos is demonstrably incorrect. Defendants assert that their produced documents were guided by the prior orders of the Court and the Special Master, which "clearly set forth that Plaintiffs are


entitled only to information that relates to the 926 debit memos. Defendants assert that multiple courts have upheld a responding party's redactions of non-responsive information in discovery productions, and assert that they have redacted non-responsive, confidential, and proprietary information pertaining to transactions and customers having nothing whatsoever to do with the 926 debit memos.

Finally Defendants assert that there is a substantial burden associated with producing information unrelated to the debit memos. Defendants argue that granting Plaintiffs' request for unredacted documents would impose a substantial burden on Defendants because "Plaintiffs undoubtedly would seek (as they have in the past) documents underlying these extraneous transactions on the theory that the limited information set forth in the unredacted documents does not provide enough context for Plaintiffs to understand the transactions." Opposition at 15. Defendants claim they have already spent a massive amount of time and money complying with the accounting discovery orders and that Plaintiffs will attempt to use any additional discovery to manufacture new claims that have nothing to do with the accounting allegations in their complaint. *Id.*

In reply, Plaintiffs assert *inter alia* that: (1) speculation about the possibility of future discovery battles arising from the production of documents does not constitute an unreasonable burden under Fed. R. Civ. P. 26, because such a rule would render virtually any document request unduly burdensome; (2) Defendants' claims that they have redacted "confidential and proprietary information" are entirely conclusory, and Defendants have failed "to identify a single piece of data that is confidential or 'proprietary' under Fed. R. Civ. P. 26(c) such as trade secrets, social security numbers, private banking account numbers or other private information;" and (3) the stipulated protective order ensures that there is no risk that any proprietary information will be disclosed by production of unredacted documents.

The July 17, 2006 Order requires Defendants to produce documents and information related to the 926 debit memos. The order did not permit Defendants to redact information from the documents that Defendants believe to be non-responsive. The documents at issue were produced by Defendants in response the July 17, 2006 Order, and thus clearly contain relevant information. Any and all redactions from responsive documents must be logged and explained. Consistent with the cases cited above, while a party may redact privileged material from a responsive document, it is inappropriate for a party to redact information on the basis that


information is "non-responsive." Defendants' unilateral redaction of information from the supplemental accounting documents on the grounds it is not relevant or is "non-responsive" is improper. Defendants have failed to support their brief assertion that they have redacted "confidential" and "proprietary information" from the documents responsive to the July 17, 2006 Order. Defendants' burden argument with respect to producing unredacted copies of the documents already produced is unpersuasive.[5]

Accordingly, Plaintiffs' motion to compel production of unredacted copies of all documents (including reports, spreadsheets and e-mails) produced by Defendants pursuant to July 17, 2006 Order is GRANTED.

*All Documents Relating to Oracle's October 2002 Unapplied Cash Project*

Plaintiffs' May 25, 2006 motion to compel sought production of documents related to Oracle's 2002 "Clean Up" of customer overpayments and unapplied cash. Plaintiffs asserted that the 2002 Clean Up, commenced shortly after Plaintiffs filed their Second Amended Complaint adding accounting allegations, was an attempt to conceal the previous November 2000 Clean Up, the fraudulent impact of the debit memo transactions, the improper bad debt reserves transfers and the overall unapplied cash scheme to hide customer overpayments. Plaintiffs sought an order compelling Defendants to produce "all documents and communications relating to any investigation, clean up, project or reconciliation relating to Oracle's unapplied cash, bad debt reserve, or customer overpayment accounts after November 17, 2000, including but not limited to any investigation relating to Account 25005, Account 12601, or Account 12018 and any debit memos, credit memos or refunds associated with those investigations. The motion to compel production of such documents was denied on the basis that while documents related to credit memos and refunds that were issued to customers in connection with debit memos were relevant to Plaintiffs' accounting claims, Plaintiffs' request for production of all documents related to Oracle's 2002 Clean Up was overbroad.

Plaintiffs contend that new evidence has confirmed that Oracle's unapplied cash project in 2002 was a direct result of Plaintiffs' lawsuit and the debit memo allegations, and as such, all documents relating to Oracle's unapplied cash clean up project commenced in October 2002 are relevant to Plaintiffs' accounting allegations and thus discoverable. Plaintiffs assert that: (1)

---

[5] It is usually more burdensome and costly to redact documents than to produce documents without redaction.


contrary to Defendants' previous representations that there was "no connection whatsoever" between the events in 2002 and Plaintiffs' accounting allegations, new testimony from former Oracle collections manager, Ian Hatada, confirms that the events in 2002 were related to the November 2000 Clean Up and the debit memos; (2) new testimony by former Oracle accounts receivable manager Terry Elam and Oracle's current CFO, Jennifer Minton, confirms that the 2002 project was related to Plaintiffs' accounting allegations; (3) new documents produced since the entry of the July 17, 2006 Order confirm that the unapplied cash project beginning in 2002 is related to Plaintiffs' accounting allegations; and (4) new evidence confirms that thousands of credit memos were issued and millions of dollars were refunded for debit memo items in 2002 and 2003.   Plaintiffs assert that the cited testimony and documents, not available at the time of the entry of the July 17, 2006 Order, confirms that the investigations and events beginning in October 2002 were not "separate" events unrelated to Plaintiffs' lawsuits and the debit memo transactions as defendants have repeatedly represented, and that the project in 2002 resulted in the reversal of debit memo transactions and countless refunds of millions of dollars that were directly related to debit memos and the November 2000 Clean Up.

Defendants contend that Plaintiffs have not provided any basis for additional discovery into the October 2002 unapplied cash project.  Defendants assert that:  (1) Mr. Hatada's testimony "amounts to little more than speculation and hearsay from a former Oracle employee who readily admitted that he did not understand what he was being told to do " and that Mr. Hatada had "no accounting background, training, or knowledge, no familiarity with Oracle's revenue recognition policies, and no involvement at any time with Oracle's revenue recognition process" (Hatada Tr. at 350-363; 473:4-11; 376:16-19; 379:7-20); (2) numerous witnesses have confirmed the lack of connection between the unapplied cash project (2002 Clean Up project) and the debit memos, citing the testimony of Molly Littlefield-Venkataramana (another Collections Manager involved in the October 2002 activities), and Michael Quinn and Thomas Williams, both former high-level Oracle executives; (3) neither Elam nor Minton "suggested even remotely that there was a connection between the creation or accounting of the debit memos and the unapplied cash project;"[6]  and (4) the documents produced in response to the July 17, 2006 Order do not justify a

---

[6]   When asked, "do you believe that any of the steps you took in that time period, October-November of 2002, changed the original accounting of the on-account debit memos that were created in November of 2000?" Mr. Elam answered, "No, I do not."  Collins-Burgard Decl., Ex. 33, (Elam Tr. at 330:5-13). Mr. Elam further testified that he did not recall any conversations in October 2002 regarding refunds of debit memos and that he did not know even if

reconsideration of the scope of discovery, stating that "if there truly were a connection between the debit memos and the unapplied cash project, one would expect that a larger percentage of the debit memo transactions would have been refunded as part of the 2002 unapplied cash project, instead of the 68 debit memos identified by Plaintiffs."

In reply, Plaintiffs assert that Defendants have repeatedly represented to Judge Jenkins, Judge Spero, and now the Special Master, that the 2002 unapplied cash project and investigation had "no connection whatsoever" to the debit memos and the November 2000 Clean Up. Greenstein Reply Decl., Exs. C (March 1, 2005 Hearing Tr. at 51:19-53:2; *Id. at 52:17-22),* D (July 10, 2006 Hearing Tr. at 79:11-14 -"The creation of the debit memos had no financial impact whatsoever and that it was a discrete separate event from the unapplied cash cleanup that happened in October of 2002...and there is no link...."); *see also id.,* Ex. D at 80:9("There simply is no connection there."). Plaintiffs, after quoting statements from Defendants' opposition brief asserting that Defendants have already "produced any documents or electronic information generated as part of that [unapplied cash] project that could be linked to one of the 926 memos." ask "how can some of the 926 debit memos be 'linked' to the 2002 project if there is 'no connection whatsoever' between the two events?" and "why were senior Oracle accounting officers asking collections personnel to research, reverse, and refund debit memos as part of the 2002 unapplied cash project." Plaintiffs assert that they have established that 20% of the sampled debit memos valued over $100,000 and 27% of those sampled valued at less than $100,000 were reversed and/or refunded during the 2002 unapplied cash project. Plaintiffs note that Mr. Hatada has the same personal knowledge of the events in late 2002 as Ms. Venkataramana and that the conflicting testimony of the two only further justifies the need for discovery into the 2002 Clean Up project. Plaintiffs argue that Defendants' strategy of attacking Mr. Hatada's personal knowledge completely fails to offer evidence refuting his testimony that he and the rest of Oracle's collections staff "was told that the lawsuit and debit memos were part of the same 'problem' that had to be cleaned up immediately to determine the 'revenue impact of the debit memo transactions. Ex. 1 at 128:8-120:2; 257:24-263." Plaintiffs further reassert that Ms.

---

his work in October 2002 involved any debit memos. *Id.* (Elam Tr. at 188:3-13). Mr. Elam also testified that there was no accounting impact from "credit memo'ing" debit memos in October 2002. *Id.* (Elam Tr. at 332: 7-11).

Ms. Minton's clarification of her testimony on the second day of her deposition was not contradictory, but only an attempt to ensure her testimony was accurate and complete. The information she received concerning the 2002 Clean Up project undercuts Plaintiffs' position because Minton was told "there was not a material impact on [Oracle's 2001] financial statements...." *Id.,* Ex. 14 (Minton Tr. at 278:15-279:20).

Minton's deposition concerning the 2002 unapplied cash project is contradictory and further justification for discovery into the project. Finally, Plaintiffs also contend that Defendants ignore the relevant testimony of Terry Elam, which confirms that the unapplied cash project in 2002 had the effect of "unapplying" debit memos and "reversing" transactions underlying the debit memos.

Judge Spero stated during the March 1, 2005 conference concerning the discovery plan:

> You are going to look at every piece of paper that has to do with these debit memos up and down and if it goes through the accounts that you suspect it is going through, well, then, that will be one thing. If it isn't, then it isn't... if it turns out that none of this money passes through the 12601 account, then why isn't that the answer? ... Okay. We will find out.

*Id.*, Ex. 3 at 44:3-19. There is no dispute between the parties that roughly 20% or more of the debit memos go "through the accounts that [Plaintiffs] suspect [they are] going through." Therefore, Plaintiffs have given the Court reason to reconsider whether discovery should be allowed into the 2002 unapplied cash project.

Mr. Hatada's testimony that he and the rest of Oracle's collections staff was told in 2002 that the unapplied cash clean up project was in response to a law suit and concerned debit memos created in 2000 cannot be negated by attacking Mr. Hatada's personal knowledge of Oracle's accounting practices. Although not conclusive on the issue, Mr. Hatada's testimony, Mr. Elam's testimony, Ms. Minton's testimony, and the documentary evidence offered by Plaintiffs in this motion together raise substantial questions about the relationship between the November 2000 debit memos and the 2002 Clean Up.

Judge Spero has already voiced concern that Defendants have made statements to the Court regarding discovery of accounting documents and then later changed their position. Here, again, Defendants have stated one position (that there is no link between the debit memos and the 2002 Clean Up project) and later shifted that position (by claiming all linked documents have been produced and that the link is not substantial). Given the Defendants' former position and the new evidence offered by Plaintiffs, the Special Master concludes that information relating to events concerning the October 2002 unapplied cash project are reasonably calculated to lead to discovery of admissible evidence regarding Plaintiffs' accounting allegations and Defendants' scienter during the Class Period. Defendants did not offer or suggest any reasonable restrictions regarding the scope of documents requested by Plaintiffs. Defendants similarly failed to offer any burden argument with respect to Plaintiffs' request. Given the new evidence presented, the



burden or expense of the proposed discovery is outweighed by its likely benefit.

Accordingly, Plaintiffs' motion to compel production of documents relating to Oracle's unapplied cash clean up project commenced in October 2002 is GRANTED.

*All Documents Relating to Transfer of Customer Overpayments and Unapplied Cash to Account 12601 in Connection with Oracle's 2Q01*

In Plaintiffs' May 25, 2006 motion to compel production of accounting documents, Plaintiffs asserted that discovery had demonstrated that Oracle overstated its 2Q01 earnings by at least an additional $20 million by improperly transferring customer overpayments (Account 25005) to Oracle's Bad Debt Reserve (Account 12601) between August 2000 and August 2002, directly impacting the Class Period, and that documents relating to Oracle's improper transfers of unapplied cash to the bad debt reserve are relevant to Plaintiffs' allegations that Oracle improperly used customer overpayments and unapplied cash to inflate Oracle's earnings in 2Q01, citing paragraphs 35-41 of the RSAC.[7]  In the July 17, 2006 Order, the Special Master found that documents relating to transfers of customer overpayments and unapplied cash to Oracle's bad debt reserve which can also be linked to the November 17, 2000 debit memos are relevant to Plaintiffs' accounting claims.  Defendants were ordered to produce all documents and communications relating to Oracle Corporation's transfers of customer overpayments (Account 25005) and unapplied cash (Account 12018) to Oracle's bad debt reserve write off accounts, including Account 12601, which can also be linked to the 926 debit memos.

Plaintiffs contend that Defendants continue to refuse to produce documents relating to Oracle's transfers of unapplied cash to Oracle's bad debt reserve account.  Plaintiffs assert that analysis of documents relating to the 926 debit memos reveals that more than $20 million in customer overpayments from Account 25005 that were transferred to Account 12601, thereby inflating Oracle's 2Q01 results, were made in connection with smaller debit memos that Oracle refused to produce.  Plaintiffs assert that the bad debt transfers were not limited to the 926 debit memos, and that new evidence reveals that Oracle frequently performed an "auto-adjustment" or "sweep" of unapplied cash to Oracle's bad debt reserve that transferred extremely small dollar amounts, in some cases as little as $0.01.  Greenstein Decl, Ex. 24.  During his deposition, Mr.

---

[7] Plaintiffs sought an order compelling Defendants to produce "all documents and communications relating to Oracle Corporation's transfers of customer overpayments (Account 25005) and unapplied cash (Account 12018) to Oracle's bad debt reserve write off accounts, including Account 12601, from the period June 2000 through the present." *See* Plaintiffs' Proposed Order Granting Plaintiffs' Motion to Compel Defendants' Production of Accounting Documents at ¶ 3.


Hatada testified, "From my understanding this is something that was ran either—you know, I don't know how often, but I know it wasn't something that wasn't ran once." *Id.*, Ex. 1 (Hatada Tr. at 348:18-349:20). Plaintiffs assert that this evidence calls into question Tom Williams' testimony to the Special Litigation Committee that the auto-adjustment process occurred only once in January 2002.

Plaintiffs contend that they are "entitled to discovery into the bad debt transfers that occurred or impacted Oracle's 2Q01, the specific quarter that plaintiffs allege was false in the SAC." Plaintiffs assert that there is no burden in producing documents relating to Oracle's bad reserve transfers for the single quarter 2Q01 because Defendants have already preserved the documents at issue and already done the research and analysis of which debit memos had a credit balance due to cash in Account 12601 as of November 2001. Specifically, Plaintiffs cite the declaration of Greg Myers, which states, "[A]ll of the 12601 transactions (from the original cash receipt transactions through the final positive miscellaneous receipt transactions) from August 2000 up through the period immediately preceding the recent 12601 project have been electronically preserved, including all of the most recent comments associated with those transactions. *Id.*, Ex. 25. Plaintiffs also cite an email from Terry Elam to Greg Myers which states: "Greg, Attached is the data from the master file for the debit memos that have a Cr. Balance due to cash as of Nov-00 in the 12601 account." *Id.*, Ex. 26.

Defendants contend that they have fully complied with the July 17, 2006 Order which required Defendants to produce only those documents concerning transfers to its bad debt reserve accounts "which can also be linked to the November 17, 2000 debit memos valued at more than $100,000." July 17, 2006 Order at 17-18. Defendants state that they voluntarily produced documents concerning transfers to its bad debt reserve accounts which could be linked to the 150 smaller value debit memos selected by Plaintiffs. Defendants argue that the exhibit relied upon by Plaintiffs, Exhibit 24, in seeking discovery of the purported "auto adjustments" is not new and was produced long ago and was used by Plaintiffs to question numerous witnesses well before the July 17 Order. Defendants argue that Mr. Hatada's testimony on this issue has no substantive value since he "acknowledged that he had no involvement in the creation of the debit memos, did not learn about them until two years later and still does not understand the accounting function of a debit memo." Finally, Defendants state that Plaintiffs' claim that there is no burden associated with producing the requested documents is unfounded and that they would face a substantial

burden in having to produce additional documents beyond the scope of the July 17 Order.

In reply, Plaintiffs state that they seek "documents related to a discreet amount of transfers ($20+ million) related to one specific quarter (2Q01). Plaintiffs reassert that both the email from Mr. Elam to Mr. Myers and the testimony of Mr. Hatada are new evidence establishing the readily availability of a "master file" concerning "debit memo's that have a Cr. Balance due to cash as of Nov-00 in the 12601 account" and that the auto-adjustment process for transferring small amounts of overpayments into the bad debt reserve was regularly used. Plaintiffs argue that while Defendants assert in a conclusory fashion that there is a substantial burden involved in producing what Plaintiffs contend is highly relevant evidence, Defendants make no showing of this burden. Plaintiffs contend that because the July 17, 2006 Order was premised on defendants' assertions of burden, the newly proffered evidence entitles them now to seek a broader scope of discovery since "[t]he relevance of the documents far outweighs any speculative burden that defendants allege." Reply at 14.

In the July 17, 2006 Order, the Special Master concluded that documents relating to transfers of customer overpayments to Oracle's bad debt reserve, which could also be linked to the November 17, 2000 debit memos were relevant to Plaintiffs' allegations. The new or different evidence cited by Plaintiffs, Exs. 11 and 26, reveal a further connection between the debit memos and Oracle's bad debt reserve account during the relevant period. Plaintiffs now seek additional documents related to Oracle's 2Q01. The requested information is relevant to Plaintiffs' allegations. The master file created by Mr. Elam should substantially decrease the burden created by enlarging the scope of production to include all such documents related to 2Q01. Plaintiffs have also produced new testimony suggesting the possibility that the auto-adjustment process was more than a one time event. Defendants have offered no specific rebuttal as to the burden involved in using the master file referred to in Mr. Elam's email to produce the requested documents. Given the new evidence presented, the burden or expense associated with the production of all documents concerning Oracle's transfers of over $20 million in unapplied cash and/or customer overpayments from Account 25004 to Account 12601 in connection with Oracle's second fiscal quarter 2001 is outweighed by its likely benefit. Accordingly, Plaintiffs' motion to compel production of all documents relating to Oracle's transfer of the more than $20 million in transfers of customer overpayments and unapplied cash from Account 25005 to Account 12601 in connection with Oracle's 2Q01 is GRANTED.


<u>Order</u>

For the reasons set forth above,

1.  Plaintiffs' motion to compel production of unredacted copies of all documents produced pursuant to the Special Master's July 17, 2006 Order re: accounting documents is GRANTED.

2.  Plaintiffs' motion to compel production of all documents relating to Oracle's unapplied cash project beginning in October 2002 is GRANTED.

3.  Plaintiffs' motion to compel production of all documents relating to Oracle's transfer of the more than $20 million in transfers of customer overpayments and unapplied cash from Account 25005 to Account 12601 in connection with Oracle's 2Q01 is GRANTED.

4.  Defendants shall provide Plaintiffs with the electronic information and documents required by this ORDER no later than January 17, 2007.

IT IS SO ORDERED.

Dated: _12-19-06_

Hon. Edward A. Infante (Ret.)
Special Master

# EXHIBIT 195

03/20/2006 05:14 PM

**oracle jeff henley**

| | |
|---|---|
| From: | Charles Phillips [charles.phillips@morganstanley.com] |
| Sent: | Thursday, December 13, 2001 5:26 AM |
| To: | Barrenchea Mark; Ron. Wohl@Oracle. Com |
| Cc: | CFO Henley Jeff |
| Subject: | FW: 11i |

and this one was worse. as you know these market analysts can have
significant impact with customers and two of the most influential analysts
at key firms are decidely negative on the quality of the apps suite and with
this sort of feedback i can see why. without a full court press to provide
them with some positive references and more data about your expereinces,
its will be nearly impossible to change market perception about oracle apps.
and its impossible to calculate what deals you don't see because a
reputation and perception preceding you and keeping you from getting the
call.

-----Original Message-----
From: Miller, Byron [mailto:BMiller@gigaweb.com]
Sent: Tuesday, December 11, 2001 2:58 PM
To: chasp@ms.com
Subject: 11i

Chuck,
I saw your very positive review of 11i. This is what is typical of what I
see. They are on 11.5.4. Any reaction?

Is our disastrous experience with Oracle 11i typical? You have some
circa early-2001 research on this, but I was wondering what it's like now
that the product is (supposed to be) a little more mature. Here's our
experience... We have recently (Oct. 2001) upgraded from Oracle 10.7 to 11i
. We use almost all the Financials, OM, & Manufacturing modules, along with
the Product Configurator and iStore (the latter for order status only, so
far). We have several customizations, mostly focusing on our use of product
serialization, but in most cases our modules are fairly out-of-the-box.
While the actual conversion itself went fairly well, we have been extremely
disappointed with the quality of the software. We have opened 158 TARs since
going live (well over 100 being Sev 1 or 2) and consistently have dozens of
TARs open at any one time. The responsiveness & quality from Oracle support
has been spotty at best. Our local Oracle developers have been able to
provide very little value-add since going live - they spend nearly all of
their time acting as an interface between end user and Oracle support,
managing TARs, diagnosing problems, coordinating the application of patches,
etc. While the product is running our business, it is not without
significant crises, manual workarounds, financial adjustments, and general
pain. What are other businesses experiencing with 11i? Thanks in advance for
your response.

Regards,
Byron

Byron D. Miller
Vice President, ERP
Giga Information Group
Technology advice. Business results.
O: 847.855.2930
F: 847.855.2931
E: bmiller@gigaweb.com
Ask me how Giga can help you Communicate the Value of IT

Exhibit No. 31
Witness: Wohl vol 2
Date: 5 - 31 - 06
Pages 2
Lucy Carrillo-Grubbs, CSR No. 6766

ORACLE
CONFIDENTIAL

1

NDCA-ORCL 061302

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

03/20/2006 05:14 PM

The information contained in this transmission may contain privileged and confidential information of Giga Information Group, Inc. It is intended for review only by the person(s) named above. Dissemination, distribution or duplication of this communication is strictly prohibited by all recipients. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. Thank you.

ORACLE
CONFIDENTIAL

2

NDCA-ORCL 061303

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

# EXHIBIT 196

ORACLE'

Oracle Announces Preliminary Third Quarter Earnings Results
http://www.oracle.com/corporate/press/619431.html

# Oracle Press Release

Contact(s):
Stephanie Aas
Oracle Corp.
(650) 506 7000
investor_us@oracle.com

## Oracle Announces Preliminary Third Quarter Earnings Results
Oracle Earnings per share expected to be $0.10

REDWOOD SHORES, Calif., Mar. 1, 2001 - (http://www.oracle.com/telinfmemor/761943\)) Today, Oracle Corporation announced estimated earnings for its fiscal third quarter ended February 28, 2001, based upon preliminary financial results for the quarter. Preliminary third quarter results indicate earnings per share grew over 20% to $0.10 per share, up from $0.08 per share in Q3 last year (excluding investment gains). Operating margins improved to 33%, up from 31% in Q3 last year.

Current estimates for the quarter, including a 4% negative currency impact, show license revenue grew approximately 6% and total revenue grew approximately 9%. Applications revenue growth is estimated at approximately 50%, and database revenue growth is estimated to be flat to slightly negative.

"License growth was strong in the first two months of Q3, and our internal sales forecast looked good up until the last few days of the quarter," said Oracle CEO Larry Ellison. "However, a substantial number of our customers decided to delay their IT spending based on the economic slowdown in the United States. Sales growth for Oracle products in Europe and Asia Pacific remained strong. The problem is the US economy."

"Oracle will provide more detailed fourth quarter financial guidance on the regularly scheduled conference call on March 15, 2001," said Oracle CFO Jeffrey O. Henley. "With continued uncertainty in the economy, we can't predict when sales growth will improve. However, we can predict that Oracle will continue to use our e-business suite software to move all our business processes to the Internet. That in turn will allow us to continue to improve efficiency and keep our overall expenses under tight control. These productivity improvements should allow us to

Kuehmichel
Exhibit
13
6/10/2005

continue to deliver year-over-year earnings growth, albeit at a lower rate than previously expected due to lower revenue growth." More information on the company's quarterly performance will be communicated in a conference call at 2:30 (PST), dial-in number at (913) 981-5591. There will be a live web broadcast available on the investor relations web site at www.oracle.com/investor. Oracle's regularly scheduled quarterly earnings conference call will take place on March 15, 2001.

Oracle Corporation is the world's second largest software company. With annual sales of more than $10 billion, Oracle provides the software that powers the Internet. For more information about Oracle, please call Investor Relations at (650) 506-4073 or visit Oracle on the web at www.oracle.com.

"Safe Harbor" Statement Under the Private Securities Litigation Reform Act of 1995. Information in this release relating to Oracle's future prospects which are "forward-looking statements" are subject to certain risks and uncertainties that could cause actual results to differ materially, including, but not necessarily limited to, the following: (1) A weakening of economic factors, particularly in the United States economy, may affect the overall demand for computer software and services which could result in decreased revenues or lower revenue growth rate. (2) Delays in closing of sales or product delivery can cause quarterly revenues and license to fall significantly short of anticipated levels. (3) Oracle is introducing new products, such as internet procurement and features to its e-commerce software, computer security applications, and application hosting services, and are subject to increased risk to timely delivery, customer acceptance for a number of business procurement needs, the market acceptance and contribution to Oracle's revenues of these products and exchanges cannot be assured. (4) Management's ability to manage growth, continuously hire and retain significant numbers of qualified employees, forecast revenues and control expenses, especially in a quarterly basis, continues to be a challenge. A accompanied decline in the growth rate of revenues without a corresponding and timely slowdown in expense growth could have a material adverse effect on results of operations. (5) Oracle has made changes to its pricing model which could lead to a decline or delay in sales or its sales force and customers subject to the new pricing policies and practices while this effort to the business model in which Oracle operates may place pressure on Oracle's future price on certain products. (6) The market for Oracle's products is intensely competitive and is characterized by rapid technological advances and frequent new product introductions. There can be no assurance that Oracle will continue to introduce new products and new versions of existing products that keep pace with technological development, satisfy increasingly sophisticated customer requirements and achieve market acceptance. Oracle undertakes no obligation to update information contained in this release. For further information regarding risks and uncertainties associated with Oracle's business, please refer to the "Risk Factors" section of Oracle Corporation's SEC filings, including, but not limited to, its annual report on Form 10-K and quarterly reports on Form 10-Q, copies of which may be obtained by contacting Oracle Corporation's Investor Relations Department at (650) 506-4073 or Oracle's Investor Relations website at http://www.oracle.com/

# # #

## Trademarks
Oracle is a registered trademark of Oracle Corporation. Other names may be trademarks of their respective owners.

Copyright © 2001 Oracle Corporation. All Rights Reserved.

Contact Us | Legal Notices and Terms of Use | Privacy Statement

# EXHIBIT 197

[Fwd: Xerox Extended Terms]

**Subject: [Fwd: Xerox Extended Terms]**
**Date:** Fri, 01 Dec 2000 13:21:45 -0800
**From:** Jeff Henley <Jeff.Henley@oracle.com>
**Organization:** Oracle Corporation
**To:** "Williams,Thomas" <THOMAS.WILLIAMS@oracle.com>
**CC:** "Snyder,Allen" <ALLEN.SNYDER@oracle.com>

Todd is right that these guys were an early 11i CRM customer and have
had some real disappointments. However, they also have cash flow
problems so they're trying to squeeze all their vendors.

At this point I don't think they'll not pay or go broke. I'm just
concerned about starting to make exceptions for customers. I'm not
aware that we do this very often. I'm copying Al Snyder for his
perspective.

---

**Subject: Re: Xerox Extended Terms**
**Date:** Fri, 01 Dec 2000 09:43:42 -0500
**From:** Todd Allen <todd.allen@oracle.com>
**Organization:** Oracle Corporation
**To:** Jeff Henley <Jeff.Henley@oracle.com>

Jeff,

The following is the breakdown of the payment schedule.

- Xerox paid 1st year support in May. This carries them through May 2001.

- Would pay for the period covering June 2001 - May 2002 in January 2002

- Would pay for the period covering June 2002 - May 2003 in January 2003.

They would then be on a 12 month renewal cycle with a corresponding payment starting in June 2003.
Xerox would have two support renewal payments in 2003.

By allowing them this change we still get all of our renewal dollars over the same period of time. This
would help Xerox's cash flow for calendar year 2001.

Please let me know if you have any additional questions,

Todd

Jeff Henley wrote:

> When you signed the deal in May I assume you got first year support up front. Per the note you want to
> do next two years semi annual in arrears so this means each 6 months after we get to annual renewel in
> May they would pay for the last 6 months. We would do this for two years (4 six month payments).
> Then what happens?

**ORACLE CONFIDENTIAL**

**CA-ORCL 021875**

1

[Fwd: Xerox Extended Terms]

Todd Allen wrote:

Jeff,

I understand your position but let me clarify the request. The Xerox request is based on the significant struggle they have had with software stability, lack of 11i education, and the lack of an 11i version of Tutor for all the modules they purchased. (Their Tutor spend was $1M). Throughout the last 5 months Xerox has continued to pay all of their consulting invoices and have not asked for a credit from Consulting even though we lost approximately 4 weeks of time debugging the code (estimated at 390 K).

When you add these circumstances to their financial woes I think this request makes sense and shows our good faith as a partner.

Todd

Jeff Henley wrote:

I'm not excited about doing this. I think it sets a bad precedent.

Credit wrote:

Jeff, Please advise if you approve of the following extended payment terms for Xerox: Company: Xerox Corporation

Requesting semi-annual in arrears payment terms for Xerox for years 2 and 3 of their support payments. Details below:

**We closed a license deal with Xerox in May '00. The support fees were: Updates and Product = $2,057,391.30 and Custom Gold = $968,183.70. Support fees were flatlined for years 2 and 3 at $3,025,575 per year.
**Xerox is requesting semi-annual arrears payment terms for the second and third years of support.

Reason for extended terms:

*We are asking for this concession based on the following:

1) Licenses were purchased in May, but the products have been extremely unstable. Xerox is just beginning to see progress.

2) Xerox is under heavy cost cutting pressure and this will ease their economic burden in 2001 and allow them to continue their implementation. *Regards, Jeff Johnson
Credit Manager
Oracle Corporation
916.315.6863
916.315.4840 (fax)
----- Original Message -----
From: Todd Allen
To: Johnson,Jeffery Cc: OSSINFO ; CREDIT_US ; Sherman,David ; Sampson,Roger Sent: Tuesday, November 28, 2000 1:44 PM Subject: Re: [Fwd: Xerox]

2          ORACLE CONFIDENTIAL          **CA-ORCL 021876**

[Fwd: Xerox Extended Terms]

Jeff,

Allison is correct, this is a concession. We are asking for this concession based on the following:

1) Licenses were purchased in May, but the products have been extremely unstable. Xerox is just beginning to see progress.

2) Xerox is under heavy cost cutting pressure and this will ease their economic burden in 2001 and allow them to continue their implementation.

Please forward to Jeff for approval. Jeff is Xerox's executive sponsor so he is familiar with Xerox's trials and tribulations.

Thanks for your help and please contact me if you have any questions.

Todd

OSSINFO wrote:

Jeff,

Xerox is asking for this two years in advance as they contracted to 3 years of support in the contract. For budgeting purposes, they wish to revise the payment schedule. This is a concession. There is no new deal in the works (Todd- please advise if I'm incorrect).

Please advise if you require additional information.

Thank you.

--
Regards,

Allison

OSSINFO:
Allison Adams
(p) 732-726-2429
(f) 732-636-5915

Travis Tom
(p) 650-506-0995
(f) 650-633-2332

Visit "esource" for the latest policies and pricing:

http://esource.oraclecorp.com

ORACLE CONFIDENTIAL

CA-ORCL 021877

NDCA-ORCL 024867

[Fwd: Xerox Extended Terms]

**Subject:** Re: Xerox
**Date:** Tue, 28 Nov 2000 12:54:24 -0800
**From:** Jeff Johnson <jeffery.johnson@oracle.com>
**Organization:** Oracle Corporation
**To:** OSSINFO <OSSINFO_US_APPR@oracle.com>

C: CREDIT_US <CREDIT.US@oracle.com>,"Sherman,David" <DAVID.SHERMAN@oracle.c

**References:** <3A22F5A7.511785C0@oracle.com>

This should be approved by credit as each support renewal comes up.  Why is Xerox asking for revision of payment terms 2 years in advance?  Is there a new deal in the works, or are we just making a concession?  Either way, this will need Jeff Henley's approval once I clear up the questions listed above.

Thanks,
Jeff

OSSINFO wrote:

Please see the included request.  The initial request went to credit on
November 15 and to date no response has been received.  This is a
critical quarter-end issue for the customer.  Please advise as soon as
possible.

Thank you.

--
Regards,

Allison

OSSINFO:
Allison Adams
(p) 732-726-2429
(f) 732-636-5915

Travis Tom
(p) 650-506-0995
(f) 650-633-2332

Visit "esource" for the latest policies and pricing:

http://esource.oraclecorp.com

ORACLE CONFIDENTIAL

4

CA-ORCL 021878

NDCA-ORCL 024868

[Fwd: Xerox Extended Terms]

**Subject:** Xerox
**Date:** Wed, 15 Nov 2000 16:20:01 -0500
**From:** OSSINFO <OSSINFO_US_APPR@oracle.com>
**To:** CREDIT_US <CREDIT.US@oracle.com>

Credit,

Please see below.

--
Regards,

Allison

OSSINFO:
Allison Adams
(p) 732-726-2429
(f) 732-636-5915

Travis Tom
(p) 650-506-0995
(f) 650-633-2332

Visit "esource" for the latest policies and pricing:

http://esource.oraclecorp.com

---

**Subject:** Return Message: Xerox
**Date:** 15 Nov 2000 13:09:46 -0800
**From:** "ORAPOST" <ORAPOST>
**To:** ossinfo_us_appr@oracle.com

The included message could not be delivered to the following invalid mail
names.  Please verify these names and try them again.

Bad name:  credit

---

**Subject:** Xerox
**Date:** Wed, 15 Nov 2000 16:14:19 -0500
**From:** OSSINFO <OSSINFO_US_APPR@oracle.com>
**To:** credit@oracle.com
**CC:** "Allen,Todd" <TODD.ALLEN@oracle.com>,
    "Sampson,Roger" <ROGER.SAMPSON@oracle.com>

ORACLE CONFIDENTIAL

CA-ORCL 021879

5

NDCA-ORCL 024869

[Fwd: Xerox Extended Terms]

Requesting semi-annual in arrears payment terms for Xerox for years 2 and 3 of their support payments. Details below:

-We closed a license deal with Xerox in May '00. The support fees were: Updates and Product = $2,057,391.30 and Custom Gold = $968,183.70. Support fees were flatlined for years 2 and 3 at $3,025,575 per year.
-Xerox is requesting semi-annual arrears payment terms for the second and third years of support. Xerox has cited the following reasons for this request (1)poor financial condition of company and (2)issues with implementation of 11i.
-The proposed payment schedule is as follows:

| Support Term | Proposed Payment Date |
|---|---|
| June 2001 - May 2002 | January 1, 2002 |
| June 2002 - May 2003 | January 1, 2003 |

OSS (Dick Sellers and Mike Mayfield) has approved the revised payment schedule for years 2 and 3.

Please advise if you require additional information.

Thanks.

--
Regards,

Allison

OSSINFO:
Allison Adams
(p) 732-726-2429
(f) 732-636-5915

Travis Tom
(p) 650-506-0995
(f) 650-633-2332

Visit "esource" for the latest policies and pricing:

http://esource.oraclecorp.com

**Subject:** Re: Xerox Support Clarification
**Date:** Wed, 15 Nov 2000 13:06:35 -0500
**From:** Dick Sellers <dick.sellers@oracle.com>
**Organization:** Oracle Corporation
**To:** OSSINFO <OSSINFO_US_APPR@oracle.com>
**References:** <3A12CFCA.8DA1F548@oracle.com>

ORACLE CONFIDENTIAL

CA-ORCL 021880

NDCA-ORCL 024870

[Fwd: Xerox Extended Terms]

I approve

OSSINFO wrote:

Dick,

Any comments regarding the arrears payment term request for Xerox?
Please see detail below as well as Paul's comments regarding the spread
of the NPV factor.

Thank you.

--
Regards,

Allison


OSSINFO:
Allison Adams
(p) 732-726-2429
(f) 732-636-5915

Travis Tom
(p) 650-506-0995
(f) 650-633-2332

Visit "esource" for the latest policies and pricing:

http://esource.oraclecorp.com

_____

**Subject:** [Fwd: Support Clarification]
**Date:** Tue, 14 Nov 2000 05:03:40 -0700
**From:** Michael Mayfield <Michael.Mayfield@oracle.com>
**Organization:** Oracle Corporation
**To:** "Tom,Travis" <OSSINFO@US.ORACLE.COM>

I approve based upon Paul's reading.

Cheers,

Mike

--

****************************************************
* Michael Mayfield               michael.mayfield@oracle.com *

7          ORACLE CONFIDENTIAL          **CA-ORCL 021881**

NDCA-ORCL 024871

[Fwd: Xerox Extended Terms]

```
* US Premium Support GVP      Phone:   +1-719-757-2060 *
* Oracle Support Services     Fax:     +1-719-757-2343 *
* 12320 Oracle Blvd                                    *
* Colorado Springs CO 80921                            *
*                                                      *
* Pam Ladd                    pamela.ladd@oracle.com   *
* Executive Assistant         Phone:   +1-719-757-2373 *
*******************************************************
```

**Subject:** Re: Support Clarification
**Date:** Mon, 13 Nov 2000 18:03:18 -0500
**From:** Paul Rando <paul.rando@oracle.com>
**Organization:** Oracle Corporation
**To:** OSSINFO <OSSINFO_US_APPR@oracle.com>
**CC:** "Sellers,Richard" <DICK.SELLERS@oracle.com>,
    "Mayfield,Michael" <MICHAEL.MAYFIELD@oracle.com>
**References:** <3A0C33F0.83EB526D@oracle.com>

Allison,

I'll support this if we (NER) share the cost proportionally based on the overall support revenue. Our proportional share is $34,854.62.
You will require Dick Sellers approval on this as well, because the remaining $ amount is recognized by the PSF.

Paul

OSSINFO wrote:

```
All,

In response to Paul's note I followed up with RevRec regarding  revenue
hits resulting from arrears payment terms.

For arrears payment terms, RevRec applies a NPV factor to support based
upon the amount of time payment is delayed.  In the case of Xerox this
would be 6 months (June to January).  The total support amount is
reduced by that NPV factor and is applied to interest expense (it is not
credited back to support).  In real numbers, the reduction for Xerox
would be $108,921 per year.  This was derived by taking the NPV factor
of .036 times $3,025,575.

--
Regards,

Allison
```

ORACLE CONFIDENTIAL

8

CA-ORCL 021882

NDCA-ORCL 024872

[Fwd: Xerox Extended Terms]

```
OSSINFO:
Allison Adams
(p) 732-726-2429
(f) 732-636-5915

Travis Tom
(p) 650-506-0995
(f) 650-633-2332

Visit "esource" for the latest policies and pricing:

http://esource.oraclecorp.com
```

**Subject:** Re: Support Clarification
**Date:** Fri, 10 Nov 2000 10:21:30 -0500
**From:** Paul Rando <paul.rando@oracle.com>
**Organization:** Oracle Corporation
**To:** OSSINFO <OSSINFO_US_APPR@oracle.com>
**CC:** "Sellers,Richard" <DICK.SELLERS@oracle.com>,
    "Mayfield,Michael" <MICHAEL.MAYFIELD@oracle.com>,
    "Slarskey,David" <DAVID.SLARSKEY@oracle.com>
**References:** <3A0C0FD5.28A7D2B3@oracle.com>

Allison,

This is semi-annual in arrears and doesn't effect the current recognition schedule.
Assuming I'm correct, I approve.

Paul

OSSINFO wrote:

   Dick and Mike,

   The following is a request for arrears payment terms for the second and third years of
   technical support for the May '00 Xerox deal. I've provided detail below:

   -We closed a Custom Gold deal with Xerox in May '00. The support fees were:
   Updates and Product = $2,057,391.30 and Custom Gold = $968,183.70. Support fees
   were flatlined for years 2 and 3 ($3,025,575).
   -Xerox is requesting an arrears payment schedule for the second and third years of
   support. Xerox has cited the following reasons for this request (1)poor financial
   condition of company and (2)issues with implementation of 11i.
   -The proposed payment schedule is as follows:

   | Support Term | Proposed Payment Date |
   |---|---|

**ORACLE CONFIDENTIAL**

**CA-ORCL 021883**

9

[Fwd: Xerox Extended Terms]



| June 2001 - May 2002 | January 1, 2002 |
| June 2002 - May 2003 | January 1, 2003 |

This request will also be sent to Credit once you've provided feedback.

Thank you.

--

Regards,

Allison

OSSINFO:
Allison Adams
(p) 732-726-2429
(f) 732-636-5915

Travis Tom
(p) 650-506-0995
(f) 650-633-2332

Visit "esource" for the latest policies and pricing:

http://esource.oraclecorp.com

Subject: [Fwd: RE: Support Clarification]
Date: Thu, 09 Nov 2000 14:31:49 -0500
From: Todd Allen <todd.allen@oracle.com>
Organization: Oracle Corporation
To: OSSINFO_US_APPR <OSSINFO.US.APPR@oracle.com>

Allison,

Per our conversation.

Todd

Subject: RE: Support Clarification
Date: Sat, 04 Nov 2000 18:22:13 -0500
From: Streb, William J <Bill.Streb@usa.xerox.com>

o: Todd Allen <todd.allen@oracle.com>,Streb, William J <Bill.Streb@usa.xerox.com>

CC: Sampson,Roger <ROGER.SAMPSON@oracle.com>

Todd,

ORACLE CONFIDENTIAL

CA-ORCL 021884

NDCA-ORCL 024874

[Fwd: Xerox Extended Terms]

Not asking for relief. More in line with software that could be used.
Still a three year contract.
Paid in August and November 200 covering June 1, 2000 - May 31 2001
To be paid Jan 1, 2002 covering June 2001 - May 31 2002
To be paid Jan 1, 2003 covering June 2002 - May 31 2003.
Bill

-----Original Message-----
From: Todd Allen [mailto:todd.allen@oracle.com]
Sent: Saturday, November 04, 2000 8:50 AM
To: Streb, William J
Cc: Sampson, Roger
Subject: Support Clarification

Bill,

Per voice mail, I need a clarification on your request.

When you asked to defer the June 2001 $3M renewal until January 2002
did
you plan on making two payments in 2002?  We might have a chance of a
deferment, but I doubt we can  get Xerox relief on 7 months of gold
support.

Please get back to me on what you meant so I can see what we can do.

Thanks,

Todd

Todd Allen <todd.allen@oracle.com>

ORACLE CONFIDENTIAL

CA-ORCL 021885

11

NDCA-ORCL 024875

# EXHIBIT 198

 

audit committee comments



**From:** Jeff Henley <Jeff.Henley@oracle.com>
**Subject:** audit committee comments

**To:** "Henley,Jeffrey" <JEFF.HENLEY@oracle.com>

## Q2 COMMENTS

Q2 ended on a strong note after a slow start for the first two months. Big applications deals carried the day including large deals at both HP and Compaq plus a nice database deal at Sun (we're building more balance between the 3 key hardware partners). The other big ones in excess of $10 mil license value were JDS Uniphase (apps), American General (apps), and Kaiser (database). These 6 big deals contributed $105 mil to the quarter or 9% of total license and other revenue which is larger than normal.

Apps growth exceeded street expectations at 66% (73% constant) and database fell back to 19% (26% constant).

As we said on the conference call, it was the 4th consecutive quarter of greater than 10 % pts of margin gain and the 2 year Q2 cum margin gain is 17 % pts with absolute margin for Q2 at 36%. Currency hit was huge at nearly 7 % pts negative but looking at constant dollar license growth it was over 30% and the past 3 of 4 quarters it's been over 30%. Last time we did this was 3 1/2 years ago.

Consulting/education growth improved 8 pts in constant terms from the low point of Q1 which we signaled at the Q2 Analyst Day and will be key to improving overall revenue growth.

## Q3 FORECAST

On the conference call we said that we had seen no slowdown in our business yet (Q2 license growth or initial pipeline growth rate). We reasoned that this was because our stuff isn't like PC's, semiconductors, etc--it's in high demand. We acknowledged that if the economy keeps falling then it might affect us at some point. I also pointed out that Q3 database was the toughest comparison for the year. Nobody asked the question about Covisant which we announced (it's $60 mil).

At this point, all data since the call point to more economic softening so there is risk of slippage in deals. Offsetting this is stronger than normal approval activity in December, the Covisant deal already in, and checks with the 3 U.S. execs saying they aren't as yet hearing of slippage from their managers (although it's still early in the quarter). Also, 11i is much more stable than in Q2 including Oracle going live at the first part of January so better demos and number of references should help our apps business in Q3. Lastly, we said currency would be neg 5 and since Euro came back the current outlook is neg 3. Net, net we still feel good about Q3 but the economy is a wildcard that nobody can fully predict with 2 long months to go.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

NDCA-ORCL 359658

# EXHIBIT 199

[Fwd: [Fwd: critical aol/J bugs]]

Subject: [Fwd: [Fwd: critical aol/J bugs]]
Date: Wed, 31 Jan 2001 09:27:47 -0800
From: Ron Wohl <ron.wohl@oracle.com>
Organization: Oracle Corporation
To: "Ellison,Lawrence" <LELLISON@US.ORACLE.COM>

-------- Original Message --------
Subject: [Fwd: critical aol/J bugs]
Date: Tue, 30 Jan 2001 23:54:46 -0800
From: Mark J Barrenechea <mark.barrenechea@oracle.com>
Reply-To: mark.barrenechea@oracle.com
Organization: Applications
To: "Ellison,Lawrence" <LARRY.ELLISON@oracle.com>, "Catz,Safra"
<SAFRA.CATZ@oracle.com>, "Wohl,Ronald" <RON.WOHL@oracle.com>

Ron, we have blown AppsWorld Paris for CRM html demos.  We have been
blocked for days, and I can say, there is not enough time left to
complete.

Further, the 11.5.4 cut off dates for Monday are not realistic.  They
are more like Feb 15th.  Why ?

1.  Blocking ERP issues for CRM;
2.  Our mutual ADS dates are Feb 15th.  This must match to the hand off
to PRM date;
3.  We need to conclude on the technology stack, still debate, no
closure:
   - 8.1.7 v. 8.1.6
   - JDK 1.1 v. 1.3
   - IAS 1.0.2 or its parts
   - jinit version 1.1.8.3 or 1.1.7.32.  if .8.3, email center and
scripting are DOA;
   - Version of forms 6.0.8.10.3 or what ?
   - AOL, memory leaks, performance with ICX, login bugs, etc

I believe we need another two weeks, atleast, with a synchronized code
and demo freeze (first and applications history).

This needs to be our agenda topic Thursday if you do not agree.

--mark

Subject: RE: critical aol/J bugs
Date: Tue, 30 Jan 2001 23:37:45 -0800
From: "Mrinal Chatterjee" <Mrinal.Chatterjee@oracle.com>
To: "Skees" <Mike.Skees@oracle.com>, "Sukumar Rathnam" <sukumar.rathnam@oracle.com>
CC: "Godwin,Clifford" <CLIFF.GODWIN@oracle.com>,
    "Buzsaki,George" <GEORGE.BUZSAKI@oracle.com>,
    "Stratton,Susan" <SUSAN.STRATTON@oracle.com>,
    "Khoury,George" <GEORGE.KHOURY@oracle.com>,
    "Sultan,Juliette" <JULIETTE.SULTAN@oracle.com>,
    "BARRENECHEA,M." <MARK.BARRENECHEA@oracle.com>,
    "Jainendra,Rohit" <ROHIT.JAINENDRA@oracle.com>,
    "Majzoub,Muhieddine" <MMAJZOUB@US.ORACLE.COM>

CA-ORCL 008552

ORACLE
CONFIDENTIAL

4/25/2002 11:29 AM

NDCA-ORCL 012439

[Fwd [Fwd: critical aol/J bugs]]

Skees - please let us know the moment this patch (#1588167) is released.
- Its still 'Checkin in Progress' as of 11:35pm.

This issue is hurting ADS and two external customers.


> -----Original Message-----
> From: Skees [mailto:Mike.Skees@oracle.com]
> Sent: Tuesday, January 30, 2001 01:08 PM
> To: Sukumar Rathnam
> Cc: Godwin,Clifford; Buzsaki,George; Stratton,Susan; Khoury,George;
> Sultan,Juliette; BARRENECHEA,M.; Jainendra,Rohit; Chatterjee,Mrinal;
> Majzoub,Muhieddine
> Subject: Re: critical aol/J bugs
>
>
> The ARU listed in the bug was 1575765, which has additional fixes
> beyond 1481176 and was used by GSI for performance and memory
> related problems.  Further the ARU for 1588167 should be released
> to today, that patch has a fix for 1612911 and the most current
> fixes for ALL AOL/J - please note it will also be necessary for
> any meaningful debug and repair on any system that has an AOL/J problem.
>
> skees
>
> Sukumar Rathnam wrote:
> >
> > 1612911 -- OSO on ADS is DOA we cannot login. test case is on the bug
> >
> > 1616521 - AOL/J- big leak - FUNCTIONMANAGER.GETENTRYIDFROMNAME LEAKING
> > ORACLECALLABLESTATEMENT. this was marked as fixed in bug
> > 1377615. fix for
> > bug 1377615 is in ARU #333428 (Solaris). ARU # 333428 is
> obsoleted and it
> > points to 1409352 - 1481176. 1409352 is obsoleted and points to 1481176.
> > 1481176 HAS BEEN APPLIED TO ALL OUR ENVIRONMENTS. WE need AOL
> to trace code
> > through jprobe and identify an ARU if one is released that
> fixes the problem
> >

Mrinal Chatterjee <Mrinal.Chatterjee@oracle.com>
Director of Development - Sales Online
Oracle Corporation
CRM Products

CA-ORCL 008553

ORACLE
CONFIDENTIAL

4/25/2002 11:29 AM

NDCA-ORCL 012440

[Fwd: [Fwd: cancel out?] bugs]]

CA-ORCL 008554

ORACLE
CONFIDENTIAL

4/25/2002 11:29 AM

NDCA-ORCL 012441

# EXHIBIT 200



1

2

3

4

5

6

7

8

9

10             IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13   In re JDS UNIPHASE CORPORATION          No. C 02-1486 CW
     SECURITIES LITIGATION
14                                           ORDER GRANTING IN
                                             PART DEFENDANTS
15                                           JDS, STRAUS,
                                             MULLER AND ABBE'S
16                                           MOTION FOR
                                             SUMMARY JUDGMENT,
17                                           GRANTING IN PART
                                             DEFENDANT
18                                           KALKHOVEN'S
                                             MOTION FOR
19                                           SUMMARY JUDGMENT
                                             AND DEFERRING
20                                           RULING ON
                                             PLAINTIFFS'
21                                           CROSS-MOTION FOR
                                             PARTIAL SUMMARY
22   _____/       JUDGMENT

23

24        Defendants JDS Uniphase Corporation (JDS), Josef Straus,

25   Anthony R. Muller and Charles Abbe jointly move for summary

26   judgment.  Defendant Kevin Kalkhoven moves separately for summary

27   judgment.  Lead Plaintiff Connecticut Retirement Plans and Trust

28

United States District Court
For the Northern District of California



United States District Court
For the Northern District of California

1  Funds opposes the motions and cross-moves for partial summary
2  judgment that Defendants have not met their burden of showing that
3  the decline in JDS's stock value was based on some event
4  independent of the alleged misrepresentations for purposes of their
5  section 11 claims.  The matter was heard on July 26, 2007 and the
6  parties filed supplemental letter briefs following the hearing.
7  Having considered the parties' papers, the evidence cited therein
8  and oral argument on the motions, the Court GRANTS in part ·
9  Defendants JDS, Straus, Muller and Abbe's motion for summary
10 judgment and DENIES it in part.  The Court GRANTS in part Defendant
11 Kalkhoven's motion for summary judgment and DENIES it in part.  The
12 Court DEFERS RULING on Plaintiffs' cross-motion for partial summary
13 judgment.

14                            BACKGROUND

15      Defendant JDS manufactures and supplies components of fiber-
16 optic networks to telecommunications and cable television system
17 providers.  Defendants Straus, Muller, Abbe and Kalkhoven are
18 current and former executive officers and directors of JDS.
19 Kalkhoven retired from his position as director and officer of JDS
20 in late September, 1999, although he continued to be employed full-
21 time by JDS until July 31, 2000, and part-time until July 31, 2001.
22 He received a $400,000 salary for the year ending July 31, 2000,
23 and $200,000 for the subsequent year of part-time work; Lead
24 Plaintiff alleges that he continued to be employed at the San Jose
25 headquarters of JDS and consulted with upper management on
26 strategic and operational issues throughout the class period.
27      Lead Plaintiff represents a class of persons and entities that
28                                2


purchased or otherwise acquired securities of JDS between October
28, 1999 and July 26, 2001, including sub-classes of plaintiffs who
acquired securities of JDS through its mergers with Optical Coating
Laboratory, Inc., E-TEK Dynamics, Inc. and SDL, Inc.(the OCLI, E-
TEK and SDL subclasses).  Plaintiffs allege that, during the class
period, Defendants engaged in a scheme to inflate artificially the
price of JDS stock by falsely representing that demand for JDS
products was strong and by overstating the value of its inventory
by failing to write off excess inventory.[1]  Plaintiffs allege that
Defendants benefitted from this scheme by selling stock at inflated
prices and by using the value of JDS stock to purchase other
companies for less than their worth.

In the SACC, Plaintiffs allege that, beginning in March, 2000,
demand for JDS products began to decrease substantially across the
country, as reported by confidential witnesses employed at a
majority of JDS manufacturing plants in North America.[2]  Plaintiffs
further allege that as demand decreased, increased numbers of order
cancellations occurred at JDS facilities, resulting in large
stockpiles of excess inventory.  In response, JDS plants did not
stop manufacturing goods, but rather continued to ship products on
canceled orders and to ship goods prematurely in anticipation of

---

[1]The second amended consolidated complaint (SACC) includes
revenue recognition claims, which Plaintiffs are no longer
pursuing.

[2]Plaintiffs do not produce any evidence based on the testimony
of the confidential witnesses.  Defendants provide declarations and
deposition testimony from some of the confidential witnesses
denying the statements Plaintiffs allege in the SACC that they
made.

United States District Court
For the Northern District of California


United States District Court
For the Northern District of California

1  future orders.

2      Plaintiffs allege that the decrease in demand for JDS products
3  continued to worsen throughout the summer of 2000.  Excess
4  inventory also continued to accumulate.  Plaintiffs allege that, as
5  a result, JDS began discussions about a wide-scale company
6  downsizing as early as June, 2000; cost-cutting measures were
7  already being implemented on a smaller scale at individual plants,
8  most notably in Ottawa, one of JDS's headquarters.  On August 18,
9  2000, manager of demand management Thomas Pitre sent an internal
10  email to twenty upper-level management employees that stated, in
11  pertinent part, "Considering all the recent demand changes over the
12  past few weeks . . . a major disconnect exists between future
13  forecasted demand and our growth curve.  It seems that we have a
14  divergence between our overarching growth of 25% QTR/QTR and the
15  forecast demand out in Q3 and Q4."

16      Meanwhile, in a conference call with securities analysts on
17  April 25, 2000, Defendants Kalkhoven and Muller reported strong
18  demand for JDS products and strong visibility regarding future
19  demand.[3]  In conference calls with securities analysts on July 26,
20  2000, October 26, 2000 and January 25, 2001, Defendants Straus,
21  Muller and Abbe similarly reported strong demand for JDS products.

22      On November 4, 1999, JDS had acquired OCLI.[4]  JDS acquired E-

23

24  [3]Plaintiffs originally challenged statements made as early as
   July, 1999.  The April, 2000 conference call included the earliest
25  statements they now challenge.

26  [4]In their motion for summary judgment Defendants argue that
   they are entitled to summary judgment on all claims made by the
27  OCLI subclass because Plaintiffs no longer challenge any statements
   made before JDS acquired OCLI.  Plaintiffs do not contest this

28                                4


1  TEK on June 30, 2000, and recorded approximately $15.7 billion in
2  good will in connection with the acquisition.  Plaintiffs allege
3  that Defendants knew or were reckless in not knowing that $15.7
4  billion was a vast overstatement of E-TEK's good will; Defendants
5  wrote off $13 billion of it in the third quarter of 2001.
6  Defendants also announced a $41 billion dollar acquisition of SDL
7  on July 10, 2000, although JDS did not obtain shareholder consent
8  for the merger until February, 2001.  Defendants made all three
9  acquisitions by exchanging shares of stock with the acquired
10 companies, and it was thus in Defendants' best interest to keep the
11 JDS stock price artificially high in order to secure a more
12 favorable exchange rate.  JDS's stock price was near an all-time
13 high in June, 2000, and had increased significantly just before the
14 OCLI acquisition, as well.  Additionally, Plaintiffs allege that
15 proxy-prospectuses that JDS filed with the Securities and Exchange
16 Commission (SEC) in connection with the acquisition of E-TEK were
17 fraudulent in that they identified strong demand based in part on
18 JDS's faulty accounting practices.  The original E-TEK statement
19 was signed by Defendants Kalkhoven, Straus and Muller, although an
20 amended version was signed only by Straus and Muller.

21      According to Plaintiffs, it was in the interests of Defendants
22 Kalkhoven, Abbe, Muller and Straus to inflate artificially JDS
23 share prices for another reason.  Plaintiffs allege that during a
24 time when JDS stock prices were near all-time highs, and with
25 knowledge of wide-spread declining demand for JDS products, these
26

27 argument.  The Court grants summary judgment on all claims made by
   the OCLI subclass.

28                              5

United States District Court
For the Northern District of California


1   Defendants sold millions of shares of JDS stock for profits in the
2   hundreds of millions of dollars in the month of August, 2000 alone.
3        On January 25, 2001, JDS publicly announced that its quarterly
4   sales would not meet projections, marking the first time that JDS
5   or its agents acknowledged publicly that business was turning sour.
6   Plaintiffs allege that, at the same time, JDS stated falsely that
7   sales in the March quarter were projected to exceed sales for the
8   quarter ending December 30, 2000 by as much as ten percent.
9   Plaintiffs allege that Defendants continued to mislead investors
10  and analysts in January, 2001 because it had yet to obtain
11  shareholder approval of its SDL acquisition.  Indeed, immediately
12  after it obtained shareholder approval on February 12, 2001, JDS
13  significantly adjusted downward its projections for the then-
14  current quarter.  JDS thereafter revealed additional bad financial
15  forecasts, including on July 26, 2001, when it announced a $44.8
16  billion write-down of good will and, for the first time, claimed
17  excess inventory ($270 million worth).
18       On the basis of these allegations, Plaintiffs claim that
19  Defendants JDS, Straus, Muller and Kalkhoven violated section 11 of
20  the Securities Act of 1933 (Securities Act); Defendants Straus,
21  Kalkhoven and Muller violated section 15 of the Securities Act;
22  Defendants JDS, Kalkhoven, Muller, Abbe and Straus violated section
23  10(b) of the Securities Exchange Act of 1934 (Exchange Act) and
24  Rule 10b-5 promulgated thereunder; Defendants Kalkhoven, Muller and
25  Straus violated section 14 of the Exchange Act and Rule 14a-9
26  promulgated thereunder; Defendants Kalkhoven, Muller, Straus and
27  Abbe violated section 20(a) of the Exchange Act; and Defendants
28

6

United States District Court
For the Northern District of California


1    Kalkhoven, Muller, Straus and Abbe violated section 20A of the
2    Exchange Act.

3        On October 11, 2002, Lead Plaintiff filed a first amended
4    consolidated complaint (FACC).  Defendants filed motions to
5    dismiss, which the Court granted in part and with leave to amend on
6    November 3, 2003.  On January 9, 2004, Lead Plaintiff filed the
7    SACC.  Defendants filed motions to dismiss, which the Court denied.
8    The class and subclasses were certified by stipulation.

9                            LEGAL STANDARD

10       Summary judgment is properly granted when no genuine and
11   disputed issues of material fact remain, and when, viewing the
12   evidence most favorably to the non-moving party, the movant is
13   clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.
14   56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);
15   Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.
16   1987).

17       The moving party bears the burden of showing that there is no
18   material factual dispute.  Therefore, the court must regard as true
19   the opposing party's evidence, if supported by affidavits or other
20   evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815
21   F.2d at 1289.  The court must draw all reasonable inferences in
22   favor of the party against whom summary judgment is sought.
23   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
24   587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d
25   1551, 1558 (9th Cir. 1991).

26       Material facts which would preclude entry of summary judgment
27   are those which, under applicable substantive law, may affect the

28                                   7


1  outcome of the case.  The substantive law will identify which facts

2  are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

3  (1986).

4     Where the moving party does not bear the burden of proof on an

5  issue at trial, the moving party may discharge its burden of

6  production by either of two methods.  <u>Nissan Fire & Marine Ins.</u>

7  <u>Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir.

8  2000).

9      The moving party may produce evidence negating an
       essential element of the nonmoving party's case, or,
10     after suitable discovery, the moving party may show that
       the nonmoving party does not have enough evidence of an
11     essential element of its claim or defense to carry its
       ultimate burden of persuasion at trial.
12
   <u>Id.</u>
13
       If the moving party discharges its burden by showing an
14
   absence of evidence to support an essential element of a claim or
15
   defense, it is not required to produce evidence showing the absence
16
   of a material fact on such issues, or to support its motion with
17
   evidence negating the non-moving party's claim.  <u>Id.</u>; <u>see also</u>
18
   <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v.</u>
19
   <u>NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the
20
   moving party shows an absence of evidence to support the non-moving
21
   party's case, the burden then shifts to the non-moving party to
22
   produce "specific evidence, through affidavits or admissible
23
   discovery material, to show that the dispute exists."  <u>Bhan</u>, 929
24
   F.2d at 1409.
25
       If the moving party discharges its burden by negating an
26
   essential element of the non-moving party's claim or defense, it
27

28                                8

United States District Court
For the Northern District of California



United States District Court
For the Northern District of California

1   must produce affirmative evidence of such negation.  <u>Nissan</u>, 210

2   F.3d at 1105.  If the moving party produces such evidence, the

3   burden then shifts to the non-moving party to produce specific

4   evidence to show that a dispute of material fact exists.  <u>Id.</u>

5       If the moving party does not meet its initial burden of

6   production by either method, the non-moving party is under no

7   obligation to offer any evidence in support of its opposition.  <u>Id.</u>

8   This is true even though the non-moving party bears the ultimate

9   burden of persuasion at trial.  <u>Id.</u> at 1107.

10      Where the moving party bears the burden of proof on an issue

11  at trial, it must, in order to discharge its burden of showing that

12  no genuine issue of material fact remains, make a <u>prima facie</u>

13  showing in support of its position on that issue.  <u>UA Local 343 v.</u>

14  <u>Nor-Cal Plumbing, Inc.</u>, 48 F.3d 1465, 1471 (9th Cir. 1994).  That

15  is, the moving party must present evidence that, if uncontroverted

16  at trial, would entitle it to prevail on that issue.  <u>Id.</u>; <u>see also</u>

17  <u>Int'l Shortstop, Inc. v. Rally's, Inc.</u>, 939 F.2d 1257, 1264-65 (5th

18  Cir. 1991).  Once it has done so, the non-moving party must set

19  forth specific facts controverting the moving party's <u>prima facie</u>

20  case.  <u>UA Local 343</u>, 48 F.3d at 1471.  The non-moving party's

21  "burden of contradicting [the moving party's] evidence is not

22  negligible."  <u>Id.</u>  This standard does not change merely because

23  resolution of the relevant issue is "highly fact specific."  <u>Id.</u>

24                          DISCUSSION

25  I.   Claims Properly Before the Court

26      Defendants first argue that many of the statements Plaintiffs

27  challenge are not properly at issue in this case either because

28                              9



1   they were not identified in the SACC or because Plaintiffs have

2   abandoned them.   Defendants do not clearly indicate which

3   statements they challenge on each basis.   However, of the fifty-six

4   statements Plaintiffs continue to challenge, Defendants appear to

5   attack twenty-four on these bases.[5]

6       Statements six, twenty-six, twenty-seven, thirty-nine and

7   fifty-one[6] were clearly addressed in the SACC.   Therefore,

8   Defendants apparently believe that these claims were abandoned

9   because Plaintiffs did not include them in their responses to

10  Defendants' interrogatories.   As evidenced by their inclusion in

11  Plaintiffs' complaint, their opposition to Defendants' motion and

12  the chart of challenged statements filed with their opposition,

13  Plaintiffs clearly intend to pursue their claims based on these

14  statements.   The Court finds that they are properly at issue.

15      The remaining nineteen statements do not appear in the SACC.

16  Therefore, Defendants argue that Plaintiffs are barred from raising

17  them under Kaplan v. Rose, 49 F.3d 1363 (9th Cir. 1994).   In

18  Kaplan, the Ninth Circuit held that, in considering the parties'

19  motions for summary judgment, the district court had properly

20  excluded statements which did not appear in the complaint.   Because

21  the statements were missing from any pleading other than the

22  plaintiff's motion, the court held that they were not fairly

23

24      [5]Plaintiffs no longer challenge any statements made before
25  April 25, 2000, including all statements supporting their revenue
    recognition claims.

26      [6]The Court refers to the alleged false or misleading
27  statements according to the statement numbers assigned by
    Plaintiffs in exhibit A to the declaration of Jon Adams.

28                                      10

United States District Court
For the Northern District of California


1   reflected in the complaint pursuant to Federal Rule of Civil

2   Procedure 9(b). Id. at 1370. The court noted that the "addition

3   of new issues during the pendency of a summary judgment motion can

4   be treated as a motion for leave to amend," but held that the

5   district court did not abuse its discretion in precluding the

6   plaintiff from pursuing claims based on the new statements because

7   it found that the defendants would be prejudiced if the plaintiff

8   was allowed to amend its complaint. Id. (citing Roberts v. Arizona

9   Bd. of Regents, 661 F.2d 796, 798 n.1 (9th Cir. 1981).

10      Plaintiffs counter that Defendants were on notice that they

11  were challenging the disputed statements because they included them

12  in their responses to Defendants' contention interrogatories. The

13  responses at issue were signed by Plaintiffs' counsel in February

14  and March, 2007. Therefore, Defendants were on notice of the

15  additional claims almost three months before their motion for

16  summary judgment was filed and over seven months before trial. In

17  Kaplan, the plaintiff first challenged the statements in his motion

18  for summary judgment, only two months before trial and after the

19  close of discovery. Id. In this case, Defendants did not seek

20  additional discovery; nor did they seek to strike the interrogatory

21  responses as the defendants did in In re Cypress Semiconductor

22  Securities Litigation, 1995 WL 241441 (N.D. Cal. 1995).

23      Federal Rule of Civil Procedure 15(a) provides that leave of

24  the court allowing a party to amend its pleading "shall be freely

25  given when justice so requires." Leave to amend lies within the

26  sound discretion of the trial court, which discretion "must be

27  guided by the underlying purpose of Rule 15 to facilitate decision

28                                  11

United States District Court
For the Northern District of California


1  on the merits, rather than on the pleadings or technicalities."

2  United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981) (citations

3  omitted).  Thus, Rule 15's policy of favoring amendments to

4  pleadings should be applied with "extreme liberality."  Id.; DCD

5  Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987)

6  (citations omitted).

7      The Supreme Court has identified four factors relevant to

8  whether a motion for leave to amend should be denied: undue delay,

9  bad faith or dilatory motive, futility of amendment, and prejudice

10  to the opposing party.  Foman v. Davis, 371 U.S. 178, 182 (1962).

11  Defendants do not argue that allowing amendment would prejudice

12  them or that Plaintiffs have demonstrated undue delay, bad faith or

13  dilatory motive.[7]  Therefore, the Court will consider statements

14  four, ten, eleven, twelve, twenty-eight through thirty, thirty-two,

15  forty, forty-two, forty-eight through fifty, fifty-two, fifty-three

16  and fifty-six in deciding the motion for summary judgment.  These

17  statements are deemed part of the complaint.  Defendants are not

18  required to answer.

19      At the hearing and its supplemental letter brief, Defendants

20  indicated that if the Court allowed Plaintiffs to pursue claims

21  related to ADVA, they likely would file a motion to dismiss those

22  claims.  Defendants may include a motion to dismiss the claims

23  related to ADVA with their motions in limine if they have grounds

24  to do so that were not raised or addressed in their motion for

25

26      [7]Defendants do argue that allowing amendment would be futile
   because the claims based on these statements are without merit.
27  However, the Court will determine the merit of the claims when it
   considers them in deciding the motion for summary judgment.

28                                  12

United States District Court
For the Northern District of California

1   summary judgment.

2        The Court finds that statements forty-one, forty-six and

3   fifty-five are not properly at issue in this case because the

4   documents in which they were made were not cited in the relevant

5   sections of the SACC or interrogatory responses.  For that reason,

6   leave to amend to add them is denied.

7   II.   Statements About Demand

8        Defendants argue that all of Plaintiffs' claims fail because

9   they cannot establish that any of the challenged statements were

10  materially false or misleading when made in that each statement was

11  either true, too vague to be misleading, or reasonably supported by

12  internal forecasts, which took into account the negative

13  information Plaintiffs cite.

14       A.   Historical Statements about Demand

15       Defendants first argue that the statements they characterize

16  as historical statements regarding demand in 2000 were true, noting

17  that JDS met or exceeded each of its revenue projections for the

18  calendar year 2000.  Therefore, Defendants contend that statements

19  in which they asserted that revenue and earnings during the 2000

20  calendar year were attributable to strong or increasing demand were

21  true and not materially misleading.  Plaintiffs counter that on May

22  15, 2000, Defendants were already aware of declining demand when

23  they issued their Form 10-Q for the third quarter of fiscal year

24  2000 stating, "Strong demand for virtually all of our optical

25  components and modules products combined with the increased

26  operations resulting from the JDS merger contributed to the

27  increases in gross profit."  Hrvatin Declaration, Exhibit 6 at 14.

28                                    13

United States District Court
For the Northern District of California


1  For example, Plaintiffs point to evidence that demand was declining
2  for various products during the first three quarters of fiscal year
3  2000.  Even so, the fact remains that demand was strong enough for
4  JDS to continue to grow throughout calendar year 2000.  Defendants
5  provide evidence, which Plaintiffs do not rebut, that overall
6  demand for JDS's products was strong during calendar year 2000.

7      Defendants also argue that their statements in the E-TEK and
8  SDL prospectuses--that the mergers with E-TEK in June, 2000 and SDL
9  in July, 2000 were "in response to unprecedented growth in the
10 telecommunications industry and demand for the fiber optic networks
11 that are enabling such growth"--were based on accurate historical
12 assessments of demand in calendar year 2000.  Statements 7, 8, 17,
13 35.  Again, Plaintiffs do not provide evidence to rebut Defendants'
14 demonstration that overall growth in the industry and demand for
15 JDS's product were strong during calendar year 2000.

16     Therefore, the Court grants Defendants' motion for summary
17 judgment to the extent it contests Plaintiffs' claims based on
18 historical statements regarding demand for JDS's products in
19 calendar year 2000.  The Court grants summary judgment on
20 statements five, seven, eight, nine, twelve, thirteen, seventeen,
21 twenty-one, twenty-three and thirty-three.

22     B.    Optimistic Statements

23     Defendants next argue that the optimistic predictions about
24 future demand and revenue projections for 2000 and 2001 are not
25 actionable.  In the Ninth Circuit, expressions of optimism and
26 projections "are only actionable as misrepresentations if (1) the
27 statement is not genuinely believed, (2) there is no reasonable

28                            14

United States District Court
For the Northern District of California


1  basis for such expression, or (3) the speaker is aware of
2  undisclosed facts undermining the statement." <u>Paracor Finance,</u>
3  <u>Inc. v. General Elec. Capital Corp.</u>, 96 F.3d 1151, 1158 (9th Cir.
4  1996) (citing <u>In re Apple Computer Sec. Litig.</u>, 886 F.2d 1109, 1113
5  (9th Cir. 1989), <u>cert. denied</u>, 496 U.S. 943 (1990)).

6      Plaintiffs contend that the statements are misleading because
7  Defendants were aware at the time the statements were made
8  that demand was declining and inventory was increasing, but did not
9  disclose that information.

10      1.   Demand Predictions Made in 2000

11      Plaintiffs challenge statements regarding existing and future
12  demand that Defendants made in conference calls with analysts on
13  April 25, July 26 and October 26, 2000.  Statements 1-4, 11, 19,
14  20, 22, 24, 26-31.  Plaintiffs also challenge a similar statement
15  made in the May 18, 200 press release, announcing Kalkhoven's
16  departure from the company.  Statement 6.  However, Plaintiffs do
17  not challenge Defendants' actual revenue projections for 2000.
18  Defendants argue that their general statements, for example that
19  "the demand for bandwidth technology and components remains
20  incredibly strong," Statement 3, and that JDS's "growth remains
21  determined by the rate at which we can expand capacity," Statement
22  9, are too vague to mislead investors.  <u>See In re Syntex Corp. Sec.</u>
23  <u>Litig.</u>, 855 F. Supp. 1086, 1096 (N.D. Cal. 1994), <u>aff'd</u>, 95 F.3d
24  922 (9th Cir. 1996).

25      Plaintiffs counter that they have produced evidence of
26  specific problems sufficient to undermine the optimistic
27  statements.  <u>See In re Syntex Corp. Sec. Litig.</u>, 95 F.3d 922, 926

28

United States District Court
For the Northern District of California



1 (9th Cir. 1996). Plaintiffs cite declines in demand and increases
2 in inventory starting in early 2000. For example, they note that
3 one of Defendants' biggest customers was interested in changing
4 from a 2.5 gigabit product to a 10 gigabit product. Therefore,
5 demand for the 2.5 gigabit product declined and inventory
6 increased, but JDS was not yet able to produce the 10 gigabit
7 product. Plaintiffs note significant drops in demand for other
8 specific products as well, particularly within the fiberoptic
9 products group (FPG), JDS's largest department.[8] Defendants
10 counter that, while demand declined and inventory increased for
11 some products, growth continued for the company as a whole and cite
12 evidence demonstrating that JDS continued to meet its projections
13 each quarter. Indeed, many of the exhibits Plaintiffs cite as
14 evidence that demand for specific products was declining address
15 those declines and cite gains in other areas that offset them.

16     For example, Plaintiffs argue that Defendants misled the
17 public by stating that declines in inventory turnover were due to
18 increased growth. Statement 14. Plaintiffs note that the declines
19 in inventory turnover in the Transmission Systems Group (TSG) were
20 due to a slow-down in purchasing by one of JDS's customers rather
21 than increased growth. However, other documents indicate that the
22 company was also seeing declines in inventory turnover in other
23 groups, which were attributed to increased growth. See, e.g., Okun
24 Declaration, Exhibit 21 (email from Muller stating, "Our business

25

26     [8]Plaintiffs produce evidence that the FPG made up between 49%
and 73% of the company's total revenue throughout calendar year
27 2000.

28                16

United States District Court
For the Northern District of California


1  is booming, and I know each of you is focused on meeting customer
2  demand.  However, during this time of production increases our
3  inventories have been growing faster than sales.  This is a real
4  problem and we must get our inventory turns back into line at 4.5
5  turns annualized."}.

6      Other specific statements that Plaintiffs challenge also are
7  either supported by the evidence that Plaintiffs cite to establish
8  that they are untrue or are mis-cited.  For example, Plaintiffs
9  point to Abbe's statement, "We do not see double bookings," at the
10  July 26, 2000 conference call with analysts.  Hrvatin Declaration,
11  Exhibit 13 at 5.  Plaintiffs cite testimony by Russell Johnson,
12  JDS's Vice President of Sales and Marketing from May, 1998 through
13  August, 2000 and Vice President of Special Projects from August,
14  2000 through January, 2001, to support their claim that the
15  statement was false.  However, while Johnson stated that there had
16  been double bookings, he recalled that they had been "resolved
17  within the month of July."  Further, an email chain Plaintiffs cite
18  regarding double bookings establishes that JDS began addressing
19  double bookings in July, 2000 and that by August 14, 2000, JDS was
20  "continu[ing] to keep track of any potential product overlap."
21  Okun Declaration, Exhibit 47 {emphasis added}.  Plaintiff has not
22  provided any evidence of double bookings between August and
23  October, 2000 when the allegedly misleading statement was made.

24      Similarly, Plaintiffs challenge Straus's statement regarding
25  inventory, which they cite as stating that JDS did "not see any
26  inventory buildup at customers."  Plaintiffs' Opposition at 19
27  (emphasis added by Plaintiffs).  However, the transcript actually

28

United States District Court
For the Northern District of California


1  states that "we do not see any inventory buildup by our customers
2  for our products <u>beyond the normal ebb and flow of good supply-</u>
3  <u>chain management and new product introductions</u>."  Hrvatin
4  Declaration, Exhibit 13 at 2 (emphasis added).  Although Plaintiffs
5  provide evidence of various cancelled orders and indications that
6  there would be some instances in which JDS could "be stuck with a
7  very large inventory at quarter's end," Okun Declaration, Exhibit
8  77, they do not indicate that this is evidence of anything beyond
9  what Defendants describe as the "normal ebb and flow."

10  Because Plaintiffs have not provided evidence demonstrating
11  that Defendants' company-wide statements regarding demand were
12  false or misleading, Defendants' motion for summary judgment is
13  granted with respect to statements one, four, six, fourteen,
14  eighteen, nineteen, twenty, twenty-two, twenty-four, twenty-seven,
15  twenty-eight and thirty-one.

16  However, Plaintiffs also challenge several of Defendants'
17  statements with respect to demand for specific products or by
18  specific customers and provide evidence that Defendants were aware
19  that demand in those areas was decreasing.  First, Defendants made
20  optimistic statements about demand for long haul and metro products
21  in their April 25, 2000 conference call.  Statement 3.  Plaintiffs
22  provide evidence that at the time Defendants made this statement,
23  they had evidence of upcoming reductions in demand for both types
24  of products.  On March 23, 2000, Defendants reduced their
25  projections for Lucent's metro product by sixty-five percent for
26  the next six months.  Okun Declaration, Exhibit 27.  The president
27  of the FPG described that product as "a huge cost sinkhole."  Okun
28  

United States District Court
For the Northern District of California



1  Declaration, Exhibit 26.  Similarly, Defendants saw significant
2  reductions in forecasts for Nortel's long haul product, with the
3  president of the FPG noting a "dramatic reduction in requirements
4  starting in March 00."  Okun Declaration, Exhibit 12.  Therefore,
5  the Court denies Defendants' motion for summary judgment with
6  respect to statement three.

7      Defendants also stated in their July 26, 2000 conference call
8  that "2.5Gb modulators continue to demonstrate strong growth".
9  Statement 11.  However, Plaintiffs provide evidence that Lucent,
10 JDS's largest customer, had informed it as early as January, 2000
11 that it was no longer interested in the 2.5 gigabit product.  The
12 Court denies Defendants' motion for summary judgment with respect
13 to statement eleven.

14     Similarly, in the same conference call, Straus responded to a
15 question regarding a "loss of momentum" with respect to product
16 transitions from Lucent and Nortel by stating, "No, we are firing
17 on all cylinders."  Statement 29.  Given the changes in forecasts,
18 and JDS's inability to transition quickly from production of the
19 2.5 gigabit to the 10 gigabit product, there is a triable question
20 of fact whether this statement is misleading.  These same factors
21 also call into question Defendants' more general statement
22 regarding JDS's progress "in expanding capacity to enable [it] to
23 meet customer demand and serve the needs of [its] markets."
24 Statement 30.  Similarly, Defendants' statement in April, 2000 that
25 the "market is exceeding [JDS's] ability to ramp up" and their
26 statement in October, 2000 that JDS was "capacity constrained" had
27 the potential to mislead investors inappropriately to believe that
28                                    19

United States District Court
For the Northern District of California


1  the company was not having any problems with transitions in
2  products.  Statements 2 and 26.  The Court denies Defendants'
3  motion for summary judgment with respect to statements two, twenty-
4  six, twenty-nine and thirty.

5      2.  Revenue Predictions Made in 2000

6      Plaintiffs also challenge Defendants' statements about
7  guidance made in the July 26, 2000 conference call.  Statement 10.
8  During that call, Muller stated that JDS was increasing its revenue
9  guidance to the high teens from previous quarters based on the
10 strength of the company's business.  Hrvatin Declaration, Exhibit 9
11 at 8.  Plaintiffs allege that this was a false statement because
12 the guidance in the last quarter had been twenty percent.  However,
13 it is clear that Muller was comparing the high teens to the ususal
14 guidance which was "sequential growth of 15 percent in sales,
15 except where our forecast was affected by acquisition-related
16 purchase accounting, such as last quarter."  Id. (emphasis added).
17 Therefore Plaintiffs' challenge is unavailing.  Muller's "high
18 teens" prediction was higher than the past quarters' guidance of
19 fifteen percent.

20     Similarly Plaintiffs challenge Defendants' earnings
21 projections for the fiscal year ending June 30, 2000, which they
22 announced during the October 26, 2000 conference call with
23 analysts.  Statement 25.  Plaintiffs note that JDS had originally
24 projected earnings of $.70 per share in the annual plan approved by
25 the board on August 2, 2000 but raised its projections to $.80 per
26 share prior to the call.  However, as Defendants point out, the
27 monthly forecast prepared for the October, 2000 Operations

28

United States District Court
For the Northern District of California

1  Committee (OpCom) meeting projected earnings of $.83 per share for
2  fiscal year 2001.  Plaintiffs do not challenge the accuracy of the
3  later monthly forecast.  Defendants' motion for summary judgment is
4  granted with respect to revenue predictions made in 2000 in
5  statements ten and twenty-five.

6         3.   Projections Made in 2001

7         Plaintiffs also challenge Defendants' earnings projections and
8  revenue growth projections made in a conference call with analysts
9  on January 25, 2001 and in a press release issued February 13,
10  2001.  Hrvatin Declaration, Exhibits 16, 17.  Plaintiffs'
11  challenges are based on conflicts between Defendants' statements
12  and projections made in an earlier OpCom report.  As with the
13  revenue prediction statements made in 2000, there were intervening
14  reports that support Defendants' public statements.  However,
15  Plaintiffs have produced evidence that creates a triable question
16  of fact regarding Defendants' motivation in creating the
17  intervening reports.

18         On January 11, 2001, Defendants issued an OpCom report that
19  projected negative 2.4% growth and revenues of $903 million for the
20  third quarter of fiscal year 2001.  Okun Declaration, Exhibit 166.
21  During that meeting Abbe asked the president of each of the
22  company's groups to create a "Q3 challenge plan" for exceeding the
23  $903 million growth by $150 million.  Okun Declaration, Exhibit
24  135.  One week later, on January 18, 2001, the OpCom met again to
25  review the Q3 challenge plan.  Although the fiberoptic products
26  group (FPG), which was responsible for meeting $75 million of the
27  $150 million target, stated that it was still in the process of

28                                    21

United States District Court
For the Northern District of California



1  "identifying opportunities" to "achieve the [$75 million] stretch
2  target," Defendants issued a new OpCom report on January 18
3  projecting 7% growth.  Okun Declaration, Exhibit 8.

4       In the January 25 conference call with analysts, Defendants
5  projected seven to ten percent growth for the third quarter of
6  fiscal year 2001.  Hrvatin Declaration, Exhibit 16.  One week
7  later, E-TEK reported that its $63 million share of the FPG's $75
8  million target was "too high, double counting, and wishful
9  thinking."  Okun Declaration at 140.  E-TEK estimated that its Q3
10 "upsides" were closer to $39 million.  Id.  Nonetheless, Defendants
11 issued a press release on February 13, 2001, projecting revenues
12 "at or above $1 billion."  Hrvatin Declaration, Exhibit 17.

13      Plaintiffs have demonstrated that there is a triable question
14 of fact regarding the misleading nature of Defendants' earnings and
15 growth projections made in January and February, 2001.  Statements
16 36-39, 43.

17 III. Forward-Looking Statements

18      Defendants also argue that all of the challenged forward-
19 looking statements discussed above are protected under the safe
20 harbor in the Private Securities Litigation Reform Act (PSLRA) of
21 1995.  Pursuant to the PSLRA's statutory safe harbor, liability in
22 a private securities action cannot be based on a forward-looking
23 statement if the statement is identified as such and is accompanied
24 by "meaningful cautionary statements identifying important factors
25 that could cause actual results to differ materially from those in
26 the forward-looking statement."  See 15 U.S.C. § 78u-5(c)(A)(I).
27 Moreover, even if the statement is not accompanied by meaningful
28                                    22

United States District Court
For the Northern District of California



1  cautionary statements, a person will be liable for making such a

2  statement only if the plaintiff proves that the statement was made

3  with actual knowledge that the statement was false or misleading.

4  See id. § 78u-5(c)(B).

5      Independent of the statutory safe harbor, the judicially-

6  created "bespeaks caution" doctrine immunizes certain forward-

7  looking statements.  "The bespeaks caution doctrine provides a

8  mechanism by which a court can rule as a matter of law (typically

9  in a motion to dismiss for failure to state a cause of action or a

10  motion for summary judgment) that defendants' forward-looking

11  representations contained enough cautionary language or risk

12  disclosure to protect the defendant against claims of securities

13  fraud."  In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1413

14  (9th Cir. 1994) (citation and quotation marks omitted).  In order

15  to invoke the bespeaks-caution doctrine, it is not enough that the

16  defendants included some cautionary language.  Rather, the

17  defendants must "include enough cautionary language or risk

18  disclosure that reasonable minds could not disagree that the

19  challenged statements were not misleading." Fecht v. Price Co., 70

20  F.3d 1078, 1082 (9th Cir. 1995) (emphasis, citation, and internal

21  quotation marks omitted).

22      The PSLRA defines the phrase "forward-looking statement" to

23  include, among other things, a projection of revenues, income,

24  earnings per share, capital expenditures, dividends, capital

25  structure or other financial items.  See 15 U.S.C. § 78u-

26  5(i)(1)(A).  A statement of the assumptions underlying such

27  projections is also a forward-looking statement.  See id. § 78u-

28                                   23

United States District Court
For the Northern District of California



1 5(i)(1)(D). Case law applying the bespeaks-caution doctrine

2 defines "forward-looking statement" in a similar manner. See,

3 e.g., Worlds of Wonder, 35 F.3d at 1414 (doctrine applies to future

4 projections, estimates and forecasts).

5 Plaintiffs counter that cautionary statements may only

6 immunize Defendants' forward-looking statements if they are

7 "precise and directly address the defendants' future projections."

8 Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir. 1996) (quoting

9 Worlds of Wonder, 35 F.3d at 1414 (internal modifications

10 omitted)). Because the Court grants summary judgment to Defendants

11 on each of the forward-looking statement claims, aside from those

12 made in the April 25, 2000, July 26, 2000, October 26, 2000 and

13 January 25, 2001 conference calls and the February 13, 2001 press

14 release, the applicability of the safe harbor and bespeaks caution

15 doctrine is only considered with respect to these statements.

16    A.    April 25, 2000 Conference Call

17 At the beginning of the April 25, 2000 conference call, Muller

18 stated generally,

19     All forward-looking statements mentioned are subject to
       risks and uncertainties that could cause the actual
20     results to differ, possibly materially, from those
       projected in the forward-looking statements. The risks
21     and uncertainties related to any forward-looking
       statements are described in our required SEC filings
22     including our annual report on Form 10-K, our 10-Q's and
       various registration statements.
23

24 Hrvatin Declaration, Exhibit 5 at 1-2. The documents referenced do

25 mention that demand is a possible source of risk. For example, the

26 form 10-Q for the quarter ending March 30, 2000 acknowledges that

27 "Lucent and Nortel each accounted for over 10% of our net sales"

28                              24



1  and that "sales would suffer if one or more of our key customers

2  substantially reduced orders for our products."  Hrvatin

3  Declaration, Exhibit 6 at 23.  However, nowhere in the conference

4  call is there any suggestion that future demand might be

5  questionable.  The only projection that Defendants exhibit any

6  uncertainty about at all is their ability to expand capacity.

7  Therefore, the general statements regarding the risks of forward-

8  looking statements and the general warning regarding changes in

9  demand in the document cited are insufficient to establish as a

10 matter of law that Defendants' statements made in the April 25,

11 2000 conference call are protected by the bespeaks-caution

12 doctrine.

13      B.   July 26, 2000 Conference Call

14      Muller made a similar general warning about forward-looking

15 statements at the beginning of the July 26, 2000 conference call,

16 but also specifically pointed analysts to "the risk factor section

17 of [JDS's] Form S-3 registration statement that [it] filed with

18 respect to the Canadian securities that [it] issued in the E-TEK

19 acquisition."  Hrvatin Declaration, Exhibit 9 at 1.  The remaining

20 challenged statement from the July 26, 2000 conference call is

21 specifically related to demand for 2.5 gigabit modulators.  The

22 Court finds that the general warning is not sufficient to establish

23 as a matter of law that this statement is protected by the

24 bespeaks-caution doctrine.[9]

25

26      [9]Defendants did not attach the Form S-3 registration statement
   to their declarations in support of their motion for summary
27 judgment and the Court was unable to locate the document.

28                                    25

United States District Court
For the Northern District of California


C.    October 26, 2000 Conference Call

As in the earlier conference calls, Muller made a general warning about forward-looking statements at the beginning of the October 26, 2000 conference call.  He also directed analysts to the "risk factor section of [JDS's] Form 10-K filed on September 28, 2000 and [its] Form S-4 filed in conjunction with the SDL transaction on September 7th."  Hrvatin Declaration, Exhibit 13. Both of the cited documents include more specific warnings, including the acknowledgment that Lucent and Nortel comprised a significant part of JDS's business and that JDS would suffer if either of those customers substantially reduced its orders. Hrvatin Declaration, Exhibit 11 at 32.  These general warnings were overshadowed by JDS's specific statements that there was no loss of momentum with respect to its business with either Lucent or Nortel. Further, any general statements regarding the volatility of the market or the need to meet precise demands by customers were undermined by more specific statements about "a continuing surge of demand in the fiberoptics communications industry" and JDS's "substantial progress in expanding capacity to enable us to meet customer demand and serve the needs of the market."  Hrvatin Declaration, Exhibit 13 at 2.  Defendants have not established as a matter of law that the forward-looking statements they made in the October 26, 2000 conference call are protected by the bespeaks-caution doctrine.

D.    January 25, 2001 Conference Call

Muller again gave a general warning about forward-looking statements at the beginning of the January 25, 2001 conference

26



1 call, but specifically directed analysts to "the risk factors

2 section of our Form 10-Q filed on November 14, 2000, and our Form

3 S4-A filed in conjunction with the SDL transaction on November 17."

4 Hrvatin Declaration, Exhibit 16 at 1.  In turn, each of the two

5 cited documents contains multiple pages of risk factors.  For

6 example, the Form 10-Q warned,

7       Recently, the Nasdaq National Market, in general, and our
        stock and the stock of our customers and competitors, in
8       particular has experienced substantial price and volume
        fluctuations, in many cases without any direct
9       relationship to the affected companies' operating
        performance. . . . Consequently, these multiples and,
10      hence, market prices may not be sustainable.  These broad
        market and industry factors have and may in the future
11      cause the market price of our stock to decline,
        regardless of the actual operating performance or the
12      operating performance of our customers.

13 Hrvatin Declaration, Exhibit 14 at 26.  Further, the statement

14 noted that JDS's "customer base is highly concentrated;" that

15 "[s]ales to any single customer may vary significantly from quarter

16 to quarter;" and that "[i]f current customers do not continue to

17 place orders, we may not be able to replace these orders from new

18 customers."  Id.  The form 10-Q also stated, "We anticipate that

19 average selling prices will decrease in the future."  Id. at 28.

20       On the call, Straus went on to state that JDS's "optimistic

21 outlook for the March quarter" was "prudently tempered only by

22 uncertain carrier spending prospects, customer inventory

23 adjustments and the sometimes lower level of near-term sales

24 visibility."  Id. at 2.  Abbe later stated,

25      Notwithstanding some near-term slowing and order growth
        rates for certain product lines due to [inventory
26      issues] . . ., the underlying growth in
        telecommunications bandwidth [] we believe continues
27      unabated.

28                                   27

United States District Court
For the Northern District of California


1  <u>Id.</u> at 5.   Finally Muller stated that the reduction in guidance to
2  a seven to ten percent increase in sales over the quarter ended
3  December 30, 2000 "reflects uncertain near-term carrier capital
4  spending plans, customer inventory adjustments, and the somewhat
5  lower level of near-term sales visibility than we and our customers
6  have experienced in recent periods."   <u>Id.</u> at 6.

7       Although the cautionary statements in the Form 10-Q and Form
8  s4-A contained general warnings that could ostensibly address the
9  declines that Plaintiffs allege should have been disclosed, they
10  were overshadowed by the more specific and more limited warnings
11  included in the call itself, each of which was accompanied by more
12  optimism.   For example, Straus stated that the company's optimistic
13  outlook was tempered <u>only</u> by certain issues.   Further, Abbe's
14  warning was not really a warning at all.   He stated that,
15  notwithstanding some near-term slowing and inventory issues, the
16  company continued to expect growth.   Finally, any caution attached
17  to Muller's report of the decreased guidance entirely masked the
18  fact that the company was "stretching" to reach even that guidance,
19  as discussed above.

20       Although the cautionary language might have mentioned the
21  "important factors that could cause actual results to differ
22  materially from those in the forward-looking statement" as required
23  by 15 U.S.C. § 77z-2(c)(1)(A)(I), all of those factors were
24  overshadowed by language limiting the emphasis on the cautions.
25  The Court denies Defendants' motion for summary judgment to the
26  extent it is based on cautionary statements made in the January 25,
27  2001 conference call.

28
                            28

United States District Court
For the Northern District of California


1    E.    February 13, 2001 Press Release

2        The February 13, 2001 press release contained only a general

3    warning that the forward-looking statements "involve risks and

4    uncertainties" and informed readers how to request SEC filings from

5    the company.  Hrvatin Declaration, Exhibit 17.  However, this type

6    of blanket reference to previous warnings is not sufficient to

7    invoke the safe harbor or bespeaks-caution doctrine.  "In order for

8    the safe harbor or bespeaks caution doctrine to apply, a cautionary

9    statement must 'accompan[y]' or be 'contained' in the statement

10   that is the basis for a plaintiff's claim."  In re Apple Computer,

11   Inc., Sec. Litig., 243 F. Supp. 2d 1012, 1025 (N.D. Cal. 2002).

12   Defendants' motion for summary judgment is denied to the extent it

13   relies upon cautionary statements made in the February 13, 2001

14   press release.

15   IV.   Accounting Claims

16       A.    Inventory

17       Plaintiffs' sole remaining accounting claim related to

18   inventory is that Defendants should have written down $254 million

19   of inventory during the quarter ending December 30, 2000 instead of

20   waiting until the end of the fiscal year,[10] because Plaintiffs

21   allege that in August, 2000, the FPG, JDS's largest product group,

22   forecasted a $532 million decline in demand over the next twelve

23   months.  Therefore, Plaintiffs challenge statements forty, forty-

24   five, forty-nine, fifty, fifty-two and fifty-four in which, they

25   allege, Defendants misstated JDS's inventory or overstated its

26

27       [10]JDS wrote down $274 million for excess inventory and $236.6
     million for obsolete inventory in its June 30, 2001 Form 10-K.

28                                    29

United States District Court
For the Northern District of California


United States District Court
For the Northern District of California

1  profits because it failed to reserve for its inventory.  Plaintiffs

2  submit the report of their expert Steven Henning in support of

3  their claim.

4      Defendants argue that Plaintiffs' claim fails because it is

5  based only on the FPG, rather than a company-wide forecast, and

6  because Henning's report is unreliable under <u>Daubert v. Merrell Dow</u>

7  <u>Pharmeceuticals, Inc.</u>, 509 U.S. 579 (1993).  Defendants cite

8  various pages from Henning's deposition to support their argument

9  that his report is not based upon sufficient facts or data and is

10  not the product of reliable principles and methods as required by

11  Federal Rule of Evidence 702.  However, the deposition testimony

12  establishes that Henning used a methodology he thought was

13  consistent with JDS's policy for writing down inventory.

14  Defendants also cite testimony that the FPG forecast was unreliable

15  because it was "unconstrained," meaning that it was not limited by

16  variables such as capacity, lead times, or technical issues.

17  However, Defendants do not offer any expert testimony establishing

18  an alternative interpretation of the FPG forecast or which

19  materials Henning should have considered instead of that forecast.

20  Further, Defendants' <u>Daubert</u> challenge was raised only in a

21  footnote in their reply brief.  The Court finds that, for purposes

22  of these motions, Henning's report is sufficiently relevant and

23  reliable to satisfy the <u>Daubert</u> standard.  Defendants may renew

24  their <u>Daubert</u> challenge in their motions in limine prior to trial.

25      There remains a triable question of fact whether JDS should

26  have written down its inventory prior to June, 2001.  The Court

27  denies Defendants' motion for summary judgment with respect to

28



1  statements forty, forty-five, forty-nine, fifty, fifty-two and
2  fifty-four.

3       B.    Good Will

4       Plaintiffs next claim that Defendants overstated the good will
5  arising from the acquisition of E-TEK and SDL beginning in the
6  quarters in which the companies were acquired.

7            1.    Acquisition of E-TEK

8       Plaintiffs acquired E-TEK on January 17, 2000 in an agreement
9  requiring an exchange of 2.2 shares of JDS stock for each common
10 share and outstanding option of E-TEK.  Based on the value of JDS
11 stock at that time, the purchase price was $17.5 billion.  $15.6
12 billion of the purchase price was allocated to good will.
13 According to Henning, even if Defendants' internal forecasts
14 showing increasing revenues for E-TEK were accurate, the allocation
15 of eighty-nine percent of the purchase price to good will was an
16 overstatement.  Further, Henning opines that at the time of the
17 acquisition, there was a decrease in customer spending, which is a
18 significant adverse change in the business climate requiring an
19 assessment of impairment.

20      Defendants counter that JDS's auditors, relying on JDS
21 management's own assessment of whether there were indicators of
22 impairment, did not believe that there was any reason to evaluate
23 whether the good will was impaired prior to the close of the
24 quarter ending March 31, 2001.  Further, Defendants point out that
25 the SEC did not state that JDS should have written down the good
26 will earlier once it declared its intent to do so at the close of
27 the quarter ending March 31, 2001.  However, neither the auditors'

28                                   31

United States District Court
For the Northern District of California


1  reliance on JDS management's own assessment of the situation nor
2  the SEC's failure to question JDS's earlier accounting is
3  sufficient to rebut Plaintiffs' expert's testimony.  There remains
4  a triable question of fact with respect to Defendants' decision not
5  to write down the good will related to the acquisition of E-TEK
6  until the close of the quarter ending March 31, 2001.  Defendants'
7  motion for summary judgment is denied with respect to statements
8  fifteen, sixteen, thirty-two, thirty-four, thirty-five, forty-two,
9  forty-seven, forty-eight and fifty-one.

10         2.  Merger with SDL

11     JDS's merger with SDL closed on February 13, 2001.  However,
12  the merger agreement had been signed in July, 2000, calling for the
13  exchange of 3.8 shares of JDS common stock and options for each
14  common share and outstanding option of SDL.  When the sale closed,
15  JDS recorded the price as $41.2 billion based on an average of the
16  higher July, 2000 stock prices and the lower February, 2001 prices.
17  $39.2 billion was allocated to good will.  According to Plaintiffs'
18  expert, the purchase price would have been only $13 billion if it
19  had been based on the February, 2001 stock price.  As early as May
20  11, 2001, when it filed its Form 10-Q for the quarter ending March
21  31, 2001, JDS acknowledged that its good will, including that
22  associated with the acquisition of SDL, was impaired.  Plaintiffs
23  argue that the good will was overstated and therefore impaired at
24  the time the merger closed.

25     Defendants argue that JDS's acknowledgment in an April 24,
26  2001 press release and conference call that its good will was
27  impaired is sufficient to inform investors of the issue.

28                                32


1   Therefore, Defendants argue that Plaintiffs' claim that JDS's May,
2   2001 Form 10-Q, which acknowledged the need to write down good
3   will, but did not actually record the write-down, is barred by <u>In</u>
4   <u>re Convergent Technologies Security Litigation</u>, 948 F.2d 507 (9th
5   Cir. 1991).   In <u>Convergent</u>, the Ninth Circuit held that "an
6   omission is materially misleading only if the information has not
7   already entered the market."   <u>Id.</u> at 513.

8        Defendants' April 24, 2001 press release states that as of
9   "March 31, 2001, the value of the Company's net assets, including
10  unamortized goodwill exceeded the Company's market capitalization
11  by approximately $40 billion."   Hrvatin Declaration, Exhibit 30 at
12  3.   During the conference call on the same day, Muller predicted
13  that "we will be writing down the value of our goodwill so that our
14  net assets are no higher than our market capitalization at the end
15  of March."   Hrvatin Declaration, Exhibit 33 at 9.   Further, the
16  May, 2001 Form 10-Q states that JDS "is currently evaluating the
17  carrying value of certain long-lived assets and acquired equity
18  method investments, consisting primarily of $56.2 billion of
19  goodwill."   Hrvatin Declaration, Exhibit 20 at 4.   The Form 10-Q
20  also acknowledged, "Goodwill will be reduced to the extent that net
21  assets are greater than market capitalization.   At March 31, 2001,
22  the value of the Company's assets . . . exceeded the Company's
23  market capitalization by approximately $39.5 billion."   <u>Id.</u> at 11.
24  Therefore, the Court grants Defendants' motion for summary judgment
25  with respect to Plaintiffs' claims based on the reporting of good
26  will in the May, 2001 Form 10-Q.   Statement 55.   However,
27  Plaintiffs also challenge the inclusion of the SDL good will on the
28                                    33

United States District Court
For the Northern District of California


1  Form 8-K related to the acquisition of SDL filed on March 23, 2001.
2  Statement 48.   Defendants do not specifically address Plaintiffs'
3  claim based on that document.

4       C.   Carrying Value of ADVA

5       Plaintiffs' final accounting claim is based on Defendants'
6  valuation of ADVA, a company in which JDS acquired a twenty-nine
7  percent interest through its acquisition of E-TEK.   Plaintiffs
8  claim that Defendants should have written down the carrying value
9  of ADVA during the quarter ending December 31, 2000.   In their
10 motion, Defendants argue only that Plaintiffs' claims related to
11 ADVA are barred because they were not included in the complaint.
12 However, as discussed above, Defendants were on notice of the claim
13 because Plaintiffs included it in their interrogatory responses.
14 See Adams Declaration, Exhibit B at 147-148.   Therefore Defendants'
15 April 24, 2001 press release and JDS's Form 10-Q for the quarter
16 ended March 31, 2001, which reported assets of $65,039.5 million,
17 including $714.5 million based on JDS's valuation of its investment
18 in ADVA, are properly before the Court.   Statements 53 and 56.

19      Plaintiffs argue that JDS was required to write down its
20 interest in ADVA beginning in the quarter ended December 30, 2000
21 because of declines in ADVA's stock prices.   Defendants challenge
22 the substance of the claim in their reply brief, arguing that JDS
23 was not required to write down its interest in ADVA under Generally
24 Accepted Accounting Principles (GAAP) because ADVA performed
25 strongly in the December, 2000 quarter.   Under GAAP, a write-down
26 is necessary only when the decline in the stock price of the equity
27 investment is not temporary.   Defendants argue that the later

28                                34

United States District Court
For the Northern District of California


1  strong performance precludes a finding that the decline was

2  anything other than temporary and fault Henning for failing to

3  consider that strong performance.  However, Defendants provide no

4  evidence of the strong performance or of any increase in ADVA's

5  stock prices.  Therefore, the Court finds that there remains a

6  disputed issue of fact and denies Defendants' motion for summary

7  judgment with respect to statements fifty-three and fifty-six.

8  V.    Scienter

9       Section 10(b) of the Exchange Act makes it unlawful for any

10 person to "use or employ, in connection with the purchase or sale

11 of any security . . . any manipulative or deceptive device or

12 contrivance in contravention of such rules and regulations as the

13 [SEC] may prescribe."  15 U.S.C. § 78j(b); see also 17 C.F.R.

14 § 240.10b-5 (Rule 10b-5).  To state a claim under section 10(b), a

15 plaintiff must allege: "(1) a misrepresentation or omission of

16 material fact, (2) reliance, (3) scienter, and (4) resulting

17 damages."  Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d

18 1151, 1157 (9th Cir. 1996); see also McCormick v. Fund Am. Cos., 26

19 F.3d 869, 875 (9th Cir. 1994).  The question of a defendant's

20 mental state is so subjective that summary judgment is rarely

21 appropriate.  See, e.g., White v. Roper, 901 F.2d 1501, 1505 (9th

22 Cir. 1990) ("Where the defendant's intent is at issue, summary

23 judgment is appropriate 'only if all reasonable inferences defeat

24 the plaintiff's claims.'" (quoting SEC v. Seaboard Corp., 677 F.2d

25 1297, 1299 (9th Cir. 1982)).

26      Defendants argue that Plaintiffs have failed to set forth

27 significant evidence that Defendants acted with the requisite

28                                    35

United States District Court
For the Northern District of California


1  scienter to support any of Plaintiffs' section 10(b) claims.
2  Further, Defendants argue that their approval of capital
3  investments during the class period undermines any claim of
4  scienter.  Plaintiffs counter that Defendants' stock sales and
5  evidence of their knowledge of declining demand are sufficient to
6  establish a triable question of fact regarding Defendants' state of
7  mind.

8      In evaluating stock sales as evidence of scienter, the Ninth
9  Circuit considers "three factors: (1) the amount and percentage of
10  shares sold; (2) timing of the sales; and (3) consistency with
11  prior trading history."  Nursing Home Pension Fund, Local 144 v.
12  Oracle Corp., 380 F.3d 1226, 1232 (9th Cir. 2004) (citing In re
13  Silicon Graphics Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999)).
14  Plaintiffs note that during the trading window that opened on July
15  31, 2000 and closed on August 31, 2000, the individual Defendants
16  sold a total of $391 million of JDS stock.  Plaintiffs also provide
17  evidence that fourteen non-defendant insiders sold $503 million of
18  JDS stock during the same period.  Further, Plaintiffs argue that
19  the stock sales were made at a time when insiders had material
20  information regarding declines in demand for specific products,
21  which they withheld from investors.

22      Defendants argue that each of the individual Defendants'
23  August, 2000 sales are consistent with his earlier sales and that
24  the timing of the sales is explained by the trading window.
25  Further, Defendants argue that the fact that JDS continued to meet
26  expectations for several months following the stock sales
27  undermines any finding of scienter.  However, this is consistent
28

United States District Court
For the Northern District of California


1  with Plaintiffs' overall theory that Defendants were aware of
2  declines in demand for specific products and withheld that
3  information from investors.  That it took several more months for
4  the declines that began in early 2000 to impact the company as a
5  whole does not undermine the scienter that can be inferred from the
6  failure to disclose those declines when they began.

7      The Court finds that Defendants' stock sales, standing alone,
8  are not sufficient to create a triable question of fact with
9  respect to Defendants' scienter.  However, the stock sales
10 contribute to the quantum of evidence needed.  Given the triable
11 questions of fact with respect to false or misleading statements
12 made prior to the sales, the size and timing of the sales are
13 sufficient to establish a triable question of fact related to
14 Defendants' scienter throughout the class period.[11]

15     In addition to the stock sales, Plaintiffs have presented
16 further evidence to support a finding of scienter with respect to
17 the statements made in 2001.  As discussed above, there is a
18 triable question of fact whether on January 18, 2001 Defendants
19 purposely created a "challenge" to increase projections in spite of
20 projections established just days earlier.

21

22     [11]Defendants state that they also seek summary judgment in
23 their favor on Plaintiffs' insider trading claims but do not
   provide written argument in support of that motion.  As stated
24 above, the Court finds that there are triable questions of fact
   with respect to whether three statements made prior to the
25 allegedly improper sales were false or misleading.  Therefore,
   there remains a triable question of fact whether Defendants had
26 material non-public information, which they had wrongfully failed
   to disclose, when they sold stocks in August, 2000.  The Court
27 denies Defendants' motion for summary judgment with respect to
   Plaintiffs' insider trading claims.

28                                37

United States District Court
For the Northern District of California


United States District Court
For the Northern District of California

1    Some forms of recklessness are sufficient to satisfy the

2  element of scienter in a section 10(b) action.  See Nelson v.

3  Serwold, 576 F.2d 1332, 1337 (9th Cir. 1978).  Within the context

4  of section 10(b) claims, the Ninth Circuit defines "recklessness"

5  as

6       a highly unreasonable omission [or misrepresentation],
        involving not merely simple, or even inexcusable
7       negligence, but an extreme departure from the standards
        of ordinary care, and which presents a danger of
8       misleading buyers or sellers that is either known to the
        defendant or is so obvious that the actor must have been
9       aware of it.

10  Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir.

11  1990) (en banc) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553

12  F.2d 1033, 1045 (7th Cir. 1977)).  As explained by the Ninth

13  Circuit in In re Silicon Graphics, 183 F.3d at 976-77,

14  recklessness, as defined by Hollinger, is a form of intentional

15  conduct, not merely an extreme form of negligence.  Thus, although

16  section 10(b) claims can be based on reckless conduct, the

17  recklessness must "reflect[] some degree of intentional or

18  conscious misconduct."  Id. at 977.  The Silicon Graphics court

19  refers to this subspecies of recklessness as "deliberate

20  recklessness."  Id.

21    The evidence of the January, 2001 efforts to increase

22  projections despite Defendants' knowledge of declining demand,

23  growing inventory, overstated good will and understated inventory

24  reserves is sufficient to support an inference that Defendants were

25  reckless in later publicizing the more optimistic statements.  This

26  is sufficient to create a triable question of fact with respect to

27  Defendants' scienter for statements made in 2001.

28                              38



1  Defendants also argue that their continued investment in JDS's
2  growth undermines any evidence of scienter.  However, there is a
3  triable question of fact whether what Defendants cite as investment
4  was actually a result of the acquisition of other companies.
5  VI.  Loss Causation

6  Finally, Defendants argue that they are entitled to summary
7  judgment on all claims because Plaintiffs cannot demonstrate loss
8  causation.  However, the Court has already rejected Defendants'
9  interpretation of <u>Dura Pharmeceuticals, Inc. v. Broudo</u>, 544 U.S.
10  336 (2005).  <u>See</u> July 21, 2005 Order denying Defendants' Motion for
11  Judgment on the Pleadings.  Defendants do not cite any intervening
12  Ninth Circuit or Supreme Court precedent undermining the Court's
13  earlier decision.

14  Plaintiffs cross-move for partial summary judgment, arguing
15  that Defendants failed to meet their burden to rebut the
16  presumption of loss causation for Plaintiffs' Section 11 claims and
17  therefore should not be permitted to raise loss causation as an
18  affirmative defense to those claims.  Defendants counter that they
19  are not required to show that JDS's stock declines were caused by
20  something other than the alleged misrepresentation because
21  Plaintiffs failed to identify the "alleged truth" that Defendants
22  should have disclosed instead of the alleged misstatements.

23  Although Plaintiffs do not identify any specific announcements
24  that were made prior to the later declines in stock prices, it is
25  implicit in their argument that various "truths" were disclosed in
26  2001 that preceded the drop in the value of JDS stock.  For
27  example, JDS wrote down $44.8 billion of good will and claimed $270
28

39

United States District Court
For the Northern District of California



1  million of excess inventory.  Counsel for Defendants represented at

2  the hearing on these motions that Defendants' expert could provide

3  analysis to support their defense that some or all of the loss was

4  caused by factors other than the alleged misleading statements.  In

5  the interest of justice the Court will allow Defendants to continue

6  to pursue the affirmative defense of loss causation if they are

7  able to produce expert opinion to meet their burden.

8       The Court defers ruling on Plaintiffs' cross-motion for

9  summary judgment.  Defendants may file an expert declaration by

10  September 5, 2007.  Defendants may also file a supplemental brief

11  of five pages or less.  Plaintiffs may file a supplemental

12  opposition of five pages or less by September 19, 2007.

13  VII. Claims Against Kalkhoven

14       A.   False or Misleading Statements

15       As discussed above, the Court has found that there are triable

16  questions of fact related to statements made in the April 25, 2000

17  conference call prior to Kalkhoven's retirement from JDS on May 18,

18  2000.  Therefore, the Court denies Kalkhoven's motion for summary

19  judgment with respect to statements two and three.

20       Plaintiffs acknowledge that Kalkhoven was not involved in the

21  company's management after May 18, 2000.  Further, Plaintiffs do

22  not argue that Kalkhoven made any statements after May 18, 2000

23  giving rise to liability.  Therefore, the Court grants Kalkhoven's

24  motion for summary judgment with respect to all other statements.

25       B.   Insider Trading Claims

26       Plaintiffs base their insider trading claim only on

27  Defendants' trading during August, 2000.  Kalkhoven argues that

28                                  40

United States District Court
For the Northern District of California



1 Plaintiffs have not established that he actually received any
2 inside information after May 18, 2000.  He submits the affidavit of
3 Sandra Thompson, the individual identified as confidential witness
4 8, who Plaintiffs alleged would testify that Kalkhoven continued to
5 work in San Jose following his retirement.  Thompson now declares
6 that she "does not recall ever seeing [Kalkhoven] there after his
7 retirement."  Caro Declaration, Exhibit 6 at ¶ 6.  Further,
8 Thompson states that she does not know whether Kalkhoven ever
9 received reports following his retirement as asserted in the SACC.
10 Id. at ¶ 7.

11     However, Plaintiffs provide evidence that Kalkhoven received
12 at least some reports regarding JDS's performance following his
13 retirement.  See Supplemental Briefing, Exhibit K (June 30, 2000
14 email including June FLASH Reports sent to Kalkhoven).  Further,
15 that there are triable questions of fact related to whether
16 statements made prior to Kalkhoven's departure from the company
17 were misleading.  Thus there are triable questions of fact related
18 to whether Kalkhoven had material non-public information that he
19 had wrongfully failed to disclose when he sold JDS stock in August,
20 2000.  Therefore, the Court denies Kalkhoven's motion for summary
21 judgment with respect to Plaintiffs' insider trading claims.

22                           CONCLUSION

23     For the foregoing reasons, the Court GRANTS in part and DENIES
24 in part Defendants JDS, Muller, Straus and Abbe's motion for
25 summary judgment (Docket No. 1090) and GRANTS in part and DENIES in
26 part Defendant Kalkhoven's motion for summary judgment (Docket No.

27

28                              41

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   1103).[12]   The Court DEFERS RULING on Plaintiffs' cross-motion for

2   partial summary judgment (Docket No. 1194).

3       IT IS SO ORDERED.

4

5   Dated:   8/24/07

    _____
    CLAUDIA WILKEN
6                                   United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20       [12]Defendants request that the Court take judicial notice of a
21   table setting forth the price of JDS stock as recorded by the Dow
     News Service.   This information is "capable of accurate and ready
22   determination by resort to sources whose accuracy cannot reasonably
     be requested."   Fed. R. Evid. 201(b)(2).   The Court GRANTS
23   Defendants' request for judicial notice (Docket No. 1100).
     Defendants' objections to evidence submitted by Plaintiffs are
24   DENIED as moot.   The Court did not consider any improper or
     inadmissible evidence in deciding these motions.   The Court DENIES
25   Plaintiffs' motion challenging the designation of documents and
     deposition testimony as confidential and highly confidential
26   without prejudice to renewing it after they have met and conferred
     with Defendants (Docket No. 1300).   The Court GRANTS Plaintiffs'
27   motion for leave to supplement its summary judgment submissions
     (Docket No. 1303).

28                                   42