# EXHIBIT 217

GEORGE ROBERTS PRESENTATION

1

2

3        INTRODUCTION:  Good morning.  Our next presenting

4   company is Oracle, and as we all know Oracle is the

5   worldwide dominant player in the database and database

6   tool space.  One of the best franchise names, one of the

7   best brand names, and one of the strongest market shares

8   in the software world.  One of the best organized and

9   managed sales force and marketing teams.

10       Oracle clearly is front and center, as it

11  deserves to be, in the software space.  And as we look at

12  Oracle moving forward, we see a database market that is

13  maturing in the range of 15 to 20 percent growth.

14  Oracle's guidance has been 15 to 25 percent growth with

15  the more exciting area that we believe will drive the

16  second leg a major second stage of growth is in the

17  application space where Oracle has made tremendous

18  investments and dedication to really building out a very

19  strong story there.

20       We see the application space over the next five

21  years growing a hundred to 150 billion in total

22  application revenue potential.  The addressable market we

23  believe is the biggest in the application space to date,

24  as you start to include the implications of CRM, B to B

25  and all the supply chain planning, collaboration and

REASON REPORTING                                    1

ORCL 0123051
NDCA-ORCL 03260
CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

EXHIBIT

Roberts 17

6/22/06        CLS

1   execution applications that are yet to be written and

2   defined.

3           So certainly Oracle is very powerful from this

4   standpoint with their version of 11i which was released

5   last May with most of the products now commercially

6   available. With a few remaining coming out this spring.

7           The real story in our opinion with Oracle is how

8   do they roll out and execute one of the most compelling

9   visions in applications, which is a fully integrated

10  suite of business applications working off one unified

11  data model where integration and multiple database server

12  applications no longer are a burden for customers.

13          And certainly that, we believe, is going to be

14  one of the more interesting stories moving forward for

15  the stock and being a key leg of growth for the stock.

16          And from the company presenting is

17  George Roberts, executive vice president North American

18  Sales.

19      MR. ROBERTS:  Good morning, everybody.

20          Thank you all for the opportunity to present to

21  you this morning. We look forward to giving you a little

22  background on where we're at and how we're doing in our

23  key objectives as far as Oracle Corporation goes.

24          So first of all obviously we have to go through

25  the Safe Harbor statement. You're all aware of this, so

REASON REPORTING        ORCL 0123052        2
                        NDCA-ORCL 03261
                        CONFIDENTIAL-SUBJECT TO
                        PROTECTIVE ORDER

1    I'll give you a couple of seconds just to peruse it one

2    more time, which you've probably done several times

3    already during the conference.

4        Just to give you a perspective on where I fit

5    within the Oracle organization or the distribution

6    organization as far as sales operations go, is we

7    actually have six key managers in the distribution

8    organization.  So we have myself, I run North American

9    Sales, that is the largest distribution organization

10   within the Americas within Oracle Corporation.  We have

11   Andy Sanderson, who runs the product industries group.

12   Oracle Consulting in Latin America.  We have

13   Jay Nussbaum.  Jay runs the Oracle Service Industries

14   Group.  And then for AMEA we have my peer, or our peer,

15   Sergio Jacoletto.  For Asia-Pacific we have

16   Derek Williams.  And for Japan we have Jakara Sano.

17       One thing I thought I'd kind of give you a

18   little piece of trivia here for all you analysts out

19   there.

20       Over the last six months there's been a lot of

21   concern about Oracle management depth, and does anybody

22   know what the average tenure is of an Oracle executive

23   vice president in the corporation today?

24       Anybody care to guess?

25       Yes, the average tenure for the executive vice

REASON REPORTING

ORCL 0123053
NDCA-ORCL 03262
CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

3

1  presidents that report to Larry Ellison is ten years.

2  Okay? Because there's been a question about that.

3  Does anybody know what the average tenure is for

4  the senior vice presidents who report to the executive

5  vice presidents in the organization?

6  It's nine years. So we have tremendous depth in

7  the management team, and I think that's important for you

8  as analysts to understand. Because it's the depth that's

9  very key to what we're trying to do as far as a

10  corporation and execute against our objectives.

11  Probably it's fair to say that about 24 months

12  ago we set some very simple goals within the

13  organization. We set the goal that we wanted to achieve

14  70 percent platform market share in our traditional

15  business, our technology business. And then we wanted to

16  move from the No. 2 applications player to the No. 1

17  applications player on a globalwide basis.

18  So everything we've done as a corporation over

19  the last 24 months is very focused on achieving those

20  objectives.

21  They're very simple, they're very easy for the

22  organization to get behind, and they're very easy to

23  structure what we're trying to do in the business.

24  So far as a recap goes for our performance at

25  the end of Q2, our revenue was up 15 percent. I think

ORCL 0123054
NDCA-ORCL 03263
CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

4

1    tremendous performance in the net income area.  Again we

2    made another down payment on the billion dollar savings

3    story, which actually has now gone from $1 billion to

4    2 billion.  As we all know, Larry never lowers the bar.

5    He always raises the bar.  So when you achieve the

6    objective of a billion dollar savings in nine months, we

7    then said we thought we could do another billion, so

8    that's our target now.

9            Operating margin, I think we've now demonstrated

10   we can sustain significantly higher operating margins

11   through the transformation of Oracle's business to an

12   e-business, which is what we've now been focused,

13   frankly, on executing for 18 months now.  We actually

14   started a planning effort 24 months ago, but we've been

15   focused on executing against those objectives now for 18

16   months, and we demonstrated that again in Q2 with margins

17   of 35 percent.

18           As all of you know who've historically followed

19   us, until we started this effort, this transformation,

20   leveraging Oracle's key enablers, technology and

21   applications, our traditional margin was always in the 22

22   to the 23 percent range.  So we've demonstrated to the

23   marketplace and the investment community that we can

24   sustain this going forward.  And we believe we can

25   actually achieve higher performance in the future.

REASON REPORTING

ORCL 0123055
NDCA-ORCL 03264
CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

5

1    Database license growth was a healthy 19

2    percent.  Applications license growth was 66 percent.

3    That was after the currency effect, which is 7 negative

4    points.  So if we had used constant dollars, our

5    applications growth would have been a 73 percent growth

6    rate over Q2 a year ago.

7         So we felt by any means this was a tremendous

8    performance in our second quarter.

9         As far as the last trailing four quarters, again

10   revenue was up 15 percent for the corporation.  Net

11   income, again demonstrating the commitment to what we're

12   doing in changing how we go to market and changing our

13   business through the transformation, our net income has

14   gone up 79 percent.  And again we've sustained operating

15   margins of 35 percent over the traditional range of 22 to

16   23 percent.

17        So we've been very successful in this effort.

18        Database license growth has been 21 percent over

19   the last trailing four quarters, and our applications

20   license growth has been 54 percent for the last trailing

21   four quarters.

22        So again we consider it very healthy

23   performance.

24        This gives you an idea as far as local currency

25   growth on a geographical basis, the performance we're

ORCL 0123056
NDCA-ORCL 03265
CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

1  seeing across the distribution organizations and

2  everything.

3      So for AMEA it's been 17 percent growth.

4  Asia-Pacific, 30.  And the Americas, 34 percent growth

5  for the last four quarters.  So that gives you an idea on

6  the state of the overall business from a growth

7  perspective by geography.

8      We think the important thing around license

9  revenue is if you look at both traditional business, our

10  traditional business, our technology business, and then

11  our applications business, our performance has continued

12  to accelerate in the applications business, while we

13  believe we've held our own with our traditional business.

14      This is very important, because we do believe

15  that applications are a key to our future.  And so while

16  we focus very much on sustaining our market share

17  increases on the platform base, we're focused very much

18  on everything we can do to accelerate our applications

19  growth in the key marketplaces we compete.

20      As you're all aware, we introduced the new

21  strategy, the E-Business Suite here.  The prodigy will

22  release this morning, this spring and summer.  I can tell

23  you that the story is being very well received in the

24  marketplace.

25      If you think frankly -- if I think about my

1    history in the industry -- and I've been with Oracle now

2    11 years; I've been in the industry for 23 years -- if

3    you think about the evolution of man from ape to

4    Neanderthal to Homo sapien, I think Oracle is on the

5    right strategy and the right path here.

6         What we're seeing is the evolution of software

7    within the industry from where originally it was custom

8    code, okay, then it was packaged software, then it became

9    Best of Breed. And the next logical step, the next

10   logical step, okay, is suites of pre-integrated software

11   to solve the business needs of our clients, and that's

12   where Oracle's taking us. So that's the strategy we're

13   presenting.

14        The marketplace has never had choice before.

15   They've always had to do Best of Breed. Oracle for the

16   first time is offering them a choice. And I can tell you

17   that from speaking to the executives who come to Oracle

18   on a regular basis now to understand how we transformed

19   this business, they are very, very interested in this

20   message, okay, because historically they have not had a

21   choice before.

22        And it's very interesting when I talk to

23   executives and I talk to them about this, I ask them. I

24   say -- I ask them a couple of simple questions. I ask,

25   "Are you living in a Best of Breed world today?"

1    They say yes.

2    And then I say, "Are you happy with it?"

3    And I've yet to have one executive say he's

4    satisfied with what he has today.  So this does provide a

5    compelling alternative.  Granted, we have to prove we can

6    do it.  We're focused very much on doing that in the

7    marketplace and for our customers today.

8    But for the first time executives actually have

9    an alternative they've never had before.

10    This shows you the trailing 12 months' growth

11    trend on our license of services.  This is on purpose.

12    We're specifically focusing our services growth in a

13    different area of the marketplace.  We have focused very

14    much on demonstrating that we can actually put these

15    packages in in an integrated fashion, in a much shorter

16    time frame, at much lower cost.

17    We're also specifically not trying to grow our

18    licenses as fast or faster than our product license

19    growth, or I should say our services as fast or faster

20    than our product license growth.  Because we're focused

21    very much on teaming with partners.  So we want to make

22    sure there's plenty of opportunity for partners to work

23    with our clients to implement the E-Business Suite and

24    the rest of the Oracle product line.

25    So we have specifically focused very much on not

1      growing our services revenue at the rate in which we grow

2      our license revenue.

3              What's hot on the traditional side of our

4      business, the technology side of our business, Oracle 9i

5      will be released this summer.  We're introducing the real

6      applications cluster option.  We think this is going to

7      be a tremendous performance improvement and a big benefit

8      to our existing client base.

9              We're also adding a tremendous number of new

10     features in this product.  So this is not really a point

11     release.  This is a major release of platform that we

12     think is going to enable us to extend our leadership

13     within the database marketplace.

14             We also have released Oracle 9i, the application

15     server.  It has data and web caching as well as wireless

16     capabilities, corporate portal capability, and

17     development capabilities.

18             It's really interesting, the 9i application

19     suite is generating a tremendous amount of interest in

20     our clients, and what -- if you think about what we're

21     doing in the applications area, we're trying to do

22     exactly the same thing in the technology area.

23             Today if someone wanted to acquire all of the

24     capabilities that we deliver from 9i, they'd have to go

25     to six or seven different technology vendors and bring in

REASON REPORTING    **ORCL 0123060**        10
                    **NDCA-ORCL 03269**
                    CONFIDENTIAL-SUBJECT TO
                    PROTECTIVE ORDER

1    six or seven different technologies, train their people

2    on six or seven different technologies, support six or

3    seven different technologies, and then try and put it

4    together in a cohesive fashion inside their networks and

5    their data systems.

6         What we're trying to do is offer the same exact

7    approach here.  Simple, complete, functional, cost

8    effective, great return on investment, and the stability

9    of the Oracle brand behind it.

10        So we're trying to offer a suite around the

11   application server versus a point solution, which is what

12   our competition offers.

13        So look for us to do the same thing in this

14   space that we're currently doing within the application

15   space with the E-Business Suite story.

16        And then there's the Oracle Technology Network.

17   We believe this is a leading indicator on how we're doing

18   in the technology marketplace because it indicates the

19   number of developers who are downloading our software for

20   free to develop products or applications around it.

21        We believe that's a leading indicator where the

22   marketplace is going.  We continue to see tremendous

23   interest in the developer community around Oracle

24   technology, 9iAS and the platform technology and the

25   portal technology and the wireless capabilities as they

NDCA-ORCL 03270
CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

1    build the applications for the future businesses

2    tomorrow.

3            As far as database growth opportunities,

4    e-business obviously expands database usage.  Packaged

5    applications, Oracle's packaged applications, other

6    packaged applications, the 9iAS Internet application

7    server again, we're very focused on, and in 9i the real

8    application clustering option we believe is going to add

9    to our revenue base.

10           As far as our market share goes in the Unix

11   world, we're currently at 63 percent vis-a-vis all of our

12   competitors according to Dataquest.

13           As far as the NT platform, we have greater

14   market share than even Microsoft.

15           We are the database of choice for packaged

16   applications.  So we're the significant foundation for

17   all of the packaged applications that the businesses use

18   today and that they're using for tomorrow as they start

19   their transformations to e-business.

20           And then the Oracle Technology Network again

21   continues to see accelerating growth.  We currently have

22   2,000 new developers signing up every day to download the

23   products and start to develop applications using Oracle

24   technology.

25           As far as what's hot in the applications arena,

ORCL 0123062
NDCA-ORCL 03271
CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

1   obviously customer relationship management continues to

2   be a hot area for the marketplace.  Business-to-business

3   collaboration around planning, exchanges and procurement.

4   We've seen an ERP rebound in the marketplace, a

5   significant rebound after Y2K.

6            And then people are looking to leverage the

7   technology in that integration advantage that they can

8   get across their businesses.

9            We're also focused very much again on delivering

10  fast implementation capability.  So we have the fast

11  forward where we'll fixed bid an application

12  implementation, 90 days or less.  That we'll commit to

13  implement within the mid-market.  Business online

14  continues to grow.  And then our international

15  capabilities are being accepted very positively in the

16  marketplace.

17           As far as the E-Business Suite, to kind of give

18  you a little kind of pictorial on why we believe this is

19  important.

20           This is what we would call the e-business kit.

21  This is what you'd have to get if you go Best of Breed.

22  The problem is that when you look across these

23  application suites, okay, your marketing application

24  contains certain information about your customers.  When

25  you go to your sales application, it contains certain

ORCL 0123063
NDCA-ORCL 03272
CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

13

1   application data or certain data about your customers

2   also.  Some of it's different.  And then when you go to

3   service, it again contains another piece of information

4   about your customers.  Again, some of that information is

5   different than the other two applications.

6         And frankly, it's worse than that.  Okay?  It's

7   fragmented and implemented on a global basis.  So while

8   a quote is supposed to be global implementation, it

9   tends to be a local implementation with these products.

10        We believe again the Oracle alternative is a

11   compelling value proposition.  It's complete and it's

12   simple and it's pre-integrated with one view of the

13   information, one view of the customer, which is very

14   important going forward.

15        So we believe that a single schema is the key to

16   this ball game.

17        If you think about it, most companies, they have

18   a supply chain to worry about, they have a demand chain

19   to worry about.  They frankly integrate into the

20   execution engine which are the ERP or financials.

21        And where they typically integrate through is

22   the order management area, and that's where the customer

23   data is.  A single view of the customer is absolutely

24   essential to being a successful business in the future.

25   That's what we're offering people today.

REASON REPORTING      ORCL 0123064    14

NDCA-ORCL 03273
CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

1    As far as the e-business supply chain suite, you

2  can see the breadth of the product areas.

3    As far as CRM, financials and HR, again complete

4  breadth across the product suite.

5    What's really interesting is that so far the

6  update for the year is we've seen 69 percent worldwide

7  applications growth in the first half.

8    The great news about this is that we didn't

9  suffer a slippage in our growth the year before.  We're

10  positive all year long vis-a-vis all of our competitors

11  had negative growth.

12    So these are against positive comparisons from

13  the previous year.  We're seeing strong performance.

14    We've seen 96 percent growth in AMEA in the

15  first half.  We've got 2,500 companies currently

16  implementing the new product line, release 11i.  And we

17  have 165 live customers.  And version 11i Release 3

18  shipped this January.

19    The other neat thing about it is 11i introduced

20  45 percent new application products, so we actually

21  expanded the product line with the release of this

22  product area.  Which means the average application sale,

23  the value of the average application sale, continues to

24  go up.

25    This kind of shows our internal roll out status

1   on where we're at with rolling out these products

2   internal to Oracle.  Again we're demonstrating that we

3   can do it first and we're demonstrating the benefits we

4   get from that.

5          So we did financials in January.  We did

6   telesales in January.  We did sales online release 11i.

7   This spring we'll roll out 11i support/service.  We're

8   expecting a big benefit internally from that.

9          11i products used by live customers are across

10  the board.  We have customers live on all of these

11  products.  The Enterprise customers that are currently

12  live or implementing, this example is some of the large

13  corporations that are putting it in.

14         This example is some of the smaller companies

15  that are putting it in.  So we have companies at the high

16  end or small to medium enterprises implementing 11i.

17         As far as execution goes, we have 8,000

18  revenue-producing sales reps on a global basis.  We have

19  12,000 revenue-producing consultants.  Development has

20  over 400 subject matter experts that focus on helping the

21  sales teams prove our value proposition to the

22  marketplace.

23         We have over 250 specialists around CRM who also

24  support the field sales force as we successfully execute

25  in growing that marketplace.

1    And we have over 6,300 dedicated third party

2  consultants.

3    We have preferred partners like KPMG, PWC, Cap

4  Gemini and E-Loyalty. We're very active with the other

5  partners such as Arthur Andersen, Accenture, CSC and

6  Deloitte & Touche.

7    We also have a development program for our

8  partners where we focus on putting development

9  environments in their businesses so they can use them

10  with their customers and we can accelerate the delivery

11  of their projects to the marketplace. And also we give

12  them access to our development resources to make sure

13  we're tightly aligned as we go to market together.

14    This gives you an example of the partner

15  resources by organization. As I mentioned, we've had ten

16  quarters of margin improvement. Again if you look at Q1

17  fiscal year 2000, that's when we announced the beginning

18  of the transformation within Oracle Corporation. So you

19  can see we continue to make a down payment every quarter

20  since we embarked upon that project.

21    You should continue to see improvement as we

22  finish out the year.

23    As I mentioned, we originally had a goal of

24  $1 billion. We said we'd do that in 18 months. We

25  actually achieved it in nine months. The new goal is an

NDCA-ORCL 03276
CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

1   this summer, that we're going to continue to see benefits

2   come afterwards. Because I believe the benefits are

3   lagging the implementation. Even though we've seen

4   strong benefits, we believe it will continue to trickle

5   in after we're done.

6       11i is in its ninth month, so it's ready for

7   prime time. The 9i database is on track for summer

8   release. So we believe we're going to see very good

9   buying intentions around that product line area.

10      Margin expansion should continue through the

11  second half. We don't see anything that indicates it

12  won't.

13      Oracle's margin improvement again, as I

14  mentioned, is a very effective tool as customers focus on

15  increasing internal cost savings within their own

16  businesses. Again both on the inside of our business,

17  the supply chain side, or the demand side, the customer

18  relationship side.

19      And that's what we talk to them about, and they

20  have a very ready ear, very willing ear, to hear how we

21  may be able to help them.

22      Overall, if there's a sharp downturn in the

23  economy, as we all know, growth could be impacted. The

24  economy's a wild card. It always is. However, our

25  guidance remains the same that we indicated at the



1    beginning of Q3 when we did our Q4 or Q2 earnings call.

2    So our guidance continues to remain the same.

3         So that's the overview on Oracle Corporation.

4    I believe we have a break-out room.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NDCA-ORCL 03280
CONFIDENTIAL-SUBJECT TO
PROTECTIVE ORDER

# EXHIBIT 218

Jun-22-06   01:04pm   From-                                          T-941   P.002   F-430

Re: Investor conference on Feb. 13

**Subject: Re: Investor conference on Feb. 13**
**Date: Fri, 12 Jan 2001 06:51:12 -0800**
From: Joelle Riccio <joelle.riccio@oracle.com>
Organization: Oracle Corporation
To: George Roberts <George.Roberts@oracle.com>
CC: "Hornberger.Elizabeth" <ELIZABETH.HORNBERGER@oracle.com>

Great. We are slotted for a 9:30 presentation. The presentation will last 30 minutes, with a breakout session for Q&A for another 30 minutes. We usually like to try to meet with investors for one on one meetings throughout the day as well if you are available. We should plan to meet sometime over the next couple of weeks to go over your presentation ( I have several you could work off of, including Sandy's) and so that I can fully prep you for the day.

Attached is the presentation Sandy used with investors this week. The focus was on B2B collaboration.

-Joelle

George Roberts wrote:

Liz how does it look. Joelle do you have a presentation for me to give? Do we need to build one? What did Sandy present?

Joelle Riccio wrote:

Hi George,

Investor Relations is targeting a number of key financial analysts this quarter whose opinions on Oracle leave room for improvement. One such analyst is Eric Upin of Robertson Stephens, who has a "hold" rating on us. We have been invited to participate in Robertson Stephens "Tech 2001" conference on February 13, which is a great opportunity to tell our positive investment story to them and a large institutional investor base. I would like to extend the invitation to you as an Oracle spokesperson to speak at the event. It would be extremely helpful to have an executive from the sales organization to provide a view of the business. We recently took Sandy Sanderson on an investor tour this week, and the feedback was tremendous.

I have outlined the specifics of the conference below, and hope you can make time to participate. Please let me know.

Regards,
Joelle Riccio
Investor Relations Manager
(650) 506-1897

*Tech 2001 Conference*
*Dates:* Feb 12-15
*Location: Palace Hotel, San Francisco*
*-presentations by the management teams from over 400 of the premier public and private technology companies in the world*
*-exploration of current trends in technology through approximately 21 workshops and panel*

ORACLE CONFIDENTIAL

EXHIBIT
Roberts 26
6/22/06      us

NDCA-ORCL 078268

CONFIDENTIAL-PURSUANT
TO PROTECTIVE ORDER

Jun-22-06   01:04pm   From-                                      T-941   P.003   F-430

Re: Investment conference on Feb 15

*discussions hosted by Robertson Stephens research analysts*
*-luncheon keynote address from General Colin Powell*
*-exclusive evening event featuring the B-52s*

· *Attendees last year:*
*Presenting companies: 405*
*Total Attendees: 3713, including investors, press*

| | Name: ssbpres.zip |
|---|---|
| 📁 ssbpres.zip | Type: Zip Compressed Data (application/x-zip-compressed) |
| | Encoding: base64 |

Joelle Riccio <joelle.riccio@oracle.com>

ORACLE CONFIDENTIAL

NDCA-ORCL 078269

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

# EXHIBIT 219

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

IN RE ORACLE CORP. DERIVATIVE    )    CONSOLIDATED
LITIGATION                       )    C.A. NO. 18751

### ANSWER

Defendants, Lawrence J. Ellison, Jeffrey O. Henley, Donald L. Lucas, Michael J. Boskin, Jack F. Kemp, Jeffrey Berg, Richard A. McGinn, Kay Koplovitz (together, the "Individual Defendants"), and nominal defendant Oracle Corporation ("Oracle" (together with the Individual Defendants, the "Defendants")), for their answer, respond to the individually numbered paragraphs of the Revised Amended Shareholder Derivative Complaint (the "Complaint"), and assert affirmative defenses, as follows:

1.      Denied, except Defendants admit that plaintiffs have purported to initiate a derivative action seeking relief against the Individual Defendants for the benefit of Oracle Corporation.

2.      Denied, except Defendants admit that certain of the Individual Defendants exercised options for and sold Oracle stock on various occasions prior to March 1, 2001.

3.      Denied, except Defendants admit that Oracle on various occasions made statements regarding the internal savings achieved by Oracle in connection with the use of its 11i Suite and state that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

4.      Denied, except Defendants respectfully refer to the Oracle press release for its contents.

## PARTIES

5. Defendants lack information sufficient to respond to this paragraph.

6. Admitted.

7. Denied, except Defendants admit the allegations of the first three sentences of this paragraph, admit that defendant Ellison sold Oracle stock between January 22, 2001 and January 31, 2001 and that, due to his position at Oracle, Ellison was privy to confidential information concerning Oracle and state that the fifth sentence of this paragraph asserts legal conclusions to which no responsive pleading is required.

8. Denied, except Defendants admit the allegations of the first sentence of this paragraph, admit that on or about January 4, 2001 defendant Henley sold approximately 1 million shares of Oracle stock and admit that, due to his position at Oracle, Henley was privy to confidential information concerning Oracle.

9. Denied, except Defendants admit the allegations of the first two sentences of this paragraph, admit that on or about January 3, 2001, defendant Lucas sold approximately 150,000 shares of Oracle stock and that due to his position at Oracle, Lucas was privy to confidential information concerning Oracle, and state that the third sentence of this paragraph asserts legal conclusions to which no responsive pleading is required

10. Denied, except Defendants admit the allegations of the first two sentences of this paragraph, admit that on or about January 17, 2001, defendant Boskin sold approximately 150,000 shares of Oracle stock and that, due to his position at Oracle, Mr. Boskin was privy to confidential information concerning Oracle, and state that the third sentence of this paragraph asserts legal conclusions to which no responsive pleading is required,.

2

11.    This paragraph consists of a defined term to which no responsive pleading is required.

12.    Denied, except Defendants admit the allegations of the first sentence of this paragraph and admit that, due to his position at Oracle, defendant Kemp was privy to confidential information concerning Oracle.

13.    Denied, except Defendants admit the allegations of the first two sentences of this paragraph and admit that, due to his position at Oracle, defendant Berg was privy to confidential information concerning Oracle.

14.    Denied, except Defendants admit that Mr. McGinn was a director of Oracle until October 15, 2001, and admit that, while he held his position at Oracle, Mr. McGinn was privy to confidential information concerning Oracle.

15.    Denied, except Defendants admit that Ms. Koplovitz was a director of Oracle until October 15, 2001, and that, while she held her position at Oracle, defendant Koplovitz was privy to confidential information concerning Oracle.

16.    This paragraph consists of a defined term to which no responsive pleading is required.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

17.    This paragraph asserts legal conclusions to which no responsive pleading is required.

18.    Denied, except Defendants admit that, due to their positions at Oracle, the Individual Defendants were privy to confidential information concerning Oracle.

19.    Denied, except Defendants state that the second sentence of this paragraph asserts legal conclusions to which no responsive pleading is required.

20.     Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

21.     Denied, except Defendants admit that, due to their positions at Oracle, the Individual Defendants were privy to confidential information concerning Oracle, and state that the last sentence of this paragraph asserts legal conclusions to which no responsive pleading is required.

22.     Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

23.     Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

24.     Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

25.     Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

26.     Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

27.     Denied, except Defendants admit the allegations of the first two sentences of this paragraph, admit that IBM and Microsoft were two of Oracle's many competitors and lack information sufficient to respond to the third sentence of this paragraph.

28.     Denied, except Defendants admit that Oracle has been a leader in the relational database management system market since the mid-1980s and that Oracle's 8i database was among the best of its line of products. Defendants further admit that the 8i database features

included, among other things, the Java Virtual Machine, SQLS, Internet File System and InterMedia.

29.     Denied, except Defendants admit the allegations of the second through fourth sentences of this paragraph, admit that DBM sales are a significant aspect of Oracle's business and admit that applications offer a strong growth prospect for Oracle.

30.     Admitted.

31.     Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

32.     Denied, except Defendants respectfully refer to the referenced pleading for its contents.

33.     Denied, except Defendants respectfully refer to the referenced pleading for its contents.

34.     Denied, except Defendants admit that Oracle maintained one or more systems for monitoring its pipeline and certain closed deals, which was updated regularly and to which Mr. Ellison had access.

35.     Denied, except Defendants admit that Oracle sales representatives regularly prepared and submitted sales reports.

36.     Denied, except Defendants respectfully refer to the referenced pleading for its contents.

37.     Denied, except Defendants lack information sufficient to respond to the third through seventh sentences of this paragraph and respectfully refer to the referenced pleading for its contents.

5

38.    Denied, except Defendants lack information sufficient to respond to the fourth sentence of this paragraph and respectfully refer to the referenced pleading for its contents.

39.    Denied, except Defendants admit that Oracle maintained a listing of managers who needed consultants for their projects.

40.    Denied, except Defendants lack information sufficient to respond to the first sentence of this paragraph and respectfully refer to the referenced pleading for its contents.

41.    Denied, except Defendants admit that Oracle bids on a large number of deals, some of which close and some of which do not close, and lack information sufficient to respond to the last sentence of this paragraph.

42.    Denied, except Defendants respectfully refer to the referenced pleading for its contents.

43.    Denied, except Defendants respectfully refer to the referenced pleading for its contents.

44.    Denied, except Defendants respectfully refer to the referenced pleading for its contents and state that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

45.    Denied, except Defendants respectfully refer to the Company's public statements for their contents.

46.    Denied, except Defendants admit the allegations of the first sentence of this paragraph and respectfully refer to the remarks of Mr. Bloom and Mr. Ellison for their contents.

47.    Denied.

6

48.    Denied, except Defendants respectfully refer to the referenced pleading for its contents and lack information sufficient to respond to the fifth sentence of this paragraph.

49.    Denied, except Defendants respectfully refer to the Konicki and Maselli article for its contents and lack information sufficient to respond to the second sentence of this paragraph.

50.    Denied, except Defendants admit that Oracle sometimes discourages customization of its software and lack information sufficient to respond to the last sentence of this paragraph.

51.    Denied.

52.    Denied.

53.    Denied, except Defendants respectfully refer to the referenced pleading for its contents.

54.    Denied, except Defendants admit that certain of Oracle's potential deals did not close on various occasions, respectfully refer to the referenced pleading for its contents and lack information sufficient to respond to the second sentence of this paragraph.

55.    Denied, except Defendants admit that deals with Oracle's 11i Suite customers closed on various occasions.

56.    Denied, except Defendants admit that, as with all software, Oracle's 11i Suite required certain patches and bug fixes, including consolidated patches.

57.    Denied, except Defendants admit that Oracle routinely uses consolidated patches.

58.    Denied, except Defendants admit that Mr. Scott, as leader of the CRM global consulting team, regularly briefed the CRM group with respect to various software issues.

7

59.     Denied, except Defendants admit that CRM field management meetings are held on a weekly basis and are sometimes attended by Ms. Borthwick and Messrs. Scott and Davis, and that the meetings regularly involved, among other things, discussions of pipeline review, staffing needs, product status and training updates.

60.     Denied.

61.     Denied, except Defendants admit that Oracle's consulting practice directors regularly monitored their business and generated corresponding reports and projections.

62.     Denied, except Defendants admit that consulting practice directors regularly reported to upper management as to the status of their business, and that Mr. Scott and the Individual Defendants were privy to such information.

63.     Denied, except Defendants admit that Oracle's consultants on occasion experienced "down" time for various reasons.

64.     Denied.

65.     Denied, except Defendants lack information sufficient to respond to the first sentence of this paragraph and admit that, for some problems experienced by certain of Oracle's customers, Oracle sent quality assurance testers and Application Database Administrators to work on resolving those problems.

66.     Denied, except Defendants lack information sufficient to respond to the last sentence of this paragraph and admit that consultants typically utilized Technical Assistance Requests to obtain assistance in resolving problems experienced by Oracle customers.

67.     Denied, except Defendants admit that Oracle negotiated fixed price deals with certain of its customers, and that the related consulting fees affected Oracle's profit margins.

68.    Denied, except Defendants admit that Mr. Ellison personally was involved with developing business relations with certain of Oracle's customers.

69.    Denied.

70.    Denied.

71.    Denied, except Defendants respectfully refer to the referenced pleading for its contents.

72.    Denied, except Defendants admit that Mr. Ellison claimed that Oracle saved approximately $1 billion by implementing its own software.

73.    Denied, except Defendants respectfully refer to the referenced pleading for its contents and state that, to the extent the last three sentences of this paragraph assert legal conclusions, no responsive pleading is required.

74.    Denied, except Defendants admit that Oracle had several consultants working with Bell South, most of whom were not working on Bell South's Custom APIs.

75.    Denied, except Defendants lack information sufficient to respond to the first three sentences of this paragraph and admit that Oracle had several consultants working with Bell South performing various tasks.

76.    Denied, except Defendants admit that it has had ongoing negotiations with Telia AB for a large deal and lack information sufficient to respond to the fourth sentence of this paragraph.

77.    Denied, except Defendants lack information sufficient to respond to the last sentence of this paragraph.

78.    Denied, except Defendants admit that JDS Uniphase is an Oracle customer, and lack information sufficient to respond to the last sentence of this paragraph.

9

79. Denied, except Defendants admit that Mr. Ellison had specific knowledge about certain of Oracle's accounts.

80. Denied, except Defendants admit that Nantucket Nectars is an Oracle customer, and lack information sufficient to respond to the last two sentences of this paragraph.

81. Denied, except Defendants admit that Alliance is running Oracle's 10.7 application and that Oracle has announced 10.7 will be de-supported in June, 2003.

82. Denied, except Defendants admit that, when an Oracle product is "desupported," no further patches are available, and lack information sufficient to respond to the remaining allegations of this paragraph.

83. Defendants lack information sufficient to respond to this paragraph.

84. Denied, except Defendants lack information sufficient to respond to the first sentence of this paragraph.

85. Denied, except Defendants admit that Motorola has not upgraded to 11i Suite and lack information sufficient to respond to the second sentence of this paragraph.

86. Denied, except Defendants lack information sufficient to respond to the second sentence of this paragraph.

87. Denied, except Defendants lack information sufficient to respond to the third sentence of this paragraph.

88. Defendants lack information sufficient to respond to this paragraph.

89. Denied, except Defendants admit the allegations of the first sentence of this paragraph and lack information sufficient to respond to the last sentence of this paragraph.

90. Denied, except Defendants respectfully refer to the referenced pleading for its contents.

91.     Denied, except Defendants lack information sufficient to respond to the first through sixth sentences of this paragraph, including, without limitation, the meaning of the term "Internet companies."

92.     Denied.

93.     Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

94.     Denied, except Defendants admit that Oracle's finance department generated reports concerning Oracle's financial performance, to which the Individual Defendants were privy.

95.     Denied, except Defendants admit that Oracle reported a declining sequential growth in the third quarter of 2001, and state that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

96.     Denied, except Defendants lack knowledge sufficient to respond to the second sentence of this paragraph, admit that Oracle's stock closed at $16.88 on March 2, 2001 and that lawsuits have been filed against Oracle, respectfully refer to Oracle's press releases concerning this third quarter 2001 EPS for their contents, and state that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

97.     Denied, except Defendants admit that Oracle did not, prior to their release, revise or adjust its revenues and earnings projections for the third quarter of fiscal year 2001, and respectfully refer to the statements of Oracle and Mr. Henley for their contents.

98.     Denied, except Defendants admit that Messrs. Ellison and Henley held a conference call for analysts on December 14, 2001, at which they discussed Oracle's earnings

11

and future growth and respectfully refer to the transcript of the December 14, 2001 conference call for its contents.

99.    Denied, except Defendants respectfully refer to the December 14, 2000 Bloomberg press release for its contents.

100.    Denied, except Defendants respectfully refer to the *R@dioWallStreet.com* discussion for its contents.

101.    Denied, except Defendants respectfully refer to Mr. Fink's December 15, 2000 Bloomberg articles for their contents.

102.    Denied, except Defendants respectfully refer to Mr. Ratigan's December 15, 2000 article for its contents.

103.    Defendants lack information sufficient to respond to this paragraph.

104.    Admitted.

105.    Denied, except Defendants respectfully refer to the Salomon Smith Barney report for its contents.

106.    Denied, except Defendants lack information sufficient to respond to the first sentence of this paragraph and respectfully refer to the January 11, 2001 Bloomberg article for its contents.

107.    Denied, except Defendants respectfully refer to the January 15, 2001 Bloomberg article for its contents.

108.    Denied, except Defendants respectfully refer to the January 17, 2001 *TheStreet.com* article for its contents and state that they lack information sufficient to respond to the last sentence of this paragraph.

109.    Denied.

12

110.   Denied.

111.   Denied, except Defendants admit the allegations of the first sentence of this paragraph and respectfully refer to the Bousquin/Sanderson interview for its contents.

112.   Denied, except Defendants admit the allegations of the third sentence of this paragraph.

113.   Denied, except Defendants admit that, on or about January 17, 2001, defendant Boskin sold approximately 150,000 shares of Oracle stock and that Messrs. Lucas and Henley sold Oracle stock in December, 2000.

114.   Denied.

115.   Denied, except Defendants admit that, on at least one occasion in February, 2001, Oracle made optimistic statements about its financial prospects and the performance of certain of its software.

116.   Denied, except Defendants respectfully refer to the February 8, 2001 First Union Securities, Inc. report for its contents.

117.   Denied, except Defendants respectfully refer to the February 8, 2001 Deutsche Banc Alex. Brown report for its contents.

118.   Denied, except Defendants lack information sufficient to respond to the first sentence of this paragraph and respectfully refer to the Jennifer Glass statements for their contents.

119.   Denied, except Defendants admit that Mr. Sanderson appeared at an analyst conference on or about February 13, 2001 and respectfully refer to the February 13, 2001 *TheStreet.com* report for its contents.

120.   Denied, except Defendants admit that Mr. Roberts appeared at the Robertson Stephens Technology Conference on or about February 13, 2001 to discuss, among other things, Oracle's business and financial prospects.

121.   Denied.

122.   Denied, except Defendants admit that Oracle competed with the "best-of-breed" application providers, and lack information sufficient to respond to the last four sentences of this paragraph.

123.   Denied, except Defendants admit that Mr. Ellison on various occasions made statements about the savings achieved by Oracle in connection with the use of its 11i Suite.

124.   Defendants lack information sufficient to respond to the allegations of this paragraph.

125.   Denied, except Defendants admit that Messrs. Ellison and Henley appeared at the Apps World Conference between February 21-23, 2001, and that Mr. Henley reaffirmed certain of Oracle's financial projections.

126.   Denied, except Defendants respectfully refer to the February 21, 2001 Deutsch Banc Alex. Brown report for its contents.

127.   Denied, except Defendants respectfully refer to the February 23, 2001 CIBC World Markets Corp. report for its contents.

128.   Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

129.   Defendants lack information sufficient to respond to this paragraph and respectfully refer to the Bluestone Capital report for its contents.

130.    Denied, except Defendants respectfully refer to the March 1, 2001 Oracle press release for its contents.

131.    Denied, except Defendants admit that Oracle's stock closed at approximately $16.88 on March 2, 2001, and lack information sufficient to respond to the first sentence of this paragraph.

132.    Denied, except Defendants admit that Oracle held a conference call with securities analysts on March 15, 2001, in which Oracle discussed its earnings and future performance and respectfully refer to the transcript of the March 15, 2001 conference call for its contents.

133.    Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

134.    Denied, except Defendants respectfully refer to the March 2, 2001 *SmartMoney.com* report, the March 1, 2001 Reuters report and the March 1, 2001 *TheStreet.com* report for their contents.

135.    Denied, except Defendants admit the allegations of the first sentence of this paragraph and respectfully refer to the Oracle Form 10-Q filed April 12, 2001 for its contents.

## INSIDER TRADING

136.    Denied, except Defendants admit that defendants Ellison, Boskin, Henley and Lucas exercised Oracle options and sold Oracle stock as set forth in the chart contained in this paragraph.

137.    Denied.

15

138.    Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

139.    Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

140.    Denied, except Defendants admit that the Board routinely held meetings in person and telephonically and state that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

141.    Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

142.    Denied.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

143.    Denied, except Defendants admit that plaintiffs have purported to initiate a derivative action seeking relief against the Individual Defendants for the benefit of Oracle.

144.    The allegations of this paragraph consist of legal conclusions to which no responsive pleading is required. To the extent a responsive pleading is required, defendants lack information sufficient to respond to the allegations of this paragraph.

145.    Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required. To the extent a responsive pleading is required, Defendants lack information sufficient to respond to the allegations of this paragraph.

146.    Denied, except Defendants admit that plaintiffs have not made any demand on the Board of Directors of Oracle and state that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

16

## FIRST CAUSE OF ACTION

### Against Defendants Ellison, Boskin, Henley and Lucas for Breach of Fiduciary Duty, Insider Selling and Misappropriation of Corporate Information

147.   Defendants incorporate by reference their answers to paragraphs 1 through 146 above.

148.   Defendants deny the allegations of this paragraph, except admit that, due to their positions at Oracle, the Individual Defendants were privy to confidential information concerning Oracle.

149.   Denied.

150.   Denied.

151.   Denied.

152.   Denied.

153.   Denied.

154.   Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

155.   Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

156.   Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

17



## SECOND CAUSE OF ACTION

### Against All Individual Defendants for Breach of Fiduciary Duty of Good Faith and Loyalty

157.   Defendants incorporate by reference their answers to paragraphs 1 through 156 above.

158.   Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

159.   Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

160.   Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

161.   Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

## THIRD CAUSE OF ACTION

### Against All Defendants for Waste of Corporate Assets

162.   Defendants incorporate by reference their answers to paragraphs 1 through 161 above.

163.   Denied, except Defendants admit that, due to their positions at Oracle, the Individual Defendants were privy to confidential information concerning Oracle and state that, to the extent this sentence asserts legal conclusions, no responsive pleading is required.

164.   Denied, except to the extent that this paragraph asserts legal conclusions, no responsive pleading is required.

165.   Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

166.   Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

167.   Denied, except that, to the extent this paragraph asserts legal conclusions, no responsive pleading is required.

## PRAYER FOR RELIEF

Defendants deny that plaintiffs are entitled to the requested relief or to any relief whatsoever.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs are unfit derivative plaintiffs to maintain this action.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs lack standing to assert the claims of the Complaint.

### THIRD AFFIRMATIVE DEFENSE

The Complaint fails to state a claim, in whole or part, upon which relief may be granted.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs are barred by the doctrine of unclean hands.

MORRIS, NICHOLS, ARSHT & TUNNELL

Kenneth J. Nachbar
Matt Neiderman
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware  19899
(302) 658-9200
  Attorneys for Defendants

February 8, 2002

20

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing document were caused to be served this 8th day of January, 2002 upon the following in the manner indicated:

### BY FACSIMILE AND REGULAR MAIL:

R. Bruce McNew, Esquire
Taylor & McNew, LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
Fax No. 302-655-9361

Matt Neiderman

EXHIBIT G

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| IN RE ORACLE CORP. DERIVATIVE LITIGATION | : | CONSOLIDATED CIVIL ACTION NO. 18751 |

REVISED
AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

NATURE OF CASE AND SUMMARY OF ACTION

1.      This is a shareholders derivative action brought pursuant to Court of Chancery Rule 23.1 for the benefit of nominal defendant Oracle Corporation ("Oracle" or the "Company"), seeking to remedy defendants' breaches of fiduciary duties, waste of corporate assets, and other violations of state law.

2.      This action arises in connection with defendants' breaches of fiduciary duty that are related to illegal insider trading by certain directors and officers of the Company which occurred between December 19, 2000 and January 31, 2001, when the price of Oracle common stock was trading above $30 per share and when the senior officers and directors of the Company were in possession of material adverse information regarding the Company's earnings and growth prospects. As alleged herein, prior to the Company's March 1, 2001 announcement that earnings per share ("EPS") for fiscal Q3 2001 would be substantially below Company guidance (affirmed only weeks prior to this disclosure) and that Oracle would miss revenue projections by as much as $200 million, several Oracle directors sold *nearly $1 billion* worth of their Oracle common stock -- including the Company's CEO and Chairman of the Board, Lawrence J. Ellison, who between January 22, 2001 and January 31, 2001 sold over 29 million shares of his personally held Oracle stock (his first sales in approximately six years) to realize gains of over $894 million.

3.      Before the illegal insider selling, Oracle represented that the Company would have sequential EPS growth of 9%, or $0.12, and revenue of over $2.9 billion. Oracle had repeatedly assured investors that an important new product for the Company, the so-called "11i

Suite", worked and required no programming systems integration to implement the product and that using the product internally saved the Company $1 billion. Defendant Ellison and the other Individual Defendants, however, actually knew or should have known that the 11i Suite was fraught with massive technical problems, including giant gaps in its Customer Relationship Management ("CRM") modules, and required expensive systems integration work to implement. The defendants also knew or should have known that Oracle's so-called "billion dollar savings" was not the result of the synergies created by Oracle's 11i Suite product, which did not work any better internally than for customers, but derived from other cost saving initiatives, including the termination of more than 2,000 employees. Throughout January and February 2001, defendants repeatedly stated that Oracle's Q3 2001[1] estimates were easily achievable, that Oracle's pipeline was "never stronger," its applications growth was "accelerating," its database and application sales were rapidly growing and that the slowing economy was showing no impact on Oracle's Q3 2001 performance. However, as early as July 2000, the pipeline for all of Oracle's products had begun to deteriorate and by the end of calender year 2000 the situation was dire and the defendants had no reasonable basis for their extraordinarily bullish projections. Weaknesses had appeared across Oracle's business lines and the new 11i Suite, which was to drive sales in Q3, needed thousands of "patches" just to work.

       4.     At no time prior to March 1, 2001 did the defendants ever disclose that Oracle would miss its Q3 2001 revenue or earnings forecasts, and in fact, just days before this shocking disclosure, Company executives appeared at an investor conference at which they presented bullish reports and reaffirmed positive guidance. Further, the disclosure was made only one week after defendant Jeff Henley, Oracle's CFO and a member of its Board of Directors (and inside seller of approximately $32.3 million of Oracle stock), appeared at the AppsWorld Conference in New Orleans, where he met personally with JP Morgan H&Q analyst Jim Pickrel and continued to guide him to expect solid results for Q3 2001. On March 1, 2001 however, Oracle revealed that it was

---

[1] Oracle operates on a May 3 fiscal year. Oracle's Q3 fiscal 2001 was the period from December 1, 2000 to February 28, 2001.

being affected by the slowdown in software sales, and that it would miss Q3 2001 forecasts and that Q4 2001 was uncertain. Specifically, Oracle revealed that, contrary to prior assurances by the Individual Defendants of Oracle's continuing "strong" revenue and EPS growth, including the defendants' assurances less than two weeks earlier that demand remained strong, Oracle would post revenue and EPS *declines*, sending Oracle's shares into a free-fall. In its press release Oracle stated:

- Oracle would post sequential EPS declines.

- Database growth would be flat to slightly negative.

- Applications growth would be two-thirds of what defendant Ellison had projected.

Immediately upon making these adverse disclosures, the price of Oracle shares plummeted on record volume of more than 221 million shares, falling to a yearly low of $15.75 per share – a decline of approximately 50% from the price at which certain defendants sold nearly $1 billion worth of their shares. Accordingly, among other things, this action seeks to recover the proceeds from the directors' improper sales. Further, the Individual Defendants' misconduct as alleged specifically herein has wiped out over $90 billion in market capitalization as the truth about Oracle, its operations and prospects began to reach the market. In addition to the illegal and improper nature of these actions, as a direct result of the defendants' wrongful and illegal course of conduct, the Company is now subject to several shareholder class action law suits which allege securities fraud relating to the illegal insider trading and violations of federal securities laws. Regardless of the outcome of these suits, the result is that defendants have caused irreparable harm to the Company's reputation.

## PARTIES

5.     Plaintiffs Thomas J. Barone, Richard K. Riman, Daniel Orona and Nicholas Vitani, at all times relevant to the allegations raised herein, have been and continue to be owners and holders of Oracle common stock.

6.     Nominal defendant Oracle is a Delaware corporation with its principal executive offices located at 500 Oracle Parkway, Redwood Shores, California 94065. According

3

to the Company's recent press releases, Oracle purports to be the world's second largest software company. The Company provides databases and relational servers, application development and decision support tools and enterprise business applications. Oracle's software runs on network computers, personal digital assistants, set-top devices, work-stations, PCS, minicomputers, mainframes and powerful super computers. For FY 2000, Oracle reported annual sales of more than $10 billion. In addition, Oracle markets itself as the Company that "provides the software that powers the Internet." The Company's common stock is traded on the NASDAQ National Market System under the symbol "ORCL." Currently there are approximately 5.6 billion shares of Oracle common stock issued and outstanding.

        7.     Defendant Lawrence J. Ellison ("Ellison") is, and at all times relevant to the allegations herein was, the Chairman of the Board of Directors (the "Board") and Chief Executive Officer of the Company, which he co-founded in 1977. Ellison has been a director since co-founding Oracle. Ellison is a member of the Executive Committee and sole member of the Planning Committee. Ellison dominated and controlled the Board of Directors during all relevant times due to his positions with the Company and his substantial Oracle stockholdings -- Ellison owns and controls approximately 25% of Oracle's voting stock. In addition, as alleged herein, Ellison has material business relations with certain of the other defendants. Between January 22, 2001 and January 31, 2001, Ellison sold over 29 million shares of his personally held Oracle stock (his first sales in approximately six years), at prices above $30 per share, to realize illicit gains of over $894 million. These sales were unusual in timing and/or amount and they were not part of any regular sales pattern by Ellison. Due to Ellison's positions at Oracle, he knew the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' and committee meetings and via reports and other information provided to him in connection therewith.

8.     Defendant Jeffrey O. Henley ("Henley") is, and at all times relevant to the allegations herein was, Chief Financial Officer, Executive Vice President and a director of the Company.  On or about January 4, 2001, Henley sold one million shares of his personally held Oracle stock, at prices above $32 per share, to realize illicit gains of over $32.3 million.  These sales were unusual in timing and/or amount and they were not part of any regular sales pattern by Henley.  Due to Henley's positions at Oracle, he knew the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' and committee meetings and via reports and other information provided to him in connection therewith.

9.     Defendant Donald L. Lucas ("Lucas") is, and at all times relevant to the allegations herein was, a director of the Company.  In addition, Lucas is also Chairman of the Executive Committee and Chairman of the Finance and Audit Committee, as well as a member of the Compensation Committee and Nominating Committee.  As alleged herein, defendant Lucas has made material investments in a company controlled by defendant Koplovitz.  On or about January 3, 2001, Lucas sold 150,000 shares of his personally held Oracle stock, at prices above $30 per share, to realize illicit gains of over $4.6 million.  These sales were unusual in timing and/or amount and they were not part of any regular sales pattern by Lucas.  Due to Lucas' Board membership, he knew the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of Directors' and committee meetings and via reports and other information provided to him in connection therewith.

10.     Defendant Michael J. Boskin ("Boskin") is, and at all times relevant to the allegations herein was, a director of the Company.  In addition, Boskin is also Chairman of the



Compensation Committee, a member of the Finance and Audit Committee and a member of the Nominating Committee. As alleged herein, defendant Boskin has made material investments in a company controlled by defendant Koplovitz. On or about January 17, 2001, Boskin sold 150,000 shares of his personally held Oracle stock, at prices above $33 per share, to realize illicit gains of over $5 million. These sales were unusual in timing and/or amount and they were not part of any regular sales pattern by Boskin. Due to Boskin's Board membership, he knew the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and via reports and other information provided to him in connection therewith.

11.    The defendants identified in paragraphs 7-10 will be referred to herein as the "Selling Defendants."

12.    Defendant Jack F. Kemp ("Kemp") is, and at all times relevant to the allegations herein was, a director of the Company. Due to Kemp's Board membership, he knew or was reckless or negligent in not knowing the adverse non-public information about Oracle's business, finances and present and future business prospects via his access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of Directors' and committee meetings and via reports and other information provided to him in connection therewith.

13.    Defendant Jeffrey Berg ("Berg") is, and at all times relevant to the allegations herein was, a director of the Company. In addition, Berg is also a member of the Finance and Audit Committee. Due to Berg's Board membership, he knew or was reckless or negligent in not knowing the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans.

6

budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of Directors' and committee meetings and via reports and other information provided to him in connection therewith.

14. Defendant Richard A. McGinn ("McGinn") is, and at all times relevant to the allegations herein was, a director of the Company. Due to McGinn's Board membership, he knew or was reckless or negligent in not knowing the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of Directors' and committee meetings and via reports and other information provided to him in connection therewith.

15. Defendant Kay Koplovitz ("Koplovitz") is, and at all times relevant to the allegations herein was, a director of the Company. In addition, defendant Koplovitz is also a member of the Nominating Committee. As alleged herein, defendant Koplovitz has entangling material business relationships with defendants Ellison, Boskin and Lucas. Due to Koplovitz's Board membership, she knew the adverse non-public information about Oracle's business, finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of Directors' and committee meetings and via reports and other information provided to her in connection therewith.

16. Collectively, the defendants identified in paragraphs 7-10 and 12-15 will be collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

17. By reason of their positions as officers, directors and/or fiduciaries of Oracle and because of their ability to control the business and corporate affairs of Oracle, the Individual

7

Defendants owed Oracle and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage Oracle in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Oracle and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of Oracle owes to Oracle the fiduciary duty to exercise due care and diligence in the administration of the affairs of Oracle and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, services, management, projections and forecasts so that the market price of the Company's common stock would be based on truthful and accurate information.

18.      The Individual Defendants, because of their positions of control and authority as directors or officers of Oracle, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Oracle, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations and future business prospects of Oracle.

19.      The Individual Defendants, who are directors and/or officers of Oracle, participated in the conduct alleged herein in order to profit from their illegal insider stock sales and/or to obtain the financial and social benefits of such positions for themselves and also to enrich and further the personal and business interests of all defendants identified herein. At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Oracle, and was at all times acting within the course and scope of said agency.

20.      To discharge their duties, the officers and directors of Oracle were required to exercise reasonable and prudent supervision over the management, policies, practices and controls

8

of the financial affairs of Oracle. By virtue of such duties, the officers and directors of Oracle were required, among other things, to:

a.    refrain from acting upon material inside corporate information to benefit themselves;

b.    manage, conduct, supervise and direct the business affairs of Oracle in accordance with the laws of the State of Delaware, federal law, state and federal rules and regulations and the charter and bylaws of Oracle;

c.    neither violate nor knowingly permit any officer, director or employee of Oracle to violate applicable federal laws, rules and regulations or state law;

d.    establish and maintain systematic and accurate books and records of the business and affairs of Oracle and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said books and records;

e.    maintain and implement an adequate and functioning system of internal financial and accounting controls, such that Oracle's financial statements and information would be accurate;

f.    exercise reasonable control and supervision over the public statements made to the securities markets and over trading in Oracle stock by the officers, directors and employees of Oracle;

g.    remain informed as to the status of Oracle's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with state and federal securities laws; and

h.    supervise the preparation and filing of any audits, reports or other information required by law from Oracle and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Oracle and to make full and

9

accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

21. During all relevant times hereto, each of the Individual Defendants occupied positions with Oracle or were associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning Oracle, its operations, finances, financial condition, services and future business prospects. Because of these positions and such access, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were concealed from the public. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, are obligated to disclose and/or cause Oracle to disclose in a timely and complete manner all material adverse information regarding Oracle or abstain from trading on such information so as to not profit from its misuse.

22. During all relevant times hereto, the Individual Defendants, and each of them, initiated a course of conduct which was designed to and did: (i) inflate the value of Oracle common stock by issuing false and materially misleading statements which were designed to and which did artificially inflate the price of Oracle common stock long enough to allow the Selling Defendants to sell nearly $1 billion worth of their privately held Oracle common stock while in possession of material adverse undisclosed information; and (ii) maintain the Individual Defendants' executive and directorial positions at Oracle, and the compensation which the Individual Defendants enjoyed as a result of those positions, in spite of these defendants' violations of law and other fiduciary breaches, as set forth herein. In furtherance of this course of conduct, the Individual Defendants, and each of them, took the actions as set forth herein.

23. The Individual Defendants engaged in a common course of conduct which involved the dissemination of false and materially misleading statements which created the false expectation that Oracle was performing in accordance with Company sponsored expectations – expectations which were reinforced by senior management of the Company as late as one week prior to Oracle's shocking March 1, 2001 Q3 2001 revenue and earnings disappointment and Q4 2001

forecast revision. The purpose of these affirmative misrepresentations and willful non-disclosures allowed the Selling Defendants to sell *almost $1 billion* of their privately-held Oracle common stock before the Company was forced to reveal its true financial condition and before the price of Oracle common stock declined over 26% in the single trading day of March 2, 2001, as a result of those belated disclosures. The Individual Defendants' conduct was in clear violation of federal and state securities laws and constituted a direct breach of the fiduciary duties owed to the Company and the Company's public shareholders. In addition, the egregious nature of the Individual Defendants' illicit conduct has harmed, and will continue to harm, the reputation, credibility and future prospects of the Company.

24.    The Individual Defendants accomplished their common course of conduct through the issuance of the false and materially misleading financial statements, public comments, private one-on-one discussions with securities analysts and press releases to the public, which manipulated, misrepresented and failed to disclose the true facts regarding Oracle's revenues and earnings and its prospects for future financial performance.

25.    Each of the Individual Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.

26.    Each of the Individual Defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute deliberate misconduct upon Oracle and its shareholders.

27.    Since its inception in 1977, Oracle has focused on becoming the principal vendor of high-end database management systems. With its 8i release, Oracle sought to increase its market share. It did so, as the Company managed to expand its total market share from 38.3% in

11

1997 to 39.8% in 1998 to 42.4% in 1999. Oracle fought the database battle on two fronts (versus IBM's DB/2 on the high end and Microsoft's SQL (structured query language) Server 2000 on the low end) and claimed it still would be able to take market share from some of the legacy database management systems ("DBMS") vendors while holding off advances from the larger competitors.

28.    Oracle has been a self-proclaimed leader in the relational database management system ("RDBMS") market since defining it during the mid-1980s. The Company's latest database, 8i, was claimed to be among the best at executing traditional RDBMS tasks, *i.e.*, enabling the storage, manipulation and retrieval of any type of data. In particular, 8i introduces:

- The Java Virtual Machine ("JVM"): The heart of Oracle's support for Java, JVM runs Java code within the database, letting users build stored procedures and database triggers in Java and executing them as Enterprise Java Beans ("EJBs").

- SQLJ: A new programming language that embeds SQL database statements into client or server side Java code. Provides links between Java and relational data so that programmers can specialize in their strengths.

- Internet File System ("IFS"): An IFS that combines file storage and messaging into a single system rather than using several separate systems.

- InterMedia: A function that facilitates the management of multimedia content for both Internet and traditional applications.

29.    While enterprise DBMS sales remain Oracle's core business, applications offer the strongest growth prospects over the next several years. With the shipment of the Suite 11i, Oracle sought to attack the market with an integrated solution in an attempt to rival best-of-breed point products from players like Siebel Systems, Inc., i2 and Ariba, Inc. However, Oracle's recent full-fledged entry into the competitive applications arena was not without dangers. Oracle's strategy was to offer customers a complete and tightly integrated package of software – everything a company needs to manage its financials, manufacturing, sales force, logistics, e-commerce and suppliers. This placed Oracle in direct competition with "best-of-breed" application sellers who had historically, throughout the 1990s, driven 25% of Oracle's core database sales. To pick up the slack from losing these application companies (who often recommend to customers which database a

customer should use with their software), Oracle had to have a competitive application package that worked. *i.e.*, what the defendants represented as the 11i Suite.

30.    Oracle asserts that the 11i Suite has more than 100 different modules that can be segmented into three discernible pieces: (i) customer relationship management ("CRM"); (ii) business-to-business ("B2B") – comprised mainly of supply chain management ("SCM"); and (iii) e-procurement and enterprise resource planning ("ERP").

31.    By mid-December, 2000, the Individual Defendants knew that: (i) Oracle's new software 11i Suite was riddled with bugs causing reduced demand and needed an enormous amount of systems programming integration work in order to be functional; (ii) the slowing economy and declining demand work for Oracle's product was negatively impacting every one of Oracle's businesses; and (iii) the Individual Defendants had no reasonable basis to assert that Oracle would report Q3 2001 EPS of $0.12. The facts concerning demand for Oracle e-business products were well known to the Individual Defendants long before the December 14, 2000 earnings release and the Individual Defendants' false public statements.   Indeed, by summer of 2000, all internal indications pointed to a dramatic slowdown of all business sections at the Company.  Rather than disclose these adverse conditions, which by the inception of Q3 2001 were *already* adversely affecting Oracle, certain of the senior officers and directors of the Company, including defendants Ellison, Henley, Lucas and Boskin, rushed to sell tens of millions of shares of Oracle common stock at allegedly artificially inflated prices, thereby reaping illicit gains of nearly $1 billion, before the market learned of the true condition of Oracle.

32.    Specifically, it has been alleged that almost immediately after the closing of Q4 2000 (summer 2000), Oracle experienced an abrupt and substantial decline, where sales and revenue from specific regions dropped 35% below internal forecasts, continued to deteriorate for the next several months and by February 2001 were 60% below internal forecasts. The severe downturn in demand and business for these database and applications products compared to FY 2000 was like night and day, because in 2000, salespeople were accustomed to entering one or more potential deals

into the Company's OASIS CRM pipeline database (this was used throughout the Company for forecasting and sales management) per day. By the fall of 2000, salespeople were entering only one potential deal every several days. In addition, throughout late 1999 and early 2000, most sales teams maintained a 3:1 conversion ratio of so-called "piped deals" to "closed deals." This ratio was used by senior management, including the Individual Defendants, to produce sales projections made to the public. However, by the fall of 2000, Oracle's pipeline dropped so dramatically that salespeople could not pipe anything. This weakness in demand was reflected in OASIS, and resulted in management exerting pressure on the sales force to generate more business from Oracle's installed base customers. However, as early as the summer of 2000, even those customers had begun to speak of budgetary constraints and tightened belts and made it clear that they were not budgeting any new purchases.

33.     It has been alleged that in the summer of 2000, the "dot.com" sector, within which Oracle had performed at 200-300% of its internal quota in 1999, had already begun to feel the effect of financial troubles, as many of the dot.coms could not pay their outstanding invoices. Indicative of this, dot.com sales representatives began to experience an increasing number of "credit backs," which is a term used for the process by which Oracle would deduct already paid commissions to its sales people for "bad debt" account receivables that were more than 90 days outstanding. It is further alleged that the specialized dot.com sales group by Q3 2001 exhibited extremely dim performance where many reps were only at 20% of Oracle's internal quota. By mid-February 2001, some representatives had only reached 40% of Oracle's internal quota, despite the fact that three-fourths of the fiscal year had passed.

34.     The Individual Defendants had access to and were aware of weak sales activity through the OASIS forecasting system, which identified each sales representative's performance in relation to sales projections, not only for the current period, but also into future quarters. In fact, that system was "live" and updated as events occurred, giving management a real time view on the status of sales progress and the likelihood of closure of deals in the pipeline.

Defendant Henley acknowledged the existence of this pipeline system during the Company's March 15, 2001 conference call, stating that "this pipeline is real time and constantly updated." Indeed, defendant Ellison has admitted on numerous occasions since Senior Executive Vice President Ray Lane left in June of 2000 that he tracks all sales contracts through a single global database enabling him to manage the numbers, which meant that Ellison had knowledge of Oracle's results "in real-time", as they occurred.

35.    In addition to OASIS, sales representatives prepared sales reports which were required to be completed with all relevant information to update their forecasts by 11:00 a.m. every Tuesday that were circulated to management (including the Selling Defendants) on a weekly basis. From June 2000 to March 2001, all of the pipeline key indicators reflected the severe and continuous decline in product sales. This information was known by all of the Selling Defendants, two of whom were Oracle's most-senior executive officers.

36.    It has also been alleged that Oracle's internal CRM system reflected the percentages of deals booked versus deals forecasted. The consulting sales organization generated its own pipeline for sales, which were recorded on Excel spreadsheets, which was later input into the CRM system used for Company-wide forecasting. Those spreadsheets included categories for customer name, product sold, dollar value, percentage of likelihood to close and amount of revenue booked for deals that had closed, giving management constant, current visibility into the sales performance to date in any given quarter. Indeed, it is further alleged that the consulting business for implementation and applications had become recognizably slow by the summer of 2000, and by November/December 2000, the demand for e-business products all but fizzled out, and there was no basis for the statements made by defendants Ellison and Henley in December 2000 that there would be growth in the database business and applications business.

37.    Moreover, not only were the number of deals in the pipeline dramatically reduced, but the number of deals closed severely decreased from FY 2000 levels. Even those deals that did close represented average dollar values significantly less than in the previous year. In July

15

2000, because Microsoft's and IBM's databases became more competitive with Oracle, customers who were going to purchase a database were looking to do so at a lower price. In order to prevent business from going to Microsoft or IBM, Oracle offered huge discounts to customers, thereby decreasing the margin of profit and dollar value of deals originally "piped" at the 8i "enterprise edition" rate which ultimately closed at the 8i "standard edition" rate. The Individual Defendants were aware of those factors because each sales representative's quota progress was consistently monitored via a live video board at the Company's Redwood Shores, California headquarters. That video board tracked all sales representatives in the western United States and displayed each representative's current percentage of meeting quota for booked deals and the percentage of each deal's likelihood to close. The Individual Defendants, through management, monitored the sales activity in the eastern United States from a similar board at Oracle's eastern United States headquarters in Boston, Massachusetts. Indeed, it has been alleged that this board at the Boston office indicated that in December 2000, only a handful of the 50 sales representatives in the northeast region were at or close to quota for FY 2001 and that some sales reps had not made a single sale between December 2000 and March 2001. When properly accounted, these discounts would serve to offset Oracle's reported margin increases which were themselves questionable to the extent that they represented shifts of costs from operating units (such as support) to non-operating units (such as development) or to Oracle's customers, who in turn demanded discounts.

38.     It has been alleged that during the fall of 2000, when media coverage of the looming economic downturn became more intensified, these symptoms had been well known at Oracle since June and July 2000. The weakness in overall demand was also felt by most of Oracle's consulting staff as well as its products sales staff. The sharp decline in business was recognized by the Individual Defendants, through Oracle's consulting staff, by the beginning of the summer of 2000 and continued through March 2001. Many employees inside Oracle questioned the Company's news releases which the Individual Defendants caused to be made because so many consultants were "sitting on the bench"(a term used when consultants are between projects). In late 1999 and through

the first couple of months of the year 2000, typically there would be one or two consulting staff people sitting on the bench. However, by summer and into the fall of 2000, that number increased to several dozen at a time and included senior people who sat on the bench for months at a time.

39.     The weakness in sales and service was evident to Oracle, its management and the Individual Defendants because Oracle's consulting staff frequently logged on to the Oracle Resource Request Browser, a Company website listing of managers world-wide who needed consultants for their projects. Typically when any given consulting group becomes too busy in its territory to handle all of the work, the local consulting manager would post a message on this board requesting applicants for a desired skill set. During the first several meetings of 2000, the list would consist of 40 listings at any given time, but that number plummeted to one or two listings by the summer of 2000 and never rebounded.

40.     In addition, new sales for state and local governments were extremely sluggish across the country in the late spring into the fall of 2000. It has been alleged that state and local government Practice Managers held weekly conference calls and consistently reported that business was slow all throughout the last nine months of 2000. In fact, by the fall of 2000, no Practice Managers were meeting Oracle's internal quotas.

41.     The Individual Defendants were well aware of the slowdown in this sector and, at the beginning of December 2000, Oracle was eagerly anticipating the close of at least one large deal with the State of Michigan Human Services Department worth as much as $50-$100 million in product sales, consulting services and database sales, much of which Oracle hoped would be booked in Q3. Accordingly, Oracle committed as many as 80 consultants, and Group Vice President Larry Mendenhall, to try to get the deal done. However, by early January 2001, the deal completely fell through. The failure of this deal threw a lot of people "on the bench."

42.     It has been alleged that during December 2000 Oracle had been projecting to close a deal with the New York City Housing Authority. That deal also failed to close, and though defendant Ellison in the March 1, 2001 conference call stated that the deals that did not close in the

quarter were merely delayed for a few days, the New York City Housing Authority was not one of them, as this deal did not close in Q4 2001 either. Overall, business in the state and local government division had been very slow during the Holiday 2000 season as the pipeline projections for state and local governments which used Oracle sales online and Oracle's internal system reflected this state of affairs.

43.    It has been alleged that during the spring of 2000 and thereafter, business within the state and local government division had become so desperate that product sales personnel were offering anything to close deals, including giving away consulting services for free. This caused high tension between product sales and consulting sales, because product sales personnel were motivated to close product deals without the consulting services because the higher cost might kill the sale. Such deals negatively affected the ability of consulting sales personnel to make their quotas. Indeed, by the end of Q3 of the business year (March 2001), some Oracle consulting services sales representatives selling to the state and local governments had only reached 50% of quota with only one quarter left to make up the other 50%.

44.    It has been alleged that in the ordinary course of Oracle's business, given the information available and the fact that database was a core and mature business, the Individual Defendants should have been aware that growth would have been negative or flat. The Individual Defendants should have been aware at least six weeks prior to the end of Q3 2001 that application growth would miss by 50%.

45.    Despite knowledge of the above referenced facts, the Individual Defendants continued to cause Oracle to make positive statements about the strength of the demand for Oracle's products in the face of a quickly weakening economy and continued to claim that 11i Suite was pre-integrated and inter-operable out-of-the-box, needing no programming systems work for implementation. The Company also continued to claim, moreover, that by implementing 11i Suite internally, Oracle had already saved $1 billion in costs and savings in one year and was well on it way to saving $2 billion. Defendant Ellison and the other Individual Defendants made this claim

18

repeatedly to persuade potential software customers that the 11i Suite would produce similar results for them, and to persuade investors of Oracle's imminent success in this part of the software market. In reality, the billion dollar savings campaign was merely a marketing tool to induce potential customers to upgrade to 11i Suite and to convince the public that it was a viable product that could support the Company's earnings and growth projections despite the slowdown in the United States economy.

46. For instance, on Highway 101 near Oracle's headquarters, throughout this time period, there was a billboard reading, "Using our own E-Business Suite, Oracle saved $1 billion in 1 year." On October 2, 2000, Gary Bloom, an Oracle Executive Vice President, had announced during his opening keynote speech at the Oracle OpenWorld conference (coinciding with a multitude of Oracle's announcements of products showcased during the week-long exposition): "We've taken well over $1 billion in expenses out of Oracle," harkening back to a promise made by defendant Ellison in June 1999. And, on February 13, 2001, defendant Ellison appeared in Paris, France and proclaimed that Oracle was on track to save another $1 billion this fiscal year and an additional $1 billion next year as it used its own 11i Suite to run more efficiently.

47. The Individual Defendants knew that all of the Company's savings, whatever the true amount, were not, as advertised, the direct result of the application of Oracle's own software. In addition, the Individual Defendants knew that other companies could not replicate Oracle's savings with the use of Oracle's current software because that software simply did not work. Defendant Ellison and the other Individual Defendants knew that most of the advertised "savings" did not require or necessarily even involve the 11i Suite technology. Rather, they knew the savings resulted from other identifiable factors, such as the centralization of computing and attendant operations resulting in the termination of more than 2,000 employees.

48. It has been alleged that internally at Oracle, 11i Suite was always "down." Specifically, when Oracle implemented the system for employee time-billing and expense entering purposes, there was a lot of down time. When an 11i Suite CRM procurement feature became

19

available internally for ordering office supplies, users could seldom get into the system, which could not handle a large volume of users. There were frantic efforts throughout this time period to rectify problems, which marginally improved around May 2001. Many Oracle employees wondered how Oracle could sell 11i Suite CRM if it did not work in their own company. Further, the Individual Defendants also knew that part of Oracle's advertised savings merely shifted cost from one Oracle category to another, *i.e.*, shifting cost out of operating expenses and into non-operating expenses. In the case of its Support line of business, Oracle shifted expenses from Support to its Development organization, which is not an Oracle line of business or even an activity that figured into Oracle's margin calculation. Oracle also shifted some Support cost to its customers, who eventually responded by seeking lower prices or alternative products. As such, the announced "savings" were just a marketing ploy; 11i Suite did not work internally any better than externally.

49.    Specifically, in the first six months of its release through the summer and fall of 2000, the 11i Suite product required an incredible 5,000 "patches," leading one industry expert to call it "'the buggiest software I've ever seen come out of Oracle.'" *See* Steve Konicki and Jennifer Maselli, *Apps Made Easy?*, InformationWeek.com News (Mar. 12, 2001), *at* http://www.informationweek.com/832/apps.htm. Oracle's early adopter customers were forced to devote extensive resources toward the application of daily patches to the 11i Suite software. Rather than having the Company admit that it released incomplete products prematurely, Oracle resorted to blaming customers for problems with their software.

50.    Oracle's use of multiple tools and technologies resulted in costly and difficult upgrades for its customers. Although Oracle offered several vertical solutions for its ERP products, it only offered one out-of-the-box industry-specific solution for 11i Suite CRM. The lack of industry solutions forced customers to perform expensive customizations to achieve their required functionality. Furthermore, Oracle discouraged customizations to its software, and customers experienced additional difficulties in making Oracle's solutions meet their business needs.

51.     Further, Oracle 11i Suite CRM runs from its own data model and integrates to ERP through interfaces. Oracle 11i Suite uses a single real-time ERP interface for order creation, which, as of the November 2000 11i Suite release, did not work at all. Oracle's claim of comprehensive out-of-the-box integration was clearly false, as customers regrettably discovered when they attempted to build the 18-24+ interfaces across 6-12 different applications that enterprise customers typically require. Oracle's technical documentation failed to make any mention of a volume database interface, making it unclear as to what would bring the CRM and ERP applications into agreement on accounts and products when orders were placed.

52.     Although Oracle discouraged customizations, it shipped incomplete products that required its customers to modify the source code, including procedural language/structural query language ("PL/SQL"), Oracle Forms and Java in order to complete integration. Oracle's approach made automated configurations impossible across releases, and sacrificed the supportability, upgradability and maintainability of the applications. For example, schema changes required extensive amounts of PL/SQL re-work. Oracle's 11i Suite applications were not built on a true multi-tiered architecture since some of the applications were based on legacy software. Proof of this lies in the fact that application logic resides both on the application server and as PL/SQL procedures in the database. Failure to use a true multi-tiered architecture resulted in poor database scalability and difficult application maintenance.

53.     It has been alleged that even when the full version of 11i Suite was made available in November 2000, it was by no means ready to go to market and that in addition to slow sales, there was a high level of customer dissatisfaction with the "bugginess" and incompleteness. In fact, Oracle sales representatives would return from field demonstrations and report that Oracle should not even bother to continue selling the CRM module because it was so ineffective. The problems with the application would become evident to customers as early as the "CD evaluation" phase of the sales process during which the customers were afforded 30 days to work with the applications before committing to purchase. It has been alleged that the "call center" application

of the CRM module was so laden with bugs that Oracle sales representatives could not believe that anyone would entertain purchasing such a problematic product. Further, even when customers would purchase the CRM module, such purchase threatened to result in refusal to purchase other Oracle licences or products.

54. It has been alleged that the new version of CRM - which began to ship with 11i Suite in May/June 2000 - was both immature and a first release. Most of Oracle's substantial customers in its install base were reluctant to be among the first to engage in a CRM procurement. Prospective deals with a large company were in the range of tens of millions of dollars. A $50 million deal would not be uncommon in sales of a full CRM suite for a large corporate customer. There were many prospective deals that entered Oracle's pipeline during the summer months, but one after another did not close. Among these were FedEx, Mutual of Omaha and several potential projects with General Electric.

55. Some 11i Suite deals did close which were substantial – worth millions of dollars in terms of revenue – but not the "mega deals" that Oracle hoped for after having announced the release of 11i Suite in May 2000. The main reason – the product did not work. The process of working on deals that did close, and presentations to larger customers that failed to materialize, was still very much the same and involved what amounted to rigged demonstrations. The Individual Defendants knew that although it represented 11i Suite was ready and being shipped, most modules did not work – a fact that the Individual Defendants concealed from customers.

56. From the time of release in May 2000 through at least January 2001, the CRM group, as well as other consulting groups, were continuously notified in e-mail memos that, although certain modules of 11i Suite had been released, they did not work, and consultants were instructed "DO NOT INSTALL." In some cases, the memos were timed with the release of a given module, so consulting knew that when contacted for a demonstration of CRM modules at a customer site for a deal in the pipeline, they should not do so because the development organization knew that the product would not work as released. In other cases, the memos were distributed to inform the

22

consulting organizations of a particular patch that would fix certain problems in a given module, so these consultants knew they could demonstrate the module (at least on a limited basis) for the particular screens that had been the subject of the patch. "Mega patches" began to be released over the summer 2000, which each fixed a host of problems within a given module for applications. Once Oracle released its full suite of CRM in approximately October 2000 (which included applications not previously released), additional memos were issued directing consulting not to install, and Oracle's process of developing patches to deploy in the field even just for demonstration purposes continued.

57.     These memos would flat out tell consulting that the product did not work and it should not be installed.  Usually, the memos identified dates when "mega patches" for the identified applications were scheduled to be released, so the consulting groups were on notice to drag their feet and stall however they could until the patch was actually deployed. A "mega patch" is a "roll up" of numerous fixes for individual problems. Sometimes, Oracle did deploy specific patches that would fix only one problem. However, in most cases, since there were so many "bugs" in the CRM applications, the development organization created "mega patches" covering basically all of the known anomalies in applications. They then incorporated this patch into the base product and would re-cut the CD, deploying that to the field in place of the originally shipped CD, which was misrepresented as a functional product. These re-cut CDS were referred to as a "family pack," where the base product now incorporated all of the current patch fixes, and relieved the consulting organization of the necessity to load each fix or patch individually and/or incrementally. These tactics were further the subject of weekly conference calls described below.  This process continued through March 2001.

58.     Oracle Consulting Vice President, Brad Scott, sat in on many meetings with the development organization at Redwood Shores. He was typically the individual briefing the CRM group in weekly conference calls that addressed the various CRM products that would not work, when mega patches were expected to be completed and family packs issued.

59.     Weekly conference calls during FY 2001 were held for the CRM group, and almost always attended by Vice President, Brad Scott, Todd Davis and sometimes Valerie Borthwick. The primary subject matter of these calls was to address potential deals in the pipeline, the non-functionality of Oracle's released modules, as well as patches and schedules for patch releases so that the field understood what could and could not be demonstrated to a customer. The conference call attendees also included regional consulting managers for Oracle's consulting organization because certain CRM projects were underway in their area, and they provided additional staffing. There would be four to five regional managers from the consulting organization, the CRM group's five or six practice directors and four or five managers with CRM responsibility, as well as the Vice Presidents described above.

60.     Throughout each quarter beginning with Q1 2001 (the summer of 2000), the group was consistently revising its forecast downward because of a lack of business in the pipeline. Oracle's original projections assumed that large customers in its install base would procure CRM, and, as described above, certain prospective deals were entered into the pipeline with projected revenues in the $50 million range. However, since none of these large "mega deals" materialized, the forecast submitted by the CRM group dropped dramatically during each quarter.

61.     The "pipeline" for the consulting organization, including the CRM group, consisted of Excel spreadsheets that identified typical information for a prospective Oracle deal. In addition, weekly reports prepared by Oracle Practice Directors included the following information in Excel spreadsheet format: utilization percentage - based on the size of the director's consulting group; the amount of available billable hours to utilize; the rate at which the individual consultants in the group would be billed; calculation of what expected revenue would be for the quarter; and estimations of expenses for the quarter. These categories were rolled up to estimated revenue, estimated expenses and estimated margin. These weekly reports consistently revised forecasts downward from the original quarterly projections throughout Q1, Q2 and through at least December of Q3 2001.

24

62.     Practice Directors were required to ensure that all information related to each individual deal had been input into these spreadsheets at the end of each week, and finalized on Mondays, so that each "practice" submitted a weekly report in the spreadsheet format to upper management. These reports were all sent to Brad Scott, and the CRM group report was incorporated into an overall consulting organization report which was then sent upward to executive management including the Individual Defendants.

63.     The consulting group's forecasting was based on loading of consultants to perform work on various deals in Oracle's consulting pipeline. However, as these deals were either pushed out beyond when originally scheduled to begin, or just did not close, this would mean consultants scheduled to perform work were instead "on the bench," and those projected billable hours would have to be subtracted from the forecast. By the beginning of Q3 2001, it became evident there was no way that the consulting group was going to make their fiscal year projections.

64.     Demonstrations of CRM capabilities to customers were "vaporware." When consultants installed 11i Suite CDS at customer facilities as released by Oracle, it was certain that many screens would not even come up, let alone be functional. Oracle's development organization and the Vice Presidents heading the CRM group devised a scheme where the CRM consultants worked at an Oracle office to put together certain demonstration screens – subject to a customer's specific requirements that would be of anticipated viewing interest – which would appear to be functional. At a local Oracle office closest to the client's facility, the consultants utilized patches created by the development organization that would allow certain screens for a given application on the client's list to come up and work in a limited fashion. The consultants rigged these demonstrations so that data was stored in a small database, where these presentations essentially became a little pilot of specific applications that appeared to be operating in a full-blown database, which in actuality was only a limited version of a limited group of screens processing limited data. Once the pilot presentation was functional in the Oracle office, the consultants would move the entire environment to the customer facility for the demonstration. The customers were not told of

25

the limited nature of these pre-prepared demonstrations, or that other screens of the application were still riddled with bugs and deficiencies, and would not work until the development organization concluded additional patchwork.

65.     Once sold and once full installation began at a customer site, these additional incapabilities of CRM applications became immediately evident.  This resulted in Oracle's deployment of additional employees from the consulting organization.  Quality assurance testers were sent to the customer site to begin testing various screens in each CRM application ordered by the customer.  Lists were created of deficiencies, documenting errors and failures.  Application Database Administrators ("Apps DBAs") then began to work on resolving these problems, applying patches that had been previously developed for the same issues, or communicating with the development organization to create new ones.

66.     When consultants could not resolve a problem with an existing patch, Technical Assistance Requests ("TARs") were sent into Oracle's consulting organization describing the problems and errors.  Many times, this resulted in delays where the development organization took several days to complete work on additional patches to fix those problems.  During this process, customers became well aware that Oracle's product as released did not work properly and that the CRM applications required extensive effort and patchwork before being operational.

67.     Oracle's customers had negotiated fixed price deals for the procurement, installation and implementation of CRM software.  The excessive amounts of consulting hours required to perform 11i Suite-related activities at customer sites significantly eroded Oracle's margins.  One particular deal with AmeriCredit in Dallas was so problematic that Oracle had taken revenue from the licensing portion of the sale and funneled some significant portion to the consulting organization.

68.     AmeriCredit, whose systems are mostly stable today, was one deal so problematic that defendant Ellison became personally involved.  In weekly conference calls during this time frame, it was also stated by either Brad Scott or Todd Davis that defendant Ellison was

26

scheduled to visit Telecom Corporation of New Zealand, Ltd. and Foster's Group Limited in Australia, because both potential purchasers of 11i Suite applications and the CRM were so concerned with functionality that they required his personal involvement and assurances. In the weekly calls there were frequent mentions of other contacts defendant Ellison made personally with customers over 11i Suite dissatisfaction, or trepidation to purchase 11i Suite applications because the software was riddled with bugs.

69.     Other major problems that occurred during CRM installations involved the integration of various Oracle applications enterprise-wide at the customer site. Even once "bugs" in individual applications were resolved by mega patches, there were still extensive integration problems between the various application modules. In the development process, it was apparent that Oracle had performed very little testing of the applications interface capabilities. Although an application could be finally made to work with patches as described above, the way that the applications worked together became an entirely different issue.

70.   ·  Although Oracle advertised that CRM applications chosen by a customer could be snapped together, the interface capability just did not exist. In addition, many of the "mega patches" released to fix individual applications, ended up breaking interface capability with others and Oracle's development organization had to produce interface fixes for the integration effort at customer sites. There were literally hundreds of integration problems between different applications, which had to be resolved during the installation process at customer sites for CRM modules throughout this time period.

71.     It has been alleged that the CRM module of the 11i Suite was still incomplete as of the end of 2000. In fact, the entire I-Procurement B2B module was totally missing and this fact was widely known throughout Oracle as efforts to develop the missing module were still ongoing at the end of 2000.

72.     While Oracle, through defendant Ellison, claimed to save the Company $1 billion by implementing Oracle's own software in 2000, the 11i Suite software was not completed

27

until June or July 2000, the last quarter of Oracle's fiscal year. Even then, the software did not work either in-house or at customer locations. Internally, the timesheets module, which was created to allow Oracle employees to enter their billable events, frequently locked up and flashed a white screen with gibberish whenever too many users logged on. Oracle's own sales people frequently questioned how Oracle could sell the 11i Suite CRM if it did not work in their own company.

73.    The allegations concerning Oracle's internal difficulties with the 11i Suite software are consistent with other allegations concerning implementation problems at one of Oracle's largest customers, BellSouth Corporation ("BellSouth").   These implementation problems completely contradict Oracle's statements concerning pre-integration and interoperability of 11i Suite. Such difficulties should have been known and expected by the Individual Defendants during the initial production and introduction of 11i Suite. In fact, the horizontal CRM model developed by Oracle, while it could work for smaller companies, would not likely meet complicated requirements of large telecommunication companies that have many services and products, and the Individual Defendants should have known that prior to completion and shipment of 11i Suite in May 2000.

74.    Even into January 2001, the components of the CRM module lacked an API interface and therefore could not communicate with one another. Furthermore, because they could not communicate, the Individual Defendants did not even know if they would work once an API interface was actually installed. The lack of the API interface was the cause of the severe delays in implementation at BellSouth because Oracle's senior consultants had to figure out how to write the interfaces themselves. To accomplish this task, Oracle had at least 90-100 consultants working day and night at BellSouth writing code to get the CRM interfacing and communicating properly.

75.    BellSouth had begun integrating 11i Suite into its digital subscriber line ("DSL") business in the summer of 2000. BellSouth had planned on purchasing 11i Suite for six other business units, but the final decision was dependent upon the success of 11i Suite in the DSL division. Thus, Oracle was dependant on the successful implementation of 11i Suite to secure more

28

business from BellSouth. Immediately after integration began in June 2000, BellSouth was complaining about serious quality issues in the 11i Suite base codes. Implementation problems were so severe and persistent throughout the summer and fall of 2000 that they resulted in Oracle sending a SWAT team of consultants to BellSouth headed by Senior Vice President, John Wheeler, who reported to Oracle Executive Vice President, Jay Nussbaum. In fact, Oracle had as many as 90-100 consultants working at BellSouth to fix the problems. The BellSouth implementation was not completed until January 2001 at the earliest and. because of the instability of the software, BellSouth deferred upgrading to and implementing 11i Suite in the other six business units. The problems at BellSouth were so severe, and because Oracle was willing to pay anything to keep BellSouth as a customer, Oracle was not compensated by BellSouth for the last six months of the year 2000.

76.    The BellSouth project had a severe detrimental affect on a deal that was in the works during the fall of 2000 with Telia AB, a Swedish telecommunication company – a deal worth approximately $35-$40 million. The deal was managed by Oracle Senior Vice President Gary Moore. Telia AB had been negotiating with Oracle to purchase the 11i Suite CRM module and Oracle Financials (a similar packaging which Oracle frequently sold in order to help develop the CRM module). However, Telia AB had also been waiting to see a U.S. telecommunications company commit to Oracle products applications and consulting services before doing so themselves. By January 2001, on the heels of failures at BellSouth, the Telia AB deal completely fell through.

77.    In addition, Hewlett Packard began the upgrade to 11i Suite in January 2001 and the process was unusually buggy and required numerous patches. The upgrade required a huge data conversion to make the system operable. Oracle had not disclosed during its sales presentations that implementation required data conversion. Rather, they had advertised 11i Suite being pre-integrated and interoperable out-of-the-box, meaning that the system had the ability to use the parts of another system without conversion. Because of the unannounced data conversion requirement,

Hewlett Packard decided to stop the upgrade to 11i Suite and will not decide on whether to upgrade until 2002.

78.    JDS Uniphase ("JDS") has been running Oracle 3i and went live with Oracle's Field Sale Module in January 2001. Even that module has hundreds of bugs. Moreover, Oracle promised JDS that the field sales module would work offline, allowing sales people to use the software even when they were not connected to the Internet. However, the software did not work offline. In fact, JDS was not informed by Oracle that the software would not work on 3i until after Oracle had completed its installation. Because of these compatibility issues, JDS has also deferred upgrading to 11i Suite until there is demonstrable functionality.

79.    Like JDS, a deal that Oracle had begun in Q3 2001 with The Principal Financial Group also fell through because Oracle had promised certain features of 11i Suite that just were not substantiated. Defendant Ellison had specific knowledge about the progress of this account because of its value of more than $1 million in product sales alone.

80.    Nantucket Allserve, Inc. ("Nantucket"), the maker of Nantucket Nectars, purchased Oracle's 11i e-business Suite in December 2000. However, before implementation of 11i Suite, the soft drink maker also got cold feet after hearing of implementation problems, including multiple software patches and long processing times implementing Oracle's 11i Suite at other company sites. Nantucket instead has decided to wait until next year to upgrade to 11i Suite, giving Oracle time to work out the kinks of the troubled software, and now uses an interim browser based version application to run its back office systems.

81.    Alliance Coal, LLC ("Alliance"), an Oracle customer, is another example of Oracle's installed base customer that is deferring implementation of the 11i Suite. Alliance is running on Oracle's 10.7 application and has decided to wait until next year to attempt an upgrade to 11i Suite. Oracle eventually announced that it would no longer support 10.7, and would not offer end-of-year patches for the 10.7 software.

30

82.   The issue of support is the primary reason that GE Capital, in November 2000, decided to purchase and implement the 11i Suite. GE Capital had been running on the Oracle 7.16 database and the 10.7 application and had comprehensive support agreements with Oracle for support of those products. However, both were schedule to be de-supported, meaning no further patches would be made for enhancements. Because of this, GE Capital had to convert both its database and applications. Indeed, they could not choose to do only one convert because, for the first time, Oracle issued an application that was not compatible with any of its own earlier databases. Prior to undertaking the move to 11i Suite, GE Capital representatives researched multiple forums and discussion groups including the Oracle Applications Users Group and noted that they had not found a single company brave enough to make the conversion from 10.7 to 11i Suite. Rather, they found that everyone was waiting for a success story before trying it themselves.

83.   Nevertheless, GE Capital started the implementation process in early January 2001. The implementation from the beginning was exceptionally difficult because of problems with the 11i Suite software itself. Each of those problems was documented and submitted to Oracle in TAR reports. Though GE Capital could download patches directly from Oracle's Technical Support website, oftentimes the patches would "fix" too much and cause other errors. The conversion process at GE Capital completely failed in April 2001, requiring a completely fresh install.

84.   Oracle records and stores all problems suffered by all of its customers on a database consisting of all of the TARs submitted by its field consultants for technical support as they encounter problems at customer sites. These TAR reports must be submitted when Oracle's Metalink web page does not have a solution to the problem that can be downloaded for the website. Every implementation is given a CSI number and all of the TARs for a specific customer or implementation can be accessed by the CSI number. In some cases it was impossible to get a solution to a TAR and impossible to get a customer care employee to personally help with problems. Instead, Oracle would admit to its consultants in the field that the product was released prematurely and that nothing could be done.

31

85.    Motorola, Inc. also walked away from upgrading to 11i Suite in Q3 2001. In mid-February 2001, Motorola, instead of taking on the risky and expensive challenge documented by other companies who have had difficulty with 11i Suite upgrades and conversions, decided to add additional capability to its already functioning Oracle 10.7 system.

86.    Oracle also confronted similar problems with Health Net, Inc., an account managed by Executive Vice President John Wheeler. In March 2001, implementation difficulties had risen to a level where Health Net was so angered by the fact that it was millions of dollars over-budget that they were withholding payments for Oracle's consulting services and ultimately canceled parts of the implementation project. There were huge problems with the implementation of 11i Suite at Health Net because the 11i Suite applications just didn't work.

87.    Now Foods, a Bloomington, Illinois company, is currently suffering from implementation problems with the February release that was supposed to be the "working" release of the 11i Suite software. To date, Now Foods has required more than 3,000 patches at this project alone. Furthermore, those problems have caused their "go live" date to be postponed for months and has cost the company more than $400,000 in profits.

88.    Even Citibank, one of the early purchasers of 11i Suite and frequently cited as one of Oracle's references that have purchased and implemented the product, has given up on parts of its implementation. Citibank had originally intended to use 11i Suite in its services division, which creates software to support thousands of other bank customers. Even as late as April 2001, Citibank has not decided where to implement it.

89.    JacMel Jewelry, Inc. ("JacMel"), also contracted with Oracle for implementation of Oracle's applications products. After attempting to install earlier Oracle applications products, Oracle finally sold JacMel on the 11i Suite based on representations that it would be easy and seamless. However, despite many months, the software still did not work, resulting in tremendous cost overruns and losses of current and future sales.

90.     This group of Oracle customers, while indicative of the massive problems that have plagued Oracle 11i Suite customers overall, is severely limited in scope due to the extraordinary efforts of the Individual Defendants to control and conceal the truth from the marketplace.  It has been alleged that Eaton Corporation's experience with 11i Suite was a nine month debacle of problematic integration and implementation.   Moreover, because of a confidentiality agreement with Oracle, Eaton Corporation is prohibited from discussing the problems publicly.  Furthermore, it has been alleged that efforts to interview employees at BellSouth regarding 11i Suite were met with the response that no interview would take place without the permission of Oracle and the presence of an Oracle representative.  Because the implementation process involves transferring all critical corporate information to Oracle's online database, Oracle effectively holds billions of dollars of the customers' corporate information hostage to further its own interest in concealing the ineffectiveness of its software from potential customers and investors.  Due to these agreements, several companies that have threatened litigation are now in the process of out-of-court settlements with Oracle, including Nike Corporation, JacMel, Eaton Corporation, Carl M. Cummings Mfg. Co. and Dynamation.

91.     At the start of the year 2000, Oracle derived 10-12% of its database license revenue from Internet companies.  By late September 2000, the beginning of the Company's Q2 fiscal 2001, the market for Internet-business related products and services was suffering a severe decline.  Internet companies which had gone public only years or months before were unable to generate revenues strong enough to make them profitable, and venture capitalists and investors had little interest in investing more money into the same companies who were proving that their business models would result in little more than bankruptcy.  In fact, by Q2 2001, many of Oracle's best dot.com database customers' money raising problems had reached crisis proportions, and by the end of Q2 2001, at least thirty of the Company's sizeable Internet database customers were already out of business.  In addition to the evisceration of at least thirty of Oracle's significant Internet database customers, also by the inception of Q2 2001, the majority of Oracle's surviving Internet customers

33

were scrambling to maintain their business amidst volatile market conditions. While Oracle had "powered" 93% of all Internet initial public offerings in FY 2000, many of these companies' ability to fund themselves and to sustain their operations was in doubt, and as a result, many if not all had begun to cut back information technology orders. Furthermore, from their frequent conversations with their customers and other Oracle employees, the Individual Defendants knew that even the Company's core customers were cutting information expenditures and that these spending reductions would cause Oracle's future revenues to decline. The materially impaired condition of the dot.com sector and the rapid disappearance of Oracle's database customers was of critical importance to Oracle, which derived approximately 12% of its FY 2000 database license revenue from these Internet companies.

92.    Thus, at the time Oracle reported its Q2 2001[2] results (on December 14, 2000), it faced increasingly bleak short-term and long-term prospects. Nevertheless, the Individual Defendants wanted Oracle to continue to lock in customers to its own applications, at least until a "working" product of the 11i Suite could be shipped, so that they could unload their shares before the truth began to be revealed about Oracle's true prospects. Thus, the Individual Defendants caused to be disseminated positive information about Oracle's business and prospects, concealing the fact that, even in November 2000, customers were cutting back on expenditures for information technologies which would hurt future results.

93.    The Individual Defendants also knew or should have known from Oracle's frequent conversations with customers and its own staff that the Company's 11i Suite, which had been first shipped to Oracle's customers in May 2000, was bug ridden and required massive and expensive programming systems integration work. The Individual Defendants, including Ellison and Henley, knew that unless they continued to cause Oracle to ship 11i Suite in its current faulty form, it would be impossible to convince the market that Oracle would be able to meet their phenomenal Q3 projections. The Individual Defendants, including Ellison and Henley, also knew

---

[2] Oracle's Q2 fiscal 2001 was the period from September 1, 2000 to November 30, 2000.

that unless Oracle could quickly develop a "new version" with fewer technical difficulties by the end of February 2001 (the end of its Q3), Oracle would be flooded with returns. During the week of February 12, 2001, two weeks away from the end of its Q3, the Individual Defendants caused Oracle to push out the "working" version of 11i Suite (the third version) and ship it to its unhappy customers who had purchased an earlier version.

94.    Ellison and the other Individual Defendants were personally familiar with Oracle's Q3 2001 revenues as they monitored Oracle's sales and closely monitored the performance of Oracle's operations via reports from Oracle's Finance Department, which were generated and provided to Oracle Management, including defendants Ellison and Henley, on a regular basis and via the OASIS pipeline reports, which summarized orders, dollar volume, buyer name, credit terms and product type. As a result, the Individual Defendants were aware that Oracle would be unable to meet its projected results, as its software business was slowing and its customers were unable to continue the capital expenditure programs at previous levels in light of the dramatic adverse economic developments of 2000. The Individual Defendants, however, continued to maintain throughout the relevant period that Oracle would post Q3 2001 revenue and EPS of at least $2.9 billion and $0.12, respectively, when, in reality, they knew that Oracle could not possibly achieve such performance.

95.    By mid-December 14, 2000, the Individual Defendants knew or had reason to know that Oracle would be unable to show sequential earnings growth in Oracle's Q3. Worse, this would be the first time in more than eight years that Oracle would report a declining sequential quarter in EPS growth. Ellison and the other Individual Defendants knew that Oracle's inability to post sequential growth, and worse, the prospect of posting declining growth, would devastate Oracle's share price, revealing that contrary to Oracle's assertions, it too was being impacted by the economic slow down. Likewise, such inability to post sequential growth also would hurt Ellison and the other Individual Defendants' ability to profit from their sale of Oracle shares, including the 20+



million shares defendant Ellison held options on that expired in August 2001, long before the Individual Defendants expected Oracle's stock price would recover from the economic slowdown.

96. It was only on March 1, 2001 that the truth about the Company was belatedly disclosed, when at that time, the information was finally revealed that Q3 2001 EPS would come in at least 17% below Company guidance, that database-license revenue would come in flat at best (well below the 20% growth the defendants had forecast only weeks before), that overall sales would come in $200 million below forecasts – demonstrating only 9% growth compared to the 20% Wall Street expectation – and that the growth in Oracle's applications business of enterprise and front-office software would be at least 25% below Wall Street estimates. This disclosure shocked the market, causing Oracle's stock to decline to as low as $15.75 per share before closing at $16.88 per share on March 2, 2001, the first trading day following the release of Oracle's Q3 2001 results. The Individual Defendants' illegal course of conduct inflicted billions of dollars of damage on Oracle's public shareholders, as over $90 billion in market capitalization disappeared since the time the Selling Defendants liquidated their personally held Oracle stock, the price of which had fallen over 50% from a high of $35 per share reached in January 2001. As a direct result of the Individual Defendants' wrongful and illegal course of conduct, the Company is now subject to several shareholder class action law suits which allege securities fraud relating to the illegal insider trading and violations of federal securities laws. Regardless of the outcome of these suits, the result is that the Individual Defendants have caused irreparable harm to the Company's reputation. Additionally, the Individual Defendants' have reaped the benefits that belong to the Company by using their knowledge concerning, and control over, Oracle to sell *nearly $1 billion* of their personal holdings of Oracle stock.

97. Despite the adverse market conditions and the severe cutbacks in database, enterprise and front-office software expenditures by its customers, at no time did Oracle revise or adjust it's revenue and earnings projections for the Q3 or Q4 2001. Instead, and to the contrary, the Individual Defendants adopted the public position that Oracle's enterprise and database businesses

were "unfazed" by slowing personal-computer sales, the impaired condition of its current and likely potential customers and the general downshifting in the U.S. economy.  By the end of December 2000, when Oracle released results for Q2 2001, Oracle's CFO, defendant Henley, publicly distinguished Oracle from other technology companies who were by then being adversely affected by negative market conditions and told analysts and investors that "[a]ll tech companies are not the same" and that "[w]e're much more immune to economic factors than others."  At the end of Q2 2001, Oracle also stated that:

- Oracle's pipeline was "never stronger" and its applications growth was "accelerating," as enough customers were accelerating their purchases to offset any declines resulting from the few customers who were cutting back or reducing orders.

- Oracle's database and applications sales were rapidly growing and Oracle would see no impact on its Q3 2001 results as a result of the slowing economy.

98.     Subsequent to the release of its Q2 2001 results after the market closed on December 14, 2000, defendants Ellison and Henley held a conference call for analysts, money and portfolio managers, institutional investors and large Oracle shareholders to discuss Oracle's Q2 results and Q3 projections and its prospects.  During the call – and in the follow-up conversations with analysts – defendants Ellison and Henley, made the following statements:

- (i) No programming systems integration work is necessary to implement the 11i Suite; (ii) Oracle would report Q3 2001 EPS of $0.12; and (iii) customers were favoring the fully integrated versus piecing together different systems from different vendors.

- Oracle would report in Q3 2001:

  - Application growth of 75%;

  - Database growth of 20-25%;

  - Licensing growth of 25%; and

  - Total service growth of 15-20%.

99.     Further, on December 14, 2000, *Bloomberg* issued a release written by Jim Finkle ("Finkle") based on an interview with defendant Henley repeating Henley's statements:

ORACLE 2ND-QTR NET RISES 62%; APPLICATIONS SALES JUMP

\* \* \*

"The economy is slowing," Henley said in an interview. "It's just not having a negative impact on our business."

\* \* \*

"If they [Oracle's customers] have to slow down on discretionary spending, it's not going to be on e-business," Henley said.

100. On December 15, 2000, defendant Henley held a conference call with *R@dioWallStreet.com* to discuss Oracle's Q2 results and Q3 projections in which he stated:

- The margins were continuing to expand nicely and the application business was really picking up steam. He saw no difference in demand for the upcoming fiscal Q3.

- The applications business was going to be solid and steady. But the real momentum in the much higher growth was going to be in the applications business. That business can grow at very high rates for the next few years.

- Oracle was seeing larger improvement across the board in every one of its businesses, in its support business, in its consulting business, and so forth.

101. On December 15, 2000, Fink reported the following, based on conversations with defendant Ellison, in his *Bloomberg* articles:

Ellison claims that using the Web-friendly products in its own business helped Oracle save more than $1 billion.

Ellison said he hasn't seen a drop in demand for Oracle products because they're not designed for PCS. Oracle can weather an economic slowdown because its software helps companies cut costs in tough times, he said.

\* \* \*

ORACLE SHARES RISE AFTER REPORTING HIGHER 2ND-QUARTER PROFIT

\* \* \*

The economic slowdown isn't hurting Oracle, said Oracle Chief Executive Larry Ellison, because the company has spent the past three years updating its product line to focus on software that helps companies use the Internet to cut costs and boost efficiency.

102.    On December 15, 2000, defendant Ellison spoke about the new software 11i

Suite with *Bloomberg* analyst Dylan Ratigan and stated the following:

> [W]e think that we have a huge winner in terms of the world's first complete and integrated e-business suite, the suite that puts all aspect of your business on the Internet. There's nothing like it in the marketplace. There's no systems integration required. No software modifications required to use our E-Business Suite. A very different value proposition on the old style of implementing in business applications and large companies.

103.    As expected, these strong projections of phenomenal Q3 2001 growth had

the effect of increasing the value of Oracle common stock, and in the days immediately after these

bullish predictions were made the price of Oracle stock increased 17.9%, reaching a high of $32.44

on December 18, 2000 – adding nearly $28 billion to Oracle's market capitalization.

104.    On January 5, 2001, Oracle issued a press release entitled "Oracle Enters New

Year Stronger Than Ever." The press release stated in part:

> Oracle Corp., the largest provider of software for e-business, today highlighted a year of accomplishments that have led to the company's strong position as it enters 2001. Over the course of the past year, Oracle has distinguished itself from the rest of the industry by introducing the first suite of integrated e-business software, the Oracle® E-Business Suite [11i] .... Part of Oracle's success story in 2000 was Oracle's own implementation of the Oracle E-Business Suite, which resulted in savings of over one billion dollars and continual improvements in its operating margins above 10 points. As it enters 2001, Oracle is seeing rapid adoption and implementation of its e-business software ....

105.    On January 8, 2001, Edward J. "Sandy" Sanderson ("Sanderson"), Executive

Vice President, Consulting and Latin American Division of Oracle, visited the offices of Salomon

Smith Barney and made the following statements to securities research analysts, which were

repeated in a report issued by Salomon Smith Barney:

> * Oracle EVP Sandy Sanderson visited our offices on Tuesday to address investor inquires about traction with the 11i E-Business Suite and 9i products and Oracle's view on the database and applications market in 2001.

> * Oracle reiterates two key value propositions for its suite approach over best-of-breed: (1) The suite provides a single view of the customer across the enterprise and (2) The suite is pre-integrated and interoperable.

> * Sanderson offered insight into Oracle's view of the competitive landscape.

To recap, Oracle's 11i E-Business Suite includes modules for traditional ERP (HR, financials), CRM (sales and marketing), e-procurement, supply chain management (SCM), and exchanges. Oracle reiterates two value propositions for the suite solution versus a "best-of-breed" approach:

* The suite provides a single view of the customer across the enterprise by incorporating a single data model.

* The suite is pre-integrated and fully interoperable out of the box, helping to lower consulting costs and time-to-value.

Sanderson quantified the second value proposition with a services-to-product ratio comparison: Instead of spending $4-$7 on consulting for every $1 spent on software as many industry leaders suggest is the norm, Oracle sees a 1:1 ratio internally. According to Sanderson, this reduction is a key component of the $1 billion Oracle purports to have saved by transitioning to a fully Web-enabled e-business and will contribute substantially to the second $1 billion the company expects to save.

*   *   *

Product Update

11i E-Business Suite Update. The company provided the following statistics regarding the status of the 11i E-Business Suite:

*   *   *

* 3,500 copies of applications shipped -- pipeline looks strong; ...

*   *   *

Market Update

Oracle sees robust demand for both its database and applications business. Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and scheduling, CRM, and SCM products are also performing well. Oracle says it is also seeing sustained demand for its database product, despite industry-wide concern over contracting IT budgets. Sanderson noted two trends driving demand for databases is demand for the 11i applications that are typically bundled with the database as well as applications of other vendors that rely on the functionality of the Oracle database.

106.    By the second week of January 2001, increased reports of an economic slowdown began to put pressure on Oracle's stock price. At this time, Oracle repeatedly denied that the economic slowdown highlighted in current reports was having any impact on its business. On January 11, 2001, Oracle spokeswoman, Stephanie Aas ("Aas") publicly rebutted any suggestion that the economic slowdown would negatively impact Oracle. In response, Aas told analysts and

40

reporters the following which was published in a *Bloomberg* news article on Thursday, January 11, 2001:

> Company spokeswoman Stephanie Aas today said Oracle has yet to see any signs that its business is being hurt by the economic slowdown or reported cuts to information-technology budgets.

107.    On January 15, 2001, *Bloomberg* published an article repeating defendant Ellison's statements concerning the impact of the economic slowdown and its current and future effects on the Company:

> Oracle is run by billionaire Larry Ellison. Executives in the U.S. said the economic slump isn't affecting Oracle and is unlikely to do so in the future because most customers buy the software to help them use the Internet to cut costs.

108.    On January 16, 2001, Sanderson discussed Oracle's future with Joe Bousquin of *TheStreet.com* following Oracle's "B2B Day" at its Redwood Shores executive offices. During that interview, Sanderson confirmed that Oracle's Q3 2001 was tracking according to plan – including Oracle's orders from customers – stating: "Our pipelines are strong." The statements made by Sanderson and published in *TheStreet.com* had the immediate effect of sending Oracle shares even higher, to over $34 per share on January 17, 2001.

109.    At the time Sanderson's statements were made, the Individual Defendants knew that: (i) Oracle was not seeing robust, surprising or sustained demand for its products as specifically detailed above; (ii) demand for Oracle products across all product lines had demonstrated significant weakness beginning in the summer of 2000; (iii) demand for new products was so weak that management directed the sales force to reach out to Oracle's installed base to generate new sales; and (iv) not only were the pipelines not strong, prospective sales entered into the Oracle pipeline reporting system were down by more than 40% in comparison to 2000 totals (and by February 2001 they were down more than 60%).

110.    Oracle's repeated assertions about how well the 11i Suite worked and that it saved Oracle $1 billion, as well as assertions that "no programming systems integration work was necessary to implement the 11i Suite" and that "the suite is pre-integrated and interoperable." were

inaccurate and misleading in that the 11i Suite had massive technical flaws and required massive and expensive programming systems integration work to function properly. Oracle faced integration and compatibility issues integrating 11i Suite with non-Oracle products. 11i Suite did not even work properly with other Oracle products. As late as January 2001, Oracle engineers had not yet developed an application programming interface ("API") which would allow the 14 different Oracle CRM modules to communicate with one another.

111.    On January 16, 2001 the Company hosted a "B2B Day" at its Redwood Shores, California campus to "introduce new software that helps companies collaborate with suppliers and customers over the Internet." Sanderson spoke with *TSC* Senior Writer, Joe Bousquin, about Oracle's sales outlook and specifically about the 11i Suite.

> Joe Bousquin:    I saw an article this morning where [Ariba CEO] Keith Krach was talking about procurement, and I think the question was who was Ariba seeing out there as competition. Was it seeing Oracle? And Keith Krach said that since [former Oracle president] Ray Lane departed [in June], you guys had, quote "vaporized."
>
> Sandy Sanderson:    (Laughing) I would respond by saying 66% application growth in Q2 and I would respond by saying 55% or 50% application growth for the year. You know people are going to say whatever they want ....
>
> \*    \*    \*
>
> Joe Bousquin:    By some analysts' estimates, as far as applications growth goes, you were talking earlier about 66%, which pleased many of the analysts on Wall Street. But there's still some discussion out there that in order to make the numbers for the year, you guys will have to do a billion dollars in applications sales in the [fiscal] fourth quarter [which ends in May]. Now, Oracle's quarters are, or its year is, back-end loaded, in that most of your business does come in the fourth quarter.
>
> Sandy Sanderson:    I wouldn't say most, but a good portion of it is.
>
> Joe Bousquin:    Can you make those numbers on the applications sales this year?
>
> Sandy Sanderson:    You know, it's a big hill to climb. Every year we climb that hill. I expect we'll do it again. Our pipelines are strong, we're well-positioned from a products perspective, and so it's all about execution. We've got stability and maturity in the management team, people running the businesses. You look at the people running the business, we've all been in place for quite a while and we expect to execute. So the fourth quarter will be a challenge, but every fourth quarter's a challenge.

112. By January 19, 2001, defendants' statements had the desired effect as the price of Oracle common stock spiked from $31.80 to $34.56, and defendant Ellison wasted no time. On Monday, January 22, 2001, defendant Ellison began his sale of more than 29 million shares of Oracle stock for nearly $900 million based on his possession of material adverse non-public information described herein. These were Ellison's first sales of Oracle common stock in approximately five years.

113. Defendant Boskin sold over $5 million of his Oracle stock two days prior. Defendants Henley and Lucas had sold approximately $37 million a few weeks before. Boskin's Lucas' and Henley's sales were all based on material inside information.

114. Meanwhile, the 11i Suite remained rife with serious problems. Those who did purchase it, however, had been persuaded by the misrepresentations of Oracle which deliberately misled customers regarding the quality of 11i Suite and the ease at which the product can be implemented.

115. During February 2001, Oracle continued to make positive statements, including: (i) claims that the Company was on track to meet its forecast, was seeing rapid adoption of and implementation of its e-business software and thus was not feeling the effects of the economic downturn; and (ii) that 11i Suite worked and was pre-integrated and interoperable out-of-the-box. These statements were consistently repeated by defendants Ellison and Henley as they endeavored to convince the public and potential customers that while it may have been true that other technology and computer related companies would suffer from the slowdown in demand for computer and PC products, Oracle would survive and thrive because its products reduced operating costs by using the Internet for critical front office and back office business functions.

116. On February 8, 2001, First Union Securities, Inc. after meeting with Oracle's senior management, including defendant Henley, authored a report stating:

> On February 7th, we met with management of Oracle, including CFO Jeff Henley at Oracle Headquarters. We note the following points regarding our meeting:

* * *

43

* Oracle now has 125 live 11i customers with strong ramp expected in future weeks.

* Management reiterates guidance of 15-20% y/y database revenue growth and 75% y/y applications revenue growth for FQ301.

\* \* \*

Oracle is not seeing the effects of a slowing economy at this point, but next several weeks will be critical. CFO Henley commented that Oracle is not seeing a decline in sales at this point as a result of reduced corporate spending, although this issue has plagued several other large technology companies... Henley also indicated Oracle would not be immune to any prolonged economic downturn, but felt that current forecasts for F2002 were conservative and had room for some general economic weakness.

\* \* \*

Management reiterates guidance of 15-20% y/y database revenue growth and 75% y/y applications revenue growth for FQ301. Although database revenue faces tough y/y comps, the company reiterated guidance of 15-20% growth. Management also indicated the applications revenue pipeline was strong and margins for the supply chain suite were meeting expectations in addition to reiterating expectations for 75% revenue growth in FQ3. However, the company also said it did not intend to reinstate the previous policy of breaking out revenue by application as in the past. Therefore, tracking actual traction of CRM and other apps products will be difficult. Investors will instead be limited to tracking the growth of the e-business suite as a whole.

117.    On February 8, 2001, Deutsche Banc Alex. Brown issued a report written by James Moore ("Moore") and Charles Chen ("Chen") repeating statements made by defendant Henley on February 7, 2001.

HIGHLIGHTS:

VISIT WITH MANAGEMENT. Yesterday, we checked in with Oracle for a mid-quarter update with CFO Jeff Henley and VPs in the server and applications development organizations.

PERSPECTIVE ON THE MACRO ENVIRONMENT.   According to management, it has yet to see macro-related weakness in its business....

STRONG PRODUCT POSITIONING MAY HELP WEATHER THE STORM. E-business software remains a top corporate IT priority, and we believe Oracle is in the midst of a strong product cycle with its 11i applications suite and forthcoming 9i database/application server platform. Barring a severe economic downturn, management sees continued growth driven by strong demand in key segments such as supply chain, customer relationship management and collaboration.

NO CHANGE TO OUTLOOK, RECENT GUIDANCE. Mr. Henley reiterated that the company's outlook and guidance were unchanged for F3Q'01 (Feb). Attempting to call Oracle's quarter with three weeks remaining and a good deal of business still to be done may be premature at this point. Given the weakening macro environment, material upside to estimates (S2.9B rev., S0.12 EPS) and upward revision to forward estimates seems less likely than three months ago, particularly in light of softening outlooks provided by other tech bellwethers such as Cisco and Sun Microsystems.

118.   On February 9, 2001, the price of Oracle common stock fell 13%, leading other computer software-related stocks lower, as rumors circulated that Oracle's Q3 2001 earnings would suffer as economic growth continued to slow. Oracle immediately sought to halt the decline in the price of Oracle stock and directed spokeswoman Jennifer Glass to issue the following statements:

ORACLE SHARES FALL ON CONCERN EARNINGS OUTLOOK MAY TURN GRIM

*   *   *

Still Upbeat

Oracle is still upbeat about its prospects for earnings growth, which will be fueled by a new suite of Internet-friendly business software dubbed Oracle 11i, spokeswoman Jennifer Glass said.

"We haven't changed our projections at all," Glass said. "This slowdown is going to provide new opportunities for Oracle as companies need to streamline and be more strategic about the technology they buy."

119.   On February 13, 2001, Sanderson appeared at an analyst conference hosted by Goldman Sachs at which he too affirmatively rebutted speculation that Oracle's Q3 2001 would fall short of Company sponsored projections. Immediately following the conference, Joe Bousquin of *TheStreet.com*, issued a report, dated February 13, 2001, which reiterated Oracle's Q3 2001 guidance and explained that Oracle was not being affected by adverse market conditions and that the Company was actually seeing an acceleration of new purchases:

As an example, [Sanderson] said one recent deal he's involved in wasn't scheduled to close until Oracle's fourth quarter, which ends in May. Instead, that deal should now close shortly.

"I met with the COO and he decided he wanted to do it in February [instead of May]," Sanderson said.

45

PeopleSoft, Inc. -- all Oracle rivals. Many had worked with Oracle for years, but are now happy to align with a company they do not compete with. "'I will not help Oracle make a single dime that I don't have to,'" says Rick Bequist, a Senior Vice President at PeopleSoft.

123.    These events did not deter defendant Ellison. On February 13, 2001, Ellison appeared in Paris, France and proclaimed that Oracle was on track to save another $1 billion this fiscal year and an additional $1 billion next year as it used its own 11i Suite (presumably working) to run more efficiently. Defendant Ellison said he saved Oracle $1 billion in its FY 2000, by implementing its Oracle 11i Suite of business software programs.

124.    In response to these statements and confirmation of Oracle's "strong" application and database business, and the fact that, according to the Individual Defendants, those lines of business "[had] never been stronger," the price of Oracle common stock spiked 12%, trading above $25 per share on February 14, 2001.

125.    Between February 21-23, 2001, defendants Ellison and Henley met with analysts, money portfolio managers, institutional investors and large Oracle shareholders at the AppsWorld Conference in New Orleans, Louisiana where they again confirmed that Oracle was poised to meet its Q3 2001 projected results, and that its business remained solid and its prospects unchanged. During the meetings -- and in the follow-up one-on-one conversations with analysts -- defendants Ellison and Henley stated:

- Oracle would report Q3 fiscal 2001 EPS of $0.12.

- Applications sales were accelerating during Q3 fiscal 2001 and would continue to do so through the end of FY 2001.

- Oracle's margins were materially expanding and could be expected to continue to do so through the end of FY 2001.

- Oracle was experiencing rapid growth in its server licensing business.

- Oracle would report Q3 2001 revenue of in line with previous guidance.

- Oracle would report FY 2001 EPS of $0.49 -- $0.12 in Q3 fiscal 2001 and $0.18 in Q4 fiscal 2001.

Oracle was seeing no impact on its business or operations as a result of any purported slowdown in the U.S. economy.

126.   On February 21, 2001, Deutsche Banc Alex. Brown issued a report written by Moore and Chen which repeated defendant Henley's statements made at the AppsWorld Conference:

MANAGEMENT GUIDANCE UNCHANGED

CFO Jeff Henley gave a brief presentation to the financial community, but offered no commentary on the current quarter (company is in its quiet period) and no change to guidance. Management still expects growth in applications license revenue to accelerate in the second half of fiscal 2001 (May) above the 43% and 66% reported in the first two fiscal quarters.

127.   On February 23, 2001, CIBC World Markets Corp. issued a report written by M. Eisenstat repeating the Individual Defendants' statements at the AppsWorld Conference:

Upbeat Conference, but no Cajun Spice P2-2

*    *    *

Currently there are 180 customers are live on 11i, with over 2,500 implementations in process. The company continues its development efforts in delivering more robust product. Approximately 45% of 11i is comprised of new modules. Management also sees strong demand in the areas of CRM and SCM.

Our quarterly EPS estimates are shown below.

|                  | 1Qtr.   | 2Qtr.  | 3Qtr.  | 4Qtr.   | Year    |
|------------------|---------|--------|--------|---------|---------|
| FY 2000 Actual   | S0.04   | S0.06  | S0.08  | S0.15   | S0.34   |
| FY 2001E Current | S0.08A  | S0.11A | S0.12E | S0.12E  | S0.51E  |
| FY 2002E Current | S0.08E  | S0.11E | S0.15E | S0.25E  | S0.61E  |

128.   As these statements were made, the Individual Defendants knew or had reason to know that throughout Q2 and Q3, (i) Oracle's new software 11i Suite was broken and needed massive integration and implementation work to be functional; (ii) potential customers were increasingly reluctant to risk upgrading to software because of high implementation costs related to bugs and poor integration; (iii) the slowing U.S. economy was severely impacting all business

sectors at Oracle; and (iv) demand for Oracle products was weak due to poor functionality of the 11i
Suite.

129.    Even as late as the morning of March 1, 2001, the Company's statements
positively influenced analysts as Bluestone Capital issued a written report by Jean Orr, upgrading
Oracle stock to market outperform, reiterating management's statements of the week prior:

Upgrading to 2-Outperform from 4-Underperform; Lowering Price Target

*    *    *

HIGHLIGHTS

* We are upgrading our rating on Oracle stock to 2 (Outperform) from 4
(Underperform) and reducing our price target to S27 from S32 per share.

*    *    *

* The company's fundamentals remain strong; management indicated last
week that Oracle had not experienced any slowdown in business this quarter.

*    *    *

* Oracle's business continues to grow; the current pipeline is as strong as it
has ever been, according to management. Application revenues, which were up 69%
year over year in the first two quarters of fiscal 2001, are benefitting from increased
implementations of the company's suite of products.

130.    Later, the same day as the Bluestone Capital report (March 1, 2001), Oracle
revealed that, contrary to prior assurances of Oracle's continuing "strong" revenue and EPS growth,
including the assurances less than two weeks earlier that demand remained strong, the Company
would post revenue and EPS declines, sending Oracle's shares into a free fall. Defendant Ellison
stated that the main culprit for the miss was the core database business and that applications would
still post 50% growth In a press release Oracle stated:

*    Oracle would post sequential EPS declines.

*    Database growth would be flat to slightly negative.

*    Applications growth would be two-thirds of what defendant Ellison had projected.

49

131.    These disclosures shocked the market, causing Oracle's stock to decline to as low as $15.75 per share before closing at $16.88 per share on record volume of more than 221 million shares, inflicting billions of dollars of damage on Oracle.  The Individual Defendants' misconduct has vaporized over $90 billion in market capitalization since the time the Selling Defendants liquidated their personally held Oracle stock, the price of which had fallen over 50% from a high of $35 per share reached in January 2001.

132.    Thereafter, on March 15, 2001, Oracle held a conference call with securities analysts and attempted to explain how its quarterly results could so widely miss the Company's repeated public guidance.  For example: (i) as opposed to 75% applications growth projection, applications grew only 25%; (ii) as opposed to 25% projected database growth, database grew a mere 6%; (iii) as opposed to 25% projected license growth, license grew only 6%; and (iv) as opposed to projected service growth of 20-25%, service grew only 12%. The Individual Defendants maintained that the cracks did not really begin to show until the last four days of the quarter, but distanced themselves from the pipeline reporting systems that they had so strongly asserted would support their aggressive earnings results. Instead of referring to their business as being immune from the slowdown in the economy and providing new opportunities (like represented previously), Oracle management said the economy was a "wildcard," and that the Company's performance in the future would be in line with U.S. economic performance.

133.    At the time each of the positive statements were made, the Individual Defendants knew or had reason to know that:

a.    demand for Oracle's products was being adversely affected by adverse market conditions because the Individual Defendants knew or disregarded that many of its former customers were going out of business or adopting defensive business strategies which no longer included making large investments in enterprise and/or database software products and that, as a result, Oracle's customers were becoming increasingly unable to pay for Oracle's products;

b.   · growth in Oracle's business-application software line would be only two-thirds of the growth stated by the Individual Defendants;

c.   growth in Oracle's database software, the Company's "cash cow," would be zero as compared to the 20%-25% growth stated by the Individual Defendants;

d.   revenue would not meet or exceed Company guidance for Q3 2001 as the Company was experiencing a revenue shortfall of at least $200 million for the quarter;

e.   of the customers who were not scaling back on their software purchases, many Oracle customers were refusing to upgrade to Oracle's new 11i Suite due to the instability of this product. These customers had become aware that certain pieces of the new Oracle system were suffering from giant gaps, including gaps in its CRM modules that Oracle failed to correct with code patches;

f.   customers were also not ordering Oracle's new 11i Suite software because they were aware that substantial programming systems integration work was required to implement the 11i Suite into their existing Oracle systems and applications, thereby rendering the Suite undesirable to Oracle's customers; and

g.   as a result of (a) through (f) above, it was impossible for Oracle to achieve Q3 2001 EPS and revenue of $0.12 and $2.9 billion, respectively.

134.   In addition to the foregoing, immediately following the announcement of Oracle's Q3 2001 results, the financial press reported on the inconsistencies that existed between the guidance given, as late as the week before the Company's March 1, 2001 announcement, and the actual results announced, as follows:

·   *SmartMoney.com* (March 2, 2001):

CHIEF EXECUTIVE Larry Ellison has been known to make outrageously bold statements from time to time, some of which have come back to haunt him. Unfortunately, that trait seems to have rubbed off on the folks who work with him.

Back in December, Oracle Chief Financial Officer Jeff Henley said the enterprise-software company was unfazed by slowing personal-computer sales and a downshifting U.S. economy in general. "All tech companies are not the same,"

51

Henley said after Oracle had issued a solid second-quarter earnings report. "We're much more immune to economic factors than others."

If by "more immune" he meant "more oblivious to," we'd agree. After the close on Thursday, the world's second-biggest software company (after Microsoft) issued its first earnings warning of the new millennium.... That news, and the lack of future guidance, caused a slew of analysts to lower earnings estimates, downgrade Oracle's stock, or both.

Shortly after Henley ate his words, investors cut their losses, sending shares plunging 21%, o $16.88 on Friday. Not that the sell-off was unprecedented; investors had already sent the stock down 38% between Jan. 19 and the close of trading Thursday.

* * *

"This is a really tough quarter," says Mark Murphy, an analyst at FAC\Equities. While he says he expected Oracle to issue an earnings warning, he didn't anticipate that the revenue results would be as gruesome as they turned out to be.

Murphy doesn't hold out much hope for Oracle shares in the short term, either. During bad times such as the mid-1980s, the company has traded at a price-to-earnings ratio of less than 18 – far lower than today's still-lofty P/E of 33. Murphy doesn't think Oracle's multiple will fall to 18, but he wouldn't be surprised if it touched 23, which would make for a $12 stock based on Murphy's revised earnings estimates.

* *Reuters* (March 1, 2001):

"We're seeing a very substantial slowdown in the U.S. economy that is making people cautious in all of their spending, including spending for software," Oracle Chairman and Chief Executive Larry Ellison told Reuters.

Oracle said its formerly bullish forecasts began to crumble when senior executives in the United States were reluctant to give final approvals as Oracle pushed to close sales for its fiscal third quarter, which ended on Wednesday.

* * *

"As long as the economy doesn't get worse, we think we're going to be just fine. We think we're better equipped to deal with the slowdown than any other company on earth," Ellison said.

[Credit Suisse First Boston] Analyst [Brent] Thill, however, sees more disappointment to come.

He said the software industry has been in a slump for the past six months but stock prices haven't bottomed out yet.

Thill said he would not be surprised if shares of some software companies slide another 15 percent to 25 percent.

52

"I don't know what's going to fix this," [Mark] Verbeck [Senior Analyst, Epoch Partners] said.

• *TheStreet.com* (March 1, 2001):

After saying for months that its business wasn't feeling the impact of an economic slowdown, Oracle said Thursday that revenue and earnings would fall short of consensus estimates for its just-ended fiscal third quarter. The culprit? Last-minute deals falling through because of the economy, stupid.

* * *

Company executives were bullish in their estimates up and down Wall Street in the days leading up to the warning. Not only did Oracle executives give bullish presentations at investment conferences two weeks ago, the company sharpened its horns at its AppsWorld users' conference last week in New Orleans.

"I had dinner with Jeff Henley at the New Orleans event," said Jim Pickrel, an analyst at J.P. Morgan H&Q, who had a buy rating on the stock as of Thursday evening. "Any chance he had to introduce a hedge clause into the conversation, he [didn't take]. Things change fast, and I'm certainly not ruling out the scenario as they laid it out, but that still creates surprise." (J.P. Morgan H&Q hasn't done underwriting for Oracle.)

There will likely be a lot of sore ears on Wall Street Friday as investors demand to know how company officials could have so thoroughly failed to detect imminent problems. Henley, Oracle's CFO for a decade, sounded a *mea culpa* in an interview with *TheStreet.com*.

135. On April 12, 2001, Oracle filed its Form 10-Q for Q3 2001 with the Securities and Exchange Commission ("SEC"). The Form 10-Q reports that "slowdown in license revenues in the third quarter of fiscal 2001 was primarily due to uncertainty related to economic conditions in the United States of America, that negatively impacted demand for the Company's systems and business application products."

## INSIDER TRADING

136. During the relevant period, the Selling Defendants exercised options and sold the following amounts of their Oracle stock while in possession of material adverse information about Oracle's business, operations and financial condition which they knew had not been disclosed to the public:

53

| DATE | INSIDER | | ACTION | SHARES | PRICE (S) | VALUE (S) |
|------|---------|---|--------|--------|-----------|-----------|
| 12/27/00 | Ellison, Lawrence J. | CEO | Exercised | 815,000 | 0.23 | 187,450 |
| 1/22/01 - 1/29/01 | Ellison, Lawrence J. | CEO | Exercised | 22,232,000 | 0.23 | 5,113,360 |
| 1/22/01 - 1/31/01 | Ellison, Lawrence J. | CEO | Sold | 29,084,576 | 30.03 - 32.01 | 894,802,664 |
| 1/17/01 | Boskin, Michael J. | D | Exercised | 150,000 | 1.44 | 216,000 |
| 1/17/01 | Boskin, Michael J. | D | Sold | 150,000 | 33.58 | 5,037,000 |
| 1/4/01 | Henley, Jeffrey O. | VP | Exercised | 1,000,000 | 1.04 - 1.69 | 1,174,048 |
| 1/4/01 | Henley, Jeffrey O. | VP | Sold | 1,000,000 | 32.31 | 32,310,000 |
| 1/3/01 | Lucas, Donald L. | D | Exercised | 150,000 | 3.69 | 553,500 |
| 1/3/01 | Lucas, Donald L. | D | Sold | 150,000 | 30.98 | 4,647,000 |

.137.  These sales were not part of any ordinary or regular pattern of selling. Further, the nature and timing of these insider sales was highly suspicious given their proximity to the release of significantly disappointing Q3 2001 results, and the fact that they were disproportionate and far larger than previous sales by those Individual Defendants.  Further, defendant Ellison's sales were particularly suspicious in that they were Ellison's first sales of Oracle common stock in approximately six years.

54

138.    As evidenced by the foregoing, the Individual Defendants breached their fiduciary duties to Oracle, by, *inter alia*, knowingly, willfully and/or intentionally:

a.    selling Oracle common stock based on material, adverse non-public information;

b.    causing Oracle to engage in the misconduct set forth herein;

c.    failing to supervise adequately and concealing from the public, including Oracle's public shareholders, the true facts concerning the operations of Oracle and the true effects the downturn in the Internet economy was having and would continue to have on Oracle;

d.    exposing Oracle to potential liability, lost earnings, lost future earnings and lost goodwill as a result of their misrepresentations and their attempt to conceal the damage to Oracle;

e.    failing to institute legal action against those responsible for causing Oracle to engage in the deceptive practices in violation of state and federal securities laws and thereby exposing Oracle to liability and other financial injury resulting therefrom;

f.    causing the Company to be liable for the defense and indemnification of those directors and officers responsible for exposing Oracle to liability in the above-mentioned securities litigation;

g.    failing to ensure that Oracle's public statements conformed with the federal and state laws; and

h.    misleading the investment community, including Oracle's public shareholders, by making inaccurate and materially misleading statements concerning the true financial and operational condition of the Company by drafting or approving of the public dissemination of Oracle's press releases and other public statements, as well as reports and SEC filings, which were materially inaccurate and misleading and failed to disclose adverse information about, *inter alia*, the Company's financial condition and exposure to risk of loss and actual losses related to the slowdown in demand for enterprise or database related software or services.

55

139.    The Individual Defendants, engaged in and/or aided and abetted and/or acquiesced in the wrongful actions complained of herein and resolved all conflicts of interest in favor of themselves and the Selling Defendants.

140.    Oracle's Board of Directors operated as a collective entity through periodic meetings held either in person or telephonically where the Board discussed matters affecting its business and reached collective and consensual decisions as to what action to take.

141.    As a result of the Individual Defendants' wrongful and improper actions, their alleged violations of state and federal securities laws, and breaches of fiduciary duty, Oracle has suffered considerable damage to and drastic diminution in value of its tangible and intangible assets.

142.    Oracle will expend significant sums of money as a result of the improper actions described above. Such expenditures will include, but are not limited to:

a.    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

b.    Costs and legal fees for defending Oracle, its officers and its directors against private litigation arising from the illegal and improper conduct alleged herein, including, but not limited to, litigation by Oracle customers and Oracle investors.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

143.    Plaintiffs bring this action derivatively in the right and for the benefit of Oracle to redress injuries suffered, and to be suffered, by Oracle as a direct result of the breaches of fiduciary duty and violations of law, as well as the aiding and abetting thereof, by the Individual Defendants.

144.    Plaintiffs will adequately and fairly represent the interests of Oracle and its shareholders in enforcing and prosecuting its rights.

145.    Plaintiffs are and were owners of the stock of Oracle during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

146.    Plaintiffs have not made any demand on the present Board of Director of Oracle to institute this action because such a demand would be a futile and useless act for the following reasons:-

a.    There are eight directors on the Oracle Board. Plaintiffs have charged that four Board members (defendants Ellison, Henley, Lucas, Boskin) sold Oracle common stock based on material, adverse non-public information (i.e., the Selling Defendants), rendering them directly interested in the challenged transaction. Accordingly, a majority of the Board is not independent and disinterested with respect to its ability to impartially consider a shareholder demand. Therefore, the Board is legally incapable of acting on a shareholder demand to institute and prosecute this action.

b.    Further, demand is also excused because the directors of Oracle cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves or other directors and officers responsible for the misconduct alleged in this Complaint, in that, *inter alia*, the Board is dominated and controlled by defendant Ellison, who co-founded the Company, who currently owns and controls approximately 25% of its voting stock as Oracle's largest single shareholder. As further evidence of defendant Ellison's control and domination over the Board, according to the Company's FY 2001 Proxy Statement, filed with the SEC on September 11, 2000, defendant Ellison is a member of the three-person Executive Committee (along with defendants Lucas and Henley, two of the Selling Defendants), which is generally vested with all the powers of the Board of Directors, except that the Executive Committee cannot take action beyond certain financial limits, liquidate the Company, sell all or substantially all of the Company's assets, merge the Company with another company where the Company is not the surviving entity or take any other action not permitted to be delegated to a committee under Delaware law or the Company's Bylaws. Despite the significant power and authority of the Executive Committee, it did not meet a single time during FY 2000, and during that same period acted nine times by unanimous written consent. Also, as the sole member of the Company's

57

Planning Committee, defendant Ellison is also authorized to approve stock option awards, subject only to certain limitations. This domination of the Board of Directors by defendant Ellison has impaired the Board's ability to validly exercise its business judgment and rendered it legally incapable of considering a shareholder demand.

        c.    Further, demand is also excused because the directors of Oracle, because of their inter-related business and personal activities, have developed debilitating conflicts of interest which prevent the Board members from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the preparation of Oracle's press releases, financial statements and other communications to the market, four of the Individual Defendants are subject to the following prejudicial entanglements, which cast doubt upon the Board's ability to consider a pre-suit shareholder demand:

> *Three of the Selling Defendants have made material investments in a company controlled by Koplovitz.* When defendant Koplovitz assumed the role of CEO at Working Woman, Inc. she took a stake in the business with a group of investors, including defendant Ellison. Sam Hill Financial Company, of which defendant Lucas is a general partner, has made material investments in Working Woman, Inc. Defendant Boskin has also made material investments in Working Woman, Inc. Furthermore, Working Woman, Inc. gave Oracle $500,000 in exchange for $1 million worth of software. Because of these entangling business relationships, defendant Koplovitz will not take any action adverse to Ellison's, Boskin's or Lucas' interests.

## FIRST CAUSE OF ACTION

Against Defendants Ellison, Boskin, Henley and Lucas for Breach of
Fiduciary Duty, Insider Selling and Misappropriation of Corporate Information

    147.    Plaintiffs hereby incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

    148.    During the term of the wrongdoing alleged herein, the Selling Defendants occupied positions with the Company that made them privy to confidential, proprietary information concerning the Company's financial condition and future business prospects. The foregoing information was a proprietary asset belonging to the Company, which the Selling Defendants used

for their own benefit and to the detriment of the Company and its shareholders. Notwithstanding their duty to refrain from trading in Oracle's common stock under the circumstances, the Selling —Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

149.    Based on his possession of material adverse non-public information, defendant Ellison sold 29,084,576 shares of Oracle common stock, reaping $894,802,664 in personal proceeds.

150.    Based on his possession of material adverse non-public information, defendant Henley sold 1,000,000 shares of Oracle common stock, reaping $32,310,000 in personal proceeds.

151.    Based on his possession of material adverse non-public information, defendant Lucas sold 150,000 shares of Oracle common stock, reaping $4,647,000 in personal proceeds.

152.    Based on his possession of material adverse non-public information, defendant Boskin sold 150,000 shares of Oracle common stock, reaping $5,037,000 in personal proceeds.

153.    All of the sales detailed in paragraphs 149-152 were not part of any regular pattern of sales for those defendants and were suspicious in timing and/or amount.

154.    At the time of their stock sales, the Selling Defendants knew that the Company's business and prospects were diminishing, which when disclosed to the market would cause the inflated price of the Company's common stock to dramatically decrease. The Selling Defendants sales of Oracle common stock, while in possession and control of this material, non-public information, was a breach of their fiduciary duties.

155.    The adverse, non-public material information regarding the Company's current and future earnings prospects was proprietary information belonging to the Company. In using their knowledge of the Company's undisclosed information to sell their personal holdings of Oracle common stock at inflated prices, the Selling Defendants used the Company's proprietary information for their own benefit. Since the use of the Company's information for the Selling Defendants' own gain constitutes a breach of fiduciary duty, the Company is entitled to the

imposition of a constructive trust on any profits the Selling Defendants received from their insider sales.

156.    As a result of their misconduct, the Selling Defendants are liable to the Company.

### SECOND CAUSE OF ACTION

#### Against All Individual Defendants for Breach of Fiduciary Duty of Good Faith and Loyalty

157.    Plaintiffs hereby incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

158.    Each of the Individual Defendants individually and/or jointly committed one or more of the acts or omissions to act as alleged herein, had actual or constructive knowledge that the Company would miss its 3Q 2001 estimates and aided and abetted in the Selling Defendants' use of material adverse non-public information to sell their personal holdings of Oracle common stock at inflated prices, which acts constituted a breach of the fiduciary duty of good faith and/or loyalty because such acts cannot be the valid exercise of business judgment. In addition by acting in their own best interests instead of Oracle's, the Individual Defendants have breached their duty of loyalty to Oracle.

159.    As a direct and proximate result of the Individual Defendants' failure to exercise good faith and loyalty in the performance of their duties, as alleged herein, Oracle has engaged in imprudent and unlawful activities, all of which have caused significant losses and the risk of further significant losses to the Company, including, but not limited to, enormous liability and costs associated with numerous securities fraud class actions filed against the Company, and the loss of the Company's goodwill and integrity in the market.

160.    By reason of the Individual Defendants' misconduct, as set forth above, Oracle has suffered damages in an amount not presently determinable, but which is expected to be in the millions of dollars.

60

161.     As a result of the misconduct alleged, the Individual Defendants are liable to the Company. '

## THIRD CAUSE OF ACTION

### Against All Defendants for Waste of Corporate Assets

162.     Plaintiffs hereby incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

163.     During the term of the wrongdoing alleged herein, the Individual Defendants occupied positions within the Company that made them privy to confidential, proprietary information concerning the Company's financial condition and future business prospects. The foregoing information was a proprietary asset belonging to the Company, which the Selling Defendants, aided and abetted by the remaining Individual Defendants, used for their own benefit and to the detriment of the Company and its shareholders.

164.     The Company received no consideration in exchange for the Selling Defendants' use of the Company's confidential and proprietary information concerning Oracle's financial condition and future business prospects.

165.     Each of the Individual Defendants individually and/or jointly committed one or more of the acts or omissions to act as alleged herein and/or aided and abetted in certain of the defendants' use, without consideration to the Company, of material adverse non-public information to sell their personal holdings of Oracle common stock at inflated prices for their own benefit and to the detriment of the Company and its shareholders. Such actions constituted a waste of corporate assets.

166.     By reason of the Individual Defendants' misconduct, as set forth above, Oracle has suffered damages in an amount not presently determinable, but which is expected to be in the millions of dollars.

167.     As a result of the misconduct alleged, the Individual Defendants are liable to the Company.

61

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.      Imposition of a constructive trust in favor of the Company for the amount of profits each of the insider selling defendants received from their sales of Oracle common stock;

B.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the breaches of fiduciary duty and corporate waste by each of the Individual Defendants;

C.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs and expenses; and

D.      Granting such other and further relief as the Court may deem just and proper.

Dated:                                                          TAYLOR & McNEW LLP


                                                        By:     _____
                                                                R. Bruce McNew
                                                                3711 Kennett Pike, Suite 210
                                                                Greenville, DE 19807
                                                                Telephone: 302/655-9200

                                                                ATTORNEYS FOR PLAINTIFFS

OF COUNSEL:

CAULEY, GELLER, BOWMAN
  & COATES, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
600 West Broadway, Suite 930
San Diego, CA 92101
Telephone: 619/702-7350

CAULEY, GELLER, BOWMAN
  & COATES, LLP
STEVEN E. CAULEY
11311 Arcade Drive, Suite 200
Little Rock, AR 72212
Telephone: 501/312-8500

62

THE EMERSON FIRM
JOHN G. EMERSON, JR.
P.O. Box 25336
Little Rock, AR 72212-5336
Telephone: 501/312-8500

SCHIFFRIN & BARROWAY, LLP
ROBERT B. WEISER
ERIC ZAGAR
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
Telephone: 610/667-7706