# EXHIBIT 230 part 1

In re ORACLE CORPORATION SECURITIES LITIGATION
**Class Action**

United States District Court
Northern District of California
Master File No. C-01-0988-MJJ

## EXPERT REPORT OF ALAN G. GOEDDE, PH.D.

Freeman & Mills, Incorporated
350 South Figueroa Street, Suite 900
Los Angeles, CA 90071

Alan G. Goedde

May 25, 2007

1

## Expert Witness Report
## Freeman & Mills, Incorporated
## Alan G. Goedde, Ph.D.

**I.     ASSIGNMENT**

I have been retained by the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins, attorneys for plaintiffs and the Class, to address Oracle's forecasting process, the reasonableness of continuing to utilize that process given the economic environment and the market for Oracle's products existing in calendar years 2000 and 2001, and to assess Oracle's actual operating performance in Q3 FY01 in relation to statements that defendants made about Oracle's performance during that quarter and the effect of the economic environment on Oracle's performance

**II.     QUALIFICATIONS**

My name is Alan G. Goedde. I am a Vice President at Freeman & Mills, Inc. My business address is 350 S. Figueroa Street, Suite 900, Los Angeles, CA 90071-1305. My educational background includes a Bachelor of Science in Engineering from Duke University, a Masters Degree in Economics from Duke University, and a Ph.D. in Economics from Duke University. My professional career includes extensive business and regulatory experience in industry and government. I was president of a technology marketing and licensing company, head of strategic planning for The NutraSweet Company and vice president-strategic planning for a division of First National Bank of Chicago. At the U.S. Department of the Treasury, I undertook numerous business valuations as well as valuing intellectual property such as patents, trademarks and copyrights. My responsibilities also included corporate fraud investigations and transfer pricing analyses. My curriculum vitae is attached as Expert Report Exhibit 1.

I am being compensated for my work on this matter at my normal and customary billing rate of $475 per hour. Expert Report Exhibit 2 lists those occasions on which I have testified at trial or deposition during the last 17 years.

**III.     DOCUMENTS AND INFORMATION CONSIDERED**

My opinions are based on information of the type reasonably relied upon by experts in my field in forming opinions or inferences, including my own education, knowledge and experience. I have reviewed and relied upon a number of documents. My sources include internal documents

2

produced by Oracle and deposition testimony from various employees of Oracle. A detailed listing of these sources is identified in Exhibit 3 to this report. In support of my opinions, I may use at trial the exhibits and information listed in this disclosure as well as other exhibits or demonstrative aids made or derived from the exhibits or information listed in this disclosure, or other materials obtained in discovery or otherwise in this action.

I have also relied on my own professional judgment and expertise gathered during more than 25 years of experience developing financial and economic analyses to solve business problems. Forecasting is a core skill of financial and economic analyses. My training in this area has been both academic and "real world." A significant part of my program in graduate school involved econometrics and statistics and their applications to various aspects of business forecasting. I then applied this training in my positions in government and business.

For example, at the U.S. Department of the Treasury, I applied my forecasting expertise to develop business valuation models to assist in determining tax liability. In numerous matters, I was asked to value a business by forecasting net income over various periods of time under different economic scenarios. As an economist for the U.S. Export-Import Bank, I applied forecasting principles to assist the Bank in determining the viability of various streams of income proposed as security by prospective borrowers.

At the First National Bank of Chicago (now JPMorgan Chase), my forecasting experience expanded to include managing the process of preparing sales forecasts of software products and services to assist bank customers in cash management, collections and disbursements. Forecasts from various departments were collected and aggregated into division-wide forecasts. I was responsible for assisting management in reviewing the accuracy of the forecasts, developing improvements to the sales forecasting process, and testing alternatives in response to changing economic and market conditions.

Forecasting was also one of my core responsibilities as Director of Strategic Planning at the NutraSweet Company. I implemented the company-wide strategic planning process, aggregated the sales forecasts and worked with management to develop metrics, such as viewing historical monthly data, to determine if quarterly sales forecast targets were likely to be met. I assisted senior management in implementing the sales forecasting process in each division, evaluated the accuracy of internal sales forecasts, interpreted the impact of changing macroeconomic and industry conditions, and tested the impact on earnings of various sales performance scenarios.

3

In my consulting work, I regularly testify to the value of lost business opportunities, the value of businesses and the value of intangible assets including patents, trademarks, copyrights and trade secrets. Forecasting is an important element of these types of analyses because the valuation depends on an accurate assessment of earnings potential under a variety of economic, market and competitor circumstances.

## IV.    SUMMARY OF OPINIONS

If called upon to testify in this matter, I am prepared to present the following opinions:

- Oracle was facing a major macroeconomic change heading into Q3 FY01 resulting in a decline in the market for its products;

- Accepted forecast principles require a forecaster to consider all relevant and material events impacting a company's business;

- Oracle failed to make adjustments to its forecast process to account for the negative impact of the changes in the economy and the market for Oracle's products in violation of accepted forecast principles;

- Defendants knew that failing to adjust for the negative impact of the changes in the economy made its Public Guidance unreliable;

- In Q2 FY01, Larry Ellison directed significant changes to Oracle's forecast process that resulted in more "risk" being included in future Field Forecasts and rendered Jennifer Minton's upside adjustments unreliable;

- The numerous internal measures available to defendants throughout Q3 FY01, including Field Forecasts, disclosed that Oracle was being impacted adversely by the declining economy and that Oracle would not achieve its Public Guidance;

- The "Hockey-Stick" phenomenon did not prevent Oracle from knowing that it would miss Public Guidance until the last few days of the quarter.

## V.    STATEMENT OF OPINIONS AND REASONS AND BASES THEREFOR

### A.    Oracle Was Facing a Major Macroeconomic Change Heading into Q3 FY01, Resulting in a Decline in the Market for Its Products

Historically, Oracle competed in various computer software markets. These include the database, application development tools, business applications and services sectors. Oracle's Form

10-K identified 15 different companies as competitors in the markets in which Oracle competes.[1] Ellison also identified Sun Microsystems and Cisco as companies that he personally used as a barometer of Oracle's performance, stating "If you plot the stock price and Cisco, Oracle, and Sun, you will see that all three companies rose and fell together in perfect synchronization as sentiment about the internet rose and fell."[2] Of these 17 companies, 14 (over 80%) trade under the NASDAQ Composite Index ("NASDAQ"). Of the 100 largest stocks in the NASDAQ, 66 were listed in the information technology industry – an industry in which Oracle competed and sold products.[3] The NASDAQ is therefore a reliable gauge of the financial wellbeing of Oracle's customers, competitors, and the economy as a whole as it relates to Oracle's business.

Oracle based its forecast for Q3 FY01,[4] the period at issue, on quarterly performance of the prior year, *i.e.*, Q3 FY00 (December 1999 – February 2000). During Oracle's Q3 FY00, the NASDAQ was at its highest level in history. Jennifer Minton, Oracle's chief accounting officer and senior vice president of global finance and operations who prepared internal forecasts at Oracle, characterized it as "a very high growth period."[5] Venture capitalists spent billions on e-business startups as the rush to the internet commenced. An article appearing in *Fortune Magazine* described this period as "a moment of frenzy, when even venture capitalists – clear-eyed professionals, supposedly – lost control and succumbed to the same exuberance and self-deception that juiced day traders and regular Joes."[6] When these new e-businesses inevitably needed database and applications software, the tidal wave of venture capital money was passed along to technology based companies like Oracle.[7]

---

[1]    Oracle Systems Form 10-K, FY 2000, 8/28/2000, at 5-6.

[2]    Matthew Symonds, *Softwar*, at 157.

[3]    The Motley Fool Index Center, http://www.fool.com.

[4]    Oracle's fiscal year ran from June 1 to May 31. Oracle's Q3 FY01, the period at issue, ran from December 1, 2000 to February 28, 2001.

[5]    *See* Minton 4/21/05 Tr. at 85:16-17.

[6]    Melanie Warner, "Fallen Idols," *Fortune*, October 30, 2000.

[7]    Expert Report Exhibit 4.

The most direct evidence that Oracle benefited from this economic environment comes from its sales in fiscal years 1999 and 2000 to dot com companies, which derived most of their operating capital from venture capital funding. Oracle's sales to dot com companies accelerated significantly during those two fiscal years. In fact, sales to dot com companies represented nearly 11% of Oracle's license revenues in Q3 FY00, compared to 3.1% a year earlier and just 0.7% in the Q1 FY99.[8] Oracle dot com sales were just $4M in Q1 FY99 compared to $111M in Q3 FY00 and $172M in Q4 FY00.[9] Accordingly, by the second half of FY00, Oracle's license revenue stream had become partially dependent on these new dot com companies to provide growth.

A year later, by Oracle's Q3 FY01, however, the NASDAQ had been declining for months. Q3 FY01 followed three straight quarters of rapid and consistent decline after the bursting of the dot com bubble in the spring of 2000.[10] According to an article in *The New York Times*, in the last three months of calendar year 2000 "investing by venture capital firms plummeted . . . [to] the lowest figure since the third quarter of [calendar year] 1999."[11] On October 30, 2000, an article in *Fortune* reported that "Much of what [venture capitalists] were creating has turned to dust."[12] In November 2000, Jay Hoag, a venture capitalist for Technology Crossover Ventures, spoke of the return to a more thoughtful and conservative approach toward investments, saying, "'[s]hame on us for losing sight of things and looking through rose-colored glasses.'"[13]

By November 2000, technology spending was down considerably and companies had problems acquiring financing. Paul Kasriel, Northern Trust Corp.'s economic research head saw "'a credit squeeze developing.'" Mr. Kasriel explained that a recent quarterly survey released by the Federal Reserve stated that "the highest percentage of bank respondents since the last recession said

---

[8]      Expert Report Exhibit 5.

[9]      *Id.*

[10]     Expert Report Exhibit 6.

[11]     Matt Richtel, "Technology: Venture Capital Investment Fell Off in Fourth Quarter," *The New York Times*, January 30, 2001.

[12]     Melanie Warner, "Fallen Idols," *Fortune*, October 30, 2000.

[13]     *Id.*

they had tightened lending terms with large- and medium-sized business borrowers."[14]    Intel spokesman Chuck Malloy announced on December 20, 2000, that there was a "worldwide slowdown in tech spending. Intel first noticed it in mid-September [2000], he said."[15]    Not only were Oracle's dot com customers disappearing, leaving a huge gap in the revenue stream that had contributed to Oracle's growth, but its existing base of more established customers had cut back on their technology spending.

The deteriorating economic conditions are also well-documented in an article that was used in January 2001 by Mr. Ellison and his co-author, Matthew Symonds, to promote their book, *Softwar*:

> "The Nasdaq index, one-time proud symbol of America's high-tech boom, has more than halved since March [2000]. All around, the dot.coms lie dead and dying. Amazon and Yahoo, the names that launched a thousand business magazine covers in the late 1990s survive, but now exist in some sad Internet twilight zone, their shares worth little more than a tenth of their value a year ago. Even the mighty Lords of Wintel-Microsoft and Intel – have lost two-thirds of their value in the last 12 months as PC growth has slumped. Shares in WorldCom, so recently the very model of next-generation telecoms, are down to \$14 compared with \$55 at the beginning of 2000. Wherever you look, whether at once-fashionable Internet business software firms such as Arabia, Commerce One and i2 or those paragons of New Economy management cool, Cisco and Dell, the rule is the same: lowered expectations, and investors stampeding for the exit."[16]

Thus, as Mr. Ellison was well aware, Oracle faced a very different economic environment heading into Q3 FY01 compared to the economic environment it faced in Q3 FY00. The situation showed no signs of changing throughout the quarter. On December 21, 2000, a Morgan Stanley Dean Witter & Co. survey indicated technology spending would rise at a significantly slower pace than in 2000. "These findings represent a more subdued spending environment as compared to 2000, which isn't surprising given the uncertainty in the economy, financial markets, corporate earnings, and political environment at the time of the survey," wrote Chuck Phillips, a leading Wall

---

[14]    Francine Knowles, "Stocks continue to stagger lower," *Chicago Sun-Times*, November 21, 2000, at 53.

[15]    Jennifer Bjorhus and Matt Marshall, "Stocks Fall as Rates Remain Unchanged Fed Concerned with Slowdown," *San Jose Mercury News (California)*, December 20, 2000, at 1A.

[16]    Ellison 3/30/07 Exhibit 155.

Street software analyst with Morgan Stanley Dean Witter's Technology Group.[17] On January 5, 2001, *Investor's Business Daily* reported that "tech spending has fallen off a cliff in the past six months."[18] And, on January 30, 2001, *Business Week Online* ran an article that put the entire picture facing Oracle into perspective:

> [T]he mood is a far cry from what it was a year ago, when . . . "Panic buying" was the buzzword. Now, a couple of trillion dollars in market value to the poorer, things are much more subdued. Cisco Systems CEO John Chambers certainly didn't help things by . . . talking about the "challenging" outlook for tech spending. "Capital spending" he says "is down dramatically.[19]

In addition, both Cisco and Sun, the companies that Ellison tracked as proxies for Oracle's performance,[20] lowered earnings expectations during this period as a result of the economy's effect on their business. Sun pre-announced on January 19, 2001[21] and Cisco pre-announced even earlier.[22]

Based on the reports and conclusions from those within Oracle's industry as well as my observations in calendar years 1999 and 2000, it is my opinion that by Q301 Oracle was facing a major market change as a result of the contraction in the economy that began a year earlier.

### B.    Accepted Forecast Principles Require a Forecaster to Consider All Relevant and Material Events Impacting a Company's Business

When creating or analyzing a forecast, a forecaster should consider all relevant and material events that could impact the company's business. Consideration of all relevant and material events involves, for example, obtaining information from a variety of sources, ensuring that the information is valid, using historical data to understand the causal connection between outside economic trends

---

[17]    "Markets; Weaker Tech Spending Expected, Surveys Show," *Los Angeles Times*, December 21, 2000, at 1.

[18]    *Investor's Business Daily*, January 5, 2001, at 2.

[19]    John Rossant, "A Handheld Wins Hands-Down at Davos," *Business Week Online*, January 30, 2001.

[20]    Matthew Symonds, *Softwar*, at 157.

[21]    David P. Hamilton, "Sun Microsystems' Profit Climbs By 19%," *The Wall Street Journal*, January 19, 2001, at 1.

[22]    Matthew Symonds, *Softwar*, at 157.

and the business, adjusting for one-time or unique events, and being systematic in the use of judgmental information to avoid bias. According to J. Scott Armstrong, Professor of Marketing, The Wharton School at the University of Pennsylvania, in his book, *Principles of Forecasting*, there are several enduring principles that represent foundations of forecasting:[23]

**Correct for Bias in Judgmental Forecasting**. Judgmental forecasting involves the judgment of an individual or group. The inherent problem is that judgmental forecasts can be strongly influenced by the forecaster's desire for a favorable outcome. This tendency is called the "optimism bias." I will show in my report that optimism bias was a fundamental flaw in Oracle's judgmental forecasts, including the "upside" management judgment adjustments to Oracle's Field Forecasts. For example, Ms. Minton only consulted with internal Oracle personnel in developing the upside adjustment. She did not consider any economic or market factors in her upside adjustment.[24]

**Forecasts Provided by Efficient Markets are Optimal**. This principle emphasizes that forecasters need to rely on the actions of the market in order to produce accurate forecasts. The actions of the market include analyses of factors that cause changes in the variable being measured, in this case, Oracle's sales. My report will show that Ms. Minton ignored the actions of the market (customer reactions to products, customer ability to purchase, internal information on areas of declining sales, the overall state of the economy, etc.) and particularly information regarding the obvious deterioration of the market leading up to and including Q3 FY01.

**Use the Longest Time Series Available**. Forecasters need to rely on all relevant historical information and not arbitrarily restrict the sources of information used in the development of a forecast. Forecasters need to be aware of and account for one-time events and changes in the data being collected. My report will show that Oracle excluded relevant information

---

[23]     J. Scott Armstrong, *Principles of Forecasting*, at 7-8 and Ch. 20 (Kluwer Academic Publishers 2001). There are three additional principles dealing with econometric methods that I excluded because Oracle did not use these models during the class period.

[24]     Minton 4/21/05 Tr. at 135:7-136:12.

from the Q3 FY01 internal forecast which formed the basis for Oracle's December 14, 2000 Public Guidance. Oracle ignored, among other factors, directives to the sales force by Larry Ellison, one-time events, and quarterly and monthly information which indicated that the Q3 FY01 Public Guidance would not be attainable.

### C. Oracle Failed to Make Adjustments to Its Forecast Process to Account for the Negative Impact of the Changes in the Economy and the Market for Oracle Products in Violation of Accepted Forecast Principles

The forecast process that Oracle used during the Class Period was described in a deposition by Jennifer Minton, Senior Vice President of Global Finance and Operations.[25] Ms. Minton, along with her staff, was in charge of consolidating the forecasts submitted from the field, analyzing the forecasts and making adjustments as necessary.[26] According to Ms. Minton, every business unit at Oracle created a revenue forecast (the "Field Forecast") that they submitted to the corporate financial planning and analysis department (the "Corporate Finance Department").[27] The Field Forecasts were based upon an input process where each sales representative input all of the deals that might possibly close in the quarter into what Oracle termed the "Pipeline."[28] The Field Forecast for each respective business unit included input from salespeople, financial assistants, and middle management (once salespeople had inputted their forecasts, several layers of division level managers added their "judgment" before the Field Forecast was submitted to Corporate Finance).[29]

The Corporate Finance Department would then take the Field Forecasts and make management judgment adjustments called "upside" adjustments to those Field Forecasts to come up with what they considered the "real company consolidated forecast" (the "Potential Forecast").[30]

---

[25]    Minton 4/21/05 Tr. at 23-24.

[26]    *Id.*

[27]    *Id.* at 102-103.

[28]    *Id.* at 110-111.

[29]    *Id.* at 110-111, 118; NDCA-ORCL 221509-221517; NDCA-ORCL 096184-096193; NDCA-ORCL 096056-096071.

[30]    Minton 4/21/05 Tr. at 104-105.

10

The Corporate Finance Department distributed the company's Field Forecast to upper-management in what is termed an "Upside Report," which was discussed and reviewed at weekly Executive Management Committee meetings that were attended by Oracle's senior executives, including each of the defendants.[31] According to Ms. Minton, every Executive Management Committee meeting started with a discussion of the forecast.[32]

Ms. Minton gave a detailed explanation of her forecast methodology and the manner in which she calculated the upside adjustment. My opinions will be directed toward this upside adjustment process as it was this process that Oracle apparently relied on for setting the sales and earnings targets issued to investors on December 14, 2000 ("Public Guidance"). Ms. Minton described the upside process as follows:

> The upside adjustments were based on a variety of factors: One was the license pipeline conversion analysis. We would take a look at the pipeline for the same corresponding prior year period, and look at what actually closed as a percentage of that pipeline to come up with a historical pipeline conversion ratio. And we would apply that to the current pipeline in order to predict what we thought would be the actual conversion or the actual – the actual conversion of that pipeline for the current quarter. And we broke it down by geography or business unit. And it was in totality a fairly good – had proven to be a fairly good predictor of what our true forecast and actual reports would be.[33]

Ms. Minton testified that she then increased the Field Forecasts based on a combination of the aforementioned historical conversion analysis, information about prospective deals from weekly conference calls among North and Latin America executives called the "Americas' Forecast" conference calls, and from "talk[ing] to the field finance folks reporting to [her], or eventually reporting to [her], and get[ting] their independent thinking as to whether – whether or not the forecast was a likely outcome or if there was more upside to the forecast."[34] Minton testified that she did not consider any macroeconomic factors in this process:

---

[31]   *Id.* at 104-105.

[32]   *Id.* at 108.

[33]   *Id.* at 122:3-15.

[34]   *Id.* at 123-124, 178-179.

Q.   . . . Now going back to the pipeline calculation that you performed, or that you looked in connection with the upside report, did you adjust that conversion rate to take into account any external factors that may cause one year's results to be different than the prior year's results?

A.    No.

Q.    Any economic factors whatsoever?

A.    No.

Q.    No. Okay. So even though the market had changed significantly in terms of like dot-com business, the conversion rate, you didn't adjust for that at all when you converted it over for purposes of making your upside adjustments?

*        *        *

THE WITNESS: I did not consider any economic factors when performing the license – when we prepared the license pipeline conversion package, it is solely based on applying the historical conversion rates for the same prior year corresponding period to the current pipeline to determine what the upside would be.

Q.    Okay. And then you would make your adjustments upward based upon that conversion rate, plus talking to the financial heads in other conversations that you had with business heads; is that fair?

A.    Yes. I would use a variety of data inputs to come up with what I felt was the appropriate upside number to get to the total consolidated forecast for the quarter.[35]

Ms. Minton failed to make adjustments to the upside process in Q3 FY01 despite the fact that Oracle had already begun to experience the effect of the economic downturn before the beginning of that quarter.[36] Oracle executives were well aware of this fact. Mr. Henley told Mr. Ellison that he was concerned with the economy and Ms. Minton testified that she "'was a bit nervous entering Q3 FY '01.'"[37] Additionally, Oracle's dot com business, which had represented 10.63% of Oracle's total revenue in Q3 FY00 (nearly $112M), had been declining leading up to Q3 FY01.[38] After

---

[35]    *Id.* at 135:7-136:12.

[36]    *Id.*

[37]    Ellison 2/26/04 Tr. at 177-178; Minton 4/1/04 Tr. at 188:4-13.

[38]    *See* Expert Report Exhibit 5.

reaching $172M in Q4 FY00, dot com sales fell to 6.01% or just $66M in Q2 FY01. *Id.* By the end of December 2000, North American Sales ("NAS")[39], the division that sold primarily to Oracle's dot com customers, reported that its dot com bubble had burst.[40] As of January 29, 2001, Oracle was projecting only 3.17% of its sales to dot com customers compared to 11% one year earlier.[41] Despite its public growth projections, in fact Oracle had not seen these diminished levels since 1999:[42]

| Quarter | Dot com Revenue | NAS License Revenue | Dot com as a % of NAS | Oracle Total License Revenue | Dot com as a % of Oracle |
|---|---|---|---|---|---|
| Q1 FY99 | $4.01M | $159.336M | 2.52% | $559.666M | .72% |
| Q2 FY99 | $5.596M | $166.660M | 3.36% | $720.102M | .78% |
| Q3 FY99 | $24.505M | $229.448M | 10.68% | $780.867M | 3.14% |
| Q4 FY99 | $35.873M | $382.274M | 9.38% | $1,487.903M | 2.41% |
| Q1 FY00 | $42.021M | $127.692M | 32.90% | $616.144M | 6.82% |
| Q2 FY00 | $56.492M | $197.401M | 28.62% | $886.783M | 6.37% |
| Q3 FY00 | $111.464M | $3 09.533M | 36.01% | $1,048.445M | 10.63% |
| Q4 FY00 | $172.631M | $523.108M | 34.87% | $1,805.676M | 9.56% |
| Q1 FY01 | $51.905M | $199.483M | 33.00% | $785.109M | 6.61% |
| Q2 FY01 | $66.146M | $278.636M | 23.74% | $1,099.960M | 6.01% |
| Q3 FY01 (Projected as of 1/29) | $41.175M | $346.000M | 11.9% | $1,296.843M | 3.17% |

---

[39]     Oracle's U.S. License Sales force was divided into three divisions which together represented, on average, 52% of Oracle's license revenues. NAS, headed by Executive Vice President ("EVP") George Roberts, generated approximately 25% of Oracle's annual license revenues and was the division that primarily sold to Oracle's dot com customers. Oracle Service Industries ("OSI"), headed by EVP Jay Nussbaum, generated approximately 17% of Oracle's annual license revenues and was the division that primarily sold to Oracle's telecommunications customers. Oracle Product Industries ("OPI"), headed by defendants and EVP Sandy Sanderson, generated approximately 9% of Oracle's annual license revenues. NAS and OSI were the main sources of Oracle's miss in Q3 FY01. *See* Expert Report Exhibit 24, discussed *infra*.

[40]     Winton 5/26/06 Exhibit 49.

[41]     *See* Expert Report Exhibit 5.

[42]     *Id.*

13

The evidence that I have reviewed shows that defendants were aware of the dot com effect on Oracle's business at the beginning of FY01 and certainly well before Q301. Nicholas Classick, who was an assistant vice president ("AVP") in Oracle's General Business West division with a focus on sales to dot com companies, began notifying Oracle's management as early as April 2000 that the dot com business was softening.[43] He notified Mr. Roberts (who attended EMC meetings and reported to defendants on the forecast and business prospects for NAS) in October 2000 of a slowdown in his dot com business.[44] In addition, Mr. Classick gave a presentation at the NAS Q2 FY01 Operations Review in October 2000 that contained a slide titled "Slowdown in .Com Space," which summarized the dot com situation facing Oracle as follows:

- VC Funding tougher: Refocus on profitability, cost sensitive IPOs, soft market, increases electivity

- Merger/Acquisitions: Consolidation, business failures, layoffs, firesales

- Software rental: Rent vs Buy, Buy as you grow, ASP/Hosting, conserve cash, smaller deal size, term

- Stock prices: 52 week lows, below IPO price[45]

Shortly after this presentation, on December 11, 2000 (just three days before Oracle issued public guidance), the NAS division prepared a "Dot com analysis," which tracked dot com sales in Oracle's General Business division dating back to Q1 FY99.[46] This analysis was sent to Ms. Minton's assistant Ivgen Guner and attached data reflecting a significant downward trend in dot com sales following Q4 FY00.[47] And by January 29, 2001, David Winton (NAS Senior Finance

---

[43]     Classick 4/12/06 Tr. at 109-110, 110:2-5 ("Q: You saw this [slowdown in venture capital funding] prior to your preplanning meeting with John Nugent in April of 2000? . . . A: We were seeing it, yes.").

[44]     Classick 4/12/06 Tr. at 114:13-21; Minton 7/7/06 Tr. at 31.

[45]     Classick 4/12/06 Exhibit 3 at 10; Classick 4/12/06 Tr. at 115-116, 124-130.

[46]     Winton 5/26/06 Exhibit 39.

[47]     *Id.*

14

Director) notified defendants, through an e-mail to Ms. Minton and Mr. Roberts, that dot com and ASP revenues were projected to be a mere $51M (down 54% year-over-year).[48] Removing the ASP revenue from the analysis, dot com revenue was only 11.9% of NAS's projected revenue at the time and 3.17% of Oracle's license revenues as a whole.[49] These percentages compared to 36.01% and 10.63%, respectively, a year earlier.[50] Despite these clear indicators, defendants informed investors and the market repeatedly that the economy was having no effect on its business and issued aggressive growth targets.

Testimony from Messrs. Ellison and Henley also show that they knew about the dot com effect on Oracle's business. Mr. Ellison testified that "I'm sure we had [seen an effect of the downturn in the economy in Oracle's dot-com sales by Q3'01]" and that "you're absolutely right that our dot-com business was certainly off by that point in time."[51] Mr. Henley testified that "I believe that we knew that the dot-com growth was starting to change, absolutely. Again, I don't see this – but George Roberts is a very honest guy. I think he represented a lot of detail about what he did in his meetings with all of his people."[52] Mr. Henley gave this testimony in response to questions about Mr. Winton's January 11, 2001 e-mail to Ms. Minton summarizing Mr. Roberts' Operations Review in Q2 FY01, which clearly stated that the General Business division of NAS had reported that its dot com bubble had burst.[53]

Mr. Ellison himself acknowledged the pressure that losing such a significant part of Oracle's business would have on results going forward. He testified that the dot com collapse put a "'lot of pressure on [Oracle's] database'" for Q3 FY01.[54] And he said that Oracle had a "very, very high hurdle. So for the business to grow, it meant we had to overcome the fact that a lot of our dot-com

---

[48]    Winton 5/26/06 Exhibit 51.

[49]    Expert Report Exhibit 5.

[50]    *Id.*

[51]    Ellison 2/26/04 Tr. at 178:9-179:1.

[52]    Henley 11/16/06 Tr. at 356:1-5.

[53]    Henley 11/16/06 Tr. at 355-356; Henley 11/16/06 Exhibit 64.

[54]    Ellison 2/26/04 Tr. at 254-257.

companies – customers, our ex-customers, were gone."[55] In fact, Mr. Henley stated that the dot.com erosion had a "negative comparison effect" on Oracle.[56] And an email from Mr. Winton stated that "growth comparisons [would be] tougher in Q3&Q4 [because] NAS results took off last year in Q3."[57]Despite the very real effect of the economic change on Oracle, defendants did not adjust the forecast process that they used as the basis for Public Guidance – and continued to represent that the economy was having no negative effect on Oracle's business.

Consistent with Mr. Ellison's testimony, the dot com collapse meant that the lost dot com sales had to be recaptured through other technology sales or applications sales in order for Oracle to reach Public Guidance. Ms. Minton forecasted that Oracle would replace the lost sales through sales of Oracle's applications products. Applications sales comprised 31.5% of Oracle's forecast on December 11, 2000[58] – three days before Oracle issued guidance to investors – but had totaled only 18.1% of Oracle's license sales in Q3 FY99 and 18.6% in Q3 FY00.[59] Applications were therefore a much more significant part of Oracle's forecast during Q3 FY01 than they had been historically. But, as will be discussed later in this report, Oracle's Pipeline declined considerably throughout Q3 FY01 because of lost Applications deals. In addition, I understand that defendants were well aware that problems with Oracle's new applications product, Suite 11i, including inoperable demos and a lack of references that made it extremely difficult to sell, combined with decreased technology spending by customers as a result of the declining economy, made this applications growth very

---

[55]     Ellison 2/27/04 Tr. at 386.

[56]     Henley 3/3/04 Tr. at 309-311.

[57]     Winton 5/26/06 Exhibit 43.

[58]     Expert Report Exhibit 7.

[59]     *See* Expert Report Exhibit 7.

unlikely.[60] Despite these facts, Minton attributed nearly 30% of Oracle's forecast to Applications sales even into February 2001.[61]

In my opinion, Oracle failed to adjust its forecast to account for the negative impact that the changes in the economy and disappointing applications sales were having on Oracle's business. Minton failed to consider market information critical to an accurate forecast. For example, she did not account for the serious macroeconomic changes facing Oracle. She ignored the collapse of Oracle's sales to the dot com sector of the market. As a result, the forecast process described by Ms. Minton that generated the Potential Forecast was inconsistent with sound and accepted forecasting principles and was therefore unreasonable given the significant changes facing Oracle in Q3 FY01.

Ms. Minton also failed to address obvious judgmental bias in the Upside Reports. All of the information sources used by Ms. Minton were internal Oracle sources. According to her testimony she explicitly excluded any independent information sources. Accepted forecasting methodology requires that if judgmental adjustments are made to a forecast that bias be addressed. For example, numerous banks and research organizations regularly report on the software industry and can provide independent sources of information. Yet, according to Ms. Minton, she did not consider any external factors in preparing her upside adjustment.[62]

### D.    Defendants Knew that Failing to Adjust for the Negative Impact of the Changes in the Economy Made Its Public Guidance Unreliable

Based on the evidence that I have reviewed, defendants knew that failing to adjust for the negative impact of the changes in the economy made its Public Guidance unreliable. Ellison himself acknowledged that the very type of macroeconomic change that Oracle was facing in Q3 FY01 would render its forecasting process unreliable.[63] He apparently acknowledged this fact in his comments to the book *Softwar* and confirmed it in his deposition:

---

[60]    I understand that plaintiffs will be submitting an expert report that addresses the status of and prospects for the Suite 11i. To the extent that report further informs my opinions, I will supplement this report.

[61]    *See* Expert Report Exhibit 7.

[62]    Minton 4/21/05 Tr. at 135-136.

[63]    Ellison 9/21/06 Tr. at 384-385.

Q    Okay. And then you enter a footnote or clarification which reads: "As I've said before, our forecasting system is not clairvoyant. Our forecasting does statistical extrapolations based on historical trends. If something that's outside our mathematical model of the business changes, like a war in the Middle East, our forecasting becomes inaccurate."

Do you see that?

A    Yes, I do.

Q    Okay. And you stand by that?

A    Absolutely.

Q    Now, it wouldn't – a war in the Middle East is just one example. There could be who knows how many examples; right?

A    Price of oil goes over a hundred dollars a barrel, lots of things.

Q    And the point you are making is that while your forecasting system does extrapolations based on historic trends, if something is happening that would suggest that the historical trend is not necessarily reliable, then your forecasting will not be reliable; is that right?

A    Right. Major macroeconomic change; sudden – sudden growth in the economy or sudden shrinkage in the economy would cause – you can't extrapolate anymore.[64]

Both Mr. Ellison and Mr. Henley also explained why an economic downturn can influence a company's business and, consequently, its forecast process. Mr. Ellison explained that in times of major recessions, "businesses get very reluctant to spend a lot of money on large new capital projects. And a lot of our software sales were part of an even larger IT development project. So these were large capital items, which are often deferred in times of recession."[65] He testified that "[l]arge deals fall out more quickly" in a declining economy and that "[w]hen the telecom's bubble got burst or the dot-com bubble burst, I would expect that sales to those industries would decline." [66]

---

[64]    Ellison 9/21/06 Tr. at 384:6-385:7

[65]    Ellison 2/26/04 Tr. at 176:2-7.

[66]    Ellison 2/26/04 Tr. at 187; Ellison 2/27/04 Tr. at 246.

18

Mr. Henley explained in an email to the audit committee on January 4, 2001, that he had told investors that "we had seen no slowdown in our business yet (Q2 license growth or initial pipeline growth rate)."[67] Despite his public statements, he noted in the email that "all data since the call point to more economic softening so there is risk of slippage in the deals." *Id.* When presented with this exhibit in deposition, Henley confirmed that he acknowledged a softening because of the economy in January and explained that he even remembers reports about softening in Q2 FY01:

Q.    . . . "At this point, all data since the call point to more economic softening, so there is risk of slippage in deals."

Do you see that?

A.    I do see that.

Q.    Do you recall holding this view in early 2001?

A.    I think whatever I said is what I thought at the time.

$$* \quad * \quad *$$

There's pros and – you know, there's ups and downs, but I definitely remember, even in the second quarter, that there were reports about the economy and, gee, are things getting worse and so forth.[68]

The economic downturn rendered Oracle's forecasting process particularly faulty because in calculating her "upside," Ms. Minton only analyzed data over a one-year period of time.[69] As explained in Section V.C., above, the basis for the "upside" portion of Oracle's Potential Forecast in Q3 FY01 was the ratio of the dollar value of license deals closing by the end of the quarter to the dollar value of license deals in the Pipeline at the various times during the quarter. This ratio was called the "conversion rate." For example, if there are potential deals worth $1 billion in the Pipeline

---

[67]    Henley 7/27/06 Exhibit 7.

[68]    Henley 7/27/06 Tr. at 49:2-19.

[69]    Ms. Minton's forecast approach has been labelled the "naïve forecast" approach. J. Holt Wilson and Barry Keating, *Business Forecasting* 28 (5th ed. McGraw-Hill/Irwin 2007). This approach assumes that conditions are identical between the last observation of the variable of interest and the present observation of the variable of interest, such that the next period will be identical to the last period. Ms. Minton's forecasting procedures followed the naïve approach at a time when the environment facing Oracle had changed dramatically.

19

at week 2 of the quarter, and $500 million of deals close by the end of the quarter, the conversion rate is 50% as of week 2. According to Ms. Minton's testimony, the week 2 conversion rate for Q3 FY00 multiplied by the Pipeline at week 2 of Q3 FY01 was the underlying basis for the "upside" portion of the Q3 FY01 revenue forecast that formed the basis of Oracle's Public Guidance.[70] Predictably, that analysis projected a forecasted pipeline conversion rate that was in line with the same conversion rate that Oracle achieved in Q3 FY00 (when the economy was at its height):

Pipeline Conversion Rates[71]

| Q3 FY00 Actual | Q3 FY01 Potential Forecast | Q3 FY01 Actual |
|---|---|---|
| 52.8% | 48.0% | 37.4% |

On its face, the application of this historical conversion ratio (from a time when the economy and dot coms were at their height) to the Q3 FY01 pipeline, given the major change in the economy, was improper and defendants knew that it would produce unreachable projections. Although the application of the historic conversion ratios (from FY99) had yielded accurate forecasts throughout the quarters in FY00, this methodology had not been an accurate predictor in either of the first two quarters of FY01. Accordingly, defendants were aware that the shrinking economy rendered Minton's "upside" calculation process unreliable.

In addition, once the actual license revenue figures for December 2000 became available, it was clear to defendants that Oracle's conversion rate was lower than in previous years. In fiscal years 1999 and 2000 Oracle had an average conversion rate of 9.8% by the end of December.[72] That is, actual revenue earned in the quarter was 9.8% of the Pipeline at the start of the quarter. However, the conversion rate in December 2000 was only 6.3% (excluding Covisint).[73]    By January, the

---

[70]    Minton 4/21/05 Tr. at 122.

[71]    *See* Expert Report Exhibit 8.

[72]    *See* Expert Report Exhibit 9.

[73]    *See* Expert Report Exhibit 9.

conversion rate was even further from the historical average. The average January QTD conversion rate for fiscal years 1999 and 2000 was 18.3%. Yet it was only 12.8% in fiscal year 2001.[74]

Additionally, internal Pipeline data available to defendants before and throughout the quarter would have disclosed to defendants that the dramatic decline in the economic environment – a major macroeconomic change – rendered this type of year-over-year analysis inherently unreliable and inaccurate, especially in Oracle's Q3 FY01. From Q3 FY99 (the earliest data made available by Oracle) through Q4 FY00, the Pipeline at the beginning of the quarter and the Pipeline at the end of the quarter changed very little.[75] Beginning in Q1 FY01, however, the Pipeline declined from the beginning of the quarter to the end of the quarter. In the six quarters prior to FY01, the Pipeline declined an average of 9% from the start of the quarter - roughly $174M.[76] By contrast, the Pipeline deteriorated by 31% in Q1 FY01, representing a dollar decline of over $548 million.[77] In Q2 FY01 the Pipeline deteriorated by over $426 million (19%) and in Q3 FY01 the Pipeline deteriorated by over $800 million (27%).[78] Such a decline indicates that potential deals in the Pipeline were being canceled or postponed during the quarter.

Ms. Minton's forecast was only effective in an economic situation similar to the previous year. It was misleading for Oracle to base Public Guidance on Ms. Minton's forecast given the major changes in the marketplace. As Mr. Ellison recognized in his deposition testimony, Ms. Minton's forecast becomes "inaccurate" in periods of major macroeconomic change.[79] The successive declines in the Pipeline during FY01 were obvious indicators that Ms. Minton's forecasting approach would generate unreliable results.

---

[74]  See Expert Report Exhibit 9 ("December and January QTD Conv. Rates").

[75]  See Expert Report Exhibit 10.

[76]  See Expert Report Exhibit 10.

[77]  See Expert Report Exhibit 10.

[78]  See Expert Report Exhibit 10.

[79]  Ellison 9/21/06 Tr. at 384-385.

Faced with the downturn in the economy, as evidenced by the dramatic change in the behavior of Oracle's Pipeline, it is my opinion that defendants knew that failing to adjust Oracle's forecast process made Oracle's Public Guidance unreliable.

### E.   In Q2 FY01, Ellison Directed Significant Changes to Oracle's Forecast Process that Resulted in More "Risk" Being Included in Future Field Forecasts and Rendered Minton's Upside Adjustments Unreliable

In Q2 FY01, Ellison directed significant changes to Oracle's forecast process that resulted in more "risk" being included in future Field Forecasts. I have reviewed an October 6, 2000 email from Patricia McManus to James English (OPI Finance Director and Finance Vice President, respectively) noting that Larry Ellison had demanded that the field include more risk in its forecast number:

"Recently Larry has changed the way that he is interpreting our forecast . . . our forecast has not usually had a significant amount of judgment. It was the amount that you believed you could deliver at a minimum . . . *now our forecast is a number that includes more risk than in the past.*"[80]

There is no evidence that I have reviewed to indicate that the field did not follow Ellison's directive. To the contrary, there is reason to believe that it did. In addition to the October 6, 2000 email, Ellison's testimony also confirms that the business units implemented his directive:

Q    What drove you to make this change?

A    The – we were going to put the three numbers in the computer system. What I wanted to see – I've done – to get more information, just getting more – you know, getting more data rather than one number, which usually was someplace between the best case and the most likely – what they used to call a commit forecast; one we could count on. I was trying to, you know, get a better idea of what, you know – get more data – more data to work with.[81]

The practical impact of Ellison's directive was to reduce the amount of "sandbagging" that had apparently plagued Oracle in the past. Ms. Minton explained in her deposition that the rationale for upside adjustments that historically had reached into the hundreds of millions of dollars was to adjust the practice in the field of always exceeding the Field Forecast – "Jay Nussbaum and George

---

[80]    Ellison 9/21/06 Exhibit 110 (emphasis added). Mr. Ellison confirmed that the reference to "Larry" in this email was to him. Ellison 9/21/06 Tr. at 423-426; Ellison 9/21/06 Exhibit 110.

[81]    Ellison 9/21/06 Exhibit 110; Ellison 9/21/06 Tr. at 425:23-426:7.

Roberts both historically always exceeded their forecast. And so that's one of the reasons why we had to put these upside adjustments in . . . ."[82] By directing the field to include riskier deals in the forecast, Ellison directed a significant change that rendered Minton's upside adjustments unnecessary and unreliable.

Ms. Minton's upside adjustments at the end of Q3 FY01 and throughout Q4 FY01 also indicate that the field followed Ellison's directive. Though not until months after Ellison announced his directive, Ms. Minton appears to have adjusted to the changes by the end of Q3 FY01 when she removed most of her upside adjustments from the Potential Forecast. By January 15, 2001, she removed the entire upside from OSI ($25M) and reduced NAS's upside by $36M.[83] By January 29, 2001, she removed all upside from NAS ($50M) and estimated a negative upside for OSI ($35M).[84] By February 5, 2001, she eliminated her upside adjustments entirely for Oracle's U.S. license divisions.[85] She appears to have made similar adjustments to her policy of "upside" adjustments in Q4 FY01 as her upside adjustments only ranged between (-$6,000,000) and $25,000,000 (as compared to hundreds of millions in the four quarters leading up to Q3 FY01).[86] Accordingly, by the end of Q3 FY01, Ms. Minton had remedied her forecast methodology to account for the extra risk in the Field Forecast per Ellison's directive. However, in the several months leading up to this change, she added upside in line with her common practice.[87] Thus, as the field added more judgment and Ms. Minton continued to add the same judgment as before, the Potential Forecast became overstated, unreasonable and unreliable.

In my opinion, the changes directed by Mr. Ellison that resulted in the field including more risk in its forecast significantly altered Oracle's forecasting process and made Ms. Minton's forecast overstated and unreliable.

---

[82]     Minton 4/21/05 Tr. at 126.

[83]     *See* Expert Report Exhibit 11.

[84]     *See* Expert Report Exhibit 11.

[85]     *See* Expert Report Exhibit 11.

[86]     *See* Expert Report Exhibit 11.

[87]     *See* Expert Report Exhibit 11.

Mr. Ellison's directive also impaired the reliance of the Field Forecast. As reflected in the upside reports that were distributed to defendants weekly, the Field Forecast was below Public Guidance of 12¢ for the entire quarter. The field forecasted only 10.7¢ earnings per share in the beginning of the quarter and did not increase that forecast until the second week of February, when its EPS forecast increased to 10.9¢. The highest the field ever reached was 11.0¢ at the end of February.[88]

In addition, the behavior of the Field Forecast was out of line with historical practice and was thus a red flag that Oracle would not meet Public Guidance. The field historically tended to increase its forecast early in the quarter as deals became more certain. In Q3 FY01, however, the behavior of the Field Forecast remained generally flat during December and January.[89] In addition, feedback from the Field also revealed problems. One of the senior executives in Oracle's NAS division commented at the end of the Q3 FY01 "AVPs [were] Beginning to Voice Concern" in the month of December and that the "AVPs [were] Reluctant to Raise Their Forecast" in the month of January.[90] It is my opinion that especially given Ellison's directive, the Field (and the behavior of its forecast) disclosed that Oracle would not achieve its Public Guidance.

It is also my opinion that Ellison's directive made the Potential Forecast unreliable. Despite the virtual removal of "sandbagging" through Ellison's directive, Ms. Minton added $159.5M of "upside" (typically added to account for "sandbagging") to the Field Forecast at the beginning of Q3 FY01 – an amount that was included in Oracle's Public Guidance for the quarter.[91] She added $25M in judgment to the OSI license forecast, another $50M in judgment to the NAS license forecast, and another $35M to the OPI license forecast.[92] Ms. Minton's $159.5M upside adjustment was in line with the same type and amount of upside adjustments that she had added in the past, despite the additional risk included in the Field Forecast (effectively doubling the amount of risk that had

---

[88]     See Expert Report Exhibit 12.

[89]     See Expert Report Exhibit 12.

[90]     Roberts 6/22/06 Exhibit 27 at NDCA-ORCL 179337.

[91]     See Expert Report Exhibit 11; Minton 4/21/05 Tr. at 124.

[92]     Minton 7/7/06 Exhibit FR 22A

previously been in the forecast).[93]  This upside put Public Guidance out of reach and disseminated a consolidated forecast that was based on flawed methodology and disregarded facts that would certainly impact Oracle's forecast.  In addition to completely failing to consider the effects of the declining economy and market for Oracle's products, Ms. Minton's practice inflated Public Guidance by adding $159.5M in management judgment to a Field Forecast that already included additional risk to account for "sandbagging."[94]

Metrics that Oracle used in the forecast process demonstrated that Ms. Minton's upside adjustments were producing unreliable results.  The spread between forecasted license revenue growth rates and the Pipeline growth rates showed that Oracle was forecasting license revenues to grow at a more rapid rate than the Pipeline was growing.[95]  Compared to prior quarters, the gap between Pipeline growth and forecasted revenue growth was shrinking in Q3 FY01.[96]  The gap between Pipeline growth and the Potential growth rate was negative at the end of December and into January.[97]  Between December 25, 2000 and January 29, 2001, the gap never reached higher than 4% and was negative half the time.[98]  This was out of line with Oracle's historical experience, which showed a negative gap only once prior to Q3 FY01, and an average spread of 13.4%.[99]  A negative gap is important because it indicates that the forecast target is less likely to be met.  As Larry Ellison noted, it would be "incautious to . . . forecast sales growth without underlying pipeline growth."[100]

Ms. Minton's upside adjustments suggest that she failed to adjust for this red flag and made Public Guidance far too aggressive and consequently unreachable.  The evidence that I have

---

[93]     *See* Expert Report Exhibit 11.

[94]     Minton 9/25/06 Exhibit FR 22A.

[95]     *See* Expert Report Exhibit 13.

[96]     *Id.*

[97]     *Id.*

[98]     *Id.*

[99]     *See* Expert Report Exhibit 13.

[100]    Ellison 2/26/04 Tr. at 87:4-5.

reviewed indicates that the difference between Pipeline growth and revenue growth was a closely watched indicator at Oracle.[101]  In my opinion, the forecast process described by Ms. Minton was inconsistent with sound and accepted forecasting principles and was therefore unreasonable.  Minton did not account for Ellison's directive to the field to increase the risk in the Field Forecast and she ignored internal indicators showing that the Potential Forecast was too aggressive.

  F. **The Numerous Internal Measures Available to Defendants Throughout Q3 FY01, Including Field Forecasts, Disclosed that Oracle Was Being Impacted Adversely by the Declining Economy and That Oracle Would Not Achieve Its Public Guidance**

  On December 14, 2000, Oracle held its quarterly conference call for the second quarter of its 2001 fiscal year.  During that call, defendant Henley discussed Oracle's results for Q2 FY01 and gave Public Guidance on Oracle's expected license revenue growth for Q3 FY01, which he presented in year-over-year terms.  Henley forecasted 15%-to-20% growth for Database sales (5 points for real (constant) dollar growth brought it to 20%-to-25%), 75% growth for Applications sales (80% real (constant) dollar growth), and 12 cents earnings per share.[102]  I refer to these growth rates collectively as Public Guidance.  Jeff Henley disseminated Oracle's Public Guidance on December 14, 2000 and reiterated Public Guidance between February 7 and 9, 2001, and again at

---

[101] Ellison 2/26/04 Tr. at 86:3-87:9, 201-202; Henley 3/24/04 Tr. at 102-104; DC 137 at CA ORCL 022290; DC 138 at CA ORCL 003227.

[102] NDCA-ORCL 03317-03361 at 03323-24.  Defendant Henley claims 12¢ per share as his EPS forecast was reasonable because, in Q2 FY01 Oracle reported 11¢ per share. "[I]f you look back at the last three years, sequentially, the third quarter, split adjusted, has been one cent better than the second quarter.  So we did 11 cents in the second quarter.  So I would assume, 12 cents would be reasonable number at this point.  I don't think history is going to be a lot different, here." However, I am informed by counsel for plaintiffs that Oracle's true EPS in 2Q FY01 was 10¢ per share.  I am informed that Oracle's reported 11¢ per share was false as a result (1) of the transfer of approximately $20 million from Oracle's customer overpayments account to its bad debt reserve account and then transferring approximately $20 million to revenue via a "bad debt reserve" adjustment.  (I recognize, for example, ORCL 440829-440845 as Oracle's final Upside Report for 2Q FY01 that actually forecasts such transfers and includes them as "upside" for EPS calculation) and (2) improperly recognizing $19.9 million in revenue and $12.9 million in net income from a "round-trip" transaction with Hewlett Packard at the end of Q2 FY01.  I understand that plaintiffs will be submitting an expert report that addresses Oracle's false financial reporting.  To the extent that report further informs my opinions, I will supplement this report.

26

Oracle's AppsWorld Conference between February 21 and 23, 2001.[103] Jennifer Glass also reiterated Oracle's Public Guidance on February 9, 2001.[104]

During Oracle's December 14, 2000 conference call, Stephanie Aas also addressed the impact of the economy on Oracle's business. Specifically, she said that "at this point, we see no impact or slowing in our business."[105] Like Public Guidance, various senior executives made similar public statements throughout Q3 FY01. The message was the same – Oracle was not seeing a negative impact from the downturn in the economy. I will refer to these statements collectively as the Economy Statements. Jeff Henley made Economy Statements on December 15, 2000, February 7, 2001, and at Oracle's AppsWorld Conference between February 21 and 23, 2001.[106] Sandy Sanderson made Economy Statements on January 9, 2001, January 20, 2001, and at a Goldman Sachs conference between February 12 and 15, 2001.[107] Stephanie Aas made an Economy Statement on January 11, 2001, and Jennifer Glass made an Economy Statement on February 9, 2001.[108]

Oracle's statements about its Public Guidance and the Economy Statements are inconsistent with the evidence that accepted forecast principles would have caused to be considered at the time. Even more importantly, those statements were inconsistent with the internal measures employed in Oracle's forecasting process of which Oracle's management was well informed at the time. Defendants knew that the decline in the economy and the market for Oracle's products was having a detrimental impact on Oracle's business. The measures that Oracle considered important in monitoring in-quarter progress indicated this fact. Larry Ellison explained in deposition that the

---

[103]    NDCA-ORCL 091531-091533; Henley 11/16/06 Tr. at Exhibit 52.

[104]    NDCA-ORCL 141679-141680.

[105]    NDCA-ORCL 03317-03361 at 03320.

[106]    NDCA-ORCL 141660-141665; NDCA-ORCL 091531-091533; Henley 11/16/06 at Exhibit 52.

[107]    NDCA-ORCL 005785-005788; NDCA-ORCL 141672-141678; NDCA-ORCL 141794-141795.

[108]    NDCA-ORCL 003376-003377; NDCA-ORCL 141679-141680.

important indicators for measuring Oracle's business in any quarter include: (1) actual results for the first and second months of the quarter; (2) year-over-year Pipeline growth; (3) field sales forecasts; (4) financial department forecasts; and (5) the number and size of the big deals that are potentially going to close in the quarter:

> Q.    What are the key intra-quarter forecasting indicators for Oracle?

> A.    Early on, the Pipeline – year over year pipeline growth, field sales forecast, financial – financial department forecast, sometimes called the upside report. Again, I'm trying to steer away from those funny names.

> I would say an actual results for the first and second months of the quarter and then going into the last ten business days of the quarter, the big deal report, the size of the – of the pipeline, if you will, or the size – the number – the number and size of the big deals that are potentially going to close this quarter. I think that's a pretty complete list.[109]

The evidence that I have reviewed in this case suggests that these measures informed defendants that the economic downturn was negatively affecting Oracle's business and its forecast and that Oracle was not likely to meet Public Guidance.

## ACTUAL RESULTS

Actual results throughout a quarter are an important measure for evaluating a forecast. This is especially true for established companies like Oracle that enjoy a track record of historical trends. While actual results throughout a quarter may not enable a forecaster to perfectly predict quarterly results, they are an important measure that enables a forecaster to determine trends in a company's business and whether or not it is on track to meet its projected numbers. Apart from Mr. Ellison's testimony, the monthly flash report described below containing monthly actual results (that was delivered to defendants on a monthly basis) shows that this was an important measure at Oracle.

In my opinion, the evidence that I have reviewed shows that monthly actual revenue was an accurate predictor of total quarterly revenues at Oracle. Monthly results at Oracle were distributed by email from Larry Garnick to the executive committee, including Mr. Ellison, Mr. Henley, and Mr. Sanderson. Larry Garnick sent the results for December 2000 in an email dated January 17, 2001 (the "January Garnick Flash Report") and the results through January 2001 in an email dated

---

[109]    Ellison 2/26/04 Tr. at 179:6-19.

February 8, 2001 (the "February Garnick Flash Report").[110]  These Flash Reports updated Oracle's management about the monthly actual revenues and growth rates in Q3 FY01 in the various lines of business in comparison to the third quarter in Oracle's previous two fiscal years.  Mr. Garnick analyzed Oracle's business in Q3 FY01 with and without $60M in revenue from Oracle's license deal with Covisint.[111]  It is my understanding that defendants Henley and Ellison were in agreement that Oracle should have analyzed the quarter with and without the license revenue from the Covisint transaction.[112]  The reason why Covisint is left out of the forecast is that it is a one-time event not likely to be duplicated . Therefore, from a forecasting perspective leaving this one-time event in the forecast would distort growth trends and future forecasts of revenue for the quarter.

The January Garnick Flash Report disclosed to defendants that Oracle was feeling the impact of the economy and that it was likely to miss Public Guidance. [113]  The e-mail notes that the NAS and OSI lines of business (the divisions that were ultimately responsible for Oracle's Q3 FY01 miss) had *negative* growth of 24% and 81% respectively, and that the OPI division had negative growth of 85% after adjusting for Covisint.[114]  Accordingly, as of January 17, 2001, defendants were aware that all three of Oracle's U.S. divisions (representing approximately 52% of its license revenues) had negative growth trends.

The e-mail also notes that "excluding the $60 million Covisint license deal, the USD growth rate would have been only 6%."[115]  Mr. Garnick's 6% figure appears to be calculated based on

---

[110]    Minton 9/25/06 Exhibits 43, 45.

[111]    In the first week of December 2000, Oracle closed the $60 million Covisint transaction, which was a massive – the Company's largest ever – one-time transaction.  Of the total $60 million, $54 million was attributed to revenue from applications and $6 million to revenue from database license.  All $60 million was attributed to OPI.  It had no impact on NAS or OSI revenues.  Ellison 2/26/04 Tr. at 212-213; DC 134.

[112]    Henley 11/16/06 Tr. at 367; Ellison 9/21/06 Tr. at 436; Minton 9/25/06 Tr. at 312.

[113]    Minton 9/25/06 Exhibit 43.

[114]    *Id.*

[115]    *Id.*

Constant Dollar figures, which Oracle did not use for public guidance purposes.[116] As Mr. Ellison was aware, Oracle's USD license growth rate would have been only 1% after adjusting for Covisint, using results in US Dollars.[117] This growth rate was anemic compared to the 25% license growth in Oracle's Public Guidance. The e-mail also informed defendants that Applications and database were also down significantly for the month without the one-time Covisint transaction:

> Applications product growth was 216% [ERP=365%, CRM=(58%)] while database product growth was 17% [Server=21%, Tools=(26%)]. Excluding Covisint, Applications product growth would have been (46%) and database product growth would have been 13%.[118]

Like license revenues, these growth rates were well below the growth rates that Oracle forecasted for the quarter (15-25% database growth; 75% applications growth).

Analyzing this data using accepted forecasting principles, Oracle was feeling the negative impact of the economy and by the end of December 2000 was not on track to reach Public Guidance:

> December license results represent 19% of the total forecast for Q3 FY01. In FY00 and FY99, December represented 16% and 19%, respectively, of the quarter total.[119]

The "total forecast" referenced in the December Garnick Flash Report appears to reference the Field Forecast. I reach this conclusion by calculating 19% of the Field Forecast referenced in the January 15, 2001 Upside Report. The $240.5M represents 19.1% of the Field Forecast and only 17.8% of the Potential Forecast as of that date.[120] Ms. Minton also confirmed that the reference to "total forecast" in the January Garnick Flash Report was to the Field Forecast.[121] It appears that despite relying on the Potential Forecast when creating Public Guidance, Oracle's management used the Field Forecast, which was far short of Public Guidance, as the basis for many of their internal measures.

---

[116]  *Id.*

[117]  *See* Expert Report Exhibit 14.

[118]  Minton 9/25/06 Exhibit 43.

[119]  *Id.*

[120]  *See* Expert Report Exhibit 15.

[121]  Minton 9/25/06 Tr. at 313-314.

I have performed an analysis of Oracle's monthly results similar to the analysis performed by Mr. Garnick to determine whether defendants knew that Oracle would miss Public Guidance. I note at the outset that analyzing Oracle's financial results for the quarter without adjusting for the Covisint transaction would present unreliable results given the size and one-time nature of the transaction (as such, it was not indicative of trends in Oracle's business). I therefore analyze Oracle's intra-quarter results as Oracle did – by adjusting for the Covisint transaction. While the deal is excluded for the purposes of projecting, it is not ignored as it represented revenue for the quarter. The $60 million is added back to the revenue calculation after the projection is calculated to credit the revenue in a way that would enable (and that did enable) Oracle to analyze its monthly results and the effect that those results would have on the quarter. This is a standard analytical procedure when a single transaction can skew the results for the period under analysis. Mr. Ellison confirmed that the $60M Covisint deal was the largest transaction for Oracle in its history at the time and both Messrs. Ellison and Henley agreed that it had to be removed from calculations in order to understand growth trends more accurately.[122]

Historical analysis enabled Oracle to determine whether its actual results for the month were on track or out of line with historical results. Data for fiscal years 1996 through 2000 show that Oracle earned an average of 21% of total third quarter license revenue in the month of December.[123] As reflected in the December Flash Report that Ivgen Guner distributed to the executive committee on January 17, 2001, Oracle's management was provided data dating back to 1996.[124] By assuming that the actual revenue earned in December 2000 would be 21% of the total revenue for the quarter, which is standard in forecast analysis, defendants could assess for themselves whether Oracle was on track to meet guidance.

Historical analysis for the time period analyzed internally at Oracle disclosed to defendants following December's results that Oracle was projecting to miss Public Guidance by $390.9M.[125]

---

[122]   Ellison 9/21/06 Tr. at 436, 450; Henley 4/6/06 Tr. at 367.

[123]   *See* Expert Report Exhibit 16.

[124]   December Flash Report (NDCA-ORCL 088715-32.).

[125]   Expert Report Exhibit 17.

Adjusting for the Covisint deal, Oracle's December 2000 license revenue was $180,524,000 – 13.3% of the most recent Potential Forecast and 14.4% of the most recent Field Forecast.[126]  Using December's historic 21% contribution to the quarter, the actual results for December of $180,524,000 projected to $859,638,095.  When the $60 million in revenue for Covisint is added back to the analysis, Oracle was projecting revenues of $919,638,095 for the quarter compared to the $1,310,556,250 in license revenue that it needed to meet Public Guidance (a shortfall of approximately $391M).  This simple calculation, which is standard in forecasting analysis, disclosed to defendants that Oracle would miss Public Guidance.[127]  Based on this analysis, it is my opinion that December results informed defendants that Oracle would have to rely on chance events or unexpected revenue in order to achieve its publicly projected results.

The February Garnick Flash Report, distributed February 8, 2001, disclosed to defendants that matters had improved little for Oracle in January.[128]  NAS and OSI still had negative growth of 33% and 17% respectively, and OPI had negative growth of 63% after adjusting for Covisint.[129]  Excluding the $60 million Covisint license deal, the USD license growth rate was only 8% – far behind the license 25% growth rate that Oracle projected as Public Guidance (25%).[130]

Like December, historical analysis for the time period analyzed internally at Oracle disclosed to defendants following January that Oracle was projecting to miss Public Guidance by $314.5M.[131]  Data for fiscal years 1996 through 2000 show that Oracle earned an average of 40% of total third quarter license revenue through the end of January.[132]  Adjusting for the Covisint deal, Oracle's

---

[126]    *See* Expert Report Exhibit 18.

[127]    *See* Expert Report Exhibit 17. The outcome is similar using the two-year period that Mr. Garnick presented to the executive committee in the January Garnick Flash Report.  Using the average for that time period, Oracle projected to miss Public Guidance by $300M (*see* Expert Report Exhibit 19).

[128]    Minton 9/25/06 Exhibit 45.

[129]    *Id.*

[130]    Minton 7/7/06 Exhibit 45.

[131]    Expert Report Exhibit 17.

[132]    Expert Report Exhibit 16.

quarter-to-date license revenue through January 2001 was $374,408,000 – just 29.7% of the most recent Potential Forecast and 30.5% of the Field Forecast.[133]    Using Oracle historic 40% QTD contribution to the quarter, Oracle's license revenue through January of $374.4M projected to $936,020,000.[134]    When the $60 million in revenue for Covisint is added back to the analysis, Oracle was projecting revenue of $996,020,000 for the quarter compared to the $1,310,556,250 that it needed to reach Public Guidance.[135]    Based on this analysis, it is my opinion that results through January informed defendants that Oracle would not achieve its publicly projected results.

Mr. Garnick performed a similar analysis and informed defendants that Oracle was projecting to miss Public Guidance:

> The analyst community is expecting 23% license revenue growth . . . for Q3 FY01. To deliver 23% USD license revenue growth we need $1,341 million in CD license revenue for the quarter, $95 million (8%) more than our current forecast.[136]

Given that Mr. Garnick appears to have conducted an analysis of the Field Forecast for presentation to the executive committee, the projected shortfall in the February Garnick Flash Report would be even greater when compared to the Potential Forecast in the Upside Report.    This analysis is consistent with my opinion that forecasting analyses informed defendants that Oracle would miss Public Guidance.

The performance in Oracle's U.S. license divisions also informed defendants that Oracle was being affected by the economic downturn and the market for Oracle's products.    According to the January 15, 2001 NAS Forecasting Package, NAS had reported only $27 million in sales for the month to date, for a total of $31.4 million quarter-to-date. [137]    In December and January 2001, NAS

---

[133]    *See* Expert Report Exhibit 18

[134]    *Id.*

[135]    *See* Expert Report Exhibit 17. Like December, the outcome is similar using the two-year period analyzed in the February Garnick Flash Report. Using that period, Oracle projected a miss of $196M (*see* Expert Report Exhibit 19).

[136]    Minton 9/25/06 Exhibit 45.

[137]    Minton 9/25/06 Exhibit 46 at NDCA-ORCL 038491; Winton 5/26/06 Exhibit 53 at NDCA-ORCL 039499.

only had total license revenue of $56 million, which was far short of the $79.1 million that NAS had earned in the first two months of Q3 FY00.[138] NAS experienced a combined year-over-year license revenue growth rate for December and January of negative 33%, compared to its negative 24% growth rate in December.[139]

The same analysis shows that Oracle's OSI division was being adversely affected by the declines in the economy and the market for Oracle's products. According to the January 9, 2001 OSI Forecast Package, OSI forecasted $73.6M in license revenue for December 2000 and January 2001.[140] But OSI fell short by $51M (69%).[141] OSI only had sales of $22.7M in December 2000 and January 2001 combined.[142] OSI license revenue through January 2001 had negative growth of 17%.[143]

Oracle's OPI division was similarly being affected by the decline in the economy and the market for Oracle's products. As of January 26, 2001, OPI had booked no license revenue in January 2001.[144] Excluding Covisint, OPI generated only $7.4 million in license revenue through January 2001.[145] Without the benefit of the Covisint transaction, OPI's performance in December and January was nearly non-existent.

In my opinion, the actual results and negative growth trends in all three of Oracle's U.S. license divisions show that Oracle was being adversely affected by the economic downturn and applications shortfalls and was not on track to meet Public Guidance. It is my opinion that

---

[138]    Minton 9/25/06 Exhibit 45.

[139]    NDCA-ORCL 292485-292488; NDCA-ORCL 292509-292511.

[140]    Minton 9/25/06 Exhibits 43, 45.

[141]    NDCA-ORCL 610989-93.

[142]    Minton 9/25/06 Exhibit 45.

[143]    *Id.*

[144]    *See* NCDA-ORCL 160665-991 at 160667.

[145]    Minton 9/25/06 Exhibit 45.

defendants' claim that Oracle would make Public Guidance is inconsistent with the evidence that any rational forecaster would consider when evaluating a forecast.

**GROWTH GAP**

The difference between forecasted license revenue growth rates and the Pipeline revenue growth rates also indicated that the economy was adversely affecting Oracle's operations and that its Public Guidance was out of reach. My analysis, which mirrors the analyses done within Oracle, compares the growth rate in the Potential Forecast with the Pipeline growth rate (given that Oracle utilized the Potential Forecast to issue Public Guidance for the quarter). Unlike the four quarters prior to the Class Period, the gap between these measures was extremely narrow in Q3 FY01. In fact, between December 25, 2000 and January 29, 2001, the gap never reached higher than 4% and was negative half the time.[146] This behavior informed defendants that the financial department was forecasting license revenues to grow at a more rapid rate than the Pipeline was growing for most of December and January. This was out of line with Oracle's historical experience, which showed a negative gap only once prior to Q3 FY01, and an average spread of 13.4%.[147] A negative gap is important because it indicates that the forecast target is less likely to be met. As Larry Ellison noted, it would be "incautious to . . . forecast sales growth without underlying pipeline growth."[148]

This evidence is inconsistent with Oracle's claims about its Public Guidance and its Economy Statements. Testimony from Mr. Ellison supports my opinion on this point. Ellison stated, "as long as the pipeline growth is greater than – than the revenue growth, you should be able to meet your numbers."[149] As the converse occurred in significant parts of December and January, Ellison's own measure indicated Oracle was not on track to reach Public Guidance. Since both metrics appeared on the first page of the Upside Report, defendants were informed of these facts throughout the quarter.[150]

---

[146]   Expert Report Exhibit 13.

[147]   *See* Expert Report Exhibit 13.

[148]   Ellison 2/26/04 Tr. at 87:4-5.

[149]   Ellison 2/27/04 Tr. at 421:12-14.

[150]   Minton 9/25/06 Exhibit FR 24A.

**PIPELINE GROWTH**

The behavior of Oracle's Pipeline also informed defendants that Oracle was being adversely impacted by the downturn in the economy and problems with its products. When combined with the behavior of the Field Forecast, Upside Forecast and actual sales, it showed that Public Guidance was out of reach. The term "Pipeline" as used in the Upside Report and other senior level reports referred to "all the deals that were being worked on or had an opportunity to close during the quarter" and includes deals that have already closed.[151] Year-over-year Pipeline growth, while as high as 52% in week 1 of the quarter, dropped precipitously in the next few weeks and continued to fall throughout the quarter. Total company Pipeline growth was 52% on December 11, 2000 and dropped by $300M to 34% by December 25, 2000.[152] As Mr. Ellison considered this a key forecasting indicator, the behavior of the Pipeline therefore informed defendants no later than December 25, 2000, that Oracle's business had been negatively impacted.[153]

The Pipeline collapse continued throughout the quarter. In addition to the $300M drop in December, Oracle's Pipeline collapsed by $544M through February 5, 2001, and by a total of $807M for the entire Q3 FY01 ($600M of which came from Applications deals).[154] By contrast, the Pipeline for the same period in the prior year *increased* by $69M in December 1999 and January 2000 and lost only $340M for the entire Q3 FY00 quarter.[155] The historical data produced by Oracle for other quarters before Q3 FY01 also reflect that the Pipeline tended to increase in the quarter before declining at the end.[156] That data also reflects that the size of the Pipeline declines in the

---

[151]   Minton 4/21/05 Tr. at 110:24-111:1, 128.

[152]   Minton 9/25/06 Exhibits FR 22A, 24A

[153]   Minton 9/25/06 Exhibits FR 22A, 24A; Henley 11/16/06 Tr. at 261:10-15 ("Q. I'll try again. At the time you made these statements, had pipeline growth within the third fiscal quarter of 2001 declined from the growth at the beginning to the growth at the time you made this statement? A. I believe it had, yes."); Ellison 9/21/06 Tr. at 457:8-17 ("Q. And do you dispute that you had that [Pipeline] information in January of 2001? . . . A. I do not.").

[154]   Expert Report Exhibit 20.

[155]   *See* Expert Report Exhibit 20.

[156]   Expert Report Exhibit 21.

previous quarters were nowhere near the size of the declines in Q3 FY01 (for the company as a whole as well as for Oracle's U.S. license divisions).[157]

The rapid and uncharacteristic decline in the pipeline indicated more deals were being lost than in prior years. With the declining stock market, tightening credit and reduced venture capital, Oracle's customers were unable or unwilling to make purchases.

Significant Pipeline declines were not isolated to Q3 FY01 but in fact had begun occurring in Q1 FY01 and continued through Q4 FY01. For example, in Q1 FY01 the licensing Pipeline declined by 31% or $548 million from the beginning to the end of the quarter.[158] The licensing Pipeline decline in Q2 FY01 was 19% or $426 million, 27% or $807 million in Q3 FY01, and 31% or $1.3 billion in Q4 FY01.[159] For FY01 the average quarterly Pipeline decline from the beginning to the end of the quarter was over 27%, while the average decline in the six quarters prior to Q1 FY01 was only 9%.[160]

These pipeline declines indicated that potential customers were making decisions to either postpone purchases or cancel them during the course of the quarter; whereas in FY00 and in FY99, these potential deals generally remained in the Pipeline indicating that customers were still considering a purchase throughout the quarter. Therefore, not only did the behavior of the Pipeline in Q3 FY01 inform defendants that Oracle was being adversely affected by the economic environment, but this same Pipeline behavior had informed defendants of deteriorating economic conditions since Q1 FY01.

The behavior of the Pipeline in Q3 FY01 therefore informed defendants throughout the quarter that Oracle was being adversely affected by the economic environment.

**FIELD FORECAST**

The behavior of the Field Forecast, which Ellison described as a key metric, (he testified that he relied on this instead of Minton's "upside," which he characterized as a "mood ring") not only

---

[157]   *See* Expert Report Exhibit 21.

[158]   Expert Report Exhibit 10.

[159]   *See* Expert Report Exhibit 10.

[160]   Expert Report Exhibit 10.

informed defendants from the beginning of the quarter that Oracle would miss Public Guidance, but also that Oracle was being affected by the economy.[161]   The Field Forecast was below Public Guidance for the entire quarter.[162]   The field forecasted only 10.7¢ earnings per share in the beginning of the quarter and increased that forecast to only 11.0¢ at the end of February – at all times at least a penny below guidance. They forecasted EPS of 10.7¢ on December 11, 2000 (three days before Oracle issued guidance), 10.6¢ on December 25, 2000, 10.6¢ on January 15, 2001, 10.7¢ on January 22, 2001, 10.7¢ on January 29, 2001, 10.5¢ on February 5, 2001, 10.9¢ on February 12, 2001, 11.0¢ on February 19, 2001, 11.0¢ on February 26, 2001, 11.0¢ on February 27, 2001, and 10.7¢ on February 28, 2001.[163]

Indeed, in December and January, contrary to historical practice, none of the U.S. license divisions increased their forecasts.[164]   The field historically tended to increase its forecast as the quarter progressed and as deals became more certain.[165]   In each of the four quarters leading up to Q3 FY01, the Field increased its forecast throughout the quarter, often quite dramatically (for example, in Q4 FY00 the Field Forecast increased by $157M and in Q2 FY01 the Field Forecast increased by $95M).   In contrast, in Q3 FY01 the Field Forecast remained steady for the first two months before plummeting in February.[166]

Like the difference between the Pipeline growth and the growth in the Potential Forecast, the behavior of the Field Forecast was out of line with historical practice.   In addition, reports from the Field confirmed the problems.   One of the senior executives in Oracle's NAS division commented at the end of the quarter that "AVPs [were] Beginning to Voice Concern" in the month of December

---

[161]   Ellison 2/27/04 Tr. at 279-281.

[162]   Expert Report Exhibit 12.

[163]   Expert Report Exhibit 12.

[164]   Expert Report Exhibit 22.

[165]   Expert Report Exhibit 22.

[166]   Expert Report Exhibit 22.

and that the "AVPs [were] Reluctant to Raise Their Forecast" in the month of January.[167] These facts further informed defendants that Oracle would miss Public Guidance.

**POTENTIAL FORECAST**

The behavior of the Potential Forecast was also highly unusual compared to historical trends and informed defendants that Oracle was forecasting to miss guidance. Ms. Minton added $159.5M in "upside" to the Field Forecast in December.[168] On January 15, 2001, Ms. Minton lowered her total company license upside by $64.6 million (from $159.5 million to $94.91 million).[169] She also lowered the upside for NAS by $36 million and eliminated all upside for OSI.[170] By January 29, 2001, Minton lowered her total company license upside by $51.5 million (from $94.91 million to $43.41 million), eliminated the upside for NAS entirely, and applied a negative $35 million upside to OSI.[171] This was the first time in the four quarters prior to Q3 FY01 that she had ever applied a negative upside adjustment to a U.S. Division in the first two months of the quarter.[172] By contrast, in Q3 FY00 Minton reduced her upside by only $35M in December and January, and only $66M for the entire quarter.[173] By January 29, 2001, the Finance Department's Potential Forecasts for total license revenue growth, database license revenue growth, and EPS were all below Public Guidance.[174]

The behavior of the Potential Forecast was inconsistent with defendants' claims that the economic downturn was not affecting Oracle's business. In fact, Mr. Henley testified that the

---

[167]   Roberts 6/22/06 Exhibit 27 at NDCA-ORCL 179337.

[168]   Expert Report Exhibit 11.

[169]   *Id.*

[170]   *Id.*

[171]   *Id.*

[172]   *Id.*

[173]   *Id.*

[174]   Minton 9/25/06 Exhibit FR 27A.

39

January 29, 2001 Upside Report led him to believe that making Public Guidance would be more of a horse race:

> "So I mean now we've had many quarters where we're forecasting virtually what we've ended up doing. Sometimes a little bit less, we end up doing a little bit less, a little bit more. But surely, I have less. She's now forecast numbers much closer so that when you get equal now, that's why I say the last month of the quarter you start thinking, "Wow," you know, "this is more of a horse race."[175]

Ms. Minton testified that she lowered her upside because of the performance of the U.S. divisions and the Pipeline since the beginning of the quarter.[176] Ms. Minton explained in her affidavit in support of Motion for Summary Judgment that several e-mails from the field caused her to drop her upside adjustments throughout the quarter.[177] By February 5, 2001, the Financial Department was forecasting earnings per share of 11.29¢, which was far enough below guidance to remove the benefit of rounding.[178] By the end of the second week of February, Minton's upside adjustments fell another $12 million.[179]

This continued a pattern of decreasing "upside" without a corresponding increase in forecast that had been occurring throughout Q3 FY01.[180] This is significant because, generally, a decline in the upside adjustment is the result of an unexpected increase in the number of deals closing or an increase in the Field Forecast. However, in Q3 FY01 the declines were not the result of more certainty from the field (as they were not accompanied by a corresponding increase in the Field Forecast). Instead of becoming more likely to close, deals on which Ms. Minton was relying for her upside adjustments were dropping out of the Pipeline completely.

---

[175]    Henley 11/16/06 Tr. at 375; Henley 3/24/04 Tr. at 266-267.

[176]    Minton 3/2/04 Tr. at 211; Minton Aff. ¶25.

[177]    Minton Aff. ¶25 ("During 3Q01, 'upside adjustments' included information based on emails received from David Winton on January 11, 2001, James English on January 17, 2001, Larry Garnick on January 17, 2001 and Sarah Kopp on January 18, 2001.").

[178]    Minton 9/25/06 Exhibit FR 28A.

[179]    Expert Report Exhibit 11.

[180]    *Id.*

It is my opinion that the behavior of the Potential Forecast and Ms. Minton's upside adjustments indicates that the defendants knew Oracle was being adversely affected by the declines in the economy and the market for Oracle's products.

## EXPENSES

In addition, Oracle could not reasonably rely on a decrease in expenses to compensate for its fading pipeline and revenues. According to Oracle's Q3 FY01 Upside Reports, forecasted expenses increased in every Upside Report from December 11, 2000 (the basis for Public Guidance) through February 12, 2001.[181] Even as forecasted expenses began to decline along with forecasted revenue, the cost structure of Oracle dictates that expenses never fell as fast as revenue (mostly commissions). This is because only a small percentage of Oracle's expenses are linked to revenue (mostly commissions). The vast majority of expenses are fixed. I tested the cost structure of Oracle using forecasted revenue and expenses contained in the Upside Reports for the period 11/29/00 through 2/28/01 and found that for every $1 change in forecasted revenue, Oracle forecasted only a $.27 change in expenses.[182]

Therefore, if revenue declined during the quarter, then the accompanying decline in margin and EPS cannot be made up by a decline in expenses. This relationship held true in Q3 FY01, as by the end of the quarter forecasted revenue had declined 10.8% and forecasted expenses fell only 3.9%.[183] As revenue falls, earnings per share declines. Oracle's relatively high fixed costs prevent it from making up the shortfall in revenue with a decline in variable expenses.

Similarly, while Oracle's forecasted margins had improved compared to prior quarters, this information was included in the December 11, 2000 Upside Report, and thus Public Guidance. Regardless of any comparisons to the margins in prior quarters, as forecasted revenues fell, and expenses rose, earnings per share plummeted, and it was clear that Oracle would not meet the Public Guidance in Q3 FY01.

---

[181]   Expert Report Exhibit 23.

[182]   *Id.*

[183]   *Id.*

This trend was clear throughout Q3 FY01 and led to a 21.5% decline in forecasted earnings per share from the start of Q3 FY01 to the end.

**LARGE DEALS**

The last measure that Mr. Ellison considered a "key" intra-quarter forecasting indicator was large deals in the last week of the quarter. It is my opinion that this indicator is irrelevant to the forecasting process because the forecast period has essentially ended by the time this information is known. A more relevant indicator is the size of the deals occurring throughout the quarter. The documents I reviewed showed that Oracle's Pipeline, at least in its largest license division, contained few large deals in the very beginning of Q3 FY01 and that it failed to close a single deal over $5M in the quarter.[184]

In addition, a December 6, 2000 e-mail from David Winton, finance director for Oracle's NAS license division, indicated that large deals were scarce even at the beginning of the quarter:

> 2. More big deals this Q1&2- As the schedule shows, our results this year have been boosted by big deals in both quarters. Combined, these >$5M deals contributed over $55M year to date. Note that we only have one deal >$5M currently in the Q3 Pipe. Last year we had four deals that netted $28M.[185]

Mr. Henley also wrote "NAS - no big deals in pipeline" on his December 8, 2000 Upside Report.[186] In my opinion, this evidence informed defendants that Oracle was being adversely affected by the economic downturn and declining sales of Oracle products.

**U.S. DIVISIONS**

I note that my opinions are supported by substantial evidence coming from Oracle's field in Oracle's U.S. license divisions, which represented approximately 52% of Oracle's license revenues.[187] On average, NAS generated approximately 25% of Oracle's annual license revenues, OSI generated approximately 17%, and OPI generated approximately 9%.[188] The evidence that I

---

[184]   Winton 5/26/06 Exhibit 43; NDCA-ORCL 02704-6.

[185]   Winton 5/26/06 Exhibit 43.

[186]   Henley 3/2/04 Tr. at 213-215; DC 144.

[187]   Expert Report Exhibit 24.

[188]   Expert Report Exhibit 24.

reviewed shows that all three U.S. license divisions were providing defendants with information indicating that the divisions were experiencing negative growth trends.

The NAS division informed the corporate division at the outset of the quarter (a week before Oracle issued its Public Guidance for Q3 FY01) that it would be unable to reach its quarterly budget (which was approximately $36M less than the $396M Potential Forecast that Ms. Minton calculated for the division after $50M in upside adjustments), that its Pipeline was not where it needed to be to reach its budget, and, as discussed above, that the division had experienced a slowdown in large deals compared to Q3 FY00 and compared to Q2 FY01 and Q1 FY01:

> 2. More big deals this Q1&2- As the schedule shows, our results this year have been boosted by big deals in both quarters. Combined, these >$5M deals contributed over $55M year to date. Note that we only have one deal >$5M currently in the Q3 Pipe. Last year we had four deals that netted $28M.
>
> 4. Q3 Pipe not where it needs to be- Based on the conversion history, I think we need another $50M of Apps and nearly $70M of Tech to feel statistically comfortable to hit our Q3 Budget. Given the past trends, GB and Majors should add incremental Pipe during the next three weeks.[189]

The NAS division also informed Ms. Minton at the outset of the quarter that growth comparisons would be tougher in Q3 FY01 and Q4 FY01 because "NAS results took off last year in Q3 and continued into Q4."[190] And as of December 8, 2000, Mr. Henley noted that NAS had "no big deals in the pipeline."[191]

By January 4, 2001, a finance director for NAS had notified Messrs. Winton and Roberts that the Division's December 2000 revenue was down from December 1999 by approximately $10M.[192] By January 11, 2001, Mr. Winton informed Ms. Minton that NAS was being affected by the economic downturn. His January 11, 2001 report followed an operations review for the entire NAS division. During that review, John Nugent, a SVP of NAS's General Business division, reported a

---

[189]   Winton 5/26/06 Exhibit 43; Minton 9/25/06 Exhibit FR 22A.

[190]   Winton 5/26/06 Exhibit 43.

[191]   Henley 3/2/04 Tr. at 213-215; DC 144.

[192]   Winton 5/26/06 Exhibit 43.

"Sluggish Economic Outlook" where the "Focus [was] on Profits" and "Reduc[ing] Costs."[193] Members of NAS discussed numerous problems plaguing the division, including the fact that in the General Business division the "bigger dot coms had acquired the Oracle database" and as a result Oracle was "going after second-tier, if you will, which meant "that other sales were going to be more difficult to dot com companies."[194]

Mr. Nugent reported on the "Loss of 'Low Hanging DotCom' Fruit" during late January 2001 and that General Business's "DotCom Fishing Hole [was] Drying Up."[195] He described a "Mid Teen Technology Growth Rate" and "6M Dot Com Deals."[196] He reported that there was a "Dramatic Decline in DotCom Business," which led to a "$40M DB Shortfall in [the] West" and suggested a "Quota Reduction" for dot com. *Id.* He also stated that "CIO's [were] on a "Shorter Leash," that "CEOs More Involved in Technological Business Applications Decisions." That "CEO's meeting with CIO's More Frequently."[197] Mr. Winton's January 11, 2001, report to Ms. Minton summarized the Ops review as follows:

> 1. The Pipe has not grown as we had anticipated. We're actually slightly down from December end reporting.
>
> 2. Lack of big deals. Unlike Q1 & Q2, we have few big deals in Best case that could drive us past the $360 line.
>
> 3. Drop in Technology. As reflected in the softening Pipe, both GB and Majors see a slow down in both Q3 and Q4. GB's dot com bubble has burst (they expect the West to end the year $30-$40 million behind their original budget for Technology)." Majors sees a slow down in spend along with smaller deal sizes. Also the change in

---

[193]    Winton 5/25/05 Exhibit 48

[194]    Nugent 5/19/04 Tr. at 78-79.

[195]    Winton 5/26/06 Ex. 48 at NDCA-ORCL 350287.

[196]    *Id.* at 302; Nugent 5/19/04 Tr. at 93:17-96:21.

[197]    Winton 5/26/06 Tr. at 285. Nugent 5/19/04 Tr. at 86-88. *See also* Roberts 3/17/04 Tr. at 61:20-62:6 ("[We discussed] the fact that the dot com revenue was dropping and consequently how that impacted the numbers, what can we do to fix it, where can we find revenue in other areas.").

the ASP model for Generic Tech hosting lic's coupled with the dot com crash is impacting projected Tech results in that segment.[198]

In my opinion, this information disclosed to defendants that NAS, Oracle's largest license division accounting for roughly 25% of license revenues and the source of the largest part of the shortfall in Q3 FY01 revenues, was being adversely affected by the economic downturn. Based on my review of Mr. Ellison's testimony, he was informed of the information contained in Mr. Winton's e-mail. While he testified that he did not recall the January 11, 2001 e-mail itself, he testified that he knew about some of the issues raised in the e-mail:

> Q   "3," Drops in – "Drop in Technology. As reflected in the softening Pipe, both GB and Majors see a slow down in both Q3 and Q4. GB's dot com bubble has burst," and in parens, "(they expect the West to end the year 30 to $40 million behind their original Budget for Technology). Majors sees a slow down in spend along with smaller deal" size – "sizes. Also, the change in the ASP model for Generic Tech hosting" 11i's – lic's coupled with the dot com crash is impacting projected Tech results in that segment."
>
> Do you see that?
>
> A   I do.
>
> Q   Were you aware of the issues raised in Point No. 3 in January of 2000 – January of 2001, excuse me?
>
> A   Yes, and I certainly don't agree with all of them. The ASP model for Generic Tech hosting never happened.[199]

Mr. Winton's January 11, 2001 e-mail also explained that "[a]t this point, I still think we're tracking to end Q3 @ $354-$355. If we get Americredit for an additional $5 (in Best), it moves to the $360 range."[200] Even this "best case scenario" was far short of the $396M that Ms. Minton had projected for NAS throughout December and in her Potential Forecast that formed the basis of

---

[198]   Winton 5/26/06 Exhibit 49.

[199]   Ellison 9/21/06 Tr. at 431:13-432:6; Ellison 9/21/06 Exhibit 112.

[200]   Ellison 9/21/06 Exhibit 112.

Oracle's Public Guidance.[201]  Following Mr. Winton's e-mail, Ms. Minton's upside adjustment for NAS dropped to $360M.[202]

On January 29, 2001, Mr. Winton informed Ms. Minton by e-mail of the negative effect that the dot com collapse was having on NAS's business in Q3 FY01 and his negative expectations for the remainder of the fiscal year.[203]  The email explained that technology sales in NAS (including dot com sales and non-dot com sales) showed negative 6% growth for Q3 FY01 in NAS's technology sales and negative 8% year over year growth in NAS's dot com and ASP technology revenue in the first half of FY01.  The e-mail also forecasted growth of negative 54% in Q3 FY01 and negative 41% in Q4 FY01 dot com and ASP and anticipated NAS's Brick and Mortar technology license revenue to drop from 65% growth in the first half of the year to 31% in Q3 FY01 and just 29% in Q4 FY01.  For the entire division, the e-mail projected that the division's technology growth would drop from 38% in the first half of the year to a negative 6% in Q3 FY01 and just 2% Q4 FY01.[204]

The evidence that I have reviewed shows that Mr. Henley and Safra Catz, Executive Vice President responsible for Global Business Practices and Corporate Development, received the e-mail the day after it was sent to Ms. Minton.[205]  According to Mr. Henley, Winton prepared the analysis because "we were all concerned about the dot-com erosion that had started several quarters earlier" and "this would have been his latest view to George as to what . . . effect that's having on his forecast."[206]  As Henley admitted, Winton's January 29, 2001 email evidenced that the dot com fallout was having a "progressively more negative impact on Oracle than in prior quarters."[207]  The EVP for the NAS division, Mr. Roberts, stated that the decline in the dot com revenue stream was a

---

[201]    Minton 9/25/06 Exhibit FR 22A.

[202]    Minton 9/25/06 Exhibit FR 25A.

[203]    Winton 5/26/06 Tr. at 205.

[204]    *Id.*

[205]    NDCA-ORCL 610142-44.

[206]    Henley 3/3/04 Tr. at 309-310.

[207]    Winton 5/26/06 Exhibit 51; Henley 3/3/04 Tr. at 310-311:9.

topic of conversation at the EMC meetings either during Q2 FY01 and/or Q3 FY01.[208]  In my opinion, this information informed defendants that Oracle was being adversely affected by the economic downturn.

The evidence that I have reviewed also shows that Oracle's OSI license division was signaling to defendants that its business had negative growth trends.  By the second week of Q3 FY01, OSI was experiencing negative 10% year-over-year growth in the Pipeline.[209]  By the end of December, OSI had experienced a negative 81% growth rate in license revenues.[210]  On January 18, 2001, Sara Kopp, the Senior Finance Director of OSI, sent Minton an email regarding Q3 FY01 forecast information for OSI.[211]

In this email, Kopp reported that: (a) Nussbaum was only standing by his $225 million forecast number so long as none of the very large opportunities dropped out, many of which were in the troubled telecom industry; (b) OSI was only committing to $134 million, so there was $91 million in judgment at Nussbaum's level to reach the $225 million forecast; (c) with the exception of one sector, conversion rates across the board were north of 50% and its Pipeline was only $422 million.[212]  As of January 18, 2001, forecasted conversion rates (the percentage of the pipeline that had to be converted to make the forecast) for OSI and each of its verticals (except state and local) were well over the 30%-40% forecasted conversion rate that Jay Nussbaum, the head of OSI, felt comfortable with.[213]  The forecasted conversion rates broke down by divisions as follows:

Federal – 62%.

State and Local – 43%.[214]

---

208    Roberts 3/17/04 Tr. at 69-70.

209    NDCA-ORCL 154504-154510.

210    Minton 9/25/06 Exhibit 43.

211    Minton 7/7/06 at Exhibit 42.

212    *Id.*

213    Nussbaum 3/23/05 Tr. at 36; DC 77; Minton 9/25/06 Exhibit 42.

214    Minton 7/7/06 at Exhibit 42.

Higher Education – 54%.[215]

Healthcare – 54%.[216]

Financial Services – 56%.[217]

Communications and Utilities – 53%.[218]

The forecasted conversion rate for the entire OSI division was 53%.[219] And by January 2001, OSI's telecom company customers were starting to feel the effects of the downturn in the economy and this telecom "bubble burst" was becoming publicly known.[220]

The divisions within OSI were still performing well below expectations as of February 13, 2001. The OSI Federal vertical was expected to close $50 million in revenue, but the field had committed to only $20 million (and it had booked only $8.6 million).[221] The OSI State and Local vertical was expected to close $35 million in revenue, but the field had committed to only $28 million (and it had booked only $5.4 million).[222] The OSI Higher Education vertical was expected to close $20 million in revenue, but the field had committed to only $8 million (and it had booked only $0.3 million).[223] The OSI Healthcare vertical was expected to close $15 million in revenue, but the field had booked only $1.6 million.[224] The OSI Communications and Utilities vertical was expected to close $80 million in revenue, but the field had committed to only $48 million (and it had booked

---

[215]   *Id.*

[216]   *Id.*

[217]   *Id.*

[218]   *Id.*

[219]   *Id.*

[220]   *See, e.g.*, DC 230-231; Henley 3/2/04 Tr. at 209-211.

[221]   NDCA-ORCL 156379-385; DC 77; Minton 9/25/06 Exhibit 42.

[222]   *Id.*

[223]   *Id.*

[224]   *Id.*

only $15 million); and the OSI Financial Services vertical was expected to close $25 million in revenue, but the field had committed to only $10 million (and it had booked only $2.8 million).[225]

The evidence that I have reviewed also shows that Oracle's OPI division was being negatively affected by the economic downturn. As I explained above, the OPI division had experienced a negative 85% growth rate without the Covisint transaction and had closed only $2.6M in deals in the month of December and only $7.4M by the end of January.[226] Excluding Covisint, OPI's business in the first two months of Q3 FY01 was virtually nonexistent. By January 17, 2001, James English, the Senior Finance Director of OPI, sent Ms. Minton an email explaining that OPI has a "lot of pipe at challenging clients."[227] He explained that the best case number for OPI was "a real stretch as several of these deals will be Q4," and that one [Area Vice President] talked of starting to see indications of client delays on decisions."[228] English testified in his derivative deposition that he wrote this email to temper his positive comments.[229] Henley testified that the e-mail meant to him that the OPI division had to work through a complicated sales cycle to make its forecast:

A. Well, again, these are typically our larger, more complicated accounts. The sales cycle is just more complicated and complex.

Q. That's what "We have a lot of pipe at challenging clients" means to you?

A. What it means to me is that we have a lot of pipeline, but we've got to work through complicated sales cycle to get home, get it done.[230]

Sanderson confirmed that OPI did have many challenging customers during Q3 FY01.[231] A January 17, 2001 email sent by Kent Kelley to Sanderson, the EVP in charge of OPI, evidenced

---

[225]    Minton 9/25/06 at Exhibit 43.

[226]    Minton 9/25/06 Exhibit 43.

[227]    Minton 7/7/06 at Exhibit 41.

[228]    *Id.*

[229]    Minton 7/7/06 at Exhibit 41; English 2/19/04 Tr. at 211-213.

[230]    Henley 11/16/06 Tr. at 360:15-22.

[231]    Sanderson 3/9/04 Tr. at 161-162.

49

slowing growth in OPI by noting that: (a) OPI was reporting a coverage ratio of 246% compared to a target of 340%; and (b) OPI was projecting 16% growth for Q4 FY01, only 65% of target.[232]

Further evidence of the effect of the economic downturn is present in the stated reasons of large customers (sales equal to at least $500 million) for not closing a deal in the last month of Q3 FY01. Of 183 "large deals" (deals over $500,000) that failed to close, Oracle was able to provide information for only eight customers regarding the reason for the failure to close. Within this group, three or 37%, indicated a reason related to the economy.[233] This evidence along with the other indicators from across Oracle's divisions informed defendants that the deteriorating economy was affecting Oracle's revenues.[234]

### G. The "Hockey-Stick" Phenomenon Did Not Prevent Oracle from Knowing that It Would Miss Public Guidance Until the Last Few Days of the Quarter

Counsel for plaintiffs have informed me that defendants have claimed that the intra-quarter timing of Oracle's revenue, what they apparently refer to as the "hockey-stick" effect, prevented them from knowing that Oracle's business was feeling the impact of the economy or that they would miss Public Guidance until the last minutes of the quarter. In my opinion, these claims ignore that Oracle had consistent patterns of revenue throughout the year and that the month of December was the largest license revenue contributor of any first month in the quarter. In fact, the monthly Flash Report that defendants received from Oracle's finance department contained historical trends of Oracle's revenue and showed that in the third quarter, Oracle's average revenues were fairly

---

[232]  NDCA-ORCL 003425-003426. *See also* English Tr. 2/19/04 at 258:24-260:24.

[233]  This percentage suggests that had defendants retained the necessary information (which I am informed that they did not) it would likely contain further support for the fact that the economy was having a negative effect on Oracle's business. In addition, although there is certainly plenty of data that has been produced which suggests that Oracle was not on track to meet Public Guidance and that it was being negatively affected by the economy, I note that my calculations, including historical and intra-quarter comparisons, were necessarily limited due to missing forecasting reports which I am informed that Oracle has been unable to produce.

[234]  Oracle Corp.'s Supplemental Responses to Plaintiff's First Set of Interrogatories, No. 4; Oracle Corp.'s Third Amended and Supplemental Responses to Plaintiff's Second Set of Interrogatories, No. 22.

consistent between months 1 and 2 and month 3 with months 1 and 2 contributing, on average, 40% of license revenue compared to 60% in month 3.

I reviewed license revenue on a monthly basis from Q1 FY95 through Q2 FY01 and found that on average 15.4% of quarterly license revenue was recognized in the first month of the quarter, 18% in the second month and 66.6% in the third month. I reviewed Q3 license revenue and found that on average, between FY95 and FY00, 22.2% of Q3 license revenue was recognized in the first month (December) and 41.5% of Q3 license revenue was recognized in December and January combined. Through a least-squares regression analysis, I also determined that the December revenue contribution was a statistically significant indicator of revenue for the entire quarter.[235] This consistent pattern of revenue, and its statistical significance to the quarter, undermines defendants' claim that Oracle's quarterly revenue is unpredictable until the last few days of the quarter.

My opinion is not only supported by Mr. Ellison's testimony that actual monthly results are a key forecasting indicator at Oracle, but also by internal documents revealing that Oracle studied monthly results. The e-mails distributed by Mr. Garnick on January 17, 2001 and on February 8, 2001, both analyzed Oracle's monthly results, as did the flash report distributed by Ivgen Guner on January 17, 2001. In fact, the December Flash Report distributed by Ivgen Guner on the same day, January 17, 2001, indicates that Oracle recognized the value of examining the monthly connection to quarterly revenue dating back five years. That report had a specific column dedicated to showing Oracle management "License as % of quarter."

Oracle's claim that the "hockey-stick" effect prevented management from knowing that Oracle's business was feeling the impact of the economy, if true, would render its own flash report meaningless. The analysis of monthly historical results to forecast quarterly results as performed by Mr. Garnick and supported by Mr. Ellison leads me to believe that senior management was well aware of the value of monthly revenue estimates.

---

[235]    *See* Expert Report Exhibit 25.

Finally, as discussed above, many other internal Oracle key indicators informed defendants that Oracle would not meet its Public Guidance. Defendants were consistently informed of these facts throughout Q3 FY01. Accordingly, defendants' claim that they were not aware of the likely miss until the very end of the quarter is not supported by the facts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 15th day of October, 2008, at Los Angeles, California.

_____
ALAN G. GOEDDE

52

# EXHIBIT 1

**ALAN G. GOEDDE**                                                    **Vice President**

Alan G. Goedde is a member of the firm of Freeman & Mills, a consulting firm offering services in the areas of accounting, finance, economics and business practices and procedures. He has over 20 years of experience developing financial and economic analyses to solve business problems. Dr. Goedde was formerly a vice president of Putnam, Hayes & Bartlett, Inc., an economic and management consulting firm. Before joining Putnam, Hayes & Bartlett and its predecessor firm, Freeman & Mills, Incorporated, Dr. Goedde had extensive business and regulatory experience while in industry and government. He was president of a technology marketing and licensing company, head of strategic planning for the NutraSweet Company and vice president-strategic planning for a division of First National Bank of Chicago. While at the U.S. Treasury, his responsibilities included corporate fraud, technology licensing, business valuation and transfer pricing. He has testified in U.S. Tax Court.

A considerable part of Dr. Goedde's practice involves intellectual property issues including patent, trademark, copyright, trade secret and unfair competition matters as well as business valuations and franchising. His background in engineering and economics combined with his work experience in profit planning, budgeting, product marketing and acquisitions analysis has enabled him to assist clients in a wide range of intellectual property litigation. Dr. Goedde can also draw upon his experience as a patent examiner at the U.S. Patent and Trademark Office.

Dr. Goedde has testified on issues involving employment compensation, lost profits, incremental costs, reasonable royalty, price erosion and licensing as well as the value of patents, trademarks and other intangible assets. In franchising matters, his experience includes franchise growth, business viability and trademark value. His industry expertise includes manufacturing, pharmaceuticals, biotechnology, industrial products, foods, automotive aftermarket, airlines, electronics and software.

Dr. Goedde has consulted on numerous high technology matters including semiconductors, telecommunications and biotechnology. His analysis and testimony have involved accelerated product life cycles, economics of startup or development stage companies, market power, product development costs and distribution economics.

In antitrust matters, Dr. Goedde has provided analysis and expert testimony on the definition of relevant markets, the competitive impact of mergers, market power, price discrimination, predatory pricing, as well as the presence and extent of price fixing. He has testified in a number of patent/antitrust matters involving inequitable conduct including Walker Process fraud. In addition to providing testimony in federal and state courts, Dr. Goedde has also appeared before the Federal Trade Commission.

Dr. Goedde has testified on financial and economic matters involving Superfund and hazardous waste sites including stigma damages. He has also testified to the use of statistical methods, sampling and economic analysis in developing damage claims and in identifying markets. His experience also includes analyses in securities pricing, bankruptcy, dealer termination, and valuation of minority holdings.

**ALAN G. GOEDDE**

Dr. Goedde has served as an arbitrator for the American Arbitration Association and has testified on matters including business interruption, wrongful termination and dealer-distributor disputes.

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1994–2000 | Putnam, Hayes & Bartlett |
| 1990–1994 | Freeman & Mills Incorporated |
| 1988–1990 | Manager, Coopers & Lybrand |
| 1987–1988 | President, Mentor International Group |
| 1986–1987 | Director of Strategic Planning, The NutraSweet Co. |
| 1984–1986 | Vice President, First National Bank of Chicago |
| 1981–1984 | Manager, Arthur Andersen & Co. |
| 1979–1981 | Financial Economist, U.S. Export-Import Bank |
| 1976–1979 | Industry Economist, U.S. Treasury Department |
| 1970–1971 | Patent Examiner, U.S. Patent Office |

## PROFESSIONAL AFFILIATIONS AND MEMBERSHIPS

- American Bar Association
- Los Angeles County Bar Association
- Los Angeles Intellectual Property Law Association
- American Society of Appraisers
- National Association of Business Economists
- Who's Who in Finance and Industry
- Board of Directors, Associated Foundations, Inc.

Dr. Goedde holds a B.S. in engineering and a M.A. and Ph.D. in economics from Duke University.

**ALAN G. GOEDDE**

## PUBLICATIONS AND PRESENTATIONS

Goedde, Alan G. and Freeman, Neill W.  Article reviews.  In *Manual on the Economics of Antitrust Law*, Ninth and Eleventh Supplements, edited by Robert H. Lande.  Chicago: American Bar Association, 1991, 1993.

Roach, George P. and Goedde, Alan G., "CEO Compensation in the Pharmaceutical Industry: Market Value, the Number of Employees and Total Return Underpin CEO Pay at Pharmaceutical Companies", *Compensation and Benefits Review*,  Vol. 35, No. 5, 66-81, 2003.

American Institute of Certified Public Accountants, Conferences on Fraud and Litigation, "Regression Analysis in Litigation", 2004.

Los Angeles County Bar Association, "Recovering Damages in Credit Deprivation Cases", 1996.

Los Angeles Intellectual Property Law Association, "Economic Damages in Copyright, Trademark and Trade Secret Litigation", 1994.

**CONTACT:**

(213) 576-1815
agoedde@freemanmills.com

# EXHIBIT 2

ALAN G. GOEDDE

## RULE 26(A)(2)(B) DISCLOSURE OF
## DEPOSITION/TRIAL TESTIMONY

| DATE | CASE | COURT | D/T |
|---|---|---|---|
| 1/90 | Chicago Specialty v. Dortmunder (DAB) | Cir. Ct., Cook Cty., IL | T |
| 1/90 | Game & Playtime v. Gametime | USDC N IL | D |
| 5/90 | Nedlog, Inc. v. ARA Services, Inc. | USDC N IL | D |
| 9/90 | Cella v. United States | USDC N IN | T |
| 12/90 | Edgerly v. State Farm Insurance | OCSC | D |
| 4/91 | Euroconcepts v. Aderans | LASC | D |
| 5/91 | Benjamin v. Levenfeld | LASC | D |
| 6/91 | Benjamin v. Levenfeld | LASC | T |
| 9/91 | Cummins-Allison, Inc. v. Brandt, Inc. | USDC N IL | T |
| 11/91 | PIC v. Kodak | USDC C Ca | T |
| 6/92 | Cummins-Allison, Inc. v. Brandt, Inc. | USDC N IL | T |
| 3/93 | Intersection Dev. Corp. v. McCain Traffic Supply | USDC C Ca | D |
| 6/93 | Bell v. G.T.E. | Ventura SC | D |
| 9/93 | Yes Clothing v. Cigna | Arbitration | T |
| 3/94 | Glamour Boutique v. Arbonne, Inc. | OCSC | D |
| 4/94 | Acton, et al. v. Merle Norman Cosmetics | USDC C Ca | D |
| 9/94 | Acton, et al. v. Merle Norman Cosmetics | USDC C Ca | D |
| 10/94 | Catalina Marketing Co. v. APT | USDC C Ca | D |
| 1/95 | Micro Pen v. Sunmex | USDC C Ca | D |
| 2/95 | California Sports, Inc. v. Transamerica, et al. | LASC | D |
| 2/95 | Guitars & Concepts v. Gibson Guitar Corp. | USDC C Ca | D |
| 4/95 | R. Murdock v. Murdock, Inc. | LASC | T |
| 6/95 | Fournier, et al. v. Lockheed | Arbitration | T |
| 10/95 | Tomen America v. Chauvin International | USDC C Ca | D |

ALAN G. GOEDDE

### RULE 26(A)(2)(B) DISCLOSURE OF
### DEPOSITION/TRIAL TESTIMONY

| DATE | CASE | COURT | D/T |
|------|------|-------|-----|
| 1/96 | Vitablend v. Boost Products, et al. | LASC | T |
| 5/96 | MCI Telecomm. Corp. v. Liberty Digital Network | Arbitration | T |
| 6/96 | Taylor Tire Co., et al. v. Goodyear Tire Co. | USDC S Ca | D |
| 6/96 | Dive N' Surf, Inc. v. Heatmax, Inc. | USDC C Ca | D |
| 6/96 | GAB Business Services, Inc. v. Lindsey-Newsom | OCSC | D |
| 8/96 | Polaris Pool Systems, Inc. v. Letro Products, Inc. | USDC C Ca | D |
| 9/96 | Swift & Associates v. M/A-COM, et al. | LASC | D |
| 10/96 | Polaris Pool Systems, Inc. v. Letro Products, Inc. | USDC C Ca | T |
| 10/96 | GAB Business Services, Inc. v. Lindsey-Newsom | OCSC | D |
| 11/96 | GAB Business Services, Inc. v. Lindsey-Newsom | OCSC | T |
| 1/97 | Swift & Associates v. M/A-COM, et al. | LASC | D |
| 5/97 | Allergan, Inc. v. Pharmacia & Upjohn Company | USDC S Ca | D |
| 9/97 | Reebok International v. TRISTAR | USDC C Ca | D |
| 4/98 | American Telecom v. RSL Communications | Arbitration | D |
| 5/98M | icrotek Lab, Inc. v. JK Technology, Inc. | LASC | D |
| 9/98A | mylin Pharmaceuticals v. Regents of the University of Minnesota | USDC S Ca | D |
| 10/98 | Cacique, Inc. v. Stella Foods, Inc. | LASC | D |
| 1/99S | kechers, Inc. v. Candies, Inc. | USDC C Ca | D |
| 5/99I | n Re: The Ant Farm | Arbitration | T |
| 8/99C | acique, Inc. v. Stella Foods, Inc. | LASC | T |
| 12/99 | Porter, et al. v. City of Los Angeles | LASC | D |
| 4/00I | ron Grip Barbell Co. v. Ivanko Barbell Company | USDC C Ca | D |

**ALAN G. GOEDDE**

## RULE 26(A)(2)(B) DISCLOSURE OF
## DEPOSITION/TRIAL TESTIMONY

| DATE | CASE | COURT | D/T |
|------|------|-------|-----|
| 7/00C | ellular 101, Inc. v. Santa Barbara Cellular Systems Ltd. et al. | USDC C Ca | D |
| 9/00P | harmavite Corp. v. Omega Nutrition et al. | USDC C.Ca | D |
| 9/00C | rystal Jukebox, et al. v. Anheuser Busch | USDC C Ca | D |
| 10/00 | Sea Star Clock International v. Direct Marketing Enterprises, Ltd. | USDC C Ca | D |
| 3/01W | echsler v. Macke International Trade, Inc. et al. | USDC C Ca | D |
| 4/01F | razier v. Roessel Cine Photo Tech, Inc. et al. | USDC C Ca | D |
| 7/01C | layton Industries, Inc. v. SPX Corporation | Arbitration | D/T |
| 7/01R | SKCo Claims Service, Inc. v. Miller et al. | LASC | D |
| 10/01 | Amazon.com v. Amazon Cosmetics and Tan Products | USDC C Ca | D |
| 11/01 | Customedia Technologies, LLC v. Hughes et al. | USDC Harris County, TX | D |
| 6/02N | PI Medical Group v. State Compensation Insurance Fund et al. | LASC | D |
| 9/02T | rustee of Bank Of New England Corp. v. Ernst & Young et al. | USDC Massachusetts | D |
| 9/02M | anning Riddell Insurance et al. v. Coastal Interactive, LLC. | LASC | D |
| 12/02 | Mitsubishi Caterpillar Forklift America v. Power Lift Corporation et al. | USDC C Ca | D |
| 12/02 | ECC Systems, Inc. v. Mallinckrodt, Inc, et al. | US Bankruptcy Court Central District LA | D |
| 1/03T | el-Rom, Inc. v. Pacific Bell Telephone Company | LASC | D |
| 2/03C | ustomedia Technologies, LLC v. Hughes et al. | USDC Harris County, TX | D |

**ALAN G. GOEDDE**

### RULE 26(A)(2)(B) DISCLOSURE OF
### DEPOSITION/TRIAL TESTIMONY

| DATE | CASE | COURT | D/T |
|------|------|-------|-----|
| 03/03 | Unitherm Food Systems, Inc. v. Conagra Foods, Inc. | USDC Western District, OK | T |
| 04/03 | Martin Manufacturing, Inc. v. Currie Technologies, Inc. et al. | USDC C Ca | D |
| 04/03 | NPI Medical Group, et al. v. State Compensation Insurance Fund, et al. | LASC | D |
| 04/03 | B. Braun Medical, Inc. v. Rozi Medical Devices Limited, et al. | USDC S Ca | D |
| 05/03 | Tel-Rom, Inc. v. Pacific Bell Company | LASC | T |
| 06/03 | B. Braun Medical, Inc. v. Rozi Medical Devices Limited, et al. | USDC S Ca | T |
| 07/03 | Scott O'Grady v. Twentieth Century Fox Film Corporation, and Discovery Communications, Inc. | USDC Eastern District, TX | D |
| 10/03 | Perfect 10, Inc. v. Net Management Services, Inc., et al. | USDC C Ca | D |
| 10/03 | NPI Medical Group, et al. v. State Compensation Insurance Fund, et al. | LASC | D |
| 10/03 | Nitro Leisure Products, LLC, et al. v. Acushnet Company | USDC Southern District, FL | D |
| 6/04B | ruselas, Ltd., v. Harriscope of Los Angeles, Media Resources, International, et al. | USDC C Ca | D |
| 7/04W | echsler v. Macke International Trade, Inc. et al. | USDC C Ca | D |
| 10/04W | echsler v. Macke International Trade, Inc. et al. | USDC C Ca | T |
| 4/05 | Ventana Medical Systems, Inc. v. BioGenex Laboratories, Inc. | USDC, Az | D |
| 8/05R | ide & Show Engineering, Inc. v. Universal City Development Partners, Ltd. et al. | USDC C Ca | D |

**ALAN G. GOEDDE**

## RULE 26(A)(2)(B) DISCLOSURE OF
## DEPOSITION/TRIAL TESTIMONY

| DATE | CASE | COURT | D/T |
|------|------|-------|-----|
| 9/05J | _AMDAT Mobile, Inc. v. Jamster International, et al. | USDC C Ca | D |
| 10/05 | LML Patent Corp. v. Nova Information Systems, Inc., Telecheck Services, et al. | USDC Delaware | D |
| 10/05 | The Home Depot, USA, Inc. v. The United States | U.S. Court of International Trade | T |
| 11/05 | Sharper Image Corporation v. Ionic Pro, LLC et al. | USDC N Ca | D |
| 11/05 | Katzkin Leather, Inc. v. Nissan North America, Inc. | USDC C Ca | D |
| 5/06M | _. Richman, Twin Cities Cardiothoracic Surgery v. Rideout Memorial Hospital, et al. | Superior Court of California, County of Yuba | T |
| 5/06H | _. Khalil, M.D. v. A. Kaul, M.D. | American Arbitration Association | D |
| 8/06C | _ore Wealth Management, LLC v. Heller et al. | Superior Court of California, County of Santa Barbara | D |
| 9/06G | _ray et al. v. Ford Motor Company | Superior Court of California, County of Sacramento | D |
| 9/06S | _puttered Films, Inc. v. Advanced Modular Sputtering, Inc., Agilent Technologies, Inc., Avago Technologies U.S., Inc. | Superior Court of California, County of Santa Barbara | D |
| 11/06 | Core Wealth Management, LLC v. Heller et al. | Superior Court of California, County of Santa Barbara | T |
| 5/07D | _. Hannah et al. v. Classified Cosmetics, LLC et al. | JAMS | T |

# EXHIBIT 3

**DOCUMENTS RELIED UPON**
**BY ALAN G. GOEDDE, PH.D.**

**Deposition Transcripts:[1]**

Nicholas Classick Derivative Tr. (Feb. 17, 2004)
Nicholas Classick Tr. (Apr. 12, 2006)

Lawrence J. Ellison Derivative Tr. (Feb. 26, 2004)
Lawrence J. Ellison Tr. (Sept. 21, 2006)
Lawrence J. Ellison Tr. (July 13, 2006)
Lawrence J. Ellison Tr. (Mar. 30, 2007)

James English Derivative Tr. (Feb. 19, 2004)

Jeffrey O. Henley Derivative Tr. (Mar. 2, 2004)
Jeffrey O. Henley Tr. (July 27, 2006)
Jeffrey O. Henley Tr. (Nov. 16, 2006)

Sarah Kopp Derivative Tr. (Feb. 19, 2004)
Sarah Kopp Derivative Tr. (June 14, 2006)

Jennifer L. Minton Derivative Tr. (Mar. 31, 2004)
Jennifer L. Minton Tr. (Apr. 21, 2005)
Jennifer L. Minton Tr. (July 7, 2006)
Jennifer L. Minton Tr. (Sept. 25, 2006)

John J. Nugent Derivative Tr. (May 19, 2004)
John J. Nugent Tr. (May 24, 2006)

Jay Nussbaum Derivative Tr. (Mar. 23, 2004)
Jay Nussbaum Tr. (June 22, 2006)

George Joseph Roberts Derivative Tr. (Mar. 17, 2004)
George Joseph Roberts Tr. (June 22, 2006)
George Joseph Roberts Tr. (Aug. 2, 2006)

Edward J. Sanderson, Jr. Derivative Tr. (Mar. 9, 2004)
Edward J. Sanderson, Jr. Tr. (July 25, 2006)

---

[1] Date identified corresponds to first day of any multiple day depositions that I reviewed.

David Winton Derivative Tr. (Feb. 12, 2004)
David Winton Tr. (May 26, 2006)


**Deposition Exhibits:**

Minton FR Exs. 22A, 24A-29A, 27, 27A (Sept. 25, 2006)
Minton FR Exs. 1-37, 31A-34A (July 7, 2006)

Winton Exs. 39 (May 26, 2006); 47 (Winton Tr.), 48 (Feb. 12, 2004); 51 (May 26, 2006)

Nugent Exs. 5, 10 (May 19, 2004)

Classick Ex. 3 (April 12, 2006)

Henley Ex. 7 (July 27, 2006)

Ellison Exs. 110, 112 (Sept. 21, 2006)

Roberts Ex. 27 (June 22 2006)

Sanderson Ex. 41 (July 26, 2006)

DEG Exs. 47, 35

DC 77, 134, 137-138, 144, 230-231


**Documents Produced by Defendants and Third Parties:**

NDCA-ORCL 00540-543
NDCA-ORCL 02704-706
NDCA-ORCL 003425-426
NDCA-ORCL 007188-202
NDCA-ORCL 007200-201
NDCA-ORCL 016242-267
NDCA-ORCL 025542-721
NDCA-ORCL 037388-389
NDCA-ORCL 038499
NDCA-ORCL 039104-124
NDCA-ORCL 080095-097
NDCA-ORCL 088715-732
NDCA-ORCL 092911-927
NDCA-ORCL 096056-071
NDCA-ORCL 142554
NDCA-ORCL 154504-510

NDCA-ORCL 156379-385
NDCA-ORCL 160665-691
NDCA-ORCL 1912030-128
NDCA-ORCL 1912225-337
NDCA-ORCL 1912226-337
NDCA-ORCL 1912338-452
NDCA-ORCL 1912453-577
NDCA-ORCL 1912578-703
NDCA-ORCL 1912704-829
NDCA-ORCL 1912830-955
NDCA-ORCL 1912956-3081
NDCA-ORCL 1913082-214
NDCA-ORCL 1913524-684
NDCA-ORCL 1914003-136
NDCA-ORCL 380160-187
NDCA-ORCL 292216-217
NDCA-ORCL 292219-220
NDCA-ORCL 292646-662
NDCA-ORCL 292240-267
NDCA-ORCL 292485-491
NDCA-ORCL 292509-513
NDCA-ORCL 293322-326
NDCA-ORCL 293411
NDCA-ORCL 294454-461
NDCA-ORCL 294348-351
NDCA-ORCL 294481-488
NDCA-ORCL 294485
NDCA-ORCL 294487
NDCA-ORCL 410067-082
NDCA-ORCL 420630-758
NDCA-ORCL 440076-245
NDCA-ORCL 440076-092
NDCA-ORCL 440144-160
NDCA-ORCL 440829-845
NDCA-ORCL 609824
NDCA-ORCL 609825-827
NDCA-ORCL 610709-711
NDCA-ORCL 610914
NDCA-ORCL 610989-993
NDCA-ORCL 610120-134
NDCA-ORCL 611267-283
NDCA-ORCL 611286
NDCA-ORCL 160723-750

**Periodicals, Journals and Textbooks:**

Warner, Melanie. "Fallen Idols." <u>Fortune</u> October 30, 2000

Richtel, Matt. "Venture Capital Investment Fell Off in Fourth Quarter." <u>The New York Times</u> January 30, 2001

Knowles, Francine. "Stocks Continue to Stagger Lower." <u>Chicago Sun-Times</u> November 21, 2000

Bjorhus, Jennifer and Marshall, Matt. "Stocks Fall as Rates Remain Unchanged Fed Concerned with Slowdown." <u>San Jose Mercury News</u> (California) December 20, 2000

Symonds, Matthew. "The Rewards of Recklessness: a Portrait of Larry Ellison and Oracle Corporation at War."

"Weaker Tech Spending Expected, Surveys Show." <u>Los Angeles Times</u> December 21, 2000.

<u>Investor's Business Daily</u> January 5, 2001.

Rossant, John. "A Handheld Wins Hands-Down at Davos." <u>Business Week Online</u> January 30, 2001

J. Holt Wilson and Barry Keating. "Business Forecasting." Fifth ed., <u>McGraw-Hill/Irwin</u> (New York, N.Y.,) 2007, p. 28

Finkle, Jim. "Oracle Shares Fall on Concerns Earning Outlook May Turn Grim." <u>Bloomberg News</u> February 9, 2001.

J. Scott Armstrong. "Principles of Forecasting." <u>Boston, Kluwer Academic Publishers</u> 2001, pp.7-8, Ch. 20

**Miscellaneous:**

-    Report of the Special Litigation Committee of the Board of Directors of Oracle Corporation dated November 22, 2002

-    *Coordination Proceeding Oracle Cases*, JCCP No. 4180, Superior Court of California, County of San Mateo, Plaintiffs' Separate Statement of Undisputed Facts in Opposition to Defendant Lawrence J. Ellison's Motion for Summary Judgment dated July 22, 2005

Oracle Systems Form 10-K, filed Aug. 28, 2000

Matthew Symonds, An Intimate Portrait of Larry Ellison and Oracle, Softwar

- The Motley Fool Index Center, http://www.fool.com.

- Pipeline Report (Dec. 11, 2000)

- Oracle Public Guidance, Dec. 14, 2000

- "ORCL: Visit with Management - Strong Buy," February 9, 2001 First Union Securities Deutsche Bank, February 7, 2001

- Lederman, Laura, "Highlights of AppsWorld Conference," February 21, 2001

- Declaration of Cathy M. Niden In Support of Its Opposition to a Lawrence T. Ellison's Motion for Summary Judgment.

- Affidavit of Jennifer Minton

- Declaration of Darrio de Ghetaldi In Opposition to a Lawrence T. Ellison's Motion for Summary Judgment.

S:\CasesSD\Oracle3\Experts\Goedde Documents Relied Upon list 3.doc

# EXHIBIT 4

**Oracle**
**NASDAQ During Oracle's FY99, FY00 and FY01**



Source: Yahoo! Finance

Oracle
NASDAQ Composite Index
Q4 FY99 - Q3 FY01
March 1, 1999 - February 28, 2001

| Date | Close [1] |
|---|---|
| 1-Mar-99 | 2295.18 |
| 2-Mar-99 | 2259.03 |
| 3-Mar-99 | 2265.2 |
| 4-Mar-99 | 2292.89 |
| 5-Mar-99 | 2337.11 |
| 8-Mar-99 | 2397.62 |
| 9-Mar-99 | 2392.94 |
| 10-Mar-99 | 2406 |
| 11-Mar-99 | 2412.25 |
| 12-Mar-99 | 2381.53 |
| 15-Mar-99 | 2431.44 |
| 16-Mar-99 | 2439.27 |
| 17-Mar-99 | 2428.97 |
| 18-Mar-99 | 2462.96 |
| 19-Mar-99 | 2421.27 |
| 22-Mar-99 | 2395.94 |
| 23-Mar-99 | 2322.84 |
| 24-Mar-99 | 2365.28 |
| 25-Mar-99 | 2434.8 |
| 26-Mar-99 | 2419.17 |
| 29-Mar-99 | 2492.84 |
| 30-Mar-99 | 2480.29 |
| 31-Mar-99 | 2461.4 |
| 1-Apr-99 | 2493.37 |
| 5-Apr-99 | 2560.06 |
| 6-Apr-99 | 2563.17 |
| 7-Apr-99 | 2544.43 |
| 8-Apr-99 | 2573.39 |
| 9-Apr-99 | 2593.05 |
| 12-Apr-99 | 2598.81 |
| 13-Apr-99 | 2583.5 |
| 14-Apr-99 | 2507.28 |
| 15-Apr-99 | 2521.77 |
| 16-Apr-99 | 2484.04 |
| 19-Apr-99 | 2345.61 |
| 20-Apr-99 | 2409.64 |
| 21-Apr-99 | 2489.08 |
| 22-Apr-99 | 2561.61 |
| 23-Apr-99 | 2590.69 |
| 26-Apr-99 | 2652.05 |
| 27-Apr-99 | 2602.41 |
| 28-Apr-99 | 2550.37 |
| 29-Apr-99 | 2528.44 |

**Oracle**
**NASDAQ Composite Index**
**Q4 FY99 - Q3 FY01**
**March 1, 1999 - February 28, 2001**

| Date | Close [1] |
|------|-----------|
| 30-Apr-99 | 2542.86 |
| 3-May-99 | 2535.58 |
| 4-May-99 | 2485.12 |
| 5-May-99 | 2534.45 |
| 6-May-99 | 2472.28 |
| 7-May-99 | 2503.62 |
| 10-May-99 | 2526.39 |
| 11-May-99 | 2566.68 |
| 12-May-99 | 2606.54 |
| 13-May-99 | 2582 |
| 14-May-99 | 2527.86 |
| 17-May-99 | 2561.84 |
| 18-May-99 | 2558.36 |
| 19-May-99 | 2577.4 |
| 20-May-99 | 2542.23 |
| 21-May-99 | 2520.14 |
| 24-May-99 | 2453.66 |
| 25-May-99 | 2380.9 |
| 26-May-99 | 2427.18 |
| 27-May-99 | 2419.15 |
| 28-May-99 | 2470.52 |
| 1-Jun-99 | 2412.03 |
| 2-Jun-99 | 2432.41 |
| 3-Jun-99 | 2403.32 |
| 4-Jun-99 | 2478.34 |
| 7-Jun-99 | 2524.21 |
| 8-Jun-99 | 2474.56 |
| 9-Jun-99 | 2519.35 |
| 10-Jun-99 | 2484.62 |
| 11-Jun-99 | 2447.88 |
| 14-Jun-99 | 2398.31 |
| 15-Jun-99 | 2414.67 |
| 16-Jun-99 | 2517.83 |
| 17-Jun-99 | 2544.15 |
| 18-Jun-99 | 2563.44 |
| 21-Jun-99 | 2630.28 |
| 22-Jun-99 | 2580.26 |
| 23-Jun-99 | 2598.12 |
| 24-Jun-99 | 2553.99 |
| 25-Jun-99 | 2552.65 |
| 28-Jun-99 | 2602.44 |
| 29-Jun-99 | 2642.11 |
| 30-Jun-99 | 2686.12 |