# EXHIBIT 249

## INTERVIEW OF DANIEL COOPERMAN

On Friday May 17, 2002, the Special Litigation Committee of Oracle Corporation ("SLC") interviewed Daniel Cooperman, the General Counsel of Oracle, at Oracle's headquarters in Redwood Shores. Present at the interview were the SLC members, Joseph Grundfest and Hector Garcia-Molina, and their counsel, George Newcombe and Alexis Coll of Simpson Thacher & Bartlett. The interview lasted approximately 3.5 hours. What follows is a summary of the interview with impressions of the counsel. It is not, and does not purport to be, a verbatim account of what was said.

### Insider Trading Policy and Implementation

The first topic of discussion was Oracle's policy governing stock trading by directors and officers. (ORCL 33291 – 33293, a version of which is attached hereto as Exhibit A). Cooperman informed the SLC that this policy was initially promulgated in 1995 as part of the Legal Policy Handbook. Cooperman did not join Oracle until February 1997, he knew little about the policy's initial drafting and formulation. However, when he joined Oracle he reviewed the policy and determined that it was a sound policy as drafted. At the same time, he also decided to disseminate the policy to a wider group of people.

    a.    Approving Requests To Trade

The policy is implemented through a pre-clearance procedure initially developed by Cooperman. It is intended to be a prophylactic device: as the policy makes clear, it is ultimately up to the individual to decide whether a trade is appropriate. The clearance process requires any director or officer who wishes to trade Oracle shares to contact Cooperman or Jeff Henley (Oracle's CFO) to obtain permission. Most officers contact them by email; directors normally contact Cooperman and Henley by phone. Cooperman explained that between he and Henley the



PLAINTIFF'S EXHIBIT
6-COOPERMAN
02-10-04

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

2

two should know all material inside information at the company that might prohibit trading.
Because the two of them have access to all financial and legal information, Cooperman is
comfortable that they know all of the material information. Accordingly, he does not do any
investigation when he receives a clearance request.

In deciding whether to approve of a trade, Cooperman considers the following factors:

- Identity of the requesting individual – is the person subject to Section 16
  restrictions? Cooperman explained that the members of the Executive Committee
  are subject to Section 16 restrictions. That committee consists of Ellison, Henley,
  Cooperman, Oracle's Comptroller Jennifer Minton and the individuals
  responsible for various aspects of product development. Cooperman volunteered
  that in practice, the only person at Oracle who makes policy is Ellison. The SLC
  requested from Cooperman a list of all members of the Executive Committee
  from Q2 FY01 through the present.

  o If the requesting party is a Section 16 officer, there are additional
    restrictions on trading. Specifically, a Section 16 officer may not engage
    in any speculative trading in any security. Cooperman said that he does
    not review the investments of the Section 16 officers (other than their
    investments in Oracle) to verify compliance with this aspect of the policy.

- Is the transaction "unusual" in timing or size? Cooperman explained that he does
  not ask the requester what his or her intentions are with regard to the size or
  timing of a proposed stock sale. However, if volunteered, it is information he
  considers in clearing the trade.

- Who is the broker?

- Is the transaction occurring at a time where the individual may be privy to any
  material non-disclosed information?

  If Cooperman determines that the proposed trade is not prohibited, Cooperman responds

by email to the individual and copies Henley and Barbara Wallace. Wallace is in Oracle's Stock

Services group (part of the Treasury Department), located in Reno, Nevada. Cooperman

informed the SLC that Wallace should have a complete record of the emails clearing trades,

Form 4s and Form 144s that she prepares for the individual before the trade.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 609416

3

If clearance is given, it is good for 7 days. While the individual may submit a limit order, the trades must be completed within the 7-day period. If events arise which would give the already cleared individual access to material non-public information, Cooperman immediately revokes the clearance. He does this *via* email and believes that Wallace would have a record of these documents as well.

When Cooperman and Henley want to trade in Oracle shares, each must contact the other (usually done by email) to obtain the appropriate clearance.

Generally, employees other than officers and directors are not subject to the pre-clearance procedure and are required to use their best efforts to conform to the employee Code of Conduct. There are no closed windows (*see* "b" below) or compliance procedures for non-director/non-officer employees.[1]  Cooperman informed us that there have been investigations by various regulatory agencies into some employees' trades but he knows of no prosecutions, enforcement actions or settlements.

    b.    <u>Periods of Time When No Clearances Will Be Given</u>

When the "window" is closed, insiders are not allowed to trade in company stock and any request for clearance will be denied. As set forth in the policy, the window is always closed for the last two weeks of each fiscal quarter and the first two full trading days after the quarterly results are announced. However, Cooperman explained that <u>in practice</u> the window is closed for

---

[1]    Although not listed in the insider trading policy, the Legal Department, the Stock Services group and the people who work with Safra Catz and Minton follow the same trading policies as the executive committee. They are not subject to pre-clearance but rather self-enforce the policy.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

4

the entire last month of each quarter.[2]  He believes this is the best approach because it is conservative.[3]  In the past he raised with the Audit Committee the issue of whether the policy should be changed to reflect the actual practice at Oracle, but it was ultimately decided not to do so.

Cooperman encourages the directors and officers to trade regularly, at least twice a year. He also encourages them to trade in the two week period that falls after the two days following the announcement of the previous quarter's earnings, because it is commonly believed that such trades are less likely to raise concerns with regulators and shareholders.

Cooperman explained that if there is reason to close the window for any one officer or director, he closes the window for all because he wants to err on the side of caution.  It is not his practice to give a reason when he refuses the clearance.  Similarly, it is not his practice to send a note to the other officers and directors of Oracle informing them that the window has been closed.  Rather, he decides that the window must be closed and he simply denies any requests that come in.  However, he will inform Henley of his decision to close the window so that they can be uniform in their responses to persons requesting clearance.  Once the window re-opens, it is Cooperman's practice to contact those persons to whom he has denied clearance while the window was closed to inform them that if they are still interested in trading that they can now

---

[2]      Cooperman recalled only one trade in his tenure that occurred during the last month.  It was a trade by Raymond Lane, the former President and COO, on November 2 or 3 in a prior year.  This trade was the subject of the last Oracle derivative suit.

[3]      Cooperman explained that most Silicon Valley firms do not close the window more than two weeks before the end of the quarter.  He knows this because he has conducted two surveys of comparable companies since he joined Oracle.  The SLC requested copies of these surveys.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

5

submit a request that will be granted. In such instances, he requires a new request so that there is a clean paper trail.

Cooperman provided some examples of when he might close the window mid-quarter: (1) the company is considering lowering quarterly guidance or (2) an important employee is going to leave the company and he believes that the fact, when it becomes public, will affect the market.

### Insider Trading Allegations in the Pending Derivative Cases

The SLC asked Cooperman to tell them about his involvement, if any, with the trades made by certain directors and officers in Q3 FY01 that are the focus of the current derivative complaints.

a.   Larry Ellison.  Cooperman stated that there was a "zero percent likelihood that Larry Ellison knew something material and undisclosed at the time of his trades that Henley or Cooperman would not have known." All financial forecasts that are sent to Ellison are sent to Henley before they reach Ellison; Henley acts as a "gateway" to Ellison. Cooperman did note, however, that Ellison might have anecdotal information to which he or Henley might not have access. Ellison does not have access to a "button on a computer" from which he can obtain all relevant financial information (including sales) in an instant (or even in an hour). Cooperman said that the "button is Ellison's dream, but not a reality today."

The trades engaged in by Ellison in Q3 FY01 were the first trades by him in 6 years. The clearance request came to Cooperman by telephone from Ellison's personal money manager, Phil Simon. In this phone-call, Simon told Cooperman that Ellison wanted to trade some stock

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 609419

6

because he had a loan coming due to the bank[4] and that he intended to use the proceeds of these sales to pay the loans. Simon did not tell Cooperman how much stock Ellison intended to trade but Simon indicated it would be a large transaction. Simon also told Cooperman that he had spoken with Deborah Lange regarding the tax consequences of Ellison's sales upon the company and that this was part of the decision to sell in 2001, not 2000. Cooperman recalls telling Simon over the phone that whatever trades Ellison was contemplating needed to be completed by no later than February 1, 2001 because of the expanded closed window.

Cooperman believed that disclosure of Ellison's trades could have a material impact on the price of Oracle's stock. Accordingly, because he knew of Ellison's planned trade in advance (Ellison's trades were announced after they were completed), he did not engage in his own trade that he has been planning in order to finance the purchase of a new car. Cooperman subsequently discussed the sales with Ellison who said "he couldn't find a better time to trade" because (1) the stock price had already dropped, (2) he believed business was improving so the stock was in a "temporary trough," and (3) he had options expiring in August 2001 and if stock price went up, the exercise of those options might draw even more attention.

    b.    <u>Henley</u>.  Cooperman did not recall the details of the request for trading clearance from Henley in Q3 FY01. On January 4, 2001, Henley completed the following transactions:

    1.    Gift of Common Stock to University of California at Santa Barbara: 15,600 shares;

    2.    Exercised options for 793,772 shares of stock for $1.04/share and sold them for $32.3125/share; and

    3.    Exercised options for 206,228 shares of stock for $1.69/share and sold them for $32.3125/share.

---

[4]    Cooperman informed us that the company has not made any loans to Ellison. However, Ellison did borrow against his Oracle stock from a bank (either Citibank or Chase). That loan became due sometime in 2001.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

7

Henley's net proceeds from those sales were $31,138,451.80.

      c.    Cooperman. His own trade on January 4, 2001 occurred at a time that management was bullish about its Q3 FY01 outlook. Doesn't recall what motivated the sale, but he does try to trade regularly, at least twice a year. The trade was approved by Henley. He cancelled plans to sell later in January—to finance his new car—when he learned of Ellison's impending trades.

**Earnings Calls**

      Cooperman explained his involvement in preparing Oracle for investors' earnings calls and other investor/analyst communications. His practice was the same during the relevant period as it is today.

      As an initial matter, someone from investor relations scripts the prepared statements to be made by the company representative. During the relevant time period, this person was Stephanie Aas; today that person is Joelle Fitzgerald. Typically, the person reading this script during the call was Henley. Before the call, Cooperman reviews the statement and discusses it with Henley.[5] Cooperman asks Henley to explain the basis for the financial projections and other financial statements. His purpose is to make sure that any statements are well-founded and not subject to challenge. Cooperman also discusses potential questions and answers with Henley and makes sure that Henley's anticipated responses are supported in fact.

---

[5]     If Cooperman is unavailable, Matt Ng of Oracle Legal is responsible for reviewing the statement.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 609421

8

Cooperman explained that while Ellison often participates in these earnings calls or other investor/analyst communications, Ellison does not meet with Cooperman for a similar vetting process.

Cooperman recalls Henley was comfortable with his "bullish" outlook in Q3 FY01 because:

1. Henley was confident the pipelines were "healthy." Cooperman explained that the "pipeline" analysis has always made him nervous because he believes its "soft" and "misunderstood." Cooperman stated that Henley disagrees with Cooperman. Henley believes that the pipeline concept is well understood among investors. Henley regularly discusses Oracle's pipeline with financial analysts and while he gives no specific numbers, he characterizes the pipeline. Cooperman described Henley as convinced that the pipeline at Oracle was "healthy" in December 2000 and January 2001.

2. Henley had reviewed a CIO report prepared by Morgan Stanley. This report was very bullish on Oracle's products and market position.

### Third-Quarter FY 2001 Financial Results

Cooperman recalled that in Q3 FY01 he believed that the overall economy was suffering and that the bursting of the Internet bubble was taking a toll. However, Cooperman believed that Oracle was not feeling the effect of this downturn. As a result of the prior quarter's high earnings and the fact that Oracle did not appear to be feeling an impact from the overall Economic downturn, Oracle's management was "bullish" in its December earnings call. Cooperman discussed these bullish statements with Henley before the call and was comfortable with the facts Henley provided to support the statements. Cooperman also stated that Henley was confident that Oracle would meet its forecast because of the $60 million Covisint deal that had closed in the opening days of the quarter.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 609422

9

Any reservations that Cooperman had about the optimistic statements Oracle was making at this time were based on public information about the Economy as a whole and earnings reports by other companies, not on any non-public Oracle-specific information. Cooperman recalls that either Henley or Ellison spoke with Mike Lehman at Sun Microsystems and Larry Carter at Cisco Systems. Cooperman's impression after hearing about these calls was that Oracle was "an island of tranquility" in a very volatile sea.

Cooperman first learned that Oracle might not meet its projected earnings for Q3 FY01 on February 26 or 27, 2001. In the preceding days, he had heard that some sales representatives were reporting weakness in various sectors, but knew nothing concrete. Cooperman believes Henley first became concerned about the business at some point in February.

Cooperman explained that the last week of the quarter is the busiest time for the company—this is because of the "hockey stick effect" in their business cycle. So that the senior executives can remain aware of how the company is doing in those last days, each member is assigned certain big deals to watch. The individual keeps in touch with the sales team responsible for the deal—by phone or email—in order to have real-time answers to how likely the deal is to close. The Executive Committee members stay in touch with one another during this time by email or phone. Cooperman said that in this last week, Catz and Minton play the key roles of being informed and informing others about the likelihood of major deals closing and about Oracle's ability to make its numbers.

According to Cooperman, Oracle missed guidance in Q3 FY01 because the "conversion rate fell off a cliff." Cooperman explained that prior to Q3 FY01, the

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

10

company did not address conversion rates during its earnings calls because it had not been an issue. Due to the problems arising from the Q3 FY01 shortfall, a discussion of conversation rate has become routine for Oracle's earnings calls.

<u>Miscellaneous</u>

No regulatory agency, including the SEC, has ever investigated any of the trades that are the subject of the current derivative lawsuits. Ellison's trades were widely publicized (and criticized) but there has been no regulatory investigation.

Cooperman explained that when there is a new product launch, Oracle <u>does</u> <u>not</u> set aside any reserves. The new product is treated like any other product even though bugs are expected.

When asked how the Executive Committee keeps informed of the company's financial condition, Cooperman said that the Executive Committee gets copied on Minton's forecast documents and that it talks about these reports on weekly phone calls. Cooperman said that the forecast reports necessarily contain subjective information because they rely upon the projections and speculation of individuals. He said that certain sales persons were routinely optimistic while other regularly projected low rates of return.

> J.A.G.
> H.G.M.
> G.M.N.
> A.S.C.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 609424

# EXHIBIT 250

#70 Interview Memorandum
of Philip Simon
07/22/02

70

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 300598



## INTERVIEW OF PHILIP SIMON

On July 22, 2002, the Special Litigation Committee ("Committee") (Joe Grundfest) and its counsel (George Newcombe and Jessica Spiegel) interviewed Philip Simon, Larry Ellison's personal financial consultant at Oracle's office in Redwood Shores. The interview lasted approximately three and a half hours. What follows is a summary of the interview along with impressions of counsel. It is not, and does not purport to be, a verbatim account of what was said.

### Simon's Education and Work Experience

Simon graduated from Yale University in 1975 and from Stanford University Law School in 1978. Thereafter, he received his CPA. In 1981, Simon co-founded Howson & Simon CPA's, an accounting firm specializing in accounting and financial consulting for high net worth individuals. He has been a partner of Howson & Simon since that time.

### Simon's Introduction to Larry Ellison

Larry Ellison became a client of Howson & Simon in the fall of 1993. Ellison was looking for a new accountant and he interviewed Simon. Simon also met with Andy Dodnick (Ellison's attorney) and Jenny Overstreet (Ellison's assistant). Ellison subsequently hired Simon to be his financial consultant.

Simon's initial role was to give Ellison tax advice and prepares his tax returns. Within a few years, Simon began managing various special projects for Ellison and advising him on how to manage his finances. Simon explained that his relationship with Ellison has evolved to the point where Simon works almost exclusively for Ellison on a monthly retainer. Once Simon became involved in Lawrence Investments (see below), he gave up almost 90% of his clients to work for Ellison.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

2

**Lawrence Investments**

In 1997, Ellison and Simon started a Limited Liability Company called Lawrence Investments. Lawrence Investments manages Ellison's private equity holdings and bank lines. Simon recommends to Ellison which of his private equity holdings to sell and when to sell them, but Ellison has the final authority on whether to execute any personal equity trades. Once Ellison has decided to trade, Simon executes Ellison's decision. Lawrence Investments is unrelated to Oracle and does not manage any of Ellison's Oracle holdings.

Simon explained that he has a profit participation in Lawrence Investments because his monthly retainer is paid by Lawrence Investments. Consequently, his and Ellison's interests with respect to these investments are strongly aligned.

**Ellison's Family Companies**

In addition to Lawrence Investments, Ellison has many "family companies" that own his boats, planes and real estate. Simon is the President of all of these companies, and has authority to sign all of the documents relating to these assets. Simon stated that he moves money for Ellison on a daily basis with respect to these companies.

**Ellison – Simon Revocable Trust**

Simon is also the co-trustee of Ellison - Simon Revocable Trust. According to Simon, almost all of Ellison's personal property is held in the Revocable Trust, including Ellison's Oracle shares.

**Power of Attorney**

Simon has a general power of attorney from Ellison. He has the power to sign all of Ellison's documents, except those documents requiring Ellison's signature as a Director of Oracle, because Ellison's directorial power is non-delegable. Simon explained that Ellison is not

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

3

always available to sign documents requiring his signature because of his busy schedule, so Simon signs most of the documents.

### Simon's Relationship With Ellison

Simon described his relationship with Ellison as "professional," not social. Simon views himself as a "financial servant," and as Ellison's personal CFO. Simon gives Ellison general financial advice for his business and personal holdings, and also specific recommendations on which holdings to trade. He advises Ellison when he feels that Ellison should become more liquid or lighten up on a particular investment. Further, he brings to Ellison's attention any pressing financial matters that require discussion.

### Simon's Contact With Ellison

Simon has gone a year without seeing Ellison. Simon speaks to Ellison by telephone very infrequently; approximately three times per year. However, when Ellison was selling Oracle holdings in January 2001, they sometimes spoke daily. Simon noted that they email more frequently, but that he is careful not to email Ellison too often so that Ellison pays attention when Simon contacts him. Simon explained that in order to capture and hold Ellison's attention, he presents issues to Ellison in a precise, cogent email, giving Ellison the information and a recommendation. According to Simon, he has the best chance of a response from Ellison if the email succinctly distills the facts and carefully recommends a course of action.

Ellison and Simon have approximately two meetings per year. Four years ago, Ellison and Simon had one of their longest meetings; a one-hour lunch. Simon stated that he and Ellison discussed how their relationship was working. Ellison conveyed at that meeting that Simon was doing a good job, and that he wanted Simon to continue to manage Ellison's finances and bother Ellison as infrequently as possible. Ellison delegated a significant amount of authority to him

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

4

once Ellison became confident in Simon's abilities. With more responsibility, Simon consults Ellison less and less. In the normal course of events, Simon informs Ellison of problems solved or action taken after the fact.

Simon communicated with Ellison largely through Ellison's former assistant, Jenny Overstreet, because Overstreet was much closer to Ellison than Simon was, almost making Simon feel as though he worked for Overstreet. However, by the time Carolyn Balkenhol became Ellison's assistant, Simon's authority had increased significantly, and he views Balkenhol as a peer, not a superior. After reviewing some of his emails to Balkenhol, Simon realized that she often forwards his emails to Ellison. He acknowledged that they keep in touch indirectly through Balkenhol more than he had realized.

### Simon's Authority to Act on Ellison's Behalf

Simon stated that his authority to act on Ellison's behalf depends on the situation. However, Simon explained that he and Ellison have an aligned interest, because the better Ellison does, the more Simon is paid. Therefore, Ellison trusts Simon to act in his best interest.

Simon stated that he funds the boats, planes and real estate without Ellison's express permission, because his authority to manage these assets is implied. However, Simon stated that he does not otherwise spend Ellison's money without Ellison's permission. He explained that he has more authority to close entities down and solve problems than he does to spend Ellison's money acquiring new investments. According to Simon, Ellison's assistant, Carolyn Balkenhol, also authorizes certain personal movements of Ellison's money.

Simon stated that he is trying to sell one of Ellison's private companies. Ellison wants to know when the sale is complete; Simon does not need to keep Ellison updated about the progress

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

of the sale. Once he sells the company, Simon will send Ellison an email informing him that the company has been sold and how much money was made or lost on the sale.

### Simon's Advice to Ellison About Oracle

Simon was asked about his advice to Ellison regarding his Oracle holdings. Simon stated that he repeatedly suggests to Ellison that Ellison should consider selling some of his Oracle holdings to pay down some of his debt and to diversify his portfolio. Ellison's practice is to borrow funds against his Oracle shares to fund his lifestyle, and Simon would prefer that Ellison pay off some of this debt by selling shares in Oracle.

Simon describes himself as a risk-averse conservative who prefers to diversify early and maintain a diverse portfolio. He describes Ellison as a typical founder and CEO of a company; attached to company stock and reluctant to part with company holdings. According to Simon, he raises the issue of Ellison selling his Oracle stock approximately once per quarter. He would prefer Ellison to lighten up on his Oracle shares, but Ellison is very reluctant to do so, and usually only does so when he has to (e.g. options expiring).

   a.    Ellison's Balance Sheet

Simon stated that Ellison's balance sheet is: (1) Oracle holdings; (2) personal property; (3) private equity investments; and (4) approximately $1 billion in debt secured by Oracle stock. Ellison's practice is to let his debt grow and only pay it off when forced to.

### Oracle's Insider Trading Policy

Simon described his understanding of Oracle's insider trading policy as prohibiting trades in the two weeks prior to and two days following the quarterly earnings announcement or during the last month of each quarter. He acknowledged that Oracle's official policy allows trading into the first two weeks of the last month, but that, in practice, no one trades during the entire last

month of the quarter.  According to Simon, Cooperman explained that Oracle has a "hockey-stick effect," which makes it very uncertain how the company will do in any given quarter. Therefore, Cooperman said, to avoid any appearances of impropriety, it is preferable for no one to trade in the last month of the quarter.

Simon always clears Ellison's trades with Matt Ng or Dan Cooperman in Oracle's Legal Department.  In addition, he always clears the trades with Oracle's Tax Department.

### Ellison's Trades in 1998-2000

Ellison stopped taking a salary from Oracle and started taking options in the company in lieu of a salary a few years ago.  Therefore, Ellison had a net operating loss each year, which is not favorable for tax purposes.[1]  Simon devised a method to generate income for Ellison from 1998-2000 so that Ellison could break even instead of having an operating loss.  The method involved exercising options at the end of the year and holding the stock acquired.  Income is generated by the difference between the exercise price and the market value at the time of exercise.  The retained stock from the exercise then carries the initial market price as its basis.

This stock acquired through the exercise of options had a higher tax basis than other stock owned by Ellison.  Simon calls them High Tax Basis lots.  Simon exercised options to generate income (and High Tax Basis lots) in 1998, 1999, and 2000.  By exercising these options, Simon tried to increase Ellison's taxable income by between $1-2 million per year to wipe out any net operating loss.  Simon noted that the exercise of options at the end of the year for this purpose did not always yield the targeted amount of income, but it was close enough.

---

[1]     Simon explained that the combination of S corporations and the LLC combined with interest on loans, legal fees, accounting fees and long and short term capital gains created the net loss.  Therefore, Simon wanted to exercise enough options to balance out these losses for a net of zero.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Simon discussed the 1998 exercise with Ellison at length, as it was the first exercise in the series. For the 1999 exercise, Simon communicated with Ellison before the exercise that he was planning on following last year's procedure, but the two did not discuss it. By the 2000 exercise, Simon did not obtain Ellison's prior approval because exercising these options had become standard operating procedure.[2]

### Discussions Preceding Ellison's Q3 FY01 Stock Sales

Simon initiated discussion with Ellison about Ellison's expiring options approximately two years prior to their expiration (summer of 1999) because of the limited windows available for trading. Simon explained to Ellison that he could not always rely on being able to trade in any of Oracle's trading windows because there are times when a specific event prevents trades during the normal window period. Further, although it is prudent to keep options for the first few years in order to reap the benefits from them, holding onto options during the final years before expiration becomes risky because of minimal available windows and possible market fluctuations. Therefore, it is Simon's practice to initiate discussions about two years prior to the expiration in order to try to devise a plan to sell.

Further, Simon stated that, although he could not recall with specificity, he could have reminded Ellison about the need to sell his expiring options in December 2000 because of his year-end tax planning. He later stated that he would have asked Balkenhol to remind Ellison that he only had three windows left to sell his holdings (January, April, July) because it was on his mental to-do list.

Simon specifically recalled discussing the expiration of these options with Ellison in the

---

[2]     Simon could not recall if he communicated directly with Ellison about the 2000 trade or if he went through Balkenhol instead.

CONFIDENTIAL PURSUANT
O PROTECTIVE ORDER

spring of 2000 because Ellison thought that his options were expiring in August 2000 instead of August 2001. However, once Simon informed Ellison that they had another year before the options were due to expire, Ellison delayed trading.

Simon noted that Ellison initially wanted to exercise his options and hold the stock. Simon advised Ellison that, in light of his other debt commitments, exercising and holding the stock was not feasible due to the significant tax obligations that would be generated. According to Simon, Ellison would have had to reconstruct his lending agreements in order to do this, and, thus, he strongly advised Ellison against it.

In order to convince Ellison to agree to sell his options, Simon explained to Ellison that: (1) his options were expiring in a few months; and (2) Ellison was not actually reducing his holdings in Oracle, but rather he was simply being paid his salary, which was solely in the form of options. Nevertheless, Ellison was reluctant to exercise and sell these options, requiring Simon to spend a significant amount of time cajoling Ellison into trading.

In addition to Ellison's options expiring and the fact that these options were merely Ellison's salary, Simon was anxious for Ellison to pay down some of his debt towards the end of calendar year 2000. At that time, Ellison did not have enough remaining credit in his bank lines to meet his cash needs for the coming year. Simon did not want to ask for a "covenant waiver" from the banks; he preferred Ellison to start paying off the debt.

**Friday January 19, 2001**

Simon took a vacation in New Zealand in the beginning of January 2001, having heard nothing from Ellison about trading his Oracle holdings during Q3 FY01. However, the day he returned home from his vacation, Balkenhol called Simon at home to inform him that Ellison was ready to exercise his options and sell the stock. Simon did not speak directly with Ellison

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

9

that day about initiating the sales; Balkenhol relayed the message. Simon was relieved that Ellison had decided to exercise his options and sell the stock, because this was the third-to-last available window for Ellison to exercise these options before their expiration.

### a.   Simon Contacted Oracle's Legal Department

Simon immediately called Oracle's Legal Department to acquire clearance for the trades. He wanted to ensure that the trading window was open and he also wanted to inform the Legal Department that trading would begin on Monday January 22 if possible. Simon recalled speaking with Dan Cooperman. Simon could not recall what he told Cooperman about Ellison's planned trades. However, Simon's nature and practice would be to tell Cooperman that he was planning on exercising and selling expiring options and possibly more Oracle shares, depending on the market. Simon stated that his practice is to be very conservative and forthcoming with trading information to ensure that Cooperman knows exactly what Simon seeks clearance for. Further, Simon would have sought clearance for large trading volumes, even if it was beyond his current authority, so that Ellison would have the flexibility to sell as much as he wanted to.

Simon stated that Cooperman reiterated Oracle's unofficial practice of not selling during the last month of the quarter. Cooperman stated that Ellison and Oracle maintain a better appearance of propriety by not trading during February, even though Oracle's formal policy allows trading to continue until the final two weeks of the quarter.

### b.   Simon Contacted Merrill Lynch

Simon decided to use Merrill Lynch for Ellison's trades. Although Ellison uses many brokers, Simon chose Merrill Lynch to ensure that Ellison's stock sales remained separate from Oracle's stock re-purchase program, which was being handled by a different brokerage firm. Simon first contacted Richard Gadboy of Merrill Lynch in Newport Beach because he is a Rule

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

144 sales specialist, but Gadboy was on vacation. Simon ultimately used Kimberly Clarke, Gadboy's assistant, and another associate named Tom Blatchfield for the trades.

In addition, Simon contacted Merrill Lynch's Legal Department in Princeton, N.J. to ensure that he had clearance for the trades and that they were legal and compliant with all SEC rules and regulations. Merrill Lynch confirmed that Ellison's planned trades were legal.

### Simon's Authority for Ellison's Q3 FY01 Stock Sales

Simon had initial authority to complete the exercise and sale of Ellison's 22 million expiring options. According to Simon, Ellison's initial parameters were to sell the options at no less than $32/share. However, as of Monday January 22, Oracle's shares were trading at $30/share. Simon sought and received authority from Ellison to drop the floor price to $30/share so that selling could begin. Further, Simon was not to move more than 10-15% of the market volume per day. Simon thought that he spoke to Ellison on a daily basis during the first few days of trading, and then communicated with Ellison by email to update him on the progress of the trades.

Aside from securing authority to continue from Ellison, Simon explained that he also had to consider other factors in his strategy for selling Ellison's shares:

a.      Effect of Ellison's Sales on the Market

Simon considered the overall effect of Ellison's sales on the stock market. Simon said that the goal was to move under 10-15% of the market volume and to proceed with the sales slowly enough to watch the market's reaction. If the market accepted Ellison's trades, then Simon would do more. If the market reacted poorly, then Simon would stop the trades.

b.      Form 144 Filing

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

11

Once Ellison sold a certain amount of his shares, he would have to file a Rule 144 form with the SEC. After the filing, his trades would become public information and Simon wanted to see how the market reacted to the news.

c.   Press Releases

Simon also considered a press release about Ellison's sales. Once Ellison was required to file the Rule 144 form and his trades became public information, Oracle would have to issue a press release. On January 24, 2001, Balkenhol and Simon exchanged emails regarding the wording of Ellison's press release. (ORCL 23691 – 23693, attached hereto as Exhibit A).

d.   Simon's Authority for Subsequent Trades

When asked about the extent of his authority to sell more than the initial 22 million expiring options, Simon stated that once he had exercised and sold Ellison's expiring options, he updated Ellison to inform him that he was going to move onto selling his High Tax Basis lots. Simon stated that he received implicit authority to continue selling to achieve the goal of reducing Ellison's debt to $400 million, which would require the sale of approximately 40 million shares. (ORCL 23488 – 23489, attached hereto as Exhibit B). Accordingly, he informed Ellison after-the-fact of the trades he conducted that day. Simon's responsibility was the same as his target with the 22 million options: sell as much as possible at a $30/share floor price and not move more than 10-15% of the market volume per day. Simon stated that the target of selling 40 million shares was within the Rule 144 limit for legal trading. Ultimately, Ellison sold approximately 29 million shares, far short of the goal of 40 million, and well under the Rule 144 legal limit. Simon said the clock ran out on him at the end of the month.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

12

### Ellison's Q3 FY01 Stock Sales

Simon explained that there were three levels of selling that occurred in January 2001: expiring options, High Tax Basis lots, and "Old" Zero holdings. Ellison made almost $1 billion from these trades, which gave him net proceeds of approximately $500 million after taxes and paying Oracle's strike price.

a.   Expiring Options

Ellison and Simon's first goal was to exercise 22 million options that were due to expire in August 2001. These were the first options that Simon exercised and sold, starting January 22, 2001. Simon and Ellison spoke Monday morning January 22. During the first two selling days, Simon spoke with Ellison daily about how the trades were going. After the first two days, Simon communicated with Ellison via email; updating him on the status of his trades. Simon was asked to review his emails over this period:

(1)   January 22 and 23 Trades

Simon's first email communication was on January 23, 2001 when he sent to Balkenhol the January 22 and January 23 trades update. (ORCL 23486 – 23487, attached hereto as Exhibit C). Ellison sold 3.1 million shares on January 22 for $32.0082/share and he sold 5.1 million shares on January 23 for $31.6388/share.

(2)   January 24 Financial Plan

Simon emailed Ellison on January 24 with a financial plan of how he was going to use the proceeds from these trades. *See* Exhibit B. In the email, Simon stated that his overall target was to sell 40 million shares, which would enable Ellison to reduce his debt to $400 million. Simon devised this plan and presented it to Ellison in hopes that Ellison would agree and realize

CONFIDENTIAL PURSUANT
O PROTECTIVE ORDER

the necessity to exercise and sell as much as possible after these expiring options to try and reduce his debt.

Although Ellison was initially reluctant about continuing to sell past the 22 million expiring options, he ultimately agreed to sell enough stock to reduce his debt to $400 million. Simon acknowledged that he never achieved the goal of selling 40 million shares, but he tried to get as close as he could. He ultimately sold approximately 29 million shares, far short of his goal, but he explained that time and market constraints did not allow for 40 million shares to be sold in only two weeks.

(3)     January 24 Press Release Discussion

Simon emailed Balkenhol on January 24 to discuss the wording of Oracle's press release about Ellison's sales. *See* Exhibit A. Upon reviewing the email, Simon noted that the language had said Ellison was only exercising option shares and that Simon wanted to be sure that the language was changed to include potential other sales.

(4)     January 24 Final Trades

Simon emailed Balkenhol at the end of the trading day on January 24 with the final numbers for Ellison's trades that day. (ORCL 23490, attached hereto as Exhibit D). Ellison sold 4.9 million shares for $30.7277/share. Upon reviewing the email, Simon noticed that he asked Balkenhol to update Ellison on today's trades for him. Consistent with his recollection, Simon stopped communicating directly with Ellison after the first couple of trading days, and usually communicated through Balkenhol.

(5)     January 25 Trades

Simon emailed Balkenhol at the end of the trading day on January 25 with the final numbers for Ellison's trades that day. (ORCL 23491, attached hereto as Exhibit E). Ellison sold

3.835 million shares at $30.1401/share. Simon also gave the total-to-date: 16.925 million shares for an average price of $31.104/share.

        (6)    <u>January 26 Trades</u>

Simon emailed Balkenhol at the end of the trading day on January 26 with the final numbers for Ellison's trades that day. (ORCL 23494, attached hereto as Exhibit F). Ellison sold 4.225 million shares for $30.0888/share. He noted in the email that he planned on being through the expiring option shares by Monday January 29 and would move directly onto the High Tax Basis lots.

        (7)    <u>January 26 List of High Basis Tranches</u>

Simon emailed Kimberly Clarke of Merrill Lynch the instructions for selling Ellison's High Tax Basis lots once they had finished selling his expiring option shares. (ORCL 23492 – 23493, attached hereto as Exhibit G). Simon provided Clarke with the proper booking information for the trades. Simon's strategy was to move through Ellison's lots in reverse order because he did not know when he could be stopped from trading by Ellison or the market.

        (8)    <u>January 29 SEC Paperwork</u>

Simon emailed Balkenhol about Barbara Wallace's proposal for how to fill out Ellison's SEC paperwork. (ORCL 23495 – 23496, attached hereto as Exhibit H). Wallace processes all SEC filings for Oracle. Simon explained that they used different wiring instructions each day for different Ellison accounts. As a result, different names appear on the SEC filings depending on whether the money was wired from the Joint Revocable Trust or Ellison's accounts where Simon had power of attorney.

        (9)    <u>January 29 Trades</u>

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Simon emailed Balkenhol in the morning of the trading day on January 29 with an update on Ellison's trades that day. (ORCL 23497, attached hereto as Exhibit I). Ellison sold 1.082 million shares for $30.0347/share, completing all the 22.232 million option shares. He noted in the email that he planned on beginning the sale of Ellison's High Tax Basis lots immediately.

     b.    <u>High Basis Tax Lots</u>

Simon immediately moved onto selling Ellison's High Tax Basis lots. According to Simon, he had implicit authority to sell these lots because he had informed Ellison that he was moving onto this group of shares and Ellison did not prevent him from doing so. Simon, who was anxious for Ellison to diversify his portfolio and pay down some of his debt, tried to sell as many of Ellison's holdings as possible before the end of January. Simon recalled one small group of High Tax Basis lots from Integral Capital Partners. Integral Capital Partners liquidated and Ellison was distributed 25,176 Oracle shares, which Simon also sold.

     (1)    <u>January 29 Trades</u>

Simon emailed Balkenhol at the end of the trading day on January 29 with the final numbers for Ellison's trades that day. (ORCL 23498, attached hereto as Exhibit J). Ellison sold 1.082 million shares for $30.0347/share, completing all the 22.232 million option shares. He also sold 815,000 High Basis Tax lots for $30.2224/share and then 1.4 million High Tax Basis lots for $30.5112/share.

     (2)    <u>January 29 Final Update</u>

Simon emailed Ellison an update on his trades and that his first Rule 144 filing went public this afternoon and that he expected more to be public tomorrow. (ORCL 23499, attached hereto as Exhibit K).

     (3)    <u>January 30 Integral Capital Partners Shares</u>

16

Simon emailed Kimberly Clarke at Merrill Lynch instructions for Ellison's Integral Capital Partners Shares.  (ORCL 23500 – 23501, attached hereto as Exhibit L).

> (4)    January 30 Trades

Simon emailed Balkenhol at the end of the trading day on January 30 with the final numbers for Ellison's trades that day.  (ORCL 23502, attached hereto as Exhibit M).  Ellison sold 2,237,576 shares for $30.5484/share, completing all of the High Tax Basis lots and moving into the "Old" Zero Basis shares.  The total shares sold to-date is 27,784,576.  Simon noted in his email that the number 576 came from the Integral Capital Partners lot.

> c.    "Old" Zero Basis Shares

Simon was able to sell 1.3 million "old" zero basis shares on January 31 (ORCL 23503 – 23504, attached hereto as Exhibit N) before getting a phone call or email that day from Balkenhol instructing him to stop trading.   Simon stated that if Ellison had not instructed him to stop trading, he might have continued into February after getting further clearance from Dan Cooperman.

> (1)    January 31 Trades

Simon emailed Ellison at the end of the trading day on January 31 with the final numbers for Ellison's trades that day and to-date.  *See* Exhibit N.  Ellison sold 1.3 million shares at $30.249/share, yielding a net proceeds of $39.45 million.  Simon outlined Ellison's proceeds to-date, concluding that his net cash available after paying the option exercise price and taxes was $546.9 million.

## Ellison's Final Accounting from the January 2001 Sales

On March 8, 2001, Simon emailed Balkenhol the final accounting of Ellison's January 2001 sales.  (ORCL 23505 – 23507, attached hereto as Exhibit O).  The timing of this email was

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

well after the trading had ended because it took Simon a significant amount of time to receive and review all of the trade confirmations. In this email, Simon outlined the status of Ellison's bank lines, his stock sale proceeds, and his cash position:

     a.    <u>LIBOR Lines</u>

The total amount outstanding on the various bank lines is $907 million.

     b.    <u>Stock Sale Proceeds</u>

Ellison sold 29,084,576 Oracle shares in January. The gross proceeds totaled $894,786,576 ($30.76/share average). After taxes and payment of strike price, net cash proceeds totaled $648,308,808. These proceeds were used for the following purposes:

          (1)    $340 million to pay down various bank lines of credit.

          (2)    $86 million as reserve to pay residual income taxes due with the filing of Ellison's 2001 tax returns.

          (3)    $150 million as reserve to fund personal expenditures expected over the next year.

          (4)    $64 million as additional pay down of the bank lines to happen over the next few weeks as the LIBOR contracts at the various banks mature.

     c.    <u>Cash Reserve Receptacle</u>

Simon used Vanguard's Prime Institutional Money Market Fund as the vehicle to hold Ellison's cash reserves. At the time of this email, Simon had already put $100 million into this account and planned to move the remainder cash funds from the Merrill Lynch account by the end of March.

     d.    <u>Oracle Holdings</u>

At this time, Ellison owned 1,318,769,324 Oracle shares, plus 47,875,000 vested stock options.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

18

**Ellison's Q3 FY01 Charitable Donations**

On January 4, 2001 Ellison donated Oracle shares to various charitable institutions. (ORCL 23484 – 23485, attached hereto as Exhibit P). Simon encouraged Ellison to use his Oracle shares for charitable donations because of the tax benefits. According to Simon, the simplified benefit to Ellison of giving shares to charities is the equivalent of selling his shares at a 30-35% premium. In actuality, Simon explained, the tax benefits are more complex, but this is the way he describes the benefits to Ellison. Simon manages Ellison's charitable donations. He contacts Oracle's Legal Department and then the particular charity and arranges the transfer. The charity may decide to sell or keep the shares.

The January 4, 2001 email mentions Ellison's joint pledge with Michael Boskin. Simon stated that Ellison and Boskin helped fund a building at U.C. Davis in honor of Mike Chapman. He did not recall any further details about this joint pledge.

**Simon's View of Oracle in Q3 FY01**

Simon had no views about Oracle's prospects during Q3 of FY01. Simon does not follow Oracle news and only focuses on managing Ellison's personal finances. He believed that the economy in general was over-valued but did not consider Oracle's position in the market.

**Simon's View of Macro-Economy in Q3 FY01**

Simon was asked if any concern about the macro-economic environment played a role in his desire to sell Ellison's holdings during Q3 of FY01. Simon stated that he has always been risk-averse and conservative and does not like to carry debt. These feelings remain consistent through good and bad economic times, and so does his financial advice to Ellison. Simon does not follow how Oracle is performing in the marketplace, and, therefore, Oracle's success or failures do not factor into his financial advice to Ellison.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

19

According to Simon, Ellison is always "bullish" and "optimistic" about Oracle and the economy. Simon explained that Ellison never provides any details or basis for his views, he simply believes that sales and the market are always doing well.

Simon acknowledged that he bought into the dot.com boom, but that his logical macro-economic view is that the bubble was inevitably going to burst because the stock market was growing at a rate that exceeded the rate of growth of the gross national product and P/E ratios were too high for the technology companies. He believed that the economy was over-valued and wanted to reduce Ellison's debt as quickly as possible.

Consistent with this view, on May 3, 2002, Simon emailed Ellison about financial planning for the coming year. (ORCL 23515 – 23516, attached hereto as Exhibit Q). According to Simon, this is the most direct email Simon has ever sent to Ellison. Simon noted that he is an independent and an objective adviser to Ellison, and feels that it is his duty to be frank about the economy and about his recommendations. Simon urged Ellison to sell more stock and pay down more debt and to diversify his portfolio. Simon stated that he spoke on the phone with Ellison in the beginning of July 2002 about more upcoming expiring options and that Ellison should take the opportunity to diversify and pay down debt. Ellison told Simon that although this is what Simon wants Ellison to do, Ellison does not want to follow this course of action.

### Simon's Contact with Oracle

Simon does not contact Oracle at all except when he speaks to Ellison, Balkenhol and the Legal and Tax Departments about Ellison's trades or finances. Further, Simon is not privy to any internal computer systems or documents. Simon stated that he does not want access to such information.

    a.    <u>Simon's Sister: Shari Simon</u>

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

20

Simon's sister worked at Oracle as a senior executive in U.S. Marketing for a few years, but she is currently on maternity leave. Simon's sister was hired after Ellison had already hired Simon. Simon does not believe that his sister was working at Oracle during Q3 FY01. He and his sister have a practice of not discussing Oracle. Simon reiterated that he manages Ellison's financial life outside of Oracle and is not interested in how the company is doing.

**Final Thoughts**

When asked if Simon could think of anyone the SLC could speak with to aid in its investigation, Simon stated that contacting the brokers at Merrill Lynch who handled Ellison's Q3 of FY01 trades might be helpful. Kimberly Clarke and Tom Blanchfield handled the trades.

J.A.G.
G.M.N.
J.L.S.

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 300618

Exhibit A

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Fwd  Re- [Fwd: press release]

**Return-Path:** <psimon@howson-simon.com>
→ **Received:** from inet-smtp2.oracle.com (inet-gw2.oracle.com [205.227.43.29]) by
    gmgw03.oraclecorp.com (8.8.8+Sun/8.8.8) with ESMTP id NAA18412 for
    <Carolyn.Balkenhol@oracle.com>; Wed, 24 Jan 2001 13:13:38 -0800 (PST)
**Received:** from dnai.com (dnai.com [207.181.194.98]) by inet-smtp2.oracle.com (8.9.3/8.9.3)
    with ESMTP id NAA04187 for <Carolyn.Balkenhol@oracle.com>; Wed, 24 Jan
    2001 13:12:49 -0800 (PST)
**Received:** from azoth.dnai.com (azoth.dnai.com [207.181.194.94]) by dnai.com (8.9.3/8.9.3)
    with ESMTP id NAA89986 for <Carolyn.Balkenhol@oracle.com>; Wed, 24 Jan
    2001 13:13:08 -0800 (PST)
**Received:** from toast (dnai-216-15-88-125.cust.dnai.com [216.15.88.125]) by azoth.dnai.com
    (8.9.3/8.9.3) with SMTP id NAA80227 for <Carolyn.Balkenhol@oracle.com>;
    Wed, 24 Jan 2001 13:13:07 -0800 (PST)
**Message-ID:** <200101242113.NAA80227@azoth.dnai.com>
  **X-Sender:** psimon@howson-simon.com@corp.toast.net
  **X-Mailer:** QUALCOMM Windows Eudora Pro Version 4.0.1
    **Date:** Wed, 24 Jan 2001 13:09:12 -0800
      **To:** "Carolyn S. Balkenhol" <Carolyn.Balkenhol@oracle.com>
    **From:** "Philip B. Simon" <psimon@howson-simon.com>
  **Subject: Fwd: Re: [Fwd: press release]**
**Mime-Version:** 1.0
**Content-Type:** multipart/alternative; types="text/plain,text/html";
    boundary="=============================_188561170==_.ALT"
**X-Mozilla-Status:** 8001
**X-Mozilla-Status2:** 00000000

An additional thought, if we actually get thru the entire 22.232m option piece, maybe we can say that Larry
has finished exercising and selling his expiring stock options. Maybe this is too cute.  But, it arguably
leaves the door open to selling already owned common shares (as opposed to same day option
exercise/sale).

*********************************

Date: Wed, 24 Jan 2001 13:06:13 -0800
To: Carolyn Balkenhol
From: "Philip B. Simon"
Subject: Re: [Fwd: press release]

Carolyn - here are a few facts/comments to digest, then we can talk about what data to give them:

1. the selling may not end with the option shares if we can get more sold above 30. This morning said
he would have to get his debt paid down to $400m (from slightly over $1.2bn). We already spoke about
selling his high basis previously exercised option shares (5.2m from 98/99/2000 exercise) - - though I
think we may have trouble getting even the 22.232m current option shares sold in today's market.

I'd word the press release to leave open the option for future selling by Larry - so we can continue the
option exercise and sale program if not completed, and sell add'l shares to reduce debt.

2. re tax immediately due - two points/questions:

**ORACLE
CONFIDENTIAL**    ORCLA 0023691

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER



Fwd: Re: [Fwd. press release]

(a) first, and most importantly, 35.45% of the option gain (plus the exercise price) is subject to immediate withholding and payment to Oracle. But, very important, is the fact that an additional 11.22% will have to be paid when Larry files his t/return. This is because fed/CA withholding is at 28/6% rates, but actual liability is at 39.6/9.3% rates. When added all up combined with the 1.45% medicare withholding and subtracting out the value of the CA tax deduction on the federal t/return we get an actual effective 46.7% tax rate. So the amount due immediately, whether stated as a percentage or a dollar amount, is not the total amount due.

(b) do we want a percentage or an amount to fill in the blank on the amount immediately required to be paid  If it's an amount, it's a moving target. I won't know how much is and at what price until we're done or ready to issue the press release if we're giving to-date amounts. If you want an amount, I can estimate based on reasonable assumptions.

2. Larry did not sell in 1996 for "similar tax planning purposes". He sold for tax planning purposes in 1996. But, I wouldn't call the tax reasons similar to what we're doing now.

3. Since Larry might stop exercising and selling the options once the news hits (if the stock price drops), I don't know if I'd automatically say that Larry exercised and sold over 22m of expiring options. It mig be less.

4. If Larry exercises and sells all 22.232m options, and he sells nothing else, he'll own after this sale as follows:

shares - 1,325,648,900
vested options - 47,875,000
unvested options - 33,000,000
total options (vested & unvested) - 80,875,000
total options (vested & unveted) and shares - 1,406,523,900

Philip

•••••••••••••••••••••••••••••••••••

And. At 12:24 PM 1/24/01 -0800, you wrote:

whaddya think? What data should we give them?

Thanks.
Carolyn
Return-Path:
Received: from oldmail.us.oracle.com (oldmail.us.oracle.com [130.35.62.15])
by gmgw03.oraclecorp.com (8.8.8+Sun/8.8.8) with ESMTP id MAA21194
for : Wed, 24 Jan 2001 12:07:54 -0800 (PST)
Received: from gmgw02.oraclecorp.com (gmgw02.us.oracle.com [130.35.60.248])
by oldmail.us.oracle.com (8.8.8+Sun/8.8.8) with ESMTP id MAA09477
for : Wed, 24 Jan 2001 12:07:54 -0800 (PST)
Received: from oracle.com (dhcp-5op11-exec-ste-west-114-161.us.oracle.com [139.185.114.161])
by gmgw02.oraclecorp.com (8.8.8+Sun/8.8.8) with ESMTP id MAA09499;
Wed, 24 Jan 2001 12:07:51 -0800 (PST)
Message-ID: <3A6F3609.CEC0948E@oracle.com>

ORACLE
CONFIDEN° AJ

ORCLA 0023693

2

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Fwd: Re: [Fwd: press release]

Date: Wed, 24 Jan 2001 12:07:37 -0800
From: "Safra A. Catz"
X-Mailer: Mozilla 4.73 [en] (Win95; U)
X-Accept-Language: en
MIME-Version: 1.0
To: "Lockhart,Joseph"
CC: Carolyn Balkenhol
Subject: press release
Content-Type: multipart/alternative;
boundary="------------CA6583DF21EDB665EAB2CB13"

I discussed the Press Release with Larry and he approved one to hit the moment the SEC publishes the notice (or the news leaks out someway)

The important facts:

Larry exercised expiring options for over 22 million shares. The options would have expired this year, worthless if not exercised. On exercise, he had an immediate tax payment of _____. He sold the shares in same day sales.
His total share holdings are _____ after the sale.
These options represented shares that were less than 1.5% of his total holdings.
He sold in 1996 for similar tax planning purposes.
His outlook on the company has not changed at all.

Carolyn, if the selling is over, tell us so we can say so in the press release.

********************************************************************
Philip B. Simon
Telephone #: (925) 977-9060, ext. 104
Fax #: (925) 977-9064
Cell Phone #: (925) 683-9644
Email Address: psimon@howson-simon.com
Mailing Address:
   Philip B. Simon
   Howson & Simon CPAs L.P.
   101 Ygnacio Valley Road, Suite 310
   Walnut Creek, CA 94596
********************************************************************

ORACLE
CONFIDENTIAL

ORCLA 0023693

3

`ONFIDENTIAL PURSUANT
O PROTECTIVE ORDER

NDCA-ORCL 300622

Exhibit B

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 300623

A Few Facts

Return-Path: <psimon@howson-simon.com>
Received: from inet-smtp2.oracle.com (inet-gw2.oracle.com [205.227.43.29]) by
    gmgw03.oraclecorp.com (8.8.8+Sun/8.8.8) with ESMTP id NAA09454; Wed. 24
    Jan 2001 13:36:55 -0800 (PST)
Received: from atlas.dnai.com (atlas.dnai.com [207.181.194.95]) by inet-smtp2.oracle.com
    (8.9.3/8.9.3) with ESMTP id NAA15380; Wed, 24 Jan 2001 13:36:06 -0800 (PST)
Received: from neptune.dnai.com (neptune.dnai.com [207.181.194.93]) by atlas.dnai.com
    (8.9.3/8.9.3) with ESMTP id NAA79113; Wed, 24 Jan 2001 13:36:24 -0800 (PST)
Received: from toast (dnai-216-15-88-125.cust.dnai.com [216.15.88.125]) by
    neptune.dnai.com (8.9.3/8.9.3) with SMTP id NAA18503; Wed, 24 Jan 2001
    13:36:24 -0800 (PST)
Message-ID: <200101242136.NAA18503@neptune.dnai.com>
X-Sender: psimon@howson-simon.com@corp.toast.net
X-Mailer: QUALCOMM Windows Eudora Pro Version 4.0.1
Date: Wed, 24 Jan 2001 13:32:26 -0800
To: Larry Ellison <larry.ellison@oracle.com>
From: "Philip B. Simon" <psimon@howson-simon.com>
Subject: A Few Facts
CC: "Carolyn S. Balkenhol" <Carolyn.Balkenhol@oracle.com>
Mime-Version: 1.0
Content-Type: text/plain; charset="us-ascii"
X-Mozilla-Status: 8001
X-Mozilla-Status2: 00000000

Dear Larry:

Following up on our conversation this morning, here are a few facts re
paying down your bank debt:

1. total currently due the banks (including $42m for nCUBE): $1.22bn

2. exercise and sale of 22.232m options that expire 8/1/01 - you have to
pay tax equal to 46.7% of the option gain (35.45% due immediately, the
remainder due when you file your 2001 t/returns) ; also you need to pay the
22.5¢ cent exercise price.  I estimate you'll net after tax 52.75% of the
sale proceeds.

3. assuming we average $31.25/sh on all 22.232m shares, the net cash will
total $366.5m ($31.25 x 22.232m = $695m; $695m x 52.75% = $366.5m)

4. you hold 5.227m high tax basis shares from 98/99/2000 option exercises.
We picked up the option income with little or no tax cost offsetting tax
losses in those years.  Total tax basis in these 5.227m shares = $111.2m.
If we sell these shares at $31/sh, grossing $162m, the tax at c/gains rates
will equal $13m ($50.7m gain @ 25.6% rate).  Thus, after tax, you'd net
$149m on this lot.

5. to generate an aggregate $822m in after tax proceeds (required to get
your debt down to $400m), at $31/sh sale price you'd need to sell 13.3m of
your old zero basis shares.  13.3m times $31 = $412m; less c/gains tax of
$105m @ 25.6% yields $307m after tax sale proceeds.  ($307m + $149m + $366m
= $822m).

6. thus, in total, to generate $822m in after tax proceeds, you'd sell
40.7m options and shares (22.232m + 5.2m + 13.3m), roughly equal to your
40m split adjusted 6/99 option grant.

Philip

ORACLE
CONFIDENTIAL

ORCLA 0023488

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

A Few Facts

```
..............................................................
Philip B. Simon
Telephone #:  (925) 977-9060, ext. 104
Fax #:  (925) 977-9064
Cell Phone #:  (925) 683-9644
Email Address:  psimon@howson-simon.com
Mailing Address:
    Philip B. Simon
    Howson & Simon CPAs L.P.
    101 Ygnacio Valley Road, Suite 310
    Walnut Creek, CA 94596
..............................................................
```

ORACLE
CONFIDENTIAL

ORCLA 0023489

2

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

Exhibit C

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 300626

Re Today's Info

Return-Path: <psimon@howson-simon.com>
Received: from inet-smtp1.oracle.com (ns2.oracle.com [209.246.15.57] (may be forged)) by
     gmgw03.oraclecorp.com (8.8.8+Sun/8.8.8) with ESMTP id OAA19027 for
     <Carolyn.Balkenhol@oracle.com>; Tue, 23 Jan 2001 14:24:13 -0800 (PST)
Received: from oberon.dnai.com (oberon.dnai.com [207.181.194.97]) by inet-smtp1.oracle.com
     (8.9.3/8.9.3) with ESMTP id OAA16975 for <Carolyn.Balkenhol@oracle.com>;
     Tue, 23 Jan 2001 14:25:21 -0800 (PST)
Received: from neptune.dnai.com (neptune.dnai.com [207.181.194.93]) by oberon.dnai.com
     (8.9.3/8.9.3) with ESMTP id OAA34024 for <Carolyn.Balkenhol@oracle.com>;
     Tue, 23 Jan 2001 14:23:38 -0800 (PST)
Received: from toast (dnai-216-15-88-125.cust.dnai.com [216.15.88.125]) by
     neptune.dnai.com (8.9.3/8.9.3) with SMTP id OAA58758 for
     <Carolyn.Balkenhol@oracle.com>; Tue, 23 Jan 2001 14:23:38 -0800 (PST)
Message-ID: <200101232223.OAA58758@neptune.dnai.com>
X-Sender: psimon@howson-simon.com@corp.toast.net
X-Mailer: QUALCOMM Windows Eudora Pro Version 4.0.1
Date: Tue, 23 Jan 2001 14:21:03 -0800
To: Carolyn Balkenhol <Carolyn.Balkenhol@oracle.com>
From: "Philip B. Simon" <psimon@howson-simon.com>
Subject: Re: Today's Info
In-Reply-To: <3A6E0132.4B2A710@oracle.com>
References: <200101232204.OAA57468@neptune.dnai.com>
Mime-Version: 1.0
Content-Type: text/plain; charset="us-ascii"
X-Mozilla-Status: 8011
X-Mozilla-Status2: 00000000


3.1m @ 532.0082.

...........................
At 02:09 PM 1/23/01 -0800, you wrote:
>And what was yesterday's?
>
>Thanks.
>Carolyn
>
>"Philip B. Simon" wrote:
>
>> 5.1m @ 531.6388
>> ...................................................................
>> Philip B. Simon
>> Telephone #:  (925) 977-9060, ext. 104
>> Fax #:  (925) 977-9064
>> Cell Phone #:  (925) 683-9644
>> Email Address:  psimon@howson-simon.com
>> Mailing Address:
>>      Philip B. Simon
>>      Howson & Simon CPAs L.P.
>>      101 Ygnacio Valley Road, Suite 310
>>      Walnut Creek, CA 94596
>> ...................................................................
>
>
...................................................................
Philip B. Simon
Telephone #:  (925) 977-9060, ext. 104
Fax #:  (925) 977-9064

ORACLE
CONFIDENTIAL

ORCLA 0023486

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 300627

Re. Today's Info

```
Cell Phone #:  (925) 683-9644
Email Address:  psimon@howson-simon.com
Mailing Address:
    Philip B. Simon
    Howson & Simon CPAs L.P.
    101 Ygnacio Valley Road, Suite 310
    Walnut Creek, CA 94596
```
********************************************************************

ORACLE
CONFIDENTIAL

ORCLA 0023487

?

CONFIDENTIAL PURSUANT
TO PROTECTIVE ORDER

NDCA-ORCL 300628