# EXHIBIT 435

122007 SJ Hearing.txt

Pages 1 - 218

United States District Court

Northern District of California

Before The Honorable Martin J. Jenkins

```
Nursing Home Pension Fund,      )
et al.,                         )
                                )
             Plaintiff,         )
                                )
   vs.                          )          No. C01-0988 MJJ
                                )
Oracle Corporation,             )
                                )
             Defendant.         )
_____)
```

San Francisco, California
Thursday, December 20, 2007

Reporter's Transcript Of Proceedings

Appearances:


For Plaintiff:          Coughlin Stoia Gellar
                        Rudman & Robbins LLP
                        100 Pine Street, Suite 2600
                        San Francisco, California  94111
                 By:    Mark Solomon, Esquire
                        Eli Greenstein, Esquire
                        Shawn A. Williams, Esquire
                        Doug Britton, Esquire
                        Monique Winkler, Esquire
                        Stacey Marie Kaplan, Esquire
                        Willow E. Radcliffe, Esquire
                        Daniel Pfefferbaum, Esquire



(Appearances continued on next page.)

Reported By:            Sahar McVickar, RPR, CSR No. 12963
                        Official Reporter, U.S. District Court
                        For the Northern District of California

                   (Computerized Transcription by Eclipse)




Appearances, continued:

For Defendant:          Latham & Watkins
                        505 Montgomery Street, Suite 1900
                        San Francisco, California  94111-2562
                 By:    Peter Wald, Esquire

Page 1

```
            122007 SJ Hearing.txt
            Patrick Edward Gibbs, Esquire
            Michele Frances Kyrouz, Esquire
            Sean Berkowitz, Esquire

            Oracle Corporation
            500 Oracle Parkway, M/S 50P7
            Redwood Shores, California  94065
            By:  James C. Maroulis, Esquire



                    ---oOo---
```

                                                3

```
1  Thursday, December 20, 2007                 9:30 a.m.

2                    P R O C E E D I N G S

3            THE COURT:  Be seated.

4            THE CLERK:  Calling civil 01-0988, In re:  Oracle

5  Corporation securities litigation.

6            Counsel, please state your appearances for the

7  record.

8            MR. SOLOMON:  Good morning, Your Honor.
```

                            Page 2

122007 SJ Hearing.txt

9          Mark Solomon representing plaintiffs.

10          MR. WILLIAMS:   Good morning, Your Honor.

11          Sean Williams for the plaintiff.

12          MS. WINSLOW:   Monique Winslow on behalf of

13  plaintiffs.

14          MS. KAPLAN:   Stacey Kaplan.

15          MR. GREENSTEIN:   Eli Greenstein on behalf of

16  plaintiffs.

17          MR. BRITTON:   Good morning, Your Honor.

18          Doug Britton on behalf of plaintiffs.

19          MS. RADCLIFFE:   Good morning.

20          Willow Radcliffe on behalf of plaintiffs.

21          THE COURT:   There are other people there.

22          MR. PFEFFERBAUM:   Good morning.

23          Daniel Pfefferbaum on behalf of plaintiffs.

24          MS. HOLLOWAY:   Good morning, Your Honor.

25  Sara Holloway on behalf of plaintiffs.

                                                    4


1          THE COURT:   Good morning.

2          MR. WALD:   Peter Wald on behalf of defendant.

3          MR. GIBBS:   Patrick Gibbs for defendants.

4          MS. KYROUZ:   Michelle Kyrouz for defendant.

5          MR. BERKOWITZ:   Good morning, Your Honor.

6          Sean Berkowitz on behalf of the defendants.

7          MR. MAROULIS:   James Maroulis for defendant, Oracle

8  Corporation.

9          THE COURT:   Okay.   So the Court has -- the

10  Daily Report has it exactly right, it's a very full record.

11  And obviously, I have not looked at all the exhibits, I did

12  read the briefs and I thought it would probably be appropriate

13  for me to give you a bit of guidance with respect to some of

                          Page 3

122007 SJ Hearing.txt

14    the issues and concerns that I have, and you can address that.

15    I think you should be able to present your arguments in about

16    an hour, an hour 15 minutes apiece.  It is certainly worthy of

17    that.

18              So let's start in this order:  Probably good to sort

19    of address questions regarding the spoliation of evidence issue

20    at the outset.  And I can give you some of my sense on that

21    question.  And then I thought we could move a bit to the expert

22    issues, and I think for purposes of today, there are probably

23    two we should talk about.

24              Now, there are -- both sides submit attacks on the

25    other side's experts.  Many of them, I think, are really

5

1    properly cast as motions in limine that don't necessarily

2    pertain to the resolution of the motion for summary judgment we

3    have on today.  We'll see what transpires with that, quite

4    honestly.

5              I think there should be some discussion about -- is

6    it Goode?

7              MR. BRITTON:   Goedde.

8              THE COURT:   Okay, Mr. Goedde and Steinholt.  I think

9    we should spend some time talking about those two.  I'll give

10    you some sense of the concerns I have there.

11              And then there are the substantive motions and there

12    is the defendant's motion for summary judgment and the

13    plaintiff's cross-motion, as I read the papers with respect to

14    the Suite 11I set of products, and specifically as to

15    Mr. Ellison.

16              And these issues are cross-linked it seems to me, in

17    the substantive motion brought by the defendants.  So the Court

18    found that there were based on the assertions of the third

Page 4

122007 SJ Hearing.txt
19    quarter guidance, the issues with respect to the macroeconomic

20    changes, the sort of on the ground issues with respect to the

21    product mix application versus technology.  Those issues really

22    get joined, I think, in the -- across the board in the

23    substantive motion, so it just makes good sense to talk about

24    them at the same time.

25              So having said that, here is my inclination and

                                                                    6


1     concerns:  Starting with the motion for sanctions, I want to

2     make sure that I have captured fully the plaintiff's position.

3     I looked at your motion; it appears to me that you sort of --

4     at a couple of different levels, one relates to what I would

5     describe -- you describe differently, the sort of ebb and flow

6     of the provision of discovery in the case, starting with the

7     initial filing of the lawsuit, the preservation requests that

8     were made tracking through to the provision of documents at

9     times late breaking representations to the Court, with respect

10    to discovery.  You have some other points you make with respect

11    to, for instance, the -- the Ellison website and things of that

12    nature.

13              And finally, the issues you spend quite a bit of

14    time on which involve Mr. Ellison's -- I'll just tell you, it's

15    difficult for me to see how I would grant a motion for

16    sanctions that would result in a default on this record.  I

17    actually think on what you provided would be error to do that.

18    There are many cases on this issue, but it seems to me that you

19    both cite to Leon quite a bit.

20              The waiving back and forth on the willfulness

21    standard, some of what you argue is discovery related, it's not

22    destruction of evidence, it's a failure to make discovery in a

23    timely fashion I think you factor in as a factor supporting

                              Page 5

122007 SJ Hearing.txt

24   your request for the entry of a default.

25          Theoretically, I suspect that is possible to support

7

1   your request, but then you would have to show some prejudice,

2   and the record is not adequate on that prong.  Even if I got by

3   the willfulness question, we have a pretty full record with

4   respect to the documentation with respect to the third quarter

5   projections.

6          And I think the Suite I product, I don't hear -- I

7   didn't see much in the motion that relates to the inflated

8   revenues you assert from the, what is it, a swap with

9   Hewlett-Packard for the $20 million in the bad debt transfer.

10   So it's -- I have real concerns about granting a motion for

11   what would essentially be a default on this record.

12          You really have not addressed every case that I've

13   seen, Judge Peckman's case you have cited to the most recent

14   case the you provided yesterday, where such a motion is granted

15   there is -- must also be a consideration, as I said, of

16   prejudice, and whether there are alternatives.  And I don't see

17   the alternatives analysis addressed at all in your papers, at

18   least not in a way that in my view supports the request you are

19   making.

20          Now, the defense, I think, argues, that you don't

21   ask for something intermediate, something short of what would

22   essentially be the death penalty, and I don't think that's

23   completely true, either.

24          There is in the brief a request for an inference of

25   Scienter that would read on the requisite standard related to

8

1   this motion, so we should probably talk about that and whether

2   or not that is -- the record sufficiently supports that

122007 SJ Hearing.txt

3    request.

4              And I think in the context of what I just said, the

5    primary evidence that I'm looking at, your brief that you rely

6    on, is the -- what transpires with the -- come at it two ways,

7    with the software materials, that is just what I'll generically

8    refer to them as.

9              One, it's clear that the plaintiff's position is

10   that that evidence was relevant at all times and so it should

11   have been obtained early on in the case and provided in the

12   course of discovery, and it was not.  So that is one data

13   point.

14             Two, then, in November 2006 time frame when this

15   issue really bubbled up, and there was a request made for the

16   tapes and backup notes.  In the record, there is a discussion

17   of Mr. Ellison's communication the plaintiff alleged was

18   clandestine and unknown to them about these very materials, and

19   that a duty to obtain them would really have attached prior in

20   time, but certainly then because there were discussions about

21   them.

22             Three, that the request made by legal counsel to

23   Mr. Ellison to reach out and obtain this information, I think

24   around January 10th or 11th, is sort of late in the day.   And

25   the combination of Mr. Ellison's communication, failure to

                                                                9


1    obtain and ask for these documentations, there is at least an

2    argument that they make that the Court ought to impute an ill

3    motive to Mr. Ellison that would support, one, their motion for

4    the entry of a default, and two, at least an evidentiary

5    sanction with respect to his state of mind.

6              Now, it strikes me it's one thing to say as a matter

7    of discovery that the materials are in the possession of

122007 SJ Hearing.txt

8   Mr. Ellison or the defendant here.  I know you still today take

9   umbrage with Judge Enfante's rulings in that regard and mine,

10  too, but that's the law of the case.  So it's one thing to say

11  that the defendants had possession, it's another to establish a

12  culpable state of mind with respect to the destruction of these

13  documents.

14          I find it difficult that I would draw, for instance,

15  an adverse inference as to Mr. Ellison's state of mind deriving

16  from actions taken by the biographer, which is essentially what

17  you asked me to do in the brief.  And so there should probably

18  be more discreet discussion about the culpability question as

19  it might relate to even an evidentiary sanction, because you

20  rely primarily, it seems to me, on the software materials for

21  that inference.  If I've understated it, I'm sure you'll let me

22  know.

23          So I don't think the record supports a request for a

24  default.  And we can have some discussion with respect to

25  the -- as it pertains to the motion for summary judgment,

                                                                10


1   whether or not there is an evidentiary sanction that would be

2   appropriate on this record.

3           And it strikes me we probably will have a, depending

4   upon what transpires, a subsequent and fuller discussion at the

5   pretrial conference on some of these issues as well.  It may

6   not be the end of the day for this discussion.  Those are my

7   views with respect to the motion for entry of a default.

8           As to the motions regarding plaintiff's expert, I'm

9   not so sure that 702 requires the kind of discreet knowledge

10  that Mr. Wald, you contend, would be necessary to opine about

11  the economic issues, the macroeconomic issues that were --

12  Oracle was confronting third quarter of 2001.  It looks to me

                              Page 8

122007 SJ Hearing.txt

13    from this record that it's the exercise of discretion, but I

14    wouldn't disqualify or say that qualifications don't pass

15    muster to at least opine on these questions.

16          I don't know, certainly definitions of

17    macroeconomics and the issue of industrial organization, firms

18    and markets and their interaction, there is a bleedover into

19    more general macroconcepts, seems to me.  So I don't think I

20    can cleave it that narrowly in a 702-type objection.

21          I think that probably the bigger issue has to do

22    with the forecasting process itself.  I might also say, I don't

23    know what "significantly undermine" means.  Their expert uses

24    that term, but I'm not sure that that's a term that is derived

25    from any training or experience.  It's an attribution.  But it

11

1     has to have legs upon which it stands that are within training,

2     experience, education, and some methodology that gives rise to

3     a finding of reliability.  And that is where I think we ought

4     to focus, and most specifically about the testimony regarding

5     the application of the conversion ratio.

6          You should talk to me more on the plaintiff's side

7     about the basis for the conclusion, the analysis, the

8     methodology that would give rise to -- I mean, it strikes me

9     that an economist might look at the data that gives rise to

10    utilization of a conversion ratio as some of the general

11    landscape that they would utilize in arriving at an opinion

12    with respect to whether or not the forecast was faulty or not.

13    But I'm trying to focus a bit more on exactly what the

14    methodology is so I can field their Daubert objection.

15          At that point, if there is a dispute from the

16    experts about how that methodology appropriately passes muster,

17    that is for the trier of fact to sort out, essentially.  And

122007 SJ Hearing.txt

18  the Court, notwithstanding the regression analysis used, if the

19  methodology is appropriate, then it could be that that

20  testimony is appropriate to consider in determining the

21  inferences that are drawn from the guidance that was given

22  third quarter and whether or not that raises in the total mix

23  of information an indication that that guidance was --

24  constitutes a misrepresentation.  So I would like a bit more

25  discussion about that.

                                                                    12


1           The other thing you can answer for me is is the

2   regression analysis really new matter?  The plaintiffs make at

3   least a plausible argument that, in fact, this issue with

4   respect to the analysis of the economics that gave rise to the

5   forecast was a live issue in play, and that it's not an opinion

6   that the expert came up with for the first time in the reply

7   declaration, it is an expansion of that opinion based on

8   information they got in defense expert economic analysis.  So I

9   think we should probably talk about that a bit as well.

10          The other thing is, I'm not sure -- how do I

11  pronounce his name, again?

12          MR. WALD:  Goedde.

13          THE COURT:  Has he submitted a declaration or an

14  affidavit?

15          MR. BRITTON:  Yes, Your Honor.  It was attached.  We

16  filed a motion for leave to file it, and we attached it to that

17  motion.

18          THE COURT:  I didn't see that.

19          MR. BRITTON:  That is still pending.

20          THE COURT:  Is that disputed?

21          MR. GIBBS:  We oppose the motion, yes.

22          THE COURT:  Okay.

                              Page 10

122007 SJ Hearing.txt

23          So just tell me why you wouldn't have filed a

24   declaration in the first instance.  That is what Rule 56

25   requires.  So you can just answer that question, and because

                                                                    13


1    they raised an objection as to whether I should consider it.

2    And so I just -- there were several of them like that.  I don't

3    know why they weren't submitted in proper form, you knew this

4    was coming, but that can be addressed in the general argument.

5          So then let's move to Steinholt, very quickly, this

6    whole issue about whether or not Steinholt actually offers an

7    opinion or not or the distinction that is made that when he --

8    that he offers an opinion, but the factual legs of the opinion

9    are for plaintiff to establish by way of proof.  It doesn't

10   necessarily join the reliability methodology argument that you

11   make with respect to Mr. Steinholt.  You probably should

12   address the issue of -- as to whether it goes to the weight or,

13   really, methodology.

14         He seems to get to his opinions with respect to lost

15   causation.  I recognize he testifies on materiality, too, but

16   seems like to me the main attack is that he fails to account

17   for other factors in the ultimate opinion that he arrives at,

18   which the case law tells us is certainly a relevant

19   consideration.  That would go right to the heart of the

20   methodology question.

21         So the elimination event studies does seem to me,

22   methodologically, would need to account for alternatives that

23   may reflect or impact, you know, the drop in stock price after

24   the miss was announced March 1st.  We should probably hear from

25   -- more from you with respect to shoring that up, both sides.

                                                                    14


                              Page 11

122007 SJ Hearing.txt
1              Those are my concerns about -- that I think experts
2       that really weigh in on the motion for -- motions for summary
3       judgment.
4              Now, the substantive motions:  As to whether or not
5       the guidance with respect to the third quarter of earnings per
6       share of 12 percent, 25, I think, percent growth, false or
7       misleading given the standard that has to be applied to find
8       that that was a misrepresentation and this underlying issue
9       that we talked a little bit about, whether or not in the --
10      either in the upside forecast or the projection where
11      Ms. Minton uses her judgment as an additional component, it's
12      -- I'm concerned that the guidance that was given seems to have
13      some conservative element built into it.
14             Henley did not adopt in lock step the 12.85 earnings
15      per share that was recommended, and so I'm interested in trying
16      to discern with respect to the earnings per share guidance, as
17      we walk along, what is it, really, that would have, from the
18      flash reports, pipeline evidence, from the December results I
19      think that issued January 17th to the February -- to the
20      January results that were issued sometime in February, up to
21      that mid point what is it that would indicate to the officers,
22      the company at large, that continuing to stay with that
23      consensus was -- they were not going to make it?
24             One of the -- I looked at the plaintiff's brief, I
25      looked at your chronicling of the slowing of the conversion

                                                                    15

1       rate in the quarters previous, and that is certainly a factor,
2       but it looks like on the ground level, from the bottom up, the
3       reports were reflecting in the field they were staying with
4       their numbers.  And so it has to be, then, I think to raise an
5       issue of fact with respect to falsity, what are the specific
                              Page 12

122007 SJ Hearing.txt

6  facts, in your view, that would establish that they realized

7  that those numbers did not really have the mix of information

8  in a concrete basis?

9          I can give you some numbers, and both sides do, but

10 if you look at it quarter over quarter, if you go out a couple

11 of quarters there, by the end of -- for January and December

12 their license revenues look comparable in the previous third

13 quarter 2000, even back to '99.  Now, that doesn't factor in

14 this whole issue about the changes in the economy, which I know

15 is a big part of your analysis as to how you get to

16 establishing that these statements were false.

17         But some of that slowing is evident in previous

18 quarters as well.  Same thing with pipeline growth; the end of

19 January, 32 percent over the prior year, and that is ahead of

20 the 25 percent consistence.

21         Then from January going forward, the necessity to --

22 how much of the pipeline they had to convert, what in the

23 record suggests that that wasn't realistic?  Even at the end of

24 January, looks to me things fell apart quite a bit when they

25 got to February and they didn't close some big deals --

                                                        16


1  actually, not big deals, but it was the scope of deals they

2  didn't close.  So we should have some discussion.  And just

3  pinpoint it for me.  I don't think we need to -- you've told

4  the story in the briefs, now we are just talking about more

5  discreet pinpointing of these issues.

6          I'm not sure in the third quarter that I have -- I

7  have concerns about the cautionary language that you submit to

8  me, whether that is susceptible to resolution on this record,

9  but that may depend on what are the actionable statements going

10 forward as well.  Generally, there is an indication of

                    Page 13

122007 SJ Hearing.txt

11   conversion variation, undetected errors with respect to Suite

12   11 and a weakening economy.   That may not be specific enough so

13   that, as the case law indicates, that that cautionary language

14   really reduced the risk of the investor to nil.   But we would

15   have, again, then, based on the same evidence, a fairly

16   significant issue with respect to actual knowledge.

17                With respect to -- the record is a bit of a jumble

18   with respect to the generalized statements about the economy.

19   I think there is some shifting here as to what you are actually

20   relying on.   So I would actually like you to outline the

21   general public statements that you rely on separate from

22   December 14th and the guidance given and the specific guidance

23   thereafter.   Let me see if I can pinpoint that for you.

24                These are the non -- I think everybody agrees these

25   are not forward-looking statements.   These are the investor

17

1   calls with Henley, no impact or slowing in the business, as

2   late as February, Henley's statements that they had yet to see

3   a macrorelated weakness in its business.

4                I think context is the issue here, whether these are

5   really false statements.   And there is some fencing in the

6   brief around that.   But no softening in demand, sustained

7   demand, how are those tethered to their ability to meet

8   guidance or the broader issues of downward trends to the -- the

9   Court discerned that they are factual issues as to whether or

10   not these statements are false.

11                When we get to the Suite 11I product, it does seem

12   to me that there are statements, January of 2001, that the

13   Suite was preintegrated and fully operable out of the box;

14   those kinds of statements seem to me to, as opposed to the

15   generalized statement about the economy, those kinds of

Page 14

122007 SJ Hearing.txt

16  statements strike me -- as the Court could not say as a matter

17  of law that those statements are not actionable.

18         But at the other end of the spectrum is the kind of

19  arguments you make about warranting the -- that the product

20  would work in a certain fashion, that it was -- as opposed to

21  being fully operable and integrated and delivered, the

22  faultiness or mechanical statements or lack thereof, those

23  statements seem to be on the other end of the spectrum.   And

24  I'm not sure that the evidentiary record supports a finding

25  that those statements are false in the first instance.

                                                          18


 1         And secondly, the argument that the Suite 11I was up

 2  and running, customers would get savings, it would cost

 3  customers less; again, it runs headlong into consulting costs,

 4  best of breed, purchase.   It just strikes me those statements

 5  don't seem to be the kind of statements that would be

 6  actionable.

 7         I suspect you need to address the evidence of

 8  customer complaints and whether that is something the Court can

 9  consider for the truth of the matter asserted.   What do you

10  offer in that regard, case law that speaks specifically to

11  that?

12         I think a larger issue, aside from falsity on Suite

13  11I, is lost causation.   And most specifically, what is it that

14  ties the defects you allege in Suite or assert that mark the

15  Suite 11I product?   What is it?   How do we tie that to what

16  transpired March 1st in a way that allows the Court to say,

17  yes, there is an issue of fact here with respect to lost

18  causation?   The actual causal connection strikes me as somewhat

19  dubious with respect to Suite 11I.

20         We have a similar issue with respect to the second

                               Page 15

122007 SJ Hearing.txt

21  quarter revenues impacted by the transfer of the bad debt

22  reserves and the $20 million swap, which essentially, I think,

23  you argue is a swap of inventory regarding Hewlett-Packard.

24  What is it I can discern from the fact that there was a stock

25  drop when the miss was announced that allows me to see the

19

1   causal connection back to the second quarter, again, inflated

2   revenues there?

3           I don't think it's enough just to say that the

4   revenues were inflated, and so then when they announced the

5   March 1st, 2001 miss, that incumbent in that, because those

6   revenues were inflated it's just by higher reasoning that there

7   is a loss.  You've got to tie it more specifically.  I'm

8   interested in what it is that more specifically you have to say

9   about that.

10          I looked at the cases you cited, and I looked at the

11  Impacts case and some of the others, it strikes me as a bit

12  different, that record is a bit different than what I just

13  suggested to you, at least with respect to Suite 11I and the

14  second quarter revenues from what are accounting

15  irregularities.

16          The Impacts case strikes me that what Judge Ware was

17  saying there is -- you tell me if you read this case

18  differently, because you both cited to it -- he had previously

19  granted several motions to dismiss because there was no lost

20  causation with respect to the first and second quarters that

21  really were linked to the credits and rebates and the

22  misrepresentations regarding those that were the sum and

23  substance of the loss allegation in the case.

24          The third time around with the evidence of the

25  November announcement and the August partial announcement to

20

Page 16

122007 SJ Hearing.txt

1    the market of the actual truth they said two things:  One, the
2    November announcement allowed inference with respect to a loss
3    occasioned for previous quarters.  The first and second it had
4    not been alleged in a way of -- for a finding of lost
5    causation.  Two, when the truth was partially revealed in
6    August and then fully acknowledged in November, there was a
7    correspondent significant drop in the stock on both dates that
8    allowed for an inference as to the cause.
9              So if we put that case in context and look at the
10   record with respect to loss causation of Suite 11I and the
11   second quarter, just address for me your reliance on that case
12   with respect to the issues that have been raised here by the
13   defense.
14             So that ought to be enough to get us going.  And
15   doesn't matter to me what order -- you have made the motion
16   with respect to the claims that resonate in the pleading, so I
17   think it makes good sense to start with you, Mr. Wald.  And
18   then I'll hear from the plaintiffs and then a short rebuttal
19   and sur-rebuttal, and we'll take it from there.
20             MR. WALD:  Thank you, Your Honor.
21             THE COURT:  Now, I didn't address the -- with
22   respect to the third quarter projection, I didn't address the
23   issues regarding the inference of knowledge that could be
24   deduced from the way in which the stock was liquidated.  It
25   does seem to me that in some respects the Ninth Circuit has
                                                              21


1    spoken to that issue.
2              When the case went up on the motion to dismiss and
3    came back, it struck me that the one way of reading the
4    defense's brief is that that evidence, you take umbrage with it
                              Page 17

122007 SJ Hearing.txt

5      on a couple of different levels.  And the one thing I didn't

6      get to do, I read quite a bit, but you cited a case at 47 Fed.

7      3d -- I can't remember the name -- it stands for the

8      proposition that the Court could make some inferences from the

9      lack of sales with respect to the other defendants as it vets

10     the issue of the suspiciousness of timing and amounts.

11             But I think when I'm referencing the Ninth Circuit

12     case, I am saying that the Circuit did have a view and

13     elucidated on its precedent about the percentage and seemed

14     to -- I hadn't seen that before that case, but they seemed to

15     look at, actually, the numbers as -- of shares that were

16     liquidated and not so much as to the percentage of the total.

17             They used terms like "astronomical," and things of

18     that nature, and so I think I'm guided by that in how I look at

19     that evidence and how that evidence may represent or allow for

20     an inference as to, depending upon what the other facts say,

21     knowledge in the case.  Okay.

22             MR. WALD:  Your Honor, on the very last point, which

23     we'll come to in my presentation, our position is that the

24     Ninth Circuit recognized that it was a factual issue.

25             THE COURT:  Right.

                                                              22


1              MR. WALD:  And it couldn't be decided simply on the

2      basis of the complaint.  Obviously, this is summary judgment,

3      and the factual record has now been assembled.

4              Your Honor, with leave, we have prepared what I hope

5      is an efficient way of getting through the issues that you have

6      raised in a slide presentation.

7              THE COURT:  I thought you were about to say that I

8      haven't been efficient in the way that I've outlined.

9                      (Laughter.)

                         Page 18

122007 SJ Hearing.txt

10          MR. WALD:  You've been very efficient.

11          If I could hand these up to you.

12          Your Honor, good morning.  What I've handed you is a

13   binder that contains a series of slides in three -- in four

14   areas.  The first area is the products area, Suite 11i.  The

15   second area is the accounting issues.  The third area is the

16   forecasting issues.  And the fourth area is lost causation.

17          To jump ahead, I think to our punch line, Your

18   Honor, we think lost causation cuts across all of these.  We

19   think that the record is devoid of evidence from which a

20   reasonable fact finder could conclude that the March 1

21   announcement announced the relevant truth, as the Supreme Court

22   has indicated it must do, and that there is simply no evidence

23   of that.

24          The Steinholt discussion, Your Honor, does fit into

25   that.  We had, just as a housekeeping matter, wanted to make

                                                            23


1    sure you had in mind a case called Ryan versus FlowServe, a

2    District Court case out of Texas that we submitted right before

3    the last scheduled hearing in November.  Very interesting case,

4    Your Honor.  Involves Mr. Steinholt, involves Mr. James, our

5    expert.  It's a Section 11 and a Section 10(b) case.  And

6    there, the District Court granted summary judgment for the

7    defendants, notwithstanding that in the Section 11 claim it was

8    the defendant's burden to show the lack of lost causation.

9          And there was a -- quite a fascinating discussion of

10   Mr. Steinholt's methodology, or lack thereof, Your Honor.  And

11   what the Court found was that the fundamental flaw in what

12   Mr. Steinholt did was that he simply assumed a connection

13   between the stock price decline and the alleged concealed

14   material and didn't demonstrate it.  And that, of course, is

                              Page 19

122007 SJ Hearing.txt

15   exactly what has happened here, as we hope we are able to

16   demonstrate to Your Honor.

17            That failure is a failure of proof in terms of an

18   element of the plaintiff's claim in addition to being a Daubert

19   failure.  So it is a 702 issue, it is a Daubert issue, but

20   beyond that, it's failure of proof to a fundamental element of

21   their case, and it is one independent reason, cutting through

22   all three sections, why the defendants are entitled to summary

23   judgment.

24            If I may, Your Honor, let me start in.  I'm going to

25   start with the Suite 11I related claims because at some level,

                                                              24


1    Your Honor, it seems to us that this is the core of the

2    plaintiff's complaint.  The plaintiff's complaint is that the

3    defendants knew but failed to disclose the fact that this was a

4    troubled product and that sales were falling off.  And that is

5    the case that they promised to this Court, and that is the case

6    that they promised to the Ninth Circuit, as we are going to

7    show.

8            The evidence as it has evolved has put the light on

9    that allegation.  There are, in fact, no lost sales that the

10   plaintiffs point to due to problems with the product, or 11I.

11   And so as the Court noted in its opening remarks, lost

12   causation is a very significant issue with respect to products

13   and also with respect to accounting and forecasting.

14            I will also briefly cover the falsity issues, Your

15   Honor.

16            Most importantly, they offer no evidence that the

17   Suite 11I problems caused Oracle to lose any deals.  In fact,

18   Your Honor, the evidence is overwhelming, and I dare say

19   unrebutted, that Oracle's third quarter earnings miss was

122007 SJ Hearing.txt

20   caused by an industry-wide economic downturn that affected

21   every single one of its competitors, something Mr. Steinholt

22   didn't even look at.

23          Now, as this Court has previously held in the Gilead

24   case, it's not enough for an economic loss to touch upon an

25   asserted lack of disclosure, the plaintiffs have to demonstrate

25

1    an actual causal connection between the alleged material

2    misrepresentation and the economic loss that is suffered.

3    That, obviously, is the teaching of Dura.

4          So let's look and see what actually was said to the

5    market, Your Honor.  On March 1st, Oracle preannounced that it

6    wouldn't achieve its guidance for the third quarter because

7    customers deferred expenditures as a result of uncertainty in

8    the economy.  That was Mr. Ellison's statement.

9          That was what the market was told, Your Honor.  The

10   market wasn't told anything about problems with the product or

11   second quarter earnings or anything of the kind.  So there was

12   no direct revelation of the falsehood, the "relevant truth," to

13   use the Supreme Court's articulation of it.

14         The plaintiff's theory has always been that there

15   was an indirect revelation, Your Honor, that the earnings

16   misreflected the problems with product I and its failure to

17   sell through.  And that's, frankly, what they promised the

18   Ninth Circuit that they were going to prove.

19         For six years, their theory has been based on the

20   assertion the customers delayed or canceled numerous large

21   deals in the third quarter because of Suite 11I defects.  And

22   they even alleged in their second amended complaint that there

23   were four specific deals totaling $186 million in license

24   revenues that evaporated in early third quarter '01.  That was

122007 SJ Hearing.txt

25      part of what drove their arguments that Mr. Ellison and

26

1       Mr. Henley knew the trouble with the quarter that was coming

2       on.  State of Michigan, Bell South, Tealia and ADT.

3               Notwithstanding a massive discovery record, and we

4       certainly agree with both you and the Delaware court that it is

5       massive, the plaintiffs have absolutely no evidence indicating

6       the product problems contributed to the third quarter miss.

7       They do not stand before the Court today pointing to a single

8       customer who failed to purchase or who delayed or canceled his

9       purchases in the third quarter because of product problems.

10              What is truly interesting and remarkable, Your

11      Honor, about that is that the plaintiffs were permitted to

12      subpoena documents from these very customers, and they did

13      subpoena documents from these very customers, including a

14      number of those that they told the Ninth Circuit dropped out in

15      the third quarter.  And notwithstanding that, Your Honor, they

16      have no evidence of lost deals.  In fact, Your Honor, having

17      failed to adduce any evidence in the course of this discovery,

18      they now claim that it isn't necessary for them to do so.

19              THE COURT:  Um-hmm.

20              MR. WALD:  So they move from December 9, 2002, the

21      allegations in the revised second amended complaint, which in

22      September of '04 the Ninth Circuit expressly relied upon in

23      reversing this Court's motion to dismiss and dismissal order.

24      And now, in August of 2007, the plaintiffs come back and say,

25      defendants incorrectly assert that plaintiffs must show that

27

1       the failure to meet third quarter earnings forecast revealed

2       new specific information about canceled or delayed purchases

Page 22

122007 SJ Hearing.txt

3  due to alleged defects with Suite 11i. Well, Your Honor, we

4  submit that is exactly what they have to show, and they know

5  perfectly well that they cannot show it.

6       Plaintiffs seek to rely on the Ninth Circuit's

7  decision in Dau for the proposition that they don't have to

8  show a causal connection; well, Your Honor, that's, of course,

9  not what Dau said, nor could Dau possibly have said that in

10 light of Dura.

11      What Dau actually says is that the complaint in that

12 case did allege a causal connection between the alleged fraud

13 and the stock drop. Dau, Your Honor, is completely consistent

14 with this Court's ruling in Gilead and with our motion for

15 summary judgment and the reason why the plaintiffs cannot

16 survive on lost causation.

17      What the plaintiffs retreat to instead, Your Honor,

18 and this is the case I mentioned previously, is Mr. Steinholt's

19 testimony. And it's something they call their true financial

20 condition theory. And their theory goes something like this:

21 When the stock dropped, the company's true financial condition

22 was revealed to the market.

23      Well, we don't contest that proposition, Your Honor,

24 we agree. The true financial condition of Oracle and every

25 other competitor in the enterprise software space was revealed

                                                              28


1  to the market, and it was revealed that there were serious

2  unanticipated economic downturns.

3       THE COURT:  What does that say about Suite 11i?

4       MR. WALD:  Certainly not a problem with the

5  products, certainly not a problem with any statements that were

6  made about its functioning, it's interoperability, product

7  defects, none of the states that are being challenged today.

                        Page 23

122007 SJ Hearing.txt

8    In other words, it was not a Suite 11-specific problem, it was

9    an economic downturn, which began, Your Honor, by the

10   measurement of the Bureau of Economists.  It began in March of

11   2001 after the third quarter.  I'll come to that, Your Honor,

12   but I don't think that it's disputed.

13           The recession, which wasn't measured by the

14   President's Council on Economic Advisers until November of '01

15   began in March of '01, after the conclusion of the quarter.

16           So what the Court in FlowServe says, Your Honor, is

17   that it isn't sufficient simply to assume a connection, you

18   have to prove it.  And if you don't prove it, Your Honor, you

19   lose where it's your burden.

20           And, Your Honor, you can reach that issue, and

21   indeed, we submit should reach that issue, irrespective of the

22   Daubert issue with respect to Mr. Steinholt.  There are plenty

23   of methodological problems, which we'll come to, but quite

24   aside from that, when all the expert does is to assume it's the

25   plaintiffs who have failed to meet their burden of coming

                                                              29


1    forward with evidence to show lost causation.

2            Now let's take a look at what the evidence actually

3    shows about the earnings miss.  The record makes clear that

4    Oracle's third quarter organization miss was the result of an

5    industry-wide economic downturn, which was so characterized and

6    recognized by Oracle's competitors and, Your Honor, by all the

7    analysts.  The analysts recognize that this was an unforeseen

8    slow down.  Credit Suisse, on March 5th, 2001, published a

9    report which says "Although bad news for Oracle, we believe the

10   announcement is a problem relating to the economy and not one

11   inherent to the company."

12           RS investments, the next day:  "We are downgrading

                          Page 24

122007 SJ Hearing.txt

13   J.D. Edwards to a market performer rating based on potential

14   effects of a slowing economy where we believe software

15   companies across the board currently face significant

16   challenges and uncertainty in light of the slowing economy and

17   more restricted II budgets."  Precisely what Oracle found when

18   their deals didn't close in the very last week, Your Honor.

19          Morgan Stanley, April 3rd:  "They call it stormy

20   Monday, but Tuesday's just as bad, at least that is how the

21   famous blues song goes.  But let's hope for a little letup on

22   Tuesday after a bloody Monday of preannouncements, a record

23   eight enterprise software companies in one day, including five

24   companies that preannounced last month, a total of 13

25   enterprise software companies have fallen on their swords.

                                                              30


1    It's been that kind a party."

2           So the analysts, Your Honor, absolutely recognized

3    that Oracle was part of a wave that the entire enterprise

4    resource software industry was affected by this, that it had

5    nothing to do with product Suite 11I alleged problems or the

6    second quarter announcements.  As we'll come to, Your Honor,

7    Mr. Steinholt didn't look at any of this information and

8    doesn't opine on it, didn't even consider it.

9           This is an interesting graph, Your Honor, it shows

10   what a bellwether or oracle, I guess you could call it, what an

11   oracle Oracle was in terms of it happening in the economy.  If

12   you take a look at this chart, what it shows is that by and

13   large its competitors in the period prior to Oracle's

14   announcements, all met or exceeded their guidance.

15          And after Oracle's announcement, and as the Court is

16   aware, Oracle of course, has this funny fiscal year which ends

17   on February 28th, and so they announce before a lot of the

                              Page 25

122007 SJ Hearing.txt

18  other people in the industry announce.  Because of that, it

19  becomes the first, but by no means the only, all of the other

20  competitors after that, Your Honor, preannounce that they, too,

21  are going to misguidance.

22          If you take a look at what they say in their press

23  releases, it's all the same stuff.  Cognos says, "In the latter

24  part of February" -- in the latter part of February, Your

25  Honor, exactly the same time frame as Oracle -- "we started to

                                                              31

1  experience hesitancy on the part of commercial customers in

2  North America to make large commitments in light of the current

3  economic outlook."  Again, completely consistent with Oracle's

4  experience, completely consistent with what Oracle told the

5  market.

6          Arriba, the same thing:  "As many others are also

7  realizing, the slow down in both the economy and technology

8  spending has been much more dramatic than we had previously

9  expected."  Again unforeseen, unexpected surprises.  And Arriba

10  says "Spending decisions at the executive level were postponed

11  as customers evaluated their budgets in light of the prevailing

12  economic uncertainty."  I2, another competitor has exactly the

13  same experience.

14          So when you come to the plaintiff's theory of lost

15  causation, Your Honor, it simply isn't consistent with reality

16  and with the record.  Indeed, Your Honor, on plaintiff's case

17  product -- Suite 11I was so defective that -- and the market

18  all of a sudden realized this at the end of their third fiscal

19  quarter, February 28th and punished Oracle by failing to close

20  these deals.

21          You would expect, Your Honor, that if that was true,

22  in the following quarter there would be a complete dropoff of

122007 SJ Hearing.txt

23    sales of Suite 11I.  Instead, Your Honor, Oracle achieved

24    record applications license revenue in the fourth quarter of

25    '01.  Again, simply no evidence.

32

1           Now, Your Honor, we have put together a number of

2     slides on the falsity issue.  For reasons that I've just said,

3     this case, I think, starts and ends easily with lost causation

4     and no evidence, but I'm going to flip through these because

5     the Court had raised some questions about -- about this.

6           Your Honor, there really are only two categories of

7     claims of falsity that the plaintiffs raise.  One is with

8     respect to preintegration, the statement that Suite 11I was

9     preintegrated and didn't require post-systems integration.  And

10    the second is a statement that I don't think they are very

11    serious about, that Oracle announced that it had been

12    translated into 23 languages, and yet it wasn't.

13          Conversion, as the Court recognized, really sets the

14    legal standard on false statement.  And the plaintiffs must

15    demonstrate that a particular statement -- "when read in light

16    of all the information then available to the market."  So

17    context is important, Your Honor, as you noted in your opening

18    remarks.

19          Let's look at the statements that the plaintiffs

20    attack and let's look at the statements that the defendants

21    actually made.  The defendants state that unlike best of breed,

22    Suite 11I required no post-purchase systems integration.  This

23    is a quote, the plaintiffs quote from the earnings column,

24    Mr. Ellison -- they only make a partial quotation.  I think

25    we've shown everything that he said, but we'll take them at

33

1     their word on the partial quotation:  It says, "no systems
                              Page 27

122007 SJ Hearing.txt

2  integration is required."  Your Honor, there simply can't be

3  any real dispute that that statement was true.  No systems

4  integration post-purchase was required.

5         The Suite 11I was a sea change, it represented a sea

6  change in the way these products went to market.  Before Suite

7  11I, there were best of breed competitors within each of the

8  family groups, Your Honor.  The customer relationship

9  management is one family group, and the enterprise resource

10 planning is another.  And typically, what people would do,

11 because they wanted to try to get the best in each module

12 within those families was they would buy what they considered

13 to be the best one, and then they would pay Anderson Consulting

14 or IBM or somebody a lot of money to come in.

15        THE COURT:  You know, that -- I understand what you

16 are arguing, but it strikes me that I read their papers just a

17 little differently.

18        I thought they were also asserting that a

19 representation for Mr. Sanderson, where he indicated in the

20 January 2001 time frame that the Suite was preintegrated and

21 fully operable out of the box.  And they tied that to testimony

22 from some of the witnesses like DeCesare some of those

23 individuals who testified that that is not true, it did not

24 operate as integrated out of the box.

25        This is a bit of a different question.  The best of

                                                          34

1  breed necessity for consultation seems to me maybe -- you may

2  be right about that at the end of the day, but that seems to me

3  to be a different assertion than whether or not in a fixed way

4  this product was fully integrated and interoperable out of the

5  box, just plug it in and play.

6         MR. WALD:  Your Honor, I think that --
                     Page 28

122007 SJ Hearing.txt

7          THE COURT:  Is there any distinction to be made
8    contextually?
9          MR. WALD:  I think context is what is important,
10   Your Honor.
11              As the Court has seen, there were numerous problems,
12   as you would expect, with a revolutionary new product as it
13   went to market.  Many, many bugs that had to be fixed, many
14   operational difficulties.  What is remarkable is how wildly
15   successful it was in a very, very short period of time.
16              You know, can the plaintiffs point to something in
17   the discovery record where somebody complains that something
18   didn't work, you know, exactly as it was designed to work,
19   which, of course, is what the representation was?  Sure, we
20   don't deny that, Your Honor.  But what is interesting, Your
21   Honor, is that not even their expert has a serious question now
22   about the quality.
23              You know, they start off on this line that it really
24   wasn't integrated, it really wasn't operable out of the box
25   because there were a lot of problems with it, a lot of things
                                                                    35


1    that didn't work exactly right.  Bear in mind, Your Honor, that
2    the proof in the pudding is always in the eating.  I mean,
3    there were record application sales in the first quarter, in
4    the second quarter, in the third and in the fourth quarter.
5    Again, that is the step back.
6          THE COURT:  That may be the kind of bracketing that
7    gets argued to those eight people who sit over there.
8          MR. WALD:  It might be, except the lost causation is
9    an element of their claim.
10         THE COURT:  You have covered that fully.
11         MR. WALD:  All right.
                    Page 29

122007 SJ Hearing.txt

12          The plaintiffs have abandoned their quality claims

13   after their expert's admission.  In the RSAC, Your Honor, they

14   alleged that the product simply didn't work, and that selling

15   Suite 11I was just like selling a car without tires, they sold

16   it without wheels.

17          Their own expert, Dr. Jensen, admitted that based on

18   the record it wasn't possible to reach any conclusion about

19   Suite 11I's overall quality.  In August of 2007, the plaintiffs

20   have now submitted a brief saying they never alleged that 11I

21   was defective like a car without wheels, notwithstanding the

22   very language in the RSAC.

23          So, Your Honor, we submit --

24          And John, do you have the slide with the one quote

25   from -- we'll pull up the one quote from the gentleman that

                                                                 36

1    Judge Jenkins asked about, DeCesare, whatever it was.

2          I'll come back to that, Your Honor.

3          Your Honor, that piece of evidence standing alone

4    does not negate the overall truth of the statement that Suite

5    11I was engineered to work in an integrated fashion and that it

6    was operable out of the box.  That doesn't mean that there

7    weren't problems, Your Honor.  And Mr. Ellison said it's a new

8    product and it's going to have bugs.  I think it's now common

9    ground, Your Honor, that every piece of software has bugs.  And

10   certainly, every new piece of software has bugs.

11          Your Honor, plaintiff's quality evidence, primarily

12   customer complaints and requests for concessions, proves

13   nothing about Suite 11I's overall quality, let alone about the

14   truth about the system's integration statements.  They are

15   hearsay if submitted.  And there is a reason they are hearsay,

16   Your Honor, and that is they are not reliable to show that the

122007 SJ Hearing.txt

17  product is actually defective as opposed to, you know, the

18  customer doesn't know how to use it or there is a problem with

19  the customer's environment or the customer wants a concession.

20  And, again, the plaintiff's own expert has acknowledged much of

21  this.

22        Mr. Jensen said, question:

23        "Q.   Is the user's error report by

24            itself typically enough to know

25            whether there is, in fact, a defect in

                                                        37


1            the software?

2        "A.   No.   Not initially, no.

3            Your Honor, with respect to the question of

4   complaints, the few dozen they talk about, the few dozen

5   customers are out of about 3000 customers that were in the

6   process of implementing the 11I E-Business Suite, just to give

7   you a dimension.

8            Ingersoll-Rand, Your Honor, one of the customers

9   that complained and asked for a concession that the plaintiffs

10  spend time on, is very interesting, and we submit illustrative

11  of the phenomenon here.

12            The plaintiffs point to a single document, an E-mail

13  from October 12th, 2000, identifying an implementation issue:

14  "Larry, please see the E-mail below from our account team and

15  the client.   Ingersoll-Rand has been a big supporter of Oracle.

16  They are now seriously considering holding off on the database

17  this quarter because of the apps issues."   That is

18  October 12th.

19            What isn't submitted along with that is from

20  October 29th, 17 days later, another E-mail:   "Good words from

21  Mark Barrenechea," who is an Oracle employee, "we have

122007 SJ Hearing.txt

22  completely turned this customer around."  Seventeen days.

23           Moving forward, February 21st, 2001, which is during

24  the class period:  "At Apps World, Ingersoll-Rand announced

25  implementation planned for its complete rollout of Suite 11I."

                                                                    38


1   So not only is there no lost sales due to Suite 11I problems,

2   Ingersoll-Rand announces that it's going to do a complete

3   rollout of Suite 11I.

4            On May 31st, Oracle and Ingersoll-Rand enter into a

5   contract for $10 million worth of new software, Your Honor.

6   I'm going to show you that.  And on August 27th of 2001,

7   Ingersoll-Rand agrees to serve as a reference customer for

8   Suite 11I.  That's the true story here.  Sure, are there

9   problems in implementation?  Of course, there always are.  Do

10  customers -- are customers wildly enthusiastic about this

11  revolutionary new product?  Yes.  And the numbers demonstrate

12  that.

13           You mentioned concessions, Your Honor, and the

14  plaintiff spent a lot of time on concessions.  Concessions are

15  marketing tools, they are negotiating tools.  There are lots of

16  reasons why concessions are given.  Ingersoll-Rand, again,

17  exemplifies the situation with why you might give a customer a

18  concession.

19           The plaintiffs point to this E-mail from Ms. Catz,

20  May 31, 2000, saying that Oracle will forgive 2.7 million in

21  consulting fee invoices under several contracts related to the

22  11I project.  This is Ingersoll-Rand.  But in the fourth

23  paragraph of the same document, Your Honor, it's part of a

24  $10 million new contract.  And this is what I had up on the

25  board previously.

                                                                    39

                          Page 32

122007 SJ Hearing.txt

1          So that is the context in which concessions get

2     made.   Certainly not sufficient evidence to show that there was

3     a material problem with Suite 11I such that it wasn't selling,

4     such that it was a car without wheels, and such that there was

5     a serious dropoff in orders that the defendants knew but hid,

6     as the Ninth Circuit was promised.

7          Your Honor, I'm not going to spend a lot of time on

8     Mr. Sanderson's statement about the different languages.   It's

9     the only actionable statement.   And there simply is no question

10    that it was true.   We have submitted declaration of

11    Greg Seiden.   Suite 11I clearly was translated into at least

12    twenty-three languages as of February 13th, 2001.   And, of

13    course, the plaintiffs offer no evidence that there was any

14    lost sales as the result of that.

15         So, Your Honor, that is our position on the

16    products.   Let me just go to the DeCesare.

17         THE COURT:   The reference I made, PXH 234 to 239 --

18         MR. WALD:   The -- yes, Your Honor, I think it's

19    this:   They cite the testimony of Michael DeCesare, a former

20    sales AVP, for the proposition that Suite 11I did not work out

21    of the box in part because it was also -- because it was not

22    engineered to work together.

23         As Mr. DeCesare later admitted, Your Honor, further

24    down in the questioning, what he was describing was missing

25    functionality, in other words, bugs in the new CRM module.

                                                              40


1     That is what he was talking about.

2          He also made clear that he felt 11I was -- that when

3     he said he felt 11I was no more integrated than any prior

4     release, he was not saying that 11I lacked preintegration

                            Page 33

122007 SJ Hearing.txt

5   compared to best of breed or that it wasn't designed to work
6   together with all of its modules working together, what he was
7   suggesting was that if the development groups had worked more
8   effectively together, there would have been fewer bugs and
9   holes, the kind of thing that is typical in a development
10  environment.  That would be his testimony at pages 234, line
11  14, to 235, line 7; 236, line 1 to 14; 265, lines 3 to 16; 272,
12  line 20, to 273, 16.
13          Importantly, Your Honor, he also admitted that his
14  statements were pure speculation based on customer hearsay.
15  That is the sum and substance of the evidence on that.  The
16  last part of that, Your Honor, is page 270, line 21, to page
17  271, line 7.  Okay, thank you.
18          Your Honor, I'm going to move, if I may, to the
19  accounting claims.
20          As the Court is aware, the first amended complaint
21  lacked any accounting claim.  And it was one of the things that
22  this Court pointed to in dismissing the first amended
23  complaint, which was the anomaly that if Suite 11I had so many
24  problems, why was it so wildly successful in the first two
25  quarters?
                                                              41

1           So the plaintiffs went back to the drawing board,
2   and they came up with a new allegation, and the new claim was
3   well, Your Honor, we take that point, but in point of fact, the
4   second quarter was misstated.  The second quarter was put
5   together by the defendants fraudulently and contained a bunch
6   of false revenue, specifically, $228 million in false revenue.
7   And so the appearance of success was just that, say the
8   plaintiffs, an appearance.  And it wasn't the reality.
9           Let's take a look at what discovery has demonstrated

122007 SJ Hearing.txt

10    in the case.   Their $228 million debit memo claim has

11    absolutely evaporated.   Their newly proffered bad debt transfer

12    claims fails at every level, the merits, materiality and

13    failure of proof.   Same for the HP allegation.   And again, they

14    have serious lost causation issues.

15              On the debit memo claim, the undisputed evidence

16    establishes that the debit memos had no financial statement

17    impact, exactly as defendants have been saying since this case

18    was filed.   And, in fact, the plaintiffs have now abandoned

19    their debit memo allegations, and a very important basis for

20    the Ninth Circuit's reversal has fallen away.   As plaintiffs

21    now concede, the debit memos had zero financial statement

22    impact.

23              What the debit memos did, Your Honor, was to remove,

24    literally remove, physically remove a check mark that was a

25    remnant flag that had been left in the system, that is all it

                                                              42

1     did.  It had no other function other than to remove that flag.

2     The funds that were in those accounts that were represented by

3     the flags had already been dealt with.  And the whole point was

4     to remove the flag so that collectors coming in later on

5     wouldn't think there was an issue with it.  The total of the

6     November 2000 debit memos was $692 million, Your Honor.  228

7     was just a part of that.

8               On November 17th, 2000, Oracle had $10.1 million in

9     revenue.  If there had been a $228 million or a $692 million

10    fraud, as the plaintiffs claim, they would have recognized more

11    than $10 million in revenue.  There just was never anything to

12    this claim, Your Honor, and we spent a lot of time on it.

13              In their motion for partial summary judgment, they

14    no longer argue that the debit memos created revenue.  Indeed,

                            Page 35

122007 SJ Hearing.txt

15  their expert now says it's not an issue in this case.   That is

16  Mr. Regan.   I don't think it's relevant.   Now it's a $20

17  million bad debt claim that it has morphed into.

18          The Ninth Circuit, Your Honor, in its opinion, as

19  the Court knows, says, "Very importantly, there are the

20  improper revenue accounting records.   Plaintiffs allege that

21  Oracle credited the amount of the debit memos as revenue,

22  thereby artificially inflating the amount of revenue reported

23  on December 14 at the end of the second quarter."   That is

24  certainly relevant to the Scienter issues and what the Court

25  thought they were dealing with, because that is what they had

43

1   been told.

2           Interestingly, the confidential witnesses that the

3   plaintiffs rely upon, Confidential Witness 49 is awaiting trial

4   on multiple felony accounts for embezzling over $1 million from

5   Oracle.

6           THE COURT:   This is pretty verbatim from the brief.

7           MR. WALD:   Yes.

8           Confidential Witness 46 conceded that she never

9   worked for Oracle and had no idea.

10          So let's go to the two transactions that this has

11  now morphed into.   With respect to the bad debt transfer claim,

12  there was never a revelation to the market.   I mean, these

13  financial statements have never been restated.   As far as the

14  market knows, these are correct.   And they are correct.   The

15  only person who has ever said they aren't correct is Mr. Regan,

16  the expert for the other side.

17          The plaintiffs have a very, very contrived, Your

18  Honor, is the only word that I can use, causation theory with

19  respect to the second quarter.   What they now claim is that the

122007 SJ Hearing.txt

20   $20 million, whether it's from HP or from the bad debt

21   transfers, allowed Oracle to report 11 cents as opposed to 10

22   cents to the street, and that in turn enabled then to give

23   guidance of 12 cents as though they needed to report 11 cents

24   in order to give guidance of 12 cents.

25            So the plaintiffs say when the earnings misoccurred

                                                                    44

1    in the third quarter, that was an indirect disclosure of the

2    overstatement of the second quarter.  That is the current sum

3    and substance of their accounting causation theory.

4             There is a lot of problems with this, Your Honor.

5    The first problem is on the merits, that in order to move from

6    11 cents down to 10 cents, the plaintiffs would need to prove,

7    and it's their burden, that at least $9.21 million of the bad

8    debt transfers were wrong and should not have been made.  This

9    they have completely failed to do.  Anything less than that

10   would still put the EPS at more than 10.50 cents, or rounded up

11   to 11.

12            Their expert conducted no analysis.  Indeed, he said

13   it would be a useless exercise.  They have no affirmative

14   evidence about the bad debt transfers, Your Honor.  The only

15   person that has actually looked at the 10.6 million of bad debt

16   transfers that are in the discovery record is our expert.

17            THE COURT:  Would a difference of one cent, when

18   viewed in the context of a miss on March 1st, raise a factual

19   issues with respect to lost causation?

20            MR. WALD:  I just don't see how you even get there,

21   Your Honor.  It's two different quarters.  You are talking now

22   about the second quarter versus the third quarter.

23            They know perfectly well that the second quarter has

24   never been restated.  The market has never been told that there

                                Page 37

122007 SJ Hearing.txt

25   was a problem with the second quarter.   Their lost causation

45

1   theory is that by bumping it up artificially to 11 cents that

2   allowed the plaintiffs -- the defendants to make this guidance

3   of 12 cents, which makes no sense, Your Honor, for all the

4   reasons you have pointed out, including the fact that the

5   internal guidance suggested that the projection was really 13

6   cents.

7              And as I'm going to show you in a minute, the

8   analysts had already projected an estimate of 12 cents before

9   the announcement of the second quarter.   So there simply is no

10  basis for the lost causation claim, but more importantly, no

11  basis for the factual claim for the predicate that there was a

12  problem with the bad debt transfer because they haven't proven

13  that.   These financial statements, Your Honor, were reviewed by

14  two accounting firms and have never been restated.

15             To sum up, the plaintiffs' expert failed to analyze

16  the second quarter bad debt transfers.   Defendant's expert

17  determined that at least some of those transfers were proper.

18  He couldn't make a determination about the other ones.   Two

19  accounting firms have reviewed Oracle's 2Q '01 financial

20  statements, and they have never been restated.   There simply is

21  no evidence of a false statement, let alone causation.

22             Let's see, now, how the plaintiff's argument has

23  morphed again.   In their opposition to summary judgment, they

24  say, "After plaintiffs filed their accounting allegations,

25  Oracle held a flurry of secret meetings and initiated an

46

1   unapplied cash cleanup project whereby accounting data was

2   altered, millions of dollars were suspiciously reversed and

3   refunded, and millions more were escheated to the state."   So

Page 38

122007 SJ Hearing.txt

4    they used the phrase "millions," Your Honor.  And I think the

5    question before the Court is where is the evidence, the proof

6    of any of that?  Putting materiality and lost causation aside,

7    where is the evidence?  It isn't there, Your Honor.

8           What they offer is Exhibit 204.  We have highlighted

9    the line items which even relate to the second quarter of 2001.

10   The unapplied cash project, Your Honor, was a project that

11   looked back over four years.  It involved many transactions.

12   The question is which of those related to the second quarter of

13   '01?

14          On the plaintiff's submission, Your Honor, there are

15   only 12 refunds purportedly linked to a second quarter bad debt

16   transfer, and they total $1.3 million.

17          The pink line represents a grouping that the

18   plaintiffs make about escheatments to the state.  They say that

19   if it was escheated to the state or refunded to the customer,

20   that proves that the bad debt transfers were improper, Your

21   Honor.  Well, they don't make a single showing of any

22   escheatment linked to the second quarter.

23          Let's take a look at what Mr. Regan does.  He points

24   to three transactions.  One is a refunded payment that was

25   never transferred to the bad debt reserve.  That's HFC.  The

                                                                47


1    second was a refunded payment was transferred to the bad debt

2    reserve, but in the first quarter.  The third is K-Force, and

3    that is a $258,000 refund.  And that was subsequently refunded

4    through the bad debt transfer.  It's part of the 1.3 million.

5           THE COURT:  What about Mr. Hatada's testimony on

6    this issue?

7           MR. WALD:  I'm glad you asked.  Let me come right to

8    that, if I may, because we have that mapped out for you.

                              Page 39

122007 SJ Hearing.txt

9          The amount of the refunds they identify relating to
10    the bad debt transfer is 1.3 million, far less than the
11    9.21 million that would be required to move the EPS from 11 to
12    10 cents.
13          The auditors, Your Honor, were made aware of the
14    unapplied cash report project and didn't require a restatement.
15    It's pretty compelling.
16          So, what do they now have?  They say that
17    Mr. Hatada's testimony shows that Oracle altered electronic
18    notes during the 2002 unapplied cash project.  That is what
19    they say; let's look, Your Honor, at the evidence.
20          Mr. Hatada's deposition, page 488, lines 19 through
21    25, shows that he testified that the practice of updating prior
22    notes during the 2002 unapplied cash project was performed in a
23    manner that preserved historical records, actually preserved
24    them.
25          And this is slide 30, Your Honor.  This is very

                                                              48


1     interesting because it actually walks through Mr. Hatada's
2     testimony.  They say -- he is the lynchpin on their spoliation
3     claim.  Let's look and see what he actually said, Your Honor:
4          "Q.    Did you ever fully delete a prior
5              note?
6          "A.    No, I never deleted any notes."
7            That is from page 488, lines 13 to 18.
8          "Q.    Did you witness anyone else in
9              the collections department changing
10             the notes?
11         "A.    No."
12           Page 490, line 17 to 22.
13         "Q.    You also didn't personally change
                          Page 40

122007 SJ Hearing.txt

```
14              any notes, correct?
15              "A.    Correct.  When I put notes in, it
16              would be in front of the note that was
17              made prior."
18               Page 490, lines 9 to 15.
19              "Q.   Are you aware of any specific
20              transaction in which the notes were
21              fully deleted?
22              "A.    No."
23               Page 489, lines 10 to 14.
24              "Q.   Are you aware of any specific
25              instances where the other collections
                                                          49


1               analysts or collection managers fully
2               deleted a notes column?
3               "A.    No, I don't have any instances of
4               that."
5                Page 489, line 16 to 21.
6               "Q.    And finally, can you identify any
7               customers who had notes columns that
8               were fully deleted as part of this
9               unapplied cash project?
10              "A.    No.  I wouldn't be able to
11              remember any items, notes from any
12              specific clients."
13               Page 490, lines 1 through 7.
14               That is, Your Honor, their spoliation case, and that
15      is the evidence that pertains to those claims.
16               On materiality, as the Court knows in Basic versus
17      Levinson, there has to be a substantial likelihood that the
18      disclosure would have been viewed by the reasonable investor as
```

Page 41

122007 SJ Hearing.txt

19   having significantly altered the total mix of information.

20          As I think we have demonstrated, there is a complete

21   failure of proof that the bad debt transfers in the second

22   quarter actually caused the EPS to go to 11 cents; in other

23   words, they haven't come close to showing enough improper bad

24   debt transfers to do that.

25          Let's take them on their claim, let's assume, which

                                                                    50


1    you can't do on summary judgment, let's assume all 20 million

2    were incorrect, what effect would that have had?  Your Honor,

3    the market was told Oracle's net income, and the market knew

4    Oracle's total diluted shares.   The market knew not what the

5    rounded EPS number was, the market knew exactly what the EPS

6    number was, in this case, 10.60 cents.

7           If all 20 million of the bad debt transfers,

8    notwithstanding the fact that the auditors looked at it and

9    said it was fine, and the fact that there is a complete failure

10   of proof, if all 20 million is taken out, it reduces it to

11   10.38 cents, something the market would have known

12   specifically.

13          I should note, Your Honor, that that still would

14   have had Oracle meeting the analyst's expectations because the

15   consensus estimate for the second quarter was 10 cents.   So

16   it's not like it would have been a miss.

17          Now, SEC v. Todd is a case that we have cited in our

18   briefs, Your Honor, and it's an important case which basically

19   says that one penny is not material as a matter of law, and

20   that to hold that it was material as a matter of law would open

21   a materiality minefield, I believe is the phrase that the Court

22   uses.

23          Here we are not even talking about a penny, we are

                                 Page 42

122007 SJ Hearing.txt

24    talking about a supposition, a hypothetical that if all

25    20 million was bad, for which there is no proof, that it would

51

1    be .22 cents.  And, Your Honor we submit that that simply in

2    these circumstances cannot be material as a matter of law.

3                Let's move to Scienter on this.

4                The plaintiffs claim that the defendants knew about

5    the improper bad debt transfers in the second quarter and

6    subsequently made a release from a reserve account that enabled

7    Oracle to beat the street, that is their theory.  So put aside

8    the fact that there is no lost causation, the fact that there

9    is no false statement because they haven't proven it, the

10   theory about Scienter is that the defendants knew about these

11   improper transfers and used it as part of a scheme to beat the

12   street.  Obviously, this is the recklessness standard from

13   Howard versus Everex, which I know the Court is familiar with.

14               It's unrebutted that the defendants were completely

15   unaware of bad debt transfers.  These declarations are in the

16   record and unrebutted.  This was going on at a very low level,

17   Your Honor, of the collections group at Oracle and in a

18   miniscule amount, not anything that the three defendants knew

19   anything about.

20               The plaintiffs tacitly concede --

21               THE COURT:  Do they -- for Scienter purposes there

22   is some discussion in the brief that to meet the quarter versus

23   they needed to deal with Hewlett-Packard.  And that was pretty

24   well-known throughout the company.

25               Now, I saw the declarations from the executives who

52

1    say that they didn't know, but does the plaintiff have to

Page 43

122007 SJ Hearing.txt

2   establish as well that the executives understood or had

3   knowledge of, control -- that the deal with Hewlett-Packard was

4   essentially a swap of inventory, that they really didn't or

5   couldn't book that revenue because there was at least some

6   hedging on how many of those licenses would actually be

7   purchased going forward?

8           MR. WALD:  Well, Your Honor, I'm happy to talk about

9   Hewlett-Packard now, it's in the slides.

10          The answer is that it wasn't a swap, that the four

11  elements of 97.2 were met, that it was reviewed and approved by

12  the Internal Revenue Recognition Group, by the Audit Committee

13  of the board and by the outside auditors.  So under those

14  circumstances, Your Honor, it's very difficult to see how there

15  is a record that these defendants had Scienter with respect to

16  that transaction when everybody that these defendants would

17  talk to and who are in a position to evaluate the requisites of

18  97.2 are saying this is a good transaction, it's good revenue.

19          And bear in mind, Your Honor, it's never been

20  restated.  This isn't a situation where things later come to

21  light, and the plaintiffs say, ah-hah, the stock drop reflected

22  this disclosure of a problem.  These second quarter financial

23  statements have never been restated.  This is an attempt by the

24  plaintiffs to salvage these accounting allegations when their

25  debit memo blew up and to do it in a way that tries to affect

                                                              53


1   the third quarter, Your Honor, not the second quarter.

2           So I think the answer is yes, they do need evidence.

3           THE COURT:  So they -- for instance, here in the

4   brief I saw this, that they set forth other reasons.  The

5   Hewlett-Packard deal was improper because the deal wasn't

6   signed and executed until after midnight on the 30th, the last

                              Page 44

122007 SJ Hearing.txt

  7    day; what about assertions like that?

  8           MR. WALD:  Let me go right to Hewlett-Packard, Your

  9    Honor.  They have never made the allegation, of course.  This

 10    is now something which they have said in opposition to summary

 11    judgment.  But that's fine, we'll deal with it on the merits.

 12           Judge Enfante, of course, recognized that it wasn't

 13    part of the case.  Here's the definition of a swap:

 14    "Reciprocal transactions are considered swap transactions if

 15    they involve one company essentially paying for its revenue and

 16    not receiving any economic benefit in return."  So the question

 17    is what did Oracle receive, Your Honor, that's the issue under

 18    the accounting definition of a swap.  Let's look at the

 19    evidence.

 20           The evidence is Oracle needed the servers at the

 21    time for its development and production departments; the Rocha

 22    deposition, page 206, lines 10 to 23.  "The agreement allowed

 23    Oracle to build upon an important and profitable strategic

 24    business alliance"; the DeCesare deposition, page 75, lines 9

 25    through 17.  "The purchase of the HP servers reduced Oracle's

                                                                    54


  1    dependence upon the Sun servers"; Ms. Catz's deposition, page

  2    19, lines 12 through 23.  So the -- all of the evidence, Your

  3    Honor, and all the people who looked at this said, of course,

  4    this isn't a swap, this is a sale.

  5           So when -- now, the plaintiffs didn't have any --

  6           THE COURT:  Now, you don't necessarily need to rely

  7    on your arguments that there was never a restatement of the

  8    revenue, but they attack that and they argue, just like I hear

  9    in lots of these cases, that the Audit Committee wasn't

 10    provided with information that would allow them to see through

 11    and make a different determination, at least raise an inference

                          Page 45

122007 SJ Hearing.txt

12 that, in fact, there was something amiss in the accounting

13 treatment with respect to this HP deal that raises an issue of

14 fact.

15          MR. WALD:  Your Honor, what I say to that is talk is

16 cheap.  Where is the evidence?  Where is the evidence?  This is

17 summary judgment.  And what is so interesting about this, Your

18 Honor, is that this is such a Johnny-come-lately theory.  The

19 plaintiffs never explored any discovery on this.  As Judge

20 Enfante said, it was never part of the case.

21          Their expert went ahead and rendered an opinion

22 about this, Your Honor, without looking at the relevant

23 documents, seriously, and I'm going to come to that, I'm going

24 to show you, he didn't look at the relevant documents and he

25 admitted that.  And, Your Honor, he admitted that he never

55

1 applied 97.2 himself.

2          Let's go to that.

3          There are four elements of 97.2:  Persuasive

4 evidence of an arrangement, delivery, the fees are fixed or

5 determinable and collectibility is probable.  The evidence

6 demonstrates that the software license agreement was executed

7 on November 30, 2000, just as everybody said that it was, that

8 that software was shipped on November 30, 2000, that the fees

9 were set forth in a written finance agreement, and that HP was

10 obviously creditworthy, Your Honor.  It's not a surprise that

11 everybody who looked at this concluded that the requisites of

12 97.2 had been met, and that it was good revenue.

13          Let's take a look at the first one:  Persuasive

14 evidence of an arrangement existed under SOP 97.2.  Here is a

15 signed contract, 11/30; it was memorialized in a written

16 contract executed on November 30th, 2000.  The plaintiffs point

Page 46

122007 SJ Hearing.txt

17     to a fax header that shows that it was faxed after midnight,

18     and they claim that that is evidence that it was signed after

19     midnight; well, Your Honor, we have another document where this

20     signature saying, 11/30 is faxed at 11:53 at night.

21              Do we have that?  Can we queue that up?

22              The fact that it's faxed at one time after midnight

23     doesn't mean that it isn't executed before midnight.  And, of

24     course, this shows that it was executed before midnight, just

25     as the person testified.  That is the sum and substance.

                                                                  56


1               Can we go back now?

2               All right, so, "persuasive evidence of an

3      arrangement"; Your Honor, clearly, no false statement.

4      Delivery had occurred.

5               There you see the Hewlett-Packard delivery.  The

6      internal shipping records demonstrate that the software was

7      delivered to Hewlett-Packard at 8:43 p.m. on November 30th.

8      There is the proof.

9               "The fees were fixed or determinable under SOP97.2";

10     not even the plaintiffs make a serious argument about this one,

11     Your Honor.

12              "Collectibility was reasonably assured"; again, no

13     one makes a serious argument about HP being a creditworthy

14     customer.

15              So, in sum, Your Honor, the Revenue Recognition

16     Group looked at this, confirmed that the revenue was good.  The

17     auditors looked at it.  Mr. Matuszak testified.  Management

18     concluded that it was appropriate to recognize revenue under

19     that license arrangement.  And Anderson, after reviewing all

20     the evidence that was provided to us, concurred with

21     management's agreement.

                          Page 47

122007 SJ Hearing.txt
22            The Audit Committee also agreed that it was
23   appropriate.  It has never been restated, the market has never
24   been told that it's incorrect.  And there is no evidence, Your
25   Honor, that it was incorrect.  The only evidence is this
                                                              57


1    opinion from Mr. Regan.  He has never personally applied the
2    relevant accounting standards, Your Honor.
3            "Q.    You personally have never had to
4                 be the person in the first instance to
5                 determine whether or not it was proper
6                 to recognize revenue on a software
7                 license transaction?
8            "A.    Not on a 97.2."
9             He failed to review the relevant documents:
10           "Q.    Is it a fair statement that you
11                reached your opinion before you even
12                looked at the revenue recognition
13                checklist?
14           "A.    Yes."
15            The revenue recognition checklist, Your Honor, is
16   where all of the evidence that I just went through is on.
17            The individual defendants clearly believed that the
18   HP transaction was proper.  And how do you get Scienter out of
19   a record where the evidence is this overwhelming and where
20   everyone whose job it is to look at the evidence and to opine
21   on revenue recognition tells these individuals that the revenue
22   was good?
23            Let's switch quickly on to lost causation with
24   respect to the accounting claim, Your Honor.
25                Stay, if you would.  It's slide 61.  There we go.
                                                              58

                              Page 48

122007 SJ Hearing.txt

1    The March 1 announcement, Your Honor, says nothing

2  about the second quarter results, debit memos, bad debt

3  transfers or HP transaction, so there is no direct disclosure

4  of the truth.

5    This is what the plaintiffs lost causation argument

6  now looks like, it's found in the motion for partial summary

7  judgment, page 25.  "Henley specifically premised the third

8  quarter forecast on the second quarter results of 11 cents per

9  share."  It's kind of the old saw, but for the nail the battle

10  was lost.

11    The -- the notion here is that the second quarter

12  was wrong, it was purposefully wrong.  It allowed the

13  defendants to get to 11 cents.  And because they could get to

14  11 cents in the second quarter, but only because they could get

15  to 11 cents in the second quarter, they project 12 cents in the

16  third quarter.  And that is part of this great scheme down the

17  line so they could sell stock.

18    Now, of course, what Mr. Henley actually said, Your

19  Honor, is that historically we were either flat or up a penny

20  or so in the third quarter, so the results that came up from

21  the bottom seemed to make sense.  There is no credibility

22  debate, Your Honor.  You have seen all the documents.  You have

23  seen the amount of work that Jennifer Minton and the financial

24  analysis and planning group go through with the business units

25  to come up with a forecast.  This is clearly a bottoms-up

                                                          59


1  forecast.

2    What Mr. Henley is saying that the results from the

3  second quarter at an overall reasonable level seem to support

4  the guidance of 12 cents, and he was comfortable with that.  He

5  didn't have second quarter results of 11 cents in order to give

122007 SJ Hearing.txt

6    12 cents guidance in the third quarter.

7              THE COURT:  It's out there.  It's grist for the

8    mill, right?

9              MR. WALD:  What is out there?

10             THE COURT:  I think, more fundamentally, it's a

11   question of whether the Court can draw an inference from the

12   miss in March as to how that, if at all, represents what

13   transpired in the second quarter.

14             MR. WALD:  Exactly.

15             THE COURT:  In every case I've seen, at least there

16   is something that points in that direction, not just generally

17   that that is true.

18             MR. WALD:  You would think that if it were true

19   there would have been an analyst, somebody in the marketplace

20   that would have said, oh, my goodness, this ties in, and here

21   is this theory.  But that's right, there is none.

22             And all of the cases you have talked about,

23   including Impacts, Gilead, including Dau, and including

24   FlowServe require that kind of causal connection.

25             If you take a look at the background here, Your

                                                              60

1    Honor, Oracle's internal guidance predicted EPS of 13 cents for

2    the third quarter.  It was Mr. Henley who reduced it to 12

3    cents to be conservative.  So, in addition, the analysts'

4    consensus estimate for the third quarter that was published on

5    November 14th was already 12 cents.  That is what the analysts

6    were expecting.  That was well before Oracle announced its

7    second quarter results.

8              So, Your Honor, in sum, there is no basis for the

9    accounting claim whatsoever.  The claim has morphed in ways

10   that are interesting and completely implausible.  The debit

                                 Page 50

122007 SJ Hearing.txt

11  memo claim has evaporated.   There is no substance to either the

12  bad debt transfer claim or the HP claim in the record, nothing

13  that creates a genuine issue of material fact.   The financial

14  statements have been reviewed, even reviewed in view of these

15  allegations never restated, and most importantly, there is

16  simply no lost causation theory.

17          Let me get, finally, then, to the third leg of the

18  plaintiff's case, which is the forecasting case.

19          Here, Your Honor --

20                  (Court and reporter confer.)

21          THE COURT:   Five minutes.

22          MR. WALD:   Okay.

23          THE COURT:   On the forecasting case, as the Court

24  has correctly instructed us, there really are two separate sets

25  of issues, one of the projections, which are clearly

                                                              61

1   forward-looking statements, and the second are statements of

2   present fact about the economy.   We treat the stock sales

3   separately, Your Honor.   And I certainly will address the Ninth

4   Circuit issue.   And there are lost causation problems with the

5   theory here, too, but first let me get to the falsity and

6   Scienter issues on this.

7           On the projection issue, Your Honor, as the Court

8   said in Adobe, the standard is, for falsity now, put Scienter

9   aside, which, as the Court has already instructed us is a safe

10  harbor issue, for falsity there has to be no reasonable basis

11  for the projection, or the speaker has to have been aware of

12  undisclosed facts tending seriously to undermine the accuracy

13  of that projection.

14          This is a very difficult standard to meet for the

15  plaintiffs, and rightly so.   There is a good public policy

122007 SJ Hearing.txt

16   reason why the standard is as it is.  That and the safe harbor

17   want to encourage public companies to speak to the public about

18   what they are seeing in their business, and they want people to

19   be able to venture out into the public markets and to make

20   statements that are reasonably supported without chilling and

21   without fear of liability.  That is why this standard is the

22   way that it is.

23            Oracle's forecast, Your Honor, clearly had a

24   reasonable basis, and we submit there is no genuine issue of

25   fact about that.  The third quarter projections were supported

                                                                    62

1    by the forecasts.  The quarterly results were subject to a

2    hockey stick effect where virtually 50 percent or more of the

3    sales came in the last week.  And as we'll see, that is where

4    the miss occurred.

5            Oracle's EPS projections from the last week of the

6    quarter historically understated the actual revenues that the

7    company achieved.  So the fact that there was a projected EPS

8    of 11 cents in the last week certainly didn't demonstrate that

9    they weren't going to make 12 cents.

10           I'm going to show you a chart where in the previous

11   seven quarters coming into the last week, the -- Ms. Minton's

12   projection showed that they were not going to meet the

13   guidance, and in every one of these quarters in the last week

14   they met or exceeded guidance.

15           All right, no false statement:  The guidance

16   supported by forecast, here is the December 11 upside report.

17   You've seen this from the briefs, this is the one three days

18   before the earnings call.  Clearly, it not only supports the

19   guidance that was given, it would have supported more robust

20   guidance.  That was clearly a bias, as you said, to be

Page 52

122007 SJ Hearing.txt

21  conservative.

22          THE COURT:  Fundamentally, is there some question on

23  this record, is it appropriate to draw some inferences, just

24  sort of tracking through, that the guidance and the statements

25  that are made thereafter, from the distinction between the

                                                                    63


1   applications and technology?

2           MR. WALD:  The answer is no, Your Honor, there isn't

3   a basis for doing it mathematically.  It's not the way the

4   company looked at it.  And, Your Honor, in the second quarter

5   where they wildly exceeded, where they exceeded guidance, the

6   exact same mix of applications to technology existed at the

7   beginning and the end of the quarter.  So their historical

8   experience, Your Honor, was that the product mix that we find

9   in the third quarter was the same as the product mix in the

10  second quarter.  There was no reason on that basis to believe

11  that they would not make it.

12          As we indicated in our brief in one of those

13  footnotes, if you actually do the math that Dr. Goedde urges us

14  to do, the range that comes out from applying different

15  conversion rates to the product mix supports the guidance.  It

16  still works as a matter of mathematics.  The range, I think,

17  goes up to 1.6 billion, I think was the number.  And the

18  guidance implied 1.3, something like that.  So no matter how

19  you look at it, there is no material disputed issue of fact.

20          The quarterly results were subject to the hockey

21  stick effect that the Court knows very well.  Week 14 is the

22  last week, and look at the percentage of the revenue received

23  in that last week.  It is the critical week in this business,

24  Your Honor.

25          This is the one I was telling you about previously:

122007 SJ Hearing.txt

64

1    The white circles represent the potential EPS at last week of
2    the quarter.   That is Ms. Minton's best guess coming into that
3    last week of the quarter with that hockey stick.   In all of
4    these quarters, that was her best guess of how they were going
5    to do.   The green represents what actually happened, and you
6    can see that they met -- they met it in first quarter of '00.
7    They exceeded it, sometimes by a significant amount, in every
8    other quarter until the third quarter of '01.   And we submit
9    this is extraordinarily compelling.   And it is explained by
10   something; it's not fraud, it's the recession that hit the
11   country at that time.
12            Nor were the defendants aware of facts that would
13   seriously undermine the accuracy of the forecast.   What
14   happened here is conclusively demonstrated.   Big deals fell out
15   unexpectedly at the end of the quarter.
16            Oracle executives were surprised by the miss.   Your
17   Honor, if this was a fraud, you would expect, with all of the
18   discovery that has been done in this case, that there would
19   have been a smoking gun E-mail, that there would have been
20   something that you would have seen where people are saying,
21   gosh, we are not going to make it.   All of the evidence, Your
22   Honor, is to the contrary.
23            This --
24            THE COURT:   I've seen a few of these cases in the
25   last few years, but I've never seen that smoking gun.

65

1            MR. WALD:   Were there spoliation claims in all of
2    them, Your Honor?
3                     (Laughter.)
                     Page 54

122007 SJ Hearing.txt

4          MR. WALD:   Some of the deals in the pipeline were

5   worth more than 500,000, the big deals --

6          THE COURT:  Right.

7          MR. WALD:   This is the last week.   Take a look at

8   what happens from 2/26 to 2/28.   The pipeline at 2/26, Your

9   Honor, the 621 million, it's a hundred million dollars larger

10  than the pipeline in the previous third quarter, in the

11  previous quarter.   They had already closed three times the

12  number of big deals on February 26th than they had closed

13  previously.   The number of the deals and the volume just

14  dropped dramatically.   And what happened was that people that

15  were making buying decisions got very skittish about what was

16  happening in the economy.

17         THE COURT:  Now, can that be tethered to the

18  concerns in the economy that existed at the beginning of the

19  quarter?

20         MR. WALD:   I think what you'll find is that the --

21  what Oracle was saying was the economy seemed to be slowing.

22  They -- Oracle wasn't seeing it in their business.   And I think

23  that is borne out by these projections.

24         THE COURT:  So we have it both ways in some

25  respects, right?   They are not seeing -- they are segmenting

                                                              66


1   their product sector and saying we are not affected, but when

2   you get to the end of the quarter, folks are being stingy with

3   their pocketbooks for some reason.

4          MR. WALD:   That's right.   I think what you will see,

5   when we get to it, is that the National Bureau of Economists,

6   it took them six months to figure it out, but what they figured

7   out is that March represented the last peak of economic

8   activity, and things took a nosedive after that.   And that is

                            Page 55

122007 SJ Hearing.txt

9    why all of Oracle's competitors who announced after Oracle in

10   March and in April experienced the same thing.

11        When you look at what they said about what their

12   experience was, they were saying the same thing, it was

13   unexpected, it hit us like a ton of bricks.  Our customers just

14   decided not to buy.  At the end they didn't convert.

15        This Nick Classick E-mail, Your Honor, is just

16   interesting because it reflects a state of mind.  It reflects

17   this extraordinary surprise and bewilderment and disappointment

18   about the fact that he didn't make his forecast, and that it

19   fell out of bed right at the end, and that he didn't come

20   through.  He is one of the guys reporting from the field.

21        Now, plaintiffs -- is this a good time to take a

22   break?

23        THE COURT:  Yeah, I think we should give her a

24   break.  Let's just take about ten minutes.  So we'll be back at

25   a quarter to.

                                                              67

1         We are probably going to have to talk about it,

2    because you have probably got another 30 minutes on -- this, to

3    me, is one of the more meatier discussions that we need to have

4    this morning.  And that is going to take us into the lunch

5    hour.  And we'll have to make sure that some of the issues that

6    you raise, that the plaintiff gets an ample opportunity.  So

7    let me think about how we want to divvy up this time going

8    forward and whether or not we argue right through or take maybe

9    a half hour and then come back, okay?

10        MR. WALD:  Thank you, Your Honor.

11        THE COURT:  Okay.

12             (Recess taken at 11:35 a.m.)

13             (Proceedings resumed at 11:50 a.m.)

                        Page 56

122007 SJ Hearing.txt

14          MR. WALD:  Your Honor, before the break, I had run

15  through the evidence on the reasonable basis, and what I was

16  now about to turn to was the plaintiff's arguments as to why

17  the projections were false.  And, Your Honor, as we believe our

18  submission demonstrates, the plaintiffs -- it's difficult for

19  the plaintiffs to argue that projections themselves -- that the

20  guidance wasn't based on reasonable projections because the

21  evidence is unrebutted and, frankly, consistent with what the

22  internal projection showed.

23          So the plaintiff's attack, then, has shifted to an

24  attack on the methodology by which the forecast was put

25  together in the first instance.  And they apparently hope to

                                                              68


1  show through that it was so flawed and so fundamentally

2  incorrect that it did not provide a reasonable basis for the

3  guidance.  So let's look at the criticisms they advance, there

4  are four of them.

5          Can you put up 13?

6          The first is that the potential projection was

7  created mechanically.  The second is that there was a major

8  macroeconomic change that Ms. Minton failed to take into

9  account.  The third was that there was a directive to increase

10  a risk in the forecast.  And the fourth was a change in the

11  product mix.  Let's take a look at the first one.

12          Your Honor, as a matter of simple math, it's pretty

13  clear that the potential projection was not created

14  mechanically.  The yellow line reflects the third quarter 2001

15  potential projection.  The blue line reflects the third quarter

16  2000 actual conversion ratio.  If they had been the same, Your

17  Honor, then they would have been the same.  They weren't.

18          It isn't just a matter of pure mathematics, Your

Page 57

122007 SJ Hearing.txt

19    Honor.  Ms. Minton and many, many people have testified at

20    enormous length about the process they went through, the field

21    forecasts and the discussions and the questions back and forth

22    and the case-by-case analysis of individual customers and the

23    likelihood that things were going to close.  Very clearly, she

24    did not mechanically apply a conversion ratio from a prior year

25    that the plaintiffs say was out of date because of economic

                                                                    69


1     changes.  That is the theory.

2                Can we go to the next slide.

3                THE COURT:  Even if she did, I mean, look at the

4     numbers and relate that -- what transpired, and relate that to

5     whether or not that the guidance and the statements reflected

6     in that same guidance are susceptible to an issue of fact that

7     they were false.  Even if she did, it seems to me that I'm

8     trying to factor in the -- I think the plaintiffs have, too --

9     part of what this is that I have to focus on, is there -- is

10    this language -- and it makes sense to me that at the outset,

11    just at the outset, that the guidance given is flawed.

12               The issue of the conversion ratio and the disparity

13    between potential versus what actually did transpire and the

14    sort of in between data point is how Ms. Minton came up with

15    that and whether she rigidly applied conversion ratios year

16    over year from a prior time.  Prior time, I'm not sure how that

17    rests in terms of whether there are issues in this record that

18    would allow for the Court to find that this is false.

19               MR. WALD:  I completely agree with that, Your Honor,

20    because the context of the attack -- you know, to go back to

21    it, these are projections, they are forward-looking statements,

22    so there has to be no reasonable basis, okay, that's got to be

23    the claim.

                            Page 58

122007 SJ Hearing.txt

24          We know that there was a reasonable basis.  We know
25   that the forecasts were based -- that the guidance was based on
                                                                    70


1    these forecasts and was conservative in light of the forecasts.
2          So the plaintiffs' attack has shifted because they
3    can't show it directly.  Now the attack is, well, the way you
4    went about putting the forecast together was so fundamentally
5    flawed that you can't say that it was reasonable.  Not only
6    that, but these people knew that it was that fundamentally
7    flawed.
8          THE COURT:  If they join that as an issue of fact,
9    they survive.
10         MR. WALD:  That's what they say, Your Honor, but
11   there has to be an issue of fact.  There has to be a material
12   disputed issue of fact.
13         What the record shows, Your Honor, amply, is that
14   Ms. Minton and the people that work with Ms. Minton spent the
15   entire third quarter, as they did every quarter, trying to
16   develop the best information possible about deal flow and what
17   were going to close.  And the only attacks, after all of this
18   record that the plaintiffs come up with, are these four that
19   I've outlined.
20         The first one is that it was wrong because she
21   mechanically applied a conversion ratio from a prior period
22   where the economy was doing better; that's the claim.  If that
23   were true, Your Honor, you would expect it to be reflected in
24   the math, it's not.  What they have done is to submit four
25   declarations from Dr. Goedde which shift, one from the other,
                                                                    71


1    and Mr. Gibbs will address Dr. Goedde on Daubert, but all of
2    which are presumably designed to show that which is impossible
                             Page 59

122007 SJ Hearing.txt

3   to show, that there was a mechanical application when all you
4   have to do is look at the numbers and see that there wasn't a
5   mechanical application.
6          So, Your Honor, it's just -- it's riveting that they
7   go through a regression analysis to try to show a relationship
8   between the third quarter of '01 and the third quarter of '00
9   in terms of the conversion ratio.  And when they do, they come
10  up with a range where the differences between what Dr. Goedde
11  predicts and what Jennifer Minton actually did range from
12  5 million to $275 million.  There is a massive range of a
13  difference when all you had to do was to take a look and see
14  what she actually did because the math doesn't work.  There is
15  just no disputed issue of fact on that issue.
16         The next one that they -- the next argument is that
17  there had been a major macroeconomic change that had occurred
18  at the beginning of the third quarter, certainly, by the
19  beginning of the third quarter, which Oracle should have but
20  failed to bake into its forecasts.
21         THE COURT:  How does that get quantified in the
22  guidance?  There is this major macroeconomic change.
23         MR. WALD:  Right.  I mean, that is a made-up term.
24  They heard Larry Ellison in a deposition use the phrase that if
25  there had been a major macroeconomic change, that might have
                                                              72

1   affected the ability of the company to forecast.  But, you
2   know, what he said as an example of that was a war in the
3   Middle East, oil prices, whatever -- they are actually there
4   now, Your Honor, but at the time six years ago, a hundred
5   dollars a barrel didn't seem likely.  But his point was if
6   there was a major macroeconomic change, that could affect the
7   way one goes about the forecast.

                              Page 60

122007 SJ Hearing.txt

8          But the evidence in the case is that there was a
9   slowing economy, there is no doubt.  We are going to take a
10  look at it.  But notwithstanding that slowing economy, Your
11  Honor, Oracle had met or exceeded guidance in the prior
12  quarters.  Notwithstanding the collapse of NASDAQ, Oracle had
13  met or exceeded guidance.  Notwithstanding the decline in .com
14  revenues, Oracle had met or exceeded guidance.
15          So the Oracle forecasting process, and again, it's a
16  forecast, it's of course not perfect, Oracle's forecasting
17  process clearly took into account what was going on in the
18  economy.  And all of these things are factored up into the
19  judgment that has to be applied.  And American companies have
20  to be entitled to apply reasonable judgment, or we simply
21  cannot have an economy that functions in the way that ours
22  does.
23          So the second claim that the plaintiffs make is that
24  there had been this major macroeconomic change and that Oracle
25  failed to take it into account; well, Your Honor, the National

                                                            73


1   Bureau of Economic Research, the Business Cycle Dating
2   Committee determined that the business activity in the US
3   economy peaked in March of 2001.  By definition, if it peaked
4   in March of 2001, it meant that on balance, all in, with the
5   bumps and bruises along the way, it was going up until March of
6   2001.
7          "A peak marks the end of an expansion and the
8   beginning of a recession.  The determination of a peak date in
9   March is this a determination that the expansion that began in
10  March of 1991 ended in March of 2001 and a recession began.
11  The expansion lasted exactly ten years, the longest in the
12  NBER's chronology."
                        Page 61

122007 SJ Hearing.txt

13          Now, the NBER couldn't figure this out until
14   November, until 6 months later.  So the idea that people in
15   good faith trying to make business forecasts and to give
16   guidance based on what they are seeing in their own business
17   should somehow have been able to figure this out, you know,
18   months in advance and be held responsible under a fraud
19   standard is just nonsense, Your Honor.
20          But beyond that, what this says is that at the time
21   they were doing the forecasts in November of 2000 the economy
22   was still expanding.  And everything that Oracle was saying was
23   correct; whatever the bumps and bruises in the economy, they
24   were not seeing it in their business.  So that is the second
25   criticism.

                                                              74

1          The third -- part of that, it's interesting to note
2    what Oracle's historical experience had been during this
3    period:  The NASDAQ closed at the end of the third quarter of
4    '00 at 47.84.  Oracle experienced 29.38 percent year over year
5    growth in total revenues and achieved consensus guidance.
6    Fourth quarter '00, the NASDAQ had fallen almost 30 percent.
7    They achieved 21 percent year over year growth in total
8    revenues and met guidance.  First quarter '01, the NASDAQ was
9    down 12 percent from its high; again, they achieved 33 percent
10   total growth.  And second quarter it was down 45 percent, and
11   they had a record second quarter with 30 percent.
12          So if you are looking at the historical record, what
13   Oracle is seeing is the same thing that everybody else is
14   seeing, there is ups and downs, people are uncertain what is
15   happening.  But in realtime, as they are measuring the impact
16   on their business and in view of what they are experiencing in
17   prior quarters, these are clearly reasonable views until that
                            Page 62

122007 SJ Hearing.txt

18  last week, when the people -- until the last week of February,

19  when you are now close to the recession which is hitting in

20  March.  And the people who are making these big purchasing

21  decisions get very skittish about what is going to happen.

22          THE COURT:  It had to be a slowing prior to that.

23          MR. WALD:  I think the economy was, Your Honor.

24          THE COURT:  Right.

25          MR. WALD:  But in terms of Oracle's experience in

                                                              75


1   the December flash report --

2           THE COURT:  That may be -- you know, that gets --

3   that is in the round discussion with respect to what the

4   numbers really say at that time.  I think that the information

5   from the Bureau of Economics might be -- it's not dispositive,

6   it may corroborate what you are saying.

7           MR. WALD:  Your Honor, the third claim is that there

8   was a directive from Mr. Ellison to increase more risk.  And

9   the background here and what the record shows is that

10  Mr. Ellison was concerned that historically there was this

11  phenomenon of sandbagging.  And people were obviously

12  submitting forecasts that were their worst-case scenarios

13  because they didn't want to be held to a standard of meeting

14  the higher case scenario.  So what he said was I want now three

15  scenarios, and I want to standardize the way we forecast this

16  across the company.

17          So based on the fact that the forecast was generally

18  between 84 and 89 percent of final licensed revenues,

19  Mr. Ellison and Jennifer Minton and the people that worked with

20  him instituted a new way of looking at the forecasts.

21          But the question was, did you want to put more risk

22  into the forecast?  And what Mr. Ellison said was, no, I have

                                Page 63

122007 SJ Hearing.txt

23  always wanted the forecast to be accurate, you know, I would
24  say slightly conservative, but accurate.  So that was -- that
25  was the point.

                                                                76

1           More to the point --
2           THE COURT:  What did she actually do?
3           MR. WALD:  That's exactly right.  What did she do?
4   What she did was she got these numbers from the field, and she
5   applied the same judgment that she had applied for a record
6   string of quarters before, when they met or exceeded guidance
7   in every quarter.
8           THE COURT:  Is it unreasonable to rely on her
9   projection based on prior history with regard to the prior
10  quarters?
11          MR. WALD:  I don't think it was unreasonable, Your
12  Honor.  I don't think it was unreasonable at all.
13          THE COURT:  Does the record evidence that what
14  she -- in the projection she provided, even assuming, assume
15  that there was a -- Mr. Ellison provided a directive that now
16  plots these three different mechanisms for arriving at what
17  would be a projection of potential revenue, even assuming that
18  that is in the mix, how does that play in terms of the
19  reasonableness of reliance on the projections that she
20  provided?
21          MR. WALD:  Your Honor, in our submission the
22  evidence is pretty clear; she took all of this information in,
23  as she had been doing all along, and she provided her judgment
24  based on all of the information that she took in, and she came
25  up with her forecast, her potential.

                                                                77


                        Page 64

122007 SJ Hearing.txt

1           And, you know, Your Honor, I mean --

2           THE COURT:   Now, are there -- in prior quarters

3   isn't there evidence of some slowing in some of the divisions,

4   NAS, as you parse through the quarter, second quarter, first

5   quarter?

6           MR. WALD:   I think what you'll find is they exceeded

7   guidance in the first and the second quarter, had record

8   quarters.   In the third quarter, the field forecasts stuck with

9   their forecasts through January, certainly, through all the

10  time of the sales.

11          And in February, Your Honor, Ms. Minton begins to

12  work with the field and begins to apply in some cases some

13  negative judgment.   In some cases she says, you know, I'm not

14  sure.   Not only am I not going to apply upside, I'm going to

15  take some of these down a little bit.   And that is why the EPS

16  begins -- in early February it falls below 11 and a half

17  percent, and then it goes back up beyond 11 and a half percent.

18          So they are not oblivious to what is going on, they

19  are trying to apply reasonable judgments to the information

20  that they are getting.   And they are making reasonable

21  judgments.   Up until the last three days, they fully expected,

22  consistent with their prior history, that they were going to be

23  able to meet or exceed this guidance.   It was when all these

24  deals fell out starting on February 26 that there was trouble

25  in Dodge that begins to show up.

                                                          78


1           So as to the Court's question, you know, what's the

2   implication of it, our view is these are just criticisms that

3   the plaintiffs make about the forecasting process to show that

4   it was so unreasonable, that it was so -- that it was -- that

5   it was so off base, that it was so blind to the reality of what

                              Page 65

122007 SJ Hearing.txt

6    the company was experiencing that it constitutes a false

7    statement, even though it's a forward-looking projection, Your

8    Honor.  That is the burden.  And I submit that under the Adobe

9    standard they don't come close to getting there.

10            The third -- or the fourth criticism was the product

11   mix, and you and I have discussed that a little bit.  What is

12   interesting is to take a look at the product mix in the second

13   quarter, where the company achieved guidance, with the product

14   mix in the third quarter, and it's basically the same,

15   technology to applications.

16            So if there was learning to be had about the product

17   mix in the third quarter, all one had to do was to go back to

18   the second quarter and say that the way the company was sizing

19   this up worked, it was reasonable, they met or exceeded

20   guidance.

21            Your Honor, all of that is on false statement, and

22   it's false statement for the projections.  And we submit that

23   the plaintiff's burden is very heavy on forward-looking

24   statements to show a false statement under the Adobe standard

25   and that they have not adduced evidence that would support a

                                                                    79


1    reasonable jury in finding that they had met that standard.

2            I want to move quickly to Scienter under the safe

3    harbor for the forward-looking statement, I know the Court is

4    quite familiar with this.

5            Forward-looking statements are protected from claims

6    of fraud, Your Honor, if they are accompanied by meaningful

7    cautionary language or if the plaintiff fails to prove that

8    they were made with actual knowledge.  In our submission, Your

9    Honor, the defendants did provide meaningful cautionary

10   language, but we understand that you probably think that that

                              Page 66

122007 SJ Hearing.txt

11  is not an issue that you are going to resolve, or at least not

12  resolve in our favor on summary judgment.  We have submitted in

13  our briefs, Your Honor, our position on meaningful cautionary

14  language.

15          The second part of the test, Your Honor, is so clear

16  that I don't want to spend a lot of time on that, I just want

17  to go right to the question of whether there was actual

18  knowledge.

19          THE COURT:  Well, it seems, in some way to be

20  presaved by what you just spent fifteen minutes arguing.

21          MR. WALD:  Right.  Correct.

22          Your Honor, the Shaw standard on the materiality of

23  intra-quarter data is the governing standard.  It says that

24  intra-quarter data is not material unless it creates a

25  substantial likelihood that the results would be an extreme

                                                              80

1  departure.  So it's a two-prong test, first, a substantial

2  likelihood, and then an extreme departure from guidance.

3          Let's take a look at the intra-quarter data.  We

4  have the flash reports, the pipeline, the division level

5  indicators, and the Q4 forecast, that is what they point to.

6  And then they also point to Suite 11I, which we have covered,

7  but those are the things they say prove that these defendants

8  knowingly made false projections because they were in

9  possession of material intra-quarter data showing and a

10  substantial likelihood of an extreme departure.  Well, let's

11  test that against the evidence.

12          The flash reports, Your Honor, the first category

13  they point to, are completely consistent with prior history.

14  The flash reports through December and January are consistent

15  with the flash reports through December and January of the

Page 67

122007 SJ Hearing.txt

16  third quarter of '00 and the third quarter of 1999.   So
17  whatever the impact of the economy, Your Honor, in those early
18  months of the quarter was not showing up in Oracle's actual
19  experience.
20          Vice Chancellor Strine looked at the same evidence
21  in an opinion that was issued after the Ninth Circuit spoke in
22  this case and concluded "The December 2000 results are
23  precisely the sort of intra-quarter data the courts have
24  considered immaterial, as they did not create any substantial
25  likelihood that Oracle would fall short of the market

                                                            81

 1  estimates."  Obviously, we are not suggesting that is binding,
 2  but it is at least illustrative.
 3          Oracle's pipeline growth, which is the second issue
 4  that it collapsed, well, Your Honor, the notion of a collapse
 5  is that it started out the quarter at 52 percent and it went
 6  down to about 34 percent, still well above the 25 percent
 7  license growth that had been predicted, Your Honor, by the
 8  company.
 9          The claim that that is a collapse, a 34 percent
10  pipeline, which the company viewed as a very healthy pipeline,
11  particularly in view of Mr. Henley's testimony that they
12  expected the pipeline to come down from the beginning of the
13  quarter, it always does.  Again, the objective reality doesn't
14  support the claim, Your Honor.  And Vice Chancellor Strine
15  characterized this claim as coming very close to failing the
16  straight-face test.
17          The next argument that the plaintiffs assert is that
18  the division level forecasts didn't support the guidance, well,
19  here they are, Your Honor.  Through the end of January, when
20  Mr. Ellison's trading stopped, they supported it in every way.

122007 SJ Hearing.txt
21    You can see, NAS, OPI and OSI were all -- none of the field

22    took down their forecasts through January.

23          If you take a look at what they are saying, and the

24    plaintiffs cite material from each one of these E-mails, but

25    they don't cite these bottom lines of the very E-mails they

82

1     discuss in their pleadings, what Mr. (sic) Winton is saying, "I

2     still think we're tracking to NQ3 of 354 to 355," which, of

3     course, is above their forecast.  "If we get Americredit for an

4     additional five, it moves to the 360 range."  That is NAS.

5          Same thing with Mr. English:  "We are holding at

6     150, but I'll be a bit more aggressive and say a likely of 150

7     to 170."  This is the information that Ms. Minton is getting.

8          Sarah Kopp at OSI:  "Jay Nusbaum is still confident

9     in 225.  My sense is that we will come out around 210 as it

10    stands today."  So certainly not material deviations,

11    singularly or in the aggregate.  This is throughout January,

12    Your Honor.  And, as the slide shows, we know from the data

13    that they did not change their forecasts throughout this

14    period.

15          The last criticism that the plaintiffs make is that

16    somehow the defendants are alleged to have known that they

17    weren't going to make the third quarter numbers because

18    sometime in the third quarter the fourth quarter forecasts were

19    done in the third quarter showed that there was going to be a

20    decline in the fourth quarter; well, Your Honor, approximately

21    40 percent of the pipeline from the last week of the quarter

22    historically slips into the next quarter.  It's hardly

23    surprising that when you are in one quarter your predictions

24    about the next quarter are low because you are hoping to close

25    as much as you can in the current quarter.

83

122007 SJ Hearing.txt

1          THE COURT:  It's pretty close to the line, that
2    this -- if we are talking about the hockey stick effect and
3    what actually transpires.  As you ramp up, you close more deals
4    at the end -- one of the problems with this case is that there
5    really is that blip that goes into the fourth quarter as well,
6    which shows that you -- as you explain it, just in terms of
7    what is transpiring in the economy and that there is a
8    recession.  So it started around March and continues.  And that
9    explains the disparity in the numbers.
10         MR. WALD:  First of all, there is no evidence, Your
11   Honor, no one has ever said that the fourth quarter forecasts
12   were relevant to the view about the third quarter, there is
13   just no contemporaneous evidence of that.  They changed those
14   forecasts throughout the quarter.
15         One thing that is ironic, Your Honor, is that they
16   attack this forecasting process, and yet the very forecasting
17   process that at one point in the quarter is, you know, not
18   predicting a robust fourth quarter again, not knowing how much
19   of the pipeline is going to come out of the third and go to the
20   fourth, that is the very forecasting process that is
21   consistently affirming the guidance, as we have seen.
22         So again, the context of this, Your Honor, is that
23   is this evidence on which a reasonable jury could conclude that
24   the defendants were in possession of intra-quarter data
25   suggesting a substantial likelihood of an extreme departure?
                                                          84


1    We submit, Your Honor that it simply can't.  Companies can't
2    function under that kind of straitjacket.
3          Now, the last thing that the -- the last thing they
4    point to is that, well, they knew about these lost deals from
                              Page 70

122007 SJ Hearing.txt

5    product 11I.  And we looked at this already, Your Honor, and,

6    of course, this was a big deal to the Ninth Circuit; these have

7    now completely evaporated, Your Honor, like the accounting

8    claim.  There was a claim that all these deals were in the

9    pipeline, there is no evidence that any of them were in the

10   pipeline, let alone -- I'm sorry, I said pipeline, but in the

11   forecast, let alone they failed to close for product problems.

12          In fact, Your Honor, there were deals with both Bell

13   South and ADT, and they did close in the third quarter.  They

14   were much smaller deals, but they, in fact, did close.  There

15   is no allegation, there is no evidence that the allegations

16   that the Ninth Circuit relied on have any merits whatsoever.

17   These other deals not in the forecast.

18          Now, in terms of what was known, Your Honor, if you

19   take a look back to the applications growth, what a reasonable

20   observer of this data, we submit, would learn was that 11I was

21   a pretty darn good success in the marketplace.  If you take a

22   look at the first quarter growth and application sales, a

23   quarter in which they achieved their consensus estimate,

24   notwithstanding the fact that the economy had already started

25   to turn down, look at the upswing in applications growth:

85

1    Second quarter, immediately preceding quarter, 66 percent

2    upswing in applications growth in the immediately preceding

3    quarter.  And as of January 31, Your Honor, 123 percent

4    increase in applications growth in the third quarter of '01

5    over the prior quarter.

6          So if you are looking for metrics for reasonable

7    people to act reasonably on the basis of, here is one that

8    shows that as late as January 31 your applications are

9    123 percent above what they had been in the prior quarter.

Page 71

122007 SJ Hearing.txt

10  Again, fraud?  I don't -- just can't be, Your Honor.

11          So to sum up on the projections, Your Honor, they

12  need to show actual knowledge of falsity.  The Shaw test is the

13  test.  They need to show actual knowledge of a substantial

14  likelihood of an extreme departure, that is the test.

15          Now, in the economy statements, as Your Honor said,

16  those are subject to the recklessness standard.  And the

17  statements were, "We see no impact or slowing in our business.

18  We have seen no slowing of our business."  These were

19  statements that were made in January and early February.  Going

20  back to all the data we just looked at, those were all true;

21  the flash reports, the pipeline, the dramatic increase as of

22  January 31st of application sales.

23          He goes on to say, by the way, Your Honor, "So, you

24  know, if we were to have, I guess, a hard landing, a recession,

25  depression, I mean, certainly, that could have some impact."

                                                              86


1   So it's a distinction between the bumps and bruises of the

2   economy --

3           THE COURT:  So what does that mean to a reasonable

4   investor that in your 10K and at the outset you indicated that,

5   you know, cautionary language, the economy is slowing down, but

6   as you go forward in these calls you are saying we know that is

7   afoot, it may not be a full-blown recession, but we are not

8   seeing any impact in our business.

9           MR. WALD:  That's right, that's exactly what he

10  said.  And those are statements of present fact.  And the

11  question is, what is the evidence, Your Honor?  And the

12  evidence is that as he is making those statements, that is what

13  they are saying.  Their forecasts continue to support the

14  guidance.  Their flash reports continue to support the

122007 SJ Hearing.txt

15    guidance.   The pipeline continues to support the guidance.   As

16    of January 31st it was 123 percent increase.

17                THE COURT:   But don't they make assertions with

18    respect to these statements that are certainly tied to guidance

19    but they say they are independently actionable?   Independent of

20    the statements that they made about guidance, these are

21    actionable statements.

22                MR. WALD:   What does it mean to say we see no impact

23    or slowing in our business?

24                THE COURT:   That's the question.

25                MR. WALD:   I mean, doesn't it have to be that there

                                                                    87


1     is no material impact or slowing in our business?

2                 I would think, Your Honor, that if you say we see no

3     impact or slowing in our business and you have given guidance,

4     it would be one thing if at the time --

5                 THE COURT:   If you are seeing some impact in some

6     specific divisions.

7                 MR. WALD:   I'm not even sure --

8                 THE COURT:   No?

9                 MR. WALD:   I'm not even sure as of the latest day

10    that you are if your January 31 evidence is that you are up

11    123 percent over the prior quarter in the application sales.

12    And so much of the quarter the back-end loaded with the hockey

13    stick effect in the last three days.

14                Even if there was a debate, an intellectual debate

15    about what that means, if your field forecasts are staying the

16    same through the end of January when these statements are being

17    made, nobody is taking their guidance down.   In fact, some of

18    the people are saying we think we might even do better.

19                And Jennifer Minton, who has been right from day one

122007 SJ Hearing.txt

20    in her forecast, is continuing to distill this data and to work
21    with it and to try to understand what it means.  And she is
22    still coming up with predictions that as late as the middle of
23    February are supporting her.
24           THE COURT:  I think we better hurry to this, but I
25    was trying to see if there was a distinction in terms of how it

1     might reasonably be interpreted sort of generally in terms of
2     the guidance that we gave -- we are not -- we are still on
3     course as opposed to whether or not that could be seen as also
4     warranting specifically within particular divisions or product
5     that we are not seeing any slowing.
6            MR. WALD:  I -- you know, Your Honor, I believe the
7     market is what is important here.  I think the market viewed
8     Oracle as a company, right?  And the analysts are -- they are
9     tracking how is the company tracking.  I think that's the only
10    fair-minded way to read this statement.  You know, context as
11    convergent to each -- is very important.
12           THE COURT:  Um-hmm.
13           MR. WALD:  And there it is.
14           So I think it's, what is the impact on the business
15    that we have been talking to you about?  We are not seeing it
16    right now.
17           All right, Your Honor, again, we have talked about
18    these, the pipeline growth, the earnings per share are all
19    supported.   The EPS bounces back up to 11.58 in mid February.
20    As we saw coming into the last week of the prior seven
21    quarters, Jennifer Minton's potential projection was below
22    estimates, and they met or beat it in every estimate.
23           So what are the plaintiffs' arguments as to why the
24    statements of present fact were false?  They say it's because

122007 SJ Hearing.txt

25    there were reduced .com revenues, so, of course, you were

89

1     seeing it, lower conversion ratios, a lack of big deals, and
2     the OSI pipeline.  Let's take those one at a time.
3            "Despite lower .com revenues, Oracle had achieved
4     its forecast in the prior four quarters."  So in Q3 '00, 10.63
5     percent of their revenues came from .coms.  That number
6     continuously decreases, and yet Oracle meets its guidance.
7            So if you are asking was this a false statement that
8     we weren't seeing in our business because the .coms were going
9     down?  No.  As Larry Ellison said, in fact, the opposite was
10    true, notwithstanding the fact that the .coms were going down,
11    they were continuing consistently to meet their guidance.  It's
12    very affirmative of what they are saying.
13           Second point they make is that despite lower
14    conversion rates that that wasn't cranked in; well, let's take
15    a look at the immediately two preceding quarters.  In the first
16    quarter of '01, the year over year conversion rate had been 56
17    in '00.  It was a 45 percent conversion rate in '01.  So, yes,
18    there was a lower conversion rate, but they met the consensus
19    estimate.
20           In the second quarter, the second quarter of '00
21    conversion rate had been 57 percent.  It went down to 49
22    percent in the second quarter of '01.  Again, they achieved EPS
23    guidance.  So notwithstanding lowered conversion rates, the
24    company was continuing to meet its guidance.
25           The third thing they complain about was the lack of

90

1     big deals in NAS; well, the actual testimony from Mr. Henley
2     was that it was good, that the NAS forecast wasn't dependent,

Page 75

122007 SJ Hearing.txt

3    Your Honor, on a few big deals.  It was binary as to whether

4    NAS was going to make its forecast or not.  There were a lot of

5    deals in the pipeline.  And assuming a normal conversion rate,

6    there should be less risk to the number.

7              Take a look at the conversion rate that was assumed.

8    The implied conversion ratio for the $346 million forecast for

9    the NAS was a 41 percent conversion ratio.  A year earlier,

10   they had had 72 percent.  So again, the evidence does lead to

11   the argument that the plaintiffs assert.

12             And the last argument is about the OSI pipeline.  It

13   bears noting that OSI is a very small percentage of the total

14   revenue of the company.  Even then, if you just take a look at

15   the difference between the pipeline and the forecast, the

16   pipeline is well above the forecast, and OSI is well within

17   striking distance of its numbers.  And they are reaffirming

18   those numbers through the end of January.

19             I think, Your Honor, the conclusion under Howard is

20   that the statements that were being made in January, December

21   and January, and even at the first week in February, do not

22   meet the Howard versus Everex standard of a highly unreasonable

23   omission or misstatement which presents a danger of misleading

24   buyers or sellers that is either known to the defendant or so

25   obvious that the actor must have been aware of it.  This is

                                                                91


1    mental state embracing an intent to deceive, as Your Honor well

2    knows.  And these facts do not support that claim.

3              Lastly, Your Honor, let me just cover the stock

4    sales.  Yes, the Ninth Circuit did point to the stock sales,

5    among other things, Your Honor, among -- including the Suite

6    11I issues and the accounting issues.  That record was not

7    developed.  And certainly, it was before Judge Strine went

122007 SJ Hearing.txt

8    through the record as well in the Court of Chancellery.

9          I think the conclusion here is that the sales do not

10   give rise to an inference of Scienter under 10(b) or certainly

11   20(a).  They were not suspicious in timing or amount.  There

12   were credible innocent explanations for them.  Very interesting

13   that Vice Chancellor Strine concluded that Ellison and Henley

14   did not possess material nonpublic information.

15         We would note, Your Honor, just as an additional

16   data point that Mr. Sanderson, the other named defendant, did

17   not sell during this period.  And the Acito case, which I think

18   is the case you were referring to, and also the Advanta case,

19   say that that is relevant evidence.

20         Your Honor, Mr. Ellison just didn't act in the way

21   that somebody who had material nonpublic information would act

22   if they were trying to divest themselves of stock at a high

23   price.  He placed serious limits on his trades.  He only sold 2

24   percent.  And I take the point that the Ninth Circuit said this

25   was an anomalous situation because for Mr. Ellison 2 percent

                                                                  92

1    equals 895 million.  I don't believe that means it's not a fact

2    that this Court can take into consideration.

3          What happened, as the Court knows, is that he had 22

4    million options that were expiring.  He had been holding onto

5    them consistent with his practice.  And he was advised that he

6    should not lose --

7          THE COURT:  I think I have a pretty good sense of

8    this part.

9          MR. WALD:  All right, let me go through here, then.

10         So the last part I would like to cover briefly is

11   lost causation, which goes through all of this.  And I'll cover

12   Mr. Steinholt in connection with that.

                        Page 77

122007 SJ Hearing.txt

13           For the reasons we've said, they cannot demonstrate

14   lost causation for their accounting or product claims.   With

15   respect to the forecasting claims, Your Honor, they have failed

16   to prove that the alleged fraud caused them to suffer an

17   economic loss, as required by Dura.

18           And what Mr. Steinholt does was to assume there was

19   a connection, he didn't demonstrate it scientifically.   And the

20   evident study that he did author, and this does speak to 702

21   and to Daubert, is fundamentally flawed in at least two

22   respects.   The first respect is that it assumed that

23   100 percent of the residual stock drop was attributable to the

24   alleged fraud.   And he didn't eliminate industry effects.   And

25   I'm going to come to that because our expert looked at those

                                                              93


1    industry effects, Your Honor, and they are very significant.

2    And you can't come up with a residual stock drop attributable

3    to fraud if you don't look at that information.

4            This is just a Dura quote, but what's important is

5    that "The lower price may reflect not the earlier

6    misrepresentation, but changed economic circumstances, changed

7    investors' expectations, knew industry specific or firm

8    specific facts, conditions or other events which taken

9    separately or together account for some or all of that lower

10   price."

11           This is the teaching of Dura, Your Honor, in the

12   Supreme Court.   This is what the plaintiffs need to contend

13   with in order to demonstrate a basis for a claim of lost

14   causation.   You have to look at this information.   You can't

15   just assume it.   You have to demonstrate it.   They didn't do

16   that.

17           The FlowServe decision is, we submit, very

                              Page 78

122007 SJ Hearing.txt

18   instructive.  It's almost this case involving the same experts.

19   There is no dispute about the facts here, Your Honor.

20   Mr. Steinholt freely admits that all he did was to make this

21   assumption.  He says it in his report and in his deposition.

22   His position here and in FlowServe is that that is all he needs

23   to do, that nothing more is required of him; well, the

24   FlowServe court didn't agree.  The FlowServe court found that

25   that violates Daubert.

94

1           "Under this logic," says the FlowServe court, "the

2    relatedness test set forth in Dura and Greenberg are optional.

3    Rather than follow precedent, a plaintiff, like here with

4    debatable evidence of fraud, can pick the largest stock drop

5    irrespective of the actual reason and still relate the fraud

6    because the stock drop is nevertheless a revelation of the

7    company's true financial health.  The, quote, 'true financial

8    condition,' end quote, theory, if accepted threatens to

9    undermine the objective of securities law and disregards

10   precedent."

11          We submit this is exactly the same situation here.

12   This is an issue of law.  And the question is have the

13   plaintiffs presented any evidence of lost causation that ties

14   the stock price drop to any of the alleged frauds, the product

15   problems, the accounting, alleged accounting problems in the

16   second quarter, the claim that the defendants were in

17   possession of information that told them that there was a

18   substantial likelihood of an extreme departure?  Has any of

19   that come out in the market?  Is there any inference that can

20   be drawn from the stock price drop that would support that from

21   which a reasonable jury can conclude?  And we submit that the

22   answer is no.

Page 79

122007 SJ Hearing.txt

23          Mr. Steinholt didn't look at the evidence.  It would

24     have been difficult for him to have submitted his opinion if he

25     had looked at the evidence.  He failed to eliminate industry

                                                                    95

1      effects.  What he did was to champion an event study in which

2      he filtered out market effects.  The NASDAQ 100 is a market

3      index, not an industry index.  But take a look at the companies

4      that are in it:  Starbucks; Bed, Bath and Beyond; Staples;

5      Ebay, and contrast it with Mr. James' industry index, which are

6      all of the competitors that the analysts compare Oracle to.

7          Mr. Steinholt's index shows a return on March 2nd of

8      minus 4.4 percent.  I believe that is the average of the

9      companies in his NASDAQ 100.  The competitor index shows an

10     average drop of 12.35 percent, a huge, huge difference, Your

11     Honor.  And it's clear that what was happening in this market

12     was not something that was just happening to Oracle, it was

13     happening to everybody in Oracle's competitive sphere.

14          Before March 1st, before this announcement, Oracle's

15     competitors exceeded their expectations.  Mr. Steinholt didn't

16     consider any of this information, but in announcing what had

17     happened up to December 31st, all of these competitors met

18     expectations.

19          Before March 1st, Oracle's competitors weren't

20     affected by the economy.  And I won't bother to read through

21     all those, but they are in here.  If you take a look at what I2

22     and Commerce 1 and BEA were saying, they weren't affected by

23     the economy.  After Oracle's miss, all of them announced

24     misses.

25          Again, that is -- if you are going to look at lost

                                                                    96

1      causation, you have to consider this information.
                          Page 80

122007 SJ Hearing.txt

2   Mr. Steinholt doesn't even pretend that he did.

3           Oracle's competitors faced the same unforeseen slow

4   down, and that is these press releases that we looked at before

5   where they attributed to an unforeseen slow down that begins in

6   the latter part of February.  I mean, the Cognos press release

7   is so interesting:  "We started to experience hesitancy on the

8   part of commercial customers in North America," very consistent

9   with Oracle's experience.

10          And the analysts didn't see this as an Oracle

11  problem.  The analysts didn't announce to the market, oh, gosh,

12  they have a lot of problems with the market, that is what is

13  going on here.  What they said is, "We believe the announcement

14  is a problem relating to the economy and not one inherent to

15  the company."  And they were uniform in all of this.  And, of

16  course, you've seen the NBER announcement previously.

17          In short, this case is FlowServe:  No direct

18  disclosure of the alleged fraud.  Plaintiff's sole evidence of

19  lost cause action is Mr. Steinholt.  Mr. Steinholt assumes that

20  which he is required to prove under Dura.  The analysts'

21  commentary did not attribute the miss to the alleged fraud,

22  they attributed it to the economy.  Competitors also missed

23  earnings and suffered from a similar fate.

24          THE COURT:  You -- your last question, you don't vet

25  this record with respect to lost causation in a way that is

                                                              97


1   consistent with what Judge Ware did in (Impacts).

2           MR. WALD:  In Impacts, Your Honor?

3           THE COURT:  I realize it's a pleading case.

4           MR. WALD:  It is a pleading case, Your Honor.  I

5   think -- if I understood his second opinion -- actually, if I

6   understood all of the opinions, I think what he found in that

122007 SJ Hearing.txt

7    series of opinions is exactly, reads exactly on what we are

8    submitting, Your Honor.

9            What he found in the first decision, or maybe the

10   first two decisions, I lose track, is that --

11           THE COURT:  The third amended complaint that he

12   allowed to go forward.

13           MR. WALD:  In the first one, what he said was that

14   there was no disclosure to the market of problems with the

15   first and second quarter.  And the only claims in the case

16   involved the first and second quarter.

17           The plaintiffs hemmed and hawed and tried to show

18   that the later disclosure somehow bore on the first and the

19   second quarter, and Judge Ware looked at it and said, no, it

20   doesn't.  This is nothing in the record.  The analysts aren't

21   talking about that.

22           When they then came back and pointed to the second

23   quarter disclosure, which then did talk about problems, at

24   least in the second quarter, and I think Judge Ware found that

25   it talked about problems in the first quarter, then he found

                                                              98


1    there was a predicate to argue that the later disclosures

2    related back to those disclosures.

3            THE COURT:  And relying on immediate drops in the

4    stock on the day of the disclosure.

5            MR. WALD:  Correct, but immediate drops in the stock

6    that were related to the disclosures that talked about the

7    problems at the company, that is the difference.  Nothing here

8    talks about the problems of the company.

9            THE COURT:  Right.

10           MR. WALD:  We take the point that if there was

11   something out there that they could point to that the company

                              Page 82

122007 SJ Hearing.txt

12  had said or somebody else had said -- what is fascinating about

13  the case is that all of the evidence is that this was the

14  economy, and that none of the problems that the plaintiffs talk

15  about are disclosed to the market.

16        Thank you, Your Honor.

17        MR. WILLIAMS:  Thank you, Peter.

18        Good morning, Your Honor.  I just want to first say

19  we appreciate the time that you put into the case.  I know that

20  we have loaded a lot of paper on you and your clerks, and you

21  don't have a room full of lawyers.

22        THE COURT:  You didn't feel so sorry for me when you

23  were drafting it, did you?

24             (Laughter.)

25        MR. WILLIAMS:  I don't think either side felt sorry

                                                              99

1   for you, but we appreciate the time that it takes to actually

2   work through some of the stuff because it's very detailed.  I

3   appreciate Mr. Wald's presentation.  A lot of it was very

4   pretty, and the Powerpoint was nice, but in our view it didn't

5   really address the actual evidence that ultimately Your Honor

6   is going to have to kind of flip through in its chambers and

7   actually come to a conclusion.

8         I do want to also say that we have divided up the

9   labor here a little bit more, so it may be a little bit choppy,

10  but I want to try to answer some of the Court's questions about

11  lost causation and some of the questions regarding 11I.

12        Mr. Greenstein will answer some questions about the

13  accounting.  And Mr. Solomon will address some of the questions

14  about the forecasting piece of the case.

15        I want to start from the back and begin with one --

16  with the issue regarding FlowServe and lost causation.  Your

                          Page 83

122007 SJ Hearing.txt

17  Honor, I wasn't planning on giving you a Powerpoint

18  presentation, I was just going to use it for my outline, but I

19  think it makes sense for me to hand this up to you to follow

20  along with what I'm doing.

21              (Handing document to opposing counsel.)

22          MR. WILLIAMS:  Don't use this against me.

23          With respect to FlowServe, Your Honor, it's true

24  that FlowServe is a recent case that involved Mr. Steinholt,

25  and I want to address that later, but discussing direct or

                                                              100


1   indirect revelation of third parties that past financial

2   statements might be false.  This issue goes to whether or not

3   the disclosures in this case that Oracle missed its forecast

4   had anything to do or indicated in any way a connection between

5   the false financials in the second quarter of 2001 and the

6   future cash flows or the financial condition of the company.

7           And this is what the Court said in FlowServe:

8   "There is no evidence that analysts changed their quantitative

9   earnings models, an indirect but telling signal that the

10  historical financials might be questionable."  In that case, it

11  was really an issue of what the evidence was that was presented

12  to her, not what Mr. Steinholt's opinion was.

13          So what did the analysts say in this case after

14  Oracle missed its forecast for the first quarter of 2001?

15          Go to the next page.  If you can make that bigger.

16          I apologize if this is a little small.

17          Merrill Lynch issued a report on March 2, 2001:

18  "Three Q shortfall prompts long-term downgrade, downgrading

19  Oracle to long term" -- "lowering our fiscal '01 revenue

20  estimates from 11 billion" -- and you can read the rest, Your

21  Honor, with respect to what Merrill Lynch believed about

122007 SJ Hearing.txt

22  Oracle's current and future financial condition.

23          Solomon Smith Barney said something very similar:

24  "Negative preliminary results lowering estimates and rating";

25  we are lowering our $33 price target to $15 based on lower

                                                                    101


1   earnings expectations.

2           THE COURT:  But they are saying two things.  They

3   are saying, you know what, that doesn't help you prove the

4   causal connection.  It's -- they made those determinations.

5   I'm not saying I agree with them.

6           MR. WILLIAMS:  That's true.

7           THE COURT:  But they are saying that it's

8   speculative, that there is -- the record does not show either

9   by the event study, because the event study doesn't properly

10  account for other factors that allow you to make that causal

11  nexus, or at least to support it from a methodology standpoint.

12  Two, Steinholt's opinion is based on assumptions.  Three, they

13  didn't say anything other than they missed.

14          MR. WILLIAMS:  And it's the third part of Your

15  Honor's commentary that I'm getting at.

16          THE COURT:  They didn't reveal any truth that might

17  also allow for some -- other than they missed the quarter,

18  which they say is supported, at least the guidance that they

19  gave in the record for the support, at least there was a

20  reasonable basis to rely on.

21          And again, I heard Mr. Wald to say both of those

22  things, talking about Dura independently with respect to

23  FlowServe, and then Mr. Steinholt's analysis and whether or not

24  his lost causation analysis is, you know, reliable under 702.

25          THE COURT:  Um-hmm.

                                                                    102

122007 SJ Hearing.txt

1          MR. WILLIAMS:  But the reliance on FlowServe is
2     exactly what we have here, the telltale signs that the
3     historical financials may be questionable.  But they go on to
4     say more.  On March 16th, it's more than the possible
5     connection between the earnings miss and the financials of the
6     second quarter of 2001.  They say -- CIBC says, "We are
7     downgrading the shares to hold due to the impact of the US
8     economy to concerns over acceptance of its E-business
9     applications," that's 11I, "and management's lack of proactive
10    plan to get back on track.  We believe the economy is only a
11    partial explanation for the shortfall.
12          Just one more.
13          Go to the next page, please.
14          Bank of America was a little bit more specific:  "On
15    the application side" -- that is 11I, "especially in light of
16    Oracle's weaker than expected Q3 applications growth, we
17    believe the economy may only explain 20 to 30 percent of the
18    weakness.  The rest, in our view, is a result of the product
19    set, 11I, not reaching a competitive level of functionality
20    relative to the best of breed."
21          THE COURT:  What is that based on?
22          MR. WILLIAMS:  I'm sorry?
23          THE COURT:  What is that based on?
24          MR. WILLIAMS:  What is the analysts' commentary
25    based on?  My assumption is it's based on their research.  I
                                                              103


1     mean, I think the analyst's reports are based on research.
2          THE COURT:  But you don't know, do you?
3          MR. WILLIAMS:  I don't know.
4          THE COURT:  But you want me to accept it as an
                              Page 86

122007 SJ Hearing.txt
5   opinion that supports lost causation in the case.

6          MR. WILLIAMS:  I want you to accept it as the

7   connection --

8          THE COURT:  Well, that's what we are talking about.

9          MR. WILLIAMS:  Absolutely.

10          THE COURT:  Okay, I gotcha.

11          MR. WILLIAMS:  So a piece of one of your initial

12   questions as to whether or not the economic loss is related to

13   applications.

14          Also, going back to December 14th of 2001 -- I'm

15   sorry, 2000, just addressing Mr. Wald's comment on Mr. Henley's

16   building of the third quarter of 2001 forecast on the earnings

17   results in the second quarter of 2000 --

18          THE COURT:  So this is lost causation with respect

19   to the accounting.

20          MR. WILLIAMS:  That's right.  Mr. Wald showed you

21   some snippets of what Mr. Henley said on the December 14th,

22   2000 conference call relating to the forecast for the third

23   quarter of 2001.  This is actually what he said, he said, "In

24   the area per share, we think it would be 12 cents.  And also,

25   just historically, the third quarter is slightly better than

                                                              104


1   the second quarter.  That is the way sequentially it's worked

2   here."

3          If you look back at the last three years, so he is

4   looking at history, "Sequentially, the third quarter split

5   adjusted has been one cent a share better than the second

6   quarter.  So we did 11 cents," which we say is false, "in the

7   second quarter, so I would assume 12 cents would be a

8   reasonable number at this point.  I don't think history is

9   going to be a lot different here."

                        Page 87

122007 SJ Hearing.txt

10          In our view, that provides the Court and the

11     plaintiffs with the connection to the shortfall that occurred

12     in -- in March -- on March 1st of 2001.  It, in our view, is

13     more than enough to demonstrate a genuine issue of material

14     fact as to lost causation on the accounting issues.

15          You'll hear a little bit more about the accounting

16     issues, but that 11 cents, we have evidence that it is

17     materially false.  We think, as you know, that we should win

18     offensively on summary judgment on this point.  So at the very

19     least, in our view, we have satisfied the demonstration of a

20     causal connection between the accounting claims and the

21     remainder of the case with the shortfall that occurred on

22     March 1st.

23          THE COURT:  What I indulge is, one, there was an

24     accounting irregularity that makes the basis for the 11 cents

25     earning per share from the second quarter concerns the

                                                               105


1      requisite falsity and then indulging and assuming and building

2      upon that to proffer a 12 percent earnings per share for the

3      third quarter.  It's indulging all those inferences that gets

4      you to lost causation base because they missed their report.

5          MR. WILLIAMS:  I don't know if there are as many

6      inferences as the Court indicated.  I think that on --

7          THE COURT:  That's the only tie to 12 percent EPS,

8      is what transpired -- you assert here and Mr. Henley's reliance

9      on it.

10          MR. WILLIAMS:  Right.

11          THE COURT:  I have to indulge from a fact and

12     inference that he relied on 11 percent.  And historically we

13     will bump it up the next quarter to 12 percent.

14          They say two things about that, one, that the Court

                              Page 88

122007 SJ Hearing.txt

15  shouldn't indulge that inference because it's speculative when

16  we get to the other end and we miss the third quarter.  But

17  second, and as importantly, the record evinces here what the 12

18  cents EPS was based on.

19          MR. WILLIAMS:  I appreciate that, Your Honor.  And

20  we didn't view it as much of an inference.

21          He says it.  We are not drawing any inference that

22  that is what it was.  He is building the third quarter off of

23  the second quarter.  And he says that notwithstanding -- and

24  these are my words here -- notwithstanding the economy,

25  notwithstanding the problems with the product that we say, you

                                                                    106


1  know, impacted earnings, there is not going to be any

2  difference, historically.  We did 11 so we are going to do 12

3  next quarter.  And that's, I think, enough.

4          THE COURT:  It's got to be tied to the miss of

5  12 percent in the third quarter, that is what I'm saying.

6  There is another bridge there aside from that statement, it's

7  how I view the representation that you say is fact.

8          MR. WILLIAMS:  Sure.

9          THE COURT:  12 percent is reasonable because we get

10  11 percent in the second quarter, which was erroneous.

11          MR. WILLIAMS:  Um-hmm.  And so we are saying there

12  is no reasonable basis at all.

13          THE COURT:  And then read that on to its causally

14  related, doesn't just touch upon, but it is causally related in

15  the way that Dura requires to the lost experience at the end of

16  the third quarter.

17          MR. WILLIAMS:  One substantial cause.  One

18  substantial cause.

19          We think that satisfies that.  And we are prepared

Page 89

122007 SJ Hearing.txt

20    to answer all the Court's questions on it.

21           THE COURT:  What is the analysis that Mr. Steinholt

22    or anybody else engages in to support that?

23           MR. WILLIAMS:  Well, Mr. Steinholt, he assumed that

24    we were going to prove all of our allegations.  There is no

25    debate about whether or not he assumed those facts.

                                                              107

1            THE COURT:  So if I disagree with you on whether or

2     not there is a factual -- facts in the record that would

3     establish the relationship between these numbers in the miss in

4     the third quarter, then you are right, Steinholt doesn't

5     address it, and it's purely just a proof issue.

6            MR. WILLIAMS:  Exactly.  To an extent, that is

7     exactly right.  This is part of the proof of the connection.

8     And, you know, maybe later a jury will disagree with us, but

9     that is, you know, our sense of that issue.

10           I want to address another issue that Mr. Wald

11    addressed with respect to the product issues.  He discussed --

12    you know, and it's important, Your Honor, because it goes to

13    your question about how 11I also impacted the loss.

14           He talked about Ingersoll-Rand, and he showed you on

15    May 2000 an E-mail from Safra Catz to someone else saying that

16    Ingersoll-Rand had purchased $9.5 million worth of product.

17    That may be true, but what happened after that is what is

18    important.  What happened after that was Ingersoll-Rand tried

19    to implement that product, and it didn't work.  It was 11I.

20           In the second and third quarter of 2001 --

21           THE COURT:  We can go back and forth on -- we can go

22    back and forth on whether or not there are false claims and

23    what the record says about that, but specifically as to lost

24    causation and 11I --

                              Page 90

122007 SJ Hearing.txt

25     MR. WILLIAMS: Okay, I'll deal with that.  Is that

                            108

1 what you would like me to address?

2       THE COURT: (Nodding head.)

3       MR. WILLIAMS: I think it begins with what the

4 company said about 11I.  And it begins in, you know, when 11I

5 was first released.

6      It's preintegrated, interoperable out of the box.

7 People are going to buy it because they don't want to buy best

8 of breed products because they are too expensive to implement.

9 And the company's future growth was going to be based on the

10 strength of sales of Suite 11I.  So Suite 11I was released in

11 the first quarter of 2000.  Sales were relativity disappointing

12 in the first quarter of 2000 with respect to Suite 11I.  And

13 the analysts discussed that, you know, publicly.  The analysts

14 analyzed that publicly and what the company's future prospects

15 were with respect to 11I.

16      If you pull up that -- what is it, October -- no,

17 the analyst's report.  Is it 129?

18      I'm not sure if that is going to be large enough for

19 you to read.

20       THE COURT: Is it in the packet you gave me?

21       MR. WILLIAMS: Yes, it is -- oh, I'm sorry, not in

22 the packet I gave you, it's in the record.

23       MR. GIBBS: Do you have an exhibit number?

24       MR. WILLIAMS: Exhibit 129.

25      I can hand you a copy of this.

                            109

1       THE COURT: Just walk me through it.

2       MR. WILLIAMS: On December 15th -- or December 14th,

3 Your Honor, the company issued its results for the second

Page 91

122007 SJ Hearing.txt

 4   quarter of 2000.  And they issued, you know, kind of a blowout

 5   quarter, not only in earnings per share, but growth of

 6   applications of Suite 11I, 66 percent.

 7            Prior to this quarter, they had actually

 8   disappointed the street with respect to sales of Suite 11I and

 9   needed to actually show strong financial results.  And that's

10   what they did.

11            On December 15th, Solomon Smith Barney issued an

12   interesting report about it.  If you look at that first -- or

13   second bullet point there, says, "We were impressed with the

14   applications growth and the number of large E-business suite

15   client wins, including JDS Uniphase, American General, Compact,

16   Qualcomm.  Hayworth actually chose Oracle over I2."

17            The third bullet point:  "The combination of

18   referencable customers, the newest version of the E-business

19   suite, the E-business suite functional products demos, and a

20   sales force trained to do" -- I'm sorry, "trained on the

21   E-business suite should propel growth in the applications

22   division."  And that last sentence is the most important part

23   of that.  The market was expecting that applications would,

24   indeed, be propelled by Suite 11I.

25            Not only that, the functional product demos, earlier

                                                              110

 1   the public knew that they were having some problems

 2   demonstrating the product, and the sales force that was trained

 3   on it was actually going to help sell this product.

 4            Going to the next page --

 5            That second bullet point there, if you blow that up.

 6            "We anticipate that applications division will

 7   continue to accelerate given that the company has exhibited

 8   significant traction with the release of version 2 of its

                             Page 92

122007 SJ Hearing.txt

9     E-business suite in October.  We are under the impression that

10    the first versions had considerable bugs, and the most recent

11    version is really gaining traction in only a matter of months."

12    Again, "the combination of referencable customers from the

13    newest version, functional product demos and sales people

14    trained on the E-business suite should propel growth in the

15    applications division."

16            That was the beginning of setting the expectations

17    of -- for Suite 11I, being the strength of what the company was

18    going to report over the next quarter.

19            THE COURT:  So going to the end to establish that,

20    does the subject of the alleged fraud, is the cause of the

21    actual loss, how do you bridge that?

22            MR. WILLIAMS:  With respect to?

23            THE COURT:  That is what you are required to show,

24    right?

25            MR. WILLIAMS:  Absolutely.  With respect to the

                                                              111


1     product problems with Suite 11I?

2             THE COURT:  Do you just take those statements and

3     infer --

4             MR. WILLIAMS:  No, no, no.

5             THE COURT:  You're working to it.

6             MR. WILLIAMS:  No.

7             THE COURT:  I said you're working to it.  I'm

8     cutting you off.  That's what I'm trying to figure out.

9             MR. WILLIAMS:  Yes, you are.

10            THE COURT:  You walk me through it.

11            MR. WILLIAMS:  Pull up Op 107.

12            Same day, "Deutche Bank Alex Brown issues a report

13    on the financial results for the second quarter."

Page 93

122007 SJ Hearing.txt

14          "Applications 11I gains momentum."  "Key part of

15  Oracle's strong fiscal 2Q was the strength of applications and

16  more importantly, marquis customer wins with the new 11I

17  E-business suite.  Applications license growth at 66 percent

18  solidly outpaced expectations in the 50 to 60 percent range."

19          Going down to the next section, "Oracle's marketing

20  message for 11I applications suite lauds the merits of tight

21  integration, end-to-end E-business functionality in its thin

22  client."  And finally, down in the next paragraph, they talk

23  about specific wins:  "JDS is rolling out the full 11I

24  E-business suite enterprise wide with 14 sites in five

25  countries, demonstrating the rapid deployment capabilities of

                                                          112


1   11I's IP architecture.  JDS Uniphase has a new cite online

2   every 17 days.  Notable 11I CRM wins include Hewlett-Packard

3   and Simplex."

4          And, you know, our position is that that

5   Hewlett-Packard deal was improperly recorded and not only

6   artificially inflated the earnings, but artificially inflated

7   the applications growth for the quarter to 66 percent rather

8   than what it would have been, which is 54 percent without what

9   we call a fraudulent transaction.

10          What do we know about what was happening with 11I

11  during that quarter?  First, they weren't able to demonstrate

12  the product in order to sell it.

13          THE COURT:  Now you are in the third quarter.  You

14  said "that quarter"; we just --

15          MR. WILLIAMS:  Well, the forecast was for -- it

16  was -- with the forecast for the third quarter, okay?

17          So what was happening?

18          THE COURT:  Those are the analysts' expectations

122007 SJ Hearing.txt

19   with respect to Suite 11I.

20          MR. WILLIAMS:  They were the company's expectations.

21   I can show them to you, Your Honor.  They are very specific.

22   In the second quarter of 2000, a conference call, they

23   projected Suite 11I applications growth to be 75 percent for

24   the quarter.

25          THE COURT:  But you are not suing that those are

                                                          113


 1   false statements.

 2          MR. WILLIAMS:  With the forecast of 75 percent

 3   growth?

 4          THE COURT:  Right.

 5          MR. WILLIAMS:  Yes, we are.

 6          THE COURT:  I didn't read your papers that way.

 7          MR. WILLIAMS:  That is certainly part of the

 8   forecast.  And they made specific statements about the

 9   functionality of Suite 11I and why the functionality of Suite

10   11I was going to drive growth.  It was going to save customers

11   money in a down economy because of the efficiencies of being

12   preintegrated and interoperable out of the box as opposed to

13   buying the --

14          THE COURT:  That is clear to me.

15          MR. WILLIAMS:  Okay.

16          So what was happening during both the second quarter

17   and the third quarter of 2000 with respect to Suite 11I and

18   being able to demonstrate it to customers in order to make

19   sales?  They couldn't do it.

20          If you look at --

21          That's MSJ16.

22          Even as early as October 6th of 2000, the company

23   was having a very difficult time demonstrating applications to

                              Page 95

122007 SJ Hearing.txt

24   customers.

25         Ken Hamill wrote to George Roberts, who was one of

                  114

1   the senior executives at the company:  "Simply put, all of our

2   demo issues have to do with our key marketed strength,

3   integration.  We still have a great deal of difficulty showing

4   Oracle's integrated suite of applications from CRM through ERP.

5   That is the key to integration.  Additionally, any order

6   management demos also involving ERP are difficult."

7         And he goes on to say, "Here is the exposure:  Not

8   only have we lost deals of which we are the new player, but

9   many deals have been lost with install-based customers."  And

10   he goes on to cite multiple customers in -- that failed demos

11   actually impacted.

12         What was his recommendation at the end?  He says,

13   "The product is the demonstration."  "In addition" -- second

14   page on the bottom.  "In addition, with respect to the sales

15   consultants, they are tasked with doing integration testing of

16   ERP and CRM, a responsibility that requires extensive time and

17   staffing.  Something is broken on the PRP side when fundamental

18   product and integration testing appears incomplete prior to

19   handing code to ADS."  So this was an issue that was occurring

20   with the company not only in the second quarter, but also in

21   the third quarter.  I'll take you to the document in the third

22   quarter demonstrating that.

23         Go to 127, Op 127.

24         This is in February, Your Honor.  This is after they

25   told investors that their product demos were working and

                  115

1   functional demonstrations were going to drive applications

Page 96

122007 SJ Hearing.txt

2  sales in the third quarter.

3       In February, Gayle Fizpatrick, another senior vice

4  president of the company, writes to George Roberts:  "George,

5  the top three issues for demonstrations remain performance,

6  product quality and stability and the ability to show a

7  complete integrated E-business suite solution.  That was the

8  value proposition of Suite 11I in the very first place."

9       We are going to sell you ERP and CRM together.  They

10  are going to be preintegrated and interoperable.  You're going

11  to be able to plug it in, make it work and start saving money

12  fast.  They couldn't even show it to customers.  This is

13  undisputed.

14       If you go to the next page, she talks about some

15  specifics.

16       Go up and highlight "Sandy."

17       This E-mail from Julie Cullivan to Sandy Sanderson.

18  Sandy Sanderson, he is one of the defendants, so he clearly

19  understood and knew that the demonstration issues were

20  continuing from -- I'm sorry, the third quarter of 2001.

21       And down on the bottom of the page, Julie Cullivan

22  writes, "With respect to CRM, we" -- in bold letters -- "cannot

23  show a complete integrated CRM demo, let alone a complete

24  E-business suite integrated demo."  The document goes on to,

25  you know, provide substantial detail about the problems.
                                                           116


1       If you go to --

2       Pull up Exhibit 131.

3       February 16, right in the middle of the quarter:

4  "And Meagan Ware (phonetic) writes to Ken Hamill about another

5  deal --

6       On the bottom --

                    Page 97

122007 SJ Hearing.txt

7          -- another deal lost primarily to the demo system

8     performance.

9          Again, an issue that the company specifically told

10    investors that they had worked out, and it was going to help

11    drive sales of applications, Suite 11I, in the third quarter.

12         And the top of the E-mail, Ken Hamill writes to

13    Ron Wohl, who was an executive vice president of development,

14    his team wrote the code for Suite 11I, or at least part of it.

15    And he reported directly to Larry Ellison.  Hamill says, "Ron,

16    here is a specific situation where the performance issues are

17    actually costing us business.  I passed this on to you so you

18    will have anecdotal data as you continue to improve the

19    environment."

20         Just go to the next one, Op Exhibit 133.

21         Now, this E-mail, Your Honor, is after the quarter

22    closed.  It's an E-mail from the defendant, Jeff Henley, to

23    George Roberts, responding to George, actually informing him

24    about the product problems with respect to demonstrations.

25         He says, "This is excellent.  You should continue to
                                                              117


1     publish these every week until they get fixed.  When you see

2     all the names of the prospects, it's really sickening.

3     Hopefully, Larry will get sick as well and put more pressure to

4     get this fixed."

5          What did George tell him?  He said, "Here's the

6     latest on the ADS from Majors," that is the demonstration

7     system.  "While 11.5.3 looks more complete to the field,

8     performance does not appear to have improved.  This quarter, we

9     have to perform flawlessly to maximize our revenues and

10    margins."  And here is the key point:  "If that does not

11    improve, we will continue" -- it will continue to impact our

                         Page 98

122007 SJ Hearing.txt
12  conversion ratios."

13          The conversion ratios are those deals that didn't
14  close during the quarter because they were unable to even show
15  that preintegrated and interoperable suite of applications to
16  the customers that could have or would have been interested in
17  buying it.  So that is the -- at least one connection.

18          THE COURT:  That is your link.

19          MR. WILLIAMS:  That is one link.

20          Second link:  Defendants didn't address this during
21  their argument, and we think it's a major link.  One of the
22  things that Oracle said about Suite 11I is that they were using
23  it themselves and they were saving money.  But what we know is
24  that in January of 2000, they attempted to implement the
25  contracts module, which is called OKS.  Prior to that, they had

                                                                118


 1  said, look, this stuff is plug and play.  You put one module
 2  in, you can snap the other in, no problems.  It's up, it's
 3  working, you are live.  Oracle couldn't do it themselves.

 4          They tried to implement OKS during the class period
 5  and ended up losing money themselves because it wasn't working.
 6  And so is that a direct cause of the miss or a direct causal
 7  link?  It certainly is, especially as it relates to the
 8  application Suite 11I.  Defendants never addressed it in their
 9  papers, their reply to ours.  And they didn't talk about it
10  today.  I wonder why.

11          I just want to go on just quickly.

12          THE COURT:  They couldn't implement it.

13          MR. WILLIAMS:  They couldn't implement it
14  themselves.

15          THE COURT:  That establishes the loss on the other
16  end.

                            Page 99

122007 SJ Hearing.txt

17          MR. WILLIAMS:  I'm sorry?

18          THE COURT:  That is relevant to the loss suffered on

19     the other end.

20          MR. WILLIAMS:  Sure, because what happened was they,

21     themselves, missed their support forecast by at least

22     $8 million as a direct result of their own implementation of

23     Suite 11I.  That is admitted.  And they submitted that to the

24     Delaware court in their SLC report several years ago, so I

25     don't know if there is much of an issue of fact there.

                                                              119


1           I just wanted to finally show the Court the E-mail

2      from defendant Jeff Henley, again, going directly to the

3      failure to demonstrate Suite 11I to customers.  It's a two-page

4      document, and he is responding to another person complaining

5      about the inability to -- the inability to show Suite 11I to

6      customers.  And he says, "This is absolutely incredible.  We

7      are blowing the opportunity of a lifetime."

8           Both of these witnesses were asked about the

9      demonstrations during the litigation phase of the case, and I

10     have for you -- and this is actually in the document Powerpoint

11     that I gave you -- the testimony on page 19, Your Honor --

12     sorry, page 19 actually has the statement that they made on

13     December 14th to investors.

14          The demonstrations, we got all those ready now, and

15     we finished up all the training," almost repeated verbatim by

16     the analysts the next day.

17          If you go to the next page, here is what Henley said

18     about it during his deposition:

19          He says, "I was certainly concerned that not having

20     optimum demos was not helpful and it would suboptimize, you

21     know, our revenue opportunity."  It's a direct link to the

                              Page 100

122007 SJ Hearing.txt

22  problems with the functionality of Suite 11I to the company's

23  financial results for the third quarter of 2001.

24      What did Robert say about it?  He agreed, "We had

25  some issues with the demonstration system.  And if you can't

                                                            120


1  show your product the way you would like to, it can impact your

2  sales process."  The facts are relatively undisputed on this

3  issue, especially in the second quarter of -- sorry, third

4  quarter of 2001 and actually going into the fourth quarter of

5  2001.

6      THE COURT:  I'm to infer that it did impact them?

7      MR. WILLIAMS:  Sorry?

8      THE COURT:  I'm to infer that it did impact actual

9  loss from saying it could impact?  That is the statement you

10  gave to me.

11      MR. WILLIAMS:  Of the witness?

12      THE COURT:  Um-hmm.

13      MR. WILLIAMS:  Oh, what we have done, Your Honor, we

14  have given you the entirety of the testimony, but it's much

15  broader than that.  We asked Mr. Roberts whether or not it

16  impacted sales, and he says, well, it certainly could.

17      The other information, the other documents that --

18      THE COURT:  That's what I'm asking you, is that --

19  that's probative and substantive evidence?

20      MR. WILLIAMS:  Absolutely.  In our view it is.  The

21  evidence is undisputed; they lost deals because they couldn't

22  show the product demo --

23      THE COURT:  You go on with that.

24      MR. WILLIAMS:  Right.

25      So what was revealed on March 1st of 2001?

                                                            121

122007 SJ Hearing.txt

1           Pull up that first page.

2           So the press release on March 1, 2001, Your Honor,

3    that is page 25 of the document that I gave you.

4           So what did they say?  Earnings fell short of

5    forecast, up 2 cents per share.  They reported 10, they had

6    forecasted 12.  It's directly related to the false statements

7    in December of 2000 regarding the forecast of 12 cents per

8    share.  I don't think they dispute that.

9           They are saying, well, you haven't shown lost

10   causation with respect to applications, and you may not have

11   shown lost causation with respect to the accounting piece of

12   the case.  They don't really make an argument about the

13   forecast piece of the case.

14          THE COURT:  They did.

15          MR. WILLIAMS:  Not on lost causation.  They don't

16   think we can prove it.

17          THE COURT:  Right.

18          MR. WILLIAMS:  But they don't argue that we haven't

19   demonstrated a causal link between the forecast and the miss at

20   the end.  And, A --

21          THE COURT:  No, that's not true.  That's not what I

22   heard.  I asked that when I came out because it wasn't as clear

23   in their brief.  The way that they briefed, it looked to me

24   like they raised the lost causation issue with respect to

25   applications Suite 11I and with respect to the second quarter.

                                                          122


1    But the argument that was made here today encompasses the

2    forecast as well.  I don't know that I agree with them on

3    that --

4          MR. WILLIAMS:  Sure.  I understood the argument to

5    be that we couldn't prove the forecast, but I didn't understand

122007 SJ Hearing.txt

6    the argument to be that, you know, if we were able to prove

7    that the forecast was false and misleading that the miss was

8    not causally linked to the forecast.  I didn't understand that

9    to be the argument.

10            THE COURT:  Okay.

11            MR. WILLIAMS:  The third bullet point, what do they

12   say about applications?  Applications revenue growth fell

13   short, only 50 percent as opposed to forecasted 75 percent.  We

14   think that that is -- that provides a direct link to the

15   alleged fraud, and here is why --

16            THE COURT:  What alleged fraud?

17            MR. WILLIAMS:  With respect to the false statements

18   about the functionality of Suite 11I.

19            THE COURT:  Okay, that is what we are talking about.

20            You used a very general term.  We have been talking

21   the last four hours about different kinds of fraud.

22            MR. WILLIAMS:  I understand.

23            THE COURT:  I don't know that I would agree with you

24   that this direct link -- you have argued based on E-mails and

25   other documents that they were having problems with the

                                                              123

1    integration of -- component of the Suite 11I.  And you also at

2    a certain point have provided some statements that link

3    possibly those problems to possibly affecting conversion

4    ratios, so I have that.

5            MR. WILLIAMS:  Um-hmm.

6            THE COURT:  You want me to infer from that, seems

7    to me, that the miss in the third quarter of 2001 relates back

8    to these problems.

9            MR. WILLIAMS:  That is exactly right.

10            THE COURT:  That's not direct.

                    Page 103

122007 SJ Hearing.txt

11            MR. WILLIAMS:  Well, when I --

12            THE COURT:  It may be you argue inferentially it

13    supports -- it's enough for you to raise an issue of fact,

14    since they have shifted the burden.

15            MR. WILLIAMS:  I can accept that, Your Honor.

16            When I was viewing direct or thinking about direct,

17    I'm thinking that did the, what we alleged to be the fraud

18    related to Suite 11I, is that connected to the miss?  And so

19    the fraud relates to the false statements concerning the

20    functionality.

21            It wasn't preintegrated and interoperable.  Were

22    people buying it everywhere?  Was it saving money?  Absolutely

23    not, in our view.  Did that result in a miss in the

24    applications growth for the third quarter of 2001?  I think in

25    that regard it's causally connected.  Whether we say it's

                                                           124


1    direct or indirect and how is it going to impact the Court's

2    judgment, I can address any concerns the Court has about that.

3            THE COURT:  I'm just saying to you, you don't have

4    to prove it's the sole reason.

5            MR. WILLIAMS:  Right.

6            THE COURT:  You don't.  But you have the affirmative

7    leg up to establish initially.  That is your burden of proof on

8    that question; you don't disagree?

9            MR. WILLIAMS:  It's our burden of proof at trial.

10            THE COURT:  Essentially, it is based on the strength

11    of inferences I would draw from the problems to a miss at the

12    end of the third quarter.

13            MR. WILLIAMS:  Sure.

14            THE COURT:  Okay.

15            MR. WILLIAMS:  The fourth bullet point we think is

                                Page 104

122007 SJ Hearing.txt

16   directly or indirectly related to the inability to --

17           THE COURT:  Don't be --

18           MR. WILLIAMS:  -- the inability to actually sell a

19   product or to have a product that did what they said it was

20   going to do.

21           What they said about Suite 11I was that, you know,

22   this IT spending issue, not a problem for us.  You know why?

23   We have a product that we have been working on for the last

24   three years that is actually going to save customers money in a

25   down economy.  That was the expectation that was set by

                                                           125


1    investors.  That is at least one of the reasons why investors

2    bought the stock.  Oracle was going to survive this downturn,

3    they didn't.  And one of the reasons they didn't was because

4    they didn't have the software they said they had.

5            The last one, of course, you know, the problem is

6    the economy, which is exactly the opposite of what they said

7    wasn't affecting them.  And again, it's related to the Suite

8    11I issues because Suite 11I was going to save customers money

9    in a down economy.

10           They went further during the conference call of the

11   same day.  I think I've touched on the first point, but on the

12   second point, both large deals and small deals didn't close.

13   One of the things that the analysts and investors were

14   concerned about on December 14th was the number of large deals

15   surrounding applications in the second quarter.  And the

16   expectation that was set by Mr. Henley, and I can show you the

17   document, if you would like to see it, Your Honor, was that the

18   investors should expect that more large deals will be

19   surrounding applications just because the demand was there for

20   applications.  So when they said that both large deals and

                              Page 105

122007 SJ Hearing.txt

21  small deals didn't close, I think that actually indicated, to

22  sophisticated investors at least, that applications certainly

23  wasn't selling in the way that they had forecasted they would

24  sell.

25          I think some of these are self-explanatory, but I

126

1   just want to go down to the last one, Your Honor, where they

2   said, "The pipeline is full of deals that didn't convert"; in

3   our view, that is directly connected to the conversion ratios

4   that dropped, at least in some part, due to the fact they had

5   no product to actually show customers to buy, which is some of

6   the evidence that I was showing you a little bit earlier.

7          Can you go to the next page, please.

8          The last, and I think one of the key factors here is

9   that Oracle couldn't give guidance for the future when

10  applications in Suite 11I was going to be the basis of future

11  growth for this company.

12          You might recall, it's in the papers, the database

13  product, which was the primary product, was Oracle's -- I'm

14  lost for words here, is their flagship product.  It was mature.

15  They didn't expect any growth or any large growth from the

16  database product.  Applications was it.

17          When they told investors they couldn't give guidance

18  on future earnings or revenue growth, that had an impact.  And

19  it was directly related to applications, again, because

20  applications were supposed to survive.  11I was going to

21  survive the economic downturn because of its efficiencies.

22          We think that that, you know, we think with respect

23  to 11I that we have satisfied, at least at this stage, the

24  causal connection for lost causation purposes.  And maybe a

25  jury will agree with us, maybe they won't, but here I think

122007 SJ Hearing.txt

127

1   we've satisfied that.

2           I would like to pass the baton to have a couple of

3   the Court's other questions answered.  I do know that there is

4   an outstanding question with respect to Mr. Steinholt and the

5   assumptions that he drew and how that relates to the summary

6   judgment.  What I didn't understand, if you could clarify for

7   me; were you taking up the Daubert piece of it, whether or not

8   he is qualified to testify or were you --

9           THE COURT:  They have attacked that.

10          MR. WILLIAMS:  I understand that.

11          THE COURT:  I think you should respond to it if I'm

12  going to consider his opinions.  And mostly it's around the

13  event study, I think.  I think that is the biggest area of

14  inquiry on that.

15          MR. WILLIAMS:  Since we are talking about it, let me

16  just say one thing.  If you -- if the Court has specific

17  questions about it that are kind of beyond the buoy for me,

18  Mr. Steinholt is available today to answer any questions.  I

19  know earlier you had said that you might want testimony.

20          He doesn't have to testify.

21          THE COURT:  I don't need to hear from Mr. Steinholt.

22          MR. WILLIAMS:  Okay, very good.  Let me just see if

23  we can get some of the other questions answered.

24          THE COURT:  Ready?

25          MR. GREENSTEIN:  I have the fortunate privilege of

128

1   talking about accounting at 1:30 after a start time of 9:30.

2   So I apologize in advance.  I'm going to try to keep it short

3   and simple.

Page 107

122007 SJ Hearing.txt

4            I think the accounting claims in this case are
5    relatively simple, if you really cut to the chase.  And our
6    claims are that Oracle issued false and misleading second
7    quarter financial results on December 14th.  They issued a
8    report saying they had earned 11 cents a share, and in reality
9    we believe the evidence shows that they didn't earn 11 cents a
10   share.
11           Now, it is undisputed that Oracle's internal
12   documents, upside reports the defendants have relied on for the
13   forecasting part of this case, that those internal reports show
14   that as of November 30th, December 1st, 2000, December 5th,
15   2000, five days after the quarter ended, that their internal
16   reports show that they did not earn 11 cents a share.
17           On November 27th, there is an internal upside report
18   prepared by Minton that is circulated to the Executive
19   Committee.  There was an Executive Committee meeting on
20   November 27th, 2000, that is Op Exhibit 30.  That upside report
21   shows that Oracle, as of three days before the end of the
22   quarter, had actually earned 9 cents a share.
23           When you include Minton's upside number to that,
24   that the potential, the best case scenario was 10.34 cents.
25   That is three days before the end of the second quarter 2001.
                                                            129


1            On December 1st, another upside report was printed
2    out.  That is Op Exhibit 7.  And that also shows that Oracle
3    earned 9 cent actual, and with Minton's upside that Oracle
4    only -- the best case scenario was 10.34 cents per share.
5    Again, that is Opposition Exhibit 7.  And that is a day after
6    the quarter already closed, Your Honor.
7            Now, we have another upside report, or an executive
8    report dated December 4th, and that is four days after the

122007 SJ Hearing.txt

9    quarter closed.  Again, the actual:  9 cents.  And that is

10   Exhibit 205.

11         December 5th:  That is a date of another Executive

12   Committee meeting with Ellison in attendance, Henley in

13   attendance.  And that upside report shows that five days after

14   the quarter closed, the actual is 9.1 cents and the potential,

15   the best-case scenario has dropped from December 4 to 10.22

16   cents.  So as of five days after the quarter closed, undisputed

17   internal Oracle documents, which I didn't even see any slides

18   on these, show that Oracle earned 10.22 cents best-case

19   scenario.  They actually earned 9 cents if you look at the

20   actual.  And that's as of December 5th, 2000.

21         So where do they get the extra $40 million?

22   Because, as you saw from the slide, the ultimate result was

23   10.6, which they rounded up to 11.  So according to this

24   report, it was 10.22.  You add 40 million to that, you get

25   around 10.6.  So where did they get the 40 million?

                                                              130


1          The first place they got the $40 million was from a

2    slush fund of customer money.  Now, it is undisputed that

3    Oracle had been keeping customer money in a fund called

4    "Customer Overpayments" for many years.  I think Mr. Wald said

5    back since 1998 that that was a problem for them.  Everyone

6    says it was a problem.  And so what they did was they took

7    20 million of that from that fund and transferred it to revenue

8    and earnings.

9          Now, Paul Regan, our accounting expert, has opined

10   on this.  It's undisputed that that money was transferred from

11   the Customer Overpayments account directly to the bottom line.

12   Their expert, who -- and I'll address this, if Your Honor wants

13   to talk about it later, but their expert, Duross O'Bryan, we

122007 SJ Hearing.txt

14   believe his entire opinion on this should be excluded for a

15   number of reasons.

16         Bottom line is, we have Paul Regan issuing an

17   opinion saying that this 20 million was transferred.  All of it

18   was improper.  It went directly to the bottom line and it

19   materially inflated their second quarter results.

20         Now, interestingly enough, defendants attacked every

21   one of our experts, they didn't attack Paul Regan.  So the

22   record is our expert says that that is what happened.  It

23   violated GAAP.  It was material.  And that has gone

24   unchallenged.  His qualifications are unchallenged.  The

25   reliability of the data he used is unchallenged.  His

                                                          131


1   methodology is unchallenged.  And the application of his

2   methodology to the facts is unchallenged.

3         What you have is a report, and I submit to Your

4   Honor that that creates a question of fact right there.  But

5   the evidence corroborates what Mr. Regan says, and they have

6   not challenged Mr. Regan other than to disagree with him, which

7   creates a question of fact.

8         Now, the second part, so they got 20 million from

9   this customer fund.  Now, the other 20 million, as you know,

10  came from a classic swap deal between HP and Oracle.  Some

11  people call it a reciprocal deal, some people call it a barter

12  deal.  Essentially what it is is one company says I'll buy some

13  product from you, you buy from me, we'll just exchange the

14  revenue.  We'll both book revenue, and that is it, regardless

15  of whether you actually need the product.

16        And there are a lot of slides up there, and like

17  Sean said, they are very pretty, but I didn't see a lot of

18  documents, so I want to show you some of these documents.

                            Page 110

122007 SJ Hearing.txt

19          I haven't seen many smoking guns, but I got to say,
20   I'll show you five right here of what I think are smoking guns
21   on the HP deal.
22          The first one is Opposition Exhibit 60.  This is a
23   November 9th E-mail, Your Honor, internal E-mail.  We didn't
24   see a lot of the evidence on the HP deal in Mr. Wald's
25   presentation.  It's a November 9th deal.  This is from

                                                              132


1    Mike DeCesare who we heard from before who is the area vice
2    president on this deal who said the product didn't work, the
3    functionality that HP wanted was never there.  And that is
4    corroborated by other evidence.  So November 9th, 2000 the last
5    month of the second quarter.
6          This is an E-mail to Edward Sanderson, Sandy
7    Sanderson, a defendant in this case.  I don't think there is
8    any dispute that this E-mail was sent to him.  It says, "Sandy,
9    Frank.  HP confirmed today that they will try and pull the CRM
10   portion of the order off providing we deliver what we have
11   outlined in the development and production systems."  And this
12   is the important part:  "Since they don't need all the license
13   users right now, they are hedging" -- and I think Your Honor
14   used that word, hedging, "they are hedging on how big an order
15   they will do until they see how much production hardware Oracle
16   comes back with.  If this turns out to be a large number, we
17   could get the entire order."
18          To me, that is a smoking gun.
19          THE COURT:  What does that tell me about what
20   happened?
21          MR. GREENSTEIN:  What this tells you, and I'll get
22   to these other documents, it tells you that the fundamental
23   premise behind this deal was reciprocal in nature.

                              Page 111

122007 SJ Hearing.txt

24          THE COURT:   That is not a smoking gun.

25          MR. GREENSTEIN:   Well --

                                                          133


1           THE COURT:   That doesn't tell me what happened at

2     the end of the day.

3           MR. GREENSTEIN:   I'm going to get to the others, and

4     maybe all five documents will provide a smoking gun.

5           So that is November 9, 2000, couple weeks left in

6     the quarter.   They are saying they are going to hedge the deal.

7           The second page of that document at the top there,

8     it says, "According to Film A, HP is willing to buy as much CRM

9     from Oracle as we buy in hardware, HW."   So again, it shows the

10    reciprocal nature of the deal.

11          The next document chronologically, November 11,

12    2000, and that is Opposition Exhibit 61, an E-mail from

13    Mark Barrenechea, a senior vice president at Oracle.   Again,

14    look who's CC'd.   Ellison, Sanderson, a number of other

15    individuals.   It says, "HPQ2 order update."   And at the bottom

16    it says, "We have an opportunity to move a Q3 15 million CRM

17    order into Q2."   So internally this establishes a link, don't

18    you think, between Q2 and Q3.   They're saying they're going to

19    pull in a deal from Q3 into Q2.   I'm not suggesting that makes

20    the causal link that we talked about before, but it's one fact.

21    So this is November -- November 11th, I believe.

22          If you look at the second page of that.   And it's

23    the second bullet --

24          If you can blow that up.

25          It says, "Production Hardware Commitment," and it

                                                          134


1     says, "Conway Snyder is currently working with all Oracle

2     organizations to come up with what hardware Oracle will need to

                          Page 112

122007 SJ Hearing.txt

3    purchase to fulfill our commitment of 100 percent of database

4    servers on HP by June.  We need to ensure this is a

5    comprehensive list," et cetera.  This is the important point:

6    "We will then need to cut HP a binding purchase order for this

7    hardware, even though it will be ordered as needed."  Okay?

8           So before we saw an E-mail that said they are

9    hedging on users that they don't even need yet, HP doesn't even

10   need this stuff yet, and now here is another E-mail that says

11   even though we are going to order it as needed.  Well, that is

12   not compliant with GAAP.  And Mr. Regan says that, which has

13   gone unchallenged.

14          If you go to the second part of that E-mail, it

15   said, "Provided HP has the confidence that both companies have

16   a common game plan on the development side and HP has

17   confidence that Oracle is stepping up to all the hardware they

18   feel we have already committed to purchase, they have committed

19   to move forward on the CRM order.  I believe we will need Larry

20   to speak to Carly after we have the above needed documentation

21   as a final step."  So they are going to need Larry Ellison to

22   talk to Carly Fiorina, which he does.

23          The next exhibit in time is an internal E-mail dated

24   November 28th, 2000.  This is Op Exhibit 59.  Again, this is

25   from Michael DeCesare to Larry Ellison and Sandy Sanderson and

                                                                135

1    a number of executives.

2           The first page -- in the first bullet it says,

3    "Production Spent."  It says, "Consistent with Larry's

4    conversations with Carly, HP will expect a purchase order for

5    the following amounts.  They will expect this purchase order to

6    be binding and commit Oracle to using the full amounts by the

7    dates we promise.  10 million by December 31st, 10 million by

122007 SJ Hearing.txt

8    May 31st."  That second bullet talks about Larry's conversation

9    with Carly again.

10           If you go down to the last bullet on the page, and

11   this kind of ties into the 11I issues, "CRM Functionality

12   Issues," functional issues, "There are 14 showstoppers that HP

13   feels are keeping them from being able to achieve their global

14   rollout."  So they are already having problems.  Before they

15   even book this deal, they are already having problems with the

16   existing software that they have, the CRM.  And that is on

17   November 28th, two days before the end of the quarter.

18           If you go to the last page of this document, it's

19   Bates Number 020849, has some handwriting.

20           If you blow up the -- sorry, underneath the last

21   typed information, "we can make happen now"?

22           Now, Sandy Sanderson testified this is his

23   handwriting.  And what this says is -- again, this is two days

24   before the end of the quarter -- "we can make happen now" --

25   "require HW purchase," which is hardware purchase from what we

                                                                  136

1    have seen from the other documents, "or wait till May showing

2    we've delivered."  One of the elements of 97-2, according to

3    Mr. Wald's slides and our experts is that you have to deliver

4    the product.  It has to be functional and you actually have to

5    deliver it.

6            So here he is talking about we can make it happen

7    now if we buy some of their goods and -- or wait until we have

8    delivered the actual product; well, you can't wait to deliver

9    the product until after you book the revenue, as Mr. Regan said

10   in his report.

11           The next document is Op 57.  This is on the last day

12   of the quarter, Your Honor.  And this is from Safra Catz to

122007 SJ Hearing.txt

13  Tom Williams, who was a VP, and Jennifer Minton, who prepared

14  the upside.  This is the last day of the quarter, and this is a

15  string of E-mails.  And it says, "Safra, I understand Larry and

16  Carly are discussing their purchase of our products this

17  quarter if we commit to purchase 20 to 30 million of their

18  product over the next 18 to 24 months."

19          This is the last day of the quarter, and they are

20  talking about -- Larry and Carly are discussing this, and it's

21  completely reciprocal.  This a classic swap deal.  There are a

22  lot of accounting rules involved in this deal, but if you just

23  read Reagan's report, he goes through all the reasons it

24  violated GAAP, violated numerous provisions of GAAP.  I think

25  these documents are important just to show, you know, to a

                                                            137


1   reasonable juror was this a swap deal or was it not?  Looks

2   like it was a swap deal that everybody knew about.

3           Now, the last document I want to show you about the

4   HP transaction, and then I'll move to the debit memos, is Op

5   Exhibit 63.  Now, this, I would submit to Your Honor, is a

6   smoking gun, if I've ever seen one.  I know you'll disagree

7   with me, but --

8           THE COURT:  I don't know that that helps you because

9   there is no foundation for -- that establishes you know what a

10  smoking gun is.

11                  (Laughter.)

12          THE COURT:  But you could cleave that from your

13  presentation and just argue the facts.

14          MR. GREENSTEIN:  True, Your Honor.

15          THE COURT:  All right.

16          Now, this document is one of the documents that

17  memorializes the HP deal.  Now, interestingly, you can see the
                              Page 115

122007 SJ Hearing.txt

18    date on the top of it, which is December 1st, 2000, okay?  That
19    is the fax line.  There are a lot of documents that say
20    December 1, 2000.  There is a disputed fact as to when this
21    deal was signed, okay?  A lot of documents say December 1st.
22    There is probably one or two that say November 30th.  Again,
23    Paul Regan, our expert, said he found this deal was not signed,
24    or at least there wasn't enough evidence to say --
25               THE COURT:  Why would I take his opinion on that
                                                                    138

1    question?  That is not the province of an expert, to say when
2    something is signed or not.
3               MR. GREENSTEIN:  Whether or not -- if something is
4    not signed, whether that precludes revenue recognition.
5               THE COURT:  That is a different question.
6               MR. GREENSTEIN:  So our expert, Paul Regan, found
7    that based on the evidence that he looked at, the fact that
8    there was not enough evidence to say that you can book this
9    deal as of November 30 -- and he was looking at the swap
10    E-mails as well as a lot of other documents.
11               So Sandy Sanderson, a defendant in this case,
12    testified that this was his handwriting.  And if you look at
13    the top, it says the real story.  And if you -- and it has the
14    deal kind of laid out.  And then on the left-hand side, the
15    last -- right there.  This says, "Is this the way we are going
16    to do deals?  Each has to buy something," with an exclamation
17    point.
18               Now, he testified that he wrote that, you know.  He
19    tried to explain it away.
20               THE COURT:  Is there a problem under 97.2 with each
21    side buying something?
22               MR. GREENSTEIN:  Yes.
                                Page 116

122007 SJ Hearing.txt

23          THE COURT:  What's the problem?

24          MR. GREENSTEIN:  It lacks economic substance.

25          One of the slides that Mr. Wald put up was to say

                                                              139


1  you need --

2          THE COURT:  Isn't that a value determination?

3          MR. GREENSTEIN:  What's that?

4          THE COURT:  Is that a value determination?

5          MR. GREENSTEIN:  There is.  And like I said, it's

6  complex accounting rules, but bottom line is if you pay

7  30 million to get 20 million, you have to net that out somehow.

8  You can't just book the 20 and not take the 30.  I'm

9  simplifying that.

10          THE COURT:  I've had quite a bit of experience with

11  97.2 over a broad range of cases, I've never heard it explained

12  as --

13          MR. GREENSTEIN:  It's whether a deal --

14          THE COURT:  -- as you've set it forth there.

15          But that is a nonissue.  It's what inference I draw

16  from this document right here and the reference in that

17  document.

18          MR. GREENSTEIN:  I would submit to Your Honor that

19  at the worst these documents raise a question of fact about

20  this deal.  And there are a lot of other documents that are in

21  our papers, but I think a juror reading these -- seeing these

22  documents may find, and hearing testimony of our expert and

23  their expert, that it's about experts, whether this was proper

24  or not.  The face of the documents I think speak volumes.

25          I lied, there is one more document I want to show

                                                              140


                          Page 117

122007 SJ Hearing.txt

1  you on the HP deal, it's Op Exhibit 64.  This is pretty

2  remarkable.  This is November 30th, 2000.  So they held a

3  special meeting on the last --

4          THE COURT:  You can't get away from this.  "Smoking

5  gun," "remarkable."

6              (Laughter.)

7          MR. GREENSTEIN:  Sorry.  My first summary judgment

8  argument.

9          THE COURT:  You are paralyzing my thought process

10  when you use terms like that.  It doesn't take much to paralyze

11  that process.

12              (Laughter.)

13          THE COURT:  It's getting long in the day, so let's

14  get --

15          MR. GREENSTEIN:  All I want to say about this

16  document is they have a special meeting on the last day of the

17  quarter.  Ellison was there, Henley was there.  And they did

18  this -- it's redacted, so we don't know, but they held a

19  meeting on this deal.  And they established a quorum because

20  Donald Lucas, another board member, wasn't there.  So it was

21  Ellison and Henley.  They all knew what was going on here.

22          THE COURT:  Depending upon what the actual deal was.

23          MR. GREENSTEIN:  I mean, Larry negotiated this deal.

24          THE COURT:  Okay.

25          MR. GREENSTEIN:  So that is it with HP.

                                                         141


1          THE COURT:  Now the debit memos.

2          MR. GREENSTEIN:  Right.

3          The first thing is that defendants have tried very

4  hard throughout this case to separate out the debit memo issues

5  and these transfers of customer overpayment issues, and you

122007 SJ Hearing.txt

6   can't do that.  If we get into the spoliation side of this
7   case, it's clear that those two issues are one in the same.
8   And our expert says the same thing, okay?  Every single
9   customer overpayment that was transferred, the 20 million, from
10   the customer overpayments account to the earnings and revenue,
11   was applied to a November 17th debit memo, okay?  So the
12   issue -- you can't unwind the issues.
13         Now, these debit memos, what happened was when you
14   apply a customer overpayment to a debit memo, it makes it look
15   like it was applied to a legitimate invoice, right?  So they
16   create these debit memos.  They look like invoices.  And they
17   apply this money to the debit memos, and essentially it
18   disappears.  Looks like somebody paid and it was applied to an
19   invoice.
20         Now, but the money that they transferred was not
21   their money.  And they shouldn't have applied it to those
22   invoices, and they did.  And that's how they clean up.  Right
23   after we filed our accounting allegations, they engage in this
24   cleanup.  And they say it has nothing to do with the debit
25   memos, but if we get into the spoliation, I'll show you --

                                               142

1         THE COURT:  How does that affect the revenue?
2         MR. GREENSTEIN:  The debit memo issues?  The
3   transfers went directly to revenue, directly to earnings, their
4   expert admits that.
5         The transfer of that money -- I can find a quote, if
6   the Your Honor would like.
7         O'Bryan depo at 146, 19 through 25.  This is
8   Duross O'Bryan.  He says, "In my opinion, there were really two
9   investigations that went on with respect to how to apply
10   250050," that is the customer overpayment account, "to 12601,"

11  that's a components of the bad debt reserve.

12          "Some of them are in October/November of 2000, when

13  individuals made decisions to transfer from 2505 to 12601."  So

14  he admits that the transfers took place.  That went right into

15  income, actually went into the reserve that went into income.

16          THE COURT:  You were going to tell me how it

17  affected the bottom line, how it affects revenue.

18          MR. GREENSTEIN:  Okay.

19          THE COURT:  That's what I asked.

20          MR. GREENSTEIN:  Okay.  Overall, the 20 million in

21  transfers affected the bottom line by $20 million, .2 cents a

22  share.

23          THE COURT:  Okay.

24          MR. GREENSTEIN:  So and that is why you see, I mean,

25  you see it go from 10.22 on December 5th, after the quarter

                                                              143


1   close, and now all of a sudden they are at 11.  And if you

2   calculate it, it's 10.6.  And there is no explanation from

3   where the money came from, because the evidence shows it came

4   from 20 million in transfers related to the debit memos and

5   20 million from the HP transaction.  There is no evidence to

6   the --

7           THE COURT:  They have put forth evidence about those

8   transfer memos and credits on the other side, I believe.

9           MR. GREENSTEIN:  But they are looking at this issue

10  on one day, on one day.  They are looking at when the actual

11  pieces of paper were created, but that is not what this issue

12  is about, it's a process.

13          As Reagan explained, the debit memos were part of

14  the process that they had.  They had these customer

15  overpayments for a long time, and they transferred them

                        Page 120

122007 SJ Hearing.txt

16    and then --

17          THE COURT:   It's got to -- it's got to reflect --

18    the argument is that, okay, there was a -- it affected the

19    earning per share, that is one of the arguments, I asked you --

20    and implicitly in that, you are saying that they -- that

21    revenue was a function of earning per share.

22          So you are saying that that miss means that they had

23    money that they couldn't account for.  They come back and said,

24    at least with respect to these debt transfer, we offset them.

25    So that's not reflective in our revenue increase, and it

                                                              144

1     doesn't relate to, necessarily, the earning per share.

2          MR. GREENSTEIN:   Okay.  So are you speaking of

3     defendants saying that 2 million of those transfers was --

4          THE COURT:   That is a subissue, that they say you

5     can't account for all of it as well.  But they have experts who

6     account for from the documents an aspect of that, of the

7     transfer.

8          MR. GREENSTEIN:   And like I said, Your Honor, if you

9     want me to get into the unreliability of that speculative

10    opinion from Mr. O'Bryan, then I will on the Daubert motion.

11          Bottom line is this:  Of those two million they

12    attacked, 500,000 of that money was -- was an amount that

13    Mr. O'Bryan said during his depo that he couldn't really say

14    definitively that it was proper.  I'll just quote you the depo.

15    So --

16          THE COURT:   You don't have to, I'll take a look at

17    it.

18          MR. GREENSTEIN:   Okay.

19          Bottom line is he said he will put it in the bucket

20    of "could be," could be proper.  Well, could be proper

                          Page 121

122007 SJ Hearing.txt

21  doesn't -- I mean, could be proper doesn't carry their burden

22  if they are moving for summary judgment.  And it certainly

23  creates a question of fact as to what happened to this money.

24  I don't think he should be able to testify in front of the jury

25  at all because I think that is speculative.  "Could be" bucket

145

1   is completely speculative.

2           I think that gets us falsity.  You can see the

3   documents, the upside reports.  I don't think on one hand they

4   can say that for the forecast they rely on the upside reports

5   and the potential number and at the same time just ignore the

6   ones in the second quarter, which show they did not earn 11

7   cents per share as of December 5th, five days after the

8   quarter.

9           Now, I know on the -- I know we don't necessarily

10  agree that the potential number is correct, okay, but what I'm

11  saying is if you take that as true with respect to the second

12  quarter, they did not earn 11 cents per share.  We have

13  submitted evidence that they got the money in order to earn 11

14  cents per share from the customer transfers and HP.  And that

15  gets you Scienter.

16          And the last thing would be materiality, if Your

17  Honor wants to talk about that.

18          THE COURT:  No, I don't think that -- I don't think

19  that is where the rubber meets the road with respect to --

20          MR. GREENSTEIN:  Okay, thank you.

21          MR. SOLOMON:  What I would like to do, if it makes

22  sense, is talk to you about the forecasting case and the

23  selling and then thereafter talk about spoliation and evidence

24  destruction separately, if that meets with your approval.

25          Your Honor, I believe that what happened in the

146

122007 SJ Hearing.txt

1    second quarter of '01 and the third quarter of '01 is precisely

2    what the SEC certainly under Arthur Levitt was trying to stamp

3    out.  They are trying to stamp out unlawful earnings

4    management, trying to stamp out unlawful insider selling.  And

5    I think that you have both together here in a fairly classic

6    way.  What I want to do is sort of jump into the middle and

7    start with Ellison and his sales and work around that.

8              If we can go to the first slide.

9              On January 17, Ellison received a flash report

10   detailing Oracle's dismal December 2000 results.  Within 36

11   hours of receiving the report, Ellison, who is on a boat

12   somewhere we think in Mexico, we are not sure, we know he was

13   E-mailing constantly, we know he was in contact with the

14   company, instructed Mr. Simon, his financial advisor, to begin

15   unloading his stock.  Mr. Simon has testified that he was in

16   New Zealand up until January 19th, had no idea up until then

17   that Mr. Ellison had these plans, but, of course, once he

18   received them and received the instructions, he started to

19   execute on Mr. Ellison's instructions.

20             And, as you know, the Ninth Circuit has described

21   what was simply astronomical in terms of the amount of stocks

22   sold, 895 million, in what, nine days.

23             Prior to January 19th, not only had Mr. Ellison not

24   told Mr. Simon, he hadn't told anybody what he was going to do.

25   Nobody at Oracle, no witnesses that we have spoken to claim any

                                                            147


1    knowledge of other than Ms. Catz, and we'll get to that, as to

2    his intention to sell.

3              Every indication was until then that he planned to

4    sell in April or in the summer.  There is no document prior to

122007 SJ Hearing.txt

5    January 19th that suggests any intention to sell in January.

6    The only documents that we have that evidence what the plan was

7    suggest that it would have been April 2001 or thereafter.

8            Next slide.

9            It's not that it was only Mr. Ellison and Mr. Henley

10   beforehand who were thinking of selling, there is a host of

11   people close to Mr. Ellison who are planning on selling as

12   well.  Ms. Minton and Mr. Sanderson contemplated selling.

13   Ms. Minton explained she hadn't sold stock for a long time, and

14   she hadn't sold any in 2001.  She was sufficiently nervous

15   about the economy that according to the defendants was fine at

16   the time.  She was sufficiently nervous about the economy that

17   she wanted to sell.

18           She recalls Sanderson wanting to trade as well, and

19   she interpreted this as Sanderson sharing her concerns about

20   the macroeconomic climate.  Of course, we are told that we

21   invented this phrase, the "macroeconomic" event; in fact,

22   Mr. Sanderson himself in January was talking about the

23   macroeconomic event, which was the decline.

24           Ms. Catz, not quite sure what her current story is,

25   but at one point she said she didn't know that either Ellison

148

1    or Henley was selling at the time.  She told the Special

2    Litigation Committee that.  But we find an E-mail that says I

3    just found out something, so I don't think I should trade.

4            And later, apparently, Ms. Catz explains it to the

5    SLC Committee that she found out that Mr. Ellison was selling,

6    and that was the material event that she had discovered that

7    somehow was going to inhibit her from selling.

8            Cooperman, the general counsel, sold on January 4th

9    along with Mr. Henley.  That was the day, of course, that

Page 124

122007 SJ Hearing.txt

10  Mr. Henley told internally at Oracle that all signs pointed to

11  a downward economy and the risk of slippage of deals, that is

12  what he told the board and the Executive Committee, and then he

13  sold.

14          Cooperman went along with him.  Cooperman and Henley

15  were the people that were supposed to authorize insider selling

16  at the company.  And I guess Cooperman authorized Henley,

17  Henley authorized Cooperman.  And we know that Henley had

18  nothing to do with authorizations from Mr. Ellison.  And, in

19  fact, Mr. Henley has testified that, really, he didn't really

20  have a role in authorizations, it was really Mr. Cooperman.

21  Sort of two stories being played simultaneously.

22          Also, Jay Nussbaum, Sergio Giacoletto, Don Lucas and

23  Michael Boskin, they all sold.  Incidentally, Lucas didn't even

24  seek permission to sell.  He sold without any authorization.

25          Ellison did not have plans to sell in January 2001,

                                                          149


1  period.  On the very day that Mr. Simon came back that Mr. --

2  Ms. Balkenhol informed him that Ellison was ready to sell.  But

3  if you look at the January 10 E-mail from Deborah Lange to

4  Jeff Henley, says, "Jeff, we are working with Larry's

5  accountants re: the timing of his exercise of his option, which

6  expire August of this year.  Now, he may be willing to exercise

7  in April if it's beneficial for the company.  The unknown

8  factor is the relative stock price, April versus August."

9          THE COURT:  You can summarize.  You don't have to

10  read them word for word.

11          MR. SOLOMON:  Thank you, Your Honor.

12          THE COURT:  Okay.

13          MR. SOLOMON:  What would prevent Mr. Ellison from

14  selling?  Good question.  What would have prevented you on

122007 SJ Hearing.txt

15  January 19th from embarking on your sales?  And Mr. Ellison
16  testified the sort of thing that would stop him intraquarter
17  from engaging in sales.  He said if there was a massive drop in
18  our sales in Europe suddenly in the middle of a quarter, which
19  is where he was, or after the end of the first month, he wasn't
20  far from there.  It was some substantial material financial
21  event occurring during the quarter, that would have required me
22  not to trade, that is what Mr. Ellison says.  Well, in fact, if
23  you look at OSI and NIS together, those sales make up more than
24  Europe.

25          If you look, and I'll get to a slide in a few

                                                              150

1   minutes as to what had happened in December for NAS and OSI,
2   that sold almost nothing, five percent of the quarter, almost
3   nothing.  And there were reports coming in of NAS problems.
4   And there is demonstrable evidence that the deals they were
5   counting on in OSI in January were very unlikely to close.  The
6   only good news they had, and if that was good news, was that
7   Covisint had come in in December for 60 million.

8          Now, of course, we have heard from Ray Lane, there
9   is an evidence destruction or withholding of evidence issue, if
10  ever there was one, we know from the Ray Lane declaration that
11  we were finally able to get that the defendants never provided
12  us and are now pretending they didn't have to because they had
13  sealed it in Delaware even though they provided other documents
14  sealed in Delaware to us, we know that he thinks, he testifies
15  there is really a July deal anyway, Covisint, or it was a
16  second quarter deal as it got reconstructed.

17          And the fact the Covisint happened in December does
18  nothing to provide Ellison or anybody else with a basis for
19  believing that that sets a trend for the third quarter.  And
                            Page 126

122007 SJ Hearing.txt

20 internally at Oracle, just as our expert has, they would, for

21 trending purposes, back out Covisint so they could see really

22 where they were heading.

23          What did Mr. Ellison want to look at, then?  We know

24 that if there was a major event, if Europe was a problem, or

25 whatever, that would stop him from trading.  What did he look

                                                              151

1 at intraquarter?  This is what he looked at:  He analyzed the

2 data personally.  He looks at the actual size of the pipe, the

3 size of pipeline, how much is actually being sold.  Very

4 important.

5          So what did, on January 19th, Mr. Ellison know that

6 the investing public didn't know?  He knew of, we believe, the

7 accounting fraud in the second quarter.  He did a midnight swap

8 deal, CEO of one company with the CEO of another company.  I

9 don't know how often that happens, but I think the jury would

10 be interested to hear that it happened at all.

11          He knew about 11I problems.  Our briefs describe a

12 legion of 11I problems, from functionality to demo testing,

13 customer dissatisfaction.  And remember what Mr. Ellison had

14 said prior to this quarter was we're there.  We've got the

15 product.  We know we had problems, but we're there.  It's

16 stable.  We are on our way.

17          Now, also just before the class period, Fortune

18 Magazine interviewed Mr. Henley and described him as sputtering

19 mad.  Why was he sputtering mad?  Because Oracle's stock price

20 collapsed in September and October.  And he said he was going

21 out to issue a press release because he wanted to get that

22 stock price back up again.

23          I think what happened in the end of the second

24 quarter and the inevitable consequences of that carrying out

122007 SJ Hearing.txt

25    into the third quarter is a function of their intense anger

152

1    that the stock had collapsed and a determination, come hell or

2    high water, that they were going keep that stock price up, they

3    were going to maintain the impression that the 11I had

4    traction, they were going to sell stock and then deal with the

5    consequences.

6           What else did Mr. Ellison know?  He knew they had

7    terrible forecasting problems.  They were going into a

8    different economy.  The growth rates were slowing dramatically,

9    they knew it.  The year before, growth rates were increasing

10   dramatically.

11          They knew there was a change in product mix.  In

12   fact, it was a new product.  11I was new, we know untested, we

13   know issued prematurely.  Ellison and Matthew Simons and

14   Softwar all speak eloquently to that in various forms.

15          And we also know that whether they like it or not,

16   Ellison issued in the fall a directive to put more risk into

17   the forecast.  If you want it to be supposedly more accurate,

18   get to that 100 percent, I don't like that 84 percent.  What

19   does that logically imply?  It implies more risk.

20          At the same time, Ellison and Sandy Sanderson with

21   the pipeline had told their sales people dump everything into

22   it.  We are sick of you wondering if you will get second

23   guessed.  Put anything in, it's okay.  We want you to put every

24   prospect into pipeline.

25          So you end up at the beginning of the third quarter

153

1    with a company that has so radically changed what's going into

2    its information systems that we submit they had no business,

Page 128

122007 SJ Hearing.txt

3  particularly in light of the economy, they had no business

4  forecasting.  They should have said things are at a stage where

5  we don't know.  And we may not make the expectations.  Why

6  can't they say that?

7          THE COURT:  That is not realistic.

8          MR. SOLOMON:  Ahh, I hope the jury will understand

9  that that should be realistic.

10          THE COURT:  All right.

11          MR. SOLOMON:  December actual results, that is what

12  he also knew.  He knew when he started selling that all of the

13  US license divisions making up half of the US revenue were

14  severely negative, negative growth rates of up to 80 percent.

15  That is what he knew.

16          He had it in his possession.  He hasn't denied it.

17  He has embraced it.  He's admitted it.  I had it all.

18          The next slide, please.

19          December is supposed to be a much bigger starting

20  month than usual.  When I spoke to Mr. Ellison about this, he

21  didn't realize, but then he speculated, okay, end of the year,

22  try to get products sold before the end of the year, maybe it

23  is a big quarter.  As I said, the license divisions made up

24  50 percent.  And NIS and OSI alone made up 40 percent of

25  Oracle's license revenues.

                                                          154


1          And if you go to the next slide, please.

2          If you look at applications, US divisions were

3  forecasting 323 million in apps excluding Covisint in

4  December 2000.  Oracle's US divisions sold less than 1.3

5  million in apps.  Remember Mr. Ellison looks at actual sales.

6  This represented year over year apps license growth of negative

7  92 percent.

Page 129

122007 SJ Hearing.txt

8          Next slide, please.

9          In December 2000, US divisions have negative

10   33 percent growth in database.  That wasn't going to help them,

11   even including Covisint.  Excluding it, negative 44 percent.

12   And if you look at total company excluding Covisint, total

13   company license growth was 1 percent.  Excluding Covisint,

14   total company's applications license growth was negative

15   46 percent.

16          What else did Ellison know?  He knew they were off

17   to a slow start.  So did Mr. Henley.

18          Next slide.

19          December flash report disclosed that Oracle was off

20   to a slow start irrespective, we think is what Mr. Henley was

21   saying, you know, excluding Covisint.

22          Ray Lane, the fact that absent Covisint US license

23   revenue growth rate for December over 19 -- 2000, over December

24   '00 was flat, essentially represents a red flag.  Mr. Lane

25   would know, he worked with these people for many, many years.

155

1          It carried on beyond the selling into February, when

2    the January actual results came in.  More negative metrics,

3    notwithstanding the constant reiteration of guidance, the

4    constant message to the market that the product was doing well,

5    the product was stable, we are not seeing any slowing, all of

6    our divisions are great, we are just not being impacted by the

7    economy.

8          THE COURT:  Isn't Mr. Ellison also getting

9    information in realtime from the ground up as to what is

10   actually happening with -- I mean, in part that seems to me to

11   be some indication that tempers this argument about conversion

12   rates and mechanical application, that they actually had a

122007 SJ Hearing.txt

13  forecasting process that had been implemented over the years.

14       And you adopt that for purposes of your argument.

15  You exclude out Covisint and focus on some of the negatives

16  earlier on, December and January.  But there is a week by week

17  adjustment going on that is from the bottom up, too, that

18  actually does reflect deals, correct?

19       MR. SOLOMON:  From --

20       THE COURT:  And ultimately -- not saying that I

21  disagree with you, but ultimately, seems to me that in terms of

22  what he knew, in terms of establishing Scienter, I can look at

23  the sales of stock, but I have to also factor in what the sales

24  reps and the managers were saying that was reflected in the

25  reports that come from the bottom up that give some -- some

                                                              156


1   indication as to whether or not they could continue on with

2   guidance, put those into some perspective with respect to prior

3   quarters and where they were, relatively speaking.  All that

4   has to be factored in, too.

5        MR. SOLOMON:  And that is interesting because there

6   is a mixture there of the fact that the field never -- if you

7   look at the field forecasts, they never got to the street

8   forecast.  So if you are looking at the field and you believe

9   Ellison's directive has accomplished the task, then the field

10  has pretty much got the forecast right.

11       And I think that would be a reasonable expectation,

12  since that is what he ordered.  Mr. Ellison, or as Jay Nussbaum

13  calls him, "His Eminence," I don't think gets ignored very

14  often.

15       There is another aspect to that, one is document

16  construction.  OSO:  They purged it.  It's gone.  When we were

17  fighting the motions to dismiss, you were looking for

Page 131

122007 SJ Hearing.txt

18  snapshots, and we couldn't really give you the snapshots that

19  you wanted.  We couldn't now because they have purged OSO

20  completely.  They did it in July of 2001.

21          How about the fact that Mr. Ellison only produced 15

22  E-mails, only 10 from within the class period?  There should be

23  tens of thousands of E-mails if you believe him.

24          What was the field telling Mr. Ellison?  We know he

25  regularly bypassed his direct reports and talked to the field,

157

1   he has admitted that.  But the defendants never preserved any

2   of the field's documents.  The never preserved any of the

3   regional manager's documents.  So we don't know.  There is this

4   sort of leapover.

5           And there is no question that if you just look at

6   what the -- his direct reports were saying, that there is a

7   huge issue as to whether or not the quarter could be made, but

8   if we had the benefit of what the field and the regional

9   managers were saying or what they were recording, we may well

10  have abundantly more proof.

11          THE COURT:  We're getting to almost a point of

12  diminishing returns.  I want to make sure that you get equal

13  time, so I think when you come back -- you are about midway

14  through your presentation with respect to the Scienter question

15  and Mr. Ellison.  It strikes me that you still have lost

16  causation to talk about, and you also probably want to say

17  something about the more generalized comments that that -- I

18  see that as -- it's not necessarily a forecasting case, per se,

19  but you probably can take those two things together.

20          So when I come back I think that what I would give

21  you is roughly a half hour to put that in.  I'll hear a bit of

22  rebuttal from you and --

Page 132

122007 SJ Hearing.txt

23          MR. SOLOMON:   And then come back to spoliation

24   thereafter?

25          THE COURT:   Right.   You have already lurched into

                                                              158


1    it.   And you have --

2           MR. SOLOMON:   You got to get a shot in.

3           THE COURT:   I got 50 pages of briefing on both of

4    those questions.

5           MR. SOLOMON:   I'm going to assume that you know a

6    lot about that.

7           THE COURT:   I only know what you told me.

8           MR. SOLOMON:   There is some stuff that needs

9    clarifying.

10          THE COURT:   If that's a lot, then I accept your

11   characterization.

12          MR. SOLOMON:   Thank you.

13          THE COURT:   Take fifteen minutes.

14          The motion, the way it really addresses, is -- you

15   might -- you address it at two levels.   You essentially have

16   asked me for an inference with respect to state of mind, that

17   is clear.   And you asked for, I think as well, an inference

18   with respect to accounting case, and I'll hear you out on that.

19          You might want to more generally address the request

20   for a default.

21          MR. SOLOMON:   Yeah.

22          THE COURT:   Because part of what you argue seems to

23   cut against -- you've got Mr. Lane's declaration.   You have

24   documents that are allowing you -- that doesn't mean that there

25   is not an issue with respect to when they were turned over and

                                                              159


1    the timing.   It does impact the bottom-line determination as to

Page 133

122007 SJ Hearing.txt

2   whether or not you are entitled to a default.

3           MR. SOLOMON:  I think you are going to prejudice.

4   And, of course, the prejudice would be if I got it timely, I

5   would have been speaking to Mr. Lane in a formal deposition.

6           THE COURT:  But then there is that issue of can it

7   be cured and are you entitled to a default.

8           MR. SOLOMON:  I understand that, and I have a lot to

9   tell you.

10              (Recess taken at 2:11 p.m.)

11              (Proceedings resumed at 2:33 p.m.)

12          MR. SOLOMON:  To continue on, the astounding

13  pipeline by the way that the defendants were promoting to the

14  investing public at the beginning of the third quarter wasn't

15  internally being described as too good to be true, can't

16  happen.  They don't tell the investing public that, but one can

17  infer that the reason they knew it was too good to be true was

18  because of all of the new deals the were going into the

19  pipeline, into OSO.  I think that it's a -- it was a

20  recognition that the pipeline was inflated that -- that led the

21  defendants to believe they could get away with saying the

22  pipeline was astounding when, in fact, they knew that it

23  wasn't.

24          If you go to slide one.

25          You have heard a lot about Oracle's competitors:

                                                            160


1   Ellison and Henley reviewed CISCO and Sun as the lockstep

2   proxies for the company.  And as Ellison has said, if you just

3   plot the stock, the graphs, you'll see that they rise and fall

4   together.

5           And Henley and Ellison were in communications with

6   both SYSCO and Sun in the third fiscal quarter of '01.  And

122007 SJ Hearing.txt

7    there is no question that they recognized that SYSCO and Sun

8    preannounced in December and in January, and that they were

9    suffering from the decline in the economy in a way that, given

10   that they were thought of as proxies, one would expect Oracle

11   to suffer from as well.

12          And you see SYSCO preannounced in early January and

13   December and Sun preannounced on January 19th, the very day

14   that Mr. Ellison, having absorbed the flash report of

15   January 17, announced his plans to sell.

16          Mr. Ellison and Mr. Henley and Mr. Sanderson all

17   knew going into the third quarter that they were dealing with

18   very difficult comparisons.

19          Next slide.

20          They recognized that in the prior year as the NASDAQ

21   was reaching its peak and we had the YK2000 issue that there

22   were huge sales in that quarter and huge growth.  And Ellison

23   says that that put a huge pressure on the database in that

24   quarter and presented a very, very high hurdle.  So one can

25   only expect that when he saw the negative results in the report

                                                                    161


1    on January 17 that it must have caused him some concern.

2          Ellison admits that by November/December the economy

3    had softened.  Now, of course, this is something they are

4    trying to rewrite history about now.  They are trying to tell

5    us that the economy hadn't suffered.  Everything was fine, at

6    least as Oracle was concerned.  But, no, he recognized that the

7    economy had softened.

8          And he said he didn't think he would be impacted,

9    but you are going to see soon some slides that make it clear

10   that US divisions were being impacted by the declining economy.

11          Defendants knew that Oracle's .com business had

                              Page 135

122007 SJ Hearing.txt

12 pretty much vanished.  They lost $17 million in revenue year

13 after year.  And by January 29th, after January 29th, Your

14 Honor, Mr. Ellison continued to sell huge amounts of stock.

15 NIS forecasts just 41 million in .com sales.  That is 3 percent

16 of revenues compared to 11 percent in the quarter in the year

17 before.  Growth of negative 54 percent growth -- excuse me,

18 growth rate of negative 54 percent in NIS's .com and NISP

19 technology.

20         No question about the Ellison directive, Your Honor.

21 He wrote -- in October Ms. McManus wrote to vice president

22 English explaining that Mr. Ellison had changed the way he

23 wanted the forecast to be performed.  Ms. Minton made it clear

24 that Larry Ellison wanted more "realistic," quote/unquote

25 forecasts.  He is not interested in "commit" quote/unquote

162

1 numbers.

2         And Ms. Minton's E-mail was attached to a study that

3 Henley himself had commissioned to see just how much the

4 divisions were underforecasting or underestimating their

5 forecasts.  And he commissioned a study and discovered that on

6 average they were underforecasting by 15 to 18 percent.

7         So Sanderson also was aware of this.  He had seen

8 Mr. Henley's study, as had Jay Nussbaum.  And Sanderson wrote,

9 and one has to wonder why, "For obvious reasons, please don't

10 forward this E-mail due to the sensitive info."  The info, of

11 course, was more risk being put into Oracle's forecast ahead of

12 the third quarter at a time when they were planning to do a

13 single instant conversion to 11I, and they knew they would be

14 going down for two weeks and they would be in the dark.

15         They say Oracle's pipeline didn't collapse, but it

16 certainly appeared that way, I believe, to the defendants in

122007 SJ Hearing.txt

17   the middle of Q3 '01.  When you -- when I asked Mr. Ellison, or

18   maybe it was in the derivative case, excuse me, what

19   information sources were available to him, he said that they

20   got the pipeline numbers in electronic form.  Where do they

21   come from?  Oracle's sales online, OSO, the very database that

22   has been purged.  And he refers also to the upside reports and

23   the Finance Committee reports that were available and that he

24   received on a weekly basis.

25              Historically, Oracle's pipeline tended to increase

163

1    over the quarter before declining at the end.  This time you

2    had a huge collapse in the pipeline.  Dropped from 52 percent

3    in week one to 34 percent by December 25th, 328 million.  And

4    250 million of that was from apps.  By the time Ellison sold,

5    the applications pipeline had decreased by $297 million, and

6    Ellison knew it.

7              The pipe continued to decrease throughout the third

8    quarter, decreasing 544 million by February 5 and 807 million

9    for the entire quarter.  Notwithstanding that, the defendants

10   continued with their relentless message to the market that they

11   were seeing no signs that they were being affected in any way

12   negatively by the declining economy, that the 11I was stable,

13   that it was selling well, that it was complete, that it was

14   plug-in, that everything was fine.

15              There is a dispute as to what is known as the

16   comfort gap, and that is the difference between the forecasted

17   revenue growth and pipeline growth.  Whether there was a

18   dispute or not, we know that Mr. Ellison looked at it and drew

19   meaning from it.  He says as long as pipeline growth is greater

20   than revenue growth, you should be able to meet your numbers.

21   Negative growth is problematic.  It would be incautions to

122007 SJ Hearing.txt

22    forecast sales growth without underlying pipeline growth.

23            Ray Lane pretty much says the same thing.  Well, as

24    we know, in fiscal third quarter '01 the comfort gap at that

25    time was a mere 4 percent.  Sometimes it disappeared

                                                              164

1     completely.

2             So in 3Q '00, it was a very -- there was a very high

3     growth period.  It was fueled, as I said earlier, by the

4     Internet fever.  Never before had there been such an appetite

5     by businesses to buy the latest in computing technology.

6             By the third quarter '01, the conversion ratio had

7     declined year over year by 11 and 8 percent in 1Q and 2Q.

8     According to defendants in the derivative case but not in this

9     case, Your Honor, but in the derivative case, they were in the

10    middle of a recession in December.  The is what they told

11    Judge Strine.

12            Confidential witness in this case, an AVP in the

13    western region was asked in her deposition, "Did you have a

14    view in the fall of 2000 as to whether or not the economy was

15    hurting Oracle?"  And her answer was, "I assumed that it was

16    the economy.  I don't know if it was the economy, but Oracle

17    was hurting."

18            Another confidential witness, Kelly Wood, was

19    questioned.

20            "Q.   Okay, at any point during fiscal

21                 year 2001, did you have any concerns

22                 about whether Oracle was going to make

23                 the forecast in terms of what it gave

24                 to the street?

25            "A.   Sure.

                                                              165

122007 SJ Hearing.txt

1        "Q.    And can you explain that for me?
2        "A.    And then we saw .coms.  We saw
3               fewer .coms.  And we saw .coms being
4               more prudent with their money end of
5               2000, start of 2001.  And it was
6               pretty dramatic."
7          Ellison says, "In the declining economy, large deals
8     fall out more quickly.  In a declining economy, you would
9     expect to see longer deal cycles, and in an expanding economy
10    you would expect to see a shorter deal cycle."
11          And you asked earlier on about the managerial level
12    and the field level and what they were saying, well, we have in
13    the record more evidence of what the people in the field were
14    saying.  And I'll get on to NIS in a moment, but the bottom
15    line is that these people that I've just mentioned and many
16    others who have been deposed saw from their corners of the
17    Oracle world negativity in the fall and the beginning of the
18    winter of 2001.
19          Fred Lang, one witness, says that he sold his stock
20    in December of 2000.  And when asked why, he said pipelines
21    were declining, things were looking bad, basically.  That is
22    why he sold his stock.
23          All data according to Henley as of January 4th
24    indicated further softening of the economy.  Cooperman agrees
25    that in Q3 he believed the overall economy was suffering, and
                                                              166

1     the bursting of the Internet bubble was taking its toll.
2     Minton, who we discussed earlier, was thinking of selling in
3     January, was saying the general macroeconomic environment was
4     suffering.
                              Page 139

122007 SJ Hearing.txt

5        Sanderson identified the .com falloff.  We didn't

6   say this until we litigated this case, but he said in the

7   middle of the class period, or describing the middle of the

8   class period as a major macroeconomic event that was likely

9   discussed at EMC meetings.

10        The article that Matthew Simons wrote to promote the

11   book that he was writing with Ellison during the class period

12   was called Rewards of Recklessness.  I think it's the article

13   in which Mr. Ellison says it's his practice to go off on a

14   branch and go to the limb and then jump up and down.   High

15   risk/high reward is the way he lives his life.

16        In that article --

17        THE COURT:   You know, this isn't particularly

18   helpful, let me tell you why.

19        MR. SOLOMON:   Tell me why.

20        THE COURT:   You can cite chapter and verse,

21   anecdotal evidence of statements people made at different

22   times, and, you know, I'll look at the record to discern

23   whether or not that, in the context of the information that was

24   available to them, supports the inference you are asking me to

25   draw.   But just to have you sit here and go through slides is

                                                                 167


1   not particularly helpful to me.

2        You have given me a context in which to view how the

3   quarter started in relationship to the second quarter, the

4   driver being the applications, and particularly Suite 11I, and

5   that is the context in which to view now not only the guidance

6   that gave, but what was actually transpiring in the quarter on

7   the ground level.

8        Oral argument is to help me get a better picture, no

9   doubt, and that is why I came out and asked you the questions

122007 SJ Hearing.txt

10    that I did at 9:30 this morning.  I think what would be more

11    helpful is just to summarize as best you can the salient points

12    that you believe -- couple of things.  One, in the course of a

13    quarter, the January time frame or so, based on what you have

14    told me about the manner in which they came into the quarter,

15    what it is that you think suffices to establish to put them on

16    notice other than sort of generic, the pipeline collapsed;

17    well, I'm looking at documentation from some of the divisions

18    that indicate, certainly, there is a disparity.  But how does

19    that disparity look in terms of what actually transpires in

20    similarly situated quarters previously and adding the

21    additional factor of what was transpiring with the economy now.

22                How much of the pipeline collapsed, as you indicate,

23    is relevant to what it is they could have reasonably thought

24    they could close going forward?  Those are the kinds of

25    metrics, seems to me, that help box this in in a way that is

168

1     helpful to me.

2                MR. SOLOMON:  All right.

3                THE COURT:  We'll stay here as long as we have to,

4     so I don't want you to read that as just an indication -- we've

5     been here about four hours now.  And Mr. Wald took quite a bit

6     of time as well in making his argument.  And I thought for the

7     most part that was helpful.  And I heard some of his jury

8     argument, too, and I'm hearing some of yours.  Let's just focus

9     a little bit more discreetly and make the high points.  That is

10    why we have about 300 pages of briefing here.

11                MR. SOLOMON:  I'll do my best.

12                Let's go to the division level and talk about NIS

13    and OSI.

14                Henley noted, Your Honor, in early December that NIS

Page 141

122007 SJ Hearing.txt

15  had no big deals, and that was something that was different.

16  Normally, it had big deals, and there was none in the pipeline.

17  Winton, who is in NIS, wrote to Roberts, who headed up NIS in

18  December describing the problem with not having big deals at

19  the beginning of the quarter and, in fact, went further and

20  described how there was an inadequate pipeline in NIS to get to

21  where they wanted to go.

22          In early December it's nowhere where it needs to be,

23  it needs to grow.  But by mid January, just before Mr. Ellison

24  sold and just after Mr. Henley sold, you see Winton writing to

25  Minton saying the pipe hadn't grown as anticipated, we are

169

1  actually slightly down.  These are indications that they are

2  being negatively affected, Your Honor, by the declining

3  economy.

4          Within that quarter, AVP's NIS were actually voicing

5  concern.  They were saying they were reluctant to raise their

6  forecast, and in January they were saying deals began to shrink

7  and get delayed.  If you are a member of the investing public,

8  that is not something you would expect to be happening

9  internally at Oracle because you are being told you are not

10  being affected at all.

11          John Nugent said that, and you will see it on the

12  slide, sluggish economic outlook, single digit growth.  Winton

13  to Minton wrote about the drop in technology.  Issues,

14  challenges, recommendations, quality and stability of 11I,

15  dramatic decline in .com business; this is all the stuff, Your

16  Honor, of undisclosed material facts and also belying the

17  representations that had been made and were continuing to be

18  made about the state of the company and how the economy was

19  affecting it.

Page 142

122007 SJ Hearing.txt
20          Not surprisingly, NIS's license growth was negative
21    24 percent in December 2000 and negative 35 percent for the
22    first two months of 3Q '01.  Again, very few sales had been
23    accomplished, something that Mr. Ellison looked at in making
24    his decisions.
25          In OSI, if we can move on to that, plummeting

170

1    pipeline.  Jeff Henley was shown a document referring to the
2    drop in the tech pipeline in OSI, Jay Nussbaum's division, and
3    he said, boy, it must have caused him concern.  He wrote about
4    it and put a question mark.  And by December 25, OSI's
5    applications pipeline had plunged by 200 million.
6          There were some necessary deals in OSI, Your Honor,
7    that they said must close, otherwise, we won't make it.  All of
8    OSI's upside was in telecom at that stage.  The telecom bubble
9    burst was notorious.
10          On January 18th, Minton was told that OSI would make
11    its forecast only if none of the very large opportunities
12    dropped out.  And they also knew that Nussbaum was a very
13    aggressive forecaster at the best of times, and he was relying
14    on deals with University of Texas and Capital One that must
15    close.  But by the end of January, or mid January 2001,
16    defendants knew that almost all of these deals had fallen out
17    or were longshots and were unlikely to close.
18          Now, we are missing big-deal reports.  I'll get on
19    to that later, but we're missing big-deal reports prior to
20    January 29, so it's hard for us to determine exactly when some
21    of these deals fell out, but fall out they did, or they only
22    had very low win probabilities to begin with.
23          So for the nontelecom section of OSI big deals,
24    University of Texas must close.  That deal was lost no later
                    Page 143

122007 SJ Hearing.txt

25    that January 29.   Capital One must close, not likely to close

171

1    by January 29, and a win probability of only 10 percent.

2          Telecom, the defendants knew that deals with AT&T,

3    Broadband, Converges (phonetic) Cable and Wireless, Verizon

4    Wireless, all these deals had to close to make its forecast,

5    and yet incredibly, these deals only had 10 percent win

6    probabilities in January.

7          Bell South, they were on site in the middle of a

8    complete disaster that was costing them 20 million in free

9    consuling and caused them to have to reverse the revenue that

10    Mr. Wald told you was recognized in the third quarter, caused

11    them to have to reverse that 6.7 million.

12          Bell South they were promoting as an example of the

13    great works they were doing, but at the time, the Bell South

14    project was a disaster, and it was costing them real money that

15    quarter to the tune of $20 million.

16          Lucent, Lucent was in all sorts of trouble.  It laid

17    off around 16,000 workers.  It fired its CFO.  It's former CEO

18    was on the board of Oracle.  Oh, counting on the deal with

19    Lucent, which, quite frankly, was extremely unlikely in

20    January, yet they pretended, I believe, to cling to it as, I

21    think as aggressive salesmen in what was that culture at the

22    time, cling to unreal targets for whatever reason.

23          One thing we do now know, Mr. Henley and Mr. Ellison

24    had the best visibility of people in the company, had access to

25    everything.  It's pretty obvious when they were getting these

172

1    reports, so they must have known of the implications.

2          Sprint, another deal they claim fell out

3    surprisingly at the end of the quarter, Sprint was refusing to

Page 144

122007 SJ Hearing.txt

4    pay for previously rendered services at the time.  So to be

5    counting on these deals at the end of the quarter, particularly

6    ones that were 10 percent win probabilities or that weren't

7    even in the forecast or in Jay Nussbaum's back pocket was

8    ridiculous.

9          OSI, the comfort gap that we talked about earlier

10   was forecasted as high as 32 percent, which Ellison

11   testified -- negative, I should say -- testified was

12   incautious.

13         And the conversion rates that OSI were forecasting

14   in order to meet the numbers that were clearly unrealistic were

15   dramatically higher than 30 to 40 percent that Mr. Nussbaum

16   said that he was comfortable with.

17         On January 18, 2001, the day before Mr. Ellison

18   sold, OSI's field was forecasting just 134 million, but

19   Oracle's guidance was based on a potential of 225 million.

20   91 million came from Jay Nussbaum's management judgment.  And

21   remember, we talked about the directive earlier, this was the

22   sort of judgment that happened in that quarter, happened the

23   next quarter, had not happened historically.  And clearly,

24   there was more being projected than was realistically

25   achievable.

173

1         Now, in OSI, remember that when the directive was

2   put in place, Minton, for the first time coming into the third

3   quarter, had different finance managers reporting to her.  One

4   of those finance managers was a Ms. Kopp, who had never worked

5   with Jay Nussbaum before.  So to the extent that they are

6   relying on what Ms. Kopp thinks Jay Nussbaum can realistically

7   project and what Ms. Kopp believes is doable when you have a 10

8   percent win probability, doesn't seem to me to make much sense.

122007 SJ Hearing.txt

9          I think Ms. Minton is more likely to know what a 10

10    percent win probability means and is more likely to know that

11    Mr. Nussbaum, who was fired a few months later, by the way, is

12    more likely to know whether what Mr. Nussbaum was projecting

13    was realistic.

14          Mr. Nussbaum said he wouldn't even forecast CRM, it

15    was in such a bad state.  And I have a confession to make, Your

16    Honor, we made a mistake; in our summary judgment motion or

17    opposition, we forgot that in the complaint, although we do

18    believe it's true, there was the allegation that at that stage

19    it was like a car without -- tires without wheels.  But it

20    wasn't us that said it first Your Honor, that was Jay Nussbaum.

21          THE COURT:  So I'm going to give you twenty minutes.

22          MR. SOLOMON:  I'm just going to show you the

23    exhibit, I'm just --

24          THE COURT:  You can use it any way you want.

25          MR. SOLOMON:  Mr. Nussbaum.

                                                          174


1          THE COURT:  I want to make sure:  Did you hear me?

2          MR. SOLOMON:  I did hear you, Your Honor.

3          THE COURT:  It's 3:00 o'clock.

4          MR. SOLOMON:  Well, surprisingly, Your Honor, OSI

5     had revenue growth of negative 84 percent for December,

6     negative 17 percent for the first two months combined.  OSI

7     booked just a small amount of money in those two months and as

8     of February 13th booked 34 million of the 225 they were

9     projecting.  And of that 225, many of those deals have been

10    lost over 10 percent win probabilities and were not likely to

11    come in before the end of the quarter.

12          Let me tell you something else in terms of deals

13    falling out at the end of the quarter.  We propounded an

                                Page 146

122007 SJ Hearing.txt

14  interrogatory asking them to tell us what deals fell out at the
15  end of the quarter.  They responded by telling us what deals
16  fell out in February and described or named 182 of them.   And
17  we were like, okay, so please tell us why they dropped out.
18  Give us some information.  Eight, that is what they came up
19  with, eight they could tell us about, 174 they couldn't.   Why
20  is that?  We know that many, many documents have either not
21  been preserved or have been destroyed.  If they can't tell us
22  what happened to those deals, then they lose, we don't.
23          Your Honor, I have another confession to make.
24          THE COURT:   Don't make any confessions, Counsel.
25          MR. SOLOMON:   We went a little --

                                                                175


1           THE COURT:   Listen to me, I'm trying to tell you
2   this is not helpful and you are not listening.   Oral argument
3   is not for you, it's for me.  So if you don't want to heed
4   this, I'll cut it off.
5           MR. SOLOMON:   Why don't you tell me what subject
6   matters you want me to address.
7           THE COURT:   I gave you an indication at 9:30 of the
8   subject matters I wanted you to address.
9           MR. SOLOMON:   Well, then Mr. Wald went through a
10  whole presentation.
11          THE COURT:   You are already close to two hours, and
12  that is what he got.
13          MR. SOLOMON:   I'm almost done with this part.   I'm
14  very eager to get on with evidence destruction.
15          THE COURT:   I'm just telling you, it's not helpful.
16  You're concerned about what you are eager to tell me, it's not
17  helpful.
18          MR. SOLOMON:   And I assume that is because you know
                    Page 147

122007 SJ Hearing.txt

19   it already.

20          THE COURT:  I assume it's because you provided a

21   hundred pages in briefing to me.

22          MR. SOLOMON:  Your Honor, I don't want to waste your

23   time.

24          THE COURT:  Can you tell me anything that is not in

25   your brief?  Are you telling me anything that is not in your

                                                              176


1    brief?

2           MR. SOLOMON:  I would hope I'm emphasizing.  I want

3    to emphasize.  I'm not going to go through the slides, but I

4    want --

5           THE COURT:  I don't want to argue with you because

6    it's not an argument you can win.

7           MR. SOLOMON:  I'm not trying to argue with you, I'm

8    trying to stop.

9           THE COURT:  You can sum up now.

10          All right.

11          In terms of the conversion ratios and that dispute,

12   Your Honor, there is no question that Ms. Minton, repeatedly,

13   described the way she applied the conversion ratio.  And she

14   did it because they thought they could model out their

15   forecasts, so did Mr. Ellison.  Number two, there is no doubt

16   that they reiterated their forecasts and their statements about

17   11I throughout the quarter.  I was going to show you some

18   slides to drive that point home, but I know I don't need to,

19   Your Honor.

20          THE COURT:  That's not the purpose of oral argument.

21          MR. SOLOMON:  Your Honor, I will actually see if I

22   can leave some time for -- so we have a little bit more time

23   for spoliation.

                              Page 148

122007 SJ Hearing.txt

24          THE COURT:  If you want to do it now, do it now.

25          I would say this:  You said you wanted to -- I think

177

1    the record is fairly full with respect to the forecasting

2    issue.  If you want to be heard on the evidentiary sanction

3    issue, I'll give you five minutes to tell me what you want to

4    tell me about that, that would be enlightening.

5          MR. SOLOMON:  Okay.

6          THE COURT:  To walk through your slide presentation

7    at this juncture, it is not -- if you want to point to

8    particular documents that you think you did not focus on

9    sufficiently in the briefs so that I have the contours, that's

10   fine.  The goal of this isn't to sit out here for five hours

11   and have you go on, it's not.

12         MR. SOLOMON:  I hear Your Honor.

13         THE COURT:  The equal amount of time that I give

14   you --

15         MR. SOLOMON:  Diminishing returns for me, Your

16   Honor, I don't want to incur those.

17         Do you want me to describe the spoliation now?

18         THE COURT:  No, I'm saying you haven't had a chance

19   to address that, although you have alluded to it at times.  And

20   you have alluded to the lack of preservation and in some ways

21   speculated from failure to explain that there is more gold in

22   them there hills.  That is the kind of argument that has been

23   made.

24         MR. SOLOMON:  Absolutely.  When there is thousands

25   of documents destroyed, I think that is reasonable.

178

1          I'm not quite clear; do you want me to make that

Page 149

122007 SJ Hearing.txt
2  presentation now, or do you want me to sit down --

3          THE COURT:  You indicated to me you wanted to, and

4  I'm giving you some time to talk about the spoliation issues,

5  if you would like to.

6          MR. SOLOMON:  I would like to.

7          If you would just give me a couple of moments.

8          THE COURT:  Nobody on your team has addressed those

9  questions.

10         MR. SOLOMON:  Excuse me?

11         THE COURT:  Nobody on your team has really addressed

12 those questions, and I would think that would be only fair to

13 give you a shot to be heard on that.

14         And then on the flip side, I'll give you fifteen

15 minutes, Mr. Wald.

16         MR. WALD:  Thank you, Your Honor.

17         THE COURT:  Just so you have in mind what I said, I

18 question, from a culpability standpoint, willfulness and the

19 possibility of other alternatives, whether or not you were

20 entitled to a default, so you can address that.

21         The other thing that I said at 9:30 was that you

22 really hadn't specifically for me in your brief enumerated the

23 evidence that would support an evidentiary sanction, because

24 most of the brief really is geared toward what would

25 essentially be a terminating sanction.  Not much is nuanced

                                                                179


1  with respect to other than requesting evidentiary sanctions,

2  and so I thought it probably would be good to hear a bit more

3  of your position on that.

4          MR. SOLOMON:  Thank you, Your Honor.

5          THE COURT:  Okay.

6          MR. SOLOMON:  I think the -- in terms of the default

122007 SJ Hearing.txt

7    judgment it depends, of course, on the severity of the conduct,

8    the willfulness, the bad faith, perhaps, or the prejudice.  Or

9    there is a continuum, the more bad faith, perhaps the less

10   prejudice.  The less bad faith, perhaps the more prejudice.

11   Maybe that's the way to think about this, just broadly, Your

12   Honor.

13          But the fact of the matter is, here we have a

14   staggering record of document destruction.  As you know, the

15   PSLRA mandates preservation, but we have a preservation effort,

16   Your Honor, that was lamentable.  Only about 40 people out of a

17   company of 40,000 people received any preservation

18   instructions.  Many of the direct reports of the defendants did

19   not receive preservation instructions.  Most of the AVPs never

20   got a preservation instruction.  Ironically, Nicholas Classick,

21   the one AVP who supposedly a couple of years later did get a

22   preservation instruction, was one of the only AVPs to receive

23   such an instruction.

24          So you have at the very beginning of this case a

25   real problem because you have a company that is run at the top

                                                              180


1    by the people in blue, basically, and then you have, Your

2    Honor, a number of very senior people, sometimes direct reports

3    of the defendants, sometimes below them, but all very senior

4    executives.

5          If you look at the red, these are the people that

6    never received an instruction, and we'll give you a copy of

7    this.  If you look at the people in the yellow, these are

8    people that got very late production notices or produced under

9    100 pages.

10          If you look at the people in orange, these are other

11   substantiated -- the bottom line is when they were mandated by

                              Page 151

122007 SJ Hearing.txt

12  PSLRA to preserve documents, they did so in such a way that was

13  calculated for us to lose a huge amount of the evidence we

14  would otherwise be entitled to.

15       In particular, the level that you've been talking

16  about, that field level and regional manager level, where is

17  the preservation of those documents?  There is none.  Where is

18  the categorical preservation of the consuling organization or

19  the sales organization or the support organization, or at least

20  of targeted people within those organization?  It's lamentably

21  few and far between that you'd find that it was accomplished

22  properly.  So just at that level you have a problem.

23       But then you have a problem at the top.  I don't

24  know how Larry Ellison -- let's face it, he's the most

25  important --

181

1       THE COURT:  This is the argument you are making

2  about the lack of E-mails from him --

3       MR. SOLOMON:  Yes, Your Honor.

4       THE COURT:  That we talked about forty-five minutes

5  ago.

6       MR. SOLOMON:  Right.  So there's that.

7       And then there is OSO, and we talked about that.

8  Then there's larryellison.com.  And then there's destroying the

9  log-ins for larryellison.com.  And then there's the fact that

10  he had three computers but no hard drives for any of them.

11       How is that, Your Honor?  Other words, Mr. Ellison

12  sold a billion dollars' worth of stock, approximately, in the

13  middle of this class period in seriously questionable

14  circumstances and must have destroyed them, Your Honor.  They

15  are not here, they must be destroyed.

16       And who knows what wealth of information would have

Page 152

122007 SJ Hearing.txt

17  been in those E-mails.  He E-mailed over 100 times a day is the

18  testimony.  It's tens of thousands of E-mails and other

19  electronic documents that we don't have that we should have

20  that I'm talking about, Your Honor.  When it comes to the 182

21  deals that they identify at the end of the quarter, we don't

22  have -- they can't tell us why 174 of them fell out.  That has

23  to mean something.

24          We have -- we are missing forecasting reports.  They

25  are under a consent decree from the last time they committed

182

1  securities fraud to keep reports properly and certainly not to

2  engage in accounting fraud.  But we have just a smattering of

3  reports.  And some of the comparisons they accuse us of not

4  being able to do cannot be done because we don't have a full

5  set of reports.

6          Ray Lane I won't get into again, I've spoken about

7  Ray Lane.

8          How it is, Your Honor, that we can arrive at the

9  point where we have that sort of document destruction and it

10  doesn't rise to the level of willful and bad faith I find

11  difficult to grasp.  But then let me come on to Softwar,

12  because Softwar really sort of gives you a flavor of what they

13  are all about.

14          THE COURT:  I wouldn't say it's the flavor, that is

15  the closest that you are going to come to -- it clearly is a

16  destruction of evidence.  It clearly was in regard to that.

17          MR. SOLOMON:  Your Honor, destruction of evidence

18  that we were clearly entitled to.  And it was clearly relevant

19  to this case.  The beginning posture was they are not

20  relevant -- first of all, you never asked for them; of course

21  we did, generically; they are not relevant.  That is

Page 153

122007 SJ Hearing.txt

22    ridiculous, of course they are relevant, okay?  So finally

23    Judge Infante rules on the 29th of December that, indeed, they

24    need to be produced.  He issues the order on the 2nd of

25    January.

183

1              I immediately follow up and say what's going on.  I

2     hear from defense counsel, we are not sure if they are going to

3     say that they no longer exist or if they just won't turn them

4     over.  And then another eight days goes by where we are still

5     trying to catch up with this, and nothing happens.

6              Now we recreate it, we know what happened.  From

7     November 1 onwards when we issued our subpoena -- excuse me,

8     when we moved to compel, Larry Ellison was in secret

9     communications with Mr. Simons.  And he did not ask for the

10    computer, even though he is CEO of what he calls the best

11    computer company in the world.  Didn't ask for it.

12             When January 2nd came along --

13             THE COURT:  He is supposed to assume they are going

14    to be destroyed.

15             MR. SOLOMON:  Well, when he is discouraging the guy

16    from producing them?  When he has actually filed a motion

17    saying that I don't have any control of them?

18             THE COURT:  Well, but that motion was a lot broader

19    than what you ultimately got in the discovery order.

20             MR. SOLOMON:  Your Honor --

21             THE COURT:  Are you telling me that Judge Infante

22    granted all the relief you requested?

23             MR. SOLOMON:  No, he gave me the relief with respect

24    to Ellison and Simons' documentation.

25             THE COURT:  Right.  I'm just posing with you the

184

122007 SJ Hearing.txt

1   inferences that get drawn either way about Mr. Ellison's

2   conduct.  And I read that part of the record where he

3   indicates -- certainly, there is some indication there about

4   his concern about personal matters, I think that is the way the

5   record reads.  From that, you are saying that I can impute and

6   should attribute to him not only that he did not want the

7   material to be turned over, but that he is an accomplice in the

8   destruction of the documents.

9           MR. SOLOMON:  Absolutely.  I'm convinced of it.

10          THE COURT:  What is the basis for your being so

11  convinced?

12          MR. SOLOMON:  Because we were given misinformation.

13          THE COURT:  Who gave you misinformation?

14          MR. SOLOMON:  His lawyers, Your Honor.  His lawyers

15  gave us misinformation about what was happening.

16          THE COURT:  What is the misinformation they gave

17  you?

18          MR. SOLOMON:  That Mr. Ellison had no personal

19  knowledge of what was going on when, in fact, he was in

20  constant phone calls --

21          THE COURT:  How do you know they knew what was going

22  on?

23          MR. SOLOMON:  Well, Mr. Ellison tells me they were

24  involved on a daily basis, basically.  I mean, they are both

25  saying they were involved.

                                                        185


1           THE COURT:  I am just suggesting to you, those are

2   some of the --

3           MR. SOLOMON:  Oh, Your Honor, I'm convinced that --

4           THE COURT:  Unfortunately, you have to convince me,

5   not you.

                        Page 155

122007 SJ Hearing.txt

6           MR. SOLOMON:  Your Honor, if you look at the record
7    carefully --
8           THE COURT:  That is the trouble with some of your
9    argument, you are so convinced.  And I admire your zealousness,
10   but that is a different question from objectivity is where I
11   sit, the inferences that I draw.
12          MR. SOLOMON:  Sure.
13          If you look at the record carefully, what you will
14   find is that the defendants denied or certainly implied that
15   there was no communication between Mr. Ellison and Mr. Simons
16   and Mr. Ellison had no personal knowledge.  The defendants
17   telegraphed to me that there was an issue.
18          THE COURT:  You mean "lawyers" when you say
19   defendants.
20          MR. SOLOMON:  I guess I do, Your Honor.
21          THE COURT:  Defendants applies to -- has a specific
22   meaning in this context.  They are not the defendants.  There
23   may be an agency relationship between what a lawyer says on
24   behalf of his client --
25          MR. SOLOMON:  I'm seeking the sanction against
                                                              186


1    Mr. Ellison for his conduct.
2           THE COURT:  That's right.
3           MR. SOLOMON:  To the extent it was assisted or
4    facilitated by his counsel is not something that I'm seeking
5    to --
6           THE COURT:  You just argued that it was.  That is
7    why I asked you the question.
8           MR. SOLOMON:  Yes.
9           As I say, if you look at it, if you look at the
10   chain of correspondence, I believe that it's pretty clear that,
                              Page 156

122007 SJ Hearing.txt

11    number one, they were in contact with Mr. Simons.  They didn't

12    have a duty to tell me, I guess that's fine.  Mr. Ellison was

13    in contact with Mr. Simons, they inferred to me that he was

14    not.

15            Judge Infante issued his order on the 2nd of

16    January.  Now, a few months have gone by, and Mr. Ellison and

17    his lawyers know that Mr. Simons does not want to turn over

18    that computer.  They know that for sure by then.

19            What happens in the next --

20            THE COURT:  What allows you to jump from that to

21    they have some sense that he is going to destroy it?

22            MR. SOLOMON:  Well --

23            THE COURT:  That it's been referenced to him that he

24    should destroy it?

25            MR. SOLOMON:  How about that I'm told --

                                                              187


1             THE COURT:  Is there any case that you have cited to

2     me on a record like that that has found willful conduct in the

3     destruction of evidence?  Is there any case?  I read several of

4     the ones that you cited to me -- on a record like that that you

5     just articulated?

6             MR. SOLOMON:  I think this is a pretty unique

7     record.  And I don't mean by that to say that there isn't

8     support in the cases for what we are seeking, but this is

9     pretty unique.

10            You are talking about one of the richest men in the

11    world and a huge law firm engaging in what I believe to be a

12    very clever, well-designed attempt to prevent us from getting

13    critical evidence.

14            I want you to think, Your Honor, what happened in

15    the eight days between the order and, finally, the defendants

122007 SJ Hearing.txt

16  seeking the computer from Mr. Simons?  Why was there that

17  delay?  We don't know.

18          Why was I told by them that they hadn't decided if

19  the position was he had destroyed them or if he wasn't going to

20  turn them over.

21          And more importantly --

22          THE COURT:  Mr. Simons, I guess, doesn't have much

23  of a mind of his own.  And he didn't have a different view on

24  custody and control of those tapes and the backup notes,

25  because part of what you argue is that they really are

                                                              188


1   confederates in this.

2           MR. SOLOMON:  It's inescapable.

3           THE COURT:  Okay.

4           MR. SOLOMON:  Why would Mr. Ellison be telling

5   Mr. Simons, even after the order, that they are not relevant,

6   that what we are seeking isn't relevant, and whatever we got we

7   seek to use against him in a personal way?  What business does

8   he have saying that when he is under court order?

9           THE COURT:  Maybe because there is information in

10  those conversations that really is personal.

11          MR. SOLOMON:  We've seen some of the transcripts, I

12  think it's pretty clear that it hits straight into our class

13  period --

14          THE COURT:  Okay, I've heard you out.  I think that

15  is a different question as to whether or not he is

16  intentionally involved in, either through indirect indications

17  or overt indications that someone should destroy evidence.

18          And then the request that the Court should also

19  glean from this record, the assertion of Fifth Amendment

20  protection, also should lie at the feet of Mr. Ellison, you

                          Page 158

122007 SJ Hearing.txt

21  also make that argument.

22          MR. SOLOMON:  They are close friends and they were

23  very involved in this.  They entered the contract together.

24  They spoke about this issue together, and ultimately the

25  evidence was destroyed after Mr. Ellison had said it was

                                                              189


1   irrelevant, but we want to use it to hurt him.

2           And later on in February, the defendants were told

3   that there was a repository in England that had been located

4   for the tapes.  And that supposed repository was told we'd hear

5   from Mr. Gibbs, who would want to retrieve the tapes.  That was

6   February 14th.  It took until March 5th for them to get in

7   touch with that supposed repository.

8           We didn't really know what was going on.  We had an

9   investigator out looking.  But we didn't know that he had found

10  the person who owned the domain name and was making

11  investigations to see if he could get hold of the transcribers.

12  But the defendants did know that Mr. Simons had told them that

13  it looked like the tapes had been found.  And Mr. Simons was

14  told that Mr. Gibbs would be calling him.  Mr. Gibbs didn't for

15  weeks and weeks and weeks.

16          You put that all together and, Your Honor, the Court

17  ordered the production of these tapes and transcripts, and I

18  believe the conduct of the defendants and their counsel in

19  response is an affront to the Court.  I understand, Your Honor,

20  that I have to convince of that, but I do belief that that is

21  the case.  Again, if you look through the evidence carefully,

22  it's demonstrable.

23          THE COURT:  You want to be heard on this?

24          MR. WILLIAMS:  I think --

25          THE COURT:  Your side, you are through, but they

                          Page 159

122007 SJ Hearing.txt

1   haven't had a chance to talk to the spoliation issue, and I
2   thought Mr. Gibbs was assigned that.  And I wanted to make sure
3   I gave him a chance to do that.
4           What is it you wanted to tell me?
5           MR. WILLIAMS:  I want to address to the issues
6   relating to the event study with respect to Mr. Steinholt.  I'm
7   sure Mr. Wald would want an opportunity to kind of take a shot
8   at that; I think I can do it in a few minutes.
9           The Court asked the question about -- had some
10  question about the event study, and I think the argument was
11  that the part of --
12          THE COURT:  It was the methodology.
13          MR. WILLIAMS:  The methodology with respect to
14  whether or not he used an industry index or a market index to
15  determine whether or not there were other factors that should
16  have been considered before he came up with, you know, the
17  residual decline that he applied to the information that was
18  released on March 1st of 2001.
19          The fact is that he did reduce his number because of
20  market factors, but he didn't use the same industry index that
21  their expert used.  He used a market index, they used what they
22  call an industry index of Oracle's direct peers.
23          In the end, it came out the same.  In fact,
24  Mr. Steinholt's index resulted in a more conservative number
25  than Mr. James' number.  And the truth is that defendants did

191

1   ask him about this in the deposition.  And specifically the
2   question was to Mr. Steinholt:
3           "Q.   What I'm getting is the fact that

Page 160

122007 SJ Hearing.txt

4              you've attributed 100 percent of that

5              decline to the fraud allegations.  In

6              other words, you are leaving out the

7              possibility that some amount of that

8              decline had something to do with

9              factors other than fraud."

10         And Mr. Steinholt responded:

11         "A.   Not really, because, I mean, what

12              I do is look at what the market and

13              the industry did at that point in

14              time, and I exclude that from the

15              price decline, look at what the

16              company specific portion is that is

17              remaining and based on, you know, what

18              is -- we discussed earlier on" --

19         This is just a little -- there is some commentary in

20    here that is not really relevant, let me direct the Court to

21    it.  It's at Tate Exhibit C.

22         He goes on to say:

23         "Q.   Was the shortfall caused by

24              factors that relate to the alleged

25              fraud or not?"

                                                            192


1          Mr. Gibbs asked:

2          "Q.   You removed industry factors, in

3              your view, by using the NASDAQ 100

4              index."

5         That was the question.

6         Answer:

7          "A.   That's correct, yes."

8         The next and final question was:

                        Page 161

122007 SJ Hearing.txt

9          "Q.    And you've concluded that

10           100 percent of the Oracle specific

11           information that caused the residual

12           drop was related to the fraud?

13          "A.    Correct."

14           So he did use a market index.  And, in fact, it's

15    the same market index that their expert on class certification

16    used, which Your Honor looked at, analyzed and ruled upon, very

17    same index.  And he found that it was the company specific

18    residual decline that he used.

19           You can take a look at Exhibit I to

20    Mr. Steinholt's --

21           THE COURT:  You know, the class certification motion

22    was not an explication of whether you could meet the issue of

23    lost causation on a record in a summary judgment context.

24           MR. WILLIAMS:  No, I understand that.

25           THE COURT:  I'm just telling you that isn't

                                                              193


1    evidence -- that I fielded the objections they are making now

2    and ruled on in rejecting their arguments with respect to why

3    based on Dura and the experts that testified that there weren't

4    common questions of law in fact, that things weren't typical.

5           MR. WILLIAMS:  No, I understand, Your Honor.  The

6    only reason I directed you to that was because at the time they

7    believed that that was the appropriate index.

8           The bottom line for us is that whether you used a

9    tighter index that they suggest or the market index does not

10    really go to whether or not the events study is appropriate.

11    It goes to whether -- you can use different event studies or

12    different indices in your event study, but here the index that

13    Mr. Steinholt used was actually more conservative than the one

                              Page 162

122007 SJ Hearing.txt
14   Mr. James used.

15            I am -- I'll just direct you to where you can find

16   that, specifically.  It's Steinholt's rebuttal at Tate

17   Declaration B.  He describes the comparison between the two

18   indices and the expert's findings, and that the index that he

19   used actually results in a lower damages number than the index

20   that the defendants used.

21            You asked another question earlier today about how

22   the, quote/unquote, "customer complaints" actually would be

23   admissible, I didn't address that earlier.  I can address it

24   very quickly.  I think that most of the documents that we

25   submitted that could be considered customer complaints are not

                                                              194


1    quite customer complaints, they are Oracle employees discussing

2    their experiences at the customer sites.  So we think that they

3    are not hearsay.

4             I think we actually were able to identify the rules

5    under which they come in in our objections, Your Honor.  And

6    I'll just direct you to a couple of cases and case cites that I

7    think support our position.  It's FTC versus Figge

8    International, 994 F.2d 595, and U.S. versus Safavian, 435 F.

9    Supp. 2d at 36, and finally, Sea-Land Service versus Lozen, 285

10   F.3d 808 at --

11            THE COURT:  And those cases stand for what

12   proposition?

13            MR. WILLIAMS:  What I wanted to do was to just get

14   all of the cases --

15            THE COURT:  What do they stand for?

16            MR. WILLIAMS:  Oh, whether or not information that

17   is in documents that relate to -- I guess I'm just going to use

18   the phrase, "customer complaints" could be admissible.  And I

                              Page 163

122007 SJ Hearing.txt

19  think these apply to circumstances such that Your Honor is
20  going to be kind of ruling on, where a lot of the documents in
21  our view are not -- they are just not hearsay, but they are a
22  lot of Oracle employees saying that their experience with the
23  customer is that they are having X, Y or Z problem, let's do
24  something about it.  They are different evidentiary rules that
25  it comes in under.

195

1          THE COURT:  Well, right, but you may have someone
2   put on notice of a problem, and it's evidence, or
3   circumstantial evidence of their conduct, what they do going
4   forward, it's another thing to admit something that someone
5   says for the truth of the matter asserted.
6          MR. WILLIAMS:  Exactly.
7          THE COURT:  Can't be rolled up into a document for
8   the truth of the matter asserted.
9          MR. WILLIAMS:  I understand that.
10         THE COURT:  And I'm asking, do these cases say that
11  they can be considered for the truth of the matter asserted?
12         MR. WILLIAMS:  These cases say, and I have to
13  confess, I have not read all of these that I just cited to you,
14  but the issue that we recognize here is that some of them are
15  just notice.  Some of them are adoptive admissions.  Some of
16  them are direct admissions of a party.
17         I think that each of these documents probably has to
18  be analyzed independently.  We think they are appropriately
19  admissible, but I wanted to address the Court's question, you
20  know, in the short time that I've got left.
21         Finally, with respect to defendants' earlier
22  argument about whether plaintiffs have to prove not only the
23  causal connection but -- between the alleged -- the

Page 164

122007 SJ Hearing.txt
24   misrepresentation or the conduct that results in the economic
25   loss and prove that it is not the decline, is not the result of
                                                                      196


1    changed economic circumstances or changed investors'
2    expectations, I think that was the argument --
3              THE COURT:  No, that wasn't the argument, because
4    that would postulate the standard a little differently than
5    it's articulated.
6              MR. WILLIAMS:  I agree.
7              THE COURT:  What I heard was a front-end argument
8    about the strength of the inferences that in the first instance
9    would allow you to establish the connection.
10             MR. WILLIAMS:  I agree.
11             THE COURT:  Not if there are other causative factors
12   in the record that may be a substantial factor in the decline.
13             MR. WILLIAMS:  I agree.  And Your Honor will draw
14   the inferences from what we say is the direct evidence and come
15   to a conclusion.
16             I appreciate the time, Your Honor.
17             MR. GIBBS:  You want to hear about spoliation?
18             THE COURT:  To the extent that you want to tell me
19   something about it.  I haven't given you the opportunity.
20             MR. GIBBS:  I know it is late, so I'm not going to
21   respond to everything Mr. Solomon said.  I think it's pretty
22   well briefed.  And from your questions, it seems clear to me
23   that you know the record and you know our position.
24             I have a couple of items I would like to address,
25   but before I do that I wanted to see if Your Honor had any
                                                                      197


1    remaining issues that you would like us to address
2    specifically.
                              Page 165

122007 SJ Hearing.txt

3          THE COURT:  No.  I just saw in the brief here this

4   reference to the OSO database, the Oracle sales online database

5   and your position that the special master denied their request

6   with respect to those documents and how that then ties into the

7   failure to preserve issue and the purge issue that relates to

8   the spoliation question.

9          MR. GIBBS:  To put a little color on the special

10  master's order there, plaintiffs moved to compel production of

11  all data from the Oracle sales online system as it existed

12  during the relevant time period.  In fact, it was a more

13  expanded time period, but they wanted everything, which

14  included the raw data in the database.

15          The special master denied that request with the

16  limited exception of ordering Oracle to produce printouts of

17  data from OSO, not the raw OSO data.  He denied that request.

18          So even if you take at face value their claim that

19  that information was not preserved, they are claiming that

20  Oracle and the individual defendants should suffer default

21  judgment, or perhaps just a crippling evidentiary sanction,

22  because they allegedly didn't preserve something that

23  plaintiffs were not entitled to get in discovery.  How they

24  could possibly show prejudice from that I don't know.

25          There is a second layer there, which is their

                                                            198


1   so-called evidence that that database was purged or destroyed,

2   is an SLC interview memorandum, which is double hearsay.  It's

3   hearsay in that the witness spoke out of court.  It's also

4   hearsay in that what the witness says is being reported by a

5   lawyer from Simpson, Thatcher & Bartlett, counsel for the

6   Special Committee.

7          It's not admissible.  It's not evidence that the OSO

122007 SJ Hearing.txt

8   database was purged.  We were never ordered to produce that

9   information.  They have no idea whether it was preserved.  The

10  idea that that could form the basis for sanctions against

11  anybody is ridiculous.

12          THE COURT:  Let's talk a little bit about Softwar.

13          MR. GIBBS:  Sure.  I agree with Your Honor, Softwar

14  is the only instance in which plaintiffs have identified a

15  specific piece of information that should have been produced in

16  discovery pursuant to orders and was not and apparently was

17  destroyed.  The problem is, it wasn't in defendants' control

18  when it was destroyed.

19          And I want to stress for Your Honor --

20          THE COURT:  But he would have some obligation, would

21  he not, to at least indicate, provide notice that that

22  documentation ought to be preserved?  Wouldn't Mr. Ellison,

23  through counsel, have some obligation to do so?

24          MR. GIBBS:  I believe so, and we did.

25          Mr. Solomon keeps saying that Mr. Ellison never

                                                              199


1   personally said to Mr. Simons preserve the information, keeps

2   saying Mr. Ellison didn't ask for the information back in

3   October or November; what he is leaving out is that after they

4   filed their motion to compel, I spoke to Mr. Simons, and I told

5   Mr. Simons, please preserve this information.  And Mr. Simons

6   told me I will, it's on my computer.  I have no reason to get

7   rid of it.

8           THE COURT:  What is the time frame in that?

9           MR. GIBBS:  That was after plaintiffs filed their

10  motion to compel.  It was in early November when I was

11  interviewing Mr. Simons about his understanding of the

12  contract, the status of the materials.

                        Page 167

122007 SJ Hearing.txt

13            THE COURT:  Is that in my record?

14            MR. GIBBS:  I believe it's in correspondence I

15    exchanged with Mr. Solomon about this issue back in January and

16    February.

17            THE COURT:  We'll check.

18            MR. GIBBS:  So we had no reason to believe that

19    Mr. Simons was going to get rid of the computer.  I asked him

20    to preserve it.  Mr. Ellison does not have an obligation to go

21    out and instruct witnesses to preserve evidence.  He is

22    entitled to rely on his counsel.

23            I will say, though, by the way, I don't think it's

24    crystal clear that he had some kind of preservation obligation

25    in the strange circumstance where you have, I think, at least a

                                                              200

1     good faith dispute over whether he has legal control over it.

2     I mean, we asked Mr. Simons to preserve it because we wanted to

3     have it preserved in case we lost the motion.

4             Notwithstanding counsel's characterizations of our

5     argument on that motion, this Court recognized there was at

6     least some support for our position in the contract.  We still

7     respectfully disagree.  I recognize your ruling, but we still

8     think the contract means what it means.  And the parties

9     certainly acted as if the materials belonged to Mr. Simons.  He

10    had them the whole time.  Mr. Ellison never said, hey, where

11    are those things you are supposed to return to me under the

12    contract.

13            THE COURT:  What about a notion that says, look, the

14    Court ruled the contract says that Mr. Ellison has custody and

15    control of it.  Mr. Ellison ought to make some efforts -- you

16    told me about the correspondence you had with Mr. Simons, but

17    some efforts ought to be made to -- I mean, that is like saying

                            Page 168

122007 SJ Hearing.txt

18 that the FBI is bringing a case jointly with the San Francisco

19 Police Department, and that joint investigation rolls up into

20 charges here in Federal Court, but because the SFPD keeps the

21 documents and they get destroyed, you can't attribute that to

22 the FBI.

23          MR. GIBBS:  I don't think that's the situation we

24 are in here.  But in terms of what happened after the order was

25 entered, the order was signed on December 29th, it was served

201

1 on us on January 2nd.

2          On January 10th, after considering how to comply

3 with an order to produce something we didn't have, three things

4 happened.  I sent a letter attaching the order and a copy of

5 the agreement on which the order was based to Mr. Simons.  And

6 I demand that he produced the information called for by the

7 order.

8          Mr. Ellison sent a separate letter to Mr. Simons and

9 said turn the materials over to my lawyer so it can be produced

10 in this case.  Mr. Ellison had a conversation with Mr. Simons.

11 And I would encourage Your Honor to read the entire portion of

12 Mr. Ellison's transcript discussing that telephone

13 conversation, because the picture the plaintiffs have painted

14 of that conversation is, I think, ultimately misleading.

15          The entire content of the communication is

16 Mr. Ellison asking Mr. Simons to turn the materials over to us.

17 In that context, Mr. Simons says to Mr. Ellison there is

18 nothing in there that is going to help them in the case.  Why

19 do they want these materials.  Mr. Ellison says they don't know

20 that, just turn it over to my lawyers.  Mr. Simons says what do

21 you think they are going do with it.  Mr. Ellison speculates

22 with resignation, is how I think it reads that they are

Page 169

122007 SJ Hearing.txt

23  probably going to use some of the personal stuff in there to

24  attack me.  Now, he had good reason to think that was true,

25  given some of the questioning during Mr. Solomon's depositions.

202

1   So it's not that surprising that he thought they might do that.

2           THE COURT:  Now, does that reference support a

3   finding that Mr. Ellison is contributing to signaling the

4   ultimate destruction of that material?

5           MR. GIBBS:  Absolutely not, Your Honor.  Expressing

6   regret that the materials have to be turned over is a far cry

7   from encouraging Mr. Simons not to turn them over.

8           Remember, the context of the conversation is what

9   are they going to do with it, I think they are going to do X.

10  He is anticipating that it's going to be turned over.  He is

11  expressing regret, I wish that wasn't going to happen, but it

12  is.

13          There is nothing in the testimony about that

14  conversation to support the inference that Mr. Ellison was

15  trying to send signals to Mr. Simons to destroy the material.

16          Thank you, Your Honor.

17          MR. WALD:  I know it's been a long day.  I'm going

18  to address three subjects.  The first is the accounting issues.

19  Unless Your Honor has questions, I'm not going to address

20  Hewlett-Packard, I think that is quite well set out.

21          I am going to address the claim that was advanced by

22  Mr. Greenstein that the evidence shows that Oracle knew that it

23  needed to do something untoward with the bad debt transfers in

24  order to make 11 cents.  That claim is fundamentally flawed

25  under the evidence, Your Honor, which I will show you in three

203

122007 SJ Hearing.txt

1  slides.

2          Plaintiffs contend that Oracle made the release in
3  order to beat the street, but the evidence shows otherwise,
4  Your Honor.   The plaintiffs say in their papers that as of
5  December 1st, 2001, Oracle knew that it did not and could not
6  beat Wall Street's expectations of 10 cents per share in the
7  second quarter without inflating earnings by $20 million or
8  more to push its EPS results to 10.5 cents.

9          They cite the December 1 upside report, that upside
10  report shows projected EPS of 10.34 cents.   As Your Honor
11  appreciates, this is the first day of the new quarter, and it
12  takes a while for Oracle to get all of the information from the
13  just completed quarter and to close its books.   That doesn't
14  happen instantly.

15          Go to the next slide.

16          The problem for their theory is that it already
17  includes a bad debt adjustment of $20 million.   The 10.34 cents
18  earnings per share already includes the $20 million release
19  from the bad debt reserve.   The release couldn't possibly have
20  been what enabled Oracle to report 11 cents.

21          If you go to the next slide, Your Honor, what
22  actually happened between December 1st and December 8th was
23  that Oracle got additional information about licensing and
24  consulting revenues as well as a reduction in expenses.   And
25  that additional information, Your Honor, increased the
                                                            204


1  projected EPS from 10.34 cents to 10.60 cents.   All one has to
2  do is to look at the December upside report and December 8
3  upside report to conclude that.

4          In addition, Your Honor, there was a misstatement to
5  the Court about the logistics of the transfers.   It actually

Page 171

122007 SJ Hearing.txt

6   happens in two separate tranches.  In the early part of the

7   third quarter in November there are a series of transfers to

8   the bad debt reserve, okay?  That doesn't have any revenue

9   impact at all.  And that is done by collections people who

10  don't know otherwise what to do with this unapplied cash.  They

11  just don't know what to do with it, so they transferred it to

12  bad debt.

13          Later on in the quarter, a different group of people

14  does what every company does at the end of the quarter, it's

15  called truing up your bad debt reserve, you take a look at

16  under FAS 5 what you think is going to come in and what you

17  think isn't going to come in, and you decide are you

18  overreserved or underreserved.  And as the Court appreciates,

19  you shouldn't be either.  You can't have cookie jar reserves,

20  either.  If the reserves aren't justified under FAS 5, you

21  release reserves.  Oracle had done that routinely in every

22  quarter.

23          Do we have that slide real quick?

24          But the evidence is that Oracle routinely adjusted

25  its bad debt reserve every quarter.  And this was just one more

                                                                205

1   adjustment of the bad debt reserve.

2           This is Exhibit 392.  If you take a look, you can

3   see historically, you know, bad debt -- releases from the bad

4   debt account in the dimension that occurred in the -- at the

5   end of the second quarter '01, beginning of the third quarter.

6   Happened routinely.  So the idea that this was part of some

7   grand conspiracy simply doesn't hold water, Your Honor.

8           The second subject I want to cover is statements

9   about the demonstration environment.  It's quite interesting

10  that out of all of the product claims that the plaintiffs have

                            Page 172

122007 SJ Hearing.txt

11   made in the case we now hear that this is a case about false

12   statements with respect to the product demonstration, the

13   demonstration environment.

14          To be clear, Your Honor, the demonstrate environment

15   is the hardware environment in which this software is

16   demonstrated.  It doesn't have do with whether the software

17   works or not.  The question is do you have the right

18   demonstration environment to be able to show customers whether

19   it works or not.  So the whole claim that the software wasn't

20   integrated, that it had bugs, that there were big problems,

21   none of that has to do with the demonstration environment, it

22   simply has to do with whether or not you can fully demonstrate

23   the capabilities of the software.

24          Your Honor, I believe we heard today for the first

25   time Mr. Williams advance the claim that one of their alleged

                                                              206


1    false statements were statements made to the market about the

2    viability of the demonstration environment.  One will search,

3    Your Honor, either the complaint or their contention

4    interrogatories in vain for a claim that there was a false

5    statement by the defendants regarding the viability of the

6    product demonstration environment, simply isn't there.

7          That is one issue with respect to falsity, but

8    moving on to the question of lost causation, as I understood

9    Mr. Williams' argument, the entirety of their lost causation on

10   products now comes down to, I think, two documents which he

11   says supplied the link to the missed quarter.  The one that I

12   had, I'm not sure what the exhibit number is, it's Fizpatrick

13   14, but the Bates is NDCA617112.

14          Not sure if we can call that up or not.

15          I can put it on the ELMO.

                              Page 173

122007 SJ Hearing.txt

16          This is the document I just referred to, Your Honor.

17   And if you take a look at the top, the date of this is

18   October 6, 2000.  This is the second quarter memo, not a third

19   quarter memo.

20          If you go down to the bottom, it says, "Here is the

21   exposure.  Not only have we lost deals in which we were the new

22   player, many deals have been lost with installed base

23   customers."  So by definition, this isn't a third quarter at

24   all.  And I would note that there is nothing on this document

25   which provides context.  Doesn't say how many deals, how much

207

1    were they worth.

2          THE COURT:  What he was doing was tracking them

3    through, that was tracking that document from the second

4    quarter into problems with Suite 11I in the third quarter and

5    basically arguing this sort of corroborates at least evidence

6    of it.

7          MR. WALD:  Fair enough.  I've got the third quarter

8    document.

9          The point I wanted to make was on a lost causation

10   basis, what is the evidence that you actually lost deals in a

11   material amount that caused the miss.  That is not a tracking

12   issue, it's a numbers and sense issue.  Is there evidence from

13   which one could conclude that there was lost causation

14   demonstrated.

15          My only point was the document I just showed you

16   certainly doesn't get there because it has nothing to do with

17   3Q misses.  And the next document, and you are right, he does

18   track it through to the third quarter --

19          THE COURT:  Generically, the argument is that he had

20   such a big problem with the implementation, evidence from that

Page 174

122007 SJ Hearing.txt

21   document what the expectations were, that it has to be that

22   that is part of the miss.

23           MR. WALD:  That may be in the argument, Your Honor,

24   but the question is in all of these documents, and this is,

25   again, one of the problems with Steinholt and their whole case;

                                                                    208


1    in all of these documents, in all of the evidence, on a motion

2    for summary judgment under Celotex, where is the evidence that

3    this caused the miss?

4            The most that this document says is another deal

5    lost primarily to demo system performance.  Again, Your Honor,

6    not to problems with the product, but problems with the demo

7    system, which they don't challenge as a false statement.

8            From a lost causation point of view, it discusses

9    one or two deals that were lost ten days before the end of the

10   third quarter of '01, Your Honor.  We don't know how big the

11   deals were, how material the deals were.

12           Here is really the killer point on this with respect

13   to lost causation, we don't know if those deal were ever in the

14   forecast, right?  Unless there is evidence that they were

15   actually in the forecast and then they fell out of the forecast

16   in a material amount for reasons having to do with the alleged

17   false statement, not the demo --

18           THE COURT:  In some ways they disagree with you, but

19   that is probably because of the lack of preservation provision

20   of documents to them.  That is what I would hear if I allowed

21   them to stand back up.

22           Right?

23           MR. SOLOMON:  Correct.

24           MR. WALD:  I think I heard that as well, Your Honor.

25   We've talked about the OSO database, and Judge Infante, who

                                                                    209

                          Page 175

122007 SJ Hearing.txt

1   certainly provided the plaintiffs with a lot of discovery in
2   this case, did not believe that the OSO database was relevant.
3           But I would say just beyond that, it's implausible
4   with all the millions of documents, if there was an earnings
5   miss that was created by product problems in a degree, there
6   would be some evidence of it.
7           And Mr. Gibbs reminds me, Your Honor, as I noted at
8   the beginning of my remarks, they were given 100 subpoenas to
9   customers, you know, not to Oracle, who they claim tubed all
10  these documents.  They were given authority, they were given
11  subpoenas to a hundred customers of Oracle to see what was in
12  the customers' files about alleged problems with 11I.  Out of
13  that, you will search their entire submission in vain for any
14  evidence of a lost deal in the third quarter due to product
15  problems.  And that's where we began.
16          So Mr. Williams, having heard my remarks, stood up
17  and that is what he chose to speak about.  And again, I say
18  that only because I think it's revelatory of the absolute
19  absence of the issue.
20          The only other point I want to make is that there
21  was some discussion about OKS and lost revenue due to OKS; Your
22  Honor, this is from the Richard Sellers deposition, page 238:
23          "Q.   And when you say bookings goal,
24               are you talking about the license
25               goal, license for the quarter?
                                                            210


1           "A.   Right.  But you know this is all
2                search for the guilty.  You know, when
3                you get to the end of this whole
4                thing, we only missed by 8 million.
                        Page 176

122007 SJ Hearing.txt

```
 5              We found all the rest.
 6         "Q.    Do you know --
 7         "A.    You are in the middle here.
 8         "Q.    No, I understand.
 9         "A.    As Paul Harvey would say, 'the
10              rest of the story.'  When we got to
11              the end of the quarter, March 1, and
12              we looked back, we were 8 million
13              short."
14              This has to do with the OKS issue.  It's not even a
15    license issue.  They claim that the miss was in the licensing,
16    this is in support revenue.  And it's an issue of $8 million
17    and is not what -- there is no evidence that that is what
18    caused the loss they are complaining about.
19              Finally, Your Honor, on forecasting, I'm not going
20    to go back through all the ins and outs.  I want to suggest a
21    big picture here.  I believe a relevant big picture, Your
22    Honor, is exactly what Vice Chancellor Strine observed after
23    his exhaustive review of these documents and the testimony in
24    the case, and that is that the plaintiffs have gone back with
25    the benefit of hindsight and recut the data and suggested,
```

211

```
 1    basically, that there were different ways that it could have
 2    been looked at, and if you had looked at it a different way
 3    would you would have reached a different conclusion.
 4              In short, it is classic fraud by hindsight, and,
 5    Your Honor, that is not what the case law says that you should
 6    do.  What the case law says under the -- these were
 7    projections, and under the Safe Harbor they need to show actual
 8    knowledge of falsity.
 9              What they are doing is recutting intradata, which
```

Page 177

122007 SJ Hearing.txt

10  did not suggest an extreme departure from the guidance it had

11  given or the substantial likelihood of extreme departure.   And,

12  in fact, this is the single most important document on that --

13  we showed this before, but these figures are not contested.

14  This was the internal forecasting process that was available to

15  the defendants, Your Honor, and on the basis of which they made

16  a decision.

17            This was done by Jennifer Minton.   Jennifer Minton

18  is not a defendant in this case.   She is not alleged to have

19  committed fraud, not alleged to be part of some grand

20  conspiracy.   She was just trying to do her job, like everybody

21  else.

22            This was the best she came up with based on the

23  information she was getting, Your Honor.   And she had been

24  right.   She had been conservative, but she had been right for

25  umpteen quarters previously.   This is what the defendants knew

                                                            212


1  about.   This does not suggest a substantial likelihood of an

2  extreme departure.   And no matter how often and how many

3  different ways Mr. Solomon tries to recut the data, he doesn't

4  get there under the governing legal standard, which is Shaw in

5  the other case.

6            Thank you, Your Honor.

7            THE COURT:   So let me ask, you may want to -- the

8  first time I've heard much, and I don't think I saw anything in

9  the briefs, I might have missed it, about the third-party

10  cause.   I don't know that given what you have put before me I

11  need to go there to resolve these issues.   But if you want to

12  join that, you can.   If you don't, you don't have to.

13            MR. WILLIAMS:   I couldn't hear --

14            THE COURT:   I'm talking to Mr. Williams.

                          Page 178

122007 SJ Hearing.txt

15          MR. WILLIAMS:  I couldn't hear what you said.

16          THE COURT:  The reference to the subpoenas with

17   respect to third parties.  I didn't see that in the briefs.  I

18   don't recollect seeing that.  But that is sort of in some ways

19   asking the Court to decide the case on a record that is not

20   before me as opposed to one that is.  So you don't have to be

21   heard on that.  I don't know if you want to be heard.

22          MR. WILLIAMS:  I don't know that it's an issue that

23   is kind of relevant --

24          THE COURT:  This record is what it is.

25          MR. WILLIAMS:  -- to the Court's decision.

                                                          213


 1          I mean, in fact, you know, we had a hundred

 2   subpoenas sent out.  And a while ago Your Honor ruled on a

 3   motion for protective order, there is a record about that.  I'm

 4   not sure what issue --

 5          THE COURT:  But --

 6          MR. WILLIAMS:  But it was part of the discovery --

 7          THE COURT:  If you don't have anything to say,

 8   that's fine.  It's not going to turn on that.

 9          MR. SOLOMON:  May I, Your Honor?

10          THE COURT:  Yeah.

11          MR. SOLOMON:  The subpoenas -- as you know, you

12   dismissed the case.  There was a stay for many years.  The

13   subpoenas eventually went out many years later.

14          THE COURT:  Right.

15          MR. SOLOMON:  And there may be reasons why there is

16   a paucity of documentation.

17          THE COURT:  There was some litigation about how

18   many --

19          MR. SOLOMON:  Absolutely.  I don't think you can

                            Page 179

122007 SJ Hearing.txt

20  draw much from any lack of documents from those sources, given
21  the length of time, apart from anything else.
22          THE COURT:   Look, if I found an issue of fact on
23  that question I wouldn't need to reach that based on what I
24  already have in the record.
25          MR. SOLOMON:   Thank you.

                                                          214


 1          THE COURT:   We should be through.
 2          MR. WALD:   Can I just point out where it is in the
 3  record?
 4          This is from defendants' opposition to the
 5  plaintiffs' amended motion for partial summary judgment.  And
 6  it's in paragraph 2.  It's Roman IIIa, paragraph 2.  And it
 7  says, quote, "Plaintiffs were allowed to serve subpoenas on
 8  over 100 Oracle customers, but the information only undercut
 9  plaintiffs' claim."  And the exhibit is 256.  And there are a
10  bunch of other exhibits, including, Your Honor, some discussion
11  of the information that came back from those customers, which
12  didn't verify, in fact, undercut, and we would suggest, Your
13  Honor, put the lie to the claims that were being made.
14          MR. SOLOMON:   Just a couple of brief points.
15          I want to remind you, if it wasn't clear from the
16  briefing, that Ms. Minton, in fact, testified that this
17  rounding issue, and it's quite important, she testified if you
18  are at 10.49, you would round down to 10, that's what would
19  happen.  But there was no policy at Oracle of rounding up.  So
20  when she was asked if you're at 10.51 would you round up, the
21  answer was, oh, no, we may want to be conservative.  So I think
22  it's important to note that.
23          The only other thing that hasn't really been
24  addressed is, and you have talked to me about default judgment
                          Page 180

122007 SJ Hearing.txt

25    and then the inferences, with respect to the inferences, I know

215

1    that in the World Courier versus Barone case, Judge Henderson

2    had issues where the inferences hadn't really been spelled out

3    in the briefing.  But his approach was that maybe on the in

4    limines things will be more clarified.

5            THE COURT:  That's what I said at 9:30 this morning.

6    That is exactly what I said.  There may be some discussion on

7    another day.

8            MR. SOLOMON:  Aside from everything else, we do

9    believe default is appropriate.  We obviously believe adverse

10   inference is appropriate.  And the last thing we think is

11   appropriate is a judgment in their favor.

12           Thank you, Your Honor.

13           MR. BRITTON:  Did you want me to answer your

14   questions about Dr. Goedde, his methods?

15           THE COURT:  I think we have -- look, it strikes me

16   that the record is more than adequately joined on the issues he

17   gives testimony on as to the impact of the conversion ratio and

18   the impact on the forecasting model as to how that was applied.

19   And so I don't know that that needs any elucidation.

20           I wanted to make sure I understood what their attack

21   was.  But, no, I don't have anything --

22           MR. BRITTON:  If I can add one thing to that?  The

23   approach that the defendants have taken has been

24   exaggerated --

25           THE COURT:  I can read it.  I can read it.

216

1            MR. SOLOMON:  Just one more thing.

2            On the OSO, I think it's important to understand,

Page 181

122007 SJ Hearing.txt

3  Judge Infante --

4           THE COURT:  Oh, yeah, okay.

5           MR. SOLOMON:   Judge Infante had been told by the

6  defendants --

7                (Extended pause.)

8           THE COURT:  What's the problem?

9           MR. SOLOMON:   This is what Judge Infante had been

10  told in the briefing by defendants on the motion to compel,

11  basically told we can't go there.  It's going to cost a

12  fortune, and it's probably not there.  And so Judge Infante may

13  not have been wanting to order an exercise in futility.

14           THE COURT:  I don't see how that makes a significant

15  difference.  The question is did he order it or didn't he, is

16  it in play, right?  That is the bottom line.

17           MR. SOLOMON:  He ordered all the printouts.

18           THE COURT:  That's what they say.  So you don't

19  dispute that?

20           MR. SOLOMON:  I do not dispute that.

21           THE COURT:  Folks, have a good holiday.  We'll get

22  you an order out.

23           MR. SOLOMON:  You, too.

24           THE COURT:  Thank you.

25                (Proceedings adjourned at 3:57 p.m.)

                                                              217


1

2                      ---oOo---

3

4

5

6

7

122007 SJ Hearing.txt

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the
United States Court, Northern District of California, hereby
certify that the foregoing proceedings were reported by me, a
certified shorthand reporter, and were thereafter transcribed
under my direction into typewriting; that the foregoing is a
full, complete and true record of said proceedings as bound by
me at the time of filing.  The validity of the reporter's
certification of said transcript may be void upon disassembly
and/or removal from the court file.

122007 SJ Hearing.txt

_____

Sahar McVickar, RPR, CSR No. 12963

January 4, 2008

# EXHIBIT 436

1 of 100 DOCUMENTS

Copyright 2001 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

Dow Jones Factiva

(Copyright (c) 2001, Dow Jones & Company, Inc.)

THE WALL STREET JOURNAL.

The Wall Street Journal

March 2, 2001 Friday

**SECTION:** Pg. A3

**LENGTH:** 745 words

**HEADLINE:** Oracle Issues Profit Warning As Sales Slow

**BYLINE:** By Lee Gomes and Don Clark, Staff Reporters of The Wall Street Journal

**BODY:**

Oracle Corp. said a sputtering economy slowed sales of two important product lines, cutting fiscal third-quarter profit below Wall Street expectations.

The Redwood Shores, Calif., company thus became the latest big high-tech concern to estimate an earnings shortfall, with slowing purchases by recession-wary business customers getting the blame.

Oracle's announcement fuels additional worries, however, by reducing the prospect that companies with new Internet-oriented product lines might be immune to a slowdown. Earlier, Oracle executives had hoped that their next-generation products, which are designed use the Web to make businesses more efficient, might still be in strong demand even during slow times.

Oracle's third quarter ended Wednesday, and the company is scheduled to release complete financial results for the period on March 15. In yesterday's preannouncement, it put earnings at about 10 cents a share, two cents below the low end of Wall Street's expectations.

The company made the announcement after 4 p.m. Oracle's shares, reflecting a modest rebound in most technology issues, were up by that time $2.38, or 13%, at $21.38 in Nasdaq Stock Market trading. But the stock tumbled following the news in after-hours trading to $16.88 a share, on heavy trading volume.

The reasons for the shortfall were at least as troubling to analysts as its magnitude. Oracle's database software, a mainstay product line used as the foundation for many other business programs, had flat to negative growth over the year-earlier period. While database sales have been slowing at Oracle for many quarters, analysts were surprised by the abruptness of the latest downturn.

Oracle also said its line of application software likely grew 50% in the quarter, well below earlier predictions that the business might grow by 75%-100%. These products are now mainly used by large companies to manage their books, but Oracle is banking on a broadened line of Web-based applications to maintain the rapid growth rates the

Oracle Issues Profit Warning As Sales Slow The Wall Street Journal March 2, 2001 Friday

company has seen in recent years.

Last week in New Orleans, in fact, the company hosted thousands of customers for a trade show that highlighted its application business. At the show, Oracle Chief Executive Larry Ellison gave a bullish assessment of the application business, saying it was "really starting to take off."

Oracle executives said they were blindsided by the sudden negative shift in the mood of customers over the past several days. On Wednesday, the final day of the quarter, "we just had a significant number of deals that were deferred," said Jeffrey Henley, Oracle's chief financial officer, in a conference call.

In many cases, Mr. Ellison added, the deals for software purchases had been approved at a vice-president level by Oracle's corporate customers, but CEOs and chief financial officers of those companies at the last minute decided to delay making a commitment.

Oracle had already been hurt by a falloff in orders from dot-com start-ups, many of which used Oracle databases to build new Web services. The company had been counting on conventional companies taking up the slack, using Oracle software to develop new electronic-business applications and improve their internal efficiency.

Still, the CEOs held off signing the purchase orders. "That was true, even where it was acknowledged that this deal would save the company money," Mr. Ellison said. "We have a lot of nervous senior executives looking at this economy and being very cautious."

Bob Austrian, a Banc of America Securities analyst who had cut his numbers for Oracle earlier this week, said the announcement showed that "the economic downturn has become severe enough that it has become a shock. And shocks always impair purchasing decisions."

Mr. Austrian said that the slower sales at Oracle are likely to extend well past the current quarter, saying they could last well into next year.

Mr. Ellison noted that the company's earnings are still expected to grow 20% over the year-earlier period, with operating-profit margins rising to 33% of sales from 31%. And Oracle hopes to keep improving its own efficiency, in part by more widely using its own software to run internal operations.

"We think we are better equipped to deal with this slowdown than any company in the world," Mr. Ellison said.

However, Mr. Ellison and Mr. Henley acknowledged that they couldn't predict when sales growth would improve, because of the continuing uncertainty among customers about the economy.

**NOTES:**
PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 5, 2004

# EXHIBIT 437

00:25am EDT 10-Oct-00 First Union Securities, Inc.  (Charles Wittmann 804-782-3
ORCL-LOWERING EPS $0.03 IN 2001 & $0.02 IN 2002 DUE TO LOWER APPLICATIONS....

### ###           FIRST UNION SECURITIES, INC.            ### ###

ORCL: LOWERING EPS $0.03 IN 2001 AND $0.02 IN 2002 DUE TO LOWER APPLICATIONS
BUSINESS FORECAST

Oracle Corp. (ORCL-NASDAQ)                          Stock Rating: 2
                                                    Price Target: $80


PRICE:          $66.75                         October 10, 2000
52-WEEK RANGE:  $93-20              Charles Wittmann, CFA / (804)782-3316
DIVIDEND/YIELD: none/nil                 Mark Tyler, CFA / (804)344-6258
                                          Joshua Wein / (804)782-4106


EPS ESTIMATES (FY  5/31) 2000A    2001E  2002E
Q1 - August              $0.08   $0.17A $0.18      AVERAGE
Q2 - November             0.13    0.18   0.23      VOLUME: 19.4MM
Q3 - February             0.17    0.22   0.26
Q4 - May                  0.31    0.38   0.48      INSIDERS
                         ----    ----   ----       OWN: 25%
Full-Year EPS            $0.69   $0.95  $1.15
    or                           $0.98  $1.17      INSTITUTIONS
                                                   OWN: 45%


P/E RATIOS                NM     70.3x  58.0x

SHARES OUTSTANDING:  2.97 billion              3-5 YEAR EPS
MARKET CAPITALIZATION:  $198 billion           GROWTH RATE: 30%


KEY POINTS

-- We are lowering our 2001 and 2002 earnings per share estimates $0.03 and
$0.02, respectively, for more modest forecast in applications business.

-- Lowering 2Q01 earnings per share $0.02 to $0.18 due to lower forecasted
applications revenue growth.

-- Trimming 2Q01 applications growth to 41% from 63% and database growth to 20%
from 24% due to slower product ramp up with 11i ebusiness product and new 9i
database transition due for release first half calendar 2001.

   Current valuation at 15x 2001E revenues leaves downside risk should
applications business not gain traction during fiscal 2001.

-- Retain Buy rating due to compelling long term application platform for ebusiness once adoption for product begins.

   CUSSION

We are lowering our 2001 and 2002 earnings per share estimates $0.03 in 2001 and $0.02 in 2002 due to lower forecasted growth in applications business this quarter.  We have lowered our revenue estimate this quarter by roughly $100 million to $2.6 billion due to lower forecasted growth in applications business and database sales over the next two quarters, in our opinion.  We make the following points:

-- We are concerned that lower than expect growth in the applications business will lower the multiple at Oracle.  We believe that Oracle's premium multiple is driven in large part by the potential growth in its ebusiness applications license fees that augment its mature, yet dominant database business.  We have lowered our applications revenue assumptions over the next two quarters due to the following reasons:

-- Few referenceable sites translates into delayed orders for ebusiness suites.  At the i2 conference held on October 9, it is evident that enterprise customers want referenceable sites.  With over 1,000, i2 has an advantage of proving value, while Oracle has 27 referenceable sites.  These few sites will need six months before ROI can be demonstrated.  This lag in forecasted ption of ebusiness applications (11i product) causes us to push our application rampup into fiscal Q4 2001.

-- Oracle appears to be focusing on middle market deals that will have lower ASP's.  Our conversations with Ariba, Commerce One, and IBM indicate that these competitors do not see Oracle in megaexchange space.  i2 indicates that Oracle is focused on smaller companies that may run on one ERP system in which an end to end solution is more compelling than with large, complex organizations.  Our conclusion is that initially the majority of transactions will be smaller transactions.

The combination of fewer deals with lower price points leads us to be more conservative on the application growth in the next two quarters.  Moreover, with the introduction of the new database product, 9i, we believe that the product transition will lower database sales as potential customers wait for 9i to be generally available in the first half of 2001.  In light of these factors we are lowering our forecast accordingly:

|  | Current | | | Prior | | |
|---|---|---|---|---|---|---|
|  | 2Q01E | 2001E | Y/Y% | 2Q01E | 2001E | Y/Y% |
| Revenues ($ Bil) | $2.6 | $11.8 | 16% | $2.7 | $13.8 | 19% |
| EPS | $0.18 | $0.95 |  | $0.20 | $0.98 |  |
| ' Growth |  |  |  |  |  |  |
| Application Revenues | 43% | 50% |  | 63% | 73% |  |
| Database Revenues | 19% | 20% |  | 24% | 22% |  |

Investment Opinion

    are lowering our revenue and growth targets for the applications business in the near term because we believe the length of time to sell the ebusiness application will take longer than our original forecast.  Enterprise customers will demand demonstrated results from third party referenceable sites and those results will not be in until Q3 2001 fiscal, in our opinion.  Moreover, the product transition in the database business may delay some orders until the new product is released next year.  We are taking a more conservative stand given the lower growth rate in the applications business may negatively impact the stock given the valuation.  Oracle is a superb long-term company and the applications business should ramp nicely, but it may take some time to gain traction with large enterprise customers.


Additional information is available upon request.

First Call Corporation, a Thomson Financial company.
All rights reserved.  888.558.2500
]

EON

# EXHIBIT 438

| Time Code | | Notes |
|---|---|---|
| | Please welcome, Chairman and CEO, Oracle Corporation, Larry Ellison. | |
| 13:09:05 | Thank you.  Thank you very much. Well it's been about, what is it, been eight months since we released Version 11i of our applications, the eBusiness suite and I thought I'd take a bit of time to give you a report card.  How we've done in our first eight months.  And we have literally dozens, actually more than a hundred customers live on 11i but I'm going to highlight some of the, I'm going to start with some very, very large companies and then I'll talk about other companies, that are just about to go live with the suite. | |
| 13:09:48 | Maybe the most interesting, maybe the most interesting, we're talking about the world's largest steel company that will be going live this year on the eBusiness suite.  The, one of the world's, one of the world's, you know, largest technology, technology companies going live on the complete suite.  But perhaps the single most interesting company is General Electric.  General Electric in many ways is a very, it's a very, it's a very unusual company.  It's got many different divisions.  They're in the finance business.  They've got GE Capital. | |
| 13:10:32 | They're in the aerospace and defense business.  They make jet engines. And actually they've got a division called GE Power where they make power generating equipment and it's a $22 billion business.  And it turns out we signed a contract for the eBusiness suite with General Electric Power in November, in November and they will have completely re-engineered their business, that is redefined all of their business processes, simplified their business processes and moved those processes to the Internet and bring, and bring a new plant live in five months.  In | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | five months. | |
| 13:11:32 | They will have completed a complete re-engineering of all 20 plants around the world in 18 months. The first plant goes live next month, in March. What's most interesting about this, I think, is anyone want to guess how many changes they made to our software? None. Not one. Anyone want to guess how much third party software there is in addition to the eBusiness suite that was integrated with the eBusiness suite? None. | |
| 13:12:25 | So General Electric, maybe the world's most respected company, has re-engineered their second most profitable business in five months and then automated, will finish automating that entire, that entire $22 billion division in 18 months. All over the world. 22 plants around the world. Now that's simply astonishing. That's never been done before. To quote GE, Jack Wells at GE said you know, we're in a lot of different businesses at General Electric. But we don't think we should finish, we don't think GE should finish Oracle's software for them. We think the right, the right company to finish Oracle software is Oracle. | |
| 13:13:38 | They don't want to make any modifications to our software at all and they didn't. The relationship between application suppliers and companies who use those applications is going to fundamentally change starting now. It used to be, it used to be we had large teams of consultants that would go out and work with, work with our customers. And the questions we'd always ask is what you know, how do you want to change our software to fit your business? And people would look at | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | how do you, [I need] to ask, so companies would ask, how am I doing business?  How have I been doing business for the last 20 years?  And all the middle managers in that company would write down their business processes. | |
| 13:14:42 | And then we'd hire consultants, Oracle consultants, IBM consultants, Anderson consultants, and they'd come in and change our software to make, to automate your company just like you'd been running that company for the last 20 years.  The thing is I don't think you want to keep running your company like you've been running it for the last 20 years.  At least General Electric doesn't.  The question is not can we change our software to run those same business processes that you've been running forever?  The question is, can you change your business processes to take advantage of the Internet? | |
| 13:15:37 | And if you don't ask that question, don't bother to put in any new software.  It's a waste of time and a waste of money.  The great thing about putting in new automation software is it gives you, the managers of these business, businesses, a chance to change the way you're doing business.  Don't automate the way you've been doing it.  Figure out how that process of billing customers should change now that there's this thing called the Internet.  Think about how that process of marketing should change now that there's the Internet.  How the process of selling and servicing your customers must change because there's an Internet.  How you do accounting and billing, everything. All of those processes can be simplified.  All of those processes can be made more efficient if you | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | : | Notes |
|---|---|---|
| | take advantage of the Internet. | |
| 13:16:51 | And when you redefine those processes, when you simplify those processes, and here's a very important one, when you standardize those processes all over the world, GE is not going to have one way of billing customers in Canada and a different way of billing customers in the United States and a different way of billing customers in Mexico. There's going to be one way of billing customers. They're not going to let every country, every group make little changes to business processes all over the world. | |
| 13:17:37 | It's called the world wide Web, not the Canada wide Web, not the American wide Web or the Mexican wide Web or the Japanese wide Web or the French wide Web or the British wide Web. It's called the world wide Web and if you don't have global business processes, then you're missing a huge opportunity to become more efficient. If you have different processes in every country, that means everyone in every country has to invent those processes. That means you need different software in every country to automate those processes. Different databases in every country to keep track of those processes. And that's a huge mistake. | |
| 13:18:28 | It's costly and you lose information. The old way of doing business of our consultants talking to your, your IT people, our consultants talking to your IT people is going to change. The old approach of us, the people in the software industry, never really understanding your business has got to change, is changing. At General Electric, the way we worked for the first six or eight weeks, now keep in mind that whole re-engineering process at GE Power started in | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | November and the first plant comes up in March with all the new business processes. We didn't have a lot of time. | |
| 13:19:19 | We had five months. It took two months to re-engineer the company, eight weeks. But we couldn't do it by talking to a hundred separate little middle managers. We talked to the senior executives at General Electric Power, including the head of the company. Because we had to, in a very short time, agree on a new simplified, standardized set of processes that take advantage of the Internet. We had to agree on a standardized set of processes that would work in France and Belgium and Germany and the UK and the United States. We had to standardize our processes. We had to move the processes to the Internet and the only people who could tell us, not how have you worked in the last 20 years, but how do you want to work in the next 20 years. | |
| 13:20:20 | How do you want to take advantage of the Internet? The only people who could tell us were the people who were running the business. Not the IT people, though the IT people were there. Not the middle managers, though the middle managers were there. The senior people in the company who were going to move, help to redefine those processes and help us move those processes to the Internet. The other thing that was, that went on is that the people that the senior managers of General Electric were talking to were not our consultants, not our salespeople, but the engineers who built the eBusiness suite. | |
| 13:21:11 | Because the fact is the eBusiness suite does not have everything that GE wants. We admit the eBusiness | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | suite does not have everything that our customers want.  But we have 80 percent or 85 percent or 86 percent. And an 85 percent solution in five months is better than 100 percent solution that you dream about happening in two years or three years after you heavily modify our software. | |
| 13;21:57 | So GE decided that the right thing to do was get to an 80 percent solution as quickly as possible.  Get the advantages of an 80 percent solution in five months.  Get the savings. Get the productivity improvements and get the understanding that you get by running a complete eBusiness suite on the Internet.  At the same time GE needed to communicate to us what was missing.  Now they couldn't communicate that to our consultants, usually what was missing, you know, you tell the consultants and the consultants would program it for you. Consultants would finish our software for you. | |
| 13:22:45 | Or Anderson consultants would finish it.  Or IBM's consultants would finish it.  It's a bad idea.  It's a very bad idea.  We have a hard time finishing our software.  It's difficult.  You shouldn't try to finish it for us.  But it's important that you explain to us what's missing.  It's important that we understand your business well enough so we knew, know, we understand that other 20 percent that we didn't put in.  Because a year from now we'll have a new version of the eBusiness suite that will take you from an 80 percent solution to an 85 percent solution or an 86 percent solution. | |
| 13:23:32 | We'll keep getting closer and closer because we're going to get smarter about taking advantage of the Internet and you're going to get | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | smarter about taking advantage of the Internet. Now there's this interesting notion of this 80 percent solution that we're not going to accept, companies, you know, an executive says we're not going to accept an 80 percent solution, we want 100 percent solution. | |
| 13:24:00 | Well, that's interesting. Do you think any company really knows the optimal, the perfect way to run the business? Do you think any company can write down a specification describing exactly how they want to run? I don't think so. We can't. We've never met a client who really could. But you could write down a specification and it might be close but I guarantee you, a year from now you'll be smarter than you are now about taking advantage of the Internet and figuring out how you want to change and improve something. So let's get to an 80 percent solution as quickly as possible. We'll get smarter, you'll get smarter. | |
| 13:24:46 | Now if you don't modify our software, if you don't make our software better, something interesting happens. A year from now when we come out with a new version of our software, you can actually use it. If you make our software better, if you make a bunch of changes to our software, if you hire consultants to put in special things just for you, when we come out with a new version of our software, you can't use it unless you call all those consultants back up, have them come out again and convert. Convert you from the custom system you have right now to the new version of our software. If you customize our software heavily, you trap yourself in an old version. | |
| 13:25:56 | And it's almost impossible to | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | upgrade.  I would also argue, we'll have a new version complete, we will finish a new version of our software before you finish making the old version better.  You will still have consultants working on that version of the software, not yet implemented in your company, when we release the next version of our software.  Be kind of funny won't it?  We'll have all these new features and functions and say here, use it and you'll say sorry, I can't.  I can't.  I haven't finished modifying your old version yet. | |
| 13:26:41 | And we see that all the time.  So what you're really saying when you hire these consultants to make our software better, you're saying Oracle, I'm going to take this one version from you and I'm going to stay on this version for a very, very, very long time and all those improvements that you're going to make over the next several years, I don't want them.  Now, I understand up until now, no company has offered you a complete suite of software to run your business.  Everything. Marketing, sales, service, supply chain automation, manufacturing, accounting, human resources, all as a single integrated system. | |
| 13:27:37 | In fact, my industry has always been a parts and labor industry.  Since no one was providing a complete set of software to run your business, you have had up until now, no choice but to shop for parts.  You buy a marketing system from Epiphany.  You buy a sales system from Siebel.  You buy an accounting system from SAP. You buy a supply chain from I2. Parts, parts.  And then labor, lots of labor, lots of labor.  You pay far more, you pay far more for hiring consultants who then put these pieces | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | together to run your business. | |
| 13:28:30 | To attach the Epiphany marketing system to the Siebel sales automation system.  To attach the Siebel automation system to the BroadVision Web store.  To attach the BroadVision Web store to the accounting system from SAP, and so on.  My industry is so immature, the software industry has been so immature that if this was the automobile industry, what we'd be selling, we wouldn't sell cars.  We would sell fuel injection pumps and engine blocks and catalytic converters and wheels and windshields and then you would put them together. | |
| 13:29:19 | Well, you wouldn't put them together. You'd hire mechanics.  IBM Mechanics, Inc.  Anderson Mechanics.  You'd hire a lot of mechanics to assemble the engine and the wheels and the body and the windshield into, I love the name, into a best of breed car.  And you might make a few changes on your own.  You might take the BMW 12 cylinder engine or, and add two more cylinders, have a 14 cylinder engine. Better, you know, [inaudible] better. I'm sure the IBM mechanics would be happy to take the BMW engine, add more cylinders.  How many cylinders do you want?  20 cylinders would be nice. | |
| 13:30:13 | And you would have the deep satisfaction of knowing that your company and your company alone, had this kind of car.  There was no other car like it in the world.  It was truly unique.  Imagine getting on an airplane where someone said to you, you know, you should be very proud sir or miss, this airplane has been especially for you.  There's not another one like in the entire world. Me, I would drive.  But that's what we do with our computer systems.  Our computer systems are made up of a | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | bunch of parts we bought. A lot of labor we hired. Our own ideas to make it better. | |
| 13:31:02 | And they're unique inside of our business. We've never had a choice because no one made airplanes, no one made cars, people just gave us parts and labor. And we've worked very hard, we've worked very hard to be the first car company. We don't want to sell parts and labor. We would like to sell you a car. We think it's cheaper, more reliable, upgradeable, it's predictable, you can install it quickly and maybe it's not as perfect as that car you dream of, I mean you can always imagine a car that's better than the best Mercedes. You look at the best Mercedes or the best Porsche and you say if it only had the Ferrari front end, I love the way that, you know. You got to imagine this is the perfect version, how we would just change it slightly. But we don't, you know, we just look at the best car we can find and buy the best car. The car we like we like the most. | |
| 13:32:07 | We don't kind of take one part and glue it onto another. We don't try to implement our fantasy in an automobile, but we do on our computer systems. So we think that's over. We think that whole notion of parts and labor is over. But it does mean a totally different relationship between a software supplier and the consumer of technology. It means for the first time we have to deeply understand your business. Because we know the cars we're making right now are not perfect. But they're better than anything else you can buy. All the pieces fit together. | |
| 13:32:53 | And we can install it in a matter of months, in a matter of months, and give you benefits in a matter of | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | months, in a short period of time. And then as we do that you will get smarter about using the Internet to make your business better, we will get smarter about your business. We'll learn more about your business and we'll figure out that the next version of our car, the next version the eBusiness suite will have a few more important features for you and because you haven't modified our software, you'll be able to install the new version of our software and make your business better. | |
| 13:33:31 | It's a long term relationship.  Us learning about your business, understanding your business.  Us making our software better.  You taking and installing the latest version of our software quickly and taking advantage of that.  Oracle was the first company to use this eBusiness suites.  We were the first company to use this eBusiness suite and in the very first year we put it in, we saved $1 billion.  In other words, our profit margins went from 20 percent to 30 percent.  In this, we're now finishing our second year of the eBusiness suite and we will save $2 billion in our second year. | |
| 13:34:11 | Easy to remember.  Year one, $1 billion in savings.  Year two, $2 billion in savings.  Year three, and I'll say it now, I believe we'll save $3 billion.  It's hard to believe. It's hard to believe.  The Internet allows us to be so much more efficient than we were before.  By the way, while doing all of this we have cut our IT budget in half. Everyone tells you well, if you want it, go to the Internet.  If you want to take advantage of all this great new stuff, you have to spend more on IT.  I don't think so.  In fact, the more you spend on IT, the worse your | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | information gets. | |
| 13:35:00 | It's true.  Let me tell you why.  Our IT systems are so fragmented.  We have so many IT systems.  Everyone says hey, let's put that great new Siebel system in for sales automation.  That will cost a lot of money.  That must be good.  We'll be spending more on IT.  That will make the board happy.  Let's put that great new Web store in from BroadVision.  That will, that's good. The trouble is the BroadVision system is separate from the Siebel system. You are fragmenting your information. You have too many IT systems.  You're spending too much money on IT because you have too many separate systems. Every time you build another separate system, you still further fragment your information.  · | |
| 13:36:02 | Some of your data is in the Epiphany marketing system.  Some of your data is in the Siebel system.  Some of your data is in the SAP system.  Some of your data is in a PeopleSoft system.  Some of your data is in an I2 system.  Some of your data is in a BroadVision system.  No wonder you can't see what's happening in your business.  Your data is chopped up into too many separate systems, too many separate databases. | |
| 13:36:32 | The more you spend, the worse it gets.  Every time you put in another brand new separate system, you take another little piece of your data and hide it in another place.  You implement another separate set of processes.  But, of course, people tell you and I'll pick on IBM.  IBM tells you this is not a problem.  We can help you. · We can glue all of these separate systems together.  We can glue them all together.  And it's a process we call systems integration.  Great word, systems | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | integration. | |
| 13:37:23 | IBM has 300,000 consultants that are eager to help you with your problems. All they want to do is help.  And they do this thing called systems integration.  And IBM actually how now, they've now made, they now have alliances.  Partnerships with 500 separate software companies to give you a large menu of choices to choose from and once you choose, they will, they have guys with glue guns come and glue it all together for you. And that's IBM's business, right now. | |
| 13:38:12 | IBM's software business is actually getting smaller but IBM's labor business is getting bigger.  What is systems integration anyway?  What does it mean to attach the Epiphany system to the Siebel system, to the BroadVision system, the SAP system, to the I2 system, to the CommerceOne system?  What is it, what does that mean?  How do they do it?  What do those 300,000 people do all day? Well, let's look at a normal day in the life of a company. | |
| 13:38:54 | One of the things companies like to do is sell their stuff.  Got to find people who are interested in buying your stuff.  So it's called marketing.  So we want to, let's say we want to use, let's say, and let's say we're using the Internet.  We want to use the Internet and we want to send electronic mail to tens of thousands of prospective customers. How do we do that?  Well, we bought this Epiphany system over here for marketing so we have to load the Epiphany database with the names and addresses of these thousands and thousands of people we want to send an e-mail to.  That's what the Epiphany system does.  It's an, it's an, it's an Internet marketing system. | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| 13:39:36 | So we've got to load up this database with those names and addresses. And us being a modern Internet kind of company, we want those people to either go to our Web site or call us on the phone if they're interested, after they get the e-mail. Visit our Web site, call us on the phone. The problem is, that Web site is run by the software we bought from BroadVision. So we need to move that, the names of those companies out of the Epiphany system over to the BroadVision system over here, just in case someone visits our Web site. That's systems integration. Writing that program to move data out of your BroadVision database into the, oh, excuse me, out of the Epiphany data, customer database, into the BroadVision database. | |
| 13:40:24 | That's systems integration, that's what those guys do. But what if they call on the phone after visiting the Web site? It's not a problem. There are 300,000 of these guys. So they also write a program to move the data out of the BroadVision system and the Epiphany system into the Siebel sales system. You see, Siebel has a customer database and BroadVision has a customer database and the Epiphany has a customer database and the databases have to agree. If you're moving data back and forth, marketing campaign at Epiphany. Visit the Web store at BroadVision. Call on the phone, Siebel system. | |
| 13:41:05 | You've got to move the data. It's great, things are going well, okay. Now, one of the customers decides to actually buy something of, darn. Let's see, now we've got to move the data from the sales system, by the way, they can buy on the Web or they can buy on the phone so you've got to move data from the Web system, from | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | BroadVision into the SAP accounting system and we've got to move data from the Siebel sales system also into the accounting system over here. Because they're going to buy something. They've just bought something and we've got to bill them. | |
| 13:41:43 | Okay. And then they call for support. This is bad. Now we've got to move the data out of the accounting system, the customer data out of the accounting system and into the support system. And that's just in France. Because the French system's different from the British system and the German system and it's crazy. It gets worse because there's suddenly an announcement that Siebel comes out with a brand new version. | |
| 13:42:19 | Fabulous. It's not a problem. They get the new Siebel version comes out. You call IBM back up. They unplug, they unplug the Siebel call center from BroadVision and they plug in the new one, they unplug the Siebel call center from Epiphany and they plug in the new one. You know, systems integration is the gift that keeps on giving. Fantastic. It's a lifetime, it's a lifetime commitment to your system integrator. You might as well marry them. | |
| 13:42:55 | It's really quite a remarkable business. It's like you drive your Porsche in, you know, you're tired of this, you've had a Porsche for a while and you're kind of tired of having a Porsche and you'd like to now, you got married and you got kids so you got to get a larger car, and what, then the first thing you do is you change your Porsche engine for a Volvo engine. It's the first step on the way to a sedan. | |
| 13:43:26 | But that's what you do. And it's not your fault. It's our fault. Because my industry is so young, the software | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | industry is so young.  It's so immature.  We've never offered you cars.  All we offer you are parts and labor.  And that's why we built the eBusiness suite.  We wanted to be the first car manufacturer.  We wanted to redefine the relationship between the software industry and its customers. | |
| 13:43:55 | We wanted to give you a system that was complete, that required no systems integration.  One that you could install quickly.  And inexpensively, by the way.  One of the problems, if you look at Oracle's business, if you look IBM's business, it's very interesting.  IBM's consulting revenue is going up. There software revenue is going down. Oracle's software revenue is going up.  We only have one business that's getting smaller.  Our consulting business.  Why is our consulting business getting smaller? | |
| 13:44:26 | See, the problem with installing that system in GE in five months is we can't charge very much.  We only, it was only five months of work.  So the cost of installing the software is a tiny fraction of installing all these best of breed systems.  There is very little labor.  You don't modify the software, you don't do systems integration.  It takes a matter of months.  It's cheap.  Our consulting business is getting smaller where our software business is getting bigger. IBM, other way around.  Software business getting smaller.  Consulting business getting bigger. | |
| 13:45:08 | The question is what do you want to do, what do you want to do with your money?  Do you want to buy labor or cars?  The whole world, I think, is about to change because of this thing called the Internet.  We're becoming vastly more productive, vastly more efficient and my industry's going to | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | have to change along with it. We have to stop treating our customers like they're hobbyists, like you love buying these parts and hiring people to glue them together. We have to deliver complete and running systems and that's what the eBusiness suite is. The very first of them. | |
| | Thank you. And I will do my best to answer whatever questions you might have about anything at all. I think we have open microphones, is that right? The gentleman over here. | |
| | I'm sorry, I'm having trouble hearing. | |
| 13:46:37 | Are you going to be working for us? Well, no. Because we can't afford to pay you. No, you're not going to be working for us. We're going to be working for you. You know, unlike, unlike the old days where you take most of your money and give it, you know, and pay for the 300, lots and lots of consulting. Hopefully, your software costs you much less, again, we cut our IT budget in half. We re-engineered our business completely, saved a billion dollars. We cut our IT budgets in half so the message is you can get your processes to the Internet while spending less on IT. | |
| 13:47:21 | You can sell to your customers on the Internet more efficiently, you can service your customers, you can do your accounting, manage your human resources, all much more efficiently and cut your IT budgets while doing it. So, no, It's not a matter well, you'd be working for us. We'll be working for you. Yes, sir. | |
| | [inaudible question] | |
| 13:48:00 | Yeah, the question was okay, we'll be implementing an 80 percent, not 100 percent solution. Of course, I'd argue you never, there, no one ever implemented 100 percent solution, they just fantasized about it. And | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | customers are going to get smarter and can our customers, can our software engineers keep up with our customers and the answer is not really.  So we'll keep making our software better and you'll keep having good ideas. | |
| 13:48:26 | So we'll always be trailing your good ideas.  We'll never be able to implement the software fast enough that you'll have all of your good ideas on the machine.  And that's a good thing.  That's, you know, that's [inaudible] the human experience. You keep getting smarter, we keep; and we're engineering.  We're just slightly behind your creative ideas. However, that's the right model.  You guys understand your business.  You guys understand your business and how to make your business better.  We're pretty good at writing software.  And the only thing I'm really saying is our specialty is writing software, that's what we should do. | |
| 13:49:05 | If you do it for us, if you finish our product for us, there is something very wrong with the industry at large.  I mean think about it.  What other industry sells you stuff that you finish for them? You don't finish your Sony TV, do you?  Comes or excuse me, your Philips TV, I'm sorry.  You don't, you know, you don't finish, you know, the Mercedes or a Peugeot or, I mean it comes finished.  Back here. | |
| | [inaudible question] | |
| 13:49:56 | Absolutely, absolutely.  But the key thing here is Volvo is responsible for delivering you a complete car with a stereo in it and, which is very different than you, you know, and sure, in fact, some of our tax software we did not write ourselves. But you're unaware of that.  We integrate that tax software with our | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | accounting software and you don't know that we didn't write that software ourselves.  It looks like, but we're responsible for, but if that tax software breaks you bring it to us. | |
| 13:50:27 | You don't have to add that tax software.  You don't have to hire IBM or Anderson or to glue that tax software into our system.  We did all that for you.  We integrated it.  We tested it.  We support it and it's part of the overall package.  So sure, we could work with other software companies and we could acquire some technology that we put into our eBusiness suite, in fact, it's our intent to do that.  But, from the point of view of the consumer of that technology, our customers, all the pieces are there.  All the pieces are integrated and the package is fully supported by us. | |
| 13:51:05 | Not by you because an interesting thing happens when you finish the software, when you modify the software.  You own it.  It's yours.  If it breaks, who fixes it?  When you hire a bunch of consultants to make the software better and that software breaks, who fixes it?  It's unlike software anyplace else in the world.  It's only, that software exists only one place in the world.  I'm sorry, I can't see all the way back there, yeah. | |
| | [inaudible question] | |
| 13:52:08 | There's, by the way, I'm, there's plenty of room for consultants in terms of figuring out these new great business processes.  I mean, I'm not saying you know, we're going to do all the creative work or all the consulting work or all the business process re-engineering.  I'm just saying that you know, that the actual computer programming is, we should | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | do.  The question was about mobile. We believe, well, we believe the mobile Internet will just create still more Internet users.  You'll expense reports on, you know, on the computer that's not, that is not wired to the Internet but has a mobile connection. | |
| 13:52:47 | You'll make hotel reservations. You'll buy things.  Pretty much, eventually, anything you can do on the internet with a wire connection, you'll be able to do with a mobile connection.  So we just see the mobile, you know, three, you know, either GPRS, you know, 2.5G or 3G mobile connection just increasing the number of Internet users and increasing the usage.  In other words, they'll be using the Internet wherever they are. | |
| 13:53:17 | All of our applications, 100 percent of our applications are mobile enabled.  And in the 11i suite there is nothing, nothing that you should be, you should be able to do on a wire line that you can't also do on a mobile connection.  We believe every single thing you can do on it with a wire line, you should also be able to do with a mobile connection.  Plus, lots of different device support. Everything from you know, wandering around in a warehouse taking inventory to configuring a complex system.  Whatever our software does, you should be able to do it on a mobile or wireless connection as well as a wired connection.  Yes, sir. | |
| | [inaudible question] in Information Week about the fact that because of the increase in devices and the number of transactions and stuff [inaudible] businesses in the future as a result of that, that business should be able to be more intelligent than it is in the sense that you | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | know, his analogy was if you run upstairs, your heart rate increases, you take on more oxygen. You don't send a message to your heart to increase, you don't you know, tell yourself to breathe more. It happens automatically. Do you believe that business automation's going to happen because of the Internet? | |
| 13:55:00 | Well, try not to chuckle. The, but [Lou's] comments. The IB, I believe the biggest problem we have right now with information, Lou's saying the information is there and that it automatically gets transferred and we adapt automatically. So there's two problems that we need to solve. One is to actually have the information that I need more oxygen. Just get the information first. And then, rather than a human being intervening, just automatically that information gets transferred and I mean a simple example in computer science, you suddenly discover you need more disk drive and automatically an order goes out to your disk drive supplier to bring over more disk drives. You anticipate you're going to need it or you're running out of space. | |
| 13:55:53 | Okay, we are so far away from that, I mean that's an interesting notion, we are so far away from that, we can't even keep track, we don't even know where our disk drives are. We are so far from that it's hilarious. How many databases do you have in your company? How many separate systems do you have in your company? Oracle had 400 customer databases. When we were selling to Michelin in France and selling to Michelin in Germany, Michelin, you know, Oracle France and Oracle Germany didn't cooperate because they were totally on separate systems and they were totally unaware | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | that there was a German team selling to Michelin and a French team selling to Michelin because they were working on two totally separate systems. | |
| 13:56:47 | By the way, in North America we had no idea this was going on.  That there was a big sales situation going on with Michelin, we were servicing a Michelin, you know, we had some service problems at Michelin.  I mean we were unaware that a large transaction was occurring either in France or Germany.  We had no idea. Because our support database was separate from our sales database.  So we had a support database in the United States.  It kept track of Michelin. We had a German sales database that kept track of Michelin. We had a French database that kept track, selling to Michelin and they didn't communicate at all. | |
| 13:57:19 | You know, if our bodies worked like our computer systems, we'd all be dead.  The biggest problem we have right now are all of these separate systems, all of these separate databases.  We're in the business of selling databases and I'm telling you you have too many of them.  You should have one customer database globally.  One customer database. The problem is you can never get that with best of breed systems.  Because Siebel has a customer database.  They keep track of customers you sell to. BroadVision has a customer database to keep track of customers that visit your Web site. | |
| 13:58:03 | Epiphany has customer database to keep track of customers you marketed to.  SAP has a customer database to keep track of customers you bill to. And then you put a separate SAP accounting system in every country, a separate BroadVision system in every country, a separate Siebel sales | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | system in every country or one for Europe and one for South America and one for Japan. You have so many separate databases, you don't know that you need more oxygen. All you know is this finger needs more oxygen in one database. In a separate brain, one brain. | |
| 13:58:34 | Another brain would say well, no, this, you know, your wrist needs more oxygen. You knee needs more oxygen. You have, your information is so broadly fragmented, you don't know you're supposed to start breathing heavily. One of the things that we did when we implemented the eBusiness suite, whether it's a General Electric or Oracle is we went to a global customer database. One customer database. When you market to a customer, what customer database do you use? Well, you only have one. When you sell to the customer in France what customer database do you use? Well, you only have one. What if you sell to a customer in Japan? It's the same database. When [inaudible] to bill the customer, well the information is there. It's in the same database. What if you need a sales forecast for Germany? Well, it's in the database. What about the world? It's in the same database. | |
| 13:59:45 | The world wide Web is remarkable because everyone in the world shares the same network. All your employees. All your customers. All your suppliers. One network, but y'all (that's a Southern expression in the United States), you got one network and hundreds of databases. It's a fundamental error in your computing architecture. You have to move your information into fewer and fewer databases until eventually you have all your customer information in | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | one place.  All your product information in one place. | |
| 14:00:29 | I'll tell you a story about Oracle. It used to be, it used to be, in fact, it's still true.  I chair the thing called the pricing committee. We set prices at how much our database cost and how much the, how much our different products costs. And I would make this decision, and we have all these very smart people in California kind of looking at the competition, looking at pricing all over the world, doing all this analysis and we would decide that the database costs, pick a number.  $100 a power unit.  Just pick a number. $100.  $100 U.S. dollars.  Then of course, we'd convert that Deutch Marks or Euros or what, you know, whatever we had to convert it to, Yen, and publish that all over the world.  You know, we'd send that out to everybody.  The first thing that we do is go across the hall, from my office, to what was called the Global Sales, Global Sales Management. They, of course, would immediately throw away all the work we had done and say well, these people know nothing about pricing.  We in sales know about pricing.  And they'd redo all the work. | |
| 14:01:36 | And then they'd send that work to our European headquarters in Geneva, Switzerland and, of course, the people in Geneva knew that Americans knew nothing about European market conditions so they threw away all that work and they did, then they did the European wide pricing you know, for the EU and then they sent it out to Germany and to France.  Well, of course, of course in Munich we knew, they knew the people in Geneva knew nothing about German market conditions so they threw out all that | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | work and then they published their price in Germany. | |
| 14:02:14 | So Germany had one price, France had another price, the Japanese had another price, the Americans had another price, we had people all over the world trying to figure out what the right price was for the, in every country. And everyone published their price in their country database. Lots of different, you know, lots of different prices. Now what happens is the pricing committee sets a price, it goes into our global Web store and within five minutes of the price being set, every customer in every country in the world knows what the new price is. | |
| 14:02:53 | We used to have over 200 people involved in setting prices around the world, now we have six. And we're the same price all over the world. Every country used to invent its own way of billing customers, its own way of filing expense reports and they kept it in their own private databases. They had their own business processes, their own databases. The duplication of effort was unbelievable. Everyone inventing separate processes for separate, in every country in every division. Different marketing processes. Different support processes. Different support policies. Different contracts. Everyone invented it over and over again. | |
| 14:03:37 | And every country had their own automation system. We had 97 e-mail systems, for God sakes. We had an e-mail system in France. We had an e-mail system in Switzerland. We had one in Germany. We had one in Liechtenstein, for God sakes. We had, everyone had an e-mail system. Now we have one. We have one global e-mail system. We had 97 computers | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | doing e-mail.  97 teams of people doing e-mail.  97 groups of people backing up data, installing new software.  Now we have two computers in our primary data center and a back up computer and a back up data center.  Three computers doing e-mail for the world.  We've cut our e-mail costs by 90 percent.  Performance is up, reliability is up, security is up.  It's the Internet. | |
| 14:04:29 | We have one customer database.  We have one way of billing a customer. We have one set of support processes. We have one way of filling out expense reports.  All of our information is in one database.  We know exactly how much we have sold in the last hour around the world and we're paying less to know more. We're paying less to know more.  The more money you spend on IT, the less you know.  Every time you put in another system, you further fragment your data.  You duplicate effort. | |
| 14:05:14 | So, as far as Lou Gerstner's comments, I don't know where to start.  I think, I think the answer is yes we will you know, automatically, automatically respond to conditions without human intervention but it won't come from IBM.  The fact, let me, let me be as harsh as I can.  No one is doing more than IBM to hide information, to fragment data, to implement more and more discretely different systems in more discretely different places. That's why their software business is getting smaller and their labor business is getting larger. | |
| | [inaudible] | |
| | Yes, there's a quote of you about eMarket places that says that there's only going to be a few left and Oracle Exchange.com is going to be one of them.  I'd like to know why | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | are you so confident about that? | |
| 14:06:20 | Well, actually, I think there'll be lots and lots of exchanges because almost every large company will have one.  So there are two kinds of exchanges.  One is you know, first of all the word exchange has many meanings so let me define, let's see if we get agreed upon definition, then I'll respond.  If an exchange is a market place where people go to buy and sell things and amongst the other ways you buy and sell is to have auctions.  If that's what you mean by an exchange where we compete with commerce, CommerceOne and Ariba and some other companies.  I believe they'll be, you know, they'll be a lot of company-owned exchanges.  You know, Sony will have an exchange you know, in fact, they do have an exchange.  They have an Oracle exchange. | |
| 14:07:01 | There will be lots of company, large, lot of large companies will have their own exchange for their company. And then there will be, on top of that, there will be some industry exchanges.  But I don't think there will be, and there will be one or two major exchanges per industry, probably one.  You know, per industry.  So I think you have two kinds of exchanges.  Marketplaces, those dedicated to large companies and then those dedicated to industries and I think that's how it will map out.  But I know at one point there was the notion that these exchanges would have enormous value. I know we were, we are a part of an exchange called Covasent, which is an exchange that is jointly owned Ford Motor Company, General Motors and Daimer-Chrysler are all the three participants in Covasent and there was an estimate when there was just | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | two companies, when it was just Ford and GM, that the exchange alone would be worth $40 billion. | |
| 14:08:05 | Now this, of course, was before the dotcom crash.  In other words they said the exchange would be worth more at the time the total value of General Motors.  Now, the question is do I believe that General Motors can take its purchasing department public and that purchasing department would be worth more than the car company? No.  I also don't believe that selling kitty litter on the Web is a technology business.  The dotcoms, there have been lot of, there's been a lot of insanity around the Internet.  I think the Internet is the most important new technology since the industrial revolution. | |
| 14:08:48 | So I think the Internet is a very big deal.  But there's been a lot of insanity around the Internet, too. Pets.com.  Petsmarts.com.  Pettopia; and people thinking that selling kitty litter was a phenomenal business.  Kitty litter translates, does that translate?  Cat food, cat gravel.  Selling that on the Internet, if you sold that in a store, that was considered a bad business.  But if you bought a $3,000 Dell computer and had a Web site suddenly, it was a great technology business.  Okay. | |
| 14:09:38 | These exchanges themselves being worth huge amounts of money, I, you know, not sure that the exchange, the purchasing department should be worth more than the company that owned the, that uses the purchasing department, it just seems strange to me.  So I think it's important.  I think big exchanges are important.  It's a more efficient way of buying.  It's a more efficient way of consumer and supplier communicating and planning | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | together, share engineering, we've expanded the notion of what an exchange is. We don't think an exchange is just a place you go to place an order or run an auction, we think an exchange is a place where a buyer and a seller get, or a supplier and a buyer get together and share engineering plans so that if you're a car company and designing a new seat belt, you can jointly engineer that new seat belt using our product design exchange for engineering. | |
| 14:10:37 | We think you're manufacturing, when you're a manufacturer and you know what your demand looks like going forward, you can share that demand information so not only with your own company but also with your suppliers so they can lower their or raise their inventories, as necessary, thereby making themselves more efficient. Thereby, you know, being a better supplier to you. So we think there are a whole bunch of things that the exchange technology brings. Joint engineering, joint supply chain planning as well as auctions. | |
| 14:11:08 | And we think that has real value but I don't think, I don't think that many of these are businesses unto themselves. Not many of them. But I think there are, I mean there's already one great exchange, called Ebay. So, and I think that's a very valuable property and there will be a few others, but not a lot. Yes, sir. | |
| | Excuse me, do you have any comments on your stocks value? | |
| 14:11:44 | Should be much higher. Should be much higher. Needs to go up. You know, well, it's been very interesting that at first, anything associated with the Internet just went up. You know, kitty litter, sock puppets, anything. Now, | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | anything associated with the Internet just goes down.  So eventually I think we'll figure this out.  I do think that in general in March of last year two things happened.  Not only did the dotcom market, which really affected my country, not only the dotcoms crater but the telephone companies also came down dramatically.  So while we were crazed about dotcoms in the United States, there was also a lot of, a lot of people, perhaps overly excited with 3G.  I mean I think, I think wireless Internet's a very big deal. I'm not, a very big deal. | |
| 14:12:43 | Huge, we're big supporters of it but the stock market had just delivered these huge values to the phone companies.  Huge values to anyone associated with the Internet, including us and Cisco and others. So I think there was so much excitement, I think the English language word is frothy, the market was so excited about the Internet and now people have kind of standing back and being a little bit more realistic about things you know, it will take 3G a little bit longer than we thought to come out. | |
| 14:13:17 | It will be a little bit more expensive to put all the, you know, put all the transmitters and receivers and all over Europe and all over Asia where they're going to go in before they go in in the United States.  Not every dotcom will be successful but I think, in the end, you'll see companies like Cisco and Oracle come back strong.  You'll see you know, the great, you know Deutsch Telecom and British Telecom and the other phone companies come back.  But right now, the, we're kind of, we've overreacted, we overreacted on the way up and now we're overreacting on | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | the way down. But the Internet is a good place, I think the internet, it's a good time to invest. All of you, ORCL on NASDQ. I'm sorry, I could not hear. Could you give him the microphone? | |
| | What would the traditional company need in order to succeed in the new economy? | |
| 14:14:22 | I think, again, traditional companies, it's through traditional companies who will make the most use of the Internet. There will be very few new companies born because of the Internet. So when you say traditional company, that's almost everyone who will take advantage of the Internet. I think it is a myth, another myth, that somehow the Internet will give birth to these new companies that did not exist before and they will drive the traditional companies out of business. That is not, I don't believe that at all. | |
| 14:14:52 | I believe that one group of traditional companies will quickly take advantage of the Internet and that group of traditional companies will put tremendous competitive pressure on other traditional companies who are slow to take advantage of the Internet. So I think there will be very few new companies that come into existence because of the Internet. Let me prove it to you. How many new companies came into existence because of the PC? Microsoft, Dell, Compaq, you could say Intel if you want to, though they've been around for a while. The PC, the most important new technology in the last 25 years gave birth to what, four companies. I'm missing somebody? Apple? Sorry, I'm on the board of Apple. And they started it all. Five. But here's the most important new technology in | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | the last 20, you know, I think the Internet's even more important, so maybe it will give birth to ten companies. But not very many. Not very many. | |
| 14:16:14 | Now the interesting thing I was talking with Michael Dell a while ago at my house, he came over for dinner, and I said Michael, there must have been 50 PC companies in the United States alone. And he said 500. When the PC industry started there were 500 companies, when it started. But only two of importance survived. Dell and Compaq. I mean IBM makes PCs but they've been around for a while and HP makes PCs. But in terms of creating new companies, very few. There will be very few new Internet companies. But the companies, the banks, automobile companies, insurance companies, retailers, who take advantage of the Internet will have a huge competitive advantage over those banks, insurance companies, automobile companies, and retailers who don't take advantage of the Internet. | |
| 14:17:10 | We were able to lower our expenses in two years by $2 billion. Now, in the software industry, that's interesting. In the retail industry, if your competitor lowers their expenses by 5 percentage points, they can lower their prices and drive their competitors out of business. You will see companies like General Electric, Citibank, other companies who are moving quickly to the Internet, put tremendous competitive pressure on other businesses with whom they compete. A lot of cases they'll end up buying those businesses. The businesses slow to the Internet will disappear but they won't, they won't lose out to some new dotcom. They'll lose out to the | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | old traditional business across the street who moved quickly to lower their expenses and improve the quality of their information.   Yes, sir. | |
| | [inaudible question] | |
| 14:18:45 | Technology tends to oscillate.   I would say that what we're marching to right now is the elimination of complexity. · And I think we're, we are, first we had to get computing, make it less expensive and when we went from mainframes to PCs we made it less expensive.   We improved going from mainframes to PCs, we made computers, we created a better use experience.   And moving to the Internet, literally everybody will have a connection to the Internet. Whether it's your cell phone or a computer at work.   Virtually everybody in the west, in the western world, will have a connection to the Internet. | |
| 14:19:33 | And what's going on with this notion of moving from client server to the Internet, it's, the Internet's just much simpler.   Complexity with compliance server meant every computer desktop, if you wanted to have a new application program, you had had to have a floppy disk and install that application on your PC. You kept data on your PC.   You had to back up your PC.   You had, what's best described as a distributed complexity model.   And what the Internet did, it said no, the data doesn't belong on desktops. ·The data belongs on servers.   Applications that manage shared data, they don't belong on desktops, they belong on servers.   Centralized complexity. Distribute information.   Distribute information but centralize complexity.   The Internet does that beautifully.   It does that | |

AppWorld 2001
Larry Ellison Keynote

| Time Code | | Notes |
|---|---|---|
| | inexpensively.  It does that globally.  So it's a kind of a battle against complexity.  It really is a battle against complexity.  That's what this integration, the reason you can put the Oracle eBusiness suite in a matter of months is because it's not complex. | |
| 14:20:44 | I don't know if you've seen IBM's new commercials but it's all about warning you, it tell, [inaudible] one company A is merging with company B and they're saying my God, when this merger is done, we'll have seven server farms and five platforms but IBM keeps on telling you how complex it is.  And their solution, now it's time, now you know it's time for IBM. IBM says boy, are things complex and we'll fix you know, so you better let us handle it because you're not smart enough to.  So that's what their ad's saying right.  Let us do it. | |
| 14:20:25 | The whole beauty of the eBusiness suite is it's simple.  It's not complex.  It doesn't require systems integration.  The Internet is simple, you know, get the complexity off the desktop, stop doing systems integration, start buying cars, stop buying parts and labor, make it simple and then you can get, then you can get to all of the business advantages that will allow you to take over your competitor rather than the other way around. | |
| | Thank you very much. | |
| | [end of tape] | |

AppWorld 2001                                    1
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
| 14:34:02 | What would you like to talk about? Yes, sir. | |
| | I have three questions if you don't mind, sir. | |
| | Three? | |
| | One is general. | |
| | Okay, as long as no one else has any questions, that's fine. | |
| | One is general.  Do you expect any downturn in Europe in the coming months?  The second question is more specific about Oracle's policy regarding the open source software movement that you see as a major threat to your traditional licensing business.  And the third question is maybe more funny.  I noticed that you had three bodyguards during you speech, and if I remember well you had only two in San Francisco a few months ago.  So does that mean that you feel [less] safer in Paris? | |
| 14:34:50 | On the latter, it's simply that we have to have French-speaking and English-speaking bodyguards, so I think is the issue.  In France it's always more difficult to have security in Europe because of the language complexity.  That's also just a half-kidding answer.  Open source movement, too, I think there's going to be an open source database that replaces Oracle.  I think it's very, very unlikely. Oracle was arguably if not the most complex, one of the most complex computer programs ever written.  It's designed to be easy to use, but the likelihood of open source certainly in my career. | |
| 14:35:34 | I'll probably be another ten years at Oracle max.  So I should be out of here before open source is a | |

AppWorld 2001                                          2
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
| | problem for us.  We're a big supported of open source in the area of operating systems and desktop operating.  Where LINUX is doing well is replacing desktop, and a desktop operating system is a pretty simple operating system. Where LINUX is doing less well is on a server based operating system.  And so, again, it will take a while even before LINUX is ready to run large scale servers let alone there being a LINUX database.  I'm sorry, the first question was? | |
| 14:36:10 | Oh, European downturn?  Again, of course the answer is no one knows, but my opinion is that the big issue in Europe of course will be the decline in the value of some of the [Telcos] and a slow rollout of 3G affecting my industry.  But now Europe, right now the European economy looks very strong, and it is much less connected to the US economy than, let's say, Asia is. So I think a downturn in the United States shouldn't automatically mean a downturn in Europe.  Yes, sir? | |
| | [question not miked] | |
| 14:37:00 | Well, do I worry?  I think, again. I can't say anything about going into the last month of our quarter.  I can't say anything about a quarter.  Our business has never been stronger.  So we'll have a great year.  We'll have even a better year next year.  For the last three years, our business is getting stronger and stronger. So talking about it on an annualized basis, I think our business continued to get stronger.  We had a very strong | |

AppWorld 2001                                          3
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
|  | growth a year ago in database, 32%.  So, and we had a lot of dot-com business, but I would say overall if you look at our business overall, our database business is getting stronger and our application business is getting stronger. |  |
|  | Any one quarter is harder to predict.  Yes, sir? |  |
|  | [question not miked] |  |
| 14:37:49 | How are going to save the 3 billion?  Well again, we've saved an awful lot of stuff in the back office already, so it really is improving our marketing and sales efficiencies.  So we expect to have huge benefits to our new global marketing system and our global sales automation system.  When a lot of people talk about CRM, they really don't, it's really not a [pre] to [proactivity] tools.  It's a management tool.  RCRM is really designed to make your sales force much more productive, and we think we'll be able to do that with both of our telesales, telesale system. |  |
| 14:38:27 | We have three integrated forms of selling in our sales system.  We have a Web store that's integrated to a call center, that's integrated to our field sales automation.  And we think those three because they are integrated with our marketing system will allow us, again, to get to and market and sell to our customers much more efficiently next year than this year.  Yes, ma'am. |  |
|  | I'm [inaudible] from [Turkey] *Capital Magazine.*  The developing countries are very enthusiastic about the Internet and e-business |  |

AppWorld 2001                                    4
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
| | subjects, and they have an advantage.  They are not practicing the downturns of the early adaptors.  In addition, these countries have a young and well-educated and cheap workforce. Does Oracle have a investment plan in this country for a software development center and what do you think about this? | |
| 14:39:27 | Well, right now we have development centers in both [Hidrobad], India, and [Bangalor], India, and we expect to be greatly increasing the size of those centers over the next 18 months. So you'll see us doing an awful lot more hiring in India going forward.  Right here. | |
| 14:39:54 | The question is when will we be number one in the ASP market?  I think we already are number one in the ASP market, actually, in terms of hosting.  We have I think total customers more than 20,000, I think.  [You] said more than 10 less than 20,000 customers.  We've just announced a new online service.  We've got sales online, and we've got our e-business suite online.  We've just announced service online.  So I believe we are by far and way in terms of business, the world's largest ASP. We don't spend a lot of time talking about it because we have many other businesses, but I think we are much, much bigger in terms of number of companies, number of users, any measure you want. | |
| | We'll kill IBM [on].  No, we would leave that to IBM.  The issue is that IBM believed is that in the business of labor.  IBM really is 14:40:38backed away.  If you look at the IBM software business, it's | |

AppWorld 2001                                                    5
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
|  | getting smaller. So IBM is not in the business of creating business software. They are a reseller of other people's software. They resell Siebel. They resell Epiphany. They resell I-2. They resell Ariba. They have [500 so] they're like a big Egghead for enterprise software, and then they provide the labor. So where they make their money is these 300,000 engineers who then glue with glue guns to glue the software together. |  |
| 14:41:22 | And we think the idea of ..ll customers buying parts and then hiring labor to assemble the parts is an old idea. And just that IBM's business is based on an old idea. [The] gentleman over here. |  |
|  | [inaudible] in the Netherlands. You're telling your customers not to modify your software. What if tell you not to modify their businesses? |  |
| 14:41:51 | That's fine. Of course, they can modify our software. They've been doing that for years. So the customers of course can do whatever they want. So we just think it's a bad idea. But of course the customers are free. We still are in the consulting business. We'll even help them modify the software. I don't personally recommend it. I don't think every customer is going to do, customers will buy software from other companies. Customers will modify our software. Customers will do what they want to do. I just think it's a mistake, but that's their business. They don't have to listen to me. Ah, the lady right here. |  |

AppWorld 2001                                              6
Larry Ellison Press Conference

| Time Code | Text | Notes |
|-----------|------|-------|
| | [inaudible] how companies competing against each other if they're running uncustomized software exactly the same. They're running the same business processes within their organizations.  Where are the new sources of competitive differentiation going to come from? | |
| 14:42:48 | Well, they don't have to be running the new, the [identical to] business processes.  Our software, you can implement many different business processes with our software.  You don't have to change the code to change the business process.  So we have a workflow engine that you can tailor to specific businesses.  So I don't want to leave the impression that you simply reengineer your business with these one set of Oracle defined business processes.  You can still define your business process that you think is best for your company. | |
| 14:43:16 | And then we support that, again, with our workflow engine and other ability to define different charts of accounts and different approval cycles and different manufacturing processes and billing processes. So you can, and you still tailor that for your business.  What you don't do is add a lot of third-party software with your systems integration.  What you don't do is hire computer programmers to change our [per] computer programs.  You define processes, not write programs.  And it's very different.  So they're a lot of competitive differentiation.  The people [still] can have different | |

AppWorld 2001                                                    7
Larry Ellison Press Conference

| Time Code | Text | Notes |
|-----------|------|-------|
| | processes within the same industry. | |
| 14:43:55 | I'd like to add also that Daimler-Chrysler competes with Ford not based on business processes but based on his car is better, and that's not just business process. That's engineering and design and all sorts of other things.  So Citibank competes with ABNM based on interest rates and different financial instruments.  So not everything is based on computer software, unfortunately for us.  Yes, right here. | |
| | Mr. Ellison, during your keynote presentation you mentioned a lot of companies like Ariba, Siebel, I-2, and so on.  But you didn't mentioned Microsoft.  So I would like to know what you think of Microsoft now since the company is managed by Steve [Warner].  What do you think of Steve [Warner's] management? | |
| 14:44:42 | I think their new game machine's going to be great.  It looks very good to me.  I think a lot of people underestimate their game machines.  So if you're a gamer, I think you should take a close look at that versus the PlayStation II. I think their Microsoft network's got some fantastic stuff on movie stars, so if you wanted to get the latest stuff on movie stars, MSN is a great place to go.  They're a consumer company.  They don't do enterprise [offer].  They have. It's just not something they do. But fabulous, I think seriously if you like playing computer games, you've got to take a close look at this product.  Looks good to me. Yes, right here. | |

AppWorld 2001                                                    8
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
|  | Well, actually perhaps I disagree with you. You've been in a place where you provided let's say databases and tools some years ago. Now you're in the application space. Microsoft just acquired Great Plains so actually they tried to copy in doing the same. So where do you think that they are going to be in perhaps five to ten years? |  |
| 14:45:47 | I don't know. If I were Sony, I'd be worried. I don't think Great Plains is a client server accounting system for businesses of less than 50 people, I don't think. We don't compete with Great Plains. They're not a competitor of ours. Great Plains is for providing accounting for little itty-bitty companies. We automate companies like General Electric or Citibank. So I don't think Microsoft is a competitor. They are [as] much in database. They have largely disappeared as a competitor [our prime]. Our primary competitor's IBM, not Microsoft. Back here. |  |
|  | [inaudible] in your speech that you don't think the Internet's creating new companies. But what impact have [pure play] such as salesforce.com had on the way that Oracle thinks about delivering software over the Internet? |  |
| 14:46:45 | Well, I think we have a service called sales online, Oracle sales online dot-com that competes with salesforce.com. I know that salesforce.com said that was their idea and then we stole it from them. That's simply not true. You can call Even Goldberg who's the CEO of Net Ledger, which is a company that I own. Oracle |  |

AppWorld 2001                                          9
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
| | started putting things on the Internet, online services on the Internet long before salesforce.com. So we [believe] this for a very, very long time and we think they'll be other companies like salesforce.com and Net Ledger. | |
| 14:47:25 | But this is a business Oracle's already in by far and away the leader in. If you look at online business, if you look at the number of businesses we have on salesonline.com, our new service offering, it's much bigger than Net Ledger or salesforce.com or any of the others. So we believe it's a trend in the industry to offer applications of the service on the Internet, absolutely a trend in the industry. We think it's a trend that we pioneered, and others like salesforce.com have copied. But we think it's going to be very hard for a little company like salesforce.com to compete. | |
| 14:48:00 | Originally all they have is sales automation. Now we have sales automation and service automation integrated in a suite. So it's our same strategy for online services. We believe that people want an integrated suite of applications, and that's what we're offering. Salesforce.com can only offer sales online. I was on the board because originally Salesforce, I invested in salesforce.com and I originally invested because they'd said that they were going to go after small businesses. | |
| | When they changed their strategy and decided to complete directly for medium-sized and large | |

AppWorld 2001                                          10
Larry Ellison Press Conference

| Time Code | Text | Notes |
|-----------|------|-------|
|  | businesses and they changed the strategy to compete directly with us, I thought it was inappropriate and they thought it was inappropriate for me to remain on the board. So we agreed it was time for me to go. Yes? |  |
|  | You're going to [keep] buying second rate products rather than go into the best-of-breed. What would answer to that be? |  |
| 14:49:05 | Well, first of all, because Siebel already claims to have a suite. They actually call themselves the CRM suite, and they bought most of their products. The Siebel, Siebel did not engineer their own products. They bought a company, they got a service product. They bought a company, they got a marketing product that [was] [inaudible]. Most of Siebel's products came from acquisitions, and Siebel has a lot. So Siebel really is the collection of a dozen separate companies and a dozen products from dozen different companies that don't fit together. |  |
| 14:49:38 | So I think not only, so I don't know if Siebel can say that they've got these wonderful products because all they did was buy them. And the problem with buying all the products is those products don't fit together. They don't even have a CRM suite. Siebel claims in their marketing, Siebel has already imitated. They've done what's called brochure engineering, Siebel has. They went out and bought a lot of companies and they claim that to be separate companies, now that they have a marketing product and a service product and a sales |  |

AppWorld 2001
Larry Ellison Press Conference

11

| Time Code | Text | Notes |
|-----------|------|-------|
| | product, that they have this thing called a CRM suite if you read Siebel's literature. | |
| 14:50:13 | In fact, well all of our products were built by Oracle so the pieces fit together.  All of Siebel's products were engineered by others and the pieces don't fit together. You can't get a suite.  You cannot get a pieces that fit together by buying ten different companies and calling them all Siebel.  That doesn't work.  The reason we didn't buy a lot of companies to go to applications is if you want the pieces to fit together, they've got to be engineered to fit together.  All Siebel has is a bunch of acquisitions. | |
| 14:50:52 | Now, to give Siebel credit, they got to market very fast, that way. They actually, they got a full set CRM products very quickly by buying a bunch of companies.  The problem is the pieces don't fit together.  They say that our pieces are not, they're pieces are better than our pieces.  Well, they bought all their pieces versus we built all of our pieces. I wouldn't agree.  I think our pieces are better than their pieces, but that's not the real issue.  The real is our windshield fits into the car body.  Their windshield does not. | |
| 14:51:27 | Their pieces don't fit together. Our pieces fit together.  We have a better car.  Just because you have good parts doesn't mean you have a good car.  You can't take the best windshield, the best hood, the best body, the best engine block, the best in transmission.  If you buy all the best pieces, it doesn't mean you | |

AppWorld 2001                                    12
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
| | can assemble those pieces together into the best car. The problem with the Siebel approach with acquisitions is that the pieces don't fit together. The lady back there in the red. | |
| | [inaudible] [Hill], [*Business* Week *Romania*]. How would describe your relationship with Central and Eastern European market today and how do you picture it, let's say, two years from now? | |
| 14:52:17 | Well, it's hard to generalize about Central Europe. Some parts of the market's growing very, very rapidly. Things [are] generally well in Poland, Hungary. I'm embarrassed to say I don't know exactly the state of our Romanian business, but it really is, it varies pretty dramatically from country to country. But we've had some very rapid growth. Sergio, do you want to comment on Central Europe? Sergio [Giacaletto] heads all of Oracle Europe. | |
| 14:52:50 | Okay. Our business in Central European, [centerist] Europe is doing pretty well in all of the countries and actually we are doing very well in Romania. We still are a small operation, but have direct presence and serve both technology and applications. I'm also confident that I see finally the Russian business coming back. | |
| | Your products, comparing you with a car, especially in Romania [I'm to say] the roads are not so good. So if I was interested to know are you going to get involved in maybe coming with a very good car where the roads are not so good? | |
| 14:53:30 | Well, if the car is really good, it handles bad roads. And so, we | |

AppWorld 2001                                                    13
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
| | have a sports utility version.  In other words, if you don't have broadband access, if you don't have a fast network, our software works pretty well even if the network isn't so fast.  So it really has been designed to work on.  It works in Vietnam which has terrible, which has bad roads, bad expensive roads.  The worst situation is when you have a bad network that costs a lot of money. Having a slow network is bad. Having a slow, expensive network is really bad.  And we still work pretty well even in that environment.  Yes, sir? | |
| | One is very general and another one is a little specific.  First of all, I think the main theme of this conference or APPS word is about e-business suites that Oracle is offering.  But what if a company or a firm decides that they don't want to spend that whole amount of money for that suite and they just want part of it first and then after that they would consider the whole e-business suite.  Does Oracle offer some parts of that car first? Another question is that. | |
| 14:54:52 | The answer, by the way, is absolutely yes.  In fact, we recommend that you start with, you try a component of the suite and then you add it in.  Now the nice thing is it's like Lego blocks. Once you have one piece in, the other pieces just snap together. There's no systems integration required.  The key thing is, you can install just one piece and then again install another piece. No systems integration.  You just basically turn it on or snap it | |

AppWorld 2001                                              **14**
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
| | together. | |
| | Oh, okay.  Plug and play. | |
| | It is absolutely, all the pieces within the suite are literally plug and play.  There's actually no software to install even, believe it or not.  Once you have one of our applications, it literally is just turn a switch on to get the other features, the other applications. | |
| | Okay, and I didn't mention that I was from Korea, [inaudible] *Business News*.  I understand that you are visiting Asia around May or June? | |
| | I'll be in Singapore and Shanghai and in Seoul. | |
| | Okay, so can I ask the purpose, the main purpose of your visiting, especially Seoul, Korea? | |
| 14:55:48 | Ah, again, we've got some very large customers in Seoul.  LG and LG Electronics being an Oracle e-business suite customer.  I'm not sure if I get myself in trouble, but a well-known steel company.  I'll just, I don't many announcements, but we have a number of major companies in Korea, very large companies that are implementing the e-business suite.  So it's very important that I spend time in Seoul talking to some of our largest customers in the world.  Yes, right here. | |
| | How does your e-business suite apply to an industry such as the travel industry which has got so many different complex systems that don't talk to each other? | |
| 14:56:38 | Well, it probably applies more, and of course the travel industry is the classic.  There are a lot of industries like the travel | |

AppWorld 2001                                              15
Larry Ellison Press Conference

| Time Code | Text | Notes |
|-----------|------|-------|
| | industry with all of these separate systems that have grown up over time. I think you'll see virtually every industry moving to reengineer their processes and bring them to the Internet and upgrade their software. At least if not, all [at]. [I'm not sure investing] all at once big bang approach. But start moving to the e-business suite. So again, from something as simple as accounting to as complex as a reservation system. We see that industry like every other industry moving from component software to a complete suite for the travel industry. I mean everything: accounting, reservations, the works. | |
| | We've already done some res systems. We're working with a number of very large organizations within the travel industry. Gentleman back here. | |
| | [Eric Ralson] from Norway. When I upgrade to the next addition of e-business suite, how much work do I have to do to redo the tailoring that I made to the previous addition? | |
| 14:58:03 | Two pieces of news: Almost no work. But this is, there are two points that are very important. When SAP came out with their My SAP, they're charging their customers to do an upgrade and it's a tremendous amount of labor to move to My SAP. When PeopleSoft came out with PeopleSoft Version 8 on the Internet, they're charging their customers and it's a huge amount of labor to move. One is we did not charge our customers for the e-business suite. There was no upgrade fee. And as you move from | |

AppWorld 2001                                                              16
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
|  | one version of the e-business suite to another, as long as you haven't made heavy modification, it's easy and fast.  It's automatic.  It's automatic. |  |
| 14:58:47 | And that's a huge difference in terms of policy and in terms of technology.  One is automatic upgrade.  [There's] this tremendous amount of labor to upgrade SAP.  Tremendous amount of labor to upgrade PeopleSoft.  But then on top of all of your labor costs, PeopleSoft charges you and SAP charges you and we don't.  I think that's a very big difference.  Yeah? |  |
|  | I'm [Audrey Burbon].  I'm from *Computer [Art] Finland*.  In Finland, actually, Siebel just had an office opened in Finland [inaudible].  Oracle has strong presence, but still our biggest companies like Nokia use Siebel systems.  How do you explain that? |  |
| 14:59:31 | Well Siebel, again, because they bought a lot of companies got to the market before we did.  Our CRM system is very new so if Nokia made this decision a while ago, I'm not surprised and Siebel sells their products.  IBM recommends Siebel.  But this is very interesting.  If you're in the business of selling a lot of labor, Siebel's perfect.  IBM loves Anderson Consulting, now known as [Essenture], recommends. So you have the big integrators recommending, they don't like us very much because there's not enough labor. |  |
|  | So interestingly enough, if you ask IBM who they recommend, call up IBM and ask them who they recommend, Oracle or Siebel.  And |  |

AppWorld 2001
Larry Ellison Press Conference

| Time Code | Text | Notes |
|-----------|------|-------|
| | the thing is IBM doesn't like the idea that you can install our software quickly.  Customers do.  But Siebel with their acquisition strategy; in fact went out and bought a dozen companies to get their products, got to market very, very quickly.  And there-by became the market leader.  [It] took us longer because we had to build the products.  We didn't buy them, but all of our pieces fit together.  We have an integrated suite.  They don't. | |
| | I believe in the end good engineering wins. | |
| | [inaudible] market.  How can you come to the market where only trading [does the] e-business [suite to] last year of [inaudible] marketing.  And the market is already quite full, what's your chances? | |
| 15:01:00 | Oh, I don't think the market's quite full at all, especially I think the Internet people are just beginning to understand and people are faced with an SAP upgrade.  They want to go SAP to My SAP.  That's a whole new system.  They got to buy it again.  We've got to pay SAP for a new license.  They've got to then to [do] tremendous amount of labor to convert from the old SAP R3 to the new My SAP.  So that's a big decision.  Same thing is true with PeopleSoft.  So the Siebel system is really not an Internet system.  It's a client server system. | |
| | So as people move to the Internet and want to take advantage of the Internet, we think they're going to consider Oracle software as the best way to do that.  Yes, way in the back, the gentleman way in the | |

AppWorld 2001                                          18
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
| | back. | |
| | Thank you.  Doing your talk you mentioned [inaudible] and [inaudible] between countries. Because it means that when you add the 97 e-mail you should [not] get [Lotus Notes] or [inaudible] to that document management and [inaudible].  We're talking strategies. | |
| 15:02:05 | Lotus Notes have the worst imaginable system because Lotus Notes has lots and lots of little databases.  Lotus Notes cannot handle.  What we have is a Internet system.  Lotus Notes is pre-Internet.  Lotus, the big problem with Lotus Notes, in fact it's [in fact], Ray [Ozzy] who wrote Lotus Notes, the programmer has now come out with a new system called Grove which runs on the Internet.  The problem with Lotus Notes, it's not an Internet system and wouldn't allow us to put in a global system.  Instead we have a document management system, and an e-mail system and a calendar that runs on the Internet. | |
| 15:02:40 | We have two computers running all of our e-mail.  If we were to do with Lotus Notes, we'd need 200. 200 at least.  At least 200.  So we have an Internet e-mail system. It's called [I-map 4] Internet standard.  Lotus Notes is proprietary; Internet is not. Lotus Notes also an APR, all its own proprietary technology.  Ours is based on the Internet, an Internet standard called [I-map 4].  We run all of our e-mail on two computers.  On two computers. You would need 200 computers to do [it with] Lotus Notes plus its all proprietary. | |

AppWorld 2001                                    19
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
|  | So we saved a fortune by moving from old client server technology to the Internet.  The last place we'd go is proprietary technology that's really dying.  Lotus Notes is over. |  |
|  | What is your strategy on collaborative?  I see something very interesting yesterday [with G peaks]. |  |
| 15:03:37 | Yes, [replace] it's using the Internet for collaboration.  Again, we have a product design exchange, something for collaboration.  We have all sorts of collaboration.  The Internet is all about collaboration and about getting everyone on the world is on the same network.  In fact, in our marketing systems, we sell [and] sales systems we have collaborative browsing where you can do product demonstrations.  We can collaborative browsing for education.  And our product design exchange we do collaborative browsing for engineering to create new products. |  |
| 15:04:10 | We do collaboration on supply chain planning so that we make sure not only do we have adequate inventory based on current demand, but also our supplier have adequate inventory based on demand.  So again, we think collaboration is all about Internet-based technology.  The lady back there.  The two ladies.  One then the other in any order. |  |
|  | We actually want to ask the same question totally off topic.  Last week in South Africa [inaudible] announced that you personally are going to see some IT advisory committee to help South Africa move forward.  Now I can see why |  |

AppWorld 2001                                                    20
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
| | Oracle thinks it can help a company.  How do you think it can help an entire country? | |
| 15:05:01 | Well again, last time I saw [Tabel] and Becky I made one recommendation which was to sell the telephone company.  That was when the telephone companies were very highly valued.  It would be harder to sell the telephone company now.  But people back then were paying top dollar for phone companies, and I thought it was a great way to raise money.  The other thing, and then the other thing was to make sure that there multiple phone companies in South Africa so that telephone service would be less expensive, better.  To have competition for phone service in South Africa. | |
| 15:05:30 | I think it's very important to have a high speed, low cost communications.  Any country in the world.  It's critical.  So again, my advice to him was to introduce competition into the South African market, to privatize the telephone business, and that would again make, get more people onto the Internet..  The other things that's going on that's interesting is there are some very interesting educational technology that's been developed in South Africa.  Actually using the Internet to teach kids.  Actually we're helping to move that from South Africa actually to where it's being used now in Great Britain. | |
| | And maybe in the United States.  So things can go in both directions.  The lady right there.  Right here.  [Over to] this gentleman up here. | |

AppWorld 2001                                              21
Larry Ellison Press Conference

| Time Code | Text | Notes |
|-----------|------|-------|
| | Hi. I'm from Portugal. [*Eneval Capustiari Chronic*]. You said you will not buy other enterprise because they have different applications. You think to grow alone in the next years or you thinking in mergers and acquisitions in [other years]. I would like to know if you think Oracle will be transforming [monopoly] in software e-business like Microsoft for the [to be] in other areas and if you like to be a monopoly. | |
| 15:07:17 | First question was what will we be buying any companies, and the answer is no. And for a very simple reason is it's very easy to write checks, but when you buy a product I believe that integration is critical. The pieces have to fit together. So, well, you get a product very quickly but it won't fit your suite. We tried that, actually. We bought a couple of companies. It didn't work. The pieces don't fit together. So we have to write software, not checks. We have to write software, not buy companies. | |
| 15:07:51 | We have to get all the pieces to fit together, the first question, so we can't just make a lot of acquisitions like Siebel or I-2 or Ariba. We can't do that. Not because our philosophy is the pieces have to fit together, complete and integrated suite. Second is do I want to be a monopoly. There's nothing illegal about a monopoly. Microsoft when it got its monopoly on Windows got its monopoly on Windows legally. I would love to be monopoly. Who wouldn't love to be a monopoly? I would love for everyone to buy | |

AppWorld 2001                                                    22
Larry Ellison Press Conference

| Time Code | Text | Notes |
|-----------|------|-------|
| | their software, their Internet software from Oracle. That'll be wonderful. | |
| 15:08:28 | However, once you are a monopoly there are very strict rules that you must operate under, and what Microsoft got in trouble is when they tried to use their Windows monopoly to obtain, to get a monopoly in browsers. Now, that's strictly against the law. You cannot use one monopoly to get a second monopoly. If we do our job very well and more and more people come to Oracle to buy their Internet software and their database, we someday could become a monopoly. That would be wonderful. That would a sign of that the people, that our software was good and people liked buying it. | |
| 15:09:03 | However, if we became a monopoly we would have to be, we would have to operate very differently because there's a whole new set of rules, a whole new set of rules when you are a monopoly. And Microsoft wrote those rules and as a result got in a lot of trouble. Gentleman right here. | |
| | [John Halawaze] from [Martin Greens]. I'm [inaudible] I suppose that [when you] Oracle model for e-business. Is that a way for the [inaudible] combination only? How about the smart combination? | |
| | I'm sorry. I missed part of your question. Is there room for [a small] company? | |
| | The right way for the very large companies only. How about the small companies? | |
| 15:09:48 | Oh no, actually we have medium-sized companies. We have lots of | |

AppWorld 2001                                          23
Larry Ellison Press Conference

| Time Code | Text | Notes |
|-----------|------|-------|
| | [e], the companies that move to the e-business suite fastest where the medium to smaller companies. Now it depends what you mean by small. $100 million. $100 million companies. But the smaller companies it's really critical for the smaller companies $100 to, say, $500 US dollars per year turnover is critical because they can't afford systems integration. It's not even an option. They can't afford to hire the IBM consultants to come do the work. So I would say that the e-business suite is even more important for medium-sized companies than it is for large companies. | |
| 15:10:35 | Large companies can afford to hire IBM and hire Anderson and hire other people, hire a lot of labor to make things work. The medium-sized company can't afford that. They need a complete integrated suite, and we've had tremendous success in the mid-market. I think that you'll see us, question from the lady from Finland, where we're going to be very, very successful very fast, I think, is more slowly with the Nokias though I think we make good progress with Nokia too. But the medium-sized businesses I think will be adopting our software, buying our software very rapidly. So we're very excited about what's called the mid-market or the medium-sized company with the e-business suite. The lady back, yeah. | |
| | I wonder what's your opinion about the browser from OPERA software. | |
| 15:11:31 | I use the OPERA browser a lot, and I think it's great. It's good that we have multiple browsers. | |

AppWorld 2001                                                    24
Larry Ellison Press Conference

| Time Code | Text | Notes |
|-----------|------|-------|
| | Another browser that's looking very good in the division to OPERA which is very small and very fast is the [Mozila] browser. Someone asked the question about public domain software like LINUX and open source and there's an open source browser called [Mozila]. It grew out of Netscape that looks very promising as well. So we will have more than just Microsoft's browser. We've got OPERA. | |
| | The [Mozila] used to be Netscape browser so very enthusiastic about those. Back here. | |
| | I'm [Gaman] from Egypt. I [want] to ask you about how do you see the Arab region and Egypt and [do] you have any future brand to expand your presence and investment in this region? Thank you. | |
| 15:12:39 | Yeah, actually we're growing very rapidly in that region. Egypt is especially so. We've got a number of educational programs, and Egypt is, I'm sure you know, provides a lot of consultants to the rest of the Middle East. And I'll let Sergio, do you want to comment on that? But again, not only are we doing a lot of selling inside of Egypt specifically but we're doing an awful lot of training of consultants including small third-party consultants who practice their consulting practice in Saudi Arabia and Kuwait and a variety of other nations in the region. So Egypt is always. | |
| | I'll get myself in trouble, has always been a cultural and economic center for that region and is a very important presence for us, again, in that region. | |

AppWorld 2001                                          25
Larry Ellison Press Conference

| Time Code | Text | Notes |
|---|---|---|
| | Okay.  How about one more question, the lady in back, and then I'll be done. | |
| | I'm [Pantania O'Neil], [país is] Spain.  I would like to [be known of] what happened yesterday with Napster and [not] getting result with copyrighted CDs [inaudible]. | |
| 154:13:49 | My general view of Napster and what's going on there?  It's a very interesting [technology]. Napster's a very interesting movement, but I have to admit I am somewhat sympathetic to the artists who write the music and the artists who perform the music who don't get paid for their work. I think that's a problem.  Thank you very much. | |

# EXHIBIT 439

**FILED**

SEP 1 1 2002

SEP 1 3 2002

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NURSING HOME PENSION FUND, et al.,

No. C 01-0988 MJJ

Plaintiffs,

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

v.

ORACLE CORPORATION, et al.,

Defendants.

/

**INTRODUCTION[1]**

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), Defendants Oracle Corporation and Lawrence J. Ellison (collectively "Oracle") move this Court to dismiss Plaintiffs' First Amended Consolidated Complaint ("FACC") for failure to state a claim upon which relief can be granted. Specifically, Oracle's motion requires the Court to decide if Plaintiffs' FACC meets the heightened pleading requirements of Rules 8(a)(2) and 9(b) as amplified by the Private Securities Litigation ("PSLRA"), Section 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder. After having carefully considered the papers, and arguments of counsel, and for the reasons set forth below, the Court finds that Plaintiffs' FACC is deficient and fails to conform to the Rules 8(a)(2) and 9(b) and the heightened pleading requirements of the PSLRA.

---

[1] With one exception, the Court judicially notices all of the parties' requests. The Court does not judicially notice Plaintiffs' Exhibit 5x because it is not "capable of accurate determination." Fed.R.Evid. 201(b)(2). The Court cannot determine what company the document relates to, what information the unlabeled columns contain, or where the documents originated from. The Court judicially notices Oracles' Exhibit R for the purpose of establishing Oracle's share price on particular days.

1

## BACKGROUND

2      This motion arises from a complaint alleging securities fraud in violation of Section 10(b) of

3 the Securities Exchange Act, and Rule 10b-5 promulgated thereunder. The complaint is brought on

4 behalf of a class of private and public investors who purchased Oracle stock between December 15,

5 2000 and March 1, 2001. The complaint alleges that during that period (the Class Period), Oracle

6 and its top executives, Chief Executive Officer (CEO) Ellison, Chief Financial Officer (CFO)

7 Henley, and Executive Vice President Sanderson, made false and misleading statements concerning

8 Oracle's projected third quarter earnings. Oracle designs and sells software for business information

9 management. Oracle has enjoyed market-share leadership in database management systems since the

10 1980s. In response to the market's need for fully integrated software applications, Oracle developed

11 the 11i Suite to enable companies to manage financial manufacturing, sales, logistics, e-commerce

12 and supplier components of its business in a single software package rather than buying separate

13 software for each function.

14      The bulk of Plaintiffs' allegations center on alleged problems with the implementation of the

15 11i Suite. Plaintiffs allege that Oracle, through executives Ellison, Henley and Sanderson, made

16 several misrepresentations about the overall viability and efficiency of the 11i Suite. Specifically,

17 Plaintiffs allege that in the spring of 2000, Ellison and others began marketing the 11i Suite as fully

18 integrated and interoperable software that obviated the need for businesses to buy and integrate a

19 number of separate applications. However, Plaintiffs claim that the software was anything but

20 integrated and interoperable. Plaintiffs allege that Oracle knew that its statements concerning the

21 interoperability of the 11i Suite were false because Ellison and other company executives were aware

22 of the product's massive defects. Plaintiffs claim that Oracle was astutely aware of the falsity of its

23 statements because the product was met with strong customer dissatisfaction and required substantial

24 programming adjustments and systems integration to work. Plaintiffs allege that on December 15,

25 2000, January 5 and 8, and February 13, 2001, Ellison and Sanderson made false statements about

26 the financial savings Oracle enjoyed as a result of using the 11i Suite internally. Plaintiffs allege that

27 Ellison and Sanderson knew that their statements to the public concerning the savings claim was

28 false because the product was "always down" and that it did not work within the company. Plaintiffs

*United States District Court*
For the Northern District of California

2

1  dismiss.  See Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th

2  Cir.1989). Where a plaintiff fails to attach to the complaint documents referred to in the complaint

3  the documents on which it is premised, a defendant may attach to the motion to dismiss documents

4  referred to in the complaint to show that they do not support plaintiff's claim.  See Branch v.

5  Tunnell, 14 F.3d 449, 44 (9th Cir. 1994), cert denied, 512 U.S. 1219 (1997).  Thus, the district

6  court may consider full texts of documents the complaint quotes only in part.  See In re Stac

7  Electronics Securities Litigation, 89 F.3d 1399, 1405 n.4 (1996), cert denied, 520 U.S. 1103

8  (1997).  This rule precludes plaintiffs "from surviving a Rule 12(b)(6) motion by deliberately

9  omitting references to documents upon which their claims are based."  Parrino v. FHP, Inc., 146

10  F.3d 699, 705 (9th Cir. 1998).

11  **Section 10(b) and Rule 10b-5**

12  Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or

13  employ in connection with the purchase or sale of any security registered on a nation securities

14  exchange or any security not so registered, any manipulative or deceptive device or contrivance in

15  contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

16  Rule 10b-5 makes it unlawful for any person to use interstate commerce

17  (a)   To employ any device, scheme, or artifice to defraud.
   (b)   To make any untrue statement of material fact or to omit a state a material fact or
18  to omit to state a material fact necessary in order to make the statements made, in the light
   of the circumstances under which they were made, not misleading, or
19  (c)   To engage in any act, practice, or course of business which operates or would
   operate as a fraud or deceit upon any person, in connection with the purchase or sale of any
20  security.

21  17 C.F.R. § 240.10b-5

22  To be actionable under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a

23  misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff

24  justifiably relied (5) that proximately caused the alleged loss.  See Binder v. Gillespie, 184 F.3d

25  1059, 1063 (9th Cir. 1999).  Additionally, in actions alleging fraud, plaintiffs must state with

26  particularity the circumstance constituting fraud. Fed.R.Civ.P. 9(b).

27  **Private Securities Litigation**

28  In 1995, Congress enacted the Private Securities Litigation PSLRA (PSLRA) to provide

5

1 "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-369, 104th
2 Cong., 1st Sess. at 32 (1995)) (Nov. 28, 1995). The PSLRA strengthened the pleading
3 requirements of Rules 8(a) and 9(B). Now, actions based on allegations of material misstatements
4 or omissions under the PSLRA must "specify each statement alleged to have been misleading, the
5 reason or reasons why the statement is misleading, and, if an allegation regarding the statement or
6 omission is made on information and belief, the complaint shall state with particularity all facts on
7 which that belief is formed." 15 U.S.C. §78u-4(b)(1).

8       The PSLRA also heightened the pleading threshold for causes of action brought under
9 Section 10(b) and Rule 10b-5. Specifically, the PSLRA imposed strict requirements for pleading
10 scienter. Now, a complaint under the PSLRA must "state with particularity facts giving rise to a
11 strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).
12 The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff
13 proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong
14 circumstantial evidence of deliberately reckless or conscious misconduct." In re Silicon Graphics
15 Inc., 183 F.3d 970, 974 (9th Cir. 1999). If the complaint does not satisfy the pleading requirements
16 of the PSLRA, the court upon motion by the defendant, must dismiss the complaint. See 15 U.S.C.
17 §78u-4(b)(1).

18                                                **ANALYSIS**

19 **Oracle's Motion to Dismiss**

20      Plaintiffs' FACC alleges that the following statements were false when made: (1) "The
21 economic slowdown isn't hurting Oracle"[4]; (2) Henley's statement that 3Q01 would produce $0.12
22 earnings per share ("EPS"), $2.9 billion in revenues, and 75% and 25% applications and database
23
24 sales, respectively[5]; and (3) "There's no systems integration required," referring to the 11i Suite.[6]
25 Oracle argues that Plaintiffs' FACC should be dismissed because its general statements about the
26

27 ─────────────
28      [4]FACC ¶ 22, December 14, 2000
        [5]FACC ¶ 23, December 14, 2000
        [6]FACC ¶¶ 27-28, December 14, 2000

United States District Court
For the Northern District of California

6

1  impact of the economy and the state of its business are non-actionable, because its statements

2  concerning the 11i Suite are non-actionable puffery, because the FACC does not meet the

3
4  heightened pleading requirements of the PSLRA, and because Defendants Ellison and Henley's

5  stock sales do not support a strong inference of scienter. The Court turns first to address the

6  several arguments raised regarding the actionability of Oracle's 3Q01 statements.

7  **Statements of Optimism**

8
     **Bespeaks Caution**

9
10  "By definition, the bespeaks caution doctrine applies only to affirmative, forward-looking

11  statements," not statements of past or present fact. In re Stac Electronics Sec. Litig., 89 F.3d

12  1399, 1408 (9th Cir. 1996). Additionally, contrary to Plaintiffs' assertions, the bespeaks caution

13  doctrine is applicable at the motion to dismiss stage. See In re Worlds of Wonder Sec. Litig., 35

14  F.3d 1407, 1413 (9th Cir. 1994) ("WOW").[7]  Under the doctrine, "cautionary language, if

15  sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." In

16
17  re Donald Trump Casino Sec. Litig., 7 F.3d 357, 372 (3rd Cir. 1993).  To be deemed sufficient,

18  the Ninth Circuit has held that:

19
20  ... economic projections, estimates of future performance, and similar optimistic
     statements in a prospectus are not actionable when precise cautionary language
21  elsewhere in the document adequately discloses the risks involved. It does not matter
     if the optimistic statements are later to have been inaccurate or based on erroneous
22  assumptions when made, provided that the risk disclosure was conspicuous, specific,
     and adequately disclosed the assumptions upon which the optimistic language was
23  based.

24  WOW, 35 F.3d at 1413 (emphasis added); see also In re Donald Trump Casino Sec. Litig., 7 F.3d

25  at 372 ("To suffice, the cautionary statements must be substantive and tailored to the specific

26
     future projections, estimates or opinions in the prospectus which the plaintiffs challenge"). As
27

28      [7]Nothing in Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995) or Provenz v. Miller, 102
     F.3d 1478 (9th Cir. 1996) alters this conclusion.

importantly, a motion to dismiss for failure to state a claim will succeed only when the documents containing the defendants' challenged statements include enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading. See Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995).

As an initial matter, the Court finds that the bespeaks caution doctrine does not apply to Oracle's statements that the economy was not hurting its sales or that the 11i Suite required no systems integration, respectively, statements (1) and (3) above, because these statements are statements of present fact. See Trump, 793 F.Supp. 543, 554 (D. N.J. 1992)("the 'bespeaks caution doctrine' applies only to .. cautionary language which directly addresses itself to future projections"). Secondly, although applicable, the bespeaks caution doctrine does not immunize Oracle's future predictions regarding 3Q01 (statement (2) above). Oracle asserts that its Forms 10-Q filed on October 16, 2000 and January 16, 2001, warned investors that quarterly projections might shift significantly at the quarter's end. See Defendants' Request for Judicial Notice, Exhibits B at 14 and C at 17-18. While Oracle's Forms 10-Q cover a broad array of potential reasons for "Uneven Patterns of Quarterly Operating Results and Revenues," id, the provisions within the Forms are not "substantive and tailored to the specific future projection[]" cited above. Trump, 7 F.3d at 371-372. Plaintiffs allege that Oracle's revenue shortfall was, in part, due to problems with the 11i Suite. Although Oracle's prior Forms 10-Q speak generally of "delay or deferral of customer implementations of the Company's software," according to Plaintiffs, by 3Q01 these generalized potential risks had become an undeniable reality. See In re Hi/fn, Inc., Sec. Litig., 2000 WL 33775286 (N.D. Cal. 2000). Assuming as true Plaintiffs' allegations of Oracle's knowledge of problems with the 11i Suite and fledgling sales, "[t]his Court cannot conclude that a prior and generalized cautionary statement was adequate as a matter of law to

8

protect defendants' later oral statements." Id. Accordingly, for the reasons cited above, this Court finds that the bespeaks caution doctrine does not render Oracle's alleged misrepresentations immaterial as a matter of law.

**Safe Harbor**

The PSLRA states that "[o]n any motion to dismiss based upon [the safe harbor provision of the PSLRA], the courts shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e). The forward-looking statement must be accompanied by an oral statement that "additional information concerning factors that could cause actual result to materially differ from those in the forward-looking statement contained in a readily available written document." See FACC Exhibit 7 at 1-2; see also 15 U.S.C. § 78u-5(c)(2)(B)(i). The accompanying oral statement must refer to a readily available SEC document. See Wenger, 2 F.Supp.2d at 1242. Oracle argues that the cautionary statements made at a December 14, 2000 press conference prior to a discussion where future predictions were expressed, protects its predictive statements made in that same press conference. See Defendants' Motion to Dismiss at 6.

Specifically, Oracle argues that ¶23, wherein Oracle stated that it would enjoy 3Q01 earnings of $0.12 EPS, growth of 75% in application sales, and 20-25% in database sales, is protected by the safe harbor provisions because its Forms 10-K and 10-Q provided "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). Although Oracle's financial projections were very broad, its SEC documents highlight the precise points of contention here. For example in its October 16, 2000 Form 10-Q, Oracle warned investors that

9

1  "[s]ignificant undetected errors or delays in new products or new versions of a product, expecially

2  in the area of CRM, may affect market acceptance of the Company's products." See Defendant's

3
4  Request for Judicial Notice Exh. B at 13. Oracle also warned investors that "pipeline estimates

5  are necessarily speculative and may not correlate to revenues in a particular quarter," and that

6  contracting patterns make its "quarterly results [ ] difficult to predict until the end of [a] quarter."

7  Id. at 14. Oracle's Form 10-Q goes on to state that this is because customers tend to delay the

8  closing of substantial license transactions "until the end of a fiscal quarter as a negotiating tactic."

9
10  Id. The delays, Oracle warned, "have historically caused and could cause quarterly revenues and

11  net income to fall significantly short of anticipated levels." Id. These statements raise the

12  question of whether Oracle's risk warnings provided meaningful cautions to offset allege false

13  statements made by Oracle. The Court finds, however, that these statements present factual issues

14  that are beyond the purview of the instant motion. Accordingly, this Court declines to apply the

15  PSLRA safe harbor provisions here.
16

17  **Puffery**

18  Oracle argues that many of its statements that the economy had not yet injured its business

19  in 3Q01 is non-actionable puffery. For example, Oracle argues that statements that Oracle's

20  business was "strong," "robust," "sustained" and "astounding" are too vague to be actionable. See

21
22  FACC ¶¶ 23, 36, 42 (a)-(c). "'Projections and general expressions of optimism may be actionable'

23  under federal securities laws." In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir.

24  1989) (citation omitted). A forecast may be actionable only if the following factors are found: (1)

25  the statement is not genuinely believed, (2) there is not a reasonable foundation for the belief, or

26
27  (3) the speaker is aware of undisclosed facts that tend to undermine the accuracy of the projection.

28  See id. Assuming the truth of Plaintiffs' allegations that Oracle knew from internal reports that it

1   would not be able to meet its 3Q01 projections, Oracle either did not believe in the alleged

2   statements or it was aware of undisclosed fact that tended to undermine the accuracy of its

3
    statements. See Hi/fn, 2000 WL at *6. Accordingly, this Court finds that Oracle's forecasts
4

5   regarding 3Q01 were not mere puffery and can be actionable. See id.

6       Oracle's statements that the 11i Suite is "pre-integrated and fully interoperable out of the

7   box," and that "no systems integration is required" are also actionable. FACC ¶¶ 29, 36. Plaintiffs

8
    allege that the Oracle knew that the 11i Suite was not fully interoperable and that it was riddled
9
    with bugs. Assuming them to be true, Plaintiffs allegations suggest that Oracle was aware of
10

11  undisclosed facts that tend to undermine the accuracy of its projections. See In re Apple Computer

12  Sec. Litig., 886 F.2d at 1113. Accordingly, this Court finds that Oracle's statements regarding the

13  11i Suite are also actionable.

14
    **Paraphrased Statements**
15

16      For the second time, Plaintiffs include analysts reports with paraphrased statements of what

17  Ellison or Henley allegedly said. This Court's prior admonitions carry the same force here. No

18  additional analysis is required. Paragraphs 36, 39, 42(a), (b), and 49 are non-actionable. The

19  Court now turns to address the pleading defects of the FACC.

20
    **Pleading Standards and Scienter**
21

22      Oracle contends that Plaintiffs have failed to plead particular facts that Oracle had actual

23  knowledge at the time the challenged statements were false when made. Federal Rule of Civil

24  Procedure 9(b) provides that

25      In all averments of fraud or mistake, the circumstances constituting fraud or mistake
26      shall be stated with particularity. Malice, intent, knowledge, and other condition of
        mind of a person may be averred generally.
27

28  Fed.R.Civ.P. 9(b)

11

1    In a securities action, a plaintiff complies with Rule 9(b) if he alleges the time, place, and

2   content of the alleged fraud, and the "circumstances indicating falseness" or "the manner in which

3   [the] representations [or omissions] at issue were false and misleading." In re GlenFed Sec. Litig.,

4

5   42 F.3d 1541, 1544 (9th Cir. 1994). "To allege falsity, a plaintiff should point to

6   contemporaneous, inconsistent statements by defendants or show that information available

7   showed different results from what was predicted. See id. at 1549. With respect to scienter,

8        "a private securities plaintiff proceeding under the [PSLRA] must plead, in great
9        detail, facts that constitute strong circumstantial evidence of deliberately reckless or
        conscious misconduct ... [Averment of p]articular facts giving rise to a strong inference
10       of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading
11       standard under the [PSLRA]."

12   In re Silicon Graphics, Inc., Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999).

13   The Court finds that Plaintiffs' FACC does not meet these standards. Plaintiffs' central

14   allegations assert that Oracle, throughout 3Q01, predicted that its 3Q01 earnings would be 12 cents

15
    per share, and that revenue from applications and database sales and from other parts of the
16

17   business would increase by certain percentages. See FACC ¶¶ 23, 42, 48, 49. Plaintiffs allege that

18   these and similar statements regarding Oracle's 3Q01 projections were false when made because

19   Oracle knew from its internal databases that overall sales were dwindling.

20
     **Negative Internal Reports**
21

22   Plaintiffs contend through several confidential witnesses that Oracle had access to a global

23   database (Oracle Sales Online) which monitored and forecasted all sales of products and consulting

24   services and provided up-to-the-minute information. Thus, Plaintiffs, argue, Oracle knew that it

25   could not meet its 3Q01 projections because the database pipeline showed that sales were drying

26
    up. Several problems exist with Plaintiffs' negative internal report theory. Although Plaintiffs
27

28   have added allegations from several new confidential witnesses that span the continent and

12

Canada, these witnesses fail to provide the particularized factual showing that would establish the falsity of any statements or that any speaker actually knew that a statement was false.

For example, in ¶ 25, Plaintiffs assert that by December 2000, Oracle knew that sales were in serious decline due to the slowing economy. Plaintiffs assert that

> ... because the database disclosed the declining sales, Ellison and Sanderson knew that the economy was severely affecting sales and revenues, and that the pipeline was suffering from the lack of new sales.

Nowhere in the FACC do Plaintiffs point out what "the database disclosed." Id. As this Court stated above, "[t]o allege falsity, a plaintiff should ... show that information available [to defendants] showed different results from what was predicted." In re GlenFed Sec. Litig., 42 F.3d at 1549. Although Plaintiffs contend that several confidential witnesses (CW's 1-4, 6, 16, 19, 28, 31, 32, 36 and 44) had access to Oracle's comprehensive, global database, Oracle Sales Online, and knew that the database contained references to every sales opportunity, its amount and its progress to closing, the FACC does not allege overall sales figures, revenue or pipeline figures. However, none of these confidential witnesses offer any information that would prove any statement false when made. As this Court has previously stated in dismissing Plaintiffs' initial complaint, Plaintiffs fail to "allege what the reports in the OASIS database said nor d[id] Plaintiffs provide any other basis from which the Court could infer knowing falsity." Order at 9. Providing the Court with information that Sanderson or Ellison had access to "up to the minute" global roll-ups without providing what the details actually were cannot satisfy the pleading requirements of the PSLRA. Nor does the fact that these confidential witnesses, from their knowledge of the several regional, national, or global databases, thought that sales "went dead," "fizzled out," "dried up," and "stopped" establish that Ellison, Sanderson or Henley knew of this information or thought the same thoughts.

1    Paragraph 24 provides another example of the deficiencies in Plaintiffs' negative internal

2    report theory. In ¶ 24, Plaintiffs assert that the accounts of at least

3

4        15 sales and consulting personnel from various departments and regions within the
         Company confirms that, in truth, the impact of the slowing economy had dramatically
5        slowed all segments of Oracle's business, including sales of database applications and
         therefore would adversely impact the 3Q01 revenue and earning forecasts upon which
6        those sales depended.

7    Although Plaintiffs allege that these confidential witnesses' accounts show that slowing

8    economy affected all segments of Oracle's business, Plaintiffs' witnesses shed light on only limited

9
     sectors of Oracle's business. For example, CW 21 was a former Senior Consultant in Southern
10

11   California; CW 16 was a former Staff Consultant in California; CW 43 was a former Senior

12   Technical Consultant in Toronto; CW 9 was responsible for sales to higher education customers in

13   the southeast region of the United States; and CW 22 was a Senior Consulting Director in the Bay.

14
     As alleged in the FACC, Plaintiffs' witnesses do not account for sufficient sectors of Oracle's
15

16   business line throughout the United States nor do the confidential witnesses speak to activity

17   occurring on various levels on the higher end of Oracle's hierarchical chain, as most witnesses

18   were only regionally or locally affiliated. Thus, Plaintiffs' witnesses do not provide an accurate

19   enough picture to make a determination with respect to what Oracle knew during relevant periods.

20
         Plaintiffs suggest that although the confidential witness accounts alone are insufficient,
21

22   viewed collectively they support a strong inference of scienter. Plaintiffs again rely on Bourjaily v.

23   United States, 483 U.S. 171, 179-80 (1987). The Court rejected this argument in its Order.

24   However, even assuming that this Court viewed the allegations of the confidential witnesses as a

25   whole, their allegations still do not sufficiently plead fraud. Plaintiffs confidential witnesses do not

26
     state what Oracle's company-wide revenue figures were at any one time. Nor do the confidential
27

28   witnesses say what any company-wide pipeline figure was at any time. While the confidential

14

1  witnesses "corroborate" one another, corroboration alone, notwithstanding the allegations, fail to

2  establish a strong inference of scienter. See In re Silicon Graphics, Inc., Sec. Litig., 183 F.3d 970,

3
4  974 (9th Cir. 1999).[8] Reliance on confidential witnesses without facts toestablish that Ellison

5  knew the same information that anonymous sales persons knew at the time he made any of his

6  alleged false statements, in no way sets forth the manner in which the misrepresentations or

7  omissions at issue were false and misleading. See In re GlenFed Sec. Litig., 42 F.3d at 1544 (9th

8  Cir. 1994).

9
10  Plaintiffs' FACC is analogous to the pleading in Kane v. Madge Networks, N.V., 2000 WL

11  33208116 * 1):

12      Plaintiffs fail to match up even one negative internal report with any specific statement
        of the defendants. [ ] All the complaint does is allege that the individual defendants
13      were "hands-on managers" who received information through "e-mail, teleconferences,
        and meetings." [ ] The complaint even attempts to turn the presences of a fax machine
14      in a conference room into evidence of scienter. [ ] All these allegations do is show that
15      defendants *could* have learned of information contradicting their public statements, not
        that they actually *did* learn such information (or that they were deliberately reckless to
16      the falsity of their statements.)

17  Id. at *9.

18
19  Plaintiffs' FACC, through its several confidential witnesses, asserts nothing more than that

20  Oracle had access to global databases that provided real-time updates regarding sales. Plaintiffs

21  fail to "place in context the significance" of the statements of confidential witnesses with "Oracle's

22  overall financial picture." Order at 11. This cannot support a strong inference of scienter, nor can

23  it plead fraud with particularity.

24
25  [I]f a plaintiff is to rely on the existence of reports as a means of establishing knowledge,

26
27  [8]"a private securities plaintiff proceeding under the [PSLRA] must plead, in great
    detail, facts that constitute strong circumstantial evidence of deliberately reckless or
28  conscious misconduct ... [Averment of p]articular facts giving rise to a strong inference
    of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading
    standard under the [PSLRA]."

15

1

2

3

4

5

she must "include adequate corroborating details," such as [ ] "who drafted them, [ ] which officers received them," and "an adequate description of their contents." [ ] The reason for requiring such detail [I] that "every sophisticated corporation uses some kind of internal reporting system reflecting earlier forecasts," and that allowing a plaintiff "to go forward with a case based on general allegations of 'negative internal' reports would expose all those companies to securities litigation whenever their stock prices dropped.

6 In re Vantive Sec. Litig., 283 F.3d 1079, 1087-88 (9th Cir. 2002).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Despite the deficiencies cited above, Plaintiffs' contend that "it is reasonable to conclude that the declining sales reported by witnesses were reflected in the global database" and that Ellison or Henley's 3Q01 predictive statements were necessarily rendered false. See FACC ¶ 41. Plaintiffs ask this Court to infer the very thing that must be proven. If Plaintiffs seek to establish that Ellison or Henley knew their predictive statements to be false when made, they must provide "an adequate" description of the contents of the negative reports. Plaintiffs also would also have to provide this Court with information showing that as of a specific date Oracle knew about a specific amount or volume of sales. Then, Plaintiffs would have to demonstrate that Oracle's knowledge of the sales volume would have made its predictive statements false when made. Plaintiffs could accomplish this by comparing the specific sales volume figures with prior quarters or some other comparative factor. This Court has no such numbers to work with. While the FACC's confidential witnesses provide information regarding regional sales figures ( for example, ¶¶ 25(a), (b), (d), (f), (h), (I)), "Plaintiffs fail to establish that the sales portfolio[s] [of these witnesses] w[ere] [ ] company-wide portfolio[s]. In other words, Plaintiffs do not demonstrate that the sales information [in the aggregate] was of a magnitude that would, of necessity, be a fact with respect to Ellison's 3Q01 projections." Order at 9 n4. "To allege falsity, a plaintiff should point to contemporaneous, inconsistent statements by defendants or show that information available showed different results from what was predicted." In re GlenFed Sec. Litig., 42 F.3d at 1549.

16

1  Plaintiffs' FACC does not.

2  **Lost Deals**

3

4  The FACC is also deficient because it attempt to prove the "negative internal report" theory

5  with several accounts from confidential witnesses regarding lost deals -- deals that either did not

6  close prior to 3Q01 or were abandoned altogether. For example, in ¶ 25(h), CW 32, a former

7  Oracle Senior Sales Consultant for 11i sales, reported that a $10 million deal did not close. CW 8

8  identifies several deals that Oracle allegedly expected to close between July 2000 and March 2001

9

10  that did not close, including deals with Federal Express, Mutual of Omaha, Fosters Beer, Telecom

11  New Zealand and GE in New York.

12  While Plaintiffs' allegations demonstrate that several deals did not close within the class

13  period, these facts do not prove Oracle's projections false when made because the allegations do

14  not go on to elucidate how many deals remained in the pipeline. Moreover, as Oracle correctly

15  notes, Plaintiffs do not allege how much of the revenue from any of these thwarted deals was

16  forecast to recognized in 3Q01. Oracle could very well have been justified in makings it 3Q01

17  predictions. This Court does not know because the information required to make that

18  determination has not been provided. Such short sided pleadings do not present "circumstances

19  indicating falseness." In re GlenFed Sec. Litig., 42 F.3d at 1544.

20

21

22  **Product Defect Allegations**

23  The FACC also fails to state a claim because Plaintiffs do not demonstrate how their

24  product defect allegations relate to the challenged 3Q01 predictive statements. Plaintiffs contend

25  that "[t]his is a fraud case in which false assurances about the declining economy and false claims

26  about product integration are intertwined, and served as a basis for false forecasts about

27  applications revenue growth." See Plaintiffs' Opposition at 17:16-18. Although Plaintiffs have

28

United States District Court
For the Northern District of California

17

included several paragraphs regarding the functionality of the 11i Suite, Plaintiffs do not establish how Oracle's alleged difficulty implementing the 11i Suite affected the revenue projections made prior to the close of 3Q01. Plaintiffs' 11i Suite allegations fall under the weight of the FACC's failure to allege any contemporaneous, hard facts relating to a company-wide financial picture that would render Oracle's company-wide projections false, as discussed above. Acknowledging after the fact that the shortfall in 11i applications sales growth accounted for nearly half ($101 million), of the $203 million revenue shortfall does not help here when Plaintiffs have not established that Oracle knew of hard, contemporaneous and contradictory facts when it made its 3Q01 projections.

Additionally, the FACC does not set forth how the product quality allegations, namely the customer relationship management module (CRM) (see ¶¶ 29(a)-(f), (h)-(I), (k)-(l), (o)), relates to 11i. As Oracle points out, the CRM is one of many modules of the 11i Suite. See Defendants' Motion to Dismiss 22:11-14. The FACC does not establish how the alleged defects in the CRM affected sales of the 11 Suite or how it affected Oracle's business as a whole.

Finally, and most importantly, Plaintiffs' FACC fails to account for Oracle's financial success in the two quarters which immediately followed the release of the 11i Suite. The first quarter following the release of the 11i Suite (the first quarter of Oracle's fiscal year 2001(beginning June 1, 2000)) was successful in that revenues reached $2.2 billion, with earnings at 8 cents per share. The second quarter following the release was even more successful than the first, with earnings at 11 cents per share, beating Oracle's own forecasts by one cent. However, Plaintiffs contend that the 11i Suite did not work, was virtually unsellable from its introduction and that the product defects led to Oracle's third quarter shortfall. Essentially, Plaintiffs argue that although most of the alleged defects in the 11i Suite occurred during two successful quarters which followed the product's introduction, these same defects are attributable to Oracle's missed 3Q01

18

1  predictions and therefore establishes that Oracle knew that its 3Q01 predictive statements were

2  false when made. Yet, Plaintiffs have not plead anything that would have made it unreasonable for

3
4  Oracle to expect that the financial success it enjoyed during the two quarters following the

5  product's release (despite the alleged product defect claims) would also obtain in 3Q01.

6  Accordingly, Plaintiffs' 11i Suite arguments (see Plaintiffs' Opposition at 14-16) do not carry the

7  day. For the foregoing reasons, the Court finds that the FACC fails to plead fraud with

8  particularity and that the facts articulated in it do not give rise to a strong inference of scienter.

9
**Stock Sales**

10

11  Plaintiffs' argument that the fact that Oracle executives reiterated strong sales, revenue and

12  earnings growth (¶¶ 113-115) only five days prior to disclosing its 3Q01 results is flawed because

13  the paragraphs do not contain any misrepresentation but only paraphrased analysts' reports, which

14  the Court has found insufficient for purposes of pleading securities fraud. The timing of the

15
16  allegedly false statements "may prove relevant when considered in conjunction with specific

17  information indicating conscious behavior or knowledge of falsity. By itself, however, it does not

18  create a strong presumption of deliberate recklessness." Autodesk, 132 F.Supp.2d at 844.

19  Similarly, Plaintiffs claim that Ellison and Henley's stock trades prior to the March 1

20  announcement provide a strong inference of scienter is unpersuasive. "'Only unusual' or
21
22  'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter."

23  Silicon Graphics, 183 F.3d at 986. Courts consider (1) the amount and percentage of shares sold

24  by insiders, (2) the timing of the sales, and (3) whether the sales were consistent with the insider's

25  prior trading history." Id. Additionally, percentages of a trader's total portfolio becomes more
26
27  significant in cases where insider trading is the only circumstance left in the case to show scienter.

28  Id. at 987-88. Plaintiffs allege that defendants Ellison and Henley's stock sales totaling $925

19

1  million shortly after "inflating" the stock with alleged falsehoods provides additional stronger

2  inference of scienter and a motive for fraud. In the Ninth Circuit, stock sales alone ("motive and

3
4  opportunity") cannot provide a strong basis for scienter. In re Splash, 160 F.Supp.2d 1059, 1081

5  (N.D. Cal. 2001). Moreover, Plaintiffs claim that the timing of Ellison and Henley's stock trades

6  were highly suspicious is unpersuasive. "[I]nsider trading is suspicious only when it is

7  'dramatically out of line with prior trading practice at times calculated to maximize the personal

8  benefit from undisclosed inside information." Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir.

9  1991).

10

11  Plaintiffs allegations are not borne out by the facts. First, Plaintiffs have not proven that

12  Ellison or Henley was aware of any undisclosed inside information. Second, Plaintiffs do not

13  provide the Court with any information about Henley's prior trading. Third, Plaintiffs cannot get

14  around the fact that Ellison sold only 2.1% of his holdings, retaining approximately 98% of his

15
16  holdings and Henley sold only 7% of his holdings. Thus, both Ellison and Henley "incurred the

17  same large losses as did the Plaintiffs." Worlds of Wonder, 35 F.3d at 1425. Additionally, neither

18  defendants sales were sold at suspicious times, both occurring two months prior to Oracle's

19  announcement of its third quarter results. Therefore, because both Ellison and Henley "retained

20  the vast majority of [their] holdings and none of the sales occurred at suspicious times, such as

21
22  immediately before a negative announcement," the Court finds that Ellison and Henley's stock

23  trades do not support a strong inference of scienter. Wenger, 2 F.Supp.2d at 1251.

24                                              **CONCLUSION**

25  "Taken as a whole, [P]laintiffs do not meet the stringent pleading standard of Silicon

26  Graphics. None of [P]laintiffs' allegations provide the critical details necessary to support an

27
28  inference" that Oracle was aware of any facts that would compromise its predictive statements."

20

1  Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002).  Nor does that FACC allege

2  particularized facts that could lead this Court to infer that Oracle's predictive statements artificially

3  inflated its stock price.  See id.  As such, Oracle's motion to dismiss for failure to state a claim

4

5  under Federal Rule of Civil Procedure 12(b)(6) is GRANTED, without prejudice.  Plaintiffs shall

6  file an amended complaint within thirty (30) days of this Order.[9] [10]

7  **IT IS SO ORDERED.**

8  Dated: September 6,  2002

9                                                                      MARTIN J. JENKINS
                                                                      UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  [9]Because they rely upon the facts and theory discussed in the body of this Order, Plaintiffs second and third causes of action fall under the weight of this Court's disposition of Plaintiffs' primary cause of action.

25  [10]Also before this Court is Oracle's motion to stay discovery in the state derivative action captioned The Oracle Cases, Judicial Council Coordination Proceeding No. 4180, currently pending before the Honorable John G. Schwartz,

26  Superior Court of California, County of San Mateo.  The motion was brought pursuant to 15 U.S.C. § 78u-4(b)(3)(D), which provides that federal district courts, upon a proper showing, may stay discovery in private state actions as necessary in aid

27  of its jurisdiction or to protect its judgments.  See 15 U.S.C. § 78u-4(b)(3)(D).  However, Oracle's motion to stay is premised on the fact that the discovery is stayed in the instant action pursuant to PSLRA's automatic stay of discovery, which is

28  triggered during the pendency of any motion to dismiss.  Oracle's motion to stay is now moot as Oracle's motion to dismiss is granted.

United States District Court
For the Northern District of California

21

whk

United States District Court
for the
Northern District of California
September 11, 2002


* * CERTIFICATE OF SERVICE * *
Entry on Civil Docket


Case Number:3:01-cv-00988


Nursing Home Pension

   vs

Oracle Corporation

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Northern District of California.

That on September 11, 2002,  I SERVED and ENTERED on the civil docket a
true and correct copy(ies) of the attached, by placing said copy(ies) in
a postage paid envelope addressed to the person(s) listed below, by
depositing said envelope in the U.S. Mail; or by placing said copy(ies)
into an inter-office delivery receptacle located in the office of the Clerk.

       Reed R. Kathrein, Esq.
       Milberg Weiss Bershad Hynes & Lerach LLP
       100 Pine Street
       Ste 2600
       San Francisco, CA  94111

       William S. Lerach, Esq.
       Milberg Weiss Bershad Hynes & Lerach LLP
       401 B Street
       Suite 1700
       San Diego, CA  92101

       Mark Solomon, Esq.
       Milberg Weiss Bershad Hynes & Lerach LLP
       401 B Street
       Suite 1700
       San Diego, CA  92101

       Darren J. Robbins, Esq.
       Milberg Weiss Bershad Hynes & Lerach LLP
       401 B Street
       Suite 1700
       San Diego, CA  92101

Douglas R. Britto   Esq.
Milberg Weiss Ber_ _d Hynes & Lerach LLP
401 B Street
Suite 1700
San Diego, CA   92101

Denise M. Douglas, Esq.
Milberg Weiss Bershad Hynes & Lerach LLP
401 B Street
Suite 1700
San Diego, CA   92101

Dorian Daley, Esq.
Oracle Corporation
500 Oracle Parkway
Redwood City, CA   94065

Lauren G. Segal, Esq.
Oracle Corporation
500 Oracle Parkway
Redwood City, CA   94065

Jamie E. Wrage, Esq.
Mayer Brown & Platt
350 So Grand Ave 25th Flr
Los Angeles, CA   90071

Steven O. Kramer, Esq.
Mayer Brown & Platt
350 So Grand Ave 25th Flr
Los Angeles, CA   90071

Javier H. Rubenstein, Esq.
Mayer Brown & Platt
190 So LaSalle St
Chicago, IL   60603

Alan N. Salpeter, Esq.
Mayer Brown & Platt
190 So LaSalle St
Chicago, IL   60603

Javier H. Rubinstein, Esq.
Mayer Brown & Platt
190 So LaSalle St
Chicago, IL   60603

Shawn a. Williams, Esq.
Milberg Weiss Bershad Hynes & Lerach LLP
100 Pine Street, Suite 2600
San Francisco, CA   94111

Nicole Lavallee, Esq.
Berman DeValerio Pease Tabacco Burt & Pucillo
425 California St
Ste 2025
San Francisco, CA   94104

Alfred G. Yates Jr., Esq.
Law Office of Alfred G. Yates Jr.

429 Forbes Ave
519 Allegheny Bldg
Pittsburgh, PA  15219

Michael Reese, Esq.
Milberg Weiss Bershad Hynes & Lerach LLP
100 Pine St
Ste 2600
San Francisco, CA  94111

Michael S. Egan, Esq.
Bernstein Liebhard & Lifshitz
10 East 40th St
New York, NY  10016

Jill M. Manning, Esq.
Kirby McInerney & Squire, LLP
7665 Redwood Blvd
Ste 200
Novato, CA  94948

Ira M. Press, Esq.
Kirby McInerney & Squire LLP
830 Third Ave
10th Flr
New York, NY  10022

Laurence D. King, Esq.
Kaplan Fox & Kilsheimer LLP
601 Montgomery Street, Suite 300
San Francisco, CA  94111

Frederic S. Fox, Esq.
Kaplan Kilsheimer & Fox LLP
805 3rd Ave
New York, NY  10022

Jonathan Levine, Esq.
Kaplan Kilsheimer & Fox LLP
805 3rd Ave
New York, NY  10022

Joshua M. Lifshitz, Esq.
Bull & Lifshitz
246 West 38th Street
New York, NY  10018

Peter D. Bull, Esq.
Bull & Lifshitz
246 West 38th Street
New York, NY  10018

Mark S. Goldman, Esq.
Weinstein Kitchenoff Scarlato & Goldman, Ltd.
1845 Walnut Street
Suite 1100
Philadelphia, PA  19103

Marc A. Topaz, Esq.
Schiffrin & Barroway LLP

Three Bala Plaza East
Suite 400
Bala Cynwyd, PA  19004

Kevin J. Yourman, Esq.
Weiss & Yourman
10940 Wilshire Blvd
24th Flr
Los Angeles, CA  90024

Michael D. Braun, Esq.
Stull Stull & Brody
10940 Wilshire Blvd.
Ste 2300
Los Angeles, CA  90024

Timothy J. Burke, Esq.
Stull Stull & Brody
10940 Wilshire Blvd.
Ste 2300
Los Angeles, CA  90024

Barbara A. Podell, Esq.
Savett Frutkin Podell & Ryan PC
325 Chestnut St
Ste 700
Philadelphia, PA  19106

Francis M. Gregorek, Esq.
Wolf Haldenstein Adler Freeman & Herz LLP
Symphony Towers
750 B St
Ste 2770
San Diego, CA  92101

Betsy C. Manifold, Esq.
Wolf Haldenstein Adler Freeman & Herz LLP
Symphony Towers
750 B St
Ste 2770
San Diego, CA  92101

Francis A. Bottini Jr., Esq.
Wolf Haldenstein Adler Freeman & Herz LLP
Symphony Towers
750 B St
Ste 2770
San Diego, CA  92101

Fred T. Isquith, Esq.
Wolf Haldenstein Adler Freeman & Herz
270 Madison Ave
New York, NY  10016

Marc S. Henzel, Esq.
Law Offices of Marc S. Henzel
210 West Washington Square
Third Floor
Philadelphia, PA  19106-3503

Jay P. Saltzman,
Schoengold & Sporn P.C.
19 Fulton Street
Ste 406
New York, NY 10038

Jules Brody, Esq.
Stull Stull & Brody
6 East 45th St 4th Flr
New York, NY 10017

Aaron C. Brody, Esq.
Stull Stull & Brody
6 East 45th St 4th Flr
New York, NY 10017

Tzivia Brody, Esq.
Stull Stull & Brody
6 East 45th St 4th Flr
New York, NY 10017

David Jaroslawicz, Esq.
Jaroslawicz & Jaros
150 Williams Street
New York, NY 10038

Lionel Z. Glancy, Esq.
Glancy & Binkow LLP
1801 Avenue of the Stars
Ste 311
Los Angeles, CA 90067

Brian Barry, Esq.
8424A Santa Monica Blvd.
Suite 184
Los Angeles, CA 90069

Jill Levine, Esq.
8424A Santa Monica Blvd.
Suite 184
Los Angeles, CA 90069

Robert C. Susser, Esq.
6 East 43rd Street
Ste. 1900
New York, NY 10017-4609

Richard W. Wieking, Clerk

BY: _William Hewlett Kelly_
Deputy Clerk

# EXHIBIT 440

1   LATHAM & WATKINS LLP                    LATHAM & WATKINS LLP
      Peter A. Wald (SBN 85705)               Patrick E. Gibbs (SBN 183174)
2     Michele F. Kyrouz (SBN 168004)          Matthew Rawlinson (SBN 231890)
3   505 Montgomery Street, Suite 2000       140 Scott Drive
    San Francisco, CA 94111-2562            Menlo Park, CA 94025
4   Telephone: (415) 391-0600              Telephone: (650) 328-4600
    Facsimile: (415) 395-8095               Facsimile: (650) 463-2600
5   E-mail: peter.wald@lw.com               E-mail: patrick.gibbs@lw.com
           michele.kyrouz@lw.com                   matt.rawlinson@lw.com
6
7   LATHAM & WATKINS LLP
      Jamie L. Wine  (SBN 181373)
8   633 West Fifth Street, Suite 4000
    Los Angeles, CA 90071-2007
9   Telephone: (213) 485-1234
    Facsimile: (213) 891-8763
10  E-mail: jamie.wine@lw.com
11
    Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
12  J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON
13  ORACLE CORPORATION
      Dorian E. Daley (SBN 129049)
14    James C. Maroulis (SBN 208316)
15  500 Oracle Parkway
    Mailstop 5OP7
    Redwood Shores, California 94065
16  Telephone: (650) 506-5200
    Facsimile: (650) 506-7114
17  E-mail: jim.maroulis@oracle.com
18  Attorneys for Defendant ORACLE CORPORATION
19
20              UNITED STATES DISTRICT COURT
21     NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION
22  In re ORACLE CORPORATION            Master File No. C-01-0988-MJJ (JCS)
    SECURITIES LITIGATION               (Consolidated)
23
24                                      CLASS ACTION
25  This Document Relates To:           ORACLE CORPORATION'S SECOND
                                        AMENDED AND SUPPLEMENTAL
26  ALL ACTIONS.                        RESPONSES TO PLAINTIFFS' SECOND
                                        SET OF INTERROGATORIES TO
27                                      DEFENDANT ORACLE CORPORATION
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

05/23/2006  16:53    6504632600              LATHAM WATKINS                    PAGE  04/29

1    Pursuant to Federal Rule of Civil Procedure 33, Defendant Oracle Corporation

2  ("Oracle") hereby objects and responds to Plaintiffs' Second Set of Interrogatories to Defendant

3  Oracle Corporation (the "Interrogatories").

4                      **GENERAL RESPONSES AND OBJECTIONS**

5    A.    Oracle objects to the Interrogatories' definitions of "Oracle" and the "Company"

6  as overbroad.

7    B.    Oracle objects to the definition of "you" and "your" as overbroad in that they are

8  defined to mean "the defendants upon whom this request is served and all officers, directors,

9  employees, representatives, or agents acting on behalf of each of the responding defendants," and

10  therefore potentially calls for answers from every Oracle employee.

11    C.    Oracle objects to the definition of "identify" as overly broad and unduly

12  burdensome.

13    D.    Oracle objects to the definition of "Relevant Time Period" as overbroad, unduly

14  burdensome, irrelevant in that it is unlikely to lead to the production of admissible information

15  and in violation of the Amended Order Setting a Discovery Plan dated March 10, 2005 (the

16  "Discovery Plan").

17    E.    Oracle objects to the Interrogatories as overbroad and unduly burdensome to the

18  extent that they request information that was neither seen by, communicated to, or relied on by

19  the Speakers. According to the Complaint, the alleged false statements concern Oracle's

20  company-wide projections and sales, not individual deals. The financial projections were for

21  Oracle as a whole and were based on consolidated company-wide data. As such, information

22  that was not communicated to the Speakers cannot be relevant.

23    F.    Oracle objects to the Interrogatories to the extent that they request information

24  that is protected by the attorney-client privilege, the attorney work product doctrine, statutory

25  and constitutional privacy rights, and other applicable doctrines.

26    G.    Oracle objects to the Interrogatories to the extent that they purport to require

27  discovery in excess of Defendants' obligations under the Federal Rules of Civil Procedure, the

28

LATHAM&WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

1    ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

1 | Federal Rules of Evidence, the Local Rules of the Northern District of California, the Discovery

2 | Plan and other applicable law or rules.

3 |     H.    Oracle objects to the Interrogatories to the extent that they are unduly

4 | burdensome, oppressive, unjustifiably expensive and/or vexatious.

5 |     I.    Oracle objects to the Interrogatories to the extent they are vague, ambiguous, or

6 | do not specify the information sought with sufficient particularity.

7 |     J.    Oracle objects to the Interrogatories to the extent that they seek information that is

8 | within the knowledge of the Plaintiffs, is a matter of public record, or is otherwise as easily

9 | obtained by the Plaintiffs as by Oracle.

10 |    K.    Oracle objects to the Interrogatories to the extent that they seek information that is

11 | not in the custody, control or possession of Oracle.

12 |    L.    Defendants' investigation and discovery in this case are ongoing.  Defendants

13 | reserve the right to supplement their objections and responses as necessary, pursuant to Federal

14 | Rule of Civil Procedure 26(e) and the Local Rules of the Northern District of California.

15 |    M.    By responding to these Interrogatories, Oracle does not admit or agree with any

16 | explicit or implicit assumption made in these Interrogatories unless admitted in full.

17 |                                **SPECIFIC OBJECTIONS**

18 | **INTERROGATORY NO. 15:**

19 |     Describe Oracle's use of "win probability ranges," including the definition attributed to

20 | each range.  *See* NDCA-ORCL 250514 for an example of the use of "win probability ranges"

21 | used by Oracle.

22 | **RESPONSE TO INTERROGATORY NO. 15:**

23 |     Oracle objects that the phrase "use of 'win probability ranges'" and the terms "definition"

24 | and "attributed" are vague, ambiguous, and fail to describe the information sought with adequate

25 | particularity.

26 |     Subject to and without waiving the foregoing objections, the phrase "win probability

27 | ranges" is not a formally defined term at Oracle and may be used by different individuals at

28 | Oracle in a variety of different contexts, using a variety of different meanings.  In general, the

LATHAM&WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

1   phrase "win probability range" refers to the likelihood that a particular deal opportunity will

2   close within a given time frame.  Oracle's CRM application, Oracle Sales Online, includes a

3   field for an estimated probability, expressed in percentage ranges, that a deal will close.  This

4   information is entered into Oracle Sales Online by individual sales representatives, and the

5   method used to estimate the likelihood that a deal will close and the definition of a particular

6   probability range will vary from salesperson to salesperson.

7   **INTERROGATORY NO. 16:**

8        Identify the documents that support your response to Interrogatory No. 1.

9   **RESPONSE TO INTERROGATORY NO. 16:**

10       Oracle incorporates each of its General Objections as though fully set forth herein.

11  Oracle further objects to Interrogatory No. 16 as an improper contention interrogatory.  Pursuant

12  to the March 10, 2005 Amended Order Setting a Discovery Plan, "no response or further

13  response to any outstanding contention interrogatories is required at this time."  Oracle reserves

14  the right to interpose additional objections to Interrogatory No. 16 at the time when a response is

15  required.

16  **INTERROGATORY NO. 17:**

17       Identify the total dollar amount of each of the "lost deals" listed in defendants' response

18  to plaintiffs' Interrogatory No. 4.

19  **RESPONSE TO INTERROGATORY NO. 17:**

20       Oracle incorporates each of its General Objections as though fully set forth herein.

21  Oracle objects to Interrogatory No. 17 as overly broad and unduly burdensome and seeking

22  information equally within the knowledge of the Plaintiffs or as easily obtained by the Plaintiffs

23  as by Oracle.  Oracle further objects to Interrogatory No. 17 as vague and ambiguous as to "total

24  dollar amount."  Indeed, in the context of deals that did not close, the phrase "total dollar

25  amount" has no meaning.  Before closing, a range of potential values may be discussed or

26  considered, and the "total dollar amount" of a potential deal is not fixed unless and until the deal

27  closes.  By definition, the lost deals identified in defendants' response to plaintiffs' Interrogatory

28

ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

1  No. 4 did not close during Q3 2001, and thus for Q3 2001 there is no "total dollar amount" for

2  those deals.

3  **INTERROGATORY NO. 18:**

4      Identify which of Oracle's products were to be included in each of the "lost deals" listed

5  in defendants' response to plaintiffs' Interrogatory No. 4.

6  **RESPONSE TO INTERROGATORY NO. 18:**

7      Oracle incorporates each of its General Objections as though fully set forth herein.

8  Oracle objects to Interrogatory No. 18 as overly broad and unduly burdensome and seeking

9  information equally within the knowledge of the Plaintiffs or as easily obtained by the Plaintiffs

10  as by Oracle. Oracle further objects to Interrogatory No. 18 as vague and ambiguous as to

11  "which of Oracle's products were to be included in each of the 'lost deals.'"

12      Subject to and without waiver of these objections, Oracle responds that the list of

13  products in a particular deal would not be fixed until closing. Below is a listing of products that

14  were potentially to be included in each of the "lost deals" listed in defendants' response to

15  plaintiffs' Interrogatory No. 4. Oracle is in the process of investigating and searching for the

16  information requested and, as the information is obtained, will continue to provide amended

17  and/or supplemental responses to this Interrogatory.

| Customer Name | Response |
| --- | --- |
| AARP #3 | Database |
| Acros | ERP |
| Acterna | CRM, ERP |
| Ahold Holdings USA, Inc. | Datawarehouse, AIS Platform Expansion |
| AK Steel | Exchange, iProcurement |
| Allina Health System | CRM (Healthcare Platform) |
| Alltel | Oracle 8i, ACI Database True Up, ACI iAS Wireless, RLS Apps Hosting DB |
| American Electric Power | Database |
| American National Insurance Company | Database, ERP (Procurement, Financials) |

| | |
|---|---|
| Americredit | CRM, Database |
| Apigent Solutions | Database |
| Arrow Electronics | Database |
| Automatic Data Processing | Database, ERP (Financials, Order Management) |
| Barton Marlow | ERP |
| BellSouth Cingular (Newco) | Financials, Order Management, Purchasing, Projects |
| Best Buy | HR, ERP |
| Bisys | iStore/TeleService, CRM, DBMS for Credit App, Database Standardization for Total Product Plus |
| BMC Software | Project Accounting, iProc |
| Boeing BCAG | DW Finance (ERP) |
| Brightpoint | Enterprise Database |
| Broadvision | Database |
| Brunswick Corporation | HR, PR, OTA, SS, BIS |
| CBT Systems | OPS, Database |
| ChaseCom | HR, Call Center |
| Ciena Corporation | ERP, 11i |
| Cigna Dental & Behavioral Health | Oracle 8i EE, Enterprise Edition Server, Partitioning, Forms Developer, Forms Server, Parallel Server, SQL Plus, Designer |
| City of Detroit Government | Migration to UPU pricing |
| City of Omaha, Nebraska | Financials, HRMS |
| Coastal Lumber | ERP |
| Compaq Computer Corporation | Partitioning |
| Concord Communications | Oracle 8i Migration |
| Consonus | OAAP |
| Continental Airlines | ASO |

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

5

ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

06/23/2006 16:53 6584632688 LATHAM WATKINS PAGE 09/29

| | | |
|---|---|---|
| 1 | Convergys Corporation | CRM |
| 2 | Cort Furniture | Database |
| 3 | CP Ships | Global Database Enterprise Management |
| 4 | CR Bard | Datawarehouse |
| 5 | Credit Suisse First Boston | Enterprise |
| 6 | Cummins ONAN | APS |
| 7 | Cypress Semiconductor | HRMS, OAB, OTA, Database |
| 8 | Data Centric Broadband | Financials, CRM |
| 9 | Defense Logistics Agency | Partitioning for DSCP, DSCR |
| 10 | Dell Computer Corporation | DFS, OFA, CRM, iStore, Database Monitoring |
| 11 | | Systems, Name & Address HSB, Additional seats for |
| 12 | | Express, FinApps |
| 13 | DFO | Apps Server |
| 14 | Diebold Incorporated | HR, PR, OTA, CRM, Database, Sales Compensation |
| 15 | DISA | DISA Flex |
| 16 | Discover Financial Services, Inc. | Add-ons; Partitioning |
| 17 | DVI Inc. | OCS, iAS, Sales Online, Financials, Technology |
| 18 | Ebenx | 8iEE Database, Partitioning, Tuning Management |
| 19 | | Pack, Diagnostic Management Ppack, Change |
| 20 | | Management Pack |
| 21 | EBS Dealings | Broker Application |
| 22 | Efficient Networks | APS, CRM, iStore, iMarketing, Call Center, Oracle |
| 23 | | Configurator |
| 24 | First Data Resources | Database |
| 25 | Fleet Bank | Database |
| 26 | Fusion UV | ERP, Instant Dx (Database, Apps), Configurator |
| 27 | Geico | Database, Server (Enterprise, Standard Edition) |
| 28 | | |

LATHAM•WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

6

ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

06/23/2006   16:53       6504632600              LATHAM WATKINS                       PAGE   10/29

| | |
|---|---|
| Global Crossing | Core Technology, Frontier |
| Health Alliance Plan | CRM |
| Ingraham Micro | Hosted Technology |
| Investors Group | CRM/DSS, Spectra Pilot |
| Janssen Ortho LLC | Financials (GL) |
| Los Angeles Department of Water and Power | Core Technology, Public Sector Financials, Supply Chain Solution, Oracle Enterprise Manager |
| McGhan Medical Corporation | CRM, ERP |
| Miami-Dade County | Financials |
| Monroe County | Enterprise License, Financials |
| Myriad | Oracle Database Enterprise Edition, Parallel Server, Partitioning, Diagnostic Management Pack, Tuning Management Pack, SQL * Plus, Programmer, Internet Directory, Message Broker, Oracle 9i Internet Application Server Enterprise Edition, Internet Developer Suite, Discoverer Desktop Edition, Purchasing, Financials, Financials Intelligence, Management Pack for Oracle Applications, TeleService, Contracts, HR Intelligence, Oracle Human Resources, Oracle Self-Service Human Resources, iProcurement |
| Nacio Systems | Datacenter, Database |
| NASA Johnson Space Center | Partitioning, WebDB, Oracle 8i, Grants Management, Manufacturing, Data Warehouse, PO, AP, Inventory |
| Navair El - 259579 | Oracle 8i EE, WebDB, ASO, Partitioning, Parallel Server, Programmer |

.ATHAM•WATKINS⁞ᵖ
Attorneys At Law
San Francisco

ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

| | |
|---|---|
| Navisite | Oracle 9i |
| Navy - ITC Orleans | Database |
| Navy - Medical | Database, ERP |
| News Corporation | HR, SS, BIS, OTA, BOL |
| Northwestern (Expanets) | ERP, CRM, Database, Service |
| Norwest Financial Services | Database, ERP |
| On Fiber Communications | Financials, Projects, BIS |
| OnStar | Database, Tools |
| OptiGlobe Communications | Database Enterprise Edition, GL, AP, AR, FA, PO, CM, iProcurement, Purchasing, Financials, Change Management Pack, Diagnostic Pack, Tuning Pack, Discoverer Plus, Internet Developer Suit |
| Origin | Database, ERP |
| Pactolis Communications | Database |
| Parsons Brinckerhoff | Internet Time & Expense, Database, Tools, Apps Server, Financials, HR, DMD |
| Personnel Decisions International | Database, ERP |
| Pizza Hut | Foundation, Sales, TeleSales, Marketing, Call Center, Scripting, OTM, Order Capture, AR, GL, INV, OM, BOM, Configurator, Advanced Pricing |
| Pomeroy Computer Resources | Financials, Financials Intelligence, Service OnLine, Advanced Scheduler, TeleService, iSupport, eMail Center, Contracts, Scripting, Project Billing, Internet Time |
| Prince Georges County Public Schools | DB EE, Advanced Security, Dd Options, iAS, IDS, Financials, HR, Payroll, iProcurement |
| Providian Financial | Oracle Store Media Pack, Database Enterprise |

ATHAM•WATKINS⊔⊔
ATTORNEYS AT LAW
SAN FRANCISCO

06/23/2006  16:53   6504632600                LATHAM WATKINS                        PAGE  12/29

| | |
|---|---|
| | Edition, Partitioning, Diagnostics, Tuning, Chg Mgmt |
| Qualcomm Consumer Products | ERP |
| Radio Systems | ERP |
| Rand Technologies Corporation | iAS, Financials, IP, Order Management |
| Raytheon | Discoverer Viewer, 9iAS, Portal, Tools |
| Real Networks | Database |
| Robert Half Inc. | Database |
| Rockefeller University | ERP |
| Ross Stores | Database, Financial Applications |
| SBC Communications | Database |
| Seagate Technology | iProcurement |
| Solectron | Database, ERP |
| Sony Semiconductor | Manufacturing |
| Southwest Alabama IJIS Project | Database |
| SPX | Enterprise Applications, ERP, Oracle SPX/IPX Protocol Adapter |
| Sun Microsystems | CRM, ERP, WebDB/iAS, BIS, Contract, Sales Compensation, Configurator, Oracle 8i EE |
| Symantec | Apps Modules, Databse |
| TDS | Performance Packs, Comms |
| TechMaster | CRM, ERP, Footprint |
| Technicolor Entertainment Services | ERP |
| Tektronix | OFA, Self Service Expense, Self Service IP |
| Timberland | Financials, Flow, HR |
| Topp Telecom | Migration to UPU pricing |
| Tosco | iProcurement |

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

9

ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

| | |
|---|---|
| University of Chicago Hospitals | Oracle 8i EE, Tuning Pack, Partitioning, Diagnostic Pack, Change Management, iAS, Discoverer Plus, Express Server, Financials, Internet Expenses, Financials Intelligence, Financial Analyzer, Oracle Purchasing, iProcurement, Purchasing Intelligence, iSupplier, Portal, Discrete Manufacturing, HR, Self-Service for HR, HR Intelligence, Payroll, Training Administration, Self-Service Tutor for Applications, Tutor for Applications, EDI Gateway |
| US Filter | Database/Applications |
| Veritas Software Corporation | ERP |
| Vision Tek, Inc. | ERP/CRM |
| VWR Scientific | CRM, Oracle 8i EE, Partitioning, Advanced Security, Change Management, Tuning, Diagnostics, Warehouse Builder, Internet Developer Suite |
| Web ID | Database |
| Website Results | Database |
| WGBH | CRM, Tools |
| Windsor Mold Group | ERP |
| Youraccounts.com | Database |
| Zimmer Inc. | Oracle 8i, Management Pack |
| Howard University | HRMS |
| WorldCom | Database, 11i |

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18:**

| Customer Name | Response |
|---|---|
| 24/7 Media | Database |
| Gap, Inc. | Database Enterprise Edition, Ebusiness Suite |

LATHAM&WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

10          ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

06/23/2006  16:53     6504632600              LATHAM WATKINS                    PAGE  14/29

| GT Interactive | Order Management |
| Halliburton Company | Global Technology Contact Consolidation |
| HE Butt Grocery | Datawarehouse |
| Inventory Locator Service | Database |
| Leader Technologies | Database, Web-based Transaction System |
| lexicon marketing | CRM, ERP |
| Lithonia Lighting | HRMS, Purchasing BIS, Sales Analyzer and Data Warehouse |
| Lockheed Martin Technology Services | Manufacturing |
| Loudcloud | iHost Buyin |
| Lucent Microelectronics or Lucent Technologies | HR |
| Maritime Telephone & Telegraph Company | Database NLA |
| McGhan Medical Corporation | CRM, ERP |
| Mellon Financial Services | Database Enterprise Edition |
| Mitsubishi Heavy Industries | Remote Monitoring, Database |
| Premier Schools | Database, Tools |
| Prudential | Database, Financials |
| TechRx Incorporated | Database |
| Tower Semi Co. | ERP, OSFM |
| Transora | Database Marketplace, eC PwC, HR, ESS, OAB, OTA, OPS, Table Partitioning, Management Packs, Financials |
| Tricare Communications and Customer Service | CRM Add-on, Database |
| Trinity | Ebusiness Suite, Financials |

LATHAM•WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

ORACLE CORPORATION'S SECOND AMENDED AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES TO ORACLE CORPORATION

| | |
|---|---|
| UCHHS | ERP, Financials, iProcurement, Inventory, HR, Payroll |
| Ultimate Electronics | Database |
| Union Bank | ERP, Oracle 9iAS |
| Unisys Corporation | iStore |
| Wells Fargo | Oracle 8i |

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18:**

| Customer Name | Response |
|---|---|
| Capital One | Database |
| Chiliad Publishing | Database |
| Columbia University | ERP |
| Comms Canada | Database |
| GE | OAB/PR, Global Financial Footprint |
| GE Lighting | iProcurement |
| GE Power Systems | CRM, Database/Technology, Global Apps, Order Management, ERP, OSB Project, Enterprise Technology, OSBc Project |
| General Electric Corporate | Shared Services |
| General Motors Corporation | GMAC Database options, Enterprise Global, NA Develop Product AIS, GMAC Web Hosting, Allison Division SAP, |
| King County | Lemenager- Compliance Berger/Relf |
| Logistics Services | CRM – iStore |
| MA ITD | Financials |
| Maryland JIS | Database and Tools |
| Mercy/HC/IC Hospotals "AKA CHE-SFLA | Cerner/Lawson project |

LATHAM&WATKINS᠁
ATTORNEYS AT LAW
SAN FRANCISCO

12    ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

| | |
|---|---|
| MI Drilling Fluids | CRM, ERP |
| Montgomery County Public Schools | Database |
| Motorola – PCS | Advanced Planning |
| NYS OFT | Enterprise license |
| Securities Industry Automation Corporation | SAXESS Implementation |
| St. Johns River Community College | Star Consortium CL |
| Starbucks | iProcurement |
| State System of Higher Education (PA) | Database |
| World Commerce Online | Server |

**INTERROGATORY NO. 19:**

Identify what employee(s) at Oracle had primary responsibility for each of the customers with "lost deals" listed in defendants' response to plaintiffs' Interrogatory No. 4.

**RESPONSE TO INTERROGATORY NO. 19:**

Oracle incorporates each of its General Objections as though fully set forth herein. Oracle objects to Interrogatory No. 19 as overly broad and unduly burdensome and seeking information equally within the knowledge of the Plaintiffs or as easily obtained by the Plaintiffs as by Oracle. Oracle further objects to Interrogatory No. 19 as vague and ambiguous as to "primary responsibility."

Subject to and without waiver of these objections, below are individuals who, together with their supervisors, may have had responsibility for each of the "lost deals" listed in defendants' response to plaintiffs' Interrogatory No. 4. Oracle is in the process of investigating and searching for the information requested and, as the information is obtained, will continue to provide amended and/or supplemental responses to this Interrogatory.

| Customer Name | Response |
|---|---|
| AARP #3 | Kent Kofman, Kermit Tolbard |
| Acros | Jeff Breslin, William Bagshaw |

13 ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

| | |
|---|---|
| Acterna | Mike Malone, Bill Montgomery, Tom Woodcheke |
| Ahold Holdings USA, Inc. | Frank Bagli, John Cleveland |
| AK Steel | Keith Garver, Cynthia Bolt |
| Allina Health System | Tony Pascaretta, Mark Romness |
| Alltel | Nolan Drevitch, Robert Rosenkoetter, William Graham, Mike Malone, pdwilson, Tracey Buckus |
| American Electric Power | Thomas Christopher, Tracey Buckus |
| American National Insurance Company | Scott Little, Natalie Crowell, Richard Sherwood, Paul Shepardson |
| Americredit | Ximena Cole, Bill Dixon, Ernie Connon, Howard Sewell, Lane Monson, Tracy Manders, Clay Pollard, David Hessie, Jeff Brown |
| Apigent Solutions | Patrick Fabian, Clay Pollard, mccraye |
| Arrow Electronics | Rosendo Marques, rjmarque |
| Automatic Data Processing | Patrick Doyle, James Walker, Pohlschmidt, Lisa Whitley, Barbara Collins, jaclark |
| Barton Marlow | jmiller, John Ruiz, anhart, Tim Kobzowicz |
| BellSouth Cingular (Newco) | John Amend, James Bart Williams |
| Best Buy | Mark Mancini, Al Masini, Richard Sherwood, Ken Feeney, Aimee Bien |
| Bisys | Tracy Manders, Lane Monson, Sheila Garland, Joel Kapit, Scott Little, Darlene Forker |
| BMC Software | Derek Cordon, Richard Sherwood, Paul Shepardson, Scott Little, Carlos Amaral, Lane Monson |
| Boeing BCAG | Matthew Doran, Vicki Ross |
| Brightpoint | Mike Lynn, jmiller |
| Broadvision | Harold Minkin, Jim Frazier |

| | |
|---|---|
| Brunswick Corporation | Richard Centracco, Douglas Westhoff, anhart |
| Capital One | lmcphers, Mark Flores |
| CBT Systems | Harold Minkin, Jim Frazier |
| ChaseCom | Darlene Forker, moro, Sheila Garland, Jeff Griebeler |
| Ciena Corporation | Jean Bright, Louise Gaskih, Kelly Valenta |
| Cigna Dental & Behavioral Health | Doug Stubbe, Keith Garver, Tyler Ring |
| City of Detroit Government | Carlton Orse, Jerry Niedzialek, Tracey Buckus |
| City of Omaha, Nebraska | dcopelan |
| Coastal Lumber | Harold Hawisher |
| Columbia University | Clare Dolan, Dennis Bonilla, jmacdoug, Tracey Buckus |
| Compaq Computer Corporation | Christopher Wilkinson |
| Concord Communications | Mike Kaszuk |
| Consonus | Paul Davis |
| Continental Airlines | Jason Little |
| Convergys Corporation | Harmoon, Brian E. |
| Cort Furniture | Jerry Nanson |
| CP Ships | Keith McCord |
| CR Bard | John Wolland, James Walker |
| Credit Suisse First Boston | Suga Savage |
| Cummins ONAN | Coleman, Kreighbaum, John Miller |
| Cypress Semiconductor | Stewark Monk, Maureen Haskell |
| Data Centric Broadband | Ginger Smith |
| Defense Logistics Agency | Linda Billingsley, K. Flack |
| Dell Computer Corporation | Jay Carter, Sally Boyd |
| DFO | Crystal Barrington, Hank Dykhuizen |
| Diebold Incorporated | John Miller, Mike Mingo, Mark Reusser |

LATHAM•WATKINS
ATTORNEYS AT LAW
SAN FRANCISCO

15          ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

| | |
|---|---|
| DISA | Linda Billingsley |
| Discover Financial Services, Inc. | Richard Shillingberg, Carl Seedhouse, Lenore McCarthy, Vicki Boew, Ron Martin, George Roberts |
| DVI Inc. | Stephen Gons |
| Ebenx | Barbara Gehl-Bland, Bill Swenson, Joel Summers |
| EBS Dealings | Lawrence Castello |
| Efficient Networks | Tracy Manders, Ximena Cole, Ron Lohr, Tony Reid |
| First Data Resources | James Norman |
| Fusion UV | Kelly Kreiger, Tim Golden, Peter Schwoerer |
| Geico | Joe McAvory, Rick Ruckstuhl |
| Global Crossing | Anthony Buckalow, Tracey Buckus |
| Investors Group | Alex Loewen |
| Janssen Ortho LLC | Kevin Sullivan, James Walker |
| Los Angeles Department of Water and Power | Mike Gillett, Bill Herrera, John Dosch |
| McGhan Medical Corporation | Michael Herdman, Scott Miller, Norm Rinngold |
| Mercy/HC/IC-Hospitals "AKA" CHE-SFLA | Stephanie Mills |
| Monroe County | Steven Frank |
| Myriad | Jeff Williams, Layne Deveraux, Rich Barta, Paul Weber, Doug Renert |
| Nacio Systems | Gregory McAllister, James Priestly |
| NASA Johnson Space Center | Dave Cerjan, John Gardiner, Patti Bowman |
| Navair El – 259579 | Kohler, Luczak, Kennedy, Bud Langston |
| Navisite | Sheehan, mmbrown, mmccraye |
| Navy – ITC Orleans | Lawrence Weiss, drcy |
| Navy – Medical | Russell Holmes, Jim Palmisano, Dan Creed, Rob |

LATHAM•WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

16   ORACLE CORPORATION'S SECOND AMENDED AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES TO ORACLE CORPORATION

| 1  |                                       | Wallace                                               |
|----|---------------------------------------|-------------------------------------------------------|
| 2  | News Corporation                      | Larry Donato, Stacy Heimbach, Mark Reid, Nicole      |
| 3  |                                       | Berlanda-Rose                                         |
| 4  | Northwestern (Expanets)               | Cathy Erdman, Cathy McGraw, dtwright                  |
| 5  | Norwest Financial Services            | Lenore McCarthy, James Norman, Richard               |
| 6  |                                       | Sherwood, Mark Mancini, William Graham               |
| 7  | NYS OFT                               | Peter Link, Courtney West, Lynn Bianco, Tracey       |
| 8  |                                       | Buckus                                                |
| 9  | On Fiber Communications               | Steven Redmon, Edward Peek                            |
| 10 | OnStar                                | Daniel Jess, Terry Bishop, Kallie Carson, James      |
| 11 |                                       | Hruby                                                 |
| 12 | OptiGlobe Communications              | Tim Golden, Kent Kofman, David Walker                |
| 13 | Origin                                | Howard Sewell, Harris Freedman, Ana Hanna            |
| 14 | Pactolis Communications               | Mike Kaszuk, Catherine Baillie, Gary O'Malley,       |
| 15 |                                       | Kevin Kennefick                                       |
| 16 | Parsons Brinckerhoff                  | Jake Villareal, Steve Schnoll, Mike Bodle, Armen     |
| 17 |                                       | Kopoyan, Ben Heisler                                  |
| 18 | Personnel Decisions International      | Tim Fox, Michael Pawlyszyn, smarting, Beverly        |
| 19 |                                       | Passmore                                              |
| 20 | Pizza Hut                             | Jeff Griebeler, John Eder, saberry, Beverly Passmore,|
| 21 |                                       | Roger Turnham, Stephen Smith                          |
| 22 | Pomeroy Computer Resources            | Robert Schaefer, Carlos Amaral, Mr. DiMassimo,       |
| 23 |                                       | Craig Tate, Lane Monson                               |
| 24 | Prince Georges County Public Schools  | Valerie Chase-Robert, Robert Isaacson, Jerry         |
| 25 |                                       | Weisman, rcruz, Stephen Holdridge, Allan Steinert,   |
| 26 |                                       | Markwood Keeney                                       |
| 27 | Providian Financial                   | Aaron Boone, Gregg Mondani, Michael Jolls, Cobe      |
| 28 |                                       |                                                       |

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17    ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

| | |
|---|---|
| 1 | Chatwood |
| 2  Qualcomm Consumer Products | Max Hill, Brian Williams |
| 3  Radio Systems | Harry Dunston, James Brown |
| 4  Rand Technologies Corporation | Don Pepper, Reid Baigrie |
| 5  Raytheon | Jay Buchta, jbwright, kalarson, Melissa Flaherty |
| 6 | Snyder, Stephen Walsh, Leonard Tuozzolo |
| 7  Real Networks | Brian Caraway, Gerald Platz |
| 8  Robert Half Inc. | Luke Siegfried, Gregg Mondani |
| 9  Rockefeller University | pneiss, Julie Malinowski |
| 10  Ross Stores | Doug Henderson, dstevens, Gregg Mondani, mgalia |
| 11  SBC Communications | William Virdin, Brian Zielinski, Joseph Zinser, John |
| 12 | Brooke, Beverly Passmore, Mike Davenport |
| 13  Seagate Technology | Steven Sovik, Emma Neale, Steve Monk |
| 14  Securities Industry Automation | James Keegan |
| 15  Corporation | |
| 16  Solectron | Richard Hazel, John Morrow, Laith Frangoul, |
| 17 | bbloodwo, Timothy Norton, Steven Sovik, Elizabeth |
| 18 | Baker, Andy Pappas, Eric Knapp |
| 19  Sony Semiconductor | John Stanger, Terry Bishop, Todd Beamer |
| 20  Southwest Alabama IJIS Project | Anthony Robinson, Mike Gosey |
| 21  SPX | Fred Cook, Kim Vogel, Mark Kreighbaum, Cooper, |
| 22 | jstang, John Fikany |
| 23  Sun Microsystems | Elizabeth Baker, Mark Flessel |
| 24  TDS | Michael Chapman |
| 25  TechMaster | Steve King |
| 26  Technicolor Entertainment Services | Brett Austin |
| 27  Tektronix | Chris Scheffer, Joseph Houston |
| 28 | |

| Timberland | Michael Bodle, Peter Hesketh |
| Topp Telecom | Fernando Hurtado |
| Tosco | Quentin Hayden |
| University of Chicago Hospitals | David Jinnett |
| US Filter | Catherine Baillie |
| Veritas Software Corporation | David Jinnett, Melissa Flaherty Snyder, pconnell |
| VWR Scientific | Paul Frascella |
| Web ID | Brian Stefano |
| Website Results | dgalia |
| WGBH | Catherine Baillie, Paul Frascella |
| World Commerce Online | mccraye |
| Youraccounts.com | William Morehouse, James Priestly |
| Zimmer Inc. | Robert Wilcox |
| Howard University | Tracey Buckus, Lee Ramsayer, Reggie Brown |
| WorldCom | Melissa Flaherty Snyder, Tracey Buckus |

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 19:

| Customer Name | Response |
|---|---|
| 24/7 Media | Simon Holland, Leslie Ponzini |
| Gap, Inc. | Elizabeth Baker |
| GT Interactive | Jake Villareal |
| Halliburton Company | Brian Pinfield |
| HE Butt Grocery | David Reichman, Jay Carter |
| Inventory Locator Service | John Anderson, Hiren Patel |
| Leader Technologies | Chad Boyer, Tony Marth |
| lexicon marketing | Siobhan Ryan, John Yoneda, Van Arrington, C. Pollard, Mike Goodhue, Greg Day |
| Lithonia Lighting | Carl Manco, Mark Reid |

.ATHAM&WATKINS™
ATTORNEYS AT LAW
SAN FRANCISCO

19       ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

| | |
|---|---|
| Loudcloud | Patrick Shaughnessy, John Long |
| Lucent Microelectronics | Michael Bodle, Mark Reid |
| Maritime Telephone & Telegraph Company | Ian MacMillan, Marcia Lamb |
| McGhan Medical Corporation | Jason Cary, John Yoneda |
| Mellon Financial Services | Robert Guidarelli, Carmel Slattery |
| Mitsubishi Heavy Industries | Pete Schulte |
| Premier Schools | Brian Mullin, Jeffrey Kuligowski, Thomas Vallanto, Louise Gaskin |
| Prudential | dstubbe, Tracey Buckus, Michael Fabijanic, Christopher Donato, Matt Bennelli, James Keegan |
| TechRx Incorporated | David Busch |
| Transora | Raul Ungaretti, Mark Mancini, Matthew Breslin |
| Tricare Communications and Customer Service | Russell Holmes |
| Trinity | Lee Walinsky |
| UCHHS | David Groesch, Joseph Morrissey |
| Ultimate Electronics | Michael Nichols |
| Union Bank | Barbara Collins |
| Unisys Corporation | Jeffrey Cooper |
| Wells Fargo | David Jinnett |
| Sprint | Tracey Buckus |

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 19:

| Customer Name | Response |
|---|---|
| Chiliad Publishing | Mike Kaszuk, kkennefi |
| Comms Canada | John McMorrow, lwhelan |
| GE | Randy Schott, Mark Reid, Patrick Daly |

| | |
|---|---|
| GE Lighting | Patrick Daly |
| GE Power Systems | Patrick Daly |
| General Electric Corporate | Patrick Daly, R. Evans |
| General Motors | djess |
| Lockheed Martin Technology Services | bbernart |
| Logistics Services | Clay Pollard, Doug Wimberly |
| Maryland JIS | Valerie Chase-Robert |
| MI Drilling Fluids | Jay Carter |
| Miami-Dade County | David Griffin |
| Montgomery County Public Schools | Valerie Chase-Robert |
| Motorola – PCS | D. Oleson |
| St Johns River Community College | sdobbs |
| Starbucks | Brian DeWeirdt, Lisa Pope |
| State System of Higher Education (PA) | Lynn Kate Jenkins, T. Cooper |
| Symantec | Maureen Haskell, Gregg Mondani |
| Tower Semi Co. | John Stanger |
| Windsor Mold Group | David MacLaren, Reid Baigrie |
| WIN/Italy | William Plant, Anna Maria Aldeghi |

**INTERROGATORY NO. 20:**

Identify the individual(s) at each of the companies listed in defendants' response to plaintiffs' Interrogatory No. 4 that informed Oracle that it would not close the deal in Oracle's third quarter of fiscal year 2001.

**RESPONSE TO INTERROGATORY NO. 20:**

Oracle incorporates each of its General Objections as though fully set forth herein. Oracle objects to Interrogatory No. 20 as overly broad and unduly burdensome and seeking information equally within the knowledge of the Plaintiffs or as easily obtained by the Plaintiffs

ATHAM&WATKINS⊔
ATTORNEYS AT LAW
SAN FRANCISCO

21    ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

1  as by Oracle.  Oracle further objects to Interrogatory No. 20 as vague and ambiguous as to

2  "informed Oracle that it would not close the deal in Oracle's third quarter of fiscal year 2001."

3        Subject to and without waiver of these objections, Oracle responds that the following

4  individuals informed Oracle that the entity they represented would not close its deal in Oracle's

5  third quarter of fiscal year 2001.  Oracle is in the process of investigating and searching for the

6  information requested and, as the information is obtained, will continue to provide amended

7  and/or supplemental responses to this Interrogatory.

8  <u>Customer Name</u>                          <u>Response</u>

9  Compaq Computer Corporation   Mr./Ms. Napier

10  Sony Semiconductor                   Mr. Kubota

11  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20:**

12  <u>Customer Name</u>  <u>Response</u>

13  Motorola – PCS   Chief Information Officer

14  Starbucks          Ms. Sherry Maples

15  **INTERROGATORY NO. 21:**

16        Identify the Oracle employee(s) that first received the information that the customers

17  listed in defendants' response to plaintiffs' Interrogatory No. 4 would not close the deal in

18  Oracle's third quarter of fiscal year 2001.

19  **RESPONSE TO INTERROGATORY NO. 21:**

20        Oracle incorporates each of its General Objections as though fully set forth herein.

21  Oracle objects to Interrogatory No. 21 as overly broad and unduly burdensome and seeking

22  information equally within the knowledge of the Plaintiffs or as easily obtained by the Plaintiffs

23  as by Oracle.  Oracle further objects to Interrogatory No. 21 as vague and ambiguous as to "first

24  received the information that the customers … would not close the deal in Oracle's third quarter

25  of fiscal year 2001."

26        Subject to and without waiver of these objections, Oracle responds that the following

27  Oracle employee(s) first received the information that the customers listed in defendants'

28  response to plaintiffs' Interrogatory No. 4 would not close the deal in Oracle's third quarter of

1  fiscal year 2001.  Oracle is in the process of investigating and searching for the information

2  requested and, as the information is obtained, will continue to provide amended and/or

3  supplemental responses to this Interrogatory.

4  <u>Customer Name</u>                      <u>Response</u>

5  Compaq Computer Corporation   Christopher Wilkinson

6  Sony Semiconductor              Masaaki Shintaku

7  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21:**

8  <u>Customer Name</u>  <u>Response</u>

9  Motorola -- PCS  Edward Sanderson

10 Starbucks       Lisa Pope

11 **INTERROGATORY NO. 22:**

12        Please identify the stated reason(s) given by each customer listed in defendants' response

13 to plaintiffs' Interrogatory No. 4 for not closing the deal in Oracle's third quarter of fiscal year

14 2001.

15 **RESPONSE TO INTERROGATORY NO. 22:**

16        Oracle incorporates each of its General Objections as though fully set forth herein.

17 Oracle objects to Interrogatory No. 22 as overly broad and unduly burdensome and seeking

18 information equally within the knowledge of the Plaintiffs or as easily obtained by the Plaintiffs

19 as by Oracle.  Oracle further objects to Interrogatory No. 22 as vague and ambiguous as to "the

20 stated reason(s) given by each customer ... for not closing the deal in Oracle's third quarter of

21 fiscal year 2001."  Oracle further objects that the reasons why customers decided not to close

22 deals during the third quarter of Oracle's fiscal year 2001 were the subject of contemporaneous

23 public statements by Oracle employees, as well as deposition testimony and documents produced

24 in the related derivative litigation matters in Delaware and California.  All such information is

25 equally available to Plaintiffs, and Defendants will not restate that information here.

26        Subject to and without waiver of these objections, Oracle responds that the following

27 reasons were stated by customers listed in defendants' response to plaintiffs' Interrogatory No. 4

28 for why they would not close their deal in Oracle's third quarter of fiscal year 2001.  Oracle is in

.ATHAM&WATKINS<sup>ur</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

                                          23

ORACLE CORPORATION'S SECOND AMENDED AND
SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET
OF INTERROGATORIES TO ORACLE CORPORATION

1   the process of investigating and searching for the information requested and, as the information

2   is obtained, will continue to provide amended and/or supplemental responses to this

3   Interrogatory.

4   | Customer Name | Response |

5   American National Insurance        iProcurement part of deal lost to Peoplesoft

6   Company

7   Capital One                        Economic conditions

8   City of Omaha                      Political concerns

9   Sony Semiconductor                 Customer's internal approval process was not complete

10  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 22:**

11  | Customer Name | Response |

12  Lexicon Marketing                  Inability to show customer a live running call center

13  Lucent Technologies                Bank rejected Lucent's financing terms

14  Motorola – PCS                     Budget freeze

15  Starbucks                          CFO was out of the country and his approval was   .

16                                     needed

17  **INTERROGATORY NO. 23:**

18        For all the "lost deals" listed in defendants' response to plaintiffs' Interrogatory No. 4,

19  please identify the date Oracle was first notified of the possibility that the deal would not close in

20  Oracle's third quarter of fiscal year 2001.

21  **RESPONSE TO INTERROGATORY NO. 23:**

22        Oracle incorporates each of its General Objections as though fully set forth herein.

23  Oracle objects to Interrogatory No. 23 as overly broad and unduly burdensome and seeking

24  information equally within the knowledge of the Plaintiffs or as easily obtained by the Plaintiffs

25  as by Oracle. Oracle further objects to Interrogatory No. 23 as vague and ambiguous as to "the

26  date Oracle was first notified of the possibility that the deal would not close in Oracle's third

27  quarter of fiscal year 2001."

28

1    Subject to and without waiver of these objections, Oracle responds that until a deal

2    closes, there is always a "possibility" that it will not close. The date on which Oracle was first

3    notified of the possibility that a given deal would not close in Oracle's third quarter of fiscal year

4    2001 is the date on which Oracle first became aware of that opportunity for the third quarter of

5    fiscal year 2001.

6

7    DATED: June 23, 2006                          _Patrick E. Gibbs /by AMF_
                                                    Patrick E. Gibbs
8
                                                    LATHAM & WATKINS LLP
9                                                   140 Scott Drive
                                                    Menlo Park, CA 94025-1105
10                                                  Telephone: (650) 328-4600
                                                    Facsimile: (650) 463-2600
11

12   SV\511594.1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2

      I am employed in the County of San Mateo, State of California. I am over the age

3

of 18 years and not a party to this action. My business address is Latham & Watkins LLP, 140 Scott Drive, Menlo Park, CA 94025.

4

      On **June 23, 2006**, I served the following document described as:

5

- **ORACLE CORPORATION'S SECOND AMENDED AND SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES TO DEFENDANT ORACLE CORPORATION**

6

7

by serving a true copy of the above-described document in the following manner:

8

### BY FACSIMILE

9

      I am familiar with the office practice of Latham & Watkins LLP for collecting,

10

processing, and transmitting facsimiles. Under that practice, when a facsimile is deposited with the Latham & Watkins LLP personnel responsible for facsimiles, such facsimile is transmitted

11

that same day in the ordinary course of business. I deposited the above-described document for facsimile transmission in accordance with the office practice of Latham & Watkins LLP for

12

collecting and processing facsimiles. The facsimile of the above-described document was transmitted to the following party from Menlo Park, California on **June 23, 2006**:

13

      Shawn A. Williams

14

      LERACH, COUGLIN, STOIA, GELLER, RUDMAN & ROBBINS LLP
      100 Pine Street, Suite 2600

15

      San Francisco, CA 94111-5238
      Tel.: (415) 288-4545

16

      Fax: (415) 288-4534

17

      I declare that I am employed in the office of a member of the Bar of, or permitted

18

to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

19

      Executed on **June 23, 2006**, at San Francisco, California.

20

21

22

                    Zoila Aurora

23

24

25

26

27

28

1

# EXHIBIT 441

**From:** Amy Bacon
**Sent:** Tue, 07 Nov 2000 01:07:52 GMT
**To:** jennifer.glass
**CC:**
**BCC:**
**Subject:** [Fwd: LJE Interview w/Newsweek]



```
begin:vcard
n:;Amy
x-mozilla-html:FALSE
adr:;;;;;;
version:2.1
email;internet:amy.bacon@oracle.com
fn:Amy Bacon
end:vcard
```

NDCA-ORCL 170549

Key:

        Ellison:                Larry Ellison

        __:                    Unidentified Person

        Questionable words or phrases in [brackets].

__: Well, we appreciate your coming by.

Ellison: I don't know what Al Gore's talking about, I love global warming. This is great.

__: I think when I invited you I said for a background discussion and if you'd prefer it to be on background that's fine, if...

Ellison: Anything you guys want.

__: Well, let's do it on the record.

Ellison: Okay.

__: I think that I read recently that somebody said that you think and live three to five years into the future. A) Do you agree with that characterization, and B) If you do, what do you see out there?

Ellison: Yeah, if it were only true. I certainly in my industry I try to figure out where the world is going. You're rewarded mightily for doing that. And in 1995 we made a decision at Oracle, or I made the decision at Oracle that we were not going to do anymore desktop software. We were doing to do nothing that run on PCs, desktop PCs. We do everything for servers and the Internet, and I know in

NDCA-ORCL 170550

1995 that was a very unpopular decision inside of Oracle.
And it was considered almost a mad decision in the industry.

But it was very clear to me by '95 that the era of
Internet computing was going to displace the era of personal
computing.  This was the year that your beautiful Empire
State Building was covered with Microsoft Windows colors.
And the week we had peace in the middle east, the '95
version of peace in the Middle East, the New York newspapers
didn't cover it because it really wasn't newsworthy compared
with the release of Windows 95 which was just huge.

__: We didn't cover that Middle East thing back then?
[OVERLAPPING CONVERSATION]
Ellison:  Near the back of the back of the magazine.  I mean
it did get some coverage if you stayed tuned for the longer
news shows, the weekend news shows, the hour-long stuff, and
you read the whole magazine, you got to it in the back.  But
the cover was clearly people rushing out to the store to buy
Windows 95, and that turned out to be the zenith of
Microsoft's success.  But by then at least it was clear to
me that we had to stop doing desktop software entirely.

__: And what did you see that convinced you of that, and
internally why were people resistant to that notion?
Ellison:  People are always resistant to change.  No one
likes change.  Change is incredibly hard work, we all have
models of the world in our head, how the world really works,

NDCA-ORCL 170551

and if we have to alter those models it's a lot of hard work.  So if you believe the Earth is the center of the universe, and the stars and the sun revolve around the Earth, and you have to suddenly reconsider planetary motion, that's a huge amount of effort.

Galileo was, Copernicus was, these guys were not popular in their day.  All new ideas, human beings just quite naturally resist having to go through all of the work of reorienting themselves.  And that's actually good, at least in terms, for us competitively.  Because people don't like to...why should I go through all of the work of...I believe that PCs are here to stay and I'm not going to reorganize my brain into this new Internet model until I know for certain the Internet model is going to displace it.

So most people are very resistant, they're not willing to put the effort into thinking it through.  It was my job to think it through.

__:  What were the straws in the wind that got you to that?

Ellison:  There were several one of which was everyone was saying, gee, we have a huge labor shortage in the computer industry.  Labor shortage?  How interesting.  There aren't enough people in the computer industry, really?  Lot of people in the computer industry, but there aren't enough?  Maybe there's something wrong with the way we run computers.

NDCA-ORCL 170552

Case 3:01-cv-00988-SI   Document 1552-39   Filed 11/18/08   Page 313 of 359

The personal computing model was a model of distributed complexity.  Everyone who bought a personal computer was responsible for loading their own software.  Everyone who bought a personal computer was responsible for backing up their own data.  It's an absurd, and I said so in '95, it's an absurd model.

Everything else we centralize complexity and professionally manage it.  Television's enormously complex, but the consumer of television doesn't have to deal with a complicated device.  You don't have to install any software to get the Super Bowl (last time I checked).

So the Internet closely resembled the television network in that, simple device with a browser on it, could be a PC with a browser but an economic computer with a browser and all the applications were on servers managed by professionals.  All your data was on servers managed by professionals.  You didn't do anything but had this simple appliance to access those applications and data.

When you centralize complexity and get economy to scale, these are not new notions, they were just new notions for this PC dominated computer era.  So that was one indication.

Another indication was one of my kids was in, young kids was using the Internet everyday with no manuals and, kindergartners were using it in their school.  And I said,

NDCA-ORCL 170553

wait a second, hold it.  This is no manuals, they're doing all of this stuff.  Everyone's...the chief technology officer for a school is the kindergarten teacher, is the twenty-three-year-old kindergarten teacher, and it's all working.  Oh, that's a good thing.  That's kind of cool.

It was painfully obvious to me that the Microsoft model, but I had had the benefit of watching the company, when I first came into the computer industry I was told that IBM was like the sun and the stars.  It rose and set everyday, and IBM was not a company against whom you would compete.  IBM was the environment in which you would compete.  IBM would go on forever.

The news media treated IBM like a nation-state, not like a company.  They were an institution who when they made a statement was treated as if it came from the...when the president said something it like it was the President of the United States, not like the president of IBM.

But low and behold a couple of teenagers from Seattle just blew their doors off.  Everybody told me IBM would go on forever, but it didn't because the world changed underneath.  The mainframe ceased...IBM still dominates mainframe computing, but mainframe computing ceased dominating the industry.  And IBM was vastly more powerful than Microsoft ever was.

NDCA-ORCL 170554

So this new technology could displace a company as powerful as IBM, and there's no comparison as to how strong IBM was versus how Microsoft at it's zenith.  It could happen to Microsoft because everyone's beating Microsoft to the...no one could ever beat Microsoft.  Oracle beat Microsoft, that's ridiculous.  Clearly, get out the medication, that man's out of his mind, that he thinks Oracle can beat Microsoft.  That's a amusing or pathetic, take your pick.  That's exactly where it was changing, and they missed it.

__: So you saw these things in '95.  What perhaps beyond the velocity of change has surprised you since?  What's turned out differently than...

Ellison:  The most surprising thing I saw about the Internet was the dot.com frenzy which continues to this day.  It's now a frenzy about B2B rather than B2C.

I started a Web site almost 2 years ago called, HeyIdiot.com.  It exists to this day.  And HeyIdiot.com we thought was the ideal Internet business.  It was a B2C business, fantastic...and the idea was, we only sell one product.  It combined all the best of a dot.com company.  It's fantastic.  E-Commerce auctions, and hot [IPL].  And this is what we would do.

HeyIdiot.com.  Our only product was our stock which we would auction off.  The price could only go up.  And it was

NDCA-ORCL 170555

a fantastic idea.  Now obviously we did this as a satire,
and then some guy calls David Rue on the phone, one of the
three founders of HeyIdiot.com and offers him 50,000 dollars
for the URL because he thinks the name is so great.

You know, I don't drink, but I was pretty shaken.  I
had seen this happen before when I was in Japan.  In 1990 I
was in Japan and I was with a friend of mine and we were
driving by the Imperial Palace, and he said you know that's
worth more than all of California.  Imperial Palace had 17
acres in Tokyo.

__: It isn't now.

Ellison: The point was, it wasn't then either.  But he said
that, and I said, no it's not.  And they said, Larry, you
don't understand, it's 380 million an acre or something like
that.  6.9 billion per acre times 7, whatever it was, the
calculation comes out it's worth more than all the real
estate in California.

I said, no, you don't understand.  I've been to
California.  I mean, nice Palace, nice trees...it's not
worth more than California.  I don't care what the real
estate market says.  It's not worth more than California.

Selling a pet food on the Internet is not a technology
business.  It's a pet food business with a Web site.  A bad
business off-line's a bad business online.  So I
don't...this nonsense that you buy, you have a Web site you

NDCA-ORCL 170556

suddenly transform a bad business into a good business is a fascinating fantasy.

So the irrational exuberance over all of this made me a little bit nervous.  That was the worst thing I saw.

___:  Even though the exuberance contributed to some sales for you.

Ellison:  Absolutely.  In fact we had an add that said 93 percent of all the public dot.coms use Oracle, and they in fact do.  And some of them, Yahoo, e-Bay, Amazon, I think a lot of them, I have tremendous respect for.  ForPets.com I'm just not sure custom branding kitty litter is going to lead to vast personal fortunes.

___:  What are the straws in the wind you see today for five years from now?

Ellison:  Oh, I think one of the most interesting things is what Jack Walsh said, he said he's going to use the Internet to save 10 billion dollars at General Electric.  Cut 48 percent off the G&A.  I think we're going to make...our own company saved a billion dollars last year in the first year of implementing its own E-Business software.

So the potential for efficiency gains using Internet technology is people have yet to grasp.  This is real money. It's not that GE's a badly managed company, and they're going to save 10 billion dollars.  They're our largest customer [inaudible] and Citibank.  Huge businesses becoming

NDCA-ORCL 170557

much more competitive, much more efficient.  Changing the nature of their businesses.

And the people who are going to exploit this new technology will triumph over the companies that are slow to move.

___:  How far along that curve do you think we are in terms of businesses really integrating the Internet into the way they do things?

Ellison:  Oh, I think we're still fairly early in the cycle. I know this, I know we have to be early in the cycle because I made a public statement also that's considered absurd when I said it and heavily ridiculed, which is fine.

There's one of two possibilities when people say I'm out of my mind.  Either I'm on to something really good and no one else is onto it yet, or I'm out of my mind.  There's always those two possibilities.  And the only way you can be ahead of the curve, the only way you knew you were ahead of the curve is when everyone says you're crazy.  And it's when you know you're going against conventional wisdom.  If everyone says you're crazy, you're violating conventional wisdom.  People resent that, and they say you're nuts.

Now the danger is of course, you might be nuts. Conventional wisdom isn't always wrong, in fact, most of the time it's right.  But sometimes it's wrong, and it's when

NDCA-ORCL 170558

it's wrong when you have a tremendous opportunity to get ahead.

Anyway, when I said Oracle was going to save a billion dollars. I said it 18 months ago. And at the time I said it, it was considered grandstanding and it was considered amusing and interesting. It was considered hyperbole. You can't do that, that's ridiculous. We're going to use our own...

__: Something you've never been accused of before.

Ellison: I'm accused of it all the time. And actually it's really interesting. Every once in a while what I say comes true. We saved more than a billion dollars this year. But they said I was nuts, but we did it.

And they said we were nuts to stop doing desktop Windows Software 95. And we did it. I remember in the very beginning when we started the company, we said we were going to build a commercial relational database [inaudible] system. And everyone said that was impossible, that we were nuts. That was a long time ago. The company's called the [ColoNet] [inaudible] bunch of other systems that pre-dated that technology.

But I'm quite serious. If people aren't saying you're nuts, you're not doing anything interesting.

__: So you've been a little skeptical about the dot.net initiative at Microsoft.

NDCA-ORCL 170559

Ellison:  No, dot.niet.  You're mispronouncing it.

__:  Given that you're [OVERLAPPING CONVERSATION]

Ellison:  No, I think it's a fantastic name.  First of all
when they announced the name they had this huge conference
in Redmond and announced the name.  Fantastic name
announcement, but that's all they do is announce the name.
[inaudible] and in a couple years they're going to have some
software ready, too.

__:  Well, given that and your remarks about the relative
non-stream from Microsoft compared to IBM in their heyday,
do we still need to go ahead and break Microsoft up.  Is
that, the decision against Microsoft irrelevant, that
they're doomed anyway no matter what happens to the
resolution in that case?

Ellison:  Two answers to that question.  First answer is, if
I break into a bank to steal, break into a bank, and I don't
shoot any guards, and I don't get any money, can I plead as
follows:  Hey, I didn't get any money.  I shouldn't go to
jail.  If you believe that then Microsoft should not be
punished because they went after the wrong company.
Microsoft broke the law to destroy Netscape.  [inaudible]
They used their Windows monopoly to create a monopoly in
browsers which they are well on the way to doing, but
unfortunately browsers are just another unimportant piece of

NDCA-ORCL 170560

desktop software.  And all the action on the Internet is not with a browser, it's with servers.

So Microsoft's plea of, hey, we killed the wrong company, we shouldn't be punished for this, plus we're doing really badly so don't put us in jail.  If you believe that's a valid argument then I think the government shouldn't prosecute them

__:  Well, it isn't about punishment, it's about competition for the future.  Is that the [inaudible]?

Ellison:  Well, Microsoft, my view is Microsoft's problems are not the Justice Department.  Microsoft's biggest problems are they've been building all the wrong software for the last five years.  That's their biggest problem.

But their other problem is that they did break the law. They violated the Sherman Anti-Trust Act and the courts are going to decide what their just punishment is as a result of that.

Now IBM still dominates mainframes.  Microsoft's still going to still dominate desktop software.  They did completely destroy Netscape.  They are on their way to getting a monopoly on browsers.

__:  Are saying so what?  Who cares if they dominate desktop software, you say that's going to be...

NDCA-ORCL 170561

Ellison:  I actually think so what.  However, the, from
Oracle's point of view, from Corel's point of view, from
Netscape's point of view, from AOL's point of view.

__:  Corel was part of Microsoft.

Ellison:  Yeah, well they can buy them off, right?
Microsoft could buy Norvell, they could buy the rest of
them.  Microsoft was not a very...we're a server centric
company, Microsoft's a desktop centric company, the whole
industry's moved to server centric computing so we're doing
fine.  We're not threatened by Microsoft.  We don't think
the Justice Department's case against Microsoft is necessary
for our survival.

__:  When you hired the detectives to kind of check out
Microsoft, that was to make sure they'd be punished, what
was that about?

Ellison:  No.  Not to make...we can't make sure that they're
punished, that's up to the courts.  We can make sure that
things they're trying to keep secret are made public.  We
can make sure that if they're paying 200 dollars for Letters
to the Editor in favor of Microsoft, that people know that
they're paying for these letters.  That if they are paying
the Independent Institute to run full page ads saying that
anything bad for Microsoft is bad for the country, that they
should know that the Independent Institute's being paid by
Microsoft to run those ads.  That if the Citizens for

NDCA-ORCL 170562

Competitive Technology, Americans for Competitive Technology
are making statements that are saying anything that hurts
Microsoft is bad for America, that Americans should know,
people should know that Microsoft's paying them to say that.

___: So you're like watch dog like we are.

Ellison: Absolutely. We were doing your job. You should
have been doing that job. In fact if you were doing that
job, we wouldn't have had to. But seriously, and of course
we gave that, we just gave that information to the press,
and you guys published it. Exactly what we did. It's true.

___: You're still on the board of [Apple]?

Ellison: I am.

___ Where does Apple fit into this universe?

Ellison: I think, in terms of desktop computing, I think
Apple is going to provide, is on the way to providing, the
best Internet experience of any desktop computer. And Steve
and I, we've spent a lot of time, really Steve runs Apple,
it's Steve's company, and I provide advice when I'm asked.

But the thing I see Apple doing with the new software
System 10 which is very important by the way, he's come up
with some great new hardware that until we get the new
operating system and the new really fast browser, which will
be a Microsoft browser by the way, get all of that stuff,
and we deliver the best Internet experience, desktop

Internet experience, we won't have done everything we need to do to make Apple as successful as it can be.

So I think this new generation of Apple software is really going to move Apple well past PCs in terms of Internet experience. And then Apple of course has iMovie and all sorts of other consumer related products which are traditionally much, are still much easier to use when you get on personal computers.

So you look at that, what they're doing for consumers, what they're doing in education, improving the overall Internet experience, they should be able to continue to increase their marketshare for some time to come. They're products are faster, easier to use, and much better than personal computers, I believe.

__: As a board member, this recent set of announcements comes as somewhat of a surprise?

__: You mean the earnings surprise?

Ellison: Yeah, sure. Surprised all of us.

__: And how does Steve [inaudible]?

__: How did Steve break it to you guys?

Ellison: He called us [inaudible].

__: The 500 dollar network computer, which...

Ellison: No, now 200 dollars.

__: Two hundred dollars. I think in fact the last time you were here, it was the 500 dollar phase. You're doing a lot

NDCA-ORCL 170564

building them out in schools, is that moving as fast you had
hoped?

Ellison:  It's not moving as fast as I had hoped because the
interesting thing is the price of PCs came down so fast when
he did this.  Remember, I remember having this discussion
with Andy [Grail] who was saying, I said, Andy, I don't
understand it.  You look at the parts of a PC and I can buy
it at Fry's for 600 dollars.  And how can people sell it for
2,500 dollars.  And Andy had this argu... this discussion.
We said, people don't buy Yugo's.  The sweet spot for cars
is always 25,000 dollars worth or whatever the price was.
PCs will always be 2,500 dollars.

     I said, I don't understand it.  Oracle uses a lot of
PCs.  We're going to specify this is what we want.   Maybe
we'll build them out of, go to Fry's and build them
ourselves, or get someone who can sell them to us for 800
bucks max.  It's crazy.  There's nothing there.  That's all
air.

     And what happened was when we announced our low-cost
desktop, the PC industry responded very, very quickly, which
was fascinating.  I mean it's a little itty bitty threat.
It didn't seem like much.  But they responded very, very
quickly to come up with all of these low-cost machines.  In
fact, there was the network PC, the response to the network
computer at the PC industry level was amazing.  This

NDCA-ORCL 170565

multiple, huge, multi-, multi-, multi- billion dollar industry responded to this little press release, and this low-cost computer.

___: Because they knew it was a commodity.

Ellison: Of course they knew. Of course they knew. And so the price came down and it got much more competitive, and we've now got the price down to 200 bucks. And the real issue here is you can get a PC for 400 bucks, you can get a network computer for 200 bucks, the grading of the network computers is so much, you can plug it in and it works. There's no software to load, everything's on CD-ROM. Works like a Sony game machine.

Which is another story. Which is what does Microsoft think the biggest threat to it is. And why is Microsoft building an X Box. They're terrified of the Sony game machine.

What is the scariest network computer that Microsoft faces? The Sony Play Station II. That's why they're building the X Box, they're terrified that...

___: You came from the wrong direction but they're...most of the day there was a line outside on 8th Avenue.

Ellison: Play Station? Yeah, one of the things I'm asked about the network computer, people criticize the network computer, they say, but, you know, it doesn't play games.

NDCA-ORCL 170566

10/26 LJE Interview with Newsweek                    18

And I say, if you want games, you aren't going to buy a PC. You get a Play Station II with Internet access.

__: [inaudible]

Ellison:  We try not to.

__:  Just looking at the consumer side again, there laying all these fiber optic cables under the ocean and across the country.  When is that going to really mean something to people?  What's it going to open up in the way of applications, how practical is that going to be for people in their homes?

Ellison:  Well, the most interesting application of course is video on demand, time-shifting in television.

__: [TIVO], that sort thing?

Ellison:  Well, no, TIVO is personal time-shifting.  Your hard disk, where this would be, we record basically all television is recorded, and you can watch whatever you want to watch right after it's broadcast, 30 minutes later, but it's all recorded on your behalf, it's on a server someplace, not on a hard disk on top of your machine.

When will all that happen?  I don't know.  As long as I can say I'm proud I got a few things right, I got a few things wrong.  The information superhighway and video on demand which I was making presentations with Walter Cronkite on ten years ago, seems as far away now as it...

__:  [inaudible]

NDCA-ORCL 170567

Ellison:  Far away now as it did then.  And I personally invested heavily in it, Oracle invested heavily in video on demand, and it just has not come to pass.

__:  Speaking of investments, aside from the sort of personal pride in watching Oracle's, and personal benefit in watching Oracle's stock go up, do you think that the stock market is a fair measure of not only your company but other companies you look at.

Ellison:  Over the long term.  Over the short term the market is mightily inefficient.  Again, otherwise how could you explain the 90 percent reduction in so many of the dot.coms.  This is really a...it should be.  Thank God our economy is so huge, and our prosperity is so broad-based that we had the collapse of all these companies and the disappearance of all this wealth, and no one noticed.  Or some noticed, the economy as a whole has weathered the storm very gracefully.  But the market makes incredible mistakes short term.

__:  Do you pay attention at the end of the day?

Ellison:  Yes.  [OVERLAPPING CONVERSATION]

__:  How many times do you check a day?

Ellison:  Twice.

__:  As CEO or shareholder?

Ellison:  I'm not sure I could tell the difference, but it certainly affects the morale.  If our stock is down, you can just feel it in the hallway.

[OVERLAPPING CONVERSATION]

Ellison:  No question about it.  It affects our turnover rate, morale, affects an awful lot of things.

__:  What are the issues that your [inaudible] concerned about in terms of the political campaign?  Are either of the candidates [inaudible] presidential campaign addressing [inaudible].

Ellison:  It's interesting.  I was with Bill Clinton yesterday, and I think there's still time to amend the Constitution.  [LAUGHTER]  If not for this election, just put the word continuous in that amendment, consecutive rather...

__:  [inaudible]

Ellison:  I think we're going to miss this president terribly.

__:  There's already a nostalgia in our business.  Started last summer.

Ellison:  He is so smart, and so wonderful.  He's just a wonderful human being.  And he decided to take on...[inaudible] nothing like taking on a few easy things right at the end of your career.  Jerusalem, that's been going on, I don't know, for say couple thousand years.  Some

NDCA-ORCL 170569

more recent problems.  The Irish and the English, the Ireland problem's only been around since the Elizabeth the First.  You know that's only about 500 years.

I mean he really is an incredible human being, and I value very minute I get to spend with him.  I am less enthusiastic about the two guys that are currently running, and I'm not...I was a very vocal supporter and Clinton's second biggest financial supporter, and very vocal supporter of Clinton, and I'm just not actively involved.

__:  What is it about this Vice President that doesn't do it for you?

Ellison:  You're kidding, right?  [LAUGHTER]

__:  He may have been kidding but what is it?

Ellison:  Well, "I'm going to fight for you.  I'm going to fight for you, and I'm going to fight for you.  I'm going to fight those big..."  Who are you fighting for me?  Who're we fighting again?  Big, big pharmaceutical companies?  Oh, great.  Anyway, I'm just not quite sure.  I know he's going to go out and fight for us all.  I just know who.  I'm just a little bit disturbed about all this fighting rhetoric.

__:  What about on industry issues as you look at Bush and Gore?

Ellison:  Well, again, I've known Al Gore for very, very long time, and a lot of people forget that Al Gore was very active in Oracle ten years ago.  He's Mr. Planned Economy.

NDCA-ORCL 170570

He wanted the government to subsidize high-definition television.  He was a huge supporter of thinking machines ten years ago in terms of governments picking winners and losers in the technology industry.  He thought the government should be sponsoring [national] parallel computer companies, thinking machines, [inaudible] transferred to thinking machines.

By the way [inaudible] at the time, the Bush administration was no better.  This was 1990 and everyone was very concerned.  The Japanese economy was going to pass us.  The Japanese tend have a more planned economy than we do to say the least.  We were feeling terribly insecure about the Japanese economy and were trying to emulate them and we thought the government had supported the high-definition television efforts.

In Japan the government was supporting what's called Fifth Generation computing in Japan ten years ago.  We felt we had to get the government and industry to work together to make sure the United States wasn't left behind.  Well that was a terribly flawed notion.

__:  And you think that he still, that's in the genetic structure?

Ellison:  He's a government activist.  A government activist in technology.

NDCA-ORCL 170571

___:  What was wrong with the [inaudible] I mean he didn't invent the Internet but he certainly participated in some investment that led to it.

Ellison:  You mean he wrote it for the bill.  Come on, the Internet's been around...

___:  [inaudible]

Ellison:  And that's great.  And there are a lot of people, it started, it was called the [ArbaNet] a long time ago before it was called the Internet, and I was, it was hooked up to the Central Intelligence Agency and the National Security Agency and all these guys, different universities, Rand Corporation, and I've been using it since it was turned on.

[END OF TAPE SIDE 1]

[BEGINNING OF TAPE SIDE 2]

Ellison:  I think he is, thinks there's a government roll for almost every aspect of the economy.  And I don't think that's true.  I think that was a huge mistake.

___:  Does that view lead to any enthusiasm for the guy on the other side of the aisle?

Ellison:  No.  No.  No.  That's why I say, I'm not, I'm just not...A)  I don't think business executives should, I don't think businesses should make campaign contributions in general, though Microsoft's made 16 million dollars worth of them, and we're feeling a little uncomfortable.  It's very

NDCA-ORCL 170572

hard to stay on the sidelines when they're spending so much money.

But I'm very strongly in favor of campaign finance reform. I don't think corporations should donate at all. I don't think who I'm for in the election should influence anybody. It's little bit like athletes endorsing soft drinks. I don't care what Kobe Bryant drinks. [inaudible] Pepsi. I'm not going to switch. I don't think so. Kobe has this, he can drink whatever he wants.

___: But you were very a vocal supporter of Clinton.

Ellison: Of Clinton? Yeah.

[OVERLAPPING CONVERSATION]

Ellison: Yeah. I was. Well, again, I was very unhappy with the Bush administration. That's the same reason I was unhappy with Al Gore I was unhappy with the Bush administration. This was back in the early 1990's, and they were talking planned economy, and Secretary [inaudible] the Secretary of Commerce, the government was becoming very, very active in picking winners and losers in the technology industry specifically in [inaudible] parallel computing, in high-definition television. I thought all of that was nuts.

___: [inaudible] Bradley and McCain, did you.[OVERLAPPING CONVERSATION]

Ellison: I like Bill Bradley a lot.

NDCA-ORCL 170573

___:  I'm not sure the analogy that the soft drink athlete analogy holds here.  After all you are one of the leading representatives in an industry that is critical to America's economic growth into the next, over the next decade.  And I would think that your opinions on the political leadership would carry a lot more validity if not weight than

[OVERLAPPING CONVERSATION]

Ellison:  How many people in the room would change my vote once you know who I'm voting for, change your vote once you know who I'm voting for?

    I just don't feel strongly about either candidate, so...

___:  Then you're a very typical American.

Ellison:  No, but I think that's true.  I think that's true. It's very hard.  Also, I know Bill Clinton very well and it's just...it's like Mickey Mantle retiring.  This is not good.

___:  Well looking into the future, one of the things Gore said in the last campaign was that he was going to put the government online, make it more efficient, put everything on the Internet.  Is that a good thing or a bad thing?

Ellison:  I don't know, I think government online is...no it should make the government much more [inaudible] and there were a number of e-government initiatives were involved where the government can be much more efficient and much

NDCA-ORCL 170574

more responsive, we think.  I believe there should be a national healthcare database.  I think people are talking about the wrong things.  In healthcare, you can say 30 cents in every dollar spent in healthcare is spent on record keeping.  And everyone is concerned about the privacy of their records.

Are our health records private?  There lost almost the minute your blood test results go into that brown envelope and that brown envelope is filed, there lost.  You don't get information more secure than that.  Those X-rays are, there in some room in someplace in some hospital.  Inaccessible shortly after they're taken.

We could save 20 out of those 30 cents by going to a national healthcare database.  And a shared resource for doctors and HMOs and insurance companies, we could do that and no one's even talking about that.  And that's, these are enormous, using technology saves enormous sums of money.

We could make, in terms of seniors, making sure people understand their benefits better.  We could use mobile pagers to remind seniors to take their medicine.  What's the cost to us both in terms of human suffering and economic when your grandfather forgets to take his medicine in the evening, and as a result ends up in the hospital?

___:  But the IRS could also audit everybody every year, too.

NDCA-ORCL 170575

Ellison:  Well, I'm not sure that's a bad thing.  I think the IRS should have, I think we should have good enforcement of the IRS.  I'm certainly for a greatly simplified tax code.  I think the current tax code...that's another thing I don't like about Al Gore.  Al Gore has this enormously, again, Al Gore bless his heart, wants to give tax cuts to people who use hybrid electric internal combustion engines. What most people don't understand is hybrid electric internal combustion engines can be used to boost horsepower not to boost mileage.  [inaudible] and that certain manufacturers' SUVs are going to build hybrid electric and gasoline engines that have mileage about 16 miles a gallon that have much better acceleration at the low end of the range.

So it's very dangerous.  You say, okay, I'm going to give you a tax cut if you...everyone thinks these hybrid engines are...everyone in these targeted tax cuts, people find loopholes and it becomes a little bit of a game, right? That's why you get tax accountants and tax experts and this is what the law says, I'm going to obey the rules, they're really trying to, for us to build engines that are more economical, use less gasoline, and pollute the environment less.  That's what they're trying to do.  But actually I could get a tax cut and just have faster SUVs because the regulation isn't written properly.

NDCA-ORCL 170576

And this game between the regulators and the regulated and all the experts, all the tax accountants we hire, and everyone else to play this game, I think is silly.  We need a much, much simpler tax code.  So and that's another thing I don't like about Al Gore, but, again, it's not like I'm in love with George W. Bush.

___:  Well, what, you talk about some missed opportunities or some things that could be subverted into bad things, what could the next administration of whatever do to screw up the businesses, your business, or the technology business in general.  What are the nightmarish things that...?

Ellison:  Well, I think the biggest thing that I worry about, I don't think either of these administrations are going to be bad for business.  Another reason why I have a hard time to choose, I think they're both, they try to be business friendly.  As much as Al Gore's rhetoric is "I'm going to fight big business, hell with the guys in that upper one percent, I feel very bad.  Actually I'm not in the upper one percent.  I only make a dollar a year, so I'm actually not part of that, which is kind of funny, but...

___:  I hope you pay taxes on more than a dollar a year because otherwise the IRS computers are going to get you.

Ellison:  Well, the IRS computers all use Oracle software so [OVERLAPPING CONVERSATION]

___:  There's an Ellison back door for...?

NDCA-ORCL 170577

Ellison:  The last Ellison in tax owed equals zero.  No we wouldn't do that.  I believe we'd go to jail.  That's worse than what Microsoft did so I'm not going to do that.

I think they are both reasonably business friendly.  Al Gore might use populist rhetoric, but I don't...both the parties are reasonably business friendly right now.

The most interesting thing that I've seen go on on a macro-governmental scale and non-governmental scale is mainly NGOs, is the protest that first started in Seattle against globalization.  One of the very strangest cabals I have ever seen in my life.  Very, in a sense, extremely disturbing.  A lot of rich American students, a lot of wealthy American kids and union members saying that we really shouldn't import things from India because the Indian people are being exploited.

Then you have the government of India and all the people in India saying, what are you talking about.  These are tax free.  I'm really glad these rich American students and American unions are trying to help the people in India by closing down trade between the United States and India.  I'm sure they have our best interests at heart.

But as president of India, the government of India, we think the trade's a good thing.  And so says Vincenti Fox in Mexico and virtually everyone else in the world.  So this globalization being exploitative of Third World countries is

NDCA-ORCL 170578

Case 3:01-cv-00988-SI   Document 1552-39   Filed 11/18/08   Page 339 of 359

exactly opposite of what's actually going on.  Through
globalization India is becoming wealthier.  Through
globalization Mexico is becoming wealthier.  A lot of the
people, Ross Perot, there's a guy I didn't like very much,
you know "that big sucking sound are jobs going to Mexico."
We want a prosperous Mexico on our border.  We don't want an
impoverished neighbor.  We don't want to force people to
sneak across the border to get a job.  We want good jobs in
Mexico, what are you talking about?

And through trade, and world trade, globalizing our
businesses, Oracle has two big engineering centers, one in
[Hidravad], India and one in Bangor, India, and we just
watch, we now watch the price competition for the...they use
to make 7,000 a year now it's 15,000, it's doubled in a very
short period of time.  The price competition between
different companies are going there, European companies
hiring, out source exhibitor IT to India, watch the Sierra
Design, Sierra Atlantic, and different, Sierra Design's
growing rapidly, selling into European markets where there's
a terrible labor shortage, IT labor shortage.
And we watch [inaudible] we watch all of the different, I
wish we would enforce NAFTA better than we're enforcing by
the way.  We're not enforcing it as much as we could, but
NAFTA as imperfectly implemented as it's been, is I think
one of the best things Bill Clinton ever did.

NDCA-ORCL 170579

Case 3:01-cv-00988-SI   Document 1552-39   Filed 11/18/08   Page 340 of 359

__: So you're concerned that an American administration's sort of give in to the noise against globalization?

Ellison: No. I don't think we'd give in to the noise unless Dick Gebhardt was running for office. I think he would give in to the [OVERLAPPING CONVERSATION] he's part of the [OVERLAPPING CONVERSATION]

__: He's part of the union driven point of view.

Ellison: Right. Exactly. Exactly. And I understand why the unions are against globalization because they don't want to compete with labor outside of the United States. I'm mean it's preferably in your interest to do that, I certainly understand their behavior.

The alliance with the students is the one that seems, I think they're just mistaken. I think they're well-intentioned people. God save me from well-intentioned people. They're well-intentioned people that just don't understand that it's this global trade that exports prosperity to these countries however imperfectly.

And with prosperity comes all sorts of good things. Prosperous nations take much better care of their environment than poor nations. Prosperous nations take much better care of their poor than poor nations. With prosperity give us the resources to do all sorts of things that we should be doing that poor nations simply can't do.

NDCA-ORCL 170580

Case 3:01-cv-00988-SI   Document 1552-39   Filed 11/18/08   Page 341 of 359

Exporting our prosperity around the world is a good thing.  The closer relationship with Mexico is a good thing.

__: A little closer to home, you've had some management changes at Oracle.  I'm curious to know the [post Ray Lane] you're getting more hands on stuff, but what's been the effect of that?  Now you've had a few months to get closer to what's going there?

Ellison:  Well actually these changes were all made almost two years ago.  So Ray, if you read Ray's statements he'll say that he really, an awful lot of responsibility had been moved from Ray to other people a year and a half ago.  So the people who ran the business last year are the people who are running the business this year.

Ray used to run marketing, he hadn't run it for a year and a half.  Ray used to run support, he didn't run it for a year and a half.  He used to have a lot of different responsibilities and those responsibilities had been moved from him to other people, again, a long, long time ago.  So the people who brought you last year, the people who delivered last year's results are the people who are running the company this year.  So it's not new.  I think that Ray just finally felt in the end...

__: So how come that story got lost.

Ellison:  No, I think he said that.  I think he said he left, but he'd had stuff taken away from him and just

NDCA-ORCL 170581

eventually there was nothing for him to stay for.  So it didn't happen suddenly.  It happened over time.  So we've been going through, it was a planned transition and we've been doing it gradually and we had a fantastic year last year, and we'll have a better year this year than we had last year.

__:  Have you personally increased your activity within the company [inaudible]

Ellison:  That was about two years ago also.

__:  [inaudible]

Ellison:  I'd always run engineering.  Since the beginning Oracle I had always run engineering.  I got involved in our products.  And we would have the new version of our application software, 11I E-Business Suite.  It suddenly dawned on me, I don't know why it took so long, that the nature of running a business was going to fundamentally change with this.  An e-business was a business that was mediated by computers.

And while I was never ever interested in sales operations or the service part of our business, I just had no interest, I was an engineer, I was interested in creating products and very little else.  And [assuming a] criticism as a CEO that I abdicated oversight, the bulk of the business to others.  It just didn't interest me.  I just worked on the products.

NDCA-ORCL 170582

Case 3:01-cv-00988-SI   Document 1552-39   Filed 11/18/08   Page 343 of 359

But all of a sudden the nature of business itself had changed.  That an e-business was, used computers much more completely than business before.  And wait a second, I know about computers.  I was suddenly competent to run the company.  Our sales process is now completely choreographed by our online sales systems.  Our marketing processes are completely choreographed by our online marketing systems. So our service process similarly, the global Internet service system, completely mediated by our online systems. Our relationship with Hewlett Packard sharing leads, our relationship with Sun sharing proposals and proposed sales support is all done online.  It's all done using computer systems, and this is what I was good at.  This is the one thing I was good at.

While I might not have been qualified to run Oracle or interested in running Oracle as a business, I was very qualified and very anxious to running Oracle as an e-business, and I re-engaged because we computerized the whole place.

___: So you would say it was a combination of the change in your own level of interest in the business and the change of Oracle's own tools basically to run your business that allowed you to take a layer out?

Ellison:  What happened was, we went from a business which I was not interested in running, nor, you could argue,

NDCA-ORCL 170583

competent to run, we went from a business to an e-business
because we computerized I was suddenly competent because I
knew about computers.  I was probably competent to run
Oracle, the e-business, not competent to run Oracle, the
business.

And when you're competent to do something, it's much
more interesting than when you're incompetent.  I'm much
more interested in playing tennis when I'm good at it than
when I'm bad at it.  I'm much more interested in playing
basketball than I am in playing tennis, I'm better at
basketball than I am at tennis.

___:  Is it wrong when people mark your depth of experience
[inaudible]

Ellison:  Unfortunately the epiphany was 46 hours in a
hurricane, so it was hell of a long drawn out epiphany.
Yeah, people are going to point to that and I've been asked
several times and I've almost been ready to give in and said
everybody wants to say this has changed me so I can now
become a new person.  I could become nice.  Just give them
the chance to write that story.

___:  Wouldn't take much.  [LAUGHTER]

Ellison:  I've always known that life is fragile and short
and precious, and this certainly, and I think I do things
that constantly remind me of that.  And this was, yeah, this
was a hell of a reminder.  But it as an amazing personal

experience.  I was bonded with these great guys, virtually all of them other than me professional sailors, to go through that experience, it was a terrible and wonderful experience all at once.  And it was a...I certainly would not do it again.  And it did do exactly what I said.  It reminded me of how beautiful...after this horrible, horrible hurricane.

We had a hundred mile wind across the deck, the boat was coming off 40 foot waves and just falling like down and elevator shaft.  You don't even have to slide down the back of the wave, you'd just exit the wave and fell through the air.  It was an 80 foot [inaudible] falling.  Like being dropped off a five story building on to asphalt, and it was doing that about every 45 seconds for 36 hours.  And things were breaking right and left, the boat was coming apart.

This was the best professional sailing crew in the world.  We were four times world champions.  We won four consecutive world championships and they are larger than America's Cup, they're called [Masi Yachts].  The Sydney papers call it the glamour maxi.  Sayonara.  We've never lost the Sydney [inaudible] We've never lost a [inaudible] regatta.  We had a phenomenal team and these guys were at the limits of their physical and mental endurance in this hurricane.

It's a long story, but as we get through the hurricane and show up at the [Derwint] which is this river estuary that leads to Hobart, Hobart is the capital of [inaudible] Tasmania, south of Australia.

And we sailed through this incredibly treacherous body of water called [Bass Straight]. The reason it's treacherous is that you're in the Southern Ocean, that means the waves just circle north of the South Pole and south of Australia and there's no land barrier so the waves just circle continuously and get steeper and steeper and steeper.

[inaudible] list the Southern Ocean as the worst place in the world to sail. It's just continuous [inaudible]. The waves go on for an infinite period of time and never stop, just go around and around.

And Bass Straight is the shallowest part of the Southern Ocean. Now the reason the waves break when they hit the seashore is because the shallows, the bottom of the wave slows up, the top of the wave doesn't, the waves break. You get breaking waves in the Bass Straight.

Hundred mile an hour winds. By the way, if you want to know what it was like, if you have a sunroof on your car, you get someone to drive your car about a hundred miles an hour, stand up in a driving rain for a day and a half. And if you're going over speed bumps that would help at a hundred miles an hour. It's a trying experience.

NDCA-ORCL 170586

___: But it had no effect on you whatsoever except

[OVERLAPPING CONVERSATION]

Ellison:  No, in terms of how I approached my life and how I approach Oracle I don't think any lasting effect because we're alive for a very, very short period of time and then we're dead forever after.

___: What do you see in the press about you personally or Oracle in general that just drives you crazy?

Ellison:  Drives me crazy?  Nothing anymore.

___: Or something short of that.  You characterize, what bothers you about what you read about yourself.

___: There's a great expression in Washington D.C. which is don't complain, don't explain.

Ellison:  Yep.  Yep.

___: I think it started with Henry Ford.

Ellison:  I don't think anything really drives me crazy anymore.  It used to drive me crazy, I would have like '95, just telling people at work, no more desktop software, trust me, Internet.  Everything on the server.

    And I was called to a meeting where they tried to talk me out of, it was actually Ray [Lane] and others, were trying to talk me out of this madness.  Talk me out of this madness.  And I used to get very upset that people didn't support these ideas.  Why do I have to carry these things on my back for so long?  Why do I have to make these decisions

NDCA-ORCL 170587

and just proselytize them for years before people will
listen.

     And I no longer think that's upsetting, I think that's
great.  If people don't get it, so much the better for us.
I shouldn't be surprised.  It's a good thing.  I don't want
Microsoft to get it, I don't want a lot of people to get it.
With our new E-Business Suite, I used to be very frustrated
that people wouldn't see it at the same time I would see it,
now I think it's wonderful.  It's a good thing.

___: What about the personal stuff?  [inaudible]

Ellison:  I used to get upset about the personal stuff,
but...and it's very interesting when I hear about people who
have strong opinions about me who have never met me.  They
think that I'm mean.  I guess the...like I was really a mean
guy or something like that.  That bothers everybody.  No one
likes...I remember my sister, my sister's a clinical
psychologist and one time she came up to me and I was in
college and she said to me, she's very smart by the way, she
always walks like this, I understand this, I'm smart.  And
she was.  She graduated high school when she was 15.  She's
very smart.

     And she came up to me and said, "Larry, what's more
important to you, to be loved or respected?"  I said well
that's easy, respected.  And she said, "Wrong"!  And just

NDCA-ORCL 170588

leaves the room. And I thought for a minute and got extremely annoyed.

This woman came into my room once with the Webster's Unabridged Dictionary and threw it at me and said, "Pick any word, try me." After five words I told her, just get out of here. I can't believe you memorized the dictionary. Just get out of here. Leave me alone, stop tormenting me. But I think she's memorized the whole bloody dictionary. As far as I could tell, she had.

__: Did she love to study?

Ellison: Did she love...? She did. That's another interesting story, she thought she was doing me a favor. And my family thought when they [inaudible] anyway I go storming into her room and said, what do you mean. I said you asked me what's more important to *me* to be respected or loved. What's more important to *me*, that was the question. What's more important to me? She said, you have a fantastic memory. That's a good question. Then when I said respected, you said "wrong." That was the answer. I get it.

So everybody wants to be loved. And I think that's true. And I think sometimes we deny that.

__: This is the epiphany.

Ellison: That happened when I was a teenager. And it wasn't an epiphany, it was shoved down my throat.

NDCA-ORCL 170589

__: Have you forgotten, or do you still [OVERLAPPING CONVERSATION]

Ellison:  No, no , no.  She was absolutely right.  Clearly everyone, and when people say things about you that you think are unfair or not true and cause people to dislike you, think you're a jerk, that's not great.  I don't think anyone likes that.

__:  Do you think you do things that are not rational either economically or personally because of that feeling that you'd rather be liked and respected?

Ellison:  No.  No.  I think you always want to be, when you can choose, I think you always want to be rational.  But I think it's also rational to build your own self esteem.  No one's ever written a hitchhiker's guide to human happiness, but another thing I learned when I was very young is that it's very hard to be happy if you don't treat people well. If you're rude to people or if you're mean to people you just destroy your own self-esteem.  So if you think you can be happy after you've destroyed your self-esteem, you're just sadly mistaken.

So altruism is actually a very interesting road to happiness.  It's kind of a trip.  It's kind of a trap. You're stuck doing the right thing because that's the only way you can live with yourself.

__:  We called Gates, he just wants to be loved.

NDCA-ORCL 170590

Case 3:01-cv-00988-SI   Document 1552-39   Filed 11/18/08   Page 351 of 359

Ellison:  Just wants to be loved.  Oh, great, thanks.  Just
wants to be loved.  Yeah, that's me.

__:  Allow me to be personal, what's at the top of your must
do, must have personal technology right now?

Ellison:  A wireless Palm.  I've got a Palm on me, a Palm 7
which I use and very, I use it.  I'm a big fan of Palm and
especially when it's wireless e-mail in it.

__:  What about at home, any gadgets?  Toaster oven,
anything like that?

Ellison:  [inaudible] toaster oven, listen to Saline Dion
while your chicken pot pie cooks.  Home gadgets.  I'm not
much of a gadget person actually.

__:  Well, that's interesting, okay.  That's what I wanted
to know.  [OVERLAPPING CONVERSATION]

__:  Is the new house wired to it's gills?

Ellison:  Well, no, it's not wired to its gills.  It's not
Bill where...Bill's a rich guy, he could buy real art rather
than just the...I never quite got that.  You're favorite
impressionist, type in your favorite impressionist paintings
and they'll show up on your wall.

   The new house is a series of wooden buildings, Japanese
medieval wooden buildings around a lake.  And it's really a
garden.  It's a large Japanese garden.  It's a phenomenal
garden.  And that is the art.

NDCA-ORCL 170591

10/26 LJE Interview with Newsweek                          43

I have two arts that I really love.  One is music, which is an entire integration of man pretty much.

\_\_: Do you have the traditional rock garden?

Ellison:  Oh, absolutely, it is I think one of the top five Japanese...

\_\_: Kioto West.

Ellison:  Exactly.  It's one of the top five Japanese gardens in the world, I think.  It's as good as [inaudible] or [inaudible] not as good as [Tatsura's] [inaudible] It is an incredible part of a Japanese village around a lake and on a very human scale.

The other thing I love is Japanese garden architecture, gardening is an astounding art which is really the collaboration of man and God, this thing, this natural looking thing.

\_\_: [inaudible]

Ellison:  What's on my CD player?  Well, actually I'm a classical guitarist so I was just listening to Jesus, Joy of Man's Desiring, I'm playing a new version of that so.

# EXHIBIT 442

1

2  LATHAM & WATKINS LLP
     Peter A. Wald (SBN 85705)
3     Michele F. Kyrouz (SBN 168004)
   505 Montgomery Street, Suite 2000
4  San Francisco, CA  94111-2562
   Telephone: (415) 391-0600
5  Facsimile: (415) 395-8095
   E-mail: peter.wald@lw.com
6         michele.kyrouz@lw.com

7  LATHAM & WATKINS LLP
     Jamie L. Wine  (SBN 181373)
8  633 West Fifth Street, Suite 4000
   Los Angeles, CA 90071-2007
9  Telephone: (213) 485-1234                    REC'D FEB 2 8 2006
   Facsimile: (213) 891-8763
10 E-mail: jamie.wine@lw.com

11 LATHAM & WATKINS LLP
     Patrick E. Gibbs  (SBN 183174)
12 135 Commonwealth Drive
   Menlo Park, CA 94025
13 Telephone: (650) 328-4600
   Facsimile: (650) 463-2600
14 E-mail: patrick.gibbs@lw.com

15

16 Attorneys for Defendants ORACLE CORPORATION, LAWRENCE
17 J. ELLISON, JEFFREY O. HENLEY, and EDWARD J. SANDERSON

18 ORACLE CORPORATION
     Dorian E. Daley (SBN 129049)
19    James C. Maroulis (SBN 208316)
   500 Oracle Parkway
20 Mailstop 5OP7
   Redwood Shores, California 94065
21 Telephone: (650) 506-5200
   Facsimile: (650) 506-7114
22 E-mail: jim.maroulis@oracle.com

23 Attorneys for Defendant ORACLE CORPORATION

24

25              UNITED STATES DISTRICT COURT

26   NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

27
   | In re ORACLE CORPORATION | Master File No. C-01-0988-MJJ (JCS) |
   | SECURITIES LITIGATION | (Consolidated) |
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' RESPONSES AND OBJECTIONS TO
PLAINTIFFS' SECOND SET OF REQUESTS FOR ADMISSIONS
Case No. C-01-0988-MJJ

<u>CLASS ACTION</u>

**DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR ADMISSIONS**

This Document Relates To:

ALL ACTIONS.

**PROPOUNDING PARTY:**     Plaintiffs

**RESPONDING PARTY:**     Oracle Corporation, Lawrence J. Ellison, Jeffrey O. Henley, and Edward J. Sanderson

**SET NUMBER:**     Two

**TO PLAINTIFFS AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendants Oracle Corporation, Lawrence J. Ellison, Jeffrey O. Henley, and Edward J. Sanderson (the "Defendants") respond to Plaintiffs' Second Set of Requests for Admissions (the "Requests") as follows:

## GENERAL OBJECTIONS

Defendants make the following General Objections, which, by this reference, are incorporated fully into each individual response below:

1.     Defendants object to each Request to the extent that it seeks information protected from disclosure by any privilege or immunity, including the attorney-client privilege, the attorney work product doctrine, the laws relating to confidentiality of business records, or any other privilege, immunity, doctrine, or rule of confidentiality.

2.     Defendants object to each Request to the extent that it is overly broad, vague or ambiguous, or would subject Defendants to oppression, harassment, undue burden or expense.

3.     Defendants object to each Request to the extent that it seeks information that is not relevant to the subject matter involved in the pending litigation and that is not

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

1     DEFENDANTS' RESPONSES AND OBJECTIONS TO
PLAINTIFFS' SECOND SET OF REQUESTS FOR ADMISSIONS
Case No. C-01-0988-MJJ

3

1    reasonably calculated to lead to the discovery of admissible evidence.

2            4.      Defendants object to each Request to the extent it purports to require

3    Defendants to obtain information from, or to respond on behalf of, persons or entities not

4    currently within Defendants' employ or over whom Defendants have no control.  Such Requests

5    are unduly burdensome, and attempt to impose obligations on Defendants that exceed the

6    permissible scope of discovery under the Discovery Plan and the Federal Rules of Civil

7    Procedure.

8            5.      Defendants object to each Request to the extent that it purports to impose

9    an obligation on Defendants to make admissions relating to anything except statements or

10   opinions of fact or of the application of law to fact.

11           6.      In making these objections, Defendants do not in any way waive or intend

12   to waive:

13           a.      any objections as to competency, relevancy, materiality and

14   admissibility of any information that may be provided in response to the Requests, or the subject

15   matter thereof;

16           b.      all rights to object on any ground to the use of any of the

17   information that may be provided in response to the Requests, or the subject matter thereof, in

18   any subsequent proceedings, including the trial of this or any other action; and

19           c.      all rights to object on any ground to any request for further

20   responses to this or any other discovery request.

21           7.      Defendants object to each instruction, definition and Request to the extent

22   it seeks to impose upon Defendants any obligations greater than those required by the Federal

23   Rules of Civil Procedure.

24                      **RESPONSES TO REQUESTS FOR ADMISSIONS**

25

26   **REQUEST FOR ADMISSION NO. 20:**

27           Admit that all documents that have been produced by Oracle in the above-

28   captioned litigation pursuant to the March 10, 2005 Amended Order Setting a Discovery Plan

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

2        DEFENDANTS' RESPONSES AND OBJECTIONS TO
PLAINTIFFS' SECOND SET OF REQUESTS FOR ADMISSIONS
Case No. C-01-0988-MJJ

4

1   and Bates numbered with the prefix NDCA-ORCL are genuine and authentic.

2   **RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

3        Defendants object that Plaintiffs have not established a proper foundation for each

4   of the documents for which they seek an admission of genuineness and authenticity.  Defendants

5   further object to this Request on the ground that it is overly broad and complying with it would

6   create an undue burden and expense for Defendants.  Subject to and without waiving their

7   objections, Defendants admit that the documents produced by Oracle Corporation are true and

8   correct copies of documents in its files, but deny the remainder of this Request.

9   **REQUEST FOR ADMISSION NO. 21:**

10       Admit that all electronic mail produced by Oracle in the above-captioned

11   litigation pursuant to the March 10, 2005 Amended Order Setting a Discovery Plan, which

12   identify current or former Oracle employees as a sender or recipient of the electronic mail, are

13   genuine and authentic.

14   **RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

15       Defendants object that Plaintiffs have not established a proper foundation for each

16   of the documents for which they seek an admission of genuineness and authenticity.  Defendants

17   further object to this Request on the ground that it is overly broad and complying with it would

18   create an undue burden and expense for Defendants.  Subject to and without waiving their

19   \ \ \

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANTS' RESPONSES AND OBJECTIONS TO
PLAINTIFFS' SECOND SET OF REQUESTS FOR ADMISSIONS
Case No. C-01-0988-MJJ

5

1   objections, Defendants admit that the documents produced by Oracle Corporation are true and

2   correct copies of documents in its files, but deny the remainder of this Request.

3

4   Dated:  February 21, 2006

5

6

7

8

9

10

11

12

LATHAM & WATKINS LLP
   Peter A. Wald
   Michele F. Kyrouz
   Jamie L. Wine
   Patrick E. Gibbs

By: _____
   Michele F. Kyrouz
   Attorneys for Defendants ORACLE
   CORPORATION, LAWRENCE J.
   ELLISON, JEFFREY O. HENLEY,
   and EDWARD J. SANDERSON

SF\550461.1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4   DEFENDANTS' RESPONSES AND OBJECTIONS TO
PLAINTIFFS' SECOND SET OF REQUESTS FOR ADMISSIONS
Case No. C-01-0988-MJJ

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to this action. My business address is Latham & Watkins LLP, 505 Montgomery Street, Suite 2000, San Francisco, Ca 94111.

On **February 21, 2006**, I served the following document described as:

## DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' SECOND SET OF REQUESTS FOR ADMISSIONS

by serving a true copy of the above-described document in the following manner:

### BY U.S. MAIL

I am familiar with the office practice of Latham & Watkins LLP for collecting and processing documents for mailing with the United States Postal Service. Under that practice, documents are deposited with the Latham & Watkins LLP personnel responsible for depositing documents with the United States Postal Service; such documents are delivered to the United States Postal Service on that same day in the ordinary course of business, with postage thereon fully prepaid. I deposited in Latham & Watkins LLP' interoffice mail a sealed envelope or package containing the above-described document and addressed as set forth below in accordance with the office practice of Latham & Watkins LLP for collecting and processing documents for mailing with the United States Postal Service:

| | |
|---|---|
| William S. Lerach | Sanford Svetcov |
| Mark Solomon | Shawn A. Williams |
| Douglas R. Britton | Willow E. Radcliffe |
| Lerach, Coughlin, Stoia, Geller, Rudman | Lerach, Couglin, Stoia, Geller, Rudman |
| & Robbins LLP | & Robbins LLP |
| 401 B Street, Suite 1600 | 100 Pine Street, Suite 2600 |
| San Diego, California 92101-4297 | San Francisco, California 94111-5238 |

### BY FACSIMILE

I am familiar with the office practice of Latham & Watkins LLP for collecting, processing, and transmitting facsimiles. Under that practice, when a facsimile is deposited with the Latham & Watkins LLP personnel responsible for facsimiles, such facsimile is transmitted that same day in the ordinary course of business. I deposited the above-described document for facsimile transmission in accordance with the office practice of Latham & Watkins LLP for collecting and processing facsimiles. The facsimile of the above-described document was transmitted to the following parties from Los Angeles, California on February 15, 2006, at the times noted on the attached confirmation sheet:

| | |
|---|---|
| William S. Lerach | Sanford Svetcov |
| Mark Solomon | Shawn A. Williams |
| Douglas Britton | Willow E. Radcliffe |
| Lerach, Coughlin, Stoia, Geller, Rudman | Lerach, Couglin, Stoia, Geller, Rudman |
| & Robbins LLP | & Robbins LLP |
| 401 B Street, Suite 1600 | 100 Pine Street, Suite 2600 |
| San Diego, California 92101-4297 | San Francisco, California 94111-5238 |
| Fax No.: (619) 231-7423 | Fax No.: (415) 288-4534 |

The facsimile number of the sending machine is (415) 395-8095. Said transmission was complete and without error. All parties on whom this facsimile transmission has been served have agreed in writing to such form of service pursuant to agreement.

I declare that I am employed in the office of a member of the Bar of, or permitted to practice before, this Court at whose direction the service was made and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **February 21, 2006**, at Los Angeles, California.

_____
John M. Eastly