# EXHIBIT A

O'Bryan, John Duross - Confidential 7/12/2007 9:29:00 AM

**1**

1    IN THE UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF CALIFORNIA
3    SAN FRANCISCO DIVISION
4
5    In re ORACLE CORPORATION
6    SECURITIES LITIGATION.
7              Master File No. C-01-0988-MJJ
8    This Document Relates To:
9
10   ALL ACTIONS.
11   _____/
12
13            ---oOo---
14           CONFIDENTIAL
15   VIDEOTAPED DEPOSITION OF JOHN DUROSS O'BRYAN
16        THURSDAY, JULY 12, 2007
17
18            ---oOo---
19   SHEILA CHASE & ASSOCIATES
     REPORTING FOR:
     LiveNote World Service
20   221 Main Street, Suite 1250
     San Francisco, California 94105
21   Phone: (415) 321-2311
     Fax: (415) 321-2301
22
23
     Reported by:
24   DIANA NOBRIGA, CSR, CRR
     LICENSE NO. 7071
25

**2**

1              I N D E X
2         INDEX OF EXAMINATION
3                         PAGE
4    EXAMINATION BY MR. GREENSTEIN        6
5              ---oOo---
6    INDEX OF CONFIDENTIAL EXHIBITS
7    DESCRIPTION                  PAGE
8    Exhibit 1  J. Duross O'Bryan, CPA Expert
9         Witness Report              10
10   Exhibit 2  Rebuttal Expert Report of J.
11        Duross O'Bryan, CPA         10
12   Exhibit 3  J. Duross O'Bryan Expert Witness
13        Report in Accordance with Rule 26    35
14   Exhibit 4  Transaction Registers       60
15   Exhibit 5  Account Analysis Reports      73
16   Exhibit 6  Sales Journal by GL Account Report   89
17   Exhibit 7  Presentation to the SEC Staff On
18        Behalf Of Oracle Corporation    94
19   Exhibit 8  E-mail from Molly Littlefield,
20        sent 26 Aug 2004 to Greg Myers    99
21   Exhibit 9  Oracle Receivables User's Guide   118
22   Exhibit 10  Lexis case printout, Donald W.
23        Farnham v. William Rehwald, Inc.    129
24   Exhibit 11  #4 Interview Memorandum of John
25        Banker, 11/13/02          220

**3**

1    Exhibit 12  Audit File, Client File
2         No. 60020382              227
3    Exhibit 13  Q2 FY 2001 Accounting Allegations   227
4    Exhibit 14  Oracle Corporation Variation
5         Analysis, Unearned Revenue as of
6         November 30, 2000          249
7    Exhibit 15  Oracle Corporation Variation
8         Analysis, Accounts Receivable as of
9         November 30, 2000          252
10   Exhibit 16  One-page document Bates
11        stamped NDCA-ORCL 603894      261
12   Exhibit 17  Oracle check to Household Finance
13        dated 5/23/02            269
14   Exhibit 18  E-mail from greg.myers, sent
15        31 Oct 2002 to Michael Quinn   269
16   Exhibit 19  Amendment Three to the Software
17        License and Services Agreement
18        Between Oracle Corporation and
19        the Hewlett-Packard Company    316
20   Exhibit 20  Purchase Order No. 47B08440 with
21        attachments             316
22
23
24
25

**4**

1         BE IT REMEMBERED that on Thursday, July 12,
2    2007, commencing at the hour of 9:29 a.m., thereof, at
3    the LAW OFFICES OF LERACH, COUGHLIN, STOIA, GELLAR,
4    RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite 3200,
5    San Francisco, California, before me, DIANA NOBRIGA, a
6    Certified Shorthand Reporter in and for the State of
7    California, personally appeared
8              JOHN DUROSS O'BRYAN
9    as a witness by the plaintiffs herein, who, being by me
10   first duly sworn, was thereupon examined and testified
11   as hereinafter set forth.
12            ---oOo---
13   Appearing as counsel on behalf of the Plaintiffs:
14        ELI GREENSTEIN, ESQUIRE
          SHAWN WILLIAMS, ESQUIRE
15        KEITH MAUTNER, CPA, CMA
          LERACH, COUGHLIN, STOIA, GELLAR,
16        RUDMAN & ROBBINS
          100 Pine Street, Suite 2600
17        San Francisco, CA 94111
          Egreenstein@lerachlaw.com
18
19   Appearing as counsel on behalf of Defendants:
20        BRIAN GLENNON, ESQUIRE
          LATHAM & WATKINS
21        633 West Fifth Street, Suite 400
          Los Angeles, CA 90071
22        brian.glennon@lw.com
23   Also Present: Gerry Fujimoto, Deloitte; Dorian Daley,
24   Oracle; James Terrell, Videographer
25

5

1  VIDEOGRAPHER: This begins the videotaped
2  deposition of J. Duross O'Bryan, tape one, Volume I, in
3  the matter In Re Oracle Corporation Securities
4  Litigation, as filed in the United States District Court
5  for the Northern District of Northern California,
6  San Francisco Division, Case No. C-01-0988-MJJ. Today's
7  date is July 12th, 2007. The time on the video monitor
8  is 9:29.
9        The video operator is James Terrell,
10 representing LiveNote World Service, located at 221 Main
11 Street, Suite 1250, San Francisco, California 94105.
12 The phone number is 415 321-2300.
13       The court reporter is Diana Nobriga, with
14 Sheila Chase and Associates, reporting on behalf of
15 LiveNote World Service.
16       Today's deposition is being taken on behalf of
17 plaintiffs and is taking place at 100 Pine Street in
18 San Francisco, California. If the parties present would
19 please introduce themselves and state whom they
20 represent.
21       MR. GREENSTEIN: Good morning, Eli Greenstein
22 Lerach, Coughlin, Stoia, Geller, Rudman and Robbins,
23 representing plaintiffs.
24       MR. MAUTNER: Keith Mautner Lerach, not
25 representing anybody, because I'm an accountant.

6

1        MR. WILLIAMS: Shawn Williams, Lerach,
2  Coughlin on behalf of the plaintiffs.
3        THE WITNESS: I'm J. Duross O'Bryan, deponent.
4        MR. GLENNON: Brian Glennon of Latham and
5  Watkins on behalf of the witness and the defendants.
6        MR. FUJIMOTO: Gerry Fujimoto, Deloitte,
7  consultants for defense counsel.
8        MS. DALEY: Dorian Daley for Oracle
9  Corporation.
10       VIDEOGRAPHER: Thank you. Can we swear the
11 witness and begin.
12             JOHN DUROSS O'BRYAN
13 having been duly sworn, testified as follows:
14             EXAMINATION BY MR. GREENSTEIN
15       MR. GREENSTEIN: Q. Good morning,
16 Mr. O'Bryan.
17    A. Good morning.
18    Q. Thank you for being here. Can you please
19 state your full name and current addresses for the
20 record.
21    A. John Duross O'Bryan, Jr. J-o-h-n,
22 D-u-r-o-s-s, O'B-r-y-a-n, Jr. Address, you want
23 business address?
24    Q. Current home address, please?
25    A. 6320 Cavalleri Road, C-a-v-a-l-l-e-r-i,

7

1  Malibu, California 90265.
2    Q. And your current business address, please?
3    A. 515 South Flower Street, Suite 3050, Los
4  Angeles, California.
5    Q. Thank you. And who retained you in this case?
6    A. Oracle Corporation.
7    Q. Okay. So you're here as a testifying expert
8  on behalf of individual defendants Larry Ellison, Edward
9  Sanderson, Jeff Henley and Oracle Corporation; is that
10 correct?
11    A. I believe so, yes.
12    Q. When were you first retained by Oracle?
13    A. I have a draft engagement letter somewhere in
14 my file. As I recall, that retention was the end of
15 2006, beginning of 2007.
16    Q. And you have a draft engagement letter?
17    A. I do.
18    Q. Was that the final engagement letter?
19    A. As I recall, yes.
20    Q. Do you know when the initial complaint was
21 filed in this case?
22    A. I don't recall that date.
23    Q. Do you know approximately the year it was
24 filed?
25    A. No.

8

1    Q. Have you looked at the complaint in this case?
2    A. Second amended complaint.
3    Q. Second amended?
4    A. Yes.
5    Q. Proposed revised second amended.
6    A. It is in my document. Second amended I don't
7  recall what it says.
8    Q. You've reviewed one complaint in this action?
9    A. I believe so, yes.
10    Q. Do you know the date of the complaint?
11    A. I don't recall the date.
12    Q. Okay. So prior to your retention in late
13 2006/2007, did you ever talk to anybody about this case?
14    A. No.
15    Q. And after you were retained in late 2006,
16 early 2007, did you talk to anybody besides counsel for
17 the defendants about this case?
18       MR. GLENNON: I'm just going to insert an
19 objection to the extent it calls for communications that
20 are protected by the stip.
21       MR. GREENSTEIN: Q. Right.
22    A. I have had communications with counsel and
23 consultants to counsel on this matter, would be the two
24 groups that I've spoken with.
25    Q. When you refer to counsel, do you mean Latham

**9**

1 and Watkins?
2    A.   Yes.
3    Q.   And consultants for counsel, do you mean --
4 who do you mean?
5    A.   Deloitte and Touche.
6    Q.   Is that the only consultant that you've spoken
7 with after you've been retained?
8    A.   Yes, I believe that's true.
9    Q.   Okay.  So the only people besides Oracle's
10 lawyers that you've talked to after you were retained
11 were consultants for Deloitte and Touche; is that
12 correct?
13    A.   Other than counsel for Oracle, right, the
14 individual defendants, that's correct.
15    Q.   Did you talk to anybody, any employees of
16 Oracle after you were retained?
17    A.   No, I did not.
18    Q.   Have you ever talked to Greg Myers after you
19 were retained?
20    A.   I have not.
21    MR. GREENSTEIN:  I want to mark this as
22 Exhibit 1, which is the expert report, opening expert
23 report filed on, or exchanged on May 25th, 2007.
24 Actually, No. 2 will be Mr. O'Bryan's rebuttal report
25 filed on June 22nd, 2007.

**10**

1       (Exhibit 1 marked for
2       identification.)
3       (Exhibit 2 marked for
4       identification.)
5    MR. GREENSTEIN:  Q.  Mr. O'Bryan, what's
6 placed before you is what has been marked as Exhibit 1
7 and 2.  Exhibit 1, as you can see, is your opening
8 report; is that correct?
9    A.   It looks to be, yes.
10    Q.   Why don't you thumb through it and make sure
11 that it is all there.
12    A.   You certainly don't want me to go page by
13 page, do you?
14    Q.   No.  You see all the exhibits are attach
15 thereto?
16    A.   Yes.  Appears to be a copy of my original
17 report dated May 25th, 2007.
18    Q.   Did you draft Exhibit 1?
19    A.   Yes, I did.
20    Q.   Did anyone help you draft Exhibit 1?
21    A.   Yes.
22    Q.   And who helped you draft it?
23    A.   My engagement team.
24    Q.   And how many individuals are on your team?
25    A.   There are three other individuals on this

**11**

1 engagement with me.
2    Q.   What are their names?
3    A.   Ben Sheppard, S-h-e-p-p-a-r-d, a CPA in our
4 office in Los Angeles.
5    Q.   That's Alix Partners?
6    A.   A-l-i-x, P-a-r-t-n-e-r-s.  Next individual is
7 Chris Simons, S-i-m-o-n-s, CPA in our Los Angeles
8 office.  And lastly Shannon Zavoda, Z-v-o-d-a --
9 Z-a-v-o-d-a, excuse me, who is also a CPA in our Los
10 Angeles office.
11    Q.   You currently work for Alix Partners in Los
12 Angeles; correct?
13    A.   I do, yes.
14    Q.   Besides those three individuals, did you work
15 with anyone outside your company on drafting the report,
16 besides Oracle's lawyers?
17    A.   No.
18    Q.   Did you talk to anybody outside your company
19 besides Oracle's lawyers and Deloitte and Touche about
20 your report?
21    A.   No.
22    Q.   When is the last time you looked at your
23 report?
24    A.   This morning.
25    Q.   Before that, when was the last time?

**12**

1    A.   Last night.
2    Q.   When was the first draft of your report
3 completed?
4    A.   The Exhibit 1?
5    Q.   Yes.
6    A.   The first draft was probably 10th to the 15th
7 of May.
8    Q.   So approximately ten days before it was filed?
9    A.   Ten to 15 days before.
10    Q.   And it took you 138 hours to draft the report;
11 correct?
12    A.   I don't recall the exact time.
13    Q.   Okay.  If you turn to Exhibit -- the last page
14 of Exhibit 1.  Do you see that?  I think that states
15 that as of April 30th, 2007 you had billed 138 hours;
16 right?
17    A.   That was through April 30th, so, between the
18 end of April and the beginning of May there was a
19 significant amount of time spent by me on this report.
20 So my guess is it is significantly higher than that.
21    Q.   Do you have a total amount that you've spent
22 drafting Exhibit 1?
23    A.   No.  I don't know that exact amount.  But it
24 is well in excess of 200 hours.
25    Q.   Could you provide that information?

13

1    A.  I can provide bills if you'd like.
2        MR. GREENSTEIN:  Well, we just want to know
3    the total number of hours and the amount billed as of
4    May 25th, 2007 on the opening report.
5        Is that okay with you?
6        MR. GLENNON:  We can provide that.  We, of
7    course, will want the same thing from plaintiff's
8    accounting expert.
9        MR. GREENSTEIN:  Sure.
10       Q.  And those three individuals you mentioned that
11   helped you working -- helped you draft the opening
12   report, did they help you draft the rebuttal report?
13       A.  They did, yes.
14       Q.  How many hours approximately did you spend
15   drafting the rebuttal report?
16       A.  The rebuttal report, this is an educated
17   guesstimate, if you will, it is in excess probably of 60
18   to 80 hours.  Me personally.
19       Q.  Okay.  And would you also be able to confirm
20   the total number of hours billed by you and/or your
21   staff on the report?
22       A.  Certainly.  Yeah, there is bills by day, as I
23   recall, or hours by day.
24       Q.  So is it fair to say you spent more hours on
25   the opening report than the rebuttal?

14

1    A.  Yes.
2    Q.  Significantly more?
3    A.  No.  The entire team probably spent more time
4    on the original report, because it is just that, an
5    original report.  But as far as the entire team on the
6    rebuttal report, I don't know those numbers.
7    Q.  As you sit here today is there anything you
8    want to change in your opening report?
9    A.  No.  There is a number of references we make
10   into footnotes that we've cleaned up.  We may say
11   something like id that follows the prior footnote, that
12   really follows the prior page.  And there is footnote
13   cleanup items that I'm happy to go through with you if
14   you'd like.
15       Q.  Are those all clerical -- in other words, when
16   you say an id, it shouldn't refer to the prior
17   reference, it should refer to the prior page?
18       A.  Correct.
19       Q.  So id at footnote, prior footnote?
20       A.  Exactly.
21       Q.  Okay.
22       A.  And there were some Bates numbers that were
23   wrong in the cites, which we've fixed.  But there is
24   nothing in the report that I've changed.
25       Q.  Substantively, you mean?

15

1    A.  No.  I think I saw two "thats" together.  So I
2    struck one of the "thats."  There is nothing substantive
3    in the report.
4    Q.  When you say Bates numbers changed, can you
5    point out which Bates numbers changed.
6    A.  There is a number of them; for example, on
7    page 13 of my report, under footnote 36, you will see
8    the reference to NDCA-ORCL 005006.
9    Q.  Right.
10       A.  That should be 050060.
11       Q.  050060?
12       A.  Correct.  Down below you will see an Oracle
13   document, '01 23157.  That should be 05036 -- excuse me.
14   050356 through 60.  Also on that page --
15       Q.  I'm sorry, can you repeat that last one?
16       A.  050356 through 60.  Also on that page at the
17   very -- second to the last line says NDCA-ORCL 012799,
18   do you see that one?  That should be 0926 -- excuse me.
19   096264 through 68.
20       Q.  So just to be clear, we're looking at footnote
21   37 on page 13; correct?
22       A.  Correct.
23       Q.  Looking at the last "see also" document?
24       A.  Yes.
25       Q.  And there are two documents?

16

1    A.  There is a range there.
2    Q.  There is a range and then a single sheet;
3    right?
4    A.  Yes.
5    Q.  Which one are you changing?
6    A.  The top line, 0127994.
7    Q.  That document is now what?
8    A.  That range changes for two, 096264 - 68.
9    Q.  Let me ask about these changes.  Why were
10   those changes made to different documents?
11       A.  When we went back and checked those documents,
12   we found there to be an error in the cite references.
13       Q.  Are they the same documents though?
14       A.  I believe so, yes.
15       Q.  The same type of document?
16       A.  It is not a different document that's being
17   referenced.  And that's it.
18       Q.  Okay.
19       A.  We just had a bad Bates range.
20       Q.  So it is still an account analysis report with
21   payables detail?
22       A.  That's correct.
23       Q.  Okay.  And any other changes in Bates numbers?
24       A.  That's it.
25       Q.  That's it?  But you don't want to change

17

1  anything substantively in the report today?
2       A.  No, I do not.
3       Q.  Have you ever changed, substantively changed
4  your expert report the day of a deposition?
5       A.  Have I ever changed it?
6       Q.  Yes, in the deposition?
7       A.  No.
8       Q.  You never have?
9       A.  No.
10      Q.  I just want to talk a little bit about your
11  work history.  Is it fair to say you joined Price --
12  Coopers and Lybrand in 1985?
13      A.  That's correct.
14      Q.  Then, when did you -- and that became PWC?
15      A.  Correct.  On July 1st, 1998.
16      Q.  And from 1995 through 1999, you were the
17  partner in charge of the New York Metro region FAS
18  practice?
19      A.  No.  I was the partner in charge of the FAS
20  practice for Coopers and Lybrand for the western region.
21      Q.  And what does FAS stand for?
22      A.  Financial advisory services.
23      Q.  And what does that mean to be partner in
24  charge?
25      A.  I was the senior partner of that practice for

18

1  the entire western region, meaning I had not only client
2  responsibilities, but also administrative
3  responsibilities in administering the practice.
4       Q.  And financial advisory you said?
5       A.  Correct.
6       Q.  Does that have anything to do with auditing,
7  or is that more consulting side?
8       A.  Both.  There were -- during my tenure as the
9  partner in charge, I continued to do audits of
10  companies, all the way up to 2000, 2001.  Also in my
11  client responsibilities, I continued to work on the
12  auditing side as well as advising clients in auditing
13  and/or accounting issues.
14      Q.  So you actually conducted audits of clients
15  during that time?
16      A.  I did, yes.
17      Q.  Did you sign any audit opinions during that
18  time?
19      A.  I did, yes, several.
20      Q.  More than five?
21      A.  Yes.
22      Q.  Okay.  During that time did you ever work for
23  Oracle?
24      A.  I did not, no.
25      Q.  Have you ever had an engagement with Oracle

19

1  prior to this retention?
2       A.  I have not.
3       Q.  Ever worked for any of the individual
4  defendants prior to being retained?
5       A.  I have not.
6       Q.  And so when did you -- when was your next
7  promotion after you were, let's say, 2000?
8       A.  I don't know if you would call it promotion,
9  but I was asked to go run the FAS practice as partner in
10  charge for the New York Metro practice.  I might
11  consider that a demotion, but.  Anyway, July 1st, 1998 I
12  left California and went to New York and ran that
13  practice for two-and-a-half years.
14      Q.  What is the time frame of that?
15      A.  1998 through about mid 2000, July 1st, 1998,
16  through about mid 2000 I was the partner in charge of
17  the financial advisory service practices for New York.
18      Q.  Okay.  And what was your next position after
19  that?
20      A.  Then was a promotion, I came back to
21  California and was the financial advisory services
22  partner in charge for the western region again from 2000
23  until my departure from PWC, which was January 31st,
24  2003.
25      Q.  So you left PWC January 31st, 2003?

20

1       A.  Correct.
2       Q.  And you joined Alix Partners at that time?
3       A.  On February 1st, 2003.
4       Q.  Okay.  And you were partner in charge of the
5  FAS practice for the LA office during that time; right?
6       A.  That time being July 1st?
7       Q.  2000 through 2003.
8       A.  That's correct.  I came back mid -- beginning
9  to mid of 2000 and left in January of 2003.  And I was
10  the FAS partner in charge as well as the partner in
11  charge of the dispute analysis and investigation
12  practice for the western region.
13      Q.  So what does dispute analysis investigations
14  unit do or department?
15      A.  It is a subset of the financial advisory
16  services practice.  And it deals principally with
17  forensic accounting issues, any other types of disputes
18  or potential disputes involving either litigants or
19  potential litigants.  It can involve expert testimony.
20  It can involve fraud investigation.  It can involve
21  internal corporate investigations.  A number of
22  different things that they have basically those three
23  items in the title, dispute, analysis, and/or
24  investigation.
25      Q.  And when you said fraud investigations, are

21

1  you hired by a company that's being investigated for
2  fraud, or are you hired by some sort of prosecuting
3  body?
4      A.  Most of my retention has been by companies,
5  whether it be the audit committee of the company or the
6  board of the company or the company itself to
7  investigate an alleged fraud.  And that can be simply an
8  internal investigation, or it can also be investigation
9  that is being reviewed by the enforcement division of
10  the SEC.
11      Q.  Okay.  During that time did you ever have any
12  engagements involving Oracle or the individual
13  defendants?
14      A.  No.  As I said, I have not worked for Oracle
15  in the past.
16      Q.  Did you ever work on any engagement involving
17  Ernst and Young?
18      A.  Ernst and Young, yes.
19      Q.  Approximately how many?
20      A.  I have worked on behalf of Ernst and Young on
21  several occasions.
22      Q.  More than five?
23      A.  Yes.
24      Q.  More than ten?
25      A.  Probably slightly more than ten.

22

1      Q.  And are these cases in which you are hired to
2  do an investigation or testify on their behalf or both?
3      A.  Typically testify as to whether or not they
4  breached the standard of care relating to general
5  accepted auditing standards.
6      Q.  Okay.  And have you ever been retained by
7  Arthur Andersen in that capacity?
8      A.  I don't believe so.
9      Q.  Have you ever worked on any engagement with
10  Arthur Andersen?
11      A.  I don't believe so.
12      Q.  Since you left PriceWaterhouse, have you done
13  any work for them?
14      A.  For PriceWaterhouseCoopers?
15      Q.  Yes.
16      A.  No.
17      Q.  You said you left PriceWaterhouse February of
18  2003?
19      A.  January of 2003.
20      Q.  January of 2003; okay.  You're aware there is
21  an issue in this case involving an unapplied cash
22  cleanup that began in October 2002; correct?
23      A.  I am, yes.
24      Q.  And are you aware that PWC was involved in
25  part of that project?

23

1      A.  I have seen their name throughout documents.
2  I don't know exactly what their involvement was.
3      Q.  Do you know when they got involved in that
4  project?
5      A.  I don't.
6      Q.  So it is only what you've seen in documents?
7      A.  Correct.
8      Q.  When you were at PWC, did you talk to anybody
9  that worked on the unapplied cash project?
10      A.  No.  I never heard of the unapplied cash
11  project until I was engaged on this matter.
12      Q.  Okay.  And you haven't talked to anybody since
13  you were retained, anybody from PCW that worked on any
14  part of the unapplied cash project?
15      A.  No.  As I said the only individuals I spoke to
16  in this engagement were the ones we talked about
17  earlier.
18      Q.  Okay.  If you could turn to Exhibit B.  It is
19  Appendix B or Exhibit B to Exhibit 1, your opening
20  report.  It is a list of prior cases in which you've
21  testified.  Appendix B.
22      A.  I'm there.
23      Q.  Okay.  It says, "Testimony at Deposition,
24  Trial and/or Arbitration from May 1st, 2003"; correct?
25      A.  That is correct.

24

1      Q.  And it lists 27 cases; correct?
2      A.  That's correct.
3      Q.  Of these cases did any of them involve
4  securities fraud allegations pursuant to the federal
5  securities laws?
6          MR. GLENNON:  I'd object only to the extent it
7  calls for a legal conclusion.
8          THE WITNESS:  I believe number 19, the FCC v.
9  Weitzen, et al. was under the federal securities laws.
10          MR. GREENSTEIN:  Q.  Do you know, was that a
11  10b-5 case.
12      A.  That's more of a legal issue.  I don't recall.
13      Q.  Do you know what rule 10b-5 is?
14      A.  Yes, I do.
15      Q.  Did that involve rule 10b-5?
16      A.  I don't remember.
17      Q.  Do you remember just the general nature of
18  that case?
19      A.  Well, the CEO, CFO and CAO of Gateway Computer
20  were alleged to have committed fraud and/or negligence
21  in their accounting for certain transactions at Gateway.
22      Q.  Gateway Computer company?
23      A.  Gateway Computer company, yes.
24      Q.  And you testified on behalf of Gateway?
25      A.  I testified on behalf of the three individual

25

1 defendants.
2 Q. One of which was Weitzen?
3 A. Jeffrey Weitzen.
4 Q. And he was the CEO?
5 A. He was the CEO, yes.
6 Q. And you submitted a report in that case?
7 A. I did, yes.
8 Q. And did you find that they -- strike that.
9 What was the conclusion of your report in that case,
10 generally?
11 MR. GLENNON: I'd object only to the extent it
12 calls for confidential information. But otherwise you
13 can answer.
14 THE WITNESS: With respect to Mr. Weitzen, he
15 was removed from the case after we filed our report.
16 And our report concluded that Mr. Weitzen, Mr. Todd, and
17 I can't think of the third individual's name, at Gateway
18 had acted properly with respect to their accounting for
19 certain transactions.
20 MR. GREENSTEIN: Q. If you look at that list,
21 are there any other cases that you can see that were
22 securities fraud related?
23 A. I don't see any others that are securities
24 fraud related.
25 Q. Have you ever provided expert testimony,

26

1 finding that an accounting transaction or transactions
2 was improper?
3 A. Yes.
4 Q. Are those cases listed here?
5 A. Karpetian v. Gazbiean, the first one, was
6 involving an individual suing a CPA relating to some
7 accounting issues, as I recall.
8 Q. Okay. Was that -- have you ever found in a
9 securities fraud case that transactions were improper,
10 any transactions were improper?
11 MR. GLENNON: Object to the extent it calls
12 for a legal conclusion.
13 THE WITNESS: I don't recall having done that,
14 no.
15 MR. GREENSTEIN: Q. Have you ever provided
16 expert testimony regarding the materiality of financial
17 misstatements?
18 A. Yes.
19 Q. And what cases did you do that in?
20 A. Number 1 would have involved materiality.
21 Number 5 would involve materiality.
22 Q. Clark versus Ernst and Young?
23 A. Yes.
24 Q. And you were retained by Ernst and Young?
25 A. I was, yes. Number 9 would have involved

27

1 materiality.
2 Q. Let me back up. So number 5, Clark versus
3 Ernst and Young, you were retained on behalf of Ernst
4 and Young, the defendant?
5 A. That's correct.
6 Q. And you opined on the materiality of financial
7 misstatements; correct?
8 A. Any time there is an alleged misstatement,
9 materiality is a factor, so it is by nature a part of
10 the assignment.
11 Q. So that it is -- that's always the case, if it
12 is a financial misstatement, necessarily it has a
13 materiality component?
14 A. Well, it has to, yeah, because APB 20, which
15 defines accounting errors, only requires they be treated
16 as a prior period adjustment under GAAP if they are
17 material.
18 Q. So Clark versus Ernst and Young, you were
19 retained on behalf of Ernst and Young, and did you find
20 that they materially misstated their financials?
21 A. No. I found that Ernst and Young's accounting
22 practices and the accounting by which they opined on the
23 assertions of management were appropriate.
24 Q. And number 9, Thayer v. Ernst and Young, I
25 think you mentioned that involved financial

28

1 misstatements; correct?
2 A. It did, yes.
3 Q. And you were retained on behalf of the
4 defendant Ernst and Young; correct?
5 A. That is correct.
6 Q. And what was the general opinion that you
7 submitted in that case?
8 A. Whether or not Ernst and Young had properly
9 complied with GAAS in opining on the GAAP financial
10 statements of Thayer.
11 Q. Did you find they properly complied with GAAS?
12 A. I did, yes.
13 Q. Did you also opine on whether the -- did you
14 just opine on whether Ernst and Young complied with
15 GAAS, or did you also opine whether certain transactions
16 complied with GAAP?
17 A. Both.
18 Q. Did you find the transactions that were at
19 issue complied with GAAP?
20 A. No, they did not comply with GAAP, because
21 they were a fraud.
22 Q. And what was -- just explain generally what
23 those transactions -- well, strike that.
24 So you found that there were certain financial
25 transactions that violated GAAP but Ernst and Young did

29

1    not violate GAAS in connection with those transactions;
2    is that correct?
3        A.  That's correct.
4        Q.  Do you remember the general nature of the
5    fraud in that case?
6        A.  It was a collusive fraud by management,
7    whereby they were changing bank statements and changing
8    sales invoices.
9        Q.  And you found that Ernst and Young complied
10   with GAAS?
11       A.  I found that Ernst and Young in performing
12   their auditing had complied with GAAS, yes.
13       Q.  Now, let's go down a line.  Any other
14   securities fraud related cases -- I see number 11
15   involves Ernst and Young also?
16       A.  That is correct.
17       Q.  Was that a securities fraud case?
18       A.  You know, I don't remember.  I'm sorry, was
19   that a securities fraud case, was your question?
20       Q.  Correct.
21       A.  I don't know if it was a securities case.  It
22   was a case that involved fraud.
23       Q.  Was it fraud allegations against Ernst and
24   Young?
25       A.  No.  It was allegations that Ernst and Young

30

1    had not performed a GAAS audit.
2        Q.  And you represented Ernst and Young?
3        A.  I did, yes.
4        Q.  What was your conclusion?
5        A.  That they had adhered to GAAS.
6        Q.  Okay.  So just going down the list, any others
7    besides number 19?
8        A.  Sorry, you're looking for --
9        Q.  Securities fraud related accounting fraud
10   cases.
11       A.  Oh.  Well, we talked about 19, that certainly
12   had those issues.
13       Q.  All right.
14       A.  Clear Channel versus City of Mountain View.
15       Q.  Number 20?
16       A.  Yes.  Involved a lease between Clear Channel
17   and the City of Mountain View where there was, I
18   believe, fraud involved.
19       Q.  And you were retained on behalf of the City of
20   Mountain View?
21       A.  That's correct.
22       Q.  What was your conclusion in that case
23   generally?
24       A.  That, in fact, Clear Channel or their
25   subsidiaries had, in fact, misreported certain financial

31

1    information to the city.
2        Q.  But Clear Channel was suing the city; correct?
3        A.  It was.  But the city counter-sued Clear
4    Channel.
5        Q.  Got it.  What was the outcome of that case?
6    Do you remember generally?
7        A.  The City of Mountain View was successful in
8    their case.
9        Q.  Okay.  Have you ever testified regarding
10   revenue recognition issues related to SOP 97-2?
11       A.  Yes.
12       Q.  How many cases, approximately?
13       A.  Dozens of times.
14       Q.  Any on here that jump out at you?
15       A.  The SEC v. Weitzen case involved SOP 97-2, as
16   I recall.
17       Q.  Okay.
18       A.  Thayer v. Ernst and Young involved 97-2.
19       Q.  Okay.
20       A.  Clark v. Ernst and Young involved 97-2.
21   Number 11, Otter Creek versus Ernst and Young involved
22   97-2.  Those would be the ones that come to mind on this
23   list.
24       Q.  Is it fair to say in all of those cases your
25   conclusion was that 97-2 was not violated?

32

1        A.  No, because to the extent there was a fraud,
2    and the earnings process was not complete based on 97-2,
3    the financial statements would have been misstated.
4        Q.  So, of these cases that involved 97-2, did you
5    ever issue an opinion or testify at trial that a
6    particular transaction violated SOP 97-2?
7        A.  On the number 11, I believe there was
8    testimony that because of fraud that certain
9    transactions, certain revenue was recognized
10   inappropriately and it would have been recognized under
11   97-2.  I don't remember if I specifically said 97-2 is
12   violated.
13       Q.  Was it software revenue recognition?
14       A.  It was, yes.  Software and hardware.
15       Q.  In other words, there were software
16   transactions -- you found that there were software
17   revenue transactions that were improperly booked,
18   regardless of whether they were under 97-2 or whatever
19   applicable rules; correct?
20       A.  That's correct.
21       Q.  Okay.  And that was at trial you testified
22   about that?  Or did you issue a report on that?
23       A.  Both.
24       Q.  Both; okay.  Do you have that report from that
25   case?

33

1      A.  Do I?
2      Q.  Yeah.
3      A.  I don't know if I still have that report or
4  not.
5      Q.  Okay.  Do you have a deposition transcript in
6  that case?
7      A.  I wouldn't have that.  I don't save those.
8      Q.  You don't save those?
9      A.  No.
10     Q.  Any?
11     A.  I don't save deposition transcripts.
12     Q.  Okay.  Do you save your reports?
13     A.  Typically I don't.  Whether or not this one
14  has been saved, I have no idea.
15     Q.  Do you save trial transcripts of testimony at
16  trial?
17     A.  I don't even get that.
18     Q.  You don't get that; okay.
19         And so were any of these other four cases that
20  you mentioned involving SOP 97-2, did you issue any type
21  of opinion or testify at trial that any transactions
22  were improper under 97-2?
23     A.  I believe Clark V. Ernst and Young had those
24  issues.  I believe number 9, Thayer V. Ernst and Young
25  had those issues.  Number 11 had those issues.

34

1      Q.  Let me stop you there.  Are you saying in
2  those cases you found -- you either testified or
3  proffered expert -- an expert report finding that a
4  transaction was improper under SOP 97-2?
5      A.  Maybe I need to explain this a little bit. SOP
6  97-2 is used quite a bit by software and high-tech
7  companies, but it really, if you look at SAB 101, issued
8  by the SEC, the four criteria within SOP 97-2 are the
9  exact criteria, that is evidence of a transaction, fixed
10  or determinable price, that the delivery has taken place
11  and the collectibility is assured.  So that bit of GAAP
12  is really pervasive throughout most revenue recognition,
13  whether it be software or whether it be construction.
14     Q.  Right, okay.  So what I'm trying to get at, in
15  any of those cases did you find a transaction was
16  improper under those rules, a revenue transaction was
17  improper?
18     A.  Yes.  And, that's what I was trying to answer,
19  I'm sorry, on the last question.  As I said, number 5 is
20  that way.
21     Q.  Okay.
22     A.  Do you want me to go down the list again?
23     Q.  You said 5, 9, 11?
24     A.  5, 9, 11, 19.  Those are the ones I can think
25  of as I sit here right now.

35

1      Q.  Do you have the reports in those cases?
2      A.  No.  I don't know if the actual -- some of
3  these I don't know if a report was issued.  And if it
4  was issued, I don't know if I would have it or not.  I
5  would have to check.
6      Q.  Can you do that?  Just make a note, if you're
7  willing to produce those, we would like them.
8      A.  So, so far I'm doing bills and reports.
9      Q.  Correct.
10     A.  So the list is complete.
11     Q.  We don't need the bills in the other cases.
12     A.  Understand.
13     Q.  So 5, 9, 11, 19, 20.
14     A.  Okay.
15     Q.  Has your testimony in any case in the past
16  five years ever been excluded by the court?
17     A.  No.
18     Q.  Never?
19     A.  No.
20         MR. GREENSTEIN:  Okay.  I'd like to mark this
21  as No. 3.
22         (Exhibit 3 marked for
23         identification.)
24         MR. GREENSTEIN:  Q.  For the record, this is
25  an expert witness report dated September 20th, 2004 from

36

1  J. Duross O'Bryan in the case GMG Stone, Inc.  Do you
2  recognize this document, Mr. O'Bryan?
3      A.  I do.
4      Q.  And was this a report that you produced in
5  connection with your report in this case?
6      A.  I'm sorry, what?
7      Q.  Do you recognize this document in front of
8  you?
9      A.  I do, yes.
10     Q.  And did you produce this in connection with
11  this case?
12     A.  Did I produce this in connection with this
13  case?
14     Q.  Yeah.
15     A.  I think it is on the list on Appendix B.
16     Q.  Well, I will represent to you it was produced
17  to us in connection with your opening report.  Did you
18  know that?
19     A.  I did not know that.
20     Q.  You didn't know that?
21     A.  No.
22     Q.  Okay.  If you look at -- what was this case
23  about, generally?  Actually, strike that.  If you turn
24  to Appendix B in the document.
25     A.  I'm there, yes.

37

1    Q.   And this is -- so this is a report dated
2  September 20th, 2004.  And it says it is a list of
3  testimony at deposition, trial and arbitration for
4  period January 1st, 1994 through September 20th, 2004.
5  Do you see that?
6    A.   I do, yes.
7    Q.   And then it's two pages.  And it looks like it
8  goes all the way back to 1994; correct?
9    A.   That's correct.  This produced a much greater
10  number because of the dates.
11    Q.   Right.  So this is ten years of testimony or
12  expert testimony at trial or in deposition; correct?
13    A.   I believe that's true, yes.
14    Q.   Okay.  Do you know if this is accurate?
15    A.   I believe it is, yes.
16    Q.   If you turn to page 2.
17    A.   I'm there.
18    Q.   And well, do you remember a case called Parnes
19  V. Harris involving a company called Puris Technologies?
20    A.   I do.
21    Q.   You do?
22    A.   Yes.
23    Q.   Do you remember when that deposition took
24  place?
25    A.   I don't.

38

1    Q.   Do you remember what that case was about?
2    A.   As I recall, it was about accounting issues,
3  and it seemed to me it was about bad debt, bad debt
4  issues or something that involved.
5    Q.   Bad debt reserve?
6    A.   I don't recall if it was reserve, or there was
7  warranty issues.  I don't recall the details of that
8  case.
9    Q.   And do you remember who you were retained by
10  on that case?
11    A.   As I recall it was Brobeck.
12    Q.   Brobeck is a law firm?
13    A.   Correct.
14    Q.   Were you retained by Brobeck to testify on
15  behalf of a party in that case?
16    A.   Yes.
17    Q.   Who was the party?
18    A.   I don't recall who the party was.  It may have
19  been Puris, the company.
20    Q.   Was it KPMG Marwick, perhaps?
21    A.   No.  No, I wasn't -- I was not retained on
22  that for KPMG.  I can't recall.  It was for the company.
23  KPMG was involved, I believe.
24    Q.   For Puris you were retained?
25    A.   I believe that's true, yes.

39

1    Q.   Do you remember the approximate date of that
2  deposition?
3    A.   I don't.
4    Q.   You were deposed in that; correct?
5    A.   As I recall, I was, yes.
6    Q.   And you submitted a report in that case;
7  right?
8    A.   I don't recall whether or not a report was
9  submitted.
10    Q.   But if it was -- if it was, say, in 2002, it
11  would be on this list here, page 2, Appendix B of
12  Exhibit 3 that you're looking at; right?
13    A.   It would be an page 1 or 2, yes.
14    Q.   Do you see it on this list?
15    A.   I don't.  But I don't know the timing of it,
16  number one.  And number two, sometimes, obviously, the
17  names are different than Puris or the obvious ones.
18    Q.   Do you remember a case called Parnes v.
19  Harris?  I will represent to you that's the case
20  involving Puris.
21    A.   Yeah, I didn't know that was the case name.
22    Q.   Okay.  Okay.  And do you remember ever being
23  involved in a case involving Stroock, Stroock and Lavan,
24  which is a law firm?
25    A.   I do, yes.

40

1    Q.   And do you remember who retained you in that
2  case?
3    A.   The case I'm thinking of was just in the last
4  couple of years.  And as I recall, I was retained by the
5  firm Stroock, Stroock and Lavan.
6    Q.   You provided expert testimony on behalf of the
7  law firm Stroock, Stroock and Lavan; correct?
8    A.   No.  The case settled before I testified, as I
9  recall.
10    Q.   If you turn to Appendix B of Exhibit 1 now,
11  which is your opening report in this case.
12    A.   Appendix B, I'm there.
13    Q.   You see number 8, Stroock, Stroock and Lavan
14  versus Houston RCW?
15    A.   I see that, yes.
16    Q.   The deposition date was May '04 it looks like;
17  correct?
18    A.   Yes.
19    Q.   Is there a reason that that case is not on
20  Appendix B to Exhibit 3 that we just looked at?
21    A.   Well, this was an American Arbitration
22  Association.  We say deposition.  I don't recall
23  testifying in a case for Stroock, Stroock and Lavan.
24    Q.   Okay.  Let's turn to Exhibit 3 now, Appendix
25  B.  You see it says, "Testimony at Deposition, Trial

41

1    and/or Arbitration for Period January 1st, '94 through
2    September 20th, 2004"?
3        A.  I'm sorry, you're on Exhibit 3 now, page --
4        Q.  I know this is confusing.  Appendix B of
5    Exhibit 3.
6        A.  I'm there, yeah.
7        Q.  And you see how it says, "and/or Arbitration"
8    at the top?
9        A.  I do, yes.
10       Q.  Is there a reason that that Stroock case is
11   not listed on here?
12       A.  I don't know.  Unless we realized I didn't
13   testify on that and there was a mistake made in the
14   original report.  Because I don't remember testifying on
15   a case for Stroock.  I know I was named on a case for
16   Stroock.  As I recall it was a Houston case.  But as I
17   recall, that case settled before I testified.
18       Q.  So, were you deposed?
19       A.  I don't recall being deposed.  It says I was
20   in May of '04, but I don't recall that.
21       Q.  Okay.  You said you reviewed the second
22   amended complaint in this case; correct?
23       A.  I believe that's true, yes.
24       Q.  Now, you may not know the distinction, but do
25   you know if it is the second amended complaint or the

42

1    revised proposed second amended complaint?
2        A.  If you let me get to my documents.
3        Q.  Sure, no problem.
4        A.  It says here, "Revised Second Amended
5    Complaint."  I'm referring to tab 2 within my binder.
6        Q.  Tab 2, is that a footnote to your opening
7    report?
8        A.  It is footnote 1 to my opening report.
9        Q.  Okay.  Great.
10       A.  There is an annotated version of this report
11   that has references, read references, that tie to the
12   documents in the three binders I have for the rebuttal,
13   two binders for the original report.  So the sections
14   may not exactly match up with the footnotes because they
15   are just different.
16       Q.  But if I were -- the report I have if I were
17   to look at the footnotes that refer to documents, would
18   those be accurate references?
19       A.  Absolutely.  They may just have a different
20   section within my support binder.
21       Q.  Got it; okay.  So after reading the complaint,
22   what is -- strike that.
23           What is your understanding of which quarters'
24   financial reports are alleged to be false and misleading
25   in this case?

43

1        A.  The second quarter of fiscal '01.
2        Q.  You're not here to testify or you don't intend
3    to testify on the falsity of Oracle's third quarter 2001
4    results; right?
5        A.  I am not testifying on the accuracy of the
6    third quarter of 2001.  I am testifying, however, that I
7    don't believe that any either alleged or potential
8    misstatements affected the second quarter, and they did
9    not affect the third quarter.
10       Q.  So you are not -- in this case you do not
11   intend to provide any testimony as to the accuracy of
12   Oracle's third quarter financial results; right?
13       A.  Only to the extent that my opinion is that any
14   accounting alleged errors or alleged misclassifications
15   affected the second quarter, and not the third quarter.
16   But I'm not going to opine about what those numbers were
17   in the third quarter or what they should have been.
18       Q.  So is it fair to say that to the extent
19   that -- strike that.
20           Are you saying that to the extent that the
21   second quarter results are inaccurate, you're not
22   opining on whether or not the third quarter was
23   inaccurate by nature of the second quarter being
24   accurate?  Is that fair to say?  Is that what you mean?
25           MR. GLENNON:  I object on vagueness grounds.

44

1            MR. GREENSTEIN:  Q.  I don't understand what
2    you mean in your last statement.
3        A.  Maybe I can simplify it.  All I'm suggesting
4    is that the second quarter alleged misstatements affect
5    the second quarter only, they do not affect any other
6    quarter of Oracle.  So they don't affect the third, they
7    don't affect the fourth.  They affect the second quarter
8    only.  They are isolated to the second quarter.
9        Q.  Okay.  Well, to the extent revenue was
10   improperly recognized in the second quarter and should
11   never have been recognized, wouldn't that have an impact
12   on the third quarter results?
13       A.  No.  It would be a second quarter issue.
14       Q.  Right.  But if a transaction was booked, for
15   example, $20 million improperly in the second quarter,
16   and it should never have been booked in any quarter?
17       A.  That would affect the second quarter only.
18       Q.  Wouldn't that revenue be part of Oracle's
19   financial statements in the third quarter?
20       A.  No.  Because it was booked in the second
21   quarter.
22       Q.  But -- so, your testimony in this case is only
23   on the accuracy or -- the accuracy of the second quarter
24   results; is that correct?
25       A.  Yes.  And just to clarify, only that it

45

1   involves the second quarter. It doesn't affect any
2   other quarter.
3        So, in other words, my opinion is that whether
4   it is $$20 million that affected the second quarter or
5   $40 million, $20 million with the bad debt reserve
6   transfers allegedly done improperly, $20 million for the
7   HP transaction allegedly done improperly, those affect
8   the second quarter. There is no rollover effect into
9   the third quarter because of those issues.
10       Q.  Why is that? Why do you believe that to be
11  the case?
12       A.  Because they were booked in the second
13  quarter. And if they are found to be not second quarter
14  transactions, they come out of the second quarter.
15       Q.  Okay. So in the case of a misstatement of a
16  particular quarter in general, is it always the case
17  that that misstatement can't impact the next quarter's
18  results?
19       A.  No. There could be issuances -- there can be
20  instances where you may move from one quarter to the
21  next.
22       Q.  To the extent something was improperly put --
23  improperly reflected in Oracle's balance sheet in the
24  second quarter and remained -- and that was improper,
25  wouldn't it remain on the balance sheet in the third

46

1   quarter?
2        A.  No. Because the third quarter would be
3   trued-up for actual results.
4        Q.  What if they didn't reverse whatever was
5   improper in the second quarter in the third quarter?
6        A.  Well, you wouldn't reverse. What we're
7   talking about here, I think you're talking about is the
8   reserve itself.
9        Q.  No. I'm talking about in general, whether a
10  misstatement in one particular quarter can impact the
11  next quarter.
12       A.  It can if it should have been moved to that
13  next quarter. But in this case, the issues we're
14  talking about just affect the second quarter, not the
15  third quarter.
16       Q.  If you could turn to page 21 in your opening
17  report, which is Exhibit 1, please.
18       A.  I'm there.
19       Q.  See how it says, "Reviewed various accounting
20  reports and documents"?
21       A.  I'm there.
22       Q.  And the first paragraph is, "Review of Summary
23  Reports."
24       A.  I'm there.
25       Q.  On this paragraph it appears that you say in

47

1   the second sentence, "The first report I reviewed was a
2   transaction register"; correct?
3        A.  Correct.
4        Q.  "Which listed all debit memos generated for
5   that day." Do you see that?
6        A.  I do.
7        Q.  Okay. And then the next sentence says, "I
8   inspected the account analysis report." Do you see
9   that?
10       A.  Two sentences down you mean?
11       Q.  The one after the transaction -- yes, yes.
12       A.  "I inspected the account"; I'm there, yeah.
13       Q.  You looked at the transaction register and the
14  account analysis report; correct?
15       A.  I did look at those two reports, yes.
16       Q.  Okay. And then in the next full paragraph it
17  says, "I also reviewed a sales journal by GL account
18  report." Do you see that?
19       A.  I do, yes.
20       Q.  So, the next section says, "Review of Sample
21  On-Account Transactions." You see that?
22       A.  I do, yes.
23       Q.  In those two paragraphs it appears that you
24  say you reviewed three reports, the transaction
25  register, the account analysis report and sales journal

48

1   by GL account report; is that fair to say?
2        A.  Correct, yes.
3        Q.  Now, are those the only reports you relied on
4   in rendering your opinion in this case?
5        A.  No. I've seen dozens of reports.
6        Q.  Okay. So with respect to these particular
7   reports, why did you cite them in this section?
8        A.  Because they have to do with understanding
9   whether or not there was any financial impact of the
10  debit memos booked on November 17th, 2000.
11       Q.  Okay. And so let's take the first one, the
12  transaction register. Do you see that?
13       A.  Yes.
14       Q.  And it says it listed all debit memos
15  generated for that day. Do you see that?
16       A.  I do.
17       Q.  And how does that tell you what the financial
18  statement impact of the debit memo says?
19       A.  You can see both a debit and credit in the
20  account for the debit memos. So you see both debits and
21  credit, which would mean the same amount, $692 million,
22  which would mean there would be no financial statement
23  impact.
24       Q.  Let me back up a little bit. In proffering
25  your expert report, you have a list, Exhibit C, that

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

49

1    provides all of the documents that you relied upon in
2    rendering your opinion; is that correct?
3        A.  That's correct.
4        Q.  If you could turn to that Exhibit C for me.
5        A.  I'm there.
6        Q.  Okay.  And see how it has a list of
7    depositions?
8        A.  It does, yes.
9        Q.  I'm going to list some names and ask you if
10   you've relied upon those depositions.  Is that okay with
11   you?
12       A.  Certainly.
13       Q.  Do you know who Terry Elam is?
14       A.  Terry Elam.  I don't recall that name.
15       Q.  Did you read his deposition?
16       A.  I don't recall reading that deposition.
17       Q.  Do you know who Julie Chan --
18       A.  I'm sorry, are you talking about with respect
19   to the original report or either?
20       Q.  Just talking about the original, the opening
21   report.
22       A.  Yes.  Julie Chan, yes, I know that name.
23       Q.  Back to Terry Elam, did you read the
24   deposition in connection with your rebuttal report?
25       A.  I have to look at that.

50

1        Q.  Let me ask you this.  If there is not a
2    deposition listed here, is it fair to say that you
3    didn't review that deposition transcript?
4        A.  No, that's not fair to say.
5        Q.  So there is some depositions you reviewed that
6    are not on this list?
7        A.  Yes.
8        Q.  Well, did you read the deposition of Terry
9    Elam at any time?
10       A.  I can't recall that deposition.
11       Q.  Okay.  Now, back to Appendix C with the
12   opening report.  It doesn't indicate that you relied
13   upon Julie Chan's deposition.  Did you read it before
14   you submitted the report?
15       A.  I did read Julie Chan's deposition.
16       Q.  But you didn't rely on anything in her
17   deposition?
18       A.  I did, actually, where she talked about the
19   transferring from the unapplied -- 25005 unapplied into
20   the 12018.
21       Q.  So you relied on Julie Chan's testimony in
22   your opening report?
23       A.  It may be in the rebuttal report.
24       Q.  What I'm asking, did you -- I'm going to focus
25   on this opening report.

51

1        A.  Okay.
2        Q.  Probably for a couple hours.
3        A.  Okay.
4        Q.  So I'm just asking you what you relied upon in
5    your opening report.
6        A.  Well, it would be -- I'm sorry, yes.
7        Q.  Do you understand that?
8        A.  I do, yes.
9        Q.  So what I'm asking is if you reviewed --
10   strike that.  What I'm asking is if you relied upon
11   anything in Julie Chan's testimony in this opening
12   report.
13       A.  I did.  I was aware of her testimony.  I read
14   her testimony specifically about the transfers from the
15   25005 account into the 12018 account.
16       Q.  So, you rely upon her testimony in this
17   opening report?
18       A.  I believe I do, yes.
19       Q.  So why isn't it listed there?
20       A.  There may also be references in the footnotes
21   within the report itself to different testimony.  I
22   don't recall if that's in here or not.
23       Q.  Well, to the extent that Julie Chan is not
24   specifically cited in the opening report, is there a
25   reason why you wouldn't list it if you relied upon her?

52

1        A.  No.  It may be that I was aware of that
2    information, it was something that I considered, it was
3    consistent with what I had seen from other testimony.
4    And I didn't see it necessary to include that.
5        Q.  So you didn't rely upon any testimony of Julie
6    Chan in this opening report, to the extent it is not
7    cited?
8        A.  Well, I mean, I looked at a number of
9    different things.  And some of this testimony I had
10   heard and/or seen from other sources, and with respect
11   to that transfer in the Arthur Andersen document,
12   specifically.  And then if I saw testimony from Julie
13   Chan that corroborated that, I considered that.
14       Q.  So you considered the testimony of Julie Chan
15   in rendering your opening report, but you didn't rely
16   upon it?
17       A.  I think that's a fair statement.
18       Q.  Okay.  The only reason I'm saying this,
19   because it says documents relied upon and you have depo
20   transcripts.  I'm trying to find out if there are any
21   depo transcripts that you relied upon that aren't in
22   here.
23       A.  I can't think of anything that I excluded.
24       Q.  I'm just going to list some names, and let me
25   know if you've read those.

53

1          Ian Hitada?
2          A.  I have reviewed some of Ian Hitada's
3    deposition testimony.
4          Q.  Did you review his deposition before you filed
5    your opening report?
6          A.  I don't recall that he's referenced in my
7    opening report.
8          Q.  Okay.  So is it fair to say you did not rely
9    on -- or you did not read Ian Hitada's testimony prior
10   to issuing your opening report?
11         A.  I think I had read it.  I just don't know that
12   I had relied upon it.
13         Q.  How about, do you know who Michelle Davidson
14   is?
15         A.  I don't know that name.
16         Q.  So you probably never read her depo?
17         A.  I may have.  I just don't recall the name as I
18   sit here.
19         Q.  I'll represent to you she was a 30(b)(6)
20   witness that testified on behalf of Household
21   Corporation.
22         A.  Okay.
23         Q.  Did you read that deposition before you
24   submitted your opening report?
25         A.  I don't recall reading that deposition.

54

1          Q.  Okay.  But you opine in your opening report --
2    you opine on the Household transaction; correct?
3          A.  I do, yes.
4          Q.  But you hadn't read Michelle Davidson's
5    testimony in reaching that conclusion?
6          A.  I don't recall reading her deposition, nor do
7    I think it was required to come to the opinion that I
8    did.
9          Q.  Okay.  But I'm just asking if you read it in
10   forming your opinion on Household.
11         A.  I don't recall reading her opinion -- her
12   deposition, excuse me.
13         Q.  Okay.  Was there a reason you didn't?
14         A.  No.
15         Q.  Okay.  Ryan Roberts?
16         A.  I don't recall the name.
17         Q.  Okay.  Sanjay Kumar?
18         A.  I do recall that name.
19         Q.  Do you know who Sanjay Kumar is?
20         A.  I forget who that individual is.
21         Q.  Well, it is not listed in here.  And I'll
22   represent to you that all these names I'm listing aren't
23   cited specifically in your opening report.  So I just
24   want to make it clear, I'm going to establish whether or
25   not you relied upon them, despite the fact it is not

55

1    cited.  Does that make sense?
2          A.  Yeah.  Yeah.  If it is not cited and it is not
3    on Appendix B, it wasn't something I relied on.
4          Q.  So, did you read the deposition of Ryan
5    Roberts prior to issuing your opening report?
6          A.  I don't recall.
7          Q.  Is that a no, or you just don't remember?
8          A.  I don't recall if I read that or not.
9          Q.  Do you know who Ryan Roberts is?
10         A.  No.
11         Q.  Sanjay Kumar, did you read his deposition
12   before you submitted your opening report?
13         A.  I don't recall reading his before my original
14   report, no.
15         Q.  You don't know who he is?
16         A.  I don't recall exactly his title.
17         Q.  Do you know anything about Sanjay Kumar?
18         A.  Not as I sit here right now.
19         Q.  Do you know who Raul Campos is?
20         A.  I do, yes.
21         Q.  Did you read his deposition before you
22   submitted your opening report?
23         A.  I thought I had reviewed through Mr. Campos'
24   deposition before my opening report, yes.
25         Q.  And -- but you didn't rely upon it, obviously,

56

1    right, because it is not listed in Appendix C?
2          A.  Correct.
3          Q.  How about Tom Rathjens?
4          A.  I know who Tom Rathjens is.
5          Q.  He's not listed in Appendix C to your opening
6    report.  Is it fair to say you didn't rely upon his
7    testimony in issuing your opening report?
8          A.  Mr. Rathjens is with HP, and, as you know, our
9    opening report was light on HP testimony, not knowing
10   what Mr. Rathjens might say about that.  So, there was
11   no reference to Mr. Rathjens.
12         Q.  You didn't read Mr. Rathjens' deposition
13   before opining on the HP transaction in your opening
14   report; correct?
15         A.  The original one; that's correct.
16         Q.  You said it was light on HP.  What do you mean
17   by that?
18         A.  If you refer to my opening report, the HP
19   transaction is discussed in page 41.  And when I say
20   light, it's simply a paragraph.  So that's what I mean
21   by light, when the rebuttal report speaks for almost 20
22   pages on the HP transaction.
23         Q.  And what's the reason why in your opening
24   report the HP transaction was, quote, unquote, light?
25         A.  Because that wasn't something that was pled

57

1   that I saw in the revised second amended complaint. The
2   only accounting issue that I knew was in the revised
3   second amended complaint was the debit memos.
4       Q.  But you provide an expert opinion on page 41
5   of your opening report in which you say, "I do not
6   believe there is anything improper in Oracle's
7   recognition of revenue from the HP transaction." Do you
8   see that?
9       A.  I do, yes.
10      Q.  So you proffered an expert opinion on the
11  propriety of that deal in this report; correct?
12      A.  I did, yes.
13      Q.  But you didn't read the deposition of HP's
14  witness before providing this testimony; correct?
15      A.  That's correct.
16      Q.  Okay.  So how did you go about determining
17  which depositions to read in connection with your
18  opening report?
19      A.  Ones that were relevant to my opinions.
20      Q.  Okay.  And how did you determine who was
21  relevant to your opinions?
22      A.  I looked through all the depositions that had
23  been taken and decided which ones were relevant or not
24  to me.
25      Q.  So you didn't think Raul Campos was relevant

58

1   to your opinion?
2       A.  As I said, I reviewed Mr. Campos' original
3   deposition in my original report, I just didn't rely on
4   it.
5       Q.  Okay.  How about Mike DeCesare, did you review
6   his deposition prior to rendering your opinion on
7   Hewlett-Packard?
8       A.  I did, yes.
9       Q.  You did?
10      A.  I did.
11      Q.  Did you rely on it?
12      A.  Prior to the original report?
13      Q.  Right.
14      A.  No.  I read Mr. DeCesare's deposition, as I
15  recall, but did not rely on it.
16      Q.  Okay.  So is it fair to say that in rendering
17  your expert opinion on page 41 and 42 of your opening
18  report on the HP transaction, you hadn't read the
19  depositions of either Tom Rathjens or Mike DeCesare; is
20  that correct?
21      A.  I don't think I had read -- I don't recall
22  about Mr. DeCesare's depo. I don't recall reading
23  Mr. Rathjens' before that initial opinion.
24      Q.  So you don't -- so is that a no?
25      A.  I don't recall reading either one before my

59

1   initial opinion.
2       Q.  Okay.  Do you know who Mike DeCesare was?
3       A.  I do.
4       Q.  Who is he?
5       A.  An individual, as I recall, with HP, having to
6   do with -- excuse me, with Oracle, having to do with
7   some of the products that HP purchased from Oracle.
8       Q.  And you didn't -- you didn't think that was an
9   important deposition to read prior to issuing an expert
10  opinion on the HP transaction?
11      A.  No.  Because when you look at the HP
12  transaction, this was a transaction that was booked by
13  Oracle in the second quarter of 2001 for $19.9 million,
14  approximately.  It was reviewed by the audit committee
15  of Oracle, it was reviewed by Arthur Andersen, the
16  outside auditors, reviewed by the revenue recognition
17  group of Oracle.  That's where my initial opinion really
18  came from.
19      So what others said with respect to that was
20  really, quite frankly, irrelevant, and only additive to
21  my opinion that that transaction was booked properly,
22  which I still believe it is today.
23      MR. GLENNON:  Eli, we've been going for about
24  an hour and 15 minutes.  Can we take a short break?
25      MR. GREENSTEIN:  Sure.

60

1       VIDEOGRAPHER:  Off record at 10:42.
2       (Recess, 10:42 a.m. - 11:05 a.m.)
3       VIDEOGRAPHER:  On record at 11:05.
4       MR. GREENSTEIN:  Q.  Mr. O'Bryan, if you can
5   turn to page 21 of your opening report, which is
6   Exhibit 1.
7       A.  I'm there.
8       Q.  Okay.  And earlier we were talking about the
9   reviewed summary reports, and in these two paragraphs
10  you list out three reports, transaction register,
11  account analysis report and sales journal by GL account
12  report; is that correct?
13      A.  That is correct.
14      MR. GREENSTEIN:  I'm going to mark for the
15  record Exhibit 4, which is a transaction register.
16      (Exhibit 4 marked for
17      identification.)
18      MR. GREENSTEIN:  Q.  For the record, this is a
19  transaction register previously marked at the deposition
20  of Greg Myers as Exhibit 4.
21      Mr. O'Bryan, if you could just take a look at
22  it and let me know when you're done, please.
23      MR. GLENNON:  I object only to the extent it
24  appears this is an expert.
25      MR. GREENSTEIN:  That's true.  For the record

61

1   this is an 800-page document.  What we've done here,
2   which is the same thing we did in Mr. Myers' deposition,
3   was to produce the first ten odd pages and the last
4   pages, because it is a large document.
5       Q.  Do you have a problem with that, Mr. O'Bryan?
6       A.  I don't.
7       Q.  Have you seen this document before?
8       A.  I have, yes.
9       Q.  And what is it?
10      A.  This is a transaction register which reflects
11  the debit memos that were run on November 17th, 2000.
12      Q.  Now, were the debit memos run on November
13  17th, 2000, or another day?
14      A.  I thought they were right around there.  I
15  thought they were on the 17th.  They might have been
16  right around there.
17      Q.  Around the 17th.  But are you sure they were
18  run on the 17th?
19      A.  I'm not exactly sure exactly what day.  That's
20  the transaction date.  The invoice date shown on the
21  transaction register, that's always the date I've
22  referred to as being the debit memo date.
23      Q.  Right.  I'm just asking if you have formed an
24  opinion based on all the evidence you reviewed as to
25  when the debit memos actually were run.

62

1       MR. GLENNON:  Objection; asked and answered.
2       THE WITNESS:  I don't recall.
3       MR. GREENSTEIN:  Q.  So it might not have been
4   November 17th?
5       MR. GLENNON:  Objection; vague and ambiguous.
6       THE WITNESS:  I just don't recall what date
7   specifically.  I've always referred to it as the
8   November 17th, 2000 date.
9       MR. GREENSTEIN:  Q.  Right.  And why do you
10  refer to it as November 17th?  Because that's what was
11  in the complaint?
12      MR. GLENNON:  Same objection.
13      THE WITNESS:  No.  Because that's what the
14  document shows.  If you take a look at the transaction
15  register, it shows invoice date November 17th.  I don't
16  recall that I addressed that specific date in my report,
17  but I may.
18      MR. GREENSTEIN:  Q.  I think you said on or
19  about November 17th.
20      A.  There you go.
21      Q.  In any event, is this the transaction register
22  that you're referring to in the -- on page 21 of your
23  opening report in the first full paragraph under section
24  A?
25      A.  I believe it is, yes.

63

1       Q.  Okay.  And what does this document purport to
2   say?
3       MR. GLENNON:  Objection; the document speaks
4   for itself.  Vague and ambiguous.
5       THE WITNESS:  I'm sorry, what do you mean,
6   what does it say?
7       MR. GREENSTEIN:  Q.  "Relied on this
8   document," quoting your report, "for the purpose of
9   understanding the total impact of the November 17th,
10  2000 accounting entries."  This is the first report you
11  relied on in forming that opinion; correct?
12      MR. GLENNON:  Same objection.
13      THE WITNESS:  I relied on this report.
14      MR. GREENSTEIN:  Q.  Okay.  Well, I'm just
15  reading.  It says, "I reviewed various accounting system
16  reports produced by Oracle for the purpose of
17  understanding the total impact of the November 17, 2000
18  accounting entries."  Do you see that?
19      A.  I do.
20      Q.  Then it says, "The first report I reviewed is
21  the transaction register" --
22      A.  Right.
23      Q.  -- "which listed all debit memos generated for
24  that day."  Do you see that?
25      A.  Yes.

64

1       Q.  Is this that transaction register that you're
2   referring to in there?
3       A.  Is this Exhibit 4?
4       MR. GLENNON:  Objection; vague and ambiguous.
5       MR. GREENSTEIN:  Q.  Is that the document
6   you're referring to there?
7       A.  There is an excerpt document.  I've seen the
8   entire 800 pages.
9       Q.  Assuming that the rest of the pages -- but
10  this is the same document; correct?
11      MR. GLENNON:  Objection; vague and ambiguous.
12      THE WITNESS:  I believe this is the same
13  document.
14      MR. GREENSTEIN:  Q.  Well, just take a look at
15  it.  I'm just wondering, this is the same document that
16  you relied upon?
17      MR. GLENNON:  Objection; vague and ambiguous.
18      THE WITNESS:  I am sorry, I don't mean to be
19  difficult.  I think I testified I think this is an
20  excerpt version of the same document I relied on.
21      MR. GREENSTEIN:  Q.  Okay, but it looks the
22  same as the transaction register that you relied on,
23  right, the 800-page document?
24      A.  Yes.
25      Q.  It reflects the same information; is that

65

1  right?
2      MR. GLENNON:  Same objection.
3      THE WITNESS:  As best I can tell.  It is only
4  ten pages of it.
5      MR. GREENSTEIN:  Q.  Well, what is a
6  transaction register?
7      A.  It is an accounting report that basically
8  summarizes, depending what the queries are of the
9  individuals running it, summarizes different
10  transactions either by account or by type or by day or
11  by GL number.
12      Q.  You said it depends on what the queries are of
13  the individuals running it; correct?
14      A.  Right.
15      Q.  So, do you know who the individuals were that
16  ran this?
17      MR. GLENNON:  Objection; vague and ambiguous.
18      THE WITNESS:  I don't know who pushed the
19  button to have this report run.
20      MR. GREENSTEIN:  But this report reflects
21  a query of whatever particular individual ran this
22  transaction register report; correct?
23      MR. GLENNON:  The document speaks for itself.
24      THE WITNESS:  That's correct.
25      MR. GREENSTEIN:  Q.  Do you know when this

66

1  document was run?
2      A.  I don't.  There's a date at the top,
3  November 5, 2002.  That may just be a print date.  So,
4  it looks to me like this document was printed on
5  November 5th, 2002.
6      Q.  And you're aware that there is an unapplied
7  cash project at issue in this case that began in October
8  2002; correct?
9      MR. GLENNON:  Objection; foundation.
10      THE WITNESS:  And you mean project -- I'm
11  aware that the collections department of Oracle went
12  about the process of trying to clean up the transfers to
13  the reserve that occurred in the second quarter of 2001,
14  in October/November of 2002.
15      MR. GREENSTEIN:  Q.  Okay.  And so you said to
16  clean up the transfers to the reserve that occurred in
17  the second quarter of 2001; right?
18      A.  And I only mean -- cleanup, that's the term
19  everyone has used, it is a cleanup process.  And I put
20  that in quotes.
21      Q.  What is your understanding of what the
22  unapplied cash -- strike that.
23      From here on after I'm going to refer to it as
24  the 2002 cleanup.  Is that okay with you?
25      MR. GLENNON:  Objection.  You're going to

67

1  refer to what as the 2002 cleanup?
2      MR. GREENSTEIN:  Q.  The unapplied cash
3  project beginning in October 2002.  You understand what
4  that is; right?
5      A.  I do, yes.
6      Q.  Because you opine on it in your report; right?
7      A.  I do, yes.
8      Q.  Okay.  I'm going to refer to that as the 2002
9  cleanup.  Is that okay with you?
10      MR. GLENNON:  Just point of clarification.
11  You're talking about all components of that, start date,
12  end date?  Anything and everything?  I think you need to
13  clarify exactly what it is you're talking about.
14      MR. GREENSTEIN:  Q.  The project that started
15  October 2002 involving the cleanup, as you call it, of
16  unapplied cash.  Is that fair to say?
17      MR. GLENNON:  Objection; vague and ambiguous.
18      THE WITNESS:  Is that a question?
19      MR. GREENSTEIN:  Q.  What is your
20  understanding of the unapplied cash project that began
21  in October 2002?
22      A.  My understanding is that the accounting
23  department of the company, Oracle, became aware of the
24  fact that there may have been transfers from 25005 into
25  12601 during the second quarter of 2001, sometime in

68

1  2002.  And they went about a process of trying to make
2  sure that those transfers were appropriate.
3      And that's what I've referred to as the
4  unapplied cash project.  People call it cleanup.  I'm
5  not sure that's a great name for it.  But that's what my
6  understanding of that unapplied cash project was
7  starting in approximately October of 2002.
8      Q.  Okay.  So, is it your understanding that that
9  project was only focusing on addressing items of
10  unapplied cash that had been transferred from 25005 to
11  12601 during the second quarter?
12      A.  Yes.
13      Q.  And is that the extent of the project?
14      MR. GLENNON:  Objection; vague and ambiguous.
15      THE WITNESS:  I don't know.  I wasn't there at
16  the time they were doing it.  For all I know there were
17  other issues going on.  I do know that that was the
18  project that I understand that started the attempts to
19  make sure and understand the transfers or better
20  understand the transfers from 25005 to 12601.
21      MR. GREENSTEIN:  Q.  Okay.  So it is not your
22  opinion that the -- that the unapplied cash project that
23  began in approximately October 2002 was only focused on
24  the transfers from 25005 to 12601 in the second quarter
25  of '01; correct?

69

1    MR. GLENNON: Objection; vague and ambiguous.
2    THE WITNESS: Well, I think that was the
3 primary objective of the exercise. Whether or not there
4 were other components to it or someone else had to do
5 something during that time frame, I don't know, I wasn't
6 there.
7    MR. GREENSTEIN: Q. But you looked at all the
8 evidence in this case that you relied on in your report?
9    A. I have, yes.
10    Q. How did you get an understanding what happened
11 during that unapplied cash project?
12    A. Based on my review in the depositions and also
13 seeing some of the work that was generated from that.
14    Q. When you say the work generated from that,
15 what do you mean?
16    MR. GLENNON: Objection; vague and ambiguous.
17    THE WITNESS: If you look at -- there is a
18 summarized document that really looks at the cash -- the
19 transfers from 25005 into 12601 that was summarized over
20 a long period of time, and where some of the outcome of
21 that project, where that went. There is a summary page
22 that I've referred to in my report and also relied on.
23    MR. GREENSTEIN: Q. And your opinion is that
24 $20.1 million in unapplied cash from 25005 was
25 transferred to 12601 in connection with the second

70

1 quarter in fiscal year '01; correct?
2    A. In connection with?
3    MR. GLENNON: Objection; vague and ambiguous.
4    THE WITNESS: I don't know what you mean, in
5 connection with.
6    MR. GREENSTEIN: Q. You say you relied on a
7 document that kind of summarizes the outcome of the 2002
8 unapplied cash project; correct?
9    A. Correct.
10    Q. What was the total amount transferred from
11 25005 to 12601 during the second quarter?
12    A. I think approximately $20 million.
13    Q. That's reflected in your report; right?
14    A. Correct.
15    Q. And I think you said that Oracle learned of
16 these transfers around that time, 2002; correct?
17    MR. GLENNON: Objection; vague and ambiguous,
18 mischaracterizes the testimony.
19    THE WITNESS: I think that Oracle was in the
20 process of investigating the allegations made on the
21 debit memos, and that sometime during that process they
22 understood -- they came to find out there may have been
23 transfers between 25005 and 12601. And that then
24 started a project, which is the unapplied cash project,
25 which started in about October of '02.

71

1    MR. GREENSTEIN: Q. It was the result of
2 plaintiffs filing their complaint in October 2002;
3 correct?
4    MR. GLENNON: Objection; mischaracterizes the
5 testimony, calls for speculation.
6    THE WITNESS: I don't know if that is the
7 genesis of it, or if -- I have no idea.
8    MR. GREENSTEIN: Q. But you mentioned
9 allegations regarding the debit memos; correct?
10    A. That's correct.
11    Q. So is it your -- strike that.
12    So are you testifying that Oracle learned of
13 these transfers from 25005 to 12601 in connection with
14 the investigation of the debit memo allegation?
15    MR. GLENNON: Objection; vague and ambiguous.
16    THE WITNESS: I don't know exactly how they
17 found out. My understanding is that it was part of that
18 process. But there could have been other reasons they
19 found out about it and investigated it.
20    I don't know exactly how they found out. My
21 assumption it had to do with part of the investigation
22 into the debit memos.
23    MR. GREENSTEIN: Q. Okay. Looking at what's
24 been marked as Exhibit 4, the transaction register for
25 November 17th, 2000.

72

1    A. Yes.
2    Q. If you look at the last page, appears to have
3 a total of $692,415,514.97. Do you see that?
4    A. I do, yes.
5    Q. And what does that mean to you?
6    MR. GLENNON: Objection; vague and ambiguous.
7 The document speaks for itself.
8    THE WITNESS: What does this mean to me?
9    MR. GREENSTEIN: Q. You said of this
10 document, saying that this -- for the, quote, "purpose
11 of understanding the total impact of the November 17th,
12 2000 accounting entries"; right?
13    A. Yes.
14    Q. So how does this document help you make that
15 determination?
16    MR. GLENNON: Objection; vague and ambiguous.
17    THE WITNESS: This just tells me the total
18 population of $692 million. There was allegations in
19 the revised complaint that went about a process of
20 trying to extrapolate based on some script outputs of
21 some 926 that alleged that potentially in excess of $228
22 million was erroneously booked into revenue because of
23 the debit memos. I found some of that -- those
24 calculations by the statistical individual -- I can't
25 think of his name, Mr. Laurentius or something like

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

73

1    that.
2         MR. GREENSTEIN: Q. Marais.
3         A. Marais?
4         Q. Yes. Laurentius, I think it is.
5         A. Thank you. -- rather interesting. Because,
6    the fact is, we've been able to quantify this and it is
7    $692 million.
8         So this just starts out to say that was the
9    amount of the debit memos run on November 17th or on or
10   around November 17th for a total amount of $692 million.
11        Q. So does this document show you what the
12   financial impact of the debit memos are on Oracle's
13   financial statements?
14        MR. GLENNON: Objection; vague.
15        THE WITNESS: No.
16        MR. GREENSTEIN: Q. It doesn't?
17        A. No.
18        Q. Why is that?
19        MR. GLENNON: Same objection.
20        THE WITNESS: Because it just totals up to
21   $692 million.
22        MR. GREENSTEIN: Okay. Put that aside. I'm
23   going to mark this as No. 5.
24             (Exhibit 5 marked for
25             identification.)

74

1         MR. GREENSTEIN: For the record this, is a
2    document Bates stamped NDCA-ORCL 050356 through 360.
3    And it is entitled, "Account Analysis Report."
4         So, have you seen this document before?
5         A. I have, yes.
6         Q. And if you turn to page 7 of your rebuttal
7    report for me.
8         A. 7 of rebuttal now?
9         Q. Yeah.
10        A. I'm there.
11        Q. Okay. And you see that this document is cited
12   in footnote 20; correct?
13        A. That's correct.
14        Q. And I'm going to refer you to this sentence
15   that precedes footnote 20, it says, "Furthermore, the
16   account analysis report with payables detail illustrates
17   that the entire $692 million was both debited and
18   credited to the same account on November 17th, 2000."
19   Do you see that?
20        A. I do.
21        Q. You refer to this document that's been marked
22   as Exhibit 5; correct?
23        MR. GLENNON: Objection; vague and ambiguous.
24        THE WITNESS: I'm referring to Exhibit 5, yes.
25        MR. GREENSTEIN: Q. Okay. Now, what does

75

1    this document purport to be?
2         MR. GLENNON: Same objection.
3         THE WITNESS: This document is an account
4    analysis report, which basically looks at, again,
5    accounts, specifically in this case 25005 account. And
6    it gives a summary of transactions that went on through
7    that for a period of time.
8         MR. GREENSTEIN: Q. Okay. And you say that
9    this document, quote, "illustrates that the entire $692
10   million was both debited and credited to the same
11   account on November 17th, 2000." Do you see that?
12        A. That's correct.
13        Q. Where in this document does it reflect that
14   the entire $692 million was both debited and credited to
15   the same account on November 17th, 2000?
16        A. On 050357.
17        Q. Okay. You're referring to the line where it
18   has a debit of approximately $692 million and a credit
19   of $692 million; right?
20        A. Yeah.
21        Q. If you look at the report cited on page 7 of
22   your rebuttal, it says, "The Account Analysis Report
23   with Payables Detail." Do you see that?
24        A. Right.
25        Q. If you look at this document it just says,

76

1    "Account Analysis Report." It doesn't say, "With
2    Payables Detail."
3         A. Well, if you look down in the batch name, see
4    where it says payables?
5         Q. I'm sorry, where?
6         A. If you look down -- in all the pages, the
7    first two pages, and really throughout the document, if
8    you look, you will see where there is actually payables
9    detail as well. This is just what's going on in the
10   25005 account.
11        Q. Okay.
12        A. And there is payable issues with respect to
13   that. Payables is probably a refund.
14        Q. Okay.
15        A. So that's where we're talking about payables
16   detail there. You see that referenced to the right of
17   batch name on 050356.
18        Q. Okay. So, but in your report it says the
19   account analysis report with payables detail.
20        Now, are you aware of a specific report that's
21   called the account analysis report with payables detail?
22        A. I'm not suggesting that's the name of the
23   report. I'm just saying it has payables detail on it,
24   which you can see under batch name.
25        Q. And I'm asking, do you have an understanding

77

1    there is another report called account analysis report
2    with payables detail that's different than this?
3         MR. GLENNON: Objection; incomplete
4    hypothetical, assumes facts not in evidence.
5         THE WITNESS: I've never seen such a report
6    like that.
7         MR. GREENSTEIN: Q. So you're saying this is
8    an account analysis report that has payables detail in
9    it?
10        A. Correct.
11        Q. Okay. So, again, how does this document
12   illustrate -- this is from your report, you say, "It
13   illustrates the entire $692 million is both debited and
14   credited to the same account on November 17th."
15        MR. GLENNON: Objection as to form.
16        THE WITNESS: If you refer back to Exhibit 4,
17   which is the transaction register, which in my opinion
18   is the summary of the debit memos run on or about
19   November 17th, you will see a number $692,415,514.97.
20   That exact same number is on Exhibit 5, and it shows in
21   this account as being both a debit and credit in the
22   account. Debit memo, it is about ten lines up from the
23   bottom, it is the exact same number. It is both a debit
24   and a credit, which would mean it has zero financial
25   statement impact.

78

1         Q. Okay. If you turn to page 12 in your opening
2    report, which is Exhibit 1.
3         A. I'm there.
4         Q. You see how there is some T accounts and
5    there's three steps, debits and credits?
6         A. Pretty good, T accounts.
7         Q. They are.
8              So, your opinion in your opening report is
9    that there were three offsetting debits and credits to
10   account 25005 on or around November 17; right?
11        A. Correct.
12        Q. If you look at the document that's Exhibit 5,
13   the account analysis report, you see there appears to be
14   one debit and one credit on November 17th reflecting
15   $692 million; do you see that?
16        A. I do.
17        Q. And if you look at page 7 of your rebuttal
18   report.
19        A. Page 7.
20        Q. 7 of your rebuttal. You're on it. And you
21   say, "The account analysis report with payables detail
22   illustrates that the entire $692 million was both
23   debited and credited to the same account, November
24   17th." Do you see that?
25        A. I do.

79

1         Q. Okay, so, where in this document does it show
2    that there were three offsetting debits and credits to
3    account 25005 of $692 million?
4         A. Well, in two places. With respect to the
5    debit memos, it is on page 050537. That is showing the
6    debit memos going in and out. Then the total impact,
7    25005, is on the very last page, excuse me, the second
8    to the last page, 050358. And if you look there it is
9    about $2.06 billion. If you multiply the 692 times 3,
10   that's the number you will get approximately.
11        Q. I'm sorry, what page are you looking at?
12        A. 050358.
13        Q. And you're looking at what number?
14        A. Just look at the biggest number, $2 billion.
15        Q. There's two numbers there, $2.923 billion in
16   debits and $2.826 billion on credits.
17        A. Yeah.
18        Q. Do you see that?
19        A. If you add those two together, the bottom
20   ones, it is about the same number. I think that's where
21   the three kind of were accumulated.
22        Q. Okay. But this document only shows one debit
23   and one credit to account 25005 in the amount of $692
24   million; right?
25        MR. GLENNON: Objection; foundation. The

80

1    document speaks for itself. Vague and ambiguous.
2         THE WITNESS: The document -- this document
3    shows that in that account, for debit memos, just debit
4    memos, there was $692 million going through as a debit
5    and credit. That's on page 2.
6         MR. GREENSTEIN: Q. Right.
7         A. And that's exactly what was debited and
8    credited to the account.
9         Q. So turning you back to page 12 of your opening
10   report, the T accounts.
11        A. Yes.
12        Q. You see how it has three steps, and there is a
13   debit and credit to 25005. Do you see that?
14        A. I do.
15        Q. You cite the testimony of Greg Myers for those
16   opinions; correct?
17        A. Correct.
18        Q. So what I'm asking is where in this document
19   does it show that there were three debits and credits to
20   25005?
21        A. The other would net out. But as I said, I
22   think I looked at this a little bit, just to kind of
23   think about that same issue. On 050358, the
24   miscellaneous receipts, or receivables, miscellaneous
25   receipts under -- second one down, $2.063 billion. So I

81

1  think that's where it actually gets -- all three are
2  shown in summary.
3       But the bottom line is, that it was -- the
4  debit memos went in and went out of the same account for
5  the same amount.
6       Q.   And you're saying -- on page 12 you say it
7  went in and out of the same account three times;
8  correct?
9       A.   Right.
10      Q.   And I'm asking you where on this document does
11  it indicate that that occurred?
12      MR. GLENNON:  Objection; vague and ambiguous,
13  asked and answered.
14      THE WITNESS:  Yeah, I think I've answered
15  that.  It is on page 2, which is the 692, okay.
16      MR. GREENSTEIN:  Q.  Um-hum.
17      A.   That's the sum of the debit memos, the sum net
18  effect of the debit memos, $692 million, which is
19  basically summarized as well on Exhibit 4.
20      Then if you wanted to try and summarize all
21  three, I think that's a component within 050358, which
22  is simply multiply those three by three and seeing that
23  number of about $2.063 billion.
24      Q.   But this report reflects all the debits and
25  credits going in and out of 25005 for this time period?

82

1       A.   Correct.
2       MR. GLENNON:  Objection; lack of foundation.
3       MR. GREENSTEIN:  Q.  So you look at page 2 of
4  this document, it shows one debit of $692 million and
5  one credit.  Do you see that?
6       A.   That's the one summarized amount that's been
7  summarized.
8       Q.   It's been summarized?
9       A.   Right.
10      Q.   So each of these numbers is a summary of --
11  I'm not sure I understand.
12      MR. GLENNON:  Objection; vague and ambiguous.
13      THE WITNESS:  That's the summary of Exhibit 4.
14  That was the debit memos run that put them into 25005 so
15  that they can then change the flag.
16      MR. GREENSTEIN:  Q.  What I'm asking is, this
17  report reflects all movements, or all debits and credits
18  in and out of 25005 for this time period, November 2000;
19  correct?
20      MR. GLENNON:  Objection; lack of foundation.
21      THE WITNESS:  You mean -- what document are
22  you talking about?
23      MR. GREENSTEIN:  Q.  Exhibit 5.
24      A.   Well, I don't know exactly what period -- this
25  says period October '00 to December '00.

83

1       Q.   But you said -- this is a document cited in
2  footnote 20 of your rebuttal report; right?
3       A.   Correct.
4       Q.   And you said that this report illustrates that
5  the entire 692 million was both debited and credited to
6  the same account; right?
7       A.   That's correct.  And it is on page 2.
8       Q.   Now, on page 12 of your opening report you say
9  there are three debits and credits to 25005 that occur
10  on that date; right?
11      A.   What I'm saying --
12      MR. GLENNON:  Let me assert an objection.
13  Vague and ambiguous.
14      THE WITNESS:  What I'm saying is that the
15  accounting process took three different steps, changing
16  from on-account to unapplied, going -- then issuing a
17  debit memo, which is transaction number two, or step two
18  of it, then applying those, then just changing the flag
19  back.
20      So the debit memos recorded in 25005 are step
21  two, and that shows -- the other ones are just changing
22  a flag.
23      MR. GREENSTEIN:  Q.  So, when you look at each
24  of these three T accounts, it says 25005; right?
25      A.   Right.

84

1       Q.   And there is a debit and a credit; correct?
2       A.   Correct.
3       Q.   And there's three debits and credits, or two
4  for each step; correct?
5       A.   Correct.
6       MR. GLENNON:  Object; vague and ambiguous.
7       MR. GREENSTEIN:  Q.  And I'm asking you where
8  that's reflected on this account analysis report, which
9  you said purports to show all the debits and credits
10  that occurred in 25005 during November 2000.
11      MR. GLENNON:  Objection; mischaracterizes the
12  testimony.  It's been asked and answered.
13      THE WITNESS:  Yeah, I think it is on page 2,
14  which is the $692 million.
15      MR. GREENSTEIN:  Q.  That's one debit and
16  credit; right?
17      A.   Right.
18      Q.   Where are the other two?
19      A.   Twofold.  One, it is just a changing of the
20  flag is the first and the third step.  And, two, I
21  believe that on page 05035 -- 60 -- excuse me, 050358,
22  you'll see a total of $2.063 billion.  I think that has
23  something to do with all three of them summarized.
24      Q.   Is it your expert opinion that that is the
25  three summarized?

85

1     MR. GLENNON:  Objection; vague and ambiguous,
2  lack of foundation.
3     THE WITNESS:  I haven't really researched it
4  in detail.  It is irrelevant.  $692 million went in and
5  $692 million came out.  That's the net impact.
6     MR. GREENSTEIN:  Q.  And I'm just wondering if
7  you can point me to somewhere on this document that
8  shows the three debits and credits to 25005 that you
9  conclude occurred on page 12 of your opening report.
10     MR. GLENNON:  Objection; vague and ambiguous,
11  asked and answered.
12     THE WITNESS:  Well, I'm not so sure you would
13  see it on there, because it was just a changing of the
14  flag, which wouldn't necessarily be reflected.  It may
15  be, as I mentioned, in the 050358, if that's where it is
16  completely summarized, which I think it might be.  I
17  haven't done that analysis.
18     Page 2 tells you exactly the total number of
19  debit memos that were run, and then used to apply and
20  change the flag.  That's the monetary impact to 25005.
21  The others are simply a changing of flags.
22     MR. GREENSTEIN:  Q.  Right.  But I'm asking if
23  your testimony is that there were three different debits
24  and credits to 25005 during November 2000?
25     A.  As summarized on page 12 of my initial report,

86

1  that's correct.
2     Q.  And those T accounts, your support for that is
3  the deposition of Greg Myers; correct?
4     A.  That is correct.  Well, yes, that's correct.
5  Plus I've seen these entries on output.
6     Q.  But -- besides script output, did you see
7  these three entries on any other document?
8     MR. GLENNON:  Objection; vague and ambiguous.
9     THE WITNESS:  A summary of those three
10  transactions?
11     MR. GREENSTEIN:  Q.  I'm talking about on
12  page 12 you indicate there are three offsetting debits
13  and credits to 25005; correct?
14     A.  That's correct.
15     Q.  And you cite Greg Myers' testimony for that;
16  right?
17     A.  That's one of the issues I cite, yes.
18     Q.  That's the only thing you cite on page 12;
19  correct?
20     A.  I've seen other things to tell me those
21  transactions occurred.
22     Q.  What other things have you seen?
23     A.  The script output.
24     Q.  Is that it?
25     MR. GLENNON:  Objection; vague and ambiguous.

87

1     THE WITNESS:  Also Mr. Williams testifies, on
2  page 13 of my report it says, "I knew that when they
3  processed those debit memos one of the first things that
4  Greg Myers told me is they booked equal and offsetting
5  debit and credit through 25005.  So by definition it did
6  not affect the balance sheet and could not have affected
7  the income statement."  So Williams also talks about it
8  as well.
9     MR. GREENSTEIN:  Q.  And it says Greg Myers
10  told him that, right?
11     A.  Yes.  But that's another individual that
12  understands it that way.
13     So, I don't remember if there is other
14  testimony people have talked about specifically those
15  offsetting.
16     Q.  I'm asking you besides Greg Myers' testimony,
17  besides Tom Williams' testimony based on what Greg Myers
18  told him, and besides the script output, is there any
19  document that reflects three offsetting debits and
20  credits to 25005 during this time?
21     A.  As I recall, the SEC presentation there was
22  also a discussion of the transactions.
23     Q.  Okay.  And that reflected three offsetting
24  debits and credits to 25005?
25     A.  I don't recall the specifics.  But I know it

88

1  talked about the process.  I don't remember if it said
2  three offsetting.
3     Q.  Okay.  Are there any internal Oracle documents
4  that reflect that that actually occurred in the general
5  ledger?
6     MR. GLENNON:  Objection; vague and ambiguous.
7     THE WITNESS:  Yes.
8     MR. GREENSTEIN:  Q.  What documents are those?
9     A.  Exhibit 4.  Exhibit 5.
10     Q.  But there's only one debit and credit on there
11  for 692?
12     A.  That was the sum effect of the debit memo,
13  $692 million.  That's what went into 25005 and was used
14  then to apply the unapplied and change the flag.
15     Q.  Okay.  But you don't see three offsetting
16  debits and credits to this account for $692 million; do
17  you?
18     MR. GLENNON:  Objection; vague and ambiguous,
19  lack of foundation.
20     THE WITNESS:  As I said, it may be part of
21  that last entry on that last page.
22     MR. GREENSTEIN:  Q.  It may be?
23     A.  I haven't done that, the math.  I think it is,
24  but I haven't done that.
25     But you wouldn't necessarily see that, because

89

1   it is the net effect of the credit memos, as I've said
2   before, which is the second entry is booking the debit
3   memo to then use to change the flag.
4       MR. GREENSTEIN: Okay. I'd like to mark this
5   as No. 6, please.
6       (Exhibit 6 marked for
7       identification.)
8       VIDEOGRAPHER: This marks the end of tape one,
9   Volume I, in the deposition of J. Duross O'Bryan at
10  11:49. Going off the record.
11      (Recess, 11:41 a.m. - 11:54 a.m.)
12      VIDEOGRAPHER: On record at 11:54. This marks
13  the beginning of tape two in Volume I in the deposition
14  of J. Duross O'Bryan.
15      MR. GREENSTEIN: Q. Mr. O'Bryan, referring
16  you to page 21 of your report under "Review of Summary
17  Reports," in the second full paragraph under the heading
18  A, it says, "I also reviewed a sales journal by GL
19  account report which listed all revenue recorded in the
20  general ledger in November 17th, 2000." Do you see
21  that?
22      A. I do, yes.
23      Q. And I just marked what as Exhibit 6, for the
24  record is NDCA-ORCL 048989 through 049207.
25      And it is a Sales Journal by GL Account

90

1   Report, GL date November 17th, 2000.
2       Mr. O'Bryan, have you seen this document
3   before?
4       A. I have, yes. It is referred to in footnote 21
5   of my report, page 7.
6       Q. Of your rebuttal report?
7       A. Yes.
8       Q. And so in your rebuttal report on page 7 you
9   say, "The sales journal by GL account report establishes
10  that Oracle only recognized approximately $10 million on
11  November 17th, 2000." Correct?
12      A. Correct.
13      Q. And you got that -- how did you come to that
14  number?
15      MR. GLENNON: Objection; vague and ambiguous.
16      THE WITNESS: Just go to the very last page.
17      MR. GREENSTEIN: Q. So, you're referring to
18  the last page where it has a total of $10,111,399.34?
19      A. Right.
20      Q. What does that number represent?
21      A. Revenue booked on that day by Oracle.
22      Q. Okay. You didn't do any other calculation to
23  support that number, it is just what is reflected on
24  this document; right?
25      MR. GLENNON: Objection; vague and ambiguous.

91

1       THE WITNESS: I don't understand the question.
2       MR. GREENSTEIN: Q. In other words, you
3   didn't do any calculations as to how much revenue was
4   actually booked at Oracle on that day; did you?
5       MR. GLENNON: Same objection.
6       THE WITNESS: This is the amount of revenue
7   booked on that day by Oracle.
8       MR. GREENSTEIN: Q. Okay.
9       A. Speaking of calculations as well, I was
10  thinking about the three entries that we talked about a
11  moment ago on Exhibit --
12      MR. GREENSTEIN: Q. 5?
13      A. 5. And so what I want to do at the break was
14  see if I could do the math really quick and show to you
15  all three entries on this.
16      And as I thought and mentioned, it is, in
17  fact, on page 050358. And the way you do the math is if
18  you take the first $692 million of debit memos, which I
19  talked about is the important piece of it, is on page
20  050357. Then if you go to 05036 -- excuse me, 58, you
21  will see $2.063 billion and $2.095 billion. The other
22  two transactions, step 1 and step 3 are in that, which
23  would then total $1,384,000,000. So simply take step 1
24  and step 3 of page 12 of my report, and then the
25  difference between that and the $2.063 billion would

92

1   simply be the cash that was recognized during the month
2   of November. And as you know, all cash goes through
3   25005.
4       And you can prove that by looking on page
5   050356 for October. You will see they brought in during
6   that month $597 million. And then if you go as well on
7   page 050360, you will see -- that's December, you will
8   see they brought in $662 million, or $635 million.
9       So the November piece is simply the plug that
10  would get you to 2.063. So I just proved the math to
11  myself based on your earlier questioning.
12      Q. Do you have any other support for that
13  calculation, any document?
14      MR. GLENNON: Objection; vague and ambiguous.
15      THE WITNESS: I have this document here. You
16  can add it up if you like. I just did the math here, is
17  my point.
18      MR. GREENSTEIN: Q. But on 050357, it only
19  shows one debit and credit to 25005; right?
20      A. That's step number two, the actual formation
21  of the debit credit -- debit memo.
22      As I told you earlier, I thought it was in
23  05036 -- or 58, and that's, in fact, where it is. The
24  other step 1 and step 3.
25      Q. But on the face of this document, there aren't

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

93

1 three separate debits and credits to account 25005 in
2 the amount of $692 million?
3       MR. GLENNON: Objection; vague and ambiguous.
4       THE WITNESS: There are.
5       MR. GREENSTEIN: Q. Where?
6    A. On page --
7    Q. I'm asking if you can show me three separate
8 debits and credits to account 25005 in the amount of
9 $692 million?
10    A. Yes.
11    Q. Okay, where?
12    A. On page 050537 is one.
13    Q. That's one.
14    A. And then on page 050358, those 692 are a part
15 of the $2.063 billion.
16    Q. Where does it say 692 on that page?
17    A. It won't say. It is a combined entry. And
18 the combination is entry one for 692, entry two for 692,
19 which comes to $1.384 billion, then the difference is
20 the cash that was received during the month of November,
21 which was both applied to -- in and out of 25005 to
22 either applied or to some other account.
23    Q. Okay.
24    A. So, anyway, I thought you might want to know
25 that I did do that math.

94

1    Q. Thank you.
2    A. You're welcome.
3    Q. Back to the document that's been marked as
4 Exhibit 6.
5    A. Yes.
6    Q. And that's the sales journal by GL account
7 report that your opinion is that that reflects $10
8 million approximately in revenue booked by Oracle on
9 that date; correct?
10    A. That is correct.
11    Q. And what is the date of this document?
12    A. Well, it looks like it was run November the
13 5th, 2002. But GL date, November 17th.
14    Q. So this report was run on November 5th, 2002;
15 right?
16       MR. GLENNON: Objection; calls for
17 speculation, lacks foundation.
18       THE WITNESS: I don't know when it was run.
19 I'm just saying it says report date. But what you have
20 to look at is the GL date, which is November 17th.
21       MR. GREENSTEIN: Mark the next as No. 7,
22 please.
23           (Exhibit 7 marked for
24            identification.)
25       MR. GREENSTEIN: Q. For the record, this is

95

1 NDCA-ORCL 971461 through 971507. It says, "Presentation
2 to the SEC Staff On Behalf Of Oracle Corporation," dated
3 October 29th, 2003. Have you ever seen this before?
4    A. I have, yes.
5    Q. If you turn to page 31, which is NDCA-ORCL
6 971491, it has a slide that says, "Revenue By Day For 2Q
7 2001."
8       By the way, for the record, when I refer to
9 2Q, or 2Q '01, what I mean is Oracle's fiscal 2Q '01.
10 Do you understand that?
11       MR. GLENNON: Objection; are you trying to
12 define a term?
13       MR. GREENSTEIN: Yeah.
14       MR. GLENNON: What term are you trying to
15 define, and with which defined term?
16       MR. GREENSTEIN: When I am talking about
17 Oracle's second quarter fiscal year 2001, I'm going to
18 refer to it as 2Q '01.
19    Q. Is that okay with you?
20       MR. GLENNON: Do you understand? He's saying
21 if he says the phrase 2Q '01, he's referring to second
22 quarter of fiscal year 2001.
23       THE WITNESS: Yes, I understand. I'm sorry, I
24 wasn't listening.
25       MR. GREENSTEIN: Q. Oracle is not on a

96

1 calendar year, they are on a fiscal year.
2    A. That's correct.
3    Q. So if you look at page 31, which is SEC
4 presentation. And have you ever looked at this slide
5 before?
6    A. I have, yes.
7    Q. And if you look at 11/17/00?
8    A. Yes, I'm there.
9    Q. And it appears that total revenue, it says
10 $9,354,677.48; correct?
11    A. That's correct.
12    Q. And if you look back at the previous document
13 we looked at, I think you testified that the total
14 amount of revenue booked by Oracle in 2Q '01 was $10.1
15 million approximately; correct?
16    A. That's correct.
17    Q. Okay. Can you explain why this document is
18 inconsistent with Exhibit 6?
19    A. I don't know the exact reconciliation, I've
20 never done that. But I certainly understand that this
21 was a report run in November of '02, it looks like. And
22 potentially there were additional adjustments that may
23 have passed through that, $800,000, which is completely
24 immaterial to Oracle. So why it changes, I don't know.
25 But I did notice that.

97

1    Q.  Okay, so let me see if I understand this
2    correctly.
3         So you're saying that in November 2002 or
4    after November 2002 when that sales report was run,
5    there may have been adjustments to Oracle's second
6    quarter results that were issued two years before?
7    MR. GLENNON:  Objection; mischaracterizes the
8    testimony, lack of foundation.
9    THE WITNESS:  No, I'm not saying that at all.
10   MR. GREENSTEIN:  Q.  I'm just trying to
11   understand the inconsistency between page 31 of
12   Exhibit 6 and the total on Exhibit 5.
13   A.  I don't, as I said, I don't know what the
14   difference is made up of.  I don't know the source of
15   971491.  I don't know where that information came from,
16   nor do I know what document was used, if it was even the
17   same run that was used in Exhibit 6.
18        I can understand why there might be
19   differences, was my point.  But I don't know what they
20   are, and I don't know what the reconciliation of that
21   $800,000 is.
22   Q.  But Oracle's second quarter '01 ended on
23   November 30th; correct?
24   A.  Correct.
25   Q.  So as an auditor, when would -- when would

98

1    somebody make an adjustment two years later to its
2    revenue numbers, such that this would occur?
3    MR. GLENNON:  Objection; lack of foundation,
4    vague and ambiguous, incomplete hypothetical.
5    THE WITNESS:  Well, this could have been a
6    report that was run at the time for 11/17, and there
7    could have been what are called topside adjustments,
8    meaning that someone decided that there was an $800,000
9    reduction in revenue that was appropriate for that day
10   because of subsequent information.
11        So topside adjustments could have very easily
12   been made off of that GL run to that summarized run.
13   There is a lot of reasons it could happen.  I don't know
14   what they are, but there is a lot of accounting reasons
15   that could occur.
16   MR. GREENSTEIN:  Q.  In your opinion, what was
17   the amount of revenue booked at Oracle on November 17th,
18   2000?
19   A.  The document I relied to, I chose the larger
20   of the two just to be conservative.  This shows 10.1.
21   This is actually a lower amount.  I chose to be
22   conservative in my report, and used 10.1.
23   Q.  Do you know what Oracle's total revenue for 2Q
24   '01 was?
25   A.  It was $2.6 billion.

99

1    Q.  Do you know what amount it was for the U.S.?
2    A.  For the U.S.?  No, I didn't break out that
3    component.
4    MR. GREENSTEIN:  Mark this as No. 8.
5         (Exhibit 8 marked for
6          identification.)
7    MR. GREENSTEIN:  For the record, NDCA-ORCL
8    1895918 through 1895922, it is an August 26th, 2004
9    e-mail from Molly Littlefield to Greg Myers and Lilly
10   Hao, H-a-o.
11   Q.  Let me know when you're finished reviewing it.
12   A.  I'm there, thank you.
13   Q.  Have you seen this document before?
14   A.  I have, yes.
15   Q.  Did you rely on this document in either your
16   report or your rebuttal report?
17   A.  No.  Considered it; didn't rely on.
18   Q.  Page 2, 1895919.  In the middle of the page it
19   is an e-mail from Molly Littlefield to a number of
20   individuals dated August 4th, 2004.  Do you see that?
21   A.  I do.
22   Q.  And it says in the first sentence, "Debit
23   memos can be very tricky, especially all the ones
24   created on November 18th, 2000."  Do you see that?
25   A.  I do.

100

1    Q.  Is it your opinion the debit memos were run on
2    November 17th or November 18th, 2000?
3    MR. GLENNON:  Objection; asked and answered.
4    THE WITNESS:  I think I answered that.  I said
5    on or around November 17th.
6    MR. GREENSTEIN:  Q.  Okay.  So it could have
7    been on November 18th; right?
8    MR. GLENNON:  Objection; vague and ambiguous.
9    THE WITNESS:  The documentation I've seen says
10   11/17.  Whether it is the 17th or the 18th really
11   doesn't make a difference.
12   MR. GREENSTEIN:  Q.  But this document written
13   in 2004 says that it was -- they were created on
14   November 18th; right?
15   MR. GLENNON:  Objection; vague and ambiguous.
16   The document speaks for itself.
17   THE WITNESS:  Well, Molly Littlefield thinks
18   it was run on the 18th.  Whether or not she really knew
19   or whether or not she was in a position to know the
20   exact date, or she may have gotten the date wrong, who
21   knows.
22   MR. GREENSTEIN:  Q.  Do you know who Molly
23   Littlefield is?
24   A.  Yes.
25   Q.  Who is she?

101

1    A.   Collections individual within Oracle.
2    Q.   Do you know if she helped create the script
3  output?
4    A.   She did not.
5    Q.   She didn't?
6    A.   I don't believe so.
7    Q.   Who did?
8         MR. GLENNON:  Objection; vague and ambiguous.
9         THE WITNESS:  I think it is Sanjay Kumar.
10        MR. GREENSTEIN:  Q.  I'm sorry.  I said the
11 script output.  I want to make a distinction between the
12 script output and debit memo script, the SQL script.  Is
13 that what you're referring to?
14   A.   I was referring to the SQL.  You asked me
15 earlier, Kumar, and I just remembered who that was.
16   Q.   I'm asking if you know -- you know what the
17 script output is; right?
18   A.   Yes.
19   Q.   What is it?
20   A.   It was done as part of this litigation, as you
21 well know.  There was about 926 produced, and it really
22 gives a transaction summary for any of the accounts
23 typically -- well, to start with, 776, over $100,000
24 that had on-account flags.  And then it -- there was an
25 additional sample 150 chosen by plaintiffs at random.

102

1  They were below potentially 150.  So, I'm sorry, it is a
2  transaction history of those transactions through a
3  period of time.
4    Q.   So a transaction history of all the
5  transactions related to the 926 debit memos; correct?
6    A.   That's correct.
7    Q.   So do you know if Molly Littlefield was
8  involved in creating the script output?
9    A.   I don't know.
10   Q.   Do you know who created the script output?
11   A.   I thought it was a combination of the
12 accounting department and the IT department of Oracle.
13   Q.   Do you know any -- well, let's turn to page 18
14 of your report.
15   A.   Original or rebuttal?
16   Q.   Original.
17   A.   I'm there.
18   Q.   And you see section D it says, "Subset of
19 Debit Memos Ordered for Discovery Purposes."  Do you see
20 that?
21   A.   I do, yes.
22   Q.   Then in the last sentence of that page it
23 says, "This production included a script output which
24 was designed by Oracle's IT department to compile a
25 step-by-step audit trail for each transaction which

103

1  contained a debit memo using data from Oracle's
2  accounting system."  Do you see that?
3    A.   I do, yes.
4    Q.   And what -- and you cite to footnote 54;
5  correct?
6    A.   That's correct.
7    Q.   And that's the Myers' declaration?
8    A.   That's correct.
9    Q.   What other evidence, if any, did you consider
10 in making the statement that the script output was
11 designed by Oracle's IT department to compile a
12 step-by-step audit trail for each transaction which
13 contained a debit memo?
14        MR. GLENNON:  Objection; vague and ambiguous.
15        THE WITNESS:  Well, that was my understanding
16 of what the discovery was all about on the debit memos.
17 So, my understanding that that was what the court
18 ordered, that detail be given for those debit memos, and
19 that that was the byproduct of that, was the script
20 output.
21        MR. GREENSTEIN:  Q.  So other than what you --
22 other than what you cite here, which is the Myers
23 declaration, did you rely upon anything else in making
24 that statement?
25   A.   You know, other than my understanding of what

104

1  the discovery orders were with respect to the scripts.
2    Q.   Okay.  But what I'm asking is, what did you
3  consider or rely upon in stating that the script output
4  was designed by Oracle to be a step-by-step audit trail
5  for each of the 926 debit memos?
6         MR. GLENNON:  Objection; compound and asked
7  and answered.
8         THE WITNESS:  I referred to Mr. Myers'
9  declaration.  I referred to I think now what I
10 understand the discovery orders were, and plus it just
11 makes logical sense to me that, who else is going to
12 design the step-by-step audit trail but Oracle?  I mean,
13 they are the ones that understand the numbers.  So, no
14 one else is going to do that.
15        MR. GREENSTEIN:  Q.  Do you know who designed
16 the script output?
17        MR. GLENNON:  Objection; asked and answered.
18        THE WITNESS:  The individual?
19        MR. GREENSTEIN:  Q.  Right.
20   A.   I think I answered that.  I do not know.
21   Q.   And you rely on the script output in your
22 report; correct?
23   A.   I do, yes.
24   Q.   Okay.  Did you do any assessment to verify the
25 accuracy of the script output?

O'Bryan, John Duross - Confidential 7/12/2007 9:29:00 AM

105

1     A.  No. I mean, I saw -- as you well know in my
2 original report, my rebuttal report, we talk about $2
3 million, where we've gone and looked at source
4 documents.
5     And I've also looked at, as you saw in my
6 report, a sample of 60, where we actually got source
7 documents and tied them back.
8     So I have seen support for those, yes. But I
9 didn't go back and audit all 926.
10    Q.  Right. So of the 926, you've looked at source
11 documentation for 60 of them; right?
12    A.  Just with respect to the three transactions,
13 the 11/17 debit memos.
14    Q.  There are 46,000 plus 11/17 debit memos;
15 correct?
16    A.  That's correct.
17    Q.  And out of that -- well, how many of those
18 debit memos did you look at in connection with your
19 reports?
20    MR. GLENNON: Objection; vague and ambiguous.
21    THE WITNESS: I looked at each and every one
22 of the 926. And then I took a subset of the 926, 60, to
23 go back and see the individual debit memos to see that
24 they tied.
25    MR. GREENSTEIN: Q. So you looked at -- so in

106

1 looking at the 926, did you look at the source documents
2 for all 926?
3    A.  No. 60.
4    Q.  Sixty. So, setting aside the 60 you looked at
5 the source documents for, the other debit memos of the
6 926 you relied on the script output for that
7 information; right?
8    MR. GLENNON: Objection; vague and ambiguous,
9 lack of foundation.
10    THE WITNESS: I looked at the script and saw
11 that there were three offsetting entries on 11/17/2000.
12    MR. GREENSTEIN: Q. Is that all you looked at
13 for those 926?
14    A.  No. Some of them there has been allegations
15 about refunds, allegations about the failure to refund,
16 there's been allegations about royalties. I looked at
17 those in a number different ways.
18    But my purpose for the original complaint or
19 the revised second amended complaint had to do with just
20 the debit memos.
21    So my first step in the 926 was to see that
22 all three of those transactions were offsetting in each
23 one of those 926.
24    Q.  Okay. So, for the 926, you relied upon the
25 script output; correct?

107

1    MR. GLENNON: Objection; vague and ambiguous.
2    THE WITNESS: I relied on the script output,
3 plus I took 60 of those and tied them back to source
4 documents.
5    MR. GREENSTEIN: Q. So of the 46,000 debit
6 memos, you looked at source documents for 60 of them;
7 correct?
8    MR. GLENNON: Objection; vague and ambiguous,
9 lack of foundation.
10    THE WITNESS: As it relates to the debit
11 memos, that's correct.
12    MR. GREENSTEIN: Q. So back to the script
13 output. So, you didn't verify or test the script output
14 to determine whether it was accurately reflecting those
15 926 debit memos; did you?
16    MR. GLENNON: Objection; vague and ambiguous.
17    THE WITNESS: No. I did. I looked at each
18 one of the three entries on the 926 script outputs, and
19 I saw there were three corresponding entries into 25005,
20 in and out.
21    MR. GREENSTEIN: Q. What I'm saying, did you
22 do any sort of testing or verification that the data in
23 the script output was accurate?
24    MR. GLENNON: Same objection; asked and
25 answered.

108

1    THE WITNESS: Yeah, as I said, I took a
2 subset -- first of all, I'm going to move into an audit
3 perspective here, inquiry and observation is evidence
4 from an auditor's perspective. So I put on an auditor's
5 hat in looking at that. And observing there were three
6 offsetting entries into the 926 script outputs helped me
7 understand that those were three offsetting transactions
8 that occurred. I then decided, using professional
9 skepticism, to then test 60 individually and see the
10 individual source documents.
11    MR. GREENSTEIN: Q. I understand.
12    A.  The actual debit memos.
13    Q.  Well, the script output has additional entries
14 other than the three offsetting entries to 25005;
15 correct?
16    A.  Absolutely.
17    Q.  So what I'm asking is, did you perform any
18 independent testing to verify the accuracy of all the
19 data that was contained in the script output?
20    MR. GLENNON: Objection; asked and answered.
21    THE WITNESS: No.
22    MR. GREENSTEIN: Q. Okay. So to the extent
23 you rely upon the script output in your reports, you're
24 assuming that the data within that is accurate; right?
25    MR. GLENNON: Objection; vague and ambiguous.

109

1    THE WITNESS: I'm assuming that the data
2  within what? I'm sorry.
3    MR. GREENSTEIN: Q. Within the script output.
4    A. I believe the script output is accurate.
5    Q. And what do you base that on?
6    A. Well, based on, A, my review of the three
7  transactions that we talked about, which had to do with
8  the only issue that I thought originally was in this
9  case at the time of my original report, which was the
10  debit memos, then I tested 60 separately.
11    And as I mentioned as part of the $2 million
12  that I believe were properly booked into revenue during
13  the second Q, we've also seen other supporting
14  documentation for that. But I have not gone back and
15  audited the 926 script outputs.
16    Q. That's fine. In performing your review of the
17  926 debit memos -- strike that.
18    So, did you do any review at all of the debit
19  memo -- the 45,000 plus debit memos that were not
20  provided in the script output?
21    MR. GLENNON: Objection; vague and ambiguous.
22    THE WITNESS: No.
23    MR. GREENSTEIN: Q. So your focus was on --
24    A. Other than seeing them on the overall debit
25  memo run, that 800 plus pages.

110

1    Q. Right. But you didn't look at -- you didn't
2  look at any of the 45,000 plus -- strike that.
3    So your review based on the script output and
4  individual debit memos was confined to the 926; correct?
5    MR. GLENNON: Objection; vague and ambiguous.
6    THE WITNESS: Would you repeat that?
7    MR. GREENSTEIN: Q. Your review of the debit
8  memos, the individual debit memos and the individual
9  transactions was confined to the 926 that appeared in
10  the script output; correct?
11    MR. GLENNON: Same objection.
12    THE WITNESS: That's correct.
13    MR. GREENSTEIN: Q. Okay. Do you know when
14  the script output was created?
15    A. I don't know the exact date.
16    Q. Okay. It was created for this litigation;
17  right?
18    A. That's my understanding, yes.
19    Q. Was the script output available on
20  November 17th?
21    MR. GLENNON: Objection; vague and ambiguous.
22    THE WITNESS: It certainly could have. All
23  the script output is, is a download of the accounting
24  information that's in the system. So, yes, that
25  information was available on 11/17.

111

1    MR. GREENSTEIN: Q. But the script output
2  wasn't available, obviously, on November 17th?
3    A. That exact document?
4    Q. Right.
5    A. No. That was created after that. But the
6  data that makes up the script output was all available
7  as of 11/17.
8    Q. And how do you know that?
9    A. Because it is just a core dump of the
10  accounting system. So it is -- it was there as of
11  11/17, it was there as of 11/15, 19, any day thereafter.
12    Q. What do you mean by core dump?
13    A. They just took the data and dumped it into an
14  SQL, which basically becomes a database and a spread
15  sheet. So all that information -- I'm sorry, repeat
16  your question.
17    Q. What is an SQL?
18    A. It is defined in my report. Structured Query
19  Language.
20    Q. And what does that mean?
21    MR. GLENNON: Objection; vague and ambiguous.
22    THE WITNESS: That was the software program,
23  that was the name of the software program designed by
24  Oracle's IT department to dump that information out of
25  the accounting records into script outputs.

112

1    MR. GREENSTEIN: Q. Just to be clear, are you
2  talking about the debit memo script that was run on or
3  around November 17th, or talking about the script output
4  that was created for this litigation?
5    A. I'm talking about the debit memo run that was
6  done on November 17th, 2000.
7    Q. So that's the core dump of data you're talking
8  about?
9    A. That was the creation of the three entries
10  that then became the 11/17/2000 debit memos.
11    Q. Okay. So from now on I'm going to refer to
12  that as the debit memo script. Is that okay with you,
13  just so we can clarify that's not the script output?
14    A. That's confusing to me. I've already confused
15  it once before. Let's call one the debit memos on
16  11/17 -- call them what you want.
17    Q. I just want to make sure we're talking about
18  the SQL script. Would that be easier for you?
19    MR. GLENNON: I don't mean to be difficult,
20  but I would object to a definition as between the two,
21  because I do think there is a real potential for getting
22  confused on those two. So maybe you want to identify
23  them by dates?
24    MR. GREENSTEIN: Sure.
25    Q. Well, how would you want to define them? What

113

1  would be easiest for you?
2      A.  One would be the 11/17 --
3      Q.  Script?
4      A.  No.  11/17 debit memos, and the next would be
5  the script output.
6      Q.  So how about I just say the 11/17 script, and
7  then the script output.  Is that confusing to you?
8      A.  Yes, it is.  You can call it what you want,
9  but I may have to have you explain it ten times.
10      MR. GLENNON:  I may have to object.
11      THE WITNESS:  It is confusing to me, because
12  they are both script.  You say script in both of them.
13  I apologize.
14      MR. GREENSTEIN:  Q.  Okay.  So were you
15  involved in creating the script output?
16      MR. GLENNON:  Objection; vague and ambiguous.
17      THE WITNESS:  Was I personally?
18      MR. GREENSTEIN:  Q.  Right.
19      A.  No.
20      Q.  Was any one of your staff involved?
21      MR. GLENNON:  Objection; vague and ambiguous.
22      THE WITNESS:  And I'm sorry to do this, but by
23  script output, you mean the 926?
24      MR. GREENSTEIN:  Q.  How about the 926 script?
25      A.  There you go.

114

1      Q.  Okay.
2      A.  No.  No one within Alix Partners or anyone I
3  know of was involved in the development of that program
4  to dump that data.
5      Q.  Looking at the script for the 926 debit memos,
6  do you find any errors or inaccuracies in that?
7      A.  I thought I remembered seeing one issue I had
8  a question about.  But I don't recall as I sit here
9  right now having any significant problems with the
10  script output.
11      Q.  What issue are you referring to?
12      A.  I know that, for example, one of the debit
13  memos didn't show up on the overall run of 46,000 debit
14  memo projects.  The debit memo run, one didn't show up.
15  And I don't remember specifically any, as I said,
16  significant problems with the script.
17      Q.  And just so we're clear, I'm talking about the
18  script for the 926 debit memos?
19      A.  I'm sorry.  We got confused again.  For the
20  926, I don't remember -- I don't recall having any
21  problems with the accuracy of those reports.
22      Q.  So, for the November 17th debit memo script
23  that was created in November 2000, you said there was an
24  issue with one debit memo that didn't show up; correct?
25      MR. GLENNON:  Objection; mischaracterizes the

115

1  testimony.
2      THE WITNESS:  I thought, as I recall, possibly
3  one of the entries or something didn't show up on the
4  overall run.
5      MR. GREENSTEIN:  Q.  And what -- is there a
6  way to identify that debit memo?
7      A.  Yeah, I have that.  55041671.
8      Q.  I see you are looking at a report.  Are you
9  looking at a particular page?
10      A.  I'm looking at my report.  I have a note on
11  the side.
12      Q.  Do you know what customer that debit memo was
13  for?
14      A.  I don't.
15      Q.  How did you determine that debit memo didn't
16  appear?
17      A.  I think one of my team told me about that.  I
18  think Mr. Sheppard told me about that.
19      Q.  Do you know why it didn't appear on the
20  November 17th script?
21      A.  I don't recall where it was and where it
22  wasn't.  I just heard that may have been the only one
23  that maybe didn't have the three offsetting entries or
24  something like that.
25      Q.  What entries did it have?

116

1      A.  I don't recall.  It wasn't material enough.
2      Q.  You don't know what customer it was for?
3      A.  No.
4      Q.  How did you find it?
5      MR. GLENNON:  Objection; asked and answered.
6      THE WITNESS:  I think one of my team members
7  told me about that, Mr. Sheppard.
8      MR. GREENSTEIN:  Q.  Did he tell you anything
9  else --
10      A.  No.
11      Q.  -- about how he found it?
12      A.  No.  It doesn't surprise me.  Out of 46,000 --
13      MR. GLENNON:  Just put an objection to the
14  extent that the communications between Mr. Duross and
15  his team are protected under the stip.
16      MR. GREENSTEIN:  Okay.
17      THE WITNESS:  Sorry.
18      MR. GLENNON:  That's all right.
19      MR. GREENSTEIN:  Q.  What is your
20  understanding of what a debit memo is?
21      A.  Debit memo is something that would increase an
22  amount owed to a company because of a transaction.  It
23  could be a new invoice, could be an adjustment to an
24  invoice.  But it is an increase to an account
25  receivable, basically.

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

117

1    Q.  So were the 46,000 debit memos an increase to
2   the accounts receivable?
3        MR. GLENNON: Objection; vague and ambiguous.
4        THE WITNESS: No.  They were an increase and a
5   decrease to an account.
6        MR. GREENSTEIN: Q.  So is that -- that's
7   inconsistent with what you believe to be the purpose of
8   a debit memo; correct?
9        MR. GLENNON: Objection; vague and ambiguous.
10  Mischaracterizes the testimony.
11       THE WITNESS: The debit memo was just a
12  process to clear a flag, that's it.  And because of
13  Oracle's accounting system, they had to create a debit
14  to relieve the on-account.  But there was no impact to
15  an individual account or to the overall financial
16  statements.  They were debits in and credits out.
17       MR. GREENSTEIN: Q.  But the use of debit
18  memos on November 17th was different from the definition
19  that you described; correct?
20    A.  There can be a number -- I mean, I gave you
21  one definition.
22       Another definition would be to use it to clear
23  an on-account flag.
24       MR. GREENSTEIN: Okay, let's mark this next,
25  9.

118

1            (Exhibit 9 marked for
2             identification.)
3        MR. GREENSTEIN: For the record, this is
4   NDCA-ORCL 047279 through 048683.  It says, "Oracle
5   Receivables User's Guide." This was previously marked
6   at Tom Williams' deposition as Exhibit 4.
7    Q.  Mr. O'Bryan, if you could turn your attention
8   to page 048665.
9    A.  I'm there.
10    Q.  You see it has a definition of debit memos?
11    A.  I see that.
12    Q.  Have you seen this document before?
13    A.  I have, yes.
14    Q.  And what is it?
15    A.  This is Oracle Receivables User's Guide, dated
16  March 1997, Volume I, Release 10SC.
17    Q.  Okay.  Did you rely on this document in
18  issuing your report?
19    A.  I certainly considered it.  I don't know that
20  I relied on it.
21    Q.  And the definition of debit memo there, it
22  says, "Debit that you assign to your customer for
23  additional charges that you want to collect." Do you
24  see that?
25    A.  I do.

119

1    Q.  Is that your understanding what a debit memo
2   is?
3    A.  No.
4    Q.  That definition is inconsistent with what you
5   believe to -- what a debit memo is?
6    A.  There are many definitions of a debit memo as
7   I mentioned.  That certainly is one, which I think I
8   mentioned previously.  But there can be many definitions
9   of a debit memo.
10       Anything to do with increasing a receivable is
11  a debit memo.  Anything to do with increasing any asset
12  is a debit memo.
13    Q.  But that definition is not -- the definition
14  you just described is not in this document; is it?
15       MR. GLENNON: Objection; vague and ambiguous.
16       THE WITNESS: No, it doesn't say it.  You can
17  see what it says.
18       MR. GREENSTEIN: Q.  If you turn to 048672,
19  you see the entry, it says, "On-account"?
20    A.  I do, yes.
21    Q.  And it says, "Payments where you intentionally
22  apply all or part of the payment amount to a customer
23  without reference to a debit item." Do you see that?
24    A.  I do.
25    Q.  Is that consistent with what you believe to be

120

1   the meaning of on-account?
2    A.  Not the only meaning of on-account.  I mean,
3   we know on-account at Oracle meant something completely
4   different.
5    Q.  But this is Oracle's user's guide; correct?
6    A.  Well, this is a guide that's used in
7   receivables.  The collection department had something
8   completely different when they were thinking of
9   on-account.
10       So on-account, because it said there in a
11  user's guide, does not restrict that's the only
12  definition a company can have to a debit memo or an
13  on-account.  It would morph into exactly what the
14  company is specifically using it for.  And the debit
15  memo was used to clear an on-account.  It is an
16  appropriate use of a debit memo.
17       An on-account at Oracle meant that it was a
18  receipt that had been dealt with.  It had been done,
19  dealt with, and accordingly applied to an invoice,
20  transferred into revenues, written off against bad debt,
21  whatever they did.  There were flags sitting, 46,000
22  that were sitting as of November 2000.
23    Q.  So you say on-account at Oracle meant it was a
24  reset that had been dealt with; right?
25    A.  That's correct.

121

1    Q.  And as of November 17th, how many on-account
2  items were there at Oracle?
3    A.  46,881.
4    Q.  So for all 46,000 of those, the receipt had
5  been dealt with; right?
6    A.  That's correct.
7    Q.  Okay.  And what do you mean by dealt with?
8    MR. GLENNON:  Objection; vague and ambiguous.
9    THE WITNESS:  That typically the collection
10  department had previously applied that receipt to
11  something, whether it be a refund, whether it be a
12  royalty that they figured out needed to be booked,
13  whether it be to an invoice.  It had been applied and it
14  was on-account.  It was applied a flag, there was no cash
15  sitting there, it was just a flag.
16    MR. GREENSTEIN:  Q.  No cash sitting there.
17  So were there any -- of the 46,000 receipts, were any of
18  them customer overpayments?
19    A.  No.  They could have been at some point in
20  time.  But as of the date they ran those debit memos,
21  those had all been cleared and put into some other
22  account.
23    Q.  And what accounts could those receipts have
24  been put into?
25    MR. GLENNON:  Objection; vague and ambiguous.

122

1    THE WITNESS:  They could have gone into a
2  refund, they could have gone into royalties, they could
3  have gone into any income account.  They could have gone
4  into accounts receivable, they could have gone against
5  a contra-account to an expense, to a tax rebate.  They
6  could have gone to a number of different places.  But
7  they had all been cleared and were just flagged sitting
8  there.  There wasn't 46,000 amounts of cash sitting
9  there to apply to something.
10    MR. GREENSTEIN:  Q.  Were any of those 46,000
11  on-account items refunded as part of the 2002 cleanup?
12    A.  They were, yes.
13    Q.  Okay.  How many?  Do you know?
14    MR. GLENNON:  Objection; vague and ambiguous,
15  lack of foundation.
16    THE WITNESS:  I couldn't have an exact number
17  of that.  As I referred to earlier, there is a summary
18  of that cleanup, what's called the unapplied or the
19  reserve process or the transfer to reserve process,
20  which was done in October, November of 2002.
21    And I have a page that summarizes it, it is
22  about $49 million.  And it split into different buckets
23  as to when it hit, those 25005s went into the reserve.
24  And the timing is such that you can't specifically say
25  what was in the quarter.  You can look for, I think it

123

1  is August of '00 through about December of '01.  So you
2  don't get an exact match.  So I can't tell you exactly
3  what was refunded out of those 46,881 debit memos.
4    MR. GREENSTEIN:  Q.  Of the 926 debit memos
5  that you reviewed, how many of those were refunded as
6  part of the 2002 cleanup?
7    MR. GLENNON:  Objection; vague and ambiguous.
8    THE WITNESS:  I don't know that number either.
9  I don't recall that number.
10    MR. GREENSTEIN:  Q.  But some of them were;
11  right?
12    A.  Certainly.
13    Q.  And why would they be refunded in 2002 if they
14  were sitting on-account as of November 17th, 2000?
15    MR. GLENNON:  Objection; calls for
16  speculation, lack of foundation.
17    THE WITNESS:  Because of the original transfer
18  that took place in, say, October or November of '00,
19  before the debit memos were run to clear the on-account,
20  if they had been put into the reserve account
21  inappropriately they would need to be fixed at some
22  point in time and some further research done.
23    MR. GREENSTEIN:  Q.  So the refunds reflect an
24  inappropriate transfer from 25005 to 12601; correct?
25    MR. GLENNON:  Objection; mischaracterizes the

124

1  testimony, lack of foundation.
2    THE WITNESS:  Way too broad of a question.
3  Sorry.
4    MR. GREENSTEIN:  Q.  What did you mean when
5  you said -- strike that.
6    So, if an on-account -- one of the on-account
7  items that were part of the debit memos transactions on
8  November 17th was refunded as part of the 2002 cleanup,
9  why was that?
10    MR. GLENNON:  Objection; vague and ambiguous,
11  lack of foundation.
12    THE WITNESS:  Because when the cash, the
13  unapplied cash was transferred into the 12601 account,
14  the 25005 account, into the 12601 account, which
15  happened for the most part in October/November of '00,
16  subsequent to that, at least six weeks later on the
17  October transfers, the debit memos were run to clear the
18  on-account.
19    So if, in fact, when those transfers were made
20  from 25005 to 12601 in October/November, if they were
21  done inappropriately, when the unapplied cash project
22  was done in November, if they researched that and saw
23  they were done inappropriately, there would be a refund.
24  Having nothing to do with the debit memos, having
25  everything to do with what was done in October and

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

125

1 November when there was a decision made to move it from
2 25005 into the 12601 account.
3 MR. GREENSTEIN: Q. Let's take a
4 hypothetical. So an item that was transferred, let's
5 say, in October 2000 from -- a receipt was transferred
6 from 25005 to 12601. You follow me?
7 MR. GLENNON: Objection. Is there a question?
8 Are you setting out a foundation for a hypo, is that
9 what you're doing?
10 MR. GREENSTEIN: Yes.
11 THE WITNESS: I understand that.
12 MR. GREENSTEIN: Q. And that occurred;
13 correct?
14 A. This is not a hypothetical?
15 Q. No. That occurred.
16 MR. GLENNON: Objection; vague and ambiguous.
17 MR. GREENSTEIN: Q. There were items of
18 unapplied cash from 25005 that were transferred to 12601
19 in October 2000; correct?
20 MR. GLENNON: Same objection.
21 THE WITNESS: There were, yes.
22 MR. GREENSTEIN: Q. Do you know how much
23 there were?
24 A. I have the number somewhere.
25 Q. Around 15 million?

126

1 MR. GLENNON: Objection; vague and ambiguous.
2 THE WITNESS: I don't remember the specific
3 number.
4 MR. GREENSTEIN: Q. So those items were
5 marked account as of November 17th; correct?
6 THE WITNESS: Were marked what?
7 MR. GREENSTEIN: Q. On-account.
8 MR. GLENNON: Objection; vague and ambiguous.
9 THE WITNESS: No. They had previously been
10 on-account, and that flag needed to go away.
11 MR. GREENSTEIN: Q. But, so they were
12 designated on-account as of November 17th; correct?
13 MR. GLENNON: Objection; vague and ambiguous
14 as to they.
15 THE WITNESS: I'm sorry, would you remind
16 repeating that? I lost your question.
17 MR. GREENSTEIN: Q. There was 46,000
18 on-account receipts as of November 17th; correct?
19 MR. GLENNON: Same objection; lack of
20 foundation.
21 THE WITNESS: Yeah, you got to start over.
22 MR. GREENSTEIN: Q. You don't understand that
23 question?
24 A. 46,000 on-account receipts as of
25 November 17th; correct? I don't even know that's a

127

1 question.
2 MR. GREENSTEIN: Q. Let me ask it this way.
3 So, earlier you stated there were 46,000 receipts
4 designated on-account as of November 17th; correct?
5 MR. GLENNON: Objection; mischaracterizes the
6 testimony, lack of foundation.
7 THE WITNESS: We can't use the word receipt.
8 There were 46,881 accounts that had an on-account flag
9 on them.
10 MR. GREENSTEIN: Q. Okay. And that -- okay.
11 And some of those items reflected a receipt being
12 transferred from 25005 to 12601; correct?
13 MR. GLENNON: Objection; vague and ambiguous.
14 THE WITNESS: And some of those reflected a
15 receipt being transferred -- I don't know what you mean.
16 MR. GREENSTEIN: Q. Well, why don't you
17 explain to me what you think the process is on
18 November 17th -- actually, scratch that.
19 So, the 46,000 items that existed as of
20 November 17th, 2000, were all those designated
21 on-account?
22 MR. GLENNON: Objection; vague and ambiguous,
23 lack of foundation.
24 THE WITNESS: All of the 46,881 debit memos
25 run, were run to clear an on-account flag on those

128

1 items.
2 MR. GREENSTEIN: Q. So all those items had an
3 on-account flag?
4 MR. GLENNON: Same objections.
5 THE WITNESS: That is correct.
6 MR. GREENSTEIN: Q. Okay. Meaning they had
7 previously been dealt with before; correct?
8 MR. GLENNON: Objection; vague and ambiguous.
9 THE WITNESS: Meaning that they had previously
10 been dealt with by transferring them against an invoice,
11 by applying them to royalties, income, expense, whatever
12 they decided to do. And some of them had moved from
13 12005 to 12601.
14 MR. GREENSTEIN: Q. You mean 25005 to 12601?
15 A. Yes. Did I misspeak?
16 Q. Yes.
17 MR. GLENNON: I don't want to interrupt. It
18 is quarter to 1:00. Can we take our lunch break?
19 MR. GREENSTEIN: Sure.
20 VIDEOGRAPHER: Off record at 12:43.
21 (Recess, 12:43 p.m. - 1:36 p.m.)
22 VIDEOGRAPHER: On the record at 1:36.
23 MR. GREENSTEIN: Q. Good afternoon,
24 Mr. O'Bryan.
25 A. Good afternoon.

129

1    Q.  Earlier you testified your testimony has never
2 been excluded from a case.  Do you remember that?
3    A.  I do, yes.
4    MR. GREENSTEIN:  I'm going to mark this next
5 as Exhibit 10.
6        (Exhibit 10 marked for
7        identification.)
8    MR. GREENSTEIN:  Q.  For the record, this is a
9 Lexis case printed out, dated April 5th, 2005.  Farnham,
10 F-a-r-n-h-a-m, v. Rehwald, R-e-h-w-a-l-d.  Mr. O'Bryan,
11 let me know when you're finished reviewing it.
12    A.  I have.
13    Q.  I would like to direct your attention to
14 page 5 of the document.  It is on the right-hand column,
15 sub point 2.  It says, "The court did not abuse its
16 discretion in excluding the testimony of J. Duross
17 O'Bryan."  Do you see that?
18    A.  I do.
19    Q.  That's you; right?
20    A.  That's correct.
21    Q.  And if you go down to right after the
22 underlined case cites, it says, "In the present case
23 Farnham attempted to prove the collectibility of an
24 enhanced settlement or judgment entirely through the
25 expert testimony of J. Duross O'Bryan, who had given

130

1 deposition testimony as to the value of certain assets
2 purportedly owned by the individual defendants in the
3 underlying action.  The trial court excluded this
4 evidence as unduly speculative and, therefore,
5 insufficient to prove collectibility."  Do you see that?
6    A.  I do, yes.
7    Q.  Is there a reason you didn't disclose this
8 earlier when I asked you if your testimony had been
9 excluded before?
10    A.  Yeah, because I never testified in court.  I
11 gave a deposition, and apparently the judge was not --
12 the judge made this ruling without even hearing my
13 testimony, other than my deposition.  I never testified
14 in court.
15    Q.  But you testified in a deposition; right?
16    A.  Yeah.  No.  When I heard your question this
17 morning, has any of my testimony ever been excluded, I
18 thought you meant as far as trial testimony.  I'm aware
19 of the fact I gave a deposition, and this court decided
20 it did not want to hear my testimony.
21    Q.  Do you know the reasons?
22    A.  What was described to me was that -- it was a
23 legal malpractice case, as I recall.  And one of the
24 issues with respect to the legal malpractice case was
25 whether or not the defendants -- or whether or not the

131

1 original cased defendants, the underlying cased
2 defendants would have had the wherewithal to pay any of
3 the damages.  And so I was asked to comment on some of
4 the values of their underlying assets in the underlying
5 case, which was part of my testimony.  Not all of my
6 testimony.  Just a part of it.  And the judge apparently
7 decided I should not give that testimony that was given
8 in deposition, not trial.
9    Q.  It was deposition testimony?
10    A.  I gave a deposition, yes.
11    Q.  So are there any other cases in which you --
12 your testimony, either deposition or at trial, has been
13 excluded?
14    MR. GLENNON:  Objection; vague and ambiguous.
15    THE WITNESS:  I am not -- this is the only
16 case I'm aware of where I gave deposition testimony that
17 was not admitted in a court.  And I'm not aware of any
18 testimony I've given in court that that has been
19 excluded.
20    MR. GREENSTEIN:  Q.  Okay.
21    A.  And that's what I was referring to this
22 morning.
23    Q.  And I think earlier we talked about a case,
24 Pames V. Harris, involving Puris.  Do you remember
25 that?

132

1    A.  Yes.
2    Q.  I think earlier you testified you never
3 changed your testimony during a deposition?
4    A.  That's correct.
5    Q.  Do you remember being deposed on June 26, 2002
6 in the Puris case?
7    A.  I don't, no.  I recall a deposition on Puris.
8 I don't recall that specific deposition.
9    Q.  Did you change your testimony in that
10 deposition?
11    A.  Not that I know of.
12    Q.  I want to direct your attention to page 32 of
13 your opening report, which is Exhibit 1, the section
14 entitled, "Review of Subset of Unapplied Cash
15 Transfers."
16    A.  32?
17    Q.  Yeah.
18    A.  Yeah, I'm there.
19    Q.  Okay.  The second sentence you say, "I've
20 reviewed the script output for the 926 debit memos to
21 determine which of the transactions that had debit memos
22 in their accounting histories also had a transfer to the
23 bad debt reserve within their audit trail."  Do you see
24 that?
25    A.  I do, yes.

133

1    Q.  You say, "Within the accounting histories of
2  the transactions relating to the 926 debit memos, I
3  found 121 transfers to the bad debt reserve during the
4  second quarter of fiscal year 2001."  Do you see that?
5    A.  I do, yes.
6    Q.  Then it says, "These 121 transfers accounted
7  for approximately $10.6 million of the $20.1 million
8  transferred to the bad debt reserve during the quarter."
9  Do you see that?
10    A.  I do, yes.
11    Q.  So you -- in looking at the 926 that you
12  reviewed of the script output, you found that
13  approximately $10.6 million had been transferred to the
14  bad debt reserve in 2Q?
15    A.  Correct.
16    MR. GLENNON:  Objection; vague and ambiguous.
17    MR. GREENSTEIN:  Q.  Did you do any analysis
18  of the other 9.5 million of the 20.1 total that was
19  transferred in the second quarter?
20    MR. GLENNON:  Same objection.
21    THE WITNESS:  Well, only to review a document
22  prepared by Oracle.
23    I'm sorry, your question is what period of
24  time?
25    MR. GREENSTEIN:  Q.  I'm asking if you did any

134

1  analysis of the $9.5 million in transfers during 2Q that
2  made up the rest of the $20.1 million.
3    MR. GLENNON:  Same objection.
4    THE WITNESS:  Well, as I referred to earlier,
5  there is a document, NDCA-ORCL 1646567.
6    MR. GREENSTEIN:  Q.  Can you repeat that?
7    A.  NDCA-ORCL 1646567.  I don't recall the name of
8  this document.  It's basically a summary, I believe, of
9  some of the reserve work that was done in
10  October/November of 2002 and on.  And it summarized kind
11  of the results of some of the work that was done in that
12  time frame.
13    And as I mentioned earlier, the miscellaneous
14  receipts column, which is column F, approximates $20
15  million.  The time frame is about the same, it's within
16  a month.  And the amount transferred into the bad debt
17  reserve is $18.9 million.  So fairly close to $20
18  million.
19    You can see a summary here of what was
20  resolved and how it was resolved in that regard.  So I
21  have also looked at that in addition to the specific 121
22  script outputs for the 926 subsection of total debit
23  memos.
24    Q.  So other than looking at that document that
25  was created by Oracle, did you perform any independent

135

1  analysis of the remaining $9.5 million in transfers to
2  the bad debt reserve in 2Q '01?
3    MR. GLENNON:  Objection; vague and ambiguous,
4  compound.
5    THE WITNESS:  No.
6    MR. GREENSTEIN:  Q.  With respect to the $10.6
7  million you looked at, the 121 transfers, can you just
8  describe the methodology you used in determining whether
9  those transfers were appropriate?
10    A.  The $10.6 million?
11    Q.  Right.
12    A.  There is a binder I brought with me today that
13  basically summarizes -- what we did was we ran a
14  database that pulled out of the 926 scripts all of those
15  that went from 25005 to 12601.
16    As I said, there was 121, totalling $6.10
17  million.
18    We then printed out script reports, script
19  output reports on each one of those and went through
20  each one of those in detail, and summarized this binder,
21  and as best summarized in a two-page document in front
22  of that binder is really the findings I've laid out with
23  respect to what I believe were appropriately, at least
24  some indication it was appropriate to include those in
25  the second Q '01 as being transferred from 25005 to

136

1  12601.
2    Q.  You're talking about -- you found that $2
3  million was appropriate?
4    A.  Approximately $2 million.  What I did was I
5  then matched that.  I found about $2 million, which I
6  could find some support for in script output, any kind
7  of notes that were taken from the collectors during that
8  time frame on the miscellaneous receipts section of
9  their report.
10    And I then matched that to the document we
11  just talked about, which summarizes the cash transfer
12  project.  And, you know, ours was $2 million.  When I
13  look at the report, it looks like it is at least $5.5
14  million that Oracle had decided was appropriately
15  recognized based into revenue based on that project.  I
16  felt like my number was conservative.
17    Q.  What was the total amount of bad debt
18  transfers that occurred, that Oracle tried to resolve
19  during the 2002 cleanup for all periods?
20    MR. GLENNON:  Objection; vague and ambiguous.
21    THE WITNESS:  I think it was approximately $50
22  million.
23    MR. GREENSTEIN:  Q.  $50 million?
24    A.  Something to that effect.
25    Q.  Could you calculate of that $50 million how

137

1  many items were refunded during the 2002 cleanup?
2      MR. GLENNON: Same objection.
3      THE WITNESS: No. Because -- I did with
4  respect to the second Q. But, again, the results are a
5  little bit skewed, because you're about a month off on
6  one side, maybe a couple months off on the other.
7      MR. GREENSTEIN: Q. So you didn't do any
8  calculations with respect to -- putting 2Q aside, the
9  rest of the, what did you say, $50 million?
10     A. Might have been $49 million.
11     Q. So you didn't do any independent analysis of
12  those other transfers, did you?
13     MR. GLENNON: Objection; vague and ambiguous.
14     THE WITNESS: What other transfers?
15     MR. GREENSTEIN: Q. The transfers in other
16  quarters besides 2Q '01 that were resolved in the 2000
17  cleanup.
18     MR. GLENNON: Same objection.
19     THE WITNESS: I didn't look at other Qs other
20  than the second Q.
21     MR. GREENSTEIN: Q. Okay. So going back to
22  that binder, that is something obviously you relied upon
23  in doing your calculations in your opening report;
24  correct?
25     A. I did, yes.

138

1      Q. Are you aware there is a stipulation in place
2  in this case that requires you to produce to plaintiffs
3  any spreadsheets, calculations, any documents you relied
4  upon, that you were supposed to produce that to us at
5  the time of your report?
6      A. Well, I think for the most part, other than
7  maybe a summary schedule that lays out the different
8  buckets, the three different buckets that we talked
9  about in my report, it is either a script output, which
10  you have all of, or there is also some supporting
11  documentation. Maybe there is credit memos or debit
12  memos, which I think have all been produced, as far as I
13  know.
14     Q. But that binder, you said you have summaries
15  on there of the $2 million that you deem to be
16  appropriate transfers; correct?
17     A. Well, one could go and look through each one
18  of the individual sheets and get that information as
19  well. All we did was summarize the sheet.
20     Q. But you prepared a summary of that information
21  that you relied upon; correct?
22     A. That is correct. Well, did I rely on it? Not
23  really. I mean, you could go through each one of these
24  schedules and get that same information out of it.
25     Q. What schedules are you referring to?

139

1      A. The script output, or a summary of the script
2  output that we prepared here.
3      Q. That document that you're pointing to there,
4  did you rely upon that?
5      A. No. All this was was just a summary for me
6  when I go through and review all the different
7  individual script outputs or the notes.
8      Q. So let me get this straight. You prepared
9  summaries of the $2 million that you felt were
10  appropriate transfers in the second quarter of '01, and
11  you relied upon those summaries in order to come to your
12  conclusions written in your report?
13     MR. GLENNON: Objection; mischaracterizes the
14  testimony, and asked and answered.
15     THE WITNESS: Yeah. No. What we did was we
16  got the script output for those 121, we reviewed through
17  each one of them individually.
18     We also got the notes, the collectors' notes
19  that were attached to the miscellaneous receipts
20  section, which was that period that best approximated
21  the second Q. And we looked at those notes.
22     We then got copies of either credit memos or
23  any other notes and data that we could find that had
24  been produced, as far as I know, and summarized that.
25     And basically we came to a conclusion whether

140

1  or not it could be either in the royalty bucket or the
2  credit memo bucket or in a bucket that was one of the
3  two but we just didn't see support for. And that's all
4  in this binder.
5      So if you took -- and then what we did is in
6  front of each one of those sections, which there is 35
7  of them, we simply put a single page, which summarizes
8  what the script says. And then we simply then
9  summarized those summaries on two pages in front.
10     If you didn't have those summaries or the
11  summary of the summary, if you will, you can still get
12  that information right out of this binder.
13     MR. GREENSTEIN: Q. But you used those to
14  calculate the total amounts, and you put those in
15  summary documents that you rely upon; right?
16     MR. GLENNON: Objection; mischaracterizes the
17  testimony, asked and answered.
18     THE WITNESS: The calculation is done in the
19  individual scripts. All that was is to summarize for
20  one place to go and look to see the number and tie it
21  back to the report.
22     MR. GREENSTEIN: Q. So you didn't rely on
23  that binder that's in front of you?
24     A. I did rely on the binder.
25     Q. You did?

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

141

1    MR. GLENNON:  Objection; mischaracterizes the
2  testimony.
3    MR. GREENSTEIN:  Q.  Did you rely on that
4  binder in front of you?
5    MR. GLENNON:  Same objection.
6    THE WITNESS:  I did rely on this binder in
7  front of me.
8    MR. GREENSTEIN:  Q.  And that binder contains
9  summaries of data that was pulled from the script
10  output; correct?
11    MR. GLENNON:  Same objection.
12    THE WITNESS:  As I said, the script outputs
13  were reviewed by us, and the information comes off of
14  that.  You can get all of the numbers that you see in my
15  report as to the $2 million right off of the script
16  outputs or the notes, the miscellaneous receipts.
17    All we did, for ease of summarization, was
18  prepare just that, a summary, which then ties to these
19  numbers.
20    So I certainly looked at it.  But the data
21  that I relied on was the source data, i.e., the script
22  outputs or the underlying source data.
23    MR. GREENSTEIN:  Q.  Turning to page 32 of
24  your report, of your opening report.  See the bullet at
25  the bottom, and it discusses, "Of the $10.6 million,

142

1  subject to my review, almost $700,000 of unapplied cash
2  transferred to the bad debt reserve during the second
3  quarter of fiscal year 2001 related to certain royalties
4  paid to Oracle."  Do you see that?
5    A.  Yes, I do.
6    Q.  How did you come up with that 700,000 number?
7    MR. GLENNON:  Objection; vague and ambiguous.
8    THE WITNESS:  By going through the script
9  outputs and the notes of the collectors as they went
10  through their cash project in October/November of 2002.
11    MR. GREENSTEIN:  Q.  So that $700,000, was
12  that related to one debit memo or multiple debit memos?
13    A.  Multiple.
14    Q.  Multiple.  How many, do you any?
15    MR. GLENNON:  Objection; vague and ambiguous.
16    MR. GREENSTEIN:  For the record the witness is
17  looking in the binder that is in front of him that he
18  said he didn't rely upon.
19    MR. GLENNON:  It is a videotaped deposition.
20    THE WITNESS:  Well, I want to clarify.  When I
21  said I didn't rely on -- when I said I did rely, I
22  relied on the script outputs and the notes.  The
23  summaries I don't need to rely on.  If you want to take
24  those out, that's fine.
25    MR. GREENSTEIN:  Q.  Can you tell me --

143

1  without looking at that binder, can you tell me how many
2  debit memos made up that $700,000 in royalties?
3    A.  Without looking at this binder?
4    Q.  Right.
5    A.  No.
6    Q.  Looking at the binder, can you tell me?
7    MR. GLENNON:  Same objection; vague and
8  ambiguous.
9    THE WITNESS:  Five.
10    MR. GREENSTEIN:  Q.  And can you tell me the
11  debit memo numbers of those five, please?
12    A.  3616, 3655, 7377, 13514, and 33069.
13    Q.  And can you tell me the customers that are
14  associated with those five?
15    A.  Yes.
16    MR. GLENNON:  Same objection; vague and
17  ambiguous.
18    THE WITNESS:  Dell Computer, Dell Computer,
19  Open Market, Structural Dynamic Research, Primavera
20  Systems, respectively.
21    MR. GREENSTEIN:  Q.  And those -- the debit
22  memo numbers that you just testified to, why aren't
23  those 550 numbers?
24    A.  We just truncated the 550.
25    Q.  So it is 550, and then the number?

144

1    A.  All the debit memos are 550.
2    Q.  Right.  And with respect to those five debit
3  memos, why don't you take me through the process of,
4  say, the Dell debit memo, and tell me what you saw in
5  the script output that led you to believe that that
6  royalty for that Dell debit memo was appropriately
7  transferred in the second quarter of '01.
8    A.  If you look at the script output on 10/1/2000,
9  the Dell Computer amount of $40,303 was transferred into
10  account 12601.  So there is the transfer.
11    Q.  On what date?
12    A.  10/1/00.  On November 17th, the debit memos
13  took place.  On 11/13/02, there was a reversal of the
14  debit memos, as the reserve project began.
15    On 5/14 of '04, they actually applied that
16  40,303 to an invoice.
17    Then if you look at the notes, the actual
18  collectors' notes, you will see that there were actually
19  royalties involved, and it was royalties that had not
20  been booked in the past, that went back all the way to
21  like May of 2000.
22    Q.  What was the invoice date of that debit memo?
23    A.  I don't see the actual date of the invoice,
24  the original invoice.  And there wasn't an invoice on
25  this one.  It was royalty that had never been booked

145

1  into revenue. That's what happened a lot of times on
2  royalties, they would get checks in from people who were
3  paying them royalties, and they hadn't issued an
4  invoice, or there was no invoice to apply it to. So
5  when they went and did the research, they realized that
6  they had a royalty relationship with these individuals
7  and that amount should have been applied to a royalty
8  income, but there was no invoice to apply it to.
9     Q. Why wouldn't there be an invoice for a royalty
10  payment?
11    A. Because sometimes Oracle wouldn't know,
12  specifically on royalty issues -- if they are --
13  basically if some of their computer people are licensing
14  some of their software and they are loading it onto
15  their computer, they paid them a royalty based on how
16  many of those they might sell, how many are loaded on
17  their computer. Oracle doesn't know how much they
18  loaded. So they don't know until they get the
19  information from the licensee as to what they loaded.
20  And at that point then they can book the revenue.
21    Some companies have different systems.
22  Apparently Oracle's is not where they can book it based
23  on knowledge of what the end-user loaded onto a
24  computer.
25    Q. So when did Oracle learn that that $700,000 in

146

1  purported royalties were actually -- should have been
2  booked as revenue?
3     MR. GLENNON: Objection; vague and ambiguous.
4     THE WITNESS: You don't know that. It could
5  have been known when they booked the original transfer
6  from 25005 to 12601.
7     MR. GREENSTEIN: Q. Well, you just said they
8  applied it to an invoice in 2004; correct?
9     A. Right. But there could have been knowledge of
10  that back in the second Q of '00/'01, and they simply
11  didn't book the invoice, they just booked it right to
12  income, which went through the reserve account.
13    Q. If they knew that the royalty payment was a
14  royalty payment and they could book it as revenue, why
15  would it need to be applied to an invoice in 2004?
16    MR. GLENNON: Objection; assumes facts not in
17  evidence, lacks foundation.
18    THE WITNESS: Because that's when -- there are
19  really two -- in my opinion there were really two
20  investigations that went on with respect to how to apply
21  25005 cash to 12601. Some of them are in October and
22  November of '00 when individuals made decisions to
23  transfer from 25005 to 12601. That went right into
24  income, actually went into reserve that went into
25  income. That was investigation number one in my

147

1  opinion.
2     Investigation number two is when the
3  collectors went back and specifically tested to see if
4  those were properly transferred to 12601 in the
5  second Q. And if they then found information that told
6  them it was properly booked, they, in fact, did that.
7     MR. GREENSTEIN: Q. And you're saying that
8  with respect to -- well, with respect to the Dell
9  royalty payment, that they learned that, according to
10  you, that it was proper, they learned that in 2004;
11  right?
12    A. No.
13    MR. GLENNON: Objection; compound, vague and
14  ambiguous.
15    THE WITNESS: I'm not saying -- I'm saying I
16  do know they knew that in 2004. I don't know that they
17  didn't know that in 2000.
18    MR. GREENSTEIN: Q. Wouldn't you -- you said
19  you looked at some notes, collectors' notes?
20    A. Correct.
21    Q. Didn't the collector note tell you when they
22  learned of this? Isn't it dated?
23    MR. GLENNON: Same objections.
24    THE WITNESS: The collectors' notes would all
25  be during the cash receipts project or the cash transfer

148

1  project -- cash reserve project in October/November of
2  2002. Those notes are from that time frame.
3     My point is, for all I know, that information
4  was known when they made the original transfer from
5  25005 to the 12601 account. They made that transfer.
6     MR. GREENSTEIN: Q. What evidence can you
7  cite that shows they knew at the time of the transfer
8  that it was a royalty payment?
9     MR. GLENNON: Objection. Calls for -- let me
10  withdraw that objection and insert a new one. Vague and
11  ambiguous.
12    THE WITNESS: Because they made the transfer.
13    MR. GREENSTEIN: Q. Because they made the
14  transfer in 2Q, that meant that they knew it was a
15  royalty payment?
16    MR. GLENNON: Same objection.
17    THE WITNESS: No. At that point all they may
18  have known was it was income.
19    MR. GREENSTEIN: Q. But if they knew it was a
20  royalty payment, wouldn't they just account for it as
21  any royalty payment? In other words, book it as
22  revenue?
23    MR. GLENNON: Same objection; calls for
24  speculation, lack of foundation.
25    THE WITNESS: That's what they did in

149

1  October/November of 2002 -- or 2000, they booked it as
2  income.
3         MR. GREENSTEIN: Q. True. But what I'm
4  saying is -- well, let me put it this way. In a normal
5  situation where Oracle receives a royalty payment, what
6  is the debit and credit?
7         MR. GLENNON: Same objection. Incomplete
8  hypothetical, lacks foundation, vague and ambiguous.
9         THE WITNESS: At what point? When they
10  booked the --
11         MR. GREENSTEIN: Q. No. If a royalty payment
12  such as Dell comes into Oracle, no invoice like you
13  described, and they know it, how do they recognize that?
14  What are the debits and credits?
15         MR. GLENNON: Same objections. Lack of
16  foundation, incomplete hypothetical and vague and
17  ambiguous.
18         Do you understand the question?
19         THE WITNESS: Yeah, I do. They debit cash,
20  credit 25005 unidentified or unapplied.
21         MR. GREENSTEIN: Q. Right. But if they knew
22  that it was legitimate royalty revenue, how would they
23  book that as revenue?
24         MR. GLENNON: Same objection.
25         THE WITNESS: Everything goes through 25005

150

1  when it comes in.
2         MR. GREENSTEIN: Q. No, but how would they
3  book -- that means it is unidentified; right?
4         A. Everything initially goes into 25005.
5         Q. I understand that. What I'm saying is if it
6  goes into 25005, it is unidentified and they can't apply
7  it to an invoice; right?
8         A. It all goes to 25005. And then it either
9  immediately gets applied by the system to an invoice or
10  it goes into unidentified or it goes into unapplied or
11  it goes into applied.
12         Q. Right. But if they figure out where it could
13  be applied, they apply it; right?
14         MR. GLENNON: Objection; vague and ambiguous.
15         THE WITNESS: Correct.
16         MR. GREENSTEIN: Q. And then it wouldn't be
17  in 25005 anymore; right?
18         A. Correct.
19         MR. GLENNON: Same objection.
20         MR. GREENSTEIN: Q. So what I'm saying is, if
21  a royalty payment came in in 2Q and Oracle knew that it
22  was a royalty payment and they wanted to book it as
23  revenue, you're saying that they would debit cash,
24  credit 25005?
25         A. That would be --

151

1         MR. GLENNON: Objection; vague and ambiguous,
2  incomplete hypothetical.
3         THE WITNESS: The initial transaction would be
4  a debit cash, credit 25005.
5         MR. GREENSTEIN: Q. What would be the next
6  transaction?
7         MR. GLENNON: Same objections.
8         THE WITNESS: The next transaction could be
9  that they take it as a debit to a receivable. And a
10  credit to income, royalty income.
11         MR. GREENSTEIN: Q. And so that would be --
12  if Oracle knew that it was a royalty, a legitimate
13  royalty payment that could be booked as revenue and they
14  knew that during 2Q, there would be those two debits and
15  credits; right?
16         MR. GLENNON: Objection; vague and ambiguous
17  and compound.
18         THE WITNESS: Well, you could also do it --
19  that's one way of doing it. There is another way of
20  doing it, which is just taking it against the reserve,
21  the 12601, and saying I recognize that 12601 will create
22  income, and book it there. It is an immaterial amount
23  of money on a quarterly basis, so it wouldn't matter, as
24  long as it gets to income one way, one how.
25         MR. GREENSTEIN: Q. Okay. So I just want to

152

1  make sure that it is clear.
2         So if a legitimate royalty payment was made
3  during the second quarter of '01, and Oracle knew that
4  it was a royalty payment that should be booked as
5  revenue, the way they would do that is by crediting
6  cash, debiting 25005 --
7         A. No.
8         Q. Just take me through the debits and credits of
9  a royalty payment that Oracle knew in 2Q should be
10  booked as revenue.
11         THE WITNESS: There are a number of ways they
12  could do that.
13         MR. GLENNON: Let me assert a "vague and
14  ambiguous" objection to the form of the question.
15         MR. GREENSTEIN: Q. So just give me the way
16  they could do it.
17         MR. GLENNON: Same objection.
18         THE WITNESS: They would debit cash, credit
19  25005. There would be no invoice to apply it to,
20  because in this hypothetical they don't know there is an
21  invoice out there.
22         They then identify this is a royalty payment
23  of some sort, so they could debit accounts receivable
24  and credit the sales revenues, then apply that cash to
25  the receivable.

153

1    Or they also could debit the 25005 and credit
2  12601. It has the same impact of going to revenue.
3    MR. GREENSTEIN: Q. That's true. Okay. So
4  what evidence do you have that Oracle knew during 2Q '01
5  that the Dell royalty payment was legitimate?
6    MR. GLENNON: Objection; vague and ambiguous
7  as to legitimate.
8    THE WITNESS: That it took that second entry,
9  debited 25005 and credited 12601. It was put into
10  income in the second Q.
11    MR. GREENSTEIN: Q. So with respect to --
12  what was the amount of the Dell debit memo?
13    A.  $40,000.
14    Q.  So with respect to the other $660,000 in
15  royalty items that were transferred to the bad debt
16  reserve in 2Q, is it your opinion that Oracle knew at
17  the time that those were royalty payments?
18    MR. GLENNON: Objection; vague and ambiguous,
19  compound.
20    THE WITNESS: I have to take you through a
21  little bit of Accounting and Auditing 101. Sorry.
22    MR. GREENSTEIN: Q. That's fine.
23    A.  Based on APB 20, which is correction of an
24  error, if somebody finds out in an accounting department
25  or a company finds out they have incorrectly accounted

154

1  for something, they need to consider whether that's
2  material. If it wasn't material, you would leave it
3  where you found it. But if somebody thinks it was
4  material at the time, then you fix it when you find it.
5  In other words, you make that correction when you find
6  it.
7    So, if in the second Q they were applying the
8  25005 to the 12601, that's recording income. If -- then
9  remember during October/November time frame they
10  reversed all of that. It all went out of reserve. It
11  reduced revenue, basically, by that $20 million.
12    So now what they are doing, they are now
13  trying to go back and redo what somebody potentially did
14  in the second Q. And in some of these instances I'm
15  finding and they are finding that the way it was booked,
16  at least as a credit to revenue, was appropriate.
17    So if it was done then in the second Q, based
18  on APB 20 and prior period adjustment GAAP accounting,
19  that's when you book it, is the second Q.
20    Q.  But you're saying that they realized that in
21  2004; correct?
22    A.  They may well have known that in 2000, the
23  second Q of 2000.
24    Somebody booked revenue on the Dell, in this
25  Dell example of $40,000 in income, it was booked income,

155

1  we know that, it was then reversed as part of this,
2  quote, unquote, cleanup process.
3    Then somebody went and researched this and
4  said, wait a minute, it was appropriately revenued in
5  the second Q, so it should be revenued in the second Q,
6  that's where you leave it.
7    Q.  Why didn't they reverse it before that?
8    MR. GLENNON: Objection; vague and ambiguous.
9    MR. GREENSTEIN: Q. Before the 2002 cleanup,
10  why didn't they reverse those transactions?
11    MR. GLENNON: Same question; same objection.
12    THE WITNESS: There was no reason to reverse
13  them, because they thought they were properly in income.
14    MR. GREENSTEIN: Q. So what was the reason
15  why they did it during 2002 cleanup?
16    A.  Because they were trying to be conservative.
17  I think you've seen plenty of testimony on this, that
18  when they thought there were transfers from 25005 to
19  12601, not fully understanding the impact, they decided
20  to be conservative and reverse everything and
21  re-research it. They, being Oracle.
22    Q.  So why did they do that -- why didn't they do
23  that in 2001?
24    MR. GLENNON: Objection; vague and ambiguous,
25  incomplete hypothetical.

156

1    THE WITNESS: Because at that point in time
2  they didn't know necessarily the magnitude or that there
3  had been 25005 transfers into 12601.
4    MR. GREENSTEIN: Q. So in looking -- in
5  determining that $700,000 of unapplied cash transferred
6  bad debt reserve in Q2 was appropriate with respect to
7  royalties, did you look at remittance information?
8    A.  We saw some remittance information.
9    Q.  For all five debit memos?
10    MR. GLENNON: Objection; vague and ambiguous.
11    THE WITNESS: I don't think it was all five.
12    MR. GREENSTEIN: Q. Was that physical copies
13  of remittance information?
14    A.  To the extent we had it, I think we would
15  have.
16    Q.  Did you cite that in your report?
17    A.  Let's go to the specifics. You're talking
18  about the five?
19    Q.  Just focused on the $700,000 royalty payments.
20    A.  I'm just going through each one of the
21  documents to see if there is any remittance information.
22    Here I see, this is on Open Market, which is
23  number -- the fourth one I think I mentioned to you,
24  NDCA-ORCL 515892. NDCA-ORCL 515892.
25    I see a copy of a remittance advice, a copy of

157

1  a check to Oracle from Open Market.
2      Q.  And is there a reason you didn't cite that in
3  your report, that document?
4      MR. GLENNON:  Objection; vague and ambiguous.
5      THE WITNESS:  You mean cite on page 20 --
6      MR. GREENSTEIN:  Q.  32.
7  A.  32?
8  Q.  Yeah.
9  A.  No.
10  Q.  Why not?
11  A.  I didn't see a reason.
12      MR. GLENNON:  Objection; vague and ambiguous.
13      MR. GREENSTEIN:  Q.  I'm sorry?
14  A.  I didn't cite every single document in the
15  report.  I may have relied on it, which would be back in
16  Appendix C, but I didn't cite each and every document we
17  saw in the report.
18  Q.  I understand.  So that document is cited in
19  Appendix C; correct?
20  A.  I believe so.
21  Q.  So what other -- did you look at source
22  documents for the $700,000 royalty payments?
23  A.  To the extent that we had them.  For example,
24  on -- well, some of the Dell information we had some
25  invoices.  On Open Market we talked about, we actually

158

1  have a royalty report that demonstrates to one of the
2  researchers that this was a royalty relationship.  And
3  I'm referring there to NDCA-ORCL 515892, which appears
4  to be attached to remittance advice.  So to the extent
5  we had source documents, we attached those.
6  Q.  So you didn't have some source documents for
7  some of those five debit memos?
8      MR. GLENNON:  Objection; vague and ambiguous.
9      THE WITNESS:  I would have to go through each
10  and every one -- we did have source documents.  I don't
11  know if they were absolutely complete.  But what made it
12  complete was the reviewing of the notes and seeing that
13  there was a royalty relationship based on the notes.
14      MR. GREENSTEIN:  Q.  When you say the notes,
15  you mean collector notes?
16  A.  That's right
17      MR. GLENNON:  Same objection.
18      MR. GREENSTEIN:  Q.  You're referring to the
19  ones in the script output; correct?
20  A.  That's correct.
21  Q.  Okay.  And was there one note for each
22  transaction?
23      MR. GLENNON:  Same objection.
24      MR. GREENSTEIN:  Q.  Strike that.
25      Was there one note for each of the five debit

159

1  memos?
2      A.  There are a number of notes.
3      Q.  So for the Dell debit memo, for example, how
4  many notes were there?
5      A.  For the Dell royalty item, there is one
6  note -- actually, there is, yeah, one note.  "No royalty
7  reports, use cash apps, per Jake, Dell is a full use
8  reseller.  They go through our partner resource network,
9  work directly with OA."
10      Q.  What date is that note?
11      A.  I don't know the exact date.
12      Q.  Okay.  Why not?
13      MR. GLENNON:  Objection; vague and ambiguous.
14      THE WITNESS:  Why not?
15      MR. GREENSTEIN:  Q.  Right.
16      A.  Because I don't see that exact date right
17  here.
18      Q.  Do you know when the note was written that you
19  just read?
20      A.  No, it doesn't matter when the date -- when it
21  was written, to me.
22      Q.  Why not?
23      MR. GLENNON:  Vague and ambiguous.
24      THE WITNESS:  I'm sorry, I thought I described
25  that, and I'll do it again.

160

1      I believe that there was work done in October
2  and November of '00 to transfer money from the 25005
3  into the 12601, and that created revenue, either
4  through -- principally through increasing the reserve.
5      Then because of the part of this cleanup
6  process, cleanup of the reserve process, that was all
7  reversed on a conservative approach by Oracle, and
8  completely re-researched.
9      And in the re-research, as far as I can tell,
10  and I will even take the later date, there is a note
11  here that Dell should be reported as a royalty.
12      So, if it was figured out in '02 or '03 or '04
13  as a royalty, that it should have been applied back at
14  the time, back into the second Q, or at the time that
15  original transfer was made it's appropriately recorded
16  as revenue then under GAAP.
17      MR. GREENSTEIN:  Q.  What do they do in 2004
18  once they learned that it was appropriate?
19      MR. GLENNON:  Objection; vague and ambiguous.
20      THE WITNESS:  They --
21      MR. GLENNON:  Incomplete hypothetical.
22      THE WITNESS:  They rebooked it to income,
23  which they had done in the second Q of '01.
24      MR. GREENSTEIN:  Q.  Do you know the date they
25  did that?

161

1    A.  The original?
2        MR. GLENNON:  Objection; vague and ambiguous.
3        MR. GREENSTEIN:  Q.  No.  The date in which
4    they booked it to revenue?
5    A.  Yes.
6        MR. GLENNON:  Same objection.
7        THE WITNESS:  On 5/11/04.
8        MR. GREENSTEIN:  Q.  And what document are you
9    referring to, the document you just looked at?
10   A.  I'm referring to the script.
11   Q.  The summary of that transaction; right?
12   A.  The script.
13       MR. GLENNON:  Objection; misstates the
14   testimony.
15       MR. GREENSTEIN:  Q.  What's the Bates number
16   of the document you're looking at?
17   A.  This is simply a printout of -- there is no
18   Bates on this.  It is just a printout of the script for
19   Dell.
20   Q.  So there is no Bates number, so I can't go
21   look at that information in a Bates numbered document;
22   right?
23       MR. GLENNON:  I object.  Plaintiffs know the
24   Bates number for the access database are all script
25   outputs.

162

1        MR. GREENSTEIN:  Q.  So you can't identify a
2    Bates number where that information is; correct?
3    A.  There is no Bates on this.  We simply printed
4    it off a database.
5    Q.  That's part of the summaries you were talking
6    about earlier?
7        MR. GLENNON:  Objection; mischaracterizes the
8    testimony.
9        THE WITNESS:  This is the script output, and
10   it is, as I said, debit memo 3616 for Dell.  And you can
11   see the application of the invoice on May 11, 2004.
12       MR. GLENNON:  We're happy to provide
13   plaintiffs with a Bates number for the script output if
14   you would like it.
15       MR. GREENSTEIN:  We're going to be requesting
16   any compilations or summaries or spreadsheets that
17   Mr. O'Bryan relied upon in coming to these conclusions,
18   which it is obvious he did, because he keeps looking at
19   them and he can't give me a Bates number.  So we're
20   going to request it, because under the stip we're
21   entitled to those documents.
22       MR. GLENNON:  I don't think you met your
23   foundation, because he's got to rely on them, and he
24   specifically said probably eight times that he relied on
25   the source documents in the script output.  And that's

163

1    what he was just referring to.
2        If you want to keep pressing him on what it
3    was he relied on, be my guest.  But I don't think you
4    met your foundation yet.
5        MR. GREENSTEIN:  Q.  Can you cite a Bates
6    number for the Dell debit memo that shows when the
7    royalty was booked?
8        MR. GLENNON:  Objection; vague and ambiguous.
9    Are you talking about the script output?
10       MR. GREENSTEIN:  Q.  Do you understand the
11   question?
12   A.  The script output, is that what you're talking
13   about?
14   Q.  No.  I'm asking if you can cite Bates numbers
15   for the source documents that you relied upon in doing
16   the calculations for the Dell debit memo.
17       MR. GLENNON:  I'm going to object again,
18   because, as you know, and as you guys printed out and
19   produced to our witnesses, when you print out specific
20   components of script output, the Bates number doesn't
21   appear on the script output.  We can provide it to you.
22   And the script output is certainly cited in the
23   appendix.
24       MR. GREENSTEIN:  Q.  So you're not willing to
25   turn over those summaries of those debit memos?

164

1    A.  I'm happy to give you the whole binder.
2    Q.  You are?
3        MR. GLENNON:  I'm not.  I don't think you've
4    met your foundation.
5        He said he relied on the underlying source
6    documents, and was reviewing and referring to the script
7    output, which plaintiffs have.
8        MR. GREENSTEIN:  Q.  So, Mr. O'Bryan, you just
9    said that you're willing to give us that binder of
10   summaries so we can figure out what you did in order to
11   calculate these amounts and how you did it; right?
12   A.  You don't need the summaries.  The two-page
13   summary that was done and the 35 individual summaries,
14   you don't need that to figure out what I've done.  All
15   you need is the 121 debit memos that had a transfer from
16   25005 to 12601.  That's all you need.  And then look at
17   the script output.  And then also have the notes from
18   the collectors with respect to the script output.
19   Q.  Why did you compile that information in
20   summary form?
21   A.  It is just easier to review.
22   Q.  Right.
23   A.  But the source of that information is the
24   script output, the notes, and any other documentation we
25   gather.

165

1      Q.  I understand that.  What I'm asking is if
2   you're willing to produce your summaries of your
3   calculations, which we believe we're entitled to anyway,
4   but if you're willing to produce those to plaintiffs?
5      MR. GLENNON:  I object.  It's outside the
6   scope of the stipulation.  He's got to rely on the
7   summaries, and he didn't rely on the summaries, he
8   hasn't relied on the summaries.  In fact, you haven't
9   identified a single piece of information that's in the
10  summaries that's not in the source documents.  He's
11  walked you through this.
12     MR. GREENSTEIN:  Q.  Are you willing to do
13  that?
14     A.  What I'm willing to do with respect to turning
15  over, I'm not the one that makes that decision.
16     MR. GLENNON:  He's not.
17     MR. GREENSTEIN:  Q.  But you're willing to do
18  it?
19     MR. GLENNON:  No, he's not.  It is not covered
20  by the stip.
21     THE WITNESS:  There is nothing in this
22  document to hide.  This is all -- except for the
23  summaries --
24     MR. GREENSTEIN:  I agree.  I agree.
25     THE WITNESS:  -- information I got that we

166

1   pulled out of the script.  So the documents are the
2   documents, the summaries are not necessary.  It is
3   simply for easier review on my part.  Whether or not it
4   is produced is certainly not my decision.
5      MR. GLENNON:  We're not going to be producing
6   anything we're not obligated to produce under the
7   stipulation, and that's the end.  That's just it.  And I
8   think we've produced everything that we were required
9   to.
10     MR. GREENSTEIN:  I understand that.
11     Why don't we take five minutes.
12     VIDEOGRAPHER:  This marks the end of tape two
13  in Volume I in the deposition of J. Duross O'Bryan.  At
14  2:21, going off the record.
15         (Recess, 2:21 p.m. - 2:34 p.m.)
16     VIDEOGRAPHER:  On record at 2:34.  This marks
17  the beginning of tape three in Volume I of the
18  deposition of J. Duross O'Bryan.
19     MR. GREENSTEIN:  Q.  Mr. O'Bryan, if we could
20  turn your attention to page 32 of your opening report,
21  same section we were talking about earlier.  In the
22  first paragraph you talk about the 121 transfers to the
23  bad debt reserve that you found of the 926?  Do you see
24  that?
25     A.  I do, yes.

167

1      Q.  Do you have a list of the 121 debit memo
2   items?
3      A.  I do.
4      Q.  And rather than ask you to tell me all of them
5   on the record, is there a list you can provide to
6   plaintiffs of those items?
7      MR. GLENNON:  Why don't we have this
8   discussion at the end.  I don't know if he relied on
9   that list.  Like I said on the record shortly before our
10  break, I don't want him to turn over anything that we're
11  not obligated to turn over.
12     MR. GREENSTEIN:  Okay.  I understand your
13  position, Brian.  What I'm saying is we believe we're at
14  least entitled to a list, if nothing else, a list of
15  these 121 transfers.  He would have had to rely on the
16  names of the customers in the debit memos.
17     MR. GLENNON:  Well, sure.  My point is simply
18  this, he's got to rely on the document or the summary in
19  order for it to be discoverable, and you haven't
20  established that he relied on this list.  In fact, he
21  couldn't have relied on this list, because he would have
22  had to generate the list in the first instance.  So you
23  don't know what he relied upon in order to determine
24  there was 121 transfers in the bad debt reserve in the
25  second quarter of fiscal year 2001.  If you want to ask

168

1   him that question, you can.
2      MR. GREENSTEIN:  Q.  This 121 transfers, can
3   you tell me right now what the names of those -- what
4   customers and debit memos they are?
5      A.  Yes.
6      Q.  And is there a document that I could -- a
7   Bates numbered document I could look at just to find out
8   what debit memo numbers they are?
9      A.  Well, it is in the script.
10     Q.  Right.  But I don't know which ones they are.
11  There is 926 in the script output; correct?
12     A.  Correct.
13     Q.  You found 121 of them that you're relying upon
14  in drawing conclusions about the appropriateness of
15  them; correct?
16     MR. GLENNON:  I object to the extent it
17  mischaracterizes the testimony and to the extent you're
18  trying to get our expert to do work that you guys can
19  easily do on your own with the materials you have.
20     MR. GREENSTEIN:  How can we find out what the
21  121 debit memos are, Brian?
22     MR. GLENNON:  Are you asking me a question?
23     MR. GREENSTEIN:  Q.  I'm asking you.
24  Mr. O'Bryan, is there any way sitting here if I go back
25  to the script output I could determine the debit memo

169

1  numbers for these 121 transfers?
2      A.  Yes.
3      Q.  Okay.  How would I do that?
4      A.  You just go into the script and run a sort in
5  the database that has the credit amount 12601, then it
6  prints all the information about that.  That's all we
7  did.
8      Q.  So if I did that, and then whatever came up as
9  crediting 12601, there would 121 transfer items?
10      MR. GLENNON:  Objection; vague and ambiguous.
11      THE WITNESS:  It would be 121 debit memos or
12  transfers from 25005 into 12601, totaling
13  $10,586,182.02.
14      MR. GREENSTEIN:  Q.  What document are you
15  looking at when you just made that calculation?
16      MR. GLENNON:  Objection; vague and ambiguous,
17  mischaracterizes the testimony.
18      THE WITNESS:  This is a summary of that query
19  that we ran off the script.
20      MR. GREENSTEIN:  Q.  And you're relying on
21  that document as we sit here right now to tell me the
22  total number; correct?
23      MR. GLENNON:  Objection; mischaracterizes the
24  testimony.
25      THE WITNESS:  Again, the basis of this is just

170

1  the script.  I didn't go through the script, all 926 of
2  them, and look to see the credited 12601 and add those
3  all up.
4      My engagement team at my request ran a query
5  on the database simply summarizing all the 12601s and
6  totaled those.  And that's 121 scripts, and $10.6
7  million.
8      MR. GREENSTEIN:  Q.  Okay.  Back to debit memo
9  55003616, it is one of the royalties that you mentioned
10  earlier.
11      A.  Yes.
12      Q.  Do you know which one that is?  The Dell, I
13  believe.
14      A.  I do.
15      Q.  Is it the Dell debit memo?
16      A.  3616?
17      Q.  Yes.
18      A.  Yes, I believe that's Dell.
19      Q.  I think you said it was reversed at some point
20  in November 2002 out of the reserve?
21      A.  Correct.
22      Q.  So there was a debit to 12601 in November
23  2002?
24      A.  Yes.
25      Q.  And is that in the script output?

171

1      A.  Yes.
2      Q.  And what is your basis for saying that there
3  was a debit to 12601 --
4      MR. GLENNON:  Objection; vague and ambiguous.
5      MR. GREENSTEIN:  Q.  -- for that debit memo in
6  November 2002?
7      MR. GLENNON:  Same objection.
8      THE WITNESS:  I'm sorry, what was your
9  question?
10      MR. GREENSTEIN:  Q.  My question is, can you
11  tell me the date that that debit memo, 55003616, was
12  reversed out of the bad debt reserve?
13      A.  I misspoke.  There is no reversal of it into
14  the 12601 account.  What I meant to say is a reversal of
15  the debit memo transaction.
16      Q.  But that item was transferred to 12601 in Q2;
17  correct?
18      A.  Correct.
19      Q.  Then during November 2002, you said it was
20  reversed out; correct?
21      MR. GLENNON:  Objection; vague and ambiguous.
22      THE WITNESS:  I misspoke on that.  It was not
23  reversed out.
24      MR. GREENSTEIN:  Q.  So it's still sitting in
25  the reserve then?

172

1      MR. GLENNON:  Objection; calls for
2  speculation, lack of foundation.
3      THE WITNESS:  No.  It was simply applied, it
4  was simply then applied to the appropriate revenue
5  account, which is a royalty, in '04.
6      MR. GREENSTEIN:  Q.  What were the debits and
7  credits in '04 to do that transaction?
8      MR. GLENNON:  Objection; vague and ambiguous.
9      THE WITNESS:  It was a debit to unapplied cash
10  and a credit to receivables.
11      MR. GREENSTEIN:  Q.  So it was never -- the
12  12601 was never debited; right?
13      MR. GLENNON:  Objection; vague and ambiguous.
14      THE WITNESS:  The 12601 was debited -- the
15  12601 was credited in October of '00.
16      MR. GREENSTEIN:  Q.  Right.  That's when it
17  was transferred to the bad debt reserve; correct?
18      A.  Correct.
19      MR. GLENNON:  Objection; vague and ambiguous.
20      MR. GREENSTEIN:  Q.  I think you testified it
21  was in November 2002 they reversed that transfer as part
22  of the cleanup; correct?
23      MR. GLENNON:  Same objection.
24      THE WITNESS:  As I said, I misspoke.  They did
25  not.

173

1    MR. GREENSTEIN: Q. So they didn't reverse
2  that transaction out of the reserve?
3    A. No.
4    MR. GLENNON: Same objection.
5    MR. GREENSTEIN: Q. So that credit of that
6  Dell debit memo is still sitting in 12601?
7    MR. GLENNON: Calls for speculation, lack of
8  foundation.
9    THE WITNESS: No. It is now in -- they put it
10  into the receivable, and then they took it out of the
11  receivable on the 12601.
12    MR. GREENSTEIN: Q. Well, help me understand
13  this, because I'm not an accountant. But if there was a
14  credit to -- there is a debit and credit for every
15  transaction; right?
16    A. Yes.
17    Q. And that's an accounting principle; correct?
18    A. That is, yes.
19    Q. So if there was a credit in October 2000 of
20  that debit memo to 12601, and then in 2002, November,
21  what you're telling me, there is no debit to 12601;
22  right?
23    MR. GLENNON: Objection; vague and ambiguous,
24  compound, incomplete hypothetical.
25    THE WITNESS: Your question was?

174

1    MR. GREENSTEIN: Q. The question -- I'm just
2  wondering, the item was transferred, credited to 12601
3  in October 2000. I'm wondering when Oracle reversed
4  that transfer, if at all.
5    MR. GLENNON: Same objection. Lacks
6  foundation, vague and ambiguous.
7    THE WITNESS: Well, they reversed it by virtue
8  of taking it against the receivable when they realized
9  it was a royalty. Then they applied the royalty to
10  that. So effectively what you have is it coming out of
11  12601 and netting with the revenue. So it was a zero
12  impact.
13    MR. GREENSTEIN: Q. Well, but there was a
14  credit in 12601. In order to get that out of there, you
15  have to debit it; correct?
16    MR. GLENNON: Objection; incomplete
17  hypothetical.
18    THE WITNESS: Or that's just increasing
19  income. Right? I'm sorry, I didn't mean to say right.
20    MR. GREENSTEIN: Q. I'm asking, there was a
21  credit to 12601, and I'm wondering if ever there was --
22  how it got out of 12601 in November 2002.
23    MR. GLENNON: Objection; vague and ambiguous.
24    THE WITNESS: Out of 12601? It didn't come
25  out of 12601. I got recorded as a revenue applied

175

1  against an invoice in November of '02.
2    MR. GREENSTEIN: Q. And you said --
3    A. Excuse me, March of '04.
4    Q. March of '04 or November '02?
5    A. March of '04.
6    Q. So you said it was applied to a receivable.
7    A. It was actually applied to an invoice.
8    Q. An invoice dated what? What was the date of
9  the invoice?
10    MR. GLENNON: Objection; vague and ambiguous.
11    THE WITNESS: All this occurred on May 4th --
12  May 11, 2004.
13    MR. GREENSTEIN: Q. Right. But when was the
14  original royalty payment?
15    MR. GLENNON: Objection; vague and ambiguous.
16    THE WITNESS: I don't know when the original
17  royalty payment was.
18    MR. GREENSTEIN: Q. Wait, but didn't you say
19  earlier that the royalty -- if a royalty comes in, there
20  is no invoice?
21    MR. GLENNON: Objection; mischaracterizes the
22  testimony, incomplete.
23    MR. GREENSTEIN: Q. Right?
24    A. That's my testimony. That's why I didn't know
25  the date of invoice, because there is no invoice,

176

1  because the royalties don't have invoices.
2    Q. So in 2004 you just said that they applied
3  that to an invoice; right?
4    A. They would have created an invoice and credit
5  memoed it up, because -- or adjusted it up, because
6  there was no invoice that existed, so you would have to
7  create the invoice, which was done in May of '04.
8    Q. So they created an invoice for a payment that
9  was made prior to November 2000; correct?
10    MR. GLENNON: Objection; vague and ambiguous.
11    THE WITNESS: Correct. You would have to,
12  because you have to apply that somewhere.
13    MR. GREENSTEIN: Q. Do you know the date they
14  created the invoice?
15    MR. GLENNON: Same objection.
16    THE WITNESS: May 2004.
17    MR. GREENSTEIN: Q. A specific date?
18    A. May 11th, 2004.
19    Q. Page 33, the bullet, "In addition, over
20  $800,000 of over transfers to the bad debt reserve
21  during this period were appropriate." Do you see that?
22    A. Where are you?
23    Q. Page 33.
24    A. Yes.
25    Q. The bullet at the top of the page, the

177

1 $800,000?
2    A.  Yes.
3    Q.  It says, "In addition, over $800,000 other
4 transfers to the bad debt reserve during this period
5 were appropriate."  Do you see that?
6    A.  I do.
7    Q.  You mean 2Q '01?
8    A.  Correct.
9    Q.  Then you say, "It's appropriate in that Oracle
10 had already reduced its revenues for certain open and
11 unpaid invoices either all or in part through the use of
12 credit memos and/or inclusion in Oracle's general bad
13 debt reserve as of the second quarter of fiscal year
14 2001."  Do you see that?
15    A.  That's correct.
16    Q.  So can you explain what you mean there?
17    A.  That when the collections department was
18 researching the applied cash project, during the applied
19 cash project in October/November of '02 time frame, they
20 researched individually all these that came -- all these
21 debit memos that got reversed.
22     And in certain instances, we have one, two,
23 three, four, five, six, seven -- twelve instances where
24 the evidence is that they are effectively adjusting up
25 an invoice because they had inappropriately issued a

178

1 credit memo back in the 2000 time frame.
2    Q.  You said 12 items.  Is that 12 debit memos?
3    A.  That's correct.
4    Q.  So 12 debit memos made up the $800,000;
5 correct?
6    A.  That's correct.
7    Q.  Can you tell me -- can you just tell me the
8 debit memo numbers --
9    A.  Certainly.
10    Q.  -- of those?
11    A.  10200, 29695, 33442, 41212 -- actually, let me
12 go back.
13     These are the numbers that relate to a credit
14 memo that are in the $800,000 or that are in part of
15 that component.  And that would be, again --
16    Q.  Let me stop you there.  So are there debit
17 memos associated with those 12 items?
18    A.  You mean credit memos?
19    Q.  I mean debit memos.
20    A.  Oh, yes.
21    Q.  So can you tell me the debit memos -- the
22 debit memo numbers?
23    A.  I am sorry.  10200, 29695, 33442, 41212, 54 --
24 excuse me -- 42380, 43304, 45164, 45180, 45240, 45311,
25 45948, and 46151.  Those total up about $727,000.

179

1    Q.  Okay.  So you just rounded up to 800,000?
2    A.  Correct.
3    Q.  Why didn't you round down to 700,000?
4    A.  Because on the -- one of the other amounts, I
5 think it is 368,000, we rounded down.
6    Q.  Okay.
7    A.  So there is another category.
8    Q.  So there is $700,000 in royalties on page 32
9 of your report; right?
10    A.  Correct.
11    Q.  And $800,000 of what you call these adjusted
12 up items, to $800,000; correct?
13    MR. GLENNON:  Objection; mischaracterizes the
14 testimony.  Vague and ambiguous.
15    THE WITNESS:  I'm sorry.
16    MR. GREENSTEIN:  Q.  I'm trying to determine
17 what you mean by the 368,000 that you rounded down.
18    A.  It is a separate column.  I probably confused
19 you.  I apologize.
20    Q.  I just want to make sure there is -- that
21 we're looking at the items; right?
22    A.  Correct.
23    Q.  Well, so, my question is -- what was the total
24 of those 12 debit memos?
25    A.  $726,581.

180

1    Q.  My question was, why did you round that up to
2 800,000 instead of rounding down to 700,000?
3    A.  Because there is other items that make up the
4 $800,000 that are not part of the credit memo piece.
5    Q.  How many debit memos are those?
6    A.  Those are one, two, three, four --
7    MR. GLENNON:  Objection; vague and ambiguous.
8    THE WITNESS:  Those are five.
9    MR. GREENSTEIN:  Q.  And what -- that makes up
10 the part of the 800,000; correct?
11    A.  Yes.  When you include those five, it would be
12 $875,000, or to be exact $874,808.  That is my rounding
13 down.
14    Q.  Were those items that were resolved in the
15 same manner as the other items that had been adjusted
16 up?
17    MR. GLENNON:  Objection; vague and ambiguous.
18    THE WITNESS:  No.
19    MR. GREENSTEIN:  Q.  Can you please explain
20 why you think those are appropriate?
21    A.  Yeah.  These are very unusual ones.  These are
22 ones where there was cash that existed, obviously, in
23 the October/November time frame, where these amounts
24 were moved from 25005 into 12601.  So the cash existed
25 and it was written into the reserve.

O'Bryan, John Duross - Confidential 7/12/2007 9:29:00 AM

181

1       However, upon further review of the invoices,
2   these were invoices that were very old, and given
3   Oracle's internal policy of reserving -- they have an
4   internal policy that over x number of days 50 percent
5   automatically goes to the reserve, over x number of days
6   20 percent goes to reserve -- those would have been
7   reserved anyway given the age of the invoice. So this
8   is a case where you literally are taking into income
9   amounts which have previously been written off, when you
10  shouldn't have written them off because you had the
11  cash.
12      Q.  Okay. What is the total of those items?
13      A.  Those only total $150,000.
14      Q.  And how many debit memos?
15      A.  One, two, three, four -- five.
16      Q.  Can you list out the --
17      A.  7412, 38577, 41310, 42059, and 5 -- 45 --
18  45161.
19      Q.  So I'm going to break it into two parts. I'm
20  going to first focus on the 12 debit memos that you said
21  were applied to previously written off invoices. Is
22  that fair to say?
23      MR. GLENNON: Objection; mischaracterizes the
24  testimony.
25      THE WITNESS: No. The 12 have to do with,

182

1   really, credit memos.
2       MR. GREENSTEIN: Q. Okay. For those 12, why
3   don't you just take me through the debits and credits
4   that occurred during the 2002 cleanup to resolve those
5   items.
6       A.  Yeah, for all 12?
7       Q.  No, no. Just -- they all were resolved in the
8   same manner; correct?
9       A.  Yeah --
10      MR. GLENNON: Objection; lack of foundation.
11      THE WITNESS: They all were resolved basically
12  in the same manner, which was based on the research done
13  by the collection department during the October/November
14  of 2002 time frame, it was discovered that a credit memo
15  had been inappropriately recorded on those amounts that
16  should not have been. And if you recorded a credit memo
17  that should not have been recorded, then you should be
18  recording income once you discover that.
19      MR. GREENSTEIN: Q. So in each of those cases
20  for those 12 debit memos, your testimony is that Oracle
21  discovered in 2002 that there had been an erroneous
22  credit memo issued with respect to that debit memo;
23  correct?
24      MR. GLENNON: Objection; mischaracterizes his
25  testimony.

183

1       THE WITNESS: Well, yeah, those are all credit
2   memos.
3       MR. GREENSTEIN: Q. So why don't you take me
4   through the debits and credits that occurred in 2002
5   with respect to these 12 items, an example.
6       A.  Okay. Before we -- I drank too much water.
7   Can I take a bathroom break?
8       MR. GREENSTEIN: Sure.
9       VIDEOGRAPHER: Off record at 2:56.
10      (Recess, 2:56 p.m. - 3:11 p.m.)
11      VIDEOGRAPHER: On the record at 3:11
12      MR. GREENSTEIN: Q. Back to page 3 of your
13  opening report.
14      A.  Yes.
15      Q.  We were talking about the first bullet point
16  on the top of the page that says, "There were $800,000
17  of other transfers to the bad debt reserve during the
18  period that were appropriate." And I think you
19  testified they were appropriate because Oracle had found
20  that there was an erroneous credit memo issued previous.
21  Is that correct?
22      MR. GLENNON: Objection; mischaracterizes the
23  testimony.
24      THE WITNESS: No. It was either an
25  inappropriately applied credit memo, or you also have

184

1   the situation where there was items that were written
2   off, but then they had the cash for it, so they had been
3   inappropriately written off. Those are the two I can
4   think of in that bucket right now.
5       MR. GREENSTEIN: Q. For the $800,000 -- I
6   just want to make sure I'm getting this straight. For
7   the $800,000 you said there were 12 debit memos that
8   were transferred that related to the erroneous credit
9   memo issue; correct?
10      MR. GLENNON: Objection; mischaracterizes the
11  testimony, vague and ambiguous.
12      THE WITNESS: I think for the most part, I
13  haven't gone through them in detail with you, which I
14  can, but I think for the most part those are credit
15  memos.
16      MR. GREENSTEIN: Q. Okay. What was the total
17  amount of those debit memos again? $728,000?
18      MR. GLENNON: Objection; vague and ambiguous.
19  Debit memos?
20      MR. GREENSTEIN: Q. The 12 debit memos we
21  were just talking about, what was the total amount?
22      A.  The 12 debit memos that had inappropriately
23  applied credit memos were $726,581.
24      Q.  Then you said there were five other debit
25  memos that related to what you called the unique issue;

185

1  correct?
2      A.  Yes.
3      Q.  What was the total of those amounts, or,
4  sorry, those five debit memos?
5      A.  About $148,000, it looks like.
6      Q.  So approximately $874,000; correct?
7      A.  Correct.
8      Q.  So is that the $800,000 you're talking about
9  there?
10     A.  Yes.
11     Q.  So first focusing on the 12 debit memos that
12  were related to erroneous, purportedly erroneous --
13  strike that.
14         Earlier you were talking about a number,
15  368,000.  I just want to clarify that's not part of this
16  800,000?
17     A.  It is not.
18     Q.  You just misspoke?
19     A.  No.  No.  What I said is -- you asked about me
20  rounding.
21     Q.  Okay.  And there was no -- I asked you why you
22  rounded 727 up to eight, remember?
23     A.  Well, I didn't mean -- I didn't round -- what
24  I had not included in the original numbers to you is the
25  five of the unusual or unique issues, which they

186

1  actually total 874.
2      Q.  Got it.
3      A.  And the last bucket, as you can see in my
4  report, is 500,000, which we really don't see all the
5  supporting documentation, but there is some evidence
6  that they were properly booked in or about the second Q
7  of '01.  That totals $482,000.
8      Q.  We'll get to that in a little bit.  So I want
9  to focus on the 12 debit memos that relate to erroneous
10  credit memos.
11         Can you explain the debits and credits that
12  occurred as part of the 2002 cleanup for those
13  transactions.  You can just use an example.
14     A.  Yeah.  Do you have -- do you want me to pick
15  the biggest one?
16     Q.  Sure.
17     A.  The biggest one is General Electric Plastics,
18  credit memo 46151.
19     MR. GLENNON:  Credit memo or debit memo?
20     THE WITNESS:  That's the debit memo number.
21         On October the 1st --
22     MR. GREENSTEIN:  Q.  Actually, why don't you
23  take me through that transaction from the transfer to
24  the bed debt reserve in 2Q and the subsequent
25  resolution.

187

1      A.  All right.  The actual transfer to 2Q to 26 --
2  getting late.
3         The actual transfer to 12601 in the second Q
4  of '00 occurred on October the 1st and October the 5th,
5  2000.  And it was for basically $184,000, where the
6  actual transfer took place, with an eventual credit to
7  12601, and a debit to 25005.
8         So they took it out of the 25005 account and
9  put it into the 12601 account.
10         Then, just to follow all the transactions, on
11  November 17th the debit memo transactions were run,
12  which were three simultaneous debits in and credits out
13  of 25005.
14         Then on November the 8th, 2002, the debit
15  memos were reversed, just reversing the 25005 account,
16  three simultaneous entries.
17         Then on the 24th of November, during the
18  unapplied -- the applied cash project, the reversal of
19  the bad debt transfer took place.  The way that has to
20  happen, you have to first debit and credit cash, because
21  the system doesn't think you have any cash there, it's
22  gone.  So it is a debit and credit to cash.  And then
23  you have a debit to 25005 and a credit to 12601.
24         So all that is doing is just reversing the
25  transfer that occurred back in October of '00.

188

1      Q.  But in order to reverse a credit to 12601
2  which occurred in 2Q, wouldn't you have to debit 12601?
3      A.  It is debited.
4      Q.  I thought you said credit?
5      A.  No, debit 12601, credit to 25005.
6      Q.  Okay, so let me back up.  So in November, you
7  said there was a debit and credit to cash; correct?
8      A.  In November when?
9      Q.  2002.
10     A.  Correct.
11     Q.  Then you said November 14th, 2002 there was a
12  debit to 12601 and a credit to 25005?
13     A.  It was November the 14th, same day.  All it is
14  doing is just reversing the October '02 transaction.
15  And it debits 12601 and it credits 25005, puts it back
16  into customer overpayments unapplied.
17     Q.  So debit 12601, credit 25005?
18     A.  Correct.
19     Q.  Okay.
20     A.  Which would have the result of reducing
21  income.  All right?
22         Then the next day on October -- excuse me,
23  November -- excuse me, a year later, November the 25th,
24  2003, after the research had been done on this
25  transaction, which is, by the way, General Electric

189

1    Plastics, they actually realized that there had been
2    credit memos that were inappropriately issued, and they
3    then booked the receivables and booked the sales.  And
4    then unbooked the 25005 account.
5       Q.  Okay.
6       A.  So, and that information was obtained through
7    looking at the notes, the collectors' notes, for this
8    account in the '03 time frame.
9       Q.  So when you say that was reflected in the
10   note, what was reflected in the notes?
11      A.  The credit memo discussion.
12      Q.  So, for these 12 transactions, how do you know
13   that those items were -- had erroneous credit memos?
14         MR. GLENNON:  Objection; vague and ambiguous.
15         THE WITNESS:  From the notes of the --
16         MR. GREENSTEIN:  Q.  Other than the notes, is
17   there any evidence that those 12 debit memos had
18   erroneous credit memos?
19         MR. GLENNON:  Same objection.
20         THE WITNESS:  In some cases you can actually
21   see credit memos.  But for the most part it was the
22   notes the collectors had done contemporaneous.
23         MR. GREENSTEIN:  Q.  Right.  You could see the
24   credit memos, but that doesn't tell you that they are
25   proper or improper; correct?

190

1       A.  Well, no.  The notes say, "Receipt notes were
2    incorrect; wrong PA; do not show sufficient credit
3    memos; erroneous notes; and credit memo 722616."
4          So you can see, you can trace that back and
5    see there was an inappropriate credit memo on -- at some
6    point in time in the history.
7       Q.  Okay, so other than the notes, is there any
8    evidence that those 12 transactions had erroneous credit
9    memos?
10      A.  That's the summary of what we considered.  As
11   I said, we have a number of different documents here,
12   which is actual invoices, and appears to be documents
13   which were put together by collectors, et cetera, to
14   support that.  I haven't gone through and reconciled
15   those specifically.
16      Q.  So what source documents would tell you that
17   the credit memo is issued erroneously?
18      A.  Well, as I said, for the most part for me I'm
19   using the notes.  Those are the contemporaneous
20   documents I'm using.
21      Q.  I just want to make sure.  You said for the
22   most part.
23         So is there any other document that you're
24   relying upon in making the determination that those 12
25   transactions had erroneous credit memos?

191

1          MR. GLENNON:  Objection; asked and answered.
2          THE WITNESS:  I know that one on this one
3    would be the summary of what I looked at, the vast
4    majority of the support.
5          MR. GREENSTEIN:  Q.  So there are no other
6    documents?
7       A.  There are other credit memos, but I haven't
8    reconciled those to that number.  They appear to be
9    documents, invoices, et cetera, that support that based
10   on the credit of the collectors' notes.
11      Q.  In other words, the 12 debit memos in which
12   you have concluded had erroneous credit memos in their
13   history, you determined that those credit memos were
14   erroneous by looking at the notes; correct?
15         MR. GLENNON:  Objection; mischaracterizes the
16   testimony.
17         THE WITNESS:  For the most part that's
18   correct.
19         MR. GREENSTEIN:  Q.  Well, is there any other
20   piece of evidence that you relied upon?
21         MR. GLENNON:  Objection; vague and ambiguous.
22         THE WITNESS:  There are other documents,
23   invoices and other support.  I just didn't go back and
24   reconcile them.  They seemed to be support for me.  I
25   didn't reconcile them individually to see that they tied

192

1    exactly back to that.
2          I felt it sufficient to see the collectors'
3    notes done contemporaneous, see that they were talking
4    about credit memos that had been inappropriately
5    applied, and use that in my analysis.
6          MR. GREENSTEIN:  Q.  When you saw the note
7    that said erroneous credit memo in it, you didn't go
8    back to check to see if there was any document that said
9    the credit memo was erroneous; correct?
10         MR. GLENNON:  Objection; vague and ambiguous.
11         THE WITNESS:  Other than reviewing the notes,
12   no.
13         MR. GREENSTEIN:  Q.  Okay.  So for that one
14   debit memo for General Electric Plastics, is there one
15   note for that that indicates it is an erroneous credit
16   memo, or multiple?
17      A.  It is one note.
18      Q.  What does it say?
19      A.  It talks about credit memo, the credit memo
20   actually being 7227616 for -- for the amount of money
21   we're talking about.
22      Q.  Can you just read that note into the record,
23   please?
24      A.  Certainly.  "Receipt notes are incorrect,
25   wrong PA number, and three PRO projects that may

193

1   associate with this reserve amount do not show
2   sufficient credit memos.  Erroneous notes.  See
3   supplemental SO 4814239 and credit memo 7227616 for
4   $181,158.40," which is the amount.  "Makes more sense."
5   And then it talks about a 12/15/96 wire, references
6   text.
7       Q.  How does that note tell you there was an
8   erroneous credit memo?
9       A.  Because it talks about credit memo and talks
10   about credit memo 722616, whatever it was.
11       Q.  It doesn't say it was erroneous, does it?
12       A.  It is using a credit memo and that's -- if it
13   is a credit memo, to me that is an inappropriate
14   application of a credit memo.
15       Q.  So -- but couldn't it have been a proper
16   credit memo that was issued, for example, for customer
17   concessions?
18       MR. GLENNON:  Objection; incomplete
19   hypothetical, vague and ambiguous.
20       THE WITNESS:  No.  Because they eventually
21   booked it back to revenue.  So that means the credit
22   memo was inappropriately booked.
23       MR. GREENSTEIN:  Q.  So the fact they booked
24   it as revenue indicates to you that the previously
25   issued credit memo was erroneous?

194

1       A.  And the notes.
2       Q.  And the notes?
3       A.  Correct.
4       Q.  But the note doesn't say that there was an
5   erroneous credit memo; does it?
6       MR. GLENNON:  Objection; calls for
7   speculation.
8       THE WITNESS:  No.  It talks about the credit
9   memos.
10       MR. GREENSTEIN:  Q.  Okay.  And why don't you
11   take me through the next transaction of the 12, the next
12   highest one in the same way you did with the General
13   Electric Plastics, please.
14       A.  The next one is Structural Dynamics Research,
15   which I think I referred to in my report.
16       Cash was received in May of 2000.  In October
17   of 2001 the amount was transferred to 12601.  On the
18   17th of November, the debit memos took place.  On the
19   7th of November, there was a reversal of the
20   November 17th memos.  On 11/2 of '02 there was a
21   reversal of the transfer to 12601.  And -- I'm sorry, I
22   beg your pardon, I was in the wrong bucket.
23       Q.  I was wondering.
24       A.  Somebody could have stopped me before I got
25   there.

195

1       Q.  One quick question about the last transaction,
2   the GE Plastics.  What was the date of the note that you
3   relied upon?
4       A.  I think you asked me that before.  I don't
5   know the date of the note.
6       Q.  Okay.
7       A.  Okay.  Caltrans on November the 5th, 2000,
8   $91,254 was transferred into the 12601 account.  On
9   November 17th, the debit memos were run.  On
10   November 11th, 2002 there was a reversal of the debit
11   memos.  On November 24th there was a reversal of the
12   transfer.  And on 2/3/03 there was an application to
13   invoices.
14       Q.  Actually, is that this transaction that's
15   listed on 35 and 36 of your report?
16       A.  Exactly.
17       Q.  Do you know the date of the note?
18       A.  No.
19       Q.  Okay.  Did you do any analysis, other than
20   looking at the note, of whether the concessions for the
21   amount in reserve -- that there was too much of a
22   concession that was given to the customer due to the
23   customer sending in a payment for 91K?
24       MR. GLENNON:  Objection; vague and ambiguous,
25   assumes facts.

196

1       THE WITNESS:  Well, I think on that one if you
2   look through the script, you can see where there is --
3   the actual credit memo.
4       MR. GREENSTEIN:  Q.  Overpayment?
5       A.  Yeah.
6       Q.  So it was a credit memo, an invoice was memoed
7   reducing the invoice.  The customer made a payment for
8   the full invoice and so overpaid the amount of credit
9   memo; correct?
10       A.  Correct.  And it was later realized that the
11   credit memo should not have been issued because there
12   actually were services being performed.
13       Q.  Were there ever any instances where
14   overpayments occurred and the credit memo was
15   legitimate?
16       MR. GLENNON:  Objection; vague and ambiguous.
17       THE WITNESS:  I'm sorry, I don't understand
18   your question.
19       MR. GREENSTEIN:  Q.  Well, we just talked
20   about an invoice being reduced if you had a credit memo.
21   And somebody overpaid -- paid the full amount of the
22   invoice which resulted in overpayment; correct?
23       MR. GLENNON:  Objection; mischaracterizes the
24   testimony.
25       MR. GREENSTEIN:  Q.  You don't recall that we

197

1  just talked about that?
2      A.  Would you mind just repeating that one more
3  time.
4      Q.  Okay.  I will ask a different question.
5      With respect to those two debit memos that you
6  just went through, the erroneous credit memos, those
7  involved overpayments of invoices; correct?
8      MR. GLENNON:  Objection; vague and ambiguous.
9      THE WITNESS:  I don't recall Caltrans was
10  necessarily an overpayment.  It was just they paid, and
11  then erroneously, Oracle issued a credit memo, not an
12  overpayment, just issued a credit memo thinking they
13  weren't due the money.  And then later realized they
14  were due the money because there were services
15  performed.
16      MR. GREENSTEIN:  Q.  Okay.  So going back to
17  page 33, I want to focus on the five debit memos for
18  $148,000, where you describe a process where cash was
19  moved from 25005 to 12601 during 2Q.  Correct?
20      A.  Yes.
21      Q.  Can you just describe the process from the
22  transfer and then how it was resolved during the 2002
23  cleanup?
24      A.  Yeah, a little different than the other ones.
25  But in this situation what it really is, is a situation

198

1  where you are writing off an invoice that you have cash
2  for, and that's an inappropriate -- in that regard, you
3  should be reporting income.  So, in other words, you
4  have set up a reserve, but you have the cash.
5      So in this situation what happened was, for
6  these five instances, amounts were transferred in
7  October/November of '00 into the 12601 account.
8  However, at the same time you have invoices -- so they
9  are basically recording the income, okay.  However, at
10  the same time -- you actually have that cash that you're
11  taking against it.  At the same time, however, you have
12  reserved for that invoice, because it got too old, it
13  got to five months, six months, whatever the days were.
14  So you're simultaneously recording a reserve which you
15  should not be recording.  You're reducing income, and
16  you shouldn't.
17      So that is a situation where you literally
18  have written off a portion of the invoice, and, in fact,
19  you shouldn't have, because you had the cash.
20      Q.  And then how was that resolved during the 2002
21  cleanup?
22      A.  Well, to the extent that you had reserved it,
23  you should not have reserved for that much, so it should
24  have been taken back into income.
25      Q.  So what are the debits and credits that

199

1  occurred during the 2002 cleanup?  Why don't you take us
2  through the largest of those transactions.
3      A.  Let's just take -- take railroad reserve,
4  $65,901.
5      Q.  What's the debit memo?
6      A.  42059.  So in that transaction, in May, cash
7  was received.
8      Q.  What year?
9      A.  '00.  I'm sorry.
10      Q.  Okay.
11      A.  In October the amount was transferred into the
12  12601 account.  So they had the cash, they took it into
13  the reserve account.  On November 17th the debit memos
14  occur.  On November 12, '02 they reverse the debit memo
15  transactions.  And on November 24 they reverse the bad
16  debt transfers.
17      So what happens there is you effectively --
18  you have reserved too much, because you have an invoice
19  that you had the cash for, but you're recording a
20  reserve because of the age.  So you have to take that
21  into income.  It should be taken into income.
22      Q.  So the invoice that -- the payment was coming
23  in for an invoice that had previously been written off;
24  right?
25      A.  Right.

200

1      MR. GLENNON:  Objection; mischaracterizes the
2  testimony.
3      MR. GREENSTEIN:  Q.  Is that right?
4      A.  Payment comes in, gets written off or gets
5  transferred from 25005 into 12601 account, as if it was
6  into the income account.  However, at the same time you
7  have actually then reserved the invoice because it got
8  too old, but you had the cash.  So you got to reverse
9  that transfer into the reserve out.
10      Q.  How do you reverse that?
11      A.  You take it from 12601.
12      Q.  So it is a debit to 12601 and credit to --
13      A.  Be in income.
14      Q.  What date was that for the particular
15  transaction you were citing?
16      A.  11/24/02.
17      Q.  Was that the only transaction, debits and
18  credits, that occurred during 2002 with respect to that
19  transaction?
20      A.  Yes.
21      Q.  And how do you know that the invoice was
22  previously written off?
23      A.  Because we actually have the invoice and look
24  at the date of the invoice and apply it to the
25  percentages that Oracle would automatically reserve it

201

1    for.

2         Q.   But do you have actual evidence that the

3    invoice was written off?

4         A.   Well, it would be automatically -- you

5    wouldn't see that in the detail we have. But you would

6    know that happened because of the date of the invoice.

7         Q.   So what you're saying is after a certain

8    amount of days where an invoice hasn't been paid, it

9    will automatically be written off?

10        A.   There are percentages that are written off, 20

11   percent, 50 percent and 85 percent.

12        Q.   So what was the date of that payment, or,

13   sorry, that invoice?

14        MR. GLENNON:  Objection; vague and ambiguous.

15        MR. GREENSTEIN:  Q.  For the railroad

16   transaction.

17        A.   May of '00.

18        Q.   And so when do you -- when did it get written

19   off?

20        A.   Well, a portion of it would have been written

21   off by 11/30/00, at the six month, 180 days.

22        Q.   Why only a portion of it?

23        A.   Because they don't write the whole thing off.

24   You just write a portion of it off. Which is typical in

25   companies, you say, look, it is automatic at a certain

202

1    day we're going to write off this much automatically,

2    because there is a presumption it can't be collected.

3         Q.   But don't they presume the other portion can

4    be collected?

5         A.   At a later point in time, if they haven't

6    collected it, the remainder of it will be written off.

7    I have seen a number of companies do that. They say,

8    180 days, automatically 50 percent gets written off no

9    matter what.

10        Q.   Turning to page 33 again, underneath the

11   $800,000 discussion, there is a discussion of at least

12   another $500,000.

13             And you state that, "These transfers were

14   appropriate, although the evidence relating to these

15   transfers is not as complete as the evidence I reviewed

16   in connection with the $1.5 million in transfers noted

17   above." Do you see that?

18        A.   Yeah. Yes.

19        Q.   So can you just explain what those

20   transactions are and why you found them appropriate?

21        A.   Well, again, they were originally transferred

22   from 25005 into 12601. They were reversed in November,

23   November 24th, '02, all these were reversed for the most

24   part. And when the unapplied cash project was performed

25   at that time, there is some evidence that it looks like

203

1    it was either an unapplied, or a credit memo that was

2    bad or a royalty that was appropriate. The notes were

3    not necessarily conclusive, or we didn't see any other

4    type of support for that.

5             So that appears to be one that should have

6    been reported, given there is some evidence of a credit

7    memo or there was some evidence of a royalty or some

8    other type of revenue that should have been booked. But

9    the notes were not conclusive for me, nor did I see any

10   other type of support. We put that into a bucket of

11   could be.

12        Q.   Could be. So you can't definitively say that

13   $500,000 of transfers was proper; correct?

14        A.   That's correct.

15        Q.   And how many debit memos made up the $500,000

16   that you're talking about?

17        A.   Twelve.

18        Q.   I hate to do this, but can you just go ahead

19   and list them into the record, please?

20        A.   Certainly.  3503, 3569, 5165, 7992, 10691,

21   40196, 44860, 2601, 5516, 43176, 44788, and 42 -- excuse

22   me, 45238.

23        Q.   Mr. O'Bryan, in your report you state that of

24   the 926 debit memos there are 277 that were refunded

25   prior to November 17th, 2000 for $103 million; is that

204

1    accurate?

2         A.   That is correct.

3         Q.   If I wanted to go into the script output and

4    figure out those 277 debit memos, what would I do?

5         A.   You just go in and run a query on accounts

6    payable to see where there was a refund.

7         Q.   How would a refund show up? Would it say

8    refund?

9         A.   The best place to go is accounts payable.

10        Q.   So if I ran a query by accounts payable,

11   277 items would pop up?

12        A.   Yes.

13        Q.   Is there anything else I would need to do to

14   figure out these 277?

15        A.   Let me get to the report and make sure that's

16   right.

17             Do you have the page of my report so I can

18   turn right to it? I can find it, if you want.

19             Counsel, do you have the page of my report

20   that says that? I can find it; I just want --

21        Q.   Oh, no, I don't.

22        A.   It is on page 13 of my rebuttal. Yeah, it is

23   AP payment details.

24        Q.   AP payment details?

25        A.   AP payment details.

205

1  Q.  So if I ran a query in the script output for
2  that column pre November 17th, then 277 items would come
3  up?
4  A.  That is correct, 277 items totaling --
5  Q.  $103 million?
6  A.  $102,906,609, which we rounded up.
7  Q.  So is it fair to say that the other 649 of the
8  926 were not refunded prior to November 17th, 2000?
9  MR. GLENNON:  Objection; assumes facts, lacks
10  foundation.
11  THE WITNESS:  I believe that to be true, yes.
12  MR. GREENSTEIN:  Q.  That's $431 million in
13  debit memos; correct?
14  A.  Correct.
15  Q.  Okay.  So in deriving your calculation of the
16  $20.1 million that was transferred from 25005 to 12601
17  in the second quarter '01, which months did you include
18  in that calculation?
19  MR. GLENNON:  Objection; vague and ambiguous.
20  THE WITNESS:  Which months did I include?
21  MR. GREENSTEIN:  Q.  Yes.
22  A.  Well, what I should include is what's in the
23  quarter, which is September, October, November.
24  Q.  And why did you choose those months?
25  A.  Those are the months in the quarter.

206

1  Q.  Well, are you aware that Oracle had a practice
2  of calculating based on the second month of the quarter?
3  In other words, so for the second quarter, it would be
4  August, September and October?
5  MR. GLENNON:  Objection; lack of foundation,
6  assumes facts, incomplete hypothetical.
7  THE WITNESS:  Yeah, I think you're
8  misunderstanding the way that process works.
9  MR. GREENSTEIN:  Q.  So you didn't see any
10  evidence that that's the way they calculated the 12601
11  transfers for 2Q?
12  A.  Well, the reserve, the actual reserve, the
13  12601 reserve is calculated, looked at on a specific
14  account, on account-by-account basis, at the second
15  month of a Q.  And in the third month of a Q it is then
16  trued up.
17  Q.  Okay.
18  A.  In other words, you then look to see -- I know
19  that the specific items that are going to go bad or are
20  bad in the reserve.  But in the last month I know I
21  booked this much revenue on a historical basis, I
22  typically put 1, 2, 3 percent, whatever it is, it then
23  gets trued up.  So a quarter is a quarter.
24  Q.  So, in other words, you calculated September,
25  October and November transfers from 25005 to 12601 in

207

1  order to come up with the $20.1 million; correct?
2  A.  That's correct.
3  Q.  Mr. O'Bryan, previously you said that in order
4  to find out the 277 refunds of the 926, you would run a
5  query on AP payment --
6  A.  Correct.
7  Q.  -- column; correct?  Are you sure that's in
8  the script output?
9  MR. GLENNON:  I'm going to object.  Lack of
10  foundation, vague and ambiguous.
11  THE WITNESS:  It is on the query we ran.
12  MR. GREENSTEIN:  Q.  Okay.  Can you think of a
13  reason why if we looked at the script output we wouldn't
14  see that column there?
15  MR. GLENNON:  Objection; calls for
16  speculation, lack of foundation.
17  THE WITNESS:  I didn't personally run the
18  filter or the run.  It was one of my team.  The thing I
19  see consistent is AP payment detail.  If it was another
20  column that then pulls that up, pulls that in, that may
21  be.
22  But what is consistent on that run, which is
23  in my work papers, is AP payment detail.
24  MR. GREENSTEIN:  Q.  Do you have a list of
25  those 277 in one place?

208

1  A.  I do, yes.
2  Q.  Are you willing to produce those?
3  A.  That's not up to me.
4  MR. GREENSTEIN:  To the extent that you can
5  establish the foundation for requiring production, we'll
6  certainly entertain that discussion.  But I don't think
7  you've done that.
8  MR. GREENSTEIN:  Q.  So you're not willing to
9  do it?
10  MR. GLENNON:  This is counsel's decision, as
11  you know.
12  But what Mr. O'Bryan has said is that
13  everything that he has gleaned and everything he's
14  relied upon is from the script output, which is actually
15  listed in the appendix to his expert report, which I'm
16  happy to point out to you, if you'd like.
17  MR. GREENSTEIN:  Q.  Mr. O'Bryan, do you think
18  it is helpful -- was it helpful for you to have a list
19  of those 277 items?
20  A.  For me personally?
21  Q.  Yeah.
22  A.  Well, certainly it summarized what they were
23  and how much they were.  But they come right out of the
24  script output.
25  Q.  If you could turn -- strike that.

209

1      Mr. O'Bryan, is it your testimony, your expert
2   testimony, that Ernst and Young analyzed the 2Q '01 bad
3   debt transfers, the transfers from 25005 to 12601 in the
4   second quarter?
5      A.  Yes.
6      Q.  They did review it?
7      A.  Yes.
8      Q.  What evidence can you provide that supports
9   your conclusion?
10     A.  As I recall, it was a deposition of Jennifer
11  Minton and also deposition of Mr. Henley.
12     Q.  Is there anything else you relied upon in
13  order to determine, to conclude that Ernst and Young
14  reviewed the $20.1 million in bad debt transfers in the
15  second quarter of '01?
16     A.  Well, just my experience as an auditor, and
17  knowing what auditors would be aware of and would talk
18  to clients about.
19         When you have the chief financial officer,
20  Mr. Henley, saying, "I've talked to them about that, or
21  would have talked to them about it," I think that's
22  pretty good evidence that they would have been spoken
23  to.
24         Then you also have Ms. Minton, who is also in
25  the accounting department, mentioning that they had been

210

1   talked to about it.  To me they would know that.
2          In addition to that, it would be an item that
3   an auditor would be interested in, given the amount, and
4   specifically given the fact that the client is telling
5   you this is something I want you to look at.
6      Q.  When you say an auditor would look at it, it
7   is not your testimony that Ernst and Young audited
8   Oracle's second quarter '01, is it?
9      A.  No.  I'm sure they performed the SAF 71
10  review.
11     Q.  Just so it is clear, Ernst and Young did not
12  audit Oracle's second quarter '01 bad debt transfers?
13     MR. GLENNON:  Objection; vague as to time.  Do
14  you want to clarify?
15     MR. GREENSTEIN:  Q.  At any time.  Is it your
16  testimony that Ernst and Young audited Oracle's second
17  quarter '01 financials?
18     A.  Well, no.  Arthur Andersen was the auditor.
19  But Ernst and Young was made aware of this in the
20  October/November of '02 time frame when this unapplied
21  cash project took place.  And I base that on testimony
22  that I've seen, as well as just my own experience as an
23  auditor that that would be something you'd see, and it
24  would be something you'd look at.
25         And as soon as you see it and as soon as you

211

1   look at it, you have to immediately look at it with
2   respect to the materiality back to the quarter it was
3   appropriately booked.
4      Q.  Why would you have to immediately look at it?
5      A.  Because it is something the clients brought up
6   to you and said, "Hey, will you take a look at this and
7   tell me" -- worst case scenario, hypothetically, which
8   we play out in my report, is the entire $20 million is
9   something that should be taken back to the second
10  quarter and reduce revenues by that.
11         The auditor would immediately say, "Look, I'm
12  not going to go do a bunch of analysis how this
13  happened.  That's the company's internal policy and
14  internal operations.  However, I do want to know if
15  that's something that has to be looked at and
16  investigated for me, the auditor, to know if it was
17  material in the second Q of '01 to potentially have to
18  restate the Q."
19         Even though they didn't audit the second Q of
20  '01, they being Ernst and Young, they certainly would
21  have had to consider materiality to go back and restate
22  that Q.  They would have responsibility for restating
23  that Q even though they did not report on it at the time
24  it was prepared.
25     Q.  So, just to be clear, your testimony is that

212

1   Ernst and Young did a review of the transfers from 25005
2   to 12601 in the second quarter '01, and issued an
3   opinion on that amount?
4      MR. GLENNON:  Objection; mischaracterizes the
5   testimony.  It is also vague and ambiguous as to time.
6      THE WITNESS:  No.  Auditors don't issue
7   opinions on individual transactions and/or accounts
8   within a set of financial statements.
9      MR. GREENSTEIN:  Q.  Let me rephrase.  So
10  you're saying they did review it though; right?
11     MR. GLENNON:  Objection; mischaracterizes the
12  testimony, it's vague and ambiguous.
13     THE WITNESS:  I believe that Ernst and Young
14  was made aware of the transfers and considered,
15  immediately upon being aware of, they would need to
16  consider whether or not it was material to that quarter.
17     MR. GREENSTEIN:  Q.  So do you -- do you know
18  if they considered it or not?
19     MR. GLENNON:  Objection; vague and ambiguous,
20  asked and answered.
21     THE WITNESS:  I do.  And they were.
22     MR. GREENSTEIN:  Q.  So your expert opinion is
23  that Ernst and Young reviewed the $20.1 million in
24  transfers from 25005 to 12601 in the second quarter?
25     MR. GLENNON:  Objection; vague and ambiguous

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

213

1    as to time, and asked and answered.
2         THE WITNESS: I'm sorry, I think you are
3    changing that question.
4         My position is that they -- I believe that
5    they were aware of it, of the transfers, and I believe
6    given the fact they were aware of it, they considered
7    the materiality of that into the second Q of '01,
8    Oracle's financial statements.
9         MR. GREENSTEIN: Q. Okay.
10    A. Did they perform audit procedures? I don't
11    know what procedures they performed. But I know having
12    been told about it, they would have had to consider the
13    materiality of it to the second Q.
14    Q. They would have had to consider it; right?
15    A. They would have, yes.
16    Q. But do you know if they did consider it?
17         MR. GLENNON: Objection; vague and ambiguous,
18    asked and answered.
19         THE WITNESS: If they were told about it, they
20    would have considered it, and considered materiality.
21    Auditors do that.
22         MR. GREENSTEIN: Q. And you said the
23    evidence -- the only evidence that you have to support
24    your opinion is testimony from Jennifer Minton and
25    testimony from Jeff Henley, and what you know about what

214

1    auditors look at in general; correct?
2         MR. GLENNON: Objection; mischaracterizes the
3    testimony.
4         THE WITNESS: There is also the audit
5    committee minutes. As I recall, the transactions, the
6    project, the unapplied cash project, was discussed in an
7    audit committee meeting. And auditors have to, by GAAS
8    requirements, basically should, look at audit committee
9    minutes.
10         So when -- I don't know if they were at that
11    meeting that it was discussed or not; I don't know that.
12    But even if they weren't, they would look at the minutes
13    of those meetings. It is a required step in audits or a
14    step all auditors perform in audits. It is actually
15    represented to the auditors that the company has made
16    available to them all the minutes.
17         So the auditor would have seen -- it's
18    Mr. Henley's testimony, Ms. Minton's testimony, it's my
19    understanding what auditors do. And, lastly, I
20    understand that it was discussed in the audit committee
21    meeting, and Ernst and Young certainly would have seen
22    those minutes and researched what that meant when they
23    were talking about the unapplied cash project or
24    whatever was discussed.
25         MR. GREENSTEIN: Q. But you don't know if

215

1    they did that or not, do you?
2         MR. GLENNON: Objection; vague and ambiguous,
3    mischaracterizes testimony.
4         THE WITNESS: I have not seen Ernst and
5    Young's work papers or talked to Ernst and Young
6    auditors that may have done that. I believe the name is
7    Mr. Banker, Mr. Caruso, or something to that effect.
8         But, I know in my 27, 29 years as being an
9    accountant, auditor, that's something that if the CFO
10    told you about it, it would be something you would
11    consider with respect to materiality.
12         MR. GREENSTEIN: Q. Can you point me to the
13    Henley testimony that you're talking about?
14         THE WITNESS: Yeah. Do you want to take a
15    two-minute break?
16         MR. GREENSTEIN: Yeah. I'm going to be asking
17    for the Minton testimony and the Henley testimony.
18         VIDEOGRAPHER: Off record at 3:55.
19         (Recess, 3:55 p.m. - 4:05 p.m.)
20         VIDEOGRAPHER: On record at 4:05.
21         MR. GREENSTEIN: Q. Mr. O'Bryan, during the
22    break you said you were going to try to find the
23    testimony of Jennifer Minton and Jeff Henley. Did you
24    do that?
25    A. I did, yes.

216

1    Q. Okay.
2    A. And the reference in my report, I'm sorry, I
3    should have asked you this in the first place, would
4    have expedited things, was on page 41 of my original
5    report, section D, where it talks about review of work
6    performed.
7         And the two cites that we go to, first to
8    Jennifer Minton, Jennifer Minton was the chief
9    accounting officer, CAO, of Oracle by 2001. And her
10    testimony when asked, "Was this analysis" -- the
11    analysis talked about was the unapplied cash analysis --
12    "shared with the outside auditors?"
13         "Answer: Yes."
14         Question, over on page 285 --
15    Q. Actually let me stop you there.
16         MR. GLENNON: Hold on. Are you finished with
17    your answer?
18         MR. GREENSTEIN: Q. I was going to say, if
19    this is the testimony that you're talking about, we
20    don't need to go through it.
21    A. There is more testimony.
22    Q. The one that said -- the stuff you cited on
23    page 41.
24         MR. GLENNON: If you want to complete your
25    answer, you can. But it is up to you.

217

1    THE WITNESS: Well, yeah, I do want to
2  complete the answer, if you don't mind.
3    MR. GREENSTEIN:  Q.  Okay.
4    A.   Then on the next page they are talking about
5  Mr. Wald asked -- there is discussion on 284 if it was
6  discussed at the audit committee meeting.  And the
7  answer was, yes.  Didn't recall if the auditors were at
8  the audit committee.
9    And then also saying Tom Williams would have
10  discussed this with the auditors.
11    So you have Ms. Minton saying it was discussed
12  with the auditors, that it was discussed at the audit
13  committee, doesn't know if the auditors were at the
14  audit committee, and also the fact Tom Williams would
15  have discussed this with the auditors.  Also, given the
16  fact that, again, as I mentioned the auditors would have
17  to look at the audit committee minutes and see that
18  discussion, would have certainly considered this as to
19  materiality in the second Q.
20    Q.   They are talking about auditors there; right?
21    A.   Talking about auditors.
22    Q.   E&Y was not Oracle's auditor at the time were
23  they?
24    A.   This is talking about the auditors at the time
25  when this project was done, which was Ernst and Young.

218

1    Q.   So, okay, so is it fair to say that your --
2  the evidence that you rely on in forming the opinion
3  that Ernst and Young looked at the 2Q '01 transfers of
4  $20.1 million is reflected on page 41 in footnote 106
5  and 107; is that correct?
6    MR. GLENNON: Objection; mischaracterizes the
7  testimony.
8    THE WITNESS: Well, the second one is
9  Mr. Henley's testimony, which is, I believe, referred
10  to.  Let me just read it to you.  And that was asked
11  again about the, I think there they called it cleanup.
12  And here it was that the -- "I got Jennifer and asked
13  all the way down.  We get the people in the department
14  itself as well as the others, including the internal
15  audit, external audit, to really get an understanding of
16  what did or didn't happen."
17    Question was: "Okay, so you've answered
18  at least the question partially.  You got Ms. Minton
19  involved, you got external auditors involved.  Which
20  external auditors?
21    "Whoever our public auditors are at the time.
22    "Okay.
23    "Either Arthur Andersen or Ernst and Young, as
24  I testified earlier.  I can't remember when we
25  switched."

219

1    So it is clearly talking about '02, because
2  they did switch from Andersen, which no longer existed.
3    (Discussion off the record.)
4    (Record read as follows:  ANSWER:  It is
5    clearly talking about '02 because they did
6    switch from Andersen, which no longer existed.)
7    MR. GREENSTEIN:  Q.  Is that a fair
8  characterization of your testimony?
9    A.   Yes.
10    Q.   So, other than this deposition testimony of
11  Jennifer Minton and Jeff Henley, and I think you said
12  there is audit committee meeting notes, other than that
13  evidence, is there any other evidence that you believe
14  supports your conclusion that Ernst and Young looked at
15  the $20.1 million in transfers from 25005 to 12601
16  during 2Q '01?
17    MR. GLENNON: Objection; mischaracterizes the
18  testimony, asked and answered.
19    THE WITNESS: The only thing I would add would
20  be my understanding of how auditors work and what they
21  would look at and what they would consider.
22    MR. GREENSTEIN:  Q.  Okay.
23    A.   Which clearly would have been looking as to
24  materiality in the second Q.
25    Q.   Did you review the --

220

1    A.   I'm sorry to do this to you, but if you
2  recall, one of the later audit committee minutes states
3  that Ernst and Young was done with their review and they
4  were proposing no adjustments, nor did they adjust the
5  second Q of '01.  So that tells you that it was not
6  material in their mind.
7    Q.   Okay, what audit committee meeting was that?
8    A.   There was a subsequent audit committee meeting
9  where Ernst and Young presented to the audit committee
10  they completed their review of one of the Qs and there
11  were no adjustments.
12    Q.   That was third quarter '01, wasn't it?
13    A.   Exactly right.  The point is that when they
14  say that there is no adjustments, it really goes all the
15  way back.  If you find adjustments at any point in time,
16  you have to go back if it is material.
17    Q.   Okay.
18    A.   Under APB 20.
19    Q.   Did you review the SLC interview memo of John
20  Banker, who is the senior audit partner for E&Y at the
21  time?
22    A.   I haven't seen that, I don't think.
23    MR. GREENSTEIN: Why don't I mark that.
24    (Exhibit 11 marked for
25    identification.)

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

221

1       MR. GREENSTEIN:  Q.  For the record, this is
2   NDCA-ORCL 296428 through 296434.  Actually, Mr. O'Bryan,
3   I'm going to focus your attention on a particular
4   portion of this.  So just let me know when you've
5   reviewed it.
6       A.  Yes, I read through that.
7       Q.  Have you seen this document before?
8       A.  I don't recall.
9       Q.  So you didn't -- did you consider it in either
10  your opening report or your rebuttal report?
11      MR. GLENNON:  Objection; vague and ambiguous.
12      THE WITNESS:  If I saw it, I considered it.  I
13  have not referred to it, so I have not relied on it.
14      MR. GREENSTEIN:  Q.  Okay.  So have you read
15  it before?
16      MR. GLENNON:  Objection; asked and answered.
17      THE WITNESS:  Yeah, I just don't recall.
18      MR. GREENSTEIN:  Q.  Okay.  If you turn to the
19  second to the last page.
20      A.  I'm there.
21      Q.  Actually, strike that.
22      Did you review the SLC final report regarding
23  the accounting allegations?
24      MR. GLENNON:  Objection; vague and ambiguous.
25      THE WITNESS:  I don't recall if I reviewed

222

1   that or not.
2       MR. GREENSTEIN:  Q.  Turning to the second to
3   the last page of this document.  You see how the heading
4   begins with, "Accounting Fraud Allegations Regarding
5   Unapplied Cash and Bad Debt Reserve."  Do you see that?
6       A.  I do, yes.
7       Q.  Why don't you go ahead and read the whole
8   thing.
9       A.  I've read that.
10      Q.  Okay.  So you read it just now.  But you're
11  not saying you read it before?
12      A.  I don't recall if I read it before.  I read a
13  lot of things.  I don't remember it.
14      Q.  You see how it says that the committee --
15  second sentence, "The committee discussed with Banker
16  that certain transfers from unapplied cash to the bad
17  debt reserve had occurred in Q3 of fiscal 2001, but that
18  the maximum amount of cash moved to the bad debt reserve
19  in Q3 was approximately $5 million."  Do you see that?
20      A.  Yes, I do.
21      Q.  Okay.  Do you see any evidence here that E&Y
22  looked at the second quarter of 2001?
23      MR. GLENNON:  Objection; document speaks for
24  itself.
25      THE WITNESS:  No.  The second quarter isn't

223

1   discussed.  But certainly Ernst and Young -- this is
2   almost a perfect example of the fact that they knew.
3   Having known -- and it says this process is ongoing.
4   Continuing its investigation of the claims regarding the
5   bad debt reserve, believe me, Ernst and Young would have
6   been all over this and looked back once the information
7   was known, which it was eventually later.
8       This was dated, I believe, November 13th.  So
9   this was before the transfer of all the bad debt, the
10  $20 million in bad debt reserves back to the 25005
11  account, which happened on November 24th.
12      So this is apparently what they knew at the
13  time, was 3Q, apparently not 2Q.  However, knowing that
14  there was ongoing investigation, Ernst and Young would
15  have been all over that.
16      Q.  You said that the reversal of the $20.1
17  million in transfer to the bad debt reserve in Q2
18  occurred on what date?
19      A.  November 24th, 2002.
20      Q.  All that $20.1 million was reversed on that
21  date?
22      A.  That's correct.
23      Q.  Okay.  So you will see this is an interview
24  memorandum from the SLC.
25      Do you know what the SLC ultimately put in

224

1   their final report?
2       MR. GLENNON:  Objection; the document speaks
3   for itself, lacks foundation.
4       THE WITNESS:  I don't recall what that report
5   says as I sit here right now.
6       MR. GREENSTEIN:  Q.  But you didn't rely upon
7   the SLC report in forming your opinion on whether E&Y
8   looked at that issue; right?
9       MR. GLENNON:  Objection; asked and answered.
10      THE WITNESS:  I didn't rely on it in my report.
11  I could have read it at one point or considered it, but
12  apparently haven't relied upon it.
13      MR. GREENSTEIN:  Q.  Mr. O'Bryan, did you --
14  in forming your opinion on Ernst and Young -- on Ernst
15  and Young's purported knowledge of the bad debt
16  transfers in 2Q '01, did you rely upon the deposition of
17  Alex Bender?
18      A.  I did see Mr. Bender's deposition where he
19  stated he didn't know anything about the second Q
20  reviews -- second Q transfers.
21      Q.  And wasn't --
22      A.  I just saved you an exhibit.
23      Q.  And are you aware that Alex Bender was the
24  person -- the witness designated by Ernst and Young as
25  the, quote, person most knowledgeable regarding these

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

225

1  issues pertaining to Oracle?
2       MR. GLENNON: Objection; lack of foundation,
3  vague and ambiguous.
4       THE WITNESS: I don't know if he was the PMK
5  or not. He was the senior manager on the engagement,
6  Mr. Banker was the partner, but I think Mr. Banker had
7  retired, so was not necessarily available to be deposed.
8  It would probably make sense that the senior manager may
9  have been the PMK.
10       MR. GREENSTEIN: Q. So --
11       MR. GLENNON: It is vague and ambiguous as to
12  these issues pertaining to Oracle as well. Do you want
13  to clarify what they were designated as PMK for?
14       MR. GREENSTEIN: No. He answered.
15       Q. So, given that you just said that you read
16  Mr. Bender's deposition, you said he didn't know about
17  the 2Q transfers, why do you still -- how do you still
18  form an opinion that they did know?
19       A. Because --
20       MR. GLENNON: Objection; vague and ambiguous,
21  asked and answered.
22       THE WITNESS: You mean they knew, you mean
23  Ernst and Young knew?
24       MR. GREENSTEIN: Q. Correct.
25       A. About the second Q transfers?

226

1       Q. Right.
2       A. Because of Ms. Minton's testimony,
3  Mr. Henley's testimony. And then also my understanding
4  of how an engagement team works. Not everybody on the
5  team knows everything about what is going on in the
6  engagement. So it is very likely Mr. Banker could have
7  known about it and gave consideration to it, and
8  somebody else did, but Mr. Bender did not. That's not
9  untypical at all.
10       Q. But --
11       A. An engagement team of an audit doesn't know
12  everything about the entire client, especially a client
13  the size of Oracle, on an ongoing basis. That's why
14  there is a team.
15       Q. So you think that it is more reliable to rely
16  on testimony of Jennifer Minton and Jeff Henley rather
17  than the testimony of Mr. Bender, who was designated by
18  Ernst and Young as its person most knowledgeable?
19       MR. GLENNON: Objection; lack of foundation,
20  argumentative, mischaracterizes the testimony.
21       THE WITNESS: Yeah, I don't think -- I've
22  considered all that testimony. And all I'm saying is
23  given all the information that I've seen, I believe that
24  Ernst and Young did review that and did consider it with
25  respect to materiality. And it is based on Ms. Minton's

227

1  testimony, Mr. Bender's testimony, Mr. Henley's
2  testimony, the audit committee information, my
3  understanding of how an engagement team works, and my
4  understanding of what auditors would be interested in
5  with respect to materiality.
6       MR. GREENSTEIN: Q. But you agree with me
7  that Mr. Bender says that he wasn't aware that Ernst and
8  Young looked at the 2Q transfer from 25005 to 12601;
9  correct?
10       MR. GLENNON: Objection; lacks foundation,
11  document speaks for itself.
12       THE WITNESS: I recall Mr. Bender saying
13  something to the effect he wasn't aware or didn't know
14  of any second Q transfers to the bad debt reserve,
15  something to that effect.
16       MR. GREENSTEIN: Okay. Mark two exhibits, 12
17  and 13.
18           (Exhibit 12 marked for
19           identification.)
20           (Exhibit 13 marked for
21           identification.)
22       MR. GREENSTEIN: Let's mark 12 first. For the
23  record, 12 is Bates stamped EY 000001 through EY 000012.
24  And Exhibit 13, for the record, Exhibit 13 is a portion
25  of the SLC report Bates stamped NDCA-ORCL 295517 through

228

1  295591.
2       Q. Mr. O'Bryan, why don't you let me know when
3  you're finished looking. Let's start with Exhibit 12.
4       A. Okay.
5       Q. Have you seen Exhibit 12 before?
6       A. I don't recall seeing this document.
7       Q. But you didn't rely upon it; correct?
8       A. That's correct.
9       Q. You see the first page is -- it's a copy of an
10  audit file that says, "Agreed upon procedures with
11  respect to debit memos to account 25005 in November
12  2000." Do you see that?
13       MR. GLENNON: Objection; the documents speaks
14  for itself.
15       THE WITNESS: I do see that it says that, yes.
16       MR. GREENSTEIN: Q. What does this appear to
17  be?
18       A. This is a binder cover from Ernst and Young's
19  work papers for the period 5/31/03. It appears to be
20  the binder cover for the agreed upon procedure of the
21  work done on the debit memos.
22       Q. If you turn to EY -- page EY 3.
23       A. I'm there.
24       Q. It is an e-mail from John Banker to
25  hfrahm@slblaw.com. And it says, "Subject: Re: Draft

Oracle                                                    Page 225 - 228

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

229

1  Insert For Your Review."  And it has a date of
2  11/19/2002.  Do you see that?
3  A.  I do, yes.
4  Q.  And the text of the e-mail says, "Buzz, here
5  is a draft marked for suggested changes by counsel and
6  me.  Please call to discuss.  Thanks.  JB."  Do you see
7  that?
8  A.  I do, yes.
9  Q.  Is it fair to say this appears to be an e-mail
10  from John Banker to an hfrahn, 11/19, enclosing some
11  changes to a document?
12  MR. GLENNON:  I'm going to just briefly object
13  just on the basis -- Eli, can you give me the background
14  on this particular document?  Has this been logged?  Is
15  this privileged?  This looks like it could be
16  privileged.
17  MR. GREENSTEIN:  Well, it was produced by
18  Ernst and Young.
19  MR. GLENNON:  All right, can we take a
20  couple-minute break so I can look into this?  I don't
21  want to shut you down on your questioning, but I can
22  just make a couple phone calls.
23  MR. GREENSTEIN:  Okay.
24  VIDEOGRAPHER:  This marks the end of tape
25  three in Volume I in the deposition of J. Duross O'Bryan

230

1  at 4:26, going off the record.
2  (Recess, 4:26 p.m. - 4:41 p.m.)
3  VIDEOGRAPHER:  On record at 4:41.  This marks
4  the beginning of tape four in the deposition of J.
5  Duross O'Bryan.
6  MR. GREENSTEIN:  Q.  Mr. O'Bryan, you have
7  before you what has been marked as Exhibits 12 and 13.
8  Exhibit 12 was the audit file, couple pages from the
9  audit file, and Exhibit 13 was a portion of the SLC
10  report.  Do you see that?
11  MR. GLENNON:  Objection; foundation.
12  THE WITNESS:  I see 12, which appears to be
13  Ernst and Young Bates stamped documents, and 13,
14  whatever Bates they are.
15  MR. GREENSTEIN:  Q.  If you turn to page EY --
16  on Exhibit 12, EY 3.
17  A.  Yes.
18  Q.  Sorry, EY 6.
19  A.  I'm there.
20  Q.  And it appears to be an e-mail from John
21  Banker to Joel Bonner, dated 3/11/2003.  It looks like
22  it includes the previous e-mail that we looked at dated
23  11/19/2002 from John Banker to Harrison Frahn.  Do you
24  see that?
25  A.  I do, yes.

231

1  Q.  It says, "Buzz, here is the draft marked for
2  suggested changes by counsel and me.  Please call to
3  discuss."  Do you see that?  "Thanks.  JB."
4  A.  I do, yes.
5  Q.  And if you turn to page 10, it appears to be a
6  red-lined Word or Word Perfect, word processing
7  document; correct?
8  A.  Appears to be, yes.
9  Q.  And see at the top it says, "On November 13th,
10  2002 the committee's counsel met with John Banker," and
11  the word "senior" is crossed out, it says, "Audit
12  Partner at EY."  Do you see that?
13  A.  I do, yes.
14  Q.  Look at Exhibit 13, and turn to page 295565.
15  A.  I'm there.
16  Q.  And you see how right under the heading:
17  "E&Y's review of the debit memos was consistent with the
18  committee's conclusions."  Do you see that?
19  A.  I do, yes.
20  Q.  Look at the first sentence at least.  It
21  appears that this language on 295565 is -- matches the
22  language on EY 10, except for the items that have been
23  underlined; correct?
24  MR. GLENNON:  I object to the extent the
25  document speaks for itself.

232

1  THE WITNESS:  I see that it looks a lot less
2  alike than it does alike.
3  Turn to 295566, it says, "Banker," and then,
4  "and Professor Grundfest," which isn't on the EY memo at
5  all.  The next sentence -- the next sentence in the EY
6  memo says it is on 556 -- I don't see -- I mean, are
7  there similar words and sentences?  Possibly.  But I
8  have not matched that up.
9  MR. GREENSTEIN:  Q.  Okay, well, let's just
10  look at it sentence by sentence.
11  So, if you look at the third sentence of both
12  documents.
13  A.  The third sentence.
14  Q.  The one that starts with, "The purpose of
15  these discussions."
16  MR. GLENNON:  Just for the record, it is not
17  the third sentence of Exhibit 13.
18  MR. GREENSTEIN:  Q.  Right.  The third
19  sentence in EY 10, and if you could find that same
20  sentence in 295566.  Do you see that?
21  A.  I see it in Exhibit 12.  And I'm now
22  looking -- I see it also in Exhibit 13.  I just see "The
23  purpose."
24  Are you asking me to do something with that?
25  I'm sorry.

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

233

1    Q.  Yeah. I just want to -- it appears to me that
2  the language in EY 10 is the same as the language in
3  295566, in that what was red-lined -- what was red-lined
4  in Exhibit 12 was removed from the final version. Does
5  that appear to be correct?
6      MR. GLENNON: Objection; foundation. The
7  document speaks for itself.
8      THE WITNESS: Are you just asking me if that
9  sentence matches?
10     MR. GREENSTEIN: Q. Yes.
11    A.  If you take out the edited portions of that?
12    Q.  Right.
13    A.  It appears to.
14    Q.  It says, "The purpose of these discussions was
15  to consider both the committee's analysis and
16  conclusions regarding the accounting fraud allegations
17  and procedures performed by EY." Then you see how it
18  crosses out "analysis"?
19    A.  Yes.
20    Q.  Okay. So it appears that Mr. Banker removed
21  that word "analysis" and added the words "at the request
22  of Oracle's management with respect to those same
23  allegations." Do you see that?
24    A.  I don't know who made that change. I don't
25  know if it was Mr. Banker or Mr. Bonner who made that.

234

1    Q.  But that change was made?
2    A.  Yeah.
3      MR. GLENNON: Objection; the document speaks
4  for itself.
5      THE WITNESS: As it should be.
6      MR. GREENSTEIN: Q. Why is that?
7    A.  Because this is an agreed-upon procedure
8  report, procedures agreed upon by E&Y and the SLC.
9    Q.  E&Y didn't do its own analysis with respect to
10  the allegations; correct?
11     MR. GLENNON: Objection; lack of foundation,
12  assumes facts.
13     THE WITNESS: Are you speaking now about the
14  debit memos or the --
15     MR. GREENSTEIN: Q. I'm looking at this
16  document, and the word "analysis" is crossed out. You
17  said that made sense to you; right?
18     MR. GLENNON: Objection; mischaracterizes the
19  testimony. The document speaks for itself, lack of
20  foundation.
21     THE WITNESS: Well, I believe this becomes
22  part of the agreed-upon procedures report.
23     MR. GREENSTEIN: Q. But I'm wondering why --
24  it appears based on this document that somebody removed
25  the word analysis, such that it said that, "The

235

1  procedures performed by EY at the request of Oracle's
2  management," so instead of saying "procedures performed
3  by EY's analysis," they crossed out "analysis" and added
4  "At the request of Oracle's management." Do you see
5  that?
6      MR. GLENNON: Objection; the document speaks
7  for itself, lack of foundation.
8      THE WITNESS: I do see that, yes.
9      MR. GREENSTEIN: Q. So doesn't that indicate
10  that EY performed procedures at the request of Oracle's
11  management, but did not perform its own analysis?
12     MR. GLENNON: Objection; calls for
13  speculation.
14     MR. GREENSTEIN: Q. At least according to
15  this document?
16     MR. GLENNON: Objection; calls for
17  speculation, lack of foundation, document speaks for
18  itself.
19     THE WITNESS: Well, as part of -- agreed upon
20  procedures are exactly that, they are agreed upon
21  between the two parties, the auditor and whoever is
22  asking the auditor to do that.
23     But as part of the agreed-upon procedures, the
24  auditors perform analysis. So if you ask me to, agreed
25  upon procedures, to go match up every word in this

236

1  document to this document and I agree to that, that's an
2  agreed-upon procedure between the two of us. And I then
3  perform an analysis to see if that's true.
4      MR. GREENSTEIN: Q. Based on your extensive
5  experience working at audit firms, do you know why E&Y
6  would cross out the word "analysis" and add "at the
7  request of Oracle's management"?
8      MR. GLENNON: Objection; lack of foundation.
9      THE WITNESS: Because it looks like it's
10  saying "analysis." If you look at the rest of the
11  edits, it looks like it would have said, "and procedures
12  performed by E&Y's analysis of those same allegations."
13     E&Y wouldn't make an analysis of the
14  investigations, that's not what they are being asked to
15  do.
16     MR. GREENSTEIN: Q. But doesn't it appear --
17  there are two underlying parts of that sentence,
18  correct, which it looks like it was added in, then there
19  is one word that was taken out. Is that fair to say?
20     MR. GLENNON: Objection; document speaks for
21  itself, lack of foundation. The witness didn't author
22  the document.
23     THE WITNESS: I'm not sure what you're asking
24  me.
25     MR. GREENSTEIN: Q. You have seen a red-lined

O'Bryan, John Duross - Confidential 7/12/2007 9:29:00 AM

237

1  document before; right?
2     A.  I have, yes.
3     Q.  Based on what you know, it appears that "the
4  procedures performed by" was added, and then "at the
5  request of Oracle's management with respect to" was
6  added; right?
7     MR. GLENNON:  Objection; the document speaks
8  for itself, lack of foundation.
9     THE WITNESS:  Well, what it appears to have
10  said in the first instance was, "The purpose of these
11  discussions was to consider both the committee's
12  analysis and conclusions regarding the accounting fraud
13  allegations and E&Y's analysis of those same
14  allegations."
15     Well, E&Y wouldn't perform an analysis of the
16  investigations.
17     MR. GREENSTEIN:  Q.  It says allegations.
18  Where does it say investigations?
19     A.  Excuse me, would not perform an analysis of
20  the allegations. E&Y would consider the allegations and
21  agree to do procedures that were agreed upon between
22  itself and the committee. And then in applying those
23  procedures would perform analysis.
24     So, to me it makes sense that the change was
25  made.  It doesn't say they are not doing an analysis.

238

1  They are simply not doing an analysis with respect to
2  the allegations.
3     Q.  They are saying they didn't do an analysis of
4  allegations; right?
5     MR. GLENNON:  Objection; asked and answered,
6  document speaks for itself, calls for speculation.
7     THE WITNESS:  I think it is just saying E&Y is
8  not trying to analyze what the allegations are, it is
9  simply performing procedures with respect to the
10  allegations.
11     It wouldn't be Ernst and Young's job to
12  analyze the allegations, what the document says and what
13  the allegations are.  It would be their job to analyze
14  and perform procedures on the specific allegations.
15     MR. GREENSTEIN:  Q.  Okay. If you look down
16  to the last paragraph, you see -- why don't you just
17  read that sentence into the record as it was before
18  these red-lines were made.
19     MR. GLENNON:  Objection to the extent that's
20  even possible.
21     MR. GREENSTEIN:  Mr. O'Bryan, you're familiar
22  with red-lined documents; correct?
23     A.  I am, yes.
24     Q.  And do you feel capable -- that you're capable
25  of reading the sentence as it existed before the

239

1  red-lines were made?
2     MR. GLENNON:  Are you representing both the
3  edits were made simultaneously?
4     MR. GREENSTEIN:  Q.  I'm just saying can you
5  read that sentence without the edits in there?
6     A.  I can read the sentence excluding the
7  underlines and including the line-outs.
8     Q.  Perfect.
9     A.  Does that work?
10     Q.  Yeah.
11     A.  "Banker informed the committee that E&Y had
12  performed its own examination of the accounting fraud
13  allegations in its review pursuant to principles that
14  E&Y agreed to with Oracle's -- with Oracle's the
15  November 17th debit memos."
16     Q.  Okay. And then you see how if you turn back
17  to page 10, EY 10, it appears that somebody crossed out
18  the portion that says -- when it says "EY had performed
19  its own examination of the accounting fraud
20  allegations," somebody crossed out "its own examination
21  of the accounting fraud allegations."  Do you see that?
22     A.  I do, yes.
23     Q.  So it appears that EY did not perform its own
24  examination of the accounting fraud allegations; is that
25  right?

240

1     MR. GLENNON:  Objection; lack of foundation,
2  calls for speculation.
3     THE WITNESS:  Well, we know what E&Y did,
4  because it is in their agreed-upon procedures. And it
5  wouldn't surprise me that they -- I mean, examination in
6  auditing means something. So to strike the words
7  "examination of the accounting fraud allegations" makes
8  all the sense in the world to me.
9     MR. GREENSTEIN:  Q.  So in the agreed-upon
10  procedures that you just referenced, was there anything
11  in there that indicated that EY was supposed to look at
12  the bad debt transfers from 25005 to 12601 in the second
13  quarter '01?
14     MR. GLENNON:  Objection; lack of foundation,
15  vague and ambiguous.
16     THE WITNESS:  No. The agreed-upon procedures
17  did not deal with the transfers from 25005 to 12601.
18     MR. GREENSTEIN:  Q.  Okay. If you look at the
19  sentence that starts, "Banker informed the committee."
20  Do you see that?
21     A.  On which exhibit?
22     Q.  Exhibit 12, EY 10.
23     A.  I see "Banker informed the committee," yes.
24     Q.  Then if you look at Exhibit 13, it is the last
25  paragraph on 295566.

O'Bryan, John Duross - Confidential 7/12/2007 9:29:00 AM

241

1     A.  I see that, yes.
2     Q.  And if you just read that sentence and then
3  read the Exhibit 12, and let me know if it looks like
4  the changes were made.
5     MR. GLENNON:  I'm just going to object.  The
6  documents speak for themselves.  Do we have dates with
7  these respective documents?
8     MR. GREENSTEIN:  Q.  I'm just asking if it
9  appears those changes in Exhibit 12 EY page 10 were made
10  such that this document Exhibit 13, 295566, reads as if
11  the changes were made.
12     MR. GLENNON:  Same objections.
13     THE WITNESS:  Yeah, the changes on Exhibit 12
14  at pages EY 10 and 11, assuming that I'm interpreting
15  the cross-outs and underlines as being adds and deletes
16  properly, is then written on Exhibit 13, page 295566.
17  Does that answer your question?
18     MR. GREENSTEIN:  Q.  Yeah.  So if you look at
19  Exhibit 12, EY 11, and you go down to the sixth line, it
20  is the sentence that reads, "E&Y observed."  Do you see
21  that?
22     A.  You're on Exhibit 12?
23     Q.  12, yeah.  EY, page 11.
24     A.  "EY observed"?
25     Q.  "E&Y observed," in the sixth line down on the

242

1  right-hand side.
2     A.  Yes.
3     Q.  And it says -- I'm just going to read it, and
4  let me know if you disagree that this is what the
5  sentence says without the red-lines.
6     MR. GLENNON:  I just object to the extent
7  there is no foundation, no way you can determine whether
8  these deletions and additions happened simultaneously or
9  at different times, or how you can possibly determine
10  what the document looked like without the edits.
11     MR. GREENSTEIN:  Q.  So it says, "E&Y observed
12  that the debit memos had no effect upon Oracle's
13  revenues.  In addition, E&Y examined the transfers from
14  account 25005 to see whether there was a single large
15  entry that would be consistent with the accounting fraud
16  allegations claimed that account 25005 was the source of
17  $228 million in revenue on November 17th, 2000."  Do you
18  see that?
19     A.  I see that you've read that and edited it
20  based on line-outs and underlines.
21     Q.  Right.  But was that consistent with how you
22  would read this red-lined document if the edits hadn't
23  been made?
24     MR. GLENNON:  I object on foundation grounds.
25  The document speaks for itself.

243

1     THE WITNESS:  I have no idea who wrote this or
2  what was intended by the underlines -- underlines or the
3  line-outs.  I see the way you read it.
4     MR. GREENSTEIN:  Q.  And do you agree that
5  that would be the way that the sentence would read but
6  for the red-lines?
7     MR. GLENNON:  Objection; lack of foundation.
8     THE WITNESS:  What I agreed to is if you
9  exclude the words that have been lined through and you
10  include the words that have been underlined, that's the
11  way it reads.
12     MR. GREENSTEIN:  Q.  And you see how it says,
13  "E&Y observed that the debit memos had no effect upon
14  Oracle's revenues," and you see somebody crossed out
15  "effect upon" and added "debits or credits to Oracle's
16  revenue"?  Do you see that?
17     A.  I do.
18     MR. GLENNON:  I make a standing objection as
19  to foundation on the edited document.
20     MR. GREENSTEIN:  Q.  Do you know someone
21  would -- someone at E&Y would cross out the words
22  "effect upon Oracle's revenues" an instead insert so
23  that it says, "E&Y observed that the debit memos had no
24  debits or credits to Oracle's revenue"?
25     MR. GLENNON:  Objection; foundation.  There is

244

1  no foundation for who made this edit.
2     THE WITNESS:  Do I know why they would do
3  that?
4     MR. GREENSTEIN:  Q.  Right.
5     A.  I have no idea who was editing this or who
6  made the edit, if it was one of the attorneys or
7  Mr. Banker.  I have no idea.
8     Q.  Is it your expert opinion that E&Y observed
9  that the debit memos had no effect upon Oracle's
10  revenue?
11     A.  Well, I would have to -- I would have to look
12  at their agreed-upon procedures report to validate that
13  back to their report.
14     Q.  Right.  But you didn't say that in your
15  opinion that they observed that the debit memos had no
16  effect upon Oracle's revenues; did you?
17     MR. GLENNON:  Objection; vague and ambiguous.
18  The report speaks for itself.
19     THE WITNESS:  I don't see that it says --
20  talking about my report on page 17?
21     MR. GREENSTEIN:  Q.  There is two places in
22  your report I believe that you talk about E&Y.
23     A.  One is about the debit memos and one is about
24  the bad debt transfer.
25     Q.  Right.  So 17?

O'Bryan, John Duross - Confidential 7/12/2007 9:29:00 AM

245

1    A.  Page 17 talks about the bad debt -- or the
2  debit memos.
3    Q.  Okay.
4    A.  So what is your question?
5    Q.  So you're not opining on page 17 that E&Y
6  observed that the debit memos had no impact on Oracle's
7  revenues, are you?
8    MR. GLENNON:  Objection; the document speaks
9  for itself.
10    THE WITNESS:  If I look at the fourth bullet
11  point down, it says, "E&Y reviewed the details relating
12  to the 145 debit memos greater than $500,000 and 55
13  arbitrarily-chosen debit memos.  E&Y found no financial
14  statement impact from these selected debit memos."
15    Next line down, "E&Y created three test
16  transactions with the same accounting distribution,
17  noting that no amount was recorded to revenue."
18    Next bullet point down says, "and found no
19  amounts recorded to revenue related to the debit memos,
20  as well as no unusual reconciling items."
21    And then my last conclusion is, "As noted
22  above, E&Y found no evidence that any revenue, or any
23  other financial statement impact was recorded as a
24  result of the November 17, 2000 debit memo project."
25    MR. GREENSTEIN:  Q.  Right.  So if you look at

246

1  the sentence that we just read where it says, "E&Y
2  observed that the debit memos had no debits or credits
3  to Oracle's revenue," you see how they removed the words
4  "effect upon Oracle's revenue"?  Do you see that?
5    MR. GLENNON:  Where are you?
6    MR. GREENSTEIN:  On EY 11, Exhibit 12.
7    MR. GLENNON:  Yeah.  Where about?
8    MR. GREENSTEIN:  The sixth line down.
9    MR. GLENNON:  Okay.
10    MR. GREENSTEIN:  Q.  Do you see that,
11  Mr. O'Bryan?
12    A.  I do.
13    Q.  So, is it still your expert testimony after
14  seeing this document that E&Y found no evidence that any
15  revenue or any other financial statement impact was
16  recorded as a result of the November 17, 2000 debit memo
17  project?
18    A.  Yes.
19    Q.  And your opinion doesn't change in looking at
20  what EY removed from this memo?
21    A.  No.
22    MR. GLENNON:  Objection; lack of foundation.
23  There has been no foundation E&Y was responsible for
24  removing what purports to have lines through it in the
25  text.

247

1    THE WITNESS:  No.  I mean, if you look at
2  this, "effect upon," the only way you can effect a
3  revenue at Oracle is to debit it or credit it.  That's
4  accounting.  That's Accounting 101.
5    So, if it didn't have any -- had no debits or
6  credits, that means it had no effect on revenue.  Why
7  those words were changed, I have no idea.  The
8  conclusion is still the same.  If you don't debit or
9  credit a revenue account, it has no effect on it.
10    MR. GREENSTEIN:  Q.  If you look at EY 11
11  again, it is right above the last paragraph, it is four
12  lines crossed out.  Do you see that?
13    A.  I do.  Starting with "Banker stated"?
14    MR. GLENNON:  Five lines?
15    MR. GREENSTEIN:  Q.  Do you see that?
16    A.  I do.
17    Q.  Okay.  And it appears that that portion was
18  removed from this memo; correct?
19    MR. GLENNON:  Objection; lack of foundation,
20  document speaks for itself.
21    THE WITNESS:  I see those lines crossed out,
22  yes.
23    MR. GREENSTEIN:  Q.  Do you know why somebody
24  at E&Y would remove the language that says, "Banker also
25  stated there was nothing in the materials that EY had

248

1  reviewed that indicated to EY that plaintiff's claims
2  about the November 17, 2000 debit memos had any
3  veracity"?  Do you see that?
4    MR. GLENNON:  Objection; lack of foundation,
5  assumes facts.
6    THE WITNESS:  Do I know why they would make
7  the change?
8    MR. GREENSTEIN:  Q.  Right.
9    A.  Well, I don't know who made the change, so I
10  don't know -- I have no idea why they would cross that
11  out.
12    You would have to look at the agreed-upon
13  procedures report and see if that was discussed.  Which
14  the veracity of the claim is really not something an
15  auditor would necessarily do.
16    Q.  So, do you have any evidence that E&Y reviewed
17  the veracity of plaintiff's claims regarding the
18  November 17, 2000 debit memos?
19    MR. GLENNON:  Objection; vague and ambiguous.
20    THE WITNESS:  I think what Ernst and Young
21  did, as laid out in my report on page 17 and 18, and
22  also included in their EY 000143 through 6, which is
23  their agreed-upon procedures memo -- and when I read
24  that memo and I also consider the testimony of
25  Mr. Bender, it appears to me as E&Y concluded there was

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

249

1   no financial statement impact from the debit memo
2   project.
3        MR. GREENSTEIN: Q.  And EY 11 doesn't change
4   your opinion one way or the other?
5        A.  Not at all.
6        Q.  Okay.
7        A.  No.
8        Q.  Mr. O'Bryan, did you in connection with your
9   issuing your opinion in your rebuttal report, did you
10  ever calculate the amount of account balance of account
11  25005 as of 11/30 -- November 30th, 2000?
12       MR. GLENNON: Objection; vague and ambiguous.
13       THE WITNESS: Did I ever calculate the account
14  balance?  You mean do I know what the account balance
15  was in 25005 at 11/30?
16       MR. GREENSTEIN: Q.  Correct?
17       A.  I don't know that my report states that.
18       MR. GREENSTEIN: I want to mark this as
19  No. 14.
20            (Exhibit 14 marked for
21             identification.)
22       MR. GREENSTEIN: Q.  Have you seen this
23  document before?
24       A.  I have, yes.
25       Q.  Did you rely upon it in issuing your report or

250

1   rebuttal?
2        A.  I considered it, and I think my rebuttal
3   report talks about some of the issues in this document.
4        Q.  What is your opinion as to what the balance of
5   account 25005 was as of November 30th, 2000?
6        MR. GLENNON: Objection; the document speaks
7   for itself.
8        THE WITNESS: $125,377,173.
9        MR. GREENSTEIN: Q.  That's the account
10  balance in -- strike that.
11       What does that $125 million represent to you,
12  knowing what you know about that account, 25005?
13       A.  At that point in time, that is just all the
14  cash that has come in to Oracle that is either in the
15  process of being applied to invoices or has not been
16  applied to invoices at that point in time.
17       Q.  So that 125 million represents unapplied cash
18  that has not yet, as of November 30th, 2000, been
19  applied to an invoice; correct?
20       A.  That's correct.  But that can represent cash
21  that came in that day or the day before that the system
22  just hasn't had the time to make the application.
23       Q.  Right.
24       A.  It doesn't mean, as Mr. Regan would suggest,
25  that they were unable to apply that to an invoice.  I

251

1   believe that's completely irresponsible of Mr. Regan to
2   suggest that.
3        Q.  You just said the $125 million was unapplied
4   cash in that account that had not yet been applied to an
5   invoice; is that right?
6        A.  Yes.  But you have to --
7        MR. GLENNON: I would also like to insert an
8   objection to the fact that there is handwritten edits
9   throughout this document that I don't think there has
10  been any foundation set for.  I also believe this
11  document has a second page that hasn't been provided.
12       MR. GREENSTEIN: Q.  Mr. O'Bryan, have you
13  looked at the handwritten notes?
14       A.  Yes.
15       Q.  Does that change your opinion of the balance
16  of 25005 as of November 30th, 2000?
17       MR. GLENNON: Hold on.  Have you read all the
18  handwritten notes?
19       THE WITNESS: I'm just in the process of
20  reading them right now.
21       I've read the notes.  Your question was what?
22       MR. GREENSTEIN: Q.  Do the notes change your
23  opinion as to what you believe the balance was in 25005
24  as of November 30th, 2000?
25       A.  I believe it's that amount.  But my point is

252

1   that this represents cash that could have come in the
2   day before, could have come in two days before.  It
3   simply has not had an opportunity to be applied yet,
4   because the system hasn't matched it up.
5        It is not, as Mr. Regan would suggest, this
6   amount of money that's sitting there that cannot --
7   cannot and has not is different.
8        Q.  Did Mr. Regan say cannot?
9        A.  I believe his report says cannot.
10       Q.  Are you sure about that?
11       A.  Not positive, but I believe it is something
12  like that.
13       So the fact is that Oracle is collecting a
14  significant amount of money every day, and this is an
15  amount that simply the system has not matched up as yet.
16       And I can't read all of footnote D, but it
17  looks like it says something about there is increased
18  consulting activity in Q2, which would explain a higher
19  amount, being that more cash would come in, and just has
20  not had the opportunity to apply to any invoices yet.
21       MR. GREENSTEIN: Mark this as Exhibit 15,
22  please.
23            (Exhibit 15 marked for
24             identification.)
25       MR. GREENSTEIN: Q.  For the record, this is

253

1  Bates stamped AA 000035.  Have you seen this document
2  before?
3      MR. GLENNON:  I'm going to insert the same
4  objection as the last document.  I don't know if this is
5  the complete document, and there is handwritten
6  notations on the document for which no foundation has
7  been set.
8      MR. GREENSTEIN:  Q.  Did you rely upon this
9  document in your report?
10     A.  I considered this document, yes.
11     Q.  Did you rely upon it?
12     A.  I don't think I reference this document.
13  Probably not.
14     Q.  Can you -- in looking at this document, can
15  you determine what the balance of account 12018, called
16  unapplied cash, was as of November 30th, 2000?
17     A.  12018?
18     Q.  Um-hum.
19     A.  Unapplied cash is $64,594,692.
20     MR. GREENSTEIN:  Okay.  Thank you.  Let's take
21  five minutes.
22     VIDEOGRAPHER:  Off record at 5:14.
23     (Recess, 5:14 p.m. - 5:33 p.m.)
24     VIDEOGRAPHER:  On record at 5:33.
25     MR. GREENSTEIN:  Q.  Mr. O'Bryan, do you know

254

1  what an aging seven buckets report is?
2      A.  I do.
3      I'm sorry to interrupt.  I would like to
4  clarify an earlier answer.  You asked me on Exhibit 14
5  what my belief of the balance of the customer
6  overpayments account was.  I said $125 million.  That
7  number is actually $25 million, $25.4 million.  Sorry,
8  my mic isn't on.
9      And that's the number your own expert, Mr.
10  Regan, shows as $25.4 million in his report.
11     The $125 million, if you look at footnote A,
12  which I didn't have a chance to fully read when you
13  handed me this document, is continued down at the bottom
14  of the page that notes that there is a $100 million loan
15  or advance and should not be classified as unearned
16  revenues.  So you got to debit unearned revenue and
17  credit, looks like, intercompany receivable.
18     So the $125 million should be taken out.
19  Which, just so you know, the reason I went to this, I
20  somewhat remembered in Mr. Regan's report, if you look
21  at his 25005 balance at 11/30, it is $25.4 million.  So
22  the amount of money in the 25005 account at 11/30/00 was
23  $25.4 million.
24     Q.  Okay.
25     A.  Okay.  I apologize for that.

255

1      Q.  So you are familiar with the seven aging
2  buckets report at Oracle; correct?
3      A.  I am, yes.
4      Q.  And what is that document or what is it used
5  for at Oracle?
6      A.  I don't know exactly what they used it for.  I
7  thought it was more of an internal document that appears
8  to show billing history and account history for a
9  certain client.  By nature of its title, it must
10  categorize things into seven buckets.
11     Q.  Did Oracle ever send those reports to their
12  customers?
13     A.  I don't think they typically did.  I think on
14  occasion some may have requested -- I believe there was
15  one on -- I don't remember the client, started with a D,
16  as I recall, that maybe Ms. Orr requested or something
17  and got ahold of.  It had gone out to clients on an
18  occasional basis.
19     Q.  When the 46,000 debit memos were created on or
20  about November 17th, 2000, did those transactions have
21  any impact on what you could see on the seven aging
22  buckets report?
23     MR. GLENNON:  Objection; calls for
24  speculation, lack of foundation.
25     THE WITNESS:  I'm sorry, I don't understand

256

1  your question.
2      MR. GREENSTEIN:  Q.  Well, the seven aging
3  buckets report, what is it -- what information does it
4  show about a particular customer?
5      A.  Invoices, issued invoices paid.  And if you're
6  going to show me the one I think you're going to show
7  me, it shows down, it is either on-account or
8  debit memo, or something like that down at the bottom of
9  it.
10     Q.  And so when the debit memos were created, did
11  it have any impact on the information that was in the
12  aging seven buckets report?
13     MR. GLENNON:  Objection; vague and ambiguous.
14     THE WITNESS:  Once the debit memos would have
15  been run, the on-account amounts would go away.
16     MR. GREENSTEIN:  Q.  Okay.  So they
17  wouldn't -- so any amounts on-account on the aging seven
18  buckets report that were related to debit memos created
19  on November 17th would not show up on the aging seven
20  buckets report the day after those debit memos were run;
21  correct?
22     MR. GLENNON:  Objection; calls for
23  speculation, lack of foundation.
24     THE WITNESS:  That's correct.  Because the
25  debit memo project got rid of the on-account flag.

257

1  Those weren't amounts of money to be applied to any
2  invoice. They weren't on-account, as you've shown me in
3  Oracle's user guide. Those were simply amounts that had
4  been previously dealt with by Oracle's collection
5  department and just had a flag sitting on them.
6      MR. GREENSTEIN: Q. But weren't some of those
7  on-account items eventually refunded?
8      A. They were.
9      Q. And why was that?
10     A. Simply because --
11     MR. GLENNON: Objection; lack of foundation,
12 calls for speculation.
13     You can answer, if you know.
14     THE WITNESS: You mean why were they
15 eventually refunded?
16     MR. GREENSTEIN: Q. Right.
17     A. Because after the unapplied cash project in
18 October/November of 2002, additional research was done
19 whereby it was discovered that they had made an
20 erroneous transfer to 12601, in October/November of '00,
21 and they refunded the money.
22     Q. Were there any on-account items that were not
23 transferred to 12601 that were on-account, and that
24 eventually were refunded as part of the 2002 cleanup?
25     MR. GLENNON: Objection; vague and ambiguous.

258

1      THE WITNESS: I don't understand the question.
2      MR. GLENNON: Lack of foundation.
3      MR. GREENSTEIN: Q. There were 46,000
4  on-account items on November 17th, 2000; correct?
5      A. Correct.
6      Q. And of those, not all of them were items that
7  had been transferred to 12601; correct?
8      A. That's correct. There was only 120 -- well --
9      Q. Of 926, there was 121; right?
10     A. 926 scripts. There was 121 transfers from
11 25005 to 12601.
12     Q. So those other items that weren't transferred,
13 were any -- of the 926, were any of those items refunded
14 as part of the 2002 cleanup?
15     MR. GLENNON: Objection; lack of foundation,
16 calls for speculation.
17     THE WITNESS: I don't know that.
18     MR. GREENSTEIN: Q. Did you make that
19 determination in issuing your expert opinion?
20     THE WITNESS: I'm sorry, the question again,
21 please.
22     MR. GREENSTEIN: Q. You would agree you
23 reviewed 926 of the 46,000 debit memos in looking at the
24 script output; correct?
25     A. Yes.

259

1      Q. And of those, you said 121 of the 926 were
2  transferred to 12601 in 2Q; correct?
3      MR. GLENNON: I'm just going to object, it
4  mischaracterizes the evidence.
5      THE WITNESS: 121 were transfers, included
6  transfers from 25005 to 12601.
7      MR. GREENSTEIN: Q. For $10.6 million?
8      A. Yeah, totaling $10.6 million.
9      Q. Setting those items aside, those 121 items,
10 and looking at the rest of the population of the 926
11 debit memos, were any of those items refunded as part of
12 the 2002 cleanup?
13     MR. GLENNON: Objection; vague and ambiguous,
14 lacks foundation.
15     THE WITNESS: I think there were, I think I've
16 seen some of those that were. I don't recall the
17 number. There may have been.
18     MR. GREENSTEIN: Q. Why would those items be
19 refunded two years later?
20     MR. GLENNON: Objection; calls for
21 speculation.
22     THE WITNESS: As I've described before, the
23 on-account simply meant that the collections department
24 had classified that receipt, which was -- for this
25 purpose was in the second Q of '00, totaling about $20

260

1  million.
2      And once the company found out there were
3  those transfers, it went about the process of reversing
4  those, all of those, and reinvestigated where they
5  should go.
6      So, I -- so some of those may have been
7  refunded.
8      MR. GREENSTEIN: Q. My question is, setting
9  aside the 121 items that were transferred to the bad
10 debt reserve in 2Q '01, setting those aside, the other
11 debit memos, the other population that made up the 926,
12 why were some of those items refunded during the 2002
13 cleanup?
14     MR. GLENNON: Objection; lack of foundation.
15     THE WITNESS: I beg your pardon. I understand
16 your question now.
17     MR. GREENSTEIN: Q. Okay.
18     A. I don't know if those were or not. I don't
19 recall specifically any details about that.
20     Q. So did you -- in issuing your expert report,
21 did you do any calculation of the number of those debit
22 memos that were not transferred to 12601 in the second
23 quarter that were ultimately refunded as part of the
24 2002 cleanup?
25     A. No.

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

261

```
 1        MR. GREENSTEIN: Okay. I want to mark this as
 2   16.
 3        (Exhibit 16 marked for
 4        identification.)
 5        MR. GREENSTEIN: Q. For the record, this is
 6   NDCA-ORCL 603894. And it -- well, Mr. O'Bryan, do you
 7   recognize this document?
 8        A. I do, yes.
 9        Q. And if you turn to page 13 of your rebuttal
10   report it appears that you proffer an analysis of a
11   debit memo relating to Household that was opined on in
12   Mr. Regan's report; correct?
13        A. Yes.
14        MR. GLENNON: Objection; the document speaks
15   for itself, and vague and ambiguous.
16        MR. GREENSTEIN: Q. And you recall that
17   Mr. Regan -- that the issue involved a debit memo for
18   $76,000 -- approximately $76,000?
19        A. That's correct.
20        Q. Do you recall that transaction?
21        A. I do, yes.
22        Q. And you did an analysis of that debit memo?
23        A. I did, yes.
24        Q. And you see it says here, you say, "One of the
25   very transactions upon which Mr. Regan focuses in his
```

262

```
 1   expert report establishes that Oracle appropriately
 2   refunded money long before the creation of the 46,000
 3   plus debit memos. Mr. Regan points out that Household
 4   made a payment to Oracle on November 17th, 1994." Do
 5   you see that?
 6        A. I do, yes.
 7        Q. Then if you go down -- I'll just keep reading.
 8        "That same day, Household returned the product
 9   and cancelled the order. However, despite the fact that
10   Mr. Regan has seen a screen demonstrating that the
11   money had been refunded to Household by a check that
12   cleared on May 4th, 1995, Mr. Regan ignores this
13   refund." Do you see that?
14        A. Yes, I do.
15        Q. Is this the document in footnote 46?
16        A. Yes, it is.
17        Q. Do you rely on this document for the
18   proposition that their debit memo item for $76,000
19   plus --
20        MR. GLENNON: Eli, can I pause you really
21   quickly. You said footnote 46?
22        MR. GREENSTEIN: Yeah. 603894.
23        MR. GLENNON: Got you.
24        MR. GREENSTEIN: Q. Mr. O'Bryan, your opinion
25   is that this debit memo item was refunded by Oracle by a
```

263

```
 1   check that cleared on May 4th, 1995; correct?
 2        A. That is correct.
 3        Q. And your support for that proposition is the
 4   screen shot NDCA-ORCL 603894; is that correct?
 5        A. That is correct.
 6        Q. And did you rely on anything else to support
 7   your opinion that this $76,000 plus debit memo was
 8   refunded on May 4th, 1995?
 9        MR. GLENNON: Objection; vague and ambiguous.
10        THE WITNESS: Did I rely on anything else?
11        MR. GREENSTEIN: Yeah.
12        MR. GLENNON: Lacks foundation.
13        THE WITNESS: Well, yeah. Yes, I did.
14        MR. GREENSTEIN: Q. What did you rely on?
15        A. Well, if you follow this transaction all the
16   way through, this was actually refunded again by Oracle.
17   By the way, this was a transaction that did not go
18   through the bad debt transfers. This was just research
19   being done by the company.
20        Anyway, when the applied cash project
21   occurred, this was actually refunded again for about
22   $178,000, at which point in time, I think it was
23   Mr. Campos realized in error. Which would
24   tell me that if they refunded -- and it was two
25   different checks. It was $100,000 and then this
```

264

```
 1   $74,000.
 2        If they refunded it in error and realized that
 3   and made notes saying we refunded this in error during
 4   the applied cash project, it tells me --
 5        MR. GLENNON: You mean unapplied cash project?
 6   You're talking about two different things. You said it
 7   twice. I just want to make sure the record is clear.
 8        THE WITNESS: Thank you.
 9        MR. GREENSTEIN: Q. You're talking about the
10   unapplied cash project in 2002?
11        A. Yes. Beg your pardon. Then that tells me it
12   had been refunded before, as well. So I use that as
13   anecdotal evidence, because I have seen evidence of the
14   $100,000, as well now as the $76,000.
15        Q. Okay. So, you're aware that Oracle refunded
16   Household a $178,000 check in May 2002, and that
17   included the amount for this debit memo, the $76,000?
18        MR. GLENNON: Objection; lacks foundation.
19        THE WITNESS: I am. I believe that was done
20   in error.
21        MR. GREENSTEIN: Q. What evidence do you have
22   that it was done in error? Well, let me stop you there.
23   Looking at this document --
24        MR. GLENNON: Did you want to answer?
25        THE WITNESS: Go ahead.
```

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

265

1      MR. GREENSTEIN:  Q.  Looking at this document,
2  this is a screen shot; is that fair to say?
3      A.  This is a copy of a screen, yes.
4      Q.  Okay.  And you say, before citing this
5  document, you say that -- you call it a screen shot
6  demonstrating that "money had been refunded to Household
7  by a check that cleared on May 4th, 1995."  Do you see
8  that?
9      A.  Yes.
10      Q.  What in this document indicates to you that
11  this money was refunded by a check that cleared on
12  May 4th, 1995?
13      A.  Well, it is the entire document.  If you look
14  at it, the bank is Wells Fargo Bank, the account, and
15  then the status says cleared.  The cleared amount was
16  $76,000, and the clear date was May 4, 1995.
17      So to me, this is very clear audit evidence
18  that that amount was paid to Household and cleared by
19  May 4th, 1995.
20      Q.  Okay.  Do you have any evidence of a check
21  that actually was paid to Household besides this screen
22  shot?
23      MR. GLENNON:  Objection -- withdrawn.
24      THE WITNESS:  You mean on that date?
25      MR. GREENSTEIN:  Q.  Is there any other

266

1  evidence that this refund was made to Household for this
2  amount on May 4th, 1995?
3      MR. GLENNON:  Objection; lack of foundation,
4  asked and answered.
5      THE WITNESS:  I've not seen a copy of a check,
6  if that's what you're asking me.
7      MR. GREENSTEIN:  Q.  I'm just wondering,
8  besides this screen shot, did you rely upon any evidence
9  indicating that a check was issued to Household on
10  May 4th, 1995 for $76,645.04 for this debit memo?
11      MR. GLENNON:  Objection; asked and answered,
12  lacks foundation.
13      THE WITNESS:  I think I already answered that.
14  I saw evidence that the eventual refund after the
15  unapplied cash project in October/November was a refund
16  of 176 or $178,000 that was done in error, which would
17  tell me that it had been previously refunded.
18      MR. GREENSTEIN:  Q.  So the fact that they
19  refunded it again in May 2002 indicates to you that the
20  refund was issued on May 4th, 1995?
21      MR. GLENNON:  Objection; mischaracterizes the
22  testimony.
23      THE WITNESS:  Yeah.  If you've refunded it
24  once, the $100,000 that was refunded, and then the
25  $76,000, which I believe was done in '95, and in the

267

1  unapplied cash project you refund it again and say, wait
2  a minute, that is not appropriate, this is a duplicate
3  refund, that tells me it was refunded initially.
4      MR. GREENSTEIN:  Q.  So, other than that, that
5  evidence and the screen shot, do you have any -- do you
6  rely upon any evidence indicating that a check was
7  issued for a refund to Household from Oracle on May 4th,
8  1995 for $76,645.04?
9      MR. GLENNON:  Objection; asked and answered.
10      THE WITNESS:  I can't think of any other
11  evidence that was adequate for me, given the
12  documentation.
13      MR. GREENSTEIN:  Q.  But you never saw the
14  actual check; right?
15      A.  No.
16      MR. GLENNON:  Objection; asked and answered.
17      MR. GREENSTEIN:  Q.  Now, did you see this --
18  so, this is one of the 926 debit memos that you reviewed
19  on the script output; correct?
20      A.  Correct.
21      MR. GLENNON:  Objection; lack of foundation.
22      MR. GREENSTEIN:  Q.  So this May 4th, 1995
23  refund should show up in the script output; correct?
24      MR. GLENNON:  Same objection.
25      THE WITNESS:  Yeah, it should.  But as I

268

1  recall, it doesn't show up.
2      MR. GREENSTEIN:  Q.  Do you know why that is?
3      A.  No.
4      Q.  Okay.  But if there was a refund in the
5  accounting history of the 926 debit memos, you would
6  expect to see that in the script output; correct?
7      MR. GLENNON:  Objection; lack of foundation.
8      THE WITNESS:  Well, yeah.  I mean, assuming --
9  as I recall, that was one of the script outputs the
10  plaintiffs requested because it was below the $100,000
11  limit.
12      MR. GREENSTEIN:  Q.  Right.
13      A.  So I expected to see it.  I did not see it.  I
14  saw evidence it was, in fact, paid.
15      Q.  The evidence is what you cited earlier?
16      A.  That's correct.
17      Q.  If you look at the next sentence on page 13 of
18  your rebuttal, it says, "Instead, Mr. Regan states that
19  Oracle did not refund the money to Household until a
20  second erroneous refund occurred on May 23rd, 2002."  Do
21  you see that?
22      A.  I do, yes.
23      Q.  And you cite to Household 1 and 2; correct?
24      A.  I cite to what, I'm sorry?
25      Q.  You cite, in footnote 47, you cite to HI 1 and

269

1   2; right?
2       A. That is correct.
3       MR. GREENSTEIN: Let me mark for the record
4   the next exhibit, which is HI 1 and 2. A check from
5   Oracle to Household in the amount of $178,346.77.
6       MR. GLENNON: I object to on two grounds.
7   One, I actually think this is part of a larger document
8   that hasn't been provided here. Second, there is
9   handwritten notes on the document for which there has
10  been no foundation.
11          (Exhibit 17 marked for
12          identification.)
13      MR. GREENSTEIN: I don't want to go off the
14  record.
15      MR. GLENNON: It will only take a minute.
16      THE WITNESS: I don't want to mix these up.
17  Sorry.
18      MR. GREENSTEIN: Mark this next in line.
19          (Exhibit 18 marked for
20          identification.)
21      MR. GREENSTEIN: Q. So you have two exhibits
22  in front of you, one is 17, which is Bates labeled HI 1
23  and 2, and the second, Exhibit 18, is NDCA-ORCL 614018
24  through 614023. Do you have both of those?
25      A. I do, yes.

270

1       Q. Have you seen these before?
2       A. I do, yes. These are both in my report.
3       Q. So this appears to be -- this is the document
4   you cite on page 13 of your rebuttal, where you say --
5   or footnote 47 is Exhibit 17; correct?
6       A. Footnote 47 is what?
7       Q. In your rebuttal report is Exhibit 17, the
8   Household check; correct?
9       A. That is correct.
10      Q. And Exhibit 49 is Exhibit 18; correct?
11      A. That is correct.
12      Q. Okay. Taking Exhibit 17, did you rely upon
13  this document in your rebuttal report in issuing your
14  opinion on the Household debit memo transaction?
15      MR. GLENNON: Objection; vague and ambiguous.
16      THE WITNESS: Did I rely on it?
17      MR. GREENSTEIN: Q. Yes.
18      A. It's in my report, so I certainly relied on
19  it.
20      Q. And is this the check that you claim was an
21  erroneous refund to Household?
22      A. Yes.
23      Q. And what evidence do you rely on in forming
24  your opinion that this was an erroneous refund to
25  Household?

271

1       A. I then refer to Exhibit 18, which is an e-mail
2   chain from Mike Quinn, and you can see down below on
3   614019, it talks about refund Household Finance
4   $178,346.77, in the subject line.
5       Q. Right.
6       A. Then up above Mr. Quinn says, "Ami, Got it.
7   Raul and Adam misinterpreted the 550 debit memos. This
8   should not have been refunded."
9       Q. So, is that --
10      A. Then it goes on to say, "Let's see how we can
11  avoid making these types of mistakes in the future."
12      Q. Okay. So, is this the only -- or, strike
13  that.
14          Other than this e-mail, which is Exhibit 18,
15  did you -- what other evidence did you rely upon in
16  forming your opinion that this check, this refund,
17  Exhibit 17, was in error?
18      MR. GLENNON: Objection; asked and answered.
19      THE WITNESS: The original refunds on
20  Household of $100,000 and the $74,000, or whatever it
21  was, $76,000.
22      Q. Are you referring to the
23  screen shot marked as Exhibit 16?
24      A. As one of them, plus the $100,000 that was
25  refunded as well.

272

1       Q. Isn't it your opinion that the $76,000 debit
2   memo item was refunded by a check that was different
3   than the $100,000 item?
4       A. Yes. So if you take the 100,000 and add it to
5   the 74,000, you get the approximately 176 or 178 you see
6   here.
7       Q. You're not aware of the check for $178,346
8   involves more than two debit memos?
9       A. I'm not aware of what?
10      MR. GLENNON: Objection; vague and ambiguous.
11      MR. GREENSTEIN: Q. That this $178,000 check
12  involves all the debit memos referred to on 614021 in
13  Exhibit 18?
14      A. Yes. You can see the 45, the 25 and the 76
15  are some of the ones we've referenced to and are part of
16  the $100,000 refund, plus the $76,000 refund, as
17  evidenced on Exhibit 16.
18      Q. Okay. Mr. O'Bryan, did you read Michelle
19  Davidson's deposition before forming your opinion on the
20  Household transaction?
21      MR. GLENNON: Objection; asked and answered.
22      THE WITNESS: I think you asked me that this
23  morning. I don't recall reading that.
24      MR. GREENSTEIN: Q. Why didn't you read her
25  deposition transcript?

273

1   A.  I didn't think it necessary.
2   Q.  Are you aware she was the PMK for Household?
3       MR. GLENNON:  Objection; asked and answered.
4       THE WITNESS:  I believe so, yes.
5       MR. GREENSTEIN:  Q.  Okay.  Are you aware that
6   this $178,000 check was uploaded into Household's
7   general ledger after they received it?
8   A.  What do you mean uploaded?
9       MR. GLENNON:  Vague and ambiguous.
10      MR. GREENSTEIN:  Q.  Are you aware Household
11  cashed this check, a copy of which is on Exhibit 17?
12      MR. GLENNON:  Objection; assumes facts, lack
13  of foundation.
14      THE WITNESS:  I don't know what they did with
15  the check after it was sent by Oracle.
16      MR. GREENSTEIN:  Q.  Did you consider the fact
17  whether this check was cashed or not in forming your
18  opinion?
19  A.  No.
20  Q.  Okay.  Did you see any evidence that this
21  $178,000 refund made to Household was ever given back to
22  Oracle?
23  A.  I don't --
24      MR. GLENNON:  Objection; vague and ambiguous,
25  lacks foundation.

274

1       THE WITNESS:  I don't recall what the eventual
2   disposition of this was.
3       MR. GREENSTEIN:  Q.  Okay.  So you don't know
4   if this $178,000 check was cashed, and you don't know
5   whether it was given back to Oracle, but your opinion is
6   that it was refunded in error; correct?
7       MR. GLENNON:  Objection; asked and answered.
8       THE WITNESS:  That's what the documents say.
9   If Household cashed it or applied it to other invoices,
10  I don't know what they did.
11      MR. GREENSTEIN:  Q.  Okay.
12  A.  But it is very clear to me that the documents
13  show that it was refunded in the '90s, and then refunded
14  in error in the 2000 time frame.
15  Q.  Okay.  So on page 13 of your rebuttal, last
16  sentence, you say, "As Mike Quinn observed in a
17  contemporaneous e-mail, the May 23rd, 2002 refund was
18  issued by mistake and should not have been made."
19      Do you see that?
20  A.  Yes.
21  Q.  And you cite to what has been marked -- the
22  e-mail marked as Exhibit 18; correct?
23  A.  Yes.
24  Q.  So is it your opinion that Mike Quinn wrote an
25  e-mail contemporaneous with the May 23rd, 2002 refund

275

1   that indicated it was a mistake?
2   A.  I'm not suggesting it was contemporaneous with
3   the exact refund.  I'm just suggesting it was
4   contemporaneous with the time, i.e., the 2002/2003 time
5   frame.  So, when it was written -- all I'm saying, it
6   wasn't written last week and it wasn't written back in
7   1995.
8   Q.  Right.  Because the e-mail you're referring to
9   was written after October 25th, 2002; isn't that right?
10      MR. GLENNON:  Objection; lack of foundation.
11  The document speaks for itself.
12      THE WITNESS:  I don't really know.  I mean, I
13  see the date is Friday, October the 25th, 2002.  When
14  the top part of this e-mail was written by Mr. Quinn, I
15  don't know.
16      MR. GREENSTEIN:  Q.  Well, this top e-mail was
17  written by Mr. Myers; wasn't it?
18      MR. GLENNON:  Objection; lack of foundation.
19  The document speaks for itself.
20      THE WITNESS:  Well, I'm talking about "Mike
21  Quinn wrote."
22      MR. GREENSTEIN:  Q.  Right.  So that
23  particular e-mail doesn't have a date?
24  A.  Correct.
25  Q.  But it is in a string of other e-mails, so the

276

1   e-mail below it is October 25th, 2002; correct?
2   A.  The date that I see below the "Mike Quinn
3   wrote," says October 25th, 2002.
4   Q.  Right.  So that e-mail that Mike Quinn wrote
5   appears to have taken place after October 25th, 2002;
6   correct?
7       MR. GLENNON:  Objection; document speaks for
8   itself, lack of foundation.
9       THE WITNESS:  I have no idea when it was
10  written.  It was above the October 25th, so whether it
11  was the same day, same time, I don't know.
12      MR. GREENSTEIN:  Q.  Right.  But, I mean,
13  based on what you know about our e-mail strings like this,
14  it appears this e-mail was written either on
15  October 25th, 2002 or after; right?
16      MR. GLENNON:  Objection; lack of foundation,
17  asked and answered.
18      THE WITNESS:  I really don't know.
19      MR. GREENSTEIN:  Q.  So seeing that above an
20  e-mail in a string that goes in chronological order
21  doesn't indicate to you that this e-mail was written on
22  or after October 25th, 2002?
23      MR. GLENNON:  Objection; lack of foundation,
24  asked and answered three times.
25      THE WITNESS:  It would seem to me that given

277

1  the form, it was written on or after October 25th. But
2  I don't know that for sure.
3      MR. GREENSTEIN: Q. Well, is it possible that
4  e-mail could have been written before October 25th?
5      MR. GLENNON: Objection; lack of foundation,
6  calls for speculation.
7      THE WITNESS: Is it possible?
8      MR. GREENSTEIN: Q. Yeah.
9      A. Well, anything is possible.
10     Q. Looking at this e-mail, your testimony is that
11 it is possible that that e-mail that occurs after in
12 time to an October 25th, 2002 e-mail could possibly have
13 been written before it?
14     MR. GLENNON: Objection; mischaracterizes the
15 testimony, asked and answered, lacks foundation.
16     THE WITNESS: I didn't write this e-mail, so I
17 don't know when it was written. But have I ever seen
18 circumstances where an e-mail above another e-mail was
19 written before? Certainly. You can say I said this and
20 then attach something different. You can attach it.
21     I don't know how it was attached, I don't know
22 if it was a string. I don't know if it was pieced
23 together. I have no idea.
24     MR. GREENSTEIN: Q. On page 13 you're not
25 saying that your opinion is that that was a

278

1  contemporaneous e-mail or that that e-mail marked as
2  Exhibit 18 was contemporaneous with the May 23rd, 2002
3  refund; right?
4      MR. GLENNON: Objection; mischaracterizes the
5  testimony.
6      THE WITNESS: I think I explained that. I
7  said it is contemporaneous to the time. It is not right
8  in the middle of all this litigation. It was
9  contemporaneous to that time.
10     MR. GREENSTEIN: Let me take five minutes,
11 then wrap up.
12     VIDEOGRAPHER: Off record at 6:05.
13     (Recess, 6:05 p.m. - 6:23 p.m.)
14     VIDEOGRAPHER: On record at 6:23.
15     MR. GREENSTEIN: Q. Mr. O'Bryan is it your
16 opinion there is no material difference between meeting
17 and beating Wall Street expectations in the mind of a
18 reasonable investor?
19     A. There can be. It can be material, it may not
20 be material.
21     Q. In what cases would it be material?
22     A. If in the total mix of the information it was
23 thought to be informative or more material to a reader.
24     Q. Okay. So, in some cases it may be material to
25 a reasonable investor whether a company meets or beats

279

1  expectations; correct?
2      MR. GLENNON: Objection; asked and answered.
3      THE WITNESS: No. What I'm saying, you have
4  to look at the total mix of the information of that
5  company and historically of that company as to whether
6  or not that meet or beat is material, as well as a
7  multitude of other things you have to consider based on
8  SAB 99.
9      MR. GREENSTEIN: Q. Right. I understand that
10 you have to analyze it company by company; correct?
11     A. That is correct.
12     Q. But there could be a material difference
13 between meeting and beating expectations depending on
14 particular facts and circumstances involved in a
15 particular quarter; right?
16     MR. GLENNON: Objection; vague and ambiguous,
17 mischaracterizes testimony.
18     THE WITNESS: Are you speaking hypothetically
19 here, or are you speaking about Oracle?
20     MR. GLENNON: Q. No. Just in general.
21     A. So it is a hypothetical?
22     Q. Yeah.
23     THE WITNESS: I'm sorry. You need to repeat
24 the question.
25     MR. GREENSTEIN: Can you read it back?

280

1      (Record read as follows: QUESTION: But there
2  could be a material difference between meeting
3  and beating expectations depending on
4  particular facts and circumstances involved in
5  a particular quarter; right?)
6      MR. GLENNON: I object on the grounds of
7  incomplete hypothetical and vague and ambiguous.
8      THE WITNESS: I'm sorry, there could be a
9  material difference between meeting and beating
10 expectations?
11     MR. GREENSTEIN: Q. Um-hum.
12     A. Well, materiality is not about whether there
13 is a material difference between the meet or the beat.
14 It is taken as a whole, all of the mix of information
15 whether it is considered material by the company and
16 their auditors.
17     Q. Whether it is material to the company or its
18 auditors?
19     A. Two different analyses are done. The company
20 performs their own analysis, these are the financial
21 statements of the company. Then separately the auditors
22 have to come up with that same conclusion.
23     Q. That's determining whether a misstatement
24 internally is material; correct?
25     MR. GLENNON: Objection.

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

281

1       THE WITNESS: Why do you say internally?
2       MR. GLENNON: Object for the record; vague and
3   ambiguous.
4       MR. GREENSTEIN: Q.  Well, let's look at your
5   report, page 38 of your opening report.
6       A.  I'm there.
7       Q.  You state that -- you're talking about the
8   $20.1 million of unapplied cash was transferred to the
9   bad debt reserve during 2Q '01; correct?
10      A.  That is correct.
11      Q.  And you say, "If we make the most conservative
12  assumption, that the entire amount of transfer
13  represents an accounting error, this would represent
14  roughly a $13 million overstatement in net income";
15  correct?
16      A.  That is correct.
17      Q.  Then you calculate earnings per share which
18  indicates that if that amount was an overstatement, that
19  the EPS would be adjusted to 10 cents from the reported
20  11; is that correct?
21      MR. GLENNON: Objection; mischaracterizes the
22  document and the testimony.  Lack of foundation.
23      THE WITNESS: Well, I think it adjusts to
24  10.38 or .1038 cents.
25      MR. GREENSTEIN: Q.  Which would be rounded

282

1   down to 10; right?
2       A.  That's correct.
3       Q.  And you say that even if that happened and
4   Oracle reported 10 cents per share in the second quarter
5   '01, that wouldn't be material in the mind of a
6   reasonable investor; correct?
7       MR. GLENNON: Objection; vague and ambiguous,
8   lacks foundation, mischaracterizes the testimony.
9       THE WITNESS: My testimony is laid out in the
10  report, that I don't think in the entire mix of
11  information that that adjustment was material by any
12  stretch of the imagination.
13      MR. GREENSTEIN: Q.  So is it your expert
14  testimony that if Oracle in the second quarter '01 had
15  reported 10 cents a share instead of 11 cents a share in
16  net expectations, that would not have been material in
17  the mind of a reasonable investor?
18      MR. GLENNON: Clarification.  Second quarter
19  fiscal year '01?
20      MR. GREENSTEIN: Didn't we define that
21  earlier?
22      MR. GLENNON: I don't know if we did or we
23  didn't.  I'm just asking.
24      MR. GREENSTEIN: Q.  Do you know what I'm
25  talking about?

283

1       MR. GLENNON: You defined Q2 '01, which is why
2   second quarter caught me off guard.  Sorry.
3       THE WITNESS: I don't think the difference
4   between 11 cents or 10 cents, given the entire mix of
5   information that was available to the public investor,
6   that that was a material change.
7       MR. GREENSTEIN: Q.  And what standard did you
8   use to determine what a reasonable investor was?
9       A.  What standard did I use?
10      MR. GLENNON: Objection; vague and ambiguous.
11      MR. GREENSTEIN: Q.  Yeah.
12      A.  I just used the SAB 99, which defines that
13  exact topic.
14      Q.  Okay.  So why don't you take me through your
15  methodology of how you determined that if Oracle had
16  reported 10 cents rather than 11 cents and met investor
17  expectations -- analyst expectations that would not be
18  material?
19      MR. GLENNON: Objection; mischaracterizes the
20  testimony, lacks foundation.
21      THE WITNESS: You want me to take you through
22  my report?
23      MR. GREENSTEIN: Q.  I'm wondering what
24  methodology you used to come to that conclusion.
25      A.  I applied SAB 99.

284

1       Q.  Did you take into account the macroeconomic
2   environment during 2Q '01?
3       MR. GLENNON: Objection; lack of foundation.
4       THE WITNESS: Sure.
5       MR. GREENSTEIN: Q.  What was the
6   macroeconomic environment during that time?
7       A.  It was a tech sector, which was probably a bad
8   time, as I recall it experienced a bit of a downturn.
9       Q.  Do you know what the dot com bust is?
10      A.  I do, yes.
11      Q.  Wasn't that around March 2000?
12      A.  I think I just said experiencing a downturn.
13      Q.  You said a slight downturn.
14      A.  I said a bit of a downturn.  I didn't say
15  slight.
16      Q.  You don't think the dot com bust was more than
17  a bit of a downturn?
18      A.  It was a downturn.
19      MR. GLENNON: Objection; lack of foundation,
20  mischaracterizes the testimony.
21      THE WITNESS: That was the macroeconomics that
22  was going on.
23      MR. GREENSTEIN: Q.  So how would you
24  characterize the macroeconomic environment as of the
25  date Oracle reported its earnings for second quarter

285

1   '01?
2       A.  Well --
3       MR. GLENNON:  I'm still going to object on
4   vague and ambiguous as to time.
5       THE WITNESS:  The macroeconomic conditions
6   were that there was a downturn in the tech sector.
7       MR. GREENSTEIN:  Q.  Okay.  Did you do any
8   analysis of what was happening to other companies in the
9   software industry during that time, if they met rather
10   than beat expectations?
11       A.  No.
12       Q.  Did you do any analysis of any companies
13   during that time, what happened when they met rather
14   than beat expectations?
15       MR. GLENNON:  Objection; vague and ambiguous.
16       THE WITNESS:  No.  The issue here is Oracle,
17   not other companies.
18       MR. GREENSTEIN:  Q.  Did you do any analysis
19   of Oracle's previous history of earnings reports to see
20   what happened to Oracle's stock when they met or beat
21   expectations?
22       MR. GLENNON:  Same objection.
23       THE WITNESS:  I did, yes.
24       MR. GREENSTEIN:  Q.  And why don't you take me
25   through what your methodology was in doing that

286

1   determination?
2       A.  Let me just find that analysis.
3       I have to go to the rest room anyway.  Do you
4   want to take a two-minute break while I find that?
5       MR. GREENSTEIN:  Sure.
6       VIDEOGRAPHER:  Off record.  6:32.
7       (Recess, 6:32 p.m. - 6:38 p.m.)
8       VIDEOGRAPHER:  On record at 6:38.
9       MR. GREENSTEIN:  Q.  So, Mr. O'Bryan, when we
10   left off, I think you were going to look at your
11   methodology in looking at the trends, the historical
12   trends prior to 2Q '01 to determine whether there was a
13   difference whether Oracle met or beat Wall Street
14   expectations; correct?
15       A.  That is correct.
16       Q.  What methodology did you use?
17       A.  I think you actually asked me a different
18   question, which was did I do an analysis of Oracle's
19   previous history of meeting or beating expectation
20   consensus.  And my answer was yes.  And I was looking
21   for that exhibit.  And that's in my work papers.
22       And I did do that analysis.  So, it is right
23   here in front of me, if you would like to talk about it.
24       Q.  You said you did it in your work papers.  Is
25   that something that you relied upon?

287

1       A.  Yes.
2       Q.  And is that -- did you produce that to
3   plaintiffs?
4       A.  I'm not aware that it was or was not.
5       Q.  Okay.
6       MR. GLENNON:  Did you rely on your work
7   papers, or did you rely on the analyst reports?
8       THE WITNESS:  This is a summary of the analyst
9   reports.
10       MR. GREENSTEIN:  Q.  A compilation?
11       A.  A compilation?  It's just a summary.
12       Q.  Similar to what you did with the script
13   output?
14       A.  Yeah.
15       Q.  So why don't you go through that and what you
16   did to determine that meeting versus beating in the
17   second quarter of '01 would not be material to a
18   reasonable investor.
19       A.  Again, that's a broader question.  I didn't
20   look at just the meet or beat as being materiality.
21   That was one of the considerations.  So do you just want
22   that component of it or an overview?
23       Q.  You did some analysis of prior tends; correct?
24       A.  Correct.
25       Q.  What was that analysis?

288

1       A.  We looked on a quarter basis for first Q '99
2   all the way through second Q of '01 the actual
3   consensus, analyst expectation, versus the actual
4   reported amounts.  Then we looked at the stock price as
5   it relates to the day that the earnings was released,
6   and the day plus one, day plus three, and day plus five.
7   We basically looked at five different days after Oracle
8   had released its earnings.
9       And what you find is there is absolutely no
10   correlation between beating and any kind of an increase
11   or decrease in the stock.  Which would lead you to
12   believe as an individual applying SAB 99, that's not
13   necessarily the only measurement of materiality.  Which
14   it is a total mix.
15       But, clearly, you have a situation here where
16   the stock went up -- excuse me, the reported was 4 cents
17   over expected in 2Q '99, the stock dropped 5 percent the
18   day of the release, dropped another 6 percent the day
19   after.
20       Q.  Did you do any statistical analysis to
21   determine why the stock price dropped in that quarter?
22       MR. GLENNON:  Were you finished?
23       THE WITNESS:  I wasn't finished.
24       MR. GREENSTEIN:  Q.  Okay.
25       A.  You see here a situation where they beat

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

289

1  expectations by 4 cents in 2Q '00 and it went down 3.6
2  percent. You see where they beat expectations by 4
3  cents in Q4 '99, went down 5 percent. One day later it
4  went up 31 percent. First Q of '01 they beat it 4 cents
5  and it goes up by 3.83 percent.
6       There is absolutely no correlation in my mind
7  from an auditor's perspective and one that looks at and
8  considers materiality almost on a daily basis that the
9  meet or beat measurement within Oracle is at all
10  material.
11       Q.  And you don't think the difference between
12  meeting and beating in a macroeconomic environment, a
13  tech downturn, as was the case in 2Q '01, would be
14  important to a reasonable investor?
15       MR. GLENNON: Objection; asked and answered,
16  lacks foundation, mischaracterizes the testimony.
17       THE WITNESS: Again, given my analysis and
18  knowledge of how materiality is measured, the meet or
19  beat issue was not a material enough issue that in the
20  total mix it would have caused the company or its
21  auditors to restate any financial statements.
22       MR. GREENSTEIN: Q. But meeting and beating
23  could be important to a reasonable investor; right?
24       A.  In your hypothetical, certainly it could,
25  depending on the entire mix of information.

290

1       Q.  Can you remember -- strike that. So you said
2  you looked at the prior nine quarters; is that correct?
3       A.  It was ten quarters, including the existing 2Q
4  '01.
5       Q.  How did you determine what the consensus
6  analyst expectation was?
7       A.  We went off of -- I forget what we used, if it
8  was first call, or what number we used.
9       Q.  So out of those ten quarters, in which
10  quarters did Oracle -- how many quarters did Oracle beat
11  expectations?
12       A.  In how many quarters did they beat
13  expectations?
14       Q.  Um-hum.
15       A.  In nine of those ten.
16       Q.  Okay. And leading up to the second quarter
17  and working backwards, how many quarters in a row had
18  Oracle beat expectations?
19       A.  Four.
20       Q.  The one instance in which they met
21  expectations, what happened to the stock price the day
22  following?
23       MR. GLENNON: Objection; vague and ambiguous.
24       THE WITNESS: The day following?
25       MR. GREENSTEIN: Q. Um-hum.

291

1       A.  Went down 6 percent.
2       Q.  Okay. Now, how did you determine -- or strike
3  that.
4       How did you decide to use, I think you said
5  the first -- the stock price on the day following, the
6  third day and the fifth day; is that right?
7       A.  That's an analysis typically done by auditors
8  as it relates to looking at materiality, particularly
9  about stock movement, looking at those first few days.
10       Q.  Is there any accounting principle or rule that
11  outlines that procedure?
12       A.  No.
13       MR. GLENNON: Objection; vague and ambiguous.
14       MR. GREENSTEIN: Q. When you say it is
15  typically done by auditors, can you cite to any
16  literature that says that that's the analysis that
17  should be conducted?
18       MR. GLENNON: Same objection.
19       THE WITNESS: It would be professional
20  standards, due to professional care and auditor's
21  judgment.
22       MR. GREENSTEIN: Q. Any article or literature
23  you could point to that suggests using that standard?
24       A.  With respect to one day, three days, five
25  days?

292

1       Q.  Yeah.
2       A.  No. That's up to the auditor's judgment.
3       Q.  You're not a statistician, are you?
4       A.  I'm actually a computer audit specialist.
5       Q.  Computer audit specialist, okay.
6       Did you run a regression analysis of any stock
7  price movement?
8       A.  I was not asked to, nor did I.
9       Q.  Do you know how to run a regression analysis?
10       A.  I do, yes. Do you want to know about
11  R-squared?
12       Q.  I know a little bit about that. Do you know
13  what the term vestigial means?
14       A.  Vestigial. As I sit rear right now, no.
15       Q.  You don't have a definition of the word
16  vestigial?
17       A.  Not as I sit here now.
18       Q.  You use it in your report?
19       A.  I do. I don't remember the context I use it
20  in.
21       Q.  The word is not part of your vocabulary as you
22  sit here today?
23       A.  Not right now.
24       MR. GLENNON: Objection; mischaracterizes the
25  testimony.

293

1      Do you want to show it to him in the report to
2   show the context?
3          MR. GREENSTEIN: Q.  I'm just asking if you
4   know the definition of vestigial.
5      A.  As I sit here now, I don't.
6      Q.  Did you write that word in your report?
7      A.  Mr. Sheppard may have put that word in there.
8   Mr. Sheppard has a better vocabulary than I.
9      Q.  Back to your analysis of the ten prior
10  quarters leading up to 2Q '01.
11      Did you do any sort of statistical analysis to
12  determine which part of the stock price movement
13  following an earnings disclosure was attributed to
14  company-specific information?
15          MR. GLENNON: Objection; compound, vague and
16  ambiguous.
17          THE WITNESS: I did not do a statistical
18  analysis of the correlation between meeting or beating
19  and by how much and the resultant stock movement.
20          MR. GREENSTEIN: Q.  Okay.  So you just looked
21  at what the stock price did the first day following a
22  disclosure, the third day and the fifth day to see if it
23  went up or down; correct?
24      A.  No.  Actually four days.
25          MR. GLENNON: Plus I want to object,

294

1   mischaracterizes the testimony.
2          THE WITNESS: We looked at the day of release,
3   the day plus one, day plus three, and day plus five.
4          MR. GREENSTEIN: Q.  The day of release?
5   Okay.
6      Well, during that time, didn't Oracle issue
7   its earnings releases after hours?
8      A.  I don't know when they issued it.
9      Q.  How would you determine the stock price
10  movement the day of release?
11      A.  You look at the stock price the day they
12  released the earnings.  If it was after hours, you do it
13  the next day.
14      Q.  Okay.  So you don't know if Oracle released
15  earnings after the market closed or before, during those
16  ten quarters?
17          MR. GLENNON: Objection; mischaracterizes.
18          THE WITNESS: I don't know.
19          MR. GREENSTEIN: Q.  You didn't look at that?
20      A.  No.  It is not relevant to my analysis.
21      Q.  Is the stock price movement on the day of an
22  earnings release important in the materiality analysis
23  if Oracle issued its earnings after market hours that
24  day?
25          MR. GLENNON: Objection; incomplete

295

1   hypothetical.
2          THE WITNESS: No.  You look -- you don't look
3   at one day, you don't look at one moment.  You look at a
4   number of different data points, which we have here.
5   When they release doesn't matter.  It is not just the
6   meet or beat.  It is an overall mix.
7          MR. GREENSTEIN: Q.  I understand what SAB 99
8   says.
9          MR. GLENNON: Are you finished?
10          THE WITNESS: Yes.
11          MR. GREENSTEIN: Q.  What I'm asking -- I
12  think you said in your analysis you looked at the stock
13  price movement in the prior ten quarters, the stock
14  price movement that occurred on the day of the earnings
15  release; correct?
16      A.  Correct.
17      Q.  So, assuming that Oracle -- let's take first
18  quarter 2001.  Okay?
19      A.  First quarter 2001.  Certainly.
20      Q.  What was the consensus, Wall Street
21  expectation?
22      A.  Thirteen cents.
23      Q.  And what was the actual?
24      A.  Seventeen cents.
25      Q.  Okay.  And so did you look -- did you look at

296

1   the stock price -- do you know the date of that?
2      A.  I do not.
3      Q.  Did you look --
4      A.  The information is in here.  Actually, you
5   know, I do have that information in here.  It was
6   released on 9/14/2000 at 11:19 a.m.
7      So I think your representation that it was
8   after the market closed may be inappropriate.
9      Q.  You're saying that that quarter's earnings was
10  issued at 11:00 in the morning?
11      A.  Correct.  11:19.
12      Q.  Do you have the time on all of those?
13      A.  I do, yes.
14      Q.  What time was it released in the one quarter
15  that it -- actually, strike that.
16      To the extent that the earnings were released
17  after hours, you wouldn't look at the stock price
18  movement before the release, you always would look at
19  the movement after the release; correct?
20          MR. GLENNON: Objection; mischaracterizes the
21  testimony, compound, vague and ambiguous.
22          THE WITNESS: It is after -- the day of the
23  release is after the release.
24          MR. GREENSTEIN: Q.  Any analysis you do of
25  stock price movement, is it fair to say you would look

297

1   at it after the release?
2        MR. GLENNON: Mischaracterizes the testimony.
3        THE WITNESS: We looked at the stock price the
4   day of the release, day plus one, day plus three, and
5   day plus five.
6        MR. GREENSTEIN: Q. Okay. But you didn't do
7   any statistical analysis of why the stock price may have
8   gone up or down on those four various days following the
9   earnings release; right?
10       MR. GLENNON: Objection; asked and answered.
11       THE WITNESS: I did not perform a statistical
12  analysis as to the correlation between stock price and
13  meet or beat. I can simply see that information on this
14  chart.
15       MR. GREENSTEIN: Q. Okay. If Oracle in the
16  second quarter issued earnings of 12 cents, would you
17  think that would be material in the mind of a reasonable
18  investor?
19       MR. GLENNON: Objection; incomplete
20  hypothetical.
21       THE WITNESS: I haven't been asked to make
22  that determination. It would have to again be the total
23  mix of all the information with respect to Oracle's
24  operations of what they disclosed, their applications
25  income, net income, revenues, a multitude of things.

298

1        MR. GREENSTEIN: Q. Why was applications
2   revenue important?
3        A. It was one of the many things --
4        MR. GLENNON: Insert an objection.
5        THE WITNESS: It was one of the many things
6   being looked at by the street.
7        MR. GREENSTEIN: Q. But it was an important
8   factor to investors?
9        A. Not necessarily. It was one of the many
10  factors that the street was looking at. Does that mean
11  it was important to an investor? That would depend on
12  the individual investor.
13       Q. Okay, so, let me ask you again. Is it your
14  opinion that applications growth in the second quarter
15  of '01 was important to investors in Oracle stock?
16       MR. GLENNON: Objection; incomplete
17  hypothetical, asked and answered, vague and ambiguous.
18       THE WITNESS: Not necessarily. I mean, most
19  of the analysts' reports looked at and/or gave a range
20  or expectation of application income, application
21  revenues. And there were ranges that were suggested by
22  Deutsche Bank, by Smith Barney, Salomon Smith Barney, et
23  cetera. So it is certainly one of the many things that
24  the street was looking at.
25       MR. GREENSTEIN: Q. Looking at analysts'

299

1   reports, do you look at every analyst report for the
2   analysts that cover Oracle during each quarter?
3        MR. GLENNON: Objection; vague and ambiguous
4   as to time.
5        THE WITNESS: I'm sure I didn't look at every
6   one.
7        MR. GREENSTEIN: Q. How did you determine how
8   many to look at before you were able to issue your
9   opinion?
10       A. Until I felt like I had sufficient and
11  competent evidence in the matter.
12       Q. Did you look at the same analyst each quarter?
13       MR. GLENNON: Objection; vague and ambiguous.
14       THE WITNESS: I don't recall looking at the
15  exact same one.
16       MR. GREENSTEIN: Q. How did you determine
17  which analyst's report to look at in that particular
18  quarter?
19       A. Whichever one I thought was judgmentally
20  appropriate to look at.
21       Q. What standard did you use in applying your
22  judgment?
23       MR. GLENNON: Objection; vague and ambiguous.
24       THE WITNESS: My 29 years of being an auditor.
25       MR. GREENSTEIN: Q. Okay. Could reasonable

300

1   minds differ as to whether a misstatement is material or
2   not?
3        MR. GLENNON: Objection; incomplete
4   hypothetical.
5        THE WITNESS: You mean just in this situation
6   or in --
7        MR. GREENSTEIN: Q. Yeah.
8        A. Well, I don't see how someone can say this was
9   material given the facts and circumstances in the mix.
10  I don't see how someone could say it was material given
11  the number of people that looked at this, the scrutiny
12  that this was under, and the overall mix of information,
13  I don't see how someone can conclude it was material.
14  So I don't think reasonable minds in this situation
15  would differ.
16       Q. In looking at the analyst reports following
17  the second quarter '01 earnings results, did you find
18  any analysts that cited to the fact that Oracle beat
19  Wall Street expectations by a penny?
20       MR. GLENNON: Objection; vague and ambiguous.
21       THE WITNESS: I'm sorry, what?
22       MR. GREENSTEIN: Q. In looking at the
23  analysts' reports after Oracle released its second
24  quarter '01 earnings of 11 cents, did you see any
25  analysts discuss the fact that Oracle beat their

301

1  expectations?
2      A.  I think most of them I saw talked about the
3  fact they beat expectations. Eleven cents versus ten
4  cents would be beating, and it would automatically be
5  talked about.
6      Q.  And why is that?
7      MR. GLENNON: Objection; vague and ambiguous.
8      THE WITNESS: Because it is a fact. Consensus
9  was 10 cents, they got to 11 cents. So the reader --
10  the analyst doesn't have to say it. The reader can see
11  that.
12      MR. GREENSTEIN: Q.  But the analyst said it;
13  right?
14      MR. GLENNON: Objection; vague and ambiguous.
15      THE WITNESS: I recall analysts saying that.
16      MR. GREENSTEIN: Q.  So they thought it was
17  important to put in their reports; right?
18      MR. GLENNON: Objection; calls for
19  speculation, lacks foundation.
20      THE WITNESS: You have to talk to them about
21  what they thought was important.
22      MR. GREENSTEIN: Q.  So you're aware that SAB
23  99 suggests that you look at surrounding circumstances
24  in making a materiality analysis; correct?
25      A.  Of course I am.

302

1      Q.  Did you -- what surrounding circumstances did
2  you look at in finding that meeting expectations in the
3  second quarter would not be material?
4      MR. GLENNON: Objection; mischaracterizes the
5  testimony.
6      THE WITNESS: Would you mind restating the
7  question?
8      MR. GREENSTEIN: Q.  Did you do an analysis of
9  the surrounding circumstances in your materiality
10  analysis?
11      A.  Absolutely.
12      Q.  What were the surrounding circumstances that
13  you looked at?
14      A.  All of the information that was talked about
15  in analyst reports, all of the information looked at
16  with respect to meeting or beating in the stock price,
17  four or five data points after that, the issue with
18  respect to what's being restated, the percentage change
19  in that potential restatement. There was a multitude of
20  things I looked at in the surrounding circumstances as
21  SAB 99 suggests.
22      Q.  Anything in particular you found important?
23      MR. GLENNON: Objection; vague and ambiguous.
24      THE WITNESS: It is all important.
25      MR. GREENSTEIN: Q.  Anything in particular

303

1  you looked at?
2      A.  I looked at all of that.
3      Q.  You said in looking at the stock reaction
4  after each of the ten quarters that you analyzed -- you
5  looked at the stock price five days after the earnings
6  release; correct?
7      MR. GLENNON: Objection; mischaracterizes the
8  testimony.
9      THE WITNESS: I looked at the stock movement
10  five days after the earnings release, yes, as one of
11  four data points, in each one of the ten quarters.
12      MR. GREENSTEIN: Q.  Is it your opinion that
13  the stock price movement five days after an earnings
14  release is somehow correlated to what the company
15  reports?
16      MR. GLENNON: Objection; vague and ambiguous.
17      THE WITNESS: I don't understand your
18  question.
19      MR. GREENSTEIN: Q.  Why did you look at the
20  fifth day following a earnings release in your
21  materiality analysis?
22      A.  More information is better in the materiality
23  calculations. So if you want to look at one day, if an
24  auditor decides to do that, or a company does, you can
25  look at two days, you can look at three days. I thought

304

1  four days was adequate.
2      Q.  Are you aware of a standard, looking at stock
3  price movements, that looks at the stock price from one
4  to three days following the earnings disclosure?
5      MR. GLENNON: Objection; lack of foundation,
6  vague and ambiguous.
7      THE WITNESS: Am I aware of a standard?
8      MR. GREENSTEIN: Q.  Yeah.
9      A.  I'm not aware of any standard that suggests
10  that, no.
11      Q.  So, is it your opinion if you looked at the
12  stock price movement seven days following an earnings
13  result, that would be a factor to look at in a
14  materiality analysis?
15      MR. GLENNON: Objection; vague and ambiguous,
16  incomplete hypothetical.
17      THE WITNESS: I'm sorry, you mean seven days
18  after the date of release?
19      MR. GREENSTEIN: Q.  Right.
20      A.  Do I think that's something to consider?
21      Q.  Um-hum.
22      A.  If an auditor or company decides to do that,
23  yes. That's up to their judgment.
24      Q.  Why did you decide to stop at five days?
25      A.  Because I thought it was adequate. And it is

305

1  adequate based on the information that I saw and based
2  on my significant number of years of experience.
3       Q.  On page 38 of your report you state that --
4       A.  My original report?
5       Q.  Yeah, your original report.
6       A.  I'm there.
7       Q.  You state, "I do not believe it would have
8  influenced the users of Oracle's financial statements."
9  Do you see that?
10      A.  I see that.
11      Q.  How did you determine who the users of
12  Oracle's financial statements were?
13      A.  Anyone looking at Oracle's financial
14  statements.
15      Q.  So it -- is the same standard applied to
16  any -- is the same standard applied to any user
17  regardless of their background?
18      MR. GLENNON:  Objection; vague and ambiguous,
19  incomplete hypothetical, lack of foundation.
20      THE WITNESS:  Well, that is really -- that's
21  more of a definition within SAB 99 of what they call a
22  reasonable investor or something to that effect.  So I
23  haven't made a determination about who all the users
24  were.  I just said whoever the user is, in general.
25      MR. GREENSTEIN:  Q.  Is there any difference

306

1  in your mind between an ordinary investor versus what
2  would be reasonable to, say, a hedge fund manager?
3       MR. GLENNON:  Objection; vague and ambiguous,
4  incomplete hypothetical.
5       THE WITNESS:  Well, their sophistication
6  certainly can be different, but they are still users of
7  the financial, which one needs to consider as it relates
8  to materiality.
9       MR. GREENSTEIN:  Q.  Right.  But would you
10  apply the same standard to determining whether something
11  was material to a user any differently depending on what
12  type of investor the person was?
13      MR. GLENNON:  Objection; incomplete
14  hypothetical, lacks foundation.
15      THE WITNESS:  Yeah.  No.  A company and/or
16  auditor don't determine materiality based on whether it
17  is known as a hedge fund or a mom and pop's retirement
18  fund.  It is the total mix and the overall financial
19  statement taken as a whole.
20      MR. GREENSTEIN:  Q.  Do you agree SAB 99 --
21  strike that.
22      What qualitative factor did you look at doing
23  your materiality analysis?
24      A.  Qualitative?
25      Q.  Yeah.

307

1       A.  I looked at the ones we talked about on page
2  39, and anything else that was mentioned in SAB 99.  And
3  you can see those laid out on pages 39 and 40 of my
4  report.
5       Q.  Let's take the first factor, whether a
6  statement arises from an item capable of precise
7  measurement or whether it arises from an estimate, and,
8  if so, the degree of imprecision in that.  Do you see
9  that?
10      A.  I do.
11      Q.  So is it your expert opinion that the
12  transfers from -- the $20.1 million in transfers from
13  25005 to 12601 in the second quarter '01 was an
14  estimate?
15      A.  Yes.
16      MR. GLENNON:  Objection; lack of foundation,
17  vague and ambiguous.
18      THE WITNESS:  It was based on an estimate of a
19  reserve account.
20      MR. GREENSTEIN:  Q.  But the actual transfer
21  from 25005 to 12601 can be accurately calculated, can't
22  it?
23      MR. GLENNON:  Objection; vague and ambiguous,
24  lack of foundation.
25      THE WITNESS:  The amount can be calculated,

308

1  but the resultant account that is being adjusted is the
2  reserve.  And that is one of the most volatile estimates
3  a company has.
4       MR. GREENSTEIN:  Q.  But actual transfers from
5  25005 to 12601 can be accurately measured; right?
6       MR. GLENNON:  Objection; asked and answered.
7       THE WITNESS:  Yes, it can be.  But that's not
8  the way you measure materiality.  Any adjustment can be
9  accurately measured.  The issue becomes would a reader
10  of a financial statement be interested in whether or not
11  an adjustment took place in cash that can be accounted,
12  or, for example, in a reserve account for bad debt that
13  they would expect to have a significant amount of
14  estimated and a significant amount of judgment placed on
15  it?
16      MR. GREENSTEIN:  Q.  Looking at the second
17  factor, whether the misstatement masks a change in
18  earnings or other trends.  Do you see that?
19      A.  Yes.
20      Q.  You stated you found, quote, "No evidence of
21  this issue"?
22      A.  That's right.
23      Q.  Have you ever found -- in conducting
24  materiality analysis, have you ever found evidence that
25  a misstatement masked a change in earnings?

309

1      MR. GLENNON:  Objection; vague and ambiguous.
2      THE WITNESS:  Certainly.
3      MR. GREENSTEIN:  Q.  What factors would allow
4  you to draw a conclusion that a misstatement masks a
5  change in earnings or other trends?
6      A.  Well, if it changes from a loss to income.
7      Q.  That's a different factor though; right?
8      A.  It also can be subsumed into that one.  Mask a
9  change in earnings, well, if you're changing the
10  earnings, that's masking a change in earnings.
11     Q.  Okay.
12     A.  So, or other trends.  Have I ever found that?
13  Is that your question?  I'm sorry.
14     Q.  I think you answered my question.
15         Take the next factor, "Whether the
16  misstatement concerns a segment or other portion of the
17  registrant's business that has been identified as
18  playing a significant role in the registrant's
19  operations or profitability."  Do you see that?
20     A.  You skipped down quite a few.
21     Q.  I'm focusing on certain ones.
22     A.  I thought you said the next one.  I'm sorry I
23  do see that one, yes.
24     Q.  And you -- your opinion is that if Oracle had
25  not been able to book the HP transaction second quarter

310

1  of '01, that that would not have been material to a
2  reasonable investor; is that correct?
3      MR. GLENNON:  Objection; incomplete
4  hypothetical, lack of foundation.
5      THE WITNESS:  Now, we're on HP?
6      MR. GREENSTEIN:  Q.  Yeah.
7      A.  My opinion is that had Oracle not booked the
8  HP transaction in the second Q would not have been
9  material; that's correct.
10     MR. GREENSTEIN:  Q.  Did you analyze what
11  Oracle's applications growth would have been in 2Q '01
12  if they did not recognize the HP deal?
13     MR. GLENNON:  Same objections.
14     THE WITNESS:  I did.
15     MR. GREENSTEIN:  Q.  You did?
16     A.  I did, yes.
17     Q.  And what would it be if they didn't recognize
18  it?
19     A.  Fifty-four percent.
20     Q.  What was it -- what was it -- strike that.
21         They did recognize the HP transaction;
22  correct?
23     MR. GLENNON:  Objection; vague and ambiguous.
24     THE WITNESS:  They did.
25     MR. GREENSTEIN:  Q.  What was the applications

311

1  growth rate in the second quarter?
2      MR. GLENNON:  Same objection; lack of
3  foundation.
4      THE WITNESS:  Sixty-six percent.
5      MR. GREENSTEIN:  Q.  So if Oracle had not
6  booked the HP deal in 2Q '01, its applications growth
7  would have been 55 percent?
8      MR. GLENNON:  Objection; asked and answered.
9      MR. GREENSTEIN:  Q.  Sorry, 54 percent?
10     A.  Fifty-four percent.
11     Q.  Fifty-four percent, okay.  Do you know what
12  analysts' expectations were for 2Q '01 in terms of
13  applications growth?
14     A.  I do.
15     MR. GLENNON:  Objection; lack of foundation.
16     MR. GREENSTEIN:  Q.  What was the consensus
17  growth expectation?
18     A.  I don't know what the consensus was.  I looked
19  at it individually.  I don't know if there really was a
20  consensus per se.
21         Smith Barney was 54 percent and Deutsche Bank
22  was 50 to 60 percent, the two that I looked at.
23     Q.  You don't think a reasonable investor would
24  have found it important that Oracle's applications
25  growth would have been more than ten percent lower if

312

1  they hadn't booked that HP deal?
2      MR. GLENNON:  Objection; mischaracterizes the
3  testimony.  Lack of foundation.
4      THE WITNESS:  I don't think in the total mix
5  of information that a reasonable investor would have
6  considered it would have been material to a reasonable
7  investor, no.
8      MR. GREENSTEIN:  Q.  You say in your report
9  that it was the largest deal in that quarter; is that
10  correct?
11     MR. GLENNON:  Objection; mischaracterizes
12  testimony.  Lack of foundation.
13     THE WITNESS:  I think I said third.  One of
14  the largest.
15     MR. GREENSTEIN:  Q.  It was the third largest
16  deals?
17     A.  I believe so, yes.
18     Q.  You don't think -- if the third largest deal
19  in a quarter was improperly booked, you don't think that
20  would be important to a reasonable investor?
21     MR. GLENNON:  Objection; lack of foundation,
22  incomplete hypothetical.
23     THE WITNESS:  The size of the deal only
24  matters with respect to whether or not in the total mix
25  of information it is considered material by the auditor

313

1   or by the company.
2        MR. GREENSTEIN:  Q.  Okay.
3        A.  What level it was on the ranking of size of
4   deal makes no difference at all.
5        Q.  Okay.  Do you agree that the HP deal in 2Q '01
6   was the largest applications deal Oracle had that
7   quarter?
8        MR. GLENNON:  Objection; lack of foundation,
9   incomplete hypothetical.
10       THE WITNESS:  I don't recall that information.
11       MR. GREENSTEIN:  Q.  You don't know if it was
12  or it was not?
13       A.  I don't recall that.
14       Q.  I know you don't recall it.  Sitting here
15  today, do you know it?
16       MR. GLENNON:  Objection; asked and answered.
17       THE WITNESS:  I said I don't recall it.
18       MR. GREENSTEIN:  Q.  Well, assuming it was the
19  largest applications deal in that quarter, is it your
20  opinion that if that deal was improper, that wouldn't
21  have been important to a reasonable investor?
22       MR. GLENNON:  Objection; lack of foundation,
23  calls for speculation, and vague and ambiguous.
24       THE WITNESS:  What do you mean by improper?
25       MR. GREENSTEIN:  Q.  If that deal hadn't been

314

1   booked, assuming it was the largest applications deal in
2   the second quarter '01, would that have been important
3   to an investor?
4        MR. GLENNON:  Same objections.
5        THE WITNESS:  I don't think, given the entire
6   mix of information, that would have been important to a
7   reasonable investor.
8        MR. GREENSTEIN:  Q.  How many analysts did you
9   look at in determining what Oracle's applications growth
10  estimates -- strike that.
11       How many analysts did you look at in
12  determining what analysts expected Oracle to report in
13  terms of applications growth?
14       MR. GLENNON:  Objection; asked and answered.
15       THE WITNESS:  There were a number.  I don't
16  remember.  I just remember those two numbers
17  specifically, SSB and Deutsche Bank.  But there were a
18  number that I looked at and considered.
19       MR. GREENSTEIN:  Q.  Did you -- so do you
20  recall which ones you looked at?
21       A.  No.
22       MR. GLENNON:  Objection; asked and answered.
23       THE WITNESS:  I could go to the binders and
24  look, if you'd like.
25       MR. GREENSTEIN:  Sure.

315

1        THE WITNESS:  We need to take --
2        MR. GLENNON:  Well, okay.
3        THE WITNESS:  Take a short break?
4        MR. GREENSTEIN:  Q.  You don't remember?  I'm
5   asking if you remember the numbers.
6        A.  I don't remember without looking.
7        Q.  Do you remember a range?
8        MR. GLENNON:  Objection; asked and answered.
9        THE WITNESS:  Smith Barney was 54 percent,
10  Deutsche Bank was 50 to 60 percent.
11       MR. GREENSTEIN:  Q.  Okay.  Looking at the
12  factor of SAB 99 that looks at whether the misstatements
13  affects the registrant's compliance with regulatory
14  requirements, are you aware of that factor?
15       A.  I am.
16       Q.  Did you look at that in connection with the 2Q
17  '01 bad debt transfers?
18       A.  Yes.
19       Q.  Did you consider whether or not those bad debt
20  transfers violated any regulatory requirements?
21       MR. GLENNON:  Objection; vague and ambiguous.
22       THE WITNESS:  They didn't violate any
23  regulatory requirements.  If they were inappropriately
24  transferred, they violated GAAP, which is not a
25  regulatory requirement, it is mentioned or contemplated

316

1   in SAB 99.
2        MR. GREENSTEIN:  Q.  Did you analyze any
3   escheatment laws in doing your materiality analysis of
4   the 2Q '01 bad debt transfer?
5        MR. GLENNON:  Objection; vague and ambiguous,
6   lacks foundation.
7        THE WITNESS:  I know of escheatment laws, I
8   have dealt with them for years.  But I don't recall
9   analyzing any of those as it relates to those transfers.
10       MR. GREENSTEIN:  Okay.  Let's go off the
11  record.
12       VIDEOGRAPHER:  This marks the end of tape four
13  in Volume I in the deposition of J. Duross O'Bryan.  At
14  7:10, going off the record.
15            (Recess, 7:10 p.m. - 7:22 p.m.)
16            (Exhibit 19 marked for
17            identification.)
18            (Exhibit 20 marked for
19            identification.)
20       VIDEOGRAPHER:  On record at 7:22.  This marks
21  the beginning of tape five in Volume I in the deposition
22  of J. Duross O'Bryan.
23       MR. GREENSTEIN:  Q.  Mr. O'Bryan, what's been
24  placed before you are the last two exhibits, 19 and 20.
25       MR. GLENNON:  I just put an objection on the

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

317

1  record as far as Exhibit 19 is concerned, it looks like
2  what plaintiffs have done is affixed a variety of
3  different documents together and marked them as a single
4  exhibit.
5      So to the extent these represent different
6  documents, I just wanted to note that for the record.
7      MR. GREENSTEIN: Q. Mr. O'Bryan, what's been
8  placed before you are Exhibits 19 and 20. And these are
9  the documents produced as part of your rebuttal report
10  on June 22nd.
11      Do you recognize the documents?
12      A. I do, yes. I mean, the ones I've just very
13  quickly looked at. I recognize the top portion of these
14  two documents, yes.
15      Q. Okay. Your opening expert report was issued
16  on May 25th; correct?
17      A. I believe that date is correct. Let me just
18  verify that for you.
19      May 25th; that's correct.
20      Q. And Exhibit 19 and 20, did you have those
21  documents at the time you wrote -- that you issued your
22  report on May 25th?
23      MR. GLENNON: Objection; vague and ambiguous,
24  lacks foundation.
25      THE WITNESS: I don't recall if these were

318

1  part of the original production.
2      MR. GREENSTEIN: Q. I didn't ask that. I
3  asked did you have these documents at the time you
4  submitted your May 25th, 2007 report?
5      MR. GLENNON: Objection; asked and answered.
6      THE WITNESS: I haven't looked through all of
7  19, so I can't say specific, unless you want me to look
8  through all of them.
9      MR. GREENSTEIN: Q. The first document, did
10  you have that at the time you issued your May 25th
11  report?
12      A. I don't recall having the SLSA.
13      Q. So is that a no?
14      MR. GLENNON: Objection; mischaracterizes the
15  testimony.
16      THE WITNESS: I just don't recall.
17      MR. GREENSTEIN: Q. Do you recall having
18  Exhibit 20 at the time you issued your May 25th report?
19      Let me ask you, are you aware of an e-mail
20  from --
21      A. I just want to answer your question here.
22      Q. Okay.
23      A. I did have -- I beg your pardon.
24      I'm not ready to answer. I don't have the
25  answer I thought I had. Sorry.

319

1      Q. So you don't know if you had the documents
2  that are marked as Exhibit 19 or 20 at the time that you
3  issued your May 25th report?
4      A. Let me just --
5      Q. You are looking for it?
6      A. Yeah.
7      Q. Sorry.
8      A. I don't think I had those. I don't recall,
9  but I don't think that I did.
10      Q. Do you know when you received those documents?
11      A. Well, when Mr. Regan issued his original --
12  his report where he spoke in detail about the HP
13  transaction, so maybe his rebuttal report, at that point
14  in time it became clear to at least me what the
15  plaintiff's position was with respect to HP.
16      And at that point in time documents were
17  gathered to show that, in my opinion, Mr. Regan is wrong
18  as it relates to the recognition of revenues.
19      So it was sometime after my original report
20  and prior to my rebuttal report. I just don't recall
21  the date.
22      Q. Are the documents in front of you, are those
23  the documents that were gathered?
24      MR. GLENNON: Objection; assumes facts, lack
25  of foundation.

320

1      THE WITNESS: Again, Exhibit 19 is 75 pages, a
2  bunch of different things stapled together, and I have
3  not been through those to cross-check those with all the
4  ones we got with respect to the secondary production.
5      MR. GREENSTEIN: Q. Is that Exhibit 20, or
6  the smaller one? You relied on that in your rebuttal
7  report. So do you recall if you had that, that was one
8  of the documents gathered after you submitted your
9  May 25th report?
10      MR. GLENNON: Objection; asked and answered.
11      THE WITNESS: As I said, I don't recall if I
12  saw this prior to the issuance of my original report. I
13  don't think so, but I just don't recall as I sit here
14  right now. It's been a long time.
15      MR. GREENSTEIN: Q. Let me ask you this. Are
16  you aware of an e-mail from Shelly Curtis where she
17  purports to describe events surrounding the signing of
18  the HP deal late on November 30th? Do you recall that
19  e-mail?
20      MR. GLENNON: Objection; lack of foundation,
21  vague and ambiguous.
22      THE WITNESS: I am aware of an e-mail that has
23  Shelly Curtis' comments about certifying that the
24  transaction with HP was completed prior to midnight on
25  11/30/2000.

321

1      MR. GREENSTEIN: Q.  You recall in that e-mail
2  that she references Arthur Andersen wanted some evidence
3  that the deal was booked on November 30th; correct?
4      MR. GLENNON: Objection; document speaks for
5  itself, lack of foundation.
6      THE WITNESS: Well, somewhere in that e-mail
7  chain is a reference to: Could you give some
8  clarification here, Andersen has asked about that.
9  Which you can see in Andersen's report or Andersen's
10  analysis on 1340.
11      MR. GREENSTEIN: Q.  Why would Arthur Andersen
12  as Oracle's auditor, want to know if the deal was signed
13  on November 30th, 2000?
14      MR. GLENNON: Objection; calls for
15  speculation, lacks foundations.
16      THE WITNESS: It is part of a revenue
17  recognition test.
18      MR. GREENSTEIN: Q.  Okay.  Do you recall
19  having that e-mail from Shelly Curtis prior to issuing
20  your May 25th report?
21      MR. GLENNON: Objection; vague and ambiguous.
22      THE WITNESS: You know, I don't recall having
23  that.  I just don't recall as I sit here if I had it or
24  not.
25      MR. GREENSTEIN: Q.  If you had it, you would

322

1  have put it on the Appendix C of your opening report and
2  you would have relied on that document?
3      MR. GLENNON: Objection; lack of foundation.
4      THE WITNESS: Had I seen that document, I
5  certainly would have considered it.  Whether I relied on
6  it would remain to be seen.
7      MR. GREENSTEIN: Q.  If you turn to page 41 of
8  your opening report.
9      A.  Sorry, back to the opening report?
10      Q.  Yeah.  The section on review of
11  Hewlett-Packard transactions.  Do you see that?
12      A.  I do, yes.
13      Q.  It says, "In supplemental interrogatory
14  responses, plaintiffs suggest that the HP
15  transaction..." Do you see that?
16      A.  I do.
17      Q.  Is it fair to say you read plaintiff's
18  interrogatory responses -- strike that.
19      So you were aware of plaintiff's allegations
20  concerning the HP transaction prior to issuing this
21  report, from their interrogatory responses; correct?
22      MR. GLENNON: Objection; lack of foundation.
23      THE WITNESS: I have seen the supplemental
24  interrogatory responses.  And I did see in those, prior
25  to the issuance of this report this allegation that HP

323

1  should not have been booked.
2      MR. GREENSTEIN: Q.  And you issued this
3  opinion; correct?
4      A.  I issued this opinion?
5      Q.  You issued this opinion after learning of
6  plaintiff's allegations about the HP transaction in the
7  supplemental interrogatory responses; correct?
8      MR. GLENNON: Objection; vague and ambiguous
9  as to this opinion.
10      THE WITNESS: I issued opinion number 7 on
11  page 41.  And at the time I issued that, I had seen the
12  supplemental interrogatory responses that alleged that
13  HP's transaction had not been properly booked.
14      MR. GREENSTEIN: Q.  If you look at page 42,
15  the third to last sentence, it starts with, "I note that
16  AA." Do you see that?
17      A.  Yes.
18      Q.  You note that "AA, Oracle's prior financial
19  statement auditors, specifically looked at the HP
20  transaction from a revenue recognition perspective and
21  even discussed it with Oracle's audit committee on
22  January 5th." Do you see that?
23      A.  I do.
24      Q.  You said, "AA did not recommend that any
25  adjustment be made to the accounting for the HP

324

1  transaction." Do you see that?
2      A.  Correct.
3      Q.  Is it required for an auditor to make an
4  adjustment in order for a revenue recognition deal to be
5  material?
6      MR. GLENNON: Objection; vague and ambiguous,
7  incomplete hypothetical.
8      THE WITNESS: I don't understand your
9  question.
10      MR. GREENSTEIN: Q.  If you turn to Appendix C
11  of your opening report.
12      A.  I'm there.  I'm there.
13      Q.  And you see the depositions that you relied
14  upon there?
15      A.  I do, yes.
16      Q.  You will see that Tom Rathjens' isn't in
17  there?
18      A.  That's correct.
19      Q.  Is it fair to say you didn't rely on the
20  deposition of Tom Rathjens in issuing this May 25th
21  opinion on the HP transaction?
22      MR. GLENNON: Objection; vague and ambiguous,
23  lacks foundation.
24      THE WITNESS: Yeah, I don't think I looked at
25  Mr. Rathjens' deposition prior to the issuance of this

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

325

1  initial report.
2      MR. GREENSTEIN:  Q.  And why not?
3      MR. GLENNON:  Objection; vague and ambiguous.
4      THE WITNESS:  Because, as I state in my
5  report, I don't see any evidence, in considering what
6  went on with this transaction, that this was improperly
7  booked at this point in time when I wrote this report.
8      With all due respect to Mr. Regan, he's the
9  only individual, at least accounting professional that
10  I've seen that seven years later suggests the HP deal
11  was not booked properly.
12      This deal was looked at by the company, by the
13  audit committee, by the revenue recognition group of the
14  company and by the auditors.  Every single one of them
15  have looked at this transaction and suggested it was
16  properly stated.
17      Seven years later Mr. Regan comes along and
18  says that that was inappropriate, which I find
19  troubling.
20      So, that was the information I was considering
21  at the time.  And there was no reason for me to look at
22  Mr. Rathjens, who was HP's individual PMK or whatever he
23  was designated as, because this thing had been fully
24  vetted.
25      What HP thought about and thinks about Oracle

326

1  booking their deal is completely irrelevant.  It is how
2  Oracle decides to book this deal.  And it was
3  appropriate to book, and it was appropriate to book
4  given all of the professionals that have looked at this.
5  And I think it is silly, quite frankly, that Mr. Regan
6  suggests otherwise.
7      MR. GREENSTEIN:  Q.  So, is it fair to say
8  that what you just said in that long answer is what you
9  considered before submitting your May 25th report?
10      MR. GLENNON:  Objection; mischaracterizes the
11  testimony, lack of foundation.
12      THE WITNESS:  Well, it is any of the footnotes
13  that I have here or references to documents or
14  depositions.  Mr. Matuszak's deposition, Arthur
15  Andersen's consideration, the audit committee.
16      MR. GREENSTEIN:  Q.  Okay.  So you didn't
17  consider Tom Rathjens' deposition in forming your expert
18  opinion on the propriety of the HP transaction on
19  May 25th?
20      MR. GLENNON:  Objection; asked and answered.
21      THE WITNESS:  In my opinion there would be no
22  need to, given the date of the original report.
23      MR. GREENSTEIN:  Okay, I'm done.
24      MR. GLENNON:  I don't have any redirect.
25      VIDEOGRAPHER:  The number of tapes used for

327

1  this deposition is five.  This is the end of videotape
2  number five in Volume I in the deposition of J. Duross
3  O'Bryan.  The original videotapes will be retained by
4  LiveNote World Service.  We're going off the record.
5  The time on the monitor is 7:37.
6      (Discussion off the record.)
7      MR. GREENSTEIN:  We just had a discussion off
8  the record.  Both parties agree that the deposition and
9  the exhibits should be designated as confidential.
10      MR. GLENNON:  And it is going to get shipped
11  to us for our review in 30 days to review and sign?
12      MR. GREENSTEIN:  Right.
13      (Whereupon, at 7:38 p.m. the deposition of
14  JOHN DUROSS O'BRYAN was adjourned.)
15
16      I declare under penalty of perjury that the
17  foregoing is true and correct.
18
19  Dated:_____   _____
20                   JOHN DUROSS O'BRYAN
21
22
23
24
25
26

-

1  STATE OF CALIFORNIA      )
2                   )
3  COUNTY OF ALAMEDA      )
4      I, DIANA NOBRIGA, hereby certify that the
5  witness in the foregoing deposition was by me duly sworn
6  to testify to the truth, the whole truth, and nothing
7  but the truth in the within-entitled cause; that said
8  deposition was taken at the time and place therein
9  stated; that the testimony of said witness was reported
10  by me, a Certified Shorthand Reporter and disinterested
11  person, and was thereafter transcribed into typewriting,
12  and that the pertinent provisions of the applicable code
13  or rules of civil procedure relating to the notification
14  of the witness and counsel for the parties hereto of the
15  availability of the original transcript of the
16  deposition for reading, correcting and signing have been
17  met.
18      And I further certify that I am not of counsel
19  or attorney for either or any of the parties to said
20  deposition, nor in any way interested in the outcome of
21  the cause named in said action.
22      DATED: _____
23
24      _____
25          DIANA NOBRIGA, CSR NO. 7071

```
1  STATE OF CALIFORNIA        )

2                             )

3  COUNTY OF ALAMEDA          )

4          I, DIANA NOBRIGA, hereby certify that the

5  witness in the foregoing deposition was by me duly sworn

6  to testify to the truth, the whole truth, and nothing

7  but the truth in the within-entitled cause; that said

8  deposition was taken at the time and place therein

9  stated; that the testimony of said witness was reported

10 by me, a Certified Shorthand Reporter and disinterested

11 person, and was thereafter transcribed into typewriting,

12 and that the pertinent provisions of the applicable code

13 or rules of civil procedure relating to the notification

14 of the witness and counsel for the parties hereto of the

15 availability of the original transcript of the

16 deposition for reading, correcting and signing have been

17 met.

18          And I further certify that I am not of counsel

19 or attorney for either or any of the parties to said

20 deposition, nor in any way interested in the outcome of

21 the cause named in said action.

22          DATED:  7/16/07

23

24

25                          DIANA  NOBRIGA, CSR NO. 7071
```

# EXHIBIT B

1

```
1        IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3
4    In re ORACLE CORPORATION
     SECURITIES LITIGATION,
5
6    vs.            Master File No.: C-01-0988-MJJ
7    This Document Relates To:
8        ALL ACTIONS.
9    _____/
10
11            ---o0o---
12        CONFIDENTIAL under the
13   Revised Stipulated Protective Order Governing Confidentiality
14        DEPOSITION OF MICHAEL QUINN
15        Tuesday, April 18, 2006
16            ---o0o---
17
18        SHEILA CHASE & ASSOCIATES
             REPORTING FOR
19          LiveNote World Service
         221 Main Street, Suite 1250
20        San Francisco, California 94105
           Phone: (415) 321-2311
21          Fax: (415) 321-2301
22
23   Reported by
     APRIL DAWN HEVEROH, CSR
24   CSR No. 8759
25
```

3

```
1        BE IT REMEMBERED that on Tuesday, April 18,
2    2004, commencing at the hour of 9:10 A.M. thereof, at
3    the offices of Lerach, Coughlin, Stoia, Geller, Rudman &
4    Robbins, LLP, 100 Pine Street, Suite 2600, San
5    Francisco, California, before me, APRIL DAWN HEVEROH,
6    CSR, a Certified Shorthand Reporter for the State of
7    California, personally appeared
8            MICHAEL QUINN,
9    called as a witness by the Plaintiffs herein, who, being
10   by me first duly sworn, was thereupon examined and
11   testified as hereinafter set forth.
12            ---o0o---
13   Appearing as counsel on behalf of Plaintiff:
14       SHAWN A. WILLIAMS, Esquire
         ELI GREENSTEIN, Esquire
15       MARK SOLOMON, Esquire
         LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBI
16       100 Pine Street, Suite 2600
         San Francisco, California  94111
17       (415) 288-4545
         shawnw@lerachlaw.com
18
19   Appearing as counsel on behalf of Defendant:
20       JAMIE L. WINE, Esquire
         PAUL KONOVALOV, Esquire
21       LATHAM & WATKINS
         633 West Fifth Street, Suite 400
22       Los Angeles, California  90071-2007
         (213) 485-1234
23       jamie.wine@lw.com
24   Also present:  Keith Mautner, Gerry Fujimoto and
                Todd Johnson
25
```

2

```
1            I N D E X
2        INDEX OF EXAMINATION
                                        PAGE
3    EXAMINATION BY MR. WILLIAMS          5
4    EXAMINATION BY
5            ---o0o---
6        INDEX OF EXHIBITS
7    DESCRIPTION                         PAGE
8    Exhibit 1   Deposition Subpoena, 9 pages    64
9    Exhibit 2   International Finance Conference Schedule,  117
             4 pages
10
11   Exhibit 3   Plaintiff's Proposed Revised Second Amended  144
             Complaint for Violations of the Federal
12           Securities Laws, 72 pages
13   Exhibit 4   Declaration of Michael Quinn, 8 pages    182
14   Exhibit 5   E-mails with dates spanning May 30, 2001 to  201
             June 19, 2002, 3 pages
15   Exhibit 6   Plaintiff's Second Amended Class Action   223
             Complaint for Violations of the Federal
16           Securities Laws, 70 pages
17   Exhibit 7   E-mails with dates spanning April 8, 2002  239
             to October 31, 2002, 6 pages
18
19   Exhibit 8   E-mails Bates stamped NDCA-ORCL 131153 to  262
             131155, 3 pages
20   Exhibit 9   E-mails with attachments Bates stamped   269
             NDCA-ORCL 061390 to 061407, 18 pages
21
     Exhibit 10  Document entitled 12601 Reserve Activity,  274
22           2 pages
23   Exhibit 11  Document entitled Oracle USA Q2-FY01 Top 20  275
             License Contracts Revenue Recognition
24           Review, 25 pages
25   Exhibit 12  E-mail dated February 20, 2001 from revrec  278
             to Ann Lanier, 2 pages
```

4

```
1            ---o0o---
2        P R O C E E D I N G S
3            ---o0o---
4        THE VIDEOGRAPHER:  Here begins the videotape
5    deposition of Michael Quinn, Tape No. 1, Volume 1, in
6    the matter of Oracle Securities Litigation in the United
7    States District Court, Northern District of California.
8    The case number is C-01-0988-MJJ.
9        Today's date is April 18th, 2006.  The time on
10   the video monitor is 9:10 A.M.  The video operator today
11   is Todd Johnson representing LiveNote World Service,
12   located at 221 Main Street, Suite 1250, San Francisco,
13   California 94105, phone number (415) 321-2300.  The
14   court reporter is April Heveroh reporting on behalf of
15   LiveNote World Service.
16        Today's deposition is being taken on behalf of
17   the plaintiff and is taking place at 100 Pine Street,
18   San Francisco, California, Suite 2600.
19        Would counsel please identify yourself and
20   state whom you represent.
21        MR. WILLIAMS:  Shawn Williams, Lerach,
22   Coughlin, Stoia, Geller, Rudman & Robbins on behalf of
23   Plaintiff.
24        MR. GREENSTEIN:  Eli Greenstein also with
25   Lerach Coughlin on behalf of the Plaintiffs.
```

5

1       MR. WILLIAMS:  Also on behalf of Plaintiffs is
2   one of our accountants, Keith Mautner, M-A-U-T-N-E-R.
3       MR. FUJIMOTO:  Gerry Fujimoto with Deloitte
4   FAS representing Defendants.
5       MR. KONOVALOV:  Paul Konovalov, Latham &
6   Watkins for the Defendant.
7       MS. WINE:  Jamie Wine, Latham & Watkins for
8   the Defendant and the witness.
9       THE VIDEOGRAPHER:  Would the court reporter
10  please swear in the witness.
11      (Whereupon, the witness was sworn by the
12          Certified Shorthand Reporter.)
13          ---o0o---
14          EXAMINATION BY MR. WILLIAMS
15          ---o0o---
16      MR. WILLIAMS:  Q.  Good morning, Mr. Quinn.
17      A.  Good morning.
18      Q.  Can you just state your full name and address
19  for the record, please.
20      A.  Michael Anthony Quinn, 560 Pala Way, P-A-L-A,
21  Sacramento, California, 95819.
22      Q.  And do you have a home phone number?
23      A.  Yes.  (916) 736-2441.
24      Q.  And do you have a cell phone number?
25      A.  I do.

6

1       Q.  And what's that?
2       A.  (916) 769-7494.
3       Q.  Okay.  Thanks.
4           I'm sure your attorneys have sort of
5   explained how this is going to proceed today, but
6   I'm just going to give you a general background of
7   what I expect to happen today, okay?
8       Do you understand?
9           The reporter sitting to your right is
10  going to take down everything that is said in the
11  room today:  My questions, your answers, counsel's
12  comments or objections.
13      Do you understand that?
14      A.  Yes.
15      Q.  She cannot record head nods or hand gestures,
16  so when I ask you a question, I'm just going to ask you
17  to reply audibly so that she can take it down.
18      Do you understand that?
19      A.  Yes.
20      Q.  Do you understand that you're testifying under
21  oath today?
22      A.  Yes.
23      Q.  And the oath that you're testifying under is
24  the same oath that you would be testifying under in a
25  court of law.

7

1       Do you understand that?
2       A.  Yes.
3       Q.  We'll take several breaks today.  You can take
4   a break whenever you want, except that if I'm in a line
5   of questioning or there is a question pending, I'll just
6   ask you to answer the question pending, and then we can
7   take whatever time you need.
8       Do you understand?
9       A.  Yes.
10      Q.  Okay.  I'm going to ask you a lot of questions
11  today.  I'm sure sometimes my questions will be slightly
12  unclear, maybe very unclear.  But if you just let me
13  know that you don't understand the question, I'll repeat
14  it.
15      Do you understand?
16      A.  Yep.
17      Q.  Or I'll try to clarify it.
18      Now, Ms. Wine is very likely to object to
19  some of my questions today.  She may object to all
20  of my questions today.
21      MS. WINE:  That's an unfair characterization.
22      MR. WILLIAMS:  Q.  And she's allowed to do
23  that.  Unless she asks you or tells you not to answer
24  the question, then you still have to answer the
25  question.

8

1       Do you understand that?
2       A.  Yes.
3       Q.  All right.  Do you understand everything that
4   I've explained to you?
5       A.  I do.
6       Q.  Any reason why you can't give your full and
7   complete testimony today?
8       A.  No.
9       Q.  You're not on any medication that might impair
10  your ability to recall facts that occurred maybe four or
11  five years ago?
12      A.  No, sir.
13      Q.  You aren't on any medication that might --
14  well, withdraw.
15      At the end of your testimony you're going
16  to have an opportunity to kind of take a look at
17  your testimony and correct any minor errors.  So you
18  don't have to worry about being absolutely correct
19  today, but you will not be able to make substantive
20  changes, and your lawyer will explain that to you.
21      Do you understand?
22      A.  Yes.
23      Q.  All right.  When was the first time you
24  learned that you would be testifying in this case?
25      A.  It was a month or two ago.  I was informed by

9

1   a lawyer.
2       Q.   Do you know who that lawyer was?
3       A.   If I recall the name, it was Jim Maroulis.
4       Q.   Jim Maroulis?
5       A.   Maroulis, yes.
6       Q.   Okay.  You called on the telephone?
7       A.   Yes.
8       Q.   And you said that was about a month and-a-half
9   ago; is that what you said?
10      A.   Yeah, one or two months ago.
11      Q.   Did he send you any documents?
12      A.   No.
13      Q.   So have you ever seen a subpoena directed to
14  you in this case?
15      A.   I have.
16      Q.   And when was the first time you saw that?
17      A.   That was about a month ago.
18      Q.   And who gave it to you?
19      A.   Someone who knocked at my door.
20      Q.   Oh, someone delivered it to your house?
21      A.   Yes.
22      Q.   Okay.  And what did you do with it when you
23  received it?
24      A.   I opened up the package or looked at the
25  document itself and read through it.

10

1       Q.   Did you call anybody when you saw it, when you
2   received it?
3       A.   I sent an e-mail to Jim saying that I received
4   the subpoena --
5           MS. WINE:  Don't --
6           Sorry.  I'm just going to instruct him not to
7   say what he communicated to Jim, but you can say whether
8   or not --
9           THE WITNESS:  I sent an e-mail to Jim.
10          MR. WILLIAMS:  Q.  And did he respond to the
11  e-mail?
12      A.   Yes, he did.
13      Q.   And did you have e-mail correspondence with
14  him about the subpoena after that initial e-mail that
15  you indicated?
16      A.   Only the -- if I recall correctly, only the
17  one I sent, and then he responded back.  I think that
18  was it.
19      Q.   Okay.  So when you indicated that he called
20  you, that was prior to you actually receiving the
21  subpoena at home?
22      A.   That's correct.
23      Q.   Okay.  Did you review any requests for
24  documents that were attached to the subpoena?
25      A.   I reviewed the subpoena and the items that

11

1   were in it.
2       Q.   Well, do you recall how many documents it was?
3   Was it one document or two documents?
4       A.   It was one that was stapled together.
5       Q.   Did you see a bunch of requests for documents?
6       A.   Yes.
7       Q.   And did you search for any of the documents
8   that were requested?
9       A.   No.
10      Q.   And how come?
11      A.   They had already been provided as part of my
12  employment at Oracle.
13      Q.   They were provided as part of your employment?
14  Do you mean that you gave them to someone --
15      A.   Yeah, anything that I had was given to Oracle,
16  turned over to them at that time when I worked for
17  Oracle.  I don't have any such documents.
18      Q.   Okay.  We'll come back to this and kind of go
19  through each one of those requests, and hopefully,
20  you'll be able to help me understand where they might
21  be, where some of those documents might be, okay?
22      A.   Sure.
23      Q.   Have you ever had your deposition taken
24  before?
25      A.   No.

12

1       Q.   Why don't you tell me what your educational
2   background is after high school.
3       A.   I attended UC Davis, graduated from there.
4       Q.   With what degree?
5       A.   Bachelor of Science in managerial economics.
6       Q.   And what year was that?
7       A.   December of '91 I finished.
8       Q.   And was that the total of your education after
9   high school?
10      A.   Correct.  Yes.
11      Q.   And so at the end of '91 when you graduated
12  from UC Davis, did you go to work?
13      A.   I worked for Arthur Anderson after that.
14      Q.   And geographically located where?
15      A.   In San Jose, California.
16      Q.   Did you move down to San Jose?
17      A.   I moved down to the Bay Area, yes.
18      Q.   To San Jose?
19      A.   No.
20      Q.   Okay.  Where?
21      A.   Sunnyvale.
22      Q.   Sunnyvale.  Okay.
23          And what position did you take at Arthur
24  Anderson?
25      A.   Staff auditor.

Quinn, Michael  4/18/2006  9:10:00 AM

13

1   Q.  That was in 1992?
2   A.  Yes.
3   Q.  Around, approximately.
4   A.  Yes.
5   Q.  And what were your responsibilities as a staff
6   auditor, if you recall?  Generally.
7   A.  Generally, I was put on engagements to audit
8   public and private and various types of companies doing
9   staff audit work.
10  Q.  I'm not an accountant, so tell me what staff
11  audit work is, if you know.
12  A.  It is anything from making copies to doing
13  disbursement testing, reviewing invoices, purchase
14  orders, matching them up, seeing that the payment made
15  against them was correct, doing tick marks, making
16  notes.
17  Q.  And how long were you a staff auditor at
18  Arthur Anderson?
19  A.  For one year.
20  Q.  Now, during that period when you were assigned
21  to engagements, was it typical for you to go to the
22  client site to do the audit, or would you get
23  information at Arthur Anderson's offices and do the work
24  there?
25  A.  It's typical to go to the client site.

14

1   Q.  And who did you report to during that first
2   year, if you remember, at Arthur Anderson?
3   A.  The reporting lines were pretty -- aren't
4   defined.  I reported to the senior for that engagement
5   while I was engaged --
6   Q.  Whoever that may have been at the time?
7   A.  Whoever it was, and it changed.
8   Q.  And so you -- after that first year, were you
9   promoted or moved laterally?
10  A.  I was promoted to experienced assistant.
11  Q.  It's the logical or next step?
12  A.  Yes.
13  Q.  And tell me how your duties expanded, if they
14  did, once you were promoted.
15  A.  Duties expanded to include the more complex
16  areas, you know, accrued liabilities, revenue, accounts
17  receivable, those types of things.  I also took on
18  assignments to -- where I was the acting senior on the
19  engagement.
20  Q.  Okay.  Now, you said that you were promote --
21  well, your duties were a little bit more complex, or
22  dealing with more complex issues.  So when you were a
23  staff auditor, matching invoices and payments, is that
24  something that you would consider not that complex, or
25  was it pretty straightforward?

15

1   A.  It became redundant.  You did it once or twice
2   and you knew how to do it.
3   Q.  So when you said that you took on
4   responsibilities for reviewing revenue and accrued
5   liabilities and things of that nature, can you be a
6   little bit more specific in describing what you did on a
7   day-to-day basis?
8   A.  It was a while ago.
9   Q.  Well, why don't we -- why don't we break that
10  down into pieces.
11      You said you had more responsibilities for
12  reviewing revenue.  That was one of the things, right?
13  A.  Yes.
14  Q.  Describe for me what you would do with respect
15  to reviewing revenue.
16  A.  As an example, one of the things would be
17  looking at the larger transactions, actual contract, and
18  reviewing it for compliance with, you know, the rev rec
19  rules.
20  Q.  And so -- and that would -- that would depend
21  on what type of company you were actually engaged with,
22  right?
23  A.  Yes.
24  Q.  So if it was a manufacturing company, you
25  might have different rev rec rules that applied to that

16

1   company, right?
2   A.  Yes.
3   Q.  And if you were dealing with a software
4   company, there may be different revenue recognition
5   rules that apply to the software company, right?
6   A.  Yes.
7   Q.  So you were promoted somewhere from staff
8   auditor to -- I forgot the title, but that's okay -- in
9   '93 or '94?
10  A.  In '93.
11  Q.  Okay.  And how long did you hold that
12  position?  And just tell me what that position was,
13  again.
14  A.  It's experienced staff.
15  Q.  Right.  Okay.
16  A.  I had that position for one year.
17  Q.  Tell me what your duties were with respect to
18  reviewing accrued liabilities.
19  A.  So --
20  Q.  You can give me an example if you want.
21  A.  As an example, as an example, you would look
22  at commissions, and there's, you know, commissions
23  payable, so that would be an accrued liability, and you
24  would go and analyze the commission plan, the sales that
25  were generated against that commission plan and what the

Quinn, Michael  4/18/2006  9:10:00 AM

17

1  commission rates were and do an estimation or
2  calculation as to what should have been accrued.
3      Q.  Okay.  And you would be doing that with a
4  team, right?  You weren't the only experienced staff
5  working on an engagement, were you, generally?
6      A.  Some engagements I was the only one, and other
7  engagements there were more than one.
8      Q.  Okay.  Now, describe for me what your duties
9  were with respect to AR.  I think you said that you had
10  some responsibilities reviewing AR.
11      A.  Yes.  As an example, again, review of the
12  accounts receivable aging in some detail, looking at the
13  largest customers or the largest balances or the oldest
14  aged items and making an assessment as to whether or not
15  it's collectible or -- if there's a reserve that's
16  required against it.
17      Q.  Okay.  All right.
18          Now, did you -- between the time you
19  graduated from UC Davis and during the period you
20  were working at Arthur Anderson in these first
21  two years, did they provide, like, detailed
22  accounting or auditing training for you?
23      A.  Detailed accounting and auditing training.  So
24  during the first five weeks I was at Anderson they
25  provided a five-week training course on intermediate

18

1  accounting.
2      Q.  Okay.  Now, prior to that had you taken
3  accounting courses in -- at Davis, UC Davis?
4      A.  Yes.
5      Q.  Okay.  And now what you -- the training that
6  you received during that five-week course, was it
7  anything new from what you had already experienced in
8  your courses at UC Davis?
9      A.  Yes, it was new.
10      Q.  Okay.  And can you describe for me, if you
11  can -- I know it was a long time ago -- how it was new?
12      A.  To be honest with you, I don't recall.
13      Q.  Okay.
14      A.  At all.
15      Q.  Maybe more practical?
16      A.  It was intermediate accounting, and I didn't
17  take intermediate accounting at Davis.  That's the
18  distinction I know.
19      Q.  I understand.
20          So what you took at Davis was a little bit --
21  a lower-level accounting, not intermediate?  You did not
22  take advanced accounting?
23      A.  I did not take advanced accounting at Davis.
24      Q.  So how long were you a -- I think --
25  withdrawn.

19

1      Q.  Did you say that you were a staff -- or an
2  experienced staff for about a year?
3      A.  Yes.
4      Q.  Okay.  And were you promoted at Arthur
5  Anderson?
6      A.  Yes.
7      Q.  To what?
8      A.  Senior.
9      Q.  Okay.  Senior staff, is that what --
10      A.  Yeah, Senior.  "Senior" is the name of the --
11  is the title of the position.
12      Q.  All right.  And do you recall when that was?
13      A.  September of 2000.  I'm sorry.  September of
14  '94.
15      Q.  September of '94.
16      A.  So two years into it.
17      Q.  And just describe for me how your
18  duties changed when you were promoted on that level.
19      A.  So at that point I was in charge of the audits
20  I was working on, so I supervised the staff, I took more
21  responsibility for coordinating with the client, I had a
22  plan, basic management, project management stuff.
23      Q.  So at that point you were no longer doing the
24  actual audit itself where you're more responsible for
25  the overall approach to the audit?

20

1      A.  I was responsible for the overall approach to
2  the audit.  I did do auditing, as well.
3      Q.  Okay.  And what type of auditing were you
4  doing at that level?
5      A.  It varied.  Many times it was whatever needed
6  to be done.  Other times it was the more complex or more
7  challenging areas.
8      Q.  And what would you describe as the more
9  complex or challenging areas?
10      A.  It could have been anything from purchase
11  accounting to revenue to equity.
12      Q.  Why would you describe revenue as more
13  challenging?
14      A.  Depending on the client, it could be more
15  complex.
16      Q.  And I just want to understand what you mean by
17  that, "depending on the client".  Do you mean because of
18  the type of business a client was in, or the manner in
19  which they actually did their revenue?
20      A.  The type of business that they're in.
21      Q.  Now, which businesses would you describe as --
22  which types of businesses would you describe as being
23  more challenging?
24      A.  Certainly a software company.
25      Q.  Okay.  And why is that?

21

1     A.    The rules around revenue recognition can be
2   complex.
3     Q.    And -- but we're talking about the 1994/95
4   area now when you're a senior, right?
5     A.    Yes.
6     Q.    Are you familiar with SOP 97-2?
7     A.    Yes, I am.
8     Q.    And what is your understanding, generally, of
9   SOP 97-2?
10     A.    SOP 97-2 is the accounting guidance for how to
11   recognize revenue on transactions that include software.
12     Q.    And -- but that wasn't in place in '94/'95,
13   right?
14     A.    No, it was not.
15     Q.    And so what were -- what were the accounting
16   rules that you had to familiarize yourself with prior to
17   the issuance of SOP 97-2?
18     A.    There's many -- many accounting rules out
19   there.  The primary one --
20     Q.    For software companies, I meant.  Sorry.
21     A.    The primary one is SOP 91-1.
22     Q.    And so you had to familiarize yourself with
23   91-1 during that 1994/95 area when you were a senior
24   responsible for some software companies?
25     A.    Yes.

22

1     Q.    Right?
2          And any others?  Prior to the issuance of
3   SOP 97-2.
4     A.    I'm sure there are others.  There's EITF,
5   Emergent Issue Task Force, TPAs, there are other things
6   that we referenced.
7     Q.    Okay.  So -- now, how long were you a senior
8   staff at Anderson?
9     A.    I was a senior for three years at Anderson.
10     Q.    Okay.  So that's up until about 1998; is that
11   fair?
12     A.    No.
13     Q.    Okay.  Why don't you tell me.
14     A.    Okay.  Till '97.
15     Q.    '97.  What happened in '97?  Were you promoted
16   again, or did you leave Anderson?
17     A.    I was promoted.
18     Q.    To what?
19     A.    Manager.
20     Q.    Okay.  Is that Audit Manager or --
21     A.    Yes.
22     Q.    -- just manager?
23     A.    Audit Manager.
24     Q.    And describe what your responsibilities were,
25   generally, as an audit manager.

23

1     A.    Generally were managing the senior and
2   ensuring that the audit was delivered, negotiating fees
3   and engaging with the client, and then going out with
4   partners to engage, to get new business and meet with
5   prospects.
6     Q.    Okay.  So would it be fair to say that you had
7   more responsibility for outlining the scope of audits
8   when you became an audit manager?
9     A.    That's a fair statement.
10     Q.    Okay.  And responsible for outlining the -- I
11   guess -- or preparing the engagement letters?
12     A.    Yes.
13     Q.    Would that be one of the responsibilities of
14   the audit manager?
15     A.    Yes.
16     Q.    Okay.  And then that would -- once that was in
17   place, generally, you would communicate that -- what the
18   engagement letter and the scope of the audits down to
19   the senior staff and -- the audit manager and then the
20   senior staff?
21     A.    Generally speaking.
22     Q.    Generally.  Okay.  That's fine.
23     A.    Sure.
24     Q.    Now, who were -- how long were you an audit
25   manager at Anderson?

24

1     A.    Approximately one year.
2     Q.    Okay.  So up till '98 or sometime in '98?
3     A.    Yes.
4     Q.    Okay.  Were you promoted again?
5     A.    No.
6     Q.    Okay.  At that point you left --
7     A.    I did.
8     Q.    -- Anderson.  Okay.
9          Now, while you were at Anderson, did
10   you -- was Oracle one of your clients?
11     A.    Yes.
12     Q.    All right.  And how long was Oracle one of
13   your clients?  For how many years?  Let me withdraw
14   that.
15          What I -- how long were you personally
16   responsible for audits of Oracle while you were at
17   Anderson?
18     A.    I was on the engagement from the spring of '93
19   through, probably, March of '98.
20     Q.    So a good portion of your tenure at Anderson
21   you were working at -- not at Oracle, but doing audits
22   for Oracle?
23     A.    Yes.
24     Q.    So is it fair to say you familiarized yourself
25   with not only Oracle, but with all of the applicable

25

1  software accounting rules?
2       MS. WINE:  Objection.  Vague and ambiguous.
3       MR. WILLIAMS:  Q.  You can answer that, unless
4  you don't understand it.
5       A.  All of the rules, I had familiarity with the
6  rules that -- I had familiarity with the revenue
7  recognition rules.
8       Q.  Okay.  And so somewhere in '97, that would
9  include SOP 97-2?
10      A.  Yes.
11      Q.  Okay.  And do you know what, I guess, the
12  basic elements of proper revenue recognition under 97-2,
13  SOP 97-2 are?
14      A.  Yes.
15      Q.  Can you just describe them for me, please?
16      A.  They are for primary -- you need to have
17  evidence of an arrangement, you need to deliver the
18  products or services, your fees must be fixed or
19  determinable, and they need to be collectable.
20      Q.  Now, I'll take you a little bit more about
21  those, but during that, it sounds like, about five,
22  five-and-a-half year period that you worked at least
23  with Oracle doing audits for Anderson, at any period --
24  at any time during that period did Anderson do the
25  audits electronically, meaning had access to Oracle's

26

1  systems through an electronic feed?
2       MS. WINE:  Objection.  Vague and ambiguous.
3       THE WITNESS:  I don't recall if anything was
4  done electronically.
5       MR. WILLIAMS:  Q.  So during that period, was
6  it always the case doing either a quarterly review or a
7  year-end audit at Oracle that you or Anderson's team
8  responsible for the Oracle engagement would go to
9  Oracle's offices to do the audit?
10      A.  We would go to Oracle's offices to do the
11  audit, yes.
12      Q.  Okay.  All the time?
13      A.  Yes.
14      Q.  Okay.  And while you were at Oracle's offices,
15  did you have access to their electronic accounting
16  systems, or were documents provided for you to do the
17  audit?
18      A.  Documents were provided to do the audit.
19      Q.  Okay.  And that's throughout the entire period
20  up through '98?
21      A.  Documents were provided during that time,
22  yeah.
23      Q.  Okay.  Did you have access to Oracle's
24  electronic accounting systems, as well?
25      A.  Only for and on a limited basis.

27

1       Q.  Okay.  Describe under what circumstances and
2  the time frame that Anderson would have access to
3  Oracle's electronic accounting systems.
4       MS. WINE:  Objection.  Foundation.
5       MR. WILLIAMS:  Q.  Go ahead.
6       A.  Answer?
7       Q.  Yes, you can answer.
8       A.  Sure.
9       I don't recall the specifics around it.
10  It was around doing confirmations for accounts
11  receivable and shipment verification for contracts.
12  They would give us a password so we could view -- do
13  a query within the system to view whatever it is we
14  needed to view, the date of a shipment or the FedEx
15  number.  I don't recall exactly what we did, but I
16  remember we would have access, for the two weeks
17  while we were out there, to do some view queries
18  into their system.
19      Q.  And when you say "confirmations of AR," what
20  does that mean?
21      A.  It is a process, it's a typical audit process
22  where you select a balance or an invoice to confirm, and
23  you create -- and the client creates a letter and the
24  auditor sends it out to that customer and asks them to
25  confirm that balance as of that specified date on the

28

1  letter.
2       Q.  And was that done, as far as you know, for
3  every invoice?
4       A.  No.
5       Q.  Under what circumstances would that process be
6  done?  I'm talking about up until the time you left
7  Anderson.
8       MS. WINE:  For a year-end audit?
9       MR. WILLIAMS:  Q.  Either a year-end audit or
10  a quarterly review.
11      A.  It was generally done for the audit as an
12  interim period --
13      Q.  What do you mean --
14      A.  Which means prior to year end, at the end of
15  the Q3, and a sample was selected, a sample of invoices
16  were selected to be sent out and confirmed.
17      Q.  Well, a sample of invoices would be selected
18  to confirm because the invoice would already be sent
19  out, right?
20      A.  Correct.  A sample, yes.
21      Q.  All right.  So who selected the invoices to be
22  confirmed?
23      A.  Arthur Anderson would.
24      Q.  And how was that process done?  Withdrawn.
25      How would you select the invoices to be

29

1   confirmed?

2         MS. WINE:  Objection.  Foundation.

3         THE WITNESS:  How would we select?  We would

4   get -- it was some statistical method to select based

5   upon dollar size of the invoice out of the population

6   of -- a certain population of invoices.

7         MR. WILLIAMS:  Q.  And I'm just trying to get

8   at how -- in practicality, how that works.  Did Oracle

9   come in with a box of documents and say, "These are all

10  the invoices for the quarter," and you kind of go

11  through and pull one out?

12        A.  No.

13        Q.  If you could describe for me how it happens, I

14  would appreciate it.

15        A.  Okay.  They would provide a file, some

16  electronic file of all of the invoices that were

17  outstanding as of the specific date that we wanted to

18  confirm of, and then we would go through and randomly or

19  systematically select which invoices that we wanted to

20  confirm.

21        Q.  So they would provide you an electronic file?

22        A.  Yes.

23        Q.  On a CD?

24        A.  A CD?  I don't think CDs -- well, they may

25  have existed back then.

30

1         Q.  Okay.

2         A.  I don't know what the file was.  I have no

3   idea.

4         Q.  Under these circumstances, they would give you

5   a password to get into the system so that you can make

6   the selection?

7         A.  No.

8         Q.  Okay.  Maybe I'm just slightly confused, and

9   help me out.  If it was an electronic file, and normally

10  you didn't have access to the electronic systems, how

11  would you make that selection that you've just

12  described?

13        A.  They would give us a file on some media, and I

14  don't know what type of media it was, but they would

15  give us that file, that data on some media.

16        Q.  Oh, like on a disk or -- a disk or --

17        A.  A floppy.

18        Q.  Or a floppy at the time.  Well, 1998 I think

19  they had -- we were beyond some floppies.

20        And was that generally how it was done

21  throughout your tenure as an auditor at Anderson

22  when you were doing the Oracle engagements?

23        A.  Yes.

24        Q.  Okay.  During that period, did you do any --

25  were you responsible for any engagements at other

31

1   software companies?

2         A.  Yes.

3         Q.  Can you tell me which ones?

4         A.  Net Manage and Versant.

5         Q.  Versant.

6         A.  Uh-huh.

7         Q.  Only those two?

8         A.  I guess I would have more -- there are more,

9   but I'm trying to think.

10        Was it Niche Communications?  I don't recall.

11  Sorry.

12        Q.  That's fine.

13        All right.  Well, let me go back to the

14  issuance of 97 -- the SOP 97-2.

15        A.  Okay.

16        Q.  You said that at least one of the first

17  elements of proper revenue recognition under SOP 97-2

18  was that you had to be proof of an arrangement; is that

19  right?

20        A.  I said "evidence of arrangements".

21        Q.  I'm sorry.  Evidence of an arrangement.

22        Can you describe what that means?

23        A.  There needs to be a contract, something

24  supporting the terms and conditions, what was sold to

25  them, how much it was sold for, payment terms, delivery

32

1   terms, those types of things.

2         Q.  Okay.  And as an auditor, what type of

3   evidence would be acceptable under 97-2, as far as you

4   know?

5         MS. WINE:  Objection.  Vague and ambiguous.

6         THE WITNESS:  It depends on the client, it

7   depends on their practice, it depends on the product or

8   service that was being sold.

9         MR. WILLIAMS:  Q.  Okay.  Why would it depend

10  on the client?

11        A.  As an example, some clients may require only a

12  purchase order that references terms and conditions.

13  Other clients may require a full-blown contract and a

14  purchase order to support that transaction.

15        Q.  All right.  So the client would dictate

16  whether or not an arrangement was in place when you were

17  doing an audit?

18        MS. WINE:  Objection.  Misstates the

19  testimony.

20        MR. WILLIAMS:  Q.  It's a question.

21        A.  The client would dictate -- we would

22  understand what their process was for doing these

23  transactions, and then apply our auditing and, you know,

24  apply the rules against what they did.

25        Q.  Okay.  Well, if a client said to you, "Well,

33

1  we got a phone call from a customer that said they were
2  going to order," would that be acceptable to satisfy the
3  first element of SOP 97-2?
4       MS. WINE: Objection. Incomplete
5  hypothetical.
6       THE WITNESS: It's a total hypothetical.
7       MR. WILLIAMS: Q. That's okay. I can ask a
8  hypothetical, so you can answer.
9  A. No problem.
10      Generally, that would be a no, we will not
11 accept that as being evidence of an arrangement.
12      Q. So that's actually what I'm trying to get at.
13 I'm trying to understand what type of evidence would be
14 acceptable as an arrangement that would satisfy SOP
15 97-2.
16      MS. WINE: Objection. Asked and answered.
17      MR. WILLIAMS: Q. Do you understand my
18 question?
19 A. I didn't hear the question.
20      Q. Okay. Well, you indicated that evidence of an
21 arrangement -- evidence of an arrangement would depend
22 on the client, right?
23 A. Yes.
24      Q. And I asked you whether or not the client
25 would dictate what the arrangement was, indeed -- was

34

1  with a customer, right?
2  A. Yes.
3       Q. And you said "not necessarily"; is that right?
4  Is that fair?
5  A. That's fair.
6       Q. Okay. And then I described for you a
7  circumstance under which a phone call would not be
8  acceptable, right?
9  A. Correct.
10      Q. Can you tell me, if you know, any other type
11 of communication, in your experience, that would not be
12 an acceptable arrangement or would not be evidence of an
13 acceptable arrangement satisfactory under SOP 97-2?
14 A. A contract that was signed by one party that
15 required two signatures would be evidence of -- would
16 not be evidence of an arrangement. That would be a good
17 example.
18      Q. Okay. Can you think of another one?
19 A. Certainly something that doesn't have any
20 documentation.
21      Q. No physical documentation?
22 A. No physical documentation associated with it.
23      Q. Uh-huh. That's it? That's all you can think
24 of right now?
25 A. That's all that comes to mind.

35

1       Q. You were an auditor for a long time, so if you
2  think of something else throughout the day, let me know.
3       All right. So that's the arrangement.
4       And the second -- the second element I
5  think you indicated was that the software would have
6  to be delivered, right?
7  A. Yes.
8       Q. And describe for me what that means.
9  A. The customer would have to -- or the -- excuse
10 me. The vendor would have to deliver the software,
11 meaning either deliver it to the customer's place or
12 give it to a third party, you know, carrier, FedEx, DHL,
13 a carrier service, or they could place it to be -- make
14 it available at a specified URL for download by the
15 customer and provide the customer with the appropriate
16 access to that URL.
17      Q. Okay. Now, would that -- withdrawn.
18      What you've just described, would that
19 satisfy delivery under SOP 97-2 and I guess
20 associated accounting regulations for the delivery
21 of software?
22 A. Yes.
23      Q. Are you familiar with SAB 101?
24 A. Yes.
25      Q. Okay. And does SAB 101 provide more

36

1  explanation with regard to whether or not software has
2  actually been delivered?
3  A. It provides further guidance for other
4  industries in regards to delivery.
5       Well, no, I take -- I'm withdrawing that.
6       Yes, it does provide some additional
7  guidance regarding delivery.
8       Q. Okay. Describe for me what that additional
9  guidance is.
10 A. I don't recall off the top of my head.
11      Q. So is it fair to say that what you just
12 described, with respect to either making software
13 available at a particular URL or delivering it to the
14 customer or a third party, is not necessarily a complete
15 delivery under SOP 97-2 as it relates to SAB 101?
16 A. That would be complete delivery.
17      Q. I'm sorry?
18 A. That would be complete delivery.
19      Q. Complete delivery. Under both?
20 A. Yes.
21      Q. Simply put, sending it.
22 A. Yes.
23      Q. So the next element, I think you said that, at
24 least under SOP 97-2, that the fees would have to be
25 determinable; is that what you said?

37

1     A.  The fees are fixed or determinable.

2     Q.  And describe for me what that means.

3     A.  That means in general, that you need to be

4  able to quantify the amount.  It can't be vague or

5  ambiguous, depending on the number of copies that they

6  make.  It's not dependent upon another thing.  It's

7  either specified in the contract or you can derive the

8  number.

9     Q.  And so if a software company was selling

10  software under a particular contract, there wasn't a

11  fixed amount that the company was definitely going to

12  receive from the customer, that would not satisfy SOP

13  97-2.  That's fair to say, right?

14     A.  That's correct.

15     Q.  So if there was some agreement that, for

16  example, if the software could not be implemented over a

17  certain period of time, the customer would get a

18  discount, that evidence would not satisfy proper revenue

19  recognition under SOP 97-2?

20     MS. WINE:  Objection.  Incomplete

21  hypothetical.

22     THE WITNESS:  I'm not sure of your question.

23  Can you repeat it?

24     MR. WILLIAMS:  Q.  Okay.  I'll repeat it.

25     Take, for example, a contract which included a

38

1  provision that if software wasn't implemented within,

2  say, 30 days, that the customer would get a discount on

3  a license, right?  You understand that?

4     A.  Yes.

5     Q.  Under those circumstances, revenue recognition

6  would not be proper.

7     MS. WINE:  Same objection.

8     THE WITNESS:  Correct.

9     MR. WILLIAMS:  Q.  And were there any other

10  circumstances that you can think of with regard to the

11  fixed nature of fees that would not be properly

12  recognizable under SOP 97-2?

13     A.  Yes.  One of the classic examples is, you

14  know, based upon the number of copies, their fees,

15  depending upon the number of copies they make off of

16  their master CD.

17     Q.  You mean how many copies the customer makes?

18     A.  Correct.  Yes.

19     Q.  Anything else?

20     A.  That's just the classic example.

21     Q.  Aside from the classic example, I'm asking for

22  examples in your experience, what you've seen, if you

23  can think of anything else.

24     A.  Nothing that comes to mind right now.

25     Q.  Okay.  And the last element I think you said

39

1  was collectability, or related to collectability, right?

2     A.  Yes.

3     Q.  Can you just describe to me what that means?

4     A.  The customer has to have the ability to pay

5  for, have the liquidity to pay for that particular

6  transaction.  Within normal terms.

7     Q.  What do you mean by "normal terms"?

8     A.  If payment terms were net 30, they would have

9  to show, at that point in time we sold them the

10  software, that they would be able to pay for it.

11     Q.  Within 30 days.

12     A.  Within 30 days.

13     Q.  So is it really a liquidity issue, or is it

14  just the ability to pay?

15     A.  It's a liquidity issue.

16     Q.  Okay.  What do you mean by "liquidity" then?

17     A.  Having the working capital to cover that

18  particular transaction.

19     Q.  What if a customer had secured credit for the

20  purchase?

21     MS. WINE:  Objection.  Incomplete

22  hypothetical.

23     THE WITNESS:  Had secured credit for -- so if

24  they had financing and the deal was contingent upon the

25  financing, then we wouldn't recognize revenue until we

40

1  got cash.

2     MR. WILLIAMS:  Q.  Until you actually received

3  the cash?

4     A.  Correct.  If they secured credit at the time

5  and they cut us a check, or the bank sent us a check,

6  then --

7     Q.  I'm not at Oracle yet.  I'm still in '98.

8     A.  No just sending the vendor a check, they would

9  be able to recognize revenue when they sent them that

10  check.

11     Q.  While you were an auditor auditing software

12  companies, and specifically Oracle, can you describe for

13  me what the process was for Anderson to determine

14  whether Oracle had properly recognized revenue under SOP

15  97-2?

16     MS. WINE:  Objection.  Lacks foundation.

17     THE WITNESS:  Okay.  The process.  So in

18  general, as I recall -- again, it was awhile ago -- you

19  would get a contract, you would review it, there would

20  be some checklist, you know, some rev rec checklist, you

21  know --

22     Q.  Provided by Anderson?

23     A.  Provided by Anderson.  You would go through

24  some basic questions and you would say, you know, "Is

25  there an arrangement?  What are the payment terms?"  You

41

1    know, "Was something shipped?"  And, you know, you would
2    go through and validate that it was shipped, looking at
3    a waybill, something to that effect, and you would go
4    through that criteria and you would say yes or no, it
5    was or was not recognized properly.
6        Q.  Okay.  So it would just be sort of a
7    questionnaire given to Oracle in such an instance --
8        A.  No.
9        Q.  Is that fair?
10       A.  No.  Reviewing the contract and just kind of
11   answering kind of a work program, if you will.
12       Q.  Okay.  All right.
13           And in the 1998 time frame, taking Oracle for
14   an example, all of this -- the evidence of the audit
15   would be contained in audit work papers, right?
16       A.  Yes.
17       Q.  And were those compiled electronically or on
18   paper?  And I'm talking about, say, '98.
19       A.  '98?  Generally -- did we do the business
20   audit?  Generally speaking, in paper, I think there were
21   some electronic documents, but I believe everything at
22   that point was still printed out and ended up on paper
23   anyway.
24       Q.  So when you would do a year-end audit for
25   Oracle, let's just say '98, what would be the volume of

42

1    just papers that would make up the audit work papers for
2    year-end audit for Oracle?
3        A.  There were a lot.  Gosh.  I don't recall
4    specifically.
5        Q.  All right.  Well, would it be, say,
6    one banker's box?
7        A.  What's a banker's box?
8        Q.  It's one of these (indicating).  Something
9    like that.
10       A.  It would probably be at least one, if not two.
11       Q.  If not two, probably two?
12       A.  Yeah.
13       Q.  Okay.  Now, would it be three?
14       A.  I have no idea.  I don't recall.
15       Q.  But would it be 10?
16       A.  Not likely.
17       Q.  Not likely.
18           Somewhere between two and five; is that fair?
19       A.  That's fair enough.
20       Q.  And -- all right.
21           So in 1998 you left Anderson, right?
22       A.  Yes.
23       Q.  And then you started working for Oracle.
24       A.  Yes.
25       Q.  And what was your -- what were you hired as,

43

1    initially, at Oracle?
2        A.  Senior Manager, Revenue Accounting.
3        Q.  Senior Manager Revenue Accounting.  At that
4    time you were pretty much -- withdrawn.
5            At that time you were pretty familiar with
6    Oracle Systems based on your experience at Anderson,
7    right?
8            MS. WINE:  Objection.  Vague and ambiguous.
9            THE WITNESS:  Which systems?
10           MR. WILLIAMS:  I'll withdraw that.
11       Q.  You were familiar with the manner in which
12   Oracle recognized revenue on software sales?
13           MS. WINE:  Same objection.
14           THE WITNESS:  In regards to the application
15   that was used, or in regards to --
16           MR. WILLIAMS:  Q.  Well, why don't you tell me
17   because you were doing the audit for Oracle prior to
18   that date, right?
19       A.  Yeah.
20       Q.  So tell me what you were familiar with with
21   respect to the way Oracle did its business at the time
22   that you became an Oracle employee.
23       A.  Okay.
24           MS. WINE:  All of its business?  Because
25   before you were talking about recognizing revenue.

44

1            MR. WILLIAMS:  Q.  No, I'm talking about its
2    business.
3        A.  I was familiar with the types -- generally,
4    the types of products they sold, that it was certainly
5    software and the services they sold, and I was generally
6    familiar with how they contracted for those, you know,
7    the look and feel and the terms that they included in
8    their contracts.  And then I was generally familiar with
9    the timing of the revenue recognition when it occurred
10   for the different types of products and services they
11   sold.
12       Q.  And at the time you were also familiar with
13   the types of, quote-unquote, "evidence" that they would
14   typically have to support revenue recognition.  Is that
15   fair?
16       A.  That's fair.
17       Q.  Who hired you?
18       A.  Larry Garnick.
19       Q.  And were you reporting to him in 1998 when you
20   were first hired?
21       A.  Yes.
22       Q.  And was he the person that you had had some
23   interface with doing the Oracle audit while you were at
24   Anderson?
25       A.  Yes.

45

1    Q.   Okay.  Was he the primary person that was --
2    withdrawn.
3         Was he the primary Oracle employee
4    interfacing with Anderson during the audit periods
5    while you were an Anderson auditor?
6    A.   No.
7    Q.   Who was it?
8    A.   In general, it was -- I guess it depends on
9    who you were on the engagement.  At the higher levels it
10   was Tom Williams.
11        MS. WINE:  I think he was asking about who you
12   interfaced with.
13        THE WITNESS:  Who I did?
14        MR. WILLIAMS:  No, no --
15        MS. WINE:  I think that was the question.
16        MR. WILLIAMS:  Yeah, but do me a favor, if
17   you're going to object to the question, object to the
18   question, but don't interpret the question for the
19   witness.
20        MS. WINE:  I'm not.
21        Can you read the question back?
22        THE REPORTER:  "Question:  Was he the primary
23        Oracle employee interfacing with Anderson
24        during the audit periods while you were an
25        Anderson auditor?"

46

1    "Answer:  No."
2    "Question:  Who was it?"
3         MR. WILLIAMS:  Q.  You can answer the
4    question.
5    A.   So Tom Williams would be one person, Theresa
6    Chong would be another person, Brandon Hughes was
7    another person.  And we did certainly speak with Larry
8    Garnick.
9    Q.   Okay.  Now, did you apply for a job there, or
10   were you recruited by Oracle in '98?
11   A.   I did not apply for a job.  Larry called me.
12   Q.   And asked you if you wanted to work for
13   Oracle?
14   A.   Yes.
15   Q.   Okay.  Did he ask you if you wanted a specific
16   position, or was it generally, did you want to work for
17   Oracle?
18   A.   He asked regarding the specific position.
19   Q.   Okay.  Did Oracle hire anyone else from
20   Anderson during that time frame they hired you?
21   A.   Not that I recall.
22   Q.   Okay.  Can you just tell me, again, the title
23   that you were hired for, the position you were hired
24   for?
25   A.   Senior manager, revenue accounting.

47

1    Q.   Okay.  And was that down at Redwood Shores?
2    A.   No.
3    Q.   Where was it?
4    A.   In Rocklin.
5    Q.   And describe what your responsibilities were
6    as Senior Manager, Revenue Accounting.
7    A.   I was responsible for the U.S. Revenue
8    Accounting Group, as well as, you know, which included
9    contract review, compliance with the revenue recognition
10   policy.
11   Q.   Okay.  So --
12   A.   For the U.S.
13   Q.   So contract review, would that be similar to
14   what you were doing as an auditor?
15   A.   Yes.
16   Q.   Okay.  But you were doing it internally,
17   right?
18   A.   Yes.
19   Q.   And you said -- was it compliance with revenue
20   recognition policy?
21   A.   Yes.
22   Q.   All right.
23        Now, are you talking about compliance with
24   Oracle's policy, or compliance with GAAP SOP 97-2 and
25   the related provisions of GAAP?

48

1    A.   Both.
2    Q.   Both.
3         Did you get additional training when you were
4    hired by Oracle?
5    A.   No.
6    Q.   No.
7         No training on Oracle's policies, revenue
8    recognition policies?
9    A.   No.
10   Q.   Okay.  So how did you do your job, just walked
11   in and just kind of jumped in and started looking at
12   contracts?
13   A.   Jumped in and read the literature that was
14   available out there with regards to business practices,
15   went through the policy again, and part of it was just
16   experience and engaging with the people who were in the
17   group already.
18   Q.   Okay.  So when you say "reading the
19   literature", you're talking about Oracle literature?
20   A.   Oracle, yes.  Yes.
21   Q.   Okay.  So their practices and procedures?
22   A.   Yes.
23   Q.   And they had books or literature on how
24   revenue was recognized at Oracle?
25   A.   Yes.

49

1     Q.  And did they have literature on their
2  electronic accounting systems as it related to revenue
3  recognition?
4     A.  I don't recall reviewing that, or reading
5  that.
6     Q.  Did you get training on Oracle's electronic
7  systems?
8        MS. WINE:  Objection.  Vague and ambiguous.
9        THE WITNESS:  The ERP system?
10       MR. WILLIAMS:  Q.  Well, the ERP or its
11  financial applications.
12      A.  Only on an as-needed basis.
13      Q.  Okay.  And what was needed when you were hired
14  at Oracle for you to do your job as it relates to using
15  financial -- Oracle's financial applications?
16      A.  There were two primary things that I did in
17  regards to that.  One was the contract tracking system,
18  which was a small little program that allowed us to
19  identify the larger transactions to review.  The other
20  was to be able to query in the system and to view an
21  order or transaction to see how the accounting lines
22  occurred.
23      Q.  What do you mean when you say "accounting
24  lines"?
25      A.  So if we did a contract and sold a license and

50

1  maintenance, support.  PCS.
2     Q.  Okay.  But you said -- how does that describe
3  how the accounting lines occurred?
4     A.  So if you look at a contract and there's
5  product and service, one of the verifications that we
6  did as part of the contract review process was to go
7  into the application, the ERP system, and view the
8  actual accounting lines, the debits and credits that
9  were going to occur as a result of that transaction.
10      Q.  And would that also include viewing the timing
11  of when debits and credits would occur?
12      A.  Yes.
13      Q.  Okay.  And how -- when you say "ERP system",
14  why don't you describe for me what you're talking about.
15      A.  The ERP system is generally the system that
16  captures all the -- our financial transactions, and for
17  this particular case it would be on the revenue cycle,
18  so it would be the order entry system where someone
19  would data enter the transactions, and it could be any,
20  you know -- any modules after that, and the specific
21  module would be the accounts receivable module where it
22  would record the receivables and --
23          So those are the two places I would go.  Where
24  the data came from, some Oracle database sitting
25  underneath it, I'm sure.

51

1     Q.  Okay.  And this is in '98, right?
2     A.  Yes.
3     Q.  So these are -- so those are the systems that
4  you would use or you were using when you first came on
5  to Oracle in '98?
6     A.  Yes.
7     Q.  How long were -- well, who did you report to
8  as Senior Manager of Revenue Accounting?
9     A.  Larry Garnick.
10      Q.  And how long did you hold that position?
11      A.  For approximately a year.
12      Q.  Okay.  Did you have any direct reports during
13  that period?
14      A.  Yes, I did.
15      Q.  And who were they?
16      A.  Julie Chan, Laura Dean, Phil Wagner, and then
17  I believe her name was Roberta -- Roberta Ronnse,
18  something to that effect.
19      Q.  Okay.  And so that takes us to somewhere in
20  '99.  If you could tell me the month that you were hired
21  in '98.  Do you recall?
22      A.  '98 was June.
23      Q.  Okay.  So you were senior manager of revenue
24  accounting until, say, June of '99; is that fair?
25      A.  Close --

52

1     Q.  Approximately?
2     A.  Close enough.
3     Q.  And these are the only people that reported to
4  you during that period; Julie Chan, Laura Dean, Phil
5  Wagner and Roberta Ronnse?
6     A.  Yeah, I think so, as best I can recall.
7     Q.  All right.  While you were in Rocklin, right?
8     A.  Yes, sir.
9     Q.  And it was a big office?
10      A.  It was a big building.
11      Q.  A big building.  I'm sorry.
12          And did these people, the ones you just
13  described, these four people that reported to you, did
14  they all sit together, sit next to you?
15      A.  No.
16      Q.  No.
17          Describe the layout of your direct reports and
18  you.
19      A.  So Laura and Julie sat in offices adjacent to
20  me.  Phil and Roberta sat in Redwood City.
21      Q.  Okay.  So Phil and Roberta, would it be fair
22  to say that you communicated with them mainly by e-mail
23  or telephone?
24      A.  Generally speaking, yes.
25      Q.  Okay.  More e-mail or more telephone?

53

1    A.   Probably more telephone, I would guess.
2    Q.   Okay.  And so in 1999, June '99, you were
3  promoted or moved laterally?
4    A.   In June '99 --
5    Q.   Approximately.
6    A.   I was promoted.
7    Q.   To what?
8    A.   Director of Credit and Collections.
9    Q.   Same geographic location?
10   A.   Yes.
11   Q.   Did you still have responsibilities for
12  revenue accounting at the time?
13   A.   No.
14   Q.   Okay.  Who took over your responsibilities for
15  revenue accounting?
16   A.   Julie Chan.
17   Q.   Okay.  And when you were moved to -- sorry --
18  was it Manager of Credit and Collections?  Was that what
19  you were promoted to?  Or director.
20   A.   Director.
21   Q.   Who did you report to then?
22   A.   I reported to Larry Garnick then.
23   Q.   Still.  Okay.
24        And who were your direct reports?
25   A.   When I joined the group, my direct reports

54

1  were Greg Myers, Mike Hahn, Adam Hahn, Michael Roche,
2  Robynne S.
3    Q.   Robynne S?
4    A.   I don't remember her last name.  Robynne S.
5  And I thought there was one other.  I don't recall.  I
6  think there was another person.  I don't recall, though.
7    Q.   Okay.  All right.
8        Did you receive training on the company's
9  credit and collections processes prior to being
10  promoted to Director of Credit Collections?
11   A.   No.
12   Q.   Okay.  How did you learn about the job?  How
13  did you learn about the responsibilities and how to do
14  the job?
15   A.   I learned them once I took the role by reading
16  the -- you know, desk instructions and looking at the
17  credit and collection policies that were in place.
18   Q.   What do you mean by "desk instructions"?
19   A.   So, you know, like the training that, you
20  know, a staff person would go through and kind of a
21  reference guide, if you have this situation, then do
22  these four things.
23   Q.   Right.  Oracle's internally published
24  collections, reference guide, something like that?
25   A.   Yeah.

55

1    Q.   Okay.  And did any of these guys, Greg Myers,
2  Adam Hahn, Michael Hahn or Robynne S., kind of teach you
3  a little bit about how Collections was done?
4    A.   Yes.
5    Q.   And among those people, who did teach you how
6  collections was done?
7    A.   The primary people were Greg and Mike and
8  Adam.
9    Q.   And that would be -- so we're still in, say,
10  summer '99 for the first few months; is that fair?
11   A.   Approximately, yeah.
12   Q.   And did you all sit in the same place?
13   A.   Yes.
14   Q.   And did you have an office and they had cubes,
15  or did you have a cube and you all actually really did
16  sit in, like, a small geographic area?
17   A.   We had adjacent offices.
18   Q.   Okay.  Describe the credit and collections
19  process for me.
20        MS. WINE:  Objection.
21        MR. WILLIAMS:  Q.  As it was -- sorry.  As it
22  was in '99 when you took the job.
23        MS. WINE:  Objection.  Vague and ambiguous.
24        THE WITNESS:  The collections process.  So if
25  I were to interpret your question, as an example, a

56

1  collector would have a territory, and they would be
2  responsible for calling on -- calling customers and
3  engaging them to inquire about why -- you know, whether
4  or not a payment was forthcoming or, you know, why they
5  hadn't paid a particular invoice or group of invoices.
6        MR. WILLIAMS:  Q.  Did you have to expand your
7  use of Oracle's ERP system when you began to do credit
8  and collections?
9    A.   No.
10   Q.   Were you using the same system?
11   A.   I was using the same system.
12   Q.   Accessing the same information that you would
13  access when you were a manager of revenue accounting?
14   A.   Same information -- the focus was different.
15  The focus was on the accounts receivable aging.
16   Q.   But it's the same system or database, right?
17   A.   Yes.
18   Q.   Now, did you get increased security access?
19   A.   I don't recall if it changed.
20   Q.   But you were using different, I guess,
21  sections of the system to do your job?
22   A.   Yes.
23   Q.   Describe those -- the sections of the system
24  that you were using to do your job.
25   A.   Okay.  Again, as I recall, generally speaking,

57

1  you know, it would be focused on the aging, the aging
2  reports, so accounts receivable aging, and reviewing the
3  general health of that.  And then occasionally I would
4  go in and look at call notes, so collectors would record
5  call notes into the application whenever they contacted
6  a customer.
7      Q.  Is that it?
8      A.  Generally, that's it.
9      Q.  Okay.  Well, wouldn't you have to look at
10  the -- any particular customer's payment or invoice
11  history?
12     A.  That wasn't something that I did.
13     Q.  Why not?
14     A.  It was responsibility for my managers.
15     Q.  Okay.  The people who reported up to you?
16     A.  That's correct.
17     Q.  Okay.  So -- but did you understand how to use
18  the system to get that type of information at the time?
19     A.  I knew how to get at the information, but I
20  wasn't a user of it.  Or I didn't do it myself.
21     Q.  Okay.  Why don't you tell me what you mean.
22  You knew how to get at the information, but you didn't
23  do it yourself.
24     A.  Correct.
25     Q.  What do you mean?

58

1      A.  I could go in there and fiddle around and find
2  what I needed, but I wasn't a regular user of the
3  application.
4      Q.  Uh-huh.  So your knowledge of, I guess, its
5  capabilities was probably less than the people who
6  reported to you; is that fair?
7      A.  That is for sure.
8      Q.  So how did you -- how did you manage those
9  people and make sure that they were actually doing their
10  jobs?
11     A.  So they reported to me, they would provide
12  their metrics, if you will, and we would review those
13  during one-on-ones, or ad hoc meetings.
14     Q.  Well, so you indicated you knew how to go in
15  and get what you needed, so could you go in and get an
16  invoice and payment history of a specific customer if
17  you needed to?
18     A.  You know, I probably could.
19     Q.  Uh-huh.  But the system that you were using,
20  it had that information in it, right?
21     A.  Yes.
22     Q.  So every invoice, every payment and -- well,
23  withdrawn.
24         Every invoice and every payment that a
25  customer may have made over how long a period of

59

1  time?
2      A.  I --
3         MS. WINE:  Objection.  Foundation.
4         THE WITNESS:  I don't recall how long the past
5  history went back.
6         MR. WILLIAMS:  Q.  One year?
7      A.  I don't know.
8      Q.  You don't know if it had one year history in
9  the system?
10     A.  One year, probably.
11     Q.  Okay.  Two years?
12         MS. WINE:  Same objection.
13         MR. WILLIAMS:  Q.  Go ahead.
14     A.  Probably.
15     Q.  All right.  How about three?
16     A.  I would guess.
17     Q.  You would guess yes, right?
18     A.  Generally, yeah.
19     Q.  Okay.  How about three?
20     A.  Yeah, I'm not sure how far back it went.
21     Q.  But it -- you would guess yes, at least three?
22     A.  Three is a -- yeah.
23     Q.  Right?  And are you saying that you don't know
24  if it went back four or five years for a specific
25  customer?

60

1      A.  I don't know how many years it went back.
2      Q.  I know you don't know how many years it went
3  back.  I'm trying to get a range, whatever you know.  If
4  you don't know, you don't know.  But are you saying that
5  you don't know whether or not the system held
6  information of invoice and payment history for a
7  specific customer for four or five years?
8      A.  I don't know.
9         MS. WINE:  Shawn, we've been going a little
10  over an hour.
11         MR. WILLIAMS:  Take a break?
12         MS. WINE:  Yeah.
13         (Recess taken from 10:18 to 10:32 A.M.)
14         MS. WINE:  Shawn, we were just going to note
15  for the record.
16         MR. WILLIAMS:  I'm sorry.  Yes.
17         Just for the record, Mark Solomon of Lerach
18  Coughlin is in the room and was here during the last
19  period, as well.
20     Q.  Okay.  Mr. Quinn, have you done anything to
21  prepare for your deposition today?
22     A.  I met with these -- the lawyers yesterday.
23     Q.  And that's Ms. Wine?
24     A.  Yes.
25     Q.  And who else?

61

1    A.  And Paul and Jerry and Tony was the other
2  person from Deloitte.
3    Q.  And where did you guys meet?
4    A.  We met at the office.
5    Q.  Here in San Francisco?
6    A.  Yeah, in San Francisco.  Sorry.
7    Q.  Okay.  And how long did you meet?
8    A.  For five or six -- no, for six or seven hours.
9    Q.  And was that the first time that you met
10 with -- personally, with any lawyers relating to this
11 case?
12   A.  Yes.
13   Q.  And you said you learned about -- you learned
14 that you would be testifying several weeks ago, maybe
15 six weeks ago, right?
16   A.  Yes.
17   Q.  Did you think about what -- withdrawn.
18     Did you know where you were being called
19 to testify?
20   A.  Did I know why --
21   Q.  Did you have an understanding of why?
22   A.  My understanding was that it was around the
23 securities litigation.
24   Q.  Was that the extent of your understanding?
25   A.  That was the extent of my understanding.

62

1    Q.  All right.  Well, you said you reviewed the
2  subpoena, right?
3    A.  Yes.
4    Q.  And you reviewed the requests that were
5  attached to the subpoena, right?
6    A.  Yes, I did.
7    Q.  All right.  And after you reviewed those
8  documents, the extent of your understanding of why you
9  were being called to testify was simply because of the
10 securities litigation?
11   A.  As it relates to anything I knew about
12 anything that was submitted in the securities
13 litigation.
14   Q.  Okay.
15   A.  That's -- you know.
16   Q.  All right.  I understand.
17   A.  I'm trying to phrase it in the right way.
18   Q.  I understand.  But Oracle has a lot of
19 employees, right?
20   A.  Yes, they do.
21   Q.  They had a lot of employees when you were
22 there between '98 and whenever you left, right?
23   A.  Yes.
24   Q.  Do you have an understanding of why you,
25 Michael Quinn, was being asked to testify in this case?

63

1    A.  Did I have an understanding?
2    Q.  Did you have an understanding of why you,
3  personally, were being asked to testify in this case?
4    A.  I had some understanding, yes.
5    Q.  Okay.  Why don't you describe what your
6  understanding was.
7    A.  My understanding was that the securities --
8  well, that it had something to do with work that I did
9  when I was at Oracle.
10   Q.  Work concerning what?
11   A.  Concerning credit and collections.
12   Q.  Okay.  Is that it?
13   A.  Yes.
14   Q.  Well, you actually submitted a declaration in
15 this case a couple years ago, right?
16   A.  I did.
17   Q.  So I just want to make sure that we begin on
18 the same page, that when you received the subpoena, the
19 extent of your understanding of why you were being
20 called to testify was simply the work you did in
21 collections -- I think that's what your answer was,
22 right?  Yeah, the work that you did concerning credit
23 and collections.
24   A.  Yes.
25   Q.  Okay.  And so --

64

1         Actually, let me ask the reporter to mark this
2  document as Quinn No. 1.
3         (Whereupon, Plaintiff's Exhibit 1 was marked
4         for identification.)
5         MR. WILLIAMS:  Q.  I'm just going to ask you
6  to take a look at Quinn No. 1, and just let me know
7  after you've just sort of reviewed it, and I'll then
8  direct your attention to specific sections of the
9  document, okay?
10   A.  Okay.
11   Q.  Are you done?
12   A.  I'm sorry.
13   Q.  Have you had a chance to just flip through it?
14   A.  Oh, sorry.  I apologize.
15   Q.  That's okay.  You don't have to read it line
16 by line.
17   A.  Okay.
18   Q.  Do you recognize what's been marked as Quinn
19 No. 1?
20   A.  Yes.
21   Q.  All right.  Is this the copy of the subpoena
22 that was delivered to your home maybe six weeks ago?
23   A.  I believe it is.
24   Q.  And you indicated that you reviewed the
25 document when you received it, right?

65

1    A.   Yes, I did.

2    Q.   Then you e-mailed Jim Maroulis?

3    A.   Yes.

4    Q.   All right.  And did you understand that the

5  subpoena and associated document requests were requiring

6  you to search for and produce certain documents?

7    A.   Yes.

8    Q.   And did you search for any of the documents

9  that were requested in the subpoena and requests

10  attached to it?

11    A.   Yes.

12    Q.   What did you do to search for them?

13    A.   I thought about it and I didn't retain any of

14  the documents after I left Oracle, and that was it.

15    Q.   And did you tell anybody where they might be

16  able to find documents that were requested in this

17  request?

18    A.   No.

19    Q.   Did you -- so -- did you ask anybody to search

20  your old computers for any documents that may have been

21  responsive to these requests?

22    A.   No.

23    Q.   Did you keep -- did you keep handwritten notes

24  while you were at Oracle in its collections department?

25    A.   Generally speaking, you know, took notes and,

66

1  you know, had a little book or a memo pad similar to

2  that.

3    Q.   And did you ask anybody to look in those memo

4  pads to see if there were any documents relating to

5  these requests in Quinn No. 1?

6    A.   No.

7    Q.   Did you check your garage to see if you have

8  anything in boxes in the garage related to Oracle or any

9  of these requests?

10    A.   No.

11    Q.   I want to direct your attention to No. -- page

12  6, request No. 5.

13    A.   Page 6.

14    Q.   Just do me a favor and read request No. 5

15  audibly, please.

16    A.   Request No. 5, "Documents relating to the on

17  account cleanup occurring in November 2000; (2) debit

18  memoranda created by Oracle on or about November 17th,

19  2000; the accounting treatment of those debit memoranda,

20  including any audit trail, and (4) all Oracle's related

21  accounting policies."

22    Q.   Okay.  And once you read request No. 5, did

23  you have an understanding of why you were being called

24  to testify in this case?

25    A.   I assumed it had something to do with that.

67

1    Q.   Those three or four things there, right?

2    A.   The November 2000.

3    Q.   On account cleanup, right?

4    A.   Yes.

5    Q.   And you were -- what was your position at

6  Oracle in November of 2000?

7    A.   Let me think.

8         I was the Director of Revenue Accounting.

9    Q.   Okay.

10    A.   I believe -- yeah, that's right.

11    Q.   I'll direct your attention down to request

12  No. 8.

13         Can you just read request No. 8 for me?

14    A.   Request No. 8, "automatic documents and

15  communications with governmental, judicial or law

16  enforcement agencies including the SEC, the U.S.

17  Department of Justice, Federal Bureau of Investigation

18  and the U.S. Attorney's Office concerning Oracle, the

19  individual defendants, or any allegations in Plaintiffs'

20  Revised Second Amended Complaint for violations of the

21  Federal Securities Laws in this action."

22    Q.   Okay.  And when you read request No. 8, did

23  you have an idea of why you were being called to testify

24  in this case?

25    A.   That it was related to the Revised Second

68

1  Amended Complaint related to securities action.

2    Q.   Well, what about the communications with the

3  SEC, the Department of Justice and the FBI?

4    A.   What about them?

5    Q.   Well, did you -- were you interviewed by the

6  SEC as it relates to matters alleged in this case?

7    A.   No.

8    Q.   Were you interviewed by the FBI as it relates

9  to matters alleged in this case?

10    A.   I was interviewed by the FBI.

11    Q.   And when did that occur?

12    A.   I don't recall the specific dates.

13    Q.   Was it last year?

14    A.   It was not last year.

15    Q.   What year was it?

16    A.   I don't recall the specific dates.

17    Q.   And what was the -- well, withdrawn.

18         Was it in 2002?

19    A.   I honestly don't recall.

20    Q.   Okay.  That's fine.

21         Could it have been in 2002?

22    A.   It very well could have.  I was still at

23  Oracle during that time.

24    Q.   Okay.  And -- well, when you read request

25  No. 8, did you have an idea of why you were being called

69

1  to testify in this case?
2      A.  To be perfectly honest with you, it didn't
3  even cross my mind regarding my discussions with the
4  FBI.
5      Q.  Okay.  And have you had any discussions with
6  any -- well, withdrawn.
7          So you met with your -- you met with your
8  lawyers yesterday, right?
9      A.  Yes.
10      Q.  Aside from talking to your lawyers, did you
11  tell anyone, between the time you got the subpoena and
12  today, that you would be testifying in a deposition in
13  this case?
14      A.  Yes.
15      Q.  And who is that?
16      A.  My wife.
17      Q.  Okay.  Who else?
18      A.  My manager at my current employment, place of
19  employment.
20      Q.  Anyone else?
21      A.  And I told Julie Chan.
22      Q.  Anyone else?
23      A.  No.
24      Q.  Okay.  When did you tell Julie Chan?
25      A.  We were friends.  We've been friends since I

70

1  hired her back at Oracle, and we communicate back and
2  forth regularly, phone or instant message.  But probably
3  three or four weeks ago, maybe.
4      Q.  And what did you tell her?
5      A.  I said, "Oh, I got called to be deposed in the
6  Oracle lawsuit."
7      Q.  And did you talk about the case?
8      A.  No.
9      Q.  Did she tell you whether or not she had been
10  called to be deposed?
11      A.  She did tell me.
12      Q.  What did she tell you?
13      A.  She said that she was called to be deposed.
14      Q.  Okay.  And this was in a telephone
15  conversation or instant messaging transmission?
16      A.  It was a telephone conversation.
17      Q.  Was she at work when you had that conversation
18  with her?
19      A.  I believe she was.
20      Q.  So it was during the day, right?
21      A.  Yes.
22      Q.  And you worked -- where do you work now?  Auto
23  Desk, is that it?
24      A.  Auto Desk.
25      Q.  And what's your position there?

71

1      A.  I'm the Director of Worldwide Revenue
2  Operations.
3      Q.  And where is that located?
4      A.  San Rafael.
5      Q.  Okay.  So you called her from Auto Desk at
6  Oracle to tell her that you were going to be deposed?
7      A.  I don't recall where I was when I called her.
8  Occasionally, I work from home.
9      Q.  When was the last time you saw Julie Chan face
10  to face?
11      A.  I don't recall the exact date.  It was at her
12  child's red egg and ginger party here in the city.
13      Q.  How long ago could it have been?
14      A.  It was within the last few months.  I forget.
15  Probably in the last three or four or five months.
16      Q.  Did Julie Chan, during the telephone
17  conversation that you mentioned, tell you when she was
18  going to be testifying?
19      A.  No.
20      Q.  Did she tell you whether or not she had any
21  documents related to the case?
22      A.  No.
23      Q.  Did she tell you that she was annoyed by the
24  fact that she had to testify in this case?
25      A.  No.

72

1      Q.  Okay.  Now, did you talk to -- so you said you
2  spoke to your wife, your manager and Julie Chan.
3      A.  Yes.
4      Q.  All right.  Have you -- when was the last time
5  you spoke to anyone that's currently working at Oracle,
6  aside from Julie?
7      A.  Anyone currently -- maybe six months ago.
8      Q.  And who was that?
9      A.  Greg Myers.
10      Q.  Okay.  Anyone else?
11      A.  No.
12          Oh -- no.  No one that's currently working.
13      Q.  Okay.  How about people who are no longer
14  working at Oracle?
15      A.  So I've spoken to Larry Garnick, I have
16  maintained a professional relationship with him.
17      Q.  Okay.  Do you work with him?
18      A.  Do I work with him today?
19      Q.  Yeah.
20      A.  No.
21      Q.  What do you mean you maintain a professional
22  relationship?
23      A.  I maintain a contact, networking type
24  situation.
25      Q.  Oh, I see.

73

1     So Greg Myers and Larry Garnick.
2     A.  Yes.
3     Q.  Is that it?
4     A.  Over what time period are you referring?
5     Q.  I'm talking about since you got the subpoena
6  about six weeks ago.
7     A.  Oh.  No.
8     MS. WINE:  And sorry.  Just to clarify, he
9  said that he spoke to Myers about six months ago, so
10  that wasn't in the time frame since he got the subpoena.
11     MR. WILLIAMS:  Q.  Okay.  That's okay.
12     When was the last time you spoke to Greg
13  Myers?
14     A.  Six months ago.
15     Q.  Okay.
16     A.  Approximately.
17     Q.  Are you friends with Greg Myers?
18     A.  Distant acquaintances.
19     Q.  Describe what that means for me.
20     A.  We don't maintain an ongoing friendship
21  interaction.  If we see each other, we're friendly and
22  we enjoy each other's company.
23     Q.  And when was the last time you spoke with Tom
24  Williams?
25     A.  I spoke with Tom probably three or four months

74

1  ago.
2     Q.  Okay.  During the conversations you had with
3  either Greg Myers or Tom Williams, did you discuss this
4  case at all?
5     A.  No.
6     Q.  Did you discuss anything that was occurring at
7  Oracle in 2000 -- between 2000 and 2002?
8     A.  No.
9     Q.  Do you know Ian Hatada?
10     A.  Yes, I do.
11     Q.  How do you know him?
12     A.  He worked at Oracle when I was there.
13     Q.  He reported to you?
14     A.  I don't think he ever reported directly to me.
15     Q.  Do you know what his position was while you
16  were working at Oracle?
17     A.  He was collections -- staff and collections
18  manager.
19     Q.  Okay.  So he had a position that was similar
20  to one that you held previously?
21     A.  Yes.
22     Q.  No?  Weren't you Director of Collections?
23     A.  Credit and Collections, yes.  And he was the
24  manager in that position, generally.  He reported to me
25  when I was the director, but later on he didn't report

75

1  to me because there was someone else in that role.
2     Q.  The position reported to you, not Ian?
3     A.  Yes, the position reported to me, not Ian.
4     Q.  But there was some overlap in those positions,
5  right?  You had access to the same computer systems,
6  right?
7     A.  That's two separate questions.
8     Q.  Let me withdraw that.
9     The position that reported to you that Ian
10  had, right, that position had the same access to
11  Oracle's electronic systems that you described to me
12  earlier, right?
13     A.  Yes.
14     Q.  All right.  So Ian was using the same system
15  that you were using when you held the position of
16  Director of Collections and Credit?
17     A.  Yes.
18     Q.  Okay.  When was the last time you talked to
19  Adam Hahn?
20     A.  It was since before I left Oracle, so 2003,
21  whenever he was terminated.  Sometime prior to that.
22     Q.  Prior to when he was terminated was the last
23  time you talked to him?
24     A.  Yeah.
25     Q.  Okay.  How about Michael Hahn?

76

1     A.  Before he was terminated from the company, as
2  well.
3     Q.  Okay.  And do you know Molly Littlefield or
4  Molly Venkataramana?
5     Is that right?
6     MS. WINE:  Very good.
7     THE WITNESS:  Molly Littlefield?  Yes, I know
8  Molly.
9     MR. WILLIAMS:  Q.  And how do you know Molly?
10     A.  She was a collections manager working in my
11  group.
12     Q.  She reported to you?
13     A.  No.
14     Q.  Well, she was a collections manager in your
15  group.  What do you mean?
16     A.  She had a reporting line that came up to me.
17  She never reported directly to me.
18     Q.  Okay.  When I say "reporting to you," I'm
19  generally saying -- I'm generally asking if you were
20  overseeing the position, that you were the ultimate
21  report for that group of people.
22     Do you understand what I mean?  If you don't,
23  you can say no.
24     A.  Well, sure.
25     I would say no.  I -- yes.  So those people

77

1    reported indirectly to me.
2         Q.   You were responsible for those people
3    ultimately?
4         A.   Ultimately.
5         Q.   Okay.  How about -- do you know Raul Campos?
6         A.   I do.
7         Q.   And how do you know Raul?
8         A.   He worked in credit and collections during
9    that time -- during my tenure at Oracle.
10        Q.   And so he ultimately reported to you, right?
11   Is that fair?
12        A.   Yes.
13        Q.   And he was using the same Oracle system that
14   you've described, right?
15        A.   Yes.
16        Q.   All right.  So back to your preparation for
17   today, so have you thought about some of the issues
18   relating to the on account cleanup occurring in
19   November 2000 over the last six weeks since you got the
20   subpoena?
21        A.   Very little.
22        Q.   Well, what little did you think about?
23        A.   It -- you know, said, "Okay."  So there's --
24   so I never specifically thought about the on account
25   cleanup, that never crossed my mind, to be perfectly

78

1    honest with you.  Even though I did read the subpoena,
2    it didn't -- I'm like, "Okay."  And I was just waiting
3    for the lawyers to instruct me where I needed to be and
4    when I needed to be there.
5         Q.   How about the accounting treatment for debit
6    memoranda, including any audit trail relating to the on
7    account cleanup?  Did you think about any of that?
8         A.   I did not think about it until, you know, we
9    were here, till my drive to San Francisco.
10        Q.   All right.
11             Did you review any documents yesterday?
12        A.   Yes.
13        Q.   And approximately what volume of documents did
14   you review?
15        A.   There were a few documents that were --
16             MS. WINE:  Just volume.
17             THE WITNESS:  Oh, volume?
18             MS. WINE:  Uh-huh.  That's all I asked.
19             MR. WILLIAMS:  Hold on a second.
20             THE WITNESS:  That I specifically reviewed?
21             MR. WILLIAMS:  Hold on a minute.
22             MS. WINE:  We can repeat the question.
23             MR. WILLIAMS:  Q.  I'm going to withdraw the
24   question and I'll ask you again just for clarity.
25        A.   Okay.

79

1         Q.   You said you reviewed documents yesterday,
2    right?
3         A.   Yes, I did review documents.
4         Q.   How many documents did you review?
5         A.   Five or -- you know, a handful.
6         Q.   A handful of documents.
7         A.   Yeah.
8         Q.   Okay.  And did you read them?
9         A.   I did not read all of them.
10        Q.   Did you read some of them?
11        A.   I did read -- I read parts of them.
12        Q.   Parts of all of them, or parts of some of
13   them?
14        A.   I read parts of all of them.
15        Q.   Okay.  And had you seen those documents prior
16   to yesterday?
17        A.   Had I seen them?  Yes.
18        Q.   Okay.  And when was the last time that you had
19   seen the documents that you had reviewed yesterday?
20        A.   Probably four years ago, three and-a-half,
21   four years ago.
22        Q.   And so you said you hadn't thought about any
23   of these issues until -- well, at least over the past
24   few weeks, right?
25        A.   No, I had not.

80

1         Q.   And did any of the documents help refresh your
2    recollection about what was occurring three or
3    four years ago when you had actually seen the documents?
4         A.   I certainly -- you know --
5             Refreshed my memory.  Yeah, I mean, it brought
6    to mind, you know, what was -- well, it brought to mind
7    some of the events that happened back then.
8         Q.   Okay.  What events?
9         A.   What events?  The -- I do recall there was the
10   project around the on account cleanup.  I certainly
11   recall, you know, now that you mention it, talking to
12   the FBI, you know, those -- generally those.
13        Q.   What did you recall about the on account
14   cleanup after you reviewed the documents yesterday?
15        A.   That we had a project around cleaning up the
16   unapplied cash account as it related to, you know,
17   credit and collections, sort of our normal activity of
18   credit and collections, unapplied cashes, one of those
19   things that's always been there and has always been a
20   challenge to manage, given the volumes of transactions.
21        Q.   And so the document that you reviewed helped
22   you recall the unapplied cash had always been a
23   challenge?
24             MS. WINE:  Are you talking about a specific
25   document?

81

1      MR. WILLIAMS:  He said that the documents he
2  reviewed helped him recall that there were -- that
3  unapplied cash was a challenge.
4      MS. WINE:  I thought you just said "document"
5  singular, so I just clarifying.
6      MR. WILLIAMS:  Q.  Oh.  Well --
7      A.  Sorry.
8      Q.  After you reviewed the documents, did the
9  documents help you recall what you just testified to?
10     A.  Yes.
11     Q.  Okay.  And which specific document helped you
12  recall that?
13     A.  I think it was an e-mail.
14     Q.  An e-mail that you wrote?
15     A.  Yes.
16     Q.  And what did it say?
17     A.  Generally, I don't -- I don't recall the exact
18  words in it.  It generally was giving instructions to
19  execute on cleaning up some of the larger unapplied
20  transaction -- unapplied cash items that were sitting
21  out there.
22     Q.  And you had -- you wrote the e-mail?
23     A.  Yes, I had.
24     Q.  And what was the date of the e-mail?
25     A.  October -- I don't know the exact day.

82

1  October of 2002, I believe, if I recall correctly.
2      Q.  October '02?
3      A.  '02, yeah.
4      Q.  Okay.  And who did you send the e-mail to?
5      A.  I believe it was addressed to Ryan -- Ryan
6  Roberts.
7      Q.  Okay.  And that e-mail helped you recall those
8  facts concerning on account cleanup?
9      A.  Yep.
10     Q.  What else did you -- what, if anything else,
11  did you recall after reviewing the documents yesterday?
12     A.  I definitely recall that being a project that,
13  you know, we focused on.
14     What else did I recall?  That we spent a lot
15  of time and did a lot of work around cleaning those
16  things up, and that we -- you know, we eventually got
17  to, you know, figure out a long-term solution for
18  unapplied cash, and we ended up offshoring or trying to
19  leverage resources over in India to help us with that --
20  you know, just the volume of problems.
21     Q.  Now, which documents helped you recall that?
22     A.  It just -- you know, just reading the e-mail
23  and kind of, "Oh, okay."  Now I kind of take this to
24  my -- to its -- kind of think through some of the steps
25  that actually occurred.

83

1      Q.  Just that one e-mail?
2      A.  Yeah.
3      Q.  So none of the other documents helped you
4  recall any facts?
5      A.  You know -- facts around that?
6      Q.  Uh-huh.
7      A.  No.  In regards to -- you mentioned the
8  declaration before.
9      Q.  Uh-huh.
10     A.  That was -- you know, I took a look at that
11  again, and I'm like, oh, okay.  I remember that document
12  and kind of some of the things that were in it.
13     Q.  All right.  You indicated yesterday that you
14  also -- you reviewed some documents that helped you
15  recall that you had spoken with the FBI.
16     A.  No.
17     MS. WINE:  Objection.  Misstates testimony.
18     THE WITNESS:  No, I did not say that.
19     MR. WILLIAMS:  Q.  Okay.  Is that all of the
20  facts that the documents you reviewed helped you recall?
21     MS. WINE:  Objection.  Vague and ambiguous.
22     THE WITNESS:  Yeah.  I mean, that was the --
23  that's certainly the primary gist of the documents.  We
24  looked at the declaration --
25     MS. WINE:  Don't go through what you looked

84

1  through.
2      THE WITNESS:  No, I understand.  You know, and
3  that e-mail.
4      MR. WILLIAMS:  Q.  Okay.  I want to -- I just
5  wanted to direct your attention to, say, September of
6  2000.
7      A.  Okay.
8      Q.  And what, exactly, was your position in
9  September of 2000?
10     A.  If I recall, I was the Director of Revenue
11  Accounting for Oracle.
12     Q.  And --
13     A.  For the U.S., I believe.
14     Q.  So your position hadn't changed from the date
15  that you had -- that you were hired by Oracle till
16  September of 2000?
17     A.  It had changed.
18     Q.  It did.
19     Can you tell me how it changed?
20     A.  Yes.  So after about approximately a year
21  stint as the director of credit and collections, I was
22  given the revenue accounting group, I was given the
23  accounts receivable group, and I was given the imaging
24  group, as well as the credit and collections group, and
25  I managed all those.  And I could have been the -- I

85

1 could have been promoted at that time to Senior
2 Director.
3 Q. So at that point you were the head of accounts
4 receivable, credit and collections, imaging and what
5 else?
6 A. Revenue accounting.
7 Q. And revenue accounting. All right.
8 Tell me what your responsibilities were with
9 respect to accounts receivable.
10 A. So the senior manager for accounts receivable
11 reported to me, and, you know, they -- their tasks or
12 their responsibilities were around managing the
13 invoicing process, managing the cash receipt process.
14 Q. And in October of 2000, who was the manager of
15 accounts receivable?
16 A. If I recall correctly, I believe it was Greg
17 Myers.
18 Q. Okay. You promoted him?
19 A. I promoted him --
20 Q. Withdrawn.
21 Did you promote Greg Myers from -- he was
22 a collections manager, I think you testified
23 earlier, right?
24 A. Yes, he was.
25 Q. All right. Did you promote him to manager of

86

1 accounts receivable?
2 A. Honestly, I do not recall. He moved from
3 credit and collections to accounts receivable while I
4 was still the Director of Credit and Collections.
5 Q. Okay.
6 A. So he was in the group when I received
7 responsibility for the group.
8 Q. All right. Now, it's possible that you
9 promoted him, though?
10 A. I may have. I don't know exactly. To be
11 perfectly honest with you, I don't know. I mean, I'm
12 not sure if it was Alex Seven or Greg Myers who reported
13 to me initially, or if Greg Myers was already promoted
14 when the group was given to me. I mean, that's just the
15 reality. I don't know.
16 Q. No, I understand.
17 And so his responsibility in September of 2000
18 was for accounts receivable and the processes
19 surrounding accounts receivable?
20 A. Yes.
21 Q. Reporting to you.
22 A. Yes.
23 Q. And you all -- withdrawn.
24 Was he still using the same system that
25 you described earlier?

87

1 A. Yes.
2 Q. Who was Manager of credit and collections at
3 that time?
4 A. At that time --
5 Q. September 2000.
6 A. -- it was -- I don't recall exactly. It was
7 either Michael Hahn and Adam Hahn shared responsibility,
8 or it was just Adam Hahn.
9 Q. Okay. And what's imaging?
10 A. Imaging is a digital document storage, you
11 scan it, image it, and then you store it in the
12 database.
13 Q. Okay. And what types of documents were you
14 responsible for imaging in September of 2000?
15 A. It was primarily contracts, contractual
16 documents. So signed license agreements, services
17 agreements, consulting agreements, that type of thing.
18 Q. Associated with accounts receivable?
19 A. Associated with any transaction that we did
20 with a customer.
21 Q. Okay. Just before I forget, when did you
22 actually leave Oracle?
23 A. When did I leave Oracle?
24 Q. When did you leave Oracle?
25 A. July of 2003.

88

1 Q. Okay. And were you fired, did you quit?
2 A. I was not fired. I quit.
3 Q. And what was the -- what were the
4 circumstances surrounding your leaving Oracle? Why did
5 you leave?
6 A. I didn't want to work there anymore.
7 Q. How come?
8 A. I didn't enjoy going to work every day.
9 Q. Why not?
10 A. I would wake up in the morning and I didn't
11 have more positive days than bad days, so I made a
12 personal decision to make a change.
13 Q. And when you left Oracle in July of '03, did
14 you have a job, or did you just leave and then look for
15 a job later?
16 A. I did not have a job.
17 Q. Okay.
18 A. I looked for a job after I left.
19 Q. Okay. And when you left, who were you
20 reporting to just prior to your departure?
21 A. Brad Newton.
22 Q. Did you know Brad Newton prior to -- well,
23 withdrawn.
24 You worked with Brad Newton at Arthur
25 Anderson, right?

89

1     A.  We were at Arthur Anderson at the same time,
2  yes.
3     Q.  And when did he come over to Oracle?
4     A.  He came over -- was it two years after I did?
5  I believe it was 2000 he came over.  I'm not entirely
6  sure if it was 1999 or 2000.
7     Q.  Okay.
8     A.  I believe it was 2000.
9     Q.  And when you left -- I'm sorry -- you left
10  Oracle, you were reporting to him?
11    A.  Yes.
12    Q.  What was his position?
13    A.  He was VP -- I think Shared Service Center.
14  That's a guess.
15    Q.  You indicated that when you reviewed some of
16  the documents yesterday, it helped you recall that -- an
17  on account cleanup in 2002, right?
18    A.  Uh-huh.
19    Q.  But the document request specifies an on
20  account cleanup in 2000.  Did you see that?  You can
21  look at it again if you'd like, No. 5.
22    A.  Okay.  That's interesting.
23        Okay.  On account cleanup.  Okay.
24    Q.  In 2000.
25    A.  Right.  So --

90

1     Q.  Did you recall an on account cleanup in 2000?
2     A.  So -- yes.
3     Q.  Okay.  And what did you recall about it?
4     A.  That Greg Myers and I had discussed -- he had
5  proposed that to better use the functionality in the
6  application was -- was to open up that on account.
7     Q.  What application are you talking about?
8     A.  The accounts receivable module and the Oracle
9  application suite, the ERP system, the accounts
10  receivable module.
11    Q.  The module that we've been talking about, the
12  same one that you described --
13    A.  Yeah, one and the same.
14    Q.  And you said he proposed what to you?
15    A.  To utilize the functionality, and one thing
16  that could be utilized was the on account field within
17  the module, but it included a bunch of data that was old
18  and wasn't relevant, and so he proposed a solution to
19  clear that out so we could use it, you know, for its
20  intended purpose, or its intended purpose at Oracle.
21    Q.  So you and he had a discussion about it?
22    A.  Yes.
23    Q.  And tell me about -- was it face to face or
24  e-mail?
25    A.  You know, I have -- I don't recall that at

91

1  all.
2     Q.  Okay.  Was it -- when did the discussion
3  occur?
4     A.  I don't recall.  I certainly don't recall the
5  timing.
6     Q.  Was it in the summer of 2000?
7     A.  You know, I don't recall anything specific
8  related to that discussion.
9     Q.  Do you recall where that discussion occurred?
10    A.  No.
11    Q.  So -- do you know -- do you recall how long
12  that discussion was?
13    A.  No.
14    Q.  Did you have more than one discussion about
15  it?
16    A.  We probably did.
17    Q.  Do you recall having more than one discussion
18  about it?
19    A.  You know, I don't know.  I don't know,
20  specifically.
21    Q.  Was anybody else a participant in that
22  discussion?
23    A.  I don't recall if there's anyone else.
24    Q.  And do you recall --
25        Did you discuss his proposal -- do you recall

92

1  discussing his proposal with anyone else?
2     A.  I don't recall.
3     Q.  Did you talk to anybody in the -- Oracle's IT
4  department about that discussion?
5     A.  I don't know if I had any direct conversations
6  with the folks in IT.  Generally, Greg would handle that
7  directly with them.
8     Q.  And did you approve of Greg's proposal in this
9  discussion?
10    A.  Yes.
11    Q.  And you recall that?
12    A.  Yes.
13    Q.  What do you recall?
14    A.  I recall discussing his proposal and him
15  asking me if I was okay with it, and me stating
16  something to the -- you know, I don't know what I stated
17  exactly, but it sounds fine.
18    Q.  Uh-huh.  So -- but you recall discussing it
19  and approving it; is that what you're saying?
20    A.  Yes.
21    Q.  And the proposal that you recall approving,
22  what was it?
23    A.  Was to do -- so in general, was to do a sequel
24  script to clear out the on account field within the
25  module, the accounts receivable module, and that would

93

1   create accounting entries. I'm not sure -- I don't
2   recall exactly if it was one accounting entry or
3   two accounting entries, and that it was going to be an
4   in and an out and an in an out all within the same
5   account, and the net impact to that account, to any
6   account was zero.
7       Q.   And you said you hadn't thought about any of
8   this stuff for the last few years, right?
9       A.   That's right.
10      Q.   But you recall the specific details of this
11  conversation?
12      A.   I recall the specific solution that Greg and I
13  discussed back then, yes.
14      Q.   Did he write it down for you during the
15  discussion? Did he write down what the accounting
16  transactions were going to be?
17      A.   You know, I don't recall if he did write it
18  down or if he just walked me through it. I don't
19  recall.
20      Q.   But he was reporting to you, right?
21      A.   Yes, he was.
22      Q.   At that time.
23      A.   Yes.
24      Q.   The videographer has to change the tape, so we
25  need to take a short break.

94

1       A.   Okay.
2           (Recess taken from 11:14 to 11:27 A.M.)
3           MR. WILLIAMS: Q. You described unapplied
4   cash as being a challenge during the last session,
5   right?
6       A.   Yes.
7       Q.   And why do you call it a challenge?
8       A.   The sheer volume of transactions that occur
9   within Oracle, certainly the U.S. with some $5 billion
10  of revenue creates a lot of challenges and
11  identifying -- when customers pay for invoices or send
12  cash to us, identifying where the cash should be
13  applied. It could be small amounts, medium amounts, big
14  amounts, and it's very difficult to keep up with that
15  volume of transactions.
16      Q.   And so the unapplied cash that Oracle had in
17  its possession had accumulated as of September 2000 --
18  had accumulated over -- let me withdraw that.
19          As of September 2000, the unapplied cash
20  that Oracle had had accumulated over the prior
21  years, right?
22      A.   It had accumulated over time. I don't know
23  what degree or what the level was at that time, if it
24  was up or down or sideways, could be because of the
25  prior periods.

95

1       Q.   What do you mean -- you said that it
2   accumulated over time, right? I think that's what you
3   testified.
4       A.   The volume of transactions just accumulated --
5   yeah.
6       Q.   No, the unapplied cash had accumulated over
7   time.
8       A.   Unapplied cash had accumulated over time.
9   Okay.
10      Q.   That's a question.
11      A.   Okay. Yes, it does accumulate over time.
12      Q.   I'm asking as of September of 2000, it had
13  accumulated over, you know, the time prior to September
14  of 2000.
15          MS. WINE: Objection. Vague and ambiguous.
16          THE WITNESS: I don't know what the balance
17  was as of September of 2000.
18          MR. WILLIAMS: Q. I'm not asking you the
19  balance.
20      A.   Okay.
21      Q.   All I'm asking is as of September of 2000,
22  unapplied cash had accumulated over the time prior to
23  September of 2000.
24      A.   Yes.
25      Q.   Okay.

96

1       A.   Yes, it had. Sorry.
2       Q.   And it was held -- withdrawn.
3           And what account was it held in? Did the
4   account have a number?
5       A.   Yes, it had a number. I don't know the exact
6   number.
7       Q.   No? Was it 25005?
8       A.   I don't know for sure. Sounds like a
9   liability account, which generally wouldn't be where the
10  unapplied cash would be, I don't think.
11      Q.   Why not?
12      A.   It would generally be -- you know, I don't
13  recall the specific account that it was in.
14      Q.   That's fine.
15          But you said unapplied cash would not
16  generally be in a liability account, and I'm asking why
17  not.
18      A.   Unless it was specific to be refunded to a
19  particular customer, it was generally -- it would
20  generally be in accounts receivable, offsetting the
21  total balance.
22      Q.   Okay. Okay.
23          So you're saying that -- say, for instance,
24  25005 was a liability account, just for purposes of this
25  conversation.

97

1    A.  Okay.
2    Q.  Unapplied cash would not be in 25005?
3        MS. WINE:  Objection.  Incomplete
4    hypothetical.
5        THE WITNESS:  There could be some unapplied
6    cash in 25005.  There could be.
7        MR. WILLIAMS:  Q.  There could be some?
8    A.  Yeah.
9    Q.  Okay.  What's the difference between unapplied
10   cash that would be in the liability account and
11   unapplied cash that would be in an accounts receivable
12   account?
13   A.  Generally speaking, it would be -- the items
14   in 25005 would be -- actually, I'm sorry.  Let me answer
15   the question.
16       The amounts that would be in a liability
17   account would be generally something that are
18   flagged to be refunded to a customer, payable to a
19   customer.
20   Q.  Okay.  So if 25005 was a liability account
21   with unapplied cash, that cash would represent money to
22   be refunded?
23       MS. WINE:  Objection.  Incomplete
24   hypothetical, lacks foundation.
25       THE WITNESS:  Generally speaking.

98

1        MR. WILLIAMS:  Q.  And that's because -- well,
2    withdrawn.
3        So what about unapplied cash in AR that
4    you described?
5    A.  Yeah, what about it?
6    Q.  What would that be used for?
7        MS. WINE:  Lacks foundation.
8        THE WITNESS:  That would be generally used to
9    apply to open receivables in the accounts receivable
10   aging.
11       MR. WILLIAMS:  Q.  Okay.  So when you
12   described unapplied cash as being a challenge, were you
13   thinking of unapplied cash in a liability account, or
14   unapplied cash in an accounts receivable account?
15   A.  I was thinking of unapplied cash overall, any
16   unapplied cash receipts.
17   Q.  And how did Oracle calculate how much
18   unapplied cash receipts it had in the fall of 2000?
19   A.  What methodology did we use?  Can you clarify
20   the question?  Sorry.
21   Q.  Sure.
22       What methodology did Oracle use?
23   A.  I believe a report, if I recall correctly, a
24   report was available, you know, the unapplied cash
25   report.

99

1    Q.  Okay.  And that would cover unapplied cash in
2    25005 if that were the liability account and an accounts
3    receivable account?
4        MS. WINE:  Objection.  Incomplete
5    hypothetical.
6        THE WITNESS:  You know, I don't recall
7    specifically.
8        MR. WILLIAMS:  Q.  So they could be -- they
9    could be different reports?
10   A.  I don't recall.
11   Q.  Well, you described Oracle's unapplied cash as
12   being a challenge, and I'm just trying to really
13   understand that.
14       In the fall of 2000, Oracle's unapplied cash
15   was a challenge, you described, and I'm trying to
16   understand what was the challenge about it.
17       Can you detail that for me, if you can?
18   A.  The challenge was there were a lot of
19   individual transactions that were unapplied at any
20   one time, and resolving those transactions took some
21   time in many cases.
22   Q.  Okay.  When you say "unapplied at one time"
23   means that Oracle received money, right?
24   A.  Yes.
25   Q.  And they just didn't know what to apply it to.

100

1    A.  Correct.
2    Q.  Okay.  But they did know, in most instances,
3    where the money came from, right?
4        MS. WINE:  Objection.  Foundation.
5        THE WITNESS:  Generally speaking, not in all
6    instances, but generally speaking, you knew who paid the
7    check.
8        MR. WILLIAMS:  Q.  Who sent you the money,
9    right?
10   A.  Yeah.
11   Q.  And so that money could kind of, at least --
12   even if it's not applied to an invoice, necessarily,
13   it's related to a customer, associated with a customer.
14   A.  Generally speaking, yes.
15   Q.  Okay.  And so that customer would have a
16   certain amount of money in unapplied, right?  That was
17   unapplied.
18   A.  Generally speaking, yes.
19   Q.  Okay.  And that customer -- and Oracle would,
20   I guess, try to figure out where it was going to be
21   applied, but it was challenging to do that, right?
22   A.  Yes.
23   Q.  And the money accumulated over a period of
24   time, right?
25   A.  Yes.

101

1    Q.  And as of September of 2000, that challenge
2  existed.
3    A.  That challenge did exist.
4    Q.  And how much money are we talking about in
5  September -- say -- withdrawn.
6       How much money are we talking about in the
7  fall of 2000?  Millions of dollars, right?
8    A.  Yes, it's fair to say millions of dollars.
9    Q.  And that was -- and you're saying today that
10  you don't know where that money was held in terms of the
11  identification of the account?
12    A.  No, I don't.
13    Q.  Okay.  And did you know in 2000?
14    A.  Yes, I did.
15    Q.  And if it was somewhere in accounts receivable
16  in 2000, that would be part of your responsibilities,
17  right?
18    A.  Yes.
19    Q.  All right.  And if it were somewhere in a
20  liability account, would that also be part of your
21  responsibility in 2000, in the fall of 2000?
22    A.  In 2000?
23    MS. WINE:  Objection.  Vague and ambiguous.
24    THE WITNESS:  It is vague.
25    MR. WILLIAMS:  Q.  Well, how can I specify

102

1  that for you?  'Cause I will.
2    A.  It could be, unless it was set up to be
3  refunded by accounts payable, then accounts payable
4  would be responsible for that portion that was set up to
5  be paid -- you know, to be -- a check cut back to the
6  customer as a refund.
7    Q.  Okay.  Separate out that circumstance.
8    A.  Okay.
9    Q.  Otherwise, it would be part of your
10  responsibility, right?
11    A.  Yes.
12    Q.  All right.  And so any unapplied cash that
13  was -- well, withdrawn.
14       If Oracle was able to identify unapplied
15  cash or identify where it goes, it would be
16  recognized as revenue, right?
17    A.  No.
18    Q.  No?  It would be applied to an invoice?
19    A.  That's correct.
20    Q.  And what happens when cash is applied to an
21  invoice in Oracle's accounting system in 2000, in the
22  fall of 2000?
23    A.  The invoice is reduced by that amount of the
24  receipt that's applied to it.
25    Q.  But it's an outstanding invoice, right, up

103

1  until cash is applied to it, right?
2    A.  That's correct.
3    Q.  Okay.  But in that circumstance, would Oracle
4  have recognized revenue when the invoice was issued at
5  some time prior?
6    MS. WINE:  Objection.  Incomplete
7  hypothetical.
8    THE WITNESS:  Depending on the -- what the
9  invoice what for, what products or services were
10  included on the invoice, and whether or not that
11  transaction met the rev rec guidelines for revenue
12  recognition would drive whether or not and how much was
13  recognized.
14    MR. WILLIAMS:  Q.  Okay.  Did Oracle issue
15  invoices prior to it being able to recognize revenue on
16  an invoice?
17    A.  Yes.
18    Q.  Okay.  Under what circumstances?
19    A.  When you sold support.
20    Q.  Any others?
21    A.  When you sold -- sometimes there would be a
22  consulting arrangement.
23    Q.  So for support and consulting, they may --
24  Oracle may have issued an invoice that it would not
25  immediately recognize revenue on, right?

104

1    A.  Correct.
2    Q.  How about for product licenses?
3    A.  Product licenses generally within the system,
4  the revenue would be recognized when the invoice is
5  generated.
6    Q.  Right.  So if there's an invoice that doesn't
7  have any cash applied to it, for example, and later
8  Oracle identifies some unapplied cash to apply to that
9  invoice, it's fair to say that Oracle would have
10  recognized revenue when the invoice was raised
11  initially, right?
12    MS. WINE:  Objection.  Incomplete
13  hypothetical.
14    THE WITNESS:  Depending on what was sold.
15    MR. WILLIAMS:  Q.  For product licenses.
16    A.  For product licenses?
17    Q.  Yes.
18    A.  Generally speaking, yes.
19    Q.  Okay.  So in the fall of 2000, what, if
20  anything, did you do to address the challenge of
21  unapplied cash?
22    A.  The challenge?  In the fall of 2000.
23    Q.  Uh-huh.
24    A.  There were regular, you know, objectives
25  within the credit and collections group to help drive

105

1  down the credit -- or the unapplied cash amounts, so
2  there would be kind of the intra-group or intra -- you
3  know, within the group competitions back and forth to
4  see if we could focus on it and clean it up.
5      Q.  And when you say -- well, competition among
6  who?
7      A.  The collectors.
8      Q.  Okay.  And the collectors reporting to you in
9  the fall of 2000 were who?
10      A.  There are 42 of them, generally speaking, plus
11  or minus.  I have no idea who their names were at that
12  point in time.
13      Q.  Who was managing them?
14      A.  In 2000, I believe -- I think I mentioned this
15  before, it was either Mike Hahn and Adam Hahn, or just
16  Adam Hahn.
17      Q.  And so those people, and particularly Adam and
18  Michael, would have access to Oracle systems that
19  identified unapplied cash, right?
20      A.  Yes.
21      Q.  All right.  And it's the same system that you
22  had access to, right?
23      A.  Yes.
24      Q.  But you don't know the number of the account
25  the unapplied cash would be in?

106

1      A.  No.
2      Q.  And what do you -- in October of 2000, let's
3  say fall of 2000, what did you understand "on account"
4  to mean?
5      A.  October of 2000, on account -- I didn't have
6  an understanding of "on account" at that time.
7      Q.  And had you heard of "on account" at the time?
8      A.  I don't recall anything specific around "on
9  account".
10      Q.  And on account was part of accounts
11  receivable, though, right?
12      A.  On account was a field in the accounts
13  receivable module.
14      Q.  Right.  And that's -- you were in charge; you
15  were the person in charge of accounts receivable, right?
16      A.  Yes.
17      Q.  And the people in accounts receivable, like
18  Greg Myers and his team, reported up to you, right?
19      A.  Yes, they did.
20      Q.  In the fall of 2000.
21      A.  Yes, they did.
22      Q.  And so are you saying that you didn't know --
23  you had no understanding of on account as it was
24  referenced in the -- in Oracle's ERP system in the fall
25  of 2000?

107

1      A.  No.
2      Q.  Okay.  And you never heard of on account in
3  Oracle's system in the fall of 2000?
4      A.  I may have heard of it.  I didn't know
5  anything about it.
6      Q.  And so it was -- so do you know that unapplied
7  cash -- withdrawn.
8      Do you know whether unapplied cash was
9  kept in the same account as money that may have been
10  in on account?
11      MS. WINE:  Objection.  Vague and ambiguous.
12      THE WITNESS:  My understanding of unapplied
13  cash and the items on account was that the items in on
14  account did not show up in any account -- you know,
15  general ledger account.  So therefore, they would not be
16  one and the same.
17      MR. WILLIAMS:  Q.  And that was your
18  understanding when?
19      A.  To be honest with you, I don't know when I got
20  that understanding.  It was sometime after that October
21  time period, October 2000 time period.
22      Q.  Okay.  So when you said that you had not --
23  that you didn't recall knowing anything about on
24  account, what you just testified to was not something
25  that you recalled knowing in October of 2000?

108

1      A.  Correct.
2      Q.  All right.  So would you say that you did not
3  know whether or not money in on account was kept in the
4  same account as unapplied cash?
5      MS. WINE:  Objection.  Vague and ambiguous and
6  asked and answered.
7      THE WITNESS:  In October of 2000, or later?
8      MR. WILLIAMS:  Q.  No, I'm talking about the
9  fall of 2000 right now.
10      A.  The fall of 2000.
11      Q.  Right.
12      A.  So the fall of 2000 in general.  Once I was
13  informed of what on account was, through my discussions
14  with Greg I came to realize that the items in on account
15  did not sit in any general ledger account.  So they were
16  not, you know -- they were separate from the unapplied
17  cash.
18      Q.  All right.
19      Well, let's go back to -- you testified
20  earlier that you had a discussion with Greg concerning
21  on account.
22      A.  Okay.
23      Q.  Right?  In 2000.
24      A.  Okay.
25      Q.  Are you saying now that you had discussions

109

1   with Greg concerning on account in 2000?
2       A.  I don't recall.
3           MS. WINE:  I think you misstated his
4   testimony.  I don't think he limited it to
5   one discussion earlier.
6           THE WITNESS:  I didn't.  I said there are
7   two -- I recall a couple discussions.  We talked about
8   it a couple of times.  I don't know how many, exactly.
9           MR. WILLIAMS:  Q.  And what did he say to you
10  the first time?
11      A.  I don't recall.
12      Q.  What did he say to you the second time, if
13  there was a second time?
14      A.  I don't recall.
15      Q.  What about the third time, if there was a
16  third time?
17      A.  I don't recall.
18      Q.  And somewhere in there in the fall of 2000 you
19  learned something for the first time about on account.
20  Is that your testimony?
21      A.  Yes, it is.
22      Q.  And even though you were responsible for that
23  area of accounts receivable?
24      A.  That's still my testimony, yes.
25      Q.  All right.  And you don't recall any of the

110

1   details -- well, withdrawn.
2           You just testified that Greg Myers told
3   you that the on account was separate from unapplied;
4   is that what you --
5       A.  Yes.
6       Q.  And what, exactly, did he say to you?
7       A.  I don't recall exactly what he said.
8       Q.  Okay.  You said you didn't recall whether that
9   was a face-to-face conversation, right?
10      A.  I do not recall if that was a face-to-face
11  conversation.
12      Q.  It was an e-mail conversation, e-mail
13  correspondence?
14      A.  I don't recall.
15      Q.  Was it on the telephone?
16      A.  I don't recall.
17      Q.  And did you talk about it with him in 2001,
18  the same topic, on account?
19      A.  I don't recall.
20      Q.  Do you recall any other discussions with Greg
21  Myers concerning Oracle's on account?
22      A.  Forever?
23      Q.  Uh-huh.
24      A.  I don't recall any specific discussions.
25      Q.  Okay.  So going back to the fall of 2000, now,

111

1   the unapplied cash, was that part of the discussion that
2   you had with Greg?
3       A.  No.
4       Q.  So -- and how do you recall that?
5       A.  The discussion that I had with Greg, as I
6   recollect, was around clearing out the on account field
7   within the AR application, and it had nothing to do with
8   unapplied cash.  They were separate.
9       Q.  Now, isn't it true that Oracle's on account in
10  the fall of 2000 had cash in it?
11          MS. WINE:  Objection.  Vague and ambiguous.
12  Lacks foundation.
13          THE WITNESS:  I don't know.
14          MR. WILLIAMS:  Q.  Is that something that you
15  would have known at the time?
16      A.  Yes, I believe I would have.
17      Q.  And why is that?
18      A.  It probably -- why is that?  So at some point
19  it was probably part of the decision-making process in
20  terms of how to clean up on account and why, when you
21  cleaned up on account, it wouldn't impact any
22  accounting; there wouldn't be any net accounting impact
23  to it.  So there's no cash, there's no revenue, there's
24  no anything else.
25      Q.  And did you -- did you have the authority to

112

1   change Oracle's accounting systems in 2000?
2       A.  No.
3       Q.  Did you have authority to change Oracle's
4   applications in 2000 and what the Oracle -- and the
5   manner in which Oracle applications functioned?
6           MS. WINE:  Objection.  Vague and ambiguous.
7           THE WITNESS:  No.
8           MR. WILLIAMS:  Q.  Okay.  And wasn't it true
9   that prior to November of 2000, Oracle applications did
10  have a designation for money in on account?
11      A.  Yes.
12      Q.  All right.  And you, at some point, authorized
13  those designations of money in on accounts to be
14  changed?
15      A.  Yes.
16      Q.  Okay.  And did you talk about that with Tom
17  Williams?
18      A.  I don't recall.
19      Q.  And did you talk about that with Jennifer
20  Minton?
21      A.  No.
22      Q.  How do you know that you didn't talk about it
23  with Jennifer Minton, but you're not sure whether you
24  talked about it with Tom Williams?
25      A.  I had irregular, very infrequent

113

1  communications with Jennifer, and this would not be
2  something that would go to her.  I may have mentioned it
3  to Tom, but in thinking back, I don't recall any
4  specific conversation or communication with him, and in
5  thinking back, there wouldn't be any reason to
6  communicate it to him.
7       Q.  And in the fall of 2000, did you discuss with
8  anyone that the unapplied cash was a challenge?
9       A.  Did I discuss it?  Only to the extent that I
10  worked with the senior managers, or senior manager Mike
11  and -- Michael and Adam Hahn about generating -- doing
12  focused project within collections to help drive down
13  the balance, you know, getting people's attention
14  focused on that.
15      Q.  And did you ever have communications with Tom
16  Williams about unapplied cash being a challenge?
17      A.  I don't recall anything specific in regards to
18  that communication, but I am sure I mentioned that to
19  him.
20      Q.  How about with Jennifer Minton?  Same
21  question.
22      A.  No, I wouldn't have any reason to discuss it
23  directly with Jennifer.
24      Q.  But is it fair to say that, say, Adam and
25  Michael Hahn --

114

1       Who else was in collections at that time?
2  Aside from Adam and Michael.
3       A.  At the manager level?
4       Q.  No.
5       A.  Just in general?
6       Q.  Just in collections, yeah.
7       A.  It's difficult to recall.  I couldn't -- I
8  couldn't pinpoint the names of the people at that time
9  in the group.
10      Q.  So you can't remember anyone else in your
11  collections group, other than Michael Hahn and Adam
12  Hahn?
13      A.  I can't, with any intellectual honesty, state
14  that -- their names, that they were there during that
15  specific time.
16      Q.  Okay.  Well, how about some people that you're
17  not sure of whether or not they were there in the fall
18  of 2000?
19      A.  Okay.  So certainly --
20      Well, I don't even know if they were there.  I
21  was going to say Michael Roche and Robynne S.  I think
22  her name was Stetzer, but actually, I think they moved
23  out of the group before that.
24      Other than names that were in collections,
25  so -- at some point in time, you know, Brandon Garoutte,

115

1  Dax Groves, Chris Wilson, Clayton Barnes, I'm not sure
2  if Ian was in the group, Ian Hatada.  Who else would
3  have been in there?  C.J. Zucker.
4       Q.  All right.  That's fine.
5       A.  There were a bunch of them, but I don't know
6  the names.  Ryan Roberts.
7       Q.  I'm sorry.  Ryan Roberts?
8       A.  Ryan Roberts was probably one of them.
9       Q.  Okay.  Now, would you say that those people
10  had a better understanding of Oracle's ERP system as it
11  relates to unapplied cash and on account than you did at
12  the time?
13      MS. WINE:  Objection.  Vague and ambiguous,
14  lacks foundation.
15      THE WITNESS:  I don't know the extent of their
16  understanding, but it's likely they would have a higher
17  understanding than I would.
18      MR. WILLIAMS:  Q.  And so if those people, say
19  Michael and Adam, described for you what was in on
20  account or unapplied cash, that they were more likely to
21  know than you were at the time?
22      MS. WINE:  Same objections.
23      THE WITNESS:  Yes.
24      MR. WILLIAMS:  Q.  And what about your
25  familiarity with the manner in which the ERP system

116

1  functioned with respect to collections, unapplied cash,
2  on account?
3       MS. WINE:  Same objections.
4       THE WITNESS:  The same question?
5       MR. WILLIAMS:  Q.  Same question.
6       A.  They would have a fuller understanding than I
7  did at that time.
8       Q.  Better working knowledge of how the system
9  functioned?
10      A.  Yes.
11      Q.  And what could be recalled from the system?
12      A.  Yes.
13      Q.  And what the system's capabilities were?
14      A.  Yes.
15      Q.  In terms of either finding or storing
16  information?
17      MS. WINE:  Same objections.
18      THE WITNESS:  Yes.  Generally, yes.
19      MR. WILLIAMS:  Q.  And so among those people
20  that you just mentioned, they would have a little --
21  maybe more knowledge than you were about those facts?
22      MS. WINE:  Vague and ambiguous, lacks
23  foundation.
24      THE WITNESS:  Generally, yes.
25      MR. WILLIAMS:  Q.  Okay.  I'm just going to go

117

1  through a couple of documents, and if you want to take
2  lunch after that, that's fine with me.  It will probably
3  take 10 minutes for me to do this, and then --
4        MS. WINE:  How are you doing?
5        THE WITNESS:  That's fine.
6        MR. WILLIAMS:  Does that make sense?
7        THE WITNESS:  Yeah.
8        MS. WINE:  If it's just going to be like 5 or
9  10, but if it's going to be anything longer --
10        MR. WILLIAMS:  Yeah, I'm just going to cover a
11  couple of things, and then we'll get back to issues that
12  may take longer.
13        I'm going to ask the reporter to mark this
14  document as Quinn No. 2.
15        (Whereupon, Plaintiff's Exhibit 2 was marked
16        for identification.)
17        MR. WILLIAMS:  And it's Bates numbered
18  NDCA-ORCL 033950 through 953.
19     Q.  I'm just going to ask you to take a look at
20  what's been marked as Quinn No. 2, and just let me know
21  after you've had a chance to kind of look through it,
22  and then I'll direct your attention to what I'm
23  interested in.
24     A.  Okay.
25     Q.  Do you recognize what's been marked as Quinn

118

1  No. 2?
2     A.  Yes.
3     Q.  What is it?
4     A.  It looks like the agenda for the International
5  Finance Conference.
6     Q.  Okay.  And do you recall attending that
7  conference in November of 2000?
8     A.  I do.
9     Q.  It was in Hawaii, right?
10     A.  Yes, it was.
11     Q.  And what was the general subject matter of the
12  conference, if you know?
13     A.  The -- I don't recall the general subject
14  matter.  It was a variety of subjects.
15     Q.  Okay.  Do you recall the -- well, do you
16  recall presenting at the conference?
17     A.  I do recall.
18     Q.  And generally, what did you present?
19     A.  I presented a credit evaluation model, I
20  believe it was for -- yeah, credit evaluation model.  I
21  forget exactly what it was for.  It was around credit.
22     Q.  Okay.  Let me -- I'm just going to direct your
23  attention to 033951, which is the second page.
24     A.  Okay.
25     Q.  Just take a look down on -- near the bottom of

119

1  the page, and let me know if that refreshes your
2  recollection of what you presented on.
3     A.  Okay.  So the credit scoring methodology,
4  that's what I recalled.  Yeah.
5     Q.  How about OFD and other emerging area issues?
6     A.  Other -- so OFD being the first bullet point,
7  OFD accounting issues, other emerging area issues,
8  credit score and methodology and hosting.  So that's how
9  those two --
10     Q.  What's OFD accounting issues?
11     A.  It's the Oracle finance division, and I don't
12  recall what the accounting issues were.
13     Q.  But you did the presentation on that?
14     A.  Yes, I did.
15     Q.  And Oracle finance division is where Oracle
16  provides financing to customers to buy Oracle products,
17  right?
18     A.  Correct.
19     Q.  And those are entered into via contract,
20  right?
21     A.  Yes.
22     Q.  Okay.  And you were -- that was something
23  under your purview in the fall of 2000?
24     A.  No.
25     Q.  And why were you presenting on it, then?

120

1     A.  I don't recall exactly why.
2     Q.  Who was responsible for OFD accounting issues?
3     A.  The gentleman's name is --
4        I'm sorry.  Repeat the question.
5     Q.  I'm asking you if OFD was under the purview of
6  what you were responsible for in the fall of 2000.
7     A.  No.
8     Q.  Who was responsible for it?
9     A.  Anil Vora.
10     Q.  Anil Vora.
11        Were you responsible for investigating revenue
12  recognition as it relates to Oracle finance division
13  contracts in the fall of 2000?
14     A.  To the extent that they were involved, they're
15  part of a license or a transaction we did.  They were
16  included as part of that contract package, so yes.
17     Q.  Who is David Matuszak, do you know?
18        I'm sorry.  Gary Matuszak.
19     A.  I don't know who David Matuszak is.
20        Gary?
21     Q.  Yes.
22     A.  Gary worked at Arthur Anderson.  I think now
23  he works at another accounting firm.
24        MR. WILLIAMS:  You know, it makes sense to
25  stop here.

121

1     (Recess taken from 12:02 to 1:07 P.M.)
2        MR. WILLIAMS:  Q.  We left off talking a
3  little bit about unapplied cash, generally.
4        What, if you know, are customer overpayments
5  at Oracle?
6        A.  Customer overpayments.  Where a customer paid
7  more than what was on the invoice.
8        Q.  And in -- prior to 2000, how did Oracle treat
9  those overpayments?
10       MS. WINE:  Objection.  Foundation.
11       THE WITNESS:  I don't know how they treated it
12 before I was a part of credit and collections.
13       MR. WILLIAMS:  Q.  Well, from the time you
14 were employed at Oracle in '98 up until November or
15 December of 2000.
16       A.  I don't know how -- the first year I was
17 there, I had no idea how they handled the overpayments
18 when I was in charge of credit and collections.
19 Customer overpayments were the collector would contact
20 the customer and let them know that there was a --
21 there's a payment -- I'm sorry -- that there was some
22 unapplied cash that they needed to resolve.  They could
23 have either -- you know, they could have resolved it in
24 one of many ways.
25       Q.  You're talking about -- what period of time

122

1  are you talking about, after your first year?
2        A.  Yes.  That's the period of time I have
3  knowledge of.
4        Q.  Okay.  All right.
5        So a customer overpayment is, you know,
6  typically, when a customer pays more than an invoice,
7  right?
8        A.  Yes.
9        Q.  Okay.  And where did Oracle keep those
10 overpayments?
11       A.  I don't recall.
12       Q.  But Oracle did have them, right?
13       A.  Yes.
14       Q.  Somewhere.
15       All right.  But when a payment comes into
16 Oracle during this period of time, say from the time you
17 were a collector until the end of 2000, where does it
18 initially go?  What account does it initially go into?
19       MS. WINE:  Objection.  Foundation.
20       THE WITNESS:  Can you repeat the question?
21 I'm sorry.
22       MR. WILLIAMS:  Q.  When a customer payment
23 comes into Oracle --
24       A.  Yes.
25       Q.  -- or at least during that period, where does

123

1  it go?
2        A.  It goes into our -- it goes into the Oracle
3  bank account.
4        Q.  And to what account?
5        A.  I don't know.
6        Q.  And how did Oracle determine whether or not a
7  customer had overpaid?
8        A.  I don't have personal knowledge of that.
9        Q.  Did you have personal knowledge of it back in
10 2000?
11       A.  It was something that the people that worked
12 in my organization did, and I never actually did it
13 myself.
14       Q.  Right, but I'm not asking what they did or
15 what you did; I'm asking where -- how did -- withdraw.
16       How does Oracle determine whether a
17 payment was an overpayment?
18       A.  How does --
19       MS. WINE:  Objection.  Lacks foundation.
20       THE WITNESS:  How does -- if a customer paid
21 more than what the invoice was for and there was -- and
22 after applying that cash or that receipt to the invoice,
23 that there was an excess amount, that would be an
24 overpayment.
25       MR. WILLIAMS:  Q.  Right.  And where would

124

1  that be held at Oracle?
2        A.  Can you clarify the question?
3        Q.  What account would it be held in?
4        A.  I'm not sure of the account number.
5        Q.  How would a collector know that there was an
6  overpayment on an invoice?
7        A.  They would be able to see it in unapplied
8  cash.
9        Q.  So you're saying it would be in unapplied
10 cash?
11       A.  Generally speaking, yes.
12       Q.  Well, what do you mean "generally speaking"?
13 Was unapplied cash something general, or was it
14 specific?
15       A.  It was specific to customer payments.
16       Q.  Customer payments or customer overpayments?
17       A.  It would include both.
18       Q.  Okay.  So -- and how would a collector
19 recognize it in Oracle's system?
20       A.  I don't know.
21       Q.  It would be assigned -- well, withdrawn.
22       You said you learned about overpayments
23 while you were overseeing collections, right?
24       A.  Yes.
25       Q.  And what did you learn about it when you were

125

1  overseeing collections?
2      A.   That customers would sometimes pay more than
3  the invoice, and there would be some excess amount that
4  needed to be resolved.
5      Q.   And is it your testimony that Oracle would
6  initiate contact with customers to determine where to
7  apply the overpayment?
8      A.   One of the tasks that collectors were
9  responsible for was to resolve unapplied cash items, and
10  then as part of their contact with the customer, they
11  would review those with the customer.
12      Q.   No, what I'm asking you, is it your testimony
13  that Oracle would initiate contact with customers to
14  indicate to them that they had overpaid an invoice?
15      A.   As part of the unapplied cash -- as part of
16  their discussion, one of their tasks, again, one of
17  their tasks was to address the unapplied items
18  associated with that -- for that particular customer,
19  the checks received from them that weren't applied.
20      Q.   That were unapplied or overpaid?
21      A.   So overpaid could be included in unapplied.
22      Q.   Okay.  How does one determine whether cash is
23  simply unapplied or it was overpaid?
24      MS. WINE:  Objection.  Foundation.
25      THE WITNESS:  I don't know specifically how

126

1  they would do that.
2      MR. WILLIAMS:  Q.   Was there a way to do it?
3      A.   I don't know.
4      Q.   Did you know back in 2000?
5      A.   Yes.
6      Q.   Okay.  And as you testified, that you knew how
7  to retrieve information from the Oracle ERP system,
8  right?
9      A.   Yes.
10      Q.   And you could retrieve information which would
11  help you determine whether a payment was an overpayment
12  or it just simply couldn't be applied for a different
13  reason?
14      A.   I don't know.  I never -- I never went to
15  retrieve that information.
16      Q.   Did you ever ask for anybody to retrieve that
17  information?
18      A.   Yes.
19      Q.   And who would you ask to retrieve that
20  information?
21      A.   I would ask the managers to do it as part of
22  their management of the collectors managing overall of
23  the unapplied cash.
24      Q.   And who was managing unapplied -- well,
25  withdrawn.

127

1      Are you saying that overpayments --
2  customer overpayments is in or was held in an
3  unapplied cash account?
4      A.   I don't know which account it was included in.
5      Q.   Okay.  Now, was it part of your job to report
6  to Tom Williams the status of customer overpayments or
7  unapplied cash?
8      A.   No.
9      Q.   Who was responsible for reporting to senior
10  management, or those doing Oracle's public financial
11  documents, the status of unapplied cash?
12      MS. WINE:  Objection.  Foundation.
13      THE WITNESS:  No one ever reported that
14  specific or presented that specific information to
15  senior management.
16      MR. WILLIAMS:  Q.   How do you know that?
17      A.   As best as I can recall, I don't ever remember
18  presenting that information, certainly in the 2000 time
19  frame, presenting that information to them.
20      Q.   Was there anyone above your position in the
21  2000 time frame who was responsible for management of
22  Oracle's on account or unapplied?
23      A.   Not that I'm aware of.
24      Q.   Is there anyone in the 2000 time frame that
25  was responsible for management of cash that customers

128

1  had overpaid?
2      A.   I'm sorry.  Could you repeat the question?
3      Q.   I'm sorry.  Withdrawn.
4      Is there anyone in the 2000 time frame
5  above your position that was responsible for
6  management of cash that customers had overpaid?
7      A.   Not that I'm aware of.
8      Q.   And who was responsible for discussing
9  Oracle's unapplied cash with Oracle's auditors, outside
10  auditors?
11      A.   I don't recall, specifically.
12      Q.   Somebody in your organization, right?
13      A.   If they had a question on it, they would go to
14  someone in my organization.
15      Q.   Right.  And who in your organization was
16  responsible for discussing customer overpayments with
17  Oracle's outside auditors?
18      MS. WINE:  Objection.  Assumes facts.
19      THE WITNESS:  They would have asked, probably,
20  Greg Myers.
21      MR. WILLIAMS:  Q.   In your organization?
22      A.   It was either Greg Myers or someone in
23  collections.
24      Q.   And who would that have been in collections?
25      A.   It could have been any of them.

129

1  Q.  No one would ask you?
2  A.  That's always a possibility someone could ask
3  me the question.
4  Q.  Would you say that in the 2000 time frame,
5  that customer overpayments had also -- withdrawn.
6      Would you say that in the 2000 time frame,
7  that the management of customer overpayments had
8  also become a challenge for Oracle?
9  A.  I don't recall that being the case.
10  Q.  Okay.  But unapplied cash was a challenge?
11  A.  Unapplied cash, yes.
12  Q.  But customer overpayments was not?
13  A.  Not specifically.
14  Q.  Okay.  So customer overpayments and unapplied
15  cash were different, then?
16      MS. WINE:  Objection.  Misstates the
17  testimony.
18      THE WITNESS:  That's not what I said before.
19      MR. WILLIAMS:  Q.  Well, I'm asking you.
20  A.  So unapplied cash and customer overpayments
21  were all part of unapplied cash.  They're included in
22  the same, you know, listing.
23  Q.  I'm sorry.  The same what?
24  A.  The same listing.
25  Q.  Okay.  So then customer overpayments would be

130

1  part of the unapplied cash challenge?
2      MS. WINE:  Objection.  Misstates his
3  testimony.
4      THE WITNESS:  They could be.
5      MR. WILLIAMS:  Q.  They're part of the --
6  you're saying that they're part of the same thing,
7  right?
8  A.  They are, if they have not been resolved.  If
9  they've been resolved, then they're somewhere else.
10  Then they're part of the AP, as I mentioned before,
11  accounts payable.
12  Q.  Now, you're talking about the customer
13  overpayments being resolved?
14  A.  No.
15  Q.  How does one resolve a customer overpayment,
16  or at least back in the 2000 time frame?
17  A.  Many ways that you could do it.  Generally
18  speaking, you would call the customer and ask them how
19  they wanted -- how they wanted the disposition of that
20  overpayment.
21  Q.  And how do you know that?  Were you doing
22  that?
23  A.  No.
24  Q.  So how do you know that's what someone in
25  your organization would do?

131

1  A.  It was my understanding of the process that
2  the collectors would follow.
3  Q.  Okay.  Did you develop that process?
4  A.  No.
5  Q.  Did you manage that process?
6  A.  Not directly.
7  Q.  Who did directly?
8  A.  The collections managers.
9  Q.  Okay.  So are you saying that you don't have
10  any firsthand knowledge of whether or not that is what
11  would happen, meaning that the collections manager or
12  someone in collections would call the customer and ask
13  them where they wanted an overpayment applied?
14      MS. WINE:  Objection.  Misstates his
15  testimony.
16      MR. WILLIAMS:  Q.  I'm asking if that's your
17  testimony.
18  A.  I don't recall.
19  Q.  You don't recall whether or not you have
20  personal knowledge of whether --
21  A.  Today, or in 2000?
22  Q.  Today.  Right now.
23  A.  So today, I don't have personal knowledge of
24  that.
25  Q.  Do you -- so -- but that's your testimony.

132

1  Your testimony is that someone in collections would call
2  the customer to determine where the customer wanted the
3  overpayment applied, right?
4  A.  Yes.
5  Q.  And what's that testimony based upon?
6  A.  It's based upon the process that the
7  collectors are instructed to follow.
8  Q.  All right.  And who instructed the collectors
9  to follow that process?
10  A.  The managers.
11  Q.  Okay.  And you were responsible for those
12  collections managers, right?
13  A.  Ultimately, yes.
14  Q.  And they reported to you as to whether or not
15  the process was being followed?
16  A.  I don't recall.
17  Q.  Well, how did you -- how did you know whether
18  or not the collectors were actually doing their jobs?
19  A.  I don't recall.
20  Q.  Do you know that they were doing their jobs
21  actually calling the customers and asking customers
22  where to apply overpayments?
23  A.  I don't recall.
24  Q.  Is that something that you would have known at
25  the time in 2000?

133

1      A.   Based -- I would have known it based upon
2   representations made to me by either the collector,
3   themselves, or the manager.
4      Q.   Right.  So you didn't have any personal
5   knowledge as to whether or not they were actually doing
6   that?
7          MS. WINE:  Objection.  Misstates the
8   testimony.
9          MR. WILLIAMS:  Q.  Right?
10     A.   I was not on the phone with them.
11     Q.   Right.  Okay.
12         And could that have been one of the reasons
13  why unapplied cash, including overpayments, had been
14  accumulating in the Oracle systems?
15         MS. WINE:  Objection.  Vague and ambiguous.
16         THE WITNESS:  There's a lot of reasons why.
17         MR. WILLIAMS:  Q.  Okay.  What are some of the
18  reasons?
19     A.   Sheer volume of transactions coming in, lack
20  of attention to it, it could be that the collectors
21  weren't doing their jobs, they weren't being managed to.
22     Q.   Okay.  So you said one of the ways that an
23  overpayment or unapplied cash could be resolved is by
24  calling the customers and asking them where to apply it,
25  right?

134

1      A.   Yes.
2      Q.   And what are some of the other ways that an
3   overpayment could be resolved?  If there are any other
4   ways.
5      A.   I don't know.
6      Q.   Were there any other ways, other than what you
7   just described to me, calling a customer and asking
8   where an overpayment should be applied?
9          MS. WINE:  Objection.  Foundation.
10         THE WITNESS:  I don't know.
11         MR. WILLIAMS:  Q.  And when you say "applied,"
12  what do you mean?
13     A.   When I say "applied," applied to an open
14  invoice.
15     Q.   Meaning that the cash is applied to an open
16  invoice to close it out?
17     A.   The cash is applied to the open invoice.
18     Q.   And where would that cash be held?
19     A.   The cash would be in a cash bank account.
20     Q.   In unapplied?  Was there a bank account for
21  unapplied or customer overpayments?
22     A.   I don't know the answer to that.
23     Q.   Who would know?
24     A.   Greg Myers would probably know.
25     Q.   Did you know at the time?

135

1      A.   Did I know what?
2      Q.   Did you know whether or not Oracle had a bank
3   account that held unapplied cash in the fall of 2000?
4      A.   No.  I didn't know.  I do not know.  I do not
5   know and I did not know.
6      Q.   You did not know at the time?
7      A.   Yeah.
8      Q.   But you were responsible, ultimately, for the
9   people who might have known?
10     A.   Yes.
11     Q.   Would people in collections know -- withdrawn.
12         Would people in collections have known?
13         MS. WINE:  Objection.  Lacks foundation.
14         THE WITNESS:  I have no idea if they would
15  have known.
16         MR. WILLIAMS:  Q.  But people in accounts
17  receivable would have known?
18         MS. WINE:  Same objection.
19         THE WITNESS:  People in accounts receivable
20  may have known.  I'm not privy to their specific
21  personal knowledge.
22         MR. WILLIAMS:  Q.  Well, wasn't it your job to
23  know what they know as the person ultimately responsible
24  for accounts receivable at the time?
25     A.   No.

136

1      Q.   No?  Well, whose job was it to know what they
2   were doing?
3      A.   That was two different questions.
4      Q.   Well, whose job was it to know what the scope
5   of the people in accounts receivable's knowledge was?
6      A.   Their manager.
7      Q.   And was it your responsibility to know the
8   scope of what managers who reported to you knew?
9      A.   I would say in part.  I wouldn't have any -- I
10  wouldn't know exactly what one manager knew or did not
11  know.
12     Q.   Who did you report to in 2000?  In the fall of
13  2000.
14     A.   In 2000?  Tom Williams.
15     Q.   Tom Williams.  Okay.
16         Would you say that when a customer
17  overpaid Oracle, that the portion of the money that
18  was the overpayment still belonged to the customer?
19     A.   I'm sorry.  Could you ask that question again?
20     Q.   Say, for instance, a customer paid $120 on a
21  $100 invoice.
22     A.   Yes.
23     Q.   $20 would be an overpayment, right?
24     A.   Yes.
25     Q.   And that would be held in Oracle systems

137

1 somewhere, right?
2        MS. WINE: Objection. Lacks foundation.
3        MR. WILLIAMS: Q. Or at least identified in
4 Oracle systems somewhere.
5        A. Yes.
6        Q. And is it fair to say that the value of that
7 overpayment still belonged to the customer?
8        MS. WINE: Calls for a legal conclusion.
9        THE WITNESS: I don't know. I would have to
10 ask someone in our legal department to say whose money
11 that is.
12        MR. WILLIAMS: Q. I'm not asking a legal
13 question. Isn't it true that some of your customers,
14 once Oracle got an overpayment, would call the customer
15 to find out where they wanted the money applied?
16        A. That was the process.
17        Q. Right. And so the customer could decide where
18 they wanted the money applied, right?
19        A. Yes, they could.
20        Q. So they wouldn't do that if it was really
21 Oracle's money, would they?
22        MS. WINE: Objection. Calls for a legal
23 conclusion and misstates the testimony.
24        THE WITNESS: I don't know the answer to the
25 question. I don't know.

138

1        MR. WILLIAMS: Q. I think your testimony was
2 that Oracle reached out to customers to ask them where
3 they wanted their overpayment to be applied, right?
4        A. Yes.
5        Q. And that's because that -- the overpayment
6 belonged to the customer, right?
7        MS. WINE: Same objection.
8        THE WITNESS: It was because there was money
9 that they paid and we wanted -- we needed to ask them
10 what they wanted done with it.
11        MR. WILLIAMS: Q. Uh-huh. I'm not talking
12 about payments that couldn't be identified; I'm talking
13 about overpayments, a payment that a customer paid more
14 money than was invoiced.
15        Do you understand what I'm asking?
16        A. So I understand that last comment.
17        Q. Okay. And so I'm asking -- what I'm asking
18 is: Isn't it true that the collectors would call
19 customers, based on your testimony, and tell them that
20 they had money that was overpaid and ask where they
21 wanted that money applied?
22        A. That is true.
23        Q. Okay. And sometimes they would refund that
24 money, right? Oracle would refund the money.
25        A. Yes.

139

1        Q. And describe the process under which Oracle
2 would refund an overpayment.
3        A. I don't know the process.
4        Q. And did you know the process back in 2000?
5        A. I didn't know any detail steps in the process.
6        Q. But you did know --
7        A. Generally speaking. Generally speaking, that
8 money was refunded and accounts payable paid the check,
9 cut a check.
10        Q. But part of that process would be in accounts
11 receivable, right, identifying what the overpayment was?
12 Isn't that right?
13        A. Yes.
14        Q. All right. And in order to issue a refund,
15 would there -- was there an approval process?
16        A. I don't recall.
17        Q. You don't recall whether or not there was an
18 approval process?
19        A. That's correct.
20        Q. So do you know whether anyone in accounts
21 receivable could authorize a refund of, say, $100,000
22 without it being approved by someone at your level or
23 above your level?
24        A. I don't recall if that was in place.
25        Q. At the time, or at all, period?

140

1        A. At the time.
2        Q. Okay. Do you know whether or not it was --
3 that process or an approval process was in place at any
4 time before you left Oracle?
5        A. I don't recall.
6        Q. You've indicated that Julie Chan was someone
7 that reported to you, right?
8        A. Yes.
9        Q. All right. And what was her position; do you
10 know?
11        A. At what time?
12        Q. In the 2000/2001 time frame.
13        A. If I recall, I believe she was the senior
14 manager or -- yeah, senior manager of revenue
15 accounting, I believe.
16        Q. Senior manager of revenue accounting.
17        A. Yeah.
18        Q. And so part of her -- just describe what her
19 duties were in 2000 and 2001.
20        A. Her primary duties were around contract
21 review, ensuring compliance with the revenue recognition
22 rules.
23        Q. Okay. Is that it?
24        A. She had responsibility for the accounting
25 around deferred revenue.

141

1    Q.   What do you mean when you say "the accounting
2  around deferred revenue"?
3    A.   She was responsible for the reconciliation of
4  the deferred revenue accounts for the U.S.
5    Q.   Okay.  And what accounts were those?
6    A.   Deferred revenue.
7    Q.   Did they have numbers?
8    A.   Yes.
9    Q.   Did you know what they were?
10   A.   No.
11   Q.   What would you characterize as within the
12  deferred revenue accounts?  What type of payments, so to
13  speak, would be in the deferred revenue accounts?
14   A.   I don't know that there would be any payments
15  in there.
16   Q.   What would be in there?
17   A.   Generally, there would be two types of things;
18  one where we booked a transaction with a customer and
19  revenue needed to be deferred.  If it was maintenance
20  revenue, it would automatically be deferred and
21  recognized over some period of time.  If it was
22  something where we needed to defer revenue on a license
23  transaction, there would be a manual journal entry made
24  to reduce revenue and increase deferred revenue.  And
25  those were the two primary types of accounts in there.

142

1    Q.   And what else was she responsible for, if
2  anything?
3    A.   That was it.
4    Q.   Did she report to you?
5    A.   She reported to me.  I'm not entirely clear on
6  the time frame 'cause she took time off, got pregnant
7  and took different roles, so different people reported
8  to me in that role.
9    Q.   So how about -- you don't recall in 2000/2001?
10   A.   I don't know the specific dates.
11   Q.   Okay.  But there was a period of time where
12  she reported directly to you?
13   A.   Yes.
14   Q.   Okay.  And how -- was she someone -- during
15  the time she reported to you, was her position lateral
16  to Greg Myers'?
17     MS. WINE:  Objection.  Vague and ambiguous.
18     THE WITNESS:  I don't recall.
19     MR. WILLIAMS:  Q.  Well, did she ever report
20  to Greg Myers directly, as far as you know?
21   A.   No, she never did.
22   Q.   Okay.  Do you know any other person at Oracle
23  that she reported directly to during the time that you
24  were at Oracle?
25   A.   I believe she reported to Tom Williams, and I

143

1  believe at one point she reported to Rachel Scott.
2    Q.   What position did Rachel Scott hold?
3    A.   Manager of revenue accounting, or senior
4  manager.  I'm not entirely sure of the titles and the
5  specific time frame.
6    Q.   Was the manager of revenue accounting within
7  your division?
8    A.   Yes.  During the time that I had --
9    Q.   Yeah, we're talking about prior to
10  November 2000, or up until November 2000.
11   A.   For the year preceding November 2000.
12   Q.   Well, why don't we just say -- sure.  In the
13  fall of 2000 is fine.
14   A.   In the fall of 2000, yes.
15     MS. WINE:  Just so I'm clear, in the fall of
16  2000, that is when Rachel Scott was a manager or senior
17  manager of revenue accounts?
18     THE WITNESS:  In the fall of 2000, I believe
19  it was Julie Chan that was the senior manager in revenue
20  accounting.
21     MR. WILLIAMS:  Q.  Okay.  That's fine.
22   A.   And again, I could have my dates wrong.  There
23  was some movement due to pregnancies.
24   Q.   That's fine.
25     Have you ever seen a complaint in this

144

1  case?
2    A.   I have.
3    Q.   And when was that?
4    A.   Sometime when I was at Oracle when I was an
5  employee there.
6    Q.   Have you seen a complaint since you left
7  Oracle?
8    A.   No.
9      Well, does yesterday count?
10     MS. WINE:  If you need to ask me about a
11  privileged question, we can go off the record.
12     MR. WILLIAMS:  Well, hold on a second.
13   Q.   I'm not asking you about any conversations
14  that you had with your lawyers.  I'm just asking you if
15  you've seen a document that's publicly filed with the
16  court, a complaint publicly filed with the court since
17  you left Oracle.
18   A.   No.
19   Q.   Okay.  And what -- do you recall -- I'll ask
20  the reporter to mark this document as Quinn No. 3.
21     (Whereupon, Plaintiff's Exhibit 3 was marked
22     for identification.)
23     MR. WILLIAMS:  Q.  I'm just going to ask you
24  to -- Quinn No. 3 is Plaintiff's Revised Second Amended
25  Complaint for Violations of the Federal Securities Laws.

145

1    I'm going to ask you to turn to page 15.  And you can
2    read to yourself.  Well, withdrawn.
3          Have you seen this document before?
4          MS. WINE:  Asked and answered.
5          THE WITNESS:  Yes.
6          MR. WILLIAMS:  Q.  Okay.  And when was that?
7       A.  I don't recall the exact period.  Sometime
8    when I worked with Oracle.
9       Q.  Okay.  Or something similar to this?
10      A.  Something similar to it, sure.
11      Q.  Okay.  I'm going to direct your attention to
12   page 15.  And if you -- you can just read page 15 and 16
13   to yourself, and let me know when you're done with that.
14         MS. WINE:  Do you want him to read to the end
15   of paragraph 36?
16         MR. WILLIAMS:  Yeah, you can just read to the
17   end of 36 as it flows over.
18         MS. WINE:  Well, 37 is the one that flows
19   over.
20         MR. WILLIAMS:  I'm sorry.
21      Q.  Just read to the end of sub A, which flows
22   over to page 17.
23      A.  Okay.
24      Q.  Okay.
25      A.  Down to 38, correct?

146

1       Q.  Yeah, that's fine.
2          I want to take you back to page 16, and you
3    see line 11, right around line 11.
4       A.  Okay.
5       Q.  You see where it says, "According to CW46,
6    Oracle did not inform customers of overpayments and did
7    not refund customer overpayments."  Do you see that?
8       A.  Yes, I do see it.
9       Q.  Prior to November, or prior to December 2000,
10   did Oracle refund customer overpayments?
11      A.  Yes.
12      Q.  In what form?
13      A.  In the form of a check.
14      Q.  Okay.  And who was responsible for refunding
15   those -- issuing those checks?
16      A.  The accounts payable department.
17      Q.  And what was the process by which Oracle would
18   refund those -- issue refund checks to customers?
19      A.  I don't recall the process.
20      Q.  So how do you know that Oracle refunded
21   overpayments?
22      A.  During my time there, we refunded, cash went
23   out.
24      Q.  How do you know that?
25      A.  How do I know that?

147

1       Q.  Uh-huh.
2       A.  'Cause the people working for me told me that
3    cash was -- or refunds were being made.
4       Q.  And who told you that refunds were
5    being made?
6       A.  Greg Myers.  He's the primary one.
7       Q.  But wouldn't the collectors be the ones who
8    were -- who would know that a customer had overpaid and
9    were, according to your testimony, calling customers to
10   find out whether or where the overpayment should be
11   applied?
12      A.  Yes.
13      Q.  And he wasn't a collector in 2000, was he?
14      A.  No.
15      Q.  Okay.  So which of your collectors, if any,
16   told you -- withdrawn.
17         Did any of your collectors tell you that
18   refunds were being made in 2000?
19      A.  I don't recall.
20      Q.  Okay.  Go down to line 15 -- I'm sorry.  Line
21   13.  You see where it says, "Instead, Oracle maintained
22   a fund of its customers' overpayments as unapplied cash
23   on A," meaning on A?
24      A.  I see that.
25      Q.  Do you see that?

148

1          And did you know that Oracle kept customers'
2    overpayments in its unapplied cash account and
3    designated them "on A"?
4          MS. WINE:  Objection.  Assumes facts.
5          THE WITNESS:  I don't know.
6          MR. WILLIAMS:  Q.  Is that something that you
7    would have known at the time in 2000?
8       A.  I don't recall.
9       Q.  You don't recall whether you would have known
10   it, or you just don't know if you would have known it at
11   the time?
12      A.  I don't recall if I would have had firsthand
13   knowledge of it.
14      Q.  Okay.  Had you heard that Oracle maintained a
15   fund of its customers' overpayments in unapplied cash
16   designating it as "on account"?
17      A.  No.
18      Q.  You had not -- had you heard that after 2000?
19      A.  After 2000?
20      Q.  Uh-huh.
21      A.  I'm not entirely sure.
22      Q.  Are you not sure if you heard of it after
23   2000, or you're not sure that you ever heard it at all?
24      A.  I'm not sure that I ever heard it after 2000.
25         Well, actually --

149

1     MS. WINE: He's just asking whether you ever
2  heard that statement.
3     THE WITNESS: So this statement --
4     MR. WILLIAMS: No, no, no, no.
5     Can you read back to where I asked whether or
6  not he recalled -- let me just withdraw that.
7     Q.  Had you heard that Oracle maintained a fund of
8  its customers overpayments in unapplied cash designating
9  it as on account after 2000?
10     MS. WINE: Objection. Assumes facts.
11     THE WITNESS: I don't recall, specifically.
12     MR. WILLIAMS: Q.  Okay. All right.
13     Had you ever heard that?
14     A.  Had I ever heard it?
15     Q.  Uh-huh.
16     A.  No.
17     Q.  You indicated that in 2000 -- well, withdrawn.
18     During what period of time did Ryan
19  Roberts report to you, if at all?
20     A.  He reported to me directly during my last year
21  at Oracle, and indirectly he was in the group, but I
22  don't recall the time frame.
23     Q.  So between July 2000 and July 2003 he reported
24  directly to you?
25     A.  No.

150

1     Q.  Wasn't that your last year at Oracle?
2     A.  2000 to 2003?
3     Q.  I'm sorry. I thought I said 2002 to 2003.
4     A.  No.
5     Q.  I'm sorry. I'll withdraw and ask you again.
6     From July of 2002 to July of 2003, did Ryan
7  Roberts report directly to you?
8     A.  Yes, I believe those are the correct dates.
9     Q.  Okay. And what position did he have at that
10  time?
11     A.  He was senior manager of credit collections.
12     Q.  So how long had he been in collections?
13     A.  I don't recall.
14     Q.  Well, was he there in 2001?
15     A.  I don't recall.
16     Q.  You don't recall whether Ryan Roberts was
17  employed in collections in 2001?
18     A.  I don't.
19     Q.  Okay. But he certainly was in 2002, right?
20  At least the second half of 2002, right?
21     A.  Yes.
22     Q.  And you said prior to July of 2002,
23  approximately, he was in your organization but didn't
24  report directly to you, right?
25     A.  Could you ask the question again? Sorry.

151

1     Q.  Prior to July 2002 he was in the collections
2  organization but did not report directly to you?
3     A.  I believe he was, but I don't recall his exact
4  dates of employment.  And if he was, he did not report
5  to me, directly to me.
6     Q.  All right.  Was it or was it not your
7  testimony that during your last year at Oracle, Ryan
8  Roberts reported directly to you, but prior to that he
9  was in your organization but did not report directly to
10  you?
11     A.  During the last year he reported to me.  Prior
12  to that, I don't recollect when his term of employment
13  was, if he was employed -- so prior to reporting to me,
14  he was in the group and he reported through -- up to me,
15  but I don't know what time frame he was.  That's the
16  whole point.
17     Q.  I understand.
18     A.  I don't know the dates.
19     Q.  No, all I'm getting at is --
20     Well, he was there before July 2002, right?
21     A.  Yes.
22     Q.  For some period, right?
23     A.  Yep.  Sure.
24     Q.  Reporting up through someone else in your
25  organization?

152

1     A.  Yes.
2     Q.  All right.  So I'm going to direct your
3  attention to line 16, the same page.  Do you see where
4  it says, "CW46 reported that she spoke with Ryan
5  Roberts, an Oracle collection manager, about this
6  practice, who confirmed that Oracle usually did not
7  refund money, and then only did so at the request of the
8  customer"?
9     Do you see that?
10     A.  Uh-huh.
11     Q.  Do you know whether it was Oracle's practice
12  to refund money, or did it only refund money to
13  customers upon request by the customer?
14     A.  It was upon request by the customer.
15     Q.  Okay.  So it's true that Oracle would not
16  initiate contact with a customer telling them that they
17  had an overpayment and offer to refund money?
18     MS. WINE: Objection. Misstates the
19  testimony.
20     MR. WILLIAMS: Q.  Isn't that true?
21     A.  The process was for the collector to contact
22  the customer and let them know that there was an
23  overpayment and how to resolve better what the
24  disposition should be.
25     Q.  Right, but Oracle wouldn't offer to refund the

153

1 money unless there was a request by a customer.
2 　　　　MS. WINE: Objection. Misstates testimony.
3 　　　　THE WITNESS: I was not on the phone with the
4 collector.
5 　　　　MR. WILLIAMS: Q. We were talking about the
6 process. You just said "process", so I'm asking you,
7 was it or was it not the process that Oracle may
8 initiate contact with a customer and -- well, let me
9 withdraw that altogether.
10 　　　　Do you see paragraph -- subparagraph D?
11 　　A. Yes.
12 　　Q. Well, withdrawn.
13 　　　　I'm going to ask you to turn to page 21.
14 I'm just going to ask you to read from line 1 on
15 page 21 to the end of line 2 on page 22.
16 　　A. Silently, to myself?
17 　　Q. You can read to yourself, yes.
18 　　A. Great.
19 　　　　Okay.
20 　　Q. Have you seen what is represented by page 21
21 and 22 prior to today?
22 　　A. I have seen this.
23 　　Q. Okay. And when did you see it?
24 　　A. Sometime when I was working with Oracle. I
25 don't recall the date.

154

1 　　Q. Okay. And who showed it to you?
2 　　A. I don't recall.
3 　　Q. Did you talk to Tom Williams about what's on
4 this page?
5 　　A. Did I speak with Tom Williams about --
6 　　Q. Yes.
7 　　A. I don't recall if we spoke directly about this
8 page.
9 　　Q. Did you speak to Tom Williams about the
10 complaint?
11 　　A. Yes.
12 　　Q. Okay. And when did that occur?
13 　　A. I honestly don't recall.
14 　　Q. While you were at Oracle, right?
15 　　A. Yes, while I was at Oracle, yes.
16 　　Q. Did you go to his office and talk to him about
17 it?
18 　　A. I don't recall.
19 　　Q. Did he come to your office and talk to you
20 about it?
21 　　A. I don't recall.
22 　　Q. Did you talk to him on the phone about it?
23 　　A. I don't recall.
24 　　Q. Exchange some e-mails about it?
25 　　A. I don't recall.

155

1 　　Q. Okay. Anybody else at Oracle that you talked
2 to about this complaint and what is -- and what's in it?
3 　　　　MS. WINE: I assume you mean other than
4 conversations with counsel.
5 　　　　MR. WILLIAMS: Q. Yeah.
6 　　A. Greg Myers.
7 　　Q. And anybody else?
8 　　A. I don't recall who else would have been
9 discussed.
10 　　Q. But you recall talking to Greg Myers about it?
11 　　A. Yes.
12 　　Q. And when did that occur?
13 　　A. I don't recall.
14 　　Q. And was it this year?
15 　　A. No, it was sometime during my --
16 　　Q. Before you left?
17 　　A. -- employment with Oracle.
18 　　Q. I'm sorry for cutting you off.
19 　　　　Before you left Oracle?
20 　　A. Yes.
21 　　Q. Did you talk to him in his office or yours?
22 　　A. I don't recall.
23 　　Q. How many times did you talk to him about this
24 complaint?
25 　　A. I don't recall.

156

1 　　Q. More than once?
2 　　A. I don't know the number.
3 　　Q. More than once?
4 　　A. I don't know the number.
5 　　Q. Okay. What did you say to him?
6 　　A. Pardon me?
7 　　Q. What, if anything, did you say to him about
8 the complaint?
9 　　A. I have no recollection of what specific words
10 I said to him.
11 　　Q. Well, generally.
12 　　A. Generally, I don't recall what we generally
13 talked about. We probably talked about this page.
14 　　Q. And what did he say to you about this -- about
15 the complaint?
16 　　A. I don't recall.
17 　　Q. Okay. I'm going to ask you to --
18 　　　　Did you ever talk to -- well, withdrawn.
19 　　　　Do you know Marisa Christie?
20 　　A. I recognize the name.
21 　　Q. And how do you recognize the name?
22 　　A. I believe she was someone in the collections
23 group at some point in time while I was at Oracle.
24 　　Q. While you were at Oracle.
25 　　　　Somebody who ultimately reported to you,

157

1　　someone within your organization?

2　　　A.  Yes.

3　　　Q.  All right.  And do you see where, starting on

4　page -- I'm sorry -- on line 4, do you see where it

5　says, "CW49 also supervised the credit analysts in the

6　Rocklin, California office, including Marisa Christie,

7　who confirmed to CW46 that money applied to the debit

8　memo 55033928 was, indeed money that had been,"

9　quote-unquote, "on reserve in Oracle's on account."  Do

10　you see that?

11　　　A.  I see it.

12　　　Q.  Do you know what "on reserve at Oracle" means?

13　　　　MS. WINE:  Objection.  Lacks foundation.

14　　　　THE WITNESS:  No.

15　　　　MR. WILLIAMS:  Q.  Okay.  And you know what

16　"on account" means or meant at Oracle?

17　　　A.  I don't know what it means here.

18　　　Q.  Is it fair to say that the collections

19　employees were familiar with Oracle's on account more so

20　than you?

21　　　A.  I don't know.

22　　　Q.  Was it not your testimony that the members of

23　the collection staffs were more familiar with Oracle

24　systems than you were?

25　　　A.  They use it more frequently than I did.

158

1　　　Q.  Right.

2　　　A.  What they knew or didn't know is not privy.

3　　　Q.  That's fine.

4　　　　On line 8, do you see where it says,

5　"Specifically, CW49 disclosed that before, during

6　and after the class period Oracle had a longstanding

7　problem of accumulating cash from customer

8　overpayments and maintaining that cash in its

9　unapplied cash account"?  Do you see that?

10　　　A.  I see it.

11　　　Q.  And that's what you were testifying to earlier

12　today, right, that there was a challenge due to

13　accumulating cash partly from customer overpayments in

14　Oracle's unapplied cash account, right?

15　　　　MS. WINE:  Objection.  Misstates the

16　testimony.

17　　　　THE WITNESS:  The problem was an accumulation

18　of items in unapplied cash.

19　　　　MR. WILLIAMS:  Q.  Including customer

20　overpayments.

21　　　A.  Which may include customer overpayments.

22　　　Q.  Well, is it "may" or -- withdrawn.

23　　　　Did unapplied cash include customer

24　overpayments?

25　　　A.  At any point in time it could have, yes.

159

1　　　Q.  Going down to line 12, do you see where it

2　begins, "Instead, Oracle would only refund customer

3　overpayments upon written request by the customer"?

4　　　A.  I see that.

5　　　Q.  Do you see that?  And was it -- was that part

6　of the process before Oracle would refund customer

7　money, get a written request for a refund from the

8　customer?

9　　　A.  To my understanding, no.

10　　　Q.  Okay.  What is your understanding?

11　　　A.  That if a customer requested verbally or in

12　writing in any manner, we would -- and it was proper to

13　refund it, they were entitled to the refund, a refund

14　would be given.

15　　　Q.  So you're saying that a refund request

16　wouldn't necessarily have to be in writing for Oracle to

17　actually refund --

18　　　A.  It would not have to be in writing.

19　　　Q.  But it would have to be a request from the

20　customer before Oracle would refund money, right?

21　　　　MS. WINE:  Objection.  Misstates testimony.

22　　　　THE WITNESS:  Once the collector contacted the

23　customer and let them know there were payments in there

24　to be applied, if the customer wanted to dispose of that

25　payment if it was an overpayment by giving a refund,

160

1　then that would be how it worked.

2　　　　MR. WILLIAMS:  Q.  Okay.  And do you see

3　where -- line 13?

4　　　A.  Yes.

5　　　Q.  Where it says, "CW49 reported that this

6　practice resulted in Oracle having approximately

7　$130 million in customer unapplied cash in its unapplied

8　cash account in any given quarter"?  Do you see that?

9　　　A.  I see that.

10　　　Q.  And did you know how much money was in

11　Oracle's unapplied cash during any given quarter?

12　　　A.  While I was there?

13　　　Q.  Uh-huh.

14　　　A.  Yes.

15　　　Q.  Okay.  Is it fair to say that Oracle, at any

16　given quarter, Oracle had more than $100 million in its

17　unapplied cash account while you were there?

18　　　A.  I don't recall.

19　　　Q.  But it's something that you knew at the time?

20　　　A.  Yes.

21　　　Q.  And people in collections would know how much

22　was in Oracle's unapplied cash account, right?

23　　　　MS. WINE:  Objection.  Foundation.

24　　　　THE WITNESS:  I don't know what they would

25　know.

161

1     MR. WILLIAMS:  Q.  Well, would they have
2  access to that information?
3     A.  I honestly -- I don't know.
4     Q.  Uh-huh.
5     Didn't you employ, quote-unquote, "unapplied
6  cash specialist" or someone with that title or close to
7  that title?
8     A.  Yes, there was that role in the group.
9     Q.  Okay.  And that person would, no doubt, know
10  how much money was in Oracle's unapplied cash at any
11  given quarter, right?
12     A.  That person would, yes.
13     Q.  Do you see line 16?
14     A.  Okay.
15     Q.  See where it says, "According to CW49, among
16  the 42 collections analysts in Oracle's collection
17  department, Raul Campos and Neal Menon, at various
18  times, were dedicated to managing Oracle's unapplied
19  cash account."  Do you see that?
20     A.  I do.
21     Q.  Okay.  Do you know Raul Campos?
22     A.  Yes.
23     Q.  And wasn't he an unapplied account specialist?
24     A.  Yes.
25     Q.  At some point and -- withdrawn.

162

1     And dedicated to managing the unapplied cash
2  account?
3     A.  Yes.
4     Q.  And he was reporting to you?
5     A.  Ultimately to me while I was there.
6     Q.  Okay.  And how about Neal Menon?
7     A.  What about him?
8     Q.  Do you know him?
9     A.  Yes.
10     Q.  And was he an unapplied cash account cash
11  specialist during the time that you were at Oracle?
12     A.  I believe he was.
13     Q.  Okay.
14     MS. WINE:  Shawn, we've been going about an
15  hour.
16     MR. WILLIAMS:  Yeah, why don't we take
17  five minutes.
18     (Recess taken from 2:07 to 2:21 P.M.)
19     MR. WILLIAMS:  Okay.  Before I forget, Jamie,
20  can you give us the Bates number of the e-mail that he
21  was referring to earlier that he said would refresh his
22  recollection about what was happening in 2002?
23     MS. WINE:  Uh-huh.
24     MR. WILLIAMS:  Okay.  Sometime before we go
25  off so that I can cross him on it.  Thanks.

163

1     Q.  Directing your attention to line No. 20, do
2  you see that?
3     A.  Yes.
4     Q.  Do you see where it says, "During Oracle's
5  Q201 ending November 2000, Senior Accounts Receivable
6  Manager Greg Myers had been under pressure from Jennifer
7  Minton, Oracle's Senior Vice President of Finance and
8  Operations, to clean up the unapplied cash account"?  Do
9  you see that?
10     A.  Yes.
11     Q.  Do you know, did Greg Myers report directly to
12  Jennifer Minton in 2000?
13     A.  No, he did not.
14     Q.  Do you know whether Greg Myers communicated
15  with Jennifer Minton in -- in the fall of 2000?
16     A.  I do not know.
17     Q.  And do you know whether -- do you know what it
18  means to clean up the unapplied cash account?
19     A.  In this -- yes.
20     Q.  What does it mean?
21     A.  It means to resolve the transactions that are
22  included in the unapplied cash account.
23     Q.  And that means to either apply them to some
24  sort of invoice or debit item, right?
25     A.  Yes, that could be one of them.

164

1     Q.  And it also -- or to refund the customer,
2  right?
3     A.  Yes.
4     Q.  And Oracle, I guess, did something to clean up
5  the unapplied cash account in November of 2000, right?
6     A.  So the only unapplied cash account activity in
7  2000 was related to the activities or the, you know,
8  actions by the credit analysts and credit managers and
9  their metrics and making sure that they cleaned things
10  up, et cetera.
11     Q.  I don't understand.  Can you explain that?
12     A.  So --
13     Q.  What are you talking about?  I'm just not sure
14  what you're talking about.
15     A.  So unapplied cash is part of a collector's
16  everyday responsibility, and regularly there would be
17  projects or focused periods of time for collectors to
18  reduce the number of items in the unapplied cash
19  accounts, so they would call customers and figure out
20  how to apply the cash or get it refunded, et cetera.
21  And so, you know, what this is, is the cleanup of the
22  unapplied cash account -- it's probably mixing up
23  two different periods of time.
24     Q.  When you say "this," are you referring to, I
25  guess, paragraph -- subparagraph C?

165

1   A.  Subparagraph C, yes.
2   Q.  Well, what do you mean, "mixing up two periods
3   of time"?
4   A.  So what happened in November of 2000 when the
5   on account item within the AR application was cleaned
6   out where Greg Myers -- I believe we discussed this
7   before -- created the sequel script with IT to take
8   those items out of the on account designation within the
9   application, doing that by doing one or two journal
10  entries in and out, in and out of the same account for a
11  net zero accounting impact.
12  Q.  So are you saying that the -- in November of
13  2000, that no activity occurred with respect to Oracle
14  unapplied cash, or cash in Oracle's unapplied account?
15  A.  I didn't say that.
16  Q.  Did you know that there was going to be a
17  cleanup of Oracle's unapplied cash in November of 2000?
18  MS. WINE:  Objection.  Assumes facts.
19  MR. WILLIAMS:  Q.  Go ahead.
20  A.  There was no cleanup of Oracle's unapplied
21  cash outside of the day-to-day activities that I
22  mentioned previously that the collectors did within
23  their normal day jobs.
24  Q.  Okay.  And was there -- did you -- withdrawn.
25  Did you ever see a, quote-unquote,

166

1   "cleanup" of Oracle's unapplied cash?
2   MS. WINE:  Objection.  Vague and ambiguous.
3   THE WITNESS:  I don't understand what you
4   mean.
5   MR. WILLIAMS:  Q.  Well, how would -- did
6   Oracle ever clean up its unapplied cash?
7   MS. WINE:  Same objection.
8   THE WITNESS:  Again, it's an ongoing challenge
9   to keep the number of transactions in there and the
10  collectors is an ongoing process to help keep it down.
11  MR. WILLIAMS:  Q.  So there was never a
12  specific, quote-unquote, "cleanup" of Oracle's unapplied
13  cash while you were at Oracle?
14  A.  A specific -- there was one in 2002 where we
15  spent a focused amount of time cleaning up the large
16  dollar items and getting things squared away.
17  Q.  And describe that for me.
18  A.  It was a project that I had the collections
19  senior manager or manager at the time, Ryan Roberts and
20  his staff, do -- you know, focus on the large dollar
21  items and determine what its proper resolution was,
22  whether it should be refunded or applied or, you know --
23  Q.  And what did you do?
24  MS. WINE:  Objection.  Vague and ambiguous.
25  THE WITNESS:  What did I do?

167

1   MR. WILLIAMS:  Q.  You said that "it was a
2   project that I had the collections senior manager or
3   manager at the time, Ryan Roberts, and his staff do, you
4   know, focus on the large dollar items and determine what
5   its proper resolution was, whether it should be refunded
6   or applied."
7   And how much money was in Oracle's
8   unapplied cash at that time?
9   A.  I don't recall.
10  Q.  And how much of that money -- of that
11  unapplied was refunded during that cleanup that you're
12  describing?
13  A.  I don't recall.
14  Q.  Was any of it refunded?
15  A.  I don't recall.
16  Q.  Was any of it applied?
17  A.  I don't recall.
18  Q.  But you know that you -- you told people in
19  the collections department to determine the proper
20  resolution of Oracle's unapplied cash?
21  A.  Yes.
22  Q.  And did you do it in -- did you order that in
23  writing?
24  A.  My communications to them were verbally.
25  There may have been something in writing.

168

1   Q.  Did that -- what precipitated that order or
2   direction by you?
3   A.  There was highlighted attention on the
4   unapplied cash account, and that it needed to get
5   cleaned up.
6   Q.  Do you know why?  Do you know what caused the
7   highlighted attention?
8   A.  I believe at one point there was activity in
9   the on account field in the AR module, and that was
10  pointed to -- I'm not sure which account.  I believe it
11  was the bad debt reserve account.  And that at some
12  point along the way, that collectors were placing
13  those -- placing unapplied cash items on account or on
14  reserve.  I don't recall the term that they used.
15  Q.  What do you mean when you say "activity in
16  the on account field"?
17  A.  After the -- after Greg Myers did his 46,000
18  debit memos that had no accounting impact, cleaned out
19  the on account item, it freed it up to use it for its
20  intended purpose, and one of the intended purposes was
21  to, say if you had a -- as I understand it, how it
22  worked, one of the intended purposes was to, say if you
23  had a cash receipt that related to a specific customer,
24  you would put it on account, and thereby, you would have
25  visibility to the customer's outstanding invoices and

169

1 any cash they had on account that they could apply to
2 it, or if it was an overpayment, they could refund it
3 or resolve it.
4     Q.  I think your testimony was that, "I believe at
5 one point there was activity in the on account field in
6 the AR module and that was pointed to -- I'm not sure
7 which account.  I believe it was the bad debt reserve
8 account."
9     A.  Uh-huh.
10     Q.  What do you mean that it was pointed to the
11 bad debt reserve account?
12     A.  As I understand it, I don't know all the
13 specifics around it, and I certainly don't recall all
14 the specifics around it, but when the -- when something
15 was placed in the on account field, it increased the bad
16 debt reserve balance, the account balance.
17     Q.  And so did the -- did the bad debt reserve
18 account have a number?
19     A.  Yes.
20     Q.  Okay.  And did the on account have a number?
21     A.  I don't know.
22     Q.  So how -- well, withdrawn.
23     You prefaced your answers with "the way I
24 understand it."  What's the basis of your
25 understanding of how the on account field would

170

1 impact the bad debt reserve?
2     A.  The basis of my understanding is an
3 explanation I received from Greg Myers when the issue
4 arose that there may have been cash or unapplied cash
5 payments moved to on account by collectors, thereby
6 increasing that reserve amount.  That's how it was
7 explained to me.
8     Q.  And when was that explanation given to you?
9     A.  I don't recall the exact date, but, you know,
10 2002, probably around the time of -- that we went and
11 did the unapplied cash cleanup project.
12     Q.  And someone told you that it was a result of
13 the debit memos that were created in November of 2000?
14     MS. WINE:  Objection.  Misstates the
15 testimony.
16     THE WITNESS:  So you need to be clear that
17 they're two separate, distinct activities there.  There
18 is one activity in November of 2000 where 46,000 debit
19 memos were created to clean out the items that were held
20 in on account.  The accounting for those 46,000 items
21 were either one or two journal entries, in and out, in
22 and out of the same account, thereby resulting in no
23 impact to a balance sheet and no impact to the P&L.  The
24 issue or the project around cleaning up unapplied cash
25 resulted from -- that occurred in 2002, resulted -- I

171

1 don't know if it resulted -- was separate from that, it
2 was based upon collectors putting unapplied cash items
3 on account or on reserve, and again, I don't recall the
4 term that they used, thereby taking it off their
5 unapplied cash stats, statistics metrics, and by doing
6 that, it caused the increase in the bad debt reserve
7 account.
8     MR. WILLIAMS:  Q.  Now, you said that the
9 46,000 debit memos were either one or two journal
10 entries in and out of the same account, right?
11     A.  Yes.
12     Q.  How do you know that?
13     A.  Based upon my discussions with Greg Myers.
14     Q.  So you don't have any personal knowledge of
15 that, other than what you heard from someone else?
16     A.  So Greg is someone that reports to me and is
17 the accounts receivable global process owner for Oracle.
18     Q.  I understand that.
19     A.  And he is the one that, because it's his job
20 to do this, to understand how this works, he's the one I
21 would go to to get that information.
22     Q.  That's fine.
23     What I'm asking you is you have no personal
24 knowledge of the journal entries, other than what you're
25 saying Greg Myers told you?

172

1     A.  That's correct.
2     Q.  Okay.  And you also said that -- you also said
3 that the journal entries in and out of the -- that were
4 in and out of the same account, right?
5     A.  Yes.
6     Q.  And that's also based on something that Greg
7 Myers told you.  You don't have any personal knowledge
8 of that, do you?
9     A.  Greg Myers told me.
10     Q.  Aside from that, do you have any personal
11 knowledge of that?
12     A.  No.
13     Q.  Did you research it to try to find out whether
14 or not what Greg Myers told you was accurate?
15     A.  No.
16     Q.  Why not?
17     A.  Because Greg Myers -- it was his
18 responsibility, I had faith and trust in him, he
19 reported to me.  My confidence in him, in terms of his
20 understanding of accounts receivable and communicating
21 to me what happened, I had confidence that that was
22 the -- that those were the facts.
23     Q.  You also -- you had confidence in a lot of
24 people in your organization, right?
25     A.  Yes.

173

1    Q.   And -- well, you didn't do any of your own
2  research to determine whether or not Greg Myers, what he
3  told you was actually accurate, right?
4    A.   That's correct.
5    Q.   And you also stated that the transaction, that
6  is, the 46,000 debit memo transactions, didn't touch the
7  P&L, right?  That's what you testified to, right?
8    A.   That's correct.
9    Q.   And you know that solely because Greg Myers
10 told you?
11   A.   That's correct.
12   Q.   You're an accountant, though, right?
13   A.   Yes, I am.
14   Q.   Right.  You're a CPA, right?
15   A.   Yes.
16   Q.   Yeah.  And you were a CPA in 2000, right?
17   A.   Inactive, I believe, but nonetheless a CPA.
18   Q.   Are you a member of any accounting trade
19 organizations?
20   A.   No.
21   Q.   Never have been?
22   A.   I'm probably a member of AICPA when I was at
23 Anderson.
24   Q.   And -- but you're licensed by the State of
25 California, right?

174

1    A.   That's correct.
2    Q.   Was Greg Myers a CPA back in 2000?
3    A.   No.
4    Q.   Did you ask him what the basis of his analysis
5  was in -- whenever he explained this transaction to you?
6    A.   Yes.
7    Q.   And what was his basis?
8    A.   As I recall, he explained, among other
9  things -- I'm sure this wasn't the only thing, but I
10 asked him to walk through -- him to walk me through the
11 accounting, the debits and credits that were going to
12 occur for this particular -- you know, the sequel script
13 that was going to impact what the debits and credits
14 were.
15   Q.   And this was what, prior to or after the
16 November 2000?
17   A.   Prior to.
18   Q.   I'm talking about after.  You said that he
19 explained to you what happened -- that the debit memos
20 had no P&L impact and that they did not -- and the
21 journal entries went in and out of the same account.
22   MS. WINE:  That wasn't his answer.  I think
23 that was a conversation that he had with him before
24 November of 2000.
25   THE WITNESS:  Correct, that's a conversation I

175

1  had with Greg before November 2000 at or about the time
2  before November 17th regarding the sequel script that
3  was going to run to clear out the on account field and
4  the AR module, and he walked me through the accounting,
5  the debits and credits, and by walking me through the
6  debits and credits, I was able to agree with his
7  conclusion that it had no accounting -- net accounting
8  impact on either the balance sheets or the P&L.
9    MR. WILLIAMS:  Q.  So correct me if I'm wrong.
10 At some point in 2002 you talked to him about this
11 complaint, though, right?
12   A.   At some point, yes.
13   Q.   And wasn't it your testimony that right before
14 what you've called a cleanup of the unapplied cash in
15 2002, you had another discussion with him?  Was that
16 your testimony?
17   MS. WINE:  Objection.  Misstates testimony.
18   THE WITNESS:  It was one and the same
19 conversation.
20   MR. WILLIAMS:  Q.  Oh, so you talked to him
21 about the complaint and the 2002 unapplied cash cleanup
22 in the same conversation?
23   A.   Yes, as best I can recall, yeah.
24   Q.   And why were you having that conversation
25 together?  Why did you discuss those topics at the same

176

1  time?
2    A.   Probably due to the characterization of this
3  paragraph C in 41 of tying the cleanup of the unapplied
4  cash directly to the November 17th, 2000 on
5  account cleanup.  They're different.
6    Q.   That's to say you had a conversation with him
7  about those two things?
8    A.   Yes.
9    Q.   And when did the October 2000 -- well,
10 withdrawn.
11   When did the 2002 cleanup that you're
12 referring to occur?
13   A.   Sometime in the October/November time frame,
14 as best I can recall.
15   Q.   Do you know whether it was before or after a
16 complaint describing the debit memo transactions was
17 filed?
18   A.   I believe it was before.  I believe it was
19 before.  Interesting.
20   I'm sorry.  Can you ask the question again
21 or repeat the question?  Sorry.  Just repeat the
22 same one.
23   Q.   Okay.  That's fine.
24   The cleanup that you say occurred in 2002, did
25 that begin before or after a complaint was filed

177

1  describing the debit memo transactions?
2      A.  I believe it occurred before the complaint was
3  filed, but I don't recall, exactly.  I don't know -- I
4  don't know when the complaint was filed, itself.
5      Q.  Okay.  All right.
6          But then the complaint was filed, and you had
7  a conversation with Greg Myers about the complaint and
8  the cleanup at the same time?
9      A.  As best as I can recall, yes.
10     Q.  And during that conversation, he told -- what
11 did he tell you?
12     A.  I don't recall.
13     Q.  Just going back to Quinn No. 3, do you see
14 where it says, line 22, "With the approval of Mike
15 Quinn, Oracle's Vice President of Revenue Accounting and
16 Tom Williams, a former controller at Oracle and
17 consultant to Minton, on November 17th, 2000, Myers
18 initiated the creation of 46,800 debit memos or
19 fictitious invoices."  Do you see that?
20     A.  Yes, I do.
21     Q.  Are those the debit memos, the 46,000 debit
22 memos that we were talking about that you were saying
23 Myers told you was unrelated to the cleanup that
24 occurred in 2002?
25         MS. WINE:  Objection.  Assumes facts.

178

1          THE WITNESS:  So there are two distinct
2  events.  The 46,000 happened in November of 2000, and it
3  had nothing -- and those -- there was no accounting
4  form, and then the cleanup of unapplied cash was
5  something different that happened two years later, or
6  approximately two years later.
7          MR. WILLIAMS:  Q.  No, I understand that to be
8  your testimony.  I was just asking you the debit memo
9  transactions that are in subsection C, those are the
10 ones that you're saying had no relationship to whatever
11 was happening in 2002?
12         MS. WINE:  Are you asking him to agree with
13 the characterization of the debit memos in that
14 paragraph?
15         MR. WILLIAMS:  No.
16         THE WITNESS:  Had no relationship to --
17         MR. WILLIAMS:  Q.  The November --
18     A.  I don't know what the relationship was between
19 the two events.
20     Q.  Okay.
21         Now, directing your attention to subsection D
22 on page 21, do you see where it says, "CW49 further
23 disclosed that at that time, November 2000, he voiced
24 his concern to superiors, including Quinn, about
25 recognizing revenue on the basis of customers' unapplied

179

1  cash," do you see that?
2      A.  I see that.
3      Q.  Do you recall someone talking to you about
4  recognizing revenue on the basis of customers' unapplied
5  cash?
6      A.  I don't recall.
7      Q.  Isn't it true that someone indicated to you
8  that that would be improper in 2000?
9          MS. WINE:  Objection.  Asked and answered.
10         THE WITNESS:  I don't recall.
11         MR. WILLIAMS:  Q.  So describe for me what you
12 ordered your collection staff to do in 2002 to clean up
13 Oracle's unapplied cash or its on account.
14     A.  I asked them to look at the total population,
15 identify the largest items, and determine what their --
16 you know, what the proper disposition of those items
17 should be.
18     Q.  And what was -- what was the process of
19 getting that done; do you know?  Do you know what steps
20 they took to do that?
21     A.  I don't recall the steps that they took.
22     Q.  Did you give them direction as to what steps
23 to take to do that?
24     A.  I think I gave them high level direction in
25 terms of scope and, you know, look at something over --

180

1  you know, look at items over 100,000 or 10,000 or -- I
2  don't recall the specific amounts.
3      Q.  Why did you give them specific amounts, do you
4  know?
5      A.  Just to scope the project, you know.  There
6  were -- I don't know the exact number of items, but
7  there were hundreds or thousands of items in there,
8  probably, and, you know, couldn't address -- it's more
9  valuable to address the $500 item or the $5,000 item
10 than the $50 item or the $5 item.  So you just focus
11 your attention on the large stuff.
12     Q.  And how long did that project last, do you
13 know?
14     A.  I don't recall.
15     Q.  Did it take a month?
16     A.  I don't know.  I don't recall.
17     Q.  Well, let's see if we can get some sort of
18 time frame around it.
19         Did it take a year?
20     A.  You know, I do not recall.
21     Q.  Well, were you at Oracle in October of 2003?
22     A.  No.
23     Q.  So it didn't take a year, then, right?  Unless
24 it was still ongoing when you left.
25     A.  You would have to ask someone else.

181

1    Q.   Was it ongoing when you left in July of 2003?
2    A.   I don't recall.
3    Q.   Who were the collections analysts that were
4  involved in the cleanup that occurred in 2002 that you
5  were describing?
6    A.   The collection analyst.  I don't remember who
7  was there as a collection analyst in that time frame.
8    Q.   But it was collections analysts that were
9  doing the work, right?
10   A.   I gave the direction to my collections
11  managers to do the work.  They may have delegated to
12  their collection staff to do the work.
13   Q.   So it wasn't people in AR.  There weren't
14  people in AR doing that work, were there?
15   A.   I don't believe so.
16   Q.   So why was it just the collections staff doing
17  that so-called cleanup?
18   A.   They had the contact information,
19  potentially -- you know, relationship with the customer,
20  they knew how to approach the customer and, you know,
21  inquire with them; if it was a payment that wasn't
22  applied, there wasn't any remittance information, there
23  was an overpayment, whatever, one of the steps would
24  be -- a natural step would be to contact the customer,
25  and the collector is the best person to do that.

182

1    Q.   And how -- well, withdrawn.
2         But the AR -- I'm sorry.  The on account
3  is part of the AR module, right, of the
4  applications?
5    A.   Yes.
6    Q.   Is unapplied cash part of the AR module?
7    A.   I'm not sure.
8    Q.   How about customer overpayments, is there an
9  account called customer overpayments?
10   A.   I'm not sure.  I don't recall, specifically,
11  the name of the account.
12   Q.   So you're saying the only reason that the
13  collections analysts were doing this sort of cleanup
14  that you described was because they had relationships
15  with customers?
16   A.   They had the contact information --
17   Q.   I'm sorry.
18   A.   And they regularly called customers.
19   MR. WILLIAMS:  Okay.  Let's go off the record
20  for 5 minutes, please.
21   (Recess taken from 2:54 to 3:05 P.M.)
22   MR. WILLIAMS:  I'll ask the reporter to mark
23  this document as Quinn No. 4.
24   (Whereupon, Plaintiff's Exhibit 4 was marked
25        for identification.)

183

1    MR. WILLIAMS:  Q.  I'll ask you to just take a
2  look at what's been marked as Quinn No. 4.  Let me know
3  if you recognize it.
4    A.   I do recognize it.
5    Q.   Okay.  And is that declaration signed by you
6  in October -- or I'm sorry -- or November of 2002?
7    A.   Yes, it is.
8    Q.   And behind that is an e-mail written by you
9  around October 21st, 2002?
10   A.   Yes.
11   Q.   Do you -- well, I'm going to ask you to turn
12  to page -- I guess it would be the page after page 4 of
13  the declaration.
14        Do you see that?
15   A.   The page after page 4.  Yes.
16   Q.   It doesn't have a number on it, but is that
17  your signature there?
18   A.   That is my signature.
19   Q.   And what's the date of that last page?
20   A.   November 14th, 2002.
21   Q.   Okay.  And you were in Brazil?
22   A.   Yes.
23   Q.   In November of 2002?
24   A.   Yes.
25   Q.   And do you know where you signed this

184

1  declaration?
2    A.   Yes.
3    Q.   Why did you sign it?
4    A.   I signed it -- I signed it because I was asked
5  to sign it, and I was asked to make or -- you know,
6  confirm and make the statements here in -- you know,
7  that -- sign that these are -- my statements are true.
8    Q.   All right.  Did you write it?
9    A.   I did not -- I did not write the -- write it.
10   Q.   Do you know who wrote it?
11   A.   I believe -- well, I'm assuming -- well, I
12  believe it was someone in our legal department -- or
13  excuse me -- Oracle's legal department.
14   Q.   And did you receive drafts of it before you
15  signed it?
16   A.   Yes.
17   Q.   And did you make comments on those drafts?
18   A.   Yes.
19   Q.   When was the last time you saw any of those
20  drafts?
21   A.   November 2002.
22   Q.   What did you do with them?
23   A.   I don't recall.
24   Q.   Did you send them back to Oracle's legal
25  department?

185

```
1       A.  I don't recall.
2       Q.  Did you -- when you signed the declaration,
3   was Greg Myers in Brazil, as well?
4       A.  I don't recall.  I don't know.
5       Q.  Okay.  Did you talk to him about the
6   declaration?
7       A.  I may have, but I don't recall.
8       Q.  Do you know whether he signed the declaration
9   in this case at or around the same time?
10      A.  No, I don't.
11      Q.  So if he -- withdrawn.
12          I'm going to direct your attention to the
13  first page of the declaration.  You see No. --
14  paragraph No. 3?
15      A.  Yes.
16      Q.  Where you say -- you write that you have
17  personal knowledge of the matters set forth in the
18  declaration?
19      A.  Yes.
20      Q.  And you see No. -- paragraph No. 4, you say
21  that your staff participated in the conversion of Oracle
22  accounts receivable and other related systems over to
23  Oracle's new 11i applications?
24      A.  Yes.
25      Q.  Can you describe what you're referring to
```

186

```
1   there?
2       A.  We upgraded from the previous version to the
3   11i version of the Oracle application suite.
4       Q.  And when -- when did that occur?
5       A.  I don't recall.
6       Q.  Do you see -- was it in October of 2000?
7       A.  I don't know.
8       Q.  Okay.  But you write here that it occurred
9   sometime in 2000, right?
10      A.  Yes.
11      Q.  Was it before or after Oracle created the
12  46,000 debit memos on November 17th, 2000?
13      A.  I didn't recall the date when we did it, when
14  we did the upgrade.
15      Q.  So you don't know whether it was before or
16  after November 17th?
17      A.  I don't want to guess.
18      Q.  Right.  So you don't know whether it was
19  before or after November 17th?
20      A.  Correct.
21      Q.  Okay.  And -- but you do know that it happened
22  in 2000?
23      A.  Correct.
24      Q.  And who -- do you know who, in Oracle's IT
25  staff, was responsible for the upgrade to 11i
```

187

```
1   financials?
2       A.  No, I don't know.
3       Q.  Would they have communicated with you to make
4   sure that the accounts receivable department at Oracle
5   collections was prepared for the upgrade?
6       A.  They would have communicated to either myself
7   or the functional managers within the groups that I
8   managed, the credit and collections or the accounts
9   receivable or the revenue accounting or the imaging
10  groups that I managed.
11      Q.  Are you saying that they may not have
12  communicated with you, the person who ran those
13  organizations, as to whether or not those org -- your
14  organization was prepared for the 11i upgrade?
15      A.  I'm saying they could have communicated to me,
16  but they also would have communicated to the functional
17  managers.
18      Q.  Is it possible that they would not have
19  communicated to you regarding the upgrade?
20      A.  It's possible.
21      Q.  Do you see the next sentence where you write,
22  or you say, "As part of that conversion, it was
23  determined that the previous functionality of assigning
24  on account notations to unassigned cash receipts, once
25  they were applied, was no longer necessary"?
```

188

```
1           MS. WINE:  Once they were to be applied.
2           MR. WILLIAMS:  Q.  I'm sorry, "once they were
3   to be applied was no longer necessary"?
4       A.  Okay.
5       Q.  I'm asking you, do you see that?
6       A.  Yes, I see it.
7       Q.  Okay.  Now, who was it -- well, withdrawn.
8           Who was it that made the determination
9   that the previous functionality of assigning on
10  account notations to unassigned cash receipts, once
11  they were to be applied, was no longer necessary?
12      A.  That would have been Greg Myers.
13      Q.  You didn't say that in your declaration,
14  though.  Why not?
15      A.  Because in communication with Greg, I came to
16  understand -- let's see.  I came to understand that this
17  was -- that this was true.
18      Q.  But you said that you had personal knowledge
19  of the matters in this declaration, so I'm trying to
20  understand --
21      A.  I'm sure I gained my personal knowledge
22  through conversations with Greg.
23      Q.  So you had no independent knowledge of what
24  you wrote or what is attributed to you, at least in
25  paragraph 4, line 9, and at least part of 10?
```

189

1      MS. WINE:  Objection.  Misstates the
2   testimony.
3      THE WITNESS:  Again, my knowledge came through
4   discussions with Greg.
5      MR. WILLIAMS:  Q.  That's what I said.  You
6   didn't have personal knowledge, other than what Greg
7   Myers told you, with regard to what is attributed to you
8   in lines 9 and 10?
9      A.  That's how I got my information.
10     Q.  Okay.  And what was the previous functionality
11  of assigning, quote-unquote, "on account notations to
12  unassigned cash"?
13     A.  I don't recall.
14     Q.  Prior to the 11i upgrade.  You don't recall?
15     A.  No, I don't.
16     Q.  Okay.  Did you know what that functionality
17  was prior to November of 2000?
18     A.  Prior to November of 2000.  I don't recall.
19     Q.  What is the functionality of assigning on
20  account notations to unassigned cash receipts?
21     A.  I don't recall.
22     Q.  You don't know what the functionality that
23  you're referring to in this declaration is?
24     A.  I don't recall.  I mean, five years ago,
25  six years ago.  Or actually -- I'm sorry.  It was about

190

1   three and-a-half years ago.
2      Q.  What was unassigned -- what was an unassigned
3   cash receipt prior to November 17th of 2000?
4      A.  I don't recall.
5      Q.  Do you know what an unassigned cash receipt is
6   at all?
7      A.  As it relates to Oracle, or just in general?
8      Q.  Yeah, Oracle.  Oracle.
9      A.  Unassigned cash receipt.  It would be an
10  unapplied cash item.
11     Q.  So is "unapplied" synonymous -- is "unapplied"
12  cash synonymous with "unassigned"?
13     A.  I'm not sure.
14     Q.  Was it synonymous with "unassigned" prior to
15  November of 2000?
16     A.  I'm not sure.
17     Q.  How did the upgrade to 11i affect on account
18  or unapplied or unassigned cash?
19     A.  I don't know.
20     Q.  Did you know in 2000?
21     A.  I don't recall.
22     Q.  But you were the Vice President of Americas
23  Revenue Accounting in 2001 and part of 2000 -- actually,
24  and 2002, right?
25     A.  I don't know the -- I was promoted to VP in, I

191

1   think, 2002, September of 2002.
2      Q.  Okay.  But prior to that, you were the
3   Director of Americas Revenue Accounting, right?
4      A.  I was the Director and Senior Director of
5   Americas Revenue Accounting.
6      Q.  So after November 2000, how did the,
7   quote-unquote, "on account and unassigned cash receipts
8   functionality of 11i" work?
9      A.  I don't recall.
10     Q.  You see where you write that, "It was no
11  longer" -- I'm sorry.  Do you see where you write, "It
12  was thus required that all existing on account flags
13  that had accumulated in our unapplied cash account 25005
14  be reversed"?  Do you see that?
15     A.  Yes, I do see that.
16     Q.  Okay.  Why was it required that -- well,
17  withdrawn.
18         What was an on account flag?
19     A.  I don't recall.
20     Q.  Did you know what an on account flag was in
21  2000 and -- in 2000?
22     A.  In 2000.  You know, I don't recall.
23     Q.  Do you know what a flag is?  As it relates --
24  I mean, it's your declaration.
25     A.  No, I understand.

192

1      Q.  What's a flag as written here?  Do you know
2   what that means?
3      A.  You know, I don't recall what that -- what the
4   definition of it is in there.
5      Q.  And during the time frame that you were
6   working for Anderson engaged doing Oracle, either,
7   quarterly reviews or year-end audits, had you ever seen
8   a, quote-unquote, "flag" in Oracle's accounting systems?
9      A.  I don't recall having seen it.
10     Q.  So do you know that unapplied cash -- the
11  unapplied cash account was 25005?
12     A.  At the time I knew.  I don't recall what it
13  was, exactly.  It may be right.
14     Q.  And you see where you write that "The
15  unapplied cash account" -- I'm sorry.  Do you see where
16  you write, "It was thus required that all existing on
17  account flags that had accumulated in our unapplied cash
18  account be reversed through a series of offsetting debit
19  and credit transactions," do you see that?
20     A.  Within account 2505, yeah.
21     Q.  Do you see that?
22     A.  Yeah.
23     Q.  You didn't have personal knowledge of that
24  when you signed this declaration, right?  This was
25  information that you received from Greg Myers?

193

1     MS. WINE:  Objection.  Assumes facts,
2  misstates the testimony.
3     THE WITNESS:  Based upon my discussions with
4  Greg Myers, who knew what's going on, that's my
5  understanding of what happened.
6     MR. WILLIAMS:  Q.  But didn't Greg Myers
7  report to you at the time that you signed this
8  declaration?
9     A.  Yes, he did.
10    Q.  And so you were the one who -- well, withdraw.
11    Do you see where you write, in paragraph
12 5, you were personally assigned -- well, "Earlier
13 this year I was personally assigned by Tom Williams
14 to manage an investigation into the proper
15 disposition of unassigned cash receipts that Oracle
16 collection staff had, over time, assigned to an
17 accounts receivable reserve known as account 12601"?
18    A.  I see that.
19    Q.  When did Tom Williams assign you to manage
20 that investigation?
21    A.  I don't recall.
22    Q.  It was sometime in 2002?
23    A.  Yes.
24    Q.  And as of 2002, what was unassigned cash?
25    A.  As of 2002, as I recall, unassigned cash was

194

1  unapplied cash.
2     Q.  So are you saying that unapplied cash and
3  unassigned cash were synonymous?
4     A.  As I read it today, yes, that's the conclusion
5  I draw.
6     Q.  Do you know whether or not unapplied cash and
7  unassigned cash were synonymous prior to October -- or
8  I'm sorry -- November of 2002?
9     A.  I don't recall.
10    Q.  And a receipt is money received from a
11 customer, right?
12    A.  Yes.
13    Q.  And do you understand any other meaning of the
14 word "receipt" as it applies to Oracle's financial
15 systems or its AR system?
16    MS. WINE:  Objection.  Vague and ambiguous.
17    THE WITNESS:  No.
18    MR. WILLIAMS:  Q.  Okay.  So is it fair to say
19 that a receipt is almost always a receipt of some sort
20 of payment from a customer?
21    A.  A receipt could be a payment from a customer
22 or some other party.
23    Q.  Okay.
24    A.  That comes in.
25    Q.  All right.  And you write that Oracle's

195

1  collection staff had, over time, assigned customer
2  receipts to an account receivable reserve.
3     Do you see that?  Lines 17 and 18.
4     A.  Yes.
5     Q.  What does that mean?
6     A.  So they had -- they had taken the unapplied
7  cash item, the cash receipt, which turns into unapplied
8  cash, if not applied to an invoice, and put it into the
9  on account field in the AR module, AR application
10 module.
11    Q.  And how did you know that?
12    A.  Based upon my discussions with Greg.
13    Q.  Had you ever seen, in 2002, that someone in
14 your collection staff had put some item in -- or some
15 unapplied cash in on account?
16    A.  I had not seen that personally.
17    Q.  Did Greg supervise the collection staff?
18    A.  No.
19    Q.  And he doesn't have any responsibility for the
20 collection staff, right?
21    A.  No responsibility to manage them, no.
22    Q.  And the collection staff had its own
23 management in 2002, didn't it?
24    A.  Yes.
25    Q.  And it had -- how many managers did you have

196

1  in collections at the time, in 2002?
2     A.  If I recall, it was six or seven.
3     Q.  Okay.  Can you tell me any of their names?
4     A.  In 2002.  Ryan Roberts, I believe Justin
5  Backs, Ann Marie Adao, I think Molly was there, Molly
6  Littlefield or V, I believe Ian Hatada was a manager at
7  the time.  What am I missing?
8     Q.  I'm sorry.  Did any -- I'm sorry.
9     Are you done?
10    A.  I'm done.
11    Q.  Did any of those collections managers tell you
12 that they had put unapplied or unassigned cash in on
13 account in 2002, and that was improper?
14    A.  Did they tell me it was improper?
15    Q.  No, did they tell you that they had put money
16 there or unassigned cash there in 2002?
17    A.  I don't recall if they told me, specifically.
18    Q.  Did you ask them?
19    A.  I don't recall.
20    Q.  Did you talk to them before you set -- before
21 you wrote that -- that Oracle's collection staff had,
22 over time, assigned to accounts receivable reserve --
23 well, withdrawn.
24    Did you talk to them before you wrote or
25 signed off on paragraph No. 5 in your declaration?

197

1    A.  I had gathered the information to be able to
2    make this statement prior to signing it.
3        Q.  From whom?
4    A.  Certainly from Greg when we looked at the
5    activity that went into 12/6/01.  I'm trying to think if
6    Adam Hahn was still there at the time.  I may have
7    spoken to him before he left.
8        Q.  Well, you said "certainly Greg".  Is there
9    certainly anyone else that you talked to before you
10   signed off on paragraph No. 5?
11   A.  I don't recall.
12       Q.  And 12601, that was the number for an accounts
13   receivable reserve?
14   A.  Yes.
15       Q.  And prior to November of 2002, money was being
16   transferred between 25005 and 12601, right?
17   A.  That's my understanding, yes.
18       Q.  And those transfers impacted Oracle's balance
19   sheet, right?
20   A.  Yes.
21       MS. WINE:  Objection.
22       MR. WILLIAMS:  Q.  And in what way?
23   A.  It increased the reserve balance that was in
24   the -- that GL account, 12601.
25       Q.  And those -- the transfers were done via auto

198

1    adjustments, weren't they?
2        MS. WINE:  Objection.  Assumes facts.
3        THE WITNESS:  I don't know.
4        MR. WILLIAMS:  Q.  Do you know what an auto
5    adjustment is?
6    A.  No.
7        Q.  Never had heard of an auto adjustment?
8    A.  I've heard of it.
9        Q.  Well, what -- so you've heard of it, but you
10   don't know what an auto adjustment is?
11   A.  I can't speak to what the functionality of it
12   is.
13       Q.  And this -- in paragraph 5 you indicate that
14   these assignments to the accounts receivable reserve had
15   occurred over time, right?
16   A.  Yes.
17       Q.  And that included 1999, 2000, 2001?
18   A.  My understanding at this time, and my
19   recollection of it was that it did not go back very far
20   or -- it didn't go back before January of 2001, if I
21   recall correctly.
22       Q.  And what is the basis of that -- of that
23   recollection?
24   A.  I recollect -- what do I recollect?
25       I recollect that when we looked at the

199

1    activity in that account, it spanned some time period
2    that went back to early 2001.
3        Q.  What activity are you talking about?  What
4    activity did you look at?
5    A.  The activity in the 12601 account.
6        Q.  What did you actually look at?
7    A.  An analysis pulled together by, I believe --
8    I'm not sure who pulled it together.  One of the people
9    that worked in my organization pulled it together.
10       Q.  And when did you look at that, while you were
11   in Brazil?
12   A.  No, that was sometime probably in the
13   September/October -- probably October 2002 time frame.
14       Q.  And how come you didn't include that in your
15   declaration?
16   A.  Include what?
17       Q.  The time -- you said that this had occurred
18   over time, rather than saying that it occurred from, you
19   know, somewhere in early January 2001.
20   A.  I don't know.
21       Q.  And you had that knowledge -- based on your
22   testimony today, you had that knowledge prior to signing
23   off on this declaration, right?
24   A.  Yeah.
25       Q.  Okay.

200

1        MS. WINE:  John, I'm sorry.  I just need
2    another quick bathroom break.
3        MR. WILLIAMS:  You want to take five?
4        (Recess taken from 3:34 to 4:01 P.M.)
5        MS. WINE:  Before we start the questioning, I
6    just wanted to put a standing objection on the record
7    with respect to the line of questioning throughout the
8    day regarding the October 2002 cleanup.  The witness has
9    testified that that had nothing to do with the creation
10   of the 46,000 debit memos in November of 2000, that they
11   are unrelated events, and that the court has ordered
12   that Plaintiffs are not entitled to get discovery beyond
13   issues surrounding the creation of the 46,000 debit
14   memos.
15       We've given you a lot of leeway for various
16   reasons that we don't need to go into now, and there's
17   actually been hearings in the submissions that we've
18   been using today, including Mr. Quinn's declaration,
19   were all submitted in connection with the debate about
20   the proper scope of discovery, which ultimately led to
21   the court's March 10 order limiting the areas of inquiry
22   for Plaintiffs.
23       So again, I think we're way beyond that.  I
24   think we've given you a lot of leeway, and I just want
25   to put a standing objection on the record.

201

1    MR. WILLIAMS:  Q.  Directing your attention to
2  paragraph 4 of your declaration, do you see that?
3    A.  Yes.
4    Q.  And that describes what someone told you
5  happened in November 2000.
6    A.  Yes.
7    MR. WILLIAMS:  I'm going to ask the reporter
8  to mark this document as Quinn No. 5.
9    (Whereupon, Plaintiff's Exhibit 5 was marked
10    for identification.)
11    MR. WILLIAMS:  Q.  Quinn No. 5 is Bates number
12  NDCA-ORCL 10479 through 81.  I'm just going to ask you
13  to take a look at Quinn No. 5, and just let me know when
14  you're done reviewing it.
15    Do you recognize Quinn No. 5?
16    A.  I see that it's a string of e-mail that
17  includes me on it.
18    Q.  Now, earlier you testified that you did not
19  know what an auto adjustment is or was.
20    Does Quinn No. 5 refresh your recollection as
21  to what an auto adjustment was at Oracle?
22    A.  Yes, it does.
23    Q.  Can you tell me what they were?
24    A.  An auto adjustment was to adjust off
25  small-dollar balances, depending on amount and age, and

202

1  clear those out of unapplied cash.
2    Q.  And those were done to adjust them off and put
3  them where?
4    A.  I'm not sure where they went.  I don't recall
5  exactly where they went.
6    Q.  Okay.  Well, who is Terry Elam?
7    A.  Terry Elam worked in the accounts receivable
8  group.
9    Q.  Okay.  And how about Omid Fardanesh?
10    A.  Omid Fardanesh?
11    Q.  I'm sorry.  Fardanesh.
12    A.  He is or he was a collector in the credit and
13  collections group.
14    Q.  Okay.  How about Sarah Sanchez?
15    A.  She was a collector, and I believe she was a
16  manager at one point in time, as well, in the credit and
17  collections group.
18    Q.  Okay.  And we've talked about Adam Hahn,
19  right?
20    A.  Yeah.
21    Q.  And he was in collections?
22    A.  Yes, he was.
23    Q.  And he was a manager in collections in May of
24  2001, right?
25    A.  Yes.

203

1    Q.  Okay.  Directing your attention to the last
2  page, 10481, you see this e-mail from Sarah to Terry
3  Elam?
4    A.  Yes.
5    Q.  It says, "All, here are the new auto
6  adjustment parameters to be run twice a month."
7    A.  Uh-huh.
8    Q.  And isn't it true that either AR or
9  collections, or both, ran these auto adjustments at
10  least a couple times a month in 2000 to 2001?
11    MS. WINE:  Objection.  Lacks foundation.
12    THE WITNESS:  AR, the accounts receivable
13  group would run the auto adjustments.  I'm not sure what
14  time period or how often they did it.
15    MR. WILLIAMS:  Q.  With your approval, right?
16    A.  I don't recall.
17    Q.  Well, go to 040480.  Do you see where Omid
18  Fardanesh writes to you, "Mike, can you please approve
19  the below auto adjustment parameters for AR to use from
20  this point on?"
21    A.  Yes.
22    Q.  And right above that do you see your response
23  to Omid, "Approved through fiscal 02"?
24    A.  Yes.
25    Q.  So these auto adjustments were done with your

204

1  approval, right?
2    A.  Yes, just these were.
3    Q.  And these auto adjustments were, you're
4  saying, done by accounts receivable?
5    A.  Yes.
6    Q.  And were these adjustments to the bad debt
7  reserve?
8    A.  I'm not entirely sure.  I believe that to be
9  the case, though.
10    Q.  Right.  And you indicated that these type of
11  auto adjustments to the bad debt reserve would increase
12  bad debt reserve, right?
13    A.  Yes.
14    Q.  And that would cause bad debt expense to be
15  decreased, wouldn't it?
16    A.  No, it would cause the bad debt account to
17  increase.
18    Q.  Bad debt expense.  I'm asking, it would cause
19  bad debt expense to decrease, right?
20    A.  No.
21    Q.  What impact would it have on bad debt expense,
22  if any?
23    A.  None.
24    Q.  Okay.  And wouldn't it be true that the
25  company would not have to increase its bad dead expense

205

1  because these auto adjustments were increasing the bad
2  debt reserve?
3      A.  It had no impact on bad debt expense.
4      Q.  At all?
5      A.  At all.
6      Q.  Okay.  And so at no time did the auto
7  adjustments that went to the reserve have any impact on
8  bad debt expense?
9      A.  That's correct.
10     Q.  Okay.  And tell me what accounts that it
11 impacted at all.
12     A.  It went to the bad debt reserve account, if my
13 recollection from looking at some other documents say
14 the 12601 account, so it would increase that balance
15 sheet account.
16     Q.  So these auto adjustments that we were talking
17 about in Quinn No. 5 would increase the bad debt
18 reserve?
19     A.  Correct.
20     Q.  Is that the only account that the auto
21 adjustments would impact?
22     A.  Other than the unapplied account because it
23 would be taken out of the unapplied account and put into
24 the bad debt reserve account.
25     Q.  Bad debt reserve account.

206

1      A.  The 12601.
2      Q.  So -- and what was the purpose of it?
3      A.  What was the purpose of what?
4      Q.  What was the purpose of these auto
5  adjustments?
6      A.  At some point you make an assessment as to how
7  much effort you want to expend on a $25 item or a $250
8  item that's, you know, 75 days old, just as an example,
9  or 180 days old, and it's to clean up and reduce the
10 number of transactions that are out there sitting in
11 unapplied cash.
12     Q.  And why would you -- well, the unapplied cash,
13 wasn't that specific customers' money?
14     A.  Wasn't that specific -- I don't know.
15     Q.  Well, isn't it fair to say that the unapplied
16 cash included customer money?
17     MS. WINE:  Objection.  Vague and ambiguous.
18     THE WITNESS:  It could have.
19     MR. WILLIAMS:  Q.  Okay.  What else would it
20 consist of?
21     A.  Oracle's money.
22     Q.  Okay.  Was Oracle paying itself?
23     A.  No.
24     Q.  Okay.  So -- well, unapplied cash would
25 consist of money that came to Oracle from customers,

207

1  right?
2      A.  Yes.
3      Q.  And for one reason or another, Oracle did not
4  or could not apply it to an open debit item, right?
5      A.  Correct, yes.
6      Q.  And it wasn't returned to customers, right?
7      MS. WINE:  Objection.  Lacks foundation.
8      THE WITNESS:  It wasn't returned to customers.
9      MR. WILLIAMS:  Q.  Well, it wasn't returned.
10 You just testified that these auto adjustments, at least
11 some of it was moved to the bad debt reserve, right?
12     A.  I have no knowledge of the disposition of each
13 and every transaction that went in there.
14     Q.  I'm not talking about the disposition of each
15 and every transaction.
16         Let's talk about the ones that you approved
17 the auto adjustments for, all right?  Those unapplied
18 receipts were customers that -- consisted of money from
19 customers that Oracle could not or did not apply to an
20 open debit item, right?
21     A.  Yes.
22     Q.  And these auto adjustments moved that money to
23 Oracle's bad debt reserve.
24     A.  That's correct.
25     Q.  And did Oracle ever tell customers that it was

208

1  doing that?
2      MS. WINE:  Objection.  Lacks foundation.
3      THE WITNESS:  I don't know.
4      MR. WILLIAMS:  Q.  Oracle was able to identify
5  the customers, though, right, that actually made the --
6  made payments that were in unapplied cash?
7      MS. WINE:  Objection.  Lacks foundation,
8  incomplete hypothetical.
9      THE WITNESS:  I don't know which ones they
10 could identify to a customer or not.
11     MR. WILLIAMS:  Q.  Wasn't it your testimony
12 that unapplied cash was money -- at least included money
13 from customers that could not be applied but would still
14 be assigned to a customer?
15     A.  It definitely was money that could not be
16 applied, and generally, you can assign it to a customer.
17 That wasn't the case for every single transaction,
18 though.
19     Q.  Right.  But in these auto adjustments that are
20 described by or described in Quinn No. 5, there's no
21 identification of customers in these auto adjustments,
22 right?
23     MS. WINE:  Objection.  Vague and ambiguous.
24     THE WITNESS:  I don't understand the question.
25     MR. WILLIAMS:  Q.  Well, look at the document,

209

1    it's Quinn No. 5.  Do you see any customer names in
2    Quinn No. 5?
3        A.  No.
4        Q.  Okay.  And -- but when you look at the amounts
5    on the first page ending 479 and ending 481, there are
6    specific amounts, right, dollar amounts?
7        A.  Yes, there are.
8        Q.  Now, these dollar amounts were not identified
9    first by selecting certain customers, were they?
10       A.  No, they weren't.
11       Q.  It's just an auto adjustment based on dollar
12    value, right?
13       A.  And days aged.
14       Q.  And days aged.
15      So some of them are less than 30 days; is that
16    fair to say?
17       A.  Yes.
18       Q.  Now, why would Oracle move an amount that was
19    in unassigned or unapplied cash for less than 30 days to
20    the bad debt reserve?
21       A.  Because there was a corresponding and
22    offsetting adjustment to any invoice that was $25 or
23    more that was credit memo'd off so the receivable was
24    reduced and the associated revenue was reduced.
25       Q.  What do you mean when you say that there was a

210

1    corresponding offsetting adjustment to an invoice?
2       A.  So a typical practice in the credit and
3    collection groups would be to define which invoices you
4    spend time collecting on, you know, if it's a million
5    dollars, if it's $100,000, at some dollar amount you
6    say, "It's not worth my time to go chase."  And so you
7    have to do something with those.  And so for a $25 -- or
8    for a zero to $25 invoice, those were written off or
9    auto adjusted, and I don't know exactly how -- what that
10    process was, but they were -- in a similar fashion,
11    either auto adjusted or auto credit memo'd off to
12    reverse the accounting on the original $25 transaction.
13       Q.  What does that have to do with customers'
14    unapplied cash?
15       A.  So if we received a cash payment of $15 for a
16    $15 invoice and it got automatically applied to that
17    invoice because they referenced the invoice number and
18    the invoice was open, it would get applied and that
19    invoice would be zero.  If we received a payment of
20    $25 -- or excuse me -- $15 and that invoice -- and it
21    was 180 days after the invoice was issued, that $15
22    invoice would have been auto credit memo'd or auto
23    adjusted off 'cause we weren't going to go collect on it
24    after 180 days.  It just wasn't worth the time.  It cost
25    more to collect on it than actually collect the cash, so

211

1    you would adjust that off, and by adjusting it off, it
2    would reverse the original accounting for it.
3       Q.  And it would reduce the unapplied cash?
4       A.  The adjustment of the invoice -- I'm sorry.
5    What would reduce the unapplied cash?
6       Q.  Well, the auto adjustment from unapplied cash
7    that you described before would reduce the dollar value
8    on unapplied cash.
9       A.  That's correct.
10       Q.  And that cash was cash that actually belonged
11    to customers.
12       MS. WINE:  Objection.  Calls for a legal
13    conclusion.
14       MR. WILLIAMS:  Q.  It was paid by -- paid to
15    Oracle by customers.
16       A.  Yes.
17       Q.  And the amounts that were in the auto
18    adjustments was never returned to customers, right?
19       MS. WINE:  Objection.  Calls for speculation.
20       THE WITNESS:  I don't know.
21       MR. WILLIAMS:  Q.  Well, under what
22    circumstances could the amount that was auto adjusted
23    off -- that was auto adjusted out of unapplied cash have
24    been returned to a customer?
25       A.  If it was identified in any subsequent

212

1    discussions with the customer, where they're reconciling
2    their customer accounts, their billing and payment
3    history and they identified that, "Oh, a $250 payment
4    happened," we auto adjusted it because it was old, it
5    was unreconciled, where you could identify that and
6    reverse that accounting and send that money back to the
7    customer.
8       Q.  Some of them were less than 30 days old,
9    right?
10       MS. WINE:  Some of what?
11       MR. WILLIAMS:  Q.  Some of the money that was
12    in unapplied cash was less than 30 days old, which was
13    part of the auto adjustments, right?
14       A.  Yes.
15       Q.  Now, when did Oracle begin -- well, withdrawn.
16      Was Oracle doing these auto adjustments
17    prior to May of 2001?
18       A.  Yes.
19       Q.  Okay.  And how long prior?
20       A.  I don't know.
21       Q.  And it was always coming out of the unapplied
22    cash?
23       A.  That's my understanding.
24       Q.  I want to go back to Quinn No. 3, which is
25    your declaration.  I'm sorry.  I think it's 4.  Your

213

1  declaration.
2      I'm going to ask you to take a look at
3  paragraph 11.  Do you see that?  It's on page 3.
4      A.  Yes, I do.
5      Q.  Do you see where it says -- where you write,
6  "Plaintiffs' witnesses are also wrong where they claim
7  that either I or anyone else at Oracle instructed
8  personnel no alter or delete historical transactions
9  notes on Oracle's A/R system"?
10     A.  Yes.
11     Q.  You see that?  And do you see another sentence
12  down -- well, the next sentence, it says, "To begin
13  with, no such instruction has been given to any employee
14  involved in the project or otherwise"?
15     A.  Yes.
16     Q.  And can you read the next sentence for me?
17     A.  "That is not to say, though, that comment
18  entries might not be changed to ensure that the comments
19  accurately reflected the current status of the
20  transaction in question."
21     Q.  Okay.  Now, here you're referring to the
22  comment notes in Oracle's ERPAR system?
23     A.  Yes.
24     Q.  And isn't it true that part of the
25  investigation that -- or the project that you instructed

214

1  members of your collection staff to do included changing
2  some of the entries in -- related to transactions in
3  Oracle's ERP and AR system?
4      A.  I instructed them to say that; that is to say
5  that any change to the system, there's a tracking of
6  those changes, and so there's a built-in audit trail, if
7  you will, so you could see who changed what when.  So
8  there's a records -- there's no deletion of historical
9  information; it's just an added item.
10     Q.  Okay.  Now, you see where you say that you --
11  in paragraph 12 where you say, "We ran a report of all
12  12601 transactions from August 2000 to October 2002
13  before we began our project"?
14     A.  Uh-huh.
15     Q.  What was the purpose of that?
16     A.  To identify the population of the transactions
17  that hit 12601.
18     Q.  Now, is it your testimony that the
19  transactions that are reflected in Quinn No. 5 hit
20  12601?  No. 5 is the document we were just looking at.
21     A.  Yes, that's my recollection.
22     Q.  And all the auto adjustments prior to May of
23  2001 that you indicated occurred also hit 12601?
24     MS. WINE:  Objection.  Lacks foundation.
25     THE WITNESS:  I believe that to be the case.

215

1  I don't know for sure.
2      MR. WILLIAMS:  Q.  And those auto adjustments,
3  they went back at least as far as August of 2000, right?
4      MS. WINE:  Objection.  Lacks foundation.
5      THE WITNESS:  I don't know the day that they
6  would go back to.
7      MR. WILLIAMS:  Q.  Well, looking at line 11 on
8  page 3 you say -- or you write -- I'm sorry.  Line 10,
9  "We ran a report of all 12601 transactions from
10  August 2000 through October 2002."
11     MS. WINE:  Objection.  Assumes facts, lacks
12  foundation.
13     THE WITNESS:  I don't know if those
14  transactions relate to the auto adjustments or not.
15     MR. WILLIAMS:  Q.  Okay.  But the first line
16  of that paragraph, paragraph 12, you discuss the 12601
17  transactions all within the same context, so maybe -- if
18  you could read paragraph 12 to yourself and then just
19  let me know when you're done.
20     MS. WINE:  Vague and ambiguous as
21  to "all in the same context."
22     MR. WILLIAMS:  Q.  Are you done?
23     A.  Yes, I'm done.
24     Q.  Now, is it fair to say that all of the auto
25  adjustments that we've been discussing related to the

216

1  12601 account were ongoing at least as far back as
2  August of 2000?
3      MS. WINE:  Objection.  Assumes facts, lacks
4  foundation.
5      THE WITNESS:  I don't know.
6      MR. WILLIAMS:  Q.  Isn't that what you're
7  referring to at line 10 in paragraph 12?
8      A.  So certainly at the time that this was put
9  together, you know, this was true.  I would not -- you
10  know, sitting here three and-a-half, four years later, I
11  don't remember all the specifics and facts and
12  circumstances surrounding it.
13     MS. WINE:  Are you asking him whether the
14  paragraph is true, or if the paragraph is referencing
15  auto adjustments?
16     MR. WILLIAMS:  Q.  Did you understand the
17  question?
18     A.  Yes.
19     Q.  'Cause you were answering -- okay.
20     Were you finished answering the question?
21     A.  Yes.
22     Q.  Okay.  Now, at least at the time that you
23  signed off on this declaration, you believed paragraph
24  12 to be true?
25     A.  Yes.

217

1    Q.  You see paragraph 13?
2    A.  Yes.
3    Q.  Can you just read that first -- you can read
4    this audibly for me, the first sentence in paragraph 13.
5    A.  "It is also important to point out that the
6    comments that Plaintiffs' witnesses refer to have
7    absolutely no accounting significance whatsoever.  As
8    explained" -- oh, the first sentence.  Sorry.
9    Q.  That's fine.
10       Now, are you saying there that the
11   comments field in the AR receivable -- I'm sorry.
12       Are you saying that the comment fields in
13   Oracle's AR system that the collections analysts
14   were either updating or changing had no accounting
15   significance, whatsoever?
16   A.  That's correct.
17   Q.  Okay.  Well, what if the accounting -- I'm
18   sorry.  What if the note field said that, "We must
19   refund the customer "X" amount of dollars"?  Would that
20   have no accounting significant, whatsoever?
21   A.  The comment has no significance.
22   Q.  Well, would any action that is taken based
23   upon the comment have accounting significance?
24   A.  Yes.
25   Q.  Possibly, right?  Right?

218

1    A.  In that particular example, yes.
2    Q.  Right.  So if, in the comments, there is
3    information about what to do with any money, it could
4    have accounting significance.
5        MS. WINE:  Objection.  Misstates the
6    testimony.
7        MR. WILLIAMS:  Q.  Any action taken could have
8    account significance.
9    A.  Any action you take can have accounting
10   significance.  Putting a comment in the comments field
11   does not.
12   Q.  What's the purpose of the comments field?
13   A.  To label that particular line item within the
14   accounting records.
15   Q.  To label a line item.  Does it not --
16   withdrawn.
17       Are the comments fields not used to
18   indicate what occurred in a conversation between a
19   collections analyst and a customer?
20   A.  It could.
21   Q.  Right.  So if there's a -- so the information
22   in the comment field could initiate action that has
23   accounting significance, right?
24   A.  Other steps would have to follow.  The
25   comment, itself, doesn't do anything.

219

1    Q.  Well, what I said was -- or the question I
2    asked was whether the comment in -- withdrawn -- whether
3    the information in the comment field could initiate
4    action that has accounting significance.
5    A.  That would not initiate the action.
6    Q.  So nothing that a collections analyst says in
7    a comment field would initiate action?
8    A.  No.
9    Q.  No?
10   A.  No.
11   Q.  So if -- withdrawn.
12       I just want to be clear.  So if a
13   collections analyst writes in the comment field, "We
14   have to refund this customer $500," would any
15   action, based upon that comment, have accounting
16   significance?
17   A.  Only if the collector acted on it and sent it
18   through its appropriate process to have the refund.
19   Q.  Do the comments -- withdrawn.
20       The comments are in a stream, right,
21   for -- in the AR module so that you can view
22   collectors' comments for a period of time; is that
23   fair?
24   A.  Which part of the module are you talking
25   about?

220

1    Q.  Any part.  You tell me.  I don't know.
2    A.  I don't know, either.
3    Q.  So you don't know any part of Oracle's AR
4    module where you could search comment fields and review
5    comments for, say, the past year?
6    A.  I do know where that is.  Or I did, at one
7    point, know where that is.
8    Q.  Okay.  So those comments would reflect things
9    that happened in the past up until the date, say, you
10   looked at it, right?
11   A.  Yes.
12   Q.  What is a miscellaneous receipts -- I'm
13   sorry -- a miscellaneous offset report?
14   A.  I don't recall.
15   Q.  Okay.  I'm going to ask you to take a look at
16   the e-mail at the back of Quinn No. 4.
17       Have you reviewed this -- well, take a
18   moment to review it, and then I'll ask you some
19   questions about it.
20   A.  Okay.
21       Okay.
22   Q.  Okay.  Do you recognize this e-mail?
23   A.  Yes.
24   Q.  And it was attached to your declaration in
25   '02, right?

221

1    A.  I don't recall that, specifically.  I don't
2    know for sure.
3    Q.  Look at paragraph 9 of your declaration.  You
4    can read that to yourself, and then let me know if you
5    think that this e-mail was attached to your declaration.
6    A.  Yes.
7    Q.  Do you now recall that it was attached to your
8    declaration?
9    A.  Yes.
10    Q.  So this e-mail is written by you to Ryan
11    Roberts, Greg Myers, Tom Williams, and cc'd to yourself
12    in October 2002, right?
13    A.  Yes.
14    Q.  All right.  Can you just read the first
15    paragraph for me?
16    A.  "Below is the action plan for addressing the
17    problems surrounding the unapplied cash issues that you
18    guys worked on last week."
19    Q.  And what were the problems you were referring
20    to there?
21    A.  It was around the item being, as I recollect,
22    the items that were placed in on account during some
23    period prior to October of 2002, and those having hit
24    the 12601 account.
25    Q.  And what were the items, customer

222

1    overpayments?
2    A.  Unapplied cash items that were placed in that
3    account.
4    Q.  Which includes customer overpayments?
5    MS. WINE:  Objection.  Lacks foundation.
6    MR. WILLIAMS:  Q.  Or can include customer
7    overpayments?
8    A.  You have to look at each specific one.
9    Q.  No, I'm asking you, they can include customer
10    overpayments?
11    MS. WINE:  Objection.  Lacks foundation.
12    THE WITNESS:  They could, sure.
13    MR. WILLIAMS:  Q.  And what was the work that
14    Greg and Ryan did in the week prior to October 21st,
15    2002?
16    A.  I don't recall.
17    Q.  Do you know if you had asked them to do the
18    work to address the problems surrounding unapplied cash
19    in the week prior to October 21st, 2002?
20    A.  In -- there's no -- I don't have any direct
21    recollection of that.  Certainly in reading this e-mail,
22    it implies -- it certainly presents that I asked them to
23    do some work, yes.
24    Q.  Okay.  And -- so that work would have had -- I
25    guess would have had to have begun, I guess, maybe 7

223

1    days prior to October 21st, right?
2    A.  That could be, yes.
3    Q.  All right.  I'm going to ask the reporter to
4    mark this document as Quinn No. 6.
5    (Whereupon, Plaintiff's Exhibit 6 was marked
6    for identification.)
7    MR. WILLIAMS:  Q.  You see what's been marked
8    as Quinn No. 6?
9    A.  Yes.
10    Q.  All right.  And what's the title of that
11    document?  Can you read it for me?  Just -- I'm sorry.
12    A.  Where is the title?
13    Q.  That's okay.
14    Do you see that it says "Plaintiff's
15    Second Amended Class Action Complaint for Violations
16    of the Federal Securities Laws"?
17    A.  Yes.
18    Q.  And I'm going to ask you to turn to page 66.
19    A.  Page 66.
20    Q.  Uh-huh.
21    A.  66.  Okay.
22    Q.  Do you see a date on that page there?
23    A.  October 11th, 2002.
24    Q.  And that was the week prior to you sending
25    this e-mail that is -- that was attached to your October

224

1    or your November 14th, 2002 declaration, right?
2    A.  Yes.
3    Q.  Had you seen Quinn No. 6 prior -- after
4    October 11th, 2002, and prior to October 21st of 2002?
5    A.  I don't recall.
6    Q.  Do you recall having meetings with your
7    collections staff in October 2002 discussing this
8    project that's reflected in this e-mail?
9    MS. WINE:  You're back on Exhibit --
10    THE WITNESS:  Exhibit 3?
11    MS. WINE:  -- 4.
12    MR. WILLIAMS:  Q.  I'm talking about the
13    attachment to your declaration, the October 21st, 2002
14    e-mail.
15    A.  And I'm sorry.  The question was did I have
16    meetings?
17    Q.  Yes, meetings concerning this unapplied cash
18    project.
19    MS. WINE:  I'm sorry.  Can I just hear the
20    whole question?  I just lost it.
21    MR. WILLIAMS:  Okay.
22    THE REPORTER:  "Question:  Do you recall
23    having meetings with your collections staff in
24    October 2002 discussing this project that's
25    reflected in this e-mail?"

225

1      THE WITNESS:  Yes.
2      MR. WILLIAMS:  Q.  And when were those
3   meetings?
4      A.  Sometime in October.
5      Q.  And who was at those meetings?
6      A.  It was the credit and collections managers, if
7   I recall correctly.
8      Q.  And during those meetings --
9      Well, what was the purpose of those meetings?
10      A.  Was to put in motion, you know, an action plan
11   to address the unapplied cash items.
12      Q.  And during those meetings -- well, withdrawn.
13      Was Ian Hatada at those meetings?
14      A.  I believe he was.
15      Q.  Was Molly Littlefield or Molly Venkataramana
16   at those meetings?
17      A.  Yes, I believe she was.
18      Q.  Was Omid Fardanesh at those meetings?
19      A.  I don't recall specifically, but he may have
20   been.
21      Q.  How about Ryan Roberts?
22      A.  I believe he was, too.
23      Q.  And during those meetings, isn't it true that
24   you discussed the impact of the debit memos that were
25   created on November 17th of 2000?

226

1      MS. WINE:  Objection.  Assumes facts not in
2   evidence.
3      THE WITNESS:  I don't recall discussing the
4   debit memos, themselves.
5      MR. WILLIAMS:  Q.  Did anybody at -- well,
6   withdrawn.
7      Isn't it true that during those meetings,
8   that people during the meetings discussed the
9   November 17th, 2000 debit memos?
10      MS. WINE:  Objection.  Lacks foundation.
11      THE WITNESS:  I don't know.  They may have.  I
12   don't recall.  They may have.
13      MR. WILLIAMS:  Q.  You see -- going back to
14   the e-mail attached to your declaration, attached to
15   Exhibit 4, do you see where you write to Ryan and Greg
16   that, "We need to provide an update to the audit
17   committee, a subcommittee of Oracle's Board of
18   Directors, in regards to what revenue impact this
19   process of taking unapplied cash receipts to the reserve
20   will have on our financial statements," do you see that?
21      A.  Yes, I do.
22      Q.  Had you ever -- prior to October 21st or --
23   withdrawn.
24      Prior to October 2002, had you ever
25   provided an update directly to Oracle's audit

227

1   committee?
2      A.  No.
3      Q.  And did someone ask you to put together an
4   update for the audit committee concerning the revenue
5   impact of taking unapplied cash to the reserve?
6      A.  Yes.
7      Q.  Who was that?
8      A.  Tom Williams.
9      Q.  And why did he do that?
10      A.  'Cause he needed to provide an update to the
11   audit committee and he wanted me to prepare the
12   information for him to present.
13      Q.  And had he talked to you about the complaint
14   that was filed against Oracle after October 11th of
15   2002?
16      MS. WINE:  At what time?
17      MR. WILLIAMS:  Any time after
18   October 11th, 2002.
19      A.  I don't recall if I spoke to him about it or
20   if he told me about it.
21      Q.  Did you talk about the complaint that was
22   filed against Oracle at any of the meetings you had with
23   your collection staff during October of 2002?
24      A.  I don't recall.
25      Q.  Did you prepare an update for the audit

228

1   committee describing the impact of taking the unapplied
2   cash receipts to the reserve to the audit committee?
3      A.  I'm assuming I did.  I can't recollect
4   actually putting it together.
5      Q.  And did that -- did the process of taking
6   unapplied cash to the reserve impact revenue in the
7   eight quarters prior -- or withdrawn.
8      Did the process of taking unapplied cash
9   to the reserve impact revenue in any of the
10   eight quarters prior to October 2002?
11      A.  Yes.
12      Q.  And in what quarters?
13      A.  I don't know.
14      Q.  And did you include that in your update?
15      A.  Yes.
16      Q.  Okay.  Was it written?
17      MS. WINE:  Sorry.  Just to clarify, I thought
18   you said you weren't even sure if you prepared an
19   update.  But I just want to make sure it's clear.  I'm
20   just trying to get a clear record.
21      MR. WILLIAMS:  If you want to, you can cross
22   him when we're done.  You can't ask him a question while
23   I'm doing my questioning.
24      MS. WINE:  Well, I just thought you might want
25   to get an answer to what you asked.

229

1      MR. WILLIAMS:  I intend to get it right.  So
2  I'm going to go back and ask you the same question and I
3  need you to answer it.
4      Q.  You had indicated that it did impact revenue
5  during the eight quarters prior to October of 2002.
6      A.  Yes.
7      Q.  And which quarters?
8      A.  I don't know.
9      Q.  And was that in your update?
10      MS. WINE:  Assumes facts.
11      THE WITNESS:  That would have been provided to
12  Tom if I -- in the event I put together the update.
13      MR. WILLIAMS:  Q.  Well, you said he asked you
14  to give him an update, right?
15      A.  Yeah.
16      Q.  Was it customary for you to ignore Tom
17  Williams' requests?
18      A.  It was not customary to ignore his requests.
19      Q.  So is it fair to say that you prepared an
20  update for Tom Williams with regard to the impact that
21  taking unapplied cash to the reserve had on revenue for
22  the eight quarters prior to October 2002?
23      A.  It's fair to say.
24      Q.  Okay.  And how -- what was the dollar value of
25  the impact that it had on revenue in the prior

230

1  eight quarters?
2      A.  I don't recall.
3      Q.  Do you see where you write, "We need to clean
4  up the entire problem prior to the end of October"?
5      A.  Uh-huh.  Yes.
6      Q.  And what was, indeed, the entire problem, if
7  you know?
8      A.  I don't recall what I was referring to there.
9      Q.  Okay.  And do you see where you write, "It has
10  to be cleaned up by moving cash receipts to the proper
11  buckets, unapplied customer overpayments or on account"?
12      A.  I see that.
13      Q.  Okay.  So when you move cash to unapplied,
14  what account does that go to?
15      A.  I don't recall.
16      Q.  When you move cash from -- when you move cash
17  to customer overpayments, where does that -- what
18  account does that go to?
19      A.  I don't recall.
20      Q.  Do you know what account it went to at the
21  time?
22      A.  Yes, at the time.
23      Q.  What account?  I'm sorry.  You knew at the
24  time, or you knew the account?
25      A.  At the time, I had the --

231

1      Q.  You could answer that question.
2      A.  I could answer the question.  Now I have no
3  idea.
4      Q.  Okay.  The same with the unapplied; you could
5  answer at the time?
6      A.  Yes.
7      Q.  All right.  Now, when cash was moved to
8  overpayment -- I'm sorry -- to on account, what account
9  did that go to?
10      A.  On October 21st?
11      Q.  Yeah, when you said you had to clean up the
12  entire problem by the end of October by moving cash
13  receipts to either unapplied customer overpayments or on
14  account.
15      A.  Right.  So -- I don't recall, specifically.
16      Q.  Was that in the report or update that you gave
17  to Tom Williams in whatever form you gave it to him?
18      MS. WINE:  Objection.  Assumes facts.
19      THE WITNESS:  I don't know.
20      MR. WILLIAMS:  Q.  You see where you write,
21  "We need to establish new policies and procedures to
22  ensure that this never happens again"?
23      A.  Yes.
24      Q.  And are you referring to the -- withdrawn.
25      Do you see where you write "we need to

232

1  establish new policies and procedures to ensure that
2  this never happens again"?
3      A.  Yes.
4      Q.  And what were you referring to that should
5  never happen again?
6      A.  The movement of unapplied cash items to on
7  account and, therefore, that hitting the 12601 account,
8  the bad debt reserve account.
9      Q.  So are you saying that the movements that you
10  described in bullet point 1, taking unapplied cash
11  receipts to the reserve account first goes to the on
12  account?
13      A.  First goes to the on account.  That's how they
14  got there.  That's how they got to the reserve account.
15      Q.  That's how they got to the reserve account.
16      A.  Yes.
17      Q.  Okay.  And did you create new policies or
18  establish new policies?
19      A.  Yes.  As I recollect, the best I can recall.
20      Q.  And who established those policies?
21      A.  I don't recall who did.
22      Q.  And would that -- did those policies mean that
23  the auto adjustments that we discussed in, I think,
24  Quinn No. 5 were no longer occurring?
25      A.  No.

233

1    Q.  Okay.  Well, what changed when those new

2  policies were established?

3    A.  I don't recall.

4        MR. WILLIAMS:  Okay.  He's got to change the

5  tape, so why don't we take five minutes.

6        (Recess taken from 4:51 to 5:16 P.M.)

7        MR. WILLIAMS: Q.  We were talking about the

8  new policies when we broke.  You indicated that new

9  policies were established?

10    A.  That's my recollection.

11    Q.  And who established them?

12    A.  I don't recall.

13    Q.  Were they written?

14    A.  I don't recall, exactly.

15    Q.  Okay.  Were they distributed to everyone in

16  AR?

17    A.  Again, sitting here today, you know, I don't

18  recall exactly what the distribution was.

19    Q.  Okay.  How about in collections?

20    A.  Again, I don't recall.

21    Q.  Do you see where you write, "We need to

22  establish new policies and procedures to ensure that

23  this never happens again."  I think I may have asked you

24  this just before the break, but I need to ask you again.

25        What was it that you needed to ensure never

234

1  happened again?

2    A.  Needed to ensure that unapplied receipts

3  weren't put on account and end up in the 12601 account.

4    Q.  Was it that -- was it the end result that

5  couldn't happen -- that should not happen again, meaning

6  that they end up in the 12601 account?

7    A.  Largely.  We wanted to make sure that people

8  were using the account correctly for its intended

9  purpose.  And not just gaining the unapplied cash

10  metrics kind of -- you know, making the unapplied cash

11  matrix looking better than they were by putting things

12  in the on account.

13    Q.  I'm not talking about on account; I'm talking

14  about taking the monies to reserve.  Because in the

15  first bullet point you don't mention on account, do you?

16  You can take a look at it.

17    A.  No, I don't.

18    Q.  And you don't mention on account in the second

19  bullet point, either, right?

20    A.  There is on account reference there.

21    Q.  I'm sorry.  But here you're saying -- in the

22  second bullet point you're talking about moving money

23  into on account.

24    A.  Yes.

25    Q.  Right?

235

1        Now, when you say that "We need to ensure that

2  this never happens again," are you saying that monies

3  should not -- from unapplied should not go to the

4  reserve account?

5    A.  In this particular case in the manner that

6  this occurred, this shouldn't happen again.

7    Q.  Okay.  So what if there was an adjustment that

8  allowed unapplied cash to go directly to the reserve

9  account without ever touching the on account; was that

10  something that would be okay?

11    A.  Depending on the circumstances, yes.

12    Q.  And tell me what circumstances.

13    A.  If it was a $25 item that you didn't want to

14  chase down or couldn't chase down or wasn't worthwhile

15  chasing down, you would move it to the reserve, to the

16  12601.

17    Q.  Directly from unapplied cash?

18    A.  Yes.

19    Q.  Now, going down to the second half of this

20  e-mail where you write "What needs to be done" --

21    A.  Okay.

22    Q.  And you see in certain bullet points you have

23  the sentences in all caps, right?

24    A.  Okay.

25    Q.  And the first one says, "This must be done by

236

1  the end of the day Tuesday."  Do you see that?

2    A.  Yes.

3    Q.  Why the urgency?

4    A.  I don't recall, precisely.

5    Q.  Was it because you had to update the audit

6  committee on Wednesday?

7    A.  That's the likely scenario.

8    Q.  And this project -- you refer to this project

9  in your declaration, right?  In paragraph 5 where you

10  say, "Earlier this year."

11    A.  Yes.

12    Q.  So you were really just talking about the

13  month prior, right?  You were just talking about

14  October.

15    A.  I don't recall the exact timing.

16    Q.  Well, this is the project you're talking about

17  in -- that's referenced in the e-mail of October 21st,

18  isn't it?

19    A.  Yes.

20    Q.  What is the "Receipts Write Off All" tab?

21    A.  It was a tab on a spreadsheet, and that was

22  the title of it.

23    Q.  It was the title of a spreadsheet?

24    A.  I think it was a -- no.  Because it says here

25  the title of the tab was "Receipts Write Off All".  The

237

1    title of the spreadsheet was "12601_detail".
2         Q.   That's what I'm asking.  What is the "Receipts
3    Write Off All" tab?  What is that a reference to?
4         A.   I don't recall.
5         Q.   And you see the spreadsheet that you say is
6    titled "12601_detail", do you see that?
7         A.   Yes.
8         Q.   Have you seen that spreadsheet since
9    October 2000 -- October 21st, 2002?
10        A.   Certainly not since my employment at Oracle.
11   I couldn't --
12        Q.   What was on that spreadsheet?
13        A.   Again, I don't recall.
14        Q.   What is "12601 detail"?
15        A.   I don't recall what that was.
16        Q.   And what is -- what is a miscellaneous offset
17   report?
18        A.   I don't know what that is.
19        Q.   Is that the title of a report?
20        MS. WINE:  Objection.  Lacks foundation.
21        THE WITNESS:  At one point in time I knew,
22   back in October of 2002, but today I don't know.
23        MR. WILLIAMS:  Q.  Can you just go back to
24   your declaration paragraph 12.
25        A.   Yes.

238

1         Q.   Line 10 where you write, "We ran a report of
2    all 12601 transactions from August 2000 through
3    October 2002 before we began our project"?
4         A.   Yes.
5         Q.   Is that the report that is -- is that related
6    to the miscellaneous offset report that you referred to
7    in the e-mail, in the third bullet point?
8         MS. WINE:  Objection.  Lacks foundation.
9         THE WITNESS:  I don't know.
10        MR. WILLIAMS:  Q.  So do you know if this
11   report would -- was attached to this e-mail?
12        A.   Which report?
13        Q.   The miscellaneous offset report.
14        A.   I don't know if it was attached.
15        Q.   And going down to the last sentence on the
16   e-mail, can you just read audibly for me beginning with
17   "Ryan"?
18        A.   "Ryan, for each of the items bulleted above,
19   we need to focus 100 percent today and tomorrow on
20   getting through all of this work.  I like what you did
21   on the items greater than 100K.  We should continue to
22   follow this method.  I have attached a revised version
23   of that spreadsheet to include a couple additional
24   columns and some formatting.  Please incorporate those
25   columns and their contents into your work.  I have

239

1    attached that spreadsheet titled as "Greater than 100K
2    in 1260151 Version 3."
3         Q.   Okay.  That suggests that maybe you did attach
4    the spreadsheet in the e-mail?
5         MS. WINE:  Objection.  Lacks foundation.
6         THE WITNESS:  It looks like the spreadsheet
7    may have been attached, but I don't know.
8         MR. WILLIAMS:  Q.  So do you know what you're
9    referring to when you say, "I like what you did on the
10   items greater than $100,000"?
11        A.   If I recall correctly, and based upon reading
12   this e-mail, the -- they probably did the work on over
13   100K, the previous -- before I sent out this e-mail, and
14   this was to expand the scope to include a broader scope
15   of items.
16        MR. WILLIAMS:  I'm going to ask the reporter
17   to mark this document as Quinn No. 7.  It's Bates
18   numbered 614018 through 614023.  I'm sorry.
19        (Whereupon, Plaintiff's Exhibit 7 was marked
20        for identification.)
21        MR. WILLIAMS:  Hold on a minute.  Did it get
22   copied out of order?  It should be 614018 through 023.
23   I think 21 might be stapled improperly.
24        Q.   I'm going to ask you to just review what's
25   been marked as Quinn No. 7.  And just let me know when

240

1    you've had a chance to review it.
2         A.   Okay.
3         Q.   Now, do you recognize Quinn No. 7?
4         A.   Yes.
5         Q.   Okay.  How do you recognize it?
6         A.   I recognize this particular refund paid to the
7    customer in the -- I have a general recognition of this
8    e-mail trail, if you will.
9         Q.   And when was the last time you saw it?
10        A.   Oh.  Sometime when I worked at Oracle.  It
11   could have been 2002.  I don't know.
12        Q.   Who's Amy Aves?
13        A.   Amy Aves is like a title.  She's in charge of
14   the accounts payable group at Oracle.
15        Q.   And does the -- does review of Quinn No. 7
16   refresh your recollection as to whether or not there was
17   an approval process for refunds in 2000, 2001 or 2002?
18        A.   Yes.
19        Q.   Okay.  What is it that you recall now, if
20   anything?
21        A.   I don't recall the specifics around approval
22   levels, just that at some point for some dollar amount
23   they needed to come to me and/or Tom Williams for
24   approval.
25        Q.   For refunds?

241

1     A.   Yeah, for refunds.
2     Q.   But you don't recall what the dollar amount
3  was?
4     A.   No, I don't.
5     Q.   You didn't have the -- you did not, however,
6  have the approval authority for $178,000; is that right?
7     A.   I don't recall that.
8     Q.   So you don't know whether you had it?
9     A.   I don't recall what it was.
10     Q.   Okay.  All right.
11         Do you know when Raul Campos began working
12  at Oracle?
13     A.   No.
14     Q.   Okay.  Was he -- at some point he reported to
15  you as the unapplied specialist, right?
16     A.   Correct.
17     Q.   And can you give me a date range of when that
18  was?
19     A.   I don't know what the date range was.
20     Q.   Okay.  Well, why don't you speculate.  Was it
21  in 2001?
22     A.   I have absolutely no idea.
23     Q.   Okay.  How about 2002?
24     A.   Same answer.
25     Q.   And 2003?

242

1     A.   I have no idea.
2     Q.   How about -- well, do you see his name on any
3  of the documents in Quinn No. 7?
4     A.   Yes.
5     Q.   Okay.  And do you know, as of May -- as of
6  May 2002, do you know what Raul Campos' position was?
7     A.   Not on my own recollection.  In looking at
8  this e-mail, this would indicate that he was in that
9  role at that time.  He was in the unapplied cash
10  specialist role at the time.
11     Q.   All right.  What -- do you know what a credit
12  memo is?
13     A.   Yes.
14     Q.   And what do you understand a credit memo to
15  be?
16     A.   A credit memo is an adjustment to an invoice.
17     Q.   And what impact does it have on the invoice?
18     A.   It depends on the accounting that's associated
19  with that credit memo.
20     Q.   Well, give me a couple of examples of the
21  impact that a credit memo could have on an invoice.
22     A.   One example would be, let's just say, for
23  instance, a license and a support transaction that was
24  booked on an invoice, if you credit memo'd the invoice
25  in total, you would reverse the exact accounting for

243

1  that invoice.
2     Q.   And that would be reversing revenue?
3     A.   Correct.
4     Q.   Give me another example.
5     A.   If there was a manual invoice done for a
6  particular reason, you would have to do a manual credit
7  memo to reverse the accounting that was done on that
8  manual invoice.
9     Q.   And that would also reverse revenue?
10     A.   If the original accounting was revenue
11  related, yes.
12     Q.   Any other examples?
13     A.   Not off the top of my head.
14     Q.   I'm going to ask you to turn to Bates
15  No. 614021.
16         All right.  Do you see where it says, in the
17  middle of the page, "Raul Campos wrote"?
18     A.   Yes.
19     Q.   Do you know if there was some text in there
20  that is no longer here?
21     A.   I do not know.
22     Q.   Do you see where there's a note from Adam
23  Hahn?
24     A.   Yes.
25     Q.   And what does he write?

244

1     A.   "Let me know what you find out."
2     Q.   And do you understand this -- I guess at the
3  bottom of the page ending 021 and -- or the 022, to be a
4  discussion regarding household?
5     A.   Yes.
6     Q.   Okay.  I actually intended to -- all right.
7         I'm going to ask you to direct your attention
8  to 614022.
9     A.   Okay.
10     Q.   Do you see this in the middle of the page,
11  someone by the name of Kate Schwermann writes to Raul
12  Campos?
13     A.   Yes.
14     Q.   Who is Kate Schwermann?
15     A.   I believe she was a collector in the
16  collections group, if I recall correctly.  I'm not
17  entirely sure, though.
18     Q.   And do you see that she wrote a message to
19  Raul Campos?
20     A.   Yes.
21     Q.   Okay.  And what does it say in the reason
22  section of her message?
23     A.   The subject line, is that what you're
24  referring to?
25     Q.   No, if you go down -- well, withdrawn.

245

1          Do you understand what a refund template
2    is?
3          A.   Yeah.
4          Q.   What is it?
5          A.   It's a standard form used to submit refunds --
6    cash receipts that need to be refunded to the customer,
7    submit them to the -- if I recall correctly, the
8    unapplied cash specialist so they could do the research
9    and submit whether or not they should be refunded.
10         Q.   And is that what this appears to be, a refund
11   template?
12         A.   Based upon my limited knowledge of this, yes,
13   that's what it appears to be.
14         Q.   Would refunds be generated without being
15   recorded on a refund template while you were at Oracle?
16         MS. WINE:   Objection.
17         THE WITNESS:   I don't recall.
18         MR. WILLIAMS:   Q.   And you see in the middle
19   of that section there it says "reason"?
20         A.   Yes.
21         Q.   What does that say?
22         A.   "Customer receipt information regarding their
23   unapplied cash amount and requested a refund."
24         Q.   Okay.  And does this process kind of -- well,
25   withdrawn.

246

1          Does this template sort of initiate the
2    process of getting a refund generated?
3          A.   It's one way to do it.
4          Q.   Okay.  And she sends this e-mail to Raul
5    Campos, right?
6          A.   She does.
7          Q.   And Raul Campos was the unapplied specialist?
8          A.   I'm assuming so at that time.
9          Q.   Okay.  Do you see the text on the top of that
10   page, 614022?
11         A.   Yes.
12         Q.   What does that say?
13         A.   "This dollar amount was applied to the debit
14   memo numbers listed above.  These debit memo numbers
15   were created to remove these funds out of our unapplied
16   account instead of placing on account."
17         Q.   And do you know -- do you know what he's
18   referring to here?
19         A.   His writing is not very -- this -- these
20   sentences are not very clear to me.
21         Q.   They're not clear to you.  Okay.
22         What about it is not clear?
23         A.   "Applying these dollars to the debit memos --
24   debit memo numbers listed above," I don't know what -- I
25   don't recollect or know or understand that particular

247

1    one.
2          Q.   Well, tell me what it is that's unclear.
3    Well, you know what a dollar sign means, right?  It
4    means money, right?  No, seriously, I just need to get
5    through this.
6          This means money.
7          A.   Yeah.
8          Q.   And when it says "applied", that means money
9    was applied to an open debit item, right?
10         MS. WINE:   Objection.  Lacks foundation.
11         THE WITNESS:   I don't know what the open debit
12   item is.
13         MR. WILLIAMS:   Q.   You may not know
14   specifically what the open debit item is, but we talked
15   earlier about the term "applied", and I think your
16   testimony was that "applied" means money was applied to
17   an open debit item.
18         A.   No.
19         Q.   What was your testimony?
20         A.   It was that it was applied to an open invoice.
21         Q.   Okay.  Isn't an invoice a debit item?
22         A.   There are debits and credits associated with
23   an invoice.
24         Q.   All right.  Well, let's just use "invoice",
25   okay?  So money applied, for example, to an open

248

1    invoice.  And did you know what a debit memo -- what a
2    debit memo is?
3          MS. WINE:   Did you know he wasn't copied on
4    this e-mail?
5          MR. WILLIAMS:   Q.   He was forwarded the entire
6    e-mail, so I'm going to ask you to -- you know, I mean,
7    object if you're going to object, but he was forwarded
8    the entire e-mail.
9          MS. WINE:   Okay.
10         MR. WILLIAMS:   Q.   So do you know what a debit
11   memo is or was at the time?
12         A.   At the time I did, yes.
13         Q.   And what was it?
14         A.   I don't recall its specific definition.
15         Q.   Okay.  Do you know if "debit memo" refers to
16   debits that you had assigned to your customer for
17   additional charges that you want to collect?
18         MS. WINE:   Objection.  Lacks foundation.
19         THE WITNESS:   I don't know.
20         MR. WILLIAMS:   Q.   Okay.  So is that why you
21   don't understand what -- what's being written in this
22   sentence 'cause you don't know what a debit memo means?
23         A.   I don't understand how it all -- how that all
24   works together, what he's trying to convey here.
25         Q.   I understand that.  I'm just going to go

249

1  through it sentence by sentence to see if we can try to
2  figure it out together.
3       So do you understand what is written here
4  in this first sentence when he refers to a debit
5  memo?
6       A.  Yes.
7       Q.  Okay.  What is he referring to?
8       A.  A debit memo that's sitting in the AR
9  application that was created somewhere in the -- in the
10  ERP system within the module.
11      Q.  And they were list -- he says that they were
12  listed above, correct?
13      A.  Yes.
14      Q.  And these appear -- if you look at 614021, it
15  appears to be debit memos issued with 550 prefixes,
16  right?
17      A.  Yes.
18      Q.  Okay.  And he goes on to say that "These debit
19  memos were created to remove money or funds out of our
20  unapplied account."  Do you see that?
21      A.  Yes.
22      Q.  Okay.  And do you understand what that means?
23          MS. WINE:  Objection.  Lacks foundation.
24          THE WITNESS:  I'm not sure what he's intending
25  there, but the debit memos are referring to the 550

250

1  resulting from the November 2000 on account cleanup.
2          MR. WILLIAMS:  Q.  Okay.  And he says that
3  they're created in order to move funds out of the
4  unapplied account, right?
5          MS. WINE:  Are you just asking what -- if he
6  says that?
7          MR. WILLIAMS:  Q.  Yeah.
8       A.  Yeah, that's what he says.
9       Q.  And what do you understand the unapplied
10  account to be?
11          MS. WINE:  Objection.  Asked and answered.
12          THE WITNESS:  The unapplied account is the
13  account that includes all the cash payments from
14  customers that have not been applied to invoices.
15          MR. WILLIAMS:  Q.  And customer overpayments,
16  included in customer overpayments?
17      A.  Yes.
18      Q.  Okay.  And do you see where he writes in the
19  parenthetical, "Instead of placing the money on
20  account"? or "instead of placing on account"?
21      A.  Yes, I see that.
22      Q.  Okay.  And did Oracle, prior to November 17th
23  of 2000, place customer overpayments on account?
24          MS. WINE:  Objection.  Lacks foundation.
25          THE WITNESS:  I don't know.

251

1          MR. WILLIAMS:  Q.  Is there any reason to
2  believe that Raul -- well, withdrawn.
3       So going to 614021, the top of the page,
4  do you see the subject line?
5       A.  "Refund:  Household Finance."
6       Q.  And the e-mail is written from Raul to Adam
7  Hahn, right?
8       A.  Yes.
9       Q.  And can you just read the text for me below
10  where it's supposed to be "References"?
11      A.  "I ran a billing history from January '98 to
12  current.  Two invoices were credit memo'd, one was a
13  migration, the other was credit memo'd back in May '98
14  with your notes," parenthetically, C memo approved and
15  process via e-mail.  Let me know if you want to see the
16  report."
17      Q.  Okay.  And does that appear to be Raul's
18  response to Adam's question or Adam's statement "Let me
19  know what you find out"?
20      A.  Yes.
21      Q.  And in May of 2002 Adam was the senior manager
22  of collections, right?
23      A.  Yes, I believe so.
24      Q.  And he had been in collections for a few years
25  at that point, right?

252

1       A.  Yes.
2       Q.  And a customer billing history indicates --
3  withdrawn.
4       As of May of 2002, customer billing
5  history would indicate items or money that a
6  customer had, quote-unquote, "on account", right?
7       A.  I don't know for sure.
8       Q.  Okay.  What's a migration?
9       A.  A migration?  So migration occurs -- let me
10  see if I can recollect this -- for a customer moving
11  their multiple support contracts to some new contract,
12  rolling them in to create -- you know, they may have
13  purchased licenses and support 10 times, have 10
14  different contracts and they roll them into one.  I
15  believe that's what it is.
16      Q.  Okay.  And do you know what an RMA is?
17      A.  A return material authorization.
18      Q.  And what does that signify?
19      A.  That a customer is going to -- that an
20  authorization number has been issued, i.e., approved by
21  Oracle, and product is going to be returned.
22      Q.  And can an RMA be part of a refund process?
23          MS. WINE:  Objection.  Incomplete
24  hypothetical.
25          THE WITNESS:  It wouldn't be part of the

253

1 refund process.
2       MR. WILLIAMS:  Q.  Well, is it true that
3 sometimes -- well, withdrawn.
4       Isn't it true that if a company issues an
5 RMA, that it's authorizing a customer to return
6 product that it previously sold to the customer?
7       A.  Yes.
8       Q.  All right.  And in many of those
9 circumstances, a refund could be issued for the product,
10 hypothetically?
11      A.  Hypothetically, that's one of the outcomes.
12      Q.  Okay.  And it could be the reason why a credit
13 memo is issued, as well, right?
14      MS. WINE:  Objection.  Incomplete
15 hypothetical.
16      THE WITNESS:  That could be one of the
17 reasons, yes.
18      MR. WILLIAMS:  Q.  All right.  I'm going to
19 ask you to take a look at 614020.
20      A.  Yes.
21      Q.  Do you see where Adam Hahn writes a message to
22 someone by the name of Mike?
23      A.  Yes.
24      Q.  In the middle of the page.
25      Is that "Mike" you?

254

1       A.  I presume so.
2       Q.  Okay.  Can you read that message audibly for
3 me?
4       A.  "Mike, please approve the following refund and
5 forward on to Tom for final approval prior to sending to
6 Sam Yohannes for processing.  The refund is due to the
7 customer for various duplicate and customer overpayments
8 they have made to Oracle out of two accounts payable
9 departments.  Raul and I have reviewed their billing
10 history and we have no reason to keep their
11 overpayments.  The customer is current and has no
12 history of items being written off as bad debt.  Thanks.
13 Adam."
14      Q.  And you approved it, right?
15      A.  Yes.
16      Q.  All right.  And what -- was it typical for a
17 customer billing history to identify duplicate payments?
18      MS. WINE:  Objection.  Incomplete
19 hypothetical.
20      THE WITNESS:  I don't know.
21      MR. WILLIAMS:  Q.  What is a duplicate
22 payment?
23      A.  If a customer has paid the same invoice twice.
24      Q.  And was it possible at Oracle to run a billing
25 history and determine whether or not there was a

255

1 duplicate payment from a customer?
2       A.  I don't know what they would -- what would be
3 run to determine that.
4       Q.  I asked you if it was possible.
5       A.  If it was possible?  I don't know.
6       Q.  You don't know if it was possible to run a
7 billing history or any type of report at Oracle which
8 would help someone determine whether a customer had made
9 a duplicate payment on an invoice?
10      A.  So any type of report?  Yes.
11      Q.  And what type of report could that be?
12      A.  I don't know.
13      Q.  All right.  Could it be a billing history?
14      A.  I don't know.
15      Q.  Do you see where Adam writes, "Raul and I have
16 reviewed their billing history and we have no reason to
17 keep their overpayments"?
18      A.  Yes, I see that.
19      Q.  And do you know what an overpayment is?
20      A.  Yes.
21      Q.  Okay.  And what is it?
22      A.  It's where the customer pays more than what
23 they owed for a particular invoice.
24      Q.  Okay.  Can you think of any reason why Oracle
25 would keep an overpayment of a customer?

256

1       MS. WINE:  Objection.  Incomplete
2 hypothetical.
3       THE WITNESS:  One reason is they don't know
4 it's an overpayment.
5       MR. WILLIAMS:  Q.  That Oracle doesn't know
6 it's an overpayment, or the customer doesn't know it's
7 an overpayment?
8       A.  Both.
9       Q.  How about either/or?
10      A.  Or either/or.
11      Q.  Okay.  No reason.
12      Do you have any other reasons?
13      A.  No.
14      Q.  Okay.  Did you pass this on to Tom Williams?
15      A.  Yes.
16      Q.  And do you know whether or not he approved it?
17      A.  He did.  It shows it there.
18      Q.  Show me where.
19      A.  At the top of 020, from Tom Williams to
20 Michael Quinn copying Adam and Raul and Sam Yohannes and
21 he says "Approved."
22      Q.  And do you know Sam Yohannes?
23      A.  Yes.
24      Q.  Who is he?
25      A.  He worked at Oracle while I was there.

257

1    Q.  Okay.  And in what position, do you know?

2    A.  At one point he worked in credit and

3  collections, and in this particular case he was working

4  in the accounts receivable group, if I recall correctly.

5    Q.  I'm going to ask you to --

6    Do you know whether or not a check was written

7  to Household for approximately $178,000 after you

8  approved this refund?

9    A.  I don't know.  But in looking at the e-mail

10  that I wrote, according to this, this should not have

11  been refunded, so cash must have been paid to them.

12    Q.  And in -- why did you approve a refund related

13  to the debit memos that were articulated on 614021?

14    MS. WINE:  Objection.  Misstates the

15  testimony.

16    THE WITNESS:  The refund was approved based

17  upon the information provided by the people that

18  reported in to me.

19    MR. WILLIAMS:  Q.  Are you talking about --

20  who are you talking about, Adam and Raul?

21    A.  Raul and Adam, and the validation that -- you

22  know, presumably they went through, they represented to

23  me that this, in fact, was a refund, and based upon that

24  research and that review on their part, I approved it.

25    Q.  I'm saying that they had forwarded this

258

1  information to you relating to each of these checks that

2  were applied to these 550 debit memos, right?

3    A.  Yeah.

4    Q.  And you approved it, right?

5    A.  I approved the refund, yeah.

6    Q.  Right.  And so -- and you knew at the time

7  that -- well, you knew that the money had been

8  previously applied to these debit memos?

9    MS. WINE:  Objection.  Misstates the

10  testimony.  Assumes facts.

11    THE WITNESS:  I don't know.

12    MR. WILLIAMS:  Q.  Well, isn't that what Raul

13  wrote to you?

14    A.  That's what he wrote.

15    Q.  Right.  And so -- and --

16    A.  So based upon the information that he

17  provided.

18    Q.  Okay.

19    Now, going up to -- directing your attention

20  to 614019 --

21    A.  Okay.  Yes.

22    Q.  You see the e-mail on the bottom of that page?

23    A.  Yes.

24    Q.  What's the date of that last e-mail?

25    A.  May 14th.

259

1    Q.  And do you see the e-mails above that?

2    A.  Yes.

3    Q.  And what are the dates on those e-mails?

4    A.  October -- 2002, October 2002.

5    Q.  Do you know why the e-mails that occurred

6  prior to -- on and prior to May 14th, 2002 were

7  forwarded back to Raul Campos and Kate Schwermann

8  five months later in October, six months?

9    A.  I don't know specifically why.

10    Q.  Do you see in the middle of the page where it

11  says, "Amy Aves wrote"?

12    A.  Yes.

13    Q.  Do you know who she was writing to?

14    A.  I'm assuming she just forwarded that to me

15  prior to -- yeah.  So Kate Schwermann sent it to her and

16  she just forwarded it on to me.

17    Q.  And your response to Amy?

18    A.  I see it.

19    Q.  Okay.  Can you read what the first -- or the

20  first two sentences of your response to Amy?

21    A.  "Got it.  Raul and Adam misinterpreted what

22  the 550 -- the 550 debit memos were for."

23    Q.  And then in the next sentence, too.

24    A.  "This should not have been refunded."

25    Q.  Now, what -- what do you mean when you write

260

1  "Raul and Adam misinterpreted what the 550 debit memos

2  were for"?

3    A.  You know, back then I certainly was up on all

4  the details around it.  Sitting here today, you know, I

5  don't know what the misinterpretation was.

6    Q.  Did you talk to Raul about it?

7    A.  I don't recall.

8    Q.  Did you talk to Adam about them?

9    A.  I don't recall.

10    Q.  And do you see where you say, "This should not

11  have been refunded"?

12    A.  I see it.

13    Q.  Do you know why you write that this should not

14  have been refunded?

15    A.  Certainly at that time, I knew.  Sitting here

16  today, I don't.

17    Q.  And this is after or during the period when

18  this -- what you've called an unapplied cash cleanup was

19  occurring in your department, right, in October 2002?

20    A.  Unapplied cash project, yes.

21    Q.  And this e-mail that was forwarded to you was

22  related to Household's unapplied cash, right?

23    A.  Yes, in looking at the e-mail, that's what it

24  appears.

25    Q.  And you know that -- I'm going to direct your

261

1   attention to Quinn No. 6.
2        Is it fair to say that as of October 25th of
3   2002, you knew that there was an allegation against
4   Oracle that Oracle had improperly converted some of
5   Household's unapplied cash to revenue?
6        A.  I'm sorry.  Can you repeat the question?  It
7   was a long question.
8        Q.  Is it fair to say that as of October 25th,
9   2002, you knew that there was an allegation against
10  Oracle that Oracle had improperly converted some of
11  Household's unapplied cash to revenue?
12       A.  I don't recall any allegation specific to
13  Household.
14       Q.  No?
15       MS. WINE:  Shawn, we've been going another
16  hour.
17       MR. WILLIAMS:  We can take five minutes if
18  you'd like.
19       (6:02 P.M. to 6:18 P.M.)
20       MR. WILLIAMS:  Q.  Still on Quinn No. 7 where
21  you write that "This should not have been refunded."  Do
22  you see that?
23       A.  Yes.
24       Q.  Do you know whether or not Oracle ever
25  demanded that money back from Household?

262

1        A.  I don't know if that happened or not.
2        Q.  Do you know if Oracle ever got that money back
3   from Household?
4        A.  I don't know.
5        Q.  Do you know who might know?
6        A.  Greg might.  Greg Myers.
7        MR. WILLIAMS:  I'm going to ask the reporter
8   to mark this document as Quinn No. 8.
9        (Whereupon, Plaintiff's Exhibit 8 was marked
10       for identification.)
11       MR. WILLIAMS:  Q.  No. 8 is Bates numbered
12  NDCA-ORCL 131153 to 131155.
13       Do you recognize Quinn No. 8?
14       A.  Okay.
15       Q.  Do you recognize Quinn No. 8?
16       A.  Yes.
17       Q.  And how do you recognize it?
18       A.  I recognized -- I recognized that I -- it
19  looks like I wrote this e-mail way back when.
20       Q.  It's a correspondence between you and other
21  people at Oracle, right?
22       A.  Yes.
23       Q.  And it's in the -- would you say it's in
24  February of 2001?
25       MS. WINE:  Which part of it?

263

1        MR. WILLIAMS:  Q.  Any part of it.
2        A.  February of 2001?  I don't see a date.
3        Q.  Okay.
4        A.  Is there a date on here?
5        Q.  Do you see at the bottom right-hand corner?
6        A.  Okay.
7        MS. WINE:  Well, are you asking --
8        MR. WILLIAMS:  Q.  Would it be fair to say
9   that this e-mail correspondence occurred sometime prior
10  to or on February 16th, 2001?
11       A.  I don't know.  I don't see any basis for
12  saying what the date is.  I just don't know.
13       Q.  Okay.
14       A.  So prior to -- that's the only date on it.
15       Q.  Well, how about let me just direct your
16  attention to the first page, the first portion of the
17  text three lines down where it says, "Forget about
18  the licenses."  Do you see that?
19       A.  Yes.
20       Q.  And it says, "The support term has not been
21  paid for and its term ends May 1, 2001"?
22       A.  Yes.
23       Q.  "Nine months down, only three months to go"?
24       A.  Okay.
25       Q.  So would that suggest that the e-mail, at

264

1   least that response, was sometime in February?
2        A.  Yes, that does.
3        MS. WINE:  Counsel, there is a date on some of
4   the e-mails.
5        MR. WILLIAMS:  Is there?
6        MS. WINE:  Yeah, if you look at page 131154,
7   two thirds of the way down, at least, there's a date of
8   November 24th, 2000.
9        MR. WILLIAMS:  Thanks.
10       Q.  Do you see the text that we just read, that's
11  an e-mail written by you, right?
12       A.  Yes.
13       Q.  And who is Mark Keeney?
14       A.  Mark Keeney, if I recall correctly, was
15  someone in the sales organization.
16       Q.  How about Jocelyn Silva?
17       A.  Who is she?
18       Q.  Yes.
19       A.  She's someone in the credit and collections
20  group.
21       Q.  Someone in your organization in February of
22  2001, right?
23       A.  Yes.
24       Q.  Okay.  What is a POEF, if you know?
25       A.  It's a purchase order exemption form.

265

1    Q.  And what is its purpose?
2    A.  In lieu of obtaining a purchase order at the
3  end -- or in lieu of obtaining a purchase order, the
4  customer would sign a POEF.
5    Q.  Which -- what is -- what is its significance?
6    A.  It plays one of two roles, depending on which
7  box the customer checks on the POEF.  It's either the
8  customer doesn't issue purchase orders and so,
9  therefore, that POEF affirms their commitment to pay for
10  the products and services included in the referenced
11  contract.  If they check the other box it says they do
12  issue purchase orders, but it's going through their
13  normal procurement process.  All of their approvals have
14  been obtained and they affirm their commitment to pay
15  for the products and services purchased.
16    Q.  Without a purchase order?
17    A.  Purchase order.  In addition, they would
18  provide a purchase order once it's available.
19    Q.  Okay.  Now, did Oracle use POEFs as the
20  evidence that an arrangement was in place in support of
21  revenue recognition in compliance with SOP 97-2?
22    A.  In certain transactions, yes.
23    Q.  What types of transactions were those?
24    A.  In transactions where the customer didn't
25  issue a purchase order, or where the customer could not

266

1  get a purchase order at the same time -- out of their
2  system at the same time they signed the contract.
3    Q.  Okay.  So in instances like the one referenced
4  in Quinn No. 8?
5    A.  Yeah, they issued a POEF.
6    Q.  And what was the value, the dollar value of
7  the POEF?
8    A.  Without looking at the POEF, I don't know,
9  specifically, what it says.
10    Q.  Okay.  Well, looking at the second page ending
11  154, do you see in the -- almost at the bottom of the
12  page it says "New York City" and it looks like $1.4
13  million, approximately?
14    A.  Yes.
15    Q.  And Oracle never got that purchase order from
16  New York City, at least not prior to February 16th;
17  isn't that right?
18    A.  Yes.
19    Q.  And you had to reverse the revenue related to
20  that POEF, right?
21    A.  Yes.
22    Q.  And how much was reversed?  Was it the entire
23  1.4 million, based on what you've written here on Bates
24  ending 153?
25    A.  I'm not sure of the exact amount that was

267

1  reversed.  Let's see.  I don't know if it was the 1.4 or
2  if it was more.
3    Q.  Could it have been 4 million?
4    A.  I don't know.
5    Q.  I'm asking, it could have been 4 million?
6    A.  It could have been.
7    Q.  And that was revenue that was -- that Oracle
8  had recognized as far back as Q2 of '01, right?  Q2
9  fiscal '01?
10    A.  Yes.
11    Q.  All right.  And was there a report at the
12  time -- well, withdrawn.
13        Did Oracle keep a record of all
14  transactions for which it had recognized revenue on
15  the basis of a POEF?
16    A.  In 2000?  It could have existed in one of
17  several forms.
18    Q.  Can you describe it for me?
19    A.  One of the -- one form would be the contract
20  package itself.  The order that was submitted to the
21  order entry group would include all relevant order
22  documents, which likely would include the POEF, per
23  policy.
24        There also may be an identifier in the
25  accounts receivable module instead of a PO number

268

1  because there wasn't one.  They put "POEF".  That would
2  be two ways to identify it.
3    Q.  Was there any manner in which Oracle tested
4  POEFs on a -- previously-issued POEFs on a quarterly or
5  monthly basis?
6    A.  What do you mean by "tested"?
7    Q.  Determined whether or not they actually got an
8  enforceable -- well, let me withdraw that.
9        Was there a manner in which Oracle
10  reviewed whether or not previously-issued POEFs had
11  actually resulted in a purchase order from a
12  customer?
13        MS. WINE:  Q.  Objection.  Misstates the
14  testimony.
15        THE WITNESS:  I don't recall doing any testing
16  on it.  One of the processes we did put in place at some
17  point in time was where a POEF was approved, the credit
18  analysts were asked to put in their tickler file, if you
19  will, a reminder to go chase that down and make sure
20  that actually occurred, that a PO was received within 30
21  days or 45 days, whatever was promised.
22        MR. WILLIAMS:  Q.  Well, in this case one had
23  been outstanding for 180 days?
24    A.  Yeah.  It sounds like nine months.  Yep.  And
25  so the process apparently either wasn't followed, or

269

1   wasn't in place at this point in time.  I don't know.
2      Q.   What is a revenue backout, if you know?
3      A.   A revenue backout.  Any context around that?
4      Q.   Well, why don't I just show you this document.
5   We should actually keep these clipped.  It's
6   one exhibit, and I'll ask the reporter to mark this
7   document as Quinn No. 9, Bates number NDCA-ORCL 061390
8   through 061407.
9         (Whereupon, Plaintiff's Exhibit 9 was marked
10       for identification.)
11      MR. WILLIAMS:  Q.  Do you recognize what's
12   been marked as Quinn No. 9?
13      A.   Vaguely.
14      Q.   Well, can you describe for me what it is?
15      A.   It's a spreadsheet analysis of adjustments
16   based upon the title.  I'm trying to figure out what
17   they're related to, but I'm having a hard time
18   dissecting.
19      Q.   Well, do you know who Ivgen Guner is?
20      A.   Yes.
21      Q.   And who is she?
22      A.   Ivgen, I believe, was in financial planning
23   and analysis or the reporting group in corporate at
24   Oracle.
25      Q.   And did you see your name on any of the

270

1   e-mails that are part of Quinn No. 9?
2      A.   Yes.
3      Q.   Where?
4      A.   On page 391 on an e-mail from Jennifer Minton
5   to -- and I was included on the "to", and the one below
6   that from Tammy Pinnick to -- and I was cc'd on that
7   one.
8      Q.   And what are the approximate dates of those
9   e-mails?
10      A.   May 2001, May 2001, June 2001.
11      Q.   Okay.  That e-mail on May 30th of 2001 on
12   Bates ending 391 from Jennifer Minton to you, among
13   other people, do you see where she writes, "Here's a
14   breakdown by year of adjustments for invoices in legal"?
15      A.   Yes.
16      Q.   Do you know what she meant by that?
17      MS. WINE:  Objection.  Lacks foundation.
18      THE WITNESS:  I don't know.
19      MR. WILLIAMS:  Q.  Do you know why she would
20   be sending this to you?
21      MS. WINE:  Objection.  Lacks foundation.
22      THE WITNESS:  I don't know, specifically, in
23   this case.
24      MR. WILLIAMS:  Q.  Is Tammy Pinnick in your
25   organization?

271

1      A.   Yes.
2      Q.   And she was revenue account manager?
3      A.   Yes.
4      Q.   And what were her duties?
5      A.   She was the accounting manager managing the
6   accountants who handled all the deferred revenue
7   accounts.
8      Q.   And that was during 2000 and 2001, that was
9   her position?
10      A.   Yeah.  I don't know the exact dates, but -- in
11   sending this e-mail, that was her role.
12      Q.   Okay.  And looking at the spreadsheet
13   beginning on 061393, what does the spreadsheet
14   represent?
15      A.   Manual deferrals for specific invoices.
16      Q.   What do you mean by "manual deferrals"?
17      A.   Revenue was reversed for these transactions.
18      Q.   Had revenue already been reversed, or was it
19   to be reversed?
20      A.   Revenue had already been reversed.
21      Q.   Well, looking at the first page ending 393, if
22   you look at the bottom line there it says, "Total
23   revenue to be backed out"?
24      A.   I'm sorry.  Where is the reference, again?
25   I'm sorry.

272

1      Q.   Bates ending 393.
2      A.   "Total revenue to be backed out."  Okay.
3      Q.   Do you know whether or not this revenue had
4   already been backed out or --
5      MS. WINE:  Objection.  Lacks foundation.
6      THE WITNESS:  Yeah, I don't know for sure.
7      MR. WILLIAMS:  Q.  But this is revenue -- the
8   spreadsheet identifies revenue that had been previously
9   recorded that either had been or is going to be backed
10   out; is that right?
11      MS. WINE:  Objection.  Lacks foundation.
12      THE WITNESS:  Without knowing the specifics on
13   all of this stuff, I don't know that for sure.
14      MR. WILLIAMS:  Q.  Well, just on the very
15   first page, again, you see the top row where is says,
16   "customer invoice number, order number" and so forth?
17      A.   On 393?
18      Q.   Uh-huh.
19      A.   Yeah.
20      Q.   Okay.  So you understand what is meant by
21   "customer name", right?
22      A.   Yes.
23      Q.   And it has all these customers listed below
24   there?
25      A.   Yep.

273

1    Q.  And do you know what's meant by "invoice
2  number"?
3    A.  Yes.
4    Q.  And what is that, just the invoice that was --
5    A.  The accounting document created in the ERP
6  system associated for that invoice.
7    Q.  And what about invoice number?
8    A.  Same thing, but for the order entry side.
9    Q.  And balance due, what does that mean?
10   A.  It's not entirely clear from here, but that's
11  probably the total amount that was recognized as
12  revenue, or was the total amount of the invoice.
13   Q.  Okay.  And two columns over it says, "Revenue
14  recognition date."  What does that mean?
15   A.  The period in which revenue was recognized.
16   Q.  And what does "LOB" mean?
17   A.  Line of business.
18   Q.  Do you know what "cost center" means?
19   A.  The profit center, cost center that's part of
20  the account distribution.
21   Q.  Okay.  And so the column that says "Revenue
22  backed out," does that indicate that revenue either was
23  reversed or is going to be reversed related to the
24  particular invoice?
25       MS. WINE:  Objection.  Lacks foundation.

274

1        THE WITNESS:  I don't know what that means.
2        MR. WILLIAMS:  Q.  You were still the director
3  of revenue --
4        Well, why don't you tell me what your position
5  was in May of 2001.
6    A.  2001.  Let's see.  I was probably Senior
7  Director of Americas Revenue Accounting or Revenue
8  Operations, something like that.
9        MR. WILLIAMS:  I'll ask the reporter to mark
10  this document as Quinn No. 10.
11       (Whereupon, Plaintiff's Exhibit 10 was marked
12       for identification.)
13       MR. WILLIAMS:  Q.  Quinn No. 10 is Bates
14  numbered NDCA-ORCL 104764 through 104765.
15       I'll ask you to take a look at it and let me
16  know when you're finished looking at it.
17   A.  Okay.  I've looked at it.
18   Q.  Do you know what it is?
19   A.  I'm not entirely sure.  It's an account
20  analysis that someone put together related to the 12601
21  reserve activity.
22   Q.  Okay.  Do you know when it was created?
23       MS. WINE:  Objection.  Lacks foundation.
24       THE WITNESS:  I don't know.
25       MR. WILLIAMS:  Q.  Did you create it?

275

1    A.  I don't recall creating it.
2    Q.  Did anyone ever ask you about it?
3    A.  I don't recall.
4    Q.  Do you know what it means?
5    A.  What "what" means?
6    Q.  Withdrawn.
7        Do you know what "miscellaneous receipt"
8  means?
9    A.  Miscellaneous receipt.  I don't recall.
10   Q.  Do you know what "adjustment" means as it
11  relates to 12601 reserve activity?
12       MS. WINE:  Objection.  Lacks foundation.
13       THE WITNESS:  No.
14       MR. WILLIAMS:  Q.  Is this the report --
15  withdrawn.
16       Is this the 12601 report that was
17  submitted as an update to the audit committee?
18       MS. WINE:  Objection.  Lacks foundation,
19  misstates testimony.
20       THE WITNESS:  I don't believe so.
21       MR. WILLIAMS:  Q.  And why is that?
22   A.  I don't recognize this.
23   Q.  Okay.  I'll ask the reporter to mark this
24  document as Quinn No. 11.
25       (Whereupon, Plaintiff's Exhibit 11 was marked

276

1        for identification.)
2        MR. WILLIAMS:  Q.  I'll just ask you to take a
3  look at Quinn No. 11 for me.  You don't need to read the
4  whole thing.  It's Bates numbered NDCA-ORCL 133278
5  through 133302.
6    A.  Okay.
7    Q.  Do you recognize Quinn No. 11?
8    A.  Yes.
9    Q.  What is it?
10   A.  It is the top 20 contract review summary.
11   Q.  And is this a document that's created in your
12  organization?
13   A.  Yes.
14   Q.  And who was responsible for creating it in Q2
15  '01?
16   A.  It was either Julie Chan or Rachel Scott,
17  whoever was in charge in that time period.
18   Q.  And who would it be distributed to?
19   A.  This would be given to Tom Williams, myself,
20  to our -- to Oracle's auditors for their quarterly
21  review and their audit.
22   Q.  Was this the only --
23       MS. WINE:  I'm sorry.  Were you done saying
24  who it would be given to?
25       THE WITNESS:  I was just going to think if

277

1  there are others.
2       MR. WILLIAMS:  Q.  Take your time.
3       A.  I don't know that it was given to anyone else.
4  I don't think it was.
5       Q.  As far as you know, was Oracle's auditors, its
6  outside auditors given license contracts beyond the top
7  20 per quarter?
8       A.  Generally, they would receive whatever was
9  included on the top 20.  Or sorry.  Whatever was
10  included within the summary.  Sometimes there were more
11  than 20.
12       Q.  So your organization would put together a
13  report of maybe top 25 or --
14       A.  Top 22 or top 21.
15       Q.  Okay.  But those are the only ones that were
16  shown to the auditors?
17       A.  During each quarter.
18       Q.  Right.
19       A.  Yes.
20       MS. WINE:  I'm sorry.  When you say "those
21  were shown," are you asking if contracts were shown, or
22  if the summaries were shown?
23       MR. WILLIAMS:  The contracts.
24       MS. WINE:  Okay.  I just didn't think that was
25  clear.

278

1       MR. WILLIAMS:  Q.  And they would get the
2  contracts and the summary?
3       A.  Yes.
4       Q.  And who was responsible for writing the text
5  in the summary for each contract?
6       A.  The accountants in either Julie Chan's or
7  Rachel Scott's group, the revenue accounting group.
8       MR. WILLIAMS:  I'm going to ask the reporter
9  to mark this document as Quinn No. 12.
10       (Whereupon, Plaintiff's Exhibit 12 was marked
11           for identification.)
12       MR. WILLIAMS:  Q.  It's Bates numbered
13  NDCA-ORCL 380038 to 380039.
14       A.  Maybe it was Laura Dean who was the manager
15  during that time.
16       Q.  I'm sorry?
17       A.  Maybe it was Laura Dean who was the manager
18  during that time, just to clarify.  Sorry.
19       Q.  This is what time, February 2001?
20       A.  That -- our prior discussion around May of
21  2001.  I may have misspoke there, so Laura was the
22  manager for a period of time.
23       Q.  Okay.  Who is -- well --
24       MS. WINE:  I'm sorry.  Can we actually take a
25  two-minute break?  It's talking about a potential

279

1  privilege issue that I just want to ask the witness
2  about.
3       MR. WILLIAMS:  Well, let me just ask him if he
4  recognizes the document.
5       MS. WINE:  You can ask him that.
6       MR. WILLIAMS:  And I won't ask him the
7  substance of it.
8       Q.  Do you recognize this document?
9       A.  No.
10       Q.  Okay.  But it was sent to you, right?
11       A.  I'm on the cc, yes.
12       Q.  All right.  In February of 2001?
13       MS. WINE:  Can we take just literally 30
14  seconds?
15       MR. WILLIAMS:  Sure.
16       MS. WINE:  Thanks.
17       (Recess taken from 6:53 to 6:56 P.M.)
18       MS. WINE:  Counsel, I asked for a break
19  because I think this document might be an
20  inadvertently-produced privileged document.  I frankly
21  need to investigate it a little bit more, but given that
22  it's the first time that at least I've become aware of
23  it, I would like to do so, and I'm going to instruct the
24  witness not to answer.  For what it's worth, I don't
25  think he has much to say about this document anyway, but

280

1  I'm going to stop the questioning right now until we can
2  figure this out.
3       MR. WILLIAMS:  And that's fine.  I just
4  noticed that Dorian Daley is cc'd on this e-mail, and
5  I'm assuming that that's why you're making the
6  objection.  So I won't ask him any more questions about
7  the document, and if you want to assert a privilege over
8  it, you can do so and then we'll deal with that.
9       MS. WINE:  Okay.  Thanks.
10       MR. WILLIAMS:  Q.  You testified earlier about
11  someone by the name of Brandon Garoutte?
12       A.  Yes.
13       Q.  What was his position?
14       A.  He was a -- he was in credit collections.
15       Q.  And during what period of time?
16       A.  I don't know exactly the period of time.  I
17  really don't know.
18       Q.  Did he report directly to you?
19       A.  No.
20       Q.  Who did he report to; do you know?
21       A.  I don't know specifically.  One of the
22  collections managers.
23       Q.  Okay.  Directing your attention back to the
24  October 2002 project that we discussed earlier, you know
25  what I'm talking about, right?

281

1    A.  Yeah.  Sorry.  I'll verbalize.

2    Q.  And you had directed several of your managers

3  to do specific things or do specific research with

4  regard to 12601 and companies -- money in unapplied

5  cash, right?

6    MS. WINE:  Objection.  Misstates the

7  testimony.

8    THE WITNESS:  I asked them to work on a

9  project related to unapplied cash.

10    MR. WILLIAMS:  Q.  Right.  And it included

11  investigation into unapplied cash and transfers to

12  12601, right?

13    A.  They weren't investigating the transfer into

14  12601; they were investigating the unapplied cash item

15  to determine what the disposition should be for it.

16    Q.  Now, during that -- well, during that process,

17  did you, at any time, tell any of your collection staff

18  to adjust up invoices?

19    A.  No, not that I recall.

20    Q.  Can you describe any circumstance under which

21  you might tell someone in collections or in your group

22  to adjust invoices up?

23    A.  No, I don't know a scenario that -- I don't

24  recall a scenario.  I may have known then, but --

25    Q.  I'm asking you if you can -- is there any

282

1  circumstances that you can -- any circumstance that you

2  can imagine where you would instruct someone in your

3  organization to adjust invoices upward?

4    MS. WINE:  Objection.  Incomplete

5  hypothetical.

6    THE WITNESS:  I can't recall a situation where

7  I would at Oracle.

8    MR. WILLIAMS:  Q.  Okay.  Can you --

9  withdrawn.

10    Can you imagine a situation under any

11  circumstances where one would adjust an invoice

12  upward?

13    MS. WINE:  Objection.  Incomplete

14  hypothetical.

15    THE WITNESS:  I'm not familiar enough why that

16  would be done.

17    MR. WILLIAMS:  Okay.  I have nothing further

18  now.  We have some outstanding discovery issues that,

19  once they're resolved, we may ask to talk to you again,

20  but I appreciate your time today.

21    THE WITNESS:  Okay.

22    MR. WILLIAMS:  Thanks.

23    MS. WINE:  Well, let's just take one minute.

24    MR. WILLIAMS:  Okay.

25    (Recess taken from 7:01 to 7:02 P.M.)

283

1    MS. WINE:  We don't have any questions at this

2  time.

3    It's our view that the depo is concluded,

4  since Counsel has used, I believe, essentially, the 7

5  hours of questioning time.

6    MR. WILLIAMS:  There is -- I guess --

7  notwithstanding that there would still be the issue as

8  to whether or not a privilege actually applies to that

9  one document which I agreed not to ask him about.

10    MS. WINE:  Sure.

11    MR. WILLIAMS:  All right.  Thanks.

12    --o0o--

13    (Whereupon, the deposition was

14    concluded at 7:03 P.M.)

15

16  Dated: _____  Signed: _____

17

18

19

20

21

22

23

24

25

284

1

2          REPORTER'S CERTIFICATE

3

4    I hereby certify that the foregoing is a true

5  record of the testimony as reported to the best of my

6  ability by me, a Certified Shorthand Reporter and a

7  disinterested person, and was thereafter transcribed

8  under my direction into typewriting by computer.

9

10    I FURTHER CERTIFY that I am not interested in

11  the outcome of the said action and not connected with

12  nor related to any of the parties in said action or

13  their respective counsel.

14  Dated: _____  _____

          APRIL DAWN HEVEROH, CSR

15          CSR NO. 8759

16

17

18

19

20

21

22

23

24

25

1

2                    REPORTER'S CERTIFICATE

3

4            I hereby certify that the foregoing is a true

5    record of the testimony as reported to the best of my

6    ability by me, a Certified Shorthand Reporter and a

7    disinterested person, and was thereafter transcribed

8    under my direction into typewriting by computer.

9

10           I FURTHER CERTIFY that I am not interested in

11   the outcome of the said action and not connected with

12   nor related to any of the parties in said action or

13   their respective counsel.

14   Dated: 5-2-06      _____
                        APRIL DAWN HEVEROH, CSR
15                           CSR NO. 8759

16

17

18

19

20

21

22

23

24

25