# EXHIBIT C

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

**1**

1         IN THE U.S. DISTRICT COURT
2      NORTHERN DISTRICT OF CALIFORNIA
3            --oOo--
4  In Re Oracle Corporation Securities
   Litigation
5
   This Document Relates to:
6  All Actions.
             No. C010988 MJJ
7
   _____/
8
            --oOo--
9
     Wednesday, June 7, 2006
10
            --oOo--
11
   CONFIDENTIAL VIDEOTAPED DEPOSITION OF
12
      THOMAS ANTHONY WILLIAMS
13
            --oOo--
14
   Ref No. 1-2699
15  Reported By:  ELIZABETH A. WILLIS, CSR No. 12155
       Registered Professional Reporter
16
17
18
19
20
21
22
23
24
25

**2**

1        A P P E A R A N C E S
2
3  For Plaintiffs:
4    LERACH, COUGHLIN, STOIA, GELLER, RUDMAN &
   ROBBINS, LLP
5    BY:  SHAWN WILLIAMS, ESQ.
   100 Pine Street
6    Suite 2600
   San Francisco, California 94111
7    Telephone: (415) 288-4545
   shawnw@lerachlaw.com
8
9
   For Defendants:
10
   LATHAM & WATKINS
11  BY:  JAMIE L. WINE, ESQ.
       PAUL V. KONOVALOV, ESQ.
12  650 Town Center
   20th Floor
13  Costa Mesa, California 92626-1925
   Telephone: (714) 540-1235
14  paul.konovalov@lw.com
15
16  Videographer:  James Terrell
17
18  Also present:  Gerry Fujimoto, Keith Mautner,
       Dorian Daley
19
20            --oOo--
21
22
23
24
25

**3**

1            INDEX
2      EXAMINATION BY COUNSEL
3           Page No.

4  Examination by Mr. Williams . . . . . . . . . . . 7

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1         EXHIBITS
2
3  Exhibit No.   Description      Page No.
4  Exhibit 1  Class action subpoena.     27
5  Exhibit 2  9-page subpoena for Mr. Williams.   29
6  Exhibit 3  10-page Bates stamped document   105
       NDCA-ORCL 443265.
7
   Exhibit 4  Bates stamped document     159
8        NDCA-ORCL 047279 through 048683.
9  Exhibit 5  25-page document listing debit memos.  241
10  Exhibit 6  Bates stamped document AA 000023,  254
       AA000040, AA000051, AA000684.
11
12   EXHIBITS PREVIOUSLY MARKED FOR IDENTIFICATION
13
14  Campos 1   Bates stamped document PLF-ORC000078
       through 000095.
15
16  Quinn 4    Declaration of Michael Quinn.
17  Quinn 5    Bates stamped document NDCA-ORCL
       140479 through 140481.
18  Myers 5    Bates stamped document NDCA-ORCL
       048710 through 048712.
19
20  Myers 14   Declaration of Greg Myers.
21
22
23
24
25

**5**

1   IN THE U.S. DISTRICT COURT
2   NORTHERN DISTRICT OF CALIFORNIA
3   --oOo--
4   In Re Oracle Corporation Securities
    Litigation
5   This Document Relates to:
6   All Actions.
                    No. C-01-0988-M33
7
    _____/
8
                    --oOo--
9
10      BE IT REMEMBERED that, on Wednesday,
11  June 7, 2006, commencing at 9:06 a.m. thereof, at the
12  offices of Carol Nygard & Associates, 4180 Truxel Road,
13  Suite 100, Sacramento, California, before me, Elizabeth
14  A. Willis, a Certified Shorthand Reporter of the State
15  of California, there personally appeared
16          THOMAS ANTHONY WILLIAMS
17  called as a witness by the Plaintiffs, who, being
18  by me first duly sworn, was thereupon examined and
19  interrogated as hereinafter set forth.
20                  --oOo--
21
22
23
24
25

**6**

1           P R O C E E D I N G S
2
3       THE VIDEOGRAPHER:  This begins the videotaped
4   deposition of Thomas Williams tape 1, volume 1 in the
5   matter entitled, "In Re Oracle Corporation Securities
6   Litigation filed in United States District Court for the
7   Northern District of California, master file number
8   C010988 MJJ.  Today's date is June 7, 2006.  The time on
9   the video monitor is 9:06 a.m.  The video operator today
10  is James Terrell representing Live Note World Service
11  located at 221 Main Street, Suite 1250, in San
12  Francisco, California 94105.  The phone number is
13  415-321-2300.  The court reporter is Beth Willis of
14  Carol Nygard & Associates reporting on behalf of
15  LiveNote World Service.  Today's deposition is being
16  taken on behalf of plaintiffs and is taking place at
17  4180 Truxel Road in Sacramento, California.
18      If counsel will now please introduce
19  yourselves and state whom you represent.
20      MR. WILLIAMS:  Shawn Williams, Lerach,
21  Coughlin, Stoia, Geller, Rudman & Robbins, on behalf of
22  the plaintiffs.
23      MS. WINE:  Do you want to introduce Keith?
24      MR. WILLIAMS:  I have with me Keith Mautner,
25  forensic accountant with Lerach, Coughlin.

**7**

1       MS. WINE:  Jamie Wine of Latham & Watkins
2   representing defendants and the witness.
3       MR. KONOVALOV:  Paul Konovalov, Latham &
4   Watkins, for the defendant and the witness.
5       MS. DALEY:  Dorian Daley, Oracle Corporation.
6       MR. FUJIMOTO:  Gerry Fujimoto with Deloitte
7   consultants for defense.
8       THE VIDEOGRAPHER:  Thank you.  And the
9   reporter may swear the witness.
10
11          THOMAS ANTHONY WILLIAMS
12      sworn by the Certified Shorthand Reporter,
13      testified as follows:
14
15          EXAMINATION BY MR. WILLIAMS:
16      Q.  Good morning, Mr. Williams.
17      A.  Good morning.
18      Q.  Can you state your full name and address for
19  the record, please?
20      A.  Thomas Anthony Williams, 2085 Longview Drive,
21  Meadow Vista, California 95722.
22      Q.  And phone number?
23      A.  530-878-3799.
24      Q.  Okay.  Now, the reporter sitting to your right
25  is going to take down everything that is said in this

**8**

1   room today -- my questions, your answers, counsel's
2   objections and comments.  Do you understand that?
3       A.  Yes.
4       Q.  Unfortunately she is unable to record head
5   nods or hand gestures.  So when I ask you a question I
6   will need to you answer audibly.  Do you understand
7   that?
8       A.  Yes.
9       Q.  Do you understand that you are testifying
10  under oath today and it is the same oath that you would
11  be testifying under in a court of law even though we are
12  in a relatively informal setting?  Do you understand
13  that?
14      A.  Yes.
15      Q.  I am going to ask you several questions.  I am
16  going to try to be as clear as I possibly can.  No doubt
17  I will fumble sometimes.  And if you don't understand
18  the question just let me know and I will repeat it for
19  you or try to clarify it for you.  Do you understand
20  that?
21      A.  Yes.
22      Q.  We will take several breaks any time you
23  want.  However, if I am in the middle of a question, or
24  in the middle of a line of questioning, I may just want
25  to complete that question or line of questioning and

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

9

1  then we can take a break for whatever period of time you
2  want.  Do you understand?
3      A.  Yes.
4      Q.  Ms. Wine is very likely to object to some of
5  my questions or a lot of my questions today.  She is
6  entitled to do that.  However, you still have to answer
7  the question unless she instructs you not to answer a
8  question.  Do you understand that?
9      A.  Yes.
10      Q.  Any reason that you can't give your full and
11  complete testimony today?  Not under any medication that
12  might alter your ability to recall facts or anything
13  like that?
14      A.  No.
15      Q.  At the end of your testimony you will be given
16  an opportunity to look at the -- look at our
17  conversation on paper and make minor corrections if
18  necessary.  So you don't have to be absolutely perfect
19  today.  You will get a chance to look at things sometime
20  over the next few weeks, although you won't be able to
21  make any substantive changes.  Do you understand that?
22      A.  Yes.
23      Q.  Have you had your deposition taken before?
24      A.  Yes.
25      Q.  And how many times?

10

1      A.  I believe, once.
2      Q.  And when was that?
3      A.  Oh, I would say approximately 15 years ago.
4      Q.  And --
5      A.  Let me re-think.  Somewhere between 14 and 15
6  years ago.
7      Q.  Okay.  And were you a party to the case that
8  you testified in?  Meaning, were you a plaintiff or a
9  defendant or were you merely a witness?
10      A.  I was a witness.
11      Q.  Okay.  How long have you known that you would
12  be testifying in this matter?
13      A.  I don't remember the date of the subpoena.
14  Whenever I got that.  So, I would say a few months ago.
15      Q.  And did you get that subpoena directly in the
16  mail at your home or did someone give it to you?
17      A.  Someone gave it to me.
18      Q.  Who was that?
19      A.  I don't know the gentleman's name.  He came to
20  the front door and served me with the subpoena.
21      Q.  So it wasn't the lawyer that gave it to you or
22  someone you used to work with that gave it to you?
23      A.  No.  It was -- a process server, I guess,
24  would be the description.
25      Q.  All right.  And it was served on you at the

11

1  address that you just testified to?
2      A.  Yes.
3      Q.  What did you do with the subpoena once you got
4  it?
5      A.  I read it and then I called to try and contact
6  counsel at Oracle.
7      Q.  And who was that?
8      A.  I put a call in to Dorian Daley.
9      Q.  And did you speak to her when you put that
10  call in?
11      A.  No.
12      Q.  Did you at some point get a return call?
13      A.  Yes.
14      Q.  And was it from Dorian Daley?
15      A.  I received a phone call from one of the other
16  attorneys at Oracle whose name escapes me at the
17  moment.  And I related --
18          MS. WINE:  I would caution you not to testify
19  about the substance of those communications.  You can
20  say who called you and whether you received a call.
21          THE DEPONENT:  Okay.  I received a phone call
22  from one of the attorneys in Oracle's legal department.
23  And I relayed that -- say this thing.  I relayed that I
24  would still like to speak to Dorian.  And so Dorian did
25  return my call a few days later.

12

1  BY MR. WILLIAMS:
2      Q.  Okay.  And when was the next time that you
3  spoke to an attorney about the subpoena that you
4  received?
5      A.  I believe, day before yesterday.
6      Q.  So you received the subpoena a few months ago?
7      A.  Yes.
8      Q.  Had one conversation with a lawyer at Oracle
9  that you don't remember -- don't remember the name?
10      A.  First name is Jim.
11      Q.  Jim Meroulis (sic)?
12      A.  Yes.
13      Q.  Sounds right?
14      A.  Yeah.
15      Q.  And then you had another conversation with
16  Dorian Daley --
17      A.  Yeah.
18      Q.  -- a few days later, right?  And then you
19  didn't speak to any lawyer at Oracle regarding this
20  subject matter until the day before yesterday?
21      A.  I believe that's true.
22      Q.  And you don't work at Oracle anymore, right?
23      A.  No.
24      Q.  When did you leave?
25      A.  My last day was the end of August of 2003.

13

1    Q.   Okay.  In the past six months have you spoken
2  to people that you used to work with at Oracle?
3    A.   Yes.
4    Q.   And who are those people or that person?
5    A.   I had a conversation with a woman -- Amy Aves.
6    Q.   Is that it?
7    A.   Yes.
8    Q.   Okay.  And Amy Aves was in the finance
9  department?
10    A.   Yes.
11    Q.   Okay.  Do you know -- what was her position at
12  the time you left Oracle in August of 2003?
13    A.   I am not sure of what her title was.  She had
14  responsibility for kind of the global processes for, I
15  believe, the accounts payable -- the accounts payable
16  area.  I don't know what her title was.
17    Q.   Okay.  And at the time of your departure from
18  Oracle was she reporting to you?
19    A.   No.
20    Q.   Who was she reporting to, if you know?
21    A.   I believe she was reporting to Brad Newton.
22  However, there was a restructuring at some time and she
23  might have been reporting to someone at corporate.  I am
24  not sure.
25    Q.   Okay.

14

1    A.   Brad was local to Rocklin where I worked.  I
2  am not sure if it was to him or to someone at
3  headquarters.
4    Q.   Okay.  And did you talk about -- well, when
5  was that conversation with Amy Aves?
6    A.   I would guess probably three months ago.
7    Q.   Did you talk with Amy about the fact that you
8  had received a subpoena in this case?
9    A.   No.
10    Q.   Okay.  Have you talked to anyone other than
11  lawyers at Oracle about the fact that you had received a
12  subpoena in this case?
13    A.   Yes.
14    Q.   And who is that?
15    A.   My wife knows.
16    Q.   Okay.  Anyone else?
17    A.   There are a couple of my friends up where I
18  live who know that I am not playing golf today because
19  I'm being deposed.
20    Q.   Okay.  And did you discuss with them the
21  subject matter of the deposition?
22    A.   No.
23    Q.   You indicated that the day before yesterday
24  you met with some lawyers from Oracle?
25    A.   Yes.

15

1    Q.   And who are those lawyers?
2    A.   Jim Meroulis -- however you pronounce it --
3  Paul, and Jerry was there as well.
4    Q.   Okay.  And where was that meeting?
5    A.   It was at a law firm on S Street in
6  Sacramento.
7    Q.   And how long did you meet?
8    A.   It was in the afternoon, approximately five
9  hours.
10    Q.   Did you review any documents during that
11  meeting?
12    A.   Yes.
13    Q.   And you have been away from Oracle for --
14  what -- almost three years now, right?
15    A.   Correct.
16    Q.   And the documents that you reviewed -- did
17  they refresh your recollection at all about matters
18  occurring at Oracle before you left?
19    A.   Generally, no.
20    Q.   What do you mean, "generally, no"?
21    A.   Some documents that I saw I knew what they
22  were.  Some documents I saw, I didn't know what they
23  were.  Some documents that I saw, you know, had me
24  remember certain aspects of my tenure at Oracle that
25  when I walked in the door I hadn't remembered.

16

1    Q.   I see.  And what were some of those aspects
2  that they helped you recall?
3    A.   There was one document that I reviewed.  Let
4  me back up.  I clearly recalled the matters that were
5  contained in -- shouldn't say, "clearly."  I remembered
6  a lot of the matters that were contained in the second
7  amended complaint to the class action lawsuit.  So when
8  I got the subpoena my initial assumption was that we are
9  going to talk about the items that were contained in
10  that.
11    Q.   I see.
12    A.   There was one document that I read, I believe
13  it was on Monday, that refreshed my memory about another
14  aspect that I now assume that we are going to discuss.
15    Q.   And what is that?
16    A.   The movement of items out of unapplied cash to
17  the bad debt reserve in the 2000 to 2002 time frame.
18    Q.   And what in particular did that document help
19  you recall about the movement of cash from -- movement
20  from unapplied cash to the bad debt reserve?
21    A.   Merely that that was an item that was being
22  reviewed in that time frame.
23    Q.   Okay.
24    A.   Again, my assumption -- not supposed to make
25  assumptions.  But my assumption was that we are going to

17

1   talk about the November debit memos. I hadn't
2   remembered that there might be another subject that we
3   might be discussing.
4       Q.   And what was the volume of documents that you
5   reviewed?
6       A.   I mean, I don't know how I would describe,
7   "volume."
8       Q.   Well, was it, you know, an inch thick, 2
9   inches thick, 3 inches thick? Was it a box?
10      A.   There were, you know, a number of documents on
11  the table during our meeting. I would estimate I did
12  not review documents totaling more than 15, 20 pages --
13  not inches, not volumes, not boxes.
14      Q.   Okay. Can you just quickly tell me your
15  educational background after high school?
16      A.   I got a Bachelors Degree in Business
17  Administration from California Polytechnic State
18  University in San Luis Obispo.
19      Q.   What year was that?
20      A.   I graduated in December 1975.
21      Q.   And is that the end of your formal education?
22      A.   I did not do any other work past the four-year
23  degree. I do not have a masters or anything else.
24      Q.   Okay. And you worked for Arthur Anderson for
25  some time?

18

1       A.   Correct.
2       Q.   And how many years is that?
3       A.   Started in December 1975, left in May of
4   1989. So, something short of 14 years.
5       Q.   And what was the last position you held before
6   you left Anderson?
7       A.   I was a partner in the audit division.
8       Q.   And then you went to work for Oracle?
9       A.   Correct.
10      Q.   And what was the position you took at Oracle?
11      A.   I was hired as the corporate controller.
12      Q.   All right. And at the time you weren't
13  reporting to Jeff Henley, right? You were reporting to
14  someone else?
15      A.   Correct.
16      Q.   Who was that?
17      A.   I reported to Steve Imbler.
18      Q.   Steve Imbler?
19      A.   I-m-b-l-e-r.
20      Q.   Was there another person by the name of Jeff
21  that you reported to in those early years at Oracle?
22      A.   No.
23      Q.   And Steve Imbler -- who did he report to at
24  the time?
25      A.   He reported to Jeff Walker, who at the time

19

1   was the Chief Financial Officer.
2       Q.   At some point you were promoted to controller?
3       A.   No, I was hired as corporate controller.
4       Q.   Were you promoted from that position?
5       A.   I -- and I don't recall the particular year,
6   but probably within, you know, a two-year, three-year
7   time frame after starting with Oracle I was promoted to
8   vice president and corporate controller. I was still
9   the Chief Accounting Officer, but I was given a vice
10  president title.
11      Q.   Same type of responsibilities?
12      A.   Yes.
13      Q.   And you know Jennifer Minton, right?
14      A.   Yes.
15      Q.   And was she at the company when you were
16  hired?
17      A.   She was hired, I want to say, within a month
18  either before or after me. I don't recall. It was
19  approximately the same time that we were hired.
20      Q.   And had she been at Arthur Anderson as well?
21      A.   She was with Arthur Anderson, yes.
22      Q.   Did you and Jennifer work together at Arthur
23  Anderson?
24      A.   No.
25      Q.   In the same office?

20

1       A.   No.
2       Q.   She reported to you once she was hired on to
3   Oracle, right?
4       A.   I think initially the answer would be, no.
5       Q.   Okay. And at some point did she report to
6   you?
7       A.   Yes.
8       Q.   I don't need to know when. What were the
9   circumstances of her position and the relationship to
10  yours when she began reporting to you?
11      A.   When she -- when I first arrived at Oracle she
12  was an accounting manager in the corporate area. There
13  was an assistant corporate controller whose name was
14  Sandra Lynn, and I believe that Jennifer reported to her
15  initially. At some point, within a few years, I think
16  after, Sandra left corporate and Jennifer became the
17  assistant corporate controller -- so at that point for
18  sure she was reporting to me. I don't recall the exact,
19  you know, reporting relationship between the accounting
20  managers and myself because we had an assistant
21  corporate controller as well.
22      Q.   Okay. Now, between 1992, which is
23  approximately the time you said you were promoted to
24  vice president --
25      A.   I mean, again, I don't --

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

21

1 　　　MS. WINE:  Wait for him to finish his
2 question.
3 　　　BY MR. WILLIAMS:
4 　　　Q.  Between, say, '91 and 1998 did your position
5 change at all?
6 　　　A.  I mean, I don't know how to answer the
7 question.  And the reason being is that I was the Chief
8 Accounting Officer of Oracle Corporation from the day I
9 was hired until 1998 when I left headquarters and moved
10 to the Sacramento area.
11 　　　Q.  Okay.
12 　　　A.  So, you know, jobs change over that amount of
13 time, but, you know, it was -- essentially I was the
14 Chief Accounting Officer.
15 　　　Q.  I see.
16 　　　A.  So -- irrespective of what my title was.
17 　　　Q.  I see.
18 　　　A.  That did not change.
19 　　　Q.  When you were the Chief Accounting Officer was
20 that for Oracle worldwide or simply for U.S., Latin
21 America?
22 　　　A.  Well, as the Chief Accounting Officer -- I was
23 the Chief Accounting Officer of Oracle Corporation, the
24 parent company.  Did I have direct responsibility for
25 the finance operations outside of the U.S.?  No.

22

1 　　　Q.  Okay.  But those people who did ultimately
2 reported to you?
3 　　　A.  No.  The finance organization at Oracle -- a
4 finance manager in France reported to a finance person
5 that had responsibility for all of Europe.  That person
6 directly reported to the business leader of all of
7 Europe.  So during my tenure at Oracle there was not a
8 direct-reporting relationship between any of the
9 subsidiaries, finance organizations, and the corporate
10 controller.
11 　　　Q.  Okay.  And during that period at some point
12 Jeff Henley became CFO?
13 　　　A.  Yes.
14 　　　Q.  And you reported to him?
15 　　　A.  No.
16 　　　Q.  Okay.  Can you just describe for me how that
17 relationship worked?
18 　　　A.  Jeff Henley was hired as the Chief Financial
19 Officer of Oracle Corporation sometime -- I don't know
20 the answer to this, but I will just say -- the early
21 '80s is just an estimate.  So he took over and Jeff
22 Walker was no longer the Chief Financial Officer.  I
23 believe Steve Imbler was still with Oracle at that
24 time.  And so I believe that I still reported to Steve
25 Imbler, who in turn reported to Jeff Henley.  At some

23

1 time Steve Imbler left Oracle and at that time I was a
2 direct report to Jeff Henley.
3 　　　Q.  Okay.
4 　　　A.  I mean, I can't tell you as I sit here
5 today --
6 　　　Q.  That's fine.
7 　　　A.  -- the year of that.
8 　　　Q.  That's okay.  Can you just briefly describe
9 for me the difference between your responsibilities as
10 Chief Accounting Officer and the responsibilities of the
11 CFO at Oracle between, you know, '91 and '98, generally?
12 　　　A.  I mean, I guess I can't speak for what the
13 responsibilities of Jeff Henley are.  I can only speak
14 to what mine were.
15 　　　Q.  Sure.
16 　　　A.  So --
17 　　　Q.  You can do that.
18 　　　A.  So, from my employment in '89 until when I
19 left the corporate organization in '98, you know, I
20 would say that I was primarily responsible for the
21 accounting operations of the U.S. corporation.  In
22 addition to that I had reporting to me the corporate
23 planning and analysis groups.  So, you know, people who
24 did management reporting that, you know, included not
25 just U.S. figures, but also international figures, you

24

1 know, basically preparing accounting reports that would
2 then be given to upper management -- Henley as well as
3 others that were on the executive management team at
4 that time.  So my focus was primarily U.S. accounting as
5 well as summarization reporting for the corporate
6 consolidated numbers to executive management.  And, I
7 mean, that was my job.  I was responsible for our SEC
8 reporting -- so 10Qs, 10Ks, and the like.  That was my
9 job. I reported to Henley.  Henley obviously had
10 additional responsibilities which included, you know,
11 investor relations, dealing with banks, financing, and
12 the like.  I wasn't responsible or involved in those
13 aspects of his job.
14 　　　Q.  Okay.  So with respect to your responsibility
15 for 10Qs and 10Ks, is it fair to say that people that
16 were in your organization put together the accounting
17 figures -- rolled them up to you and you ultimately sent
18 them on to be reported to the public?
19 　　　A.  Yes.  The corporate consolidations group was
20 one of the groups that was in headquarters that reported
21 to me that took data from the subsidiaries, translated
22 it, cumulated, it and put it into the basic financials
23 for reporting to the outside world.
24 　　　Q.  Okay.  And that was up until -- excuse me --
25 up until 1998?

25

1    A.  Correct.
2    Q.  Who was -- well, in 1998 who were your direct
3  reports?
4    A.  That is a long time ago.  Jennifer Minton
5  reported to me.  At one point in time -- and I don't
6  know when it changed -- internal audit -- the internal
7  audit director reported to me.  The head of purchasing
8  reported to me and the head of travel reported to me.
9  And I am not sure if I had additional direct reports or
10  not.
11    Q.  Were any of those people in corporate
12  consolidations?
13    A.  No.  I believe the corporate consolidations
14  reported to Jennifer, which reported to me.
15    Q.  Sounds like there were a lot of people in the
16  organization that you were responsible for during that
17  time?
18    A.  Yes.
19      MS. WINE:  Objection.  Vague and ambiguous.
20    BY MR. WILLIAMS:
21    Q.  There were more than 20, right?
22    A.  Yes.
23    Q.  More than 50 probably, right?
24    A.  Yes.
25    Q.  How did you keep track of who was in your

26

1  organization?  Did you have an organizational chart or a
2  spreadsheet that kind of tracked who reported to who?
3    A.  Yes.
4    Q.  And was that something that was updated
5  regularly?
6    A.  You know, at Oracle at that time there was
7  a -- effectively an organization chart maintained online
8  that was based on the hierarchies in the HR database.
9  So you could go to that screen, database, whatever --
10  you know, location on the server and see your name in a
11  box and see all of the direct reports that you had in a
12  box and see below them their direct reports.  So you
13  could effectively drill down and see everybody in your
14  organization.
15    Q.  Okay.  And did that as of the time you left --
16  did you still have that capability when you left in
17  2003?
18    A.  I mean, it was a -- it was called Aria,
19  A-r-i-a -- something -- that, you know, IT had developed
20  based on the HR database that allowed anyone in the
21  company to see their organization structure or to see
22  anybody's organization structure.  So you could go on
23  and say, "Who are Larry Ellison's direct reports?"
24      MS. WINE:  I think he asked you if you still
25  had access to the system when you left.

27

1      THE DEPONENT:  I had access to the system,
2  yes, because it was available to all employees at
3  Oracle.
4    BY MR. WILLIAMS:
5    Q.  Even in 2003, when you left?
6    A.  I believe it was still available at that time,
7  yes.
8    Q.  Okay.  I will ask the reporter to mark this
9  document as Williams number 1.
10      (Exhibit No. 1 was marked for identification.)
11    BY MR. WILLIAMS:
12    Q.  Williams number 1 is a notice of subpoena.  I
13  will just ask you to just take a look at the caption
14  page and let me know if you see that page.
15    A.  Caption page being the, "first page"?
16    Q.  Absolutely.
17    A.  I see my name on it, yes.
18    Q.  And then I am going to ask you to turn one
19  page in, and I will direct your attention down to the
20  bottom of the page.  And let me know if you see your
21  name on that page?
22    A.  Yes, I do.  I should say that this is not the
23  document that I was served with.
24    Q.  I understand.
25    A.  Okay.

28

1    Q.  And I am going to ask you to turn -- you are
2  going to have to count because there are several notices
3  here.  It is about the 10th page in.  I am going to ask
4  you if you see your name on that page?
5    A.  Yes, "Schedule A, Thomas A. Williams."
6    Q.  If you could just take a minute or so -- you
7  don't have to read it line-by-line, but read that page
8  with your name and the -- and page 3.
9    A.  Do -- you want me to read 1 and then you want
10  me to read 3?
11    Q.  You can read the whole thing if you like, but
12  it would take more time than necessary for what I am
13  going to ask you about this document.  But if you like
14  you can read 1 through 5.
15      MS. WINE:  Do whatever you need to familiarize
16  yourself with the document.
17    BY MR. WILLIAMS:
18    Q.  You can read 1 through 7 if you like.  Just
19  let me know what you are going to do.
20    A.  Let me just scan through this and see if this
21  is -- can I ask you, is this -- this document -- these
22  seven pages, is that the same document that I was served
23  with?
24    Q.  You just testified that it wasn't.
25    A.  No, no.  What I testified was that I received

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

29

1   no piece of paper that had, as an example, this
2   page (indicating) -- the second page.
3       Q.  I see.
4       A.  That had other people's names on it.  I did
5   receive a document that --
6       Q.  That had Schedule A on it?
7       A.  The only -- well, I believe it had -- it had a
8   number of pages attached to it.  I am just asking you if
9   this is the same set of seven pages that would have been
10  attached to what was served on me, you know, a couple
11  months ago.
12      Q.  That is a good question.  And I think what I
13  can do to clarify that is just -- I will have the
14  reporter mark this document as Williams number 2 and you
15  can put that aside for the moment.
16          (Exhibit No. 2 was marked for identification.)
17  BY MR. WILLIAMS:
18      Q.  Let me know if you recognize what has been
19  marked as Williams number 2.
20      A.  So, I recognize the first page.  I did not
21  have the second page.  And the balance of it appears to
22  be what I received.
23      Q.  Okay.
24      A.  So, yes.
25      Q.  And you indicated earlier that when you

30

1   received this document, obviously without the second
2   page that you are testifying to --
3       A.  Right.
4       Q.  -- you read it?
5       A.  Yes, I did.
6       Q.  And did you understand it to be requesting you
7   to look for and produce any documents?
8       A.  Yes, I did.
9       Q.  Did you look for any documents once you
10  received it?
11      A.  No, I did not.
12      Q.  Why not?
13      A.  Because I had no documents.
14      Q.  And did you ask anyone to look at documents --
15  look for documents that you may have left at Oracle when
16  you left?
17      A.  No.
18      Q.  Did you direct anyone to any documents that
19  you may have had before you left Oracle?
20      A.  I don't know how to answer the question
21  because it has to do with a conversation I had with one
22  of the attorneys.
23      Q.  Okay.  That's fine.  Were there documents at
24  Oracle when you left that would have been responsive to
25  the request that you read?

31

1       A.  I'm sure there were documents at Oracle that
2   would have been responsive.  This is a pretty general
3   list of things.  I had no documents in my possession
4   when I left Oracle as was required of me.  I lost access
5   to all of the files, e-mail, and everything else at
6   Oracle.  And when I left Oracle I took no paper
7   documents with me.
8       Q.  Okay.  And you testified earlier that -- you
9   testified earlier that when you read the request you had
10  some idea that you would be deposed regarding the second
11  amended complaint in this case, right?
12      A.  No.  No, what I said is when I got this
13  document my assumption was, because it was an
14  accounting-related issue in the second amended complaint
15  that I had not read for -- I don't know -- four years,
16  three years -- whatever it was -- my assumption was --
17  is that the items in that having to do with the November
18  2000 debit memos is what we are going to talk about
19  because that was the accounting-related item that I
20  recalled.  That's what I said.
21      Q.  Okay.  I wasn't trying to quote you.
22  Generally when you read this document you understood
23  that we would talk about the items, or at least some of
24  the items, that you read in the second amended
25  complaint, right?

32

1          MS. WINE:  Objection.  Mischaracterizes his
2   testimony.
3          THE DEPONENT:  Let me start again.  When
4   Oracle was served with the second amended complaint a
5   number of people got notification that it had been filed
6   and that if you had any documents that were responsive
7   to the second amended complaint that you should furnish
8   them to legal.  Legal, perhaps because of my historical
9   position, sent an attorney to my office in Rocklin and
10  went through all of my files.  So any document that was
11  in the second amended complaint that was relevant to
12  that -- my belief is -- is that legal has.  So when I
13  got this document three-and-some-change years later, you
14  know, I didn't have any documents.  And any documents
15  that I had originally that would have been responsive to
16  this document -- my belief were they are already in the
17  possession of the legal department.
18  BY MR. WILLIAMS:
19      Q.  Okay.  So let me clarify my question.  After
20  someone from legal came to your office and reviewed your
21  files and possibly took documents that may have been
22  related to the second amended complaint did you do any
23  investigation or have any communications with anyone
24  regarding the second amended complaint?
25      A.  You have to --

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

33

1        MS. WINE:  At the time of the filing?
2        THE DEPONENT:  You have to say that again.
3     BY MR. WILLIAMS:
4        Q.   After someone from legal came to your office
5   and reviewed your files and took whatever may have been
6   relevant -- after that did you have communications --
7   written communications with anyone at Oracle regarding
8   the second amended complaint?
9        MS. WINE:  I am sorry.  Can you read that
10  again?
11       COURT REPORTER:  "Q.  After
12       someone from legal came to
13       your office and reviewed your
14       files and took whatever may have
15       been relevant -- after that did
16       you have communications -- written
17       communications with anyone at Oracle
18       regarding the second amended
19       complaint?"
20       MS. WINE:  Okay.  I would caution you not to
21  reveal the substance of any communications you may have
22  had with lawyers.
23       THE DEPONENT:  Can you read it one more time
24  to me, please?
25       COURT REPORTER:  "Q.  After

34

1       someone from legal came to
2       your office and reviewed your
3       files and took whatever may have
4       been relevant -- after that did
5       you have communications -- written
6       communications with anyone at Oracle
7       regarding the second amended
8       complaint?"
9        THE DEPONENT:  I don't believe so.
10    BY MR. WILLIAMS:
11       Q.   Okay.  So you never sent anybody an e-mail in
12  your organization about that -- about the allegations in
13  the second amended complaint after someone from legal
14  came to your office and took your stuff?
15       A.   I don't believe so.  I don't know why I would
16  have.
17       Q.   Okay.  All right.  And so, when you -- I am
18  just going to ask you to direct your attention to page
19  5.
20       A.   And we are on the number 2?
21       Q.   On the document that looks like this, right
22  (indicating).
23       A.   Okay.
24       Q.   And so after someone came to your office and
25  took your -- or came and reviewed your files with

35

1   respect to request number 1 do you believe that you had
2   any written communications with anyone at Oracle
3   concerning what is written in request number 1?
4        MS. WINE:  Shawn, can we just clarify?  He
5   mentioned that the -- legal came to take his documents
6   well before this document was served.
7        MR. WILLIAMS:  He didn't say that.  That is
8   not what his testimony was.
9        THE DEPONENT:  Yes, it is.  This was served, I
10  said, two months ago.  Obviously legal did not come to
11  my office two months ago or something less.
12       MR. WILLIAMS:  You didn't say that.
13       THE DEPONENT:  Because I am no longer an
14  employee of Oracle.  I no longer have an office at
15  Oracle.  I already told you that when I left Oracle I
16  left with no documents.  So --
17    BY MR. WILLIAMS:
18       Q.   When did legal come to your office, then?
19       A.   I wouldn't be able to tell you the exact date.
20       Q.   Right.
21       A.   I do remember, like, any time there was
22  anything that they thought might be in finance's files
23  they would periodically send out e-mails saying, "We
24  have got this issue.  Here is what it is asking for.  If
25  you have anything in your possession you need to provide

36

1   it to legal."  So the date I do not know.  I know it was
2   after the second amended complaint.  They came to my
3   office and they went through all my files and they took
4   whatever they thought was relevant.  So you ask me have
5   I had any communications after that, and the answer is,
6   no.
7        Q.   Okay.  And that's what I am asking you about.
8   And I will ask you, if you have an objection, make the
9   objection.  You can answer the question the best way you
10  know how, but I am going to ask you again.
11       After they came to your office and took those
12  files is it your testimony that after that that you
13  didn't have any written communications?  Obviously it
14  would be before you left Oracle.
15       A.   That is what I thought was obvious as well,
16  but you said that was not my testimony.
17       Q.   Before you left Oracle --
18       A.   Okay.  Right.
19       Q.   -- did you have any written communications
20  with anyone at Oracle on any of the topics you see in
21  request number 1?
22       A.   I don't believe so.
23       Q.   Okay.  Now, if you would do me a favor and
24  just quickly read each request and let me know what your
25  answer is to the same question whether -- prior to the

37

1    time you left Oracle and after the time someone from
2    legal came to your office and took your documents
3    whether or not you had any written communications with
4    anyone at Oracle regarding the request that you read?
5        A.  Okay.  Can I --
6        Q.  So --
7        A.  Can I ask you a question first?
8        Q.  Certainly.
9        A.  So the first paragraph refers to June 1st,
10   2000, to June 1st, 2001?
11       Q.  Um-hum.
12       A.  So are you asking me with regard to request 1,
13   2, 3, et cetera -- any documents pertaining to that
14   period?
15       Q.  Um-hum.
16       A.  Okay.  Could I -- when was the second amended
17   complaint filed?
18       Q.  In October of 2002.
19       A.  October 2002?
20       Q.  Um-hum.
21       A.  I mean, I will go through each of these.
22       Q.  Sure.  Take your time.
23       A.  So I have to sort of reiterate this.  So it is
24   pertaining to documents where the period June 1, 2000,
25   to 2001 -- the second amended complaint was filed

38

1    sometime in 2002.  Legal came and reviewed my documents
2    at that time.  So I don't really understand how your
3    question is relevant given what I said.  You know, they
4    went through all my files.  That's fine.  I will go
5    through it.  On request number 1, no, I don't believe
6    so.  On 2, I don't believe so.  On 3, I don't believe
7    so.  On 4, no.  On 5 -- on 5 -- I mean, I would not have
8    had anything back in 2001 after the second amended
9    complaint.  You know, we did clearly review the
10   assertions in that which related to this topic.  I
11   believe that any documents that I had pertaining to that
12   were given to legal because -- I say this -- legal was
13   kept apprised of the work that we were doing.  So I
14   don't believe that I had any documents that related to
15   number 5 that weren't given to legal.
16       MS. WINE:  Shawn, I think he might be
17   answering something different than what you asked.
18       BY MR. WILLIAMS:
19       Q.  I was just asking you -- I know that this
20   is -- it may be a little confusing, but I was just
21   asking whether or not you had communications with people
22   regarding the topic -- written communications.  Whether
23   or not you gave them to legal is something separate.  I
24   understand your response to suggest that maybe you had
25   some correspondence with people regarding the topic?

39

1        A.  On number 5, yes.  On number 6, no.  On number
2    7 -- I mean, I had discussions with the SLC.
3        Q.  Did you -- I am sorry.  Were you about to say
4    something?
5        A.  Well --
6        MS. WINE:  He is just asking -- I think his
7    question was whether or not you had any written
8    communications with anyone regarding this topic after
9    the filing of the second amended complaint.
10       THE DEPONENT:  Yes.
11       BY MR. WILLIAMS:
12       Q.  Okay.  You can go down to the next document.
13       A.  Okay.  Number 8, no.  Number 9, no.  I don't
14   understand 10.  Can you give me an example of what one
15   would be?
16       Q.  You can skip number 10.
17       A.  Okay.  Number 11, no.
18       Q.  Okay.  So for 5 and 7 you said you did have
19   some written communications with some people after legal
20   had come by your office and taken your documents,
21   right?  Is that fair?
22       A.  I believe that's true, yes.
23       Q.  And with respect to number 5, who might some
24   of those people be?  People in the finance organization?
25       A.  Well, I guess I would say on 5 and 7, I am

40

1    really talking about -- the same thing is, you know, all
2    of the work that was done looking at the on-account
3    cleanup from, you know, two years previous.  That -- you
4    know, there were meetings.  There was memorandum.  But
5    in my mind they are all sort of the same thing because
6    the meetings were -- at least a large purpose of the
7    meetings was to get the SLC up to speed on what was the
8    outcome of those reviews.
9        Q.  Sure.  I understand that.  Thank you.  With
10   respect to number 5 -- would you say that you were
11   communicating with people in either accounts receivable
12   and collections regarding the topic number 5?
13       A.  I would think I was more -- I mean, I don't
14   recall whether or not the communications were verbal,
15   e-mail, memorandum.  There clearly was, you know,
16   communication between myself and people within the
17   receivable area -- specifically Greg Myers and with the
18   guy that worked for me that was in charge of both
19   receivables and collections and rev rec, which was Mike
20   Nguyen.
21       Q.  Anyone else?
22       A.  Past that the only other communications that I
23   recall were with the SLC.  And possibly -- because I
24   can't recall this definitely -- but possibly a memo
25   summarizing the work that was done that was provided to

41

1  the audit committee at the request of counsel.
2      Q.  Okay.  Did you communicate with Jennifer
3  Minton with respect to request number 5 or the issues
4  you have been discussing regarding the cleanup after you
5  received the second amended complaint?
6      A.  I remember having discussions with Jennifer in
7  the 2002 time frame.  I don't recall whether or not I
8  did anything specifically directed to her, whether it be
9  e-mail or memo.
10     Q.  Same question.  Did you discuss the subject
11  matter in request number 5 and what you have been
12  discussing about -- the work that you did or people in
13  your organization did after receiving the second amended
14  complaint with Jeff Henley?
15     A.  I am sorry.  Can you repeat that?
16         COURT REPORTER: "Q.  Same
17         question.  Did you discuss the
18         subject matter in request number
19         5 and what you have been
20         discussing about -- the work that
21         you did or people in your
22         organization did after receiving
23         the second amended complaint
24         with Jeff Henley?"
25         THE DEPONENT:  I don't believe I had any

42

1  conversations with Jeff directly.
2  BY MR. WILLIAMS:
3      Q.  On this topic?
4      A.  Correct.
5      Q.  How about Larry Ellison?
6      A.  No.
7      Q.  And aside from the SLC is there anyone else
8  that you can recall that you discussed this -- the
9  subject matter in request number 5 with?
10     A.  No.  I mean, I had discussions with, as I
11  said, Mike and Greg trying to gather information.  The
12  only sort of summarization and reporting, I think, was
13  really -- it was all directed at being able to report to
14  the SLC on what we found in response to the allegations
15  in the second amended complaint.  So I don't think I
16  would have had a conversation or directed a
17  communication to anybody other than the SLC and
18  potentially Jennifer.
19     Q.  Now, you indicated that you had some meetings
20  with at least Greg and Mike after you received the
21  second amended complaint, right?
22     A.  Yes.
23     Q.  And what was the subject -- not the subject
24  matter.  Do you recall what you may have said to them
25  in, let's say, the first meeting with them after you

43

1  received the second amended complaint?
2      A.  I mean -- I mean, I can't recall specifically
3  what it was.  I mean, the general topic was to try and
4  find out -- well, what are the facts behind, you know,
5  the allegations that were in the second amended
6  complaint and specifically the debit memos.  So I don't
7  recall the specifics.  I do recall that the first
8  meeting would have been, you know, "What was this?"
9      Q.  Do you know who gave you a copy of the second
10  amended complaint?
11     A.  No.
12     Q.  Do you recall reading it when you got it?
13     A.  Yes.
14     Q.  And what was your reaction when you read it
15  for the first time, if you remember?
16     A.  I thought it was ludicrous.
17     Q.  Why is that?
18     A.  Because the very premise of booking on-account
19  items to revenue would be against every policy that
20  Oracle ever had.  And also just not -- I could not
21  imagine an instance in -- where it could have occurred
22  without someone knowing.  Revenue doesn't appear out of
23  nowhere and have people just say, "Oh, well, that is
24  great news."  People monitor their deals, forecast their
25  revenues, get cost-center level reports that show what

44

1  their revenues are by transaction.  It seemed totally
2  unbelievable to me that something like that could have
3  occurred.
4      Q.  Do you recall feeling as though the entirety
5  of what you read seemed ludicrous or that there were
6  parts of what you read that appeared to be accurate, but
7  that something -- the conclusion was ludicrous?
8      A.  I mean, I have to admit that the major item --
9  the debit memos -- the November of 2000 debit memos and
10  some big number that came out of that -- once I had sort
11  of read that and said, "Well, that's not possible," I
12  didn't really read the balance of it with the objective
13  of saying, "Well, this is possible.  This is not."  You
14  asked me what my initial reaction was.  That is what it
15  was.
16     Q.  Okay.
17     A.  Now, you get a document.  It is a lawsuit.
18  You know, whether or not I believe it is ludicrous or
19  not -- it does not preclude me from investigating to
20  show to everyone else that there is no substance to
21  those claims.
22     Q.  I understand that.  So are you saying that
23  when you read it you read something about debit memos
24  and some large number, but didn't read the remainder of
25  the substance before you --

45

1    A.  I --
2    Q.  Let me just finish my question and then you
3  can respond.  Are you saying that when you got it and
4  you read it you recognized that, you know, this -- the
5  major item being the debit memos and some large number
6  that came out of it -- that at that point you had the
7  opinion that, "This just can't be.  This is ludicrous,"
8  or did you review the substance of the allegations and
9  make a determination that maybe, "Some of this is true.
10  Some of this -- I don't know if it is, but the ultimate
11  conclusion is ludicrous"?
12    A.  My initial reaction was that, you know, the
13  concept of recording a couple hundred million dollars --
14  whatever the number was --
15    Q.  Right.
16    A.  -- of revenue by booking revenue for
17  on-account receipts -- whatever those were -- that that
18  was not a believable occurrence to me.  I read the
19  entire document.  I then, you know, as was, I thought,
20  my responsibility said, "Okay.  Let's go through
21  every one of these things and let's look and find out --
22  is there truth to it or not?"  My initial reaction was,
23  "Not a chance."  But then, you know, I had Greg Myers
24  and, you know, other staff that supported him go look at
25  every single item that was in that second amended

46

1  complaint to try and determine what was the true facts
2  associated with it as opposed to the wording that was in
3  the document.
4    Q.  And did they submit a written report to you?
5  I am sorry.  Did you just say, "Greg Myers," or did you
6  just say, "Quinn and Myers"?
7    A.  I mean, I met with both of them, as I said
8  before.  Greg was really -- Greg and the staff that
9  supported him was really the guy with his feet on the
10  street that could go get the information out of the
11  system.  He was more familiar with it I found.  So it
12  was primarily Greg and the staff that supported him that
13  looked into each of the items that was in the amended
14  complaint -- second amended complaint.
15    Q.  Did he submit a written report to you?
16    A.  No.  You know, we had a variety of
17  discussions.  He ran a variety of reports.  I don't
18  believe there was ever requested of him that he provide
19  me a report on his findings.  It was more of piecemeal
20  communication as we were going through the process.
21    Q.  And would you say those were verbal,
22  telephone, or by e-mail?
23    A.  I mean, I can't recall at this point.
24    MS. WINE:  I am sorry.  Just when you are done
25  with this -- we have been going about an hour.

47

1    MR. WILLIAMS:  We can take a break.
2    THE DEPONENT:  You can finish.
3    MR. WILLIAMS:  No, I can pick up when we get
4  back.
5    THE DEPONENT:  That's fine.
6    THE VIDEOGRAPHER:  Off the record at 10:07.
7    (Off the record.)
8    THE VIDEOGRAPHER:  On record at 10:21.
9  BY MR. WILLIAMS:
10    Q.  Okay.  We left and we were discussing that you
11  had at least instructed Greg and Mike to do some
12  investigation with regard to the allegations in the
13  second amended complaint.  Is that fair?
14    A.  Yes.
15    Q.  When you read the allegations in the second
16  amended complaint were you familiar personally with any
17  of the facts that were alleged in the complaint
18  regarding the debit memos?
19    A.  I am sorry.  Regarding the debit memos?
20    Q.  Um-hum.
21    A.  No.
22    Q.  So when you read at least the allegation that
23  sometime in November of 2000 -- that there was a --
24  there were a certain number of debit memos generated at
25  that time, you had been unaware of that fact?

48

1    A.  Correct.
2    Q.  Okay.  And when you read that fact did that
3  mean anything to you?  Did you know what debit memos
4  were, generally?
5    A.  I know what a debit memo is, yes.
6    Q.  Right.  And at the time you rated it I presume
7  you knew what a debit memo was, generally?
8    A.  Yes.
9    Q.  And at that time did -- can you tell me what
10  in your mind a debit memo was generally?
11    A.  An adjustment to a previously issued invoice.
12    Q.  Okay.  And when you read the allegation that
13  these debit memos were created -- you know, many
14  thousands of them -- had you known -- had you had an
15  independent knowledge of whether or not it actually
16  occurred and if it had occurred the reason why it had
17  occurred?
18    A.  No.
19    Q.  Okay.  At some point after that you were able
20  to confirm that indeed it had occurred, right -- at
21  least that piece?
22    A.  That the debit memos had been processed, yes,
23  in November 2000.
24    Q.  Right.  And did you learn that during your
25  first meetings with Greg and Mike?

49

1    A. I don't recall if it was the first meeting. I
2  mean, it was -- the subject, I think, of the
3  conversation is, "What is this assertion?" So likely it
4  would have been in the first meeting that Greg would
5  have explained to me what occurred in November of 2000.
6    Q. Okay. As we go forward, if you could for me
7  differentiate when you talked to Greg only or Mike and
8  Greg. Based on what you have told me earlier you
9  started out saying, you know, you talked to Mike Quinn
10  and Greg Myers, but recently you have only been saying
11  Greg. And if that's the case, then fine. I just want
12  to know, should I just be thinking of Greg here or was
13  Mike Quinn part of this investigation materially?
14    A. I mean, I will try and differentiate if it was
15  just Greg or if it was Greg and Mike. It is difficult
16  due to passage of time to remember. You know, Greg was
17  more involved -- he was more involved talking to Greg
18  than I was to Mike.
19    Q. On this issue at least?
20    A. Right.
21    Q. Okay. Now, at the time that you read the
22  allegation in the complaint you knew that Oracle did
23  have an account called 25005, correct?
24    A. Yes.
25    Q. And that in that account were some dollar

50

1  value of customer overpayments?
2    A. I mean, there is a population. I wouldn't
3  necessarily say -- I don't know how -- some customer
4  overpayments, yes. Some items that were not customer
5  overpayments -- they needed to be applied to the correct
6  invoice.
7    Q. Right, and I understand that. But at the time
8  when you read the allegation you knew that there was
9  this account, 25005, and that within that account there
10  was -- there were at least some customer overpayments
11  that had yet to be applied?
12    A. Well, but a customer overpayment and yet to be
13  applied doesn't go together.
14    Q. I will withdraw that part of the question.
15    A. Did I know that there were some customer
16  overpayments? Using the word, no -- I would say, no,
17  n-o. By definition what was in 25005 were a number of
18  receipts that had yet to be applied. They could have
19  been, you know, receipts that were yet to be applied to
20  a specific invoice. They could have been receipts that
21  were, in fact, an advance -- an advance against future
22  purchases or they could have been, as you said, a
23  customer overpayment. I couldn't know which of those
24  three buckets each of those items would fall into.
25    Q. So at the time you are saying that you would

51

1  not know whether or not any of what was in 25005 at any
2  given point in time was customer overpayments, but you
3  knew that within 25005 there were a range of different
4  receipts?
5    A. Within 25005 there were a variety of receipts
6  that could have fallen into any of those buckets. I
7  would not have known how much one was versus another.
8  So I am just trying to clarify --
9    Q. I understand.
10    A. -- because that is another thing. Do I know
11  there were customer overpayments? I don't know that.
12    Q. That's fine. Was 25005 at that time called,
13  "customer overpayments"?
14    A. I don't recall what the description of the
15  account was.
16    Q. Do you know if it was ever called, "customer
17  overpayments"?
18    A. I don't know as I sit here today what it is
19  called. I don't. You know, I remember 25005 as the
20  account number. I remember, you know, that, yes, there
21  could be customer advances, there could be customer
22  overpayments. What the caption was, I don't know today.
23    Q. Okay. At the time when you received the
24  second amended complaint do you know if there was any
25  particular person in the finance organization that was

52

1  responsible for maintaining or reconciling 25005?
2    A. There would have been someone responsible.
3  Who that individual was at that time, I don't know.
4    Q. Would that individual have been reporting up
5  through accounts receivable or through collections?
6    A. It would not have been collections because
7  what you said was in charge of reconciling and there
8  weren't accountants in collections. So it would have
9  been someone either in accounts receivable or actually
10  in the general ledger group that would have been
11  responsible to reconcile that account to the general
12  ledger.
13    Q. I wasn't using the word, "reconcile," for an
14  accounting purpose in that question.
15    A. Okay.
16    Q. I was just trying to get at who was
17  responsible for monitoring what was in 25005 and
18  classifying those items correctly, if there was such a
19  person.
20    A. I mean, I don't -- I don't know who it was
21  that was responsible. I mean, this is the semantics of,
22  "reconcile," an accounting term. And I don't think --
23    Q. My question isn't that.
24    A. Right. So, could you, like, rephrase it?
25    Q. Sure. Well, was there anyone who had the

53

1   responsibility of knowing what was in 25005?
2       A.   25005 is a GL account -- a general ledger
3   account.
4       Q.   I understand.
5       A.   That would have the liability portion of a
6   larger population called, "receipts," that have not yet
7   been resolved where to apply.  So when you say, "25005,"
8   the answer is there could only be someone in either GL
9   or AR who was responsible for reconciling it.  If -- but
10  that doesn't seem to be your question.  So I don't know
11  how to answer it.
12      Q.   Okay.  Well, you said that Greg Myers was the
13  person with his feet on the street on -- I guess, on the
14  system or on the issue of the debit memos?
15      A.   I would say both as related to an accounting
16  person.
17      Q.   Okay.
18      A.   Not an IT systems person.
19      Q.   Fine.  And with respect to this issue, the
20  account was 25005 -- at least alleged in the complaint?
21      A.   No, no.  Well, then we are talking about two
22  different things because there is a body of receipts
23  that have been, you know, cash received by Oracle and
24  has not yet been applied to a specific invoice.  If it
25  was applied to a specific invoice it wouldn't be -- it

54

1   would be applied.  The receivable would have been
2   removed from the trial balance, the cash applied to it.
3   So there is a body of receipts that are -- we will call
4   them, "unapplied cash."  Some of those need to be
5   applied against invoices.  Some of those could be
6   customer deposits or -- could be deposits or
7   overpayments.  The portion that are in 25005 are the
8   portion that is estimated to be customer overpayments or
9   customer advances.  It is not the same as unapplied
10  cash.
11      Q.   I hadn't mentioned unapplied cash yet.  I
12  don't know if my question sort of implicates unapplied
13  cash, but I don't think I asked about it yet.
14      A.   There is no detail listing of customer
15  overpayments and advances.
16      MS. WINE:  Can we read back what question is
17  actually pending?
18      COURT REPORTER:  "Q.  And
19      with respect to this issue,
20      the account was 25005 -- at
21      least alleged in the complaint?"
22      THE DEPONENT:  I need to go farther back than
23  that.
24      MR. WILLIAMS:  You can go back another
25  question or so.

55

1       COURT REPORTER:  "Q.  Well,
2       you said that Greg Myers was
3       the person with his feet on
4       the street on -- I guess, on
5       the system or on the issue
6       of the debit memos?
7       A.  I would say both as related
8       to an accounting person.
9       Q.  Okay.
10      A.  Not an IT systems person.
11      Q.  Fine.  And with respect to this
12      issue, the account was 25005 -- at
13      least alleged in the complaint?"
14      BY MR. WILLIAMS:
15      Q.   We will talk about unapplied cash and you can
16  tell me everything I need to know about it, but I was
17  just asking about -- let me just back up and see if I
18  can get us back on track.
19      A.   Okay.
20      Q.   With respect to 25005 I initially asked
21  whether or not there was somebody who was in charge of
22  maintaining or monitoring that account.  And I think you
23  made a differentiation between -- from reconciling it
24  from an accounting perspective and maybe an IT-type of
25  perspective.  And all I want to know is whether or not

56

1   there was somebody responsible for monitoring what was
2   in 25005, if you can answer that?
3       MS. WINE:  Objection.  Vague and ambiguous.
4       THE DEPONENT:  I mean, I don't know how to
5   answer it because I keep trying to go to who reconciled
6   accounting and that doesn't seem to be what you are
7   asking about.  So I don't know other than, "reconcile
8   accounting," how to answer your question.
9       BY MR. WILLIAMS:
10      Q.   Well, answer that question then.  If there is
11  someone responsible for reconciling 25005 from an
12  accounting perspective who would that person have been?
13      A.   I don't recall the individual.  It would have
14  been somebody either in accounts receivable or in
15  general ledger.
16      Q.   Okay.  And both of those organizations, you
17  know, kind of fed up to you?
18      A.   Yes, they did.
19      Q.   And Greg Myers was in accounts receivable,
20  right?
21      A.   Correct.
22      Q.   And you asked him to do the investigation as
23  it relates to the debit memos and alleged overpayments
24  in the complaint, right?
25      A.   Debit memos have nothing to do with 25005.

57

1   They have to do with items that are sitting in the AR
2   sub-ledger with a flag called, "on-account." They are
3   by definition, I later found out, not on the balance
4   sheet of Oracle Corporation. They were not in 25005.
5        Q.   At some point later you are saying you found
6   out that the debit memos or items in on-account were not
7   in 25005?
8        A.   Yes.
9        Q.   And -- but at the time you read those
10  allegations you did not know that, right?
11       A.   That is correct.
12       Q.   You asked Greg Myers to do this
13  investigation -- Greg Myers and Michael Quinn, right?
14       A.   Yes.
15       Q.   And that would have included a review of
16  25005 -- the debit memos and customer overpayments
17  generally -- right, because that is what was alleged in
18  the complaint?
19       A.   Could you read that back, please?
20       COURT REPORTER: "Q.   And
21            that would have included a
22            review of 25005 -- the debit
23            memos and customer overpayments
24            generally -- right, because that
25            is what was alleged in the

58

1            complaint?"
2        THE DEPONENT: Our initial discussions had to
3   do with the debit memos. The debit memos really related
4   to the on-account cleanup. They did not relate to
5   customer overpayments or unapplied cash.
6   BY MR. WILLIAMS:
7        Q.   But that was something that you have indicated
8   to me you learned later, right?
9        A.   Yes.
10       Q.   Okay. So all I am asking is, you know -- you
11  asked Greg Myers to do the initial investigation into
12  the relationship between these three things -- 25005,
13  customer overpayments, and the debit memos -- at the
14  point you read the allegations in the complaint?
15       MS. WINE: Objection. Misstates his
16  testimony.
17  BY MR. WILLIAMS:
18       Q.   Is that fair?
19       A.   But I -- I will agree that what was in the
20  complaint I asked him to investigate. And so, as stated
21  in the complaint, it said it thought it was related to
22  customer overpayments.
23       Q.   That's right. That is all I am asking.
24       A.   Yes, I asked him to investigate those issues
25  that were in the second amended complaint.

59

1        Q.   Okay. And he is in AR -- he was -- he was in
2   AR?
3        A.   At that time, yes.
4        Q.   And he reported to Mike Quinn, right?
5        A.   I believe, yes, he reported directly to Mike.
6        Q.   And did you ask him to do the investigation
7   because he was in AR or simply because you felt that
8   Greg Myers might be the right guy to do it?
9        A.   Greg Myers is, you know -- as I described
10  earlier, he was more familiar with the AR application
11  and how it worked. Mike was, you know, either at this
12  time a director or a vice president in charge of revenue
13  operations. He was in a managerial position. He was
14  not in a -- go look at this, run reports, et cetera, et
15  cetera. So I asked Greg because Greg was more
16  knowledgeable about getting details out of the system.
17       Q.   Okay. And you knew that at the time,
18  obviously?
19       A.   Yes, I did.
20       Q.   And Greg didn't report directly to you, did
21  he?
22       A.   No, he did not.
23       Q.   Did you guys sit next to each other or near
24  each other?
25       A.   No.

60

1        Q.   And how long -- as of 2002 how long had Greg
2   been at the company? Do you know?
3        A.   I do not know. Somewhere between, I would
4   say, three to four years.
5        Q.   Okay. And so did he tell you anything during
6   your initial meeting to persuade you that what was in
7   the complaint was either not true or inaccurate?
8        A.   I don't recall if it would have been the
9   initial meeting or a subsequent meeting.
10       Q.   At some point in some subsequent meeting he
11  did?
12       A.   Yes.
13       Q.   And what did he say?
14       A.   He explained what the debit memos were and how
15  the accounting impact of them was a zero effect on the
16  balance sheet and income statement of Oracle
17  Corporation.
18       Q.   Did he give you a report that said that or did
19  he just come and tell you that?
20       A.   I believe it was a verbal conversation.
21       Q.   And was it more detailed than what you just
22  offered to me?
23       A.   Yes.
24       Q.   And was anybody else at that meeting?
25       A.   I mean, we had a number of meetings. And I

61

1  can't today tell you if there was more than one person,
2  you know, other than Greg and I in these meetings. I
3  don't know.
4      Q.  And so prior to your multiple meetings with
5  Greg, and maybe Mike somewhere in there, did you know
6  what had happened with the debit memos in early -- in
7  late 2000?
8          MS. WINE:  Objection. Asked and answered.
9          THE DEPONENT:  I believe so.
10         MS. WINE:  Can you repeat that question?
11         COURT REPORTER:  "Q. And
12             so prior to your multiple
13             meetings with Greg, and maybe
14             Mike somewhere in there, did
15             you know what had happened
16             with the debit memos in early --
17             in late 2000?"
18         THE DEPONENT:  And I think the answer is -- I
19  mean, he told me what had occurred and I believe that I
20  understood what occurred.
21         BY MR. WILLIAMS:
22     Q.  Right. But, you know, prior to him explaining
23  to you what had occurred you hadn't had an independent
24  knowledge of what occurred?
25     A.  Correct.

62

1      Q.  Right. Okay. Some time after you received
2  the second amended complaint you met with members of the
3  SLC?
4      A.  Correct.
5      Q.  And at the time you had read -- at the time
6  you got and read the second amended complaint -- you had
7  met with the SLC prior to that too, right?
8      A.  I don't believe so.
9      Q.  Okay. Do you remember if you met with the SLC
10  on more than one occasion?
11     A.  Yes.
12     Q.  Okay. And do you remember if the subject
13  matter of your meetings with the SLC were different on
14  the separate occasions that you met?
15     A.  I mean, the only thing that I remember is
16  meetings related to the debit-memo issue. So if I met
17  with them on some other issue, I don't recall that.
18     Q.  Okay. And do you recall where you met with
19  the SLC on the debit-memo issue -- location?
20     A.  It was in a conference room in building 2 in
21  Rocklin.
22     Q.  Prior to meeting with the SLC had you heard
23  from the audit committee at Oracle with regard to this
24  subject?
25     A.  I mean -- I don't know the answer to that

63

1  question.
2      Q.  Did you ever give a presentation to the audit
3  committee at Oracle regarding this -- regarding what
4  happened with the debit memos?
5      A.  I mean, I don't recall if I gave a
6  presentation to them or not.
7      Q.  Did you talk to them about it?
8      A.  When I was at corporate up to '98 as the
9  corporate controller I went to all of the audit
10  committee meetings every quarter. So I am not sure if
11  one of -- you know, one of the members might have called
12  me after the second amended complaint. I don't
13  remember. You know, I tend to recall more of the
14  reading the document, you know, investigating, meeting
15  with the SLC. I don't know if I ever met with the audit
16  committee. I do believe that one of the members of the
17  SLC -- at least one was on the audit committee. So, I
18  mean, that is -- my confusion is I don't remember if I
19  met with the audit committee.
20     Q.  And who is that member that was also on the
21  audit committee?
22     A.  Joe Grenfest.
23     Q.  Okay. Earlier you began telling me about
24  unapplied cash -- a little bit, right?
25     A.  Right.

64

1      Q.  And do you recall seeing the term or phrase,
2  "unapplied cash," in relation to the allegations in the
3  second amended complaint?
4      A.  I don't recall if that's in there or not.
5      Q.  Okay. Did Oracle have a specific account
6  designation that was called, "unapplied cash"?
7      A.  I can't remember if it was a GL account or if
8  it was a subset of a -- I mean, I don't remember if
9  there was an account that said, "unapplied cash," or if
10  there was an AR -- accounts receivable account that a
11  subset thereof was unapplied cash. I don't remember.
12     Q.  Okay. But there was some body of cash at
13  Oracle that was unapplied cash?
14     A.  Yes.
15     Q.  And did that include customer overpayments?
16     A.  I believe that there was a listing of customer
17  receipts that could include unapplied cash, could
18  include customer overpayments, could include customer
19  deposits.
20     Q.  Okay. That's fine. And was there anybody at
21  Oracle who was responsible from an accounting
22  perspective of reconciling unapplied cash?
23     A.  Yes. And, again --
24     Q.  Don't know who it was?
25     A.  Don't know who it was.

65

1    Q.   But it was somebody in AR, likely?
2    A.   Somebody in AR or general ledger.
3    Q.   General ledger.  Who are the people in general
4  ledger, if you can recall, in 2000?
5    A.   I do not recall.  At one point in time there
6  was a GL manager called John Margozawitz.  However, John
7  might have transferred over to payroll by then.  After
8  John there was a gentleman -- Brad Newton, who was
9  responsible for the general accounting areas, which
10  included GL.  You know, there are a number of
11  accountants that worked for them and I don't really
12  remember their names.
13    Q.   But general ledger and AR were separate?
14    A.   I mean, they are two different departments.
15  They both roll up to, you know, the finance
16  organization.  They were both physically located in
17  Rocklin for the U.S. entity, but they are two different
18  departments.
19    Q.   Now, do you recall during your -- at least one
20  of your meetings with the SLC that you told them that
21  the -- among the 46,000 debit memo transactions that
22  occurred in November of 2000, that many or most of them
23  had been items that had been previously refunded to
24  customers?
25    A.   I remember telling them that a number of them

66

1  were previously refunded.  I don't know if I used the
2  word, "most."  I think there could have been a variety
3  of reasons why things were on-account -- that
4  classification within the AR sub-ledger.  Don't know if
5  I said, "most," or not.
6    Q.   But you at least said, "some"?
7    A.   Yes.
8    Q.   And did you personally do an investigation
9  into whether or not any of those 46,000 debit memo
10  transactions referenced monies that had been previously
11  refunded to customers?
12    A.   Did I, personally?
13    Q.   Um-hum.
14    A.   I would say -- I could say that I managed
15  others who went to get the detail information to then
16  report back to show that they were previously refunded
17  items.  And I did not myself, personally, go, you know,
18  look at the AR system, look at, you know, the AP
19  system.  I didn't do that.
20    Q.   Can you tell me the process generally for
21  refunding customer overpayments in the 2000 -- well,
22  let's say between 1999 and 2002, if you know?
23    A.   Well, first I would like to -- because we have
24  now moved off of the on-account items in the debit
25  memos.

67

1    Q.   We haven't really.  That is just my question.
2    A.   Well, I am merely saying that the question you
3  have now asked me, I would say, has nothing to do with
4  the 46,000 debit memos.
5    Q.   Okay.  I wouldn't agree, but it is okay.  If
6  you answer the question, that would be great.  I mean, I
7  understand what you mean or what you are saying.
8    A.   The 46,000 debit memos related to items that
9  might previously have been refunded.  So, I mean, we
10  just moved to a related topic.  Can you re-read the
11  question to me again, please?
12        COURT REPORTER: "Q.  Can
13        you tell me the process
14        generally for refunding
15        customer overpayments in the
16        2000 -- well, let's say
17        between 1999 and 2002, if
18        you know?"
19        THE DEPONENT:  Most often a collector would
20  generate a request for a refund to a customer because of
21  a refund (sic).
22        BY MR. WILLIAMS:
23    Q.   Because of a refund or an overpayment?
24    A.   Overpayment -- I am sorry.  There was at that
25  time frame an approval matrix, which I don't remember

68

1  the dollar amounts on -- but what refund could be
2  approved by a collector or collector management -- what
3  needed to go to their management, Mike Quinn, what
4  needed to go to his manager, me, to get a refund for an
5  overpayment approved for processing.  So the practice
6  would be there was an e-mail template that would be
7  filled out specifying who the customer was, what the
8  amount was, what the reason for the refund was.  That
9  would then be sent to their management -- collections
10  manager, to Mike Quinn, or to me based on dollar
11  amount.  So I didn't see them all.  I probably would
12  have seen those that were, say, greater than 10,000 or
13  greater than 25,000 -- some dollar amount, which -- I
14  don't recall what it was.  That was the process.  If it
15  was approved then that template was sent to the accounts
16  payable department who would then generate a check and
17  mail it to the customer.
18    Q.   So the process would begin with a collector?
19    A.   I said generally the answer to that would be,
20  yes.
21    Q.   Sure.
22    A.   I mean --
23    Q.   Generally.  That's fine.
24    A.   Okay.
25    Q.   So generally the process would begin with a

69

1 collector who somehow identifies that there has been an
2 overpayment that needs to be refunded --
3     A.  Yes.
4     Q.  -- right?  And did you understand the process
5 of how a collector would identify an overpayment?
6     A.  Generally.
7     Q.  Can you explain that?
8     A.  Each of the collectors had a territory.  And,
9 again, all of this relates to Oracle U.S. at the time
10 that I was there.  I don't know what they are doing
11 now.  But each collector had a territory, which was an
12 alpha territory.  So somebody was assigned any customer
13 that started with an A.  Somebody else had B.  You know,
14 somebody else had Cs and Ds.  And their
15 responsibility -- primary was to collect on receivables
16 that were past due.  Because some of those receivables
17 that they were trying to collect could also have already
18 been paid and not been applied by the system.  They also
19 were responsible for the unapplied cash -- generic
20 term -- which, again, could be, you know -- from my
21 perspective could be an overpayment, could be just -- it
22 wasn't applied to the right invoice, could be an advance
23 against future products.  They also owned responsibility
24 for the alpha component of that other list.
25     So, if in trying to collect a receivable, you

70

1 know, they tried to match it against the unapplied cash
2 and in discussions with the customer they found that,
3 "Oh, it seems like this has been overpaid, duplicate
4 paid," whatever -- you know, they might -- I mean, part
5 of the process was -- the objective is to try to apply
6 items in unapplied cash against receivables and get them
7 off the ledger.  But if in doing that work they found
8 that there was an overpayment by the customer then they
9 would typically fill out this template and send it up
10 through the approval chain to get it approved and have
11 AP cut the check.
12     Q.  Okay.  So -- and no collector could simply
13 approve a refund, right?
14     MS. WINE:  Objection.  Misstates testimony.
15     THE DEPONENT:  I do not believe that they
16 could.  I do not believe accounts payable would have
17 processed a refund request without an approval that was
18 in accordance with this matrix.  Which dollar amounts, I
19 do not remember at this point.
20     BY MR. WILLIAMS:
21     Q.  Okay.  So within that matrix -- and there
22 would be a few different levels based on dollar amount
23 probably?
24     A.  My recollection is that I was on it, Mike was
25 on it, and the collection managers, I think, were on

71

1 it.  Probably not lower than that.
2     Q.  Okay.
3     A.  So if there was it probably needed at least
4 the collection manager approval.
5     Q.  Okay.  And based on your knowledge was there
6 any different process that a collector generally would
7 adhere to in trying to get a refund sent out?
8     A.  I don't believe there could be another
9 process, no.
10     Q.  So it wouldn't be, based on your knowledge,
11 that a collector just picks up the phone -- someone
12 calls someone in accounts payable and says, "Hey, send X
13 company a refund of 50 grand"?
14     A.  No.  I mean, that would have been against
15 policy.
16     Q.  Okay.
17     A.  It should not have been processed by AP if
18 that was the hypothetical situation.  You know,
19 hypothetically speaking they should have said, "No."  It
20 never would have gone somewhere.
21     Q.  Okay.
22     A.  I don't believe that that would have occurred.
23     Q.  So is it fair to say that for those debit
24 memos that referenced amounts that had been previously
25 refunded to customers there would be a -- an e-mail

72

1 template or some communication including an approval by
2 someone within the matrix that you just described and
3 ultimately a check made to the customer?
4     A.  I am going to say, no, because we just moved
5 from this '99 to 2002 time frame to God knows when.  I
6 mean, the items that were previously refunded to
7 customers that were in, you know, that debit memo list
8 from November of 2000 -- those things could have been
9 five years prior.  They could have been before I ever
10 showed up in Rocklin.  So I don't know what the policy
11 or practice would have been in the prior periods.
12     Q.  You showed up in Rocklin in '98 -- sometime in
13 '98 right?
14     A.  Late '98.
15     Q.  And was the process the same as what you have
16 described to me, at least from the time that you arrived
17 in Rocklin?
18     A.  I do not know the answer to that question.  I
19 would say the first day that I arrived in Rocklin -- you
20 know, collections had never reported directly through me
21 before.  I don't know what their practice was the first
22 day.  Sometime during that time frame I know that that
23 was the practice and that there was an approval level
24 that included me.  The day before I arrived there it
25 obviously couldn't have been that same practice because

73

1    I wasn't there.  There might have been something else
2    and I don't know what it was.
3         Q.   But even prior to that you were responsible
4    for corporate accounting in the company, right?
5         A.   My -- yes.
6         Q.   And within that would you ultimately have
7    oversight, even if it was through direct reports, over
8    cash refunds that were being sent to customers?
9         A.   Yes, but what I just described to you was not
10   the practice in -- as an example, 1992, because I wasn't
11   in Rocklin.  I was not included in an approval matrix.
12   There would have been something different in the
13   different time frames.  When I moved from corporate to
14   Rocklin clearly my level of responsibility changed.
15        Q.   I understand what you are saying there.  That
16   you certainly would not have been part of the approval
17   matrix.  Whether the process was similar, you don't
18   know.  Is that fair?
19        MS. WINE:  Objection.  Misstates testimony.
20        THE DEPONENT:  Can you repeat that last
21   question?
22        COURT REPORTER: "Q.  That
23            you certainly would not have
24            been part of the approval
25            matrix.  Whether the process

74

1            was similar, you don't know.
2            Is that fair?"
3         THE DEPONENT:  I mean, I think that is true.
4    I mean, I was not on a specific approval matrix when I
5    was at headquarters.  I don't know what the practice
6    was -- what the approval levels were.
7    BY MR. WILLIAMS:
8         Q.   Okay.  It is fair to say that there was some
9    level of approval involved in sending cash refunds to
10   customers, right, prior to 1998 when you arrived in
11   Rocklin?
12        MS. WINE:  Objection.  Misstates testimony,
13   asked and answered.
14        THE DEPONENT:  My assumption is that there
15   would have been something.  I do not believe that the
16   accounts payable or treasury department are going to
17   disperse a check without some approval of the
18   transaction.  What it was at that time, I don't know.
19   BY MR. WILLIAMS:
20        Q.   Okay.  Let's go back into the '98 to 2000
21   range after you arrived in Rocklin.
22        A.   Okay.
23        Q.   So, during -- for refunds that occurred, say,
24   between 1999 and 2002, is it fair to say that the
25   process -- the general process that you described

75

1    earlier was in place?
2         MS. WINE:  Objection.  Misstates testimony.
3         THE DEPONENT:  I believe that to be true.
4    BY MR. WILLIAMS:
5         Q.   Okay.  And that for those refunds there would
6    be an e-mail template, an approval, or a request for an
7    approval -- an approval and then an ultimate check that
8    went to a customer for those refunds, right?
9         A.   I believe that to be true.
10        Q.   And do you know what, if anything, Greg Myers
11   or Mike Quinn or anyone in their -- or anyone who
12   reported to them did to determine that the items in --
13   related to the debit memos had been refunded prior to
14   November 17th of 2000?
15        A.   I mean, I can't speak for Greg and Mike.  I
16   know on specific transactions that they provided reports
17   off of the AP system, off the AR system showing that a
18   refund had been processed, check sent to the customer
19   prior to that date.  I reviewed some of those
20   documents.  I didn't review them all.
21        Q.   You don't know what they actually did, but
22   they were able to provide you information from Oracle's
23   systems that related to at least some of those items?
24        A.   My recollection is that on a number of the
25   large items within the 46,000 I specifically requested

76

1    that they go find out what was the original genesis of
2    this -- of this item.  Why was it on the list in
3    on-account?  Did it represent a liability to a third
4    party?  And so, large-dollar items -- and I don't recall
5    the scope I gave them, but I had them look at the
6    largest items within the 46,000 debit memos.  And then I
7    also had them look at all of the items that were listed
8    in the second amended complaint.  And my recollection is
9    that those were shown to be, you know, items that were
10   not liabilities of Oracle Corporation.  That they had
11   either previously been paid back to the customer --
12   there was one item, the largest on the list, that I
13   believe was a stop payment on a check.
14        And, so, no, there was not a refund back, but
15   the cash came through the lock box and then the check
16   was stopped by the customer.  So there was obviously in
17   that instance not a refund back to them because they
18   stopped payment, but, again, an example of an item that
19   was within the 46,000 debit memos, that was not a
20   liability of Oracle Corporation.  So there were a number
21   of refunds, but there was also a myriad of other reasons
22   why items were on there.  But in looking at those they
23   were not amounts due.  They were not customer
24   overpayments that had not previously been satisfied.
25        Q.   Were they unapplied cash?

77

1    A.  No.
2    Q.  How do you know that?
3    A.  Again, because those on-account items were not
4  unapplied cash.  Unapplied cash had a separate flag
5  within the AR system that said, "Here is a receipt that
6  has been processed into cash that we have not found what
7  invoice to apply it against yet."
8    Q.  So generally you are saying that if an item
9  back in 2000 had, "on-account," next to it that that in
10  no instance represented money that Oracle had that was
11  either unapplied or belonged to a customer?
12    A.  I am not going to speak to the 46,000
13  population because I didn't look at 46,000 items.  I had
14  them look at, like, the transactions that were referred
15  to in the second amended complaint and the large-dollar
16  transactions.  And my recollection is that they were not
17  amounts due back to customers.
18    Q.  Okay.  Do you know approximately how many you
19  looked at?
20    A.  How many they looked at, no, I cannot say.
21  How many did I ask them to report back to me on for me
22  to be comfortable that these did not affect our
23  financial statements?  My recollection is there was
24  probably 10 or so items specifically mentioned in the
25  second amended complaint -- could be 15, could be 8.  I

78

1  mean, I don't know what it was.  But those items I had
2  them look at.  And then I had them take the 46,000 debit
3  memos, export it -- import it into Excel and sort it in
4  descending dollar order.  And, you know, my recollection
5  is on the first page of that spreadsheet was probably 20
6  items.
7    Q.  Okay.
8    A.  So, those as well.
9    Q.  I am just asking -- you said that on-account
10  did not represent customer overpayments, but instead was
11  a flag for something else.  Is that your testimony?
12    A.  I said that on-account on November 17th of
13  2000 -- you know, it was a number of items in the AR
14  sub-ledger -- the accounts receivable sub-ledger of
15  receipts that had occurred over many, many, many years
16  that had a flag on them that was a flag that said,
17  "on-account."  You know, if you go look at what those
18  items are they could be there for a variety of reasons.
19  What apparently they were doing in the early days of
20  using the AR application is if it was an item that, in
21  fact, was not a customer amount due to a customer or an
22  item that was still believed to be needed to be applied
23  to an invoice, they used this on-account flag to
24  indicate that that really wasn't related to unapplied
25  cash or customer advances or customer overpayments.  Why

79

1  they did that I have no idea.  That was well before my
2  time.
3    Q.  Well, I am asking whether on November 17th
4  those items that you are indicating had an on-account
5  flag next to them -- whether any of those items were
6  monies that belonged to customers or had to be refunded
7  to customers?
8    MS. WINE:  Objection.  Asked and answered.
9    BY MR. WILLIAMS:
10    Q.  Any of them.
11    A.  You are saying had to be refunded subsequent
12  to November 17th of 2000?
13    Q.  Sure.
14    A.  And what I answered was -- for the ones that I
15  looked at the answer was, no, but I can't speak to all
16  46,000.
17    Q.  That's fine.  I think he has got to change the
18  tape.  So we will take five minutes.
19    THE VIDEOGRAPHER:  This marks the end of tape
20  1, volume 1 in the deposition of Thomas Williams.  Going
21  off the record at 11:11.
22    (Off the record.)
23    THE VIDEOGRAPHER:  On record at 11:27.  This
24  marks the beginning of tape 2 in volume 1 in the
25  deposition of Thomas Williams.

80

1    BY MR. WILLIAMS:
2    Q.  Okay.  You said that you wanted Greg and Mike
3  to give you some subset of the 46,000 to satisfy you
4  that the debit memo transactions did not affect the
5  financial statements, right?
6    A.  Correct.
7    Q.  And under -- were you concerned at the time
8  that they could have or might have impacted the
9  financial statements?
10    A.  I guess I would say, no.  And the underlying
11  reason for that being that I knew that when they
12  processed those debit memos one of the first things that
13  Greg told me is that they booked an equal and offsetting
14  debit and credit through 25005.  So by definition it did
15  not affect the balance sheet and could not have affected
16  the income statement.  The additional work was more of
17  a, "Well, now explain to me why these items are in here
18  in the first place.  What are they?"
19    Q.  Are in where?
20    A.  Are in this listing of on-account
21  transactions.
22    Q.  Okay.  And so prior to your discussion with
23  Greg you did not have an independent knowledge of that?
24    A.  That is correct.
25    Q.  Okay.  And talking about the subset of the

81

1    debit memo transactions that you asked them for, what
2    type of information did they provide for you with regard
3    to those transactions?
4        A.  I mean, I am not sure that it was the same in
5    each and every instance.  I do recall them providing --
6    as an example, when a refund check had been previously
7    issued, a screen shot off of the AP application showing
8    the check made out to -- I mean, a screen shot, if you
9    understand that terminology.  You know, so within that
10   screen shot would be, you know, the payee name, you
11   know, the amount, and the like.  So it varied by
12   transaction, but I remember seeing some of those screen
13   shots out of AP showing the actual check.
14       Q.  Okay.  When you say, "showing the actual
15   check," you are not looking at a copy of the check on a
16   screen shot.  You are just looking at something
17   different, right?
18       A.  Correct.  I mean, yes, showing the information
19   in the accounts payable system related to the check.
20   Yes.  I certainly did not see the check from the bank.
21       Q.  And did they provide you with the underlying
22   information regarding the transaction?  Meaning, if
23   they -- if one of the instances was a refund that had
24   been sent to a customer prior to that date do they
25   provide you with the initial invoice, the payment which

82

1    may have been an overpayment, and the template for the
2    refund, and the ultimate refund?
3        A.  I don't recall ever looking at a template --
4    approval template, which is what I think you are
5    referring to.  That wasn't one of the things that I
6    asked for nor was it one that was given.  I don't recall
7    what the individual pieces of paper were that supported
8    it.  But, you know, again, for the items that I asked
9    for they gave me information -- don't recall the detail
10   of it -- that was sufficient for me to conclude that we
11   had already previously made that payment.
12       Q.  And do you recall telling the members of the
13   SLC that the accounting entries referenced by the
14   plaintiffs in the second amended complaint were -- in
15   every specific instance cited an internal cleanup of
16   residual accounting entries in an accounts receivables
17   software application and not Oracle's general ledger for
18   funds that had either been refunded to customers or
19   which had never been -- never actually been received in
20   the first instance?  Do you recall telling the members
21   of the SLC something along those lines?
22       A.  I mean, I don't remember what I said to them
23   three years ago.
24       Q.  Um-hum.  Do you recall that being the case --
25   that the accounting entries referenced by plaintiffs

83

1    were -- in every specific instance cited an internal
2    Oracle cleanup of residual accounting entries in an
3    accounts receivable software application and not in
4    Oracle's general ledger for funds that had either
5    already been refunded to customers or which Oracle had
6    never actually received in the first instance?
7        A.  I mean, I wouldn't have used those particular
8    words.  The general gist of the statement I believe to
9    be correct.
10       Q.  Okay.  Do you know which words that you may
11   not have used?
12       A.  Read it to me again.
13       Q.  Sure.  The accounting entries referenced by
14   plaintiffs were -- in every specific instance cited an
15   internal Oracle cleanup of residual accounting entries
16   in an accounts receivable software application and not
17   in Oracle's general ledger for funds that had either
18   already been refunded to customers or which Oracle had
19   never actually received in the first instance?
20       A.  I would not have said, "cleanup of accounting
21   entries," in the underlying accounts receivable
22   application because, I mean, I would not have considered
23   those items accounting entries.
24       Q.  Okay.
25       A.  Other than that -- I mean, generally that

84

1    sounds like something I could have said.
2        Q.  Okay.  And did Mike Quinn or Greg Myers
3    provide you with information related to any of those
4    debit memos that showed to you that Oracle had never
5    received any money for those debit memos or transactions
6    in the first place?
7        A.  Well, the one transaction that I referred to
8    before break where it was a stop payment, that might
9    have been the one that I was referring to when I made
10   that comment.
11       Q.  Okay.
12       A.  There might have been others that were similar
13   to that.  I don't recall.
14       Q.  But you had only seen about -- less than 50
15   transactions?
16       A.  That is probably a good estimate.  I can't
17   recall how many.
18       Q.  Now, any of -- with respect to the on-account
19   flag that you are referring to, were any of those part
20   of Oracle's general ledger as of November 17th of 2000?
21       MS. WINE:  Sorry.  Can you repeat the
22   question?
23       COURT REPORTER:  "Q.  Now,
24      any of -- with respect to
25      the on-account flag that you

85

1      are referring to, were any of
2   those part of Oracle's general
3   ledger as of November 17th
4   of 2000?"
5        MS. WINE:  Objection.  Vague and ambiguous.
6        THE DEPONENT:  I don't -- well, I don't
7   believe so.
8        BY MR. WILLIAMS:
9        Q.  What is the basis of your belief?
10       A.  Because when the -- all of those transactions
11  were created and applied against the on-account items it
12  did not affect the financial statements.  So that would
13  tell me that they were not in the financial statements
14  unless there was an instance where it was a reconciling
15  item between the detail of unapplied cash and the
16  balance in the general ledger for 25005 and any related
17  AR account that contained unapplied cash.
18       Q.  But you are saying that because those
19  transactions did not affect the financial statements --
20  that is based on what you heard from Greg Myers, right?
21       A.  Based on what I heard and based on what I saw,
22  which was the account analysis report that showed that
23  the debits and the credits for all of that batch hit the
24  exact same account in the exact same dollar amount on
25  the exact same day.  So the generation of the debit

86

1   memos could not have affected our financial statements.
2   You asked me could there be an item that was included in
3   that 46,000 that, in fact, was in the general ledger.
4   And I couldn't answer, no, because in theory there could
5   be one of those items in the general ledger in a -- I
6   have got to give you an example.  If on November 16th
7   there was an item that was in unapplied cash and someone
8   erroneously changed the flag in some fashion, which -- I
9   don't know how they could do it -- but just
10  hypothetically change the flag from unapplied to
11  on-account it could still be in the general ledger, but
12  because it now had an on-account flag it would not show
13  up as a -- as an item in the unapplied cash listing.
14  But in that scenario there should be a reconciling item
15  between the listing of unapplied cash and the balance in
16  the general ledger.
17       Q.  Do you hypothetically -- under what
18  circumstance, if there is one, would someone move
19  something from unapplied cash to on-account?
20       MS. WINE:  Objection.  Incomplete
21  hypothetical, lacks foundation.
22       THE DEPONENT:  Hypothetically speaking, I have
23  no idea, but you asked me there was there any item in the
24  debit memos that was in the general ledger balance and I
25  can't answer, no, because in theory there could be some

87

1   exception that I don't know of.  And I don't know how it
2   would have occurred, but that might have.  So I don't
3   want to say, no, to your answer (sic) the way that it
4   was phrased.
5        BY MR. WILLIAMS:
6        Q.  Okay.  Now, you indicated earlier that Greg
7   Myers told you that prior to the -- prior to his running
8   this on-account cleanup on November 17th that there was
9   a -- that there were offsetting transactions in 25005
10  which gave you some comfort that whatever happened
11  didn't impact the balance sheet.  Is that fair?
12       A.  Well, first off, I did not have this
13  conversation until 2002, and it sounded like you might
14  have been talking about the November 17th --
15       Q.  No, I meant when you had the conversation.
16       A.  Okay.  When we had the conversation he
17  explained what the accounting transaction was, explained
18  why he was doing it, and I got a copy of the trial
19  balance, and I got a copy of the Account Analysis Report
20  that had that batch on it that showed me that what he
21  told me about the debits and credits going to the same
22  account was, in fact, true.
23       Q.  What is the Account Analysis Report?
24       A.  It is a report run off of the general ledger
25  that for a period of time for an account -- will give

88

1   you all of the entries -- increases, decreases to that
2   account for that period.
3        Q.  Now, do you recall telling the special
4   committee in substance that Greg Myers had identified
5   the use of the on-account designation as deviating from
6   the practice in other Oracle offices and decided to
7   revise the use of the designation to bring the domestic
8   accounts receivable department in line with Oracle's
9   other offices?
10       A.  Yes.
11       Q.  And did Greg Myers tell you that in 2000 or in
12  2002?
13       A.  2002.
14       Q.  And did you know that the, quote, unquote,
15  "on-account," designations in the United States had been
16  different from other Oracle offices?
17       A.  Not until he told me that in 2002.
18       Q.  What did you know about on-account prior to
19  2000 -- the 2002 conversation you had with Greg Myers?
20       A.  Nothing.
21       Q.  Was it your testimony earlier today that in
22  the early '90s that on-account was used for or changed
23  from one usage to another generally?  Was that your
24  testimony?
25       MS. WINE:  Objection.  Misstates testimony.

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

89

1    THE DEPONENT: No. What I said -- as I
2 learned it -- in 2002 I learned from talking to Greg
3 that a -- you know, how the U.S. was using it was
4 different from how other subsidiaries or certain
5 subsidiaries were using it. And, B, that, you know, it
6 was used for a variety of purposes over the years. I
7 didn't know any of that until we had the conversation in
8 2002.
9 BY MR. WILLIAMS:
10   Q.  And do you know where he learned that?
11   A.  No.
12   Q.  And did you know what was in Oracle's internal
13 manuals concerning accounts receivable and quote,
14 unquote, "on-account"?
15   A.  No.
16   Q.  And did you know whether the collections staff
17 as of November 2000 through 2002 understood quote,
18 unquote, "on-account," to be money that customers had
19 that could be used for a later purpose?
20    MS. WINE: Objection. Lacks foundation, calls
21 for speculation.
22    THE DEPONENT: I don't believe that generally
23 the collections staff would even have known -- as I
24 stated previously, the collections staff got copies of
25 trial balances -- you know, accounts receivable trial

90

1 balances for their territory and they got copies of the
2 unapplied cash report. I don't believe that the
3 collectors ever had access or used a listing of
4 on-account because by definition, as I found in 2002,
5 they were items that really had nothing at all to do
6 with the current task of that collector.
7 BY MR. WILLIAMS:
8    Q.  Well, I was asking you from 2000 through
9 2002. It sounds like you are telling me what you
10 learned in 2002?
11   A.  That is correct.
12   Q.  So prior to 2002 you don't know whether or not
13 on-account was a designation that would identify funds
14 belonging to a customer that could be used at a later
15 date?
16    MS. WINE: Objection. Misstates testimony.
17    THE DEPONENT: As I said, my belief is that
18 the collectors would not have even had those reports.
19 BY MR. WILLIAMS:
20   Q.  Why not?
21   A.  Because they weren't relevant to collecting
22 their territory.
23   Q.  Okay. Do you know what a billing history is?
24   A.  Yes.
25   Q.  And can you tell me what a billing history is?

91

1    A.  It is a report off of the AR system that's run
2 that shows all of the billing transactions for a period
3 of time specified.
4    Q.  Is it fair to say that the collections staff
5 using billing histories -- or at least at the time you
6 were at Oracle, uses billing histories as part of their
7 job?
8    A.  I can't speak to what they used.
9    Q.  Well, was it or was it not your testimony that
10 they would not have access to any reports that would
11 have on-account on them?
12   A.  I said that they would not have access, I
13 don't believe -- is what I said -- to a report of
14 on-account items. I did not say that, you know, an
15 on-account item might show up in some other report. I
16 don't know whether or not on-account shows up in a
17 billing history report, as an example.
18   Q.  Thanks for the distinction in your testimony.
19 Because what I am asking is, do you know whether or not
20 when an Oracle employee runs a billing history for a
21 customer whether a billing history would indicate
22 amounts that were quote, unquote, "on-account"?
23   A.  I don't know the answer to that question.
24   Q.  Okay. So if someone in collections told you
25 that they ran a billing history and -- for a specific

92

1 customer and the billing history showed 10 items
2 on-account for that customer you would have no reason to
3 disbelieve that, would you?
4    MS. WINE: Objection. Incomplete
5 hypothetical.
6    THE DEPONENT: If you could show me a billing
7 history and show me where it says an on-account item
8 then, I mean, I guess, I could answer the question, but
9 no one ever asked me that. No one ever said that to
10 me. So, you know, I could only answer in a
11 hypothetical.
12 BY MR. WILLIAMS:
13   Q.  Okay. But prior to your conversation with
14 Greg Myers it was your understanding that the
15 collections staff didn't have access to an on-account
16 list or an -- a list of on-account items?
17   A.  What I stated is prior to talking to Greg in
18 2002 I didn't even know what an on-account item was in
19 the U.S. AR system.
20   Q.  Okay. Can we take five minutes?
21    THE VIDEOGRAPHER: Off record at 11:50.
22    (Off the record.)
23    THE VIDEOGRAPHER: On record at 11:51.
24 BY MR. WILLIAMS:
25   Q.  I am going to show you what has been

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

93

1    previously marked as Campos number 1. Campos number 1
2    is Bates numbered PLF-ORC 000078 through 95. Just ask
3    you to just take a look at it briefly -- you don't need
4    to read it -- and let me know if you recognize it?
5        A.  No, I do not.
6        Q.  Do you know who Raul Campos is?
7        A.  No, I do not.
8        Q.  If you look at the first page of the document
9    do you see what appears to be an e-mail address under,
10   "Phone List"?
11       A.  Yes.
12       Q.  And do you recognize that address?
13       A.  No.
14       Q.  Does it appear to be an Oracle address?
15           MS. WINE:  Objection.  Lacks foundation.
16           THE DEPONENT:  It says, "@USOracle.com," so I
17   would assume so, yes.
18   BY MR. WILLIAMS:
19       Q.  Did Oracle have kind of an internal web pages
20   that employees could use to find different things at the
21   company internally?
22       A.  Yes.
23       Q.  Does that appear to be one of those?
24       A.  I don't know.  I have not seen the document
25   before.

94

1        Q.  Can you just read the title of the document?
2        A.  "Collections Internal Web Page."
3        Q.  Okay.  I am going to ask you to turn to Bates
4    ending 00092.  Do you see on the bottom of the page
5    where it says, "unapplied account"?
6        A.  Yes.
7        Q.  Did Oracle have an unapplied account as far as
8    you knew in 2000?
9        A.  I don't know what an unapplied account is as
10   described in this document because I am not familiar
11   with the document.
12       Q.  I am just asking you separate from looking at
13   the document if Oracle had what was called an unapplied
14   account?
15       A.  Where?  In the general ledger?
16       Q.  Anywhere.
17       A.  I mean, it is semantics.  There is certainly
18   unapplied cash, you know.  So is that what they are
19   talking about?
20       Q.  It might be.  Do you see below where it says,
21   "unapplied account," and there is a bullet point that
22   says, "The unapplied account is any funds, i.e. checks,
23   wires, payments, or credit cards that have not been
24   assigned to an invoice or a cost center"?
25       A.  Yes.

95

1        Q.  Do you see that?  And you understand that
2    there was an account at Oracle in 2000 that was either
3    unapplied account or unapplied cash, right?
4        A.  I don't believe that this relates to a general
5    ledger account.
6        Q.  How come?
7        A.  Because, as I said before, the collectors were
8    given detail of the accounts receivable trial balance
9    relative to their territory, alpha customer names, and
10   they were given a listing of the unapplied cash.  So
11   that listing is not a GL account.  It is a listing that
12   was used by collections to see if they could determine
13   if some of those items on the list should be applied
14   against the open trade receivables.  So I guess we are
15   just on semantics here.  But we talked before about what
16   is 25005.  And what I said is all receipts that had not
17   been matched to a receivable and had an unapplied cash
18   flag reside in that account.  Again, could be items that
19   needed to be applied against receivable, could be
20   customer advances, could be customers' payments.  That's
21   a GL account.  This is, I believe, a listing -- a
22   listing of items in the AR system that have an unapplied
23   cash flag.  The collectors are not accountants.
24       Q.  I understand that.
25       A.  So the terminology they use is not necessarily

96

1    the same as mine.
2        Q.  Well, but this -- this isn't a collectors
3    terminology -- what we are referring to as Exhibit 1,
4    right?
5        A.  This is a document which you have said is a
6    collections internal web page.  So it is a document out
7    of collections.
8        Q.  Um-hum.
9        A.  I mean --
10       Q.  But it is an Oracle document and it is
11   relating to collections?
12           MS. WINE:  Objection.  Lacks foundation.
13   BY MR. WILLIAMS:
14       Q.  It is relating to collections, right?
15           MS. WINE:  Objection.  Lacks foundation.
16           THE DEPONENT:  It appears to relate to
17   collections, yes, I agree.
18   BY MR. WILLIAMS:
19       Q.  Do you see the second bullet point?
20       A.  Yes.
21       Q.  Do you see where it says, "The main reason the
22   collections department has been tasked with managing the
23   unapplied cash fund is that collection is in direct
24   communication with Oracle's customers"?
25       A.  Yes.  I mean, I would point out --

97

1    MS. WINE: He hasn't asked you a question.
2    BY MR. WILLIAMS:
3    Q.  And does that alter your testimony at all with
4    respect to what the collections staff has access to with
5    respect to unapplied cash?
6    A.  No.  But I would point out that this says,
7    "the unapplied cash fund," which differs from unapplied
8    account, which is -- the distinction I was trying to
9    make is an account typically would be a general ledger
10   account.  I believe this document, which I have not
11   reviewed in detail, is discussing the listing of
12   unapplied cash -- those items in the AR system that have
13   an unapplied flag associated with them.
14   Q.  Okay.  So -- but it is not the quote, unquote,
15   "unapplied cash account," that is in the general
16   ledger.  Is what -- is that what you are saying?
17   A.  I am saying the listing that they are
18   referring to is not an account.  It is a listing.
19   Q.  So then the terminology in this document is
20   inconsistent with your understanding of what they had
21   access to and availability -- well, what they had access
22   to?
23   MS. WINE: Objection.  Misstates testimony.
24   THE DEPONENT: I mean, what I stated was in
25   the first bullet.  It is called, "unapplied account,"

98

1    or -- in the caption it is called, "unapplied account."
2    In the second bullet it now talks about, "unapplied cash
3    fund."  I mean, it is inconsistent within the document.
4    I am not sure exactly what they are talking about.  But,
5    as I stated before, I believe that what the collectors
6    are using is a listing off the AR system of items that
7    have an unapplied flag.
8    BY MR. WILLIAMS:
9    Q.  Okay.  And do you know where that listing
10   would be generated from?
11   A.  Generated from the accounts receivable system.
12   Q.  Okay.  Do you see where it says, "As
13   receivables managers the collections department can
14   better determine resolution of unapplied by comparing
15   the customer's aging to their unapplied and be able to
16   communicate this to the customer"?
17   A.  Yes.
18   Q.  Right?  And that is all from the listing that
19   you are talking about?
20   A.  I mean, again, this is not my document.  I am
21   reading it the same time as you are.
22   Q.  All right.  But these -- the collections staff
23   rolled up to you, right?
24   A.  Yes, they did.
25   Q.  The next -- do you see the next bullet point

99

1    where it says, "Collections wants to resolve the
2    unapplied issue in order to prevent revenue loss by
3    ensuring that all quotes and pre-paid checks have
4    invoices created for them in a timely manner while the
5    customer still wishes to pay for the product or service
6    provided by Oracle"?  Do you see that?
7    A.  I see that.
8    Q.  Do you have an understanding of what that
9    means?
10   MS. WINE: Objection.  Lacks foundation.
11   THE DEPONENT: No, I don't understand what
12   that means.
13   BY MR. WILLIAMS:
14   Q.  Okay.  Do you know -- from your perspective
15   would a collections manager or someone more closely
16   responsible for collections be in a better position to
17   answer that question?
18   MS. WINE: Objection.  Vague and ambiguous,
19   lacks foundation.
20   THE DEPONENT: Could you restate?
21   BY MR. WILLIAMS:
22   Q.  I am asking you from your perspective would
23   someone that was a collections manager or someone more
24   closely responsible for collections be in a better
25   position to answer that question?

100

1    THE DEPONENT: And which -- that question?
2    MS. WINE: Objection.  Vague and ambiguous,
3    lacks foundation.
4    BY MR. WILLIAMS:
5    Q.  The question of what that bullet point means.
6    MS. WINE: Same objection.
7    THE DEPONENT: If this is a document that was
8    created by the collections department then one would
9    think that someone in the collections department would
10   be more knowledgeable about what it means than I am.
11   BY MR. WILLIAMS:
12   Q.  Okay.  Did you approve policy for the function
13   of the collections department --
14   A.  Define, "policy."
15   Q.  -- during -- well, the manner in which they
16   went about collecting open receivables?
17   A.  There was an accounts receivable policy -- a
18   corporate policy that was generated, distributed by the
19   corporate group.  So with regard to that policy I would
20   have read it and approved it.  With regard to individual
21   practice aids or, you know, desk manuals -- I would not
22   have been involved in that.
23   Q.  Okay.  Do you -- just go -- if you can go back
24   to page 93.  Do you see the third bullet -- well, second
25   bullet point on that page where it says, "It is also

101

1   necessary to protect Oracle from future liability by not
2   holding money that legally belongs to our customers"?
3       A.   Yeah.
4       Q.   Do you see that?  Do you have an understanding
5   of what that means?
6           MS. WINE: Objection. Lacks foundation.
7           THE DEPONENT:  Well, in the context of talking
8   about unapplied cash it seems to say that if we know we
9   have someone's cash -- that they have made a duplicate
10  payment or an overpayment -- that we should refund it to
11  them.
12  BY MR. WILLIAMS:
13      Q.   And with respect to the unapplied cash account
14  that you indicated earlier that is part of the GL, is
15  that the account where refunds are generated from?
16      A.   Yes.
17      Q.   Okay.  And in the unapplied cash account when
18  a collector does the -- you know, creates an e-mail
19  template and does a request for approval -- so accounts
20  payable writes a check from the unapplied cash account?
21      A.   I mean, I believe the credit would be to cash
22  leaving the bank and the debit would be to 25005.
23      Q.   And do you know -- kind of going back to the
24  debit memo transactions --
25      A.   Right.

102

1       Q.   -- based on your understanding, none of
2   those -- the 2500 -- I am sorry.  None of the debit
3   memos were refunds from -- I am sorry.  Let me back up.
4   Going back to our earlier conversation, is it your
5   understanding that the debit memo transactions -- that
6   none of them were related to cash in Oracle's unapplied
7   cash account as of November 17th of 2000?
8       A.   I think I already answered that question.  But
9   to restate it, you know, the items that they looked at
10  for me -- the items in the second amended complaint and
11  the large-dollar items -- that none of those were items
12  that were in 25005, because by definition they would
13  have already been refunded.
14      Q.   By definition they have already been refunded?
15      A.   Well, I shouldn't say, "by definition."  I
16  should say, as I described earlier, based on the work
17  that Greg Myers had done when we looked at those items
18  they were either refunded or it was the stop-payment
19  order other there was some other reason why they were not a
20  liability of Oracle and so they were not in 25005.
21      Q.   Okay.
22      A.   I said I couldn't speak to all 46,000 items.
23      Q.   Now, if you learned that some of those
24  transactions were tied to money that was in Oracle's
25  unapplied cash account as of November 17th, 2000, in

103

1   your opinion would that have impacted Oracle's financial
2   statements at all?
3           MS. WINE: Objection. Incomplete
4   hypothetical, vague and ambiguous.
5           THE DEPONENT:  The 46,000 debit memos did not
6   affect 25005.  If subsequently it was learned that there
7   was an item on that list that should have been refunded
8   to a customer -- then when that was subsequently learned
9   it would have been set up as a liability and the check
10  would have been sent to the customer hypothetically
11  because I don't know whether that applies to any of the
12  items on the list.
13  BY MR. WILLIAMS:
14      Q.   Can you describe for me what account 12018
15  was, if you remember?
16      A.   I couldn't tell you without looking at the
17  account or an account analysis for it.  I do not recall.
18      Q.   Is that how you were able to research items as
19  part of your job -- just pull up an Account Analysis
20  Report?
21          MS. WINE: Objection. Incomplete
22  hypothetical.
23  BY MR. WILLIAMS:
24      Q.   Generally?
25      A.   I mean, if I was looking at a trial balance

104

1   and I saw an account that I was interested in
2   determining more information about then I would request
3   a reconciliation of the account so I could see what was
4   in it, what it was used for.
5       Q.   Okay.  Do you know what account 12008 was?
6       A.   Not offhand.  Same answer as the other one.  I
7   could -- if you showed me a reconciliation I could
8   perhaps tell you.
9       Q.   Are reconciliations reports that are easily
10  run at Oracle?
11      A.   A reconciliation is -- well, I mean, it is
12  often an Excel spreadsheet that reconciles between a
13  general ledger balance and the underlying sub-ledger.
14  That underlying sub-ledger could be an accounts payable
15  trial balance, an accounts receivable trial balance.  So
16  the reconciliation takes you from the detail to the
17  general ledger or from some accounts it could be a
18  detailed listing of what is in that account.  If you are
19  talking about pre-paid rent it might list 12 properties
20  in the amount of pre-paid rent by building.  So, a
21  reconciliation, you know -- I can't just look at -- you
22  can't give me an account number and have me tell you
23  what it is.
24      Q.   Okay.  I am going to ask the reporter to mark
25  this document as Williams number 3.

105

1     (Exhibit No. 3 was marked for identification.)
2     BY MR. WILLIAMS:
3     Q.  Williams number 3 is Bates numbered NDCA-ORCL
4  443265, but it includes 10 sheets.  I will represent for
5  you that this is an excerpt of a document that was
6  produced by Oracle relating to the debit memos -- the
7  debit memo transactions and what purports to be the
8  audit trail of the debit memo transactions.  And for the
9  transactions listed in Williams number 3 it relates to
10  one specific debit memo.  And you will see the debit
11  memo number on the top left.  Do you see that?
12     A.  Yes.
13     Q.  Now, do you see that on the top of each page
14  of the document that there is a heading describing
15  what's in the column below?  Do you see that?
16     A.  Yes.
17     Q.  And do you recognize any of those columns to
18  be those that you would or could review at Oracle if you
19  were researching a specific transaction or debit memo?
20     MS. WINE:  Objection.  Incomplete
21  hypothetical.
22     THE DEPONENT:  I don't understand the
23  question.
24     BY MR. WILLIAMS:
25     Q.  Okay.  The top headings --

106

1     A.  Yes.
2     Q.  -- I am asking if you recognize any of them
3  as headings that would be on any type of report at
4  Oracle if you were to do research on a specific
5  transaction or a specific debit memo?
6     A.  I mean, I see an account -- an account
7  description column, third from the right -- "account."
8  Those appear to be GL account numbers.  And the second
9  from the right appears to be a description for that
10  account.
11     Q.  Okay.  When you see -- if you look at the
12  account description column -- well, account and account
13  description column do you recognize those or some of
14  those to be accounts at Oracle?
15     A.  Yes.
16     Q.  Okay.  And just quickly, which ones do you
17  recognize?
18     A.  I recognize the first one, recognize the
19  second one, the third one, the fifth one, the sixth one,
20  seventh -- I mean, a number of them.
21     Q.  Okay.  Just -- did you know that each of the
22  debit memos began with the prefix 550?
23     A.  Originally.
24     Q.  Originally you knew or originally --
25     A.  Originally -- I knew in 2002.  I didn't -- I

107

1  didn't know yesterday, but with you saying that today
2  that sounds familiar to me that they started with a 550.
3     Q.  Okay.  I am going to see if we can talk about
4  this document together.  Maybe you can help me
5  understand some things.
6     A.  Okay.
7     Q.  If you would just do me a favor and look at
8  lines 1 through 4, and let me know if you understand
9  that to be an invoice -- an Oracle invoice related to a
10  specific transaction.
11     MS. WINE:  Objection.  Lacks foundation.
12     THE DEPONENT:  I mean, I have never seen this
13  report before --
14     BY MR. WILLIAMS:
15     Q.  I understand.
16     A.  -- and so I wouldn't want to guess what this
17  means.
18     Q.  Okay.  If you were looking at one -- lines 1
19  through 4, just based on your experience as an
20  accountant do you think that you would understand what
21  is represented by lines 1 through 4 on the first page?
22     MS. WINE:  Objection.  Lacks foundation, calls
23  for speculation.
24     THE DEPONENT:  I mean, I -- you know, there
25  are things that are, you know, familiar -- debits and

108

1  credits, accounts and descriptions, but I don't know how
2  it relates to original debit memo number.  I don't know
3  how it relates to original receipt number.  I don't know
4  how it relates to the effective GL date.  So, you know,
5  if you want to ask me, you know, what do I think
6  columns --
7     MS. WINE:  He isn't asking you that.
8     THE DEPONENT:  Well, okay.
9     BY MR. WILLIAMS:
10     Q.  What do you think?
11     A.  About what?
12     Q.  Well, what -- if you were reviewing lines 1
13  through 4 --
14     A.  Okay.
15     Q.  -- just based on your experience as an
16  accountant would you have a general opinion as to what
17  appears to be represented by lines 1 through 4?
18     MS. WINE:  Objection.  Lacks foundation, calls
19  for speculation, and incomplete hypothetical.
20     THE DEPONENT:  If I ignore the first two
21  columns, because I have --
22     BY MR. WILLIAMS:
23     Q.  So ignore.
24     A.  -- the original debit memo, original receipt
25  number -- because I don't know how they relate to

109

1    anything here --
2        Q.  Fine.
3        A.  -- I would look at this and say it looks to be
4    a journal entry that was effective in September of 1999
5    in U.S. dollars where accounts receivable was increased
6    by 258. There was a liability recorded for state sales
7    tax payable for 14,652 and there was a credit to revenue
8    for support for 243,589. That's what I would say.
9        Q.  Okay. And if you went down to lines 7 through
10   10, ignoring the first two columns, would you have an
11   understanding or an opinion as to what is represented by
12   lines 7 through 10?
13       MS. WINE:  Objection. Lacks foundation, calls
14   for speculation, incomplete hypothetical.
15       THE DEPONENT:  You know, again, it looks like
16   it is a journal entry processed with an effective date
17   of November 15th of 1999, with a debit to cash of 258, a
18   credit to customer overpayments of 258, a debit to
19   customer overpayments of 193, and a credit to trade
20   receivables of 193.
21   BY MR. WILLIAMS:
22       Q.  Okay. Now, if you looked at lines 1 through 4
23   and lines 7 through 10 together, you know, obviously
24   excluding the first two columns, would you have an
25   opinion as to the relationship between the two general

110

1    transactions that you described?
2        MS. WINE:  Objection. Lacks foundation, calls
3    for speculation, incomplete hypothetical.
4        THE DEPONENT:  Looking at it -- the first four
5    lines versus 7 through 10 -- looking at the date -- the
6    original date, 9-22-99, versus 11-15-99, it would appear
7    that perhaps -- hypothetically that in November the
8    customer that was billed for 258, in fact, remitted the
9    cash. So $258,000 went in the cash account. When it
10   first came in it had not been applied to anything. So
11   there is an offsetting credit to customer overpayments
12   25005 of 258,241.84, and then of that 258,241 the
13   system, or collectors, or someone was able to
14   specifically apply of the 258, 193,000 against a
15   specific invoice.
16   BY MR. WILLIAMS:
17       Q.  Okay. And, you know, just based on, you know,
18   general understanding of what appears to be in 1 through
19   4, and 7 through 10, that would leave a certain amount
20   in customer overpayments. Is that fair?
21       MS. WINE:  Objection. Lacks foundation, calls
22   for speculation.
23       THE DEPONENT:  You know, looking at the
24   journal entries it would leave 258,241 less 193,234 in
25   account 25005.

111

1    BY MR. WILLIAMS:
2        Q.  Right. The difference would be --
3        A.  With a -- well, I mean, it would leave a
4    balance in the general ledger of that amount.
5        Q.  Okay. Now, if you go down to lines 39 to
6    42 -- if you could look at what is represented by lines
7    39 to 42, excluding the first two columns. If you could
8    take a look at that and let me know if you have an
9    opinion as to what that series of lines means?
10       MS. WINE:  Objection. Lacks foundation, calls
11   for speculation, incomplete hypothetical.
12       THE DEPONENT:  Appears to be a journal entry
13   and out of the -- out of 25005 is moving 258,241 into
14   account 12601.
15   BY MR. WILLIAMS:
16       Q.  And that would -- and that would just be
17   the -- that's the total of the transaction that appears
18   there, right?
19       A.  Well, the first two transactions are the same
20   dollar amount offsetting in the same account. So, yes,
21   that would be the net effect.
22       Q.  And so based on that, looking at 1 through 4,
23   7 through 10, and 39 to 42 together do you have an
24   opinion as to how the transactions may relate to one
25   another?

112

1        A.  No.
2        MS. WINE:  Objection. Let me say my
3    objections. Objection. Lacks foundation, calls for
4    speculation, incomplete hypothetical.
5        THE DEPONENT:  The answer is, no. I mean, you
6    got a report that or -- an Excel spreadsheet that has
7    got 80-some lines on it. You know, I can't look at
8    three or four of them and understand what this thing
9    was. You would have to look at each of these
10   transactions. You would have to go through and find out
11   what they were for. So, I can't -- I can't relate them.
12   BY MR. WILLIAMS:
13       Q.  Okay.
14       MS. WINE:  Shawn, whenever you are ready it is
15   almost 12:30. Just want to let you know we should take
16   lunch at some point.
17   BY MR. WILLIAMS:
18       Q.  Now, if you wanted to research the
19   transactions based on what you see there what would you
20   need to kind of research, I guess, the history and
21   ultimate conclusion of the transaction?
22       MS. WINE:  Objection. Incomplete
23   hypothetical.
24       THE DEPONENT:  I mean, I don't even know what
25   this is, so I wouldn't know where to start. You know,

113

1    you have -- again, I don't know what the first two
2    columns are. So I don't even know that this relates to
3    debit memo 5503501 (sic). I don't even know what it is.
4         BY MR. WILLIAMS:
5         Q. Well, I will tell you that the debit memo
6    number -- that first column --
7         A. Right.
8         Q. -- is debit memo 55003501 --
9         A. Okay.
10        Q. -- among the November 17th, 2000, debit memos.
11        MS. WINE: Objection. Incomplete hypothetical
12   still.
13        BY MR. WILLIAMS:
14        Q. So I am just asking, if you wanted to research
15   debit memo 55003501, based on what you see here what
16   other information would you need to --
17        A. I would approach this --
18        MS. WINE: Objection.
19        THE DEPONENT: -- the same way that I did back
20   in the days of 2002. I would probably give this to
21   someone in the accounts receivable department and --
22   "Tell me, what does this all mean?" I can't look at 84
23   lines of journal entries and -- not knowing what
24   happened behind it in terms of payments, credits,
25   returns -- no idea.

114

1         BY MR. WILLIAMS:
2         Q. So going to -- if you could take a look at
3    lines 43 to 44 --
4         MS. WINE: Shawn, are we going to break at
5    some point?
6         MR. WILLIAMS: I want to get through this line
7    of questioning first.
8         MS. WINE: How long will you be?
9         MR. WILLIAMS: Maybe 10 minutes.
10        BY MR. WILLIAMS:
11        Q. Line 43 and 44 -- if you could just take a
12   look at line 43 and 44. If you could just look at those
13   and tell me --
14        A. I --
15        MS. WINE: Let him ask you a question.
16        BY MR. WILLIAMS:
17        Q. Just give me your opinion as to what appears
18   to be happening in line 43 and 44 just based on your
19   experience as an accountant.
20        MS. WINE: Objection. Lacks foundation, calls
21   for speculation, incomplete hypothetical.
22        THE DEPONENT: So you want 43 and 44?
23        BY MR. WILLIAMS:
24        Q. Um-hum.
25        A. Same answer as before. You know, I can tell

115

1    you what it says. This is a debit and credit, but you
2    can read that just as well. I mean, you look at the
3    next 10 or 12 lines and there is another 10 or 12 lines
4    with the exact same dollar amounts going back and forth,
5    here and there. You know, I would have to research
6    this. I would have to, if I was still at Oracle, give
7    it to the -- someone in AR and tell them, "Cut through
8    all of this stuff for me and tell me what occurred." I
9    can't look at this document and tell you. I have no
10   idea.
11        Q. That's fine. But -- well, based on what it
12   says in 43 and 44, isn't it true that -- at least in
13   line 43 it appears that there is a credit amount of
14   $258,241.84 in account 25005, which was customer
15   overpayments, right?
16        A. Yes.
17        Q. And on the same day there is a debit to -- of
18   the same amount to 25005 -- customer overpayments,
19   right?
20        A. I agree.
21        Q. And in 43 the account type is on-account and
22   on 44 --
23        A. Account type -- I don't know --
24        Q. I understand.
25        MS. WINE: Shawn --

116

1         THE DEPONENT: You know, there is -- on those
2    I read what it says. I have no idea what is behind
3    this.
4         MS. WINE: Shawn, I would like to --
5         THE DEPONENT: So, if you would like to have
6    me --
7         MR. WILLIAMS: Okay.
8         MS. WINE: If I can just interrupt. You put
9    this document in front of the witness and talked about
10   the account headings at the top of each page. I don't
11   think it has been explained and I don't think the
12   witness has had an opportunity to look that, in fact,
13   the titles at the top are not the same for each page and
14   it appears that you actually have to look at this
15   document by putting some of these pages side-by-side to
16   see the entirety of the account headings. And I don't
17   think the witness has had the opportunity to appreciate
18   that and see what is in this document.
19        BY MR. WILLIAMS:
20        Q. That is actually -- that's right. I am just
21   going to direct your attention to lines 45 to 50. If
22   you could just take a look at lines 45 through 50. And
23   just based on your experience as an accountant if you
24   can tell me what looks like is happening between lines
25   45 and 50?

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

117

1        MS. WINE:  Objection.  Lacks foundation, calls
2    for speculation.  To the extent you are looking at it, I
3    suggest -- if you need to you can look at the remainder
4    of the document on those lines.
5        THE DEPONENT:  What lines are we on?
6    BY MR. WILLIAMS:
7        Q.    45 through 50.
8        A.    Couldn't tell you.  I mean, I would have to
9    review the entire document with -- actually the pages
10   and all of the columns side-by-side.  Again, I mean,
11   this particular transaction had a net effect of zero on
12   25005.  There is just a bunch of stuff going in and out
13   of that particular account.
14       Q.    And you are referring right now to 45 through
15   50, right?
16       A.    45 through 50.
17       Q.    Okay.  And now if you could look at 51 through
18   54.  And just based on your experience as an accountant
19   if you can tell me what appears to be depicted in lines
20   51 through 54?
21       MS. WINE:  Objection.  Lacks foundation, calls
22   for speculation.
23       THE DEPONENT:  So I am going to have to review
24   the entire document.  I can't take these out of context
25   and try and tell you what you can read yourself, which

118

1    is this is just a debit and a credit to the same
2    account.  I don't know what it means.
3    BY MR. WILLIAMS:
4        Q.    Is that what you see on lines 51 to 54 --
5    lines 51 through 54?
6        A.    Well, it seems to me that 51 and 54 -- seems
7    to be similar to lines -- you asked me on the previous
8    page, which -- I forget what number they were.
9        Q.    I think they were lines 39 to 42.
10       A.    I mean, it is like they seem to be the
11   reversal of 41 and 42.
12       Q.    Right.  And 41 and 42 was --
13       A.    I mean, again, I don't know -- sorry to
14   interrupt you.  I mean, I don't know what this thing
15   is.  I have never seen this document before in my life.
16   But, you know, I don't want to talk about four lines out
17   of context without even seeing what the rest of it is.
18       Q.    So if you want to look at it over lunch,
19   that's fine.
20       A.    That's fine.
21       MR. WILLIAMS:  You guys want to take lunch?
22       MS. WINE:  Sure.
23       THE VIDEOGRAPHER:  Off the record at 12:36.
24       (Off the record.)
25       THE VIDEOGRAPHER:  On record at 1:57.

119

1    BY MR. WILLIAMS:
2        Q.    We left off talking about Exhibit number -- I
3    think it is 3.  Did you have an opportunity to look at
4    it further during the lunch hour?
5        A.    Yes.
6        Q.    And I think we left off discussing lines 51
7    through 54.  And based on your review were you able to
8    describe what appears to be depicted in lines 51 through
9    54?
10       A.    Yes.  Though, could I ask you a question?  So
11   when I look at this document -- like I say, I didn't see
12   it before, but what it appears to be is a history of all
13   of the transactions related to, I am assuming, this
14   original transaction of 258,241.  Could I just sort of
15   briefly walk down each of the pages as opposed to --
16       Q.    Sure.
17       A.    -- dealing specifically with --
18       Q.    Well, you can do that.  First, I want to see
19   if you -- there are some sections that I would like to
20   discuss with you particularly.
21       A.    Okay.
22       Q.    And if you would like to kind of go through
23   each of the transactions or the pages with me to give me
24   your perspective of what you think it means in full
25   context that will be fine too.

120

1        MS. WINE:  I --
2    BY MR. WILLIAMS:
3        Q.    Is that what you are saying?
4        MS. WINE:  I would caution you that if you
5    can't answer the questions about the specific lines
6    without the overall context -- then I think we should
7    have him walk through all of the entries on all of the
8    pages and put it in context.
9    BY MR. WILLIAMS:
10       Q.    Actually, I am going to ask you about the
11   lines 51 through 54.
12       A.    Okay.
13       Q.    And can you tell me what you believe is
14   represented by lines 51 through 54?
15       MS. WINE:  If you can do that out of context.
16   BY MR. WILLIAMS:
17       Q.    And then there are some additional lines I
18   want to ask you about.  And then if you think that you
19   have, like, some overview of what you see here I would
20   be happy to hear it.
21       A.    Okay.
22       Q.    So why don't we begin with 51 through 54?
23       A.    51 through 54 -- the net result of those four
24   lines appears to be a reversal of the items that are on
25   lines 39 to 42.

121

1    Q.  Okay.  And 39 to 42 appears to be a movement
2    from 25005, customer overpayments, to 12601, which is
3    bad debt write-offs; is that correct?
4    A.  Correct.
5    Q.  And what is the net effect of 39 to 42?
6    A.  Well, I mean, taken in conjunction with 51 to
7    54 the net effect is zero.  There are two things going
8    on in 39 to 42.  As you say, there is 258,000 being
9    moved out of customer overpayments and put into 12601,
10   bad debt write-offs.  And then the other items you --
11   lines that you asked about -- 51 to 54 -- are the
12   reversal of that.  So after those -- after line 54
13   effectively it has negated the effect of four items on
14   39 to 42.
15   Q.  Okay.  Now, the items -- 39 to 42 appears to
16   have occurred on October 1st of 2000, right?
17   A.  Based on what this document says, yes.
18   Q.  And the movement to 12601 from 25005, customer
19   overpayments, on October 1st, 2000 -- what impact, if
20   any, would that have on Oracle's balance sheet?
21   MS. WINE:  Objection.  Lacks foundation, calls
22   for speculation.
23   THE DEPONENT:  You know, as of that date what
24   it would have done is move a credit.  It would have
25   reduced the balance in 25005, which rolled up to a

122

1    liability line on the balance sheet.  And instead that
2    credit would have been sitting netted against AR,
3    accounts receivable, in the bad debt reserve.  So the
4    net effect would be a reduction of 258 in assets and a
5    reduction of 258 in liabilities.
6    BY MR. WILLIAMS:
7    Q.  And would that have the impact of -- of
8    increasing income?
9    A.  Not in itself here.
10   Q.  Explain to me why not.
11   A.  Because all that happened on 39 to 42, which
12   was reversed on 51 to 54, was a balance sheet entry.  So
13   if it is balance sheet only it did not affect income.
14   Q.  Okay.  Go ahead.  And under what circumstances
15   would -- would it affect income?
16   MS. WINE:  Objection.  Incomplete
17   hypothetical.
18   THE DEPONENT:  Every quarter there was a
19   specific accounts receivable reserve adequacy review
20   that was completed.  So to the extent that a --
21   requirements for reserves were -- just picking a
22   hypothetical number -- 50 million dollars, and the
23   reserve was 50 million dollars, there would be no
24   entry.  If -- there would be no need to increase or
25   reduce the reserves.  The requirements in this

123

1    hypothetical of 50 would equal the reserve on the
2    balance sheet of 50.  There would be no adjustment if in
3    that same hypothetical, you know, a week or a month
4    before the -- the reserve analysis was done there was an
5    entry that moved 258,000 into 12601, then when the
6    review was done -- if, again, the requirements were 50
7    the reserve would be 50,258,000.  So there would have
8    been an excess which would have been adjusted through
9    P&L.
10   BY MR. WILLIAMS:
11   Q.  Well, are you saying that this entry on
12   October 1st, 2000 -- the movement from 25005 to 12601,
13   bad debt write-offs, without anything further would have
14   impact on Oracle's income for the second quarter of
15   2001, which ended November 30th of 2000?
16   MS. WINE:  Objection.  Incomplete
17   hypothetical.
18   THE DEPONENT:  This entry itself without
19   anything further had no effect on Oracle's income for
20   that quarter.
21   BY MR. WILLIAMS:
22   Q.  Without anything further or without any
23   further analysis by you?  If this was all the
24   information that you had -- that on October 1st, 2000,
25   that this amount, $258,241.84, was moved out of 25005 to

124

1    bad debt write-offs that it would not impact Oracle's
2    income for the second quarter of 2001?
3    MS. WINE:  Objection.  Incomplete
4    hypothetical.
5    THE DEPONENT:  On October 1st, when this was
6    booked, it would not have had an effect.  In the month
7    of November as a result of a totally separate group
8    calculating the reserve for doubtful accounts, if you
9    will, the bad debt reserve, and comparing it to the
10   balance in the general ledger, it would have an effect.
11   BY MR. WILLIAMS:
12   Q.  And what would that effect be?
13   MS. WINE:  Same objection.
14   THE DEPONENT:  The $258,000 entry.
15   BY MR. WILLIAMS:
16   Q.  Would have what effect on Oracle's income?
17   A.  Would have absent this entry -- actually, I
18   have to back up a little bit.  I don't know whether or
19   not this specifically would have affected the earnings
20   in that particular period.  And the reason being is that
21   Oracle with its size came up with its reserve
22   requirements for accounts receivable, compared it to the
23   balance on the general ledger.  If there was a
24   significant difference between the requirements and the
25   reserve then an adjustment would be booked.  If it was

125

1 not a significant difference then no adjustment would be
2 booked. So I don't know whether or not this 258
3 hypothetical would have affected Oracle's P&L for that
4 quarter because I don't know what they did in terms of
5 judging how close the reserve was to the reserve
6 requirements and whether or not they booked an
7 adjustment to make them equal or if they, as an example,
8 said, "It is a couple-million-dollars difference. You
9 know, why don't we just be conservative and leave the
10 reserve on the books?" I don't know what they did.
11     Q.  If it had any effect on Oracle's income for
12 the second quarter of 2001, it -- would it have a
13 positive or negative effect on income?
14     MS. WINE:  Objection.  Incomplete
15 hypothetical.
16     THE DEPONENT:  If it -- in this hypothetical
17 situation if it had an effect it would have been an
18 increase to income.  It would not have been a decrease.
19     BY MR. WILLIAMS:
20     Q.  Now, when we looked at lines 51 through 54,
21 you indicated earlier that lines 51 to 54 appeared to be
22 a reversal of what occurred on -- what appears to have
23 occurred in lines 39 to 42?
24     A.  Correct.
25     Q.  And 51 through 54 appears to be a transaction

126

1 on February 4th of 2001, right?
2     A.  Correct.
3     Q.  And in between that time Oracle had reported
4 revenues and earnings for its second quarter of fiscal
5 2001, correct?
6     A.  Correct.
7     Q.  Now, I will ask you to take a look at lines 55
8 to 62.
9     A.  Okay.
10     Q.  And based on your review of that section of
11 the document and your experience as an accountant can
12 you tell me what appears to be depicted in those lines?
13     MS. WINE:  If you can answer it out of the
14 fuller context.
15     THE DEPONENT:  I am sorry.  55 through what
16 line?
17     BY MR. WILLIAMS:
18     Q.  62.
19     A.  62.  So the effect of those transactions,
20 because they are all debits and credits to customer
21 overpayments, would be zero.
22     Q.  Okay.  But is there a change in designation
23 from applied to unapplied or unapplied to applied?
24     A.  Yes.
25     Q.  Okay.  And that is -- and what is that change?

127

1     A.  I mean, I would have to add up the numbers.
2     Q.  Not necessarily the numbers.  Is it from
3 applied to unapplied or unapplied to applied?
4     A.  Well, there is a debit to unapplied of 165 and
5 a credit of 165.  So --
6     Q.  What portion of it --
7     A.  -- it is kind of -- you know, it would appear
8 to be the differential between the 165 and the 258,
9 but --
10     Q.  Becomes unapplied?
11     A.  I believe so.  That is what it looks like to
12 me.
13     Q.  And if you look at 63 through 70 -- I will ask
14 you to take a look at those lines.
15     A.  Okay.
16     Q.  And based on your review and your experience
17 if you could tell me what appears to be depicted in
18 lines 63 to 70.
19     A.  I think there is a -- depicting a refund paid
20 of 92,333.41.
21     Q.  And that is on February 19th of 2001, correct?
22     A.  Right.
23     Q.  So based on your review up to this point are
24 you able to tell by looking at this document what, if
25 anything, happened between September '99 and the date of

128

1 February 19th of 2001, with respect to any
2 communications with the customer?
3     A.  I can't tell that from this document.
4 There -- let me look and see if there is anything else
5 that is indicated on the comment field on another page.
6 Could you repeat his question, please?
7     COURT REPORTER: "Q.  So
8     based on your review up to
9     this point are you able to
10     tell by looking at this document
11     what, if anything, happened
12     between September '99 and the
13     date of February 19th of 2001,
14     with respect to any communications
15     with the customer?"
16     THE DEPONENT:  I would answer, "no," to that.
17     BY MR. WILLIAMS:
18     Q.  And based on your review of -- well, I am
19 going to -- I am going to ask you to take a look at page
20 6 of 10 on line 70 and ask you to just read that for me.
21     A.  "Refund" -- something -- "PROJ reserve.
22 SUP/apply 40033935/per Cruz, INV 40033935 was financed
23 through OCC.  Customer cancelled products and downgraded
24 licenses.  Refund per Tom Williams."
25     Q.  Now, does that appear to suggest that you

129

1   approved a refund for this specific transaction?
2       A.   I can only read what it says.  I don't recall
3   whether or not I approved a refund on this specific
4   transaction and this doesn't refresh my memory on that
5   particular customer.
6       Q.   Okay.  Now, do you know whether or not the
7   comments that you just read was written by you?
8       A.   It was not written by me.
9       Q.   How can you tell?
10      A.   Because if I ever saw this spreadsheet and
11  filled it out I would have remembered it.  This is
12  nothing that I had worked with before.  So it would not
13  be my comment.
14      Q.   Now, in February of 2001, if such a refund as
15  represented in lines 63 through 70 were done there
16  should be a refund template -- an e-mail with a refund
17  template and a request for an approval and an ultimate
18  approval of that refund, correct?
19      MS. WINE:  Objection.  Lacks foundation.
20      THE DEPONENT:  What I described was a
21  process.  You know, I don't know whether or not there is
22  one for this specific one.
23  BY MR. WILLIAMS:
24      Q.   But based on your description of the process
25  would you assume that there would be that type of audit

130

1   trail?
2       A.   Yes.
3       Q.   And do you know where that could be found?
4       A.   I believe the approval templates would have
5   been forwarded to accounts payable.  And so, if I was
6   guessing I would say accounts payable would have them
7   filed as support for the check that was disbursed.
8       Q.   Okay.  I am going to ask you to go down to
9   lines 71 through 76.
10      A.   Okay.
11      Q.   I will ask you to review those lines and let
12  me know, based on your review and your experience, if
13  you can describe for me what appears to be depicted
14  there?
15      A.   You know, it appears that 25005 was reduced by
16  165,908.43 and 12018 was increased by 165,908.  So a
17  balance sheet entry -- you know, it appears to me it is
18  really related to the next four lines as well, which is
19  the -- well, I shouldn't say the next four lines.  The
20  next eight seems to be related to the refund of the
21  additional 165,908.43.
22      Q.   Okay.  And does it appear that the designation
23  of applied and/or unapplied changes in that series?
24      A.   Again, I mean, I think I said this before.  I
25  don't know where the data comes in -- account type.  So

131

1   reading this spreadsheet it would appear that there was
2   a difference -- a change between applied and unapplied,
3   but because I am not sure what these other lines are
4   doing -- the, "Rec Rev, Rec Rec" -- I couldn't tell you
5   if -- after all of that if there was a change to applied
6   and unapplied.
7       Q.   Okay.  Do you know where the rest of the data
8   on these documents comes from?
9       MS. WINE:  Objection.  Lacks foundation.
10      THE DEPONENT:  I am sorry.  What -- rest of
11  what data?
12  BY MR. WILLIAMS:
13      Q.   You indicated that you don't know where the
14  data and account type comes from.
15      A.   I think that it would -- it could be answered
16  by whoever prepared this report.  They would know where
17  that came from.  I personally don't.
18      Q.   I understand.
19      A.   If I was making an assumption I would say it
20  is out of the AR system, but I don't know that.  And so,
21  you know, I would rather direct you to somebody who
22  actually prepared the report rather than myself.
23      Q.   I was only asking if you know where the
24  remainder of the information on the document comes
25  from.  You indicated you don't know where the account

132

1   type comes from, but what about the rest of the
2   information on the page?
3       MS. WINE:  Objection.  Lacks foundation.
4       THE DEPONENT:  I don't know where it came
5   from.  However, based on the data that is on here I
6   believe it came out of the AR system.  It appears to
7   be -- you know, all of this data, I think, would be
8   contained in the AR system.
9   BY MR. WILLIAMS:
10      Q.   Okay.
11      A.   Again, without regard to the first two
12  columns, which I still don't really know about.
13      Q.   And 12018 -- based on your recollection was
14  that unapplied cash account?
15      A.   That is what it says on here.  I don't
16  remember what the specific account was.  The 12,000
17  series of accounts were all AR-related accounts.  So AR
18  reserve is in there, trade receivables, unapplied cash.
19      Q.   Okay.
20      A.   In there somewhere.
21      Q.   Now, looking at line 77 through line 80 --
22      A.   Yes.
23      Q.   -- can you tell me, based on a review of
24  those lines, in your experience what appears to be
25  occurring in those lines?

133

1      A.  165,000 is being removed from unapplied cash
2  and a check is being disbursed to the customer for
3  165,908.
4      Q.  And this is -- would you assume that the same
5  type of refund template and backup for this refund is
6  available at Oracle?
7      MS. WINE:  Objection.  Incomplete
8  hypothetical, lacks foundation.
9      THE DEPONENT:  I would assume that, yes.
10  BY MR. WILLIAMS:
11      Q.  Okay.  And lines 81 through 84 -- does that
12  show a check being issued for this customer?
13      A.  81 to 84, yes.
14      Q.  And that's in March of 2003 --
15      A.  Correct.
16      Q.  -- right?  Now, it is fair to say based on
17  your review of Exhibit No. 3 that the monies depicted by
18  the two refunds we discussed at 81 through 84 and 63 to
19  70 -- that Oracle had those monies as early as September
20  of 1999?
21      MS. WINE:  Objection.  Lacks foundation.
22      THE DEPONENT:  No.
23  BY MR. WILLIAMS:
24      Q.  No?  Why not?
25      A.  Because the earliest the company would have

134

1  had the monies based on this report is 258,000 in
2  November -- on November 15th, '99, plus -- which
3  again -- well, there is, as I see it, five payments here
4  that relate to this particular transaction.  There is
5  the 258,241.84 on November 15th and then there are four
6  payments that are contained within these wires from
7  OCC.  So on the -- January 4th of 2000, based on this
8  document, the company received 65,007.81, on March 7th
9  of 2000 received an additional 64,588.59, on July 3rd of
10  2000 received an additional 64,588.58, and on September
11  5th 2000, received 64,056.83.
12      Q.  Okay.  So there are multiple receipts.  It
13  appears that way?
14      A.  Yes.  I mean, based on this document there was
15  a payment from the original customer and there was an
16  additional duplicate payment made in four installments
17  by Sanwa Bank.
18      Q.  Now, how do you know that the Sanwa Bank
19  transactions here are duplicate payments for the same
20  transaction or invoice?
21      A.  Well, you asked me to review the document.
22  So, again -- I mean, I go back to -- I haven't seen it
23  before, but looking through this document and
24  interpreting it from an accounting perspective I can see
25  or -- I think what happened here, which -- was the

135

1  company was invoiced for a support billing for
2  258,241.84, and they paid it, but they also at the same
3  time would appear to have leased either this transaction
4  or this transaction plus others through Oracle Credit
5  Corp.  So on, you know, November 15th of '99, where we
6  get the 258,241 we are good.  We have got our money for
7  our receivable that we billed.  The complexity comes
8  when the same funds come through Sanwa Bank to Oracle.
9  And so, I think that is -- sort of the reason why this
10  became such a confusing transaction is effectively it
11  wasn't a double payment from KForce.  That would have
12  been more easily determined.  It instead came from two
13  sources.  One, you know, on a rather large check or
14  checks coming from Sanwa and the other portion coming
15  with a check from KForce.
16      Q.  Okay.
17      A.  So, I mean, just the to -- you know, to point
18  this out, the numbers that are on here -- the November
19  3rd wire of 1,277,000, the January 4th of 235 --
20  2,354,919, the wire on July 3rd of 2000, 4,191,586 --
21  those would have been payments from the Sanwa that
22  included a number of invoices, not just things related
23  to KForce.
24      Q.  How do you know that?
25      A.  Because there is no -- because, you know,

136

1  again as we look at this report, which purports to be,
2  you know, a transaction history of everything that
3  happened with this original invoice -- original
4  receipt -- it is only a $258,000 transaction, but there
5  is monies coming in here for, you know, 4, 5, 8 million
6  dollars -- whatever the number adds up to.  My
7  assumption -- don't know this -- is that somehow or
8  another in preparing this report they linked any
9  receipts that contained any payments related to
10  original invoice number.
11      Q.  But the original invoice number, as you see
12  here, is a debit memo?
13      A.  No, the original invoice number is not a debit
14  memo.
15      Q.  Then it is not here?
16      A.  No.
17      Q.  You don't see the original invoice number here?
18      A.  Correct.
19      Q.  And so whoever created this would have had to
20  know what the original invoice number is to do -- to
21  create this spreadsheet in the way that you just
22  described, right?
23      A.  I don't know how this was created.  So I can
24  only say, you know, whoever did prepare it would be a
25  better person to ask how did they link these

137

1 transactions. But I am merely pointing out to you these
2 OCC numbers are not related to this one transaction for
3 258.
4     Q.   Okay. Now, do you know who in the financial
5 department would be responsible for doing the type of --
6 I am just going to use the word, "reconciliation," here
7 because I can't think of anything that would be more
8 appropriate for now -- of this particular transaction
9 between say, September 2000 -- September '99 and through
10 the refund in March of '03?
11        MS. WINE: At any step along the way who was
12 responsible for that?
13     BY MR. WILLIAMS:
14     Q.   Sure. You can tell me a department and if you
15 know of specific people within the department that might
16 be responsible you can tell me that too.
17        MS. WINE: Objection. Lacks foundation, calls
18 for speculation.
19        THE DEPONENT: I mean, the original invoicing
20 would have been done by the accounts receivable
21 department. You know, the cash numbers that come into
22 the lock boxes in creating the corresponding credits
23 really are based on treasury-generated -- you know,
24 things that come out of the treasury deposit. They get
25 the lock box reports from the banks, which are then

138

1 supplied to -- I am not sure what department would
2 actually post the entry -- probably receivables.
3 Anything having to do with applied, unapplied,
4 on-account -- I believe those would be generally --
5 because I haven't looked at each one of these, but most
6 of those would probably be related to things that
7 collections did.
8        You know, when I reviewed this thing -- and, I
9 mean, just real briefly -- the transaction that is on
10 November 15th where the cash comes in of 258, 193,000 is
11 applied and so the balance of it effectively goes to
12 unapplied. I mean, typically the process is -- there is
13 this thing called, "auto lock box," which matches a
14 receipt against the AR trial balance based on remittance
15 advice that came with the money -- what was supplied to
16 the bank. So what it looks like to me is -- what
17 happened is they had -- KForce had $193,000 of
18 receivables outstanding. The assumption was made, I
19 believe, by a collector that they could apply 193 of the
20 258 against those open receivables. That did not seem
21 to be a very good idea because by January 7th of 2000,
22 on line 15 and 16 they reversed that application as
23 applied and put it back in unapplied.
24        And, you know, I would look at this -- and,
25 again, I am making some assumptions here, but the 258

139

1 came in. There was not outstanding invoices equal to
2 258 from KForce that they could apply it to. They could
3 only find 193. The real invoice that was out there was,
4 I think, one that should have been satisfied by the
5 payments from OCC. If you added up those -- 65,000, the
6 64,000, the 64,000, and the 63 -- those four numbers
7 total 258,241. So I think what happened in the interim
8 is someone in collections was trying to take the money
9 in unapplied and find an invoice to apply it to and then
10 along would come the next payment from Sanwa and they
11 would say, "Gee, I already applied it. Oh, I must have
12 done that incorrectly." So you see them un-reversing it
13 or reversing the application and having it put back into
14 unapplied.
15     Q.   Now, why do you think that whoever did that
16 was someone from collections?
17     A.   Because other than this automated process
18 that when the lock box information comes in from the
19 bank electronically looks at the payment and the
20 remittance information, which would typically be, "I am
21 paying the following six invoices." Other than that
22 process the only way something can be applied -- the
23 only way a receipt can be applied under this specific
24 invoice is for a collector to go find out what were they
25 paying and then manually apply it against the invoice.

140

1     Q.   And no one in accounts receivable had that
2 responsibility or ability?
3     A.   I couldn't speak to ability, but that was not
4 the responsibility. The responsibility to do cash
5 applications was the collector if it did not
6 automatically via this auto lock box function within the
7 application.
8     Q.   Okay. So the collectors would just by -- just
9 by doing their job could impact the balances in 25005?
10        MS. WINE: Objection. Misstates the
11 testimony.
12        THE DEPONENT: They could affect the balances
13 in applied, unapplied. I don't know if they could move
14 a balance from unapplied to on-account. I don't know
15 that.
16     BY MR. WILLIAMS:
17     Q.   You do know that they could move a balance
18 from applied to unapplied or vice versa, but you don't
19 know if they could move a balance to on-account. Is
20 that what you are saying?
21     A.   Yes. And, again, it goes back to -- what I
22 described is they have their accounts receivable trial
23 balance. They have their listing of unapplied cash
24 items -- so those that are in the AR system that have an
25 unapplied flag -- and they try and match them up. And

141

1  to the extent they can match them up, either by looking
2  at further detail from the customer or calling them,
3  then they will attempt to apply the cash against the
4  invoice, which creates on -- you know, any number of
5  these lines where you have a reduction to accounts
6  receivable trade and a reduction to customer
7  overpayments.
8      Q.  So actually they -- you are saying that
9  collectors could also impact the balance in 1200 -- I am
10  sorry -- 12008?
11     MS. WINE:  Objection.  Misstates the
12  testimony.
13     THE DEPONENT:  Indirectly.  I mean, they can't
14  make a journal entry into the general ledger, but they
15  can take a transaction and say, "I have, you know" --
16  hypothetically $50,000 sitting in unapplied cash and it
17  came from Boeing.  And they go look at the accounts
18  receivable trial balance, their territory, and they see
19  a $50,000 invoice there.  They can code that receipt as
20  being related to that invoice in the trial balance.
21  When they do that it is going to generate an entry that
22  is going to reduce 25005 and is going to reduce 12008.
23     Q.  I am sorry.  Go ahead.  Is that automatic?
24     A.  Yes.  I mean, they don't go do a journal entry
25  for each time they apply cash.  The system recognizes

142

1  when you have applied a receipt against an invoice.  And
2  so, you know, whether they posted AR daily or weekly or
3  monthly, I don't know.  But, you know, their
4  transaction -- I am going to make one modification.  I
5  don't believe that all collectors had that function.  I
6  think that there were selected individuals and
7  collectors that could do it.  But, you know, past that I
8  really shouldn't say anything more because that is all I
9  know.
10     Q.  And so, looking at 39 to 41, when there is a
11  transfer between 12601 and 25005 who has the ability, or
12  what department has the ability to move items in between
13  12601 and 25005?
14     MS. WINE:  Objection.  Lacks foundation, calls
15  for speculation, incomplete hypothetical.
16     THE DEPONENT:  I could only say it is either
17  AR or it is collections.  Those would be the only two
18  groups that would possibly be able to do it.  I mean, it
19  wouldn't be anybody outside those two groups that would
20  have the ability.
21  BY MR. WILLIAMS:
22     Q.  All right.  Looking at 39 to 42, can you tell
23  what -- the purpose of moving the 258,241.84 from -- I
24  guess, from the lock box into 12601?
25     MS. WINE:  Objection.  Lacks foundation.

143

1      THE DEPONENT:  No.  It is -- I mean, there is
2  a debit and a credit with the lock box that are equal
3  and offsetting.  So you really just look at the last two
4  lines and it is a reduction to 25005 and a credit to
5  12601 for 258,241.
6  BY MR. WILLIAMS:
7      Q.  Right.  And can you -- based on this document
8  can you tell what the purpose of that was?
9      MS. WINE:  Objection.  Lacks foundation.
10     THE DEPONENT:  I can only read the comments
11  which says, "Per collections moved to reserve."
12  BY MR. WILLIAMS:
13     Q.  And do you know why collections was moving
14  items to reserve from 25005?
15     MS. WINE:  Objection.  Lacks foundation, asked
16  and answered.
17     THE DEPONENT:  No.
18  BY MR. WILLIAMS:
19     Q.  Looking at this document, this KForce
20  transaction was related to a debit memo?
21     MS. WINE:  Objection.  Misstates the
22  testimony.
23     THE DEPONENT:  I mean, I believe that it is --
24  the entire history of the transactions related to this
25  original 258,241.84 invoice that was issued January 22nd

144

1  of '99, which clearly wasn't the debit memo because the
2  debit memo number is related to the November 17th,
3  2000 -- November 17th, 2000, time frame.
4  BY MR. WILLIAMS:
5      Q.  I understand that.  But within this -- within
6  the history of this invoice and the ultimate refund
7  there was a debit memo, isn't that right, based on what
8  you can see here?
9      A.  Well, I mean, on lines 45 to 50 are the
10  accounting entries related to that debit memo --
11     Q.  Um-hum.
12     A.  -- which all -- as I said earlier, the debits
13  and the credits are all to the exact same account,
14  25005.
15     Q.  And when Greg Myers explained what happened
16  with the debit memos to you did he explain to you that
17  some of the debit memos had a history that had impacted
18  12601?
19     MS. WINE:  Objection.  Misstates the
20  testimony -- the evidence.
21     THE DEPONENT:  I mean, there is two different
22  subjects here.  All of the discussions, I think, we have
23  had so far related to the November 17th debit memos.
24  BY MR. WILLIAMS:
25     Q.  And -- you and I, you are talking about?

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

145

1    A.  Yes.  So the discussions that I talked about
2  before with Greg Myers were directed at that.  It was
3  not directed at an internal transaction as presented on
4  this particular schedule.
5    Q.  That's okay.  I am just asking you, during
6  your discussions with Greg Myers about the debit memos
7  after you read the second amended complaint did he
8  explain to you that some of the debit memos had a
9  history that -- a history of transfers that touched
10  12601?
11    A.  No.
12    MS. WINE:  Objection.  Misstates his testimony
13  and mischaracterizes the evidence.
14  BY MR. WILLIAMS:
15    Q.  Your answer was, "no"?
16    A.  My answer was, "no."
17    Q.  And would that have been information that you
18  would have been interested in at the time?
19    MS. WINE:  Objection.  Incomplete
20  hypothetical.
21    THE DEPONENT:  I don't know if he knew it at
22  the time.  He did not mention anything to me at the time
23  when we were first talking about the second amended
24  complaint and, "What's this thing with debit memos?" --
25  subsequent conversations.

146

1    MS. WINE:  I think he just asked if it would
2  have been important.
3    MR. WILLIAMS:  If you have an objection,
4  Jamie, just make it.
5    MS. WINE:  I just want to make sure --
6    MR. WILLIAMS:  No, you are actually coaching
7  the witness.  He was responding to my question and I
8  didn't understand his response to be complete and you
9  cut him off -- what he was trying to say.
10    MS. WINE:  I actually didn't think he was
11  responding to your question.  So --
12    MR. WILLIAMS:  But that is not your -- you are
13  not allowed to cut the witness off.  He was responding
14  directly to my question.
15    MS. WINE:  I am allowed to get a clear record.
16    MR. WILLIAMS:  All right.  Well, we will find
17  out.
18    Can you read back my question, please?
19    COURT REPORTER:  "Q.  And
20    would that have been information
21    that you would have been interested
22    in at the time?"
23    MS. WINE:  Objection.  Incomplete
24  hypothetical.
25    THE DEPONENT:  I mean, it is unclear what, "at

147

1  the time," meant.  And so, what I was trying to clarify
2  is when we first met and talked about the debit memos
3  there wasn't any conversation about it.  You know,
4  subsequent conversations later in the process did
5  indicate that there were some items moving out of 25005
6  into 12601.
7  BY MR. WILLIAMS:
8    Q.  Prior to the debit memos --
9    A.  No.
10    Q.  -- and related to them?  No?
11    A.  No, this is in the 2002 time frame.
12    Q.  Let me withdraw the question because I think
13  that was unclear.  You said during the first
14  conversation that you had with Greg Myers after you read
15  the second amended complaint there was no mention of any
16  transfers between 25005 and 12601.  Is that fair?
17    A.  Yes.
18    Q.  And during that conversation -- well, after
19  that conversation he mentioned something to you about
20  transfers between 12601 and 125005?
21    A.  I don't recall if it was Greg or not.
22    Q.  Okay.  Now, did -- in that initial
23  conversation no one mentioned to you that among the
24  debit memos that were created on November 17th, 2000,
25  some of them had a history -- the transactions had a

148

1  history that touched upon 12601?
2    MS. WINE:  Objection.  Mischaracterizes the
3  evidence.
4    THE DEPONENT:  I already said it wasn't
5  discussed at that first meeting in 2002.
6  BY MR. WILLIAMS:
7    Q.  All right.  And subsequent to the first
8  meeting did you have a discussion with anyone during
9  which anyone said to you that some of the November 17th,
10  2000, debit memos had a history that touched on 12601?
11    A.  No.
12    Q.  If that were true that some of them did would
13  that information have been important to you?
14    MS. WINE:  Objection.  Incomplete
15  hypothetical.
16    THE DEPONENT:  Not at that point.
17  BY MR. WILLIAMS:
18    Q.  Why not?
19    A.  Because -- and I don't remember the genesis of
20  it, but we had started to look at what was the activity
21  going into 12601, coming out of 25005.  So at that point
22  whether it was in the November 17th debit memos or not
23  was somewhat irrelevant to me.  It was a different issue
24  to me.
25    Q.  Did at some point that become important to

149

1    you?
2        A.  It became important to me to understand how
3    much moved from 25005 to 12601, yes.
4        Q.  And did you ask anyone to provide you with a
5    history of any of the debit memo transactions that had
6    at some point gone through 12601?
7        A.  No.
8        Q.  Why not?
9        A.  Because it wouldn't be relevant.
10       Q.  To what?
11       A.  The debit memos had no effect on the company's
12   financial statements.  The debit and the credit went
13   exactly the same place, 25005.  So the 46,000 debit
14   memos from my perspective were done with whether or
15   not -- once we determined that that was the accounting
16   entry debit, credit, same account, no effect on the
17   financial statements.  Separate from that was an
18   additional issue which is, "Okay.  Have things moved out
19   of 25005 to 12601?"  Whether or not they were ever in
20   the debit memo population was irrelevant because we were
21   dealing with, "Well, how much moved from 25005 to 12601
22   and was it appropriate?"  So it was not meaningful for
23   me to try and look at the 46,000 debit memos because,
24   you know, I am not going to look at 46,000 items to find
25   out did they ever go through 12601.  It was much easier

150

1    to go look at 25005 and 12601 and look at every
2    transaction that moved between those two accounts.
3        Q.  So do you know whether any of the debit memo
4    transactions on November 17th, 2000, moved to 12601?
5        MS. WINE:  Objection.  Vague and ambiguous.
6        THE DEPONENT:  Based on this document I
7    believe there was at least one.  Do I know if there are
8    additional ones?  No.
9    BY MR. WILLIAMS:
10       Q.  And so during your -- when it became relevant
11   to you and you began looking at what had gone from 25005
12   through 12601, did you find any -- any transactions that
13   were also related to a debit memo?
14       A.  Never attempted to link them to a debit memo
15   because, again, the debit memos didn't create an
16   accounting entry that affected the financial
17   statements.  The only transactions that could affect the
18   financial statements were a movement from 25005 to 12601
19   that was inappropriate.
20       Q.  So when you were looking at those 25005 to
21   12601 transactions were you looking at the full history
22   of those transactions or were you just looking to
23   determine whether or not there was a specific tie from
24   25005 straight to 12601?
25       A.  I don't understand that question.  "Specific

151

1    tie"?  I don't understand.
2        Q.  Well, a direct transaction from 12601 to 25005
3    or vice versa?
4        MS. WINE:  Can you repeat the question?  I am
5    not following it.
6        COURT REPORTER:  "Q.  So
7    when you were looking at those
8    25005 to 12601 transactions were
9    you looking at the full history
10   of those transactions or were
11   you just looking to determine
12   whether or not there was a specific
13   tie from 25005 straight to 12601?"
14       MS. WINE:  Objection.  Vague and ambiguous.
15       MR. WILLIAMS:  He is out of time on the tape.
16       THE VIDEOGRAPHER:  This marks the end of tape
17   2, volume 1, in the deposition of Thomas Williams at
18   2:49.  Going off the record.
19       (Off the record.)
20       THE VIDEOGRAPHER:  On record at 3:04.  This
21   marks the beginning of tape 3, volume 1, in the
22   deposition of Thomas Williams.
23       MR. WILLIAMS:  I am going to ask the reporter
24   to mark this document as Williams number 4.
25       (Exhibit No. 4 was marked for identification.)

152

1    BY MR. WILLIAMS:
2        Q.  Williams number 4 is an excerpt of the Oracle
3    Receivables User's Guide.  And it is -- the first page
4    is Bates number NDCA-ORCL 047279, and the next page
5    begins with the glossary numbered 048657 through 683.
6    Have you seen the Oracle Receivables User's Guide
7    before?
8        A.  Seen versions of it, yes.
9        Q.  Do you know if you have seen the version dated
10   March 1997?
11       A.  No.
12       Q.  You don't know if you have seen it?
13       A.  I don't know if I have seen it.
14       Q.  And under what circumstances had you seen it
15   before -- not necessarily the 1997 one?
16       A.  Sitting on someone's desk.  I mean, I did not
17   have my own copy of the user's guide, but I have seen
18   the user's guide for receivables as well as the other
19   applications.
20       Q.  Did you use the user's guide in your duties at
21   Oracle?
22       A.  No.
23       Q.  How about people in your organization?
24       A.  Yes.
25       Q.  Was it something that was republished

153

1   periodically with updates and things like that?
2        A.   Yes.
3        Q.   How often were the updates, if you know?
4        A.   I don't know.  Let me finish this.  I think --
5   I believe on each release there was a new user's guide.
6        Q.   Okay.  And it was distributed to whoever
7   wanted one in Oracle?
8            MS. WINE:  Objection.  Lacks foundation.
9            THE DEPONENT:  I don't know what the
10  distribution policy was.
11  BY MR. WILLIAMS:
12       Q.   Could you also look at it online at the
13  company?
14       A.   All of the company software has online
15  documentation.
16       Q.   Okay.  I just --
17       A.   I -- maybe I misspoke on that.  "Online,"
18  being that when you buy the product the CD has
19  electronic documentation included with it.  I don't know
20  whether or not the guide was published on the internal
21  Oracle web site.
22       Q.   Okay.  I just wanted you to look at this with
23  me and maybe we can look at some of the Receivables
24  User's Guide definitions for some of the terms we have
25  been discussing.

154

1        A.   Okay.
2        Q.   If you could turn to NDCA-ORCL 0486588.  It is
3   only three pages in.  And just take a look at -- do you
4   see a definition for the term, "applied" -- "applied"
5   -- yeah, "applied payment," or applied?  Do you see
6   that?
7        A.   Yes, I do.
8        Q.   Can you read it for me?
9        A.   It says, "Payment in which you record the
10  entire amount as settlement for one or more debit
11  items."
12       Q.   Do you have an understanding of what that
13  means?
14       A.   In connection with the AR system, yes.
15       Q.   Okay.  And does it have a meaning that is
16  beyond what is written here?
17       A.   Is there a specific word that --
18       Q.   No.  I am just wondering if, "applied," means
19  exactly what it says here?
20       A.   I mean, I read it.  I don't -- I can't -- I
21  don't know what else to say.  I read it.
22       Q.   Okay.  Can you turn to --
23       A.   Since on their debit items they are not just
24  debit memos.
25       Q.   I understand.  If you can turn to Bates ending

155

1   663.  Do you see the term, "credit memo," there?
2        A.   Yes.
3        Q.   Can you read that for me?
4        A.   "A document which partially or fully reverses
5   an original invoice.  You can create credit memos
6   through the receivables, intercredit memos form, or
7   through auto invoice."
8        Q.   Is that your understanding of what a credit
9   memo is?
10       A.   Sure.  Yes.
11       Q.   Can you go to page, I guess -- glossary 9,
12  Bates ending 665?  Do you see the definition there for,
13  "debit memos"?
14       A.   Yes.
15       Q.   Can you read that for me?
16       A.   "Debits that you assign to your customer for
17  additional charges that you want to collect.  You may
18  want to charge your customers for unearned discounts
19  taken, additional freight charges, taxes, and finance
20  charges."
21       Q.   Okay.  Is that your understanding of what a
22  debit memo is?
23       A.   Sure.  Yes.
24       Q.   Can you turn to glossary page 16, Bates ending
25  672?  Do you see a definition there for, "on-account"?

156

1        A.   Yes.
2        Q.   Can you read that for me?
3        A.   "Payments where you intentionally apply all or
4   part of the payment amount to a customer without
5   reference to a debit term" -- or excuse me -- "debit
6   item.  On-account examples include pre-payments and
7   deposits."
8        Q.   Okay.  Now, is that your understanding of the
9   meaning of the term, "on-account"?
10       A.   Not in relation to what we have discussed so
11  far today.
12       Q.   Okay.  Was there a different meaning of the
13  term, "on-account," in Oracle receivables than what is
14  represented in the user's guide?
15           MS. WINE:  Objection.  Asked and answered.
16           THE DEPONENT:  As I stated earlier today,
17  which you brought up, I think the issue of whether or
18  not you read from some report there -- whether or not
19  Oracle U.S. was using the application in the same
20  fashion as other subsidiaries -- and being out of
21  whatever item that was -- this is a document that is the
22  standard user's guide that is shipped with every CD that
23  includes Oracle software to all customers that buy the
24  product.  It is not a -- I mean, not every company uses
25  it in the same fashion.  During the period of time that

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

157

1   we are discussing, the on-account was not used for this
2   purpose.  That is exactly the reason why they had to go
3   through the process -- the 46,000 debit memos so that
4   they could convert to a global process similar to what
5   was used in some of the international subsidiaries that
6   used on-account as described in this user guide.
7       BY MR. WILLIAMS:
8       Q.  Do you know whether in this case -- that this
9   user's guide has been submitted to the court as a
10  reference of the meaning of, "on-account," or what
11  occurred with the debit memos?
12      MS. WINE:  Sorry.  Can you say that again?
13      COURT REPORTER:  "Q.  Do
14          you know whether in this case --
15          that this user's guide has
16          been submitted to the court as
17          a reference of the meaning of,
18          'on-account,' or what occurred
19          with the debit memos?"
20      MS. WINE:  Objection.  Lacks foundation, calls
21  for speculation.
22      THE DEPONENT:  I mean, I don't know under what
23  basis this was supplied.
24      BY MR. WILLIAMS:
25      Q.  Okay.  Do you recall telling the special

158

1   committee that beginning as early as 1990 Oracle's
2   accounts receivable group in the United States changed
3   the use of quote, unquote, "on-account status"?  Rather
4   than using the on-account designation to track a credit
5   that could be applied against a customer's account,
6   Oracle used on-account status to demonstrate to internal
7   users of the accounts receivable application that the
8   cash had already been applied to specific -- to a
9   specific account and thus was not available as an open
10  credit for a customer's account?  In substance do you
11  recall telling the special committee that?
12      A.  Yes.
13      Q.  And was that something that you learned from
14  Greg Myers after you spoke with him after you read the
15  second amended complaint?
16      A.  Yes.
17      Q.  Okay.  You did not have independent knowledge
18  of what you represented to the SLC that Oracle's
19  accounts receivable group in the early 1990s changed the
20  use of on-account status?
21      A.  I would -- because -- you said generally is
22  that what I said?
23      Q.  Yeah.
24      A.  I don't believe that Oracle -- I am trying to
25  think when the original AR application was implemented.

159

1   It is probably not too dissimilar from, you know, late
2   '80s, early '90s.  So a, "change" -- I don't know --
3   would have been what I said to them.  In answer to your
4   question, you know, I talked to many people -- Greg.
5   You know, Mike Quinn might have talked to people who
6   worked for Greg about these issues.  I was reporting to
7   the SLC as the finance representative.  So I in no way
8   tried to infer to them that I had independent knowledge
9   of any of the things that were reported to them.
10      Q.  I understand.  I am just trying to get from
11  you whether this information you communicated to them
12  was based on your independent knowledge or knowledge you
13  had gotten -- or information you got from Greg Myers and
14  Mike Quinn?
15      A.  It was the latter.
16      Q.  Okay.  And Greg Myers wasn't at Oracle in the
17  early '90s though, was he?
18      A.  That would be correct.
19      Q.  And he didn't start working at Oracle until
20  maybe in 1997; isn't that right?
21      A.  I don't know when he started, but it clearly
22  would not have been early '90s.
23      Q.  And do you know whether he started as a
24  collections manager or did he start in AR?
25      A.  He was in collections.

160

1       Q.  Okay.  And he was there for about a year or
2   so.  Is that fair?
3       A.  First off, I don't know what his title was
4   when he was in collections and I don't know how long he
5   was there.  But, yes, I am aware he was in collections
6   before he moved to AR.
7       Q.  Okay.  And collections wasn't necessarily
8   using the accounts receivable module, were they?
9       A.  That would not be true.
10      Q.  Okay.  Tell me how they were using it.
11      A.  I mean, the accounts receivable trial balance
12  that they used to go manage and collect their territory
13  comes off the accounts receivable system.  I think a
14  number of tasks that they perform use reports.  You
15  referred to a billing history report.  That comes off
16  the AR system.  So, they use AR.
17      Q.  Okay.  So would it be fair to say that the
18  members of collections had limited rights in the
19  accounts receivable application?
20      MS. WINE:  Objection.  Misstates testimony.
21      THE DEPONENT:  Limited rights meaning limited
22  functionality -- could not access all functions within
23  the application, yes.
24      BY MR. WILLIAMS:
25      Q.  Okay.  Do you know when Greg Myers moved from

161

1  collections to accounts receivable?
2      A.  No.
3      Q.  Mike Quinn wasn't at Oracle in the early '90s
4  either, was he?
5      A.  That is correct.
6      Q.  And he didn't start working at Oracle until,
7  you know, 1997, 1998; isn't that right?
8      A.  I think approximately that time frame.
9      Q.  Okay.  Did they tell you who they had gotten
10  that information from that in 1990, or the early '90s,
11  the United States Oracle accounts receivable group
12  changed the on-account usage?
13     A.  I mean, as I previously said, I don't know
14  that I ever said, "changed."
15     Q.  Okay.
16     A.  So that is a document that -- whatever you are
17  reading from wasn't one that I wrote.  So I don't know
18  that I ever said the word, "changed."  In answer to your
19  question, do I know who they talked to?  No.  But Mike's
20  role was the global process owner for, you know, the
21  revenue-to-cash function within Oracle.  He would have
22  talked to everybody including developers, including
23  people in other countries about how they were using the
24  application.  Who they spoke to specifically, couldn't
25  tell you.

162

1      Q.  Going back to Exhibit No. 4, if you could turn
2  to page 20, which is Bates ending 676, do you see a
3  definition for, "receipts," there?
4      A.  Yes.
5      Q.  Okay.  Can you read that for me?
6      A.  "These include applied and unapplied receipts
7  entered within the GL date range that you specified.  If
8  the receipt you applied within the GL date range that
9  you specified" -- oh, I am sorry.  "If the receipt is
10  applied within the GL date range you specified it will
11  appear in the applied receipts register.  Otherwise it
12  will appear in the unapplied receipts register.  See
13  cross site and cross customer receipts."
14     Q.  Did you have the ability to run an unapplied
15  receipts register report?
16     A.  Myself, personally?
17     Q.  Sure.
18     A.  No.
19     Q.  You didn't have the ability to do it?
20     A.  Don't believe that I had access to AR.
21     Q.  Okay.  But is it fair to say that anyone in AR
22  could run that report -- the unapplied receipts
23  register?
24         MS. WINE:  Objection.  Lacks foundation.
25         THE DEPONENT:  Unclear.  Within each of the

163

1  applications there is defined user roles that determine
2  what screens or what processes you can get to.  I don't
3  know what responsibility this would be.  I mean, if you
4  will, there could be an AR user, there could be an AR
5  supervisor, an AR super user.  Each of those categories
6  allowed the individual to get to different reports or
7  different processes.  I don't know where this was in AR.
8      BY MR. WILLIAMS:
9      Q.  But if you wanted one of these reports while
10  you were at Oracle you certainly could have one run?
11     A.  Yes.
12     Q.  Who -- you would go to someone in AR to do
13  that?
14     A.  Yes.  I would go to someone in AR.
15     Q.  Do you know if people in collections had the
16  ability to run that report?
17     A.  I don't know whether or not they had the
18  ability to run it.  But, again, this is what they were
19  using.  They had their AR trial balance, open invoices,
20  their territory, and then they had the unapplied
21  receipts report -- if that is what it is -- unapplied
22  receipts register -- if that is what it is called --
23  that would have given them the items that were unapplied
24  that they should be looking -- to determine should they
25  be applied against one of the invoices.

164

1      Q.  And, actually, that is what I was getting at.
2  You did identify earlier that there was an unapplied
3  list that you believed that the collectors were using
4  that was different from the unapplied cash account,
5  right?
6      A.  What I said is the unapplied cash account is a
7  GL account.
8      Q.  Right.
9      A.  And so I was saying they were using an
10  unapplied cash report.  Whether it is this exact report
11  or not, I couldn't say.
12     Q.  Okay.
13     A.  But this would be more in line of what I was
14  trying to describe.
15     Q.  Okay.  Can you turn to glossary 26, Bates
16  ending 682?  Do you see a definition there for,
17  "unapplied payment"?
18     A.  Yes.
19     Q.  And can you read that for me?
20     A.  "The status of a payment for which you can
21  identify the customer, but you have not applied or
22  placed on-account all or part of the payment.  For
23  example, you receive a check for $1,200 and you pay an
24  open debit item for $1,000.  The remaining $200 is
25  unapplied until you either apply the payment to a debit

165

1    item or place the amount on-account."
2        Q.   Okay.  You talked a little bit earlier about
3    flags?
4        A.   Yes.
5        Q.   And looking at the definition of, "unapplied
6    payment," now where it says, "The status of a payment
7    for which you can identify a customer, but you have not
8    applied or placed on-account all or part of the
9    payment" --
10       A.   Yes.
11       Q.   Now, if a payment is applied is that simply a
12   flag or some sort of indicator that shows up on a screen
13   in Oracle systems?
14           MS. WINE:  Objection.  Incomplete
15   hypothetical.
16           THE DEPONENT:  I don't know if there is a -- I
17   mean, clearly there is a cash receipts register in some
18   detail for what went in the bank.  Whether or not there
19   is a specific register that shows the applied amounts, I
20   don't know.
21   BY MR. WILLIAMS:
22       Q.   Okay.  My question was directed at identifying
23   an amount that is applied.  And I am wondering if there
24   is some sort of -- you used the word, "flag," and I
25   don't know what that means necessarily.  But is there

166

1    some sort of visual indicator when -- in Oracle's
2    systems that says, "Well, this amount is applied"?
3        A.   I believe so, yes.  This other report that we
4    looked at -- the Williams 3, you know -- and it
5    references -- again, I don't know exactly what it is --
6    but original receipt number 124541.  You know, not
7    saying that all of these are exactly the same, but I
8    believe that you can run a query or run a report by
9    receipt and see what its status is.  So, you know,
10   original check was $100,000.  You know, how much was
11   applied?  What remains unapplied?  I believe that there
12   is that capability.
13       Q.   So have you ever seen one of those?
14       A.   I mean, I have seen a number of reports over
15   my tenure at Oracle and I believe I have seen some
16   reports that indicated something on, you know, what
17   happened to that receipt.
18       Q.   Okay.
19       A.   I can't recall specifically what it looks
20   like, but I believe that it is available.
21       Q.   Okay.  So looking at the same definition,
22   though, where it says, "Status of the payment for which
23   you can identify the customer, but you have not applied
24   or placed on-account" -- is there another so-called flag
25   or visual identifier that tells a user of the system

167

1    that an amount is quote, unquote, "on-account"?
2        A.   You know, as I said previously, this is the
3    standard generic manual.  This is not the way that
4    Oracle USA used this application in 1998 to 19 -- you
5    know, to 2000.  By definition the items that we are
6    discussing on-account contain a flag similar to what is
7    described here, but was -- those items are not what was
8    indicated in the definition of on-account.  I mean,
9    on-account is you give me $1,000, and you say, "I
10   haven't bought product yet," or, "I am prepaying $500
11   for an invoice that is outstanding," and it gets
12   applied.  "I want the balance of it to be on-account."
13          So it is not specific to an invoice.  It is an
14   item that within AR, as described in this manual, would
15   show that you were due $500.  That wasn't the way that
16   on-account was being used at Oracle.  That's exactly --
17   why they made the changes in 2000 is to try and conform
18   the U.S. to the global practice, to make it use the
19   generic product as opposed to a customized product.
20   They used on-account for something other than what is
21   defined here.  So you cannot read this definition and
22   think that that's the same as the on-account cleanup
23   that we were talking about earlier.
24       Q.   I am just asking you if there is some visual
25   flag or identifier that shows an item to be on-account

168

1    whatever the usage was?
2        A.   Sure.  There is a flag, yes.
3        Q.   And what does it look like?  Does it just say,
4    "on-account"?
5        A.   I can't tell you that.  But, again, this
6    account type here -- where it had unapplied, applied,
7    on-account -- somewhere within the AR system, I assume,
8    that is contained in a field.  What report you can run
9    to get that, I don't know, but clearly they ran a query
10   and a report in order to identify the 46,000 items that
11   were on-account prior to December 17th (sic).
12       Q.   And would you say --
13          MS. WINE:  November 17th.
14          THE DEPONENT:  November 17th, pardon me.
15   BY MR. WILLIAMS:
16       Q.   Would you say the same for unapplied -- that
17   there was some report that you could run that has a flag
18   or some visual identifier that indicates that there is
19   an amount that is unapplied?
20       A.   Yes.  And I think that, as we said before, the
21   unapplied -- what page was that?
22          MS. WINE:  I think it was under the definition
23   of, "receipts."
24          THE DEPONENT:  Yes, under, "receipts," the
25   unapplied receipts register.  And, again, I mean, I

169

1    don't know if Oracle U.S. at this time was using the
2    generic report out of the application or if it was a
3    report that was written custom by the IT group, but
4    there clearly was an unapplied receipts report that was
5    used by collections.  Again, I don't know if it is the
6    generic report out of the vanilla application.
7        BY MR. WILLIAMS:
8        Q.  Okay.  Based on what we have talked about with
9    respect to the glossary is there anything else that --
10   in the glossary that was used by Oracle in a different
11   manner than what is represented here other than the --
12   what we have talked about?
13       A.  I couldn't tell you the answer to that
14   question.  First off, I would have to read it.  And even
15   after I read it, I was not an expert in the day-to-day
16   operations of the receivable application.  I managed
17   people who managed people that used the application.
18   This one I know because that I learned when we discussed
19   the November 17th, 2000, debit memos.
20       Q.  Do you recall telling the members of the SLC
21   that Oracle used the on-account designation for two
22   purposes or -- two primary purposes -- payments for
23   non-invoiced items and customer overpayments for which
24   refunds were sought generally?
25       A.  Could you repeat that, please?

170

1        Q.  Do you recall communicating to the SLC in
2    substance that Oracle used the on-account designation
3    for two primary purposes -- payments for non-invoiced
4    items and customer overpayments for which refunds were
5    sought?
6        A.  No.
7        Q.  Is there something incorrect about what I have
8    said or something different from your understanding?
9        A.  If from a historical standpoint -- I mean, the
10   last phrase was what there?
11       Q.  I will just --
12       A.  Just the last one.
13       Q.  Payments for non-invoiced items and customer
14   overpayments for which refunds were sought.
15       A.  I mean, the last one is wrong.  I wouldn't
16   have said that because the whole description of what
17   happened with the on-account cleanup was items, in fact,
18   that were not customer overpayments for which refunds
19   were sought -- that sounds like in the future.  You
20   know, it certainly was used for items where a customer
21   refund had already been processed and paid.  You know,
22   it definitely included receipts that were
23   non-invoiceable items -- as an example, sublease rental
24   income that came in.  It didn't have anything to do with
25   AR.  It would have been a journal entry book to record

171

1    the sublease income.  And I believe that item would have
2    been placed on-account using the process that was in
3    place before they changed the global process to use
4    the -- well, actually, I don't know if they got the
5    on-account feature used like in the generic
6    documentation these days or not because I don't work
7    there.
8        Q.  Do you recall telling the members of the SLC
9    that once a customer requested that an overpayment be
10   refunded and Oracle had approved the request that Oracle
11   would re-designate unapplied cash -- the unapplied cash
12   receipt as on-account?
13       A.  No.
14       Q.  Is that something that you would not have
15   said?
16       A.  That is something that I would not have said.
17   I mean, what happened as soon as you had an item in
18   unapplied that needed to be refunded to a customer and
19   had approval for it -- it would have moved to the AP
20   clearing account.  It wouldn't have moved to
21   on-account.  Our little exhibit, Williams 3 --
22       Q.  I thought you didn't like that exhibit.
23       A.  Well --
24       MS. WINE:  When did he say that?
25       THE DEPONENT:  The money moves out of --

172

1        MS. WINE:  Why don't you reference what lines
2    you are looking at?
3        THE DEPONENT:  On line 79 the $165,000 item or
4    line 70, the $92,000 item -- moves out of 12018 or out
5    of 25005, unapplied, and moves to accounts payable
6    clearing, which was refunds clearing 20002 on line 66
7    and on line 82.  So I would not have said it goes to
8    on-account.  I would have said that it goes to AP
9    clearing and then the check is cut and sent to the
10   customer.
11       BY MR. WILLIAMS:
12       Q.  Let me -- I left out a parenthetical here and
13   I am going to read it to you to see if that changes your
14   answer.  "Once a customer requested that the overpayment
15   be refunded and Oracle had approved the request (which
16   Williams said would occur as long as the customer's
17   account was in good standing and the customer had no
18   other outstanding invoices) Oracle would redesignate the
19   unapplied cash receipt as on-account."
20       A.  Still, that is not what I would have said.  A,
21   it doesn't go to on-account, and, B, there was never a
22   requirement that they have no open invoices.  So I don't
23   believe that I said that either.
24       Q.  Do you recall telling members of the SLC that
25   if a customer overpaid, but did not request a refund,

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

173

1  the overpayment would remain designated as unapplied and
2  would not be designated as on-account?
3      A.  Say that -- read that one more time, please.
4      Q.  Okay.  Do you recall telling members of the
5  SLC that if a customer overpaid, but did not request a
6  refund, the overpayment would remain designated as
7  unapplied and would not be designated as on-account?
8      A.  I believe that to be true with the exception
9  of -- I mean, that particular statement it would be
10 unapplied, yes.  It would not be in on-account, which is
11 why that prior statement conflicts directly with that
12 one.  And then the other thing about -- if the customer
13 did not request -- refunds were not based solely on
14 customer request.  They could have been requested by
15 collections as well.  So it was not a matter of only
16 customers could request.  Collectors could.
17     Q.  Okay.  Well, under what circumstances would an
18 overpayment remain in unapplied?
19     MS. WINE:  Objection.  Incomplete
20 hypothetical.
21     THE DEPONENT:  Hypothetically, if, you know,
22 there is an item sitting in the unapplied cash account,
23 the collector hasn't got around to even calling the
24 customer to find out, "Why haven't you paid the
25 invoices?" hasn't communicated with them, "Well, I have

174

1  got this unapplied account here.  Do they offset?" -- I
2  mean, it could sit there because they had not gained
3  enough information to determine if it was an overpayment
4  or not.
5      BY MR. WILLIAMS:
6      Q.  And based on your experience at Oracle could
7  items or cash remain in unapplied for more than a year?
8      A.  I wouldn't want to say.  I don't believe I
9  ever saw an aging of the items in unapplied, so I don't
10 know.
11     Q.  If there were items in the unapplied cash that
12 were there for more than a year would that have been
13 something that would have been of concern to you if you
14 had heard that while you were either in charge of Oracle
15 accounting for the United States or when you moved to
16 Rocklin?
17     MS. WINE:  Objection.  Incomplete
18 hypothetical.
19     THE DEPONENT:  I guess it would depend on how
20 big the amounts were.  There was a process within
21 collections to, as an example, take small-dollar
22 invoices that were past due.  And based on how much past
23 due and how large they were they would write them off
24 against the reserve.  So effectively saying, you know,
25 "I don't have time.  It is not worth the effort to go

175

1  try and collect this $50 item or $100 item."  I think
2  that a similar thing could be said for unapplied cash
3  receipts.  That, you know, depending on the dollar
4  amount, you know, at some point in time you just really
5  don't -- it is too far in the past.  The customer
6  doesn't remember.  It is too hard to determine.  At some
7  point in time something that is in unapplied cash
8  similar to the outstanding invoices that are low-dollar
9  amounts -- at some point in time you have just got to
10 give up on it.  So, you know, it really would depend on
11 how large it was and how long it was in unapplied cash.
12     BY MR. WILLIAMS:
13     Q.  Okay.  And, say, for instance, it was two
14 years.  Would it -- would it have concerned you if there
15 were monies in unapplied cash for two years?
16     MS. WINE:  Objection.  Incomplete
17 hypothetical.
18     THE DEPONENT:  It depends on how big the
19 amount was and it really depends on what the situation
20 was with the customer.  You know, hypothetically you can
21 have a very simple customer that has limited activity
22 that -- you call them up and they say, "I paid this
23 invoice on that date.  That amount should be applied to
24 the following three invoices."  You get somebody that
25 has got a decentralized accounts payable department who

176

1  doesn't really know who paid whom -- you know, take a
2  large -- you know, large company -- it could take a
3  long, long time to do a reconciliation between the
4  customer and between collections.  So I can't say that
5  there is a bright line at 3 months, 6 months, 12
6  months.  Depends on what the situation was.
7      BY MR. WILLIAMS:
8      Q.  So there are situations where in -- from your
9  perspective Oracle could have unapplied cash from a
10 customer that it can identify for two years and, you
11 know, that might not concern you?
12     A.  I didn't say that.
13     Q.  I thought you said that.
14     MS. WINE:  Objection.  Incomplete
15 hypothetical.
16     THE DEPONENT:  I couldn't say at what point in
17 time it would trouble me.  I can say that if there was
18 an unapplied cash item that was $150 and it had been
19 there for two years, you know, we should just write it
20 off because the reality is that, like the $150 invoices
21 that we were writing off from that same customer as they
22 aged out -- giving you a hypothetical -- you know, that
23 if there is a $100 invoice and it is six months past due
24 the practice was to write that item off, take the P&L
25 charge.  And so, similarly at some point in time, based

177

1   on some dollar amount, it would not trouble me to do the
2   opposite with an item that was in unapplied cash that
3   could not be applied.
4   　　BY MR. WILLIAMS:
5   　　Q.  So what do you do with it?  When you say, "do
6   the opposite," what does that mean?
7   　　A.  Well, to answer your question -- I mean, we
8   went through the one example with the 12601.  That was
9   an example of where it should not have moved to 12601.
10   But my assumption is that the collector, probably doing
11   their best, couldn't figure out where it belonged and so
12   transferred it to 12601.  Obviously subsequent to that
13   found out that that was not the correct entry.  It was
14   restored to unapplied cash and refunds were given to the
15   customer.
16   　　Q.  So what you are saying is for those items that
17   for one reason or another are in unapplied cash for a
18   certain period of time if they don't reach a certain
19   dollar amount that might concern you that it would just
20   get transferred to 12601?
21   　　MS. WINE:  Objection.  Misstates the testimony.
22   　　THE DEPONENT:  Didn't say that.
23   　　BY MR. WILLIAMS:
24   　　Q.  Was that the substance of what you were
25   saying?

178

1   　　A.  No.  What I said was that at some point in
2   time -- you know, because you are questioning me on,
3   "How long is it going to take before it troubles you
4   that something is in unapplied cash?"  Well, if your
5   only options are to leave it there forever or to resolve
6   it, I am merely introducing the concept that for a
7   lesser dollar amount -- not saying the one with KForce
8   was a lesser dollar amount -- it might be appropriate to
9   do what they did, which is to move it to the reserve.
10   　　Q.  Okay.
11   　　A.  I mean, there were items that were credit
12   memo'ed -- written off the company's books, charge taken
13   against revenues that were subsequently found out to be
14   in unapplied cash.  The appropriate entry in that
15   particular instance would, in fact, be to restore
16   revenue, which is effectively what you do when you move
17   it through 12601.
18   　　Q.  Okay.  You said a lot there.  Back to my
19   original question or a follow-up to it.  Were there
20   instances at Oracle where unapplied cash would be moved
21   to 12601 for reasons that you have just articulated --
22   either they are small dollar amounts, the difficulty in
23   actually determining the proper placement or proper
24   reconciliation would be too difficult?  Were there
25   instances where those monies would be transferred to

179

1   12601?
2   　　A.  I believe the answer to that is, yes.
3   　　Q.  And prior to October of 2002, did you know
4   that certain monies from unapplied cash were being
5   transferred to 12601?
6   　　A.  No.
7   　　Q.  Okay.  And that also means then that you did
8   not know the volume of transfers to 12601 that had
9   occurred prior to October of 2002?
10   　　A.  That's correct.
11   　　Q.  Okay.  And you ultimately looked at that
12   issue, right?
13   　　A.  Yes.
14   　　Q.  And you found that that had been done for at
15   least a couple of years prior to October of 2002?
16   　　A.  I believe so, yes.
17   　　Q.  And when that was done it would have the
18   impact of positively affecting earnings or income,
19   right?
20   　　MS. WINE:  Objection.  Misstates testimony.
21   　　BY MR. WILLIAMS:
22   　　Q.  Generally.
23   　　MS. WINE:  Misstates --
24   　　THE DEPONENT:  Indirectly.  As I described the
25   process earlier, the movement to 12601 does not create

180

1   income.  A subsequent evaluation of required reserves
2   versus actual reserves could result in an adjustment to
3   profits.
4   　　BY MR. WILLIAMS:
5   　　Q.  Isn't 12601 a reserve account?
6   　　A.  I believe the answer to that is, yes, but I
7   think there is more than one.
8   　　Q.  How many are there or do you know?
9   　　A.  No, I do not know.
10   　　Q.  Do you know who is responsible for doing the
11   reserves analysis?
12   　　A.  I can't remember if it was the GL group or if
13   the revenue recognition group was responsible for doing
14   that.
15   　　Q.  And you learned after filing the -- after you
16   saw the second amended complaint that it had been done
17   for at least a couple of years prior to October 2002,
18   right?
19   　　A.  Yes.
20   　　Q.  And how often was it done?  Do you know?
21   　　A.  No.
22   　　Q.  Was that something that you looked at, then,
23   or you investigated in October of '02?
24   　　A.  Yes.  I mean, I am not sure of the exact time
25   frame.  Approximately -- I mean, it was late in 2002.

181

1    It was after the initial review of the debit-memo
2    question.
3         Q.   And what is a -- what is a miscellaneous
4    receipt write-off?
5         A.   Don't know.
6         Q.   Ever heard of that term?
7         A.   I believe I have heard of the term, but I
8    couldn't define it for you.
9         Q.   Do you know what a miscellaneous receipt is?
10        A.   Same answer.  Heard the term, but could not
11   define it for you.
12        Q.   Do you have an understanding of what it is?
13        A.   No.  I mean, other than the words,
14   "miscellaneous receipt," I don't know.  Or I should say,
15   "I can't recall."  I might have at one point.
16        Q.   Do you recall telling the special committee
17   that even after a customer received refund payment from
18   Oracle the accounts receivable application retained the
19   vestigial on-account designation?
20        A.   I guess the first thing embarrassing is I
21   don't know what, "vestigial," is defined to mean.  That
22   would not have been my word.
23        Q.   Okay.
24        A.   So, read it to me again.
25        Q.   Do you recall telling the special committee

182

1    that even after a customer had received the refund
2    payment from Oracle that the accounts receivable
3    application retained the vestigial on-account
4    designation?
5         A.   Without using the word -- whatever that is --
6    I mean, that's -- what I was describing is a number of
7    the items that were on-account that were contained in
8    the 46,000 debit memos were, in fact, items that
9    previously were refunded, but they still were in the --
10   the original receipt was still in the AR system with an
11   on-account flag.
12        Q.   And that -- and Greg Myers told you that?  I
13   am sorry.
14        A.   I am sure Greg did tell me that, yes.  But,
15   again, having seen the results of the inquiries into,
16   you know, the specific transactions, I learned from
17   feedback from those that that was, in fact, the case.
18        Q.   Do you recall telling the committee that the
19   only way to get rid of the vestigial designation was to
20   create another transaction with corresponding offsetting
21   entries in account 25005?
22        A.   I mean, I don't recall saying that.  I don't
23   know if there would have been another way.  I mean, I am
24   not an IT techie familiar with, you know, how was the
25   best way to deal with that issue.  I don't know.  I

183

1    don't believe I would have said the only way.  I don't
2    recall making that comment.
3         Q.   Do you recall telling the members of the
4    committee that the customer billing history reports
5    generated for those customers who had overpaid and
6    received refunds still showed the refunded amount as
7    designated on-account for the customer?
8         A.   I don't know what the billing history report
9    showed with regard to on-account.  I know it did show
10   the debit memos -- the November 17th debit memos, which
11   created more confusion because then all of a sudden
12   there seemed to be another item out there that -- nobody
13   knew what it was.  I don't know if the on-account part
14   of it was there or not.
15        Q.   And do you recall telling the committee that
16   these entries did not reflect funds that the customer
17   had on-account to apply to future invoices?
18        A.   I mean, based on what I had seen -- again, I
19   didn't look at all 46,000 transactions.  So I would
20   believe that that's a fair representation of what I told
21   them.
22        Q.   And do you know whether members of the
23   collections staff believed that the quote, unquote,
24   "on-account," designation meant that the customer had
25   funds available for future use?

184

1         MS. WINE:  Objection.  Lacks foundation.
2         THE DEPONENT:  I don't know what they
3    thought.  I mean, again -- I mean, I don't believe that
4    typically have would have been dealing with billed
5    invoices and unapplied receipts.  So I don't know what,
6    if anything, they understood on-account was.
7    BY MR. WILLIAMS:
8         Q.   Did you hear what they understood on-account
9    was?
10        A.   I can only say, reading the second amended
11   complaint and the ex parte application, that clearly
12   whoever those witnesses were didn't understand at all
13   what they were.
14        Q.   What about people who weren't witnesses in
15   either the second amended complaint or the ex parte
16   application?
17        MS. WINE:  Does he know what they thought or
18   did he ever hear what they thought?
19        MR. WILLIAMS:  No, he is the one who raised
20   that issue.
21   BY MR. WILLIAMS:
22        Q.   You said the people in the complaint or the
23   the ex parte application didn't know what they were.
24        A.   What I said was they obviously didn't
25   understand what they were based on reading what was in

185

1  those documents. I didn't have a conversation with
2  anyone else about it, so I couldn't comment on what they
3  thought -- whoever they are.
4      Q.  And how do you know that the witnesses or
5  people in the ex parte application didn't understand
6  what they were?
7      A.  Well, perhaps I shouldn't have said that
8  because I don't know who they are or what their
9  positions were. However, reading those documents which
10  I have not read for, at this point, three years, I again
11  thought, "How could they possibly have come up with that
12  particular assertion?" The first one, just like the
13  46,000 debit memos -- that somehow or another that that
14  created revenue -- it clearly didn't, based on, you
15  know, the review that I did. The ex parte
16  application -- it just had a number of other little
17  quotes from somebody who is quoting somebody else that
18  seemed to be very similar to me. Now, I haven't read it
19  in three years. So maybe that was a generalization that
20  I should not have made. But I don't think my evaluation
21  of the individuals that did that would be that they
22  understood how this all worked. Because if they had
23  understood how it all worked there wouldn't have been a
24  second amended complaint in the first place with regard
25  to the accounting issue.

186

1      Q.  Now, do you know whether members of Oracle's
2  collections staff who are not in the second amended
3  complaint or the ex parte application believed that
4  on-account meant that a customer had money available for
5  application to a future invoice or for future use?
6      A.  No, I don't know.
7      MS. WINE:  Objection. Lacks foundation.
8      BY MR. WILLIAMS:
9      Q.  Did you ask Mike Quinn whether or not he had
10  queried his staff in collections on whether or not they
11  believed the on-account designation meant that customers
12  had money available for future use?
13      A.  I didn't ask Mike, no.
14      Q.  How come? Wasn't he in charge of collections
15  at the time of the second amended complaint?
16      A.  I merely didn't ask that question.
17      Q.  Did you ask him anything about whether he had
18  either instructed or communicated to his staff that
19  on-account meant something other than a customer had
20  money available for future use?
21      A.  I don't recall.
22      Q.  Do you think that is something that he would
23  have known at the time -- what, "on-account," meant?
24      MS. WINE:  Objection. Lacks foundation.
25      THE DEPONENT:  Who is, "he"?

187

1      BY MR. WILLIAMS:
2      Q.  Talking about Michael Quinn, who is in charge
3  of collections.
4      A.  At what time frame?
5      Q.  At the time, October of 2002.
6      A.  I certainly believe that Mike knew what
7  on-account meant as implemented at Oracle U.S. I
8  believe he also knew what it meant as defined in the
9  generic application -- the Exhibit 4 -- because that was
10  what he and Greg Myers were doing -- is trying to design
11  a process that would have one single global process for
12  revenues and receivables.
13      Q.  Did you do any research or query on your own
14  what -- what other subsidiaries were doing in other
15  parts of the world?
16      A.  No.
17      Q.  Were they using the Oracle receivables module
18  in the standard manner in which we have looked at in
19  exhibit number -- what is that -- 4?
20      MS. WINE:  Objection. Lacks foundation.
21      BY MR. WILLIAMS:
22      Q.  Do you know?
23      A.  Oracle at this point was moving to what is
24  called the GSI, Global Single Instance. The plan was --
25  is that all subsidiaries would be run on standard

188

1  applications on a global single instance. Where they
2  were going to put the computer or where (sic) they did,
3  I have no idea. But in order to do that -- in order to
4  have all on one everyone had to be the same.
5      So, you know, whether or not, you know, 5
6  percent or 50 percent or 80 percent of the subsidiaries
7  were doing one thing versus another, all had to conform
8  to using the generic application in its standard form.
9  That's what he was charged with -- Mike Quinn -- as the
10  global process owner for receivables and revenues -- is
11  to help develop those policies so that everyone could be
12  on the same page using the application in the same
13  fashion. That's why I say that he knew what was being
14  done in the U.S. and he knew what was being done in the
15  rest of the world. So that's why I didn't independently
16  try and take any kind of poll. I don't know what the
17  communication was from Mike down to the collections
18  group.
19      Q.  So it was Mike Quinn that was charged with
20  making sure that whatever was happening in Oracle
21  receivable in the U.S. was -- also was consistent with
22  what would be the global process going forward?
23      A.  Subject to whatever local statutory
24  requirements there might be in the various subsidiaries,
25  but that was his job the same way that Amy Aves was the

189

1  global process owner for the procurement-to-pay
2  function. She, being in AP -- they were finance people
3  assigned to be the process owners working with, you
4  know, the IT organization, working with the business
5  people to try and get everybody using the application in
6  the same fashion.
7      Q.  Okay. Do you recall telling the committee
8  that even though the November 17th, 2000, debit memos
9  were not invoices the software system was hard-coded to
10  print Oracle invoices as the heading of documents -- of
11  such documents when they were later printed out?
12     A.  Yes.
13     Q.  And how did you know that?
14     A.  Because one of the pieces of paper that I was
15  given was an -- and I believe -- I don't know where I
16  got it, though I kind of think it might have been
17  Discovery from the other side, but I don't know. There
18  was a document that was one of these debit memos that
19  was printed. At the top it said, "Oracle invoice," and
20  it was on a, you know, normal 8 1/2 x 11 copy paper.
21  And I remember telling them that, "That is not an Oracle
22  invoice." Oracle invoices were not printed internally.
23  They were printed through an outside shop on -- I don't
24  want to say invoice letterhead, but on a pre-printed
25  form. I remember asking, "Why does it say, 'Oracle

190

1  invoice,' when it was a debit memo?" And I remember
2  being told, I believe, by Greg Myers that that was
3  hard-coded into this application. So I remember saying
4  that to the SLC. That was the basis under which I said
5  it.
6      Q.  So in that regard, I guess, the receivable
7  system was being used in the standard fashion?
8      A.  The invoice-writing function could very well
9  have been a custom application for the U.S. as well.
10     Q.  Okay.
11     A.  So I don't know the answer to that.
12     Q.  Okay. I would like to take five minutes, if
13  we can.
14         THE VIDEOGRAPHER: Off record at 4:07.
15         (Off the record.)
16         THE VIDEOGRAPHER: On record at 4:22.
17  BY MR. WILLIAMS:
18     Q.  I am going to show you what has been
19  previously marked as Myers number 5. Myers number 5 is
20  Bates numbers NDCA-ORCL 048710 through 712. Just ask
21  you to take a moment to review that for me unless you
22  have seen it already and don't need to.
23     A.  I have not.
24     Q.  Okay. Have you had an opportunity to read
25  Myers number 5?

191

1      A.  I mean, I scanned through it.
2      Q.  Okay. Quickly, do you know if there is a way
3  in Oracle's systems to determine at -- on what date an
4  on-account flag was put on an item?
5          MS. WINE:  Objection. Lacks foundation.
6          THE DEPONENT: No, I don't.
7  BY MR. WILLIAMS:
8      Q.  Take a look at the first page of Myers
9  number 5. And it is an e-mail from, you know -- among
10  several people at Oracle in September and October -- I
11  am sorry -- September 2000 and then looks like it was
12  forwarded to Krithika Bhat in October of 2002. Do you
13  see that?
14     A.  Yes.
15     Q.  Have you seen this e-mail discussion prior to
16  today?
17     A.  No.
18     Q.  No one forwarded this to you in October of
19  2000?
20     A.  No.
21     Q.  Looking at the September 20th, 2000 e-mail,
22  there are a lot of e-mail addresses there. Do you
23  recognize any of those addresses?
24     A.  I mean, a few of them.
25     Q.  Just which ones do you recognize?

192

1      A.  Well, Sanjay.
2      Q.  And who is he? Do you know?
3      A.  He is in the IT organization and Krithika
4  Bhat -- she is also in the IT organization, Greg Myers,
5  of course. I don't recognize any of the other ones.
6      Q.  Okay. Was Sanjay still at the company when
7  you left?
8      A.  I don't know.
9      Q.  Just going to the second half of the first
10  page, do you see where it says, "Sanjay Kumar wrote"?
11     A.  Yes.
12     Q.  And do you see where -- looks like he is
13  writing to Krithika saying, "I arranged a meeting with
14  product develop (sic) and Greg Myers today to discuss
15  the existing refund data sitting in AR and a new
16  proposed refund solution. Our discussion was focused on
17  the following questions"? Do you know what is meant by,
18  "existing refund data sitting in AR"?
19         MS. WINE: Objection. Lacks foundation.
20         THE DEPONENT: No.
21  BY MR. WILLIAMS:
22     Q.  Do you see later on -- is Krithika a male or
23  female?
24     A.  She is a female.
25     Q.  Do you see where Sanjay writes what should be

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

193

1  done with existing refund data sitting in AR -- in the
2  AR application? And you say you don't know what,
3  "refund data sitting in the AR application," means,
4  right?
5      MS. WINE: Objection. Asked and answered.
6      THE DEPONENT: Only what I could speculate on
7  based on what this note says.
8  BY MR. WILLIAMS:
9  Q.  Tell me what that is.
10  A.  Well, it appears to talk about items that are
11  in the on-account status.
12  Q.  Okay. Do you see where she writes or --
13  Sanjay writes, "Receipts with on-account transaction for
14  refunds should be offset by creating a debit memo in
15  AR"? Right?
16  A.  Yes.
17  Q.  And a debit memo, as far as you understood,
18  was properly defined in the glossary that we talked
19  about earlier, right?
20      MS. WINE: Objection. Misstates the
21  testimony.
22  BY MR. WILLIAMS:
23  Q.  Based on your understanding of what a debit
24  memo is?
25      MS. WINE: As referenced in this document?

194

1      MR. WILLIAMS: No, in the glossary we were
2  looking at before.
3      MS. WINE: Objection. Misstates his
4  testimony.
5      THE DEPONENT: Could you repeat the question,
6  please?
7  BY MR. WILLIAMS:
8  Q.  And a debit memo, as far as you understood,
9  was properly defined in the glossary that we talked
10  about earlier? And I don't remember what exhibit that
11  is. Is that 4? Yes, 4.
12  A.  You know, you asked me if I agreed with the
13  definition of a debit memo in the Exhibit 4, and I said,
14  yes. I don't understand your question with regard to
15  this.
16  Q.  Fine. That's okay. Do you see later in the
17  same document Sanjay writes, "Following was the two-step
18  solution proposed by product development. A, create
19  debit memos for all old data sitting in AR for refunds.
20  B, apply these debit memos to receipts which has
21  on-account entries." Do you see that?
22  A.  Yes.
23  Q.  Do you see that just below that there is a,
24  "B," and it looks like either Sanjay or Krithika writes,
25  "Correction"?

195

1  A.  Right.
2  Q.  That says, "The on-account cash receipt is to
3  be applied to the debit memo, not the other way around"?
4  A.  Yes.
5  Q.  Do you see that? Do you have any
6  understanding of what that means?
7      MS. WINE: Objection. Lacks foundation.
8      THE DEPONENT: I don't know how they are using
9  the term, "debit memo," in this e-mail because I have
10  never seen it before and I wasn't involved in its
11  drafting or review.
12  BY MR. WILLIAMS:
13  Q.  Okay. Turn to the next page. Do you see
14  where it states, "Because of the volume of the data it
15  is not possible to do a debit memo manually through the
16  application screen. So there must be some sort of
17  scripts need (sic) to be written to achieve A and B.
18  Here are some statistics as of today." Do you see
19  that?
20  A.  Yes.
21  Q.  And below that it looks like there is some
22  information about what is actually in the AR
23  application, right?
24  A.  Yes.
25  Q.  And do you see where it says, "The total

196

1  number of records in AR with on-account entries as of 19
2  September 2000, equals 44,029," right?
3  A.  Yes.
4  Q.  Below that it says, "Total number of records
5  in refunds equals 11,761"?
6  A.  Yes.
7  Q.  Do you know what, "Total records in refunds,"
8  means?
9      MS. WINE: Objection. Lacks foundation.
10      THE DEPONENT: No. No.
11  BY MR. WILLIAMS:
12  Q.  Do you see below that where it says, "Total
13  number of non-refunds equals 44,029 minus 11,761 for a
14  total of 32,268"? Do you see that?
15  A.  Yes.
16  Q.  Do you know what, "non-refunds," means in this
17  context?
18  A.  I don't know what that means.
19  Q.  Did you ever learn that there were items in
20  on-account that were non-refunds?
21  A.  Yes.
22  Q.  And what were those items?
23  A.  I gave you an example of one of them
24  previously, which was a receipt for sublease rental on a
25  building. That would not be -- it was in on-account,

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

197

1 but would not have had anything to do with a refund.
2      Q.   Okay.  And did you learn after you got the
3 second amended complaint that in November of 2000, there
4 were approximately 11,000 records that were refunds or
5 related to refunds and 44,000 non-refunds?
6           MS. WINE:  Objection.  That misstates the
7 document.
8           MR. WILLIAMS:  I am not relying on the
9 document.
10          THE DEPONENT:  Well, the answer would be, no.
11     BY MR. WILLIAMS:
12     Q.   We talked earlier about a statement that was
13 attributed to you by the SLC that the only way to remove
14 the on-account flags was to create offsetting entries
15 into 25005.  Remember that discussion, generally?
16     A.   I didn't say, "only."
17     Q.   No.  I know you didn't say, "only."  I am just
18 saying the discussion that we had earlier regarding
19 statements that were attributed to you -- whether you
20 actually said it or not?
21     A.   Yes.
22     Q.   Did you understand that Greg Myers was simply
23 trying to remove the on-account flags or was he trying
24 to create a new refund solution or a new manner in which
25 the company did refunds?

198

1           MS. WINE:  Objection.  Lacks foundation.
2           THE DEPONENT:  I didn't know that he was -- I
3 mean, I read what it says here.  We didn't have any
4 conversations about a new refund status or process.
5      BY MR. WILLIAMS:
6      Q.   Okay.  You see on the second page, Bates
7 ending 711, number 3 says, "How should the process be
8 triggered in the new" -- "in new refund solution?"  Do
9 you see that?
10     A.   Yes.
11     Q.   And you don't understand what that meant,
12 right?
13     A.   No, I do not.
14     Q.   Do you see where Sanjay writes, "As soon as
15 the debit memos has been applied to the receipt AP
16 interface program should pick up those debit memos which
17 has been closed."  Do you see that?
18     A.   Yes.
19     Q.   Do you have an understanding of what that
20 meant?
21           MS. WINE:  Objection.  Lacks foundation.
22           THE DEPONENT:  No.
23           BY MR. WILLIAMS:
24     Q.   Just below that do you see where he writes,
25 "You may still want to consider an approval step.  It is

199

1 always dangerous to allow the same person to credit a
2 debit memo for refund and also trigger the creation of
3 that refund.  I would suggest an approval step be
4 included in the AR" -- "this AR process unless there is
5 an approval process in AP once the debit memo has been
6 transferred to AP.  You need some type of
7 checks-and-balances in place between requesting refund
8 and issuing payment."  Do you see that?
9      A.   Yes.
10     Q.   Do you have an understanding of why Krithika
11 wrote that?
12           MS. WINE:  Objection.  Lacks foundation.
13           THE DEPONENT:  No.  But, as I stated earlier,
14 I believe that there was an approval process in place.
15 Perhaps she didn't know that.
16           MS. WINE:  Also, just for the record, you are
17 saying that Krithika made that statement and I am not
18 clear if it is Krithika or Sanjay making that statement.
19           MR. WILLIAMS:  You are correct.  I think it
20 was Sanjay who wrote that statement.
21           BY MR. WILLIAMS:
22     Q.   Was Sanjay in accounts receivable?  Was there
23 an IT unit that was specifically designated for accounts
24 receivable?
25     A.   There was an IT group that supported that

200

1 application.  They may have supported more than one
2 application.
3      Q.   When you were doing your investigation in
4 October of 2000 (sic), did anyone show you any of the
5 correspondence surrounding the actual November 17, 2000
6 transactions?
7           MS. WINE:  I think you meant to say, "in
8 October of 2002."
9           MR. WILLIAMS:  Sorry.
10           BY MR. WILLIAMS:
11     Q.   In October of 2002 did anyone show you any of
12 the correspondence surrounding the creation of the debit
13 memo transactions in November of 2000?
14     A.   No.
15     Q.   Do you recall telling the special committee
16 that in October of 2002 in the process of investigating
17 the debit memo allegations in the second amended class
18 action complaint that you learned from Mike Quinn and
19 Greg Myers that certain people or persons in Oracle's
20 collections department had on an ad hoc basis moved
21 certain items from Oracle's unapplied cash to its bad
22 debt reserve?
23     A.   General conversation, yes.
24     Q.   You remember the general conversation with the
25 SLC or --

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

201

1    A.  Yes.  I remember the conversation with the SLC
2  and generally, yes, that is what I told them.
3    Q.  What did Greg Myers and Mike Quinn tell you
4  about that topic?
5    A.  I mean, I don't remember the specifics of the
6  conversation.  You know, I really at this point don't
7  recall more than pretty much what you summarized there.
8  I remember a conversation, but I today don't remember if
9  it was with Greg and Mike.  And -- I do remember, but I
10  do remember telling them that items had moved out of the
11  25005 to the AR reserve, but I don't remember the
12  specifics of it.
13    Q.  Do you remember telling them that it was done
14  on an ad hoc basis?
15    A.  "Ad hoc," would not have been my word.  I
16  don't know what I said.
17    Q.  Do you have an understanding as you sit here
18  today how often it was done?
19    A.  I don't know how often, no.
20    Q.  You just know that it was done?
21    A.  Well, I know it was done.  And, you know, I
22  know there was some quantification of what the maximum
23  dollar amount would be during some period.
24    Q.  Okay.
25    A.  But I certainly don't know how many or how

202

1  often.  That to me is more of the quantity as opposed to
2  the dollars.
3    Q.  Well, wouldn't the -- well, if it was very
4  often wouldn't it necessarily accumulate into more
5  dollars?
6    MS. WINE:  Objection.  Incomplete
7  hypothetical.
8    THE DEPONENT:  I never recall looking at the
9  number of transactions.  I do recall looking at the
10  dollars.  But, you know, whether that was, you know, two
11  transactions for a large-dollar amount or 100,000
12  transactions for a very small amount -- I don't recall
13  ever looking at it at that level.
14  BY MR. WILLIAMS:
15    Q.  Do you know what an auto adjustment is as it
16  relates to transfers from 25005 to 12601?
17    A.  No.  I mean, I don't recall what that would
18  mean.  I mentioned before that there were some auto
19  adjustments having to do with small-dollar invoices, but
20  those would not relate to 25005.
21    Q.  Let me show you what has been previously
22  marked as Quinn number 5.  Quinn number 5 is Bates
23  numbered NDCA-ORCL -- I am sorry -- 140479 through 81.
24  I would just ask you to take a look at that document and
25  let me know when you are done.

203

1    A.  Okay.
2    Q.  Do you know who Sara Sanchez is?
3    A.  No, I do not.
4    Q.  How about Terry Elam?
5    A.  Familiar name.  I think he might have worked
6  in AR.
7    Q.  And do you know Adam Hahn?
8    A.  Yes.
9    Q.  How about -- you obviously know Mike Quinn,
10  right?
11    A.  Yes.
12    Q.  I am just going to ask to you turn to page 3
13  of this document, ending 481.  Do you see where the
14  writer Sara Sanchez writes to Terry Elam, "All hear, the
15  new auto adjustment parameters to be run twice a month"?
16    A.  Yes.
17    Q.  When you reviewed this page are these the auto
18  adjustments of the small amounts you were talking about?
19    MS. WINE:  Objection.  Lacks foundation.
20    THE DEPONENT:  As I said before, I didn't -- I
21  don't know -- I don't recall what the dollar amounts
22  are.  This would seem to be the small-dollar invoices,
23  yes.
24  BY MR. WILLIAMS:
25    Q.  Okay.  And so -- and the auto adjustment would

204

1  be a computer script that would just move anything that
2  fit within these parameters to 12601?
3    A.  This is the invoices.  It would credit 12008
4  and would debit 12601.
5    Q.  And based at least on page 3, this auto
6  adjustment was being run twice a month?
7    MS. WINE:  Objection.  Lacks foundation.
8    THE DEPONENT:  I don't know what the period
9  was.
10  BY MR. WILLIAMS:
11    Q.  Well, do you see where Sara writes, "Here are
12  the new auto adjustment parameters to be run twice a
13  month"?
14    A.  I read that.  I don't know that they were run
15  twice a month.
16    Q.  Okay.  Go to the previous page, page 2.  Do
17  you know Omid Fardanesh?
18    A.  Again, familiar name.  I believe he was in IT,
19  but I am not sure.
20    Q.  And --
21    A.  Actually might be a collections guy.  I don't
22  know who he is.
23    Q.  Okay.  If you look -- if you review the bottom
24  half of the second page it appears that he is seeking
25  from Terry approvals from Adam and -- looks like just

205

1    an, "M," there.  I am assuming it is Mike, but it is cut
2    off.  Do you see that?
3        A.   I see that.  I don't know.
4        Q.   Okay.  In July of '01, Michael Quinn was in
5    charge of revenue accounting, right, in your
6    organization?
7        A.   I mean, I don't know what -- Mike ran revenue
8    recognition.  He ran collections.  At some point in time
9    he was promoted to run both of those plus AR.  I don't
10   know what the time frame -- what his promotion was.
11       Q.   Okay.  You stated just a moment ago that with
12   respect to page 3 that these appear to be the
13   small-dollar invoices in the auto adjustment.  Are these
14   invoices or receipts?
15       MS. WINE:  Objection.  Lack of foundation.
16       THE DEPONENT:  I don't know the answer to that
17   question.  What I referred to previously is I knew there
18   was a program with criteria based on aging that dealt
19   with small-dollar invoices.  I don't know if there was
20   ever a similar program to deal with small-dollar
21   receipts.
22       BY MR. WILLIAMS:
23       Q.   Would you -- for what purposes would you do an
24   adjustment -- an auto adjustment for small-dollar
25   invoices?

206

1        MS. WINE:  Objection.  Incomplete
2    hypothetical.
3        THE DEPONENT:  I mean, an example, if you
4    looked at this matrix, is if it is greater than 45 days
5    old and it is between $50.01 and $100 you should do an
6    auto adjustment.  Not sure that this is talking about
7    the same thing.  However, there was a, you know, general
8    agreement that as a small-dollar invoice ages out
9    farther and farther the chances of you being able to get
10   the accounts payable department on the other side to
11   even return your call about it decreases significantly.
12   So at some point in time it is an evaluation that says,
13   "Even though we are going to write it off, even though
14   we are going to take a charge to P&L, it -- you know,
15   there is -- we are never going to be able to collect
16   it."  So under that scenario it was an auto write-off.
17       BY MR. WILLIAMS:
18       Q.   For invoices?
19       A.   Yes.  That is the only one that I can speak to
20   because that is the only process I know was in place for
21   invoices.
22       Q.   Right, for invoices.  And was there another
23   process in place for receipts?
24       MS. WINE:  Objection.  Lacks foundation.
25       THE DEPONENT:  I don't know the answer to that

207

1    question.
2        BY MR. WILLIAMS:
3        Q.   Do you recall telling the committee that one
4    of the sources of the credits to 12601 were unapplied
5    receipts from account 25005?
6        A.   Yes.
7        Q.   And do you recall telling the committee that
8    you learned of the transfers following the allegations
9    in the second amended complaint?
10       A.   Yes.
11       Q.   Do you recall telling them that the transfers
12   appear to have been managed by Adam Hahn, who was in --
13   who in 2000 was head of collections?
14       A.   Does the word, "managed," appear?
15       Q.   Yeah.
16       A.   I don't believe that would have been my use of
17   terminology.
18       Q.   Otherwise, do you recall that?
19       A.   Well, I mean, it is a statement of fact that
20   transfers were made and Adam Hahn was the person who
21   managed collections.
22       Q.   I --
23       A.   I might have used the word, "managed," in
24   connection with he managed collections, not that he
25   managed --

208

1        Q.   The auto adjustment?
2        A.   -- the auto adjustments or any other
3    adjustments.
4        Q.   Do you recall telling the committee that it
5    was your understanding that the auto adjustments of
6    receipts from 25005 to 12601 had not occurred in fiscal
7    2001?
8        A.   I don't believe that I ever said anything
9    about auto adjustments in connection with movement from
10   25005 to 12601.  The only auto adjustments I could have
11   talked about were the small-dollar invoices that were,
12   in fact, being written off from 12008 to 12601.
13       Q.   Okay.  I am a little confused and I want to
14   just clarify something and then we can move on.  So you
15   were aware of an auto adjustment for invoices being
16   written off, but is it your testimony that you were
17   unaware of an auto adjustment of receipts moving money
18   from 25005 to 12601?
19       A.   As I sit here today I don't have a
20   recollection of any auto adjustment for receipts.
21       Q.   Do you recall telling the committee that
22   transfers were accomplished by designating cash receipts
23   as on-account, then executing a miscellaneous cash
24   receipt to move funds from 25005 to 12601?
25       A.   I mean, I don't recall the mechanics of doing

209

1    it. I do recall telling them that, you know, subsequent
2    to the other review of the debit memos that we did find
3    that items were being moved out of 25005 into 12601.
4    How that was accomplished -- whether it was an interim
5    step of on-account -- I don't recall that today.
6        Q.  If it was true that transfers were
7    accomplished by designating the cash receipt as
8    on-account, then executing a miscellaneous cash receipt
9    to move the funds from 25005 to 12601, would that be
10   moving money that had -- that really didn't exist
11   because based on your testimony on-account was simply a
12   flag that a refund had already occurred?
13       A.  No. And, again, I don't know how they
14   mechanically did this, but if there was an item in
15   unapplied cash -- it had an unapplied flag -- it showed
16   up on this unapplied receipts report, or whatever it is
17   called, and you, you know -- hypothetically it is
18   $1,000, and you say, "That is -- I can't figure out what
19   it is for. I don't think it is unapplied. I have
20   looked at all of the invoices. I think we should just
21   take this thing to the reserve." Then in order to get
22   it off of the unapplied cash report you would have to
23   change the flag because if it still had the unapplied
24   flag it is still going to be on the report. Follow?
25       Q.  Um-hum.

210

1        A.  So, I mean, the reality is it has nothing -- I
2    mean, the movement to 12601 is affected by debiting
3    25005 and crediting 12601. Changing the flag to
4    on-account wouldn't have done that. I mean, there has
5    got to be another way it gets there. I don't know how
6    it got to 12601. I did say that, yes, we became aware
7    of the fact that items were being transferred by, you
8    know, collections out of 25005 into 12601. The
9    mechanics of doing that, I don't know.
10       Q.  But so are you saying, if one said that the
11   transfers were accomplished by designating the cash as
12   on-account then executing a miscellaneous cash receipt
13   to move the funds from 25005 to 12601, would that make
14   sense to you?
15       A.  I mean, I -- I can't answer the question
16   because I don't really understand how the miscellaneous
17   cash receipts worked within the AR system. I mean, I
18   would be speculating. I don't know. I mean, if you are
19   asking me did things move from 25005 to 12601, yes. I
20   mean, that's what I did tell the Special Litigation
21   Committee. I don't recall what I told them about the
22   mechanics of getting it there.
23       Q.  I understand that. I was just asking you if
24   it made sense -- if one told you that it was
25   accomplished by designating a cash receipt as on-account

211

1    and then executing a miscellaneous cash receipt to move
2    the funds from 25005 to 12601 -- if that would make
3    sense?
4        MS. WINE: Objection. Lacks foundation,
5    incomplete hypothetical.
6        THE DEPONENT: I mean, I don't know if it
7    makes sense because I don't know how the miscellaneous
8    cash receipt would work. If that would take it out of
9    25005 and move it to 12601 then there wouldn't be a need
10   to have changed a flag to on-account. So, I don't know.
11       BY MR. WILLIAMS:
12       Q.  If that were true, however, that the transfers
13   were accomplished by designating a cash receipt as
14   on-account then creating miscellaneous cash receipt,
15   wouldn't that mean that on-account did not necessarily
16   mean that -- or did not flag that an item had been
17   refunded prior to the date it was designated on-account?
18       MS. WINE: Objection. Misstates his testimony
19   and incomplete hypothetical.
20       THE DEPONENT: I never stated that on-account
21   meant that it was refunded.
22       BY MR. WILLIAMS:
23       Q.  Okay. Do you recall telling the committee
24   that unapplied receipts accumulated in 25005 over time
25   and that at some point Oracle would reach a judgment

212

1    that it was not going to match a particular receipt to
2    any invoice?
3        A.  And I don't recall saying that.
4        Q.  Is that something that you would have said?
5    Was it accurate?
6        A.  I believe that at some point if you have done
7    everything you can to try and identify it then you are
8    going to have to dispose of that item similar to how you
9    have to dispose of an invoice. Eventually you write it
10   off.
11       Q.  Now, do you recall telling the committee that
12   Oracle would also conclude after some point that the
13   receipts were not overpayments because no customer had
14   asked for them to be returned?
15       A.  Could you say that again?
16       Q.  Do you recall telling the committee that
17   Oracle would also conclude after some point that the
18   receipts were not overpayments because no customer had
19   asked for them to be returned?
20       A.  I don't recall saying that.
21       Q.  Is that an accurate statement or
22   representation?
23       A.  Well, to the extent that, you know, there is
24   an item -- it is sitting in unapplied. You try
25   everything you can -- talking to the customer,

213

1 reviewing, you know, your prior billings and all the
2 rest of it, and you can't figure out what it is, and you
3 go to the customer and the customer doesn't say, "Well,
4 you know, you owe that to me because it is an
5 overpayment" -- the customer also acknowledges that they
6 don't know what it was -- you know, if that's the
7 scenario at some point you are going to say, "Okay. We
8 can't figure it out. They can't figure it out." You
9 know, I believe that it would be appropriate to move it.
10    Q.  Was that the process as far as you understood?
11    A.  I mean -- no, I am not saying that that is the
12 process at all.  You asked me would I think that would
13 be appropriate.  And I think in a given scenario you
14 might find that that would be the appropriate
15 conclusion.
16    Q.  I asked if that was an accurate representation
17 as to what Oracle did.
18    A.  And I would have to answer, no, to that
19 because I don't know why specifically these items moved.
20    Q.  Do you recall telling the committee that it
21 appeared to you that under Adam Hahn's direction that
22 Oracle had moved certain cash receipts to 12601 to
23 offset invoices it had previously written off?
24    A.  I don't recall saying that.  I do recall
25 saying that some of the items that did move from 25005

214

1 to 12601 were appropriate because we had already written
2 off the invoice.  And so by moving it to 12601 we
3 effectively restored the debit to P&L that we previously
4 had taken when we did that credit memo.
5    Q.  Do you recall meeting with the committee
6 during the time period that people in your organization
7 were doing an investigation as to what occurred with the
8 debit memos?
9    A.  You know, as I said before, I think I talked
10 to them more than once.  I don't recall where those
11 meetings were.  I mean, they obviously were after the
12 second amended complaint, but I don't know exactly when
13 they were.
14    Q.  Do you recall telling the committee that,
15 based on at least the preliminary work that had been
16 done to investigate what occurred, that it appeared that
17 approximately 40 percent of the transfers matched
18 written-off invoices?
19    A.  No.  I mean, I recall having some data that I
20 relayed to them in a preliminary result, but I don't
21 remember what percentage was in what bucket.  So I
22 couldn't say today that it was 40 percent.
23    Q.  Do you recall the conclusion of the
24 investigation into the transfers to 12601?
25    MS. WINE:  Objection.  Vague and ambiguous.

215

1    THE DEPONENT:  I mean, the end result was if
2 there was an error made in moving something from 25005
3 to 12601 we put it back where it belonged.  If the
4 amount was owed to a customer we paid them and, you
5 know, the net amount of, you know -- of items that were
6 moved was not material enough because I know we did not
7 adjust our financial statements for any prior periods.
8 BY MR. WILLIAMS:
9    Q.  Do you have -- as you sit here today do you
10 know what the number was?
11    A.  As I sit here today, no.
12    Q.  Do you recall telling the committee that in
13 the process of investigating the debit memo allegations
14 Mike Quinn and Greg Myers told you that some of these
15 transfers had been occurring?  Right?
16    A.  I mean, I don't believe so.  I sort of
17 remember this as being two distinct items.  One of which
18 was, you know, the items in the second amended
19 complaint.  Did we or did we not book any revenue
20 related to the processing of those debit memos on
21 November 17th?  No.  Separate issue -- and I don't
22 recall when it came up -- was, "Well, you know, there
23 has been some movement."  There was no connection
24 between the two of them.  They were two different
25 topics, if you will.

216

1    Q.  Do you know whether the second sort of
2 investigation occurred before or after you saw the ex
3 parte application?
4    A.  I don't recall.
5    MR. WILLIAMS:  Do you want to change that now?
6    THE VIDEOGRAPHER:  This marks the end of tape
7 3, in volume 1, in the deposition of Thomas Williams at
8 5:10.  Going off the record.
9    (Off the record.)
10    THE VIDEOGRAPHER:  On record at 5:24.  This
11 marks the beginning of tape 4, in volume 1, in the
12 deposition of Thomas Williams.
13 BY MR. WILLIAMS:
14    Q.  I am going to show you what has been
15 previously marked as Quinn number 4.  I am going to ask
16 you to just take a look at Quinn number 4 for me,
17 including an e-mail attached at the back of it.
18    A.  Okay.
19    Q.  Okay.  Now, had you seen Quinn number 4 prior
20 to today?
21    A.  I don't recall if I had or not.  I mean,
22 reading it I recall something about mine doing a
23 declaration.  I don't know if I read this or not.
24    Q.  You can see that it is a declaration in
25 opposition to plaintiff's ex parte application, right?

217

1    A.  Yes.
2    Q.  I will ask you to turn to, I guess, page
3  number -- there is no page number, but it is the first
4  page, paragraph 5. Do you see where he writes, "Earlier
5  this year I also was personally assigned by Thomas
6  Williams to manage an investigation into the proper
7  disposition of unassigned cash receipts that Oracle's
8  collections staff had over time assigned to an accounts
9  receivable reserve account known as 12601"? Do you see
10  that?
11    A.  Yes.
12    Q.  And do you see -- if you turn to page 5 -- or
13  5 doesn't have a page number on it, but do you see that
14  it is signed and dated November of 2002?
15    A.  Yes.
16    Q.  Do you know when you had assigned Michael
17  Quinn to do this investigation into the proper
18  disposition of unassigned cash receipts?
19    A.  No.
20    Q.  Do you have any recollection of when you
21  learned that the collections staff had over time
22  assigned to an accounts receivable reserve known as
23  12601 unassigned cash receipts?
24    A.  I mean, I don't know the date. I can only
25  estimate a time frame within the year.

218

1    Q.  Can you estimate it, please?
2    A.  You know, I would estimate it as being late --
3  you know, September, October of 2002. And the reason I
4  say that -- being that the e-mail that is also attached
5  here is dated October 21st, 2002. It would have been,
6  you know, not too far before this date.
7    Q.  Because when you learned about it you would
8  want to do sort of an immediate investigation into it,
9  right?
10    A.  Yes.
11    MS. WINE:  Objection.
12  BY MR. WILLIAMS:
13    Q.  Right?
14    A.  Yes.
15    Q.  Turning to the e-mail -- it is an October
16  21st, 2000, e-mail from Michael Quinn to Ryan Roberts
17  and Greg Myers. Do you know Ryan Roberts?
18    A.  I know who he is. I don't know him, no.
19    Q.  Who is he?
20    A.  One of the guys in collections.
21    Q.  Okay. And do you know if he was one of the
22  people that had been moving money from 25005 to 12601?
23    A.  No, I don't know.
24    Q.  He CCs you on this e-mail, right?
25    A.  Correct.

219

1    Q.  Do you know why?
2    MS. WINE:  Lacks foundation.
3    THE DEPONENT:  Well, I believe that I
4  instructed him to go get this work done. So he cc'ed me
5  to let me know that he was following up on my request.
6  BY MR. WILLIAMS:
7    Q.  Okay. Were there any other e-mail
8  correspondence (sic) between you and Michael Quinn
9  regarding this subject in or around this time?
10    A.  I can't recall.
11    Q.  Okay. Do you see his first -- the first
12  sentence where he says, "Ryan, Greg, below is the action
13  plan for addressing the problem surrounding the
14  unapplied cash issues that you guys worked on last
15  week"?
16    A.  Yes.
17    Q.  Does that help refresh your recollection about
18  when you may have assigned him to do this investigation?
19    A.  Not more -- I mean, not more than it was in
20  the latter part of 2002. I don't know if it was a week
21  before or two weeks before. I don't know.
22    Q.  How long did it take Michael Quinn and Greg
23  Myers to do the investigation regarding the debit memos
24  that you asked them to do?
25    A.  I can't answer that question. I can only say

220

1  it started after the second amended complaint and it was
2  at least partially done when I met with the special
3  litigation committee. And I don't know the date of that
4  meeting either.
5    Q.  Okay. I will represent for you that the
6  special committee appears to indicate that you met with
7  them on October 22nd of 2002, and then on -- again on
8  November 12th of 2002.
9    A.  Okay.
10    MS. WINE:  Is there a question?
11  BY MR. WILLIAMS:
12    Q.  Also, I will tell that you the second amended
13  complaint was filed on October 11th of 2002. Do any of
14  those facts help you recall how long it took for Greg
15  Myers and Michael Quinn to do the investigation into the
16  debit memo transactions that you asked them to do?
17    A.  No. I mean, it wasn't a day. It wasn't a
18  month, but it wasn't a real extended period of time
19  either.
20    Q.  So they were doing the -- would it be fair to
21  say that they were doing the debit memo investigation at
22  the same time that they were doing this investigation
23  into the cash movements from 25005 to 12601?
24    MS. WINE:  Objection. Misstates the
25  testimony.

221

1    THE DEPONENT: No.
2    BY MR. WILLIAMS:
3    Q.  Why not?
4    A.  I mean, because my belief is that the debit
5    memo was sort of the first priority and the first
6    question that was raised.  That's what got started on
7    first.  You know, they might have been going on
8    concurrently at some point in time, but the debit memo
9    was first, in my recollection, before the issue with the
10   items moving from 25005.
11   Q.  Okay.  That was my question.  Whether or not
12   they were occurring at the same time?
13   A.  I don't believe they started at the same
14   time.  I believe that they could have been going on at
15   the same time for some portion --
16   Q.  Um-hum.
17   A.  -- of it.
18   Q.  And the debit memo investigation was first?
19   A.  In my recollection it was first, yes.
20   Q.  And during that period the other investigation
21   into the transfers from 25005 to 12601 occurred?
22   A.  You know, one started -- the debit memo
23   started on some day and finished on some day.  The
24   transfers started on some day, which I believe was after
25   the first one and concluded on some other day.  My

222

1    impression would be -- is the debit memo was done before
2    the -- had been completed --
3    Q.  Had been completed?
4    A.  -- before the other one was completed.
5    Q.  But both of them involved 25005?
6    A.  In an unrelated fashion.  There was accounting
7    entries on the second.  There were not accounting
8    entries on the first.
9    Q.  Looking at Michael Quinn's e-mail, do you see
10   the second bullet point where he writes, "We need to
11   clean up the entire problem prior to the end of October
12   by moving cash receipts to the proper buckets --
13   unapplied customer overpayments or on-account as
14   appropriate"?  Do you see that?
15   A.  I see that.
16   Q.  Was it your understanding that monies from
17   unapplied cash customer overpayments and from on-account
18   was moved to 12601?
19   A.  No.
20   Q.  Okay.  Do you understand the meaning of this
21   bullet point?
22   A.  I don't --
23   MS. WINE: Objection. Lacks foundation.
24   THE DEPONENT: I don't understand the section
25   in parentheses.

223

1    BY MR. WILLIAMS:
2    Q.  Do you see where below that he writes, "What
3    needs to be done" --
4    A.  Yes.
5    Q.  -- "for items currently on-account"?  Why
6    don't you just read that section for me?
7    A.  "For items currently on-account we need to
8    continue to work through each item greater than $10,000
9    to determine, 1, what should have happened to the cash
10   receipt, and, 2, make the correction and put it in the
11   right place.  This comprises 523 items totaling 18.5
12   million which represents approximately 72 percent of the
13   25.8 million in the" -- "in on-account.  This must be
14   done by end of day Tuesday."
15   Q.  Okay.  Does that suggest that monies were --
16   money was moved from on-account to 12601?
17   MS. WINE: Objection. Lacks foundation.
18   THE DEPONENT: As I said before, I don't know
19   the mechanics of how it got out of 25005 into 12601.
20   BY MR. WILLIAMS:
21   Q.  Did you at some point learn the mechanics?
22   A.  If I did I don't recall them today.
23   Q.  Well, what I am asking -- well, the previous
24   question was based on the bullet -- the first bullet
25   point under, "What needs to be done."  Doesn't that

224

1    suggest that money was moved from quote, unquote,
2    "on-account," to 12601?
3    MS. WINE: Objection. Asked and answered,
4    lacks foundation.
5    THE DEPONENT: On-account is not a general
6    ledger account.  So it can't move from on-account to
7    12601.  12601 is a general ledger account.
8    BY MR. WILLIAMS:
9    Q.  Okay.  Well, does this suggest that items that
10   were designated or flagged on-account were moved from
11   somewhere to 12601?
12   MS. WINE: Objection. Lacks foundation.
13   THE DEPONENT: I mean, I don't -- I don't know
14   the answer to the question.
15   BY MR. WILLIAMS:
16   Q.  Okay.
17   A.  I agree that the purpose of the review was to
18   find out how much moved from 25005 into 12601.  You
19   know, I was not concerned, nor do I recall the mechanics
20   of how it moved from one to the other and whether or not
21   it included on-account or your question before about
22   miscellaneous cash receipts.
23   Q.  You don't have any -- I am sorry.  Are you
24   finished?
25   A.  Yes, I am done.

225

1    Q.   You don't have any reason to believe that
2  Michael Quinn when he wrote, "For items currently
3  on-account we need to continue to work through each item
4  greater than $10,000 to determine what should have
5  happened with the cash receipt and make the correction
6  and put it in the right place" -- you don't have any
7  reason to believe that he was mistaken when he quoted,
8  "on-account," there, do you?
9          MS. WINE:  Objection.  Lacks foundation.
10         THE DEPONENT:  I don't know.
11  BY MR. WILLIAMS:
12    Q.   This was a -- this October 2002 e-mail still
13  refers to quote, unquote, "on-account."  Was it your
14  testimony that the purpose of the November 17th, 2000,
15  debit memos was to remove the quote, unquote,
16  "on-account," flags from certain items?
17         MS. WINE:  Are you asking him if that was his
18  prior testimony?
19  BY MR. WILLIAMS:
20    Q.   I am asking you if that was your prior
21  testimony?
22    A.   I believe the result of the November 17th,
23  2000, debit-memo creation and then application of
24  on-account receipts to it would have, I think, removed
25  the flag because it would have been applied, but -- I am

226

1  not positive, but that's my belief.
2    Q.   Was it your understanding that that was the
3  purpose of the November 17th, 2000, debit memos?
4          MS. WINE:  Objection.  Asked and answered.
5          THE DEPONENT:  I mean -- can I have the
6  question again, please?
7          COURT REPORTER:  "Q.  Was
8          it your understanding that
9          that was the purpose of the
10         November 17th, 2000, debit memos?"
11         THE DEPONENT:  What was the purpose of the
12  November 17th -- you need to give me, I guess, the prior
13  questions.
14  BY MR. WILLIAMS:
15    Q.   I can kind of clear this up for you.  Okay.
16    A.   Okay.
17    Q.   Why don't you take a look at the first page of
18  Michael Quinn's declaration?
19    A.   Okay.
20    Q.   And in paragraph 4 do you see where it says,
21  "In 2000 my staff participated in the conversion of
22  Oracle's accounts receivable" -- "Oracle's accounts
23  receivable and other related systems over to Oracle's
24  new 11I applications"?
25    A.   Yes.

227

1    Q.   "As part of that conversion it was determined
2  that the previous functionality of assigning on-account
3  notations to unassigned cash receipts once they were to
4  be applied was no longer necessary and it was thus
5  requiring that" -- "and it was thus required that all
6  existing on-account flags that had accumulated in our
7  unapplied cash account, 25005, be reversed," et cetera.
8          Now, is it your understanding that the purpose
9  of the November 17th, 2000, debit memos was to remove
10  the quote, unquote, "on-account," flags from the
11  unapplied cash account, 25005?
12         MS. WINE:  Objection.  Lacks foundation.
13         THE DEPONENT:  As I have stated before, my
14  understanding is the items that were -- had on-account
15  flags at November 17, 2000, were, in fact, not in
16  account 25005.
17  BY MR. WILLIAMS:
18    Q.   But that understanding came from Greg Myers
19  and Michael Quinn, right?
20    A.   I can only state what my understanding was.
21  And to clarify why it is my understanding, the balance
22  in 25005 was a relatively small number relative to the
23  size of the 46,000 debit memos that were created.  So it
24  could not have been in 25005.
25    Q.   Okay.  So what you are saying is that Michael

228

1  Quinn's declaration, at least in paragraph 4, is wrong?
2          MS. WINE:  Objection.  Misstates the
3  testimony.
4  BY MR. WILLIAMS:
5    Q.   Based on your understanding.
6    A.   Based on my understanding I would not have
7  said, "Thus it was required all existing on-account
8  flags that would have accumulated in our unapplied cash
9  account 25005 be reversed."  That is not my
10  understanding.
11    Q.   Okay.  Well, let me just show you what has
12  been marked as Myers number 14.  Okay.  Will you take a
13  look at paragraph 3 of Myers' declaration?
14    A.   I see it.
15    Q.   Okay.  Do you see where he writes that, you
16  know, "As part of that conversion it was determined that
17  the previous functionality of assigning 'on-account'
18  notations to unassigned cash receipts once they were to
19  be applied was no longer necessary, and it was thus
20  required that all existing on-account flags that had
21  accumulated in our unapplied cash account, 25005, be
22  reversed," et cetera?  Do you see that?
23    A.   I see it.
24    Q.   And based on your understanding Greg Myers is
25  wrong, at least as he represents the on-account flags

229

1 and 25005 in paragraph 3 of his declaration?
2        MS. WINE: Objection. Misstates the
3 testimony.
4        THE DEPONENT: I do not know what Greg or Mike
5 meant by that sentence. I would not have expressed it
6 in the same words. I can't comment as to whether or not
7 that is an inaccurate declaration because I don't know
8 what they interpreted those words to mean.
9 BY MR. WILLIAMS:
10       Q. Okay. Well, going back to the e-mail at the
11 back of Michael Quinn's declaration, looking at the
12 first bullet point -- based on the statements in the
13 first bullet point it appears that two years later the
14 on-account designations or flags were still in the
15 Oracle's accounts receivable system, right?
16       MS. WINE: Objection. Lacks foundation,
17 misstates the document. And I think you are talking
18 about the third bullet point on the page.
19       MR. WILLIAMS: I actually meant the first
20 bullet point under where it says, "What needs to be
21 done." Sorry.
22       THE DEPONENT: Let me try this again. If
23 there was an item that was in 25005 -- $1,000 unapplied
24 cash had an unapplied flag to it, okay, and someone in
25 collections determined that it should no longer be in

230

1 unapplied -- it should instead be moved to 12601 -- in
2 order to get it from 25005 into 1261 (sic) you have to
3 book a journal entry and you have to reduce 25005. So
4 debit that account and you have to credit or increase
5 12601 by an equal amount. So if something moved from
6 25005 into 12601, it isn't in 25005. So this concept of
7 there is 23.8 million dollars -- the number that is --
8 25.8 million dollars in on-account status -- that isn't
9 in 25005.
10 BY MR. WILLIAMS:
11       Q. Okay. All I am asking is -- the on-account
12 flags that were supposed to be removed by the November
13 17th debit memo transactions according to Quinn and
14 Myers were not removed based on what's written here by
15 Mike Quinn?
16       MS. WINE: Objection. Misstates the document,
17 lacks foundation.
18 BY MR. WILLIAMS:
19       Q. Is that fair to say?
20       A. Yeah.
21       Q. Okay. So you are still -- the company was
22 still using the quote, unquote, "on-account," flags
23 after November 17th, 2000, right?
24       A. The 46,000 debit memos that were created
25 November 17th, 2000, removed the 46,000 items that had

231

1 an on-account flag as of that date.
2       Q. Okay.
3       A. I never said that there was no transaction
4 after November 17th, 2000, that had an on-account flag
5 to it.
6       Q. Now, do you know whether after November 17th,
7 2000, the quote unquote, "on-account," designation was
8 intended to be used in accordance with what the software
9 was originally designed to use it for?
10       A. I don't have the level of detail that would
11 allow me to answer that question. Mike Quinn was the
12 global process owner. Whether or not he -- I don't
13 believe he was eliminating the flag because, in fact, in
14 the user manual it allows for the use of that flag.
15       Q. But -- so you don't know what it was going to
16 be used for after November 17th? Is that what you mean?
17       A. That would be correct.
18       Q. Okay. And so looking at the Michael Quinn
19 e-mail of October 21st where he writes -- where he
20 quotes, "on-account," you don't know what he is
21 referring to?
22       A. As I stated earlier, I know -- I recall that
23 items were moved from 25005 into 12601. And I stated
24 that I didn't know the mechanics of that -- whether it
25 was -- you know, because you made reference to

232

1 on-account status. You made reference to miscellaneous
2 cash receipt. I said I don't know how they got it
3 there. I know that -- you know, I recall that items
4 were moved.
5       Q. I understand. I am just asking you where he
6 writes, "on-account," in this document -- is it your
7 testimony that you don't know what he is referring to
8 when he writes, "on-account," for items currently
9 on-account?
10       A. I can read this the same way as you. You
11 know, I guess I don't know what he meant. I didn't
12 write this e-mail.
13       Q. Okay. That is all I am asking.
14       A. Okay.
15       Q. Do you see in the next bullet point where he
16 writes, "For items in the receipts write-off all tab of
17 the spreadsheet titled, '12601 Detail,' we need to
18 review each item over $10,000 to determine what should
19 have happened to the cash receipt, make the correction
20 to put it in the right place. This comprises 149 items
21 totaling 3.6 million, which represents approximately 60
22 percent of the 6.3 million in receipts write-off."
23       Do you know what, "receipts write-off," is?
24       A. No.
25       Q. Do you think it is something you knew at the

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

233

1  time?
2     A.  Quite possibly.
3     Q.  Do you see where he writes, "For items in the
4  Miscellaneous Offset Report, August 2000 through
5  September 2002, we need to continue the work" -- "to
6  work through each item greater than $10,000"?  Do you
7  see that?
8     A.  Yes.
9     Q.  "And determine what should have happened to
10  the cash receipt, make sure the correction is put in the
11  right place" -- do you see that?
12     A.  Yes.
13     Q.  Now, was it your understanding that you -- the
14  investigation only reviewed items over $10,000 that were
15  moved from 25005 to 12601?
16     A.  I don't remember whether there was an additive
17  step after this or not.
18     Q.  Okay.  Well, at least based on this document
19  it appears that as of the 21st in this communication
20  they are only talking about items greater than $10,000,
21  right?
22     A.  Correct.
23     MS. WINE:  Objection.  Lacks foundation.
24     THE DEPONENT:  It appears that way to me, yes.
25  BY MR. WILLIAMS:

234

1     Q.  Do you see where he writes, "Ryan, for each of
2  the items bulleted above we need to focus 100 percent
3  today and tomorrow on getting through all of this work.
4  I like what you did on the items greater than $100,000.
5  We should continue to follow this method"?  Do you see
6  that?
7     A.  Yes.
8     Q.  Do you know how many items greater than
9  $100,000 had been moved between 25005 to 12601 between
10  August 2000 and September of 2002?
11     A.  No.
12     Q.  Do you know if that was ultimately reported to
13  you in one way or another orally, by e-mail, or in some
14  sort of report?
15     A.  I mean, I recall they had spreadsheets, which
16  are referred in here (sic), that had a lot of
17  information on them.  Seems familiar to me that it
18  included some quantity and dollar amounts by some size
19  strata.  So I can't recall what they are now.  I can't
20  recall what the quantity was, but I think at one point I
21  would have seen some spreadsheets that were in process
22  while they were doing the work.
23     Q.  Going down to the next paragraph there do you
24  see where he writes, "Greg" -- I am assuming that is,
25  Greg Myers -- "please confirm that all ability to move

235

1  anything to 12601 via on-account or creating a
2  miscellaneous receipt write-off has been turned off."
3  Do you see that?
4     A.  Yes, I do.
5     Q.  Do you know what he is referring to when he
6  says, "12601 via on-account"?
7     MS. WINE:  Objection.  Lacks foundation.
8     THE DEPONENT:  You know, as I said -- as I
9  said before, I know things move from 25005 to 12601.
10  The mechanics -- I don't know if the mechanics are --
11  on-account are creating miscellaneous receipt
12  write-offs.  That may be true.  I don't know that.
13  BY MR. WILLIAMS:
14     Q.  And what are the ways items can move from
15  25005 to 12601?  Is that depicted in Williams number 3
16  between 39 -- lines 39 and 42?
17     A.  I mean, reading this tells me it moved from
18  25005 to 12601, but does not tell me how it got there.
19     Q.  Okay.  Is there a document or a type of
20  document that would show the manner in which an item
21  moves from 25005 to 12601?
22     A.  I guess the document that you just referred to
23  -- Williams 3, on page 7 of 10 in the column, "Record
24  type," on line 39 to 42 indicates miscellaneous cash
25  receipts detail.

236

1     Q.  Do you know what that is?
2     A.  No, but that might allow you to figure out --
3  is there -- I mean, perhaps that is the way that it got
4  there.
5     Q.  So, looking at Quinn number -- I am sorry --
6  the Quinn e-mail of October 21st of 2002, it appears
7  that some type of miscellaneous -- miscellaneous either
8  receipt write-off precipitated the movement of 12601 --
9  I am sorry -- precipitated the movement of items from
10  on-account to 12601, right?
11     MS. WINE:  Objection.  Lacks foundation,
12  misstates the document.
13  BY MR. WILLIAMS:
14     Q.  I am looking at the second page of the e-mail.
15     MS. WINE:  He is looking right here
16  (indicating).  And I said, "Objection.  Lacks foundation
17  and misstates the document."
18     THE DEPONENT:  I mean, I know it got from one
19  account to the other.  Again, I mean, I am just guessing
20  looking at these documents --
21  BY MR. WILLIAMS:
22     Q.  I understand.
23     A.  -- how it got there.
24     Q.  I was just reading directly from the
25  document.  It looks like --

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

237

1     A.  Right.
2     Q.  It is -- he says to Greg, "Please confirm that
3  all ability to move anything to 12601 via on-account or
4  creating a miscellaneous receipt write-off has been
5  turned off."
6        MS. WINE:  Is that a question?
7  BY MR. WILLIAMS:
8     Q.  Right?
9        MS. WINE:  That that is what it says?
10 BY MR. WILLIAMS:
11    Q.  That that is what it says?
12    A.  Yes.
13    Q.  Going back to Williams number 3, in this
14 particular instance, between lines 39 and 42, that was a
15 debit memo moved from 25005 to 12601 through some
16 miscellaneous -- miscellaneous cash receipt detail?
17    A.  No.
18       MS. WINE:  Objection.  Misstates the document.
19 BY MR. WILLIAMS:
20    Q.  So tell me where -- what I mischaracterized,
21 if anything, there?
22    A.  And, again, it gets back to my original
23 comment of I don't know what the first two columns are,
24 but original debit memo number is on every single one of
25 these lines.  There was only one debit memo.  It was

238

1  created on November 17th of 2000.
2     Q.  For this transaction, right?
3     A.  For this transaction, and it is represented by
4  the distribution lines 45 through 50.  So this has
5  nothing at all to do with the debit memo line 39 to 40.
6  It was done October 1st of 2000, some, you know, 11
7  months before -- I am sorry -- some one month before the
8  debit memo was processed in November.
9     Q.  Wouldn't that be -- wouldn't the debit memo be
10 part of the audit trail of this transaction?
11    A.  The debit memo is part of this schedule on
12 lines 45 through 50.  That is the debit memo.
13    Q.  Isn't it part of the history of this
14 transaction?
15       MS. WINE:  Objection.  Vague and ambiguous.
16 What is, "this transaction"?
17 BY MR. WILLIAMS:
18    Q.  "This transaction," is what is depicted by
19 Williams number 3 from the -- what appears to be maybe
20 an invoice through refund.
21    A.  I believe this is the history of the original
22 invoice number that is not displayed on this particular
23 schedule that I have seen for 258,241.84 that was
24 originally processed on September 22nd of '99.
25    Q.  Okay.

239

1     A.  So all of this is a history of what happened
2  with regard to that original transaction.
3     Q.  Right.  Okay.  Just quickly while we are on
4  that page, do you see line 5 and 6 where we discussed
5  wire transfers from, maybe, Sanwa Bank?
6     A.  Yes.
7     Q.  Do you see where it says, "Wire February 3rd,
8  2000, OCC"?
9     A.  I see that.
10    Q.  And then it says, "Effective GL date, November
11 3rd, 1999"?
12    A.  Yes.
13    Q.  Do you know under what circumstances the
14 receipt and the GL date would be off like that?
15       MS. WINE:  Objection.  Lacks foundation,
16 mischaracterizes the document.
17       THE DEPONENT:  No.
18 BY MR. WILLIAMS:
19    Q.  What is OCC?
20    A.  Standing for Oracle Credit Corp.
21    Q.  So in some instances Oracle would provide
22 credit to a customer and then pay for products and the
23 customer would pay Oracle Credit Corp?
24    A.  No.
25    Q.  How does it work?

240

1     A.  A customer would express some desire to pay
2  for their software or their services over time.  Oracle
3  Credit Corp would facilitate them obtaining financing by
4  going to Sanwa, GE Capital -- whatever -- saying, "Here
5  is a customer.  They want to buy a million dollars of
6  product."
7     Q.  I see.
8     A.  "Here is the payment terms they are willing to
9  make to you.  You know, will you agree to pay us now --
10 today, net present value and then you will get your
11 payment from them directly over whatever the agreed
12 payment term is?"
13    Q.  Is OCC an Oracle subsidiary or is it a
14 separate company?
15    A.  It is an Oracle subsidiary -- wholly owned and
16 consolidated.
17    Q.  By the company?
18    A.  Yes, it was when I was there.  I can't speak
19 after 2003.
20    Q.  All right.  Just going back to page 7 of 10,
21 if you can just -- do you see the column that says,
22 "Record type"?
23    A.  Yes.
24    Q.  Do you recognize any of those record types?
25    A.  No.  I think somebody that was more familiar

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

241

1   with AR would be better suited to answer the question.
2   I don't personally know what they mean.
3       Q.   How about if you go to page 8?  Do you
4   recognize any of those -- same column -- "Record type"?
5       A.   Same answer.  Appears to be something in the
6   AR application.
7       Q.   Do you see where at least there are a couple
8   of instances where it says, "Debit memo applications and
9   credit memo"?  57 -- same page.  I am sorry -- 58 and
10  57, actually.
11      A.   I see it.
12      Q.   Does that have any meaning to you?
13      A.   No.
14      Q.   How much time do I have?
15          THE VIDEOGRAPHER:  We have about half an hour.
16          MR. WILLIAMS:  Okay.  I will ask the reporter
17  to mark this document as Williams number 5.
18          (Exhibit No. 5 was marked for identification.)
19          BY MR. WILLIAMS:
20      Q.   Williams number 5 is an excerpt of Bates
21  number NDCA-ORCL 282677.  I will just ask you to take a
22  quick look at it and -- do you see on the top of the
23  document there are column headings?
24      A.   Yes.
25      Q.   The first one is, "Plaintiff's identifier,"

242

1   and that column has been put in by us.  But do you see
2   the next column where it says, "Debit memo number"?
3       A.   Yes.
4           MS. WINE:  Just so I understand, this is a
5   document produced by Oracle, but there has been a column
6   put in?
7           MR. WILLIAMS:  Added, yes, just the -- to
8   numerically identify sequentially --
9           MS. WINE:  Can you give me the Bates number of
10  the Oracle --
11          MR. WILLIAMS:  NDCA-ORCL 282677.
12          MS. WINE:  Thank you.
13          BY MR. WILLIAMS:
14      Q.   Do you see the column that says, "Debit memo
15  number"?
16      A.   Yes.
17      Q.   And, "Debit memo GL date"?
18      A.   Yes.
19      Q.   And do you see the column that says, "Batch
20  source" --
21      A.   Yes.
22      Q.   -- "on-account cleanup billed to customer
23  name"?  Do you see that?
24      A.   Yes.
25      Q.   And, "Debit memo amount" -- do you see that?

243

1       A.   Yes.
2       Q.   And, "Credit memo number" -- do you see that?
3       A.   Yes.
4       Q.   And the, "Credit memo GL date" -- do you see
5   that?
6       A.   Yes.
7       Q.   And the, "Credit memo amount applied" -- do
8   you see that?
9       A.   Yes.
10      Q.   Do you know whether any of the November 17th
11  debit memo transactions were ultimately -- were later
12  refunded to customers?
13          MS. WINE:  Objection.  Vague and ambiguous.
14          THE DEPONENT:  I guess the answer would be,
15  yes, because, based on Williams 3, that was an item that
16  was usually refunded to customer.
17          BY MR. WILLIAMS:
18      Q.   Okay.  Do you know how many of the debit memos
19  that were created on November 17th were later refunded
20  to customers?
21      A.   No.
22          MS. WINE:  Objection.  Vague and ambiguous.
23          BY MR. WILLIAMS:
24      Q.   Did you ever do an analysis of that?
25      A.   No.

244

1       Q.   And did you ever ask anyone to look at that?
2       A.   No.
3       Q.   When a credit memo is issued to a customer
4   that reduces revenue, doesn't it?
5           MS. WINE:  Objection.  Incomplete
6   hypothetical.
7           THE DEPONENT:  Could.
8           BY MR. WILLIAMS:
9       Q.   Under what circumstances could it?
10          MS. WINE:  Same objection.
11          THE DEPONENT:  A credit memo reverses the
12  original accounting distribution of the invoice.  If the
13  original invoice was for a deferred revenue item then
14  reversing it reverses deferred revenue.  It does not --
15  which is a balance sheet account -- would not affect
16  revenues.  So it could, but not necessarily so.
17          BY MR. WILLIAMS:
18      Q.   Okay.  The deferred revenue is reported to --
19  in the Oracle's 10K, isn't it?
20      A.   I mean, it might be included in a caption on
21  the 10K.  I am not sure if it is separately disclosed or
22  not.
23      Q.   I don't know what you mean, "it could be
24  included in a caption"?
25      A.   There could be a caption and it is called,

245

1   "Customer advances and unearned revenue."  So it is a
2   composite of both of those things.
3       Q.  Okay.  And it would be -- well --
4       A.  Deferred revenue.
5       Q.  It is both?
6       A.  No, deferred revenue would be on the liability
7   side of the balance sheet.  You asked is it, you know,
8   reported in the 10K.  I said, yes.  However, it might be
9   a subset of a caption that's in the 10K.  There might be
10  other accounts that roll to the same place for external
11  reporting.
12      Q.  Right.  So it may be that it is there
13  somewhere, but there is not a specific line item that
14  says, "Deferred revenue."  It may be captured in another
15  caption?
16      A.  Yes.
17      Q.  Okay.  I am going to take five minutes to see
18  -- yeah.
19          THE VIDEOGRAPHER:  Off record at 6:15.
20          (Off the record.)
21          THE VIDEOGRAPHER:  On record at 6:27.
22          MS. WINE:  Shawn, just before we move to
23  another exhibit, I was wondering if you could give us a
24  better explanation of what Exhibit 5 is?  You said it
25  was an excerpt -- Williams 5 -- you said it was an

246

1   excerpt from a document produced by Oracle.  I am just
2   wondering what the excerpt is?  Are these consecutive
3   pages from a document or was something done --
4           MR. WILLIAMS:  No.  I mean, we could talk
5   forever about that document because it is very long and
6   it has a lot of information on it.  But it is all of the
7   credit memos that were issued in relationship to the
8   debit memos, which was -- and that was all taken from
9   that document and put in a smaller spreadsheet.
10          MS. WINE:  So you are saying that the smaller
11  spreadsheet reflects --
12          MR. WILLIAMS:  Yes, this is the smaller
13  spreadsheet.
14          MS. WINE:  -- the credit memos that relate to
15  a debit memo?
16          MR. WILLIAMS:  Uh-huh.
17          MS. WINE:  What was the larger document that
18  was produced?
19          MR. WILLIAMS:  I don't know what the rest --
20  it is all kinds of data.  You guys say you know what it
21  is.
22          MS. WINE:  Okay.  I am just trying to
23  understand.  So you took that data and --
24          MR. WILLIAMS:  And just took stuff out of it
25  and made a smaller spreadsheet so that what we are

247

1   interested in talking about was easier to go through.
2           MS. WINE:  And this purports to reflect credit
3   memos that are affiliated with any of the 46,000 debit
4   memos?
5           MR. WILLIAMS:  Right.  And, in fact, I think
6   the columns are from the actual document.
7           MS. WINE:  Except for the plaintiff's
8   identifier column.
9           MR. WILLIAMS:  Except for us numbering them
10  down the side.
11          MS. WINE:  Okay.  Thank you.
12          MR. WILLIAMS:  Is that going to eat into my
13  minutes?
14          MS. WINE:  No, I will give you another minute
15  back.
16          BY MR. WILLIAMS:
17      Q.  I will show you what has been previously
18  marked as Quinn number 10.  And Quinn number 10 is
19  numbered NDCA-ORCL 104764 to 765.  I am just going to
20  ask you to take a look at that and let me know if you
21  recognize it.
22      A.  Yes.  I believe that I have seen it before,
23  yes.
24      Q.  Okay.  When is the last time you saw it?
25      A.  Sometime -- late 2002.

248

1       Q.  And what is it?
2       A.  I believe -- if I recall it correctly it is a
3   spreadsheet that summarizes the ins-and-outs from 12601
4   from items that were previously in 25005.
5       Q.  Is this the spreadsheet -- well, did you give
6   this spreadsheet to the special committee?
7       A.  I don't believe so.
8       Q.  Did you tell the special committee that you
9   would share with them a spreadsheet that showed what
10  your investigation had come up with to-date?
11      A.  I mean, I don't recall three-and-a-half years
12  ago what specifically I said, nor what documents I might
13  have shared with the SLC.
14      Q.  Okay.  Do you know who created this
15  spreadsheet?
16      A.  Not for sure.  Could have been me summarizing
17  data that was provided in a different format by Greg
18  Myers.
19          MS. WINE:  Just so the record is clear, we are
20  just talking about the first page of the document?
21          MR. WILLIAMS:  No.
22          THE DEPONENT:  Well, I did not, for sure,
23  prepare the second page.
24          BY MR. WILLIAMS:
25      Q.  Okay.  How can you tell?

249

1      A.   Because I was never really into formatting.
2  And, I mean, that wouldn't have been my format, if you
3  will.
4      Q.   Are you sure you created the first page?
5      A.   Absolutely?  No.  And I recall -- it looks
6  like a familiar spreadsheet to me.  I know I had
7  prepared a spreadsheet that summarized some data that, I
8  think, Greg had given me.  I think this might be it.
9      Q.   Okay.  And when you said you may have seen
10  this spreadsheet a couple of years ago in late 2002 were
11  you referring to the first page or both pages?
12      A.   The first page.
13      Q.   And do you know whether your investigation of
14  transfers between 25005 and 12601 was complete at the
15  time that you -- well, when you saw this spreadsheet
16  last?
17      A.   I don't know.
18      Q.   Looking at just the -- I guess the top row of,
19  I guess, five different rows -- the first row is,
20  "Activity," right?
21      A.   That's what it says, yes.
22      Q.   And it looks like it is -- covers June 2000
23  through November 2000, which would be Oracle's fiscal Q1
24  and Q2, right?
25      A.   Of fiscal '01, yes.

250

1      Q.   Right.  Okay.  So what is the first row that
2  says, "Miscellaneous receipt"?  What does that refer to?
3      A.   Again, if I prepared this schedule, which I am
4  not totally sure about, all I did was take data that
5  Greg Myers had provided and put it in a format that was
6  more understandable to me.  So, you know, I would not
7  have changed numbers.  I would not have changed the
8  captions that he had on the rows.  So, you know, as I
9  said before, miscellaneous receipt versus trade
10  receipt -- why something shows up in one of those
11  categories versus another, I couldn't tell you.  Might
12  have known three years ago.  As I sit here today, I
13  can't.  What I, you know, can tell you is that I think
14  that this was a summary that was prepared that -- showed
15  the total transfers out of 25005 into 12601 during
16  this -- this has got nine quarters on it.  That's what
17  it, you know -- that's what it showed.
18      Q.   Okay.  Well, looking at Q2, '01, which is, you
19  know, I guess, the second part of the first row --
20  October, November --
21      A.   Yes.
22      Q.   September, October, November of 2000, right?
23      A.   Yes.
24      Q.   It looks like there is approximately 20
25  million dollars from -- of miscellaneous receipts that

251

1  were sent to 12601 in 2Q, '01, right?
2      A.   Yes.
3      Q.   And that would have positively impacted
4  Oracle's income for Q2, '01, right?
5          MS. WINE:  Objection.  Misstates testimony.
6          THE DEPONENT:  Indirectly it could have.
7  BY MR. WILLIAMS:
8      Q.   By that amount?
9      A.   No.
10      Q.   Okay.  Explain to me what you mean when you
11  say, "no."
12      A.   The bad debt reserve analysis was always done
13  a month in advance of the end of the quarter.  So you
14  look at what are your requirements at the end of -- for
15  Q2, October compared to -- what was the balance as of
16  October.  So a November activity would not affect Q2.
17  It may affect Q3.
18      Q.   So, then only -- well, the 15 million in
19  October would have impacted income for Q2 --
20          MS. WINE:  Objection.  Misstates testimony.
21  BY MR. WILLIAMS:
22      Q.   -- '01, right?
23      A.   I don't know what was done to the bad debt
24  reserve in this period.  I don't know if they adjusted
25  to the specific requirement or if they left some

252

1  additional amounts as general reserve.  So, I can't tell
2  you.
3      Q.   If this were all the information you had it
4  would have had a positive impact for Q2, '01; isn't that
5  true?
6          MS. WINE:  Objection.  Misstates testimony.
7          THE DEPONENT:  If this was the only
8  information I had I couldn't answer your question.  I
9  would have to know -- what did they do with the reserve
10  on the general ledger at the end of Q2 of '01?  Did they
11  adjust it exactly to what the requirements were or did
12  they leave some additional monies as general reserve?
13  BY MR. WILLIAMS:
14      Q.   Did you look at that when this spreadsheet was
15  created?
16      A.   I know I certainly didn't look at it for the
17  nine quarters that were on here.  So, no.
18      Q.   When you created this first page, if you
19  created it, it sounds like you had a detailed report
20  that you drew information from?
21          MS. WINE:  Objection.  Misstates the
22  testimony.
23          THE DEPONENT:  I believe what I had was no
24  greater detail than what is on this first page.  The
25  only thing that I did was adjust it so that it would

253

1  have shown me quarterly totals and then adjust it so
2  that I would take out the effect of this one-month lag
3  between the date that the review is done and when the --
4  versus the end of the quarter.
5      BY MR. WILLIAMS:
6      Q.  What type of backup would one need to create a
7  spreadsheet like this with this information in it?
8      MS. WINE:  Objection.  Vague and ambiguous.
9      THE DEPONENT:  What I needed, I think, if I
10  created this, was merely this level of detail.  Where
11  did that detail come from?  It came from reports that
12  Greg Myers would have run off of the AR system.  I
13  didn't request the detail by transaction.  I merely
14  received how much were the gross amounts in each of the
15  periods that are on this piece of paper.
16      BY MR. WILLIAMS:
17      Q.  But whoever created this would have to --
18  well, whoever came up with the numbers here would have
19  to run certain reports to figure out what the numbers
20  actually were?
21      A.  Correct.
22      Q.  And you know that that was done by Greg Myers
23  and not Michael Quinn?
24      A.  I know that it was not done by me because I
25  didn't run reports off the AR system.  I believe that it

254

1  was Greg Myers.
2      Q.  Okay.  What is the line on the bottom there
3  that says, "Maximum amount affecting AR reserve"?  What
4  is depicted by that?  I guess it is a line representing
5  the nine quarters you talked about?
6      A.  It is the amounts from above moving -- well,
7  as an example in Q1, '01, it says, "0."  Because if you
8  look up above the miscellaneous receipt in June and July
9  and the trade receipt and -- everything is zeros.  The
10  amount that is for Q2 of '01 is the sum of the August,
11  September, and October amounts on the miscellaneous
12  receipt line and on the trade receipt line.
13      Q.  Now, do you know whether any of those amounts
14  that make up the 19.3 million dollars for Q2, '01 also
15  were associated in any way with a debit memo?
16      A.  No.
17      Q.  You don't know or --
18      A.  I do not know.
19      Q.  I am going to ask the reporter to mark this
20  document as Williams number 6.
21      (Exhibit No. 6 was marked for identification.)
22      BY MR. WILLIAMS:
23      Q.  Williams Number 6 is Bates numbered AA000023,
24  40, and 51.
25      MS. WINE:  And 684.

255

1      MR. WILLIAMS:  Is it?  I am sorry.  And 684.
2      BY MR. WILLIAMS:
3      Q.  Mr. Williams, this was produced by Arthur
4  Anderson, just so you know what the, "AA," means.  Just
5  let me know when you have had a chance to review that.
6      A.  Do you want me to read it all?
7      Q.  No, that is all right.
8      A.  Okay.
9      Q.  I will just ask you to take a look at the
10  first page, Bates number AA -- ending 23.  Have you seen
11  this document or a document that looks like it?
12      A.  I can't recall if I have seen this particular
13  one.
14      Q.  Do you recognize what it is?
15      A.  Yes.
16      Q.  What is it?
17      A.  It is a schedule prepared by Oracle that
18  summarized the unearned revenue accounts.  It summarizes
19  for a quarter -- compares it to the prior quarter.  It
20  is given to Arthur Anderson as -- they call them,
21  PBCs -- schedules prepared by client.  It is just sort
22  of the starting point for them to get some information
23  on what the balances are -- what the comparable balances
24  are and whatever explanation would apply.
25      Q.  Do you see where it says, "25005, customer

256

1  overpayments"?
2      A.  Yes.
3      Q.  Do you see where it says the balance as of
4  August 31st, 2000, is a credit of 148.6 million?
5      A.  Yes.
6      Q.  And I am going to ask you to turn to the third
7  page in, ending 51.
8      A.  Oh, okay.  Bates number ending 51, yes.
9      Q.  And is that the same type of schedule?
10      A.  Appears to be, yes.
11      Q.  But it is for -- it looks like this one was
12  created as of February 28th of 2001, right?
13      A.  Correct.
14      Q.  That is the end of Q3 of '01, right?
15      A.  Right.
16      Q.  Do you see where it says, "25005, customer
17  overpayments"?
18      A.  Yes.
19      Q.  And it has the balance as of November 30th of
20  2000?
21      A.  Yes.
22      Q.  And do you see that it says, "25.3 million
23  dollars"?
24      A.  Yes.
25      Q.  Okay.  Do you know why the customer

257

1  overpayments dropped from 148 million dollars at the end
2  of August of 2000 to 25 -- I am sorry -- 148 million
3  dollars to 25 million at the end of November 2000?
4      MS. WINE:  Objection.  Lacks foundation.
5      THE DEPONENT:  No.
6  BY MR. WILLIAMS:
7      Q.  Now, if you take a moment to review the
8  document more closely could you determine why the
9  customer overpayments dropped from 148 million to 25
10  million between Q2 and Q3 of '01?
11      A.  You know, I can read the same thing that you
12  can read here.  There might have been additional
13  information in Arthur Anderson's work papers that would
14  give some supplemental information as well.
15      Q.  I am sorry.  I meant to say, "Q" -- I meant to
16  say, "Q1 and Q2."
17      A.  I mean, sort of the same answer.  I can read
18  what's here, but I can't comment on it.  There might
19  have been additional information that was contained in
20  Arthur Anderson's work papers that supplemented the
21  conversation or the note that is in here.  So, I mean,
22  looking at this, I am confused.  On the first page it
23  says May 31st is 74 million and then August 31st says
24  148 or 149 million.  On the next page it shows the 11-30
25  balance as being 125 million compared to the August 31st

258

1  balance of 74 million, which is obviously not the same
2  as the 148 on the prior page.  So --
3      Q.  So -- I am sorry.
4      A.  -- there obviously is some other issue going
5  on here that I could not respond to.  The 11-30 on the
6  third page says -- 11-30 was 25,377, but on the prior
7  page it said it was 125,377.
8      Q.  Well, do you want to take a look at the second
9  page ending Bates 40?  Do you see that, I guess, there
10  is a tic mark at the bottom of the page A?
11      A.  Tic A?  We are on the second page here, right?
12      Q.  Yeah, Bates ending 40.
13      A.  Yes.  Okay.
14      Q.  Do you know who Cynthia Chavez is?
15      A.  No.
16      Q.  Okay.  It appears that she was in Oracle
17  treasury, right?
18      A.  I mean, I read the same thing you do --
19  "Cynthia Chavez, Treasury."  I don't know her.
20      Q.  Do you know what is meant by that tic mark,
21  "A," there?
22      MS. WINE:  Objection.  Lacks foundation.
23      THE DEPONENT:  No.
24      MS. WINE:  How much time do we have?
25      THE VIDEOGRAPHER:  About one minute.

259

1      MS. WINE:  You can have two because I gave you
2  a minute back for my question.
3      MR. WILLIAMS:  So it looks like I am not going
4  to get another question in before we are done here.  We
5  have some outstanding discovery disputes that -- I guess
6  there is a small chance that we may talk again, but I
7  appreciate you coming today and I am done for now.
8      MS. WINE:  Can we mark the whole transcript
9  confidential?
10      MR. WILLIAMS:  Sure.
11      THE VIDEOGRAPHER:  This is the end of
12  videotape number 4, volume 1, in the deposition of
13  Thomas Williams.  The original videotapes will be
14  retained by Live Note World Service.  We are going off
15  the record.  The time on the monitor is 6:52.
16      (Thereupon Volume 1 in the deposition of
17      Thomas Anthony Williams recessed at 6:52 p.m.)
18
19      Signed under penalty of perjury:
20
21      _____
22      THOMAS ANTHONY WILLIAMS
23
24      _____
25      Date

260

1      --o0o--
2      I, ELIZABETH A. WILLIS, a Certified Shorthand
3  Reporter of the State of California, duly authorized to
4  administer oaths, do hereby certify:
5      That I am a disinterested person herein; that
6  the Witness, named in the foregoing deposition was by me
7  duly sworn to testify the truth, the whole truth, and
8  nothing but the truth; that the deposition was reported
9  in shorthand by me, ELIZABETH A. WILLIS, a Certified
10  Shorthand Reporter of the State of California, and
11  thereafter transcribed into typewriting.
12      That before completion of the deposition,
13  review of the transcript ( ) was ( ) was not
14  requested.  If requested, any changes made by the
15  deponent (and provided to the reporter) during the
16  period allowed are appended hereto.
17
18      _____
19
20      ELIZABETH A. WILLIS, RPR, CSR 12155
21
22      --o0o--
23
24
25

Williams, Thomas Anthony  6/7/2006  9:06:00 AM

261

```
1                    --o0o--
2        I, THOMAS ANTHONY WILLIAMS, make the following
3   changes to my deposition taken in the matter of IN RE
    ORACLE CORPORATION SECURITIES LITIGATION, Case Num
4   C010988 MJJ:
5   Date_____
                    THOMAS ANTHONY WILLIAMS
6
    Page  Line          Change
7
8   ____  ____   _____
9   ____  ____   _____
10  ____  ____   _____
11  ____  ____   _____
12  ____  ____   _____
13  ____  ____   _____
14  ____  ____   _____
15  ____  ____   _____
16  ____  ____   _____
17  ____  ____   _____
18  ____  ____   _____
19  ____  ____   _____
20  ____  ____   _____
21  ____  ____   _____
22  ____  ____   _____
23  ____  ____   _____
24  ____  ____   _____
25  ____  ____   _____
```

I, ELIZABETH A. WILLIS, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That I am a disinterested person herein; that the Witness, named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition was reporter in shorthand by me, ELIZABETH A. WILLIS, a Certified Shorthand Reporter of the State of California, and thereafter transcribed into typewriting.

That before completion of the deposition, review of the transcript [ ] was [X] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

Date_____6-8-06_____

_Elizabeth A Willis_
ELIZABETH A. WILLIS,
RPR, CSR #12155

--oOo--

# EXHIBIT D

This Exhibit Was Intentionally Left Blank