# EXHIBIT E

Hatada, Ian  10/5/2006  9:55:00 AM

## 1

```
1   page
1               IN THE UNITED STATES DISTRICT COURT
2                 NORTHERN DISTRICT OF CALIFORNIA
3                          --o0o--
4   In re ORACLE CORORATION
    SECURITIES LITIGATION
5
              File No.  C-01-0988-MJJ
6
7   _____/
                --o0o--
8
            THURSDAY, OCTOBER 5, 2006
9
                --o0o--
10
          VIDEOTAPED DEPOSITION OF
11
              IAN HATADA
12
                --o0o--
13
14  Reported By:  CAROL NYGARD DROBNY, CSR No. 4018
             Registered Merit Reporter
15
16
17
18
19
20
21
22
23
24
25
```

## 2

```
1
2                  APPEARANCES:
3   For the Plaintiffs:
4   LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
    ROBBINS
5   BY:  ELI GREENSTEIN, Attorney at Law
    100 Pine Street, Suite 2600
6   San Francisco, California  94111
    415.288.4545
7   elig@lerachlaw.com
8   For the Defendants:
9   LATHAM & WATKINS, LLP
    BY:  BRIAN T. GLENNON, Attorney at Law
10  633 West Fifth Street, Suite 4000
    Los Angeles, California  90071
11  213.485.1234
    brian.glennon@lw.com
12
13  LATHAM & WATKINS, LLP
    BY:  JAMIE L. WINE, Attorney at Law
14  53rd at Third, 885 Third Avenue
    New York, New York  10022
15  212.906.1200
    jamie.wine@lw.com
16
17  For the witness IAN HATADA:
18  MEADE & SCHRAG, LLP
    BY:  MICHAEL SCHRAG, Attorney at Law
19  1816 Fifth Street
    Berkeley, California  94710
20  510.843.3670
    michael@meadeschrag.com
21
    Videographer:
22
23  GARY BREWER
    Also Present Via Remote Internet Connection:
24
25  KEITH MAUTNER
```

## 3

```
1                      INDEX
             EXAMINATION BY COUNSEL
1                    Page No.
3
4
    Examination By Mr. Greenstein         7
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## 4

```
1                    EXHIBITS
2   For the Plaintiffs    Description    Page No.
3   Exhibit 1   E-mail String Bates Stamped
                PLF-ORC 000001           164
4
5   Exhibit 2   E-mail to Ian Hatada and
                Others From Ryan Roberts,
6               Subject:  New List, Bates
                Stamped PLF-ORC 000008   171
7   Exhibit 3   E-mail String Bates Stamped
                PFL-ORC 000003           180
8
9   Exhibit 4   Oracle Applications Document
                Bates Stamped NDCA-ORCL
10              748908 Through 748917    201
11  Exhibit 5   Document Bates Stamped
                NDCA-ORCL 883052 Through 883061,
11              883458 Through 883461,
                883666 Through 883667    218
13  Exhibit 6   Document Entitled Unapplied
                Auto Adjustments, Bates Stamped
14              PLF-ORC 000214 Through 000223  229
15  Exhibits
    Previously
16  Marked
17  Venkataramana 2 Document Bates Stamped
                PFL-ORC 001161 Through 001215   46
18
    Venkataramana 3 Oracle Fax Message From Marisa
19              Christie to Kathy With
                Attachments, Bates Stamped
20              PLF-ORC 000507 Through 000532   194
21  Venkataramana 5 Document Bates Stamped
                PLF-ORC 000002           109
22
    Venkataramana 8 Document Bates Stamped
23              PFL-ORC 000122 Through 000129   85
24  Chen 12     October 21 E-mail From Michael
                Quinn to Ryan Roberts and
25              Greg Myers               100
```

5

```
1              IN THE UNITED STATES DISTRICT COURT
2                NORTHERN DISTRICT OF CALIFORNIA
3                          --oOo--
4       In re ORACLE CORORATION
        SECURITIES LITIGATION
5
                   File No.  C-01-0988-MJJ
6       _____/
7
                          --oOo--
8
9              BE IT REMEMBERED, that on Thursday, October 5,
10      2006, commencing at the hour of 9:55 a.m. thereof, at
11      the offices of Carol Nygard & Associates, 4180 Truxel
12      Road, Suite 100, Sacramento, California before me, Carol
13      Nygard Drobny, a Certified Shorthand Reporter of the
14      State of California, there personally appeared
15                        IAN HATADA
16      called as a witness by the Plaintiffs, who, being by me
17      first duly sworn, was thereupon examined and
18      interrogated as hereinafter set forth.
19             VIDEOGRAPHER:  Good morning.  We're going on
20      the record.
21             Here marks the beginning of videotape number
22      one in the deposition of Ian Hatada in the matter of --
23      volume one in the matter of In Re:  Oracle Corporation
24      Securities Litigation in the United States District
25      Court, Northern District of California, Case Number
```

6

```
1       C-01-0988-MJJ.
2              Today's date is October 5th, 2006, and the
3       time on the monitor is 9:56 a.m.
4              The video operator is Gary Brewer,
5       representing LiveNote World Service, located at 221 Main
6       Street, Suite 1250, San Francisco, California 94105,
7       telephone number 415-321-2300.
8              The Court Reporter is Carol Nygard of --
9       reporting on behalf of LiveNote World Service.
10             Today's deposition is being taken on behalf of
11      the Plaintiff and is taking place at 4180 Truxel Road,
12      Sacramento, California.
13             Counsel, would you please introduce yourselves
14      and state whom you represent.
15             MR. GREENSTEIN:  Good morning.  Eli Greenstein
16      with Lerach, Coughlin, Stoia, Geller, Rudman & Robbins
17      representing Plaintiffs.
18             MS. WINE:  Good morning.  Jamie Wine of Latham
19      and Watkins representing Defendants.
20             MR. GLENNON:  Good morning.  Brian Glennon
21      also of Latham and Watkins on behalf of the Defendants.
22             And, if I could just also note for the record,
23      the Defendants have served a cross subpoena for
24      Mr. Hatada's deposition this morning.
25             MR. SCHRAG:  Michael Schrag, Meade & Schrag,
```

7

```
1       for the witness.
2              VIDEOGRAPHER:  If there are no stipulations,
3       would the Reporter please swear the witness.
4              (Thereupon the oath was administered to the
5               witness by the Court Reporter.)
6              VIDEOGRAPHER:  Please begin.
7                        EXAMINATION
8       BY MR. GREENSTEIN:
9          Q.   Good morning, Mr. Hatada.
10         A.   Good morning.
11         Q.   Can you please state your full name and
12      current address for the record.
13         A.   Ian Hatada.
14              Actually, Ian Thomas Hatada.  Address is 2272
15      Longview Drive, Roseville, California 95747.
16         Q.   Thank you.
17              And have you ever had your deposition taken
18      before?
19         A.   No.
20         Q.   I'm going to go over some ground rules.
21      You've probably gone over them with your counsel before
22      this, but just so we get them on the record.
23              The Court Reporter sitting to your right is
24      going to be taking everything down, everything that's
25      said here today, my questions, your answers.
```

8

```
1              It's important that you speak verbally.  Try
2       not to use hand gestures or head nods.  You know, answer
3       "yes" or "no" rather than nodding your head.  That way
4       the Court Reporter can get everything that's said here
5       today.
6              Also, I'll probably -- sometimes we'll talk
7       over each other.  You'll start to answer before I finish
8       the question.
9              Let's just try to -- you know, try to let me
10      finish my question, and then I'll let you answer, and --
11      and that way the Court Reporter can get everything down
12      here.
13              You understand that the oath you're taking
14      here today is the same oath as if you were sitting in
15      Court -- in a Court of Law?
16         A.   I do.
17         Q.   Your attorney may make objections today.
18      Also, counsel for Oracle may make objections.
19              I would ask that you answer any question
20      regardless of the objection unless your attorney,
21      Michael Schrag, instructs you specifically not to answer
22      the question.
23              You understand that?
24         A.   I do.
25         Q.   We can take breaks any time you feel you need
```

Hatada, Ian  10/5/2006  9:55:00 AM

9

1  to.
2      If you want to go to the bathroom, if you need
3  to clear your head, just let me know.
4      Sometimes I may finish a line of questioning
5  or finish a question, if we're in the middle of the
6  question, but, you know, if you just want to step out,
7  let me know.  We can take a break.
8      Now, if you don't understand my questions, I'm
9  happy to rephrase them, so just tell me.
10     But, if you answer, I'm going to just assume
11 that you understood what I meant.
12     Is that fair?
13  A.  It is.
14  Q.  Sometimes you may not remember something and
15 later something will jar your memory.
16     You're always entitled to go back and change
17 your answers or clarify certain things.
18     So just know that you don't have to -- if you
19 step out and you remember something, you can come back
20 and -- and let us know.
21     Do you understand that?
22  A.  Thank you.
23  Q.  At the end of the deposition you're going to
24 be given a chance to review the transcript and make any
25 changes, so don't feel like you have to be absolutely

10

1  perfect here today.
2      Do you understand that?
3  A.  I do.
4  Q.  And are you under the influence of any
5  medication or drugs that would impair your ability to
6  testify here today?
7  A.  No, sir.
8  Q.  Okay.  When did you first become employed at
9  Oracle Corporation?
10  A.  I believe it was September '99.
11  Q.  Do you remember who hired you?
12  A.  I believe her name was Jamie.  I don't recall
13 her last name.
14  Q.  Okay.  And what was your position when you
15 were hired, when you were first hired?
16  A.  An applied specialist -- or not an applied
17 specialist.  I'm sorry.
18     Receivables analysis -- receivables analyst.
19  Q.  Okay.  Accounts receivable analyst?
20  A.  Accounts receivable -- well, it was -- yeah,
21 it was kind of -- it was accounts receivable analyst.
22     I'm sorry.
23  Q.  Okay.  Was that the formal title or is that
24 just -- is that just what you're calling it, or was
25 there a formal title?

11

1      MR. GLENNON:  Objection.  Compound.  Vague and
2  ambiguous.
3      THE WITNESS:  It was account -- accounts
4  receivable specialist.  That's about as clear as I can
5  put it.
6      MR. SCHRAG:  That was the formal title?
7      THE WITNESS:  Uh-huh.
8  BY MR. GREENSTEIN:
9  Q.  Okay.  And how long were you an accounts
10 receivable specialist?
11  A.  For about -- God -- two years.
12  Q.  Two years?
13     So you -- from approximately September '99 to
14 approximately September 2001?
15  A.  Correct.
16  Q.  Okay.  And what were your duties and
17 responsibilities during that two-year period generally?
18  A.  To collect outstanding receivables.
19  Q.  Okay.  And do you mean outstanding receivables
20 from Oracle customers?
21     MR. GLENNON:  Objection.  Leading.
22     THE WITNESS:  True.
23  BY MR. GREENSTEIN:
24  Q.  And did you receive any formal training in
25 order to do your job as an AR specialist -- or AR

12

1  specialist?
2  A.  Yes.
3  Q.  Okay.
4  A.  Two weeks, three weeks.
5  Q.  Two weeks?
6      Okay.  Do you remember who trained you, if
7  anybody?
8  A.  I don't.  There was probably three or four
9  different people.
10  Q.  Okay.  Do you remember any names?
11  A.  I don't.
12  Q.  Okay.  In order to collect outside receivables
13 from Oracle customers why don't you just explain your
14 general -- what you had to do on a day-to-day basis to
15 do that.
16  A.  As a collections analyst or accounts
17 receivable specialist you were to -- you had a spread
18 sheet of items that were invoices that were outstanding,
19 and you would make phone calls to the client to attempt
20 to collect that -- those outstanding amounts.
21  Q.  Okay.  So is it fair to say -- so -- strike
22 that.
23     When you were an AR specialist, were you
24 working in the Accounts Receivable Department or was it
25 Credit and Collections?

13

```
 1        MR. GLENNON:  Objection.  Compound.
 2        THE WITNESS:  Collections.
 3    BY MR. GREENSTEIN:
 4        Q.   Collections?
 5        A.   It was in the Collections Department, but the
 6    Accounts Receivables Department as well as the
 7    Collections Department was, I believe, kind of all in
 8    one type of thing.
 9        Q.   They sat together; right?
10        A.   Yeah.
11        Q.   Okay.
12        A.   Yes.
13        Q.   And Collections worked with -- or personnel
14    from Collections would work with personnel from Accounts
15    Receivable fairly frequently; right?
16        A.   True.
17        MR. GLENNON:  Objection.  Leading.
18    BY MR. GREENSTEIN:
19        Q.   Okay.  And who did you report to during that
20    two-year period?
21        A.   I believe there was -- I believe three or four
22    different managers, one being Matt Irman, Troy -- I
23    can't remember his last name.
24        Q.   Is it Tandy?
25        A.   Yep.
```

14

```
 1        MR. SCHRAG:  Say "yes" or "no."
 2        THE WITNESS:  Yes.
 3        Ryan Roberts -- and Adam Hahn.
 4    BY MR. GREENSTEIN:
 5        Q.   Okay.  And did you as an accounts receivable
 6    specialist -- did you have anybody reporting to you?
 7        A.   Not as an accounts receivable specialist, no.
 8        Q.   Okay.  And so your tasks were generally to
 9    collect outstanding receivables from Oracle customers;
10    right?
11        A.   True.
12        Q.   Okay.  And I think you said in order to do
13    that you referred to some sort of spread sheet; is that
14    correct?
15        MR. GLENNON:  Objection.  Leading.
16        THE WITNESS:  Correct.
17    BY MR. GREENSTEIN:
18        Q.   And what -- was that electronic spread sheet
19    that you looked at on the computer, or was that a paper
20    spread sheet, or both?
21        MR. GLENNON:  Objection.  Compound and
22    leading.
23        THE WITNESS:  Both.
24        For the first six months that I was there we
25    did it off of paper.  After that we changed to an Excel
```

15

```
 1    spread sheet.
 2    BY MR. GREENSTEIN:
 3        Q.   Okay.  And did something change that -- did
 4    something change after six -- the first six months such
 5    that you would start looking at the spread sheet -- or
 6    that the spread sheets would be kept electronically
 7    rather than paper?
 8        A.   It was easier.
 9        Q.   It was easier?
10        A.   Yeah, less paper.
11        Q.   Okay.  So what did those spread sheets look
12    like?
13        Did they -- were those just lists of
14    customers, you know, outstanding amount of receivable
15    and maybe the age of the receivable?
16        A.   Typically had the customer name, maybe an
17    account number, invoice number, amount, original amount,
18    and amount outstanding.
19        Q.   Okay.  And at that time do you know what
20    Oracle's policy was with respect to writing off
21    receivables?
22        MR. GLENNON:  Objection.  Vague and ambiguous.
23    Calls for speculation.
24        THE WITNESS:  I don't believe that there was
25    any kind of policy.
```

16

```
 1        It was -- if it was past a certain amount of
 2    days past due and under a certain amount, it was
 3    eligible to be written off.
 4    BY MR. GREENSTEIN:
 5        Q.   Okay.  I'll break that out.
 6        So you said if it was past a certain amount of
 7    days; right?
 8        You mean the days outstanding that -- or the
 9    days that the receivable was outstanding; right?
10        A.   (Nodding head)
11        Q.   And that was one of the criterias used in
12    writing off receivables?
13        A.   True.
14        Q.   Okay.  And the second part is if it was under
15    a certain amount then it would be eligible to be written
16    off?
17        Is that what you said?
18        A.   True.
19        Q.   Okay.  And what did you mean by that, if it
20    was under a certain amount?
21        A.   So if it was under -- you know, a certain
22    amount of thousands of dollars, and it wasn't over a
23    certain amount, then it could be swept.
24        Q.   Okay.
25        A.   What I mean --
```

17

1    Q.   Oh.  Go ahead.
2    A.   What I mean by "being swept," is that you
3    could take all of the invoices that were a certain
4    amount of days past due as well as a certain amount,
5    under a certain amount, and you would sweep them, and
6    they would all be -- credited.
7    Q.   Okay.  When you say "sweeped," do you mean
8    written off?
9    A.   Written off.  Sorry.
10    Q.   Okay.  Was there a -- was there some sort of
11    automatic process by which those receivables, those
12    lower receivables, were swept?
13    A.   Yes.  Yes.
14    Q.   Okay.  And do you know who -- was that a
15    written policy that said this certain amount was to be
16    swept?
17    A.   Yes.
18    Q.   Yes?
19      And do you know who -- implemented that
20    policy, if anybody?
21    A.   I don't.
22      I know who managed the policy.  I believe it
23    was Greg Myers.
24    Q.   Okay.  And so it was an -- but do you remember
25    the parameters for -- for whatever was -- for the

18

1    policy, if you will?
2    A.   Days past due and amount.
3      MR. GREENSTEIN:  Yeah.
4      MR. GLENNON:  Objection.  Vague and ambiguous.
5      THE WITNESS:  I don't.
6    BY MR. GREENSTEIN:
7    Q.   Okay.  So was it automatic -- was -- was this
8    sweep -- I'm just going to call it "the accounts
9    receivable sweep."
10      Is that okay with you?
11    A.   Yes.
12    Q.   Was the accounts receivables sweep done, you
13    know, every week, every month?
14    A.   I believe it was done on a monthly basis.
15    Q.   Okay.  And was it done by a computer?
16      Was it done electronically or did someone have
17    to go in and actually manually conduct the sweep?
18      MR. GLENNON:  Objection.  Compound.
19      THE WITNESS:  I believe it was done both.  I
20    believe it was done electronically as well as manually.
21    BY MR. GREENSTEIN:
22    Q.   Okay.  Now, do you know why that the smaller
23    amounts were -- were swept rather than larger receivable
24    amounts?
25    A.   I don't.

19

1      I just believe that -- that the smaller
2    amounts were maybe due to partial payments or --
3    invoices that maybe should have been credited that
4    weren't or -- there's several different reasons.
5    Q.   Okay.  When you say "invoices should have been
6    credited," what do you mean by that?
7    A.   They maybe just weren't credited off, and they
8    were so -- they were such a low amount that you couldn't
9    call one of our clients and ask them, "Could you please
10    pay this invoice that's $700."
11    Q.   Right.
12      And there were a lot them; right?
13    A.   Yeah.
14      MR. GLENNON:  Objection.  Vague and ambiguous.
15    BY MR. GREENSTEIN:
16    Q.   Now, do you know what "unapplied cash" is?
17    A.   Yes.
18    Q.   What is "unapplied cash"?
19    A.   "Unapplied cash" is the amount that comes from
20    the client that was not applied to any invoices.
21    Q.   Okay.  And that can -- and when you say "not
22    applied to an invoice," do you mean a payment could come
23    in from a customer and Oracle couldn't determine whether
24    there was an invoice to apply that payment to; right?
25      MR. GLENNON:  Objection.  Leading and

20

1    incomplete hypothetical.
2      THE WITNESS:  It could be an overpayment.
3      It could be an invoice that -- that the
4    customer paid the full amount and Oracle credited
5    partially, but the customer paid the full amount.
6      Any type of payment that came in that wasn't
7    fully applied to an invoice --
8      MR. GREENSTEIN:  Okay.  Sorry.
9      THE WITNESS:  -- would be unapplied.
10    BY MR. GREENSTEIN:
11    Q.   So let's break that up a little bit.
12      With respect to a payment, an overpayment,
13    what do you mean by that?
14    A.   An invoice has a certain amount.  The customer
15    pays over that amount.  Whatever is over that amount is
16    unapplied.
17    Q.   Okay.  So, for example, if there was a hundred
18    thousand dollar invoice and a customer paid $150,000,
19    that $50,000 would be considered an overpayment; right?
20    A.   Correct.
21      MR. GLENNON:  Objection.  Mischaracterizes the
22    testimony and incomplete hypothetical.
23    BY MR. GREENSTEIN:
24    Q.   Correct?
25    A.   Correct.

21

1  Q.  And so that that 50,000 would be considered
2  unapplied cash?
3  A.  Correct.
4  MR. GLENNON:  Same objection.
5  BY MR. GREENSTEIN:
6  Q.  Do you know where that -- that unapplied cash
7  would go?
8  Was there an account that it would go to?
9  A.  It would go in to the unapplied account.
10  Q.  Okay.  Do you know if there was a number for
11  that account?
12  A.  I believe there were a few different numbers
13  for unapplied accounts, but the ones that were visible
14  to me I don't recall what -- the exact number, but there
15  were unapplied accounts that were visible and unapplied
16  accounts that were not visible.
17  Q.  Okay.  Does 25005 ring a bell?
18  A.  Yes.
19  Q.  Okay.  Was that an unapplied -- an account
20  where unapplied cash would go?
21  A.  Yes.
22  Q.  Okay.  Does the account 12018 ring a bell?
23  A.  Yes.
24  Q.  Okay.  And in connection with unapplied cash?
25  A.  Yes.

22

1  MR. GLENNON:  Objection.  Vague and ambiguous.
2  BY MR. GREENSTEIN:
3  Q.  When you say some were visible, some were
4  invisible, what do you mean by that?
5  A.  Just from what I know in looking at unapplied,
6  the unapplied account, there was what we thought was
7  unapplied and then there were other accounts that had
8  other unapplied amounts to it that maybe were so old
9  that were not in the current unapplied account.
10  Q.  Okay.  So with unapplied accounts broken up --
11  okay.
12  Strike that.
13  When you said "old," was there a specific
14  account for older unapplied account items or maybe a
15  year or two years old?
16  MR. GLENNON:  Objection.  Vague and ambiguous.
17  THE WITNESS:  I'm not sure what the parameters
18  were.
19  BY MR. GREENSTEIN:
20  Q.  Okay.  So during that two-year period is it
21  fair to say that there were old items of unapplied cash
22  sitting in an account at Oracle?
23  A.  Yes.
24  Q.  Okay.  And how old, you know, 10 years old,
25  five years old?

23

1  MR. GLENNON:  Objection.  Leading.
2  THE WITNESS:  Easily.
3  BY MR. GREENSTEIN:
4  Q.  Easily?
5  A.  Yeah.
6  Q.  Okay.  So were there any that were over 10
7  years old?
8  A.  I would say right around 10.  I don't --
9  recall.
10  I just know that there were some very, very
11  old unapplied amounts.
12  Q.  Right.
13  And when you say "unapplied amounts," amounts
14  that were paid by Oracle customers that could not be
15  applied to invoices; right?
16  A.  Correct.
17  Q.  And those amounts were sitting in an Oracle
18  account for up to 10 years; is that correct?
19  MR. GLENNON:  Objection.  Leading.
20  THE WITNESS:  Correct.
21  BY MR. GREENSTEIN:
22  Q.  And approximately how many unapplied cash
23  items would you say were -- old unapplied cash items
24  were sitting in that account, let's say --
25  MR. GLENNON:  Objection --

24

1  BY MR. GREENSTEIN:
2  Q.  Sorry.
3  Let's say during 1999 through 2001.
4  MR. GLENNON:  Objection.  Calls for
5  speculation.  Vague and ambiguous.
6  MR. SCHRAG:  It's vague and ambiguous.
7  Do you mean how many or how -- dollar amount?
8  MR. GREENSTEIN:  Yeah, dollar amount.
9  THE WITNESS:  Millions.
10  MR. GLENNON:  Still calls for speculation.
11  BY MR. GREENSTEIN:
12  Q.  Millions?
13  A.  Uh-huh.
14  Q.  Tens of millions?
15  A.  Uh-huh.
16  Q.  A hundred million?
17  MR. SCHRAG:  Wait.  Please say "yes" or "no."
18  THE WITNESS:  Yes, I believe it was over tens
19  of millions.
20  BY MR. GREENSTEIN:
21  Q.  Tens of millions?
22  Could it be a hundred million?
23  MR. GLENNON:  Objection.  Leading.
24  THE WITNESS:  I believe the number that I
25  recall was somewhere in the vicinity of 30.

25

```
1              MR. GREENSTEIN: Okay.
2              THE WITNESS: But I --
3      BY MR. GREENSTEIN:
4         Q.   Was there any point that that changed -- well,
5      strike that.
6              So there was an account where the old items of
7      unapplied cash were kept, and was that separate from
8      items of new unapplied cash that may have come in, say,
9      in the past couple months?
10             MR. GLENNON: Objection. Compound. Vague and
11     ambiguous.
12             THE WITNESS: True.
13     BY MR. GREENSTEIN:
14        Q.   Okay. Was there somebody in charge of
15     unapplied cash during that time, '99 through 2001?
16        A.   There was a couple different people.
17             I think there was a person named Neil Menon,
18     and I believe there was a person named Dax Gross.
19             Those are the only two people I recall.
20        Q.   And how did you know that there were -- that
21     there was this account of older items of unapplied cash?
22             Could you see it somewhere, or was it on a
23     piece -- was it on a report of some kind?
24             MR. GLENNON: Objection. Compound.
25             THE WITNESS: No. No.
```

26

```
26 page
1              At the time of finding out about another
2      account that had unapplied items with it, I wouldn't --
3      I couldn't see it.
4              It was -- advised to -- this -- you know, once
5      I was a manager I found out that there was another
6      account that had unapplied cash in it, and we were given
7      this information by Michael Quinn, and he had gathered
8      up a meeting and stated that we needed to clear this un
9      -- these unapplied amounts up as soon as possible.
10     BY MR. GREENSTEIN:
11        Q.   Okay. Do you remember when you first found
12     out about that account?
13        A.   It would probably be within the last two years
14     when I was there. So --
15        Q.   Okay.
16        A.   -- '03.
17        Q.   Sorry.
18             So September 2001 did you change titles at
19     Oracle?
20        A.   I went from a collections analyst or accounts
21     receivable specialist to a collections manager.
22        Q.   And how long were you collections manager?
23        A.   I believe I was collections manager for --
24     over three years.
25        Q.   So roughly fall 2001 through fall 2004; right?
```

27

```
1         A.   True.
2              MR. GREENSTEIN: Bless you.
3              MR. GLENNON: Bless you.
4              MR. SCHRAG: Thank you.
5      BY MR. GREENSTEIN:
6         Q.   So the meeting that you just described where
7      you found out about these -- this account with all this
8      unapplied cash in it, you say that was in the --
9      probably the latter two years of your employment;
10     right?
11        A.   Uh-huh. Yes.
12             MR. GLENNON: Objection. Mischaracterizes the
13     testimony.
14     BY MR. GREENSTEIN:
15        Q.   You said that; right?
16        A.   Yes.
17        Q.   Do you remember if it was in late October 2002
18     that that meeting was held with Mike Quinn?
19        A.   It could have been '02 or '03.
20        Q.   Right. Okay.
21             But two years -- so -- well, strike that.
22             So fall 2004 collections manager.
23             How long did you work at Oracle after 2004?
24             MR. GLENNON: Objection. Compound. Vague and
25     ambiguous.
```

28

```
1              THE WITNESS: One more year.
2      BY MR. GREENSTEIN:
3         Q.   One more year?
4         A.   Yeah.
5         Q.   Okay. Did you get promoted in the fall of
6      2004?
7         A.   I believe I was already -- it was either '03
8      or '04 I was promoted to a manager.
9         Q.   To -- okay.
10             So -- let me back up.
11             So fall 2001 through fall 2004 you were a
12     collections manager?
13             MR. GLENNON: Objection. Leading.
14             THE WITNESS: From '99 to -- maybe somewhere
15     in '03 I was collections specialist or AR specialist.
16             At that point, somewhere in there, I don't
17     know an exact date, I was promoted to a collections
18     manager.
19             MR. SCHRAG: In 2003?
20             I think before you said 2001. I just want to
21     make sure it's clear.
22             THE WITNESS: Okay. Yeah, I believe it was
23     2003. I'm not very --
24     BY MR. GREENSTEIN:
25        Q.   So you said about three years.
```

29

```
1          Sorry.
2          You said about three years you were a --
3     A.   Two or three years I was a -- yeah.
4     Q.   -- collections manager?
5     A.   Collections manager.
6     Q.   Okay.  And then you got promoted to another
7  position?
8          MR. GLENNON:  Objection.  Leading.
9          THE WITNESS:  No.
10  BY MR. GREENSTEIN:
11     Q.   Oh.  So that was it?
12          That was your last position?
13     A.   Right.
14          Collections manager was the last position that
15  I held, and it was the position that I had when I left
16  Oracle in '05.
17     Q.   Okay.  And who did you -- as a collections
18  manager who did you report to?
19     A.   Ryan Roberts.
20     Q.   Anybody else?
21     A.   I believe Adam Hahn was first for a short
22  period of time, and then it changed to Ryan Roberts.
23     Q.   Backing up to your position as an AR
24  specialist, '99 -- September '99 through September 2001,
25  do you know who -- Greg Myers was your direct superior;
```

30

```
1  right?
2          MR. GLENNON:  Objection.  Leading.  Misstates
3  his testimony.
4          THE WITNESS:  Yes, he was.  He was the
5  accounts receivable manager.  He was one of the accounts
6  receivable managers.
7          I believe he was actually a director at the
8  time.
9  BY MR. GREENSTEIN:
10     Q.   Okay.  A director of accounts receivable?
11     A.   Uh-huh.
12     Q.   Okay.  Do you know who he reported to?
13     A.   I believe he reported to Michael Quinn.
14     Q.   Okay.  And do you know who Quinn reported to?
15     A.   Tom Williams.
16     Q.   And do you know who Tom Williams reported to?
17     A.   Jennifer something.
18     Q.   Minton?
19     A.   Yeah.
20     Q.   Okay.  Collections manager, fall 2001 through
21  fall 2000 -- roughly fall 2004.
22          You said you reported to Ryan Roberts, and for
23  a short time Adam Hahn; correct?
24          MR. GLENNON:  Objection.  Leading.  Compound
25  and vague and ambiguous.
```

31

```
1          THE WITNESS:  True.
2  BY MR. GREENSTEIN:
3     Q.   Do you know who Ryan Roberts reported to?
4     A.   Ryan Roberts reported to, I believe, Adam Hahn
5  for a short time and as well as Michael Quinn.
6     Q.   Okay.  And do you know who -- let's break it
7  up.
8          Do you know who Adam Hahn reported to?
9     A.   Michael Quinn.
10     Q.   Okay.  Do you know then Quinn reported to?
11     A.   Tom Williams.
12     Q.   Tom Williams?
13          Tom Williams reported to Jennifer Minton?
14     A.   Yes.
15          MR. GLENNON:  Objection.  Leading.
16  BY MR. GREENSTEIN:
17     Q.   Okay.  Did Tom Williams report to Jennifer
18  Minton in 2001 through roughly 2004?
19     A.   Yes.
20     Q.   Okay.  Do you know who Jennifer Minton
21  reported to?
22     A.   From what I know I believe Jennifer Minton
23  reported to Larry -- or there might have been one
24  position in between.
25     Q.   Okay.  Do you -- does the name Jeff Henley
```

32

```
1  mean anything to you?
2     A.   Yes.
3          I believe Jennifer Minton reported to Jeff
4  Henley and Jeff Henley reported do Larry Ellison.
5     Q.   Okay.  And as a collections manager, fall 2001
6  through fall 2004, did anybody report to you?
7     A.   Yes.  It was anywhere from six to 12 people at
8  a time.
9     Q.   Six to 12 people at a time?
10     A.   (Nodding head)
11     Q.   Okay.  And were those collections analysts?
12     A.   They were.
13     Q.   Okay.  Do you remember any names, just so you
14  can rattle off names if you remember?
15     A.   Kei Hoang, Victor Vasquez, Terri Ruiz.
16          I'm not sure.
17     Q.   Okay.
18     A.   There were a lot.  I might be able to remember
19  some more a little bit later.
20     Q.   So is it fair to say that the hierarchy for --
21  in your department was collections analysts and those
22  reported to collections managers?
23          Is that right?
24     A.   Uh-huh.
25     Q.   Okay.  And then collections managers reported
```

33

1    to -- was there a title above that?
2          MR. GLENNON:  Objection.  Leading.
3          THE WITNESS:  Above the collections manager
4    was the senior collections manager.
5          Above the senior collections manager was the
6    -- director.
7    BY MR. GREENSTEIN:
8       Q.   Was a senior collections manager -- you mean
9    either Ryan Roberts or Adam Hahn?
10      A.   Yes.
11         MR. GLENNON:  Objection.  Leading.
12         MR. GREENSTEIN:  Right?
13         THE WITNESS:  Yes.
14   BY MR. GREENSTEIN:
15      Q.   And when you say "director," do you mean Mike
16   Quinn or Tom Williams?
17      A.   Michael Quinn --
18      Q.   Okay.
19      A.   -- was the Director of Credit and Collections.
20      Q.   Okay.  Why don't you describe for me your
21   duties and responsibilities as a collections manager
22   versus your duties and responsibilities as an AR
23   specialist.
24      A.   As an AR specialist or collections manager --
25   or a collections analyst, and I'm lumping all that

34

1    together, was the individual that called the clients
2    that had past due amounts or past due invoices and --
3    and proceeded to collect on those amounts.
4          The collections manager oversaw all of the
5    collections analysts that were making those phone calls
6    to collect the outstanding amounts, and ensured that
7    they were, you know, keeping a healthy aging on their
8    territories.
9       Q.   Okay.  So when you were collections manager
10   did you personally do any -- have any collection
11   efforts in --
12      A.   Only when it escalated.
13         If something escalated to where there was a
14   problem with the client and we had to get on a
15   conference call with them and figure out a way to -- to
16   ensure that they paid the invoice, then I would get
17   involved.
18      Q.   Okay.  But as an AR specialist you were -- it
19   was more in the trenches, calling customers, trying to
20   collect on --
21         MR. GLENNON:  Objection.  Leading.
22         THE WITNESS:  As a collections analyst or AR
23   specialist, yes, they were the ones that are in the
24   trenches that were making all of the phone calls.
25         The collections manager was just overseeing

35

1    what they were doing.
2    BY MR. GREENSTEIN:
3       Q.   Okay.  And did you have any sort of -- as a
4    collections manager do you have any sort of deliverable,
5    you know -- did you have to -- as a result of your
6    oversight of collections analysts did you have to report
7    to anybody with a deliverable?
8          MR. GLENNON:  Objection.  Vague and ambiguous.
9          THE WITNESS:  Yes.
10         We had a certain amount that was in my line of
11   business that was outstanding, and we had to ensure that
12   we kept that healthy, and, obviously, brought it down to
13   a healthy amount, and ensured that there was, you know,
14   not a lot of invoices over 30 days past due, or 60, or
15   90, just keeping a healthy aging.
16   BY MR. GREENSTEIN:
17      Q.   Okay.  And did you have to submit some sort of
18   report on -- on your line of business?
19      A.   Sure.
20      Q.   Okay.  What was your line of business, by the
21   way?
22      A.   Consulting.
23      Q.   Okay.  And do you remember the -- who were the
24   other --
25         Well, were there any other collections

36

1    managers in other lines of business such as license?
2       A.   True.
3          There was Troy Tandy.  There was Pam Andrews.
4    There was Justin Backs.  There was Molly Littlefield,
5    and Anne Marie Adao.
6       Q.   And do you remember of those individuals -- do
7    you remember what line of business they were collections
8    managers for?
9       A.   Yeah.
10         I believe Molly and Anne Marie were
11   responsible for -- I believe Molly was license, and Anne
12   Marie was education, and Justin Backs was support, and I
13   was consulting.
14      Q.   And that was fall 2001 through fall 2004;
15   correct?
16      A.   Correct.
17      Q.   Okay.  So does -- is it fair to say that they
18   were your counterparts in other lines of business?
19      A.   They were.
20         MR. GLENNON:  Objection.  Leading.
21   BY MR. GREENSTEIN:
22      Q.   You were -- your position was the same level
23   as Molly Littlefield, Justin Backs, Anne Marie Adao,
24   Troy Tandy?
25         Is that fair to say?

37

1      MR. GLENNON:  Objection.  Leading and
2  compound.
3      THE WITNESS:  We all had the same position as
4  collection -- collection manager, and we rolled up to
5  Ryan Roberts, who was the senior collections manager.
6  BY MR. GREENSTEIN:
7      Q.   Okay.  So, for example, if Molly Littlefield
8  was collections manager in license, she would be in
9  charge of all the collections analysts collecting on
10  receivables in the license line of business; right?
11      A.   Correct.
12      Q.   Okay.
13      A.   As well as Anne Marie would be for education
14  and Justin would be for support.
15      Q.   Okay.  Does Omid Fardaneh ring a bell?
16      A.   He was also a collections manager at the time.
17      Q.   Okay.
18      A.   For a short time, not as long as the other
19  four that I named, but Omid was there for part of it as
20  well.
21      Q.   Okay.  So in terms of your deliverable, was
22  there any sort of report whereby all of the collections
23  efforts in the different lines of business were compiled
24  to learn?
25      MR. GLENNON:  Objection.  Vague and ambiguous.

38

1      THE WITNESS:  Yes.
2      I believe we were all responsible for our line
3  of business, but they -- they also brought it together
4  in to one report, and I believe they were separated by
5  tabs.
6  BY MR. GREENSTEIN:
7      Q.   Tabs?
8      A.   Different worksheets.
9      Q.   Oh.  Sorry.  Say that again.
10      A.   Different worksheets and an Excel worksheet.
11  You'd have the consulting worksheet, and you'd have the
12  license, and the education, and the support.
13      Q.   Okay.  During your time as a collections
14  manager did you ever work with unapplied cash at all?
15      A.   Yes.
16      Q.   Okay.  And how so?
17      A.   My directs or the individuals that were
18  underneath me as collections analysts were responsible
19  for unapplied cash, just as they were responsible for
20  collecting on outstanding amounts.
21      So they collected, and they also had to
22  maintain the unapplied cash within their territory to be
23  as little as possible.
24      That's part of my responsibilities as a
25  collections manager, but the biggest thing that I was

39

1  ever responsible for when it came to unapplied cash was
2  the point of Michael Quinn and Greg Myers getting all of
3  us collections managers together and letting us know
4  that there was a problem with the unapplied cash, and we
5  had a large amount of unapplied cash that was a lot
6  larger than us collections managers had ever seen
7  before, and it was our responsibility as quick as
8  possible to clear this unapplied cash and find a home
9  for this unapplied -- the unapplied amounts.
10      Q.   Okay.
11      A.   And that's -- the biggest -- the biggest thing
12  I've ever done with unapplied cash.
13      Q.   Okay.  So let me back up a little bit.
14      So when you were an AR specialist you were
15  essentially -- or strike that.
16      When you were an AR specialist, did you have a
17  certain territory with unapplied cash that you worked
18  with?
19      A.   Yes.
20      Q.   Okay.  And do you remember the amount for your
21  specific territory?
22      A.   I -- it went all over the board, because there
23  would be invoices coming in that could take it to a
24  certain level, and then a week later they could be
25  applied to invoices and they would drop down and cut it

40

1  in half.
2      Q.   Right.  So it would fluctuate?
3      A.   It would fluctuate.
4      Q.   Right.
5      Because some unapplied cash would be applied
6  to --
7      A.   Correct.
8      MR. GLENNON:  Objection.  Leading.
9  BY MR. GREENSTEIN:
10      Q.   Okay.  And some wouldn't be; right?
11      MR. GLENNON:  Objection.  Leading.
12      THE WITNESS:  Correct.
13  BY MR. GREENSTEIN:
14      Q.   So at the time you arrived at -- well, strike
15  that.
16      When you were an AR specialist, September '99
17  through September 2001, you were aware of the unapplied
18  cash in your territory; correct?
19      A.   Correct.
20      Q.   And -- but I think you said earlier that you
21  were not aware of the older items of unapplied cash; is
22  that right?
23      MR. GLENNON:  Objection.
24      THE WITNESS:  We found out --
25      THE REPORTER:  I'm sorry.  I can't hear the

41

1 objection and --
2     MR. SCHRAG:  You can object.
3     Give him time to get his objection in, and
4 then, when he's done objecting, answer the question.
5     MR. GREENSTEIN:  Yeah, and it's -- you
6 probably just want to pause before answering any
7 question, just to give him time.
8     THE WITNESS:  Okay.
9     MR. GLENNON:  Thanks.
10 BY MR. GREENSTEIN:
11     Q.  So you said as an AR specialist there was a --
12 there were items of -- unapplied -- older items of
13 unapplied cash that you were not aware September '99
14 through September 2001; right?
15     MR. GLENNON:  Objection.  Mischaracterizes the
16 testimony.
17     THE WITNESS:  Correct.
18     There was the amount of unapplied that I was
19 responsible for that I could see, and years later we
20 found out that there was -- as a collections manager
21 found out that there was unapplied amounts that we could
22 not see.
23 BY MR. GREENSTEIN:
24     Q.  All right.  And you're -- you're speaking
25 of a meeting or meetings that occurred years later where

42

1 you found out about these older items of unapplied cash;
2 right?
3     MR. GLENNON:  Objection.  Leading.
4     THE WITNESS:  Correct.
5 BY MR. GREENSTEIN:
6     Q.  And I think earlier -- I think earlier --
7 strike that.
8     So up until those meetings where you found out
9 about the old unapplied cash items you were just aware
10 of the unapplied cash items for your particular
11 territory; right?
12     A.  Correct.
13     I was only aware of the unapplied cash that I
14 was responsible for as well as the entire department was
15 responsible for.
16     Q.  Because every line of business had certain
17 territories, and every territory had some unapplied
18 cash; right?
19     MR. GLENNON:  Objection.  Leading.
20     THE WITNESS:  Correct.
21     Every different line of business had their
22 unapplied cash, and every collections analyst had his or
23 her unapplied cash.
24 BY MR. GREENSTEIN:
25     Q.  So before you found out about these older

43

1 items of unapplied cash how old were the unapplied cash
2 items that you could see?
3     A.  They could be anywhere from four days old to a
4 year old -- or two years old.
5     Q.  Or two years old?
6     A.  Or three years old.
7     Q.  So when you're talking about the older
8 unapplied cash that you couldn't see, you're talking 10
9 years, five years; right?
10     MR. GLENNON:  Objection.  Leading.
11 Mischaracterizes the testimony.
12     THE WITNESS:  Yeah.  I would say more like
13 five plus to 10.
14 BY MR. GREENSTEIN:
15     Q.  So these are items of unapplied cash that had
16 been sitting at Oracle that couldn't be applied to
17 customer invoices, and they were still there 10 years
18 after or five years after the payments were made?
19     MR. GLENNON:  Objection.  Leading and
20 compound.
21     THE WITNESS:  Correct.
22 BY MR. GREENSTEIN:
23     Q.  And you talked earlier about not being able to
24 see these older items of unapplied cash; correct?
25     A.  Correct.

44

1     Q.  For the items of unapplied cash that you could
2 see, how could you see them?
3     Was there a report?
4     A.  We were given a report.
5     As a collections analyst or AR specialist we
6 were given a report on a weekly basis.  "Here is your
7 unapplied.  This is what you're responsible for."
8     But at the beginning and maybe the first six
9 months it came out as a paper report.
10     After that it turned in to an Excel spread
11 sheet -- and on a weekly basis we would be able to see,
12 you know, what it was that we had and what we were
13 responsible for, and it -- once it got to be where it
14 was on Excel spread sheet you could see it everyday.
15     Q.  Okay.  So could you see the fluctuations
16 everyday?
17     A.  Yes.
18     Q.  Okay.
19     A.  Maybe every 24 to 48 hours.
20     Q.  Right.
21     So if an item of unapplied cash got applied to
22 an open invoice, for instance, that would be reflected
23 in the report; right?
24     A.  Right.  So the next report it would -- maybe
25 like in a couple days, when it was actually applied, you

45

1    would be able to see it.
2         You'd be able pull it up on a report to see
3    it.
4         Q.   Okay.  And could you -- was it -- were all
5    those items compiled in to a single report or was it
6    broken down by line of business?
7         MR. GLENNON:  Objection.  Compound.
8         THE WITNESS:  Both.
9         They had broken down by line of business, they
10   had broken down by collections analyst, and they had it
11   done by the entire department.
12   BY MR. GREENSTEIN:
13        Q.   Okay.  And do you know, was there a formal
14   title for those reports?
15        A.   The unapplied report.
16        Q.   Did you ever refer to it as "unapplied cash
17   report"?
18        A.   "Unapplied cash report."
19        Q.   Okay.  Does -- have you ever heard it called
20   the "unapplied unidentified receipts report"?
21        A.   Yes, I have heard it called that.
22        Q.   Is that the same thing as a -- the unapplied
23   cash report?
24        MR. GLENNON:  Objection.  Vague and ambiguous.
25        THE WITNESS:  The unapplied cash report --

46

1    previous to having the meetings of this problem arising,
2    it was called "the unapplied cash report," and at the
3    point of having these meetings of knowing that there was
4    a problem with the unapplied cash, then it was called
5    "the unidentified receipts."
6         There were -- there were more reports that
7    came out that had different names such as -- "the
8    unapplied cash" and "unidentified receipts report."
9    BY MR. GREENSTEIN:
10        Q.   Okay.  I'd like to -- actually, this has been
11   previously marked, so we don't need to mark it again.
12        This was previously marked as Venkataramana
13   Number 2, Exhibit 2, and you can get the spelling
14   afterwards.
15        But before I actually mark this, do you know
16   Molly Littlefield -- do you know if Molly Littlefield
17   ever changed her name?
18        A.   Yes.
19        Q.   And was it Venkataramana?
20        A.   After I left I believe she had changed it
21   because she married an Indian person from Bangalore, I
22   believe.
23        MR. GREENSTEIN:  Okay.  So, again, for the
24   record this is Venkataramana Exhibit 2 previously
25   marked.

47

1         If you can take a look at that, and let me
2    know when you're finished, Mr. Hatada.
3         THE WITNESS:  Thanks.
4         MR. SCHRAG:  Just look at it.  You don't have
5    to read the whole thing.
6         Just look at it and see if you can identify
7    what it is.
8         MR. GREENSTEIN:  And for the record this is
9    Bates stamped PLF-ORC 001161 through 001215.
10        And you can just look at it generally.
11        THE WITNESS:  Uh-huh.
12        (Discussion off the record)
13   BY MR. GREENSTEIN:
14        Q.   Do you recognize this type of report?
15        A.   Yes, I do.
16        Q.   Is this the unapplied cash report?
17        A.   This is one of the unapplied cash reports,
18   yes.
19        Q.   Okay.  And you see how it's 53 pages long;
20   right?
21        A.   Uh-huh.
22        Q.   And does it -- does it appear to be
23   alphabetized by customer?
24        You see on the first page it's -- all the --
25   most of the customers are A's and then it goes on, and

48

1    then at the end, last page it's Xerox?
2         Do you see that?
3         MR. GLENNON:  Objection.  Document speaks for
4    itself.
5         THE WITNESS:  True.
6    BY MR. GREENSTEIN:
7         Q.   So it looks like these are all --
8         A.   Alphabetically.
9         Q.   Right.
10        So it appears that the unapplied cash report
11   could be organized alphabetically; right?
12        MR. GLENNON:  Objection.
13        Document speaks for itself.  Leading.
14        THE WITNESS:  Correct.
15   BY MR. GREENSTEIN:
16        Q.   Okay.  Now, could it also be -- strike that.
17        Now, would this report be available to you
18   electronically when you were a collections manager or AR
19   specialist?
20        A.   This report would be both.  It would be
21   available as a collections analyst as well as a
22   collections manager.
23        MR. SCHRAG:  Available electronically?
24        THE WITNESS:  Available electronically.
25   BY MR. GREENSTEIN:

49

1    Q.   Okay. And could you go in and sort it by any
2  of these column headings here?
3    A.   Yes.
4    Q.   Okay.
5      Oh. I'm sorry. Go ahead.
6    A.   What I believe this report is is actually an
7  attempt to clean up the unapplied cash, so taking the
8  unapplied cash report, and you would be able to sort it
9  by collector as well as any of these columns.
10      You could sort it by company. You could sort
11  it by days old. You could sort it by collector.
12      And I know that what we did some of the time
13  was sort it by collector, and hand them out to the
14  actual collectors, so they could resolve them and know
15  which portions of this report was theirs.
16    Q.   Okay.
17    A.   And the notes part of it they were supposed to
18  update.
19    Q.   Okay. So let's -- let's just look at the --
20  well, first of all, look at the first page.
21      Do you recognize that -- the first page with
22  the handwriting on it?
23      Flip there.
24      No, no, no. The --
25      MR. SCHRAG:  Cover page.

50

1      MR. GREENSTEIN:  Cover page. Exactly.
2  BY MR. GREENSTEIN:
3    Q.   See that?
4    A.   Uh-huh.
5    Q.   Now, do you recognize that handwriting?
6    A.   Let's see.
7      I don't recognize it. The print down
8  below, --
9    Q.   Uh-huh.
10    A.   -- I know that I was always one to print. I
11  never did cursive.
12      But the top of it, you know, could be -- could
13  be given to someone with the cursive up top, and then
14  the person who received it wrote "This is my copy."
15      But I couldn't tell you who wrote that.
16    Q.   All right. So turning to the second page of
17  the document, you see the column heading "date received"
18  -- "date, r-e-c"?
19      Do you see that?
20    A.   Yes.
21    Q.   What does that refer to, if you know?
22    A.   I believe that date received is when the check
23  was actually received in-house at Oracle.
24    Q.   So a check from an Oracle customer to Oracle;
25  right?

51

1      MR. GLENNON:  Objection. Leading.
2      MR. GREENSTEIN:  Right?
3      THE WITNESS:  So in referencing the first line
4  item, check 132419 was received on January 12th at 1:00.
5  BY MR. GREENSTEIN:
6    Q.   And the check was received by customer 21st
7  Century Insurance Group; right?
8      MR. GLENNON:  Objection. Document speaks for
9  itself. Lack of foundation.
10      THE WITNESS:  Check was sent from customer
11  21st Century Insurance Group, customer number, and then
12  that amount, and it has been outstanding for 80 days.
13  BY MR. GREENSTEIN:
14    Q.   Okay. So "days old" means the amount of time
15  that that item of unapplied cash has remained
16  outstanding; right?
17      MR. GLENNON:  Objection. Leading.
18      THE WITNESS:  Correct.
19  BY MR. GREENSTEIN:
20    Q.   And the "collector" refers to somebody at
21  Oracle; right?
22      MR. GLENNON:  Same objection.
23      THE WITNESS:  Yes. On the first line item
24  Victor Vasquez was responsible for that item.
25  BY MR. GREENSTEIN:

52

1    Q.   Okay. And you're speaking of the "V. Vasquez"
2  written under "collector;" right?
3    A.   Correct.
4    Q.   And Victor Vasquez was a collections analyst;
5  correct?
6    A.   Correct.
7    Q.   You see the notes there?
8    A.   Yes.
9    Q.   Now, what is -- what does -- the "notes"
10  heading mean to you?
11    A.   The "PA" is referring to the fact that he
12  believes that it's a consulting invoice.
13      Not quite sure what everything else means.
14    Q.   Okay.
15    A.   The "Woodland" could mean that maybe it came
16  from the Woodland branch.
17    Q.   Okay. In general, though, what was the note
18  -- what was the "notes" column used for?
19      MR. GLENNON:  Objection. Vague and ambiguous.
20  Lack of foundation.
21      THE WITNESS:  In this report it was used for
22  the collections analyst to do the research on it and be
23  able to put in the notes column which line of business
24  they felt that this check was from.
25      So, in regards to item number 1, check 132419,

53

1   Victor Vasquez felt that this was a consulting invoice,
2   because it had a "PA" in front of it.
3        Raul Campos felt that the item number 2, check
4   53964, was a license invoice, and he felt that it was
5   supposed to be -- it was meant to go to invoice number
6   1328728.
7   BY MR. GREENSTEIN:
8        Q.   Okay.  Now, you, as a collections manager,
9   could you go in to the spread sheet and write a note in
10  that column?
11       A.   Sure.
12       Q.   Okay.  And could the collections analyst do
13  it?
14       A.   Yeah.  Most of them did.  That's what -- these
15  notes that are on the far right under "notes" were
16  typically written by Victor on the first one and then --
17  Raul on the second one.
18       Q.   Okay.  So "R. Campos" in the second line
19  refers to Raul Campos; right?
20       A.   Correct.
21       Q.   And who is Raul Campos?
22       A.   He was another one of the unapplied
23  specialists during my time there.
24       Q.   Okay.  And "T. Tandy" on the third line is
25  Troy Tandy?

54

1        A.   Troy Tandy.
2        Q.   And who is J. Badovin?
3        A.   I don't recall.
4        Q.   Okay.  Is it fair to say that the "collector"
5   heading refers to the collector that was responsible for
6   researching that particular item of unapplied cash?
7   Right?
8        MR. GLENNON:  Objection.  Vague and ambiguous.
9   Leading.
10       THE WITNESS:  Yes, it was.
11       The -- the collector name in the collector
12  column is the individual responsible for resolving the
13  check number and putting the notes in on the far right.
14  BY MR. GREENSTEIN:
15       Q.   Can you see -- let's turn to the second page
16  -- or third page of the document.
17       And, if you go down to the March 26th, '01
18  entry, Advanced Telecom Group, Inc.
19       MR. GLENNON:  Eli, just a question for
20  qualification.
21       MR. GREENSTEIN:  Yeah.
22       MR. GLENNON:  You got page 2, which is the
23  third page, or page 3, which is actually the fourth
24  page.
25       MR. GREENSTEIN:  Yeah.  Thank you.

55

1   It's actually page 3 of the document, but it
2   says page 2 of the report.  So --
3        MR. GLENNON:  Okay.
4   BY MR. GREENSTEIN:
5        Q.   So, Mr. Hatada, if you could just look at the
6   March 26th, '01 entry for Advanced Telecom Group.
7        Do you see that?
8        A.   March 28th?  26th?  What's --
9        Q.   Yeah.  It's 26th or 28th, the number next to
10  it, 33657.
11       A.   I see it.
12       Q.   Okay.  If you go -- so if you look further
13  down, to the column with the amount 123,303.80.
14       Do you see that?
15       A.   Correct.
16       Q.   So is it fair to say that that's the check
17  amount?
18       If you turn back to the second page that's
19  under the column "check amount," so that's how much the
20  -- that's how much the check was that came in that
21  resulted in an item of unapplied cash; right?
22       MR. GLENNON:  Objection.  Foundation.
23  Document speaks for itself.
24       MR. GREENSTEIN:  Right?
25       THE WITNESS:  Correct.  Check number's 33657,

56

1   in the amount of 123,303.80.
2   BY MR. GREENSTEIN:
3        Q.   And then, if you look down to the "notes"
4   column, it says "DUP pay."
5        Do you see that?
6        A.   Correct.
7        Q.   What does that mean?
8        A.   It means it's a duplicate payment of invoice
9   40073357.
10       Q.   So, based on your experience as a collections
11  manager, is it fair to say that what this refers to is
12  if there's an item of unapplied cash from Advanced
13  Telecom Group, Inc., that was a result of a duplicate
14  payment on invoice number 40073357; is that right?
15       A.   Correct.
16       MR. GLENNON:  Objection.  Compound and
17  leading.
18  BY MR. GREENSTEIN:
19       Q.   Correct?
20       A.   Correct.
21       Q.   So what does "duplicate payment" mean?
22       Does that mean a customer pays an invoice
23  twice?
24       MR. GLENNON:  Objection.  Leading.
25       THE WITNESS:  It means that Advanced Telecom

57

1   Group, Inc., previously paid invoice 40073357 in the
2   amount 123,303.80, and they paid it again.
3   BY MR. GREENSTEIN:
4       Q.   Okay.
5       A.   And by means of this is the amount -- the
6   second payment that they made.
7       Q.   Right.
8            So the second payment came in, couldn't be
9   applied to an invoice, and so it was designated as an
10  item of unapplied cash; right?
11          MR. GLENNON:  Objection.  Leading.
12          THE WITNESS:  Correct.
13  BY MR. GREENSTEIN:
14      Q.   And the task of collectors was to figure out
15  what to do with it; right?
16          MR. GLENNON:  Objection.  Leading.
17          THE WITNESS:  Yes.  J. Badovin was responsible
18  for finding out where this 123,000 came from, and she
19  listed that it was a duplicate payment of invoice
20  40073357.
21  BY MR. GREENSTEIN:
22      Q.   If you turn to the next page, which is -- it
23  says "page 3" at the bottom --
24          MR. SCHRAG:  What's the Bates number?
25          That would be less confusing.

58

1           MR. GREENSTEIN:  Yeah.  Thank you.
2           001164.
3   BY MR. GREENSTEIN:
4       Q.   And if you look at the March 22nd, '01 entry,
5   it's the one, two, three -- fourth line down for Air
6   Touch Cellular.
7            Do you see that?
8       A.   I do.
9       Q.   And it's an 101,484 item.
10           Do you see that?
11      A.   Correct.
12      Q.   And do you see in the notes column it says
13  "CN"?
14      A.   Yes.
15      Q.   Right?
16           What does that mean?
17      A.   That means that the customer, Air Touch
18  Cellular, paid for invoice 40057460 in the amount of
19  101,484.38, but because that invoice was credit memoed
20  in full -- or partial, they have an outstanding amount
21  of 101,483.38.
22      Q.   You say "outstanding amount."
23           You mean outstanding amount of unapplied cash
24  that could be applied to an invoice for that customer;
25  right?

59

1           MR. GLENNON:  Objection.  Leading.
2           THE WITNESS:  Correct.
3           The reason that the 101,484.38 is not applied
4   to any invoice is because there is no invoice to be
5   applied to because the invoice was credit memoed.
6   BY MR. GREENSTEIN:
7       Q.   And what -- for what reasons would an invoice
8   be credit memoed?
9           MR. GLENNON:  Objection.  Foundation.
10          THE WITNESS:  We could have billed them
11  incorrectly.
12          They could have -- had a complaint that they
13  wanted it to be partially credit memoed, and maybe they
14  wanted to short pay it, or whatnot, and it just so
15  happened that, you know, we credited it for whatever
16  reason.
17          Maybe we -- obviously, we billed them
18  incorrectly, but they -- paid it in full.
19  BY MR. GREENSTEIN:
20      Q.   Okay.  So there -- is it fair to say that
21  there were multiple reasons an invoice could be credit
22  memoed?  Right?
23          MR. GLENNON:  Objection.  Mischaracterizes the
24  testimony.
25          THE WITNESS:  Multiple reasons.

60

1   BY MR. GREENSTEIN:
2       Q.   And one of the reasons is if a customer may
3   complain and say, "Hey, we want our money back," or "We
4   don't like this product"?
5            Could that be a reason for a credit memo?
6       A.   Correct.
7       Q.   Okay.  And that would reduce the amount of the
8   invoice by the same amount as a credit memo; right?
9           MR. GLENNON:  Objection.  Leading.
10          THE WITNESS:  Yes, for -- if the -- invoice
11  was 101,484.38, it could be credit memoed for
12  101,484.38, or it could be credit memoed for 50,000.
13          It could be credit memoed for any amount.
14  BY MR. GREENSTEIN:
15      Q.   And so the residual amount -- so the customer
16  would pay, and the amount -- that couldn't be applied
17  because of the credit memo would become unapplied cash;
18  right?
19          MR. GLENNON:  Objection.  Leading.
20  BY MR. GREENSTEIN:
21      Q.   Right?
22      A.   Yes.
23      Q.   Go ahead.
24      A.   In many cases this invoice, 40057460, could
25  have been for $550,000, but maybe we credit memoed

61

1   101,484.38 for whatever reason, and they paid the
2   invoice in full, and that is why the 101 is outstanding
3   -- or is unapplied.
4       MR. GREENSTEIN:  Okay.  Why don't we take a
5   five-minute break.
6       VIDEOGRAPHER:  Off the record, the time is
7   10:53 a.m.
8       (Thereupon a recess was taken at 10:53 a.m.
9       and the deposition resumed at 11:06 a.m.)
10      VIDEOGRAPHER:  We are back on the record.  The
11  time is 11:06 a.m.
12      MR. SCHRAG:  Counsel, before you start,
13  Mr. Hatada wants to clarify what the names of his
14  positions were while he was there.
15      MR. GREENSTEIN:  Okay.
16      THE WITNESS:  So there was only two different
17  positions or titles that I had at Oracle while I was
18  there for the five years, and the first one was called
19  collections analyst, and the second one was called
20  collections manager, and I believe I said accounts
21  receivable specialist, and --
22  BY MR. GREENSTEIN:
23      Q.  Okay.  But, as far as your duties and
24  responsibilities go, your testimony was accurate?
25      A.  It was.

62

1       Q.  Okay.
2       A.  I just wanted to make sure I changed it.
3       Q.  Okay.  Thank you.
4           So, looking again at Venkataramana Exhibit 2,
5   which is in front of you, the report of unapplied cash,
6   I'd like to direct your attention to Bates 001165, which
7   is on the lefthand side, and I think the first entry is
8   Allen, Maxwell and Silver, January 30th.
9           Do you see that?
10      MR. GLENNON:  Objection.  Document speaks for
11  itself.
12      THE WITNESS:  46710?
13      MR. GREENSTEIN:  Yeah.
14      THE WITNESS:  Correct.
15  BY MR. GREENSTEIN:
16      Q.  Right.
17          So I want to -- direct your attention to the
18  February 2nd, '01 entry for American Civil Liberties.
19  It's in the middle of the page.
20          Do you see that?
21      A.  4502?
22      Q.  Yes.
23          See that line?
24      A.  I do.
25      Q.  And if you go down to the "comments" field, it

63

1   says "DUP pay."
2       Do you see that?
3       A.  I do.
4       Q.  And that refers to -- it was -- this item of
5   unapplied cash was due to a duplicate payment from
6   American Civil Liberties for that invoice number,
7   40071835; right?
8       MR. GLENNON:  Objection.  Lack of foundation.
9   Document speaks for itself.
10  BY MR. GREENSTEIN:
11      Q.  Is that correct?
12      A.  That's correct.  The 2,677.50 was a duplicate
13  payment on invoice 40071835.
14      Q.  Thank you.
15          And if you look down, it's the fourth line
16  from the bottom, March 12th, '01 entry for 677 -- it's
17  check number 6778, for America's Job Network.
18          Do you see that?
19      A.  I do.
20      Q.  And if you go down, and it's an amount $15.56,
21  do you see that?
22      A.  I do.
23      Q.  Okay.  And then in the "notes" field it says
24  "awaiting CC refunds."
25          Do you see that?

64

1       A.  I do.
2       Q.  What does "awaiting cc refund" mean?
3       MR. GLENNON:  Objection.  Foundation.
4   Document speaks for itself.
5       THE WITNESS:  "Awaiting cc refund," I believe
6   means that they are awaiting for the credit card refund.
7           So -- J. Badovin is going to refund America's
8   Job Network's credit card for 15.56, and they're
9   awaiting that, so the unapplied amount will come off of
10  this report.
11  BY MR. GREENSTEIN:
12      Q.  So is it fair to say that in certain instances
13  an item of unapplied cash that couldn't be applied to an
14  invoice was refunded to the customer?
15          Right?
16      A.  At times it would be refunded to the customer.
17      Q.  Right.
18          If you couldn't -- if you couldn't find an
19  open invoice to apply it to; right?
20      MR. GLENNON:  Objection.  Leading.
21  BY MR. GREENSTEIN:
22      Q.  That's one reason?
23      A.  It would not always be refunded to the
24  customer if there were no invoices to apply it to.
25          There was a point in time when we were given

65

1    direction by Tom Williams to not refund anything for a
2    long period of time.
3        Q.    Okay.  Did you say a point in time -- do you
4    remember when that was that Tom Williams said that?
5        A.    It was during the point of us trying to
6    resolve the unapplied that had popped up that we had
7    never seen before.
8        Q.    Okay.  And are you referring to the meetings
9    where you found out about the old unapplied cash items
10   that you never knew about before?
11       A.    Yes.
12       Q.    Okay.  And that time period, you said, was in
13   the last -- well, roughly the last two years of your
14   employment?
15       A.    Yes.
16       Q.    Okay.  So at that time Tom Williams told you
17   -- strike that.
18            How did you -- did he tell you personally not
19   to refund items or did he tell multiple people in a
20   meeting?
21       MR. GLENNON:  Objection.  Compound.  Vague and
22   ambiguous.
23       THE WITNESS:  I heard from Molly Littlefield
24   and Ryan Roberts to shut down on all refunds back to the
25   client for a period of time until he said that we were

66

1    able to refund again.
2        MR. GREENSTEIN:  Okay.
3        THE WITNESS:  So just because this says
4    "awaiting credit card refund" or some of the other notes
5    in here says "refund back to client" doesn't mean it
6    always went back to the client.
7            At times we -- we had to put together a
8    request to the Accounts Receivable Department to refund,
9    and at times those requests would be put on hold for
10   long periods of time, and the money would not go back to
11   the client.
12   BY MR. GREENSTEIN:
13       Q.    Okay.  So was it determined that an item of
14   unapplied cash needed to be refunded but the process was
15   never implemented so the money never got refunded?
16            Is that correct?
17       MR. GLENNON:  Objection.  Compound and
18   leading.
19       THE WITNESS:  True.
20   BY MR. GREENSTEIN:
21       Q.    Even though the collectors determined that it
22   was the customer's money and should go back to the
23   customer, it was never refunded; was it?
24       A.    True.
25       Q.    And that happened multiple times; didn't it?

67

1        MR. GLENNON:  Objection.  Leading.
2        THE WITNESS:  Yes.
3    BY MR. GREENSTEIN:
4        Q.    So back to when you first started at Oracle
5    and part of your duties, I guess, as a collection
6    analyst, you said, was to -- you know, you had a list of
7    unapplied cash for your territory; right?
8        A.    Yes.
9        Q.    And was part of your task to try to resolve
10   some of those items of unapplied cash, figure out if
11   they could -- if they could be applied to invoices?
12       MR. GLENNON:  Objection.  Compound.
13   BY MR. GREENSTEIN:
14       Q.    Right?
15       A.    Yes.
16       Q.    Did you ever as a collections analyst resolve
17   all of your items of unapplied cash assigned to you?
18       A.    Never.
19       Q.    Never?  Why do you say that?
20       A.    No one would ever resolve.
21       Q.    And why is that?
22       A.    All of their amounts that were unapplied.  It
23   was impossible.
24            There was too many items to resolve -- for one
25   person to resolve.

68

1            It was looked at as being a success if you
2    could just lower it from time-to-time.
3            You would never be able to resolve the entire
4    thing, just because there was so many older items that
5    were unresolvable, not from just Oracle's standpoint,
6    but from the clients' standpoint as well, because they
7    were so old that the individuals that originally wrote
8    the check to Oracle had been gone long ago, and there
9    were new people, you know, there's a new point of
10   contact, and maybe they didn't carry reports for that
11   long ago.
12       Q.    Okay.  And when you say it was impossible to
13   resolve all of the unapplied cash items, was that
14   because there were too many of them?
15       A.    Yes.
16            And there were points -- there were times when
17   we did a really good job of getting the unapplied down,
18   but it would never be -- taken care of in full.
19            It would never be completely done.
20       Q.    Right.
21            So the collectors did their best to resolve
22   items of unapplied cash in their territory, but there
23   was so many and some of them were so old that they -- it
24   was impossible to resolve them; right?
25       MR. GLENNON:  Objection.  Leading.

69

1    THE WITNESS:  Yes.
2        They would go through each one of them and try
3    to -- and attempt to resolve each item, but a large
4    percentage of those items they didn't really need to
5    look at anymore because they were just unresolvable.
6    BY MR. GREENSTEIN:
7        Q.   Now, do you know how it could be that an item
8    of unapplied cash could be still sitting at Oracle five
9    years after the payment was made?
10       A.   Because most of the reason why unapplied got
11   to the point of where it was was because amounts --
12   through however long, many years before I even got
13   there, there were amounts that were randomly applied to
14   different invoices, different companies, that made it so
15   hard to try to resolve and find out the amounts of where
16   they were applied to, partially applied to, that it --
17   it would have taken the entire department years and
18   years of just going through the unapplied and not even
19   doing their job in order to resolve it.
20       Q.   And so are you saying that the unapplied cash
21   had accumulated over time?
22       MR. GLENNON:  Objection.  Leading.
23   Mischaracterizes the testimony.
24       THE WITNESS:  Yes, unapplied was accumulating
25   every day.

70

1    BY MR. GREENSTEIN:
2        Q.   So, now, do you know if you were -- if all the
3    collections staff in the entire company were devoted to
4    just resolving items of unapplied cash eight hours a
5    day, would they be able to do it?
6        MR. GLENNON:  Objection.  Calls for
7    speculation.
8        THE WITNESS:  I seriously think it would take
9    years to try to figure it out -- for 40 people to try to
10   figure it out -- every day.
11   BY MR. GREENSTEIN:
12       Q.   If you turn to page Bates stamped 001167, it's
13   the first line, March 5th, '01, it's an entry for Aspect
14   Communications.
15       Do you see that line?
16       A.   I do.
17       Q.   Okay.  And do you see the amount -- well,
18   sorry -- the check number is 63884 -- 684.  I can't
19   tell.  Right?
20       A.   Yes.
21       Q.   Anyway, do you see the amount is 4.4 million
22   and change?
23       A.   Correct.
24       Q.   So that means there's a 4.4 million dollar
25   item of unapplied cash?

71

1        MR. GLENNON:  Objection --
2    BY MR. GREENSTEIN:
3        Q.   For that -- sorry.
4        For that aspect for Aspect Communications at
5    this time; right?
6        MR. GLENNON:  Objection.  Foundation.
7    Document speaks for itself.
8        THE WITNESS:  Yes.  Check 63884 has an amount
9    on it for 4,462,355, which has been in-house for 28
10   days.
11   BY MR. GREENSTEIN:
12       Q.   Okay.  And you see where it says "contacted
13   Dorian Daley" in the "notes" column at the end?
14       A.   Yes.
15       Q.   Do you know who Dorian Daley was?
16       A.   I believe Dorian Daley was the lead in
17   Oracle's Legal Department, from what I remember.
18       She was the individual that we contacted when
19   we had any unapplied cash for customers that were -- had
20   previously been sent to Legal.
21       MR. GLENNON:  I'm just going to insert for the
22   record an objection to the extent you're seeking
23   attorney/client privilege, because Oracle's the holder
24   of the privilege -- and to the extent any such
25   communications are called for I'd ask for Mr. Schrag to

72

1    instruct his client not to answer because it's Oracle's
2    privilege.
3        MR. SCHRAG:  Did -- did you have any
4    conversations with the attorney at Oracle about that?
5        THE WITNESS:  Dorian Daley?
6        MR. SCHRAG:  Yes.
7        THE WITNESS:  Yes.
8        MR. SCHRAG:  Okay.  So you should not reveal
9    information from your conversations with Dorian Daley.
10       If you can answer Mr. Greenstein's question
11   with information you learned anywhere else other than
12   from the Oracle attorney, you can do that, but don't
13   answer based on information that you only knew from the
14   attorney.
15       MR. GREENSTEIN:  Yeah.
16       And for the record I think we may this
17   disagree with that, Michael, whether those
18   communications are privileged or not.
19       But for now, you know, Ian, I don't want to
20   know about any conversations you've ever had with any
21   lawyers.
22       Do you understand that?
23       MR. GLENNON:  And if there's a reason they're
24   not privileged we can talk about it off the record.
25       MR. GREENSTEIN:  Yes.  Agreed.

73

1       MR. SCHRAG:  I can change instruction if I
2   don't agree it's privileged.
3       MR. GREENSTEIN:  Right.  And I should have
4   said that at the beginning, which I usually do.
5       I don't -- I don't want to know any
6   conversations you had with lawyers, period.
7       So to the extent I -- I can ask, you know, if
8   you met with a lawyer, but I don't want to know anything
9   you said to a lawyer.
10      Is that -- do you understand that?
11      THE WITNESS:  Yes.  So --
12  BY MR. GREENSTEIN:
13      Q.   Okay.  So --
14      Sorry.
15      So I just want to know if you knew who Dorian
16  Daley was.
17      A.   I do.
18      Q.   Okay.  And she was Oracle's -- an Oracle
19  lawyer; correct?
20      A.   I believe she was the lead in our Legal
21  Department.
22      Q.   Okay.  Now, without revealing communications
23  why would a collector say "contacted Dorian Daley" in
24  connection with an item of unapplied cash?
25      MR. GLENNON:  Lack of foundation.

74

1       I'm still going to assert my objection on the
2   grounds of attorney/client privilege.
3       MR. SCHRAG:  If you can answer that question
4   without revealing communications, go ahead and answer
5   it.
6       MR. GREENSTEIN:  I'm just asking for the
7   reason why -- what would a reason be why a collector
8   would be put a note in there or contact Dorian Daley in
9   connection with an item of unapplied cash.
10      MR. GLENNON:  Same objection.  I don't think
11  he can articulate a reason without articulating the
12  message.
13      MR. GREENSTEIN:  Okay.  Well, I don't think
14  you're his lawyer.  So --
15      MR. SCHRAG:  If you -- if you learned of the
16  reason -- this is a little bit tricky, so take your
17  time.
18      If you learned of a reason from the attorney,
19  then you should not answer the question.
20      If you learned of the reason anywhere else,
21  then you can answer the question.
22      So if someone in your department other than
23  the attorney told you why you were talking to the
24  attorney, that's okay, but if the attorney herself told
25  you, then don't answer.

75

1       THE WITNESS:  Okay.  Our managers had told us
2   that any company that was -- that had been sent to Legal
3   in the past and had unapplied cash, we were -- we were
4   advised to contact the Legal Department.
5   BY MR. GREENSTEIN:
6       Q.   Okay.  And when you say when they were -- had
7   contacted Legal in the past, do you mean that an item of
8   unapplied cash was the subject of a legal dispute?
9       A.   Aspect Communications -- and I'm -- I'm just
10  going on what I'm reading here in this report --
11  apparently was a company that was -- or had been sent to
12  Legal because of a dispute, and in an effort to solve
13  this unapplied cash of 4 million we were advised by --
14  as collections managers and collections analysts were
15  advised by our -- the upper level management at the
16  director level or higher or senior management that in --
17  in order to solve this unapplied cash of 4 million we
18  were to contact the Oracle Legal Department.
19      Q.   Okay.  And were there more than one of those
20  situations, as far as you know?
21      A.   There was --
22      MR. GLENNON:  Objection.  Vague and ambiguous.
23      THE WITNESS:  There were many.
24  BY MR. GREENSTEIN:
25      Q.   There were many?

76

1       A.   (Nodding head)
2       Q.   Many items of unapplied cash that needed to be
3   reported to the Legal Department?
4       MR. GLENNON:  Objection.  Leading.
5   BY MR. GREENSTEIN:
6       Q.   Right?
7       A.   Correct.
8       Q.   Okay.  If you look down at the March -- on
9   that same page, the March 30th, '01 entry for -- it's
10  the last one for customer Avaya, and if you look at the
11  amount, you see it's $321,000 --
12      A.   Uh-huh.
13      Q.   -- and change?
14      A.   Oh.  Yes.  Sorry.
15      Q.   And you see the notes says "NRI with wire"?
16      Now, what does "NRI with wire" mean to you?
17      MR. GLENNON:  Objection.  Foundation.
18  Document speaks for itself.
19      THE WITNESS:  This line item states that on
20  3-29-01 there was a wire sent through for 321,000, or
21  this is what's left in the unapplied amount of that, and
22  it had been in-house for three days.
23  BY MR. GREENSTEIN:
24      Q.   Okay.
25      A.   Again, I'm not quite sure what "NRI" means.

77

1    Q.   Okay.  Could that mean no remittance
2  information?
3    A.   Yes.
4        MR. GLENNON:  Objection.  Lack of foundation.
5  BY MR. GREENSTEIN:
6    Q.   Does that mean no remittance information?
7        MR. GLENNON:  Document speaks for itself.
8        THE WITNESS:  Yes, now that I think about it,
9  no remittance -- "NRI" means no remittance information
10  came with the -- the wire of 3-29-01.
11  BY MR. GREENSTEIN:
12    Q.   All right.  So customer Avaya sent a wire of
13  money to Oracle for payment, and maybe they didn't
14  submit remittance information to allow Oracle to apply
15  that payment to the correct invoice, and so it was
16  sitting in unapplied cash; right?
17        MR. GLENNON:  Objection.  Lack of foundation.
18        THE WITNESS:  Correct.  Avaya did not specify
19  where they wanted the 321,000 to be applied to.
20  BY MR. GREENSTEIN:
21    Q.   Okay.  Now, you see if you look -- if you look
22  through this, there appears to be several, you know,
23  hundreds of thousands of dollars items of unapplied
24  cash.
25        Do you see that?

78

1    A.   I do.
2    Q.   Okay.  So --
3        MR. SCHRAG:  That's a little vague and
4  ambiguous.
5        Where are you -- where are you asking?
6        MR. GREENSTEIN:  Right.
7  BY MR. GREENSTEIN:
8    Q.   Well, I mean, just generally it appears from
9  this document that there were millions if not -- there
10  were tens of millions if not hundreds of millions of
11  dollars sitting in unapplied cash at the time of this
12  report; right?
13        MR. GLENNON:  Objection.  Foundation.  The
14  document speaks for itself.
15        THE WITNESS:  Correct.  There are many
16  millions of dollars in unapplied -- showing with this
17  report.
18  BY MR. GREENSTEIN:
19    Q.   Sorry.
20        And that doesn't surprise you, right, because
21  based on what you know, the amount of unapplied cash wa
22  large at the time you were at Oracle; right?
23        MR. GLENNON:  Objection.  Vague and ambiguous.
24        THE WITNESS:  Yes, it was large from the time
25  I got there to the time I left.

79

1  BY MR. GREENSTEIN:
2    Q.   I think you characterized it as a "problem;"
3  right?
4    A.   Say it again.
5    Q.   I think you characterized it as a "problem;"
6  right?
7    A.   It was a very, very large problem, the biggest
8  problem that anybody in collections or accounts
9  receivable had.
10        MR. SCHRAG:  Just for the record there's a sum
11  on this; correct, counsel?
12        MR. GREENSTEIN:  Oh, yeah.  I'm sorry.
13  BY MR. GREENSTEIN:
14    Q.   If you look at Bates Number 001215, it's the
15  last page, you see how it appears to be the sum of all
16  the -- the total amounts of unapplied cash, and it's
17  99,865,000 and change?
18        Do you see that?
19        MR. GLENNON:  Objection.  Foundation.
20  Document speaks for itself.
21        THE WITNESS:  Yes, I do.
22  BY MR. GREENSTEIN:
23    Q.   Does that surprise you, that the amount of
24  unapplied cash was almost a hundred million dollars?
25        MR. GLENNON:  Objection.  Lack of foundation.

80

1        THE WITNESS:  No, not at all.
2  BY MR. GREENSTEIN:
3    Q.   Okay.
4        Oh.  And just one point of clarification.
5        The amount -- if you turn to the second page
6  of this document, which is 001162, I just want to
7  clarify, the check amount here, that doesn't mean the
8  amount of the check that came in that resulted in an
9  item of unapplied cash, that is the amount of the
10  unapplied cash item that may have resulted from -- from
11  the check number which could have been in a different
12  amount; right?
13        MR. GLENNON:  Objection.  Foundation.
14        MR. SCHRAG:  That's vague and ambiguous.
15        Do you understand what he was saying?
16        THE WITNESS:  Yes.
17        MR. SCHRAG:  Okay.  Good.
18        MR. GREENSTEIN:  And your answer is "yes"?
19        THE WITNESS:  Yes.  Item number 1132419, being
20  the check number, that 3,072 could be a partial amount
21  of unapplied with the original amount of the check being
22  a million.
23  BY MR. GREENSTEIN:
24    Q.   Right.
25        So say a customer overpaid on an invoice.

Hatada, Ian  10/5/2006  9:55:00 AM

81

1 That would be the residual -- the amount that was
2 overpaid sitting in unapplied cash; right?
3     MR. GLENNON: Objection. Foundation.
4     THE WITNESS: The check amount is what is in
5 unapplied. It doesn't mean it's the original amount of
6 the check.
7 BY MR. GREENSTEIN:
8   Q.   Okay. That's all I needed to know.
9       Thank you.
10      Now, did you use this report while you were at
11 Oracle at all?
12  A.   Yes.
13  Q.   Okay. And how did you access it?
14      Was it electronically?
15  A.   Yes.
16  Q.   Now, were you ever told -- were you ever told
17 to preserve these reports?
18     MR. GLENNON: Objection. Vague and ambiguous.
19     THE WITNESS: Can you restate that in a
20 different --
21 BY MR. GREENSTEIN:
22  Q.   Yeah.
23      Were you ever told to make sure that you keep
24 all documentation such as these reports in connection
25 with items of unapplied cash?

82

1     MR. GLENNON: Same objection, and I object to
2 the extent it calls for attorney/client communications.
3     MR. SCHRAG: So answer to the extent you can
4 answer without revealing any communications with lawyers
5 at Oracle.
6     THE WITNESS: Yes.
7      Any spread sheet that we have -- we had we
8 were told to hold on to it by senior management.
9 BY MR. GREENSTEIN:
10  Q.   It was saved in Oracle's system, right,
11 electronically?
12  A.   Correct.
13  Q.   So you could print it out at any time; right?
14  A.   Correct.
15     MR. GREENSTEIN: I'd like this next document
16 has also been previously marked as Venkataramana Numb
17 8, and -- actually, you can put that aside and just keep
18 it handy.
19      For the record it's PLF-ORC 000122000 --
20 through 000129.
21      Go ahead and just flip through it a little
22 bit.
23 BY MR. GREENSTEIN:
24  Q.   Are you finished?
25  A.   I am.

83

1   Q.   And, actually, I want to refer you back to the
2 first exhibit we looked at, which is Venkataramana
3 Number 2.
4      If you look at the "comments" field, which is
5 the last column, I think you said that --
6     MR. SCHRAG: You mean "notes"?
7     MR. GREENSTEIN: Yeah, "notes." Thank you.
8 BY MR. GREENSTEIN:
9   Q.   You said this is an area where collections
10 analysts and collections managers could go in and write
11 comments about items of unapplied cash; right?
12  A.   Yes.
13  Q.   Okay. If there was a comment written in this
14 notes field and then somebody wanted to write another
15 note in it, would they be able to erase the note, the
16 first note?
17  A.   Yes.
18     MR. GLENNON: Objection. Incomplete
19 hypothetical.
20     THE WITNESS: Yes.
21 BY MR. GREENSTEIN:
22  Q.   They would?
23  A.   Yes.
24  Q.   Okay. So on or around -- let's say 2002/2003,
25 when you learned about this unapplied cash problem --

84

1 actually, strike that.
2      I think you discussed some meetings whereby
3 you were told that collections was going to have to try
4 to resolve these items of unapplied cash; right?
5  A.   Yes.
6  Q.   Okay. During that time period, once
7 collectors went out and researched items of unapplied
8 cash, were they able to go in to these notes fields and
9 delete notes?
10     MR. GLENNON: Objection. Calls for
11 speculation. Lack of foundation.
12     THE WITNESS: Yes. You could delete notes and
13 -- put new notes in there at any time.
14 BY MR. GREENSTEIN:
15  Q.   Okay. And so, if you deleted a note --
16 because you could access it, and it was a spread sheet
17 on your computer, and you could just delete what was in
18 that note and write over it; right?
19     MR. GLENNON: Objection. Leading.
20     THE WITNESS: Correct.
21 BY MR. GREENSTEIN:
22  Q.   Okay. Now -- and there was no way to get
23 those -- the notes that you deleted, do you know if
24 there's any way to get those, to look at those after it
25 was deleted?

85

1    MR. GLENNON:  Objection.  Lack of foundation.
2    THE WITNESS:  I don't believe so.
3  BY MR. GREENSTEIN:
4    Q.  Okay.  And these notes, collectors were going
5  in and changing these notes or adding comments, deleting
6  comments, as part of that project that you guys were
7  told to resolve of unapplied cash; right?
8    MR. GLENNON:  Objection.  Vague and ambiguous.
9    THE WITNESS:  Yes.
10    We had many different unapplied projects that
11  had these kinds of reports, this one and this one, where
12  you would be updating the notes column on what it is
13  that we were going to do with those checks and those
14  amounts.
15  BY MR. GREENSTEIN:
16    Q.  All right.  Okay.  Thanks.
17    So if you could turn to the -- the next
18  document, which was Venkataramana Exhibit 8, do you
19  recognize this type of report?
20    A.  I do.
21    Q.  Okay.  What is it?
22    A.  It is another unapplied report that was
23  manually -- that we manually came up with off of this
24  report or any other unapplied report that had columns
25  added to it for collector name, notes as far as the

86

1  background of the check and where we felt that it came
2  from, and then a -- another notes column stating what we
3  felt should happen with this check.
4    Q.  Okay.  And was this -- you say this was done
5  manually.
6    Do you mean this wasn't available
7  electronically?
8    A.  It was after it was invented and put on the
9  share drive.
10    Q.  And the "share drive," what is that?
11    A.  It's somewhere where we could go on the C
12  drive and -- on your C drive and just -- and pull it up
13  under the unapplied.
14    Q.  Okay.  Turn to the second page, which is
15  000123.
16    Do you see on the lefthand column it has --
17  "Vic"?  It says "Vic"?
18    Do you know what that refers to?
19    A.  Victor Vasquez.
20    Q.  Okay.  So that's a name of a collector that's
21  responsible for this particular item of unapplied cash;
22  right?
23    MR. GLENNON:  Objection.  Lack of foundation.
24  Document speaks for itself.
25  BY MR. GREENSTEIN:

87

1    Q.  Right?
2    A.  Yes.  This column that says "Vic" in it is
3  referring to an item that Victor Vasquez is responsible
4  for resolving.
5    Q.  Okay.  And Reynolds & Reynolds Company, that's
6  the customers; right?
7    MR. GLENNON:  Objection.  Lack of foundation.
8    THE WITNESS:  Yes.
9  BY MR. GREENSTEIN:
10    Q.  Okay.  And you see how the second to the last
11  column where it says "invoice number 1430775" was
12  written off as uncollectible?
13    See that?
14    A.  Correct, I see it.
15    Q.  And says "need to take out of RES and have AR
16  adjust up invoice by that amount to applied cash."
17    Do you see that?
18    A.  I do.
19    Q.  Do you know what "adjusting up an invoice" is?
20    MR. GLENNON:  Objection.  Lack of foundation.
21    THE WITNESS:  It means taking the invoice that
22  has a zero balance and adjusting it up to where it's now
23  outstanding 13,706.55.
24    So the amount in unapplied cash for this check
25  for Reynolds & Reynolds can be applied and wash out.

88

1  BY MR. GREENSTEIN:
2    Q.  Okay.  If you turn to page 000124, and at the
3  top it's an entry for Comedy Central.
4    Do you see that?
5    A.  I do.
6    Q.  Do you see the" KY" there?
7    A.  Yes.
8    Q.  What does -- that refers to a collector;
9  right?
10    MR. GLENNON:  Objection.  Document speaks for
11  itself.  Lack of foundation.
12    THE WITNESS:  It has -- this item, Comedy
13  Central, is -- was given to Kei Hoang, and he's
14  responsible for resolving this check.
15  BY MR. GREENSTEIN:
16    Q.  How do you spell that name -- if you know?
17    A.  H-o -- H-o-a-n-g.
18    Q.  Okay.  So Kei Hoang was responsible for this
19  item of unapplied cash for Comedy Central; correct?
20    MR. GLENNON:  Objection.  Lack of foundation.
21  Document speaks for itself.
22    THE WITNESS:  Yes.
23  BY MR. GREENSTEIN:
24    Q.  Okay.  And you see there in the second to the
25  last column it says "Applied amount -- unapplied amount

89

1    due to credit memo on invoice number --" on that invoice
2    number.
3          Do you see that?
4       A.   I do.
5       Q.   And then says "AR needs to adjust up invoice
6    to post the available cash."
7          Do you see that?
8       A.   I do.
9       Q.   So does that mean that for this item of
10   unapplied cash the reason why the unapplied item existed
11   was because a credit memo was issued on that invoice,
12   and then a payment was made, that item, that amount,
13   13,316, was -- couldn't be applied because of the credit
14   memo, and then AR had to adjust up the invoice to post
15   that amount; right?
16         MR. GLENNON:  Objection.  Lack of foundation.
17   Compound.
18         Vague and ambiguous.  Document speaks for
19   itself.
20   BY MR. GREENSTEIN:
21      Q.   Right?  Right?
22      A.   Correct.
23      Q.   Why don't you just in your own words explain
24   what that means to you, those last two columns.
25         MR. GLENNON:  Objection.  Document speaks for

90

1    itself.  Lack of foundation.
2          THE WITNESS:  Kei is stating that the
3    unapplied amount of 13,000 is due to a credit memo that
4    was done on invoice 40079330.
5          The payment was received on 11-01.
6          He feels that it was a premature decision to
7    send the invoice to third party and credit the invoice,
8    therefore, due to the fact that they actually paid the
9    invoice and because there's an outstanding amount in
10   unapplied cash, he feels that accounts receivable needs
11   to adjust up the invoice by 13,316.33 so the unapplied
12   amount of 13,316.33 can be applied and it can be a wash.
13   BY MR. GREENSTEIN:
14      Q.   Okay.  So, in other words, there was zero
15   amount on the invoice for Comedy Central and AR adjusted
16   that invoice up by the amount of unapplied cash so that
17   they could apply the item of unapplied cash to the
18   invoice and it would look like a proper transaction;
19   right?
20         MR. GLENNON:  Objection.  Lack of foundation.
21         THE WITNESS:  Correct.
22   BY MR. GREENSTEIN:
23      Q.   Now, did you ever adjust up invoices yourself?
24      A.   I didn't do it myself.  I put requests in to
25   the Accounts Receivable Department to adjust up

91

1    invoices.
2       Q.   Okay.  Did somebody -- was that because
3    somebody told you what adjusting up invoices was, or was
4    that a typical practice at Oracle?
5          MR. GLENNON:  Objection.  Compound.  Vague and
6    ambiguous.
7          THE WITNESS:  I personally -- Molly
8    Littlefield actually had came in and explained to us
9    managers what adjusting up an invoice was, and at that
10   point we were aware of what you could do with an invoice
11   in order to -- to zero out the unapplied cash.
12   BY MR. GREENSTEIN:
13      Q.   Okay.  And do you remember when that occurred,
14   when Molly Littlefield explained to you what "adjusting
15   up invoices" was?
16      A.   This was after the meetings with Michael Quinn
17   and Greg Myers, that there was a problem with the
18   unapplied cash and that we needed to resolve it.
19      Q.   Okay.  So is it fair to say that Molly
20   Littlefield explained to you guys one way to resolve all
21   these outstanding -- millions of dollars of outstanding
22   unapplied cash items -- one of the ways was to take a
23   zero balance invoice for a customer, adjust it up, take
24   the unapplied cash amount and apply it to that invoice;
25   right?

92

1          MR. GLENNON:  Objection.  Incomplete
2    hypothetical.
3          THE WITNESS:  Correct.
4          If there was nothing else to do with the
5    invoice and we -- and we knew that it was due to a
6    credit memo that was incorrectly credited or -- or like
7    Kei says, it's pretty much their decision, then we were
8    to adjust up the invoice.
9    BY MR. GREENSTEIN:
10      Q.   Okay.  And did you understand what "adjusting
11   up an invoice" was -- meant other than it was -- other
12   than that it was explained to you by Molly Littlefield?
13      A.   Just that it was taking an invoice that had a
14   zero balance and now putting a balance on it -- taking
15   the credit memo away from the invoice in -- in an effort
16   to now have out -- an outstanding amount on the invoice
17   in order to apply the unapplied cash.
18      Q.   Okay.  So let me give you an example.
19         So say a million dollar invoice was created
20   for a customer and a credit memo is issued for whatever
21   reason and it reduces the invoice by 500,000.
22         You with me?
23      A.   Yeah.  Yes.
24      Q.   So the invoice amount is now 500,000; right?
25      A.   Yes.

93

1    Q.   Okay.  And then say the customer makes the
2    full million dollar payment on that invoice.
3        That would result in a $500,000 item of
4    unapplied cash; right?
5        MR. GLENNON:  Objection.  Incomplete
6    hypothetical.
7        THE WITNESS:  Yes.
8    BY MR. GREENSTEIN:
9    Q.   And if that item of unapplied cash sat there
10   and then at some point collectors were tasked with
11   resolving it, one way that they could resolve that is by
12   taking that invoice which was reduced by the credit memo
13   by 500,000 so it was now a $500,000 invoice; right?
14   A.   Correct.
15   Q.   And now adjusting it up to a million dollars
16   and then applying the 500,000 to the million?
17       MR. GLENNON:  Objection.  Incomplete
18   hypothetical.  Foundation.
19       I'm confused.
20       THE WITNESS:  Typically we only adjusted up
21   invoices if there was a credit memo on them.
22       If there was a payment made on them, then we
23   would try to find out why they paid in full.
24   BY MR. GREENSTEIN:
25   Q.   Okay.

94

1    A.   When -- you know, as long as there was a
2    credit memo done on the invoice, you could adjust up the
3    invoice and take away the credit memo to apply.
4    Q.   Okay.
5    A.   So --
6    Q.   Oh.  Sorry.
7        So you reverse the previous credit memo that
8    was applied that reduced the invoice; right?
9    A.   Correct.
10   Q.   And how would you reverse a credit memo?
11   A.   It would be a -- a request to accounts
12   receivable to reverse the credit, so, therefore, now the
13   credit is no longer on the invoice, there's an
14   outstanding amount.
15       It matches the amount that's in the unapplied,
16   and, like I said, it was at that point a wash once you
17   applied it.
18   Q.   Okay.  And if you just look at the next page,
19   which is 000124 -- it's actually the same page.  I'm
20   sorry.  124.
21       And you see the second entry, Soluclent, LLC?
22       Do you see that?
23   A.   Correct.
24   Q.   If you look at down in the column -- the notes
25   column, it says "unapplied due to overpayment on OCC

95

1    order."
2        Do you see that?
3    A.   Correct.
4    Q.   And what does that mean to you?
5        MR. GLENNON:  Objection.  Lack of foundation.
6    Document speaks for itself.
7        THE WITNESS:  I can't remember what the "OCC"
8    stands for.
9    BY MR. GREENSTEIN:
10   Q.   Okay.  But does this appear to be an
11   overpayment on some order that the customer made?
12       MR. GLENNON:  Objection.  The document speaks
13   for itself.  Lack of foundation.
14       THE WITNESS:  Correct.  They made an OCC order
15   and they overpaid that order.
16   BY MR. GREENSTEIN:
17   Q.   And it appears that the notes say "We'll
18   contact OCC and customer regarding a refund;" right?
19       MR. GLENNON:  Objection.  Document speaks for
20   itself.
21       THE WITNESS:  Correct.
22   BY MR. GREENSTEIN:
23   Q.   And that means they're going to refund the
24   overpayment; right?
25       MR. GLENNON:  Same objection.  Lack of

96

1    foundation.
2    BY MR. GREENSTEIN:
3    Q.   Right?
4    A.   Correct.
5    Q.   Now, were you aware when you were trying --
6    when you were trying to resolve these items of unapplied
7    cash, were you aware that some of the items were
8    refunded to Oracle customers?
9    A.   Yes.  There was refunds that were done from --
10   Q.   Right.
11   A.   We did refunds all the time, but, obviously,
12   not enough to where it would make a difference.
13   Q.   All right.  Would it surprise you that -- if
14   Molly Littlefield said that she gave hundreds of refunds
15   to Oracle customers of items of unapplied cash?
16       MR. GLENNON:  Objection.  Mischaracterizes his
17   testimony.  Lack of foundation.
18       THE WITNESS:  No.  I think that hundreds
19   wouldn't be a stretch, but we're talking about 99
20   million dollars, or whatever that -- I mean, the refunds
21   could have been $10 or a hundred dollars, because a
22   hundred dollar refund is going to be approved a lot
23   sooner than a $50,000 refund, and that's just the way it
24   went when you made requests to refund.
25   BY MR. GREENSTEIN:

Hatada, Ian  10/5/2006  9:55:00 AM

97

1 Q. And refunds -- how would you request a refund?
2   Would you have to use some sort of document?
3 A. Uh-huh.  Yes.
4   You would have to give an explanation as to
5 why the amount needed to be refunded.
6 Q. And was there a specific formal document that
7 you would use for each and every refund?
8   MR. GLENNON:  Objection.  Vague and ambiguous.
9   THE WITNESS:  Yes.
10 BY MR. GREENSTEIN:
11 Q. Was it called a "refund template"?
12 A. Yes.
13 Q. Was that an E-mail that you would send to
14 whoever needed to approve the refund?
15 A. Yes.
16 Q. So collectors would determine that an item of
17 unapplied cash needed to be refunded, and there would be
18 a paper trail of where they requested the approval
19 authority needed to refund that item of unapplied cash
20 to the customer; right?
21   MR. GLENNON:  Objection.  Vague and ambiguous.
22 Incomplete hypothetical.
23   THE WITNESS:  Correct.
24 BY MR. GREENSTEIN:
25 Q. And those would be sent over E-mail; right?

98

1 A. Correct.
2 Q. And do you know who had the approval or the
3 authority to approve refunds during your time at Oracle?
4 A. We would go through maybe three or four steps.
5   If it came from a collections analyst, it
6 would come to me, and then it would go to the senior
7 manager, and then it would go to the director, and it
8 depended on what the level, how much it was for.
9   If it was for $50, then the approval chain
10 would be a lot shorter than if it was for a hundred
11 thousand.
12 Q. Right.
13   So there was certain individuals that -- if
14 there was a certain dollar amount, above a certain
15 dollar amount, a certain individual would have to
16 approve it; right?
17 A. Yeah.
18   Just as an example, if it was a $20 refund,
19 then myself and the senior manager would approve it and
20 send it to AR.
21   If it was for $150,000, and I'm just throwing
22 out numbers, then it might have to go all the way up
23 through Tom Williams and Jennifer Minton.
24 Q. So Jennifer Minton had -- so refunds from
25 time-to-time would go through Jennifer Minton?

99

1 A. I believe so, if they were large enough, yes.
2 Q. Do you know if refunds would go through Jeff
3 Henley?
4 A. I believe that there could be large enough
5 refunds it would have to acquire his approval.
6 Q. But, in any event, they would all be
7 documented, every refund would be documented somehow
8 right?
9 A. Correct.  It would go through an E-mail chain,
10 and you'd have record of it.
11 Q. And were you ever asked to preserve any of
12 those E-mails that you were involved with or any refunds
13 that you were involved with for items of unapplied cash?
14   MR. GLENNON:  I'm going to object to the
15 extent it calls for attorney/client communication.
16   MR. SCHRAG:  So you can answer to the extent
17 you know of information other than coming from Oracle's
18 attorneys.
19   THE WITNESS:  Repeat that question, please.
20 BY MR. GREENSTEIN:
21 Q. Other than the normal process by which these
22 electronic documents are stored in the normal course of
23 business did anybody ever come to you besides a lawyer
24 and tell you to preserve those refund documents?
25 A. Well, it was always, you know, something that

100

1 us managers did, was to put everything that was maybe a
2 refund in a certain file and hold on to them, if that's
3 what you're talking about.
4 Q. Okay.  You mean a file in a computer?
5 A. Yes.
6   The file may be on the shared drive or --
7 Q. Okay.  So like a folder --
8   Sorry.  Go ahead.
9 A. Or maybe on the personal management that he
10 kept for his own group.
11 Q. Okay.
12 A. For example, if I -- had refunds that I needed
13 to approve, I would save them in a document that has all
14 consulting and -- you know, the line of business that I
15 was responsible for.
16   MR. GREENSTEIN:  This is -- the next document
17 I'm going to discuss was previously marked as Chen
18 Number 12, the deposition of Julie Chen.
19   Yeah.  Why don't we change the tape, take two
20 minutes to change the tape, and then you can go ahead
21 and look at the document in the meantime.
22   VIDEOGRAPHER:  We are going off the record.
23   The time is 11:51 a.m.
24   Here marks the end of videotape number one,
25 volume one, in the deposition of Ian Hatada.

101

1    (Thereupon a recess was taken at 11:51 a.m.
2    and the deposition resumed at 12:01 p.m.)
3    VIDEOGRAPHER:  We are back on the record.  The
4    time is 12:01 p.m.
5    Here marks the beginning of videotape number
6    two, volume one, in the deposition of Ian Hatada.
7    BY MR. GREENSTEIN:
8    Q.   Mr. Hatada, I've placed before you what's been
9    previously marked as Exhibit 12 to the deposition of
10   Julie Chen.
11   For the record, it is an October 21st, 2002
12   E-mail from Mike Quinn -- Michael Quinn to Ryan Roberts
13   and Greg Myers, and it copies Thomas Williams and
14   Michael Quinn.
15   Have you had a chance to review this E-mail?
16   A.   Yeah, I've read through it.
17   Q.   Okay.  Now, you see the date is October 21st,
18   2002; right?
19   A.   Correct.
20   Q.   And you see how -- the first line, it's Mike
21   Quinn writing to Ryan Roberts and Greg Myers.
22   Below is the action plan for addressing the
23   problems surrounding the unapplied cash issues that you
24   guys worked on last week.
25   Do you see that?

102

1    MR. GLENNON:  Objection.  Foundation.
2    Document speaks for itself.
3    THE WITNESS:  I do.
4    BY MR. GREENSTEIN:
5    Q.   Now, earlier you were discussing some meetings
6    or meeting where you learned of all these old items of
7    unapplied cash, and you discussed what had become a
8    problem with unapplied cash; correct?
9    A.   Correct.
10   Q.   Now, looking at this E-mail, October 21st,
11   2002, does that refresh your recollection that these
12   meetings took place roughly around end of October 2002?
13   MR. GLENNON:  Objection.  Lack of foundation.
14   THE WITNESS:  Yes, it does.
15   BY MR. GREENSTEIN:
16   Q.   Okay.  Now, do you remember -- well, if you
17   read the first line that it says, "Below is the action
18   plan for addressing the problems surrounding unapplied
19   cash."
20   Do you know what the term "action plan" refers
21   to?
22   MR. GLENNON:  Objection.  Lack of foundation.
23   Calls for speculation.  Document speaks for itself.
24   THE WITNESS:  It's referring to finding a way
25   to resolve the large amount of unapplied cash that has

103

1    just arrived.
2    BY MR. GREENSTEIN:
3    Q.   Again, when you say "just arrived," what do
4    you mean by that?
5    A.   Well, because, as I stated before, there was
6    an unapplied cash that -- previous to these around this
7    date that people knew that was the unapplied cash, and
8    then there was the problem of other accounts popping up
9    that had unapplied cash in them that we weren't aware
10   of, and -- and I believe that when she says "addressing
11   the problems surrounding the unapplied cash issues,"
12   that's what -- or that's what he's talking about.
13   Q.   Okay.  So let me back up.
14   I think earlier you testified that in the
15   normal course of duties in collections you -- you were
16   aware of certain items or reports of unapplied cash;
17   correct?
18   A.   Correct.
19   Q.   And then I think just now you said that during
20   this time there were -- you became aware of items of
21   unapplied cash that were in accounts that had just
22   popped up; right?
23   A.   Correct.
24   Q.   Now, do you know what the term "on account"
25   means?

104

1    A.   Somewhat.
2    I mean, it's -- from what I know, putting on
3    an amount on account -- you know, from a collections
4    analyst or collections manager standpoint it would erase
5    it from the unapplied account and move it to the reserve
6    or another account.
7    Q.   Okay.  And when you say "move it to the
8    reserve," what do you mean by that?
9    A.   Move it to an account that wasn't visible or
10   that wasn't in the actual unapplied account that was
11   visible to all collections analysts as well as managers.
12   Q.   Okay.  So prior to around this time, and I'm
13   going to refer to late October 2002, were you aware of
14   what "on account" meant?
15   A.   No.
16   Q.   Okay.  So the first time you learned of what
17   "on account" meant was during these meetings in late
18   October 2002; right?
19   A.   Correct.
20   Q.   Now, were there -- was it one meeting where
21   you learned of this information, or was it multiple
22   meetings in October 2020?
23   A.   Multiple meetings.  Several meetings.
24   Q.   Several?
25   Do you know how many approximately?

105

1    A.   I'd say once we had that first meeting there
2    was a meeting every couple days to discuss what Mike
3    Quinn or what Jeff Henley wanted us to do moving forward
4    with our action plans.
5    Q.   Okay.  You say Jeff Henley.
6    So Jeff Henley -- was Jeff Henley involved in
7    this project?
8    MR. GLENNON:  Objection.  Calls for
9    speculation.  Lack of foundation.
10   THE WITNESS:  Once we would put together a --
11   the report and get to a -- you know, a few steps,
12   whether it be finding out where it was coming from or
13   what's the -- you know, what we thought it had -- had
14   happened to the check, and we had labeled them in their
15   different -- the different areas that the checks came
16   from, whether it be -- the line of business or the
17   reason code, it would be sent up the chain, Mike Quinn,
18   Jeff Henley, and then it -- and then it would be -- it
19   would come back with, okay, this is good, or, you know,
20   this isn't good, we want you to change it and make it
21   this way.
22   So there was many meetings of how we actually
23   wanted to proceed, and rather than even resolving it it
24   took a long time to figure out how we actually were --
25   what kind of action plan we were going to put together

106

1    to resolve it.
2    There was many steps involved, and -- and Jeff
3    Henley was involved in that.
4    BY MR. GREENSTEIN:
5    Q.   Okay.  Now, do you recall the first time you
6    learned about this problem with unapplied cash --
7    MR. GLENNON:  Objection.
8    BY MR. GREENSTEIN:
9    Q.   -- as referred to in this E-mail?
10   MR. GLENNON:  Objection.  Document speaks for
11   itself.  Lack of foundation.
12   THE WITNESS:  I believe Ryan Roberts got us
13   together and -- with just the senior manager himself and
14   the line managers, which was the collections managers
15   and advised us as to what was about to happen, and
16   shortly after that we had met with Mike Quinn and Greg
17   Myers to give us an explanation of why -- which was even
18   more confusing.  But --
19   BY MR. GREENSTEIN:
20   Q.   So there was -- there was a meeting -- was
21   there a single meeting where it was explained to you why
22   this was occurring, or was it multiple meetings?
23   A.   There was multiple meetings.
24   I just -- I remember one that Michael Quinn
25   had called to explain to -- or tried to explain to us

107

1    managers, meaning Ryan Roberts and his directs, the
2    collections managers, as to why it happened, and -- and,
3    you know, why there was such an urgency to -- to resolve
4    it, and what he felt we needed to do.
5    That was -- that was the first meeting that we
6    had, but there was several more.
7    Q.   Around late October 2002; right?
8    A.   Correct.
9    Q.   Now, when you say "urgency," what was the
10   urgency?
11   MR. GLENNON:  Objection.  Calls for
12   speculation.  Lack of foundation.
13   THE WITNESS:  I remember him specifically
14   stating that we were not collections managers anymore or
15   senior collections managers anymore, we were unapplied
16   -- we were to resolve the unapplied until it was done,
17   and if it took months to do it, to drop everything that
18   we were doing, that we were normally responsible for.
19   So that was the urgency.  That's how urgent it
20   was, and by -- I felt that was pretty urgent.
21   BY MR. GREENSTEIN:
22   Q.   So are you saying that you stopped doing your
23   normal collections duties and focused solely on this
24   unapplied cash problem?
25   MR. GLENNON:  Objection.  Vague and ambiguous

108

1    -- as to time.
2    THE WITNESS:  Correct.
3    BY MR. GREENSTEIN:
4    Q.   And all the other collections managers, such
5    as Molly Littlefield, Omid Fardanesh, Anne Marie Adao,
6    were they all taken off their normal duties and put on
7    this project as well?
8    MR. GLENNON:  Objection.  Calls for
9    speculation.  Lack of foundation.
10   THE WITNESS:  Correct.
11   BY MR. GREENSTEIN:
12   Q.   And from now on I'm going to refer to it as
13   "the 2002 unapplied cash project."
14   Is that okay with you?
15   A.   That's fine.
16   MR. GLENNON:  Objection.  I object to that.
17   What exactly are you defining as "the 2002
18   unapplied cash project"?
19   MR. GREENSTEIN:  Well, I don't -- it's not
20   your deposition.
21   I'm asking the witness if he understands when
22   I'm talking about --
23   MR. SCHRAG:  Do you understand what he's
24   talking about?
25   THE WITNESS:  I do.

109

1      MR. GLENNON:  I'm going to insert a standing
2  objection on the grounds that that definition is vague
3  and ambiguous.
4  BY MR. GREENSTEIN:
5      Q.   And for the record I'm talking about from the
6  first time you learned of this unapplied cash problem in
7  late October 2002, the meetings that you had in relation
8  to this project and anything that happened to resolve
9  these items of unapplied cash thereafter.
10      Does that make sense to you?
11      A.   It does.
12      MR. GLENNON:  I'm going to reinsert my
13  objection for the record.
14      MR. GREENSTEIN:  Okay.  So I'm going to mark
15  this next -- well, it's already been previously marked
16  as Venkataramana Number -- Exhibit Number 5, and,
17  actually, keep that E-mail in front of you, if you can.
18      For the record this is Bates stamped PLF-ORC
19  Number 2, so it's a single page document.
20      And Mr. Hatada, if you can just read it and
21  let me know when you're finished, please.
22      MR. SCHRAG:  Do you want him to read the whole
23  thing or just --
24      MR. GREENSTEIN:  Yeah, please.
25      THE WITNESS:  Okay.

110

1  BY MR. GREENSTEIN:
2      Q.   So, Mr. Hatada, in looking at this, this
3  appears to be some typed notes with October -- late
4  October dates.
5      Do you see that?
6      A.   I do.
7      Q.   Okay.  Did you type these notes?
8      A.   I did not.
9      Q.   Okay.  Looking at these notes, it appears that
10  they're discussing -- like the first one, October 21st,
11  Monday, it says, "managers meeting -- explanation of on
12  account problem."
13      Do you see that?
14      A.   I do.
15      Q.   Looking at this, does this refresh your
16  recollection about -- that there were several meetings
17  in late October 2002?
18      MR. GLENNON:  Objection.  Lack of foundation.
19  Document speaks for itself.
20  BY MR. GREENSTEIN:
21      Q.   Correct?
22      A.   Correct.
23      Q.   Now, do these notes accurately reflect what
24  was said during the late October 2002 meetings in
25  connection with the unapplied cash project?

111

1      MR. GLENNON:  Objection.  Lack of foundation.
2  Document speaks for itself.
3      Calls for speculation.
4      THE WITNESS:  Correct.
5  BY MR. GREENSTEIN:
6      Q.   Okay.  And you see the October 21st entry, it
7  says, "manager meeting -- explanation of on account
8  problem and company's suite to pay back money."
9      Do you see that?
10      A.   Correct.  I see it.
11      Q.   So earlier when you were talking about you
12  learned of on account for the first time during this
13  unapplied cash project, looking at that entry, is that
14  what you meant, there was an explanation during a
15  meeting of an on account problem?
16      MR. GLENNON:  Objection.  Document speaks for
17  itself.  Lack of foundation.
18  BY MR. GREENSTEIN:
19      Q.   Is that right?
20      A.   Correct.
21      Q.   Okay.  And what was the explanation of the on
22  account problem in late October 2002?
23      Well, let me -- let me back up.
24      Let me withdraw that.
25      The first meeting that you recall attending in

112

1  connection with this unapplied cash project who was
2  present?
3      A.   I believe the first meeting that we had to
4  give us the heads up as to what was about to happen was
5  -- was Ryan Roberts, and Molly Littlefield, Justin
6  Backs, Anne Marie Adeo, Omid Fardanesh, and -- myself,
7  and I -- I'm not sure if Troy Tandy was there.
8      Q.   So sounds like it was the collections
9  managers.
10      Is that fair to say?
11      A.   It was the senior collections managers and his
12  collections manager -- and the collections managers.
13      Q.   Okay.  Was Mike Quinn present in the first
14  meeting?
15      A.   I don't believe he was.
16      I don't know that he was present in the first
17  meeting, but I know it was the second -- at least the
18  second.
19      It could have been the first, but I -- it was
20  at least the second meeting that he was.
21      Q.   Okay.  And was Greg Myers present at the first
22  meeting?
23      A.   I don't think Greg Myers was present until
24  maybe like the -- the third meeting.
25      There was a couple of meetings, and then we

113

1    met with Mike Quinn and Greg Myers.
2        Q.   And does this -- this type -- this document,
3    Venkataramana Number 5, does that accurately depict the
4    time frame in October 2002 of these meetings?
5        MR. SCHRAG: Objection. Calls for
6    speculation. Lack of foundation.
7        The document speaks for itself.
8        THE WITNESS: From what I can see, yeah, this
9    is -- this is how it happened.
10   BY MR. GREENSTEIN:
11       Q.   Okay. So the first meeting, there was an
12   explanation of the on account problem; is that correct?
13       MR. GLENNON: Objection. Calls for
14   speculation. Lack of foundation.
15       Document speaks for itself.
16       THE WITNESS: Correct.
17   BY MR. GREENSTEIN:
18       Q.   And, other than looking at that document, what
19   do you recall -- after looking at it what do you recall
20   was the explanation of the on account problem?
21       A.   Well, I -- I mean, like this first item, you
22   know, we were called together to explain exactly what it
23   says, that, you know, there's an unapplied account
24   issue, there's -- there's a lawsuit that's about to
25   happen, and -- and we need to resolve -- you know, we're

114

1    going to have to resolve these unapplied amounts, and,
2    you know, there will be a meeting in the near future to
3    explain how we're going to do it.
4        And, you know, the bottom line was that they
5    needed to figure out if it was -- if we had recognized
6    revenue on it or we had not, so if it was revenue
7    impacting or not revenue impacting.
8        And then by the second or third meeting, when
9    Quinn got together and attempted to explain it to us
10   with Greg Myers, and I -- this happened so long before
11   any of us had got there, that he was, you know,
12   explaining to us, that, you know, Greg Myers had made a
13   big mistake in what he had did with the on account and
14   the reserve to make the actual unapplied account that
15   was visible less.
16       So it -- from -- from his point of view it was
17   -- you know, "Greg, you made this mistake, and it was a
18   bad idea to do this."
19       And from what I had heard it was, you know, to
20   ensure that the actual unapplied account that we all
21   were looking at or anybody had looked at was less than
22   what it really was.
23       That's what I understood.
24       Q.   Oh. Sorry. Go ahead.
25       A.   And that's what I understood, and it was

115

1    difficult because he was going in to credits and debits
2    and all kinds of different things where it was really
3    hard to understand.
4        Q.   Okay. Did you -- do you know what a "debit
5    memo" is?
6        A.   I probably would have to look.
7        VIDEOGRAPHER: I'm sorry.
8        Counsel -- it's distorting the sound.
9        MR. GREENSTEIN: It's probably over. Is it
10   over?
11       VIDEOGRAPHER: I understand, but if you can
12   put it on the floor, so when it rings -- I mean, I lose
13   testimony.
14       MR. GREENSTEIN: Does that work?
15       VIDEOGRAPHER: I don't know.
16       MR. GREENSTEIN: Well, it only comes up when
17   it rings; right?
18       VIDEOGRAPHER: Let's go off the record for one
19   moment.
20       Off the record, the time is 12:19 p.m.
21       (Discussion off the record)
22       VIDEOGRAPHER: Back on the record, the time is
23   12:21 p.m.
24       MR. GLENNON: Yeah, so -- go ahead.
25       MR. GREENSTEIN: Off the record we discussed

116

1    there was a -- it's of a technical problem where a cell
2    phone rings and it may distort the audio transcription
3    of the -- of testimony, and so we wanted to read back
4    the last answer that Mr. Hatada gave so that there's
5    audio -- that there's an audio record of what he said.
6        MR. GLENNON: To the extent there's an
7    objection before the answer I'd like to have that read
8    back in as well.
9        (Record Read)
10   BY MR. GREENSTEIN:
11       Q.   Okay. Just a minute ago I think you testified
12   that some of the discussion involved something that
13   happened long before you were there.
14       Do you remember testifying to that?
15       MR. GLENNON: Objection. Mischaracterizes the
16   testimony.
17       THE WITNESS: Correct.
18   BY MR. GREENSTEIN:
19       Q.   And what -- what were you referring to when
20   you said it happened long before you were there?
21       MR. GLENNON: Objection. Calls for
22   speculation.
23       THE WITNESS: That a decision was made to --
24   to move, you know, money from a certain account to
25   another account, which created a problem for us at that

117

1    time, or when we were in this meeting.
2          It happened a lot -- you know, a long time
3    before any of us managers had got there, but they were
4    trying to explain, you know, what had happened just so
5    we knew what to do moving forward to resolve it.
6          And then, you know, when you asked me what the
7    -- what a "debit memo" is, I really have to look at
8    notes or something, because I -- I couldn't give you a
9    good explanation.
10   BY MR. GREENSTEIN:
11        Q.   Okay.  Prior to these meetings in late October
12   2002 did you know what a "debit memo" was?
13        A.   At the time of that -- no.
14             Prior to the meetings, no.  Before the
15   meetings I did not know what a "debit memo" was.
16        Q.   Okay.  So the first time you learned of a
17   "debit memo" was during this meetings in late October
18   2002; right?
19        A.   Correct.
20        Q.   Okay.  And so was there -- earlier you said
21   there were some debits and credits and you didn't
22   necessarily understand it.
23             Now, was there a discussion of debit memos
24   during these meetings?
25             MR. GLENNON:  Objection.  Compound.

118

1    Mischaracterizes testimony.
2          THE WITNESS:  Correct.
3          Mike and Greg attempted to explain to us what
4    -- the debits and credits and what had happened in that
5    specific meeting, you know, so when we went in to the
6    system and looked at it, we knew what they were talking
7    about, but it was -- it was very brief and -- and very
8    hard to understand.
9    BY MR. GREENSTEIN:
10        Q.   Okay.  Did they -- did they explain this or
11   was there some sort of written explanation?
12             Did they -- on a board of some kind?
13             MR. GLENNON:  Objection.  Vague and compound.
14             THE WITNESS:  They wrote it on the board.
15             A couple of us took notes.  I don't think I
16   took notes.
17             And -- but it was written on the board, and --
18   but I don't believe that they made it a -- an actual
19   document of it, of the notes.
20             I just think that it was -- you know, we all
21   took notes as best we could, and -- you know, by the
22   time I got done with my notes I didn't even understand
23   it.
24   BY MR. GREENSTEIN:
25        Q.   So you took notes?

119

1        A.   Yeah, but -- yeah, I took notes.
2          Everyone took notes, but it was a waste --
3    the notes that I took I just -- it wasn't.
4        Q.   Why do you say that?  Was that because you
5    didn't understand what they were saying?
6        A.   Yeah, just because of the explanation of it
7    was very vague, and -- and it was hard to understand,
8    I'll be honest, you know, from all of us, points of
9    view.
10             It was just -- you know.
11        Q.   And you referred to -- you said that there was
12   a lawsuit discussed.
13             Are you aware that on October 11th, 2002
14   Plaintiffs in this case filed a Complaint with
15   allegations concerning debit memos and on account
16   clean-up that had occurred in November 2000?
17             MR. GLENNON:  Objection.  Foundation.
18             MR. SCHRAG:  Is he aware now or was he aware
19   at the time?
20             MR. GREENSTEIN:  Yeah.
21   BY MR. GREENSTEIN:
22        Q.   Are you aware, sitting today -- sitting here
23   today, that there was a lawsuit filed on October 11th,
24   2002?
25        A.   I recall something of that nature that was

120

1    explained in the meetings, but --
2          MR. SCHRAG:  He's asking are you aware now.
3          THE WITNESS:  Not the details of it, no.
4    BY MR. GREENSTEIN:
5        Q.   Okay.  But in those -- during those meetings
6    there was discussion of a lawsuit filed by Plaintiffs in
7    this case regarding debit memos on account and an on
8    account clean-up; right?
9          MR. GLENNON:  Objection.  Mischaracterizes the
10   testimony and vague and ambiguous.
11             THE WITNESS:  Correct.
12   BY MR. GREENSTEIN:
13        Q.   Now, other than the people you've already
14   named can you recall any other individuals attending any
15   of these meetings in late October 2002?
16        A.   I don't believe so.
17        Q.   Okay.
18        A.   I think we named all of them.
19        Q.   Looking at Venkataramana Number 5, looking at
20   the entry October 22nd, Tuesday, it says "Quinn sends SS
21   to managers to be cut up amongst management team to
22   resolve items that had been reserved."
23             Do you see that?
24        A.   Uh-huh.  Yes.
25        Q.   Does this refresh your recollection about a

121

1 meeting held on or about October 22nd where Mike Quinn
2 sent something around for managers to cut up to resolve
3 items that had been reserved?
4     MR. GLENNON: Objection. Lack of foundation.
5 The document speaks for itself.
6     THE WITNESS: Correct.
7     Quinn sent a spread sheet to the managers to
8 be divvied up per line of business.
9 BY MR. GREENSTEIN:
10     Q.   Okay. So "SS" there refers to spread sheet?
11     A.   Correct.
12     Q.   Okay. And then when it says "management team
13 to resolve items that had been reserved," what do you --
14 what do you remember about that discussion?
15     MR. GLENNON: Objection. Witness is
16 testifying as to documents he didn't create. Lack of
17 foundation. Calls for speculation.
18 BY MR. GREENSTEIN:
19     Q.   Actually, reading this, and then putting it
20 aside, what do you recall about this meeting on or
21 around October 22nd when Quinn sent around a spread
22 sheet to resolve items that had been reserved?
23     MR. GLENNON: Objection. Compound. Vague and
24 ambiguous. Document speaks for itself. Lack of
25 foundation.

122

1     THE WITNESS: From what I recall, you know, he
2 said the spread sheet is out, and, you know, very
3 shortly after those meetings we were going to see the
4 unapplied cash that we knew of in the items in the
5 amounts that we knew of in the unapplied cash was going
6 to take a huge hike in the items as well as the amount.
7     So, therefore, taking out a reserve and adding
8 to -- you know, what applied was, and then we were going
9 after -- resolve that spread sheet.
10 BY MR. GREENSTEIN:
11     Q.   Okay. And earlier I think you talked about
12 items of older unapplied cash that you weren't aware of
13 until these meetings took place; right?
14     A.   Correct.
15     Q.   And are you aware that those items were items
16 that had been previously moved to the reserve -- moved
17 to the reserve and then you needed to take them out of
18 the reserve in order to resolve them during October
19 2002; right?
20     MR. GLENNON: Objection. Lack of foundation.
21 Mischaracterizes the testimony.
22     MR. GREENSTEIN: Right?
23     THE WITNESS: Yes, that's exactly how it
24 happened.
25 BY MR. GREENSTEIN:

123

1     Q.   Now, did they explain what this reserve was?
2     MR. GLENNON: Objection. Vague as to "they"
3 and time frame.
4     THE WITNESS: Like I said, in the meetings I
5 think they attempted to, but it was -- it wasn't really
6 easy to understand.
7 BY MR. GREENSTEIN:
8     Q.   Okay. And all these -- this whole line of
9 questioning is going to be discussing the October 2002
10 meetings, that time frame --
11     A.   Okay.
12     Q.   -- and the project thereafter.
13     Do you understand that?
14     A.   Yes, I do.
15     Q.   Okay. So there was an explanation during
16 these meetings in October 2002 about items that had been
17 moved to the reserve; right?
18     A.   Correct.
19     Q.   Unapplied cash items that had been moved in to
20 the reserve; right?
21     MR. GLENNON: Objection. Foundation.
22     THE WITNESS: Right.
23 BY MR. GREENSTEIN:
24     Q.   Now, does the account 12601 ring a bell?
25     A.   Yes, but I couldn't tell you what the name --

124

1 or what it was for.
2     I just know I recall the number.
3     Q.   Okay. So -- correct me if I'm wrong, but I
4 think you just testified that at the time of these
5 meetings in 2002 the amount of unapplied cash increased
6 as a result of all these items that had previously been
7 moved to reserve being put back in to the -- on the
8 unapplied cash report; right?
9     MR. GLENNON: Objection. Foundation.
10 Mischaracterizes the testimony.
11     THE WITNESS: Correct.
12 BY MR. GREENSTEIN:
13     Q.   So -- and are you referring to the older items
14 of unapplied cash that you said were not visible to you
15 until October 2002?
16     MR. GLENNON: Same objection.
17     THE WITNESS: Correct.
18 BY MR. GREENSTEIN:
19     Q.   And are those the items of unapplied cash that
20 resulted from whatever you said happened long before --
21 long before you were there?
22     MR. GLENNON: Objection. Vague and ambiguous.
23     THE WITNESS: Correct.
24 BY MR. GREENSTEIN:
25     Q.   And when they were talking about "debit

125

1   memos," and "on account" -- withdraw that.
2       If you look at the October 23rd entry on
3   Venkataramana Number 5, it says "collections
4   managers --"
5       Oh. Sorry.
6       Look at the October 22nd entry, and you see it
7   says "create a plan to resolve --" second sentence,
8   "Create a plan to resolve and get out of reserve by
9   Friday."
10      Do you see that?
11  A.  Yes, I do.
12  Q.  And then it says "Collections meets with AR to
13  adjust invoices and how to send over details."
14      Do you see that?
15  A.  I do.
16  Q.  Does that refresh your recollection about a
17  plan to resolve items of unapplied cash and get out of
18  the reserve on or around October 22nd?
19      MR. GLENNON:  Objection. Lack of foundation.
20  Document speaks for itself.
21      THE WITNESS:  I do.
22  BY MR. GREENSTEIN:
23  Q.  And what do you recall about that?
24      MR. GLENNON:  Same objection. Lack of
25  foundation.

126

1       THE WITNESS:  I believe it was Molly
2   Littlefield was in meeting with AR to get an assessment
3   on how we were going -- what the rules were to adjusting
4   up invoices and how we, as collections managers, were
5   going to send over the details in an effort to -- to,
6   you know, add all pertinent information, and -- in order
7   for them to adjust it up -- what you could you adjust up
8   and what you couldn't adjust up basically.
9   BY MR. GREENSTEIN:
10  Q.  Okay. And was there a point during this time,
11  late 2002, October 2002, where the items of unapplied
12  cash were cut up amongst the collections managers?
13      MR. GLENNON:  Objection. Vague and ambiguous.
14      THE WITNESS:  Correct.
15  BY MR. GREENSTEIN:
16  Q.  And when I say "cut up," I mean allocated.
17      Certain items were allocated to each of the
18  collections managers in an attempt to resolve them;
19  right?
20      MR. GLENNON:  Objection. Leading.
21      THE WITNESS:  Correct.
22  BY MR. GREENSTEIN:
23  Q.  And do you remember how many items were given
24  to you?
25  A.  I don't.

127

1   Q.  Okay. And did you delegate those --
2   withdrawn.
3       What did you do with items once you got them?
4       MR. GLENNON:  Objection. Vague and ambiguous.
5       MR. GREENSTEIN:  Unapplied cash items.
6       MR. GLENNON:  Same objection.
7       THE WITNESS:  In the beginning it was, you
8   know, step-by-step, trying to label them at first to
9   find out, you know, from the information that we could
10  tell in the system where they came from, when they --
11  when they arrived, what we felt that they were for, and
12  a reason code as to, you know, why it was unapplied, and
13  then, you know, steps after that was -- a description as
14  well as an action plan of what we were supposed to do
15  with it, whether we were supposed to refund it, or -- or
16  adjust it up, or apply it to a different invoice.
17  BY MR. GREENSTEIN:
18  Q.  Okay. So, when you said that the total amount
19  of unapplied cash increased during October 2002, all of
20  a sudden as a result of these items that had been
21  reserved in the past all of a sudden becoming visible
22  again; right?
23      MR. GLENNON:  Objection. Foundation.
24  Mischaracterizes the testimony.
25      THE WITNESS:  Correct.

128

1   BY MR. GREENSTEIN:
2   Q.  Okay. Can you explain that -- how you learned
3   that there were all these items of unapplied cash that
4   you couldn't see and then suddenly the items increased,
5   as far as you knew -- in October 2002?
6       MR. GLENNON:  Objection. Vague and ambiguous.
7   Asked and answered.
8       THE WITNESS:  Well, the first -- the first
9   meeting that we had to actually give us a -- kind of a
10  short overview as to what we were going to get involved
11  with was that the unapplied that we were looking at
12  currently or at that time, there was a lot more in the
13  reserve that we were going to have to try to resolve
14  because of a specific lawsuit that, you know, that we
15  had money that we shouldn't have had, and whether it was
16  in the reserve or the unapplied, but the best
17  description would just be that there was money in an
18  account that was, you know, unapplied money that we had
19  never seen before, and we were going to all of a sudden
20  see and have to resolve.
21  BY MR. GREENSTEIN:
22  Q.  And were those the items, as far as you know,
23  that resulted from creation of debit memos previously?
24      MR. GLENNON:  Objection. Calls for
25  speculation. Lack of foundation.

129

1      THE WITNESS: I believe that was one of the
2  reasons that Mike Quinn and Greg Myers had given us.
3  BY MR. GREENSTEIN:
4      Q.   If you look at the October 23rd entry here, it
5  says "Wednesday," it says, "Collection managers break up
6  workload amongst staff and tell them to finish by close
7  of business. SS sent to Quinn who sends back with his
8  notes and said 'This isn't good enough.'"
9      Do you see that?
10      A.   I do.
11      Q.   "SS" refers to spread sheet, as far as you
12  know; right?
13      MR. GLENNON: Objection. Leading. Document
14  speaks for itself. Lack of foundation.
15      THE WITNESS: Correct.
16  BY MR. GREENSTEIN:
17      Q.   So did -- does this refresh your recollection
18  that on or around October 23rd during a meeting Quinn,
19  Michael Quinn, sent back a spread sheet that was given
20  to him with notes saying it wasn't good enough?
21      MR. GLENNON: Objection. Lack of foundation.
22  The document speaks for itself.
23      THE WITNESS: I do.
24  BY MR. GREENSTEIN:
25      Q.   Okay. What do you remember about -- about

130

1  that meeting?
2      MR. GLENNON: Same objection -- and vague and
3  ambiguous.
4      THE WITNESS: From what I remember, Ryan
5  Roberts called the meeting to let us know that what we
6  had presented to Michael Quinn and in regards to
7  breaking it up and -- and the notes that we had by the
8  items -- the first bunch of items that we started
9  working on, the reasons, or, slash, reason codes, were
10  not good enough for him, so we had to go back to the
11  drawing board and figure out a better way to do it the
12  way he wanted us to do it.
13  BY MR. GREENSTEIN:
14      Q.   Okay. So what was the way he wanted you to do
15  it?
16      MR. GLENNON: Objection. Calls for
17  speculation.
18      THE WITNESS: I think -- I believe he wanted
19  it done with -- with, you know, a small amount of reason
20  codes.
21      He also wanted it to -- wanted us to look at
22  every item and -- and advise him if it was revenue
23  impacting or if it wasn't revenue impacting, and the
24  first spread sheet that we sent him did not give us --
25  give him that information.

131

1  BY MR. GREENSTEIN:
2      Q.   Didn't give him the information on whether it
3  was revenue impacting or not revenue impacting?
4      A.   Well, that, and it didn't give him the reason
5  codes that he wanted, which was more concise, and -- I
6  think there was maybe only like four or five of them,
7  whereas, when we turned in the first spread sheet, there
8  was all kinds of different reasons, and he wanted it
9  broke down in to smaller categories.
10      Q.   And what is a "reason code"?
11      Is that -- does that mean the reason why an
12  item of unapplied cash existed?
13      MR. GLENNON: Objection. Leading. Lack of
14  foundation.
15      THE WITNESS: One of the reason codes was
16  overpayment. Another reason code could be credit memo.
17      There's -- I think we had a -- one that was
18  titled legal. There's another one that's OCC, which I
19  can't remember what it stood for.
20  BY MR. GREENSTEIN:
21      Q.   Okay. Was there a reason code for duplicate
22  payments?
23      A.   Yes.
24      Q.   So after Mike Quinn sent back the spread sheet
25  and said it wasn't good enough, did you guys go back and

132

1  research items of unapplied cash and determine whether
2  they were revenue impacting or not?
3      A.   Yes.
4      MR. GLENNON: Objection. Vague and ambiguous.
5  Lack of foundation.
6  BY MR. GREENSTEIN:
7      Q.   You did?
8      A.   Yes.
9      Q.   And did you provide that information then to
10  Mike Quinn?
11      And when I say "that information," I mean the
12  items of unapplied cash that were revenue impacting and
13  those items that were not.
14      A.   Yes.
15      Q.   And the items that were cut up and split up
16  amongst the managers, were those all resolved during
17  late 2002?
18      MR. GLENNON: Objection. Vague and ambiguous.
19      THE WITNESS: No.
20  BY MR. GREENSTEIN:
21      Q.   Okay. And do you recall a percentage, how
22  many were resolved and how many weren't?
23      A.   I don't, but I know that at the point of it --
24  the project going away, I don't believe we had resolved
25  everything.

133

1   Q.   Okay.  And when -- oh.  Sorry.
2   A.   We had got to a certain point.
3        Obviously, we started with the larger amounts
4   first and the older amounts, but I don't believe we got
5   to everything -- from my recollection.
6   Q.   And why was that?
7        Why couldn't you get to everything?
8        MR. GLENNON:  Objection.  Calls for
9   speculation.  Lack of foundation.
10       THE WITNESS:  There was just way too many to
11  try to resolve, you know.
12       We -- we put a dent in it, but I don't believe
13  we fully resolved it.
14       Like I said before, I don't think it would
15  ever be fully resolved.
16  BY MR. GREENSTEIN:
17  Q.   Because there was so many items; right?
18  A.   Yeah.
19       MR. GLENNON:  Objection.  Leading.
20  BY MR. GREENSTEIN:
21  Q.   So when do you recall this project, as far as
22  you know, being completed?
23  A.   That's hard to say.
24       I know that we -- there were different levels
25  of how hard we had to work on it.

134

1        I know the first three weeks we were somewhat
2   obligated to work about anywhere from 12 to 18 hours a
3   day on it, and then it tapered off to where it got a
4   little bit more organized, but it was quite a bit of
5   time, as far as months went by that we were trying to
6   resolve it.
7   Q.   Okay.  Do you -- do you recall that the
8   collections staff at Oracle was ever transferred to
9   India?
10       MR. GLENNON:  Objection.  Foundation.
11       THE WITNESS:  Yes.  I was actually part of the
12  transition.
13  BY MR. GREENSTEIN:
14  Q.   Okay.  Do you remember when you learned --
15  withdrawn.
16       What do you remember about the Collections
17  Department being transferred to India?
18       MR. GLENNON:  Objection.  Foundation.
19       THE WITNESS:  Well, as a collections manager,
20  we were told that, you know, at some point, and I can't
21  recall specific dates, that we were going to be
22  transitioning all back office or at least the AR and
23  collections to Banglore, India, and at first the
24  individuals that Oracle hired from India had came over
25  to the States, and we had trained them at our office,

135

1   and there were two times where we as collections
2   managers and collections analysts had to fly over there
3   and train them in Banglore, India.
4   BY MR. GREENSTEIN:
5   Q.   Okay.  Now, going back to the October 2002
6   unapplied cash project, for the items that weren't
7   resolved when you were done trying to resolve them, did
8   any of those items -- were any of those items sent to
9   employees in India to resolve?
10  A.   Yes.
11       At a certain point in the -- the resolution of
12  the project it kind of backed up in to the India
13  project, and, therefore, the unapplied was handed over
14  to the individuals in India to resolve, and I believe
15  Molly Littlefield was somewhat directing that
16  transition.
17  Q.   Okay.  And do you remember after these series
18  of meetings in late October 2002 was there any single
19  document that was created with all of the explanations
20  for the reasons for unapplied cash items?
21       MR. GLENNON:  Objection.  Foundation.  Vague
22  and ambiguous.
23       THE WITNESS:  Yes.  There was many different
24  reports, but I believe there was a final.
25       That's the point of -- you know, stopping the

136

1   project.  There was a final that was -- that Molly
2   Littlefield was responsible for.
3   BY MR. GREENSTEIN:
4   Q.   Okay.  And do you know -- was that a spread
5   sheet?
6   A.   Correct.
7   Q.   Okay.  Did she give that to anybody after it
8   was given to her?
9        MR. GLENNON:  Objection.  Calls for
10  speculation.  Lack of foundation.  Vague and ambiguous.
11       THE WITNESS:  I don't believe I ever saw it
12  because I had -- she was responsible for it, but I am
13  sure that -- that senior management as well as all
14  managers in accounts receivable were -- had, you know,
15  everybody had the ability to look at it, but once I was
16  done with the project I didn't -- I myself didn't
17  necessarily have it, but I'm sure she wasn't the only
18  one looking at it.
19  BY MR. GREENSTEIN:
20  Q.   Okay.  If you look at -- then to Venkataramana
21  Number 5, October 23rd entry, where it says "Quinn meets
22  with managers and lights in to them," do you see that?
23       It's the last sentence of the October 23rd
24  entry.
25  A.   Correct.

137

1  Q.  Do you remember Quinn lighting in to the
2  collections managers during a meeting during this time?
3  MR. GLENNON: Objection. Vague and ambiguous.
4  Document speaks for itself. Lack of foundation.
5  THE WITNESS: Yeah. Yes, I do.
6  BY MR. GREENSTEIN:
7  Q.  So what do you recall about that?
8  MR. GLENNON: Objection. Vague and ambiguous.
9  THE WITNESS: That the -- the notes, so far as
10  the resolution of it, was not good enough for what he
11  wanted to see, and that, again, we needed to make
12  changes to it, and -- and he wanted it to be -- he
13  wanted it to happen faster, and he wanted it to -- be
14  more detailed but less reason codes.
15  BY MR. GREENSTEIN:
16  Q.  Okay. Do you know why he wanted there to be
17  less reasons codes?
18  A.  From -- from what I took of -- of the meeting,
19  it was -- he wanted it to be more kind of cut and dry,
20  because there was so many different reasons that you
21  could have that amount and in reserve, tons of different
22  reasons of why it could happen, but he wanted it to be
23  more specific as to, you know, here's the reason and
24  what are we going to do with it.
25  Q.  Okay. And you see the second paragraph in the

138

1  October 23rd entry on Venkataramana Number 5, it says
2  "Quinn wants to figure out why the items were reserved
3  and can't tell if the item was a revenue impact or not."
4  Do you see that?
5  A.  I do.
6  Q.  And does that refer to what you discussed
7  earlier about where he asked the collections managers to
8  put on the -- or to identify which items were revenue
9  impacting and which weren't, and then put that in the
10  spread sheet and give it back to them?
11  MR. GLENNON: Objection. Calls for
12  speculation. Lack of foundation.
13  Document speaks for itself.
14  THE WITNESS: Yes.
15  BY MR. GREENSTEIN:
16  Q.  Okay. And you see where it says "will not
17  refund any item that impacts revenue, adjust up invoice
18  for revenue impacting item"?
19  Do you see that?
20  A.  I do.
21  Q.  Do you recall being told not to refund any
22  items that impact -- not to refund any items of
23  unapplied cash that impacted revenue?
24  MR. GLENNON: Same objection.
25  THE WITNESS: I do.

139

1  BY MR. GREENSTEIN:
2  Q.  Okay. And who told you not to refund items
3  that impact revenue?
4  A.  Well, it came down from -- you know, it
5  happened a couple of times.
6  It happened when Quinn had -- advised us not
7  to refund anything that was revenue impacting, and it
8  happened when we got farther in to the project and found
9  that there were a lot of items that truly needed to be
10  refunded, and Tom Williams shut off the -- the whole
11  refunding of the project.
12  I believe it was him -- him and Mike and -- I
13  mean, no more refunds until we can -- until they can get
14  back to us and tell us what we were going to do with
15  those.
16  Q.  And did they ever get back to you?
17  MR. GLENNON: Objection. Vague and ambiguous.
18  THE WITNESS: I don't remember that happening.
19  BY MR. GREENSTEIN:
20  Q.  Okay. So did -- did you learn during this
21  project that there were a lot of items, unapplied cash
22  items, that after you did your research you realized
23  should be refunded to customers?
24  MR. GLENNON: Objection. Vague and ambiguous.
25  THE WITNESS: Yes.

140

1  BY MR. GREENSTEIN:
2  Q.  And so would you -- and you had put -- when
3  you gave that information to Mike Quinn and the
4  higher-ups, vis-a-vis the spread sheets that had the
5  notes on it; right?
6  A.  Well --
7  MR. GLENNON: Objection. Lack of foundation.
8  THE WITNESS: A lot of us managers would give
9  our reason codes, and we'd separate them out, and maybe
10  the refunds would all go to Molly, and then she would
11  take all of them and present them to -- to -- to Ryan
12  Roberts, and he'd present them to Mike Quinn, and then
13  he'd take them and present them to AR, whether -- if it
14  even got that far, and then it would come back to us
15  stating this can't be refunded -- or for whatever
16  reason.
17  BY MR. GREENSTEIN:
18  Q.  Okay. Prior to these meetings do you recall
19  the -- general -- or estimated number of total unapplied
20  cash before you learned of the stuff that you didn't
21  know about?
22  MR. GLENNON: Objection. Vague as to time
23  frame.
24  THE WITNESS: Can you repeat that.
25  BY MR. GREENSTEIN:

141

1    Q.   Yeah.
2        I think you earlier testified that there --
3    during this October 2002 process you learned of all
4    these items -- of older items of unapplied cash that you
5    didn't know about that were invisible and that suddenly
6    the total number of unapplied cash increased; is that
7    right?
8        MR. GLENNON:  Objection.  Mischaracterizes the
9    testimony.
10       THE WITNESS:  Correct.
11   BY MR. GREENSTEIN:
12   Q.   And that was because all those new -- those
13   items of unapplied cash, the older items that you didn't
14   know about, were aggregated with the unapplied cash
15   items that you knew about; right?
16       MR. GLENNON:  Objection.  Leading.
17       THE WITNESS:  Correct.
18   BY MR. GREENSTEIN:
19   Q.   Do you remember what the level of increase was
20   when the older items were aggregated with the newer
21   items?
22       MR. GLENNON:  Objection.  Vague and ambiguous.
23       THE WITNESS:  No.  I couldn't tell you the
24   actual amount.  I just know that it was -- when we
25   originally looked at it, it was -- it was looked at as

142

1    being impossible -- just because it was so big.
2    BY MR. GREENSTEIN:
3    Q.   Okay.
4    A.   It was such a large amount that we -- just
5    didn't think that it -- we could put a dent in it,
6    obviously, but we would never be able to resolve the
7    whole thing.
8    Q.   And you weren't ever able to resolve the whole
9    thing; right?
10   A.   No.
11   Q.   So when those older -- withdrawn.
12       See the October 24th, Thursday, entry, on
13   Venkataramana Number 5, it says "No calls.  Collectors
14   work all day on clean-up, majority of staff."
15       Do you see that?
16   A.   I do.
17   Q.   Were you ever told not to make any calls
18   during this time, October 24th, 2002?
19       MR. GLENNON:  Objection.  Lack of foundation.
20       Calls for speculation.  Document speaks for
21   itself.
22       THE WITNESS:  In one of the meetings we were
23   told by Michael Quinn to -- to not do anything of -- our
24   regular duties as a collections manager, and that the
25   only thing that we were required to do at this time was

143

1    to resolve this unapplied cash issue until it was
2    complete.
3    BY MR. GREENSTEIN:
4    Q.   And do you recall, did you work on it for a
5    week, two weeks, on the project?
6    A.   Several weeks.
7    Q.   And then the result of that was something that
8    Molly Littlefield was in charge of -- a document that
9    Molly Littlefield was in charge of that she gave to the
10   higher-ups; right?
11       MR. GLENNON:  Objection.  Mischaracterizes
12   testimony.  Calls for speculation.
13       THE WITNESS:  Correct.
14   BY MR. GREENSTEIN:
15   Q.   And do you know what happened after that
16   document was -- or after that information was given by
17   Molly Littlefield to her superiors?
18       MR. GLENNON:  Objection.  Lack of foundation.
19   Calls for speculation.
20       THE WITNESS:  Well, shortly thereafter it was
21   -- you know, we had a -- a different project, and we
22   were off of -- you know, Molly was in charge of it now
23   instead of all of us managers.
24       It was just Molly, and that's when I believe,
25   you know, India started getting involved, and it was --

144

1    it was a long transition, but she was responsible for it
2    for quite some time.
3    BY MR. GREENSTEIN:
4    Q.   So shortly after the project the decision was
5    made to move some aspect at least of collections to
6    India; right?
7        MR. GLENNON:  Objection.  Calls for
8    speculation.  Lack of foundation.
9        THE WITNESS:  Correct.
10       But it was a long time.  It was a long
11   transition of first hearing about India and then
12   actually going through with it.
13   BY MR. GREENSTEIN:
14   Q.   Okay.  Now, are you aware that Michael Quinn
15   left Oracle at some point?
16   A.   Yes.  I was there actually when he left.  I
17   was still there.
18   Q.   Oh.  You were still there.  Okay.
19       Do you know why Mike Quinn left Oracle or --
20   withdrawn.
21       Do you know when you learned that Mike Quinn
22   left Oracle?
23   A.   I don't know the date, but I know it was
24   shortly after this -- not too long after this project, I
25   believe.  I don't know a date though.

145

```
1     Q.   Okay.  Do you know why he left?
2          Withdrawn.
3          So you say you learned that he left shortly
4   after this project.
5          You're referring to the October 2002 unapplied
6   cash project; right?
7     A.   Correct.
8     Q.   So do you know why he left shortly after that
9   project?
10    A.   He had stated to us that he wanted to take
11  some time off, so -- of work.
12         I think he -- he just had twins, and so that
13  was his explanation to us, that he was pursuing a
14  different avenue by taking a break.
15    Q.   Okay.  Other than what he told you, did you
16  learn of other reasons why he may have left Oracle?
17         MR. GLENNON:  Objection.  Calls for
18  speculation.  Lack of foundation.
19         THE WITNESS:  Well, you hear things through
20  the grapevine, and -- you know, from what I heard,
21  really the only thing that I heard was that he was --
22  that he was asked to resign, but -- I didn't witness
23  that.
24  BY MR. GREENSTEIN:
25    Q.   Okay.  Who did you hear that from?
```

146

```
1     A.   I heard that from the majority of the managers
2   that I had been working with.
3     Q.   The majority of the collections managers?
4     A.   Correct.
5     Q.   And did you hear that -- or was it ever
6   discussed, the reasons why he might have been asked to
7   resign?
8          MR. GLENNON:  Objection.  Calls for
9   speculation.  Lack of foundation.
10         THE WITNESS:  Any discussion that was ever
11  about why he resigned, it all basically bottle-necked in
12  to this project and what had happened, or what he had
13  allowed to happen, but, again, I didn't hear that from
14  him or anything.
15  BY MR. GREENSTEIN:
16    Q.   That was the discussion amongst the collection
17  managers; right?
18    A.   True.
19    Q.   Looking at -- you can put that aside.
20         Looking at what's been previously marked as
21  Venkataramana Number 5 -- oh.  Sorry.  Number 8.  No.
22  Again, Chen Number 12.  Sorry.
23         The October 21st, 2002 E-mail from Mike Quinn
24  to Ryan Roberts and Greg Myers, you see where it says at
25  the top, "There are three deliverables," and then it has
```

147

```
1   three bullet points there?
2     A.   I see it.
3     Q.   And you see the first bullet point says, "We
4   need to provide an update to the audit committee, a
5   subcommittee of Oracle's Board of Directors, in regards
6   to what revenue impact this process of taking unapplied
7   cash receipts to the reserve will have on our financial
8   statements?"
9          Do you see that?
10    A.   I do.
11    Q.   Do you know if there was an update provided to
12  the audit committee regarding what's reflected here?
13         MR. GLENNON:  Objection.  Lack of foundation.
14         Calls for speculation.  The document speaks
15  for itself.
16         THE WITNESS:  From what I heard there was a
17  continuous update to that audit committee that Jeff
18  Henley was responsible for doing, and that's why we were
19  responsible for getting those answers to Quinn as well
20  as he was responsible to get it to Henley -- from -- you
21  know, from what I heard.
22  BY MR. GREENSTEIN:
23    Q.   You see where it says "In addition, we need to
24  provide what impact this process has had on revenue in
25  each of the last eight quarters"?
```

148

```
1          Do you know if there was any conclusion about
2   what impact the process had on revenue in each of the
3   last eight quarters?
4          MR. GLENNON:  Objection.  Calls for
5   speculation.  Lack of foundation.
6          The document speaks for itself.
7          THE WITNESS:  I never had any numbers as to
8   what impact this had on them -- on Oracle time, you
9   know, from the beginning.
10  BY MR. GREENSTEIN:
11    Q.   Do you remember during these meetings in
12  October 2002 a discussion of -- of an on account
13  clean-up that involved debit memos in November 2000, so
14  roughly two years prior to these meetings?
15    A.   Yes.
16    Q.   And what do you recall about the on account
17  clean-up that occurred two years earlier?
18    A.   From what I knew, it was just another
19  unapplied project that was a clean-up to get rid of any
20  -- find resolution to the items that were in unapplied
21  -- for them to be resolved.
22         I don't believe I had a hand in it, but I had
23  heard of it.
24    Q.   So you weren't personally involved in the --
25  in the on account clean-up occurring in November 2000;
```

149

1 right?
2    A.   All of the unapplied projects that I was
3 involved with dealt with what was in unapplied, and, you
4 know, ensuring that -- that my directs were -- were
5 getting their unapplied down, and we had projects where
6 we would once a month -- we'd have like a pizza party
7 that it was called an unapplied party, or something like
8 that, where they'd have everyone stay, you know, three
9 or four hours over and get overtime to resolve as many
10 unapplied items as they could, and there was a contest
11 to -- you know, that had -- prizes or whatnot to --
12    Q.   Did you -- did you ever win the contest?
13    A.   No.
14    Q.   Was there somebody that won more contests than
15 others?
16    A.   Yeah.
17        MR. GLENNON:  Objection.  Vague and ambiguous.
18 BY MR. GREENSTEIN:
19    Q.   Who?
20    A.   I couldn't recall their name, but I know that
21 that did happen.
22    Q.   But in terms of the discussion of the on
23 account clean-up that occurred two years before these
24 meetings, were you told that -- that those involved the
25 creation of debit memos?

150

1        MR. GLENNON:  Objection.  Vague and ambiguous.
2        THE WITNESS:  Can you repeat that, please.
3 BY MR. GREENSTEIN:
4    Q.   Yeah.
5        When you learned -- I think you said earlier
6 you didn't know what a "debit memo" was until these
7 meetings; right?
8    A.   Uh-huh.
9    Q.   So I'm just wondering what was said during
10 these meetings regarding the on account clean-up and in
11 November 2000 and the creation of the debit memos two
12 years before the meetings.
13        MR. GLENNON:  Same objection.
14        THE WITNESS:  Well, like I said, they tried to
15 explain it to us, and it didn't sink in very well with
16 me, so, you know, as far as debit memos and the on
17 account clean-up, you know, I -- I didn't have much
18 information on it other than it was a clean-up.
19 BY MR. GREENSTEIN:
20    Q.   And, as far as you knew, it resulted in a
21 large number of unapplied items being added on to the
22 items that you had to resolve in October 2002; right?
23        MR. GLENNON:  Objection.  Mischaracterizes the
24 testimony.
25        Lack of foundation.  Calls for speculation.

151

1        MR. GREENSTEIN:  Is that right?
2        THE WITNESS:  True.
3 BY MR. GREENSTEIN:
4    Q.   Because whatever happened in November 2000
5 with respect to debit memos had the result, as far as
6 you knew, of making unapplied cash items disappear;
7 right?
8        MR. GLENNON:  Objection.  Calls for
9 speculation.  Lack of foundation.
10 BY MR. GREENSTEIN:
11    Q.   Correct?
12    A.   Correct.
13    Q.   And then in October 2002 those items suddenly
14 reappeared and were added to the items of unapplied cash
15 that collections was trying to resolve; right?
16        MR. GLENNON:  Same objection.  Lack of
17 foundation.
18        THE WITNESS:  Correct.
19 BY MR. GREENSTEIN:
20    Q.   And it resulted in a huge increase of
21 unapplied cash items, an increase from the level that
22 was right before you learned of -- of the unapplied cash
23 problem; right?
24        MR. GLENNON:  Objection.  Mischaracterizes
25 prior testimony.  Vague and ambiguous.

152

1 BY MR. GREENSTEIN:
2    Q.   Correct?
3    A.   Correct.
4    Q.   See in the third bullet point -- sorry --
5 the second bullet point on Chen Number 12, it says "We
6 need to clean up the entire problem prior to the end of
7 October.  I'm moving cash receipts to the proper
8 buckets, unapplied, customer overpayments, or on account
9 as appropriate."
10        Do you see that?
11    A.   Yes.
12    Q.   Where it says "the entire problem," based on
13 what you know, does this refer to the unapplied cash
14 problem that you've been discussing?
15        MR. GLENNON:  Objection.  Calls for
16 speculation.  Document speaks for itself.
17        This witness is not even on the address for
18 this E-mail.
19        THE WITNESS:  True.
20        This is referring to the entire problem, which
21 is what is said -- stated up top here, the problems
22 surrounding unapplied cash issue that we were told to
23 resolve.
24 BY MR. GREENSTEIN:
25    Q.   Okay.  See the third bullet point, it says,

153

1 "We need to establish new policies and procedures to
2 ensure this never happens again"?
3      Do you see that?
4      A.   I do.
5      Q.   Do you know if there were new policies and
6 procedures implemented at Oracle to ensure that the
7 problem never occurred again?
8          MR. GLENNON:  Objection.  Calls for
9 speculation.
10         Lack of foundation.  Document speaks for
11 itself.
12         THE WITNESS:  I'm sure there was, and I'm sure
13 that they were given to India -- to ensure that this
14 didn't happen again.
15 BY MR. GREENSTEIN:
16     Q.   And why -- why did these individuals not want
17 the problem to occur again, if you know?
18         MR. GLENNON:  Objection.  Calls for
19 speculation.  Lack of foundation.
20         THE WITNESS:  Well, because it -- there's
21 several reasons.
22         It took away from productivity.  It -- you
23 know, made us work on a project and took us away from
24 our everyday work, and it was -- from what you can read
25 here and what is stated, it just -- there's -- there's

154

1 just a major revenue impact, and -- that's from what I
2 know, just -- and we had been talking about the problem,
3 and they just, obviously, didn't want it to happen
4 again, by putting policies and procedures in place
5 hoping that it wouldn't arise.
6 BY MR. GREENSTEIN:
7      Q.   Did customers ever call you to complain about
8 items of unapplied cash that needed to be refunded?
9          MR. GLENNON:  Objection.  Vague as to time.
10         THE WITNESS:  No.  No.
11         There were never -- you know, if they were
12 advised of it, it -- with it, then -- you know, then it
13 would be -- hopefully be resolved.
14         But, you know, as I said before, when you
15 contact someone about a check that was written by that
16 company years and years before they even got there, then
17 how are they going to even resolve it?
18         A lot of times it wasn't even in their system.
19 BY MR. GREENSTEIN:
20     Q.   Right.
21         So were customers ever told that they had
22 these items of unapplied cash that had been there for
23 years, been at Oracle for years?
24         MR. GLENNON:  Objection.  Calls for
25 speculation.  Lack of foundation.

155

1          THE WITNESS:  Yeah, there was -- there were
2 some items, you know, that -- after you did your three
3 to five steps of trying to resolve the thing, and you
4 couldn't do anything else, then, you know, you needed to
5 call the client and find out what they meant that amount
6 to pay for if you couldn't resolve it yourself.
7          MR. GLENNON:  Eli, is now the appropriate time
8 to take a break?
9          MR. GREENSTEIN:  Well, I have a couple more
10 minutes just with this document, but pretty soon.  I'd
11 say five minutes.
12         Is that okay with you, Ian?
13         THE WITNESS:  That's fine.
14 BY MR. GREENSTEIN:
15     Q.   Okay.  See the second set of bullet points,
16 "What needs to be done"?
17         "For items currently on account we need to
18 continue to work through each item, over 10,000, to
19 determine what should have happened to the cash receipt,
20 and make the correction and put this in the -- put it in
21 the right place."
22         Do you see that?
23         MR. GLENNON:  Objection.  Document speaks for
24 itself.
25         THE WITNESS:  I do.

156

1 BY MR. GREENSTEIN:
2      Q.   Does that refresh your recollection that part
3 of your task was to work through each on account item
4 and determine where the cash receipt should have gone?
5          MR. GLENNON:  Objection.  Lack of foundation.
6          THE WITNESS:  Yes.
7 BY MR. GREENSTEIN:
8      Q.   And that was part of your task during late
9 October 2002, was to try to resolve these on account
10 items; correct?
11         MR. GLENNON:  Objection.  Vague and ambiguous.
12 Mischaracterizes testimony.
13         THE WITNESS:  True.
14 BY MR. GREENSTEIN:
15     Q.   See the second bullet point at the bottom
16 half, it says "For items in the receipts write off all
17 tab of the spread sheet titled 12-6-01 detail, we need
18 to review each item over 10,000"?
19         Do you see that?
20     A.   I do.
21     Q.   Do you know what the "receipts write off all
22 tab of this spread sheet" is?
23         MR. GLENNON:  Objection.  Lack of foundation.
24         Again, document speaks for itself.
25         THE WITNESS:  I -- I've obviously looked at it

157

1 plenty of times.  I just couldn't give you a proper
2 definition.
3          MR. GREENSTEIN:  Oh.  Sorry.
4          THE WITNESS:  Go ahead.
5 BY MR. GREENSTEIN:
6     Q.   Is that a tab on a spread sheet like an Excel
7 spread sheet?
8     A.   It is.
9     Q.   Okay.  And where it says "12-6-01 detail,"
10 what does that mean to you as you sit here today?
11          MR. GLENNON:  Objection.  Calls for
12 speculation.
13          He's testifying about a document that he has
14 not even been sent and he didn't author.
15          THE WITNESS:  The 12-6-01 detail, which is a
16 spread sheet, it gives the detail of that -- of those
17 items similar to Exhibit 2.
18 BY MR. GREENSTEIN:
19     Q.   When you say "Exhibit 2," are you referring to
20 -- what's been previously -- what was previously marked
21 as -- Venkataramana Number 2?
22     A.   Correct.  It was similar, in the same format.
23     Q.   Okay.
24     A.   I'm not saying that it was the same report.
25 It was just -- it was similar to that format.

158

1     Q.   Okay.  And why -- do you know why the 12-6-01
2 -- this account number, was part of -- actually,
3 withdraw that.
4          See the third bullet point in the second half
5 of the document says, "For items in the miscellaneous
6 offset report, August 2000 through September 2002"?
7          Do you see that?
8     A.   I do.
9     Q.   Do you know what a "miscellaneous offset
10 report" is?
11          MR. GLENNON:  Objection.  Document speaks for
12 itself.
13          Calls for speculation.  Lack of foundation.
14          THE WITNESS:  I couldn't give a proper
15 definition.
16          It was just another tab on -- on, you know,
17 the -- the many reports that they had.
18 BY MR. GREENSTEIN:
19     Q.   And all those reports, were those in Oracle's
20 electronic system?
21          MR. GLENNON:  Objection.  Calls for
22 speculation.
23          THE WITNESS:  Correct.
24 BY MR. GREENSTEIN:
25     Q.   And you can access all those reports by

159

1 logging on to Oracle's database system; right?
2          MR. GLENNON:  Same objection.
3          THE WITNESS:  Us managers could access it on
4 the share drive.
5 BY MR. GREENSTEIN:
6     Q.   If you look at the bottom -- the last sentence
7 at the bottom says, "Ryan, for each of the items
8 bulleted above we need to focus a hundred percent today
9 and tomorrow on getting through all this work.  I like
10 what you did on the items over a hundred thousand.  We
11 should continue to follow this method."
12          Do you know what method Ryan Roberts used for
13 items over a hundred thousand?
14          MR. GLENNON:  Objection.  Calls for
15 speculation.  Lack of foundation.
16          Document speaks for itself.
17          THE WITNESS:  Yes.
18          It was giving them reason codes and advising
19 them -- well, it was just giving reason codes, you know,
20 to say what they were.
21          MR. GREENSTEIN:  Okay.
22          THE WITNESS:  What they were from, to the best
23 of our ability.
24 BY MR. GREENSTEIN:
25     Q.   And you see the second paragraph on the second

160

1 page, "Greg, please confirm that all ability to move
2 anything to 12601 via on account or creating a
3 miscellaneous receipt write-off has been turned off."
4          Do you see that?
5     A.   Correct.
6     Q.   Do you know why Mike Quinn was writing to Greg
7 Myers telling him to confirm that all ability to move
8 anything to 12601 on account should be turned off?
9          MR. GLENNON:  Objection.  Calls for
10 speculation.  Lack of foundation.
11          THE WITNESS:  Previous to this -- these
12 meetings and us knowing about this project -- I wasn't
13 aware that you could move -- that any collector could
14 move money on account, which was true, anybody could do
15 it, anybody that had access to the Oracle system that
16 was a collector or accounts receivable analyst, and he
17 wanted Greg to turn that off so no one else could put
18 any more money in there, because it was -- obviously,
19 people were -- you know, they're saying that there was
20 collectors had moved money to this account.
21 BY MR. GREENSTEIN:
22     Q.   Right.  And that's -- I think earlier you said
23 that's what caused those items of unapplied cash to
24 disappear; right?
25     A.   It was part of it.

161

1  Q.  Right?
2  A.  I don't believe it was the whole thing, but it
3  was part of it.
4  MR. GLENNON:  I'm just going to assert an
5  objection calls for speculation, lack of foundation.
6  MR. GREENSTEIN:  All right.  I think we can
7  take a little lunch break.
8  VIDEOGRAPHER:  Off the record, the time is
9  1:13 p.m.
10  (Thereupon a recess was taken at 1:13 p.m.
11  and the deposition resumed at 2:00 p.m.)
12  VIDEOGRAPHER:  We are back then on the record.
13  The time is 2:00 p.m.
14  MR. GREENSTEIN:  Mr. Hatada, I'm handing you
15  what will be marked, I think this is -- is the first or
16  the second exhibit?
17  THE REPORTER:  First.
18  MR. GREENSTEIN:  First?  This will be Hatada
19  Number 1.
20  For the record, this is --
21  MR. SCHRAG:  I think you gave me something
22  different than --
23  MR. GREENSTEIN:  Yeah.  The first page,
24  counsel, just rip it off and put it in the back.
25  It just got copied the wrong way.

162

1  So, Mr. Hatada, you have all the pages in
2  order.
3  For the record the order of the pages is
4  PLF-ORC 001877 through 001880.
5  THE WITNESS:  Correct.
6  MR. GREENSTEIN:  Okay.  So go ahead and just
7  review that, and let me know when you're finished,
8  please.
9  THE WITNESS:  Okay.
10  MR. SCHRAG:  You want him to look through it
11  or read the whole thing?
12  MR. GREENSTEIN:  Yeah, just look through it
13  and read it, what you need to, to understand it, if you
14  do.
15  MR. SCHRAG:  Okay.
16  MR. GLENNON:  I'm just going to put an
17  objection on the record that these records are different
18  than the ones with the same Bates label than Plaintiffs
19  have produced to us.
20  MR. GREENSTEIN:  Say that again.
21  MR. GLENNON:  These documents are different
22  than the one Plaintiffs have produced to us in two
23  respects.
24  1878 has additional language, as does 1800,
25  and I'll tell you exactly what that is.

163

1  1880 has the phrase "Quinn directive" with an
2  arrow pointing down.  The one that was produced to us
3  does not.
4  1878 has "adjusting up invoices to keep cash"
5  written on it and a line attaching that to a circled
6  star.
7  The one that was produced to us has the star
8  circled section but no phrase "adjusting up invoices to
9  keep cash."
10  MR. SCHRAG:  There's a redacted mark on there;
11  is that right?
12  MR. GLENNON:  Yes, there is.
13  MR. GREENSTEIN:  Yeah, so -- well, it appears
14  for the record that the document that I just handed
15  Mr. Hatada -- the document I gave him has some work
16  product on it, and that was redacted from the copies
17  that were actually produced to Defendant, so it was
18  inadvertent, and I would ask that the documents come
19  back to me.
20  MR. GLENNON:  Okay.  I have some work product
21  on mine now, too.
22  MR. GREENSTEIN:  That's fine.
23  MS. WINE:  So do I.
24  How about we all just rip these up and throw
25  them away.

164

1  MR. GREENSTEIN:  Yeah.  So why don't we just
2  destroy these.
3  MS. WINE:  I'm not actually playing games.
4  Do you know for sure that that's work product,
5  that that's what that writing was and that's why it was
6  redacted?
7  MR. GREENSTEIN:  I believe -- as I sit here
8  today, I believe that that writing -- that we redacted
9  it because it was work product and/or privileged.
10  I'm not sure exactly.  I have to go back and
11  look.
12  I'm sure it's reflected on a log.  If it's
13  not, you know, we'll have to look at that at another
14  time.
15  Okay.  So I want to mark the -- so the -- and
16  actually, Mr. Hatada, you can give that back if you want
17  to.
18  THE WITNESS:  Oh.  We're not doing this now?
19  MR. GREENSTEIN:  So I'm going to mark this
20  next document as Hatada Number 1.
21  (Exhibit No. 1 was marked for Identification.)
22  MR. GREENSTEIN:  For the record this is Bates
23  stamped PLF-ORC Number 1.
24  And, Mr. Hatada, if you can just review the
25  E-mail string and let me know when you're finished,

165

1   please.
2       And, for the record, this is an E-mail string,
3   first E-mail is April 23rd, 2002 from Wendy So, S-o, to
4   Vince Jones and Ian Hatada.
5       THE WITNESS: Okay.
6   BY MR. GREENSTEIN:
7       Q.   Finished?
8       A.   Yes.
9       Q.   Do you recognize this E-mail?
10      A.   Not really, but -- I mean, it was sent to me,
11  so --
12      Q.   Okay. It was copied to you?
13      A.   I read it before, obviously.
14      Q.   Does it appear that -- that the E-mail at the
15  top was copied to you on or about April 23rd, 2002?
16      MR. GLENNON: Objection. Foundation. The
17  document speaks for itself.
18      THE WITNESS: Yes.
19  BY MR. GREENSTEIN:
20      Q.   Okay. And you see -- let's start with the
21  E-mail at the bottom, Subject: AR revenue recognition.
22      It's from Stephen Buckingham.
23      Do you know who that is?
24      A.   No.
25      Q.   Okay. And it doesn't appear that you were a

166

1   recipient of this original E-mail, but that it was later
2   copied as part of this E-mail at the top; correct?
3       A.   Correct.
4       MR. GLENNON: Objection. Foundation.
5   BY MR. GREENSTEIN:
6       Q.   Okay. And the E-mail at the bottom is to
7   Jonathan Kwok.
8       Do you know who that is?
9       A.   No.
10      Q.   Okay. Do you recognize any of the individuals
11  in the cc line of the E-mail at the bottom of this
12  document?
13      A.   Wendy So -- and that's about it.
14      Q.   Who is Wendy So?
15      A.   I just recall hearing her name before. She
16  worked -- at Oracle somewhere.
17      I just remember hearing her name.
18      Q.   Okay. And you see how there's a discussion
19  about a GAAP issue in the E-mail at the bottom?
20      A.   I do.
21      Q.   Okay. Do you know what "GAAP" is?
22      A.   I can't recall.
23      Q.   Okay. See in the second paragraph in the
24  bottom E-mail it says, "One of the major issues we have
25  with OPN fee income is unallocated cash"?

167

1       Do you see that?
2       A.   Yes.
3       Q.   Do you know what "OPN fee income" is?
4       MR. GLENNON: I'm just going to object on the
5   grounds of foundation that the document speaks for
6   itself.
7       THE WITNESS: I couldn't give you a detailed
8   description of it.
9   BY MR. GREENSTEIN:
10      Q.   So generally do you know what it refers to?
11      MR. GLENNON: Objection. Vague and ambiguous.
12      THE WITNESS: I guess it could be a fee --
13      MR. SCHRAG: Let me caution you, don't
14  speculate.
15      THE WITNESS: Yeah.
16      MR. SCHRAG: He doesn't want you to speculate.
17  If you know something, you --
18      THE WITNESS: I just don't know. I can't
19  recall.
20  BY MR. GREENSTEIN:
21      Q.   That's fair enough.
22      In the next paragraph it says, "Some of this
23  unallocated cash is over a year old. In my view this
24  means that, since the payment is for an annual service
25  contract and the money is due whether or not they have

168

1   requested anything from us, then whoever has paid us has
2   received the service. My question is, can we recognize
3   any unallocated cash over 12 months old as cost relief?"
4       Do you see that?
5       A.   I do.
6       Q.   The term "unallocated cash," at this time of
7   this E-mail does that refer to unapplied cash?
8       MR. GLENNON: Objection. Lack of foundation.
9   Calls for speculation.
10      THE WITNESS: Yes, I believe so.
11  BY MR. GREENSTEIN:
12      Q.   Okay. So she's talking about some unallocated
13  cash for whether or not, quote, we -- "Can we recognize
14  any unallocated cash greater than 12 months or -- as
15  cost relief?"
16      MR. GLENNON: Objection. Calls for
17  speculation. Lack of foundation.
18  BY MR. GREENSTEIN:
19      Q.   Do you see that?
20      A.   Yes.
21      Q.   Do you know what "cost relief" is -- means?
22      A.   I don't. I can't recall.
23      Q.   Okay. So it appears she's asking this
24  question in this E-mail, and then Wendy So writes --
25  cc's you on an E-mail and writes, "Vince/Ian, This is to

169

1   follow up on my voice mail regarding EMEA's request on
2   treatment of the unapplied cash.  The question is
3   whether they can recognize the unapplied cash over 12
4   months old from unknown partners for OPN fees as a cost
5   relief.  Does the U.S. have a similar policy as such?
6   Please advise."
7          Now, do you recall a voice mail from Wendy So
8   discussing this issue?
9       A.   No.
10      Q.   Okay.  Do you recall -- do you know why Wendy
11  So was writing you and Vince Jones about this issue?
12      A.   Probably just so she could get back to EMEA's
13  or EMEA, you know, on the question of whether they can
14  recognize the unapplied cash from the unknown partners.
15          I mean, I -- I really don't remember this
16  E-mail all that much or the voice mail.
17          I'm only going on what's been stated here at
18  this top paragraph.
19      Q.   Okay.  And what was the reason why you think
20  you were -- she was writing this to you?
21      A.   Because Vince --
22          MR. GLENNON:  Calls for speculation.
23          THE WITNESS:  Because Vince Jones was someone
24  -- one of my directs, so I managed Vince, and he dealt
25  with EMEA, and so in an effort to get ahold of Vince and

170

1   ask him these questions, she copied his manager, which
2   was me.
3          Basically I -- you know, in this example, I
4   wasn't really involved all that much.  She just copied
5   me to ensure that he would get back to her.
6   BY MR. GREENSTEIN:
7       Q.   Okay.  Because you were Vince Jones'
8   supervisor at the time; right?
9       A.   Exactly.
10      Q.   Okay.  So do you recall how this question or
11  this issue was resolved?
12          MR. GLENNON:  Objection.  Calls for
13  speculation.
14          THE WITNESS:  I don't.
15  BY MR. GREENSTEIN:
16      Q.   And what does "EMEA" stand for?
17      A.   I couldn't tell you.
18      Q.   Okay.
19      A.   It's a client name, I believe.
20      Q.   Well, could it be a geographic area of Oracle?
21      A.   It could be.
22      Q.   Okay.
23      A.   Then, again, I couldn't guarantee that.
24          MR. GREENSTEIN:  Okay.  You can put that
25  aside.

171

1          The next document we'll mark as -- this is
2   Hatada Number 2.
3          (Exhibit No. 2 was marked for Identification.)
4          MR. GREENSTEIN:  For the record this is a
5   one-page document Bates stamped PLF-ORC 000008.
6          MR. SCHRAG:  Just want to instruct you, make
7   sure that the Court Reporter gets these documents back.
8   Don't leave with them.
9          THE WITNESS:  Okay.
10         MR. GREENSTEIN:  Thank you.
11         Let me know when you're finished reading it.
12         THE WITNESS:  Okay.
13         Okay.
14  BY MR. GREENSTEIN:
15      Q.   Do you recognize this E-mail?
16      A.   Yes.
17      Q.   And you see how at the bottom righthand corner
18  it's dated -- it appears to be dated 10-30-2002?
19         Do you see that?
20      A.   I do.
21      Q.   And is that -- is it reasonable to say that
22  this E-mail was sent on or around 10-30 -- October 30th,
23  2002?
24         MR. GLENNON:  Objection.  Lack of foundation.
25         THE WITNESS:  Yes.

172

1   BY MR. GREENSTEIN:
2       Q.   Okay.  Because is it normal -- there's no date
3   at the top.
4          Usually there's a date at the top; right?
5       A.   Right.
6       Q.   Have you seen that before, where there's a
7   date at the bottom of an E-mail?
8          THE WITNESS:  Yes.
9          MR. GLENNON:  Objection.  Calls for
10  speculation.
11  BY MR. GREENSTEIN:
12      Q.   Okay.  So see how it's an E-mail from Ryan
13  Roberts to you and the other collections managers that
14  you referenced earlier?
15      A.   Correct.
16      Q.   Okay.  And October 30th, 2002 was around the
17  time of these unapplied cash meetings; right?
18      A.   True.
19      Q.   And you see how Ryan's writing to you and
20  others, "Attached is our new working list.  I've broken
21  out from the list and sorted by dollar, so I can get
22  back the ones that we have not yet worked on.  They are
23  listed out for you by name."
24         Do you see that?
25      A.   I do.

173

1    Q.   So what does Ryan Roberts mean when he -- when
2  writes that to you?
3        MR. GLENNON: Objection. Calls for
4  speculation. Lack of foundation.
5        THE WITNESS: When -- when he says "They are
6  listed out for you by name," it means that there was a
7  list that had my name on it, and there was a list that
8  had Molly's name, Omid, and Justin.
9  BY MR. GREENSTEIN:
10   Q.   And those are lists of unapplied cash that
11  needed to be resolved; right?
12   A.   Correct.
13       This is part of the project, and we were
14  divvied out these items, and then we were supposed to
15  take them and divvy them out to our team so they could
16  resolve them, as you've seen in the other document with
17  notes, resolution plan.
18   Q.   Okay. And it says farther down -- it says,
19  "Please do not resort these."
20       Do you know why he wrote that?
21       MR. GLENNON: Objection. Calls for
22  speculation.
23       THE WITNESS: Because if you resort this
24  spread sheet, you're not able to match it up again with
25  the master.

174

1        I think there was a master that -- if you
2  resorted it, then it was hard to resort back to -- who
3  knows how he sorted it, and he was supposed to put it
4  back in the master to then send to Mike Quinn.
5  BY MR. GREENSTEIN:
6    Q.   Okay. And who kept the master?
7        MR. GLENNON: Objection. Foundation.
8        THE WITNESS: We all had it at some point or
9  another, but, you know, Molly, Ryan, and -- you know, we
10  sent it to Quinn.
11       So Ryan and Molly mostly.
12  BY MR. GREENSTEIN:
13   Q.   Okay. And see how it says, "Each of you has
14  between 50 to 52 items"?
15   A.   Uh-huh.
16   Q.   Is that items of unapplied cash?
17       MR. GLENNON: Objection. Document speaks for
18  itself. Calls for speculation.
19       THE WITNESS: It is just for these dollar
20  amounts. There's just a certain dollar amount.
21       This is just a little small portion of what we
22  were -- this is a portion of the project.
23       It's just -- and I don't know what dollar
24  amount these were sorted in, but they were 50 to 52
25  items, each manager, and they were between a certain

175

1  dollar amount.
2  BY MR. GREENSTEIN:
3    Q.   I see.
4        So the "50 to 52 items" referred to in this
5  E-mail referred to items in a certain dollar range;
6  right?
7    A.   Yeah, and maybe they were only over 250,000 or
8  something.
9    Q.   Okay. But there were other items that needed
10  to be resolved that aren't reflected in this E-mail;
11  right?
12   A.   Correct.
13   Q.   Do you remember how many items each of you --
14  each of the collections managers was tasked to resolve?
15   A.   Beyond this spread sheet?
16   Q.   Right, in total.
17       MR. GLENNON: Objection. Vague as to time.
18       THE WITNESS: Yes. Hundreds.
19  BY MR. GREENSTEIN:
20   Q.   Hundreds?
21       And when I -- again, when I'm talking about
22  "this E-mail," it's October 30th, 2002. When I ask
23  about "this project," I'm referring to that time period.
24       Do you understand that?
25   A.   I do.

176

1    Q.   So hundreds.
2        Each of you -- each of the collections
3  managers had hundreds of items that they needed to
4  resolve, and this E-mail is talking about 50 to 52 items
5  in a certain dollar amount range; right?
6        MR. GLENNON: Objection. Lack of foundation.
7        Document speaks for itself.
8        THE WITNESS: Correct.
9  BY MR. GREENSTEIN:
10   Q.   And it says, "Feel free to meet with your
11  teams tonight or tomorrow morning to get them assigned."
12       And do you remember doing that around this
13  time?
14   A.   Yes.
15       MR. GLENNON: Objection. Vague and ambiguous.
16  BY MR. GREENSTEIN:
17   Q.   And so you assigned these items to various
18  collections analysts; right?
19   A.   Yes.
20   Q.   Okay. You see later it says "My goal is to be
21  done by 4:30 tomorrow so we can get the In Focus and go
22  over them"?
23       Do you see that?
24       MR. GLENNON: Objection. Document speaks for
25  itself.

177

1     THE WITNESS: I do.
2   BY MR. GREENSTEIN:
3     Q.   Do you know what "In Focus" means?
4     A.   Yeah.
5         So once we were done with them we would send
6   them back to Ryan, and he would -- or Molly, and they
7   would put them in to a -- one spread sheet with
8   different tabs on it, and we would -- they would be
9   separated by collections manager, you know, of the 50 to
10  52 items, and then in the evening we would go in to a
11  meeting room, put the spread sheet up on an In Focus
12  machine, and go ever each one of them one-by-one to mak
13  sure that they were done correctly in the way that Mike
14  Quinn wanted them to be done.
15    Q.   Okay.  Were there instances where you put an
16  item of unapplied cash up on the board -- up on the In
17  Focus machine and Mike Quinn said "That's not the way I
18  want it to be done"?
19    A.   Yes, many times.
20    Q.   Okay.  And did he ever tell you guys to change
21  the notes in the spread sheet that had the -- kind of
22  the explanation of -- of what happened to this -- or why
23  this item of unapplied cash occurred?
24        MR. GLENNON: Objection. Vague and ambiguous.
25        THE WITNESS: Yeah.

178

1         Yes, he would say, "This needs to be more
2   detailed," or -- you know, "It needs to be researched
3   further," not necessarily completely changing the notes,
4   but mostly more detail, or -- you know, or -- you know,
5   going back to the drawing board, and if you didn't have
6   that much research on it or not enough detail, you'd
7   need to look in to it further.
8   BY MR. GREENSTEIN:
9     Q.   Okay.  Was there ever a time where you
10  personally deleted a note and then wrote another note in
11  its place on the spread sheet?
12        MR. GLENNON: Objection. Vague and ambiguous.
13        THE WITNESS: Not myself, no.
14  BY MR. GREENSTEIN:
15    Q.   Okay.  But your collectors -- collections
16  analysts underneath you, did they do that?
17        MR. GLENNON: Objection. Calls for
18  speculation. Lack of foundation.
19        THE WITNESS: Yes, I believe so.
20  BY MR. GREENSTEIN:
21    Q.   The older notes that they deleted, those
22  weren't stored anywhere; were they?
23        MR. GLENNON: Objection. Calls for
24  speculation. Lack of foundation.
25        THE WITNESS: I don't believe they were.

179

1   BY MR. GREENSTEIN:
2     Q.   Okay.  Because in a spread sheet you just
3   delete a field and the data doesn't exist anymore;
4   right?
5         MR. GLENNON: Objection. Counsel is
6   testifying.
7         THE WITNESS: Yes, and the first note that you
8   have on it might not have been researched enough and
9   could be changed.  So --
10  BY MR. GREENSTEIN:
11    Q.   So these were changed on or around October
12  30th, 2002, after --
13        MS. WINE:  Is he done answering?  I think he
14  was saying --
15        MR. SCHRAG:  Were you done answering?
16        MR. GREENSTEIN: I'm sorry.
17        THE WITNESS: Yes, I was done.
18        MR. GREENSTEIN: Oh. I'm sorry.
19  BY MR. GREENSTEIN:
20    Q.   So these notes were -- the notes for the items
21  of unapplied cash were changed or around October 30th,
22  2002, around this time period; right?
23        MR. GLENNON: Objection. Calls for
24  speculation. Lack of foundation.
25        THE WITNESS: Correct.

180

1   BY MR. GREENSTEIN:
2     Q.   And that was after you were told about the
3   lawsuit involving Plaintiffs in this case at the
4   meetings involving the debit memos; right?
5         MR. GLENNON: Objection. Lack of foundation.
6   Mischaracterizes testimony.
7         THE WITNESS: Correct.
8         MR. GREENSTEIN: Okay.  You can put that
9   aside.
10        Next one is to be marked as Hatada Number 3.
11        (Exhibit No. 3 was marked for Identification.)
12        MR. GREENSTEIN: And you can go ahead and read
13  the whole thing.
14        THE WITNESS: Okay.
15        MR. GREENSTEIN: For the record, this is Bates
16  stamped PLF-ORC 000003.
17  BY MR. GREENSTEIN:
18    Q.   Okay.  See how this is a two part E-mail?
19        The first part is Omid Fardanesh writing --
20  forwarding you an E-mail, subject, "P" as in Paul, "F"
21  as in Frank, "R," and it's to Justin Backs, Anne Marie
22  Adao, Ian Hatada, Molly Littlefield, and Ryan Roberts.
23        Do you see that?
24        MR. GLENNON: Objection. Document speaks for
25  itself.

181

BY MR. GREENSTEIN:

1 Q. And appears to be forwarding -- I'm sorry.
2 Did you see that? Do you see that?
3 A. Yes, I do.
4 Q. And Omid is forwarding you an E-mail exchange
5 between Kim Henderson and himself.
6 Do you see that?
7 MR. GLENNON: Objection. Lack of foundation.
8 THE WITNESS: I do.
9 BY MR. GREENSTEIN:
10 Q. Okay. And Omid Fardanesh was one of your
11 counterparts. He was a collection manager at the same
12 time you were; right?
13 MR. GLENNON: Objection. Leading.
14 THE WITNESS: He was.
15 BY MR. GREENSTEIN:
16 Q. And do you know who Kim Henderson is -- or
17 was?
18 A. She was the individual that was responsible
19 for -- I don't know what department she was in, but she
20 had the ability to turn on and turn off the pro forma
21 site, so she had access to it.
22 Q. So -- I'm sorry.
23 You said "the pro forma site"?
24 A. Yep.

182

1 Q. Okay. So -- do you remember getting this
2 E-mail?
3 A. I do.
4 Q. Okay. Can you explain -- well, let's take it
5 piece-by-piece.
6 At the bottom there's an E-mail from Omid to
7 Kim Henderson, and it says, "Here in collections we are
8 doing reconciliation for on account, which consists of
9 receipts we have received."
10 Do you see that?
11 A. I do.
12 Q. And do you know -- he's referring -- is he
13 referring to the on account -- withdrawn.
14 Is he referring to the unapplied cash project
15 that you guys were doing in late November 2002?
16 MR. GLENNON: Objection. Calls for
17 speculation.
18 THE WITNESS: Yes, he is.
19 BY MR. GREENSTEIN:
20 Q. And do you see at the bottom of the E-mail on
21 the righthand corner it says "October 30th, 2002" again?
22 MR. GLENNON: Objection. Document speaks for
23 itself.
24 THE WITNESS: I do.
25 BY MR. GREENSTEIN:

183

1 Q. So when he says "Here in collections we are
2 doing a reconciliation for on account," and then he
3 says, "The problem we are running in to, some of the
4 checks reference a PFR number," do you see that?
5 A. I do.
6 MR. GLENNON: Objection. Document speaks for
7 itself.
8 BY MR. GREENSTEIN:
9 Q. What's a "PFR number"?
10 A. A PFR number is like an invoice number, but
11 it's a pro forma invoice number, and in -- in an effort
12 to -- to find that number you have to go to a pro forma
13 site that at one time was running, and they ended up
14 shutting it down, because it ended up causing a lot of
15 problems, because you had a real invoice number, and
16 then you had a pro forma number.
17 Q. Okay. What is a "pro forma invoice"?
18 A. It's an invoice that's been manually changed
19 by -- or made up to reference another invoice, but it's
20 -- the wording on it is changed or the -- there were
21 certain things that you couldn't change on it, but then
22 there were other things that you could change, like line
23 item explanations or whatnot, and so that's why there
24 was pro forma numbers.
25 Q. Okay. So --

184

1 A. There was a site that held these, and it was
2 shut down at the point of this project so we couldn't
3 get in to it, and we needed to get in to it because a
4 lot of the checks that came in that we were trying to
5 resolve that -- in the past had been reserved or put in
6 to this other account of unapplied referenced the -- a
7 PFR number or a pro forma invoice number that the amoun
8 was supposed -- was intended to go to that pro forma
9 invoice.
10 Q. Okay. So let me see if I understand this.
11 So a pro forma invoice is an invoice created
12 -- well, withdrawn.
13 What's the difference between a regular
14 invoice that was created at Oracle and a pro forma
15 invoice?
16 A. An invoice -- a regular invoice from Oracle is
17 an invoice that's actually in the system. It's a
18 legitimate invoice.
19 A pro forma invoice is something that has been
20 manually changed to meet the customer needs.
21 Basically that's what it was, is to meet the
22 customer needs we would -- you know, I wouldn't or --
23 you know, not necessarily -- you know, there were times
24 where collections had to do that, but we found that a
25 lot of times it was the sales field that were -- that

185

1  were making these invoices to meet the customer needs,
2  and then it was -- they were -- they were supposed to be
3  going on to this pro forma site, and a lot of times they
4  would, and sometimes they wouldn't, so they caused
5  problems with -- the differences between what has been
6  read on the pro forma invoice and what was read on --
7  what was written on the regular invoice.
8      Q.   Okay.
9      A.   It caused a lot of confusion.
10     Q.   Okay. So I think you referred to a regular
11  invoice as "a legitimate invoice;" correct?
12     A.   True.
13     Q.   So was the pro forma invoice an illegitimate
14  invoicing?
15         MR. GLENNON: Objection. Vague and ambiguous.
16         THE WITNESS: It was an invoice to meet the
17  customer needs, and the way we were able to hold the
18  information was by this pro forma site that had PFR
19  numbers on it.
20         The number for the invoice, it was intended to
21  be the same invoice, were -- a lot of times two
22  different numbers.
23         It might just be a difference between it had a
24  letter "A" in front of it, or "B," or whatnot.
25  BY MR. GREENSTEIN:

186

1      Q.   Okay.
2      A.   But in order to track and keep record it was
3  on this site.
4      Q.   Okay. Why was there -- why was a site created
5  just for pro forma invoices?
6         MR. GLENNON: Objection. Calls for
7  speculation. Lack of foundation.
8         THE WITNESS: Because if -- if there wasn't a
9  legitimate pro forma invoice, then billing -- or
10  receivables wouldn't know where -- what the remittance
11  was on the checks that were coming in.
12         So it -- it was intended to help the
13  collections or AR field to apply correctly.
14  BY MR. GREENSTEIN:
15     Q.   So the site for pro forma invoices was
16  originally to be used by collectors to give it a
17  reference or research and find pro forma invoices if
18  they saw the PFR number in other documents; right?
19         MR. GLENNON: Objection. Calls for
20  speculation.
21         THE WITNESS: Correct, as well as a place for,
22  you know, anyone who had manually -- you know, invented
23  a pro forma invoice or came up with a pro forma invoice
24  to meet the customer needs, they had a place to put it
25  so it would keep track of records, and from my

187

1  understanding that's what -- what it was for.
2  BY MR. GREENSTEIN:
3      Q.   Okay. So I think you mentioned sales
4  personnel before.
5         Was there -- were there ever cases where sales
6  personnel at Oracle would create pro forma invoices
7  manually?
8         MR. GLENNON: Objection. Calls for
9  speculation.
10         THE WITNESS: Yes.
11  BY MR. GREENSTEIN:
12     Q.   And were there instances that you were aware
13  of where an invoice would be generated for a customer
14  and then another pro forma invoice was generated for
15  that same amount, same customer, and so there would be
16  two -- one legitimate invoice and one pro forma invoice?
17         MR. GLENNON: Objection. Vague and ambiguous.
18         THE WITNESS: Yes, we ran in to that a lot.
19  BY MR. GREENSTEIN:
20     Q.   A lot?
21     A.   (Nodding head)
22     Q.   Okay. And would there ever be occasions where
23  the customer would pay -- make payments for both the
24  regular invoice and the pro forma invoice created
25  manually?

188

1         MR. GLENNON: Objection. Vague and ambiguous.
2  Calls for speculation.
3         THE WITNESS: Yes.
4  BY MR. GREENSTEIN:
5      Q.   And did that result in -- so -- they paid the
6  same invoice twice; right?
7      A.   Correct.
8         You had one invoice was an invoice in the
9  system, and then you had another invoice that had a
10  different number on it, but they paid both of them
11  because they were meant for the same thing.
12     Q.   Did that happen a lot at your time at Oracle?
13         MR. GLENNON: Objection. Vague and ambiguous.
14         THE WITNESS: Yeah. It was one of the reasons
15  as to why there was unapplied cash.
16  BY MR. GREENSTEIN:
17     Q.   Okay. So that one of the reasons why there
18  were items of unapplied cash were due to duplicate or --
19  duplicate payments made because the customer thought
20  there were two invoices when there were only really one;
21  right?
22         MR. GLENNON: Objection. Calls for
23  speculation.
24         THE WITNESS: True.
25  BY MR. GREENSTEIN:

189

1  Q.  Okay.  So in those cases if a customer paid
2  for a regular invoice and a pro forma invoice and you,
3  as a collector figured that out, would that money --
4  would need to be refunded; right?
5  MR. GLENNON:  Objection.  Incomplete
6  hypothetical.
7  THE WITNESS:  Correct.
8  BY MR. GREENSTEIN:
9  Q.  So ordinarily to do a refund you would have to
10  go through that process, approval process; right?
11  MR. GLENNON:  Objection.  Vague and ambiguous.
12  THE WITNESS:  Yes, and you'd have to list the
13  reasoning of, you know, paid invoice as well as pro
14  forma invoice, double payment.
15  BY MR. GREENSTEIN:
16  Q.  Oh.  Sorry.
17  So was there a reason code for pro forma
18  invoice, or was that part of --
19  A.  I believe it was --
20  Q.  Sorry.
21  A.  I believe it was included in a duplicate
22  payment reason code.
23  Q.  Okay.  So do you know why in this E-mail at
24  the bottom of -- Hatada Number 2; is it?
25  THE WITNESS:  3.

190

1  MR. GLENNON:  3.
2  BY MR. GREENSTEIN:
3  Q.  Why Kim Henderson -- or sorry -- why Omid is
4  saying that they shut down the -- deactivated the site
5  that allowed them to search PFR number?
6  MR. GLENNON:  Objection.  Calls for
7  speculation.
8  THE WITNESS:  Do you know why they deactivated
9  it?  Is that --
10  MR. GREENSTEIN:  Yeah.
11  THE WITNESS:  Well, because it was -- you
12  know, at a certain point pro formas were not allowed
13  anymore, because they were causing such a big problem
14  with double payment, or, you know, sales creating a pro
15  forma invoice that collections or AR didn't have
16  anything to do with or wasn't aware of, so you're
17  collecting on an amount on the regular invoice that
18  doesn't match the amount that the pro forma invoice was
19  given to the client.
20  So, regardless if they had two clients,
21  they're, obviously, going to take the one that meets
22  their needs, so we ran in to a lot of problems with
23  that, and it was causing such a problem that they just
24  said no more pro formas.
25  BY MR. GREENSTEIN:

191

1  Q.  And so Omid says, "I know that we recently --
2  or that recently we deactivated the site."
3  Does that refresh your recollection that the
4  site was deactivated around late -- or October 2002?
5  MR. GLENNON:  Objection.  Lack of foundation.
6  Calls for speculation.
7  THE WITNESS:  I believe it was even before
8  that --
9  MR. GREENSTEIN:  Okay.
10  THE WITNESS:  -- because we were having such a
11  problem with it.
12  BY MR. GREENSTEIN:
13  Q.  Do you know if -- if the reason they
14  deactivated it was because once they started this
15  unapplied cash project in October 2002 they realized
16  some of the reasons for so many unapplied cash items
17  were because of these pro forma invoices?
18  MR. GLENNON:  Objection.  Calls for
19  speculation.
20  THE WITNESS:  Yes.
21  BY MR. GREENSTEIN:
22  Q.  And so, if you look at the middle E-mail,
23  where Kim responds back to Omid, she says, "I've
24  reactivated the query component of the old pro forma
25  site.  I had to restart our old database that had the

192

1  pro forma table in it.  I will leave it up until Friday,
2  November 1st, and then shut it down again."
3  Do you see that?
4  A.  I do.
5  Q.  Do you remember this happening, that Kim
6  Henderson reactivated the site to allow collections
7  managers to research PFR numbers?
8  A.  I do.
9  Q.  Okay.  Did your -- did you collection analysts
10  research any PFR numbers in connection with researching
11  unapplied cash items?
12  A.  I believe the responsibility was given to one
13  or two people so we could keep it to where everyone was
14  -- was doing it, and -- I'm not sure who that person --
15  obviously, I think it was Omid.  He would do the
16  research on it -- and then maybe a few others.
17  Q.  Okay.  And do you know what would the
18  motivation -- well, withdraw.
19  Why would a salesperson create a pro forma
20  invoice?
21  MR. GLENNON:  Objection.  Calls for
22  speculation.
23  THE WITNESS:  To meet the needs of the client.
24  BY MR. GREENSTEIN:
25  Q.  Okay.  But why wouldn't they just create -- or

193

1   update the original invoice to meet the needs of the
2   client?
3       A.   There's plenty of reasons.
4       I mean, to get it paid in a timely manner, to
5   ensure that they keep doing business with us.
6       Q.   Okay.
7       A.   Plenty of reasons.
8       Q.   So it appears that this -- this pro forma site
9   was reactivated for a certain period of time, and then
10  some research was conducted in connection with items of
11  unapplied cash and then it was set up again?
12      MR. GLENNON: Objection. Counsel is
13  testifying.
14      MR. GREENSTEIN: Do you recall that?
15      MR. GLENNON: Same objection.
16      THE WITNESS: True.
17  BY MR. GREENSTEIN:
18       Q.   Did you ever access the pro forma website
19  after it was shut down?
20       A.   No.
21      MR. GREENSTEIN: Okay. Oh. We have to change
22  the tape.
23      VIDEOGRAPHER: We're going off the record.
24  The time is 2:37 p.m.
25      This marks the end of videotape number two,

194

1   volume one, in the deposition of Ian Hatada.
2      (Thereupon a recess was taken at 2:37 p.m.
3      and the deposition resumed at 2:57 p.m.)
4      VIDEOGRAPHER: We are back on the record. The
5  time is 2:57 p.m.
6      This marks the beginning of videotape number
7  three, volume one, in the deposition of Ian Hatada.
8  BY MR. GREENSTEIN:
9       Q.   Mr. Hatada, I'm going to hand you what's been
10  previously marked as Venkataramana Exhibit 3.
11      Can you take a look at it, just thumb through
12  it.
13      For the record, it's Bates stamped PLF-ORC
14  000507 through 000532.
15      Finished?
16       A.   Yeah.
17       Q.   Do you recognize this document?
18       A.   I've never seen it before, but I know what it
19  is.
20       Q.   Okay. What is it?
21       A.   It's a billing summary for Southwestern Bell,
22  and looks like the collections analyst, Marisa Christie,
23  did a -- somewhat of a complete reconciliation for Kathy
24  at SBC or Southwestern Bell.
25       Q.   Okay. Have you -- during your time at Oracle

195

1   did you ever refer to these reports as "billing
2   histories"?
3       A.   Sure.
4       Q.   Okay. Is that the same thing, billing history
5   and billing summary?
6       A.   Same thing.
7       Q.   And Marisa Christie, who was she?
8       A.   A collections analyst.
9       Q.   Okay. And so, if you look at the second page
10  of the document, which is the -- 0000508, and you see it
11  says "Billing Summary Sorted By Customer Name"?
12      MR. GLENNON: Objection. Document speaks for
13  itself.
14      MR. GREENSTEIN: Do you see that?
15      THE WITNESS: I do.
16  BY MR. GREENSTEIN:
17       Q.   Okay. So does this appear to be a billing
18  history for Southwestern Bell sorted by customer name?
19      MR. GLENNON: Objection. Document speaks for
20  itself.
21      THE WITNESS: It is.
22  BY MR. GREENSTEIN:
23       Q.   Okay. Now, in general, billing histories, did
24  you ever have to use billing histories or billing
25  summaries to do your job at Oracle?

196

1       A.   Sure. Yes.
2       Q.   Okay. And what would you -- for what purpose
3   would you use a billing history?
4       A.   Typically to help the client reconcile their
5   account.
6      A lot of times they would have unapplied cash
7   that we needed to find out every invoice that was ever
8   issued to them for the past however long and -- and find
9   out if it was paid or credit memoed, if there was still
10  past due amounts on it why, and basically gives you the
11  complete detail of the line item and advises you on, you
12  know, what exactly had happened with that -- with the
13  history of that invoice.
14       Q.   So in, let's say, 2000, if you wanted to pull
15  up a billing history for a specific customer, how would
16  you do that?
17      MR. GLENNON: Objection. Vague and ambiguous.
18      THE WITNESS: You just go in to the Oracle
19  system and -- and punch in their -- the customer name
20  and the correct customer number, and it would pull out
21  the complete billing history for that client.
22  BY MR. GREENSTEIN:
23       Q.   Okay. And when you say "Oracle's system," did
24  it have a name or was it just called "Oracle system"?
25       A.   I believe there was two different names that

197

1   they had when I was there.
2         I know one of them was 11I, and it was the --
3   basically the receivables application for 11I.
4         Before 11I it was called something else.  I
5   don't remember.
6      Q.   Do you remember if it was called 9I?
7      A.   Yeah, I think so.
8      Q.   Okay.
9      A.   I believe so, it was 9I and 11I.
10     Q.   Do you remember when Oracle implemented 11I
11  internally?
12     A.   I think it was within the first two years that
13  I was there, so somewhere in between, you know, '99 and
14  '01 maybe.
15     Q.   Do you remember -- sorry.
16        Were you finished?
17     A.   I just remember that we had to test it as a
18  group to ensure that it worked over a period of time.
19     Q.   Okay.  And do you remember any problems that
20  occurred after -- as far as you were aware, once they
21  implemented 11I?
22        MR. GLENNON:  Objection.  Vague and ambiguous.
23        THE WITNESS:  Sure.  It was -- with any -- any
24  time an application gets renewed or anything like that
25  there was several problems that we had to overcome.

198

1   BY MR. GREENSTEIN:
2      Q.   Do you remember any specific problems in terms
3   of collections activity that occurred once 11I was
4   implemented?
5         MR. GLENNON:  Objection.  Vague and ambiguous.
6         THE WITNESS:  From what I remember, it was
7   mostly -- it had to go down a lot just because it --
8   there were patches and different things that needed to
9   happen with it.
10        So far as specifics in regards to billing, I
11  don't recall that at this time.
12  BY MR. GREENSTEIN:
13     Q.   Okay.  So looking at this document, you see on
14  the top lefthand corner it says "customer name" between,
15  quote, "Southwestern Bell" and quote -- "Southwestern
16  Bell," end quote, and, quote, "Southwestern Bell ZZZ,"
17  end quote?
18     A.   Yes.
19     Q.   Does that -- what does that mean to you?
20        MR. GLENNON:  Objection.  Document speaks for
21  itself.  Lack of foundation.
22        THE WITNESS:  It means that when she ran the
23  report that she ran the report as pulling everything
24  from Southwestern Bell to any word or letter that came
25  after "Southwestern Bell," because Southwestern Bell

199

1   might have had 15 to 20 customer numbers that they
2   booked invoices under, and even though it was all the
3   same company, there was, you know, you had to fight
4   through many problems of -- of it's not just one
5   customer and one customer number.  It was several that
6   you had to pull reports from.
7   BY MR. GREENSTEIN:
8      Q.   Okay.  So --
9      A.   That's why she ran it that way.
10     Q.   Okay.  So going back to -- did you ever access
11  billing histories to do your job?
12     A.   Yes.
13     Q.   Okay.  Do you know if you could sort by all of
14  the column headings here, customer, invoice, order?
15        Could you sort by each of those if you wanted
16  to?
17     A.   Yes.
18     Q.   Okay.  And you see how it appears that this
19  one is sorted by invoice number?
20        See how the first one is 1190057?
21        MR. GLENNON:  Objection.  Document speaks for
22  itself.
23  BY MR. GREENSTEIN:
24     Q.   And then it goes on in sequential order and it
25  increases?

200

1         MR. GLENNON:  Same objection.
2         THE WITNESS:  Correct.
3   BY MR. GREENSTEIN:
4      Q.   So this appears to be a billing history that's
5   sorted by -- not only by customer but by invoice number
6   as well; right?
7         MR. GLENNON:  Same objection.
8         THE WITNESS:  Correct.
9         I think it was sorted by customer name first
10  and then invoice number.
11  BY MR. GREENSTEIN:
12     Q.   Okay.  And, if you turn to the last page,
13  000532, and if you look at the invoices, the last
14  invoices, for Southwestern Bell, you see how they have a
15  550 prefix?
16     A.   Yes.
17     Q.   Do you know what that -- does that mean
18  anything to you, that an invoice has a 550 prefix?
19        MR. GLENNON:  Objection.  Document speaks for
20  itself.  Lack of foundation.
21        THE WITNESS:  There was a -- a word for it,
22  and I'm drawing a blank right now as far as what the "5"
23  had meant.
24  BY MR. GREENSTEIN:
25     Q.   Did it mean debit memo; do you know?

201

1      A.   Yeah.  It -- I believe it meant debit memo.
2           I believe that anything -- any invoice that
3      started with a "5" meant that it was a debit memo.
4           MR. GREENSTEIN:  Okay.  Put that aside.
5      Let's mark this as Hatada Number 4.
6           (Exhibit No. 4 was marked for Identification.)
7           MR. GREENSTEIN:  Go ahead and look at the
8      whole thing, please.
9           For the record it's NDCA-ORCL 748908 through
10     748917.
11          THE WITNESS:  Okay.
12     BY MR. GREENSTEIN:
13     Q.   Do you recognize this document?
14          MR. GLENNON:  I'm just going to assert an
15     objection to the record in that I don't know if it's a
16     single document, and the way it's assembled makes it
17     appear as if it is, but I don't believe it is.
18          MR. GREENSTEIN:  Okay.  I believe that's
19     because it was -- the way it was produced to us had slip
20     sheets, and there were slip sheets surrounding this
21     document, which indicated it was, but, if it isn't, you
22     guys can, obviously, tell us that later.
23     BY MR. GREENSTEIN:
24     Q.   So do you recognize this document?
25     A.   Yes.

202

1      Q.   And what is it?
2           What is it?
3      A.   It's a refund request with all the backup
4      details sending up through the chain.
5      Q.   Okay.  And so when you say it's a refund
6      request, you see how the -- the number of pages -- there
7      are a number of pages in this document, and in between
8      some -- what appear to be screen shots, there's an
9      E-mail, two-page E-mail?
10          Do you see that?
11     A.   Uh-huh.
12     Q.   Okay.  So when you say it's a refund request,
13     is -- are you referring to the E-mail?
14     A.   I am.
15     Q.   Right.
16          And then the backup -- or the backup
17     documentation, when you say that, are you referring to
18     these -- these screen shots?
19     A.   (Nodding head)
20     Q.   Okay.
21     A.   Yeah.  When I say "refund request," I was
22     referring to the E-mail that was sent up through the
23     chain.
24     Q.   Uh-huh.
25     A.   And then I'm not sure why, but the backup

203

1      detail's in front of it as well as in back of it with
2      the screen shots -- shots.
3      Q.   Okay.  So are these -- or what are these?
4           Like the first -- the first page, 748908, is
5      that a -- a copy of what -- is that a copy of a screen
6      on a computer?
7      A.   Correct.  It's the -- receipt section of --
8      our receivables -- or Oracle's receivables application.
9           It's the receipt section.
10     Q.   Okay.  You see at the top is has "Oracle
11     Applications GSIAP"?
12          MR. GLENNON:  Objection.  Document speaks for
13     itself.
14          THE WITNESS:  Say that again.
15     BY MR. GREENSTEIN:
16     Q.   The top lefthand corner of the first page
17     screen shot says "Oracle Applications GSIAP"?
18          MR. GLENNON:  Same objection.
19          THE WITNESS:  Of the first page?
20          MR. GREENSTEIN:  Right, right here.
21          THE WITNESS:  Oh, yeah, yeah, yeah.  Okay.
22     BY MR. GREENSTEIN:
23     Q.   Do you know what "GSIAP" is?
24          MR. GLENNON:  Same objection.
25          THE WITNESS:  I don't know exactly what it

204

1      stands for, but it's the -- the application itself.
2      BY MR. GREENSTEIN:
3      Q.   Okay.  And you see how, if you look at the
4      first page, it says "receipt type, miscellaneous;"
5      right?
6      A.   Correct.
7      Q.   And then has a functional amount, and it has
8      -- looks like negative $126,602.72?
9           Do you see that?
10          MR. GLENNON:  Objection.  Document speaks for
11     itself.
12          THE WITNESS:  Correct.
13     BY MR. GREENSTEIN:
14     Q.   And then "status reversed," do you see that?
15     A.   I do.
16     Q.   And then below that it says "paid by name,"
17     and it says "reserve;" right?
18     A.   Correct.
19          MR. GLENNON:  Same objection.
20     BY MR. GREENSTEIN:
21     Q.   Does that -- looking at those items on the
22     screen shot, does that -- can you -- does that mean
23     anything to you?
24          MR. GLENNON:  Objection.  Lack of foundation.
25     Calls for speculation.  Vague and ambiguous.

Hatada, Ian  10/5/2006  9:55:00 AM

205

1       THE WITNESS:  So it looks like Libby Brewster
2  in reference to reasoning as to why this needs to be
3  refunded was just -- took a screen shot of the receipt
4  section for this check showing that it was -- moved in
5  to the reserve as a negative amount, 126,672.72.
6  BY MR. GREENSTEIN:
7       Q.   Okay.  Well -- how do you know it was Libby
8  Brewster?
9       A.   Because in the E-mail it states from Libby
10  Brewster.
11      Q.   Okay.  So turning to the E-mail 748913 through
12  748914 -- and you've read this E-mail; right?
13      A.   I have.
14      Q.   Okay.  So can you take me through -- oh.
15           And you said this was a refund request; right?
16      A.   Yeah, it's E-mail trying to get approval for
17  -- to -- for a refund request back to the -- the client.
18      Q.   Okay.  And, reading the entire E-mail, can you
19  take me through what this -- what these E-mails --
20  convey to you?
21       MR. GLENNON:  Objection.  Lack of foundation.
22  Document speaks for itself.
23  BY MR. GREENSTEIN:
24      Q.   In other words, what is going on in this
25  E-mail, as far as you know?

206

1       MR. GLENNON:  Objection.  Lack of foundation.
2  Calls for speculation.  Document speaks for itself.
3       THE WITNESS:  It's -- has all the information
4  that she needs to have in here, and it was being sent to
5  myself as well as Raul Campos, and then it went up the
6  chain to Mike Hernandez, to Mike Quinn, and to Brad
7  Newton.
8  BY MR. GREENSTEIN:
9       Q.   Okay.  And who is Michael Hernandez?
10      A.   He was the -- one of the managers that came on
11  and -- actually replaced Quinn.
12      Q.   Replaced Michael Quinn?
13      A.   Well, in -- some sense, because he -- he was a
14  -- the Director of Credit and Collections, and Michael
15  Quinn kind of stepped out of the role, and then -- then
16  he left.
17      Q.   Okay.  And who is Samuel Yohannes?
18      A.   Samuel Yohannes was an accounts receivable
19  analyst that took care of the refunds.
20      Q.   Okay.  When you say "take care of the
21  refunds," what do you mean?
22      A.   He was responsible for the refunds and getting
23  things put together for refunds.
24      Q.   Okay.  So would he -- if you wanted to
25  initiate a refund request for a particular item of

207

1  unapplied cash, would you have to go through Samuel
2  Yohannes to do that?
3       MR. GLENNON:  Objection.  Calls for
4  speculation.  Lack of foundation.
5       THE WITNESS:  In the end it would have to end
6  up in his lap in order for it to get refunded, him and
7  maybe like two others that actually did the process.
8           But that's -- it looks like -- Brad Newton is
9  approving it and sending it to Sam.
10  BY MR. GREENSTEIN:
11      Q.   Okay.  And who is Brad Newton?
12      A.   Brad Newton was -- supervised -- I believe --
13  I believe he took Tom William's position.
14      Q.   Okay.  Did -- so Tom Williams left Oracle?
15      A.   Well, at some point in there, and I'm not sure
16  when this was, but Tom Williams had taken himself out of
17  the responsibility over Michael Quinn, and Brad Newton
18  kind of took over that position.  So --
19      Q.   Do you know why Tom Williams did that?
20      A.   I don't.
21       MR. GLENNON:  Objection.  Calls for
22  speculation.
23  BY MR. GREENSTEIN:
24      Q.   Okay.  So, if you go to the second page of the
25  E-mail, which is 748914, you see how the top you have

208

1  Libby Brewster's E-mail and then your E-mail address?
2       A.   Correct.
3       Q.   Okay.  And then you see, "customer name,
4  Michelin North America"?
5           You see that?
6       A.   I do.
7       Q.   So does that mean that this refund was
8  initiated for that customer?
9       MR. GLENNON:  Objection.  Lack of foundation.
10  Document speaks for itself.
11       THE WITNESS:  Correct.
12  BY MR. GREENSTEIN:
13      Q.   And the customer number is just the number
14  associated with each customer at Oracle; right?
15      A.   Correct.
16      Q.   And what does "receipt GL date" -- do you see
17  that, "May 14th, 1999"?
18       MR. GLENNON:  Same objection.
19       THE WITNESS:  So the receipt date is the
20  actual date on the check.
21           So on this check it should read "May 14, '99."
22  BY MR. GREENSTEIN:
23      Q.   Okay.  So it appears that a check came in from
24  Michelin North America on around May 14th, 1999, and it
25  -- eventually resulted in a refund; right?

209

1    A.   Yeah.  Looks like four years before this was
2  submitted.
3    Q.   Okay.  So see how it says receipt amount,
4  221,000 and change?
5        MR. GLENNON:  Document speaks for itself.
6  Objection.
7        THE WITNESS:  Correct.
8  BY MR. GREENSTEIN:
9    Q.   And you see it has -- refund amount -- so
10  receipt amount, that's the amount of the check number
11  that's referred to above it; right?
12        MR. GLENNON:  Objection.  Lack of foundation.
13  Document speaks for itself.
14        THE WITNESS:  Michelin North America sent a
15  check in for 221,000 in an effort to pay, you know,
16  however many invoices.
17        The -- the unapplied amount was 126,602 due to
18  an invoice that was a duplicate or the reason for refund
19  is it was a duplicate.  They paid it twice, 6071503 and
20  6072727.
21        So both those invoices were paid twice.
22  BY MR. GREENSTEIN:
23    Q.   Okay.  So when you say "the invoices," you're
24  referring to where it says "dup pay on invoice number
25  6071503 and 6072727"?

210

1        MR. GLENNON:  Objection.  Lack of foundation.
2  Document speaks for itself.
3  BY MR. GREENSTEIN:
4    Q.   Right?
5    A.   Correct, and both these invoices amount to the
6  126K.
7    Q.   Okay.  So there was a duplicate payment made
8  by Michelin that total -- on those two invoices that
9  totalled 126,000 and change; right?
10        MR. GLENNON:  Objection.  Lack of foundation.
11  Document speaks for itself.
12        The deponent is not testifying from personal
13  knowledge.
14        THE WITNESS:  Correct.
15  BY MR. GREENSTEIN:
16    Q.   And that's based on your personal knowledge of
17  being on this E-mail and working and having experience
18  in collections; right?
19        MR. GLENNON:  Same objection.
20        THE WITNESS:  It tells it based on this
21  E-mail.  It states it right here.
22  BY MR. GREENSTEIN:
23    Q.   Right.  Right.
24        So, if you turn back to the first page of the
25  E-mail, 748913, and you see the top of the E-mail it's

211

1  "Refund Request," and it's dated May 19th, 2003?
2        Do you see that?
3    A.   Yes.
4    Q.   And so it's -- and then below that you see it
5  says "approved."
6        So it appears Brad Newton was approving this
7  refund request; right?
8        MR. GLENNON:  Objection.  Lack of foundation.
9  Document speaks for itself.
10        THE WITNESS:  Correct.
11  BY MR. GREENSTEIN:
12    Q.   Okay.  So, if you turn back, it looks like the
13  payment was made on -- the duplicate payments were mad
14  on May 14th, 1999; right?
15        MR. GLENNON:  Objection.  Lack of foundation.
16  Document speaks for itself.
17        The witness isn't testifying from personal
18  knowledge but reading from a document.
19        THE WITNESS:  So May 14th, 1999 is when the
20  check came in -- or that's the date of the check, the GL
21  date.
22  BY MR. GREENSTEIN:
23    Q.   And so it resulted in a -- it resulted in
24  duplicate payments in the amount of 126,000 and change;
25  right?

212

1        MR. GLENNON:  Objection.  Documents speaks for
2  itself.  Lack of foundation.
3        THE WITNESS:  Correct.
4  BY MR. GREENSTEIN:
5    Q.   And then -- you see how next to the "126" it
6  says "refund amount"?
7    A.   Yes.
8    Q.   So does it appear from this E-mail that there
9  was a refund request initiated in 2003, May, for
10  $126,000 and the refund was related to a transaction or
11  a cash receipt that occurred in 1999?
12        MR. GLENNON:  Objection.  Document speaks for
13  itself.  Lack of foundation.  No personal knowledge.
14        THE WITNESS:  That's exactly what it says.
15  BY MR. GREENSTEIN:
16    Q.   Okay.  And do you -- do you remember this --
17  this particular refund request?
18    A.   There was plenty of them that came across my
19  desk, but -- not necessarily.
20    Q.   When you say "plenty," were there plenty of
21  them -- well, withdrawn.
22        Do you --
23        MR. SCHRAG:  He asked if you remembered this
24  one.
25        THE WITNESS:  This specific one?

213

1          MR. GREENSTEIN:  Right.
2          THE WITNESS:  No.
3     BY MR. GREENSTEIN:
4          Q.   Okay.  Well, there were many; right?
5          A.   Yeah.  Yes.
6          Q.   Now, do you have any idea why it took four
7     years for Oracle to figure out that this customer was
8     owed -- that it needed a refund of $126,000?
9          MR. GLENNON:  Objection.  Lack of foundation.
10    Calls for speculation.
11         THE WITNESS:  Well, because it was not visible
12    until a certain point in time, whereas in '03 it was,
13    and Libby was responsible for taking care of her
14    unadvised.
15    BY MR. GREENSTEIN:
16         Q.   Right.
17         Because in 2003, by that time, Oracle had
18    initiated the unapplied cash clean-up in October 2002,
19    and so they discovered all these new unapplied cash
20    items that they didn't know about before; right?
21         MR. GLENNON:  Objection.  Compound.  Counsel
22    is testifying.
23         MR. GREENSTEIN:  Right?
24         THE WITNESS:  True.  It wasn't visible for
25    quite a long period of time.

214

1     BY MR. GREENSTEIN:
2          Q.   So Oracle -- so Oracle owed Michelin -- based
3     on this E-mail Oracle owed Michelin 126,000 and change
4     for -- for four years before it refunded it; right?
5          MR. GLENNON:  Objection.  Foundation.
6     Document speaks for itself.
7          THE WITNESS:  Correct.
8     BY MR. GREENSTEIN:
9          Q.   Okay.  And do you recall that occurring
10    frequently at Oracle, where Oracle would have an item of
11    unapplied cash and then years later would realize that
12    it needed to be refunded?
13         MR. GLENNON:  Objection.  Calls for
14    speculation.  Vague and ambiguous.
15         THE WITNESS:  Once it was visible, then we
16    found plenty of them that were like this, and even
17    older.
18    BY MR. GREENSTEIN:
19         Q.   Even older?
20         A.   That we had to take care of and find a way to
21    resolve them.
22         Q.   Did any customers ever -- contact Oracle
23    regarding these refunds and ask, "Why is this being
24    refunded?"
25         A.   Yes.

215

1          Q.   And did you ever talk to any of those
2     customers?
3          A.   I answered the phone a couple of times as to,
4     "Hey, we just received this check, and we have no idea
5     why," and I had to get off the phone and research as to
6     when it was refunded or -- why they received it.
7          Q.   Okay.  And what -- what would you tell them if
8     it related to a refund that was given for an item that
9     had -- a cash receipt that had come in years before
10    that?
11         How did you explain to them?
12         MR. GLENNON:  Objection.  Lack of foundation.
13         THE WITNESS:  I don't recall my exact words,
14    but I advised them of the specifics of the situation and
15    basically giving them the details as this E-mail has.
16    BY MR. GREENSTEIN:
17         Q.   So you -- sorry.
18         A.   That they'd paid -- they had a duplicate
19    payment on these invoices, and it's now being refunded
20    back to them.
21         Q.   Okay.  Did the customers ever get angry at the
22    fact that Oracle was holding their money?
23         MR. GLENNON:  Objection.  Calls for
24    speculation.
25         THE WITNESS:  Sure.  Yes.

216

1          Oftentimes it would -- it would make us have
2     to do an account reconciliation on -- on some of the
3     accounts because they were confused as to why they were
4     receiving money that -- that maybe they should have
5     received three or four years earlier.
6     BY MR. GREENSTEIN:
7          Q.   Okay.  Do you know if Oracle ever paid them
8     the amount they owed them plus interest?
9          Did any customer ask for the interest in the
10    years that it was sitting in unapplied cash?
11         MR. GLENNON:  Objection.  Calls for
12    speculation.
13         THE WITNESS:  I don't recall.
14    BY MR. GREENSTEIN:
15         Q.   They were probably happy just getting the
16    money back; right?
17         MR. GLENNON:  Objection.  No question pending.
18    Counsel is testifying.
19    Calls for speculation.
20         MR. SCHRAG:  You can answer.
21         THE WITNESS:  Yes.
22    BY MR. GREENSTEIN:
23         Q.   So if a refund was initiated for an item of
24    unapplied cash at Oracle, would there necessarily be an
25    E-mail like this to document the refund?

217

1          MR. GLENNON:  Objection.  Calls for
2    speculation.  No foundation.
3          THE WITNESS:  Yeah.
4          I believe at -- sometimes it would be like a
5    template that we used, and then other times it moved to
6    be kind of a template within an E-mail.
7          MR. GREENSTEIN:  Okay.
8          THE WITNESS:  So I -- you know, this is --
9    from what I remember this is the form that it usually
10   came in.
11   BY MR. GREENSTEIN:
12        Q.    And do you know, when you first started at
13   Oracle, was there a similar form used, so in 1999?
14        MR. GLENNON:  Objection.  Vague and ambiguous.
15        THE WITNESS:  I believe when I first started
16   it was more of like an attachment, like a -- like a Word
17   doc, whatnot.
18   BY MR. GREENSTEIN:
19        Q.    A Word document attached to an E-mail which
20   had the reasons for the refund?
21        A.    Correct.
22        Q.    And the approvals; right?
23        A.    Correct.
24        But, either way, it was in basically the same
25   format, had the same detail.

218

1          MR. GREENSTEIN:  Right.
2          Put that aside.
3          Let's mark this next exhibit as Number 5,
4    Hatada Number 5.
5          (Exhibit No. 5 was marked for Identification.)
6          MR. GREENSTEIN:  For the record -- this
7    document is -- well, there's -- there's different Bates
8    stamps, but the first -- I'll just give you the ranges.
9          It's stapled as one document, NDCA-ORCL 883052
10   through 059 -- no -- through 061, and then there's a new
11   range, 883458 to 461, and then the last two pages are
12   883666 to 667.
13        And just to clarify for the record, what this
14   is is a spread sheet that was produced to Plaintiffs by
15   Defendants in this case, and it's a large spread sheet,
16   but what we've done is we've just printed out -- there
17   are various tabs on the spread sheet as it was produced
18   electronically.
19        What we did was print out some of the various
20   tabs, and you can see the tabs on the bottom righthand
21   corner, but this isn't the full document, just because
22   it's so large.  It's hundreds of pages.
23        So we just took a sample of each of the tabs
24   that were in this spread sheet.
25        MR. GLENNON:  I'm going to object just to the

219

1    extent that any excerpted portion omits material
2    information from this particular document.
3          MR. GREENSTEIN:  So, Mr. Hatada, if you could
4    just go ahead and review it, look through it, see if you
5    recognize it.
6          MR. SCHRAG:  You can just look in general, see
7    if you recognize the document.
8          THE WITNESS:  Okay.
9    BY MR. GREENSTEIN:
10        Q.    So do you recognize this document?
11        A.    I don't.
12        It's -- it looks like something that -- that
13   maybe Ryan Roberts put together for -- for Mike Quinn so
14   far as revenue impact or nonrevenue impact.
15        Q.    And when you say "revenue impact or nonrevenue
16   impact," are you referring to the determination that was
17   attempted to be made during late October 2002 to
18   determine if unapplied cash items impacted revenue or
19   not?
20        MR. GLENNON:  Objection.  Vague and ambiguous.
21   No foundation.
22        THE WITNESS:  Correct.
23   BY MR. GREENSTEIN:
24        Q.    And so I think earlier you testified that at
25   some point spread sheets were given to Mike Quinn and

220

1    then he sent them back saying that he wanted it -- he
2    wanted to know the -- that they were not sufficient and
3    that he wanted to know the revenue impact of the
4    unapplied cash items; right?
5          MR. GLENNON:  Objection.  Mischaracterizes
6    testimony.
7          THE WITNESS:  Correct.
8    BY MR. GREENSTEIN:
9        Q.    And so does this appear to be a spread sheet
10   that Ryan Roberts put together reflecting that
11   information that he then gave to Mike Quinn?
12        MR. GLENNON:  Objection.  No foundation.  No
13   personal knowledge.
14        THE WITNESS:  Correct.  It's basically a
15   reason code spread sheet.  It's got the numbers to the
16   left, definition of the code, and if it's a revenue
17   impact or not.
18   BY MR. GREENSTEIN:
19        Q.    Okay.  See how it says "scrub" towards --
20   well, it's the box on the top, top half of the box, and
21   then towards the bottom it says "scrub of receipts
22   greater than 2,000 -- 250K"?
23        Do you see that?
24        MR. GLENNON:  Objection.  Document speaks for
25   itself.

221

1    THE WITNESS: Yeah. This is -- I believe this
2  is for everything over 250K.
3  BY MR. GREENSTEIN:
4    Q.  Okay. And the reason codes on the first page,
5  which is 883052, you see the reason codes on the
6  lefthand side, and there are a number of reason codes,
7  and then to the -- towards the right in the middle it
8  has an explanation of the code; is that right?
9    MR. GLENNON: Objection. Documents speaks for
10  itself.
11    THE WITNESS: Correct.
12  BY MR. GREENSTEIN:
13    Q.  So in the middle where it says "order to be
14  rebooked, nonrevenue impacting," that reason code is
15  number 13?
16    MR. GLENNON: Objection. Document speaks for
17  itself. No personal knowledge.
18    He said he'd never seen this document before.
19    THE WITNESS: Correct.
20  BY MR. GREENSTEIN:
21    Q.  So reason code number 2 is a refund?
22    MR. GLENNON: Objection. No foundation.
23  Document speaks for itself.
24  BY MR. GREENSTEIN:
25    Q.  Right?

222

1    A.  Correct.
2    Q.  And you see at the bottom says "10 percent of
3  receipts less than 250,000"?
4    A.  I do.
5    Q.  Do you know what that -- what that refers to?
6    MR. GLENNON: Objection. Calls for
7  speculation. No foundation.
8    THE WITNESS: It's -- I believe it's stating
9  that 10 percent of all the receipts are less than
10  $250,000. It's breaking it up by a percentage --
11    MR. GREENSTEIN: Okay.
12    THE WITNESS: -- what's less than 250, and
13  everything over 250 is right above it.
14  BY MR. GREENSTEIN:
15    Q.  Okay. And so at the top where it says "notes"
16  under there and it says "adjustments per Ryan's
17  analysis, activity in 12600," do you see that?
18    A.  Uh-huh.
19    Q.  What does that mean to you, "adjustments per
20  Ryan's analysis, activity in 12600, bad debt
21  recoveries"?
22    MR. GLENNON: Objection. No foundation. No
23  personal knowledge.
24    Document speaks for itself.
25    THE WITNESS: I really wouldn't know. None --

223

1  you know, other than what it states. So, you know --
2  BY MR. GREENSTEIN:
3    Q.  Okay. That's fine.
4    If you look at the second page, 883053, you
5  see how it has "reason code" -- or has codes on the
6  lefthand side?
7    Is that reason code?
8    MR. GLENNON: Objection. Calls for
9  speculation.
10    No foundation. No personal knowledge.
11    THE WITNESS: Correct.
12  BY MR. GREENSTEIN:
13    Q.  Okay. And then "definition," do you know what
14  that means?
15    MR. GLENNON: Same objections.
16    THE WITNESS: It's the definition of the code,
17  the number -- in the top -- the top line it says "12,"
18  and then that's the number of the code, and then the
19  definition of -- is that the customer is out of
20  business, and then the revenue impact, obviously, is
21  revenue impact or not -- or to be determined.
22  BY MR. GREENSTEIN:
23    Q.  Okay. So it appears that this -- these are
24  the spread sheets that you were talking about earlier,
25  where during October 2002 collections was asked to

224

1  figure out what unapplied cash items had revenue impact
2  or not.
3    These spread sheets appear to be
4  memorialization of the research that Ryan Roberts did;
5  right?
6    MR. GLENNON: Objection. No foundation. No
7  personal knowledge, and counsel is testifying.
8    THE WITNESS: Correct. This is just basically
9  a -- a log of the definition of reason codes and -- and
10  their numbers.
11  BY MR. GREENSTEIN:
12    Q.  So, if you turn to 883060, and you see there
13  are some items there, has dates and then "name of
14  customer."
15    Do you see that?
16    A.  I do.
17    Q.  Okay. And then when you see the heading at
18  the top, under the "CND" it says "Sam."
19    A.  Correct.
20    Q.  Do you know what that means?
21    MR. GLENNON: Objection. Lack of foundation.
22  Calls for speculation.
23    THE WITNESS: From what it looks like, it
24  looks like a column that is shown -- that is basically
25  showing Sam Yohannes what can be done with this

225

1   unapplied item.
2   BY MR. GREENSTEIN:
3       Q.   Oh, I see.  Because -- so was Samuel Yohannes
4   in charge of this aspect of the project?
5           MR. GLENNON:  Objection.  Vague and ambiguous.
6           THE WITNESS:  He was an accounts receivable
7   specialist, so -- he did a lot of the actual -- I guess
8   and all -- what exactly happened with the -- the item,
9   he actually did it.
10          He was -- you know, was the last -- whether he
11  refunded it, or applied it, or -- adjusted out the
12  invoice, he played a pretty big part in that.
13  BY MR. GREENSTEIN:
14      Q.   He played a pretty big part in that, in
15  adjusting up invoices?
16          MR. GLENNON:  Objection.  Calls for
17  speculation.
18          THE WITNESS:  Himself and a few others, but
19  Sam was the most senior guy in that department, so I
20  think that they trusted him to -- to take care of these,
21  you know, what exactly needed to happen with these, --
22          MR. GREENSTEIN:  Right.
23          THE WITNESS:  -- these items.
24          So, you know, his name was on it.
25  BY MR. GREENSTEIN:

226

1       Q.   So do you see where it says "unapplied
2   amount," and then below that for Bell South it has
3   300,500 and change.
4           Do you see that?
5       A.   Yes.
6       Q.   Is that the amount of unapplied cash for that
7   customer?
8           MR. GLENNON:  Objection.  Lack of foundation.
9   Calls for speculation.
10          The witness isn't testifying on the basis of
11  personal knowledge.
12          THE WITNESS:  Yes, it's the unapplied amount,
13  as it states in the column above it.
14  BY MR. GREENSTEIN:
15      Q.   Right.
16          And then "days old" -- well, if you look down
17  -- withdrawn.
18          You see the column at the right -- the far
19  righthand side, "last updated by," and then it's got --
20  for Bell South it has "MOFIELD"?
21          Do you see that?
22      A.   Yeah.
23      Q.   What does that mean?
24      A.   Molly Littlefield.
25          MR. GLENNON:  Objection.  Lack of foundation.

227

1   Calls for speculation.
2           The witness is not testifying on the basis of
3   personal knowledge.
4           THE WITNESS:  So "MOFIELD" was Molly
5   Littlefield's name basically, and "JBACKS" for Justin
6   Backs.
7           These were the managers.
8   BY MR. GREENSTEIN:
9       Q.   Collections is -- I'm sorry.  Go ahead.
10      A.   They updated -- they were the last person to
11  update these items.
12      Q.   And what does that mean, "the last person to
13  update the item"?
14      A.   They were the last person to work on this item
15  and give the last update.
16          Molly Littlefield is stating that 550750 for
17  Bell South for 300K can be applied.
18          That's her note to Sam.
19          MR. GREENFIELD:  Okay.
20          MR. GLENNON:  I'm just going to object to the
21  extent the witness is testifying on the basis of what
22  the document says as opposed to personal knowledge.
23          THE WITNESS:  That's just what I'm reading.
24  BY MR. GREENSTEIN:
25      Q.   Right.

228

1           Based on what you know based on these reports
2   and your experience as a collections manager --
3           MR. GLENNON:  Objection.
4           MR. GREENSTEIN:  Hold on.  Hold on.
5           Working on this project; right?
6           MR. GLENNON:  Objection.  Lack of foundation.
7   Mischaracterizes the testimony.
8           He said he'd never seen the document before.
9   BY MR. GREENSTEIN:
10      Q.   In other words, the basis for your testimony
11  is, A, your experience at Oracle, right, B, you worked
12  on the unapplied cash project in 2002, C, you recall
13  these spread sheets being given to Mike Quinn; right?
14          All of those factors and based on what you've
15  seen and what you remember, that's what your testimony
16  is based on; right?
17          MR. GLENNON:  D, he's got no personal
18  knowledge of 557057, Bell South Corporation.
19          MR. SCHRAG:  Objection?
20          MR. GLENNON:  Yes.
21          If you want to ask him if he's got personal --
22          MR. GREENSTEIN:  What's the objection?
23          MR. GLENNON:  The objection is he's got no
24  personal knowledge, lack of foundation, calls for
25  speculation.

229

1      MR. GREENSTEIN:  Thank you.
2      MR. SCHRAG:  Do you have the question in mind?
3      THE WITNESS:  Correct.
4      I mean, there's also a ton of these different
5  spread sheets, and this one looks like it's -- just
6  looks like it's all the over the board, the way you said
7  it was so long that it -- that it had to be printed on
8  so many different pages.
9      So I -- I mean, I can -- I can tell you what
10  page 1 is, and I can tell you what -- which is 883053,
11  and then I can tell you what 883060 is.
12      I think everything else is just a -- a part of
13  the spread sheet that -- that was in length.
14  BY MR. GREENSTEIN:
15      Q.  Right.
16      It was long -- you know, in other words, if
17  you -- it was many columns wide, and that just reflects
18  the columns that were just printed out; right?
19      MR. GLENNON:  Objection.  No foundation.
20  Counsel is testifying.
21      MR. GREENSTEIN:  Right?
22      THE WITNESS:  Correct.
23      MR. GREENSTEIN:  Okay.  Put that aside.
24      Are we on Number 6?
25      (Exhibit No. 6 was marked for Identification.)

230

1      MR. GREENSTEIN:  Marking Hatada Number 6.
2      For the record, this is PLF-ORC 214 through
3  223.
4  BY MR. GREENSTEIN:
5      Q.  Just let me know when you're finished.
6      A.  Okay.  Okay.
7      Q.  Finished?
8      Do you recognize this document?
9      A.  Yes.
10      Q.  And what is it?
11      A.  This is just another report showing a --
12  unapplied cash report with notes to the right of it.
13      Q.  Uh-huh.
14      And so you've seen a report like this before;
15  right?
16      A.  Correct.
17      Q.  Now, do you see at the top lefthand corner of
18  the first page it says "unapplied auto adjustments"?
19      A.  Correct.
20      Q.  Do you know what "unapplied auto adjustments"
21  means?
22      A.  Unapplied auto adjustments were done for
23  invoices that were below a certain amount, certain
24  dollar amount, so, as an example, anything below maybe
25  $20 was auto adjusted.

231

1      Q.  Okay.  And what does it mean to be auto
2  adjusted?
3      What would happen to the items of unapplied
4  cash?
5      A.  It would be swept.
6      So after a certain amount of days old,
7  sometimes it wouldn't even be a certain amount of days
8  old, it would just be underneath a certain amount, and
9  then it would just be -- it would be swept.
10      Q.  Do you know where it would be swept to?
11      A.  I don't.
12      I have a feeling that it would just go in to
13  another account, not the real unapplied account, but --
14      Q.  Right.
15      So earlier I think you testified about a type
16  of sweep by which aged accounts receivable at Oracle
17  would be written off; right?
18      MR. GLENNON:  Objection.  Mischaracterizes the
19  testimony.
20      MR. GREENSTEIN:  Right?
21      THE WITNESS:  Correct.
22  BY MR. GREENSTEIN:
23      Q.  After a certain amount of days old a
24  receivable would be determined, a certain amount would
25  be written off or swept based on the age of it; right?

232

1      A.  Correct.
2      Q.  Now, correct me if I'm wrong, but I think what
3  you're saying here is that for items of unapplied cash
4  there wasn't necessarily -- there was -- there was a
5  sweep conducted that was different from the sweep of
6  aged receivables; correct?
7      MR. GLENNON:  Objection.  Mischaracterizes the
8  testimony.
9      Counsel is coaching.
10      THE WITNESS:  Correct.
11      Not only were they -- was there sweeps for
12  invoices, but there was sweeps for unapplied as well.
13      As you can see, there's some of these on here
14  that are one cent.  So --
15  BY MR. GREENSTEIN:
16      Q.  Right.
17      So when you say "one cent" -- so let's take
18  the first one.
19      You see it's "date received July 16th, '01"?
20      Do you see that?
21      A.  I do.
22      Q.  Okay.  And check number, there's a check
23  number there?
24      A.  36127 --
25      Q.  Uh-huh.

233

1      A.   -- for Cambridge.
2          Some of it is cut off.  Cambridge Energy or
3   whatnot.
4          It has the customer number, the check amount,
5   which is cut off, the days old, and the notes.
6      Q.   Okay.  So let's take the first item, for
7   example, and for Cambridge Energy, and it appears that
8   there was a check -- well, is that check -- does that
9   refer to -- an actual check received by Cambridge for a
10  penny?
11         MR. GLENNON:  Objection.  Calls for
12  speculation.  No foundation.
13         Document speaks for itself.
14         THE WITNESS:  Typically when you would see
15  something for as low as one cent or even, you know, $10,
16  it -- it would -- it's basically showing that this check
17  was -- had an original amount of -- a lot larger than
18  that, but it might have been applied to several
19  different invoices and -- had one or two cents left over
20  on it -- which, in turn, would be swept.
21  BY MR. GREENSTEIN:
22     Q.   So -- and it says "applied auto adjustments."
23         So was there an automatic process by which
24  certain small items of unapplied cash were swept in to
25  another account?

234

1          MR. GLENNON:  Objection.  Calls for
2   speculation.  No foundation.
3          THE WITNESS:  Correct.
4   BY MR. GREENSTEIN:
5      Q.   So, looking at the first item again, you see
6   how in the notes it says "unapplied amount due to
7   overpayment"?
8          Does that mean that the one cent was -- was a
9   penny of unapplied cash that resulted from a customer
10  over -- from Cambridge Energy overpaying?
11         MR. GLENNON:  Objection.  No foundation.
12         Document speaks for itself.  Calls for
13  speculation.
14         THE WITNESS:  Can you ask that question again.
15  BY MR. GREENSTEIN:
16     Q.   Okay.  Why don't you tell me -- just look at
17  the first item for Cambridge Energy and tell me what
18  that -- looking at all those items there, what that
19  means to you.
20         MR. GLENNON:  Objection.  Calls for
21  speculation.  No foundation.
22         THE WITNESS:  Well, typically any -- any
23  company that -- that Oracle would deal with wouldn't
24  write a check for one cent.
25         It usually meant that the amount was applied

235

1   to an invoice or invoices, and by the time it was almost
2   fully applied it ended up still having a cent still
3   unapplied.
4   BY MR. GREENSTEIN:
5      Q.   Okay.  So, looking at the first item, does
6   that mean that that one cent was unapplied due to an
7   overpayment, and because it was so small it was swept in
8   to another account automatically?
9          MR. GLENNON:  Objection.  Calls for
10  speculation.  No foundation.
11         THE WITNESS:  Correct.
12  BY MR. GREENSTEIN:
13     Q.   Okay.  Do you know what accounts these items
14  of unapplied cash were swept in to?
15         MR. GLENNON:  Objection.  Asked and answered.
16         THE WITNESS:  I do not.
17  BY MR. GREENSTEIN:
18     Q.   Okay.  And did this occur the entire time
19  while you were at Oracle?
20         MR. GLENNON:  Objection.  Vague and ambiguous.
21         THE WITNESS:  I believe so.
22  BY MR. GREENSTEIN:
23     Q.   Okay.  Do you know -- do you know how often
24  this auto adjustment of unapplied cash would occur?
25     A.   I do not.

236

1      Q.   Okay.  Do you know who was -- was there
2   somebody in charge of the auto adjustments of unapplied
3   cash?
4      A.   From my understanding it was Sam Yohannes and
5   maybe one other person within that group that was
6   responsible for any adjustment, whether it be invoice
7   adjustments or unapplied adjustments.
8      Q.   Okay.  Did --
9      A.   Any kind of sweeps he was responsible for.
10     Q.   Who, Sam Yohannes was?
11     A.   Correct.
12     Q.   Now, was there -- when this occurred, this
13  auto adjustment, was there an announcement that it had
14  occurred, or was it just something that occurred
15  unbeknownst to you?
16     A.   I believe for the first, I don't know, couple
17  years I was there I wasn't really aware of it, but after
18  a while, I was -- I realized that they did do this and
19  there was some kind of communication between AR and
20  collections that there was going to be a sweep every so
21  often, and I can't recall whether it was done monthly or
22  quarterly, but it was done.
23     Q.   Do you know if Terri Elam was involved in the
24  process?
25     A.   Yes.  Sam Yohannes actually rolled up to Terri

237

1  Elam, I believe.
2      Q.   Okay.  Now, do you know when you first learned
3  of this auto adjustment process of unapplied cash?
4      A.   Probably a couple years in to being at Oracle.
5      Q.   Do you remember who told you?
6      A.   I believe I got an E-mail from Sam Yohannes.
7  I think he sent it out to the entire group stating
8  something about a -- a sweep.
9      Q.   Okay.  And it appears that the sweep occurs --
10  well, does it appear from this document that --
11  withdrawn.
12      What would happen if -- if these items of
13  unapplied cash were swept in to another account
14  automatically and then later Oracle would determine that
15  those items were duplicate payments and had to be
16  refunded?
17      Would they be able to get this money out of
18  the account that it was swept to?
19      MR. GLENNON:  Objection.  Calls for
20  speculation.  Incomplete hypothetical.
21      THE WITNESS:  Yes.
22      Once -- once you knew what the check number
23  was and where it was, so -- after the -- after, you
24  know, the whole problem of the unapplied issues came
25  about, then you'd -- you know, you'd run in to that

238

1  more.
2  BY MR. GREENSTEIN:
3      Q.   And --
4      A.   It's a sweep, and you can't see it, and then
5  you -- then you end up finding it in the reserve.
6      Q.   End up finding it in the reserve once you --
7      A.   Do the research.
8      Q.   Sorry.
9      Once you did the research?
10      A.   (Nodding head)
11      Q.   As part of the unapplied cash clean-up in
12  2020?
13      MR. GLENNON:  Objection.  Foundation.
14      THE WITNESS:  Correct.
15      And it can also happen with any of the other
16  unapplied research that maybe they would -- maybe they
17  were doing.
18      I don't -- myself didn't do that, but I'm sure
19  that there were people aware of -- of it.
20  BY MR. GREENSTEIN:
21      Q.   Was there ever a case where you or one of your
22  collections analysts would research small items such as,
23  you know, 10 cents of unapplied cash?
24      Would you research it to determine where it
25  came from?

239

1      A.   No.
2      Q.   And why was that?
3      A.   Because it wasn't visible -- usually.
4      You didn't see 10 cents on the unapplied
5  report -- and, if you did, it was -- you'd never get to
6  it because you started with the high dollar amounts
7  first.
8      Q.   Right.
9      A.   There's no way you'd get to it.
10      Q.   You see on the days -- in the column right
11  before "notes" it says "days," it appears that the first
12  item says "7 days;" right?
13      A.   Correct.
14      Q.   So it appears that these auto adjustments of
15  unapplied cash occurred as soon as seven days after the
16  item became -- or the cash receipt came in that resulted
17  in the item of unapplied cash; right?
18      MR. GLENNON:  Objection.  Lack of foundation.
19  The document speaks for itself.
20      THE WITNESS:  That's what it's stating here,
21  that this check had one cent on it seven days after it
22  appeared.
23  BY MR. GREENSTEIN:
24      Q.   Okay.  So in some cases an item of -- a
25  payment would come in, result in an item of unapplied

240

1  cash that was small, and seven days later it would be
2  swept in to another account, and then it wouldn't be
3  visible to an Oracle collector; right?
4      MR. GLENNON:  Objection.  Compound,
5  mischaracterizes the testimony and lack of foundation.
6      THE WITNESS:  Correct.
7  BY MR. GREENSTEIN:
8      Q.   You see, if you go down on the first page to
9  the January 23rd entry for User Technology, and it looks
10  like Association, but it's cut off?
11      A.   First -- first page?
12      Q.   Yes, first page.  It's the entry January 23rd,
13  '01?
14      A.   Okay.
15      Q.   And "User Technology Ass.," do you see that?
16      A.   I do.
17      Q.   And it says "check," it appears to be "$5;"
18  right?
19      MR. GLENNON:  Objection.  Document speaks for
20  itself.  Lack of foundation.
21      THE WITNESS:  Correct.  Looks like $5.
22  BY MR. GREENSTEIN:
23      Q.   And then it says -- in the notes it says
24  "overpaid, refund per S. Sanchez."
25      Do you see that?

241

1   A.   I do.
2   Q.   Do you know who S. Sanchez was?
3   A.   Her name was Sarah Sanchez.
4   Q.   Okay.  Was she a collections analyst?
5   A.   Correct.
6   Q.   Okay.  And do you remember the time that -- or
7   the time period she was a collections analyst?
8   A.   Well, she was there when I got there, and she
9   probably didn't leave the department until '03, maybe --
10  maybe earlier.
11  Q.   Okay.  So when it says "overpaid refund per S.
12  Sanchez," does that mean a $5 refund would be given to
13  that customer?
14  MR. GLENNON:  Objection.  Lack of foundation.
15  Document speaks for itself.
16  THE WITNESS:  Correct.
17  BY MR. GREENSTEIN:
18  Q.   Okay.  And then you see the last entry in this
19  -- on this first page, it's for West Stat?
20  A.   I do.
21  Q.   And then it has a check for $9?
22  A.   Yes.
23  Q.   And the days is 12.
24  Do you see that?
25  MR. GLENNON:  Objection.  Document speaks for

242

1   itself.
2   BY MR. GREENSTEIN:
3   Q.   And it says "unapplied amount due to credit
4   memo on invoice."
5   Do you see that?
6   A.   I do.
7   Q.   Earlier you testified, I think, that sometimes
8   an item of unapplied cash would be the result of a
9   payment coming in on an invoice that had been previously
10  reduced by a credit memo.
11  Do you remember testifying about that?
12  A.   I do.
13  Q.   And sometimes a customer would make the full
14  payment because they weren't aware of a credit memo; is
15  that right?
16  A.   Correct.  That happened a lot.
17  Q.   Okay.  And -- so when this in the note says
18  "unapplied amount due to credit memo and invoice," does
19  that mean to you that that $9 was a result of an invoice
20  that had been previously credit memoed, a payment had
21  come in, cash receipt, and they had overpaid $9?
22  MR. GLENNON:  Objection.  Lack of foundation.
23  Document speaks for itself.
24  BY MR. GREENSTEIN:
25  Q.   Is that right?

243

1   A.   It could be, but I doubt that they would do a
2   credit memo for $9.
3   I believe that there was maybe some
4   misapplications, and I -- you know, obviously, I can't
5   tell for sure, but I doubt that we would do a credit
6   memo for $9, maybe it would be a lot larger than that,
7   and it would just be misapplied to where in the end it
8   would come out to -- to where there was $9 left on the
9   check for whatever reason.
10  But it's stating here that -- it doesn't state
11  how much the credit memo was for.
12  All it states is that there was a credit memo
13  done on that invoice, and that's why at the -- in the
14  end, after applications were all done, $9 was left.
15  Q.   Okay.  Now, speaking of credit memos, were you
16  ever informed that there were credit memos issued by
17  mistake?
18  A.   Yes.
19  Q.   And how often did that happen?
20  A.   Well, we found -- after we started the project
21  we found that there was, you know, many cases that there
22  was credit memos that were done that should not have
23  been done, or -- that were done on -- on invoices that
24  maybe were partially applied, and we weren't able to
25  collect the remaining amount of the invoice so it was

244

1   credited.
2   So, in turn, we credit memoed in -- in error.
3   MR. GREENSTEIN:  Okay.  Well, it's four
4   minutes to four o'clock, and I know you have to leave at
5   4:00, so I think we're going to -- I'm going to stop
6   here for the day.
7   Let's go off the record.
8   MR. GLENNON:  Actually -- but -- okay.  But I
9   want to go back on the record after we talk.
10  MR. GREENSTEIN:  Okay.  That's fine.
11  VIDEOGRAPHER:  But we can end the video
12  portion?
13  MR. GLENNON:  Yes.
14  VIDEOGRAPHER:  Is that okay, or --
15  MR. GLENNON:  Yeah.  We don't have to put this
16  on video.
17  VIDEOGRAPHER:  Okay.
18  MR. GREENSTEIN:  Actually, you know, I just
19  want to -- oh.  We're going to go back on the record?
20  MR. GLENNON:  We are going to go back on the
21  record.
22  MR. GREENSTEIN:  Yeah.  Okay.
23  VIDEOGRAPHER:  This is the end of videotape
24  three, volume one, in the deposition of Ian Hatada.
25  The original videotapes will be retained by

Hatada, Ian  10/5/2006  9:55:00 AM

245

1    LiveNote World Service.
2          Going off the record, the time on the monitor
3    is 3:58 p.m.
4          (Discussion off the record.)
5          MR. GREENSTEIN:  So we're back on the record,
6    and we just had a discussion about scheduling a second
7    day for Mr. Hatada's deposition.
8          We've gone about four-and-a-half hours, I
9    believe, Plaintiffs have, and we're entitled to seven.
10         Also, we have agreed that Defendants are
11   entitled to their seven hours, so long as Mr. Hatada's
12   counsel agrees, and we're willing to sit for a second
13   day.
14         We need to finish up probably an hour,
15   hour-and-a-half, of additional questioning, and then,
16   you know, we've agreed to allow Defendants to do their
17   seven hours, if they need it, subject, of course, to
18   Mr. Hatada and his counsel.
19         MR. GLENNON:  Just for the record,
20   Mr. Hatada's counsel represented he will allow us an
21   opportunity to question the witness.
22         We don't think we'll go for the seven hours.
23         MR. SCHRAG:  We've agreed to a second day.
24   Hopefully that would be the end of it.
25         MR. GREENSTEIN:  Right.

246

1    That's it.
2    Thereupon the deposition was recessed at
3    4:05 p.m.)
4    Signed under penalty of perjury:
5    _____
6         IAN HATADA
7    _____
          Date
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

247

1          --o0o--
2          I, CAROL NYGARD DROBNY, a Certified Shorthand
3    Reporter of the State of California, duly authorized to
4    administer oaths, do hereby certify:
5          That I am a disinterested person herein; that
6    the Witness, IAN HATADA, named in the foregoing
7    deposition was by me duly sworn to testify the truth,
8    the whole truth, and nothing but the truth; that the
9    deposition was reported in shorthand by me, CAROL NYGA[
10   DROBNY, a Certified Shorthand Reporter of the State of
11   California, and thereafter transcribed into typewriting.
12         That before completion of the deposition,
13   review of the transcript [X ] was [ ] not requested.
14   If requested, any changes made by the deponent (and
15   provided to the Reporter) during the period allowed are
16   appended hereto.
17
18         Dated: _____
19
20         _____
           CAROL NYGARD DROBNY CSR #4018
21
22         --o0o--
23
24
25

I, CAROL NYGARD DROBNY, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That I am a disinterested person herein; that the Witness, named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition was reported in shorthand by me, CAROL NYGARD DROBNY, a Certified Shorthand Reporter of the State of California, and thereafter transcribed into typewriting.

That before completion of the deposition, review of the transcript [x] was [  ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

Date _October 6, 2006_

_Carol Nygard Drobny_
CAROL NYGARD DROBNY,
CSR #4018

--o0o--

248

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3                    --o0o--
 4   In re ORACLE CORPORATION
     SECURITIES LITIGATION
 5
                File No. C-01-0988-MJJ
 6   _____/
 7
                     --o0o--
 8
            TUESDAY, OCTOBER 10, 2006
 9
                     --o0o--
10
                   VOLUME 2
11
        VIDEOTAPED DEPOSITION OF
12
                 IAN HATADA
13
                     --o0o--
14
     Reported By:  CAROL NYGARD DROBNY, CSR No. 4018
15          Registered Merit Reporter
16
17
18
19
20
21
22
23
24
25
```

250

```
 1   Also Present:
 2   TONI M. THINGVOLD, Senior Manager
     Deloitte Financial Advisory Services, LLP
 3   50 Fremont Street
     San Francisco, CA  94105
 4   415.783.5565
     tthingvold@deloitte.com
 5
 6   Also Present Via Remote Internet Connection:
 7   KEITH MAUTNER
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

249

```
 1
 2             APPEARANCES:
 3   For the Plaintiffs:
 4   LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
     ROBBINS
 5   BY:  ELI GREENSTEIN, Attorney at Law
     100 Pine Street, Suite 2600
 6   San Francisco, California  94111
     415.288.4545
 7   elig@lerachlaw.com
 8   For the Defendants:
 9   LATHAM & WATKINS, LLP
     BY:  BRIAN T. GLENNON, Attorney at Law
10   633 West Fifth Street, Suite 4000
     Los Angeles, California  90071
11   213.485.1234
     brian.glennon@lw.com
12
13   LATHAM & WATKINS, LLP
     BY:  PAUL V. KONOVALOV, Attorney at Law
14   650 Town Center Drive, 20th Floor
     Costa Mesa, CA  92626
15   714.540.1235
     paul.konovalov@lw.com
16
17   For the witness IAN HATADA:
18   MEADE & SCHRAG, LLP
     BY:  MICHAEL SCHRAG, Attorney at Law
19   1816 Fifth Street
     Berkeley, California  94710
20   510.843.3670
     michael@meadeschrag.com
21
22   Videographer:
23   GARY BREWER
24
25
```

251

```
 1                    INDEX
              EXAMINATION BY COUNSEL
 1                    Page No.
 3
     Further Examination By Mr. Greenstein  256
 4
     Examination By Mr. Glennon        357
 5
 6   Further Examination By Mr. Greenstein  598
     Further Examination by Mr. Glennon     609
```

Hatada, Ian  10/10/2006  9:53:00 AM

252

```
1                    EXHIBITS
2  For the Plaintiffs    Description        Page No.
3  Exhibit 7    Four-page Handwritten Document
                 Bates Stamped PLF-ORC 001877
4                Through 001880              268
5  Exhibit 8    Comments and Notes_Call Notes
                 150.ls Document Bates Stamped
6                NDCA-ORCL 649588 Through
                 650203                     313
7
   Exhibit 9    Document Bates Stamped
8                NDCA-ORCL 104534 Through
                 140560                     333
9
   Exhibit 10   Third Notice of Deposition
10               Of Third Party Ian Hatada  359
11 Exhibit 11   Revenue Recognition Policy
                 Bates Stamped PLF-ORC 000020
12               Through 000065             377
13 Exhibit 12   Transaction Register Bates
                 Stamped NDCA-ORCL 049208
14               Through 050060             397
15 Exhibit 13   Sales Journal by GI Account
                 Report Bates Stamped
16               NDCA-ORCL 314015 Through
                 314324                     405
17
   Exhibit 14   Account Analysis Report Source
18               Item Period OCT-00 to DEC-00
                 Bates Stamped NDCA-ORCL
19               050356 Through 050360      411
20 Exhibit 15   Screen Print Bates Stamped
                 NDCA-ORCL 050308          418
21
   Exhibit 16   Four-Page Handwritten Document
22               Bates Stamped PLF-ORC 001877
                 Through 001880             563
23
24
25
```

253

```
1  Exhibits
   Previously
2  Marked
3  Venkataramana 5  One-Page Document Bates   548
                     Stamped PLF-ORC 000002
4
   Matuszak 4    #1 Interview Memorandum   340
5                Of Thomas Williams
                 (Interview 3) 11/12/02
6                Bates Stamped NDCA-ORCL
                 313777 Through 313784
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

254

```
1         IN THE UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF CALIFORNIA
3                     --o0o--
4  In re ORACLE CORPORATION
   SECURITIES LITIGATION
5
            File No. C-01-0988-MJJ
6  _____/
7
                     --o0o--
8
9       BE IT REMEMBERED, that on Tuesday, October 10,
10 2006, commencing at the hour of 9:53 a.m. thereof, at
11 the offices of Carol Nygard & Associates, 4180 Truxel
12 Road, Suite 100, Sacramento, California before me, Carol
13 Nygard Drobny, a Certified Shorthand Reporter of the
14 State of California, there personally appeared
15               IAN HATADA,
16 called as a witness by the Plaintiffs, who, being by me
17 first duly sworn, was thereupon examined and
18 interrogated as hereinafter set forth.
19       VIDEOGRAPHER:  Okay.  Good morning.  We're
20 going on the record.
21       Here marks the beginning of videotape number
22 one, volume two, in the deposition of Ian Hatada in the
23 matter of In Re:  Oracle Corporation Securities
24 Litigation in the United States District Court, Northern
25 District of California, Case Number C-01-0988-MJJ.
```

255

```
1        Today's date is October 10th, 2006, and the
2  time is 9:53 a.m.
3        The video operator today is Gary Brewer,
4  representing LiveNote World Service located at 221 Main
5  Street, Suite 1250, San Francisco, California, 94105,
6  phone number 415-321-2300.
7        The Court Reporter is Carol Nygard of --
8  reporting on behalf of LiveNote World Service.
9        Today's deposition is being taken on behalf of
10 the Plaintiff.
11       Counsel, would you please introduce yourselves
12 and state whom you represent.
13       MR. GREENSTEIN:  Good morning.  Eli Greenstein
14 with Lerach, Coughlin, Stoia, Gellar, Rudman & Robbins
15 representing Plaintiffs.
16       MR. GLENNON:  Good morning.  Brian Glennon of
17 Latham & Watkins on behalf of Defendants.
18       And, just for the record, we have also
19 cross-subpoenaed Mr. Hatada for his testimony this
20 morning.
21       MR. KONOVALOV:  Good morning.  Paul Konovalov,
22 Latham & Watkins, for the Defendants.  Also present is
23 Toni Thingvold.
24       MR. SCHRAG:  Michael Schrag, Meade & Schrag,
25 for the witness.
```

256

1      VIDEOGRAPHER:  Counsel, do you want to reswear
2  the witness?
3      MR. GREENSTEIN:  Whatever's usual.
4      (Thereupon the oath was administered to the
5      witness by the Court Reporter.)
6      MR. GREENSTEIN:  Also for the record we're
7  doing LiveNote.  We're streaming this -- the audio
8  portion of this deposition to one of our forensic
9  accountants, Keith Mautner, who is listening in.
10          FURTHER EXAMINATION
11  BY MR. GREENSTEIN:
12      Q.  Good morning, Mr. Hatada.
13      A.  Good morning.
14      Q.  Thanks again for being here for the second day
15  of this deposition.
16          Do you understand that you're still under
17  oath?
18      A.  I do.
19      Q.  Okay.  I'm going to refer to some prior
20  testimony that you gave in the first day of deposition,
21  and I'll just refer to it as "deposition number one."
22          Is that okay with you?
23      A.  That's okay.
24      Q.  Okay.  So in deposition one do you recall
25  testifying about a series of meetings held in late

257

1  October 2002 to discuss a project to clean up Oracle's
2  unapplied cash?
3      A.  I do.
4      Q.  Did anybody explain to you at the time
5  that this project was discussed why Oracle was doing it
6  in late October 2002 versus some earlier period of time?
7      MR. GLENNON:  Objection.  Vague and ambiguous.
8  Calls for speculation.
9      THE WITNESS:  They did attempt to explain it,
10  but it wasn't very clear.
11          The majority of what the meetings were all
12  about was what exactly we needed to do and how fast we
13  needed to get it done.
14  BY MR. GREENSTEIN:
15      Q.  Okay.  And were there a series of meetings --
16  withdrawn.
17          When you say they tried to explain it, who do
18  you mean "they"?
19      A.  I mean Michael Quinn, Greg Myers.
20      Q.  And so did they try to explain why Oracle was
21  doing this clean-up in October -- late October 2002
22  versus doing it earlier?
23      MR. GLENNON:  Objection.  Asked and answered.
24      THE WITNESS:  What was said in those meetings
25  from Michael and Greg Myers was that they had done

258

1  something previously that needed to be fixed, they made
2  a mistake, and it needed to be cleaned up, and we, as
3  collections managers or collections analysts, were not
4  aware of what had happened previously but what now needs
5  to be resolved.
6  BY MR. GREENSTEIN:
7      Q.  Okay.  Was there ever discussion of the
8  creation of debit memos in around November 2000?
9      MR. GLENNON:  Objection.  Vague as to time.
10      THE WITNESS:  Yes, there was.  In those
11  meetings there was discussions about debit memos and
12  credits.
13  BY MR. GREENSTEIN:
14      Q.  And you're referring to the meetings in late
15  October 2002; correct?
16      A.  Correct.
17      Q.  Okay.  So you refer to a mistake.
18          Actually, withdrawn.
19          So there was discussion of the creation of
20  debit memos in November 2000; correct?
21      MR. GLENNON:  Objection.  Asked and answered.
22      THE WITNESS:  Well, the first I heard of debit
23  memos and credits was in the meeting that we were
24  discussing the other day with Mike Quinn and Greg Myers.
25          I believe you were stating that that was in

259

1  '02.
2          But the first meetings that we had to clean --
3  to actually have this cleaned up was the first time that
4  I had heard about these debit memos.
5  BY MR. GREENSTEIN:
6      Q.  Okay.  And those were the meetings where you
7  learned of this unapplied cash project in October 2002;
8  right?
9      A.  Correct.  Correct.
10      Q.  Okay.  So I think you just said that they
11  talked about something being a mistake.
12          Do you recall the mistake being the creation
13  of debit memos in November 2000?
14      A.  Yes.
15          It was Mike Quinn informing us as managers
16  that Greg Myers had made a mistake with debit memos and
17  credits and the unapplied.
18      Q.  Okay.  Why don't you just tell me everything
19  you remember about what Mike Quinn said about that
20  mistake.
21      A.  He had stated that Greg Myers in an effort to
22  -- to resolve the unapplied had made a mistake with
23  debit memos and credits and other accounts that we were
24  not aware of that held unapplied cash, and that was
25  basically what I remember coming from a statement from

260

```
1    Michael Quinn.
2        Q.   When you say there were -- that there were
3    discussions of other accounts that you were not aware
4    of, what do you mean by that?
5        A.   Other accounts than --than the unapplied cash
6    accounts that we were aware of looking -- that we were
7    able to look at and be invisible on a daily basis.
8        There was other accounts, meaning other money,
9    that was reserved or moved that we were not able to see
10   as collections analysts or collections managers.
11       Q.   So when you say you were not able to see it,
12   do you mean that until the 2002 clean-up, unapplied cash
13   clean-up, you weren't able to see certain items of
14   unapplied cash that had been previously transferred to
15   different accounts?
16           MR. GLENNON:  Objection.  Vague and ambiguous.
17           THE WITNESS:  Correct.
18   BY MR. GREENSTEIN:
19       Q.   Okay.  Was there ever discussion that certain
20   items of unapplied cash had been transferred from the
21   unapplied cash account to Oracle's bad debt reserve?
22           MR. GLENNON:  Objection.  Vague as to time.
23           THE WITNESS:  I'm not sure how the "bad debt
24   reserve" and the actual term "reserved" correlates, but
25   from what I know it was that the unapplied cash account
```

261

```
1    money had been moved from that account -- that was
2    visible by collections analysts and collections
3    managers.
4        Some of that money was moved over to another
5    account.
6    BY MR. GREENSTEIN:
7        Q.   And was it a reserve account?
8        A.   That's what they had called it.
9        Q.   They called it a "reserve account"?
10           MR. GLENNON:  Objection.  Vague and ambiguous.
11   Asked and answered.
12   BY MR. GREENSTEIN:
13       Q.   Do you understand that the last line -- this
14   whole line of questioning pertains to what was discussed
15   in October 2002?
16       Do you understand that?
17       A.   I do.
18       Q.   Okay.  And in this line of questioning I'm
19   going to be referring to things that happened during the
20   -- well, to what you learned in late October 2002 as
21   part of the unapplied cash clean-up.
22       Do you understand that?
23       A.   Correct.
24       Q.   Okay.  So when you use the words "visible" or
25   "invisible," what did you mean by that?
```

262

```
1        A.   Unapplied cash was something that was visible
2    to all collections analysts as well as collections
3    managers.
4        Every person in the collections department had
5    a responsibility of their own territory that held
6    unapplied cash, and they were responsible for resolving
7    it with the client.  That amount, whether it be that
8    specific territory of unapplied cash that each
9    individual was responsible for or the entire
10   department's unapplied cash, that was visible.  You
11   could see that on a daily basis.
12       What was not visible was what we were trying
13   to resolve that was being moved in or coupled with the
14   unapplied cash.
15       That was not -- that was not visible -- until
16   after the meetings in '02.
17       Q.   In 2002?
18       A.   Uh-huh.
19       Q.   Okay.  And those items of unapplied cash that
20   weren't visible to collections, were those related to
21   the creation of the debit memos in November 2000?
22           MR. GLENNON:  Objection.  Lack of foundation.
23   Calls for speculation.
24           THE WITNESS:  That's what I had understood
25   from -- from Michael Quinn.
```

263

```
1    BY MR. GREENSTEIN:
2        Q.   And is it true that when you were told about
3    the unapplied cash project in 2002 that suddenly there
4    was an increase in the -- in the items of unapplied cash
5    that you were aware of before that time?
6        A.   Correct.
7        Q.   Okay.  And was -- and was that because the
8    items of unapplied cash that had become invisible in
9    November 2002 suddenly became visible as part of the
10   unapplied cash project?
11           MR. GLENNON:  Objection.  Lack of foundation.
12   Calls for speculation.
13           THE WITNESS:  Correct.
14   BY MR. GREENSTEIN:
15       Q.   And during those meetings in October 2002 I
16   think you've testified on day one of the deposition,
17   this deposition, that there was a discussion of a
18   securities fraud lawsuit; is that correct?
19           MR. GLENNON:  Objection.  Mischaracterizes the
20   testimony.
21           THE WITNESS:  Correct, but I -- I didn't know
22   the specific details of it.
23       It's just exactly what you said.
24   BY MR. GREENSTEIN:
25       Q.   Okay.  So is it true that there was a
```

264

1   discussion in October -- in those October 2002 meetings
2   about a securities fraud lawsuit against Oracle?
3          MR. GLENNON: Objection. Lack of foundation.
4          THE WITNESS: Correct.
5   BY MR. GREENSTEIN:
6      Q.   Okay. Did those discussions involve --
7   withdrawn.
8          What do you remember about what was discussed
9   pertaining to the securities fraud lawsuit?
10         MR. GLENNON: Objection. Lack of foundation.
11  Asked and answered.
12         THE WITNESS: From -- from what I know from
13  meetings that we had from -- with Ryan Roberts, that
14  there was a lawsuit and it was our job to clean up the
15  unapplied plus what had been now moved in to the
16  unapplied account from other accounts because of the
17  lawsuit, so in an effort to -- to clean that up, to --
18  to help Oracle with this lawsuit.
19         That was what -- my understanding.
20  BY MR. GREENSTEIN:
21     Q.   And you said "There was a lawsuit and it was
22  our job to clean up the unapplied plus what had now been
23  moved to the unapplied account from other accounts
24  because of the lawsuit."
25         When you say that, are you referring to the

265

1   unapplied cash items that were related to the debit
2   memos that had now become part of the clean-up project
3   in 2002?
4          MR. GLENNON: Objection. Lack of foundation.
5   Calls for speculation.
6          THE WITNESS: From my understanding.
7   BY MR. GREENSTEIN:
8      Q.   Right.
9          And was there a discussion with Ryan Roberts
10  about debit memos?
11     A.   He was in the meetings.
12     Q.   Okay. And did Oracle collections -- actually,
13  withdrawn.
14         I think in day one of your -- well, actually,
15  withdrawn.
16         Was Jennifer Minton involved at all as far as
17  you knew in the 2002 unapplied cash project?
18         MR. GLENNON: Objection. Calls for
19  speculation.
20         THE WITNESS: Jennifer Minton was never in the
21  meetings, neither was Jeff Henley -- in our meetings as
22  collections.
23         We were only to report what we had done on a
24  weekly basis to Mike Quinn, which, in turn, reported it
25  to Tom Williams, Jeff Henley, Jennifer Minton.

266

1   BY MR. GREENSTEIN:
2      Q.   So did Tom Williams report the -- the results
3   of the clean-up to Jennifer Minton?
4          MR. GLENNON: Objection. Mischaracterizes the
5   testimony. Calls for speculation.
6          THE WITNESS: I don't know for sure how -- you
7   know, who reported to who other than the fact that we
8   were to report to Mike Quinn and Mike Quinn was to
9   report it up the chain from there.
10         I know Jeff Henley was -- you know, we were
11  supposed to get this information to Jeff Henley, and the
12  -- in the end.
13         I mean, that's where it was supposed to end
14  up.
15  BY MR. GREENSTEIN:
16     Q.   Okay. And how do you know that?
17     A.   From our meetings with Mike Quinn.
18     Q.   So did Mike Quinn ever say, "We need to get
19  these results to Jeff Henley"?
20         MR. GLENNON: Objection. Vague and ambiguous.
21         THE WITNESS: Yes, he did.
22  BY MR. GREENSTEIN:
23     Q.   Okay. Now, do you know if all of the items of
24  unapplied cash relating to this 2002 clean-up were
25  resolved?

267

1          MR. GLENNON: Objection. Asked and answered.
2          THE WITNESS: At the point of me leaving in
3   '05 they weren't.
4   BY MR. GREENSTEIN:
5      Q.   Okay. So --
6      A.   Or '04. I'm sorry.
7      Q.   So at the time you left the unapplied cash
8   items related to the -- the clean-up had not been fully
9   resolved?
10         MR. GLENNON: Objection. Asked and answered.
11         THE WITNESS: It was my understanding that we
12  put a dent in it, but that we didn't resolve it in full.
13  BY MR. GREENSTEIN:
14     Q.   Okay. And that was years later; right?
15     A.   Correct.
16     Q.   And when you said "dent," why was it that
17  Oracle collections was only able to make a dent in the
18  unapplied cash clean-up?
19         MR. GLENNON: Objection. Lack of foundation.
20  Vague and ambiguous.
21         THE WITNESS: There was way too many items for
22  30-plus people to resolve.
23         It would have taken a lot more years than --
24  than I was there, I believe.
25         MR. GREENSTEIN: I want to mark this as next.

268

1  I'm not sure what number is next.
2          THE REPORTER: 7.
3          MR. GREENSTEIN: 7?
4          Hatada Number 7.
5          (Exhibit No. 7 was marked for Identification.)
6  BY MR. GREENSTEIN:
7      Q.   Mr. Hatada, go ahead and read through this
8  document and let me know when you're done.
9          For the record it's PLF-ORC 001877 through
10  001880.
11          MR. GLENNON: I'm going to put an objection on
12  the record on the grounds that this document has been
13  redacted.
14          During day one of the deposition counsel for
15  Plaintiffs represented that this document was redacted
16  because it contained attorney work product, when, in
17  fact, that work product has not been logged in any of
18  privilege or work product logs.
19          So that leads me to believe that, A, either
20  they failed to log this particular document, or, B,
21  perhaps worse, that counsel has altered this particular
22  document before showing it to this witness.
23          MR. GREENSTEIN: Okay.  Well, I don't think
24  there's any foundation to think that anyone altered any
25  document.

269

1          As I said on the record, this document was
2  redacted because of what we feel was attorney work
3  product.
4          I told counsel that at the deposition, and to
5  the extent there is no log, then if Defendants want a
6  log, then we'll be happy to give it to them.
7          MR. GLENNON: Was that your writing or an
8  attorney from Lerach's writing?
9          MR. GREENSTEIN: I'm not -- like I said, it's
10  work product, so I don't know why I would even tell you
11  what was on that --
12          MR. GLENNON: Because it's not logged, and if
13  it's the original author who wrote it and you're
14  redacting it, that's alteration of documents.
15          MR. GREENSTEIN: Okay.
16          MR. GLENNON: And you're showing this witness
17  an altered document.
18          MR. GREENSTEIN: Okay.
19          MR. GLENNON: Was it an attorney from Lerach's
20  writing that you redacted?
21          Because, if so, then it's just a problem with
22  the log.  But if that is somebody inside Oracle who made
23  these notes and then you redacted it on the grounds of
24  attorney/client privilege or work product, there's no
25  grounds for that, and you're showing this witness an

270

1  altered document.
2          MR. GREENSTEIN: Okay.  Are you done?  Are you
3  done?
4          MR. GLENNON: I looked -- I looked at your
5  log.
6          MR. GREENSTEIN: Are you done?
7          MR. GLENNON: Well, I don't know.  What's your
8  response?
9          MR. GREENSTEIN: Okay.  My response is we
10  redacted this information on the grounds that it was
11  work product; okay?
12          If Defendants disagree with that and you want
13  to fight that, then you have every right to do so, and I
14  can say --
15          MR. KONOVALOV: (Inaudible)
16          MR. GREENSTEIN: Hold on.  Okay.  Let me
17  finish.  Let me finish.
18          MR. KONOVALOV: Go ahead.
19          MR. GREENSTEIN: Okay?
20          Now, if you disagree with that position, then
21  you can -- you know, perhaps Plaintiffs will be willing
22  to give you the unredacted versions.
23          I'm not sure, I'm not going to address that
24  right now.
25          What I'm telling you now is this document was

271

1  produced to you in redacted form based on work product.
2          Now, if you disagree with that, then you can
3  state your position -- not during this deposition --
4          MR. GLENNON: I have to state my position at
5  this deposition.
6          MR. GREENSTEIN: No, you can.
7          But as far as -- I'm not going to fight about
8  it now.
9          If you think it's not work product, then we
10  can fight about that later, --
11          MR. GLENNON: Well, I don't think --
12          MR. GREENSTEIN: -- and, like I said,
13  Plaintiffs might be willing to go back and look at it
14  and perhaps produce the documents in unredacted form.
15          I just don't know.
16          MR. KONOVALOV: We can't assess whether it's
17  work product if you haven't logged it.
18          MR. GREENSTEIN: Okay.  Well, okay.  Well --
19          MR. GLENNON: Let me just raise one additional
20  point.
21          To the extent it's work product I believe it's
22  waived because it was read in to the record, number one.
23          Number two, it's not been logged and this was
24  produced months ago.
25          Number three, if it's not work product, then

272

1 you're showing the witness a document that you have
2 altered for no basis.
3       Do you understand my concern here?
4       You're showing the witness an altered
5 document.
6       MR. SCHRAG:  Can I suggest just for
7 Mr. Hatada's sake we should move forward for Mr. Hatada?
8       I just suggest that you guys discuss this off
9 the record, that Mr. Greenstein will give you the reason
10 it was redacted and move on and go forward with the
11 deposition from here.
12       MR. GLENNON:  I object to showing the witness
13 a document that has been redacted when there's no
14 foundation for any basis.
15       I believe you're showing the witness a
16 doctored document.
17       MR. GREENSTEIN:  Okay.  Well, I mean, that has
18 no basis whatsoever.
19       We're going to show him the document.  You
20 have this document in redacted form.
21       Defendants have never made a challenge to this
22 redaction at all.
23       MR. GLENNON:  I made a challenge during day
24 one of the deposition.  Of course I did.
25       MR. GREENSTEIN:  Okay.  Well, there -- there

273

1 there was no challenge to the work -- to our assertions
2 of work product.
3       MR. GLENNON:  Because you never asserted it
4 until that hearing.  When did you assert it previously?
5       MR. GREENSTEIN:  Okay.  Well, we've had --
6 we've had --
7       MR. GLENNON:  When did you assert it
8 previously?
9       MR. GREENSTEIN:  Brian, I'm not going to have
10 this argument with you.
11       You knew about -- you knew our position.  I
12 discussed our position on the record in day one of the
13 deposition; okay?
14       MR. GLENNON:  And I went back and looked at
15 your log, and your log was not supporting that position.
16       MR. GREENSTEIN:  Okay.  Well, I haven't heard
17 about it until today.
18       MR. GLENNON:  Right.
19       MR. GREENSTEIN:  So I'm not going to fight
20 about this on the record in a deposition.
21       What I just told you is that we redacted this
22 because we believe it's attorney work product.
23       If you disagree with that, we can deal with it
24 off the record; okay?  Now --
25       MR. GLENNON:  I'm just stating my objection

274

1 for the record that you --
2       MR. GREENSTEIN:  That's fine.  That's fine.
3       MR. GLENNON:  Because you're demonstrating --
4 you are showing the witness an incomplete document that
5 has been redacted on a basis that you can't support or
6 have not supported.
7       MR. GREENSTEIN:  Well, like I said, we will
8 give you our support off the record.
9       If you disagree with it, then you're entitled
10 to file any type of motion you want.
11       Sorry about that, Mr. Hatada.
12       THE WITNESS:  That's all right.
13 BY MR. GREENSTEIN:
14    Q.  Have you seen this document before?
15    A.  Yes.
16    Q.  Okay.  And what is it?
17    A.  It's notes that I took from our meetings.
18    Q.  Okay.  When you say "our meetings," do you
19 mean the meetings in or around October 2002 in
20 connection with the unapplied cash clean-up?
21    A.  Correct.
22    Q.  Okay.  And is there anything on this document
23 that is not your handwriting?
24    A.  Not on the first two pages, but on the third
25 page, the top portion.

275

1    Q.  Okay.  And just for the record why don't you
2 just --
3       MR. SCHRAG:  That's page 1879?
4       THE WITNESS:  Yes.  Sorry about that.  001879.
5 BY MR. GREENSTEIN:
6    Q.  Okay.  And which portion do you believe is not
7 your handwriting?
8    A.  The top says "debit memos 1990 through
9 November '00."
10    Q.  Is there anything else on 001879 that
11 you believe is not your handwriting?
12    A.  No.
13       MR. GREENSTEIN:  Okay.
14       MR. SCHRAG:  Is it just those two -- I just
15 want to be clear -- just those two lines are not your
16 handwriting, "debit memos 1990" and then everything else
17 is your writing?
18       THE WITNESS:  Correct.  Everything down
19 from --
20       MR. SCHRAG:  Okay.
21       THE WITNESS:  -- "cash receipt" down --
22       MR. SCHRAG:  Okay.
23       THE WITNESS:  -- looks like my writing.
24       MR. GREENSTEIN:  Okay.
25       THE WITNESS:  Above that does not.

276

1    I don't write in cursive -- typically.
2  BY MR. GREENSTEIN:
3    Q.   Typically.  But do you sometimes write in
4  cursive?
5    A.   Occasionally.
6    Q.   Okay.
7    A.   But very seldom.
8    Q.   So -- but looking at this document, the only
9  item that you believe is not your handwriting is on
10  001879, and it's the top of the document, it says "debit
11  memos 1990 through November 2000;" is that right?
12    A.   Correct.
13    Q.   Okay.  So is everything on this document
14  besides that item your handwriting?
15    A.   It is.
16    Q.   Okay.  And -- are these the notes you took
17  during one of the meetings in October 2002 in connection
18  with the unapplied cash clean-up?
19    A.   They are.
20    Q.   Okay.  Now, were these notes taken during one
21  meeting or are they a compilation of notes taken in
22  several meetings?
23    A.   They're either notes that I took in the first
24  meeting or the first meeting and the second meeting.
25    Q.   Okay.  And how do you know that?

277

1    A.   Just because it's the beginning of what we
2  were told to do in regards to the research.
3    Q.   Okay.
4    A.   It looks like maybe the -- first page
5  might be the first meeting and the second page might be
6  the second meeting.
7    Q.   Okay.  And how many meetings were there in
8  connection with the unapplied cash project in late
9  October 2002?
10    Do you recall?
11    A.   A dozen.
12    Q.   Okay.
13    A.   If we didn't have a meeting every day, we had
14  one every other day.
15    We had a lot of meetings.
16    Q.   Okay.  And was that to discuss the progress
17  the of clean-up of unapplied cash?
18    A.   Most of those meetings were to discuss the
19  progress.
20    Q.   Okay.  So on the first page, see at the top it
21  says "on account clean-up equals debit memos," and then
22  it has "less than November 2000."
23    Well, sorry.
24    It has a less than symbol?  Do you see that?
25    A.   Correct.

278

1    Q.   Okay.  And looking at this document what did
2  you -- what do you recall about these notes you took and
3  what was being reflected here?
4    MR. GLENNON:  Objection.  Vague and ambiguous.
5    THE WITNESS:  The notes I was taking here was
6  just to state exactly what it says, the on account
7  clean-up was due to the -- the debit memos that were
8  done before November 2000.
9    MR. GREENSTEIN:  Okay.
10    THE WITNESS:  So that's why there's a less
11  than sign there.
12  BY MR. GREENSTEIN:
13    Q.   Okay.  And earlier you talked about
14  discussions of a mistake that occurred prior to October
15  2002 and what was done with unapplied cash items;
16  correct?
17    A.   Correct.
18    Q.   And this on account clean-up, these notes,
19  reflect the discussion of that -- of that earlier
20  clean-up that Mike Quinn was talking about; right?
21    MR. GLENNON:  Objection.  Lack of foundation.
22  Compound.
23    THE WITNESS:  Correct.
24  BY MR. GREENSTEIN:
25    Q.   Okay.  Now, when it says "debit memos in

279

1  system" and then it says "refunds in system," "right
2  flex field will show exact check," do you see that?
3    A.   Correct.
4    Q.   Okay.  Do you know what that means?
5    A.   That's basically just -- giving us instruction
6  of where to find it in the system and -- you know, how
7  -- how to reference it.
8    When you saw debit memos in the system or
9  refunds in the system, it was just -- when you wanted to
10  find out the exact check, that right flex field would
11  show it to you.
12    So it was basically just giving us information
13  on the actual application that we were going to be in
14  to.
15    Q.   Okay.
16    A.   To help us with the research.
17    Q.   To help you with the research on the unapplied
18  cash memos related to debit memos; correct?
19    A.   Correct.
20    MR. GLENNON:  Objection.  Vague and ambiguous.
21  Compound.
22  BY MR. GREENSTEIN:
23    Q.   Is that right?
24    A.   Correct.
25    Q.   Okay.  And was this something that was written

280

1    on the board or was -- withdrawn.
2         Were these notes written on the board, or was
3    this something that you wrote based on what somebody was
4    saying to you?
5         MR. GLENNON: Objection. Foundation.
6         THE WITNESS: I believe it was both.
7         It was instruction -- that was written on the
8    white board as well as verbally. I just took down notes
9    to help me understand.
10   BY MR. GREENSTEIN:
11        Q.   Okay. Looking at the second page, 001878 --
12   you see at the top it says "receipt write-off tab"?
13        A.   I do.
14        Q.   Okay. What does that mean?
15        A.   That was -- this is also in reference to the
16   application that we're in, the -- actually, scratch
17   that.
18        The receipt write-off tab was a tab on a -- on
19   a spread sheet.
20        Q.   Was that a spread sheet that you had to
21   utilize in order to resolve -- or research issues --
22   items of unapplied cash?
23        A.   This is the original -- we were talking about
24   the original spread sheet that was put together of
25   everything that was reserved that we needed to resolve,

281

1    and I just put down notes in reference to this receipt
2    write-off tab within that spread sheet.
3         Q.   Okay. So this was a spread sheet that had all
4    items of unapplied cash that had been previously
5    reserved; right?
6         A.   Correct.
7         Q.   Okay. And so how does that -- how does the
8    receipt write-off -- withdrawn.
9         Was the receipt write-off tab related to that
10   spread sheet of items that had been moved to the
11   reserve?
12        MR. GLENNON: Objection. Vague and ambiguous.
13        THE WITNESS: Correct.
14   BY MR. GREENSTEIN:
15        Q.   Okay. And so was that somewhere you could go
16   and look on a computer and find out what items of
17   unapplied cash had been moved to the prior -- previously
18   moved to the reserve?
19        A.   Not the -- the receipt write-off.
20        The receipt write-off tab was actually just a
21   worksheet in a -- in a -- within a spread sheet.
22        And these notes were -- just notes in regards
23   to what we were to do and how we were to resolve them,
24   whether they were a credit memo, or third party, or a
25   refund.

282

1    This is the beginning of trying to -- to
2    resolve this through the spread sheet, and -- and, you
3    know, locate the different reason codes, you know, as to
4    why it was unapplied.
5         Q.   Okay. And you see the first star there under
6    the receipt write-off tab it says "CM due to bad info.
7    Adjust up. Were the credit CMs done in error?"
8         Do you know what that means?
9         A.   It's -- it says "credit memo due to bad
10   information. Adjust up."
11        So it's basically stating that -- if we found
12   a credit memo that was due to bad information given to
13   us, then, therefore, the credit memo was done in error
14   and should be adjusted up in an effort to apply the
15   unapplied cash.
16        So it has a dash there, and basically stating,
17   you know, the question, were the credit memos done in
18   error.
19        Q.   Okay. And do you recall finding items of
20   unapplied cash in which a credit memo was done in error?
21        A.   Yes.
22        Q.   Okay. And do you remember how many --
23   approximately how many credit memos were done in error?
24        A.   Many.
25        Q.   Okay. See where it says "Talk to Nadine about

283

1    credit memo reasons, how to find them," and it says "if
2    credit memoed, why?"
3         Do you see that?
4         A.   I do.
5         Q.   And what does that mean?
6         A.   Nadine was someone that worked -- as a
7    manager, just like myself, but for the consulting side
8    within -- within finance, and -- she had a lot of
9    information that I could, you know -- I always went to
10   her for -- for different things, to help me with the
11   reasons as to why things -- why different items were
12   credit memoed.
13        That was -- that was just another note I put
14   in there kind of like an action item for me to do.
15        Q.   Okay. You see the box there where it's the
16   last star on the first set of stars says, "If it's not a
17   clear-cut refund from paying an invoice twice, then we
18   need to find all credit memos due to bad debt or bad
19   info and adjust up invoice that was credited"?
20        Do you see that?
21        MR. GLENNON: Objection. Misstating the
22   document.
23        THE WITNESS: I do.
24   BY MR. GREENSTEIN:
25        Q.   Okay. Do you know what that means?

284

1    A.   It's basically saying that if it's -- if it's
2  not a definite refund from paying the invoice twice,
3  which in some cases it was, and in many cases it was due
4  to all kinds of other different reasons, then we were
5  advised to -- that, you know, we need to find all credit
6  memos that might have been done in error or, you know,
7  like it says here, "due to bad debt or bad information,"
8  and -- and adjust up the invoice.
9    Q.   Okay.  When you say "adjust up the invoice,"
10 do you recall on day one of your deposition explaining
11 what "adjusting up an invoice" means?
12   A.   I do.
13   Q.   And is that the same -- when you refer to
14 "adjusting up an invoice" in these notes, is that the
15 same process that you described in day one of your
16 deposition?
17   A.   It is.
18   Q.   Okay.  Now, do you recall that there were
19 items that were clear-cut refunds from paying an invoice
20 twice?
21   A.   Yes.
22   Q.   Okay.  And do you recall how many there were?
23   A.   I couldn't tell you.
24   Q.   Okay.
25   A.   A lot.

285

1    Q.   A lot?
2    A.   Yeah.
3    Q.   You see under the box it says "revenue -- rev
4  impact, refund, can't track legitimate CM"?
5         Do you see that?
6    A.   I do.
7    Q.   And then it says "no rev impact, CM in error,
8  adjust for third party"?
9         Do you see that?
10   A.   I do.
11   Q.   Can you explain what that part of these notes
12 means?
13   A.   It's basically stating that if -- if we refund
14 it, or if we can't track it, or if it was a legitimate
15 credit memo that was to be done on that invoice, making
16 unapplied cash, then it was going to be revenue
17 impacting.
18        If it was a credit memo done in error or
19 adjusted for it being sent to third party, then it
20 wasn't going to be an impact on our revenue.
21   Q.   Okay.  And was this something that was -- was
22 this written on the board during those meetings in
23 October 2002 or was this something that was told to you?
24        MR. GLENNON:  Objection.  Vague and ambiguous.
25        THE WITNESS:  I believe this is something that

286

1  was told to me and I just wrote it down how I -- so I
2  could understand it.
3  BY MR. GREENSTEIN:
4    Q.   Right.
5         So in connection with the October 2002
6  clean-up, did collections refund -- or did collections
7  determine that there were revenue impacting items
8  related to refunds and legitimate credit memos?
9         MR. GLENNON:  Objection.  Lack of foundation.
10        THE WITNESS:  Yes.
11 BY MR. GREENSTEIN:
12   Q.   And do you remember how many of those revenue
13 impacting items there were?
14   A.   There were a lot, but I couldn't tell you how
15 many.
16   Q.   Okay.  You see the third line in that center
17 point where it says "OFD/legal.  Go to Ryan.  He will
18 --" something "them to him"?
19        Do you see that?
20        Actually, can you just read that, what you --
21 what you wrote there?
22   A.   So it says "OFD/legal.  Go to Ryan.  He will
23 be reliable."
24        Oh.  "He will relabel them."
25   Q.   Okay.  So that says "He will relabel them to

287

1  him"?
2    A.   Yeah.
3         So he will relabel them to himself.
4         So basically anything that was unapplied due
5  to OFD or due to the client being in legal, Ryan would
6  take those items and relabel them to his initial -- to
7  where he was responsible for them.
8    Q.   And I'm sorry.
9         What does "OFD" mean?
10   A.   I couldn't tell you.
11        Oracle -- I couldn't --
12        MR. SCHRAG:  Don't speculate.
13        THE WITNESS:  I couldn't tell you.
14        I think in day one I wasn't able to tell you
15 what it was either.  I don't remember.
16 BY MR. GREENSTEIN:
17   Q.   Okay.  Okay.
18        So I think in day one you testified about
19 certain items of unapplied cash that had previously been
20 referred to the legal department prior to the October
21 2002 meetings.
22        Do you remember that?
23   A.   I do.
24   Q.   Okay.  And are you referring here to those
25 unapplied cash items that had been referred to legal,

288

1   those go to Ryan Roberts?
2       MR. GLENNON: Objection. Vague and ambiguous.
3   Compound.
4       THE WITNESS: Correct.
5   BY MR. GREENSTEIN:
6     Q.  You see in the second set of stars there -- in
7   the second star it says "reason plus action plan should
8   be very detailed/don't do outcome."
9       Do you see that?
10     A.  I do.
11     Q.  What did you mean by "don't do --" when you
12   wrote "don't do outcome"?
13       MR. GLENNON: Objection. Foundation.
14       THE WITNESS: I think -- I believe the first
15   part of -- of us resolving the items were to fill in the
16   boxes that had reasons and action plans and make sure
17   they were very detailed, but don't fill in the outcome
18   portion of the spread sheet for whatever reason.
19   BY MR. GREENSTEIN:
20     Q.  Okay. And do you know why you weren't
21   supposed to fill in the outcome portion of the spread
22   sheet?
23       MR. GLENNON: Objection. Calls for
24   speculation.
25       THE WITNESS: I believe that there was no

289

1   outcome yet, and that's why we were not to put it in
2   there, because if we stated an outcome when it wasn't an
3   outcome yet, then all of us would think it was resolved
4   when it really wasn't.
5   BY MR. GREENSTEIN:
6     Q.  Oh, I see.
7       So the outcome field was to be put in once the
8   item -- once it was determined what would happen to the
9   unapplied cash item; is that fair?
10       MR. GLENNON: Objection. Leading.
11       THE WITNESS: Correct. So there's a reason,
12   and then there's an action plan of what we were to do,
13   but the outcome couldn't be filled in unless everything
14   was approved and -- it was done.
15       So at this point of this meeting we were not
16   to fill in any outcome, because we were only submitting
17   what we felt needed to happen, not actually doing -- not
18   actually resolving it.
19   BY MR. GREENSTEIN:
20     Q.  Okay. And you refer to a spread sheet.
21       What -- what spread sheet are you referring
22   to?
23       MR. GLENNON: Objection. Lack of foundation.
24       THE WITNESS: I'm referring to the spread
25   sheet that we had of all of the unapplied items that we

290

1   were told to resolve.
2   BY MR. GREENSTEIN:
3     Q.  Okay. You see in the third star says "receipt
4   notes should not be the reason"?
5       Do you see that?
6     A.  I do.
7     Q.  What does that mean?
8       MR. GLENNON: Objection. Lack of foundation.
9       THE WITNESS: So there's a receipt notes field
10   and there's a reason field.
11       The receipts notes field should have been what
12   was in the system at that time, and we had some
13   collections analysts that were just copying and pasting
14   it in to the reasoning, so basically not doing any of
15   the work on it, just taking what was in the receipt
16   notes already and then just transferring it over, which,
17   in turn, there wouldn't be any research done on it, it
18   would just be what was in the notes in the first place.
19       So, therefore, we were just told, you know,
20   don't take what's in the system right now and put it in
21   there as the reason, actually do the research and then
22   put a reason in there to make sure that the receipt
23   notes were correct, and many times they weren't.
24   BY MR. GREENSTEIN:
25     Q.  Okay. Many times the receipt notes were not

291

1   correct?
2     A.  No.
3     Q.  Okay. And why was that?
4       MR. GLENNON: Objection. Calls for
5   speculation. Vague and ambiguous.
6       THE WITNESS: Could be a number of reasons.
7   Most of the time there wasn't enough research
8   done on it, and it was just the first thing that they
9   felt of why it was unapplied, so they would type it in
10   there.
11       In many cases it was incorrect.
12   BY MR. GREENSTEIN:
13     Q.  Okay. So were these receipt notes -- were
14   these something on a spread sheet that you could go in
15   and -- and write a note on?
16     A.  No.
17       Receipt notes are what's in the application,
18   the Oracle 11I application.
19     Q.  Okay. So could a collector go in and input
20   notes in to the receipt notes tab -- or field?
21     A.  Yes.
22     Q.  Okay. And after -- after these meetings did
23   collectors go in and write items in the receipt notes
24   field?
25       MR. GLENNON: Objection. Calls for

292

1  speculation. No foundation.
2      THE WITNESS: Yes, because at times some -- it
3  didn't have any receipt notes.
4      Some items never had receipt notes in them.
5  They were blank.
6      Others were very vague, maybe had one or two
7  words in them.
8      MR. GREENSTEIN: Okay.
9      THE WITNESS: So notes would be updated from
10  time-to-time.
11  BY MR. GREENSTEIN:
12    Q.   So notes would be updated, and that's after
13  these meetings in October 2002; correct?
14    A.   Correct.
15      MR. GLENNON: Objection. Vague and ambiguous.
16  Lack of foundation.
17  BY MR. GREENSTEIN:
18    Q.   Were there any notes that were incorrect that
19  were deleted and then other notes put in its place after
20  these meetings?
21      MR. GLENNON: Objection. Compound.
22      Vague and ambiguous. Calls for speculation.
23      THE WITNESS: Yes, I believe that happened,
24  because the notes weren't correct --
25      MR. GREENSTEIN: Okay. So --

293

1      THE WITNESS: -- in the first place.
2      The first -- the first notes that were in
3  there were completely off base or incorrect, so they
4  would go in and put the correct note in of what actually
5  had happened with that unapplied item.
6  BY MR. GREENSTEIN:
7    Q.   And -- and those notes were electronic notes;
8  right?
9    A.   Correct.
10    Q.   Okay. So after you -- after you learned about
11  -- after you guys learned in those meetings about the
12  law -- securities lawsuit filed against Oracle, after
13  that point in time did collectors ever go and change
14  incorrect notes to the correct notes?
15      MR. GLENNON: Objection. Lack of foundation.
16  Calls for speculation. Incomplete hypothetical.
17      THE WITNESS: I'm sure that they did.
18      I myself had never done that, but I'm sure
19  that it had happened.
20  BY MR. GREENSTEIN:
21    Q.   Okay. Did anybody ever tell you that because
22  a lawsuit was filed you were not to go in and delete any
23  notes that were in this -- on this spread sheet?
24      MR. GLENNON: I'm going to object on the
25  grounds that it calls for attorney/client communication,

294

1  and I'm going ask Mr. Schrag to instruct his witness not
2  to answer, please.
3      MR. SCHRAG: Yeah.
4      If you know the answer to that question apart
5  from talking to Oracle counsel, you can answer that, but
6  if you found out from Oracle counsel, you should not
7  answer that question.
8      If you don't know, just say "I don't know."
9      THE WITNESS: Okay.
10      Could you repeat that.
11  BY MR. GREENSTEIN:
12    Q.   Did anybody ever tell you after -- well,
13  withdrawn.
14      Can you read back the previous question.
15      (Record Read)
16      MR. GLENNON: Same objection.
17      THE WITNESS: No.
18  BY MR. GREENSTEIN:
19    Q.   Turn to page 001879.
20      You see the top half of this page -- it looks
21  like there's some -- well, actually, why don't you
22  explain to me from the point where it says "Cash receipt
23  applied to invoice" and then there's some what appear to
24  be debits and credits, and what that refers to here.
25      MR. GLENNON: Objection. Lack of foundation.

295

1  Document speaks for itself.
2      THE WITNESS: I believe this is where I was
3  taking notes in -- in that first or second meeting.
4      I didn't really understand what kind of notes
5  I was taking, so I -- I really couldn't tell you.
6      I know that -- I was trying to write down
7  notes to understand it, and it was -- wasn't very clear.
8  So --
9      MR. GREENSTEIN: Okay.
10      THE WITNESS: -- I couldn't tell you.
11      Sorry.
12  BY MR. GREENSTEIN:
13    Q.   You see towards the bottom it says "before
14  November 17th" there?
15      Do you see that?
16    A.   I do.
17    Q.   Okay. And then it has an arrow pointing to
18  the -- above; is that right?
19    A.   I do.
20    Q.   Okay. So here where it says "D - cash,
21  C-25005 unapplied cash," and then says "D2205 C-AR," do
22  you know what that means?
23      MR. GLENNON: Objection. Asked and answered.
24  Calls for speculation.
25      THE WITNESS: Yeah. This is where they were

296

1  trying to explain the process before November 17th, and
2  everything below that was -- what the process was now or
3  what we needed to do.
4       That's what I take from it.
5  BY MR. GREENSTEIN:
6       Q.  Okay.  So was this -- were these notes written
7  based on something that was written on a board of some
8  kind?
9       MR. GLENNON:  Objection.  Vague and ambiguous.
10      THE WITNESS:  Yes, this is written on a white
11  board.
12  BY MR. GREENSTEIN:
13      Q.  Okay.  And who was writing on -- on the white
14  board during these meetings?
15      A.  Michael Quinn.
16      Q.  Okay.  Was Greg Myers ever writing on the
17  board?
18      A.  Yes.  Both of them were.
19      Q.  Both of them were?
20      A.  Yes.
21      Q.  Okay.  You see in the bottom half of the
22  E-mail where it says "November 17th," and then has an
23  arrow pointing downward and says "debit memos"?
24      Do you see that?
25      A.  I do.

297

1       Q.  Then it has the number "550001"?
2       A.  I do.
3       Q.  Okay.  So was there a discussion during this
4  meeting of debit memos with the prefix 550?
5       MR. GLENNON:  Objection.  Asked and answered.
6  Calls for speculation.
7       THE WITNESS:  Yes.
8  BY MR. GREENSTEIN:
9       Q.  And was this the explanation written on the
10  board of what happened earlier with respect to the
11  creation of debit memos?
12      MR. GLENNON:  Objection.  Vague and ambiguous.
13      MR. GLENNON:  Can you say that one more time.
14  BY MR. GREENSTEIN:
15      Q.  Do these notes under the box which says "debit
16  memos" -- were these notes based on what was written on
17  the board when they were trying to explain what happened
18  earlier with the creation of debit memos?
19      MR. GLENNON:  Objection.  Vague and ambiguous.
20  Compound.
21      THE WITNESS:  Yes.  This is what was written
22  on the board to help us explain what the process
23  was like before November 17th and then -- and then after
24  it was done what the process was or what had happened.
25      They were trying to explain to us before and

298

1  after.
2  BY MR. GREENSTEIN:
3       Q.  Okay.  Now, at this time did it make sense to
4  you, what they were writing on the board?
5       MR. GLENNON:  Objection.  Asked and answered.
6       THE WITNESS:  No.
7  BY MR. GREENSTEIN:
8       Q.  Okay.  Did -- do you know if it made sense to
9  any of your other counterparts in collections --
10      MR. GLENNON:  Objection.  Calls for
11  speculation.
12      MR. GREENSTEIN:  Will you let me finish my
13  question, please.
14      MR. GLENNON:  I thought you were done.
15  BY MR. GREENSTEIN:
16      Q.  Okay.  Do you know if what they read on the
17  board during these meetings made sense to your
18  counterparts, other collections managers?
19      MR. GLENNON:  Are you done?
20      MR. GREENSTEIN:  Yeah.
21      MR. GLENNON:  Objection.  Calls for
22  speculation.  Compound.
23      THE WITNESS:  I believe the majority of us
24  walked out of that meeting not really understanding what
25  had happened on the before and after, and we're just

299

1  basically trying to concentrate or what our action items
2  were instead of the why.
3  BY MR. GREENSTEIN:
4       Q.  And part of your action items were to research
5  old items of unapplied cash that -- that had been
6  invisible to you earlier that now became invisible in
7  October 2002; right?
8       MR. GLENNON:  Objection.  Vague and ambiguous.
9       THE WITNESS:  Correct.
10      MR. GLENNON:  Okay.
11  BY MR. GREENSTEIN:
12      Q.  Now, did anybody ask questions when they were
13  writing this explanation on the board and discussing it?
14      A.  I believe Molly asked a couple questions.
15      I don't -- I don't believe anybody else.
16      Q.  Okay.  Do you know what she asked?
17      A.  I believe she was just trying to understand it
18  a little bit better, because she was responsible for
19  unapplied and she was having a tough time understanding
20  what was being written on the board, so she asked a few
21  questions.
22      I don't believe anybody else did.
23      Q.  Do you remember Mike Quinn ever being angry
24  during any of these meetings in October 2002?
25      MR. GLENNON:  Objection.  Calls for

300

1  speculation.
2      THE WITNESS: Yeah, the majority of meetings
3  we had with him he was in a pretty bad mood, especially
4  the first meeting, for -- you know, he had basically
5  given all the blame to -- Greg Myers, and it was his
6  wonderful idea for us to do this.
7  BY MR. GREENSTEIN:
8      Q.  And when you say "to do this," you mean the
9  creation of debit memos two years earlier?
10     MR. GLENNON: Objection. Calls for
11 speculation. Lack of foundation.
12     THE WITNESS: Yes.
13     From my understanding that's what he was
14 talking about when he was telling Greg that it was his
15 wonderful idea -- and being sarcastic.
16 BY MR. GREENSTEIN:
17     Q.  And did he ever say, "Well, so what happened
18 in November 2000 was a mistake, and so now we have to
19 figure out a way to fix it"?
20     MR. GLENNON: Objection. Calls for
21 speculation. Lack of foundation.
22     THE WITNESS: Yes.
23 BY MR. GREENSTEIN:
24     Q.  And the way that Oracle tried to fix it was --
25 withdrawn.

301

1      And the October 2002 unapplied cash clean-up
2  was an attempt to fix what had happened earlier;
3  correct?
4      MR. GLENNON: Objection. Vague and ambiguous.
5  No foundation.
6      THE WITNESS: Correct.
7  BY MR. GREENSTEIN:
8      Q.  You see at the bottom of 001879 it says
9  "January 1st, '01, it makes the change from --"
10     Well, why don't you just read that in to the
11 record, please.
12     A.  "January 1st, '01 it makes the change from on
13 account in -- 25005 -- or account 2005 to on account --
14 now goes to 12601."
15     Q.  Okay. Was that also something that was
16 written on a board during these meetings?
17     A.  Correct.
18     Q.  And so what did it -- what do you remember
19 about -- or what do you understand that to mean, "the
20 change from account 2505 now goes to 12601"?
21     MR. GLENNON: Objection. Lack of foundation.
22     THE WITNESS: Basically just what it says, is
23 that it -- they -- in January 1, '01 they made the
24 change from everything that was in 25005 to on account
25 now goes to 12601.

302

1  BY MR. GREENSTEIN:
2      Q.  Okay. Did you understand what this meant at
3  the time or was this something you just -- you put down
4  because it was written on the board?
5      A.  I pretty much just put it down because it was
6  written on the board.
7      Q.  Okay. So you didn't really understand what
8  that meant; right?
9      A.  Not really.
10     Q.  Okay. See where it says "Then receipt
11 write-off is to take care of small stuff goes to 12601"?
12     Do you see that?
13     A.  I do.
14     Q.  What does that mean?
15     A.  It says "Then receipt write-off is to take
16 care of small stuff," meaning low dollar amounts. And
17 they were moved to 12601.
18     Q.  Okay. And do you remember in day one where
19 you were testifying about certain auto adjustment
20 procedures by which small items of unapplied cash were
21 kind of swept in to another account?
22     MR. GLENNON: Objection. Mischaracterizes the
23 testimony.
24     THE WITNESS: I do.
25 BY MR. GREENSTEIN:

303

1      Q.  Okay. And is this -- is that here, this
2  portion of the notes, referring to -- when it says "the
3  small stuff," referring to small items of unapplied cash
4  that had been swept in to account 12601?
5      MR. GLENNON: Objection. Lack of foundation.
6      THE WITNESS: I don't know if these -- if
7  they're the same thing.
8      So -- but this is basically just stating that
9  small dollar items are moved in to the 12601.
10     MR. GREENSTEIN: Okay.
11     THE WITNESS: I have a feeling that it -- is
12 part of that -- those small dollars that are swept, but
13 I'm not sure.
14 BY MR. GREENSTEIN:
15     Q.  But you --
16     MR. SCHRAG: I'll just caution you, don't --
17 don't speculate on things.
18     THE WITNESS: Okay.
19     MR. SCHRAG: If you have a feeling about
20 something, don't say what that is unless you have a
21 basis for it.
22     THE WITNESS: Okay.
23     MR. SCHRAG: If it's just speculation,
24 Mr. Greenstein doesn't want your speculation.
25     THE WITNESS: Okay.

304

1      MR. GREENSTEIN: Right. Thank you.
2  BY MR. GREENSTEIN:
3      Q.   You see where it says "5160101 refunds or
4  OFD"?
5          Do you see that?
6      A.   I do.
7      Q.   What does that mean?
8      A.   So everything that was labelled a refund or
9  OFD was moved to 5160101.
10     Q.   Do you know what that number is?
11         Is that an account number or is that something
12  else?
13         MR. GLENNON: Objection. Compound.
14         THE WITNESS: It's a number, just like 12601
15  or 25005.
16  BY MR. GREENSTEIN:
17     Q.   Okay. If you turn to the last page, 001880,
18  and it says at the top "On account team solving the on
19  account issue by Friday."
20         Well, actually, why don't you just read that
21  top portion, because there's some abbreviations in
22  there. So to the extent you know what that means go
23  ahead and read it.
24     A.   Okay. "Solving the on account issue by
25  Friday. On account team -- seniors," which is senior,

305

1  referring to senior collectors, "to work on major -- to
2  work major overtime until system is down on Friday. In
3  return will get Friday afternoon and Monday off because
4  of their overtime."
5      Q.   Okay. And does -- is it fair to say that this
6  is referring to -- to the tasks that were assigned to
7  the senior collectors to resolve the items of unapplied
8  cash during October 2002?
9          MR. GLENNON: Objection. Leading. Lack of
10  foundation.
11         THE WITNESS: True.
12  BY MR. GREENSTEIN:
13     Q.   Okay. You see it says "on account of Mike's
14  meeting" and then below that it says "56M two years"?
15         Do you see that?
16     A.   I do.
17     Q.   Does that "56M" mean 56 million?
18     A.   It does.
19     Q.   And when it says "two years," what -- what
20  does that mean, "56 million, two years"?
21     A.   It's basically stating that Mike had stated
22  that that -- that the -- what had been put on account
23  was 56 million over a two-year period.
24     Q.   When you say "what was put on account," do you
25  mean the amount that was transferred -- the unapplied

306

1  cash that was transferred to the reserve?
2          MR. GLENNON: Objection. Calls for
3  speculation.
4          THE WITNESS: Correct.
5  BY MR. GREENSTEIN:
6      Q.   Okay. And that was based on Mike's meeting --
7  Mike's meeting -- Mike Quinn?
8      A.   Correct.
9      Q.   And he explained that to you guys during this
10  meeting?
11         MR. GLENNON: Objection. Leading.
12         THE WITNESS: Correct.
13  BY MR. GREENSTEIN:
14     Q.   Did he explain that to you in this meeting?
15     A.   That's what he was stating in that meeting, --
16     Q.   Okay.
17     A.   -- that over a certain period of years that
18  the -- what was in the reserve, put on account, from
19  what I understood was that 56 million --
20     Q.   Okay.
21     A.   -- over those two years.
22     Q.   Okay. And you see where it says "revenue
23  impacting, i.e., refund"?
24         Does that refer to you what you talked about
25  earlier -- where if it -- well, what does that mean?

307

1      A.   It's the same thing that I wrote down in the
2  other -- last page of notes, that -- just to help me
3  understand what items would be revenue impacting and
4  what items would not be revenue impacting, because
5  really, you know, at a bottom line, this is really what
6  they wanted to know -- from Mike's point of view, was he
7  wanted to know after it's all said and done what's going
8  to be revenue impacting and what's not going to be
9  revenue impacting.
10     Q.   Okay.
11     A.   And this was to help me understand if we
12  labelled these items a refund that it would be
13  impacting, and if it was a credit memo rebill or just up
14  it would not.
15     Q.   Okay. And what is -- where it says
16  "nonrevenue impacting, i.e., credit memo rebill, adjust
17  up" -- what does that mean?
18     A.   So if it was not -- if it was a credit memo in
19  error or if something was rebilled because the first --
20  first bill was incorrect, or if we were going to adjust
21  it up, it would not affect Oracle's revenue, but if we
22  were giving the money back that was already in house, it
23  was going to affect our revenue.
24     Q.   Okay. And how many -- do you remember how
25  many of the unapplied cash items that you guys

308

1 researched during October 2002 were refunded to
2 customers?
3      MR. GLENNON: Objection. Calls for
4 speculation. Vague and ambiguous.
5      THE WITNESS: I don't.
6 BY MR. GREENSTEIN:
7      Q. Okay. Do you remember approximately the
8 number?
9      MR. GLENNON: Asked and answered.
10      THE WITNESS: I couldn't tell you.
11 BY MR. GREENSTEIN:
12      Q. Okay. Would it surprise you if documents
13 showed that hundreds of refunds for millions of dollars
14 were made in connection with these unapplied cash items?
15      MR. GLENNON: Objection. Lack of foundation.
16      THE WITNESS: Can you state that one more
17 time.
18 BY MR. GREENSTEIN:
19      Q. Would it surprise you if you learned that of
20 the unapplied cash items that were being researched at
21 this time that millions of dollars of those items were
22 refunded to customers subsequent to October 2002?
23      MR. GLENNON: Objection. Lack of foundation.
24      THE WITNESS: No.
25 BY MR. GREENSTEIN:

309

1      Q. It wouldn't surprise you?
2      A. No, it would not.
3      Q. And -- what does a "credit memo rebill" mean?
4      Is that a certain process at Oracle?
5      A. It's just basically stating that the first
6 bill was credited and we rebilled it the way the client
7 -- or the way it should have been billed in the first
8 place, originally taking the first invoice or the first
9 bill and making it zero and then rebilling them for
10 whether it was a different amount or it had different
11 line items or it -- incorrect information or whatnot.
12      It was correcting the bill.
13      Q. Okay. Would they issue a new invoice as part
14 of the rebill?
15      A. Correct.
16      Q. Okay. You see down towards the bottom of the
17 page it says "Small dollar amount should refund if not
18 too old"?
19      Do you see that?
20      A. Yes. "Small dollar -- should refund if not
21 too old." Yep.
22      Q. Okay. And do you know what that means?
23      A. It's just another direction that, you know, if
24 it's a real small dollar amount, then it -- whatever it
25 was due to, if it wasn't too old, you should look at

310

1 refunding it.
2      Q. Okay. Does that mean that small dollar amount
3 of -- of unapplied cash?
4      A. Correct.
5      Q. Okay. And it says "should refund if not too
6 old."
7      Does that mean that there were items --
8 withdrawn.
9      Were there items of unapplied cash that were
10 not refunded because they were too old?
11      MR. GLENNON: Objection. Calls for
12 speculation. Lack of foundation.
13      THE WITNESS: If they were over a certain
14 amount of days old, it -- it was going to be a lot
15 harder to do the research and find out if it should be
16 refunded in the first place.
17      If it was a newer amount, it would be easier
18 to find out what it came from and why it was an
19 overpayment, or due to a credit memo, or whatnot.
20      But, if it was really old, then we couldn't
21 just take something that was years old and send it back
22 to the client, and -- you know, I'm sure they would
23 wonder why they were getting this check for however
24 much --
25      MR. GREENSTEIN: Okay. So were there -- oh.

311

1 Sorry.
2      THE WITNESS: -- they sent to us three years
3 earlier.
4 BY MR. GREENSTEIN:
5      Q. Right.
6      So I think in day one you testified that there
7 were some items of unapplied cash that could be five to
8 10 years old; is that right?
9      A. Correct.
10      Q. And so is it fair to say that there were items
11 of unapplied cash that were too -- that were too old and
12 they were small enough dollar amounts such that Oracle
13 would not refund them to customers?
14      MR. GLENNON: Objection. Calls for
15 speculation. Lack of foundation.
16      THE WITNESS: Correct.
17      And they needed to be researched further,
18 because, like I said, you can't take something that
19 we've had for four years and try to give it back to the
20 client with not enough reasoning.
21 BY MR. GREENSTEIN:
22      Q. And see where it says "all on account has a
23 debit memo"?
24      Do you see that?
25      A. Correct.

312

```
1    Q.   What does that mean?
2    A.   It means that everything that was placed on
3  account has a debit memo number that, you know, started
4  with the 55, I believe.
5    Q.   550?
6    A.   Yeah.
7    Q.   Okay.
8    A.   Yes.
9    Q.   See at the bottom it says, "Add to reason
10  after further research, put adjustments on separate
11  sheet to send to AR"?
12        Do you see that?
13    A.   I do.
14    Q.   What does that mean, "put adjustments on
15  separate sheet to send to AR"?
16    A.   So instead of sending the entire spread sheet
17  to them, if we were going to make adjustments or adjust
18  up, they needed to be on a separate spread sheet the way
19  AR wanted it to be, so it would be easy for them to read
20  and everybody would be on the same page instead of
21  sending the entire spread sheet.
22        It would be a little bit more confusing if we
23  did that.
24    MR. GREENSTEIN:  Okay.  Why don't we take --
25  we've been going about an hour and some odd minutes, so
```

313

```
1  why don't we take a quick break?
2    MR. SCHRAG:  You through with this document?
3    MR. GREENSTEIN:  Yeah.
4    VIDEOGRAPHER:  Going off the record, the time
5  is 11:01 a.m.
6    (Thereupon a recess was taken at 11:01 a.m.
7    and the deposition resumed at 11:21 a.m.)
8    VIDEOGRAPHER:  Back on the record.  The time
9  is 11:21 a.m.
10    MR. GREENSTEIN:  Mr. Hatada, I'm going to mark
11  this next as Hatada Number -- Exhibit Number 9.
12    THE REPORTER:  8.
13    MR. GREENSTEIN:  8.  I always get that wrong.
14    (Exhibit No. 8 was marked for Identification.)
15  BY MR. GREENSTEIN:
16    Q.   You don't have to read every line.  You can
17  just kind of flip through it and see if you recognize
18  it.
19        So, for the record, it's NDCA-ORCL
20  649588-650203.
21        And, actually, I'll direct your attention,
22  Mr. Hatada, to 649694.  Your name is on that page.
23        And, for the record, this -- these are
24  excepts.
25        The first page is the actual first page of the
```

314

```
1  document, how it was produced.  This was a large
2  document, I think 700-and-something pages.
3        So what we did is we just took excepts of it
4  so that we could -- because there's some -- Mr. Hatada's
5  name appears on these documents, so -- but we didn't --
6  this isn't the whole document.
7        So, Mr. Hatada, do you recognize this
8  document?
9    A.   Yes.  This is just another report from --
10  looks like it's from the system.
11    Q.   Okay.  When you say "the system," what do you
12  mean by that?
13    A.   Meaning that it wasn't one of the -- doesn't
14  look like one of the spread sheets that was actually put
15  together manually.
16        It looks like a report that was ran through
17  the system.
18    Q.   Okay.  And can you clarify for me what --
19  withdrawn.
20        As part of the 2002 unapplied cash clean-up,
21  were there reports that were created manually in
22  connection with the project?
23    MR. GLENNON:  Objection.  Vague.
24    THE WITNESS:  Correct.
25        We -- we had to in order to get the right
```

315

```
1  reason codes and the -- you know, how we labeled the
2  different items and -- different fields --
3    MR. GREENSTEIN:  Okay.
4    THE WITNESS:  -- in order to understand it.
5    MR. GREENSTEIN:  Sorry.
6  BY MR. GREENSTEIN:
7    Q.   So to clarify, there was some reports that
8  were electronic and there was some that were manual?
9        Is that fair to say?
10    A.   Some of the reports that you have given me
11  have been reports that we put together manually through
12  a spread sheet, and others that I've looked at have been
13  ones that are reports are ran through the Oracle system.
14    Q.   Okay.  And is this document, Exhibit 8 -- this
15  was a report kept electronically at Oracle on or around
16  October 2002?
17    MR. GLENNON:  Objection.  Lack of foundation.
18  Calls for speculation.
19  BY MR. GREENSTEIN:
20    Q.   Right?
21    A.   This report looks like it's something that
22  came out of the system.
23    Q.   Okay.  You see at the top it says "comments
24  and notes, call notes"?
25        Do you see that?
```

316

1   A.   Correct.
2   Q.   One hundred -- and it says "150.xls."
3        Do you see that?
4   A.   Correct.
5   Q.   What does that mean to you?
6        MR. GLENNON: Objection. Calls for
7   speculation. No foundation.
8        Document speaks for itself.
9        THE WITNESS: When I look at this, it just
10  looks like a report that was ran that's the comments and
11  notes report, and it involves the call notes -- per
12  item.
13       So it looks to me like a comments and notes,
14  slash, call notes report that was ran through the
15  system.
16  BY MR. GREENSTEIN:
17  Q.   Okay. And do you remember when this report
18  was created?
19       MR. GLENNON: Lack of foundation. Calls for
20  speculation.
21       THE WITNESS: This specific one when it was
22  ran, or --
23       MR. GREENSTEIN: Yeah.
24       THE WITNESS: I couldn't tell you --
25       MR. GREENSTEIN: Okay.

317

1        THE WITNESS: -- except for that there's --
2   no, because it doesn't -- it doesn't state on here
3   what --
4   BY MR. GREENSTEIN:
5   Q.   Okay. And what is a "call note"?
6   A.   A "call note" is basically where the item is
7   at that current time in regards to the collector or the
8   last person that did research on it.
9        It could also be -- items that were -- when
10  they first get put in to the system, there's notes
11  that's placed in to the item by the individual that
12  placed them in to the system, and it could -- usually
13  is, you know, accounts receivable, and then they can be
14  updated whenever they change.
15       If it's in a -- if the item is in a certain
16  situation in one month and then two months later it
17  changes, whoever, you know, changes it, puts their notes
18  in there.
19  Q.   Okay. And -- does this document reflect the
20  call notes for certain items of unapplied cash that
21  collections was researching at some point in time?
22       MR. GLENNON: Objection. Lack of foundation.
23  Calls for speculation.
24       Document speaks for itself.
25       THE WITNESS: I couldn't tell you.

318

1   BY MR. GREENSTEIN:
2   Q.   Okay. See on page -- let's see -- 649694?
3   A.   Okay.
4   Q.   And if you just hold on to the first page,
5   because that has the column headings, --
6   A.   Uh-huh.
7   Q.   -- so you could see what column refers to.
8        So on 649694 you see how under the column
9   heading "collector name" it has "I. Hatada" there?
10  A.   Correct.
11  Q.   Okay. And, if you flip back to the first
12  page, you see in the first column it says "original
13  debit memo number"?
14  A.   Correct.
15  Q.   Okay. And if you flip to 649694, it appears
16  that you entered -- or does it appear that you entered
17  notes in connection with researching certain debit memo
18  items?
19       MR. GLENNON: Objection. Calls for
20  speculation. Lack of foundation.
21       Document speaks for itself.
22       Witness does not recall this document.
23       THE WITNESS: It could be anyone that put
24  those notes in there.
25       When you run a report for debit memos like

319

1   this one, it doesn't specifically -- it doesn't state
2   that the person that -- that's under "collector name"
3   actually put those notes in there.
4        It just says that they're -- the party name is
5   their part -- is the collector name's party that they're
6   responsible for.
7        So those -- that -- if you look on 649694,
8   Defense Information Systems Agency, it --"
9        MR. GREENSTEIN: Uh-huh.
10       THE WITNESS: -- is within I. Hatada's
11  territory, and then it looks like there's notes on
12  column J.
13  BY MR. GREENSTEIN:
14  Q.   Actually, if you look on 69 -- 649696, these
15  spread sheets were many columns wide, and so, you know,
16  when you print them there are multiple pages.
17       So if you look at -- for example, if you look
18  back at 649694, item 718 -- do you see that?
19  A.   I do.
20  Q.   Okay. And then if you flip two pages, item
21  718 is still there, and then it has what appear to be
22  notes.
23       Is that fair to say there?
24       MR. GLENNON: Objection. Lack of foundation.
25  Document speaks for itself.

320

1       THE WITNESS: Okay. Yeah.
2       So J is such a long report that I'm trying to
3   figure out what -- J might be like the remittance
4   information or the contact information, and then U is
5   the actual notes as to the update.
6   BY MR. GREENSTEIN:
7       Q.   Okay. If you look in the first page of this
8   document, the last column, J, you see how it just has
9   "address"?
10      A.   Correct.
11      Q.   So that appears to be the addresses for each
12  of these items; correct?
13      MR. GLENNON: Objection. Lack of foundation.
14      The witness is not testifying from personal
15  knowledge.
16      The document speaks for itself.
17  BY MR. GREENSTEIN:
18      Q.   See that?
19      A.   Correct.
20      Q.   So those are addresses for these items; right?
21      MR. GLENNON: Objection. Lack of foundation.
22  Calls for speculation.
23      THE WITNESS: Correct.
24  BY MR. GREENSTEIN:
25      Q.   Okay. So if you flip to 649647, and let's

321

1   take item 729, column J appears to be the address for
2   Defense Information Systems.
3       Is that fair to say?
4       MR. GLENNON: Objection.
5       THE WITNESS: I'm sorry. Which report are you
6   on?
7       MR. GREENSTEIN: 649697.
8       MR. SCHRAG: Item 729?
9       MR. GLENNON: I'm going to insert an
10  objection. Lack of foundation. The document speaks for
11  itself and calls for speculation.
12      THE WITNESS: Can you repeat that.
13  BY MR. GREENSTEIN:
14      Q.   Okay. So on 649697, if you look at item 729
15  at the top, see how there's a debit memo number
16  "55045134"?
17      Do you see that?
18      A.   I do.
19      Q.   And you see how in column J it has an address
20  there?
21      MR. GLENNON: Objection. Document speaks for
22  itself.
23      THE WITNESS: I do.
24  BY MR. GREENSTEIN:
25      Q.   Okay. And based on what you saw on the first

322

1   page of this document does that appear to be the address
2   for this customer that's related to the item 729?
3       MR. GLENNON: Objection. Calls for
4   speculation. Lack of foundation.
5       THE WITNESS: Correct. There's just an area
6   and attention to above it versus if you look at the
7   first page it just has the address.
8       So, yeah, it's the same column.
9       MR. GREENSTEIN: Right.
10  BY MR. GREENSTEIN:
11      Q.   So if you flip two pages, so it would be
12  649699, and you look at item 729 again, and you see how
13  it's got in column U -- there it has some sort of note?
14      Do you see that?
15      MR. GLENNON: Objection. Document speaks for
16  itself.
17      THE WITNESS: I do.
18  BY MR. GREENSTEIN:
19      Q.   Is that a call note for that item 729?
20      MR. GLENNON: Objection. Calls for
21  speculation. Lack of foundation.
22      THE WITNESS: It is. Everything in the column
23  U is the call notes, which this report is a call note
24  report.
25  BY MR. GREENSTEIN:

323

1       Q.   Okay. So -- and those are the call notes
2   associated with each item on this report; right?
3       MR. GLENNON: Objection. Calls for
4   speculation. Lack of foundation.
5       THE WITNESS: True.
6   BY MR. GREENSTEIN:
7       Q.   Okay. So if you flip back to 649697 and you
8   look at the column that has -- the collector name,
9   column F, and it says "I. Hatada" -- do you see that?
10      A.   Yep. Yes.
11      Q.   Okay. I think just now you testified that
12  that doesn't necessarily mean that you entered the
13  notes; correct?
14      A.   Yeah.
15      And that was basically -- because J is a --
16  sometimes notes will be put in when the item is new, and
17  it will be put in by accounts receivable, and sometimes
18  -- I was referring to if J was the address in the notes
19  column, but then I saw U.
20      So -- yeah, there's that -- times that my --
21  because this is referring to my territory of I. Hatada,
22  I could have put those notes in there, and then I
23  couldn't have.
24      There's a chance that maybe I didn't put those
25  notes in there.

324

1    Q.   Okay.  So it could be that you put the notes
2  in, or it could be that a collector underneath you, one
3  of your direct reports, typed the notes, and because it
4  was in your territory your name is on there.
5        Is that fair to say?
6        MR. GLENNON:  Objection.  Incomplete
7  hypothetical.  Mischaracterizes the testimony.
8        THE WITNESS:  Correct, that's what I'm saying.
9  BY MR. GREENSTEIN:
10   Q.   Okay.  So -- so if a collector entered a note
11  on a particular item of unapplied cash, your name could
12  appear in this, column on this report; right?
13       MR. GLENNON:  Objection.  Lack of foundation.
14  Calls for speculation.
15       THE WITNESS:  Correct.
16  BY MR. GREENSTEIN:
17   Q.   Okay.  So you see how there are a number of
18  items, 729 through 738, that have your name associated
19  with it?
20        See that?
21   A.   I do.
22   Q.   Okay.  And if you turn back to the first page,
23  and you see the first column says "original debit memo
24  number," column A?
25   A.   I do.

325

1    Q.   Okay.  And then if you flip through, or if you
2  just look on that first page, you see how they're all
3  550 invoices -- numbers?
4   A.   Correct.
5   Q.   Okay.  And do you understand those to be debit
6  memo invoice numbers?
7        MR. GLENNON:  Objection.  Calls for
8  speculation.  Lack of foundation.
9        THE WITNESS:  I do.
10  BY MR. GREENSTEIN:
11   Q.   Okay.  So it appears based on this document
12  that -- collections was researching debit memos at the
13  time this document was created?
14        Is that fair to say?
15       MR. GLENNON:  Objection.  Lack of foundation.
16  Calls for speculation.
17       THE WITNESS:  Yes.
18  BY MR. GREENSTEIN:
19   Q.   Okay.  And I think you earlier testified that
20  you didn't know what a debit memo was until the October
21  2002 meetings; is that correct?
22   A.   Correct.
23   Q.   Okay.  So this document reflects research that
24  was done on debit memos after you learned what a "debit
25  memo" was.

326

1        Is that fair to say?
2        MR. GLENNON:  Objection.  Calls for
3  speculation.  Lack of foundation.
4        THE WITNESS:  Correct.
5  BY MR. GREENSTEIN:
6    Q.   Okay.  And why -- do you know why collections
7  was researching all these debit memos?
8        MR. GLENNON:  Objection.  Calls for
9  speculation.  Lack of foundation.
10       THE WITNESS:  Well, there's notes by them, so,
11  I mean, they're trying to figure out basically why
12  they're in the position that they are due to the
13  research that we were doing.
14  BY MR. GREENSTEIN:
15   Q.   Okay.  When you say "why the position -- they
16  were in the position that they are," do you mean why
17  there's an item of unapplied cash associated with these
18  debit memos?
19       MR. GLENNON:  Objection.  Calls for
20  speculation.  Leading.
21       THE WITNESS:  Correct.
22  BY MR. GREENSTEIN:
23   Q.   Okay.  Because these are -- so this report
24  reflects items of unapplied cash associated with debit
25  memos that collections needs to research; correct?

327

1        MR. GLENNON:  Objection.  Lack of foundation.
2        THE WITNESS:  It's more the other way around.
3  It's referring to debit memos that are associated to
4  unapplied cash, instead of unapplied cash referring.
5        Does that make sense?
6  BY MR. GREENSTEIN?
7    Q.   Okay.  Sorry.
8        Do you mean that these debit memo numbers that
9  are being researched in this report are -- relate to
10  items of unapplied cash that need to be resolved?
11       MR. GLENNON:  Objection.  Mischaracterizes the
12  testimony.  Lack of foundation.
13       THE WITNESS:  Correct.
14  BY MR. GREENSTEIN:
15   Q.   Okay.  So why don't you look at page --
16  649694.
17        And keep the first page handy just so you can
18  refer to the column headings.
19        So 649694, item 718, do you see that?
20   A.   I do.
21   Q.   And just based -- on what you see there -- and
22  see it's debit memo 55045134?
23        Do you see that?
24   A.   I do.
25   Q.   So what does this -- these entries reflect

328

1  with respect to that debit memo?
2      MR. GLENNON:  Objection.  Vague and ambiguous.
3      MR. SCHRAG:  You want to go through each
4  column?
5      Sorry.
6      MR. GLENNON:  That's all right.
7      Objection.  Vague and ambiguous.  Calls for
8  speculation.  Lack of foundation.
9  BY MR. GREENSTEIN:
10     Q.  Yeah.
11     I just want to know, you know, what this item
12  718, the information that's presented here, if you could
13  just articulate what it -- what it means with respect to
14  that item.
15     MR. SCHRAG:  Column-by-column?
16     MR. GREENSTEIN:  Yeah.
17     MR. SCHRAG:  Go ahead.
18     MR. GLENNON:  Same objections.
19     THE WITNESS:  So 718, it has a debit memo
20  number with a call I.D.  It gives you the E-mail address
21  of the creator -- or basically the person that the
22  territory is under.
23     It has time, status, again, the territory that
24  the -- the -- that the item is under.
25     I'm not sure what that number is before the

329

1  party name, but it has the party name in column H, the
2  account number, address, and then I don't know where it
3  leaves off.
4      I don't know where it goes from there.
5  BY MR. GREENSTEIN:
6      Q.  Okay.  If you look at 649696, and item 718,
7  and then column S says "Invoice not received."
8      See that?
9      MR. GLENNON:  Objection.  Document speaks for
10  itself.
11     MR. SCHRAG:  Are you saying you don't know
12  what column K is?
13     THE WITNESS:  I don't see a column K.
14  BY MR. GREENSTEIN:
15     Q.  I'm sorry.  Okay.
16     Why don't you turn to 649694 again.
17     A.  Okay.  718?
18     Q.  Right, item 718.
19     And, if you flip the page to the next page,
20  there's a column K; okay?
21     A.  Okay.
22     Q.  Do you know what that refers to, that column?
23     If you don't, that's fine.
24     A.  I'm trying to figure out.  It looks like
25  just --

330

1      MR. GLENNON:  I'm just going to object that
2  the witnesses is not testifying on the basis of personal
3  knowledge.
4      MR. SCHRAG:  Don't speculate here.  If you
5  don't know, just say "I don't know."
6      THE WITNESS:  I don't know, because it does
7  not have a column heading on it.  I don't know.
8      MR. GREENSTEIN:  Okay.
9      THE WITNESS:  I don't know what K is.
10  BY MR. GREENSTEIN:
11     Q.  Then if you look at 649696, look at S, column
12  S, column S.
13     Column S -- do you know what column S is?
14     MR. GLENNON:  Objection.  Calls for
15  speculation.  Lack of foundation.
16     THE WITNESS:  It's basically a reason code of
17  the status, invoice not received, cannot contact,
18  customer researching, basically where it is at the time,
19  not a detailed explanation of it, but a short -- like
20  reason code of where it is.
21  BY MR. GREENSTEIN:
22     Q.  And do you -- do you mean reason code for why
23  the item was -- had become an item of unapplied cash?
24     MR. GLENNON:  Objection.  Mischaracterizes the
25  testimony, leading, and lack of foundation.

331

1      THE WITNESS:  No, I don't.
2  BY MR. GREENSTEIN:
3      Q.  Okay.  What do you mean, the reason code for
4  what?
5      A.  A reason code as far as -- the reason that it
6  -- it's a debit memo, a short reason, and, you know,
7  this first 718 says "invoice not received."
8      719 says "cannot contact, customer
9  researching."
10     So, if you look at them, they're all -- they
11  all have some short reason code next to them, whether
12  it's a pricing dispute, --
13     Q.  Okay.  So does this document as a whole
14  refresh your recollection that at some point in time
15  collections was asked to research items of unapplied
16  cash related to debit memos?
17     MR. GLENNON:  Objection.  Lack of foundation.
18  Calls for speculation.
19     THE WITNESS:  Correct.
20  BY MR. GREENSTEIN:
21     Q.  Okay.  And you learned -- is it true that you
22  learned what a "debit memo" was for the first time in
23  October 2002?
24     MR. GLENNON:  Objection.  Mischaracterizes the
25  testimony.  Asked and answered.

332

1      THE WITNESS: It was the first time I've heard
2  of it, yes.
3  BY MR. GREENSTEIN:
4      Q.  Okay.  So is it fair to say that this research
5  on these debit items occurred after you learned what a
6  "debit memo" was?
7      MR. GLENNON: Objection.  Calls for
8  speculation.  Lack of foundation.
9      There's a date on the document.
10     MR. GREENSTEIN: Oh.  Is there?
11     What is it, Brian?
12     MR. GLENNON: Column D.
13     MR. GREENSTEIN: Well, that's not the date of
14 the document, that the document was created.
15     MR. GLENNON: Well, when was the document
16 created?
17     MR. GREENSTEIN: Anyway --
18     MR. GLENNON: When was the document created?
19     You're putting in front of the witness a
20 document that he's never seen before and asking
21 questions about dates, making him speculate.
22     MR. GREENSTEIN: Okay.  Is that an objection?
23     MR. GLENNON: Yes.
24     MR. GREENSTEIN: Okay.  What's the objection?
25     MR. GLENNON: No personal knowledge, lack of

333

1  foundation, and mischaracterizing the document.
2  BY MR. GREENSTEIN:
3      Q.  Okay.  So, Mr. Hatada, looking at this --
4  looking at this document as a whole, is it fair to say
5  that this -- that there was research done on these debit
6  memo items by collections after you learned of what
7  "debit memos" were in October 2002?
8      MR. GLENNON: Objection.  Lack of foundation.
9  No personal knowledge.  Document speaks for itself.
10     THE WITNESS: Yes.
11     MR. GREENSTEIN: Okay.  You can put it aside.
12     Let's mark this as Exhibit Number 9, please.
13     (Exhibit No. 9 was marked for Identification.)
14 BY MR. GREENSTEIN:
15     Q.  And, again, you can just briefly thumb through
16 it.
17     For the record, it's NDCA-ORCL 140534 --
18 through 140560.
19     Mr. Hatada, do you recognize this document?
20     A.  It's -- looks like it's just another report,
21 and it looks like it's one that's ran out of the system
22 for the offset, miscellaneous offset.
23     Q.  Okay.  Do you know what a "miscellaneous
24 offset report" is?
25     A.  I couldn't give you a detailed explanation of

334

1  it, no.
2      Q.  Okay.  And you see in the top lefthand corner
3  it says "November 14th, 2002"?
4      A.  I do.
5      Q.  Do you know whether -- was collections still
6  researching items of unapplied cash in November of 2002?
7      A.  Yes.
8      Q.  Okay.
9      A.  Collections was always researching unapplied
10 cash.
11     Q.  All right.  So do you recall using that
12 collections used miscellaneous offset reports in
13 connection with a research in to items of unapplied
14 cash?
15     MR. GLENNON: Objection.  Calls for
16 speculation.  No foundation.
17     THE WITNESS: Yes.
18 BY MR. GREENSTEIN:
19     Q.  Okay.  And how would collectors use
20 miscellaneous offset reports in researching items of
21 unapplied cash?
22     A.  This is basically just showing the account, of
23 where it is, the receipt number.
24     It's just another report that's going to give
25 you information, original amount, the -- the -- you

335

1  know, who paid it, or where it's -- where it's paid
2  from, and then a note next to, you know, where it's
3  being moved or who approved it.
4      So it's just giving more detailed information
5  as to when -- and -- and sometimes why these items were
6  moved.
7      Q.  When you say "moved," what do you mean, moved
8  to where?
9      MR. GLENNON: Objection.  Document speaks for
10 itself.  Lack of foundation.
11     THE WITNESS: You have an account number on
12 the left, next to "receipt number," and you have an
13 amount of the receipt the customer -- or the customer
14 and then amount of the receipt, and then a note.
15     Like, for example, this first one, it states
16 the wire on 1-12-99 for 602K is being moved for M. Hahn
17 to 12-13.
18 BY MR. GREENSTEIN:
19     Q.  Okay.  And is it being -- does that -- does
20 that mean, if you look at the second column, it says
21 "account 12601."
22     Do you see that?
23     A.  I do.
24     Q.  Does that mean these items are being moved
25 from account 12601 to other accounts?

336

1      MR. GLENNON: Objection. Documents speaks for
2  itself.
3      Calls for speculation. No foundation.
4      THE WITNESS: From what it's stating, it's --
5  if you look at the last item on here, from North --
6  Northrop Corporation, it's got the 38K and the comments
7  on it says "moved to 1213."
8  BY MR. GREENSTEIN:
9   Q.   Okay. So have you seen this type of report
10  before, miscellaneous offset report?
11      MR. GLENNON: Objection. Vague and ambiguous.
12      THE WITNESS: I have.
13  BY MR. GREENSTEIN:
14   Q.   Okay. So based on what you know about these
15  types of reports, if you look at -- let's take the last
16  entry on this page for Northrop Corporation.
17      If you could just take me through what this
18  means on this report, what each entry means.
19      MR. GLENNON: Objection. Lack of foundation.
20  Document speaks for itself.
21      Calls for speculation.
22      THE WITNESS: Most of these are
23  self-explanatory.
24      They give you a receipt number, the account in
25  which it's in, the customer, the amount, and the comment

337

1  as far as what is to be done with it.
2  BY MR. GREENSTEIN:
3   Q.   Okay. Are these items reflected on this
4  report items of unapplied cash?
5      MR. GLENNON: Objection. Calls for
6  speculation. No foundation.
7      THE WITNESS: I believe so.
8  BY MR. GREENSTEIN:
9   Q.   So are -- does this document, this report,
10  reflect items of unapplied cash that were moved in
11  around November 14th, '02 from 1260 -- account 12601 to
12  another account?
13      MR. GLENNON: Objection. Calls for
14  speculation.
15      No foundation. Document speaks for itself.
16      THE WITNESS: That's what it's stating in some
17  of these items.
18  BY MR. GREENSTEIN:
19   Q.   Okay. Do you recall that collectors on -- in
20  October 2002 or November 2002 that there were items of
21  unapplied cash moved from account 12601 to other
22  accounts?
23      MR. GLENNON: Objection. Calls for
24  speculation.
25      THE WITNESS: I'm -- I'm -- I couldn't tell

338

1  you if it was done like that.
2      I know that in certain situations if you put
3  something on account, or if you moved it, or if -- you
4  know, you -- it went to the reserve, it was moved to a
5  certain account, but the collectors wouldn't know that
6  it was moved.
7      They just would -- if -- if it was -- if it
8  was moved, the reserve, or if it was put on account,
9  that doesn't mean that they knew that it was moving from
10  12601 to 1213.
11      This is not a report that necessarily a
12  collection -- a collector would be looking at.
13  BY MR. GREENSTEIN:
14   Q.   Okay. Who would look at this report?
15      MR. GLENNON: Objection. Calls for
16  speculation.
17      THE WITNESS: This is more of a report that
18  account receivable management would look at.
19  BY MR. GREENSTEIN:
20   Q.   Okay. And who at the time, November 2002, who
21  -- who was managing accounts receivable, if you
22  remember?
23   A.   I believe it was --
24      MR. GLENNON: Objection. Mischaracterizes the
25  document. Calls for speculation.

339

1      I'm sorry. Go ahead.
2      THE WITNESS: I believe it was Greg Myers.
3  BY MR. GREENSTEIN:
4   Q.   Okay. So do you know if -- would Greg Myers
5  use this report as part of this unapplied cash project
6  in October or November 2002?
7      MR. GLENNON: Objection. Calls for
8  speculation.
9      THE WITNESS: I'm not quite sure if he would.
10  I could only say that it would help.
11  BY MR. GREENSTEIN:
12   Q.   It would help what?
13   A.   It would help to know which -- items were
14  moved from one account to another account.
15   Q.   Okay. So is it fair to say that this document
16  reflects items of unapplied cash that were moved from
17  12601 to other accounts during this unapplied cash
18  clean-up in late 2002?
19      MR. GLENNON: Objection. Lack of foundation.
20  Calls for speculation.
21      THE WITNESS: Not necessarily, just because
22  this -- it tells you what the account is, and it just
23  tells you the comments, and if it just says "moved to
24  1213," it doesn't necessarily mean it was moved to 1213.
25      I couldn't tell you.

340

1    BY MR. GREENSTEIN:
2        Q.   Okay.  Can you tell me if this miscellaneous
3    offset report was one of the reports used as part of the
4    unapplied cash clean-up in late 2002?
5        MR. GLENNON:  Objection.  Asked and answered.
6    Calls for speculation.
7        THE WITNESS:  I personally did not use it, but
8    I believe that Ryan Roberts used it as well as Greg
9    Myers and Michael Quinn.
10       MR. GREENSTEIN:  Okay.  This is a document,
11   Mr. Hatada, I'm going to place before you, has already
12   been previously marked Matuszak Number 4.
13       For the record it's NDCA -- and go ahead
14   and --
15       MR. SCHRAG:  Is there another one?
16       MR. GREENSTEIN:  -- read the whole thing.
17       MR. GLENNON:  I'm just going to object to you
18   showing him an SLC interview memoranda.
19       I mean, I've sat here and let you show him
20   documents that he's never seen before and he had no part
21   in preparing, but having him read a memo produced from
22   somebody else and then testify based on that is not only
23   putting him in the untenable position of testifying
24   under oath as to facts he doesn't know about, it -- it
25   lacks foundation, and there's -- I -- I think there's a

341

1    whole array of problems with doing what you're about to
2    do here.
3        I just counsel you against doing it.
4        MR. GREENSTEIN:  Okay.  Well, we disagree.
5        As you know, this interview memorandum was
6    marked in to evidence in at least three, four, possibly
7    five depositions.
8        I don't think an objection was made in those
9    depositions.
10       Several witnesses have already testified about
11   it, including Tom Williams and other witnesses.
12       MR. GLENNON:  Well, it's his memo.
13       MR. GREENSTEIN:  Hold on.  Hold on.  Hold on.
14       Aside from Tom Williams at least three
15   witnesses have testified about this document.
16       MR. GLENNON:  Who?
17       MR. GREENSTEIN:  And -- well --
18       MR. SCHRAG:  Can I have a copy of it, please.
19       MR. GREENSTEIN:  Terry Elam.  Terry Elam.
20   Oh, yeah.
21       MR. SCHRAG:  I need mine.  Can you guys share.
22       MR. GREENSTEIN:  Terry Elam is one I can think
23   of off the top of my head.
24       Dave Matuszak, obviously, because it was
25   stamped Matuszak, was third a party, Arthur Anderson.

342

1    And so that's two for you.
2        I can get you -- after the depo I can get you
3    a complete list.
4        But for the record that objection was never
5    made at any time when these memos were entered in to
6    evidence at the other depos, so I'm going to put it in
7    evidence here.
8        MR. GLENNON:  Well, you're marking it.  You're
9    not putting anything in to evidence.  We're not in
10   trial.
11       MR. GREENSTEIN:  Right.
12       MR. KONOVALOV:  For the record, objections
13   were made at the deposition.  So it's a
14   mischaracterization of the evidence.
15       MR. GREENSTEIN:  Okay.
16       MR. SCHRAG:  Counsel, do you want him to read
17   the whole thing?
18       MR. GREENSTEIN:  Yes, please.
19       Actually, I think we have to change the tape
20   soon.  So --
21       MR. SCHRAG:  It's going to take about 10
22   minutes to read.
23       MR. GREENSTEIN:  -- let's go off the record.
24       MR. GLENNON:  Wait.  No.  No.  No.  No.
25       If you want him to read this, this is on your

343

1    time.
2        MR. GREENSTEIN:  Let's go off the record.
3    This is my deposition.  Let's go off the record.
4        MR. GLENNON:  No.  You can't go off the record
5    unless I agree.
6        MR. GREENSTEIN:  We have to change the tape.
7        MR. GLENNON:  We have to agree.  We have got
8    to agree.
9        You want him to read this, this is on your
10   clock, because already you're backing us up in to a
11   hole.  You want to take your time out of your seven
12   hours and make him read it --
13       MR. GREENSTEIN:  We have to change the tape.
14   If the witness --
15       MR. GLENNON:  That doesn't mean we have to go
16   off the record.  We can keep the clock running; right?
17       MR. GREENSTEIN:  While we change the tape?
18       MR. GLENNON:  Sure.
19       MR. GREENSTEIN:  Okay.  You're saying on the
20   record that we can't go off the record to change the
21   tape?
22       VIDEOGRAPHER:  You know what?  I can change
23   the tape in a minute-and-a-half.  So --
24       MR. GLENNON:  Okay.
25       VIDEOGRAPHER:  -- we'll just --

344

1      MR. GLENNON: I'd like -- I'd like, if you
2  want him to read this, to be on your time.
3      MR. GREENSTEIN: Okay. That's fine. We have
4  to change the tape; don't we?
5      MR. GLENNON: How much time do we have before
6  we change the tape?
7      MR. GREENSTEIN: No. Let's go off the record
8  and change the tape.
9      MR. GLENNON: I haven't agreed yet.
10     How much time do we have before we change the
11 tape?
12     MR. GREENSTEIN: All right. Well, this is
13 eating in to your time, Brian.
14     MR. GLENNON: No, it's not.
15     VIDEOGRAPHER: Eight minutes.
16     MR. GLENNON: Eight minutes?
17     MR. GREENSTEIN: Let's change the tape.
18     MR. GLENNON: Okay. We can change the tape.
19     VIDEOGRAPHER: Okay. Off the record, the time
20 is 11:55 a.m.
21     Here marks the end of videotape number one,
22 volume two, in the deposition of Ian Hatada.
23     (Discussion off the record)
24     VIDEOGRAPHER: Back on the record, the time is
25 12:04 p.m.

345

1      Here marks the beginning of videotape number
2  two, volume two, in the deposition of Ian Hatada.
3  BY MR. GREENSTEIN:
4      Q.  All right. Mr. Hatada, so what's been placed
5  before you has been previously marked Matuszak -- as
6  Matuszak Number 4, says "Interview Memorandum of Thomas
7  Williams" dated 11--- November 12th, 2002.
8      Have you had a chance to read the entire
9  document?
10     A.  I did.
11     Q.  Okay. Were you aware on or around November
12 12th, 2002 that Tom Williams was being interviewed in
13 connection with items of unapplied cash?
14     A.  No.
15     Q.  Okay. Were you aware around this time or the
16 time of the clean-up that any Oracle employees were
17 being interviewed by a special litigation committee who
18 was investigating certain claims made in derivative
19 lawsuits?
20     A.  No. All I know during that time was there was
21 always a group of people that were going through our --
22 our recordings, and records, and finances, and different
23 things for whatever reason, just to -- that were --
24 basically researching it, but I -- I didn't know exactly
25 what it was for.

346

1      Q.  Okay. So you weren't aware that --
2      A.  I wasn't aware of anybody being interviewed
3  and --
4      Q.  Okay.
5      A.  -- like this.
6      Q.  And you see on the second page of this
7  document, 313778, there's a sentence that starts with
8  "He stated that in October 2002"?
9      Do you see that?
10     It's about five lines up.
11     MR. GLENNON: Objection. Lack of foundation.
12 Document speaks for itself.
13     THE WITNESS: Yes.
14 BY MR. GREENSTEIN:
15     Q.  See how it says, "He stated that in October
16 2002 in the process of investigating the debit memo
17 allegations, which Williams characterized as false and
18 baseless, he had learned from Mike Quinn and Greg Myers,
19 who were responsible for conducting the investigation,
20 that certain persons in Oracle's collections department
21 had apparently on an ad hoc basis over time moved
22 certain items from Oracle's unapplied cash account to
23 its bad debt reserve account"?
24     Do you see that?
25     A.  I do.

347

1      MR. GLENNON: Objection. Lack of foundation.
2  Document speaks for itself.
3  BY MR. GREENSTEIN:
4      Q.  You see how it says, "He further stated to the
5  company he's in the process -- the process of
6  investigating this past practice"?
7      MR. GLENNON: Same objections.
8      THE WITNESS: Yes.
9  BY MR. GREENSTEIN:
10     Q.  Is that -- is that the statement there --
11 those statements consistent with what you learned in the
12 meetings in October 2002 regarding the movement of
13 unapplied cash to Oracle's bad debt reserve?
14     MR. GLENNON: Objection. Calls for
15 speculation. Lack of foundation.
16     THE WITNESS: Correct.
17 BY MR. GREENSTEIN:
18     Q.  And you see, if you could turn to page 313781,
19 -- and if you look at the second paragraph from the
20 bottom, you see how that paragraph talks about auto
21 adjustments that would take money out of unapplied cash
22 and transfer it to the bad debt reserve?
23     MR. GLENNON: Objection. Lack of foundation.
24 Document speaks for itself.
25     THE WITNESS: Correct.

348

1 BY MR. GREENSTEIN:
2    Q.   Okay.  And I think in day one of your
3 deposition you looked at a document and testified about
4 auto adjustments of unapplied cash that were swept to
5 Oracle's bad debt reserve; is that right?
6        MR. GLENNON:  Objection.  Mischaracterizes the
7 testimony.
8        THE WITNESS:  Correct.
9 BY MR. GREENSTEIN:
10    Q.   And then you see at the last sentence it says,
11 "Williams states -- said that Oracle had run an auto
12 adjustment for receipts only once, in January 2002"?
13        Do you see that?
14        MR. GLENNON:  Objection.  Document speaks for
15 itself.  Lack of foundation.
16        THE WITNESS:  I do.
17 BY MR. GREENSTEIN:
18    Q.   Okay.  Knowing what you know about the auto
19 adjustments from the sweep of unapplied cash to Oracle's
20 bad debt reserve for the small items, are you aware that
21 the auto adjustments were run prior to January 2002?
22        MR. GLENNON:  Objection.  Lack of foundation.
23 Calls for speculation.
24        THE WITNESS:  Yes.
25 BY MR. GREENSTEIN:

349

1    Q.   You're aware of that?
2    A.   Yes.  I don't believe that it was only ran
3 once.
4    Q.   Okay.  So, just to clarify, when -- where it
5 says "Williams said that Oracle had run an auto
6 adjustment for receipts only once, in January 2002," you
7 don't believe that's accurate?
8        MR. GLENNON:  Objection.  Lack of foundation.
9 Calls for speculation.
10        THE WITNESS:  From my understanding this is
11 something that was ran either -- you know, I don't know
12 how often, but I know it wasn't something that was ran
13 once.
14 BY MR. GREENSTEIN:
15    Q.   And is that because it was a procedure that
16 was run -- every so often as part of an auto adjustment
17 process?
18        MR. GLENNON:  Objection.  Vague and ambiguous.
19 Lack of foundation.
20        THE WITNESS:  True.
21 BY MR. GREENSTEIN:
22    Q.   Okay.  You can put that aside.
23        From the time you started at Oracle to the
24 time you sat here today, have you ever been interviewed
25 by the FBI?

350

1    A.   Yes.
2    Q.   Okay.  And when was that?
3    A.   I couldn't tell you any exact date -- sometime
4 in '04.
5    Q.   Okay.  Have you ever been interviewed by the
6 SEC?
7    A.   No.  I don't believe so.
8    Q.   Okay.  Have you ever been interviewed by any
9 other government organization?
10        And what I mean by that is any lawyers that
11 represent the Government of the United States, or
12 California, or any city.
13    A.   From my knowledge the only people that had
14 interviewed me was the FBI.
15    Q.   Okay.  And who was present at that meeting
16 besides you?
17    A.   Just me.
18    Q.   Okay.  And I'm not going to get in to the
19 conversations with the FBI, because I believe an
20 objection was made by Jamie Wine at a previous
21 deposition, I think it was Ryan Roberts, where she
22 basically instructed another Oracle employee not to
23 answer any questions relating to interviews with the
24 FBI, so we didn't ask about it then.
25        So I'm not going to get in to you -- get in to

351

1 that discussion with you now.
2        Okay.  So besides the FBI did you meet with
3 any lawyers for Oracle between the time you learned of
4 your deposition and today?
5    A.   No.
6    Q.   Did any lawyers from Oracle ever call you in
7 connection with this lawsuit?
8    A.   Yes.
9        I had two different individuals from -- that
10 were representing Oracle call me and asked if I needed
11 to be -- if I needed help or if I needed -- I can't
12 think of the right word right now, but they were calling
13 me to --
14    Q.   Did they ask you -- did they --
15    A.   -- to represent me.
16    Q.   Did they offer -- did they offer to represent
17 you?
18    A.   Yes.
19    Q.   And what did you tell them?
20    A.   I said no.
21    Q.   Okay.  Did they ask you any questions other
22 than asking if you wanted to be represented?
23    A.   No.
24        It was -- just that -- they asked if I needed
25 representation and if I was already being represented.

352

```
1      Q.   Okay.  Do you remember when that was?
2      A.   I think the first time it was probably -- you
3   know, six to eight months ago, and the last time was
4   probably two months ago.
5      Q.   Okay.  So this -- the first conversation that
6   -- asked if you wanted to be represented and you said
7   no?
8      A.   Yes.
9      Q.   Okay.  Did they tell you anything other than
10  that during that call, anything about the facts of this
11  case?
12     A.   No.  We didn't get in to details.
13     Q.   Okay.  Did they give you any names?
14          Did they mention any names of people that
15  worked for Oracle?
16     A.   No.
17     Q.   Okay.  So the extent of the discussion was
18  just about representation?
19     A.   Yeah.
20          Once I told them I wasn't interested, that was
21  pretty much the end of the conversation.
22     Q.   Okay.  Did they ask if you had a lawyer before
23  -- or on that call?
24     A.   Yeah.
25          Well, they asked if I was already being
```

353

```
1   represented.
2      Q.   Okay.  The second conversation, did they --
3   they called you again, and what did they -- talk to you
4   about?
5      A.   Just the same question.
6      Q.   Same thing?
7          Did they mention any names of anybody?
8      A.   No.
9      Q.   Okay.  Did they talk about any facts in this
10  case?
11     A.   No.
12     Q.   Do you remember the names of the lawyers?
13     A.   I couldn't tell you.  They were short
14  conversations.
15     Q.   Okay.  And did you ever meet with your
16  attorney, Michael Schrag, before -- before day one of
17  your deposition?
18     A.   No.
19          MR. GREENSTEIN:  Okay.
20          MR. SCHRAG:  Are you talking about an
21  in-person meeting?
22          MR. GREENSTEIN:  Yeah, just whether you met
23  with him in general.
24          MR. SCHRAG:  Okay.
25          THE WITNESS:  (Shaking head)
```

354

```
1          Just on the phone.
2   BY MR. GREENSTEIN:
3      Q.   Okay.  Do you recall ever meeting with lawyers
4   for Plaintiffs, myself and Monique Winkler?
5      A.   I do.
6      Q.   Okay.  Do you remember when that meeting took
7   place?
8      A.   I couldn't tell you.
9      Q.   Okay.  You said many months ago?
10     A.   Yeah.
11          So -- yeah, six, eight months ago -- six -- I
12  don't know -- somewhere around there.
13     Q.   We met in person --
14     A.   Yes.
15     Q.   -- at this office.
16          Do you recall that?
17          MR. GLENNON:  Objection.  Leading.
18          THE WITNESS:  We did.
19  BY MR. GREENSTEIN:
20     Q.   Did we meet in this office?
21     A.   We did.  We met in that room right over there.
22     Q.   Okay.  And do you recall how many hours we met
23  for?
24     A.   We met for -- a little under a day, so it was
25  a lot -- a big portion of the day.
```

355

```
1      Q.   All right.  And -- do you recall that we told
2   you that if you wanted to get an attorney in connection
3   with the deposition that -- that Lerach Coughlin, our
4   firm, would pay for it?
5          Do you recall that?
6      A.   I do.
7      Q.   Okay.  And you decided -- you decided that
8   there wasn't an attorney you knew of, so we suggested an
9   attorney for you?
10          Do you recall that?
11     A.   Correct.
12     Q.   Okay.  And that's Michael Schrag?
13     A.   Correct.
14     Q.   Okay.  Now, everything that you talked to
15  Monique Winkler and myself about during that meeting,
16  everything you told us, is that consistent with your
17  testimony given in the day one of your deposition and
18  your testimony given here today?
19          MR. GLENNON:  Objection.  Vague and ambiguous.
20  Compound.
21          THE WITNESS:  Correct.
22  BY MR. GREENSTEIN:
23     Q.   Okay.  Is there anything else you'd like to
24  clarify with respect to the discussions you had with us,
25  anything that's inconsistent with what you've testified
```

356

1  about in these depositions?
2       MR. GLENNON: Objection. Vague and ambiguous.
3       THE WITNESS: I guess the only thing that I'd
4  like to clarify is that, you know, from the time of --
5  myself and the other managers doing the research to
6  resolve this we never really had all of the full details
7  of what had happened.
8       It was more of "Here's your action item. Go
9  resolve these."
10      So it -- we were basically just doing what we
11 were told to do.
12 BY MR. GREENSTEIN:
13      Q.  When you say what you were told to do, in
14 connection with researching these items of unapplied
15 cash and debit memos; right?
16      A.  In connection with not doing what you're being
17 paid for really, not doing really the job that you
18 signed up for.
19      It's -- you're not a collections manager
20 anymore, you're to do this research on these unapplied
21 items, and that's what your job is until we tell you
22 that you're not supposed to do it anymore.
23      Q.  Okay. And was that part of your job duties,
24 to research -- or withdrawn. Withdrawn.
25      And are you referring to that you were taken

357

1  off of your normal job duties full time in order to
2  address this unapplied cash problem in October 2002
3       MR. GLENNON: Objection. Vague and ambiguous.
4       THE WITNESS: Correct.
5       MR. GREENSTEIN: Okay. I have nothing
6  further.
7       VIDEOGRAPHER: Okay. Should we go off the
8  record?
9       MR. GREENSTEIN: Yeah.
10      MR. GLENNON: Yeah.
11      VIDEOGRAPHER: One moment, please.
12      We are going off the record. The time is
13 12:17 p.m.
14      (Thereupon a recess was taken at 12:17 p.m.
15      and the deposition resumed at 12:52 p.m.)
16      VIDEOGRAPHER: We are back on the record. The
17 time is 12:52 p.m.
18            EXAMINATION
19 BY MR. GLENNON:
20      Q.  Good afternoon, Mr. Hatada.
21      A.  Good afternoon.
22      Q.  Mr. Hatada, once again, my name is Brian
23 Glennon. Sitting to my right is Paul Konovalov, and to
24 his right is Toni Thingvold.
25      Toni's in Deloitte Financial Consulting. Paul

358

1  and I are at Latham & Watkins.
2       We represent the Defendants in this matter.
3       At the beginning of your deposition, really at
4  the beginning of day one of your deposition, counsel for
5  Plaintiffs gave you a series of admonitions or ground
6  rules which govern kind of the deposition process and
7  help ensure a clean transcript.
8       Do you remember those ground rules?
9       A.  Basically to --
10      MR. SCHRAG: He just asked if you remembered.
11      THE WITNESS: Oh. Yes.
12      MR. SCHRAG: You don't have to recite them all
13 over.
14 BY MR. GLENNON:
15      Q.  Okay. Do you need me to go over any of those
16 again, or are you comfortable with the process at this
17 point, having gone through it for a day-and-a-half now?
18      A.  I'm comfortable with the process.
19      Q.  Okay. There are two particularly important
20 rules that I want to reiterate just to make sure the
21 record is -- is clear.
22      First, do not speculate.
23      You're testifying under oath, and because
24 we're talking about a number of things that took place
25 years ago, there -- I may ask you questions you don't

359

1  remember the answer to, you don't know the answer to,
2  and that's perfectly okay.
3       While I'm entitled to your best recollection,
4  what I don't want you to do is guess or speculate.
5       And the second rule I just wanted to reiterate
6  is related to the first in the sense that you are still
7  testifying under oath.
8       That's why it's particularly important not to
9  speculate, because your oath in the context of this
10 deposition carries the same force and effect as if you
11 were testifying in a Court of Law.
12      Is that clear?
13      A.  It is clear. Understood.
14      MR. GLENNON: Okay. I' like to start by
15 having the Court Reporter mark what will be Hatada
16 Number 11 -- 10. Hatada Number 10.
17      (Exhibit No. 10 was marked for
18      Identification.)
19 BY MR. GLENNON:
20      Q.  Mr. Hatada, have you seen this document
21 before?
22      A.  I really -- haven't -- I don't think so.
23      Q.  Okay. Have you ever seen a subpoena that
24 Oracle served on you or your counsel in connection with
25 this deposition?

360

1      A.   I actually have seen this come in the mail
2   before or delivered by somebody.
3      Q.   Okay.
4      A.   I didn't really get a chance to look through
5   the whole thing, but --
6      Q.   Can you take a moment to flip to the second
7   page of Exhibit A, please.
8      A.   Just the second page of the --
9      Q.   No.  If you -- if you flip a few pages
10  further, --
11     MR. SCHRAG:  Here's Exhibit A.  Keep going.
12     THE WITNESS:  Oh, okay.
13     MR. SCHRAG:  The second page.
14  BY MR. GLENNON:
15     Q.   Have you reviewed these particular document
16  requests before this afternoon?
17     MR. SCHRAG:  The second page of Exhibit A is
18  actually labeled "page 1."
19     Do you want him to turn to page 2?
20     MR. GLENNON:  Yes.  Yeah.
21     Thank you for clarifying.
22     MR. SCHRAG:  Turn to the last page.
23     MR. GLENNON:  Page number 2.  At the top
24  there's a Roman numeral 4 with the heading "Document
25  Request."

361

1      THE WITNESS:  Okay.
2   BY MR. GLENNON:
3      Q.   Have you reviewed these document requests
4   before this afternoon?
5      A.   No.
6      Q.   Can you take a moment to -- to review them and
7   just let me know when you have, please.
8      A.   Okay.
9      Q.   Mr. Hatada, are you aware of whether you have
10  any documents that are responsive to these requests set
11  forth in the subpoena?
12     MR. GREENSTEIN:  Objection.  Vague and
13  ambiguous.  Lacks foundation.
14     MR. SCHRAG:  Also, counsel, I'll represent
15  that, while he may not have reviewed them, he has
16  discussed them, these specific requests.
17     MR. GLENNON:  Okay.
18     THE WITNESS:  I do not have any documents.
19  BY MR. GLENNON:
20     Q.   That would include -- that would include
21  documents on your computer files, you don't have any
22  computer files with documents responsive to this --
23  these document requests?
24     MR. GREENSTEIN:  Objection.  Compound.  Lack
25  of foundation and vague.

362

1      THE WITNESS:  No, sir.
2   BY MR. GLENNON:
3      Q.   And that would also include hard copies
4   documents, you don't have any hard copy documents
5   responsive to these particular requests that you're
6   looking at?
7      MR. GREENSTEIN:  Same objections.
8      THE WITNESS:  No, sir.
9   BY MR. GLENNON:
10     Q.   Okay.  In correspondence the document request
11  would also call for correspondence.
12     You don't have any correspondence that are --
13  that is responsive to these particular document
14  requests; do you?
15     MR. GREENSTEIN:  Objection.  Same objection.
16     THE WITNESS:  Can you describe
17  "correspondence"?
18     MR. GLENNON:  Sure.  Letters, E-mails, text
19  messages, instant messages.
20     MR. GREENSTEIN:  Objection.  Same objections.
21     THE WITNESS:  No, sir.
22  BY MR. GLENNON:
23     Q.   Okay.  Have you since leaving your employment
24  at Oracle had any documents that are responsive to these
25  particular document requests in your personal

363

1   possession?
2      MR. GREENSTEIN:  Objection.  Vague.  Lacks
3   foundation.
4      THE WITNESS:  No.
5   BY MR. GLENNON:
6      Q.   Okay.  You can go ahead and put that aside.
7      Thanks, Mr. Hatada.
8      Mr. Hatada, before getting in to specific
9   issues with you I want to ask you a couple of overview
10  types of questions.
11     Did you take any accounting or finance courses
12  at Boise State in connection with your studies for your
13  Bachelor's in Public Affairs?
14     A.   No.
15     Q.   Did you have any accounting or bookkeeping
16  responsibilities during the time you worked at Home
17  Depot?
18     A.   No.
19     Q.   Did you have any accounting or bookkeeping
20  responsibilities during the time you were employed at
21  Micron Technology?
22     MR. GREENSTEIN:  I want to object to that as
23  vague and ambiguous and also the previous questions the
24  term "accounting" is vague.
25  BY MR. GLENNON:

364

```
1      Q.   Do you understand what I'm asking you?
2      A.   I do.
3      Q.   Did you have any accounting or bookkeeping
4   responsibilities during your employment at Micron
5   Technology?
6          MR. GREENSTEIN: Objection. Vague.
7          THE WITNESS: No.
8   BY MR. GLENNON:
9      Q.   Mr. Hatada, are you currently employed?
10     A.   I am.
11     Q.   And where are you employed?
12     A.   Advo.
13     Q.   Can you spell that for me?
14     A.   A-d-v-o.
15     Q.   And what is Advo?
16     A.   I sell direct mail advertising, so we are a
17  direct mail advertising company.
18     Q.   And what are your job responsibilities at
19  Advo?
20     A.   I sell direct mail to my clients.
21     Q.   You make calls to clients, potential clients?
22         MR. GREENSTEIN: Objection. Foundation.
23  BY MR. GLENNON:
24     Q.   Actually, let me withdraw that.
25         How do you go about selling direct mail
```

365

```
1   advertising to clients?
2      A.   I make calls to prospects, meet with them and
3   assist them in selling their product through direct
4   mail.
5      Q.   And do you have any bookkeeping or accounting
6   responsibilities at Advo?
7          MR. GREENSTEIN: Objection. Vague.
8          THE WITNESS: I do not.
9   BY MR. GLENNON:
10     Q.   Mr. Hatada, are you a Certified Public
11  Accountant?
12     A.   No.
13     Q.   Other than the on-the-job training at Oracle
14  that you described during the first day of your
15  deposition have you had any other training in
16  accounting?
17         MR. GREENSTEIN: Objection. Vague.
18         THE WITNESS: No.
19  BY MR. GLENNON:
20     Q.   Other than the on-the-job training that you
21  described during the first day of your deposition that
22  you -- the on-the-job training that you received at
23  Oracle have you had any other training in finance?
24         MR. GREENSTEIN: Objection. Vague.
25         THE WITNESS: No.
```

366

```
1   BY MR. GLENNON:
2      Q.   You testified earlier in your deposition that
3   you're not familiar with Generally Accepted Accounting
4   Principles; is that correct?
5          MR. GREENSTEIN: Objection. Mischaracterizes
6   the testimony.
7          THE WITNESS: True.
8          I was only -- I was -- I knew what I was
9   supposed to do as far as my responsibilities within
10  collections.
11  BY MR. GLENNON:
12     Q.   Let me rephrase the question.
13         Are you familiar with Generally Accepted
14  Accounting Principles?
15     A.   No.
16     Q.   You testified earlier in your deposition about
17  certain items having revenue impact.
18         Do you recall that?
19     A.   I do.
20     Q.   What does that mean?
21         MR. GREENSTEIN: Sorry. Objection. Form.
22         THE WITNESS: "Revenue impacting" meaning it
23  -- whatever had happened, or, you know, in trying to
24  resolve the unapplied items, was it going to affect the
25  revenue that Oracle had already stated as their revenue.
```

367

```
1   BY MR. GLENNON:
2      Q.   And what is your understanding of the term
3   "revenue"?
4          MR. GREENSTEIN: Objection. Vague. Lacks
5   foundation.
6          THE WITNESS: Money that Oracle has made by
7   selling their product.
8   BY MR. GLENNON:
9      Q.   And do you know whether revenue includes costs
10  or income?
11         MR. GREENSTEIN: Objection. Foundation.
12  Vague. Calls for speculation.
13         THE WITNESS: I'm sure it does at a higher
14  level, but -- we were looking at invoices, amounts of
15  invoices, and what we had collected.
16  BY MR. GLENNON:
17     Q.   Do you know whether invoices are revenue
18  impacting?
19         MR. GREENSTEIN: Objection. Vague. Calls for
20  speculation. Lack of foundation.
21         THE WITNESS: I'm sure they're not until
22  they're collected.
23  BY MR. GLENNON:
24     Q.   And what do you base that testimony on?
25         MR. GREENSTEIN: Objection. Vague. Sorry.
```

Hatada, Ian  10/10/2006 9:53:00 AM

368

1      THE WITNESS: Money that has been collected
2  for the invoice that we have sent to the client as a
3  bill.
4  BY MR. GLENNON:
5      Q.   And your testimony is that an invoice is not
6  revenue impacting until money is collected; is that
7  correct?
8      MR. GREENSTEIN: Objection. Mischaracterizes
9  testimony. Lacks foundation.
10     Counsel is testifying.
11     THE WITNESS: I'm not sure I understand the
12  question.
13  BY MR. GLENNON:
14     Q.   Okay. When an invoice is issued, do you have
15  -- when Oracle issues an invoice, do you know at which
16  point that invoice is revenue impacting?
17     MR. GREENSTEIN: Same objections.
18     MR. SCHRAG: Counsel, are you talking about
19  revenue as the term is used in -- in GAAP?
20     MR. GREENSTEIN: No. I'm asking in his
21  definition.
22     MR. SCHRAG: Just his understanding?
23     MR. GLENNON: Yeah.
24     MR. SCHRAG: Okay.
25     MR. GLENNON: That's why I started with it.

369

1      MR. GREENSTEIN: So objection. Foundation.
2  Calls for speculation. Vague and mischaracterizes
3  testimony.
4      MR. SCHRAG: I'm just going to caution you,
5  answer if you know the answer and don't speculate.
6      THE WITNESS: I'm unsure.
7  BY MR. GLENNON:
8      Q.   Are you familiar with the phrase "revenue
9  recognition"?
10     A.   I am.
11     Q.   What is your understanding of what it means to
12  recognize revenue?
13     MR. GREENSTEIN: Objection. Vague. Lacks
14  foundation.
15  BY MR. GREENSTEIN:
16     Q.   Let me -- let me ask that another way. I
17  might be able to simplify it.
18     Do you have an understanding of what it means
19  to recognize revenue?
20     MR. GREENSTEIN: Objection. Vague.
21     THE WITNESS: From what I know recognizing
22  revenue is -- for instance, you know, what Oracle has
23  stated as, you know, what -- what they have recognized
24  as revenue for that quarter or for that year.
25  BY MR. GLENNON:

370

1      Q.   Right.
2      I guess what I'm asking is, do you know what
3  that means, the revenue that's been recognized?
4      MR. GREENSTEIN: Objection. Vague. Lacks
5  foundation.
6      THE WITNESS: To me it's pretty
7  self-explanatory.
8      If it's recognized as -- as revenue, it's --
9  and collected or accepted by Oracle.
10  BY MR. GLENNON:
11     Q.   Are you -- aware of any instances in which
12  revenue has been recognized where a payment has not been
13  collected or accepted?
14     MR. GREENSTEIN: Objection. Vague. Lacks
15  foundation. Calls for speculation.
16     THE WITNESS: No.
17  BY MR. GLENNON:
18     Q.   And you also said "from what I know" when you
19  defined what it meant to recognize revenue.
20     What is the basis for your knowledge as to the
21  meaning of "revenue recognition"?
22     MR. GREENSTEIN: Objection. Vague. Lacks
23  foundation. Compound.
24     THE WITNESS: Can you state that again?
25  BY MR. GLENNON:

371

1      Q.   Sure.
2      What is the basis for your understanding as to
3  what "recognizing revenue" means?
4      MR. GREENSTEIN: Same objections.
5      THE WITNESS: Just from the time that I had
6  worked in finance or accounting or collections at
7  Oracle.
8  BY MR. GLENNON:
9      Q.   Did you ever work in finance during the time
10  you worked at Oracle?
11     MR. GREENSTEIN: Objection. Vague.
12     THE WITNESS: Well, depends on what you call
13  "finance."
14     I worked in the accounting department or the
15  finance department, which collections would be
16  considered a --
17  BY MR. GLENNON:
18     Q.   Well, you testified that you worked as a
19  collection analyst; is that correct?
20     A.   Correct.
21     Q.   And you also testified that you worked as a
22  collection manager; isn't that correct?
23     A.   Correct.
24     Q.   And did you work in the collections department
25  the entire time you were employed at Oracle?

372

1  A.  Correct.
2  Q.  And, just so we're clear, you never held the
3  title of accounts receivable specialist; correct?
4  A.  Correct, and I stated that on day one, that I
5  made a mistake with that.
6  Q.  Right.  Right.  You did.
7  Did you ever -- were you ever employed in the
8  accounts receivable department?
9  A.  No.
10  And -- at Oracle it's -- AR and collections is
11  kind of looked at -- as one department, so that's why I
12  accidently stated that, but the actual title of my two
13  positions at Oracle were collections analyst and
14  collections manager.
15  Q.  You said it -- at Oracle AR and collections
16  are kind of looked at as one department.
17  What do you base that statement on?
18  A.  Just off of -- it -- you know, the whole group
19  sat together, they were all managed by the same
20  director, we were somewhat more or less doing -- the
21  same duties.  We were working on receivables.
22  Q.  But you never worked in the accounts
23  receivable department, per se; is that correct?
24  MR. GREENSTEIN:  Objection.  Well, hold on.
25  Objection.  Mischaracterizes testimony.  Lack

373

1  of foundation.
2  MR. GLENNON:  You can answer.
3  THE WITNESS:  Okay.  No.  I -- my title was
4  collections analyst or collections manager.
5  BY MR. GLENNON:
6  Q.  Did you ever work in the finance department?
7  MR. GREENSTEIN:  Objection.  Vague as to
8  "finance."
9  THE WITNESS:  What does that mean?
10  BY MR. GLENNON:
11  Q.  Well, are you familiar with whether Oracle has
12  a finance department?
13  MR. GREENSTEIN:  Same objection.
14  THE WITNESS:  From what I know it -- I was
15  just -- I just looked at it as being a back office
16  finance department.
17  I know there's other finance departments
18  within Oracle, but, I, myself, worked in the collections
19  department.
20  BY MR. GLENNON:
21  Q.  Okay.  So you didn't work in any of those
22  other finance departments; is that correct?
23  MR. GREENSTEIN:  Objection.
24  Hold on.  Objection.  Mischaracterizes
25  testimony.  Vague.  Lacks foundation.

374

1  THE WITNESS:  Sorry.
2  MR. SCHRAG:  Let me just remind the witness of
3  the same rules as before.
4  Pause a little --
5  THE WITNESS:  Okay.
6  MR. SCHRAG:  -- so that counsel can object,
7  and then you can answer unless I instruct you not to
8  answer.
9  THE WITNESS:  Okay.
10  While I was at Oracle I had two different
11  positions, one, collections analyst, one was collections
12  manager, and they were both in the collections
13  department, no other department.
14  BY MR. GLENNON:
15  Q.  Okay.  Coming back, are you familiar with the
16  authorities that govern revenue recognition?
17  MR. GREENSTEIN:  Objection.  Vague as to
18  "authorities that govern revenue recognition."
19  Lacks foundation.  Calls for speculation.
20  THE WITNESS:  Can you explain?
21  BY MR. GLENNON:
22  Q.  Well, do you know whether there are any
23  published authorities that govern the concept of revenue
24  recognition?
25  MR. GREENSTEIN:  Same objections.  Vague.

375

1  Foundation.
2  THE WITNESS:  I still -- I still don't
3  understand your question.
4  BY MR. GLENNON:
5  Q.  Okay.  Are you familiar, for instance, with
6  SEC Staff Accounting Bulletin 104?
7  MR. GREENSTEIN:  Objection.  Lacks foundation.
8  Vague as to "SEC Staff Bulletin."
9  Calls for speculation.
10  MR. GLENNON:  Your objections are speaking
11  objections.
12  If they're vague, you can just say they're
13  vague.  You don't need to highlight to the witness what
14  it is that you believe they're vague about.
15  MR. GREENSTEIN:  Okay.  Well, counsel did that
16  when I was direct -- taking my direct, so I'll try not
17  to.
18  MR. SCHRAG:  Do you have the question in mind?
19  BY MR. GLENNON:
20  Q.  Let me just repeat it.
21  Are you aware of whether or not there are any
22  published authorities which govern when revenue can be
23  recognized and when it is improper to recognize revenue?
24  MR. GREENSTEIN:  Objection.  Compound, lacks
25  foundation and vague.

376

1      THE WITNESS: No, I do not have the details on
2  that.
3  BY MR. GLENNON:
4     Q.  Okay. Do you know of any authorities that
5  govern when revenue recognition is proper?
6      MR. GREENSTEIN: Same objection and calls for
7  speculation.
8      THE WITNESS: I'm unsure. I do not know.
9  BY MR. GLENNON:
10    Q.  Do you have any familiarity with the revenue
11  recognition policies that govern software companies?
12     MR. GREENSTEIN: Objection. Vague and
13  ambiguous. Lacks foundation. Calls for speculation.
14     THE WITNESS: No.
15  BY MR. GLENNON:
16    Q.  Are you familiar with Oracle's revenue
17  recognition policy?
18     MR. GREENSTEIN: Same objections.
19     THE WITNESS: No.
20  BY MR. GLENNON:
21    Q.  Do you know whether Oracle maintains a written
22  revenue recognition policy?
23     MR. GREENSTEIN: Same objections.
24     THE WITNESS: Yes, they do.
25  BY MR. GLENNON:

377

1     Q.  Have you ever reviewed Oracle's revenue
2  recognition policy?
3     MR. GREENSTEIN: Same objections.
4     THE WITNESS: No.
5     MR. GLENNON: At this point I'd like the Court
6  Reporter to mark the next exhibit, which, I believe, is
7  Hatada 11.
8      (Exhibit No. 11 was marked for
9      Identification.)
10    MR. SCHRAG: He can look at the one she marks.
11    MR. GREENSTEIN: Yeah.
12  BY MR. GLENNON:
13    Q.  Mr. Hatada, have you seen this document
14  before?
15    A.  I have.
16    Q.  When did you see this document?
17    A.  While I was a collections manager.
18    Q.  Let me -- let's just let the record reflect
19  that what has been marked as Hatada Number 11 is a
20  document entitled "Revenue Recognition Policy."
21     What were the circumstances under which you
22  saw this particular document when you were a collections
23  manager?
24     Do you recall?
25     MR. GREENSTEIN: Objection. Vague. Lacks

378

1  foundation.
2     THE WITNESS: I do not.
3  BY MR. GLENNON:
4    Q.  You see at the bottom of the page, bottom
5  lefthand corner, it says "effective date November 19th,
6  2001"?
7    A.  Yes.
8    Q.  Do you know whether this was the operative
9  policy that governed Oracle's revenue recognition during
10  November of 2000?
11     MR. GREENSTEIN: Objection. Vague and
12  ambiguous.
13     Lacks foundation. Calls for speculation.
14     THE WITNESS: I'm unsure.
15  BY MR. GLENNON:
16    Q.  Do you know whether this was the policy that
17  governed Oracle's revenue recognition during 2002?
18     MR. GREENSTEIN: Same objections.
19     THE WITNESS: I'm unsure.
20  BY MR. GLENNON:
21    Q.  Do you know whether Oracle had a separate
22  revenue recognition department during the time you were
23  employed by Oracle?
24     MR. GREENSTEIN: Objection. Vague and
25  ambiguous.

379

1     Lacks foundation. Calls for speculation.
2     THE WITNESS: Yes, there was a revenue
3  recognition department that was -- had probably three or
4  four people in it that were -- sat right next to
5  collections.
6  BY MR. GLENNON:
7    Q.  And did you ever work in the revenue
8  recognition department at your -- during the course of
9  your employment at Oracle?
10    MR. GREENSTEIN: Objection. Vague. Lacks
11  foundation.
12    THE WITNESS: No, sir.
13  BY MR. GLENNON:
14    Q.  During the course of your employment as a
15  collection -- a collections analyst and collections
16  manager, was determining whether revenue should be
17  recognized ever part of your job duties?
18    MR. GREENSTEIN: Objection. Foundation.
19  Vague.
20    THE WITNESS: No.
21  BY MR. GLENNON:
22    Q.  At any time during your employment at Oracle
23  did you have access to Oracle's general ledger?
24    MR. GREENSTEIN: Objection. Vague. Lacks
25  foundation.

380

1     THE WITNESS: Yes.
2  BY MR. GLENNON:
3     Q.   And would you, in fact, ever access it?
4     MR. GREENSTEIN: Objection. Vague. Lacks
5  foundation.
6     THE WITNESS: No.
7  BY MR. GLENNON:
8     Q.   How do you know that you had access to the
9  general ledger?
10    A.   Just because I had been with other managers
11 and we've pulled it up, we've gone inside of it.
12    It's -- it wasn't part of our duties. I -- I
13 never accessed it myself.
14    Q.   And did you see other people access it?
15    MR. GREENSTEIN: Objection. Vague.
16    THE WITNESS: Yes.
17 BY MR. GLENNON:
18    Q.   And how do you know it was the general ledger
19 as opposed to a subledger?
20    MR. GREENSTEIN: Objection. Compound. Vague.
21    THE WITNESS: Just from what I was told.
22 BY MR. GLENNON:
23    Q.   And who told you?
24    MR. GREENSTEIN: Same objections.
25    THE WITNESS: One of the managers that I was

381

1  working with.
2  BY MR. GLENNON:
3     Q.   Do you remember who you saw pull up the
4  general ledger?
5     MR. GREENSTEIN: Objection. Mischaracterizes
6  testimony. Vague. Lacks foundation.
7     THE WITNESS: I believe it was Molly
8  Littlefield.
9     Q.   And do you recall when you saw her pull up the
10 general ledger?
11    MR. GREENSTEIN: Same objections.
12    THE WITNESS: No.
13 BY MR. GLENNON:
14    Q.   Do you recall whether it was once or on more
15 than one occasion?
16    A.   I think it was only once.
17    Q.   Okay. And was that the person that you
18 testified a moment ago who told you that it was the
19 general ledger?
20    MR. GREENSTEIN: Objection. Vague. Lacks
21 foundation. Calls for speculation.
22    THE WITNESS: Yes. Sorry.
23 BY MR. GLENNON:
24    Q.   Other than what she told you did you have an

382

1  independent basis of believing that what she was pulling
2  up was, in fact, the general ledger?
3     MR. GREENSTEIN: Same objections.
4     THE WITNESS: No.
5  BY MR. GLENNON:
6     Q.   All right. You can put that exhibit aside.
7     Thank you.
8     Now, Mr. Hatada, you testified on direct that
9  you were aware that on November 17th, 2000 Oracle
10 created 46,000 debit memos; is that correct?
11    MR. GREENSTEIN: Objection. Lacks foundation.
12 Mischaracterizes testimony.
13    THE WITNESS: That's only what I was told.
14 BY MR. GLENNON:
15    Q.   You learned about the 46,000 debit memos for
16 the first time two years after the fact in October of
17 2002; is that a correct statement?
18    MR. GREENSTEIN: Objection. Leading. Lacks
19 foundation.
20    THE WITNESS: Correct.
21 BY MR. GLENNON:
22    Q.   So in between the time of November 17th, 2000
23 through the series of meetings you've testified about in
24 October of 2002, you were unaware of the creation or
25 accounting of the 46,000 debit memos; is that accurate?

383

1     MR. GREENSTEIN: Objection. Mischaracterizes
2  testimony. Compound. Vague and ambiguous. Lacks
3  foundation. Calls for speculation.
4     THE WITNESS: Correct.
5  BY MR. GLENNON:
6     Q.   Before the fall of 20002 did you know what a
7  "debit memo" was?
8     MR. GREENSTEIN: Objection. Vague.
9     THE WITNESS: No.
10 BY MR. GLENNON:
11    Q.   Before the fall of 2002 did you know what
12 debit memos were used for in the Oracle system?
13    MR. GREENSTEIN: Objection. Vague. Lacks
14 foundation.
15    THE WITNESS: No.
16 BY MR. GLENNON:
17    Q.   Before the fall of 2002 did you understand the
18 credits and debits associated with debit memos?
19    MR. GREENSTEIN: Objection. Vague.
20 Foundation. Speculation.
21    THE WITNESS: No.
22 BY MR. GLENNON:
23    Q.   As you sit here today, do you have an
24 understanding as to a what a "debit memo" is?
25    A.   No. I couldn't give you a full description on

384

```
1   it, what exactly it was.
2        Q.   As you sit here today, do you have an
3   understanding as to the accounting entries associated
4   with debit memos in the Oracle system?
5        MR. GREENSTEIN: Objection. Vague. Lacks
6   foundation. Calls for speculation.
7        THE WITNESS: Can you repeat that?
8        MR. GLENNON: Can I have the Court Reporter
9   repeat the question, please.
10       (Record Read)
11       MR. GREENSTEIN: Same objections.
12       THE WITNESS: I couldn't give you a full
13  description, no.
14  BY MR. GLENNON:
15       Q.   Well, can you give me any description as to
16  the accounting entries that are associated with debit
17  memos?
18       MR. GREENSTEIN: Same objections.
19       THE WITNESS: From what I understand, debit
20  memos are created when you're in the application.
21       Whether credits are -- are done, like I said,
22  I couldn't give you a full description of exactly what
23  it is.
24  BY MR. GLENNON:
25       Q.   Did you personally participate in the creation
```

385

```
1   of the 46,000 debit memos on November 17th, 2000?
2        MR. GREENSTEIN: Objection. Lacks foundation.
3   Vague.
4        THE WITNESS: No.
5   BY MR. GLENNON:
6        Q.   Do you know whether the debit memos that were
7   created on November 17th, 2000 were created manually or
8   through a computer program?
9        MR. GREENSTEIN: Objection. Vague. Calls for
10  speculation.
11       THE WITNESS: From what I was told they were
12  -- created by both.
13  BY MR. GLENNON:
14       Q.   And who told you that the debit memos were
15  created both manually and by a computer script?
16       A.   Michael Quinn and Greg Myers.
17       Q.   And when did they tell you that?
18       A.   In our first meeting to discuss the
19  reconciliation of this project.
20       Q.   And what was the date of that first meeting?
21       A.   I'm not sure.
22       Q.   Do you know the year of that first meeting?
23       A.   I believe it was '02.
24       Q.   Do you know whether that meeting took place in
25  2003?
```

386

```
1        MR. GREENSTEIN: Objection. Vague. Lacks
2   foundation.
3        THE WITNESS: I believe it took place in '02.
4   BY MR. GLENNON:
5        Q.   Okay. Do you recall the month in which that
6   meeting took place?
7        A.   No.
8        Q.   Have you ever reviewed any computer program in
9   connection with the creation of the 46,000 debit memos
10  on November 17th, 2000?
11       MR. GREENSTEIN: Objection. Vague.
12  Foundation.
13       THE WITNESS: No.
14  BY MR. GLENNON:
15       Q.   Do you know whether the debit memos that were
16  created on November 17th, 2000 were given a specific
17  prefix number?
18       MR. GREENSTEIN: Objection. Vague.
19  Foundation.
20       THE WITNESS: I know they were all -- they all
21  started with a 55 something. I don't know.
22       I -- from what I was told and what I saw in
23  the system it was just -- they all started with a five.
24  BY MR. GLENNON:
25       Q.   Now, do you know if that was unique to the
```

387

```
1   debit memos that were created on November 17th, 2000 or
2   all debit memos in Oracle's system started with the
3   number five?
4        MR. GREENSTEIN: Objection. Compound. Vague
5   and ambiguous. Lacks foundation. Calls for
6   speculation.
7        THE WITNESS: From what I understand, what I
8   saw, what I was told, every one of them started with a
9   five.
10  BY MR. GLENNON:
11       Q.   I don't understand your answer. I'm sorry.
12       When you say "every one of them," are you
13  saying every debit memo --
14       A.   Sorry.
15       Q.   Go ahead.
16       A.   All debit memos --
17       Q.   Okay.
18       A.   -- from what I understood started with a five.
19       Q.   Regardless of when they were created?
20       MR. GREENSTEIN: Objection. Mischaracterizes
21  the testimony. Leading. Lacks foundation.
22       THE WITNESS: Correct.
23  BY MR. GLENNON:
24       Q.   Do you know what the difference is between how
25  Oracle accounts for a debit memo versus how Oracle
```

Hatada, Ian  10/10/2006  9:53:00 AM

388

1    accounts for an invoice?
2          MR. GREENSTEIN: Objection. Foundation.
3    Speculation. Vague.
4          THE WITNESS: I do not.
5    BY MR. GLENNON:
6      Q.  Did you participate in any discussions or any
7    of the decision-making with regards to whether to create
8    the 46,000 debit memos in November of 2000?
9          MR. GREENSTEIN: Objection. Compound.
10   Foundation. Vague. Speculation.
11         THE WITNESS: No.
12   BY MR. GLENNON:
13     Q.  Do you know which accounts were credited as
14   part of the creation of the November 17th, 2000 debits
15   memos?
16         MR. GREENSTEIN: Same objections.
17         THE WITNESS: As we sit here today, I couldn't
18   tell you which accounts.
19   BY MR. GLENNON:
20     Q.  Do you know which accounts were debited as
21   part of the creation of the 46,000 debit memos on
22   November 17th, 2000?
23         MR. GREENSTEIN: Same objections.
24         MR. SCHRAG: You're asking his memory right
25   now?

389

1          MR. GLENNON: Correct.
2          MR. GREENSTEIN: Same objections.
3          THE WITNESS: No.
4    BY MR. GLENNON:
5      Q.  Do you know whether any revenue impacts were
6    -- revenue accounts were debited or credited as part of
7    the creation of the 46,000 debit memos?
8          MR. GREENSTEIN: Same objections.
9          THE WITNESS: No.
10   BY MR. GLENNON:
11     Q.  Do you have an understanding of what the
12   accounting impact, if any, would be if you debit and
13   credit the same account in the same amount
14   simultaneously?
15         MR. GREENSTEIN: Same objections.
16         THE WITNESS: I do not.
17   BY MR. GLENNON:
18     Q.  Do you have any independent personal knowledge
19   about whether the creation of the 46,000 debit memos on
20   November 17th, 2000 resulted in any money changing
21   accounts?
22         MR. GREENSTEIN: Same objections.
23         THE WITNESS: Can you ask that question again?
24   I'm sorry.
25         MR. GLENNON: No problem.

390

1          Can I have the Court Reporter repeat the
2    question, please.
3          (Record Read)
4          MR. GREENSTEIN: Same objections.
5          MR. SCHRAG: I have a question about what you
6    mean by "independent."
7          He's testified for the last couple days of his
8    deposition about what people told him.
9          MR. GREENSTEIN: Right.
10         MR. SCHRAG: Do you want him to exclude what
11   anybody told him from his answer?
12         I'm just not clear, and I don't want him to
13   answer inaccurately from your perspective. So what --
14         MR. GLENNON: First of all, yes. Let's start
15   with excluding what anybody has told you.
16         Do you have any independent knowledge?
17         MR. GREENSTEIN: Same objection.
18         MR. SCHRAG: You can answer if you understand
19   it.
20         THE WITNESS: No. I've only -- I mean, from
21   -- from what I saw -- well, actually from what I saw
22   independently in the system and what I saw through
23   spread sheets, yes, but it was also through what people
24   had told me. So --
25   BY MR. GLENNON:

391

1      Q.  Okay. So you said -- you saw information in
2    this system which -- which indicated to you that money
3    changed accounts on November 17th, 2000 through the
4    creation of the 46,000 debit memos; is that correct?
5          MR. GREENSTEIN: Objection. Mischaracterizes
6    the testimony. Lacks foundation.
7          THE WITNESS: From spread sheets I've -- I've
8    seen it, but -- I mean, I don't have it in front of me.
9    I couldn't tell you.
10   BY MR. GLENNON:
11     Q.  Well, can you tell me what spread sheets that
12   you reviewed indicated to you that money changed
13   accounts on November 17th, 2000 by virtue of the 46,000
14   debit memos?
15         MR. GREENSTEIN: Objection. Vague.
16   Mischaracterizes the testimony. Foundation.
17   Speculation.
18         MR. SCHRAG: So, if you remember what they
19   are, tell him. If you --
20         THE WITNESS: No.
21   BY MR. GLENNON:
22     Q.  Do you remember when you saw these spread
23   sheets that indicated to you that money had changed
24   accounts on November 17th, 2000 through the creation of
25   the debit memos?