392

1     MR. GREENSTEIN: Same objections.
2     THE WITNESS: During or shortly thereafter the
3  first meeting that we had with Mike Quinn and Greg
4  Myers.
5  BY MR. GLENNON:
6     Q.  Do you recall what kind of spread sheets these
7  were?
8     A.  From my knowledge it looked like a -- report
9  ran out of the application.
10     Q.  What was it about these spread sheets that
11  indicated to you that money had changed accounts on
12  November 17th, 2000 through the creation of the 46,000
13  debit memos?
14     MR. GREENSTEIN: Objection. Mischaracterizes
15  the testimony. Vague. Foundation. Speculation.
16     THE WITNESS: Just from the different numbers
17  on the accounts.
18  BY MR. GLENNON:
19     Q.  What about the different numbers on the
20  accounts indicated to you that money had changed
21  accounts through the creation of the debit memos on
22  November 17th, 2000?
23     MR. GREENSTEIN: Same objections.
24     THE WITNESS: Just seeing one number -- and
25  then, obviously, another number.

393

1     But, again, I don't recall it stating that it
2  -- you know, exactly went from here to there.
3     I just recall seeing a spread sheet.
4  BY MR. GLENNON:
5     Q.  Do you recall -- which account the money went
6  from?
7     A.  No.
8     MR. GREENSTEIN: Object. Sorry.
9     Objection. Vague. Foundation. Speculation
10  and mischaracterizes the testimony.
11  BY MR. GLENNON:
12     Q.  Do you recall which account the money went to?
13     MR. GREENSTEIN: Same.
14     THE WITNESS: No.
15  BY MR. GLENNON:
16     Q.  Do you recall whether the spread sheet that
17  you had just testified about indicated which account the
18  money came from and which account the money went to?
19     MR. GREENSTEIN: Same objections.
20     THE WITNESS: No.
21  BY MR. GLENNON:
22     Q.  Now, this spread sheet that you were just
23  describing to me, was that the spread sheet you
24  described in the system or did you see other information
25  in the system separate and apart from this spread sheet

394

1  that indicated to you that money had changed accounts
2  during the creation of the debit memos?
3     MR. GREENSTEIN: Objection. Compound. Vague.
4  Foundation.
5     MR. SCHRAG: Do you understand the question?
6     MR. GREENSTEIN: Speculation.
7     THE WITNESS: I do.
8     From what I understood it was both. There was
9  some that was showing through reports that were ran from
10  what I remember, and some that were manual that --
11  BY MR. GLENNON:
12     Q.  Well, other than the spread sheet you've just
13  described for me do you recall reviewing any other
14  reports or seeing anything else on the system which
15  indicated to you that money changed accounts on November
16  17th, 2000 through the creation of the debit memos?
17     MR. GREENSTEIN: Objection. Mischaracterizes
18  the testimony.
19     Vague. Foundation. Speculation.
20     THE WITNESS: No.
21  BY MR. GLENNON:
22     Q.  Going back for a moment to the spread sheet,
23  do you recall how much money the spread sheet indicated
24  changed accounts on November 17th, 2000 through the
25  creation of the debit memos?

395

1     MR. GREENSTEIN: Objection. Mischaracterizes
2  the testimony. Vague. Foundation.
3     THE WITNESS: No.
4  BY MR. GLENNON:
5     Q.  Have you ever reviewed the general ledger for
6  November 17th, 2000?
7     MR. GREENSTEIN: Objection. Vague.
8     THE WITNESS: No.
9  BY MR. GLENNON:
10     Q.  Have you reviewed any subledgers -- subledgers
11  for November 17th, 2000?
12     MR. GREENSTEIN: Vague.
13     THE WITNESS: No.
14  BY MR. GLENNON:
15     Q.  Do you know the total sum of the 46,000 debit
16  memos that were created on November 17th, 2000?
17     MR. GREENSTEIN: Objection. Vague.
18  Foundation.
19     THE WITNESS: I don't remember.
20  BY MR. GLENNON:
21     Q.  Separate and apart from what anybody might
22  have told you do you have any independent personal
23  knowledge about whether the creation of the 46,000 debit
24  memos reduced the amount of money in the unapplied
25  account on November 17th, 2000?

396

1        MR. GREENSTEIN: Objection. Vague.
2   Speculation. Foundation.
3        THE WITNESS: No.
4   BY MR. GLENNON:
5        Q.   Did you see a drop in the amount of unapplied
6   cash in the unapplied account on November 17th, 2000?
7        MR. GREENSTEIN: Objection. Vague.
8   Foundation.
9        THE WITNESS: No.
10  BY MR. GLENNON:
11       Q.   Have you ever compared the unapplied cash as
12  of November 16th, 2000 with the unapplied cash as of
13  November 17th, 2000?
14       MR. GREENSTEIN: Same objections.
15       THE WITNESS: Can you repeat those two dates?
16  BY MR. GLENNON:
17       Q.   Sure.
18       The two dates were November 16th, 2000 versus
19  November 17th, 2000.
20       A.   No.
21       Q.   Do you know where the 46,000 debit memos
22  appear on Oracle's general ledger?
23       MR. GREENSTEIN: Objection. Vague.
24  Foundation.
25       THE WITNESS: No. Never personally reviewed

397

1   the general ledger.
2   BY MR. GLENNON:
3        Q.   Do you know whether -- let me start that
4   question over again.
5        Do you know where the 46,000 debit memos
6   appear on Oracle's subledger?
7        MR. GREENSTEIN: Objection. Vague.
8   Foundation.
9        THE WITNESS: No.
10  BY MR. GLENNON:
11       Q.   Do you have personal knowledge about whether
12  the creation in accounting for the 46,000 debit memos
13  resulted in the recognition of revenue on November 17th,
14  2000?
15       MR. GREENSTEIN: Objection. Compound. Vague.
16  Foundation. Speculation.
17       THE WITNESS: No.
18       MR. GLENNON: I'd like to have the Court
19  Reporter mark at this time an excerpted transaction
20  register beginning NDCA-ORCL 049208 to NDCA-ORCL 050060.
21       (Exhibit No. 12 was marked for
22  Identification.)
23       MR. SCHRAG: 12?
24       THE REPORTER: Yes.
25  BY MR. GLENNON:

398

1        Q.   Mr. Hatada, have you seen this document
2   before?
3        A.   Yes.
4        This is another report that comes out of the
5   system referencing debit memo numbers.
6        Q.   And have you seen this particular report, the
7   report that's been marked as Exhibit 12?
8        A.   No. I couldn't -- no.
9        Q.   But you're familiar with this type of report;
10  is that right?
11       A.   I'm familiar with the type of report. I
12  couldn't tell you that I've seen this exact report.
13       Q.   Do you know what types of transactions are
14  listed on this particular exhibit?
15       MR. GREENSTEIN: Objection. Vague.
16       THE WITNESS: It just looks like it has debit
17  memo numbers to the far left, the type, which is on
18  account, the customer name, customer number, the
19  invoice, and the GL date.
20  BY MR. GLENNON:
21       Q.   Now, separate and apart from what it says on
22  this document do you have a familiarity with any of the
23  transactions identified in this particular report?
24       MR. GREENSTEIN: Objection. Vague.
25       THE WITNESS: No.

399

1   BY MR. GLENNON:
2        Q.   Okay. Do you know what the term "invoice
3   currency" means?
4        A.   No.
5        Q.   Do you know what the term "functional
6   currency" means?
7        A.   I'd be speculating. No.
8        Q.   None of that.
9        A.   Yeah.
10       Q.   Do you have any understanding as to the
11  significance, if any, of the fact that the invoice
12  currency and functional currency are the exact same
13  amount in this transaction register?
14       MR. GREENSTEIN: Objection. Vague.
15  Foundation. Speculation.
16       THE WITNESS: No.
17       MR. SCHRAG: Are you representing they're the
18  same on each one?
19       You want him to look at it?
20       MR. GLENNON: You can compare.
21       MR. GREENSTEIN: Same objections.
22       MR. GLENNON: But, yes, I'll represent for
23  that they're the same for purposes of that question.
24       MR. SCHRAG: That's fine.
25       Did he answer the question?

400

1    MR. GLENNON: He did.
2    THE WITNESS: Yeah.
3    MR. SCHRAG: Okay.
4    BY MR. GLENNON:
5    Q.  Mr. Hatada, you mentioned a moment ago that --
6    actually, let me start that question over again.
7    See the column which says "on," space "ACCOU"?
8    A.  Yes.
9    Q.  Do you know what that means?
10   A.  I believe it means on account.
11   Q.  What does "on account" mean?
12   A.  I couldn't give you a specific description.
13   Q.  Do you know what "on account" meant before
14   November -- November of 2000?
15   MR. GREENSTEIN: Objection. Asked and
16   answered.
17   THE WITNESS: No.
18   BY MR. GLENNON:
19   Q.  Do you know how Oracle's foreign offices
20   defined or used the on account feature in 2000?
21   MR. GREENSTEIN: Objection. Vague.
22   Foundation.
23   THE WITNESS: No.
24   BY MR. GLENNON:
25   Q.  Do you know how Oracle used the on account

401

1    feature in the 1990s?
2    MR. GREENSTEIN: Same objections.
3    THE WITNESS: No.
4    BY MR. GLENNON:
5    Q.  Do you know how Oracle used the on account
6    feature in 2002?
7    MR. GREENSTEIN: Same objections.
8    THE WITNESS: No.
9    BY MR. GLENNON:
10   Q.  Are you familiar with any changes in the on
11   account function during the period that you were
12   employed at Oracle?
13   MR. GREENSTEIN: Vague. Foundation.
14   THE WITNESS: Only the process of what was
15   done before and what was done after, but I really don't
16   really know what was done before.
17   I just know, I guess, the process after.
18   BY MR. GLENNON:
19   Q.  Well, what was the process after and what was
20   it after?
21   MR. GREENSTEIN: Objection --
22   THE WITNESS: They were just stating to not
23   place anything on account moving forward.
24   MR. SCHRAG: I believe he's asking you after
25   what.

402

1    THE WITNESS: Oh.
2    After the meetings that we had -- that Mike
3    and Quinn and Craig Myers had.
4    BY MR. GLENNON:
5    Q.  Do you know what the impact, if any, would be
6    by placing an item on account at the time of those
7    meetings?
8    MR. GREENSTEIN: Objection. Vague.
9    Foundation. Speculation.
10   THE WITNESS: From what I was told it would
11   just make more of a mess that was -- than we already
12   had.
13   BY MR. GLENNON:
14   Q.  Do you know how it would make more of a mess?
15   Did you know the specifics?
16   MR. GREENSTEIN: Same objections.
17   THE WITNESS: From what I understood it would
18   -- basically give us a false sense of what was, you
19   know, in our unapplied.
20   BY MR. GLENNON:
21   Q.  Do you know how it would give you a false
22   sense of what was in your unapplied?
23   MR. GREENSTEIN: Objection. Vague.
24   THE WITNESS: Just the specific numbers of --
25   like I was saying before, what we felt was in our

403

1    unapplied account and what was truly what we needed to
2    resolve.
3    BY MR. GLENNON:
4    Q.  Are you aware of whether there would be any
5    accounting entries contemplated by placing something on
6    account as of October of 2002?
7    MR. GREENSTEIN: Objection. Vague.
8    Foundation. Speculation.
9    THE WITNESS: No.
10   BY MR. GLENNON:
11   Q.  And I want to circle back, because I'm not
12   sure if I got an answer to this question.
13   Are you familiar with various changes in the
14   on account function over the course of the years that
15   you were employed by Oracle?
16   MR. GREENSTEIN: Objection. Vague.
17   Foundation.
18   THE WITNESS: No, I couldn't give you a full
19   description.
20   BY MR. GLENNON:
21   Q.  Now, can you -- let me start that question
22   over.
23   Turning back to Exhibit 12, can you determine
24   based upon your review of this document how Oracle
25   accounted for the list of dollar amounts?

404

1      MR. GREENSTEIN: Objection. Vague.
2   Foundation. Asked and answered.
3      THE WITNESS: No.
4   BY MR. GLENNON:
5      Q.  If you skip ahead to the very last page, which
6   is NDCA-ORCL 050060, you'll see a number in the amount
7   of $692,415,514.97; correct?
8      A.  Correct.
9      Q.  Do you know what that number represents?
10     MR. GREENSTEIN: Objection. Vague.
11     THE WITNESS: I do not.
12  BY MR. GLENNON:
13     Q.  Do you know whether this number represents an
14  asset or a liability?
15     MR. GREENSTEIN: Objection. Vague.
16  Foundation. Speculation.
17     THE WITNESS: I do not.
18  BY MR. GLENNON:
19     Q.  Do you have any personal knowledge regarding
20  whether this particular number here changed accounts on
21  November 17th, 2000?
22     MR. GREENSTEIN: Objection. Vague.
23  Foundation. Speculation.
24     THE WITNESS: I do not.
25  BY MR. GLENNON:

405

1      Q.  Do you know whether Oracle recognized revenue
2   on any of the transactions listed on this particular
3   exhibit?
4      MR. GREENSTEIN: Objection. Vague.
5   Foundation. Speculation.
6      THE WITNESS: On this specific exhibit?
7      MR. GLENNON: Yes, correct, the transactions
8   listed in the document you're looking at.
9      THE WITNESS: Like I said, I've never seen
10  this specific exhibit, so, no.
11     MR. GLENNON: All right. We can put that one
12  aside for the time being.
13     I'd like to ask the Court Reporter to mark as
14  Exhibit 13 a document entitled "Sales Journal By GL
15  Account Report."
16     (Exhibit No. 13 was marked for
17     Identification.)
18     MR. GLENNON: Don't worry. We're not going to
19  read the whole thing.
20  BY MR. GLENNON:
21     Q.  Mr. Hatada, have you seen this document
22  before?
23     MR. SCHRAG: What do you want him to do to
24  ascertain that?
25     Do you want him to flip through it?

406

1      MR. GLENNON: Well, he can flip through it or
2   there may be -- I don't want to put words in his mouth
3   -- there may be information on the front page that would
4   indicate to him whether or not he's seen it.
5      THE WITNESS: I've seen something like this or
6   I've seen this report, but not this specific one.
7      I don't -- I couldn't tell you if I -- saw
8   this.
9   BY MR. GLENNON:
10     Q.  Are you familiar with Sales Journal By GL
11  Account Reports?
12     A.  No. I couldn't give you a full description.
13     Q.  Have you ever reviewed an Oracle GL Subledger
14  Report to your knowledge?
15     MR. GREENSTEIN: Objection. Vague.
16     THE WITNESS: No. Like I said before, I've
17  never reviewed a GL or subaccount.
18  BY MR. GLENNON:
19     Q.  Are you familiar with the numbers of Oracle's
20  accounts?
21     MR. GREENSTEIN: Objection. Vague.
22     Is he familiar with all the numbers?
23     MR. GLENNON: Well, do you have a general
24  familiarity?
25     I'm going to ask him a specific question.

407

1   So --
2      MR. GREENSTEIN: Objection. Vague.
3      THE WITNESS: Are you talking about account
4   numbers per client?
5      MR. GLENNON: Here. I can make it a lot
6   easier.
7   BY MR. GLENNON:
8      Q.  On the cover, if you look at "GL account,"
9   there's a number after the second decimal point, "3000."
10     Do you see that?
11     A.  Yeah.
12     Q.  And then it says "to," and then it says 39999.
13     Excuse me.
14     I guess the first number is 30,000.
15     But 30000 to 39999.
16     Do you see where I'm referring to?
17     MR. GREENSTEIN: Objection. Document speaks
18  for itself.
19     THE WITNESS: Yes.
20  BY MR. GLENNON:
21     Q.  Do you know what accounts those refer to?
22     MR. GREENSTEIN: Objection. Document speaks
23  for itself. Vague. Foundation.
24     THE WITNESS: I couldn't specifically describe
25  what this exact means, but -- yeah. No.

408

1  BY MR. GLENNON:
2      Q.   Okay.  You see the GL date row directly above
3  the numbers that you were just looking at?
4      A.   I do.
5      Q.   What does the GL date refer to?
6          MR. GREENSTEIN:  Objection.  Speculation.
7  BY MR. GLENNON:
8      Q.   Do you know what the GL date refers to?
9      A.   November 17 to November 17th.
10     Q.   And do you have an understanding as to what
11 that means?
12         MR. GREENSTEIN:  Same objections.
13         THE WITNESS:  From my understanding it's the
14 report is ran on this day to this day, so -- all records
15 for that day.
16 BY MR. GLENNON:
17     Q.   Now, going up two more rows, do you see where
18 it says "GL account type"?
19     A.   I do.
20     Q.   And you see the three letters to the right of
21 the "GL type account," "REV"?
22     A.   I do.
23     Q.   Do you have an understanding of what "REV"
24 means in terms of the GL account type?
25         MR. GREENSTEIN:  Objection.  Document speaks

409

1  for itself.  Speculation.
2          THE WITNESS:  No.  I'd be speculating.
3  BY MR. GLENNON:
4      Q.   Now, you testified earlier that you had an
5  understanding or you had heard at least that 46,000
6  debit memos were created on November 17th, 2000; isn't
7  that right?
8          MR. GREENSTEIN:  Objection.  Mischaracterizes
9  testimony.
10         THE WITNESS:  Correct.
11 BY MR. GLENNON:
12     Q.   And you also testified that the GL dates
13 encompassed by this particular document are that same
14 day; is that correct?
15         MR. GREENSTEIN:  Objection.  Mischaracterizes
16 the testimony.  Foundation.
17         THE WITNESS:  Correct.
18 BY MR. GLENNON:
19     Q.   I'm going to call your attention to the last
20 page, if I can, please.  It's ORCL 0127101.
21         THE WITNESS:  Can you say that number again.
22         MR. GREENSTEIN:  Of course.
23         MR. SCHRAG:  The last page of the document.
24         MR. GLENNON:  Yeah.  ORCL 0127101.
25         THE WITNESS:  I don't think I have the right

410

1  one.
2          MR. SCHRAG:  It's got two different sets of
3  Bates numbers on it.  That's what's confusing.
4  There's an NDCA also.
5          THE WITNESS:  Oh.  Okay.  I got it.  I was
6  looking at the NDCA.
7          MR. GLENNON:  Okay.
8          THE WITNESS:  So it's 01270101?
9          MR. GLENNON:  I apologize.  That's odd.  Mine
10 only has one set.  No.  I believe you.  So --
11 I'm referring to the ORCL number.  Are we on
12 the same page?  It's 012 --
13         THE WITNESS:  It says "Oracle confidential"
14 underneath.
15         MR. GLENNON:  Correct.
16         THE WITNESS:  Okay.  Yeah.
17         MR. GLENNON:  All right?
18 Sorry about that confusion.
19 BY MR. GLENNON:
20     Q.   You see the last number in the debit amount
21 column as $756,722.86?
22     Do you see where I'm referring to?
23     A.   I do.
24     Q.   Do you have an understanding as to what this
25 number represents?

411

1          MR. GREENSTEIN:  Objection.  Speculation.
2  Foundation.
3          THE WITNESS:  I don't.
4  BY MR. GLENNON:
5      Q.   Directly to the right of it under the column
6  "credit amount" is the number $10,111,399.34.
7      Do you see where I'm referring to?
8      A.   I do.
9      Q.   Do you have an understanding as to what this
10 number represents?
11         MR. GREENSTEIN:  Objection.  Speculation.
12 Document speaks for itself.
13         THE WITNESS:  I do not.
14 BY MR. GLENNON:
15     Q.   Do you know how much total revenue Oracle
16 recognized on November 17th, 2000?
17         MR. GREENSTEIN:  Objection.  Vague.  Lacks
18 foundation.  Calls for speculation.
19         THE WITNESS:  I do not.
20         MR. GLENNON:  Okay.  We can put that one
21 aside.
22 I'd like to have the Court Reporter mark as
23 Exhibit Hatada 14 an account analysis report Bates
24 numbered NDCA-ORCL 050356 through NDCA-ORCL 050360.
25     (Exhibit No. 14 was marked for

412

```
1       Identification.)
2   BY MR. GLENNON:
3       Q.   Mr. Hatada, do you recognize this document?
4       A.   Yes.
5       Q.   And what is this document?
6       A.   It's an account analysis report.
7       I'm not specific as to -- I've never seen this
8   one. I just know I've seen it before.
9       Q.   You're familiar with this type of document; is
10  that what you're saying?
11      A.   Somewhat. I've seen it.
12      Q.   At the very top of the document there's a
13  period entry.
14      Do you see where I'm talking about?
15      A.   I do.
16      Q.   Do you know what that refers to?
17      MR. GREENSTEIN: Objection. Speculation.
18      THE WITNESS: Items entered in to the system
19  between October 2000 to December 2000.
20  BY MR. GLENNON:
21      Q.   Okay. And over on the lefthand side do you
22  see the rows, "accounts from" and "to"?
23      A.   I do.
24      Q.   Okay. Do you recognize that particular
25  account?
```

413

```
1       MR. GREENSTEIN: Objection. Document speaks
2   for itself. Vague.
3       THE WITNESS: I don't.
4   BY MR. GLENNON:
5       Q.   Do you know whether the account number 25005
6   is Oracle's unapplied cash account?
7       A.   I do not.
8       Q.   Do you have an understanding as to what it
9   means when Oracle reports have a "to" and -- a "from"
10  and a "to" entry and the "to" has a series of Zs?
11      Do you see where I'm talking about, like on
12  this particular document?
13      MR. GREENSTEIN: Objection. Vague.
14  Foundation.
15      THE WITNESS: I do.
16  BY MR. GLENNON:
17      Q.   Okay. Do you know what those Zs mean?
18      A.   In other reports that you run within an Oracle
19  system you have to put in a certain number that you're
20  looking for through another number or letter.
21      That's the only thing I could think of that it
22  might be, but I couldn't tell you exactly.
23      Q.   Do you have an understanding as to whether
24  this is an account analysis report for account 25005?
25      MR. GREENSTEIN: Objection. Vague. Calls for
```

414

```
1   speculation.
2       THE WITNESS: I do not.
3   BY MR. GLENNON:
4       Q.   Can I get you to flip to the next page,
5   please.
6       Next to the word "period" says "Nov-00."
7       Do you see where I'm talking about?
8       A.   At the top?
9       Q.   Not at the very top. I mean, before --
10      A.   Oh, okay.
11      Yes. Sorry. Yes.
12      Q.   Okay. Do you have an understanding of what
13  "Nov-00" refers to?
14      MR. GREENSTEIN: Objection. Speculation.
15  Document speaks for itself.
16      THE WITNESS: From my understanding it's
17  November 2000.
18  BY MR. GLENNON:
19      Q.   And what do you base that understanding upon?
20      MR. GREENSTEIN: Same objections.
21      THE WITNESS: Just what it looks like to me,
22  November, 2000.
23      I couldn't tell you. I don't have -- I
24  couldn't give you a description.
25  BY MR. GLENNON:
```

415

```
1       Q.   Have you seen other reports that cover certain
2   periods of time?
3       MR. GREENSTEIN: Objection. Vague.
4       THE WITNESS: Yes.
5   BY MR. GLENNON:
6       Q.   And is this abbreviation for November of 2000
7   consistent with how Oracle abbreviates time periods in
8   its reports?
9       MR. GREENSTEIN: Objection. Vague.
10      VIDEOGRAPHER: Ian, I'm sorry. Your
11  microphone.
12      THE WITNESS: Sorry.
13      I couldn't tell you for sure.
14  BY MR. GLENNON:
15      Q.   All right. Fair enough.
16      About 80 percent of the way down on the second
17  page, if you look under the category column, there is
18  the word "debit memo."
19      A.   Okay.
20      Q.   Do you see that?
21      A.   I do.
22      Q.   Looking over to the right, do you see the
23  account number for the unapplied account?
24      A.   Which -- would that be?
25      Q.   Oh. Well, a fair question.
```

416

1    Do you know what the account number for the
2 unapplied account is?
3        MR. GREENSTEIN: Objection. Calls for
4 speculation.
5        THE WITNESS: I don't know for sure.
6 BY MR. GLENNON:
7    Q.   Okay. Well, do you know whether the unapplied
8 account is account number 25005?
9        MR. GREENSTEIN: Speculation.
10       THE WITNESS: Could be, but I didn't look at
11 it that way. So --
12 BY MR. GLENNON:
13   Q.   In other words, you didn't refer to it as
14 account number?
15   A.   No.
16   Q.   And you're not certain -- or you don't have
17 any knowledge as to whether or not account number 25005
18 is the unapplied cash account?
19       MR. GREENSTEIN: Objection. Leading.
20 Foundation.
21 BY MR. GLENNON:
22   Q.   Is that correct?
23   A.   Correct. The unapplied account to me was the
24 unapplied account.
25 BY MR. GLENNON:

417

1    Q.   Okay. Now, in the debits column you see the
2 number $692,415,514.97?
3    A.   I do.
4    Q.   Okay. And do you see that identical number
5 right next to it in the credits column?
6    A.   I do.
7    Q.   Do you know what these numbers represent?
8        MR. GREENSTEIN: Objection. Speculation.
9 Vague. Foundation.
10       THE WITNESS: No.
11 BY MR. GLENNON:
12   Q.   Do you know what would happen if the unapplied
13 cash account was both debited and credited
14 simultaneously in the exact amount?
15       MR. GREENSTEIN: Objection. Foundation.
16 Speculation. Vague.
17       THE WITNESS: No.
18 BY MR. GLENNON:
19   Q.   Do you know whether the credits and debits
20 would offset one another?
21       MR. GREENSTEIN: Same objections.
22       THE WITNESS: I'm sure they would, but I can't
23 tell you specifically.
24 BY MR. GLENNON:
25   Q.   Do you know whether debiting and crediting the

418

1 same account simultaneously in the same amount would
2 have a revenue impact?
3        MR. GREENSTEIN: Same objections.
4        THE WITNESS: I don't.
5 BY MR. GLENNON:
6    Q.   Do you see anything in this particular
7 document that would indicate to you that a reserve
8 account was credited as part of this particular
9 transaction that we were just looking at?
10       MR. GREENSTEIN: Objection. Foundation.
11 Vague. Speculation.
12       THE WITNESS: I don't.
13 BY MR. GLENNON:
14   Q.   Do you see any reference to any reserve
15 accounts on this particular document?
16       MR. GREENSTEIN: Objection. Vague.
17 Foundation.
18       THE WITNESS: I don't.
19       MR. GLENNON: Okay. You can put that aside.
20 I'd like to have the Court Reporter mark as
21 Hatada Exhibit 15 a one-page document which purports to
22 be a screen shot from the Oracle system.
23       (Exhibit No. 15 was marked for
24        Identification.)
25 BY MR. GLENNON:

419

1    Q.   Now, Mr. Hatada, you testified that you worked
2 on Oracle's internal accounting database; isn't that
3 right?
4        MR. GREENSTEIN: Objection. Mischaracterizes
5 testimony.
6        THE WITNESS: True.
7 BY MR. GLENNON:
8    Q.   And you worked on suite 9I and then 11I; is
9 that right?
10   A.   Correct.
11   Q.   You also testified that you have some
12 familiarity with screen shots from the Oracle internal
13 system; is that right?
14   A.   When they refer to invoices, sure.
15   Q.   Do you recognize this as being a screen shot
16 from Oracle's internal database?
17       MR. GREENSTEIN: Objection. Vague.
18 Foundation.
19       THE WITNESS: Yes, it is.
20 BY MR. GLENNON:
21   Q.   Do you see the word "source" -- excuse me.
22   Do you see next to the word "source" the
23 phrase "on account clean-up"?
24       MR. GREENSTEIN: Objection. Document speaks
25 for itself.

420

1   THE WITNESS: I do.
2   BY MR. GLENNON:
3   Q.   And do you see under the date "17-NOV-2000"?
4   A.   I do.
5   Q.   Do you understand this to be a screen shot
6   reflecting one of the 46,000 debit memos that were
7   created on November 17th, 2000?
8   MR. GREENSTEIN: Objection. Foundation.
9   Vague.
10  THE WITNESS: It could be. That's what it's
11  stating, it's a debit memo.
12  BY MR. GLENNON:
13  Q.   And you see the debit -- the number at the top
14  begins with the 55, which, as you testified before, is
15  the prefix for debit memos?
16  MR. GREENSTEIN: Document speaks for itself.
17  THE WITNESS: Correct.
18  BY MR. GLENNON:
19  Q.   Now, looking to the series of columns along
20  the bottom, do you see the accounting date on there?
21  A.   I do.
22  Q.   And is November 17th, 2000 the date on which
23  you believe Oracle created 46,000 debit memos?
24  MR. GREENSTEIN: Objection. Vague.
25  Foundation. Speculation.

421

1   THE WITNESS: That's what I was told.
2   BY MR. GLENNON:
3   Q.   And in terms of the next column over with the
4   accounts, do the two rows -- are the two rows referring
5   to the exact same account?
6   MR. GREENSTEIN: Objection. Document speaks
7   for itself. Foundation. Speculation.
8   THE WITNESS: They are.
9   BY MR. GLENNON:
10  Q.   And in the next row over you'll see a debit in
11  the amount of $15,582.55.
12  Do you see that?
13  MR. GREENSTEIN: Objection. Document speaks
14  for itself.
15  THE WITNESS: I do.
16  BY MR. GLENNON:
17  Q.   And is that the same amount set forth under
18  the credit column?
19  MR. GREENSTEIN: Same objection.
20  THE WITNESS: It is.
21  BY MR. GLENNON:
22  Q.   Now, do you have an understanding as to what
23  the accounting impact of this particular transaction
24  would be?
25  MR. GREENSTEIN: Objection. Foundation.

422

1   Vague.
2   THE WITNESS: Nope.
3   BY MR. GLENNON:
4   Q.   Do you see anything in this particular
5   document that indicates to you that a reserve account
6   was credited as part of this particular debit memo?
7   MR. GREENSTEIN: Objection. Vague.
8   Foundation. Speculation.
9   THE WITNESS: I couldn't tell you.
10  BY MR. GLENNON:
11  Q.   Well, I guess what I'm asking you is, do you
12  see any data on this particular screen shot referencing
13  or indicating that a reserve was credited as part of
14  this -- the accounting for this debit memo?
15  MR. GREENSTEIN: Same objections and compound.
16  THE WITNESS: Not on this screen shot, no.
17  MR. GLENNON: You can put that aside.
18  MR. SCHRAG: If you're at a convenient place,
19  I'd like to take a five-minute break.
20  MR. GLENNON: Sure.
21  Before we go off the record really quickly,
22  can we keep it to five minutes, or you need more time
23  than that?
24  MR. SCHRAG: Five is fine.
25  MR. GREENSTEIN: Okay. Great.

423

1   VIDEOGRAPHER: Off the record, the time is
2   1:57 p.m.
3   (Thereupon a recess was taken at 1:57 p.m.
4   and the deposition resumed at 2:09 p.m.)
5   VIDEOGRAPHER: Going back on the record, the
6   time is 2:09 p.m.
7   BY MR. GLENNON:
8   Q.   Mr. Hatada, we're back on the record.
9   I just want to remind you that you're still
10  testifying under oath.
11  Mr. Hatada, you testified on direct about your
12  work in connection with the unapplied cash account.
13  Do you recall that?
14  A.   I do.
15  Q.   And you're familiar with Oracle's unapplied
16  cash account; correct?
17  A.   I am.
18  Q.   Do you know whether Oracle's unapplied cash
19  account is a revenue account?
20  MR. GREENSTEIN: Objection. Vague. Lacks
21  foundation. Speculation.
22  Sorry.
23  THE WITNESS: I believe it is.
24  BY MR. GLENNON:
25  Q.   And upon what do you base that belief?

424

1   A.   It's money that we have collected, and it's in
2   our system.
3   Q.   Do you have any other facts to support your
4   contention that the unapplied cash account is a revenue
5   account?
6       MR. GREENSTEIN: Objection. Vague.
7       THE WITNESS: No.
8   BY MR. GLENNON:
9   Q.   Is it your belief that all money that Oracle
10  has collected and that's in Oracle's system is revenue?
11      MR. GREENSTEIN: Objection. Mischaracterizes
12  the testimony. Speculation. Foundation.
13      MR. SCHRAG: Don't speculate. Just answer if
14  you know.
15      THE WITNESS: From my understanding.
16  BY MR. GLENNON:
17  Q.   From your understanding, yes?
18  A.   Yes. From my -- from my understanding, yes.
19  Q.   And upon what facts do you base that
20  understanding?
21  A.   Just from what I've been told and -- how I was
22  trained.
23  Q.   Do you recall anybody telling you that
24  Oracle's unapplied cash account was a revenue account?
25      MR. GREENSTEIN: Objection. Vague.

425

1   Foundation.
2       THE WITNESS: I do.
3   BY MR. GLENNON:
4   Q.   You do recall someone telling you that?
5   A.   I do.
6   Q.   Okay. And do you recall when somebody told
7   you that?
8   A.   No.
9   Q.   Do you recall who that person was?
10  A.   No.
11  Q.   Do you recall when that conversation took
12  place?
13  A.   No.
14  Q.   Do you recall why that person told you the
15  unapplied cash account was -- was a revenue account?
16      MR. GREENSTEIN: Objection. Speculation.
17      THE WITNESS: No.
18  BY MR. GLENNON:
19  Q.   Other than what this particular person told
20  you, do you have any other basis for your belief that
21  Oracle's unapplied cash account is a revenue account?
22      MR. GREENSTEIN: Objection. Speculation and
23  vague.
24      THE WITNESS: No.
25  BY MR. GLENNON:

426

1   Q.   You testified that during varying points in
2   time the amount of money in Oracle's unapplied account
3   was very large.
4       Do you recall that?
5   A.   I do.
6   Q.   Do you recall how much money was in Oracle's
7   unapplied cash account at the end of 1999?
8       MR. GREENSTEIN: Objection. Calls for
9   speculation.
10      THE WITNESS: No.
11  BY MR. GLENNON:
12  Q.   Do you recall how much money was in Oracle's
13  unapplied cash account at the end of 2000?
14      MR. GREENSTEIN: Same.
15      THE WITNESS: No.
16  BY MR. GLENNON:
17  Q.   Do you recall how much money was in Oracle's
18  unapplied cash account at the end of 2001?
19      MR. GREENSTEIN: Same.
20      THE WITNESS: No, I do not recall an exact
21  amount of how much was in Oracle's unapplied at any
22  point when I was there.
23      I just know it was millions.
24      I couldn't tell you a specific number.
25  BY MR. GLENNON:

427

1   Q.   Do you recall at any -- let me start that
2   question over.
3       What was the largest amount of money you ever
4   recall seeing at Oracle's unapplied cash account?
5       MR. GREENSTEIN: Objection. Vague. Calls for
6   speculation.
7       THE WITNESS: I believe it was somewhere
8   around 90 million.
9   BY MR. GLENNON:
10  Q.   And do you recall when that was?
11  A.   '04 maybe.
12  Q.   And what was the smallest amount of money you
13  recall seeing in Oracle's unapplied cash account?
14      MR. GREENSTEIN: Objection. Vague.
15      THE WITNESS: I believe it was 60.
16  BY MR. GLENNON:
17  Q.   $60?
18  A.   No, 60 million. Sorry.
19  Q.   No worries.
20  A.   My apologies.
21  Q.   And when was that?
22  A.   I believe it was right before I had left
23  Oracle they had got it down to that amount.
24  Q.   Now, you testified that you first learned
25  about the 46,000 debit memos created on November 17th,

428

1  2000 during a series of meetings you and the other
2  collection managers had towards the end of 2002; is that
3  correct?
4      MR. GREENSTEIN: Objection. Testimony speaks
5  for itself.
6      THE WITNESS: Can you repeat that. I'm sorry.
7      MR. GLENNON: Sure.
8      Can I have the Court Reporter repeat the
9  question, please.
10     (Record Read)
11     THE WITNESS: Correct.
12 BY MR. GLENNON:
13     Q.   How many total meetings were there at the end
14 of 2002?
15     MR. GREENSTEIN: Objection. Vague.
16     THE WITNESS: I couldn't tell you.
17 BY MR. GLENNON:
18     Q.   Do you know if it was more or less than 10?
19     A.   It's more than 10.
20     Q.   Do you know if it's more or less than 20?
21     A.   It was more than 20.
22     Q.   Do you know whether it was more or less than
23 50?
24     A.   No.
25     Q.   Okay. Do you have any estimate or your best

429

1  estimate as to the number of meetings that took place in
2  connection with this project you worked on towards the
3  end of 2002?
4      MR. GREENSTEIN: Objection. Asked and
5  answered. Speculation.
6      THE WITNESS: No.
7  BY MR. GLENNON:
8      Q.   Do you recall the date of the first meeting?
9      MR. GREENSTEIN: Objection. Asked and
10 answered.
11     THE WITNESS: No.
12 BY MR. GLENNON:
13     Q.   Do you recall the dates of any of the
14 meetings?
15     MR. GREENSTEIN: Objection. Asked and
16 answered.
17     THE WITNESS: No.
18 BY MR. GLENNON:
19     Q.   Do you recall who attended the first meeting?
20     MR. GREENSTEIN: Same objection. Vague.
21     THE WITNESS: I believe the first meeting with
22 -- that Mike Quinn and Greg Myers called was -- Mike
23 Quinn, Greg Myers, Ryan Roberts, Justin Backs, Anne
24 Marie Adao, Molly Littlefield, Omid Fardanesh, and
25 myself.

430

1  BY MR. GLENNON:
2      Q.   Now, is that the first in this series of
3  meetings in October or in the fall of 2002?
4      MR. GREENSTEIN: Objection. Vague.
5      THE WITNESS: There could have been one other
6  one that Ryan Roberts called, but just to tell us that
7  we were having a meeting with Mike and Greg.
8      Where we actually started off the whole
9  project, it was the meeting that Mike and Greg called.
10     So I would say it would be -- you'd call that
11 the first meeting.
12 BY MR. GLENNON:
13     Q.   Now, you testified at one point there was a
14 meeting every few days to discuss -- what Mike Quinn or
15 Jeff Henley wanted to do with respect to the unapplied
16 cash; is that correct?
17     MR. GREENSTEIN: Objection. Mischaracterizes
18 the testimony.
19     THE WITNESS: Correct.
20 BY MR. GLENNON:
21     Q.   Did Jeff Henley ever attend any one of these
22 meetings?
23     A.   No.
24     Q.   Have you ever spoken to Jeff Henley about
25 unapplied cash?

431

1      A.   No.
2      Q.   How do you know that Jeff Henley was involved
3  in determining what to do with respect to the unapplied
4  cash?
5      MR. GREENSTEIN: Objection. Vague.
6      THE WITNESS: Because this is what we were
7  told from Mike Quinn.
8  BY MR. GLENNON:
9      Q.   Okay. Have you ever spoken directly to Jeff
10 Henley about anything?
11     MR. GREENSTEIN: Objection. Vague.
12     THE WITNESS: No.
13 BY MR. GLENNON:
14     Q.   And other than what Mike Quinn told you do you
15 have any reason to believe that Jeff Henley was involved
16 in this unapplied cash project?
17     MR. GREENSTEIN: Objection. Vague. Calls for
18 speculation.
19     THE WITNESS: No, just what Mike Quinn had
20 stated, that he was -- he needed to report the
21 information we were giving him to Jeff Henley.
22 BY MR. GLENNON:
23     Q.   Now, you testified at one point that during
24 the meetings Mike Quinn explained the on account
25 problem.

432

1    Do you recall that?
2    MR. GREENSTEIN: Objection. Mischaracterizes
3 the testimony.
4    THE WITNESS: I do.
5 BY MR. GLENNON:
6    Q.   Now, was that at the first meeting?
7    A.   It was.
8    Q.   And you don't recall the date of that
9 particular meeting; is that correct?
10    A.   Correct.
11    Q.   Was it your understanding that the on account
12 problem was the movement of a large block of unapplied
13 cash in to the unapplied cash account?
14    MR. GREENSTEIN: Objection. Vague.
15 Foundation.
16 BY MR. GLENNON:
17    Q.   Let me start that question over.
18    What was your understanding of what the
19 unapplied cash -- or excuse me -- the on account problem
20 was?
21    MR. GREENSTEIN: Objection. Vague.
22    THE WITNESS: My understanding was that there
23 was unapplied cash that was moved out of the normal
24 unapplied account that was visible to collections
25 analysts as well as collections managers at some point

433

1 and it needed to now be moved back in to the visible
2 unapplied account, which we were to resolve moving
3 forward.
4 BY MR. GLENNON:
5    Q.   Do you know when this unapplied cash was moved
6 out of the normal unapplied account?
7    MR. GREENSTEIN: Objection. Calls for
8 speculation.
9    THE WITNESS: No.
10 BY MR. GLENNON:
11    Q.   Do you know when this unapplied cash was moved
12 out of the normal unapplied account?
13    MR. GREENSTEIN: Same objection. And vague.
14    THE WITNESS: No.
15 BY MR. GLENNON:
16    Q.   Do you know how this unapplied cash was moved
17 out of the normal unapplied account?
18    MR. GREENSTEIN: Same objection.
19    THE WITNESS: No, I do not know exactly how it
20 was moved out.
21 BY MR. GLENNON:
22    Q.   Do you know what accounting entries were made
23 in connection with this movement of unapplied cash that
24 was moved out of the normal unapplied account?
25    MR. GREENSTEIN: Objection. Vague.

434

1 Foundation. Speculation.
2    THE WITNESS: No. I wasn't a part of that.
3 BY MR. GLENNON:
4    Q.   Do you know who moved the unapplied cash out
5 of the normal unapplied account?
6    MR. GREENSTEIN: Same objections.
7    THE WITNESS: From my understanding from that
8 first meeting Mike Quinn had stated that Greg Myers was
9 responsible for the movement.
10 BY MR. GLENNON:
11    Q.   And other than what Mike Quinn told you did
12 you have any other basis for believing that Greg Myers
13 was responsible for moving the unapplied cash out of the
14 normal unapplied account?
15    MR. GREENSTEIN: Objection. Vague.
16 Speculation.
17    THE WITNESS: No. Again, this is the first I
18 heard of movement.
19 BY MR. GLENNON:
20    Q.   Did Mike Quinn also explain to you during this
21 meeting that this on account problem at issue in 2002
22 was a recent problem?
23    MR. GREENSTEIN: Objection. Vague.
24 Foundation.
25    THE WITNESS: He said it was both a problem

435

1 from years past as well as ongoing.
2 BY MR. GLENNON:
3    Q.   Do you know how Greg Myers went about -- let
4 me start that question over.
5    Do you have an understanding based on what
6 Mike told you about how Greg Myers moved this unapplied
7 cash out of the normal unapplied account?
8    MR. GREENSTEIN: Objection. Speculation.
9 Vague.
10    THE WITNESS: No.
11 BY MR. GLENNON:
12    Q.   Now, during this series of meetings towards
13 the end of 2002 the November 17th, 2000 debit memos were
14 discussed; correct?
15    A.   Correct.
16    Q.   Were Quinn and Myers explaining the debit
17 memos because Oracle's collections managers and analysts
18 were coming across them in customer billing histories
19 and were getting confused as to whether the debit memos
20 were open invoices?
21    MR. GREENSTEIN: Objection. Vague. Lacks
22 foundation. Speculation.
23    THE WITNESS: There was some conversation in
24 regards to that, but it wasn't -- it was -- they were --
25 they were stating that there was some confusion with the

436

1  collections analysts.
2  BY MR. GLENNON:
3      Q.   And that was in connection with the discussion
4  about the 46,000 debit memos that were appearing in
5  customer billing histories; is that correct?
6          MR. GREENSTEIN: Same objections and leading.
7          THE WITNESS: Correct, but it was a small
8  portion of it.
9  BY MR. GLENNON:
10     Q.   Did Quinn and Myers clarify during the course
11  of this particular meeting that the debit memos were
12  in fact, not open invoices and that you couldn't apply
13  money against one of the 550 debit memos?
14         MR. GREENSTEIN: Objection. Compound.
15  Foundation. Vague.
16         THE WITNESS: I'm unsure if they had stated
17  that.
18  BY MR. GLENNON:
19     Q.   Do you specifically recall whether Myers or
20  Quinn specifically said that the 46,000 debit memos were
21  responsible for moving the money from the unapplied
22  account in to a reserve account?
23         MR. GREENSTEIN: Objection. Foundation.
24  Speculation. Vague. Leading.
25         THE WITNESS: I specifically remember Mike

437

1  Quinn stating that.
2  BY MR. GLENNON:
3      Q.   Stating that the 46,000 debit memos had moved
4  the money in to a reserve account?
5          MR. GREENSTEIN: Same objections.
6          THE WITNESS: I don't know a number. He just
7  said "debit memos."
8  BY MR. GLENNON:
9      Q.   Okay. Do you recall Mike Quinn saying that
10  debit memos that were created on November 17th, 2000 --
11  actually, let me start that question over.
12         Do you know which debit memos Mike Quinn was
13  describing as having moved money from the unapplied
14  account to a reserve account?
15         MR. GREENSTEIN: Objection. Vague.
16  Speculation. Foundation.
17         THE WITNESS: I couldn't tell you exact
18  numbers. He just said "debit memos on November 17th,
19  2000."
20  BY MR. GLENNON:
21     Q.   Okay. So your specific recollection -- and
22  you specifically recall Mike Quinn saying that debit
23  memos that were created on November 17th, 2000 moved
24  money from the unapplied account to a reserve account?
25         You specifically recall that statement?

438

1          MR. GREENSTEIN: Objection. Mischaracterizes
2  testimony. Lacks foundation. Vague. Leading.
3          THE WITNESS: From what I remember, that's
4  what he had stated to Greg Myers.
5          He was explaining that -- trying to explain it
6  to us, but, again, as I stated in my -- in the first
7  deposition, what was being stated to us, we didn't
8  understand it fully when we walked out of there.
9  BY MR. GLENNON:
10     Q.   So you didn't understand what Mike Quinn was
11  explaining with respect to the debit memos' impact on
12  the unapplied cash account; is that fair?
13         MR. GREENSTEIN: Objection. Mischaracterizes
14  testimony. Leading. Foundation.
15  BY MR. GLENNON:
16     Q.   Is that a fair statement?
17     A.   That's fair.
18     Q.   Mr. Hatada, are you aware of the fact that
19  Ernst & Young reviewed the 46,000 debit memos that were
20  created on November 17th, 2000 and concluded that no
21  money changed accounts by virtue of those debit memos?
22         MR. GREENSTEIN: Objection. Lacks foundation.
23  Vague.
24         THE WITNESS: No.
25  BY MR. GLENNON:

439

1      Q.   Okay. Are you aware that Oracle engaged a
2  special litigation committee composed of world-renowned
3  experts incorporate governance specifically to study the
4  accounting impact of the debit memos that were created
5  on November 17th, 2000 and that special litigation
6  committee concluded that the debit memos did not result
7  in money, any money, changing accounts?
8          MR. GREENSTEIN: Objection. Lacks foundation.
9  Vague. Mischaracterizes testimony.
10         THE WITNESS: No.
11  BY MR. GLENNON:
12     Q.   Mr. Hatada, are you aware that the creation in
13  accounting for the debit memos that were created on
14  November 17th, 2000 were investigated by the United
15  States Securities & Exchange Commission and that after
16  that investigation the SEC refused to bring formal
17  charges against Oracle?
18         MR. GREENSTEIN: Objection. Lacks foundation.
19         THE WITNESS: No.
20  BY MR. GLENNON:
21     Q.   You are aware, however, that Oracle's other
22  current and former employees, including employees who
23  worked in collections and accounts receivable during
24  20023, have been deposed in this case; right?
25         MR. GREENSTEIN: Objection. Leading.

440

```
1    Foundation.
2        MR. SCHRAG: Other than him, are you asking?
3        MR. GLENNON: Right.
4    BY MR. GLENNON:
5        Q.   Are you aware of other Oracle employees who
6    worked in collections and accounts receivable during
7    2002 -- are you aware that those employees have been
8    deposed in this case?
9        A.   Yes.
10       MR. GREENSTEIN: Same objections and compound.
11   BY MR. GLENNON:
12       Q.   Mr. Hatada, would it surprise you that not a
13   single one of these other witnesses has described Quinn
14   or Myers as having said that the creation of the debit
15   memos on November 17th, 2000 resulted in a movement of
16   money from the unapplied account to a reserve account?
17       MR. GREENSTEIN: Objection. That
18   mischaracterizes the deposition testimony. That
19   testimony speaks for itself.
20       Lacks foundation.
21       THE WITNESS: No.
22   BY MR. GLENNON:
23       Q.   Now, Mr. Hatada, considering the fact that
24   we're testifying about conversations that took place
25   over four years ago about debit memos, which you
```

442

```
1        MR. GREENSTEIN: Objection. Leading and
2    foundation.
3        THE WITNESS: Correct.
4    BY MR. GLENNON:
5        Q.   You testified earlier that you believed that
6    the debit memos that were created on November 17th, 2000
7    were created both by a script and manually; is that
8    accurate?
9        MR. GREENSTEIN: Objection. Mischaracterizes
10   testimony. Foundation.
11       MR. SCHRAG: Is it accurate that that's what
12   was said or --
13   BY MR. GLENNON:
14       Q.   Yeah.
15       Is that an accurate summary of your testimony?
16       A.   Yeah.
17       MR. GREENSTEIN: Same objections.
18       THE WITNESS: I agree.
19   BY MR. GLENNON:
20       Q.   Is this also based on what Quinn and Myers
21   said to you during the course of this meeting?
22       MR. GREENSTEIN: Objection. Lacks foundation.
23   Vague.
24       THE WITNESS: Yes.
25   BY MR. GLENNON:
```

441

```
1    admittedly don't fully understand, is it possible that
2    you could have just misunderstood what Mr. -- what Quinn
3    and Myers were explaining to you during the course of
4    these meetings in the fall of 2002?
5        MR. GREENSTEIN: Objection. Leading. Lacks
6    foundation. Mischaracterizes the previous testimony.
7        THE WITNESS: Sure.
8        As I said, I walked out of there not
9    understanding fully what had taken place.
10   BY MR. GLENNON:
11       Q.   Now, other than what you recall Quinn and
12   Myers having explained to you during the course of these
13   meetings, do you have any other facts or any other
14   reason to believe that creation of the debit memos on
15   November 17th, 2000 resulted in the movement of money
16   from the unapplied account to a reserve account?
17       MR. GREENSTEIN: Objection. Asked and
18   answered. Lacks foundation. Calls for speculation.
19       Leading. Sorry. Leading.
20       THE WITNESS: No. I was thoroughly basing it
21   on what I had heard.
22   BY MR. GLENNON:
23       Q.   And when you say what you had heard, you're
24   referring to what you had heard from Myers and Quinn
25   during the course of these meetings in the fall 2002?
```

443

```
1        Q.   What exactly did Quinn or Myers say to you
2    about the manual creation of debit memos?
3        MR. GREENSTEIN: Objection. Vague.
4        THE WITNESS: Just that there was some
5    confusion with the debit memos, not only with what Greg
6    Myers had done, but with other people in collections as
7    well.
8        So that's what made me believe that maybe
9    there was something done manually as well, not just done
10   by Greg Myers.
11   BY MR. GLENNON:
12       Q.   So Quinn didn't say that debit memos were
13   created manually, he just said that there was some
14   confusion surrounding debit memos; is that accurate?
15       MR. GREENSTEIN: Objection. Mischaracterizes
16   testimony. Leading. Foundation.
17       THE WITNESS: I took it as manually, but, I
18   mean, you know, you asked me a question, and I just felt
19   that from my understanding it wasn't just done by an
20   application or by one person, it could have been done by
21   several people.
22   BY MR. GLENNON:
23       Q.   Okay. Do you --
24       A.   What that means to me is manually.
25       Q.   Okay. Do you recall anybody telling you that
```

444

```
1    any of the November 17th, 2000 debit memos were created
2    manually?
3          MR. GREENSTEIN: Objection. Vague.
4    Foundation.
5          THE WITNESS: Only from what I heard in that
6    meeting.
7    BY MR. GLENNON:
8       Q.   And did anybody tell you during that meeting
9    that any of the November 17th, 2000 debit memos were
10   created manually?
11         MR. GREENSTEIN: Objection. Vague.
12   Foundation.
13         THE WITNESS: Because he stated that they were
14   not only done -- by one person and in the application,
15   that there was some confusion with some of the
16   collectors that could have done some debit memos
17   manually, that I felt that there was also some -- some
18   things done manually, not only done --
19         MR. GLENNON: Right.
20         THE WITNESS: -- within the application.
21         That was my understanding.
22   BY MR. GLENNON:
23      Q.   Okay. And I'm not trying to be difficult.
24      A.   Yeah.
25      Q.   But you're testifying based on your
```

445

```
1    interpretation of the description about there being some
2    confusion.
3          My question is, did anybody during the course
4    of this particular meeting tell you that any of the
5    November 17th, 2000 debit memos were -- those debit
6    memos were created manually?
7          MR. GREENSTEIN: Asked and answered.
8          MR. SCHRAG: Objection. Asked and answered.
9          Are you asking if they used the word
10   "manually"?
11         MR. GLENNON: Yeah. Yeah.
12         MR. GREENSTEIN: Excuse me. Sorry.
13         Can I log my objections?
14         MR. SCHRAG: Sure.
15         MR. GREENSTEIN: Foundation. Asked and
16   answered.
17         MR. GLENNON: I'm going to withdraw the
18   question.
19         MR. GREENSTEIN: Okay.
20   BY MR. GLENNON:
21      Q.   Do you recall anybody using the specific
22   phrase "manual creation" in connection with the
23   description about the creation of the 46,000 debit memos
24   on November 17th, 2000?
25         MR. GREENSTEIN: Objection. Vague. Asked and
```

446

```
1    answered.
2          THE WITNESS: No. I just interpreted it that
3    way.
4    BY MR. GLENNON:
5       Q.   And when you interpret it, you're interpreting
6    the description about there being confusion about debit
7    memos generally; is that correct?
8          MR. GREENSTEIN: Objection. Leading.
9    Foundation.
10         THE WITNESS: In conjunction with other
11   individuals, not just Greg Myers, so that made me feel
12   like there was something done manually, but, again, it
13   could have been confused with the way he said it.
14   BY MR. GLENNON:
15      Q.   Are you aware of any other individuals having
16   manually created a debit memo on November 17th, 2000?
17         MR. GREENSTEIN: Objection. Calls for
18   speculation. Foundation. Vague.
19         THE WITNESS: No.
20   BY MR. GLENNON:
21      Q.   Mr. Hatada, you also testified that at one of
22   the meetings Mike Quinn mentioned a lawsuit against
23   Oracle.
24         Do you recall that?
25      A.   I believe it was in the first meeting before
```

447

```
1    we had the meeting with Mike Quinn and Greg Myers, and
2    -- if I remember right, I believe it was Ryan Roberts
3    that had stated that, not Mike Quinn.
4       Q.   So it was Ryan Roberts --
5       A.   Uh-huh.
6       Q.   -- who referred to a lawsuit during what you
7    believe to be the first meeting?
8       A.   True.
9       Q.   And do you recall the date of that particular
10   meeting?
11      A.   It was probably days before the actual meeting
12   that Mike and Greg had called.
13      Q.   Oh.
14      A.   I couldn't tell you.
15      Q.   Okay. Do you remember the month that that
16   meeting took place?
17      A.   It was in the same month of that meeting that
18   we had with Mike and Greg, and I couldn't tell you when
19   that is.
20      Q.   Okay. But you recall Ryan Roberts referring
21   to a lawsuit in connection with this initial meeting; is
22   that right?
23      A.   True.
24      Q.   Do you know how many lawsuits were pending
25   against Oracle at the time of this particular meeting?
```

448

1　　MR. GREENSTEIN: Objection. Vague.
2 Foundation.
3　　THE WITNESS: No.
4 BY MR. GLENNON:
5　　Q.　Do you know whether Ryan Roberts was referring
6 to the derivative lawsuit pending in Delaware?
7　　MR. GREENSTEIN: Objection. Vague.
8 Foundation.
9　　THE WITNESS: No. I have no specifics on
10 which lawsuit he was referring to.
11　　I just heard him say it was specific to this
12 project.
13 BY MR. GLENNON:
14　　Q.　But you didn't know which lawsuit he was
15 referring to?
16　　MR. GREENSTEIN: Same objections.
17　　THE WITNESS: (Shaking head)
18 BY MR. GLENNON:
19　　Q.　And do you understand how -- let me start that
20 question over.
21　　Do you know when the particular lawsuit that
22 Ryan Roberts was referring to was filed?
23　　MR. GREENSTEIN: Objection. Vague.
24 Speculation.
25　　THE WITNESS: I don't know anything about the

449

1 lawsuit that Ryan Roberts was talking about --
2　　MR. GLENNON: Okay.
3　　THE WITNESS: -- other than that he said that
4 there was a lawsuit that was in conjunction with the
5 project that we were about to partake in.
6 BY MR. GLENNON:
7　　Q.　Did he explain to you how the lawsuit was in
8 conjunction with the project that you were about to
9 undertake?
10　　MR. GREENSTEIN: Objection. Vague.
11　　THE WITNESS: Just that it had to do with
12 unapplied funds that should have been refunded back to
13 the client.
14 BY MR. GLENNON:
15　　Q.　But you don't know which specific lawsuit he
16 was referring to?
17　　MR. GREENSTEIN: Objection. Asked and
18 answered. Vague.
19　　THE WITNESS: No idea.
20 BY MR. GLENNON:
21　　Q.　You testified at the -- at one point that Mike
22 Quinn had sent the collection managers a spread sheet;
23 is that correct?
24　　MR. GREENSTEIN: Objection. Mischaracterizes
25 testimony.

450

1　　THE WITNESS: Correct.
2 BY MR. GLENNON:
3　　Q.　Do you recall the date on which Mike Quinn
4 sent the collection managers the spread sheet?
5　　MR. GREENSTEIN: Same objections.
6　　THE WITNESS: No.
7 BY MR. GLENNON:
8　　Q.　Do you recall the month in which Mike Quinn
9 sent the collections managers the spread sheet?
10　　MR. GREENSTEIN: Same and speculation.
11　　THE WITNESS: No.
12 BY MR. GLENNON:
13　　Q.　Do you recall whether or not that was in 2002?
14　　MR. GREENSTEIN: Same.
15　　THE WITNESS: Yeah. I believe it was in '02.
16 BY MR. GLENNON:
17　　Q.　And upon what facts do you base that belief?
18　　MR. GREENSTEIN: Objection. Vague.
19　　THE WITNESS: The spread sheet that was sent
20 to us that we were working off of was sent to us when we
21 had started the project of resolving the unapplied cash
22 issue, and I'm not very good with dates, times, months,
23 years.
24　　I just know that when we worked on it he had
25 sent it to us.

451

1 BY MR. GLENNON:
2　　Q.　You also testified that there was a large
3 amount of other unapplied cash that was transferred in
4 to the unapplied cash account that you were familiar
5 with at about the same time; is that correct?
6　　MR. GREENSTEIN: Objection. Mischaracterizes
7 the testimony.
8　　THE WITNESS: Correct.
9 BY MR. GLENNON:
10　　Q.　What was the total dollar amount of the
11 receipts that were transferred in to the unapplied
12 account during this period of time?
13　　MR. GREENSTEIN: Objection. Foundation.
14 Speculation.
15　　THE WITNESS: I don't know.
16 BY MR. GLENNON:
17　　Q.　Do you know whether it was more or less than
18 50 million dollars?
19　　MR. GREENSTEIN: Same objections.
20　　THE WITNESS: I believe it was over 50
21 million, but I don't have an exact amount.
22 BY MR. GLENNON:
23　　Q.　Okay. Why do you believe it was over 50
24 million?
25　　A.　Just from what I remember.

452

1 I know it was -- wasn't any -- I don't believe
2 it was any less than 40, but it was somewhere in that
3 vicinity of 40 to 60.
4 Q. So your best estimate is it was between 40 and
5 60 million dollars were transferred back in to the
6 unapplied account; is that correct?
7 A. Somewhere in the vicinity of that amount, but,
8 again, I couldn't tell you an exact amount.
9 MR. GLENNON: I'm told we need to change tape.
10 I don't need a break, so we can just change
11 tape and keep going? That's okay?
12 If you need -- are you okay?
13 THE WITNESS: Fine.
14 VIDEOGRAPHER: Off the record, the time is
15 2:37 p.m.
16 Here marks the end of videotape number two,
17 volume two, in the deposition of Ian Hatada.
18 (Discussion off the record)
19 VIDEOGRAPHER: We are back on the record. The
20 time is 2:39 p.m.
21 Here marks the beginning of videotape number
22 three, volume two, in the deposition of Ian Hatada.
23 BY MR. GLENNON:
24 Q. Mr. Hatada, we're back on the record.
25 Quickly I just want to go back to a subject we

453

1 were just discussing, and that is Ryan Robert's
2 reference to a lawsuit in what you believe to be the
3 first meeting in connection with this unapplied cash
4 project.
5 A. Uh-huh.
6 Q. At the time Ryan Roberts mentioned that to you
7 were you aware of any lawsuit pending against Oracle?
8 A. No.
9 Q. Other than what Ryan Roberts said to you
10 during the course of this meeting were you aware of this
11 or any particular lawsuit?
12 MR. GREENSTEIN: Objection. Vague.
13 THE WITNESS: No.
14 BY MR. GLENNON:
15 Q. Excuse me.
16 Lawsuit against Oracle, I guess I should have
17 said.
18 A. No.
19 Q. Okay. Now, shortly before we switched tapes
20 you estimated that the amount of money that had
21 transferred in to the unapplied account was somewhere in
22 the vicinity of 40 to 60 million dollars; is that
23 correct?
24 A. From what I remember.
25 Q. Do you know the date on which this transfer

454

1 took place?
2 A. I do not.
3 MR. GREENSTEIN: Objection.
4 Sorry. Objection. Speculation.
5 BY MR. GLENNON:
6 Q. Do you know from which account this transfer
7 took place?
8 MR. GREENSTEIN: Objection. Vague.
9 MR. GLENNON: Let me start that question over
10 again.
11 BY MR. GLENNON:
12 Q. Do you know from which account these
13 particular funds were transferred from?
14 MR. GREENSTEIN: Objection. Vague.
15 Speculation.
16 THE WITNESS: No.
17 BY MR. GLENNON:
18 Q. Did you participate in transferring the actual
19 transfer of those funds in to the unapplied account?
20 MR. GREENSTEIN: Same objections.
21 THE WITNESS: No.
22 BY MR. GLENNON:
23 Q. Do you know who transferred the funds?
24 MR. GREENSTEIN: Same objections.
25 THE WITNESS: All I knew is that it was the AR

455

1 department that had moved it from one to the other.
2 I couldn't tell you who actually did it.
3 BY MR. GLENNON:
4 Q. Yeah.
5 How did you know the AR department moved it
6 from one account to another?
7 A. Because they had control of that.
8 Q. And how did you know they had control of that?
9 A. Just from hearing from Greg Myers, and Sam
10 Johannes, and the people we were dealing with at AR.
11 Q. So your understanding that AR was responsible
12 for this transfer of funds was based on things that you
13 were hearing from Greg Myers and Samuel Johannes; is
14 that correct?
15 MR. GREENSTEIN: Objection. Mischaracterizes
16 testimony. Leading. Foundation.
17 THE WITNESS: Correct.
18 BY MR. GLENNON:
19 Q. Do you know which accounts were debited and
20 which accounts were credited as part of this particular
21 transfer?
22 MR. GREENSTEIN: Objection. Vague.
23 Foundation.
24 THE WITNESS: No.
25 BY MR. GLENNON:

456

```
1     Q.  Did you review any of the general or subledger
2  entries associated with this particular transfer at the
3  end of 2002?
4         MR. GREENSTEIN: Objection. Vague.
5  Foundation.
6         THE WITNESS: No.
7  BY MR. GLENNON:
8     Q.  Did you review any of the journal entries
9  associated with this particular transfer?
10        MR. GREENSTEIN: Same objections.
11        THE WITNESS: No.
12  BY MR. GLENNON:
13    Q.  Do you know the account number of the account
14  from which this block of unapplied cash was transferred
15  in to the unapplied cash account in 2002?
16        MR. GREENSTEIN: Objection. Foundation.
17  Vague -- and speculation.
18        THE WITNESS: I don't remember the exact
19  numbers of any of the accounts.
20  BY MR. GLENNON:
21    Q.  Do you know the name of the account from which
22  this particular block of unapplied cash was transferred
23  in to the unapplied cash account in 2002?
24        MR. GREENSTEIN: Same objections.
25        THE WITNESS: Some people -- there obviously
```

457

```
1  was a number for it that I don't know, and then other
2  people looked -- referred to it as a "reserve" or -- a
3  "reserve account," but I don't know the specific name.
4  BY MR. GLENNON:
5     Q.  Do you know -- do you have personal knowledge
6  as to whether or not this money came from a reserve
7  account?
8         MR. GREENSTEIN: Objection. Foundation.
9  Vague. Speculation.
10        THE WITNESS: Only from what I heard.
11  BY MR. GLENNON:
12    Q.  And what was it that you heard that led you to
13  believe that this money came from a reserve account?
14        MR. GREENSTEIN: Objection. Foundation.
15  Speculation.
16        THE WITNESS: Just from -- what I had heard,
17  that it came from an account that -- that, obviously, we
18  couldn't see that was -- had sometimes been called the
19  reserve, and then it was more -- or a reserve account,
20  whether -- whichever number it was called, I have no
21  idea, and it ended up having to go back in to unapplied.
22  BY MR. GLENNON:
23    Q.  So the only basis for your understanding that
24  this came from a reserve account is what people told
25  you; is that correct?
```

458

```
1         MR. GREENSTEIN: Objection. Mischaracterizes
2  testimony. Lacks foundation.
3         THE WITNESS: True.
4  BY MR. GLENNON:
5     Q.  Do you recall who told you that this money
6  came from a reserve account?
7         MR. GREENSTEIN: Objection. Foundation.
8         THE WITNESS: No.
9  BY MR. GLENNON:
10    Q.  Do you recall when anybody told you that this
11  money was transferred from a reserve account?
12        MR. GREENSTEIN: Same.
13        THE WITNESS: It was right around the time
14  when those meetings had started, and it could have been
15  any of those managers, on Mike Quinn, or Greg Myers.
16        I don't remember exactly who.
17        MR. GLENNON: Okay.
18        THE WITNESS: And I -- I really didn't --
19  wasn't paying attention to exactly where it came from.
20        I was just concentrating on what I had to do
21  when it ended up in unapplied.
22  BY MR. GLENNON:
23    Q.  So other than what one of these individuals
24  may have said to you about the origin of the money that
25  was being transferred in to the unapplied account you
```

459

```
1  didn't have personal knowledge as to where that money
2  came from; is that right?
3         MR. GREENSTEIN: Objection. Leading.
4  Argumentative.
5         Lacks foundation. Misstates testimony.
6         THE WITNESS: Correct.
7  BY MR. GLENNON:
8     Q.  Do you know what a "reserve account" is?
9         MR. GREENSTEIN: Objection. Vague.
10  Foundation.
11        THE WITNESS: I couldn't give you a
12  description of it, no.
13  BY MR. GLENNON:
14    Q.  Okay. Do you know under what circumstances it
15  is appropriate to transfer money in to a reserve
16  account?
17        MR. GREENSTEIN: Objection. Vague.
18  Foundation. Speculation.
19        THE WITNESS: I couldn't give you a
20  description of the reserve account, and I do not know on
21  what basis it can be transferred.
22  BY MR. GLENNON:
23    Q.  Do you know how many reserve accounts Oracle
24  maintained during the course of your employment?
25        MR. GREENSTEIN: Same objections.
```

460

1    THE WITNESS: No.
2    BY MR. GLENNON:
3    Q.   Now, you had described the money that came in
4    to the unapplied account in 2002, this block of
5    unapplied cash, as being previously invisible.
6    Is that -- is that right?
7    Is that a fair characterization of your
8    testimony?
9    MR. GREENSTEIN: Objection. Misstates
10   testimony. Foundation.
11   THE WITNESS: From us in collections that were
12   actually trying to resolve the unapplied amounts, we
13   knew the unapplied to be -- a certain amount, which was
14   visible to us on a daily basis or weekly, and we were
15   responsible for controlling that unapplied.
16   The money that had been transferred in to it
17   that made us have to resolve it in a timely manner, I
18   had not much -- I didn't have any information as to
19   where it was coming from or -- you know, not -- I didn't
20   have a good description of why it just -- that we had to
21   resolve it.
22   BY MR. GLENNON:
23   Q.   Okay. But you described it as previously
24   being invisible; is that right?
25   MR. GREENSTEIN: Objection. Mischaracterizes

461

1    testimony. Foundation.
2    MR. GLENNON: Let me start that question over
3    again.
4    BY MR. GLENNON:
5    Q.   Before it was transferred in to the unapplied
6    cash account that you had familiarity with, you
7    testified that this was invisible unapplied cash. Was
8    that -- or was it invisible to you?
9    Is that accurate?
10   MR. GREENSTEIN: Objection. Vague. Misstates
11   testimony. Foundation.
12   MR. SCHRAG: Which one do you want him to
13   answer?
14   MR. GLENNON: Yeah. That's just -- let me
15   just start that one over.
16   THE WITNESS: I can answer that.
17   MR. SCHRAG: The problem is answering he asked
18   two different questions.
19   THE WITNESS: All right.
20   MR. GLENNON: I have two questions out there.
21   Appreciate it though.
22   BY MR. GLENNON:
23   Q.   You testified that before this money was
24   transferred in to the unapplied account that you were
25   familiar with that it was invisible to you; is that

462

1    correct?
2    MR. GREENSTEIN: Objection. Misstates
3    testimony. Foundation.
4    THE WITNESS: That's correct.
5    BY MR. GLENNON:
6    Q.   Did you or any of the collection managers have
7    any responsibility for maintaining any of the bad debt
8    reserve accounts?
9    MR. GREENSTEIN: Objection. Vague.
10   Foundation.
11   THE WITNESS: Yeah. On a quarterly basis we
12   did bad debt, but we basically -- collected the
13   information as far as which invoices that were over a
14   hundred thousand dollars were deemed uncollectible, and
15   we put them on a spread sheet, sent them to Molly
16   Littlefield, and at that point we'd wash our hands of
17   it.
18   So that's the only thing that we had that was
19   responsible for the bad debt, was that we needed to do
20   that on a quarterly basis and just give her the
21   information which, in turn, she just put together a
22   spread sheet and gave it to -- I'm not even sure who she
23   sent it to, but she'd send it up the chain.
24   BY MR. GLENNON:
25   Q.   And this particular task contemplated

463

1    gathering up all of the old uncollectible invoices;
2    isn't that right?
3    MR. GREENSTEIN: Objection. Misstates
4    testimony. Foundation.
5    THE WITNESS: They weren't always old.
6    Some of them could be brand-new, but if our
7    collectors or myself knew that they were uncollectible,
8    we'd label them as bad -- on the bad debt, put them on a
9    spread sheet and send them up.
10   BY MR. GLENNON:
11   Q.   How would you know that something that was
12   relatively new would be uncollectible?
13   MR. GREENSTEIN: Objection. Vague.
14   THE WITNESS: It could be due to there needing
15   to be credit memos done on it for the full amount. It
16   could be incorrectly invoiced, a customer satisfaction
17   issue, legal -- plenty of different reasons.
18   There was many different reason codes for bad
19   debt.
20   BY MR. GLENNON:
21   Q.   Okay. But the collection managers and
22   collection analysts didn't have responsibility for
23   maintaining the actual bad debt reserve account, did
24   they, during the course of your employment at Oracle?
25   MR. GREENSTEIN: Objection. Foundation.

464

```
1    Leading.
2         THE WITNESS:  No.  It was specifically the --
3    the transition of information.
4    BY MR. GLENNON:
5         Q.   Was maintaining the bad debt reserve something
6    that the accounts receivable department would do?
7         MR. GREENSTEIN:  Objection.  Vague.
8         THE WITNESS:  I'm unsure who was responsible
9    for it.  I just knew that we had a small part in it.
10   BY MR. GLENNON:
11        Q.   But you didn't have access to the bad debt
12   reserve itself, which is why you described it as
13   invisible?
14        Let me start that question again.
15        Were you describing the account as previously
16   being invisible because you didn't have access to the
17   bad debt reserve or whatever account this money was
18   transferred from?
19        MR. GREENSTEIN:  Objection.  Leading.
20   Mischaracterizes testimony.  Foundation.
21        THE WITNESS:  Yeah.  I didn't have access to
22   it and I wasn't sure where it was coming from.
23   BY MR. GLENNON:
24        Q.   Okay.  Do you know whether that account from
25   which this block of receipts was transferred from was
```

465

```
1    visible to or accessible by other Oracle employees prior
2    to the time that it was transferred in to the unapplied
3    cash account?
4         MR. GREENSTEIN:  Objection.  Vague.  Compound.
5    Foundation.  Speculation.
6         THE WITNESS:  Sure.
7         I believe everyone from the senior -- senior
8    management level up, which was -- was visible -- or it
9    could be visible through, and I think that's -- you
10   know, Greg Myers, Mike Quinn, Tom Williams.
11   BY MR. GLENNON:
12        Q.   So, in other words, when you say that this
13   account previously was invisible, do you mean that it
14   was invisible to you as a collections manager during the
15   time of this -- before the time of this unapplied cash
16   project?
17        MR. GREENSTEIN:  Objection.  Vague.
18   Foundation.  Misstates testimony.
19        THE WITNESS:  All I knew at that time was that
20   we were responsible for the unapplied and after the date
21   of having these meetings and putting together this
22   project that we were supposed to resolve all these
23   unapplied items that were going to be added in to our
24   unapplied, we now had visibility to the -- the entire
25   thing.
```

466

```
1    But before this project the only thing we knew
2    as being unapplied was the unapplied account, and this
3    money did not come from the unapplied account that we
4    knew as being the unapplied account.
5    BY MR. GLENNON:
6         Q.   Right.
7         Are you aware of any other Oracle employees
8    who had visibility in to this other account from which
9    this block of unapplied cash was transferred?
10        MR. GREENSTEIN:  Objection.  Foundation.
11        THE WITNESS:  No.
12   BY MR. GLENNON:
13        Q.   And you testified that you thought that Greg
14   Myers, Mike Quinn, or Tom Williams would have visibility
15   in to this other account; is that correct?
16        MR. GREENSTEIN:  Objection.  Foundation.
17   Misstates testimony.
18        THE WITNESS:  Sure.  They were the ones that
19   informed us of the situation.
20        They had to have access to -- to the account.
21   They were giving us the information.
22   BY MR. GLENNON:
23        Q.   In other words, they couldn't transfer the
24   money unless they had access to this account; is that
25   correct?
```

467

```
1         MR. GREENSTEIN:  Objection.  Leading.
2         Sorry.
3         Objection.  Leading.  Foundation, speculation.
4         THE WITNESS:  Yeah.  They were the ones that
5    informed us of the money and that it was going to be
6    coming in to the unapplied, so I just took it as, yes,
7    of course, they had visibility to it.
8    BY MR. GLENNON:
9         Q.   Okay.  So, in other words, when you were
10   describing this money as previously having been
11   invisible, it's not as if it was invisible to everybody
12   at Oracle, it was just that it was invisible to you as a
13   collections manager and perhaps other collections
14   managers.
15        Is that a fair statement?
16        MR. GREENSTEIN:  Objection.  Compound.
17   Foundation.  Misstates testimony -- and leading.
18        THE WITNESS:  That's correct.
19        It was invisible to the people that were now
20   held responsible for resolving it.
21   BY MR. GLENNON:
22        Q.   Okay.  Now, did you ever personally move money
23   in to the bad debt reserve?
24        MR. GREENSTEIN:  Objection.  Vague.
25   Foundation.
```

468

1    THE WITNESS: No.
2    BY MR. GLENNON:
3    Q.  Do you have any independent knowledge of when
4    the cash receipts that ultimately were transferred back
5    in to the unapplied cash account originally were
6    transferred in to the bad debt reserve?
7    MR. GREENSTEIN: Objection. Vague.
8    Foundation. Speculation.
9    THE WITNESS: No.
10   BY MR. GLENNON:
11   Q.  Now, you testified that among other things one
12   of the items that the collections managers did in an
13   attempt to resolve this unapplied cash was determine
14   whether the items were revenue impacting or not revenue
15   impacting; is that right?
16   MR. GREENSTEIN: Objection. Misstates
17   testimony. Foundation.
18   THE WITNESS: Correct.
19   BY MR. GLENNON:
20   Q.  And how do you go about determining whether
21   unapplied cash is revenue impacting versus not revenue
22   impacting?
23   MR. GREENSTEIN: Objection. Compound.
24   Foundation. Vague.
25   MR. SCHRAG: Don't speculate. Just answer if

469

1    you know.
2    THE WITNESS: Okay. From my understanding
3    with the unapplied -- the biggest issue we had once we
4    started the project was Mike Quinn wanted to know out of
5    all these items that we were working on, which was
6    revenue impacting and which wasn't, so after we actually
7    labeled it with a reason code to state this is what
8    we're going to do with this item, once we knew what we
9    were going to do with it, the question was is that
10   action item that we're going to do with it going to be
11   revenue impacting to Oracle or is it not, meaning, for
12   example, if we refund it back to the customer, that's
13   ultimately going to be revenue impacting, because we
14   already had the money, now we're giving it back, and
15   this is from my understanding.
16   If we had just upped the invoice and applied
17   the amount in unapplied to that invoice, we're keeping
18   that money, meaning it's not revenue impacting, and that
19   was my understanding of it.
20   BY MR. GLENNON:
21   Q.  Okay. And what -- and what do you -- what do
22   you base your understanding of revenue impacting versus
23   nonrevenue impacting?
24   MR. GREENSTEIN: Objection. Asked and
25   answered. Foundation.

470

1    THE WITNESS: My simple explanation is, you
2    know, at the end of the day are we keeping that money or
3    are we giving it away -- or giving it back.
4    BY MR. GLENNON:
5    Q.  I understand.
6    So your interpretation of "revenue impacting"
7    is refunding the money; is that correct?
8    MR. GREENSTEIN: Objection. Misstates
9    testimony.
10   Counsel is testifying. Foundation.
11   THE WITNESS: Yes, that was one of the reason
12   codes that could be revenue impacting.
13   BY MR. GLENNON:
14   Q.  Okay. And if you didn't refund the money but
15   found a different application for the money, your
16   understanding was that that was not revenue impacting;
17   is that accurate?
18   MR. GREENSTEIN: Objection. Misstates
19   testimony. Foundation. Vague.
20   THE WITNESS: That was my understanding.
21   BY MR. GLENNON:
22   Q.  And where did you get that understanding?
23   Where did you learn that?
24   MR. GREENSTEIN: Objection. Asked and
25   answered.

471

1    THE WITNESS: From --
2    MR. GREENSTEIN: Vague.
3    THE WITNESS: -- the various meetings that we
4    had with our collections group as well as Mike Quinn and
5    Greg Myers.
6    BY MR. GLENNON:
7    Q.  Okay. So the same meetings we were talking
8    about earlier that took place somewhere in 2002?
9    MR. GREENSTEIN: Objection. Vague.
10   THE WITNESS: Correct.
11   BY MR. GLENNON:
12   Q.  Now, did you make any determinations as to
13   whether or not something was revenue impacting or was
14   your job to figure out what action code to apply to an
15   unapplied cash item?
16   MR. GREENSTEIN: Objection. Compound.
17   Foundation. Vague.
18   THE WITNESS: My -- my job was to research it,
19   give it a reason code, and then all of us as managers
20   were to get together at the end of the day and look at
21   the comments, the history, the detail, the action item,
22   and then label it all together as, okay, this is revenue
23   impacting, or, no, it's not revenue impacting.
24   BY MR. GLENNON:
25   Q.  Now, did you personally label items as revenue

472

1  impacting or not revenue impacting or was that
2  somebody's else's responsibility?
3      A.   I think it was --
4      MR. GREENSTEIN: Hold on. Hold on a second.
5  Sorry.
6      Objection. Compound. Foundation. Leading.
7  Sorry.
8      THE WITNESS: I think it was all of us
9  managers as a group had to label those items as revenue
10  impacting or not revenue impacting and then send it up
11  the chain to Mike.
12  BY MR. GLENNON:
13      Q.   Now, correct me if I'm wrong, but I think you
14  testified that this unapplied cash project that you
15  undertook in 2002 had a major revenue impact; is that
16  correct?
17      Is that your understanding?
18      MR. GREENSTEIN: Objection. Misstates
19  testimony. Foundation. Vague.
20      THE WITNESS: There was a possibility that it
21  could have, and that's what I took out of our meetings,
22  especially the first meetings, that, you know, it could
23  cause a big problem with revenue if we end up refunding
24  all of this cash.
25      That's why we have to research it as much as

473

1  possible to find out if -- if it does go back to the
2  client or does not.
3  BY MR. GLENNON:
4      Q.   Do you know whether the end result of the
5  unapplied cash project in -- in 2002 or at any point
6  after it was initiated ever had a major revenue impact
7  on Oracle?
8      MR. GREENSTEIN: Objection. Vague. Asked and
9  answered.
10      THE WITNESS: No. I -- I mean, once I was
11  done with the project, I was done with it.
12  BY MR. GLENNON:
13      Q.   Now, as part of this unapplied cash project
14  you testified that Oracle's managers would do -- and I
15  have a list of four major things -- adjusting up
16  invoices, amending notes columns or amending notes,
17  applying the unapplied cash to any open invoices where
18  applicable, and issuing refunds at various points in
19  time.
20      Is that -- is that correct?
21      MR. GREENSTEIN: Objection. Misstates
22  testimony. Lack of foundation.
23      THE WITNESS: That could -- yeah, that could
24  happen at any given time, that we were trying to -- once
25  we got to the resolution part of it.

474

1  BY MR. GLENNON:
2      Q.   And what do you mean, once you got to the
3  resolution part of it?
4      A.   Well, a big portion of our project was to
5  label, --
6      Q.   Uh-huh.
7      A.   -- put comments in, notes, give the -- the
8  exact detail of what happened, and sometimes that took a
9  long time for one -- to resolve one item, especially
10  some of the bigger, older one ones, because there was so
11  many different transactions done on that one item with
12  different checks, different invoices.
13      So it took a long time to resolve one item
14  sometimes, and at the end of the day or at the end of
15  the project it could have happened -- any of those four
16  things could have happened, could have been refunded,
17  could have been adjusted up, could have been applied to
18  open invoices per the customer.
19      Q.   When you talk about "get the exact detail of
20  what happened," are you referring to drilling down and
21  determining why this piece of unapplied cash is
22  unapplied?
23      MR. GREENSTEIN: Objection. Foundation.
24  Leading.
25      THE WITNESS: Correct.

475

1      The history of the check from the point of us
2  receiving it to the point of us trying to resolve it.
3  BY MR. GLENNON:
4      Q.   And how would you go about researching and
5  trying to determine how this item of unapplied cash came
6  to be an item of unapplied cash?
7      MR. GREENSTEIN: Objection. Calls for
8  speculation. Foundation. Vague.
9      THE WITNESS: Well, we'd look at the
10  application history, find out where it -- and first and
11  foremost, look at the check and the remittance
12  information, and a lot of times checks that are sent in
13  by customers to Oracle don't have remittance
14  information, or it would be the -- it would be -- it
15  wouldn't match our invoice, so we'd have to really go in
16  to the applications part of it in the system and find
17  out, okay, where was it applied and why was maybe --
18  maybe why was it applied to five invoices when the
19  remittance info -- information said three invoices?
20      You know, so you'd have to dig down deep, like
21  you said, and try to resolve that and figure out if
22  there was any incorrect applications causing this
23  unapplied cash.
24  BY MR. GLENNON:
25      Q.   Okay. And so once you -- you dug down and

476

1  researched why the item of unapplied cash was, in fact,
2  unapplied cash, then you could take any one of the four
3  remedial measures, such as adjusting up invoices,
4  amending notes, applying the unapplied cash, or perhaps
5  refunding the cash, if that was appropriate; does that
6  sound correct?
7      Do I have -- do I have the system down?
8      MR. GREENSTEIN: Objection. Foundation.
9  Misstates testimony.
10     THE WITNESS: Yeah, all four of those things
11 could have happened.
12 BY MR. GLENNON:
13     Q.  Okay.  Is there -- and putting aside the first
14 part, which I understand to be the big, cumbersome
15 component of the research, are there other remedial
16 measures other than the four that I just identified that
17 were common in terms of resolving the unapplied cash
18 once it had been labeled?
19     MR. GREENSTEIN: Objection. Vague.
20 Ambiguous. Foundation. Speculation.
21     THE WITNESS: I can't think of any right now.
22 BY MR. GLENNON:
23     Q.  Okay.  Let's take a moment to discuss this
24 concept of adjusting up invoices.
25     Oracle's collections staff would adjust

477

1  invoices to remove credit memos; is that correct?
2      MR. GREENSTEIN: Objection. Leading.
3  Foundation.
4      MR. GLENNON: I can reask it.
5      MR. GREENSTEIN: Vague.
6  BY MR. GLENNON:
7      Q.  Would Oracle's collection staff adjust up
8  invoices to remove credit memos?
9      MR. GREENSTEIN: Objection. Vague.
10 Foundation.
11     THE WITNESS: No. It's the -- it would --
12 wouldn't be the collections department.
13     It would be the AR department, and they
14 wouldn't be adjusting up to remove a credit memo.
15     They would be removing a credit memo to adjust
16 an invoice.  It would be opposite.
17 BY MR. GLENNON:
18     Q.  I see.
19     So the concept of adjusting up an invoice
20 really means just removing a credit memo; is that
21 correct?
22     MR. GREENSTEIN: Objection. Misstates
23 testimony. Leading. Foundation.
24     THE WITNESS: Correct.  In most -- in many
25 cases we would look at a credit memo done incorrectly

478

1  for whatever reason, whether it's bad debt or it got too
2  old and we ended up credit memoing it and then finding
3  out later that they actually did pay that invoice in
4  full, it is in unapplied, so then take the credit memo,
5  get rid of the credit memo, which now causes a balance
6  on the invoice, which hopefully matches the amount in
7  unapplied, and then apply it and it's a wash.
8  BY MR. GLENNON:
9      Q.  Right.
10     So really adjusting up an invoice isn't a
11 process where you go in and dummy up an invoice, but,
12 rather, you go in and you remove a credit memo; is that
13 accurate?
14     MR. GREENSTEIN: Objection. Leading.
15     Counsel is testifying. Foundation.
16     THE WITNESS: From my understanding that's
17 what account receivables does, but we never did it.
18 Collections department doesn't do the -- the adjusting
19 up of the invoices.  We just requested it.
20 BY MR. GLENNON:
21     Q.  Okay.  All right.
22     Did you ever personally remove a credit memo
23 such that an invoice was adjusted up?
24     MR. GREENSTEIN: Objection. Vague.
25 Foundation.

479

1      THE WITNESS: No.  Like I said, accounts
2  receivable department was responsible for that.
3      We -- we just -- if we did the research and it
4  ended up to be a credit memo in error causing the
5  unapplied cash, then we would request the AR department
6  to delete the credit memo and adjust up the invoice to
7  apply the cash.
8  BY MR. GLENNON:
9      Q.  Are you aware of any specific instance in
10 which an Oracle collections employee or an accounts
11 receivable employee would remove a credit memo and
12 adjust up an invoice where the invoice was not
13 incorrectly applied to begin with?
14     MR. GREENSTEIN: Objection. Compound.
15 Vague. Foundation. Speculation.
16     THE WITNESS: Are you saying you mean where
17 the credit memo was not incorrectly applied?
18     MR. GLENNON: Right.
19 BY MR. GLENNON:
20     Q.  What I'm saying is -- the way I understand
21 this is that you would remove the credit memo and adjust
22 up the invoice where the credit memo itself was
23 incorrect -- when your research demonstrated that the
24 credit memo was incorrectly applied; is that right?
25     THE WITNESS: Correct.

480

1      MR. GREENSTEIN: Objection. Foundation.
2  BY MR. GLENNON:
3      Q.   Are you aware of any specific instance in
4  which a collections employee or an accounts receivable
5  employee would remove a credit memo and adjust up an
6  invoice where the original credit memo was correctly
7  applied?
8      MR. GREENSTEIN: Objection. Compound. Vague.
9  Foundation.
10     THE WITNESS: So I'm sure that in many cases
11 there were credit memos that were incorrectly applied,
12 but I -- I'm sure that in other cases there was
13 situations where credit memos were correctly applied as
14 well.
15     The ones that were incorrectly credit memoed
16 could be because the invoice was so old and the amount
17 was maybe small that we -- you know, us, as being
18 Oracle, didn't want to contact the client for an invoice
19 that was a thousand days old and 3,000 bucks, so you
20 take that, you credit memo it due to bad debt, which is
21 not necessarily -- there's no real reason for that
22 credit memo to happen other than the fact that it's so
23 old and then the client didn't pay it.
24     So whether you want to call that incorrectly
25 credit memoing or not, it was -- the credit memo was

481

1  taken away, and the amount was applied to the invoice
2  that was now -- had a balance to it.
3      MR. GLENNON: Right.
4      THE WITNESS: Some it could be incorrect
5  credit memo or it could be a correct credit memo, but
6  the ones that were done because they were old, I
7  couldn't tell you whether that's correct or incorrect.
8  BY MR. GLENNON:
9      Q.   Okay. Are you aware -- are you specifically
10 aware of any instances in which a correct credit memo
11 was removed and an invoice was adjusted up as part of
12 this unapplied cash project?
13     MR. GREENSTEIN: Objection. Vague.
14 Foundation. Speculation.
15     THE WITNESS: No, not that I personally did,
16 no.
17 BY MR. GLENNON:
18     Q.   Now, did Molly Littlefield speak to the
19 accounts receivable department to determine under what
20 circumstances removing a credit memo and adjusting up an
21 invoice would be appropriate?
22     MR. GREENSTEIN: Objection. Vague.
23 Foundation. Speculation.
24     THE WITNESS: Yes. She talked to Sam Johannes
25 in reference to which ones would be appropriate, and I

482

1  believe we -- she came to a conclusion that the ones
2  that were bad debt that were done due to old age or
3  whatnot would be okay to adjust up.
4  BY MR. GLENNON:
5      Q.   Now, were you present for that particular
6  discussion between Molly Littlefield and Sam Johannes?
7      MR. GREENSTEIN: Objection. Vague.
8      THE WITNESS: No. Molly Littlefield came back
9  to us in a meeting and explained that to us.
10 BY MR. GLENNON:
11     Q.   Now, you testified that Molly Littlefield came
12 to the conclusion that the ones that were bad debt that
13 were done due to old age it would be okay to adjust up
14 or move those credit memos; is that right?
15     MR. GREENSTEIN: Objection. Misstates
16 testimony. Foundation.
17     THE WITNESS: Per her conversation with Sam
18 Johannes.
19 BY MR. GLENNON:
20     Q.   Okay.  So it could have been Sam Johannes who
21 had made that decision?
22     MR. GREENSTEIN: Same objection.
23     Sorry. Same objection.
24     THE WITNESS: She didn't make any of the
25 decisions when it came to adjusting up.

483

1      She just went to the individual that was
2  responsible for transferring the information, and then
3  she'd bring it to us -- which in many cases that
4  happened.
5  BY MR. GLENNON:
6      Q.   Now, you never personally removed a credit
7  memo or adjusted up an invoice, but only made a request
8  for that to happen; is that right?
9      MR. GREENSTEIN: Objection. Misstates
10 testimony. Foundation. Leading.
11     THE WITNESS: Correct, and I didn't even
12 personally take it to Sam Johannes.
13     I would label it on a spread sheet, send it to
14 Molly, and she would accumulate all of it on one spread
15 sheet, any of the ones that needed to be adjusted up,
16 and send it to Sam.
17 BY MR. GLENNON:
18     Q.   So you never even saw Sam remove the credit
19 memo or adjust up the invoice; is that right?
20     MR. GREENSTEIN: Objection. Leading.
21 Misstates testimony. Foundation.
22     THE WITNESS: No.  I only saw the end result.
23 BY MR. GLENNON:
24     Q.   Did you ever speak directly to anybody in the
25 accounts receivable department to determine the

484

```
1   appropriate circumstances under which a credit memo
2   could be withdrawn and an invoice adjusted up?
3          MR. GREENSTEIN: Objection. Foundation.
4   Speculation. Vague.
5          THE WITNESS: No. Like I said, the -- Molly
6   was responsible for talking to accounts receivable and
7   then talking to us. So I personally didn't talk to Sam
8   about it.
9          MR. SCHRAG: Counsel, when you're at a
10  convenient point, I need to notify you I need a break.
11         MR. GLENNON: Okay. All right.
12         It will be about one minute or less.
13         MR. SCHRAG: That's fine.
14  BY MR. GLENNON:
15     Q.   Mr. Hatada, do you know whether the practice
16  of removing the credit memos and adjusting up the
17  invoices as part of this unapplied cash project had any
18  impact on the accounting for the 46,000 debit memos that
19  were created on November 17th, 2000?
20         MR. GREENSTEIN: Objection. Vague and
21  ambiguous. Foundation. Calls for speculation.
22         THE WITNESS: No.
23         MR. GLENNON: I'm at a good spot.
24         MR. SCHRAG: Great.
25         MR. GLENNON: You guys want to take five?
```

485

```
1          MR. SCHRAG: Okay.
2          VIDEOGRAPHER: Off the record, the time is
3   3:10 p.m.
4          (Thereupon a recess was taken at 3:10 p.m.
5          and the deposition resumed at 3:23 p.m.)
6          VIDEOGRAPHER: We are back on the record. The
7   time is 3:23 p.m.
8   BY MR. GLENNON:
9      Q.   Mr. Hatada, we're back on the record and
10  you're still testifying under oath.
11     A.   Okay.
12     Q.   Before we took a short recess we were talking
13  about the various things that the collections employees
14  would do to try and resolve these items of unapplied
15  cash once they had been labeled.
16         Do you recall that?
17     A.   I do.
18     Q.   One of the things I believe you testified
19  about was Mike Quinn instructing Oracle's collections
20  staff to change certain customer notes or call notes to
21  provide more detail; is that correct?
22         MR. GREENSTEIN: Objection. Misstates
23  testimony. Foundation.
24         THE WITNESS: He wanted more detail as well as
25  -- the time when he was really upset about it was that
```

486

```
1   he wanted to see whether it was revenue impacting or
2   not.
3          He wanted us to -- to -- after doing the
4   detail and the research, advise him on how many of these
5   items were revenue impacting and how many were not.
6          I think he was -- mostly concerned with that
7   -- as well as the detail.
8   BY MR. GLENNON:
9      Q.   Okay. Now, were these notes changed in Excel
10  spread sheet?
11         MR. GREENSTEIN: Objection. Vague.
12  Foundation.
13         THE WITNESS: Correct.
14  BY MR. GLENNON:
15     Q.   Okay. Now, did you ever go in to Oracle's
16  database and change notes, or were you changing notes on
17  the spread sheet for the project?
18         MR. GREENSTEIN: Objection. Compound. Vague.
19  Foundation.
20         THE WITNESS: I believe the application that
21  held the notes -- from my understanding what you were
22  supposed to do was to -- if you had new notes for a
23  certain item, then you needed to put it on top of the
24  note that was previously done.
25         Therefore, we could see -- okay, at first they
```

487

```
1   thought it was this issue or this was the problem, and
2   now on this date they realized that that wasn't a
3   problem now, this is the problem.
4          So that was the procedure in how it was
5   supposed to go.
6          So then you'd have a flow of what had happened
7   in the beginning all the way through the end of the
8   item.
9          It didn't always happen like that. Sometimes
10  it would be fully deleted, and then you'd have just the
11  only note -- the last note that was there.
12  BY MR. GLENNON:
13     Q.   Okay. But when you say "fully deleted," are
14  you talking about deleted in the Excel spread sheet that
15  you were working on in connection with the unapplied
16  cash project, or were you talking about some other
17  program in the Oracle system itself?
18         MR. GREENSTEIN: Objection. Compound. Vague.
19  Foundation.
20         THE WITNESS: You asked me about the
21  application, right, the notes in the application?
22  BY MR. GLENNON:
23     Q.   Well, what -- I guess my question is, what is
24  the application?
25         MR. GREENSTEIN: Objection. Vague.
```

488

1    THE WITNESS: Oracle's collection application,
2    11I, whatever we were working in at that time.
3    BY MR. GLENNON:
4    Q.   Okay. So the system?
5    A.   The system.
6    Q.   Okay. Now, can you give me any specific
7    instances of when notes were fully deleted?
8        MR. GREENSTEIN: Objection. Calls for
9    speculation. Foundation.
10       THE WITNESS: No, I couldn't give you specific
11   instances.
12   BY MR. GLENNON:
13   Q.   Did you ever fully delete a prior note?
14   A.   No.
15       The process was to put your note on top of the
16   old note, therefore, being able to see, you know, which
17   notes and when -- when they happened, so I never deleted
18   any notes.
19   Q.   In other words, the protocol was to preserve
20   the prior data so that you could draw from it and try to
21   resolve the unapplied cash item?
22       Is that accurate?
23       MR. GREENSTEIN: Objection. Misstates
24   testimony. Leading. Foundation.
25       THE WITNESS: Correct.

489

1    BY MR. GLENNON:
2    Q.   And you said you never fully deleted any
3    items; is that correct?
4    A.   True.
5        MR. GREENSTEIN: Sorry. Objection.
6    Mischaracterizes testimony. Foundation.
7    BY MR. GLENNON:
8    Q.   Do you know of anybody -- do you know if
9    anyone -- well, let me start that question over again.
10       Are you aware of any specific transaction in
11   which the notes were fully deleted?
12       MR. GREENSTEIN: Objection. Vague.
13   Foundation. Speculation.
14       THE WITNESS: No.
15   BY MR. GLENNON:
16   Q.   Are you aware of any specific instances where
17   the other collections analysts or collections managers
18   fully deleted a notes column?
19       MR. GREENSTEIN: Objection -- same objections.
20       THE WITNESS: No. I don't have any instances
21   of that.
22   BY MR. GLENNON:
23   Q.   Are you aware of any specific customers whose
24   notes columns were fully deleted?
25       Let me start that question over again.

490

1    Can you identify any customers who had notes
2    columns that were fully deleted as part of this
3    unapplied cash project?
4        MR. GREENSTEIN: Objection. Speculation and
5    foundation. Vague.
6        THE WITNESS: No. I wouldn't be able to
7    remember any items, notes from any specific clients.
8    BY MR. GLENNON:
9    Q.   Now, you testified that you also didn't
10   personally change any notes; is that correct?
11       MR. GREENSTEIN: Objection. Misstates
12   testimony.
13       THE WITNESS: Correct.
14       When I put notes in the system, it would be in
15   front of the note that was made prior.
16   BY MR. GLENNON:
17   Q.   Did you witness firsthand anyone else in the
18   collections department actually going in and changing
19   the notes?
20       MR. GREENSTEIN: Objection. Vague.
21   Foundation. Speculation.
22       THE WITNESS: No.
23   BY MR. GLENNON:
24   Q.   Now, you testified on direct that you thought
25   that if information on a prior note was deleted you

491

1    thought that it was irretrievable; is that correct?
2    A.   I'm unsure if it would be -- if it would not
3    be retrievable or not. I have --
4    Q.   Oh. I'm sorry.
5    A.   I have no idea.
6        I mean, it's possible that you can go in there
7    and find it, but I personally wouldn't be able to do it.
8    Q.   Have you ever tried to go back in and retrieve
9    a call note that previously had been deleted,
10   overwritten, or amended?
11       MR. GREENSTEIN: Objection. Vague.
12   Foundation.
13       THE WITNESS: No.
14       When you run a call report and -- on a
15   specific item, the call report's going to give you
16   exactly what you're reading in the application. So --
17   BY MR. GLENNON:
18   Q.   But I -- I guess I'm going to ask my question
19   again, and I'm not trying to be difficult. I just don't
20   know if you answered it.
21   A.   Uh-huh.
22   Q.   Have you ever tried to go back in and retrieve
23   a call note that previously had been deleted,
24   overwritten, or amended?
25       MR. GREENSTEIN: Objection. Compound. Vague.

492

1  Foundation.
2         THE WITNESS: No.
3  BY MR. GLENNON:
4     Q.   Have you ever spoken to Oracle's IT department
5  about whether notes are saved in the Oracle system even
6  after they're deleted or edited?
7         MR. GREENSTEIN: Objection. Vague.
8  Foundation.
9         THE WITNESS: No.
10  BY MR. GLENNON:
11     Q.   Okay. Are you familiar with the term
12  "metadata"?
13     A.   No.
14     Q.   Okay. Do you know whether the prior notes
15  that could have been deleted or -- or changed during the
16  course of unapplied cash project are saved on Oracle's
17  system as part of the metadata?
18         MR. GREENSTEIN: Objection. Vague.
19  Foundation.
20         Calls for speculation. Sorry.
21         THE WITNESS: Like I said, I have no idea how
22  to retrieve old notes if they were deleted, and I didn't
23  know there was a process to do that if we could.
24  BY MR. GLENNON:
25     Q.   Okay. Bottom line is, you don't know whether

493

1  or not you could retrieve old notes after they were
2  deleted; is that a fair statement?
3         MR. GREENSTENI: Objection. Leading.
4  Counsel's testifying.
5         Misstates testimony.
6         THE WITNESS: Correct.
7  BY MR. GLENNON:
8     Q.   Do you know whether the practice of updating
9  these notes as part of the 2002 unapplied cash project
10  had any impact on the accounting for the 46,000 debit
11  memos that were created on November 17th 2000?
12         MR. GREENSTEIN: Objection. Vague.
13  Foundation. Speculation.
14         THE WITNESS: Can you repeat that.
15         (Record Read)
16         MR. GREENSTEIN: Same objections.
17         THE WITNESS: Any notes that were updated on
18  any item that we were working on to try and resolve the
19  unapplied cash issues were -- I felt were helping us get
20  to the bottom of -- of the problem.
21         So I would have to say that notes that were
22  updated in the system due to more research done would
23  help the situation that we were in and trying to
24  resolve.
25  BY MR. GLENNON:

494

1     Q.   Yeah. I understand that.
2         I'm asking a very specific question.
3         Do you know whether the -- updating these
4  notes or editing these notes had any impact on the
5  accounting for the 46,000 debit memos that were created
6  back in November of 2000?
7         MR. GREENSTEIN: Objection. Vague.
8  Foundation. Compound.
9         MR. SCHRAG: Do you understand the question?
10         THE WITNESS: I do.
11         No. I -- would not.
12  BY MR. GLENNON:
13     Q.   Do you know whether -- let -- let my start
14  that question over again.
15         I hate to do this, but I'm just looking at the
16  record, and because Mr. Schrag inserted a question in
17  between your response it isn't totally clear on the
18  transcript, so I'm just -- I'm just going to ask this.
19         Do you know whether the practice of updating
20  these notes that we've been discussing had any
21  accounting impact on the 46,000 debit memos that were
22  created back in November of 2000
23         MR. GREENSTEIN: Same objection as before.
24         THE WITNESS: No. I do not know specifically
25  if the notes had any impact on the end result.

495

1         (Discussion off the record)
2  BY MR. GLENNON:
3     Q.   So your testimony, if I understand it
4  correctly, is you don't know whether the process of
5  editing or updating these notes impacted the accounting
6  treatment of the 46,000 debit memos; is that accurate?
7         MR. GREENSTEIN: Objection. Misstates
8  testimony. Vague. Foundation. Speculation.
9         THE WITNESS: Correct.
10  BY MR. GLENNON:
11     Q.   You also testified that in some instances
12  Oracle would refund money in the unapplied account to
13  its customers; is that right?
14     A.   Correct.
15     Q.   You testified at one point that Tom Williams
16  gave an instruction not to refund money.
17         Do you remember that testimony?
18     A.   Correct.
19     Q.   And did you ever speak to Tom Williams
20  directly about this instruction not to refund money?
21         MR. GREENSTEIN: Objection. Vague.
22         THE WITNESS: No.
23  BY MR. GLENNON:
24     Q.   Did you ever speak to Tom Williams directly
25  about customer refunds in general?

496

1    MR. GREENSTEIN: Same objection.
2    THE WITNESS: I never once spoke to Tom
3  Williams at all -- at any time.
4  BY MR. GLENNON:
5    Q.   How did you -- let me start that question over
6  again.
7    How did you come to know that the instruction
8  not to refund money came from Tom Williams?
9    A.   Because Molly Littlefield stated to us as
10  collections managers that Tom Williams had stated not to
11  refund any more money at this point until he gets back
12  to us with, you know, with the fact that we can still do
13  it or go forward with it.
14    So the information that I got with that
15  testimony was coming from Molly Littlefield.
16    Q.   Other than what Molly Littlefield told you do
17  you have any other basis for believing that Tom Williams
18  ever issued a mandate not to refund money?
19    MR. GREENSTEIN: Objection. Misstates
20  testimony and vague. Foundation.
21    THE WITNESS: No. It was just a verbal
22  statement from Molly.
23  BY MR. GLENNON:
24    Q.   Now, do you know if Molly spoke directly with
25  Tom Williams or she spoke to somebody who, in turn,

497

1  spoke to Tom Williams?
2    MR. GREENSTEIN: Objection. Compound.
3    THE WITNESS: I couldn't tell you that.
4  BY MR. GLENNON:
5    Q.   Okay. Staying on the topic of refunds for a
6  moment, you also testified that different refunds needed
7  to be approved by different levels of Oracle brass, for
8  lack of a better phrase; is that right?
9    MR. GREENSTEIN: Objection. Misstates
10  testimony. Vague.
11    THE WITNESS: Correct.
12    Refunds had different levels of approval due
13  to dollar amount.
14  BY MR. GLENNON:
15    Q.   And you testified that Tom Williams had to
16  approve certain -- certain refunds; is that correct?
17    A.   Yeah. I believe Larry Ellison had to approve
18  certain refunds.
19    Q.   All right. Let's take them one at a time.
20    A.   Meaning that they went all the way up.
21    Q.   Okay. On -- upon what facts do you base your
22  testimony that the approval process for refunds went all
23  the way up?
24    MR. GREENSTEIN: Objection. Vague.
25    THE WITNESS: Because in the system -- in --

498

1  in Oracle's system it would show you who needed to
2  approve it before it could be done, and it would have
3  the name of the manager, or senior manager, or director,
4  or VP, whoever it was that needed to approve it and
5  whose -- I guess, whose computer it was with, or whose
6  -- you know, the job of approving it.
7  BY MR. GLENNON:
8    Q.   Do you recall what Tom Williams' approval --
9  refund approval was?
10    In other words, when I say "refund approval
11  level," what I'm talking about is refunds, the threshold
12  over which refunds had to go to Tom Williams in order to
13  be approved for the refund.
14    MR. GREENSTEIN: Objection. Speculation.
15  Vague.
16  BY MR. GLENNON:
17    Q.   Let me just ask that question again.
18    Do you know what the refund amount needed to
19  be in order for Tom Williams' approval to be required?
20    MR. GREENSTEIN: Objection. Vague.
21  Foundation. Speculation.
22    THE WITNESS: I don't have any threshold
23  numbers, dollar amounts, of who was to approve at
24  certain levels.
25    I just know that there was certain amounts.

499

1  For an example, if it was, you know, 50,000 to a hundred
2  thousand, then you would have -- it would be the
3  director, if it was a hundred thousand to 250,000, it
4  would be the VP, as an example.
5    But I don't----
6  BY MR. GLENNON:
7    Q.   But those are just hypothetical numbers,
8  though; is that right?
9    A.   Hypothetical numbers.
10    Q.   Did you -- and is that the case for Tom
11  Williams, Jennifer Minton, and Larry Ellison?
12    Let me start that question over again.
13    Is it your testimony that you don't know what
14  the threshold approval is for refunds to need to be
15  approved by Tom Williams, Jennifer Minton, or Larry
16  Ellison?
17    Is that correct?
18    MR. GREENSTEIN: Objection. Compound.
19  Foundation.
20    THE WITNESS: Correct.
21  BY MR. GLENNON:
22    Q.   Did you ever go to Tom Williams to seek a
23  refund?
24    MR. GREENSTEIN: Objection. Vague.
25    THE WITNESS: Like I said, I never talked to

Hatada, Ian  10/10/2006  9:53:00 AM

500

1   Tom Williams once.
2   BY MR. GLENNON:
3       Q.   Okay.  So you said "talked."  I was wondering
4   whether you had any E-Mail --
5       A.   No, I never had a conversation with Tom
6   Williams through E-mail -- any correspondence.
7       Q.   Okay.  Ever have a correspondence through any
8   means with Jennifer Minton?
9       MR. GLENNON: Objection. Vague.
10      THE WITNESS: No.
11  BY MR. GLENNON:
12      Q.   Ever have any communication or conversation
13  through any means, be it E-mail, telephone, fax with
14  Larry Ellison?
15      MR. GREENSTEIN: Objection. Foundation.
16      THE WITNESS: No.
17  BY MR. GLENNON:
18      Q.   So is it fair to say that you never went to
19  Tom Williams, Jennifer Minton, or Larry Ellison to seek
20  approval for a refund during your course of employment
21  at Oracle?
22      MR. GREENSTEIN: Objection. Misstates
23  testimony. Leading. Foundation. Compound.
24      THE WITNESS: True.  All of my requests would
25  go to the next level, which was Ryan Roberts.  He would

501

1   send it up the chain from there.
2       I didn't copy anybody on the E-mail or leave
3   another voice mail.  It was just sent to Ryan Roberts,
4   and he did the rest of it.
5   BY MR. GLENNON:
6       Q.   Now, I think you testified that -- that there
7   were many instances when collectors concluded that a
8   refund should issue but a refund action never occurred;
9   is that right?
10      MR. GREENSTEIN: Objection. Misstates
11  testimony. Foundation.
12      THE WITNESS: I don't have specifics on that.
13      I just know that there was situations where an
14  unapplied note in the system would say refund three or
15  four years ago, and then we're still looking at the same
16  note stating that it should be refunded, and it never
17  was refunded.
18      I do not know why it wasn't, but it wasn't.
19  BY MR. GLENNON:
20      Q.   Okay.  Well, let me just break down that
21  answer quickly.
22      You can't think of a specific instance of
23  customer or dollar amount on the Oracle system that says
24  should be refunded, but, in fact, wasn't refunded; is
25  that correct?

502

1       MR. GREENSTEIN: Objection.
2       Sorry.  Objection.  Leading.  Foundation.
3   Vague.
4       THE WITNESS: Correct.
5       I just know I've seen them.  I couldn't tell
6   you that it was for a specific company, dollar amount,
7   or how old it was and what date it came in.
8       I just know that I've seen them before.
9   BY MR. GLENNON:
10      Q.   Okay.  And in those instances is it also a
11  true statement that you don't know why those refunds
12  hadn't been issued during that period of time?
13      MR. GREENSTEIN: Objection. Leading.
14  Foundation. Misstates testimony. Vague.
15      THE WITNESS: True, I do not have the
16  specifics as to why.
17  BY MR. GLENNON:
18      Q.   Now, did you ever personally approve refund
19  requests?
20      MR. GREENSTEIN: Objection. Vague.
21      THE WITNESS: I believe at some point we were
22  having to approve the refund request, but, again, it
23  came from the collection analyst, and I would have to
24  approve it, and then it would go to my boss, Ryan
25  Roberts, and just up the chain, so -- it would start at

503

1   the collections analyst, go to me, I would approve it,
2   then Ryan Roberts, and Mike Quinn, and up the chain.
3   BY MR. GLENNON:
4       Q.   And this would have begun -- let me start that
5   question over again.
6       In other words, you would have begun approving
7   certain refund requests at about the time that you were
8   promoted to collections manager; is that right?
9       MR. GREENSTEIN: Objection. Leading.
10  Misstates testimony. Foundation.
11      THE WITNESS: Correct.
12  BY MR. GLENNON:
13      Q.   Do you know when Oracle first started using
14  the refund template?
15      A.   I couldn't give you a specific date on that.
16      Q.   Can you give me an approximate date?
17      I don't want you to speculate, but if you've
18  got -- if you've got an estimation, I'm entitled to it,
19  but, if you don't know at all, then you don't know.
20      A.   I don't know.
21      Q.   Do you know when Oracle started using E-mails
22  with backup data rather than the refund template for
23  refund requests?
24      MR. GREENSTEIN: Objection. Lack of
25  foundation. Vague. Speculation.

504

1    THE WITNESS: No.
2    BY MR. GLENNON:
3    Q.   Do you know whether those two methods of
4    seeking refund approvals ever overlapped at any period
5    of time?
6    MR. GREENSTEIN: Same objections.
7    THE WITNESS: I recall certain situations
8    where they overlapped, but I couldn't tell you when that
9    was, and -- and what company, and what situation it was.
10    I just recall that -- you know, there had to
11    have been -- I remember there being situations where
12    people were requesting the refund the old way instead of
13    the new way, and we had to get together and inform
14    everybody of how it should be done moving forward.
15    BY MR. GLENNON:
16    Q.   Are you aware of circumstances under which
17    Oracle employees would use a Word document to request a
18    refund?
19    MR. GREENSTEIN: Objection. Vague.
20    Speculation.
21    THE WITNESS: I believe the refund template
22    was in a Word doc. As is recall, I think one of them
23    was.
24    BY MR. GLENNON:
25    Q.   Yeah.

505

1    Do you recall whether or not there was more
2    than one refund template during the course of your
3    employment at Oracle?
4    MR. GREENSTEIN: Objection. Vague.
5    Speculation.
6    THE WITNESS: From what I understand, there
7    was two. I believe there was a Word document as well as
8    just an E-mail chain.
9    BY MR. GLENNON:
10    Q.   Do you know how refunds were requested in
11    Oracle's foreign offices during your employment at
12    Oracle?
13    MR. GREENSTEIN: Objection. Vague.
14    Foundation. Speculation.
15    THE WITNESS: I have no idea how they did
16    things in other countries.
17    BY MR. GLENNON:
18    Q.   What about Oracle's subsidiaries?
19    Are you familiar with the method through which
20    Oracle subsidiaries would process refund approvals
21    during the period of time you were employed at Oracle?
22    MR. GREENSTEIN: Same objections.
23    THE WITNESS: Can you describe "subsidiaries"?
24    BY MR. GLENNON:
25    Q.   Sure.

506

1    A company that is -- a separate company that
2    is either owned in whole or in majority part by Oracle.
3    MR. GREENSTEIN: Same objections.
4    THE WITNESS: No.
5    BY MR. GLENNON:
6    Q.   Have you ever watched another collections
7    analyst factually complete a refund request?
8    MR. GREENSTEIN: Objection. Vague.
9    Speculation.
10    THE WITNESS: Sure.
11    BY MR. GLENNON:
12    Q.   Who did you watch complete a refund request?
13    A.   Umm -- I believe I watched Libby Brewster fill
14    out a refund request one time.
15    Q.   Anyone else?
16    A.   I think that's the only one I remember.
17    Q.   Do you recall when you watched Libby Brewster
18    complete a refund request?
19    A.   It had to be within the last eight months I
20    was there, because that's when I managed her.
21    Q.   And what were the circumstances surrounding
22    you watching Libby Brewster complete a refund request?
23    A.   It was just that it needed to get done, and
24    she was doing it, and she had some questions for me, and
25    I was trying to help her through it.

507

1    Q.   And so you were watching her, because you were
2    assisting her in completing the refund request; is that
3    correct?
4    MR. GREENSTEIN: Objection. Leading.
5    Foundation.
6    THE WITNESS: Exactly.
7    BY MR. GLENNON:
8    Q.   And do you recall the specific customer?
9    A.   No.
10    Q.   Do you recall the dollar amount?
11    MR. GREENSTEIN: Objection. Vague.
12    THE WITNESS: I don't recall anything about
13    the specifics of the refund template other than I was
14    watching her, helping her.
15    BY MR. GLENNON:
16    Q.   Okay. Do you recall what -- or do you know --
17    let me start that question over again.
18    Do you know whether that specific refund
19    request was ultimately granted, the money refunded?
20    MR. GREENSTEIN: Objection. Speculation.
21    Foundation. Vague.
22    THE WITNESS: No, I do not.
23    BY MR. GLENNON:
24    Q.   Have you ever searched Oracle's database to
25    determine whether or not a paper trail exists for each

Hatada, Ian  10/10/2006  9:53:00 AM

508

1 and every refund request?
2        MR. GREENSTEIN: Objection. Vague.
3 Foundation.
4        THE WITNESS: No.
5 BY MR. GLENNON:
6    Q.  Have you ever looked in Oracle's database to
7 determine whether an E-mail exists for each and every
8 refund request made at Oracle during the period of time
9 you were employed there?
10        MR. GREENSTEIN: Objection. Foundation.
11        THE WITNESS: No.
12 BY MR. GLENNON:
13    Q.  Do you have personal knowledge as to whether
14 or not every refund request that was made during the
15 course of your employment at Oracle had an accompanying
16 E-mail request?
17    A.  No.
18    Q.  When was the last time you saw a refund
19 request?
20        MR. GREENSTEIN: Objection. Vague.
21        THE WITNESS: Probably -- the last time we
22 were in here.
23 BY MR. GLENNON:
24    Q.  Prior to the time you were deposed in
25 connection with this particular lawsuit do you recall

509

1 the last time you saw a refund request?
2    A.  Yeah.
3        It was probably in the last couple of months
4 that I was employed with Oracle.
5    Q.  Do you recall when the last time was that you
6 actually requested a refund?
7        MR. GREENSTEIN: Objection. Vague.
8        THE WITNESS: I'd have to say it was within
9 the last few months that I was employed with Oracle.
10 BY MR. GLENNON:
11    Q.  Now, is that an estimate or can you
12 specifically recall making a refund request within the
13 last couple of months you were employed by Oracle?
14        MR. GREENSTEIN: Objection. Compound.
15        THE WITNESS: It's an estimate, just because
16 we were -- you know, we were still doing refunds at that
17 time, and I couldn't say the date that it happened.
18 BY MR. GLENNON:
19    Q.  Do you know whether any of these particular
20 refunds impacted the accounting for the 46,000 debit
21 memos that were created in November of 2000?
22        MR. GREENSTEIN: Objection. Vague. Calls for
23 speculation. Foundation.
24        THE WITNESS: I have no idea what the end-all
25 result of this project was --

510

1        MR. GLENNON: Okay.
2        THE WITNESS: -- especially in regards to the
3 debit memos.
4 BY MR. GLENNON:
5    Q.  Okay. So you don't know how the refunds that
6 were issued in connection with this project impacted, if
7 at all, the debit memos that were created in November of
8 2000; is that fair?
9        MR. GREENSTEIN: Same objections and misstates
10 testimony and leading.
11        THE WITNESS: Correct.
12 BY MR. GLENNON:
13    Q.  You also testified that in some instances
14 after drilling down in terms of the research and
15 determining why a specific item of unapplied cash was,
16 in fact, unapplied that eventually on some occasions you
17 could apply the unapplied cash to an open invoice; is
18 that correct?
19        MR. GREENSTEIN: Objection. Misstates
20 testimony.
21        Counsel is testifying. Leading.
22        THE WITNESS: Correct.
23 BY MR. GLENNON:
24    Q.  In order to do this I think one of the things
25 you testified to was that you would research a

511

1 customer's billing history to look for open invoices;
2 isn't that true?
3        MR. GREENSTEIN: Objection. Vague.
4 Foundation.
5        THE WITNESS: Correct.
6 BY MR. GLENNON:
7    Q.  Now, as part of this effort you testified that
8 Oracle reactivated the query component of its pro forma
9 invoice database.
10        Do you recall that testimony?
11        MR. GREENSTEIN: Objection. Misstates
12 testimony. Foundation.
13        THE WITNESS: I do.
14 BY MR. GLENNON:
15    Q.  Are pro forma invoices specialized invoices
16 created to fit the needs of a particular customer?
17        MR. GREENSTEIN: Objection. Vague.
18 Foundation. Speculation.
19        THE WITNESS: Correct, or -- or make
20 corrections to the original invoice that needed to be
21 corrected instead of rebilling it.
22 BY MR. GLENNON:
23    Q.  So the instances in which you would create a
24 pro forma invoice was either to accommodate a customer
25 need or correct an existing invoice that was incorrect?

512

1  MR. GREENSTEIN: Objection. Foundation.
2  Compound. Leading and lack of foundation.
3  THE WITNESS: Correct.
4  When pro formas were -- I guess you could say
5  if we had the ability to -- to make a pro forma invoice,
6  those were the reasons -- when we did have the ability.
7  BY MR. GLENNON:
8  Q.  Now, what kind of customer needs would
9  necessitate creating a pro forma invoice?
10  MR. GREENSTEIN: Objection. Vague.
11  Speculation.
12  THE WITNESS: Most of them were just for the
13  record in regards to line items, customer wanted the
14  line item of what was being sold to them to read exactly
15  what they were getting, and at times the line item would
16  -- would be very vague and not detailed, so, therefore,
17  they would want to have something in that line item that
18  explained to -- for the record what exactly Oracle was
19  selling to them.
20  BY MR. GLENNON:
21  Q.  Did you understand this to be a need for the
22  customer to have its own internal documents to be
23  consistent?
24  MR. GREENSTEIN: Objection. Vague.
25  Speculation. Foundation.

513

1  THE WITNESS: Sure.
2  That's -- was part of the reason why you did a
3  pro forma, because typically, you know, if you didn't
4  meet their needs to correct the invoice, they weren't
5  going to pay it.
6  BY MR. GLENNON:
7  Q.  What other needs -- what other customer needs
8  would necessitate issuing a pro forma invoice as opposed
9  to a traditional invoice?
10  MR. GREENSTEIN: Objection. Vague.
11  Speculation.
12  THE WITNESS: That was the only -- only real
13  reason that -- that I knew of.
14  I'm sure there was more, but I couldn't
15  remember.
16  BY MR. GLENNON:
17  Q.  Let me see if I understand this correctly.
18  Oracle would create pro forma invoices in
19  those instances where the customer needed the
20  description of the goods in a very specific way in order
21  to reconcile their own recordkeeping?
22  MR. GREENSTEIN: Objection. Misstates
23  testimony. Vague. Foundation. Leading.
24  THE WITNESS: Yeah.
25  In most cases they wanted the line item to

514

1  read a certain way, so, you know, in order for them to
2  pay the invoice, if it didn't -- if it read incorrectly
3  as to what services they were receiving or products,
4  then they didn't want to pay it.
5  BY MR. GLENNON:
6  Q.  What is the line item that you're referring
7  to?
8  A.  A line item on an invoice states exactly what
9  service or product Oracle is -- is actually selling to
10  the client.
11  Just like you get a receipt when you buy
12  something, it states on there what you're buying.
13  That's a line item.
14  Q.  So the description of goods or services?
15  A.  True.
16  Q.  So Oracle would issue pro forma invoices to
17  those customers who needed the description of goods or
18  services in a specific way?
19  MR. GREENSTEIN: Objection. Foundation.
20  Misstates testimony.
21  BY MR. GLENNON:
22  Q.  Is that correct?
23  A.  Correct. That was one of the -- of the
24  reasons.
25  Q.  And you can't recall any of the other reasons

515

1  as you sit here today?
2  MR. GREENSTEIN: Objection. Leading.
3  MR. GLENNON: Is that right?
4  MR. GREENSTEIN: Misstates testimony.
5  THE WITNESS: Not specifically.
6  BY MR. GLENNON:
7  Q.  Are you aware of any instances -- instance of
8  Oracle issuing a pro forma invoice for the specific
9  purpose, for the intentional purpose, of double billing
10  a customer?
11  MR. GREENSTEIN: Objection. Compound.
12  Speculation.
13  THE WITNESS: No. Any time we double billed
14  it was due to an accident because they received the
15  original E-mail as well as the pro forma invoice, hence,
16  getting two invoices.
17  BY MR. GLENNON:
18  Q.  Now, at some point you testified that Oracle
19  shut down the pro forma database; is that correct?
20  A.  Correct.
21  Q.  Who made the decide to shut down the pro forma
22  database?
23  Do you know?
24  MR. GREENSTEIN: Objection. Speculation.
25  THE WITNESS: I do not.

Hatada, Ian  10/10/2006  9:53:00 AM

516

1  BY MR. GLENNON:
2     Q.   Did you have any discussions with anybody at
3  or near the time the database was shut down about the
4  reasons for the database being shut down?
5        MR. GREENSTEIN: Objection. Vague.
6  Speculation.
7        THE WITNESS: The reasons for the database
8  being shut down, we -- was because it was starting to
9  get confusing as to which invoices -- you know, we were
10  billing the client with, as well as the sales or the
11  field was starting to have access to that particular
12  application, and it was starting to cause some confusion
13  when sales -- sales reps would get on the application,
14  print out the invoice, send it -- deliver it personally
15  while we're mailing one at the same time.
16        So then, you know, they not only have two
17  invoices, they might have three.  It just depends.
18        It was just causing a big problem.
19  BY MR. GLENNON:
20     Q.   And how do you know that?
21        How do you know that that was the reason for
22  the pro forma database being shut down?
23        MR. GREENSTEIN: Objection. Vague.
24        THE WITNESS: Just from speaking with clients,
25  they'd state that, you know, well, so-and-so sales rep

517

1  handed me this invoice, and they'd fax it to me, and it
2  was a pro forma invoice, when maybe we didn't know about
3  it or -- we weren't using the pro forma invoice.
4        So it was just an error in communication, so
5  we had to make sure we shut it down as well as shut down
6  the whole process of pro forma invoices.
7  BY MR. GLENNON:
8     Q.   Right.
9        I guess my question is, how do you know that
10  it was this confusion -- and I understand the nature of
11  the confusion, but how do you know that it was the
12  confusion that was caused by the pro forma invoice that
13  caused the pro forma database to be shut down?
14        Did somebody tell you that?
15        MR. GREENSTEIN: Objection. Compound. Vague
16  and ambiguous. Foundation. Speculation.
17        THE WITNESS: Yeah.  I believe Omid Fardanesh
18  just stated that those -- the confusion portion of it
19  was the reasons of, you know, why we were shutting down
20  the pro forma application.
21  BY MR. GLENNON:
22     Q.   Do you recall when he told you that?
23     A.   Around the same date that he was requesting
24  that it be opened back up so we could do research.
25     Q.   So he told you the reason why it was shut down

518

1  around the same day he was requesting that it be opened
2  back up?
3        MR. GREENSTEIN: Objection. Leading.
4  Counsel is testifying.  Lacks foundation.
5        THE WITNESS: Correct.
6  BY MR. GLENNON:
7     Q.   Do you recall the date on which it was
8  actually shut down?
9     A.   No.
10     Q.   But you remember at some point later Omid
11  Fardanesh explaining to you why it was shut down at some
12  point previously?
13        MR. GREENSTEIN: Objection. Vague.
14        THE WITNESS: Correct.
15  BY MR. GLENNON:
16     Q.   If you needed to go in to the pro forma
17  database to run a query and search for a specific
18  invoice today, do you know whether you could do it?
19        MR. GREENSTEIN: Objection. Calls for
20  speculation. Foundation.
21        THE WITNESS: I'm sure I could.  It was pretty
22  self-explanatory.
23        You put in the invoice or the company name,
24  and it would -- it would -- I'd figure it out.
25        I couldn't tell you step-by-step sitting here

519

1  today.
2  BY MR. GLENNON:
3     Q.   No.  That's fine.
4        What I'm driving at here, Mr. Hatada, is the
5  fact that, I mean -- that the pro forma invoice database
6  is shut down.
7        You could still open it back up and search it
8  if you needed to; is that a correct statement?
9        MR. GREENSTEIN: Objection. Leading. Lack of
10  foundation. Speculation.
11        MR. SCHRAG: Right now?
12        MR. GLENNON: Well, yeah.  That's a good
13  point.
14        Let me rephrase that question.
15  BY MR. GLENNON:
16     Q.   After the pro forma database was shut down was
17  it possible to open it back up to run queries to find
18  invoices if you needed to?
19        MR. GREENSTEIN: Objection. Vague. Lack of
20  foundation. Calls for speculation.
21        THE WITNESS: No.  That's why in the day --
22  day one of the deposition we were reading that E-mail
23  that stated Omid sending another E-mail asking for the
24  IT department or finance -- I don't know who exactly it
25  was to open it back up, because we had no -- we had no

520

1  rights to open it back up.
2        We didn't have the ability to do that. We had
3  to have somebody else open it back up.
4  BY MR. GLENNON:
5        Q.  No. I understand, and I wasn't clear, and I
6  apologize.
7        What I'm saying is that Oracle could open the
8  pro forma database up again after it was shut down; is
9  that correct?
10       MR. GREENSTEIN: Objection. Leading. Lack of
11  foundation. Speculation.
12       THE WITNESS: Yes. We did that.
13  BY MR. GLENNON:
14       Q.  Do you know whether or not Oracle could open
15  up the pro forma database today if it needed to?
16       MR. GREENSTEIN: Same objections.
17       THE WITNESS: Well, I'm sure if they opened it
18  up back then they could open it up now.
19  BY MR. GLENNON:
20       Q.  All right. Now, taking a step back, do you
21  know whether or not the process of applying cash to --
22  to open invoices or unpaid invoices as part of the 2000
23  unapplied cash project - do you know if that impacted
24  any of the 46,000 debit memos that were created in
25  November of 2000?

521

1        MR. GREENSTEIN: Objection. Vague and
2  ambiguous. Foundation. Speculation.
3        THE WITNESS: From what I was told in
4  different meetings it was kind of the other way around.
5        It was -- you know, there were a lot of
6  problems as to why we had unapplied problems or
7  unapplied issues.
8        You know, debit memos being created, maybe it
9  was -- one of them leading to -- cash being applied to
10  incorrect invoices, or invoices that were incorrectly
11  credit memoed, or -- I mean, there was several, several
12  problems.
13  BY MR. GLENNON:
14       Q.  Here's -- here's my question, and I'll be more
15  specific.
16       Are you aware of -- do you have personal
17  knowledge of whether applying cash to open invoices is
18  part of the 2002 unapplied cash project, whether or not
19  that impacted any of the accounting for the 46,000 debit
20  memos that occurred in November of 2000?
21       MR. GREENSTEIN: Objection. Vague and
22  ambiguous. Calls for speculation. Lack of foundation.
23       THE WITNESS: No.
24  BY MR. GLENNON:
25       Q.  As -- as part of the unapplied cash project

522

1  you testified that Molly Littlefield compiled the work
2  of the various collectors and put it in to a master
3  report; is that correct?
4        A.  Correct.
5        She was in control of the master.
6        Q.  You never reviewed the master of this
7  particular spread sheet during the course of the
8  unapplied cash project; did you?
9        MR. GREENSTEIN: Objection. Leading. Lacks
10  foundation.
11       THE WITNESS: Yes, at the -- close to the end
12  of the project we had all met in her office to go over
13  the master, and each item -- all the items that were
14  given to the various managers we had to go through
15  one-by-one.
16       So if I had, for example, and this is
17  hypothetically speaking, if I had 25 items on that
18  master list, or 300, we'd have to go over those -- I'd
19  have to go over those with her and review that they were
20  correct verbally and visibly.
21  BY MR. GLENNON:
22       Q.  So you recall this one instance in which the
23  collection managers got together to review the master
24  spread sheet; is that correct?
25       MR. GREENSTEIN: Objection. Misstates

523

1  testimony.
2        THE WITNESS: Correct.
3  BY MR. GLENNON:
4        Q.  Do you recall the date of this particular
5  meeting?
6        A.  No.
7        Q.  And do you recall the other collection
8  managers being present at this particular meeting?
9        MR. GREENSTEIN: Objection. Vague.
10  Foundation.
11       THE WITNESS: Yes. We were all there.
12  BY MR. GLENNON:
13       Q.  Okay. So you were all there.
14       Other than the collection managers are you
15  aware or do you have personal knowledge of anyone else
16  at Oracle reviewing this master spread sheet?
17       MR. GREENSTEIN: Objection. Calls for
18  speculation.
19       THE WITNESS: No, just the collections
20  managers and Ryan Roberts, which was the senior
21  collections manager.
22  BY MR. GLENNON:
23       Q.  You testified that you had thought that the
24  spread sheet was sent up the chain to various other
25  people during the course of this particular project.

524

1   Do you recall that testimony?
2   MR. GREENSTEIN: Objection. Misstates
3   testimony. Vague and ambiguous. Lack of foundation.
4   THE WITNESS: Correct.
5   So after the collections managers and Ryan
6   Roberts, which we were the -- kind of the work horses of
7   the whole project -- after it was in that position, it
8   would be sent up the chain to Michael Quinn, and Tom
9   Williams, and Jennifer Minton, whoever -- wherever it
10  ended, and that's -- you know, pretty much everybody
11  above Ryan Roberts saw the master spread sheet.
12  BY MR. GLENNON:
13  Q.   How do you know that?
14  MR. GREENSTEIN: Objection. Calls for
15  speculation.
16  THE WITNESS: Because it was priority one for
17  Oracle at the time, and everybody that we've talked
18  about was involved.
19  BY MR. GLENNON:
20  Q.   Well, how do you know that everybody reviewed
21  this particular spread sheet?
22  MR. GREENSTEIN: Objection. Asked and
23  answered. Calls for speculation.
24  THE WITNESS: Just from Michael Quinn coming
25  in and letting us know that, you know, so-and-so looked

525

1   at it, whether it be Henley or Minton, and wants this
2   changed or whatnot, just from verbal by -- from Mike.
3   BY MR. GLENNON:
4   Q.   Okay. So you never spoke to Tom Williams
5   about the master spread sheet; is that correct?
6   MR. GREENSTEIN: Objection. Asked and
7   answered. Argumentative.
8   MR. GLENNON: All right. Let me wrap it up
9   with a single question.
10  BY MR. GLENNON:
11  Q.   Did you ever speak to Tom Williams, Jeff
12  Henley, or Jennifer Minton about this particular master
13  spread sheet?
14  MR. GREENSTEIN: Objection. Compound. Lack
15  of foundation.
16  THE WITNESS: I've never had any
17  correspondence with any three of those three people you
18  just mentioned at any time while I was at Oracle.
19  BY MR. GLENNON:
20  Q.   Okay. And other than Mike -- what Mike Quinn
21  told you during the context of the unapplied cash
22  project do you have any other basis for believing that
23  Tom Williams, Jeff Henley, or Jennifer Minton actually
24  reviewed this master spread sheet?
25  MR. GREENSTEIN: Objection. Vague and

526

1   ambiguous. Calls for speculation. Misstates testimony.
2   THE WITNESS: I -- no, I don't believe I've --
3   I've ever seen anything other than verbally Mike stating
4   -- that it was going up the chain.
5   BY MR. GLENNON:
6   Q.   Now, you have testified about your personal
7   participation in connection with the unapplied cash
8   project; is that right?
9   A.   Correct.
10  Q.   And you also supervised others in connection
11  with the unapplied cash project in 2002 and thereafter;
12  is that right?
13  A.   Correct.
14  Q.   Now, at the time you were engaging in this
15  process did you think you were involved in some type of
16  wrongful activity?
17  MR. GREENSTEIN: Objection.
18  Hold on.
19  Objection. Lack of foundation.
20  MR. SCHRAG: Actually, I need to consult with
21  my client before he answers that.
22  Just take a minute?
23  MR. GLENNON: Sure.
24  VIDEOGRAPHER: Off the record, the time is
25  4:06 p.m.

527

1   (Thereupon a recess was taken at 4:06 p.m.
2   and the deposition resumed at 4:13 p.m.)
3   VIDEOGRAPHER: We are back on the record.
4   The time is 4:13 p.m.
5   MR. GLENNON: At the time we took a break
6   there was a question pending. If I could have the Court
7   Reporter just repeat the question, please.
8   (Record Read)
9   MR. GREENSTEIN: Objection. Vague.
10  THE WITNESS: To answer the question, no.
11  I did not feel like I was engaged in any
12  wrongful activity during this project. I felt that we
13  just needed to resolve it, and everything would be fine.
14  BY MR. GLENNON:
15  Q.   You testified that you had -- you believe that
16  that audit committee was continuously updated with the
17  progress of the unapplied cash project; is that correct?
18  MR. GREENSTEIN: Objection. Misstates
19  testimony. Foundation.
20  THE WITNESS: I'm not sure what I said
21  completely, but the audit committee had been working
22  inside Oracle for a long, long, period of time.
23  Sometimes they would come in for six months
24  and they'd be gone for a couple and then come back, but
25  they were always there on and off for what I thought was

528

1  to be years.
2      I don't know specifically, because I didn't
3  talk to any of them exactly what they were researching,
4  but they were there for quite a long time.
5  BY MR. GLENNON:
6      Q.  Do you know whether or not they were working
7  on this unapplied cash project?
8      MR. GREENSTEIN: Objection. Calls for
9  speculation. Vague. Foundation.
10     THE WITNESS: No. It was just rumor that they
11 were, but -- I couldn't tell you from personal
12 experience or hearing from -- from them.
13 BY MR. GLENNON:
14     Q.  Do you know who was on the audit committee at
15 this point in time?
16     A.  People's names?
17     Q.  Yeah.
18     A.  No. They worked for a different company.
19     MR. GREENSTEIN: Sorry. Sorry.
20     I want to insert an objection. Vague as to
21 time to the last question.
22     MR. SCHRAG: Were you done answering?
23     THE WITNESS: (Nodding head)
24 BY MR. GLENNON:
25     Q.  Now, when you're talking about the people

529

1  working for a different company, are you sure you're not
2  discussing the special litigation committee versus the
3  audit committee?
4      MR. GREENSTEIN: Objection. Compound.
5  Foundation. Speculation.
6      THE WITNESS: I couldn't tell you exactly
7  where they were from. I just knew that they had a room
8  to themselves and they were there for a long period of
9  time auditing us.
10 BY MR. GLENNON:
11     Q.  Okay. Let me -- let me ask this question.
12     Do you have any knowledge about Oracle's audit
13 committee being continuously updated with the progress
14 of the unapplied cash project?
15     MR. GREENSTEIN: Objection. Asked and
16 answered.
17     THE WITNESS: Only hearsay, not -- not
18 verbally from that audit committee or anything.
19     MR. GLENNON: Okay.
20     THE WITNESS: Just from other people stating
21 that.
22 BY MR. GLENNON:
23     Q.  You never spoke to any member of the Oracle
24 audit committee about the unapplied cash project; is
25 that correct?

530

1      MR. SCHRAG: I'm not sure you guys are
2  speaking on the same page.
3      He's talking about a specific committee, and
4  I'm not sure he knows whether it's the audit committee,
5  as you're referring to it.
6      So you might want to just clarify the record
7  on that.
8      That's my understanding. I could be wrong.
9      MR. GLENNON: Well, okay. I want to make sure
10 we're on the same page.
11     During day one, and I can give you the
12 citation, he testified that he understood that the audit
13 committee was continuously updated with the progress of
14 the unapplied cash project.
15 BY MR. GLENNON:
16     Q.  Do you have an understanding of who the audit
17 committee was?
18     MR. GREENSTEIN: Objection. Misstates
19 testimony.
20     THE WITNESS: No. Like I said, I didn't
21 understand who they were, as far as I didn't know them.
22     I just knew they were working for a different
23 company auditing us, and it was just verbally through
24 different managers or other people that they were being
25 updated.

531

1  BY MR. GLENNON:
2      Q.  Okay. And you don't know whether the
3  committee that you're thinking of is either the audit
4  committee or the special litigation committee?
5      MR. GREENSTEIN: Objection. Asked and
6  answered. Vague.
7      MR. SCHRAG: Do you know whether it was one of
8  those two?
9      THE WITNESS: No.
10     MR. GLENNON: Okay.
11 BY MR. GLENNON:
12     Q.  And you never had a conversation with this
13 particular committee about the progress of the unapplied
14 cash project; is that right?
15     MR. GREENSTEIN: Objection. Vague. Leading.
16     THE WITNESS: No.
17     MR. GLENNON: Okay.
18     THE WITNESS: I've never met any of them, just
19 was "hello" in the hall. That was about it.
20 BY MR. GLENNON:
21     Q.  You also testified during the first day of
22 your deposition that Mike Quinn ultimately left his job
23 at Oracle; isn't that right?
24     A.  Correct.
25     Q.  And the reason that Mike Quinn gave you for

532

1  leaving was that he had just had twins and wanted to
2  pursue a different avenue; is that right?
3        MR. GREENSTEIN: Objection. Misstates
4  testimony.
5        THE WITNESS: Correct.
6  BY MR. GLENNON:
7     Q.   You testified that there was a fair amount of
8  gossip about other possible reasons, suspected or
9  otherwise, as to why he left when he left; is that
10  right?
11        MR. GREENSTEIN: Objection. Misstates
12  testimony.
13        I don't think he said "gossip."
14        THE WITNESS: It wasn't gossip. It was just
15  there was many different -- feelings towards why he left
16  from other people, none of my own, just what I heard
17  from other people.
18  BY MR. GLENNON:
19     Q.   Do you have personal knowledge about why Mike
20  Quinn left his job at Oracle?
21        MR. GREENSTEIN: Objection. Vague.
22  Speculation.
23        THE WITNESS: The only thing I heard from Mike
24  Quinn and the last time I have talked to him was that he
25  was leaving to search out other avenues and because he

533

1  needed to take a break.
2  BY MR. GLENNON:
3     Q.   Did you ever see or hear anyone tell Mike
4  Quinn that he had to leave Oracle because of the
5  circumstances that gave rise to the unapplied cash
6  project?
7        MR. GREENSTEIN: Objection. Vague.
8        THE WITNESS: No. That was completely from
9  the talk around the office or -- other individuals
10  speaking what -- how they felt it happened.
11  BY MR. GLENNON:
12     Q.   So you didn't attend Mike Quinn's exit
13  interview, or review his termination agreement, or
14  anything like that?
15        MR. GREENSTEIN: Objection. Argumentative.
16        THE WITNESS: No.
17  BY MR. GLENNON:
18     Q.   Did you ever ask Mike Quinn whether he, in
19  fact, had been fired because of the circumstances
20  precipitating the unapplied cash project?
21        MR. GREENSTEIN: Objection. Asked and
22  answered.
23        THE WITNESS: No. Like I said, the last time
24  I spoke with Mike was that he was leaving due to
25  searching out other avenues and taking a break.

534

1        MR. GLENNON: Okay. Mr. Hatada, I'm going to
2  quickly go through a couple of the exhibits that
3  Mr. Greenstein showed you in connection with his direct
4  examination.
5        Do we have a complete set of the Court marked
6  here?
7        (Discussion off the record)
8        MR. GREENSTEIN: Okay. Do you have a complete
9  set of what he showed?
10        MR. SCHRAG: On day one?
11        MR. GLENNON: Yeah.
12        MR. SCHRAG: I have some of them. I believe I
13  have them.
14        MR. GLENNON: I have some as well. My problem
15  is I've marked on them.
16        MR. SCHRAG: Which ones do you want?
17        MR. GLENNON: What was marked as Venkataramana
18  Number 2.
19        First page has some handwriting on it saying
20  "53-page list of opened unapplied cash."
21  BY MR. GLENNON:
22     Q.   Mr. Hatada, do you recall testifying about
23  this particular document?
24     A.   I don't remember the exact words that were
25  stated, but --

535

1        MR. SCHRAG: He's just asking if you recall
2  testifying about the document.
3        THE WITNESS: Yeah.
4        Sorry. I recall looking at this document and
5  testifying on it.
6  BY MR. GLENNON:
7     Q.   Now, prior to the first day of your deposition
8  had you ever seen that specific unapplied cash report
9  before?
10     A.   I can't remember. It's a long time ago.
11        I've looked at so many different unapplied
12  cash reports, I couldn't reference one over the other.
13     Q.   So you don't know whether you had seen that
14  particular unapplied cash report prior to the first day
15  of your deposition?
16        MR. GREENSTEIN: Objection. Asked and
17  answered.
18        THE WITNESS: No. They all look the same to
19  me.
20  BY MR. GLENNON:
21     Q.   Okay. You testified about some specific
22  entries on this particular document during the first day
23  of your deposition.
24        Do you recall that?
25     A.   Yes.

536

1   Q.   You testified, for instance, about the 21st
2   Century Insurance Group payment that had been
3   outstanding for 80 days.
4       Do you remember that testimony?
5       MR. GREENSTEIN: Objection. Misstates
6   testimony.
7       THE WITNESS: I do.
8   BY MR. GLENNON:
9   Q.   You also testified about Advanced Telecom
10  Group making a duplicate payment in the amount of
11  $123,303.80.
12      Do you recall that testimony?
13  A.   Not sure where that is.
14  Q.   My question, I guess, is do you recall
15  testifying about that particular transaction?
16  A.   I think I -- testified on a couple different
17  ones.
18      I don't remember exactly which ones they were.
19  I just know that I explained to you guys line-by-line
20  what it was stating.
21  Q.   Now, when you were explaining line-by-line
22  what this particular exhibit was stating, and, for the
23  record, it's Venkataramana 2, were you merely
24  interpreting the contents of this particular document?
25      MR. GREENSTEIN: Objection. Foundation.

537

1       I want to lodge an objection to all this line
2   of questioning because he hasn't shown him any testimony
3   that he gave on day one, and I don't think he should
4   speculate about what he said during day one.
5       It's on the record. The Defendants have it.
6   They can put it before him.
7       MR. GLENNON: Your objection is done.
8       MR. GREENSTEIN: And they can put it before
9   him.
10      So -- to the extent it mischaracterizes
11  Mr. Hatada's previous testimony that's in the record
12  already.
13      MR. SCHRAG: Objection. Overbroad.
14      MR. GLENNON: Let me ask the question
15  differently then.
16      THE WITNESS: Okay.
17  BY MR. GLENNON:
18  Q.   Looking at this particular document, do you
19  have an independent recollection of any of these
20  unapplied cash items separate and apart from what this
21  document says on it?
22      MR. GREENSTEIN: Objection. Vague.
23      THE WITNESS: No.
24      Like I said, you know, all of these -- any of
25  these unapplied reports -- they all look the same, and

538

1   they all look different, so, I mean, it's just -- I was
2   basically stating to you guys exactly what each field
3   meant -- per line item.
4   BY MR. GLENNON:
5   Q.   Okay. I understand that.
6       But the point I'm getting at is that is based
7   on your interpretation of the document as opposed to,
8   for instance, a specific recollection about an item --
9   an individual item of unapplied cash; is that right?
10      MR. GREENSTEIN: Objection. Leading.
11      THE WITNESS: To give you an example, I don't
12  remember 21st Century Insurance Group at the top, that
13  it was for 3,072.
14      I just can tell you exactly what these
15  different fields mean and what the notes mean.
16      MR. GLENNON: Okay.
17      THE WITNESS: I don't remember exactly looking
18  at 21st Century Insurance Group.
19  BY MR. GLENNON:
20  Q.   Do you recall -- do you have independent
21  recollection, and by "independent recollection" I mean a
22  memory other than just simply reading and interpreting
23  from that document, about any of the unapplied items in
24  that particular report?
25      MR. GREENSTEIN: Objection. Vague and

539

1   ambiguous.
2       MR. SCHRAG: Do you want him to look at each
3   transaction?
4       THE WITNESS: Same answer.
5       I just -- it's -- I don't recall any of these
6   singled out, that I have looked at them before.
7       I just -- I know exactly what each field means
8   to each item.
9       MR. GLENNON: Okay. Fair enough. We can put
10  that one aside.
11      You got a clean copy of Venkataramana Number 8,
12  which is the second exhibit Plaintiffs introduced? It's
13  a spread sheet.
14  BY MR. GLENNON:
15  Q.   Mr. Hatada, do you recall testifying about
16  this document during the first day of your deposition?
17  A.   I do.
18  Q.   Now, separate and apart from the contents of
19  this document do you have an independent recollection or
20  memory of any of the transactions contained on this
21  document?
22      MR. GREENSTEIN: Objection. Vague. Compound.
23      THE WITNESS: Before looking at it I couldn't
24  tell you that I remember that General Electric had an
25  item and had, you know, this information on it.

540

1    I can just tell you what this is, item -- or
2    field-by-field.
3    BY MR. GLENNON:
4        Q.    In other words, you're testifying as to what
5    the document says; is that correct?
6        MR. GREENSTEIN: Objection. Vague. Leading.
7        THE WITNESS: Yes, and I've looked at it
8    before, but I don't -- I couldn't tell you -- if I
9    wasn't looking at it right now, I wouldn't be able to
10   say that the General Electric Company had an item for
11   February 5th, '01.
12       I've looked at this before because it has
13   Vic's name next to it, and he was -- I managed Vic, and
14   he was -- he was a senior collections analyst that was
15   responsible for trying to resolve these items.
16   BY MR. GLENNON:
17       Q.    Do you recall when you looked at this document
18   before?
19       A.    At some point after the project had started.
20       Q.    But in looking at this do you have an
21   independent recollection as to any of these unapplied
22   cash amounts that are listed on this document?
23       MR. GREENSTEIN: Objection. Asked and
24   answered.  Vague.
25       THE WITNESS: No.

541

1    BY MR. GLENNON:
2        Q.    Is there anything on this particular document
3    indicating to you that the sums of money listed on this
4    document had been transferred to the bad debt account by
5    the 46,000 debit memos that were created on November
6    17th, 2000?
7        MR. GREENSTEIN: Objection. Vague and
8    ambiguous. Calls for speculation.
9        Foundation. Document speaks for itself.
10       THE WITNESS: No.  I couldn't tell you that.
11   BY MR. GLENNON:
12       Q.    Is there anything on this document even
13   referring to the November 17th, 2000 debit memos?
14       MR. GREENSTEIN: Same objections.
15       THE WITNESS: No.
16   BY MR. GLENNON:
17       Q.    Directing your attention to the document
18   itself, there are two columns which appear to contain
19   dates.
20       Do you see where I'm referring to?
21       A.    Correct.
22       Q.    Do you know what those dates represent?
23       MR. GREENSTEIN: Objection. Asked and
24   answered.
25       THE WITNESS: I don't know in which order, but

542

1    I believe it's when the check came in and when it was
2    applied.
3    BY MR. GLENNON:
4        Q.    So is it your testimony that one of these
5    dates refers to when the check came in and the other
6    refers to when the check was applied?
7        MR. GREENSTEIN: Objection. Misstates prior
8    testimony. Lack of foundation.
9        Document speaks for itself, and the testimony
10   on day one speaks for itself.
11       THE WITNESS: I believe so.
12   BY MR. GLENNON:
13       Q.    Let's focus on the dates on General Electric.
14       Do you see the February 5, 2001 and April
15   30th, 2002, Mr. Hatada?
16       A.    Correct.
17       Q.    Mr. Hatada, how could those doc -- how could
18   that particular payment have been transferred to the bad
19   debt reserve through the debit memos on November 17th,
20   2000 considering the date on which Oracle received the
21   payment is months or years after the time the debit
22   memos were created?
23       MR. GREENSTEIN: Objection. Lack of
24   foundation. Document speaks for itself.
25       Vague and ambiguous and speculation.

543

1        MR. SCHRAG: Do you understand the question?
2        THE WITNESS: Yeah.  I never said this was due
3    to the debit memos.
4    BY MR. GLENNON:
5        Q.    If Oracle received the money itself after
6    November 17th, 2000, then the debit memos couldn't
7    possibly have transferred the cash receipt in to the bad
8    debt reserve; isn't that right?
9        MR. GREENSTEIN: Objection. Leading. Calls
10   for speculation. Lack of foundation and vague.
11       THE WITNESS: I'm unsure. I don't know.
12   BY MR. GLENNON:
13       Q.    Let me ask you this.
14       Can you think of any way that Oracle could
15   transfer a cash receipt in to the bad debt reserve in
16   November of 2000 if it hadn't received the cash receipt
17   until February 5th of 2001?
18       MR. GREENSTEIN: Same objections. Document
19   speaks for itself.
20       THE WITNESS: No.  I'm -- I'm unsure.
21   BY MR. GLENNON:
22       Q.    Okay. We can put that document aside.
23       Mr. Hatada, are you aware of the fact that
24   Mike Quinn requested Ryan Roberts and Greg Myers to
25   produce three different deliverables on October 21st,

544

1    2002?
2         MR. GREENSTEIN: Objection. Lack of
3    foundation. Calls for speculation.
4         THE WITNESS: No.
5    BY MR. GLENNON:
6         Q.   Do you have any knowledge as to what these
7    particular deliverables were?
8         MR. GREENSTEIN: Same objection. Asked and
9    answered.
10        THE WITNESS: No, not if I wasn't looking at
11   it.
12   BY MR. GLENNON:
13        Q.   Okay. At the -- at the same time are you
14   aware of whether Mike Quinn gave Ryan Roberts and Greg
15   Myers three tasks that he said needed to be done?
16        Are you aware of these facts?
17        MR. GREENSTEIN: Objection. Foundation.
18   Calls for speculation. Vague as to time period.
19        THE WITNESS: Mike Quinn gave many different
20   deliverables to Ryan Roberts and Greg Myers during this
21   project.
22        Yeah. I'm sure he -- sent many different
23   action items to them.
24   BY MR. GLENNON:
25        Q.   But on October 21st, 2002 are you aware of

545

1    Mike Quinn giving Ryan Roberts and Greg Myers three
2    specific tasks that he said needed to be done?
3         Do you know about this?
4         MR. GREENSTEIN: Objection. Speculation.
5    Asked and answered. Lack of foundation and vague.
6         THE WITNESS: I couldn't tell you as far as
7    dates and details of the -- or description of the
8    deliverables, no.
9         Q.   Or can you give me a description of the things
10   that he said that needed to be done?
11        Is that what you meant by "deliverables"?
12        A.   Yeah.
13        MR. GREENSTEIN: Objection. Same objections
14   to that question.
15        MR. GLENNON: Do you have a clean copy of
16   Plaintiff's third exhibit, which is an E-mail from
17   Michael Quinn to Roberts on October 21st, 2002?
18        MR. SCHRAG: What's the number?
19        MR. GLENNON: It is --
20        SCHRAG: Hatada 3?
21        MR. GLENNON: Hold on. I'll tell you.
22        It is Chan 12.
23   BY MR. GLENNON:
24        Q.   Do you recall testifying about this particular

546

1    document, Mr. Hatada?
2         A.   I do.
3         Q.   When was the first time you saw this document?
4         A.   I don't believe I ever saw it previous to -- I
5    actually believe that Ryan forwarded it to all of us
6    managers, but I couldn't guarantee that, because I don't
7    have a copy of it.
8         Q.   Do you have a specific recollection of having
9    received this particular E-mail?
10        MR. GREENSTEIN: Objection. Asked and
11   answered.
12        THE WITNESS: Yes, because this is really when
13   it all started -- and I didn't really read through it
14   thoroughly.
15        I got most of my information in -- in the
16   meeting.
17   BY MR. GLENNON:
18        Q.   Did you ever speak directly to Mike Quinn
19   about this particular E-mail?
20        A.   No.
21        Q.   Do you recall when this particular E-mail was
22   forwarded to you by Ryan Roberts?
23        MR. GREENSTEIN: Objection. Asked and
24   answered.
25        THE WITNESS: No.

547

1    BY MR. GLENNON:
2         Q.   Now, when you were testifying on day one of
3    your deposition about the contents of this E-mail, is it
4    fair to say that you were interpreting what Mike Quinn's
5    instructions were based on this document?
6         MR. GREENSTEIN: Objection. Lack of
7    foundation.
8         His testimony on day one speaks for itself, so
9    it mischaracterizes the previous testimony.
10        MR. SCHRAG: Objection. Overbroad.
11        THE WITNESS: Yes, like I said, it was -- I
12   didn't know this E-mail inside out at the time I looked
13   at it on day one.
14        I just -- I had seen it before, and -- I was
15   trying to explain to Eli what it meant.
16   BY MR. GLENNON:
17        Q.   Now, let me ask you this.
18        If you were to flip the document over and not
19   look at it, could you -- and I'm not asking you to do
20   this. I don't want a memory test. I'm just trying to
21   determine to what extent you're testifying based on
22   personal knowledge versus what extent you were just
23   reading and interpreting a document.
24        Would you be able to identify the specific
25   instructions, the deliverables, and the things that

548

1 needed to be done that are outlined on this E-mail?
2      MR. GREENSTEIN: Objection. I think that's
3 many questions.
4      Lack of foundation. Speculation. Leading.
5 Vague.
6      THE WITNESS: No, it had been a very long time
7 between looking at it on the day one of deposition
8 versus looking at it very quickly at the time it was
9 forwarded to me after the date it was -- it was
10 originally sent, so if I turned it over, I wouldn't be
11 able to -- to read back or -- exactly what it stated.
12      MR. GLENNON: Understandable.
13      You can put it aside.
14      You had a Venkataramana Exhibit 5. It's a
15 redacted timeline.
16 BY MR. GLENNON:
17      Q.   Mr. Hatada, do you recall testifying about
18 this particular document?
19      A.   I do.
20      Q.   You said you didn't type this document; is
21 that correct?
22      A.   Correct.
23      Q.   Now, did you write it and have someone else
24 type it?
25      A.   No.

549

1      Q.   Do you know who wrote this particular
2 document?
3      MR. GREENSTEIN: Objection. Calls for
4 speculation.
5      THE WITNESS: Nope. No.
6 BY MR. GLENNON:
7      Q.   When was the first time you saw this document?
8      A.   I believe the first time I saw this document
9 -- was the first day of the deposition.
10      Q.   So you don't recall seeing this document
11 before the first day of the deposition; is that
12 accurate?
13      MR. GREENSTEIN: Objection. Asked and
14 answered.
15      THE WITNESS: Yes. I was basically explaining
16 to Eli what the paragraphs had meant as he read them to
17 me, because I was involved in the actions on those dates
18 -- regardless of who wrote it.
19      I just -- I didn't write it.
20 BY MR. GLENNON:
21      Q.   Now, again, similar question to what I asked
22 last time.
23      If you were to take that document and flip it
24 over, would you be able to articulate which dates the
25 specific meetings took place on and what occurred -- let

550

1 me start that question over again.
2      When you were testifying about this particular
3 document, were you testifying as to the contents of this
4 particular document?
5      MR. GREENSTEIN: Objection. Testimony on day
6 one speaks for itself, so I'll have a standing
7 objection.
8      Calls for speculation.
9      THE WITNESS: Yes, like I said, as Eli was
10 reading through it, I was explaining to him what the
11 sentences and paragraphs had meant --
12      MR. GLENNON: Okay.
13      THE WITNESS: -- per date.
14 BY MR. GLENNON:
15      Q.   Now, if you were to flip this document over,
16 would you be able to, for instance, identify which
17 meeting happened on which specific date?
18      MR. GREENSTEIN: Objection. Calls for
19 speculation.
20      THE WITNESS: No.
21 BY MR. GLENNON:
22      Q.   Okay. Do you have any idea as to how
23 Plaintiffs got this document?
24      MR. GREENSTEIN: Objection. Vague.
25 Foundation. Speculation.

551

1      THE WITNESS: No.
2      MR. GLENNON: Okay. We can put this document
3 aside.
4      Do you have a copy of what was marked as
5 Hatada 3?
6      MR. SCHRAG: May not have that.
7      What does it look like?
8      Oh. Yes, I do.
9      MR. GLENNON: E-mail.
10 BY MR. GLENNON:
11      Q.   Mr. Hatada, do you recall testifying about
12 this specific document?
13      A.   Yes.
14      Q.   And do you recall actually receiving this
15 particular E-mail on October 30th, 2002?
16      MR. GREENSTEIN: Objection. Asked and
17 answered.
18      THE WITNESS: Yes. I'm on the distribution.
19 BY MR. GLENNON:
20      Q.   But besides looking at your name on the
21 distribution list do you have an independent
22 recollection of having received this E-mail on this
23 particular date?
24      MR. GREENSTEIN: Objection. Asked and
25 answered.

552

1       THE WITNESS: Yeah. I remember Omid sending
2   the E-mail to Kim.
3   BY MR. GLENNON:
4       Q.   Okay. That's all I've got on this one. We
5   can move on.
6           Then Venkataramana Number 3.
7           Do you recall testifying about this document,
8   Mr. Hatada?
9       A.   I do.
10      Q.   Prior to your first day of your deposition had
11  you seen this particular billing summary before?
12      A.   This specific billing?
13      Q.   Correct.
14      A.   No.
15      Q.   Do you have any independent recollection of
16  any of the invoices or billings Oracle issued to
17  Southwest Bell during the time you were employed at
18  Oracle?
19          MR. GREENSTEIN: Objection. Foundation.
20  Speculation. Vague.
21          THE WITNESS: Other than having Southwestern
22  Bell in my territory, I couldn't tell you specifics on
23  items, invoices.
24  BY MR. GLENNON:
25      Q.   So when you were testifying about specific

553

1   invoices listed in this particular exhibit, is it fair
2   to say that you were interpreting the data contained in
3   this exhibit as opposed to testifying based on personal
4   recollection?
5           MR. GREENSTEIN: Objection.
6           I think his testimony on day one speaks for
7   itself, to the extent that mischaracterizes his
8   testimony, that's my objection.
9           THE WITNESS: I was -- yeah, basically
10  stating, explaining to Eli, what each field was stating
11  to help explain.
12  BY MR. GLENNON:
13      Q.   Each field in the particular document; is that
14  correct?
15      A.   Each item, whether it be an invoice, an order
16  number, or an invoice date, due date.
17      Q.   But you don't have an independent personal
18  knowledge about any of the invoices contained on that
19  particular document; do you?
20          MR. GREENSTEIN: Objection. Leading.
21  Mischaracterizes testimony.
22          THE WITNESS: No.
23          MR. GLENNON: Okay. We can put that one
24  aside.
25          Do you have a copy of Hatada Number 4?

554

1           I promise I'm not doing this with all of them,
2   only a few.
3           MR. SCHRAG: Yes.
4   BY MR. GLENNON:
5       Q.   Mr. Hatada, do you recall having seen this
6   document -- let me start that question over again.
7           Do you recall testifying about this document
8   during the first day of your deposition?
9       A.   I do.
10      Q.   And prior to your first day of your deposition
11  had you ever seen this particular document before?
12      A.   I don't remember seeing this specific
13  document, no.
14      Q.   Without reading from this document do you have
15  an independent recollection about a refund to Michelin
16  North America in the amount of $126,602.72 initiated in
17  March 2003?
18          MR. SCHRAG: Objection. Vague.
19          THE WITNESS: No.
20  BY MR. GLENNON:
21      Q.   Without referring to the contents of this
22  document do you have an independent recollection as to
23  why Libby Brewster believed that the money should be
24  refunded?
25          MR. GREENSTEIN: Objection. Calls for

555

1   speculation.
2           THE WITNESS: Not without looking at her
3   E-mail.
4   BY MR. GLENNON:
5       Q.   Did you -- do you recall having spoken to
6   Libby about this particular refund?
7       A.   I spoke to Libby about every refund that she
8   did, but I -- as far as my memory goes, that long ago, I
9   can't remember this specific one, because there was so
10  many.
11      Q.   So, Mr. Hatada, when you were testifying about
12  this particular document, is it fair to say you were
13  interpreting the entries on this particular document as
14  opposed to testifying based on your personal
15  recollection?
16          MR. GREENSTEIN: Objection. Misstates
17  testimony.
18          His testimony on day one speaks for itself.
19  The document speaks for itself.
20          THE WITNESS: Yes, I was -- telling all of you
21  exactly what it meant.
22          MR. GLENNON: Okay. We can put that one
23  aside.
24          Hatada Number 5.
25  BY MR. GLENNON:

556

1    Q.   Mr. Hatada, do you recall testifying about
2    this document during the first day of your deposition?
3    A.   I do.
4    Q.   Prior to the first day of your deposition had
5    you ever seen this document before?
6    A.   I might have seen something like it, but not
7    the -- not the exact one. I don't remember seeing this
8    exact one.
9    Q.   You testified that the spread sheet looked
10   like something that Ryan Roberts put together from Mike
11   Quinn to assess whether certain receipts impacted
12   revenue.
13        Do you recall your testimony about this point?
14        MR. GREENSTEIN: Objection. I'm going to
15   lodge a standing objection that his testimony on day one
16   speaks for itself and the document speaks for itself.
17        THE WITNESS: I do.
18   BY MR. GLENNON:
19   Q.   Did you -- do you recall actually seeing Ryan
20   Roberts draft this particular spread sheet?
21        MR. GREENSTEIN: Objection. Lack of
22   foundation.
23        THE WITNESS: No.
24   BY MR. GLENNON:
25   Q.   How do you know that Ryan Roberts drafted this

557

1    particular spread sheet?
2        MR. GREENSTEIN: Objection. Lack of
3    foundation. Calls for speculation.
4        THE WITNESS: I didn't watch him do it.
5        I just know that he was the one that supplied
6    us with spread sheets like this one that had information
7    as far as definitions to codes and -- and revenue impact
8    or not.
9    BY MR. GLENNON:
10   Q.   So you were inferring based on the contents of
11   this exhibit?
12        MR. GREENSTEIN: Objection. Leading.
13   Misstates testimony. Lack of foundation.
14        THE WITNESS: I was referring to receiving
15   spread sheets from -- or seeing spread sheets from Ryan
16   like this one. I don't know if it was this exact one.
17   BY MR. GLENNON:
18   Q.   Well, do you recall having received this
19   particular spread sheet from Ryan Roberts?
20        MR. GREENSTEIN: Objection. Asked and
21   answered.
22        THE WITNESS: No.
23   BY MR. GLENNON:
24   Q.   You also testified that you believed this
25   document covered the unapplied payments over $250,000.

558

1        Do you recall that?
2        MR. GREENSTEIN: Objection. Testimony on day
3    one speaks for itself, so it also mischaracterizes
4    testimony.
5        THE WITNESS: I don't remember.
6    BY MR. GLENNON:
7    Q.   You also testified about Molly Littlefield
8    determining that a payment in the amount of $300,502.39
9    could be applied on behalf of Bell South Corporation.
10        Do you recall that testimony?
11        MR. GREENSTEIN: Objection. Misstates
12   testimony. The testimony on day one speaks for itself.
13   Lack of foundation.
14        THE WITNESS: What I stated was that the field
15   from -- line 36 was last updated by Molly Littlefield.
16   BY MR. GLENNON:
17   Q.   Do you have any personal knowledge about Molly
18   Littlefield determining -- let me start that question
19   over again.
20        Separate and apart from what that document
21   says do you have any personal knowledge about Molly
22   Littlefield determining that a payment in the amount of
23   $300,502.39 could be applied on behalf of Bell South
24   Corporation?
25        MR. GREENSTEIN: Objection. Speculation.

559

1    Foundation. Vague.
2        THE WITNESS: No. I'm going off of the user
3    name that's in the "last updated by" column.
4        MR. GLENNON: We can put that document aside
5    now.
6        Let's take a moment for the tape.
7        VIDEOGRAPHER: We are going off the record.
8    The time is 4:49 p.m.
9        Here marks the end of videotape number three,
10   volume two, in the deposition of Ian Hatada.
11        (Thereupon a recess was taken at 4:49 p.m.
12        and the deposition resumed at 5:01 p.m.)
13        VIDEOGRAPHER: We are going back on the
14   record. The time is 5:01 p.m.
15        Here marks the beginning of videotape number
16   four, volume two, in the deposition of Ian Hatada.
17   BY MR. GLENNON:
18   Q.   Mr. Hatada, we're back on the record.
19        You're still testifying under oath. You
20   understand that?
21   A.   I do.
22   Q.   Okay. Do you have Hatada Number 6, by chance,
23   there?
24        There it is.
25        Mr. Hatada, do you recall testifying about

560

1 this specific document?
2     A.   I do.
3     Q.   Prior to the first day of your deposition had
4 you seen this particular document before?
5     A.   Not this specific one, but I've just -- I've
6 seen the auto adjustments spread sheet before or report.
7     Q.   Do you have any personal knowledge about any
8 of the specific adjustments that are set forth in this
9 particular exhibit?
10     MR. GREENSTEIN: Objection. Vague and
11 ambiguous. Lacks foundation.
12     THE WITNESS: No. I've only just seen this
13 report before and not this specific one.
14 BY MR. GLENNON:
15     Q.   And so, for instance, when you testify about
16 User Technology Association, what you're doing is
17 interpreting the contents of this particular exhibit as
18 opposed to testifying based on a personal recollection;
19 is that accurate?
20     MR. GREENSTEIN: Objection. Misstates prior
21 testimony.
22     His testimony on day one is already in the
23 record and speaks for itself.
24     THE WITNESS: Yes, I was advising Eli of which
25 field meant what.

561

1 BY MR. GLENNON:
2     Q.   All right. You can put that one aside.
3     Do you have -- today we're on to Hatada Number
4 7.
5     MR. SCHRAG: It's probably near the bottom.
6 There it is.
7 BY MR. GLENNON:
8     Q.   Mr. Hatada, do you recall testifying about
9 this specific document?
10     A.   I do.
11     Q.   If you look at page 001878 and 001879 as well
12 as 001880, you'll see a stamp, typewritten word,
13 "redacted."
14     Do you see that?
15     A.   I do.
16     Q.   Do you know what "redacted" means?
17     MR. GREENSTEIN: Objection. Vague. Calls for
18 speculation.
19     THE WITNESS: No.
20 BY MR. GLENNON:
21     Q.   Do you see anything on -- let's look at page
22 PLF-ORC 001878.
23     Do you recognize anything on this particular
24 document that has been erased?
25     MR. GREENSTEIN: Objection. Vague. Calls for

562

1 speculation. Foundation.
2     MR. SCHRAG: Do you know what he's asking?
3     THE WITNESS: Not really.
4     I mean, I've looked at it. This is the second
5 time I'm looked at it; right?
6 BY MR. GLENNON:
7     Q.   Do you recall making any handwritten notes on
8 this particular document that you don't see on the copy
9 that you're looking at?
10     MR. GREENSTEIN: Objection. Lacks foundation.
11     THE WITNESS: No. I took these notes a long
12 time ago, and I know that I wrote them, but -- they are
13 what they are.
14     MR. GLENNON: Well said.
15     THE WITNESS: I don't --
16 BY MR. GLENNON:
17     Q.   Just flipping to the next page, I'm going to
18 ask you the same question essentially about the next
19 three pages.
20     Looking at PFL-ORC 001879 --
21     MR. SCHRAG: Why don't you just ask him to
22 look through the whole document?
23     MR. GLENNON: Yeah.
24 BY MR. GLENNON:
25     Q.   The three pages that are stamped "redacted,"

563

1 can you take a look and see if you recall writing
2 anything on those particular pages that doesn't appear
3 in this copy of the exhibit?
4     MR. SCHRAG: So just look through the rest of
5 the document and then answer his question.
6     MR. GREENSTEIN: I'll object. It's vague.
7 Lacks foundation.
8     THE WITNESS: So you're saying did I write
9 anything on here that -- in my notes way back when that
10 is not here now?
11     MR. GLENNON: That's right.
12     MR. GREENSTEIN: Same objections.
13     THE WITNESS: No.
14     MR. GLENNON: I'd like to introduce as Hatada
15 16 a copy of Hatada 7 -- only without the redacted mark.
16     (Exhibit No. 16 was marked for
17     Identification.)
18     MR. GLENNON: I apologize. I'm going to -- I
19 only have one copy of this, so I'm going to -- share it
20 with you.
21 BY MR. GLENNON:
22     Q.   Mr. Hatada, directing your attention to the
23 second page, do you see the language up at the top, the
24 handwritten language referring to the adjusting up
25 invoices?

564

1      A.  I do.
2      Q.  Is that your handwriting?
3      A.  No.
4      Q.  Do you know whose handwriting that is?
5          MR. GREENSTEIN: Objection. Calls for
6  speculation.
7          THE WITNESS: No.
8  BY MR. GLENNON:
9      Q.  Okay. Turning to the next page, PLF-ORC
10  001879, see about midway through there's a box around
11  the phrase "debit memos," and then there's an arrow
12  referring to the creating of fake invoices?
13          Do you see that?
14      A.  I do.
15      Q.  Is that your handwriting?
16      A.  No.
17      Q.  Do you know whose handwriting that is?
18          MR. GREENSTEIN: Objection. Calls for
19  speculation.
20          THE WITNESS: I do not. Looks like the same
21  handwriting on the first one, but --
22  BY MR. GLENNON:
23      Q.  Can I get you to turn the page one additional
24  time to PLF-ORC 001880.
25          You'll see across the top of this particular

565

1  document is the phrase "Quinn directive" with an arrow
2  pointing down.
3          Is that your handwriting?
4      A.  No.
5      Q.  Do you know whose handwriting that is?
6          MR. GREENSTEIN: Objection. Calls for
7  speculation.
8          THE WITNESS: I don't.
9  BY MR. GLENNON:
10      Q.  Just a couple more questions, Mr. Hatada, on
11  this particular document.
12          Mr. Hatada, do you have any idea how
13  Plaintiffs got a copy of your notes?
14          MR. GREENSTEIN: Objection. Lacks foundation.
15  Calls for speculation.
16          THE WITNESS: No.
17  BY MR. GLENNON:
18      Q.  Do you know after you took these notes what
19  happened to them?
20          MR. GREENSTEIN: Objection. Vague. Calls for
21  speculation.
22          THE WITNESS: No.
23  BY MR. GLENNON:
24      Q.  Do you know if somebody at Oracle, perhaps
25  somebody in the collections department, took your

566

1  handwritten notes from you?
2          MR. GREENSTEIN: Same objections. Calls for
3  speculation.
4          THE WITNESS: Could happen, but I'm not
5  specifically aware of it.
6  BY MR. GLENNON:
7      Q.  Do you recall giving those notes to
8  Plaintiff's counsel?
9          MR. GREENSTEIN: Same objections.
10          THE WITNESS: No. I didn't give these.
11  BY MR. GLENNON:
12      Q.  Okay. Directing your attention quickly to
13  page PLF-ORC 001879, at the top of the page it says
14  "debit memos," and then there's a date, and I believe
15  you testified on direct that that's not your
16  handwriting; is that correct?
17      A.  Correct.
18          MR. GREENSTEIN: Just to clarify for the
19  record, you mean "debit memos," the portion at the top
20  that says "debit memos, 1990 through Nov," N-o-v,
21  "comma, 00"?
22          Is that what you mean?
23          MR. GLENNON: That's right, that's what I'm
24  referring to. Thank you.
25          THE WITNESS: I'm not sure what I said in the

567

1  first time we talked about this.
2          The "1990/November 2000" could be my writing.
3  I just know for sure that I don't write in cursive very
4  often, so the "debit memos" part of it I know isn't
5  mine.
6  BY MR. GLENNON:
7      Q.  Do you know who wrote that?
8          MR. GREENSTEIN: Objection. Calls for
9  speculation.
10          THE WITNESS: No.
11  BY MR. GLENNON:
12      Q.  Right under that provision is a series of
13  debits and credits.
14          Do you see that?
15          MR. GREENSTEIN: Objection. Document speaks
16  for itself.
17          THE WITNESS: What are you looking at?
18  I'm sorry.
19  BY MR. GLENNON:
20      Q.  Right under the phrase "cash receipt,
21  miscellaneous receipt," you see the "D" mark "cash" and
22  then the "C-25005"?
23          Do you see that?
24      A.  Yes.
25      Q.  Do you have a recollection of whether or not

568

1    that is your attempt to draft the accounting entries
2    associated with the November 17, 2000 debit memos?
3         MR. GREENSTEIN: Objection. Vague and
4    ambiguous. Lack of foundation. Calls for speculation.
5         Sorry.
6         THE WITNESS: It's my notes.
7    BY MR. GLENNON:
8         Q.   Do you -- do you recall what you were trying
9    to -- let me start that question over again.
10        Do you recall what your notes are describing
11   in this particular entry, where you have the "D/cash"
12   and the "C-2205"?
13        Do you know which transaction you are taking
14   notes on?
15        MR. GREENSTEIN: Objection. Calls for
16   speculation. Vague and ambiguous.
17        THE WITNESS: No.
18   BY MR. GLENNON:
19        Q.   As you sit here and look at this particular
20   entry, same section of the notes that we've been talking
21   about, do you understand what the accounting entries are
22   that you've drafted here on this particular page of the
23   notes?
24        MR. GREENSTEIN: Objection. Lacks foundation.
25   Calls for speculation.

569

1         I think it's vague as to which part -- which
2    part of this document you're talking about.
3    BY MR. GREENSTEIN:
4         Q.   Do you know which portion of the document I'm
5    talking about, Mr. Hatada?
6         A.   Are you referring to "D/cash" through "C/AR"?
7         MR. GLENNON: Correct.
8         Let the record reflect I'm showing the witness
9    the specific spots on the document which appear to
10   contain at least partial accounting entries.
11   BY MR. GLENNON:
12        Q.   Do you have an understanding as to what you're
13   taking notes on there?
14        MR. GREENSTEIN: Objection. Calls for
15   speculation. Lack of foundation and vague.
16        THE WITNESS: I believe I'm trying to decipher
17   debits and credits, but I couldn't guarantee that.
18        It's pretty vague.
19   BY MR. GREENSTEIN:
20        Q.   Do you recall whether or not these notes
21   encompass the full set of debits and credits that you're
22   trying to memorialize with these notes?
23        MR. GREENSTEIN: Objection. Calls for
24   speculation. Lack of foundation. Vague.
25        THE WITNESS: No.

570

1         There was a lot more notes than just these on
2    debits and credits. This is just a portion of it.
3    BY MR. GREENSTEIN:
4         Q.   Okay. And so you testified, I think, at one
5    point that you were taking notes based on something that
6    was written on a board; is that correct?
7         A.   Correct.
8         Q.   Did you copy everything that was written on
9    the board in to your notes?
10        A.   No.
11        A lot of it was abbreviated and I tried to go
12   as fast as I could to get it down, but --
13        Q.   So there could be accounting entries
14   associated with this particular transaction that you're
15   testifying about in your notes that aren't, in fact, in
16   your notes; is that right?
17        MR. GREENSTEIN: Objection. Vague. Lack of
18   foundation. Calls for speculation -- and leading.
19        THE WITNESS: Yes, it's possible, but -- I
20   can't even tell from my own notes what it's really
21   stating.
22   BY MR. GLENNON:
23        Q.   A little bit -- just below that there appears
24   to be the phrase "refund issue," "stop payment issue,"
25   and then an arrow or an angle, and it says "After

571

1    submitted we still have items on account."
2         Do you see which portion of the notes I'm
3    talking about?
4         A.   I do.
5         Q.   Do you have an understanding as to what you
6    meant in taking the notes "After submitted we still have
7    items on account"?
8         MR. GREENSTEIN: Objection. Calls for
9    speculation.
10        Document speaks for itself.
11        THE WITNESS: No. I couldn't tell you a clear
12   description.
13   BY MR. GREENSTEIN:
14        Q.   Do you know whether in taking these notes you
15   were -- let me start that over.
16        Do you know whether these notes refer to the
17   fact that prior to November of 2000 refunded -- refunded
18   items and items that had been paid but a stop payment
19   placed on the check remained on account?
20        MR. GREENSTEIN: Objection. Vague and
21   ambiguous. Lack of foundation. Calls for speculation.
22   Mischaracterizes the document.
23        THE WITNESS: Like I said, I'm not fully clear
24   as to what I meant by this note.
25   BY MR. GREENSTEIN:

572

1    Q.   Okay.  Moving back one page, PLF-ORC 001878,
2  I'd like to direct your attention to the entry that has
3  a star and that has a circle, I guess, around it.
4        It refers to a clear-cut refund from paying an
5  invoice twice.
6        Do you see that testimony -- or that entry?
7    A.   I do.
8    Q.   As you sit here today, do you have any
9  specific recollection about a clear-cut refund stemming
10  from an invoice that had been paid twice?
11       MR. GREENSTEIN:  Objection.  Asked and
12  answered.  Calls for speculation.
13       THE WITNESS:  Sure.  There was situations
14  where there were clear-cut refunds.
15  BY MR. GREENSTEIN:
16    Q.   Do you recall any?
17       MR. GREENSTEIN:  Same objections.
18       THE WITNESS:  No.  I couldn't tell you which
19  ones they were.  I just remember them happening.
20  BY MR. GREENSTEIN:
21    Q.   Do you recall any customers that were owed a
22  quote, unquote, "clear-cut refund"?
23       MR. GREENSTEIN:  Same objections.  Asked and
24  answered also.
25       THE WITNESS:  No.

573

1  BY MR. GREENSTEIN:
2    Q.   Do you recall any dollar amounts that you
3  determined were, in fact, a quote, unquote, "clear-cut
4  refund"?
5       MR. GREENSTEIN:  Same objections.
6       THE WITNESS:  No.  I have no specifics to an
7  item that was a clear-cut refund other than I know that
8  it happened.
9  BY MR. GREENSTEIN:
10    Q.   Flipping ahead to PLF-ORC 001880, you
11  testified earlier about the "56M" that's inside the
12  square.
13        Do you see where I'm talking about?
14    A.   I do.
15    Q.   Do you have an independent recollection as to
16  what that entry is referring to?
17       MR. GREENSTEIN:  Objection.  Calls for
18  speculation.
19       THE WITNESS:  From my recollection it was just
20  stating that there was -- over the period of two years
21  there had been 56 million items put on account -- not 56
22  million items -- 56 million dollars put on account.
23        So not necessarily -- there wasn't 56 million
24  items.  It was in the amount of 56 million.
25  BY MR. GREENSTEIN:

574

1    Q.   Are you aware of which account those on
2  account items were placed in?
3       MR. GREENSTEIN:  Objection.  Lacks foundation.
4  Calls for speculation.
5       THE WITNESS:  No.
6  BY MR. GREENSTEIN:
7    Q.   Are you aware of whether or not placing an
8  item on account between 2001 and 2002 had the same
9  impact as placing an item on account prior to and
10  including November 17th, 2000?
11       MR. GREENSTEIN:  Objection.  Vague and
12  ambiguous.
13        Calls for speculation.  Foundation.
14       THE WITNESS:  I think in my notes it stated
15  that it was different, but I didn't refresh and read
16  through all of it.
17        So, no, I -- I'm not sure.
18       MR. GLENNON:  Okay.  You can put that exhibit
19  aside.
20        Hatada Exhibit Number 8.
21        That will go right here.
22  BY MR. GLENNON:
23    Q.   Mr. Hatada, do you recall testifying about
24  this particular document earlier today?
25    A.   I do.

575

1    Q.   Now, prior to your testimony earlier today do
2  you ever recall having seen this specific call notes
3  report?
4       MR. GREENSTEIN:  Objection.  Asked and
5  answered.
6       THE WITNESS:  No, not this specific one.  I've
7  just seen some like it.
8  BY MR. GREENSTEIN:
9    Q.   Now, in questioning you on this particular
10  document counsel indicated that this was a document --
11  this particular document was a document that you used in
12  connection with applying unapplied cash in the October
13  2002 time frame.
14        Do you remember that line of questioning?
15       MR. GREENSTEIN:  Objection.  Mischaracterizes
16  the testimony and the line of questioning.
17        The document speaks for itself, as does the
18  record.
19       THE WITNESS:  True.
20  BY MR. GREENSTEIN:
21    Q.   Do you see anything on this particular
22  document indicating that this document was printed out
23  or used in connection with the unapplied cash project in
24  2002?
25       MR. GREENSTEIN:  Objection.  Calls for

576

1    speculation. Lack of foundation. Vague.
2       THE WITNESS: No.
3       All I was stating in my previous testimony was
4    that we had used the comments and notes, underscore
5    column notes report, to find information as we were
6    doing the project, but I have no hard copy evidence of
7    that. It's just that we used them before.
8    BY MR. GREENSTEIN:
9       Q.   Now, directing your attention to NDCA-ORCL
10   649694 --
11      MR. SCHRAG: It's got my notes on the back, so
12   don't look at the back.
13      MR. GREENSTEIN: Brian, what is that again?
14   Sorry.
15      MR. GLENNON: 649694.
16   BY MR. GREENSTEIN:
17      Q.   The top entry relates to Defense Information
18   Systems.
19      Do you see that?
20      A.   I do.
21      Q.   Do you recall testifying about that earlier
22   today?
23      A.   I do.
24      Q.   Separate and apart from what this document
25   says, do you have a specific recollection about

577

1    researching and trying to determine how to apply
2    unapplied cash on behalf of Defense Information Systems?
3       MR. GREENSTEIN: Objection. Vague and
4    ambiguous. Lack of foundation.
5       THE WITNESS: Sure.
6       I recall researching Defense Information
7    Systems Agency, but not this specific item.
8       I can't remember. It's too long ago.
9    BY MR. GREENSTEIN:
10      Q.   Directing your attention to column D, there
11   appears to be a date there.
12      Do you see that?
13      A.   I do.
14      Q.   Do you know what that date refers to?
15      MR. GREENSTEIN: Objection. Doc -- objection.
16   Document speaks for itself. Calls for speculation.
17      THE WITNESS: I couldn't give you full detail.
18   BY MR. GREENSTEIN:
19      Q.   Do you know whether that's the date on which
20   you entered the call notes that appear on NDCA-ORCL
21   649696, column U?
22      MR. GREENSTEIN: Objection. Calls for
23   speculation.
24      Document speaks for itself.
25      THE WITNESS: Yes.

578

1    So, if you look at the first page, it's got
2    the column heading and it says "call date," so I believe
3    that the notes were put in on -- well, yeah, it could be
4    that the notes were put in on that date.
5    BY MR. GREENSTEIN:
6       Q.   On September 21st, 1999?
7       MR. GREENSTEIN: Objection. Document speaks
8    for itself.
9       THE WITNESS: Correct.
10      But that -- it doesn't necessarily mean that I
11   put that note in there.
12   BY MR. GREENSTEIN:
13      Q.   Understood.
14      But do you understand column D, the date set
15   forth in column D as being the date on which the call
16   notes were -- were made?
17      MR. GREENSTEIN: Objection. Asked and
18   answered. The document speaks for itself.
19      Calls for speculation.
20      THE WITNESS: I believe that's what it's
21   saying in that column, call date.
22   BY MR. GLENNON:
23      Q.   All of these call dates, or at least the ones
24   you were testifying about, occurred prior to the
25   unapplied cash project; isn't that correct?

579

1       MR. GREENSTEIN: Objection. Misstates
2    testimony. Document speaks for itself. Lack of
3    foundation.
4       THE WITNESS: I believe so, but, again, I --
5    you know, couldn't have been -- you know, it might not
6    have been me that put those notes in there. So --
7    BY MR. GREENSTEIN:
8       Q.   Right.
9       But the dates on which these notes were
10   entered predate the unapplied cash project; isn't that a
11   fair statement?
12      MR. GREENSTEIN: Objection. Document speaks
13   for itself. Asked and answered. Calls for speculation.
14      THE WITNESS: Yeah. Yes.
15   BY MR. GREENSTEIN:
16      Q.   And do you recall using this specific
17   document, Mr. Hatada, in your efforts to apply the
18   unapplied cash as part of the project in 2002?
19      MR. GREENSTEIN: Objection. Vague and
20   ambiguous. Lacks foundation.
21      THE WITNESS: Yes. We used comments and
22   notes, underscore call notes.
23   BY MR. GLENNON:
24      Q.   But my question is this specific document.
25      A.   No, no, no.

580

1     MR. GREENSTEIN: Same objection. Sorry.
2     THE WITNESS: Not this specific document
3  necessarily.
4     MR. GLENNON: Okay.
5     THE WITNESS: Because I can't -- I couldn't
6  tell you, because it was a long time ago, but we just
7  used this kind of report before.
8  BY MR. GLENNON:
9     Q.   Mr. Hatada, can I direct your attention to
10 Hatada Exhibit Number 9.
11    Mr. Hatada, do you recall testifying about
12 this particular document during your deposition this
13 morning?
14    A.   Yes.
15    Q.   Do you recall testifying about the wire set
16 forth on the very first row?
17    A.   I do.
18    Q.   What about the payment for Northrop
19 Corporation set out on the very last row of the first
20 page?
21    MR. GREENSTEIN: Objection. Vague and
22 ambiguous.
23    THE WITNESS: I do.
24 BY MR. GREENSTEIN:
25    Q.   Now, in testifying about these particular

581

1  entries are you testifying based on the contents of the
2  document or do you have an independent recollection of
3  these particular receipts?
4     MR. GREENSTEIN: Objection. Compound.
5     THE WITNESS: I'm referencing what I'm reading
6  here.
7  BY MR. GREENSTEIN:
8     Q.   Okay. Now, up on the top righthand corner
9  you'll see what appears to be a date range.
10    Do you see where I'm referring to?
11    MR. GREENSTEIN: Objection. Document speaks
12 for itself.
13    THE WITNESS: I do.
14 BY MR. GREENSTEIN:
15    Q.   Do you understand what that means?
16    MR. GREENSTEIN: Calls for speculation.
17    THE WITNESS: No.
18 BY MR. GREENSTEIN:
19    Q.   Do you have any understanding as to the date
20 range -- let me start that question over again.
21    Do you have any understanding as to the range
22 of dates in which this specific transfer is identified
23 in this particular document fall within?
24    MR. GREENSTEIN: Objection. Document speaks
25 for itself. Calls for speculation.

582

1  Lacks foundation. Vague.
2     THE WITNESS: I don't.
3  BY MR. GREENSTEIN:
4     Q.   Now, you testified that a miscellaneous offset
5  report was something that you might have used in
6  connection with the unapplied cash project in 2002.
7     Do you recall that testimony?
8     MR. GREENSTEIN: Objection to the extent it
9  misstates what's already on the record.
10    THE WITNESS: Yes.
11 BY MR. GREENSTEIN:
12    Q.   Do you know whether you used this particular
13 unapplied -- excuse me -- this particular miscellaneous
14 offset report in connection with the 2002 unapplied cash
15 project?
16    MR. GREENSTEIN: Objection. Calls for
17 speculation. Foundation.
18    THE WITNESS: No.
19    I just said that I -- I've seen it before and
20 it had been used before, but I wasn't referring to this
21 specific report.
22 BY MR. GLENNON:
23    Q.   Mr. Hatada, if I could direct your attention
24 to what has been marked already as Hatada Number 10.
25    No. Excuse me. Matuszak Number 4.

583

1  Do you recall reading this this morning?
2     A.   I do.
3     Q.   Prior to seeing this during the deposition
4  this morning had you seen this document before?
5     A.   No.
6     Q.   And you testified that you'd never spoken to
7  Tom Williams; isn't that right?
8     MR. GREENSTEIN: Objection. Misstates
9  testimony.
10    THE WITNESS: True.
11 BY MR. GREENSTEIN:
12    Q.   All right. You can put that document aside.
13    Shifting gears, I just have a couple of small
14 areas to wrap up with you, Mr. Hatada.
15    Mr. Hatada, do you know Adam Hahn?
16    A.   Yes, I do.
17    Q.   Are you aware that Adam Hahn currently is
18 being prosecuted by the California Attorney General for
19 embezzling over one million dollars from Oracle during
20 the course of his employment?
21    MR. GREENSTEIN: Objection. Lacks foundation.
22    THE WITNESS: No.
23 BY MR. GREENSTEIN:
24    Q.   Did you ever speak with Adam Hahn about the
25 unapplied cash project?

584

1     MR. GREENSTEIN: Objection. Vague.
2     THE WITNESS: I don't think he was working
3  there at the time.
4     I think Adam was -- he was my first boss, and
5  I believe he was gone before any of the project had
6  taken place.
7     MR. SCHRAG: Counsel, can you represent these
8  questions you're asking are about this case as opposed
9  to having to do with Adam Hahn's case?
10     MR. GLENNON: I can. Absolutely.
11     And, if you'd like me to make a proffer off
12  the record, I will, but I will be done faster than I can
13  make the proffer.
14     MR. SCHRAG: That's fine. That's enough.
15  BY MR. GLENNON:
16     Q.   Okay. You testified that you thought Adam
17  Hahn had left his employment at Oracle at the time of
18  the unapplied cash project; is that correct?
19     MR. GREENSTEIN: Objection. Misstates
20  testimony.
21     THE WITNESS: Prior to the project.
22  BY MR. GLENNON:
23     Q.   Do you recall ever speaking to Adam Hahn about
24  the unapplied cash project after he left his employment
25  at Oracle?

585

1     MR. GREENSTEIN: Objection. Vague.
2     THE WITNESS: No, I don't have memory of that.
3  BY MR. GLENNON:
4     Q.   Okay. You don't recall him calling and asking
5  you questions about the unapplied cash project?
6     MR. GREENSTEIN: Objection. Asked and
7  answered.
8     THE WITNESS: I don't recollect it.
9  BY MR. GREENSTEIN:
10     Q.   Do you recall ever providing Adam Hahn with
11  any documents relating to the unapplied cash project
12  after the time he left his employment at Oracle?
13     THE WITNESS: No.
14  BY MR. GREENSTEIN:
15     Q.   You ever heard of Ken Keeley?
16     A.   No.
17     Q.   Now, you were shown a series of E-mails in the
18  course of this particular deposition.
19     You recall testifying about those?
20     MR. GREENSTEIN: Objection. Testimony speaks
21  for itself.
22     That's vague as to what testimony you're
23  talking about.
24     MR. SCHRAG: Do you know which ones he's
25  talking about?

586

1     THE WITNESS: There was probably, what, three
2  or four of them?
3     MR. GLENNON: Sure.
4     THE WITNESS: Yeah. I testified on three or
5  four of them, I'm sure.
6  BY MR. GLENNON:
7     Q.   Do you recall what your E-mail address at
8  Oracle was during the time you were employed there?
9     A.   I believe it was ianhatada@Oracle.
10     Q.   At oracle.com?
11     A.   I believe so.
12     Q.   And is it your testimony that that was your
13  E-mail address during the entire time you were employed
14  there?
15     A.   I believe that's what it was.
16     Q.   Okay. Do you recall any -- at any occasion
17  your E-mail address changing?
18     A.   No, I don't recall.
19     Q.   And you received E-mails at this particular
20  E-mail address ian.hatada@oracle.com during your
21  employment there; is that correct?
22     A.   I did.
23     Q.   And it was your practice to read the E-mails
24  that were sent specifically to you; is that correct?
25     A.   Yes.

587

1     MR. GREENSTEIN: Objection.
2     MR. GLENNON: I'm going to need one moment.
3  Please excuse me.
4     MR. SCHRAG: Why don't we take a minute.
5  Let's go off the record. I need to check a
6  message.
7     MR. GLENNON: Sure.
8     VIDEOGRAPHER: Off the record, the time is
9  5:32 p.m.
10     (Thereupon a recess was taken at 5:32 p.m.
11  and the deposition resumed at 5:39 p.m.)
12     VIDEOGRAPHER: We are back on the record.
13  The time is 5:39 p.m.
14  BY MR. GLENNON:
15     Q.   Good afternoon, Mr. Hatada.
16     We're back on the record. You continue to be
17  testifying under oath.
18     Is that clear?
19     A.   It is.
20     Q.   Okay. Just two quick clean-up points.
21     We were talking just before the break about
22  Adam Hahn.
23     Do you recall that?
24     A.   I do.
25     Q.   Do you still talk with Adam Hahn?

588

1     A.   It's probably been -- six months to a year.
2     Q.   But you've spoken with Adam Hahn since the
3   time he left Oracle's employment?
4     A.   Sure.  I've ran in to him a couple of times.
5     Q.   Okay.  And have you ever discussed the
6   unapplied cash project that you've been testifying about
7   today with Adam Hahn during any of those instances?
8         MR. GREENSTEIN:  Objection.
9         Hold on.
10        Objection.  Asked and answered and vague.
11        THE WITNESS:  No.  I don't recall having a
12   conversation with him in regards to this project.
13   BY MR. GLENNON:
14    Q.   All right.  Shifting gears, at the end of
15   Mr. Greenstein's examination this afternoon he asked you
16   some questions about a meeting you had with Plaintiff's
17   counsel.
18        Do you recall that?
19    A.   Can you describe that, "Plaintiff's counsel."
20        MR. GLENNON:  Sure.  The law firm of Lerach
21   Coughlin.
22        THE WITNESS:  Oh, yes.  Yes.  Sorry.
23   BY MR. GLENNON:
24    Q.   Did you have more than one meeting with
25   Plaintiff's counsel?

589

1     A.   I only remember one.
2     Q.   And did that meeting take place in these
3   offices?
4     A.   Yeah.  It took place in that room over there.
5     Q.   Okay.  Do you recall when this meeting took
6   place?
7         MR. GREENSTEIN:  Objection.  Asked and
8   answered.
9         THE WITNESS:  I think I told Eli it was, you
10   know, six to eight months ago.
11        I'm not quite sure.
12   BY MR. GLENNON:
13    Q.   Can you tell me what you discussed during the
14   course of this meeting?
15    A.   We just discussed the project and -- kind of
16   like similar -- the same things that we've talked about
17   in this deposition, Michael Quinn and Greg Myers, and
18   the meetings, and the project, and unapplied.
19    Q.   Do you recall any specific questions that they
20   asked you?
21    A.   No.
22    Q.   And during the direct examination,
23   Mr. Greenstein indicated that it was he and Monique
24   Winkler who met with you.
25        Is that accurate?

590

1     A.   I believe that was her name, but I couldn't
2   guarantee that.
3     Q.   Was there anybody else there other than those
4   two individuals?
5     A.   It was Eli and another woman.
6     Q.   Okay.  Do you recall whether Plaintiffs showed
7   you any documents during this particular meeting?
8     A.   Yes, there was a couple documents that I
9   looked at.
10    Q.   Do you recall which documents those were?
11    A.   I believe there was maybe like a -- an
12   unapplied report that -- you know, random unapplied
13   report with names on it.
14        There might have been an E-mail.
15        I couldn't tell you specifically which ones,
16   because it was quite a while -- quite a long time ago.
17    Q.   Right.
18        Did those documents refresh your recollection
19   about the unapplied cash account -- excuse me --
20   unapplied cash project?
21        MR. GREENSTEIN:  Objection.  Vague.
22        THE WITNESS:  Meaning?
23   BY MR. GLENNON:
24    Q.   Well, did they refresh your recollection about
25   dates, and events, and processes, and things that took

591

1   place at the end of 2002 in connection with your
2   involvement in the unapplied cash project?
3         MR. GREENSTEIN:  Objection.  Compound.
4         THE WITNESS:  Sure.
5         There was things just like there are in -- in
6   these that we've looked at that kind of come back to me
7   as I look at them.
8   BY MR. GLENNON:
9     Q.   Do you recall how many documents total
10   Plaintiff's lawyer showed you?
11    A.   No.
12        MR. GLENNON:  I'm going to put a request on
13   the record that those documents be produced to us as
14   soon as possible.
15        MR. GREENSTEIN:  Okay.  Well, we'll have to
16   consider that.
17   BY MR. GLENNON:
18    Q.   Did you discuss the substance of your
19   deposition testimony with Plaintiffs during this
20   particular meeting?
21        MR. GREENSTEIN:  Objection.  Vague.
22        It was before the deposition actually
23   happened.
24        THE WITNESS:  Like what to expect of the
25   deposition?

592

1      MR. GLENNON: Sure.  Let's start with that.
2      THE WITNESS: No.
3   BY MR. GLENNON:
4      Q.   Did you discuss your anticipated answers to
5   questions during a deposition during the course of this
6   meeting?
7      In other words, did you go through a mock
8   question and answer session during this conference?
9      MR. GREENSTEIN: Objection. Vague.
10      THE WITNESS: No.
11   BY MR. GLENNON:
12      Q.   Did Plaintiffs provide you with any analysis
13   or information about the documents they were showing you
14   as opposed to you explaining the documents to them?
15      MR. GREENSTEIN: Objection. Compound. Vague
16   and ambiguous.
17      THE WITNESS: No.
18   BY MR. GLENNON:
19      Q.   Did Plaintiffs provide you with any
20   suggestions or advice on how to testify on any
21   particular topics in connection with any of the things
22   that you were discussing during this meeting?
23      MR. GREENSTEIN: Objection. Vague. Compound.
24      THE WITNESS: No.
25   BY MR. GLENNON:

593

1      Q.   Did Plaintiffs provide you with counsel for
2   today's deposition?
3      MR. GREENSTEIN: Objection. Vague.
4      MR. SCHRAG:  I'm going to just caution you not
5   to reveal anything -- any information that you've
6   learned from me.
7      If you can answer that independently from
8   something you know other than conversations with me, you
9   can answer it.
10      THE WITNESS: Can you rephrase that again and
11   explain it?
12      MR. GLENNON: Sure.
13      Well, let me ask you this.
14   BY MR. GLENNON:
15      Q.   Did -- I understand that Mr. Schrag is
16   representing you in connection with today's deposition.
17      A.   Correct.
18      Q.   Did you go out and find Mr. Schrag and hire
19   him?
20      A.   No.
21      Q.   How did he come about being your lawyer?
22      And let me just say with the caveat I'm not
23   looking to intrude on conversations you had with
24   Mr. Schrag.
25      I just want to know the facts and

594

1   circumstances surrounding his engagement as your
2   counsel?
3      MR. GREENSTEIN: Okay. Hold on. Hold on.
4      MR. SCHRAG: Let me just object first.
5      Answer to the extent you can answer without
6   revealing discussions with me.
7      MR. GREENSTEIN: And also I want to lodge a
8   standing objection to this line of questioning that it's
9   asking for legal conclusions about retaining lawyers,
10   representation, Mr. Hatada may not understand, and it's
11   vague.
12      MR. GLENNON: You understand my question?
13      THE WITNESS: I did not seek Mr. Schrag. He
14   was provided to me.
15   BY MR. GLENNON:
16      Q.   Was he provided to you by the lawyers at
17   Lerach Coughlin?
18      MR. GREENSTEIN: Same objections.
19      THE WITNESS: Eli's firm.
20   BY MR. GLENNON:
21      Q.   The Plaintiff's counsel's law firm provided
22   you with counsel; is that correct?
23      MR. GREENSTEIN: Same objections.
24      THE WITNESS: Correct.
25   BY MR. GLENNON:

595

1      Q.   And did you meet with Plaintiff's counsel any
2   additional times other than the meeting that you just
3   described to me?
4      A.   No.
5      Q.   Did you speak with them over the phone on any
6   additional instances?
7      Let me start that question over again.
8      Putting aside the meeting you had in person in
9   this room right over here, how many times have you
10   spoken on the phone to the lawyers for Plaintiffs?
11      A.   Are you speaking of -- Eli or Michael?
12      MR. SCHRAG: So when he says "Plaintiff's
13   counsel," --
14      THE WITNESS: Uh-huh.
15      MR. SCHRAG: -- he's talking about Eli or
16   people in his firm.
17      THE WITNESS: Okay. Sorry.
18      MR. GLENNON: That's all right.
19      THE WITNESS: I've spoke to Eli a few times on
20   the phone.
21   BY MR. GLENNON:
22      Q.   Do you recall when the first time was?
23      A.   Obviously before we met and a couple times
24   after we met.
25      Q.   Let's focus on that first phone call.

596

1      Did you discuss the unapplied cash project
2  during that first phone call?
3      A.   No, we didn't start discussing the unapplied
4  project until we -- we had a meeting in that room.
5      Q.   Okay.  What about the second phone call?
6      Did you discuss the unapplied cash project
7  during the second phone call?
8      A.   No.  The phone conversations that we had were
9  not in reference to the unapplied.
10     They were -- mostly when we -- you know, I
11  could be ready for a deposition if it were to happen.
12     Q.   Scheduling calls?
13     A.   Basically.
14     Q.   Did you discuss the substance of your
15  deposition testimony on any of these three phone calls?
16     MR. GREENSTEIN:  Objection.  Vague.  Lack of
17  foundation.
18     This deposition hadn't even happened yet.
19     THE WITNESS:  No.
20  BY MR. GLENNON:
21     Q.   Do you recall ever exchanging E-mails with the
22  lawyers at Eli's firm?
23     A.   I don't believe so.  I think -- believe it was
24  all phone conversations.
25     Q.   Did you provide any documents to Plaintiff's

597

1  counsel?
2      MR. GREENSTEIN:  Objection.  Asked and
3  answered.
4      THE WITNESS:  No.  I have no documents.
5  BY MR. GLENNON:
6      Q.   Are Plaintiff's counsel paying for your
7  attorney in connection with today's deposition?
8      MR. GREENSTEIN:  Objection.  Vague.
9      THE WITNESS:  Yes.
10     MR. GLENNON:  Okay.  That concludes my line of
11  questioning.
12     Thank you for staying late.  I really
13  appreciate it.
14     Should we go off the record and put a
15  stipulation --
16     MR. GREENSTEIN:  Well, actually, I have -- I
17  have remaining time, and I just want to use about five
18  minutes just to clear up --
19     MR. GLENNON:  How much time do you have
20  remaining?
21     MR. GREENSTEIN:  I'd say five minutes, no
22  longer than 10 for sure.
23     MR. GLENNON:  I want to see how much time you
24  have remaining, because --
25     MR. GREENSTEIN:  Oh.  How long remaining?

598

1      MR. GLENNON:  Yeah.
2      MR. GREENSTEIN:  I mean if --
3      MR. GLENNON:  Why don't we go off the record.
4      MR. GREENSTEIN:  Sure.
5      VIDEOGRAPHER:  Off the record, the time is
6  5:49 p.m.
7      (Discussion off the record)
8      VIDEOGRAPHER:  We are back on the record.  The
9  time is 5:50 p.m.
10     FURTHER EXAMINATION
11  BY MR. GREENSTEIN:
12     Q.   Mr. Hatada, we just left off with Mr. Glennon
13  questioning you about conversations you had with Lerach
14  Coughlin attorneys including myself.
15     Do you remember that?
16     A.   I do.
17     Q.   Okay.  And other than the meeting that you
18  described where Monique Winkler and I met with you here
19  in this office -- withdrawn.
20     The phone calls that you had with Plaintiff's
21  counsel after that meeting occurred, were those all
22  before you retained your attorney, Michael Schrag?
23     A.   Yes, they were.
24     Q.   And do you remember me having a discussion
25  with you offering that our firm would pay for any lawyer

599

1  that you wanted to retain in connection with
2  representation at this depo?
3      A.   Yes, I do.
4      Q.   And did you decide that you didn't have a
5  lawyer that you knew that you wanted to use?
6      A.   Yes.
7      Q.   Okay.  And do you recall that once --
8  withdrawn.
9      Do you recall ever having a discussion with me
10  over the phone where I told you that once you and your
11  attorney, Michael Schrag, established a relationship
12  that I was not allowed to talk to you and you were not
13  allowed to talk to me?
14     A.   Yes, I do.
15     Q.   And did we have any discussions or did you
16  have any discussions with any Lerach Coughlin attorneys
17  after the point in which you talked to Michael Schrag?
18     A.   No.  We did not have any conversations once I
19  talked to Mr. Schrag.
20     Q.   Okay.  And to the extent there were any phone
21  conversations other -- any phone conversations at all
22  with Plaintiff's counsel, it was about scheduling this
23  deposition; isn't that right?
24     A.   True.
25     Q.   And do you recall in the meeting where you met

Hatada, Ian  10/10/2006  9:53:00 AM

600

1  with Monique Winkler and myself -- that we said you
2  should tell the truth at the deposition?
3       A.   Yes.
4       Q.   Earlier you testified about certain call notes
5  that collectors would use to document -- research time
6  on certain items of unapplied cash.
7            Do you remember that?
8            MR. GLENNON: Objection. Lack of foundation.
9  Mischaracterizes the testimony.
10           THE WITNESS: I do.
11  BY MR. GREENSTEIN:
12      Q.   Okay. And those call notes were on some sort
13  of electronic spread sheet, and you can go in and you
14  could update them; correct?
15           MR. GLENNON: Objection. Asked and answered.
16           THE WITNESS: The report that I was looking at
17  was a call note report ran out of the system.
18           It was -- when you ran it, it had the most
19  current updated notes that were placed in the system.
20  BY MR. GREENSTEIN:
21      Q.   Okay. Now, after October 2002 those meetings
22  in connection with the unapplied cash project, was there
23  ever a case where collectors would go in and see that a
24  note was incorrect?
25           MR. GLENNON: Objection. Calls for

601

1  speculation. Lack of foundation.
2            THE WITNESS: Yes.
3  BY MR. GREENSTEIN:
4       Q.   Okay. And if it was incorrect, would there
5  ever be a case where the collector would go in and put
6  the correct note in there in the system?
7            MR. GLENNON: Objection. Calls for
8  speculation. Lack of foundation.
9            THE WITNESS: The process was to write on top
10  of it or in front of it to ensure that you had every
11  note that's ever been logged on that item, but at times
12  -- sometimes it would get deleted or they would write
13  over it.
14  BY MR. GREENSTEIN:
15      Q.   Okay. When you say "write over it," if there
16  was an incorrect note and you found out the -- the
17  correct note that should be put in there, and you
18  entered that correct note, would the incorrect note that
19  was there before still be there?
20           MR. GLENNON: Objection. Calls for
21  speculation. Lack of foundation.
22           THE WITNESS: I don't believe the application
23  had the ability to keep it once it was over -- over done
24  with a new note.
25  BY MR. GREENSTEIN:

602

1       Q.   Right.
2            It was overwritten essentially; right?
3       A.   Overwritten.
4            MR. GLENNON: Objection. Leading.
5  BY MR. GREENSTEIN:
6       Q.   Is that right?
7       A.   Correct.
8       Q.   So the old incorrect note would be deleted
9  from the spread sheet; right?
10      A.   From my understanding it took the most --
11  whatever note was in there, whether it was a list of
12  notes with many different dates on it or just one with
13  the most recent.
14      Q.   Right.
15           So sometimes you would add notes and other
16  times you would write over and correct notes; is that
17  fair to say?
18           MR. GLENNON: Objection. Calls for
19  speculation.
20           THE WITNESS: Yes.
21           And just to clarify, I always put it in front
22  of the most -- the last note or on top of it, but at
23  times there would only be one note in the system, and it
24  would be the most recent one.
25  BY MR. GREENSTEIN:

603

1       Q.   So when you say it would be only one note in
2  the system, does that mean that the old note wouldn't be
3  in the system?
4            MR. GLENNON: Objection. Calls for
5  speculation. Lack of foundation.
6            THE WITNESS: True.
7  BY MR. GREENSTEIN:
8       Q.   Now, were you aware that collectors overwrote
9  notes after you learned of Plaintiff's lawsuit in
10  October 2002?
11           MR. GLENNON: Objection. Vague. Lacks
12  foundation.
13           THE WITNESS: I didn't see it specifically. I
14  just heard that it had happened.
15  BY MR. GREENSTEIN:
16      Q.   Okay. Well, after -- you said you learned of
17  a lawsuit early on in the meetings in connection with
18  the unapplied cash project in late 2002; isn't that
19  right?
20      A.   True.
21      Q.   Okay. After that point collectors spent
22  virtually all their time researching issues of unapplied
23  cash; isn't that right?
24      A.   Correct.
25      Q.   Okay. As part of that research were there

604

1 ever cases where collectors would find out there were
2 incorrect notes and put the correct notes, overwrite the
3 old notes with the new notes?
4        MR. GLENNON: Objection. Calls for
5 speculation.
6        THE WITNESS: Sure. At times we would see
7 only one note in there on a very old invoice that had an
8 updated date.
9 BY MR. GREENSTEIN:
10    Q.  And did that occur after you learned about the
11 lawsuit in the meeting?
12        MR. GLENNON: Objection. Calls for
13 speculation.
14        THE WITNESS: Correct.
15 BY MR. GREENSTEIN:
16    Q.  Okay. And did that happen multiple times?
17        MR. GLENNON: Same objection.
18        THE WITNESS: I would say that it happened --
19 it happened.
20        It happened. I don't know if it happened a
21 lot, but it happened.
22 BY MR. GREENSTEIN:
23    Q.  And that was after the collections department
24 learned about the lawsuit; correct?
25        MR. GLENNON: Objection. Asked and answered.

605

1 Calls for speculation.
2        How is he supposed to know when the
3 collections department learned of something?
4 BY MR. GREENSTEIN:
5    Q.  Is that correct?
6    A.  Correct.
7    Q.  Earlier I think Mr. Glennon questioned you
8 about pro forma invoices.
9        Do you remember that line of questioning?
10    A.  I do.
11    Q.  And I think he asked you about certain reasons
12 why a pro forma invoice would be generated at Oracle.
13        Do you remember that?
14    A.  I do.
15    Q.  Irrespective of why a pro forma invoice would
16 be created at Oracle, are you aware that the creation of
17 pro forma invoices resulted in duplicate payments from
18 Oracle customers?
19        MR. GLENNON: Objection. Calls for
20 speculation.
21        THE WITNESS: I am.
22 BY MR. GREENSTEIN:
23    Q.  And do you remember how many -- withdrawn.
24        Do you remember how many items of unapplied
25 cash were a result of customers paying twice -- making

606

1 duplicate payments in connection with a pro forma
2 invoice?
3        MR. GLENNON: Objection. Lack of foundation.
4        THE WITNESS: I do not have a specific number.
5 Just know that it happened.
6 BY MR. GREENSTEIN:
7    Q.  Did it happen more than once?
8    A.  Yeah. It happened many times.
9    Q.  And so, even though you may not know why a
10 particular pro forma invoice was generated, the reasons,
11 you know that it resulted in the customer paying twice;
12 is that correct?
13        MR. GLENNON: Objection. Calls for
14 speculation.
15        THE WITNESS: Correct.
16        A client would get an original invoice as well
17 as a pro forma invoice and pay both, resulting in a
18 double payment.
19 BY MR. GREENSTEIN:
20    Q.  Okay. And did you just -- did -- in
21 connection with your research as part of the unapplied
22 cash project in 2002 did you discover those duplicate
23 payments and then refund any customers because they had
24 paid on a pro forma invoice?
25        MR. GLENNON: Objection. Calls for

607

1 speculation. Lack of foundation.
2        THE WITNESS: I know during our research we
3 found that there was many duplicate payments, and the --
4 end-all result or what we had advised for our department
5 to do was to refund the money.
6        I'm not quite sure if that happened.
7        MR. GREENSTEIN: Okay. I just have about a
8 couple more questions.
9 BY MR. GREENSTEIN:
10    Q.  On this I would just like to put in front of
11 you Venkataramana Number 5, which is some typed notes.
12        Do you recognize the document?
13    A.  Okay.
14    Q.  Yes?
15    A.  Yes, I recognize it.
16    Q.  And Mr. Glennon asked you if you wrote
17 those notes and you said no; is that right?
18    A.  Yes, I did not write it.
19    Q.  Okay. But after looking -- and do you
20 remember testifying on direct examination about that
21 Exhibit, Venkataramana Number 5?
22    A.  I don't remember exactly what was said.
23        I just remember explaining
24 paragraph-by-paragraph the -- the validity of what had
25 happened, so -- just stating that -- that everything

608

1  here did happen.
2      Q.   Okay.  So, even though you didn't write the
3  notes, reading the notes refreshes your recollection
4  that those events depicted in that document actually
5  happened?
6          MR. GLENNON:  Objection.  Leading.
7          MR. GREENSTEIN:  Is that right?
8          MR. GLENNON:  Lack of foundation.
9          THE WITNESS:  Correct.
10  BY MR. GREENSTEIN:
11     Q.   Okay.  Is everything that you see on
12  Venkataramana Number 5 consistent with what you recall
13  to be the case during those meetings in October 2002?
14         MR. GLENNON:  Objection.  Leading.  Lack of
15  foundation.  Calls for speculation.
16         THE WITNESS:  Yes, I do.
17  BY MR. GREENSTEIN:
18     Q.   And I think I asked this, but this is my last
19  question.
20         I think I asked this before, but were you --
21  were you aware that Molly Littlefield at some point in
22  time changed her name to Venkataramana?
23     A.   Yes.  I know she -- she married an individual
24  with a very long name, and I believe that was it.
25         MR. GREENSTEIN:  Okay.  I'm going to represent

609

1  to you that Molly Littlefield changed her name to Molly
2  Venkataramana.
3          MR. GLENNON:  I'm going to object.
4          MR. GREENSTEIN:  Well, do you agree with that,
5  counsel?
6          MR. GLENNON:  I will stipulate that she got
7  married to --
8          MR. SCHRAG:  Mr. Venkataramana.
9          MR. GLENNON:  Your shot is as good as mine.
10  BY MR. GREENSTEIN:
11     Q.   Well, only thing I want to ask is, when you
12  referred to "Molly Littlefield," are you speaking about
13  the same person, Molly Venkataramana, collections
14  manager that was there during the time you were at
15  Oracle?
16     A.   I am.
17         MR. GREENSTEIN:  Okay.  I'm done.
18         MR. GLENNON:  I've got three.
19              FURTHER EXAMINATION
20  BY MR. GLENNON:
21     Q.   Mr. Hatada, as you sit here today, can you
22  identify a specific instance of customer notes being
23  overwritten?
24         MR. GREENSTEIN:  Objection.  Vague.  Calls for
25  speculation.

610

1          THE WITNESS:  No.
2          I think I stated to Eli that I never watched
3  it happen.
4          I just saw that some notes had been -- had
5  been placed with an updated date that had a -- an item
6  that was extremely old.
7  BY MR. GLENNON:
8      Q.   But can you identify a specific instance of
9  this happening?
10         MR. GREENSTEIN:  Objection.  Asked and
11  answered.
12         MR. SCHRAG:  I believe he said no.
13         THE WITNESS:  No.
14  BY MR. GLENNON:
15     Q.   Can you identify the dates on which any of the
16  notes were overwritten?
17         MR. GREENSTEIN:  Objection.  Vague.  Calls for
18  speculation.
19         THE WITNESS:  No.
20  BY MR. GLENNON:
21     Q.   Do you know the dates on which this lawsuit,
22  or any lawsuit, for that matter, was filed against
23  Oracle?
24     A.   No.
25     Q.   Are you aware of any specific instance of a

611

1  duplicate payment being made because both a pro forma
2  and a standard invoice was issued to an Oracle customer?
3          MR. GREENSTEIN:  Objection.  Vague.
4  Speculation.
5          THE WITNESS:  Although it happened many times,
6  I couldn't give you a specific item number, amount,
7  check.
8  BY MR. GLENNON:
9      Q.   Customer?
10     A.   Customer, no.
11         MR. GLENNON:  Okay.  That's all I have.
12         VIDEOGRAPHER:  Okay.
13         MR. GLENNON:  We should -- can we go off --
14  better yet, we can probably stip directly on the record,
15  because we've done a ton of these.
16         I'd like the transcript to be treated as
17  confidential.
18         I guess I should be talking to you.
19         MR. SCHRAG:  I don't have an opinion on that,
20  because it's not -- I don't think anything is
21  proprietary to the witness except maybe his notes.
22         MR. GLENNON:  Well, we have certain internal
23  processes that --
24         MR. SCHRAG:  I'm sure there's a protective
25  order that you --

612

1    MR. GLENNON:  Right.  I mean, you got a
2  problem putting this transcript under -- treating this
3  transcript as being confidential?
4    MR. SCHRAG:  I certainly don't object to that.
5    MR. GREENSTEIN:  I can give you an answer.  I
6  don't think I have a problem, but I want to check with
7  my colleagues, and I will give you an answer within 30
8  minutes.
9    MR. GLENNON:  Okay.  That's fine.
10    And then if -- if we have the Court Reporter
11  direct it to you, is 30 days enough time for Mr. Hatada
12  to review and either sign or we can use the unsigned
13  final for all purposes including trial?
14    MR. SCHRAG:  That's fine.
15    MR. GLENNON:  Okay.  Mr. Hatada, on the record
16  I'd like -- on behalf of everybody here to thank you for
17  staying late.
18    THE WITNESS:  No problem.
19    MR. GREENSTEIN:  Thank you very much.
20    THE WITNESS:  Thank you.
21    VIDEOGRAPHER:  Okay.  One moment.
22    This is the end of videotape number four,
23  volume two, the deposition of Ian Hatada.
24    The original videotapes will be retained by
25  LiveNote World Service.

613

1    Going off the record, the time is 6:04 p.m.
2    Thereupon the deposition was recessed at
3    6:04 p.m.)
4    Signed under penalty of perjury:
5    _____
          IAN HATADA
6
7    _____
          Date
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

614

1    --oOo--
2    I, CAROL NYGARD DROBNY, a Certified Shorthand
3  Reporter of the State of California, duly authorized to
4  administer oaths, do hereby certify:
5    That I am a disinterested person herein; that
6  the Witness, IAN HATADA, named in the foregoing
7  deposition was by me duly sworn to testify the truth,
8  the whole truth, and nothing but the truth; that the
9  deposition was reported in shorthand by me, CAROL NYGARD
10  DROBNY, a Certified Shorthand Reporter of the State of
11  California, and thereafter transcribed into typewriting.
12    That before completion of the deposition,
13  review of the transcript [X] was [ ] was not requested.
14  If requested, any changes made by the deponent (and
15  provided to the Reporter) during the period allowed are
16  appended hereto.
17
18    Dated: _____
19
20    _____
          CAROL NYGARD DROBNY CSR #4018
21
22    --oOo--
23
24
25

--oOo--

1

2        I, CAROL NYGARD DROBNY, a Certified Shorthand

3   Reporter of the State of California, duly authorized to

4   administer oaths, do hereby certify:

5        That I am a disinterested person herein; that

6   the Witness, IAN HATADA, named in the foregoing

7   deposition was by me duly sworn to testify the truth,

8   the whole truth, and nothing but the truth; that the

9   deposition was reported in shorthand by me, CAROL NYGARD

10  DROBNY, a Certified Shorthand Reporter of the State of

11  California, and thereafter transcribed into typewriting.

12       That before completion of the deposition,

13  review of the transcript [X ] was [ ] was not requested.

14  If requested, any changes made by the deponent (and

15  provided to the Reporter) during the period allowed are

16  appended hereto.

17

18       Dated: *October 18, 2006*

19

20       *Carol Nygard Drobny*

21       CAROL NYGARD DROBNY CSR #4018

22                --oOo--

23

24

25

614