# EXHIBIT F

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

**1**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
 5   In re ORACLE CORPORATION
 6   SECURITIES LITIGATION.
 7                 Master File No. C-01-0988-MJJ
 8   This Document Relates To:
 9
10   ALL ACTIONS.
11   _____/
12
13            ---oOo---
14             CONFIDENTIAL
15   VIDEOTAPED DEPOSITION OF JOHN DUROSS O'BRYAN
16            THURSDAY, JULY 12, 2007
17
18            ---oOo---
19
         SHEILA CHASE & ASSOCIATES
             REPORTING FOR:
20           LiveNote World Service
         221 Main Street, Suite 1250
         San Francisco, California 94105
21        Phone: (415) 321-2311
             Fax: (415) 321-2301
22
23
     Reported by:
24   DIANA NOBRIGA, CSR, CRR
     LICENSE NO. 7071
25
```

**2**

```
 1                I N D E X
 2            INDEX OF EXAMINATION
 3                              PAGE
 4   EXAMINATION BY MR. GREENSTEIN          6
 5            ---oOo---
 6       INDEX OF CONFIDENTIAL EXHIBITS
 7   DESCRIPTION                     PAGE
 8   Exhibit 1  J. Duross O'Bryan, CPA Expert
 9            Witness Report         10
10   Exhibit 2  Rebuttal Expert Report of J.
11            Duross O'Bryan, CPA     10
12   Exhibit 3  J. Duross O'Bryan Expert Witness
13            Report in Accordance with Rule 26   35
14   Exhibit 4  Transaction Registers     60
15   Exhibit 5  Account Analysis Reports      73
16   Exhibit 6  Sales Journal by GL Account Report   89
17   Exhibit 7  Presentation to the SEC Staff On
18            Behalf Of Oracle Corporation    94
19   Exhibit 8  E-mail from Molly Littlefield,
20            sent 26 Aug 2004 to Greg Myers    99
21   Exhibit 9  Oracle Receivables User's Guide   118
22   Exhibit 10  Lexis case printout, Donald W.
23            Farnham v. William Rehwald, Inc.   129
24   Exhibit 11  #4 Interview Memorandum of John
25            Banker, 11/13/02        220
```

**3**

```
 1   Exhibit 12  Audit File, Client File
 2            No. 60020382           227
 3   Exhibit 13  Q2 FY 2001 Accounting Allegations   227
 4   Exhibit 14  Oracle Corporation Variation
 5            Analysis, Unearned Revenue as of
 6            November 30, 2000       249
 7   Exhibit 15  Oracle Corporation Variation
 8            Analysis, Accounts Receivable as of
 9            November 30, 2000       252
10   Exhibit 16  One-page document Bates
11            stamped NDCA-ORCL 603894     261
12   Exhibit 17  Oracle check to Household Finance
13            dated 5/23/02           269
14   Exhibit 18  E-mail from greg.myers, sent
15            31 Oct 2002 to Michael Quinn   269
16   Exhibit 19  Amendment Three to the Software
17            License and Services Agreement
18            Between Oracle Corporation and
19            the Hewlett-Packard Company    316
20   Exhibit 20  Purchase Order No. 47B08440 with
21            attachments             316
22
23
24
25
```

**4**

```
 1       BE IT REMEMBERED that on Thursday, July 12,
 2   2007, commencing at the hour of 9:29 a.m., thereof, at
 3   the LAW OFFICES OF LERACH, COUGHLIN, STOIA, GELLAR,
 4   RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite 3200,
 5   San Francisco, California, before me, DIANA NOBRIGA, a
 6   Certified Shorthand Reporter in and for the State of
 7   California, personally appeared
 8            JOHN DUROSS O'BRYAN
 9   as a witness by the plaintiffs herein, who, being by me
10   first duly sworn, was thereupon examined and testified
11   as hereinafter set forth.
12            ---oOo---
13   Appearing as counsel on behalf of the Plaintiffs:
14       ELI GREENSTEIN, ESQUIRE
         SHAWN WILLIAMS, ESQUIRE
15       KEITH MAUTNER, CPA, CMA
         LERACH, COUGHLIN, STOIA, GELLAR,
16       RUDMAN & ROBBINS
         100 Pine Street, Suite 2600
17       San Francisco, CA 94111
         Egreenstein@lerachlaw.com
18
19   Appearing as counsel on behalf of Defendants:
20       BRIAN GLENNON, ESQUIRE
         LATHAM & WATKINS
21       633 West Fifth Street, Suite 400
         Los Angeles, CA 90071
22       brian.glennon@lw.com
23   Also Present: Gerry Fujimoto, Deloitte; Dorian Daley,
24   Oracle; James Terrell, Videographer
25
```

5

1　　　　VIDEOGRAPHER:  This begins the videotaped
2　deposition of J. Duross O'Bryan, tape one, Volume I, in
3　the matter In Re Oracle Corporation Securities
4　Litigation, as filed in the United States District Court
5　for the Northern District of Northern California,
6　San Francisco Division, Case No. C-01-0988-MJJ.  Today's
7　date is July 12th, 2007.  The time on the video monitor
8　is 9:29.
9　　　　The video operator is James Terrell,
10　representing LiveNote World Service, located at 221 Main
11　Street, Suite 1250, San Francisco, California 94105.
12　The phone number is 415 321-2300.
13　　　　The court reporter is Diana Nobriga, with
14　Sheila Chase and Associates, reporting on behalf of
15　LiveNote World Service.
16　　　　Today's deposition is being taken on behalf of
17　plaintiffs and is taking place at 100 Pine Street in
18　San Francisco, California.  If the parties present would
19　please introduce themselves and state whom they
20　represent.
21　　　　MR. GREENSTEIN:  Good morning, Eli Greenstein
22　Lerach, Coughlin, Stoia, Geller, Rudman and Robbins,
23　representing plaintiffs.
24　　　　MR. MAUTNER:  Keith Mautner Lerach, not
25　representing anybody, because I'm an accountant.

7

1　Malibu, California 90265.
2　　　Q.　And your current business address, please?
3　　　A.　515 South Flower Street, Suite 3050, Los
4　Angeles, California.
5　　　Q.　Thank you.  And who retained you in this case?
6　　　A.　Oracle Corporation.
7　　　Q.　Okay.  So you're here as a testifying expert
8　on behalf of individual defendants Larry Ellison, Edward
9　Sanderson, Jeff Henley and Oracle Corporation; is that
10　correct?
11　　　A.　I believe so, yes.
12　　　Q.　When were you first retained by Oracle?
13　　　A.　I have a draft engagement letter somewhere in
14　my file.  As I recall, that retention was the end of
15　2006, beginning of 2007.
16　　　Q.　And you have a draft engagement letter?
17　　　A.　I do.
18　　　Q.　Was that the final engagement letter?
19　　　A.　As I recall, yes.
20　　　Q.　Do you know when the initial complaint was
21　filed in this case?
22　　　A.　I don't recall that date.
23　　　Q.　Do you know approximately the year it was
24　filed?
25　　　A.　No.

6

1　　　　MR. WILLIAMS:  Shawn Williams, Lerach,
2　Coughlin on behalf of the plaintiffs.
3　　　　THE WITNESS:  I'm J. Duross O'Bryan, deponent.
4　　　　MR. GLENNON:  Brian Glennon of Latham and
5　Watkins on behalf of the witness and the defendants.
6　　　　MR. FUJIMOTO:  Gerry Fujimoto, Deloitte,
7　consultants for defense counsel.
8　　　　MS. DALEY:  Dorian Daley for Oracle
9　Corporation.
10　　　　VIDEOGRAPHER:  Thank you.  Can we swear the
11　witness and begin.
12　　　　　　　　JOHN DUROSS O'BRYAN
13　having been duly sworn, testified as follows:
14　　　　　　EXAMINATION BY MR. GREENSTEIN
15　　　　MR. GREENSTEIN:  Q.  Good morning,
16　Mr. O'Bryan.
17　　　A.　Good morning.
18　　　Q.　Thank you for being here.  Can you please
19　state your full name and current addresses for the
20　record.
21　　　A.　John Duross O'Bryan, Jr. J-o-h-n,
22　D-u-r-o-s-s, O'B-r-y-a-n, Jr. Address, you want
23　business address?
24　　　Q.　Current home address, please?
25　　　A.　6320 Cavalleri Road, C-a-v-a-l-l-e-r-i,

8

1　　　Q.　Have you looked at the complaint in this case?
2　　　A.　Second amended complaint.
3　　　Q.　Second amended?
4　　　A.　Yes.
5　　　Q.　Proposed revised second amended.
6　　　A.　It is in my document.  Second amended I don't
7　recall what it says.
8　　　Q.　You've reviewed one complaint in this action?
9　　　A.　I believe so, yes.
10　　　Q.　Do you know the date of the complaint?
11　　　A.　I don't recall the date.
12　　　Q.　Okay.  So prior to your retention in late
13　2006/2007, did you ever talk to anybody about this case?
14　　　A.　No.
15　　　Q.　And after you were retained in late 2006,
16　early 2007, did you talk to anybody besides counsel for
17　the defendants about this case?
18　　　　MR. GLENNON:  I'm just going to insert an
19　objection to the extent it calls for communications that
20　are protected by the stip.
21　　　　MR. GREENSTEIN:  Q.  Right.
22　　　A.　I have had communications with counsel and
23　consultants to counsel on this matter, would be the two
24　groups that I've spoken with.
25　　　Q.　When you refer to counsel, do you mean Latham

9

1   and Watkins?
2      A.  Yes.
3      Q.  And consultants for counsel, do you mean --
4   who do you mean?
5      A.  Deloitte and Touche.
6      Q.  Is that the only consultant that you've spoken
7   with after you've been retained?
8      A.  Yes, I believe that's true.
9      Q.  Okay.  So the only people besides Oracle's
10  lawyers that you've talked to after you were retained
11  were consultants for Deloitte and Touche; is that
12  correct?
13     A.  Other than counsel for Oracle, right, the
14  individual defendants, that's correct.
15     Q.  Did you talk to anybody, any employees of
16  Oracle after you were retained?
17     A.  No, I did not.
18     Q.  Have you ever talked to Greg Myers after you
19  were retained?
20     A.  I have not.
21         MR. GREENSTEIN:  I want to mark this as
22  Exhibit 1, which is the expert report, opening expert
23  report filed on, or exchanged on May 25th, 2007.
24  Actually, No. 2 will be Mr. O'Bryan's rebuttal report
25  filed on June 22nd, 2007.

10

1            (Exhibit 1 marked for
2             identification.)
3            (Exhibit 2 marked for
4             identification.)
5         MR. GREENSTEIN:  Q.  Mr. O'Bryan, what's
6   placed before you is what has been marked as Exhibit 1
7   and 2.  Exhibit 1, as you can see, is your opening
8   report; is that correct?
9      A.  It looks to be, yes.
10     Q.  Why don't you thumb through it and make sure
11  that it is all there.
12     A.  You certainly don't want me to go page by
13  page, do you?
14     Q.  No.  You see all the exhibits are attach
15  thereto?
16     A.  Yes.  Appears to be a copy of my original
17  report dated May 25th, 2007.
18     Q.  Did you draft Exhibit 1?
19     A.  Yes, I did.
20     Q.  Did anyone help you draft Exhibit 1?
21     A.  Yes.
22     Q.  And who helped you draft it?
23     A.  My engagement team.
24     Q.  And how many individuals are on your team?
25     A.  There are three other individuals on this

11

1   engagement with me.
2      Q.  What are their names?
3      A.  Ben Sheppard, S-h-e-p-p-a-r-d, a CPA in our
4   office in Los Angeles.
5      Q.  That's Alix Partners?
6      A.  A-l-i-x, P-a-r-t-n-e-r-s.  Next individual is
7   Chris Simons, S-i-m-o-n-s, CPA in our Los Angeles
8   office.  And lastly Shannon Zavoda, Z-v-o-d-a --
9   Z-a-v-o-d-a, excuse me, who is also a CPA in our Los
10  Angeles office.
11     Q.  You currently work for Alix Partners in Los
12  Angeles; correct?
13     A.  I do, yes.
14     Q.  Besides those three individuals, did you work
15  with anyone outside your company on drafting the report,
16  besides Oracle's lawyers?
17     A.  No.
18     Q.  Did you talk to anybody outside your company
19  besides Oracle's lawyers and Deloitte and Touche about
20  your report?
21     A.  No.
22     Q.  When is the last time you looked at your
23  report?
24     A.  This morning.
25     Q.  Before that, when was the last time?

12

1      A.  Last night.
2      Q.  When was the first draft of your report
3   completed?
4      A.  The Exhibit 1?
5      Q.  Yes.
6      A.  The first draft was probably 10th to the 15th
7   of May.
8      Q.  So approximately ten days before it was filed?
9      A.  Ten to 15 days before.
10     Q.  And it took you 138 hours to draft the report;
11  correct?
12     A.  I don't recall the exact time.
13     Q.  Okay.  If you turn to Exhibit -- the last page
14  of Exhibit 1.  Do you see that?  I think that states
15  that as of April 30th, 2007 you had billed 138 hours;
16  right?
17     A.  That was through April 30th, so, between the
18  end of April and the beginning of May there was a
19  significant amount of time spent by me on this report.
20  So my guess is it is significantly higher than that.
21     Q.  Do you have a total amount that you've spent
22  drafting Exhibit 1?
23     A.  No.  I don't know that exact amount.  But it
24  is well in excess of 200 hours.
25     Q.  Could you provide that information?

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

13

1    A.  I can provide bills if you'd like.
2        MR. GREENSTEIN:  Well, we just want to know
3    the total number of hours and the amount billed as of
4    May 25th, 2007 on the opening report.
5        Is that okay with you?
6        MR. GLENNON:  We can provide that.  We, of
7    course, will want the same thing from plaintiff's
8    accounting expert.
9        MR. GREENSTEIN:  Sure.
10    Q.  And those three individuals you mentioned that
11    helped you working -- helped you draft the opening
12    report, did they help you draft the rebuttal report?
13    A.  They did, yes.
14    Q.  How many hours approximately did you spend
15    drafting the rebuttal report?
16    A.  The rebuttal report, this is an educated
17    guesstimate, if you will, it is in excess probably of 60
18    to 80 hours.  Me personally.
19    Q.  Okay.  And would you also be able to confirm
20    the total number of hours billed by you and/or your
21    staff on the report?
22    A.  Certainly.  Yeah, there is bills by day, as I
23    recall, or hours by day.
24    Q.  So is it fair to say you spent more hours on
25    the opening report than the rebuttal?

14

1    A.  Yes.
2    Q.  Significantly more?
3    A.  No.  The entire team probably spent more time
4    on the original report, because it is just that, an
5    original report.  But as far as the entire team on the
6    rebuttal report, I don't know those numbers.
7    Q.  As you sit here today is there anything you
8    want to change in your opening report?
9    A.  No.  There is a number of references we make
10    into footnotes that we've cleaned up.  We may say
11    something like id that follows the prior footnote, that
12    really follows the prior page.  And there is footnote
13    cleanup items that I'm happy to go through with you if
14    you'd like.
15    Q.  Are those all clerical -- in other words, when
16    you say an id, it shouldn't refer to the prior
17    reference, it should refer to the prior page?
18    A.  Correct.
19    Q.  So id at footnote, prior footnote?
20    A.  Exactly.
21    Q.  Okay.
22    A.  And there were some Bates numbers that were
23    wrong in the cites, which we've fixed.  But there is
24    nothing in the report that I've changed.
25    Q.  Substantively, you mean?

15

1    A.  No.  I think I saw two "thats" together.  So I
2    struck one of the "thats."  There is nothing substantive
3    in the report.
4    Q.  When you say Bates numbers changed, can you
5    point out which Bates numbers changed?
6    A.  There is a number of them; for example, on
7    page 13 of my report, under footnote 36, you will see
8    the reference to NDCA-ORCL 005006.
9    Q.  Right.
10    A.  That should be 050060.
11    Q.  050060?
12    A.  Correct.  Down below you will see an Oracle
13    document, '01 23157.  That should be 05036 -- excuse me.
14    050356 through 60.  Also on that page --
15    Q.  I'm sorry, can you repeat that last one?
16    A.  050356 through 60.  Also on that page at the
17    very -- second to the last line says NDCA-ORCL 012799,
18    do you see that one?  That should be 0926 -- excuse me.
19    096264 through 68.
20    Q.  So just to be clear, we're looking at footnote
21    37 on page 13; correct?
22    A.  Correct.
23    Q.  Looking at the last "see also" document?
24    A.  Yes.
25    Q.  And there are two documents?

16

1    A.  There is a range there.
2    Q.  There is a range and then a single sheet;
3    right?
4    A.  Yes.
5    Q.  Which one are you changing?
6    A.  The top line, 0127994.
7    Q.  That document is now what?
8    A.  That range changes for two, 096264 - 68.
9    Q.  Let me ask about these changes.  Why were
10    those changes made to different documents?
11    A.  When we went back and checked those documents,
12    we found there to be an error in the cite references.
13    Q.  Are they the same documents though?
14    A.  I believe so, yes.
15    Q.  The same type of document?
16    A.  It is not a different document that's being
17    referenced.  And that's it.
18    Q.  Okay.
19    A.  We just had a bad Bates range.
20    Q.  So it is still an account analysis report with
21    payables detail?
22    A.  That's correct.
23    Q.  Okay.  And any other changes in Bates numbers?
24    A.  That's it.
25    Q.  That's it?  But you don't want to change

17

1 anything substantively in the report today?
2     A.  No, I do not.
3     Q.  Have you ever changed, substantively changed
4 your expert report the day of a deposition?
5     A.  Have I ever changed it?
6     Q.  Yes, in the deposition?
7     A.  No.
8     Q.  You never have?
9     A.  No.
10     Q.  I just want to talk a little bit about your
11 work history.  Is it fair to say you joined Price --
12 Coopers and Lybrand in 1985?
13     A.  That's correct.
14     Q.  Then, when did you -- and that became PWC?
15     A.  Correct.  On July 1st, 1998.
16     Q.  And from 1995 through 1999, you were the
17 partner in charge of the New York Metro region FAS
18 practice?
19     A.  No.  I was the partner in charge of the FAS
20 practice for Coopers and Lybrand for the western region.
21     Q.  And what does FAS stand for?
22     A.  Financial advisory services.
23     Q.  And what does that mean to be partner in
24 charge?
25     A.  I was the senior partner of that practice for

18

1 the entire western region, meaning I had not only client
2 responsibilities, but also administrative
3 responsibilities in administering the practice.
4     Q.  And financial advisory you said?
5     A.  Correct.
6     Q.  Does that have anything to do with auditing,
7 or is that more consulting side?
8     A.  Both.  There were -- during my tenure as the
9 partner in charge, I continued to do audits of
10 companies, all the way up to 2000, 2001.  Also in my
11 client responsibilities, I continued to work on the
12 auditing side as well as advising clients in auditing
13 and/or accounting issues.
14     Q.  So you actually conducted audits of clients
15 during that time?
16     A.  I did, yes.
17     Q.  Did you sign any audit opinions during that
18 time?
19     A.  I did, yes, several.
20     Q.  More than five?
21     A.  Yes.
22     Q.  Okay.  During that time did you ever work for
23 Oracle?
24     A.  I did not, no.
25     Q.  Have you ever had an engagement with Oracle

19

1 prior to this retention?
2     A.  I have not.
3     Q.  Ever worked for any of the individual
4 defendants prior to being retained?
5     A.  I have not.
6     Q.  And so when did you -- when was your next
7 promotion after you were, let's say, 2000?
8     A.  I don't know if you would call it promotion,
9 but I was asked to go run the FAS practice as partner in
10 charge for the New York Metro practice.  I might
11 consider that a demotion, but.  Anyway, July 1st, 1998 I
12 left California and went to New York and ran that
13 practice for two-and-a-half years.
14     Q.  What is the time frame of that?
15     A.  1998 through about mid 2000, July 1st, 1998,
16 through about mid 2000 I was the partner in charge of
17 the financial advisory service practices for New York.
18     Q.  Okay.  And what was your next position after
19 that?
20     A.  Then was a promotion, I came back to
21 California and was the financial advisory services
22 partner in charge for the western region again from 2000
23 until my departure from PWC, which was January 31st,
24 2003.
25     Q.  So you left PWC January 31st, 2003?

20

1     A.  Correct.
2     Q.  And you joined Alix Partners at that time?
3     A.  On February 1st, 2003.
4     Q.  Okay.  And you were partner in charge of the
5 FAS practice for the LA office during that time; right?
6     A.  That time being July 1st?
7     Q.  2000 through 2003.
8     A.  That's correct.  I came back mid -- beginning
9 to mid of 2000 and left in January of 2003.  And I was
10 the FAS partner in charge as well as the partner in
11 charge of the dispute analysis and investigation
12 practice for the western region.
13     Q.  So what does dispute analysis investigations
14 unit do or department?
15     A.  It is a subset of the financial advisory
16 services practice.  And it deals principally with
17 forensic accounting issues, any other types of disputes
18 or potential disputes involving either litigants or
19 potential litigants.  It can involve expert testimony.
20 It can involve fraud investigation.  It can involve
21 internal corporate investigations.  A number of
22 different things that they have basically those three
23 items in the title, dispute, analysis, and/or
24 investigation.
25     Q.  And when you said fraud investigations, are

21

1   you hired by a company that's being investigated for
2   fraud, or are you hired by some sort of prosecuting
3   body?
4       A.   Most of my retention has been by companies,
5   whether it be the audit committee of the company or the
6   board of the company or the company itself to
7   investigate an alleged fraud.  And that can be simply an
8   internal investigation, or it can also be investigation
9   that is being reviewed by the enforcement division of
10  the SEC.
11      Q.   Okay.  During that time did you ever have any
12  engagements involving Oracle or the individual
13  defendants?
14      A.   No.  As I said, I have not worked for Oracle
15  in the past.
16      Q.   Did you ever work on any engagement involving
17  Ernst and Young?
18      A.   Ernst and Young, yes.
19      Q.   Approximately how many?
20      A.   I have worked on behalf of Ernst and Young on
21  several occasions.
22      Q.   More than five?
23      A.   Yes.
24      Q.   More than ten?
25      A.   Probably slightly more than ten.

22

1       Q.   And are these cases in which you are hired to
2   do an investigation or testify on their behalf or both?
3       A.   Typically testify as to whether or not they
4   breached the standard of care relating to general
5   accepted auditing standards.
6       Q.   Okay.  And have you ever been retained by
7   Arthur Andersen in that capacity?
8       A.   I don't believe so.
9       Q.   Have you ever worked on any engagement with
10  Arthur Andersen?
11      A.   I don't believe so.
12      Q.   Since you left PriceWaterhouse, have you done
13  any work for them?
14      A.   For PriceWaterhouseCoopers?
15      Q.   Yes.
16      A.   No.
17      Q.   You said you left PriceWaterhouse February of
18  2003?
19      A.   January of 2003.
20      Q.   January of 2003; okay.  You're aware there is
21  an issue in this case involving an unapplied cash
22  cleanup that began in October 2002; correct?
23      A.   I am, yes.
24      Q.   And are you aware that PWC was involved in
25  part of that project?

23

1       A.   I have seen their name throughout documents.
2   I don't know exactly what their involvement was.
3       Q.   Do you know when they got involved in that
4   project?
5       A.   I don't.
6       Q.   So it is only what you've seen in documents?
7       A.   Correct.
8       Q.   When you were at PWC, did you talk to anybody
9   that worked on the unapplied cash project?
10      A.   No.  I never heard of the unapplied cash
11  project until I was engaged on this matter.
12      Q.   Okay.  And you haven't talked to anybody since
13  you were retained, anybody from PCW that worked on any
14  part of the unapplied cash project?
15      A.   No.  As I said the only individuals I spoke to
16  in this engagement were the ones we talked about
17  earlier.
18      Q.   Okay.  If you could turn to Exhibit B.  It is
19  Appendix B or Exhibit B to Exhibit 1, your opening
20  report.  It is a list of prior cases in which you've
21  testified.  Appendix B.
22      A.   I'm there.
23      Q.   Okay.  It says, "Testimony at Deposition,
24  Trial and/or Arbitration from May 1st, 2003"; correct?
25      A.   That is correct.

24

1       Q.   And it lists 27 cases; correct?
2       A.   That's correct.
3       Q.   Of these cases did any of them involve
4   securities fraud allegations pursuant to the federal
5   securities laws?
6            MR. GLENNON:  I'd object only to the extent it
7   calls for a legal conclusion.
8            THE WITNESS:  I believe number 19, the FCC v.
9   Weitzen, et al. was under the federal securities laws.
10           MR. GREENSTEIN:  Q.  Do you know, was that a
11  10b-5 case.
12      A.   That's more of a legal issue.  I don't recall.
13      Q.   Do you know what rule 10b-5 is?
14      A.   Yes, I do.
15      Q.   Did that involve rule 10b-5?
16      A.   I don't remember.
17      Q.   Do you remember just the general nature of
18  that case?
19      A.   Well, the CEO, CFO and CAO of Gateway Computer
20  were alleged to have committed fraud and/or negligence
21  in their accounting for certain transactions at Gateway.
22      Q.   Gateway Computer company?
23      A.   Gateway Computer company, yes.
24      Q.   And you testified on behalf of Gateway?
25      A.   I testified on behalf of the three individual

25

1  defendants.
2  Q.  One of which was Weitzen?
3  A.  Jeffrey Weitzen.
4  Q.  And he was the CEO?
5  A.  He was the CEO, yes.
6  Q.  And you submitted a report in that case?
7  A.  I did, yes.
8  Q.  And did you find that they -- strike that.
9  What was the conclusion of your report in that case,
10  generally?
11  MR. GLENNON:  I'd object only to the extent it
12  calls for confidential information.  But otherwise you
13  can answer.
14  THE WITNESS:  With respect to Mr. Weitzen, he
15  was removed from the case after we filed our report.
16  And our report concluded that Mr. Weitzen, Mr. Todd, and
17  I can't think of the third individual's name, at Gateway
18  had acted properly with respect to their accounting for
19  certain transactions.
20  MR. GREENSTEIN:  Q.  If you look at that list,
21  are there any other cases that you can see that were
22  securities fraud related?
23  A.  I don't see any others that are securities
24  fraud related.
25  Q.  Have you ever provided expert testimony,

26

1  finding that an accounting transaction or transactions
2  was improper?
3  A.  Yes.
4  Q.  Are those cases listed here?
5  A.  Karpetian v. Gazbiean, the first one, was
6  involving an individual suing a CPA relating to some
7  accounting issues, as I recall.
8  Q.  Okay.  Was that -- have you ever found in a
9  securities fraud case that transactions were improper,
10  any transactions were improper?
11  MR. GLENNON:  Object to the extent it calls
12  for a legal conclusion.
13  THE WITNESS:  I don't recall having done that,
14  no.
15  MR. GREENSTEIN:  Q.  Have you ever provided
16  expert testimony regarding the materiality of financial
17  misstatements?
18  A.  Yes.
19  Q.  And what cases did you do that in?
20  A.  Number 1 would have involved materiality.
21  Number 5 would involve materiality.
22  Q.  Clark versus Ernst and Young?
23  A.  Yes.
24  Q.  And you were retained by Ernst and Young?
25  A.  I was, yes.  Number 9 would have involved

27

1  materiality.
2  Q.  Let me back up.  So number 5, Clark versus
3  Ernst and Young, you were retained on behalf of Ernst
4  and Young, the defendant?
5  A.  That's correct.
6  Q.  And you opined on the materiality of financial
7  misstatements; correct?
8  A.  Any time there is an alleged misstatement,
9  materiality is a factor, so it is by nature a part of
10  the assignment.
11  Q.  So that it is -- that's always the case, if it
12  is a financial misstatement, necessarily it has a
13  materiality component?
14  A.  Well, it has to, yeah, because APB 20, which
15  defines accounting errors, only requires they be treated
16  as a prior period adjustment under GAAP if they are
17  material.
18  Q.  So Clark versus Ernst and Young, you were
19  retained on behalf of Ernst and Young, and did you find
20  that they materially misstated their financials?
21  A.  No.  I found that Ernst and Young's accounting
22  practices and the accounting by which they opined on the
23  assertions of management were appropriate.
24  Q.  And number 9, Thayer v. Ernst and Young, I
25  think you mentioned that involved financial

28

1  misstatements; correct?
2  A.  It did, yes.
3  Q.  And you were retained on behalf of the
4  defendant Ernst and Young; correct?
5  A.  That is correct.
6  Q.  And what was the general opinion that you
7  submitted in that case?
8  A.  Whether or not Ernst and Young had properly
9  complied with GAAS in opining on the GAAP financial
10  statements of Thayer.
11  Q.  Did you find they properly complied with GAAS?
12  A.  I did, yes.
13  Q.  Did you also opine on whether the -- did you
14  just opine on whether Ernst and Young complied with
15  GAAS, or did you also opine whether certain transactions
16  complied with GAAP?
17  A.  Both.
18  Q.  Did you find the transactions that were at
19  issue complied with GAAP?
20  A.  No, they did not comply with GAAP, because
21  they were a fraud.
22  Q.  And what was -- just explain generally what
23  those transactions -- well, strike that.
24  So you found that there were certain financial
25  transactions that violated GAAP but Ernst and Young did

29

1    not violate GAAS in connection with those transactions;
2    is that correct?
3        A.  That's correct.
4        Q.  Do you remember the general nature of the
5    fraud in that case?
6        A.  It was a collusive fraud by management,
7    whereby they were changing bank statements and changing
8    sales invoices.
9        Q.  And you found that Ernst and Young complied
10   with GAAS?
11       A.  I found that Ernst and Young in performing
12   their auditing had complied with GAAS, yes.
13       Q.  Now, let's go down a line.  Any other
14   securities fraud related cases -- I see number 11
15   involves Ernst and Young also?
16       A.  That is correct.
17       Q.  Was that a securities fraud case?
18       A.  You know, I don't remember.  I'm sorry, was
19   that a securities fraud case, was your question?
20       Q.  Correct.
21       A.  I don't know if it was a securities case.  It
22   was a case that involved fraud.
23       Q.  Was it fraud allegations against Ernst and
24   Young?
25       A.  No.  It was allegations that Ernst and Young

30

1    had not performed a GAAS audit.
2        Q.  And you represented Ernst and Young?
3        A.  I did, yes.
4        Q.  What was your conclusion?
5        A.  That they had adhered to GAAS.
6        Q.  Okay.  So just going down the list, any others
7    besides number 19?
8        A.  Sorry, you're looking for --
9        Q.  Securities fraud related accounting fraud
10   cases.
11       A.  Oh.  Well, we talked about 19, that certainly
12   had those issues.
13       Q.  All right.
14       A.  Clear Channel versus City of Mountain View.
15       Q.  Number 20?
16       A.  Yes.  Involved a lease between Clear Channel
17   and the City of Mountain View where there was, I
18   believe, fraud involved.
19       Q.  And you were retained on behalf of the City of
20   Mountain View?
21       A.  That's correct.
22       Q.  What was your conclusion in that case
23   generally?
24       A.  That, in fact, Clear Channel or their
25   subsidiaries had, in fact, misreported certain financial

31

1    information to the city.
2        Q.  But Clear Channel was suing the city; correct?
3        A.  It was.  But the city counter-sued Clear
4    Channel.
5        Q.  Got it.  What was the outcome of that case?
6    Do you remember generally?
7        A.  The City of Mountain View was successful in
8    their case.
9        Q.  Okay.  Have you ever testified regarding
10   revenue recognition issues related to SOP 97-2?
11       A.  Yes.
12       Q.  How many cases, approximately?
13       A.  Dozens of times.
14       Q.  Any on here that jump out at you?
15       A.  The SEC v. Weitzen case involved SOP 97-2, as
16   I recall.
17       Q.  Okay.
18       A.  Thayer v. Ernst and Young involved 97-2.
19       Q.  Okay.
20       A.  Clark v. Ernst and Young involved 97-2.
21   Number 11, Otter Creek versus Ernst and Young involved
22   97-2.  Those would be the ones that come to mind on this
23   list.
24       Q.  Is it fair to say in all of those cases your
25   conclusion was that 97-2 was not violated?

32

1        A.  No, because to the extent there was a fraud,
2    and the earnings process was not complete based on 97-2,
3    the financial statements would have been misstated.
4        Q.  So, of these cases that involved 97-2, did you
5    ever issue an opinion or testify at trial that a
6    particular transaction violated SOP 97-2?
7        A.  On the number 11, I believe there was
8    testimony that because of fraud that certain
9    transactions, certain revenue was recognized
10   inappropriately and it would have been recognized under
11   97-2.  I don't remember if I specifically said 97-2 is
12   violated.
13       Q.  Was it software revenue recognition?
14       A.  It was, yes.  Software and hardware.
15       Q.  In other words, there were software
16   transactions -- you found that there were software
17   revenue transactions that were improperly booked,
18   regardless of whether they were under 97-2 or whatever
19   applicable rules; correct?
20       A.  That's correct.
21       Q.  Okay.  And that was at trial you testified
22   about that?  Or did you issue a report on that?
23       A.  Both.
24       Q.  Both; okay.  Do you have that report from that
25   case?

33

1    A. Do I?
2    Q. Yeah.
3    A. I don't know if I still have that report or
4  not.
5    Q. Okay. Do you have a deposition transcript in
6  that case?
7    A. I wouldn't have that. I don't save those.
8    Q. You don't save those?
9    A. No.
10   Q. Any?
11   A. I don't save deposition transcripts.
12   Q. Okay. Do you save your reports?
13   A. Typically I don't. Whether or not this one
14  has been saved, I have no idea.
15   Q. Do you save trial transcripts of testimony at
16  trial?
17   A. I don't even get that.
18   Q. You don't get that; okay.
19      And so were any of these other four cases that
20  you mentioned involving SOP 97-2, did you issue any type
21  of opinion or testify at trial that any transactions
22  were improper under 97-2?
23   A. I believe Clark V. Ernst and Young had those
24  issues. I believe number 9, Thayer V. Ernst and Young
25  had those issues. Number 11 had those issues.

34

1    Q. Let me stop you there. Are you saying in
2  those cases you found -- you either testified or
3  proffered expert -- an expert report finding that a
4  transaction was improper under SOP 97-2?
5    A. Maybe I need to explain this a little bit. SOP
6  97-2 is used quite a bit by software and high-tech
7  companies, but it really, if you look at SAB 101, issued
8  by the SEC, the four criteria within SOP 97-2 are the
9  exact criteria, that is evidence of a transaction, fixed
10  or determinable price, that the delivery has taken place
11  and the collectibility is assured. So that bit of GAAP
12  is really pervasive throughout most revenue recognition,
13  whether it be software or whether it be construction.
14   Q. Right, okay. So what I'm trying to get at, in
15  any of those cases did you find a transaction was
16  improper under those rules, a revenue transaction was
17  improper?
18   A. Yes. And, that's what I was trying to answer,
19  I'm sorry, on the last question. As I said, number 5 is
20  that way.
21   Q. Okay.
22   A. Do you want me to go down the list again?
23   Q. You said 5, 9, 11?
24   A. 5, 9, 11, 19. Those are the ones I can think
25  of as I sit here right now.

35

1    Q. Do you have the reports in those cases?
2    A. No. I don't know if the actual -- some of
3  these I don't know if a report was issued. And if it
4  was issued, I don't know if I would have it or not. I
5  would have to check.
6    Q. Can you do that? Just make a note, if you're
7  willing to produce those, we would like them.
8    A. So, so far I'm doing bills and reports.
9    Q. Correct.
10   A. So the list is complete.
11   Q. We don't need the bills in the other cases.
12   A. Understand.
13   Q. So 5, 9, 11, 19, 20.
14   A. Okay.
15   Q. Has your testimony in any case in the past
16  five years ever been excluded by the court?
17   A. No.
18   Q. Never?
19   A. No.
20      MR. GREENSTEIN: Okay. I'd like to mark this
21  as No. 3.
22      (Exhibit 3 marked for
23      identification.)
24      MR. GREENSTEIN: Q. For the record, this is
25  an expert witness report dated September 20th, 2004 from

36

1  J. Duross O'Bryan in the case GMG Stone, Inc. Do you
2  recognize this document, Mr. O'Bryan?
3    A. I do.
4    Q. And was this a report that you produced in
5  connection with your report in this case?
6    A. I'm sorry, what?
7    Q. Do you recognize this document in front of
8  you?
9    A. I do, yes.
10   Q. And did you produce this in connection with
11  this case?
12   A. Did I produce this in connection with this
13  case?
14   Q. Yeah.
15   A. I think it is on the list on Appendix B.
16   Q. Well, I will represent to you it was produced
17  to us in connection with your opening report. Did you
18  know that?
19   A. I did not know that.
20   Q. You didn't know that?
21   A. No.
22   Q. Okay. If you look at -- what was this case
23  about, generally? Actually, strike that. If you turn
24  to Appendix B in the document.
25   A. I'm there, yes.

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

37

1    Q.  And this is -- so this is a report dated
2  September 20th, 2004.  And it says it is a list of
3  testimony at deposition, trial and arbitration for
4  period January 1st, 1994 through September 20th, 2004.
5  Do you see that?
6    A.  I do, yes.
7    Q.  And then it's two pages.  And it looks like it
8  goes all the way back to 1994; correct?
9    A.  That's correct.  This produced a much greater
10  number because of the dates.
11    Q.  Right.  So this is ten years of testimony or
12  expert testimony at trial or in deposition; correct?
13    A.  I believe that's true, yes.
14    Q.  Okay.  Do you know if this is accurate?
15    A.  I believe it is, yes.
16    Q.  If you turn to page 2.
17    A.  I'm there.
18    Q.  And well, do you remember a case called Parnes
19  V. Harris involving a company called Puris Technologies?
20    A.  I do.
21    Q.  You do?
22    A.  Yes.
23    Q.  Do you remember when that deposition took
24  place?
25    A.  I don't.

38

1    Q.  Do you remember what that case was about?
2    A.  As I recall, it was about accounting issues,
3  and it seemed to me it was about bad debt, bad debt
4  issues or something that involved.
5    Q.  Bad debt reserve?
6    A.  I don't recall if it was reserve, or there was
7  warranty issues.  I don't recall the details of that
8  case.
9    Q.  And do you remember who you were retained by
10  on that case?
11    A.  As I recall it was Brobeck.
12    Q.  Brobeck is a law firm?
13    A.  Correct.
14    Q.  Were you retained by Brobeck to testify on
15  behalf of a party in that case?
16    A.  Yes.
17    Q.  Who was the party?
18    A.  I don't recall who the party was.  It may have
19  been Puris, the company.
20    Q.  Was it KPMG Marwick, perhaps?
21    A.  No.  No, I wasn't -- I was not retained on
22  that for KPMG.  I can't recall.  It was for the company.
23  KPMG was involved, I believe.
24    Q.  For Puris you were retained?
25    A.  I believe that's true, yes.

39

1    Q.  Do you remember the approximate date of that
2  deposition?
3    A.  I don't.
4    Q.  You were deposed in that; correct?
5    A.  As I recall, I was, yes.
6    Q.  And you submitted a report in that case;
7  right?
8    A.  I don't recall whether or not a report was
9  submitted.
10    Q.  But if it was -- if it was, say, in 2002, it
11  would be on this list here, page 2, Appendix B of
12  Exhibit 3 that you're looking at; right?
13    A.  It would be an page 1 or 2, yes.
14    Q.  Do you see it on this list?
15    A.  I don't.  But I don't know the timing of it,
16  number one.  And number two, sometimes, obviously, the
17  names are different than Puris or the obvious ones.
18    Q.  Do you remember a case called Parnes v.
19  Harris?  I will represent to you that's the case
20  involving Puris.
21    A.  Yeah, I didn't know that was the case name.
22    Q.  Okay.  Okay.  And do you remember ever being
23  involved in a case involving Stroock, Stroock and Lavan,
24  which is a law firm?
25    A.  I do, yes.

40

1    Q.  And do you remember who retained you in that
2  case?
3    A.  The case I'm thinking of was just in the last
4  couple of years.  And as I recall, I was retained by the
5  firm Stroock, Stroock and Lavan.
6    Q.  You provided expert testimony on behalf of the
7  law firm Stroock, Stroock and Lavan; correct?
8    A.  No.  The case settled before I testified, as I
9  recall.
10    Q.  If you turn to Appendix B of Exhibit 1 now,
11  which is your opening report in this case.
12    A.  Appendix B, I'm there.
13    Q.  You see number 8, Stroock, Stroock and Lavan
14  versus Houston RCW?
15    A.  I see that, yes.
16    Q.  The deposition date was May '04 it looks like;
17  correct?
18    A.  Yes.
19    Q.  Is there a reason that case is not on
20  Appendix B to Exhibit 3 that we just looked at?
21    A.  Well, this was an American Arbitration
22  Association.  We say deposition.  I don't recall
23  testifying in a case for Stroock, Stroock and Lavan.
24    Q.  Okay.  Let's turn to Exhibit 3 now, Appendix
25  B.  You see it says, "Testimony at Deposition, Trial

**41**

1  and/or Arbitration for Period January 1st, '94 through
2  September 20th, 2004"?
3      A.  I'm sorry, you're on Exhibit 3 now, page --
4      Q.  I know this is confusing.  Appendix B of
5  Exhibit 3.
6      A.  I'm there, yeah.
7      Q.  And you see how it says, "and/or Arbitration"
8  at the top?
9      A.  I do, yes.
10     Q.  Is there a reason that that Stroock case is
11  not listed on here?
12     A.  I don't know.  Unless we realized I didn't
13  testify on that and there was a mistake made in the
14  original report.  Because I don't remember testifying on
15  a case for Stroock.  I know I was named on a case for
16  Stroock.  As I recall it was a Houston case.  But as I
17  recall, that case settled before I testified.
18     Q.  So, were you deposed?
19     A.  I don't recall being deposed.  It says I was
20  in May of '04, but I don't recall that.
21     Q.  Okay.  You said you reviewed the second
22  amended complaint in this case; correct?
23     A.  I believe that's true, yes.
24     Q.  Now, you may not know the distinction, but do
25  you know if it is the second amended complaint or the

**42**

1  revised proposed second amended complaint?
2      A.  If you let me get to my documents.
3      Q.  Sure, no problem.
4      A.  It says here, "Revised Second Amended
5  Complaint."  I'm referring to tab 2 within my binder.
6      Q.  Tab 2, is that a footnote to your opening
7  report?
8      A.  It is footnote 1 to my opening report.
9      Q.  Okay.  Great.
10     A.  There is an annotated version of this report
11  that has references, read references, that tie to the
12  documents in the three binders I have for the rebuttal,
13  two binders for the original report.  So the sections
14  may not exactly match up with the footnotes because they
15  are just different.
16     Q.  But if I were -- the report I have if I were
17  to look at the footnotes that refer to documents, would
18  those be accurate references?
19     A.  Absolutely.  They may just have a different
20  section within my support binder.
21     Q.  Got it; okay.  So after reading the complaint,
22  what is -- strike that.
23         What is your understanding of which quarters'
24  financial reports are alleged to be false and misleading
25  in this case?

**43**

1      A.  The second quarter of fiscal '01.
2      Q.  You're not here to testify or you don't intend
3  to testify on the falsity of Oracle's third quarter 2001
4  results; right?
5      A.  I am not testifying on the accuracy of the
6  third quarter of 2001.  I am testifying, however, that I
7  don't believe that any either alleged or potential
8  misstatements affected the second quarter, and they did
9  not affect the third quarter.
10     Q.  So you are not -- in this case you do not
11  intend to provide any testimony as to the accuracy of
12  Oracle's third quarter financial results; right?
13     A.  Only to the extent that my opinion is that any
14  accounting alleged errors or alleged misclassifications
15  affected the second quarter, and not the third quarter.
16  But I'm not going to opine about what those numbers were
17  in the third quarter or what they should have been.
18     Q.  So is it fair to say that to the extent
19  that -- strike that.
20         Are you saying that to the extent that the
21  second quarter results are inaccurate, you're not
22  opining on whether or not the third quarter was
23  inaccurate by nature of the second quarter being
24  accurate?  Is that fair to say?  Is that what you mean?
25         MR. GLENNON:  I object on vagueness grounds.

**44**

1         MR. GREENSTEIN:  Q.  I don't understand what
2  you mean in your last statement.
3      A.  Maybe I can simplify it.  All I'm suggesting
4  is that the second quarter alleged misstatements affect
5  the second quarter only, they do not affect any other
6  quarter of Oracle.  So they don't affect the third, they
7  don't affect the fourth.  They affect the second quarter
8  only.  They are isolated to the second quarter.
9      Q.  Okay.  Well, to the extent revenue was
10  improperly recognized in the second quarter and should
11  never have been recognized, wouldn't that have an impact
12  on the third quarter results?
13     A.  No.  It would be a second quarter issue.
14     Q.  Right.  But if a transaction was booked, for
15  example, $20 million improperly in the second quarter,
16  and it should never have been booked in any quarter?
17     A.  That would affect the second quarter only.
18     Q.  Wouldn't that revenue be part of Oracle's
19  financial statements in the third quarter?
20     A.  No.  Because it was booked in the second
21  quarter.
22     Q.  But -- so, your testimony in this case is only
23  on the accuracy or -- the accuracy of the second quarter
24  results; is that correct?
25     A.  Yes.  And just to clarify, only that it

45

1 involves the second quarter. It doesn't affect any
2 other quarter.
3      So, in other words, my opinion is that whether
4 it is $$20 million that affected the second quarter or
5 $40 million, $20 million with the bad debt reserve
6 transfers allegedly done improperly, $20 million for the
7 HP transaction allegedly done improperly, those affect
8 the second quarter. There is no rollover effect into
9 the third quarter because of those issues.
10     Q.  Why is that? Why do you believe that to be
11 the case?
12     A.  Because they were booked in the second
13 quarter. And if they are found to be not second quarter
14 transactions, they come out of the second quarter.
15     Q.  Okay. So in the case of a misstatement of a
16 particular quarter in general, is it always the case
17 that that misstatement can't impact the next quarter's
18 results?
19     A.  No. There could be issuances -- there can be
20 instances where you may move from one quarter to the
21 next.
22     Q.  To the extent something was improperly put --
23 improperly reflected in Oracle's balance sheet in the
24 second quarter and remained -- and that was improper,
25 wouldn't it remain on the balance sheet in the third

46

1 quarter?
2      A.  No. Because the third quarter would be
3 trued-up for actual results.
4      Q.  What if they didn't reverse whatever was
5 improper in the second quarter in the third quarter?
6      A.  Well, you wouldn't reverse. What we're
7 talking about here, I think you're talking about is the
8 reserve itself.
9      Q.  No. I'm talking about in general, whether a
10 misstatement in one particular quarter can impact the
11 next quarter.
12     A.  It can if it should have been moved to that
13 next quarter. But in this case, the issues we're
14 talking about just affect the second quarter, not the
15 third quarter.
16     Q.  If you could turn to page 21 in your opening
17 report, which is Exhibit 1, please.
18     A.  I'm there.
19     Q.  See how it says, "Reviewed various accounting
20 reports and documents"?
21     A.  I'm there.
22     Q.  And the first paragraph is, "Review of Summary
23 Reports."
24     A.  I'm there.
25     Q.  On this paragraph it appears that you say in

47

1 the second sentence, "The first report I reviewed was a
2 transaction register"; correct?
3      A.  Correct.
4      Q.  "Which listed all debit memos generated for
5 that day." Do you see that?
6      A.  I do.
7      Q.  Okay. And then the next sentence says, "I
8 inspected the account analysis report." Do you see
9 that?
10     A.  Two sentences down you mean?
11     Q.  The one after the transaction -- yes, yes.
12     A.  "I inspected the account"; I'm there, yeah.
13     Q.  You looked at the transaction register and the
14 account analysis report; correct?
15     A.  I did look at those two reports, yes.
16     Q.  Okay. And then in the next full paragraph it
17 says, "I also reviewed a sales journal by GL account
18 report." Do you see that?
19     A.  I do, yes.
20     Q.  So, the next section says, "Review of Sample
21 On-Account Transactions." You see that?
22     A.  I do, yes.
23     Q.  In those two paragraphs it appears that you
24 say you reviewed three reports, the transaction
25 register, the account analysis report and sales journal

48

1 by GL account report; is that fair to say?
2      A.  Correct, yes.
3      Q.  Now, are those the only reports you relied on
4 in rendering your opinion in this case?
5      A.  No. I've seen dozens of reports.
6      Q.  Okay. So with respect to these particular
7 reports, why did you cite them in this section?
8      A.  Because they have to do with understanding
9 whether or not there was any financial impact of the
10 debit memos booked on November 17th, 2000.
11     Q.  Okay. And so let's take the first one, the
12 transaction register. Do you see that?
13     A.  Yes.
14     Q.  And it says it listed all debit memos
15 generated for that day. Do you see that?
16     A.  I do.
17     Q.  And how does that tell you what the financial
18 statement impact of the debit memo says?
19     A.  You can see both a debit and credit in the
20 account for the debit memos. So you see both debits and
21 credit, which would mean the same amount, $692 million,
22 which would mean there would be no financial statement
23 impact.
24     Q.  Let me back up a little bit. In proffering
25 your expert report, you have a list, Exhibit C, that

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

49

1 provides all of the documents that you relied upon in
2 rendering your opinion; is that correct?
3     A.   That's correct.
4     Q.   If you could turn to that Exhibit C for me.
5     A.   I'm there.
6     Q.   Okay.  And see how it has a list of
7 depositions?
8     A.   It does, yes.
9     Q.   I'm going to list some names and ask you if
10 you've relied upon those depositions.  Is that okay with
11 you?
12     A.   Certainly.
13     Q.   Do you know who Terry Elam is?
14     A.   Terry Elam.  I don't recall that name.
15     Q.   Did you read his deposition?
16     A.   I don't recall reading that deposition.
17     Q.   Do you know who Julie Chan --
18     A.   I'm sorry, are you talking about with respect
19 to the original report or either?
20     Q.   Just talking about the original, the opening
21 report.
22     A.   Yes.  Julie Chan, yes, I know that name.
23     Q.   Back to Terry Elam, did you read the
24 deposition in connection with your rebuttal report?
25     A.   I have to look at that.

50

1     Q.   Let me ask you this.  If there is not a
2 deposition listed here, is it fair to say that you
3 didn't review that deposition transcript?
4     A.   No, that's not fair to say.
5     Q.   So there is some depositions you reviewed that
6 are not on this list?
7     A.   Yes.
8     Q.   Well, did you read the deposition of Terry
9 Elam at any time?
10     A.   I can't recall that deposition.
11     Q.   Okay.  Now, back to Appendix C with the
12 opening report.  It doesn't indicate that you relied
13 upon Julie Chan's deposition.  Did you read it before
14 you submitted the report?
15     A.   I did read Julie Chan's deposition.
16     Q.   But you didn't rely on anything in her
17 deposition?
18     A.   I did, actually, where she talked about the
19 transferring from the unapplied -- 25005 unapplied into
20 the 12018.
21     Q.   So you relied on Julie Chan's testimony in
22 your opening report?
23     A.   It may be in the rebuttal report.
24     Q.   What I'm asking, did you -- I'm going to focus
25 on this opening report.

51

1     A.   Okay.
2     Q.   Probably for a couple hours.
3     A.   Okay.
4     Q.   So I'm just asking you what you relied upon in
5 your opening report.
6     A.   Well, it would be -- I'm sorry, yes.
7     Q.   Do you understand that?
8     A.   I do, yes.
9     Q.   So what I'm asking is if you reviewed --
10 strike that.  What I'm asking is if you relied upon
11 anything in Julie Chan's testimony in this opening
12 report.
13     A.   I did.  I was aware of her testimony.  I read
14 her testimony specifically about the transfers from the
15 25005 account into the 12018 account.
16     Q.   So, you rely upon her testimony in this
17 opening report?
18     A.   I believe I do, yes.
19     Q.   So why isn't it listed there?
20     A.   There may also be references in the footnotes
21 within the report itself to different testimony.  I
22 don't recall if that's in here or not.
23     Q.   Well, to the extent that Julie Chan is not
24 specifically cited in the opening report, is there a
25 reason why you wouldn't list it if you relied upon her?

52

1     A.   No.  It may be that I was aware of that
2 information, it was something that I considered, it was
3 consistent with what I had seen from other testimony.
4 And I didn't see it necessary to include that.
5     Q.   So you didn't rely upon any testimony of Julie
6 Chan in this opening report, to the extent it is not
7 cited?
8     A.   Well, I mean, I looked at a number of
9 different things.  And some of this testimony I had
10 heard and/or seen from other sources, and with respect
11 to that transfer in the Arthur Andersen document,
12 specifically.  And then if I saw testimony from Julie
13 Chan that corroborated that, I considered that.
14     Q.   So you considered the testimony of Julie Chan
15 in rendering your opening report, but you didn't rely
16 upon it?
17     A.   I think that's a fair statement.
18     Q.   Okay.  The only reason I'm saying this,
19 because it says documents relied upon and you have depo
20 transcripts.  I'm trying to find out if there are any
21 depo transcripts that you relied upon that aren't in
22 here.
23     A.   I can't think of anything that I excluded.
24     Q.   I'm just going to list some names, and let me
25 know if you've read those.

53

1        Ian Hitada?
2        A.  I have reviewed some of Ian Hitada's
3    deposition testimony.
4        Q.  Did you review his deposition before you filed
5    your opening report?
6        A.  I don't recall that he's referenced in my
7    opening report.
8        Q.  Okay.  So is it fair to say you did not rely
9    on -- or you did not read Ian Hitada's testimony prior
10   to issuing your opening report?
11       A.  I think I had read it.  I just don't know that
12   I had relied upon it.
13       Q.  How about, do you know who Michelle Davidson
14   is?
15       A.  I don't know that name.
16       Q.  So you probably never read her depo?
17       A.  I may have.  I just don't recall the name as I
18   sit here.
19       Q.  I'll represent to you she was a 30(b)(6)
20   witness that testified on behalf of Household
21   Corporation.
22       A.  Okay.
23       Q.  Did you read that deposition before you
24   submitted your opening report?
25       A.  I don't recall reading that deposition.

54

1        Q.  Okay.  But you opine in your opening report --
2    you opine on the Household transaction; correct?
3        A.  I do, yes.
4        Q.  But you hadn't read Michelle Davidson's
5    testimony in reaching that conclusion?
6        A.  I don't recall reading her deposition, nor do
7    I think it was required to come to the opinion that I
8    did.
9        Q.  Okay.  But I'm just asking if you read it in
10   forming your opinion on Household.
11       A.  I don't recall reading her opinion -- her
12   deposition, excuse me.
13       Q.  Okay.  Was there a reason you didn't?
14       A.  No.
15       Q.  Okay.  Ryan Roberts?
16       A.  I don't recall the name.
17       Q.  Okay.  Sanjay Kumar?
18       A.  I do recall that name.
19       Q.  Do you know who Sanjay Kumar is?
20       A.  I forget who that individual is.
21       Q.  Well, it is not listed in here.  And I'll
22   represent to you that all these names I'm listing aren't
23   cited specifically in your opening report.  So I just
24   want to make it clear, I'm going to establish whether or
25   not you relied upon them, despite the fact it is not

55

1    cited.  Does that make sense?
2        A.  Yeah.  Yeah.  If it is not cited and it is not
3    on Appendix B, it wasn't something I relied on.
4        Q.  So, did you read the deposition of Ryan
5    Roberts prior to issuing your opening report?
6        A.  I don't recall.
7        Q.  Is that a no, or you just don't remember?
8        A.  I don't recall if I read that or not.
9        Q.  Do you know who Ryan Roberts is?
10       A.  No.
11       Q.  Sanjay Kumar, did you read his deposition
12   before you submitted your opening report?
13       A.  I don't recall reading his before my original
14   report, no.
15       Q.  You don't know who he is?
16       A.  I don't recall exactly his title.
17       Q.  Do you know anything about Sanjay Kumar?
18       A.  Not as I sit here right now.
19       Q.  Do you know who Raul Campos is?
20       A.  I do, yes.
21       Q.  Did you read his deposition before you
22   submitted your opening report?
23       A.  I thought I had reviewed through Mr. Campos'
24   deposition before my opening report, yes.
25       Q.  And -- but you didn't rely upon it, obviously,

56

1    right, because it is not listed in Appendix C?
2        A.  Correct.
3        Q.  How about Tom Rathjens?
4        A.  I know who Tom Rathjens is.
5        Q.  He's not listed in Appendix C to your opening
6    report.  Is it fair to say you didn't rely upon his
7    testimony in issuing your opening report?
8        A.  Mr. Rathjens is with HP, and, as you know, our
9    opening report was light on HP testimony, not knowing
10   what Mr. Rathjens might say about that.  So, there was
11   no reference to Mr. Rathjens.
12       Q.  You didn't read Mr. Rathjens' deposition
13   before opining on the HP transaction in your opening
14   report; correct?
15       A.  The original one; that's correct.
16       Q.  You said it was light on HP.  What do you mean
17   by that?
18       A.  If you refer to my opening report, the HP
19   transaction is discussed in page 41.  And when I say
20   light, it's simply a paragraph.  So that's what I mean
21   by light, when the rebuttal report speaks for almost 20
22   pages on the HP transaction.
23       Q.  And what's the reason why in your opening
24   report the HP transaction was, quote, unquote, light?
25       A.  Because that wasn't something that was pled

57

1    that I saw in the revised second amended complaint.  The
2    only accounting issue that I knew was in the revised
3    second amended complaint was the debit memos.
4        Q.  But you provide an expert opinion on page 41
5    of your opening report in which you say, "I do not
6    believe there is anything improper in Oracle's
7    recognition of revenue from the HP transaction."  Do you
8    see that?
9        A.  I do, yes.
10       Q.  So you proffered an expert opinion on the
11    propriety of that deal in this report; correct?
12       A.  I did, yes.
13       Q.  But you didn't read the deposition of HP's
14    witness before providing this testimony; correct?
15       A.  That's correct.
16       Q.  Okay.  So how did you go about determining
17    which depositions to read in connection with your
18    opening report?
19       A.  Ones that were relevant to my opinions.
20       Q.  Okay.  And how did you determine who was
21    relevant to your opinions?
22       A.  I looked through all the depositions that had
23    been taken and decided which ones were relevant or not
24    to me.
25       Q.  So you didn't think Raul Campos was relevant

58

1    to your opinion?
2       A.  As I said, I reviewed Mr. Campos' original
3    deposition in my original report, I just didn't rely on
4    it.
5       Q.  Okay.  How about Mike DeCesare, did you review
6    his deposition prior to rendering your opinion on
7    Hewlett-Packard?
8       A.  I did, yes.
9       Q.  You did?
10       A.  I did.
11       Q.  Did you rely on it?
12       A.  Prior to the original report?
13       Q.  Right.
14       A.  No.  I read Mr. DeCesare's deposition, as I
15    recall, but did not rely on it.
16       Q.  Okay.  So is it fair to say that in rendering
17    your expert opinion on page 41 and 42 of your opening
18    report on the HP transaction, you hadn't read the
19    depositions of either Tom Rathjens or Mike DeCesare; is
20    that correct?
21       A.  I don't think I had read -- I don't recall
22    about Mr. DeCesare's depo.  I don't recall reading
23    Mr. Rathjens' before that initial opinion.
24       Q.  So you don't -- so is that a no?
25       A.  I don't recall reading either one before my

59

1    initial opinion.
2       Q.  Okay.  Do you know who Mike DeCesare was?
3       A.  I do.
4       Q.  Who is he?
5       A.  An individual, as I recall, with HP, having to
6    do with -- excuse me, with Oracle, having to do with
7    some of the products that HP purchased from Oracle.
8       Q.  And you didn't -- you didn't think that was an
9    important deposition to read prior to issuing an expert
10    opinion on the HP transaction?
11       A.  No.  Because when you look at the HP
12    transaction, this was a transaction that was booked by
13    Oracle in the second quarter of 2001 for $19.9 million,
14    approximately.  It was reviewed by the audit committee
15    of Oracle, it was reviewed by Arthur Andersen, the
16    outside auditors, reviewed by the revenue recognition
17    group of Oracle.  That's where my initial opinion really
18    came from.
19       So what others said with respect to that was
20    really, quite frankly, irrelevant, and only additive to
21    my opinion that that transaction was booked properly,
22    which I still believe it is today.
23       MR. GLENNON:  Eli, we've been going for about
24    an hour and 15 minutes.  Can we take a short break?
25       MR. GREENSTEIN:  Sure.

60

1       VIDEOGRAPHER:  Off record at 10:42.
2       (Recess, 10:42 a.m. - 11:05 a.m.)
3       VIDEOGRAPHER:  On record at 11:05.
4       MR. GREENSTEIN:  Q.  Mr. O'Bryan, if you can
5    turn to page 21 of your opening report, which is
6    Exhibit 1.
7       A.  I'm there.
8       Q.  Okay.  And earlier we were talking about the
9    reviewed summary reports, and in these two paragraphs
10    you list out three reports, transaction register,
11    account analysis report and sales journal by GL account
12    report; is that correct?
13       A.  That is correct.
14       MR. GREENSTEIN:  I'm going to mark for the
15    record Exhibit 4, which is a transaction register.
16       (Exhibit 4 marked for
17       identification.)
18       MR. GREENSTEIN:  Q.  For the record, this is a
19    transaction register previously marked at the deposition
20    of Greg Myers as Exhibit 4.
21       Mr. O'Bryan, if you could just take a look at
22    it and let me know when you're done, please.
23       MR. GLENNON:  I object only to the extent it
24    appears this is an expert.
25       MR. GREENSTEIN:  That's true.  For the record

61

1  this is an 800-page document. What we've done here,
2  which is the same thing we did in Mr. Myers' deposition,
3  was to produce the first ten odd pages and the last
4  pages, because it is a large document.
5      Q. Do you have a problem with that, Mr. O'Bryan?
6      A. I don't.
7      Q. Have you seen this document before?
8      A. I have, yes.
9      Q. And what is it?
10     A. This is a transaction register which reflects
11  the debit memos that were run on November 17th, 2000.
12     Q. Now, were the debit memos run on November
13  17th, 2000, or another day?
14     A. I thought they were right around there. I
15  thought they were on the 17th. They might have been
16  right around there.
17     Q. Around the 17th. But are you sure they were
18  run on the 17th?
19     A. I'm not exactly sure exactly what day. That's
20  the transaction date. The invoice date shown on the
21  transaction register, that's always the date I've
22  referred to as being the debit memo date.
23     Q. Right. I'm just asking if you have formed an
24  opinion based on all the evidence you reviewed as to
25  when the debit memos actually were run.

62

1      MR. GLENNON: Objection; asked and answered.
2      THE WITNESS: I don't recall.
3      MR. GREENSTEIN: Q. So it might not have been
4  November 17th?
5      MR. GLENNON: Objection; vague and ambiguous.
6      THE WITNESS: I just don't recall what date
7  specifically. I've always referred to it as the
8  November 17th, 2000 date.
9      MR. GREENSTEIN: Q. Right. And why do you
10  refer to it as November 17th? Because that's what was
11  in the complaint?
12     MR. GLENNON: Same objection.
13     THE WITNESS: No. Because that's what the
14  document shows. If you take a look at the transaction
15  register, it shows invoice date November 17th. I don't
16  recall that I addressed that specific date in my report,
17  but I may.
18     MR. GREENSTEIN: Q. I think you said on or
19  about November 17th.
20     A. There you go.
21     Q. In any event, is this the transaction register
22  that you're referring to in the -- on page 21 of your
23  opening report in the first full paragraph under section
24  A?
25     A. I believe it is, yes.

63

1      Q. Okay. And what does this document purport to
2  say?
3      MR. GLENNON: Objection; the document speaks
4  for itself. Vague and ambiguous.
5      THE WITNESS: I'm sorry, what do you mean,
6  what does it say?
7      MR. GREENSTEIN: Q. "Relied on this
8  document," quoting your report, "for the purpose of
9  understanding the total impact of the November 17th,
10  2000 accounting entries." This is the first report you
11  relied on in forming that opinion; correct?
12     MR. GLENNON: Same objection.
13     THE WITNESS: I relied on this report.
14     MR. GREENSTEIN: Q. Okay. Well, I'm just
15  reading. It says, "I reviewed various accounting system
16  reports produced by Oracle for the purpose of
17  understanding the total impact of the November 17, 2000
18  accounting entries." Do you see that?
19     A. I do.
20     Q. Then it says, "The first report I reviewed is
21  the transaction register" --
22     A. Right.
23     Q. -- "which listed all debit memos generated for
24  that day." Do you see that?
25     A. Yes.

64

1      Q. Is this that transaction register that you're
2  referring to in there?
3      A. Is this Exhibit 4?
4      MR. GLENNON: Objection; vague and ambiguous.
5      MR. GREENSTEIN: Q. Is that the document
6  you're referring to there?
7      A. There is an excerpt document. I've seen the
8  entire 800 pages.
9      Q. Assuming that the rest of the pages -- but
10  this is the same document; correct?
11     MR. GLENNON: Objection; vague and ambiguous.
12     THE WITNESS: I believe this is the same
13  document.
14     MR. GREENSTEIN: Q. Well, just take a look at
15  it. I'm just wondering, this is the same document that
16  you relied upon?
17     MR. GLENNON: Objection; vague and ambiguous.
18     THE WITNESS: I am sorry, I don't mean to be
19  difficult. I think I testified I think this is an
20  excerpt version of the same document I relied on.
21     MR. GREENSTEIN: Q. Okay, but it looks the
22  same as the transaction register that you relied on,
23  right, the 800-page document?
24     A. Yes.
25     Q. It reflects the same information; is that

65

1  right?
2       MR. GLENNON: Same objection.
3       THE WITNESS: As best I can tell. It is only
4  ten pages of it.
5       MR. GREENSTEIN: Q. Well, what is a
6  transaction register?
7       A. It is an accounting report that basically
8  summarizes, depending what the queries are of the
9  individuals running it, summarizes different
10  transactions either by account or by type or by day or
11  by GL number.
12      Q. You said it depends on what the queries are of
13  the individuals running it; correct?
14      A. Right.
15      Q. So, do you know who the individuals were that
16  ran this?
17      MR. GLENNON: Objection; vague and ambiguous.
18      THE WITNESS: I don't know who pushed the
19  button to have this report run.
20      MR. GREENSTEIN: Q. But this report reflects
21  a query of whatever particular individual ran this
22  transaction register report; correct?
23      MR. GLENNON: The document speaks for itself.
24      THE WITNESS: That's correct.
25      MR. GREENSTEIN: Q. Do you know when this

66

1  document was run?
2       A. I don't. There's a date at the top,
3  November 5, 2002. That may just be a print date. So,
4  it looks to me like this document was printed on
5  November 5th, 2002.
6       Q. And you're aware that there is an unapplied
7  cash project at issue in this case that began in October
8  2002; correct?
9       MR. GLENNON: Objection; foundation.
10      THE WITNESS: And you mean project -- I'm
11  aware that the collections department of Oracle went
12  about the process of trying to clean up the transfers to
13  the reserve that occurred in the second quarter of 2001,
14  in October/November of 2002.
15      MR. GREENSTEIN: Q. Okay. And so you said to
16  clean up the transfers to the reserve that occurred in
17  the second quarter of 2001; right?
18      A. And I only mean -- cleanup, that's the term
19  everyone has used, it is a cleanup process. And I put
20  that in quotes.
21      Q. What is your understanding of what the
22  unapplied cash -- strike that.
23      From here on after I'm going to refer to it as
24  the 2002 cleanup. Is that okay with you?
25      MR. GLENNON: Objection. You're going to

67

1  refer to what as the 2002 cleanup?
2       MR. GREENSTEIN: Q. The unapplied cash
3  project beginning in October 2002. You understand what
4  that is; right?
5       A. I do, yes.
6       Q. Because you opine on it in your report; right?
7       A. I do, yes.
8       Q. Okay. I'm going to refer to that as the 2002
9  cleanup. Is that okay with you?
10      MR. GLENNON: Just point of clarification.
11  You're talking about all components of that, start date,
12  end date? Anything and everything? I think you need to
13  clarify exactly what it is you're talking about.
14      MR. GREENSTEIN: Q. The project that started
15  October 2002 involving the cleanup, as you call it, of
16  unapplied cash. Is that fair to say?
17      MR. GLENNON: Objection; vague and ambiguous.
18      THE WITNESS: Is that a question?
19      MR. GREENSTEIN: Q. What is your
20  understanding of the unapplied cash project that began
21  in October 2002?
22      A. My understanding is that the accounting
23  department of the company, Oracle, became aware of the
24  fact that there may have been transfers from 25005 into
25  12601 during the second quarter of 2001, sometime in

68

1  2002. And they went about a process of trying to make
2  sure that those transfers were appropriate.
3       And that's what I've referred to as the
4  unapplied cash project. People call it cleanup. I'm
5  not sure that's a great name for it. But that's what my
6  understanding of that unapplied cash project was
7  starting in approximately October of 2002.
8       Q. Okay. So, is it your understanding that that
9  project was only focusing on addressing items of
10  unapplied cash that had been transferred from 25005 to
11  12601 during the second quarter?
12      A. Yes.
13      Q. And is that the extent of the project?
14      MR. GLENNON: Objection; vague and ambiguous.
15      THE WITNESS: I don't know. I wasn't there at
16  the time they were doing it. For all I know there were
17  other issues going on. I do know that that was the
18  project that I understand that started the attempts to
19  make sure and understand the transfers or better
20  understand the transfers from 25005 to 12601.
21      MR. GREENSTEIN: Q. Okay. So it is not your
22  opinion that the -- that the unapplied cash project that
23  began in approximately October 2002 was only focused on
24  the transfers from 25005 to 12601 in the second quarter
25  of '01; correct?

O'Bryan, John Duross - Confidential 7/12/2007 9:29:00 AM

**69**

1 MR. GLENNON: Objection; vague and ambiguous.
2 THE WITNESS: Well, I think that was the
3 primary objective of the exercise. Whether or not there
4 were other components to it or someone else had to do
5 something during that time frame, I don't know, I wasn't
6 there.
7 MR. GREENSTEIN: Q. But you looked at all the
8 evidence in this case that you relied on in your report?
9 A. I have, yes.
10 Q. How did you get an understanding what happened
11 during that unapplied cash project?
12 A. Based on my review in the depositions and also
13 seeing some of the work that was generated from that.
14 Q. When you say the work generated from that,
15 what do you mean?
16 MR. GLENNON: Objection; vague and ambiguous.
17 THE WITNESS: If you look at -- there is a
18 summarized document that really looks at the cash -- the
19 transfers from 25005 into 12601 that was summarized over
20 a long period of time, and where some of the outcome of
21 that project, where that went. There is a summary page
22 that I've referred to in my report and also relied on.
23 MR. GREENSTEIN: Q. And your opinion is that
24 $20.1 million in unapplied cash from 25005 was
25 transferred to 12601 in connection with the second

**70**

1 quarter in fiscal year '01; correct?
2 A. In connection with?
3 MR. GLENNON: Objection; vague and ambiguous.
4 THE WITNESS: I don't know what you mean, in
5 connection with.
6 MR. GREENSTEIN: Q. You say you relied on a
7 document that kind of summarizes the outcome of the 2002
8 unapplied cash project; correct?
9 A. Correct.
10 Q. What was the total amount transferred from
11 25005 to 12601 during the second quarter?
12 A. I think approximately $20 million.
13 Q. That's reflected in your report; right?
14 A. Correct.
15 Q. And I think you said that Oracle learned of
16 these transfers around that time, 2002; correct?
17 MR. GLENNON: Objection; vague and ambiguous,
18 mischaracterizes the testimony.
19 THE WITNESS: I think that Oracle was in the
20 process of investigating the allegations made on the
21 debit memos, and that sometime during that process they
22 understood -- they came to find out there may have been
23 transfers between 25005 and 12601. And that then
24 started a project, which is the unapplied cash project,
25 which started in about October of '02.

**71**

1 MR. GREENSTEIN: Q. It was the result of
2 plaintiffs filing their complaint in October 2002;
3 correct?
4 MR. GLENNON: Objection; mischaracterizes the
5 testimony, calls for speculation.
6 THE WITNESS: I don't know if that is the
7 genesis of it, or if -- I have no idea.
8 MR. GREENSTEIN: Q. But you mentioned
9 allegations regarding the debit memos; correct?
10 A. That's correct.
11 Q. So is it your -- strike that.
12 So are you testifying that Oracle learned of
13 these transfers from 25005 to 12601 in connection with
14 the investigation of the debit memo allegation?
15 MR. GLENNON: Objection; vague and ambiguous.
16 THE WITNESS: I don't know exactly how they
17 found out. My understanding is that it was part of that
18 process. But there could have been other reasons they
19 found out about it and investigated it.
20 I don't know exactly how they found out. My
21 assumption it had to do with part of the investigation
22 into the debit memos.
23 MR. GREENSTEIN: Q. Okay. Looking at what's
24 been marked as Exhibit 4, the transaction register for
25 November 17th, 2000.

**72**

1 A. Yes.
2 Q. If you look at the last page, appears to have
3 a total of $692,415,514.97. Do you see that?
4 A. I do, yes.
5 Q. And what does that mean to you?
6 MR. GLENNON: Objection; vague and ambiguous.
7 The document speaks for itself.
8 THE WITNESS: What does this mean to me?
9 MR. GREENSTEIN: Q. You said of this
10 document, saying that this -- for the, quote, "purpose
11 of understanding the total impact of the November 17th,
12 2000 accounting entries"; right?
13 A. Yes.
14 Q. So how does this document help you make that
15 determination?
16 MR. GLENNON: Objection; vague and ambiguous.
17 THE WITNESS: This just tells me the total
18 population of $692 million. There was allegations in
19 the revised complaint that went about a process of
20 trying to extrapolate based on some script outputs of
21 some 926 that alleged that potentially in excess of $228
22 million was erroneously booked into revenue because of
23 the debit memos. I found some of that -- those
24 calculations by the statistical individual -- I can't
25 think of his name, Mr. Laurentius or something like

73

1   that.
2       MR. GREENSTEIN: Q. Marais.
3     A. Marais?
4     Q. Yes. Laurentius, I think it is.
5     A. Thank you. -- rather interesting. Because,
6   the fact is, we've been able to quantify this and it is
7   $692 million.
8       So this just starts out to say that was the
9   amount of the debit memos run on November 17th or on or
10   around November 17th for a total amount of $692 million.
11     Q. So does this document show you what the
12   financial impact of the debit memos are on Oracle's
13   financial statements?
14     MR. GLENNON: Objection; vague.
15     THE WITNESS: No.
16     MR. GREENSTEIN: Q. It doesn't?
17     A. No.
18     Q. Why is that?
19     MR. GLENNON: Same objection.
20     THE WITNESS: Because it just totals up to
21   $692 million.
22     MR. GREENSTEIN: Okay. Put that aside. I'm
23   going to mark this as No. 5.
24       (Exhibit 5 marked for
25         identification.)

74

1     MR. GREENSTEIN: For the record this, is a
2   document Bates stamped NDCA-ORCL 050356 through 360.
3   And it is entitled, "Account Analysis Report."
4       So, have you seen this document before?
5     A. I have, yes.
6     Q. And if you turn to page 7 of your rebuttal
7   report for me.
8     A. 7 of rebuttal now?
9     Q. Yeah.
10     A. I'm there.
11     Q. Okay. And you see that this document is cited
12   in footnote 20; correct?
13     A. That's correct.
14     Q. And I'm going to refer you to this sentence
15   that precedes footnote 20, it says, "Furthermore, the
16   account analysis report with payables detail illustrates
17   that the entire $692 million was both debited and
18   credited to the same account on November 17th, 2000."
19   Do you see that?
20     A. I do.
21     Q. You refer to this document that's been marked
22   as Exhibit 5; correct?
23     MR. GLENNON: Objection; vague and ambiguous.
24     THE WITNESS: I'm referring to Exhibit 5, yes.
25     MR. GREENSTEIN: Q. Okay. Now, what does

75

1   this document purport to be?
2     MR. GLENNON: Same objection.
3     THE WITNESS: This document is an account
4   analysis report, which basically looks at, again,
5   accounts, specifically in this case 25005 account. And
6   it gives a summary of transactions that went on through
7   that for a period of time.
8     MR. GREENSTEIN: Q. Okay. And you say that
9   this document, quote, "illustrates that the entire $692
10   million was both debited and credited to the same
11   account on November 17th, 2000." Do you see that?
12     A. That's correct.
13     Q. Where in this document does it reflect that
14   the entire $692 million was both debited and credited to
15   the same account on November 17th, 2000?
16     A. On 050357.
17     Q. Okay. You're referring to the line where it
18   has a debit of approximately $692 million and a credit
19   of $692 million; right?
20     A. Yeah.
21     Q. If you look at the report cited on page 7 of
22   your rebuttal, it says, "The Account Analysis Report
23   with Payables Detail." Do you see that?
24     A. Right.
25     Q. If you look at this document it just says,

76

1   "Account Analysis Report." It doesn't say, "With
2   Payables Detail."
3     A. Well, if you look down in the batch name, see
4   where it says payables?
5     Q. I'm sorry, where?
6     A. If you look down -- in all the pages, the
7   first two pages, and really throughout the document, if
8   you look, you will see where there is actually payables
9   detail as well. This is just what's going on in the
10   25005 account.
11     Q. Okay.
12     A. And there is payable issues with respect to
13   that. Payables is probably a refund.
14     Q. Okay.
15     A. So that's where we're talking about payables
16   detail there. You see that referenced to the right of
17   batch name on 050356.
18     Q. Okay. So, but in your report it says the
19   account analysis report with payables detail.
20       Now, are you aware of a specific report that's
21   called the account analysis report with payables detail?
22     A. I'm not suggesting that's the name of the
23   report. I'm just saying it has payables detail on it,
24   which you can see under batch name.
25     Q. And I'm asking, do you have an understanding

77

1  there is another report called account analysis report
2  with payables detail that's different than this?
3      MR. GLENNON: Objection; incomplete
4  hypothetical, assumes facts not in evidence.
5      THE WITNESS: I've never seen such a report
6  like that.
7      MR. GREENSTEIN: Q. So you're saying this is
8  an account analysis report that has payables detail in
9  it?
10     A. Correct.
11     Q. Okay. So, again, how does this document
12  illustrate -- this is from your report, you say, "It
13  illustrates the entire $692 million is both debited and
14  credited to the same account on November 17th."
15     MR. GLENNON: Objection as to form.
16     THE WITNESS: If you refer back to Exhibit 4,
17  which is the transaction register, which in my opinion
18  is the summary of the debit memos run on or about
19  November 17th, you will see a number $692,415,514.97.
20  That exact same number is on Exhibit 5, and it shows in
21  this account as being both a debit and credit in the
22  account. Debit memo, it is about ten lines up from the
23  bottom, it is the exact same number. It is both a debit
24  and a credit, which would mean it has zero financial
25  statement impact.

78

1      Q. Okay. If you turn to page 12 in your opening
2  report, which is Exhibit 1.
3      A. I'm there.
4      Q. You see how there is some T accounts and
5  there's three steps, debits and credits?
6      A. Pretty good, T accounts.
7      Q. They are.
8      So, your opinion in your opening report is
9  that there were three offsetting debits and credits to
10  account 25005 on or around November 17; right?
11     A. Correct.
12     Q. If you look at the document that's Exhibit 5,
13  the account analysis report, you see there appears to be
14  one debit and one credit on November 17th reflecting
15  $692 million; do you see that?
16     A. I do.
17     Q. And if you look at page 7 of your rebuttal
18  report.
19     A. Page 7.
20     Q. 7 of your rebuttal. You're on it. And you
21  say, "The account analysis report with payables detail
22  illustrates that the entire $692 million was both
23  debited and credited to the same account, November
24  17th." Do you see that?
25     A. I do.

79

1      Q. Okay, so, where in this document does it show
2  that there were three offsetting debits and credits to
3  account 25005 of $692 million?
4      A. Well, in two places. With respect to the
5  debit memos, it is on page 050537. That is showing the
6  debit memos going in and out. Then the total impact,
7  25005, is on the very last page, excuse me, the second
8  to the last page, 050358. And if you look there is
9  about $2.06 billion. If you multiply the 692 times 3,
10  that's the number you will get approximately.
11     Q. I'm sorry, what page are you looking at?
12     A. 050358.
13     Q. And you're looking at what number?
14     A. Just look at the biggest number, $2 billion.
15     Q. There's two numbers there, $2.923 billion in
16  debits and $2.826 billion on credits.
17     A. Yeah.
18     Q. Do you see that?
19     A. If you add those two together, the bottom
20  ones, it is about the same number. I think that's where
21  the three kind of were accumulated.
22     Q. Okay. But this document only shows one debit
23  and one credit to account 25005 in the amount of $692
24  million; right?
25     MR. GLENNON: Objection; foundation. The

80

1  document speaks for itself. Vague and ambiguous.
2      THE WITNESS: The document -- this document
3  shows that in that account, for debit memos, just debit
4  memos, there was $692 million going through as a debit
5  and credit. That's on page 2.
6      MR. GREENSTEIN: Q. Right.
7      A. And that's exactly what was debited and
8  credited to the account.
9      Q. So turning you back to page 12 of your opening
10  report, the T accounts.
11     A. Yes.
12     Q. You see how it has three steps, and there is a
13  debit and credit to 25005. Do you see that?
14     A. I do.
15     Q. You cite the testimony of Greg Myers for those
16  opinions; correct?
17     A. Correct.
18     Q. So what I'm asking is where in this document
19  does it show that there were three debits and credits to
20  25005?
21     A. The other would net out. But as I said, I
22  think I looked at this a little bit, just to kind of
23  think about that same issue. On 050358, the
24  miscellaneous receipts, or receivables, miscellaneous
25  receipts under -- second one down, $2.063 billion. So I

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

81

1 think that's where it actually gets -- all three are
2 shown in summary.
3 But the bottom line is, that it was -- the
4 debit memos went in and went out of the same account for
5 the same amount.
6 Q. And you're saying -- on page 12 you say it
7 went in and out of the same account three times;
8 correct?
9 A. Right.
10 Q. And I'm asking you where on this document does
11 it indicate that that occurred?
12 MR. GLENNON: Objection; vague and ambiguous,
13 asked and answered.
14 THE WITNESS: Yeah, I think I've answered
15 that. It is on page 2, which is the 692, okay.
16 MR. GREENSTEIN: Q. Um-hum.
17 A. That's the sum of the debit memos, the sum net
18 effect of the debit memos, $692 million, which is
19 basically summarized as well on Exhibit 4.
20 Then if you wanted to try and summarize all
21 three, I think that's a component within 050358, which
22 is simply multiply those three by three and seeing that
23 number of about $2.063 billion.
24 Q. But this report reflects all the debits and
25 credits going in and out of 25005 for this time period?

82

1 A. Correct.
2 MR. GLENNON: Objection; lack of foundation.
3 MR. GREENSTEIN: Q. So you look at page 2 of
4 this document, it shows one debit of $692 million and
5 one credit. Do you see that?
6 A. That's the one summarized amount that's been
7 summarized.
8 Q. It's been summarized?
9 A. Right.
10 Q. So each of these numbers is a summary of --
11 I'm not sure I understand.
12 MR. GLENNON: Objection; vague and ambiguous.
13 THE WITNESS: That's the summary of Exhibit 4.
14 That was the debit memos run that put them into 25005 so
15 that they can then change the flag.
16 MR. GREENSTEIN: Q. What I'm asking is, this
17 report reflects all movements, or all debits and credits
18 in and out of 25005 for this time period, November 2000;
19 correct?
20 MR. GLENNON: Objection; lack of foundation.
21 THE WITNESS: You mean -- what document are
22 you talking about?
23 MR. GREENSTEIN: Q. Exhibit 5.
24 A. Well, I don't know exactly what period -- this
25 says period October '00 to December '00.

83

1 Q. But you said -- this is a document cited in
2 footnote 20 of your rebuttal report; right?
3 A. Correct.
4 Q. And you said that this report illustrates that
5 the entire 692 million was both debited and credited to
6 the same account; right?
7 A. That's correct. And it is on page 2.
8 Q. Now, on page 12 of your opening report you say
9 there are three debits and credits to 25005 that occur
10 on that date; right?
11 A. What I'm saying --
12 MR. GLENNON: Let me assert an objection.
13 Vague and ambiguous.
14 THE WITNESS: What I'm saying is that the
15 accounting process took three different steps, changing
16 from on-account to unapplied, going -- then issuing a
17 debit memo, which is transaction number two, or step two
18 of it, then applying those, then just changing the flag
19 back.
20 So the debit memos recorded in 25005 are step
21 two, and that shows -- the other ones are just changing
22 a flag.
23 MR. GREENSTEIN: Q. So, when you look at each
24 of these three T accounts, it says 25005; right?
25 A. Right.

84

1 Q. And there is a debit and a credit; correct?
2 A. Correct.
3 Q. And there's three debits and credits, or two
4 for each step; correct?
5 A. Correct.
6 MR. GLENNON: Object; vague and ambiguous.
7 MR. GREENSTEIN: Q. And I'm asking you where
8 that's reflected on this account analysis report, which
9 you said purports to show all the debits and credits
10 that occurred in 25005 during November 2000.
11 MR. GLENNON: Objection; mischaracterizes the
12 testimony. It's been asked and answered.
13 THE WITNESS: Yeah, I think it is on page 2,
14 which is the $692 million.
15 MR. GREENSTEIN: Q. That's one debit and
16 credit; right?
17 A. Right.
18 Q. Where are the other two?
19 A. Twofold. One, it is just a changing of the
20 flag is the first and the third step. And, two, I
21 believe that on page 05035 -- 60 -- excuse me, 050358,
22 you'll see a total of $2.063 billion. I think that has
23 something to do with all three of them summarized.
24 Q. Is it your expert opinion that that is the
25 three summarized?

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

85

1      MR. GLENNON:  Objection; vague and ambiguous,
2  lack of foundation.
3      THE WITNESS:  I haven't really researched it
4  in detail.  It is irrelevant.  $692 million went in and
5  $692 million came out.  That's the net impact.
6      MR. GREENSTEIN:  Q.  And I'm just wondering if
7  you can point me to somewhere on this document that
8  shows the three debits and credits to 25005 that you
9  conclude occurred on page 12 of your opening report.
10      MR. GLENNON:  Objection; vague and ambiguous,
11  asked and answered.
12      THE WITNESS:  Well, I'm not so sure you would
13  see it on there, because it was just a changing of the
14  flag, which wouldn't necessarily be reflected.  It may
15  be, as I mentioned, in the 050358, if that's where it is
16  completely summarized, which I think it might be.  I
17  haven't done that analysis.
18      Page 2 tells you exactly the total number of
19  debit memos that were run, and then used to apply and
20  change the flag.  That's the monetary impact to 25005.
21  The others are simply a changing of flags.
22      MR. GREENSTEIN:  Q.  Right.  But I'm asking if
23  your testimony is that there were three different debits
24  and credits to 25005 during November 2000?
25     A.  As summarized on page 12 of my initial report,

86

1  that's correct.
2     Q.  And those T accounts, your support for that is
3  the deposition of Greg Myers; correct?
4     A.  That is correct.  Well, yes, that's correct.
5  Plus I've seen these entries on output.
6     Q.  But -- besides script output, did you see
7  these three entries on any other document?
8      MR. GLENNON:  Objection; vague and ambiguous.
9      THE WITNESS:  A summary of those three
10  transactions?
11      MR. GREENSTEIN:  Q.  I'm talking about on
12  page 12 you indicate there are three offsetting debits
13  and credits to 25005; correct?
14     A.  That's correct.
15     Q.  And you cite Greg Myers' testimony for that;
16  right?
17     A.  That's one of the issues I cite, yes.
18     Q.  That's the only thing you cite on page 12;
19  correct?
20     A.  I've seen other things to tell me those
21  transactions occurred.
22     Q.  What other things have you seen?
23     A.  The script output.
24     Q.  Is that it?
25      MR. GLENNON:  Objection; vague and ambiguous.

87

1      THE WITNESS:  Also Mr. Williams testifies, on
2  page 13 of my report it says, "I knew that when they
3  processed those debit memos one of the first things that
4  Greg Myers told me is they booked equal and offsetting
5  debit and credit through 25005.  So by definition it did
6  not affect the balance sheet and could not have affected
7  the income statement."  So Williams also talks about it
8  as well.
9      MR. GREENSTEIN:  Q.  And it says Greg Myers
10  told him that, right?
11     A.  Yes.  But that's another individual that
12  understands it that way.
13      So, I don't remember if there is other
14  testimony people have talked about specifically those
15  offsetting.
16     Q.  I'm asking you besides Greg Myers' testimony,
17  besides Tom Williams' testimony based on what Greg Myers
18  told him, and besides the script output, is there any
19  document that reflects three offsetting debits and
20  credits to 25005 during this time?
21     A.  As I recall, the SEC presentation there was
22  also a discussion of the transactions.
23     Q.  Okay.  And that reflected three offsetting
24  debits and credits to 25005?
25     A.  I don't recall the specifics.  But I know it

88

1  talked about the process.  I don't remember if it said
2  three offsetting.
3     Q.  Okay.  Are there any internal Oracle documents
4  that reflect that that actually occurred in the general
5  ledger?
6      MR. GLENNON:  Objection; vague and ambiguous.
7      THE WITNESS:  Yes.
8      MR. GREENSTEIN:  Q.  What documents are those?
9     A.  Exhibit 4.  Exhibit 5.
10     Q.  But there's only one debit and credit on there
11  for 692?
12     A.  That was the sum effect of the debit memo,
13  $692 million.  That's what went into 25005 and was used
14  then to apply the unapplied and change the flag.
15     Q.  Okay.  But you don't see three offsetting
16  debits and credits to this account for $692 million; do
17  you?
18      MR. GLENNON:  Objection; vague and ambiguous,
19  lack of foundation.
20      THE WITNESS:  As I said, it may be part of
21  that last entry on that last page.
22      MR. GREENSTEIN:  Q.  It may be?
23     A.  I haven't done that, the math.  I think it is,
24  but I haven't done that.
25      But you wouldn't necessarily see that, because

89

1   it is the net effect of the credit memos, as I've said
2   before, which is the second entry is booking the debit
3   memo to then use to change the flag.
4        MR. GREENSTEIN: Okay. I'd like to mark this
5   as No. 6, please.
6        (Exhibit 6 marked for
7        identification.)
8   VIDEOGRAPHER: This marks the end of tape one,
9   Volume I, in the deposition of J. Duross O'Bryan at
10  11:49. Going off the record.
11       (Recess, 11:41 a.m. - 11:54 a.m.)
12  VIDEOGRAPHER: On record at 11:54. This marks
13  the beginning of tape two in Volume I in the deposition
14  of J. Duross O'Bryan.
15  MR. GREENSTEIN: Q. Mr. O'Bryan, referring
16  you to page 21 of your report under "Review of Summary
17  Reports," in the second full paragraph under the heading
18  A, it says, "I also reviewed a sales journal by GL
19  account report which listed all revenue recorded in the
20  general ledger in November 17th, 2000." Do you see
21  that?
22       A. I do, yes.
23       Q. And I just marked what as Exhibit 6, for the
24  record is NDCA-ORCL 048989 through 049207.
25       And it is a Sales Journal by GL Account

90

1   Report, GL date November 17th, 2000.
2        Mr. O'Bryan, have you seen this document
3   before?
4        A. I have, yes. It is referred to in footnote 21
5   of my report, page 7.
6        Q. Of your rebuttal report?
7        A. Yes.
8        Q. And so in your rebuttal report on page 7 you
9   say, "The sales journal by GL account report establishes
10  that Oracle only recognized approximately $10 million on
11  November 17th, 2000." Correct?
12       A. Correct.
13       Q. And you got that -- how did you come to that
14  number?
15  MR. GLENNON: Objection; vague and ambiguous.
16  THE WITNESS: Just go to the very last page.
17  MR. GREENSTEIN: Q. So, you're referring to
18  the last page where it has a total of $10,111,399.34?
19       A. Right.
20       Q. What does that number represent?
21       A. Revenue booked on that day by Oracle.
22       Q. Okay. You didn't do any other calculation to
23  support that number, it is just what is reflected on
24  this document; right?
25  MR. GLENNON: Objection; vague and ambiguous.

91

1   THE WITNESS: I don't understand the question.
2   MR. GREENSTEIN: Q. In other words, you
3   didn't do any calculations as to how much revenue was
4   actually booked at Oracle on that day; did you?
5        MR. GLENNON: Same objection.
6        THE WITNESS: This is the amount of revenue
7   booked on that day by Oracle.
8        MR. GREENSTEIN: Q. Okay.
9        A. Speaking of calculations as well, I was
10  thinking about the three entries that we talked about a
11  moment ago on Exhibit --
12  MR. GREENSTEIN: Q. 5?
13       A. 5. And so what I want to do at the break was
14  see if I could do the math really quick and show to you
15  all three entries on this.
16       And as I thought and mentioned, it is, in
17  fact, on page 050358. And the way you do the math is if
18  you take the first $692 million of debit memos, which I
19  talked about is the important piece of it, is on page
20  050357. Then if you go to 05036 -- excuse me, 58, you
21  will see $2.063 billion and $2.095 billion. The other
22  two transactions, step 1 and step 3 are in that, which
23  would then total $1,384,000,000. So simply take step 1
24  and step 3 of page 12 of my report, and then the
25  difference between that and the $2.063 billion would

92

1   simply be the cash that was recognized during the month
2   of November. And as you know, all cash goes through
3   25005.
4        And you can prove that by looking on page
5   050356 for October. You will see they brought in during
6   that month $597 million. And then if you go as well on
7   page 050360, you will see -- that's December, you will
8   see they brought in $662 million, or $635 million.
9        So the November piece is simply the plug that
10  would get you to 2.063. So I just proved the math to
11  myself based on your earlier questioning.
12       Q. Do you have any other support for that
13  calculation, any document?
14  MR. GLENNON: Objection; vague and ambiguous.
15  THE WITNESS: I have this document here. You
16  can add it up if you like. I just did the math here, is
17  my point.
18  MR. GREENSTEIN: Q. But on 050357, it only
19  shows one debit and credit to 25005; right?
20       A. That's step number two, the actual formation
21  of the debit credit -- debit memo.
22       As I told you earlier, I thought it was in
23  05036 -- or 58, and that's, in fact, where it is. The
24  other step 1 and step 3.
25       Q. But on the face of this document, there aren't

93

1  three separate debits and credits to account 25005 in
2  the amount of $692 million?
3       MR. GLENNON: Objection; vague and ambiguous.
4       THE WITNESS: There are.
5       MR. GREENSTEIN: Q. Where?
6   A. On page --
7   Q. I'm asking if you can show me three separate
8  debits and credits to account 25005 in the amount of
9  $692 million?
10  A. Yes.
11  Q. Okay, where?
12  A. On page 050537 is one.
13  Q. That's one.
14  A. And then on page 050358, those 692 are a part
15  of the $2.063 billion.
16  Q. Where does it say 692 on that page?
17  A. It won't say. It is a combined entry. And
18  the combination is entry one for 692, entry two for 692,
19  which comes to $1.384 billion, then the difference is
20  the cash that was received during the month of November,
21  which was both applied to -- in and out of 25005 to
22  either applied or to some other account.
23  Q. Okay.
24  A. So, anyway, I thought you might want to know
25  that I did do that math.

94

1   Q. Thank you.
2   A. You're welcome.
3   Q. Back to the document that's been marked as
4  Exhibit 6.
5   A. Yes.
6   Q. And that's the sales journal by GL account
7  report that your opinion is that that reflects $10
8  million approximately in revenue booked by Oracle on
9  that date; correct?
10  A. That is correct.
11  Q. And what is the date of this document?
12  A. Well, it looks like it was run November the
13  5th, 2002. But GL date, November 17th.
14  Q. So this report was run on November 5th, 2002;
15  right?
16       MR. GLENNON: Objection; calls for
17  speculation, lacks foundation.
18       THE WITNESS: I don't know when it was run.
19  I'm just saying it says report date. But what you have
20  to look at is the GL date, which is November 17th.
21       MR. GREENSTEIN: Mark the next as No. 7,
22  please.
23       (Exhibit 7 marked for
24        identification.)
25       MR. GREENSTEIN: Q. For the record, this is

95

1  NDCA-ORCL 971461 through 971507. It says, "Presentation
2  to the SEC Staff On Behalf Of Oracle Corporation," dated
3  October 29th, 2003. Have you ever seen this before?
4   A. I have, yes.
5   Q. If you turn to page 31, which is NDCA-ORCL
6  971491, it has a slide that says, "Revenue By Day For 2Q
7  2001."
8       By the way, for the record, when I refer to
9  2Q, or 2Q '01, what I mean is Oracle's fiscal 2Q '01.
10  Do you understand that?
11       MR. GLENNON: Objection; are you trying to
12  define a term?
13       MR. GREENSTEIN: Yeah.
14       MR. GLENNON: What term are you trying to
15  define, and with which defined term?
16       MR. GREENSTEIN: When I am talking about
17  Oracle's second quarter fiscal year 2001, I'm going to
18  refer to it as 2Q '01.
19  Q. Is that okay with you?
20       MR. GLENNON: Do you understand? He's saying
21  if he says the phrase 2Q '01, he's referring to second
22  quarter of fiscal year 2001.
23       THE WITNESS: Yes, I understand. I'm sorry, I
24  wasn't listening.
25       MR. GREENSTEIN: Q. Oracle is not on a

96

1  calendar year, they are on a fiscal year.
2   A. That's correct.
3   Q. So if you look at page 31, which is SEC
4  presentation. And have you ever looked at this slide
5  before?
6   A. I have, yes.
7   Q. And if you look at 11/17/00?
8   A. Yes, I'm there.
9   Q. And it appears that total revenue, it says
10  $9,354,677.48; correct?
11  A. That's correct.
12  Q. And if you look back at the previous document
13  we looked at, I think you testified that the total
14  amount of revenue booked by Oracle in 2Q '01 was $10.1
15  million approximately; correct?
16  A. That's correct.
17  Q. Okay. Can you explain why this document is
18  inconsistent with Exhibit 6?
19  A. I don't know the exact reconciliation, I've
20  never done that. But I certainly understand that this
21  was a report run in November of '02, it looks like. And
22  potentially there were additional adjustments that may
23  have passed through that, $800,000, which is completely
24  immaterial to Oracle. So why it changes, I don't know.
25  But I did notice that.

97

1    Q.  Okay, so let me see if I understand this
2  correctly.
3        So you're saying that in November 2002 or
4  after November 2002 when that sales report was run,
5  there may have been adjustments to Oracle's second
6  quarter results that were issued two years before?
7        MR. GLENNON:  Objection; mischaracterizes the
8  testimony, lack of foundation.
9        THE WITNESS:  No, I'm not saying that at all.
10       MR. GREENSTEIN:  Q.  I'm just trying to
11  understand the inconsistency between page 31 of
12  Exhibit 6 and the total on Exhibit 5.
13       A.  I don't, as I said, I don't know what the
14  difference is made up of.  I don't know the source of
15  971491.  I don't know where that information came from,
16  nor do I know what document was used, if it was even the
17  same run that was used in Exhibit 6.
18       I can understand why there might be
19  differences, was my point.  But I don't know what they
20  are, and I don't know what the reconciliation of that
21  $800,000 is.
22       Q.  But Oracle's second quarter '01 ended on
23  November 30th; correct?
24       A.  Correct.
25       Q.  So as an auditor, when would -- when would

98

1  somebody make an adjustment two years later to its
2  revenue numbers, such that this would occur?
3        MR. GLENNON:  Objection; lack of foundation,
4  vague and ambiguous, incomplete hypothetical.
5        THE WITNESS:  Well, this could have been a
6  report that was run at the time for 11/17, and there
7  could have been what are called topside adjustments,
8  meaning that someone decided that there was an $800,000
9  reduction in revenue that was appropriate for that day
10  because of subsequent information.
11       So topside adjustments could have very easily
12  been made off of that GL run to that summarized run.
13  There is a lot of reasons it could happen.  I don't know
14  what they are, but there is a lot of accounting reasons
15  that could occur.
16       MR. GREENSTEIN:  Q.  In your opinion, what was
17  the amount of revenue booked at Oracle on November 17th,
18  2000?
19       A.  The document I relied to, I chose the larger
20  of the two just to be conservative.  This shows 10.1.
21  This is actually a lower amount.  I chose to be
22  conservative in my report, and used 10.1.
23       Q.  Do you know what Oracle's total revenue for 2Q
24  '01 was?
25       A.  It was $2.6 billion.

99

1    Q.  Do you know what amount it was for the U.S.?
2    A.  For the U.S.?  No, I didn't break out that
3  component.
4        MR. GREENSTEIN:  Mark this as No. 8.
5        (Exhibit 8 marked for
6          identification.)
7        MR. GREENSTEIN:  For the record, NDCA-ORCL
8  1895918 through 1895922, it is an August 26th, 2004
9  e-mail from Molly Littlefield to Greg Myers and Lilly
10  Hao, H-a-o.
11       Q.  Let me know when you're finished reviewing it.
12       A.  I'm there, thank you.
13       Q.  Have you seen this document before?
14       A.  I have, yes.
15       Q.  Did you rely on this document in either your
16  report or your rebuttal report?
17       A.  No.  Considered it; didn't rely on.
18       Q.  Page 2, 1895919.  In the middle of the page it
19  is an e-mail from Molly Littlefield to a number of
20  individuals dated August 4th, 2004.  Do you see that?
21       A.  I do.
22       Q.  And it says in the first sentence, "Debit
23  memos can be very tricky, especially all the ones
24  created on November 18th, 2000."  Do you see that?
25       A.  I do.

100

1    Q.  Is it your opinion the debit memos were run on
2  November 17th or November 18th, 2000?
3        MR. GLENNON:  Objection; asked and answered.
4        THE WITNESS:  I think I answered that.  I said
5  on or around November 17th.
6        MR. GREENSTEIN:  Q.  Okay.  So it could have
7  been on November 18th; right?
8        MR. GLENNON:  Objection; vague and ambiguous.
9        THE WITNESS:  The documentation I've seen says
10  11/17.  Whether it is the 17th or the 18th really
11  doesn't make a difference.
12       MR. GREENSTEIN:  Q.  But this document written
13  in 2004 says that it was -- they were created on
14  November 18th; right?
15       MR. GLENNON:  Objection; vague and ambiguous.
16  The document speaks for itself.
17       THE WITNESS:  Well, Molly Littlefield thinks
18  it was run on the 18th.  Whether or not she really knew
19  or whether or not she was in a position to know the
20  exact date, or she may have gotten the date wrong, who
21  knows.
22       MR. GREENSTEIN:  Q.  Do you know who Molly
23  Littlefield is?
24       A.  Yes.
25       Q.  Who is she?

101

1    A.  Collections individual within Oracle.
2    Q.  Do you know if she helped create the script
3  output?
4    A.  She did not.
5    Q.  She didn't?
6    A.  I don't believe so.
7    Q.  Who did?
8         MR. GLENNON:  Objection; vague and ambiguous.
9         THE WITNESS:  I think it is Sanjay Kumar.
10        MR. GREENSTEIN:  Q.  I'm sorry.  I said the
11  script output.  I want to make a distinction between the
12  script output and debit memo script, the SQL script.  Is
13  that what you're referring to?
14   A.  I was referring to the SQL.  You asked me
15  earlier, Kumar, and I just remembered who that was.
16   Q.  I'm asking if you know -- you know what the
17  script output is; right?
18   A.  Yes.
19   Q.  What is it?
20   A.  It was done as part of this litigation, as you
21  well know.  There was about 926 produced, and it really
22  gives a transaction summary for any of the accounts
23  typically -- well, to start with, 776, over $100,000
24  that had on-account flags.  And then it -- there was an
25  additional sample 150 chosen by plaintiffs at random.

102

1  They were below potentially 150.  So, I'm sorry, it is a
2  transaction history of those transactions through a
3  period of time.
4    Q.  So a transaction history of all the
5  transactions related to the 926 debit memos; correct?
6    A.  That's correct.
7    Q.  So do you know if Molly Littlefield was
8  involved in creating the script output?
9    A.  I don't know.
10   Q.  Do you know who created the script output?
11   A.  I thought it was a combination of the
12  accounting department and the IT department of Oracle.
13   Q.  Do you know any -- well, let's turn to page 18
14  of your report.
15   A.  Original or rebuttal?
16   Q.  Original.
17   A.  I'm there.
18   Q.  And you see section D it says, "Subset of
19  Debit Memos Ordered for Discovery Purposes."  Do you see
20  that?
21   A.  I do, yes.
22   Q.  Then in the last sentence of that page it
23  says, "This production included a script output which
24  was designed by Oracle's IT department to compile a
25  step-by-step audit trail for each transaction which

103

1  contained a debit memo using data from Oracle's
2  accounting system."  Do you see that?
3    A.  I do, yes.
4    Q.  And what -- and you cite to footnote 54;
5  correct?
6    A.  That's correct.
7    Q.  And that's the Myers' declaration?
8    A.  That's correct.
9    Q.  What other evidence, if any, did you consider
10  in making the statement that the script output was
11  designed by Oracle's IT department to compile a
12  step-by-step audit trail for each transaction which
13  contained a debit memo?
14        MR. GLENNON:  Objection; vague and ambiguous.
15        THE WITNESS:  Well, that was my understanding
16  of what the discovery was all about on the debit memos.
17  So, my understanding that that was what the court
18  ordered, that detail be given for those debit memos, and
19  that that was the byproduct of that, was the script
20  output.
21        MR. GREENSTEIN:  Q.  So other than what you --
22  other than what you cite here, which is the Myers
23  declaration, did you rely upon anything else in making
24  that statement?
25   A.  You know, other than my understanding of what

104

1  the discovery orders were with respect to the scripts.
2    Q.  Okay.  But what I'm asking is, what did you
3  consider or rely upon in stating that the script output
4  was designed by Oracle to be a step-by-step audit trail
5  for each of the 926 debit memos?
6         MR. GLENNON:  Objection; compound and asked
7  and answered.
8         THE WITNESS:  I referred to Mr. Myers'
9  declaration.  I referred to I think now what I
10  understand the discovery orders were, and plus it just
11  makes logical sense to me that, who else is going to
12  design the step-by-step audit trail but Oracle?  I mean,
13  they are the ones that understand the numbers.  So, no
14  one else is going to do that.
15        MR. GREENSTEIN:  Q.  Do you know who designed
16  the script output?
17        MR. GLENNON:  Objection; asked and answered.
18        THE WITNESS:  The individual?
19        MR. GREENSTEIN:  Q.  Right.
20   A.  I think I answered that.  I do not know.
21   Q.  And you rely on the script output in your
22  report; correct?
23   A.  I do, yes.
24   Q.  Okay.  Did you do any assessment to verify the
25  accuracy of the script output?

105

1    A.  No.  I mean, I saw -- as you well know in my
2  original report, my rebuttal report, we talk about $2
3  million, where we've gone and looked at source
4  documents.
5    And I've also looked at, as you saw in my
6  report, a sample of 60, where we actually got source
7  documents and tied them back.
8    So I have seen support for those, yes.  But I
9  didn't go back and audit all 926.
10    Q.  Right.  So of the 926, you've looked at source
11  documentation for 60 of them; right?
12    A.  Just with respect to the three transactions,
13  the 11/17 debit memos.
14    Q.  There are 46,000 plus 11/17 debit memos;
15  correct?
16    A.  That's correct.
17    Q.  And out of that -- well, how many of those
18  debit memos did you look at in connection with your
19  reports?
20    MR. GLENNON:  Objection; vague and ambiguous.
21    THE WITNESS:  I looked at each and every one
22  of the 926.  And then I took a subset of the 926, 60, to
23  go back and see the individual debit memos to see that
24  they tied.
25    MR. GREENSTEIN:  Q.  So you looked at -- so in

106

1  looking at the 926, did you look at the source documents
2  for all 926?
3    A.  No.  60.
4    Q.  Sixty.  So, setting aside the 60 you looked at
5  the source documents for, the other debit memos of the
6  926 you relied on the script output for that
7  information; right?
8    MR. GLENNON:  Objection; vague and ambiguous,
9  lack of foundation.
10    THE WITNESS:  I looked at the script and saw
11  that there were three offsetting entries on 11/17/2000.
12    MR. GREENSTEIN:  Q.  Is that all you looked at
13  for those 926?
14    A.  No.  Some of them there has been allegations
15  about refunds, allegations about the failure to refund,
16  there's been allegations about royalties.  I looked at
17  those in a number different ways.
18    But my purpose for the original complaint or
19  the revised second amended complaint had to do with just
20  the debit memos.
21    So my first step in the 926 was to see that
22  all three of those transactions were offsetting in each
23  one of those 926.
24    Q.  Okay.  So, for the 926, you relied upon the
25  script output; correct?

107

1    MR. GLENNON:  Objection; vague and ambiguous.
2    THE WITNESS:  I relied on the script output,
3  plus I took 60 of those and tied them back to source
4  documents.
5    MR. GREENSTEIN:  Q.  So of the 46,000 debit
6  memos, you looked at source documents for 60 of them;
7  correct?
8    MR. GLENNON:  Objection; vague and ambiguous,
9  lack of foundation.
10    THE WITNESS:  As it relates to the debit
11  memos, that's correct.
12    MR. GREENSTEIN:  Q.  So back to the script
13  output.  So, you didn't verify or test the script output
14  to determine whether it was accurately reflecting those
15  926 debit memos; did you?
16    MR. GLENNON:  Objection; vague and ambiguous.
17    THE WITNESS:  No.  I did.  I looked at each
18  one of the three entries on the 926 script outputs, and
19  I saw there were three corresponding entries into 25005,
20  in and out.
21    MR. GREENSTEIN:  Q.  What I'm saying, did you
22  do any sort of testing or verification that the data in
23  the script output was accurate?
24    MR. GLENNON:  Same objection; asked and
25  answered.

108

1    THE WITNESS:  Yeah, as I said, I took a
2  subset -- first of all, I'm going to move into an audit
3  perspective here, inquiry and observation is evidence
4  from an auditor's perspective.  So I put on an auditor's
5  hat in looking at that.  And observing there were three
6  offsetting entries into the 926 script outputs helped me
7  understand that those were three offsetting transactions
8  that occurred.  I then decided, using professional
9  skepticism, to then test 60 individually and see the
10  individual source documents.
11    MR. GREENSTEIN:  Q.  I understand.
12    A.  The actual debit memos.
13    Q.  Well, the script output has additional entries
14  other than the three offsetting entries to 25005;
15  correct?
16    A.  Absolutely.
17    Q.  So what I'm asking is, did you perform any
18  independent testing to verify the accuracy of all the
19  data that was contained in the script output?
20    MR. GLENNON:  Objection; asked and answered.
21    THE WITNESS:  No.
22    MR. GREENSTEIN:  Q.  Okay.  So to the extent
23  you rely upon the script output in your reports, you're
24  assuming that the data within that is accurate; right?
25    MR. GLENNON:  Objection; vague and ambiguous.

109

1        THE WITNESS: I'm assuming that the data
2 within what? I'm sorry.
3        MR. GREENSTEIN: Q. Within the script output.
4    A. I believe the script output is accurate.
5    Q. And what do you base that on?
6    A. Well, based on, A, my review of the three
7 transactions that we talked about, which had to do with
8 the only issue that I thought originally was in this
9 case at the time of my original report, which was the
10 debit memos, then I tested 60 separately.
11        And as I mentioned as part of the $2 million
12 that I believe were properly booked into revenue during
13 the second Q, we've also seen other supporting
14 documentation for that. But I have not gone back and
15 audited the 926 script outputs.
16    Q. That's fine. In performing your review of the
17 926 debit memos -- strike that.
18        So, did you do any review at all of the debit
19 memo -- the 45,000 plus debit memos that were not
20 provided in the script output?
21        MR. GLENNON: Objection; vague and ambiguous.
22        THE WITNESS: No.
23        MR. GREENSTEIN: Q. So your focus was on --
24    A. Other than seeing them on the overall debit
25 memo run, that 800 plus pages.

110

1    Q. Right. But you didn't look at -- you didn't
2 look at any of the 45,000 plus -- strike that.
3        So your review based on the script output and
4 individual debit memos was confined to the 926; correct?
5        MR. GLENNON: Objection; vague and ambiguous.
6        THE WITNESS: Would you repeat that?
7        MR. GREENSTEIN: Q. Your review of the debit
8 memos, the individual debit memos and the individual
9 transactions was confined to the 926 that appeared in
10 the script output; correct?
11        MR. GLENNON: Same objection.
12        THE WITNESS: That's correct.
13        MR. GREENSTEIN: Q. Okay. Do you know when
14 the script output was created?
15    A. I don't know the exact date.
16    Q. Okay. It was created for this litigation;
17 right?
18    A. That's my understanding, yes.
19    Q. Was the script output available on
20 November 17th?
21        MR. GLENNON: Objection; vague and ambiguous.
22        THE WITNESS: It certainly could have. All
23 the script output is, is a download of the accounting
24 information that's in the system. So, yes, that
25 information was available on 11/17.

111

1        MR. GREENSTEIN: Q. But the script output
2 wasn't available, obviously, on November 17th?
3    A. That exact document?
4    Q. Right.
5    A. No. That was created after that. But the
6 data that makes up the script output was all available
7 as of 11/17.
8    Q. And how do you know that?
9    A. Because it is just a core dump of the
10 accounting system. So it is -- it was there as of
11 11/17, it was there as of 11/15, 19, any day thereafter.
12    Q. What do you mean by core dump?
13    A. They just took the data and dumped it into an
14 SQL, which basically becomes a database and a spread
15 sheet. So all that information -- I'm sorry, repeat
16 your question.
17    Q. What is an SQL?
18    A. It is defined in my report. Structured Query
19 Language.
20    Q. And what does that mean?
21        MR. GLENNON: Objection; vague and ambiguous.
22        THE WITNESS: That was the software program,
23 that was the name of the software program designed by
24 Oracle's IT department to dump that information out of
25 the accounting records into script outputs.

112

1        MR. GREENSTEIN: Q. Just to be clear, are you
2 talking about the debit memo script that was run on or
3 around November 17th, or talking about the script output
4 that was created for this litigation?
5    A. I'm talking about the debit memo run that was
6 done on November 17th, 2000.
7    Q. So that's the core dump of data you're talking
8 about?
9    A. That was the creation of the three entries
10 that became the 11/17/2000 debit memos.
11    Q. Okay. So from now on I'm going to refer to
12 that as the debit memo script. Is that okay with you,
13 just so we can clarify that's not the script output?
14    A. That's confusing to me. I've already confused
15 it once before. Let's call one the debit memos on
16 11/17 -- call them what you want.
17    Q. I just want to make sure we're talking about
18 the SQL script. Would that be easier for you?
19        MR. GLENNON: I don't mean to be difficult,
20 but I would object to a definition as between the two,
21 because I do think there is a real potential for getting
22 confused on those two. So maybe you want to identify
23 them by dates?
24        MR. GREENSTEIN: Sure.
25    Q. Well, how would you want to define them? What

113

1  would be easiest for you?
2      A.  One would be the 11/17 --
3      Q.  Script?
4      A.  No.  11/17 debit memos, and the next would be
5  the script output.
6      Q.  So how about I just say the 11/17 script, and
7  then the script output.  Is that confusing to you?
8      A.  Yes, it is.  You can call it what you want,
9  but I may have to have you explain it ten times.
10      MR. GLENNON:  I may have to object.
11      THE WITNESS:  It is confusing to me, because
12  they are both script.  You say script in both of them.
13  I apologize.
14      MR. GREENSTEIN:  Q.  Okay.  So were you
15  involved in creating the script output?
16      MR. GLENNON:  Objection; vague and ambiguous.
17      THE WITNESS:  Was I personally?
18      MR. GREENSTEIN:  Q.  Right.
19      A.  No.
20      Q.  Was any one of your staff involved?
21      MR. GLENNON:  Objection; vague and ambiguous.
22      THE WITNESS:  And I'm sorry to do this, but by
23  script output, you mean the 926?
24      MR. GREENSTEIN:  Q.  How about the 926 script?
25      A.  There you go.

114

1      Q.  Okay.
2      A.  No.  No one within Alix Partners or anyone I
3  know of was involved in the development of that program
4  to dump that data.
5      Q.  Looking at the script for the 926 debit memos,
6  do you find any errors or inaccuracies in that?
7      A.  I thought I remembered seeing one issue I had
8  a question about.  But I don't recall as I sit here
9  right now having any significant problems with the
10  script output.
11      Q.  What issue are you referring to?
12      A.  I know that, for example, one of the debit
13  memos didn't show up on the overall run of 46,000 debit
14  memo projects.  The debit memo run, one didn't show up.
15  And I don't remember specifically any, as I said,
16  significant problems with the script.
17      Q.  And just so we're clear, I'm talking about the
18  script for the 926 debit memos?
19      A.  I'm sorry.  We got confused again.  For the
20  926, I don't remember -- I don't recall having any
21  problems with the accuracy of those reports.
22      Q.  So, for the November 17th debit memo script
23  that was created in November 2000, you said there was an
24  issue with one debit memo that didn't show up; correct?
25      MR. GLENNON:  Objection; mischaracterizes the

115

1  testimony.
2      THE WITNESS:  I thought, as I recall, possibly
3  one of the entries or something didn't show up on the
4  overall run.
5      MR. GREENSTEIN:  Q.  And what -- is there a
6  way to identify that debit memo?
7      A.  Yeah, I have that.  55041671.
8      Q.  I see you are looking at a report.  Are you
9  looking at a particular page?
10      A.  I'm looking at my report.  I have a note on
11  the side.
12      Q.  Do you know what customer that debit memo was
13  for?
14      A.  I don't.
15      Q.  How did you determine that debit memo didn't
16  appear?
17      A.  I think one of my team told me about that.  I
18  think Mr. Sheppard told me about that.
19      Q.  Do you know why it didn't appear on the
20  November 17th script?
21      A.  I don't recall where it was and where it
22  wasn't.  I just heard that may have been the only one
23  that maybe didn't have the three offsetting entries or
24  something like that.
25      Q.  What entries did it have?

116

1      A.  I don't recall.  It wasn't material enough.
2      Q.  You don't know what customer it was for?
3      A.  No.
4      Q.  How did you find it?
5      MR. GLENNON:  Objection; asked and answered.
6      THE WITNESS:  I think one of my team members
7  told me about that, Mr. Sheppard.
8      MR. GREENSTEIN:  Q.  Did he tell you anything
9  else --
10      A.  No.
11      Q.  -- about how he found it?
12      A.  No.  It doesn't surprise me.  Out of 46,000 --
13      MR. GLENNON:  Just put an objection to the
14  extent that the communications between Mr. Duross and
15  his team are protected under the stip.
16      MR. GREENSTEIN:  Okay.
17      THE WITNESS:  Sorry.
18      MR. GLENNON:  That's all right.
19      MR. GREENSTEIN:  Q.  What is your
20  understanding of what a debit memo is?
21      A.  Debit memo is something that would increase an
22  amount owed to a company because of a transaction.  It
23  could be a new invoice, could be an adjustment to an
24  invoice.  But it is an increase to an account
25  receivable, basically.

117

1    Q.   So were the 46,000 debit memos an increase to
2  the accounts receivable?
3         MR. GLENNON:  Objection; vague and ambiguous.
4         THE WITNESS:  No.  They were an increase and a
5  decrease to an account.
6         MR. GREENSTEIN:  Q.  So is that -- that's
7  inconsistent with what you believe to be the purpose of
8  a debit memo; correct?
9         MR. GLENNON:  Objection; vague and ambiguous.
10  Mischaracterizes the testimony.
11        THE WITNESS:  The debit memo was just a
12  process to clear a flag, that's it.  And because of
13  Oracle's accounting system, they had to create a debit
14  to relieve the on-account.  But there was no impact to
15  an individual account or to the overall financial
16  statements.  They were debits in and credits out.
17        MR. GREENSTEIN:  Q.  But the use of debit
18  memos on November 17th was different from the definition
19  that you described; correct?
20    A.   There can be a number -- I mean, I gave you
21  one definition.
22        Another definition would be to use it to clear
23  an on-account flag.
24        MR. GREENSTEIN:  Okay, let's mark this next,
25  9.

118

1              (Exhibit 9 marked for
2              identification.)
3         MR. GREENSTEIN:  For the record, this is
4  NDCA-ORCL 047279 through 048683.  It says, "Oracle
5  Receivables User's Guide."  This was previously marked
6  at Tom Williams' deposition as Exhibit 4.
7    Q.   Mr. O'Bryan, if you could turn your attention
8  to page 048665.
9    A.   I'm there.
10   Q.   You see it has a definition of debit memos?
11   A.   I see that.
12   Q.   Have you seen this document before?
13   A.   I have, yes.
14   Q.   And what is it?
15   A.   This is Oracle Receivables User's Guide, dated
16  March 1997, Volume I, Release 10SC.
17   Q.   Okay.  Did you rely on this document in
18  issuing your report?
19   A.   I certainly considered it.  I don't know that
20  I relied on it.
21   Q.   And the definition of debit memo there, it
22  says, "Debit that you assign to your customer for
23  additional charges that you want to collect."  Do you
24  see that?
25   A.   I do.

119

1    Q.   Is that your understanding what a debit memo
2  is?
3    A.   No.
4    Q.   That definition is inconsistent with what you
5  believe to -- what a debit memo is?
6    A.   There are many definitions of a debit memo as
7  I mentioned.  That certainly is one, which I think I
8  mentioned previously.  But there can be many definitions
9  of a debit memo.
10        Anything to do with increasing a receivable is
11  a debit memo.  Anything to do with increasing any asset
12  is a debit memo.
13   Q.   But that definition is not -- the definition
14  you just described is not in this document; is it?
15        MR. GLENNON:  Objection; vague and ambiguous.
16        THE WITNESS:  No, it doesn't say it.  You can
17  see what it says.
18        MR. GREENSTEIN:  Q.  If you turn to 048672,
19  you see the entry, it says, "On-account"?
20   A.   I do, yes.
21   Q.   And it says, "Payments where you intentionally
22  apply all or part of the payment amount to a customer
23  without reference to a debit item."  Do you see that?
24   A.   I do.
25   Q.   Is that consistent with what you believe to be

120

1  the meaning of on-account?
2    A.   Not the only meaning of on-account.  I mean,
3  we know on-account at Oracle meant something completely
4  different.
5    Q.   But this is Oracle's user's guide; correct?
6    A.   Well, this is a guide that's used in
7  receivables.  The collection department had something
8  completely different when they were thinking of
9  on-account.
10        On-account, because it said there in a
11  user's guide, does not restrict that's the only
12  definition a company can have to a debit memo or an
13  on-account.  It would morph into exactly what the
14  company is specifically using it for.  And the debit
15  memo was used to clear an on-account.  It is an
16  appropriate use of a debit memo.
17        An on-account at Oracle meant that it was a
18  receipt that had been dealt with.  It had been done,
19  dealt with, and accordingly applied to an invoice,
20  transferred into revenues, written off against bad debt,
21  whatever they did.  There were flags sitting, 46,000
22  that were sitting as of November 2000.
23   Q.   So you say on-account at Oracle meant it was a
24  reset that had been dealt with; right?
25   A.   That's correct.

121

1     Q. And as of November 17th, how many on-account
2 items were there at Oracle?
3     A. 46,881.
4     Q. So for all 46,000 of those, the receipt had
5 been dealt with; right?
6     A. That's correct.
7     Q. Okay. And what do you mean by dealt with?
8     MR. GLENNON: Objection; vague and ambiguous.
9     THE WITNESS: That typically the collection
10 department had previously applied that receipt to
11 something, whether it be a refund, whether it be a
12 royalty that they figured out needed to be booked,
13 whether it be to an invoice. It had been applied and it
14 was on-account. It was simply a flag, there was no cash
15 sitting there, it was just a flag.
16     MR. GREENSTEIN: Q. No cash sitting there.
17 So were there any -- of the 46,000 receipts, were any of
18 them customer overpayments?
19     A. No. They could have been at some point in
20 time. But as of the date they ran those debit memos,
21 those had all been cleared and put into some other
22 account.
23     Q. And what accounts could those receipts have
24 been put into?
25     MR. GLENNON: Objection; vague and ambiguous.

122

1     THE WITNESS: They could have gone into a
2 refund, they could have gone into royalties, they could
3 have gone into any income account. They could have gone
4 into accounts receivables, they could have gone against
5 a contra-account to an expense, to a tax rebate. They
6 could have gone to a number of different places. But
7 they had all been cleared and were just flagged sitting
8 there. There wasn't 46,000 amounts of cash sitting
9 there to apply to something.
10     MR. GREENSTEIN: Q. Were any of those 46,000
11 on-account items refunded as part of the 2002 cleanup?
12     A. They were, yes.
13     Q. Okay. How many? Do you know?
14     MR. GLENNON: Objection; vague and ambiguous,
15 lack of foundation.
16     THE WITNESS: I couldn't have an exact number
17 of that. As I referred to earlier, there is a summary
18 of that cleanup, what's called the unapplied or the
19 reserve process or the transfer to reserve process,
20 which was done in October, November of 2002.
21     And I have a page that summarizes it, it is
22 about $49 million. And it split into different buckets
23 as to when it hit, those 25005s went into the reserve.
24 And the timing is such that you can't specifically say
25 what was in the quarter. You can look for, I think it

123

1 is August of '00 through about December of '01. So you
2 don't get an exact match. So I can't tell you exactly
3 what was refunded out of those 46,881 debit memos.
4     MR. GREENSTEIN: Q. Of the 926 debit memos
5 that you reviewed, how many of those were refunded as
6 part of the 2002 cleanup?
7     MR. GLENNON: Objection; vague and ambiguous.
8     THE WITNESS: I don't know that number either.
9 I don't recall that number.
10     MR. GREENSTEIN: Q. But some of them were;
11 right?
12     A. Certainly.
13     Q. And why would they be refunded in 2002 if they
14 were sitting on-account as of November 17th, 2000?
15     MR. GLENNON: Objection; calls for
16 speculation, lack of foundation.
17     THE WITNESS: Because of the original transfer
18 that took place in, say, October or November of '00,
19 before the debit memos were run to clear the on-account,
20 if they had been put into the reserve account
21 inappropriately they would need to be fixed at some
22 point in time and some further research done.
23     MR. GREENSTEIN: Q. So the refunds reflect an
24 inappropriate transfer from 25005 to 12601; correct?
25     MR. GLENNON: Objection; mischaracterizes the

124

1 testimony, lack of foundation.
2     THE WITNESS: Way too broad of a question.
3 Sorry.
4     MR. GREENSTEIN: Q. What did you mean when
5 you said -- strike that.
6     So, if an on-account -- one of the on-account
7 items that were part of the debit memos transactions on
8 November 17th was refunded as part of the 2002 cleanup,
9 why was that?
10     MR. GLENNON: Objection; vague and ambiguous,
11 lack of foundation.
12     THE WITNESS: Because when the cash, the
13 unapplied cash was transferred into the 12601 account,
14 the 25005 account, into the 12601 account, which
15 happened for the most part in October/November of '00,
16 subsequent to that, at least six weeks later on the
17 October transfers, the debit memos were run to clear the
18 on-account.
19     So if, in fact, when those transfers were made
20 from 25005 to 12601 in October/November, if they were
21 done inappropriately, when the unapplied cash project
22 was done in November, if they researched that and saw
23 they were done inappropriately, there would be a refund.
24 Having nothing to do with the debit memos, having
25 everything to do with what was done in October and

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

125

1  November when there was a decision made to move it from
2  25005 into the 12601 account.
3       MR. GREENSTEIN:  Q.  Let's take a
4  hypothetical.  So an item that was transferred, let's
5  say, in October 2000 from -- a receipt was transferred
6  from 25005 to 12601.  You follow me?
7       MR. GLENNON:  Objection.  Is there a question?
8  Are you setting out a foundation for a hypo, is that
9  what you're doing?
10      MR. GREENSTEIN:  Yes.
11      THE WITNESS:  I understand that.
12      MR. GREENSTEIN:  Q.  And that occurred;
13  correct?
14      A.  This is not a hypothetical?
15      Q.  No.  That occurred.
16      MR. GLENNON:  Objection; vague and ambiguous.
17      MR. GREENSTEIN:  Q.  There were items of
18  unapplied cash from 25005 that were transferred to 12601
19  in October 2000; correct?
20      MR. GLENNON:  Same objection.
21      THE WITNESS:  There were, yes.
22      MR. GREENSTEIN:  Q.  Do you know how much
23  there were?
24      A.  I have the number somewhere.
25      Q.  Around 15 million?

126

1       MR. GLENNON:  Objection; vague and ambiguous.
2       THE WITNESS:  I don't remember the specific
3  number.
4       MR. GREENSTEIN:  Q.  So those items were
5  marked account as of November 17th; correct?
6       THE WITNESS:  Were marked what?
7       MR. GREENSTEIN:  Q.  On-account.
8       MR. GLENNON:  Objection; vague and ambiguous.
9       THE WITNESS:  No.  They had previously been
10  on-account, and that flag needed to go away.
11      MR. GREENSTEIN:  Q.  But, so they were
12  designated on-account as of November 17th; correct?
13      MR. GLENNON:  Objection; vague and ambiguous
14  as to they.
15      THE WITNESS:  I'm sorry, would you remind
16  repeating that?  I lost your question.
17      MR. GREENSTEIN:  Q.  There was 46,000
18  on-account receipts as of November 17th; correct?
19      MR. GLENNON:  Same objection; lack of
20  foundation.
21      THE WITNESS:  Yeah, you got to start over.
22      MR. GREENSTEIN:  Q.  You don't understand that
23  question?
24      A.  46,000 on-account receipts as of
25  November 17th; correct?  I don't even know that's a

127

1  question.
2       MR. GREENSTEIN:  Q.  Let me ask it this way.
3  So, earlier you stated there were 46,000 receipts
4  designated on-account as of November 17th; correct?
5       MR. GLENNON:  Objection; mischaracterizes the
6  testimony, lack of foundation.
7       THE WITNESS:  We can't use the word receipt.
8  There were 46,881 accounts that had an on-account flag
9  on them.
10      MR. GREENSTEIN:  Q.  Okay.  And that -- okay.
11  And some of those items reflected a receipt being
12  transferred from 25005 to 12601; correct?
13      MR. GLENNON:  Objection; vague and ambiguous.
14      THE WITNESS:  And some of those reflected a
15  receipt being transferred -- I don't know what you mean.
16      MR. GREENSTEIN:  Q.  Well, why don't you
17  explain to me what you think the process is on
18  November 17th -- actually, scratch that.
19      So, the 46,000 items that existed as of
20  November 17th, 2000, were all those designated
21  on-account?
22      MR. GLENNON:  Objection; vague and ambiguous,
23  lack of foundation.
24      THE WITNESS:  All of the 46,881 debit memos
25  run, were run to clear an on-account flag on those

128

1  items.
2       MR. GREENSTEIN:  Q.  So all those items had an
3  on-account flag?
4       MR. GLENNON:  Same objections.
5       THE WITNESS:  That is correct.
6       MR. GREENSTEIN:  Q.  Okay.  Meaning they had
7  previously been dealt with before; correct?
8       MR. GLENNON:  Objection; vague and ambiguous.
9       THE WITNESS:  Meaning that they had previously
10  been dealt with by transferring them against an invoice,
11  by applying them to royalties, income, expense, whatever
12  they decided to do.  And some of them had moved from
13  12005 to 12601.
14      MR. GREENSTEIN:  Q.  You mean 25005 to 12601?
15      A.  Yes.  Did I misspeak?
16      Q.  Yes.
17      MR. GLENNON:  I don't want to interrupt.  It
18  is quarter to 1:00.  Can we take our lunch break?
19      MR. GREENSTEIN:  Sure.
20      VIDEOGRAPHER:  Off record at 12:43.
21          (Recess, 12:43 p.m. - 1:36 p.m.)
22      VIDEOGRAPHER:  On the record at 1:36.
23      MR. GREENSTEIN:  Q.  Good afternoon,
24  Mr. O'Bryan.
25      A.  Good afternoon.

129

1  Q.  Earlier you testified your testimony has never
2  been excluded from a case.  Do you remember that?
3  A.  I do, yes.
4  MR. GREENSTEIN:  I'm going to mark this next
5  as Exhibit 10.
6  (Exhibit 10 marked for
7  identification.)
8  MR. GREENSTEIN:  Q.  For the record, this is a
9  Lexis case printed out, dated April 5th, 2005.  Farnham,
10  F-a-r-n-h-a-m, v. Rehwald, R-e-h-w-a-l-d.  Mr. O'Bryan,
11  let me know when you're finished reviewing it.
12  A.  I have.
13  Q.  I would like to direct your attention to
14  page 5 of the document.  It is on the right-hand column,
15  sub point 2.  It says, "The court did not abuse its
16  discretion in excluding the testimony of J. Duross
17  O'Bryan."  Do you see that?
18  A.  I do.
19  Q.  That's you; right?
20  A.  That's correct.
21  Q.  And if you go down to right after the
22  underlined case cites, it says, "In the present case
23  Farnham attempted to prove the collectibility of an
24  enhanced settlement or judgment entirely through the
25  expert testimony of J. Duross O'Bryan, who had given

130

1  deposition testimony as to the value of certain assets
2  purportedly owned by the individual defendants in the
3  underlying action.  The trial court excluded this
4  evidence as unduly speculative and, therefore,
5  insufficient to prove collectibility."  Do you see that?
6  A.  I do, yes.
7  Q.  Is there a reason you didn't disclose this
8  earlier when I asked you if your testimony had been
9  excluded before?
10  A.  Yeah, because I never testified in court.  I
11  gave a deposition, and apparently the judge was not --
12  the judge made this ruling without even hearing my
13  testimony, other than my deposition.  I never testified
14  in court.
15  Q.  But you testified in a deposition; right?
16  A.  Yeah.  No.  When I heard your question this
17  morning, has any of my testimony ever been excluded, I
18  thought you meant as far as trial testimony.  I'm aware
19  of the fact I gave a deposition, and this court decided
20  it did not want to hear my testimony.
21  Q.  Do you know the reasons?
22  A.  What was described to me was that -- it was a
23  legal malpractice case, as I recall.  And one of the
24  issues with respect to the legal malpractice case was
25  whether or not the defendants -- whether or not the

131

1  original cased defendants, the underlying cased
2  defendants would have had the wherewithal to pay any of
3  the damages.  And so I was asked to comment on some of
4  the values of their underlying assets in the underlying
5  case, which was part of my testimony.  Not all of my
6  testimony.  Just a part of it.  And the judge apparently
7  decided I should not give that testimony that was given
8  in deposition, not trial.
9  Q.  It was deposition testimony?
10  A.  I gave a deposition, yes.
11  Q.  So are there any other cases in which you --
12  your testimony, either deposition or at trial, has been
13  excluded?
14  MR. GLENNON:  Objection; vague and ambiguous.
15  THE WITNESS:  I am not -- this is the only
16  case I'm aware of where I gave deposition testimony that
17  was not admitted in a court.  And I'm not aware of any
18  testimony I've given in court that that has been
19  excluded.
20  MR. GREENSTEIN:  Q.  Okay.
21  A.  And that's what I was referring to this
22  morning.
23  Q.  And I think earlier we talked about a case,
24  Parnes V. Harris, involving Puris.  Do you remember
25  that?

132

1  A.  Yes.
2  Q.  I think earlier you testified you never
3  changed your testimony during a deposition?
4  A.  That's correct.
5  Q.  Do you remember being deposed on June 26, 2002
6  in the Puris case?
7  A.  I don't, no.  I recall a deposition on Puris.
8  I don't recall that specific deposition.
9  Q.  Did you change your testimony in that
10  deposition?
11  A.  Not that I know of.
12  Q.  I want to direct your attention to page 32 of
13  your opening report, which is Exhibit 1, the section
14  entitled, "Review of Subset of Unapplied Cash
15  Transfers."
16  A.  32?
17  Q.  Yeah.
18  A.  Yeah, I'm there.
19  Q.  Okay.  The second sentence you say, "I've
20  reviewed the script output for the 926 debit memos to
21  determine which of the transactions that had debit memos
22  in their accounting histories also had a transfer to the
23  bad debt reserve within their audit trail."  Do you see
24  that?
25  A.  I do, yes.

133

1    Q. You say, "Within the accounting histories of
2  the transactions relating to the 926 debit memos, I
3  found 121 transfers to the bad debt reserve during the
4  second quarter of fiscal year 2001." Do you see that?
5    A. I do, yes.
6    Q. Then it says, "These 121 transfers accounted
7  for approximately $10.6 million of the $20.1 million
8  transferred to the bad debt reserve during the quarter."
9  Do you see that?
10    A. I do, yes.
11    Q. So you -- in looking at the 926 that you
12  reviewed of the script output, you found that
13  approximately $10.6 million had been transferred to the
14  bad debt reserve in 2Q?
15    A. Correct.
16    MR. GLENNON: Objection; vague and ambiguous.
17    MR. GREENSTEIN: Q. Did you do any analysis
18  of the other 9.5 million of the 20.1 total that was
19  transferred in the second quarter?
20    MR. GLENNON: Same objection.
21    THE WITNESS: Well, only to review a document
22  prepared by Oracle.
23    I'm sorry, your question is what period of
24  time?
25    MR. GREENSTEIN: Q. I'm asking if you did any

134

1  analysis of the $9.5 million in transfers during 2Q that
2  made up the rest of the $20.1 million.
3    MR. GLENNON: Same objection.
4    THE WITNESS: Well, as I referred to earlier,
5  there is a document, NDCA-ORCL 1646567.
6    MR. GREENSTEIN: Q. Can you repeat that?
7    A. NDCA-ORCL 1646567. I don't recall the name of
8  this document. It's basically a summary, I believe, of
9  some of the reserve work that was done in
10  October/November of 2002 and on. And it summarized kind
11  of the results of some of the work that was done in that
12  time frame.
13    And as I mentioned earlier, the miscellaneous
14  receipts column, which is column F, approximates $20
15  million. The time frame is about the same, it's within
16  a month. And the amount transferred into the bad debt
17  reserve is $18.9 million. So fairly close to $20
18  million.
19    You can see a summary here of what was
20  resolved and how it was resolved in that regard. So I
21  have also looked at that in addition to the specific 121
22  script outputs for the 926 subsection of total debit
23  memos.
24    Q. So other than looking at that document that
25  was created by Oracle, did you perform any independent

135

1  analysis of the remaining $9.5 million in transfers to
2  the bad debt reserve in 2Q '01?
3    MR. GLENNON: Objection; vague and ambiguous,
4  compound.
5    THE WITNESS: No.
6    MR. GREENSTEIN: Q. With respect to the $10.6
7  million you looked at, the 121 transfers, can you just
8  describe the methodology you used in determining whether
9  those transfers were appropriate?
10    A. The $10.6 million?
11    Q. Right.
12    A. There is a binder I brought with me today that
13  basically summarizes -- what we did was we ran a
14  database that pulled out of the 926 scripts all of those
15  that went from 25005 to 12601.
16    As I said, there was 121, totalling $6.10
17  million.
18    We then printed out script reports, script
19  output reports on each one of those and went through
20  each one of those in detail, and summarized this binder,
21  and as best summarized in a two-page document in front
22  of that binder is really the findings I've laid out with
23  respect to what I believe were appropriately, at least
24  some indication it was appropriate to include those in
25  the second Q '01 as being transferred from 25005 to

136

1  12601.
2    Q. You're talking about -- you found that $2
3  million was appropriate?
4    A. Approximately $2 million. What I did was I
5  then matched that. I found about $2 million, which I
6  could find some support for in script output, any kind
7  of notes that were taken from the collectors during that
8  time frame on the miscellaneous receipts section of
9  their report.
10    And I then matched that to the document we
11  just talked about, which summarizes the cash transfer
12  project. And, you know, ours was $2 million. When I
13  look at the report, it looks like it is at least $5.5
14  million that Oracle had decided was appropriately
15  recognized based into revenue based on that project. I
16  felt like my number was conservative.
17    Q. What was the total amount of bad debt
18  transfers that occurred, that Oracle tried to resolve
19  during the 2002 cleanup for all periods?
20    MR. GLENNON: Objection; vague and ambiguous.
21    THE WITNESS: I think it was approximately $50
22  million.
23    MR. GREENSTEIN: Q. $50 million?
24    A. Something to that effect.
25    Q. Could you calculate of that $50 million how

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

137

1  many items were refunded during the 2002 cleanup?
2       MR. GLENNON: Same objection.
3       THE WITNESS: No. Because -- I did with
4  respect to the second Q. But, again, the results are a
5  little bit skewed, because you're about a month off on
6  one side, maybe a couple months off on the other.
7       MR. GREENSTEIN: Q. So you didn't do any
8  calculations with respect to -- putting 2Q aside, the
9  rest of the, what did you say, $50 million?
10      A. Might have been $49 million.
11      Q. So you didn't do any independent analysis of
12  those other transfers, did you?
13      MR. GLENNON: Objection; vague and ambiguous.
14      THE WITNESS: What other transfers?
15      MR. GREENSTEIN: Q. The transfers in other
16  quarters besides 2Q '01 that were resolved in the 2000
17  cleanup.
18      MR. GLENNON: Same objection.
19      THE WITNESS: I didn't look at other Qs other
20  than the second Q.
21      MR. GREENSTEIN: Q. Okay. So going back to
22  that binder, that is something obviously you relied upon
23  in doing your calculations in your opening report;
24  correct?
25      A. I did, yes.

138

1       Q. Are you aware there is a stipulation in place
2  in this case that requires you to produce to plaintiffs
3  any spreadsheets, calculations, any documents you relied
4  upon, that you were supposed to produce that to us at
5  the time of your report?
6       A. Well, I think for the most part, other than
7  maybe a summary schedule that lays out the different
8  buckets, the three different buckets that we talked
9  about in my report, it is either a script output, which
10  you have all of, or there is also some supporting
11  documentation. Maybe there is credit memos or debit
12  memos, which I think have all been produced, as far as I
13  know.
14      Q. But that binder, you said you have summaries
15  on there of the $2 million that you deem to be
16  appropriate transfers; correct?
17      A. Well, one could go and look through each one
18  of the individual sheets and get that information as
19  well. All we did was summarize the sheet.
20      Q. But you prepared a summary of that information
21  that you relied upon; correct?
22      A. That is correct. Well, did I rely on it? Not
23  really. I mean, you could go through each one of these
24  schedules and get that same information out of it.
25      Q. What schedules are you referring to?

139

1       A. The script output, or a summary of the script
2  output that we prepared here.
3       Q. That document that you're pointing to there,
4  did you rely upon that?
5       A. No. All this was was just a summary for me
6  when I go through and review all the different
7  individual script outputs or the notes.
8       Q. So let me get this straight. You prepared
9  summaries of the $2 million that you felt were
10  appropriate transfers in the second quarter of '01, and
11  you relied upon those summaries in order to come to your
12  conclusions written in your report?
13      MR. GLENNON: Objection; mischaracterizes the
14  testimony, and asked and answered.
15      THE WITNESS: Yeah. No. What we did was we
16  got the script output for those 121, we reviewed through
17  each one of them individually.
18      We also got the notes, the collectors' notes
19  that were attached to the miscellaneous receipts
20  section, which was that period that best approximated
21  the second Q. And we looked at those notes.
22      We then got copies of either credit memos or
23  any other notes and data that we could find that had
24  been produced, as far as I know, and summarized that.
25      And basically we came to a conclusion whether

140

1  or not it could be either in the royalty bucket or the
2  credit memo bucket or in a bucket that was one of the
3  two but we just didn't see support for. And that's all
4  in this binder.
5       So if you took -- and then what we did is in
6  front of each one of those sections, which there is 35
7  of them, we simply put a single page, which summarizes
8  what the script says. And then we simply then
9  summarized those summaries on two pages in front.
10      If you didn't have those summaries or the
11  summary of the summary, if you will, you can still get
12  that information right out of this binder.
13      MR. GREENSTEIN: Q. But you used those to
14  calculate the total amounts, and you put those in
15  summary documents that you rely upon; right?
16      MR. GLENNON: Objection; mischaracterizes the
17  testimony, asked and answered.
18      THE WITNESS: The calculation is done in the
19  individual scripts. All that was is to summarize for
20  one place to go and look to see the number and tie it
21  back to the report.
22      MR. GREENSTEIN: Q. So you didn't rely on
23  that binder that's in front of you?
24      A. I did rely on the binder.
25      Q. You did?

141

1    MR. GLENNON: Objection; mischaracterizes the
2  testimony.
3    MR. GREENSTEIN: Q. Did you rely on that
4  binder in front of you?
5    MR. GLENNON: Same objection.
6    THE WITNESS: I did rely on this binder in
7  front of me.
8    MR. GREENSTEIN: Q. And that binder contains
9  summaries of data that was pulled from the script
10  output; correct?
11    MR. GLENNON: Same objection.
12    THE WITNESS: As I said, the script outputs
13  were reviewed by us, and the information comes off of
14  that. You can get all of the numbers that you see in my
15  report as to the $2 million right off of the script
16  outputs or the notes, the miscellaneous receipts.
17    All we did, for ease of summarization, was
18  prepare just that, a summary, which then ties to these
19  numbers.
20    So I certainly looked at it. But the data
21  that I relied on was the source data, i.e., the script
22  outputs or the underlying source data.
23    MR. GREENSTEIN: Q. Turning to page 32 of
24  your report, of your opening report. See the bullet at
25  the bottom, and it discusses, "Of the $10.6 million,

142

1  subject to my review, almost $700,000 of unapplied cash
2  transferred to the bad debt reserve during the second
3  quarter of fiscal year 2001 related to certain royalties
4  paid to Oracle." Do you see that?
5    A. Yes, I do.
6    Q. How did you come up with that 700,000 number?
7    MR. GLENNON: Objection; vague and ambiguous.
8    THE WITNESS: By going through the script
9  outputs and the notes of the collectors as they went
10  through their cash project in October/November of 2002.
11    MR. GREENSTEIN: Q. So that $700,000, was
12  that related to one debit memo or multiple debit memos?
13    A. Multiple.
14    Q. Multiple. How many, do you any?
15    MR. GLENNON: Objection; vague and ambiguous.
16    MR. GREENSTEIN: For the record the witness is
17  looking in the binder that is in front of him that he
18  said he didn't rely upon.
19    MR. GLENNON: It is a videotaped deposition.
20    THE WITNESS: Well, I want to clarify. When I
21  said I didn't rely on -- when I said I did rely, I
22  relied on the script outputs and the notes. The
23  summaries I don't need to rely on. If you want to take
24  those out, that's fine.
25    MR. GREENSTEIN: Q. Can you tell me --

143

1  without looking at that binder, can you tell me how many
2  debit memos made up that $700,000 in royalties?
3    A. Without looking at this binder?
4    Q. Right.
5    A. No.
6    Q. Looking at the binder, can you tell me?
7    MR. GLENNON: Same objection; vague and
8  ambiguous.
9    THE WITNESS: Five.
10    MR. GREENSTEIN: Q. And can you tell me the
11  debit memo numbers of those five, please?
12    A. 3616, 3655, 7377, 13514, and 33069.
13    Q. And can you tell me the customers that are
14  associated with those five?
15    A. Yes.
16    MR. GLENNON: Same objection; vague and
17  ambiguous.
18    THE WITNESS: Dell Computer, Dell Computer,
19  Open Market, Structural Dynamic Research, Primavera
20  Systems, respectively.
21    MR. GREENSTEIN: Q. And those -- the debit
22  memo numbers that you just testified to, why aren't
23  those 550 numbers?
24    A. We just truncated the 550.
25    Q. So it is 550, and then the number?

144

1    A. All the debit memos are 550.
2    Q. Right. And with respect to those five debit
3  memos, why don't you take me through the process of,
4  say, the Dell debit memo, and tell me what you saw in
5  the script output that led you to believe that that
6  royalty for that Dell debit memo was appropriately
7  transferred in the second quarter of '01.
8    A. If you look at the script output on 10/1/2000,
9  the Dell Computer amount of $40,303 was transferred into
10  account 12601. So there is the transfer.
11    Q. On what date?
12    A. 10/1/00. On November 17th, the debit memos
13  took place. On 11/13/02, there was a reversal of the
14  debit memos, as the reserve project began.
15    On 5/14 of '04, they actually applied that
16  40,303 to an invoice.
17    Then if you look at the notes, the actual
18  collectors' notes, you will see that there were actually
19  royalties involved, and it was royalties that had not
20  been booked in the past, that went back all the way to
21  like May of 2000.
22    Q. What was the invoice date of that debit memo?
23    A. I don't see the actual date of the invoice,
24  the original invoice. And there wasn't an invoice on
25  this one. It was royalty that had never been booked

145

1  into revenue. That's what happened a lot of times on
2  royalties, they would get checks in from people who were
3  paying them royalties, and they hadn't issued an
4  invoice, so there was no invoice to apply it to. So
5  when they went and did the research, they realized that
6  they had a royalty relationship with these individuals
7  and that amount should have been applied to a royalty
8  income, but there was no invoice to apply it to.
9      Q.  Why wouldn't there be an invoice for a royalty
10  payment?
11      A.  Because sometimes Oracle wouldn't know,
12  specifically on royalty issues -- if they are --
13  basically if some of their computer people are licensing
14  some of their software and they are loading it onto
15  their computer, they paid them a royalty based on how
16  many of those they might sell, how many are loaded on
17  their computer. Oracle doesn't know how much they
18  loaded. So they don't know until they get the
19  information from the licensee as to what they loaded.
20  And at that point then they can book the revenue.
21      Some companies have different systems.
22  Apparently Oracle's is not where they can book it based
23  on knowledge of what the end-user loaded onto a
24  computer.
25      Q.  So when did Oracle learn that that $700,000 in

146

1  purported royalties were actually -- should have been
2  booked as revenue?
3      MR. GLENNON:  Objection; vague and ambiguous.
4      THE WITNESS:  You don't know that. It could
5  have been known when they booked the original transfer
6  from 25005 to 12601.
7      MR. GREENSTEIN:  Q.  Well, you just said they
8  applied it to an invoice in 2004; correct?
9      A.  Right. But there could have been knowledge of
10  that back in the second Q of '00/'01, and they simply
11  didn't book the invoice, they just booked it right to
12  income, which went through the reserve account.
13      Q.  If they knew that the royalty payment was a
14  royalty payment and they could book it as revenue, why
15  would it need to be applied to an invoice in 2004?
16      MR. GLENNON:  Objection; assumes facts not in
17  evidence, lacks foundation.
18      THE WITNESS:  Because that's when -- there are
19  really two -- in my opinion there were really two
20  investigations that went on with respect to how to apply
21  25005 cash to 12601. Some of them are in October and
22  November of '00 when individuals made decisions to
23  transfer from 25005 to 12601. That went right into
24  income, actually went into reserve that went into
25  income. That was investigation number one in my

147

1  opinion.
2      Investigation number two is when the
3  collectors went back and specifically tested to see if
4  those were properly transferred to 12601 in the
5  second Q. And if they then found information that told
6  them it was properly booked, they, in fact, did that.
7      MR. GREENSTEIN:  Q.  And you're saying that
8  with respect to -- well, with respect to the Dell
9  royalty payment, that they learned that, according to
10  you, that it was proper, they learned that in 2004;
11  right?
12      A.  No.
13      MR. GLENNON:  Objection; compound, vague and
14  ambiguous.
15      THE WITNESS:  I'm not saying -- I'm saying I
16  do know they knew that in 2004. I don't know that they
17  didn't know that in 2000.
18      MR. GREENSTEIN:  Q.  Wouldn't you -- you said
19  you looked at some notes, collectors' notes?
20      A.  Correct.
21      Q.  Didn't the collector note tell you when they
22  learned of this? Isn't it dated?
23      MR. GLENNON:  Same objections.
24      THE WITNESS:  The collectors' notes would all
25  be during the cash receipts project or the cash transfer

148

1  project -- cash reserve project in October/November of
2  2002. Those notes are from that time frame.
3      My point is, for all I know, that information
4  was known when they made the original transfer from
5  25005 to the 12601 account. They made that transfer.
6      MR. GREENSTEIN:  Q.  What evidence can you
7  cite that shows they knew at the time of the transfer
8  that it was a royalty payment?
9      MR. GLENNON:  Objection. Calls for -- let me
10  withdraw that objection and insert a new one. Vague and
11  ambiguous.
12      THE WITNESS:  Because they made the transfer.
13      MR. GREENSTEIN:  Q.  Because they made the
14  transfer in 2Q, that meant that they knew it was a
15  royalty payment?
16      MR. GLENNON:  Same objection.
17      THE WITNESS:  No. At that point all they may
18  have known was it was income.
19      MR. GREENSTEIN:  Q.  But if they knew it was a
20  royalty payment, wouldn't they just account for it as
21  any royalty payment? In other words, book it as
22  revenue?
23      MR. GLENNON:  Same objection; calls for
24  speculation, lack of foundation.
25      THE WITNESS:  That's what they did in

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

149

1   October/November of 2002 -- or 2000, they booked it as
2   income.
3          MR. GREENSTEIN: Q. True. But what I'm
4   saying is -- well, let me put it this way. In a normal
5   situation where Oracle receives a royalty payment, what
6   is the debit and credit?
7          MR. GLENNON: Same objection. Incomplete
8   hypothetical, lacks foundation, vague and ambiguous.
9          THE WITNESS: At what point? When they
10  booked the --
11         MR. GREENSTEIN: Q. No. If a royalty payment
12  such as Dell comes into Oracle, no invoice like you
13  described, and they know it, how do they recognize that?
14  What are the debits and credits?
15         MR. GLENNON: Same objections. Lack of
16  foundation, incomplete hypothetical and vague and
17  ambiguous.
18         Do you understand the question?
19         THE WITNESS: Yeah, I do. They debit cash,
20  credit 25005 unidentified or unapplied.
21         MR. GREENSTEIN: Q. Right. But if they knew
22  that it was legitimate royalty revenue, how would they
23  book that as revenue?
24         MR. GLENNON: Same objection.
25         THE WITNESS: Everything goes through 25005

150

1   when it comes in.
2          MR. GREENSTEIN: Q. No, but how would they
3   book -- that means it is unidentified; right?
4   A.  Everything initially goes into 25005.
5   Q.  I understand that. What I'm saying is if it
6   goes into 25005, it is unidentified and they can't apply
7   it to an invoice; right?
8   A.  It all goes to 25005. And then it either
9   immediately gets applied by the system to an invoice or
10  it goes into unidentified or it goes into unapplied or
11  it goes into applied.
12  Q.  Right. But if they figure out where it could
13  be applied, they apply it; right?
14         MR. GLENNON: Objection; vague and ambiguous.
15         THE WITNESS: Correct.
16         MR. GREENSTEIN: And then it wouldn't be
17  in 25005 anymore; right?
18  A.  Correct.
19         MR. GLENNON: Same objection.
20         MR. GREENSTEIN: Q. So what I'm saying is, if
21  a royalty payment came in in 2Q and Oracle knew that it
22  was a royalty payment and they wanted to book it as
23  revenue, you're saying that they would debit cash,
24  credit 25005?
25  A.  That would be --

151

1          MR. GLENNON: Objection; vague and ambiguous,
2   incomplete hypothetical.
3          THE WITNESS: The initial transaction would be
4   a debit cash, credit 25005.
5          MR. GREENSTEIN: Q. What would be the next
6   transaction?
7          MR. GLENNON: Same objections.
8          THE WITNESS: The next transaction could be
9   that they take it as a debit to a receivable. And a
10  credit to income, royalty income.
11         MR. GREENSTEIN: Q. And so that would be --
12  if Oracle knew that it was a royalty, a legitimate
13  royalty payment that could be booked as revenue and they
14  knew that during 2Q, there would be those two debits and
15  credits; right?
16         MR. GLENNON: Objection; vague and ambiguous
17  and compound.
18         THE WITNESS: Well, you could also do it --
19  that's one way of doing it. There is another way of
20  doing it, which is just taking it against the reserve,
21  the 12601, and saying I recognize that 12601 will create
22  income, and book it there. It is an immaterial amount
23  of money on a quarterly basis, so it wouldn't matter, as
24  long as it gets to income one way, one how.
25         MR. GREENSTEIN: Q. Okay. So I just want to

152

1   make sure that it is clear.
2          So if a legitimate royalty payment was made
3   during the second quarter of '01, and Oracle knew that
4   it was a royalty payment that should be booked as
5   revenue, the way they would do that is by crediting
6   cash, debiting 25005 --
7   A.  No.
8   Q.  Just take me through the debits and credits of
9   a royalty payment that Oracle knew in 2Q should be
10  booked as revenue.
11         THE WITNESS: There are a number of ways they
12  could do that.
13         MR. GLENNON: Let me assert a "vague and
14  ambiguous" objection to the form of the question.
15         MR. GREENSTEIN: Q. So just give me the way
16  they could do it.
17         MR. GLENNON: Same objection.
18         THE WITNESS: They would debit cash, credit
19  25005. There would be no invoice to apply it to,
20  because in this hypothetical they don't know there is an
21  invoice out there.
22         They then identify this is a royalty payment
23  of some sort, so they could debit accounts receivable
24  and credit the sales revenues, then apply that cash to
25  the receivable.

153

1    Or they also could debit the 25005 and credit
2  12601. It has the same impact of going to revenue.
3        MR. GREENSTEIN:  Q.  That's true. Okay. So
4  what evidence do you have that Oracle knew during 2Q '01
5  that the Dell royalty payment was legitimate?
6        MR. GLENNON:  Objection; vague and ambiguous
7  as to legitimate.
8        THE WITNESS:  That it took that second entry,
9  debited 25005 and credited 12601. It was put into
10  income in the second Q.
11        MR. GREENSTEIN:  Q.  So with respect to --
12  what was the amount of the Dell debit memo?
13     A.  $40,000.
14     Q.  So with respect to the other $660,000 in
15  royalty items that were transferred to the bad debt
16  reserve in 2Q, is it your opinion that Oracle knew at
17  the time that those were royalty payments?
18        MR. GLENNON:  Objection; vague and ambiguous,
19  compound.
20        THE WITNESS:  I have to take you through a
21  little bit of Accounting and Auditing 101. Sorry.
22        MR. GREENSTEIN:  Q.  That's fine.
23     A.  Based on APB 20, which is correction of an
24  error, if somebody finds out in an accounting department
25  or a company finds out they have incorrectly accounted

154

1  for something, they need to consider whether that's
2  material. If it wasn't material, you would leave it
3  where you found it. But if somebody thinks it was
4  material at the time, then you fix it when you find it.
5  In other words, you make that correction when you find
6  it.
7        So, if in the second Q they were applying the
8  25005 to the 12601, that's recording income. If -- then
9  remember during October/November time frame they
10  reversed all of that. It all went out of reserve. It
11  reduced revenue, basically, by that $20 million.
12        So now what they are doing, they are now
13  trying to go back and redo what somebody potentially did
14  in the second Q. And in some of these instances I'm
15  finding and they are finding that the way it was booked,
16  at least as a credit to revenue, was appropriate.
17        So if it was done then in the second Q, based
18  on APB 20 and prior period adjustment GAAP accounting,
19  that's when you book it, is the second Q.
20     Q.  But you're saying that they realized that in
21  2004; correct?
22     A.  They may well have known that in 2000, the
23  second Q of 2000.
24        Somebody booked revenue on the Dell, in this
25  Dell example of $40,000 in income, it was booked income,

155

1  we know that, it was then reversed as part of this,
2  quote, unquote, cleanup process.
3        Then somebody went and researched this and
4  said, wait a minute, it was appropriately revenued in
5  the second Q, so it should be revenued in the second Q,
6  that's where you leave it.
7     Q.  Why didn't they reverse it before that?
8        MR. GLENNON:  Objection; vague and ambiguous.
9        MR. GREENSTEIN:  Q.  Before the 2002 cleanup,
10  why didn't they reverse those transactions?
11        MR. GLENNON:  Same question; same objection.
12        THE WITNESS:  There was no reason to reverse
13  them, because they thought they were properly in income.
14        MR. GREENSTEIN:  Q.  So what was the reason
15  why they did it during 2002 cleanup?
16     A.  Because they were trying to be conservative.
17  I think you've seen plenty of testimony on this, that
18  when they thought there were transfers from 25005 to
19  12601, not fully understanding the impact, they decided
20  to be conservative and reverse everything and
21  re-research it. They, being Oracle.
22     Q.  So why did they do that -- why didn't they do
23  that in 2001?
24        MR. GLENNON:  Objection; vague and ambiguous,
25  incomplete hypothetical.

156

1        THE WITNESS:  Because at that point in time
2  they didn't know necessarily the magnitude or that there
3  had been 25005 transfers into 12601.
4        MR. GREENSTEIN:  Q.  So in looking -- in
5  determining that $700,000 of unapplied cash transferred
6  bad debt reserve in Q2 was appropriate with respect to
7  royalties, did you look at remittance information?
8     A.  We saw some remittance information.
9     Q.  For all five debit memos?
10        MR. GLENNON:  Objection; vague and ambiguous.
11        THE WITNESS:  I don't think it was all five.
12        MR. GREENSTEIN:  Q.  Was that physical copies
13  of remittance information?
14     A.  To the extent we had it, I think we would
15  have.
16     Q.  Did you cite that in your report?
17     A.  Let's go to the specifics. You're talking
18  about the five?
19     Q.  Just focused on the $700,000 royalty payments.
20     A.  I'm just going through each one of the
21  documents to see if there is any remittance information.
22        Here I see, this is on Open Market, which is
23  number -- the fourth one I think I mentioned to you,
24  NDCA-ORCL 515892. NDCA-ORCL 515892.
25        I see a copy of a remittance advice, a copy of

157

1    a check to Oracle from Open Market.
2        Q.  And is there a reason you didn't cite that in
3    your report, that document?
4        MR. GLENNON: Objection; vague and ambiguous.
5        THE WITNESS: You mean cite on page 20 --
6        MR. GREENSTEIN: Q.  32.
7        A.  32?
8        Q.  Yeah.
9        A.  No.
10       Q.  Why not?
11       A.  I didn't see a reason.
12       MR. GLENNON: Objection; vague and ambiguous.
13       MR. GREENSTEIN: Q.  I'm sorry?
14       A.  I didn't cite every single document in the
15    report.  I may have relied on it, which would be back in
16    Appendix C, but I didn't cite each and every document we
17    saw in the report.
18       Q.  I understand.  So that document is cited in
19    Appendix C; correct?
20       A.  I believe so.
21       Q.  So what other -- did you look at source
22    documents for the $700,000 royalty payments?
23       A.  To the extent that we had them.  For example,
24    on -- well, some of the Dell information we had some
25    invoices.  On Open Market we talked about, we actually

158

1    have a royalty report that demonstrates to one of the
2    researchers that this was a royalty relationship.  And
3    I'm referring there to NDCA-ORCL 515892, which appears
4    to be attached to remittance advice.  So to the extent
5    we had source documents, we attached those.
6       Q.  So you didn't have some source documents for
7    some of those five debit memos?
8       MR. GLENNON: Objection; vague and ambiguous.
9       THE WITNESS: I would have to go through each
10    and every one -- we did have source documents.  I don't
11    know if they were absolutely complete.  But what made it
12    complete was the reviewing of the notes and seeing that
13    there was a royalty relationship based on the notes.
14       MR. GREENSTEIN: Q.  When you say the notes,
15    you mean collector notes?
16       A.  That's right
17       MR. GLENNON: Same objection.
18       MR. GREENSTEIN: Q.  You're referring to the
19    ones in the script output; correct?
20       A.  That's correct.
21       Q.  Okay.  And was there one note for each
22    transaction?
23       MR. GLENNON: Same objection.
24       MR. GREENSTEIN: Q.  Strike that.
25       Was there one note for each of the five debit

159

1    memos?
2       A.  There are a number of notes.
3       Q.  So for the Dell debit memo, for example, how
4    many notes were there?
5       A.  For the Dell royalty item, there is one
6    note -- actually, there is, yeah, one note.  "No royalty
7    reports, use cash apps, per Jake, Dell is a full use
8    reseller.  They go through our partner resource network,
9    work directly with OA."
10       Q.  What date is that note?
11       A.  I don't know the exact date.
12       Q.  Okay.  Why not?
13       MR. GLENNON: Objection; vague and ambiguous.
14       THE WITNESS: Why not?
15       MR. GREENSTEIN: Q.  Right.
16       A.  Because I don't see that exact date right
17    here.
18       Q.  Do you know when the note was written that you
19    just read?
20       A.  No, it doesn't matter when the date -- when it
21    was written, to me.
22       Q.  Why not?
23       MR. GLENNON: Vague and ambiguous.
24       THE WITNESS: I'm sorry, I thought I described
25    that, and I'll do it again.

160

1       I believe that there was work done in October
2    and November of '00 to transfer money from the 25005
3    into the 12601, and that created revenue, either
4    through -- principally through increasing the reserve.
5       Then because of the part of this cleanup
6    process, cleanup of the reserve process, that was all
7    reversed on a conservative approach by Oracle, and
8    completely re-researched.
9       And in the re-research, as far as I can tell,
10    and I will even take the later date, there is a note
11    here that Dell should be reported as a royalty.
12       So, if it was figured out in '02 or '03 or '04
13    as a royalty, that it should have been applied back at
14    the time, back into the second Q, or at the time that
15    original transfer was made it's appropriately recorded
16    as revenue then under GAAP.
17       MR. GREENSTEIN: Q.  What do they do in 2004
18    once they learned that it was appropriate?
19       MR. GLENNON: Objection; vague and ambiguous.
20       THE WITNESS: They --
21       MR. GLENNON: Incomplete hypothetical.
22       THE WITNESS: They rebooked it to income,
23    which they had done in the second Q of '01.
24       MR. GREENSTEIN: Q.  Do you know the date they
25    did that?

161

1     A.  The original?
2     MR. GLENNON:  Objection; vague and ambiguous.
3     MR. GREENSTEIN:  Q.  No.  The date in which
4  they booked it to revenue?
5     A.  Yes.
6     MR. GLENNON:  Same objection.
7     THE WITNESS:  On 5/11/04.
8     MR. GREENSTEIN:  Q.  And what document are you
9  referring to, the document you just looked at?
10    A.  I'm referring to the script.
11    Q.  The summary of that transaction; right?
12    A.  The script.
13    MR. GLENNON:  Objection; misstates the
14  testimony.
15    MR. GREENSTEIN:  Q.  What's the Bates number
16  of the document you're looking at?
17    A.  This is simply a printout of -- there is no
18  Bates on this.  It is just a printout of the script for
19  Dell.
20    Q.  So there is no Bates number, so I can't go
21  look at that information in a Bates numbered document;
22  right?
23    MR. GLENNON:  I object.  Plaintiffs know the
24  Bates number for the access database are all script
25  outputs.

162

1     MR. GREENSTEIN:  Q.  So you can't identify a
2  Bates number where that information is; correct?
3    A.  There is no Bates on this.  We simply printed
4  it off a database.
5    Q.  That's part of the summaries you were talking
6  about earlier?
7    MR. GLENNON:  Objection; mischaracterizes the
8  testimony.
9    THE WITNESS:  This is the script output, and
10  it is, as I said, debit memo 3616 for Dell.  And you can
11  see the application of the invoice on May 11, 2004.
12    MR. GLENNON:  We're happy to provide
13  plaintiffs with a Bates number for the script output if
14  you would like it.
15    MR. GREENSTEIN:  We're going to be requesting
16  any compilations or summaries or spreadsheets that
17  Mr. O'Bryan relied upon in coming to these conclusions,
18  which it is obvious he did, because he keeps looking at
19  them and he can't give me a Bates number.  So we're
20  going to request it, because under the stip we're
21  entitled to those documents.
22    MR. GLENNON:  I don't think you met your
23  foundation, because he's got to rely on them, and he
24  specifically said probably eight times that he relied on
25  the source documents in the script output.  And that's

163

1  what he was just referring to.
2    If you want to keep pressing him on what it
3  was he relied on, be my guest.  But I don't think you
4  met your foundation yet.
5    MR. GREENSTEIN:  Q.  Can you cite a Bates
6  number for the Dell debit memo that shows when the
7  royalty was booked?
8    MR. GLENNON:  Objection; vague and ambiguous.
9  Are you talking about the script output?
10    MR. GREENSTEIN:  Q.  Do you understand the
11  question?
12    A.  The script output, is that what you're talking
13  about?
14    Q.  No.  I'm asking if you can cite Bates numbers
15  for the source documents that you relied upon in doing
16  the calculations for the Dell debit memo.
17    MR. GLENNON:  I'm going to object again,
18  because, as you know, and as you guys printed out and
19  produced to our witnesses, when you print out specific
20  components of script output, the Bates number doesn't
21  appear on the script output.  We can provide it to you.
22  And the script output is certainly cited in the
23  appendix.
24    MR. GREENSTEIN:  Q.  So you're not willing to
25  turn over those summaries of those debit memos?

164

1    A.  I'm happy to give you the whole binder.
2    Q.  You are?
3    MR. GLENNON:  I'm not.  I don't think you've
4  met your foundation.
5    He said he relied on the underlying source
6  documents, and was reviewing and referring to the script
7  output, which plaintiffs have.
8    MR. GREENSTEIN:  Q.  So, Mr. O'Bryan, you just
9  said that you're willing to give us that binder of
10  summaries so we can figure out what you did in order to
11  calculate these amounts and how you did it; right?
12    A.  You don't need the summaries.  The two-page
13  summary that was done and the 35 individual summaries,
14  you don't need that to figure out what I've done.  All
15  you need is the 121 debit memos that had a transfer from
16  25005 to 12601.  That's all you need.  And then look at
17  the script output.  And then also have the notes from
18  the collectors with respect to the script output.
19    Q.  Why did you compile that information in
20  summary form?
21    A.  It is just easier to review.
22    Q.  Right.
23    A.  But the source of that information is the
24  script output, the notes, and any other documentation we
25  gather.

165

1  Q.  I understand that.  What I'm asking is if
2  you're willing to produce your summaries of your
3  calculations, which we believe we're entitled to anyway,
4  but if you're willing to produce those to plaintiffs?
5  MR. GLENNON:  I object.  It's outside the
6  scope of the stipulation.  He's got to rely on the
7  summaries, and he didn't rely on the summaries, he
8  hasn't relied on the summaries.  In fact, you haven't
9  identified a single piece of information that's in the
10  summaries that's not in the source documents.  He's
11  walked you through this.
12  MR. GREENSTEIN:  Q.  Are you willing to do
13  that?
14  A.  What I'm willing to do with respect to turning
15  over, I'm not the one that makes that decision.
16  MR. GLENNON:  He's not.
17  MR. GREENSTEIN:  Q.  But you're willing to do
18  it?
19  MR. GLENNON:  No, he's not.  It is not covered
20  by the stip.
21  THE WITNESS:  There is nothing in this
22  document to hide.  This is all -- except for the
23  summaries --
24  MR. GREENSTEIN:  I agree.  I agree.
25  THE WITNESS:  -- information I got that we

166

1  pulled out of the script.  So the documents are the
2  documents, the summaries are not necessary.  It is
3  simply for easier review on my part.  Whether or not it
4  is produced is certainly not my decision.
5  MR. GLENNON:  We're not going to be producing
6  anything we're not obligated to produce under the
7  stipulation, and that's the end.  That's just it.  And I
8  think we've produced everything that we were required
9  to.
10  MR. GREENSTEIN:  I understand that.
11  Why don't we take five minutes.
12  VIDEOGRAPHER:  This marks the end of tape two
13  in Volume I in the deposition of J. Duross O'Bryan.  At
14  2:21, going off the record.
15  (Recess, 2:21 p.m. - 2:34 p.m.)
16  VIDEOGRAPHER:  On record at 2:34.  This marks
17  the beginning of tape three in Volume I of the
18  deposition of J. Duross O'Bryan.
19  MR. GREENSTEIN:  Q.  Mr. O'Bryan, if we could
20  turn your attention to page 32 of your opening report,
21  same section we were talking about earlier.  In the
22  first paragraph you talk about the 121 transfers to the
23  bad debt reserve that you found of the 926?  Do you see
24  that?
25  A.  I do, yes.

167

1  Q.  Do you have a list of the 121 debit memo
2  items?
3  A.  I do.
4  Q.  And rather than ask you to tell me all of them
5  on the record, is there a list you can provide to
6  plaintiffs of those items?
7  MR. GLENNON:  Why don't we have this
8  discussion at the end.  I don't know if he relied on
9  that list.  Like I said on the record shortly before our
10  break, I don't want him to turn over anything that we're
11  not obligated to turn over.
12  MR. GREENSTEIN:  Okay.  I understand your
13  position, Brian.  What I'm saying is we believe we're at
14  least entitled to a list, if nothing else, a list of
15  these 121 transfers.  He would have had to rely on the
16  names of the customers in the debit memos.
17  MR. GLENNON:  Well, sure.  My point is simply
18  this, he's got to rely on the document or the summary in
19  order for it to be discoverable, and you haven't
20  established that he relied on this list.  In fact, he
21  couldn't have relied on this list, because he would have
22  had to generate the list in the first instance.  So you
23  don't know what he relied upon in order to determine
24  there was 121 transfers in the bad debt reserve in the
25  second quarter of fiscal year 2001.  If you want to ask

168

1  him that question, you can.
2  MR. GREENSTEIN:  Q.  This 121 transfers, can
3  you tell me right now what the names of those -- what
4  customers and debit memos they are?
5  A.  Yes.
6  Q.  And is there a document that I could -- a
7  Bates numbered document I could look at just to find out
8  what debit memo numbers they are?
9  A.  Well, it is in the script.
10  Q.  Right.  But I don't know which ones they are.
11  There is 926 in the script output; correct?
12  A.  Correct.
13  Q.  You found 121 of them that you're relying upon
14  in drawing conclusions about the appropriateness of
15  them; correct?
16  MR. GLENNON:  I object to the extent it
17  mischaracterizes the testimony and to the extent you're
18  trying to get our expert to do work that you guys can
19  easily do on your own with the materials you have.
20  MR. GREENSTEIN:  How can we find out what the
21  121 debit memos are, Brian?
22  MR. GLENNON:  Are you asking me a question?
23  MR. GREENSTEIN:  Q.  I'm asking you.
24  Mr. O'Bryan, is there any way sitting here if I go back
25  to the script output I could determine the debit memo

169

1  numbers for these 121 transfers?
2      A.  Yes.
3      Q.  Okay.  How would I do that?
4      A.  You just go into the script and run a sort in
5  the database that has the credit amount 12601, then it
6  prints all the information about that.  That's all we
7  did.
8      Q.  So if I did that, and then whatever came up as
9  crediting 12601, there would 121 transfer items?
10     MR. GLENNON:  Objection; vague and ambiguous.
11     THE WITNESS:  It would be 121 debit memos or
12  transfers from 25005 into 12601, totaling
13  $10,586,182.02.
14     MR. GREENSTEIN:  Q.  What document are you
15  looking at when you just made that calculation?
16     MR. GLENNON:  Objection; vague and ambiguous,
17  mischaracterizes the testimony.
18     THE WITNESS:  This is a summary of that query
19  that we ran off the script.
20     MR. GREENSTEIN:  Q.  And you're relying on
21  that document as we sit here right now to tell me the
22  total number; correct?
23     MR. GLENNON:  Objection; mischaracterizes the
24  testimony.
25     THE WITNESS:  Again, the basis of this is just

170

1  the script.  I didn't go through the script, all 926 of
2  them, and look to see the credited 12601 and add those
3  all up.
4      My engagement team at my request ran a query
5  on the database simply summarizing all the 12601s and
6  totaled those.  And that's 121 scripts, and $10.6
7  million.
8      MR. GREENSTEIN:  Q.  Okay.  Back to debit memo
9  55003616, it is one of the royalties that you mentioned
10  earlier.
11     A.  Yes.
12     Q.  Do you know which one that is?  The Dell, I
13  believe.
14     A.  I do.
15     Q.  Is it the Dell debit memo?
16     A.  3616?
17     Q.  Yes.
18     A.  Yes, I believe that's Dell.
19     Q.  I think you said it was reversed at some point
20  in November 2002 out of the reserve?
21     A.  Correct.
22     Q.  So there was a debit to 12601 in November
23  2002?
24     A.  Yes.
25     Q.  And is that in the script output?

171

1      A.  Yes.
2      Q.  And what is your basis for saying that there
3  was a debit to 12601 --
4      MR. GLENNON:  Objection; vague and ambiguous.
5      MR. GREENSTEIN:  Q.  -- for that debit memo in
6  November 2002?
7      MR. GLENNON:  Same objection.
8      THE WITNESS:  I'm sorry, what was your
9  question?
10     MR. GREENSTEIN:  Q.  My question is, can you
11  tell me the date that that debit memo, 55003616, was
12  reversed out of the bad debt reserve?
13     A.  I misspoke.  There is no reversal of it into
14  the 12601 account.  What I meant to say is a reversal of
15  the debit memo transaction.
16     Q.  But that item was transferred to 12601 in Q2;
17  correct?
18     A.  Correct.
19     Q.  Then during November 2002, you said it was
20  reversed out; correct?
21     MR. GLENNON:  Objection; vague and ambiguous.
22     THE WITNESS:  I misspoke on that.  It was not
23  reversed out.
24     MR. GREENSTEIN:  Q.  So it's still sitting in
25  the reserve then?

172

1      MR. GLENNON:  Objection; calls for
2  speculation, lack of foundation.
3      THE WITNESS:  No.  It was simply applied, it
4  was simply then applied to the appropriate revenue
5  account, which is a royalty, in '04.
6      MR. GREENSTEIN:  Q.  What were the debits and
7  credits in '04 to do that transaction?
8      MR. GLENNON:  Objection; vague and ambiguous.
9      THE WITNESS:  It was a debit to unapplied cash
10  and a credit to receivables.
11     MR. GREENSTEIN:  Q.  So it was never -- the
12  12601 was never debited; right?
13     MR. GLENNON:  Objection; vague and ambiguous.
14     THE WITNESS:  The 12601 was debited -- the
15  12601 was credited in October of '00.
16     MR. GREENSTEIN:  Q.  Right.  That's when it
17  was transferred to the bad debt reserve; correct?
18     A.  Correct.
19     MR. GLENNON:  Objection; vague and ambiguous.
20     MR. GREENSTEIN:  Q.  I think you testified it
21  was in November 2002 they reversed that transfer as part
22  of the cleanup; correct?
23     MR. GLENNON:  Same objection.
24     THE WITNESS:  As I said, I misspoke.  They did
25  not.

173

1      MR. GREENSTEIN: Q.  So they didn't reverse
2  that transaction out of the reserve?
3      A.  No.
4      MR. GLENNON:  Same objection.
5      MR. GREENSTEIN: Q.  So that credit of that
6  Dell debit memo is still sitting in 12601?
7      MR. GLENNON:  Calls for speculation, lack of
8  foundation.
9      THE WITNESS:  No.  It is now in -- they put it
10  into the receivable, and then they took it out of the
11  receivable on the 12601.
12      MR. GREENSTEIN: Q.  Well, help me understand
13  this, because I'm not an accountant.  But if there was a
14  credit to -- there is a debit and credit for every
15  transaction; right?
16      A.  Yes.
17      Q.  And that's an accounting principle; correct?
18      A.  That is, yes.
19      Q.  So if there was a credit in October 2000 of
20  that debit memo to 12601, and then in 2002, November,
21  what you're telling me, there is no debit to 12601;
22  right?
23      MR. GLENNON:  Objection; vague and ambiguous,
24  compound, incomplete hypothetical.
25      THE WITNESS:  Your question was?

174

1      MR. GREENSTEIN: Q.  The question -- I'm just
2  wondering, the item was transferred, credited to 12601
3  in October 2000.  I'm wondering when Oracle reversed
4  that transfer, if at all.
5      MR. GLENNON:  Same objection.  Lacks
6  foundation, vague and ambiguous.
7      THE WITNESS:  Well, they reversed it by virtue
8  of taking it against the receivable when they realized
9  it was a royalty.  Then they applied the royalty to
10  that.  So effectively what you have is it coming out of
11  12601 and netting with the revenue.  So it was a zero
12  impact.
13      MR. GREENSTEIN: Q.  Well, but there was a
14  credit in 12601.  In order to get that out of there, you
15  have to debit it; correct?
16      MR. GLENNON:  Objection; incomplete
17  hypothetical.
18      THE WITNESS:  Or that's just increasing
19  income.  Right?  I'm sorry, I didn't mean to say right.
20      MR. GREENSTEIN: Q.  I'm asking, there was a
21  credit to 12601, and I'm wondering if ever there was --
22  how it got out of 12601 in November 2002.
23      MR. GLENNON:  Objection; vague and ambiguous.
24      THE WITNESS:  Out of 12601?  It didn't come
25  out of 12601.  It got recorded as a revenue applied

175

1  against an invoice in November of '02.
2      MR. GREENSTEIN: Q.  And you said --
3      A.  Excuse me, March of '04.
4      Q.  March of '04 or November '02?
5      A.  March of '04.
6      Q.  So you said it was applied to a receivable.
7      A.  It was actually applied to an invoice.
8      Q.  An invoice dated what?  What was the date of
9  the invoice?
10      MR. GLENNON:  Objection; vague and ambiguous.
11      THE WITNESS:  All this occurred on May 4th --
12  May 11, 2004.
13      MR. GREENSTEIN: Q.  Right.  But when was the
14  original royalty payment?
15      MR. GLENNON:  Objection; vague and ambiguous.
16      THE WITNESS:  I don't know when the original
17  royalty payment was.
18      MR. GREENSTEIN: Q.  Wait, but didn't you say
19  earlier that the royalty -- if a royalty comes in, there
20  is no invoice?
21      MR. GLENNON:  Objection; mischaracterizes the
22  testimony, incomplete.
23      MR. GREENSTEIN: Q.  Right?
24      A.  That's my testimony.  That's why I didn't know
25  the date of invoice, because there is no invoice,

176

1  because the royalties don't have invoices.
2      Q.  So in 2004 you just said that they applied
3  that to an invoice; right?
4      A.  They would have created an invoice and credit
5  memoed it up, because -- or adjusted it up, because
6  there was no invoice that existed, so you would have to
7  create the invoice, which was done in May of '04.
8      Q.  So they created an invoice for a payment that
9  was made prior to November 2000; correct?
10      MR. GLENNON:  Objection; vague and ambiguous.
11      THE WITNESS:  Correct.  You would have to,
12  because you have to apply that somewhere.
13      MR. GREENSTEIN: Q.  Do you know the date they
14  created the invoice?
15      MR. GLENNON:  Same objection.
16      THE WITNESS:  May 2004.
17      MR. GREENSTEIN: Q.  A specific date?
18      A.  May 11th, 2004.
19      Q.  Page 33, the bullet, "In addition, over
20  $800,000 of over transfers to the bad debt reserve
21  during this period were appropriate."  Do you see that?
22      A.  Where are you?
23      Q.  Page 33.
24      A.  Yes.
25      Q.  The bullet at the top of the page, the

177

1 $800,000?
2 A. Yes.
3 Q. It says, "In addition, over $800,000 other
4 transfers to the bad debt reserve during this period
5 were appropriate." Do you see that?
6 A. I do.
7 Q. You mean 2Q '01?
8 A. Correct.
9 Q. Then you say, "It's appropriate in that Oracle
10 had already reduced its revenues for certain open and
11 unpaid invoices either all or in part through the use of
12 credit memos and/or inclusion in Oracle's general bad
13 debt reserve as of the second quarter of fiscal year
14 2001." Do you see that?
15 A. That's correct.
16 Q. So can you explain what you mean there?
17 A. That when the collections department was
18 researching the applied cash project, during the applied
19 cash project in October/November of '02 time frame, they
20 researched individually all these that came -- all these
21 debit memos that got reversed.
22       And in certain instances, we have one, two,
23 three, four, five, six, seven -- twelve instances where
24 the evidence is that they are effectively adjusting up
25 an invoice because they had inappropriately issued a

178

1 credit memo back in the 2000 time frame.
2 Q. You said 12 items. Is that 12 debit memos?
3 A. That's correct.
4 Q. So 12 debit memos made up the $800,000;
5 correct?
6 A. That's correct.
7 Q. Can you tell me -- can you just tell me the
8 debit memo numbers --
9 A. Certainly.
10 Q. -- of those?
11 A. 10200, 29695, 33442, 41212 -- actually, let me
12 go back.
13       These are the numbers that relate to a credit
14 memo that are in the $800,000 or that are in part of
15 that component. And that would be, again --
16 Q. Let me stop you there. So are there debit
17 memos associated with those 12 items?
18 A. You mean credit memos?
19 Q. I mean debit memos.
20 A. Oh, yes.
21 Q. So can you tell me the debit memos -- the
22 debit memo numbers?
23 A. I am sorry. 10200, 29695, 33442, 41212, 54 --
24 excuse me -- 42380, 43304, 45164, 45180, 45240, 45311,
25 45948, and 46151. Those total up about $727,000.

179

1 Q. Okay. So you just rounded up to 800,000?
2 A. Correct.
3 Q. Why didn't you round down to 700,000?
4 A. Because on the -- one of the other amounts, I
5 think it is 368,000, we rounded down.
6 Q. Okay.
7 A. So there is another category.
8 Q. So there is $700,000 in royalties on page 32
9 of your report; right?
10 A. Correct.
11 Q. And $800,000 of what you call these adjusted
12 up items, to $800,000; correct?
13       MR. GLENNON: Objection; mischaracterizes the
14 testimony. Vague and ambiguous.
15       THE WITNESS: I'm sorry.
16       MR. GREENSTEIN: Q. I'm trying to determine
17 what you mean by the 368,000 that you rounded down.
18 A. It is a separate column. I probably confused
19 you. I apologize.
20 Q. I just want to make sure there is -- that
21 we're looking at the items; right?
22 A. Correct.
23 Q. Well, so, my question is -- what was the total
24 of those 12 debit memos?
25 A. $726,581.

180

1 Q. My question was, why did you round that up to
2 800,000 instead of rounding down to 700,000?
3 A. Because there is other items that make up the
4 $800,000 that are not part of the credit memo piece.
5 Q. How many debit memos are those?
6 A. Those are one, two, three, four --
7       MR. GLENNON: Objection; vague and ambiguous.
8       THE WITNESS: Those are five.
9       MR. GREENSTEIN: Q. And what -- that makes up
10 the part of the 800,000; correct?
11 A. Yes. When you include those five, it would be
12 $875,000, or to be exact $874,808. That is my rounding
13 down.
14 Q. Were those items that were resolved in the
15 same manner as the other items that had been adjusted
16 up?
17       MR. GLENNON: Objection; vague and ambiguous.
18       THE WITNESS: No.
19       MR. GREENSTEIN: Q. Can you please explain
20 why you think those are appropriate?
21 A. Yeah. These are very unusual ones. These are
22 ones where there was cash that existed, obviously, in
23 the October/November time frame, where these amounts
24 were moved from 25005 into 12601. So the cash existed
25 and it was written into the reserve.

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

181

1    However, upon further review of the invoices,
2 these were invoices that were very old, and given
3 Oracle's internal policy of reserving -- they have an
4 internal policy that over x number of days 50 percent
5 automatically goes to the reserve, over x number of days
6 20 percent goes to reserve -- those would have been
7 reserved anyway given the age of the invoice.  So this
8 is a case where you literally are taking into income
9 amounts which have previously been written off, when you
10 shouldn't have written them off because you had the
11 cash.
12    Q.  Okay.  What is the total of those items?
13    A.  Those only total $150,000.
14    Q.  And how many debit memos?
15    A.  One, two, three, four -- five.
16    Q.  Can you list out the --
17    A.  7412, 38577, 41310, 42059, and 5 -- 45 --
18 45161.
19    Q.  So I'm going to break it into two parts.  I'm
20 going to first focus on the 12 debit memos that you said
21 were applied to previously written off invoices.  Is
22 that fair to say?
23    MR. GLENNON:  Objection; mischaracterizes the
24 testimony.
25    THE WITNESS:  No.  The 12 have to do with,

182

1 really, credit memos.
2    MR. GREENSTEIN:  Q.  Okay.  For those 12, why
3 don't you just take me through the debits and credits
4 that occurred during the 2002 cleanup to resolve those
5 items.
6    A.  Yeah, for all 12?
7    Q.  No, no.  Just -- they all were resolved in the
8 same manner; correct?
9    A.  Yeah --
10    MR. GLENNON:  Objection; lack of foundation.
11    THE WITNESS:  They all were resolved basically
12 in the same manner, which was based on the research done
13 by the collection department during the October/November
14 of 2002 time frame, it was discovered that a credit memo
15 had been inappropriately recorded on those amounts that
16 should not have been.  And if you recorded a credit memo
17 that should not have been recorded, then you should be
18 recording income once you discover that.
19    MR. GREENSTEIN:  Q.  So in each of those cases
20 for those 12 debit memos, your testimony is that Oracle
21 discovered in 2002 that there had been an erroneous
22 credit memo issued with respect to that debit memo;
23 correct?
24    MR. GLENNON:  Objection; mischaracterizes his
25 testimony.

183

1    THE WITNESS:  Well, yeah, those are all credit
2 memos.
3    MR. GREENSTEIN:  Q.  So why don't you take me
4 through the debits and credits that occurred in 2002
5 with respect to these 12 items, an example.
6    A.  Okay.  Before we -- I drank too much water.
7 Can I take a bathroom break?
8    MR. GREENSTEIN:  Sure.
9    VIDEOGRAPHER:  Off record at 2:56.
10    (Recess, 2:56 p.m. - 3:11 p.m.)
11    VIDEOGRAPHER:  On the record at 3:11
12    MR. GREENSTEIN:  Q.  Back to page 3 of your
13 opening report.
14    A.  Yes.
15    Q.  We were talking about the first bullet point
16 on the top of the page that says, "There were $800,000
17 of other transfers to the bad debt reserve during the
18 period that were appropriate."  And I think you
19 testified they were appropriate because Oracle had found
20 that there was an erroneous credit memo issued previous.
21 Is that correct?
22    MR. GLENNON:  Objection; mischaracterizes the
23 testimony.
24    THE WITNESS:  No.  It was either an
25 inappropriately applied credit memo, or you also have

184

1 the situation where there was items that were written
2 off, but then they had the cash for it, so they had been
3 inappropriately written off.  Those are the two I can
4 think of in that bucket right now.
5    MR. GREENSTEIN:  Q.  For the $800,000 -- I
6 just want to make sure I'm getting this straight.  For
7 the $800,000 you said there were 12 debit memos that
8 were transferred that related to the erroneous credit
9 memo issue; correct?
10    MR. GLENNON:  Objection; mischaracterizes the
11 testimony, vague and ambiguous.
12    THE WITNESS:  I think for the most part, I
13 haven't gone through them in detail with you, which I
14 can, but I think for the most part those are credit
15 memos.
16    MR. GREENSTEIN:  Q.  Okay.  What was the total
17 amount of those debit memos again?  $728,000?
18    MR. GLENNON:  Objection; vague and ambiguous.
19 Debit memos?
20    MR. GREENSTEIN:  Q.  The 12 debit memos we
21 were just talking about, what was the total amount?
22    A.  The 12 debit memos that had inappropriately
23 applied credit memos were $726,581.
24    Q.  Then you said there were five other debit
25 memos that related to what you called the unique issue;

185

1  correct?
2      A.  Yes.
3      Q.  What was the total of those amounts, or,
4  sorry, those five debit memos?
5      A.  About $148,000, it looks like.
6      Q.  So approximately $874,000; correct?
7      A.  Correct.
8      Q.  So is that the $800,000 you're talking about
9  there?
10     A.  Yes.
11     Q.  So first focusing on the 12 debit memos that
12  were related to erroneous, purportedly erroneous --
13  strike that.
14         Earlier you were talking about a number,
15  368,000.  I just want to clarify that's not part of this
16  800,000?
17     A.  It is not.
18     Q.  You just misspoke?
19     A.  No.  No.  What I said is -- you asked about me
20  rounding.
21     Q.  Okay.  And there was no -- I asked you why you
22  rounded 727 up to eight, remember?
23     A.  Well, I didn't mean -- I didn't round -- what
24  I had not included in the original numbers to you is the
25  five of the unusual or unique issues, which they

186

1  actually total 874.
2      Q.  Got it.
3      A.  And the last bucket, as you can see in my
4  report, is 500,000, which we really don't see all the
5  supporting documentation, but there is some evidence
6  that they were properly booked in or about the second Q
7  of '01.  That totals $482,000.
8      Q.  We'll get to that in a little bit.  So I want
9  to focus on the 12 debit memos that relate to erroneous
10  credit memos.
11         Can you explain the debits and credits that
12  occurred as part of the 2002 cleanup for those
13  transactions.  You can just use an example.
14     A.  Yeah.  Do you have -- do you want me to pick
15  the biggest one?
16     Q.  Sure.
17     A.  The biggest one is General Electric Plastics,
18  credit memo 46151.
19         MR. GLENNON:  Credit memo or debit memo?
20         THE WITNESS:  That's the debit memo number.
21         On October the 1st --
22         MR. GREENSTEIN:  Q.  Actually, why don't you
23  take me through that transaction from the transfer to
24  the bed debt reserve in 2Q and the subsequent
25  resolution.

187

1      A.  All right.  The actual transfer to 2Q to 26 --
2  getting late.
3         The actual transfer to 12601 in the second Q
4  of '00 occurred on October the 1st and October the 5th,
5  2000.  And it was for basically $184,000, where the
6  actual transfer took place, with an eventual credit to
7  12601, and a debit to 25005.
8         So they took it out of the 25005 account and
9  put it into the 12601 account.
10         Then, just to follow all the transactions, on
11  November 17th the debit memo transactions were run,
12  which were three simultaneous debits in and credits out
13  of 25005.
14         Then on November the 8th, 2002, the debit
15  memos were reversed, just reversing the 25005 account,
16  three simultaneous entries.
17         Then on the 24th of November, during the
18  unapplied -- the applied cash project, the reversal of
19  the bad debt transfer took place.  The way that has to
20  happen, you have to first debit and credit cash, because
21  the system doesn't think you have any cash there, it's
22  gone.  So it is a debit and credit to cash.  And then
23  you have a debit to 25005 and a credit to 12601.
24         So all that is doing is just reversing the
25  transfer that occurred back in October of '00.

188

1      Q.  But in order to reverse a credit to 12601
2  which occurred in 2Q, wouldn't you have to debit 12601?
3      A.  It is debited.
4      Q.  I thought you said credit?
5      A.  No, debit 12601, credit to 25005.
6      Q.  Okay, so let me back up.  So in November, you
7  said there was a debit and credit to cash; correct?
8      A.  In November when?
9      Q.  2002.
10     A.  Correct.
11     Q.  Then you said November 14th, 2002 there was a
12  debit to 12601 and a credit to 25005?
13     A.  It was November the 14th, same day.  All it is
14  doing is just reversing the October '02 transaction.
15  And it debits 12601 and it credits 25005, puts it back
16  into customer overpayments unapplied.
17     Q.  So debit 12601, credit 25005?
18     A.  Correct.
19     Q.  Okay.
20     A.  Which would have the result of reducing
21  income.  All right?
22         Then the next day on October -- excuse me,
23  November -- excuse me, a year later, November the 25th,
24  2003, after the research had been done on this
25  transaction, which is, by the way, General Electric

189

1  Plastics, they actually realized that there had been
2  credit memos that were inappropriately issued, and they
3  then booked the receivables and booked the sales.  And
4  then unbooked the 25005 account.
5     Q.  Okay.
6     A.  So, and that information was obtained through
7  looking at the notes, the collectors' notes, for this
8  account in the '03 time frame.
9     Q.  So when you say that was reflected in the
10 note, what was reflected in the notes?
11    A.  The credit memo discussion.
12    Q.  So, for these 12 transactions, how do you know
13 that those items were -- had erroneous credit memos?
14    MR. GLENNON:  Objection; vague and ambiguous.
15    THE WITNESS:  From the notes of the --
16    MR. GREENSTEIN:  Q.  Other than the notes, is
17 there any evidence that those 12 debit memos had
18 erroneous credit memos?
19    MR. GLENNON:  Same objection.
20    THE WITNESS:  In some cases you can actually
21 see credit memos.  But for the most part it was the
22 notes the collectors had done contemporaneous.
23    MR. GREENSTEIN:  Q.  Right.  You could see the
24 credit memos, but that doesn't tell you that they are
25 proper or improper; correct?

190

1     A.  Well, no.  The notes say, "Receipt notes were
2  incorrect; wrong PA; do not show sufficient credit
3  memos; erroneous notes; and credit memo 722616."
4        So you can see, you can trace that back and
5  see there was an inappropriate credit memo on -- at some
6  point in time in the history.
7     Q.  Okay, so other than the notes, is there any
8  evidence that those 12 transactions had erroneous credit
9  memos?
10    A.  That's the summary of what we considered.  As
11 I said, we have a number of different documents here,
12 which is actual invoices, and appears to be documents
13 which were put together by collectors, et cetera, to
14 support that.  I haven't gone through and reconciled
15 those specifically.
16    Q.  So what source documents would tell you that
17 the credit memo is issued erroneously?
18    A.  Well, as I said, for the most part for me I'm
19 using the notes.  Those are the contemporaneous
20 documents I'm using.
21    Q.  I just want to make sure.  You said for the
22 most part.
23        So is there any other document that you're
24 relying upon in making the determination that those 12
25 transactions had erroneous credit memos?

191

1     MR. GLENNON:  Objection; asked and answered.
2     THE WITNESS:  I know that one on this one
3  would be the summary of what I looked at, the vast
4  majority of the support.
5     MR. GREENSTEIN:  Q.  So there are no other
6  documents?
7     A.  There are other credit memos, but I haven't
8  reconciled those to that number.  They appear to be
9  documents, invoices, et cetera, that support that based
10 on the credit of the collectors' notes.
11    Q.  In other words, the 12 debit memos in which
12 you have concluded had erroneous credit memos in their
13 history, you determined that those credit memos were
14 erroneous by looking at the notes; correct?
15    MR. GLENNON:  Objection; mischaracterizes the
16 testimony.
17    THE WITNESS:  For the most part that's
18 correct.
19    MR. GREENSTEIN:  Q.  Well, is there any other
20 piece of evidence that you relied upon?
21    MR. GLENNON:  Objection; vague and ambiguous.
22    THE WITNESS:  There are other documents,
23 invoices and other support.  I just didn't go back and
24 reconcile them.  They seemed to be support for me.  And
25 I didn't reconcile them individually to see that they tied

192

1  exactly back to that.
2        I felt it sufficient to see the collectors'
3  notes done contemporaneous, see that they were talking
4  about credit memos that had been inappropriately
5  applied, and use that in my analysis.
6     MR. GREENSTEIN:  Q.  When you saw the note
7  that said erroneous credit memo in it, you didn't go
8  back to check to see if there was any document that said
9  the credit memo was erroneous; correct?
10    MR. GLENNON:  Objection; vague and ambiguous.
11    THE WITNESS:  Other than reviewing the notes,
12 no.
13    MR. GREENSTEIN:  Q.  Okay.  So for that one
14 debit memo for General Electric Plastics, is there one
15 note for that that indicates it is an erroneous credit
16 memo, or multiple?
17    A.  It is one note.
18    Q.  What does it say?
19    A.  It talks about credit memo, the credit memo
20 actually being 7227616 for -- for the amount of money
21 we're talking about.
22    Q.  Can you just read that note into the record,
23 please?
24    A.  Certainly.  "Receipt notes are incorrect,
25 wrong PA number, and three PRO projects that may

193

1    associate with this reserve amount do not show
2    sufficient credit memos.  Erroneous notes.  See
3    supplemental SO 4814239 and credit memo 7227616 for
4    $181,158.40," which is the amount.  "Makes more sense."
5    And then it talks about a 12/15/96 wire, references
6    text.
7        Q.  How does that note tell you there was an
8    erroneous credit memo?
9        A.  Because it talks about credit memo and talks
10   about credit memo 722616, whatever it was.
11       Q.  It doesn't say it was erroneous, does it?
12       A.  It is using a credit memo and that's -- if it
13   is a credit memo, to me that is an inappropriate
14   application of a credit memo.
15       Q.  So -- but couldn't it have been a proper
16   credit memo that was issued, for example, for customer
17   concessions?
18       MR. GLENNON:  Objection; incomplete
19   hypothetical, vague and ambiguous.
20       THE WITNESS:  No.  Because they eventually
21   booked it back to revenue.  So that means the credit
22   memo was inappropriately booked.
23       MR. GREENSTEIN:  Q.  So the fact they booked
24   it as revenue indicates to you that the previously
25   issued credit memo was erroneous?

194

1        A.  And the notes.
2        Q.  And the notes?
3        A.  Correct.
4        Q.  But the note doesn't say that there was an
5    erroneous credit memo; does it?
6        MR. GLENNON:  Objection; calls for
7    speculation.
8        THE WITNESS:  No.  It talks about the credit
9    memos.
10       MR. GREENSTEIN:  Q.  Okay.  And why don't you
11   take me through the next transaction of the 12, the next
12   highest one in the same way you did with the General
13   Electric Plastics, please.
14       A.  The next one is Structural Dynamics Research,
15   which I think I referred to in my report.
16       Cash was received in May of 2000.  In October
17   of 2001 the amount was transferred to 12601.  On the
18   17th of November, the debit memos took place.  On the
19   7th of November, there was a reversal of the
20   November 17th memos.  On 11/2 of '02 there was a
21   reversal of the transfer to 12601.  And -- I'm sorry, I
22   beg your pardon, I was in the wrong bucket.
23       Q.  I was wondering.
24       A.  Somebody could have stopped me before I got
25   there.

195

1        Q.  One quick question about the last transaction,
2    the GE Plastics.  What was the date of the note that you
3    relied upon?
4        A.  I think you asked me that before.  I don't
5    know the date of the note.
6        Q.  Okay.
7        A.  Okay.  Caltrans on November the 5th, 2000,
8    $91,254 was transferred into the 12601 account.  On
9    November 17th, the debit memos were run.  On
10   November 11th, 2002 there was a reversal of the debit
11   memos.  On November 24th there was a reversal of the
12   transfer.  And on 2/3/03 there was an application to
13   invoices.
14       Q.  Actually, is that this transaction that's
15   listed on 35 and 36 of your report?
16       A.  Exactly.
17       Q.  Do you know the date of the note?
18       A.  No.
19       Q.  Okay.  Did you do any analysis, other than
20   looking at the note, of whether the concessions for the
21   amount in reserve -- that there was too much of a
22   concession that was given to the customer due to the
23   customer sending in a payment for 91K?
24       MR. GLENNON:  Objection; vague and ambiguous,
25   assumes facts.

196

1        THE WITNESS:  Well, I think on that one if you
2    look through the script, you can see where there is --
3    the actual credit memo.
4        MR. GREENSTEIN:  Q.  Overpayment?
5        A.  Yeah.
6        Q.  So it was a credit memo, an invoice was memoed
7    reducing the invoice.  The customer made a payment for
8    the full invoice and so overpaid the amount of credit
9    memo; correct?
10       A.  Correct.  And it was later realized that the
11   credit memo should not have been issued because there
12   actually were services being performed.
13       Q.  Were there ever any instances where
14   overpayments occurred and the credit memo was
15   legitimate?
16       MR. GLENNON:  Objection; vague and ambiguous.
17       THE WITNESS:  I'm sorry, I don't understand
18   your question.
19       MR. GREENSTEIN:  Q.  Well, we just talked
20   about an invoice being reduced if you had a credit memo.
21   And somebody overpaid -- paid the full amount of the
22   invoice which resulted in overpayment; correct?
23       MR. GLENNON:  Objection; mischaracterizes the
24   testimony.
25       MR. GREENSTEIN:  Q.  You don't recall that we

197

1  just talked about that?
2      A.  Would you mind just repeating that one more
3  time.
4      Q.  Okay.  I will ask a different question.
5      With respect to those two debit memos that you
6  just went through, the erroneous credit memos, those
7  involved overpayments of invoices; correct?
8      MR. GLENNON:  Objection; vague and ambiguous.
9      THE WITNESS:  I don't recall Caltrans was
10 necessarily an overpayment.  It was just they paid, and
11 then erroneously, Oracle issued a credit memo, not an
12 overpayment, just issued a credit memo thinking they
13 weren't due the money.  And then later realized they
14 were due the money because there were services
15 performed.
16     MR. GREENSTEIN:  Q.  Okay.  So going back to
17 page 33, I want to focus on the five debit memos for
18 $148,000, where you describe a process where cash was
19 moved from 25005 to 12601 during 2Q.  Correct?
20     A.  Yes.
21     Q.  Can you just describe the process from the
22 transfer then how it was resolved during the 2002
23 cleanup?
24     A.  Yeah, a little different than the other ones.
25 But in this situation what it really is, is a situation

198

1  where you are writing off an invoice that you have cash
2  for, and that's an inappropriate -- in that regard, you
3  should be reporting income.  So, in other words, you
4  have set up a reserve, but you have the cash.
5      So in this situation what happened was, for
6  these five instances, amounts were transferred in
7  October/November of '00 into the 12601 account.
8  However, at the same time you have invoices -- so they
9  are basically recording the income, okay.  However, at
10 the same time -- you actually have that cash that you're
11 taking against it.  At the same time, however, you have
12 reserved for that invoice, because it got too old, it
13 got to five months, six months, whatever the days were.
14 So you're simultaneously recording a reserve which you
15 should not be recording.  You're reducing income, and
16 you shouldn't.
17     So that is a situation where you literally
18 have written off a portion of the invoice, and, in fact,
19 you shouldn't have, because you had the cash.
20     Q.  And then how was that resolved during the 2002
21 cleanup?
22     A.  Well, to the extent that you had reserved it,
23 you should not have reserved for that much, so it should
24 have been taken back into income.
25     Q.  So what are the debits and credits that

199

1  occurred during the 2002 cleanup?  Why don't you take us
2  through the largest of those transactions.
3      A.  Let's just take -- take railroad reserve,
4  $65,901.
5      Q.  What's the debit memo?
6      A.  42059.  So in that transaction, in May, cash
7  was received.
8      Q.  What year?
9      A.  '00.  I'm sorry.
10     Q.  Okay.
11     A.  In October the amount was transferred into the
12 12601 account.  So they had the cash, they took it into
13 the reserve account.  On November 17th the debit memos
14 occur.  On November 12, '02 they reverse the debit memo
15 transactions.  And on November 24 they reverse the bad
16 debt transfers.
17     So what happens there is you effectively --
18 you have reserved too much, because you have an invoice
19 that you had the cash for, but you're recording a
20 reserve because of the age.  So you have to take that
21 into income.  It should be taken into income.
22     Q.  So the invoice that -- the payment was coming
23 in for an invoice that had previously been written off;
24 right?
25     A.  Right.

200

1      MR. GLENNON:  Objection; mischaracterizes the
2  testimony.
3      MR. GREENSTEIN:  Q.  Is that right?
4      A.  Payment comes in, gets written off or gets
5  transferred from 25005 into 12601 account, as if it was
6  into the income account.  However, at the same time you
7  have actually then reserved the invoice because it got
8  too old, but you had the cash.  So you got to reverse
9  that transfer into the reserve out.
10     Q.  How do you reverse that?
11     A.  You take it from 12601.
12     Q.  So it is a debit to 12601 and credit to --
13     A.  Be in income.
14     Q.  What date was that for the particular
15 transaction you were citing?
16     A.  11/24/02.
17     Q.  Was that the only transaction, debits and
18 credits, that occurred during 2002 with respect to that
19 transaction?
20     A.  Yes.
21     Q.  And how do you know that the invoice was
22 previously written off?
23     A.  Because we actually have the invoice and look
24 at the date of the invoice and apply it to the
25 percentages that Oracle would automatically reserve it

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

201

1   for.
2       Q.  But do you have actual evidence that the
3   invoice was written off?
4       A.  Well, it would be automatically -- you
5   wouldn't see that in the detail we have.  But you would
6   know that happened because of the date of the invoice.
7       Q.  So what you're saying is after a certain
8   amount of days where an invoice hasn't been paid, it
9   will automatically be written off?
10      A.  There are percentages that are written off, 20
11  percent, 50 percent and 85 percent.
12      Q.  So what was the date of that payment, or,
13  sorry, that invoice?
14      MR. GLENNON:  Objection; vague and ambiguous.
15      MR. GREENSTEIN:  Q.  For the railroad
16  transaction.
17      A.  May of '00.
18      Q.  And so when do you -- when did it get written
19  off?
20      A.  Well, a portion of it would have been written
21  off by 11/30/00, at the six month, 180 days.
22      Q.  Why only a portion of it?
23      A.  Because they don't write the whole thing off.
24  You just write a portion of it off.  Which is typical in
25  companies, you say, look, it is automatic at a certain

202

1   day we're going to write off this much automatically,
2   because there is a presumption it can't be collected.
3       Q.  But don't they presume the other portion can
4   be collected?
5       A.  At a later point in time, if they haven't
6   collected it, the remainder of it will be written off.
7   I have seen a number of companies do that.  They say,
8   180 days, automatically 50 percent gets written off no
9   matter what.
10      Q.  Turning to page 33 again, underneath the
11  $800,000 discussion, there is a discussion of at least
12  another $500,000.
13          And you state that, "These transfers were
14  appropriate, although the evidence relating to these
15  transfers is not as complete as the evidence I reviewed
16  in connection with the $1.5 million in transfers noted
17  above."  Do you see that?
18      A.  Yeah.  Yes.
19      Q.  So can you just explain what those
20  transactions are and why you found them appropriate?
21      A.  Well, again, they were originally transferred
22  from 25005 into 12601.  They were reversed in November,
23  November 24th, '02, all these were reversed for the most
24  part.  And when the unapplied cash project was performed
25  at that time, there is some evidence that it looks like

203

1   it was either an unapplied, or a credit memo that was
2   bad or a royalty that was appropriate.  The notes were
3   not necessarily conclusive, or we didn't see any other
4   type of support for that.
5       So that appears to be one that should have
6   been reported, given there is some evidence of a credit
7   memo or there was some evidence of a royalty or some
8   other type of revenue that should have been booked.  But
9   the notes were not conclusive for me, nor did I see any
10  other type of support.  We put that into a bucket of
11  could be.
12      Q.  Could be.  So you can't definitively say that
13  $500,000 of transfers was proper; correct?
14      A.  That's correct.
15      Q.  And how many debit memos made up the $500,000
16  that you're talking about?
17      A.  Twelve.
18      Q.  I hate to do this, but can you just go ahead
19  and list them into the record, please?
20      A.  Certainly.  3503, 3569, 5165, 7992, 10691,
21  40196, 44860, 2601, 5516, 43176, 44788, and 42 -- excuse
22  me, 45238.
23      Q.  Mr. O'Bryan, in your report you state that of
24  the 926 debit memos there are 277 that were refunded
25  prior to November 17th, 2000 for $103 million; is that

204

1   accurate?
2       A.  That is correct.
3       Q.  If I wanted to go into the script output and
4   figure out those 277 debit memos, what would I do?
5       A.  You just go in and run a query on accounts
6   payable to see where there was a refund.
7       Q.  How would a refund show up?  Would it say
8   refund?
9       A.  The best place to go is accounts payable.
10      Q.  So if I ran a query by accounts payable,
11  277 items would pop up?
12      A.  Yes.
13      Q.  Is there anything else I would need to do to
14  figure out these 277?
15      A.  Let me get to the report and make sure that's
16  right.
17          Do you have the page of my report so I can
18  turn right to it?  I can find it, if you want.
19          Counsel, do you have the page of my report
20  that says that?  I can find it; I just want --
21      Q.  Oh, no, I don't.
22      A.  It is on page 13 of my rebuttal.  Yeah, it is
23  AP payment details.
24      Q.  AP payment details?
25      A.  AP payment details.

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

205

1   Q.  So if I ran a query in the script output for
2   that column pre November 17th, then 277 items would come
3   up?
4   A.  That is correct, 277 items totaling --
5   Q.  $103 million?
6   A.  $102,906,609, which we rounded up.
7   Q.  So is it fair to say that the other 649 of the
8   926 were not refunded prior to November 17th, 2000?
9   MR. GLENNON:  Objection; assumes facts, lacks
10  foundation.
11  THE WITNESS:  I believe that to be true, yes.
12  MR. GREENSTEIN:  Q.  That's $431 million in
13  debit memos; correct?
14  A.  Correct.
15  Q.  Okay.  So in deriving your calculation of the
16  $20.1 million that was transferred from 25005 to 12601
17  in the second quarter '01, which months did you include
18  in that calculation?
19  MR. GLENNON:  Objection; vague and ambiguous.
20  THE WITNESS:  Which months did I include?
21  MR. GREENSTEIN:  Q.  Yes.
22  A.  Well, what I should include is what's in the
23  quarter, which is September, October, November.
24  Q.  And why did you choose those months?
25  A.  Those are the months in the quarter.

207

1   order to come up with the $20.1 million; correct?
2   A.  That's correct.
3   Q.  Mr. O'Bryan, previously you said that in order
4   to find out the 277 refunds of the 926, you would run a
5   query on AP payment --
6   A.  Correct.
7   Q.  -- column; correct?  Are you sure that's in
8   the script output?
9   MR. GLENNON:  I'm going to object.  Lack of
10  foundation, vague and ambiguous.
11  THE WITNESS:  It is on the query we ran.
12  MR. GREENSTEIN:  Q.  Okay.  Can you think of a
13  reason why if we looked at the script output we wouldn't
14  see that column there?
15  MR. GLENNON:  Objection; calls for
16  speculation, lack of foundation.
17  THE WITNESS:  I didn't personally run the
18  filter or the run.  It was one of my team.  The thing I
19  see consistent is AP payment detail.  If it was another
20  column that then pulls that up, pulls that in, that may
21  be.
22  But what is consistent on that run, which is
23  in my work papers, is AP payment detail.
24  MR. GREENSTEIN:  Q.  Do you have a list of
25  those 277 in one place?

206

1   Q.  Well, are you aware that Oracle had a practice
2   of calculating based on the second month of the quarter?
3   In other words, so for the second quarter, it would be
4   August, September and October?
5   MR. GLENNON:  Objection; lack of foundation,
6   assumes facts, incomplete hypothetical.
7   THE WITNESS:  Yeah, I think you're
8   misunderstanding the way that process works.
9   MR. GREENSTEIN:  Q.  So you didn't see any
10  evidence that that's the way they calculated the 12601
11  transfers for 2Q?
12  A.  Well, the reserve, the actual reserve, the
13  12601 reserve is calculated, looked at on a specific
14  account, on account-by-account basis, at the second
15  month of a Q.  And in the third month of a Q it is then
16  trued up.
17  Q.  Okay.
18  A.  In other words, you then look to see -- I know
19  that the specific items that are going to go bad or are
20  bad in the reserve.  But in the last month I know I
21  booked this much revenue on a historical basis, I
22  typically put 1, 2, 3 percent, whatever it is, it then
23  gets trued up.  So a quarter is a quarter.
24  Q.  So, in other words, you calculated September,
25  October and November transfers from 25005 to 12601 in

208

1   A.  I do, yes.
2   Q.  Are you willing to produce those?
3   A.  That's not up to me.
4   MR. GLENNON:  To the extent that you can
5   establish the foundation for requiring production, we'll
6   certainly entertain that discussion.  But I don't think
7   you've done that.
8   MR. GREENSTEIN:  Q.  So you're not willing to
9   do it?
10  MR. GLENNON:  This is counsel's decision, as
11  you know.
12  But what Mr. O'Bryan has said is that
13  everything that he has gleaned and everything he's
14  relied upon is from the script output, which is actually
15  listed in the appendix to his expert report, which I'm
16  happy to point out to you, if you'd like.
17  MR. GREENSTEIN:  Q.  Mr. O'Bryan, do you think
18  it is helpful -- was it helpful for you to have a list
19  of those 277 items?
20  A.  For me personally?
21  Q.  Yeah.
22  A.  Well, certainly it summarized what they were
23  and how much they were.  But they come right out of the
24  script output.
25  Q.  If you could turn -- strike that.

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

209

1      Mr. O'Bryan, is it your testimony, your expert
2  testimony, that Ernst and Young analyzed the 2Q '01 bad
3  debt transfers, the transfers from 25005 to 12601 in the
4  second quarter?
5    A.  Yes.
6    Q.  They did review it?
7    A.  Yes.
8    Q.  What evidence can you provide that supports
9  your conclusion?
10    A.  As I recall, it was a deposition of Jennifer
11  Minton and also deposition of Mr. Henley.
12    Q.  Is there anything else you relied upon in
13  order to determine, to conclude that Ernst and Young
14  reviewed the $20.1 million in bad debt transfers in the
15  second quarter of '01?
16    A.  Well, just my experience as an auditor, and
17  knowing what auditors would be aware of and would talk
18  to clients about.
19      When you have the chief financial officer,
20  Mr. Henley, saying, "I've talked to them about that, or
21  would have talked to them about it," I think that's
22  pretty good evidence that they would have been spoken
23  to.
24      Then you also have Ms. Minton, who is also in
25  the accounting department, mentioning that they had been

210

1  talked to about it. To me they would know that.
2      In addition to that, it would be an item that
3  an auditor would be interested in, given the amount, and
4  specifically given the fact that the client is telling
5  you this is something I want you to look at.
6    Q.  When you say an auditor would look at it, it
7  is not your testimony that Ernst and Young audited
8  Oracle's second quarter '01, is it?
9    A.  No. I'm sure they performed the SAF 71
10  review.
11    Q.  Just so it is clear, Ernst and Young did not
12  audit Oracle's second quarter '01 bad debt transfers?
13    MR. GLENNON:  Objection; vague as to time. Do
14  you want to clarify?
15    MR. GREENSTEIN:  Q.  At any time. Is it your
16  testimony that Ernst and Young audited Oracle's second
17  quarter '01 financials?
18    A.  Well, no. Arthur Andersen was the auditor.
19  But Ernst and Young was made aware of this in the
20  October/November of '02 time frame when this unapplied
21  cash project took place. And I base that on testimony
22  that I've seen, as well as just my own experience as an
23  auditor that that would be something you'd see, and it
24  would be something you'd look at.
25      And as soon as you see it and as soon as you

211

1  look at it, you have to immediately look at it with
2  respect to the materiality back to the quarter it was
3  appropriately booked.
4    Q.  Why would you have to immediately look at it?
5    A.  Because it is something the clients brought up
6  to you and said, "Hey, will you take a look at this and
7  tell me" -- worst case scenario, hypothetically, which
8  we play out in my report, is the entire $20 million is
9  something that should be taken back to the second
10  quarter and reduce revenues by that.
11      The auditor would immediately say, "Look, I'm
12  not going to go do a bunch of analysis how this
13  happened. That's the company's internal policy and
14  internal operations. However, I do want to know if
15  that's something that has to be looked at and
16  investigated for me, the auditor, to know if it was
17  material in the second Q of '01 to potentially have to
18  restate the Q."
19      Even though they didn't audit the second Q of
20  '01, they being Ernst and Young, they certainly would
21  have had to consider materiality to go back and restate
22  that Q. They would have responsibility for restating
23  that Q even though they did not report on it at the time
24  it was prepared.
25    Q.  So, just to be clear, your testimony is that

212

1  Ernst and Young did a review of the transfers from 25005
2  to 12601 in the second quarter '01, and issued an
3  opinion on that amount?
4    MR. GLENNON:  Objection; mischaracterizes the
5  testimony. It is also vague and ambiguous as to time.
6    THE WITNESS:  No. Auditors don't issue
7  opinions on individual transactions and/or accounts
8  within a set of financial statements.
9    MR. GREENSTEIN:  Q.  Let me rephrase. So
10  you're saying they did review it though; right?
11    MR. GLENNON:  Objection; mischaracterizes the
12  testimony, it's vague and ambiguous.
13    THE WITNESS:  I believe that Ernst and Young
14  was made aware of the transfers and considered,
15  immediately upon being aware of, they would need to
16  consider whether or not it was material to that quarter.
17    MR. GREENSTEIN:  Q.  So do you -- do you know
18  if they considered it or not?
19    MR. GLENNON:  Objection; vague and ambiguous,
20  asked and answered.
21    THE WITNESS:  I do. And they were.
22    MR. GREENSTEIN:  Q.  So your expert opinion is
23  that Ernst and Young reviewed the $20.1 million in
24  transfers from 25005 to 12601 in the second quarter?
25    MR. GLENNON:  Objection; vague and ambiguous

213

1   as to time, and asked and answered.
2       THE WITNESS: I'm sorry, I think you are
3   changing that question.
4       My position is that they -- I believe that
5   they were aware of it, of the transfers, and I believe
6   given the fact they were aware of it, they considered
7   the materiality of that into the second Q of '01,
8   Oracle's financial statements.
9       MR. GREENSTEIN: Q. Okay.
10      A. Did they perform audit procedures? I don't
11  know what procedures they performed. But I know having
12  been told about it, they would have had to consider the
13  materiality of it to the second Q.
14      Q. They would have had to consider it; right?
15      A. They would have, yes.
16      Q. But do you know if they did consider it?
17      MR. GLENNON: Objection; vague and ambiguous,
18  asked and answered.
19      THE WITNESS: If they were told about it, they
20  would have considered it, and considered materiality.
21  Auditors do that.
22      MR. GREENSTEIN: Q. And you said the
23  evidence -- the only evidence that you have to support
24  your opinion is testimony from Jennifer Minton and
25  testimony from Jeff Henley, and what you know about what

214

1   auditors look at in general; correct?
2       MR. GLENNON: Objection; mischaracterizes the
3   testimony.
4       THE WITNESS: There is also the audit
5   committee minutes. As I recall, the transactions, the
6   project, the unapplied cash project, was discussed in an
7   audit committee meeting. And auditors have to, by GAAS
8   requirements, basically should, look at audit committee
9   minutes.
10      So when -- I don't know if they were at that
11  meeting that it was discussed or not; I don't know that.
12  But even if they weren't, they would look at the minutes
13  of those meetings. It is a required step in audits or a
14  step all auditors perform in audits. It is actually
15  represented to the auditors that the company has made
16  available to them all the minutes.
17      So the auditor would have seen -- it's
18  Mr. Henley's testimony, Ms. Minton's testimony, it's my
19  understanding what auditors do. And, lastly, I
20  understand that it was discussed in the audit committee
21  meeting, and Ernst and Young certainly would have seen
22  those minutes and researched what that meant when they
23  were talking about the unapplied cash project or
24  whatever was discussed.
25      MR. GREENSTEIN: Q. But you don't know if

215

1   they did that or not, do you?
2       MR. GLENNON: Objection; vague and ambiguous,
3   mischaracterizes testimony.
4       THE WITNESS: I have not seen Ernst and
5   Young's work papers or talked to Ernst and Young
6   auditors that may have done that. I believe the name is
7   Mr. Banker, Mr. Caruso, or something to that effect.
8       But, I know in my 27, 29 years as being an
9   accountant, auditor, that's something that if the CFO
10  told you about it, it would be something you would
11  consider with respect to materiality.
12      MR. GREENSTEIN: Q. Can you point me to the
13  Henley testimony that you're talking about?
14      THE WITNESS: Yeah. Do you want to take a
15  two-minute break?
16      MR. GREENSTEIN: Yeah. I'm going to be asking
17  for the Minton testimony and the Henley testimony.
18      VIDEOGRAPHER: Off record at 3:55.
19      (Recess, 3:55 p.m. - 4:05 p.m.)
20      VIDEOGRAPHER: On record at 4:05.
21      MR. GREENSTEIN: Q. Mr. O'Bryan, during the
22  break you said you were going to try to find the
23  testimony of Jennifer Minton and Jeff Henley. Did you
24  do that?
25      A. I did, yes.

216

1       Q. Okay.
2       A. And the reference in my report, I'm sorry, I
3   should have asked you this in the first place, would
4   have expedited things, was on page 41 of my original
5   report, section D, where it talks about review of work
6   performed.
7       And the two cites that we go to, first to
8   Jennifer Minton, Jennifer Minton was the chief
9   accounting officer, CAO, of Oracle by 2001. And her
10  testimony when asked, "Was this analysis" -- the
11  analysis talked about was the unapplied cash analysis --
12  "shared with the outside auditors?"
13      "Answer: Yes."
14      Question, over on page 285 --
15      Q. Actually let me stop you there.
16      MR. GLENNON: Hold on. Are you finished with
17  your answer?
18      MR. GREENSTEIN: Q. I was going to say, if
19  this is the testimony that you're talking about, we
20  don't need to go through it.
21      A. There is more testimony.
22      Q. The one that said -- the stuff you cited on
23  page 41.
24      MR. GLENNON: If you want to complete your
25  answer, you can. But it is up to you.

217

1    THE WITNESS: Well, yeah, I do want to
2  complete the answer, if you don't mind.
3    MR. GREENSTEIN: Q. Okay.
4    A.  Then on the next page they are talking about
5  Mr. Wald asked -- there is discussion on 284 if it was
6  discussed at the audit committee meeting.  And the
7  answer was, yes.  Didn't recall if the auditors were at
8  the audit committee.
9    And then also saying Tom Williams would have
10 discussed this with the auditors.
11    So you have Ms. Minton saying it was discussed
12 with the auditors, that it was discussed at the audit
13 committee, doesn't know if the auditors were at the
14 audit committee, and also the fact Tom Williams would
15 have discussed this with the auditors.  Also, given the
16 fact that, again, as I mentioned the auditors would have
17 to look at the audit committee minutes and see that
18 discussion, would have certainly considered this as to
19 materiality in the second Q.
20    Q.  They are talking about auditors there; right?
21    A.  Talking about auditors.
22    Q.  E&Y was not Oracle's auditor at the time were
23 they?
24    A.  This is talking about the auditors at the time
25 when this project was done, which was Ernst and Young.

218

1    Q.  So, okay, so is it fair to say that your --
2  the evidence that you rely on in forming the opinion
3  that Ernst and Young looked at the 2Q '01 transfers of
4  $20.1 million is reflected on page 41 in footnote 106
5  and 107; is that correct?
6    MR. GLENNON: Objection; mischaracterizes the
7  testimony.
8    THE WITNESS: Well, the second one is
9  Mr. Henley's testimony, which is, I believe, referred
10 to.  Let me just read it to you.  And that was asked
11 again about the, I think there they called it cleanup.
12 And here it was that the -- "I got Jennifer and asked
13 all the way down.  We get the people in the department
14 itself as well as the others, including the internal
15 audit, external audit, to really get an understanding of
16 what did or didn't happen."
17    Question was: "Okay, so you've answered
18 at least the question partially.  You got Ms. Minton
19 involved, you got external auditors involved.  Which
20 external auditors?
21    "Whoever our public auditors are at the time.
22    "Okay.
23    "Either Arthur Andersen or Ernst and Young, as
24 I testified earlier.  I can't remember when we
25 switched."

219

1    So it is clearly talking about '02, because
2  they did switch from Andersen, which no longer existed.
3    (Discussion off the record.)
4    (Record read as follows:  ANSWER:  It is
5    clearly talking about '02 because they did
6    switch from Andersen, which no longer existed.)
7    MR. GREENSTEIN: Q.  Is that a fair
8  characterization of your testimony?
9    A.  Yes.
10    Q.  So, other than this deposition testimony of
11 Jennifer Minton and Jeff Henley, and I think you said
12 there is audit committee meeting notes, other than that
13 evidence, is there any other evidence that you believe
14 supports your conclusion that Ernst and Young looked at
15 the $20.1 million in transfers from 25005 to 12601
16 during 2Q '01?
17    MR. GLENNON: Objection; mischaracterizes the
18 testimony, asked and answered.
19    THE WITNESS: The only thing I would add would
20 be my understanding of how auditors work and what they
21 would look at and what they would consider.
22    MR. GREENSTEIN: Q.  Okay.
23    A.  Which clearly would have been looking as to
24 materiality in the second Q.
25    Q.  Did you review the --

220

1    A.  I'm sorry to do this to you, but if you
2  recall, one of the later audit committee minutes states
3  that Ernst and Young was done with their review and they
4  were proposing no adjustments, nor did they adjust the
5  second Q of '01.  So that tells you that it was not
6  material in their mind.
7    Q.  Okay, what audit committee meeting was that?
8    A.  There was a subsequent audit committee meeting
9  where Ernst and Young presented to the audit committee
10 they completed their review of one of the Qs and there
11 were no adjustments.
12    Q.  That was third quarter '01, wasn't it?
13    A.  Exactly right.  The point is that when they
14 say that there is no adjustments, it really goes all the
15 way back.  If you find adjustments at any point in time,
16 you have to go back if it is material.
17    Q.  Okay.
18    A.  Under APB 20.
19    Q.  Did you review the SLC interview memo of John
20 Banker, who is the senior audit partner for E&Y at the
21 time?
22    A.  I haven't seen that, I don't think.
23    MR. GREENSTEIN: Why don't I mark that.
24    (Exhibit 11 marked for
25    identification.)

221

1      MR. GREENSTEIN:  Q.  For the record, this is
2  NDCA-ORCL 296428 through 296434.  Actually, Mr. O'Bryan,
3  I'm going to focus your attention on a particular
4  portion of this.  So just let me know when you've
5  reviewed it.
6      A.  Yes, I read through that.
7      Q.  Have you seen this document before?
8      A.  I don't recall.
9      Q.  So you didn't -- did you consider it in either
10  your opening report or your rebuttal report?
11      MR. GLENNON:  Objection; vague and ambiguous.
12      THE WITNESS:  If I saw it, I considered it.  I
13  have not referred to it, so I have not relied on it.
14      MR. GREENSTEIN:  Q.  Okay.  So have you read
15  it before?
16      MR. GLENNON:  Objection; asked and answered.
17      THE WITNESS:  Yeah, I just don't recall.
18      MR. GREENSTEIN:  Q.  Okay.  If you turn to the
19  second to the last page.
20      A.  I'm there.
21      Q.  Actually, strike that.
22      Did you review the SLC final report regarding
23  the accounting allegations?
24      MR. GLENNON:  Objection; vague and ambiguous.
25      THE WITNESS:  I don't recall if I reviewed

222

1  that or not.
2      MR. GREENSTEIN:  Q.  Turning to the second to
3  the last page of this document.  You see how the heading
4  begins with, "Accounting Fraud Allegations Regarding
5  Unapplied Cash and Bad Debt Reserve."  Do you see that?
6      A.  I do, yes.
7      Q.  Why don't you go ahead and read the whole
8  thing.
9      A.  I've read that.
10      Q.  Okay.  So you read it just now.  But you're
11  not saying you read it before?
12      A.  I don't recall if I read it before.  I read a
13  lot of things.  I don't remember it.
14      Q.  You see how it says that the committee --
15  second sentence, "The committee discussed with Banker
16  that certain transfers from unapplied cash to the bad
17  debt reserve had occurred in Q3 of fiscal 2001, but that
18  the maximum amount of cash moved to the bad debt reserve
19  in Q3 was approximately $5 million."  Do you see that?
20      A.  Yes, I do.
21      Q.  Okay.  Do you see any evidence here that E&Y
22  looked at the second quarter of 2001?
23      MR. GLENNON:  Objection; document speaks for
24  itself.
25      THE WITNESS:  No.  The second quarter isn't

223

1  discussed.  But certainly Ernst and Young -- this is
2  almost a perfect example of the fact that they knew.
3  Having known -- and it says this process is ongoing.
4  Continuing its investigation of the claims regarding the
5  bad debt reserve, believe me, Ernst and Young would have
6  been all over this and looked back once the information
7  was known, which it was eventually later.
8      This was dated, I believe, November 13th.  So
9  this was before the transfer of all the bad debt, the
10  $20 million in bad debt reserves back to the 25005
11  account, which happened on November 24th.
12      So this is apparently what they knew at the
13  time, was 3Q, apparently not 2Q.  However, knowing that
14  there was ongoing investigation, Ernst and Young would
15  have been all over that.
16      Q.  You said that the reversal of the $20.1
17  million in transfer to the bad debt reserve in Q2
18  occurred on what date?
19      A.  November 24th, 2002.
20      Q.  All that $20.1 million was reversed on that
21  date?
22      A.  That's correct.
23      Q.  Okay.  So you will see this is an interview
24  memorandum from the SLC.
25      Do you know what the SLC ultimately put in

224

1  their final report?
2      MR. GLENNON:  Objection; the document speaks
3  for itself, lacks foundation.
4      THE WITNESS:  I don't recall what that report
5  says as I sit here right now.
6      MR. GREENSTEIN:  Q.  But you didn't rely upon
7  the SLC report in forming your opinion on whether E&Y
8  looked at that issue; right?
9      MR. GLENNON:  Objection; asked and answered.
10      THE WITNESS:  I don't rely on it in my report.
11  I could have read it at one point or considered it, but
12  apparently haven't relied upon it.
13      MR. GREENSTEIN:  Q.  Mr. O'Bryan, did you --
14  in forming your opinion on Ernst and Young -- on Ernst
15  and Young's purported knowledge of the bad debt
16  transfers in 2Q '01, did you rely upon the deposition of
17  Alex Bender?
18      A.  I did see Mr. Bender's deposition where he
19  stated he didn't know anything about the second Q
20  reviews -- second Q transfers.
21      Q.  And wasn't --
22      A.  I just saved you an exhibit.
23      Q.  And are you aware that Alex Bender was the
24  person -- the witness designated by Ernst and Young as
25  the, quote, person most knowledgeable regarding these

225

1  issues pertaining to Oracle?
2      MR. GLENNON: Objection; lack of foundation,
3  vague and ambiguous.
4      THE WITNESS: I don't know if he was the PMK
5  or not. He was the senior manager on the engagement,
6  Mr. Banker was the partner, but I think Mr. Banker had
7  retired, so was not necessarily available to be deposed.
8  It would probably make sense that the senior manager may
9  have been the PMK.
10     MR. GREENSTEIN: Q. So --
11     MR. GLENNON: It is vague and ambiguous as to
12  these issues pertaining to Oracle as well. Do you want
13  to clarify what they were designated as PMK for?
14     MR. GREENSTEIN: No. He answered.
15     Q. So, given that you just said that you read
16  Mr. Bender's deposition, you said he didn't know about
17  the 2Q transfers, why do you still -- how do you still
18  form an opinion that they did know?
19     A. Because --
20     MR. GLENNON: Objection; vague and ambiguous,
21  asked and answered.
22     THE WITNESS: You mean they knew, you mean
23  Ernst and Young knew?
24     MR. GREENSTEIN: Q. Correct.
25     A. About the second Q transfers?

226

1      Q. Right.
2      A. Because of Ms. Minton's testimony,
3  Mr. Henley's testimony. And then also my understanding
4  of how an engagement team works. Not everybody on the
5  team knows everything about what is going on in the
6  engagement. So it is very likely Mr. Banker could have
7  known about it and gave consideration to it, and
8  somebody else did, but Mr. Bender did not. That's not
9  untypical at all.
10     Q. But --
11     A. An engagement team of an audit doesn't know
12  everything about the entire client, especially a client
13  the size of Oracle, on an ongoing basis. That's why
14  there is a team.
15     Q. So you think that it is more reliable to rely
16  on testimony of Jennifer Minton and Jeff Henley rather
17  than the testimony of Mr. Bender, who was designated by
18  Ernst and Young as its person most knowledgeable?
19     MR. GLENNON: Objection; lack of foundation,
20  argumentative, mischaracterizes the testimony.
21     THE WITNESS: Yeah, I don't think -- I've
22  considered all that testimony. And all I'm saying is
23  given all the information that I've seen, I believe that
24  Ernst and Young did review that and did consider it with
25  respect to materiality. And it is based on Ms. Minton's

227

1  testimony, Mr. Bender's testimony, Mr. Henley's
2  testimony, the audit committee information, my
3  understanding of how an engagement team works, and my
4  understanding of what auditors would be interested in
5  with respect to materiality.
6      MR. GREENSTEIN: Q. But you agree with me
7  that Mr. Bender says that he wasn't aware that Ernst and
8  Young looked at the 2Q transfer from 25005 to 12601;
9  correct?
10     MR. GLENNON: Objection; lacks foundation,
11  document speaks for itself.
12     THE WITNESS: I recall Mr. Bender saying
13  something to the effect he wasn't aware or didn't know
14  of any second Q transfers to the bad debt reserve,
15  something to that effect.
16     MR. GREENSTEIN: Okay. Mark two exhibits, 12
17  and 13.
18     (Exhibit 12 marked for
19      identification.)
20     (Exhibit 13 marked for
21      identification.)
22     MR. GREENSTEIN: Let's mark 12 first. For the
23  record, 12 is Bates stamped EY 000001 through EY 000012.
24  And Exhibit 13, for the record, Exhibit 13 is a portion
25  of the SLC report Bates stamped NDCA-ORCL 295517 through

228

1  295591.
2      Q. Mr. O'Bryan, why don't you let me know when
3  you're finished looking. Let's start with Exhibit 12.
4      A. Okay.
5      Q. Have you seen Exhibit 12 before?
6      A. I don't recall seeing this document.
7      Q. But you didn't rely upon it; correct?
8      A. That's correct.
9      Q. You see the first page is -- it's a copy of an
10  audit file that says, "Agreed upon procedures with
11  respect to debit memos to account 25005 in November
12  2000." Do you see that?
13     MR. GLENNON: Objection; the documents speaks
14  for itself.
15     THE WITNESS: I do see that it says that, yes.
16     MR. GREENSTEIN: Q. What does this appear to
17  be?
18     A. This is a binder cover from Ernst and Young's
19  work papers for the period 5/31/03. It appears to be
20  the binder cover for the agreed upon procedure of the
21  work done on the debit memos.
22     Q. If you turn to EY -- page EY 3.
23     A. I'm there.
24     Q. It is an e-mail from John Banker to
25  hfrahn@slblaw.com. And it says, "Subject: Re: Draft

229

```
 1   Insert For Your Review."  And it has a date of
 2   11/19/2002.  Do you see that?
 3        A.  I do, yes.
 4        Q.  And the text of the e-mail says, "Buzz, here
 5   is a draft marked for suggested changes by counsel and
 6   me.  Please call to discuss.  Thanks.  JB."  Do you see
 7   that?
 8        A.  I do, yes.
 9        Q.  Is it fair to say this appears to be an e-mail
10   from John Banker to an hfrahn, 11/19, enclosing some
11   changes to a document?
12        MR. GLENNON:  I'm going to just briefly object
13   just on the basis -- Eli, can you give me the background
14   on this particular document?  Has this been logged?  Is
15   this privileged?  This looks like it could be
16   privileged.
17        MR. GREENSTEIN:  Well, it was produced by
18   Ernst and Young.
19        MR. GLENNON:  All right, can we take a
20   couple-minute break so I can look into this?  I don't
21   want to shut you down on your questioning, but I can
22   just make a couple phone calls.
23        MR. GREENSTEIN:  Okay.
24        VIDEOGRAPHER:  This marks the end of tape
25   three in Volume I in the deposition of J. Duross O'Bryan
```

230

```
 1   at 4:26, going off the record.
 2           (Recess, 4:26 p.m. - 4:41 p.m.)
 3        VIDEOGRAPHER:  On record at 4:41.  This marks
 4   the beginning of tape four in the deposition of J.
 5   Duross O'Bryan.
 6        MR. GREENSTEIN:  Q.  Mr. O'Bryan, you have
 7   before you what has been marked as Exhibits 12 and 13.
 8   Exhibit 12 was the audit file, couple pages from the
 9   audit file, and Exhibit 13 was a portion of the SLC
10   report.  Do you see that?
11        MR. GLENNON:  Objection; foundation.
12        THE WITNESS:  I see 12, which appears to be
13   Ernst and Young Bates stamped documents, and 13,
14   whatever Bates they are.
15        MR. GREENSTEIN:  Q.  If you turn to page EY --
16   on Exhibit 12, EY 3.
17        A.  Yes.
18        Q.  Sorry, EY 6.
19        A.  I'm there.
20        Q.  And it appears to be an e-mail from John
21   Banker to Joel Bonner, dated 3/11/2003.  It looks like
22   it includes the previous e-mail that we looked at dated
23   11/19/2002 from John Banker to Harrison Frahn.  Do you
24   see that?
25        A.  I do, yes.
```

231

```
 1        Q.  It says, "Buzz, here is the draft marked for
 2   suggested changes by counsel and me.  Please call to
 3   discuss."  Do you see that?  "Thanks.  JB."
 4        A.  I do, yes.
 5        Q.  And if you turn to page 10, it appears to be a
 6   red-lined Word or Word Perfect, word processing
 7   document; correct?
 8        A.  Appears to be, yes.
 9        Q.  And see at the top it says, "On November 13th,
10   2002 the committee's counsel met with John Banker," and
11   the word "senior" is crossed out, it says, "Audit
12   Partner at EY."  Do you see that?
13        A.  I do, yes.
14        Q.  Look at Exhibit 13, and turn to page 295565.
15        A.  I'm there.
16        Q.  And you see how right under the heading:
17   "E&Y's review of the debit memos was consistent with the
18   committee's conclusions."  Do you see that?
19        A.  I do, yes.
20        Q.  Look at the first sentence at least.  It
21   appears that this language on 295565 is -- matches the
22   language on EY 10, except for the items that have been
23   underlined; correct?
24        MR. GLENNON:  I object to the extent the
25   document speaks for itself.
```

232

```
 1        THE WITNESS:  I see that it looks a lot less
 2   alike than it does alike.
 3        Turn to 295566, it says, "Banker," and then,
 4   "and Professor Grundfest," which isn't on the EY memo at
 5   all.  The next sentence -- the next sentence in the EY
 6   memo says it is on 556 -- I don't see -- I mean, are
 7   there similar words and sentences?  Possibly.  But I
 8   have not matched that up.
 9        MR. GREENSTEIN:  Q.  Okay, well, let's just
10   look at it sentence by sentence.
11        So, if you look at the third sentence of both
12   documents.
13        A.  The third sentence.
14        Q.  The one that starts with, "The purpose of
15   these discussions."
16        MR. GLENNON:  Just for the record, it is not
17   the third sentence of Exhibit 13.
18        MR. GREENSTEIN:  Q.  Right.  The third
19   sentence in EY 10, and if you could find that same
20   sentence in 295566.  Do you see that?
21        A.  I see it in Exhibit 12.  And I'm now
22   looking -- I see it also in Exhibit 13.  I just see "The
23   purpose."
24        Are you asking me to do something with that?
25   I'm sorry.
```

233

1  Q. Yeah. I just want to -- it appears to me that
2  the language in EY 10 is the same as the language in
3  295566, in that what was red-lined -- what was red-lined
4  in Exhibit 12 was removed from the final version. Does
5  that appear to be correct?
6  MR. GLENNON: Objection; foundation. The
7  document speaks for itself.
8  THE WITNESS: Are you just asking me if that
9  sentence matches?
10  MR. GREENSTEIN: Q. Yes.
11  A. If you take out the edited portions of that?
12  Q. Right.
13  A. It appears to.
14  Q. It says, "The purpose of these discussions was
15  to consider both the committee's analysis and
16  conclusions regarding the accounting fraud allegations
17  and procedures performed by EY." Then you see how it
18  crosses out "analysis"?
19  A. Yes.
20  Q. Okay. So it appears that Mr. Banker removed
21  that word "analysis" and added the words "at the request
22  of Oracle's management with respect to those same
23  allegations." Do you see that?
24  A. I don't know who made that change. I don't
25  know if it was Mr. Banker or Mr. Bonner who made that.

234

1  Q. But that change was made?
2  A. Yeah.
3  MR. GLENNON: Objection; the document speaks
4  for itself.
5  THE WITNESS: As it should be.
6  MR. GREENSTEIN: Q. Why is that?
7  A. Because this is an agreed-upon procedure
8  report, procedures agreed upon by E&Y and the SLC.
9  Q. E&Y didn't do its own analysis with respect to
10  the allegations; correct?
11  MR. GLENNON: Objection; lack of foundation,
12  assumes facts.
13  THE WITNESS: Are you speaking now about the
14  debit memos or the --
15  MR. GREENSTEIN: Q. I'm looking at this
16  document, and the word "analysis" is crossed out. You
17  said that made sense to you; right?
18  MR. GLENNON: Objection; mischaracterizes the
19  testimony. The document speaks for itself, lack of
20  foundation.
21  THE WITNESS: Well, I believe this becomes
22  part of the agreed-upon procedures report.
23  MR. GREENSTEIN: Q. But I'm wondering why --
24  it appears based on this document that somebody removed
25  the word analysis, such that it said that, "The

235

1  procedures performed by EY at the request of Oracle's
2  management," so instead of saying "procedures performed
3  by EY's analysis," they crossed out "analysis" and added
4  "At the request of Oracle's management." Do you see
5  that?
6  MR. GLENNON: Objection; the document speaks
7  for itself, lack of foundation.
8  THE WITNESS: I do see that, yes.
9  MR. GREENSTEIN: Q. So doesn't that indicate
10  that EY performed procedures at the request of Oracle's
11  management, but did not perform its own analysis?
12  MR. GLENNON: Objection; calls for
13  speculation.
14  MR. GREENSTEIN: Q. At least according to
15  this document?
16  MR. GLENNON: Objection; calls for
17  speculation, lack of foundation, document speaks for
18  itself.
19  THE WITNESS: Well, as part of -- agreed upon
20  procedures are exactly that, they are agreed upon
21  between the two parties, the auditor and whoever is
22  asking the auditor to do that.
23  But as part of the agreed-upon procedures, the
24  auditors perform analysis. So if you ask me to, agreed
25  upon procedures, to go match up every word in this

236

1  document to this document and I agree to that, that's an
2  agreed-upon procedure between the two of us. And I then
3  perform an analysis to see if that's true.
4  MR. GREENSTEIN: Q. Based on your extensive
5  experience working at audit firms, do you know why E&Y
6  would cross out the word "analysis" and add "at the
7  request of Oracle's management"?
8  MR. GLENNON: Objection; lack of foundation.
9  THE WITNESS: Because it looks like it's
10  saying "analysis." If you look at the rest of the
11  edits, it looks like it would have said, "and procedures
12  performed by E&Y's analysis of those same allegations."
13  E&Y wouldn't make an analysis of the
14  investigations, that's not what they are being asked to
15  do.
16  MR. GREENSTEIN: Q. But doesn't it appear --
17  there are two underlying parts of that sentence,
18  correct, which it looks like it was added in, then there
19  is one word that was taken out. Is that fair to say?
20  MR. GLENNON: Objection; document speaks for
21  itself, lack of foundation. The witness didn't author
22  the document.
23  THE WITNESS: I'm not sure what you're asking
24  me.
25  MR. GREENSTEIN: Q. You have seen a red-lined

237

1  document before; right?
2      A. I have, yes.
3      Q. Based on what you know, it appears that "the
4  procedures performed by" was added, and then "at the
5  request of Oracle's management with respect to" was
6  added; right?
7      MR. GLENNON: Objection; the document speaks
8  for itself, lack of foundation.
9      THE WITNESS: Well, what it appears to have
10 said in the first instance was, "The purpose of these
11 discussions was to consider both the committee's
12 analysis and conclusions regarding the accounting fraud
13 allegations and E&Y's analysis of those same
14 allegations."
15     Well, E&Y wouldn't perform an analysis of the
16 investigations.
17     MR. GREENSTEIN: Q. It says allegations.
18 Where does it say investigations?
19     A. Excuse me, would not perform an analysis of
20 the allegations. E&Y would consider the allegations and
21 agree to do procedures that were agreed upon between
22 itself and the committee. And then in applying those
23 procedures would perform analysis.
24     So, to me it makes sense that the change was
25 made. It doesn't say they are not doing an analysis.

238

1  They are simply not doing an analysis with respect to
2  the allegations.
3      Q. They are saying they didn't do an analysis of
4  allegations; right?
5      MR. GLENNON: Objection; asked and answered,
6  document speaks for itself, calls for speculation.
7      THE WITNESS: I think it is just saying E&Y is
8  not trying to analyze what the allegations are, it is
9  simply performing procedures with respect to the
10 allegations.
11     It wouldn't be Ernst and Young's job to
12 analyze the allegations, what the document says and what
13 the allegations are. It would be their job to analyze
14 and perform procedures on the specific allegations.
15     MR. GREENSTEIN: Q. Okay. If you look down
16 to the last paragraph, you see -- why don't you just
17 read that sentence into the record as it was before
18 these red-lines were made.
19     MR. GLENNON: Objection to the extent that's
20 even possible.
21     MR. GREENSTEIN: Mr. O'Bryan, you're familiar
22 with red-lined documents; correct?
23     A. I am, yes.
24     Q. And do you feel capable -- that you're capable
25 of reading the sentence as it existed before the

239

1  red-lines were made?
2      MR. GLENNON: Are you representing both the
3  edits were made simultaneously?
4      MR. GREENSTEIN: Q. I'm just saying can you
5  read that sentence without the edits in there?
6      A. I can read the sentence excluding the
7  underlines and including the line-outs.
8      Q. Perfect.
9      A. Does that work?
10     Q. Yeah.
11     A. "Banker informed the committee that E&Y had
12 performed its own examination of the accounting fraud
13 allegations in its review pursuant to principles that
14 E&Y agreed to with Oracle's -- with Oracle's the
15 November 17th debit memos."
16     Q. Okay. And then you see how if you turn back
17 to page 10, EY 10, it appears that somebody crossed out
18 the portion that says -- when it says "EY had performed
19 its own examination of the accounting fraud
20 allegations," somebody crossed out "its own examination
21 of the accounting fraud allegations." Do you see that?
22     A. I do, yes.
23     Q. So it appears that EY did not perform its own
24 examination of the accounting fraud allegations; is that
25 right?

240

1      MR. GLENNON: Objection; lack of foundation,
2  calls for speculation.
3      THE WITNESS: Well, we know what E&Y did,
4  because it is in their agreed-upon procedures. And it
5  wouldn't surprise me that they -- I mean, examination in
6  auditing means something. So to strike the words
7  "examination of the accounting fraud allegations" makes
8  all the sense in the world to me.
9      MR. GREENSTEIN: Q. So in the agreed-upon
10 procedures that you just referenced, was there anything
11 in there that indicated that EY was supposed to look at
12 the bad debt transfers from 25005 to 12601 in the second
13 quarter '01?
14     MR. GLENNON: Objection; lack of foundation,
15 vague and ambiguous.
16     THE WITNESS: No. The agreed-upon procedures
17 did not deal with the transfers from 25005 to 12601.
18     MR. GREENSTEIN: Q. Okay. If you look at the
19 sentence that starts, "Banker informed the committee."
20 Do you see that?
21     A. On which exhibit?
22     Q. Exhibit 12, EY 10.
23     A. I see "Banker informed the committee," yes.
24     Q. Then if you look at Exhibit 13, it is the last
25 paragraph on 295566.

241

1    A. I see that, yes.
2    Q. And if you just read that sentence and then
3  read the Exhibit 12, and let me know if it looks like
4  the changes were made.
5    MR. GLENNON: I'm just going to object. The
6  documents speak for themselves. Do we have dates with
7  these respective documents?
8    MR. GREENSTEIN: Q. I'm just asking if it
9  appears those changes in Exhibit 12 EY page 10 were made
10  such that this document Exhibit 13, 295566, reads as if
11  the changes were made.
12    MR. GLENNON: Same objections.
13    THE WITNESS: Yeah, the changes on Exhibit 12
14  at pages EY 10 and 11, assuming that I'm interpreting
15  the cross-outs and underlines as being adds and deletes
16  properly, is then written on Exhibit 13, page 295566.
17  Does that answer your question?
18    MR. GREENSTEIN: Q. Yeah. So if you look at
19  Exhibit 12, EY 11, and you go down to the sixth line, it
20  is the sentence that reads, "E&Y observed." Do you see
21  that?
22    A. You're on Exhibit 12?
23    Q. 12, yeah. EY, page 11.
24    A. "EY observed"?
25    Q. "E&Y observed," in the sixth line down on the

242

1  right-hand side.
2    A. Yes.
3    Q. And it says -- I'm just going to read it, and
4  let me know if you disagree that this is what the
5  sentence says without the red-lines.
6    MR. GLENNON: I just object to the extent
7  there is no foundation, no way you can determine whether
8  these deletions and additions happened simultaneously or
9  at different times, or how you can possibly determine
10  what the document looked like without the edits.
11    MR. GREENSTEIN: Q. So it says, "E&Y observed
12  that the debit memos had no effect upon Oracle's
13  revenues. In addition, E&Y examined the transfers from
14  account 25005 to see whether there was a single large
15  entry that would be consistent with the accounting fraud
16  allegations claimed that account 25005 was the source of
17  $228 million in revenue on November 17th, 2000." Do you
18  see that?
19    A. I see that you've read that and edited it
20  based on line-outs and underlines.
21    Q. Right. But was that consistent with how you
22  would read this red-lined document if the edits hadn't
23  been made?
24    MR. GLENNON: I object on foundation grounds.
25  The document speaks for itself.

243

1    THE WITNESS: I have no idea who wrote this or
2  what was intended by the underlines -- underlines or the
3  line-outs. I see the way you read it.
4    MR. GREENSTEIN: Q. And do you agree that
5  that would be the way that the sentence would read but
6  for the red-lines?
7    MR. GLENNON: Objection; lack of foundation.
8    THE WITNESS: What I agreed to is if you
9  exclude the words that have been lined through and you
10  include the words that have been underlined, that's the
11  way it reads.
12    MR. GREENSTEIN: Q. And you see how it says,
13  "E&Y observed that the debit memos had no effect upon
14  Oracle's revenues," and you see how somebody crossed out
15  "effect upon" and added "debits or credits to Oracle's
16  revenue"? Do you see that?
17    A. I do.
18    MR. GLENNON: I make a standing objection as
19  to foundation on the edited document.
20    MR. GREENSTEIN: Q. Do you know someone
21  would -- someone at E&Y would cross out the words
22  "effect upon Oracle's revenues" an instead insert so
23  that it says, "E&Y observed that the debit memos had no
24  debits or credits to Oracle's revenue"?
25    MR. GLENNON: Objection; foundation. There is

244

1  no foundation for who made this edit.
2    THE WITNESS: Do I know why they would do
3  that?
4    MR. GREENSTEIN: Q. Right.
5    A. I have no idea who was editing this or who
6  made the edit, if it was one of the attorneys or
7  Mr. Banker. I have no idea.
8    Q. Is it your expert opinion that E&Y observed
9  that the debit memos had no effect upon Oracle's
10  revenue?
11    A. Well, I would have to -- I would have to look
12  at their agreed-upon procedures report to validate that
13  back to their report.
14    Q. Right. But you didn't say that in your
15  opinion that they observed that the debit memos had no
16  effect upon Oracle's revenues; did you?
17    MR. GLENNON: Objection; vague and ambiguous.
18  The report speaks for itself.
19    THE WITNESS: I don't see that it says --
20  talking about my report on page 17?
21    MR. GREENSTEIN: Q. There is two places in
22  your report I believe that you talk about E&Y.
23    A. One is about the debit memos and one is about
24  the bad debt transfer.
25    Q. Right. So 17?

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

245

1    A.  Page 17 talks about the bad debt -- or the
2 debit memos.
3    Q.  Okay.
4    A.  So what is your question?
5    Q.  So you're not opining on page 17 that E&Y
6 observed that the debit memos had no impact on Oracle's
7 revenues, are you?
8    MR. GLENNON:  Objection; the document speaks
9 for itself.
10    THE WITNESS:  If I look at the fourth bullet
11 point down, it says, "E&Y reviewed the details relating
12 to the 145 debit memos greater than $500,000 and 55
13 arbitrarily-chosen debit memos.  E&Y found no financial
14 statement impact from these selected debit memos."
15    Next line down, "E&Y created three test
16 transactions with the same accounting distribution,
17 noting that no amount was recorded to revenue."
18    Next bullet point down says, "and found no
19 amounts recorded to revenue related to the debit memos,
20 as well as no unusual reconciling items."
21    And then my last conclusion is, "As noted
22 above, E&Y found no evidence that any revenue, or any
23 other financial statement impact was recorded as a
24 result of the November 17, 2000 debit memo project."
25    MR. GREENSTEIN:  Q.  Right.  So if you look at

246

1 the sentence that we just read where it says, "E&Y
2 observed that the debit memos had no debits or credits
3 to Oracle's revenue," you see how they removed the words
4 "effect upon Oracle's revenue"?  Do you see that?
5    MR. GLENNON:  Where are you?
6    MR. GREENSTEIN:  On EY 11, Exhibit 12.
7    MR. GLENNON:  Yeah.  Where about?
8    MR. GREENSTEIN:  The sixth line down.
9    MR. GLENNON:  Okay.
10    MR. GREENSTEIN:  Q.  Do you see that,
11 Mr. O'Bryan?
12    A.  I do.
13    Q.  So, is it still your expert testimony after
14 seeing this document that E&Y found no evidence that any
15 revenue or any other financial statement impact was
16 recorded as a result of the November 17, 2000 debit memo
17 project?
18    A.  Yes.
19    Q.  And your opinion doesn't change in looking at
20 what EY removed from this memo?
21    A.  No.
22    MR. GLENNON:  Objection; lack of foundation.
23 There has been no foundation E&Y was responsible for
24 removing what purports to have lines through it in the
25 text.

247

1    THE WITNESS:  No.  I mean, if you look at
2 this, "effect upon," the only way you can effect a
3 revenue at Oracle is to debit it or credit it.  That's
4 accounting.  That's Accounting 101.
5    So, if it didn't have any -- had no debits or
6 credits, that means it had no effect on revenue.  Why
7 those words were changed, I have no idea.  The
8 conclusion is still the same.  If you don't debit or
9 credit a revenue account, it has no effect on it.
10    MR. GREENSTEIN:  Q.  If you look at EY 11
11 again, it is right above the last paragraph, it is four
12 lines crossed out.  Do you see that?
13    A.  I do.  Starting with "Banker stated"?
14    MR. GLENNON:  Five lines?
15    MR. GREENSTEIN:  Q.  Do you see that?
16    A.  I do.
17    Q.  Okay.  And it appears that that portion was
18 removed from this memo; correct?
19    MR. GLENNON:  Objection; lack of foundation,
20 document speaks for itself.
21    THE WITNESS:  I see those lines crossed out,
22 yes.
23    MR. GREENSTEIN:  Q.  Do you know why somebody
24 at E&Y would remove the language that says, "Banker also
25 stated there was nothing in the materials that EY had

248

1 reviewed that indicated to EY that plaintiff's claims
2 about the November 17, 2000 debit memos had any
3 veracity"?  Do you see that?
4    MR. GLENNON:  Objection; lack of foundation,
5 assumes facts.
6    THE WITNESS:  Do I know why they would make
7 the change?
8    MR. GREENSTEIN:  Q.  Right.
9    A.  Well, I don't know who made the change, so I
10 don't know -- I have no idea why they would cross that
11 out.
12    You would have to look at the agreed-upon
13 procedures report and see if that was discussed.  Which
14 the veracity of the claim is really not something an
15 auditor would necessarily do.
16    Q.  So, do you have any evidence that E&Y reviewed
17 the veracity of plaintiff's claims regarding the
18 November 17, 2000 debit memos?
19    MR. GLENNON:  Objection; vague and ambiguous.
20    THE WITNESS:  I think what Ernst and Young
21 did, as laid out in my report on page 17 and 18, and
22 also included in their EY 000143 through 6, which is
23 their agreed-upon procedures memo -- and when I read
24 that memo and I also consider the testimony of
25 Mr. Bender, it appears to me as E&Y concluded there was

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

249

1 no financial statement impact from the debit memo
2 project.
3       MR. GREENSTEIN: Q. And EY 11 doesn't change
4 your opinion one way or the other?
5       A. Not at all.
6       Q. Okay.
7       A. No.
8       Q. Mr. O'Bryan, did you in connection with your
9 issuing your opinion in your rebuttal report, did you
10 ever calculate the amount of account balance of account
11 25005 as of 11/30 -- November 30th, 2000?
12       MR. GLENNON: Objection; vague and ambiguous.
13       THE WITNESS: Did I ever calculate the account
14 balance? You mean do I know what the account balance
15 was in 25005 at 11/30?
16       MR. GREENSTEIN: Q. Correct?
17       A. I don't know that my report states that.
18       MR. GREENSTEIN: I want to mark this as
19 No. 14.
20       (Exhibit 14 marked for
21       identification.)
22       MR. GREENSTEIN: Q. Have you seen this
23 document before?
24       A. I have, yes.
25       Q. Did you rely upon it in issuing your report or

250

1 rebuttal?
2       A. I considered it, and I think my rebuttal
3 report talks about some of the issues in this document.
4       Q. What is your opinion as to what the balance of
5 account 25005 was as of November 30th, 2000?
6       MR. GLENNON: Objection; the document speaks
7 for itself.
8       THE WITNESS: $125,377,173.
9       MR. GREENSTEIN: Q. That's the account
10 balance in -- strike that.
11       What does that $125 million represent to you,
12 knowing what you know about that account, 25005?
13       A. At that point in time, that is just all the
14 cash that has come in to Oracle that is either in the
15 process of being applied to invoices or has not been
16 applied to invoices at that point in time.
17       Q. So that 125 million represents unapplied cash
18 that has not yet, as of November 30th, 2000, been
19 applied to an invoice; correct?
20       A. That's correct. But that can represent cash
21 that came in that day or the day before that the system
22 just hasn't had the time to make the application.
23       Q. Right.
24       A. It doesn't mean, as Mr. Regan would suggest,
25 that they were unable to apply that to an invoice. I

251

1 believe that's completely irresponsible of Mr. Regan to
2 suggest that.
3       Q. You just said the $125 million was unapplied
4 cash in that account that had not yet been applied to an
5 invoice; is that right?
6       A. Yes. But you have to --
7       MR. GLENNON: I would also like to insert an
8 objection to the fact that there is handwritten edits
9 throughout this document that I don't think there has
10 been any foundation set for. I also believe this
11 document has a second page that hasn't been provided.
12       MR. GREENSTEIN: Q. Mr. O'Bryan, have you
13 looked at the handwritten notes?
14       A. Yes.
15       Q. Does that change your opinion of the balance
16 of 25005 as of November 30th, 2000?
17       MR. GLENNON: Hold on. Have you read all the
18 handwritten notes?
19       THE WITNESS: I'm just in the process of
20 reading them right now.
21       I've read the notes. Your question was what?
22       MR. GREENSTEIN: Q. Do the notes change your
23 opinion as to what you believe the balance was in 25005
24 as of November 30th, 2000?
25       A. I believe it's that amount. But my point is

252

1 that this represents cash that could have come in the
2 day before, could have come in two days before. It
3 simply has not had an opportunity to be applied yet,
4 because the system hasn't matched it up.
5       It is not, as Mr. Regan would suggest, this
6 amount of money that's sitting there that cannot --
7 cannot and has not is different.
8       Q. Did Mr. Regan say cannot?
9       A. I believe his report says cannot.
10       Q. Are you sure about that?
11       A. Not positive, but I believe it is something
12 like that.
13       So the fact is that Oracle is collecting a
14 significant amount of money every day, and this is an
15 amount that simply the system has not matched up as yet.
16       And I can't read all of footnote D, but it
17 looks like it says something about there is increased
18 consulting activity in Q2, which would explain a higher
19 amount, being that more cash would come in, and just has
20 not had the opportunity to apply to any invoices yet.
21       MR. GREENSTEIN: Mark this as Exhibit 15,
22 please.
23       (Exhibit 15 marked for
24       identification.)
25       MR. GREENSTEIN: Q. For the record, this is

253

1   Bates stamped AA 000035. Have you seen this document
2   before?
3        MR. GLENNON: I'm going to insert the same
4   objection as the last document. I don't know if this is
5   the complete document, and there is handwritten
6   notations on the document for which no foundation has
7   been set.
8        MR. GREENSTEIN: Q. Did you rely upon this
9   document in your report?
10       A. I considered this document, yes.
11       Q. Did you rely upon it?
12       A. I don't think I reference this document.
13  Probably not.
14       Q. Can you -- in looking at this document, can
15  you determine what the balance of account 12018, called
16  unapplied cash, was as of November 30th, 2000?
17       A. 12018?
18       Q. Um-hum.
19       A. Unapplied cash is $64,594,692.
20       MR. GREENSTEIN: Okay. Thank you. Let's take
21  five minutes.
22       VIDEOGRAPHER: Off record at 5:14.
23       (Recess, 5:14 p.m. - 5:33 p.m.)
24       VIDEOGRAPHER: On record at 5:33.
25       MR. GREENSTEIN: Q. Mr. O'Bryan, do you know

254

1   what an aging seven buckets report is?
2        A. I do.
3        I'm sorry to interrupt. I would like to
4   clarify an earlier answer. You asked me on Exhibit 14
5   what my belief of the balance of the customer
6   overpayments account was. I said $125 million. That
7   number is actually $25 million, $25.4 million. Sorry,
8   my mic isn't on.
9        And that's the number your own expert, Mr.
10  Regan, shows as $25.4 million in his report.
11       The $125 million, if you look at footnote A,
12  which I didn't have a chance to fully read when you
13  handed me this document, is continued down at the bottom
14  of the page that notes that there is a $100 million loan
15  or advance and should not be classified as unearned
16  revenues. So you got to debit unearned revenue and
17  credit, looks like, intercompany receivable.
18       So the $125 million should be taken out.
19  Which, just so you know, the reason I went to this, I
20  somewhat remembered in Mr. Regan's report, if you look
21  at his 25005 balance at 11/30, it is $25.4 million. So
22  the amount of money in the 25005 account at 11/30/00 was
23  $25.4 million.
24       Q. Okay.
25       A. Okay. I apologize for that.

255

1        Q. So you are familiar with the seven aging
2   buckets report at Oracle; correct?
3        A. I am, yes.
4        Q. And what is that document or what is it used
5   for at Oracle?
6        A. I don't know exactly what they used it for. I
7   thought it was more of an internal document that appears
8   to show billing history and account history for a
9   certain client. By nature of its title, it must
10  categorize things into seven buckets.
11       Q. Did Oracle ever send those reports to their
12  customers?
13       A. I don't think they typically did. I think on
14  occasion some may have requested -- I believe there was
15  one on -- I don't remember the client, started with a D,
16  as I recall, that maybe Ms. Orr requested or something
17  and got ahold of. It had gone out to clients on an
18  occasional basis.
19       Q. When the 46,000 debit memos were created on or
20  about November 17th, 2000, did those transactions have
21  any impact on what you could see on the seven aging
22  buckets report?
23       MR. GLENNON: Objection; calls for
24  speculation, lack of foundation.
25       THE WITNESS: I'm sorry, I don't understand

256

1   your question.
2        MR. GREENSTEIN: Q. Well, the seven aging
3   buckets report, what is it -- what information does it
4   show about a particular customer?
5        A. Invoices, issued invoices paid. And if you're
6   going to show me the one I think you're going to show
7   me, it shows down here, it is either on-account or
8   debit memo, or something like that down at the bottom of
9   it.
10       Q. And so when the debit memos were created, did
11  it have any impact on the information that was in the
12  aging seven buckets report?
13       MR. GLENNON: Objection; vague and ambiguous.
14       THE WITNESS: Once the debit memos would have
15  been run, the on-account amounts would go away.
16       MR. GREENSTEIN: Q. Okay. So they
17  wouldn't -- so any amounts on-account on the aging seven
18  buckets report that were related to debit memos created
19  on November 17th would not show up on the aging seven
20  buckets report the day after those debit memos were run;
21  correct?
22       MR. GLENNON: Objection; calls for
23  speculation, lack of foundation.
24       THE WITNESS: That's correct. Because the
25  debit memo project got rid of the on-account flag.

257

1  Those weren't amounts of money to be applied to any
2  invoice. They weren't on-account, as you've shown me in
3  Oracle's user guide. They were simply amounts that had
4  been previously dealt with by Oracle's collection
5  department and just had a flag sitting on them.
6  MR. GREENSTEIN: Q. But weren't some of those
7  on-account items eventually refunded?
8  A. They were.
9  Q. And why was that?
10  A. Simply because --
11  MR. GLENNON: Objection; lack of foundation,
12  calls for speculation.
13  You can answer, if you know.
14  THE WITNESS: You mean why were they
15  eventually refunded?
16  MR. GREENSTEIN: Q. Right.
17  A. Because after the unapplied cash project in
18  October/November of 2002, additional research was done
19  whereby it was discovered that they had made an
20  erroneous transfer to 12601, in October/November of '00,
21  and they refunded the money.
22  Q. Were there any on-account items that were not
23  transferred to 12601 that were on-account, and that
24  eventually were refunded as part of the 2002 cleanup?
25  MR. GLENNON: Objection; vague and ambiguous.

258

1  THE WITNESS: I don't understand the question.
2  MR. GLENNON: Lack of foundation.
3  MR. GREENSTEIN: Q. There were 46,000
4  on-account items on November 17th, 2000; correct?
5  A. Correct.
6  Q. And of those, not all of them were items that
7  had been transferred to 12601; correct?
8  A. That's correct. There was only 120 -- well --
9  Q. Of 926, there was 121; right?
10  A. 926 scripts. There was 121 transfers from
11  25005 to 12601.
12  Q. So those other items that weren't transferred,
13  were any -- of the 926, were any of those items refunded
14  as part of the 2002 cleanup?
15  MR. GLENNON: Objection; lack of foundation,
16  calls for speculation.
17  THE WITNESS: I don't know that.
18  MR. GREENSTEIN: Q. Did you make that
19  determination in issuing your expert opinion?
20  THE WITNESS: I'm sorry, the question again,
21  please.
22  MR. GREENSTEIN: Q. You would agree you
23  reviewed 926 of the 46,000 debit memos in looking at the
24  script output; correct?
25  A. Yes.

259

1  Q. And of those, you said 121 of the 926 were
2  transferred to 12601 in 2Q; correct?
3  MR. GLENNON: I'm just going to object, it
4  mischaracterizes the evidence.
5  THE WITNESS: 121 were transfers, included
6  transfers from 25005 to 12601.
7  MR. GREENSTEIN: Q. For $10.6 million?
8  A. Yeah, totaling $10.6 million.
9  Q. Setting those items aside, those 121 items,
10  and looking at the rest of the population of the 926
11  debit memos, were any of those items refunded as part of
12  the 2002 cleanup?
13  MR. GLENNON: Objection; vague and ambiguous,
14  lacks foundation.
15  THE WITNESS: I think there were, I think I've
16  seen some of those that were. I don't recall the
17  number. There may have been.
18  MR. GREENSTEIN: Q. Why would those items be
19  refunded two years later?
20  MR. GLENNON: Objection; calls for
21  speculation.
22  THE WITNESS: As I've described before, the
23  on-account simply meant that the collections department
24  had classified that receipt, which was -- for this
25  purpose was in the second Q of '00, totaling about $20

260

1  million.
2  And once the company found out there were
3  those transfers, it went about the process of reversing
4  those, all of those, and reinvestigated where they
5  should go.
6  So, I -- so some of those may have been
7  refunded.
8  MR. GREENSTEIN: Q. My question is, setting
9  aside the 121 items that were transferred to the bad
10  debt reserve in 2Q '01, setting those aside, the other
11  debit memos, the other population that made up the 926,
12  why were some of those items refunded during the 2002
13  cleanup?
14  MR. GLENNON: Objection; lack of foundation.
15  THE WITNESS: I beg your pardon. I understand
16  your question now.
17  MR. GREENSTEIN: Q. Okay.
18  A. I don't know if those were or not. I don't
19  recall specifically any details about that.
20  Q. So did you -- in issuing your expert report,
21  did you do any calculation of the number of those debit
22  memos that were not transferred to 12601 in the second
23  quarter that were ultimately refunded as part of the
24  2002 cleanup?
25  A. No.

261

1      MR. GREENSTEIN: Okay. I want to mark this as
2  16.
3          (Exhibit 16 marked for
4          identification.)
5      MR. GREENSTEIN: Q. For the record, this is
6  NDCA-ORCL 603894. And it -- well, Mr. O'Bryan, do you
7  recognize this document?
8      A. I do, yes.
9      Q. And if you turn to page 13 of your rebuttal
10  report it appears that you proffer an analysis of a
11  debit memo relating to Household that was opined on in
12  Mr. Regan's report; correct?
13      A. Yes.
14      MR. GLENNON: Objection; the document speaks
15  for itself, and vague and ambiguous.
16      MR. GREENSTEIN: Q. And you recall that
17  Mr. Regan -- that the issue involved a debit memo for
18  $76,000 -- approximately $76,000?
19      A. That's correct.
20      Q. Do you recall that transaction?
21      A. I do, yes.
22      Q. And you did an analysis of that debit memo?
23      A. I did, yes.
24      Q. And you see it says here, you say, "One of the
25  very transactions upon which Mr. Regan focuses in his

262

1  expert report establishes that Oracle appropriately
2  refunded money long before the creation of the 46,000
3  plus debit memos. Mr. Regan points out that Household
4  made a payment to Oracle on November 17th, 1994." Do
5  you see that?
6      A. I do, yes.
7      Q. Then if you go down -- I'll just keep reading.
8      "That same day, Household returned the product
9  and cancelled the order. However, despite the fact that
10  Mr. Regan has seen a screen shot demonstrating that the
11  money had been refunded to Household by a check that
12  cleared on May 4th, 1995, Mr. Regan ignores this
13  refund." Do you see that?
14      A. Yes, I do.
15      Q. Is this the document in footnote 46?
16      A. Yes, it is.
17      Q. Do you rely on this document for the
18  proposition that their debit memo item for $76,000
19  plus --
20      MR. GLENNON: Eli, can I pause you really
21  quickly. You said footnote 46?
22      MR. GREENSTEIN: Yeah. 603894.
23      MR. GLENNON: Got you.
24      MR. GREENSTEIN: Q. Mr. O'Bryan, your opinion
25  is that this debit memo item was refunded by Oracle by a

263

1  check that cleared on May 4th, 1995; correct?
2      A. That is correct.
3      Q. And your support for that proposition is the
4  screen shot NDCA-ORCL 603894; is that correct?
5      A. That is correct.
6      Q. And did you rely on anything else to support
7  your opinion that this $76,000 plus debit memo was
8  refunded on May 4th, 1995?
9      MR. GLENNON: Objection; vague and ambiguous.
10      THE WITNESS: Did I rely on anything else?
11      MR. GREENSTEIN: Yeah.
12      MR. GLENNON: Lacks foundation.
13      THE WITNESS: Well, yeah. Yes, I did.
14      MR. GREENSTEIN: Q. What did you rely on?
15      A. Well, if you follow this transaction all the
16  way through, this was actually refunded again by Oracle.
17  By the way, this was a transaction that did not go
18  through the bad debt transfers. This was just research
19  being done by the company.
20      Anyway, when the applied cash project
21  occurred, this was actually refunded again for about
22  $178,000, at which point in time, I think it was
23  Mr. Campos realized in was done in error. Which would
24  tell me that if they refunded -- and it was two
25  different checks. It was $100,000 and then this

264

1  $74,000.
2      If they refunded it in error and realized that
3  and made notes saying we refunded this in error during
4  the applied cash project, it tells me --
5      MR. GLENNON: You mean unapplied cash project?
6  You're talking about two different things. You said it
7  twice. I just want to make sure the record is clear.
8      THE WITNESS: Thank you.
9      MR. GREENSTEIN: Q. You're talking about the
10  unapplied cash project in 2002?
11      A. Yes. Beg your pardon. Then that tells me it
12  had been refunded before, as well. So I use that as
13  anecdotal evidence, because I have seen evidence of the
14  $100,000, as well now as the $76,000.
15      Q. Okay. So, you're aware that Oracle refunded
16  Household a $178,000 check in May 2002, and that
17  included the amount for this debit memo, the $76,000?
18      MR. GLENNON: Objection; lacks foundation.
19      THE WITNESS: I am. I believe that was done
20  in error.
21      MR. GREENSTEIN: Q. What evidence do you have
22  that it was done in error? Well, let me stop you there.
23  Looking at this document --
24      MR. GLENNON: Did you want to answer?
25      THE WITNESS: Go ahead.

265

1    MR. GREENSTEIN:  Q.  Looking at this document,
2   this is a screen shot; is that fair to say?
3    A.  This is a copy of a screen, yes.
4    Q.  Okay.  And you say, before citing this
5   document, you say that -- you call it a screen shot
6   demonstrating that "money had been refunded to Household
7   by a check that cleared on May 4th, 1995."  Do you see
8   that?
9    A.  Yes.
10    Q.  What in this document indicates to you that
11   this money was refunded by a check that cleared on
12   May 4th, 1995?
13    A.  Well, it is the entire document.  If you look
14   at it, the bank is Wells Fargo Bank, the account, and
15   then the status says cleared.  The cleared amount was
16   $76,000, and the clear date was May 4, 1995.
17    So to me, this is very clear audit evidence
18   that that amount was paid to Household and cleared by
19   May 4th, 1995.
20    Q.  Okay.  Do you have any evidence of a check
21   that actually was paid to Household besides this screen
22   shot?
23    MR. GLENNON:  Objection -- withdrawn.
24    THE WITNESS:  You mean on that date?
25    MR. GREENSTEIN:  Q.  Is there any other

266

1   evidence that this refund was made to Household for this
2   amount on May 4th, 1995?
3    MR. GLENNON:  Objection; lack of foundation,
4   asked and answered.
5    THE WITNESS:  I've not seen a copy of a check,
6   if that's what you're asking me.
7    MR. GREENSTEIN:  Q.  I'm just wondering,
8   besides this screen shot, did you rely upon any evidence
9   indicating that a check was issued to Household on
10   May 4th, 1995 for $76,645.04 for this debit memo?
11    MR. GLENNON:  Objection; asked and answered,
12   lacks foundation.
13    THE WITNESS:  I think I already answered that.
14   I saw evidence that the eventual refund after the
15   unapplied cash project in October/November was a refund
16   of 176 or $178,000 that was done in error, which would
17   tell me that it had been previously refunded.
18    MR. GREENSTEIN:  Q.  So the fact that they
19   refunded it again in May 2002 indicates to you that the
20   refund was issued on May 4th, 1995?
21    MR. GLENNON:  Objection; mischaracterizes the
22   testimony.
23    THE WITNESS:  Yeah.  If you've refunded it
24   once, the $100,000 that was refunded, and then the
25   $76,000, which I believe was done in '95, and in the

267

1   unapplied cash project you refund it again and say, wait
2   a minute, that is not appropriate, this is a duplicate
3   refund, that tells me it was refunded initially.
4    MR. GREENSTEIN:  Q.  So, other than that, that
5   evidence and the screen shot, do you have any -- do you
6   rely upon any evidence indicating that a check was
7   issued for a refund to Household from Oracle on May 4th,
8   1995 for $76,645.04?
9    MR. GLENNON:  Objection; asked and answered.
10    THE WITNESS:  I can't think of any other
11   evidence that was adequate for me, given the
12   documentation.
13    MR. GREENSTEIN:  Q.  But you never saw the
14   actual check; right?
15    A.  No.
16    MR. GLENNON:  Objection; asked and answered.
17    MR. GREENSTEIN:  Q.  Now, did you see this --
18   so, this is one of the 926 debit memos that you reviewed
19   on the script output; correct?
20    A.  Correct.
21    MR. GLENNON:  Objection; lack of foundation.
22    MR. GREENSTEIN:  Q.  So this May 4th, 1995
23   refund should show up in the script output; correct?
24    MR. GLENNON:  Same objection.
25    THE WITNESS:  Yeah, it should.  But as I

268

1   recall, it doesn't show up.
2    MR. GREENSTEIN:  Q.  Do you know why that is?
3    A.  No.
4    Q.  Okay.  But if there was a refund in the
5   accounting history of the 926 debit memos, you would
6   expect to see that in the script output; correct?
7    MR. GLENNON:  Objection; lack of foundation.
8    THE WITNESS:  Well, yeah.  I mean, assuming --
9   as I recall, that was one of the script outputs the
10   plaintiffs requested because it was below the $100,000
11   limit.
12    MR. GREENSTEIN:  Q.  Right.
13    A.  So I expected to see it.  I did not see it.  I
14   saw evidence it was, in fact, paid.
15    Q.  The evidence is what you cited earlier?
16    A.  That's correct.
17    Q.  If you look at the next sentence on page 13 of
18   your rebuttal, it says, "Instead, Mr. Regan states that
19   Oracle did not refund the money to Household until a
20   second erroneous refund occurred on May 23rd, 2002."  Do
21   you see that?
22    A.  I do, yes.
23    Q.  And you cite to Household 1 and 2; correct?
24    A.  I cite to what, I'm sorry?
25    Q.  You cite, in footnote 47, you cite to HI 1 and

269

1  2; right?

2      A.  That is correct.

3          MR. GREENSTEIN:  Let me mark for the record

4  the next exhibit, which is HI 1 and 2.  A check from

5  Oracle to Household in the amount of $178,346.77.

6          MR. GLENNON:  I object to on two grounds.

7  One, I actually think this is part of a larger document

8  that hasn't been provided here.  Second, there is

9  handwritten notes on the document for which there has

10  been no foundation.

11          (Exhibit 17 marked for

12              identification.)

13          MR. GREENSTEIN:  I don't want to go off the

14  record.

15          MR. GLENNON:  It will only take a minute.

16          THE WITNESS:  I don't want to mix these up.

17  Sorry.

18          MR. GREENSTEIN:  Mark this next in line.

19          (Exhibit 18 marked for

20              identification.)

21          MR. GREENSTEIN:  Q.  So you have two exhibits

22  in front of you, one is 17, which is Bates labeled HI 1

23  and 2, and the second, Exhibit 18, is NDCA-ORCL 614018

24  through 614023.  Do you have both of those?

25      A.  I do, yes.

270

1      Q.  Have you seen these before?

2      A.  I do, yes.  These are both in my report.

3      Q.  So this appears to be -- this is the document

4  you cite on page 13 of your rebuttal, where you say --

5  or footnote 47 is Exhibit 17; correct?

6      A.  Footnote 47 is what?

7      Q.  In your rebuttal report is Exhibit 17, the

8  Household check; correct?

9      A.  That is correct.

10      Q.  And Exhibit 49 is Exhibit 18; correct?

11      A.  That is correct.

12      Q.  Okay.  Taking Exhibit 17, did you rely upon

13  this document in your rebuttal report in issuing your

14  opinion on the Household debit memo transaction?

15          MR. GLENNON:  Objection; vague and ambiguous.

16          THE WITNESS:  Did I rely on it?

17          MR. GREENSTEIN:  Q.  Yes.

18      A.  It's in my report, so I certainly relied on

19  it.

20      Q.  And is this the check that you claim was an

21  erroneous refund to Household?

22      A.  Yes.

23      Q.  And what evidence do you rely on in forming

24  your opinion that this was an erroneous refund to

25  Household?

271

1      A.  I then refer to Exhibit 18, which is an e-mail

2  chain from Mike Quinn, and you can see down below on

3  614019, it talks about refund Household Finance

4  $178,346.77, in the subject line.

5      Q.  Right.

6      A.  Then up above Mr. Quinn says, "Ami, Got it.

7  Raul and Adam misinterpreted the 550 debit memos.  This

8  should not have been refunded."

9      Q.  So, is that --

10      A.  Then it goes on to say, "Let's see how we can

11  avoid making these types of mistakes in the future."

12      Q.  Okay.  So, is this the only -- or, strike

13  that.

14          Other than this e-mail, which is Exhibit 18,

15  did you -- what other evidence did you rely upon in

16  forming your opinion that this check, this refund,

17  Exhibit 17, was in error?

18          MR. GLENNON:  Objection; asked and answered.

19          THE WITNESS:  The original refunds on

20  Household of $100,000 and the $74,000, or whatever it

21  was, $76,000.

22          MR. GREENSTEIN:  Q.  Are you referring to the

23  screen shot marked as Exhibit 16?

24      A.  As one of them, plus the $100,000 that was

25  refunded as well.

272

1      Q.  Isn't it your opinion that the $76,000 debit

2  memo item was refunded by a check that was different

3  than the $100,000 item?

4      A.  Yes.  So if you take the 100,000 and add it to

5  the 74,000, you get the approximately 176 or 178 you see

6  here.

7      Q.  You're not aware of the check for $178,346

8  involves more than two debit memos?

9      A.  I'm not aware of what?

10          MR. GLENNON:  Objection; vague and ambiguous.

11          MR. GREENSTEIN:  Q.  That this $178,000 check

12  involves all the debit memos referred to on 614021 in

13  Exhibit 18?

14      A.  Yes.  You can see the 45, the 25 and the 76

15  are some of the ones we've referenced to and are part of

16  the $100,000 refund, plus the $76,000 refund, as

17  evidenced on Exhibit 16.

18      Q.  Okay.  Mr. O'Bryan, did you read Michelle

19  Davidson's deposition before forming your opinion on the

20  Household transaction?

21          MR. GLENNON:  Objection; asked and answered.

22          THE WITNESS:  I think you asked me that this

23  morning.  I don't recall reading that.

24          MR. GREENSTEIN:  Q.  Why didn't you read her

25  deposition transcript?

O'Bryan, John Duross - Confidential  7/12/2007  9:29:00 AM

273

1       A.  I didn't think it necessary.
2       Q.  Are you aware she was the PMK for Household?
3       MR. GLENNON:  Objection; asked and answered.
4       THE WITNESS:  I believe so, yes.
5       MR. GREENSTEIN:  Q.  Okay.  Are you aware that
6   this $178,000 check was uploaded into Household's
7   general ledger after they received it?
8       A.  What do you mean uploaded?
9       MR. GLENNON:  Vague and ambiguous.
10      MR. GREENSTEIN:  Q.  Are you aware Household
11  cashed this check, a copy of which is on Exhibit 17?
12      MR. GLENNON:  Objection; assumes facts, lack
13  of foundation.
14      THE WITNESS:  I don't know what they did with
15  the check after it was sent by Oracle.
16      MR. GREENSTEIN:  Q.  Did you consider the fact
17  whether this check was cashed or not in forming your
18  opinion?
19      A.  No.
20      Q.  Okay.  Did you see any evidence that this
21  $178,000 refund made to Household was ever given back to
22  Oracle?
23      A.  I don't --
24      MR. GLENNON:  Objection; vague and ambiguous,
25  lacks foundation.

274

1       THE WITNESS:  I don't recall what the eventual
2   disposition of this was.
3       MR. GREENSTEIN:  Q.  Okay.  So you don't know
4   if this $178,000 check was cashed, and you don't know
5   whether it was given back to Oracle, but your opinion is
6   that it was refunded in error; correct?
7       MR. GLENNON:  Objection; asked and answered.
8       THE WITNESS:  That's what the documents say.
9   If Household cashed it or applied it to other invoices,
10  I don't know what they did.
11      MR. GREENSTEIN:  Q.  Okay.
12      A.  But it is very clear to me that the documents
13  show that it was refunded in the '90s, and then refunded
14  in error in the 2000 time frame.
15      Q.  Okay.  So on page 13 of your rebuttal, last
16  sentence, you say, "As Mike Quinn observed in a
17  contemporaneous e-mail, the May 23rd, 2002 refund was
18  issued by mistake and should not have been made."
19      Do you see that?
20      A.  Yes.
21      Q.  And you cite to what has been marked -- the
22  e-mail marked as Exhibit 18; correct?
23      A.  Yes.
24      Q.  So is it your opinion that Mike Quinn wrote an
25  e-mail contemporaneous with the May 23rd, 2002 refund

275

1   that indicated it was a mistake?
2       A.  I'm not suggesting it was contemporaneous with
3   the exact refund.  I'm just suggesting it was
4   contemporaneous with the time, i.e., the 2002/2003 time
5   frame.  So, when it was written -- all I'm saying, it
6   wasn't written last week and it wasn't written back in
7   1995.
8       Q.  Right.  Because the e-mail you're referring to
9   was written after October 25th, 2002; isn't that right?
10      MR. GLENNON:  Objection; lack of foundation.
11  The document speaks for itself.
12      THE WITNESS:  I don't really know.  I mean, I
13  see the date is Friday, October the 25th, 2002.  When
14  the top part of this e-mail was written by Mr. Quinn, I
15  don't know.
16      MR. GREENSTEIN:  Q.  Well, this top e-mail was
17  written by Mr. Myers; wasn't it?
18      MR. GLENNON:  Objection; lack of foundation.
19  The document speaks for itself.
20      THE WITNESS:  Well, I'm talking about "Mike
21  Quinn wrote."
22      MR. GREENSTEIN:  Q.  Right.  So that
23  particular e-mail doesn't have a date?
24      A.  Correct.
25      Q.  But it is in a string of other e-mails, so the

276

1   e-mail below it is October 25th, 2002; correct?
2       A.  The date that I see below the "Mike Quinn
3   wrote," says October 25th, 2002.
4       Q.  Right.  So that e-mail that Mike Quinn wrote
5   appears to have taken place after October 25th, 2002;
6   correct?
7       MR. GLENNON:  Objection; document speaks for
8   itself, lack of foundation.
9       THE WITNESS:  I have no idea when it was
10  written.  It was above the October 25th, so whether it
11  was the same day, same time, I don't know.
12      MR. GREENSTEIN:  Q.  Right.  But, I mean,
13  based on what you know about e-mail strings like this,
14  it appears this e-mail was written either on
15  October 25th, 2002 or after; right?
16      MR. GLENNON:  Objection; lack of foundation,
17  asked and answered.
18      THE WITNESS:  I really don't know.
19      MR. GREENSTEIN:  Q.  So seeing that above an
20  e-mail in a string that goes in chronological order
21  doesn't indicate to you that this e-mail was written on
22  or after October 25th, 2002?
23      MR. GLENNON:  Objection; lack of foundation,
24  asked and answered three times.
25      THE WITNESS:  It would seem to me that given

277

1 the form, it was written on or after October 25th. But
2 I don't know that for sure.
3 MR. GREENSTEIN: Q. Well, is it possible that
4 e-mail could have been written before October 25th?
5 MR. GLENNON: Objection; lack of foundation,
6 calls for speculation.
7 THE WITNESS: Is it possible?
8 MR. GREENSTEIN: Q. Yeah.
9 A. Well, anything is possible.
10 Q. Looking at this e-mail, your testimony is that
11 it is possible that that e-mail that occurs after in
12 time to an October 25th, 2002 e-mail could possibly have
13 been written before it?
14 MR. GLENNON: Objection; mischaracterizes the
15 testimony, asked and answered, lacks foundation.
16 THE WITNESS: I didn't write this e-mail, so I
17 don't know when it was written. But have I ever seen
18 circumstances where an e-mail above another e-mail was
19 written before? Certainly. You can say I said this and
20 then attach something different. You can attach it.
21 I don't know how it was attached, I don't know
22 if it was a string. I don't know if it was pieced
23 together. I have no idea.
24 MR. GREENSTEIN: Q. On page 13 you're not
25 saying that your opinion is that that was a

278

1 contemporaneous e-mail or that that e-mail marked as
2 Exhibit 18 was contemporaneous with the May 23rd, 2002
3 refund; right?
4 MR. GLENNON: Objection; mischaracterizes the
5 testimony.
6 THE WITNESS: I think I explained that. I
7 said it is contemporaneous to the time. It is not right
8 in the middle of all this litigation. It was
9 contemporaneous to that time.
10 MR. GREENSTEIN: Let me take five minutes,
11 then wrap up.
12 VIDEOGRAPHER: Off record at 6:05.
13 (Recess, 6:05 p.m. - 6:23 p.m.)
14 VIDEOGRAPHER: On record at 6:23.
15 MR. GREENSTEIN: Q. Mr. O'Bryan is it your
16 opinion there is no material difference between meeting
17 and beating Wall Street expectations in the mind of a
18 reasonable investor?
19 A. There can be. It can be material, it may not
20 be material.
21 Q. In what cases would it be material?
22 A. If in the total mix of the information it was
23 thought to be informative or more material to a reader.
24 Q. Okay. So, in some cases it may be material to
25 a reasonable investor whether a company meets or beats

279

1 expectations; correct?
2 MR. GLENNON: Objection; asked and answered.
3 THE WITNESS: No. What I'm saying, you have
4 to look at the total mix of the information of that
5 company and historically of that company as to whether
6 or not that meet or beat is material, as well as a
7 multitude of other things you have to consider based on
8 SAB 99.
9 MR. GREENSTEIN: Q. Right. I understand that
10 you have to analyze it company by company; correct?
11 A. That is correct.
12 Q. But there could be a material difference
13 between meeting and beating expectations depending on
14 particular facts and circumstances involved in a
15 particular quarter; right?
16 MR. GLENNON: Objection; vague and ambiguous,
17 mischaracterizes testimony.
18 THE WITNESS: Are you speaking hypothetically
19 here, or are you speaking about Oracle?
20 MR. GLENNON: Q. No. Just in general.
21 A. So it is a hypothetical?
22 Q. Yeah.
23 THE WITNESS: I'm sorry. You need to repeat
24 the question.
25 MR. GREENSTEIN: Can you read it back?

280

1 (Record read as follows: QUESTION: But there
2 could be a material difference between meeting
3 and beating expectations depending on
4 particular facts and circumstances involved in
5 a particular quarter; right?)
6 MR. GLENNON: I object on the grounds of
7 incomplete hypothetical and vague and ambiguous.
8 THE WITNESS: I'm sorry, there could be a
9 material difference between meeting and beating
10 expectations?
11 MR. GREENSTEIN: Q. Um-hum.
12 A. Well, materiality is not about whether there
13 is a material difference between the meet or the beat.
14 It is taken as a whole, all of the mix of information
15 whether it is considered material by the company and
16 their auditors.
17 Q. Whether it is material to the company or its
18 auditors?
19 A. Two different analyses are done. The company
20 performs their own analysis, these are the financial
21 statements of the company. Then separately the auditors
22 have to come up with that same conclusion.
23 Q. That's determining whether a misstatement
24 internally is material; correct?
25 MR. GLENNON: Objection.

281

1      THE WITNESS: Why do you say internally?
2      MR. GLENNON: Object for the record; vague and
3  ambiguous.
4      MR. GREENSTEIN: Q. Well, let's look at your
5  report, page 38 of your opening report.
6      A. I'm there.
7      Q. You state that -- you're talking about the
8  $20.1 million of unapplied cash was transferred to the
9  bad debt reserve during 2Q '01; correct?
10     A. That is correct.
11     Q. And you say, "If we make the most conservative
12  assumption, that the entire amount of transfer
13  represents an accounting error, this would represent
14  roughly a $13 million overstatement in net income";
15  correct?
16     A. That is correct.
17     Q. Then you calculate earnings per share which
18  indicates that if that amount was an overstatement, that
19  the EPS would be adjusted to 10 cents from the reported
20  11; is that correct?
21     MR. GLENNON: Objection; mischaracterizes the
22  document and the testimony. Lack of foundation.
23     THE WITNESS: Well, I think it adjusts to
24  10.38 or .1038 cents.
25     MR. GREENSTEIN: Q. Which would be rounded

282

1  down to 10; right?
2      A. That's correct.
3      Q. And you say that even if that happened and
4  Oracle reported 10 cents per share in the second quarter
5  '01, that wouldn't be material in the mind of a
6  reasonable investor; correct?
7      MR. GLENNON: Objection; vague and ambiguous,
8  lacks foundation, mischaracterizes the testimony.
9      THE WITNESS: My testimony is laid out in the
10  report, that I don't think in the entire mix of
11  information that that adjustment was material by any
12  stretch of the imagination.
13     MR. GREENSTEIN: Q. So is it your expert
14  testimony that if Oracle in the second quarter '01 had
15  reported 10 cents a share instead of 11 cents a share in
16  net expectations, that would not have been material in
17  the mind of a reasonable investor?
18     MR. GLENNON: Clarification. Second quarter
19  fiscal year '01?
20     MR. GREENSTEIN: Didn't we define that
21  earlier?
22     MR. GLENNON: I don't know if we did or we
23  didn't. I'm just asking.
24     MR. GREENSTEIN: Q. Do you know what I'm
25  talking about?

283

1      MR. GLENNON: You defined Q2 '01, which is why
2  second quarter caught me off guard. Sorry.
3      THE WITNESS: I don't think the difference
4  between 11 cents or 10 cents, given the entire mix of
5  information that was available to the public investor,
6  that that was a material change.
7      MR. GREENSTEIN: Q. And what standard did you
8  use to determine what a reasonable investor was?
9      A. What standard did I use?
10     MR. GLENNON: Objection; vague and ambiguous.
11     MR. GREENSTEIN: Q. Yeah.
12     A. I just used the SAB 99, which defines that
13  exact topic.
14     Q. Okay. So why don't you take me through your
15  methodology of how you determined that if Oracle had
16  reported 10 cents rather than 11 cents and met investor
17  expectations -- analyst expectations that would not be
18  material?
19     MR. GLENNON: Objection; mischaracterizes the
20  testimony, lacks foundation.
21     THE WITNESS: You want me to take you through
22  my report?
23     MR. GREENSTEIN: Q. I'm wondering what
24  methodology you used to come to that conclusion.
25     A. I applied SAB 99.

284

1      Q. Did you take into account the macroeconomic
2  environment during 2Q '01?
3      MR. GLENNON: Objection; lack of foundation.
4      THE WITNESS: Sure.
5      MR. GREENSTEIN: Q. What was the
6  macroeconomic environment during that time?
7      A. It was a tech sector, which was probably a bad
8  time, as I recall it experienced a bit of a downturn.
9      Q. Do you know what the dot com bust is?
10     A. I do, yes.
11     Q. Wasn't that around March 2000?
12     A. I think I just said experiencing a downturn.
13     Q. You said a slight downturn.
14     A. I said a bit of a downturn. I didn't say
15  slight.
16     Q. You don't think the dot com bust was more than
17  a bit of a downturn?
18     A. It was a downturn.
19     MR. GLENNON: Objection; lack of foundation,
20  mischaracterizes the testimony.
21     THE WITNESS: That was the macroeconomics that
22  was going on.
23     MR. GREENSTEIN: Q. So how would you
24  characterize the macroeconomic environment as of the
25  date Oracle reported its earnings for second quarter

285

1    '01?
2        A.  Well --
3        MR. GLENNON:  I'm still going to object on
4    vague and ambiguous as to time.
5        THE WITNESS:  The macroeconomic conditions
6    were that there was a downturn in the tech sector.
7        MR. GREENSTEIN:  Q.  Okay.  Did you do any
8    analysis of what was happening to other companies in the
9    software industry during that time, if they met rather
10   than beat expectations?
11       A.  No.
12       Q.  Did you do any analysis of any companies
13   during that time, what happened when they met rather
14   than beat expectations?
15       MR. GLENNON:  Objection; vague and ambiguous.
16       THE WITNESS:  No.  The issue here is Oracle,
17   not other companies.
18       MR. GREENSTEIN:  Q.  Did you do any analysis
19   of Oracle's previous history of earnings reports to see
20   what happened to Oracle's stock when they met or beat
21   expectations?
22       MR. GLENNON:  Same objection.
23       THE WITNESS:  I did, yes.
24       MR. GREENSTEIN:  Q.  And why don't you take me
25   through what your methodology was in doing that

286

1    determination?
2        A.  Let me just find that analysis.
3        I have to go to the rest room anyway.  Do you
4    want to take a two-minute break while I find that?
5        MR. GREENSTEIN:  Sure.
6        VIDEOGRAPHER:  Off record. 6:32.
7        (Recess, 6:32 p.m. - 6:38 p.m.)
8        VIDEOGRAPHER:  On record at 6:38.
9        MR. GREENSTEIN:  Q.  So, Mr. O'Bryan, when we
10   left off, I think you were going to look at your
11   methodology in looking at the trends, the historical
12   trends prior to 2Q '01 to determine whether there was a
13   difference whether Oracle met or beat Wall Street
14   expectations; correct?
15       A.  That is correct.
16       Q.  What methodology did you use?
17       A.  I think you actually asked me a different
18   question, which was did I do an analysis of Oracle's
19   previous history of meeting or beating expectation
20   consensus.  And my answer was yes.  And I was looking
21   for that exhibit.  And that's in my work papers.
22       And I did do that analysis.  So, it is right
23   here in front of me, if you would like to talk about it.
24       Q.  You said you did it in your work papers.  Is
25   that something that you relied upon?

287

1        A.  Yes.
2        Q.  And is that -- did you produce that to
3    plaintiffs?
4        A.  I'm not aware that it was or was not.
5        Q.  Okay.
6        MR. GLENNON:  Did you rely on your work
7    papers, or did you rely on the analyst reports?
8        THE WITNESS:  This is a summary of the analyst
9    reports.
10       MR. GREENSTEIN:  Q.  A compilation?
11       A.  A compilation?  It's just a summary.
12       Q.  Similar to what you did with the script
13   output?
14       A.  Yeah.
15       Q.  So why don't you go through that and what you
16   did to determine that meeting versus beating in the
17   second quarter of '01 would not be material to a
18   reasonable investor.
19       A.  Again, that's a broader question.  I didn't
20   look at just the meet or beat as being materiality.
21   That was one of the considerations.  So do you just want
22   that component of it or an overview?
23       Q.  You did some analysis of prior tends; correct?
24       A.  Correct.
25       Q.  What was that analysis?

288

1        A.  We looked on a quarter basis for first Q '99
2    all the way through second Q of '01 the actual
3    consensus, analyst expectation, versus the actual
4    reported amounts.  Then we looked at the stock price as
5    it relates to the day that the earnings was released,
6    and the day plus one, day plus three, and day plus five.
7    We basically looked at five different days after Oracle
8    had released its earnings.
9        And what you find is there is absolutely no
10   correlation between beating and any kind of an increase
11   or decrease in the stock.  Which would lead you to
12   believe as an individual applying SAB 99, that's not
13   necessarily the only measurement of materiality.  Which
14   it is a total mix.
15       But, clearly, you have a situation here where
16   the stock went up -- excuse me, the reported was 4 cents
17   over expected in 2Q '99, the stock dropped 5 percent the
18   day of the release, dropped another 6 percent the day
19   after.
20       Q.  Did you do any statistical analysis to
21   determine why the stock price dropped in that quarter?
22       MR. GLENNON:  Were you finished?
23       THE WITNESS:  I wasn't finished.
24       MR. GREENSTEIN:  Q.  Okay.
25       A.  You see here a situation where they beat

289

1 expectations by 4 cents in 2Q '00 and it went down 3.6
2 percent. You see where they beat expectations by 4
3 cents in Q4 '99, went down 5 percent. One day later it
4 went up 31 percent. First Q of '01 they beat it 4 cents
5 and it goes up by 3.83 percent.
6      There is absolutely no correlation in my mind
7 from an auditor's perspective and one that looks at and
8 considers materiality almost on a daily basis that the
9 meet or beat measurement within Oracle is at all
10 material.
11     Q. And you don't think the difference between
12 meeting and beating in a macroeconomic environment, a
13 tech downturn, as was the case in 2Q '01, would be
14 important to a reasonable investor?
15     MR. GLENNON: Objection; asked and answered,
16 lacks foundation, mischaracterizes the testimony.
17     THE WITNESS: Again, given my analysis and
18 knowledge of how materiality is measured, the meet or
19 beat issue was not a material enough issue that in the
20 total mix it would have caused the company or its
21 auditors to restate any financial statements.
22     MR. GREENSTEIN: Q. But meeting and beating
23 could be important to a reasonable investor; right?
24     A. In your hypothetical, certainly it could,
25 depending on the entire mix of information.

290

1     Q. Can you remember -- strike that. So you said
2 you looked at the prior nine quarters; is that correct?
3     A. It was ten quarters, including the existing 2Q
4 '01.
5     Q. How did you determine what the consensus
6 analyst expectation was?
7     A. We went off of -- I forget what we used, if it
8 was first call, or what number we used.
9     Q. So out of those ten quarters, in which
10 quarters did Oracle -- how many quarters did Oracle beat
11 expectations?
12     A. In how many quarters did they beat
13 expectations?
14     Q. Um-hum.
15     A. In nine of those ten.
16     Q. Okay. And leading up to the second quarter
17 and working backwards, how many quarters in a row had
18 Oracle beat expectations?
19     A. Four.
20     Q. The one instance in which they met
21 expectations, what happened to the stock price the day
22 following?
23     MR. GLENNON: Objection; vague and ambiguous.
24     THE WITNESS: The day following?
25     MR. GREENSTEIN: Q. Um-hum.

291

1     A. Went down 6 percent.
2     Q. Okay. Now, how did you determine -- or strike
3 that.
4     How did you decide to use, I think you said
5 the first -- the stock price on the day following, the
6 third day and the fifth day; is that right?
7     A. That's an analysis typically done by auditors
8 as it relates to looking at materiality, particularly
9 about stock movement, looking at those first few days.
10     Q. Is there any accounting principle or rule that
11 outlines that procedure?
12     A. No.
13     MR. GLENNON: Objection; vague and ambiguous.
14     MR. GREENSTEIN: Q. When you say it is
15 typically done by auditors, can you cite to any
16 literature that says that that's the analysis that
17 should be conducted?
18     MR. GLENNON: Same objection.
19     THE WITNESS: It would be professional
20 standards, due to professional care and auditor's
21 judgment.
22     MR. GREENSTEIN: Q. Any article or literature
23 you could point to that suggests using that standard?
24     A. With respect to one day, three days, five
25 days?

292

1     Q. Yeah.
2     A. No. That's up to the auditor's judgment.
3     Q. You're not a statistician, are you?
4     A. I'm actually a computer audit specialist.
5     Q. Computer audit specialist, okay.
6     Did you run a regression analysis of any stock
7 price movement?
8     A. I was not asked to, nor did I.
9     Q. Do you know how to run a regression analysis?
10     A. I do, yes. Do you want to know about
11 R-squared?
12     Q. I know a little bit about that. Do you know
13 what the term vestigial means?
14     A. Vestigial. As a I sit right now, no.
15     Q. You don't have a definition of the word
16 vestigial?
17     A. Not as I sit here now.
18     Q. You use it in your report?
19     A. I do. I don't remember the context I use it
20 in.
21     Q. The word is not part of your vocabulary as you
22 sit here today?
23     A. Not right now.
24     MR. GLENNON: Objection; mischaracterizes the
25 testimony.

293

1    Do you want to show it to him in the report to
2  show the context?
3    MR. GREENSTEIN: Q. I'm just asking if you
4  know the definition of vestigial.
5    A. As I sit here now, I don't.
6    Q. Did you write that word in your report?
7    A. Mr. Sheppard may have put that word in there.
8  Mr. Sheppard has a better vocabulary than I.
9    Q. Back to your analysis of the ten prior
10  quarters leading up to 2Q '01.
11    Did you do any sort of statistical analysis to
12  determine which part of the stock price movement
13  following an earnings disclosure was attributed to
14  company-specific information?
15    MR. GLENNON: Objection; compound, vague and
16  ambiguous.
17    THE WITNESS: I did not do a statistical
18  analysis of the correlation between meeting or beating
19  and by how much and the resultant stock movement.
20    MR. GREENSTEIN: Q. Okay. So you just looked
21  at what the stock price did the first day following a
22  disclosure, the third day and the fifth day to see if it
23  went up or down; correct?
24    A. No. Actually four days.
25    MR. GLENNON: Plus I want to object,

294

1  mischaracterizes the testimony.
2    THE WITNESS: We looked at the day of release,
3  the day plus one, day plus three, and day plus five.
4    MR. GREENSTEIN: Q. The day of release?
5  Okay.
6    Well, during that time, didn't Oracle issue
7  its earnings releases after hours?
8    A. I don't know when they issued it.
9    Q. How would you determine the stock price
10  movement the day of release?
11    A. You look at the stock price the day they
12  released the earnings. If it was after hours, you do it
13  the next day.
14    Q. Okay. So you don't know if Oracle released
15  earnings after the market closed or before, during those
16  ten quarters?
17    MR. GLENNON: Objection; mischaracterizes.
18    THE WITNESS: I don't know.
19    MR. GREENSTEIN: Q. You didn't look at that?
20    A. No. It is not relevant to my analysis.
21    Q. Is the stock price movement on the day of an
22  earnings release important in the materiality analysis
23  if Oracle issued its earnings after market hours that
24  day?
25    MR. GLENNON: Objection; incomplete

295

1  hypothetical.
2    THE WITNESS: No. You look -- you don't look
3  at one day, you don't look at one moment. You look at a
4  number of different data points, which we have here.
5  When they release doesn't matter. It is not just the
6  meet or beat. It is an overall mix.
7    MR. GREENSTEIN: Q. I understand what SAB 99
8  says.
9    MR. GLENNON: Are you finished?
10    THE WITNESS: Yes.
11    MR. GREENSTEIN: Q. What I'm asking -- I
12  think you said in your analysis you looked at the stock
13  price movement in the prior ten quarters, the stock
14  price movement that occurred on the day of the earnings
15  release; correct?
16    A. Correct.
17    Q. So, assuming that Oracle -- let's take first
18  quarter 2001. Okay?
19    A. First quarter 2001. Certainly.
20    Q. What was the consensus, Wall Street
21  expectation?
22    A. Thirteen cents.
23    Q. And what was the actual?
24    A. Seventeen cents.
25    Q. Okay. And so did you look -- did you look at

296

1  the stock price -- do you know the date of that?
2    A. I do not.
3    Q. Did you look --
4    A. The information is in here. Actually, you
5  know, I do have that information in here. It was
6  released on 9/14/2000 at 11:19 a.m.
7    So I think your representation that it was
8  after the market closed may be inappropriate.
9    Q. You're saying that that quarter's earnings was
10  issued at 11:00 in the morning?
11    A. Correct. 11:19.
12    Q. Do you have the time on all of those?
13    A. I do, yes.
14    Q. What time was it released in the one quarter
15  that it -- actually, strike that.
16    To the extent that the earnings were released
17  after hours, you wouldn't look at the stock price
18  movement before the release, you always would look at
19  the movement after the release; correct?
20    MR. GLENNON: Objection; mischaracterizes the
21  testimony, compound, vague and ambiguous.
22    THE WITNESS: It is after -- the day of the
23  release is after the release.
24    MR. GREENSTEIN: Q. Any analysis you do of
25  stock price movement, is it fair to say you would look

297

1  at it after the release?
2      MR. GLENNON: Mischaracterizes the testimony.
3      THE WITNESS: We looked at the stock price the
4  day of the release, day plus one, day plus three, and
5  day plus five.
6      MR. GREENSTEIN: Q. Okay. But you didn't do
7  any statistical analysis of why the stock price may have
8  gone up or down on those four various days following the
9  earnings release; right?
10      MR. GLENNON: Objection; asked and answered.
11      THE WITNESS: I did not perform a statistical
12  analysis as to the correlation between stock price and
13  meet or beat. I can simply see that information on this
14  chart.
15      MR. GREENSTEIN: Q. Okay. If Oracle in the
16  second quarter issued earnings of 12 cents, would you
17  think that would be material in the mind of a reasonable
18  investor?
19      MR. GLENNON: Objection; incomplete
20  hypothetical.
21      THE WITNESS: I haven't been asked to make
22  that determination. It would have to again be the total
23  mix of all the information with respect to Oracle's
24  operations of what they disclosed, their applications
25  income, net income, revenues, a multitude of things.

298

1      MR. GREENSTEIN: Q. Why was applications
2  revenue important?
3      A. It was one of the many things --
4      MR. GLENNON: Insert an objection.
5      THE WITNESS: It was one of the many things
6  being looked at by the street.
7      MR. GREENSTEIN: Q. But it was an important
8  factor to investors?
9      A. Not necessarily. It was one of the many
10  factors that the street was looking at. Does that mean
11  it was important to an investor? That would depend on
12  the individual investor.
13      Q. Okay, so, let me ask you again. Is it your
14  opinion that applications growth in the second quarter
15  of '01 was important to investors in Oracle stock?
16      MR. GLENNON: Objection; incomplete
17  hypothetical, asked and answered, vague and ambiguous.
18      THE WITNESS: Not necessarily. I mean, most
19  of the analysts' reports looked at and/or gave a range
20  or expectation of application income, application
21  revenues. And there were ranges that were suggested by
22  Deutsche Bank, by Smith Barney, Salomon Smith Barney, et
23  cetera. So it is certainly one of the many things that
24  the street was looking at.
25      MR. GREENSTEIN: Q. Looking at analysts'

299

1  reports, do you look at every analyst report for the
2  analysts that cover Oracle during each quarter?
3      MR. GLENNON: Objection; vague and ambiguous
4  as to time.
5      THE WITNESS: I'm sure I didn't look at every
6  one.
7      MR. GREENSTEIN: Q. How did you determine how
8  many to look at before you were able to issue your
9  opinion?
10      A. Until I felt like I had sufficient and
11  competent evidence in the matter.
12      Q. Did you look at the same analyst each quarter?
13      MR. GLENNON: Objection; vague and ambiguous.
14      THE WITNESS: I don't recall looking at the
15  exact same one.
16      MR. GREENSTEIN: Q. How did you determine
17  which analyst's report to look at in that particular
18  quarter?
19      A. Whichever one I thought was judgmentally
20  appropriate to look at.
21      Q. What standard did you use in applying your
22  judgment?
23      MR. GLENNON: Objection; vague and ambiguous.
24      THE WITNESS: My 29 years of being an auditor.
25      MR. GREENSTEIN: Q. Okay. Could reasonable

300

1  minds differ as to whether a misstatement is material or
2  not?
3      MR. GLENNON: Objection; incomplete
4  hypothetical.
5      THE WITNESS: You mean just in this situation
6  or in --
7      MR. GREENSTEIN: Q. Yeah.
8      A. Well, I don't see how someone can say this was
9  material given the facts and circumstances in the mix.
10  I don't see how someone could say it was material given
11  the number of people that looked at this, the scrutiny
12  that this was under, and the overall mix of information,
13  I don't see how someone can conclude it was material.
14  So I don't think reasonable minds in this situation
15  would differ.
16      Q. In looking at the analyst reports following
17  the second quarter '01 earnings results, did you find
18  any analysts that cited to the fact that Oracle beat
19  Wall Street expectations by a penny?
20      MR. GLENNON: Objection; vague and ambiguous.
21      THE WITNESS: I'm sorry, what?
22      MR. GREENSTEIN: Q. In looking at the
23  analysts' reports after Oracle released its second
24  quarter '01 earnings of 11 cents, did you see any
25  analysts discuss the fact that Oracle beat their

301

1  expectations?
2      A.  I think most of them I saw talked about the
3  fact they beat expectations.  Eleven cents versus ten
4  cents would be beating, and it would automatically be
5  talked about.
6      Q.  And why is that?
7      MR. GLENNON:  Objection; vague and ambiguous.
8      THE WITNESS:  Because it is a fact.  Consensus
9  was 10 cents, they got to 11 cents.  So the reader --
10  the analyst doesn't have to say it.  The reader can see
11  that.
12      MR. GREENSTEIN:  Q.  But the analyst said it;
13  right?
14      MR. GLENNON:  Objection; vague and ambiguous.
15      THE WITNESS:  I recall analysts saying that.
16      MR. GREENSTEIN:  Q.  So they thought it was
17  important to put in their reports; right?
18      MR. GLENNON:  Objection; calls for
19  speculation, lacks foundation.
20      THE WITNESS:  You have to talk to them about
21  what they thought was important.
22      MR. GREENSTEIN:  Q.  So you're aware that SAB
23  99 suggests that you look at surrounding circumstances
24  in making a materiality analysis; correct?
25      A.  Of course I am.

302

1      Q.  Did you -- what surrounding circumstances did
2  you look at in finding that meeting expectations in the
3  second quarter would not be material?
4      MR. GLENNON:  Objection; mischaracterizes the
5  testimony.
6      THE WITNESS:  Would you mind restating the
7  question?
8      MR. GREENSTEIN:  Q.  Did you do an analysis of
9  the surrounding circumstances in your materiality
10  analysis?
11      A.  Absolutely.
12      Q.  What were the surrounding circumstances that
13  you looked at?
14      A.  All of the information that was talked about
15  in analyst reports, all of the information looked at
16  with respect to meeting or beating in the stock price,
17  four or five data points after that, the issue with
18  respect to what's being restated, the percentage change
19  in that potential restatement.  There was a multitude of
20  things I looked at in the surrounding circumstances as
21  SAB 99 suggests.
22      Q.  Anything in particular you found important?
23      MR. GLENNON:  Objection; vague and ambiguous.
24      THE WITNESS:  It is all important.
25      MR. GREENSTEIN:  Q.  Anything in particular

303

1  you looked at?
2      A.  I looked at all of that.
3      Q.  You said in looking at the stock reaction
4  after each of the ten quarters that you analyzed -- you
5  looked at the stock price five days after the earnings
6  release; correct?
7      MR. GLENNON:  Objection; mischaracterizes the
8  testimony.
9      THE WITNESS:  I looked at the stock movement
10  five days after the earnings release, yes, as one of
11  four data points, in each one of the ten quarters.
12      MR. GREENSTEIN:  Q.  Is it your opinion that
13  the stock price movement five days after an earnings
14  release is somehow correlated to what the company
15  reports?
16      MR. GLENNON:  Objection; vague and ambiguous.
17      THE WITNESS:  I don't understand your
18  question.
19      MR. GREENSTEIN:  Q.  Why did you look at the
20  fifth day following a earnings release in your
21  materiality analysis?
22      A.  More information is better in the materiality
23  calculations.  So if you want to look at one day, if an
24  auditor decides to do that, or a company does, you can
25  look at two days, you can look at three days.  I thought

304

1  four days was adequate.
2      Q.  Are you aware of a standard, looking at stock
3  price movements, that looks at the stock price from one
4  to three days following the earnings disclosure?
5      MR. GLENNON:  Objection; lack of foundation,
6  vague and ambiguous.
7      THE WITNESS:  Am I aware of a standard?
8      MR. GREENSTEIN:  Q.  Yeah.
9      A.  I'm not aware of any standard that suggests
10  that, no.
11      Q.  So, is it your opinion if you looked at the
12  stock price movement seven days following an earnings
13  result, that would be a factor to look at in a
14  materiality analysis?
15      MR. GLENNON:  Objection; vague and ambiguous,
16  incomplete hypothetical.
17      THE WITNESS:  I'm sorry, you mean seven days
18  after the date of release?
19      MR. GREENSTEIN:  Q.  Right.
20      A.  Do I think that's something to consider?
21      Q.  Um-hum.
22      A.  If an auditor or company decides to do that,
23  yes.  That's up to their judgment.
24      Q.  Why did you decide to stop at five days?
25      A.  Because I thought it was adequate.  And it is

305

1  adequate based on the information that I saw and based
2  on my significant number of years of experience.
3      Q.  On page 38 of your report you state that --
4      A.  My original report?
5      Q.  Yeah, your original report.
6      A.  I'm there.
7      Q.  You state, "I do not believe it would have
8  influenced the users of Oracle's financial statements."
9  Do you see that?
10     A.  I see that.
11     Q.  How did you determine who the users of
12 Oracle's financial statements were?
13     A.  Anyone looking at Oracle's financial
14 statements.
15     Q.  So it -- is the same standard applied to
16 any -- is the same standard applied to any user
17 regardless of their background?
18     MR. GLENNON:  Objection; vague and ambiguous,
19 incomplete hypothetical, lack of foundation.
20     THE WITNESS:  Well, that is really -- that's
21 more of a definition within SAB 99 of what they call a
22 reasonable investor or something to that effect.  So I
23 haven't made a determination about who all the users
24 were.  I just said whoever the user is, in general.
25     MR. GREENSTEIN:  Q.  Is there any difference

306

1  in your mind between an ordinary investor versus what
2  would be reasonable to, say, a hedge fund manager?
3      MR. GLENNON:  Objection; vague and ambiguous,
4  incomplete hypothetical.
5      THE WITNESS:  Well, their sophistication
6  certainly can be different, but they are still users of
7  the financial, which one needs to consider as it relates
8  to materiality.
9      MR. GREENSTEIN:  Q.  Right.  But would you
10 apply the same standard to determining whether something
11 was material to a user any differently depending on what
12 type of investor the person was?
13     MR. GLENNON:  Objection; incomplete
14 hypothetical, lacks foundation.
15     THE WITNESS:  Yeah.  No.  A company and/or
16 auditor don't determine materiality based on whether it
17 is known as a hedge fund or a mom and pop's retirement
18 fund.  It is the total mix and the overall financial
19 statement taken as a whole.
20     MR. GREENSTEIN:  Q.  Do you agree SAB 99 --
21 strike that.
22     What qualitative factor did you look at doing
23 your materiality analysis?
24     A.  Qualitative?
25     Q.  Yeah.

307

1      A.  I looked at the ones we talked about on page
2  39, and anything else that was mentioned in SAB 99.  And
3  you can see those laid out on pages 39 and 40 of my
4  report.
5      Q.  Let's take the first factor, whether a
6  statement arises from an item capable of precise
7  measurement or whether it arises from an estimate, and,
8  if so, the degree of imprecision in that.  Do you see
9  that?
10     A.  I do.
11     Q.  So is it your expert opinion that the
12 transfers from -- the $20.1 million in transfers from
13 25005 to 12601 in the second quarter '01 was an
14 estimate?
15     A.  Yes.
16     MR. GLENNON:  Objection; lack of foundation,
17 vague and ambiguous.
18     THE WITNESS:  It was based on an estimate of a
19 reserve account.
20     MR. GREENSTEIN:  Q.  But the actual transfer
21 from 25005 to 12601 can be accurately calculated, can't
22 it?
23     MR. GLENNON:  Objection; vague and ambiguous,
24 lack of foundation.
25     THE WITNESS:  The amount can be calculated,

308

1  but the resultant account that is being adjusted is the
2  reserve.  And that is one of the most volatile estimates
3  a company has.
4      MR. GREENSTEIN:  Q.  But actual transfers from
5  25005 to 12601 can be accurately measured; right?
6      MR. GLENNON:  Objection; asked and answered.
7      THE WITNESS:  Yes, it can be.  But that's not
8  the way you measure materiality.  Any adjustment can be
9  accurately measured.  The issue becomes would a reader
10 of a financial statement be interested in whether or not
11 an adjustment took place in cash that can be accounted,
12 or, for example, in a reserve account for bad debt that
13 they would expect to have a significant amount of
14 estimated and a significant amount of judgment placed on
15 it?
16     MR. GREENSTEIN:  Q.  Looking at the second
17 factor, whether the misstatement masks a change in
18 earnings or other trends.  Do you see that?
19     A.  Yes.
20     Q.  You stated you found, quote, "No evidence of
21 this issue"?
22     A.  That's right.
23     Q.  Have you ever found -- in conducting
24 materiality analysis, have you ever found evidence that
25 a misstatement masked a change in earnings?

309

1      MR. GLENNON: Objection; vague and ambiguous.
2      THE WITNESS: Certainly.
3      MR. GREENSTEIN: Q. What factors would allow
4  you to draw a conclusion that a misstatement masks a
5  change in earnings or other trends?
6      A. Well, if it changes from a loss to income.
7      Q. That's a different factor though; right?
8      A. It also can be subsumed into that one. Mask a
9  change in earnings, well, if you're changing the
10  earnings, that's masking a change in earnings.
11      Q. Okay.
12      A. So, or other trends. Have I ever found that?
13  Is that your question? I'm sorry.
14      Q. I think you answered my question.
15      Take the next factor, "Whether the
16  misstatement concerns a segment or other portion of the
17  registrant's business that has been identified as
18  playing a significant role in the registrant's
19  operations or profitability." Do you see that?
20      A. You skipped down quite a few.
21      Q. I'm focusing on certain ones.
22      A. I thought you said the next one. I'm sorry I
23  do see that one, yes.
24      Q. And you -- your opinion is that if Oracle had
25  not been able to book the HP transaction second quarter

310

1  of '01, that that would not have been material to a
2  reasonable investor; is that correct?
3      MR. GLENNON: Objection; incomplete
4  hypothetical, lack of foundation.
5      THE WITNESS: Now, we're on HP?
6      MR. GREENSTEIN: Q. Yeah.
7      A. My opinion is that had Oracle not booked the
8  HP transaction in the second Q would not have been
9  material; that's correct.
10      MR. GREENSTEIN: Q. Did you analyze what
11  Oracle's applications growth would have been in 2Q '01
12  if they did not recognize the HP deal?
13      MR. GLENNON: Same objections.
14      THE WITNESS: I did.
15      MR. GREENSTEIN: Q. You did?
16      A. I did, yes.
17      Q. And what would it be if they didn't recognize
18  it?
19      A. Fifty-four percent.
20      Q. What was it -- what was it -- strike that.
21      They did recognize the HP transaction;
22  correct?
23      MR. GLENNON: Objection; vague and ambiguous.
24      THE WITNESS: They did.
25      MR. GREENSTEIN: Q. What was the applications

311

1  growth rate in the second quarter?
2      MR. GLENNON: Same objection; lack of
3  foundation.
4      THE WITNESS: Sixty-six percent.
5      MR. GREENSTEIN: Q. So if Oracle had not
6  booked the HP deal in 2Q '01, its applications growth
7  would have been 55 percent?
8      MR. GLENNON: Objection; asked and answered.
9      MR. GREENSTEIN: Q. Sorry, 54 percent?
10      A. Fifty-four percent.
11      Q. Fifty-four percent, okay. Do you know what
12  analysts' expectations were for 2Q '01 in terms of
13  applications growth?
14      A. I do.
15      MR. GLENNON: Objection; lack of foundation.
16      MR. GREENSTEIN: Q. What was the consensus
17  growth expectation?
18      A. I don't know what the consensus was. I looked
19  at it individually. I don't know if there really was a
20  consensus per se.
21      Smith Barney was 54 percent and Deutsche Bank
22  was 50 to 60 percent, the two that I looked at.
23      Q. You don't think a reasonable investor would
24  have found it important that Oracle's applications
25  growth would have been more than ten percent lower if

312

1  they hadn't booked that HP deal?
2      MR. GLENNON: Objection; mischaracterizes the
3  testimony. Lack of foundation.
4      THE WITNESS: I don't think in the total mix
5  of information that a reasonable investor would have
6  considered it would have been material to a reasonable
7  investor, no.
8      MR. GREENSTEIN: Q. You say in your report
9  that it was the largest deal in that quarter; is that
10  correct?
11      MR. GLENNON: Objection; mischaracterizes
12  testimony. Lack of foundation.
13      THE WITNESS: I think I said third. One of
14  the largest.
15      MR. GREENSTEIN: Q. It was the third largest
16  deals?
17      A. I believe so, yes.
18      Q. You don't think -- if the third largest deal
19  in a quarter was improperly booked, you don't think that
20  would be important to a reasonable investor?
21      MR. GLENNON: Objection; lack of foundation,
22  incomplete hypothetical.
23      THE WITNESS: The size of the deal only
24  matters with respect to whether or not in the total mix
25  of information it is considered material by the auditor

313

1 or by the company.
2     MR. GREENSTEIN: Q. Okay.
3     A. What level it was on the ranking of size of
4 deal makes no difference at all.
5     Q. Okay. Do you agree that the HP deal in 2Q '01
6 was the largest applications deal Oracle had that
7 quarter?
8     MR. GLENNON: Objection; lack of foundation,
9 incomplete hypothetical.
10     THE WITNESS: I don't recall that information.
11     MR. GREENSTEIN: Q. You don't know if it was
12 or it was not?
13     A. I don't recall that.
14     Q. I know you don't recall it. Sitting here
15 today, do you know it?
16     MR. GLENNON: Objection; asked and answered.
17     THE WITNESS: I said I don't recall it.
18     MR. GREENSTEIN: Q. Well, assuming it was the
19 largest applications deal in that quarter, is it your
20 opinion that if that deal was improper, that wouldn't
21 have been important to a reasonable investor?
22     MR. GLENNON: Objection; lack of foundation,
23 calls for speculation, and vague and ambiguous.
24     THE WITNESS: What do you mean by improper?
25     MR. GREENSTEIN: Q. If that deal hadn't been

314

1 booked, assuming it was the largest applications deal in
2 the second quarter '01, would that have been important
3 to an investor?
4     MR. GLENNON: Same objections.
5     THE WITNESS: I don't think, given the entire
6 mix of information, that would have been important to a
7 reasonable investor.
8     MR. GREENSTEIN: Q. How many analysts did you
9 look at in determining what Oracle's applications growth
10 estimates -- strike that.
11     How many analysts did you look at in
12 determining what analysts expected Oracle to report in
13 terms of applications growth?
14     MR. GLENNON: Objection; asked and answered.
15     THE WITNESS: There were a number. I don't
16 remember. I just remember those two numbers
17 specifically, SSB and Deutsche Bank. But there were a
18 number that I looked at and considered.
19     MR. GREENSTEIN: Q. Did you -- so do you
20 recall which ones you looked at?
21     A. No.
22     MR. GLENNON: Objection; asked and answered.
23     THE WITNESS: I could go to the binders and
24 look, if you'd like.
25     MR. GREENSTEIN: Sure.

315

1     THE WITNESS: We need to take --
2     MR. GLENNON: Well, okay.
3     THE WITNESS: Take a short break?
4     MR. GREENSTEIN: Q. You don't remember? I'm
5 asking if you remember the numbers.
6     A. I don't remember without looking.
7     Q. Do you remember a range?
8     MR. GLENNON: Objection; asked and answered.
9     THE WITNESS: Smith Barney was 54 percent,
10 Deutsche Bank was 50 to 60 percent.
11     MR. GREENSTEIN: Q. Okay. Looking at the
12 factor of SAB 99 that looks at whether the misstatements
13 affects the registrant's compliance with regulatory
14 requirements, are you aware of that factor?
15     A. I am.
16     Q. Did you look at that in connection with the 2Q
17 '01 bad debt transfers?
18     A. Yes.
19     Q. Did you consider whether or not those bad debt
20 transfers violated any regulatory requirements?
21     MR. GLENNON: Objection; vague and ambiguous.
22     THE WITNESS: They didn't violate any
23 regulatory requirements. If they were inappropriately
24 transferred, they violated GAAP, which is not a
25 regulatory requirement, it is mentioned or contemplated

316

1 in SAB 99.
2     MR. GREENSTEIN: Q. Did you analyze any
3 escheatment laws in doing your materiality analysis of
4 the 2Q '01 bad debt transfer?
5     MR. GLENNON: Objection; vague and ambiguous,
6 lacks foundation.
7     THE WITNESS: I know of escheatment laws, I
8 have dealt with them for years. But I don't recall
9 analyzing any of those as it relates to those transfers.
10     MR. GREENSTEIN: Okay. Let's go off the
11 record.
12     VIDEOGRAPHER: This marks the end of tape four
13 in Volume I in the deposition of J. Duross O'Bryan. At
14 7:10, going off the record.
15     (Recess, 7:10 p.m. - 7:22 p.m.)
16     (Exhibit 19 marked for
17     identification.)
18     (Exhibit 20 marked for
19     identification.)
20     VIDEOGRAPHER: On record at 7:22. This marks
21 the beginning of tape five in Volume I in the deposition
22 of J. Duross O'Bryan.
23     MR. GREENSTEIN: Q. Mr. O'Bryan, what's been
24 placed before you are the last two exhibits, 19 and 20.
25     MR. GLENNON: I just put an objection on the

317

1  record as far as Exhibit 19 is concerned, it looks like
2  what plaintiffs have done is affixed a variety of
3  different documents together and marked them as a single
4  exhibit.
5      So to the extent these represent different
6  documents, I just wanted to note that for the record.
7      MR. GREENSTEIN: Q. Mr. O'Bryan, what's been
8  placed before you are Exhibits 19 and 20. And these are
9  the documents produced as part of your rebuttal report
10  on June 22nd.
11      Do you recognize the documents?
12      A. I do, yes. I mean, the ones I've just very
13  quickly looked at. I recognize the top portion of these
14  two documents, yes.
15      Q. Okay. Your opening expert report was issued
16  on May 25th; correct?
17      A. I believe that date is correct. Let me just
18  verify that for you.
19      May 25th; that's correct.
20      Q. And Exhibit 19 and 20, did you have those
21  documents at the time you wrote -- that you issued your
22  report on May 25th?
23      MR. GLENNON: Objection; vague and ambiguous,
24  lacks foundation.
25      THE WITNESS: I don't recall if these were

318

1  part of the original production.
2      MR. GREENSTEIN: Q. I didn't ask that. I
3  asked did you have these documents at the time you
4  submitted your May 25th, 2007 report?
5      MR. GLENNON: Objection; asked and answered.
6      THE WITNESS: I haven't looked through all of
7  19, so I can't say specific, unless you want me to look
8  through all of them.
9      MR. GREENSTEIN: Q. The first document, did
10  you have that at the time you issued your May 25th
11  report?
12      A. I don't recall having the SLSA.
13      Q. So is that a no?
14      MR. GLENNON: Objection; mischaracterizes the
15  testimony.
16      THE WITNESS: I just don't recall.
17      MR. GREENSTEIN: Q. Do you recall having
18  Exhibit 20 at the time you issued your May 25th report?
19      Let me ask you, are you aware of an e-mail
20  from --
21      A. I just want to answer your question here.
22      Q. Okay.
23      A. I did have -- I beg your pardon.
24      I'm not ready to answer. I don't have the
25  answer I thought I had. Sorry.

319

1      Q. So you don't know if you had the documents
2  that are marked as Exhibit 19 or 20 at the time that you
3  issued your May 25th report?
4      A. Let me just --
5      Q. You are looking for it?
6      A. Yeah.
7      Q. Sorry.
8      A. I don't think I had those. I don't recall,
9  but I don't think that I did.
10      Q. Do you know when you received those documents?
11      A. Well, when Mr. Regan issued his original --
12  his report where he spoke in detail about the HP
13  transaction, so maybe his rebuttal report, at that point
14  in time it became clear to at least me what the
15  plaintiff's position was with respect to HP.
16      And at that point in time documents were
17  gathered to show that, in my opinion, Mr. Regan is wrong
18  as it relates to the recognition of revenues.
19      So it was sometime after my original report
20  and prior to my rebuttal report. I just don't recall
21  the date.
22      Q. Are the documents in front of you, are those
23  the documents that were gathered?
24      MR. GLENNON: Objection; assumes facts, lack
25  of foundation.

320

1      THE WITNESS: Again, Exhibit 19 is 75 pages, a
2  bunch of different things stapled together, and I have
3  not been through those to cross-check those with all the
4  ones we got with respect to the secondary production.
5      MR. GREENSTEIN: Q. Is that Exhibit 20, or
6  the smaller one? You relied on that in your rebuttal
7  report. So do you recall if you had that, that was one
8  of the documents gathered after you submitted your
9  May 25th report?
10      MR. GLENNON: Objection; asked and answered.
11      THE WITNESS: As I said, I don't recall if I
12  saw this prior to the issuance of my original report. I
13  don't think so, but I just don't recall as I sit here
14  right now. It's been a long time.
15      MR. GREENSTEIN: Q. Let me ask you this. Are
16  you aware of an e-mail from Shelly Curtis where she
17  purports to describe events surrounding the signing of
18  the HP deal late on November 30th? Do you recall that
19  e-mail?
20      MR. GLENNON: Objection; lack of foundation,
21  vague and ambiguous.
22      THE WITNESS: I am aware of an e-mail that has
23  Shelly Curtis' comments about certifying that the
24  transaction with HP was completed prior to midnight on
25  11/30/2000.

321

1     MR. GREENSTEIN: Q. You recall in that e-mail
2  that she references Arthur Andersen wanted some evidence
3  that the deal was booked on November 30th; correct?
4     MR. GLENNON: Objection; document speaks for
5  itself, lack of foundation.
6     THE WITNESS: Well, somewhere in that e-mail
7  chain is a reference to: Could you give some
8  clarification here, Andersen has asked about that.
9  Which you can see in Andersen's report or Andersen's
10  analysis on 1340.
11     MR. GREENSTEIN: Q. Why would Arthur Andersen
12  as Oracle's auditor, want to know if the deal was signed
13  on November 30th, 2000?
14     MR. GLENNON: Objection; calls for
15  speculation, lacks foundations.
16     THE WITNESS: It is part of a revenue
17  recognition test.
18     MR. GREENSTEIN: Q. Okay. Do you recall
19  having that e-mail from Shelly Curtis prior to issuing
20  your May 25th report?
21     MR. GLENNON: Objection; vague and ambiguous.
22     THE WITNESS: You know, I don't recall having
23  that. I just don't recall as I sit here if I had it or
24  not.
25     MR. GREENSTEIN: Q. If you had it, you would

322

1  have put it on the Appendix C of your opening report and
2  you would have relied on that document?
3     MR. GLENNON: Objection; lack of foundation.
4     THE WITNESS: Had I seen that document, I
5  certainly would have considered it. Whether I relied on
6  it would remain to be seen.
7     MR. GREENSTEIN: Q. If you turn to page 41 of
8  your opening report.
9     A. Sorry, back to the opening report?
10     Q. Yeah. The section on review of
11  Hewlett-Packard transactions. Do you see that?
12     A. I do, yes.
13     Q. It says, "In supplemental interrogatory
14  responses, plaintiffs suggest that the HP
15  transaction..." Do you see that?
16     A. I do.
17     Q. Is it fair to say you read plaintiff's
18  interrogatory responses -- strike that.
19     So you were aware of plaintiff's allegations
20  concerning the HP transaction prior to issuing this
21  report, from their interrogatory responses; correct?
22     MR. GLENNON: Objection; lack of foundation.
23     THE WITNESS: I have seen the supplemental
24  interrogatory responses. And I did see in those, prior
25  to the issuance of this report this allegation that HP

323

1  should not have been booked.
2     MR. GREENSTEIN: Q. And you issued this
3  opinion; correct?
4     A. I issued this opinion?
5     Q. You issued this opinion after learning of
6  plaintiff's allegations about the HP transaction in the
7  supplemental interrogatory responses; correct?
8     MR. GLENNON: Objection; vague and ambiguous
9  as to this opinion.
10     THE WITNESS: I issued opinion number 7 on
11  page 41. And at the time I issued that, I had seen the
12  supplemental interrogatory responses that alleged that
13  HP's transaction had not been properly booked.
14     MR. GREENSTEIN: Q. If you look at page 42,
15  the third to last sentence, it starts with, "I note that
16  AA." Do you see that?
17     A. Yes.
18     Q. You note that "AA, Oracle's prior financial
19  statement auditors, specifically looked at the HP
20  transaction from a revenue recognition perspective and
21  even discussed it with Oracle's audit committee on
22  January 5th." Do you see that?
23     A. I do.
24     Q. You said, "AA did not recommend that any
25  adjustment be made to the accounting for the HP

324

1  transaction." Do you see that?
2     A. Correct.
3     Q. Is it required for an auditor to make an
4  adjustment in order for a revenue recognition deal to be
5  material?
6     MR. GLENNON: Objection; vague and ambiguous,
7  incomplete hypothetical.
8     THE WITNESS: I don't understand your
9  question.
10     MR. GREENSTEIN: Q. If you turn to Appendix C
11  of your opening report.
12     A. I'm there. I'm there.
13     Q. And you see the depositions that you relied
14  upon there?
15     A. I do, yes.
16     Q. You will see that Tom Rathjens' isn't in
17  there?
18     A. That's correct.
19     Q. Is it fair to say you didn't rely on the
20  deposition of Tom Rathjens in issuing this May 25th
21  opinion on the HP transaction?
22     MR. GLENNON: Objection; vague and ambiguous,
23  lacks foundation.
24     THE WITNESS: Yeah, I don't think I looked at
25  Mr. Rathjens' deposition prior to the issuance of this

O'Bryan, John Duross - Confidential 7/12/2007 9:29:00 AM

325

1    initial report.
2          MR. GREENSTEIN:  Q.  And why not?
3          MR. GLENNON:  Objection; vague and ambiguous.
4          THE WITNESS:  Because, as I state in my
5    report, I don't see any evidence, in considering what
6    went on with this transaction, that this was improperly
7    booked at this point in time when I wrote this report.
8          With all due respect to Mr. Regan, he's the
9    only individual, at least accounting professional that
10   I've seen that seven years later suggests the HP deal
11   was not booked properly.
12         This deal was looked at by the company, by the
13   audit committee, by the revenue recognition group of the
14   company and by the auditors.  Every single one of them
15   have looked at this transaction and suggested it was
16   properly stated.
17         Seven years later Mr. Regan comes along and
18   says that that was inappropriate, which I find
19   troubling.
20         So, that was the information I was considering
21   at the time.  And there was no reason for me to look at
22   Mr. Rathjens, who was HP's individual PMK or whatever he
23   was designated as, because this thing had been fully
24   vetted.
25         What HP thought about and thinks about Oracle

326

1    booking their deal is completely irrelevant.  It is how
2    Oracle decides to book this deal.  And it was
3    appropriate to book, and it was appropriate to book
4    given all of the professionals that have looked at this.
5    And I think it is silly, quite frankly, that Mr. Regan
6    suggests otherwise.
7          MR. GREENSTEIN:  Q.  So, is it fair to say
8    that what you just said in that long answer is what you
9    considered before submitting your May 25th report?
10         MR. GLENNON:  Objection; mischaracterizes the
11   testimony, lack of foundation.
12         THE WITNESS:  Well, it is any of the footnotes
13   that I have here or references to documents or
14   depositions.  Mr. Matuszak's deposition, Arthur
15   Andersen's consideration, the audit committee.
16         MR. GREENSTEIN:  Q.  Okay.  So you didn't
17   consider Tom Rathjens' deposition in forming your expert
18   opinion on the propriety of the HP transaction on
19   May 25th?
20         MR. GLENNON:  Objection; asked and answered.
21         THE WITNESS:  In my opinion there would be no
22   need to, given the date of the original report.
23         MR. GREENSTEIN:  Okay, I'm done.
24         MR. GLENNON:  I don't have any redirect.
25         VIDEOGRAPHER:  The number of tapes used for

327

1    this deposition is five.  This is the end of videotape
2    number five in Volume I in the deposition of J. Duross
3    O'Bryan.  The original videotapes will be retained by
4    LiveNote World Service.  We're going off the record.
5    The time on the monitor is 7:37.
6          (Discussion off the record.)
7          MR. GREENSTEIN:  We just had a discussion off
8    the record.  Both parties agree that the deposition and
9    the exhibits should be designated as confidential.
10         MR. GLENNON:  And it is going to get shipped
11   to us for our review in 30 days to review and sign?
12         MR. GREENSTEIN:  Right.
13         (Whereupon, at 7:38 p.m. the deposition of
14   JOHN DUROSS O'BRYAN was adjourned.)
15
16         I declare under penalty of perjury that the
17   foregoing is true and correct.
18
19   Dated:_____  _____
20                  JOHN DUROSS O'BRYAN
21
22
23
24
25
26

-

1    STATE OF CALIFORNIA       )
2                             )
3    COUNTY OF ALAMEDA        )
4          I, DIANA NOBRIGA, hereby certify that the
5    witness in the foregoing deposition was by me duly sworn
6    to testify to the truth, the whole truth, and nothing
7    but the truth in the within-entitled cause; that said
8    deposition was taken at the time and place therein
9    stated; that the testimony of said witness was reported
10   by me, a Certified Shorthand Reporter and disinterested
11   person, and was thereafter transcribed into typewriting,
12   and that the pertinent provisions of the applicable code
13   or rules of civil procedure relating to the notification
14   of the witness and counsel for the parties hereto of the
15   availability of the original transcript of the
16   deposition for reading, correcting and signing have been
17   met.
18         And I further certify that I am not of counsel
19   or attorney for either or any of the parties to said
20   deposition, nor in any way interested in the outcome of
21   the cause named in said action.
22         DATED: _____
23
24         _____
25                  DIANA NOBRIGA, CSR NO. 7071

```
 1   STATE OF CALIFORNIA        )

 2                              )

 3   COUNTY OF ALAMEDA          )

 4            I, DIANA NOBRIGA, hereby certify that the

 5   witness in the foregoing deposition was by me duly sworn

 6   to testify to the truth, the whole truth, and nothing

 7   but the truth in the within-entitled cause; that said

 8   deposition was taken at the time and place therein

 9   stated; that the testimony of said witness was reported

10   by me, a Certified Shorthand Reporter and disinterested

11   person, and was thereafter transcribed into typewriting,

12   and that the pertinent provisions of the applicable code

13   or rules of civil procedure relating to the notification

14   of the witness and counsel for the parties hereto of the

15   availability of the original transcript of the

16   deposition for reading, correcting and signing have been

17   met.

18            And I further certify that I am not of counsel

19   or attorney for either or any of the parties to said

20   deposition, nor in any way interested in the outcome of

21   the cause named in said action.

22            DATED:   7/16/07

23

24

25                            DIANA  NOBRIGA, CSR NO. 7071
```

# EXHIBIT G

Hubbard, R. Glenn   7/3/2007  8:20:00 AM

1

1  IN THE UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF CALIFORNIA
3  - - - - - - - - - - - - - - - - - -x
4  In re ORACLE CORPORATION
   SECURITIES LITIGATION      MASTER FILE NO.
5            C-01-0988-MJJ
6  THIS DOCUMENT RELATES TO:
   ALL ACTIONS
7
   - - - - - - - - - - - - - - - - - -x
8
9            July 3, 2007
             8:20 a.m.
10
11       Videotaped Deposition of
12  R. GLENN HUBBARD, taken by attorneys for
13  Plaintiffs, held at the offices of Lerach Coughlin
14  Stoia Geller Rudman & Robbins LLP, 52 Duane Street,
15  New York, New York, before Andrew Walker, a
16  Registered Professional Reporter (1991) and Notary
17  Public.
18
19
20
21
22
23
24
25

2

1  A P P E A R A N C E S :
2
3       LERACH COUGHLIN STOIA GELLER RUDMAN &
        ROBBINS LLP
4            Attorneys for Plaintiffs
             401 B Street - Suite 1700
5            San Diego, California  92101
6       BY:  MARK SOLOMON, ESQ.
             STACEY M. KAPLAN, ESQ.
7
8
        LATHAM & WATKINS LLP
9            Attorneys for Defendants and the
             Witness
10           505 Montgomery Street - Suite 1900
             San Francisco, California
11                94111-2562
12      BY:  MICHELE F. KYROUZ, ESQ.
13           -and-
14      LATHAM & WATKINS LLP
             140 Scott Drive
15           Menlo Park, California  94025-1008
16      BY:  ANDREW M. FARTHING, ESQ.
17
18  ALSO PRESENT:
19      BRUCE DEAL
        Analysis Group
20
        DOUG BRITTON (via Internet feed)
21
        J.D. MARTINEZ, Videographer
22      LiveNote World Service
23
24
25

3

1       THE VIDEOGRAPHER:  We're on the
2  record.  Here begins the videotaped
3  deposition of Glenn Hubbard, Tape 1, Volume
4  I, in the matter of In re Oracle Corporation
5  Securities Litigation, filed in the United
6  States District Court, Northern District of
7  California, Case No. C-01-0988-MJJ.  Today's
8  date is July 3rd, 2007 and the time on the
9  video monitor is 8:20 a.m.
10      The video operator today is
11  J.D. Martinez representing LiveNote World
12  Service located at 221 Main Street, Suite
13  1250, San Francisco, California 94105, phone
14  number (415)321-2300.  The court reporter is
15  Andrew Walker, reporting on behalf of
16  LiveNote World Service.  Today's deposition
17  is being taken on behalf of the plaintiff and
18  is taking place at 52 Duane Street, New York,
19  New York.
20      Counsels, please introduce yourselves
21  and state whom you represent.
22      MR. SOLOMON:  Mark Solomon,
23  representing plaintiffs.
24      MS. KAPLAN:  Stacey Kaplan,
25  representing plaintiffs.

4

1       MS. KYROUZ:  Michele Kyrouz and Andrew
2  Farthing, of Latham & Watkins, representing
3  defendants and the witness.
4       THE VIDEOGRAPHER:  The witness may be
5  sworn.
6       R. G L E N N  H U B B A R D,
7  having been first duly sworn by the Notary Public
8  (Andrew Walker), was examined and testified as
9  follows:
10  EXAMINATION
11  BY MR. SOLOMON::
12  Q.   Good morning, Mr. Hubbard.
13  A.   Good morning.  How are you?
14  Q.   I'm very well, thank you.  How are you?
15  A.   Great, thanks.
16  Q.   How do you prefer to be referred to, Mr.
17  Hubbard, Dr. Hubbard, Professor Hubbard, Mother
18  Hubbard?
19  A.   Anything, Glenn -- Mother Hubbard would be
20  pushing it but any of the above would be fine.
21  Q.   You are here to testify as an expert on
22  behalf of defendants, you understand that?
23  A.   Yes, sir.
24  Q.   And how did you come to be retained as an
25  expert in this case?

5

1   A.   I was retained in the fall of 2006 by counsel
2 for the defendants.
3   Q.   And at that time, had you any experience --
4 excuse me, at that time, had you ever had any
5 working relationship with anyone at Oracle before
6 that?
7   A.   Not to my knowledge, no.
8   Q.   And what do you understand the retention was
9 for?
10   A.   Really two purposes for me. One, to opine on
11 the state of the U.S. economy as affecting Oracle
12 during the period in question; and second, given
13 that information, was the guidance offered by Oracle
14 during the quarter in question reasonable from an
15 economist's perspective.
16   Q.   You offer your services out, promote yourself
17 out as an expert in order to get retained?
18   A.   I don't promote myself, no.
19   Q.   And what you're saying is defendants found
20 you?
21   A.   Yes, sir.
22   Q.   Have you provided expert testimony in any
23 other situation before?
24   A.   Yes, I have, sir.
25   Q.   And in how many cases have you actually

6

1 provided testimony?
2   A.   I don't really recall. We probably turned
3 over a list to you. I can tell you the general
4 areas--in regulation, tax policy, securities and
5 antitrust. I don't do very many but I think the
6 list from the past few years was provided to you.
7   Q.   Okay, you provided a list of engagements
8 between 2003 and 2007; do you understand that?
9   A.   Yes.
10   Q.   There were engagements before 2003?
11   A.   Well, from 2001 to 2003 I was in the
12 government. Prior to that time, my work had been
13 principally in either telecommunications, those were
14 regulatory proceedings which generally were
15 antitrust in character, and tax cases but not very
16 many, a handful.
17   Q.   When you say "a handful," less than ten?
18   A.   Yes.
19       MR. SOLOMON: Okay, so let's have
20 marked as the first exhibit your initial
21 report.
22       (Expert report of R. Glenn Hubbard
23 dated May 25, 2007, no Bates numbers, marked
24 Hubbard Exhibit 1 for identification, as of
25 this date.)

7

1   Q.   If we go to the back of the report to
2 appendix or to the appendices --
3   A.   Yes, sir.
4   Q.   -- please, you start off with your curriculum
5 vitae?
6   A.   Yes, Appendix A.
7   Q.   Is there anything that you want to add or
8 subtract to that CV?
9   A.   I'm sure there may be papers that I have
10 written recently, I don't think anything material.
11   Q.   This CV is almost as long as your report.
12   A.   Not quite. I apologize for the length of the
13 report.
14   Q.   If you go to Appendix B, it provides the
15 identity of some cases you seem to have been
16 involved in?
17   A.   Yes, sir.
18   Q.   Starting at the top, with the first case, who
19 did you represent in that case - sorry, who were
20 you appearing on behalf of in that case?
21   A.   Franklin Resources.
22   Q.   And what was the nature of that litigation?
23   A.   This matter is ongoing --
24       THE WITNESS: Is this appropriate for
25 me to talk about?

8

1       MS. KYROUZ: If it's subject to a
2 confidentiality order, it may not be.
3       Is there something in particular you
4 want to know?
5   A.   I can say generally perhaps what it's about
6 but --
7   Q.   Correct, that's what I'm looking for right
8 now.
9   A.   Oh, it's mutual fund litigation, it's a
10 question about the appropriateness or so-called
11 excessiveness of fees.
12   Q.   And you're testifying on behalf of Franklin
13 as to the excessive or nonexcessive nature of such
14 fees?
15   A.   Yes, sir.
16   Q.   And is it your position that the fees were
17 not excessive in that case?
18   A.   This is, again, an ongoing matter --
19       THE WITNESS: I'm not sure what's an
20 appropriate answer.
21       MS. KYROUZ: Yeah, I'm not --
22   Q.   We'll leave that for the moment.
23   A.   Yeah.
24   Q.   Number 2, this case involves Microsoft. Can
25 you tell me what this case is or was about?

9

1   A.   Well, this is an antitrust case about whether
2   Microsoft's alleged market power led to charging of
3   excessive prices which would need to be disgorged,
4   it's a state court matter.
5   Q.   And which side are you on in that case?
6   A.   Microsoft.
7   Q.   And the next case is -- excuse me, what's
8   your task in the case involving Microsoft? What's
9   your expert task?
10   A.   Well, as I indicated, to analyze the question
11   of market power that Microsoft may or may not have
12   and whether one could come to a judgment about
13   whether the prices charged for its products were
14   excessive as economists would use that term.
15   Q.   And then the third case, can you tell me
16   which side you were on in that case?
17   A.   American Century.
18   Q.   What's the nature of that litigation?
19   A.   This has concluded.  It is -- was a case
20   involving, again, mutual funds and whether or not
21   certain fees were excessive.
22   Q.   And the next one down, the fourth one
23   involves Merrill Lynch and McKesson.  Can you tell
24   me what side you're on there?
25   A.   Merrill Lynch, plaintiff.

10

1   Q.   And what's the nature of that case?
2   A.   The case was--this is also concluded--whether
3   or not McKesson had misled investors surrounding the
4   merger between McKesson and HBOC and whether these
5   two Merrill Lynch funds might have represented -- or
6   would be entitled to restitution.
7   Q.   And what was the nature of your expertise
8   that was called upon in that case?
9   A.   To examine whether the McKesson statements
10   about HBOC reflected the economic reality as was
11   known to McKesson officials at the time of the
12   acquisition.
13   Q.   And what statements in particular were at
14   issue in that case?
15   A.   Well, the issue was whether McKesson believed
16   that HBOC was worth what it paid in the acquisition,
17   did it overpay and, hence, basically harm the
18   existing McKesson shareholders among whom were the
19   Merrill Lynch funds.
20   Q.   What was the resolution?  You said it's been
21   resolved, did you?
22   A.   Yes; that case did not go to trial.  It was a
23   very favorable result but I can't describe the
24   result, I don't believe, as a legal matter.
25   Q.   And the last one on the list is Florida State

11

1   Board versus Alliance Capital.  What side were you
2   on in that case?
3   A.   Alliance Capital.
4   Q.   And what was the nature of that dispute?
5   A.   This was a state court case which has
6   concluded involving the question raised by the
7   Florida State Board of Administration, essentially
8   the pension funds, the public pension funds, as to
9   whether or not Alliance adhered to its investment
10   guidelines in its agreement with the state in two
11   particular ways, one was its purchase of Enron
12   securities, and, second, whether the risks generally
13   taken by Alliance were consistent with the
14   investment management agreement to which it agreed
15   with the state.
16   Q.   And can you describe the resolution of that
17   case?
18   A.   A total win for the defendants, the
19   plaintiffs even had to pay the costs of the court
20   proceedings.
21   Q.   Now, prior to these testimonies, you gave
22   testimony in a handful of antitrust or tax-related
23   cases; is that fair?
24   A.   Yes, sir.
25   Q.   Have you, in connection with any of the

12

1   testimonies you've given in the past, ever changed
2   your mind?
3   A.   No, sir.
4   Q.   And have you been on the losing side of any
5   of the litigations that you've been involved in?
6   A.   In -- I don't know what you mean by losing
7   side.  If you mean a verdict against my side, I
8   don't recall any, no.
9   Q.   And have any of the cases in which you've
10   testified gone to trial?
11   A.   Sir, we just discussed the trials.
12   Q.   A jury trial?
13   A.   Yes, sir.
14   Q.   And how many cases have gone to jury trial?
15   A.   Well, certainly the Florida State Board of
16   Administration is a jury trial.  The others --
17   American Century would have been a jury trial, it
18   was not.  Franklin Resources has not yet been tried.
19   So the tax and telecom cases are regulatory or tax
20   court which aren't jury cases.
21   Q.   When did you begin to prepare your report
22   that was submitted initially in this case?
23   A.   In the fall of 2006.
24   Q.   And between the fall and the submission of
25   the report, did you meet with defendants' lawyers to

Hubbard, R. Glenn   7/3/2007   8:20:00 AM

13

1 prepare the report?

2 　　MS. KYROUZ: Objection; vague.

3 A.   I certainly didn't meet with counsel in terms

4 of preparing the report. I did have some

5 conversations with counsel toward the end of my

6 preparation of the report to describe, you know,

7 what I was doing. Counsel would have been aware, of

8 course, at the beginning of the outlines of what I

9 planned to do in the report.

10 Q.   When you first learned of the engagement,

11 were you aware of the facts that are in dispute in

12 this litigation?

13 A.   I was certainly --

14 　　MS. KYROUZ: Objection; vague.

15 A.   -- I was sent a copy of the complaint.

16 Q.   Okay. Now, before being sent a copy of the

17 complaint and reviewing it, did you know about this

18 litigation?

19 A.   Just from general events. No, I didn't have

20 any specific knowledge of the litigation.

21 Q.   And subsequent to submitting your report in

22 this case, did you review the report of Dr. Goedde?

23 A.   Yes, sir, I did.

24 Q.   And you responded with a rebuttal; is that

25 right?

14

1 A.   Yes, sir, I did.

2 Q.   And you know that Mr. or Dr. Foster has also

3 submitted a rebuttal report; are you aware of that?

4 A.   Yes, I'm aware of that.

5 Q.   Why was it that Dr. Foster, instead of you,

6 prepared a separate rebuttal --

7 　　MS. KYROUZ: Objection.

8 Q.   -- on certain issues?

9 A.   It's not a question that I can answer,

10 Mr. Solomon. I was asked to prepare a report and a

11 rebuttal report on a particular topic, and I did.

12 I'm not aware of the conversations with Dr. Foster.

13 Q.   Have you had any conversations with

14 Dr. Foster?

15 A.   None.

16 Q.   Were you aware at the time of preparing your

17 rebuttal that Dr. Foster was preparing a separate

18 rebuttal?

19 A.   I don't recall. I may have but I certainly

20 don't recall. As I say, we had no conversation

21 about it.

22 Q.   Were there any issues in Dr. Goedde's report

23 that you did not respond to?

24 　　MS. KYROUZ: Objection; vague.

25 A.   Well, I considered that I addressed the

15

1 macroeconomic issues and industry issues, which was

2 the subject of my original report. Dr. Goedde also

3 made references to product-specific issues which was

4 beyond the purview of my report.

5 Q.   And when you say it was beyond the purview,

6 in what way was it beyond the purview?

7 A.   To assess the quality issues with certain

8 products. For example, 11i was not assigned to me

9 as a macroeconomist.

10 Q.   Do you think product issues are relevant to

11 the forecasting that's in dispute in this case?

12 　　MS. KYROUZ: Objection; vague.

13 A.   It certainly depends on what you mean by that

14 question. A forecasting process, that is, a method

15 of gathering and evaluating information, need not be

16 product specific, but, of course, information on how

17 well or how poorly any product is doing is an input

18 into a reasonable forecasting process.

19 Q.   But in performing your task, that wasn't an

20 input that you considered; is that fair?

21 A.   No, sir, that's not fair.

22 Q.   And what's unfair about that?

23 A.   The forecasting process at Oracle involved at

24 its base the collection of information by

25 salespeople in the field, which leads to something

16

1 called a field forecast. Taking, say, the license

2 business for the moment, which is your question,

3 that information would have aggregated up all kinds

4 of product information. So that would certainly be

5 there. It was not my task, as a macroeconomist, to

6 provide a technical product evaluation of 11i or any

7 other individual product.

8 Q.   And you testified that product information is

9 relevant to the forecasting process.

10 　　Would a technical evaluation of 11i be

11 relevant to forecasting?

12 　　MS. KYROUZ: Objection; vague.

13 A.   It isn't what I said. What I said was that

14 you can think of inputs in a forecasting process. A

15 forecasting process is an analytical tool that takes

16 inputs and produces an estimate. Inputs include the

17 quality and any other attribute of products that are

18 being sold and, of course, it's relevant as an input

19 and, of course, salespeople would have taken a look

20 at that. My task as an economist was not to opine

21 at the very micro level on every single product but

22 really to look at the aggregate inputs and

23 forecasting process.

24 Q.   Do you think of the 11i suite as being more

25 than one product?

17

1    A.    11i, as I understand it--this is an
2    economist, not being an engineer--as I understand
3    it, it is the attempt to create a suite of
4    products -- a suite to replace a series of
5    relationship management products, so you could call
6    that one product or several but, again, I'm not an
7    engineer.
8    Q.    In the third fiscal quarter of 2000, do you
9    know what percentage of the pipeline was comprised
10   of 11i?
11   A.    No, sir, I don't recall that.
12   Q.    Would that figure be relevant to the
13   forecasting process in fiscal year -- in the third
14   fiscal quarter of '01?
15         MS. KYROUZ:  Objection; vague.
16   A.    I think I've answered that.  If you were
17   looking at the -- that line of business, you'd have
18   to look at both databases and applications,
19   applications being the smaller of the two and 11i
20   being a component of that, so, yes, it is an
21   element, it would have gone into sales forecasts.
22   I'm not sure there's much more I could say.
23   Q.    Do you know what the difference in the
24   percentage of the pipeline was between third fiscal
25   quarter '00 and third fiscal quarter '01 with

18

1    respect to 11i?
2    A.    I don't recall that, no.  Applications as a
3    whole were moderately higher but I don't recall 11i.
4    Q.    When you say "moderately higher," what do you
5    mean?
6    A.    Yeah, I don't remember the numbers in my
7    head, but certainly as a fraction of business
8    there's a modest increase in applications relevant
9    to database although database remains the dominant
10   of the two as components of the licensed business.
11   Q.    And where there's a difference, moderate or
12   otherwise, how would that be taken into account
13   appropriately in forecasting for the third fiscal
14   quarter of 2001?
15   A.    Much as it would be in any other quarter.
16   Salespeople have to come to a judgment about the
17   likelihood of sales and concluding sales of any
18   particular product, and that would be part of their
19   forecast.
20   Q.    Have you ever heard of -- step back a bit.
21        Have you ever met Larry Ellison?
22   A.    No, sir.  I've seen Mr. Ellison at
23   conferences, but I have not met him, no.
24   Q.    What conferences have you seen him at?
25   A.    Oh, I don't know.  I recall seeing him at

19

1    industry events where he would have been a speaker,
2    a business conference, but I don't believe I've ever
3    met him.
4    Q.    And can you recall which business
5    conferences?
6    A.    No, sir, I can't.
7    Q.    Were they associated with Oracle or
8    associated with --
9    A.    General business conferences.
10   Q.    General business?
11   A.    Yeah.
12   Q.    Did you form an impression of him when you
13   saw him?
14        MS. KYROUZ:  Objection; vague.
15   A.    I don't have an impression of him one way or
16   another.
17   Q.    And you've had no conversations with him at
18   all ever, correct?
19   A.    No, sir, never.
20   Q.    You reviewed his deposition that was taken in
21   this case?
22   A.    Yes, sir, I did.
23   Q.    Which days of his deposition did you review?
24   A.    I don't recall.
25   Q.    How many days of deposition did you review?

20

1    A.    Of Mr. Ellison?  I really don't recall.
2    Q.    Did you review the deposition testimony of
3    other people in preparation for your report other
4    than Mr. Ellison?
5    A.    Yes, sir, I did.
6    Q.    Just before I go into those other people, did
7    you review Mr. Ellison's deposition testimony before
8    you had submitted your initial report?
9    A.    Yes, sir.
10   Q.    And did you review it in connection with
11   your rebuttal?
12   A.    I don't recall doing that.  It wasn't that
13   much of an issue.
14   Q.    And can you tell me the other depositions you
15   read before you submitted your initial report,
16   please.
17   A.    Yes, sir.  I recall Mr. Henley, the CFO,
18   Ms. Minton, the controller, Mr. Nugent,
19   Mr. Classick, Mr. Winton, maybe others -- that's
20   what I recall, sitting here right now.
21   Q.    Okay.
22        If you go to page 15 of Appendix C --
23   A.    Oh, Appendix C, yes, sir.
24   Q.    -- there's an indication on that page of the
25   depositions you looked at; is that right?

21

1　A.　Yes, sir.
2　Q.　Can you tell me where Mr. Ellison appears?
3　A.　I don't see it there but I do recall taking a
4　look at it.
5　Q.　So your testimony is that you did read it but
6　you've forgotten to put it down here?
7　A.　I did take a look at it, yes.
8　Q.　So why is it not here?
9　A.　I apologize, sir.
10　　　MS. KYROUZ:  Mark, I just note that
11　the parties' stipulation in the case is as to
12　what documents get listed here.
13　　　MR. SOLOMON:  I'm sorry?
14　　　MS. KYROUZ:  I just note that the
15　parties' expert stipulation in this case
16　is -- would specify certain documents that
17　are disclosed in the report, so it's a
18　narrower set than just anything that someone
19　used, so...
20　BY MR. SOLOMON::
21　Q.　I just want to be straight.  Did you read
22　Mr. Ellison's deposition testimony before you wrote
23　your initial report and is this wrong or did you not
24　and it's right?
25　A.　I do, as I said to you, I do recall looking

22

1　at Mr. Ellison's deposition.
2　Q.　What about Mr. Ellison's deposition in the
3　derivative proceedings associated or that have been
4　associated with this case, have you ever looked at
5　that?
6　A.　I don't recall ever having seen that if I'm
7　remembering the difference.
8　Q.　And what about interviews that were conducted
9　by the Special Litigation Committee in this case of
10　Mr. Ellison, have you ever looked at those?
11　A.　I don't recall having looked at those, no.
12　Q.　The deposition of Mr. Henley that you say
13　that you read, was that the deposition that was
14　taken in this case?
15　A.　Yes, sir.
16　Q.　Did you read the deposition transcript of his
17　testimony in the derivative case?
18　A.　I don't recall doing so, no.
19　Q.　And did you read any of the interview
20　transcripts from the SLC?
21　A.　I don't recall doing that, no.
22　Q.　How did you choose which deposition
23　transcripts to read and which not to?
24　A.　Well, really from thinking about the
25　forecasting process and who the central players were

23

1　in the forecasting process, so I wanted to get a
2　sense of top management view in talking about the
3　economy but also the sense of people involved at
4　other levels in the organization.  So most of the
5　people I identified below the top folks were part of
6　the NAS division, so it gave me an example, if you
7　will, of how information was transcribed.
8　Q.　Do you know who Safra Catz is?
9　A.　I'm sorry?
10　Q.　Do you know who Safra Catz is?
11　A.　I don't recall.
12　Q.　Would you recall who Safra Catz was, do you
13　think, if he or she were a top official at Oracle?
14　A.　I know the name is part of this litigation; I
15　just don't recall the position.
16　Q.　You say in your report that you worked for
17　President Bush.
18　　　When did you become associated with President
19　Bush?
20　A.　Well, originally my association with him was
21　as Governor Bush during his campaign for the
22　presidency.  I then joined the government when he
23　became elected president.
24　Q.　How did you get involved with him as
25　governor?

24

1　A.　Well, through two channels.  I worked for his
2　father, I was in charge of the tax policy part of
3　the Treasury Department when his father was
4　president of the United States.  His policy advisory
5　group was chaired by two individuals, for the 2000
6　campaign was chaired by two individuals, Allen
7　Hubbard, no relation to me, same name, and Steve
8　Goldsmith who had brought me in to see Governor
9　Bush.
10　Q.　And it was Goldsmith who you knew?
11　A.　I knew both of them.
12　Q.　And what time frame is this?
13　A.　This would have been very late 1998/early
14　1999.
15　Q.　Prior to that, had you been active in
16　politics?
17　A.　I'm not a politician, no.  I follow politics,
18　I've been a government official, politically
19　appointed official but I'm not a politician.
20　Q.　You were appointed by the first Bush --
21　A.　Yes, sir.
22　Q.　-- into a position?
23　　　And by the second Bush?
24　A.　Yes, sir.
25　Q.　Have you been appointed by any Democrats?

25

1  A.   No, sir, I think that would be rather
2  unlikely but --
3  Q.   Why would that be unlikely?
4  A.   Because I'm a Republican.  Typically
5  political appointees are the same party.
6  Q.   Do you have views on the propriety or lack
7  thereof of securities class action litigation?
8       MS. KYROUZ:  Objection; vague.
9  A.   Are you asking my opinion as an individual,
10  as an economist?
11  Q.   I'll take both.
12  A.   I've certainly offered the opinion in the
13  context of the national commission that I recently
14  co-chaired with John Thornton that securities class
15  action litigation has some problematic elements.
16  Q.   And what do you believe those problematic
17  elements are?
18  A.   The question in the report, which was the
19  report of the Committee on Capital Markets
20  Regulation, was really to offer advice to regulators
21  and our committee, not my personal view, but my
22  corporate views speaking for the committee is that
23  the SEC should offer clarification in so-called
24  10b-5 litigation.
25  Q.   What clarification?

26

1  A.   As to materiality, scienter.
2  Q.   Are these views presented in a written
3  report?
4  A.   Yes, sir.  The report of the Committee on
5  Capital Markets Regulation is available on the
6  committee's website and was presented to the
7  president on November 30th of last year.
8  Q.   And how did you describe yourself in the
9  drafting process, were you one of the drafters?
10  A.   Well, I was co-chair.  I certainly
11  participated in the drafting process, so did other
12  individuals.  The staff director for the committee
13  was Professor Hal Scott from Harvard Law School but
14  there were 22 members of the committee.
15  Q.   Now, let's just break down your personal
16  views, opinions and your what you'd say are your
17  expert opinions.
18       Your personal opinions about securities class
19  action litigation are what?
20       MS. KYROUZ:  Objection; vague.
21  A.   Well, I've certainly offered in the context
22  of the report discussion the observation that,
23  certainly not unique to me as an economist, that
24  this would not be where economists might start as a
25  way of redress because it's taking money from

27

1  shareholders and giving it back to shareholders with
2  a number of leakages in between.  Many economists
3  have questioned whether that's the most efficient
4  mechanism.
5  Q.   And that's one view.
6       Any other views?
7  A.   That's principally what I had offered in the
8  context of the report.
9  Q.   And is it fair to say as a result of that
10  view you're more comfortable sitting here testifying
11  for defendants than you would be testifying for any
12  plaintiffs --
13       MS. KYROUZ:  Objection; vague.
14  Q.   -- in this type of litigation?
15  A.   No, sir.
16  Q.   And why is that -- why am I not right when I
17  suggest that that would be the case?
18  A.   My view is not that there is no grounds for
19  securities litigation.  My question as an economist
20  is whether the class action framework for handling
21  securities litigation is optimal.  Those are two
22  very different questions.
23  Q.   Have you spoken with Paulson about this?
24       MS. KYROUZ:  Objection; vague.
25  A.   Secretary Paulson is certainly aware of my

28

1  views and I of his.
2  Q.   Have you ever shared any other criticisms of
3  securities class action litigation with anyone other
4  than saying that there's a problem because it takes
5  money from one shareholder and gives it to others,
6  to another?
7  A.   I don't recall.  I mean, the work on this was
8  in the context of the report.  I've certainly
9  offered commentary on the subject, but it's
10  derivative of the points that I have already made.
11  Q.   Do you believe this is abusive litigation in
12  any way?
13       MS. KYROUZ:  Objection; vague.
14  A.   It's not for me to draw that opinion and I'm
15  here as an expert on a particular issue.
16  Q.   But can you answer the question?  Do you
17  believe this is abusive litigation in any way?
18       MS. KYROUZ:  Objection; vague.
19  A.   There's no way I could come to that
20  conclusion from the facts that I know.
21  Q.   Do you think reasonable people could take a
22  different view than the view you've presented of the
23  macroeconomic environment going into Q3 '01?
24  A.   Certainly in economics are a group that
25  there are reasonable people with reasonable

29

1  differences.  The issue in this case, of course, is
2  something quite different, whether a particular view
3  is reasonable but, yes, reasonable people may
4  disagree.
5  Q.   What is the particular view that you were
6  talking about in this case?
7  A.   Well, the issue that I was asked to examine
8  was whether, given the macro information I would put
9  into two groups, aggregate U.S. economy information
10  or information about a sector, whether that
11  information was reasonably reflected in guidance
12  that a particular firm, Oracle here, happened to
13  give.  That's different from the question about
14  whether there could be other interpretations from
15  the same data.
16  Q.   Let's ask that question:  Could there be
17  other interpretations from the same data?
18  A.   Anything is possible, Mr. Solomon.  But I
19  must tell you, having watched this matter
20  exquisitely at the time, I recall not that many
21  alternative views from Wall Street or from the
22  policy-making committee -- committees.  With the
23  lens of hindsight, many views are possible.  In
24  realtime, there was enormous uncertainty, some
25  disagreement, but I don't recall any particular

30

1  favoritism that the view I expressed was, you know,
2  somehow out of bounds.
3  Q.   When there is enormous uncertainty, rapid or
4  sudden changes in the economic environment, do you
5  have an understanding of what Mr. Ellison has
6  testified you can do or not do in terms of
7  extrapolating?
8      MS. KYROUZ:  Objection; misstates
9  testimony.
10  A.   That was not my recollection of Mr. Ellison's
11  description of his testimony.  I know he refers
12  sometimes in other writings that he isn't an
13  economist and I think that's clear in the way he
14  speaks.
15      My recollection is he referred to concern
16  what I would call more about events than the
17  economy, I think he refers to major macroeconomic
18  events like a 9/11 which, of course, wasn't there at
19  the time, or a war, or some particular disruption --
20  events as opposed to general conditions that reflect
21  those events.
22  Q.   I noticed that in your report actually you
23  actually say that, that what Mr. Ellison was talking
24  about was something like war in the Middle East.
25      Is that right?

31

1  A.   I believe that's what Mr. Ellison himself
2  says, yes.
3  Q.   But is there a reason why you don't also add
4  that Mr. Ellison also said that if there was a
5  sudden change in the economy, extrapolating would
6  become difficult, if not impossible?
7  A.   My reading of his deposition testimony, sir,
8  that he was centered mainly on events.  Sudden
9  change in economy is not a term of art as economists
10  would use that term.  You'd need to describe what
11  you mean, either some event, which he does spend
12  time talking about, or some change in what you could
13  think of as the propagation mechanism, so I have an
14  event and then how does that filter through to the
15  economy.  I don't give the color that you just gave
16  to his words.
17  Q.   You don't disagree, do you, that if there
18  were, for example, a sudden deceleration in the
19  growth rate in the economy, that that would have an
20  impact on forecasting?
21      MS. KYROUZ:  Objection; vague.
22  A.   Let's parse that out because one has to be
23  careful.
24      It is certainly true that a deceleration in
25  the economy is an input one considers.  A

32

1  forecasting process, remember, is a mechanism for
2  evaluating data, but certainly your inputs might
3  change with your views on the economy.  Remember,
4  that there's no such thing as the economy.  There's
5  thousands and millions of individual decisions of
6  consumers and firms and governments, that's what the
7  economy is.  It's the job of a business to take a
8  look at these aggregate numbers and figure out how
9  those numbers would affect this business.  Remember,
10  the stock market had peaked in March of 2000 and the
11  sector had continued to do very well.  So the usual,
12  you know, aggregate linkages didn't seem so obvious.
13      MR. SOLOMON:  Could you just go back
14  to the question, please.
15      (Pause for review of realtime record)
16  Q.   And my question was, "You don't disagree, do
17  you, that if there were, for example, a sudden
18  deceleration in the growth rate in the economy, that
19  would have an impact on forecasting?"  And let's
20  just see if we can get a more precise answer.
21      A sudden deceleration in the growth rate
22  in the economy, on the one hand, and a forecast that
23  preceded that knowledge of that fact, would that
24  forecast typically be impacted by a sudden
25  deceleration in the growth rate in the economy?

33

1   MS. KYROUZ:  Objection; asked and
2   answered, incomplete hypothetical.
3   A.   Well, let me try to break down the
4   hypothetical.
5        There exists no hypothetical the way you
6   actually put it.  We don't know in real life whether
7   we see known sudden accelerations, decelerations in
8   the economy, no one has a direct line to some
9   supreme being telling them that.  So the question is
10  how do you ascertain in realtime whether that's
11  likely that's the element here.
12       Your views on that would certainly be an
13  input into your forecasting, that is, inputs into
14  your forecasting mechanism but not in a rigid
15  formulaic way.  In other words, you shouldn't think
16  of the U.S. economy as being millions of identical
17  agents who add up mechanically, multiply one of them
18  times all the others and get to the top; it's many
19  thousands and millions of heterogenous decisions and
20  it's actually quite complicated for businesspeople,
21  let alone economists just looking at the data, to
22  figure out where we are.  So the hypothetical is not
23  one that you observe in the real world.
24  Q.   You're saying war in the Middle East is
25  something tangible that you can get your arms around

34

1   but a sudden change in the economy you can't?
2        MS. KYROUZ:  Objection; misstates
3   testimony.
4   A.   No, I'm merely saying you can't use 20/20
5   hindsight and call it forecasting.  So you have to
6   ask yourself is in realtime what would your views be
7   about the macroeconomy or sector of your own
8   business.  You know, looking back, you can say you
9   had periods in which growth accelerated or
10  decelerated, those are known things.  They're not
11  known at the time, so I'm just cautioning you,
12  saying I knew there's a deceleration, what do I do
13  about it, that's not the hypothetical that a
14  businessperson actually looks at.
15       Even in the case of a war in the Middle East,
16  what a businessperson can observe is that there's a
17  war in the Middle East.  There's still a question
18  about what the propagation mechanism is that takes
19  the war in the Middle East to macroeconomic
20  outcomes.
21  Q.   Have you ever been employed in the position
22  where you've had to provide forecasts in the
23  business environment?
24  A.   Well, certainly in government twice a bulk of
25  my job consisted of forecasting, one of revenues

35

1   when I was at the Treasury and the second, the
2   economy when I was in the White House.  In my
3   service as a corporate director, because of my
4   background, I'm called upon to take a look at the
5   way we do forecasts and to try to evaluate those
6   forecasts.
7   Q.   And do you consider that those roles
8   establish your expertise in this case?
9        MS. KYROUZ:  Objection; vague.
10  A.   I consider my expertise as coming from a
11  number of factors.  One, I was asked to consider
12  effects of the macroeconomy on a business' decision;
13  that is certainly a subject area of which I am
14  significantly familiar in my academic and practical
15  work.  My experience as a corporate director has
16  given me direct business experience with forecasting
17  and processes.  And my two stints at the government
18  were, as I say, centered in large part on
19  forecasting.
20  Q.   And have -- strike that.
21       After reading Dr. Goedde's rebuttal, is there
22  anything that you want to change in either of your
23  reports?
24  A.   No, sir.
25  Q.   Anything you want to add?

36

1   A.   Not sitting here today.  The opinions I
2   offered there are the opinions I have right now.  I
3   understand Dr. Goedde hasn't yet been deposed but if
4   he offers up new material, I may well want to
5   comment on that but I have no revision based on what
6   I have seen.
7   Q.   Okay.
8        Now, have you seen reference to a directive
9   by Mr. Ellison to put more risk in the forecast?
10  A.   I have seen reference to, you know, an
11  exhortation to try to raise the field forecast, yes.
12  Q.   When was the first time you ever became aware
13  of that reference?
14  A.   Oh --
15       MS. KYROUZ:  Objection; vague.
16  A.   -- I don't remember, sir.  It's certainly
17  something I looked at in preparing the report or
18  description of it.
19  Q.   Right, but did you know that in the fall or
20  was it something you learned about recently?
21  A.   Oh, I recall knowing that fact during the
22  presentation of my -- the preparation of my report,
23  yes.
24  Q.   Which report, your first report?
25  A.   The original report, yes.

37

```
 1    Q.    And you don't mention that in your report.
 2    Is there a reason for that?
 3    A.    Frankly, I think a bit less of the
 4    observation than Dr. Goedde seems to.  We can
 5    discuss that if you like.  It would not have seemed
 6    to me to be first order important.
 7    Q.    That Larry Ellison wanted more risk in
 8    the forecast doesn't really have much to do with the
 9    forecasting issues in this case; that's your
10    testimony?
11         MS. KYROUZ:  Objection; misstates the
12    record, argumentative.
13    A.    It's not what I said.  What I said was --
14    Q.    But is that --
15    A.    -- given the incentives in forecasting and
16    statements from CEOs periodically, nothing in that
17    dialogue would have struck me as exceptional or
18    contravening my description either of the inputs in
19    the field forecast or the so-called upside
20    adjustments that were done by Ms. Minton and her
21    colleagues.
22    Q.    Did you rely in any way on that knowledge,
23    the knowledge of the directive, in preparing your
24    report?
25         MS. KYROUZ:  Objection; vague.
```

38

```
 1    A.    I'm not quite sure what you mean.  I
 2    certainly was aware of it and, you know, it did not
 3    influence me to change the opinion from what you
 4    saw.  That's all I can say.
 5    Q.    Were you aware when you prepared your initial
 6    report that the product mix in Q3 '01 was
 7    significantly different from the product mix in Q3
 8    '00?
 9         MS. KYROUZ:  Objection; vague,
10    misstates the record.
11    A.    I'm not sure what you mean by
12    "significantly."  Certainly if you think about the
13    license business going back to the conversation we
14    had a few minutes ago, there would have been some
15    changes at the margin database applications in terms
16    of components of that business, but I don't recall
17    anything I would classify as, you know, a sudden
18    major shift in the business.
19    Q.    Do you have an understanding what products
20    were available for sale by or license by Oracle in
21    the third fiscal quarter of '00?
22    A.    I'm sorry, of '00 or '01?
23    Q.    Of '00.
24    A.    I can't tell you product names.  They really
25    fell into, you know, big enterprise databases that
```

39

```
 1    were sort of Oracle's traditional stock-in-trade
 2    firm reputation, and then applications for customer
 3    relationship management, enterprise relationship
 4    management, that is, linking applications.  I can't
 5    name the literal product names for you but that's my
 6    understanding.  That's within licenses, there are
 7    other lines of businesses but within licenses those
 8    would be the products.
 9    Q.    Okay, and would your answer be any different
10    with respect to the third fiscal quarter of '01?
11    A.    Well, there's, of course, I'm sure different
12    products at any given time.  My understanding is
13    those are still basically the lines of business for
14    Oracle within licenses with, of course, the other
15    businesses, consulting and education and support.
16    Q.    And you're not aware of any change in the mix
17    of those products that would suggest that the
18    forecasting process utilized by Oracle in the third
19    fiscal quarter of '01 was inappropriate?
20    A.    Let me break that up because it's got several
21    parts.
22         It's certainly a case there was some change
23    in the mix, as I recall, of database and
24    applications.  I didn't recall that as being
25    significant.
```

40

```
 1         Now, to your question -- those inputs.
 2         Now, to your question about the process, the
 3    process itself I think is structured in a way in
 4    which judgment would be applied to whatever the mix
 5    of products is because the senior management
 6    obviously are familiar with the components of the
 7    field forecast.
 8    Q.    Do you know what sandbagging is in the
 9    context of this case?
10    A.    Sandbagging is beyond Oracle.  It's a
11    familiar phenomenon, yes.
12    Q.    And sandbagging in the forecasting sense is
13    where a person doesn't necessarily give 100 percent
14    of what he or she believes is obtainable because
15    they want to be sure that they can attain the amount
16    they're going to forecast and so they go under a
17    hundred percent; is that fair?
18    A.    That's generally right.  I mean, it's linked
19    to whatever your incentive system is.  I mean the
20    more I tell you I reward you for beating what you
21    told me, then, of course, your incentive is to tell
22    me something below what you think you can actually
23    deliver.  This is a common problem with sales
24    organizations.
25    Q.    And is it your understanding that Ms. Minton
```

41

```
 1   added her potential in order to mitigate the effects
 2   of sandbagging?
 3         MS. KYROUZ:  Objection; vague.
 4   A.    Well, I think that's a narrower description
 5   in my understanding from Ms. Minton's deposition of
 6   what she did.  Certainly an element was her taking
 7   into account, based on her own experience and
 8   knowledge and others, potential sandbagging but she
 9   might make adjustments for other reasons as well.
10   Q.    When you prepared your report, were you aware
11   of any facts that suggested that in the third fiscal
12   quarter of '01 there was likely to be less
13   sandbagging than there had been in the past at
14   Oracle?
15   A.    I guess I don't understand that question.  It
16   would require knowledge of the answer -- to say
17   someone is sandbagged, you'd have to say relative to
18   what.  So is your question was there a greater
19   difference between the field forecasts and what
20   actually happened, is that what you mean by
21   sandbagging?  Because that wouldn't be a traditional
22   use of the term.
23   Q.    No, what I'm asking is, did you see anything
24   in preparing your report that informed you that
25   going into the third fiscal quarter of '01 there was
```

42

```
 1   likely to be less sandbagging at Oracle than there
 2   had been beforehand?
 3   A.    I don't recall.  It's certainly the case that
 4   Ms. Minton was relatively conservative that quarter
 5   in her so-called upside adjustments compared with
 6   previous quarters, but it would require me to draw
 7   an inference from her head to answer your question.
 8   Q.    Have you ever heard what the purpose was of
 9   Ellison's directive that more risk be put into the
10   forecast?
11         MS. KYROUZ:  Objection; misstates the
12         record.
13   A.    I don't recall.  And in my reading of it and
14   understanding of it, it was more just to try to
15   remove or to mitigate sandbagging, which is a
16   chronic problem.
17   Q.    Are you aware of the insider trading
18   allegations in this case?
19   A.    I am -- if I understand the question
20   narrowly, no, you'd have to help me with what you're
21   asking.
22   Q.    Okay.
23         You've read the complaint; is that right?
24   A.    Yes.
25   Q.    So in the complaint, did you see some
```

43

```
 1   references to trading by Henley and Ellison?
 2   A.    Yes, you mean of Mr. Ellison's sales of
 3   securities and Mr. Henley, yes.
 4   Q.    And beyond reading the allegations in the
 5   complaint, do you have any further understanding
 6   concerning those allegations?
 7   A.    No, sir, I don't.
 8   Q.    And you haven't been asked to opine in any
 9   way concerning those allegations; is that right?
10   A.    Well, I'm not quite sure what you mean.  It
11   could be that the input I provide them where the
12   guidance is reasonable is an input to that
13   discussion but the narrow task was not mine if
14   that's what you're asking.
15   Q.    Do you have an understanding what the law is
16   concerning insider trading?
17         MS. KYROUZ:  Objection; vague.
18   A.    I'm sorry, in what sense?
19   Q.    Do you understand what prohibition there is
20   on trading while in possession of inside
21   information?
22   A.    Yes, of course.
23   Q.    And what's your understanding?
24   A.    That one cannot trade on inside information.
25   Q.    You've heard of the Covisint transaction?
```

44

```
 1   A.    Yes, sir.
 2   Q.    Were you asked to opine in any way on the
 3   impact that Covisint had on the forecasting process
 4   at Oracle?
 5         MS. KYROUZ:  Objection; vague.
 6   A.    Well, again, let's take the transaction,
 7   break it up into data and forecasting process --
 8   Q.    Sorry, if you just answer the question, were
 9   you asked to opine in any way on the impact on the
10   forecasting process of the Covisint transaction?
11   A.    Well, as a general matter, yes, because any
12   transaction affects the outcomes.  If you let me
13   finish, I'll answer.
14         That transaction was, my recollection, was
15   the largest single sale that Oracle had had and I
16   think it was in the $60 million range within
17   license.  In this business, there are a number of
18   lumpy transactions that come from time to time and
19   it's always a question of how do you take that into
20   account in your forecast.
21         So certainly I know that management did look
22   at the size of the Covisint transaction, if that's
23   what you're asking me.  I was not asked narrowly to
24   follow that transaction through the forecast, if
25   that's what you're asking.
```

45

1    Q.   Do you have any understanding as to why it
2    was recognized as revenue in Q3 as opposed to Q2?
3    A.   No, sir, I don't recall that.
4    Q.   Have you ever heard of earnings management?
5    A.   Of course.
6    Q.   What's your understanding when I say earnings
7    management?
8    A.   Now, earnings management unfortunately could
9    mean different things to different people.  It
10   really refers to, you know, timing issues in
11   earnings as opposed to revenue recognition issues on
12   the top line.  Typically it would be having reserves
13   or some other mechanism that might allow you to move
14   accounting earnings from one quarter or reporting
15   period to the next.
16   Q.   Do you have a view as to whether earnings
17   management is a good or bad thing?
18        MS. KYROUZ:  Objection; vague.
19   A.   Well, it certainly wasn't something I was
20   asked to opine upon here.  Economists generally
21   caution "Watch the cash."  As a profession and
22   finance, we teach students to value the present
23   discounted value of free cash flows but, yes, there
24   is an accounting literature on earnings management.
25   It is not unambiguous in its conclusion on effects

46

1    on share prices.  Many businesspeople at a point in
2    time seem to believe it was valuable.
3    Q.   Are you one of those people?
4    A.   I'm not a businessperson, sir, I'm a
5    professor.
6    Q.   Well, when you're a director on a
7    corporation, are you a professor or a
8    businessperson?
9    A.   I don't think earnings management is
10   appropriate in the sense in which I just used it,
11   which is the deliberate creation of reserves.
12   Q.   And have you heard of allegations in this
13   case that amount to allegations that Oracle engaged
14   in earnings management?
15   A.   I don't recall that, no.
16   Q.   If Oracle was managing its earnings, would
17   that have any impact on your analysis in this case?
18        MS. KYROUZ:  Objection; vague,
19   incomplete hypothetical.
20   A.   Well, the two things I was asked to do were
21   to comment on the state of the economy and then,
22   second, to say whether the guidance of 12 cents per
23   share in this particular quarter in this particular
24   company was reasonable.  So I don't think those are
25   related.

47

1    Q.   So the answer is no?
2    A.   Well, as I understand your question, whether
3    or not there is earnings management is not this
4    assignment.
5    Q.   You mentioned that in fiscal '00 part of
6    Oracle's product mix was ERP and CRM.
7    Can me tell me what particular CRM and ERP
8    applications you're talking about?
9    A.   I really don't recall.  As I say, I wasn't
10   assigned the task of looking at the individual
11   products.
12        MR. SOLOMON:  Let's go off the record
13   for five minutes.
14        THE VIDEOGRAPHER:  Going off the
15   record 9:19, end of Tape No. 1.
16        (Recess taken)
17        THE VIDEOGRAPHER:  Returning to the
18   record, 9:38 a.m., beginning of Tape No. 2.
19   BY MR. SOLOMON::
20   Q.   Mr. Hubbard, when did you first start working
21   for President Bush on his presidential election
22   campaign?
23   A.   I would say the first direct campaign meeting
24   I recall was early February 1999, might have been
25   late January but somewhere around there.

48

1    Oh, you mean the reelection or election?  I'm
2    sorry.
3    Q.   Election, first election.
4    A.   Yes, February '99.
5    Q.   And you stayed with that team through the
6    election; is that right?
7    A.   Well, I was a faculty member, I didn't take a
8    leave to move to Austin but I was in Austin a fair
9    amount and certainly, you know, helping him develop
10   his budget and policies.
11   Q.   And between his election and him becoming
12   president, were you part of a transition team?
13   A.   Yes.  Remember, there was uncertainty about
14   who the president of the United States was.  We had
15   a transition office that was in McLean, Virginia as
16   a result of that uncertainty and I was there working
17   on the budget for what I thought would be the
18   president.
19   Q.   You said earlier that you dealt with the
20   issue, I guess the issue of the macroeconomy,
21   exquisitely at the time.
22   Are you talking about immediately after the
23   election?
24   A.   Well, for the period after the election, you
25   know, really through my tenure as CEA chairman, it

49

1   was one of the most uncertain times in the economy
2   that economists had seen in a generation so that
3   entire period was one of great focus.
4   Q.    And it's true, isn't it, that people in the
5   Bush camp at that time were talking about the
6   economy suddenly deteriorating; isn't is that true?
7        MS. KYROUZ:  Objection; vague as to
8        time.
9   A.    It's certainly the case that, you know, in
10  the campaign and in the transition team we talked
11  with a number of businesspeople, a number of
12  economists, there certainly were people with that
13  view.  My colleague Larry Lindsey, who was one of
14  the president's advisors, certainly had that view.
15  My own view was this was a time of extreme
16  uncertainty and it was difficult to tell where we
17  were headed.
18  Q.    So Mr. Lindsey would be more likely to be an
19  expert for plaintiffs in this case than defendants,
20  do you think?
21  A.    I can't speak to what Mr. Lindsey would or
22  wouldn't say.  He tends to generally have a
23  pessimistic view on the American economy.
24  Q.    And what about your leader at the time,
25  Mr. Bush, didn't he have the view that the economy

50

1   was suddenly deteriorating?
2        MS. KYROUZ:  Objection; vague as to
3        time.
4   Q.    And I'm talking post-election and those first
5   few weeks and months.
6   A.    Well, certainly the president heard views
7   from businesspeople -- he had meetings with business
8   leaders in which in some quarters, you know, concern
9   about the economy was expressed.  Our economic team,
10  you know, we certainly expressed to the president
11  that there was substantial uncertainty about the
12  outlook in part because obviously the preparation of
13  his budget requires an economic set of assumptions
14  to know what to base revenue on, spending on, so we
15  had that discussion with him and with the vice
16  president-elect.  Both the president and the vice
17  president did at times during the transition make
18  public comments of concern about the economy.
19  Q.    And, in fact, by the middle of January 2001,
20  isn't it true that Mr. Bush was telling the media at
21  least that he was very pessimistic about the
22  economy?
23  A.    I think that's an overstatement of the
24  president's remarks.  I do think he made reference
25  to growth prospects slipping.  He came close to if

51

1   not using the word "recession" in his public
2   remarks, certainly the vice president-elect had done
3   so.
4   Q.    At the time, were you in disagreement with
5   him?
6   A.    I said to him that nothing in the data at
7   that time could be construed as suggesting the
8   economy was in a recession.  I said that that just
9   simply wasn't a reasonable reading of the data.  As
10  to whether the economy might enter a recession,
11  that, of course, is a possibility.
12  Q.    And, again, just back to Mr. Lindsey, you
13  were in disagreement with Mr. Lindsey at that time?
14  A.    You know, I think disagreement is too strong
15  a word and it depends on the timing of when a
16  recession might happen.  I think that most
17  professional economists, you know, were of the view
18  that the growth rate of the economy was slowing and
19  the question was to what level.
20  Q.    Is it your view that Mr. Greenspan panicked
21  in January of 2001?
22        MS. KYROUZ:  Objection; vague.
23  A.    I certainly wouldn't have that criticism of
24  Mr. Greenspan as panicking any time, January 2001 or
25  any other time.

52

1   Q.    So when he led the two rate cuts in January,
2   that wasn't a panic move, that was just a reflection
3   of the deteriorating economy or it reflected the
4   deteriorating economy, correct?
5        MS. KYROUZ:  Objection; misstates
6        evidence.
7   A.    I think one has to be much more careful in
8   looking at the Feds moves at the time.  The federal
9   funds rate had gone as high as 6-1/2 percent, and I
10  think there had been concern among economists even
11  in the fall of 2000 as to whether the funds rate was
12  too high for the current state of the economy.  The
13  Fed was certainly making adjustments.  It outlined
14  its own reasons for doing so in minutes.  Not the
15  first rate cut, which was an intermeeting cut, but
16  in the January 30th rate cut the observations the
17  Fed had were that they did believe fundamentals were
18  deteriorating, but they also opined that they
19  thought the economy was still on its long-term
20  potential growth pattern.
21  Q.    But both of your bosses in a sense of Cheney
22  and Bush thought that and said that you were on the
23  verge of a recession at that time or the economy
24  was, not you, on the verge of a recession, the
25  economy was on the verge of a recession at the time,

53

1  did they not?
2  A.   Both certainly made statements to that
3  regard.  To the extent that the argument was whether
4  we were in a recession, the National Bureau has told
5  us we were not in a recession at the time those
6  statements were made, and there's considerable --
7  there was considerable discussion among economists
8  at the NBER as to when a recession began.  But even
9  well into the spring of 2001, virtually no member of
10  the Business Cycle Dating Committee had any inkling
11  that we were in a recession.
12  Q.   It's true, though, isn't it, that both in
13  December of 2000 and January of 2001 the refrain
14  from the White House was that there had been a
15  sudden slowing and that we were on the verge of a
16  recession?
17       MS. KYROUZ:  Objection; vague.
18  A.   "Refrain" is a term I'm not sure what you
19  mean.  It is certainly the case that on at least one
20  occasion I recall both the vice president-elect and
21  the president-elect making that statement.  The
22  question is more, you know, what were the views of
23  professional economists, of market-makers,
24  financiers, people who were close -- it was clear
25  that was a time of significant uncertainty.  It was

54

1  by no means clear that the economy was on the verge
2  of a recession.
3  Q.   Well, in fact, it was and it turns out they
4  were right and you were wrong, surely?
5       MS. KYROUZ:  Objection; argumentative.
6  A.   Well, the fact that there was a recession
7  that we now are dating it as March 2001 in no way
8  violates our statement that we were not in a
9  recession.  Whether we were on the verge, as I said
10  to you earlier, depended on highly uncertain factors
11  in the economy.  You can look back with a lens of
12  hindsight but I can assure you my record is better
13  than the president's in judging movements in the
14  economy and I mean no disrespect in that, simply to
15  say that the fact that a leader makes a statement I
16  don't think is construed as expertise in making that
17  statement the way it might be with a Fed chairman.
18  Q.   There's a lot I'm very tempted to say that I
19  won't say, but is it not true that this may be one
20  of the rare occasions when President Bush's judgment
21  was right?
22       MS. KYROUZ:  Objection; argumentative.
23  A.   I'm not sure what President Bush's judgment
24  was.  He certainly made a statement on a number of
25  occasions that he thought the economy was on the

55

1  verge of a recession and mentioning the word
2  "recession" in his statements.  Ex post, with the
3  lens of hindsight, we did have a recession that the
4  National Bureau tells us commenced that spring.
5  Q.   Now, you wouldn't tell people in the business
6  of forecasting for their businesses that you have to
7  wait for a, quote-unquote, recession before you take
8  any note of a deteriorating economy in your
9  forecasting process, would you?
10  A.   No, of course not.
11  Q.   You don't dispute, do you, that people at
12  Oracle, within Oracle at the end of calendar 2000
13  and the beginning of fiscal 2001 were of the view
14  that the economy was deteriorating?
15  A.   Well, it's certainly the case that Mr. Henley
16  uses the expression "the economy is a wild card" in
17  the December 14th, if I'm remembering the date,
18  announcement.  So, yes, there had been a recognition
19  and a continued recognition during the quarter, for
20  Oracle what would have been the third quarter of its
21  fiscal year, that the economy was a set of
22  conditions worth watching.
23  Q.   Is that all you remember Mr. Henley saying
24  about the economy, the wild card, or do you remember
25  him saying anything else about the economy?

56

1  A.   He may have made other observations; I don't
2  recall.
3  Q.   And you don't know whether they were positive
4  or negative observations?
5  A.   I really don't recall.  I mean to the extent
6  that they're observations about the macroeconomy,
7  they would have likely been ones of doubt,
8  uncertainty.
9  Q.   Is it fair to say that as of the beginning of
10  January, all of the indicators at least -- strike
11  that.
12       At the beginning of January, Mr. Henley was
13  of the view that all of the economic indicators were
14  suggesting an economic slowdown and that we were in
15  an economic slowdown; are you aware of that?
16  A.   I don't recall that.  It depends what you
17  mean by an economic slowdown; there's a big
18  difference between --
19  Q.   I'm talking about slowed growth.
20  A.   For GDP or for Oracle?
21  Q.   I'm talking about, first of all, for GDP.
22  A.   For GDP I don't recall that although
23  certainly that would have been, you know,
24  professional economists' view at the time.
25  Q.   And as to the indicators that Henley

57

1  perceived, do you know what his view was at the
2  beginning of January as to whether or not the
3  economy and Oracle was heading in the right or the
4  wrong direction?
5  A.  Well --
6        MS. KYROUZ:  Objection; vague.
7  A.  -- I do recall Mr. Henley I believe using the
8  expression, things like kicking the tires, pushing
9  back, making sure that when forecasts are made that
10  they actually do reflect the conditions that people
11  are seeing, you know, are salespeople getting this,
12  I recall that discussion, yes.
13  Q.  And that discussion, is that consistent with
14  Mr. Ellison's directive to put more risk in the
15  forecast?
16        MS. KYROUZ:  Objection; misstates the
17  record.
18  A.  I don't recall any such linkage, no.
19  Q.  Were you a member of the FOMC in 2000?
20  A.  No, sir, the FOMC are federal reserve
21  governors and a set of regional bank presidents.
22  Q.  So you had no involvement in preparing any of
23  their reports?
24  A.  That's correct, the Fed's independent of the
25  government.

58

1  Q.  You read their reports in preparation -- in
2  preparing your report?
3  A.  Well, I read the minutes of the FOMC
4  meetings, at the time when I was in the government I
5  saw the Green Books, the full presentation.
6  Q.  Now, you say that neither Cisco nor Sun
7  Microsystems are competitors of Oracle, correct?
8  A.  I don't think I put it quite so finely but
9  they are fundamentally earning their living in
10  different businesses, yes.
11  Q.  Are you also aware that Mr. Ellison has
12  stated that their stocks tend to perform similarly
13  to Oracle's stock?
14  A.  He may have said that; I don't recall.
15  Q.  Does that fact have any impact on your
16  opinions in this case?
17        MS. KYROUZ:  Objection; vague.
18  A.  Not particularly.  I'm being asked to opine
19  on whether guidance is reasonable.  If your question
20  is some piece of information about Sun or Cisco of
21  value to me, it would only be insofar as it would
22  help me inform the judgment about Oracle's business.
23  Q.  You noted in your report that plaintiffs
24  assert that Mr. Ellison has admitted that he did not
25  take any notice really of Ms. Minton's potential.

59

1  Do you recall that issue?
2  A.  I'm aware of that allegation, yes.
3  Q.  And Mr. Ellison has referred to Ms. Minton's
4  potential as a mood ring, are you aware of that?
5  A.  I'm aware of that allegation, yes.
6  Q.  And then you query if that's the case, why
7  are we talking about the forecasting process; is
8  that right?
9  A.  Well, I think --
10        MS. KYROUZ:  Objection; vague.
11  A.  -- what I queried was where you or Dr. Goedde
12  seems to want to wind up would be at a very
13  different number than the forecasting process would
14  have even without Ms. Minton's adjustment.  So you
15  can't square that circle; that was my logical
16  retort.
17  Q.  But let's break that down.
18        If Mr. Ellison did not take any notice or did
19  not rely upon Ms. Minton's upside of her potential,
20  what does that inform you as to what Mr. Ellison
21  would have perceived based on what he was looking at
22  at the time?
23        MS. KYROUZ:  Objection; misstates the
24  record, incomplete hypothetical.
25  A.  You're asking me to get inside Mr. Ellison's

60

1  head.  My recollection certainly from Mr. Henley's
2  discussion as CFO was that he did take quite
3  explicitly Ms. Minton's forecast into account and I
4  restate my logical retort, that if you believed that
5  it shouldn't be taken into account at all, how could
6  Dr. Goedde reach the conclusions of his report?
7  It's logically not possible.
8  Q.  Is it not possible that the forecasting
9  process was flawed and that Mr. Ellison had
10  information outside of the normal -- beyond the
11  information that would be in the formal forecast and
12  that you have a situation where Mr. Ellison would
13  have known, based on what he was looking at, that
14  the forecast was unreliable independently of whether
15  or not the forecasting process itself was
16  unreliable?
17        MS. KYROUZ:  Objection; vague,
18  misstates the record.
19  A.  Two, two points there.  One, of course, I
20  can't be inside Mr. Ellison's head and it's highly
21  unlikely that his knowledge could exceed that of all
22  of the salespeople talking to all of the customers.
23  Second, Dr. Goedde himself puts great credence in
24  the field forecast; hence, my comment that you can't
25  square that circle because the field forecast is

61

1  substantially higher than where Oracle wound up.
2  Q.   You're saying the field forecast throughout
3  months one and two was --
4  A.   Close to the bloody end.
5  Q.   And give me the process by which you arrive
6  at that.
7  A.   Looking at the numbers.  I have -- in the
8  upside reports, I know what the field forecast is, I
9  know what her upside is and I know what the
10  so-called potential adding the two is.
11  Q.   And what's the difference -- what was the
12  difference in January, then, between the potential
13  and the field?
14  A.   I really don't remember.  I remember that the
15  upside started out a little over two cents and then
16  shrinks so I don't remember exactly where it was in
17  January.
18  Q.   You say you doubt that he would have any more
19  information.  Mr. Ellison would have any more
20  information than the field.
21  But, again, going back to his directive, it's
22  true, is it not, that Mr. Ellison made an attempt to
23  get the field to stop sandbagging and give
24  information that was realistic; is that not true?
25  MS. KYROUZ:  Misstates the record.

62

1  A.   Sir, to your hypothetical if Mr. Ellison knew
2  everything and then some from the field, what would
3  it profit him to give that directive?  Again, you
4  can't square the circle logically.  Either
5  Mr. Ellison had all the information and not the
6  field or you go back to the forecasting process but
7  you can't assert both.  Just as a matter of logic.
8  Q.   Have you looked at the directive?
9  MS. KYROUZ:  Objection; vague.
10  A.   I think directive is not a term that I would
11  use but certainly I'm familiar with the exhortation.
12  Q.   And what was the date of the exhortation?
13  A.   I don't recall.
14  Q.   Do you know if it was before or after the
15  third fiscal quarter of '01?
16  A.   I really don't remember the exact date.
17  Q.   Would it not be important to you to know that
18  date?
19  A.   I think I've already answered that when I
20  said that I didn't think the exhortation was
21  material.
22  Q.   And I don't know if you've explained why it's
23  not material, but if you have, I apologize, can you
24  tell me again?
25  A.   Again, it's -- sandbagging, as we discussed

63

1  earlier, is a chronic problem, it's one that senior
2  managers deal with all the time.  The typical
3  solution of sandbagging isn't saying don't sandbag;
4  it's to either change incentives or to make
5  adjustments.  Oracle had done this through the
6  so-called upside adjustment process.
7  MR. SOLOMON:  Can I just see that
8  answer again, please.
9  (Pause for review of realtime record)
10  Q.   Well, what do you mean the typical solution,
11  tell me how you say that's the typical solution?  I
12  don't know where that comes from.
13  A.   I'm sorry, typical solution to sandbagging?
14  Q.   The typical solution isn't to say don't
15  sandbag, why -- I don't understand why that wouldn't
16  be a typical solution.  If there's sandbagging going
17  on, you don't want it and you're Larry Ellison, why
18  don't you tell your people not to do it?
19  A.   In theory you never want your employees to
20  sandbag but the question of sandbagging arises
21  because you have different incentives and different
22  information sets.  I'm in the field, you're in the
23  head office, I know what's going on in the field,
24  you have to judge from a distance, you have to try
25  to get me to be as direct with you about what I'm

64

1  actually seeing.  To the extent that, you know, I
2  can gain some benefit by consistently exceeding the
3  expectations that I bring to you, I'm going to
4  sandbag.  I mean that's the basic sandbagging
5  problem, it's not an Oracle problem, it's a general
6  problem.
7  The way businesses typically deal with that
8  is to either do central adjustments or to try to
9  design compensation systems that don't reward
10  sandbagging.
11  Q.   Right, but that -- but what happened here--I
12  know you want to talk about the typical
13  situation--what happened here, though, was
14  Mr. Ellison issued a directive so it's not typical
15  anymore, we're talking about this situation and what
16  I'm asking you is, why is it that you won't credit
17  that that directive was most likely adhered to?
18  MS. KYROUZ:  Objection; misstates the
19  record.
20  A.   Yeah, again, I think it's too strong a term.
21  And, second, I could this afternoon send out a memo
22  to the Columbia Business School faculty telling them
23  to work harder.  I do not expect that that directive
24  in and of itself, with no change in my behavior or
25  auditing or incentives, will have much of an effect.

65

1   If you could solve information problems by
2   directives, as you call it--I don't think it's a
3   directive--business leaders would simply issue
4   directives and we would have no information or
5   incentive problems in the economy.  It would be
6   great if that were true.
7   Q.   So, in other words, Mr. Ellison was kind of
8   being silly, what was the point?
9   A.   I can't say that. I can't be in his head, I
10  can't know the color of what he's saying.  It's
11  certainly the case he might want to set a tone that
12  says, you know, I'm serious, I'm going to be looking
13  at this closely, but I wouldn't interpret from what
14  you call a directive that this is, you know, a law
15  that will now suddenly radically alter behavior.
16  Q.   Do you believe that his directive that more
17  risk be put in the forecast was within
18  Oracle-sensitive information?
19       MS. KYROUZ:  Objection; lacks
20  foundation, misstates the record.
21  A.   Well, first of all, I don't interpret it as
22  being, first, a directive and, second, to put more
23  risk in the forecast as opposed to don't sandbag.
24  I've already told you that I don't think it's
25  particularly important, and so I'm -- not being an

66

1   attorney, not knowing the sense in which you're
2   using "sensitive," it wouldn't strike me as first
3   order information.
4   Q.   If you saw that directive and an Oracle
5   employee describing it as sensitive and this
6   document, you know, basically needs to be destroyed
7   rather than it sees the light of day, would that
8   change your opinion in any way as to the import of
9   the directive?
10       MS. KYROUZ:  Objection; misstates the
11  record.
12  A.   And I don't know the record and with that
13  hypothetical as a basis, all I'm saying is that as
14  an economist looking at this, did it affect my
15  judgment? No.
16  Q.   And as an economist looking at it, you can't
17  tell me whether the directive was put in place
18  before or after the third fiscal quarter of '01; is
19  that right?
20  A.   Given that I think it isn't material --
21  Q.   You don't care?
22  A.   -- it wouldn't matter to me but as a matter
23  of fact, no, I don't recall.
24  Q.   Okay, are you aware that it's -- that at
25  Oracle it took a lot longer to close applications

67

1   deals in 2000 and 2001 than it took to close
2   database deals?
3        MS. KYROUZ:  Objection; vague.
4   A.   I don't know if I'd characterize it -- I do
5   know yes, that on balance, there are conversion
6   differences between the two, pipeline to actual,
7   whether it's taking longer or just harder to do, I
8   can't parse out but yes, there's a difference.
9   Q.   Assuming there was, I just want you to assume
10  this, assuming there was a significant change in the
11  product mix, what would that lead a reasonable
12  forecaster to do, if anything, in relation to
13  forecasted conversion rates?
14       MS. KYROUZ:  Objection; vague,
15  incomplete.
16  A.   Yeah, it's a hypothetical because I'm not
17  sure that you could describe this as significant.
18  I've already said I do think there's a change in the
19  applications database --
20  Q.   I've asked you to assume it's significant.
21  A.   It's a hypothetical.  We could state other
22  hypotheticals that aren't meaningful either but if
23  you assume that, you would expect that the field
24  forecast, you know, as salespeople are generating
25  their numbers, would take that into account because

68

1   salespeople, remember, are getting case -- you know,
2   a range of potential outcomes.
3   Q.   So, in other words, you're saying it wouldn't
4   and shouldn't and need not affect the process?
5        MS. KYROUZ:  Objection; misstates
6   testimony.
7   A.   No, that's not what I said.  Certainly the
8   information would be coming into the process and
9   really, you know, materially affecting the numbers,
10  the field forecast is going to be very importantly
11  affected by this alleged or hypothetical change in
12  the product mix.
13  Q.   Can you conceive of a situation in which
14  Ms. Minton, for example, would be best advised to
15  adjust her projected conversion or forecasted
16  conversion ratio to take account of new realities?
17       MS. KYROUZ:  Objection; vague.
18  A.   My impression is, from Ms. Minton's
19  deposition of what she did, testimony as to what she
20  did, was that she did alter her so-called
21  conversions from pipeline to business so that they
22  would be reacting to events, not necessarily in a
23  formulaic way but during the quarter she would make
24  changes.
25  Q.   So the answer is yes?

Hubbard, R. Glenn  7/3/2007  8:20:00 AM

69

1   A.   Well, yes, Ms. Minton did that is my answer.
2   Q.   And what is your understanding that prompted
3   Ms. Minton to do what you just testified you believe
4   she did?
5   A.   Well, what Ms. Minton says I believe in her
6   deposition testimony is obviously she's trying to
7   produce her best possible estimate.  If she gets
8   information over time that suggests there's a bigger
9   or smaller gap, you know, she changes her
10  conversions.
11  Q.   Is the only way in your view that Ms. Minton
12  should account -- is the only way in your view that
13  Ms. Minton should have accounted for the
14  macroeconomic situation by relying on the field?
15  A.   I don't think that's quite what I said.  Keep
16  in mind, go back to your counterfactual, your
17  baseline, there exists no known macro situation so
18  it's not as if I draw a ball from the urn and I know
19  what I'm looking at.  So what Ms. Minton has to do
20  is look at a series of possible outcomes for the
21  macroeconomy, for the sector, for Oracle, and make
22  her judgment.  She describes that she does that.
23       The principal way in which that will feed
24  into the process is for the change in the field
25  forecast.  If it were the case, for example, that

70

1   the macroeconomy's alleged weakness is discouraging
2   people from buying products, applications,
3   databases, whatever, that will show up, a field will
4   come back and say, you know what, we're seeing a lot
5   smaller pipeline than we did in previous quarters,
6   so it will definitely have an effect and be seen in
7   that forecast.
8   Q.   Now, can you conceive of a situation in which
9   Ms. Minton, faced with a change in the product mix,
10  would be best advised to adjust the conversion
11  ratios that are being assumed?
12       MS. KYROUZ:  Objection; vague,
13  incomplete hypothetical.
14  A.   Yeah, again, my understanding is that
15  Ms. Minton does vary the conversion ratio -- if you
16  take any particular upside report for a particular
17  quarter and just go down the list of weeks, you
18  know, sort of I think almost the rightmost column
19  there or penultimate column there, you'll see that
20  she does change her conversions during a quarter, as
21  she's getting information she makes changes.  Some
22  of that may reflect the macroeconomy, some of it may
23  reflect her judgment about other things.
24       If you're asking me do businesspeople
25  typically use formulas, you know, if GDP does this,

71

1   I'll do that, well, typically not.
2   Q.   In other words, you're saying you've never
3   heard of a situation where sort of top-down, in
4   reaction to information that's been received by
5   senior level forecasters, that that senior level
6   forecaster would then make an adjustment to the
7   conversion ratio that's being assumed; is that what
8   you're saying?
9   A.   No, that's not at all what I'm saying.  Let
10  me give you a simple example.
11       Suppose I were in two lines of business, one
12  has a high margin and one a low margin.  Now you're
13  telling me that I no longer have the high margin
14  business, they were both 50/50 but I now double the
15  low margin business, the top line is identical.  I
16  would certainly be making changes to my forecasting
17  process.  That is a very radical change, a discrete
18  change and a known change.
19       Ms. Minton says that she, of course, is
20  looking at all of these things in making her
21  adjustments but there's no kind of simple formulaic
22  exercise like the one that I just laid out.
23  Q.   Are you familiar with the January 17th
24  Garnick Flash Report?
25  A.   I don't remember particular Flash Reports.

72

1   Yes.
2   Q.   Do you remember noting that, adjusting for
3   Covisint, that all of the American divisions in
4   January were showing negative growth?
5   A.   I don't recall that but it's certainly, given
6   the size of that particular transaction, that's
7   possible.
8   Q.   And are you aware that that information was
9   made available to Mr. Ellison who then engaged in
10  almost a billion dollars worth of sales; are you
11  aware of that?
12       MS. KYROUZ:  Objection; argumentative.
13  A.   That's way too many dots for me to connect.
14  I don't know when or under what motivation Larry
15  Ellison sold stock.  If you're asking me how does
16  that get into the forecasting process, that's
17  certainly an input.  I would remind that you in many
18  of the previous quarters Oracle found itself short
19  at various parts in the quarter relative to its
20  guidance and had always beaten it.  So that
21  information in and of itself has little value.
22  Q.   And you've looked at that carefully, have
23  you?
24  A.   Well, did I perform an analysis over a set of
25  quarters preceding the 3Q FY'01, the quarter at

73

1    issue, yes.
2    Q.    And you noticed in prior quarters all three
3    divisions in the U.S. showing negative growth six
4    weeks, seven weeks into the quarter?
5    A.    I didn't say that, sir.  What I said was that
6    if you look at the firm itself, you find situations
7    that Oracle had found itself in many times in which
8    it had wound up beating expectations despite at some
9    point showing that it was significantly in the hole
10   vis-a-vis those expectations.
11         MR. SOLOMON:  Can you just give me the
12         answer, the second part of that answer,
13         please.
14         (Pause for review of realtime record)
15   Q.    Okay, can you tell me what points they were?
16   What quarters you're talking about?
17   A.    My recollection was, if you look at the six
18   quarters prior, four of the six, I think fell into
19   that pipe -- I discuss this in my report, that's my
20   recollection.
21   Q.    Are you aware that Oracle insiders believed
22   that the pipeline figures in December were simply
23   too good to be true?
24   A.    I'm not aware of that, no.
25   Q.    And this is the first time you've heard that

74

1    today?
2         MS. KYROUZ:  Objection; vague.
3    A.    I mean I may have seen allegations to that
4    effect, but I'm certainly not aware that that has
5    any basis in fact whatsoever.
6    Q.    So if I told you Mr. Henley's admitted that,
7    that would be the first you've heard of that?
8    A.    One, I'm not sure that's true.  Second, I'd
9    have to see the context of what Mr. Henley is
10   talking about.  There's always uncertainty about
11   pipeline numbers, so...
12   Q.    Sounds like you're hedging a bit now.
13   A.    No, I think it's asked and answered but I'm
14   trying to be polite.
15   Q.    Do you believe the pipeline figures in
16   December of 2000 were too good to be true?
17        MS. KYROUZ:  Objection; vague.
18   A.    In order to have a basis to answer that, I or
19   anybody else would have to have some inside
20   knowledge that was unavailable to the preparers of
21   field forecasts or the upside potential.  I
22   certainly don't have that inside information about
23   Oracle, I couldn't answer that.
24   Q.    And it's fair to say the investors in Oracle
25   didn't have that information in December 2000 or

75

1    January 2001?
2         MS. KYROUZ:  Objection; argumentative.
3    A.    An investor would be in the same position
4    that I am but, again, I don't understand even what
5    the counterfactual is but they're certainly in the
6    position I am, if that's your point.
7    Q.    Do you know that Ms. Minton decided to,
8    nonetheless, issue forecasts based on a pipeline
9    that was, quote-unquote, too good to be true?
10        MS. KYROUZ:  Objection; misstates the
11        record.
12   A.    Again, I'm not accepting it's a pipeline
13   that's too good to be true.  What Ms. Minton did
14   was, you know, if you look at each of her upside
15   reports, she does have a pipeline that comes from
16   the underlying field forecasts at a relatively micro
17   level, you know, by division.  She does obviously
18   use that as an input into her process.  I don't have
19   any recollection of Ms. Minton ever saying that she
20   lacked confidence in that.
21   Q.    Is it appropriate in your view to issue
22   forecasts using, in order to make your forecast, a
23   figure, a pipeline figure that you believe is too
24   good to be true?
25        MS. KYROUZ:  Objection; misstates the

76

1    record.
2    A.    You've assumed a conclusion in proposing your
3    question.  Obviously --
4    Q.    I don't know what your answer is.
5    A.    -- you should not misrepresent.  That's a
6    simple truism in capital markets and, fortunately,
7    the law.
8         Having said that, nothing I see in the record
9    suggests to me that Ms. Minton believed that she was
10   doing that.
11   Q.    Have you seen anything in the record that
12   causes you to question Ms. Minton's honesty?
13   A.    I've seen nothing that would lead me to
14   question her honesty, no.
15   Q.    And I assume that's the same with everybody
16   else that you've been able to identify as being at
17   Oracle at the time in question?
18   A.    Yes, sir.  I know none of these as
19   individuals; I can only judge based on what I read.
20   Q.    As you're aware, Mr. Goedde referenced a book
21   called Principles of Forecasting.  Are you familiar
22   with that book?
23   A.    I'm aware that he referenced it.  I don't
24   recall the book particularly.
25   Q.    Do you have any problem with his references?

77

```
1        MS. KYROUZ:  Objection; vague.
2    A.    Not as a general rule.  Remember, my job
3    wasn't to opine on the micro forecasting process.
4    Dr. Goedde does wade into that territory; I do not.
5        MR. SOLOMON:  Let's go off the record
6    for five minutes.
7        THE VIDEOGRAPHER:  Going off the
8    record, 10:19 a.m.
9        (Recess taken)
10       THE VIDEOGRAPHER:  We're returning to
11   the record, 10:39 a.m.
12   BY MR. SOLOMON::
13   Q.    With respect to the third fiscal quarter of
14   2000, Mr. Hubbard, was there anything out of the
15   ordinary in that quarter as it affected Oracle?
16       MS. KYROUZ:  Objection; vague.
17   A.    I really -- you're talking 2000, not 2001?
18   Q.    Yeah.
19   A.    I really don't recall, sorry.
20   Q.    You have testified that the year-over-year
21   comparisons that Ms. Minton was making in the third
22   quarter of fiscal 2001 were appropriate; is that
23   fair to say?
24   A.    I don't re --
25   Q.    Maybe you haven't testified, maybe it's your
```

78

```
1    report; is that right?
2    A.    What I said was that she did use that as a
3    check in her procedure to take -- because the
4    seasonality of the business to go from same quarter
5    last year to same quarter this year for conversions
6    as a check, yes, she did that.
7    Q.    If the third fiscal quarter of 2000 was
8    nonrepresentative, in other words, if it was an
9    outlier quarter, would that affect the propriety of
10   doing that year-over-year analysis in the third
11   fiscal quarter of 2001?
12       MS. KYROUZ:  Objection; vague.
13   A.    If I understand the question, no.  Remember,
14   what Ms. Minton is doing is doing this upside
15   adjustment that's her judgmental forecast or add
16   factor, if you will.  What we were just speaking of
17   was one of the checks that she does for
18   reasonableness, it's not the answer.
19   Q.    So your -- so, in other words, your answer is
20   no, even if the third fiscal quarter of 2000 was
21   nonrepresentative, it would not affect the propriety
22   of using that as a comparison in fiscal 3 '01?
23       MS. KYROUZ:  Objection; vague.
24   A.    Let's break that up.  To be clear what I'm
25   saying, I don't recall that it was an exceptional
```

79

```
1    quarter.  Second, that's not what the upside does,
2    that's the check, the conversion check.  So it
3    really wouldn't affect her calculation of the
4    upside, only of the check.
5    Q.    And what if it's not a check, the application
6    of the conversion ratio, what if that's part of the
7    process?
8        MS. KYROUZ:  Objection; vague.
9    A.    It is part of the process since it's one of
10   the checks that she does.
11   Q.    How would that function as a reliable check
12   if the third fiscal quarter of '00 was
13   nonrepresentative?
14   A.    Again, I'm not accepting that it is
15   nonrepresentative, but it's certainly somewhat less
16   valuable as a check to the extent of which it's
17   atypical but that, again, isn't what she's doing in
18   the upside adjustment.  I think there's a confusion
19   in Dr. Goedde's report on that.
20   Q.    And you say that isn't what she's doing
21   because that's what she told -- that's what she told
22   you?  How do you make that understanding?
23   A.    Well, I have her numbers, so I am aware of
24   what her upside adjustment is.
25   Q.    Let's assume that fiscal -- the third fiscal
```

80

```
1    quarter of 2000 was a nonrepresentative highly
2    successful quarter.
3        Would it have been appropriate, in those
4    circumstances, for Ms. Minton or others when
5    conducting this check to account for the fact in
6    some way that that quarter was an extraordinarily
7    good quarter that's being compared to?
8        MS. KYROUZ:  Objection; vague,
9    incomplete.
10   A.    Well, again, I can't necessarily accept the
11   hypothetical, but certainly the check is more
12   valuable to the extent to which the quarters are
13   more comparable, you know, all other things equal,
14   but for time.  But the real question is how is she
15   doing her upside adjustment, which is not that way,
16   and there's substantial variation in the upside
17   adjustment within the quarter, not just across
18   quarters.
19   Q.    When you talk about the field forecast, does
20   that include management judgment?
21   A.    Depending on what you mean by management,
22   yes.  The -- if you think about the layers of this,
23   there are the salespeople out in the field, then
24   there's sales management, and then there are
25   higher-ups, the NAS management or the executive
```

81

1   management committee for whom Ms. Minton is
2   preparing the report.  There's judgment all along
3   there.  So if you mean by -- is sales management
4   judgment reflected?  Yes, it's my understanding.
5   Q.    And you said sales management judgment, is
6   that what you said?
7   A.    That's my understanding from Mr. Classick's
8   description and Mr. Nugent's.
9   Q.    So is it fair to say that everything below
10  Ms. Minton represents the field?
11        MS. KYROUZ:  Objection; vague.
12  A.    Well, again, I'm not sure how one parses it
13  because I just said the managers of the salespeople
14  are also involved in that.  But I think the way
15  Oracle viewed the process, as Ms. Minton described
16  it and Mr. Henley in depositions, is you could think
17  of there being a field that is bottoms-up and then a
18  central top management adjustment for the executive
19  management committee that reflects their judgment
20  ranging from sandbagging that we talked about
21  earlier to their own independent views of the
22  business and so on.  That's the so-called upside
23  that then gives you potential.
24  Q.    Now, you've testified that you have not
25  looked into the product issues in this case,

82

1   correct?
2   A.    What I said was I wasn't assigned the task of
3   looking at the individual products that comprise
4   these categories we spoke of, yes.
5   Q.    And you don't know when the executive -- the
6   Ellison directive to put more risk in the forecast
7   was issued, correct?
8   A.    I don't -- would not describe it as a
9   directive but I don't recall that date, as I already
10  said.
11  Q.    And you don't know to what extent there was a
12  change in product mix between third fiscal quarter
13  of 2000 and 2001; is that correct?
14  A.    Well, certainly documented in the report the
15  different mixes of applications and database but if
16  you're asking at the micro product level among micro
17  products, I didn't put that in the report, wasn't my
18  assignment.
19  Q.    Do you know the relative mix of database and
20  applications in the third fiscal quarter of 2000
21  compared to the third fiscal quarter of 2001?
22  A.    What I reported was in Figure 2 in the report
23  on page 11, which was an annual comparison, it was
24  in the section which is describing Oracle's business
25  which breaks out license revenue by applications and

83

1   systems but I didn't report it at the level of the
2   quarter.
3   Q.    Okay.
4        And why did you not?
5   A.    I was simply trying to summarize Oracle's
6   business in these tables and I think I submitted a
7   lot of figures and tables so I tried to be
8   economical.
9   Q.    But you concede for the forecasting process
10  in the third fiscal quarter of 2001 that the data
11  for the third fiscal quarter of 2000 would be
12  relevant?
13        MS. KYROUZ:  Objection; vague.
14  A.    I'm sorry, I didn't understand the question.
15  Q.    Do you agree that notwithstanding the fact
16  that you've only done this -- you haven't done this
17  on a quarterly basis, do you agree, though, that the
18  data, in other words, the product mix in the third
19  fiscal quarter of 2000 is relevant to the forecast
20  in 2001 if there was a significant change in the
21  product mix?
22        MS. KYROUZ:  Objection; hypothetical,
23  vague.
24  A.    But I think the answer before is that I'm not
25  accepting there is such a significant change, to use

84

1   your term, but, yes, of course, that should be
2   figured into the forecast.
3   Q.    And you don't know, correct me if I am
4   wrong, you didn't know that as of January 17,
5   adjusting for Covisint, each of the U.S. license
6   divisions was showing negative growth?
7        MS. KYROUZ:  Objection; misstates
8   testimony.
9   A.    I said that I didn't recall, found it
10  potentially plausible because of the size of the
11  transaction that you mentioned, but I also reminded
12  you that Oracle had been in a position many times
13  before in which it was short of guidance.
14  Q.    Okay, that's fine.  And you didn't know until
15  today and you still don't necessarily believe me, I
16  understand that, but you didn't know until today
17  that Mr. Henley has admitted that he thought the
18  pipeline in 2000 was too good to be true?
19        MS. KYROUZ:  Objection; misstates the
20  record.
21  A.    Well, I don't recall that but you have to
22  understand that he made a very direct adjustment
23  himself.  Recall, that the internal -- if you look
24  at what the so-called potential is at the beginning
25  of the quarter at issue, I'm going from memory, but

85

1  I think it was 12.8 cents, close to 13 cents,
2  Mr. Henley doesn't say 13 cents, he's quite
3  conservative and he says 12.  To the extent that he
4  may have had views about the pipeline, he took them
5  into account.  So I -- without recalling your
6  specific statement, it's hard to believe that there
7  was any nefarious use of that information given that
8  Mr. Henley was extremely conservative.
9  [MO]      MR. SOLOMON:  Okay, and I'll move
10      to strike that as nonresponsive because
11  my question is:
12  Q.   Were you aware, before today, of an admission
13  by Mr. Henley that he knew that the forecast in
14  2000, in December 2000 was too good to be true?
15      MS. KYROUZ:  Objection:
16      mischaracterizes the record.
17  A.   I think I just answered that.  I said I don't
18  recall but given that Mr. Henley took a very
19  conservative stance in his guidance relative to what
20  the potential number is, he may or may not have
21  believed that, but he took a conservative stance
22  possibly in response.
23  Q.   And just so I can get an answer to the
24  precise question:  You didn't know until today that
25  there was this issue at least of this admission?

86

1  A.   I don't recall is what I say.
2  Q.   Now, given that those are some of the things
3  that you either don't recall or you haven't looked
4  at or don't know that we've just been through, can
5  you arrive at an expert opinion, not that the
6  forecasting process at Oracle was reasonable but
7  that the guidance itself was appropriate?
8      MS. KYROUZ:  Objection: vague.
9  A.   Those are two sides of a coin, Mr. Solomon.
10  If -- as long as the forecasting process is
11  reflecting accurately the information
12  available--whether it's company-specific,
13  sector-specific, macro information--and that
14  information, you know, at least meets or exceeds the
15  actual guidance being offered by the firm, I can't
16  rule that out as unreasonable.  Nothing in the
17  plaintiffs' record or Dr. Goedde's report has said
18  what is reasonable, nothing can be unreasonable if
19  something is not also reasonable as a matter of
20  logic.  But if you're asking me, I as an economist,
21  I would not think that unreasonable, no.
22  Q.   Can you, given what you've told me over the
23  last few minutes, you either don't know, you don't
24  recall, can you affirmatively say that guidance in
25  the third fiscal quarter of 2001 was reasonable?

87

1  A.   Yes.
2  Q.   And you can say that without knowing the
3  change in the product mix, you can say that without
4  knowing the impact of the directive or whether it
5  were issued, you can say that without knowing or
6  conceding that Mr. Ellison thought the pipeline was
7  too good to be true, all those things that you
8  either don't know or don't recall don't change your
9  view that the actual guidance was reasonable and
10  you're willing to say that?
11      MS. KYROUZ:  Objection; misstates the
12      record, argumentative.
13  A.   Let's break down your question.
14      As to Mr. Ellison's directive, I've already
15  stated I view it as immaterial, so I'm not --
16  Q.   What Mr. Ellison wants is immaterial, what he
17  says is immaterial?
18  A.   That's not what I said.  I said if your
19  question was the mechanical effect of that
20  directive, I view it as immaterial.  I'm trying to
21  answer your question, sir.
22      On the issue of the field forecast, my view
23  is changes in the product mix are in the field
24  forecast, so that's there.
25      And then the third part was the question

88

1  about Mr. Henley and the pipeline.  I already said
2  to you I don't recall that Mr. Henley said that or
3  the context in which he said it but I do know from
4  the data that he was extremely conservative in his
5  guidance in Q3 of FY '01.
6      So, yes, I think that guidance was
7  reasonable.
8      It is also the case that the analyst
9  community virtually unanimously accepted that
10  guidance.
11  Q.   The analyst community pretty much does what
12  the issuer says, does it not?
13      MS. KYROUZ:  Objection; argumentative.
14  A.   I think that's an allegation.  It might be
15  the subject of other inquiries or proceedings, but
16  24 of 25 analysts who regularly followed Oracle,
17  wrote Oracle's guidance and didn't budge for the
18  entire quarter, the one who didn't was 11 cents, not
19  12 cents, not materially different.  It's also the
20  case, my recollection is, that Oracle was not
21  heavily into investment banking business during this
22  period so to the extent that you're casting
23  aspersions on the industry, I'm querying you on
24  means, motive and opportunity.
25  [MO]      MR. SOLOMON:  I'll move to strike

89

1    as nonresponsive.

2    Q.   The fact that the analysts reflected Oracle's

3    guidance throughout the quarter may simply be a

4    reflection of Oracle's continuing a fraud, no?

5         MS. KYROUZ:  Objection; argumentative.

6    A.   As a matter of logic you're trying to square

7    circles again.  You cannot have as a theory that it

8    is macroeconomic information being ignored.

9    Macroeconomic information is by construction

10    available to everyone, including the analysts.  So

11    they have to be similarly duped, dumb, incapable of

12    forecasting, to meet your observation -- I can't

13    imagine a world in which what you're saying is true.

14    Q.   You can't imagine a world in which the

15    analyst would be, "Looks difficult to us but

16    Oracle's saying they can do it so we're going to

17    take them at their word"; that's an unrealistic

18    world, is it?

19    A.   Oh, that's a very different characterization

20    than the aspersion you just cast.  That

21    characterization is more akin to "The significant

22    uncertainty in all of the previous quarters that we

23    have recent history Oracle has been able to do this

24    and we do believe management that, indeed, is

25    possible."  That's very different than the aspersion

90

1    you cast before.

2    Q.   And if in those preceding quarters Oracle had

3    made its numbers through managing its earnings,

4    would that be an issue that gave you any concern?

5         MS. KYROUZ:  Objection.

6    Q.   Would that be a fact that caused you any

7    concern?

8         MS. KYROUZ:  Objection; argumentative.

9    A.   I have no --

10    Q.   I know you have no information, I'm asking

11    you to assume that.

12         MS. KYROUZ:  Incomplete hypothetical.

13    A.   It's a totally -- first of all, there's

14    nothing in the record that suggests that.  Second,

15    that's a hypothetical that's very hard to imagine

16    because it's hard to know what you mean by earnings

17    management as you're defining it and over what

18    period.

19    Q.   Have you read the reports of the accounting

20    experts in this case?

21    A.   No, sir.

22    Q.   And are you aware of an issue in the second

23    fiscal quarter of 2001 in this case, an issue

24    concerning accounting or issues -- excuse me,

25    concerning accounting, are you aware of that?

91

1    A.   I'm not aware of it in the specifics, I know

2    that there is an issue but...

3    Q.   But whatever that issue is hasn't fed into

4    your analysis at all; is that right?

5    A.   It wasn't my assignment, no.

6    Q.   So you haven't heard of any inappropriate

7    transfers to Oracle's bad debt reserves at the end

8    of the second fiscal quarter of '01; is that right?

9    A.   I'm not aware of specific allegations, no.

10    Q.   And are you aware of a swap transaction with

11    Hewlett-Packard at the very end of the second fiscal

12    quarter of 2001?

13         MS. KYROUZ:  Objection; misstates the

14    record.

15    A.   Again, I'm not aware of that.  It's an

16    allegation.

17    Q.   If it turned out that Oracle improperly

18    recognized revenue at the end of the second fiscal

19    quarter of 2001, assume that's the case, would that

20    affect your analysis that you performed?

21         MS. KYROUZ:  Objection; incomplete

22    hypothetical.

23    A.   It's too much of a hypothetical to answer.

24    But I can say that, without condoning any such

25    alleged behavior, that it would depend.  You know,

92

1    it need not affect the numbers for 3Q '01 even if

2    the behavior had been bad, and I'm not conceding

3    that any such behavior occurred.

4    Q.   Do you know who Mr. Nussbaum is?

5    A.   I believe that Mr.Nussbaum -- he's in the

6    NAS -- he may be the manager of the NAS, he's one of

7    the managers.

8    Q.   Do you know if he's still at the company?

9    A.   I do not, no.

10    Q.   You haven't heard that he was fired shortly

11    after the class period?

12    A.   I hadn't heard that, no.

13    Q.   Have you ever read any testimony by Mr. --

14    that Mr. Nussbaum has given?

15    A.   Oh, I don't recall.  I may well have because

16    I was looking at NAS and it's in the list here.

17    Since I chose NAS and I believe he's the head of

18    NAS, I might well have.  Let's see.

19         MS. KYROUZ:  I think he's OSI.

20         THE WITNESS:  Is he OSI?  Then in all

21    likelihood --

22         MS. KYROUZ:  It's in the list.

23    A.   Yeah, he's there but --

24    Q.   We'll swear Ms. Kyrouz in.

25    You've listed him on page 15.

93

1   A.   Yes.

2   Q.   And you've listed a deposition taken in 2004.

3       Is that the only deposition of his that

4   you've reviewed?

5   A.   You know, I don't recall, I recall a

6   deposition.

7   Q.   And do you recall what Mr. Nussbaum had to

8   say about forecasting in that deposition?

9   A.   I do not, no.

10   Q.   Did he say anything?

11   A.   I don't recall, sorry.

12   Q.   If it turned out that people at Oracle in the

13   third fiscal quarter of 2001, including senior

14   management, were unwilling to or reluctant to

15   forecast for 11i because of the product problems,

16   would that be something you'd want to know in

17   conducting your analysis?

18       MS. KYROUZ: Objection; vague,

19   incomplete hypothetical.

20   A.   You know, again, my assignment isn't to look

21   at 11i specifically versus any other suite of

22   applications. That should show up in the field

23   forecasts and I'm not aware of any such criticism

24   that you've alleged.

25   Q.   Okay.

94

1       Did you understand Dr. Goedde's report to

2   essentially be saying that in the third fiscal

3   quarter of 2001 the economy was already in a

4   recession?

5   A.   I don't recall that Dr. Goedde actually

6   described that. One might infer that but that

7   wasn't the thesis of his argument.

8   Q.   You understood that the thesis was that there

9   was a sudden contraction in growth?

10   A.   Yes, those were the words that he used.

11   Whether that's accurate across the board is another

12   matter, looking at data in realtime, but yes, I do

13   understand that that's his thesis.

14   Q.   And you disagree with that thesis?

15   A.   Well, yes, in simple terms, if the question

16   is sitting there in realtime looking at all of the

17   macro and industry data, I don't think one can

18   unequivocally say that. I make reference in my

19   report to still quite reasonable health in the

20   software sector. There is still, you know,

21   considerable uncertainty from labor market data,

22   which still looks very, very strong.

23       What is decelerating during the period at

24   interest are some things that are observable in

25   realtime--consumer confidence comes to mind,

95

1   declines in the PMI for production--other things

2   that aren't really as observable in realtime like

3   the Federal Reserve minutes which come out later but

4   Dr. Goedde cites them as if they were a realtime

5   observation.

6       So I don't think -- if you're asking me with

7   the lens of hindsight was there a deceleration, of

8   course, that's not the question.

9   Q.   Without the lens of hindsight, do you not

10   think that if halfway through the quarter all of

11   your U.S. divisions are showing negative growth,

12   that that would be indicative of the company being

13   affected negatively --

14       MS. KYROUZ: Objection; vague,

15   incomplete.

16   Q.   -- by the status of the economy?

17   A.   Well, a couple of comments. Remember, that

18   both the stock market peak and the software peak had

19   occurred prior to this and Oracle had managed to do

20   quite well, a fact known to Oracle as well as to the

21   investing public.

22       Second, Oracle's senior management did make

23   statements that more questions need to be asked.

24   You have Henley saying, you know, let's make sure

25   that we're on top of this, let's kick the tires, I

96

1   think were his terms. You did see that kind of

2   inquisitiveness on the part of senior managers

3   during that period.

4   Q.   You may have seen statements to that effect.

5       Have you seen documents that evidence

6   Mr. Henley kicking the tires?

7   A.   We know that Mr. Henley's guidance is less

8   than the potential through much of the quarter.

9   Q.   Is that the extent of his tire kicking that

10   you've seen?

11   A.   Well, we know Mr. Henley says that that's

12   what he says. I can't be in his head, I can only

13   observe what he says.

14   Q.   Do you know what Mr. Henley's view was of

15   Oracle's stock price in November and December of

16   2000?

17   A.   I do not, no.

18   Q.   Do you care?

19       MS. KYROUZ: Objection; argumentative.

20   A.   I have no idea what that question is about.

21   Q.   If he was very upset at the price of the

22   stock because it was too low and had expressed that

23   around November or December of 2000, would that be

24   of any concern to you?

25   A.   Sir, I can't imagine a businessperson alive

97

```
1   who doesn't express the frustration that his or her
2   stock price is too low.  Rarely do I hear
3   businesspeople walking around complaining that their
4   stock price is too high.
5   Q.   What about being satisfied that the stock
6   price is about right, does that never happen?
7   A.   Businesspeople are by their nature quite
8   optimistic and, you know, tend to have very
9   favorable views of their firms.  You know, I don't
10  read anything into that without knowing the context
11  you're talking about.
12  Q.   You could imagine a situation, couldn't you,
13  where an executive is upset that the stock price of
14  a stock is too low and goes and starts telling lies
15  to the market to inflate the price of the stock and
16  then sell some of it; could you imagine a situation
17  like that?
18       MS. KYROUZ:  Objection; vague.
19  Q.   Or do American businessman just not do that?
20       MS. KYROUZ:  Misstates the record,
21  argumentative.
22  A.   Well, it's certainly a hypothetical.  It
23  would also be value-destroying for that individual
24  if you sold --
25  Q.   Some go to jail, don't they?
```

98

```
1   A.   Well, yes, but if you sell stock and you
2   still are holding a lot of stock and you lose value,
3   it's hard to argue that you're very economically
4   wise to have done so.  If you're asking me is there
5   any economic incentive to do that in this case?
6   Hard to see.
7   Q.   For either Mr. Henley or for Mr. Ellison?
8   A.   Well, you know, I'm not being asked to offer
9   an opinion on that.  I will tell you that it would
10  be by no means obvious without a series of very
11  complicated calculations, particularly for
12  Mr. Ellison who holds so much stock.
13  Q.   Why did Mr. Ellison sell, do you know?
14  A.   Mr. Ellison doesn't confide in me his
15  financial transactions.
16  Q.   And, again, you haven't been asked to look at
17  the sales in any way, shape or form; is that true?
18  A.   I was not asked to do that, no.
19  Q.   You've talked about the hockey stick effect a
20  little bit.
21       Are you familiar with that?
22  A.   Yes, sir.
23  Q.   And you know that Oracle claims -- well, it's
24  hard to keep up with their claims but at one point
25  Oracle claimed that they had just lost a few large
```

99

```
1   deals at the end of the quarter; are you familiar
2   with that claim?
3   A.   Yes, I am.
4   Q.   And is that true?
5   A.   Yes.
6   Q.   How do you know that's true?
7   A.   Well, I've seen information about several of
8   them.  One that comes to mind is the Lucent
9   transaction because Lucent was one that had actually
10  been agreed to by management but then the bankers
11  had said no at the last minute.  And any of these
12  things, when you have lumpy investments like this,
13  you know, you can have a few wins at the end that
14  are very surprising and a few losses at the end that
15  are very surprising.  One deal, as I recall, closed
16  the next day but it was too late for this quarter.
17  Things like that happen.
18  Q.   What deal was it that closed the next day?
19  A.   Oh, I'm going from memory.  It starts with an
20  A, Axterra, something like that.
21  Q.   I'm sorry, A?
22  A.   Axterra perhaps, I'd have to go back.
23  Q.   So that closed the next day and the other
24  deal you talked about was Lucent?
25  A.   Lucent.
```

100

```
1   Q.   Other than those deals, can you identify any
2   others?
3   A.   I recall another that was I believe a firm in
4   Ohio where it just sat on a desk, didn't make the
5   quarter, in other words, the approval.
6   Q.   And how do you know about Lucent, first of
7   all?
8   A.   You know, I don't recall.
9   Q.   You don't know how you know?
10  A.   No, I don't recall.
11  Q.   And how do you know about the one that began
12  with an A that closed the next day?
13  A.   Again, I don't recall.  I asked to see some
14  of this information because the question that I
15  asked was, you know, what would you need to know
16  about so-called big deals at the end that come to
17  some conclusion about whether there might be some
18  prospects, and I did get a list of which I don't
19  recall all of them.
20  Q.   Okay.
21       And when you say you got a list, was that a
22  list that was prepared particularly for you by the
23  lawyers, do you know, or was it a document that was
24  prepared --
25  A.   I --
```

Hubbard, R. Glenn  7/3/2007  8:20:00 AM

101

1  Q.  -- in the ordinary course?
2  A.  I really don't recall.
3  Q.  And what about Ohio, same answer?
4  A.  Yes.
5  Q.  Can you think of any others other than those
6  three?
7  A.  No, sir, not off the top of my head, no.
8  Q.  And do you know the amount of those
9  transactions?
10  A.  Well, Lucent I referred to in my report, I
11  don't remember the number, 20, 30 million dollars,
12  something like that.  I don't remember the others.
13  Q.  Now, is that your -- is it your understanding
14  that that is Oracle's explanation for what happened
15  at the end of the third fiscal quarter of 2001,
16  that, unexpectedly, a few large deals at the very
17  end of the quarter didn't get closed; is that your
18  understanding?
19      MS. KYROUZ:  Objection; vague,
20      misstates testimony.
21  A.  That's not my understanding, no.
22  Q.  Okay.
23  A.  I mean I think that's the symptom, not the
24  underlying concern.  I think what Mr. Henley says in
25  mid-March in diagnosing what went wrong was to refer

102

1  to things like that but mainly in the context of,
2  you know, near the end it became apparent that they
3  had a larger problem, meaning some combination of
4  the economy being weaker than had been thought or
5  the probability that given deals closed.  I think it
6  was both of those, I don't think they were simply
7  saying oh, well, we just missed these deals
8  idiosyncratically, the economy definitely played a
9  role.
10  Q.  Just so we're clear on your understanding,
11  then, your understanding is that at the very end of
12  the quarter a few large deals unexpectedly fell out
13  and the economy played a role in explaining why
14  those few large deals fell out; is that your
15  understanding?
16  A.  Not precisely.
17  Q.  Okay.
18  A.  That a few large deals didn't close at the
19  end factually is correct.  As to why Oracle missed
20  its guidance for that or any other reason, Henley
21  says, "I said to you the economy was a wild card
22  going back," he refers to other points in time at
23  which he had referred to the economy and says, "Yes,
24  indeed we were surprised."  As it turns out later,
25  other firms in the industry were surprised.

103

1  So I think that there's quite a heavy weight
2  on the economy, not just on, you know, idiosyncratic
3  deal losses or at least that's my reading of what
4  Mr. Henley says.
5  Q.  Again, I sort of want to understand that so
6  aside from what you call the idiosyncratic deal
7  losses, what else happened at Oracle that affected
8  it negatively and made it miss its estimate?
9      MS. KYROUZ:  Objection; vague.
10  A.  Yeah, it's hard to know what you're asking
11  but what Henley says in the March 15th I think it is
12  call is that the economy did play a larger role,
13  particularly near the end.  He doesn't say that
14  simply in the context of a handful of deals but more
15  generally, that people may have become more cautious
16  about spending in this area, that the firm is
17  learning that this situation may have been worse
18  than it initially had feared.
19  Q.  Do you have an understanding why there was --
20  so you're saying there was a difference between the
21  initial announcement and the announcement on the
22  15th; is that fair?
23  A.  Not really.  I mean what Henley says at the
24  beginning is that "It's a wild card and I haven't
25  turned it over yet" --

104

1  Q.  No, no, I'm talking about the beginning of
2  March -- the middle of March, excuse me.
3      MS. KYROUZ:  Objection; misstates his
4      testimony.
5  A.  That's not what I talked about.  What I just
6  talked about was going from December 14th to
7  March 15th, if I'm getting the dates right, I do
8  believe that in around, on or around the beginning
9  of March, you know, the company is still obviously
10  reaffirming its guidance at 12 cents.  If you look
11  at the exhibit that I presented in the report where
12  you have the field forecast, upside, and then
13  obviously what ultimately happens, it's not until,
14  going from memory, not even two weeks before the end
15  that you start to fall out of the 12-cent range,
16  given that Oracle rounds up from 11-1/2, you don't
17  fall out of an 11-1/2 bound until right at the end.
18      MS. KYROUZ:  You said on or around the
19      beginning of March the company is still
20      reaffirming its guidance.  You don't mean
21      March, do you?
22      THE WITNESS:  No, I'm sorry --
23      MR. SOLOMON:  We can clean that up
24      separately.  There's no need to interrupt the
25      witness, so please don't do it again.

105

BY MR. SOLOMON::

1  BY MR. SOLOMON::
2  Q.  So let's focus again on March of 2001.
3  A.  Right.
4  Q.  There was an announcement at the beginning of
5  March 2001, agreed?
6  A.  Right.
7  Q.  How did they explain the quarter miss in that
8  announcement?
9  A.  You know, again, I don't recall but I think
10  the economy played a significant role --
11  Q.  Okay.
12  A.  -- in that announcement.
13      MR. SOLOMON:  Let's go off the record
14  because we need to change tapes.
15      THE WITNESS:  Take a break?
16      MR. SOLOMON:  Absolutely.
17      THE VIDEOGRAPHER:  11:15 a.m., end of
18  Tape No. 2.
19      (Recess taken)
20      THE VIDEOGRAPHER:  Returning to the
21  record 11:21 a.m., beginning of Tape No. 3.
22  BY MR. SOLOMON::
23  Q.  Okay, I just want to go back to March 2001
24  again and see if we can get on the same page.
25      Do you understand there were two

106

1  announcements in March, right?
2  A.  Right.
3  Q.  And the first announcement, the explanation
4  for the miss was a few large deals unexpectedly not
5  closing at the end of the quarter; yes or no?
6  A.  I recall it's in the announcement.  I think
7  that there's more shading than that, certainly there
8  is by the 15th.
9  Q.  Okay, that's what I'm getting at.  When we
10  get to the 15th, what is that increased shading?
11  A.  A significant discussion of the economy,
12  almost a time line of, I'm going from memory, but
13  going back to the December 14th wild card remark
14  through various other times in which the economy was
15  mentioned by senior management and then very much a
16  pointing to the economy, you know, as explaining
17  things toward the end.  That's my recollection from
18  the conference call.
19  Q.  Was there any change, notwithstanding that,
20  though, was there any change in the explanation
21  that -- sorry, not the explanation, any change in
22  the representation that a few large deals fell out
23  at the end of the quarter and it was the economic
24  consequence of losing those deals that caused Oracle
25  to miss its estimate in that quarter?

107

1  A.  I don't recall that change, no.  You know,
2  the large deals issue is a subset of the economy
3  issues, it's the most visible but...
4  Q.  Okay, so you're not aware that Oracle later
5  amended its explanation to say, "Well, it wasn't
6  really just large deals falling out at the end of
7  the quarter, it was we've lost all sorts of deals,
8  small and large, throughout February," you never
9  heard that?
10  A.  Well, I think I just said that there was
11  significantly more color on the economy in the
12  March 15th conference call.  I don't view those as
13  contradictory.  As I said, one is a subset of the
14  other.
15  Q.  No, but I did ask you, didn't I, that was
16  there a change in the focus of big deals falling out
17  at the end of the quarter as being the explanation
18  and I think you thought that that didn't change, and
19  now I'm saying, well, do you not understand, in
20  fact, that the explanation did appear to change to
21  one that it wasn't just large deals falling out at
22  the end of the quarter, it was all sorts of deals
23  falling out throughout February?
24      MS. KYROUZ:  Who's testifying now,
25  Mark?

108

1      MR. SOLOMON:  I'm asking.
2  Q.  Is that something that you recall?
3  A.  That's not how I recall it at all,
4  Mr. Solomon.  I recall it all being part of the same
5  story, which is about the economy with first flash
6  illustration and then a more colored illustration
7  but I don't see those as being different stories,
8  no.
9  Q.  Now, I kind of don't understand how you're
10  sitting here as an expert saying that guidance was
11  reasonable when you can't even tell me -- you can't
12  even identify by name more than one company that
13  supposedly fell out unexpectedly at the end of the
14  quarter.  Isn't that surprising that you don't
15  really have those facts at your fingertips?
16      MS. KYROUZ:  Objection; argumentative.
17  A.  I'm sorry, I don't even know what you're
18  asking there.
19  Q.  All these deals supposedly fell out, what
20  were they?  You've told me one was Lucent, you don't
21  know much about that, one began with an A and the
22  other involved Ohio, and you can't even give me
23  numbers.
24      MS. KYROUZ:  Objection; argumentative.
25  A.  That it would have no bearing -- if you go

109

1  back to the chart, maybe it's useful to follow
2  through this.  If you look, it's somewhere in the
3  nineties, let me find it for you.
4      Yeah, if you look at page 94 and let's have a
5  look at Figure 44 so we can sort of track what's
6  going on during the quarter.  You know, it's very,
7  very clear that, you know, up until the very end,
8  nothing much is happening here.
9      So whether I can name which handful of deals
10  it is or which piece of news in the economy is not
11  really central.  You can see it even more clearly
12  perhaps on page 95 when you look at the potential
13  forecast and upside adjustments relative to the band
14  range, you're not even falling out of the band until
15  not even two weeks before the end.
16      So this is, you know, prima facie reasonable
17  guidance given the economic information that was
18  there.  The fact that something happens at the
19  end--as, by the way, Oracle had been through this
20  many other quarters before--is simply no assertion
21  of the contrary nor have you offered an assertion of
22  what is reasonable.
23  Q.   Just on page 94, if you look at 4Q '00, does
24  that not sort of tell you that that was a remarkable
25  quarter, an outlier?

110

1      MS. KYROUZ:  Objection; vague.
2  A.   I'm not sure how I could infer that.  In
3  order for me to infer it, I'd have to have a time
4  series of significance of 4Qs.  We already know that
5  4Q is in more difficult economic times, we know that
6  4Q '99 is in a big boom, so I'm not sure how I could
7  ascertain that from this picture, no.  It is the
8  highest dark line in the picture -- is that what
9  you're asking me?  But that in no way could convey
10  exception.
11  Q.   And, again, that doesn't tell you, then, just
12  this chart doesn't suggest to you that the fourth
13  quarter of '00 was an outlier in terms of comparable
14  quarters?
15      MS. KYROUZ:  Objection; asked and
16      answered.
17  A.   I don't think you could infer that because
18  you would need, given the seasonality of the
19  business, you'd need a time series of 4Qs and
20  unfortunately the other two 4Qs in the picture are
21  periods that are decidedly not comparable.
22  Q.   Now, just back to what would not make a
23  difference, it wouldn't make any difference to your
24  analysis or your opinion, you're saying, whether you
25  knew the companies -- whether you knew the details

111

1  of any of the companies that supposedly were unable
2  to close their transactions with Oracle in the third
3  fiscal quarter?
4  A.   The question at issue and the question on
5  which I'm opining is how the forecasting process
6  treated that information, was that information
7  there, could there have been a reasonable
8  expectation based on past performance and knowledge
9  of the economy, whether the deals are called A, B, C
10  or D, E, F is orthogonal to that point, unrelated to
11  that point.
12  Q.   Okay.
13      You've told us about your testimonies but I
14  don't know that you've told us about all of your
15  engagements as an expert in the past four years to
16  start with.
17      Are there any other engagements in which
18  you've been retained but you haven't given
19  testimony?
20  A.   There was another matter from Microsoft in
21  which I didn't give testimony.  There are some other
22  matters for which I have been engaged but they're at
23  a much earlier stage than we are in this proceeding.
24  Q.   And who have you been engaged by?
25  A.   Again, I'm not sure whether that's -- I'm not

112

1  disclosed --
2      MS. KYROUZ:  You haven't been
3  disclosed in those cases --
4      THE WITNESS:  No.
5      MS. KYROUZ:  -- so it's confidential
6  information.
7  A.   Yes, there are.  Not a lot.
8  Q.   What areas of your expertise have been sought
9  in those cases?
10  A.   Antitrust.
11  Q.   Antitrust?
12      Have you ever worked for Latham & Watkins
13  before?
14  A.   I may well have a long time ago but I don't
15  recall.  I think it's possible that I did in a case,
16  another securities matter case in the '90s.
17  Q.   Do you remember the name of that case?
18  A.   I believe, if I'm going -- this is from dark
19  memory, the Hilton Bally's case, Delaware Chancery
20  Court case, and I don't remember that it was
21  Latham & Watkins but it's enough of a correlation it
22  might well be.
23  Q.   Okay, and what side were you on?
24  A.   Defendant, and we won.
25  Q.   It's not hard in Delaware Chancery for a

Hubbard, R. Glenn   7/3/2007   8:20:00 AM

113

1  defendant to win, is it?
2  A.  I haven't studied the actions for Delaware
3  Chancery Court.
4  Q.  Although I'm sure you did a great job.
5  What was the nature of your testimony?
6  A.  I don't remember, sir. I remember it was in
7  the '90s but I don't remember when. It would have
8  been between '97 and '99, somewhere in that time
9  frame.
10  MR. SOLOMON:  Okay, let's go off the
11  record.
12  THE VIDEOGRAPHER:  Going off the
13  record, 11:31. Take five minutes.
14  MS. KYROUZ:  Sure.
15  (Recess taken)
16  THE VIDEOGRAPHER:  Returning to the
17  record, 11:47 a.m.
18  BY MR. SOLOMON::
19  Q.  In preparing your report, have you worked
20  with other people -- your reports, excuse me, have
21  you worked with other people?
22  A.  There were staff and Analysis Group who
23  certainly worked under my direction on my report,
24  the initial report and the rebuttal.
25  Q.  And which individuals assisted you?

114

1  A.  Mr. Deal who is here today, Mr. Ortenzi,
2  O-r-t-e-n-z-i, Mr. Hess, H-e-s-s, and Mr. Rosberg, I
3  believe R-o-s-b-e-r-g.
4  Q.  And did any of those individuals do any of
5  the drafting of your reports?
6  A.  No, I was the draftsperson of my report.
7  What the AG team did under my direction was help
8  with many presentations of exhibits, finding data,
9  information.
10  Q.  And is that the same for both your initial
11  report and your rebuttal?
12  A.  That's my general practice, yes.
13  Q.  Nothing changed in the way you prepared your
14  rebuttal from the way you prepared your first
15  report; is that fair?
16  A.  Same process, yes.
17  Q.  And you don't have any kind of list that
18  would identify the deals that supposedly didn't
19  close in the third fiscal quarter of '01 thereby
20  causing Oracle to miss its quarter?
21  A.  Sitting here today, no. As I told you, I
22  asked about this information, I recall some, but no,
23  I don't have a list here.
24  Q.  And you don't have a list back at the office
25  or anywhere; is that right?

115

1  A.  No, I don't save things -- if I don't have
2  them, I don't have them.
3  Q.  I notice you said you didn't save anything.
4  My real concern is did you ever get such a list?
5  MS. KYROUZ:  Objection; vague.
6  A.  No, I did ask about the big deals and a list
7  and I do remember some of them suggesting that I saw
8  that list or heard that list, I just don't recall.
9  Q.  And, again, you don't know if it was in a
10  conversation or if it was in a document?
11  A.  I really don't recall, sorry.
12  Q.  And do you recall how many companies were on
13  that list, whether it be an oral list or a written
14  list?
15  A.  I don't, but not a large number. Ten or
16  fewer.
17  Q.  Are you aware that during the class period,
18  which is December 14 through March 1, are you aware
19  that Oracle had a stock repurchase program in
20  effect?
21  A.  I don't recall that, no.
22  Q.  Would Oracle's repurchasing activity have any
23  impact on the opinions or the preparation for the
24  opinions you've given here today?
25  A.  As a general rule, no.

116

1  Q.  Could you conceive circumstances when it
2  would affect analysis of whether a forecasting
3  process was appropriate?
4  MS. KYROUZ:  Objection; vague.
5  A.  Honestly, I can't. I suppose I can sit here
6  and torture myself and try but none comes to mind,
7  no.
8  Q.  Do you know who Ray Lane is?
9  A.  I know that he filed an affidavit in this
10  proceeding and once worked for Oracle in a
11  relatively senior job. That's my only recollection.
12  I'm sorry, I don't recall more.
13  Q.  Okay.
14  And the affidavit, what do you know about the
15  affidavit?
16  A.  My recollection was you, know, it was quite
17  critical of Oracle during this period although I
18  don't recall the specifics.
19  Q.  But you did read it?
20  A.  I recall looking at the Lane affidavit. But
21  I -- as I say, it's not -- I don't recall well
22  enough to know when or in what form.
23  Q.  Let's try and talk in generalities then.
24  Around when did you first see the Lane
25  affidavit?

117

```
 1   A.   You know, I don't recall.  If I had a chance
 2   to really review it, it probably would have been
 3   more recently.  As I recall, I believe, again, I'm
 4   going from memory, that this comes up in the second
 5   Goedde report.
 6   Q.   Okay.  And is it your belief that that was
 7   the first time that you heard of the Lane affidavit?
 8   A.   Again, I don't recall.  I know it's top of
 9   mind as of that but I don't recall.
10   Q.   And you don't recall its contents?
11   A.   I recall that it was quite critical of Oracle
12   by somebody who had had a difficult relationship
13   with Oracle.  I, you know -- frankly, it wasn't
14   necessarily germane for what I was doing.
15   Q.   When you say it wasn't germane, is that
16   because it didn't talk about forecasting?
17   A.   Well, I recall actually that it may have made
18   references to forecasting.
19   Q.   But forecasting that wasn't germane to your
20   forecasting report?
21   A.   Well --
22            MS. KYROUZ:  Objection; vague.
23   A.   -- keep in mind I'm not assigned to develop a
24   forecast but to look at a forecasting process and a
25   set of guidance and offer my opinion as an economist
```

118

```
 1   as to whether it's reasonable.  I can do that
 2   without knowing the opinion of disgruntled former
 3   employees of Oracle.
 4   Q.   And that's how you were meaning to
 5   characterize Mr. Lane's affidavit pretty much,
 6   right, "Oh, that's the affidavit a disgruntled
 7   former employee," right?
 8   A.   Given that I had deposition testimony from so
 9   many other individuals with a different point of
10   view, yes.
11   Q.   And, therefore, you credited the ones with a
12   different point of view and you assumed Mr. Lane is
13   lying, right?
14   A.   I don't need to do any such thing.  All I'm
15   assigned to do is to look at facts and circumstances
16   about the U.S. economy which, by the way, rely on
17   none of these individuals for their assessment, and
18   to look at the forecasting process that Oracle used
19   and to opine as to whether it's reasonable from an
20   economic perspective.
21   Q.   Are you offering the opinion, though, not
22   just that the forecasting process was reasonable but
23   also that the guidance given in this case was
24   reasonable?
25   A.   Yes, for this quarter at issue, that is
```

119

```
 1   indeed what I'm offering.
 2   Q.   So if Mr. Lane addressed forecasting and
 3   guidance for the third fiscal quarter of '01,
 4   wouldn't one ordinarily expect that to be relevant
 5   to your inquiry?
 6   A.   Well, first and foremost, recall,
 7   Mr. Solomon, that I have all of the quantitative
 8   data that go into that through the so-called upside
 9   reports, I have the testimony of several layers of
10   people in Oracle, more junior to more senior, and I
11   have to form my opinion based on the totality of the
12   evidence I see, principally the quantitative
13   evidence of what was done in the upside, how field
14   forecasts were generated and so on.
15   Q.   And do you believe that it's necessary to be
16   an expert in that field to arrive at an informed
17   opinion?
18            MS. KYROUZ:  Objection; vague "field."
19   A.   I'm not sure what you're asking about is the
20   field or the opinion.
21   Q.   Is your expertise necessary for the opinion
22   you've reached?
23   A.   I believe that my expertise as an economist
24   is absolutely necessary as to whether or not what
25   was the state of the macroeconomy, what was knowable
```

120

```
 1   at that time and did Oracle appear to be taking
 2   these considerations into account, yes, I think you
 3   would need an economist.
 4   Q.   So aside from the fact that Mr. Lane is a
 5   former disgruntled employee, as you've described
 6   him, is there anything that you can recall in his
 7   declaration that has any relevance to your inquiry?
 8   A.   As I said, I don't really recall all the
 9   substance of his declaration.
10   Q.   So you can't say yes or no?
11   A.   Obviously I believed at the time of looking
12   at it that it did not as I did not choose to
13   incorporate it.
14   Q.   If you had chosen to incorporate it, how
15   would you have incorporated it?
16            MS. KYROUZ:  Objection; vague,
17        incomplete hypothetical.
18   A.   It's actually an excellent question because
19   it gets to the heart of why this isn't particularly
20   useful.  What I'm trying to ascertain is what was
21   actually done in the forecasting process by which I
22   can look at the numbers, I can see what a field
23   forecast was, I can look quarter by quarter at what
24   Ms. Minton does, I, of course, have her own
25   testimony as to what she says she does and
```

121

1   Mr. Henley's and then those who are feeding into
2   her, and I can reach an opinion.
3      So what somebody's views of the process are
4   doesn't shed much light given that I had the actual
5   data that was being used.
6   Q.   Back to that for a second, to Ms. Minton.
7   What if instead of it being a check, as you call her
8   analysis of the conversion forecast, conversion
9   ratios, what if that was the process that she
10   utilized, in other words, what if it wasn't that she
11   was going to the field all the time but that she was
12   just automatically plugging in the rate from the
13   previous year, would that have any impact on your
14   analysis?
15      MS. KYROUZ: Objection; vague,
16   incomplete hypothetical.
17   A.   But that's not my understanding of what she
18   does --
19   Q.   No, I know it's not, that's --
20   A.   She does have a mechanical conversion process
21   but that's not the up -- what the output of this is
22   what's called the upside, and she does a check
23   called the conversion that does reach back and
24   compare it to the previous four quarters but that's
25   in no sense a locked-in thing that the term is the

122

1   upside. I think this was a confusion in
2   Dr. Goedde's report as well.
3   Q.   And so to the extent that Ms. Minton forecast
4   revenues that are arrived at exactly as a result of
5   applying the last year's conversion ratio, that's
6   just a very happy coincidence?
7   A.   Well, again, many pieces of that question.
8   My understanding is that that isn't what she does.
9   She has a check, she comes up with the answer. My
10   recollection was I couldn't replicate Dr. Goedde's
11   calculations so whether it's happy coincidence or an
12   arithmetic error, that I can't say sitting here
13   today, but it is not my understanding that that's
14   what Ms. Minton does as the upside.
15   Q.   If that were the case, would it alter your
16   analysis?
17   A.   I don't know, there's so much going on
18   there --
19      MS. KYROUZ: Objection; vague.
20   A.   -- it's a hypothetical because there are so
21   many inputs into a forecast and all I can say is
22   that my understanding is that she does both across
23   quarters and within a quarter vary her upside based
24   on the latest information, that it is not simply
25   mechanical. What is mechanical is the check.

123

1   Q.   And what I'm trying to say is, what if all
2   the field stuff didn't really happen the way you
3   think it happened and it was just the mechanical
4   application of the conversion ratio that she was
5   doing, would that affect your analysis?
6      MS. KYROUZ: Objection; incomplete
7   hypothetical, contradicts the record.
8   A.   Also understand it's not even the -- the
9   question I think you were asking before, there are
10   two things going on here, there's a field forecast
11   and there's an upside. And you seem to be asking
12   is -- your latest question is is there something
13   wrong with the field forecast, your previous
14   question was is there something mechanical that
15   converts the field to potential.
16      I don't know of those questions it is
17   you want me to answer.
18   Q.   Answer them both.
19   A.   The answer would be the same--she describes
20   that she takes into account everything in the field
21   forecast, she does an upside which varies both
22   across and within quarters, and does do a check on
23   conversions based on lagged information for same
24   quarter to get at seasonality. That is my
25   understanding of what she has done and what I

124

1   believe is in her numbers.
2   Q.   And that's because you do not believe that
3   her application of the conversion ratios was
4   anything more than a check, correct?
5      MS. KYROUZ: Objection; misstates
6   testimony.
7   A.   I don't know about anything more than but it
8   was principally there for a check, she does an
9   upside adjustment which varies within the quarter.
10   If something varies within a quarter, it can't
11   simply be mechanical across quarters. It's just a
12   matter of arithmetic.
13   Q.   Well, doesn't it depend if she's applying the
14   conversion ratio from fiscal '00 to the forecast in
15   fiscal year '01, if that's what she's automatically
16   doing and arriving at precisely the numbers that
17   you'd expect by making that --
18   A.   Well, keep -- whoa. Keep in mind that what
19   you see in these reports is also she's doing this at
20   different weeks, right, this isn't like a one-time
21   thing. That's why I said there's considerable
22   variation within a quarter, not simply across a
23   quarter. I illustrate this in the report.
24   Q.   So, again, you won't accept--this is my
25   understanding--you won't accept the premise that

125

1 Ms. Minton may have been slavishly applying an
2 historical conversion ratio in fiscal year one not
3 as a check but, in fact, as a forecasting tool?
4 A. It is my understanding that that was not the
5 thrust of her process. To the extent that the
6 numbers compare that way, you know, they do --
7 Q. Happy coincidence?
8 A. Well, perhaps. As I say, I couldn't in my
9 quick look even replicate what Dr. Goedde did, so...
10 Q. Have you read Softwar?
11 A. No, I have not.
12 Q. Have you read parts of it?
13 A. I've seen snippets of it.
14 Q. And did that factor into your -- the contents
15 of that book factor into your analysis in any way?
16 A. No.
17 Q. Have you relied on it in any way?
18 A. I think I possibly just answered that
19 question, but, no.
20 Q. Okay.
21      MR. SOLOMON: We'll have marked as the
22 next -- go off the record, we need to copy an
23 exhibit.
24      THE VIDEOGRAPHER: Going off the
25 record, 12:03.

126

1      (Recess taken)
2      THE VIDEOGRAPHER: Returning to the
3 record, 12:12 p.m.
4 BY MR. SOLOMON::
5 Q. I just want to go back to the issue of
6 Ms. Minton and her application of conversion rates.
7      Again, I want to ask you, if the field
8 forecast was the field forecast just as it was in
9 third fiscal quarter of '01 but what Ms. Minton did
10 to arrive at her upside was to mechanically apply
11 the corresponding weakened month and quarters
12 conversion rates in the prior year to get the upside
13 to get the potential, would that alter your
14 analysis?
15      MS. KYROUZ: Objection; incomplete
16 hypothetical.
17 A. Well, two things. One, I don't believe
18 that's what she did --
19 Q. No, I know, you say that every time, you
20 don't have to say that because I'm asking you to
21 assume.
22 A. Second, it would depend, as a statistical
23 answer, because it would depend, you know, how
24 representative the quarters are that you're
25 comparing, how close you are, how far off you are.

127

1 Q. You just don't want to say that it would have
2 affected your analysis because it would depend on
3 stuff that's not in the hypothetical; is that what
4 you're saying?
5      MS. KYROUZ: Objection; argumentative.
6 A. Hypotheticals are hypotheticals, I'd prefer
7 to look at what somebody actually did.
8 Q. I understand that but the nature of expert
9 testimony, as you probably know, often involves a
10 lot of hypotheticals to test your thesis.
11      And what I'm trying to ask you now is, would
12 your thesis change, would your analysis, the report
13 that you've given, would it change in any
14 significant way if, in fact, the underlying facts
15 were as I ask you to assume them?
16      MS. KYROUZ: Objection; asked and
17 answered, incomplete hypothetical.
18 A. I can't give a yes or no answer to that for
19 the simple reason that I'm not sure of the extent to
20 which that's true or the extent of any error that
21 might have been introduced.
22 Q. All right, let's put it another way. Would
23 you have done anything different if defense counsel
24 had represented to you that that was how Ms. Minton
25 arrived at her potential?

128

1      MS. KYROUZ: Same objections.
2 A. Again, it would depend on how far off I
3 thought that was from the process. I mean there's
4 no simple yes or no answer. Ultimately, my opinion
5 is a zero one, do I think the guidance is reasonable
6 or not. You're asking me a continuous, not a
7 discrete question, and it doesn't necessarily map.
8      MR. SOLOMON: Let's have marked as the
9 next exhibit the declaration -- the affidavit
10 of Ray Lane.
11      (Affidavit of Raymond Lane sworn to
12 April 10, 2003, no Bates numbers, marked
13 Hubbard Exhibit 2 for identification, as of
14 this date.)
15      MR. SOLOMON: Now, Ms. Kyrouz,
16 defendants have never produced this document
17 to us. In fact, we've been told throughout
18 the years that you don't really know what
19 we're talking about when we've asked for this
20 document.
21      Do you have any explanation as to why
22 this has never been produced?
23      MS. KYROUZ: I don't know whether your
24 representations are accurate or not so I'm
25 happy to take up later with you.

129

1    Obviously this is the first I'm
2    hearing of your question.
3    BY MR. SOLOMON::
4    Q.   So this is an affidavit by Ray Lane.
5    Do you see this?
6    A.   Yes, sir.
7    Q.   And is this the document you think you may
8    have seen but you can't recall the contents of?
9    A.   I can't recall, it was something from Ray
10   Lane, so...
11   Q.   Have you at any time taken the time to read
12   this affidavit from the beginning to the end?
13   MS. KYROUZ:  Objection; asked and
14   answered.
15   A.   Yeah, I don't, don't recall giving it so
16   careful a scrutiny, just that I saw it.
17   Q.   Have you ever heard of the company Booz Allen
18   Hamilton?
19   A.   Yes, sir.
20   Q.   What is that entity?
21   A.   They're a management consulting firm,
22   everything from strategic consulting to operations,
23   implementation.
24   Q.   Are they respectable?
25   A.   Yes, sir.

130

1    I write a column in their magazine.
2    Q.   I'm looking at the second page.
3    A.   Yes, sir.
4    Q.   At paragraph 9, Mr. Lane says in part the
5    following, "To accurately assess the license revenue
6    and the direction of the license revenue business,
7    Covisint's results should have been backed out of
8    the December revenue actuals."
9    Do you see that?
10   A.   Yes, sir.
11   Q.   Do you agree with that?
12   A.   You're asking me do I agree with the first
13   sentence?
14   Q.   Yes.
15   A.   Well, the first thing isn't a sentence, I'm
16   not sure what it is but -- is that a comma?  You're
17   asking me do I agree that Covisint's results should
18   have been backed out of the December?
19   Q.   Yes.  In the forecasting process.
20   A.   Well, that's asking me for knowledge about
21   the timing of that transaction.
22   Q.   Okay, okay.
23   Let's go on a little bit further.
24   "Except for the technical timing of the
25   booking of the revenues, the Covisint deal was not a

131

1    Q3 deal, and was not indicative of the business at
2    the time or relevant in assessing its prospects
3    going forward."
4    Do you see that?
5    A.   I do.
6    Q.   Were you aware of a view, prior to today,
7    that Covisint was not a Q3 deal?
8    MS. KYROUZ:  Objection; vague.
9    A.   I think we've discussed this, this is
10   Mr. Lane's view.  You yourself asked me a line of
11   inquiry what if we excluded Covisint and we've
12   already talked about a world without Covisint, so
13   this statement adds nothing to that conversation.
14   Q.   And the world without Covisint was still a
15   good world, as far as you're concerned, right?
16   A.   It may well have given four of the previous
17   six quarters I believe was our discussion.
18   Q.   Have you looked at what is called the comfort
19   gap?
20   A.   I'm sorry?
21   Q.   The comfort gap.  Do you know what that is?
22   A.   I don't recall that term.
23   Q.   Have you opined on -- strike that.
24   Go to page 3.
25   A.   Yes, sir.

132

1    Q.   Paragraph 11, "The most important gauges of
2    the company's business and its prospects were actual
3    performance data, including license revenue and
4    pipeline data, combined with realtime interface with
5    the division heads regarding their sales."
6    Do you see that?
7    A.   Yes, sir.
8    Q.   Is that consistent with your understanding of
9    the most important gauges of the company's business
10   and prospects?
11   MS. KYROUZ:  Objection; vague.
12   A.   It's very loosely worded.  You know, I would
13   think that if prospects is in your area that you're
14   trying to define importance, you might want to have
15   some forecasts for your sector for the economy but
16   certainly these would be among factors that would be
17   important, if that's what you're asking.
18   Q.   Okay.
19   Then he goes on to say, "These were the
20   gauges Larry Ellison and I routinely relied on in
21   assessing the company, both on an intraquarter basis
22   and going forward."
23   Do you see that?
24   A.   Yes, that's simply consistent with looking at
25   the upside reports would have conveyed that

133

1   information.
2   Q.  Okay.
3      And you say simply looking at the upside
4   reports.  That would be looking at the "actual
5   performance data, including license revenue and
6   pipeline data, combined with realtime interface with
7   the division heads regarding their sales"?
8   A.  Yes, sir, because the interface is occurring,
9   you know, as part of that process.
10   Q.  Okay.
11      And then he goes on to say, "The fact that,
12   absent Covisint, the USD license revenue growth rate
13   for December 2000 over December 1999 was flat, as
14   reflected in the Garnick e-mail, was a red flag
15   indicating softening in the license business."
16      Do you see that?
17   A.  Yes, sir I see that.
18   Q.  And do you have any reason to dispute that?
19   A.  Yes.  We've discussed this earlier this
20   morning.  These deals are lumpy, this happens to be
21   the largest but there are lumpy deals from time to
22   time and the question is, you know, is this one that
23   Oracle is going to pull out relative to their
24   experience and having done it in the past.  So I --
25   factually, Covisint is a big deal but whether it's a

134

1   red flag is -- requires much more inference than
2   Mr. Lane seems to have provided here.
3   Q.  The next paragraph reads, "In assessing the
4   trend for the quarter and thereafter, analysts would
5   have been interested in the fact the license revenue
6   growth absent Covisint was flat on a year-over-year
7   comparative basis."
8      Do you see that?
9   A.  Yes, it's essentially a restatement of the
10   previous sentence, yes.
11   Q.  And the next paragraph talks about additional
12   red flags and it talks about Ms. Minton lowering her
13   upside.
14      Do you see that?
15   A.  Yes, I see this is evidence that Ms. Minton
16   is actually reacting to things and moving her
17   upside.  That's, as I said to you, she does that
18   within a quarter.
19   Q.  Okay.
20      And, in fact, the upside was reduced in
21   January on a number of occasions, correct?
22   A.  Yes.  I believe she sort of steadily reduced
23   it at that point.
24   Q.  If you go to paragraph 14 on page 4, it
25   starts with the following language, "Pipeline data

135

1   included in Q301 upside reports provided another
2   indication of weakening in the license business.  In
3   evaluating Oracle's intraquarter revenue figures, it
4   was understood by Oracle's senior management that
5   the closer the relationship between the average of
6   the forecasted growth and potential growth figures
7   ('average forecasted growth') on the one hand and
8   the pipeline growth figures on the other hand, the
9   less comfort there would be that the forecasted
10   growth figures would actually be met."
11      Do you see that?
12   A.  I see that.
13   Q.  And that's known as the comfort gap?  Do you
14   recognize it as such?
15   A.  That's what he calls it, yes, uh-huh.
16   Q.  And do you agree with that statement?
17   A.  As a statistical matter, it needn't be true.
18   Suppose I told you there are two series, one
19   correlation of two variables I know with perfect
20   certainty and the other is subject to some
21   uncertainty, one could be quite close, indeed
22   identical, and I could be confident, and the other
23   not.  So, again, I'd need to know something about
24   certainty in the environment.
25   Q.  If you go below the chart --

136

1   A.  Uh-huh.
2   Q.  -- he says, "At the beginning of Q301 there
3   was a 'comfort gap' of 22 percent, but that gap
4   narrowed on December 25 to 4 percent and remained
5   between 3 and 6 percent in January of 2001."
6      Do you see that?
7   A.  Yes, I see that.
8   Q.  Is that indicative of negative trends
9   affecting Oracle's business?
10      MS. KYROUZ:  Objection; vague.
11   A.  I don't know how I could infer that.  What I
12   can say is my recollection of what Ms. Minton did,
13   which was to continue to reduce her upside so that
14   she is taking into account that information,
15   whatever coloration we want to put on it.
16   Q.  How is she reducing her upside mechanically,
17   how does that happen?
18      MS. KYROUZ:  Objection; vague.
19   A.  My understanding is it's judgmental.
20   Q.  You've never spoken to her about why she
21   reduced her upside or how she went about it,
22   correct?
23   A.  I have not personally spoken to her, this is
24   from her deposition testimony.
25   Q.  And in her deposition, does she explain how

137

1 she goes about reducing the upside?

2 A.   She talked about a series of judgment, of

3 conversations, of the processes essentially that she

4 would go through.  Again, she starts the quarter I

5 think somewhere like 2.7 cents and, you know,

6 shrinks during the quarter quite substantially.

7 Q.   He goes on to say, "On December 25, 2000 and

8 January 22, 2001, the projected 'potential growth'

9 percentage was actually higher than the pipeline

10 growth percentage, an event that should only happen,

11 if at all, during the last two or three weeks of a

12 quarter when the 'potential growth' figures can be

13 more accurately predicted."

14       Do you see that?

15 A.   I see that.

16 Q.   Do you agree with that?

17 A.   There's no way -- I haven't done any of these

18 calculations.  I'm accepting Mr. Lane's arithmetic

19 as well as his coloration to answer a question like

20 that.  Again, we know Ms. Minton is reducing her own

21 upside during that period, so she's clearly taking

22 into account that something seems to be

23 deteriorating for her but I can't verify these

24 unless I were to do his math.

25 Q.   It goes on to say, "The narrow gap starting

138

1 on December 25, 2000 and throughout January 2001

2 indicated an increased difficulty in meeting

3 Oracle's forecasted revenue."

4       Do you agree with that statement?

5 A.   Well, that would require me doing his math.

6 I do, however, do my own math in my report that

7 shows up until roughly, memory, last two, two and a

8 half weeks, you're within the bounds and then yes,

9 in that last part there is a disagreement.

10 Q.   I'm looking at paragraph 17.  And halfway

11 into that paragraph it says, "Nussbaum was

12 consistently aggressive in his forecasts, and was

13 viewed as such by Henley and me.  This level of

14 judgment," referring to a $91 million level of

15 judgment, "combined with the forecasts' reliance on

16 large deals, in particular a prospective Bell South

17 deal, and the historical aggressiveness of this

18 division head's forecasts, calls into question the

19 reliability of the $225 million forecast."

20       Have you seen that sentence before?

21 A.   I don't recall.

22 Q.   And do you have a view as to its accuracy?

23 A.   Well, this is clearly Mr. Lane's opinion.

24 OSI, which is the service part, we know through the

25 lens of the hindsight through which he's looking in

139

1 April of 2003 that telecommunications that were part

2 of that OSI sector fared worse than manufacturing,

3 which was an OPI, we know that with the lens of

4 hindsight.  To say this he would have to believe

5 that the field forecasts in realtime were

6 systematically flawed.  I have no basis for

7 believing that that's the case.  This is his view

8 and unsubstantiated at that.

9 Q.   And you say it's unsubstantiated because he

10 had left the company by then; is that the reason

11 you're saying that?

12 A.   No, I see no evidence.  He simply --

13 historical aggressiveness, I don't see any

14 statistical analysis.  Level of judgment, ex post

15 forecasting.  He --

16 Q.   He would know that because he was an insider

17 and you wouldn't; is that fair?

18 A.   I'm sorry, the lens of hindsight are

19 available to all of us.  We can all be outstanding

20 two years after the fact.

21 Q.   But I'm talking about his experience with

22 Mr. Nussbaum when he worked with him, you agree that

23 he would have insights into Mr. Nussbaum's habits

24 that would be --

25 A.   What I'm expressing doubt is that he has

140

1 unique insights.  This process aggregated

2 information from the sales reps, from their

3 managers, up through the firm so to believe what

4 you're saying, that there's some unique insight that

5 Mr. Lane has, that's not obvious and certainly not

6 substantiated here.

7 Q.   And you notice that this is a sworn

8 affidavit?

9 A.   I see that.

10 Q.   And you have no reason to believe that

11 Mr. Lane is deliberately telling untruths in this

12 declaration, do you?

13 A.   I can certainly say that these could well be

14 Mr. Lane's opinions, that's what he's swearing.

15 Q.   And, again, you have not spoken to anybody at

16 the company concerning the forecasting process, your

17 knowledge is derived solely from the documents that

18 you've listed that you've relied upon; is that

19 correct?

20 A.   That's correct.

21       MR. SOLOMON:  Let's take a break, five

22 minutes, and then we'll finish up.

23       THE VIDEOGRAPHER:  Off the record,

24 12:31.

25       (Recess taken)

141

```
 1        THE VIDEOGRAPHER:  Returning to the
 2     record, 12:37 p.m.
 3     BY MR. SOLOMON::
 4     Q.   Okay.  Now, I know, Mr. Hubbard, that we all
 5     have the benefit of hindsight now, but I want to
 6     just see if I can go back to the comparable fiscal
 7     periods or supposedly comparable fiscal periods Q3
 8     '01 and Q3 '00.
 9     A.   Yes, sir.
10     Q.   And sitting here today, just with respect to
11     the application of conversion ratios, was Q -- was
12     fiscal 3 '00 an appropriate quarter in which to
13     conduct comparables with Q3 '01?
14        MS. KYROUZ:  Objection; vague.
15     A.   I think we've also talked about it this
16     morning.  You know, to -- any check with a previous
17     quarter is always going to be subject to some risk,
18     if you've had any change in your product or
19     whatever, but it is still a check one might want to
20     do.  I have no reason to suggest that it's prima
21     facie unreasonable.  In the report I gave you sort
22     of pipeline factors by quarter so you could see
23     where the '01 quarter fit into usual patterns.
24     Q.   I'm just trying to really limit your answer
25     to the precise question and that is, and I'm not
```

142

```
 1     even at the moment trying to take you back to Q3 '01
 2     as if you were making the judgment then, I'm asking
 3     now, when you sit here and look at it now, was it
 4     appropriate to use FY '00 comps to use as a
 5     comparison with fiscal 3 '01?
 6        MS. KYROUZ:  Objection; vague.
 7     A.   Well, I think I've already said it's a check,
 8     it is still something you'd want to do as an input
 9     into this kind of a process, so I -- same answer --
10     same question, same answer.
11     Q.   Okay, what if it wasn't a check, what if this
12     is what Ms. Minton used to get at her potential,
13     would using fiscal 3 '00 to compare with fiscal 3
14     '01 be appropriate?
15        MS. KYROUZ:  Objection; asked and
16        answered, incomplete hypothetical.
17     A.   I answered that in theory and in practice,
18     and I'll repeat what I said.  It is not my
19     understanding at all what Ms. Minton did, and as a
20     matter of statistical practice, it would depend how
21     far off you were doing in doing that, you could do
22     that in error and still not affect things very much.
23     But the bottom line, the more important conceptual
24     point, is it's not what she did, Dr. Goedde asserts
25     it but it doesn't make it so.
```

143

```
 1     Q.   And the basis for you saying that's not what
 2     she did is what?  What it is you've listed that
 3     you've relied upon?
 4        MS. KYROUZ:  Same objections.
 5     A.   Same thing, looking at the numbers, looking
 6     at what Ms. Minton said, and noticing the errors in
 7     Dr. Goedde's calculations.
 8     Q.   How many hours have you devoted to this case
 9     so far?
10     A.   I would guess a little over a hundred.
11     Q.   And your rate is a thousand dollars an hour?
12     A.   Yes, sir.
13     Q.   Do you know until Dr. Foster came along you
14     won the prize but I think he's now beating you at
15     1,100?
16     A.   That's great.  It's a wonderful country.
17     Q.   Do you plan on devoting many more hours to
18     the case?
19     A.   That depends on what happens obviously from
20     Dr. Goedde's deposition, whether the case goes to
21     trial.
22     Q.   Do you plan on attending the trial and giving
23     testimony if you're adjudged to be sufficiently
24     expert?
25     A.   If I'm adjudged to be sufficiently expert and
```

144

```
 1     asked to do it, yes, I will be there.
 2     Q.   Then in the meantime, I have no further
 3     questions.  Thank you very much.
 4     A.   Great, thank you.
 5        MS. KYROUZ:  Okay.
 6        THE WITNESS:  Going off the record,
 7        12:41 p.m.  End of today's questioning.
 8        (Time noted:  12:41 p.m.)
 9
10        _____
11             R. GLENN HUBBARD
12
13     Signed and subscribed to before me
14     this_____day of_____, 2007.
15        _____
16        Notary Public
17
18
19
20
21
22
23
24
25
26
27
```

Hubbard, R. Glenn  7/3/2007  8:20:00 AM

145

1      C E R T I F I C A T E

2

3          I, ANDREW WALKER, a Registered

4    Professional Reporter and Notary Public, do hereby

5    certify:

6          I reported the proceedings in the

7    within-entitled matter, and that the within

8    transcript is a true record of such proceedings.

9          I further certify that I am not related,

10   by blood or marriage, to any of the parties in

11   this matter and that I am in no way interested in

12   the outcome of this matter.

13          IN WITNESS WHEREOF, I have

14   hereunto set my hand this_____day

15   of_____, 2007.

16

17          _____

18          ANDREW WALKER, RPR

19

20

21

22

23

24

25

26

146

1      I N D E X

2      E X H I B I T S

3                    FOR

4    HUBBARD                    IDENT

5

6    1      Expert report of R.    7

7          Glenn Hubbard dated

8          May 25, 2007, no

9          Bates numbers

10

11   2      Affidavit of        129

12          Raymond Lane sworn

13          to April 10, 2003,

14          no Bates numbers

15

16

17          MOTIONS TO STRIKE

18          Pages:   85, 88

19

20

21

22

23

24

25

26

27

28

29

30

147

1                ERRATA SHEET

2    PAGE/LINE          CORRECTION

3    _____    _____

4    _____    _____

5    _____    _____

6    _____    _____

7    _____    _____

8    _____    _____

9    _____    _____

10   _____    _____

11   _____    _____

12   _____    _____

13   _____    _____

14   _____    _____

15   _____    _____

16   _____    _____

17   _____    _____

18   _____    _____

19   _____    _____

20   _____    _____

21   _____    _____

22   _____    _____

23   _____    _____

24   _____    _____

25   _____    _____

26   _____    _____

27   _____    _____

28   _____    _____

29   _____    _____

30   _____    _____

31   _____    _____

32   _____    _____

33   _____    _____

34   _____    _____

35   _____    _____

36   _____    _____

37   _____    _____

38   _____    _____

39   _____    _____

40   _____    _____

41   _____    _____

42   _____    _____

43   _____    _____

44   _____    _____

45   _____    _____

46   _____    _____

47   _____    _____

145

```
 1               C E R T I F I C A T E

 2

 3          I, ANDREW WALKER, a Registered

 4   Professional Reporter and Notary Public, do hereby

 5   certify:

 6          I reported the proceedings in the

 7   within-entitled matter, and that the within

 8   transcript is a true record of such proceedings.

 9          I further certify that I am not related,

10   by blood or marriage, to any of the parties in

11   this matter and that I am in no way interested in

12   the outcome of this matter.

13          IN WITNESS WHEREOF, I have

14   hereunto set my hand this____6____day

15   of____July____, 2007.

16

17          _____Andrew Walker_____

                     ANDREW WALKER, RPR

18

19

20

21

22

23

24

25
```