# EXHIBIT H

1

1   IN THE UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF CALIFORNIA
3
4   In re ORACLE CORPORATION
    SECURITIES LITIGATION,
5
6   vs.         Master File No.: C-01-0988-MJJ
7   This Document Relates To:,
8   ALL ACTIONS.
9   _____/
10
11          ---o0o---
12          CONFIDENTIAL
13      DEPOSITION OF JEFFREY HENLEY
14      Thursday, July 27, 2006
15      VOLUME I, Pages 1 - 227
16          ---o0o---
17
18      SHEILA CHASE & ASSOCIATES
            REPORTING FOR
19      LiveNote World Service
        221 Main Street, Suite 1250
20      San Francisco, California 94105
        Phone: (415) 321-2311
21      Fax: (415) 321-2301
22
23   Reported by
    APRIL DAWN HEVEROH, CSR
24   CSR No. 8759
25

2

1          I N D E X
2      INDEX OF EXAMINATION
                            PAGE
3   EXAMINATION BY MR. SOLOMON          8
4          ---o0o---
5
6      INDEX OF EXHIBITS
7   EXHIBIT    DESCRIPTION        PAGE
8   Exhibit 1  E-mail from Stephanie Aas to Jeff Henley   15
        Bates stamped NDCA-ORCL 031608, 2 pages
9
10  Exhibit 2  E-mail string Bates stamped NDCA-ORCL    19
        020544 to 020547, 4 pages
11
    Exhibit 3  E-mail string Bates stamped NDCA-ORCL    21
12      025764 to 025767, 4 pages
13  Exhibit 4  E-mail string Bates stamped NDCA-ORCL    24
        013731 to 013734, 4 pages
14
    Exhibit 5  E-mail string Bates stamped NDCA-ORCL    28
15      021388 to 021390, 3 pages
16  Exhibit 6  E-mail string Bates stamped NDCA-ORCL    38
        025770 to 025771, 3 pages
17
    Exhibit 7  E-mail from Jeff Henley to Henley, Jeffrey  44
18      Bates stamped ORCL 0045275, one page
19  Exhibit 8  E-mail string Bates stamped NDCA-ORCL    50
        039324 to 039328, 5 pages
20
    Exhibit 9  E-mail string Bates stamped NDCA-ORCL    55
21      617806 to 617809, 4 pages
22  Exhibit 10  Document entitled Q1 R11i Product Issues  59
        by Area, Bates stamped NDCA-ORCL 202671 to
23      202674, 4 pages
24  Exhibit 11  E-mail string Bates stamped NDCA-ORCL    64
        056045, one page
25

3

1      INDEX OF EXHIBITS (Continued)
2   EXHIBIT    DESCRIPTION        PAGE
3   Exhibit 12  E-mail string Bates stamped NDCA-ORCL   68
        039547 to 039551, 5 pages
4
    Exhibit 13  E-mail string Bates stamped NDCA-ORCL   70
5       169718 to 169720, 3 pages
6   Exhibit 14  E-mail string Bates stamped NDCA-ORCL   75
        617453 to 617462, 10 pages
7
    Exhibit 15  E-mail string Bates stamped NDCA-ORCL   80
8       018737 to 018742, 6 pages
9   Exhibit 16  E-mail string Bates stamped NDCA-ORCL   86
        101671 to 101673, 3 pages
10
    Exhibit 17  E-mail string Bates stamped NDCA-ORCL   89
11      012381 to 012383, 3 pages
12  Exhibit 18  E-mail string Bates stamped NDCA-ORCL   95
        012433 to 012438, 6 pages
13
    Exhibit 19  E-mail string Bates stamped NDCA-ORCL   98
14      061306 to 061309, 4 pages
15  Exhibit 20  E-mail string Bates stamped NDCA-ORCL   109
        175158 to 175161, 4 pages
16
    Exhibit 21  E-mail string Bates stamped NDCA-ORCL   120
17      092885 to 092889, 5 pages
18  Exhibit 22  E-mail string Bates stamped NDCA-ORCL   138
        111763 to 111765, 3 pages
19
    Exhibit 23  E-mail string Bates stamped NDCA-ORCL   139
20      059745 to 059747, 3 pages
21  Exhibit 24  Document entitled Oracle Corporation    141
        Strong Buy, Visit with Management, 3 pages
22
    Exhibit 25  E-mail string Bates stamped NDCA-ORCL   152
23      121704 to 121707, 4 pages
24  Exhibit 26  E-mail from Mark Berrenchea to Lawrence  154
        Ellison, Bates stamped NDCA-ORCL 062005,
25      one page

4

1      INDEX OF EXHIBITS (Continued)
2   EXHIBIT    DESCRIPTION        PAGE
3   Exhibit 27  E-mail from Ivgen Guner to Keith       156
        Block Bates stamped NDCA-ORCL
4       131696 to 131702, 7 pages
5   Exhibit 28  E-mail string Bates stamped NDCA-ORCL   160
        061302 to 061303, 2 pages
6
    Exhibit 29  E-mail string Bates stamped NDCA-ORCL   163
7       040638 to 040640, 3 pages
8   Exhibit 30  E-mail string Bates stamped NDCA-ORCL   173
        024862 to 024864, 3 pages
9
    Exhibit 31  Document entitled Jeff Henley          179
10      Roundtable Bates stamped NDCA-ORCL
        017069 to 017097, 28 pages
11
    Exhibit 32  E-mail string Bates stamped ORCL       187
12      0069431 to 0069432, 2 pages
13  Exhibit 33  Document dated December 14, 2000       189
        entitled Bloomberg News, 2 pages
14
    Exhibit 34  E-mail string Bates stamped NDCA-ORCL   191
15      308087 to 308088, 2 pages
16  Exhibit 35  E-mail string Bates stamped NDCA-ORCL   194
        086728 to 086729, 2 pages
17
    Exhibit 36  E-mail string Bates stamped NDCA-ORCL   194
18      610546 to 610548, 3 pages
19  Exhibit 37  E-mail string Bates stamped NDCA-ORCL   195
        056207 to 056212, 6 pages
20
    Exhibit 38  E-mail string Bates stamped NDCA-ORCL   196
21      035384 to 035387, 4 pages
22  Exhibit 39  E-mail string Bates stamped NDCA-ORCL   197
        100279 to 100284, 6 pages
23
    Exhibit 40  E-mail from Jeff Henley to Jennifer     199
24      Minton Bates stamped 097883, one page
25  Exhibit 41  E-mail string Bates stamped NDCA-ORCL   201

5

INDEX OF EXHIBITS (Continued)

EXHIBIT    DESCRIPTION    PAGE

Exhibit 42  E-mail string Bates stamped NDCA-ORCL    201
101468 to 101470, 3 pages

Exhibit 43  E-mail string Bates stamped NDCA-ORCL    203
101474 to 101476, 3 pages

Exhibit 44  E-mail string Bates stamped NDCA-ORCL    203
060383 to 060385, 3 pages

Exhibit 45  E-mail string Bates stamped NDCA-ORCL    207
078388 to 078390, 3 pages

Exhibit 46  Document entitled "Oracle's VP/CFO    208
Jeffrey Henley will discuss quarterly
Results 12/15/00, 6 pages

Exhibit 47  Transcription of conversation dated    221
December 14, 2000, Moderator:
Stephanie Aas, 33 pages

---oOo---

6

BE IT REMEMBERED that on Thursday, July 27, 2006, commencing at the hour of 9:11 A.M. thereof, at the offices of Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, 100 Pine Street, Suite 2600, San Francisco, California, before me, APRIL DAWN HEVEROH, CSR, a Certified Shorthand Reporter for the State of California, personally appeared

JEFFREY HENLEY,

called as a witness by the Plaintiffs herein, who, being by me first duly sworn, was thereupon examined and testified as hereinafter set forth.

---oOo---

Appearing as counsel on behalf of Plaintiff:

MARK SOLOMON, Esquire
STACEY KAPLAN, Esquire
LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBI
100 Pine Street, Suite 2600
San Francisco, California  94111
(415) 288-4545
marks@lerachlaw.com

Appearing as counsel on behalf of Defendant:

PETER A. WALD, Esquire
MICHELE KYROUZ, Esquire
LATHAM & WATKINS
505 Montgomery Street, Suite 1900
San Francisco, California  94111-2562
(415) 391-0600
peter.wald@lw.com

Also present: Keith Mautner, Sarah Holloway and

7

PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We're going on the record. Here marks the beginning of Videotape No. 1, Volume 2, in the deposition of Jeffrey Henley in the matter of Oracle Securities Litigation in the United States District Court, Northern District of California, Case No. C-01-0988MJJ.

Today's date is July 27th, 2006, and the time is 9:11 A.M. The video operator today is Gary Brewer representing LiveNote World Service located at 221 Main Street, Suite 1250, San Francisco, California, 94105, phone number (415) 321-2300. The court reporter is April Heveroh, reporting on behalf of LiveNote World Service.

Today's deposition is being taken on behalf of --

I'm sorry. Plaintiff?

MR. SOLOMON: Correct.

THE VIDEOGRAPHER: -- Plaintiff, and is taking place at 100 Pine Street, San Francisco, California.

Counsel, please introduce yourselves and state whom you represent.

MR. SOLOMON: Mark Solomon representing Plaintiffs.

MS. KAPLAN: Stacey Kaplan representing

8

Plaintiffs.

MS. HOLLOWAY: Sarah Holloway representing Plaintiffs.

MR. MAUTNER: Keith Mautner, also with Lerach Coughlin.

MR. WALD: Peter Wald of Latham & Watkins representing the defendants and the witness.

MS. KYROUZ: Michele Kyrouz from Latham also representing Defendants and the witness.

MR. KAHN: James Maroulis from Oracle Corporation for Defendant Oracle Corporation.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness.

(Whereupon, the witness was sworn by the Certified Shorthand Reporter.)

---oOo---

EXAMINATION BY MR. SOLOMON

---oOo---

MR. SOLOMON: Q. Good morning again, Mr. Henley.

A. Good morning.

Q. Have you been deposed before?

A. Yes.

Q. How many times?

A. Numerous. I lost track.

9

1    Q.  You're familiar with the procedures?
2    A.  Yes.
3    Q.  Have you read the complaint in this case?
4    A.  I don't recall if I ever read the complaint.
5    Q.  Okay.  Are you aware that you're a defendant
6    in this case?
7    A.  Yes.
8    Q.  Was the complaint ever made available to you,
9    do you know?
10   A.  I believe it was.  I believe it was sent to
11   me, but I'm not sure if I actually read it all.
12   Q.  Okay.  Is there a reason why you wouldn't have
13   read it all, that you can tell us?
14   A.  My recollection was it was long, that sort of
15   thing, and I just -- it's a long time ago, so I just
16   don't remember what I did or didn't read.
17   Q.  Okay.  Do you believe you have an
18   understanding of the nature of this case?
19   A.  Yes.
20   Q.  And what is that understanding?
21   A.  That there is a claim that Oracle missed its
22   quarter and knew that it was going to miss its quarter
23   well ahead of time.
24   Q.  And is that your complete understanding of the
25   nature of this case?

10

1    A.  Again, I don't know what "complete" means, so
2    I gave you my summary of what I think this is about.
3    Q.  Okay.  Do you have any understanding of what
4    the complaint says about you and your conduct?
5    A.  Again, I can't remember if I read it all, but
6    clearly, I'm one of the defendants, is the Chief
7    Financial Officer at Oracle.  The complaint asserts, I
8    guess, that I had some role in this, so --
9    Q.  Okay.  You were the Chief Financial Officer,
10   as you just mentioned, of Oracle.  When did you start as
11   Chief Financial Officer?
12   A.  I started in March of '91, 1991.
13   Q.  And you're no longer the Chief
14   Financial Officer; is that right?
15   A.  That's correct.
16   Q.  And when did you cease being the CFO?
17   A.  I believe it was two years ago in July.  So it
18   would have been July 2004.
19   Q.  Okay.  And why did you stop being the CFO?
20   A.  Basically decided that I had done this for a
21   lot of years and it was time to, you know -- you know,
22   retire, if you will, and so at that point I had agreed
23   with the company to stay on in the role as Chairman of
24   the company but give up my CFO responsibility.
25   Q.  And are you still Chairman?

11

1    A.  Yes.
2    Q.  That's Chairman of the Board?
3    A.  Yes.
4    Q.  Are you a member of any committees of the
5    board?
6    A.  There -- not the traditional financier
7    compensation.  I am a member of the executive committee.
8    There's three of us:  Larry, myself and Don Lucas, who
9    form what's called executive committee.
10   Q.  Okay.  How long has that committee been in
11   existence?
12   A.  I'm not certain.  As long as I've been at
13   Oracle, I believe.
14   Q.  Were you a member of that executive committee
15   in the year 2000 and 2001?
16   A.  Yes.
17   Q.  The years 2000 and 2001.
18       What is the function of that executive
19   committee?
20   A.  It is -- it plays a small role.  On occasion
21   it has been -- received a delegation from the board to
22   act on something on their behalf, so it was a matter of
23   expediting things and not having to get all the board
24   involved.  It meets very infrequently, and there's not
25   many matters that come before the three people.

12

1    Q.  Okay.  In 2000 and 2001 were you a member of
2    other committees of the board of directors?
3    A.  No.
4    Q.  Have you ever been a member of the finance and
5    audit committee?
6    A.  No.
7    Q.  And have you ever been a member of the
8    compensation committee?
9    A.  No.
10   Q.  In January of 2001 you exercised options and
11   sold stock; is that right?
12   A.  Yes.
13   Q.  And do you know what you realized in terms of
14   gross proceeds from those sales?
15   A.  I don't recall exactly.  I exercised stock on
16   many occasions over the time since I joined Oracle, and
17   I don't remember, exactly, any of the exact amounts.
18   Q.  Okay.  For the January one, do you have -- of
19   2001, do you have an idea, a rough idea of how much you
20   realized?
21   A.  Again, I don't know what "rough" means.
22   Q.  Well, do you know if it's 10, 20, 30 or
23   $40 million?
24   A.  I'm not sure, exactly.  I would have to go
25   back and check my records.

13

1    Q.  Do you know, in aggregate, how much over the
2  years you've realized in gross proceeds from exercising
3  options that you held in Oracle?
4    A.  No, I've never actually calculated that.
5    Q.  Is it fair to say it would be in the hundreds
6  of millions of dollars?
7    A.  Again, I don't know about hundreds, but it
8  certainly would be well over 100, I'm sure.
9    Q.  In 2002 and 2001 did you have any program in
10 place for selling stock?
11   A.  You're talking about a formal --
12   Q.  Yes, I am.
13   A.  -- 10B5 or whatever?  No, we hadn't been using
14 that at Oracle at that period of time.
15   Q.  Do you know who Jay Nussbaum is?
16   A.  Yes.
17   Q.  He left the company in late 2001; is that
18 right?
19   A.  I don't recall exactly when he left.
20   Q.  Do you know the circumstances of his
21 departure?
22   A.  I'm not sure, again, what -- I wasn't involved
23 with his dismissal, per se.  He didn't report to me.
24   Q.  Okay.  Who dismissed him?
25   A.  Larry Ellison, his boss.

14

1    Q.  Okay.  And do you know why?
2    A.  I don't know why exactly, you know.  I think
3  that Larry -- Larry would know much better than I, so --
4    Q.  Did you hear any accounts of why he was
5  dismissed?
6    A.  I think that -- yes, I heard some things,
7  sure.
8    Q.  What did you hear?
9    A.  I think Larry had lost confidence in Jay, as
10 many times this happens.  Jay had done a good job for
11 the company over the years, but at some point Larry felt
12 that we needed to make a change.
13   Q.  When you say "as happened over the years,"
14 what do you mean by that?
15   A.  In my experience in business, every company
16 I've ever worked, you know, people can do a great job at
17 a point, and it's like baseball managers, or whatever,
18 in any business.  So I think we reached a point after a
19 lot of good years with Jay that Larry felt that we
20 needed to make a change.
21   Q.  Are you aware of any investigation of
22 Mr. Nussbaum performed by the company?
23   A.  I don't recall.
24   Q.  You just don't know one way or the other
25 whether there ever was an investigation?

15

1    A.  I don't recall if there was one; right.
2    Q.  I'll have marked as the first Henley exhibit a
3  document produced by Oracle with the control numbers
4  031608 and 031609.
5        (Whereupon, Plaintiff's Exhibit 1 was marked
6        for identification.)
7        MR. SOLOMON:  Q.  And I want you to take a
8  look at this, and then let me know, once you've looked
9  at it, if you recognize it.
10       And for the record, while you're looking at
11 it, this is dated Friday, March 31, 2000, and it's from
12 Stephanie Aas to Jeff Henley.
13   A.  Okay.
14   Q.  Do you recognize it?
15   A.  Uh-huh.
16   Q.  You received this e-mail exchange or these
17 e-mail exchanges on or around Friday, March 31, 2000?
18   A.  I'm shown on here as receiving it, so I
19 probably did.
20   Q.  Okay.  And you're familiar with the E-Business
21 Suite?
22   A.  Yes.
23   Q.  You'll see that in the -- that there are
24 two exchanges.  The first is from Stephanie Aas to you,
25 and below that there's an e-mail from Oracle Worldwide

16

1  Marketing to various recipients.  Do you see that?
2    A.  Yes.
3    Q.  In the e-mail exchange between you and
4  Stephanie Aas it starts off reading, "I know.  Yesterday
5  I worked with marketing and Gary to provide Larry with
6  all of the facts before he made that decision.  It is
7  unfortunate because all the major audiences -- industry
8  analysts, financial analysts/investors, partners, OAUG
9  board -- already know about the delay.  We will lose
10 even more credibility if we go back on what is already
11 out in the market."
12       Do you see that?
13   A.  I do see that.
14   Q.  Do you have an understanding what Ms. Aas was
15 referring to when she says "we will lose even more
16 credibility"?
17   A.  I'm not sure I recall exactly what was going
18 on at the time.
19   Q.  Were you aware at the time that Oracle had
20 lost credibility?
21   A.  And this was in March 2000.  No, I don't
22 recall.
23   Q.  Okay.  Did you have a -- strike that.
24       It goes on to say, "We'll lose even more
25 credibility if we go back on what is already out in the

17

1 market."
2      Did you have a reluctance to go back on what
3 was already out in the market in or around March of
4 2000?
5      A.  I never have a reluctance to do anything but
6 what is the facts, okay?  So, you know, if facts change,
7 you get the facts out.  So, no, I don't have any
8 reluctance to say whatever is right.
9      Q.  Okay.  Do you remember having any concern
10 about this e-mail from Stephanie Aas in or around March
11 of 2000?
12      A.  I just don't recall.
13      Q.  If you go down into the second exchange, it
14 says, in part, "By May, Oracle will have released all
15 components of the world's first E-Business Suite,
16 including the complete set of CRM products.  A recent
17 report from GIGA stated otherwise.  The report is simply
18 not true."
19      Do you see that?
20      A.  Yes.
21      Q.  Do you have a recollection of the GIGA report
22 referenced here?
23      A.  No, I don't have any recollection of that
24 specific report.
25      Q.  And then going back up the e-mail you see it

18

1 says, "Jeff Henley wrote:  Larry now says that Mark was
2 wrong and that all of CRM will be available end of May."
3      Do you see that?
4      A.  Uh-huh.
5      Q.  The Larry is to Larry Ellison; is that right?
6      A.  Yes.
7      Q.  And who is the Mark reference to?
8      A.  Mark Berrenechea, who was the development head
9 for CRM.
10      Q.  And do you recall hearing Larry say that Mark
11 was wrong?
12      A.  Yes.  I think that's why I wrote this thing.
13 I'm sure this came up in a meeting, and I asked the
14 question of Larry, and Larry said this, and so I
15 passed -- I reported this.
16      Q.  Okay.  And you reported, additionally, that
17 Larry said that all CRM will be available end of May.
18 Do you see that?
19      A.  Yes, I do see that, and I'm sure what I wrote
20 here was what I heard.
21      Q.  And do you have an understanding what it
22 means, what Larry Ellison meant when he said "CRM will
23 be available end of May"?
24      A.  Yes, I think my recollection was we were
25 getting ready to launch the 11i E-Business Suite, and so

19

1 there was a question over, you know, when it would be
2 out, and then would CRM be out at the same time that the
3 ERP stuff would be out.
4      Q.  And was it?
5      A.  And was what?
6      Q.  Was CRM out at the same time as ERP?
7      A.  Ultimately, no.  Ultimately, there was a delay
8 that occurred after this point in time.
9      Q.  And what was the reason for the delay?
10      A.  I don't think it was ready, so there was a
11 decision made subsequent to this that we would go out
12 with the ERP and the CRM would follow in a few months.
13      MR. SOLOMON:  I'll have marked as the next
14 exhibit another document produced by Oracle with the
15 control numbers 020544 through 547.
16      (Whereupon, Plaintiff's Exhibit 2 was marked
17      for identification.)
18      MR. SOLOMON:  Q.  And again, I'd ask to you
19 look at it, and then the question will be:  Do you
20 recognize it?
21      And for the record, this appears to be an
22 e-mail dated the 6th of September, 2000, from Jeff
23 Henley to Stephanie Aas, or to S. Aas, with other
24 e-mails attached.
25      A.  Okay.  I've looked at this string of e-mails,

20

1 yes.
2      Q.  And do you recognize them?
3      A.  I'm not sure if I recall them all, but I
4 apparently forwarded them on to Stephanie Aas, so...
5      Q.  If you go to the third page of the document
6 you'll see at the bottom there's a reference to "Ron
7 Wohl wrote."
8      MR. WALD:  This is Bates 546, Mark?
9      MR. SOLOMON:  Correct.
10      Q.  It says, "Mary Ann has the detail.  I believe
11 the first 10 customers are running various parts of ERP.
12 I'm not sure if any are running CRM components yet."
13      Do you see that?
14      A.  Yes.
15      Q.  At this time, which appears to be around the
16 end of August of 2000, were you aware that the CRM
17 components were not ready?
18      A.  Yes.  As I testified a few minutes ago, at
19 some point, as we got closer to that summer launch, the
20 decision was made that we would wait a couple months to
21 get the CRM stuff out.
22      Q.  And were you aware, as of August 2000, as
23 reflected in the middle of this page, that there were no
24 customers live on CRM?
25      MR. WALD:  Object to the form.  Misstates the

21

1 document.
2      THE WITNESS: Again, I don't -- I don't
3 recall.
4      MR. SOLOMON: Q. If you go to the second page
5 of the document which has the control No. 20545, it
6 says, in part in the middle, "This past weekend we had
7 three more 11i go-lives bringing us up to 15."
8      Do you see that?
9      A. Yes, I do.
10      Q. And you were aware at the time that the 15
11 referenced here as going live were ERP and not CRM?
12      A. I'm aware from reading this document?
13      Q. No, were you aware at the time?
14      A. Again, I was aware that in the middle of
15 summer before we went live the decision was made to wait
16 several months to start releasing CRM. So...
17      Q. We'll have marked as the next exhibit a
18 document produced by Oracle with the control numbers
19 025764 to 767.
20      (Whereupon, Plaintiff's Exhibit 3 was marked
21      for identification.)
22      MR. SOLOMON: Q. And again, if you can take a
23 look at it, and then the question will be: Do you
24 recognize it?
25      And while you're looking at it, it's an e-mail

22

1 from Jeff Henley dated the 14th of September, 2000, to
2 J. Minton and S. Aas, and it attaches other e-mails.
3      A. Do you want me to read all of it? What would
4 you like me --
5      Q. Just let me know if you recognize it, whether
6 you need to read it all or not to tell me that --
7      A. I don't recall particularly, but again, it's
8 from me to two of my folks in my organization passing on
9 information, so I'm sure I must have received it.
10      Q. Okay. Do you know what the AMR summit refers
11 to in this document? If you look at the second page of
12 the document at the bottom.
13      A. I know who AMR is. I don't recognize the
14 so-called AMR Summit.
15      Q. And who is AMR?
16      A. They're a research firm that covers the
17 enterprise software market.
18      Q. You'll see at the bottom of the second page it
19 says, "Peggy Menconi published this very favorable note
20 as a result of the briefings she received at the AMR
21 Summit a couple of weeks ago."
22      Do you see that?
23      A. Yes, I do.
24      Q. Do you know anything about the briefings
25 referenced there?

23

1      A. I don't recall that I knew anything about --
2 it's not typical I would sit in these briefings.
3      Q. So you would occasionally, but not typical; is
4 that correct?
5      A. Sometimes I met people from AMR, but very
6 infrequently. Generally, the technical people met with
7 the product people and described their product in great
8 detail.
9      Q. Do you have any belief one way or another
10 whether you participated in the briefing --
11      A. I don't recall whether I did or not.
12      Q. You'll see on the second page, the last
13 paragraph of the second page, which is 25766, it starts
14 off saying, "This level of CRM permeates through Oracle
15 11i, seamlessly blending enterprise-wide information."
16      Do you see that?
17      A. Is it down --
18      Q. It's the very last paragraph on the second
19 page. The first sentence of the last paragraph.
20      A. Yes, I do see that.
21      Q. Okay. As of September 2000, is it true that
22 the level of CRM referenced here permeated throughout
23 Oracle 11i seamlessly?
24      MR. WALD: Object to the form. Lacks
25 foundation.

24

1      THE WITNESS: Yes, and I'm not sure what's
2 meant by that term. I'm not -- we had a design
3 philosophy which was well communicated to the market of
4 having a so-called integrated suite with a common data
5 model, a common development tool methodology and so
6 forth, so the idea of this integration was just that.
7      MR. SOLOMON: Q. And as of September 2000,
8 did Oracle's 11i seamlessly blend enterprise-wide
9 information?
10      MR. WALD: Object to the form. Same
11 objection.
12      THE WITNESS: Again, I -- I don't -- again, I
13 don't know what she means by this. We clearly had a
14 design objective, and that's what we were working to.
15 At any point in time it's always a work in progress,
16 so --
17      MR. SOLOMON: Okay. I'll have marked as the
18 next exhibit another document produced by Oracle with
19 the control numbers 013731 to 34.
20      (Whereupon, Plaintiff's Exhibit 4 was marked
21      for identification.)
22      MR. SOLOMON: Q. For the record, this starts
23 with an e-mail dated Thursday, November 9th, 2000, from
24 Jay Nussbaum to Charles Kendig and Ronald Police, and
25 below that are further addressees, including Jeff

25

1  Henley.  And again, the question is going to be if you
2  just take a look at it and let me know if you recognize
3  it, first of all.
4      A.  Again, I don't recall specifically, but I was
5  copied.  I'm sure I received it.
6      Q.  Okay.  You'll see there are escalations
7  referred to.  Do you know what an escalation is?
8      A.  Yes.
9      Q.  What's an escalation?
10     A.  This is typically when a customer has a
11  problem and it is escalated, if you will, into Oracle at
12  some point, and then there are several levels that it
13  could be -- it could be escalated within the
14  organization to get to the point where somebody can
15  solve the problem for the customer.
16     Q.  Okay.  So if you go to the last page of the
17  exhibit, which is 13734, you'll see, under the heading
18  "Escalation Edition/Removal", there are references to
19  customers with escalation issues.
20         Do you see that?
21     A.  Yes.
22     Q.  And you were aware at the time of these
23  escalation issues with these customers; is that right?
24     MR. WALD:  Was the witness personally aware?
25     MR. SOLOMON:  Q.  Correct.

26

1      A.  Again, I don't recall.  Many of the
2  escalations at Oracle I would never be aware of, but
3  whether I knew of something with these, I just don't
4  know.
5      Q.  If you look at the second from last page at
6  the heading "Special Report", you'll see that there are
7  numerous customers mentioned under that heading.
8         Do you see that?
9      A.  Under the "Special Report"?
10     Q.  Yes.
11     A.  I see there's, apparently, five customers
12  mentioned here, yes.
13     Q.  And you don't dispute that around the time of
14  November 2000, that this information was provided to
15  you; is that right?
16     A.  It apparently was.  I was shown as a copy, so
17  I don't dispute that.
18     Q.  Okay.  And that would be the same for, if
19  you'd look to the second page of the exhibit under the
20  heading "Current Hot Escalation", and it's the number 8,
21  and then a number of customers are referenced under that
22  heading.  You don't dispute that in November of 2000 you
23  were made aware of those escalations?
24     A.  No.  Again, I apparently got this.  I've
25  gotten escalation -- various escalation reports

27

1  periodically over all the years that I've been at
2  Oracle.  We have thousands of customers, and there's
3  always some degree of escalated problems.
4      Q.  Okay.  Was the degree of escalated problems
5  associated with 11i any different from escalations of
6  other products in your experience at Oracle?
7      A.  I think it's fair to say that because it was a
8  major, major new release, that there was a lot of
9  changes, and in the early stages there was -- because
10  there was so many modules involved, there were a larger
11  amount of issues, again because there were so many new
12  products, and so a customer may have a problem with
13  one module out of 20, but that's still a problem.  So,
14  yeah, I think we had a lot of shaking out, if you will,
15  of the product in the early stages, which is to be
16  expected any time you undertake a major new change like
17  we did here.
18     Q.  Was the product released too early to
19  customers?
20     A.  I have no basis to make a judgment.
21     Q.  What would you need to have a basis to make
22  that judgment?
23     A.  Well, it's a competitive market, and there's
24  always the question of should you wait longer.  The
25  longer you wait in any product, the more mature; the

28

1  more you're going to shake out issues with the product.
2  So the flip side is the sooner you get the product in
3  the hands of a lot of customers, the quicker you'll get
4  to the root of the problems and get the problems
5  resolved and the product will mature.  So that's always
6  the judgment call that you have to make whenever you
7  issue, you know, any new releases, and this was a major
8  release.  We well understood that, and I think the
9  market understood.  It was a very ambitious project.
10     Q.  Were you concerned about the price of Oracle
11  stock in or around November of 2000?
12     MR. WALD:  Object to the form.  Vague and
13  ambiguous.
14     THE WITNESS:  I don't recall.  I really don't
15  recall what my concerns -- I'm not sure I've ever been
16  concerned about our stock.  I mean, my view is the stock
17  is what it is.  I concern myself a lot about trying to,
18  you know, improve the company, make things better and
19  that sort of thing, but I long ago realized that there's
20  not much I can do about the stock, other than try to
21  make the company perform better.
22     MR. SOLOMON:  Q.  Okay.  I'll have marked as
23  the next exhibit another document produced by Oracle
24  with the control No. 021388 through 390.
25         (Whereupon, Plaintiff's Exhibit 5 was marked

29

1     for identification.)
2        MR. SOLOMON:  Q.  For the record, the first
3  page has an e-mail from Mike Rosser to Stephanie Aas,
4  and then also an exchange between Jeff Henley and
5  Stephanie Aas, and below that an exchange among Mark
6  Berrenechea, Larry Ellison, Safra Catz and Jeff Henley.
7        And the question is:  Do you recognize this?
8     A.  Again, I don't recall that I specifically have
9  it. I'm shown on here, so I'm sure I got it and passed
10  it on, as is shown here, to Stephanie Aas.
11     Q.  Okay.  And on the first page halfway down is
12  an e-mail exchange dated December 4, 2000, and that's
13  the one from Mark Berrenechea to you, among others.
14     A.  Uh-huh.
15     Q.  It says, "Do not forward."
16        Do you know what that refers to?
17     A.  I don't.  I really don't know exactly.
18  Obviously --
19        I'm not going to speculate.  I don't know why.
20     Q.  Okay.  Did you often get e-mails that said "Do
21  not forward"?
22     A.  I don't know.  I don't recall getting a lot of
23  them, but again, I don't remember how many I would have
24  gotten that said "Do not forward".
25     Q.  You don't recall wondering why Mark

30

1  Berrenechea wouldn't want the information contained in
2  that e-mail forwarded?
3        MR. WALD:  Forwarded beyond Mr. Ellison,
4  Ms. Catz and Mr. --
5        MR. SOLOMON:  Correct.
6        THE WITNESS:  It's financial information, I
7  suppose.  It's sensitive, that sort of thing, and, of
8  course, I forwarded it to Stephanie Aas, who runs
9  industrial relations.  She's very aware of the
10  sensitivity of the information.  And she forwarded it to
11  Mike Roster who works for Mark and is totally aware of
12  the information, as well.
13        MR. SOLOMON:  Q.  Okay.  If you look at the
14  second page, looking a third of the way down there's a
15  reference to "TOP Apologies".  Do you know what "T-O-P
16  Apologies" is?
17     A.  No.
18     Q.  Okay.  You don't know what it refers to?
19     A.  No.
20     Q.  And in parentheses there's a reference "Pushed
21  to Q3."  What does that mean, do you know?
22     A.  My assumption is that it means these things
23  were -- didn't happen in a quarter, but they're still
24  out there and being worked on.
25     Q.  And when you say "didn't happen," you mean the

31

1  deals weren't consummated?
2     A.  Yeah, that's typically what "pushed" means
3  when deals -- there's been no decision.  And so we're
4  still working on them, but they're not going to happen
5  as quickly as was originally forecasted.
6        MR. WALD:  And for the record, Mark, I don't
7  think it came out right in the transcript.  The actual
8  language on page 389 is "pushed", P-U-S-H-E-D, "to Q3."
9  On the transcript it says "push", P-U-S-H.
10        MR. SOLOMON:  Okay.  Thank you.
11     Q.  Again, there's a reference to a number of
12  customers.
13        Do you recall the customers reference there,
14  having deals pushed to Q3?
15     A.  No, not particularly.  I mean, these,
16  apparently, were CRM deals, so no, I --
17     Q.  Okay.  You said that these were apparently CRM
18  deals, so I don't understand --
19     A.  Because Mark Berrenechea ran -- as I testified
20  earlier, was the product development guy for CRM, so he
21  would clearly be talking about transactions he was
22  involved in relating to CRM.  That's my assumption here.
23     Q.  Right, but just because he was involved in
24  those transactions wouldn't mean that you would not be
25  aware; is that --

32

1     A.  That I would not be aware?
2     Q.  That you would not be aware.
3     A.  I agree.  In looking at the list, I do see the
4  name Bell South.  That would be the only one where I did
5  remember hearing about Bell South.  Whether I heard
6  about it before or after this, I don't recall.
7     Q.  What did you hear about Bell South?
8     A.  That it was a large CRM opportunity that we
9  were working on, but I don't recall whether I heard
10  about it because of this or at a management meeting or
11  something.
12     Q.  Okay.  And as the CFO, you would have been
13  familiar, would you not, with any financial issues
14  surrounding the Bell South transaction; is that right?
15        MR. WALD:  Object to the form.
16        THE WITNESS:  No, it's not correct.  There's
17  many, many negotiations and things involved with a
18  variety of customers that I would know nothing about.
19        MR. SOLOMON:  Q.  Let me put it another way.
20  Did you hear of any financial issues surrounding the
21  Bell South transaction?
22     A.  I don't know what "financial issues" means,
23  what that term means.
24     Q.  You're the Chief Financial Officer, right?  Or
25  you were.

33

1     A. I rarely -- I was. I never got involved with
2 negotiating contracts, so I don't know what you mean
3 with "financial issues". So I don't know if you're
4 talking about price negotiations or concessions or -- I
5 don't know what you're speaking to when you say
6 "financial issues".
7     Q. Do you recall ever having any concern with
8 respect to the Bell South transaction?
9     MR. WALD: Object to the form. Vague and
10 ambiguous.
11     MR. SOLOMON: Q. Well, do you not know what
12 "concern" means?
13     A. Well, concerns, I remember that we ultimately
14 won the Bell South CRM contract. We also had a variety
15 of other things we had done with Bell South over the
16 years, and I remember that we had them come and make a
17 presentation at our analyst day. I'm sure all this
18 happened after we won the contract. And there were --
19 it was a very ambitious, early stage contract, and we
20 made all kinds of financial concessions and threw in all
21 kinds of consulting, which was reported in our
22 management meetings, and Jay Nussbaum, you mentioned
23 earlier, was involved with the contract. So I was aware
24 at the periphery that Jay was spending a lot of money
25 and all that sort of thing to try to make the project

34

1 work.
2     Q. Did you ever tell the investors that?
3     A. I don't -- I don't believe I ever got into the
4 details of individual deals because no individual deal
5 is big enough to matter to Oracle. So no, I don't think
6 I ever got in to telling an investor about that.
7     As I testified just a few minutes ago, we
8 actually brought -- my recollection was we brought the
9 fellow who ran that division that brought the CRM
10 product to analyst day, and he talked about the product,
11 and he talked about the challenges and the fact that we
12 were, you know, together jointly trying to make this
13 product successful and so forth. So we did give them --
14 let them ask him questions and so forth. So we
15 definitely showcased, if you will, Bell South, and
16 certainly he didn't hide the fact that we were having
17 issues getting the functionality to the point that it
18 was usable for him.
19     Q. And what did you tell the analysts about the
20 concessions that were being granted to Bell South?
21     A. I told him nothing. I never told any
22 customers about -- any analysts about any particular
23 customer pricing or concessions or whatever we've done.
24     Q. Okay. If you look at the second page still,
25 021389, at the bottom of the page there's a heading

35

1 "Special Highlights", and it says, "OSI, we missed Bell
2 South, but the convertible Q3 pipeline looks great."
3     Do you see that?
4     A. I do see that.
5     Q. And that's reflecting, is it, that the Bell
6 South deal didn't close in Q2 of '01?
7     A. I believe that is because I do -- my
8 recollection is we ultimately did win a contract with
9 Bell South for some CRM products.
10     Q. Then it says "OPI, without HP, it would have
11 been different."
12     Do you know what that means?
13     A. I don't recall what that means.
14     Q. It goes on to say, "The east did not bring in
15 any business. Steve M. has a large Q3 pipeline."
16     Do you see that?
17     A. I do see that.
18     Q. Do you know who Steve M. is?
19     A. I don't recall who Steve M. would be, no.
20     Q. Okay. There's another reference under
21 "Special Highlights" to EMEA, and it says,
22 "EMEA...struggling. Rosser and myself are sending" -- I
23 believe he meant to say spending, but it says "sending
24 lots of time here."
25     Do you see that?

36

1     A. I do see that.
2     Q. Do you recall, in late 2000, that EMEA was
3 struggling?
4     A. I don't recall exactly what they were doing,
5 but typically, the pattern at Oracle, historically, was
6 EMEA was not an early adopter. They did not take up new
7 products as quickly as the Americas did.
8     Q. Over the page it starts at the top "Talent,
9 demos, partner training, translations."
10     A. This is on the same page?
11     Q. It's at the top of the third page, excuse me.
12     A. Which number?
13     Q. 021390.
14     A. 90. Okay.
15     Q. "Talent, demos, partner training,
16 translations." Do you see that?
17     A. Yes, I do.
18     Q. Do you know what that refers to?
19     A. I think it refers to people, demos, partners,
20 translations, just what it says, I guess. I don't know
21 any more than you do. I'm just reading it.
22     Q. In late 2000 did you -- were you aware of
23 translation problems with the CRM component of the
24 E-Business Suite?
25     A. I don't recall, but, I mean, I do generically

37

1  understand -- long have understood that new products,
2  new releases, it takes time to get all these new
3  products translated into a variety of different
4  languages. So that's just sort of a generic statement,
5  but I don't believe -- I don't recollect whether I knew
6  what the translation status was at any point in time on
7  CRM.
8      Q. Okay. Just going back to the second page in
9  that reference to HP, do you recall being involved in
10  any transaction with Hewlett Packard in late 2000?
11     A. I was not involved, no.
12     Q. Do you recall a transaction with HP in late
13  2000?
14     A. Yes, I do remember it was one of the larger
15  transactions, so I typically always heard about -- we
16  had a report that listed the larger transactions in any
17  quarter, so I do recall a large transaction at Hewlett
18  Packard.
19     Q. And do you recall discussing any issues
20  relating to that transaction with anybody?
21     A. Again, I don't know what "issues" mean. I do
22  recall that we were very pleased to win a large
23  transaction with Hewlett Packard that quarter, but I
24  don't remember there being issues, if you will. Again,
25  I'm not quite sure what you mean by "issues".

38

1      Q. Do you know who was involved in negotiating
2  that transaction?
3      A. There was clearly a sales rep and so forth,
4  but I believe that Ray Lane, himself, was running sales
5  for us, was involved, and he --
6      Q. Was Larry Ellison?
7      A. I don't recall whether Larry, himself, was
8  involved. In the -- in this particular sale to him, if
9  you will.
10     Q. Okay. We'll have marked as the next exhibit a
11  document -- another document produced by Oracle with the
12  control No. 025770 through 772.
13         (Whereupon, Plaintiff's Exhibit 6 was marked
14         for identification.)
15         MR. SOLOMON: Q. And these are e-mail
16  exchanges dated December 10th and December 9th
17  involving, among others, Jeff Henley.
18     A. Okay. I've scanned it.
19     Q. Okay. Do you recognize it?
20     A. I don't recall it specifically, but again, I
21  passed it on to Stephanie Aas in our industrial
22  relations department, and I'm sure I received it. And
23  every quarter I got similar kind of things over the
24  years about what was going on.
25     Q. Okay. Did you know Sergio Giacoletto?

39

1      A. Yes.
2      Q. And he ran EMEA; is that right?
3      A. He still does, yes.
4      Q. And I'm looking at the second page of the
5  document under the heading 3, "Risks and Opportunities,"
6  halfway down the page.
7      A. Yes.
8      Q. And below that a couple of paragraphs there's
9  a heading "CRM", and it says, "We are loosing a bit of
10  momentum." I'm sure he means "losing".
11         "Salespeople are reluctant to engage to the
12  product problems, lack of references and local language
13  issues. We are also loosing," I'm sure he means losing,
14  "many people to Siebel, still, and we are short of 50
15  sales consultants across EMEA. Hopefully the situation
16  will turn in January once we get 11.5.3 running in local
17  language."
18         Do you see that?
19     A. Yes, I do.
20     Q. And in or around December of 2000 you were
21  aware of those facts being reported by Mr. Giacoletto?
22     A. Again, I don't recall this specific e-mail,
23  but I'm sure I received it, and therefore -- at least I
24  sat in the weekly meetings where Sergio would give
25  reports and make forecasts and so forth, so I'm sure I

40

1  must have been aware of what he was saying.
2      Q. Okay. The next heading on that page is
3  "Exchanges". Do you see that?
4      A. Yes.
5      Q. Do you know what "Exchanges" refers to?
6      A. This was a new sort of concept that was
7  hitting the industry, and a variety of different
8  industries were trying to form exchanges, and we had
9  some software that we were competing with other people
10  doing this sort of thing, and it was kind of a real hot
11  area at the time.
12     Q. And could you describe an exchange
13  transaction?
14     A. Well, again, it's not a transaction; it's -- I
15  wouldn't describe it as a transaction. This is where an
16  industry, let's say the automotive industry wants to
17  form a consortium between some of the major vendors, the
18  auto companies in this case, and all the vendors, and to
19  be able to -- so they can exchange information, do
20  auctions, all this sort of thing to make the supply
21  chain more efficient, if you will. This was a very,
22  very big part of the whole dot-com era, and it was very
23  popular. There were several companies that all they did
24  was do exchange kind of software.
25     Q. And under that heading it says, "The pipeline

41

1 is good, but we need to still satisfy our existing
2 clients first.  The operations are more stable, but we
3 have major functionality gaps, lack of 6.1 migration
4 commitment and lack of definite information to transfer
5 hosting to the clients."
6         Do you see that?
7     A.  I do see that.
8     Q.  And in December of 2000 you were aware of this
9 report of major functionality gaps, et cetera; is that
10 right?
11    A.  Again, I don't recall this specific document.
12 Over the years the sales force always send up all kinds
13 of information, and typically always identified things
14 that need to get better improved.  You never have a
15 perfect product; you're always striving to figure out
16 what to do next or what gaps, or whatever.  So this is
17 typical of the kind of things that I received over the
18 many years at Oracle, and still see some reports, not as
19 much as I used to.
20    Q.  All right.  But just to get back to the
21 question, you're aware, as of December 2000, of major
22 functionality gaps being reported by Mr. Giacoletto?
23    A.  I don't recall that, no.  As I say, I have,
24 have been over the years, that we're always identifying
25 things we need to improve and do better, but I don't

42

1 recall, at that point in time, where we were with
2 exchanges.  I know it was an area we were interested in,
3 competing for and so forth.
4     Q.  Do you know what a major functionality gap is
5 as referred to here?
6         MR. WALD:  Under the heading "Exchanges"?
7         MR. SOLOMON:  Yes.
8         THE WITNESS:  Again, I don't know specific to
9 Exchanges, if that's your question, no.  I'm certainly
10 aware of the term "functionality gap".
11        MR. SOLOMON:  Q.  Okay.  I'm looking at the
12 second page of the document under the heading 2,
13 "Pipeline and OSO".
14    A.  Yes.
15    Q.  What is OSO?
16    A.  Oracle Sales Online.  It's a CRM application
17 that helps sales forces put together their forecast, and
18 we use it -- we're using it at that time inside of
19 Oracle.
20    Q.  And did you use OSO?
21    A.  I used the output from OSO.  I don't think I
22 ever personally ever used the details of the
23 application, no.
24    Q.  And when you say you never used the details,
25 does that mean you never -- you never actually utilized

43

1 OSO directly?
2     A.  That's correct.  In other words, I did not go
3 in and -- I saw a couple of demos of it, but I was not a
4 trained user.  But I certainly used the summarization
5 that came out of it, which was included in our financial
6 reporting, internal manager reporting, if you will.
7     Q.  And OSO provided realtime information; is that
8 right?
9     A.  Yes.  I typically looked at it on sort of a
10 weekly basis, but you could go in at any point in time
11 and run a query and see what data was in there at any
12 point in time.
13    Q.  I'm looking still at that paragraph, and at
14 the third sentence it says, "The growth of pipeline and
15 technology is only 10 percent.  This number, however,
16 does not include the run rate of the partners and the
17 SAP revenue.  We will focus to improve it."
18        Do you recall receiving that information?
19    A.  Again, as I testified earlier, I do not recall
20 receiving this.  I'm sure I did.
21    Q.  But this question is a little bit different,
22 or was intended to be a little bit different.
23        Do you recall being aware or being made aware,
24 in December of 2000, that the growth of the pipeline in
25 technology was only 10 percent?

44

1         MR. WALD:  I'm sorry.  In the EMEA context?
2         MR. SOLOMON:  Correct.
3         THE WITNESS:  I can guarantee you I looked at
4 all of the summarizations, as I did every quarter, about
5 what Europe's forecast was, what the Americas was, what
6 was Japan, Asia Pacific, Latin America, all these
7 people, and I always looked at pipeline forecasts and so
8 forth.  So I'm certain that I was aware of whatever
9 numbers they reported, the forecast.
10        MR. SOLOMON:  Q.  I'll have marked as the next
11 exhibit another document produced by Defendants with the
12 control No. 0045275.
13        (Whereupon, Defendant's Exhibit 7 was marked
14        for identification.)
15        MR. SOLOMON:  Q.  And while your looking at
16 it, this is from Jeff Henley to Jeff Henley.  At the
17 bottom right-hand side it says, "1/4/2001", and the
18 subject is "Audit Committee Comments."
19        The question will be do you recognize it?
20    A.  Yes.  There's no date on it.  I assume this is
21 relating to the period that you're probing into.
22    Q.  Yeah, if you look at the bottom of the
23 right-hand side --
24    A.  Way down at the bottom.  Sorry.  Yes, yes.
25    Q.  So it was at least a document that had been

45

1 created no later --
2     A.   Those are notes to myself to go into the audit
3 committee and -- as I did every quarter all the time as
4 CFO and talk about the results for the current quarter
5 and the outlook for the next quarter.
6     Q.   Okay.  Who were the members of the audit
7 committee at the time?
8     A.   Don Lucas for sure because he predated me,
9 even.  I believe it was Michael Boskin and Joe Grunfest.
10 I believe they were both on the audit committee at the
11 time.  I'm not certain of that.
12     Q.   This starts with "Q2 Comments", first
13 sentence, "Q2 ended on a strong note after a slow start
14 for the first two months.  Big applications deals
15 carried the day, including large deals at both HP and
16 Compaq, plus a nice database deal at Sun," and in
17 parentheses "(We're building more balance between the 3
18 key hardware partners)."
19     Do you see that?
20     A.   Yes.
21     Q.   Do you recall reporting the fact that the big
22 applications deals carried the day for Q2?
23     A.   When you say "reporting," I'm not sure what
24 you're speaking to.
25     Q.   Well, are these your comments?

46

1     A.   These are my comments -- these are notes that
2 I made to myself.  I'm sure I made these comments orally
3 to our audit committee at the audit committee meeting.
4     Q.   Okay.  So in or around --
5     A.   I don't know if I read this, or whether I just
6 sort of ad libbed the comments, but I'm sure I conveyed
7 most of this, probably, to them at the meeting.
8     Q.   Okay.  And it was your view, was it not, as
9 reflected here, that big applications deals carried the
10 day with respect to Q2?
11     MR. WALD:  Object to the form.  Misstates the
12 document.
13     THE WITNESS:  Again, I'm not sure -- I'm not
14 sure exactly what I meant, 'cause clearly, the database
15 business is a much larger part of Oracle than
16 applications, okay?  But when I said this, perhaps I was
17 referring to the fact that, you know, it was a really
18 good applications quarter, so that, therefore, some
19 quarters we would have -- you know, we would sort of
20 exceed expectations in database, and so that was the big
21 story for the quarter because people wanted to hear
22 about that, or sometimes we had a great applications
23 quarter.  So that was the big event, if you will, for
24 the quarter.  So I'm guessing that's probably what I
25 meant by the statement.

47

1     MR. SOLOMON:  Q.   Okay.  The second paragraph
2 of this document says, "Apps growth exceeded street
3 expectations at 66 percent," in parens, "(73 percent
4 constant), and database fell back to 19 percent, in
5 parens, "(26 percent constant)."
6     You recall that that was your view in early
7 2001?
8     A.   I'm sure that I got the facts right off the
9 financial statement, so I'm sure this is what the facts
10 were.  And we had had a conference call several weeks
11 earlier where we had talked, and so I reference that,
12 again, as we said, on the conference call reading this
13 note here.
14     Q.   Okay.  In fact, if you look at -- under "Q3
15 Forecast" is another reference to a conference call, and
16 that paragraph starts off, "On the conference call we
17 said that we had seen no slowdown in our business yet,"
18 in parens, "(Q2 license growth or initial pipeline
19 growth rate).  We reasoned that this was because our
20 stuff isn't like PCs, semiconductors, et cetera.  It's
21 in high demand."
22     Do you recall expressing these views?
23     A.   Yes, definitely.
24     Q.   And then it goes on to say, "We acknowledged
25 that if the economy keeps falling, then it might" --

48

1     MR. SOLOMON:  Q.   Okay.  The second paragraph
2 There's a D on the end.
3     MR. SOLOMON:  It may have just been my
4 pronunciation.  I'll try and emphasize the D in the
5 future.
6     Q.   "We acknowledged that if the economy keeps
7 falling, then it might affect us at some point.  I also
8 pointed out that Q3 database was the toughest comparison
9 for the year.  Nobody asked the question about Covisint,
10 which we announced", in parentheses, "(it's
11 60 million.)"
12     First of all, do you recall expressing those
13 views?
14     A.   Are you speaking expressing these views to the
15 audit committee?
16     Q.   Yeah.
17     A.   Yes.
18     Q.   And you say nobody asked the question about
19 Covisint.
20     What question are you referring to?
21     A.   On the conference call to analysts, I think we
22 announced that we had won a large exchange deal with
23 Covisint, but nobody asked how much was it.
24     Q.   Okay.  And is that the pronunciation,
25 "Co-vis-int", not "Co-vy-sint"?

49

1   A. I think it's "Co-vis-int".
2   Q. Okay. Then you go on to say, "At this point,
3   all data since the call point to more economic
4   softening, so there is risk of slippage in deals."
5       Do you see that?
6   A. I do see that.
7   Q. Do you recall holding this view in early 2001?
8   A. I think whatever I said is what I thought at
9   the time.
10      MR. WALD: It does go on.
11      THE WITNESS: If you want to keep reading,
12  there were more than just that going on, of course.
13  "Offsetting this is stronger than normal approval
14  activity."
15      MR. SOLOMON: No, I see all that.
16      THE WITNESS: There's pros and -- you know,
17  there's ups and downs, but I definitely remember, even
18  in the second quarter, that there were reports about the
19  economy and, gee, are things getting worse and so forth.
20  So we were -- we talked about it on the conference call,
21  as I said earlier here.
22      MR. SOLOMON: Q. In that paragraph it also
23  says, "Also, 11i is much more stable than in Q2
24  including Oracle going live at the first part of
25  January, so better demos and number of references should

50

1   help our apps business in Q3."
2       Do you recall having that view in early 2001?
3   A. Sure. I'm sure I said this. Typically, when
4   you introduce new products every quarter, you go through
5   a learning curve, you get more people live, you get more
6   stability in the product, so this would be quite natural
7   to reason this way.
8   Q. Okay. I'll have marked as the next exhibit
9   another document produced by Defendants with the control
10  numbers 039325 through 328. Sorry, 324 through 328.
11      (Whereupon, Plaintiff's Exhibit 8 was marked
12      for identification.)
13      MR. SOLOMON: Q. Let me know if you've seen
14  any of these before.
15  A. Again, I was copied, but I don't specifically
16  remember Paxar, if you will, but --
17  Q. Okay. So I'm looking at the second page, and
18  there's an e-mail exchange from George Roberts to you,
19  among others. Do you see that?
20  A. Yes, it was to Larry, and then there's -- a
21  lot of us were also included, right.
22  Q. Okay. And the e-mail says, "Larry, you should
23  be aware of this one in case it continues to escalate.
24  It may make sense to discuss this one and any additional
25  critical situations at the next EC. As you know, some

51

1   of the earliest 11i customers," and in parens,
2   "(especially CRM and Order Management) are exhausted
3   from the effort of implementing the products."
4       Were you aware of these facts around the end
5   of December 2000?
6   A. Again, I don't recall this particular one, but
7   as I said earlier, this was a large, ambitious release,
8   and we had a number of customers that were -- in the
9   early -- first customers who definitely struggled as the
10  product was maturing. So I do recall that in general,
11  we had some issues. I don't specifically remember
12  Paxar, per se.
13  Q. Okay. And for the record, that e-mail was
14  dated December 27th, 2000, and then on the next page
15  with the control number 039326, there's an e-mail from
16  Michael Cochran to a number of people at Oracle,
17  including yourself.
18      Do you see that?
19  A. Yes, I do see that.
20  Q. And that e-mail starts off saying, "Victor
21  Heschaft, Paxar's Vice Chairman, has been dealing with
22  an extremely critical 11i implementation. By all
23  accounts from those involved, this has been very ugly,
24  and we've put the customer through extreme hardship."
25      Do you see that?

52

1   A. Yes.
2   Q. And you were aware of that at the end of
3   December 2000?
4   A. Again, I don't recall this one specifically.
5   I was certainly aware that there were a number of
6   customers having issues with -- particularly with new
7   products, and Order Management was a complete rewrite,
8   so it was certainly a newer product, as was most of the
9   CRM products.
10  Q. I'm looking at the second page halfway down,
11  there's a heading "Paxar's Contentions". Do you see
12  that?
13  A. So this is the second page of the Paxar one.
14  So this is 27?
15  Q. You've got it.
16  A. Yes, okay, here it is.
17  Q. It says, "Paxar is refusing to pay the
18  $1.8 million license fee that was financed through OFC
19  but later assigned to an outside financing source
20  (Leastec) until such time as they go live on the
21  software which is now projected for March 2001."
22      Do you see that?
23  A. Yes.
24  Q. And you're aware, at the end of December 2000,
25  that Paxar was refusing to pay a $1.8 million license

53

1 fee?
2     A.  Again, as I testified a few minutes ago, I
3 don't remember the Paxar note.  I'm sure I got it.
4     Q.  Okay.
5     A.  But I was aware that we had a variety of
6 different -- as we had any quarter, there's always some
7 customer issues, but I was certainly aware that in the
8 CRM area, in the Order Management area we had a number
9 of early customers that -- where we were stabilizing the
10 software with them.
11    Q.  It goes on to say, "They are also looking for
12 relief in the area of support payments of $30,000 a
13 month which they have been paying since 2/28/00.
14 Although support has been responsive, Paxar is thinking that
15 they are beta testing the software and beta sites don't
16 pay for support."
17        Do you see that?
18    A.  Yes, I see that.
19    Q.  Do you recall that being an issue you were
20 made aware of at the end of December of 2000?
21    A.  I don't recall, no.
22    Q.  We'll skip the next paragraph, and looking at
23 the paragraph that reads, "Paxar has been contacting
24 other 11i customer," he meant customers, I'm sure, "to
25 assess their experience with 11i.  They have also made

54

1 some veiled threats about publish disclosure of their
2 challenges, so we need to act quickly."
3        Do you see that?
4     A.  I do see that.
5     Q.  Do you recall being made aware of that at the
6 end of 2000?
7     A.  Again, I don't remember this particular
8 situation with Paxar.
9     Q.  Okay.  And you were not involved, is that
10 right, in the decision to provide non-billable support
11 to Paxar?
12    A.  I don't believe so.  I'm never involved in
13 those kinds of things.
14        (Recess taken from 10:25 to 10:37 A.M.)
15        MR. SOLOMON:  Q.  Were you familiar with any
16 issues surrounding the demonstration of the E-Business
17 Suite to customers?
18    A.  And again, this is in the period -- this
19 period of time you're speaking to, right?
20    Q.  The year 2002, early 2001.
21    A.  My recollection was that we had gone to a
22 centralized demo system which was still being shaken
23 out, and, you know, there were a lot of parts to the
24 E-Business Suite that we were in different release
25 numbers and so forth, so we were definitely, you know,

55

1 stabilizing, if you will, the demo environment.
2     Q.  Is that another way of saying you had real
3 problems with the demonstrations to customers?
4     A.  Well, I wouldn't say that.  I don't think
5 that's a fair characterization.  We had some problems.
6 So some demos went well, my recollection was, and some
7 demos didn't.  Sometimes there could be performance
8 issues or networking problems, so there was a variety of
9 things we were stabilizing that didn't always affect the
10 demo, but sometimes they did, and so it was certainly
11 not optimum during that period of time.
12    Q.  Okay.  I have marked as the next exhibit a
13 document produced by Defendants with the control numbers
14 617806 to 809.  I'll ask you to look at it and then tell
15 me if you recognize it.
16        (Whereupon, Defendant's Exhibit 9 was marked
17            for identification.)
18        MR. SOLOMON:  Q.  And it's an e-mail from Ron
19 Wohl to George Roberts copying a number of people,
20 including Jeffrey Henley.
21    A.  Okay.
22    Q.  Do you recognize it?
23    A.  Again, I don't recall this specific one, but
24 as I just testified, I do recollect that we had a less
25 than optimum environment which we were stabilizing and

56

1 sorting out a variety of different moving parts to get
2 these -- to get to what I call a consistent optimum
3 situation.
4     Q.  Okay.  And you'll see that there are exchanges
5 between George Roberts and Gayle Fitzpatrick below the
6 addressees.  Do you see that?
7     A.  Yes, I do see this.
8     Q.  And halfway down the page it says, "Gayle
9 Fitzpatrick wrote," and then it says, "George, here are
10 the details of the numerous applications demo issues
11 that Majors has encountered over the past several weeks,
12 as we discussed at the OPS review.  This note is rather
13 lengthy but is covers many key issues we are facing
14 today."
15        And the next paragraph reads, "The problems
16 fall into three categories:  1) System stability and
17 performance, 2) product integration and stability, and
18 3) deviation from ADS scripts.  The system stability and
19 performance issues, and our inability to show an
20 integrated demo leaves doubt in our customers mind that
21 Oracle can show or deliver the E-Business solution."
22        Do you see that?
23    A.  I do see that.
24    Q.  Do you recall being made aware of those
25 problems or issues --

57

1    A. Again, as I said, I don't remember this
2 specific note, but I do remember discussing, in some of
3 our manager meetings, that we had some issues to work on
4 in this centralized demonstration, the environment that
5 we had. So yes, I do remember we were working hard, and
6 this was very typical for the field to bubble up -- any
7 time you have problems, they bubble them up all the way
8 to the top and everybody goes to work to fix them.
9    Q. Okay. And just to be clear, you were aware,
10 in October of 2000, that the system stability and
11 performance and Oracle's inability to show an
12 integrated demo left doubt in Oracle's customers' minds
13 that Oracle could deliver the E-Business solution?
14    MR. WALD: Object to the form.
15    THE WITNESS: Again, I was aware that our
16 demos were less than optimum, and so that on some demos
17 we didn't show as well as we could, and so this was not
18 good. I'm definitely aware of that, and any time we've
19 had issues over the years at Oracle we always work them
20 through and we get them right and so forth. So at this
21 stage that was an area we were working on.
22    MR. SOLOMON: Q. And in October of 2002, as
23 reflected in this e-mail exchange, if you look at the
24 second page, you were made aware of issues confronting
25 Pier One; is that right?

58

1    A. Again, I don't remember any of these customers
2 shown here on this page, but I was made aware, and we
3 discussed this in our manager meetings, that we had
4 issues to work with on our demos, definitely.
5    Q. Okay. And again, just so the record's clear,
6 you agree, then, that you were made aware of the issues
7 confronting Pier One, Litton, Clopay, Warner Brothers --
8    A. No, I was not made aware of those customer
9 names. I may have received this e-mail. I cannot
10 recall it. But I am aware at the higher level that we
11 definitely had issues with some customers and we
12 didn't -- our demos didn't work as well as they should
13 have. But I don't recall these particular customers.
14    Q. Okay. Let's put it another way. Do you
15 dispute being made aware, in October of 2000, of the
16 issues reflected here confronting Pier One, Litton,
17 Clopay, Warner Brothers, McGraw-Hill, J&J, Schreiber
18 Foods?
19    A. I don't dispute that I probably received this
20 e-mail. I just can't recall it.
21    MR. SOLOMON: Okay. We'll have marked as the
22 next exhibit another document produced by the
23 defendants, control numbers 202671 to 674.
24    MR. WALD: Mark, while the witness is looking
25 for this, for the record, let me just note that there is

59

1 three pages in this document, and they bear the Bates
2 numbers NDCA-ORCL 202671, 672 and 674.
3    MR. SOLOMON: You don't have 3?
4    MR. WALD: I don't have 3.
5    MR. SOLOMON: That must be a copy issue
6 because I do.
7    Let's go off the record for a couple seconds
8 and just get that copied properly.
9    (Recess taken from 10:48 to 10:57 A.M.)
10    MR. SOLOMON: We now have a complete version
11 of Exhibit 10 which includes the missing page 202673.
12    MR. WALD: Thank you.
13    (Whereupon, Defendant's Exhibit 10 was marked
14    for identification.)
15    MR. SOLOMON: Q. Do you recognize this,
16 Mr. Henley?
17    A. No.
18    Q. Do you recognize the form of the document at
19 all?
20    A. I don't -- I don't recall ever seeing this
21 document.
22    Q. Okay. You'll see it says "Q1 R11i Product
23 Issues by Area."
24    A. Yes.
25    Q. And then it has three columns: Account, Days

60

1 and Product.
2    The account, do you understand, refers to the
3 customer?
4    A. That would seem to me to be what it means.
5    Q. Okay. Under "Days," do you have an
6 understanding what the reference is?
7    A. I can speculate.
8    Q. Okay. Go ahead.
9    A. Should I speculate? I mean --
10    MR. WALD: No. If you have an understanding
11 of it, you should give him your best understanding of
12 it. If you're speculating, don't speculate.
13    THE WITNESS: Well, I'd be speculating. I
14 mean --
15    MR. SOLOMON: Q. Well, go ahead and
16 speculate. I don't mind.
17    A. When we talk about days, typically, we're
18 talking about consulting days. So my guess is this is a
19 report from consultants that talked about the number of
20 days they were working on 11i accounts and problems.
21    Q. And then "products" speaks for itself; it's
22 the Oracle product, right?
23    A. These are Oracle applications, and they're --
24 what's listed here are specific products as part of the
25 E-Business Suite. I don't know what year it was or what

61

1   the dates were, but it says Q1, so I don't know what
2   Q1 -- when that was.
3       Q.   Okay.  And then there are various boxes having
4   total days; total northeast days, total southeast days,
5   total north central days, total south central days,
6   total west days, total North America.  Do you see those?
7       A.   Yes.
8       Q.   And they have dollar amounts assigned to them,
9   as well as days.
10      Do you know what the dollar amounts are, refer
11  to?
12      A.   Again, I'm assuming they correspond to the
13  days.  The more days you spend on something, the more
14  dollars are involved in the labor to do the work.
15      Q.   Now, do you have any understanding whether
16  these dollar amounts are dollars that Oracle received,
17  or dollar amounts that Oracle sacrificed?
18      A.   I don't know for sure what that means.
19      Q.   Okay.  And if you go to the last
20  three pages --
21      Actually, excuse me.  The second and third
22  page, there appears to be customers listed toward the
23  left, product name, number of days impact, and then an
24  issues column.  Do you see that?
25      A.   Yes.

62

1       Q.   And looking at these issues against each of
2   these customers, were you aware, in the calendar year
3   2000, of the issues referred to here?
4       A.   Again, I don't -- I don't recollect being
5   involved with these specific accounts, but I was
6   clear -- clearly recognized that we had a number of
7   early accounts where we had product issues, which is
8   typical when you introduce new products.  And so we had
9   to go out and fix products, the product problems; either
10  development worked on them or people in our field
11  consulting group worked on them.  But I don't recollect
12  this specific document or these particular accounts.
13      Q.   Okay.  And what about the particular problems
14  or issues, as they're referred to; are you familiar with
15  those issues confronting Oracle's customers in calendar
16  2000?
17      MR. WALD:  As set forth in Henley 10?
18      MR. SOLOMON:  Q.   Correct.
19      A.   Again, I -- these specific ones, I would have
20  to read them all, I guess, but I clearly recognize --
21  heard that we had a number of customers who had early
22  problems, and I think there was a -- you know, variety
23  of issues that we worked -- again, over the years in any
24  quarter, including today, there's always issues with
25  customers, and so sometimes we can correct them over the

63

1   phone; sometimes we have to fix them in development;
2   sometimes our consultants help work on them.
3       Q.   Okay.  What you're starting to do is you're
4   answering the question and then you're going on.
5       A.   Okay.  I'll try to be shorter.
6       Q.   That's just going to cost us some time, okay?
7       So if you look at the issues in the right-hand
8   side, my question is:  Were you aware of the issues
9   reflected here in calendar 2000?
10      A.   No.  Again, I'm not.  I'm reading this page
11  here, 672, I'm not aware of those specific issues with
12  those specific customers, no.  I don't recall that.
13      Q.   But your testimony is -- and tell me if I'm
14  wrong -- is that these issues here are typical, correct?
15      THE WITNESS:  I didn't say that.
16      MR. WALD:  Yeah, object to the form of the
17  question.  No foundation.
18      THE WITNESS:  I didn't say that.  I said that
19  I was aware, in this period of time, that we had issues
20  relating to the new E-Business Suite product, and it was
21  new, it was a major new release, as I testified earlier,
22  and there were a variety of problems which we worked
23  very hard to correct and get the customers happy.
24      MR. SOLOMON:  Q.   Was there, in 2000, a
25  shortage of trained consultants within Oracle to deal

64

1   with 11i problems?
2       A.   I don't know.  I don't recall.
3       Q.   Was there, in calendar 2000, a lack of
4   dedicated project staff at customer sites?
5       A.   I don't -- I don't -- I don't know.  As I
6   testified earlier, we had a number of issues, but
7   whether we had a shortage, I don't know.
8       Q.   Okay.  I'll have marked as the next exhibit a
9   document produced by Defendants with the control
10  No. 056045.
11      (Whereupon, Defendant's Exhibit 11 was marked
12      for identification.)
13      MR. WALD:  It actually might be best if we
14  just -- if we kept them separate just so that we know
15  that it could be the same document that was examined on
16  in both.  For purposes of this deposition we'll refer to
17  it as Henley 9, 10, 11.
18      MR. SOLOMON:  Fine with me.
19      Q.   Let me know if you've seen this before.
20      A.   Again, I don't recall it.  This is Exhibit 11?
21      Q.   Correct.
22      A.   I'm not shown as a copy.  I certainly don't
23  recall getting it or seeing it.
24      Q.   Okay.  You'll see that the message at the
25  bottom of the page says, "Don and Ron, as I indicated in

65

1  another e-mail, I will talk to Don about this tomorrow,
2  but I am very frustrated about this. Consulting had to
3  step in and make SSP4 and 5 successful. As you know, we
4  literally targeted 10 clients and did everything we
5  could to turn them into successful implementations," in
6  parentheses, "(many would not be references given their
7  overall experience)."
8      And just stopping there, were you aware, in
9  October of 2000, that many -- that the customers would
10  not become -- some customers would not become references
11  because of adverse experiences with the 11i?
12     A.  I don't recall that. I mean, I definitely, as
13  I testified earlier, recall we had a number of people
14  that were -- had problems and we were working to fix
15  them. We've had that over the years, and many times we
16  turn those customers around and they're later
17  referenceable.
18     Q.  Okay. You're doing it again.
19         And it goes on to say, "The gratitude given
20  was no coverage of costs for the consulting work, and
21  now a product," in parens, "(apps), that does not work
22  very well."
23         Are you aware of that fact in October of 2000,
24  as reflected here?
25     A.  Again, I'm not aware of this note. I'm aware

66

1  that -- I do recall that the consultants on occasion had
2  to go out and do work that they didn't get reimbursed
3  for, and so it hurt their P&L and made the -- made them
4  mad because they -- it hurt their P&L.
5      Q.  It goes on to say, "Why can't we deliver
6  product that works? This will require another
7  superhuman effort from consulting? To make things
8  worse, there is no training for a product that was
9  released in May, five months ago," signed "Sandy."
10         Do you see that?
11     A.  I do see that.
12     Q.  And were you aware of that in October of 2000?
13     A.  Aware of what, that there was what?
14     Q.  Let's break it down. First that Sandy
15  Sanderson was of the view that you were delivering
16  product that didn't work.
17     A.  As I testified earlier, I'm aware that we had
18  released a very large set of products, and some of them
19  had some product issues that we were working on
20  improving, and so some of the customers struggled for a
21  while until we could get these products to, you know,
22  perform at the right speeds, or whatever the issues
23  were, sure.
24     Q.  Okay. And were you aware, as of October 2000,
25  that Sandy Sanderson had the view that there was no

67

1  training for a product that was released five months
2  earlier?
3      A.  I don't recall that.
4      Q.  And when you say you don't recall, are you
5  saying you don't know one way or another?
6      A.  Yeah, I don't know one way or the other. I
7  don't know if it's factual or not.
8      Q.  And you don't know one way or another whether
9  you were made aware that that was Sandy Sanderson's view
10  in or around October of 2000?
11     A.  That's right. I don't recall what his view
12  was.
13         MR. WALD: Mark, for the record, this
14  paragraph refers to something called APS.
15         MR. SOLOMON: Correct.
16     Q.  Does that help refresh any recollection you
17  have, the fact that Mr. Wald has told you that it refers
18  to APS; does that help you at all --
19         MR. WALD: Actually, I was telling you.
20         MR. SOLOMON: Telling the world, I guess.
21         MR. WALD: Fair enough.
22         MR. SOLOMON: Subject to the confidentiality
23  agreement.
24         THE WITNESS: It doesn't change my statement.
25         MR. SOLOMON: Q.  I'll have marked as the next

68

1  exhibit a document produced by Defendants with the
2  control numbers 039547 and 548.
3         (Whereupon, Defendant's Exhibit 12 was marked
4          for identification.)
5         MR. SOLOMON: Q.  After you've had a chance to
6  look at it, let me know if you've seen it before.
7      A.  I don't recall seeing this. I don't --
8  looking at those copies, I apparently don't show as a
9  copy, either. So --
10     Q.  Do you know the entity Ingersoll-Rand?
11     A.  I know of them, sure.
12     Q.  Were you aware in 2000 that they were an 11i
13  customer?
14     A.  I don't -- well, I know that they were an
15  Oracle applications customer. Whether they were 11i or
16  not, I couldn't -- I can't remember. I visited them
17  years ago, so --
18     Q.  When did you visit them?
19     A.  I don't recall if it was before this or after
20  this, but I -- I don't have close contact, but I
21  actually call on many customers, and I do recall meeting
22  with some people from Ingersoll-Rand many years ago. So
23  I think they may have been an early APS customer. I
24  just don't know.
25     Q.  Do you recall why you met with them?

69

1    A.   Just getting to -- I actually made a
2  presentation to their CIOs, all their IT people at one
3  point, and just talked about our direction, our
4  strategy, that sort of thing.  I do that often.
5    Q.   And did you talk to them specifically about
6  the E-Business Suite?
7    A.   No, no.  It was a very generic presentation.
8  I had nothing to do with any individual products or
9  things like that.
10    Q.   Okay.  And do you recall being made aware at
11  all in 2000 that Ingersoll-Rand had expressed their
12  frustration and disappointment concerning the 11i suite?
13    A.   I don't recall that.
14    Q.   Do you recall Ingersoll-Rand being raised in
15  any executive committee discussions in calendar 2000?
16    A.   Again, I don't recall it.
17    Q.   Do you recall being made aware in calendar
18  2000 that Hewlett Packard was unhappy with Oracle's CRM
19  products?
20    A.   In calendar 2000.
21    Q.   Well, let's strike that.
22         Do you recall ever being made aware that
23  Hewlett Packard was unhappy with --
24    A.   Yes, I do remember Hewlett Packard being
25  mentioned.  They're right there in the valley, a big

70

1  customer.  So I either read it or heard it in a
2  management meeting that they were going to implement
3  some of our CRM stuff, and working with development to
4  sort out functionality, other issues.
5    Q.   And in what context did you hear that?
6    A.   Again, I don't recall whether it was in a
7  management meeting or an e-mail or what.
8    Q.   Do you recall that Hewlett Packard had
9  expressed the view that they had been provided with an
10  uninstallable product by Oracle?
11    A.   I don't recall that.
12    Q.   I'll have marked as the next exhibit a
13  document produced by the defendant with the control
14  numbers 169718 to 720.
15         (Whereupon, Defendant's Exhibit 13 was marked
16         for identification.)
17    MR. SOLOMON:  Q.   Take a look at this and let
18  me know if you recognize these exchanges.
19    A.   I don't remember receiving this document and
20  I'm not shown on here, either.
21    Q.   Okay.  Were you aware, in October of 2000, of
22  an escalation being received from Xerox?
23    A.   This says "Ford Supply Chain Status," and then
24  it goes on to say an escalation from Xerox.  So I'm not
25  sure -- so this relates to Xerox, I guess.

71

1  No, I'm not.
2    Q.   What about Ford Supply Chain Status?
3    A.   No, I'm not.  Again -- no, I'm not.  I don't
4  recall being made aware of that.
5    Q.   I'm looking at the bottom third of the page
6  and it says, "Todd Allen wrote," and it says, "Mike,
7  we've been on the calls, we have expressed our concerns
8  during the calls.  The problem we're dealing with is
9  that we're getting inconsistent information on a daily
10  basis regarding 11.5.2 release and patches.  At this
11  time we have put in every available patch for CRM up to
12  10/17," in parentheses, "(this is over 100 CRM patches
13  in the last two and-a-half weeks!)" an exclamation mark.
14  "We still can't get contracts to work!" exclamation
15  mark.  "We have no idea what awaits us as we implement
16  the rest of CRM!" exclamation mark.  "The products do
17  not integrate to the back office, they don't work,
18  period.  The customer knows what we have been going
19  through and is wondering as we are when will the system
20  be stable?'"
21         Do you see that?
22    A.   I do see that.
23    Q.   Were you aware of that in October of 2000 --
24    A.   Again, I do not recall being made aware of
25  that.

72

1    Q.   And you don't recall being aware of it,
2  period; is that right?
3    A.   I do not recall being aware of it.
4    Q.   It goes on to say, "The CRM organization needs
5  to step up and provide us development resources on site
6  in Webster, NY.  We know that Mark's organization has
7  done this for Ingersoll-Rand and Bell South.  We need
8  the same attention!" exclamation mark.  "Xerox is
9  threatening to write a letter to Larry and will be
10  asking for their money back.  They have also used words
11  like," in quotes, "your company is two steps away from
12  fraudulent."  If that can't get us some help, I don't
13  know" -- excuse me.  "If that can't get us some help, I
14  don't what can."  They have left out the "know".
15         Do you see that?
16    A.   I do see that.
17    Q.   Okay.  Were you aware, in October of 2000, of
18  Xerox threatening to write a letter to Larry asking for
19  their money back?
20    A.   I don't recall being aware of that, no.
21         Again, I'm still troubled by the start of
22  this.  I mean, I'm assuming these other things that
23  follow were dated October 19th, 2000, right?
24    Q.   Okay.
25    A.   But I don't believe this header has anything

73

1  to do with these notes that follow. Todd Allen I know.
2      Q.  Who is Todd Allen?
3      A.  Todd Allen handled the Xerox account.
4      Q.  Okay.
5      A.  This note up here with the date and all these
6  people copied had to do with the Ford Supply Chain
7  status. So I'm just making a point. I don't recall
8  seeing this, I wasn't copied, but these notes, I don't
9  think, have anything to do with Ford and John Pickney
10 and all these guys worked at Ford. I don't see Todd
11 Allen's name up there, so I'm just passing that on.
12     Q.  I'm probably as mystified as you are.
13         But nonetheless, Todd Allen had the Xerox
14 account, right?
15     A.  Yes.
16     Q.  And did you interact with Todd Allen on a
17 regular basis?
18     A.  Well, not on a regular, but certainly I've had
19 several meetings with him over the years.
20     Q.  Did you talk to Todd Allen about Xerox's
21 implementation of the CRM?
22     A.  I don't recall that. I don't recall whether I
23 got involved in that particular part of the
24 relationship.
25     Q.  If he had a customer that was threatening to

74

1  ask for their money back, would you expect him to
2  mention it to you?
3      A.  That wouldn't be typical. It's possible. It
4  wouldn't be typical.
5      Q.  If you had a customer that described Oracle as
6  being two steps away from fraudulent, would you expect
7  him to convey that to you?
8      A.  No, because in the heat of battle lots of
9  people say lots of things. So typically, these things
10 don't get escalated to the Chief Financial Officer; they
11 get escalated to the management teams, and development
12 works on fixing problems and people calm down.
13     Q.  On the second page halfway down it says, "Todd
14 Allen wrote: Mike, do I need to take this to Mark? We
15 have a 'Bell South' situation at Xerox and I need you
16 guys to step up!" exclamation mark.
17         Do you see that?
18     A.  I do see that.
19     Q.  And do you recall being aware, in late 2000,
20 of Xerox having a Bell South situation?
21     A.  Again, I don't relate -- I don't remember them
22 having a CRM problem, and so therefore, I don't know any
23 more than that. And I don't know what time -- what date
24 these e-mails were written, as I pointed out to you
25 earlier.

75

1      Q.  I'll have marked as the next exhibit a
2  document produced by Defendants with the control numbers
3  617453 through 462.
4          (Whereupon, Defendant's Exhibit 14 was marked
5          for identification.)
6          THE WITNESS: Okay. I've scanned it quickly.
7          MR. SOLOMON: Q. Have you ever seen this
8  before?
9      A.  I don't believe so. I don't recall seeing it.
10 And I don't -- at least what I show here doesn't show me
11 as copied.
12     Q.  Okay. I'm going to the fourth page of the
13 document which --
14     A.  56?
15     Q.  Yes, exactly, 56. And the heading at the top
16 is "November 2, 2000, E-Business Suite Issues, NAS
17 Executive Dialogues."
18         Do you see that?
19     A.  Yes.
20     Q.  Have you ever seen a document in this form
21 from NAS?
22     A.  I don't recall ever receiving something in
23 this form from NAS, right.
24     Q.  I'm looking at a third of the way down the
25 page under "CRM Session". Do you see that?

76

1      A.  Yes.
2      Q.  And it says, "Main issue: No live sites. The
3  field needs live 11i customer referenceable sites to go
4  up against Siebel."
5          Do you see that?
6      A.  Yes.
7      Q.  Were you aware that, in November of 2000, that
8  there were no live sites?
9      A.  I don't recall, but certainly the product
10 hadn't been out very long, so it was quite conceivable
11 we didn't yet have real live sites. It takes a number
12 of months to implement software.
13     Q.  Okay. It goes on to say, in part in italics,
14 "My sales cycle is 40 percent longer due to lack of
15 references, and without any live sites soon, Siebel will
16 take us to the cleaners."
17         Do you see that?
18     A.  Yes, I do.
19     Q.  Were you aware of that in November of 2000?
20     A.  Again, I don't recall if I knew that
21 precisely, but it's certainly -- without live sites,
22 it's difficult. Every customer wants to see people
23 live, so it's always important to get out, and it takes
24 a number of months, as I just testified, but eventually
25 you get customers live and now you've got references.

77

Q. Okay. The next sentence reads, "The instability of 11i CRM code is putting Oracle behind Siebel even with extra efforts on the part of sales, OCS, support united in the sales and implementation efforts."

Do you see that?

A. I do see that.

Q. Were you aware of that in November 2000?

A. Again, you know, I was definitely aware that the product was new and that we were sorting out problems, as I've testified earlier, and that it takes a number of months to get customers live. So I don't recall exactly if I knew who was live or wasn't live, but I definitely knew, as I have testified earlier, that we had issues, we were stabilizing the product, and we were trying to get customers live.

Q. Under the heading 1, "Development", there's a reference Tom Sheehan, EVP and CIO, Entegra Corp.

Do you see that?

A. Yes.

Q. Do you know who Tom Sheehan is?

A. I don't believe I know him.

Q. Do you know the entity Entegra Corp?

A. I don't believe I ever -- no.

Q. It goes on to say that he wrote, "Basically,

78

we are running 11i ERP applications which are finally up and running after much pain. But we are also running i-store and SellingPoint. SellingPoint is still not up and running, although it should have been a month ago. Basically what we are finding is that the product is not fully developed and is being developed on the fly by your support and development organization. As of our status meeting this morning, our company has 52 TARS open for i-store and SellingPoint. I am not very happy. As a matter of fact, I am irate. I just don't know what to do. I think problems are being addressed, but they're not being addressed fast enough, and quite frankly there is much more to address than there ever should be. I am not a novice to Oracle implementations, so I know that my expectations are not out of line."

Do you see that?

A. I do see that.

Q. Were you aware of these sentiments being expressed by an Oracle customer in November of 2000?

A. Again, as I said, I certainly heard from the field, and our management meetings, I testified earlier, that we had problems with various customers. I don't recollect which ones, and we were stabilizing the product and we were putting a lot of effort in development in the field to get through this early stage

79

of getting a very complex product stabilized.

Q. I'm looking at the page -- sixth page with the Bates number 617458. Take a look at the heading "Joint Development - CRM/ERP" under the heading "Demo Issues", and the question I have is: Were you aware of the demo issues reflected here in November of 2000?

A. Again, I don't recall this particular document, but as I testified earlier today, I was aware that we had various issues with our demo environment that was less than optimum, I think the words I used.

Q. And down to the heading "11i Product Issues", were you aware in 2000 of the product issues reflected here?

A. Again, as I testified earlier, I don't recall this particular thing, but I did testify that I was aware that we had product issues because -- you know, in the early stages of releasing a major new release, yes.

Q. Do you know of the entity Liberty Mutual?

A. Yes.

Q. Did you interact with them in calendar 2000?

A. I don't -- I don't recall. I have met them back at their site, and I know -- but I don't remember when. And again, it wasn't related to any product issues that I can recall or -- it was more of a high-level sort of customer relationship meeting, is my

80

recollection.

Q. Okay. Were you aware that in 2000, November of 2000, Liberty Mutual was of the view that Oracle had delivered a system without enough functionality to even test it adequately?

A. I don't -- I don't recall knowing that, no, or hearing that.

Q. And let's make that question broader. Were you aware, in November of 2000, that Oracle was delivering systems to its customers that lacked sufficient functionality for them to test adequately?

A. Functionality for them to test adequately?

Q. Yes.

A. I'm not sure what that means. But no, so -- do I remember hearing statements that Oracle doesn't have adequate functionality to allow you to test? I don't -- I can't relate to that. No, I don't remember hearing something like that. I'm not sure what it means.

Q. I'll have marked as the next exhibit a document produced by Defendants with the control numbers 018737 to 742.

(Whereupon, Defendant's Exhibit 15 was marked for identification.)

MR. SOLOMON: Q. And this exhibit consists of

81

1  an e-mail dated Wednesday, November 8th, 2000, from Joel
2  Summers to a number of recipients, and on the second
3  page there's an e-mail from Ron Wohl to a number of --
4  to three recipients.  And I note that you are not a
5  recipient, Mr. Henley.
6      A.  Okay.
7      Q.  And attached to that second e-mail is what
8  appears to be a letter to Larry Ellison from Terry
9  Conner at Liberty Mutual.
10     A.  All right.
11     Q.  And have you seen any of these before?
12     A.  I don't recall seeing them, no.
13     Q.  Okay.  It says, at the beginning on the first
14  page, "All, as you can see from the attached, Liberty
15  Mutual has escalated their significant dissatisfaction
16  with Oracle HRMS to Larry.  This will be a topic of
17  discussion tomorrow.  The letter raises two major
18  current issues that must be addressed:  1) 11i product
19  issues and resolution, and 2) Support responsiveness."
20         Do you see that?
21     A.  Yes, I do see that.
22     Q.  You don't recall being involved in any meeting
23  where Liberty Mutual was the topic?
24     A.  I don't recall it.  Again, we had a variety of
25  sessions over the years and it's possible, but I don't

82

1  recall it.
2      Q.  Okay.  On the second page, if you look at the
3  third paragraph beginning with "The issue", it says,
4  "The issue that I take exception with in their letter is
5  the statement that", in quotes, "we have not yet, in our
6  opinion, been delivered a system with enough
7  functionality to even test adequately."
8         Do you see that?
9      A.  Yes.
10     Q.  And then if you go to the next page you'll see
11  that that page and the following two pages are the
12  letter from Liberty Mutual.
13     A.  Yes.
14     Q.  And if you go to the third page of the --
15  excuse me, the fourth page of the exhibit, which is 40,
16  18740 --
17     A.  40, yes.
18     Q.  -- you'll see that that quote that I just read
19  from the previous e-mail is two thirds of the way down
20  the page.
21     A.  I see --
22     Q.  Do you see it?
23     A.  "With enough functionality to even test
24  adequately."  This is what -- this is what Joel Summers
25  was apparently referring to.

83

1      Q.  Right.  So if you look above that, you'll see
2  that there's a number of issues that they report in
3  summary fashion, starting with 7 or 8 lines down where
4  it says, "The base system was promised by 3/31/00."  Do
5  you see that?
6      A.  Yes.
7      Q.  Okay.  So were you aware, in late 2000, that
8  Liberty Mutual was of the view that they had been
9  promised the base system by 3/31/2000 and it was
10  delivered in June of 2000?
11     A.  I don't recall being made aware of that, no.
12     Q.  Were you aware of Liberty Mutual reporting
13  their being unable to run their first test payroll until
14  7/26, and that they continue to face serious issues with
15  technical assistance as reflected in that paragraph?
16     A.  Again, I don't believe I was made aware of
17  that, no.
18     Q.  And then I'm going a few lines down.  Do you
19  see where the sentence says, "We are burning our
20  resources"?
21     A.  Yes, I see that.
22     Q.  Okay.  It says, "We are burning our resources
23  and time and every effort to resolve base functionality
24  problems when we should be directing those resources to
25  building critical interfaces, testing, and bringing this

84

1  project to a successful conclusion."
2      A.  I see that.
3      Q.  Does that help you understand the expression
4  that in their opinion, they hadn't been delivered a
5  system with enough functionality to even test
6  adequately?
7         MR. WALD:  Object to the form of the question
8  and lacks foundation and calls for speculation.
9         THE WITNESS:  Yeah, again, I testified earlier
10  I wasn't quite sure what the term meant.  I'm still not
11  sure that I would express the term the way they did, so
12  I'm not sure what -- exactly what he meant.
13         MR. SOLOMON:  And if you go a few more
14  lines down you'll see there's a sentence that begins,
15  "As with any new product implementation," do you see
16  that?
17         MR. WALD:  Major product implementation.
18         MR. SOLOMON:  Q.  Correct, thank you.
19     A.  Yes.
20     Q.  And it says, "As with any new major product
21  implementation, our people have had many of the usual
22  problems caused by lack of product-specific knowledge.
23  Nevertheless, the bottom line is that we have a product
24  that does not work and it will take a great deal of
25  joint effort to bring us to the outcome that was

85

1  intended - one of the first successful installations of
2  a product which we believe to be in a targeted growth
3  area for Oracle."
4        Q.  Do you see that?
5        A.  Yes.
6        Q.  So do you recall being made aware in late 2000
7  that Liberty Mutual was of the view that they had been
8  delivered a product that didn't work?
9        A.  Again, I don't recollect receiving this. I
10  wasn't shown on it. I don't recall.
11       Q.  Outside of the document, though?
12       A.  Outside of the document, I testified I met
13  them once at their offices. I can't remember if it was
14  before or after or during this time. I just don't
15  recollect.
16       Q.  They talk about a targeted growth area for
17  Oracle. Do you see that?
18       A.  Yes.
19       Q.  Do you have an understanding what that refers
20  to?
21       A.  Sure. It's the human resource area with
22  payroll, which Joel Summers was the head developer for,
23  was an area that we were interested in at that time and
24  still are interested in continuing to grow and add
25  customers and so forth.

86

1        Q.  Okay. We'll mark as the next exhibit a
2  document produced by the defendants with the control
3  numbers 101671 to 673.
4        (Whereupon, Defendant's Exhibit 16 was marked
5        for identification.)
6        MR. SOLOMON:  Q.  This is dated Thursday,
7  November 9th, 2000, and it's a -- an e-mail from Paul
8  Seminara to George Roberts and others. And below that
9  there's an e-mail exchange from Mark Jarvis to Gary
10  Bloom and others.
11       The question is: Have you seen this before?
12       A.  Again, I don't recall seeing it, and I
13  don't -- to the best of my knowledge, I don't think I'm
14  shown on here.
15       Q.  Okay. If you go to the second page of the
16  exhibit it starts after the addressees saying, "As you
17  all know, the investor community is looking for customer
18  implementations of 11i, Oracle9i App Server, et cetera,
19  in order to be satisfied that what we're promoting is
20  and selling is being implemented."
21       Do you see that?
22       A.  Yes.
23       Q.  And were you aware in November of 2000 that
24  the investor community was looking for customer
25  implementations of 11i, et cetera, in order to be

87

1  satisfied as reflected here?
2        A.  Sure. It's always very typical any time you
3  have new releases, people want to know -- to go talk to
4  customers that have gone live.
5        Q.  Okay. Was it the practice at Oracle to offer
6  customers discounts if they would provide Oracle with
7  good PR?
8        A.  I don't know if that was ever a formal policy
9  or something, but it wouldn't surprise me if, from time
10  to time, we did something and asked the customer, "As
11  part of this, could we use you as a reference?" or
12  something like that.
13       Q.  And the question was the quid pro quo for the
14  PR would be a discount --
15       A.  Again, I don't know if that was ever a policy
16  or whatever. I don't get involved in pricing or
17  whatever. But we clearly always try to get customers to
18  act as references. It's very helpful.
19       Q.  Was it a practice at Oracle to bribe customers
20  into giving references?
21       MR. WALD:  Object to the form.
22       THE WITNESS:  We don't have any practices to
23  bribe anyone.
24       MR. SOLOMON:  Q.  Okay. Have you ever heard
25  of Oracle being accused of engaging in such practices?

88

1        A.  Of bribing people? No, I've never heard of
2  Oracle -- I don't recall anybody saying that we're
3  trying to bribe people.
4        Q.  Do you know the company GE?
5        A.  Yes.
6        Q.  And was GE an Oracle customer in 2000?
7        A.  Yes.
8        Q.  Did you interact with GE?
9        A.  I've had several interactions with GE over the
10  years.
11       Q.  Okay. And did you interact with GE with
12  respect to 11i?
13       A.  I don't recall.
14       Q.  Do you recall discussing with anybody, in
15  calendar 2000, the implementation by GE of 11i?
16       A.  I don't recall GE specifically, as I've
17  testified earlier. There were lots of customers
18  mentioned and things, but I don't recall that.
19       Q.  Were you aware in late 2000 that GE was
20  experiencing problems and reporting frustration to
21  Oracle with respect to 11i?
22       A.  Again, I don't recall that specifically.
23       Q.  So you're not saying you're unaware; you're
24  just saying you don't know if you were aware; is that
25  right?

89

1      A.  I don't recall.  I think that's what I said; I
2   don't recall it.
3      Q.  I'll have marked as the next exhibit a
4   document produced by the defendants with the control
5   numbers 012381 to 383.
6          (Whereupon, Plaintiff's Exhibit 17 was marked
7          for identification.)
8      MR. SOLOMON:  Q.  This is an e-mail dated
9   December 4, 2000 from Ron Wohl to a number of recipients
10  attaching a communication involving Kirsten Shaw and
11  Phillip Tate, and I note that you are not an addressee.
12         Have you seen it before?
13     A.  I don't recall seeing this before.
14     Q.  You'll see that on the first page it says,
15  two thirds of the way down, "Escalation level:  Ellison.
16  Temperature:  Hot."
17         Do you see that?
18     A.  Yes.
19     Q.  And then there's language that goes on to talk
20  about the issues that GE were reporting.
21         Do you recall talking to Mr. Ellison in
22  December of 2000 about the GE issues reflected here?
23     A.  No.  I do not recall that.
24     Q.  And did you speak to anybody in late 2000
25  about GE's implementation of 11i?

90

1      A.  Again, I don't -- I don't recall talking to
2   anybody or hearing about that specific account at that
3   time.
4      Q.  Did you hear, in late 2000, of Pepsi having
5   implementation problems with 11i?
6      A.  Again, I don't recall that I did.
7      Q.  Do you know a company called Brock Tools?
8      A.  I don't believe so.
9      Q.  Okay.  It's fair to say, then, that you
10  haven't heard about implementation problems they had
11  with 11i?
12     A.  I don't recall.
13     Q.  Have you heard of Application Technologies?
14     A.  I don't believe so.
15     Q.  So it's fair to say you don't recall hearing
16  about problems they had with 11i?
17     A.  Correct.
18     Q.  And you don't recall Application Technologies
19  expressing concern that it was unable to deliver the 11i
20  solution to its customer, Brock Tools?
21     A.  That's correct.  I don't recall that.
22     MR. SOLOMON:  Let's go off the record for
23  five minutes.
24         (Recess taken from 11:55 to 12:06 P.M.)
25     MR. SOLOMON:  Q.  Do you have an

91

1   understanding, Mr. Henley, of when it's legally
2   permissible for an insider of a public company to trade
3   stock?
4      A.  Yes.
5      Q.  And what's that understanding?
6      A.  That I -- that the insider shouldn't sell
7   stock if they possess material inside information that
8   the market doesn't understand.
9      Q.  Okay.
10     A.  Or know about.
11     Q.  And it's true, is it not, that regardless of
12  an insider's pattern, historic pattern of trading, if an
13  insider is in possession of inside information when he
14  or she trades stock, that is a violation of insider
15  trading laws?  Is that your understanding?
16     MR. WALD:  Object to the form of the question.
17  Calls for a legal conclusion.
18     THE WITNESS:  I agree.  I'm not a lawyer,
19  so --
20     MR. SOLOMON:  Q.  All right.  Did you have a
21  role at Oracle with respect to insider trading?
22     A.  Did I have a role?  Do you mean am I an
23  insider?
24     Q.  No, no --
25     A.  Did I trade stock?

92

1      Q.  No, when you were at Oracle as the Chief
2   Financial Officer --
3      A.  I see.  Of monitoring inside, or approving or
4   this sort of thing?
5      Q.  Correct.
6      A.  Yes, I worked, all the time I was there as
7   CFO, with the legal department to make sure that if I
8   knew of material events or things, that we -- I would
9   speak to the general counsel of the company to make sure
10  that we weren't allowing transactions until that
11  information was available to the market.  So that's the
12  sort of role, to use your words, I guess, that I played.
13     Q.  Okay.  What did you do in order to ensure, if
14  anything, that that role was played appropriately?
15     A.  I -- the general counsel sat through all of
16  our audit committee meetings; sits through, sat through
17  and sits through all of the audit committee meetings,
18  all of the board meetings, so there was regular, you
19  know, knowledge that they had about the general
20  condition and the current -- the latest forecast for a
21  company for the upcoming quarter, and then the agreement
22  I've always had with our general counsel, if I become
23  aware of something or they become aware of something, we
24  talk about it, and so that we can try to decide whether
25  we should keep people from doing a trade or not.

93

1    Q.   Okay.  In calendar 2000, did anybody request
2  leave to trade that you refused leave to?
3    A.   Calendar 2000?  I don't recall that there was.
4  I can only -- there were a couple times, and I don't
5  even remember the times over the years, where either he
6  or I thought there might be something happening, M&A
7  transaction or something like that, but I don't recall
8  not allowing anything in calendar 2000.
9    Q.   Okay.  And what about 2001, same question?
10    A.   Again, I don't recall -- I don't recall that,
11  no, that we didn't allow anyone to trade.
12    Q.   Okay.  And I think you said -- your testimony
13  was "a couple of times".
14    A.   Yes.
15    Q.   Are you saying a couple of times over the
16  years?
17    A.   Over all the years that we've had this, there
18  was a couple of occasions where the general counsel and
19  I talked and we decided that we shouldn't allow a trade.
20  So it was very infrequent, but it happened a few times.
21  But my recollection, I can't remember that occurring in
22  2000 or 2001.
23    Q.   Okay.  And is it fair to say that almost
24  always, not always, given that testimony, but almost
25  always leave was granted or permission was granted when

94

1  trading permission was requested?
2    MR. WALD:  Object to the form.  It's
3  overbroad, it's compound, and I would caution the
4  witness to exclude, from the ambit of any answer that
5  you would give, any understanding that you have received
6  from a lawyer for Oracle, whether it's in-house or
7  outside.
8    MR. SOLOMON:  Q.  You can work that one out
9  for yourself.
10    A.   Well, I think --
11    Could you repeat the question now?
12    MR. SOLOMON:  Can you read it back, please?
13    (Record read by the reporter.)
14    THE WITNESS:  So again, as I testified
15  earlier, there weren't many times over the years where
16  the general counsel and I concluded that we should not
17  allow a trade to happen.  So by definition, you're
18  right; more times than not, many more times than not the
19  trade -- but it was because we were clear that, to the
20  best of our knowledge, there wasn't any material
21  information that wasn't understood in the marketplace.
22    MR. SOLOMON:  Q.  Okay.  Now, when you traded,
23  who had to provide authorization for your trades?
24    A.   The general counsel.
25    Q.   Okay.

95

1    A.   As he did with all of the other insiders.
2    Q.   And for 2000/2001 that would be Mr. Cooperman?
3    A.   That's correct.
4    Q.   Did anybody, other than Mr. Cooperman, have to
5  provide you with permission?
6    A.   I don't believe so.  I don't believe I ever
7  sought other people's permission, no.
8    Q.   Okay.  And it's your contention -- and correct
9  me if I'm wrong -- that when you traded in January of
10  2001, you weren't in possession of inside information;
11  is that your contention?
12    MR. WALD:  You mean non-public inside
13  information?
14    MR. SOLOMON:  Q.  Correct.
15    A.   Absolutely.
16    Q.   I'll have marked as the next exhibit a
17  document produced by Defendants with the control numbers
18  012433 through 38.
19    (Whereupon, Plaintiff's Exhibit 18 was marked
20    for identification.)
21    MR. SOLOMON:  Q.  This is dated January 10th,
22  2001, and it starts with an e-mail from Ron Wohl to
23  Steve Miranda, and then there's an exchange among Mark
24  Berrenechea, Jeff Henley and others dated March 10 also,
25  and over the page, exchanges among Mark Berrenechea,

96

1  Jeff Henley and others, including Larry Ellison and
2  Safra Catz.
3    The question is:  Do you recognize these
4  documents?
5    A.   Again, I don't -- I don't recall them
6  specifically, but I'm copied.  In fact, I'm -- one of
7  these I'm passing on this note from Mark Berrenechea, so
8  I'm sure I've got it and sent it on.
9    MR. SOLOMON:  If I said March, I misspoke.
10  They're both January.
11    Q.   So looking at the second page of the document,
12  it's a -- an e-mail from Mark Berrenechea.
13    A.   Yes.
14    Q.   Do you recall receiving that e-mail?
15    A.   Again, I said I don't remember exactly, but
16  clearly I did because I passed it on with a comment.
17    Q.   Okay.  And you'll see that there is attached
18  to Bell South Bug Report.  Do you see that?
19    A.   Yes.
20    Q.   And do you recall seeing the Bug Report?
21    A.   Again, I don't.
22    Q.   But you don't dispute that you saw it?
23    A.   I don't dispute that I saw it.
24    Q.   I'm looking at the second page of the exhibit
25  where you write, "FYI, I am surprised so many

97

1  receivables since we've cleaned it up already inside
2  Oracle."
3      Do you see that?
4  A.  Yes.
5  Q.  What are you talking about there?
6  A.  Again, looking at this report, which I don't
7  recall, but just looking at it, there's 14 receivables,
8  bugs shown on this Bell South Bug Report.  Our practice
9  at Oracle has always been to be what we call early
10  adopters of new releases, so we have routinely always
11  taken new releases, dot releases and tested them,
12  installed them inside Oracle to help, you know, debug
13  the system, find problems early, fix them and so forth.
14  So we did that with 11i, just like we did with 10 and 8
15  and all the other products over the years.
16      So I think my comment was, gee, I'm surprised
17  that there are still bugs there because we cleaned up
18  all the bugs on the version that we were using inside
19  Oracle.
20  Q.  Okay.  I have marked as the next exhibit a
21  document produced by the defendants with the control
22  numbers 175158 through 161.
23      MR. WALD:  Mark, sorry.  Again, we're missing
24  a page.  At least we are.
25      THE WITNESS:  59?

98

1      MR. WALD:  Yeah, we're missing 59.
2      THE WITNESS:  I don't have that, either.
3  There seems to be a bug in your Xerox.
4      MR. SOLOMON:  You think there's a bug in our
5  Xerox?
6      We'll come back to this later.
7      MR. WALD:  So for the record, we're
8  withdrawing that as Henley 19, and the next document
9  that Mr. Solomon offers will be Henley 19.
10      I will mark as the next exhibit a document
11  produced by Defendants with the control numbers 061306
12  through 309.
13      (Whereupon, Plaintiff's Exhibit 19 was marked
14      for identification.)
15      MR. SOLOMON:  Q.  This is an e-mail exchange
16  dated February 22nd, 2001, from Jeff Henley to Julie
17  Cullivan, and another exchange dated February 20th, 2001
18  between Brad Harrington and Jeff Henley.
19  A.  Uh-huh.
20  Q.  And another exchange dated February 6th from
21  Brad Harrington to Jeff Henley.
22      Do you recognize these, Mr. Henley?
23  A.  Yeah.  I definitely remember these,
24  definitely.
25  Q.  You definitely remember --

99

1  A.  I definitely remember them, yes.  I'd have to
2  read them to recall everything that was in them, but I
3  definitely remember sending them.
4  Q.  Okay.  And you say, on page 307, 061307, it
5  says, "Jeff Henley wrote:  FYI, there's a reason that
6  Siebel is kicking our ass.  They are far more aggressive
7  in getting a sales machine in place."
8      Do you see that?
9  A.  This is me to Julie, is that who that is going
10  to?  I don't think I said that to Brad.
11      MR. WALD:  Why don't you take a moment, Jeff,
12  and just go ahead and read the whole document.
13      THE WITNESS:  I would have to look at it.  It
14  started with me passing on the resume of my nephew.
15      MR. SOLOMON:  Q.  Who is your nephew?
16  A.  Brad Harrington.  But then I think the thing
17  you're referring to me is I'm commenting to Julie
18  Cullivan, who was one of our sales consultants in the
19  west and used to work in the finance department, so I
20  knew Julie pretty well.  So that's the context in which
21  I'm making this comment.
22  Q.  Okay.
23  A.  So I do see what I wrote, "There's a reason
24  that Siebel's kicking our ass," right.
25  Q.  And how long, as of February 2001, had Siebel

100

1  been kicking your ass?
2  A.  Well, let me try to put this in -- I don't
3  remember exactly, but they had been in the CRM business
4  way before us, so they were sort of the early pioneers
5  of -- one of the real developers of the idea of CRM.  So
6  we were late getting into that business.  But exactly
7  how many years ahead of us they were, I don't know.
8  Q.  Above that it says, "Jeff, I agree with your
9  comments.  The good news is that I just hired two great
10  guys from Siebel.  Now if we can get 11i where it needs
11  to be and get some pipeline developed, we might be more
12  competitive."
13      Do you see that?
14  A.  Yes.
15  Q.  And were you aware, in February of 2001, that
16  the 11i was not where it needed to be and you needed
17  better pipeline?
18  A.  Well, again, there is a glance -- I didn't
19  fully read the page before this, but I think that that
20  followed in that exchange, right?  And in there I say
21  that 11.5.3 will be better and more stable and hopefully
22  will be enough, although it will be 11.5.4 to really get
23  the ideal stability.
24      So as I testified earlier, we were going
25  through this long period of maturation getting the very

101

1 complicated release out, getting through all these dot
2 releases and getting new functionality, as well as more
3 stability in the product.  So yes, I was aware of this
4 evolution that was going on.
5      Q.  Okay.  And going to that first page, it
6 says -- at the bottom it says, "Jeff Henley wrote:  Why
7 did they leave Siebel?  Why is pipeline for CRM light?
8 I.e., is the field afraid to sell it, or is it because
9 we don't have enough visibility as a CRM player,
10 including references?  How stable is the demo
11 environment?  I know that it's been a problem but I've
12 heard that it's finally starting to settle down."
13      Do you see that?
14      A.  I do see that.
15      Q.  So to just break that down a bit, so on
16 February 2nd, 2001, this was your view that the CRM
17 pipeline is light, correct?
18      A.  I don't dispute that I wrote this, so it must
19 have been my view at the time.
20      Q.  Okay.  And as of February 22nd, 2001, you
21 questioned whether the field might be afraid to sell it,
22 correct?
23      A.  That's what I said here.  I asked the
24 question.  I just asked the question.  Is that -- is
25 that a concern?

102

1      Q.  Okay.  And was the field frightened to sell
2 it?
3      A.  I don't know.  I would to have read what she
4 said.  She's only one person, but again, I don't recall
5 the details.
6      MR. WALD:  Why don't you take a minute, Jeff,
7 and why don't you read the last two e-mails on this
8 chain.
9      THE WITNESS:  Right.  Okay.  So now ask me the
10 question again.
11      MR. SOLOMON:  Q.  So as of February 22nd, you
12 were questioning whether the field may be frightened of
13 selling CRM, and then I asked you were they frightened
14 of selling CRM?
15      A.  And I don't recall, honestly.  But the reason
16 I ask it is 'cause salespeople always want to take the
17 easiest, safest route, and so a number of our
18 salespeople over the years didn't push new products as
19 hard as they pushed bread and butter stuff they knew
20 there was -- like database and stuff like that.  So I
21 was trying to get a sense there, I guess, of, you know,
22 from her, at least, what her view is.  She actually
23 isn't the salesperson; she's a -- or was, at the time,
24 a -- what we call a pre-salesperson, but she did demos
25 and things.

103

1      Q.  As CFO at the time, did you want to take the
2 safest and easiest route?
3      MR. WALD:  Object to the form of the question,
4 vague and ambiguous.
5      THE WITNESS:  Yeah, I have no idea what that
6 means.
7      MR. SOLOMON:  Q.  I thought you just said as
8 sales representatives, they wanted to take the easiest
9 and safest route.
10      MR. WALD:  Object to the form.
11      MR. SOLOMON:  Q.  Didn't you just testify to
12 that?
13      A.  Let me just try to expand on this.  If I'm a
14 salesperson and you're selling the whole bag of products
15 and I want to maximize my revenue, unfortunately,
16 sometimes we had some sales reps that would want to take
17 the easiest, simplest way, which is to not worry about
18 selling applications and just sell database, for
19 instance, right?  And that's been one of our issues,
20 and, in fact, subsequently we have split the sales force
21 up more and more over the years to get more focus on
22 selling.  And she pointed out that we've actually been
23 applying some new resources to try to get more focus, so
24 that's really what I meant by that.
25      Q.  Let's go up the e-mail chain.  It says, "Julie

104

1 Cullivan wrote:  The CRM pipeline is light for both the
2 reasons that you mention."
3      Do you see that?
4      A.  I do.
5      Q.  So she's saying -- do you understand that
6 she's saying that it's light because both the field is
7 frightened to sell and also because of the lack of
8 visibility, including references?
9      A.  Okay.  I do understand that she -- I asked
10 that question, "Is it afraid to sell, or is it we don't
11 have enough visibility as a CRM player?"  She said it's
12 both.
13      Now, you asked me was the field afraid to sell
14 it.  I don't know based on -- Julie Cullivan is
15 one person.  She wasn't a sales rep; she was a person
16 that did demos.  So it's an opinion she had, but I can't
17 draw from one person that the field was afraid to sell
18 it.  But I'm certain, in a field of thousands of people,
19 there may have been some people that were reluctant.
20 But whether I generalize that to the field, I don't
21 think I could make that statement.  As I sit here today,
22 I'm not sure that was fair.
23      Q.  Did you ever have a conversation around this
24 time with Jay Nussbaum about whether the field was
25 frightened or not to sell CRM?

105

1   A.  I can't remember if I did or not.
2   Q.  Do you know what Jay Nussbaum's view was?
3   A.  No, but I do know that -- 'cause I testified
4   earlier over the years, whenever we had new products, if
5   we didn't have a lot of good references, if people
6   really weren't certain, then they -- I wouldn't want to
7   say were afraid to sell, but they just took the easy
8   route; they sold the stuff, and so that was always part
9   of our problem was getting focus on newer things where
10   it was more difficult to get out there and took a longer
11   time and everything else to get a sale done.
12   Q.  I'm going to skip a paragraph and then it goes
13   on -- this is the Julie Cullivan e-mail, it says, "As
14   for demo/product issues, we have high hopes for 11.5.3
15   and hope to get these environments soon but always seem
16   to be waiting for the next release, and meanwhile we
17   have to try and compete with what we've got and it's not
18   adequate."
19   Do you see that?
20   A.  I do see that.
21   Q.  And you were aware of that in February of
22   2001?
23   MR. WALD:  Of Ms. Cullivan writing that?
24   MR. SOLOMON:  Correct.
25   THE WITNESS:  Yeah, I'm -- I don't recall it

106

1   specifically, but I'm sure I wrote this because it all
2   started with my nephew, so I really remember starting
3   this conversation.
4   MR. SOLOMON:  Q.  And was that news to you
5   that, at least in her view, Oracle always seemed to be
6   waiting for the next release and meanwhile had to
7   compete with what it had and it was not adequate?
8   A.  No, it was not news to me, actually.  I was
9   aware that we were maturing the product, that we had
10   issues, I testified earlier, with the centralized demo
11   decision we had made, and we were getting better with
12   every month and every dot release, and we were competing
13   with a -- primarily against Siebel who had been in the
14   business a lot longer than we had.  So it was an uphill
15   battle to get to that point.
16   Q.  And then the top -- at the top of this, this
17   is your message starting with, "Presumably the culture";
18   is that right?
19   A.  Yes.
20   Q.  And then you go on to say, "It's been a long,
21   hard road, but I think we're close and I think we've got
22   the right idea."
23   You weren't certain at that stage that you had
24   the right idea; is that right?
25   A.  I wasn't certain?

107

1   Q.  Right.
2   A.  Why would I say what I said, then?
3   Q.  Because you say you think.
4   A.  I think.  Well, that's the best -- if I said I
5   think we're on the right road and I think things are
6   getting better, that's obviously what I felt.  Nothing
7   is certain in life.  Nothing is certain in life.  But
8   when I say I think something, then that's my best
9   judgment of my -- what I believe.  So I was certain.
10   Q.  As opposed to "I know", "I think" is a little
11   bit less --
12   A.  Sure, it is a little less because there's --
13   you know, it's the best of my knowledge, anyway.  But
14   sure.
15   Q.  You say, "It's just been hugely difficult to
16   migrate through all the tech stack change, schema
17   changes, functionality, et cetera.  I think this
18   stabilizes, the issue" -- sorry.  "I think as this
19   stabilizes, the issue switches to field execution and
20   marketing."
21   Do you see that?
22   A.  Yes.
23   Q.  So as of February 22, 2001, you were of the
24   view that it had been extremely difficult to migrate
25   through those issue that you list, including

108

1   functionality, correct?
2   A.  I believe this is totally consistent with what
3   I testified earlier in the morning to.
4   Q.  But as of February 22nd, that was your view,
5   right?
6   A.  Absolutely.
7   Q.  And as of February 22nd, the E-Business Suite
8   rollout had not stabilized, had it?
9   MR. WALD:  Object to the form.
10   THE WITNESS:  I don't -- it -- the way I would
11   answer that is that it was getting progressively more
12   stable with each dot release and with each month, and
13   that's the way I would put it.  But as I said in the
14   note, we were hoping to get it even more stable with the
15   next dot release.
16   MR. SOLOMON:  Q.  Okay.  Did you hire your
17   nephew?
18   A.  No.
19   Q.  Why not?
20   A.  I wouldn't have hired him.  It would have been
21   in the product development team.
22   Q.  Do you know why he wasn't hired?
23   A.  There weren't any openings.  He interviewed
24   with several people, but my recollection was they liked
25   him, but they just didn't have any openings to hire him.

109

1 So...
2     MR. SOLOMON: If we break now for lunch, is
3 that agreeable?
4     MR. WALD: Would you mind, Mark, if we just
5 went about another half an hour? That would be great.
6     MR. SOLOMON: That's fine.
7     MR. WALD: It would just make the afternoon
8 that much easier.
9     MR. SOLOMON: It's not a problem.
10     (Recess taken from 12:38 to 12:42 P.M.)
11     THE VIDEOGRAPHER: Here marks the beginning of
12 Videotape No. 3, Volume 2 in the deposition of Jeffrey
13 Henley.
14     MR. SOLOMON: Can we have marked as next
15 exhibit a document produced by Defendants with control
16 numbers 175158 through 161.
17     (Whereupon, Plaintiff's Exhibit 20 was marked
18     for identification.)
19     MR. SOLOMON: Q. This is the exhibit that we
20 attempted to mark earlier, but we've now got the missing
21 page, 175159 into the exhibit. It's an e-mail dated
22 Wednesday, February 7th, 2001 from Jeff Henley to Larry
23 Ellison -- or actually to Renee Knee, copying Larry
24 Ellison and others. And the second page is just a vcard
25 page, and the third page of the document is an e-mail

110

1 that appears to be from or among Renee Knee, George
2 Roberts, Mike Rosser, Mark Berrenechea, and then a third
3 page -- or actually, the fourth page, the last page is
4 an e-mail from Jim Dow or "Doe" to M. Rosser and others.
5     And the question is going to be: Do you
6 recognize these exchanges?
7     A. Yeah, I do recollect the Renee Knee note in
8 the note that I sent.
9     MR. WALD: Have you been able to read through
10 the whole thing?
11     THE WITNESS: Yes, I have.
12     MR. WALD: Okay. Great.
13     THE WITNESS: I don't recollect the early
14 stuff from Jim Dow, I don't recall whether I got that or
15 not, but I do recall the Renee Knee note.
16     MR. SOLOMON: Q. If you look at the third
17 page of the document, the 175160 page, at the bottom it
18 says, "George Roberts" -- towards the bottom it says,
19 "George Roberts wrote: I think we need to devote an
20 hour or two to this topic in the EC. Right or wrong our
21 competition continues to out execute us at the partner
22 level."
23     Do you see that?
24     A. Yes.
25     Q. And what does that refer to?

111

1     A. This referred to -- I guess he's referring
2 specifically to Mike Rosser's note regarding Siebel and
3 IBM, I guess. I mean, you know, if you read that
4 without the attachment, you could talk to maybe about
5 partners in general, but apparently, he's referring to
6 that particular note.
7     Q. Above it says, "Renee wrote" --
8     A. So then I go on to her note. See, I think
9 she's talking more generically, not just about the IBM;
10 I think she's really talking about partnering.
11     Q. And then she writes, "We're facing a serious
12 threat in our partner base, not only by IBM and Siebel
13 and the highly competitive go to market commitments
14 and partner programs they offer to the major customer
15 influencing partners, but with our local," in
16 parentheses, "(country level) partners who are finding
17 they can no longer do profitable business with Oracle
18 when we limit the training, support and implementation
19 method/tools we offer them. We can continue to believe
20 that because our revenue has been strong, that we are
21 fine without these influencers recommending us as their
22 partner of choice to their customers, but the fact is
23 that we are losing deals when we cannot commit to them,
24 or when we do win a deal with them and then we compete
25 against them with OC inside those deals."

112

1     Do you see that?
2     A. Yes.
3     Q. And then at the top of the page there's a
4 language that starts with "I agree." Do you know who
5 wrote that?
6     A. I believe that came from me, right? 'Cause
7 there's sort of a nothing page in between, but it looks
8 like I sent this to Larry Ellison, Mark Berrenechea and
9 others, right, to talk about at an EC meeting.
10     Q. And do you recall talking about these issues
11 at an EC meeting?
12     A. I don't recall that we talked about it, but I
13 certainly recall, over the years, talking about
14 partnering. I don't recall if we had -- as a result of
15 this note, whether we talked about it, I don't know. We
16 certainly talked about partnering many times over the
17 years.
18     Q. When Renee talks about Oracle limiting the
19 training, support and implementation method/tools
20 offered to partners, do you have an understanding what
21 she means by that?
22     A. Yes, I think so.
23     Q. And what's your understanding?
24     A. I think that Renee -- we've had a variety of
25 people that have run the partner program. At the time

113

1  she was put in to run that, she came in, did an
2  assessment, and in her opinion, at least in parts of the
3  world, or maybe everywhere, she felt there was a variety
4  of things we should do to promote better partnering.  So
5  in her view, we weren't doing enough training, we
6  weren't providing enough support at times and providing
7  enough tools, and as she points out later, we had the
8  issue of competing with these people, which we still do
9  and we always have to some degree.  And so we had some
10  tools that OC had developed and we weren't, at that
11  point, at least, sharing those with our partners because
12  we viewed them as proprietary tools in implementation
13  work.
14      Q.  And as of February 7th, 2001, it was your view
15  and you believed it was everybody's view that Oracle was
16  not making enough progress building partner strength; is
17  that right?
18      MR. WALD:  Object to the form of the question;
19  it's compound.
20      THE WITNESS:  Yeah, I am not sure, when I saw
21  this note, I definitely -- if that's her view, it
22  concerned me that perhaps we weren't and we should
23  discuss it.  So it's always been a topic 'cause, you
24  know, we want to have a good partner channel, and over
25  the years we've done all sorts of things to try to

114

1  ensure that we're building up strength with our
2  partners.  So when you see a note like this, "Hey, let's
3  discuss it.  If this is Renee's opinion, let's figure
4  out what we should be doing differently."
5      MR. SOLOMON:  Q.  But back to my question, as
6  of February 7th, it was your view, and you believed it
7  was everybody's view, that Oracle was not making enough
8  progress building partner strength; is that right?
9      A.  I think that's true.  I think I said that, but
10  I'm trying to put it in context.  I never believed in
11  my -- for the 10 years previously, that we ever did a
12  good enough job building partners.  I was always looking
13  to raise this issue with Larry and the committee because
14  it was very difficult, because we had a competing
15  implementation service ourselves.  So this is something
16  we weren't blind to, we were constantly trying to figure
17  out how to do a better job.  So I was using -- my
18  recollection is I was using her note as a way to, once
19  again, make the point that we could/should be doing
20  better in partnering than we have been.
21      Q.  Did you interact with the financial analysts
22  following Oracle?
23      A.  Yes.
24      Q.  Can you describe the way you interacted?
25      A.  We had a variety of interactions.  I always

115

1  was on the earnings call.  We did an earnings call
2  shortly -- or the day that we released our earnings,
3  within an hour or two of releasing earnings we would do
4  a formal earnings call discussing the results, answering
5  some questions.  We did an analyst day typically twice a
6  year where we invited the sell side and many of the buy
7  side analysts to come out, and many times it was at
8  Oracle, sometimes other places, and discuss the state of
9  affairs and all that sort of thing.
10      So -- and then a few times a year I would go
11  out and participate in what are called sell side
12  analysts days where, I mean, in particular, Goldman
13  Sachs or Morgan Stanley was having a conference and they
14  would bring in companies like Oracle to discuss to
15  investors.  And then occasionally I would meet with a
16  new analyst to sort of help educate them about Oracle.
17      So there was a variety of ways I dealt with
18  the sell side and sometimes the buy side.  But -- and
19  then we had an investment -- a relations department that
20  did a lot of the day-to-day answering of questions and
21  follow-up and that sort of thing, and they reported to
22  me.
23      Q.  Okay.  Aside from the earnings call, the
24  bi-annual analyst day, visiting sell side analysts and
25  meeting with new analysts, did you interact in any other

116

1  way?
2      A.  Well, I think that would probably cover the
3  waterfront.  I mean, sometimes you could do things
4  telephonically, sometimes you could do things in e-mail,
5  sometimes you did things face to face.  But those were
6  just sort of ways of accomplishing what you just
7  mentioned.  So I don't believe I had any other way of
8  talking to the so-called analyst community.
9      Q.  Okay.  So -- but you would add, to be
10  complete, telephone calls and e-mails?
11      A.  Sure, those are ways of communicating; of
12  course.
13      Q.  And with what frequency would you make
14  telephone calls to analysts?
15      MR. WALD:  Object to the form.  It's
16  overbroad.
17      MR. SOLOMON:  Q.  Was it a regular thing?
18      A.  No.  No.  I -- I tried -- my objective -- and
19  I told analysts this, was my objective was to spend the
20  bulk of my time helping Oracle to grow and prosper, so
21  every second I spent with them took me away from that
22  goal.  So I limited the amount of time beyond the
23  bi-annual analyst day and the earnings calls; I really
24  tried to limit the amount of time I spent on talking to
25  these folks.

Henley, Jeffrey  7/27/2006  9:11:00 AM

117

1    Q.  Did you, in calendar 2000, ever initiate a
2  telephone call --
3    A.  I don't recall.  I mean, I just don't recall.
4    Q.  Was it -- again, I'm on telephone calls.  Was
5  it more frequent to receive calls than to make them to
6  analysts?
7    MR. WALD:  If you can generalize.
8    THE WITNESS:  Yes.  Yes, I would say that's
9  true, but again, didn't get very many.  They were
10  trained to go to investor relations and deal with them
11  first, and they would forward stuff to me if they needed
12  answers.
13    MR. SOLOMON:  Q.  Did you have any particular
14  analysts that you engaged with more often than others?
15    A.  Yes.  I mean, I think there was a hardcore
16  group that had been around for a long time that, over
17  the years, stayed following us, so because of -- because
18  I got to know them better, and because they knew the
19  company better, I tended to -- had a stronger
20  relationship, and I thought they actually knew more
21  about the company based on their tenure.  So I typically
22  would attend their conventions.  The Morgan Stanley, the
23  Goldman Sachs, they were tier one guys, so for a variety
24  of reasons there were a handful of them I had more
25  interaction with than others.

118

1    Q.  Did any of them ever send you draft analyst
2  reports?
3    A.  To the best of my knowledge, no.  Not me,
4  personally.
5    Q.  Did any of them ever send to Oracle draft
6  reports?
7    A.  I believe they may have had discussions with
8  whoever was running investor relations, but I didn't
9  typically get involved with that sort of thing.
10    Q.  And who was running investor relations in 2000
11  and early 2001?
12    A.  I believe it was Stephanie Aas because that's
13  whose e-mails you're showing me, so she must have been
14  the head during that period of time.  She once headed
15  it, and so it must have been during that period.
16    Q.  Did you ever see any draft reports that Oracle
17  sent to Stephanie Aas or anyone else?
18    A.  I don't -- I would have to put an asterisk by
19  what I said earlier, I guess.  I may have gotten one or
20  two early -- in the early days of Oracle.  I never read
21  them; I simply said, "I don't do this.  I don't get
22  involved with looking at your drafts."  So if I received
23  one, I never read them.  And it may have been once or
24  twice, and they tried to get me to look at a draft and I
25  routinely said, "I don't do that.  That's your job, not

119

1  my job."
2    Q.  The analyst?
3    A.  The analyst's job.
4    Q.  So why would Stephanie ask for draft reports?
5    A.  I don't know.  I said she may have.  I have no
6  idea.
7    Q.  And do you know who Chuck Phillips is?
8    A.  Yes.
9    Q.  Who is Chuck Phillips?
10    A.  Who is he?
11    Q.  Who is he?
12    A.  Who is he?  He's the current Co-President of
13  Oracle right now, and for a number of years before he
14  joined Oracle he worked at several different brokerage
15  firms as a sell side analyst, and one of the firms he
16  covered was Oracle.
17    Q.  And was he one of those analysts that was top
18  tier, as far as you're concerned?
19    A.  Most definitely.  He worked for top tier in
20  terms of scale of firm, but his last assignment was at
21  Morgan Stanley, so they were a tier 1 firm, and he was
22  top tier in that he had covered Oracle about as long as
23  anybody, so he knew an awful lot about Oracle.  And so I
24  always found his insight better than many of the
25  younger, newer analysts who just didn't understand the

120

1  company as well.
2    Q.  Let's mark as the next exhibit a document
3  produced by Defendants with the control numbers 092885
4  through 889.
5    (Whereupon, Plaintiff's Exhibit 21 was marked
6    for identification.)
7    MR. SOLOMON:  Q.  This is an e-mail dated --
8  while you're looking at it, this is an e-mail dated
9  Tuesday, February 27th, 2001, from Safra Catz to Jeff
10  Henley, and attaching an e-mail exchange from Stephanie
11  Aas, or a report, perhaps, by Stephanie Aas concerning
12  Morgan Stanley.
13    A.  Yes.
14    Q.  Do you see that?
15    A.  Yes.
16    Q.  Have you seen this before?
17    A.  Have I seen -- there are several parts of
18  this.  Have I seen the Morgan Stanley coverage?
19    Q.  Sure.
20    A.  I don't recall if I read it.  I'm sure I got
21  it.
22    Q.  Okay.
23    A.  Probably, but, I mean, I don't know if I read
24  it all.
25    Q.  Okay.

121

1  A. But there's a note above it from me, right?
2  Q. Yes.
3  A. Which -- I really don't think it related to
4  this topic, but a separate thing.
5  Q. Okay. It says, at the top, "From Safra Catz
6  to Jeff Henley," and the re line is "forward Morgan
7  Stanley's coverage of Apps World."
8  A. Yes.
9  Q. Doesn't that suggest, then, that these e-mails
10 would have been viewed by you?
11 A. No, no, no, I -- I don't recall whether I got
12 it or read it, but it certainly is likely. But this
13 note is really something different than Apps World.
14 Q. It's about hiring Phillips, correct?
15 A. Yes. Exactly. Right.
16 Q. Looking at the report below that, it starts
17 off, "Great coverage from Chuck Phillips on Apps World.
18 See full reports below and attached."
19    Do you see that?
20 A. Yes.
21 Q. And then the first line item is "Pipeline" --
22 does that say "intact"?
23 A. Intact, yes.
24 Q. And it says, "After meetings with dozens of
25 integrators, Oracle partners, and Oracle sales and

122

1  finance executives, we walked away thinking business
2  still sounds pretty solid."
3     Do you see that?
4  A. I do see that.
5  Q. Were you one of the finance executives who
6  attended the Apps World conference?
7  A. Yes.
8  Q. And so this would reflect something that you
9  had said to Chuck Phillips; is that fair?
10 A. I think my modus operandi has been clear over
11 the years because as I testified earlier, I've done
12 many, many of these conferences over the years, and I've
13 always been very clear that I don't want to talk about
14 the quarter, per se. I will talk about just business
15 trends and certainly at Apps -- particularly at Apps
16 World we were very intent on explaining where we were
17 with 11i and this process of stabilizing and growing
18 that business. So that was the context in which I
19 helped to host this day, which was to present customers
20 and other things so they could get an independent view
21 from customers and partners about where they thought we
22 were. But I was always clear not to get into talking
23 about the current quarter.
24 Q. Okay. So I'm looking at -- towards the end of
25 that first page it says, under "Applications Business

123

1  Gaining Traction", it says, "Oracle's E-Business Suite
2  now has 180 customers live, 2,500 implementations
3  underway and 11,000 total applications customers."
4     Do you see that?
5  A. Yes.
6  Q. Was it true that Oracle's E-Business Suite, as
7  of February 27, 2001, had 180 customers live?
8  A. I believe Chuck was pretty good at taking down
9  notes, and I'm sure we made -- again, the essence of
10 this was to try to give him a status report or a
11 snapshot of where we were at the time, so we had some
12 Powerpoints, and I don't know who presented it, but we
13 did present information about how many customers were
14 live, how many were being in the process of
15 implementation, and we routinely did that. So yeah, I'm
16 assuming he copied those numbers down right.
17 Q. And is it true that there were 2,500
18 implementations under way at that stage?
19 A. Again, if these are the numbers that we
20 represented, to the best of my knowledge this was
21 factual information; that's correct.
22 Q. I'm looking at the second page of the
23 document, and I'm at the top of the page. It says, "We
24 dropped in on the Big Easy to check on the Oracle
25 Applications user conference this past week. After

124

1  meetings with dozens of integrators, Oracle partners,
2  and Oracle sales and finance executives, we walked away
3  thinking business still sounds very solid. Despite the
4  carnage of many technology bellwethers, Oracle's
5  pipeline of deals continues to grow nicely, from what we
6  can tell, and the close rate sounded a bit better than
7  we anticipated. Recognizing the back end skew to every
8  quarter, we expected to hear more hedging on the quarter
9  until things closed."
10    Do you see that?
11 A. Yes.
12 Q. So as of February 27, 2001, were you and your
13 colleagues representing that Oracle's pipeline of deals
14 continued to grow nicely?
15    MR. WALD: Object to the form of the question.
16    THE WITNESS: Again, I don't believe I made
17 any comments about the quarter.
18    MR. SOLOMON: Q. Okay. What about your
19 colleagues?
20 A. I can't speak to my colleagues. All I know is
21 that I was very -- always very careful and always
22 prefaced the start of any of these things that I'm not
23 going to talk about the quarter. But again, the notion
24 of this was to talk about the applications business;
25 where we were, all the other things. And so we gave

125

1  them, as I testified earlier, a number of facts which
2  indicated there was a lot going on.
3      Q.  Okay.  But you don't recall overhearing any of
4  your colleagues saying that the pipeline of deals
5  continued to grow nicely; is that true?
6      A.  I don't recall -- no, I don't recall hearing
7  that, whatever.  But again --
8      Q.  That's okay.  If you don't recall, that's
9  fine.  That's the answer.
10      Then the next page, which is 092887 --
11      A.  887, right?
12      Q.  Okay.  I'm looking at the top, "Oracle
13  Applications Release 11i Status Summary," and then it
14  says, "Management provided an update of the key
15  performance metrics for 11i."
16      Do you see that?
17      A.  Yes.
18      Q.  And it says, "180 customers live on Oracle
19  applications 11i.  2,500 implementations underway on
20  11i", and provided some more information.
21      Do you see that?
22      A.  Yes.
23      Q.  Was that you providing the update?
24      A.  I don't remember.
25      Q.  I'm looking at the fifth -- sorry, the fourth

126

1  page, page No. 092888, and towards the bottom
2  "Consulting and Services."
3      Do you see that?
4      A.  Yes.
5      Q.  "Consulting services remains a drag on total
6  services and total revenue."
7      Do you see that?
8      A.  Yes.
9      Q.  Is that information that you provided?
10      A.  I don't recall what I said, or whatever, but I
11  do generally -- we had made a strategy change, and Larry
12  had talked about this several quarters earlier, about
13  trying to -- as part of this partner thing, which I
14  testified earlier, to not compete as much with our
15  partners, to try to encourage them to work with us.  So
16  we said that we would stand down and let partners take
17  more of our business if they would work with us and so
18  forth.
19      So I think this is what this comment that we
20  made was where we said that we were continuing to try to
21  deemphasize consulting, not maximize the growth, but
22  actually give more business to our partners, and I
23  believe that what that comment relates to, it says
24  "remains a drag."  This is something that we had been
25  working on for several quarters.  This is a specific

127

1  strategy change that Larry had made.
2      Q.  Now, this is -- February 27, 2001 is one day
3  before the close of Q3 2001; is that right?
4      A.  That's correct.  I don't think it was a leap
5  year, so yeah.
6      Q.  And at that stage you were aware that Oracle
7  was going to miss its quarter; is that right?
8      A.  No, I don't believe that.
9      Q.  You weren't aware, then?
10      A.  No.  I don't believe I became aware we were
11  going to miss our quarter until the last afternoon of
12  the last day of the quarter.  So this was one day before
13  that.
14      Q.  Okay.  Were you of the view, in or around
15  March of 2001, that the 11i had proven difficult to
16  bring to the market with respect to stability and
17  delivery times?
18      A.  Again, I've testified as much as I know
19  earlier, so I can repeat what I said earlier about the
20  early stages and maturing the product and so forth.  I
21  don't have any other thing I could add.
22      Q.  Okay.  When did 11i become stable?
23      A.  I don't know the answer to that.  There's no
24  magic point, I think, but the history of this industry
25  is as products get -- stay around longer and they have

128

1  more and more users, more and more bugs get identified
2  and worked out, and eventually products get stable.  I
3  have no idea.  Different customers would tell you the
4  product was stable than other customers.  It depended
5  upon their particular circumstance.  So we had a number
6  of customers, actually, that I met in late 2000,
7  calendar 2000 that told me the product was fine.  But I
8  was definitely aware there were other product customers
9  who didn't think the product was stable.
10      Q.  Who told you the product was fine?
11      A.  I don't remember the names, just like I don't
12  remember the names of some of the customers we had
13  problems with.  But there were many, many products, and
14  some of the products were better than others, were more
15  stable and became stable.  So there is no magic date I
16  could tell you the product became stable.  It really
17  depended upon the circumstance for the particular
18  customer, when it would be so-called "stabilized".
19      Q.  Can you give me the number of any one customer
20  who, in Q3 '01 or before then, told you that the 11i
21  E-Business Suite was fine?
22      A.  No, I can't because I don't recollect.
23      Q.  Okay.
24      A.  But I do recollect there were customers that I
25  met in the early days that had been early beta customers

129

1  and so forth that were happy with the product. But, I
2  mean, to say that even they thought everything was
3  perfect, I'm sure they didn't. But they felt the
4  product was operable, and it wasn't that -- we had other
5  customers who were quite concerned. I was well aware of
6  that.
7      Q.   And you can't recollect any of the companies'
8  names who said it was fine or any individuals --
9      A.   No, I can't recollect, as I testified earlier,
10  of all the customers who -- some of the customers that
11  had problems, either.
12      MR. SOLOMON:  Okay.  Let's take a lunch break.
13      (Recess taken from 1:14 to 1:45 P.M.)
14      MR. SOLOMON:  Q.  Mr. Henley, you testified
15  earlier that it was on the afternoon of the last day of
16  the quarter of Q3 '01 that you first realized that
17  Oracle was going to miss its forecast for that
18  quarter; is that correct?
19      A.   That we knew that -- we were certain we were
20  going to miss the quarter, yes.
21      Q.   When did you first suspect that you might miss
22  it?
23      MR. WALD:  Object to the form.
24      THE WITNESS:  The last several days.  Every
25  day the forecast kept dropping, so clearly, as it

130

1  dropped more and more, the chances of missing grew. But
2  as I testified earlier, we didn't get to the point till
3  the last -- literally the last day when the east coast
4  was kind of -- everybody knew what was left, that we
5  really missed.  So certainly that we were -- the last
6  few days we were starting to get concerned that we might
7  miss.
8      MR. SOLOMON:  Q.  Okay.  Now, as opposed to
9  missing the forecast, when were you first aware that the
10  company was being affected negatively by the state of
11  the economy?
12      MR. WALD:  Object to the form, vague and
13  ambiguous.
14      THE WITNESS:  I think until we missed the
15  forecast so badly that it really dawned on us that
16  clearly something was going on out there with customer
17  confidence, and it turned out to be, in hindsight, that
18  the U.S. was looking towards a recession.
19      MR. SOLOMON:  Q.  So is your answer that you
20  first became aware that the economy was having an
21  adverse impact on Oracle, that it was just the same as
22  when you realized you were going to miss the forecast?
23  Are you saying the two are the same; is that what you're
24  trying to say?
25      A.   Yeah, let me -- if I understand your question,

131

1  yeah, I think so.  I think what I'm saying is that
2  what -- and what we said on the calls after we missed
3  the quarter was that there was a precipitous change at
4  the executive levels in these companies where all of a
5  sudden deals that had been promised to us weren't
6  happening now.  And so I think that was because business
7  confidence was changing very rapidly because people's
8  own outlooks of where the economy was headed and their
9  book of business was changing, and so all of a sudden
10  that changed their view as to whether they want to sign
11  a contract with us, and our competitors, as well.
12      Q.   You say deals that had been promised to you.
13  What deals are you talking about?
14      A.   On the conference call we pointed out that a
15  number of deals that our sales force had counted on in
16  their forecast, and in some cases, you know, usually you
17  work with a customer and say, "Can we get this
18  negotiated, signed and -- signed and finished by the end
19  of the quarter?"  We were assured that we could, and it
20  didn't happen.  And a lot of deals ended up just
21  slipping and not getting completed.
22      Q.   But you used the word "promise".  That's a
23  strong word, isn't it?
24      A.   Promise, sure, absolutely.  Many customers,
25  when you negotiate with them, you're saying, "Look" --

132

1  the salesperson will say, "Look, the end of my quarter
2  is now.  I would really like to get this done.  Do you
3  think we can get this done?"
4      And sometimes a customer will say, "Yeah, I
5  think so."  Sometimes they won't commit.  Sometimes
6  they'll say, "Well, maybe.  I don't know."  But we had a
7  number of customers who, in any quarter, will say,
8  "Yeah, I think we probably can get that done."
9      So if that's a promise, I don't know.  Nothing
10  is guaranteed until it's finished, but that's a very
11  typical way our sales force works is trying to get a
12  sense of urgency, a deadline that everybody kind of
13  worked to to get something done, and typically, the end
14  of the quarter is a good way to kind of galvanize
15  everybody to get something finished.
16      Q.   Can you identify the customers that promised
17  to do deals but ended up not doing deals?
18      A.   No, I can't recall and wouldn't even know
19  that.  I mean, at my level we were getting -- you know,
20  we would do weekly reporting, and there's a whole
21  pipeline and there's forecasts made.  It's all bottoms
22  up coming out of thousands of deals all over the world.
23      Q.   So was it thousands of deals all over the
24  world that fell through at the end of the quarter?
25      A.   I don't know how many deals, but it was a lot

133

1  of deals.  It wasn't one or two deals that slipped.  You
2  wouldn't have missed the quarter as badly as we missed
3  it if there wasn't a real change in sentiment out there
4  that affected a lot of transactions.
5      Q.  Did you or any other executives tell the
6  investing public that it was just a few deals that had
7  fallen out of the end of the quarter?
8      A.  I don't believe I used the word "few".  I
9  would have to go back and read the transcript of what I
10  said in the call, but I don't believe I ever used the
11  word "few".  I think there was a significant change in
12  business sentiment, and that's why it was such a shock
13  to us and a shock to -- why we missed the forecast a lot
14  worse than we ever thought we would.
15      Q.  You were aware that a few weeks earlier Larry
16  Ellison engaged in the biggest insider selling binge,
17  almost, in history?
18      MR. WALD:  Object to the form of the question.
19  You don't need to adopt that characterization.
20      THE WITNESS:  So no, I wasn't aware of what he
21  was doing.  I rarely would ever know what Larry or the
22  other people do inside the company.
23      MR. SOLOMON:  Q.  So why, when you had the
24  responsibility to police insider selling, would you not
25  know?

134

1      A.  Because as I testified earlier, my
2  responsibility is if I know something material,
3  particularly materially adverse that might affect our
4  forecast or things that aren't known by the public, I'm
5  obligated to tell our general counsel and we would
6  discuss it and decide to not allow people to trade.
7  There was no need for me to do that in the period where
8  Larry Ellison sold.  So -- or any other executives that
9  may have sold in that period of time.
10      Q.  Did you know that Larry Ellison was selling
11  stock when he sold stock in January of 2001?
12      A.  No.
13      Q.  And why did you not know that?
14      A.  Because I just testified, I do not routinely
15  get involved in approving different insiders in the
16  company selling the stock.  My responsibility that the
17  general counsel and I agreed to was I would let him know
18  if I knew of any reason why we had to stop people from
19  trading.
20      Q.  So did you ever issue approvals for trading?
21      A.  I may have in the early days, yes.  In the
22  early days of my tenure at Oracle, before Dan's time,
23  Dan Cooperman, general counsel, I think I did get -- was
24  a little more involved where the general counsel and I
25  were on these e-mails, and I reached a point years

135

1  before this period, I think, where I concluded that I
2  wasn't adding any value.  My real value is just not the
3  administration side; it's if I know of something, I will
4  get with the general counsel and we'll discuss it, and
5  if we agree, we'll stop trading.
6      Q.  So it's your testimony that in 3Q '01 you were
7  not involved in issuing approvals for stock sales by
8  insiders?
9      A.  I don't believe I was.  It's not my
10  recollection.  There was a point where I was, but I
11  think by then I wasn't routinely in this approval cycle.
12      Q.  Let's put it another way:  If you were
13  involved, would it make any sense that you would be
14  issuing approvals for some people but not be involved in
15  issuing an approval for Larry Ellison?
16      MR. WALD:  Object to the form.  It's a
17  hypothetical.  No foundation.
18      THE WITNESS:  Again, I -- again, I don't -- I
19  don't -- my role, I used the word "role" in the previous
20  question earlier in the morning.  My role was not to be
21  involved in the administrative approval of something.
22  My role was to -- because I had very deep -- more deep
23  knowledge than the general counsel about our forecast
24  and such -- was to make the general counsel who was
25  doing these approvals aware of a material event or

136

1  something that was not known to the public.  So that was
2  my role, and I have always done that.  If I ever know of
3  something that's significant, I'll talk to them about
4  it.
5      Q.  But that's only happened like twice over 10 or
6  15 years, right?
7      A.  Yeah, yeah, very infrequently --
8      Q.  So when you say "always," you've done it
9  twice, right?
10      MR. WALD:  You're talking over each other.
11  Let's go back, Jeff, with your answer.
12      THE WITNESS:  Whenever there is a reason for
13  me to go to him, i.e., something that's significantly
14  adverse in particular, then I would always feel
15  obligated and would go and talk to the general counsel
16  no matter what.  And as I testified earlier, it's only
17  happened, I think, a couple of times over the course of
18  time.
19      MR. SOLOMON:  Q.  As of March of 2001, was it
20  your view that there was not much support for Oracle's
21  CRM products?
22      MR. WALD:  Object to the form.
23      THE WITNESS:  Again, as I -- as I testified
24  earlier, there were clearly issues with demos and
25  product stability and such, but my view, my recollection

Henley, Jeffrey  7/27/2006  9:11:00 AM

137

1   of my view in March was that we were making progress.
2   It was a slow slog, but we were, every month, getting
3   better and better and getting more resources in place
4   and so forth to be successful in CRM.
5       MR. SOLOMON:  Q.  Was it your view in 3Q '01
6   that Oracle's database business was driven in large part
7   by packaged applications?
8       A.  You would have to be clearer to me.  What does
9   "large part" mean, and what does "packaged" -- Oracle
10  packaged, or all packaged applications?
11      Q.  Oracle.
12      A.  That was not my view then, no.  It was not my
13  view then -- and again, you probably should define
14  "large part" to be sure I'm answering you correctly.  If
15  you tell me what the definition of "large part" is and
16  you define Oracle, then I can give you an answer.
17      Q.  Let me ask another question.  Was it your view
18  in Q3 '01 that Oracle's database business was driven in
19  any way by Oracle's applications business?
20      A.  In any way.  Certainly to the extent that we
21  sell Oracle applications, in many times there was a
22  database element to that sale, not always, but many
23  times.  So there was some effect on our database
24  business, but it was certainly not a huge part of our
25  business by any degree.

138

1       Q.  I'll mark as the next exhibit a document
2   produced by Oracle with the control numbers 111764 and
3   765.  Correction, that is 11763 through 764.
4       (Whereupon, Plaintiff's Exhibit 22 was marked
5       for identification.)
6       MR. SOLOMON:  Q.  The question will be:  Do
7   you recognize any of these exchanges?
8       A.  I don't recall them, and I'm not shown as a
9   recipient.
10      Q.  Okay.  If you look at the second page you'll
11  see, in fact, that on the e-mail dated Friday, March
12  9th, 2001, you are shown as a recipient.
13      A.  Yes, I'm sorry.  So I missed it in the long
14  stream of names.
15      That said, I don't recall seeing it, but I'm
16  sure I saw it.  I'm not disputing the fact that I was
17  copied and got a copy.
18      Q.  Okay.  And you'll see that the third page of
19  this exhibit at the top refers to an Information Week
20  article.  Do you recall seeing any such article?
21      A.  Again, I don't recall.
22      Q.  Okay.  You'll see that there's a bullet point
23  "Difficulties with Euro transition."
24      Do you remember being aware of difficulties
25  with Euro transition?

139

1       A.  Again, you're talking about in this period of
2   time with this particular account?
3       Q.  Sure.
4       A.  No.
5       Q.  Was it your view that at around that time, it
6   would have been March of 2001, Oracle was in denial with
7   respect to the problems with 11i?
8       A.  As I testified earlier, I think that we were
9   all well aware of the status and evolution of things
10  since that previous summer and had a lot of discussions
11  at meetings, and certainly executives were well involved
12  working with accounts where there were problems.  So I'm
13  not sure -- I wouldn't characterize it as denial.  We
14  clearly were working through the -- getting all these
15  problems resolved and making all the customers happy.
16      Q.  Okay.  I'll have marked as the next exhibit a
17  document produced by Defendants with the control numbers
18  059745 through 747.
19      (Whereupon, Plaintiff's Exhibit 23 was marked
20      for identification.)
21      MR. SOLOMON:  Q.  These are e-mail exchanges
22  dated March 22nd, 2002, involving Jeffrey Henley, among
23  others.
24      MR. WALD:  For the record, this is 2002?
25      MR. SOLOMON:  That's what it says.

140

1       MR. WALD:  Okay.
2       THE WITNESS:  So I have this.
3       MR. SOLOMON:  Q.  Do you recognize it?  Well,
4   let's just be specific.
5       Do you recognize the e-mail on the second half
6   of the first page from Larry Ellison to you and others?
7       A.  Yes, I do.  I do.
8       Q.  All right.  And he says, on the second page
9   now, "Our top priority is to get Oracle users are," in
10  quotes "delighted," closed quotes, "with the quality and
11  functionality our CRM products.  Until that happens, I
12  doubt we will achieve success in the market.  The
13  biggest problem is missing features as opposed to show
14  stopper bugs.  There are a few of those as well, but
15  they are much easier to fix.  Every applications meeting
16  now centers around representatives from our user
17  community who report back on application quality and set
18  priorities for development.  We cannot remain in denial
19  if we talk with our users every day.  We need to work
20  very hard to achieve a high degree of customer
21  satisfaction for our sales and marketing products as
22  soon as possible.  We will have major improvements by
23  June, but we are unlikely to deliver all we need until
24  September."
25      Do you see that?

141

1    A.  I do see that.
2    Q.  And do you recall reading these statements by
3  Larry Ellison in March of 2002?
4    A.  Yeah, I don't recollect all the words, but I
5  definitely remember the discussion and pressing him,
6  and, you know, continuing to press him on things that we
7  needed to get and so forth.
8        This first memo here, the last part of it, I
9  guess, kind of goes backwards in chronology, but from
10  Mark to Jeff and Jennifer related to weekly meetings
11  in -- inside Oracle about functionality we needed with
12  the various CRM products to do our jobs better.
13    Q.  I'll have marked as the next exhibit an
14  analyst report dated February 8th, 2001.
15        (Whereupon, Plaintiff's Exhibit 24 was marked
16        for identification.)
17    MR. SOLOMON:  Q.  This is a first call
18  printout of an analyst report from Deutsche Banc.  And
19  when you've had a chance to look at it, just let me know
20  if you recognize this as an analyst report you've seen
21  before.
22    A.  I don't recall seeing it, but --
23    Q.  You don't dispute --
24    A.  I know who Jim Moore is, and I don't dispute
25  the fact he wrote the note.

142

1    Q.  All right.  It says, "Highlights: Visit with
2  management," and then it goes on to say, "Yesterday we
3  checked in with Oracle for a mid-quarter" -- I'm not
4  sure what's -- I've got a hole punch there.
5        Can you tell me what that word says?
6    A.  "Update", maybe.  I'm only speculating.
7    Q.  Okay.  "With CFO Jeff Henley and VPs in the
8  server and applications development customizations."  Is
9  that right?  Or excuse me, "organizations".
10    A.  Right.
11    Q.  Do you recall being visited by representatives
12  from Deutsche Banc?
13    A.  I don't recall.  I'm assuming he visited me; I
14  just don't recall.
15    Q.  It then goes on to say, "Perspective on the
16  macro environment."  Then it goes on to say, "According
17  to management, it has yet to see macro-related weakness
18  in its business."
19        Do you see that?
20    A.  Yes.
21    Q.  Did you tell Deutsche Banc, on or around
22  February 8th, 2001 -- actually, February 7th,
23  2001 -- that you saw no macro-related weakness in
24  Oracle's business?
25    A.  I don't recall what I said, but no.  And

143

1  I'm -- I read on further.  I have never reiterated our
2  outlook or guidance; that's just not the way I operate.
3  I don't go and say, "I'm reiterating to you that the
4  forecast is the same" --
5    Q.  We're going to get to that because I know you
6  testified earlier on about that topic.
7    A.  So sometimes these guys meet with you and they
8  talk to me and the servers and the app people, and they
9  sort of read body language, I guess, and they say,
10  "Well, gee, this is what I had," but I have always been,
11  as I testified earlier, very careful not to talk about
12  the quarter when people come in to see me.  I have no
13  interest in getting into details of the quarter.
14    Q.  Okay.  We're going to get to that, okay?  But
15  you anticipated.  I want to stick with where we were.
16        You don't recall saying that Oracle hadn't
17  seen any macro --
18    A.  I don't recall.
19    MR. WALD:  I think it says "has yet to see".
20    MR. SOLOMON:  "Has yet to see".  Right.
21    THE WITNESS:  Certainly, that was, I think,
22  still my view that despite the things that had gone on,
23  we said that there was a wild card.  The forecast I was
24  getting still seemed to support, you know, that we would
25  make our quarter and that sort of thing, which was still

144

1  going to be a good quarter and so forth.  But whether I
2  told him or not, I don't know.
3    MR. SOLOMON:  Q.  Okay.
4    A.  I don't recall that.
5    Q.  Let's go back to what you anticipated would
6  become a topic, and it is about to become a topic --
7    MR. WALD:  You're not going to read the next
8  sentence?
9    MR. SOLOMON:  Well, I think that that's --
10    MR. WALD:  I'm joking.
11    MR. SOLOMON:  I think that's more what
12  Deutsche Banc is saying.  I'm interested in particular
13  in what Mr. Henley is saying.
14    MR. WALD:  I don't necessarily agree with that
15  characterization, but I have no reason to argue.
16    MR. SOLOMON:  Q.  So anyway, I'm skipping down
17  to, "No Change to Outlook, recent guidance."  And it
18  says, "Mr. Henley reiterated that the company's outlook
19  and guidance were unchanged for F3Q '01," and your
20  testimony is that that is not true.
21    A.  My stock line is always that I'm not going to
22  get into the quarter.  If we have something to report to
23  you, we'll do it publicly.  I'm not going to get into
24  the quarter.  So a lot of these guys interpret that, I
25  guess, to mean that there's no change.  I don't use

145

1   those words; never have, never will.  I just don't get
2   into talking about the quarter.
3       Q.   So just to be absolutely clear, if Mr. Moore
4   or Mr. Chen were to say that you reiterated outlook and
5   guidance, that they would be lying?
6       A.   I'm not going to accuse them of lying.  I
7   would never say that.  I don't know what they thought.
8   I'm just telling you the way these guys all work is when
9   they meet, because I don't tell them anything new,
10  they're going to say, "Well, then nothing has changed
11  and he's reiterating the guidance."  And I have just
12  always steadfastly maintained over the years I'm not
13  going to talk about the quarter.
14      Q.   So you don't want to call them liars, but you
15  would say they were absolutely mistaken if they were to
16  say --
17      A.   That I said those words?  I did not reiterate
18  to them that everything is hunky dory, I'm not going to
19  change a thing, no, because that's not the way I do
20  things.  I was always very careful to say if and when
21  there's something that's material or something, I'll let
22  the whole world know, but I'm not going to talk about
23  the quarter.  So if they interpret things based on that,
24  I don't know.  Maybe that's how they got those
25  statements.  So I'm certainly not going to call them a

146

1   liar that he thinks that I wasn't making any changes,
2   because I wasn't.  I wasn't -- you know, I can't recall
3   any quarter in the history of Oracle where I have been
4   the CFO where I have changed guidance.  They all know
5   that because you never know until the end of the quarter
6   what is going to happen because it's so back-end loaded,
7   so it would never make any sense for me to change
8   forecast or change guidance.  I don't think I ever have
9   changed guidance.
10      Q.   What's the point of guidance if you never know
11  until --
12      A.   The point of it is at the first of a quarter,
13  when we do our earnings call, to try to give people our
14  best view of the way things look for that quarter.  We
15  never go out beyond the quarter, but -- so they'll get
16  their numbers as close to ours as we can and give the
17  market a view of what we think, we give them guidance.
18  And as I just told you, I can't recall ever changing
19  guidance because we just don't know.  A couple months go
20  by and then we wait for this flurry of business to close
21  at the end of a quarter, and most times over the
22  50-some-odd quarters I've had it, things work out and we
23  meet or exceed the EPS number that we put out in our
24  guidance.  We didn't in this particular quarter you're
25  talking about, though.

147

1       Q.   Did you engage in earnings management?
2       A.   What does that mean, earnings management?
3       Q.   You never heard that before?
4       A.   I've never falsified records, I've never -- my
5   people have never knowingly done anything to put out
6   wrong financial -- financials, if that's what you mean
7   by earning --
8            What do you mean by "earnings management"?
9       Q.   Do you not have an understanding what earnings
10  management is?
11      A.   No, I'm not sure.  You tell me what earnings
12  management is.
13      Q.   Have you ever read an SEC pronouncement on
14  earnings management?
15      A.   You tell me what you mean by "earnings
16  management" and I'll try to answer your question.
17      Q.   No, I'm taking the deposition -- I'm taking
18  the deposition, you're not, and I'm asking you --
19      A.   I think I've read articles where people
20  knowingly manipulated their numbers.  We have never
21  knowingly manipulated our numbers.
22      Q.   I'm asking have you or did you engage in
23  earnings management?
24      A.   If you're defining that -- you have to define
25  it for me.  I'm not going to answer your question

148

1   without you telling me what earnings management means.
2   I testified that I've read stories, I have, to your
3   point, about people knowingly falsifying numbers.  We
4   have, to the best of my knowledge, never done that.
5       Q.   And back to my question about earnings
6   management, have you ever read an SEC pronouncement on
7   earnings management?
8       A.   No, I don't believe I have.  I don't believe I
9   have.  I'm just --
10      Q.   Have you ever read any accounting literature
11  about earnings management?
12      A.   Sure, and I'm saying this, and I say "sure" in
13  the context that it's very important that companies
14  accurately reflect the real results of their quarters,
15  both their income statements and balance sheets, and
16  that they don't manipulate the numbers, they don't set
17  up false reserves or hide things, or whatever.  So we've
18  always been very, very diligent, and I have very
19  competent people who take it very seriously to make sure
20  that when we go out on any quarter, our numbers are
21  accurate.
22      Q.   Have you ever pulled in a deal from a future
23  quarter into a current quarter in order to meet
24  forecasts?
25      A.   Have I, personally?

Henley, Jeffrey  7/27/2006  9:11:00 AM

149

1    Q. Or your staff.
2    A. My finance staff? No, that's not -- well, I'm
3  not sure how my finance staff could do that, but no, the
4  answer is no.
5    Q. Have you ever witnessed any incidents at
6  Oracle where a deal scheduled to close and be recognized
7  in a subsequent quarter was pulled into an earlier
8  quarter?
9    MR. WALD: Object to the form of the question.
10    THE WITNESS: There is lots of pressure in any
11  company to -- for people to meet their sales targets.
12  So I'm very aware that there's lots of pressure for
13  people to get out there and make their sales forecast
14  and work hard to get customers lined up and committed to
15  closing deals and making sure they hit their numbers.
16  And so there's lots of activity where sales reps are out
17  there trying to expedite deals to make sure they don't
18  slip; absolutely, I'm aware of that. And if they -- if
19  deals -- they have a variety of deals, they don't close
20  them all, so if some deals they counted on slipped and
21  they work real hard to try to get other customers to
22  sign to make up for it and that sort of thing. So I'm
23  aware of that. My staff and myself have nothing to do
24  with that, but I'm certainly aware of that.
25    MR. WALD: There's nothing wrong with it.

150

1    MR. SOLOMON: Are you testifying, Mr. Wald?
2    MR. WALD: No, I'm just trying to understand
3  what the basis for your question is.
4    MR. SOLOMON: You don't need to do that. You
5  know that. You're better than that.
6    MR. WALD: Mark, you've been badgering the
7  witness now for 15 minutes on this issue.
8    MR. SOLOMON: About earnings management that
9  he has never heard of.
10    MR. WALD: He doesn't say that he hasn't heard
11  of it. Obviously, you haven't heard of it because you
12  haven't been able to define it. That's been the problem
13  here.
14    MR. SOLOMON: Q. Have you ever witnessed a
15  situation where a deal that could have been recognized
16  in an earlier quarter was pushed out to a subsequent
17  quarter in order to meet forecasts?
18    A. No, no. I've never been involved in something
19  like that or seen something like that, no.
20    Q. Have you ever seen a situation where an
21  expense was either pushed out or pulled into a quarter
22  in order to smooth earnings?
23    A. No. Again, I have a very ethical staff of
24  people and they work very hard to make sure that we book
25  expenses and revenue in accordance with GAAP and company

151

1  policy and so forth.
2    Q. And you don't know what the SEC or accounting
3  bodies have said about the topic of, in quotes,
4  "earnings management", right?
5    A. Again, I am aware of articles out there
6  where -- and this goes back several years ago when there
7  were articles about IBM and the way they treated certain
8  items; there were certain things that they classified in
9  their income statements that the SEC took issue with;
10  there's been lots of articles about SEC taking issue
11  with the way people are doing accounting and stuff like
12  that, and I've read articles about people smoothing
13  earnings and that sort of thing. I just, again, I would
14  love to know what you mean by "earnings management". If
15  that's what you mean, I have read articles about
16  companies smoothing out their earnings, all right? If
17  that's what you mean by "earnings management".
18    Q. Have you ever engaged in that practice?
19    A. No. I've testified earlier, we and the
20  corporate controller, and so forth, have all worked very
21  hard over the years to make sure that each quarter
22  stands on its own, and we've always worked very openly
23  with our auditors to make sure that they know everything
24  that's going on so that, you know, we can do the best
25  job representing what happened in the quarter. And

152

1  we've also tried to describe unusual things in our MDNAs
2  and so forth. So I feel very good about the way we've
3  handled ourselves over the years.
4    MR. SOLOMON: Let me go off the record for
5  two minutes.
6    (Recess taken from 2:22 to 2:26 P.M.)
7    MR. SOLOMON: We'll have marked as the next
8  exhibit a document produced by the defendants with the
9  control numbers 121704 through 707.
10    (Whereupon, Plaintiff's Exhibit 25 was marked
11    for identification.)
12    MR. SOLOMON: Q. Do you recall seeing these
13  exchanges?
14    A. I don't. I'm copied on here, so I'm not
15  disputing that I got the copy, but I just don't recall
16  it.
17    Q. Okay. For the record, the first page is a
18  memo from -- is an e-mail, excuse me, from Larry Ellison
19  to George Roberts, and it copies a number of people
20  including Jeff Henley, and attached to that are
21  exchanges involving George Roberts, Steve Johnson,
22  Maryann Gillespie and others.
23    On the first page the e-mail by Larry Ellison
24  talks about needing a list of other escalated customers.
25    Do you see that?

153

1     A.  Yes.
2     Q.  And in March of 2001 did Mr. Ellison become
3  more involved with dissatisfied customers relating to
4  the 11i product?
5     A.  I don't know what you mean by "more".  I mean,
6  I think Larry was always involved.  There were periods
7  when he might get more involved for a month or two,
8  but -- so I don't recall whether this is a period where
9  he wanted to get more involved or whatever, but I think
10  he always took it seriously, and ultimately the buck
11  stopped with him.  And so if there were problems and
12  they weren't getting resolved with someone, he would
13  jump right in and say, you know, "Look, keep me in
14  touch, let me know what's going on," that sort of thing.
15     Q.  Was more attention paid to product problems
16  with 11i in March of 2001 than before then?
17     A.  I -- I would only be speculating.  I have no
18  idea.  I think, as I testified earlier, I think the
19  whole company was very serious from the time of the
20  launch to continue to work and try to resolve problems
21  to make customers happy.  So to say we were more, I
22  doubt it, but I would only be speculating.
23     Q.  Okay.  I'll have marked as the next exhibit a
24  document produced by the defendants with the control
25  No. 062005.  This is an e-mail dated April 24, 2001, and

154

1  it's from Mark Berrenechea and it's to Larry Ellison,
2  Safra Catz and Jeffrey Henley.
3     (Whereupon, Plaintiff's Exhibit 26 was marked
4     for identification.)
5     THE WITNESS:  Yes, I see it.
6     MR. SOLOMON:  Q.  Do you remember this e-mail?
7     A.  No, not specifically.
8     Q.  On the forward line it says, "Forward customer
9  quotes," ellipsis, "from Color Line."
10     Do you see that?
11     A.  Yes, I do.
12     Q.  Do you know what that means?
13     A.  No, I don't.  My assumption is that there's
14  some other, maybe, page or something.  I don't know.
15  There were some quotes, apparently.
16     Q.  You'll see that it -- there's a reference to a
17  number of customers.  Do you see that?
18     A.  Yes.
19     Q.  And it says "Live with 11i"?
20     A.  Yes.
21     Q.  Do you have an understanding what that's
22  conveying?
23     A.  Typically, when somebody talks about a
24  customer live, it means they've gone through their
25  testing and all the other stuff and they're literally

155

1  running that application in production.
2     Q.  Okay.
3     A.  Users are conducting their work using that
4  application.
5     Q.  So does this represent 11 of the 180 live
6  customers that Oracle said were live earlier on in the
7  quarter, actually earlier on in the prior quarter?
8     MR. WALD:  Object to the form.
9     THE WITNESS:  I don't know because this is a
10  couple of months later.  So it's possible they weren't
11  live back when we had that meeting in February.
12     MR. SOLOMON:  Q.  Is it true that as a result
13  of 11i problems, that Oracle had lost the confidence of
14  many sales partners, analysts and customers?
15     A.  I don't know if it's true or not.
16     Q.  Is it true that internally at Oracle it was
17  recognized that 11i 5.4 was the first stable release of
18  11i?
19     A.  Again, I've testified previously that
20  stability was at a customer level.  There were some
21  customers that were -- the product was stable before
22  then, some later.  So it really depended upon the unique
23  requirements of that customer.  But with each dot
24  released, I have testified the products got more and
25  more stable, more and more mature.  So this product

156

1  would have been more mature than the dot 3 release.
2     Q.  I'll have marked as the next exhibit a
3  document produced by the defendants with the control
4  numbers 131696 through 702.
5     (Whereupon, Plaintiff's Exhibit 27 was marked
6     for identification.)
7     MR. SOLOMON:  Q.  Let me know if you recognize
8  it.
9     A.  I know what it was about, and again, I don't
10  know if I got this, per se.  I got something from --
11  eventually, again, maybe this was modified.  I don't
12  know.
13     Q.  So it starts off with an e-mail dated 11th of
14  June, 2001, an exchange that doesn't have you involved
15  but says -- or doesn't have you as an addressee, I
16  should say, but says, "I am preparing an FY02 budget
17  presentation for Jeff to review with the Board."
18     Do you see that?
19     A.  Yes.
20     Q.  And attached are what appears to be the
21  budget --
22     A.  Some of the pages.  It was a voluminous
23  package, but this was some of the pages, apparently.
24     Q.  And you don't know if this was final?
25     A.  I don't know.  She was seeking some input, so

157

1 perhaps what I got from her may have had some changes.
2 I just don't know. But inevitably, she definitely put
3 the package together for me, and we agreed upon what I
4 would present to the board.
5     Q. Okay. I'm looking at the fourth page of the
6 document.
7     A. Consulting Business, page 4 or --
8     Q. The page number is 131699.
9     A. Okay. So it's -- all right. So it says page
10 3, but you meant --
11     Q. Yes.
12     A. Okay. I got it.
13     Q. The fourth page --
14     A. I got it. Yeah, yeah. 99.
15     Q. It starts off with the heading, "Unforeseen
16 slow down in U.S. economy in Q3 and Q4."
17        Do you see that?
18     A. Yes.
19     Q. Did you write that, do you know?
20     A. I don't know. I mean, I just don't. But I
21 clearly agreed to whatever we finalized and I presented
22 to the board.
23     Q. The next bullet point, "11i E-Business Suite
24 instability issues."
25        Do you see that?

158

1     A. Yes.
2     Q. It says "took one full year to stabilize."
3     A. Yes.
4     Q. "Lost market momentum to SAP and PeopleSoft."
5     A. Yes.
6     Q. "I2 and Siebel moved ahead in the
7 marketplace."
8     A. Yes.
9     Q. Is that your language?
10     A. Again, I don't know if I wrote it, she wrote
11 it, but I certainly would not have shown it to the board
12 if I didn't believe what was said, okay?
13        MR. WALD: Again, just for the record, I don't
14 know that you've established that this was the final
15 that was shown.
16        THE WITNESS: That's correct. But whatever
17 was final, again -- you're correct. Whatever was final,
18 whether I wrote the draft or not, I mean, clearly I
19 would have had to agree because I was the one making the
20 presentation.
21        MR. SOLOMON: Q. And with reference to the
22 instability issues, isn't it true that those instability
23 issues continued for another year after this
24 presentation?
25     A. Again, it really depended upon the product and

159

1 the customer, but it took longer than we certainly
2 thought it was going to take. But this stage a year
3 into the project it -- you know, I was representing to
4 them that this -- the product was very complicated, very
5 large and it took longer. I don't recollect what
6 particular products may still have -- or issues may have
7 still arisen, but I'm clear that we still had issues
8 with some customers.
9        But, for instance, I will add we used the
10 product, and certainly as of the time of this writing
11 the product was perfectly functional inside Oracle. I
12 mean, it was stable, if you will. It was running. As
13 you pointed in the earlier note, there was still some
14 functionality in some of the CRM that we would have
15 liked. But in terms of -- I think of stable being the
16 product is running, it's performing; it's not falling
17 apart, and you're getting your jobs done. So inside
18 Oracle, we were a big user of all the ERP modules and it
19 was stable.
20     Q. There's no question pending.
21     A. I think we were a good proxy for many of our
22 customers.
23     Q. There's no question pending, so I'll move to
24 strike that. But thank you, anyway.
25        I'll mark as the next exhibit a document

160

1 produced by the defendants with the control numbers
2 061302 to 303.
3        (Whereupon, Plaintiff's Exhibit 28 was marked
4 for identification.)
5        MR. SOLOMON: Q. Do you recognize this?
6     A. No, I do not recall seeing it.
7     Q. Okay. These are dated -- this e-mail exchange
8 is among you, Mark Berrenechea, Ron Wohl and Chuck
9 Phillips and Byron Miller.
10        Do you see that?
11     A. I do see that I was copied. But again, I
12 don't recall, but since I was copied, I may have gotten
13 them. I'm not disputing the fact that he intended to
14 send it to me.
15     Q. Do you know who Byron Miller is?
16     A. No.
17     Q. Do you know GIGA Information Group?
18     A. No. Well, GIGA, I believe GIGA is a -- I
19 believe they're a research company that follows, much
20 like the other firm I mentioned earlier. I think
21 they're in -- one of the industry guys, but I'm not
22 positive.
23     Q. The e-mail from Byron Miller reads, "Chuck, I
24 saw your very positive review of 11i. This is what is
25 typical of what I see. They are on 11.5.4. Any

161

1  reaction?"
2      Do you know who "they" is that is referred to
3  here?
4      A.  I would have to read this.  Is there somebody
5  mentioned in here?
6      Q.  Okay.  Well, let's go into the body.  It goes
7  on to say, "Is our disastrous experience with Oracle 11i
8  typical?  You have some circa early 2001 research on
9  this, but I was wondering what it's like now that the
10  product is supposed to be a little more mature.  Here's
11  our experience," and it goes on.
12      Do you see that?
13      A.  So this note apparently is from Byron, right?
14      Q.  Uh-huh.
15      A.  I don't know what "they" means.
16      Q.  Okay.
17      A.  Unless he's referring to his own firm, I
18  guess.  I don't know.
19      Q.  Okay.  Then focusing on the e-mail from
20  Charles Phillips, it says, "And this one was worse.  As
21  you know, these market analysts can have significant
22  impact with customers, and two of the most influential
23  analysts at key firms are decidedly negative on the
24  quality of the apps suite, and with this sort of
25  feedback I could see why.  Without a full court press to

162

1  provide them with some positive references and more data
2  about your experiences, it would be nearly impossible to
3  change market perception about Oracle apps, and it's
4  impossible to calculate what deals you don't see because
5  a reputation and perception preceding you and keeping
6  from you getting the call."
7      Do you see that?
8      A.  I do see it.
9      Q.  And do you recall Chuck Phillips making you
10  aware of those facts --
11      A.  I don't recall receiving the note, but I was
12  shown this copy.  It was directed to the two heads of
13  development, Mark Berrenechea and Ron Wohl.
14      Q.  Do you think Mark Berrenechea was a liar?
15      A.  I thought that Mark -- over time I thought
16  that Mark Berrenechea was not realistic, at a minimum,
17  was not realistic in some of his comments.
18      Q.  Did you play any role in the internal upgrade
19  within Oracle to 11i?
20      A.  Yes.
21      Q.  What was your role?
22      A.  I attended some of the meetings that we worked
23  with the IT people and the development people on
24  statusing where we were and testing and all that, so I
25  was not a hands-on person, but I certainly was getting

163

1  status reports along with the management of where we
2  were, action items, things to do and so forth.
3      Q.  I will have marked as the next exhibit a
4  document produced by the defendants with control numbers
5  040638 through 640.
6      A.  And let me also add, I was primarily involved
7  with my organization, the finance, the HR, so -- because
8  we were users.  So that was my knowledge more than
9  anything was our own use of these and tests and so
10  forth.
11      Q.  Okay.
12      (Whereupon, Plaintiff's Exhibit 29 was marked
13      for identification.)
14      MR. SOLOMON:  Q.  Do you recognize this?
15      A.  Parts of it, I think, yeah.  Not all of it.
16  Just parts of it.  I'm not sure what they --
17      Q.  Okay.  The exchange is dated October 16, 2000,
18  and October 13, 2000, and it reflects e-mails involving,
19  at the top of the first page, Jay Nussbaum and Terrence
20  Ford and Ron Police, and below that it reflects an
21  e-mail exchange among Mark Berrenechea, Larry Ellison,
22  you and others, correct?
23      A.  Yes.
24      Q.  And then on the second page of the exhibit a
25  quarter of the way down it says, "Lawrence J. Ellison

164

1  wrote: We will not upgrade unless we are at the
2  90 percent confidence level that the new OSO will work
3  better than the current one.  We do not want to
4  discourage the field the last month of the quarter.  Nor
5  do we want to lose a mission critical system.  Larry."
6      Do you see that?
7      A.  Yes.
8      Q.  Do you recall receiving that message in
9  October of 2000?
10      A.  Yes, I actually do, yes.
11      Q.  And Mr. Ellison's reference to a mission
12  critical system, what's your understanding of that?
13      A.  Well, I think it's a fairly common definition.
14  Within a company, it's those kinds of software projects
15  or applications that are -- have a lot of users, a lot
16  of different people using, accessing, doing their work,
17  as opposed to somebody doing -- a couple of people doing
18  some little thing over in the corner.  So most of the
19  core way we work across organizations is all so-called
20  mission critical kind of applications.  All E-Business
21  Suite typically would be called -- any of those modules
22  would be called mission critical types of applications.
23      Q.  And is that because they're critical to the
24  operations of the company?
25      A.  Yes, our company or others use these to get

165

1   work done, get sales forecasted, take in orders, close
2   their books, and there's many people involved so that if
3   a system doesn't work, stops working or something, then
4   you affect the work of a lot of people.  And so that's
5   why they're so-called mission criticals.  Any large
6   company has lots of little things around the edges that
7   a couple of people rely on that if that failed, it
8   doesn't affect a lot of people, so it's not very
9   noticeable.
10       Q.  And then down the page it says, "Jeff Henley
11  wrote: Finance has folks working on the OSO/OSC upgrade
12  project," and when you say OSO, you're referring to --
13       A.  Oracle Sales Online.
14       Q.  And OSC?
15       A.  Yeah, I'm not sure if I remember what that is.
16       Q.  Okay.  It says -- then it goes on to say,
17  "From what we're hearing, and based on years of previous
18  upgrade experiences, I would think it is unrealistic to
19  plan to upgrade OSO to 11i this month, and yet we're
20  hearing just that," and parens, "(we're told the plan is
21  to upgrade by the end of October)."  And then you make a
22  number of points beginning with, "1) We hear it's all
23  new code for OSO.  Historically this requires longer
24  testing to identify and resolve bugs," in parentheses
25  "(11i order management is a good example)."

166

1       Do you see that?
2       A.  Yes.
3       Q.  Okay.  And what did you mean by "11i order
4   management is a good example"?
5       A.  Let's see now.  Let's go back and -- where is
6   that?
7       Oh, yes.  This is about the new code, point 1.
8   Again, as users, we were using OSO along with the field
9   people, the sales organization, and we were the sole
10  users of Order Management.  So in the 11i testing, it
11  took a lot more testing and bug fixes to get the Order
12  Management product stable because it was brand new code.
13  So typically, when you have brand new code, it's just
14  there's more issues that come up and it takes longer to
15  stabilize that product.
16       Q.  What do you mean by "sole users"?
17       A.  Well, the users that were using that
18  application were all in my organization.  Whereas with
19  OSO, we had financial people using OSO, but also we had
20  sales personnel using OSO.  So it was a shared
21  application doing several different user groups.
22       Q.  Now, is there a tie in this between the
23  necessity of identifying and resolving bugs and Order
24  Management?
25       A.  Again, I'm not sure what you mean.

167

1       Q.  In the sense that it says, "Historically, this
2   requires longer testing to identify" --
3       A.  As I said earlier, I guess, to use your word
4   "tie", is I was saying, for instance, Order Management
5   was a rewritten product with all new code, and just like
6   in Order Management with OSO, since it's new, our
7   experience is it takes longer to fix all the bugs.
8       Q.  Okay.
9       A.  So I think that was alluding to a similar kind
10  of situation where my users had a lot of experience,
11  whenever we had brand new products or rewritten
12  products, that it took us longer to shake them down.
13       Q.  And Order Management, the Order Management
14  module was very problematic for you?
15       A.  Again, it was a totally rewritten product, and
16  so, therefore, it took longer to get through all the bug
17  lists and get the thing to the point that it was stable.
18       Q.  Okay.  Then below -- I'm on the third page of
19  the exhibit now, in bold it says, "This is not new data,
20  but the marketing rollout relies on the same core
21  technology."
22       What's that reference to?
23       A.  I'm not sure.  I don't believe I wrote that.
24  I think this is -- it sounds like it's somebody
25  responding to the points I made.

168

1       Q.  Okay.  And you don't know exactly what it
2   means?
3       A.  No, I'm not sure I know exactly what it means.
4       Q.  Okay.  And then point 2, you say, "As of today
5   we still don't have a test system and only have a week
6   and one-half for testing.  Not only do we have to test
7   the new code but also the data migration," parens, "(the
8   migration to 3i resulted in a lot of data migration
9   issues and all the customer names came over as
10  unspecified)."
11       Did you write that?
12       A.  I wrote that.  That was what was being
13  represented to me by my users who were doing all the
14  work; right.
15       Q.  And then below that in bold it says, in caps,
16  "Not," then in lower case, "true ref: customer data."
17       Do you see that?
18       A.  Yes.
19       Q.  Do you know what that means?
20       A.  No.  Again, I think it's somebody in
21  development, CRM group probably disputing some of the
22  statements that my users were making.
23       Q.  And then 3, it says, "Historically we've never
24  upgraded in the last month of the quarter.  OSO is now a
25  mission critical system which we all rely upon just like

169

1  financials, HR, et cetera.  Even if things go reasonably
2  successfully, we understand that the system will be down
3  for five days which will prevent us from having a weekly
4  forecast at a critical time in the quarter.  We'd prefer
5  to upgrade after our earnings announcement since we rely
6  heavily upon OSO for the analyst call."
7      Did you write that?
8  A.  Yes.
9  Q.  And then below that in bold it says "Current
10  systems will remain read-only while we are upgrading.
11  Order entry systems such as store and QuoteBuilder
12  remain operational."
13      Do you see that?
14  A.  Yes, I do.
15  Q.  And do you understand that?
16  A.  No.  I mean, I know what he said, but I'm not
17  sure -- I'm not sure what -- I know what read-only
18  means; I just don't know how that solved the problem.
19  Q.  Okay.  What does read-only mean to you?
20  A.  Clearly, we've got users that are concerned
21  here, and somebody in -- maybe Mark Berrenechea, I don't
22  remember who, but somebody is going back and saying,
23  "Look, this is not the whole story.  There are
24  mitigating factors," or whatever.  But exactly what he
25  meant by that, I don't know.

170

1  Q.  And you say you know what read-only means.
2  What's your understanding?
3  A.  Well, again, when you have read-only, you
4  can't go in and change anything.  You can't input data;
5  you can just simply read information that's there in
6  that application coming out of that database.  If you're
7  in normal mode, you can be inputting data, changing
8  data, stuff like that.
9  Q.  4, it says, "Our team is responsible for
10  training.  So far we haven't seen a test system so we
11  can develop the training material and a schedule.  Now
12  that we have broad adoption of the sales force, we want
13  to ensure we have a successful migration so they don't
14  lose confidence in the product."
15      Do you see that?
16  A.  Yes.
17  Q.  And you wrote that?
18  A.  Yes.
19  Q.  And then in bold it says, "Christain,
20  responsible for OSC training, has been on board with
21  this plan.  Sukumar will follow up directly."
22      Do you know what that refers to?
23  A.  Again, I think it's a comment coming from
24  either Mark Berrenechea or somebody in the CMT --
25  probably Mark, and responding that he's aware that -- he

171

1  may think that, but he's got somebody on board and
2  they'll follow up and make sure that the testing is
3  there.
4  Q.  And then what happened thereafter with respect
5  to the upgrade of OSO?
6  A.  I actually don't recall.  I mean, we upgraded
7  it.  I can't remember if we made the decision later in
8  that month to delay it or not.  I really don't know.
9  But at the time I really do remember this because our
10  people were -- we had never -- as I said in one of the
11  notes, we had never tried to upgrade any of our -- we
12  had done many upgrades over the years in the last month,
13  of course, because we just know there is extra risk
14  involved here.  And Mark Berrenechea was pushing very
15  hard to do this stuff, and we just thought it was too
16  risky.  So that's why we started this discussion, to
17  make sure Larry really understood what Mark was trying
18  to do.  And I made a comment earlier, I testified that I
19  thought over time, as I got to know Mark better and
20  watched things like this, I thought that Mark was
21  unrealistic sometimes in some of the things he was
22  trying to do.
23  Q.  But you're not calling him a liar?
24  A.  I said at a minimum I thought he was
25  unrealistic.  I'm not sure he ever lied, but I thought

172

1  he was certainly -- as I watched things unfold over
2  time, I just thought he was naive or unrealistic at
3  times, is my assessment of him.
4  Q.  Are you aware that Jay Nussbaum called him a
5  liar?
6  A.  I don't recall if Jay called him a liar, but
7  it wouldn't surprise me if somebody in the company would
8  call him a liar because I think he made statements at
9  times that just didn't pan out the way he claimed they
10  were.  Now, whether that's lying or just naive or not
11  informed well enough to make a statement, I don't know.
12  So that's why I would fall short on maybe calling him a
13  liar.
14  MR. SOLOMON:  Off the record to change the
15  tape.
16  (Recess taken from 3:03 to 3:14 P.M.)
17  MR. SOLOMON:  Q.  Did you reach the 90 percent
18  confidence level that Larry Ellison was requiring for
19  the OSO upgrade to take place?
20  A.  Again, I said -- I testified earlier that I
21  couldn't recall whether we upgraded that period.  I know
22  we did at some point; I just can't remember -- and I
23  think that typically we wouldn't have agreed to upgrade
24  until we were confident.
25  Q.  Okay.  I've marked as the next exhibit a

173

1  document produced by Defendants with the control numbers
2  024862 to 864.
3          While you're looking for the record, these are
4  e-mail exchanges dated the 15th and 16th of
5  November 2000 involving Jennifer Minton, Jeff Henley,
6  Mark Berrenechea, Ron Wohl, Safra Catz and Larry
7  Ellison.
8          (Whereupon, Plaintiff's Exhibit 30 was marked
9          for identification.)
10         MR. SOLOMON: And Tom Williams.
11         THE WITNESS: Yes, I've scanned it.
12         MR. SOLOMON: Q.  Do you recognize this?
13     A.  Yeah, again, I don't remember every word, but
14  I -- again, this ties back to the previous thing we were
15  talking about where we were trying to put pressure on
16  the development team, Larry, everybody, to not force us
17  to do something until we were comfortable with it.
18     Q.  Okay.
19     A.  And there was a -- it was complicated because
20  the -- Mark and Ron had roles to play, and in this
21  e-mail I guess they're going back and forth about who
22  should be doing what to whom.
23     Q.  What was your view of the relationship between
24  Wohl and Berrenechea?
25         MR. WALD: At what point in time?

174

1          MR. SOLOMON: Q.  In calendar 2000 and early
2  2001.
3     A.  They each had parts of the E-Business Suite,
4  and so they were -- had their own modules to work on,
5  and yet there were things that they had to do together
6  to agree upon with Larry about data models and things
7  like that.  So they regularly had meetings with Larry
8  and they were all working together, but clearly there
9  was contention at times, I mean, and finger pointing
10  which happens sometimes if you don't have control over
11  everything; you tend to point fingers.  "Well, that's
12  not my problem, that's yours."  And so there was some of
13  that going on here, I think, where they were trying to
14  point at each other, but I didn't care.  My only point
15  in this note was to make sure that everybody got to the
16  bottom of whatever things needed to be fixed and tested
17  before we went live.
18     Q.  And were you aware that Ron Wohl was calling
19  Mark Berrenechea a liar at the time?
20     A.  Again, I don't remember -- I don't recall what
21  he called him, but clearly, there was a lot of pressure
22  on both of them, and they were not the best of friends,
23  I think is a fair was to say it; that's for sure.
24     Q.  I'm looking at the second page of the exhibit
25  with the control No. 24863.  At the bottom of the page

175

1  it says, "Mark Berrenechea wrote:  Ron, it is time to
2  have the hard discussion on the upgrade for
3  December 15th."  And it goes on to say, "I am being told
4  all issues, all must be resolved by November 23rd.
5  Final environments," that's point 1.
6          Point 2, "The bug counts are at an 11 week
7  high.  18 OM PLs, 40 P2s.  3 of the 80 OM priority OM
8  flows in progress, none complete.  205 customizations
9  not complete.  186 still under review.  Over 100 P1 and
10  P2 issues that must be resolved in 10 days.  Find/fix
11  ratios have not declined in two weeks.  No real
12  performance testing."
13         4, "I still cannot get a build list for
14  production cut over activities.  Still cannot get it.
15  No one can tell me the 1000 items, in what order, and
16  their durations, or estimate durations, or place holder
17  for items that have to happen the moment we decide to
18  begin the process.  Major red flag in the 30 window.
19  Have" -- I think it probably means "How can we make a
20  single tradeoff that makes any sense."
21         Were you aware of these issues confronting the
22  internal implementation in November of 2000?
23     A.  Again, I believe I got this.  I know I
24  forwarded it on to Larry, so I think I was pretty
25  knowledgeable that there were issues.  My people were

176

1  uncomfortable.  There was finger pointing going on
2  between Ron and Mark, so yeah.
3     Q.  And then it goes on --
4     A.  Again, both would have their sides of all
5  these facts, right?  So one would assert things, the
6  others would say that's not all true.  I didn't really
7  care.  All I wanted them to do was satisfy my users that
8  this thing was ready to go.
9     Q.  And you wanted to get the stock price up so
10  you could sell stock; is that true?
11         MR. WALD: Object to the form.  Argumentative.
12         THE WITNESS: Please.  Are you kidding?
13         MR. SOLOMON: Q.  I'm serious.
14     A.  This has nothing to do with Oracle stock
15  price.  This has to do with getting our jobs done as
16  financial professionals.
17     Q.  And it goes on to say, "5, The 11.5.2 upgrade
18  CD has been broken until this week.  Yup, the 11.5.2 CD
19  does not work out of the box for upgrades."
20         "6, as of Friday Ann D has to approve all CRM
21  patches going into GSIAD."
22         What does that stand for; do you know?
23     A.  Which is the GSID?
24     Q.  Uh-huh.
25     A.  It has to do with an IT term.  The global

177

1 single instance applications development environment, or
2 something, but I think it's a server where they're
3 testing these products, these releases before we try to
4 put them into production. I believe that's what it is.
5      Q. It goes on to say, "This is bullshit and
6 causing two to three-day delays in getting CRM patches
7 into the ERP environment. The environments are not
8 productive for CRM. The process your team has put in
9 place is directly negatively affecting CRM's ability to
10 execute. At this point, we are burning our teams
11 unnecessarily. I am getting hate mail from my end users
12 in developments. From my seat, December 15th or
13 December in general is not going to happen. Can any of
14 you tell me otherwise?"
15      Are you aware of Mark Berrenechea stating
16 these issues in December -- excuse me -- in November of
17 2000?
18      A. Again, as I testified, I'm aware that Mark was
19 asserting all sorts of things, Ron was asserting all
20 sorts of things. I didn't really care. They needed to
21 get together, needed to get these things resolved to the
22 satisfaction of my users so we felt comfortable to go
23 live, and the IT folks. Myself and the IT team together
24 were putting this stuff into place.
25      Q. Okay. And at this time, at around this time,

178

1 November or December of 2000, did you want Oracle stock
2 price to appreciate so that you could sell stock and
3 make a higher return?
4      A. I think all of my life at Oracle I've always
5 wanted Oracle to do better, and my assumption was if we
6 do better, that's good for Oracle. So that's -- I don't
7 think in terms of the day-to-day Oracle stock price, but
8 I clearly think as a senior member of management, my job
9 is to make the company better, to grow, to make more
10 money, and then it's up to the marketplace to put values
11 on stock and all that sort of thing. So I really don't
12 think the way you're trying to describe it -- it's not
13 the way I operate.
14      Q. On the first page of the exhibit halfway down
15 there's a reference to, "We significantly disagree on
16 the status."
17      Do you see that?
18      A. Yes, I do.
19      Q. And again, this reflects the differences that
20 Ron Wohl and Mark Berrenechea had?
21      A. Yes, I testified previously that they
22 disagreed, finger pointed, asserted things between them,
23 and this was -- this was a good example of that from
24 time to time.
25      Q. And you say -- and I'm going above this now --

179

1 "FYI, I actually like this exchange with copies to
2 Larry. It escalates the pressure to get to the bottom
3 of what is really happening here. I took my shot at EC
4 on Monday, so this is supplemental ammo."
5      Do you see that?
6      A. Uh-huh.
7      Q. What's the shot that you're referring to?
8      A. Again, expressing concern that we were getting
9 these products all installed on time. So this is
10 further sort of detailed stuff that sort of reinforces
11 that point to Larry.
12      Q. And do you recall the EC that you refer to?
13      A. What EC means?
14      Q. The meeting -- sorry.
15      Do you recall the EC meeting?
16      A. I don't -- we had them every Monday, most
17 Mondays. I can't recall exactly, but I must have said
18 something about this topic, which is why I said it in
19 the e-mail.
20      Q. I'll have marked as the next exhibit a
21 document produced by the defendants with the control
22 numbers 017069 through 097.
23      (Whereupon, Plaintiff's Exhibit 31 was marked
24      for identification.)
25      MR. SOLOMON: Q. Take a look, and the

180

1 question will be do you recognize it, once you've had a
2 look.
3      A. Well, I guess I'll have to go read a bit of
4 it. It says Jeff Henley Roundtable, so --
5      Q. Do you know what that refers to?
6      A. I'm not sure. If I read it a ways, maybe I'll
7 recollect. There's no dates on it. Do you -- that I
8 can see. Am I missing it somewhere? Is there a date
9 when this was --
10      Q. I don't think there's a date. I think you
11 would have to go to the context to --
12      A. Okay.
13      Q. -- get the date.
14      Let me put it this way: I'll represent to you
15 that it was produced by you and your co-defendants, and
16 you can tell me if you have any reason to believe that
17 this isn't an accurate -- to the extent that it tries to
18 be accurate --
19      A. Well, I have to read it all.
20      Q. Let me just finish. You can read it all;
21 don't worry, but what I want to know is whether you have
22 any dispute as to whether or not this is a transcript of
23 a roundtable involving you.
24      MR. WALD: And for the record, let's give the
25 witness a chance to read the document and see if he can

181

1   identify it.
2       MR. SOLOMON:  That's fine.
3       THE WITNESS:  I mean, you know, just -- I've
4   read two pages.  If you want me to read the whole
5   thing -- it certainly sounds like a transcript from a
6   conversation I had.  It sounds like my -- I'm not -- so
7   far of what I'd read, if you're representing it came
8   from our files or somebody's files, it sounds like -- I
9   don't know when it was.
10      MR. SOLOMON:  Q.  Okay.
11      A.  I would have to read a lot more to see if I
12  could figure out exactly when I said this.
13      Q.  Okay.  That's -- I mean, I don't want to
14  deprive you of the opportunity to read it, if that's
15  what you prefer to do, but we can go to particular
16  places in this document and I can ask you questions
17  whenever you're ready.
18      MR. WALD:  Fair enough, and I know, Mark, it's
19  kind of you to extend that invitation.
20      I just want to say to Mr. Henley that
21  apparently Mr. Solomon does want to ask you questions
22  about the document, and that's fair, but I do think that
23  you should look through the document and --
24      THE WITNESS:  It would help me if I knew
25  when -- just put it in context of the time frame.

182

1       MR. SOLOMON:  Q.  I can tell you that I
2   believe it was Q2 of '01, fiscal, but it's not for me to
3   tell you that; it's for you to tell me what you think
4   after you've had an opportunity to see it.
5       A.  Okay.  I speed read it.  I couldn't take a
6   test on every line, but I think I have enough context
7   you can ask me questions.
8       Q.  First of all, do you believe this to be a
9   transcript of a roundtable that you participated in?
10      A.  Yes.
11      Q.  And who else participated in the roundtable;
12  do you know?
13      A.  I don't know.
14      Q.  And what was the forum?  Was it in person or
15  was it telephonic?
16      A.  I don't know.
17      Q.  And do you know when it took place?
18      A.  Again, I don't know.  There was -- I saw
19  one thing in here that talked about -- I thought that
20  the 11i was starting to stabilize six months into it, so
21  based on that, I would agree that it was towards the
22  very end of 2000, would be my guess, but I -- there's no
23  dates that I can see on this.
24      Q.  Six months after May, right?
25      A.  Six months to when we -- after we released the

183

1   product; right.
2       Q.  Going to control No. 017086.
3       A.  Yes.
4       Q.  There's a question, "Why have you stuck around
5   here?"
6       Do you see that?
7       A.  Yes.
8       Q.  And it says, "Jeff:  I've enjoyed myself by
9   and large.  I can't tell you every day is a great
10  delight to go to Oracle, but 9 days out of 10 it's fun
11  to get up in the morning and it's fun to go to Oracle.
12  It's evolved, it's grown lightly in the 10 years that
13  I've been here, and right now we're on the verge of
14  something really big.  I think Larry is as excited as
15  I've ever seen.  I'm actually as excited as I've ever
16  been at Oracle.  It's a whole new opportunity.  Now,
17  whether we'll do it or not, I have no idea, but it's the
18  thrill of doing something really big with 11i.  So I
19  have strong financial incentives to want to stay, and
20  certainly the stock has imploded.  I'd like to see it
21  regain, do a double or a triple, and get some of my
22  capital.  I want my money back, that sort of thing.
23  I've got a lot of vested options, so a lot of reasons, a
24  lot of reasons that I've stayed."
25      Do you see that?

184

1       A.  Yes, I do.
2       Q.  And did you say what I just read in late 2000?
3       A.  Again, I'm not certain of the time, but I'm
4   certain that this is a good transcript of what I said,
5   and I was asked -- on many occasions there was these
6   rumors running around of leaving, and I always said,
7   "First of all, I still enjoy what I'm doing, and
8   secondly, I've got a strong financial incentive to
9   stay."
10      Q.  Now, there's a reference to the stock having
11  imploded.  Do you recall the stock imploding?
12      A.  I wouldn't have said it if I didn't believe
13  it.
14      Q.  No, what I'm saying now is do you recall the
15  stock imploded?
16      A.  Do I recall now?
17      Q.  Yeah, as you sit here today, do you remember
18  the stock implosion that you're referencing here?
19      A.  Sure, I remember that the stock had dropped a
20  lot from the peak; sure.
21      Q.  Okay.  And do you remember saying this to
22  anybody at the time?  I know you don't dispute saying
23  it.  I'm asking do you recall saying it?
24      A.  Did I remember saying, what, that the stock
25  imploded?

185

1   Q. Yes.
2   A. I don't recall if I said that. I have no
3   doubt that -- to believe that I didn't say it. But I
4   definitely recall that the stock had dropped
5   significantly; I definitely recall that. I don't know
6   if I used the word "imploded", but I must have.
7   Q. Okay. Did you regularly have something called
8   a roundtable?
9   A. No, that's why the word kind of stumps me. I
10   don't recall having -- that term that often, but maybe
11   somebody called that getting some analyst or people
12   together to have a discussion, or so-called roundtable.
13   But we certainly had a variety of meetings with
14   investors and analysts over time, but we typically
15   didn't refer to them as roundtables.
16   Q. And I'm now at control No. 017080. And it
17   reads, "And if you sat down" -- on the top of the page,
18   reading the first full paragraph of that page, "And if
19   you sat down and really asked Larry, Larry would tell
20   you the same thing. He glosses over stuff, but the
21   major thing is that this is normal, this is not
22   abnormal, we're not having abnormal problems. We've
23   always had problems with big complex releases, and it
24   takes about six months to get through it. So I think
25   we're just about there."

186

1   Do you see that?
2   A. Absolutely.
3   Q. And that's the reference I -- that's -- you
4   were referring to that earlier when you were guessing
5   what the date of this document was?
6   A. That's correct.
7   Q. And then you go on to say, "I don't think
8   there's any customer now that's got all the patches and
9   everything else, but they're making progress, getting
10   better, getting better. We've been testing internally.
11   We're going live on it in December. So because we
12   tested all the time ourselves, all of our demo
13   environments," and it says "inaudible" in brackets. "So
14   I talk to our sales force all the time and they've told
15   me recently in the last two weeks, they keep talking,
16   yeah, it's finally getting stable, finally getting
17   better. So I think we're just about there."
18   Do you see that?
19   A. Uh-huh.
20   Q. And you don't dispute saying that in late
21   2000?
22   A. No, I think that's absolutely what I felt at
23   the time.
24   Q. Okay. And is that because Ron Wohl and Mark
25   Berrenechea were telling you that it was getting better

187

1   and better and you were just about there?
2   A. A variety of sources, you know, certainly them
3   saying things. My own people going through the testing,
4   we had been testing the product internally on and off
5   for several months starting back in about October,
6   talking to the sales force reporting how the new dot
7   releases were doing; there was -- I had no reason to
8   believe that things weren't getting better and better
9   with each month and each new dot release.
10   Q. I'll have marked as the next exhibit a
11   document produced by the defendants with the control
12   numbers 0069431 to 432.
13   (Whereupon, Plaintiff's Exhibit 32 was marked
14   for identification.)
15   MR. SOLOMON: Q. When you've had the chance
16   to look at it, let me know if you recognize it.
17   A. Again, this is an e-mail I wrote in
18   preparation for comments we were going to make at the
19   upcoming quarterly earnings call.
20   Q. All right.
21   A. And this was December 2000.
22   Q. Okay. Thank you.
23   Looking at the second page of the document,
24   and I'm looking at point 5, and you say, "We see no
25   slowdown in our business to date. Our current

188

1   assumption is that while the U.S. economy is slowing
2   down and while there are tech sectors like
3   semiconductors, PCs, et cetera, showing slowing demand,
4   E-Business software, database and appliances is a high
5   priority for customers, so this explains why our
6   pipeline isn't slowing down."
7   Do you see that?
8   A. Uh-huh.
9   Q. Do you know at this stage -- it's dated
10   December 12, 2000 -- whether OSO had been upgraded?
11   A. Again, I don't recall.
12   Q. And I'm now going back to the first page to
13   point 1, halfway -- or two thirds of the way into that
14   paragraph you say, "It's certainly possible" --
15   A. What point, again?
16   Q. Point 1.
17   A. On the previous page.
18   Q. Yeah, previous page. You say -- in part, you
19   say, "It's certainly possible that applications growth
20   will be even higher than Q2 now that we're through the
21   11i," in quotes, "birthing phase, our applications
22   pipeline is even better for Q3 than the past several
23   quarters."
24   Do you see that?
25   A. Yes.

189

1    Q.   And it goes on to say, "For server, our
2  toughest comparison for fiscal '01 is Q3."
3        Do you see that also?
4    A.   Yes.
5    Q.   So on December 12, 2000, it was your view that
6  you had been through the birthing phase of 11i, correct?
7    A.   Yes.
8    Q.   And what is the birthing phase?  What do you
9  mean by "birthing"?
10   A.   This is this sort of six-month period where
11 you're trying to get the product -- a lot of kinks
12 worked out, get the product stable, if you will, and now
13 you can start, you know, having more success in your
14 demos and more customers are going live and you have
15 more references and all this sort of thing.
16   Q.   Now, we've seen documents today, have we not,
17 dated after this that demonstrate that 11i was not
18 stable?
19   A.   Yes, you've shown me documents where we had
20 problems with certain customers.
21   Q.   I'm going to have marked as the next exhibit a
22 document dated December 14, 2000, and it's a printout
23 from Bloomberg.
24        (Whereupon, Plaintiff's Exhibit 33 was marked
25        for identification.)

190

1        MR. SOLOMON:  Q.  When you've had a chance to
2  look at this, let me know if you've seen this or a
3  version of this report before.
4    A.   Again, I don't remember if I read what
5  Bloomberg printed after the earnings release.
6    Q.   Looking at the second page it says, a third of
7  the way down the page, "Henley says he expects sales
8  growth at Oracle 11i to accelerate in the third quarter
9  enabling the company to meet its full year application
10 sales growth target of 50 percent to 100 percent."
11       Do you see that?
12   A.   Yes.
13   Q.   And you were aware at the time that you said
14 that of all of the customer problems and issues that
15 we've shown you today?
16       MR. WALD:  Excuse me.  Object to the form of
17 the question.  It's overbroad.  The customer issues that
18 you've identified, Mark, span a long period of time
19 and --
20       MR. SOLOMON:  Well, you jumped it a little bit
21 quickly, and I don't mind clarifying that.
22       MR. WALD:  And many after the date of this
23 release.  That's all I was going to say.
24       MR. SOLOMON:  Q.  Okay.  So I'm going to limit
25 it to the customer issues and problems that you've been

191

1  shown today that preceded this document.
2    A.   Again, I testified that many of those I didn't
3  recall knowing about.  I have testified that I was aware
4  there were certainly problems as we were stabilizing the
5  software up to this point of December 14th, so I was
6  aware we had been going through a birthing stage, and I
7  sincerely believed that we were getting towards the end
8  and things were starting to stabilize.  So --
9    Q.   Okay.  We'll have marked as the next exhibit a
10 document produced by the defendants with the control
11 numbers 308087 and 88.
12       (Whereupon, Plaintiff's Exhibit 34 was marked
13       for identification.)
14       THE WITNESS:  Yes, I see it.
15       MR. SOLOMON:  Q.  On the first page, the first
16 exchange is from Jennifer Minton to Tom Williams, and it
17 says, "Do not forward."
18       Do you see that?
19   A.   Yes.
20   Q.   Do you have any understanding why Ms. Minton
21 had asked Tom Williams not to forward?
22   A.   No.
23   Q.   The next exchange is from you to Jennifer
24 Minton, "FYI".  Do you see that?
25   A.   Yes.

192

1    Q.   Okay.  And then below that the e-mail that I
2  believe you're bringing Ms. Minton's attention to is
3  from Mark Berrenechea, Larry Ellison, Ronald Wohl, Safra
4  Catz, you and Sandra Sanderson, correct?
5    A.   Yes.
6    Q.   And that's dated Friday, the 1st of December,
7  correct, 2000?
8    A.   Yes.
9    Q.   Okay.  And it says, "Ron, there are over 60 P1
10 defects in OM, QP, TCA, AR that continue to
11 significantly slow progress on contracts testing.  There
12 are over 200 P2s that need to be resolved, CRM patches
13 are taking upwards to 2 days to apply, so turnaround and
14 validation is slow.  We were kicked out of," in quotes,
15 "T, yet HR was allowed to remain.  We complained, HR
16 continues with good progress, contracts is restricted to
17 only 'D' Dog."  And then brackets, "[pricing a single
18 service line item takes two to four minutes.]  My team
19 feels that" -- excuse me.  "My team feels the
20 December 15th is wacko and I received the threat of
21 two resignations today.  I instructed the team to work
22 the weekend nonetheless, bear through the slow
23 environment, slow patching, sorry at", in quotes "T",
24 and then I don't know if that says -- "T v", in quotes
25 "D, sorry about HR being productive, and will drive to

193

1  December 15th until Ron says we cannot make it.
2  Further, as of today, I have stopped work on
3  Ingersoll-Rand, Xerox and NCR 100 percent," in brackets,
4  "[Sandy, heads up] to make a date that is not
5  achievable.  This was for contracts only, but these
6  customers will mostly like escalate across the entire
7  E-Business Suite next week," brackets, "[heads up all]",
8  and it says, "Worse case scenario, December 15th is not
9  real, people resign, people work straight through the
10  holiday," in brackets, "[another one], I piss off these
11  three customers when I do not have to.  We deploy
12  sometime in January or even beyond that.  If we know the
13  date is January 15th or something different, I can
14  manage priorities better.  If December 15th is real,
15  then we risk only 7 to 10 days of escalations.  Do you
16  have any guidance on the date?  Mark."
17       See all that?
18    A.  I see it.
19    Q.  And do you remember on -- being informed, on
20  or around December 1, 2000, of the facts or purported
21  facts being stated by Mark Berrenechea in this e-mail?
22    A.  Yes, I attended numerous meetings with a host
23  of people discussing P1 statuses and a variety of
24  testing and all sorts of things, and as I testified
25  earlier, there was friction between Mark and Ron and

194

1  finger pointing.  So this was another good example like
2  the other one you produced where Mark was pointing
3  fingers at Ron.
4    Q.  I have marked as the next exhibit a document
5  produced by Oracle with the control numbers 086728 to
6  729.
7       (Whereupon, Plaintiff's Exhibit 35 was marked
8       for identification.)
9       THE WITNESS:  Okay.  I think I have it, yeah.
10       MR. SOLOMON:  Q.  And do you recall receiving
11  this on or around Wednesday, December 6th, 2000?
12    A.  I don't recall it, but as I've testified,
13  there was a variety of meetings, e-mails.  I was deeply
14  involved in the whole feedback loop here to make sure
15  that if and when we went live, that, you know, we
16  would -- we would be ready for it, and things would work
17  well.
18       And actually, going back to a previous
19  question you asked, and based upon these dates, I said I
20  didn't remember if we had gone live.  By this date,
21  apparently, we still hadn't gone live.  I don't know.
22    Q.  I'll have marked as the next exhibit a
23  document produced by the defendants with the control
24  numbers 610546 to 548.
25       (Whereupon, Plaintiff's Exhibit 36 was marked

195

1       for identification.)
2       THE WITNESS:  Okay.
3       MR. SOLOMON:  And this is dated January 9th,
4  2001, and it's an e-mail or e-mail exchanges among Safra
5  Catz, Larry Ellison, Larry Garnick, Jennifer Minton and
6  yourself.
7    A.  Yes.
8    Q.  Do you recognize it as --
9    A.  Yes, I do.  I remember it.
10    Q.  Any particular reason you remember this
11  document?
12    A.  Again, this was during this whole period where
13  we were going through -- at this stage now we had gone
14  live, so we had waited until actually early January
15  until we got through the first month, and now we're
16  proceeding to actually upgrade to 11i.
17    Q.  Okay.
18    A.  So this would have been a report of what was
19  going on after we had gone live.
20    Q.  Okay.  I'll have marked as the next exhibit a
21  document with the control numbers 056207 to 212.  It
22  reflects e-mail exchanges dated January 18 and
23  January 19 of 2001.
24       (Whereupon, Plaintiff's Exhibit 37 was marked
25       for identification.)

196

1       MR. SOLOMON:  Q.  My question is:  Do you
2  recognize these exchanges?
3    A.  Yes.  This was another one of the daily
4  reports we had decided to do, and it was issued a few
5  days after the earlier one you showed me.
6    Q.  Okay.
7    A.  It's from a different person who I think was
8  in the IT group.
9    Q.  Okay.  I'll have marked as the next exhibit a
10  document produced by the defendants with the control
11  numbers 035384 to 387.
12       (Whereupon, Plaintiff's Exhibit 38 was marked
13       for identification.)
14       THE WITNESS:  Yes.
15       MR. SOLOMON:  Q.  Do you recognize this?
16    A.  Yes.
17    Q.  And these are e-mail exchanges dated Monday,
18  January 29, 2001, and Saturday, January 27, 2001 --
19    A.  Let me say I recognize it.  I don't think I'm
20  copied, but I certainly am aware of the issue.  Whether
21  I got this particular one or not, I'm not sure.
22       Oh, here I am.  I am shown, but -- so I
23  certainly recognize it probably because I was copied.
24  Maybe that's why I recognize it, or some other thing.
25    Q.  Who is JLH?  Is that John L. Hall?

197

1    A.  JLH.  Probably John L. Hall.
2    Q.  You see on the first page --
3    A.  He was in charge of our education business,
4  still is.
5    Q.  He says "Serious trouble for education."  Do
6  you see that?
7    A.  Yes.
8    Q.  Do you know what that refers to?
9    A.  Yes, I'm well aware of this.  We knew all
10  during the testing that the one area where there was the
11  most risk was with our education business because we
12  were unhooking a lot of the spoke home-grown systems and
13  really taking more risk because it wasn't an upgrade, as
14  much as it was a brand new implementation taking place
15  for a lot of the spoke systems, and we put it in and
16  clearly were having serious problems initially.
17    Q.  I'll have marked as the next exhibit a
18  document produced by Oracle with the control numbers
19  100279 through 284.
20    (Whereupon, Plaintiff's Exhibit 39 was marked
21    for identification.)
22    THE WITNESS:  Yep.
23    MR. SOLOMON:  Q.  Do you recognize these
24  exchanges?
25    A.  Yeah, and I remember the topic, as well, sure.

198

1    Q.  So what was the topic?
2    A.  Again, as part of the upgrade, we were
3  implementing some -- some of the newer products here,
4  and support had moved over to this new module, as
5  opposed to the way they were traditionally doing
6  business, and this first e-mail at the top here is from
7  Mike Rocha who was running our support business.  So he
8  was talking about issues with this new -- this new
9  module that his team was using.
10    Q.  Okay.  And did this reflect a problem?
11    A.  Sure.  I mean, in terms of it was -- we were
12  having initial problems getting comfortable with this
13  application because it was new and different and --
14    Q.  Would you characterize it as a disaster?
15    A.  Would I characterize it as a disaster?  I
16  don't know that I would use that characterization.  As I
17  sit here and think about it, the product became stable
18  at some point.  It's been a great product for us, but we
19  certainly had initial problems getting everybody trained
20  and running it right and sorting through some of the
21  issues.
22    Q.  Okay.  I've marked as the next exhibit a
23  document produced by the defendants with the control
24  No. 097883.
25    A.  283?

199

1    Q.  097883.  No, this hasn't been marked yet.
2    A.  Oh, I'm sorry, a new one.
3    (Whereupon, Plaintiff's Exhibit 40 was marked
4    for identification.)
5    MR. SOLOMON:  Q.  Let me know if you recognize
6  this.
7    A.  I recognize that I wrote something.
8    Q.  Okay.
9    A.  Okay.  So I read it now, yes.
10    Q.  Okay.  And you'll see that it's from you to
11  Jennifer Minton.
12    A.  Uh-huh.
13    Q.  And you copied some people, including Ellison
14  and Catz?
15    A.  Yes.
16    Q.  And you start off saying, "Sounds like a
17  disaster based on the large drop in support revenue
18  growth for Q3"?
19    MR. WALD:  No, "seems".
20    THE WITNESS:  I'm saying yes so far, but I'll
21  explain.
22    MR. SOLOMON:  Q.  Go ahead.  No, that's all --
23    A.  I've read down below, which I responded to,
24  and your previous question had to do with the
25  application, I guess, that we had upgraded to, right?

200

1  So in here I talk about some functional problems with
2  the software, the lack of management reporting.  Now I
3  talk about a lack of management focus due to turnovers,
4  which has nothing to do with the new system.  A lack of
5  productivity due to OKS, so that would be, I guess, the
6  software.  Migration of licenses to power unit pricing,
7  which has nothing to do with the software.  Multiple
8  year price holds, which I don't think had anything to do
9  with the software.
10    And the point is, you know, that reading the
11  e-mail at the time, there was a whole litany of issues
12  and it was affecting our revenue, and I characterize it
13  as a disaster because I want everybody to get off their
14  rear ends and fix it, you know?  But I make the point --
15  and I remember this.  This was a very irritating period,
16  and I personally got involved in meetings, but it had
17  way more to do than just the software.  Mike Rocha had
18  come in to run this organization, we went through some
19  change-out of people and there was a variety of moving
20  parts here, all cumulatively causing a real problem,
21  which I, in this note, said was a disaster.
22    MR. SOLOMON:  Okay.  Let's take --
23    MR. WALD:  Five?
24    MR. SOLOMON:  Five is fine, yeah.
25    (Recess taken from 4:19 to 4:26 P.M.)

201

1    MR. SOLOMON:  Q.  We'll have marked as the
2  next exhibit a document produced by the defendants with
3  the control numbers 101192 through 101194.
4    (Whereupon, Plaintiff's Exhibit 41 was marked
5    for identification.)
6    THE WITNESS:  Okay.
7    MR. SOLOMON:  Q.  And do you recognize this?
8    A.  Again, I'm not sure if I -- I see I'm copied.
9  I'm not sure if I remember the details of this, but I
10  clearly was aware of this problem, as I testified
11  earlier.
12    Q.  Okay.
13    A.  And was involved in some of the meetings.
14    Q.  Okay.  I'll have marked as the next exhibit a
15  document produced by the defendants with the control
16  numbers 101468 to 470.
17    (Whereupon, Plaintiff's Exhibit 42 was marked
18    for identification.)
19    THE WITNESS:  Uh-huh.
20    MR. SOLOMON:  Q.  Do you recognize this?
21    A.  Yes.
22    Q.  Okay.  Go to the left page of the exhibit.
23  You see there's a reference to you under point 4, it
24  says, "The only unofficial word from Henley's
25  organization is that all available revenue is being

202

1  worked, but not all of the 20 million will be recovered.
2  This is purely a business issue, shrinking economy,
3  reduced renewals, change in OSS processes in and how
4  support is obtained from license deals, et cetera."
5    Do you see that?
6    A.  Yes, I see that.
7    Q.  Do you know what is meant by "all available
8  revenue being worked"?
9    A.  Yes, I think so.  I think we were -- again, as
10  I testified earlier, there were a variety of issues,
11  one of which there was turnover and people not doing,
12  necessarily, their job right.  There was a variety of
13  issues, so we discovered that there were some -- that
14  the renewal rate seemed to be shrinking and we were
15  trying to get to the bottom of why it was, and there
16  were clearly deals that were just sitting there, and we
17  hadn't contacted the customer to get the renewal.  So
18  that's what we were attempting to do, hiring some temps
19  in order to try to get on all of the things where we
20  just simply hadn't notified the customer yet to renew
21  their contract, their support contract.
22    Q.  And ultimately, do you know what shortfall
23  there was?
24    A.  I don't recollect.
25    Q.  I'll have marked as the next exhibit a

203

1  document produced by the defendants with the control
2  numbers 101474 through 476.
3    (Whereupon, Plaintiff's Exhibit 43 was marked
4    for identification.)
5    THE WITNESS:  Okay.
6    MR. SOLOMON:  Q.  Okay.  And the question is:
7  Do you recognize these exchanges?
8    A.  Boy, I don't know if I remember this, but
9  I'm -- I believe I was copied, certainly, again, aware
10  of the general problems when we were wrestling through
11  these issues, and I've been in several meetings, and
12  Jennifer Minton was much closer to it even than I, so
13  this was one of a string of e-mails.  This, I think, was
14  the day after the previous one you showed me.
15    Q.  And I'll have marked as the next exhibit a
16  document produced by the defendants with the control
17  numbers 060383 and 384.
18    (Whereupon, Plaintiff's Exhibit 44 was marked
19    for identification.)
20    THE WITNESS:  I have it, yep.
21    MR. SOLOMON:  Q.  Okay.  Do you recognize
22  these exchanges?
23    A.  I don't recall it, but again, it's -- I was
24  copied, I responded, so I'm sure I got it.
25    Q.  Okay.  On the second page there's an addressee

204

1  reference "Henley org"?
2    A.  Yes.
3    Q.  What is that?
4    A.  We have a capability in the e-mail to create
5  what's called an alias, and you can then put as many
6  people as you want under that alias.  So this is a way
7  of sending to a broad group of people just simply typing
8  in an alias; in this case, Henley org.  So these would
9  be people in my organization would be included in that
10  alias.
11    Q.  So, that is, you had your e-mail address at
12  Oracle.  This was another repository for e-mail?
13    A.  My e-mail is for me personally, as most
14  people's are, but there are so-called aliases where you
15  can say, "Gee," you know, "I want these hundred people
16  to be part of this distribution list."  It's a
17  distribution list, if you will.  We call it an alias.
18  So Henley org is an alias for a whole bunch of people
19  that are in my organization.
20    Q.  Okay.  And do you know how many aliases had
21  you as a member?
22    A.  No.
23    Q.  If that makes sense.
24    A.  I don't know how many different aliases would
25  be representing my organization, no.

205

```
1      Q.  And was the Henley org alias regularly used?
2      A.  I don't know.  I really don't know.  I don't
3   even know if I'm included in the Henley org distribution
4   list.  I just don't know.  I'm on some aliases, and
5   others I'm not, so --
6      Q.  Okay.  Looking at the first page at the bottom
7   it says, "Sharon Montoya wrote:  Purchasing!!!", and
8   then there's four exclamation marks.  "I can't believe
9   this one.  Our system has been down for the last
10  two months!!!!!!" and there's six or seven exclamation
11  marks, "and none of our vendors can get paid.  I spent
12  20 percent of my day being a bill collector" -- sorry,
13  "I spend 20 percent of my day being a bill collector.
14  Okay, I am not yelling at you, I'm just amazed at this
15  one."
16          Do you see that?
17     A.  Yes.
18     Q.  And then you responded to that, right, saying
19  "I agree"?
20     A.  Yes.  "I agree it seems odd."
21     Q.  "I agree it seems odd that the purchasing
22  department can't control 11i quality.  The upgrade has
23  been a large challenge."
24          Are those your words?
25     A.  Yes.
```

206

```
1      Q.  And then at the top, exchange from Sharon
2   Montoya to Sherry Jean?
3      A.  Jean Sherry, actually.
4      Q.  Jean Sherry.  It says, "Subject:  Forward:  An
5   interesting response, I've edited out the sender."
6          Do you know what that means, what that's
7   about?
8      A.  I guess she didn't want me to know who was
9   making the comments.
10     Q.  Okay.  And then it says, "Jeannie La Tour,
11  just FYI, Jeff's response brings up a good point.  It's
12  not really purchasing's issue, it's", in all caps,
13  APPLICATIONS...hmm.  Not to worry, no one knew it was
14  from you.  XOXOX."
15          Do you know what all that's about?
16     A.  No, other than she's just telling her that I
17  did talk to Jeff about it, and here's his comment.
18  That's all I can figure.
19     Q.  And the reference "this application", that's
20  the reference to the quality of the application?
21     A.  Yeah, the difficulty we were having getting
22  the upgrade done, and I think there was an earlier note
23  you gave me, one of those status reports they talked
24  about self-service having performance problems, so I --
25  I don't believe that I would have heard for lots of
```

207

```
1   people who didn't pay all our vendors in two months, but
2   clearly we had some delays with vendors, I'm sure,
3   because some of the self-service stuff had performance
4   issues.
5          For the record, I think -- I'm not certain,
6   but I believe we were probably the largest customer
7   because we considered ourselves a customer, if you will,
8   at that stage.  That was always our goal was to get on
9   as quick as we could to new releases and dot releases so
10  we can not only test the functionality, but stress test
11  the system because we knew that when you put a lot of
12  users on, you find more problems, you find other issues.
13  And we were putting in the latest version of our
14  database, so we knew there would be performance issues,
15  which is part of the shake-out that you go through.
16     Q.  I'll have marked as the next exhibit a
17  document produced by the defendants with the control
18  numbers 078388 through 390.
19          (Whereupon, Plaintiff's Exhibit 45 was marked
20          for identification.)
21     THE WITNESS:  Yep.
22     MR. SOLOMON:  Q.  Have you seen these
23  exchanges before?
24     A.  Again, I don't believe I've seen this one.
25  I'm certainly aware of the issue, but I don't see myself
```

208

```
1   copied, so I don't recall seeing the specific e-mail.
2      Q.  Okay.  And you'll see at the bottom of the
3   first page there's a reference in the e-mail from Ron
4   Wohl saying, "We are going live knowing that we have
5   unacceptable performance, counting on our being able to
6   fix these bugs quickly."
7          Do you see that language?
8      A.  Yes.
9      Q.  And were you aware, in December of 2000, that
10  you were going live knowing that there was unacceptable
11  performance?
12     A.  I can't recall.  We sat through the meetings
13  and we knew that -- we always knew, whenever we did
14  major releases, we were going to have -- no matter what
15  kind of testing we did, we would have some issues.  So
16  the point he makes in here, I think, is right that the
17  reason we don't do it at the last month of a quarter is
18  to give ourselves some time to sort through the
19  inevitable performance issues.
20     Q.  I'll have marked as the next exhibit a
21  transcript of Oracle's quarterly results call dated
22  12/15/00.
23          (Whereupon, Plaintiff's Exhibit 46 was marked
24          for identification.)
25     MR. WALD:  For the record, there's no Bates
```

209

1  numbers on these.
2  MR. SOLOMON: Correct. I add also for the
3  record this appears to be a transcript of an interview
4  conducted on Radio Wall Street dated 12/15/00.
5  THE WITNESS: Okay.
6  MR. SOLOMON: Q. Do you have any reason to
7  dispute that this is an accurate transcript?
8  A. No.
9  Q. Looking at the first page, and it answers the
10  question, "Let's go over the numbers. How did Oracle do
11  in this quarter?"
12  You said the following: "Well, we had a great
13  quarter. We did well in our applications business
14  bouncing up to 66 percent growth, and we beat our
15  earnings estimate out on the street by about 10 percent.
16  And our net income grew 62 percent, so we had another
17  very large margin improvement story this quarter. We've
18  had that for a number of quarters now, so the margins
19  are continuing to expand nicely and our application
20  business is really picking up steam."
21  Do you see that?
22  A. I do.
23  Q. What was the basis for you saying your
24  application business was really picking up steam?
25  A. The fact that we had such a strong quarter and

210

1  that our pipeline, at that point, looked to be good,
2  looked to be strong.
3  Q. Okay. And how could you identify the pipeline
4  at that stage?
5  A. Because we get reports for database pipeline,
6  applications pipeline, compare that to previous points
7  in the prior year and that sort of thing.
8  Q. And what's the source of those reports?
9  A. It's varied, but at this stage, based on what
10  I've seen so far, I think we were using -- I think we
11  were using a previous version of OSO. We talked about
12  the upgrade to 11i, but I believe that by then we were
13  using a previous version of OSO. Before that,
14  historically, at points we would use spreadsheets, we
15  would use a variety of tools.
16  Q. Okay. You go on to say, "And I think we told
17  Wall Street that with the economy right now, even though
18  it's slowing, it doesn't seem to be affecting us. We
19  see no difference in demand for our upcoming third
20  quarter. So far so good. We're optimistic at this
21  point."
22  Do you see that?
23  A. Yes.
24  Q. And you don't dispute that you said all that,
25  right?

211

1  A. I don't. In fact, I went on to -- in the next
2  paragraph, to further explain my thoughts on that.
3  Q. Don't worry, we're going to go through some of
4  that.
5  You say, over the page on -- the second page
6  of the transcript, "Well, we're in a different segment,
7  you know. We're showing Internet software, E-Business
8  software. That's where the real interest and demand is
9  right now. So I think that if people are cutting back a
10  little bit in some areas, that's that's right now, I
11  don't think they really want to cut back on. As long as
12  the economy is simply slowing and kind of doing a soft
13  landing, I think we'll be fine. If the economy got
14  really, really bad, then obviously that would probably
15  have some effect on all of us. But so far we look
16  pretty hard at previous indicators. We're seeing no
17  softening in our business."
18  You said that, right?
19  A. That's correct.
20  Q. And then --
21  A. And I think this was probably the next day
22  after the earnings call, so it's pretty consistent with
23  what I probably said on the earnings call.
24  Q. You think the earnings call was November 14 --
25  I'm sorry -- December 14?

212

1  A. December 14th. So usually I would do a few
2  interviews after the earnings call. In this case, this
3  was one of the ones I did.
4  Q. Okay. The next question is, "Where are you
5  building momentum in the business going forward?"
6  And then you answer, "In our applications
7  business, we think that our database business is going
8  to be solid and steady."
9  What does that mean?
10  A. That means that our database business is a lot
11  bigger and we have a -- been around a lot longer and we
12  had much less opportunity to see increases in growth
13  rates, but we're in applications because of 11i, because
14  of the whole move to the Internet architecture, we were
15  much more bullish at that stage about being able to grow
16  that faster.
17  Q. And you go on to say "That the real momentum
18  and much higher growth is going to be in our
19  applications business. We think that business can grow
20  at very high rates for the next few years," right?
21  A. Absolutely. I'd been saying that for
22  six months when we first launched the product.
23  Q. Okay. So I'm going now to the third page.
24  A. This was the second?
25  Q. That was the second page. And I'm going to

213

1  the bottom quarter of the page, Jarvis says, "So the 11i
2  suite of applications, you expect to have several
3  hundred by end of your fiscal year?"  And then there's a
4  reference to Stanley.
5  　　　Who is Stanley?
6  　　A.  I don't know.  Stanley.  Stanley.  It must
7  have been someone from Oracle, perhaps in marketing
8  or -- I'm just not sure.  Stanley.
9  　　Q.  Do you think it may be a mistake and it's
10  meant to say Henley?
11  　　A.  Possibly, because typically I do the interview
12  sort of one-on-one, so it's quite possible that was me
13  because I usually didn't do joint interviews.
14  　　Q.  So the response by Stanley, aka Henley, reads,
15  "Well, except that several hundred live, we have several
16  thousand people that are in the process of upgrading
17  right now."
18  　　　Do you see that?
19  　　A.  Yes.
20  　　Q.  And the several hundred live, what are you
21  referring to?
22  　　A.  Well, this is, as I testified earlier, when
23  you asked me the question about the 180, or whatever,
24  you know, so, I mean, this was kind of this
25  generalization that we had a couple hundred live, but we

214

1  had several thousand customers who were in some stage of
2  moving to 11i, contemplating or in the process of
3  upgrading or new customers deploying.  So I think that
4  we've always thought that was very important to show not
5  only who's live, but the volume of people that are in
6  some stage of moving to 11i.
7  　　Q.  And is it your testimony that as of
8  December 2000, Oracle had several hundred customers live
9  on the 11i suite of applications?
10  　　MR. WALD:  Just for the record, the question
11  is:  "So the 11i suite of applications, you expect to
12  have several hundred live by the end of your fiscal
13  year?"
14  　　MR. SOLOMON:  Correct.
15  　　MR. WALD:  Which is not December of '00.
16  　　THE WITNESS:  So the question was, "You expect
17  to have several hundred by the end of your fiscal year?"
18  But my point is yes, but beyond the several hundred
19  there is several thousand who are also going through
20  this process of upgrading, as well.  So it's much
21  bigger, really, in terms of the move to 11i.
22  　　MR. SOLOMON:  Q.  Okay.  Let's just be clear
23  what we're getting here.  Are you saying that this
24  reference, "Well, except that several hundred live,"
25  you're not saying that there were several hundred live

215

1  as of December 2000?
2  　　A.  I think I was responding to the question.  I
3  believe I was responding to the question.
4  　　Q.  Okay.  Let's do this another way.  As of
5  December 2000, did you believe that there were several
6  hundred customers live on the 11i suite of applications?
7  　　A.  I don't remember what I believed.  I don't
8  remember what we would have said on the earnings call if
9  we gave a number.  I do remember, because you jogged my
10  memory with what was said at the Apps World, the number
11  was 180 at that point, but I don't remember what I would
12  have thought or said a month or two earlier.
13  　　Q.  Okay.
14  　　A.  The point is for a company our size, several
15  hundred is not a big number.  So my point was to
16  indicate that it really is much bigger than several
17  hundred because there's several thousand really coming
18  along the way, and at various points we'll go live.
19  　　Q.  And, in fact, you stated, is it true, then, in
20  December 2000 that at that stage, in December of 2000,
21  there were several thousand people in the process of
22  upgrading right then?
23  　　A.  I think that's what I said, yes.  I indicated
24  that we had, according to my reports I was getting, we
25  had several thousand people that were in some stage

216

1  of -- in the process of upgrading.  That process can be
2  we've sort of decided we're gonna do it where we've got
3  staff allocated, we're halfway through it, we're in
4  final test; I mean, there's this whole process, right?
5  　　Q.  How could that assertion be verified today?
6  　　A.  I think that you got tons of e-mails, there's
7  probably e-mails around because we were getting regular
8  reports from the marketing people and applications
9  people as to status as to how many customers were live,
10  how many were in the queue, and it was common for us to
11  report when we had meetings with analysts, give them
12  updates on number of customers live, number of customers
13  in the process, et cetera, et cetera, because we were
14  trying to show that, you know, we were going through
15  this improving situation, and eventually, obviously,
16  expected to get everyone, but that would take a long
17  time because there are people that are not early
18  adopters and hang on with old releases for a long time.
19  But we had a significant number of people who had
20  indicated and were in some stage of planning to go to
21  11i, or actually doing it.
22  　　Q.  So are you saying that you believe that there
23  are e-mails that are being produced to us that tell us
24  that several thousand people, as of December '00, were
25  in the process of going live with 11i application suite?

217

1    A.  I don't know where I got the data, but I don't
2  believe I made the numbers up.  I don't believe I made
3  up the numbers.  So I believe I saw documents, I saw
4  presentations, I heard things.  I don't believe I made
5  the number up, but I would have to go back and look
6  through all the documents that are out there to try to
7  figure out, but I just don't randomly throw a number out
8  that I haven't been told.
9    Q.  But you can't, today, tell me where --
10   A.  I can't recall where I heard or found the
11  number, no.  But as you pointed out to me, you know,
12  within by February we made a presentation that made
13  essentially the same points.  So my guess is these were
14  earlier, you know, reports or numbers that were out
15  there.
16   Q.  And then you go on to say, "A lot of current
17  customers that are moving to the new architecture and
18  then we have lots of new customers that are buying this
19  stuff, so in some combination but certainly we have, I
20  think, 7 or 8,000 application customers so that all,
21  eventually, over the course of a couple of years,
22  upgrade to 11i suite."
23      Do you see that?
24   A.  Yes.
25   Q.  What was your basis for assuming that 7 or

218

1  8,000 of your applications customers would all upgrade
2  to 11i?
3    A.  You mean there was two statements, that we had
4  7 to 8,000 customers, and then I said at some point in a
5  few years they would all move, right?
6    Q.  You did.
7    A.  Based on history.  So again, I don't know
8  exactly where I got the facts, but I didn't make up that
9  we had 7 or 8,000 customers, okay?  And based on
10  history, we only support several releases.  So based on
11  the history of that point, at some point we stop
12  supporting old releases and everybody moves to the
13  E-Business Suite release.
14   Q.  In fact, wasn't there an attempt to
15  prematurely cut off support for prior releases to force
16  customers into 11i?
17   A.  I don't recall us ever prematurely -- to use
18  your words -- cutting off support.  We definitely had a
19  policy over the years of not -- trying to not support
20  too many releases, and so -- and we've typically, if
21  anything, extended dates, but we've always tried to get
22  people to sort of recognize that, "Hey, time is starting
23  to come, we ought to think about upgrading," and then
24  we've got people saying, "I'm not ready," and so
25  historically we typically found ourselves relaxing those

219

1  dates even further so that we would not inconvenience
2  customers.
3    Q.  Jarvis then says, "The greatest margins you
4  enjoy at Oracle are on the applications side?"
5      And Stanley, aka you, replies, "No, no, that's
6  not true."
7      Jarvis says, "No?"  Question mark.
8      And Stanley, aka you, apparently says, "No, no
9  way.  Historically our database business has made a
10  higher profit margin, but our applications business is
11  now starting to come up and get closer to that so that
12  both businesses are profitable and we're seeing larger
13  improvement across the board in every one of our
14  businesses, in our support business, in our consulting
15  business, so forth."
16      You said that, right?
17   A.  That's correct.  This was a period where we
18  had been going through this global transformation and
19  our margins had been, as was referenced in here, going
20  up, and it was in our 10 Ks and Qs, and everybody could
21  see that we were, across the board, seeing improvement.
22   Q.  Okay.
23   A.  And I, many times, commented on the fact that
24  our database business was historically more profitable
25  than our applications business.

220

1    Q.  Okay.  And then Jarvis asks, "Were services
2  down slightly, though?"
3      And Stanley, who we believe is you, replies,
4  "No, the service business before the effect of currency
5  was up, and that's been something that started to turn
6  around, and we've told people that we'll grow
7  sequentially, we'll see better growth for each quarter
8  for the next couple of quarters because our consulting
9  business is rebounding."
10      Do you see that?
11   A.  Yes.
12   Q.  What was your basis for stating that your
13  consulting business was rebounding?
14   A.  I don't recall.  Again, all I know is that I
15  believe I made factual comments based upon forecast and
16  information we had in the company.
17      MR. SOLOMON:  The tape's about to run out, I
18  believe, so we need to go off the record.
19      (Recess taken from 5:06 to 5:09 P.M.)
20      THE VIDEOGRAPHER:  Here marks the beginning of
21  Videotape No. 5, Volume 2 in the deposition of Jeffrey
22  Henley.
23      MR. SOLOMON:  I'll have marked as the next
24  exhibit a document produced by Defendants with the Bates
25  range -- sorry, the control numbers 128973 through

221

1  129005.
2      (Whereupon, Plaintiff's Exhibit 47 was marked
3      for identification.)
4      MR. SOLOMON:  Q.  And while you're looking at
5  this, it's entitled "Oracle Corporation Moderator:
6  Stephanie Aas, December 14th, 2000, 4:30 P.M. central
7  time."
8      A.  Yes.
9      Q.  And is this the conference call that you
10  referred to a few minutes ago?
11      A.  I believe so.
12      Q.  Does this reflect that?
13      A.  Yes, I believe this is a translation of that
14  call.
15      Q.  I want to go to, first of all, page 3 of the
16  document, which is 128975.
17      A.  Okay.
18      Q.  And two thirds of the way down the page
19  there's a paragraph which starts, "The applications
20  business."  Do you see that?
21      A.  Yes.
22      Q.  And apparently you say, "The applications
23  business, we said, would rebound and we thought it would
24  do quite a bit better than Q1, and it did.  It was
25  66 percent in dollars or 73 percent local currency.  And

222

1  certainly, as I'll talk about later, we're very
2  optimistic about the third quarter and beyond because
3  we're now through this first couple of quarters and feel
4  like everything is kind of stabilized and we're kind of
5  ready to run full-throttle now from here on out with
6  11i."
7      Do you see that?
8      A.  Uh-huh.
9      Q.  And what was your basis for saying that
10  everything is kind of stabilized as of December '00?
11      A.  Again, based on the fact that, historically,
12  it takes several quarters to really get a lot of the
13  problems resolved, not all the problems, but to the
14  point where you feel like the demos are getting better,
15  a lot of the initial early bugs are starting to sort
16  themselves out, and you're at a stage where, you know,
17  it just keeps getting better and better.
18      Q.  You testified a few minutes ago that you
19  thought the OSO that provided the basis for your pipeline
20  statements was the old version as of around this date,
21  correct?
22      A.  I believe so.  I believe we had -- my
23  recollection was we had an early version of it, but the
24  11i version came later.  So --
25      Q.  Do you know how much later after this date,

223

1  December 14, the new version was implemented?
2      A.  Again, I testified earlier, I don't recall.  I
3  know it ultimately did, but I don't remember when.
4      Q.  And again, just to be sure, do you know
5  whether it was within Q3 '01?
6      A.  Again, I don't recall.
7      Q.  I'm looking at page 10, which is control
8  No. 128982.
9      A.  Okay.
10      Q.  I'm looking at the top of the page, the first
11  full paragraph of that page, you say, "The good news
12  about applications, this quarter, is that every part of
13  the little submarkets that we're in, we're strong.  And
14  every geography we're strong, Europe, Asia, U.S.  So
15  there's nothing that we -- no weakness in our
16  applications business, and the pipelines at every one of
17  these geographies looks astounding for this next
18  quarter.  So we're very excited and we really do think
19  that the message we have will only continue to gain
20  traction over time."
21      Do you see that?
22      A.  Yes, I do.
23      Q.  And you said that?
24      A.  I'm sure I did, and I'm sure I absolutely
25  believed it.

224

1      Q.  And you believed that notwithstanding what
2  Sergio Giacoletto was saying?
3      A.  Everything is relative to where they've come
4  from, so they were never as strong in the applications
5  in Europe as they were in the U.S., so sure.
6      Q.  Well, don't you, in this paragraph, suggest
7  that applications is strong everywhere, including
8  Europe, Asia and U.S.?
9      A.  Yes, again, everything is relative to where we
10  have come from.  SEP is a much more dominant share in
11  Europe than it does in America.
12      Q.  And you don't think this is at all misleading
13  about the strength of applications in Europe?
14      A.  No, I don't -- I don't think so or I wouldn't
15  have said it.
16      Q.  Okay.
17      A.  And, in fact, I'm just reading the next --
18  which maybe you're going to get to, when Larry Ellison
19  reiterated what I said, "Pipelines really are
20  astounding."  So...
21      Q.  Yes, and again, the pipelines that are really
22  astounding, the information they provided the basis for
23  you guys saying that was on OSO; is that right?
24      A.  Again, I testified I believe it was on an
25  earlier version of OSO.  So -- and I also, you know,

225

1     whenever we did these calls, we have weekly meetings, so
2     we always talked to our executives about the business,
3     where the business is, you know, how they feel about it,
4     so again, I think uniformly, despite individual concerns
5     about this or that, whatever, generally, people felt
6     very good that the 11i message was really getting out
7     there and that we had a lot of interest.
8       Q.   Were those meetings that you're talking about
9     recorded in any way?
10      A.   As best of my knowledge, we've never recorded
11    our Monday EC calls. There are e-mails that are
12    recorded, if you will, so there's records of those.
13       Q.   Okay. No notes taken of those meetings?
14      A.   By whom?
15       Q.   By anybody.
16      A.   I think various people may make notes from
17    time to time. I was not a big note taker. I took notes
18    occasionally, more to remind myself or follow up
19    something, but I'm personally not a heavy note taker.
20       Q.   In those meetings who do you recall taking
21    notes?
22      A.   I don't. I mean, I think there's a variety of
23    people in the meeting, and I really don't know who took
24    notes and who didn't.
25       Q.   And you couldn't tell me that "X" was a person

226

1    that would typically make some notes, and "Y" was a
2    person who would never make any notes?
3      A.   I wouldn't want to speculate. I didn't sit
4    there and observe who was taking notes and who wasn't
5    taking notes.
6       MR. SOLOMON: Okay. Is now a good time for
7    you, Peter?
8       MR. WALD: Sure.
9       MR. SOLOMON: Okay. We're going to go off the
10   record and reconvene in a date later in September, we
11   believe.
12
13         --o0o--
14       (Whereupon, the deposition was
15       concluded at 5:20 P.M.)
16
17   Dated: _____ Signed: _____
18
19
20
21
22
23
24
25

227

1
2          REPORTER'S CERTIFICATE
3
4      I hereby certify that the foregoing is a true
5   record of the testimony as reported to the best of my
6   ability by me, a Certified Shorthand Reporter and a
7   disinterested person, and was thereafter transcribed
8   under my direction into typewriting by computer.
9
10      I FURTHER CERTIFY that I am not interested in
11   the outcome of the said action and not connected with
12   nor related to any of the parties in said action or
13   their respective counsel.
14   Dated: _____ _____
          APRIL DAWN HEVEROH, CSR
15           CSR NO. 8759
16
17
18
19
20
21
22
23
24
25

REPORTER'S CERTIFICATE

 1

 2

 3

 4        I hereby certify that the foregoing is a true

 5   record of the testimony as reported to the best of my

 6   ability by me, a Certified Shorthand Reporter and a

 7   disinterested person, and was thereafter transcribed

 8   under my direction into typewriting by computer.

 9

10        I FURTHER CERTIFY that I am not interested in

11   the outcome of the said action and not connected with

12   nor related to any of the parties in said action or

13   their respective counsel.

14   Dated: *August 1, 2006*        *April D. Heveroh*

                      APRIL DAWN HEVEROH, CSR

15                        CSR NO. 8759

228

```
1              IN THE UNITED STATES DISTRICT COURT
2                NORTHERN DISTRICT OF CALIFORNIA
3
4   In re ORACLE CORPORATION
    SECURITIES LITIGATION,
5
6   vs.              Master File No.: C-01-0988-MJJ
7   This Document Relates To:,
8      ALL ACTIONS.
9   _____/
10
11             ---o0o---
12              CONFIDENTIAL
13         DEPOSITION OF JEFFREY HENLEY
14         Thursday, November 16, 2006
15         VOLUME II, Pages 228 - 494
16             ---o0o---
17
18       SHEILA CHASE & ASSOCIATES
              REPORTING FOR
19          LiveNote World Service
         221 Main Street, Suite 1250
20        San Francisco, California 94105
            Phone: (415) 321-2311
21           Fax: (415) 321-2301
22
23  Reported by
    APRIL DAWN HEVEROH, CSR
24  CSR No. 8759
25
```

229

```
1                I N D E X
2            INDEX OF EXAMINATION
                                    PAGE
3   EXAMINATION BY MR. SOLOMON        236
4              ---o0o---
5
6            INDEX OF EXHIBITS
7   DESCRIPTION                    PAGE
8   Exhibit 48  Deposition transcript of Jeffrey   238
          Henley taken July 27, 2006, 227 pages
9
10  Exhibit 49  News article dated October 4, 2000,  239
          2 pages
11  Exhibit 50  Analyst report dated October 4, 2000,  246
          Bates stamped NDCA-ORCL 006112 to
12        006115, 4 pages
13  Exhibit 51  News article dated November 30, 2000,  249
          2 pages
14
15  Exhibit 52  Document entitled "Highlights of   257
          AppsWorld Conference, Bates stamped
16        WBC 0012 to 0013, 2 pages
17  Exhibit 53  Document entitled "Highlights From  279
          Oracle Non-Deal Roadshow, Bates
18        stamped NDCA-ORCL 109482 to 109484,
          3 pages
19  Exhibit 54  Oracle Corporation Finance and Audit  297
          Committee Meeting report, Bates stamped
20        NDCA-ORCL 102701 to 102820, 169 pages
21  Exhibit 55  Oracle Corporation Finance and Audit  299
          Committee Meeting report, Bates stamped
22        NDCA-ORCL 420976 to 421002, 27 pages
23  Exhibit 56  Document entitled "Oracle Speaker  303
          Biography, Bates stamped NDCA-ORCL
24        195262 to 195269, 8 pages
25  /////
```

230

```
1            INDEX OF EXHIBITS (Continued)
2   DESCRIPTION                    PAGE
3   Exhibit 57  E-mail dated November 30, 2000,  306
          stamped NDCA-ORCL 025020 to 025021,
4         2 pages
5   Exhibit 58  Document entitled Oracle, January 8,  311
          2001, Board of Directors, Bates stamped
6         NDCA-ORCL 044428 to 044505, 78 pages
7   Exhibit 59  E-mail string with attachments, Bates  326
          stamped NDCA-ORCL 055957 to 055962,
8         6 pages
9   Exhibit 60  E-mail dated November 30, 2000,  330
          stamped NDCA-ORCL 025018, one page
10
11  Exhibit 61  Document entitled "December Flash  338
          Report dated January 17, 2001, Bates
12        stamped NDCA-ORCL 088715 to 088732,
          18 pages
13  Exhibit 62  Oracle Corp. Pipeline Reporting  341
          Package dated December 11, 2000,
14        Bates stamped NDCA-ORCL 398302 to
          398311, 10 pages
15
16  Exhibit 63  E-mail string Bates stamped NDCA-ORCL  342
          609550 to 609551, 2 pages
17  Exhibit 64  E-mail dated January 11, 2001, Bates  347
          stamped NDCA-ORCL 040617, one page
18
19  Exhibit 65  E-mail dated December 11, 2000, Bates  350
          stamped NDCA-DER 039420, one page
20  Exhibit 66  E-mail dated January 18, 2001, Bates  351
          stamped NDCA-ORCL 039430, one page
21
22  Exhibit 67  Document entitled "Exhibit M"  359
          consisting of an e-mail dated January
23        17, 2001, Bates stamped NDCA-ORCL
          297772 to 297773, 2 pages
24  Exhibit 68  E-mail with attachments dated January  362
          17, 2001, Bates stamped NDCA-ORCL
25        013415 to 013418, 4 pages
```

231

```
1            INDEX OF EXHIBITS (Continued)
2   DESCRIPTION                    PAGE
3   Exhibit 69  E-mail dated October 4, 2000,  368
          stamped NDCA-ORCL 014044, one page
4
5   Exhibit 70  Document entitled "Total Company  370
          Q3 FY01 Forecast, Bates stamped
6         ORCL-DER 003447 to 003463, 17 pages
7   Exhibit 71  Deposition transcript of Jeffrey O.  371
          Henley taken March 2, 2004, Bates
8         stamped NDCA-ORCL 606383 to 606688,
          306 pages
9   Exhibit 72  Document entitled "Oracle  381
          Presentation", Bates stamped NDCA-ORCL
10        03281 to 03311, 31 pages
11  Exhibit 73  Document entitled "TheStreet.Com",  385
          Bates stamped NDCA-ORCL 141794 to
12        141795, 2 pages
13  Exhibit 74  E-mail string Bates stamped NDCA-ORCL  398
          061311 to 061315, 5 pages
14
15  Exhibit 75  E-mail dated January 12, 2001, Bates  396
          stamped NDCA-ORCL 618166 to 618169,
16        4 pages
17  Exhibit 76  E-mail dated January 31, 2001, Bates  399
          stamped NDCA-ORCL 012439 to NDCA-ORCL
18        012441, 3 pages
19  Exhibit 77  E-mail string Bates stamped NDCA-ORCL  401
          061369 to 061373, 5 pages
20  Exhibit 78  E-mail dated December 4, 2000, Bates  404
          stamped NDCA-ORCL 052474, one page
21
22  Exhibit 79  Summary Analysis of Oracle CRM  405
          Customers FY 1Q02 Earnings Call
23        Announcement, Bates stamped NDCA-ORCL
          397378 to 397380, 3 pages
24  /////
25  /////
```

Henley, Jeffrey  11/16/2006  9:20:00 AM

232

1           INDEX OF EXHIBITS (Continued)
2           DESCRIPTION                           PAGE
3    Exhibit 80  Memo from Rick Pierce to Mark Keever,  406
            et al., dated January 26, 2001, Bates
4           stamped NDCA-ORCL 1029900 to 1029905,
            6 pages
5
     Exhibit 81  Letter to Drew and Chris from Greg,   407
6           Bates stamped NDCA-ORCL 1032070,
            one page
7
     Exhibit 82  E-mail string Bates stamped NDCA-ORCL  413
8           061297 to 061298, 2 pages
9    Exhibit 83  E-mail string Bates stamped NDCA-ORCL  416
            063478 to 063480, 3 pages
10
     Exhibit 84  E-mail dated March 25, 2002, Bates    422
11          stamped NDCA-ORCL 061300 to 061301,
            2 pages
12
     Exhibit 85  E-mail dated October 6, 2000, Bates   425
13          stamped NDCA-ORCL 203681 to 203683,
            3 pages
14
     Exhibit 86  E-mail string Bates stamped NDCA-ORCL  426
15          612306 to 612307, 2 pages
16   Exhibit 87  Presentation to the SEC Staff On     439
            Behalf of Oracle Corporation, Bates
17          stamped NDCA-ORCL 050209 to 050255,
            47 pages
18
     Exhibit 88  E-mail string Bates stamped NDCA-ORCL  445
19          120138 to 120140, 3 pages
20   Exhibit 89  E-mail dated May 2, 2001, Bates      446
            stamped NDCA-ORCL 120192 to 120194,
21          3 pages
22   Exhibit 90  E-mail string Bates stamped NDCA-ORCL  448
            119340 to 119344, 5 pages
23
     Exhibit 91  Memo Bates stamped PLF-ORC 000006,    458
24          one page
25   /////

234

1    BE IT REMEMBERED that on Thursday, July 27,
2    2006, commencing at the hour of 9:20 A.M. thereof, at
3    the offices of Lerach, Coughlin, Stoia, Geller, Rudman &
4    Robbins, LLP, 100 Pine Street, Suite 2600, San
5    Francisco, California, before me, APRIL DAWN HEVEROH,
6    CSR, a Certified Shorthand Reporter for the State of
7    California, personally appeared
8           JEFFREY HENLEY,
9    called as a witness by the Plaintiffs herein, who, being
10   by me first duly sworn, was thereupon examined and
11   testified as hereinafter set forth.
12                ---oOo---
13   Appearing as counsel on behalf of Plaintiff:
14          MARK SOLOMON, Esquire
            STACEY KAPLAN, Esquire
15          LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBI
            655 West Broadway, Suite 1900
16          San Diego, California  92101
            (619) 231-1058
17          marks@lerachlaw.com
18   Appearing as counsel on behalf of Defendant:
19          GREGORY LINDSTROM, Esquire
            MICHELE KYROUZ, Esquire
20          LATHAM & WATKINS
            505 Montgomery Street, Suite 1900
21          San Francisco, California  94111-2562
            (415) 391-0600
22          michele.kyrouz@lw.com
23
24   Also present:  Keith Mautner, Sarah Holloway,
            James Maroulis and James Terrell,
25          Videographer

233

1           INDEX OF EXHIBITS (Continued)
2           DESCRIPTION                           PAGE
3    Exhibit 92  Billing and Receipt History Bates    459
            stamped NDCA-ORCL 050364 to 050390,
4           11 pages
5    Exhibit 93  E-mail dated October 21, 2002 from   463
            Michael Quinn to Ryan Roberts, et al.,
6           2 pages
7    Exhibit 94  Document entitled "Unapplied Auto    469
            Adjustments", Bates stamped PFL-ORC
8           000214, 10 pages
9    Exhibit 95  Photocopy of Oracle check No. 1509347 470
            dated 5/23/02, Bates stamped HSBC
10          000001, one page
11   Exhibit 96  E-mail dated April 20, 2001, Bates   472
            stamped NDCA-ORCL 120113 to 120114,
12          2 pages
13   Exhibit 97  E-mail string Bates stamped NDCA-ORCL  474
            101525 to 101530, 6 pages
14
     Exhibit 98  Memo Bates stamped NDCA-ORCL 623514,  476
15
16   Exhibit 99  E-mail dated November 30, 2000, Bates  476
            stamped NDCA-ORCL 025066 to 025067,
17          2 pages
18   Exhibit 100  Document entitled "Q3 of FY 2001",   482
            Bates stamped NDCA-ORCL 297300,
19          one page
20   Exhibit 101  Document entitled "Q3FY01 USA Support  487
            Revenue Model", Bates stamped NDCA-ORCL
21          147106 to 147107, 2 pages
22   Exhibit 102  Excerpt from "Softwar", 3 pages      490
23
24                ---oOo---
25

235

1                ---oOo---
2            P R O C E E D I N G S
3                ---oOo---
4           THE VIDEOGRAPHER:  This begins the videotaped
5    deposition of Jeffrey Henley, Tape 1, Volume 2 in the
6    matter entitled In Re Oracle corporation Securities
7    Litigation filed in the United States District Court for
8    the Northern District of California, case
9    No. C-01-0988-MJJ.
10          Today's date is November 16, 2006.  The time
11   on the video monitor is 9:20.  The video operator today
12   is James Terrell representing LiveNote World Service
13   located at 221 Main Street, Suite 1250, San Francisco,
14   California, 94105.  The phone number is (415) 321-2300.
15   The court reporter is April Heveroh with Sheila Chase &
16   Associates reporting on behalf of LiveNote World
17   Service.  Today's deposition is being taken on behalf of
18   plaintiff and is taking place at 100 Pine Street,
19   San Francisco, California.
20          And if counsel will now please introduce
21   yourselves and state whom you represent.
22          MR. SOLOMON:  Mark Solomon representing
23   Plaintiffs.  I'm here with Stacey Kaplan and with Keith
24   Mautner, our branch accountant, and with Sarah Holloway,
25   law student and clerk who was with us at the first

236

1    session.
2        MR. LINDSTROM:  Greg Lindstrom for Mr. Henley
3    and the other defendants.
4        MS. KYROUZ:  Michele Kyrouz from Latham, also
5    for Mr. Henley and defendants.
6        MR. MAROULIS:  James Maroulis of Oracle
7    Corporation for Defendant Oracle Corporation.
8        THE VIDEOGRAPHER:  Thank you.
9        And the reporter may swear in the witness.
10       (Whereupon, the witness was sworn by the
11       Certified Shorthand Reporter.)
12       ---o0o---
13       EXAMINATION BY MR. SOLOMON
14       ---o0o---
15       MR. SOLOMON:  Q.  Good morning, Mr. Henley.
16    A.  Good morning.
17    Q.  Since the last session of this deposition,
18    have you spoken with anybody about that session?
19       MR. LINDSTROM:  About his past session?
20       MR. SOLOMON:  Yes.
21       THE WITNESS:  Spoken to anyone about my past
22    session.  What do you mean by "spoken to"?
23       MR. SOLOMON:  Q.  Used your mouth and
24    articulated words.
25    A.  No, I haven't spoken to anyone.  I came

237

1    yesterday afternoon and we had a briefing with my
2    lawyers, but excluding that, I didn't speak with anybody
3    about the session that we did several months ago.
4    Q.  Okay.  And have you looked at any documents in
5    preparation for this session?
6    A.  Yesterday afternoon I looked at several, and I
7    got familiarized again with some of the time lines and
8    that sort of thing.
9    Q.  Refreshed your recollection?
10    A.  Yeah, about the general time lines and
11    sequences and things.
12    Q.  Okay.  And let's break that down.  Can you
13    tell me what you mean when you say that, time line --
14    A.  Well, it was a long time ago, so I just
15    remembered that -- when fiscal Q2 was and fiscal Q3 and
16    that sort of thing; what calendar years those were and
17    so forth, things like that.
18    Q.  Okay.  What about as to issues in the
19    litigation, itself?  Did it refresh your recollection as
20    to any of the issues?
21    A.  I don't know about that.  I think I remember
22    what the issues were.
23    Q.  What's your recollection of the issues?
24    A.  Again, as I answered, I think the last time I
25    was deposed, the plaintiffs are asserting that myself

238

1    and Larry and others, I guess, somehow knew that we were
2    going to miss our quarter and we were trading stock and
3    knowing what the market did.  So I think that's the
4    central issue.
5    Q.  And your understanding of the issues, then,
6    hasn't changed at all since we first began speaking the
7    first session; is that right?
8    A.  That's right.
9        MR. SOLOMON:  Let's have in front of you the
10    transcript of the first session.  I guess we may as well
11    mark it as Exhibit 48.
12       (Whereupon, Plaintiff's Exhibit 48 was marked
13       for identification.)
14       MR. SOLOMON:  Q.  And just to be clear, you
15    didn't, after the first session, have any conversations
16    with Mr. Ellison about --
17    A.  No, I've never had any conversations with him
18    about this.
19    Q.  Or, in fact, with anybody other than your
20    lawyers; is that your testimony?
21    A.  That's correct.
22    Q.  And have you reviewed your deposition
23    transcript since the first session?
24    A.  Yes.
25    Q.  And were there any errors in there that you

239

1    noticed?
2    A.  I think we noted a few minor things and that
3    sort of thing, but for the most part, I think it was
4    reflective of what we said.
5    Q.  Turn to page 143 of the transcript.  You'll
6    see that, if you look at line 10 onwards, you say,
7    "'Well, gee, this is what I had,' but I've always been,
8    as I testified earlier, very careful not to talk about
9    the quarter when people come in to see me.  I have no
10    interest in getting into the details of the quarter."
11       Do you see that?
12    A.  Yes.
13    Q.  And you stick by that testimony today, do you?
14    A.  That's correct.
15    Q.  And it's your testimony still that you didn't
16    reaffirm guidance intra-quarter; is that your testimony?
17    A.  Yes.  My policy was always to not get into
18    reiterating guidance because I had no more information
19    than what I did on the earnings call at any quarter.
20       MR. SOLOMON:  Okay.  I'll have marked as the
21    next exhibit a news article dated October 4, 2000.
22       (Whereupon, Plaintiff's Exhibit 49 was marked
23       for identification.)
24       MR. SOLOMON:  Q.  Do you recognize this?
25    A.  I don't, but I'm sure I must have said it.

240

1  I'm sure it must have been published, apparently, by
2  Oracle.
3      Q.  And what is this if it's not you reiterating
4  guidance intra-quarter?
5      A.  I don't -- I don't view this as reiterating
6  guidance.  I think this is a -- this was done,
7  apparently, at one of our conventions.  This is our
8  annual trade show Open World, and our PR people were --
9  I don't know if I said this at the conference or whether
10 they put this out, but, you know, I don't consider this
11 reiterating guidance.  My position was always that I --
12 we gave everybody everything we do at our quarterly
13 earnings call, and unless there was a material change
14 that I could be sure of that there was no benefit for me
15 to, you know, reiterate guidance, there was nothing more
16 for me to tell people.  My obligation was to tell people
17 if something changed.
18     Q.  Here's what it says in the second paragraph in
19 part in quotes.  "There has been no change in the
20 outlook for Oracle's financial results in the current
21 fiscal quarter and its full fiscal year,' said Oracle
22 Chief Financial Officer Jeff Henley."
23         What is that if it's not reiterating guidance?
24     A.  I don't know.  All I know is this was --
25         Again, what was the date?  October 4th?

241

1      Q.  That's what it says at the top, October 4,
2  2000.
3      A.  So this would have been a couple of weeks
4  after we had our earnings call, I think, 'cause
5  typically, we would have -- we would end our quarter.
6  That quarter would have been August.  We would have done
7  an earnings call two or three weeks into September.  So
8  this would have been, I guess, a couple of weeks after
9  the September call.  So it's -- you know, I don't
10 remember it, but maybe I did say it.  But it was
11 basically just reiterating what I basically told the
12 analysts a couple weeks before.
13     Q.  This is an Oracle document.  Do you know that?
14     A.  It -- apparently, it says it's coming from PR
15 Newswire, which is put out by Oracle, yes.
16     Q.  And you know you never produced this in
17 litigation to us.  We had to get this ourselves.  Did
18 you know that?
19     A.  I did not know that.
20     Q.  And isn't it remarkable that you lied about
21 not reaffirming guidance and we find it in a document
22 you didn't produce?
23         MR. LINDSTROM:  Objection, argumentative.
24 Assumes facts.
25         THE WITNESS:  I didn't lie about anything.

242

1  I'm telling you what my position has been when I was CFO
2  for Oracle for 13 years.  It was always to basically
3  tell people, "Look, I've given you the quarter in the
4  earnings call.  I've told you everything I know, and
5  unless something changes, there's nothing more I can
6  tell you."  And I really spent most of my time
7  historically, whenever I talked to analysts, talking
8  about the big picture of where things were going.  So I
9  don't find this inconsistent.
10         MR. SOLOMON:  Q.  I want you to look at page
11 144.
12         MR. LINDSTROM:  Of his deposition, Exhibit 48?
13         THE WITNESS:  The next page here?
14         MR. SOLOMON:  Q.  Start at line 17.  And it
15 reads, "And it says, 'Mr. Henley reiterated that the
16 company's outlook and guidance were unchanged for F3Q
17 '01.'"
18         And your testimony is that that is not true,
19 and your answer was, "My stock line is always that I'm
20 not going to get into the quarter.  If we have something
21 to report to you, we'll do it publicly.  I'm not going
22 to get into the quarter.  So a lot of these guys
23 interpret that, I guess, to mean that there's no change.
24 I don't use those words; never have, never will.  I just
25 don't get into talking about the quarter."

243

1      A.  That's correct.  And again --
2          MR. LINDSTROM:  There's no pending question.
3  He's just reading from your prior transcript.  If he
4  wishes to ask you a question, he'll do so.
5          MR. SOLOMON:  Q.  The pending question now is:
6  What did you want to add?
7      A.  I don't think I have any more to add than what
8  I said in the deposition last time.  I think that
9  summarized the positions I always had.
10     Q.  And your position is you would only give
11 guidance at the beginning of the quarter, and you would
12 never reiterate guidance within the quarter; is that
13 right?
14         MR. LINDSTROM:  Objection.  Mischaracterizes
15 his testimony.
16         MR. SOLOMON:  Q.  Is that your testimony?
17     A.  My testimony, again, is that we gave a lot of
18 thought into what happened in the previous quarter at
19 our earnings call and what the outlook was for the
20 current quarter, and that I -- my stock answer, whenever
21 I went to conferences during that quarter, was, "Look,
22 I've told you all I know about the quarter.  There's no
23 sense getting into the quarter at this point.  That's
24 not why I'm here to talk to you."
25     Q.  Okay.  And you did not use these words, then;

244

1  is that right?
2      A.  I never used -- to the best of my
3  recollection, I have never used the words "I reiterate
4  guidance. I reiterate that our guidance is the same."
5  I don't believe I've ever used those words.
6      Q.  But you may have used the word that there has
7  been no change in the outlook for Oracle's financial
8  results in the current fiscal quarter. Is that your
9  testimony?
10     MR. LINDSTROM: Objection. Argumentative,
11 mischaracterizes his testimony.
12     THE WITNESS: You've showed me a document
13 where, apparently, I was quoted saying something, so
14 it's quite conceivable this is what I said. And it may
15 have -- I may have occasionally done something in a
16 public format like this a couple weeks after, but I
17 don't consider that reiteration guidance when something
18 comes out of our PR department at Open World two weeks
19 after I just made all the statements to the public.
20     MR. SOLOMON: Q.  Okay. And was this an
21 unusual event, by the way, for you to do this?
22     MR. LINDSTROM: To do what?
23     MR. SOLOMON: Q.  Sorry. For Oracle to issue
24 a statement in the middle of the quarter, almost in the
25 middle of the quarter saying there's been no change in

245

1  the outlook for Oracle's financial results?
2      MR. LINDSTROM: Assumes facts, vague and
3  ambiguous.
4      THE WITNESS: Yeah, I don't know. I don't
5  know what's --
6      MR. SOLOMON: Q.  Well, was it usual or not
7  usual?
8      A.  I think, generally, we issued a news release
9  and did an earnings call, and that was it. But trying
10 to remember the facts sometimes if we had a trade show
11 or something that fell after that, then we might have
12 done something else.
13     Q.  So the answer is it's possible that on a
14 regular basis you gave intra-quarter earnings guidance
15 or confirmed earnings guidance at least publicly?
16     MR. LINDSTROM: Mischaracterizes his
17 testimony, vague and ambiguous, compound.
18     You may answer if you understand what
19 counsel's asking.
20     THE WITNESS: I don't think we -- this was a
21 regular occurrence. Typically, I think what happened
22 was that because we had just put out the numbers a
23 couple weeks before and we were having a trade show, the
24 PR people came and wanted to say something to promote
25 the show and that sort of thing. But we just did an

246

1  Open World. I don't recollect that we did something
2  like this at our recent Open World, so I think it was
3  sporadic. Sometimes they would want to do certain
4  things from a marketing standpoint and a flurry of press
5  releases get generated in these various events.
6      MR. SOLOMON: Q.  Okay. And it's true, isn't
7  it, that shortly after this date of October 4, 2000, you
8  were expressing internally at Oracle that you were
9  concerned of the low stock price? True or false?
10     A.  I was expressing internally --
11     I don't remember. I really don't remember.
12 This was -- this was October or something in 2000?
13     Q.  Correct.
14     A.  I don't recall.
15     Q.  So you deny that you were expressing concern?
16     A.  I said I don't recall what I was expressing
17 about the stock price.
18     MR. SOLOMON: We'll have marked as the next
19 exhibit an analyst report dated October 4, 2000.
20     (Whereupon, Plaintiff's Exhibit 50 was marked
21     for identification.)
22     THE WITNESS: So this is the same date as this
23 PR news wire?
24     MR. SOLOMON: Q.  Correct.
25     MR. LINDSTROM: Why don't you take a few

247

1  minutes to read the document.
2      MR. SOLOMON: Q.  Let me know if you have seen
3  this before.
4      MR. LINDSTROM: Have you completed reviewing
5  the document?
6      THE WITNESS: No.
7      MR. SOLOMON: Q.  And I have no objection to
8  you reading the whole document. I would just rather not
9  hear from your counsel in written pleadings that you'll
10 be spending too much time allowing you people to read
11 the documents.
12     MR. LINDSTROM: Well, if you want to direct
13 his attention to some portion of the document, that's
14 fine. But as things now stand, you put the document
15 before him, asked him if he's recognized it. He needs
16 to read it in order to answer the question.
17     MR. SOLOMON: Q.  If you need to read it to
18 the very end, go ahead, before you can answer the
19 question if you recognize it. If that's what you need
20 to do, go ahead.
21     A.  I actually don't recognize the document.
22 There's tons of these documents. This is not --
23     MR. LINDSTROM: You've answered the question.
24     MR. SOLOMON: Q.  Go to the second page. It
25 says, two thirds of the way down the page, "Jeff Henley

248

1 gave an overview of Oracle's financial performance over
2 the past year.  The key point stress was that
3 application license growth was accelerating as services
4 and tools were growing slowly and declining
5 respectively."
6          Do you see that?
7     A.  Yes.
8     Q.  Did you say that?
9     A.  I'm guessing I did, sure.
10    Q.  So this is you at an analyst conference in
11 October of 2000, correct?
12    A.  This was this Open World conference, yes.
13    Q.  Excuse me.  It was sponsored by Oracle; is
14 that right?
15    A.  Yes.
16    Q.  And this information that is reflected here,
17 is that reflected in the press release where you -- I'm
18 sorry.  You don't say you want to confirm guidance, but
19 where, apparently, you are quoted as saying there has
20 been no change in the outlook for Oracle's financial
21 results in the current fiscal quarter?
22        MR. LINDSTROM:  Objection.  The document
23 speaks for itself.
24        THE WITNESS:  So again, what was the question?
25        MR. SOLOMON:  Q.  Is that -- I'm looking now

249

1 where -- reports that you gave an overview of Oracle's
2 financial performance over the past year.  Do you see
3 that?
4     A.  Yes.
5        MR. LINDSTROM:  In Exhibit 50, correct?
6        MR. SOLOMON:  Q.  And then you talk about
7 application license growth accelerating.  Do you see
8 that?
9     A.  Yes.
10    Q.  What I'm asking you is:  Is that information
11 reflected in the press release that I've shown you,
12 which is Exhibit 49?
13        MR. LINDSTROM:  Objection.  The press release
14 speaks for itself.
15        THE WITNESS:  The press release is like
16 one line, one sentence or something.  So I think it was
17 a very short sentence.  In an analyst day, there will be
18 lots of slides, there will be lots of information.
19        MR. SOLOMON:  Then let's have marked as
20 the next exhibit a document dated November 30, 2000.
21        (Whereupon, Plaintiff's Exhibit 51 was marked
22         for identification.)
23        MR. SOLOMON:  Q.  Do you recognize this?
24    A.  No.
25    Q.  Did you attend a meeting sponsored by Credit

250

1 Suisse First Boston at the end of November 2000?
2     A.  Apparently.
3     Q.  Do you remember?
4     A.  I don't.  I really -- I go to many, many
5 meetings, but I have no doubt I must have been there.
6     Q.  And since you don't remember, I guess you
7 don't remember making any presentations.
8     A.  No, but -- no.
9     Q.  And it says, in the fourth paragraph -- sorry.
10 The fifth paragraph, "Henley reiterated the company's
11 previous guidance for quarterly results."
12        Do you see that?
13    A.  Yes, I see that.
14    Q.  Is that true?
15    A.  Again, what I did at these conferences was
16 show them slides and said, "Here is what we did last
17 quarter, and here's what we disclosed on our analyst
18 call about how the quarter looks."  I never said, "I'm
19 reiterating our guidance."
20    Q.  In fact, it's true, isn't it, you went so far
21 as to have dinner with analysts on occasion and confirm
22 guidance; isn't that true?
23        MR. LINDSTROM:  Argumentative.
24        THE WITNESS:  Sometimes I have had dinner with
25 analysts.

251

1        MR. LINDSTROM:  The question said "and
2 confirmed guidance".
3        THE WITNESS:  But no, did not say, "I'm
4 reiterating guidance" or something like that.
5        MR. SOLOMON:  Q.  Well, let's get away from
6 direct quotes.  What I'm trying to ask you and get you
7 to tell me the truth about is whether, when you spoke to
8 analysts intra-quarter, you ever basically told them,
9 "Things were on track.  We're going to make it"?
10        MR. LINDSTROM:  All right.  I'm going to
11 object to that first as argumentative, Counsel.  I mean,
12 you have no basis for that kind of argumentative comment
13 about getting him to tell you the truth.  He is telling
14 you the truth; you just don't like what he's saying.
15 That's my first objection.
16        The second objection is the question, as
17 stated, is hopelessly vague and ambiguous.
18        MR. SOLOMON:  Q.  Don't worry; I do like what
19 you're saying, Mr. Henley.  So don't feel offended.
20    A.  Any time that I have met with analysts,
21 whether it was in a public forum or dinner -- 'cause I
22 have done that occasionally -- my standard thing is to
23 say, "Look, you guys follow this industry.  You know
24 better than I that everything happens at the end of the
25 quarter.  There's nothing I can really tell you.  I've

252

1  done my best to tell you how things looked at the start
2  of the quarter," and that's really been the thing. I
3  would be foolish to ever suggest that we're going to
4  make our quarter because no one knows. For the most
5  part, we've always made them, but we've had a few misses
6  over the years because it's difficult to project.
7       Q.  Well, what about -- what about telling the
8  analysts, "We're on track"?  You wouldn't even do that?
9  You wouldn't even say that, right?
10           MR. LINDSTROM: Objection. Argumentative.
11           MR. SOLOMON: Q.  Or words to that effect.
12  You wouldn't even say that?
13      A.  I think over the years I may have said that
14  once or twice, that it's too early in the quarter to
15  know for sure, but so far so good, that sort of thing.
16  But never, "Therefore, we're going to make the quarter."
17  No, I've never said that.  To my knowledge, I've never
18  said that, "Guaranteed, we're going to make the
19  quarter."  That would be a foolish statement to make
20  because there are no guarantees.
21      Q.  You're not suggesting that when I'm asking you
22  if, in general terms, you've reiterated guidance, that
23  I'm asking you if you issued a guarantee, are you?
24           MR. LINDSTROM: Objection. Vague and
25  ambiguous, calls for a conclusion.

253

1           THE WITNESS: No.  I was responding to the
2  one thing about I will make the quarter, something like
3  that. But, no, I agree. I don't think reiterating
4  guidance is a guarantee. I agree with that.
5           MR. SOLOMON: Q.  And didn't you, in the third
6  fiscal quarter of '01, in order to accommodate the
7  insider sales engaged in by you and Mr. Ellison and
8  others, isn't it true that throughout that quarter,
9  almost to the bitter end, you were telling analysts,
10  publicly and privately, that you were on track?
11           MR. LINDSTROM: Assumes facts, argumentative,
12  vague and ambiguous.
13           THE WITNESS: Well, and of course it's
14  preposterous if you're suggesting, by the way you said
15  that statement, that I was doing something because Larry
16  and I were selling stock. I was doing unusual things or
17  whatever out of the ordinary. Of course that's untrue.
18           MR. SOLOMON: Q.  Well, is it or is it not out
19  of the ordinary for you to meet with an analyst
20  privately at dinner and tell the analyst what sort of
21  growth to expect in that quarter with respect to
22  particular product lines? Would that be unusual?
23           MR. LINDSTROM: Vague and ambiguous, compound.
24           THE WITNESS: From time to time, people have
25  asked me questions about, "What do you think the

254

1  database business is going to do?"  Not for the quarter,
2  necessarily, but what's the sort of outlook for the
3  database growth or the applications growth? And I've
4  made statements about that, but I've tried to avoid
5  pinning myself down to any particular quarter, if you
6  will.
7           MR. SOLOMON: Q.  So your testimony is,
8  basically, that from time to time, and maybe within the
9  third fiscal quarter of '01, you sat down privately at
10  dinner and told analysts how the company was performing;
11  is that fair?
12           MR. LINDSTROM: Mischaracterizes his
13  testimony.
14           THE WITNESS: Again, yes. The purpose of
15  sitting down with any analyst, whether it's at dinner or
16  in my office or in a group or whatever, was always to
17  make sure that they had an understanding of what we were
18  saying so that they really could not misinterpret our
19  business or statements we had made or -- so it was
20  really trying to answer questions about the financial
21  statements and give them a sense for our business.
22           MR. SOLOMON: Q.  I want to draw your
23  attention back to page 143.
24           MR. LINDSTROM: Of his deposition?
25           MR. SOLOMON: Of his deposition.

255

1       Q.  I'm looking at line 10, starting at line 10 on
2  that page. And it says, "Well, gee," and we read this
3  before, "'Well, gee, this is what I had,' but I have
4  always been, as I testified earlier, very careful not to
5  talk about the quarter when people come in to see me."
6       Do you see that?
7       A.  Yes.
8       Q.  Now, we seem to have moved a long way from
9  that testimony, haven't we?
10           MR. LINDSTROM: Objection. Mischaracterizes
11  his testimony, calls for a conclusion, argumentative.
12           THE WITNESS: Yeah, I disagree. I think this
13  has been my policy, and it's the way I've conducted
14  myself.  I have not --
15           MR. SOLOMON: Q.  Except when we catch you in
16  a lie?
17           MR. LINDSTROM: Would you let the witness
18  finish his response, please, Counsel, and not interject
19  your argumentative, editorial comments?
20           MR. SOLOMON: Go ahead.
21           MR. LINDSTROM: You're too professional for
22  this, Mark.
23           MR. SOLOMON: Go ahead.
24           MR. LINDSTROM: Or should be.
25           THE WITNESS: Right. So I have --

256

1     MR. SOLOMON: Or used to be, right?
2     MR. LINDSTROM: I don't know whether you were
3  in the past.
4     MR. SOLOMON: I'm putting up with a lot of
5  lies, Greg.
6     Carry on.
7     THE WITNESS: I resent the fact that you're
8  suggesting that I have ever lied, okay?  What I have
9  tried to do is consistently tell you the way I have
10 tried to operate and conduct myself.  We have had
11 hundreds and hundreds of meetings.  I can't recollect
12 everything I ever did or said, but my general philosophy
13 and principle was to not get into the details or
14 changing things about a quarter because there was --
15 things don't change that much.  I did my level best to
16 tell people what I thought was going to happen for the
17 quarter on a public earnings call, and that was it.  But
18 people want to understand our business, they want to
19 understand the directions of things, and sure, I've
20 answered lots of questions over the years trying to help
21 people understand our business.
22    MR. SOLOMON: Q.  Including getting into the
23 details of the business intra-quarter with analysts,
24 right?
25    MR. LINDSTROM: Argumentative, vague and

257

1  ambiguous as to "details of the business".  And it's
2  asked and answered.  You've gone over this same ground
3  with him multiple times already this morning.
4     MR. SOLOMON: Let's have marked as the next
5  exhibit a William Blair and Company report dated
6  February 21, 2001.
7     (Whereupon, Plaintiff's Exhibit 52 was marked
8        for identification.)
9     THE WITNESS: Okay.
10    MR. SOLOMON: Q.  Okay.  So have you seen this
11 before?
12    A.  I don't recollect.  I certainly know Laura
13 Letterman.
14    Q.  And that's the author of this?
15    A.  Yes.
16    Q.  And how do you know her?
17    A.  She's one of the sale site analysts that
18 followed Oracle.  Still does, I believe.
19    Q.  And do you recall having dinner with her at
20 the APSWorld Conference?
21    A.  We had an analyst day that she's reporting on
22 here, and then we had a dinner for, I think, most of the
23 sale site analysts that evening, is my recollection.
24    Q.  Okay.  And it says, in part at the bottom,
25 "According to Mr. Henley, business looks good.  He was

258

1  very bullish in the sessions."
2     Do you see that?
3     A.  I do see that.
4     Q.  Okay.  Now, did you say that business looks
5  good, or words to that effect, at the conference?
6     A.  I don't recollect what I said.  I honestly
7  don't.
8     MR. LINDSTROM: You've answered the question.
9     MR. SOLOMON: Q.  Were you very bullish in the
10 sessions that are referred to here?
11    A.  I don't know what "very bullish" means.  I was
12 certainly positive on our business prospects.  It was an
13 Open World applications day, and at that point we were
14 still in the early stages of an 11i rollout.  And as she
15 reported, we had different partners, different people
16 trying to help the analysts get a sense for how things
17 were going, and we were -- Larry Ellison and myself, we
18 were all very positive on the outlook for the future for
19 our applications business.  I do recall that.
20    Q.  Do you know what "bullish" means?
21    A.  I know the term "bullish", sure.  I think it's
22 a matter of degrees.  That's what I'm saying,
23 one person's bullishness may not be somebody else's.
24 But, I mean, I think it means -- to me, it means
25 positive.

259

1     Q.  And it goes on to say, "We want to quote a few
2  of the things he said," and then it goes on to say, "In
3  regard to applications growth, he said that the second
4  half growth will be as good or better than the
5  69 percent growth placed in the first half."
6     Do you see that?
7     A.  Yeah, I see that.
8     Q.  Did you say that?
9     A.  I don't recall.  I'm not going to dispute it;
10 I just don't recall what I said.
11    Q.  "As for the economy, he commented that Oracle
12 is not seeing any impact."
13    Did you say that?
14    A.  Yes, I did.  And it goes on to say, which I
15 remember saying, that -- because we put that in our deck
16 of slides, that we had seen concerns from various people
17 about the economy in general, and we started saying it's
18 a wild card.  We haven't seen it in our business, and
19 our business looks good, but there are certainly reports
20 out there that the economy is weakening.
21    Q.  Now, by the time you said that, was pipeline
22 growth at Oracle growing or shrinking?
23    A.  Was the year-over-year change in our pipeline
24 growing or shrinking?
25    Q.  No, was pipeline growth within the quarter

260

1  growing or shrinking?
2      A.  I don't know what you mean by that.  I just
3  tried to define it and you said something else.
4      Q.  Correct.
5      A.  My definition of growth is if the pipeline, in
6  this case a third quarter of 2001, is larger than the
7  year before that same quarter.  If that's what you mean,
8  then I believe our pipeline was growing.
9      Q.  And the question I asked and I tried to
10  clarify it, since it perhaps wasn't clear in the first
11  place, was at the time you made this statement, was
12  pipeline growth within the third fiscal quarter of 2001
13  growing or shrinking?
14      MR. LINDSTROM:  No foundation.
15      THE WITNESS:  I just don't -- I've tried to
16  answer your question.  I don't understand -- you have a
17  different way of thinking about this, I guess.
18      MR. SOLOMON:  Q.  Well, for example, if, at
19  the beginning of December, you reported pipeline growth
20  year over year, say, over 50 percent, and by the end of
21  January pipeline growth was down to 30 percent, that
22  would be a reduction in pipeline growth within the
23  quarter; would it not?
24      A.  Oh, that's a different answer.  That's a
25  different point.

261

1      Q.  That's the question I'm trying to ask.
2      MR. LINDSTROM:  Can you restate the question?
3      THE WITNESS:  I don't believe that's what you
4  asked, but now --
5      MR. SOLOMON:  Q.  Do you need me to restate it
6  again?
7      A.  Yeah, why don't you restate it again because I
8  think the latest one is different than what you first
9  asked me.
10      Q.  I'll try again.  At the time you made these
11  statements, had pipeline growth within the third fiscal
12  quarter of 2001 declined from the growth at the
13  beginning to the growth at the time you made this
14  statement?
15      A.  I believe it had, yes.
16      Q.  Okay.  We got there.
17      What about conversion rates; were they
18  improving within the quarter or declining?
19      A.  I don't recall.  I really don't recall that.
20      Q.  Would that have been important to you at the
21  time?
22      A.  Well, I think that conversion rates were
23  one of the factors we always looked at in terms of
24  making forecasts, and we did a lot of historical work
25  and so forth.  So certainly, that's something to factor

262

1  in.  But you can't really figure out a conversion rate
2  until the quarter is over.  So you look at a lot of
3  previous quarters to try to get a sense for your
4  forecast to assume a reasonable conversion rate.
5      Q.  And did Oracle have the tools available to
6  look at conversion rates and trends within a particular
7  quarter?
8      MR. LINDSTROM:  Objection.  Vague and
9  ambiguous.
10      THE WITNESS:  Did we have the tools?  We could
11  certainly make the calculations.  I don't think that
12  they made any sense.  I don't recall paying attention to
13  conversion rates until our quarter was over.  That was a
14  very fundamental bit of information.
15      MR. SOLOMON:  Q.  Why would performance
16  intra-quarter not be important to you?
17      A.  Because so much of our business happens in the
18  last week of the quarter.
19      Q.  Oh, that's the hockey stick effect that you
20  guys use as a defense, right?
21      A.  It's not our defense; it's a reality.
22      MR. LINDSTROM:  Argumentative.
23      THE WITNESS:  For not just our company, but
24  all of the software companies that sell enterprise
25  software.

263

1      MR. SOLOMON:  Q.  Basically, all forecasts are
2  reckless until the last week of the quarter; is that
3  right?
4      MR. LINDSTROM:  Argumentative.  Calls for a
5  conclusion as to "reckless", vague and ambiguous.
6      THE WITNESS:  I think that's an unbelievably
7  terrible way to characterize forecasting.  Certainly our
8  forecasting was not reckless, but there is -- we always
9  know, based on history, there's a large amount of
10  business that has to happen last week.
11      MR. SOLOMON:  Q.  So basically, you're saying
12  take little notice of this until the last week of the
13  quarter?  Is that what you're telling the investing
14  partners?
15      MR. LINDSTROM:  Argumentative.
16      THE WITNESS:  On a conversion rate, your
17  question was conversion rates, did I look at conversion
18  rates intra-quarter?  I don't recall ever doing that
19  because it doesn't mean anything.  The conversion rate
20  was very important at the end of a quarter to see how
21  much business we converted compared to what we
22  forecasted, absolutely.  But not intra-quarter.
23      MR. SOLOMON:  Q.  But you're saying day over
24  day, week over week, month over month, no importance to
25  you?

264

```
1      A.  Conversion rates?  No, not important to me.
2      Q.  What about conversion ratios, are they
3   important to you?
4      A.  I think they're one and the same.  As I
5   testified just earlier, it's very important to
6   understand, when you're forecasting, what of your
7   pipeline you think you will convert in the quarter.  So
8   that's very important.  But I don't spend a lot of
9   time -- didn't spend a lot of time intra-quarter kind of
10  rethinking conversion rates, okay, because they -- what
11  really mattered was how we ended up for the quarter and
12  then plug that information into our history bank and
13  continued to do forecasting.
14     Q.  And what about forecasted conversion ratios;
15  would they have been important to you intra-quarter?
16        MR. LINDSTROM:  Vague and ambiguous.
17        THE WITNESS:  Again, would they have been
18  important?  As I testified earlier, conversion rates are
19  important.  If you have no pipeline, then obviously you
20  have to have an infinite conversion rate.  So you're
21  always interested.  If your pipeline changed
22  dramatically, you know, then you would have to have our
23  conversion rate.  So you obviously consider these
24  things.  But the most important thing in terms of our
25  forecasting is understanding historical conversion rates
```

265

```
1   for a full quarter.
2         MR. SOLOMON:  Q.  What about trends in upside;
3   do you know what the upside report is at Oracle?
4      A.  Yes.
5      Q.  Do you know what it was in fiscal 3 '01?
6      A.  Yes.  I know of one, at least, the one that
7   Jennifer Minton and corporate finance puts out.  There
8   may be other regional people that have upside reports,
9   but I assume that's the one you're referring to.  I'm
10  familiar with the corporate one, yes, the one that
11  Jennifer Minton publishes.
12     Q.  And at the time you were making these
13  statements at APSWorld, were you aware of any trend
14  one way or another within the quarter with respect to
15  upside numbers?
16     A.  I don't recall exactly what upside numbers
17  were.
18     Q.  Is it something you paid attention to in
19  fiscal 3 '01?
20     A.  Sometimes on calls with different regions, you
21  know, I've always listened to the range of things that
22  they're thinking they can do and so forth, sure.  And
23  Jennifer Minton's people take all of that into account
24  when they would try to forecast what they thought we
25  would do for the quarter.
```

266

```
1      Q.  And at the time of your statements at
2   APSWorld, were you aware that the upside forecasts were
3   heading in a downward direction at Oracle?
4         MR. LINDSTROM:  No foundation, assumes facts.
5         THE WITNESS:  Again, I don't recall that
6   particular --
7         MR. SOLOMON:  Q.  Before you traded your stock
8   on January 4, 2001, did you take a very close look at
9   the financial metrics for December?
10        MR. LINDSTROM:  Vague and ambiguous as to
11  "close look" and "metrics".
12        THE WITNESS:  I don't believe so.  I'm not
13  sure they were available.  Usually our December results
14  wouldn't be out for a number of days, so I don't recall
15  if they were available or not.
16        MR. SOLOMON:  Q.  When, in January, did they
17  become available; do you know?  January of 2001.
18     A.  Again, I don't know.  Typically, it might be
19  like five business days, something like that, I think,
20  that the numbers came out.
21     Q.  Okay.
22     A.  But I don't recall whether they were out or
23  not out.
24     Q.  And when you say "out", you mean out
25  internally at Oracle, correct?
```

267

```
1      A.  Correct, published to myself and other people.
2      Q.  Now, notwithstanding the fact that they
3   weren't out, is it true that as of early January, you
4   had the ability on a realtime basis to look to see what
5   the results were; is that true or false?
6      A.  It's false.  That I had the ability is false.
7      Q.  And what would you need to be able to do that?
8   Strike that.
9         Was it possible at Oracle on a realtime basis,
10  as of January 4, 2001, to see how the December month had
11  fared?
12     A.  It was not possible for me, because I was not
13  trained in using any of our financial products.  I was
14  not a detail user, and we would have been going through
15  the global consolidation of that process at that point,
16  so I never, ever got into any of that.  I waited for the
17  final numbers to be published.
18     Q.  Okay.  Now, at the time you were the Chief
19  Financial Officer.
20     A.  That's correct.
21     Q.  Are you a CPA?
22     A.  No.
23     Q.  What are your qualifications to be a Chief
24  Financial Officer?
25     A.  Having worked in financial organizations,
```

268

1 understanding forecasting and planning and tax and all
2 these kinds of things. So I had, with a large company
3 like Oracle, specialists in all those functions; large
4 departments in accounting, tax, other areas who had
5 people much more technical, much more knowledgeable than
6 I about doing these things.
7     Q. When you talked about not being trained in
8 using Oracle's financial products, what financial
9 products are you talking about?
10     A. The Oracle financial application. General
11 ledger, accounts receivable, accounts payable. There's
12 a suite of products that we and our customers use to
13 keep subsidiary records and then ultimately consolidate
14 those all into our general ledger and then consolidate
15 all of the various countries together to create a
16 consolidated income statement, balance sheet and so
17 forth. And that has always been done monthly at Oracle,
18 but there's no realtime way to assess what these final
19 results are until the final consolidation is done. And
20 again, I didn't use these tools, so I just simply waited
21 until the reports came out.
22     Q. In January of 2001, would utilization of
23 Oracle Sales Online have allowed you to gain any
24 information concerning the performance by Oracle in
25 December 2000?

269

1     MR. LINDSTROM: No foundation, calls for
2 speculation.
3     Could we have that question reread, please?
4     THE REPORTER: "Question: In January of 2001,
5     would utilization of Oracle Sales Online have
6     allowed you to gain any information concerning
7     the performance by Oracle in December 2000?"
8     THE WITNESS: I don't think they're related.
9 I mean, the Oracle Sales Online is a system used by the
10 sales force that is summarized by the finance department
11 that talks about pipeline and the quarter and that sort
12 of thing. You asked me about financial -- actual
13 results in one month, the month of December. So I don't
14 think there's much of a correlation there.
15     MR. SOLOMON: Q. But I want to focus on the
16 question that I asked you, and I'll ask it again. In
17 January of 2001, would utilization of Oracle Sales
18 Online have allowed you to gain any information
19 concerning the performance by Oracle in December 2000?
20     MR. LINDSTROM: No foundation, calls for
21 speculation.
22     THE WITNESS: Again, I don't know how there's
23 any correlation there. That -- December is a very small
24 month. As I testified earlier, the last month, the last
25 week of the month is always huge. So January is

270

1 always -- December is always a very low month, and so I
2 don't think it has much to do with what the sales online
3 information is talking about the quarter.
4     MR. SOLOMON: Q. Why do you say December is
5 always a very slow month?
6     A. Because it is. Typically at Oracle, in any
7 quarter, the first month of the quarter is a smaller
8 amount of revenue than the subsequent quarters,
9 particularly the third month of the quarter. Excuse me,
10 months, particularly the third month of any quarter. So
11 December was no exception in that regard.
12     Q. Okay. And you say that a lot of the sales, I
13 think you were saying, is in the last week of December,
14 which is a low month, and therefore -- just tell me if
15 I'm right or wrong -- and therefore, Oracle Sales Online
16 wouldn't have given you any information on the
17 performance in December 2000 as of around January 4,
18 2001?
19     A. There's -- as I testified earlier, the large
20 amount of activity is in the last week of the last month
21 of the quarter. December was the first month of the
22 quarter. So --
23     MR. LINDSTROM: I think he may have misspoken
24 before when he said it's the last week of December.
25     THE WITNESS: I would have meant the last week

271

1 of February, the last week of the third month. That's
2 where all the activity is.
3     MR. SOLOMON: Q. I know that that's something
4 that you believe.
5     A. No, I don't believe it; I know it. It's a
6 fact.
7     Q. And I'm not -- not necessarily disputing it,
8 at least not now. But that's not what I'm focusing on.
9     A. Okay.
10     Q. What I'm focusing on is what information you
11 would have had as of when you decided to sell stock, or
12 what information was available to you when you decided
13 to sell stock on January 4, 2001, okay? Do you
14 understand that?
15     A. I do understand that.
16     Q. And what I'm trying to find out is what Oracle
17 Sales Online was capable of providing you as of early
18 January 2001 with respect to December trends. Just to
19 put it, trends.
20     A. See, where you're getting off, you're talking
21 about a month, December, and that's why I'm saying --
22 Sales Online is useful, as you found out, as you've
23 discovered things. It's something that tells you about
24 pipelines and that sort of thing, but it reflects a
25 quarter, it reflects how things look for the quarter.

272

1  It doesn't necessarily correlate to what you did in the
2  first month of the quarter. That's all I'm trying to
3  say here. You keep going back to December. If you're
4  talking about what it would have indicated for the
5  quarter, then that's a different question, I think.
6      Q.  Are you saying that even a few days later when
7  December results were published internally in the
8  company, they were meaningless?
9      MR. LINDSTROM: Mischaracterizes his
10  testimony. And it's vague and ambiguous as to
11  "meaningless." For what purpose?
12      MR. SOLOMON: Q.  Go ahead, Mr. Henley.
13      A.  We -- you know, I've always looked at every
14  month throughout a quarter. So to say it's meaningless
15  is not true. However, it is of small value. It is not
16  a clear indicator of how you'll do for the quarter. We,
17  over the years, have learned that, right? But certainly
18  it's another data point, it's information about level of
19  spending, revenues, all sorts of things. So it's
20  important to look at it. But in terms of whether or not
21  you're going to make your quarter based upon a
22  relatively small part of the quarter being done, no,
23  it's not a particularly helpful -- you certainly can't
24  go to the bank with it; that's for sure.
25      Q.  Now, if I were to shift to February, and

273

1  looking back on January results in February, as you look
2  on December results in January, is your answer the same;
3  January results are of no particular help in discerning
4  what direction the company's going in?
5      A.  Again, it would be somewhat more helpful
6  because now you've got two months, rather than three,
7  although the bulk of the license revenue is still to
8  come in the third month. So it is another data point,
9  it's another indication, not just of revenue, but
10  expense levels and so forth. So for a variety of
11  reasons, it's somewhat more meaningful because you're
12  deeper into the quarter. But again, because so much
13  rides on the last month, it has historically not been
14  the best indicator of how well you do. Sometimes we
15  have done better than the first two months in terms of
16  growth rate; sometimes we have done worse. So it's an
17  information; it's somewhat better than December, but
18  it's certainly not a guarantee of how you'll end up the
19  quarter, that's for sure.
20      Q.  There are never guarantees; isn't that true?
21      A.  There are never guarantees.
22      Q.  That's not what we're talking about, right?
23      A.  No.
24      Q.  Have you ever used the expression that the --
25  the quarter and the potential for making the fiscal

274

1  quarter '01 -- third fiscal quarter in '01 is a horse
2  race?
3      A.  I don't recall.
4      Q.  Is that an expression you use, typically?
5      A.  It's not typical, but it doesn't mean I didn't
6  use it. I don't recall.
7      Q.  Do you have an understanding what I mean when
8  I use that expression?
9      A.  No.
10      Q.  I'm still looking at the exhibit, the William
11  Blair exhibit.
12      MR. LINDSTROM: Is that Exhibit 52, for the
13  record?
14      THE WITNESS: Yes.
15      MR. SOLOMON: Q.  It says, in that first
16  paragraph, "He also stated that we are in spaces that
17  are high ROI, and it's not clear if we'll see much of an
18  impact in our business due to the economy."
19      Did you say that?
20      A.  In which -- is this the very start of the
21  paragraph?
22      MR. LINDSTROM: He's on page 2.
23      MR. SOLOMON: Q.  Page 2 in the top.
24      A.  This is -- yes, I see it.
25      Yes, and I think this is what I basically said

275

1  at the earnings call in December. So --
2      Q.  And as far as you are concerned, nothing had
3  changed; is that right?
4      A.  That's correct. Other than we did start
5  saying that we kept hearing about economic issues, and
6  so I did say, as you read later, that the economy's a
7  wild card, but unless there's a serious recession, we're
8  not sure we'll see much of an impact, because we felt,
9  at the time, that people would still want to do good ROI
10  projects, even if their business was a little soft.
11      Q.  And at this stage, would you have
12  characterized Oracle's potential to make the quarter as
13  a horse race?
14      MR. LINDSTROM: Objection. Vague and
15  ambiguous.
16      THE WITNESS: You'll have to define "horse
17  race" for me.
18      MR. SOLOMON: Q.  And then a wild card, what
19  is a wild card?
20      A.  Well, what I meant by a wild card was that
21  if -- as I said in this thing, if the economy turned
22  down very sharply and became -- we went into recession,
23  then we felt, based on history, that there would be a --
24  there could be a slowdown in our business. But unless
25  if it were was a more modest slowdown in the economy,

276

1  that people would still keep spending on high ROI
2  projects. And so at this point, there was no clear
3  indication that customers were telling us they were
4  cutting off spending. They were still saying all of our
5  sales force and all of the checking was still -- things
6  are a little soft, but the customers are committed to
7  buying the software. So that was kind of what -- but we
8  kept reading about statements of other people about
9  their business was getting worse, the economy was
10 getting worse, so I said it's a wild card. And it all
11 depends on how bad the economy does, ultimately.
12     Q.  When did you start reading statements of other
13 people or hearing statements of other people about their
14 business getting worse?
15     A.  I think we were asked the question in our
16 earnings call in the second quarter. So in that
17 December 2000 call, we were -- we commented on why did
18 certain companies seem to be softer and we had such a
19 good quarter, which we did. And our answer was, well,
20 our theory was that we had higher ROI kind of stuff, and
21 so people were maybe starting to ration their budgets a
22 bit, but they were still using our stuff because it had
23 a higher ROI.
24     Q.  Did you take any steps to look at the
25 performance of Oracle any closer than you normally would

277

1  in light of the fact that you were hearing that other
2  companies were being adversely affected?
3         MR. LINDSTROM:  Vague and ambiguous.
4         THE WITNESS:  I sat through all of the weekly
5  sales calls, and I recall definitely pushing a little
6  harder on the sales force to sort of say, "Look, I'm
7  hearing that some of the other companies out there and
8  other certain segments are softening. What are you guys
9  seeing? Are you seeing your customers starting to back
10 off?" Whatever. And I really kind of pressed hard to
11 be sure that there wasn't something that I was missing
12 for the numbers.
13        And the guys were pretty aggressive and
14 standing up and saying, "No, we have gone back to our
15 sales guys. We're pretty convinced we'll get a normal
16 conversion rate of the business we've got here, and we
17 think things are okay." For all the reasons I just told
18 you. I mean, I didn't make up this high ROI thing.
19 This is what I was hearing from customers and from our
20 sales force.
21     Q.  Now, as of the start of the third fiscal
22 quarter, fiscal quarter of '01, was more risk put into
23 the forecast than had been in the forecasts in prior
24 quarters?
25        MR. LINDSTROM:  Vague and ambiguous.

278

1         THE WITNESS:  I don't know. I mean, Jennifer
2  Minton did the forecast. And so it -- I don't recall
3  whether we tried to factor in additional risks or
4  whatever. I think we had a long history of making our
5  quarters, we had a pretty good sense of how things
6  converted, and as I testified earlier, I kept pressing
7  the sales guys to be confident that they thought we
8  would have sort of normal success rates and so forth.
9  So that's how we developed the forecast. And Jennifer
10 Minton regularly made these calls, she regularly tried
11 to assess what everybody was saying and all the numbers
12 and did regular updates to reflect her best thinking of
13 where she thought things stood.
14        MR. SOLOMON:  Q.  So you don't know if more
15 risk was in the forecast in fiscal 3 '01 than earlier,
16 correct?
17     A.  I don't recall her methodology or her thought
18 processes or how she was assigning these things, no.
19     Q.  And what about interactions with Mr. Ellison
20 concerning this; did you talk at all with Mr. Ellison
21 about how much should be -- excuse me.
22        Did you talk with Mr. Ellison about whether or
23 not more risk ought to be placed into the forecast for
24 fiscal 3 '01 than previously?
25     A.  Well, the weekly sales calls that our

279

1  executive committee, Mr. Ellison, was typically there.
2  So when I was pressing the salespeople, he was
3  interested in hearing what their response; always, any
4  quarter, as with Safra Catz and other people. So I
5  think everyone's job is to listen and try to understand
6  what's going on with the business and, you know, try to
7  figure out whether the forecast is right or wrong, or
8  whatever.
9      Q.  But again, as to whether or not there was more
10 risk in the fiscal 3 '01 forecast and whether you were
11 aware of it at the time, you don't recall --
12     A.  I don't recall. Again --
13        MR. LINDSTROM:  You've answered, twice. You
14 don't recall.
15        THE WITNESS:  Okay.
16        (Recess taken from 10:23 to 10:36 A.M.)
17        MR. SOLOMON:  I'll have marked as the next
18 exhibit a document produced by the defendants with the
19 control numbers 109482 through 484.
20        (Whereupon, Plaintiff's Exhibit 53 was marked
21        for identification.)
22        MR. SOLOMON:  Q.  You can take as long as you
23 need to take, Mr. Henley, and tell me whether you
24 recognize this.
25     A.  I remember doing a road show.

280

1  Q. Okay.
2  A. With Jim Moore, so this perhaps is a writeup
3  from that road show. I'm not sure I remember this
4  specific document, but I definitely remember meeting
5  with a number of investors in New York with him.
6  Q. Okay. And you'll see this is dated
7  October 25th, 2001.
8  A. Yes.
9  Q. And it talks on the highlights of them hosting
10  Oracle CFO Jeff Henley. Do you see that?
11  A. Yes.
12  Q. And the next bullet point below that says,
13  "Henley reiterated visibility is very weak and that
14  business is likely to worsen in the U.S. and Europe over
15  the near term. However, the company expects to see a
16  pickup in the domestic economy by spring 2002 and does
17  not believe that Europe will contract as sharply as the
18  U.S."
19  Do you see that?
20  A. I do see that.
21  Q. And then if you go over the page to page --
22  with the control No. 109483, page 2 of 3 at the top, and
23  you'll see under "Near term remains cautious," there's
24  an attribution to you. Halfway down, "Henley stated."
25  Do you see that? And there's a discussion about

281

1  pipeline and conversion rates. Do you see that?
2  A. Yes.
3  Q. And then under the heading "Comparisons will
4  get easier", there's more attribution to you. "Henley
5  indicated that license comparisons should get easier by
6  F3Q," et cetera.
7  Do you see that?
8  A. Uh-huh.
9  Q. So how is that consistent with your testimony
10  in the earlier session of this deposition where you say
11  you're "very careful not to talk about the quarter when
12  people come in to see me. I have no interest in getting
13  into details of the quarter"?
14  A. All these things you've pointed out I don't
15  think relate to the quarter. They tend to be trends,
16  all of which I'm sure I covered on our earnings calls.
17  So when I went out and did these calls, oftentimes
18  investors didn't listen to the earnings call, and so
19  basically -- went to our semi-annual analyst day. So
20  it's really to make sure the investors understand the
21  big picture of what's going on, and by this stage, it's
22  a year later from the stuff we were talking about
23  earlier, the economy is clearly -- had a significant
24  reversal in -- so I'm just kind of giving them things
25  that I had talked about to large audiences of people. I

282

1  don't believe these were quarter, sort of, related
2  things, from what you've pointed out to me here so far.
3  Q. Well, if you look under --
4  A. Current quarter.
5  Q. Yes, if you look under "Near term remains
6  cautious," that paragraph, it says, "However, EPS of
7  $0.09 beat expectations due to solid cost controls."
8  And then it goes on to say, "Management reiterated its
9  guidance of a 15 percent year-over-year decline in
10  license revenue in the current quarter, but noted
11  visibility was weak."
12  Now, how is that not getting into the details
13  of the quarter that you testified you didn't do?
14  A. I agree. I testified -- I don't say -- I
15  don't go out and say, "I'm reiterating guidance." I
16  just don't do that. So Jim may interpret showing them a
17  slide deck, which is what we showed at the earnings
18  call, as reiterating guidance, but I don't go out and
19  say, "I'm reiterating that that's our number." That's
20  just not the way I operate.
21  But most of these things -- you pointed out a
22  whole bunch of things here, you read to me -- were more
23  than the quarter. But that particular statement I don't
24  believe I made. I don't believe I went out and said I
25  reiterated guidance. That's just not what I did.

283

1  Q. And so all of the people that say that you did
2  are either, by coincidence, mistaken or just a bunch of
3  liars; is that --
4  MR. LINDSTROM: Argumentative. Assumes facts.
5  MR. SOLOMON: Q. Is that right?
6  A. I believe that the sale site analyst tried to
7  tell investors that, you know, if things change or not.
8  And so using that term "management reiterated guidance"
9  is a term they all like to use, but it's not a term that
10  I used.
11  Q. Why is it not a term that you used?
12  A. Because, as I've testified earlier, I always
13  tell people, once I put a forecast together, unless
14  something changes materially -- and it never has since
15  I've been here -- I don't know at the end of the
16  quarter. There's nothing new for me to tell people.
17  And if there is, and if I'm sure that I'm going to miss
18  a quarter, I'll be the first person to tell you all.
19  That's always been my thing. So the fact that I go out
20  and they want to know what we said on our earnings call
21  our quarter would be, that, to me, is not reiterating
22  guidance. That is simply saying, "Here's what we said
23  on the call."
24  Q. So if there's a difference between what you
25  said and reiterating guidance, presumably, you would

284

```
1    want that corrected.
2        A.  If some -- are you saying if somebody writes
3    something like this report, or what are you saying?
4        MR. LINDSTROM:  The question's vague and
5    ambiguous.
6        MR. SOLOMON:  Q.  I would say that if someone
7    says that you reiterated guidance and you believe that
8    what you said was different, in substance, than
9    reiterating guidance, presumably you would want it
10   corrected.
11       MR. LINDSTROM:  And then -- that's the
12   question.  Is that true?
13       MR. SOLOMON:  Q.  Is that true?
14       MR. LINDSTROM:  Thank you.
15       THE WITNESS:  No, I don't think it's
16   necessary, because I haven't changed anything.  I have
17   not gone out and changed our numbers.  So they're saying
18   it a different way than I would say it.  They're
19   basically saying he hasn't changed his numbers.  And so
20   it doesn't bother me that they choose to use that term,
21   but it's not factually correct that I go out and say I'm
22   reiterating guidance.  It's just not.  But at the end of
23   the day, it's still the same result.  I mean, we
24   routinely never changed our current quarter numbers
25   because there was no basis to do it.
```

285

```
1        MR. SOLOMON:  Q.  So did you -- instead of
2    saying "I reiterate guidance," was your practice to say
3    "Our numbers haven't changed"?  Is that what you would
4    say?
5        MR. LINDSTROM:  Objection.  Mischaracterizes
6    his testimony.  He's told you this a dozen times, or a
7    half dozen times.
8        THE WITNESS:  I don't know how many more times
9    I can say it to you.  I testified last time, I think we
10   testified this time.  I don't know what more I can say.
11       MR. SOLOMON:  Q.  Well, what I'm trying to
12   find out is why you testified last time that you avoided
13   getting into talking about how the quarter was going,
14   that you avoided the term "confirming guidance,"
15   basically, that all you did was say -- and this is what
16   I'm trying to get at -- basically, all you would do
17   would be to say, "Our numbers haven't changed."
18       MR. LINDSTROM:  Mischaracterizes his
19   testimony.
20       MR. SOLOMON:  Q.  Are you saying you would say
21   that?
22       A.  No, again, I don't think I did that.
23       What I would typically do is say, "Look, here
24   is a deck," and typically they don't want to look at the
25   deck, you know; they want to just ask you questions
```

286

```
1    about the business, you know.  But the deck would
2    usually be, "Here's last quarter's financial
3    performance, all of this stuff in recent years has been
4    posted on the Internet," and that sort of thing.  But,
5    you know -- and, "Here's what we said regarding the
6    current quarter," right?
7        And I would -- I can't swear I said it every
8    time, but I would typically say, "Look," you know,
9    "we're in the quarter now.  I'm not going to talk about
10   the quarter.  There's nothing else to talk about," you
11   know?  "Nothing's changed that I know of, and so I'm
12   happy to talk about these things.  What's the general
13   economic environment?  When do we think it's going to
14   change?  We have no idea, but we think things will start
15   to pick up X", and that sort of thing.  So that's
16   generally what I try to do.
17       "What about your data bases?  What about 9i?"
18   I explain that to them, so as investors, they get a
19   better sense of Oracle.  And talking about the current
20   quarter is not -- I know they want to talk about it, but
21   I've always tried to stay away from that.  That's not
22   what I'm there to talk about.  I don't have any better
23   information.
24       Q.  And you say that notwithstanding that I am
25   showing you documents in which it appears you are
```

287

```
1    talking about the quarter to analysts.
2        MR. LINDSTROM:  Objection.  Mischaracterizes
3    the documents and his testimony.
4        MR. SOLOMON:  Q.  I'm just trying to square
5    your testimony.  Maybe it's impossible to square it.  I
6    don't know.
7        A.  I think it's impossible to square it, I guess,
8    maybe because they write in a way that's different than
9    the way we operate, okay?  And they have a code they
10   talk about with investors.  When they say, "He
11   reiterated guidance, reiterated guidance," I just don't
12   believe I did that.  Now, maybe that's their read.
13       Q.  Okay.  Did the facts that analysts, whether
14   you said it or not, would, on occasion, say you
15   reiterated guidance, did that, in your view, have any
16   effect on Oracle's stock price?
17       A.  If they said I reiterated guidance.  I don't
18   know.  I really don't know.
19       Q.  Is that something that you would want to know
20   as then-CFO of Oracle?
21       A.  I think -- what I want to know?  I think that
22   I've gotten to know investors a lot.  I think a lot of
23   investors hear me, talk to me, they're on my quarterly
24   calls.  Many of them, you know, aren't interested in
25   what analysts have to say, they're more interested in
```

288

1  what we have to say.  They take a lot of stock, and
2  we've been reasonably accurate over the years.  So,
3  whether or not that affects it --
4       Now, if I went out and changed our forecast in
5  our quarter, lowered our guidance or something, that
6  would definitely impact our stock.  That I'm pretty
7  positive of.
8       Q.  Okay.  Oracle was involved in a stock
9  repurchase plan in fiscal 3 '01, correct?
10      A.  Yes, we had an annual plan for 10 years or
11  more.
12      Q.  Right.  And you're out there spending the
13  company's money on its stock, correct?
14      A.  That's correct.  We've been doing that for
15  more than 10 years.
16      Q.  And as a result, at least, of that, you would
17  want to know whether your statements, or statements
18  attributed to you, were having an effect on the stock
19  price, wouldn't you?
20      A.  You know, the -- again, I'm not sure what
21  those reiteration statements that you're referring to,
22  again, have to do with the stock.  That's speculation.
23  I don't know.  But our approach has been long-term.  Our
24  approach has been we were generating excess cash, we
25  didn't have, at least in those days, a lot of

289

1  acquisition, so either we're going to pay dividends or
2  buy back stock.  The board, the audit committee, in
3  particular, routinely reviewed this stuff and routinely
4  decided it would be more tax efficient to buy stock
5  back.  So we had an ongoing program for many years, this
6  quarter included, typically always have been in the
7  market, to some degree, of buying stock back for years.
8  And so it's not, "Gee, what's the price this month?
9  Should we buy stock or not?"  It's been kind of an
10  averaging process over the years.
11      Q.  What role did you play in fiscal 3 '01 in the
12  stock repurchase plan?
13      A.  I don't think there was anything different in
14  that quarter than what the role I ever played.
15      Q.  And what was that role?
16      A.  I didn't handle repurchases.  Our repurchases
17  were done by our treasurer, and typically, we met with
18  the audit committee, the finance and audit committee,
19  and set a budget for the year, typically, talked about
20  how much we wanted to buy over the course of the year.
21  Every quarter had an audit committee, decided do we want
22  to change anything; basically got an agreement with our
23  audit committee about how much our treasurer should be
24  buying back for the year, for the quarter, that sort of
25  thing.  They pretty well decided how much to do.  They

290

1  would ask my opinion and I would give them my opinion.
2  Sometimes they agreed with my opinion about the amounts,
3  and sometimes they wouldn't.  I did not play an active
4  role.  Our committee was very strong in terms of
5  deciding how much we should be buying back.  And
6  typically, it was an annual number, and then they broke
7  it down into quarters.
8       Q.  Were you consulted in Q3 '01 concerning the
9  stock repurchase plan?
10      A.  I don't remember.
11      Q.  Who would be involved in the decision in Q3
12  '01 as to how much stock to repurchase and when to
13  repurchase it?
14          MR. LINDSTROM:  You're talking about the
15  mechanics?
16          MR. SOLOMON:  Q.  Yes.
17      A.  Again, typically, we would try to get, as I
18  testified earlier, an amount agreed to for the year.  If
19  half the year was over, maybe how much now do we want to
20  get for the second half, that sort of thing.  And that
21  was done at the finance and audit committee meeting,
22  okay?  And then once we agreed upon a number, our
23  treasurer would go out and execute that.  And if he had
24  questions about things, he would come to me, I would go
25  to Safra Catz in those days and continue.  Safra

291

1  continued to be pretty active in this.  So he might seek
2  direction from us, but we were basically interpreting, I
3  believe, what had been agreed to by the finance and
4  audit committee.
5       Q.  And am I correct that the finance and audit
6  committee was chaired at that time by someone who didn't
7  even bother to get clearance for the stock sales in
8  January '01?
9           MR. LINDSTROM:  Objection.  No foundation,
10  calls for speculation.
11          THE WITNESS:  I don't know any of that.  I
12  know who was the chairman of the audit committee, but I
13  don't know --
14          MR. SOLOMON:  Q.  Who was that?
15      A.  Don Lucas.
16      Q.  And you know, don't you, Mr. Henley, that he
17  traded stock without asking for clearance?
18      A.  I don't know that.  I actually don't.
19          MR. LINDSTROM:  You've answered the question.
20          MR. SOLOMON:  Q.  So you still haven't told me
21  who was involved in Q3 '01 with the decisions as to how
22  much stock to repurchase within that quarter and on what
23  date.
24          MR. LINDSTROM:  That's compound.  I think he
25  told you the first part.  I agree that he didn't get

292

1 around to answering the second part.
2        MR. SOLOMON: All right. I agree. So let's
3 go with the second part.
4        THE WITNESS: So what is the second part,
5 again?
6        MR. SOLOMON: Q. The second part is what
7 dates did you agree to engage in the repurchases?
8        A. Again, I don't recall the details of my
9 involvement in Q3, or any other quarter.
10       MR. LINDSTROM: He wants to know who handled
11 the execution, as you described it.
12       THE WITNESS: Bruce Lang, at that time, was
13 our treasurer.
14       MR. SOLOMON: Q. Okay. And who guided
15 Mr. Lang as to what dates on which to trade?
16       A. Again, typically, he would trade in those days
17 in the non-quiet periods, and he would, as I testified
18 earlier, get direction for amounts at our audit
19 committee meetings, and then he would go out and figure
20 out how to spread that out over the course of a quarter.
21       Q. Oh. Now, would he consult with anybody when
22 he was figuring out how to spread that out over the
23 course of a quarter?
24       A. Occasionally, over the years he might ask me,
25 you know, what I thought about something. I don't think

293

1 I ever picked the broker. He always picked the broker,
2 and usually he did all the execution. But from time to
3 time he might ask me or ask Safra, "Do you think this is
4 what the audit committee intended?" or something like
5 that.
6        But I didn't get into, "Gee, go do this
7 day, wait till next Monday." I never got into that
8 level of detail. These were sort of policy decisions or
9 questions he might ask me from time to time, really
10 trying to interpret what the audit committee. I never
11 took it upon myself to try to figure out how much we
12 should be buying back. I think that was our board's
13 responsibility, and I never got involved in daily
14 execution; never, ever. But I did respond from time to
15 time that he might have a question about something, what
16 did I think about something?
17       Q. When -- what dates did Oracle repurchase stock
18 in Q3 '01?
19       MR. LINDSTROM: No foundation.
20       THE WITNESS: I don't know. I really don't
21 know the details of what we did, or remember the details
22 of what we did.
23       MR. SOLOMON: Q. Did Oracle repurchase stock
24 the day you traded?
25       A. Again, I don't know.

294

1        Q. Did Oracle trade stock during the time that
2 Mr. Ellison traded?
3        A. Again, repurchase stock when -- I don't know,
4 again.
5        Q. Did you ever know?
6        A. There were times when I might see a daily
7 report, but I didn't routinely get into that mode over
8 the years. I basically focused on how much the board
9 wanted Bruce to do. We would talk about that, and once
10 that was done, Bruce kind of worked on the details of
11 how to get that done. And one of the guiding principles
12 he had was to spread it out so that there was not any
13 large percentage of the float or the transactions that
14 were done in the market that day that he was doing so as
15 to not affect the price of the stock.
16       Q. And what are those daily reports? What are
17 they called?
18       A. I don't know. I mean, I don't -- if you go
19 back over the years, I don't think I got that many of
20 them. But there were times when I might see how much he
21 had done, not so much a day, but maybe a week or
22 something like that.
23       Q. And did you get such reports in January of
24 2001?
25       A. I don't remember. I don't remember.

295

1        Q. Do they still exist if they --
2        MR. LINDSTROM: No foundation, calls for
3 speculation.
4        THE WITNESS: I have no idea.
5        MR. SOLOMON: Q. Did you take any steps to
6 preserve any such reports?
7        MR. LINDSTROM: Assumes facts.
8        THE WITNESS: Again, to the extent I got any
9 of the reports and it fell into periods where I was
10 asked to retain e-mails and stuff like that, I retained
11 all of my e-mails, to the best of my knowledge.
12       MR. SOLOMON: Q. Are you aware that your
13 counsel is refusing to give us any documents that give
14 us the details of the repurchases in Q3 '01?
15       MR. LINDSTROM: No foundation, assumes facts,
16 calls for speculation.
17       THE WITNESS: I'm not aware.
18       MR. SOLOMON: Q. Can you think of any reason
19 why we shouldn't see those reports?
20       MR. LINDSTROM: Objection. Assumes facts.
21       THE WITNESS: I really haven't thought about
22 it. I'm not a lawyer. I would leave it to my counsel
23 to make decisions like that.
24       MR. SOLOMON: Q. But at the moment, can you
25 think of any reason?

296

1  MR. LINDSTROM:  Calls for speculation, no
2  foundation.
3  THE WITNESS:  Yeah, again, I'm not going
4  there.  I'm not trained to know whether you should or
5  not, so I just -- it's not of a concern to me.
6  MR. SOLOMON:  Q.  Is it possible that the
7  reason the documents aren't being produced is because
8  there were repurchases at the time that either you or
9  Mr. Ellison traded stock?
10  MR. LINDSTROM:  No foundation, calls for
11  speculation.  Argumentative.
12  THE WITNESS:  I have no idea, again, why our
13  counsel would make decisions on what should be given to
14  you or not be given to you.
15  MR. SOLOMON:  Q.  Are you aware of any
16  deliberate effort on the part of defendants to actually
17  conceal that information?
18  A.  Again, I don't know how that squares with what
19  you asked earlier.  You stated that, apparently, our
20  counsel has not revealed that.  That's your statement.
21  So if that were true, they're representing the
22  defendants, I think.  So I --
23  Q.  That's fair.  Let's break it down.  Are you
24  aware of any deliberate effort on the part of the
25  defendants themselves, yourselves, to conceal that

297

1  information?
2  MR. LINDSTROM:  Compound, no foundation, calls
3  for speculation.
4  THE WITNESS:  Again, I've had no contact with
5  discovery counsel on your side, so I have no -- I just
6  kept everything that I've been asked to keep, and our
7  counsels are taking care of all of that.
8  MR. SOLOMON:  Q.  I'll have marked as the next
9  exhibit a document produced by the defendants with the
10  control numbers 102701 through 820.
11  (Whereupon, Plaintiff's Exhibit 54 was marked
12  for identification.)
13  MR. SOLOMON:  Q.  I'm hoping, Mr. Henley, you
14  don't have to read it all to tell me if you recognize
15  it, but take as long as you need to.
16  A.  Well, I recognize it without reading it all.
17  It is a quarterly package we put together for the -- our
18  finance and audit committee meeting, and this one was
19  dated April 20th, 2001.
20  Q.  Okay.  Bear with me a second.  I'll draw your
21  attention to the document I'm looking for.
22  If you go to the control No. 102754.
23  A.  Yes.
24  Q.  Okay.  You'll see that it's a page that lists
25  share repurchases.  Do you see that information?

298

1  A.  Yes.
2  Q.  And you'll note that at the top it says "Q4
3  year-to-date summary."  Do you see that?
4  A.  Let's see here.
5  Q.  Or Q4 something summary.
6  MR. LINDSTROM:  I think it's --
7  MR. SOLOMON:  '01, maybe.
8  MR. LINDSTROM:  Correct.
9  THE WITNESS:  That's the title, Q4 '01.
10  MR. SOLOMON:  Q.  Right.  And then in the
11  larger box there are dates that appear to be March and
12  April, and they appear to reflect repurchases.
13  Do you see that?
14  A.  This is the second sort of box down there.
15  Q.  Correct.
16  A.  There's some annual data, and then there's
17  a -- some daily data within the current fourth quarter
18  that this meeting's being --
19  Q.  Right.  Right.  Do you see that?
20  A.  Yes.
21  Q.  Okay.  And the daily data seems to refer to
22  the fourth fiscal quarter of '01; is that fair?
23  A.  Yes, that's what it says, "Q4 Fiscal '01
24  purchase detail."
25  Q.  Okay.  So if this appears in the April 20th,

299

1  2001 finance and audit committee meeting package, can
2  you tell me where I can expect to find the same detail
3  for the repurchases in Q3 '01?
4  A.  I don't know whether that detail.  My
5  recollection is we always had information about share
6  purchase history, but I'm not sure we always had daily
7  details.  So whether or not we had daily detail for the
8  previous quarter, I just don't know.
9  Q.  Okay.  Let's go off the record for a few
10  minutes.
11  (Recess taken from 11:05 to 11:20 A.M.)
12  MR. SOLOMON:  I'm going to have marked as the
13  next exhibit a document produced by Oracle with the
14  control numbers 420976 through 421002.
15  (Whereupon, Plaintiff's Exhibit 55 was marked
16  for identification.)
17  MR. SOLOMON:  Q.  When you've had a chance,
18  let me know if you recognize it, please.
19  A.  Again, this is a finance and audit committee
20  meeting approximately three months earlier than the last
21  one I saw.
22  Q.  Okay.  And if you go to control No. 420996,
23  which is --
24  A.  Okay.
25  Q.  Do you see that?  You'll see that that

300

1  purports to be a Q2 FY01 summary.  Do you see that?
2      A.  The top of the summary title, the title.
3      Q.  Yes.
4      A.  Yes.
5      Q.  And then in the large box it appears to be
6  dates on which Oracle engaged in stock repurchases.  Do
7  you see that?  Dates and amounts?
8      A.  Yes, it appears to be -- correct.
9      Q.  So this meeting was held in January of 2001,
10  correct?  That's what it says at front.
11      A.  That's what it says in the front, yes, uh-huh.
12      Q.  And it has the prior quarter's repurchase
13  detail, as I've just shown you.  Do you see?
14      A.  Yes, I see it right here.
15      Q.  And then the exhibit I showed you previously,
16  which was April 20th, 2001 finance and audit committee
17  meeting, did not have the prior quarter; in other words,
18  fiscal 3 '01 detail; it had, for some reason, fiscal 4
19  '01 detail.  Do you recognize that?
20      A.  I do recognize that.
21      Q.  Can you tell me where I'll find the fiscal 3
22  '01 detail?
23      A.  Perhaps it was never done.  I think, unless
24  there was some sort of special meeting in between these
25  two meetings, we occasionally have -- but I think these

301

1  seem to be the routine quarterly meetings.  For whatever
2  reason, maybe it wasn't produced.  I don't know.
3      Q.  And are you aware that for every finance and
4  audit committee meeting package that we have that has
5  been produced by defendants, the stock repurchase detail
6  for a quarter is, in fact, reflected in the audit
7  committee meeting in the subsequent quarter, in the
8  package concerning the audit committee meeting in the
9  subsequent quarter?
10      MR. LINDSTROM:  Vague and ambiguous.
11      THE WITNESS:  Again, I don't know what periods
12  of time, and I honestly, as I testified earlier, I don't
13  remember, you know, all the details of what we put in.
14  But we typically did some kind of information about
15  stock option repurchase, but my recollection over the
16  years was that we always showed something about share
17  price repurchase, but that I don't recall if we always
18  showed daily.  I really just don't.  It's not something
19  I focused on.  I was typically interested in the broader
20  trends of the year and all that sort of thing.
21      MR. SOLOMON:  Q.  And you don't find it at all
22  remarkable that we have this sort of information for the
23  second fiscal quarter of '01.  We apparently have it for
24  the fourth fiscal quarter of '01, at least through the
25  date of the audit committee meeting on April 20th, 2001,

302

1  but we have no detail for fiscal 3 '01.  Do you find
2  that surprising?
3      A.  I don't know about surprising or not.  It
4  apparently wasn't in the package.  I don't know.  I have
5  nothing to do with preparing these packages.
6      Q.  Okay.  Who was responsible for putting these
7  packages together, or who was at the time?  I'm looking
8  now -- let's break it down -- at the April 20th, 2001
9  package.
10      A.  The April one, and are you speaking about a
11  particular section?  Because the sections were produced
12  by different individuals.
13      Q.  Yes, I'm talking about the section that
14  includes the detail of the stock option repurchase.
15      A.  I believe that came from our treasurer at the
16  time, at the time was Bruce Lang.  Whether he prepared
17  it or one of his staff prepared it, but he was
18  ultimately the guy responsible to talk about it with the
19  audit committee.
20      Q.  And he would have been responsible also for
21  the January 5th, 2001 package; is that right?
22      A.  Yes.
23      Q.  Okay.  Did you ever have a discussion with him
24  after March 1, 2001 concerning the stock repurchases
25  within fiscal 3 '01?

303

1      A.  I don't believe so.  I certainly don't recall
2  it.
3      MR. SOLOMON:  I'll have marked as the next
4  exhibit a document produced by defendants with the
5  control numbers 195262 to 269.
6      (Whereupon, Plaintiff's Exhibit 56 was marked
7      for identification.)
8      MR. SOLOMON:  Q.  And once you've had a
9  chance, just let me know if you recognize it, once
10  you've had a chance to look at it.
11      A.  Do you want me to read this whole thing or --
12      Q.  No, I just want to know if you recognize it.
13      A.  I don't.  Again, I gave -- I've given a number
14  of interviews over the years to the press; I would
15  describe these guys as the media type.  So it looks like
16  some media interview I granted.
17      Q.  Okay.  If you look at the second page of the
18  exhibit, 195263, under TheStreet.Com July 10, 2002
19  header, it says, "Oracle reaffirms guidance."  Do you
20  see that?  "Aims a new product at Microsoft."
21      Do you see that?
22      A.  Yes, I see that.
23      Q.  And is it your testimony that if anyone at
24  Oracle reaffirmed guidance, it wasn't you?
25      MR. LINDSTROM:  That's a question, correct?

304

1     MR. SOLOMON: Uh-huh.  Yes, it's a question.
2     THE WITNESS:  I've testified earlier that I
3 didn't use the term "reaffirmed guidance", yes.  I
4 repeatedly testified to that.
5     MR. SOLOMON: Q.  Let me ask you this:  Did
6 analysts say, "Do you reaffirm guidance?" and you would
7 answer yes or no?  Did that happen?
8     A.   I don't believe that even they used the term,
9 "Do you reaffirm guidance?"  If that's -- you know, I'm
10 not saying somebody never -- but even that's not normal.
11     Q.   Okay.  And do you recall the interview here
12 that's being referred to?
13     A.   I don't.  But I certainly remember
14 interviewing these people over the years once or twice.
15 This may have been the one I recall, but I don't
16 remember reading this.
17     Q.   Okay.  Did you make any effort to not go into
18 any detail about the current quarter during that
19 interview?
20     MR. LINDSTROM: There's a couple articles
21 here.  Which one are you talking about, Counsel?
22     MR. SOLOMON: I'm sorry.  I'm talking about
23 TheStreet.Com still.
24     MR. LINDSTROM: Thank you.
25     THE WITNESS:  Okay.  So we're talking about

305

1 street.com.  And again, the approach was, again,
2 educational, whether it was with analysts or the media
3 or whatever, to talk about broader trends, what's going
4 on with our products, our competitors, that sort of
5 thing.  It was not to get into the details of the
6 current quarter.
7     MR. SOLOMON: Q.  Now, we talked in the last
8 session about a second quarter '01 deal with Hewlett
9 Packard.  Do you recall that?
10     MR. LINDSTROM: Do you recall the deal or the
11 prior testimony?
12     MR. SOLOMON: The prior testimony.
13     THE WITNESS:  I don't remember.  I do remember
14 the vague bits of the deal.  Whether I remember it in
15 the testimony or before that, I don't know.
16     MR. SOLOMON: All right.  If you go to the
17 transcript that's an exhibit, I believe it's Exhibit 48.
18     MR. LINDSTROM: 48.
19     THE WITNESS:  48.
20     MR. LINDSTROM: What page would you like him
21 to look at?
22     THE WITNESS:  Back to the transcript.  Sorry.
23     MR. SOLOMON: Q.  Page 37.
24     A.   37.  Okay.
25     Q.   And you'll see, at line 8, I say, "Okay.  Just

306

1 going back to the second page in that reference to HP,
2 do you recall being involved in any transaction with
3 Hewlett Packard late 2000?"  And the answer was "I was
4 not involved, no."
5     Do you see that?
6     A.   Yes.
7     Q.   And is that true testimony?
8     A.   Yes.
9     MR. SOLOMON: Let's have marked as the next
10 exhibit a document produced by Oracle with control
11 numbers 025020 to 021.
12     (Whereupon, Plaintiff's Exhibit 57 was marked
13     for identification.)
14     THE WITNESS:  Okay.
15     MR. SOLOMON: Q.  Have you seen this before?
16     A.   Yes.
17     Q.   And when did you last see it?
18     A.   I don't know.
19     Q.   Years ago, or more recently?
20     A.   That's what I'm saying; I don't know.  But I
21 definitely remember because it was a large transaction
22 that quarter.  So --
23     Q.   Okay.  And you'll see that there are two sets
24 of addressee information.
25     A.   Uh-huh.

307

1     Q.   The first, going bottom to top, is dated
2 November 30th, 2000, and it's from Gary Roberts to Larry
3 Ellison, and it copies a number of people, including
4 you.  Do you see that?
5     A.   Yes.
6     Q.   And then the above -- above that there's a
7 transmission from you to Tom Williams.  Do you see that?
8     A.   Yes.
9     Q.   First, going to the body of the e-mail, it
10 says, "Larry, I believe you'll be discussing discounts
11 with HP today.  Please keep these figures in mind."
12     Do you see that?
13     A.   Yes.
14     Q.   Now, just focusing on, "Larry, I believe
15 you'll be discussing discounts with HP today," do you
16 know what that refers to?
17     A.   Apparently, he said Larry's going to be
18 talking to HP.  That's all -- all I know is what I read.
19     Q.   Okay.  You don't know of any discussions that
20 Mr. Ellison had with HP?
21     A.   No.
22     Q.   Do you know who Mr. Ellison's contact person
23 was at HP?
24     A.   No.
25     MR. LINDSTROM: Assumes facts.

308

1      MR. SOLOMON:  Q.  If anyone.  You don't know?
2      A.  No.
3      Q.  In fact, you know nothing about Larry Ellison
4   at HP; is that fair?
5      A.  Well, no.  Are you talking about in general,
6   or on this particular --
7      Q.  Larry Ellison's relationship with HP.
8      A.  Oh, sure.  I think Larry's met a number of
9   people over the years that have been -- senior people at
10   HP over the years.  From time to time, he's met people.
11   I know that.  Just like he's met people from Sun and
12   some of our large hardware partners.
13      Q.  And has he met them socially or in the context
14   of business?
15      A.  Certainly, I'm speaking of business.  I have
16   no idea what he does socially.
17      Q.  And when he did business with Hewlett Packard,
18   what was his role in doing business with Hewlett
19   Packard?
20      MR. LINDSTROM:  Compound, assumes facts, no
21   foundation.
22      THE WITNESS:  Again, over the years, they --
23   Sun, IBM, others -- had been important partners.  They
24   sell our database on their hardware.  So he's had
25   relational meetings with them, talked about working

309

1   together, you know, going to market together, things
2   like that.  But beyond that, I really have typically not
3   been in the meetings.  I have no idea the kinds of
4   things he's gotten into with them.
5      MR. SOLOMON:  Q.  Okay.  Gary Roberts, do you
6   know him to be an honest man?
7      A.  Yes.
8      Q.  And if he says, "Larry, I believe you'll be
9   discussing discounts with Hewlett Packard today," you've
10   got no reason to believe that that's not true?
11      A.  I believe he said what he said.  He said, "I
12   believe you'll be discussing."  He's speculating, I
13   guess.  I don't know.
14      Q.  All right.  Now, why did you forward this on
15   to Tom Williams?
16      A.  Because they -- we were trying to sell them
17   software, and based on what Gary said, we have a process
18   that if we ever have a situation where we're both trying
19   to sell each other something, I want to make sure the
20   revenue recognition people are right front and center.
21   So Tom Williams ran revenue recognition for us for many
22   years and is a very able guy, so I immediately forwarded
23   it to him, so he was aware of it and could weigh in
24   with Gary or anybody else to be confident that this was
25   separate transactions, arms length, et cetera.

310

1      Q.  Okay.  Did you get involved with assessing the
2   propriety of this deal?
3      A.  I don't believe so.  Again, that's why I said
4   before, I wasn't involved.  I was aware of this and
5   other things over time.  But my approach was to send it
6   to the experts in this case.  If it's a rev rec issue,
7   let Tom Williams get involved and make those calls.
8      Q.  Okay.  So when you testified -- excuse me.
9   Let me just go back to it.
10      When you testified that you weren't involved,
11   you meant to say you weren't involved beyond forwarding
12   this --
13      A.  Yes.  That's informational stuff, but my
14   involvement is if I'm good at making calls on revenue
15   recognition, or I'm involved in negotiating, that, to
16   me, is involvement.  I think I did testify I was aware
17   of it, heard about it and so forth.
18      Q.  How did you hear about it?
19      A.  Again, I knew we were talking to them, and at
20   the end of the quarter we published quarters of all of
21   the larger transactions.  So I'm always made aware of
22   all of our larger transactions at the end of the
23   quarter.  Again, informational, typically never -- many
24   of them I have never heard of.  This one I had heard of
25   because of this information that I got that I forwarded

311

1   to Tom Williams.
2      MR. SOLOMON:  I'll have marked as the next
3   exhibit a document produced by the defendants in this
4   litigation with the control numbers 044428 through 505.
5      (Whereupon, Plaintiff's Exhibit 58 was marked
6      for identification.)
7      THE WITNESS:  Again, you don't want me to read
8   all of this?
9      MR. SOLOMON:  Q.  No, I want to know if you
10   recognize it, though.
11      A.  Again, this looks like a typical quarterly
12   package that's sent to our directors in advance of our
13   quarterly board meeting.
14      Q.  Okay.  I'm looking at the second page of the
15   document.  It lists you as being a recipient.
16      Do you see that?
17      A.  Yes, on the -- it says, "The notice of the
18   regular meeting."
19      Q.  Yeah.
20      A.  Yes.
21      Q.  And as far as you know, you did receive this,
22   right?
23      A.  Yes.  Sure.  I always get the quarterly
24   package.
25      Q.  And on the next page, control No. 044430,

312

1  you'll see there's an agenda, list of the agenda.
2      Do you see that?
3  A. Yes.
4  Q. And there's a D, it says "Redacted". Do you
5  know what's concealed by that redacted stamp?
6  A. I don't remember.
7  Q. Do you know why it's redacted?
8  A. I don't know.
9  Q. And then if you -- if you go to control
10  No. 044434, you'll see at the top it says "Executive
11  Committee, special meeting November 30th, 2000," and
12  then there's information redacted.
13      Do you know what's being concealed?
14  A. No.
15  Q. Do you know why it was redacted?
16  A. I don't know.
17  Q. And do you get the same answer with respect to
18  redactions, other redactions on that page?
19  A. Again, this answer is the same. I don't know
20  why certain things were redacted.
21  Q. Okay. If you now go to control No. 044458.
22  A. Okay.
23  Q. You'll see that there's a reference to an
24  executive meeting of the executive committee of the
25  board of directors.

313

1      Do you see that?
2  A. Yes.
3  Q. Who was on the executive committee as of
4  November 30th, 2000?
5  A. I believe it's been the same since I've been
6  there. Don Lucas, myself and Larry Ellison. In fact --
7  and apparently, we were all present.
8      No, it says Don Lucas was not in attendance.
9  So Larry and I were present.
10  Q. And it's the same executive committee now, is
11  it?
12  A. Yeah, I believe so. I don't believe it's
13  changed.
14  Q. It says, "Also present was Safra Catz and
15  Daniel Cooperman."
16      Do you remember them being present?
17  A. I don't remember if they were present. Must
18  have been.
19  Q. Okay. And then it says, under 2, "Approval of
20  purchase of hardware and services from the" -- and then
21  we don't know what else it says. Can you see that?
22  A. Uh-huh.
23  Q. Can you tell us me what else it says?
24  A. I don't know. I would only be speculating.
25  Q. And what's your speculation?

314

1      MR. LINDSTROM: Objection. No foundation,
2  calls for speculation.
3      You may answer, nonetheless.
4      THE WITNESS: Is the question -- what degree
5  of speculation? I mean, I'm really not sure I can be
6  certain what it was.
7      MR. SOLOMON: Q. I know you can't be, but
8  I'll take your uncertain speculation.
9      MR. LINDSTROM: Same objections.
10      THE WITNESS: I have no idea. You -- you
11  showed me this Hewlett Packard deal, which -- so
12  possibly it's that, but it's clearly speculation.
13  Typically, the executive committee has to approve large
14  purchases that fall beyond Larry's individual spending
15  authority. So it's possible it was that. I honestly
16  don't remember.
17      MR. SOLOMON: Q. So you don't remember having
18  a recollection of having a meeting on November 30th,
19  2000 discussing the HP deal?
20  A. I don't, but I certainly remember we did the
21  deal. I do remember that. But I don't recall the
22  meeting, per se. We've had many meetings and written
23  consents over the years about certain executive
24  committee things, but I honestly don't remember,
25  specifically, this, but I do remember we did a

315

1  transaction with HP.
2  Q. Was it a particularly important deal for that
3  quarter?
4  A. I can't -- I mean, every large transaction is
5  always important, and we do a number of them every
6  quarter, typically. So, I mean --
7  Q. So you have no recollection either of
8  discussing the deal or whether the deal was particularly
9  important for that quarter?
10      MR. LINDSTROM: Now, I mean, are you --
11      MR. SOLOMON: Q. You don't recall either of
12  those?
13  A. I testified earlier I do remember the HP
14  transaction. I remembered that I forwarded something to
15  Tom Williams that we were very clear that we had to work
16  both sides, 'cause we wanted to buy some hardware, they
17  wanted to sell us some software. We wanted to be sure
18  that that was set off separately. And I remember
19  reading about the transaction being finished or hearing
20  about it, certainly reading about it in the final
21  reports. So yes, I'm definitely aware of the
22  transaction.
23  Q. Okay. But you testified in the last session
24  you had no role. You've now testified that your role
25  was limited to forwarding on the document that you've

316

1  exhibited to Tom Williams, and now it appears your role
2  included also discussing the deal in an executive
3  session in the board of directors; is that right?
4      MR. LINDSTROM:  No, no.  He said his role was
5  talking about the expense side.  In other words, the
6  purchase of equipment from HP.  I mean, there's -- it
7  mischaracterizes his testimony.
8      MR. SOLOMON:  Q.  Hard to know how you were
9  involved or not involved.  Were you involved or not?
10     A.  Let's try it again, be very clear.
11         When I talk about involvement, that's when I'm
12  personally involved in the original context of this
13  whole thing was negotiating the transaction, I believe.
14  So I clearly wasn't involved in negotiating either side
15  of this transaction.  But I was involved to make sure
16  that Tom would get involved in passing on information to
17  make sure that our rev rec guys were involved and we got
18  it right, okay?  And then for formality purposes, since
19  Larry had agreed to do this deal with the IT guys and
20  pricing that we thought was reasonable and so forth, as
21  a formality, Don Lucas and I have to approve it.
22         So, I mean, you know -- but, I mean, that, to
23  me, is not -- that is not involvement in the details or
24  whatever.  Sure, technically I've got to approve it, but
25  I don't call that involvement in negotiating the deal.

317

1  And that was really the whole spirit, I think, when you
2  first started your line of questioning the last time.
3      Q.  It says Don Lucas wasn't present.  How was he
4  involved in the approval?
5      A.  Just like me.  There's three of us that have
6  to go -- if something goes beyond Larry Ellison's
7  spending authority, then it goes to the executive
8  committee.  And then if it goes beyond the spending
9  authority of the executive committee, the full board has
10  to approve it.
11     Q.  Who approved this deal, this HP deal?  Who
12  approved it?
13     MR. LINDSTROM:  Objection.  No foundation,
14  calls for speculation.  It's also ambiguous as to what
15  deal you're talking about, whether it's the purchase of
16  hardware from HP or the purchase by HP of product from
17  Oracle.  You just referred to "deal".
18     THE WITNESS:  I agree.  So if you could --
19     MR. SOLOMON:  Q.  Who approved the purchase
20  from HP?
21     A.  Well, it started with Gary Roberts negotiating
22  it, probably, who ran IT and some of his guys.  Then
23  clearly, the chain of command is Larry Ellison had to
24  then approve it because Gary didn't have the spending
25  authority, and Larry himself had to send it up to Don

318

1  and me because it was beyond his -- so technically, the
2  final approval was the three of us.  But all the work
3  was done way below my level.
4      Q.  How did Don Lucas indicate his approval?
5      A.  I don't know.
6      Q.  What has been redacted?
7      MR. LINDSTROM:  He's already answered you.
8      THE WITNESS:  I told you earlier, I have no
9  idea what's been redacted.
10     MR. SOLOMON:  Q.  Do you know the purpose of
11  the redaction?
12     A.  I told you earlier, I have no idea.
13     Q.  What do you mean when you say that you wanted
14  to be sure the HP deal was offset separately?
15     MR. LINDSTROM:  Mischaracterizes his
16  testimony.
17     THE WITNESS:  We've had a rule for a long time
18  that we don't do what is referred to in the industry and
19  what I've read about in some companies doing called
20  barter transactions, all right?  So we will only buy
21  things from vendors when we need them and at arms length
22  prices.  And a way to make sure that -- and our auditors
23  are very concerned about this, as well.  So we've had a
24  process that any time something like this came up --
25  there have been several situations like this over the

319

1  years, that Tom Williams got involved, our auditors
2  looked at it, 'cause we wanted to be absolutely certain
3  that this was a legitimate, independent transaction from
4  what was being sold to the customer.
5      MR. SOLOMON:  Q.  And how did you satisfy
6  yourself when giving approval that you were looking at
7  independent transactions?
8      MR. LINDSTROM:  Assumes facts.
9  Mischaracterizes his testimony.
10     THE WITNESS:  I -- certainly there was a
11  presentation made to us to give us the assurance that it
12  was a -- each side stood on its own and so forth, and
13  Tom Williams had looked at it.  So I have great
14  confidence that if he would buy off on it, it met all
15  the tests from an accounting standpoint.  And certainly
16  from a business standpoint, Larry, as well as Gary
17  Roberts, were well aware of the concern that we had that
18  we had to make sure that these things were, you know,
19  legitimate business purposes and not done just to sort
20  of generate revenue.
21     Q.  And who made the presentation?
22     A.  I don't remember.
23     Q.  Do you know whether, under GAAP, the
24  transaction with HP on November 30th, 2000 would be
25  characterized as a barter deal?

320

1     MR. LINDSTROM: Objection. No foundation,
2  calls for expert conclusion beyond his expertise.
3     THE WITNESS: Yeah, ask me the question again.
4     MR. SOLOMON: Q. Do you know whether, under
5  GAAP, the transaction with HP on November 30th, 2000
6  would be characterized as a barter deal?
7     MR. LINDSTROM: Same objections.
8     THE WITNESS: I don't know the answer to that.
9  I know that Tom Williams looked at it very carefully,
10  and however we recognized revenue, booked the cost into
11  our fixed assets records, I'm confident was done
12  properly according to GAAP. Whether the barter -- I'm
13  not sure what that means.
14     MR. SOLOMON: Q. Now, you were the Chief
15  Financial Officer at the time, correct?
16     A. That's correct.
17     Q. And Tom Williams reported to you; is that
18  right?
19     A. He did for a number of years. He was our
20  Chief Accounting Officer, and then he moved to Rocklin
21  and took on a role as the head of shared services and
22  revenue recognition. So I honestly don't remember
23  whether Tom was in his former role or his latter role,
24  but in either role, he always got involved with revenue
25  recognition issues of large transactions. So he may not

321

1  have reported to me when -- he didn't when he was in
2  Rocklin, but he still had the same functional
3  responsibility for revenue recognition.
4     Q. Now, if you look at the minutes under
5  attendants and quorum, it doesn't appear that
6  Mr. Williams was invited to attend that meeting.
7     Is that fair?
8     A. Where is this, again?
9     MR. LINDSTROM: Objection. The document
10  speaks for itself.
11     MR. SOLOMON: Q. 044458.
12     A. He's not listed.
13     Q. Okay. Now, why would he not be there if this
14  meeting was to assess whether or not to approve the
15  deal?
16     MR. LINDSTROM: Which deal?
17     MR. SOLOMON: Q. The Hewlett Packard deal or
18  deals.
19     A. Well, we don't know. I mean, it was
20  something, apparently, but I don't think we always have
21  every expert at every meeting. Safra and Dan, myself,
22  all know what Tom does, and if Tom looked at something
23  and told us, "Okay. It doesn't necessarily need to be
24  there." Certainly if anybody had a question, they could
25  phone him. I don't recollect whether we did that or

322

1  not.
2     Q. Okay. Now, if you look at the e-mail exchange
3  involving Gary Roberts, yourself and Mr. Ellison and
4  others, which is the --
5     A. Previous one.
6     Q. -- previous exhibit, yes.
7     MR. LINDSTROM: Exhibit 57.
8     MR. SOLOMON: Thank you very much.
9     MR. LINDSTROM: Is there a pending question?
10     THE WITNESS: The same one, 57?
11     MR. SOLOMON: Q. Yes.
12     You'll see that that's dated 1259 -- sorry.
13  It's time at 12:59 on the 30th of November.
14     Do you see that?
15     A. Yes.
16     Q. And then the minutes of the meeting reflect
17  that your executive committee meeting took place at
18  11:45 A.M.
19     Do you see that?
20     A. Let's see. Let me go back -- which page was
21  the --
22     Q. 044458.
23     A. So I can see that -- the time of this e-mail,
24  right?
25     Q. Yeah.

323

1     A. And this meeting was held 11:45. Okay. I see
2  those dates and times, yeah.
3     Q. Now, does that not indicate that the deals --
4  deal or deals had already been approved before you
5  forwarded the e-mail to Mr. Williams?
6     MR. LINDSTROM: Objection. No foundation,
7  calls for speculation. He's told you he doesn't even
8  know what the meeting concerns, and your question is
9  predicated on an assumption on your part that the
10  meeting involved an approval of both aspects of the HP
11  deal, and so you're just piling speculation on
12  speculation.
13     MR. SOLOMON: Q. And by the way, Mr. Henley,
14  when we get these documents unredacted, as we hope the
15  court will instruct your lawyers to do, we will want to
16  talk to you again and reserve our rights to do so.
17     But yes, it's true that I can't tell you too
18  much about what was -- information's been redacted, but
19  my question is: Does this indicate to you that the deal
20  or deals had already been approved by the time you
21  forwarded the e-mail between Roberts and Ellison to
22  Mr. Williams?
23     MR. LINDSTROM: Objection. No foundation.
24  Calls for speculation.
25     THE WITNESS: It's totally speculative. There

324

1  may have been other heads-ups that I gave Tom Williams
2  before this, and this was another FYI. Here's some more
3  on it. So I have no idea when Tom first became aware of
4  it. Many times people would go to Tom and not even get
5  me involved, so I have no idea when Tom first got
6  involved in the HP transaction, and I have no idea
7  whether this related to HP, as I previously testified.
8      Q.  Do you recall any concern on November 30th of
9  2000 that you needed the HP deal to get to where you
10  wanted EPS to end up at Q2 01?
11     A.  I don't recall. But again, I will --
12         MR. LINDSTROM:  You've answered the question.
13         THE WITNESS:  Yes, I don't recall.
14         MR. SOLOMON:  Q.  Was there an executive
15  committee meeting on November 30th, 2000, subsequent to
16  the one that we are looking at now and reflected in the
17  minutes?
18     A.  Was there a meeting --
19     Q.  In other words, we look at the minutes that
20  suggest that there was a meeting of the executive
21  committee at 11:45 A.M. on November 30th, 2000.
22     A.  Yes.
23     Q.  And my question is: Was there another meeting
24  that day thereafter?
25     A.  I don't know. I don't recall.

325

1      Q.  If there was, you would expect it to be
2  reflected in minutes; is that fair?
3      A.  If it was an executive committee meeting that
4  required approvals, I would think so, sure. I mean,
5  sometimes there's informational meetings; sometimes
6  there's meetings that require, you know, approvals.
7      Q.  You'll see that other pages of this document
8  have been redacted, and I don't want to spend too much
9  time if your uniform answer is going to be that you
10  don't know anything about the information that's been
11  redacted, but let's just take a few pages and see what
12  you say.
13         044460, you'll see there's a redacted stamp.
14     A.  4460?
15     Q.  Yes. Do you know what information is being
16  concealed there?
17     A.  No.
18     Q.  And if you go to 044465 -- sorry -- 64 and 65,
19  is your answer the same?
20     A.  Yes. I don't know.
21     Q.  And for 66, as well?
22     A.  Yes.
23     Q.  Okay. Let's go off the record for
24  five minutes and I'll get some documents.
25         (Recess taken from 12:01 to 12:13 P.M.

326

1         MR. SOLOMON:  Q.  I'll have marked as the next
2  exhibit a document produced by defendants with the
3  control numbers 055957 through 962.
4         (Whereupon, Plaintiff's Exhibit 59 was marked
5         for identification.)
6         MR. SOLOMON:  Q.  And Mr. Henley, just so you
7  know, I'm going to ask you about the first page of the
8  document, but I'll let you take a look at the rest. If
9  you've seen any of it before, let me know.
10     A.  I don't recall seeing it.
11     Q.  Now, looking at the first page at the top,
12  there's an e-mail exchange from Michael Decesare to
13  Sandy Sanderson, Frank Varasano and Kurt Speck.
14         Do you see that?
15     A.  Yes.
16     Q.  And then it says, "Sandy/Frank, HP confirmed
17  today," and just -- I should interrupt. This is dated
18  November 9th, 2000. "HP confirmed today that they will
19  try and pull the CRM portion of the order off providing
20  we have delivered what we have outlined in development
21  and production systems. Since they don't need", in
22  caps, "ALL the license users right now, they are hedging
23  on how big an order they will do until they see how much
24  production hardware Oracle comes back with. If this
25  turns out to be a large number, we could get the entire

327

1  order."
2         Do you see that?
3      A.  I do.
4      Q.  Now, does that language raise any concerns in
5  your mind as former CFO, CFO at this time of the
6  company, with respect to the propriety of the proposed
7  transaction?
8      A.  No, it's just like any of these kind of
9  situations, they're trying to use leverage on us. So
10  the key is that our IT people, rev rec people are
11  comfortable that whatever we ended up buying is needed.
12  It's -- we're not just buying something that isn't
13  needed. So we're sensitive of these issues, we work
14  very hard on them and, you know, so -- on the surface,
15  it's just something that we need to be careful about
16  that we are doing a proper transaction.
17     Q.  Okay. And do you see that, implicit in this
18  language, that HP was waiting to see how much hardware
19  Oracle would buy before they committed to purchasing
20  from Oracle?
21         MR. LINDSTROM:  The document speaks for
22  itself, calls for speculation.
23         THE WITNESS:  I read what I read.
24         MR. SOLOMON:  Q.  Okay. Go to page 2 which is
25  055958, and at the top of the page, the third full

328

1  paragraph beginning, "According." Do you see that? It
2  says, "According to Phil May, HP is willing to buy as
3  much CRM from Oracle as we buy in HW, support and other
4  requirements from Oracle."
5        Do you see that?
6     A.  I do see that.
7     Q.  Does that raise any concerns in your mind, as
8  the CFO at the time, as of the propriety of the
9  transaction proposed?
10     A.  Again, my only concern is that the IT people
11  are buying stuff they're going to really need and use,
12  and that the prices are arm's length, and that our rev
13  rec people are aware of the transaction so they can get
14  involved and make sure that everything is, you know,
15  proper from accounting business sense and so forth.
16     Q.  Well, it would be a surprising coincidence,
17  would it not, that it just happened that HP needed as
18  much CRM from Oracle as Oracle needed hardware from HP?
19        MR. LINDSTROM:  Objection. Argumentative,
20  mischaracterizes the document.
21        THE WITNESS:  HP's a huge company, and I'm
22  sure, like many customers, it's just a question of how
23  much they want to buy at one point in time.
24        MR. SOLOMON:  Q.  If you knew, at the time of
25  the HP transaction or transactions, that HP didn't

329

1  intend to use all of the software that Oracle was
2  selling, would that have raised a concern in your mind
3  as CFO of the company?
4        MR. LINDSTROM:  Assumes facts, calls for
5  speculation and a conclusion beyond his expertise.
6        THE WITNESS:  Yeah, I mean, I have no idea
7  what their intentions are. It's a large sophisticated
8  company. I can't imagine they wouldn't buy something
9  they didn't need.
10        MR. SOLOMON:  Q.  Okay. But if you did have
11  an idea in this hypothetical world, would that affect
12  how you assess the propriety of the transaction?
13        MR. LINDSTROM:  Assumes facts, no foundation,
14  calls for speculation and a conclusion beyond his
15  expertise.
16        THE WITNESS:  Yeah, I mean, I think
17  respectfully, everything I've ever known about HP, it's
18  a very high quality company. My concern is that we're
19  getting the accounting right, that there's a business
20  need from Oracle standpoint to buy the right amount of
21  IT equipment from Hewlett Packard.
22        MR. SOLOMON:  Q.  Would you agree that the
23  appearance from these exchanges is that a swap
24  transaction or a barter deal was being contemplated?
25        MR. LINDSTROM:  Objection. The documents

330

1  speak for themselves, calls for a conclusion,
2  speculation.
3        MR. SOLOMON:  Q.  Go ahead.
4     A.  I think that we were regular buyers of
5  equipment from Hewlett Packard. I assume we still are.
6  I haven't looked in recent years. I haven't been
7  involved in that, but -- so to me, there's a distinction
8  between conjuring up a deal that there's really no
9  reason for you to buy something, as opposed to deciding
10  that they want CRM, we're going to need some more
11  equipment, and so trying to figure out -- them putting
12  pressure on us to sort of make a hard commitment. That
13  is not a swap. We don't say, "Look, we'll trade you 20
14  separate purchase orders, separate negotiated business
15  terms." They happened to fall in the same time frame.
16  That's why we're very sensitive to making sure there's
17  real business purpose on both sides.
18        MR. SOLOMON:  Let's have marked as the next
19  exhibit another document produced by the defendants with
20  the control No. 025018.
21        (Whereupon, Plaintiff's Exhibit 60 was marked
22        for identification.)
23        THE WITNESS:  I've read it.
24        MR. SOLOMON:  Q.  Have you seen this before?
25     A.  I don't recall seeing it.

331

1     Q.  And you'll see that it's timed 13:22 on the
2  30th of November 30th, 2000, which would have been after
3  the executive committee meeting that you attended; is
4  that right?
5     A.  Again, there was an executive committee with a
6  date that, as I've said, I don't know what was redacted,
7  I don't know what was discussed.
8     Q.  And you'll see that it says that, "Safra, I
9  understand that Larry and Carly are discussing their
10  purchase of our products this quarter if we commit to
11  purchase 20 to $30 million of their products over the
12  next 18 to 24 months."
13        Do you see that?
14     A.  Yes.
15        MR. LINDSTROM:  You're not talking about the
16  7:00 A.M. e-mail that's --
17        MR. SOLOMON:  Thank you very much. I am.
18  7:13 A.M. dated November 30th.
19        THE WITNESS:  I see that.
20        MR. SOLOMON:  Q.  Does that raise any concern
21  in your mind, as a former CFO, as to the propriety of
22  the transaction being proposed?
23     A.  Again, so long as -- and our auditors looked
24  at all these things. So long as we need the commitment
25  and we're paying commercial prices, and some of that

332

1  relates to this -- apparently, this note, that's the
2  issue. We do not want to be buying stuff we don't need
3  just to generate software sales. So it was clear to me
4  that we had a long history, we were going to continue to
5  buy from HP, we were happy with their products. So it
6  doesn't necessarily concern me.
7      What concerns me is we just be sure that
8  enough people have been involved that will vouch
9  internally that they really do need this stuff.
10     Q. Now, your auditors were Arthur Anderson at the
11  time; is that right?
12     A. I don't recall. I just don't recall when we
13  switched.
14     Q. Do you recall what the ratio was between
15  Oracle's payment for audit services from Arthur Anderson
16  compared to the payment for consulting services?
17     A. I don't recall.
18     Q. Were you aware at the time you were paying
19  Arthur Anderson far more for consulting services than
20  you were for their audit services?
21     A. What do you define as consulting services?
22     Q. Non-audit services?
23     MR. LINDSTROM: Objection. Assumes facts.
24     THE WITNESS: You're speaking to tax, other
25  kinds of things?

333

1      MR. LINDSTROM: Are you making a
2  representation to him?
3      MR. SOLOMON: Q. Everything other than audit
4  services.
5      A. No, I don't recall.
6      Q. Were you ever concerned about that ratio?
7      A. No.
8      Q. Okay.
9      A. We never bought services from Arthur Anderson
10  or any other lawyer or accounting firm unless there was
11  a need and we thought they would do the best job with
12  it.
13     Q. Okay. And when did your auditors look at the
14  HP transaction for the first time?
15     A. I don't know the answer to that.
16     Q. Do you recall discussing the transaction with
17  the auditors at any time?
18     A. I don't recall. I don't recall. Many times
19  they --
20     MR. LINDSTROM: You've answered the question.
21     THE WITNESS: Okay.
22     MR. SOLOMON: Q. Do you know who Ivgen Guner
23  is, I-V-G-E-N?
24     A. Yes.
25     Q. Who is that?

334

1      A. She works in our forecasting and planning
2  department in our corporate office.
3      Q. Did she, in the years 2000 and 2001, prepare
4  monthly flash reports?
5      A. She and her staff, yes.
6      Q. And did you get a copy of the monthly flash
7  reports in that time frame?
8      MR. LINDSTROM: 2000/2001?
9      MR. SOLOMON: Q. Yeah.
10     A. I got different reports from her. Whether I
11  got every report she generated, I don't know. But I
12  certainly was a regular receiver of reports from her
13  about forecasts and actuals and all of that sort of
14  thing.
15     Q. Would you receive them electronically or in
16  hard form?
17     A. It varied. Many times just electronically.
18  Sometimes I might ask for a hard copy.
19     Q. Did you have a practice of keeping and
20  organizing the monthly flash reports?
21     A. Keeping -- you're talking about if they were
22  electronic, you mean organizing them in a special folder
23  or something, or --
24     Q. Either way. In other words, did you have a
25  practice, in 2000 or 2001, of ensuring that you had

335

1  ready access to the monthly flash reports?
2      MR. LINDSTROM: For the entire period, those
3  two years?
4      MR. SOLOMON: Q. (Nods head.)
5      A. No, I usually didn't concern myself about
6  that. I just might keep one for a few weeks or
7  something like that. But I knew she was the originator.
8  If I ever wanted to go back in history, I could talk to
9  her. But I don't typically keep stuff for long periods
10  of time.
11     Q. Would you have expected the flash report for
12  December of 2000 to have been in your files as of
13  March 2001?
14     A. It -- I just don't know. Sometimes I kept
15  things for a couple of months; sometimes I didn't.
16  Sometimes I didn't keep them at all because they came
17  up, you know, routinely.
18     Q. What about for January of 2001, will you
19  expect a January 2001 flash report to be in your files
20  in March --
21     A. Again, I just don't know.
22     Q. And what about for February of 2001, same
23  answer?
24     A. Same answer.
25     Q. Okay. Would you expect Oracle, itself, to

336

1  have retained, one way or another, the December 2000 and
2  January and February 2001 flash reports as of
3  March 2001?
4      MR. LINDSTROM: Objection. Vague and
5  ambiguous as to "Oracle".
6      MR. SOLOMON: Q. Let me put it another way.
7  Would it surprise you if, as of March 2001, the January
8  and February flash reports no longer existed in the
9  files of senior executives or management at Oracle?
10     MR. LINDSTROM: Objection. Assumes facts.
11     THE WITNESS: Senior executives like myself,
12 you mean? Or Larry Ellison or --
13     MR. LINDSTROM: It's compound also.
14     MR. SOLOMON: Q. I'm going to say -- let me
15 say I would say senior executives like yourself and
16 Larry Ellison. First of all, let's go with that. Would
17 it surprise you if senior executives like yourself and
18 Larry Ellison wouldn't have had, as of March in 2001, in
19 any of your files the flash reports for December 2000,
20 first of all?
21     MR. LINDSTROM: Assumes facts.
22     THE WITNESS: Again, it wouldn't surprise me.
23     MR. SOLOMON: Q. Okay.
24     A. I was sporadic in what I --
25     MR. LINDSTROM: You've answered the question.

337

1      MR. SOLOMON: Q. Now, what about all of the
2  direct reports to you and Mr. Ellison? Would it
3  surprise you if none of they, those people, had in their
4  files, as of March 2001, the January 2001 flash report?
5      MR. LINDSTROM: Assumes facts.
6      THE WITNESS: My direct reports. They
7  wouldn't all, but there might be someone that would have
8  it, sure.
9      Q. And the same answer for February 2001.
10     MR. LINDSTROM: Assumes facts.
11     THE WITNESS: These reports weren't
12 distributed to all my direct reports, first of all. But
13 there's one or two of them that were on distribution,
14 so --
15     MR. SOLOMON: Q. Same answer?
16     MR. LINDSTROM: Assumes facts.
17     MR. SOLOMON: Q. Would it surprise you that
18 of all the files that were searched in order to retrieve
19 documents for this litigation, none of those files,
20 apparently, contained any flash report for January 2001
21 or February 2001?
22     MR. LINDSTROM: Assumes facts.
23     THE WITNESS: Again, let's go back to your
24 definition of the flash report. What is that? What is
25 the flash report?

338

1      MR. SOLOMON: Let's have marked as the next
2  exhibit a document produced by the defendants with the
3  control numbers 088715 to 732.
4      (Whereupon, Plaintiff's Exhibit 61 was marked
5      for identification.)
6      THE WITNESS: Ah, this is the monthly actuals.
7  This is not a forecast. This is the monthly actual
8  results. So in this case, this is December.
9      MR. SOLOMON: Q. Ms. Guner has authored a
10 document, you're included as a recipient, and it's
11 called the December flash report, correct?
12     A. Yes. And I'm just telling you that it -- it
13 now rings a bell, but this was the actual historic
14 December.
15     MR. LINDSTROM: Can you stop asking questions
16 until we can get a copy of the document?
17     MR. SOLOMON: Calm down. It's fine.
18     MR. LINDSTROM: There seems to be some
19 confusion as to whether you and the witness are talking
20 about the same thing.
21     THE WITNESS: Okay. So I'm definitely --
22     MR. LINDSTROM: Wait. We're not going to
23 proceed until Counsel has a copy of the document. And
24 this is Exhibit 61, which we now have.
25     Thank you, Counsel.

339

1      MR. SOLOMON: You're welcome.
2      MR. LINDSTROM: You may proceed.
3      MR. SOLOMON: Q. Okay. So you have in front
4  of you what's called a December flash report, it's dated
5  January 17, 2001, and it's to you. It copies Ms. Catz,
6  Ms. Minton and Larry Garnick, and it's from Ivgen Guner,
7  correct?
8      A. Yes.
9      Q. And my questions -- my question -- the
10 question -- one of my questions was: Would it surprise
11 you to learn that the corresponding document for
12 January 2001 and February 2001 wasn't produced, because,
13 apparently, it doesn't exist in any of the files that
14 were searched for documents in this litigation?
15     MR. LINDSTROM: Assumes facts.
16     THE WITNESS: So are you asking me am I
17 surprised that it wasn't produced, or that you couldn't
18 find a copy of it?
19     MR. SOLOMON: That's a very good distinction.
20     MR. LINDSTROM: He's talking about -- I think
21 you're raising a good point, which is produced in this
22 context maybe vague and ambiguous. I think he's talking
23 about produced in the litigation. You may be talking
24 about produced at all; in other words, created.
25     MR. SOLOMON: Q. Two things: No. 1, would it

340

1 surprise you if it didn't exist as of March 2001 -- when
2 I say "it", I mean they, the January flash report --
3     A.  If I went over to accounting department at the
4 end of March or the end of April or something and said,
5 "Could you give me the previous two months, February and
6 January," or something, yeah, I would think they
7 probably would have those.  I can't be sure.
8     Q.  All right.  Well, I appreciate that.
9     A.  Yeah.
10     Q.  I appreciate that.
11         For whatever reason, it appears that we don't
12 have those documents, and we would request they be
13 produced by counsel, and we'll leave it at that for the
14 moment.
15     MR. LINDSTROM:  We'll take your request under
16 advisement.
17     MR. SOLOMON:  I will also add for the record,
18 so there's no one being misled, Ms. Kyrouz earlier
19 identified Exhibit -- I think it was 48, which is a
20 press release, that I had said did not appear to have
21 been produced by Defendants.  Apparently, that has been
22 produced, and Ms. Kyrouz has given me a Bates number for
23 that document.
24     MR. LINDSTROM:  I think you're referring to
25 49, Counsel.  I assume 48 is the depo transcript.

341

1     MR. SOLOMON:  It's 49.  I'm sorry.  It's 49.
2 However -- and I appreciate that.  However, it does
3 appear that we don't have those flash reports, and I do
4 want those produced.
5     MR. LINDSTROM:  Well, I don't know that they
6 even exist, but in any event, we'll take your request
7 under advisement and look into it.
8         Thank you.
9     MR. SOLOMON:  We'll have marked as next
10 exhibit a document produced by the defendants with the
11 control numbers 398302 to 311.
12         (Whereupon, Plaintiff's Exhibit 62 was marked
13         for identification.)
14     MR. SOLOMON:  Q.  Do you recognize this?
15     A.  Yes.
16     Q.  Okay.  And have you seen it before?
17     A.  I can't be certain, but certainly this is a
18 regular report we used to do.
19     Q.  And you say "we".  Who would have created this
20 report?
21     A.  Again, probably Ivgen Guner and her people, at
22 the time, were doing that.
23     Q.  And it's called a pipeline report for
24 reporting package.  Can you tell me what frequency this
25 package was created?

342

1     A.  I don't recall.  I don't recall.  Either --
2 whether it was weekly or biweekly.  It was more than
3 once a month.
4     Q.  Okay.  And you'll see that the pipeline growth
5 is the left-hand column, second from left at the bottom?
6     A.  Yes.
7     Q.  Now, did you have any understanding, as of
8 around the date of this document, December 11, 2000,
9 that deals were being entered into the pipeline under
10 different -- any different criteria than was in place
11 for the prior quarter -- for the prior quarter?
12     A.  I don't recall.
13     MR. SOLOMON:  Okay.  I'm going to have marked
14 as the next exhibit another document produced by the
15 defendants with the control No. 609550 and 51.
16         (Whereupon, Plaintiff's Exhibit 63 was marked
17         for identification.)
18     MR. SOLOMON:  Q.  Do you recognize this?
19     A.  I'm not sure if I can -- if I remember this.
20     Q.  Okay.  You don't dispute, though, that you
21 wrote it, the first string?
22     A.  Correct.  And factually, it is correct.  The
23 fact is that, historically, Q2 and Q3 were very similar
24 on EPS.
25     Q.  And you're referring to your language where

343

1 you say, "I think we should position the folks at the
2 call that historically, Q3 isn't a lot more EPS than
3 Q2...  So a penny more per share would seem right."  Is
4 that right?
5     A.  Uh-huh.
6     Q.  And do you know what the EPS was for Q2 that
7 fiscal year?
8     A.  I don't recall.  I'm looking at the second
9 page.  I can read that if you want.  It says 11 cents,
10 but I --
11     Q.  Okay.
12     A.  I don't recall.
13     Q.  Okay.
14     A.  Presumably, this is correct, I guess.
15     Q.  And so, therefore, consistent with your
16 assessment, if it was 11 cents in Q2, 12 cents in Q3
17 would appear reasonable to you; is that right?
18     A.  That's correct.  Historically, we either were
19 flat or up a penny or so.  So the results that came up
20 from the bottom seemed to make sense.
21     Q.  And, in fact, the true results for Q2 were 10
22 cents and not 11, then you would have inserted 11 cents,
23 rather than 12 cents for --
24     A.  Well, I certainly would have asked myself why
25 is it up more than a penny.  So that's for sure.  It

344

1  would definitely send out signals to me of, "Gee," you
2  know, "it's 2 cents too much."
3      Q.  And are you aware that if the accounting rules
4  had been followed for Q2 01, that Oracle would have
5  reported less than 11 cents per share?
6      MR. LINDSTROM:  Assumes facts, argumentative.
7      THE WITNESS:  Again, I think Oracle, to the
8  best of my knowledge, always followed the accounting
9  rules when I was CFO.  So I have no reason to believe
10  our quarter wasn't what it was.
11      MR. SOLOMON:  Q.  Okay.  If -- if Oracle's
12  pipeline was showing signs of softening in January of
13  2001, do you believe that would be information that any
14  reasonable investor at Oracle would want to know about?
15      MR. LINDSTROM:  Objection.  Calls for
16  speculation, no foundation.
17      THE WITNESS:  It depends on, you know, all the
18  interpretations of what's going on.  So we started, I
19  recall, with a pipeline that you presented to me that
20  was very, very high.  In fact, we didn't believe it
21  totally, so we went with a forecast that contemplated
22  that probably there would be some slowdown in the
23  pipeline growth as we went through the quarter.  So, you
24  know, if we positioned a growth target based on the
25  original pipeline, then that would be relevant,

345

1  absolutely.  It might indicate we would miss our
2  quarter.  But that wasn't the case.
3      MR. SOLOMON:  Q.  If, in January of 2001, the
4  Majors in your NAS division were seeing a slowdown,
5  would that be information that Oracle investors would
6  reasonably want to know?
7      MR. LINDSTROM:  Objection.  Calls for
8  speculation, no foundation.
9      THE WITNESS:  Again, I don't know what seeing
10  a slowdown means.  I really don't know what that means.
11  As I testified earlier, I routinely sat in the weekly
12  calls with George Roberts, who ran NAS, and the other
13  individuals, and we talked about the forecast.  Jennifer
14  Minton was there and Larry was there, 'cause I had been
15  concerned about the economy.  But they were steadfast in
16  their ability to deliver the quarter.
17      MR. SOLOMON:  Q.  If, as of January 2001, both
18  general business and Majors in your NAS division were
19  seeing a slowdown for both Q3 and Q4, do you believe
20  that would be information that a reasonable investor in
21  Oracle might want to know?
22      MR. LINDSTROM:  No foundation, calls for
23  speculation.  Assumes facts.
24      THE WITNESS:  Everything is relative to what
25  their expectations are already, what we've said.  So

346

1  it's not clear at all to me, you know, what -- without
2  seeing the information, without putting in context of
3  what their expectations were and so forth.  So --
4      MR. SOLOMON:  Q.  Their expectations would be
5  guided, do you agree, by the public statements and
6  statements you made to other analysts?
7      A.  We set out guidance, as I've testified
8  earlier, in that December call, earnings call for the
9  quarter.  So I agree that they had an expectation based
10  upon what we had said there.
11      Q.  And didn't you talk about no slowing in the
12  pipe and astounding pipeline and that sort of stuff?  Is
13  that how you recall describing the state of Oracle's
14  pipeline in December of 2000?
15      A.  Yes.  My recollection was we had come off with
16  a very strong November, and that things still looked
17  very good, and so we felt very bullish, despite the
18  economic signs that were out there.  And we talked about
19  that, as I testified earlier at length, about why we
20  thought our business and our pipeline still looked good.
21      Q.  And as of January, if the pipeline hadn't
22  grown as you had anticipated, would that be information
23  that a reasonable investor in Oracle might want to know?
24      MR. LINDSTROM:  Asked and answered, assumes
25  facts.

347

1      THE WITNESS:  I think I have answered that.
2      MR. SOLOMON:  Q.  Did you know, in January of
3  2001, that the pipeline for NAS was softening?
4      A.  I don't recall.  My recollection, as I've
5  testified earlier, was I was concerned about external
6  reports that were talking about a softening economy and
7  potentially affecting things, and as I said earlier, I
8  kept asking our guys, looking at reports, but I don't
9  remember what I -- you know, what the pipeline thing was
10  showing.  But I do know that after intense grilling, we
11  continued to, you know, believe that we could make our
12  quarter.
13      Q.  Did you know that general business and Majors
14  in NAS were seeing a slowdown for Q3 and Q4 in January
15  of 2001?
16      MR. LINDSTROM:  Assumes facts.
17      THE WITNESS:  Again, everything's relative.
18  Slowdown from what?  From what they saw at the start of
19  the quarter, from what they expected and we put out
20  publicly?  I mean, it's all -- it's a complicated
21  question that you're oversimplifying, I believe.
22      MR. SOLOMON:  I'll have marked as the next
23  exhibit a document produced by the defendants with the
24  control numbers 040617.
25      (Whereupon, Plaintiff's Exhibit 64 was marked

348

1    for identification.)
2        THE WITNESS: Okay. I've read it.
3        MR. SOLOMON: Q. Okay. Have you seen this
4  before?
5        A. I don't believe so.
6        Q. Do you know who David Winton is?
7        A. He was a financial manager or analyst in the
8  North American business.
9        Q. Did he work for you?
10       A. He worked in the organization. He didn't work
11  directly for me, but I can't remember if he worked for
12  Jennifer Minton or through somebody else to Jennifer
13  Minton.
14       Q. So he reported indirectly to you; is that --
15       A. He was in the finance organization, so he --
16  but he just didn't -- he was several levels below me.
17       Q. Okay. Now, you testified, in the last
18  session, that you did not, in Q3 of 2001, issue trading
19  clearances. Do you remember that?
20       A. Yes.
21       MR. LINDSTROM: Do you want to show him his
22  testimony?
23       MR. SOLOMON: Q. Do you remember that, first
24  of all?
25       A. I remember asking about Larry Ellison. I

349

1  don't remember about the broad thing 'cause I don't
2  recall. But if you want to show it to me, I'll take a
3  look at what I testified to.
4        Q. Okay. If you go to page 134 and 135.
5        A. Okay.
6        Q. And I'm just going to read into the record the
7  exchange.
8        MR. LINDSTROM: What line are you starting at?
9        MR. SOLOMON: Q. Line 20 on page 134.
10  "Sir, did you ever issue approvals to
11  trading?"
12  "Answer: I may have in the early days, yes.
13  In the early days of my tenure at Oracle,
14  before Dan's time, Dan Cooperman, general
15  counsel, I think I did get -- was a little
16  more involved where the general counsel and I
17  were on these e-mails, and I reached a point
18  years before this period, I think, where I
19  concluded that I wasn't adding any value. My
20  real value is just not the administration
21  side; it's if I know something, I will get
22  with the general counsel and we'll discuss it,
23  and if we agree, we'll stop trading."
24  "Question: So it's your testimony that in 3Q
25  '01 you were not involved in issuing approvals

350

1  for stock sales by insiders?"
2  "Answer: I don't believe I was. It's not my
3  recollection. There was a point where I was,
4  but I think by then I wasn't routinely in this
5  approval cycle."
6        Do you see that?
7        A. Yes, I do.
8        Q. Okay. Is that true?
9        A. I think that was accurate testimony. I don't
10  have any different recollection.
11       Q. Okay. Give me a second.
12       I'll have marked as the next exhibit a
13  document produced by the defendants with the control
14  numbers 039420.
15       (Whereupon, Plaintiff's Exhibit 65 was marked
16       for identification.)
17       MR. SOLOMON: Q. Do you recognize this?
18       A. Yes, I see it.
19       Q. Okay. And this reflects your involvement in
20  the approval process, yes?
21       A. Yes. In this case, one of our executives that
22  has to get approvals elected to send it to me and to Dan
23  Cooperman. I responded, but, I mean, the fact of the
24  matter is I don't think everyone routinely went through
25  me. But if somebody sent me a note, you know, I would

351

1  use that as a basis to sort of re -- you know, reaffirm
2  to Dan that I didn't know of any reason. But I don't
3  believe everyone, even in the -- they used to years ago.
4  I think by then, as I said in the testimony, I believe
5  they weren't all sent to me, but I...
6        MR. SOLOMON: Let's have marked as the next
7  exhibit another document produced by the defendants with
8  the control numbers 039430.
9        (Whereupon, Plaintiff's Exhibit 66 was marked
10       for identification.)
11       MR. SOLOMON: Q. Do you recognize this?
12       A. Yes.
13       Q. And this also reflects that you were involved
14  in the approval process.
15       A. Yes.
16       Q. Correct?
17       A. Yes.
18       Q. So, in fact, your testimony before was
19  inaccurate; isn't that true?
20       MR. LINDSTROM: He said "routinely". You
21  mischaracterized his testimony.
22       THE WITNESS: I said "I believe". I honestly
23  don't remember -- I guarantee you for the last number of
24  years I haven't been involved at all. There was a
25  period, as I testified previously, where I literally --

Henley, Jeffrey  11/16/2006  9:20:00 AM

352

1    I and the general counsel did everything.  And then when
2    Cooperman came in, at some point we transitioned to the
3    point that my job was to tell him if there was a reason
4    to stop trading because of financial issues, right?  And
5    so I phased out of that.  I don't recall exactly when I
6    did, but I think there was a period there in transition
7    where some people still thought I needed to approve it.
8    So they would send it to me and -- you know.  But that's
9    the best of my recollection.
10       MR. SOLOMON:  Q.  Okay.  If you look at -- and
11   I'm sorry.  I don't have the exhibit number at hand, but
12   if you look at the e-mail from David Winton to Jennifer
13   Minton that we spoke about a few moments ago.
14       MR. LINDSTROM:  64.
15       MR. SOLOMON:  Thank you, Greg.
16       THE WITNESS:  Yes.
17       MR. SOLOMON:  Q.  You'll see that under
18   heading 1 it says, "The pipe has not grown as we had
19   anticipated.  We are actually slightly down from
20   December and reporting."
21       Do you see that?
22       A.  Yes.
23       Q.  Now, today is the first time you're seeing
24   that; is that right?
25       A.  I think so.  I don't recall seeing this.

353

1        Q.  Okay.
2        A.  I wasn't shown as a copy, but --
3        Q.  So in -- is it fair to say, in granting your
4    approval for Mr. Nussbaum, you are unaware of what's
5    detailed against No. 1 here?
6        A.  I think that's right.  But even if I saw this,
7    it wouldn't have changed my position.
8        Q.  I'm sure that's going to be your position.
9        Under 2, it says, "Lack of big deals.  Unlike
10   Q1 and 2, we have a few big deals in best case" --
11   sorry.  "We have few big deals in best case that could
12   drive us past the 360 line."
13       Do you see that?  The $360 line.
14       A.  Uh-huh.
15       Q.  Now, were you aware of that at the time you
16   granted approval to Mr. Nussbaum?
17       A.  Again, I don't recall this note, and I don't
18   recall all the details of comments that George Roberts
19   or other people made.  I really don't.
20       Q.  Okay.  Under 3 it says, "Drop in technology."
21   It says, "As reflected in the softening pipe, both GB
22   and Majors see a slowdown in both Q3 and Q4.  GB's dot
23   bubble have burst," and parens, "(They expect the west
24   to end the year 30 to $40 million behind their original
25   budget for technology.)"

354

1        Do you see that?
2        A.  Yes.
3        Q.  Does that part of 3, were you aware of those
4    facts at the time you allowed Mr. Nussbaum to trade?
5        A.  I don't recall, other than I did, as I
6    testified earlier, get occasional pipeline reports which
7    had their numbers as part of the global numbers.  As I
8    testified earlier, we were skeptical of the strength of
9    the pipeline to start the quarter, so we did not make
10   all that into our forecast for the third quarter.  So
11   the fact that some of that pipeline growth slowed down
12   was not a big surprise.  We didn't expect it.  We would
13   have never forecasted 52 percent growth in license
14   revenue even if the pipeline said it.
15       Q.  And just in terms of your skepticism, what
16   drove your skepticism as to the strength of the
17   pipeline?
18       A.  It was just too good to be true.  In other
19   words, the pipeline is somewhat unscientific.  It
20   doesn't have perfect correlation.  We've looked at it
21   over the years, and it just -- it sounded great, but we
22   weren't going to get out there and set an expectation
23   based on a number that just seemed high.  We couldn't
24   get a good read from people, and so we just decided to
25   be more conservative, and sure enough, fairly quickly my

355

1    recollection was that the pipeline growth was still
2    good, but it slowed down a bit from what the original
3    numbers that you showed me here.
4        Q.  Carrying on in point 3, "Majors sees a
5    slowdown in spend along with smaller deal sizes."
6        Were you aware of that at the time of the
7    Nussbaum trade?
8        A.  I don't recall.  I had thorough conversations
9    at our executive committee with all the executives,
10   so -- I don't recall exactly all the details of what was
11   said.
12       Q.  And then it goes on to say, "Also, the change
13   in the ASP model for generic tech hosting, 11 C's,"
14   looks like, but you can tell me what that means, if you
15   know, "coupled with the dot-com crash is impacting
16   projected tech results in that segment."
17       Do you see that?
18       MR. LINDSTROM:  I don't think it's 11 Cs.
19       MR. SOLOMON:  What does it say, 11 --
20       MS. KYROUZ:  L-I-C.
21       MR. SOLOMON:  Thank you very much.
22       Q.  So I assume that's short for licenses?
23       A.  Licenses, I believe, sure.
24       Q.  So were you aware of those facts at the time
25   you allowed Mr. Nussbaum to trade?

Henley, Jeffrey  11/16/2006  9:20:00 AM

356

1   A.  I believe that we knew that the dot-com growth
2   was starting to change, absolutely.  Again, I don't see
3   this -- but George Roberts is a very honest guy.  I
4   think he represented a lot of detail about what he did
5   in his meetings with all of his people.  David, I think,
6   worked for him.  So I don't remember exactly all the
7   things that were done, other than we grilled all of our
8   executives intensively trying to be sure we had a good
9   sense of how we were going to do for the quarter and
10  whether we were going to make the quarter.
11      Q.  It's fair to say, is it not, that the
12  information here, with respect to the softening of the
13  pipe and the slowdown in GB and Majors, was non-public
14  information at the time; is that true?
15      A.  We did not publish interim pipeline data
16  publicly.  We didn't publish any pipeline data publicly,
17  never have.  And again, you're -- you're talking about a
18  relative change in growth rate.  It was still a very
19  healthy growth rate.  It just wasn't as strong as the
20  initial report, which we had discounted when we made our
21  forecast.
22      Q.  Because that was too good to be true?
23      A.  Yeah, it just didn't make sense, so we
24  decided, "Look, let's -- it's early.  A lot of times
25  there's cleanup that goes on in pipelines, and so let's

357

1   be more conservative based on trends, and we'll see how
2   it comes out."
3       Q.  Wouldn't another element of the conservative
4   approach and prudent approach have been to not allow
5   people to trade while in possession of this non-public
6   information?
7       MR. LINDSTROM:  Can we have that question
8   reread, please?
9       THE REPORTER:  I'm struggling with it myself.
10  I was going to ask him to say it again.
11      MR. SOLOMON:  Q.  Wouldn't another element of
12  the conservative approach you're talking about have been
13  to not allow people inside the company to trade while
14  the investing public didn't have this information?
15      MR. LINDSTROM:  Objection.  Argumentative.
16      THE WITNESS:  Well, then we would never trade
17  because we never give out that information.  So I don't
18  understand your point.  We never give out pipeline data.
19  We routinely generate it.  It was factored into our
20  forecast.
21      MR. SOLOMON:  Q.  Well, maybe you should never
22  trade if you're in possession of non-public information
23  that would affect the public's --
24      MR. LINDSTROM:  Objection, argumentative.
25      MR. SOLOMON:  Q.  Well, is that funny?

358

1       A.  It is funny.
2       Q.  Why is that funny?
3       A.  It is funny.  No company can take a position
4   that they can never trade stock because they know
5   information.  Our professional responsibility is to
6   interpret all this information and create guidance for
7   the investing public that we think, based on our history
8   and knowledge, is a good proxy for what's going to
9   happen and put all the appropriate caveats around it.
10  That, we did.  And again, I testified that we were
11  conservative because we were skeptical that that
12  pipeline would do as well as it did, and sure enough, it
13  slowed down a bit.  It still exhibited very good growth,
14  but not as good as originally.
15      So what I always used to tell people they want
16  to -- can't trade from a financial standpoint is if I
17  know that we're going to miss our quarter, cause I know
18  that will upset the market, right?  So this data on OSO
19  had nothing to do -- wasn't in conflict with the
20  forecast that we had been using or continued to use
21  throughout that quarter.
22      MR. LINDSTROM:  All right.  Why don't we -- if
23  this is a good time, why don't we take a break for
24  lunch.
25      MR. SOLOMON:  Certainly.

359

1       (Recess taken from 1:07 to 1:44 P.M.)
2       MR. SOLOMON:  Okay.  I'll have marked as the
3   next exhibit a document produced by the defendants with
4   the control numbers 297772 through 73.
5       (Whereupon, Plaintiff's Exhibit 67 was marked
6       for identification.)
7       MR. SOLOMON:  Q.  Have you seen this before?
8       A.  I don't believe so.
9       Q.  I'm sorry?
10      A.  I don't believe so.
11      Q.  Do you know who Jim English is?
12      A.  Yes.
13      Q.  Who is he?
14      A.  He's a person that works in the finance
15  organization.  Again, I don't know if he worked directly
16  for Jennifer or one level below her.
17      Q.  And did he work within any particular division
18  at Oracle?
19      A.  At this time, based on the accounts he's
20  talking about, I believe he worked in the strategic
21  accounts in North America.
22      Q.  And you'll see that in the second full
23  paragraph, the last sentence says, "We have a lot of
24  pipe at challenging clients."  Do you see that?
25      A.  No, I'm trying to figure out where --

360

1  Q. Second paragraph. The last sentence of that
2  paragraph. Okay. The first paragraph begins, "When you
3  asked for a forecast."
4  A. Yes.
5  Q. Second one begins, "We are holding at" --
6  A. Yes, I got it. I got it. "We have a lot of
7  pipe at challenging clients." Right.
8  Q. Do you know what that means?
9  MR. LINDSTROM: Objection. Calls for
10  speculation, no foundation.
11  THE WITNESS: I would only be speculating.
12  MR. SOLOMON: Q. Okay. And what do you
13  speculate it means?
14  MR. LINDSTROM: Same objections.
15  THE WITNESS: Well, again, these are typically
16  our larger, more complicated accounts. The sales cycle
17  is just more complicated and complex.
18  MR. SOLOMON: Q. That's what "We have a lot
19  of pipe at challenging clients" means to you?
20  A. What it means to me is that we have a lot of
21  pipeline, but we've got to work through complicated
22  sales cycle to get home, get it done.
23  Q. Okay.
24  A. It's my speculation, again. I didn't write
25  this.

361

1  Q. And as of January 17th, 2001, were you aware
2  of a sentiment within Oracle that there was a lot of
3  pipe at challenging clients?
4  A. Again, I don't think I got the note, and I'm
5  only speculating what that even means. So no, I don't
6  think I was aware of this.
7  Q. If you skip below the first three bullet
8  points to the next sentence, it reads, "Our best is at
9  220 million, which is a real stretch as several of these
10  deals will be Q4." Do you see that?
11  A. Yes.
12  Q. And do you know what the "real stretch" means?
13  MR. LINDSTROM: Objection. No foundation,
14  calls for speculation.
15  THE WITNESS: Typically, there's a range of
16  possibilities that they talk about within the sales
17  teams, kind of high, low, medium, that sort of thing.
18  It sounded like that was the high side of where they
19  probably thought they could land.
20  MR. SOLOMON: Q. Okay. And then you'll see
21  the next sentence reads, "One AVP talked of starting to
22  see indications of client delays on decisions."
23  Do you see that?
24  A. Again -- yes.
25  Q. And were you aware, as of this date, the 17th

362

1  of January, 2001, that one of your AVPs was talking
2  about indications of client delays on decisions?
3  A. No, again, I'm not aware of that.
4  Q. Now, were you concerned in January that
5  analysts may rock the boat for Oracle? January of 2001.
6  MR. LINDSTROM: Objection. Vague and
7  ambiguous.
8  THE WITNESS: I don't recall, you know, being
9  concerned about what analysts did. Our job is to go out
10  and deliver the numbers. But I can't influence
11  analysts. They're going to write what they're going to
12  write. So, no, I don't recall being concerned.
13  MR. SOLOMON: Okay. I'll have marked as the
14  next exhibit a document produced by the defendants with
15  the control No. 014044 through -- excuse me. That's the
16  only number. 014044.
17  We'll move on to another exhibit and get
18  copies of this for you. So if you can just hold off.
19  While we're waiting for that other exhibit,
20  we'll mark another document produced by Defendants with
21  the control No. 013415 to 418.
22  MR. LINDSTROM: So will this be 68?
23  MR. SOLOMON: Let's make this 68, and we'll
24  make the other one 69 when it arrives.
25  (Wherefore, Plaintiff's Exhibit 68 was marked

363

1  for identification.)
2  MR. SOLOMON: Q. While you're looking at it,
3  you'll see it's dated the 17th of January, 2001, and
4  it's from Larry Garnick to a number of people, including
5  yourself.
6  A. Yes.
7  Q. Have you seen this before?
8  A. Again, I don't recall, but typically, I was --
9  I'm shown on here. Typically, I got these every month.
10  Usually, I got them and looked at them.
11  Q. Okay. When was the last time you looked at
12  this document?
13  A. This document? I don't recall.
14  Q. You'll see, if you turn over to the second
15  page of the document, that there is -- there are a
16  number of columns, and in the middle of the columns on
17  the second page there's a column entitled "Percent
18  Growth in U.S. Dollars." Do you see that?
19  A. Yes.
20  Q. And do you see, under license organization,
21  there's a reference to Nussbaum and OSI. Do you see
22  that?
23  A. Yes.
24  Q. And do you see that in the percentage growth
25  in U.S. dollars, there's a negative 81 percent there?

364

1    Do you see that?

2       A.   Yes.

3       Q.   Okay.  And were you aware, at or around the

4    date of this report, of OSI reporting a negative growth

5    rate in U.S. dollars of 81 percent?

6       A.   I don't recall.  But as I've previously

7    testified, the first month of any quarter is not

8    particularly meaningful.  It tends to be very small.

9       Q.   But regardless of that comment, you don't

10   recall --

11      A.   I don't recall whether I saw plus 81 or plus

12   or minus 81, or plus 82 later in the column.  I don't

13   recall any of this.

14      Q.   Okay.  Now, it's fair to say, isn't it, that

15   the investing public, as of January 17, 2001, would not

16   know of this negative 81 percent trend reflected here?

17      A.   That's correct.

18      Q.   And the same for Roberts and NAS.  You see

19   there's a negative 24 percent there.  Do you see that?

20      A.   Yes.

21      Q.   And do you see that -- sorry.  You agree that

22   the investing public wouldn't have that information as

23   of the middle of January 2001?

24      A.   That's correct.

25      Q.   And do you remember whether you had that

365

1    information?

2       A.   Again, I don't recall whether I went through

3    every line of detail on this report.

4       Q.   Okay.

5       A.   So I just don't recall.

6       Q.   And then under Sanderson and OPI, you see a

7    positive there of 243 percent.  Do you see that?

8       A.   Uh-huh.

9       Q.   And were you aware of that in the middle of

10   January of 2001?

11      A.   I was aware of the Covisint transaction having

12   been concluded.  So I was aware that that created, you

13   know, a big effect for him in that month.

14      Q.   Okay.

15      A.   I don't remember the precise number.

16      Q.   Okay.  Do you know what the -- what that

17   figure would have been if you backed Covisint out?

18      A.   No.  I would have to go look at the document.

19   Offhand, I don't know.

20      Q.   Would it surprise you to learn that it would

21   be in the negative 80 percent or more?

22      A.   It's positive, it's possible, just like

23   252 percent positive in Smith.  I mean, there's all

24   sorts of things in first months of quarters.  You

25   just -- it's not particularly indicative of how your

366

1    quarter will do, as I testified earlier.

2       Q.   Okay.  It gets more indicative as the quarter

3    goes, is your testimony; is that right?

4       A.   I said it's somewhat more indicative after

5    two quarters, but I said at the end of the day, the real

6    numbers happen in the third month, and particularly in

7    the last week of the quarter.  That's what I said

8    earlier.

9       Q.   Okay.  Now, if you'll go to the first page,

10   you'll see that there's a reference to, in the first

11   bullet point, to license revenue growth.  Do you see

12   that?

13      A.   Yes.  The first bullet?  Yes.

14      Q.   Yes.  And you'll see the last sentence says,

15   "Excluding Covisint, OPI license revenue growth would

16   have been negative 85 percent."  Do you see that?

17      A.   Yes, I do.

18      Q.   Okay.  Now, did you have anything to do with

19   the creation of this document?

20      A.   No.

21      Q.   Did you discuss this document with anybody

22   around the time you received it?

23      A.   I don't recall.

24      Q.   And did you discuss with anybody, either

25   before the creation of this document or afterwards, the

367

1    exclusion of Covisint to show what rates would have been

2    applicable without the Covisint deal?

3          MR. LINDSTROM:  Vague and ambiguous.

4          THE WITNESS:  Ask the question again.

5          MR. SOLOMON:  Q.  I guess what I'm trying to

6    get at is:  Did you talk about why Mr. Garnick backed

7    out of Covisint to show you that negative 85 percent?

8       A.   I don't recall, but --

9          MR. LINDSTROM:  You've answered the question.

10         THE WITNESS:  I don't recall.

11         MR. SOLOMON:  Q.  And do you have an idea as

12   to why he would have done that?

13      A.   I can speculate.

14      Q.   Go ahead.

15      A.   Standard financial analysis at Oracle was to

16   do all kinds of supplemental analysis to try to look at

17   different trends.  So we all knew Covisint was very

18   large, and so I think it's not the only time in our

19   history where we've kind of taken things out and said,

20   "Well, it would have been with and without," and that

21   sort of thing.  So that was the purpose of it.  I think

22   he did it on his own.  It's not something I instructed

23   him to do, but it was a typical analytic technique that

24   we use from time to time.

25      Q.   And you said, just to quote your language, you

368

1    do the analysis to try and look at different trends.
2    And why would you want to look at different trends?
3        A.   Particularly in the first month of a quarter,
4    which I've already testified, is small, that was a large
5    transaction.  So that would distort the growth.  So we
6    wanted to make sure we understood that without that,
7    what the trend would be.  He wanted to show -- make sure
8    we understood that.  Nevertheless, it is in the
9    forecast, it is now an actual and it was clearly going
10   to happen for the quarter.  So --
11       Q.   Okay.  And then -- okay.  We'll leave it at
12   that for the moment.  Thank you.
13           And now we'll have marked as 69 the document
14   that I mentioned earlier with the control No. 014044.
15       (Whereupon, Plaintiff's Exhibit 69 was marked
16        for identification.)
17       THE WITNESS:  Okay.
18       MR. SOLOMON:  Q.  Okay.  Do you recognize
19   this?
20       A.   Again, no, I don't recall it, but --
21       Q.   Okay.  It's from Sandy Sanderson to Tom Thimot
22   and others, but I don't see that you're a recipient.
23   But it does refer to you.
24           Do you see the reference to you?
25       A.   Yes, I did.  I did read that.

369

1        Q.   And it says, "The quarter looks good.  I spoke
2    to Jeff Henley about this.  He said the market is so
3    tenuous right now, and one analyst can rock the boat."
4            Do you see that?
5        A.   I do see that.
6        Q.   Did you say those things?
7        A.   I have no idea how I characterized what he
8    told me.  This is merely what his take on it was.
9        Q.   Did you have a view, in the fall of 2000, that
10   the market was tenuous?
11       A.   Again, I have no idea what I told Sandy or
12   what I thought, but any -- so that's the answer.
13       MR. LINDSTROM:  Correct.
14       THE WITNESS:  I'm not supposed to keep
15   speculating more and more.
16       MR. SOLOMON:  Q.  Okay.  What about having the
17   belief that one analyst could rock the boat, did you
18   have that belief in the fall of 2000?
19       A.   Again, I don't remember what I told him, but
20   any time, particularly when an influential analyst
21   writes something negative or something, it can influence
22   adjusters.  So -- but I have no idea what I told him.
23       Q.   Okay.  And then you'll see below that it says,
24   "Tom Thimot wrote:  Our tech numbers should be stronger,
25   not weaker.  Is there an overall weakness in some other

370

1    part of Oracle?"
2            Do you see that?
3        A.   Yes.
4        Q.   Do you recall that question being asked in the
5    fall of 2000?
6        A.   Again, I don't recall any of this being asked
7    of me.  So --
8        MR. SOLOMON:  I'll have marked as the next
9    exhibit a document produced by the defendants with the
10   control range 003447 through 463.
11       (Whereupon, Plaintiff's Exhibit 70 was marked
12        for identification.)
13       MR. SOLOMON:  Q.  If you'll just take a look
14   and let me know if you recognize it, Mr. Henley.
15       A.   I recognize the format, sure.  It's a -- I
16   don't know if I -- I'm looking for a date, even.  I'm
17   not sure.
18       Q.   If you go to control No. 003463, you'll see
19   there's a --
20       A.   It says it was Q3 fiscal '01.  So that we
21   know.  I certainly recognize the format.  It's a
22   standard report put out, again, by Jennifer Minton.  But
23   whether I remember this specific version of it or
24   something, I don't recall.
25       Q.   Okay.  Let's have marked -- hold on a second.

371

1            Okay.  Marked as the next exhibit a document
2    produced in litigation by the defendants with the
3    control numbers 606383 through 606688.
4        (Whereupon, Plaintiff's Exhibit 71 was marked
5         for identification.)
6        MR. LINDSTROM:  This appears to be a couple
7    hundred pages.  What do you want him to do with that?
8        MR. SOLOMON:  Q.  Yes, this is the first
9    transcript of your deposition in a derivative case,
10   Mr. Henley, and I want you to just have that in front of
11   you for a moment because I'm going to talk to you about
12   that, and I'm going to talk to you about the previous
13   exhibit, which is the upside report.  Now, you'll see
14   that on page 003459 where it says "upside" at the
15   bottom, there's a reference to 29.  Do you see that?
16       A.   459?
17       Q.   Yes.  459.
18       A.   Yes, I see at the bottom.
19       Q.   Okay.  Now, is it -- am I right in saying that
20   this appears to be the upside report for January 29th,
21   2001?
22       MR. LINDSTROM:  No foundation, calls for
23   speculation.
24       THE WITNESS:  Yeah, I have no idea.  I see
25   that it says 1 underscore 29 something, but I don't know

372

1   if that's what it means or --
2        MR. SOLOMON: Q.  Okay.  If you go to page 265
3   of the deposition transcript --
4        A.  265?
5        MR. LINDSTROM:  And again, for identification,
6   this is Exhibit 71, the derivative deposition, not
7   Exhibit 48, right?
8        MR. SOLOMON:  Yes.
9        THE WITNESS:  265?
10       MR. SOLOMON: Q.  Yes, please.
11       A.  Okay.
12       Q.  Okay.  You'll see that at line 19 there's the
13   following question.  It reads, "Okay.  And if we look at
14   the January -- the December 8th report, the figure for
15   total revenues is 175,000 for upside.  If we look for
16   December," then it says, "January 15th, that number has
17   dropped to 104,910."
18       Do you see that?
19       A.  I do see that.
20       Q.  And you say that's correct?
21       A.  I see that.
22       Q.  Now, if you go to the next page, 266 of that
23   transcript --
24       A.  Yes.
25       Q.  -- you'll see there's a reference at line 17,

373

1   question, "And if we look now to the January 29th upside
2   report, Exhibit 134, the number -- Ms. Minton's judgment
3   has dropped here to 54,940, I believe."
4        Do you see that?
5        A.  Yes.
6        Q.  Now, if you go to the flash report that's next
7   to you there, and look at page No. 0 --
8        A.  I don't think it's -- it's not the flash
9   report.
10       Q.  I'm sorry.  The upside report.  Excuse me.
11       A.  Exhibit 70, right?
12       Q.  Yeah, go to page 003448.
13       A.  448.  Yep.
14       Q.  If you look in the revenue column to the last
15   line at the top, you'll see "Year to date FY01 upside"
16   towards the right-hand side of the document, and a
17   figure of 54,940.  Do you see that?
18       A.  For total revenue.  Yes, I do see that.  It
19   says, actually, 9 -- I think 54,945, I think, is what it
20   says.
21       Q.  Okay.  And then if you look at the next page,
22   there's another reference -- and you're quite right.
23   It's more clear on the next page, 003449 --
24       A.  449, uh-huh.
25       Q.  Do you see that?

374

1        A.  Yes.
2        Q.  Now, at that stage, then, when -- on
3   January 29th, 2001, Ms. Minton is reporting that upside
4   reduction to 54,945.  Did you, then, believe that Oracle
5   was now in a horse race as to whether or not it could
6   make its Q3 forecast?
7        MR. LINDSTROM:  Objection.  Vague and
8   ambiguous.
9        THE WITNESS:  Again, I don't recall whether
10   using the word "horse race", but clearly, we're now down
11   kind of tight to what we had indicated when we had our
12   earnings call.  So now there's no margin for safety, if
13   you will, but we've been in this situation before.
14       MR. SOLOMON: Q.  Was it a horse race?
15       MR. LINDSTROM:  Objection.  Vague and
16   ambiguous.
17       THE WITNESS:  I don't know.  I don't know what
18   a horse race means, or if I said it, you know.  I can
19   try to describe to you, you know, what I think it meant,
20   I guess, but I don't know.  I don't recall using the
21   word.
22       MR. SOLOMON: Q.  Okay.  So if you're looking
23   at -- we're still looking at page 266, and let's read
24   your answer.  "Well" -- you say at the very bottom of
25   the page, "Well, yeah, now you're getting down to the

375

1   point where she's forecasting, in this case, 24 percent
2   growth."
3        Do you see that?
4        A.  Uh-huh.
5        Q.  Then over the page you start another answer at
6   line 4, and you say, "So I mean now we've had many
7   quarters where we're forecasting virtually what we've
8   ended up doing.  Sometimes a little bit less, we end up
9   doing a little bit less, a little bit more.  But surely,
10   I have less.  She's now forecast numbers much closer so
11   that when you get equal now, that's why I say the last
12   month of the quarter you start thinking, "Wow," you
13   know, "this is more of a horse race."
14       A.  Okay.  Again, I have no idea --
15       MR. LINDSTROM:  There's no pending question.
16       MR. SOLOMON: Q.  Okay.  What did you mean?
17       A.  Again, I said -- as I testified earlier, I'm
18   not sure what I meant, but I can speculate.
19       Q.  I don't need you to speculate on what you
20   meant, sir.
21       A.  Fine.  So I can't tell you what I meant.
22       Q.  You can only speculate what you think we and
23   you can't tell me what you meant, then I think we're in
24   trouble, aren't we?
25       MR. LINDSTROM:  Objection.  Argumentative.

376

1  He's already answered the question.
2     MR. SOLOMON: Q.  So after this upside report
3  on January 29th of 2001, what did you do, if anything,
4  to ensure that Mr. Ellison was complying with the
5  federal securities laws concerning insider trading?
6     A.  I didn't do anything.  If I --
7     MR. LINDSTROM: You've answered the question.
8  If he wants to ask a follow-up question, he will.
9     MR. SOLOMON: Q.  And that's because it was
10  okay -- even though you thought it was a horse race, it
11  was okay for Mr. Ellison to continue trading; is that
12  right?
13     MR. LINDSTROM: Objection.  No foundation,
14  mischaracterizes his testimony.
15     MR. SOLOMON: Q.  Your answer?
16     A.  My answer?
17     Q.  Uh-huh.
18     A.  Again, there was no basis for me to believe,
19  definitively, that we would miss the quarter.  It would
20  be tight.  We've been through this, as I testified in
21  that deposition in the past; we've had tight forecasts,
22  and it could be up a little bit, up/down a little bit,
23  but I saw no reason to think we were going to have any
24  material miss to the quarter at that point in time.
25  Therefore, I didn't say anything to Dan Cooperman or

377

1  Larry Ellison or anybody else.
2     Q.  Now, the investing public didn't know, on
3  January the 29th of 2001, that one of Oracle's most
4  senior executives was characterizing Oracle's ability to
5  make the quarter as a horse race?
6     MR. LINDSTROM: Objection.  Mischaracterizes
7  the testimony given later.
8     THE WITNESS:  Again, I'm reading what I said.
9  I said many quarters we ended up very close to where we
10  were forecasting.  So to use, you know -- it was now
11  down to, you know, precisely how we would end up, but
12  that's a far cry from saying we would miss the quarter.
13     MR. SOLOMON: Q.  But the investing public
14  didn't know that that's what you were down to, did it?
15     A.  We never get into what our forecasts are
16  when -- many quarters when we were right on our number
17  that we ended up doing.
18     Q.  The investing public was still going on your
19  statements that the pipeline was astounding and had
20  never been stronger, right?
21     MR. LINDSTROM: Objection.  Argumentative, no
22  foundation, calls for speculation.
23     THE WITNESS:  I think the investing public
24  relied on what we said in that quarterly call, and I
25  changed and added the wild card a few weeks later in the

378

1  later things to say, you know, we heard things about the
2  economy, we still -- you know, we still think things are
3  okay, but it's a wild card.  So I think that's the only
4  new piece of news that I added after the earnings call
5  that we did in December.
6     MR. SOLOMON: Q.  But with a softening
7  pipeline and the decreasing upside and requirement that
8  you -- your conversion ratio be better than ever to make
9  the quarter, all of those together represent information
10  that was in your possession and not in the possession of
11  the investing public in January of 2001; isn't that
12  right?
13     MR. LINDSTROM: Assumes facts.  And also calls
14  for speculation as to the knowledge of the investing
15  public.
16     THE WITNESS:  I think I've answered your
17  question several times.  So I don't know what you want
18  me to do with the question.
19     MR. SOLOMON: Q.  Well, you say that the
20  economy was a wild card, and that's what you were saying
21  at the time.  But it's true, isn't it, that as of
22  January 29, 2001, you knew of -- that the pipeline
23  growth was reducing?
24     A.  Was growing at a lesser rate than I thought
25  was probably overstated when we started the quarter.

379

1  That's correct.
2     Q.  You knew there were negative trends and NAS,
3  OSI and OPI?
4     A.  I didn't testify I knew there was negative
5  trends.  I said I didn't see all those e-mails.  I
6  grilled George Roberts and Sandy Sanderson and everybody
7  else about how things were, and they continually came
8  back that they weren't seeing the softness.  They read
9  the economic report just like I did, but customers were
10  still going to do these high ROI projects.  They felt
11  good about making their quarter.
12     Q.  Okay.  You say you didn't see those e-mails.
13  You knew Mr. Ellison saw those e-mails.
14     MR. LINDSTROM: No foundation.  Calls for
15  speculation.
16     MR. SOLOMON: Q.  Do you know if
17  Mr. Ellison saw them?
18     A.  I don't know what Mr. Ellison saw, no.
19     Q.  So as far as you know --
20     A.  But I know that Mr. Ellison sat through the
21  executive committee meetings, and he heard my questions,
22  he would ask questions.  There was a lot of back and
23  forth around all the executives in these weekly meetings
24  to try to get a sense for how the quarter was doing, and
25  that's typical a lot of times, but particularly because

380

1  we heard about these concerns of the economy, we kept
2  pressing the management, the sales management to see if
3  things were still looking good.
4       Q.  When you say you didn't see all these e-mails,
5  what e-mails are you particularly referring to?
6       A.  The ones you presented to me earlier and asked
7  me had I seen them, I wasn't copied, and I said I didn't
8  recall seeing them.
9       Q.  Okay.  So you saw the Garnick January 17th,
10  2001 e-mail, right?
11       MR. LINDSTROM:  Can we have a reference to the
12  specific exhibit?
13       THE WITNESS:  The flash report?
14       MR. SOLOMON:  Q.  Correct.
15       A.  Again, I'm certain I received it.  I don't
16  recall looking at it, but I'm certain I received it.
17  That was kind of routine.
18       Q.  So you were aware of the negative trends
19  reflected in there?
20       A.  In the actuals for December?
21       Q.  Correct.
22       MR. LINDSTROM:  Assumes facts.
23       THE WITNESS:  Again --
24       MR. LINDSTROM:  Mischaracterizes the
25  testimony.

381

1       THE WITNESS:  I don't know how many more times
2  you want me to say the same thing.  I've said this so
3  many times about the first month of a quarter and what
4  it means or doesn't mean.
5       MR. SOLOMON:  Q.  Let's go to -- I'll have
6  marked as the next exhibit a document produced by the
7  defendants with the control numbers NDCA-ORCL 03281 --
8  excuse me -- yeah, 03281 through 2977.
9       (Whereupon, Plaintiff's Exhibit 72 was marked
10       for identification.)
11       MR. SOLOMON:  So it's through 03311.
12       Q.  I'm going to represent to you that this is a
13  transcript of a Goldman Sacks conference attended by
14  Sandy Sanderson.  I don't necessarily expect you've seen
15  this before.
16       Do you recall seeing it before?
17       A.  I don't recall seeing it.
18       Q.  And then if I can direct you to control
19  No. 03309, which is page 29 of the document.
20       A.  0 --
21       Q.  3309, or the original page No. 29.
22       A.  29.  Let me try that.  03309.  Okay.  Yes.
23       Q.  Now, I want to read an answer, or at least
24  part of an answer given by Mr. Sanderson.  It says,
25  "We're actually -- I guess I'd start out by saying that

382

1  our pipelines are -- at application and database have
2  never been stronger.  And that continues to be the
3  case."
4       Do you see that?
5       A.  Where in this --
6       Q.  I'm sorry.  I started at line 18 on the
7  original page 29 of the document.
8       A.  Yes, I see that.
9       MR. LINDSTROM:  He's read part of that answer.
10       THE WITNESS:  I just read that particular
11  thing starting on 18.
12       MR. SOLOMON:  Correct.
13       MR. LINDSTROM:  And he wants to know if you
14  see that.
15       THE WITNESS:  Yes, I do see that.
16       MR. SOLOMON:  Q.  Okay.  Now, "Pipelines at
17  application and database never been stronger, that
18  continues to be the case," was that a true statement in
19  December of 2000?
20       A.  December of 2000.  I believe that our
21  pipelines were, for that point of time, the highest they
22  had been.  Absolutely.
23       Q.  Was that a true statement in January 2001?
24       A.  January 2001?
25       MR. LINDSTROM:  No foundation.

383

1       THE WITNESS:  I would have to look at the
2  data, but -- again, I would be speculating.  I remember
3  when you showed me a report here for December, I would
4  have to go back and look at January to be certain, I
5  guess.
6       MR. SOLOMON:  Q.  Was your pipeline as strong
7  in January as it was in -- 2001 as it was in
8  December 2000?
9       A.  Well, that's a question of what "stronger"
10  means.  Is the issue, what does "stronger" mean?  Does
11  it mean larger than it was the year before in January?
12       Q.  All right.  So let's go back to the line of
13  questioning.  You think it's true, as of December 2000,
14  you can't, without more information, tell me if it was
15  true for January 2001; is that right?
16       A.  Right, 'cause we've already reminded myself,
17  looking at the September -- excuse me -- the December
18  report, that we had 52 percent in total and higher ups,
19  whatever.  So, you know, without being sure and looking
20  at January.
21       Q.  Okay.  Let's put it this way:  If there had
22  been a decline in pipeline growth --
23       A.  If the growth rate were somewhat lower than
24  the 52 percent?
25       Q.  Yes.  Correct.  Would that statement still be

384

1 true?
2          MR. LINDSTROM:  Calls for speculation, no
3 foundation.
4          THE WITNESS:  Yeah, it could well be,
5 absolutely.
6          MR. SOLOMON:  Q.  Tell me how.
7     A.   Because, again, everything is relative.
8 Everything is relative to where you are in the course of
9 a quarter, historically how much your -- the absolute
10 size of the pipeline at that point in time.  So the
11 pipelines typically come down over the course of a
12 quarter because deals slip and so forth.  So you
13 wouldn't expect the pipeline to be as large at the end
14 of January as it is at the end of -- as it is starting
15 out in December, for instance.  I mean, so it's a
16 very -- but I think his statement is accurate in that we
17 were still seeing a very strong pipeline.  Things looked
18 very good.
19     Q.   Okay.  Now --
20          MR. LINDSTROM:  Counsel, can you make a
21 representation as to when this conference occurred, or
22 when the statement was made?
23          MR. SOLOMON:  I can't right now, but I will
24 endeavor to.
25     Q.   Now, as of -- let's ask the question for

385

1 February now.  Would this be true in February of 2001?
2     A.   And again, we're assuming he's making these
3 statements in that period of time, right?  Again, I
4 would have to go see the information to be sure.
5     Q.   You don't know is the answer?
6     A.   I don't know.  I don't know without going back
7 and looking at the data.
8          MR. SOLOMON:  Okay.  Let's have marked as the
9 next exhibit a document produced by the defendants with
10 the control numbers 141794 and 95.
11          (Whereupon, Plaintiff's Exhibit 73 was marked
12          for identification.)
13          THE WITNESS:  Okay.
14          MR. SOLOMON:  Q.  Okay.  Have you seen this
15 before?
16     A.   I don't recall seeing it.
17     Q.   Okay.  And you see it's by TheStreet.com and
18 it's entitled "Goldman Conference:  Its Stock Weak,
19 Oracle Talks of Strong Business."
20          Do you see that?
21     A.   Yes.
22     Q.   And you'll see that there's a reference in the
23 top third left-hand portion of the first page to
24 "Conference Coverage Goldman Sachs."  Do you see that?
25     A.   Yes.

386

1     Q.   It seems to indicate the conference took place
2 February 12 to 15.
3          MR. LINDSTROM:  It speaks for itself, the
4 document.
5          MR. SOLOMON:  Q.  Do you see that?  And you'll
6 see that three quarters of the way down the page there's
7 language that says -- quoting Sanderson saying,
8 "Actually, our pipelines around applications and
9 database have never been stronger."
10          Do you see that?
11     A.   Yes.
12     Q.   And this appears to be the same language that
13 we just read from the previous exhibit.  Do you see
14 that?  So as of February 12 to 15, it's simply not true,
15 is it, Mr. Henley, that the pipelines at Oracle around
16 applications and database had never been stronger?
17     A.   I simply, as I answered earlier, I don't
18 recall what the pipelines were.  So I don't know.
19     Q.   You'll see, if you go to the second page, the
20 first full paragraph beginning "Insider", it says,
21 "Insider selling by Ellison has also hung on Oracle's
22 stock lately.  But Sanderson said the CEO had to sell
23 shares recently because they were tied to options that
24 would expire if he didn't."
25          Do you see that?

387

1     A.   Yes.
2     Q.   That's not true, is it?
3          MR. LINDSTROM:  Objection.  No foundation.
4          THE WITNESS:  Which isn't true?
5          MR. SOLOMON:  Q.  The options weren't going to
6 expire in January 2001 if Mr. Ellison didn't sell, were
7 they?
8          MR. LINDSTROM:  Mischaracterizes the document.
9          THE WITNESS:  Yeah, again, I don't know what
10 he said specifically and, you know, what these guys say.
11 So I don't know exactly what he said.
12          MR. SOLOMON:  Q.  And then it goes on to say,
13 "But Sanderson couldn't address the subsequent
14 scuttlebutt in the market that Ellison, who has a
15 penchant for jets and sailing yachts, was selling the
16 shares to buy a new boat."
17          Do you see that?
18     A.   I do see that.
19     Q.   Do you know why Mr. Ellison sold his shares in
20 January of 2001?
21     A.   I have no idea why he picked a specific point
22 in time to sell shares, no.
23     Q.   Okay.  And do you know what the purpose of the
24 sale was?
25     A.   No, absolutely not.

388

1  Q. And then it goes on to say, "'You know, we
2  don't talk about that stuff,' Sanderson said. 'It's
3  amazing, when you're with Larry, all he does is work.'"
4  Do you see that?
5  A. Yes.
6  Q. Is that a fair reflection; when you're with
7  Larry, all he does is work?
8  A. Is that -- is that Sandy's perception,
9  or what?
10  Q. No, is that consistent with your perception in
11  the 2000/2001 time frame?
12  A. It's no different than me or anybody else. He
13  clearly has another life than just working.
14  MR. SOLOMON: Okay. Okay. Let's go off the
15  record for five minutes.
16  (Recess taken from 2:33 to 2:41 P.M.)
17  MR. SOLOMON: We'll mark as the next exhibit a
18  document produced by the defendants with the control
19  numbers 061311 through 315.
20  (Whereupon, Plaintiff's Exhibit 74 was marked
21  for identification.)
22  MR. SOLOMON: Q. You'll see that you are
23  apparently involved in at least some of these exchanges,
24  so once you've had a chance to look at the document, let
25  me know if you recognize any of the exchanges, please.

389

1  A. Yes, I remember not all the details, but I do
2  remember receiving this from Julie and sending it on to
3  Larry.
4  Q. Okay. And on that first page you make
5  reference to comments at an EC meeting. Do you see
6  that?
7  A. Yes.
8  Q. What were the comments you were referring to?
9  A. "Per your comments at the EC meeting that you
10  wanted to know everything I'm passing along." So I
11  think Larry was -- you know, gets feedback from the
12  sales force, and he said if there's any issues, let me
13  know. So I think that was the spirit of me passing this
14  along to him.
15  Q. And was that any issues with respect to
16  anything in particular, or just generally, any issues?
17  A. I think this had to do with the 11i release,
18  which was new at that point.
19  Q. Okay. And then if you go to the third page of
20  the document, it has your name at the top and it says,
21  "Oracle, Jeff Henley," and then it says, "From Sandy
22  Sanderson to Julie Cullivan." Do you see that?
23  A. I see that. I don't know why it says "Oracle
24  Jeff Henley" at the top. She sent a note to me, I
25  think. The previous page is kind of like what I would

390

1  expect, so I'm not sure why it says "Oracle Jeff Henley"
2  at the top. Other than that, I mean, I think she sent
3  this long note to me from the previous, and then I
4  forwarded it on to Larry.
5  Q. And the note that we're looking at now, the
6  page with the control No. 061313 starts off with Sandy
7  Sanderson apparently saying, "Wow. I have sent this to
8  Ron and Mark. I know this may cause some pain, but they
9  need to hear this. I am sure they're not indicating
10  these issues to their management. Let's hope this gets
11  them motivated to fix these issues."
12  Do you see that?
13  A. Yes.
14  Q. And the issues that are being referred to are
15  the issues listed by Julie Cullivan in the e-mail below;
16  is that right?
17  MR. LINDSTROM: The document speaks for
18  itself.
19  THE WITNESS: Yeah, I think the document is
20  what it is.
21  MR. SOLOMON: Q. And Julie Cullivan had
22  written, in part, "Sandy, per your request, the
23  consistent themes continue to be poor performance,
24  inability to prove our EBusiness Suite integration
25  story, and product stability/quality issues."

391

1  Do you see that?
2  A. Yes.
3  Q. Were you aware that those were consistent
4  themes at the very beginning of February 2001?
5  A. Consistent themes. I was certainly aware that
6  we were still in the early shakeout stage of 11i, and I
7  heard comments from a variety of people inside the
8  company that, you know -- but whether those were
9  characterized by everyone as the consistent themes, I
10  don't know.
11  Q. If you -- if you look at the itemization under
12  Order Management and Configuration, the itemization
13  there of problems, were you aware of those as of the
14  beginning of February 2001?
15  MR. LINDSTROM: We're talking about in the
16  demonstration environment, or generally with the
17  product?
18  MR. SOLOMON: Q. Just as reflected in this
19  e-mail.
20  A. These apparently reflect the OPI demonstration
21  environment. I was certainly -- I can't remember when
22  she forwarded this to me. February 22. So I don't know
23  if I was aware of this on February 21. I doubt it.
24  But, I mean, certainly when she forwarded it to me, I
25  became aware of her position of -- and she was one of