392

1  our sales consultants that did demos.
2    Q.  If you look at CRM, go over to the next page,
3  in capital letters it says "Cannot show a complete
4  integrated CRM demo, let alone a complete EBiz Suite,
5  (CRM/ERP) integrated demo.
6      Do you see that?
7    A.  Uh-huh.
8    Q.  Were you aware of that as of the beginning of
9  February 2001?
10    A.  Again, I can't remember if I heard about it
11  before I got her note later in February.
12    Q.  Now, do you agree that an inability to
13  demonstrate a product would result in a -- would result
14  in more difficulty in selling the product?
15    A.  It can't be helpful.
16    Q.  And all of these problems itemized here as of
17  the beginning of February 2001, with the demonstration
18  of the E Business Suite, were not disclosed to the
19  investing public at the time, were they?
20    A.  I can't remember what we told the investment
21  public, but I know that when we launched the product, I
22  think the people who follow the company clearly
23  understand there is a shakeout period, when you do new
24  releases, of getting initial trials and shaking out bugs
25  and all that sort of thing.  And we did say this is a

393

1  very comprehensive major new release and so forth.  So I
2  think what we were experiencing at that point was
3  clearly some of the growth pains that you go through
4  with major new releases like this.  We haven't done many
5  in the history of Oracle this comprehensive.
6    Q.  Okay.  You started off answering, "I can't
7  remember what we told the investing public."  And is
8  your answer, then, you don't know whether these problems
9  were disclosed at the time to investing public or not?
10    A.  Well, I'm sure we never got into --
11      THE REPORTER:  I'm sorry.  You guys are
12  talking over each other.
13      MR. SOLOMON:  Q.  You started out saying that
14  you can't remember whether you told the investing
15  public.  Is your testimony that you simply don't know if
16  the investing public was told of these problems as
17  reflected in this e-mail at around the time of the
18  e-mail?
19    A.  Oh, I don't know, but I can almost be certain
20  that we would never go through this level of detail
21  just -- it wouldn't occur to me to --
22    Q.  What about, "Hey, we can't demonstrate our
23  product very well without problems"?  Was that
24  disclosed?
25    A.  I can't remember.  But I think we were clear,

394

1  when we started, it was an ambitious project and it
2  would take a few quarters to shake down and get it
3  stabilized and so forth.
4    Q.  In fact, around the time these problems were
5  being discussed internally at Oracle, the message to the
6  investing public was that the product was stable,
7  pre-integrated and interoperable out of the box and it
8  snapped together, wasn't it?
9      MR. LINDSTROM:  Assumes facts,
10  mischaracterizes the document.
11      MR. SOLOMON:  Q.  Is that funny?
12    A.  I think she is -- well, I think you're trying
13  to, again, put words in -- you know, oversimplify
14  things.  I think that we were able to demo the product,
15  but as Julie pointed out, it was not fully shaken out
16  yet.  We still had problems.  We were still getting all
17  the pieces to work well together, and some of the
18  functionality, as she points out, didn't work as well as
19  it would ultimately work as we shook out the product.
20      So we've gone through several issues like this
21  over the years, and you never get into bearing all of
22  this out to the investing public, let alone our
23  customers.  We don't get into detailed discussions of
24  what works or what doesn't work.  But clearly, we were
25  very clear that it was a very complex major new

395

1  revolutionary kind of release that we were very
2  confident would be successful, but there was a shakeout
3  period.
4    Q.  Does Mr. Ellison believe that being reckless
5  is a key to success?
6      MR. LINDSTROM:  No foundation, calls for
7  speculation.
8      THE WITNESS:  Again, I have no idea.
9      MR. SOLOMON:  Q.  Have you ever heard him say
10  anything to that effect?
11    A.  No, I've never heard him say that being
12  reckless was an ingredient to success.
13    Q.  Would you be surprised to hear that he said
14  that?
15    A.  Again, everything is out of context.  I have
16  no idea if he ever said it.  So I would have to hear the
17  whole context and everything else to figure out whether
18  I'm surprised or not.
19    Q.  Was the release of 11i, in May of 2000,
20  reckless?
21    A.  Was it reckless?  I think it was aggressive.
22  I think we very much wanted to get it out, and I think
23  that there was more optimism on the part of the
24  development teams and Larry, in terms of how long it
25  would take to shake it out.  But I will not characterize

396

1    that as reckless because we knew it was a big
2    complicated release and there would be some amount of
3    bugs and problems.
4         Q.  And you knew that it wouldn't be a revenue
5    driver for at least a couple of years; is that true?
6         A.  That's not true.
7         MR. SOLOMON:  Let's have marked as the next
8    exhibit a document produced by the defendants with the
9    control No. 618166 to 169.
10        (Whereupon, Plaintiff's Exhibit 75 was marked
11         for identification.)
12        MR. SOLOMON:  Q.  Once you've had a chance to
13   look at it, please let me know if you recognize it.
14        A.  Again, I can't recall whether I saw this or
15   not.  But again, this is a long list of -- long e-mail
16   describing for, in this case, I guess -- hmm.  James
17   McHugh.  Is that to James McHugh from, again, a person
18   involved in demos?  Her assessment of the state of demos
19   and some of the issues and so forth.
20        Q.  The previous document was concerning Sandy
21   Sanderson and OPI; is that right?
22        A.  Yes.  Yes, she was in Sandy's organization.
23        Q.  And this one appears to be NAS; is that right?
24        A.  I'm not sure.
25        Q.  When it says "Demo update for George," does

397

1    that indicate --
2         A.  Well, it is, but I think -- my recollection
3    was Gayle also did some work with Sandy.  So I -- but I
4    just -- it definitely says "Demo update for George,"
5    who, I think, would be George Roberts.
6         Q.  Okay.  Now, the -- I'm now going into the
7    third page of the document, and you'll see that there's
8    an e-mail exchange at the top, "Subject:  Urgent, demo
9    update for George."
10        Do you see that?
11        A.  Yes.
12        Q.  It's dated the 10th of January, 2001, and it's
13   to Antony Cioletti, Lee Paulino, Grant Franjione and
14   Mary Delaney.
15        Do you see that?
16        A.  Yes.
17        Q.  Do you know any of those people?
18        A.  I think the only person I met occasionally was
19   Grant.  And the other ones don't ring a bell.
20        Q.  And where did he work within --
21        A.  He was in sales.
22        Q.  For what division?
23        A.  I think in George Roberts' sales division.
24        Q.  Okay.  And it starts off saying, "At the OPS
25   review today, the demo environment came up again.  I owe

398

1    George by Friday a current writeup on our issues so he
2    can discuss with Larry at next week's EC meeting."
3         Do you see that?
4         A.  Yes.
5         Q.  Now, do you recall an executive committee
6    meeting the week after this, the week after the 10th of
7    January 2001, involving Larry Ellison?
8         A.  I don't recall a specific meeting, but I do
9    recall, from time to time over the years, different
10   people commenting on our products, including demo
11   environment, and I definitely remember people
12   complaining about issues with the early demos of 11i.
13        Q.  Okay.  And then back to the first page of the
14   document, there are six itemized product demonstration
15   difficulties.  Do you see those?
16        A.  Uh-huh.
17        Q.  Were you aware of those difficulties as of
18   January 12, 2001?
19        A.  Again, I can't remember -- recollect whether I
20   got this, and I can't recollect what details were
21   discussed, but I certainly was aware that the field had
22   issues with the demos, and it had been talking to Larry
23   about it and the development heads and so forth.
24        Q.  And again, these difficulties were not items
25   that the investing public was alerted to?

399

1         MR. LINDSTROM:  No foundation.
2         THE WITNESS:  Again, certainly I didn't
3    communicate that.  We've had --
4         MR. LINDSTROM:  You've answered the question.
5         MR. SOLOMON:  Q.  I'll have marked as the next
6    exhibit a document produced by the defendants with the
7    control numbers 012439 to 441.
8         (Whereupon, Plaintiff's Exhibit 76 was marked
9         for identification.)
10        MR. SOLOMON:  Q.  Tell me if you recognize
11   this.
12        A.  I don't believe so.
13        Q.  And were you aware, around the end of
14   January 2001, beginning of February, that there was a
15   sentiment that Oracle had blown APSWorld with respect to
16   its demos?
17        MR. LINDSTROM:  Objection.  Mischaracterizes
18   the document.
19        MR. SOLOMON:  Q.  Go ahead.
20        A.  I don't recall hearing anything about the
21   demos for AppsWorld Paris.
22        Q.  Were you concerned that because of these
23   difficulties, as reflected in the various e-mails in
24   demonstrating the product, that Oracle was blowing a
25   huge opportunity?

400

1    A.  Let's see.  I was certainly concerned that not
2  having optimum demos was not helpful, and that it would
3  suboptimize, you know, our revenue opportunity.  So
4  certainly, like all of management anxious to see these
5  problems, you know, work themselves out and get
6  resolved, 'cause that could only make things better for
7  us.
8    Q.  And, in fact, even in April of 2001, you were
9  of the view that Oracle was risking blowing the
10  opportunity of a lifetime because of demo problems with
11  11i; is that right?
12    MR. LINDSTROM:  Vague and ambiguous.
13    THE WITNESS:  Again, I would have to go back
14  and look at what I said, but I think that it's true that
15  it took us longer with each passing month to kind of get
16  everything stabilized, certainly longer than I ever
17  thought it would take.
18    MR. SOLOMON:  Q.  You said you were blowing
19  the opportunity of a lifetime, didn't you?
20    A.  Don't know.  You would have to refresh my
21  memory and see it.  But I certainly got frustrated, as
22  time went on, that we didn't seem to get all the pieces
23  really working optimally, and that was -- if it
24  continued for a long period of time, it would definitely
25  be a very serious problem for us.

401

1    MR. SOLOMON:  I'll have marked as the next
2  exhibit a document produced by Defendants with the
3  control numbers 061369 through 373.
4    (Whereupon, Plaintiff's Exhibit 77 was marked
5      for identification.)
6    MR. SOLOMON:  Q.  Do you recognize this?
7    A.  Again, not particularly.  But I -- the format,
8  I mean, for a while George was forwarding, I think at
9  Larry's request, these weekly reports so that, you
10  know -- so everybody could see whether we were making
11  progress or not.  And clearly, after looking at this for
12  a few weeks, I got frustrated because, as I testified
13  earlier, if this were to continue, just carry forward,
14  not making progress, this is not good.
15    Q.  And that's your language, "Absolutely
16  incredible.  We're blowing the opportunity of a
17  lifetime."  This is your language, right?
18    A.  It's what I wrote.
19    Q.  So that's your language?
20    A.  Absolutely.
21    Q.  All right.
22    A.  But I tried to put it in a little bit more
23  context as to why I would say something like that in my
24  earlier testimony.
25    Q.  This is just more of the same.  This is the

402

1  story in May of 2000, June, July, August, September,
2  October, November, December, January 2001, February,
3  March, April.  That's the story, isn't it, with the 11i?
4  This isn't new.
5    MR. LINDSTROM:  Compound, argumentative, vague
6  and ambiguous.
7    THE WITNESS:  I don't know that we -- I don't
8  know when we launched 11i, but I think it was the summer
9  of 2000 when we launched it, and we -- I remember
10  distinctly we all saying, "This is going to take a few
11  quarters to sort itself out.  It's a big release," and
12  so forth.
13    What got frustrating was here in April, you
14  know, still struggling with some of these issues.  So I
15  was not surprised, in the first few quarters, to see the
16  initial sort of teething problems, if you will.  The
17  level of frustration for all of us, I think, got more in
18  this time frame now where we're starting to see, you
19  know -- still having problems.  So this period was a
20  very acute period where we were really honing in on why
21  haven't these things started to stabilize?  Here we are
22  in April, and we don't seem to make enough progress now.
23  You would expect by now that things would have
24  stabilized better.
25    So that was the frustration.  And if you don't

403

1  fix these things, clearly, we're going to blow this
2  opportunity, so we've got to get on with it.  And I said
3  that to Larry; we were all frustrated, as was Larry.  We
4  were working hard to resolve these problems.
5    MR. SOLOMON:  Q.  It's fair to say that when
6  you and Mr. Ellison traded your stock in January of
7  2001, that you and Mr. Ellison were aware of all of
8  those sorts of problems, but the investing public was
9  not.
10    MR. LINDSTROM:  Compound, no foundation.
11  Argumentative.  Actually, it also calls for speculation
12  as to what the investing public knew about 11i.
13    THE WITNESS:  I'll stipulate that I certainly
14  knew more about 11i than the public did.  I think that's
15  quite natural, of course.
16    MR. SOLOMON:  Q.  And you knew information
17  that was adverse?
18    A.  Yes, but as I said earlier, at that stage, it
19  wasn't that shocking to still be having a lot of
20  problems stabilizing all this code and getting these
21  demos right.  It was really more in the spring.  By the
22  time the spring came around, it just seemed like we were
23  still fighting with issues that should have been
24  resolved several months before.
25    Q.  Okay.  Let's have marked as the next exhibit

404

1  another document produced by the defendants in the
2  litigation with the control No. 052474.
3          (Whereupon, Plaintiff's Exhibit 78 was marked
4          for identification.)
5          MR. SOLOMON:  Q.  Just let me know if you
6  recognize that.
7      A.  No, not particularly.  I don't think I'm
8  copied on it.
9      Q.  Did you have any discussions with
10  Ms. Balkenhol concerning her frustration with this
11  product?
12      A.  I don't recall, no.  I don't know what product
13  it is.  WEBREQS, apparently.
14      Q.  You don't know what module that is?
15      A.  Yes, I think I know what it is.  I think she's
16  referring to a self-service product that was called
17  WEBREQS.
18      Q.  And is that part of 11i?
19      A.  Yes.
20      Q.  And were you aware that she was encountering
21  problems?
22      A.  I can't recall.
23      Q.  Let's have marked as the next exhibit a
24  document produced in the litigation with the control
25  numbers 397378 through 397380.

405

1          (Whereupon, Plaintiff's Exhibit 79 was marked
2          for identification.)
3          MR. SOLOMON:  Q.  Let me know, when you've had
4  a chance to look at it, if you've seen this before.
5      A.  I don't recall ever seeing this, no.
6      Q.  Do you have any idea where it comes from?
7      A.  Again, I would only be speculating.  It's not
8  clear.
9      Q.  What's your speculation?
10          MR. LINDSTROM:  Objection.  Calls for
11  speculation, no foundation.
12          THE WITNESS:  It doesn't look like something
13  Oracle generated, no.
14          MR. SOLOMON:  Q.  Do you think it came from
15  Siebel?
16      A.  It seems like it.  The person keeps talking
17  about Siebel, so...
18      Q.  And do you recognize any of the handwriting
19  throughout this document?
20      A.  No.
21      Q.  Have you looked at each page just so you're
22  sure you don't recognize any?
23      A.  Again, I'm not a handwriting expert, so no,
24  I -- I don't believe I recognize anybody's handwriting
25  here, no.

406

1      Q.  Okay.  And without -- I accept that you say
2  you haven't seen the document before.
3          Have you discussed, with anybody, Siebel
4  making accusations that Oracle lied or misrepresented
5  the condition of its products?
6          MR. LINDSTROM:  In the way it's suggested in
7  Exhibit 78?
8          MR. SOLOMON:  Q.  In the way it's suggested,
9  Correct.  Yes, thank you.
10      A.  No, I didn't listen to Siebel earnings calls,
11  or whatever, but I am aware that they frequently said
12  they never saw Oracle in their deals.  Those things
13  were reported -- and I never listened to one of their
14  calls, but it was reported to me that they always
15  pooh-poo'd the degree of competition we were creating,
16  and analysts would say that to us.  But I don't recall
17  any of these specific examples.
18          MR. SOLOMON:  I'll have marked as the next
19  exhibit a document with the control numbers 1029900 to
20  32070.
21          (Whereupon, Plaintiff's Exhibit 80 was marked
22          for identification.)
23          MR. SOLOMON:  Q.  When you've had a chance to
24  look at it, let me know if you recognize these
25  exchanges, or any of them.

407

1      A.  Again, I don't remember the e-mail, but I
2  definitely remember calling on Zone Technologies, which
3  is in the Bay Area, with the sales representative for
4  Baker, and I think that's why I was probably copied on
5  this.  It shows me as a copy.
6      Q.  Did you have a particular role with respect to
7  Zone Technologies?
8      A.  Just a sort of executive relationship going
9  out and getting to know them and trying to figure out
10  what we could be helpful and that sort of thing.
11      Q.  That would be the executive sponsor?
12      A.  Yeah, that's the term we use inside the
13  company.
14          MR. LINDSTROM:  So Mark, before you proceed
15  further, let me just get some clarification from you.
16          The last page, this may not be intended to be
17  part of this Exhibit 79, but there's a big jump in the
18  Bates stamp numbers.
19          MR. SOLOMON:  Thank you.  Thank you for that.
20  What we'll do is just take off that last page and make
21  it Exhibit 81.  So if you can make the document with the
22  control No. 1032070 the Exhibit 81, and Exhibit 80 is
23  now comprised of control numbers 1029900 through 9905.
24          (Whereupon, Plaintiff's Exhibit 81 was marked
25          for identification.)

408

1	THE WITNESS: And also, this looks like a
2	duplication. Is that what this is? It looks like --
3	it's a different type, but it looks like the fourth page
4	on is a repeat of the first three. If it is, I don't
5	have to read it.
6	MR. SOLOMON: It looks like it. I agree.
7	Q. So the first iteration of the document is on
8	control numbers 1029901 and 02, and then the -- what
9	appears to be a copy of the same language is 1029903 and
10	04; is that right?
11	A. Yes.
12	Q. Okay.
13	A. That's what it looks like to me.
14	Q. And then if you look at what is now
15	Exhibit 81, you'll see in there there's a reference to
16	you as Zone's executive sponsor. Do you see that?
17	A. Yes.
18	Q. Okay. Now, I know this isn't dated, but maybe
19	we can deduce a date, maybe we can't, but it says
20	that --
21	Well, let's read the first part of it into the
22	record. "Drew and Chris, not sure if you've been
23	involved with Zone Technologies to date. Jeff Henley,
24	Zone's executive sponsor, is meeting with Zone's CFO to
25	discuss a number of issues associated with their

409

1	implementation of Oracle applications. At the top of
2	Zone's list of concerns is their belief that there are
3	functional deficiencies in our application software."
4	Do you see that?
5	A. Yes.
6	Q. Now, do you recall discussing with someone at
7	Zone their concern that the application software
8	suffered from functional deficiencies?
9	MR. LINDSTROM: I assume you're talking about
10	11i, right?
11	MR. SOLOMON: Correct.
12	MR. LINDSTROM: As opposed to other
13	applications, such as the ones referenced in the
14	previous exhibit?
15	THE WITNESS: And apparently, these particular
16	two modules were management and Oracle Service.
17	MR. SOLOMON: Q. Say it again.
18	A. Apparently, it related to these two
19	application modules, Oracle management and Oracle
20	Service.
21	Q. And are you saying that that's not part of
22	11i?
23	A. No, no, but I'm just saying there's a whole
24	variety of modules, these particular two, apparently,
25	and I don't recall. I met them when we were going out

410

1	to win the account. And in reading this, I don't recall
2	the sequence, but in reading it, it sounds like
3	Elizabeth wanted me to go back out and meet with them to
4	help, you know, sort out their concerns, I guess. So
5	I'm not sure until I saw this note from her that I was
6	aware that there were some issues. And then reading it,
7	I said I would be happy to go out and talk to them, but
8	we needed to get the development guys, Mark Berrenechea
9	and so forth, to tell me what's going on. I don't know
10	what to represent. I don't know what our position is.
11	Q. Now, do you recall the time frame in which you
12	had the meeting in which the functional deficiencies was
13	raised?
14	A. Pardon me?
15	Q. I know your counsel's trying to draw your
16	attention to something in the document. I don't know
17	what it is.
18	MR. LINDSTROM: I'm wondering why you're
19	asking him questions about 11.03 and not 11i. In other
20	words, I don't understand what the point of this is.
21	THE WITNESS: That's true. I didn't read
22	that. Hmm.
23	MR. LINDSTROM: They're different products.
24	MR. SOLOMON: I'm listening.
25	THE WITNESS: Apparently, this particular

411

1	situation was 11.0. So that was the earlier product,
2	and we were replacing that now with 11i.
3	MR. SOLOMON: Q. That's right. This was part
4	of an implementation of 11i to replace 1103. Is that
5	not right?
6	A. I don't know. I would to have read this whole
7	thing.
8	MR. LINDSTROM: Why don't you read the whole
9	thing because I know counsel wants your most accurate
10	testimony.
11	MR. SOLOMON: Q. When you get to the point
12	where you disagree, if you disagree with your counsel,
13	let me know, Mr. Henley.
14	MR. LINDSTROM: Well, he's going to have to
15	read the whole document before he can answer that
16	question, Counsel.
17	THE WITNESS: Fortunately, it's two pages, I
18	guess, so I'm on the second page.
19	Okay. So my fast read of two pages.
20	MR. SOLOMON: Q. Yeah.
21	A. I don't read in here that the talk is about
22	they want to go to 11i. Clearly, at some point they
23	would, but it seemed like this related to some issues
24	they were having with 1103. That seems to be what this
25	relates to. I mean, there is one thing in here about

412

1  11i, expectations of improvements, and then anticipation
2  of 11i is further.  But I don't think there's any
3  mention of when that was planned to happen or be
4  implemented.
5      Q.  So you don't know if it was happening at the
6  time of this e-mail or not; is that true?
7      A.  It certainly doesn't sound like it.  It
8  certainly sounds like they were on 1103 and still not
9  happy, and they were trying to get some escalation in
10  development to deal with these issues.
11      Q.  Okay.  Did Zone purchase, from Oracle 11i,
12  modules?
13      A.  Again, I read it fairly quickly, but it
14  seemed -- she said that they had implemented the ERP
15  stuff in record time.
16      Q.  And were those 11i?
17      A.  It doesn't say.  So my assumption was probably
18  1103, and under your -- when you buy 1103 11.0, you have
19  the right to upgrade.  So I'm guessing that probably
20  they were still on 11.0 for financials.
21      Q.  But you can't -- you don't know unless I can
22  show you something else?
23      A.  I don't know, but if they bought 1103, that
24  would give them the right to upgrade at no charge under
25  their support agreement for like modules in 11i.

413

1      Q.  Okay.  There's a reference on what is control
2  No. 1029901 to the special report section of the daily
3  CRM manage go live report.
4      A.  Okay.
5      Q.  Do you know what that is?
6      A.  No.
7      Q.  Do you recall what happened with your business
8  relationship with Zone?
9      A.  No.
10      MR. LINDSTROM:  Objection.  Vague and
11  ambiguous.
12      THE WITNESS:  I have no recollection.
13      MR. SOLOMON:  Okay.  I'm going to have marked
14  as the next exhibit a document produced by the
15  defendants in this litigation with the control numbers
16  061297 and 298.
17      (Whereupon, Plaintiff's Exhibit 82 was marked
18      for identification.)
19      MR. SOLOMON:  Q.  And once you've had a chance
20  to look at it, I want to know, first of all, if you
21  recognize it.
22      A.  Again, I don't recall it.  There's one from
23  William Plant where I'm copied, and I'm copied down here
24  on the second part of this, so I must have received it.
25      Q.  Okay.  I'm just going to focus, at least

414

1  initially, on the first page of the document, and if you
2  look at the bottom on the first page, there's an
3  exchange from Larry Garnick to Jennifer Minton and to
4  you.
5      Do you see that?
6      A.  Yes.
7      Q.  And it says, in part, "The oddity is Europe
8  where server is way up and apps are way down.  Trending,
9  you would expect 55 to $60 million in apps revenue in
10  Europe, but actual was CD 38 million.  The apps forecast
11  was 45 million.  We compared actuals to forecast by
12  country and found that all countries except the UK and
13  Emerging Territories came in under forecast for apps.
14  Conversely, server actuals were above forecast in
15  75 percent of the EMEA countries.  It does not appear to
16  be an error coming from one or two countries, but does
17  need explaining.  Thoughts, William."
18      Do you see that?
19      A.  Yes.
20      Q.  Then above, Sergio Giacoletto writes, "I have
21  a simple, internal only, explanation.  Given the R11i
22  problems in Q1/Q2, many of our salespeople decide to
23  focus on technology to make their quota and wait for the
24  product to be stable.  Ciao."
25      Do you see that?

415

1      A.  Yes.
2      Q.  Now, were you aware, in Q3 '01, that
3  salespeople in Europe were holding back on 11i because
4  it was not stable?
5      A.  Again, I don't recall this note or whatever.
6  Sergio has been with us a long time, and I'm sure that's
7  a theory he put out there.
8      Q.  Do you know why he said "internal only" as to
9  the explanation?
10      A.  No.
11      Q.  And did you tell the investing public that
12  Oracle had missed its apps revenue numbers in Europe in
13  Q3 '01?
14      A.  I don't recall.  This note -- this note would
15  have been after Q3, so as you know, 'cause you looked at
16  all these documents, we had a pre-announcement call,
17  then we had a long call after that at the quarterly
18  call, and I honestly don't remember what we said, but we
19  typically broke out applications and technology by
20  geography.  So there at least would have been actual
21  results.  Whether we commented on how that compared to
22  our forecast, I doubt it.  But we always showed actuals
23  by geography and so forth.
24      Q.  But not by product line?
25      A.  No.  Applications versus technology, database,

416

1  we've had that format for many years. I believe we were
2  doing it by then in our public quarterly earnings call
3  where we comment on the most recent quarter.
4     MR. SOLOMON: Okay. And I'd like to have
5  marked as the next exhibit another document produced by
6  the defendants in this litigation with the control
7  numbers 063478 through 063480.
8     (Whereupon, Plaintiffs' Exhibit 83 was marked
9        for identification.)
10     MR. SOLOMON: Q.  Let me know if you recognize
11  this.
12     A.  No, I don't recall it. I think I'm copied on
13  it.
14     Q.  Were you aware, during Q3 of '01, that Oracle
15  was having great difficulty finding any happy
16  referenceable customers for the 11i?
17     MR. LINDSTROM: You're asking him during Q3
18  '01?
19     MR. SOLOMON: Q.  Correct.
20     A.  I'm not aware of the status. We didn't have a
21  lot of live accounts, but that was growing each quarter,
22  and we were reporting that each quarter, how many new
23  live accounts we had. But how many of them were
24  referenceable or not, I don't recall on that.
25     Q.  Now, who is Mark Jarvis?

417

1     A.  He, at that time, I believe, was running
2  marketing, worldwide marketing for Oracle.
3     Q.  Okay. I'm looking at No. 4 on the 1st page
4  and it reads as follows: "We brief some financial and
5  industry analysts on the status under", in quotes,
6  "'nondisclosure' on the basis that their inside
7  knowledge of how focused we are on this may help pour a
8  little water on the fire. At least the press will have
9  less negative to quote."
10     Do you see that?
11     A.  Uh-huh.
12     Q.  What do you think of that suggestion?
13     MR. LINDSTROM: Objection, irrelevant. Calls
14  for a conclusion.
15     THE WITNESS: I believe he said that and was
16  doing that, apparently.
17     MR. SOLOMON: Q.  Did you approve?
18     A.  I had nothing to do with Mark's part of the
19  business. He doesn't report to me. I don't get
20  involved in marketing, per se, but --
21     Q.  Were you senior to Mark Jarvis at the time?
22     A.  I think at that stage Mark reported to Larry.
23  So I'm older.
24     Q.  That didn't mean senior, in essence.
25     A.  But I think we both reported to Larry at that

418

1  time.
2     Q.  So you think you were laterals?
3     A.  I believe so. I believe we both reported to
4  Larry at the time.
5     MR. LINDSTROM: And the time you're talking
6  about is March 26, 2001?
7     MR. SOLOMON: Right.
8     THE WITNESS: And I'm guessing, 'cause I don't
9  remember, but at one point I believe that Mark reported
10  to Larry. So if he did, that meant that we both
11  reported to Larry and we were both peers, if you will,
12  in terms of we both reported to the same boss.
13     MR. SOLOMON: Q.  Now, just help me with this.
14  You testified that you didn't get into discussions with
15  analysts intra-quarter about what was going on at the
16  company because I believe you didn't think it
17  appropriate; is that right?
18     MR. LINDSTROM: Mischaracterizes his
19  testimony.
20     MR. SOLOMON: Q.  Is that right or wrong?
21     A.  Ask me the question again.
22     MR. LINDSTROM: Do you want to reread it?
23     MR. SOLOMON: No, just help me with this.
24  You testified that you didn't get into discussions with
25  analysts intra-quarter about what was going on at the

419

1  company because I believe you didn't think it
2  appropriate; is that right?
3     A.  Yeah, I didn't get into financial discussions
4  with customers after we did arrange call for the current
5  quarter. I testified that ad nauseam, yes.
6     As I read this, this is something different.
7  He does say financial analysts, but my understanding of
8  market is they mostly worked with industry analysts, the
9  Gartners and these people.
10     Q.  Yes, but he's talking about both.
11     A.  I know he is. I understand what he read. I'm
12  just telling you my understanding of their function. I
13  had investor relations reporting to him, he had industry
14  relations reporting to him. So I don't know. Perhaps
15  he did talk to some -- unbeknownst to me, talked to some
16  financial analysts, or got reports from them, or
17  whatever.
18     Q.  What I'm getting at is when I read this to you
19  and asked you what you thought about the suggestion, you
20  basically seemed to say, "Nothing to do with me, he's my
21  lateral, I don't tell him what to do, it's fine." Isn't
22  that, in summation, what you were trying to tell me?
23     MR. LINDSTROM: Mischaracterizes his testimony
24  and the document.
25     THE WITNESS: Right. So again, try it again

420

1  of what you want me to say.
2      MR. SOLOMON:  Q.  Is this not inconsistent
3  with your testimony earlier today that, as far as you're
4  concerned, when you talk to financial analysts
5  intra-quarter, it's inappropriate to talk about what's
6  going on at the company.
7      A.  I think if the -- I think if the industry
8  analysts group that reported to Mark and/or Mark himself
9  met with Gartner or IDC or all these various industry
10  analysts who have nothing to do with financial
11  projections, right, and they talked to big user bases
12  and they're reporting to Mark that customers are up in
13  arms, they're mad about this or mad about that, that's
14  Mark's job.  It has nothing to do with quarterly
15  financial reports or anything like that.  And so at
16  least on the industry analyst, you know, and if he's
17  friends with or knows a few financial analysts that pass
18  on information and there's a document here from Charles
19  Phillips who was at Morgan Stanley at the time, that,
20  apparently, Mark got or something, then, you know, for
21  him to say, you know, "Gee, here's some financial
22  analysts saying some of the same things."  This had
23  anything to do with the quarterly financials; it was
24  feedback from what they were hearing from customers.
25  And so, apparently, reading what he said, he went out

421

1  and tried to, you know, explain to them what we were
2  doing, the attack plan on stabilizing the product and so
3  forth.  I wasn't involved in that; it doesn't seem like
4  a bad thing to do, to get out and try to explain what we
5  were doing.
6      Q.  Have you ever heard of reg FD?
7      A.  Yes.
8      Q.  What does that say?
9      MR. LINDSTROM:  Are you asking for his
10  understanding?
11      MR. SOLOMON:  Yeah.
12      THE WITNESS:  My understanding of reg FD,
13  again, is that you're not supposed to go out and give
14  material -- non-public information to selected people or
15  something.  In other words, the market, if there's
16  something material to be known, you should tell the
17  whole market so that nobody has unique material inside
18  information.
19      MR. SOLOMON:  Q.  And does not No. 4 ring a
20  reg FD alarm bell in your head?
21      MR. LINDSTROM:  Calls for speculation on his
22  part, mischaracterizes the document.
23      THE WITNESS:  Again, I tried to give you my
24  perspective on what I read here.  It does not
25  necessarily ring a reg FD bell in my head, no.

422

1      MR. SOLOMON:  Q.  That's because when you read
2  this, you like to exclude the word "financial",
3  notwithstanding the fact that he includes it.
4      MR. LINDSTROM:  Argumentative.
5      THE WITNESS:  No, I told you what his
6  responsibility is, and I know for sure his group talked
7  to the so-called industry analysts.  There's a reference
8  to a note from Charles Phillips who, at the time, was a
9  financial analyst.  Now, I don't know if he talked to
10  him or he just said, "Look, this is the same thing I'm
11  hearing from the industry analyst," right?
12      MR. SOLOMON:  Q.  Chuck Phillips is now the
13  president of Oracle, right?
14      A.  Yes.
15      MR. SOLOMON:  Let's go off the record to
16  change tape.
17      (Recess taken from 3:43 to 3:55 P.M.)
18      MR. SOLOMON:  I've marked as the next exhibit
19  a document produced by the defendants with the control
20  numbers 061300 to 301.
21      (Whereupon, Plaintiff's Exhibit 84 was marked
22      for identification.)
23      MR. SOLOMON:  Q.  And once you've had a chance
24  to look sufficiently, let me know if you recognize this.
25      A.  Again, I don't recall.  It's directed to me,

423

1  so I must have received it, I'm assuming.
2      Q.  Okay.  And you see it's March 25th, 2002.
3      A.  Uh-huh.
4      Q.  From Charles Phillips, who is still at Morgan
5  Stanley then, apparently.  Do you see that?
6      A.  Yes.
7      Q.  To you.
8      Under overview -- excuse me.  It appears that
9  Charles Phillips has forwarded to you the AMR research
10  Oracle 11i quality article; is that right?
11      A.  Charles is forwarding --
12      Q.  Yes.  Is that right?
13      A.  -- some extract or something, it looks like.
14      Q.  And then it says "Overview" in that e-mail
15  from Jeff Freyermuth.
16      Do you know who that is, by the way?
17      A.  I don't.
18      Q.  It says "Overview:  Since its release in
19  May 2000, many customers have expressed concerns about
20  the quality of Oracle's E-Business Suite 11i.  AMR
21  Research recently interviewed more than 50 large
22  companies implementing or upgrading to 11i and found
23  that these problems still persist."
24      Do you see that?
25      A.  Yes.

424

1    Q.  Do you agree that the problems referred to
2   there still persisted in March of 2002?
3        MR. LINDSTROM:  Calls for speculation, vague
4   and ambiguous.
5        THE WITNESS:  Again, I think it stands, based
6   upon interviews they did.
7        MR. SOLOMON:  Q.  Were you aware, in 2002,
8   that these problems were persisting?
9    A.  I was aware that there were still complaints
10  and some degree of problems.  I think there was progress
11  being made, but I think that, as I testified earlier,
12  even a year earlier, by that spring, things weren't
13  getting resolved quite as quick as I originally thought
14  they would have been.  And this is apparently, what, a
15  year later, March 2002.
16   Q.  Right.
17       Do you know how it came about that
18  Mr. Phillips started working for Oracle?
19   A.  Vaguely, 'cause I talked to him in the
20  interview process, so I have a pretty good sense of why
21  he decided to join Oracle.
22   Q.  How did he -- okay.  Tell me why.
23   A.  So I can tell you what he told me, and so
24  forth.
25   Q.  Please do.

425

1    A.  He was tired of being a financial analyst and
2   had followed Oracle for many years, and thought if he
3   was going to leave the industry, we would be a great
4   company to work for because he believed in Larry,
5   believed in the company.  So he had a conversation with
6   Larry, and Larry was thinking about getting more
7   executive cover, thinking about M&A, some other things
8   where he thought Charles could be a good addition to the
9   team.
10   Q.  But was it Mr. Phillips who applied for a
11  position, as opposed to someone in the company offering
12  him a job?
13   A.  I can't remember how the first things got
14  started.
15       MR. SOLOMON:  I'll have marked as the next
16  exhibit a document produced by the defendants with the
17  control numbers 203681 to 683.
18       (Whereupon, Plaintiff's Exhibit 85 was marked
19       for identification.)
20       MR. SOLOMON:  Q.  And when you've had a chance
21  to look at it, just let me know if you've seen this
22  before.
23   A.  I don't believe I have.  I'm just reading it
24  since it's reasonably short.
25   Q.  Okay.  When you're done, just let me know.

426

1    A.  Okay.  Yes, I've read it now.
2    Q.  Were these changes implemented at Oracle?
3    A.  I don't know.
4    Q.  Okay.  Did you discuss the, as it's described,
5   at least, new terminology on forecasting with anyone?
6    A.  Did I discuss it with anyone?  I don't believe
7   so.  I think -- I do think -- I have been in EC meetings
8   before where Larry has tried to get people to give him
9   forecasts who can understand, and he's talked about,
10  "Look, don't give me a forecast that's so conservative
11  that you'll never miss it."  So some of the stuff that's
12  in here sounds Larry-like, to be honest with you, but
13  exactly what he said and exactly how these people
14  interpret it, I don't know.
15       MR. SOLOMON:  Okay.  So I'll have marked as
16  the next exhibit a document produced in this litigation
17  with the control numbers 612306 and 307.
18       (Whereupon, Plaintiff's Exhibit 86 was marked
19       for identification.)
20       MR. SOLOMON:  Q.  Do you recognize this?
21   A.  No, I don't.
22   Q.  Okay.  And you haven't seen any of these
23  exchanges before, correct?
24   A.  Again, I don't believe so.
25   Q.  Okay.  And you'll see that the bottom half of

427

1   the first page is dated the 6th of December, 2000, it's
2   from David Winton to David Winton, and then the line
3   above appears to transmit the e-mail below, and it's
4   from David Winton to George Roberts.
5    A.  Yes.
6    Q.  Is that right?
7    A.  And it's entitled "First Q3 Forecast
8   Thinking."
9    Q.  Right.  You'll see that there are
10  four itemized points starting with, "1:  Slow start in
11  FY '00."  Do you see that?  And Mr. Minton makes the
12  point that, "The growth comparisons to last year have
13  been relatively easy in the first two quarters as we did
14  not perform that well a year ago."
15       Do you see that?
16   A.  Yes.
17   Q.  Were you aware of that going into the third
18  fiscal quarter of '01, that that -- that the growth
19  comparisons for NAS were relatively easy for the first
20  two quarters?
21   A.  I can't remember.  We have all the same
22  analysis at corporate, so I look at all this
23  information, but I don't remember exactly what I
24  remembered or observed at the time.
25   Q.  You're not disputing that, though; is that

428

1  fair?
2      MR. LINDSTROM:  Not disputing what?
3      MR. SOLOMON:  Q.  Disputing that the growth
4  comparisons for Q1 and Q2 in FY '01 were relatively easy
5  because of the poor performance in those corresponding
6  quarters in fiscal '00.
7      MR. LINDSTROM:  For NAS.
8      MR. SOLOMON:  Q.  For NAS.
9      A.  I'm neither disputing it or affirming it.
10  Again, I just don't have access to data.  This is a
11  statement he made, so he may well be right.
12      Q.  And No. 2, he says, "More big deals this Q1
13  and 2.  As the schedule shows, our results this year
14  have been boosted by big deals in both quarters.
15  Combined, these over $5 million deals contributed over
16  $55 million year to date.  Note that we only have
17  one over $5 million currently in the Q3 pipe.  Last year
18  we had four deals that netted $28 million."
19      Do you see that?
20      A.  Yes.
21      Q.  Were you aware of that at the beginning of the
22  this fiscal quarter of '01?
23      A.  Again, I don't recall.
24      Q.  No. 3, "Growth comparisons tougher in Q3 and
25  4.  NAS results took off last year in Q3 and continued

429

1  into Q4.  Growth rates will slow in the second half, but
2  we still feel that the annual 31 percent target is
3  achievable with some potential upside of two to
4  three points if Q3 is strong."
5      Do you see that?
6      A.  Yes, I do.
7      Q.  And were you aware of that going into the
8  third fiscal quarter of '01?
9      A.  Again, I don't remember this document.  I may
10  well have been aware of it because of analysis we do at
11  corporate.
12      Q.  And then over to page 4, it says, "Q3 pipe,
13  not where it needs to be.  Based on the conversion
14  history, I think we need another 50 million of Apps and
15  nearly 70 million of tech to feel statistically
16  comfortable to hit our Q3 budget.  Given the past
17  trends, GB and Majors should add incremental pipe during
18  the next three weeks.  If so, we move up."
19      Do you see that?
20      A.  I do see that.
21      Q.  Were you aware of that going into the third
22  fiscal quarter of '01?
23      A.  Again, no.  I don't -- not from this document,
24  'cause I don't recall seeing this document.
25      Q.  Okay.

430

1      A.  Okay?  And this refers to budget, not
2  forecast.  So their different terminologies mean
3  different things.
4      Q.  Were you of the view that for NAS, going into
5  fiscal -- third fiscal quarter of '01, that the pipe was
6  not where it needed to be?
7      A.  I don't recall.
8      Q.  Okay.
9      A.  And again, reading this note, that relates to
10  hit his Q3 budget.  It's a different number, different
11  concept than forecast.
12      Q.  I hear what you're saying, but I'm --
13      A.  I'm just making sure --
14      Q.  Wait a second.  I'm just asking you whether,
15  in your view, going into fiscal -- the third fiscal
16  quarter of '01, the NAS pipe is where it needed to be.
17      A.  And again, I told you I don't know.
18      Q.  Okay.
19      A.  But I'm pointing out to you, since you may not
20  be aware of the differences between forecast and budget,
21  that he was referring to budget.
22      Q.  Okay.  I appreciate that.  Thank you.
23      A.  Which is not what I use to create guidance for
24  the street.  It's an interesting concept, but we talk
25  about forecast, and we do not disclose our budgets to

431

1  the street.
2      Q.  Why do you think Mr. Minton was making these
3  points?
4      A.  Giving George Roberts perspective.  This is
5  very common to analyze quarters versus previous quarters
6  and that sort of thing.  Doing his job as the financial
7  person, you give George perspective.
8      MS. KYROUZ:  You said Mr. Minton, but I think
9  you meant Mr. Winton.  Is that fair?
10      MR. SOLOMON:  Yes.  Thank you.
11      Q.  Now, are you familiar, Mr. Henley, with
12  allegations in this case concerning debit memo
13  transactions in November of 2000?
14      A.  Yes.
15      Q.  And what do you understand those allegations
16  to be?
17      A.  That somehow the accounting department
18  manufactured hundreds of millions of dollars of
19  fictitious revenue, is the way I would boil it down.
20      Q.  And were you involved, in November of 2000,
21  with any of the debit memo transactions that are alleged
22  in our complaint?
23      A.  Again, I'm mindful of the earlier day
24  conversation about defining involvement, okay?
25      Q.  Okay.

432

1    A.  Since this was in my shop, I was a little more
2  involved at a high level, when the allegations were
3  made, in making sure that we checked it out, but I was
4  never involved in creating any of these debits and using
5  the Oracle systems and so forth.  But I surely heard
6  about it, and we certainly launched an investigation to
7  make sure that these claims were hopefully not true, and
8  they proved to be not true.
9    Q.  Did you -- well, the jury hasn't determined
10  that yet, has it?
11    A.  Auditors, our internal auditors, we have a
12  variety of experts that did determine that there was no
13  fictitious revenue created.
14    Q.  And were you involved as a result of reviewing
15  what happened, or were you involved in November of 2000
16  with any activity concerning the debit memo
17  transactions --
18    A.  As reviewed in former, but once these
19  allegations were stated, I clearly was -- wanted to know
20  what was going on, and, you know, got people involved all
21  the way down the level to -- and then we brought in
22  auditors and so forth.  So -- but I was never involved
23  in creating any of these transactions.  It was all news
24  to me that this stuff was going -- supposedly going on,
25  if you will.

433

1    Q.  Were you aware of a so-called cleanup at the
2  time?
3    MR. LINDSTROM:  At the time?
4    THE WITNESS:  At the time, no.  Again, it was
5  way down below me, and I was far removed in this stage
6  of my career at Oracle of getting involved in, you know,
7  accounts payable, accounts receivable, thousands of
8  people in my organization.  So, no, I was not aware.
9    MR. SOLOMON:  Q.  Do you have an understanding
10  now what was going on in November 2000 with respect to
11  the debit memos?
12    A.  At a high level.
13    Q.  What is your understanding?
14    A.  Again, it was awhile ago, so I can't tell you
15  precisely every last detail that went on.
16    Q.  Give me your understanding, please.
17    A.  Again, my understanding was that we were going
18  through a change in our system, and that debits and
19  credits weren't being applied to the right individual
20  accounts, but in total, at the end of the day, once you
21  got all the stuff cleaned up, there was no effect on
22  revenue.  I mean, these were not sort of one-sided
23  entities that create phantom revenues as these
24  allegations were being made.  And we ultimately had our
25  auditors look at it, internal auditors, we made a full

434

1  report to the audit committee.  This was a very serious
2  allegation.  I wanted to be certain that there was no
3  basis for it, but I, like everybody else, sat and
4  listened to all the information and so forth.
5    Q.  And is it your belief that there was zero
6  financial statement impact as a result of the November
7  2000 cleanup?
8    A.  Again, zero is a fairly precise number.  It's
9  my belief there was no significant or material impact.
10    Q.  Okay.  Which suggests that you may think that
11  there was some impact, but it was not material.
12    A.  It would be hard to know, you know -- when you
13  get involved in lots of entries, if there might be
14  something, but it was -- it could have been zero, it
15  could have been 10, I don't know.  But we were assured
16  by the auditors and everybody else that there was no
17  significant impact here.  So, yeah, I think it was -- it
18  was a misunderstanding, I guess, by people who
19  thought -- who didn't understand the way the system
20  worked, that somehow there was revenue being created
21  that wasn't real.
22    Q.  If, but for that cleanup, Oracle would have
23  only reported, for example, 11 cents EPS for the second
24  quarter of fiscal '01, rather than 12 cents for that
25  quarter, would you have considered that to be material?

435

1    MR. LINDSTROM:  Calls for speculation,
2  hypothetical, no foundation.
3    THE WITNESS:  And this was Q what?
4    MR. SOLOMON:  Q.  Q2.
5    A.  Q2.
6    MR. LINDSTROM:  So you're asking him to assume
7  if the debit memo issue had a 1-cent impact on the EPS?
8    MR. SOLOMON:  Essentially.
9    MR. LINDSTROM:  Would he view that as
10  material?
11    MR. SOLOMON:  Correct.
12    MR. LINDSTROM:  Do you understand the
13  question?
14    THE WITNESS:  I understand the question.
15  It -- certainly, if there was a significant amount of
16  revenue that I knew we were doing, or something, we may
17  well disclose that and say, "Look, here's the numbers
18  for the quarter."  From time to time we would do that.
19  If there was something unusual, positive or negative, we
20  may well say, you know, "Gee, there was," to use your
21  example, "a penny of favorable," or whatever.  We would
22  be obliged to do something like that.  Again, I was not
23  aware of -- that anything was going on, first, and
24  second point, from the work that was done after these
25  allegations were raised, I don't believe there was any

436

1  material impact.
2      Q.  But again, you're careful to say "material".
3  You won't say that you don't believe there was no
4  impact.
5      A.  Because I can't remember, and I didn't go
6  through and do all the detail. But I know the entire
7  committee was very satisfied that there wasn't any
8  significant impact. And again, my recollection was it
9  wasn't related to -- it was a cumulative set of issues
10  that took place over several quarters. This was not
11  something that happened just in Q2, if you will.
12      Q.  Who, in your view, is best placed to assess
13  whether or not any impact would have been material or
14  not?
15      MR. LINDSTROM:  I'm confused by the question.
16  Are you focusing on the materiality, or the precise
17  amount of any impact that may have occurred? The
18  judgment that it was material, or the calculation of any
19  impact?
20      MR. SOLOMON:  Q.  The judgment, which I assume
21  will be preceded by some kind of calculation.
22      MR. LINDSTROM:  Did you understand the
23  question?
24      THE WITNESS:  Yeah, I think I understand the
25  question.

437

1      I think the people that, first of all, got
2  into more of the detail and reviewed it were our
3  corporate controller, Jennifer Minton, and the previous
4  corporate controller, Tom Williams.  So those two people
5  are CPAs, they're quite knowledgeable and way more into
6  the details than I was.
7      MR. SOLOMON:  Q.  Were you involved in making
8  a presentation to the SEC with respect to any of the
9  debit memo transactions?
10      A.  A presentation to the SEC.  On this issue?
11      MR. LINDSTROM:  That's the question.
12      MR. SOLOMON:  Q.  Yes.
13      A.  I don't recall making a presentation
14  personally to the SEC on this issue.
15      Q.  Do you know if a presentation was made to the
16  SEC?
17      A.  I honestly can't recall.  I don't know.
18      Q.  Is the SEC investigating Oracle in any manner
19  right now that you're aware of?
20      A.  I'm not aware.  I haven't been the CFO for
21  several years, so I have no idea what they may or may
22  not be doing.  Nothing I'm aware of.
23      Q.  Did the SEC ever become involved in any kind
24  of investigation, formal or otherwise, concerning the
25  events of the third fiscal quarter of 2001?

438

1      MR. LINDSTROM:  So this is broader than the
2  debit memos?
3      THE WITNESS:  Broader than the debit memos.
4      MR. LINDSTROM:  Vague and ambiguous as to
5  "events", but you may answer.
6      THE WITNESS:  I don't recall them. We've had
7  several, you know, reviews over the years that are
8  typical of every company, you know? So I can remember a
9  couple of times when they came in and reviewed with our
10  accounting staff, our 10 Ks and Qs and all that sort of
11  thing, but I don't recall there was a special process
12  and review, and all that sort of thing, as specifically
13  around Q3.
14      MR. SOLOMON:  Q.  How about the justice
15  department; have they investigated Oracle or any of its
16  executives with respect to events in Q2 or Q3 in fiscal
17  '01?
18      A.  Again, I can't remember if they did or not.
19      Q.  Okay.  Have you ever testified, formally or
20  informally, to either the SEC or the justice department
21  concerning events that transpired in fiscal -- in the
22  second or third fiscal quarter of 2001?
23      MR. LINDSTROM:  So you're talking about the
24  events that form the basis of the lawsuit?
25      MR. SOLOMON:  Q.  That's fair, yes.

439

1      A.  I don't recall.  I've certainly been deposed a
2  few times by plaintiff lawyers, but I don't recall
3  testifying on that -- we testified in the justice
4  department antitrust suit, but no, I don't believe I
5  ever -- either the SEC or the justice department. Me
6  personally, no.
7      MR. SOLOMON:  Let's have marked as the next
8  exhibit a document produced in this litigation with the
9  control numbers 050209 through 255.
10      (Whereupon, Plaintiff's Exhibit 87 was marked
11      for identification.)
12      MR. SOLOMON:  Q.  Let me know if you recognize
13  this document at all.
14      A.  Okay.  No, I don't.  I don't recall seeing
15  this.
16      Q.  Now, this was -- this is dated October 29,
17  2003. Do you see that? On the front page.
18      A.  Yes.
19      Q.  What was your position at the company on that
20  date?
21      A.  I still would have been Chief Financial
22  Officer at that date.
23      Q.  Okay.  And as a result, you were responsible
24  for all of the financial department that you preside
25  over; is that right?

440

1  A. Yeah, ultimately, they all report to me, and
2  as I indicated earlier, it's a big company. I have lots
3  of experts in all these departments, but ultimately,
4  they report to me.
5  Q. Now, can you tell me why you weren't involved
6  in this, at least to the extent that you reviewed it;
7  why you were not involved at least to that extent?
8  MR. LINDSTROM: Vague and ambiguous, no
9  foundation, calls for speculation.
10  THE WITNESS: Would you like me to speculate?
11  MR. SOLOMON: Q. Sure.
12  MR. SOLOMON: Well, let's start with if he
13  knows.
14  THE WITNESS: Again, I testified earlier, I
15  don't think I saw this. I don't think I testified. I
16  don't think I did. So now -- I think I testified
17  earlier that either -- you asked me the SEC or the
18  justice department, and I said -- we were talking about
19  the quarter. This actually relates, I guess, to the
20  so-called phony debit memos. So this is a specific
21  particular item in this case.
22  MR. SOLOMON: Q. Do you believe that --
23  A. So you're asking me that -- again, so you're
24  asking me, now, what, why didn't I or --
25  Q. Well, first of all, have you ever seen this

441

1  before now?
2  A. Again, as I testified earlier, I don't believe
3  I have.
4  Q. Okay. And can you explain why it is, as CFO
5  of the company at the time this was created, and as a
6  defendant in this lawsuit, you have never seen this
7  before?
8  MR. LINDSTROM: Lacks foundation, calls for
9  speculation.
10  THE WITNESS: Again, you want me to speculate?
11  MR. SOLOMON: Q. Sure.
12  A. My assumption is this is now almost two years
13  later. I think this is long after we have already done
14  a very voluminous internal investigation, which I told
15  you about, had our external internal auditors look at
16  it, and reported to the audit committee and concluded
17  that there weren't a bunch of phony invoices, and this
18  had no material effect. So if this was something as
19  serious as that and was real, sure, I would probably be
20  there front and center with our general counsel and
21  everybody else talking to the SEC, but since it didn't
22  prove to be anything, I didn't think it was a good use
23  of my time to go do it. Not that we disrespect the SEC,
24  but I thought our experts could just take them through
25  all the details and it would be pretty straightforward.

442

1  That's my guess of why I never got involved at this
2  level. But as I reported earlier, I definitely was
3  quite interested, until we got to the bottom of this, to
4  make sure there wasn't a real problem here.
5  Q. Okay. If you go to the third page of the
6  document, the first bullet point is "Complaint is being
7  dismissed with prejudice."
8  Do you see that?
9  A. Yes.
10  Q. Now, at the time, you didn't think that this
11  case was going to proceed; is that right?
12  MR. LINDSTROM: Objection. No foundation,
13  mischaracterizes the document, calls for speculation.
14  THE WITNESS: I think at the time, based on
15  all the work that we did, we thought there -- these
16  allegations were baseless. Whether that -- something
17  would proceed, I have no idea.
18  MR. SOLOMON: Q. If you go to page 5 of the
19  document, which is 050213, it says, "These customers
20  allegedly overpaid, but Oracle never refunded."
21  Do you see that?
22  A. I see that.
23  Q. And then if you look at the page beforehand,
24  the customers they're referring to are Eli Lilly,
25  Household and an unidentified customer. Do you see that

443

1  on the preceding page?
2  A. I do see that.
3  Q. Okay. I'm now at page 13 of the document,
4  which is 050221.
5  A. Pardon me? Go to what page?
6  Q. Page 050221, which is page 13, original page
7  13, and it's entitled "Household".
8  A. Okay. And you want me to skip over all these
9  other pages that --
10  Q. I just don't have time to go through them all,
11  unfortunately. If you look at Household, it says,
12  "Oracle supposedly applied three overpayments by
13  Household to invoices created November 17th, 2000," and
14  then you'll see that the alleged overpayments are
15  itemized. And at the bottom it says, "In fact, all
16  refunded years ago."
17  Do you see that?
18  A. I see that.
19  Q. Now, are you aware that, in fact, subsequent
20  to the cleanup, so-called cleanup, that Oracle sent a
21  refund check to Household?
22  A. No, I'm not.
23  Q. Would it surprise you to learn that they, in
24  fact, did that?
25  MR. LINDSTROM: Assumes facts not in evidence.

444

1       THE WITNESS: Again, I have no idea what the
2   history or anything it related to. So I --
3       MR. SOLOMON: Q. Okay.
4       A. It's a lot of context. I have no idea how to
5   be surprised or not surprised.
6       Q. How about the fact that no one's ever told the
7   SEC that, contrary to the presentation made here, a
8   refund was made to Household subsequent to
9   November 2000?
10      MR. LINDSTROM: Assumes facts, no foundation,
11  calls for speculation.
12      The question, again, is whether he would be
13  surprised?
14      MR. SOLOMON: Q. Yeah.
15      Let me ask you another question. Would you be
16  concerned if people at your company misled the SEC?
17      A. I would be concerned if people at my company
18  knowingly misled anybody, including the SEC, of course.
19      Q. So you're not concerned if they unknowingly
20  misled them, apparently.
21      A. Well, of course. I mean, you don't want to
22  make mistakes.
23      Q. So period. You would be concerned if they
24  misled --
25      A. I would be more concerned if we knowingly did

445

1   something, 'cause that's really not right. Sometimes we
2   can make honest mistakes and tell somebody to the best
3   of our knowledge, and we just got it wrong.
4       MR. SOLOMON: I'll have marked as the next
5   exhibit a document produced by the defendant in this
6   litigation with the control numbers 120138 through 140.
7       (Whereupon, Plaintiff's Exhibit 88 was marked
8       for identification.)
9       MR. SOLOMON: Q. And once you've had a chance
10  to read it, just let me know if you've seen it before.
11      A. Okay.
12      Q. Okay. Are you familiar with the issues
13  reflected on the first page of the document concerning
14  the -- and I'm looking halfway down the page -- "back
15  dated revenue in Feb"? Do you see that?
16      A. This is in the second paragraph?
17      Q. Yes, it is. If you look at the last sentence
18  beginning "Interestingly enough" --
19      MR. LINDSTROM: And the question is whether
20  he's familiar personally with --
21      MR. SOLOMON: Yes.
22      MR. LINDSTROM: -- the subject matter
23  identified in that sentence.
24      MR. SOLOMON: Correct.
25      THE WITNESS: I'm not. I don't think so.

446

1   I've never heard of back dating of support revenue.
2       MR. SOLOMON: Q. Okay. We haven't got an
3   answer yet.
4       Have you seen this before?
5       A. No, I don't believe so. I'm not shown on this
6   thing.
7       Q. Okay. And you don't know what that refers to,
8   then? You have no understanding of what the back dating
9   revenue is referring to?
10      A. Back dating? No, I am not familiar with that.
11      MR. SOLOMON: Okay. Let's have marked as the
12  next exhibit a document produced in this litigation with
13  the control numbers 120192 to 194.
14      (Whereupon, Plaintiff's Exhibit 89 was marked
15      for identification.)
16      MR. SOLOMON: Q. And once you've had a chance
17  to look at it, let me know if you've seen this exchange
18  before.
19      A. Again, I don't believe I recall. I'm not
20  shown as a copy, apparently.
21      Q. I'm looking at the second bullet point on the
22  first page where it says, "Support renewals, prior
23  periods. Bill has identified a population of contracts
24  in entered status with date problems that appear to be
25  overstating the backdated revenue potential. Will try

447

1   to finalize the analysis tomorrow."
2       Do you know what that refers to?
3       A. No, I don't.
4       Q. And you haven't seen any reference to this
5   issue before now?
6       A. Again, I don't recall.
7       Q. Okay. And then I'm skipping a bullet point to
8   the fourth bullet point, it says, "Prior period Rev/Rec
9   corrections. We know there is revenue that has already
10  been booked that will have to come out but we don't know
11  the amount yet. I put a $10 million slug in for it."
12      Do you see that?
13      A. Uh-huh.
14      Q. Before today, have you heard of that?
15      A. Again, I don't recall it.
16      Q. And then the last bullet point, "Credit Memos,
17  all unpaid invoices that have been turned over to Legal
18  but not resolved are being written off at the LOB level
19  this month. I suspect to get the support number in the
20  morning and evaluate whether the $15 million slug for
21  credit memos is large enough to cover this."
22      Do you see that?
23      A. Yes.
24      Q. Do you know what the $15 million slug refers
25  to?

448

1    A.  No.
2    Q.  The first time you've seen reference to --
3    A.  Again, yes, I think -- again, I've testified I
4  don't remember this e-mail.
5        MR. SOLOMON:  I'll have marked as the next
6  exhibit a document with the control numbers 119340 to
7  344.
8        (Whereupon, Plaintiff's Exhibit 90 was marked
9        for identification.)
10       THE WITNESS:  Do you want me to read it all
11 or --
12       MR. SOLOMON:  Q.  No.  You haven't seen this
13 before; is that right?
14   A.  Again, I don't recollect.  I'm aware that,
15 again, we switched to a new system called OKS or Off
16 OKS.  One or the other.  But no, I don't recollect
17 seeing this e-mail.
18   Q.  And you see at the beginning it says,
19 "Jennifer, the final may support revenue recognition
20 correction was 7 million, most of which was recorded in
21 Q3 in error."
22       Do you see that?
23   A.  Uh-huh.
24   Q.  And this is the first time today you've been
25 aware of a suggestion of that $7 million being recorded

449

1  in error in Q3?
2    A.  I don't remember hearing there was a
3  $7 million error, but I was aware we were going through
4  implementation issues with OKS.  I do recollect that.
5    Q.  If you go to the second page of the exhibit,
6  you'll see that under "Justification" it says, "This
7  journal entry is proposed to cumulatively correct
8  revenue recognition for support contracts booked from
9  January 2001 to April 2001.  This is a net correction
10 for two problems that occurred."
11       Do you see that?
12   A.  Uh-huh.
13   Q.  This is the first time you're seeing this?
14       MR. LINDSTROM:  The document?
15       THE WITNESS:  This document?
16       MR. SOLOMON:  Q.  Yes.
17   A.  Again, I think -- I don't think I got this
18 document, because I've testified just a few minutes ago,
19 I was aware that we had implementation as to issues with
20 OKS.
21   Q.  Okay.  And if you go to the next page of the
22 document, you see, under "Accounting Impact," it says,
23 "The majority of this adjustment relates to revenue
24 recorded in Q3 FY01.  The problems were identified and
25 averted midway through Q4 FY01 before most Q4 bookings

450

1  were done."
2        Do you see that?
3    A.  Yes.
4    Q.  And do you recall reversing -- having revenue
5  reversed out of Q3 '01 because it was recorded
6  incorrectly?
7        MR. LINDSTROM:  You're asking him whether he
8  recalls?
9        MR. SOLOMON:  Yes.
10       THE WITNESS:  Again, I said that I didn't
11 recollect the numbers, anything that happened in the
12 accounting organization.
13       MR. SOLOMON:  Q.  Okay.
14       Okay.  Let's go off the record for a few
15 minutes.
16       (Recess taken from 4:43 to 5:06 P.M.)
17       MR. SOLOMON:  Q.  Were you aware, Mr. Henley,
18 that throughout fiscal 2001, tens of millions of dollars
19 were transferred from Oracle's customer overpayments
20 account to Oracle's bad debt reserve?
21   A.  Customer overpayments to bad debts.  Again,
22 does this relate to this matter we talked about earlier
23 where there were accounting -- things were being debited
24 and credited to wrong accounts, and we had to go clean
25 that up?  Is this what you're referring to?

451

1    Q.  I'm trying to ask you that question, actually,
2  without necessarily tying it to the cleanup.  I just
3  want to know if you're aware that throughout fiscal
4  2001, tens of millions of dollars was taken out of the
5  customer overpayment account at Oracle and applied to
6  the bad debt reserve.
7    A.  Again, as I said earlier, I was not aware of
8  all the ins and outs of what people were doing in the
9  departments.
10   Q.  Who at Oracle, in fiscal 2001, would have been
11 responsible for making adjustments to Oracle's bad debt
12 reserve?
13   A.  Certainly the review was done by Jennifer
14 Minton, and then there were typically people in the
15 geographic areas, like the Americas in this case.  I
16 think you're speaking to like Tom Williams and his group
17 would go through that review, sure.
18   Q.  So assuming it's true, that tens of millions
19 of dollars in fiscal 2001 were taken from the customer
20 overpayment account and applied to the bad debt reserve,
21 assuming that's true, would you expect Ms. Minton to
22 have been aware of it?
23   A.  I don't know.  I mean, the original
24 assertions, allegations that were made, I remember she
25 was like me.  We didn't -- it was over in Rocklin, and

452

1  both of us thought it was a fantasy, but it was a
2  concern. "My goodness, we need to look into this." So
3  I have no idea what she knew or didn't know. But I know
4  specifically she did a review with the folks over there,
5  and did this for years, on the bad debt reserve.
6      Q.  And she would do that intra-quarter; is that
7  right?
8      A.  Typically, we would do it before the quarter
9  ended, yes.
10     Q.  Right.
11     A.  Towards the end of the quarter.
12     Q.  Okay. And you said, earlier on, that with
13  respect to the -- what we're going to call, or what I
14  think Oracle has called the cleanup, with respect to the
15  debit memos in November of 2000, after we made our
16  allegations, you got people involved; is that right?
17     A.  That's correct.
18     MR. LINDSTROM:  Vague and ambiguous.
19     THE WITNESS:  I asked Jennifer and then all
20  the way down, and we got people in the -- the department
21  itself, as well as others, including the internal audit,
22  external auditors, to really get in and understand what
23  did or didn't happen.
24     MR. SOLOMON:  Q.  Okay. And so you've
25  answered at least the question partially. You got

453

1  Ms. Minton involved, you got external auditors involved.
2  Which external auditors?
3      A.  Whoever were our public auditors at the time.
4      Q.  Okay.
5      A.  Either Arthur Anderson or Ernst and Young.
6  And I testified earlier, I can't remember when we
7  switched auditors.
8      Q.  And you got Tom Williams involved?
9      A.  Tom Williams worked for Jennifer Minton, and
10  he clearly was involved because the credit collections
11  department and billing and those things all reported to
12  him, I think.
13     Q.  Are you aware that after allegations had been
14  made with respect to the debit memos, that thereafter,
15  hundreds of refunds were then made to Oracle customers?
16     MR. LINDSTROM:  Assumes facts.
17     THE WITNESS:  I can't remember, but I was
18  aware of the cleanup, and part of the cleanup was kind
19  of getting caught up on duplicate payments or things
20  like that. So whether it was hundreds or not, I don't
21  know the specifics.
22     MR. SOLOMON:  Q.  Okay. And have you ever
23  made an effort to ascertain the total dollar amount of
24  refunds that were made after our allegations were filed?
25     A.  These are refunds to customers? No, I have

454

1  not done that.
2      Q.  Okay. Did Oracle have a practice, in fiscal
3  2001, of not alerting customers who had overpaid Oracle
4  that Oracle was holding their money?
5      A.  I don't know. I don't know what the
6  individuals over in Rocklin were doing because I was far
7  removed from it. When I first came into the company, I
8  was much closer to that stuff. I certainly didn't have
9  a practice of it. That was not the practice I set up
10  when I joined the company, but I don't know what they
11  were doing over there.
12     Q.  Are you familiar with the legality or
13  illegality of holding on to customer payments when you
14  know they don't belong to the corporation?
15     A.  I don't know if you're referring to escheat
16  laws or --
17     Q.  That's one.
18     A.  Certainly, that's one form. I'm well aware of
19  escheat laws, and again, our policy has been to abide by
20  the laws. If payroll checks, for instance, don't come
21  back and give them to the state and so forth, and that
22  sort of thing. So sure.
23     Q.  And with respect to customer overpayments, did
24  you ever give customer overpayments to the state in
25  compliance with escheatment laws?

455

1      MR. LINDSTROM:  Now, you're saying ever,
2  literally?
3      MR. SOLOMON:  Ever, yes.
4      THE WITNESS:  As far as I know, I believe our
5  tax department got involved with our accounting
6  department and payroll departments, and I believe there
7  periodically were escheats made. Money was escheated,
8  if you will, to the states and so forth. As far as I
9  know, there was. Again, I didn't get involved in that,
10  but we were all clear at the top that that was a
11  requirement, and I was always led to believe we were
12  doing that.
13     MR. SOLOMON:  Q.  And one place, clearly, to
14  look for funds that would need to be returned or paid to
15  the state under the escheatment laws would be the
16  customer overpayments account, wouldn't it?
17     A.  Again, I don't know that customer payments are
18  covered under escheat laws. I don't really technically
19  know that. But my policy, and again, when I joined the
20  company, we had a backlog, if you will, and we worked
21  very hard in trying to clean up that backlog in my first
22  couple of years at Oracle, and I was crystal clear with
23  people that when we had an overpayment, we knew it was
24  an overpayment, duplicate payment, we should return the
25  money to the customer.

456

1    Q.  Because then, escheatment wouldn't come into
2  place because you know who the money belongs to, right?
3  Is that the point you're making?
4    A.  More importantly, I just think it's the right
5  thing to do.
6    Q.  Because otherwise, it's theft, right?
7    A.  It's the right thing to do.  There are --
8  being on the other side of it, I'm well aware that
9  there's many customers that don't tell you if you've
10  double paid them.  But I don't think that's right.
11  Whether it's legal or whatever, I don't know.  In other
12  words, they wait till you tell them.
13    My policy, when I came into Oracle, is let's
14  not wait.  If we're crystal clear that there's money
15  owed to a customer that's been duplicate payment, let's
16  pay it.  So that was my policy, and in the first few
17  years, we kind of cleaned up things and got caught up
18  and were doing that.
19    Q.  Okay.  But you didn't say whether you agreed
20  with me, to hold on to a customer's money, knowing that
21  it didn't belong to you, would be -- would amount to
22  theft, wouldn't it?
23    MR. LINDSTROM:  He told you he didn't have the
24  legal expertise to say.
25    MR. SOLOMON:  I don't see that in his answer.

457

1    MR. LINDSTROM:  Well, I heard him say it,
2  so --
3    MR. SOLOMON:  I think he said it's the right
4  thing to do.
5    MS. KYROUZ:  "Whether it was legal or
6  whatever, I don't know."  Line 7.
7    THE WITNESS:  And again, the presumption is
8  that you're taking the money and never giving it back,
9  or something like that.  But my position was rather than
10  wait for customers to tell us something, that we owed
11  them money, just get it approved and send it back to the
12  customer.
13    MR. SOLOMON:  Q.  Have you heard of the civil
14  tort of conversion?
15    A.  No.  I have not, actually.  I have heard of
16  escheat laws, but I have not heard of that particular
17  one.
18    MR. SOLOMON:  Let's have marked as the next
19  exhibit a document that's been exhibited in a prior
20  deposition but was not provided to us by Oracle.  We're
21  going to have to wait and clean up the document before
22  we do that, since there's some work product in the
23  margins.
24    Instead, let's have marked as the next exhibit
25  the document produced by the plaintiffs in this

458

1  litigation with the control No. 000006.
2    (Whereupon, Plaintiff's Exhibit 91 was marked
3    for identification.)
4    MR. SOLOMON:  Q.  When you've had a chance to
5  look through it, let me know -- or look at it, let me
6  know if you've seen it before.
7    A.  I don't believe so.
8    Q.  Okay.
9    A.  Just one page, right?
10    Q.  Right.
11    A.  Thank you.
12    Q.  And you'll see at the top it says, "Greg,
13  please confirm" in caps -- I'm sorry.  "Please confirm
14  that", in caps, "ALL ability to move anything to 12601
15  via On Account or creating a Misc receipt write off has
16  been turned off."
17    Do you see that?
18    A.  I do see that.
19    Q.  Do you know what that means?
20    A.  No.
21    Q.  Okay.  Do you know what 12601 is at Oracle, or
22  what it was at the time?
23    A.  No.
24    Q.  When did you stop being CFO?
25    A.  July of 2004, I believe.  Almost

459

1  two and-a-half years ago.
2    Q.  Okay.  And what was your reason for ceasing?
3    A.  'Cause I didn't want to be a CFO.  I had done
4  it too many years.  I was ready to move on and do
5  something else.
6    Q.  And do you have an executive role still with
7  Oracle, other than your position as Chairman of the
8  Board?
9    A.  I don't have anybody reporting to me.  I'm
10  sort of a customer advocate.  So I still do a lot of
11  work with customers, as well as run the board meetings.
12    Q.  Is Oracle still your full-time occupation?
13    A.  I don't -- I wouldn't say I work as hard or as
14  many hours, but yeah, it's still -- I still spend a lot
15  of time with Oracle.  I haven't taken another job with
16  another company or something like that.
17    MR. SOLOMON:  I'll have marked as the next
18  exhibit a document produced by the defendants in the
19  litigation with the control No. 050365 to 390.
20    Excuse me.  It's 050364 through 390.
21    (Whereupon, Plaintiff's Exhibit 92 was marked
22    for identification.)
23    MR. LINDSTROM:  It's one exhibit, right?
24    MR. SOLOMON:  Q.  Then just let me know if
25  you've seen this before.

Henley, Jeffrey 11/16/2006 9:20:00 AM

460

1    A.  Do you want me to go through each page?
2    Q.  Only for the purpose, initially, of telling me
3  whether you recognize any of this.  I don't intend to
4  spend very long on the document.
5    A.  I don't believe I've seen this.
6    Q.  Are you familiar with this format for billing
7  and receipt histories at Oracle?
8    A.  No.
9    Q.  And that's because you didn't get involved?
10    A.  In the detail customer account level with all
11  the accounting and so forth.
12    Q.  If you look at the pagination after the first
13  page, so I'm on to the second page of the exhibit, and
14  there's a reference to January '89 to December '93.
15      Do you see that?
16    A.  Yes.
17    Q.  Do you have any idea what that refers to?
18      MR. LINDSTROM:  Other than --
19      THE WITNESS:  Other than the period that it
20  says it refers to, I can see that it's, apparently, for
21  a period of four years or so, five years, but I don't
22  know anything about it.
23      MR. SOLOMON:  Q.  Then go to the next page,
24  and you'll see at the top it says "1 of 11".
25    A.  3 of 11.

461

1    Q.  That's the problem.  You just identified it.
2  It goes from 1 of 11 to 3 of 11, and we're missing 2 of
3  11.
4    A.  Okay.
5    Q.  Any idea where 2 of 11 is?
6      MR. LINDSTROM:  Objection.  No foundation.
7      THE WITNESS:  Are you asking me?
8      MR. SOLOMON:  Q.  Well, I guess it could have
9  just jumped from 1 to 3, but it seems sort of
10  remarkable.  So I'm asking you, do you know --
11    A.  I have no idea.  I had nothing to do with
12  producing documents, I am not familiar with the report,
13  so I really have no knowledge.
14    Q.  Okay.
15      Counsel, I would like that page produced if it
16  exists, and if it doesn't exist, we would like an
17  explanation as to why it doesn't exist.
18      MR. MAROULIS:  The Bates numbers are
19  non-sequential.
20      MR. SOLOMON:  Is that your explanation?
21      MR. MAROULIS:  Well, I'm just noting for the
22  record that the Bates numbers are non-sequential.
23      MR. SOLOMON:  Q.  So what Mr. Maroulis is
24  saying, Mr. Henley, just so you know what's going on, is
25  the first three pages -- the first page says 11 of 11,

462

1  right?  This is what we've been given to work with, so
2  I'm not trying to torture you with this.
3    A.  I see 1 of 11, 3 of 11.
4    Q.  Yeah, so the first page says 11 of 11, and
5  it's -- and it says 050364.  Okay?  The very first page
6  of the exhibit, it says 050364.
7    A.  Yes.
8    Q.  Okay.  And that says, in the top right-hand
9  side, 11 of 11.
10    A.  Yes.
11    Q.  And then the next number is 365, and the next
12  is 366.
13    A.  Yes.
14    Q.  And that takes us to page 1 of 11, right?
15    A.  Yes.
16    Q.  And then, as Mr. Maroulis has pointed out, the
17  Bates range then starts at 050383 and goes through to
18  390.  Do you see that?
19    A.  Yes.
20    Q.  And so that starts, then, with page 3 of 11.
21    A.  Yes.  I see all that.
22    Q.  And you have no idea where 2 of 11 is?
23    A.  I have the same answer as before.
24    Q.  Okay.  We'll have the same request of Counsel.
25      Okay.  Let's have marked as the next exhibit a

463

1  document produced -- excuse me -- a document not
2  produced by defendants, but marked in a previous
3  deposition in this case.
4      (Whereupon, Plaintiff's Exhibit 93 was marked
5      for identification.)
6      MR. SOLOMON:  Q.  Let me know if you recognize
7  it.
8    A.  Again, on my copy, I don't believe I'm
9  familiar with this particular document.
10    Q.  Okay.  And it's called the Unapplied Cash
11  Project.  And if you look on the first page, it's dated
12  October 21, 2002, it's from Michael Quinn to Ryan
13  Roberts, Greg Myers and copies Tom Williams and Michael
14  Quinn.
15      Do you see that?
16    A.  Yes.
17    Q.  And it says, "There are three deliverables.
18  We need to provide an update to the audit committee," in
19  parens, "(a subcommittee of Oracle's Board of Directors)
20  in regards to what revenue impact this process of taking
21  unapplied cash receipts to the reserve will have on our
22  financial statements."
23      Do you see that?
24    A.  Yes.
25    Q.  Do you know what reserve is being discussed

464

1  there?
2      A.  I'm not sure.
3      Q.  Okay.  And then it goes on to say, "In
4  addition, we need to provide what impact this process
5  has had on revenue in each of the last 8 quarters.  The
6  update will be provided to the audit committee", in
7  capitols, "THIS WEDNESDAY."
8          The next bullet point, "We need to clean up
9  the ENTIRE", capitals, "problem prior to the end of
10  October by moving cash receipts to the proper buckets",
11  in parens, "(unapplied, customary overpayments, or on
12  account) as appropriate."
13          And the last bullet point, "We need to
14  establish new policies and procedures to ensure this
15  never happens again."
16          Do you see all that?
17      A.  Yes.
18      Q.  These requirements, are these the requirements
19  that you imposed when you had people look into this?
20      A.  I don't recall what requirements that started
21  with, as we talked about earlier, this allegation that
22  there was all of this manufactured or false revenue, or
23  whatever.  So out of that, we discovered that accounts
24  were not being applied to the right accounts, and things
25  like that.  So there was a lot of analysis and work and

465

1  ultimate cleanup.  But I don't remember exactly what we
2  agreed were the deliverables or whatever, but certainly
3  myself, the audit committee, everybody wanted to be sure
4  that we got things corrected and right and that,
5  hopefully, we weren't going to repeat some of the same
6  problems.
7      Q.  And what was the cause of those problems?
8      A.  Again, my recollection, as best I can tell, I
9  think, was that the group over there that was in that
10  department started falling behind and was not -- were
11  not staying up on top of the work, and it had -- there
12  was a similar problem when I joined the company many
13  years ago, which we cleaned up.  And so I was
14  disappointed when I found out about it because here we
15  were repeating sins of the past many years later.
16      Q.  And were there no internal controls in place
17  to ensure that that didn't happen again?
18      A.  Again, there were a lot more controls in the
19  company over the years, but -- and certainly in the
20  revenue recognition area, a number of controls.  But in
21  this case, there was a collections department, there was
22  a manager, and I don't think there was adequate
23  supervision.  So there was some that -- while there were
24  controls, they fell behind.  It didn't necessarily
25  create a material accounting problem, but it was

466

1  sloppiness and it was not thorough, and so we devoted a
2  lot of effort, my recollection was, to get on top of
3  this again and get it clean, get it right.
4      Q.  Okay.  If you go to the last bullet point on
5  the first page, beginning "For items in the
6  Miscellaneous Offset", do you see that?
7      A.  Yes.
8      Q.  The last sentence of that bullet point says,
9  "I do not have the full report", and then the parens,
10  "(Greg, please send to this group), closed parens,
11  "however, based upon looking at the August, October and
12  November reports in the 12601 detail spreadsheet, this
13  should cover over 80 percent of the total."
14          Do you see that?
15      A.  Yes.
16      Q.  You don't know what the 12601 detail
17  spreadsheet refers to, do you?
18      A.  Again, I'm not familiar with that, no.
19      Q.  Would you be concerned were you to learn that,
20  in fact, amounts that were in the customer overpayment
21  account were utilized, at least in part, to add to the
22  bad debt reserve?
23          MR. LINDSTROM:  Assumes facts, calls for
24  speculation.
25          THE WITNESS:  Again, in the process of

467

1  cleaning up, they did all kinds of nettting and so
2  forth, so I have no idea what -- the right context to
3  that -- your comment into.
4          MR. SOLOMON:  Q.  If, at the end of a quarter,
5  Oracle reported, for example -- had calculated, for
6  example, 10.6 pennies EPS for the quarter, how would
7  that ultimately get reported in the financial statements
8  as 10.6 EPS?
9      A.  Usually, we did simple rounding.  An analyst
10  could calculate it, and some actually, I think, did,
11  probably, and put it in their own spreadsheets, but --
12  'cause they can make the calculation.  But for
13  simplicity, we typically rounded to whole pennies.
14      Q.  And you rounded up from 5 and down from 5; is
15  that right?
16      A.  Yes.
17          MR. LINDSTROM:  Mark, if I may, I notice, in
18  looking at the LiveNote, that the reporter, in his last
19  response prior to this exchange that you've now engaged
20  in, where I believe the witness said that there was
21  netting, he was talking about netting, it got recorded
22  as "neglect".
23          THE REPORTER:  If you look down, though, I put
24  parentheses.  I corrected it.
25          MS. KYROUZ:  Ah, I just saw that.

468

1      MR. LINDSTROM: Okay. Great. Thank you.
2      MR. SOLOMON: Q. Well, there was both, wasn't
3  there?
4      MR. LINDSTROM: That's argumentative.
5      He's very witty, especially late in the day.
6      MR. SOLOMON: Q. Okay. Now, looking at the
7  second page of the exhibit --
8      It's okay. I think we already saw that
9  language in a different document.
10     A. That was in that one page that you gave me
11  already.
12     Q. That's fine. Thank you.
13     On to the first page. Another question.
14     MR. LINDSTROM: So we're back, still, on 93?
15     MR. SOLOMON: Yes, we are.
16     Q. At the bottom of the document it says, "Greg,
17  for the Miscellaneous Offset Report, I need you to add
18  the date the item was moved to 12601. We need to be
19  able to accumulate the error by quarter."
20     Do you see that?
21     A. Yes.
22     Q. And do you know what error is being referred
23  to there?
24     A. No.
25     MR. SOLOMON: We'll have marked as the next

469

1  exhibit a document produced by the plaintiffs in this
2  litigation with the control No. 000214 to 223.
3      (Whereupon, Plaintiff's Exhibit 94 was marked
4      for identification.)
5      MR. SOLOMON: Q. Have you seen this before?
6      A. No.
7      Q. And you'll see that there's a heading
8  "Unapplied Auto Adjustments." Have you ever heard of
9  that title at Oracle?
10     A. I don't believe so.
11     Q. And do you have an understanding of what this
12  document reflects?
13     A. I can speculate.
14     Q. Okay. What's your speculation?
15     MR. LINDSTROM: Objection. No foundation,
16  calls for speculation.
17     MR. SOLOMON: Q. You can speculate.
18     A. Just looking at the format, it appears to be a
19  list of customers where there are amounts with notations
20  that say "unapplied amount".
21     Q. Okay.
22     A. For a variety of reasons.
23     Q. But beyond that, you don't have an
24  understanding?
25     A. No.

470

1      Q. And if I were to tell you that these are
2  amounts that automatically got switched to the bad debt
3  reserve, that wouldn't help you?
4      MR. LINDSTROM: Assumes facts.
5      THE WITNESS: Again, no, I don't know the
6  disposition of all these things.
7      MR. SOLOMON: So I'll have marked as the next
8  exhibit a document produced by HSBC in this litigation
9  with the HSBC control number of 000001.
10     (Whereupon, Plaintiff's Exhibit 95 was marked
11     for identification.)
12     MR. SOLOMON: Q. You'll see that this is a
13  copy of a check dated May 23rd, 2002, and let me know if
14  you've seen this before.
15     A. No, I don't recall seeing this before.
16     Q. Do you know whether or not Oracle has told the
17  SEC that it issued this check to Household in 2002?
18     A. I don't know.
19     Q. Are you aware that Oracle did not tell the SEC
20  that when it made its presentation to the SEC?
21     MR. LINDSTROM: Assumes facts, no foundation,
22  calls for speculation.
23     THE WITNESS: Again, I don't know what was
24  presented. As I said earlier, it was not the
25  presentation, to the best of my knowledge, and so I

471

1  don't know what was said --
2      MR. SOLOMON: Q. Do you have a concern as
3  Chairman of the Board at Oracle that the SEC be given
4  complete and honest information by Oracle?
5      MR. LINDSTROM: A concern?
6      MR. SOLOMON: Q. A desire.
7      A. Certainly. As I said earlier, hopefully,
8  we -- you know, to the best of our knowledge, presented
9  factual information to them. We wouldn't want to
10  withhold information or not be truthful and so forth, so
11  sure.
12     Q. And if it turns out that I'm right, and that
13  this was never told to the SEC, will you take steps to
14  ensure the SEC is informed?
15     MR. LINDSTROM: Assumes facts, calls for
16  speculation.
17     THE WITNESS: I would have to go talk to lots
18  of people to try to figure out what really happened, and
19  whether it was material or something that was --
20  something we should do. So I don't have enough
21  information to make a judgment yet.
22     MR. SOLOMON: Q. But with billions of dollars
23  on the line, you are going to make that judgment --
24     MR. LINDSTROM: Assumes facts, no foundation,
25  argumentative.

472

1      THE WITNESS:  Again, I'm -- I believe our
2  people spent a lot of time, worked with auditors,
3  counsel, so forth, and I believe we did the best job we
4  could.  You know, we didn't knowingly withhold any
5  information, or stuff like that.
6      MR. SOLOMON:  I'll have marked as the next
7  exhibit a document produced by the defendants in this
8  litigation with control numbers 120113 to 114.
9      (Whereupon, Plaintiff's Exhibit 96 was marked
10      for identification.)
11      THE WITNESS:  Okay.  I've seen it.
12      MR. SOLOMON:  Q.  Okay.  Have you seen this
13  before?
14      A.  I don't believe so.
15      Q.  Okay.  And you'll see that it's from Jennifer
16  Minton to Michael Rocha and copying Larry Garnick dated
17  April the 20th, 2001.
18      Do you see that?
19      A.  Yes.
20      Q.  Towards the bottom of the page there's an
21  exchange between Larry Garnick and Mike Rocha starting,
22  "Chris' team is responsible for getting the renewals
23  done."
24      Do you see that?
25      A.  Yes.

473

1      Q.  Then the next paragraph, the last sentence
2  says, "Also, why was there 24 million in backdated
3  revenue recognized in Feb?" question mark.
4      Do you see that?
5      A.  Yes.
6      Q.  Do you know anything about that?
7      A.  Again, no.  You showed me earlier documents
8  that I think superseded this from Larry Garnick that --
9  because this, I think, related to those other --
10      Q.  Do you know for sure if it does?
11      A.  I certainly assume so.  Larry Garnick, after
12  reading those other documents, they sounded like there
13  was work being done after this to continue to work on
14  these issues with the OKS conversion.
15      Q.  And when did you first become aware of the
16  backdated revenue issue?
17      A.  Again, I don't -- as I testified, I don't
18  recall being aware of the so-called backdated revenue,
19  but I was definitely aware that we were having issues
20  with the conversion.  Jennifer reported that to me, and
21  they were working with the support people and trying to
22  get this thing smoothed out and working properly.
23      MR. SOLOMON:  Let's have marked as the next
24  exhibit a document with control No. 147106.
25      All right, we're going to have to defer that

474

1  document because it has some work product in the
2  margins.
3      So we'll have marked as the next exhibit a
4  document with the control numbers 101525 to 530.
5      (Whereupon, Plaintiff's Exhibit 97 was marked
6      for identification.)
7      THE WITNESS:  Do you want me to go through
8  this whole --
9      MR. SOLOMON:  Q.  Tell me if you recognize the
10  document.
11      A.  I don't.
12      Q.  Let's look at the first page.  There's a
13  reference to support revenues softening for Q4 and
14  perhaps even Q3.
15      Do you see that?
16      A.  This is the second note down here.
17      Q.  Yes.
18      A.  A note to Jennifer.
19      Q.  Yes.
20      A.  Yes, I see that.
21      Q.  Okay.  Now, were you aware, at the beginning
22  of February 2001, that support revenues might be
23  softening for Q4 and perhaps even Q3 at Oracle?
24      A.  I don't recall that.
25      Q.  If you go to the second page, you'll see

475

1  there's a -- an exchange between a Cecile and Roberto.
2      Do you see that?
3      A.  It starts on the bottom of the first page and
4  then carries over?
5      Q.  Correct.
6      A.  Right.
7      Q.  Actually, I'm looking at the top of that
8  second page where it begins saying, "I see risk in the
9  Q4 numbers".
10      A.  Yes, I see that.
11      Q.  And were you aware of the risk being reported
12  here as of the beginning of February 2001?
13      A.  Again, I don't.  I don't recall what comments
14  Mike Rocha would have made at the EC meetings or what.
15      Q.  Okay.  Now, Covisint, do you recall the
16  Covisint deal?
17      A.  Yes.
18      Q.  That was scheduled for Q2, was it not,
19  internally at Oracle?  Was it forecast for Q2 '01
20  originally?
21      A.  I can't remember.  I do remember it being
22  worked very hard in the second quarter.  But I can't
23  remember if it was in the official forecast or not.  It
24  might have shown up as upside.  I just don't recall.
25      MR. SOLOMON:  I'll have marked as the next

476

1  exhibit a document produced by the defendants with the
2  control No. 623514.
3      (Whereupon, Plaintiff's Exhibit 98 was marked
4      for identification.)
5      MR. SOLOMON:  Q.  And just let me know if
6  you've seen this document before, please.
7      A.  Again, I -- I don't recall.
8      Q.  Okay.  You'll see that it appears to suggest,
9  halfway down, that Covisint was an upside deal for Q2
10  that was not likely to close.
11      Do you see that?
12      A.  I see that it's shown under upside deals not
13  likely to close.  I don't see a date.  So I don't know
14  what --
15      Q.  Okay.  That's fair enough.
16      A.  -- period this related to for sure.
17      MR. SOLOMON:  I'll have marked as the next
18  exhibit a document produced by Defendants with the
19  control numbers 025066 and 67.
20      (Whereupon, Plaintiff's Exhibit 99 was marked
21      for identification.)
22      MR. SOLOMON:  Q.  Once you've had a chance to
23  look at it, let me know if you've seen it before.
24      A.  Again, I'm quite familiar with the report.
25  Whether I looked at this particular report that

477

1  particular day, but I'm very aware of the report.
2      Q.  You see you are a recipient?
3      A.  Yes, so I'm sure I got it.  Whether I looked
4  at it that particular day, I don't know.
5      Q.  And it seems to suggest at the top, doesn't
6  it, that Covisint and BAE fell off, JDS Uniface, Kaiser
7  and Teradyne are in.
8      Do you see that?
9      A.  I do see that.
10      Q.  And then on the next page there are some
11  asterisked sentences, one referring to closed deals, the
12  other referring to pipeline deals.
13      Do you see that?
14      A.  The double asterisks?  Yes.
15      Q.  And then under the double asterisk, or against
16  it it says, "Pipeline deals are deals where contracts
17  has received an approval form, a quote or contract draft
18  has been prepared, and the sales rep has indicated the
19  deal may still close in November."
20      Do you see that?
21      A.  Yes.
22      Q.  Is that your understanding of what a pipeline
23  deal was at Oracle at the time?
24      A.  Well, let me see if I can think about what you
25  asked again.

478

1      MR. LINDSTROM:  You mean -- are you saying for
2  purposes of this document, Exhibit 99, or in general,
3  when people use the term "pipeline" or in other reports,
4  is this how it's used?
5      MR. SOLOMON:  Q.  It may be that there are
6  different meanings.  I don't know --
7      A.  There may be different meanings.  I think for
8  her purposes, she was trying to make sure that people
9  understand how she was defining what deals that are
10  still open for that quarter.  So she's saying, in this
11  case, this is day minus 1, I think it's right towards
12  the end, she's including things that reps have not told
13  her are going to slip, right?  So as long as reps still
14  think there's a chance to close over there, she's going
15  to show them the pipeline.
16      Q.  What did it take in Q2 of fiscal '01 to get a
17  potential deal into the pipeline?
18      MR. LINDSTROM:  So you're saying as of this
19  date, the last day of the quarter, or at any point in
20  the quarter?
21      MR. SOLOMON:  Q.  If it changed at Q2 '01,
22  tell me.  But otherwise, just tell me what it was.
23      A.  You're talking about what it took to get into
24  her report?
25      Q.  Into Oracle's pipeline.

479

1      A.  Again, we have --
2      Q.  I'm talking about the astounding pipeline,
3  Mr. Henley.
4      A.  Yeah, the OSO report you talked about earlier
5  and so forth.
6      Sales reps put, in their manager's review of
7  the stuff, deals they're working on, different stages,
8  expected amounts, hoped for closed dates, and et cetera,
9  so there's all that data out there.  And then financial
10  people try to put all this into quarterly forecast, and
11  for her purposes, coming down to the end, the sales reps
12  may not have changed their OSO reports.  So she's
13  working -- her contracts people are working quite
14  closely with the field.  So the field says, "Dead, it's
15  not going to happen this quarter."  She's indicating
16  here, "I'm not going to include that in the pipeline.
17  Even if OSO says it's there, I know it's not going to
18  happen.  I want you guys to know the latest view with
19  the date of go of what's still active, what still being
20  worked.  It won't necessarily all close, but there's a
21  chance it will happen."
22      Q.  Have you heard of -- well, strike that.
23  Excuse me.
24      Would it be inappropriate, in your view, if a
25  customer was dissatisfied with Oracle's product, to say,

480

1 "We will fix it for free if you give us -- if you become
2 a reference for that product"? Would that be
3 appropriate in your view?
4      MR. LINDSTROM: Calls for speculation. No
5 foundation.
6      THE WITNESS: There is -- we're dealing with
7 large, sophisticated customers. There's all kinds of
8 negotiations that go on during the life cycle of
9 relationships with customers. So customers ask for all
10 sorts of things, and we end up doing some things they
11 want and some things they don't want and so forth.
12      MR. SOLOMON: Q. Right. But if a customer is
13 unhappy with Oracle's product, would it be appropriate
14 for Oracle to say, "You ain't going to get that fixed by
15 us for free unless you become a reference for the
16 product"?
17      MR. LINDSTROM: Same concern; hypothetical.
18 Calls for speculation.
19      THE WITNESS: It's a hypothetical thing. It
20 depends on the facts and circumstances of whether it's
21 appropriate or not. But, I mean --
22      MR. SOLOMON: Q. Let me ask you another
23 question. Would it be appropriate at Oracle to proclaim
24 to the world that a customer was a reference customer
25 when the customer had instructed Oracle not to use it as

481

1 a reference customer?
2      A. Yes. I mean, I think that would not be right,
3 and, again, we shouldn't knowingly go out and do
4 something like that.
5      Q. All right.
6      A. And typically, we didn't offer -- we always
7 checked with customers to see if they were willing to
8 let us use their name in a press release, or something
9 like that.
10      Q. Okay. Now, do you know why Covisint slipped
11 from Q2 to Q3?
12      A. Again, my recollection was that it was a rev
13 rec call, that ultimately we couldn't get all the
14 details sorted out the way we needed, and so came
15 midnight, we couldn't -- Tom Williams, to my
16 recollection, was involved in it and so forth. But I
17 don't remember exactly why it slipped, to use your
18 words.
19      Q. Do you know -- so I think you've already
20 testified, so let's just be clear. You don't know which
21 rev rec criteria was not met in Q2?
22      A. I don't recall all the details of what
23 happened.
24      Q. Okay. I'll have marked as the next exhibit a
25 document produced in this litigation with control

482

1 No. 297300.
2      (Whereupon, Plaintiff's Exhibit 100 was marked
3      for identification.)
4      MR. SOLOMON: Q. And while the reporter is
5 marking this, this is one page of an interview memoranda
6 prepared in the SLC -- by the SLC, and the interviewee
7 was Ms. Safra Catz.
8      MR. LINDSTROM: And is this Exhibit 100?
9      THE REPORTER: Yes.
10      MR. SOLOMON: Q. And if you look at the third
11 paragraph starting, "Catz was heavily involved," do you
12 see that?
13      A. Yes.
14      Q. Okay. "When asked why it slipped from Q2
15 '01 -- FY01 into Q3 FY01, Catz explained that she had
16 insisted the customer pay cash because it was a huge
17 deal with a large discount. The deal slipped into the
18 third quarter because Covisint was working on getting
19 enough cash. The cash did not hit Oracle's account in
20 time to be logged as a second quarter deal."
21      Do you see that?
22      A. Yes.
23      Q. Do you know what revenue recognition criteria
24 Ms. Catz had in mind when she decided that the deal
25 should not be recognized in Q2?

483

1      MR. LINDSTROM: No foundation.
2      THE WITNESS: Again, I don't believe she made
3 the determination. I believe the determination on
4 revenue recognition was made by Tom Williams; that he
5 would typically be the person -- Safra Catz, like
6 myself, is not a trained public accountant and doesn't
7 know all the vagueries of revenue recognition. So I
8 think she's portraying what happened, but she's relying
9 on Mr. Williams to make the call.
10      MR. SOLOMON: Q. Do you agree that it's not a
11 revenue recognition criterion that the customer pay cash
12 prior to revenue recognition?
13      MR. LINDSTROM: No foundation. He just told
14 you he's not a rev rec expert.
15      MR. SOLOMON: Q. As a CFO, I thought you may
16 just have some vague knowledge about it.
17      A. I think the main -- again, the keg is at a
18 very high level. The main issue about revenue
19 recognition is there can be no uncertainties, signed
20 contracts and all that, no uncertainties. And there is
21 a variety of things that come to play that could create
22 uncertainties. So if there is an uncertainty about
23 getting cash or something, then that would potentially
24 be a reason this could be deferred. And you said, just
25 earlier, that apparently, all the cash wasn't in the

484

1  company. Covisint was a separately formed venture at
2  the time, so --
3      Q. And who were the ventured partners in that
4  venture?
5      A. It was several of the big auto companies. I
6  don't know if it was all the big three, but I remember
7  Ford was involved and they were trying to enlist, and I
8  can't remember, ultimately, who ultimately joined it.
9  But Ford was kind of leading the charge, is my
10 recollection originally.
11     Q. And would you normally require cash in a bag
12 from entities like Ford before you would recognize
13 revenue?
14     A. Again, I think you would have to go back and
15 look at the circumstances, but this was a highly unusual
16 new venture, and it was a lot of money. So it was a
17 separate entity, and so there was uncertainty.
18     Q. You weren't involved in the decision one way
19 or another?
20     A. No, I never made rev rec calls, and Safra was
21 actively involved in negotiating the deal.
22     MR. SOLOMON: Okay. Let's go off the record a
23 second.
24     (Recess taken from 6:11 to 6:19 P.M.)
25     MR. SOLOMON: Mr. Lindstrom, I have a -- just

485

1  a question about a document that's been designated as
2  highly confidential, attorneys eyes only by HP. My
3  understanding is that -- it certainly doesn't look like
4  it should be highly confidential, but my understanding
5  is that HP has not necessarily withdrawn that
6  designation yet.
7      Are you aware of any withdrawal by HP of that
8  designation on any of the documents?
9      MS. KYROUZ: No.
10     MR. SOLOMON: Okay. And it's fair to say,
11 then, that with respect to documents produced by HP with
12 that designation, Mr. Henley won't have seen them. You
13 wouldn't have shown him.
14     MR. LINDSTROM: I can't hear you.
15     MR. SOLOMON: Is it fair to say -- and I'm not
16 trying to get into attorney/client privilege, but I just
17 want to see if I can use a document that's marked
18 attorneys' eyes only or not.
19     MR. LINDSTROM: So your question to me is
20 would we have shown it to him?
21     MR. SOLOMON: Under any agreement with HP.
22 I'm not saying improperly. Has that happened?
23     MR. LINDSTROM: I'm not aware of any document
24 designated highly confidential by HP that's been shown
25 to this witness.

486

1      MR. SOLOMON: Okay. I appreciate it. Thanks
2  for your help.
3      Q. Mr. Henley, are you aware that HP expressed
4  dissatisfaction with the transaction in which Oracle
5  provided software to HP on November 30th, 2000?
6      MR. LINDSTROM: So you're saying aware of his
7  own personal knowledge, independent of whatever document
8  you're holding?
9      MR. SOLOMON: Correct.
10     THE WITNESS: So you're saying am I aware that
11 on that date, they were dissatisfied or something?
12     MR. SOLOMON: Q. Thereafter. Let me back up.
13     There was a deal or deals on November 30th,
14 2000, okay? Are you aware of HP expressing, thereafter,
15 dissatisfaction with the deal or deals?
16     A. The only thing I'm aware of is I was aware
17 that, a number of months later, they reconsidered
18 whether they wanted to use our CRM or somebody else's,
19 and that was a number of months later.
20     Q. Okay. And are you aware that HP went so far
21 as to complain that they had been misled by Oracle?
22     A. No.
23     MR. SOLOMON: Okay. Let's have marked as the
24 next exhibit a document produced by the defendants.
25 We've had to reformat it because it otherwise wasn't

487

1  usable. The control numbers are 147106 and 147106. I
2  guess it was one document we've had to split into
3  two pages. One page.
4      (Whereupon, Plaintiff's Exhibit 101 was marked
5      for identification.)
6      MR. SOLOMON: Q. And once you've had a chance
7  to review it, let me know if you've seen this before.
8      A. I can't recollect if I saw this or not.
9      Q. Okay. And you'll see in the columns toward
10 the left-hand side of the page there are references to
11 backdated revenue.
12     Do you see the references?
13     A. Again, I do see something starting the prior
14 month. Backdated revenue, is that what you're talking
15 about?
16     Q. Below "Prior Month" there's a reference to
17 prior month backdated revenue, and under "Current Month"
18 there's a reference to current month backdated revenue.
19     Do you see that?
20     A. Yes, down at the bottom of that second
21 category? Yes.
22     Q. Do you know what that refers to?
23     A. Again, no. Is there a date on this report?
24     Q. It's dated the 16th of November, if you look
25 at the top. It doesn't have the year, though.

Henley, Jeffrey  11/16/2006  9:20:00 AM

488

1    A. It doesn't have the year. Okay. I can see
2  the 16 November.
3    Q. And I don't know if that's necessarily the
4  date that this document was created or not. I can't
5  tell you.
6    A. Nor can I. We're just both reading the
7  report, I guess, the corner.
8    Q. I'm finished with the document if you're not
9  familiar with it.
10    A. Okay.
11    Q. Were you aware, in November of 2000, that the
12  internal audit function at Oracle, or the internal audit
13  department of Oracle, was revising the internal audit
14  procedures at the company?
15    A. I don't recollect that.
16    Q. Would you have been involved in that at all?
17    A. Um, from time to time, if they decided to
18  audit a different scope of things or do something, they
19  might come to me, or certainly come to me and the audit
20  committee and talk about, you know, how they wanted to
21  proceed, what they thought was high priority to be
22  looking into and so forth. And that happened -- it was
23  kind of evolutionary over the years. But I don't recall
24  whether they were doing that at that particular time.
25    Q. Okay. Did you ever read a book called Soft

489

1  War?
2    A. This was the one that was written by the
3  English guy?
4    Q. Yes.
5    A. I read a fair amount of it after it came out,
6  and as you know, if you read it, I guess, I was
7  interviewed by him.
8    Q. How long were you interviewed by him for?
9    A. I think we had a couple of sessions.
10    Q. Did he record the interview?
11    A. I don't know.
12    Q. Was there a tape recorder in the room that you
13  remember?
14    A. I just don't remember. But I definitely think
15  I met him at least two times. I don't think it was just
16  one interview.
17    Q. And do you know how long the interviews, in
18  aggregate, were?
19    A. I don't remember exactly. I mean, they
20  weren't all day, or something like that, if that's what
21  you're saying, but, I mean, they were probably an hour
22  or so, my recollection.
23    MR. SOLOMON: I'll have marked as the next
24  exhibit an excerpt from Soft War.
25    Did you discuss with Mr. Ellison whether or

490

1  not the book ought to be written or published?
2    A. I don't recall. I remember he told me that he
3  was working with him, and would I interview with him,
4  and felt he was an able, fair guy coming out of the
5  economist's side, and he would give a balanced view and
6  he wouldn't take one particular point of view. He
7  thought he would be objective.
8    Q. Okay.
9    A. He seemed comfortable that it was a good idea.
10    MR. SOLOMON: Okay.
11    (Whereupon, Plaintiff's Exhibit 102 was marked
12    for identification.)
13    MR. SOLOMON: Q. I'm looking at page 221 of
14  the book, and I'm looking towards the top of the page,
15  and it says, "Ellison" -- let me start the sentence.
16  "However, even at Oracle, with its much-trumpeted
17  $1 billion of savings and the boast of being able to
18  extract as much again this year," and parens, "(recently
19  slightly moderated because of the economy)", closed
20  quotes, "Ellison was, according to his own CFO, Jeff
21  Henley, running slightly ahead of reality. But for
22  customers, including some of the ones around the table
23  on Broadway, what might be galling was the fact that
24  until very recently, Oracle had enthusiastically been
25  selling the very approach, namely customized

491

1  best-of-breed solutions, that Ellison was now describing
2  as madness."
3    Do you see that?
4    A. I do see that.
5    Q. And did you describe Mr. Ellison as running
6  slightly ahead of reality?
7    A. I don't remember what I said. I don't know if
8  I used those words, or whether that was his way of
9  describing something I said in several interviews or
10  something.
11    Q. Are you disputing that you would have conveyed
12  that to Mr. Symonds?
13    MR. LINDSTROM: Conveyed the precise words
14  used here?
15    MR. SOLOMON: Q. That Mr. Ellison was running
16  slightly ahead of reality.
17    A. I really have no idea whether I would have
18  used those exact words or not. I really don't recall.
19    MR. LINDSTROM: So I think we're done, aren't
20  we?
21    We're out of time.
22    MR. SOLOMON: How much time are we at?
23    THE VIDEOGRAPHER: Zero.
24    MR. SOLOMON: All right. I have many more
25  questions, but I'm going to have to move the court to

Henley, Jeffrey  11/16/2006  9:20:00 AM

492

1   get permission to ask you some more.  Thank you very
2   much.
3        MS. KYROUZ:  We would like to designate the
4   transcript as confidential.
5            --o0o--
6        (Whereupon, the deposition was
7         concluded at 6:29 P.M.)
8
9   Dated: _____ Signed: _____
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

493

1        CERTIFICATE OF WITNESS
2
3
4
5        I, the undersigned, declare under penalty of
6   perjury that I have read the foregoing transcript, and I
7   have made any corrections, additions, or deletions that
8   I was desirous of making; that the foregoing is a true
9   and correct transcript of my testimony contained
10  therein.
11       EXECUTED this _____ day of _____,
12  2006, at _____, _____.
13
14
15
16
17
18       _____
19        Signature of Witness
20
21
22
23
24
25

494

1        REPORTER'S CERTIFICATE
2
3        I hereby certify that the foregoing is a true
4   record of the testimony as reported to the best of my
5   ability by me, a Certified Shorthand Reporter and a
6   disinterested person, and was thereafter transcribed
7   under my direction into typewriting by computer.
8
9        I FURTHER CERTIFY that I am not interested in
10  the outcome of the said action and not connected with
11  nor related to any of the parties in said action or
12  their respective counsel.
13  Dated: _____ _____
                 APRIL DAWN HEVEROH, CSR
14               CSR NO. 8759
15
16
17
18
19
20
21
22
23
24
25

Oracle

Page  492 - 494

1          REPORTER'S CERTIFICATE

2

3          I hereby certify that the foregoing is a true

4    record of the testimony as reported to the best of my

5    ability by me, a Certified Shorthand Reporter and a

6    disinterested person, and was thereafter transcribed

7    under my direction into typewriting by computer.

8

9          I FURTHER CERTIFY that I am not interested in

10   the outcome of the said action and not connected with

11   nor related to any of the parties in said action or

12   their respective counsel.

13   Dated: 11-21-06

                    APRIL DAWN HEVEROH, CSR
14                       CSR NO. 8759

15

16

17

18

19

20

21

22

23

24

25