# EXHIBIT J

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         NORTHERN DISTRICT OF CALIFORNIA
 3              SAN FRANCISCO DIVISION
 4
 5   In re ORACLE CORPORATION
 6   SECURITIES LITIGATION.
 7              Master File No. C-01-0988-MJJ
 8   This Document Relates To:
 9
10   ALL ACTIONS.
11   _____/
12
13              ---o0o---
14              CONFIDENTIAL
15      DEPOSITION OF LAWRENCE ELLISON
16                VOLUME I
17         THURSDAY, JULY 13, 2006
18              ---o0o---
19
20      SHEILA CHASE & ASSOCIATES
              REPORTING FOR:
21         LiveNote World Service
           221 Main Street, Suite 1250
22      San Francisco, California 94105
            Phone: (415) 321-2311
23            Fax: (415) 321-2301
24   Reported by:
     DIANA NOBRIGA, CSR, CRR
25   LICENSE NO. 7071
```

2

```
 1              I N D E X
 2         INDEX OF EXAMINATION
 3                       PAGE
 4   EXAMINATION BY MR. SOLOMON        12
 5
 6
 7              ---o0o---
 8         INDEX OF EXHIBITS
 9   EXHIBIT      DESCRIPTION      PAGE
10   Exhibit 1   E-mail from Stephanie Aas,
11       dated March 31, 2000 to Jeff
12       Henley            17
13   Exhibit 2   E-mail from Ka Wai Leung,
14       dated May 24, 2000 to
15       snaroff@apple.com        20
16   Exhibit 3   E-mail from Jay Nussbaum, sent
17       July 20, 2000 to John Wheeler    22
18   Exhibit 4   E-mail from Sandy Sanderson,
19       dated July 30, 2000 to George
20       Roberts            26
21   Exhibit 5   E-mail dated August 11, 2000 to
22       Sandy Sanderson from Vincent
23       Bodsworth            32
24
25
```

3

```
 1   Exhibit 6   One-page document, first line
 2       indicating in part:  In
 3       August of 1998 we signed a $10
 4       million dollar agreement      40
 5   Exhibit 7   Two-page document, first line
 6       indicating in part:  In August
 7       of 1998 we signed a $10 million
 8       dollar agreement        42
 9   Exhibit 8   One-page document, first line
10       indicating:  See keith
11       block's comments re:  11i
12       training and product quality.    43
13   Exhibit 9   E-mail from Frank Varasano,
14       dated October 11, 2000 to
15       ron.wohl@oracle.com        45
16   Exhibit 10  Two-page document, Subject:
17       BellSouth            56
18   Exhibit 11  E-mail from John Fikany, sent
19       October 19, 2000 to Tom, Frank
20       Varasano, Sandy Sanderson...    60
21   Exhibit 12  One-page document, first line
22       indicating:  For tomorrow with
23       Karen            66
24
25
```

4

```
 1   Exhibit 13  E-mail from Safra A. Catz,
 2       dated November 30, 2000
 3       to Thomas Williams        67
 4   Exhibit 14  E-mail from Ron Wohl, dated
 5       December 12, 2000 to
 6       Kevin Miller          69
 7   Exhibit 15  E-mail from Safra A. Catz,
 8       dated January 2, 2001 to
 9       Wohl,Ronald          73
10   Exhibit 16  E-mail from Cliff Godwin,
11       dated January 3, 2001 to
12       Sanders,Roger          77
13   Exhibit 17  E-mail from Safra A. Catz, sent
14       January 5, 2001 to Carolyn
15       Balkenhol          79
16   Exhibit 18  E-mail from Cliff Godwin, dated
17       January 10, 2001 to
18       Huda,Andrew          83
19   Exhibit 19  E-mail from Gayle Fitzpatrick,
20       sent January 12, 2001 to James
21       McHugh            85
22   Exhibit 20  E-mail from Lawrence Ellison,
23       dated August 5, 2000 to Safra A.
24       Catz            89
25
```

5

1   Exhibit 21   E-mail from Jeff Henley, dated
2                September 6, 2000 to
3                saas@us.oracle.com            99
4   Exhibit 22   E-mail from Jeff Henley, dated
5                September 14, 2000 to jminton    102
6   Exhibit 23   E-mail from Jay Nussbaum,
7                dated October 10, 2000 to
8                Police                        102
9   Exhibit 24   E-mail from Michael Rocha,
10               dated October 12, 2000 to
11               larry.ellison@oracle.com      112
12  Exhibit 25   E-mail from Sandy Sanderson,
13               dated October 12, 2000 to
14               Larry Ellison                 116
15  Exhibit 26   FY 02 Consulting Budget Review
16               April 3, 2001                 118
17  Exhibit 27   E-mail from Joel Summers,
18               dated November 8, 2000 to
19               Larsen,Kurt                   121
20  Exhibit 28   E-mail from Jennifer Minton,
21               dated November 16, 2000 to
22               Williams,Thomas               126
23  Exhibit 29   2000 Annual Report entitled:
24               Oracle Software Powers the Internet  129
25

6

1   Exhibit 30   E-mail from Ron Wohl, dated
2                December 4, 2000 to Kirsten,Shaw    134
3   Exhibit 31   E-mail from Jay Nussbaum,
4                sent December 7, 2000 to
5                dafreedman@bellsouthips.com    138
6   Exhibit 32   E-mail from Sergio Giacoletto,
7                dated December 9, 2000 to
8                Lawrence J. Ellison           141
9   Exhibit 33   E-mail from Ron Wohl, dated
10               December 16, 2000 to
11               Kshaw@oracle.com              144
12  Exhibit 34   E-mail from Ami Vora, dated
13               January 5, 2001 to Lowry Fenton    149
14  Exhibit 35   E-mail from Safra A. Catz, dated
15               January 9, 2001, cc to
16               Ellison,Lawrence              156
17  Exhibit 36   E-mail from Ron Wohl, dated
18               January 9, 2001 to
19               Shaw.Kirsten                  159
20  Exhibit 37   E-mail from Safra A. Catz,
21               dated January 9, 2001 to
22               Ellison,Lawrence              163
23  Exhibit 38   E-mail from Rebecca Enonchong,
24               dated January 11, 2001 to
25               Kirsten Shaw                  166

7

1   Exhibit 39   E-mail from Safra A. Catz,
2                dated January 16, 2001 to
3                Ellison,Lawrence              168
4   Exhibit 40   E-mail from Safra A. Catz,
5                dated January 23, 2001 to
6                HQAPP                         169
7   Exhibit 41   E-mail from Ron Wohl, dated
8                January 21, 2001 to
9                Sergio Giacoletto             171
10  Exhibit 42   E-mail from Lawrence J. Ellison,
11               dated January 27, 2001 to
12               Lawrence J. Ellison           177
13  Exhibit 43   E-mail from Safra A. Catz,
14               dated January 29, 2001 to
15               Ellison,Lawrence              182
16  Exhibit 44   E-mail from Safra A. Catz,
17               dated January 30, 2001 to
18               Ellison,Lawrence              186
19  Exhibit 45   E-mail from Ron Wohl, dated
20               January 31, 2001 to
21               Ellison,Lawrence              192
22  Exhibit 46   E-mail from Michael DeCesare,
23               dated November 28, 2000 to
24               Ellison,Lawrence              195
25

8

1   Exhibit 47   E-mail from Ron Wohl, dated
2                February 6, 2001 to
3                Ellison,Lawrence              208
4   Exhibit 48   E-mail from Jeff Henley,
5                sent February 7, 2001 to
6                Renee Knee                    211
7   Exhibit 49   Two-page document, second page
8                being an e-mail from Ron
9                Wohl, dated February 8, 2001
10               to Ellison,Lawrence           214
11  Exhibit 50   E-mail from Jeff Henley,
12               dated February 19, 2001 to
13               Jennifer Minton               219
14  Exhibit 51   E-mail from Lawrence J. Ellison,
15               dated March 8, 2001 to
16               Catz.Safra                    223
17
18
19
20
21
22
23
24
25

**9**

1  BE IT REMEMBERED that on Thursday, July 13,
2  2006, commencing at the hour of 9:33 a.m., thereof, at
3  the LAW OFFICES OF LERACH, COUGHLIN, STOIA, GELLAR,
4  RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite 2600,
5  San Francisco, California, before me, DIANA NOBRIGA, a
6  Certified Shorthand Reporter in and for the State of
7  California, personally appeared
8  LAWRENCE ELLISON,
9  as a witness by the plaintiffs herein, who, being by me
10  first duly sworn, was thereupon examined and testified
11  as hereinafter set forth.
12
13  ---oOo---
14
15  Appearing as counsel on behalf of the Plaintiffs:
16  MARK SOLOMON, ESQUIRE
    STACY KAPLAN, ESQUIRE
17  VALERIE McLAUGHLIN, ESQUIRE
    LERACH, COUGHLIN, STOIA, GELLAR,
18  RUDMAN & ROBBINS
    655 West Broadway, Suite 1900
19  San Diego, CA 92101-3301
    marks@lerachlaw.com
20
    SHAWN A. WILLIAMS, ESQUIRE
21  ELI GREENSTEIN, ESQUIRE
    JENNIE LEE ANDERSON, ESQUIRE
22  LERACH, COUGHLIN, STOIA, GELLAR,
    RUDMAN & ROBBINS
23  100 Pine Street, Suite 2600
    San Francisco, CA 94111
24  Shawnw@lerachlaw.com
25

**10**

1  Appearing as counsel on behalf of Defendants:
2  GREGORY P. LINDSTROM, ESQUIRE
    LATHAM & WATKINS
3  505 Montgomery Street, Suite 2000
    San Francisco, CA 94111-2562
4  gregory.lindstrom@lw.com
5  PATRICK E. GIBBS, ESQUIRE
    LATHAM & WATKINS
6  140 Scott Drive
    Menlo Park, CA 94025-1008
7  patrick.gibbs@lw.com
8
9  Present via Internet:  Keith Mautner, Esq.;  Doug
10  Lerach, Esq.;  Doug Britton, Esq.;  John Mayer, Esq.;
11  Monique Winkler, Esq.
12
13  Also Present:  Dorian Daley, Esq., Oracle;
14  James Terrell, Videographer
15
16
17
18
19
20
21
22
23
24
25

**11**

1  VIDEOGRAPHER:  This begins the videotaped
2  deposition of Larry Ellison, tape one, Volume I, in the
3  matter entitled:  In Re Oracle Corporation Securities
4  Litigation, as filed in the United States District Court
5  for the Northern District of California, Master File
6  No. C-01-0988-MJJ, today's date is July 13, 2006.  The
7  time on the video monitor is 9:33.  The video operator
8  today is James Terrell representing LiveNote World
9  Service, located at 221 Main Street, Suite 1250 in
10  San Francisco, California 94105.  The phone number is
11  415 321-2300.  The court reporter is Diana Nobriga of
12  Sheila Chase and Associates, reporting on behalf of
13  LiveNote World Service.
14  Today's deposition is being taken on behalf of
15  plaintiffs and is taking place at 100 Pine Street in
16  San Francisco, California.  Would counsel now please
17  introduce yourselves and whom you represent.
18  MR. SOLOMON:  Mark Solomon of Lerach,
19  Coughlin, representing plaintiffs.
20  MS. KAPLAN:  Stacy Kaplan of Lerach, Coughlin,
21  representing plaintiffs.
22  MS. McLAUGHLIN:  Valerie McLaughlin, Lerach,
23  Coughlin, representing plaintiffs.
24  MR. WILLIAMS:  Shawn Williams, Lerach,
25  Coughlin, representing plaintiffs.

**12**

1  MS. ANDERSON:  Jennie Lee Anderson, Lerach,
2  Coughlin, representing plaintiffs.
3  MR. GREENSTEIN:  Eli Greenstein, Lerach,
4  Coughlin, representing plaintiffs.
5  MR. LINDSTROM:  Greg Lindstrom, Latham and
6  Watkins, representing the defendants and the witness.
7  MR. GIBBS:  Patrick Gibbs, Latham and Watkins,
8  representing the defendants and witness.
9  MS. DALEY:  Dorian Daley, Oracle, representing
10  the witness.
11  VIDEOGRAPHER:  You may swear in the witness.
12  LAWRENCE ELLISON,
13  having been duly sworn, testified as follows:
14  EXAMINATION BY MR. SOLOMON
15  MR. SOLOMON:  Q.  Good morning, Mr. Ellison.
16  A.  Good morning.
17  Q.  You know you're here to give your deposition
18  today in a securities class action?
19  A.  I do.
20  Q.  And you've had your deposition taken many
21  times in the past?
22  A.  I have.
23  Q.  And you've actually given testimony at trial
24  on occasion in the past, too; is that correct?
25  A.  I have.

13

1    Q.  So you're familiar with these proceedings?
2    A.  I am.
3    Q.  Okay.  Are you prepared for your deposition
4  today?
5    A.  I think so.
6    Q.  Did you -- first of all I want to break down
7  the preparation.  In terms of preparation not involving
8  your lawyers, how did you prepare?
9    A.  I didn't.
10    Q.  Okay.  And in terms of preparation involving
11  your lawyers, did you meet with your lawyers?
12    A.  I did.
13    Q.  When did you meet with them?
14    A.  Yesterday.
15    Q.  How long did you meet with them for?
16    A.  Pardon me?
17    Q.  How long did you meet with them for?
18    A.  Four or five hours.
19    Q.  Okay.  And did you review some documents?
20    A.  I did.
21    Q.  Did those documents help refresh your
22  recollection?
23    A.  They did.
24    Q.  And as to what topics did they help you
25  refresh your recollection?

14

1    A.  The topics around the time period in late
2  2000, earlier 2001.
3    Q.  Did you read the -- have you ever read the
4  complaint in this matter?
5    A.  I have not.
6    Q.  Do you have an understanding what this action
7  is about?
8    A.  A general understanding, yes.
9    Q.  What is that understanding?
10    A.  That we missed our quarter in Q3 of fiscal
11  2001, and people -- the complaint was we -- I think the
12  complaint said we knew we were going to miss it.
13    Q.  Do you have any understanding of any other
14  allegations other than missing Q3?
15    A.  No.
16    Q.  You met with your lawyers yesterday for four
17  or five hours.  And did you meet with them this morning
18  as well?
19    A.  Just when I stepped out this moment.
20    Q.  Okay.  And I guess just before we start, just
21  for the record, I know you came in a little bit late,
22  and it is understandable given the traffic.  We're
23  entitled to 14 hours of deposition time, I'm not sure if
24  we need it all.  We're certainly entitled to it.  We're
25  going to finish at 5:00 today.  To the extent that I

15

1  need the extra time I lost this morning, that will
2  happen on some subsequent occasion.  Do you understand
3  that?
4    A.  I do.
5    MR. LINDSTROM:  That's fine, counsel.  And
6  also I offered to Shawn, and I will offer to you, we'll
7  try and take a shorter lunch break than we would
8  otherwise to try and make up the half hour we lost.
9    MR. SOLOMON:  Totally appreciate that.
10    Q.  Now, is it part of your understanding of this
11  case that your sales of Oracle stock are involved?
12    A.  Yes, generally.
13    Q.  Because in the last week of January 2001, it's
14  true that you exercised options and sold stock to the
15  tune of around $894 million?
16    A.  That is not correct.
17    Q.  Tell me what's correct.
18    A.  Throughout the month of January.  I believe I
19  sold throughout the month of January.  Wasn't a one-week
20  period.
21    Q.  You started at the beginning of January and
22  ended at the end?
23    A.  I believe so.
24    Q.  And you're aware, are you not, that there is a
25  prohibition on trading stock as an executive of a

16

1  publicly traded corporation if you have in your
2  possession material knowledge that's not available to
3  the general public?  Are you aware of that?
4    MR. LINDSTROM:  Objection to the extent it
5  calls for a legal conclusion.  He may answer according
6  to his lay understanding.
7    MR. SOLOMON:  Q.  Go ahead.
8    A.  Yes.
9    Q.  And it's your defense, is it, or is it part of
10  your defense that when you traded your stock throughout
11  the month of January, you didn't have in your possession
12  material facts that the investing public didn't have?
13    MR. LINDSTROM:  Same objection.
14    You may answer according to your understanding
15  of material and the other legal aspects that were
16  inherent in that question.
17    THE WITNESS:  I thought we were in a very
18  strong position to make our number.
19    MR. SOLOMON:  Q.  So is the answer to the
20  question, yes, you know you were not in possession of
21  material information the investing public didn't have,
22  or you were?
23    MR. LINDSTROM:  Same objection.
24    THE WITNESS:  I wasn't in possession of any
25  material information that would make it seem like we

17

1 would miss our quarter. We had signed the largest deal
2 in our history early in the quarter. I don't think that
3 was generally available. So the information I had was
4 that we were off to a very, very strong start.
5 MR. SOLOMON: Q. So you would say you weren't
6 in possession of any material adverse information?
7 A. That's correct.
8 Q. Is that fair?
9 A. That's correct.
10 MR. SOLOMON: I want to take you through some
11 documents, Mr. Ellison. Have marked as Ellison
12 Exhibit 1 a document produced by defendants in this
13 action, with a Bates range NDCA-ORCL -- I won't mention
14 the pretext in the future, I'll just mention the
15 numbers -- 031608 though 09.
16 (Exhibit 1 marked for
17 identification.)
18 MR. SOLOMON: Q. And if you take a chance to
19 look at it, it is dated Friday, March 31st, 2000, and it
20 is an e-mail exchange involving Stephanie Aas and Jeff
21 Henley. Once you've had a chance to look at it, just
22 let me know.
23 A. Okay.
24 Q. First, have you seen this e-mail exchange
25 before?

18

1 A. I don't recall.
2 Q. Okay. On the first page, almost halfway down
3 where it says, "Jeff Henley wrote: Larry now says that
4 Mark was wrong and that all of CRM will be available end
5 of May," do you see that?
6 A. I do.
7 Q. Do you know if that refers to you, Larry
8 Ellison?
9 A. I would be guessing, but I'm guessing, yes.
10 Q. And do you know who the Mark is referenced
11 there?
12 A. Again, I assume it is Mark Barrenechea.
13 Q. And do you recall an incident that's reflected
14 here where you were saying that Mark was wrong, as
15 stated in that sentence?
16 A. I don't recall.
17 Q. Okay. If we go to the first sentence, it
18 reads -- the first two sentences, "Yesterday I worked
19 with marketing and Gary to provide Larry with all the
20 facts before he made that decision. It is unfortunate
21 because all the major audiences, industry analysts,
22 financial analysts/investors, partners, OAUG board,
23 already know about the delay."
24 Do you see that?
25 A. I do.

19

1 Q. Does that reference the delay in bringing the
2 suite 11i to market?
3 MR. LINDSTROM: Objection; no foundation,
4 calls for speculation.
5 MR. SOLOMON: Q. If you know.
6 A. I don't know.
7 Q. Okay. And where it says, "We will lose even
8 more credibility if we go back on what is already out on
9 the market," do you have an understanding what that
10 refers to?
11 A. In a general sense, yes.
12 Q. What is your general sense?
13 A. Well, when you say one thing and something
14 else happens, you lose credibility.
15 Q. Okay. Did you experience a loss of
16 credibility in this situation, do you know?
17 MR. LINDSTROM: Objection; no foundation.
18 THE WITNESS: Again, I'm not -- I'm not quite
19 sure what she's referring to, so ...
20 MR. SOLOMON: Okay.
21 THE WITNESS: She's --
22 MR. LINDSTROM: Don't speculate.
23 THE WITNESS: I'm just saying she's an
24 investor relations analyst.
25 MR. SOLOMON: Q. When you say she?

20

1 A. Stephanie Aas.
2 Q. Do you work closely with her?
3 A. No.
4 Q. In those days did you?
5 A. No.
6 MR. SOLOMON: I'll have marked as Ellison 2
7 another document produced in this litigation with the
8 Bates number 019152, dated Wednesday, May 24th, 2000.
9 (Exhibit 2 marked for
10 identification.)
11 MR. SOLOMON: Q. And again, if you just take
12 a chance to look at it. And while you're looking at it,
13 this is an e-mail from Ka, K-a, Wai, W-a-i, Leung,
14 L-e-u-n-g, to S-n-a-r-o-f-f and to Joe Bishop, and it
15 copies Peri Frantz. Have you seen this before?
16 A. I have not.
17 Q. It starts with, "Hi, Sohaib updated Larry on
18 the latest status. He is glad that things are
19 progressing well and wants to be informed on program
20 status. He expressed concerns about the performance
21 issue as expected and its impact on customer perception
22 of Apps 11i on Apple."
23 Do you see that?
24 A. I do.
25 Q. Do you recall -- first of all, do you believe

21

1  this refers to you, Larry Ellison?
2      A.  I believe so.
3      Q.  And do you recall being concerned about the
4  performance issues reflected here?
5      A.  On the Apple Computer?
6      Q.  With respect to Apps 11i on Apple, yes.
7      A.  Apple is a very, very small market, and to
8  make -- our software is primarily designed to work on
9  PCs.  And to make it work on Apple, we had to have a
10  Java virtual machine that performed on Apple
11  effectively, approximately the same performance that it
12  performs on a PC.
13          The Java virtual machine is not built by us,
14  it is built by Sun Computer or other companies.  And we
15  had gone back to Sun and asked for several performance
16  fixes and several fixes to make it work on Apple.
17          And the general concern was us getting that
18  Java virtual machine to work on Apple and getting the
19  Sun fixes in a reasonable time frame.
20      Q.  Second paragraph goes on to say, "The big risk
21  is" -- in part, I should say, "The big risk is that we
22  do a big public splash and the performance fix does not
23  appear in July.  We hope this scenario does not happen,
24  but we're also dealing with future code that hasn't been
25  verified yet."

22

1          Do you see that?
2      A.  I do.
3      Q.  Do you understand what that's referring to?
4      A.  Again, about less than one percent of our
5  customers or users are on Apple machines.  However, a
6  few universities and Apple themselves, who was a
7  prospect at the time, are important customers.  So we
8  were concerned that if the Java virtual machine bugs
9  were not fixed, there was nothing we could do within our
10  power to make our application perform adequately on
11  Apple, and we were concerned.
12      Q.  Was this an issue that would have an impact on
13  Oracle's credibility, in your view?
14      A.  Among Apple customers, among those industries
15  that used Apple computers, sure.
16      MR. SOLOMON:  I've marked as the next
17  exhibit documents produced by defendants, Bates range
18  150893 to 895.
19          (Exhibit 3 marked for
20          identification.)
21      MR. SOLOMON:  Q.  While you are looking at it,
22  this is another e-mail exchange, and involved in these
23  exchanges are, apparently, John Wheeler, Kevin Summers,
24  Izecher, Mark Barrenechea, and Jay Nussbaum.
25  And when you've had a chance to look at it, the question

23

1  will be have you seen it before?
2      MR. LINDSTROM:  Take your time to review the
3  entire document.
4      THE WITNESS:  I will.
5      Okay.
6      MR. SOLOMON:  Q.  Have you seen it before?
7      A.  I have not.
8      Q.  Are you familiar with BellSouth?
9      A.  Yes, I am.
10      Q.  And are you familiar with the BellSouth
11  implementation of 11i in 2000/2001?
12      A.  Yes.
13      Q.  And if you go to the second page of the
14  document, you'll see that down towards the bottom of the
15  page there is a subject line, "Testing," dated Friday,
16  7th of July.  The first line saying, "The testing is not
17  going well at this time, which is a disappointment to
18  everyone involved."
19          Do you see that?
20      A.  I do.
21      Q.  Do you have an understanding what the testing
22  is referring to?
23      A.  Yes.  There was a large project, huge
24  consulting effort combined with some new software from
25  Oracle Corporation to automate a system at BellSouth.

24

1  And there was a huge amount of custom code combined with
2  a brand new product from Oracle, and it wasn't
3  delivering the functionality that BellSouth had
4  expected.
5      Q.  Were you aware around Friday, 7th of July, I
6  say around, that the testing was not going well at
7  BellSouth?
8      A.  I certainly came to be aware that things did
9  not go well at BellSouth.  There were lots of meetings,
10  but I can't pinpoint the date of when I first became
11  aware of the problems.
12      Q.  Okay.  And if you go to the first page of the
13  document, you'll see that a third of the way, nearly
14  half the way down in the e-mail exchange it says, "Will
15  let you know if Friday is in jeopardy, if so, you will
16  need to get Ellison involved to fly cover."
17          Do you see that?
18      A.  I do.
19      Q.  Do you have an understanding what that means,
20  "You need to get Ellison involved to fly cover"?
21      A.  I'm not sure.  I would be guessing.
22      Q.  Okay.  Did you get involved in response to
23  this e-mail, do you know?
24      A.  I don't think in response to this e-mail.  I
25  subsequently -- I met with BellSouth about this project.

25

1   But I have no idea if it was in response to this e-mail
2   or the exact date I met with them.
3       Q.   Okay.  Do you know if it was in July of 2000?
4       A.   I do not.
5       Q.   And then just ahead of that, the first line of
6   that e-mail, "The pressure is building, we are due to
7   turn over the system this Friday for the system testing
8   to start."
9           Do you know what system testing is being
10  referred to there?
11      A.   Yes.
12      Q.   What is that?
13      A.   It was the combination -- again we had large
14  consulting projects, the consultants had written a great
15  deal of code, and we had a new Oracle software product.
16  And the combination of those, the consulting code and
17  the Oracle product, they began to run the BellSouth data
18  through that code.
19      Q.   In preparing for this deposition, did you see
20  any documents relating to BellSouth that refreshed your
21  recollection?
22      A.   I don't recall.
23      MR. LINDSTROM:  You've answered the question.
24      MR. SOLOMON:  Q.  If I just measure on the
25  desk, how many documents did you look at?

26

1       A.   An inch.
2       MR. SOLOMON:  Have marked as the next exhibit
3   a document produced by Oracle with the Bates numbers
4   101654 to 656.
5           (Exhibit 4 marked for
6           identification.)
7       MR. SOLOMON:  Q.  Again, once you had a chance
8   to look at it, the question is going to be, have you
9   seen it before?
10      A.   I have not seen it before.
11      Q.   I want to go to the second page, first of all.
12  And you'll see there is an e-mail exchange there at the
13  top, it's to Safra Catz, Edward Sanderson, Ron Wohl and
14  Mark Barrenechea from George Roberts.  And it says, "We
15  are having challenges with the 11i demo system that is
16  costing us Q1 business."  I think it is supposed to say
17  "are," but it seems to say, "Ro are aware."  Do you know
18  what that means, by the way?
19      A.   The R-o?
20      Q.   Yes.
21      A.   No.
22      Q.   "-- are aware of this and working the issues
23  but I believe we should have calls weekly/b to track the
24  progress on this like we do forecasts because of how
25  crucial it is to" -- then it says "s" -- I think we

27

1   missed some lines here -- "e-Business suite story."
2           Do you see that?
3       A.   Yes.
4       Q.   Were you aware around July of 2000 of
5   challenges with the 11i demo system that was costing you
6   Q1 business?
7       A.   I was certainly aware that the demonstration
8   system was sometimes months behind the actual product,
9   and because 11i was relatively new, we didn't have as
10  comprehensive set of demos for it as we did some of the
11  older products.  That is not an uncommon situation, when
12  we come up with a new product it takes a while to
13  actually build the sales-oriented demonstrations for
14  that product.
15      Q.   Do you know whether there were the calls
16  weekly or biweekly to track the progress as suggested
17  here?
18      A.   I assume there were.  I don't know it to be a
19  fact.
20      Q.   You weren't involved, as far as you know?
21      A.   I was not.
22      Q.   And then under the first page, it's an e-mail
23  from Kevin Glynn to Sandy Sanderson.  Do you know who
24  Kevin Glynn is?
25      A.   I do not.

28

1       Q.   You do know who Sandy Sanderson is?
2       A.   Yes.
3       Q.   It starts off saying, "Yes, we have several
4   demo challenges.  ADS does not complete their build out
5   of" -- this is a little bit frustrating, because I think
6   we're missing some of the print.  Do you think it is
7   possible -- is this the way it was produced?
8           We'll sort of muddle our way through a little
9   bit, but, counsel, apparently this is how this was
10  produced.  If it is possible to produce a legible copy
11  with more detail on the right-hand side, that would be
12  helpful.
13      MR. LINDSTROM:  We'll take your request under
14  advisement.
15      MR. SOLOMON:  Q.  So it says, "Yes, we have
16  several demo challenges.  ADS does not complete their
17  build out of new -- something -- after product is
18  released or close to release.  This means they are
19  always behind."
20          Then it goes on to say, "Specifically, Order
21  Management performance has been poor.  ADS believes this
22  has been resolved in -- something -- week."
23          Then 2 is, "Lack of data in CRM."  Then
24  language about that.
25          And 3 is, "Lack of stable integrated

29

1  instance."
2      It goes on to say, "To the best of my
3  knowledge we have only one" -- I think that would say
4  "instance," I don't know -- "development that is an
5  integrated version of CRM and ERP," and more language.
6  "4 - Lack of data in emerging modules such as APS."
7      Goes on to say, "This is also causing us
8  delivery problems. Clients install Vision first to
9  learn," then there is some more language.
10      Just with respect to those sort of bullet type
11  points, were you aware of those issues around July of
12  2000?
13      MR. LINDSTROM:  Objection; compound.
14      MR. SOLOMON:  Q.  Just because of that
15  objection, let's take it one at a time.
16      A.  Okay.
17      Q.  So, were you aware, first of all, of several
18  demo challenges in the first line?
19      A.  I'll probably get in trouble for doing this,
20  but I can help you interpret the second page.
21      The "RO" was Ron Wohl, and probably Mark
22  Barrenechea you're probably missing, that was Ron was
23  aware of it.
24      The first paragraph on the front page was
25  referring to the fact that the demo system was not

30

1  keeping up to date with the actual production code.  So
2  the development teams released production code.  That
3  code has to be taken into the demo system, then data has
4  to be supplied in the demonstration system to complete
5  the demo.  Sometimes the demonstration system was months
6  behind the actual product release.
7      Q.  Okay.
8      A.  Which was a problem, because we're demoing one
9  thing, we're demoing older code, which is not something
10  we really wanted to do.  Because we wanted to show them
11  our latest and best stuff.  So the salespeople weren't
12  happy about that.
13      And the rest -- the rest of the memo is
14  referring to the problems associated not with the
15  product, but the problems associated with demoing and
16  selling the product.
17      So the demo systems, we have a bunch of
18  servers that are available to the sales force to show
19  prospective clients what our product can do.  And if it
20  doesn't have the latest version of the software, if it
21  doesn't have what we refer to as a Vision database,
22  doesn't have example data or demonstration data, it is
23  that much harder to sell the product, to demonstrate and
24  sell the product.  And the general -- there is that
25  general concern.

31

1      And the final concern was sometimes in an
2  implementation customers who had then decided to buy the
3  product would begin to familiarize themselves, train
4  themselves on the product by using the demonstration
5  system with the synthetic data.
6      So all of those issues are raised in this
7  memo.  Also, that there aren't enough servers, there
8  aren't enough what are called instances to do
9  demonstrations.  So if I'm -- if I'm one of the
10  salespeople and I'm doing a demonstration, I reserve a
11  server for myself, and we literally have thousands of
12  salespeople, and if we don't have enough what are called
13  demo instances or servers, they end up having to queue
14  up and take turns or wait to be able to do a demo.
15  Again, all of these things are --
16      Q.  Okay.  So in reaction to these demo issues,
17  what, if anything, did you do?
18      A.  I believe, you know, I asked our people -- you
19  know, again, there is not a lot I could do directly.  I
20  mean, indirectly our development organization worked
21  hard at finishing the demos.  But it's a project.  First
22  thing -- it is a linear process.  The first thing you
23  have to do is build the production code, you have to
24  move it over to the demonstration system.  You had to go
25  ahead and build -- create the synthetic data, test the

32

1  demonstration, build it.  So it is a separate
2  development process in itself.  It is building the code
3  and then building the demo.  So one was likely to trail
4  the other by some amount of time.
5      Q.  Is it your testimony that, in fact, the 11i
6  product or modules that you were developing at this time
7  were, in fact, superior to what was being tested?
8      MR. LINDSTROM:  Demoed?
9      MR. SOLOMON:  Q.  Yes.
10      A.  They were -- absolutely.  It was newer, it was
11  later.  Later code, right.
12      Q.  You were demoing the wrong product?
13      A.  They were demoing an older version, demoing an
14  older version.
15      MR. SOLOMON:  Mark as the next exhibit a
16  document produced by Oracle, Bates number 013665 to 668.
17          (Exhibit 5 marked for
18          identification.)
19      MR. SOLOMON:  Q.  And while you're looking at
20  it, this is an e-mail exchange or e-mail exchanges
21  involving Vincent Bodsworth, Sandy Sanderson and Ron
22  Wohl -- Wohl, excuse me.  Dated August 11, 2000.  And
23  attached at the third page is a letter from Kyeong-Ryul,
24  Ryoo, K-y-e-o-n-g-R-y-u-l, R-y-o-o, to Larry Ellison.
25  And attached to that is a schedule, it would appear,

33

1  entitled, "POSCO Critical Issues List."
2      Have you seen -- first of all, have you seen
3  each of these e-mails before?  When I say each, I'm
4  looking at the first page.  The second page doesn't seem
5  to be containing any real information.  So the first
6  e-mail exchange followed by the next two pages.
7      A.  I think, again, I'm not certain, I think these
8  are attachments to the same e-mail.  So these are
9  documents that were attached to the e-mail.
10     Q.  Have you seen them before?
11     A.  I don't believe so.
12     MR. LINDSTROM:  Objection; compound.  Are you
13  referring to the collection that's been marked Exhibit 5
14  or some subset?
15     MR. SOLOMON:  I'm now asking about these four
16  pages, has he seen them before.
17     MR. LINDSTROM:  Together?
18     MR. SOLOMON:  Yes.
19     THE WITNESS:  I don't recall.
20     MR. SOLOMON:  Q.  Let's go to the second two
21  pages, 13667 and 68.
22     So we're looking at the letter from Ryoo to
23  you.  Have you seen that before?  I'm looking at 13667.
24     A.  I don't recall.
25     Q.  Okay.  Do you know what POSCO, P-O-S-C-O, is?

34

1      A.  I certainly do.
2      Q.  And what is it?
3      A.  They are one of the world's largest and most
4  profitable steel companies located in Korea.
5      Q.  He starts off, "Dear Mr. Ellison, I am the CIO
6  of POSCO, the world's largest steel producer based in
7  Korea, and we are actively engaged in implementing
8  Oracle Applications Release 11i."
9      He then references that he's writing to you
10  because Ray Lane has left.
11     Then goes on in the third paragraph to say,
12  "Ray was the Executive Sponsor for our Release 11i
13  implementation project and his departure has left a gap
14  which is now having an impact on this project."
15     Stopping there, do you recall around August of
16  2000 the fact that Mr. Lane had left had created a gap with
17  respect to POSCO?
18     A.  Ray was the executive sponsor for POSCO, our
19  senior contact, and that contact was then transitioned
20  to a combination of Ron Wohl and me.
21     Q.  And so were you aware in August there was a
22  gap, as referred to here?
23     A.  That the transition --
24     Q.  Yes.
25     A.  I'm not sure there was a gap.  When Ray left,

35

1  we decided to -- you know, I decided to become an
2  executive sponsor to POSCO, combined with Ron Wohl.  I'm
3  not sure we had gone through the formal process that is
4  required in the Korean culture to make that transition.
5      Q.  All right.  I'm looking at the fourth
6  paragraph.  "In this project we are implementing over 50
7  modules of Oracle Applications Release 11i in an 18
8  month time frame with a go live date of July 2001.  The
9  project is the largest one in POSCO's 30-year history,
10  involving over 1,170 people in this development stage
11  alone.  At present we are in the stage of building a
12  complete enterprise prototype with a target completion
13  date of September this year.  Unfortunately the number
14  of issues we have encountered with the product and the
15  time to clear them has seriously affected our progress,
16  putting this target date at risk."
17     Were you aware as of August 2000, POSCO was
18  expressing the concern that they had encountered a
19  number of issues that was putting the target date at
20  risk?
21     A.  Absolutely.  In fact, I monitored this all the
22  way through to staying up all night during the day they
23  turned the system on live.
24     Q.  Do you know when that was?
25     A.  On schedule, July of 2001.

36

1      Q.  Okay.  What about the target completion date
2  of September this year for the complete enterprise
3  prototype?
4      A.  Again, I can't tell you exactly all the
5  intermediate milestones on the POSCO project.  But they
6  are one of our largest and most successful
7  implementations in the world.  And I remember vividly --
8  you didn't ask the question.
9      Q.  You shouldn't answer.
10     A.  I'll get in trouble, my lawyers will get mad
11  at me and will punch me, and I probably won't get a good
12  lunch.
13     Q.  It is going to be a short one, anyway.
14     A.  You can tell me to stop, if you want me to.
15  But if the system doesn't work at POSCO, if it is a
16  steel rolling mill -- if you shut down a digital
17  factory, it is actually fairly easy, the assembly line
18  just stops.  If you shut down the steel rolling mill,
19  the steel cools and the factory has to be rebuilt.
20     Q.  I am asking you to stop.
21     A.  Okay.
22     Q.  Next page.
23     A.  Okay.
24     Q.  "POSCO Critical Issues List, August 2000,"
25  1st of August 2000.

37

1    A.  Okay.

2    Q.  There is a list of eight issues.  Looking at

3  issue number 1, "Activity Based Activa still not on

4  production release, no firm date."

5    Were you aware in August of 2000 of that

6  issue?

7    A.  I was aware there were a variety of issues

8  that POSCO had raised of things that had to work in a

9  certain way to meet their needs, and that we met them

10  all.

11    Q.  Let me put it another way.  Looking at this,

12  is there any issue reflected 1 to 8 that in August 2000

13  you believe you were unaware of?

14    MR. LINDSTROM:  The specific enumerated items

15  on this page Bates stamped 668?

16    MR. SOLOMON:  You got it.

17    THE WITNESS:  Again, I didn't know -- I don't

18  recall every single issue POSCO had.  They had a variety

19  of issues.  Again, I think they said they had 50 issues,

20  and new issues kept coming up.

21    I do know we met our dates, went live, and

22  they are one of our happiest and most successful

23  customers in the world.

24    MR. SOLOMON:  Q.  I heard that.  I heard that.

25  You don't dispute that you received this in around

38

1  August of 2000, do you?

2    A.  No, I do not.

3    Q.  On to the first page.  You'll see that there

4  is an e-mail from Vincent Bodsworth.  Do you know who

5  Vincent Bodsworth is?

6    A.  No.

7    Q.  It says, "I had another conversation with

8  Mr. Ryoo about his visit to RWS and Larry Ellison's

9  non-availability.  I explained to Mr. Ryoo that Larry

10  would not be back until 1th September and is presently

11  not accessible."  It is "1th September."

12    "Nevertheless, he still wants to have a

13  meeting with Larry after 14th September.  Mr. Ryoo will

14  travel to wherever is necessary to do this."

15    And down the page, the last paragraph says,

16  "Also no response has been received from Larry's office

17  to Mr. Ryoo's fax and e-mail.  I think this will be

18  viewed as discourteous at the very least.  Even if there

19  is no reply from Larry, can his office send at least an

20  acknowledgment of receipt or tell me if nothing was

21  received."  And it goes on.

22    Do you recall there being a concern that you

23  weren't being responsive to Mr. Ryoo at around this

24  time?

25    A.  Again, my office -- if someone -- a senior

39

1  executive contacts my office, it is our practice to get

2  back to them very quickly.  So I'm not sure what they

3  are referring to.

4    Q.  Okay.  And at the top of the page, it says in

5  the second paragraph, "In terms of actual bugs, I told

6  Mr. Ryoo that all the critical bugs (i.e. those actually

7  holding the project up) have been cleared this week.  We

8  have still outstanding some 30 or so further TARs (not

9  all bugs) on which good progress is being made (i.e.

10  we're closing them at a faster rate than opening them at

11  the moment).  The issues that are substantive and on

12  which I'm not able to provide any satisfactory reply are

13  those concerning the availability of the production

14  version of ABM, the TRM for ABM and the HP (middle tier)

15  port for ARM."

16    Do you see that?

17    A.  I do.

18    Q.  Do you understand the references to the

19  concern concerning the production versions of ABM?

20    A.  Again, the Oracle e-business suite is an

21  enormously complex product.  There are bugs, and

22  sometimes there are functions that don't operate exactly

23  as a given customer wants them to operate.  And in the

24  process of an implementation, we go through, you know,

25  again, go through a process of fixing those bugs and

40

1  addressing the functional gaps.  That's what was going

2  on in this project.

3    MR. SOLOMON:  Okay.  Mark as the next exhibit

4  a document produced by defendants with the Bates number

5  275637.

6    (Exhibit 6 marked for

7    identification.)

8    MR. SOLOMON:  And the question, once

9  you've had a chance to look at it, will be, have you

10  seen it before?

11    A.  I don't believe so.  This is it, the one page?

12    Q.  This is what we've got, yeah.

13    MR. LINDSTROM:  Can I ask just for sake of

14  clarity of the record that the exhibits that are being

15  handed to Mr. Ellison for his review be the actual ones

16  being marked by the reporter for attachment to the

17  transcript, so we don't need to be concerned that the

18  copies don't match what --

19    MR. SOLOMON:  That's fine.

20    MR. LINDSTROM:  Make that change, Larry.  And

21  from now on you may look at the versions given to you

22  earlier by counsel, but your testimony ought to run off

23  the one that bears the stamped exhibit number.

24    THE WITNESS:  Okay.

25    MR. LINDSTROM:  Thank you, counsel.

41

1       MR. SOLOMON: Q. Do you know, in the first
2  line, do you know what GEAE refers to?
3       A.   General Electric Aircraft Engines.
4       Q.   And MRO?
5       A.   It is a maintenance system to maintain large,
6  complicated equipment. Maintenance and repair, MR.
7       Q.   Now, there is some asterisks, then a third
8  asterisk and some bolded language, "Oracle has missed
9  every date and commitment made for MRO."
10      Do you see that?
11      A.   I do.
12      Q.   Do you know what that refers to?
13      A.   MRO was a specialty product we were building
14  pretty much just for GE. GE is our largest commercial
15  customer. We do unusual things for GE. Building this
16  MRO product for GE was something they asked us to do and
17  we endeavored to do. It wasn't ever a product we made
18  generally available to the public.
19      Q.   And did you know -- and since this isn't
20  dated, it is hard to be precise. But it refers to,
21  above that, you see, "Final delivery of the software in
22  second calendar quarter of 2000."
23      Do you see that? Above the bolded language
24  that I just read to you.
25      A.   Yes.

42

1       Q.   Were you aware at any time of Oracle missing
2  every date and commitment made for MRO?
3       A.   I'm not sure we missed every date and
4  commitment, but we certainly failed to deliver on MRO.
5       MR. SOLOMON: Mark as the next exhibit a
6  document produced by Oracle bearing the Bates numbers
7  377275 and 276.
8       (Exhibit 7 marked for
9       identification.)
10      MR. SOLOMON: Q. When you've had a chance to
11  look at it, the question is, have you seen it before?
12      A.   Not that I recall.
13      Q.   You'll see that the very last sentence reads,
14  "Safra, I hope this background is informative. I will
15  contact you today to answer any subsequent questions."
16  Obviously, that would refer to Safra Catz. But does
17  that help you identify who this is from? First of all,
18  did you write this?
19      A.   No.
20      Q.   Do you know who wrote it?
21      A.   I do not.
22      Q.   Do you remember talking to Safra about this
23  e-mail, or this message?
24      A.   No.
25      Q.   I'm halfway down the page, looking at the

43

1  following language, "In order for the relationship to
2  continue, we need to deliver MRO. The potential revenue
3  impact to Oracle from aircrafts for FY '01 is $12 to $14
4  million in lost revenue, $4 million in MRO license
5  revenue, $8 to $10 million in APS, ERP, CRM and Exchange
6  revenue that will be difficult to bring in without
7  delivering on MRO."
8       Do you see that?
9       A.   I do.
10      Q.   Do you recall having a concern that there may
11  be lost revenue as a result of being unable to timely
12  deliver MRO?
13      A.   I was convinced, you know, that we -- there
14  would be lost revenue because we couldn't deliver MRO.
15      Q.   Do you know when MRO ultimately was delivered?
16      A.   Never.
17      Q.   Never?
18      A.   (Nodding.)
19      MR. SOLOMON: Let's have marked as the next
20  exhibit a document produced by defendants bearing Bates
21  number 023076.
22      (Exhibit 8 marked for
23      identification.)
24      MR. SOLOMON: Q. Once you've taken a look at
25  it, the question will be, have you seen it before?

44

1       A.   I don't recall.
2       Q.   You see it says the following, and I'm not
3  sure if it is part of a larger document, but this is
4  what we have, it says, "See Keith Block's comments re:
5  11i training and product quality. Clients are deciding
6  and in some cases consulting is recommending based on
7  experience to delay 11i implementations. Product
8  quality in Q1 alone impacted profitability by $3
9  million. Is Larry getting routine updates on product
10  training and quality? Sandy."
11      Do you recall having any discussions in which
12  the concerns here were the topic?
13      A.   Yes.
14      Q.   And who did you have those discussions with?
15      A.   The entire management team.
16      Q.   And when were you having those discussions?
17      A.   Again, in the general -- on the general issues
18  of product quality, we have them constantly. I should
19  say routinely.
20      Q.   And do you know, there is a reference to
21  "delay 11i implementations," in calendar 2000 and early
22  2001, were 11i implementations delayed?
23      A.   We certainly had no policy to delay
24  implementations.
25      Q.   And to the extent this reflects someone

45

1 suggesting that there be such a policy, are you saying
2 that that was rejected?
3     A.   Whenever we deliver a new product, typically
4 it takes a larger consulting effort to implement the new
5 product. The consultants themselves have to be trained.
6 The product -- the early versions of the product are
7 never as stable as the later versions of the product.
8 And that usually means that the consulting
9 implementation is -- can be delayed.
10     It is just much more problematic than later
11 implementations. We just have to go through the
12 learning curve. It happens on virtually every product
13 we deliver.
14     MR. SOLOMON:  Have marked as the next exhibit
15 a document produced by defendants, Bates range 039547
16 through 551.
17         (Exhibit 9 marked for
18         identification.)
19     MR. SOLOMON:  Q.  And if you take a chance to
20 look at these, and again the question is going to be,
21 have you seen them before?
22     A.   Not that I recall.
23     Q.   I want to start with the second from the last
24 page, which has the number 039550.
25     MR. LINDSTROM:  Larry, do you need to read the

46

1 entire document to have the context? Or have you had a
2 chance to do so?
3     THE WITNESS:  I think -- I think I know what's
4 going on.
5     MR. SOLOMON:  Q.  Okay. Do you know, first of
6 all, who Steve Carrington at Ingersoll-Rand is?
7     A.   I do not.
8     Q.   And I think there is names at the top,
9 Walrath, Johnson. Do you have any idea who those people
10 are?
11     A.   I do not.
12     Q.   See at the top it appears to be forwarded, it
13 says, "Ingersoll-Rand Critical Situation."
14     Do you see that? Very top of the page.
15     A.   You're on the second to the last page?
16     Q.   Yes.
17     MR. LINDSTROM:  What page are you on, counsel?
18     MR. SOLOMON:  039550.
19     THE WITNESS:  I can't find where it says
20 critical situation.
21     MR. SOLOMON:  Q.  Top left hand below the fax
22 reference it says, "Fwd, Fwd, Ingersoll-Rand, Critical
23 Situation."
24     A.   I've got it now. I was looking at the body of
25 the text.

47

1     Q.   And then it appears to be dated 10/10/00. Do
2 you see that?
3     A.   I do.
4     Q.   Good. It says, "Topics for discussion. We
5 made the decision to move to 11i for the G2 project for
6 two reasons. A. The functionality in 11i was needed."
7 And it goes on with some more language. And then it
8 says, "B. We were assured this version was of a quality
9 level that we would have no major issues relating to the
10 new release."
11     Do you see that?
12     A.   I do.
13     Q.   Point 3 says, "The system is running in an
14 Oracle center managed by Oracle DBAs and Oracle Unix
15 people and supported by onsite Oracle consultants, yet
16 we cannot get the software to function. We have little
17 confidence in Oracle's ability to provide us a stable
18 working environment in a time frame we need. Our onsite
19 consultants are spending valuable time debugging
20 software instead of working on the project activities."
21     Do you see that?
22     A.   I do.
23     Q.   Were you aware at around October of 2000 that
24 these issues were being raised by Ingersoll-Rand?
25     A.   I was certainly aware that a small percentage

48

1 of our customers that were implementing release 11i were
2 having problems, and one of them was Ingersoll-Rand.
3     Q.   Point 4, "We are in fact a full month delayed
4 on the CRP and we expect the CRP could not begin until
5 the week after next at the earliest. This assumes all
6 the issues are resolved. We have little confidence in
7 any dates given to us at this point. While we feel the
8 onsite people are good, we feel Oracle as an
9 organization has let us down."
10     Were you aware of that sentiment from
11 Ingersoll-Rand in October of 2000?
12     A.   There were several customers who were
13 implementing 11i, a small percentage of our total
14 customers. We have 30,000 application customers. A
15 small percentage that were implementing 11i were having
16 problems. The vast majority of those that had problems
17 are successful, happy customers now, like POSCO and
18 Ingersoll-Rand.
19     Doesn't mean they didn't have problems during
20 the implementation. These are very complicated
21 engineering projects.
22     Q.   Point 5, "We need the same level of guarantee
23 that Larry gave GE when it looks like SSP would not
24 work." Do you understand that?
25     A.   I'm not sure what SSP is. But I am the

49

1 corporate sponsor to General Electric.
2     Q.  What sort of guarantee is being referred to,
3 do you know?
4     A.  I don't know.  I am -- I spend a lot of time
5 with General Electric.  As I say, I'm the corporate
6 sponsor for GE, I attend their management meeting.
7     MR. LINDSTROM:  He doesn't want you to
8 speculate.  He's asking if you know with respect to this
9 specific reference.
10     THE WITNESS:  I don't know.
11     MR. SOLOMON:  Q.  Was it, "Don't worry, you
12 don't have to pay," or, "Don't worry, you'll get your
13 money back"?
14     A.  No.
15     Q.  But you don't know what it was?
16     A.  If you want me to guess, I will guess.
17     MR. LINDSTROM:  He doesn't want you to guess.
18 And I don't either.
19     MR. SOLOMON:  You don't want him to guess.  I
20 may want you to.
21     THE WITNESS:  Okay.
22     MR. SOLOMON:  Q.  What is your guess?
23     MR. LINDSTROM:  Objection; calls for
24 speculation.
25     THE WITNESS:  What I normally -- normally tell

50

1 anybody is that we will work as hard as we can to make
2 this work.  And the vast majority -- we have 300,000
3 customers around the world.  You know, 99.99 percent of
4 those customers, the software is working successfully.
5     When you're doing a company and building a big
6 engineering project, what these guys do is they
7 interface 11i, it is not just 11i, but they are
8 connecting it to a lot of other systems, there is a lot
9 of consulting and engineering going on, these businesses
10 are changing their business processes, often going from
11 a local to global systems.  There is a lot -- these are
12 huge engineering projects when you put in all new
13 systems.
14     And all we can guarantee is that we'll work as
15 hard as we can to make this successful in your company.
16     Again, the vast majority of our customers were
17 successful.  And Ingersoll-Rand was very successful with
18 the implementation.
19     MR. SOLOMON:  Q.  Again, when you are talking
20 about level of guarantee then, it is your guess that it
21 was basically -- that it is you saying, "We'll do it"?
22     A.  "We'll do everything in our power to make you
23 successful."
24     Q.  Do you recall giving, issuing that guarantee
25 to GE?

51

1     MR. LINDSTROM:  The one he just described as
2 his guess?
3     MR. SOLOMON:  Correct.
4     THE WITNESS:  It is a routine thing that I
5 say, that we will work as hard as we can to make our
6 customers successful.
7     MR. SOLOMON:  Q.  Okay.  The last sentence of
8 that point 5 says, "The issues we are facing make it
9 difficult to support our Oracle position."
10     Do you see that?
11     A.  Yes.
12     Q.  Do you know what the Oracle position is that's
13 being referred to here?
14     A.  Yes.  It means that there are a number of
15 people inside of Ingersoll-Rand that are champions for
16 Oracle, that they pick the Oracle product, they were
17 enthusiastic about the implementation.  And now there
18 are some bumps along the road and they are concerned.
19     But we did work closely with them, and
20 Ingersoll-Rand again is now implemented successfully and
21 is very happy.
22     Q.  I just want to jump back up to 1.B where it
23 says, "We were ensured" -- and I believe it probably
24 means "assured," but, "We were ensured that this version
25 of a quality -- that this version was of a quality level

52

1 that we would have no major issues related to the new
2 release."
3     Do you know of any such assurance emanating
4 from Oracle?
5     A.  I do not.
6     Q.  And can you take a guess as to who wrote this?
7     MR. LINDSTROM:  Objection; calls for
8 speculation.
9     MR. SOLOMON:  Excuse me.  Strike that.  Not
10 who wrote it.
11     Q.  Can you take a guess as to who was interfacing
12 with Ingersoll-Rand from Oracle?
13     MR. LINDSTROM:  Same objection.
14     THE WITNESS:  You want me to guess?
15     MR. SOLOMON:  Q.  Yes.
16     A.  Our accountants, the people at Oracle
17 responsible for selling and consulting to
18 Ingersoll-Rand.
19     Q.  You wouldn't know the names of the people?
20     A.  Not offhand.
21     Q.  I'm looking now at the next page back, which
22 is 039548.  Two pages back, excuse me.  You'll see again
23 it refers to "Subject:  Ingersoll-Rand Critical
24 Situation."  And it is addressed to Mark and Ron.  It
25 says, "I am the account manager for Ingersoll-Rand."

53

1  Then it mentions Frank Varasano.  Do you know who Frank
2  Varasano is?
3      A.  Yes.
4      Q.  Who is he?
5      A.  A sales executive.
6      Q.  It says, "Frank Varasano and I met today with
7  Mary Walrath, CIO for Ingersoll-Rand.  It was not a
8  pleasant meeting.  Given the urgency of the situation,
9  Frank asked that I generate this e-mail to you both."
10      And it goes on to say, "As indicated in Steve
11  McLaughlin's e-mail of 9/28, we are failing with our
12  attempts to install 11i CRM and ORM Applications in a
13  Conference Room Pilot (CRP) at IR's G2 sector.  As a
14  result, we are missing a related opportunity for $10 to
15  $20 million in CRM, OM and manufacturing incremental
16  revenue.  We are trying to offer a deal two times as
17  larger but can't get the customer to listen until we get
18  existing applications up and running.  This account is
19  eager to become a reference, but we are not giving them
20  a chance to do so."
21      Do you see that?
22      A.  I do.
23      Q.  And do you understand -- excuse me.  Do you
24  recall being aware of this particular exchange in and
25  around September/October of 2000?

54

1      A.  No.
2      Q.  Are you aware, or were you aware around that
3  time of the suggestion that Ingersoll-Rand stood to lose
4  a revenue opportunity of $10 to $20 million?
5      A.  I was not.
6      Q.  Goes on to say, "Situation.  We are in a
7  crisis situation."
8      Were you aware in or around September or
9  October of 2000 that Ingersoll-Rand was in a crisis
10  situation?
11      A.  Again, that is someone's characterization of
12  it.
13      I was aware of what was going on at
14  Ingersoll-Rand.  It was a complicated implementation.
15  They had run into some problems.  This is not uncommon.
16  It was happening at a small number of our customers, but
17  it was happening.  We put in the necessary resources,
18  fixed the problems.
19      Q.  Okay.  It goes on to say, "IR believes 11i CRM
20  and OM are not ready for deployment."
21      Do you recall that being a sentiment expressed
22  from Ingersoll-Rand in or around September/October 2000?
23      A.  Not specifically, no.
24      Q.  Was it your view that 11i CRM and OM was ready
25  for deployment?

55

1      A.  Absolutely.
2      MR. LINDSTROM:  In this time frame of this
3  e-mail?
4      MR. SOLOMON:  Correct.
5      THE WITNESS:  Absolutely, yes.
6      MR. SOLOMON:  Q.  It goes on to say, "They are
7  considering replacement strategies for Oracle at the G2
8  implementation that includes Siebel (see e-mail below)."
9  Were you aware of that at the time?
10      A.  No.
11      Q.  "There appears to be little 11i
12  documentation."
13      Were you aware of that at the time?
14      A.  I don't think it's true.
15      Q.  "There appears to be little 11i training."
16      Were you aware of that at the time?
17      A.  I don't believe that's true either.
18      Q.  Are you aware that some of your former
19  consultants have testified in this case that there was
20  little 11i training?
21      A.  No.
22      Q.  Goes on to say, "Since we are trying to bring
23  the CRP up together with the IR project team, they are
24  seeing firsthand our daily failures and shortcomings."
25      Were you aware of that at the time?

56

1      A.  No.
2      Q.  And then on to the first page, which bears the
3  number 039547, and you'll see that it's from Frank
4  Varasano at the top to Ron Wohl, copying Sandy
5  Sanderson, and it says, "I believe your personal
6  involvement in fixing this would be time well spent.
7  This could be a critical reference for us, but the
8  management team is very frustrated.  We are about to
9  lose the CRM opportunity and a lot of additional ERP
10  business because of the situation that Dan summarized in
11  his e-mail."
12      Do you see that?
13      A.  I do.
14      Q.  And were you aware of these risks being
15  expressed at the time?
16      A.  I was not.
17      Q.  And the time now we see is October 2000.
18      A.  Right.
19      MR. SOLOMON:  Have marked as the next exhibit
20  a document produced by defendants, Bates numbers 144262
21  and 263.
22      (Exhibit 10 marked for
23          identification.)
24      MR. SOLOMON:  Q.  The question is, have you
25  seen it before?

57

1    A.  Not that I recall.
2        MR. SOLOMON:  And, counsel, this is a document
3    that appears to not have been produced completely.  It
4    says 2 of 3 and 3 of 3.  I don't believe we have 1 of 3.
5    I ask that be produced.
6        MR. LINDSTROM:  It is my understanding that
7    you do.  And if we are able to get you it, could we have
8    the full document substituted as an exhibit?
9        MR. SOLOMON:  Absolutely.
10       MR. LINDSTROM:  Thank you.
11       MR. SOLOMON:  Q.  Now, I'm looking at -- you
12   are familiar with the BellSouth implementation; correct?
13   A.  Yes.
14   Q.  Were you personally involved in that?
15   A.  Yes.
16   Q.  In what way?
17   A.  I met with the project teams and I met with
18   the customer.
19   Q.  And did you meet with them in the fall of
20   2000?
21   A.  I don't recall.
22   Q.  You see under "Big Issues," there are a number
23   of items.
24       "17 product defects that need to be fixed,"
25   and some more language.

58

1    "23 product defects by October 23rd."
2        It says, "115" -- I'm leaving out some
3    language, but, "115 consulting enhancements.  We have
4    only tested 80 percent of the solution.  Go live plan is
5    Big Bang, all users at once.  Far too little time for
6    system and integration testing.  No out of the box
7    environment at BS.  Performance and a performance plan
8    are big unknown.  Onsite environments need better
9    management."
10       Do you see all those big issues?
11   A.  I do.
12   Q.  Were you aware of those big issues in October
13   or November -- September, October or November of 2000?
14       MR. LINDSTROM:  Objection; compound.
15       THE WITNESS:  I was aware of the fundamental
16   issue at BellSouth, which was that it wasn't really a
17   product implementation, it was really a big consulting
18   project, that BellSouth wanted a lot of features and
19   functions that were not in the product nor did we have
20   plans to put them in the product, so they were
21   implemented through consulting.  It was a huge project.
22   Because it was all custom, it had an enormous amount of
23   risk associated with it.
24       MR. SOLOMON:  Q.  Do you believe that you
25   promised BellSouth something that you didn't deliver?

59

1    A.  When you say me, you mean me or anyone in the
2    company?
3    Q.  Correct.
4    A.  I can't speak for anyone in the company.  I
5    certainly didn't promise BellSouth something we couldn't
6    deliver.  In fact, my comments to BellSouth was -- my
7    comments were, "This is a huge consulting project.  We
8    cannot make our product do everything BellSouth wants it
9    to do."
10       This is not uncommon that the product does 80
11   percent of the functions, then there is some amount of
12   customization that is needed on top of it.
13       In this case it wasn't 80 percent.  The
14   product probably did -- as it says here in this memo,
15   does half of what the customer needs.  That means half
16   the features and functions are going to have to be a
17   huge custom consulting project.  Given the time frames
18   and the size of project, I always thought it was an
19   enormously risky project.
20   Q.  Which takes me to the bottom of the page where
21   it says, "Extremely Risky"?
22   A.  Yes.
23   Q.  Were you aware of that at the time?
24   A.  Absolutely.
25   Q.  Are you aware of executives from Oracle

60

1    stating that, in fact, they believed that BellSouth was
2    promised something that they didn't get and couldn't
3    get?
4        MR. LINDSTROM:  You're asking him about
5    statements apart from this document?
6        MR. SOLOMON:  Correct.
7        MR. LINDSTROM:  Do you have the question in
8    mind?
9        THE WITNESS:  You're asking me to state --
10       MR. SOLOMON:  Q.  I'm asking if you are aware
11   of other Oracle executives --
12   A.  I don't know what other Oracle executives
13   represented to BellSouth.
14   Q.  Okay.  You know Jay Nussbaum?
15   A.  I do.
16   Q.  Do you know what he said about BellSouth in
17   the derivative case related somewhat to this case?
18   A.  I do not.
19       MR. SOLOMON:  Have marked as the next exhibit
20   a document produced by the defendants with the numbers
21   169718 to 720.
22       (Exhibit 11 marked for
23        identification.)
24       MR. SOLOMON:  Q.  Question is, once you've had
25   a chance to look at it, have you seen this document

61

1  before?
2      A.  I have not.
3      Q.  Okay.  I -- first of all, I guess, it's from
4  John Fikany, F-i-k-a-n-y.  Do you know who that is?
5      A.  Yes.
6      Q.  Who is he?
7      A.  A sales rep.
8      Q.  And it is dated October 19, 2000.  And it is
9  to a number of addressees that I won't list now.  But it
10  begins with Frank Varasano and Sandy Sanderson.  And the
11  subject is "Ford Supply Chain Status."
12          And I'm looking two-thirds of the way down the
13  first page and it says, "Todd Allen wrote."
14          Do you know who Todd Allen is?
15      A.  I do not know.
16      Q.  And it says, "Mike, we have been on the calls,
17  we've expressed our concerns during the calls.  The
18  problem we are dealing with is that we're getting
19  inconsistent information on a daily basis regarding
20  11.5.2 release and patches.  At this time we have put in
21  every available patch for CRM up to 10/17 (this is over
22  100 CRM patches in the last two and a half weeks!)  We
23  still can't get contracts to work.  We have no idea what
24  awaits us as we implement the rest of CRM!  The products
25  do not integrate to the back office, they don't work

62

1  period.  The customer knows what we have been going
2  through and is wondering, as we are, when will the
3  system be stable?"
4          Do you see that?
5      A.  I do.
6      Q.  Are you aware of these concerns being raised
7  in or around October 2000?
8      A.  Not these specific concerns.  I'm aware of the
9  general concern that our products sometimes have bugs in
10  them and those bugs have to be fixed.
11      Q.  Okay.  It goes on to say, "The CRM
12  organization needs to step up and provide its
13  development resources on site in Webster, New York.  We
14  know that Mark's organization has done this for
15  Ingersoll-Rand and BellSouth.  We need the same
16  attention!  Xerox is threatening to write a letter to
17  Larry and will be asking for their money back."  Just
18  stopping there.
19          Did you ever receive a letter from Xerox, do
20  you know?
21      A.  Not that I know of.
22      Q.  Were you aware of an intention to escalate it
23  to you in the way that was suggested?
24      A.  Again, this was a problem we had in an
25  implementation.  We fixed the problem.  Xerox is now

63

1  successful and buying more software from us.
2      Q.  The next sentence reads, "They have also used
3  words like 'your company is two steps away from
4  fraudulent.'"
5          Do you see that?
6      A.  I do.
7      Q.  Were you aware that some people thought your
8  company was as far away as two steps away from
9  fraudulent at the time?
10      A.  I mean, clearly they were very upset with a
11  problem.  What I can say is they are a happy customer
12  buying more software.  If they thought we were
13  fraudulent, I don't think they would be buying more
14  software from us.
15      Q.  Okay.  But we're talking about the time frame,
16  as you know, of October 2000.
17      A.  At any point in time we have large
18  implementations ongoing, 2000, 2001, today.  There are
19  customers who are doing these enormously complicated
20  engineering projects, and they have problems.  This is
21  just not an uncommon occurrence.
22          You do this enormous engineering project,
23  you're connecting our software to a lot of existing
24  systems, you're changing business processes.  These are
25  hard engineering projects, and people, you know, get

64

1  frustrated.
2      Q.  And you don't dispute, though, if you upset
3  too many customers in a particular time frame, it could
4  affect your financial results, do you?
5      A.  Absolutely.
6      Q.  And those customers may ultimately end up
7  happy, but that doesn't necessarily mean that the impact
8  on your financial results was entirely innocent, does
9  it?
10      MR. LINDSTROM:  Objection; calls for
11  speculation, argumentative.
12      THE WITNESS:  Sure.
13      MR. SOLOMON:  Q.  The last sentence says, "If
14  that can't get us some help, I don't know what can."
15          Do you see that on the second page at the top?
16      A.  Yep.
17      Q.  Okay.  And then further down it says, "Do I
18  need to take this to Mark?  We have a BellSouth
19  situation at Xerox and I need you guys to step up!"
20          Do you see that?
21      A.  Yes.
22      Q.  Do you recall this situation being like at
23  around this time to the BellSouth situation?
24      A.  Just incorrect, fundamentally incorrect.  We
25  had a small -- at this point in time we had a small

65

1 number of customers that were having problems. Very
2 similar to pretty much at any time in our history. And
3 where the BellSouth project was an enormous consulting
4 project, Xerox was implementing fairly standard
5 software. So it was erroneous to compare the two.
6     Q. Okay.
7     A. Again, Xerox was implemented successfully,
8 very close to on schedule.
9     Q. And down to the bottom of that page, it starts
10 with, "Bruce."
11     Do you know who Bruce is?
12     A. I do not.
13     Q. It says, "You might recall when we were in the
14 final stages of the Xerox OTC contract, we discussed the
15 occasional need for development triage support. With
16 the 11.5.2 release our consultants are requesting this
17 resource based on significant customer escalations due
18 to the code quality of the current release of 11i. We
19 have struggled with both code quality and patch issues
20 and we are reaching a critical point with Xerox."
21     Do you recall at around that time, October of
22 2000, these concerns concerning code quality and the
23 patch issues being raised by Xerox?
24     A. Whenever we come up with a new version of our
25 product, we have to patch bugs, we have to fix bugs.

66

1 Again, this is a routine thing that happens in our
2 business.
3     Q. I understand that you want to say that, and
4 there is probably a better time to say it.
5     My question is, were you aware at the time
6 that Xerox was raising these issues?
7     A. I was not aware there were specific problems
8 at Xerox.
9     MR. SOLOMON: Have marked as the next exhibit
10 a document produced by defendants with a Bates number
11 620842.
12         (Exhibit 12 marked for
13          identification.)
14     MR. SOLOMON: Q. And the question will be,
15 have you seen this document before?
16     A. No.
17     Q. And do you have an understanding who the Karen
18 is at the top of the page, "For tomorrow with Karen"?
19     A. No.
20     Q. You see it references Hewlett-Packard?
21     A. Yes.
22     Q. The third bullet point, "Premium Support
23 Order. Oracle has handled this very poorly. Internally
24 we have been told the quality of the individuals is poor
25 and that HP put these folks on site at their own risk."

67

1 Do you see that?
2     A. Yes.
3     Q. Were you aware of this issue of HP being
4 handled poorly by Oracle and individuals being put on
5 site at their own risk?
6     MR. LINDSTROM: Objection; compound.
7     THE WITNESS: HP is one of our largest
8 customers.
9     MR. SOLOMON: Q. I'm talking about at the
10 time.
11     A. Has been one of our largest customers for a
12 very, very long period of time, and I wasn't aware of
13 any problems at HP.
14     MR. SOLOMON: Okay. Have marked as the next
15 exhibit a document with Bates number 025018 to 019.
16         (Exhibit 13 marked for
17          identification.)
18     MR. SOLOMON: Q. The question will be, have
19 you seen this before?
20     A. No.
21     Q. It is dated Thursday, November 30th, 2000.
22 And it is from Safra Catz to Tom Williams and Jennifer
23 Minton. That's the top addressee line. Then below that
24 from Gary Roberts to Safra Catz.
25     Reads, "Safra, I understand Larry and Carly

68

1 are discussing their purchase of our products this
2 quarter if we commit to purchase $20 to $30 million of
3 their product over the next 18 to 24 months."
4     Do you see that?
5     A. I do.
6     Q. Do you recall this -- do you recall having any
7 discussion with Carly? Who is Carly?
8     A. Carly Fiorina, the event CEO of Hewlett
9 Packard.
10     Q. Do you recall the conversation or the
11 discussion reflected here?
12     A. I don't believe I had that discussion with
13 her.
14     Q. No? So Gary Roberts is wrong, is what you're
15 saying?
16     A. I didn't discuss the sale of our products to
17 Carly, no.
18     Q. Do you know if anybody did?
19     A. I'm sure our sales teams did.
20     Q. But to your knowledge, it wasn't you. Was it
21 Safra?
22     A. I don't know.
23     Q. Did you discuss with anybody at HP the deal
24 reflected here?
25     A. No.

69

1    Q.  You were very heavily involved with the GE
2  transaction in the fall of 2000, or a GE transaction?
3    A.  Which one.
4    Q.  GE Power?
5    A.  Yes, GE Power.  I shouldn't say I was very
6  heavily involved with the transaction.  I attend GE
7  Power management meetings.  But I actually am not
8  involved with sales transactions.
9    Q.  Was GE Power complaining about problems with
10  the 11i in around the fall of 2000?
11    A.  I don't think they were complaining.  They
12  were listing issues, and we were working through the
13  issues.  I wouldn't characterize that as complaining.
14    MR. SOLOMON:  Mark as the next exhibit a
15  document with the numbers 063405 to 407.
16    (Exhibit 14 marked for
17    identification.)
18    MR. SOLOMON:  Q.  And the question will be
19  when you've had a chance to look at it, have you seen it
20  before?
21    A.  Not that I recall.
22    Q.  Front page, it is dated Tuesday,
23  December 12th, 2000.  It's to Kevin Miller and Shawn
24  Kirsten from Ron Wohl.  And it says, "Who can supply a
25  list of upgrade issues they have encountered?  I would

71

1    MR. SOLOMON:  Q.  Would that be rough?
2    A.  I guess some people might find that rough.
3    MR. LINDSTROM:  You've answered the question.
4    MR. SOLOMON:  Q.  If you go on to the second
5  page, you will see it says, "Reminder message:
6  Everyone, the following conference call has been
7  scheduled for Friday, December 15th, GE Oracle monthly
8  call," and a list of people headed by you.
9    Do you see that?
10    A.  I do.
11    Q.  Did you participate in that call as scheduled?
12    A.  I did.
13    Q.  Do you recall it being rough?
14    A.  I wouldn't characterize it as rough.  We go
15  through a list of issues and we attach resources to get
16  issues fixed.  And the issues are normally on the GE
17  side and on the Oracle side.  And we fix our problems,
18  and, again, we delivered it on time, successfully, to
19  GE.
20    Q.  And do you know who, on the first page, do you
21  know who Kevin is who was talking about the rough call?
22    A.  He is one of our engineering managers.
23    Q.  Okay.
24    A.  I'd like to recharacterize what I just said.
25  I said we delivered on time successfully.  I'm not sure

70

1  like to understand them better before the call.
2  Thanks."
3    And below that it says, "Kevin Miller wrote:
4  This is likely going to be a rough call with the upgrade
5  issues they've encountered," signed "Kevin."
6    First of all, are you aware -- were you aware
7  in or around December of 2000 of GE having upgrade
8  issues?
9    A.  Routine --
10    MR. LINDSTROM:  Vague and ambiguous.
11    THE WITNESS:  The answer is, yes.  But they
12  are routine.
13    MR. SOLOMON:  Q.  That's fine.  The answer is
14  yes?
15    A.  Yes.
16    Q.  And it says it was going to be a rough call.
17    Now, you say they are not complaining, but it
18  is going to be a rough call.  What does that mean, if
19  you know?
20    MR. LINDSTROM:  Objection; calls for
21  speculation, vague and ambiguous.
22    THE WITNESS:  I don't know what he meant by
23  the word rough.  The calls with GE are disciplined and
24  organized, and they expect results.  And that's how it
25  works.

72

1  we delivered every single component on time, that would
2  be an exaggeration.  But we were in the end successful.
3    MR. LINDSTROM:  While counsel is selecting the
4  next exhibit, we've been going about an hour and a half,
5  and if you need a break at any time, let us know.
6    MR. SOLOMON:  That might be a signal.
7    MR. LINDSTROM:  It is not a signal from me.  I
8  just wanted to make sure you understand that you have
9  that option.
10    MR. SOLOMON:  Let me tell you something that
11  your counsel is going to tell you when you take a break.
12  Counsel is going to tell you you weren't selling
13  throughout the month of January.
14    THE WITNESS:  Say again.
15    MR. SOLOMON:  Q.  Your counsel will tell you
16  when you take your break that you were not selling your
17  stock throughout the month of January.  You testified
18  to that when you first moved in -- when you first arrived
19  here today.  That, in fact, is wrong.
20    Do you want to reflect on that?
21    MR. LINDSTROM:  Let me first interpose an
22  objection.  You have no idea what I'm going to talk to
23  him about, if anything.
24    If you want to pose a question to him, do so.
25  Do not lecture him about what you believe the evidence

73

```
 1    to be.
 2         He's giving you the best of his testimony
 3    according to his recollection today. If you have
 4    documents that suggest otherwise, show them to him.
 5         MR. SOLOMON: Fine.
 6         I'm giving you a chance here to try and test
 7    your memory a little bit better.
 8         MR. LINDSTROM: Pose the question.
 9         MR. SOLOMON: Q. Is it still your testimony
10    that you sold your stock throughout the month of January
11    2001?
12         A. I believe so. That's my recollection.
13         MR. SOLOMON: Have marked as the next exhibit
14    a document with the Bates range 035243 to 35264.
15              (Exhibit 15 marked for
16              identification.)
17         MR. SOLOMON: And if you could take a look
18    at it and tell me if you've seen it before.
19         MR. LINDSTROM: Again, counsel, this document
20    is many, many pages. I assume you're talking about the
21    entire collection as it's been placed before him?
22         MR. SOLOMON: Correct.
23         THE WITNESS: Okay.
24         MR. SOLOMON: Q. Have you seen it before?
25         A. I don't believe so. Even though there was a
```

74

```
 1    letter written to me at the end, I don't recall seeing
 2    it.
 3         Q. You see the letter at the end is from a
 4    William Grebe?
 5         A. Yes.
 6         Q. Is that name familiar to you?
 7         A. No.
 8         Q. Letter aside, if you look at the letter, are
 9    you -- do you have a recollection of the issues
10    reflected in the letter?
11         A. Not really. Only in the general sense.
12         Q. Okay. On the first page, I'm looking at the
13    message from Renee Knee. Do you know who that is?
14         A. Renee Knee, yes.
15         Q. Who is she?
16         A. I believe she ran our partner programs, our
17    independent software vendor reseller programs.
18         Q. It is Ron Wohl, Donald Klaiss, and copies to
19    Ian Thacker, Safra Catz, Mike Rocha.
20         A. Rocha.
21         Q. And starts off saying, "Ron Don and Drew, I
22    cannot answer these questions for this partner and as
23    you can see it is a very poor reflection on the partner
24    program and Oracle overall, but we're not able to
25    address the quality issues we are facing with 11i OM
```

75

```
 1    right now across all of our partners."
 2         Do you see that?
 3         A. Um-hum.
 4         Q. And "across all of our partners" is
 5    underlined.
 6         Do you see that?
 7         A. Yes.
 8         Q. Were you aware of that concern being raised
 9    internally at Oracle in or around -- on or around
10    Tuesday, December the 19th, 2000?
11         A. No.
12         Q. And if you go to the next paragraph, she says,
13    "Rebecca represents a small implementation firm but one
14    whose business is only successful when we support her
15    with our products. She is a squeaky wheel and I have
16    had many conversations with her over the last several
17    months on her views of our product quality, support and
18    partner program. However, her views are the same as all
19    of our partners implementing 11i OM."
20         Do you see that?
21         A. I do.
22         Q. Then goes on to say, "They all have
23    significant backlogs of implementation service. They
24    are trying to deliver and cannot either install our
25    products successfully in a reasonable amount of time,
```

76

```
 1    manage their customers' orders processing with our OM
 2    due to outstanding and answered Tars/Bugs, nor stabilize
 3    their customers' environments with our patches. I need
 4    to know what we in Alliances can do to help you set the
 5    partner's expectations about OM and the 11i product
 6    quality. If you cannot give me honest and accurate
 7    information as to when 11i product quality will improve,
 8    I am not going to be able to keep the partners from
 9    stopping their implementations in the marketplace."
10         Do you see all that?
11         A. I do.
12         Q. Were you aware of these concerns being raised
13    internally at Oracle in December of 2000?
14         MR. LINDSTROM: Objection; compound.
15         THE WITNESS: I can give you a general answer,
16    but not specifically, in response to this letter.
17         MR. SOLOMON: Q. Okay. So were you aware in
18    2000 that there was a concern among all of your partners
19    that 11i product qualities were impeding their business?
20         A. I don't believe that to be the case.
21         Q. Okay.
22         MR. SOLOMON: Would you like to take a break
23    now?
24         MR. LINDSTROM: The witness hasn't requested
25    one, so if you would like to take a break, that's fine.
```

77

1     MR. SOLOMON: Would you like to take a break,
2  Mr. Ellison? Either way; I don't mind.
3     THE WITNESS: Let's go on.
4     MR. LINDSTROM: I would like to break for
5  lunch within an hour.
6     MR. SOLOMON: Okay. Let's have marked as the
7  next exhibit a document with the Bates numbers 058291 to
8  293.
9        (Exhibit 16 marked for
10        identification.)
11     MR. SOLOMON: Q. The question, after you've
12  had a chance to look at it, will be have you seen it
13  before?
14     A. I have not seen it before.
15     Q. And looking halfway down the page, it appears
16  to be an e-mail from Joel Summers.
17     A. Yes.
18     Q. To Clifford Godwin and a number of other
19  people.
20        Do you know who Clifford Godwin is?
21     A. Yes.
22     Q. And who is he?
23     A. He's the chief architect of the applications.
24     Q. And do you know who Joel Summers is?
25     A. Yes.

78

1     Q. And who is he?
2     A. He's in charge of our human resources -- he
3  was in charge then of our human resources payroll
4  products.
5     Q. And it says, "Cliff, per our conversation, we
6  are working with a critical R11i HR/Payroll customer in
7  the US, Liberty Mutual, who received a commitment from
8  Larry that Development would ensure their ability to go
9  live on January 1. They did in fact make that date,
10  however, in our daily call today they indicated that
11  both forms and self-service performance is atrocious,
12  degrading over the course of the day as the number of
13  concurrent users increase. (Performance is good under
14  limited load conditions.)"
15        Do you see that?
16     A. Yes.
17     Q. And then it goes on to say, "I am asking for
18  assistance in analyzing the issues and proposing
19  resolution," then miss some language. Go to the end of
20  the paragraph on the second page, and you'll see it
21  says, "As usual, this is a critical issue, and we are
22  asking for this to be worked on an escalated basis."
23        My question is, are you aware of these issues
24  being raised by Liberty Mutual in or around the date of
25  this e-mail, which is January 3rd, 2001?

79

1     A. Yes. I recall the Liberty Mutual issues.
2     Q. Okay. And were you involved in responding to
3  the issues raised?
4     A. I was certainly briefed on their problems, and
5  we fixed the problems.
6     Q. And do you know when you were briefed? Was it
7  sometime after this e-mail?
8     A. I can't tell you the date I was briefed.
9     Q. And do you remember how you addressed the
10  problem? What did you do?
11     A. Again, this is -- pretty standard operating
12  procedure. They had done an implementation, they were
13  having performance problems. We have a team of people
14  that do performance tuning. The performance tuning
15  group went to work and fixed the problem.
16     MR. SOLOMON: Have marked as the next exhibit
17  a document produced by defendants with the Bates numbers
18  219294 to 296.
19        (Exhibit 17 marked for
20        identification.)
21     MR. SOLOMON: Q. When you've had a chance to
22  look at it, I'll ask you if you've seen it before. In
23  the meantime, it is dated January 5, 2001, e-mail
24  exchanges involving Safra Catz, Carolyn Balkenhol,
25  Sergio Giacoletto, Andrew Derrer, Michele Delvaux and

80

1  Juan Rada, R-a-d-a.
2        Have you seen this before?
3     A. Not that I recall.
4     Q. Okay. Do you know who Alison Hutchinson is?
5     A. Senior executive at Barclays, I believe.
6     Q. Have you communicated with her in the past?
7     A. I don't think I've ever communicated with her,
8  no.
9     Q. And the reference to "Please find the
10  suggested updated letter from Larry to Alison
11  Hutchinson," do you believe "Larry" refers to you?
12     A. I do. I do.
13     Q. Just go back to you saying you never
14  communicated with her, is that because neither this
15  draft letter ever went out in final signed by you, and
16  there was no other letter?
17     A. It is possible a letter went out under my name
18  but was drafted by someone in European or UK operations.
19  But I can't ever remember speaking to her or drafting a
20  letter myself.
21     Q. Okay. You'll see in the second paragraph it
22  says, "It is important that Larry's letter reach them
23  this week. If this is not possible a short note stating
24  that it's coming will be helpful. A meeting around the
25  15, 16 of January is critical as Barclays wants to

81

1  review the situation on January 19th, the next board
2  meeting, and they might decide to revisit alternative
3  software providers.  This is even more critical as
4  yesterday we informed them that our 'get well plan' has
5  slipped significantly."
6        Do you see that?
7        A.  I do.
8        Q.  Do you know what the reference is to the get
9  well plan?
10       A.  It is just a project to usually fix bugs in
11  the software or resolve consulting problems or whatever
12  it is.  If a customer is not happy about something and
13  we're putting a project in place to make them happy.
14       Q.  So this is bad news heaped on bad news then,
15  right?  There is a problem and a get well plan to fix
16  the problem?
17       MR. LINDSTROM:  Objection; mischaracterizes
18  the document.
19       THE WITNESS:  Again, I'm not familiar with the
20  Barclays problems.
21       MR. SOLOMON:  Q.  When we look at the draft
22  letter on the second page, and this would, had you
23  signed it, apparently have you saying -- not saying you
24  said it, because we don't know if you signed it, but you
25  would have, had you signed it, you would have said, "We

82

1  are aware that our UK support and technical operations
2  are inadequate.  We are addressing this in the migration
3  to an improved call handling process, will streamline
4  support for many operational problems and reduce the
5  likelihood of internal communication and escalation
6  problems."
7        Were you aware of those issues as described in
8  this draft?
9        A.  I'm aware in the general sense sometimes our
10  overseas customers prefer communicating directly with
11  California rather than the people in the UK, because the
12  California support teams are closer to the engineering
13  organization.  So again, it is not an uncommon
14  situation.
15       Q.  Okay.
16       A.  I'm not aware specifically what was going on
17  at Barclays.
18       MR. SOLOMON:  Let's go off the record and take
19  a ten-minute break.
20       VIDEOGRAPHER:  This marks the end of tape one,
21  Volume I, in the deposition of Larry Ellison at 11:21.
22  Going off the record.
23       (Recess, 11:21 a.m. - 11:38 a.m.)
24       VIDEOGRAPHER:  On record at 11:38.  This marks
25  the beginning of tape two, Volume I, in the deposition

83

1  of Larry Ellison.
2        MR. SOLOMON:  I suggest we go for an hour and
3  have lunch.
4        MR. LINDSTROM:  That's fine.
5        MR. SOLOMON:  Does that suit you?
6        MR. LINDSTROM:  That's fine.
7        MR. SOLOMON:  Mark the next document produced
8  by defendants 058335 to 338.
9             (Exhibit 18 marked for
10             identification.)
11       MR. SOLOMON:  Q.  While you're looking at it,
12  it's dated Wednesday, January 10th, 2001.  Reflects
13  e-mail exchanges including Cliff Godwin, Phil Tate,
14  eburshti, B-u-r-s-h-t-i.  And copying some other people.
15  And the reference is, "Liberty Mutual Escalation."
16       A.  Okay.
17       Q.  Have you seen this before?
18       A.  Not that I recall.
19       Q.  You see on the first page, there is a
20  reference to you being involved.  It says, "I need your
21  help with getting an on-site to assist with Liberty
22  Mutual.  Liberty Mutual is our fifth largest HR/Payroll
23  customer and went live early this January.  Prior to
24  going live they escalated their situation with 11i to
25  Larry.  Even though they are now live, they have

84

1  considerable performance problems and will not be
2  satisfied until they are resolved due to the negative
3  impact to their business."
4        Do you see that?
5        A.  I do.
6        Q.  And there is reference, as I mentioned, to it
7  being escalated to you.  Do you recall that escalation?
8        A.  Not specifically the event of an escalation.
9  I certainly remember the Liberty Mutual issue.
10       Q.  And in terms of the use of the phrase
11  escalation, escalation means going through various
12  levels as a problem was sought to be resolved?
13       A.  Yes.
14       Q.  And the top escalation would be to you; is
15  that right?
16       A.  That's right.
17       Q.  Then on the second page, you'll see that in
18  the middle of that e-mail exchange involving -- from
19  Joel Summers to Mike Murphy, and other people copied, in
20  the middle of that message it says, "Nevertheless,
21  Liberty is not satisfied that the implementation is
22  complete until the performance issues are resolved."
23       Do you recall being aware around January 9,
24  2001 that Liberty was not satisfied that the
25  implementation of 11i was complete?

85

1    A.  Well, I can't tell -- I don't recall the exact
2  date, but I remember we had performance problems at
3  Liberty Mutual, which we fixed.  That's all I recall.
4    Q.  Do you know when they were fixed?
5    A.  I don't.  But I think it was pretty
6  expeditiously.  Because, as I say, they were live and we
7  did put our best people on it.  And they are a very
8  large customer.
9        MR. SOLOMON:  I've marked as the next exhibit
10  a document with the control numbers 618166 to 169.
11        (Exhibit 19 marked for
12        identification.)
13        MR. SOLOMON:  Q.  And while you're looking at
14  it, this is dated Friday, January 12th, 2001.  And it is
15  from James McHugh -- excuse me, from Gayle Fitzpatrick
16  to James McHugh.
17        Have you seen this before?
18    A.  Not that I recall.
19    Q.  See on the first page, James McHugh wrote to
20  Gayle, and there is some language followed by a heading,
21  "Production Demonstration Difficulties," and it goes
22  through six itemized difficulties.
23        Do you see that?
24    A.  I do.
25    Q.  Okay.  Were you aware around January 2001 of

86

1  the product demonstration difficulties as itemized here?
2        MR. LINDSTROM:  Objection; compound.
3        THE WITNESS:  I was aware of some of the
4  specific issues, but not all of them.
5        MR. SOLOMON:  Q.  Let's go through number 1.
6  Were you aware of the sales comp difficulty?
7    A.  Not specifically, no.
8    Q.  What about the number 2, the mobile field
9  sales, "We are getting our clocks cleaned by Siebel."
10  Do you see that?
11    A.  Yes.
12    Q.  Were you aware of that?
13    A.  Again, not the specific details.  I certainly
14  know that Siebel routinely sold more CRM than we did.
15  They were the number one player in that market.
16    Q.  Number 3, "Certain applications have
17  performance issues during demonstration cycles."  And
18  the reference is to "Planner's Workbench, Self Service
19  Expenses, Web Discoverer."
20        Were you aware of that in January 2001?
21    A.  Again, not those specific details.
22    Q.  And number 4, "BIS."
23        Do you know what that stands for?
24    A.  I think it is Business Intelligence.
25    Q.  And it says, "BIS depending on the type is

87

1  either inconsistent or not available to demonstrate."
2        Were you aware of that issue in January 2001?
3    A.  Not specifically.
4    Q.  And number 5 says, "Although the ADS demo
5  dashboard is good, accessing CRM and ERP requires two
6  separate demonstrations from the dashboard.  Prospects
7  have picked up on this and questioned why?  Are they
8  different systems?  Then they see the different
9  interfaces."
10        Do you know what that refers to?
11    A.  The CRM products were somewhat newer, using
12  somewhat newer technology than the ERP products;
13  therefore, the user interface cosmetically was
14  different.
15    Q.  Were you aware of that issue in January of
16  2001?
17    A.  Yes.
18    Q.  And number 6, it says, "In existing clients
19  who are currently implementing 11i, heavy patching due
20  to product instability is impacting our ability to
21  engage them in additional sales cycles."
22        Were you aware of that in January 2001?
23    A.  I was certainly aware in the early version of
24  11i and all of our products we do a lot of patching and
25  bug fixing, yes.

88

1    Q.  "There are currently four Northeast accounts
2  that are on an implementation triage plan."
3        Do you know what those accounts were?
4    A.  I do not.
5    Q.  "Areas receiving heavy TIR activity thus far
6  are OSO, OSC, Advanced Benefits."
7        Do you see that?
8    A.  I do.
9    Q.  Were you aware of that in January 2001?
10    A.  Not specifically.
11    Q.  And again, we talked earlier about product
12  demonstration issues in earlier 2000.  Are these the
13  same sort of demonstration issues that were confronting
14  you in 2000?
15    A.  Yes.
16        MR. LINDSTROM:  Which?
17        THE WITNESS:  Some of them.  I have to read
18  them one at a time.  Certainly the biggest issue I
19  recall -- again, I wasn't aware of all of them
20  specifically.  This mentions performance issues, that's
21  different than the previous memo.  Some of the things I
22  certainly recall, that is that the demo system did not
23  have the latest production software, which was the
24  biggest complaint.  But, again, so it is back to knew
25  about some of them, not all of them.

89

1      MR. SOLOMON: Let's have marked as the next
2  exhibit a document produced by the defendants with the
3  Bates range 035038 to 39.
4          (Exhibit 20 marked for
5          identification.)
6      MR. SOLOMON: Q.  The question will be, once
7  you've had a chance to look at it, do you recognize it?
8      A.  Okay.
9      Q.  Do you recognize it?
10     A.  I don't.
11     Q.  You see that at the top on the first page
12  there is a reference to an e-mail from you to Safra
13  Catz.
14     A.  Yes.
15     Q.  Right?  And it simply says, "Approved, Larry"?
16     A.  Right.
17     Q.  You have no recollection of that?
18     A.  I do not.
19     Q.  You don't dispute though that this is, in
20  fact, a document that you wrote?
21     A.  Well --
22     Q.  To that extent?
23     A.  I wrote "Approved, Larry," yes.  And I read
24  that I'm -- I read the document at the time, I'm sure.
25     Q.  Okay.  And after "Approved, Larry," it says,

90

1  "Safra Catz wrote:  Spoke to Sandy about this.  This is
2  a company in tough financial condition.  Clearly some of
3  our software didn't help."
4          Do you see that?
5      A.  Yes.
6      Q.  Do you recall Safra Catz or anybody else
7  talking to you around this time of Oracle's software not
8  helping this customer?
9      A.  All I know is what I just read in the
10  document.
11     Q.  And then below that there is a reference to
12  "National Pen/Modern Mold."  And I want to skip a few
13  lines to start with, "National Pen is making the
14  following claims:  1.  They were shown features in the
15  software demonstrations that were not available for
16  implementation.  2.  The orders entry software is not
17  suitable for a high-volume order entry environment like
18  theirs.  3.  The software performance and flow causes
19  them extreme difficulty in processing orders.  In their
20  minds they are worse off now than before the
21  implementation.  4.  They claim that the implementation
22  was flawed in some way.  They also claim that they were
23  'unaware' of and did not agree to certain consulting
24  engagement decisions that were made."
25          Do you see that?

91

1      A.  I do.
2      Q.  Were you aware around August of 2000 that
3  National Pen was making the following claims with
4  respect to Oracle's software?
5      A.  I really don't recall anything about National
6  Pen, other than what I learned in this document.
7      Q.  But, again, as I think you testified, you
8  don't dispute you would have read this around the time?
9      A.  That's correct.
10     Q.  And then on the second page, I'm looking at
11  where it has a heading, "Justification."  And it says,
12  "National Pen (Modern Mold) is a privately held general
13  business account located in San Diego.  The customer is
14  extremely upset with the gap between their expectations
15  and actual business results of the software
16  implementation performed by Oracle.  National Pen is
17  also in extreme financial difficulty.  They have lost
18  their financial backing and are running the business
19  with cash from operations.  They claim the
20  implementation of the Oracle Applications has been a
21  major factor in their business decline."
22          Do you see that?
23     A.  I do.
24     Q.  Do you have any current recollection of those
25  facts?

92

1      A.  No, not at all.
2      Q.  And you don't know what, if anything, was ever
3  done to resolve the concerns?
4      A.  I have no idea.
5      Q.  Back to the first page.  This is an e-mail
6  from you.
7          Are you aware that in this litigation there
8  are some documents that are sourced to you?  Do you
9  understand what I'm saying when I say that?
10     A.  No, I don't.
11     Q.  Do you have an understanding what your files
12  are?
13     A.  My files?
14     Q.  Right.
15     MR. LINDSTROM: As they've been produced in
16  the litigation?
17     MR. SOLOMON: Correct.
18     THE WITNESS: Yes.
19     MR. SOLOMON: Q.  And what's your
20  understanding?
21     A.  Copies of my e-mails and other documents
22  that -- hard copy, hard drive documents that I was asked
23  to retain at the time the suit was initiated.
24     Q.  And who asked you to retain documents when the
25  suit was initiated?

93

1      A.  Our legal department.
2      Q.  And what did you do to comply with that
3  request?
4      A.  I stopped deleting all e-mails and all other
5  files; though, virtually everything I do is in e-mail.
6      Q.  And did you do that immediately when you got
7  the instruction?
8      A.  I stopped deleting all business e-mails
9  immediately, yes.
10      Q.  And aside from stopping deleting business
11  e-mails, what else did you do?
12      A.  I didn't throw away any other files.
13      Q.  Aside from not throwing away files and not
14  deleting e-mail, did you affirmatively retrieve any
15  information yourself?
16      MR. LINDSTROM:  Objection; vague and
17  ambiguous.
18      THE WITNESS:  I can't answer?
19      MR. LINDSTROM:  You may answer if you
20  understand.
21      MR. SOLOMON:  Lawyers often don't understand
22  what the witness clearly does understand.
23      THE WITNESS:  I relied on the legal department
24  to go through my -- I was asked to look for documents.
25  I really wasn't exactly certain what was relevant, what

94

1  wasn't relevant.  I thought the safest thing for me to
2  do was turn everything over to the legal department and
3  let them decide what was relevant or not.
4      MR. SOLOMON:  And when you say turning
5  everything over, what did you literally turn over?
6      A.  All of my -- they got access to all of my
7  e-mail, I believe they got access to all of my
8  computers, and looked at the hard drive, had experts
9  come out.
10      But I'm not exactly -- I'm not 100 percent
11  sure of what they did.  In general that's what they did.
12      Q.  Now, I know that, for example, that you have
13  computers on your boats.
14      A.  Yes, I do.
15      Q.  Were those actually taken by legal and
16  preserved?
17      A.  I don't know.  If I change -- I can tell you
18  my practice today is if a computer is upgraded, that
19  computer then goes to the legal department for storage.
20      I'm not sure they took the computers, in other
21  words, took them, because -- but they made periodic
22  visits to those computers and searched the hard drive
23  for information.
24      Q.  So people from your legal department went onto
25  your boats and looked at your computers and did

95

1  something, whatever it was, to preserve what was on
2  those computers on your boats?
3      A.  I believe so.  I'm not sure if they were from
4  the legal department.  They were either a technical
5  representative working on behalf of the legal
6  department, or someone from the legal department did
7  that, yes.
8      Q.  Do you know when that happened?
9      A.  I don't know when they did that.
10      Q.  Is there a record of that happening?
11      A.  I don't know.
12      Q.  If I wanted to know, as obviously I do, when
13  that happened, how would I find out?
14      A.  I would ask one of our lawyers, I guess.
15  Dorian is not here.  But I believe Dorian was in charge
16  of all that.
17      Q.  Now, apart from the computers on your boat,
18  you had computers at your homes?
19      A.  Yes.
20      Q.  Is it the same answer with respect to the
21  computers at your homes?
22      A.  Yes.
23      Q.  As of getting the instruction, do you know how
24  many e-mails you had in your computer or computers?
25      A.  No.  No idea.

96

1      Q.  Did you have a practice in 2000, first of all,
2  did you have a practice in 2000 of purging or deleting
3  e-mail?
4      A.  Periodically -- I would keep everything but
5  spam, pretty much everything for long periods of time.
6  And then I would spend several hours -- you know, once a
7  year, again, a generalization, I'm not sure, once a year
8  I go through and do a cleanup.
9      Q.  And do you know if you did that in 2000?
10      A.  I don't.
11      Q.  And do you know if you did that in 2001?
12      A.  Certainly after the instruction, I stopped all
13  cleanup activity.
14      Q.  All right.  Now, this first e-mail is dated
15  August 5th, 2000, and it is from you.
16      MR. LINDSTROM:  Referring to Exhibit 19 again?
17      MR. SOLOMON:  Correct, yes.
18      Q.  And it is from you.  And it was not produced
19  from your files.  It was produced from somewhere else.
20      Can you tell me why this e-mail was not
21  produced from your files?
22      A.  I cannot.
23      Q.  Let me ask you another question about this
24  e-mail.  If I wanted to somehow access this e-mail from
25  your file, is there any disaster recovery tape or backup

97

1   tape at Oracle that would permit me to do so?
2       A.   I'm not sure what our -- what our document
3   retention tapes, being documents, what our backup tape
4   retention cycle is for those documents.  I do know now,
5   though I don't know when it was initiated, literally
6   none of my e-mails are deleted.  All of my e-mails go
7   into a special server that the legal department keeps.
8   So I'm unable to delete anything.  That's been true for
9   several years.
10      MR. LINDSTROM:  He's asking a different
11  question.
12      THE WITNESS:  Okay.
13      MR. SOLOMON:  Q.  You don't believe that was
14  the case in 2000 or 2001; do you?
15      A.   No.  I'm pretty sure it was not.  It was
16  subsequent to me receiving that retention -- that
17  retention notice.  And I'm also saying -- I answered too
18  many things with that one answer.  You're saying is
19  there a backup tape where you could find this in my
20  e-mail.  And the answer is, I don't know, because I
21  don't know what our -- how old our backup tape, our
22  e-mail backup tapes are.
23      Q.   Okay.  Have you made any attempt to retrieve
24  through backup tapes any information for production in
25  this lawsuit?

98

1       A.   Me personally?
2       Q.   Yes.
3       A.   No.  I've relied on our legal department to do
4   all the production.  They've had the access to our
5   technical people.
6       Q.   In 2000, if you deleted an e-mail and did no
7   more, would that stay on a server somewhere?
8       MR. LINDSTROM:  No foundation.  Calls for
9   speculation.
10      You may answer, if you know.
11      THE WITNESS:  Okay.  There are different kinds
12  of deletes.  There is a delete to get it off the Window
13  on your screen, but it is still actually in your file,
14  desktop files and on the server.  There is another
15  delete that will actually purge it from your desk top
16  files, but it will still be on the server and backup
17  tapes.
18      Eventually if you do the more complete delete,
19  I think it is called a purge, it will still be on the
20  backup tapes for some period of time.  It depends on how
21  long those backup tapes are retained.
22      MR. SOLOMON:  Q.  What if you don't do the
23  purge, but you just do the delete, how long would it
24  simply sit on the server?
25      A.   Forever.

99

1       Q.   Did you often purge as opposed to just delete?
2       A.   Every time I do my cleanup, I did deletes plus
3   purges, to free up the disk space.
4       Q.   Is there any way of identifying when you did
5   those cleanups?
6       A.   It would depend on the availability of the
7   backup tapes, which I'm not aware of.
8       Q.   There wouldn't be a notation anywhere, as far
9   as you know, that you cleaned it out today or whatever?
10      A.   No.
11      MR. SOLOMON:  I marked as the next exhibit a
12  document produced by the defendants with the numbers
13  02544 to 547.
14      (Exhibit 21 marked for
15      identification.)
16      MR. SOLOMON:  Q.  And when you've had a chance
17  to look at it, let me know whether you recall seeing
18  these exchanges before.
19      A.   Okay.
20      Q.   Have you seen this before?
21      A.   I believe I have, though I don't recall it
22  specifically.
23      Q.   You'll see on the first page, the first e-mail
24  exchange is dated Wednesday, September 6, 2000.  It is
25  from Ron Wohl to you and others.  And the first message

100

1   is, "This past weekend we had three more 11i go lives,
2   bringing us up to 15."
3       Do you see that?
4       A.   I do.
5       Q.   And on the next page, there is another
6   exchange dated, I believe, 28th of August 2000.  And if
7   you go to the bottom, it says, "Ron, I would like to
8   know precisely which modules are running in each
9   customer.  We have a hard time to believe they have ERP
10  and CRM running together."
11      Do you see that?
12      A.   Yes.
13      Q.   And then the response appears to be from Ron
14  Wohl, "Mary Ann has the detail.  I believe the first ten
15  customers are running various parts of ERP.  I'm not
16  sure if any are running CRM components yet."
17      Do you see that?
18      A.   Yes.
19      Q.   And then above that, a message from Mary Ann,
20  "I'm not aware of any customers who are live on CRM at
21  this time."
22      Do you see that?
23      A.   I do.
24      Q.   Were you aware as of August 2000 that there
25  were no live customers on CRM?

101

1    A.  Again, I don't specifically recall, but I
2  certainly knew in general that CRM was a new business
3  for us.  So we had been in ERP for a decade, and CRM was
4  brand-new.  Not only was 11i a new version of our ERP
5  products, it was also an all-new -- it was our
6  introduction into the CRM business largely, and that we
7  had a lot more ERP customers than we had CRM customers.
8    Q.  And again, this is -- these exchanges involve
9  you and your e-mail address.  But this document, again,
10  has not been produced.  The document pertaining to your
11  e-mail address has not been produced from your files.
12    Is it your testimony that you don't know why
13  that's the case?
14    A.  That's correct.
15    Q.  And you think Ms. Gray is probably the only
16  person who can tell me; is that right?
17    MR. LINDSTROM:  Objection; calls for
18  speculation, mischaracterizes his testimony.
19    THE WITNESS:  As I say, the document retrieval
20  and production was done by our legal department, so they
21  know a lot more about it than I do.
22    MR. SOLOMON:  I meant Ms. Daley.
23    Have marked as the next exhibit a document
24  produced by defendants with the Bates numbers 020631
25  through 634.

102

1    (Exhibit 22 marked for
2    identification.)
3    MR. SOLOMON:  Q.  And let me know if you've
4  seen this before, when you've had a chance to look at
5  it.
6    A.  Again, I believe I have.  I'm on the
7  distribution list, although I don't recall it
8  specifically.
9    Q.  And with respect to the fact that this didn't
10  come from your files, again, you would have no knowledge
11  as to why?
12    A.  No.
13    MR. LINDSTROM:  Again, you're making that
14  representation to him?
15    MR. SOLOMON:  I'm making that representation.
16    Let's have marked as the next exhibit a
17  document with a Bates range 013717 through 720.
18    (Exhibit 23 marked for
19    identification.)
20    THE WITNESS:  Okay.
21    MR. SOLOMON:  Q.  Do you recognize this?
22    A.  No, I do not.
23    Q.  Do you dispute receiving this in or around
24  October of 2000?
25    A.  No.

103

1    Q.  It is -- well, at the very top of the first
2  page there is a communication from Jay Nussbaum to
3  Police, RPOLICE or Police.
4    It says, "Ron, fyi.  Didn't know who should
5  see this."
6    Do you see that?
7    A.  I do.
8    Q.  And below that there's a message from George
9  Roberts to Gayle Fitzpatrick, and it cc's a number of
10  people including you?
11    A.  Yes.
12    Q.  Do you see that?
13    A.  I do.
14    Q.  The first message below that is, "I've asked
15  the team to get more specific our on ADS systems issues.
16  Below is the Majors detail.  I know it goes against our
17  message, but do we need to stop doing demos at the
18  clients' site wherever possible and pull them into the
19  offices for better integrity?  As we stated in our
20  meeting last week, these difficulties are now common
21  knowledge by our competition, and they position our
22  inability to competently pull these off as 'proof' that
23  the e-Business suite is not a reality."
24    Do you see that?
25    A.  I do.

104

1    Q.  Were you aware of that sentiment being
2  expressed internally at Oracle in or around October of
3  2000?
4    A.  Well, I am aware that we had a new demo system
5  where we demonstrated the product not in our offices,
6  but at the client offices.  That's what this is
7  referring to.
8    And when you demo at the client offices you're
9  going across the public Internet on a client computer.
10  And making that network connection -- we were the only
11  ones to actually do this kind of demonstration where we
12  went to the client office directly, they connected to
13  our servers via a network.  And this is a new way of
14  demoing our products, it was a new approach.  And we
15  were always kind of pushing that we were a modern
16  Internet company.
17    And we were having a good deal of difficulty
18  making the demonstrations work across the Internet.  I
19  think if you read the specific examples in here, the
20  bulk of the problem doesn't have so much to do with our
21  software, it has to do with the fact that working in
22  client offices and getting it to work across the public
23  Internet was very, very challenging.  And when the
24  customer saw bad performance, they didn't know it was
25  really a network issue, as opposed to a software issue.

105

1 I think that is the bulk of what is said in here.
2     Q.  I understand.  But, again, if you could just
3 focus on the question.
4         And the question was, were you aware of those
5 concerns being expressed internally at Oracle at the
6 time?
7     A.  I was certainly aware that we had problems
8 with our demonstration system.
9     Q.  Then let's go on to page 2.  And at the top of
10 the page it says, "The problems fall into three
11 categories:  1) system stability and performance, 2)
12 product integration and stability, and 3) deviation from
13 the ADS scripts.  The system stability and performance
14 issues and our inability to show an integrated demo
15 leaves doubt in our customers' minds that Oracle can
16 show or deliver the e-Business solution."
17        And the question is, were you aware of those
18 concerns being raised internally at Oracle in 2000?
19     MR. LINDSTROM:  Objection; compound.
20     THE WITNESS:  I certainly was aware we had a
21 new demonstration system.
22     MR. SOLOMON:  Q.  That's not what I'm asking.
23     A.  And there were problems with it.
24     Q.  Okay.  And with respect to the problems
25 identified here, system stability and performance,

106

1 product integration and stability, and the deviation
2 from the ADS scripts, were you aware of each of those
3 issues being expressed internally at Oracle in October
4 of 2000?
5     A.  If you read this memo in its entirety, you
6 read the different examples, you will see that the bulk
7 of these examples have to do with the fact that we're
8 doing it at a client site rather than in our office, and
9 they are network related issues.
10        However, I certainly knew that 11i was a new
11 product, and the first version of a new product will
12 have more bugs than later versions.
13     Q.  I understand that.  And as we get shorter in
14 time, I'm going to have to cut you off more and more.
15     A.  Sure.
16     Q.  Because I need answers to my questions.
17     A.  Okay.
18     Q.  If you skip a paragraph, and I'm talking now
19 about the paragraph beginning with "Detail below."
20     A.  Okay.
21     Q.  And I'm halfway through that paragraph, the
22 "The ADS support team has done a great job in trying to
23 resolve some of these issues with us, but I'm not sure
24 they are equipped to deal with the complexity of the
25 solutions we need to show the customer.  The end result

107

1 is a poor showing in front of the customer and we need
2 to be able to demonstrate that our e-Business solution
3 and architecture are better performing than our
4 competitors, particularly those who bring in their own
5 servers."
6        Were you aware of that being expressed in
7 October of 2000?
8     A.  I was aware of it being expressed.  I didn't
9 agree with the approach, the solution they proposed.
10     Q.  Okay.  Then there is reference to a
11 demonstration at Pier One, a demonstration at Litton, a
12 demonstration at Clopay, at Warner Brothers and
13 McGraw-Hill, J&J, Schreiber Foods.
14        Were you aware of demonstrations being
15 attempted at those clients in and around the fall of
16 2000?
17     MR. LINDSTROM:  Objection; compound.
18     THE WITNESS:  Not specifically.
19     MR. SOLOMON:  Q.  What about Pier One, were
20 you aware of that?
21     A.  Not specifically.
22     Q.  What about Litton?
23     A.  Not specifically.
24     Q.  Clopay?
25     A.  Not specifically.

108

1     Q.  Warner Brothers?
2     A.  No.
3     Q.  McGraw-Hill?
4     A.  Nope.
5     Q.  J&J?
6     A.  Nope.
7     Q.  Schreiber Foods?
8     A.  No.
9     Q.  If you go to Clopay, it says, "The first
10 Clopay demo was held in the Oracle office in Cincinnati
11 with our internal web connection."
12        Do you see that?
13     A.  Yes.
14     Q.  "Response time was awful.  Mike Metcalf
15 described it as worse than 2400 baud."
16        Do you know what that means?
17     A.  Yes.
18     Q.  What does that mean?
19     A.  It is an old-fashioned, very slow teletype
20 connection.
21        It's just his way of emphasizing how slow the
22 connection was.
23     Q.  "In addition, drop ship functionality was not
24 working and fake data was required."
25        Do you know what that means?

109

1     A.  I do not.
2     Q.  And you don't recall around the fall of 2000
3 being made aware of that as a result of getting this
4 e-mail?
5     A.  Not specifically, no.
6     Q.  If you look at J&J on page 13719, you'll see
7 it says, "Presented financials to J&J at the Oracle
8 Iselin office."
9     Do you see that?
10     A.  I do.
11     Q.  "With an audience in attendance of over 20,
12 one hour into the demo we experienced extreme
13 performance degradation (latency was well over 250ms).
14 Jim McHugh immediately called the ADS hotline.  ADS said
15 the issue was not with the data center and referred him
16 to the Corporate Help Desk.  Upon calling the Corporate
17 Help Disk, Jim was immediately placed on hold for
18 several minutes before the call was handled.  Both ADS
19 and the Corporate Help Desk said there was nothing they
20 could do.  Meanwhile, the prospect, J&J, was asking if
21 the demo performance was illustrative of expected post
22 implementation performance.  After several additional
23 minutes the Corporate Help Desk issued a P1.  Issues
24 were resolved after one hour of SC dancing/powerpoints
25 waiting for the situation to improve."

110

1     Do you recall those issues being raised with
2 you in the fall of 2000?
3     MR. LINDSTROM:  In conjunction with the J&J
4 presentation?
5     MR. SOLOMON:  Correct, yes.
6     THE WITNESS:  No.
7     MR. SOLOMON:  Q.  Let's go over to the last
8 page, which is 013720.  There is a summary.  You see
9 that?
10     A.  I do.
11     Q.  Okay.  It says, "Our demo
12 deployment/methodology strategy is the right one,
13 however, the lead time between the release of our
14 products to the market and our ability to show these to
15 our customers is hurting the business.  The
16 uncontrollable elements between the data center and demo
17 site need to be addressed.  These elements, equipment,
18 demo laptops, connection method, port restrictions, poor
19 modem speeds and Oracle's own internal network and
20 office performance need to be performing controllable
21 and quantifiable elements to ensure a favorable customer
22 perception of our architecture and applications
23 performance.  The need for an integrated demo is high.
24 I know that it's coming soon, but we've had to stall our
25 scheduled demos to customers so that we can show them

111

1 their business requirements in the demo.  Our
2 competitors know that we're struggling with this and do
3 an outstanding job of setting up customers to see a
4 'live integrated demo' from Oracle.  Once the integrated
5 demo environment is available, we have to be able to
6 customize the demos to meet our customers' requirements.
7 This is key to our success in Majors.  We can't keep
8 going back to the customers to ask for a 'do-over' when
9 it comes to demos.  This has been the norm rather than
10 the exception of late."
11     Do you see that?
12     A.  Yes.
13     Q.  In the fall of 2000, were you aware of the
14 issues as expressed in that summary?
15     MR. LINDSTROM:  Objection; compound.
16     THE WITNESS:  Again, in a general sense, I was
17 certainly aware as we went to this global demo system
18 across the network, whenever you introduce a new piece
19 of technology, there are problems.  And there were
20 specific problems in network performance.  So, in a
21 general sense I was aware we had problems bringing up
22 our global demo system.
23     MR. SOLOMON:  Q.  And, again, this is an
24 e-mail with your address on it.  You can't tell me why
25 it was not produced from your files, can you?

112

1     A.  I cannot.
2     MR. SOLOMON:  I've marked as the next exhibit
3 a document produced by the defendants, Bates number
4 014244 and 45.
5     (Exhibit 24 marked for
6     identification.)
7     MR. SOLOMON:  Q.  If you take a look at it,
8 please, then let me know if you've seen it before.  Do
9 you recognize this?
10     A.  Yes.
11     Q.  And it's a memo to you from Mike Rocha?
12     A.  Yes.
13     Q.  Copying some other people, dated October 12th,
14 2000?
15     A.  Yes.
16     Q.  And there is a reference to Carly Fiorina?
17     A.  Yes.
18     Q.  You testified earlier, I thought, that you
19 didn't negotiate with Carly --
20     MR. LINDSTROM:  Objection.
21     MR. SOLOMON:  Q.  -- in the fall of 2000; is
22 that right?
23     MR. LINDSTROM:  Objection; mischaracterizes
24 his testimony.
25     THE WITNESS:  I have never negotiated a

113

1  transaction with Carly Fiorina.
2      MR. SOLOMON:  Q.  All right.  It says here
3  there is an understanding you were meeting with her the
4  next day.
5      A.  Yes.
6      Q.  Did you meet with her?
7      A.  Yes.
8      Q.  And it wasn't to negotiate any transaction?
9      A.  No.
10      Q.  What was the meeting about?
11      A.  Just general, you know, general climate --
12  general climate of business for both Oracle and HP and
13  how we might better work together.
14      Q.  But not to the level of a transaction?
15      A.  No.
16      Q.  So just general macro type things?
17      A.  It is my practice not to negotiate business
18  transactions with any of our customers.
19      Q.  Okay.  Just looking at point 1, it says, "HP
20  isn't happy with the quality of the CRM products.  While
21  the lead sharing system is operational, HP believes that
22  they received an uninstallable product and were asked to
23  pay consulting fees to make it work.  They have withheld
24  payment of consulting fees.  Mark is directly involved
25  in the account.  HP will ask that you get involved."

114

1      Do you see that?
2      A.  Yes.
3      Q.  Do you recall being made aware of that around
4  the time of this e-mail?
5      A.  Yes.
6      Q.  Okay.  And did HP ask that you get involved?
7      A.  No.
8      Q.  So that was a prediction that just didn't come
9  true?
10      A.  That's correct.
11      Q.  Okay.  Did you discuss the quality of the CRM
12  products with Carly Fiorina when you met her the
13  following day?
14      A.  No.
15      Q.  If you go to point 4, it says, "HP expects
16  that we will purchase the hardware required to make our
17  build and integration environments comparable to Sun,
18  (power unit equivalent).  I'm sitting on a $1.7 million
19  request for the 9i line (complete with OPS).  My opinion
20  is based on the Wall Street Journal article Bill Russell
21  feels that he was screwed by us, therefore, he isn't
22  willing to be reasonable on the development
23  environments.  Given the size of our software sales
24  opportunity, you may want to agree that we'll purchase
25  the hardware.  We need it."

115

1      Do you see that?
2      A.  I do.
3      Q.  Do you recall being made aware of that as a
4  result of getting this e-mail in October of 2000?
5      A.  Yes.
6      Q.  Were you aware of that outside of receiving
7  this e-mail, or is this the vehicle by which you became
8  aware?
9      A.  No.  I certainly knew about a general
10  expectation.  HP certainly would like to sell us
11  hardware.  In a general sense, they are always trying to
12  sell us more hardware and we were always trying to sell
13  them software.
14      Q.  And did you hear, other than from this e-mail,
15  of the concerns HP had with the CRM?
16      MR. LINDSTROM:  We're back to item 1 now?
17      MR. SOLOMON:  Back to item 1, yes.
18      THE WITNESS:  I could just tell you in a
19  general sense that -- you know, I can't say this
20  specific document made me aware exactly at this time.
21  But HP is a big Siebel customer, and we were trying to
22  get our CRM in you, know, to displace Siebel, and it was
23  just a hard road.
24      Siebel is the market leader in this.  Their
25  products are quite good.  And we had a hard time

116

1  competing with them at HP and other places in CRM.
2      MR. SOLOMON:  Q.  And, again, this would have
3  been in your e-mail file, and you can't explain why it
4  wasn't produced from your source in this litigation?
5      MR. LINDSTROM:  Objection; mischaracterizes
6  the testimony as to what would or would not have been in
7  his e-mail file at this time.
8      MR. SOLOMON:  Q.  Let's back up.
9      This would have been in your e-mail in October
10  of 2000; true?
11      A.  True.
12      Q.  And you can't explain why it was not
13  retrievable and retrieved in March of 2001 and produced
14  in this litigation from your file?
15      A.  I cannot.
16      MR. SOLOMON:  Have marked as the next exhibit
17  a document produced by Oracle with the Bates number
18  039546.
19          (Exhibit 25 marked for
20          identification.)
21      MR. SOLOMON:  Q.  Let me know if you've seen
22  it before when you've had a chance to look at it,
23  please.
24      A.  Okay.
25      Q.  Have you seen this before?

117

1    A.  Yes.  Yes, I have.
2    Q.  And you recognize it as an e-mail you received
3  on or around October 12th, 2000?
4    A.  Yes.
5    Q.  And from Sandy Sanderson?
6    A.  Yes.
7    Q.  And it says "Larry, please see the e-mail
8  below from our account team and the client.
9  Ingersoll-Rand has been a big supporter of Oracle, this
10  should have been an easy sale.  We have $2.5 million in
11  forecasts with $5 million in upside for IR.  The $2.5
12  million is for db, upside is apps.  They are now
13  seriously considering holding off on the db this quarter
14  because of the apps issues."
15      Do you see that?
16    A.  I do.
17    Q.  Were you aware of that being a, I won't say
18  threat, but a suggestion, at least, from Ingersoll-Rand
19  in or around October of 2000?
20    A.  I don't -- clearly I was made aware of it in
21  this e-mail note, but I don't recall it.
22    Q.  But you don't dispute you were aware of it
23  then?
24    A.  No.
25    Q.  And then you testified earlier that

118

1  Ingersoll-Rand is now a happy customer?
2    A.  Yes.
3    Q.  Is that right?  And isn't it true that you had
4  to pay Ingersoll-Rand $2 million to placate it with
5  respect to its apps issues?
6    A.  I don't recall.
7    Q.  You don't dispute that?
8    A.  I don't.  I have no idea.
9      MR. SOLOMON:  Have marked as the next exhibit
10  a document produced by Oracle with a Bates range 159545
11  through 575.
12      (Exhibit 26 marked for
13      identification.)
14      MR. SOLOMON:  Q.  You see this is entitled,
15  "FY 02 Consulting Budget Review," and is dated April 3,
16  2001?  And just so you know, by all means flip through
17  it, I'm only going to be asking you questions at least
18  right now about page 169568.
19      MR. LINDSTROM:  So that would be page 24 of
20  the PowerPoint?
21      MR. SOLOMON:  That's correct.
22      MR. LINDSTROM:  Thank you.
23      THE WITNESS:  What is the date of this
24  document again?
25      MR. SOLOMON:  Q.  On the front it says --

119

1    A.  April 13th, 2001.
2    Q.  Yes.
3    A.  Okay.
4    Q.  And this is just for the consulting
5  organization; correct?
6    A.  I believe so, yes.
7    Q.  Looking at 159568, which is page 24 of the
8  presentation, and it talks about, "R11i Product Issues
9  have resulted in a 2 point deterioration in fiscal year
10  01 Margin Percentage."
11      Do you see that?
12    A.  I do.
13    Q.  Then there is some figures then an asterisk,
14  then it talks about -- it says the following, "Largest
15  customers include Paxar ($2M), Ingersoll-Rand ($2M),
16  Xerox ($1M), Greenway Medical ($1M), Honeywell ($1M),
17  and Franklin Covey ($1M).
18      Do you see all that?
19    A.  No, I don't.  Page 25 -- are we on the same
20  page?
21    Q.  Maybe not.
22    A.  We're not on the same page.  That's page 24 of
23  the presentation.
24    Q.  Did I say 25?  I apologize.
25      MR. LINDSTROM:  And I think counsel -- go

120

1  ahead.  If you will, I think he's referring to the
2  asterisk at the bottom of the page.
3      THE WITNESS:  Because that's not consistent
4  with the next page of the presentation.
5      MR. LINDSTROM:  Now that we have the right
6  page, why don't you repose the question.
7      THE WITNESS:  It is interesting that the
8  document, page 24, says, "$2M Ingersoll-Rand," and here
9  it says Ingersoll-Rand is less than a million.
10      MR. LINDSTROM:  There is no pending question.
11      THE WITNESS:  Okay.  I just noticed they are
12  not consistent.
13      MR. SOLOMON:  This is your document.
14      THE WITNESS:  Not mine personally.  Someone at
15  Oracle wrote this document.  Okay.
16      MR. SOLOMON:  Q.  So, anyway, I was looking at
17  page 24 of the presentation and I was -- I referenced
18  the 2 point deterioration in margin as a result of R11i
19  product issues.  Then I was going to the asterisk where
20  it says, "Largest customers include," then we went
21  through the dollar amounts.
22      This appears, does it not, to reflect the fact
23  that Oracle had to make concessions to those customers
24  with respect to the implementation of 11i; is that fair?
25    A.  Go on.  But it was a new product.  New product

121

1 takes more consulting to deliver.  The customers
2 sometimes get upset if the size of the consulting bill
3 is too big, because the consultants are learning about
4 the products as they go, and it is not uncommon for us
5 to have to make concessions under those circumstances.
6    Q.   Okay.  So you agree?
7    A.   Yes.
8        MR. SOLOMON:  I've marked as the next exhibit
9 a document produced by defendants with a Bates range
10 018737 to 742.
11        (Exhibit 27 marked for
12         identification.)
13        MR. SOLOMON:  Q.   Take a chance to look at it,
14 then tell me if you recognize it, please.
15    A.   Okay.
16    Q.   Do you recognize it?
17    A.   I do.
18    Q.   And you received it on or around November 8th
19 of 2000?
20    A.   Parts of it, yes.
21    Q.   If you go to the third page of the document,
22 which is 018379, it is addressed to you, Larry Ellison?
23    A.   Yes.
24    Q.   And it is signed Terry Conner, Senior Vice
25 President and CIO, President of Information Systems.  Do

122

1 you see that?
2    A.   I do.
3    Q.   The last page.
4        It appears it was also perhaps signed by Helen
5 Sayles, Senior Vice President of Human Resources.
6        Do you see that on the right bottom?
7    A.   I do.
8    Q.   Do you know those individuals?
9    A.   I do not.
10    Q.   Did you read this e-mail when it was sent to
11 you?
12    A.   I did.
13    Q.   And you'll see that after identifying the
14 company, the writers say -- I'm on page 018739 -- "We
15 are writing this to bring to your attention what we
16 consider a major breach of promise from Oracle and in
17 the hope that we can yet recover to a mutually
18 acceptable outcome."
19        Do you see that?
20    A.   I do.
21    Q.   It goes on to say, "Having gone through
22 extensive review of alternatives, we purchased the
23 Oracle 11i Human Resources Management System in late
24 1999.  Our decision was based on your team's explicit
25 commitment to delivery of a product that would perform

123

1 as intended in a time frame that would allow for smooth
2 implementation - including all of the essential testing
3 required.  We believed that purchase of the HRMS would
4 not only allow us to fulfill a critical internal need,
5 but would also allow us to evaluate the technology
6 platform, technical capabilities, service delivery and
7 support as we look to the future technology platforms
8 required to support our multiple business units.
9 Unfortunately, based on our most recent project review
10 with our team today, our confidence in both the quality
11 of the product and in Oracle's ability to support us in
12 meeting those objectives is so low that we feel that
13 without a major change on your part, the project has
14 very little chance of success.  To put it bluntly, we
15 have encountered multiple software quality problems and
16 we have struggled to get appropriate support and
17 response to our issues.  The situation is dire, and
18 absent a concerted effort on your part, we now stand in
19 great jeopardy on this implementation.  The success of
20 this project is crucial to Liberty Mutual's business
21 plans for 2001 and represents a significant investment
22 with Oracle."  And it goes on.
23        Do you remember reading that in or around
24 November 2000?
25    A.   I sure do

124

1    Q.   Then on the next page they take you through
2 problems they've been experiencing.  And they say, "The
3 base system was promised by 3/31/00 - it was delivered
4 on 6/2/00.  We were unable to run a first test payroll
5 until 7/26/00.  We have continually faced serious issues
6 with your technical assistance request process, with
7 multiple TARs remaining dormant while our people have
8 tried to escalate the issues within your organization.
9 When escalated, the issues appear to get a flurry of
10 action, but the number of issues do not appear to
11 diminish, and your customer support process has not been
12 effective in resolving flaws in what would appear to be
13 basic functionality.  We have been working with people
14 over 9 different time zones - testing multiple potential
15 solutions suggested by Oracle, only to find the
16 solutions do not work."  It goes on to detail their
17 problems.
18        Do you recall reading this in November of
19 2000?
20    A.   Yes.
21    Q.   What was your reaction?
22    A.   This is an escalation that we had to make sure
23 our best people in development and engineering were
24 aware of it and worked to fix the problem.
25    Q.   On the first page now, it says, "As you can

125

1  see from the attached, Liberty Mutual has escalated
2  their significant dissatisfaction with Oracle HRMS to
3  Larry. This will be a topic of discussion tomorrow."
4      Do you know what meeting is being referenced
5  when it says, "topic for discussion tomorrow"?
6      A.  I think I called for a meeting. We have
7  regular -- I chair regularly scheduled engineering
8  meetings both for applications and database technology,
9  and I think it was the regularly scheduled -- I wanted
10  to put it on the agenda. When I said "Joel, let's
11  review this tomorrow," my comment was to put it on the
12  agenda of our regularly scheduled applications meeting.
13      MR. SOLOMON:  Okay. Let's take a five-minute
14  break. Actually, you know what, let's go for lunch.
15      MR. LINDSTROM:  That's fine.
16      VIDEOGRAPHER:  This marks the end of tape two,
17  Volume I, in the deposition of Larry Ellison. At 12:50
18  going off the record.
19      (Lunch recess - 12:50 p.m. - 1:36 p.m.)
20      VIDEOGRAPHER:  On record at 1:36. This marks
21  the beginning of tape three, Volume I, in the deposition
22  of Larry Ellison.
23      MR. SOLOMON:  I want to have marked as the
24  next exhibit a document produced by defendants with
25  control number 024862 through 864.

126

1      (Exhibit 28 marked for
2       identification.)
3      MR. SOLOMON:  Q.  And if you just let me know
4  when you've had a chance to look at it, if you recognize
5  it, please.
6      A.  Okay.
7      Q.  Do you recognize it?
8      A.  Not really.
9      Q.  Okay.
10      A.  Not specifically. I recognize the general
11  dispute between the two parties, but --
12      Q.  Okay. Who are the two parties you're
13  referring to?
14      A.  Ron Wohl and Mark Barrenechea.
15      Q.  And one was responsible for ERP and the other
16  for CRM; is that right?
17      A.  That's correct.
18      Q.  You don't dispute receiving this around the
19  date of the document where you were an addressee, which
20  is 15th of November 2000?
21      A.  I do not.
22      Q.  And what was the dispute?
23      A.  Ron was complaining about Mark, you know,
24  Mark's code, and Mark was complaining about Ron's code.
25      Q.  Is that a problem, or was that a problem that

127

1  confronted Oracle?
2      A.  Still to some degree confronts Oracle, that
3  groups are interdependent upon one another. They will
4  say:  I'm late because the database team didn't -- it
5  wasn't my fault, it was his fault that I was late.
6      So a lot of our software is interdependent, so
7  our applications, for example are built on top of our
8  database and on top of our middleware, and sometimes
9  there will be finger pointing to some people. Sometimes
10  people prefer to assign blame to someone other than
11  themselves or their own group.
12      Q.  This -- when I say "this" I'm looking at the
13  e-mail dated November 15th, 2000, second -- two-thirds
14  of the first page, this refers to the internal roll-out
15  of 11.5.2?
16      A.  It does.
17      Q.  And then on Thursday, November 16th, 2000,
18  there is an e-mail from Jeff Henley to Jennifer Minton
19  where it says, "FYI, I actually like this exchange with
20  copies to Larry, it escalates the pressure to get to the
21  bottom of what is really happening here. I took my shot
22  at EC on Monday, so this is supplemental ammo."
23      Do you recall seeing that?
24      A.  Not specifically. But I certainly remember
25  the climate at the time this was all occurring.

128

1      Q.  EC refers to executive committee?
2      A.  That's correct.
3      Q.  Do you recall the meeting that's referred to
4  there on the Monday?
5      A.  Again, not specifically. But in general, yes,
6  absolutely.
7      Q.  And were there heated exchanges in these
8  meetings between Ron Wohl and Mark Barrenechea?
9      A.  Mark would be heated; Ron would be
10  quantitative and analytical.
11      Q.  Who would be at these meetings?
12      A.  The senior -- the senior managers in the
13  company.
14      Q.  And that would be Sandy Sanderson, George
15  Roberts?
16      A.  Yes, they were there.
17      MR. LINDSTROM:  We're talking about the EC
18  meetings referred to in this document?
19      MR. SOLOMON:  Yes.
20      MR. SOLOMON:  Q.  Jay Nussbaum?
21      A.  Yes.
22      Q.  And Wohl and Barrenechea and you, and who else
23  other than that group?
24      A.  Safra Catz, Jeff Henley.
25      Q.  Okay.

129

1   A. Chuck Rozwat.
2   Q. And what was his position?
3   A. He ran database engineering.
4   Q. Anybody else?
5   A. Mike Rocha, who at the time ran support.
6   Q. The reference is, "Get to the bottom of what
7 is really happening here."
8   Do you recall ever getting to the bottom of
9 what was really happening?
10   A. I wonder if I ever get to the bottom of what's
11 really happening. No. It was a normal -- it was kind
12 of a normal development process. We had a new product,
13 there was problems with Ron's code, there were problems
14 with the CRM code. They were both under tremendous
15 pressure to fix those problems as quickly as they could.
16 And they were just feeling the pressure.
17   MR. SOLOMON: Okay. Have marked as the next
18 exhibit a document not produced by Oracle, at least not
19 this version.
20   (Exhibit 29 marked for
21   identification.)
22   MR. SOLOMON: Q. You see this is the Oracle
23 2000 Annual Report, as referenced on the front page?
24   A. Yes.
25   Q. I'm going to focus on the fifth page of the

130

1 document which has your photograph on the right.
2   A. Okay.
3   Q. And this is part of a letter that you wrote to
4 the shareholders; is that right?
5   A. Yes.
6   Q. And I'm looking on that page with your
7 photograph on it, at the bottom of the page, and it says
8 the following, "We also developed several new
9 applications so that the E-Business Suite would be
10 complete. Today the suite includes every application
11 you need to run your business, marketing, sales, supply
12 chain, manufacturing, customer service, accounting,
13 human resources - everything. It works in every country
14 and in every language. The E-Business Suite is the
15 first and only complete set of applications ever to have
16 been built."
17   Do you see that?
18   A. I do.
19   Q. That wasn't true when you wrote it, was it?
20   A. Yes, it was.
21   Q. Are you saying that it worked at that time in
22 every country, in every language?
23   A. I didn't say it worked perfectly. But with
24 the engineering -- it was engineered to do all of those
25 things, it had all of those components. It had

131

1 marketing, it had sales, it had supply chain, it had
2 manufacturing, customer service, human resources. It
3 had all of those things. And it had the ability -- it
4 had virtually the ability to put it in every language.
5 It doesn't mean that every feature, every feature you
6 could possibly want for your business was in there, but
7 ever major functional area was covered.
8   Q. You see it says, back to the page with your
9 picture on it, it says, "Today," not yesterday, not
10 tomorrow, it says, "Today the suite includes every
11 application you need to run your business," and it goes
12 through that. And you say "everything," and you say,
13 "it works in every country."
14   You don't agree that gives the impression that
15 everything was there, everything was ready and it
16 worked?
17   A. I mean, I suppose, to make it very precise, it
18 should say every major country, probably it would work
19 in Afghanistan, with the tax laws in Afghanistan. So
20 you can take exception that it was general rather
21 than -- general and imprecise, and it didn't work -- if
22 you were a bank, it didn't have every application a bank
23 would use. But that's why I enumerated the applications
24 that we had.
25   So what I mean by everything, it's everything

132

1 that's common across businesses. Everyone has
2 marketing, everyone has sales. I shouldn't say
3 everyone. The legal business doesn't have marketing.
4 Most businesses have marketing, most businesses have
5 sales, most businesses have supply chain, customer
6 service, accounting, human resources. All those things
7 were there, all engineered to work together. And it was
8 designed and engineered to support every language.
9   Q. Now, you say that, but isn't it true that you
10 were engineering them, perhaps, to go together, but to
11 suggest that it was complete and ready, as this
12 suggests, is not accurate?
13   MR. LINDSTROM: Objection; argumentative.
14   THE WITNESS: What was the date of this
15 document?
16   MR. SOLOMON: Q. I believe it was October of
17 2000.
18   A. I believe we delivered the e-business suite in
19 May of 2000. So we were in the midst of our first
20 deliveries. If you mean by finish and ready that all
21 the bugs were fixed and all those things -- it was
22 certainly a new product. I concede to you it was a new
23 product and as a new product it had a lot of bugs that
24 needed to be fixed.
25   Q. You say it was already delivered. Who was it

133

1  delivered to?
2       MR. LINDSTROM:  As of what point in time?
3       MR. SOLOMON:  I think -- let's go back.  Can
4  you read back the question before this question and the
5  answer.
6       (Record read as follows:  QUESTION: Now, you
7       say that, but isn't it true that you were
8       engineering them, perhaps, to go together, but
9       to suggest that it was complete and ready, as
10      this suggests, is not accurate?  THE WITNESS:
11      What was the date of this document?
12      QUESTION:  I believe it was October of 2000.
13      THE WITNESS:  I believe we delivered the
14      e-business suite in May of 2000.  So we were in
15      the midst of our first deliveries.)
16      MR. SOLOMON:  Q.  What did you deliver in May
17  of 2000?
18      A.  The basic -- marketing, sales, supply chain,
19  manufacturing, customer service, accounting and human
20  resources, I think.  I think those things.
21      Q.  So is it fair to say that in May of 2000, you
22  delivered CRM and ERP to a customer; is that what you're
23  saying?
24      A.  I'm not sure that all of -- I mean, customer
25  service is a portion of CRM.  I'm not certain exactly

134

1  what dates the different customer service -- for
2  example, I did not -- so I'm not exactly certain what
3  dates the first CRM components came out.  But I believe
4  all the pieces were in the May release, that's my
5  recollection.
6       Q.  Do you reference in this document any of the
7  problems that your customers were having with
8  implementations?
9       A.  No, I don't think so.
10      MR. SOLOMON:  Mark as the next exhibit a
11  document produced by Oracle with the numbers 012381
12  through 83.
13      (Exhibit 30 marked for
14      identification.)
15      MR. SOLOMON:  Q.  Take a while to look at it,
16  then let me know if you recognize it, please.
17      A.  Okay.
18      MR. LINDSTROM:  Again, counsel, this document
19  consists of a number of e-mails, plus I see there's what
20  appears to be an analyst statement or article that's
21  embedded in here.  I assume you are asking whether he's
22  seen all these together in the way they are presented to
23  him as Exhibit 30?
24      MR. SOLOMON:  Thank you for that.  It will be
25  two-part.  If he hasn't seen it all, then I will get

135

1  into what appears to be a separate message.
2       MR. LINDSTROM:  Thank you for that
3  clarification.
4       THE WITNESS:  The first piece I have not seen.
5       MR. SOLOMON:  Q.  The first page?
6       A.  The first -- I think the first messages, the
7  first three pages, the first e-mails, the first three
8  pages.
9       MR. SOLOMON:  Can you pull off the others,
10 because I've got just the first three pages.
11      MR. LINDSTROM:  So, for the record, which --
12      MR. SOLOMON:  You should hang on to 012381
13 through 383.
14      THE WITNESS:  Okay.
15      MR. SOLOMON:  And the others, pass back to me.
16      THE WITNESS:  I have not seen this document
17 before.
18      MR. SOLOMON:  Q.  You see your name is
19 referenced on the first page against "Escalation Level,"
20 "LELLISON"?  You see that?
21      A.  Right.
22      Q.  And do you recall the escalation that's
23 referred to here, regardless of whether you saw the
24 document?
25      A.  Again, GE is a funny case, because I am the

136

1  account manager for GE, so theoretically I'm involved in
2  everything that goes on with GE.
3       Q.  I want to look at some language at the bottom
4  of the page where it starts with, "Problem Summary."
5  And it reads, "As I understand, the CIO of GE Corp has
6  biweekly calls with LJE."
7       That's you; right?
8       A.  Yep.
9       Q.  "LJE recommended that GE upgrade to 11.5.2
10 from 11.0.3."
11      Then over the page, "GE began the upgrade on
12 11.6 and has not been able to completely upgrade a
13 single instance after almost four weeks of trying.  The
14 upgrade should have been completed on 12/1.  Tactically,
15 GE Corp is now behind in their project plans which
16 seriously jeopardizes their 2/5/01 go-live.  Further,
17 they have had to work around or bypass many steps in the
18 upgrade process, which is of their -- which in their
19 opinion has left them with an 'unreproducible' upgrade
20 path from 10.0.3 to 11.5.2.  Additionally, GE is
21 expressing strong concern regarding the maintainability
22 of 11.5.2, for example, the time it takes to build
23 search indexes, the amount of disk space required (2GB
24 per language)."  And I'll stop there.
25      Were you aware around this time, which is

137

1  December, beginning of December 2000, that GE was
2  expressing its concerns as reflected in that e-mail?
3      A.  Again, GE is such a large company with so many
4  divisions and there is so much going on at General
5  Electric, again, I don't specifically remember this
6  e-mail or this set of problems.
7      But there is always, I mean, literally, the
8  last ten years I worked at GE, there is always a set of
9  problems that we're focused on.
10     Q.  As a sponsor, would you have expected to have
11  received this e-mail in the normal course of business?
12     A.  I would certainly expect to be made aware of
13  what was going on at GE. I don't expect to be copied on
14  every single e-mail regarding GE.
15     Q.  And then at the top of that first page, it
16  says, "I'm confused about what is going wrong with the
17  11i.2 upgrade here." And that's from Ron Wohl, it would
18  appear.
19     A.  Right.
20     Q.  Do you recall having any conversations with
21  Ron Wohl about that?
22     A.  I mean, not specifically related to this
23  document.
24     MR. SOLOMON:  Next document is a document
25  dated December 7, 2000, with the Bates number 154023.

138

1          (Exhibit 31 marked for
2          identification.)
3      THE WITNESS:  Okay.
4      MR. SOLOMON:  Q.  Do you remember this
5  exchange?
6      A.  Vaguely, yeah.
7      Q.  Do you know who Fran Dram is?
8      A.  Senior executive, IT executive at BellSouth.
9      Q.  And he says, "Larry, I have been told that
10  you're aware of this ut" -- I imagine that meant "but,"
11  don't you?
12     Anyway, "Larry, I have been told that you're
13  aware of this ut. We may not be able to cut over the
14  Oracle CRM system this weekend for BellSouth because of
15  performance problems in scripting."
16     Do you see that?
17     A.  I do.
18     Q.  Is ut some kind of techno thing or --
19     A.  I don't know what UT is.
20     Q.  "I would appreciate any help you can give" --
21     A.  I don't think it's techno.
22     Q.  Okay.  "I would appreciate any help you can
23  give. This potential cancellation will be highly
24  visible."
25     Do you see that?

139

1      A.  I do.
2      Q.  What is the cancellation being referred to, do
3  you know?
4      A.  I think the cancellation of the upgrade or the
5  cutover. When they are turning one system off and
6  turning another system on, they had a specific date and
7  plans, and had to postpone, cancel. That's what they
8  mean by cancellation.
9      Q.  When they say visible, do you understand what
10  the visibility is they are concerned about?
11     A.  There will be a lot of people inside of
12  BellSouth that would be aware that the upgrade was
13  postponed.
14     Q.  Then your response was to Fran; is that right?
15     A.  Yes.
16     Q.  Is that your response?
17     A.  Yes.
18     Q.  You say you were involved every third, but I
19  think you mean every 30 minutes?
20     A.  I think I was getting updates -- I think this
21  was one of those situations like POSCO we discussed
22  earlier where they are in the verge of a cutover, I
23  really do monitor it almost constantly. And I was in
24  constant contact with our support people. They were
25  actually logged on to the BellSouth system.

140

1      Q.  How were you communicating then every 30
2  minutes? What mode of communication?
3      A.  It varies. Sometimes we'll actually have a
4  conference call that is continuously ongoing, just a
5  line that is open, as well as e-mail messages and other
6  things. But normally for that it is a conference call
7  or something that looks like a little chat room.
8      Q.  Okay.  The top says, "Debbie/Linda, I just
9  wanted to share this information with you. Larry and
10  Fran are communicating. Let's keep our fingers crossed
11  that this will work out. We are all on it."
12     Do you recall a resolution to that particular
13  issue?
14     A.  You know, I'm not certain what happened in the
15  end with BellSouth. I don't, you know. I've said POSCO
16  is a happy customer, GE is a happy customer,
17  Ingersoll-Rand. I'm not sure if we ever got the system
18  at BellSouth working. Again, it was a huge consulting
19  project. It was a very, very complicated
20  implementation. And this was a long time -- I should
21  remember, but I just don't remember what the ultimate
22  resolution was.
23     Q.  Do you recall that you had to give away $20
24  million worth of consulting in connection with the
25  BellSouth deal?

141

1  A.  You're refreshing my memory. I don't know
2  exactly if it was $20 million, but that number doesn't
3  surprise me.
4  Q.  This again is an e-mail that comes from your
5  files, but was not produced from your files. We got it
6  through some other file.
7  You can't tell me why it is that this wasn't
8  in your file at the time of the litigation?
9  A.  I cannot.
10  MR. SOLOMON: I've marked as the next document
11  a document produced by the defendants with the Bates
12  numbers 013401 and 402.
13  (Exhibit 32 marked for
14  identification.)
15  THE WITNESS: Okay.
16  MR. SOLOMON: Q.  Okay, do you recognize it?
17  A.  I mean, not specifically.
18  Q.  Okay. But you don't dispute that you would
19  have received it and read it around Saturday,
20  December 9th, 2000?
21  A.  That's right.
22  Q.  Looking at page 2 to start with, I guess I
23  should first of all say this appears to be an e-mail
24  exchange between you and Sergio Giacoletto; is that
25  right?

142

1  A.  That's correct. I don't think it's an
2  exchange. I think it is Sergio can't attend the Monday
3  EC meeting, and he's giving a forecast report via e-mail
4  in lieu of that.
5  Q.  So on that second page under "CRM,"
6  Mr. Giacoletto is saying, "We're losing a bit of
7  momentum. Salespeople are reluctant to engage to the
8  product problems, lack of references and local language
9  issues. We are also losing" -- it says "loosing," I
10  think he means "losing many people to Siebel still, and
11  we are short of 50 sales consultants across EMEA.
12  Hopefully the situation will turn in January once we get
13  11.5.3 running in local language."
14  Do you see that?
15  A.  I do.
16  Q.  Mr. Giacoletto wasn't an Oracle executive in
17  Afghanistan, was he?
18  A.  Yes, he actually has -- is he responsible for
19  Afghanistan? He does. He's got all of Europe, Middle
20  East Africa, which includes Afghanistan.
21  Q.  Is he referring to Afghanistan when he's
22  talking about local language issues?
23  A.  I think he's referring to some of the CRM
24  components.
25  Q.  Do you think he's referring in terms of the

143

1  language issues to Afghanistan?
2  A.  No, I don't think he is.
3  Q.  More like European language, do you think?
4  MR. LINDSTROM: Objection; calls for
5  speculation.
6  THE WITNESS: I don't know. I don't know
7  which languages he's referring to.
8  MR. SOLOMON: Q.  Do you recall being aware of
9  these issues when they were raised by Mr. Giacoletto?
10  MR. LINDSTROM: Which issues?
11  MR. SOLOMON: Q.  The issues under "CRM"?
12  A.  Again, the note gives me a very strong -- it
13  is a note of very strong forecasts, and CRM is a very
14  small business. Understand, it is a brand new business
15  for Oracle and it is tiny, so he's raising the fact
16  we've got this brand new, tiny business, and there is
17  risk associated with it.
18  Until we bought Siebel, it's always been a
19  very, very tiny business for us.
20  Q.  Weren't you saying at the time applications
21  were going to drive database sales?
22  A.  Applications do to some degree drive database
23  sales, but only to some degree.
24  We have 30,000 application customers, and we
25  have almost 300,000 database customers.

144

1  Q.  Put another way, were you not saying at the
2  time that the e-business suite was complete, working and
3  in such a state that it was going to drive database
4  sales in the third quarter of 2001?
5  A.  No. I mean, again, the application
6  contribution of database sales even today is still a
7  very small number, versus the total software databases.
8  But it doesn't mean it doesn't contribute. It does
9  contribute. But it just doesn't contribute a very large
10  amount.
11  MR. SOLOMON: Okay. Have marked as the next
12  exhibit document with Bates range 297892, 893.
13  (Exhibit 33 marked for
14  identification.)
15  MR. SOLOMON: Q.  And if you take a look at
16  this and let me know if you recall seeing this before.
17  A.  Okay.
18  Q.  Do you recall seeing this before?
19  A.  Not specifically. But once again, I received
20  it and I'm sure you got it.
21  Q.  Do you know John Rourke?
22  A.  I don't.
23  Q.  Excuse me, John Bourke?
24  A.  No.
25  Q.  He wrote to you on or around the 15th of

145

1   December 2000.
2       Do you dispute that you would have read this
3   around that date?
4     A.  No, I don't.
5     Q.  He says, and I'll read some of it, "I'm a
6   director of finance at the Pepsi Cola concentrate plant
7   in Cork, Ireland. I've been an admirer of yours for a
8   number of years and have noted with interest, although
9   not necessarily agreeing with, some of your
10   pronouncements on technology developments. This e-mail
11   to you is in some respects an appeal for help, as well
12   as a way of venting my frustration which is caused by
13   one of your product. By the way, I've been around long
14   enough to know my appeal will almost certainly be
15   ignored." It goes on to say, "JD Edwards financial have
16   performed very well for us for a number of years, but
17   the Pepsico corporation decided that Oracle was to be
18   the standard software for the future. So rather than go
19   with a necessary upgrade of JDE, we decided to transfer
20   to Oracle because we were sold on the increased
21   functionality of Oracle 11i. Our Oracle project has
22   been an unmitigated disaster for us from both a cost,
23   employee and relationship perspective. We have spent a
24   fortune (to us) on consultants trying merely to get your
25   product to work, and months later we still do not have

146

1   even a system to test. How can you release software
2   that does not work is simply beyond my comprehension.
3   Is it only businesses that buy totally defective
4   products? If you were selling me groceries, your
5   organization would have been out of business long ago.
6   We have had a small number of employees fully focused on
7   the project and they are totally demoralized. They are
8   some of our most dedicated and best individuals and it
9   annoys me to witness their frustration. One of our
10   goals is to make Cork an outstanding place to work,
11   visit and do business with. The team are having a bad
12   time putting in very long hours trying to play catch-up.
13   They are viewing the failure of the project to date as a
14   reflection on themselves. They are all young
15   professionals trying to forge their own careers. No
16   matter how often I repeat the delay in the project is
17   due to faulty software, they still feel presently at
18   fault."
19       Are you blaming them, by the way?
20     A.  Blaming?
21     Q.  Do you blame the young professionals for what
22   they have been experiencing here?
23     A.  I have no firsthand knowledge of what happened
24   in Cork.
25     MR. LINDSTROM: Objection. No foundation.

147

1     MR. SOLOMON: Q.  It goes on to say, "Our
2   reputation will now be tarnished as we will have to
3   announce shortly the delay, and worse still we have to
4   admit we do not know how long the delay will be. A
5   number of world-wide best practice initiatives, e.g.,
6   marketing effectiveness, T&E, et cetera, are on hold
7   pending implementation of Oracle. I am not looking
8   forward to the reaction to our announcement. I thought
9   I would be feel better after writing down my thoughts.
10   Unfortunately, I think I feel worse. I also did not
11   think I would write so much."
12       Do you recall now reading this around that
13   time?
14     A.  Not specifically.
15     Q.  You then reply on December 15th, is that
16   right, and you say, "Well, we'll look into this
17   immediately. Have you modified the 11i software? What
18   version are you using? Ron, please follow up. Larry."
19       Is that right?
20     A.  Yes.
21     Q.  Do you recall writing that?
22     A.  Not specifically.
23     Q.  And then the response to that message is,
24   "Thank you for showing an interest. Our intention is to
25   go as much as possible with the vanilla Oracle software

148

1   and to avoid modifications. As we cannot load 11i, no
2   modifications have been made."
3       Do you recall receiving that response?
4     A.  No, I don't.
5     Q.  Okay. And then it looks like John Bourke then
6   writes to Ron Wohl saying, "This e-mail does not appear
7   to have got through to you."
8       Then a message from Ron Wohl saying, "Thank
9   you for resending it, John. Courtney, Bill, can you
10   review the situation below and figure out what action is
11   needed and close the loop with John. Please update me
12   on status regularly until resolved."
13       Do you see that?
14     A.  I do.
15     Q.  Do you recall getting Wohl involved?
16     A.  Not specifically.
17     Q.  Do you recall any resolution to this?
18     A.  I do not.
19     Q.  Okay. This, at least part of these documents,
20   if not all of them, were in your file apparently as an
21   addressee, yet none of them were produced in this
22   litigation from your file.
23       You can't tell me or explain why that's the
24   case; is that right?
25     A.  I cannot.

149

1    MR. SOLOMON: I've marked as the next exhibit
2  a document produced by defendants with control numbers
3  039324 to 328.
4         (Exhibit 34 marked for
5          identification.)
6    THE WITNESS: Okay.
7    MR. SOLOMON: Q.  Have you seen this before?
8  A.  Not that I recall.
9  Q.  Okay. You'll see that on the second page you
10 are an addressee. Do you see that?
11 A.  Yes.
12 Q.  And there is a message, a forwarding message
13 saying essentially that you should be aware of what
14 follows. Do you see that?
15 A.  Yes.
16 Q.  And then on the next page there is an e-mail
17 exchange from Michael Cochran to George Roberts, Jeff
18 Henley and a number of others. Do you see that?
19 A.  I do.
20 Q.  Do you know, are you familiar with Paxar?
21 A.  Not really.
22 Q.  Okay. It starts, "Victor Heschaft,
23 H-e-s-c-h-a-f-t, "Paxar's vice-chairman has been dealing
24 with an extremely critical 11i implementation. By all
25 accounts from those involved, this has been very ugly

150

1  and we've put the customer through extreme hardship."
2         Do you see that?
3  A.  I do.
4  Q.  Do you recall being made aware of that with
5  respect to Paxar in December of 2000?
6  A.  I do not.
7  Q.  If you go to the forth paragraph it says,
8  "Paxar's Oracle History - Paxar's marketing system
9  division in Ohio had implemented 10.7 in the 1997 time
10 frame. The implementation was painful, late and over
11 budget, but Paxar decided that they needed one global
12 system for all their businesses, and since Oracle was
13 already implemented at one of their divisions, it made
14 sense to implement Oracle apps globally in their Apparel
15 Division. Paxar's 11i Product History - After a 6 month
16 sales cycle and reassurances from Drew Campbell and Ron
17 Wohl that 11i (specifically Order Management) would be a
18 tested and stable release, they decided to go forward
19 with Oracle."
20        Stopping there, were you aware that Ron Wohl
21 and Drew Campbell had made a representation to Paxar
22 that Order Management was a tested and stable release?
23 A.  I'm really not familiar with Paxar at all.
24 Q.  Are you aware that around December of 2000,
25 Drew Campbell and Ron Wohl were representing or had

151

1  represented that Order Management was a stable and
2  tested release?
3    MR. LINDSTROM: To Paxar?
4    MR. SOLOMON: Q.  At all. At all, to anyone.
5  A.  Yeah. I think we were selling the components
6  that -- Order Management is a central portion of ERP,
7  and we were delivering it to customers. We certainly
8  knew it was brand new, and it had bugs. But we thought
9  we would be able to fix those bugs in the process -- in
10 the period of an implementation and get customers live
11 and running. And almost -- and in almost all cases we
12 did.
13 Q.  And to get back to the question so we have a
14 good record, were you aware that those two gentlemen
15 were making -- were stating to anybody at that time that
16 Order Management was a tested and stable release?
17 A.  I have no firsthand knowledge of the
18 representations that they were making.
19 Q.  Did you make such a representation to anyone
20 around that time?
21   MR. LINDSTROM: You're referring to the
22 specific representation that is attributed to those two
23 gentlemen here?
24   MR. SOLOMON: Q.  That Order Management was a
25 tested and stable --

152

1  A.  I don't think I commented about Order
2  Management specifically.
3    MR. LINDSTROM: Thank you for the
4  clarification.
5    MR. SOLOMON: Q.  If you look down a little
6  bit in that same paragraph, it says, "Paxar was one of
7  the EARLIEST" -- in capitals -- "customer to commit to a
8  large scale, single instance implementation of 11i."
9         Do you see that?
10 A.  I do.
11 Q.  That would make them a particularly important
12 customer to you at that time, would it not?
13 A.  I'm not sure what you mean by particularly
14 important.
15 Q.  I just saw the language that they were one of
16 the earliest customers to commit to a large scale,
17 single instance implementation of 11i.
18 A.  Nothing against Paxar, but Liberty Mutual or
19 General Electric -- I mean, Paxar is a medium size
20 company, and the customers that we take the best care of
21 are our largest customers.
22 Q.  Okay.
23 A.  Or -- yeah.
24 Q.  I'm on the second page now. Heading at the
25 top, "Order Management" -- I don't know if it is a

153

1  heading. "Order Management Functionality only in 11i."
2  Then the paragraph has some language, and I'm reading
3  now from the second half of that paragraph, which says,
4  "The 11/2000 date was moved out to 12/2000, then 1/2001,
5  and is now projected for 3/15/01 because of the
6  necessity for more significant parallel testing due to
7  the lack of confidence in the integrity of the 11i
8  release."
9      Do you see that?
10  A.  I do.
11  Q.  And then it goes on to say, "In the late
12  summer time frame, Paxar's vice-chairman first expressed
13  his dissatisfaction with the 11i quality and stability.
14  A conference call with Ron Wohl was arranged and Bill
15  Bounds from the development triage team was assigned to
16  assist.  The situation has been improving slowly, but
17  after hundreds of patches and a significant number of
18  severity 1 bugs which prevented conference room pilots
19  and user acceptance testing.  OCS has logged over 1,700
20  hours of non-billable time on such issues."
21      Do you see that?
22  A.  I do.
23  Q.  Were you aware around December 2000 that OCS
24  had been logging over 1,700 hours of nonbillable time in
25  connection with this project?

154

1  A.  I really was not that familiar with the
2  situation at Paxar.
3  Q.  Skipping down to -- two-thirds of the way down
4  the page, there is a paragraph that says, "Paxar has
5  been contacting other 11i customers to assess their
6  experience with 11i.  They've also made some veiled
7  threats about public disclosure of their challenges, so
8  we need to act quickly."
9      Do you see that?
10  A.  I do.
11  Q.  Were you aware of the threat or suggestion
12  that they would go public if their problems weren't
13  resolved?
14  A.  I really wasn't familiar with Paxar.
15  Q.  Okay.  And if you go back to the first page,
16  third paragraph, it says, "Paxar Corporation
17  Background - Paxar is a $700 million publicly traded,
18  worldwide enterprise," et cetera.
19  MR. LINDSTROM:  Where are you, counsel?
20  THE WITNESS:  Right here.
21  MR. SOLOMON:  Third paragraph.
22  MR. LINDSTROM:  Third; thank you.
23  MR. SOLOMON:  Q.  Does that refresh your
24  recollection as to what Paxar is?
25  A.  Until I saw this document, I had no

155

1  recollection of anything about Paxar.
2  Q.  Now, on the second page where you are the
3  addressee, that would suggest that this was in your file
4  at some stage; correct?
5  A.  Yes.
6  Q.  And it was not produced from your file in this
7  litigation.  Can you explain why?
8  A.  I cannot.
9  Q.  Second page of the document.  Looking at the
10  message, "Larry," it says, "Larry, you should be aware
11  of this one in case it continues to escalate.  It may
12  make sense to discuss this one and any additional
13  critical situations at the next EC.  As you know, some
14  of our earliest 11i customers (especially CRM and Order
15  Management) are exhausted from the effort of
16  implementing the products."
17      Do you see that?
18  A.  I do.
19  Q.  Were you aware of the earliest clients being
20  exhausted, especially those with respect to CRM and
21  Order Management?
22  A.  I certainly knew that CRM and Order Management
23  had more bugs in them than some of the other more mature
24  products.  CRM and Order Management were, if you will,
25  rewrites, it was all fresh code, it was all new code,

156

1  and there's usually a longer period of debugging when
2  the product is all new.
3  Q.  And do you recall getting that message to the
4  effect that the customers were exhausted with those
5  efforts?
6  A.  Not specifically.
7  Q.  But you don't dispute you got that message at
8  the time?
9  A.  No.  No, I don't.
10  MR. LINDSTROM:  When you say the message, you
11  mean the e-mail that's been marked as Exhibit 34?
12  MR. SOLOMON:  That's correct.
13  Have marked as the next exhibit a document
14  produced by the defendants, 035275.
15      (Exhibit 35 marked for
16      identification.)
17  MR. SOLOMON:  Q.  This is dated January 9th,
18  2001.
19  A.  Got it.
20  Q.  Seen it before?
21  A.  Yes.
22  Q.  Do you recall Mark Barrenechea expressing, "Do
23  not burn me"?
24  A.  Not specifically, no.
25  Q.  And you'll see at the top it is entitled, "Re:

157

1  Do not forward, BellSouth."
2      Do you see that?
3      A.  Yes.  I think that means by "Don't burn me;
4  "don't forward it to the people I'm raising issues
5  about."
6      Q.  And it's a document that copies you from Safra
7  Catz.  And it says, "Wheeler and OSI consulting not a
8  pretty picture."
9      That appears to be from Safra Catz; is that
10  right, that message that I just read?
11      A.  Yes.
12      Q.  Then she has then forwarded to you, perhaps,
13  the Barrenechea note; is that right?
14      A.  That's right.
15      Q.  And it says, "Mark Barrenechea wrote: Do not
16  forward, do not burn me.  1.  This OSI consulting team
17  is whacked, Larry, and is wasting our F-N time.
18  2.  I have dispatched Andrew Holsworth to being on site,
19  best ST Kernel person to be on site, best CRM
20  performance person to be on site.  OSI has enormous bind
21  variable problems in their custom code, needs to be
22  fixed.  They are running file system and not raw
23  devices.  No use of jprobe.  They do not know the
24  difference between library cache pin or lock.  I will be
25  on call every hour for the next 48 hours to personally

158

1  manage this.  This is a real waste and I'm getting
2  pissed.  Do not forward, do not burn me."
3      Hard to forget this, hum?
4      A.  It is.
5      Q.  So you were aware around January 9, 2001 of
6  these issues that Barrenechea is raising; is that right?
7      A.  It doesn't say here; this is a BellSouth
8  issue.  This is a big consulting project where they
9  wrote a huge amount of code, of custom code, and as a
10  result they were having tremendous performance problems.
11  So I'm very familiar with the situation.
12      Q.  Okay.  And again, this would have -- go ahead.
13      A.  So because it was a combination of the
14  consulting project plus Mark Barrenechea's CRM code,
15  Mark was pulled into it.  Where the consulting group was
16  saying, "It's Mark's problem," Mark was saying, "It's
17  the consulting group's problem."
18      Q.  Okay.  This again was in your files in or
19  around January of 2001.  It wasn't produced from your
20  files.
21      Can you explain why?
22      A.  I cannot.
23      MR. SOLOMON:  Have marked as the next exhibit
24  a document produced by defendants, the control number
25  012414 through 417.

159

1      (Exhibit 36 marked for
2      identification.)
3      THE WITNESS:  I think the body -- most of this
4  you gave me in a previous document.
5      MR. SOLOMON:  Q.  Is that right?
6      A.  They are attachments.  The first page is new,
7  then the other stuff is connected --
8      Q.  That's correct.  Thank you.
9      Have you seen this first page before?
10      A.  I was certainly copied on it.  I assume I read
11  it, but I don't recall specifically reading this
12  document.
13      Q.  Okay.  Look at the second page of the
14  document, I guess, to start.  And I'm looking at, "Hi,
15  my name is Rebecca."
16      A.  I believe this is the part you asked me about
17  before.
18      Q.  Correct.
19      MR. LINDSTROM:  15, Exhibit 15.
20      MR. SOLOMON:  Thank you.
21      Q.  Now, are you familiar were Brock Tools?
22      A.  I'm not.
23      Q.  And you don't recall prior to today knowing
24  about Brock Tools?
25      A.  No.

160

1      Q.  And if you look at the first page there is
2  expressed -- I could read it all, I guess, but there
3  seems to be expressed frustration that the Order
4  Management issues were not being addressed.  Is that
5  fair?
6      A.  Give me a second.
7      MR. LINDSTROM:  Can you direct the witness to
8  some specific language?
9      MR. SOLOMON:  Sure.
10      MR. LINDSTROM:  Other than simply on the first
11  page.
12      MR. SOLOMON:  Q.  If you look to "Renee and
13  Ron, I still have not received any reply."
14      A.  Okay.
15      Q.  Do you see that?
16      A.  Okay.
17      Q.  Just the first few lines.
18      A.  Okay.
19      Q.  Okay.  Were you aware at the time that issues
20  concerning Order Management were being raised by Oracle
21  customers?
22      A.  Yes.
23      Q.  Was the resolution of any of those problems
24  costing Oracle money?
25      MR. LINDSTROM:  Does your question go beyond

161

1  Brock Tools?
2          MR. SOLOMON: Yes.
3          THE WITNESS: The development of -- I'm not
4  sure I understand your question. I'm not trying to be
5  cute.
6          But clearly, to develop the software, to debug
7  the software, to test the software, to deliver the
8  software, always costs us money.
9          MR. SOLOMON: Q. I'm getting at either legal
10  settlements or free consulting or free implementation.
11     A.  I think there are certainly cases where we
12  couldn't bill for consulting. Not very many cases. But
13  again -- but there were certainly some cases of not
14  being able to charge for consulting. And I'm sure there
15  are a few cases of legal settlements, but not very many.
16     Q.  Okay. I don't know if I asked you the file
17  question, but in case I didn't, this would have been in
18  your file in January, it wasn't produced from your file.
19  You don't know why?
20     A.  I do not know why.
21         MR. LINDSTROM: Well, again, when you say
22  wouldn't it have been in his file January 2001, that
23  mischaracterizes his testimony, or would have been in
24  his file. So I'll object to the question on that
25  ground. The answer may stand.

162

1          MR. SOLOMON: I'm not sure I followed that,
2  but that's fine.
3          MR. LINDSTROM: Well, he told you that prior
4  to the institution of the litigation that he had a
5  practice of periodically cleaning up his e-mails, and so
6  when you preface your statement by saying, "This would
7  have been in his files as of January 2001," we don't
8  know that. We don't know whether that might have been
9  cleaned up as one of his periodic --
10         MR. SOLOMON: It is dated January. Do you
11  think he deleted it before he got it?
12         MR. LINDSTROM: I'm missing the point.
13         MR. SOLOMON: It is dated January. I'm just
14  saying it was in his file at some stage.
15         MR. LINDSTROM: No, no. What you're saying is
16  it would have been in his file.
17         MR. SOLOMON: Of course it would have been.
18         MR. LINDSTROM: I see. What you're saying it
19  was in his file initially.
20         MR. SOLOMON: Yeah.
21         MR. LINDSTROM: I was taking your question as
22  you stated it to mean that it was in his file when the
23  litigation commenced. I apologize.
24         MR. SOLOMON: That's not what I said.
25         So let's look at the next exhibit, which is

163

1  610546 through 548.
2          THE WITNESS: I have been answering that
3  question understanding that if it showed up -- if it has
4  this date, on that date it should have been in my file,
5  on the date it was sent.
6          MR. SOLOMON: Q. At least?
7     A.  Exactly. That is my understanding.
8          MR. SOLOMON: Appreciate it.
9          THE WITNESS: All right.
10         MR. SOLOMON: Actually, I'm going to withdraw
11  this. Sorry.
12         And we'll have marked as the next exhibit a
13  document produced by the defendants with control number
14  035276 through 279.
15         (Exhibit 37 marked for
16         identification.)
17         THE WITNESS: Okay.
18         MR. SOLOMON: Q. Do you recognize this?
19     A.  I recognize the issues being discussed in the
20  document. But I don't recognize the specific document.
21     Q.  You don't dispute that you received it on or
22  around Tuesday, January 9th, 2001?
23     A.  I do not.
24     Q.  I'm going to the second page of the document.
25  And just for the record, this is a January 9th, 2001

164

1  e-mail from Mark Barrenechea to Mark Barrenechea, which
2  then gets forwarded to Larry Ellison on the same date.
3          And on the second page towards the bottom it
4  says, "Mark Barrenechea wrote: I have been advised that
5  GEAC is not interested in ASO."
6          Do you know what GEAC is?
7     A.  GE Aircraft -- I think it means GEAE. It is
8  GEAE up above. I think it's just a typo. That's GE
9  Aircraft Engines.
10     Q.  ASO?
11     A.  It's a successor product to MRO. We discussed
12  MRO earlier.
13     Q.  It says, "Further, they have not signed a new
14  agreement and I have been told they have no interest in
15  doing so. We presented over three months ago and we
16  were told they are no longer interested. There are
17  three developers finishing maintenance on the 10.7
18  baseline."
19         Do you see that?
20     A.  I do.
21     Q.  Were you aware of those facts in January of
22  2001?
23     A.  I was -- I think I followed the entire MRO ASO
24  saga at GE Aircraft Engines from beginning to end.
25     Q.  And they said they were no longer interested.

165

1 Did they ever become interested?
2      MR. LINDSTROM:  In what?
3      MR. SOLOMON:  Q.  In ASO.
4      A.  As we discussed briefly earlier, that MRO was
5 a custom project, a maintenance repair project for GE
6 Aircraft Engines to maintain and repair aircraft
7 engines, jet engines, and it was custom built for GE.
8 GE was not happy with the work that we did and decided
9 not to proceed with the product.
10      We then decided to take the MRO work and
11 productize, make it a major general product.  Rather
12 than specifically for GE Engines, we decided to make it
13 a more generally applicable maintenance and repair
14 product, and released something called ASO.  And the
15 first customer for ASO is mentioned on the top of this,
16 that's the Israeli Air Force.  But GE Aircraft Engines
17 wasn't interested in ASO.
18      Q.  Thank you.  The message at the top of that
19 page reads in part, "Steve McLaughlin wrote:  Mark, what
20 GEAE told Oracle is the upgrade to MRO 11i without the
21 work benches did not offer any incremental functionality
22 to justify the consulting cost to upgrade.  GE's
23 hesitation was also based on incremental slide in the
24 project deliverables which effectively eliminated ROI
25 for 2002."

166

1      Do you see that?
2      A.  I do.
3      Q.  And were you aware of that sentiment coming
4 from GE Aircraft Engines in January of 2001?
5      A.  Again, I can't recall the specifics.  Along
6 the way I know we built this custom project for GE.
7 Aircraft Engines was not happy with it; in the end they
8 cancelled.
9      Q.  And this document, let's be clear this time,
10 shall we, at least on Tuesday the 9th of January 2001
11 would have been in your e-mail file?
12      A.  Yes.
13      Q.  And it wasn't produced from your file in this
14 litigation and you can't explain why; is that right?
15      A.  That's correct.
16      MR. SOLOMON:  Have marked as the next document
17 a document produced -- next exhibit, a document produced
18 by defendants, Bates range is 013041 through 47.
19      (Exhibit 38 marked for
20      identification.)
21      MR. SOLOMON:  Q.  You will see it is dated
22 Thursday, 11th of January 2001.
23      A.  Yes.
24      Q.  And I think you will recognize the topics,
25 since we've been looking at different exhibits relating

167

1 to this.
2      A.  Yes.
3      Q.  I'm looking halfway down the page where it
4 says, "The problem is with the product which was far
5 from ready to be shipped.  Just because a TAR is not
6 considered to be a 'showstopper' does not mean it is
7 less important.  We will end up delivering a solution to
8 the customer -- for the customer, excuse me, that will
9 be less than satisfactory.  After all the efforts we
10 have made to make this a success, we will not have a
11 referenceable site for our 11i Oracle Order Management
12 experience.  You can imagine what this means to a small
13 organization like ours.  Bill Grebe, Brock's CEO, has
14 resigned himself to be unimportant to Oracle."
15      Do you see that?
16      A.  I do.
17      Q.  Was that an appropriate resignation?
18      MR. LINDSTROM:  No foundation, calls for
19 speculation, vague and ambiguous.
20      THE WITNESS:  No.  I mean, I think we value
21 all of our customers.
22      MR. SOLOMON:  Q.  So did Brock become
23 important or it was important at the time to you?
24      A.  I think all -- all of our customers are
25 important.

168

1      Q.  This again has a copy of the e-mail going into
2 your e-mail file.  So at least as of January 11, 2001,
3 it would have been in your file; correct?
4      A.  That's correct.
5      Q.  It wasn't produced from your files and you
6 can't explain why; is that correct?
7      A.  That's correct.
8      MR. SOLOMON:  Have marked as the next exhibit
9 a document with the control number 035298 through 300.
10      (Exhibit 39 marked for
11      identification.)
12      MR. SOLOMON:  Q.  Do you recognize it?
13      A.  Again, not this specific document, but I'm
14 very familiar with the contents.
15      Q.  And again, it relates to GE?
16      A.  Yes, it does.
17      Q.  On the second page there is a message from
18 Sandy Sanderson.  And it reads, "Because they are making
19 a huge commitment to Oracle, we have been anything but
20 stellar on MRO.  When we did the deal, we said we would
21 step up to this kind of commitment.  They expect us to
22 stand by our word.  Finally, if we don't do this, our
23 relationship will go south big time.  They are asking
24 that we give guarantees that we don't cancel the
25 project.  They are not asking that we commit to

169

1 delivering functionality jointly documented with Mark
2 and his team. Sandy."
3      Do you see that?
4      A. I do.
5      Q. Do you recall seeing that before?
6      A. Again, I'm very familiar with the negotiation
7 around this deal, the product, everything to do with it.
8 I just don't remember the specific document.
9      Q. The reference to Oracle being anything but
10 stellar on MRO, do you understand that?
11      A. Oh, yeah. As I said, the MRO project failed
12 at GE. So when -- I can stop there?
13      MR. LINDSTROM: Yes, you've answered the
14 question.
15      THE WITNESS: Okay.
16      MR. SOLOMON: Have marked as the next exhibit
17 the document with the Bates range 035362 to 64.
18      (Exhibit 40 marked for
19      identification.)
20      THE WITNESS: Same document?
21      MR. SOLOMON: Q. That's right. I think there
22 may be just a little bit more information on the first
23 page, and a little bit more perhaps on the second page.
24 I just have a couple questions on it.
25      A. Okay.

170

1      Q. First, do you recognize the first page, the
2 exchanges?
3      A. Again, I'm very familiar with the exchanges, I
4 just don't recognize this specific document.
5      Q. Okay. I'm looking at the second page, going
6 up to the first page. And it says, "Mark Barrenechea
7 wrote: Why are they not asking for these commitments in
8 other areas?" Then there is some language.
9      And above that, "Sandy Sanderson wrote: Are
10 you still committed to delivering asset leasing?"
11      And if you go to the first page, the response
12 to that is, "100 percent."
13      Then above that, "It is a strange request, but
14 it is fine with me if we end up signing it. Larry."
15      The reference, "It is a strange request, but
16 it is fine with me," that's you? That's you making that
17 reference on the first page?
18      A. Yes.
19      Q. What request is strange?
20      A. Well, as best I recall, GE wanted us to -- as
21 we had attempted to build an MRO system for GE Aircraft
22 Engines, which is a relatively small portion of GE, now
23 their largest division, which is GE Capital, was asking
24 us to build a lease management system. They were very
25 concerned, because we failed with this one project. We

171

1 had lots of success with GE, but we had failed in this
2 custom MRO system.
3      Now we're going to build again a custom lease
4 system that we're going to turn into a product, a huge
5 project for them. Multiple years, lots and lots of
6 money for them, lots and lots of money for us. So they
7 wanted us to sign up for penalties if we cancelled, if
8 we decided to walk away from this.
9      So I believe that we signed up for penalties
10 in the tens of millions of dollars if we walked away
11 from it. We didn't. It is now a huge success at GE
12 Capital. But it was a risky project, and this one
13 worked.
14      Q. And again, at least as of Wednesday, 17th of
15 January 2001, these documents would have been in your
16 e-mail file?
17      A. Yes, sir.
18      Q. They weren't produced from your file and you
19 cannot explain why; is that right?
20      A. That's correct.
21      MR. SOLOMON: Have marked as the next exhibit
22 a document produced by defendants with the control
23 numbers 035356 through 358.
24      (Exhibit 41 marked for
25      identification.)

172

1      THE WITNESS: Okay.
2      MR. SOLOMON: Q. Do you recognize this?
3      A. Same answer I usually give. I'm very familiar
4 with the issues raised in this, but I don't recall the
5 specific document.
6      Q. But you don't dispute you would have received
7 this and read the contents around the time it was sent?
8      A. I'm sure I did.
9      Q. And I'm looking at an exchange between Sergio
10 Giacoletto and a number of people, including yourself;
11 correct?
12      A. Yes.
13      Q. And he says that he has some good and some bad
14 news. I'm looking at the second page, a few lines down.
15 "I'm sure some of those problems also exist in the USA."
16 He's referencing problems that he's just identified.
17 "But there we have no language issue and we have
18 critical mass and more help from development. In order
19 for us to achieve 30 percent growth overall, we need to
20 grow applications at least 65 percent each quarter and
21 we need to fix those issues."
22      Do you see that?
23      A. I do.
24      Q. Do you remember being made aware of that at
25 the time?

173

1  A.  Yes.  And I would like to clarify what, you
2  know, what, quote, the language issues are, if I may.
3  Q.  What are the language issues?
4  A.  Okay, so -- well, the applications work in all
5  languages, what I mean by that is you can store a
6  service request in Chinese or even the Afghanistan
7  language, all of it.  So we could accept data from any
8  language.
9  That does not mean that every manual that we
10  publish, like how to install the software, is also --
11  that manual is also available in Chinese, or specific
12  error messages that come out of the system is also going
13  to translate into Chinese.
14  So even though the systems work with all these
15  different languages doesn't mean we finished every
16  document that we have related to those products, we've
17  translated all of those.
18  That's what he's referring to.  Often in the
19  sales process one of the things you show them is you
20  show them the documentation.  That's how they learn to
21  install the system.  If they are Chinese engineers, most
22  aren't familiar with English, but if they are not,
23  that's a problem.
24  So, again, the systems work in all languages,
25  but not all the documentation was available in all

174

1  languages.
2  Q.  Okay.  Then going down, he says he expands
3  each point, and he talks about issues with gaps between
4  code freeze, and he talks about patches and he talks
5  about new functionality.
6  Were you aware of these issues prior to him
7  outlining these to you?
8  A.  You're talking about "Let me explain these
9  points," that section there?
10  Q.  I just really want to know if there is
11  anything here that is new to you, that's news, or is it
12  stuff that you knew before he outlined it to you?
13  A.  I'm sure there is -- some of the details were
14  new.  But I certainly knew that our translations were
15  lagging, some of the languages were lagging English.  It
16  is a matter of we have priority, we do five to eight
17  languages first, we do English first, we translate to
18  five to eight languages, then eventually we had a couple
19  of dozen different languages.
20  Q.  Let's look at point 1.  It says, "The gap
21  between code freeze NLS availability is growing again.
22  For example 11.5.3 NLS will not be fully translated
23  including help until May 2001 for the first languages
24  and August 2001 for the last language.  The code was
25  frozen (I believe) in October 2000.  So from a field

175

1  point of view we have a minimum gap of four months and a
2  maximum of ten!  This is due to translation workload and
3  lack of full automation."
4  Do you see that?
5  A.  Yes.
6  Q.  Were you aware of that prior to it being
7  disclosed to you in this e-mail?
8  A.  I'm not sure I was aware of four months and
9  ten months, those specific gaps.  I certainly knew that
10  there were gaps in translation.
11  Q.  Next, "We just completed the testing of the
12  translation of 11.5.1 NLS and we found almost 5,000
13  translation issues to be fixed.  This is a problem for
14  our mid market strategy where NLS is critical."
15  The question is, were you aware of that prior
16  to it being outlined to you here?
17  A.  Certainly not the number 5,000.
18  Q.  Number 2, "Due to the gap between code freeze
19  and CD, we have to do a lot of patching at each customer
20  site.  Platinum is helping a lot, but is only available
21  in English and we still need to apply manually
22  translation patches, assuming they exist.  Mark is
23  looking to provide Platinum in four to five languages.
24  This would be good."
25  Do you see that?

176

1  A.  I do.
2  Q.  Were you aware of that before this was
3  outlined to you?
4  A.  No.
5  Q.  Continuing, "The patching process is prone to
6  errors.  There is no central patch log database and
7  automation could be improved.  Ron has this as a top
8  priority.  This will help us to improve customer
9  satisfaction and consulting margin."
10  Do you see that?
11  A.  I do.
12  Q.  Then it goes on to 3.  "New functionality is
13  being added to each new release.  The training material
14  is not kept up to date and there is too much information
15  to use traditional methods of teaching in any case, so
16  we need to use web training and to have more support in
17  the field for development.  As discussed at the EC, we
18  should have a few experts from development in new
19  products deployed in EMEA."
20  Do you see that?
21  A.  I do.
22  Q.  Were you aware of these suggestions prior to
23  them being suggested to you in January of 2000?
24  A.  I mean, not this specific question about the
25  experts from development in each new product deployed.

177

1   Q.  And EMEA, Europe, Middle East and Africa?
2   A.  That's right.
3   Q.  And Afghanistan is in the Middle East?
4   A.  It is.
5   Q.  Again, this would have been in your files on
6   or around Sunday, January 21, 2001?
7   A.  Yes.
8   Q.  And it has not been produced from your files
9   in this litigation, and you cannot explain why; right?
10   A.  That's correct.
11   MR. SOLOMON:  Have marked as the next exhibit
12   a document with the control numbers 035381 through 383.
13        (Exhibit 42 marked for
14        identification.)
15   MR. SOLOMON:  Q.  Once you had a chance to
16   look at it, let me know if you recognize it.
17   A.  Yes, I do.
18   Q.  The first sheet suggests that it's from you to
19   you, and to Safra Catz and Mark Barrenechea; is that
20   right?
21   A.  Yes.
22   Q.  And there's an article or a statement headed
23   "Oracle's eCRM Suite in 90 Days."
24        Do you see that?
25   A.  That's right.  Yes.

178

1   Q.  And that first sentence, "Oracle guarantees it
2   can do a worldwide installation of our eCRM suite at
3   your company in just 90 days."
4        Do you see that?
5   A.  Yes.
6   Q.  And then there is a question mark.  Is that
7   your question mark?
8   A.  No.  Don't know where that came from.
9   Q.  Okay.
10   A.  Truth is, I have no idea.
11   Q.  Now, this document I'm going to represent to
12   you, was not -- this particular document wasn't sourced
13   to your files, but we actually do have this document
14   produced from your files as well.
15   MR. LINDSTROM:  Which document?  The second
16   page?
17   MR. SOLOMON:  The second page, yeah.
18   Q.  So can you explain to me how it is that at
19   least the second page of this document was produced from
20   your files, and yet we haven't been able to get the
21   other documents that I've referred to, haven't been able
22   to establish that they were in your files?
23   A.  (Shaking head.)
24   Q.  Don't know?
25   A.  No.

179

1   Q.  I guess what I'm trying to say is that we've
2   been through a series of e-mails going from the summer
3   of 2000 into January, and I've represented to you even
4   though you're an addressee, they weren't produced from
5   your files.
6        And what I'm also representing to you now is
7   that this second page, a version of it has been produced
8   from your files.
9        My question is, do you know what permitted
10   that to be in your files but not the other documents?
11   A.  I can guess.  But I assume you don't want me
12   to do that.
13   MR. LINDSTROM:  I don't want you to do that.
14   As he's asked you before for speculation, he can do so
15   again, but I'll object.
16   MR. SOLOMON:  Q.  What's your guess?
17   MR. LINDSTROM:  Objection; calls for
18   speculation.
19        You may answer according to your guess.
20   THE WITNESS:  Well, I made a point of not
21   throwing away things.  During a cleanup period I
22   wouldn't throw away things that I would need later on,
23   that would be useful later on.
24   MR. SOLOMON:  Got you.
25   MR. LINDSTROM:  Counsel, just for sake of

180

1   clarification, you said the second page had been
2   produced from Mr. Ellison's files.  Is it actually the
3   second and third pages or just the second page?
4   MR. SOLOMON:  I can tell you now, it is
5   actually the first and second page.
6   MR. LINDSTROM:  But not the third?
7   MR. SOLOMON:  And I'm not going to represent
8   one way or the other whether it was the third.
9   MR. LINDSTROM:  For clarification, the e-mail
10   was produced in this instance with the attachment?  Is
11   that what you're saying?
12   MR. SOLOMON:  I believe it may well have been.
13   But this isn't the one from his source.
14   MR. LINDSTROM:  I see.
15   MR. SOLOMON:  Do you understand?
16   MR. LINDSTROM:  Yes.  The one marked as
17   Exhibit 42 is not the one from his source file.
18   MR. SOLOMON:  Right.  My representation is
19   this is a very similar if not exactly the same copy in
20   his source file.
21   MR. LINDSTROM:  Thank you.
22   MR. SOLOMON:  Q.  I want to go into the body
23   of the "Oracle eCRM Suite in 90 Days" document.  Looking
24   where it says, "Siebel CRM suite is neither complete nor
25   integrated.  Complete.  They resell products."  It goes

181

1   on to say, "Siebel product acquisition and product
2   resale strategy enabled them to deliver the world's
3   first CRM suite, but that suite is not complete, not
4   integrated, not global. It is very difficult and
5   expensive to install. Once installed you have multiple
6   systems with multiple customers and product databases.
7   The data fragmentation caused by the multiple databases
8   makes it more difficult to get information out of a
9   Siebel system."
10          Do you see that?
11      A.  I do.
12      Q.  Is that true?
13      A.  This is a draft of a marketing promotion, a
14   special offer we were going to make to sell CRM. I
15   don't know what state the draft was in at this stage.
16   We did actually come up with the CRM in 90 Days program
17   and -- but I don't think this is a finished document.
18   That's one thing I would like to say.
19          The next -- in answer to your question, is
20   the -- Siebel implementations generally were done a
21   country at a time. So France would have their own
22   version, Japan would have their own version, that's the
23   way Siebel was typically implemented. One of the unique
24   things about our system is it did work in multiple
25   languages and could co-exist in a single system with all

182

1   these different character sets, with Japanese, Chinese,
2   English and Russian all in the same database. It was a
3   unique advantage we had over Siebel, being global in a
4   single database. I hope that's responsive.
5      Q.  Is that paragraph true?
6          MR. LINDSTROM:  Again, for sake of the record,
7   can you identify the paragraph?
8          MR. SOLOMON:  It starts with the sentence,
9   "Siebel CRM suite is neither complete," that sentence,
10   then the paragraph below beginning, "Siebel products"
11   and ending "Siebel system."
12          MR. LINDSTROM:  Those two paragraphs together
13   you're asking him about?
14          MR. SOLOMON:  Yes.
15          THE WITNESS:  I really don't remember the
16   state of Siebel when I drafted this. I'm just not --
17   I'm just not sure I can answer that question.
18          MR. SOLOMON:  Okay. I marked as the next
19   exhibit a document produced by defendants with the Bates
20   range 035384, 385, 386.
21               (Exhibit 43 marked for
22                identification.)
23          MR. SOLOMON:  Q.  Do you recognize this?
24      A.  Pretty much, yeah.
25      Q.  Do you know who Scott Stoll is?

183

1      A.  No.
2      Q.  How about Sohaib Abbasi?
3      A.  Yes.
4      Q.  Who is Sohaib Abbasi?
5      A.  He was one of our engineering managers, but he
6   also ran education for a while.
7      Q.  And looking at the second page of the
8   document, dated Friday, January 26, 2001, and you are an
9   addressee, do you see that?
10      A.  Yes.
11      Q.  The good news, if you look down to the bottom
12   of the page, was "Everybody used the new application and
13   didn't resort to the web queue for a crutch at all."
14          Do you see that?
15      A.  Yes.
16      Q.  Then the bad news is reported as "The
17   application performance was fair, (total time to create
18   and book an order) in the morning, (8 to 9 minutes) and
19   waned as the day progressed, (15 to 30 minutes). The
20   application was very unstable, one minute certain
21   functionality worked, the next minute it doesn't
22   (Feedback from reps and managers)." It goes on to say,
23   "The telesales reps also have recorded close to 5 new
24   major and/or minor bugs an hour. They've been so busy
25   with upset customers, we have little time to log them

184

1   all. Our call statistics suffered to a point where we
2   can't process calls in a timely fashion nor help most of
3   our customers."
4          Do you see all that?
5      A.  I do.
6      Q.  Were you made aware of these issues as a
7   result of this e-mail, or did you know about them
8   beforehand?
9      A.  I don't know. I was only aware of the issues.
10      Q.  Okay. And you will see on the front page
11   there is reference to "Serious trouble for education.
12   JLH."
13          Is that Mr. Hall, John Hall?
14      A.  Yes.
15      Q.  Did you consider what is contained here as
16   serious trouble for education?
17          MR. LINDSTROM:  Are you asking him that as of
18   the time --
19          MR. SOLOMON:  When he received this, yes.
20          THE WITNESS:  Would I characterize it that
21   way?
22          MR. SOLOMON:  Q.  Yes.
23      A.  No. We put in an all new order entry system
24   for education, and the reps had to be trained and the
25   system had to be tuned.

185

1    Whenever you cut over from one system to
2  another, it is a difficult process whether it is
3  internal or with one of our customers.
4    Q.  But what I'm asking you is, do you agree
5  with -- maybe you did answer.  Let me ask you again.  Do
6  you agree with Mr. Hall's characterization that there
7  was serious trouble for education?
8    A.  No.  I don't think it had significant impacts
9  on our business.  It certainly made -- it was difficult
10  for the reps to make the transition from one system to a
11  new system.
12    Q.  Do you recall receiving the message from
13  Mr. Hall?
14    A.  Again, not specifically.  But I'm -- I recall
15  very clearly what was going on at the time.
16    Q.  Do you recall doing anything in response to
17  this?
18    A.  I think we reviewed it periodically in
19  meetings, looking at reports not unlike the one that's
20  on page 3, looking at how long it was taking to process
21  orders and how many calls were dropped and the usual
22  statistics until we got comfortable that the new system
23  was working at least as well as the old one.
24    Q.  On the bottom of page 3, there is an
25  interesting quote, you may not be interested in it, but

186

1  it says, "Prefer a loss to a dishonest gain.  One brings
2  pain for the moment, the other for the remainder of
3  time."
4    Do you see that?
5    A.  I do.
6    Q.  How did that find its way on here?
7    A.  I think a lot of people have -- they attach --
8  have little -- have quotes attached to their e-mails
9  automatically.  One of the things e-mail systems will do
10  for you automatically, it will attach your quotes.
11    MR. SOLOMON:  Let's take a ten-minute break.
12    VIDEOGRAPHER:  This marks the end of tape
13  three in the deposition of Larry Ellison.  At 3:23,
14  going off the record.
15    (Recess, 3:23 p.m. - 3:48 p.m.)
16    VIDEOGRAPHER:  On record at 3:48.  This marks
17  the beginning of tape four in the deposition of Larry
18  Ellison.
19    MR. SOLOMON:  I've marked as the next exhibit
20  a document produced by defendants with a Bates range
21  035425 through 428.
22    (Exhibit 44 marked for
23     identification.)
24    MR. SOLOMON:  Q.  And, as usual, just take a
25  look at it, please, then let me know if you recognize

187

1  it.
2    A.  Okay.
3    Q.  Okay, do you recognize it?
4    A.  No.  I remember the issue, but I don't
5  recognize this specific document.
6    Q.  But you don't dispute that you received it and
7  read it around the time, the time being January 30th,
8  2001?
9    A.  No, I don't.
10    Q.  I should be more precise.
11    A.  I do not dispute that I read this document.
12    Q.  Around the time --
13    A.  Yes.
14    Q.  -- of the e-mails?  And the e-mails are dated
15  the 30th of January 2001 and the 25th of January 2001.
16    Going to the second page of the exhibit, and
17  I'm looking under the heading, "The facts."  And in the
18  middle of the first paragraph, or the paragraph under
19  "The Facts," it says, "They're experiencing major
20  performance problems with 11i, as well as there still
21  are some features/function gaps.  The performance
22  problem could be network issues, DB/app tuning, 11i
23  product issues or combinations of all three.  BOL and
24  Oracle support have been working with the customer to
25  resolve the issues for the past week."

188

1    And the business in question is Chipotle.  Do
2  you see that?
3    A.  Yes.
4    Q.  And were you aware of the issues referenced
5  here prior to receiving this e-mail?
6    A.  Again, I don't know.  I certainly was aware of
7  the issues, which are multi.
8    Q.  The next paragraph under "The Problem," it
9  reads in part, "We are getting very bad press from the
10  Columbus Accounting Group based on the poor performance
11  of 11i.  In fact, the CIO of McDs and the worldwide
12  controller called my yesterday to express their concern
13  over our apps performance.  Both of these execs are
14  Oracle advocates, and in the CIO's words, 'Oracle is not
15  doing themselves any favors with our inability to
16  quickly address these performance issues.'  The 11i
17  performance issues need to be fixed at Chipotle or BOL,
18  or lose one of their strongest references, and Oracle
19  will be in a poor position to be McDonald's global
20  applications provider."
21    Do you see that?
22    A.  I do.
23    Q.  And McDonald's was a big enough company for
24  you to be concerned about?
25    A.  Yes.

189

1    Q.   And do you remember being concerned about
2  McDonald having issues, performance issues with 11i at
3  around this time?
4    A.   They weren't -- to be precise, this was an
5  unusual situation in that not only were they running
6  11i, they were running 11i in our data center.  BOL is
7  Oracle Business Online or on demand.  It's a method of
8  delivering your applications over the Internet.  Not
9  unlike our demo systems, we would actually host the
10  Chipotle application in our data center in Austin,
11  Texas, and deliver their application across the
12  Internet.
13    And we were having -- and they were one of our
14  earlier customers for Business Online, a new service,
15  and they were having what turned out to be network
16  performance problems, and it was a problem.
17    Q.   Then the next heading is, "How Oracle turns a
18  negative into a positive."  And it says, "Oracle (sales
19  BOL, Support and OCS) needs to respond and fix this
20  performance problem quickly.  Right now we appear to be
21  very reactive with no real plan for resolution."
22    Do you see that?
23    A.   I do.
24    Q.   You were aware at the time of there being a
25  perception within Oracle that Oracle was being reactive

190

1  with respect to McDonald's and had no real plan for
2  resolution?
3    A.   Again, I just don't agree with that
4  characterization.  We were aware of the problem, we were
5  trying to fix the problem.  There was some -- there was
6  some uncertainty what exactly was causing the problem.
7  So we put our people on it, and it turned out to be a
8  network performance issue, and we fixed the problem.
9    Q.   Okay.  And, again, this was a document that
10  would have been in your files in or around late January
11  2001?
12    A.   Yes, I believe I received this specific
13  document as a result of Safra Catz forwarding it to me
14  on the, what, on the 30th of January.
15    Q.   Okay.
16    A.   Right.
17    Q.   Yet, it was not produced or sourced to you
18  from your files in this litigation and you cannot
19  explain why; is that right?
20    A.   That's right.
21    Q.   Page 2, there is a message, it says, "Keith,
22  Can you make sure we get a top resource to lead this.
23  Funding will get covered by the appropriate
24  organizations which will be decided later.  McDonald's
25  may be in danger of missing their close of books for the

191

1  end of the year.  We obviously can't allow that to occur
2  if at all possible."
3    Do you see that?
4    A.   I do.
5    Q.   Do you recall being aware at the time that
6  owing to 11i issues that McDonald's was in danger of not
7  being able to close its year?
8    A.   There was no 11i issues with regard to
9  Chipotle.  It was a network performance issue from
10  business from the Austin data center to McDonald's
11  accounting headquarters.  It was a network issue, not
12  11i issue.  There was never any danger in McDonald's not
13  being able to close their books.  That's just a
14  hyperbolic statement.
15    Q.   Okay.  Do you know who wrote that?
16    A.   George Roberts.
17    Q.   And is he prone to hyperbole?
18    A.   Not very often.  But that was --
19    Q.   That was his moment?
20    A.   Yeah, that was his moment.  That was the
21  moment.  Needless to say, a large public company like
22  McDonald's not being able to close their books would
23  have gotten enormous attention.
24    MR. SOLOMON:  Have marked as next exhibit a
25  document produced by Oracle with the control number

192

1  012439 through 41.
2    (Exhibit 45 marked for
3    identification.)
4    MR. SOLOMON:  Q.   And do you recognize seeing
5  this before?
6    A.   I don't.  Don't recall seeing it.  I'm sure I
7  did, but don't recall.
8    Q.   You don't dispute you would have seen it and
9  read it around the date it was sent, which appears to be
10  January 31, 2001?
11    A.   It looks like 30 January.  But, no, I don't
12  dispute that.
13    Q.   I'm looking at the top one that says 31.  But
14  you're right, the one below that says the 30th.  So
15  those two days.
16    A.   Right.
17    Q.   And the bottom of the page, the subject is
18  "Critical AOL/J bugs."  And the message on the second
19  page at the top reads, "Skees, please let us know the
20  moment this patch," then there is a number, "is
21  released.  It's still 'checkin in Progress' as of 11:35
22  p.m.  This issue is hurting ADS and two external
23  customers."
24    Do you see that?
25    A.   I do.

193

1    Q.  First of all, do you recall becoming aware of
2  that on January 30th of 2001?
3    A.  I don't recall.
4    Q.  Okay.  Where it says, "The issue is hurting
5  ADS and two external customers," do you know what that
6  is referring to?
7    A.  ADS is the demonstration system, the network
8  demonstration system.  And what he's saying is there is
9  a bug in our software that's -- that AOL is a layer of
10  tools beneath the applications that is shared by both
11  CRM and ERP.  And he is saying -- and that group was
12  managed by Ron Wohl, and there is a bug that he'd like
13  to get fixed --
14    Q.  Okay.
15    A.  -- in AOL.
16    Q.  Do you know who the two external customers are
17  referenced there?
18    A.  I do not.
19    Q.  On the first page it says from Ron Wohl to
20  you, at the top, with no message.  And then below that
21  it is from Mark Barrenechea to you, and to some others
22  including Safra Catz and Ron Wohl.
23          And it says, "Ron, we have blown AppsWorld
24  Paris for CRM html demos.  We've been blocked for days.
25  I can say there is not enough time left to complete."

194

1          Do you see that?
2    A.  I do.
3    Q.  Do you recall hearing that information around
4  this time?
5    A.  I don't, but I'm certainly familiar with the
6  issue.
7    Q.  Okay.  Again, this is a document that would
8  have been in your files, or each of these e-mails would
9  have been in your files in late January 2001?
10    A.  Yes.
11    Q.  And they were not produced from your files,
12  and you can't explain why they weren't in your files at
13  the time of documents being produced in this litigation;
14  correct?
15    A.  That's correct.
16    Q.  Now, regardless of when you traded stock in
17  January, this is dated January 31, 2001, do you recall
18  when you stopped trading stock in 2001?
19    A.  I don't.
20    Q.  Is it fair to say by this date you had
21  accomplished a lot of your sales?
22    A.  I remember clearly I did not trade in
23  February.  So the 31st, if it was a weekday, would have
24  been the last day I could have traded.  I don't know if
25  I traded on the 31st or the 30th.  I just don't know.

195

1    MR. LINDSTROM:  Are we finished with
2  Exhibit 45?
3    MR. SOLOMON:  Yes, we have.
4          Have marked as the next exhibit a document
5  produced by Oracle, bearing the Bates numbers 020844
6  through 849.
7          (Exhibit 46 marked for
8          identification.)
9    MR. SOLOMON:  Q.  I want you to take a look at
10  this document and let me know if you recognize it.
11    A.  Okay.
12    Q.  And if you go to page 1, you testified earlier
13  that you never engaged in a transaction -- negotiated a
14  transaction with Carly Fiorina?
15    A.  That's correct.
16    Q.  And you look at the first bullet point, and it
17  reads, "Production Spend - Consistent with Larry's
18  conversations with Carly, HP will expect a purchase
19  order for the following amounts.  They will expect this
20  purchase order to be binding and commit Oracle to using
21  the full amounts by the dates we promise.  10 million by
22  December 31.  (I asked for this to give us time to scope
23  out the configurations we currently need) 10 million by
24  May 31."
25          Do you see that?

196

1    A.  I do.
2    Q.  Is that just simply completely and utterly
3  inaccurate?
4    A.  That's correct.  It is completely and utterly
5  inaccurate.  I just don't negotiate business terms, it
6  is just not my practice to do so.  I just never do it.
7  I should say, hold up; "never" is a bit extreme.
8          I didn't do it in this case, and I haven't
9  done it for a very long time.
10    Q.  Now, you are on this e-mail, it is addressed
11  to you.  Do you see that?
12    A.  I am.
13    Q.  Did you respond to this?
14    A.  Not that I recall.  This is from the sales
15  rep, the sales -- the HP sales rep.
16    Q.  Did you fire him for telling a bunch of lies?
17    A.  No.  He wasn't with my -- in my meeting with
18  Carly Fiorina.  We just don't go in -- we don't sit
19  there and negotiate contracts between the two of us.  It
20  just doesn't happen.  It is not what we talk about.
21          The sales, that's the responsibility of the
22  sales rep and the purchasing people at HP.
23    Q.  The second bullet point says, "CRM
24  Development - As a follow-up to Larry's conversation
25  with Carly, Mark Barrenechea will be sending me a note

197

1  tonight which will spell out exactly what Oracle will do
2  within our CRM development environment to move to HP."
3       Again, complete nonsense?
4       A.   No.  It was complete nonsense that it is
5  following my -- well, I certainly spoke to Carly, I had
6  meetings with Carly.  We just didn't discuss the details
7  of individual transactions at any of those meetings.
8  The -- those transactions were negotiated by people
9  lower down in the organization.
10      Q.   Who is Michael DeCesare?
11      A.   He's a sales -- you know, he was the sales
12  manager in charge of HP.
13      Q.   What was his official title?
14      A.   I don't know.  It would be director,
15  vice-president.  I'm not sure.
16      MR. LINDSTROM:  Don't speculate.
17      THE WITNESS:  I don't know.
18      MR. SOLOMON:  Q.  Area vice-president,
19  perhaps.
20      A.   He could have been an AVP, right.
21      Q.   I'm looking now at the third page of the
22  document, which has the number 20846.
23      A.   Yes.
24      Q.   And it says, among other things, with a bullet
25  point against it, "Documents - We are currently working

198

1  on a document that will be given to HP tomorrow that
2  explicitly spells out what Oracle will do within our CRM
3  environment.  We are prepared to make this binding, but
4  should this cause problems from a timing perspective
5  with HP legal, then we will get 'executive sign off'
6  from Larry."
7       Do you see that?
8       A.   I do.
9       Q.   Do you agree that most likely references Larry
10  Ellison?
11      A.   Yes.
12      Q.   And you don't have any knowledge of this; is
13  that right?
14      A.   What do you mean, any knowledge of what?
15      Q.   Any knowledge of the potential for an
16  executive sign-off from you in connection with this
17  proposed transaction?
18      A.   The only thing I would typically sign off -- I
19  approve a lot of the large purchases.  So if it is -- I
20  don't get involved in selling, practically I don't get
21  involved in selling and negotiating the terms of our
22  selling activity.  I do get directly involved in
23  approving our hardware purchases.  So if it is a large
24  purchase, I do approve those things.
25      Q.   So this could be accurate?

199

1       A.   Again, I'm not quite sure it's -- if they are
2  asking for a large purchase to be executed with
3  Hewlett-Packard, they would have to get my approval,
4  yes.
5       MR. LINDSTROM:  Again, we're talking about the
6  top of Bates stamp page 20846?
7       MR. SOLOMON:  Correct.
8       MR. LINDSTROM:  The third bullet point down
9  entitled "Documents" in italics?
10      MR. SOLOMON:  Correct.
11      MR. LINDSTROM:  Right?
12      MR. SOLOMON:  Correct.
13      THE WITNESS:  So as a business practice if
14  they are going to buy a bunch of HP machines, I would
15  have to approve it.
16      MR. SOLOMON:  Q.  Now, there is a few more
17  bullet points below, under the heading "Hardware Spend
18  Document."  And among those points, it says, "Instead of
19  allowing each owner within Oracle to purchase HP when
20  the machines they are currently using need to be
21  upgraded, this is a corporate wide commitment to move
22  everything to HP according to the schedule we've
23  discussed.  This will result in more money and a more
24  rapid sales process than HP would ever be able to
25  achieve, selling business unit by business unit."

200

1       Do you see that?
2       A.   It is --
3       MR. LINDSTROM:  The question is, do you see
4  it?
5       THE WITNESS:  I see it.
6       MR. SOLOMON:  Q.  And then skip a bullet
7  point, "Larry Ellison will issue an internal note to
8  Oracle confirming the commitment to HP (CRM development,
9  production)."
10      Do you see that?
11      A.   I do.
12      Q.   Does that make sense?
13      A.   The things you just read me?
14      Q.   That Larry Ellison will issue an internal
15  note.
16      A.   None of this makes sense.
17      Q.   Okay.
18      A.   In fact, may I explain, or not?  I would be
19  happy not to.
20      Q.   You may in a second.
21      A.   Okay.
22      Q.   Do you often get e-mails from people in your
23  organization suggesting that you've had conversations
24  with other senior executives that you're doing a
25  transaction that's absolutely inaccurate and wrong that

201

1  you do nothing about, that you take no action on?
2       MR. LINDSTROM:  Mischaracterizes his
3  testimony, argumentative.
4       THE WITNESS:  Do I see people write things
5  that are incorrect and me not correct them?
6       MR. SOLOMON:  Q.  When an e-mail within your
7  organization is directed to you that contains complete
8  and utter inaccuracies and falsehoods concerning you and
9  your relationship with other executives, do you not take
10  any action?
11      A.  If it's -- if clarifying what really happened
12  wouldn't change our behavior very much, no.
13      There are other patently inaccurate statements
14  in this document which I also didn't correct.
15      Q.  You didn't correct any statement in this
16  document?
17      A.  I don't think so.
18      Q.  So now at 020849, last page.
19      My first question is, do you recognize the
20  writing?
21      A.  No.
22      Q.  Halfway down there is a bullet point which
23  reads, "Our end goal is to generate a document which
24  Larry and Carly can agree to as the game plan both
25  companies will execute against.  It will contain what

202

1  Oracle will do, metrics for measuring success against
2  these goals and an escalation path if either company
3  feels the other is not delivering.  Currently this has
4  been reviewed by Jim Clark and Mike Rocha."
5       Do you see that?
6       A.  I do.
7       Q.  Do you have a recollection of reading this
8  around the time of end of November 2000?
9       MR. LINDSTROM:  The sentence you just quoted?
10      MR. SOLOMON:  Yes.
11      THE WITNESS:  No.
12      MR. SOLOMON:  Q.  The it goes on below that,
13  "Hardware Requirements to get to 100% database servers
14  on HP."  And it says, "In August 1999 Oracle committed
15  to 50% of all production servers on HP.  Since then
16  Larry confirmed to Carly that Oracle would now move 100%
17  of our production database servers to HP."
18      Do you see that?
19      A.  I do.
20      Q.  Did you say that to Carly?
21      A.  I don't think so.
22      Q.  At the end of this document, "Q2 CRM Order to
23  HP.  HP will not require the additional licenses until
24  January 2001 to June 2000 (sic) but is willing to commit
25  to these licenses in exchange for the above points.  The

203

1  list price on these new licenses is 46M and we are
2  currently in front of them at a 50% discount for net
3  license deal of 23M."
4       Do you see that?
5       A.  I do.
6       Q.  Do you recall reading that in late November
7  2000?
8       A.  I do not.
9       Q.  Do you recall reading any of this in late
10  November 2000?
11      MR. LINDSTROM:  Now, when you say any of this,
12  you mean anything contained within Exhibit 46?
13      MR. SOLOMON:  You got it.
14      THE WITNESS:  I do not.
15      MR. SOLOMON:  Q.  Did you ever discuss with
16  anybody the concept of you and Carly doing business
17  together?
18      MR. LINDSTROM:  I'm not sure what you mean by
19  doing business.
20      THE WITNESS:  I met with Carly Fiorina many
21  times.  We discussed business every time we met.
22      MR. SOLOMON:  Q.  You have no idea why Michael
23  DeCesare is saying these things?
24      A.  No.  I know exactly why he's saying these
25  things.

204

1       Q.  You know exactly why he's saying these things?
2       A.  I think so.
3       Q.  What's the exact reason why he's telling these
4  lies?
5       MR. LINDSTROM:  Objection; argumentative.
6       THE WITNESS:  He's not telling lies.  I think
7  a lot of people believe they know when two CEOs of large
8  companies get together what they talk about.  And they
9  think what we talk about is what is most important to
10  them as a sales rep.  So they think when we get together
11  -- and that's also true of people inside of Oracle, they
12  think we get together and are just going to go down all
13  of the issues that are important to them.  But there are
14  a lot of issues between the two companies besides us
15  buying their hardware and their buying some of our
16  software.  It's particularly important to Mike DeCesare,
17  not necessarily the most important thing on our list to
18  discuss.
19      MR. SOLOMON:  Q.  Okay.
20      A.  But it is what Mike would like us to discuss.
21      Q.  He sort of knows a lot of -- seems to know --
22  if you look at page 1, "Production Spend" and "CRM
23  Development."  He seems to know a lot of this
24  non-occurring conversation, hum?
25      MR. LINDSTROM:  Objection; mischaracterizes

205

1  the document, argumentative.
2      THE WITNESS: He's trying to get a deal done,
3  and he's putting together a deal between Oracle and HP
4  and that's his job.
5      MR. SOLOMON: Q.  Didn't he oddly address it
6  to you?
7      A.  No.  There is another document you showed me
8  from Mike Rocha who gave me a list of things that Carly
9  would want to discuss.  It was from the Oracle side.  I
10  think it was a preparatory document that said, "Before
11  you go into your meeting with Carly Fiorina, I'm sure
12  she'll mention all of these things."
13      I guess we can go back and plow through it and
14  try to find that.  She mentioned none of them.
15      This is exactly the same situation from the
16  other side.
17      Q.  Okay.  Has this ever happened before?
18      A.  It happens all the -- well --
19      Q.  Really?
20      A.  Well --
21      Q.  Sorry.  You were going to say it happens all
22  the time.
23      A.  It happens whenever I have a meeting with a
24  senior executive of another company.  Let's say we have
25  business pending with Sun, I'll get a note saying, "I'm

206

1  sure Scott McNealy will" -- Scott is no longer the CEO
2  there -- "I'm sure Scott McNealy will want to discuss A,
3  B and C."
4      What they're really saying is, "Larry, when
5  you see Scott, please mention our deal and try to help
6  move the deal along."
7      Q.  That perhaps is understandable.
8      What about, though, not, "I'm sure they're
9  going to ask you this," what about, "These are the
10  conversations Larry had with Carly" and then detailing
11  them?
12      MR. LINDSTROM: Objection; argumentative, and
13  it also mischaracterizes the document.  You've been over
14  this ground with him two or three times now.
15      MR. SOLOMON: We're almost done.  It's a
16  little bit different.
17      THE WITNESS: Ask the question again.
18      MR. SOLOMON: Q.  That's a little bit
19  different.  Speculating what someone might ask you is a
20  little bit different from recording a conversation that
21  you supposedly had; do you agree?
22      MR. LINDSTROM: Mischaracterizes the document.
23  This document doesn't record a conversation.
24      MR. SOLOMON: Q.  Why don't you go ahead and
25  answer Mr. Ellison.

207

1      A.  Yes.  There are documents that are
2  prospective, "She'll want to talk about this."  It is
3  different than documents that are retrospective, "She
4  has talked about this."
5      Q.  Did Safra Catz meet with Carly Fiorina around
6  that time?
7      A.  I don't think so.
8      COURT REPORTER: Could we go off the record?
9      MR. SOLOMON: Sure.
10      VIDEOGRAPHER: Off record at 4:22.
11      (Off the record.)
12      VIDEOGRAPHER: On record at 4:24.
13      THE WITNESS: I can volunteer one more
14  explanation why I believe I did not discuss the terms of
15  this deal with Carly Fiorina.
16      MR. SOLOMON: Good.
17      THE WITNESS: I don't like discussing terms
18  and conditions with other customers and prospective
19  customers.  I don't like the negotiating process, and
20  I've avoided it for years and years and years.  So it's
21  very unlikely I would have made an exception for Carly.
22      MR. SOLOMON: I thought for a second you were
23  going to say, "I don't like Carly."
24      THE WITNESS: I would never say that.
25      MR. SOLOMON: Q.  On the last page, I want to

208

1  go back, because I think I read something wrongly into
2  the record.  On the very last page, I may have got the
3  date wrong.
4      So what I should have read into the record was
5  the last page, "Q2 CRM Order to HP," this is how it
6  should read, "HP will not require the additional
7  licenses until late 2001 to June 2002, but is willing to
8  commit to these licenses in exchange for the above
9  points.  The list price on these new licenses is 46M and
10  we are currently in front of them at a 50 percent
11  discount for net license deal of 23M."
12      I believe that's now accurate.  No question,
13  Mr. Ellison.
14      I marked as the next exhibit a document
15  produced by the defendants with the control number
16  063429.
17      (Exhibit 47 marked for
18      identification.)
19      MR. SOLOMON: Q.  And, Mr. Ellison, before you
20  go into 47, just if you look at 46 again, I don't think
21  I went through it with you, but this would have been a
22  document that would have been in your e-mail file on or
23  around Tuesday, 28th of November 2000 at least; correct?
24      A.  That's correct.
25      Q.  And it wasn't produced from your source file

209

1    and you can't tell us why?
2        A.   That's correct.
3        Q.   Thank you.  Then we'll go on to 47.  For the
4    record, this is an e-mail dated Tuesday, 6th of February
5    2001, from Ron Wohl to Larry Ellison and others.
6        A.   Yes.
7        Q.   Question is, do you recognize seeing this
8    before?
9        A.   Yes.
10       Q.   It says, "All, let me give you a heads up on
11   some serious quality complaints we will get at the
12   Appsworld over the next two weeks.  For several months
13   we've had persistent problems with your NT version of
14   our product.  These problems stem from issues in the 8.0
15   NT Pro C code.  Despite the best efforts of Chuck's
16   team, these problems persist and we are still in the
17   position where it is very difficult to predict a
18   resolution.  For a long period of time the development
19   team has hoped that we were within two weeks resolution
20   of the problem.  We need to be prepared for both
21   customer and press criticism on this issue.  Some
22   customers may ask us why we didn't withdraw the product
23   from the market once we became aware of the problems.
24   At least one customer has returned the product and is in
25   legal discussions with us."

210

1        Do you see that?
2        A.   Yes.
3        Q.   Do you remember receiving this information at
4    around this date?
5        MR. LINDSTROM:  The information or the e-mail?
6        MR. SOLOMON:  The information.
7        THE WITNESS:  Yes.
8        MR. SOLOMON:  Q.  And did you get the
9    information via the e-mail or by some other source?
10       A.   I don't recall.
11       Q.   And there is a reference to the customer
12   having returned the product and having legal
13   discussions.
14       Do you know what customer that refers to?
15       A.   I do not.
16       Q.   Do you know if there was any litigation
17   concerning this?
18       A.   I do not.
19       Q.   And did you take any action in response to
20   this e-mail?
21       A.   This is a problem with our database.
22       Q.   Yes.
23       A.   So it's -- that affects the version of our
24   applications that run on the Windows operating system.
25   So we -- the action I took is I escalated the problem

211

1    and we fixed it.
2        Q.   Do you know when it was fixed?
3        A.   I don't know when it was fixed.
4        Q.   Are you sure it was fixed?
5        A.   Oh, yes.
6        Q.   And again, this came from your -- excuse me.
7    This would have been in your files at least on or around
8    the 6th of February 2001?
9        A.   That's correct.
10       Q.   And it wasn't produced from your files in this
11   litigation and you'll explain why; correct?
12       A.   Correct.
13       MR. SOLOMON:  Have marked as the next exhibit
14   a document produced by the defendants with Bates range
15   175158 to 161.
16           (Exhibit 48 marked for
17            identification.)
18       MR. SOLOMON:  Q.  Do you recognize having seen
19   this before?
20       A.   Again, not this specific document, but I'm
21   aware of the issue.
22       Q.   You don't dispute that you would have received
23   the document and read the contents around the 7th of
24   February 2001?
25       A.   No, I do not.

212

1        Q.   I'm looking on the second page where it says,
2    "Renee Knee wrote:" and she says, "We are facing a
3    serious threat in our partner base, not only by IBM and
4    Siebel and the highly competitive go to market
5    commitments and partner programs they offer to the major
6    customer influencing partners, but with our local
7    (country level) partners who are finding they can no
8    longer do profitable business with Oracle when we limit
9    the training, support and implementation method/tools we
10   offer them."
11       Do you see that?
12       A.   I do.
13       Q.   Do you recall receiving this information in
14   February of 2001?
15       A.   I don't.
16       Q.   Okay.  So it is fair to say you don't dispute
17   that you received it and read it, but you don't
18   remember?
19       A.   Not specifically this paragraph you just read.
20       Q.   Okay.
21       A.   Again, once again, I'm very familiar with the
22   issues that she's raising in this e-mail note.  I just
23   don't remember that specific paragraph.
24       Q.   Okay.  Did you perceive a serious threat to
25   your partner base in February of 2001?

213

1    A.  The way I read this note is she's concerned
2  that IBM and Siebel are partnering, and that's a very
3  formidable partnership.  And it's true, I mean, IBM is a
4  large company, and Siebel is number one in CRM.  And the
5  combination of those two is a very formidable opponent
6  in the marketplace.  I think she's just raising that
7  issue.
8    Q.  It is something she raised earlier?
9    A.  Renee was in charge of our partner programs,
10  and there aren't many partners of the size of IBM.  And
11  when IBM decides to partner with Siebel and CRM, it
12  means we're terribly disadvantaged.
13        It's true.  I'm not exactly sure what we do
14  about it.  I mean, there are only two class A partners
15  in our business, one is IBM, the other is Accenture.
16    Q.  This represents bad news, but not bad news you
17  can do much about?
18    A.  It's not bad news.  IBM has been partnering
19  with Siebel for a very long time.  We knew about this.
20        I think she's just emphasizing it.  IBM was --
21  I'm not sure that is true.  Accenture partners were
22  early investors in Siebel, and IBM is Siebel's largest
23  customer.
24        The combination of those two things meant that
25  the largest partners we might work together with in the

214

1  CRM marketplace were gone and were wedded to Siebel.
2        MR. SOLOMON:  Okay.  Have marked as the next
3  exhibit a document produced by defendant with the
4  control numbers 297837, and 838.
5        (Exhibit 49 marked for
6        identification.)
7        THE WITNESS:  Okay.
8        MR. SOLOMON:  Q.  Do you recall seeing this
9  before?
10    A.  Yes.  Yes, I do.
11    Q.  And did you receive it around the 8th of
12  February 2001?
13    A.  Yes.
14    Q.  And it is from Ron Wohl to you.  And it says,
15  "I've confirmed that CRM has not turned in any minipacks
16  yet."
17        Do you see that?
18    A.  Yes.
19    Q.  What is a minipack?
20    A.  It is a series of patches or bug fixes or
21  enhancements.  A patch is either an enhancement or a bug
22  fix.  It could be several different things.
23    Q.  When it says, "Has not turned in," what does
24  that mean?
25    A.  Hasn't delivered.

215

1    Q.  Then it goes on to say, "At this point though
2  I would ask that you not slam Mark hard to deliver fast.
3  I'm concerned that all that would do is cause Mark to
4  get his teams to deliver code before testing is
5  complete, causing more work for everyone all around.  I
6  think we're just stuck with the delay.  In the meantime
7  Greg's group continues to do the initial build work with
8  the ERP code and is finding and fixing the first wave of
9  build errors.  What pisses me off about this is that had
10  we known in advance, we would have used the time more
11  effectively.  It's hard trying to have an e-Business
12  suite with someone who lies."
13        Do you know who is the liar being referred to
14  there?
15    A.  Ron is calling Mark Barrenechea a liar.
16    Q.  Okay.  And did you agree with that?  Is Mark
17  Barrenechea a liar?
18    A.  No, I don't think so.
19    Q.  He's not the first person who has called Mark
20  Barrenechea a liar, is he?
21    A.  Probably not.  But during his whole life?  I'm
22  not sure what you're referring to.
23    Q.  At Oracle.
24        MR. LINDSTROM:  Objection; no foundation.
25        MR. SOLOMON:  Q.  Other Oracle executives have

216

1  called Mark Barrenechea a liar?
2        MR. LINDSTROM:  No foundation.
3        THE WITNESS:  I can't recall offhand.  You
4  could be right.  I don't recall.
5        MR. SOLOMON:  Q.  Would it surprise you to
6  learn that Jay Nussbaum called Mark Barrenechea a liar?
7    A.  Not really.
8    Q.  Just so we're sure, you don't subscribe to him
9  being a liar, but you don't know if he's not a liar?
10  You don't know either way?
11    A.  I would not characterize him as a liar, no.
12    Q.  Okay.  Did it upset you that Ron Wohl was
13  calling Barrenechea a liar?
14    A.  I think they were both under -- when you're
15  delivering a new product, whether it is Microsoft,
16  Oracle, IBM, doesn't really matter, which are a huge
17  piece of code, you're under tremendous pressure to get
18  that code out and then to fix bugs when it is first
19  delivered.  It is -- their people are working 16, 17, 18
20  hours a day.  They are under a lot of pressure, working
21  very, very hard.  The teams are working hard.  They get
22  frustrated, they get upset.  So I look at Ron as being
23  extremely frustrated and upset with Mark, who he is
24  partially dependent upon to get his work done.
25    Q.  Symbiotic relationship, the two of them?

217

1    A.  I think they worked extremely well together in
2  the past.  And as pressure dials up, people, you know,
3  get upset.
4    Q.  Did you fire Jay Nussbaum?
5    A.  Jay Nussbaum resigned.
6    Q.  Did you fire Ray Lane?
7    A.  Yes.  Well, hold it, slow down, slow down.  I
8  think technically -- I think fired is -- might be a
9  legal term of art.  I'm not sure exactly what you mean.
10  I think technically Ray resigned, but I asked him to
11  resign.
12    Q.  Is that different?
13    A.  Ray Lane wrote -- there's a book.  Ray
14  Lane -- let me -- Ray Lane wrote me an e-mail note
15  saying I fired -- you know, the term fired came from
16  him, not from me.  And he wrote me an e-mail note saying
17  I fired my best guy.  And that e-mail note subsequently
18  found its way into a book.
19    Q.  Is that different -- was it a different sort
20  of a circumstance than Jay Nussbaum?  Did you ask Jay
21  Nussbaum to resign?
22    A.  We were reviewing different business practices
23  in Jay's organization, and it wasn't me, it was Jeff
24  Henley and other people were reviewing different
25  business practices in Jay's organization, and Jay

218

1  decided under the circumstances that it would be better
2  if he left.  But it was quite different than the Ray
3  Lane situation.
4    Q.  Okay.  With this exhibit, again, it's dated
5  February 8th, 2001.  And it is -- would have been in
6  your file around that date; correct?
7    A.  Yes.
8    Q.  And this was not produced from your files, and
9  you can't explain to me why it was not; is that right?
10    A.  That's right.
11    MR. LINDSTROM:  Counsel, in each case in these
12  questions the preface is that the document hasn't been
13  produced in the litigation.  And I assume in each case
14  you're making a representation to the witness that
15  that's true; that correct?
16    MR. SOLOMON:  Yes, I am.
17    MR. LINDSTROM:  Thank you.
18    MR. SOLOMON:  And if you demonstrate to me I'm
19  wrong, I will acknowledge it and apologize.
20    MR. LINDSTROM:  My concern is the way the
21  question is posed, I think the witness has no idea
22  what's been produced in the litigation or not, and one
23  could look at the question as having been posed in a way
24  that requires him to adopt the preface in order to
25  respond.  I don't think that's what you intend.

219

1    MR. SOLOMON:  I think it is all clear.
2    MR. LINDSTROM:  Thank you.
3    MR. SOLOMON:  Q.  I want to go back to the
4  prior exhibit, which I think would have been 48, maybe.
5    I'm not sure we went through the line of
6  questioning about your file.  This would have been in
7  your file around February 7th, 2001; correct?
8    A.  Correct.
9    Q.  And you can't -- and I want to represent it
10  wasn't produced from your source files.  And you can't
11  explain why; correct?
12    A.  I cannot.
13    MR. SOLOMON:  Have marked as the next exhibit
14  a document produced by Oracle with the Bates numbers
15  097883 and 884.
16    (Exhibit 50 marked for
17    identification.)
18    THE WITNESS:  Okay.
19    MR. SOLOMON:  Q.  Do you recognize having seen
20  this before?
21    A.  Again, I'm familiar with the issues.  I don't
22  remember seeing this specific document.
23    Q.  But you don't dispute that you received and
24  read it on or around Monday, February 19th, 2001?
25    A.  That's correct.

220

1    Q.  It is from Jeff Henley, at least at the top,
2  to Jennifer Minton, and you're copied.
3    Do you see that?
4    A.  Yes.
5    Q.  First paragraph, "Seems like a disaster based
6  on the large drop in support revenue growth for Q3.  For
7  the past several quarters we've been falling behind, and
8  for Q3 it seems like it's getting worse rather than
9  better.  We'll need extraordinary effort until we get
10  caught up.  I doubt we can catch up in time for Q3.  If
11  there are lots of transactions involved we should focus
12  on the large dollar items first.  We need operations, IT
13  and finance to be all activity involved.  I suggest
14  daily meetings for a while to make sure we're doing all
15  we can do."
16    Do you see that?
17    A.  I do.
18    Q.  Do you recall being aware of this described
19  disaster at around this time?
20    A.  I knew we had fallen behind in support
21  renewals.  It is not that customers weren't renewing,
22  it's just that we weren't getting the documents done in
23  time.
24    Q.  All right.  Then below it says, "Jennifer
25  Minton wrote:  Jeff, please call me to discuss the

221

1  status.  I have not been able to prove the shortfall in
2  support revenue is due to a systems issue.  I have had a
3  PI focus on this issue from ERP IT to ensure that there
4  was not a conversion issue.  Unfortunately, we have not
5  found any problems as of tonight."
6      Do you see that?
7  A.  I do.
8  Q.  And then I just wanted to skip the next
9  paragraph.  It says, "If the support renewals rate is
10  decreased significantly, I suspect it is attributed to
11  the following: Lack of management reporting for the new
12  system, OKS, which has crippled management's ability to
13  detect an underlying problem in the renewal rate in a
14  timely fashion."
15  A.  Of course, that's not what happened.
16  Q.  You see that; right?
17  A.  I see it.
18  Q.  And then there is a bunch of other bullet
19  points.  And let's focus in on what you were just about
20  to say.  And you were about to say that OKS wasn't the
21  problem; is that right?
22  A.  No.  I was about to say that -- no.  I was
23  about to say our renewal hadn't declined.  So customers
24  were still renewing at the same rates they had been
25  renewing before.

222

1  Q.  What about OKS?
2  A.  It was a new system and, as I say, whenever
3  you put in a new system, there are problems.
4  Q.  How long had you been aware of the drop in
5  support revenue growth?
6  A.  I think -- I think at the time of this note,
7  it was near the end of the quarter, because that's when
8  accounting is making its forecasts.  We tend not to -- I
9  shouldn't say that.  We tend to refine the forecast for
10  support revenue right at the end of the quarter, and
11  this issue came up the 19th, so.
12  Q.  Okay.
13  A.  A week before the quarter closed.
14  Q.  You didn't know about it before then, is that
15  what you're saying?
16  A.  Not -- not this specific set of system issues.
17  It turned out to be they were system issues, not renewal
18  rate issues.
19  Q.  And, again, this is dated Monday,
20  February 19th.  And at least on that date it would have
21  been in your files; correct?
22  A.  That's correct.
23  Q.  And I want to represent to you it wasn't
24  produced from your files.  And you can't explain to me
25  why it was not; correct?

223

1  A.  That's correct.
2      MR. SOLOMON:  Have marked as the next exhibit
3  a document produced by the defendants with control
4  number 053228 through 229.
5      (Exhibit 51 marked for
6      identification.)
7      MR. SOLOMON:  Q.  And just take a look and
8  tell me if you've seen it before, please.
9  A.  I'm sure I have.  I don't recall it
10  specifically, but I'm sure I have.
11  Q.  Okay.  And it's dated March 8th, 2001, and on
12  the first page it is from you to Safra Catz.
13      Do you see that?
14  A.  Yes.
15  Q.  And it says, "One more time"; right?
16  A.  Yes.
17  Q.  What does that mean?
18  A.  It means GE is a very demanding customer, so,
19  you know, we got to get our routine -- if GE doesn't ask
20  us to do something special for them every two weeks, we
21  feel like they don't love us anymore.
22  Q.  And two-thirds of the way down the page it
23  says, "Larry, we are still having very significant
24  problems with the 11i roll out of indirect procurement.
25  Here are the top five issues.  They have caused us to

224

1  halt the continuation of the roll out until they are
2  fixed.  I'm having a difficult time keeping the
3  businesses motivated to go forward.  Anything you could
4  do to accelerate progress would be enormously
5  appreciated.  Thanks very much.  Gary."
6  A.  Yes.
7  Q.  Who is Gary?
8  A.  Gary Rohner is executive vice-president and
9  chief information officer of General Electric.
10  Q.  The next page, see a chart?
11  A.  I do.
12  Q.  Have you seen this before?  Do you remember
13  seeing this before?
14  A.  I don't remember seeing it before.  But I've
15  seen so many charts from GE in my lifetime.
16  Q.  That was what I was going to actually say.
17  This appears to be a GE document; is that right?
18  A.  Yes, it is.
19  Q.  And the bottom it says, "Oracle deliverable
20  quality is poor.  We feel as though we are their QA
21  department.  We sent three different copies of our
22  database to Oracle in an effort to have Oracle get
23  'ahead of the curve' and test patches/fixes in our
24  environment so that the end product is solid.  To date
25  this has yielded no benefit."

225

1    Do you see that?
2    A.  I do.
3    Q.  Was that a concern to you in March of 2001?
4    A.  Absolutely.  But we got their database, we
5    fixed the problems, made them successful, and they're
6    our largest customer in the world -- largest commercial
7    customer in the world, largest standardized Oracle top
8    to bottom.
9    Q.  But at the time they were having significant
10   problems; is that fair?
11   A.  Yeah.  Again, when 11i came out and people
12   were doing these new implementations, these -- I know
13   I'm repeating myself -- these are enormously complicated
14   engineering projects, and there is a lot involved in
15   both the customer side and our side, and there are
16   always a long list of problems that have to be solved
17   before we make one of these implementations successful.
18   And GE still is the largest -- it is just a huge
19   company, a huge and complicated company.  It is even
20   harder there.
21   Q.  It is fair to say there is huge risks on both
22   sides; is that right?
23   A.  Yes.  Yeah.  Let me take that back.  I'm not
24   sure, huge risks, if risk is the right word.  There is a
25   huge amount of effort on both sides required to make it

227

1    MR. LINDSTROM:  For the record, we started 33
2    minutes late.
3    MR. SOLOMON:  Okay.
4    MR. LINDSTROM:  And you're --
5    MR. SOLOMON:  We don't need to do it now.
6    There is a clock, we counted it up.  We know what the
7    issue is.  We can either resolve it among ourselves or
8    go to Magistrate Judge Infante.
9    MR. LINDSTROM:  Fine.
10   MR. SOLOMON:  Is that okay?
11   The other thing I want to do is let you know
12   that we're going to want to meet and confer again, to
13   the extent you think it is necessary we're going to
14   renew our spoliation motion.  Okay, thanks.  Off the
15   record.
16   VIDEOGRAPHER:  This marks the end of videotape
17   number four, Volume I, in the deposition of Larry
18   Ellison.  The original videotapes will be retained by
19   LiveNote World Service.  At 4:58, going off the record.
20
21   (Deposition adjourned at 4:58 p.m.)
22
23
24
25

226

1    successful.  Not necessarily risk.
2    MR. SOLOMON:  I think we just about hit 5:00.
3    And we look forward to reconvening most likely in a date
4    in late September.
5    We've had a bit of trouble scheduling this,
6    Mr. Ellison.  What I want to do is try to schedule a
7    second a day in late September.  Do you know of anything
8    that would prevent you from being able to meet a date in
9    late September?
10   THE WITNESS:  I don't have a calendar in front
11   of me.  But I can't think of anything offhand.  But
12   again --
13   MR. SOLOMON:  Try to work it out with your
14   counsel?
15   MR. LINDSTROM:  So, counsel, according to my
16   watch, we're at six hours.
17   MR. SOLOMON:  Yes.
18   MR. LINDSTROM:  And the witness is here and
19   available to continue his deposition for the seven hours
20   that we had committed to you for today.  So do you want
21   to continue?
22   MR. SOLOMON:  No, no, I don't.  I'm not upset.
23   I understand there were traffic issues; but you guys
24   were late today, and I want to catch up with that time.
25   Not now, it will have to be in the future.

228

1    CERTIFICATE OF WITNESS
2
3    I, the undersigned, declare under
4    penalty of perjury that I have read the foregoing
5    transcript, and I have made any corrections,
6    additions, or deletions that I was desirous of
7    making; that the foregoing is a true and correct
8    transcript of my testimony contained therein.
9
10   EXECUTED this _____ day of _____,
11
12   2006, at _____, _____.
13        (City)          (State)
14
15
16
17        _____
18        LAWRENCE ELLISON
19
20
21
22
23
24
25

229

```
 1        CERTIFICATE OF DEPOSITION OFFICER
 2            I, DIANA NOBRIGA, hereby certify that the
 3    witness in the foregoing deposition was by me duly sworn
 4    to testify to the truth, the whole truth, and nothing
 5    but the truth in the within-entitled cause; that said
 6    deposition was taken at the time and place therein
 7    stated; that the testimony of said witness was reported
 8    by me, a Certified Shorthand Reporter and disinterested
 9    person, and was thereafter transcribed into typewriting,
10    and that the pertinent provisions of the applicable code
11    or rules of civil procedure relating to the notification
12    of the witness and counsel for the parties hereto of the
13    availability of the original transcript of the
14    deposition for reading, correcting and signing have been
15    met.
16            I further certify that I am not of counsel or
17    attorney for either or any of the parties to said
18    deposition, nor in any way interested in the outcome of
19    the cause named in said action.
20            In WITNESS WHEREOF, I have hereunto
21    subscribed by my hand this 19th day of July 2006.
22
23
24        _____
25        DIANA NOBRIGA, CSR NO. 7071
```

1   CERTIFICATE OF DEPOSITION OFFICER

2     I, DIANA NOBRIGA, hereby certify that the

3   witness in the foregoing deposition was by me duly sworn

4   to testify to the truth, the whole truth, and nothing

5   but the truth in the within-entitled cause; that said

6   deposition was taken at the time and place therein

7   stated; that the testimony of said witness was reported

8   by me, a Certified Shorthand Reporter and disinterested

9   person, and was thereafter transcribed into typewriting,

10   and that the pertinent provisions of the applicable code

11   or rules of civil procedure relating to the notification

12   of the witness and counsel for the parties hereto of the

13   availability of the original transcript of the

14   deposition for reading, correcting and signing have been

15   met.

16     I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said action.

20     In WITNESS WHEREOF, I have hereunto

21   subscribed by my hand this 19th day of July 2006.

22

23

24

25   DIANA NOBRIGA, CSR NO. 7071

229

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       NORTHERN DISTRICT OF CALIFORNIA
 3
 4
 5   In re ORACLE CORPORATION
 6   SECURITIES LITIGATION.
 7              Master File No. C-01-0988-MJJ
 8   This Document Relates To:
 9
10   ALL ACTIONS.
11   _____ _____/
12
13              ---oOo---
14              CONFIDENTIAL
15   VIDEOTAPED DEPOSITION OF LAWRENCE ELLISON
16              Volume II
17       Thursday, September 21, 2006
18              ---oOo---
19       SHEILA CHASE & ASSOCIATES
            REPORTING FOR:
20          LiveNote World Service
         221 Main Street, Suite 1250
21       San Francisco, California 94105
            Phone: (415) 321-2300
22          Fax: (415) 321-2301
23
24   Reported by:
     RACHEL FERRIER, CSR
25   CSR No. 6948
```

230

```
 1              I N D E X
 2         INDEX OF EXAMINATION
 3                              PAGE
 4   EXAMINATION BY MR. SOLOMON        241, 334
 5
 6              ---oOo---
 7         INDEX OF EXHIBITS
 8   DESCRIPTION                      PAGE
 9   Exhibit 52   E-mail from Elizabeth
                  Baker to Larry Ellison
10                dated 1/2/01          243
11   Exhibit 53   E-mail from Lawrence
                  Ellison to George
12                Roberts, et al., dated
                  1/5/01                248
13
     Exhibit 54   E-mail from Safra Catz to
14                Lawrence Ellison dated
                  1/9/01                252
15
     Exhibit 55   E-mail from Safra Catz to
16                Mark Barrenechea dated
                  1/11/01               253
17
     Exhibit 56   E-mail from Safra Catz to
18                Lawrence Ellison dated
                  1/3/01                257
19
     Exhibit 57   Cover page titled "Exhibit
20                N" with attached e-mail
                  from Sohaib Abbasi to
21                Lawrence Ellison dated
                  2/1/01                258
22
     Exhibit 58   Document entitled "CEO
23                Roundtable-San Francisco
                  Briefing Document 2/6/2001"   259
24
25
```

231

```
 1   Exhibit 59   E-mail from Lawrence
                  Ellison to Jennifer
 2                Minton dated 2/22/01    266
 3   Exhibit 60   E-mail from Lawrence
                  Ellison to Gary Reiner,
 4                et al., dated 2/26/01   268
 5   Exhibit 61   E-mail from Gary Reiner
                  to Larry Ellison dated
 6                3/20/01                 270
 7   Exhibit 62   E-mail from Gayle
                  Fitzpatrick to George
 8                Roberts dated 3/20/01   273
 9   Exhibit 63   E-mail from Sergio
                  Giacoletto to Mark
10                Jarvis dated 3/23/01    274
11   Exhibit 64   E-mail from Kirsten
                  Shaw to Ronal Wohl
12                dated 3/26/01           275
13   Exhibit 65   E-mail from Mark Jarvis
                  to George Roberts dated
14                3/29/01                 284
15   Exhibit 66   E-mail from Mark Jarvis
                  to Safra Catz dated
16                3/26/01                 287
17   Exhibit 67   E-mail from Mark
                  Barrenechea to Lawrence
18                Ellison, et al., dated
                  4/9/01                  293
19
     Exhibit 68   E-mail from Stephen Smith
20                to Lawrence Ellison dated
                  4/13/01                 294
21
     Exhibit 69   E-mail from George Roberts
22                to Ken Hamel dated 4/19/01   295
23   Exhibit 70   E-mail from Mark
                  Barrenechea to Lawrence
24                Ellison dated 4/24/01   296
25
```

232

```
 1   Exhibit 71   E-mail from Mark
                  Barrenechea to Tom Victory
 2                dated 4/26/01           297
 3   Exhibit 72   E-mail from Madhu Gowda
                  to Kirsten Shaw dated
 4                5/9/01                  298
 5   Exhibit 73   E-mail from Mike Runda
                  to Larry Ellison, et al.,
 6                dated 5/21/01           300
 7   Exhibit 74   Part of an e-mail
                  beginning "Safra A. Catz
 8                Wrote"                  301
 9   Exhibit 75   E-mail from Lawrence
                  Ellison to Safra Catz,
10                et al., dated 6/3/01    303
11   Exhibit 76   E-mail from Nadeem Syed
                  to Stephanie Aas dated
12                6/6/01                  305
13   Exhibit 77   E-mail from Sergio
                  Giacoletto to Mark
14                Barrenechea dated 6/7/01   306
15   Exhibit 78   E-mail from Mike Runda
                  to Lawrence Ellison, et al.,
16                dated 6/11/01           308
17   Exhibit 79   E-mail from Mike Rund
                  to Larry Ellison, et al.,
18                dated 6/18/01           308
19   Exhibit 80   E-mail from Mark Jarvis
                  to Benny Souder dated
20                8/30/01                 315
21   Exhibit 81   Document entitled "Summary
                  Analysis of Oracle CRM
22                Customers FY 1Q02 Earnings
                  Call Announcement"      316
23
24   Exhibit 82   E-mail from Mark Jarvis
                  to Julie Gibbs dated
25                10/23/01                321
```

1   Exhibit 83    E-mail from Jennifer
        Minton to William Plant,
2       et al., dated 3/22/02
3                                       326
    Exhibit 84    E-mail from Susan Marks
4       to Lawrence Ellison dated
5       3/29/02              329
    Exhibit 85    Cover page titled "Exhibit
6       Y" with attached e-mail
        from Eric Louttit to Lisa
7       Pope dated 4/11/02        330
    Exhibit 86    E-mail from Mark Jarvis
8       to Lisa Arthur dated
        5/21/02              331
9
    Exhibit 87    Pages 182-183 from the
10      Software book          334
    Exhibit 88    Page 191 from the Software
11      book                341
12
    Exhibit 89    Page 192 from the Software
13      book                342
    Exhibit 90    Page 196 from the Software
14      book                345
15
    Exhibit 91    Pages 193-195 from the
16      Software book          351
    Exhibit 92    Pages 199-201 from the
17      Software book          358
18
    Exhibit 93    Page 202 from the Software
19      book                372
    Exhibit 94    Page 210 from the Software
20      book                373
21
    Exhibit 95    Page 213 from the Software
22      book                376
    Exhibit 96    Page 221 from the Software
23      book                377
24
    Exhibit 97    Page 226 from the Software
25      book                381

1   Exhibit 98    Page of Chapter 12 from
        the Softwar book          385
2
    Exhibit 99    Page 229 from the Softwar
3       book                385
    Exhibit 100   Page 141 from the Softwar
4       book                388
5
    Exhibit 101   Pages 143-144 from the
6       Software book          395
    Exhibit 102   Page 147 from the Softwar
7       book                397
8
    Exhibit 103   Page 180 from the Software
9       book                402
    Exhibit 104   Page 177 from the Softwar
10      book                403
11
    Exhibit 105   Page 189 from the Software
12      book                409
    Exhibit 106   Pages 156-157 from the
13      Software book          413
14
    Exhibit 107   E-mail from mhagan to
15      Larry Ellison, et al.,
        dated 1/11/00          414
16
    Exhibit 108   E-mail from Jeff Henley
17      to Jennifer Minton
        dated 9/11/00          417
18
    Exhibit 109   E-mail from Lia Burke
19      to Lawrence Ellison,
        et al., dated 9/22/00      421
20
    Exhibit 110   E-mail from Patricia
21      McManus to James English
        dated 10/6/00          423
22
    Exhibit 111   E-mail from David Winton
23      to George Roberts dated
        12/7/00              426
24
25

1   Exhibit 112   E-mail from David Winton
        to Jennifer Minton dated
2       1/11/01              429
3   Exhibit 113   Cover page titled "Exhibit
        M" with attached e-mail
4       from Jim English to
        Jennifer Minton dated
5       4/11/02              433
6   Exhibit 114   E-mail from Jennifer
        Minton to Ivgen Guner
7       dated 1/18/01          437
8   Exhibit 115   E-mail from Larry Garnick
        to Jennifer Minton,
9       et al., dated 1/17/01      440
10  Exhibit 116   Document entitled
        "Defendants' Response to
11      Plaintiffs' First Set of
        Requests for Admissions"    455
12
13  Exhibit 117   E-mail from Jay Nussbaum
        to Terrence Ford, et al.,
        dated 10/16/00          457
14
15  Exhibit 118   Pages 286-287 from the
        Software book          460
16  Exhibit 119   E-mail from George
        Roberts to nagvp, et al.,
17      dated 12/4/00          464
18  Exhibit 120   E-mail from Mike Rosser
        to Stephanie Aas dated
19      12/4/00              466
20  Exhibit 121   E-mail from Jennifer
        Minton to Ron Police,
21      et al., dated 12/6/00      469
22  Exhibit 122   E-mail from Ron Wohl to
        Jennifer Minton dated
23      12/9/00              470
24  Exhibit 123   Document entitled "Custom
        Calendar Report"        488
25

1   Exhibit 124   E-mail from Deborah Lange
        to Jeff Henley dated
2       1/10/01              494
3   Exhibit 125   E-mail from Safra Catz
        to Dan Cooperman dated
4       1/19/01              496
5   Exhibit 126   E-mail from Safra Catz
        to Jonathan White dated
6       1/22/01              498
7   Exhibit 127   E-mail from Safra Catz
        to Larry Ellison dated
8       1/24/01              500
9   Exhibit 128   Memorandum from Daniel
        Cooperman            503
10
    Exhibit 129   E-mail from Lawrence
11      Ellison to Michael
        Rocha dated 10/12/00      505
12
    Exhibit 130   Letter from Larry
13      Ellison to Cary Fiorina
        dated 11/30/00          509
14
    Exhibit 131   Board of Directors
15      January 8, 2001 Meeting
        Minutes              511
16
    Exhibit 132   E-mail from Lawrence
17      Ellison to Jay Nussbaum
        dated 4/21/00          518
18
    Exhibit 133   E-mail from Safra Catz
19      to Scott Little dated
        1/29/01              521
20
    Exhibit 134   Bloomberg News report
21      dated 1/24/01          523
22  Exhibit 135   E-mail from Jeff Henley
        to Thomas Williams
23      dated 11/30/00          525
24
25

237

```
1    Exhibit 136    Letter from Larry
                    Ellison to Cary Fiorina
2                   dated 11/30/00, with
                    handwritten notes        526
3
     Exhibit 137    Document entitled
4                   "E-Business Suite
                    High Level Requirements
5                   Document"                530
6    Exhibit 138    E-mail from Jennifer
                    Glass to Larry Ellison
7                   dated 10/30/00           540
8    Exhibit 139    Pages 205-206 from the
                    The Difference Between
9                   God and Larry Ellison
                    book                     547
10
     Exhibit 140    Letter from Mark
11                  Solomon to Peter Wald
                    dated 8/29/06            556
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

239

```
1    Appearing as counsel on behalf of the Defendants:
2        GREGORY P. LINDSTROM, Esquire
         LATHAM & WATKINS, LLP
3        505 Montgomery Street, Suite 1900
         San Francisco, California 94111-2562
4        (415) 391-0600
         gregory.lindstrom@lw.com
5
6        PATRICK E. GIBBS, Esquire
         LATHAM & WATKINS, LLP
7        140 Scott Drive
         Menlo Park, California 94025-1008
8        (650) 328-4600
         patrick.gibbs@lw.com
9
10       JAMES C. MAROULIS, Esquire
         ORACLE CORPORATION
11       500 Oracle Parkway, MS 5OP7
         Redwood Shores, California 94065
12       (650) 506-5200
         jim.maroulis@oracle.com
13
14
15   Present via Internet:  Shawn Williams, Esq.
                            Monique Winkler, Esq.
16
17   Also present:    James Terrell, Videographer
18
19
20
21
22
23
24
25
```

238

```
1        BE IT REMEMBERED that on Thursday,
2    September 21, 2006, commencing at the hour of
3    9:49 a.m., thereof, at the Law Offices of LERACH,
4    COUGHLIN, STOIA, GELLAR, RUDMAN & ROBBINS, LLP,
5    100 Pine Street, Suite 2600, San Francisco,
6    California, before me, RACHEL FERRIER, a Certified
7    Shorthand Reporter in and for the State of
8    California, personally appeared
9             LAWRENCE ELLISON,
10   called as a witness by the Plaintiffs herein, who,
11   being by me first duly resworn/affirmed, was
12   thereupon examined and testified further as
13   hereinafter set forth.
14            ---oOo---
15   Appearing as counsel on behalf of Plaintiffs:
16       MARK SOLOMON, Esquire
         STACY KAPLAN, Esquire
17       LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
         ROBBINS, LLP
18       655 West Broadway, Suite 1900
         San Diego, California 92101-3301
19       (619) 231-1058
         marks@lerachlaw.com
20       skaplan@lerachlaw.com
21
         JENNIE LEE ANDERSON, Esquire
22       LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
         ROBBINS, LLP
23       100 Pine Street, Suite 2600
         San Francisco, California 94111
24       (415) 288-4545
         jenniea@lerachlaw.com
25
```

240

```
1        THE VIDEOGRAPHER:  This begins Tape 1,
2    Volume 2, in the videotaped deposition of Larry
3    Ellison in the matter In Re Oracle Corporation
4    Securities Litigation filed in the United States
5    District Court, Northern District of California,
6    number C-01-0988-MJJ.
7        Today's date is September 21, 2006.  The
8    time on the video monitor is 9:49.
9        The Video Operator today is James Terrell,
10   representing LiveNote World Service.  The Court
11   Reporter is Rachel Ferrier with Sheila Chase &
12   Associates reporting on behalf of LiveNote World
13   Service.
14       Today's deposition is taking place at 100
15   Pine Street, San Francisco, California, for
16   plaintiffs' counsel.
17       You may continue.
18       MR. SOLOMON:  And just for the record, here
19   for plaintiffs today for the second day of
20   Mr. Ellison's deposition is myself, Mark Solomon;
21   Stacy Kaplan, and Jennie Anderson.
22       I don't know if you want to make an
23   introduction, Mr. Lindstrom.
24       MR. LINDSTROM:  Thank you, Mark.
25       I'm Greg Lindstrom, on behalf of the
```

241

1 witness and Oracle.
2       MR. GIBBS: Patrick Gibbs, also on behalf
3 of the witness and defendants.
4       MR. MAROULIS: James Maroulis from Oracle
5 Corporation for Oracle Corporation.
6       LAWRENCE ELLISON,
7 having been duly sworn, testified further as
8 follows:
9       EXAMINATION
10 BY MR. SOLOMON:
11       Q   Since you gave testimony in this matter in
12 July, have you had a chance to review the transcript
13 of that testimony?
14       A   I have.
15       Q   Okay.  And have you made any corrections?
16       A   I think a few.
17       Q   And do you have those corrections with you?
18       A   I -- counsel has the corrections.
19       Q   Okay.  And have you signed those
20 corrections?
21       A   I believe so.
22       MR. SOLOMON: Okay.  Could I have those
23 corrections, Counsel?
24       MR. GIBBS: The signed version is on its
25 way over.

242

1       MR. SOLOMON: Okay.  Thank you.
2       Q   And since your testimony in July, have you
3 now reviewed the complaint in this matter?
4       A   I have not.
5       Q   Okay.  Have you prepared in any way for
6 this session?
7       A   I met with counsel yesterday afternoon.
8       Q   Okay.  How long did you meet for?
9       A   Three hours.
10       Q   And did you review documents?
11       A   A few.
12       Q   Did they refresh your recollection as to
13 events in the past?
14       A   They did.
15       Q   What events did they refresh your
16 recollection regarding?  Go ahead.
17       A   Sorry.
18       The period around my stock sales between --
19 in late January.
20       Q   Okay.  Anything else?
21       MR. LINDSTROM: As to which his
22 recollection was refreshed?
23       MR. SOLOMON: Correct.
24       THE WITNESS: Our results at the end of the
25 quarter, the quarter that ended in February.

243

1 BY MR. SOLOMON:
2       Q   Okay.  Did any of the documents refresh
3 your recollection as to issues concerning the 11i
4 suite?
5       A   No.
6       Q   Okay.  We are going to start -- we are
7 going to continue where we left off, pretty much, and
8 that was talking about 11i and showing you some
9 documents.
10       I want to have marked as the next exhibit a
11 document produced by the defendants in this
12 litigation with the control numbers 019153 through
13 155.
14       (Exhibit No. 52 was marked for
15       identification.)
16 BY MR. SOLOMON:
17       Q   And if you recall, Mr. Ellison, the drill
18 is to take a look at it, and then once you have had a
19 chance to review it, I'm going to ask you if you
20 recognize it.
21       A   I don't recognize the document
22 specifically, but I recognize the issue that the
23 document refers to.
24       Q   Okay.  And you will see on the first page
25 it's addressed to you.  It's dated 2nd of January

244

1 2001 from Elizabeth Baker with a number of people
2 copied.
3       Do you see that?
4       A   I do.
5       Q   And it says, at the beginning, "Larry,
6 Happy New Year," and it goes on to say, "The
7 Oracle -- Sun R11i - JDK client certification process
8 is going very, very slow.  This is hindering our
9 ability to secure Oracle Compensation," then in
10 parens, "($4 million in license).  Our Competition is
11 Siebel and Siebel is making this a big issue."
12       Do you see that?
13       A   I do.
14       Q   Do you recall being aware at around the
15 date of this document that there was this issue with
16 the potential loss of $4 million in license?
17       A   Yes, I do.
18       Q   And do you know -- tell me what you
19 remember about it.
20       A   Well, Sun was an unusual customer.  They
21 wanted virtually every other customer that we have
22 for our applications, run those applications on
23 desktop personal computers, or they run the user
24 interface on desktop personal computers.  Sun had its
25 own device called the Sun Ray, and the Sun Ray was

245

1  again -- it's also called the Java Station.  It ran a
2  computer program called Java as opposed to Windows.
3        And what Sun asked, because Sun was a big
4  application customer of ours and a big customer of
5  ours, was that we make our applications work on the
6  Sun Ray desktop machine rather than Windows, because
7  they didn't want to use the Microsoft -- Sun and
8  Microsoft don't get along, so they didn't want to use
9  a Microsoft desktop computer; they wanted to use the
10  Sun computer.
11        And in order for us to do that, Sun had to
12  certify what's called the JDK.  Certify their Java,
13  the Java that they had implemented on the work -- on
14  their workstation to work with our applications.
15  And, in fact, it took years before Sun actually
16  completed that certification process.
17        So what we are waiting for here is not
18  really an Oracle -- Oracle engineering to be
19  completed; we are waiting for Sun certification of
20  their JDK to be completed.
21     Q    Okay.  And do you know what happened with
22  respect to the compensation referred to, the
23  $4 million in license?
24     A    Sun is completely standardized on -- I
25  mean, I can't tell you exactly --

246

1     Q    Okay.
2     A    -- you know, what happened on this
3  particular transaction, but Sun is now completely
4  standardized on all Oracle applications, but I
5  don't -- I know it took a very, very long time for
6  Sun to finish their engineering, and it was a point
7  of frustration for everybody.
8     Q    Okay.  And this document would have been in
9  your files as of January 2, 2001; is that correct?
10     A    I think so, yeah.
11     Q    And it -- I can represent to you that it
12  was not produced from your files.
13        Can you explain why?
14     A    I cannot.
15     Q    Did there come a time in the
16  December-2000-to-March-2001 time frame when you
17  adopted a practice of offering to pay customers or
18  allow them concessions if they would act as a
19  reference for 11i?
20     A    I don't recall.
21     Q    Do you understand what I mean --
22     A    Yes.
23     Q    -- when I say that?
24     A    Yes.
25     Q    Is it a practice at Oracle generally to pay

247

1  customers to be references for Oracle's products?
2     A    Well, characterize "pay."  If we have a
3  particularly important reference customer -- let's
4  say it's a brand-new banking customer, and we just
5  implemented a new version of our software at that
6  bank, and we pepper that customer with lots and lots
7  of references -- they are taking a lot of their time
8  and they are doing demonstrations for prospective
9  clients of ours -- we will often give them free
10  consulting or discounts on software or something to
11  compensate them for their efforts of being a
12  reference.
13     Q    Isn't it true that between December 2000
14  and March 2001 that you were so desperate for
15  references for the 11i that you engaged in the
16  practice of offering concessions or payments to
17  customers to be references?
18     A    I think -- I think we have done that
19  historically, yeah.  It depends on how much a
20  reference is used.
21     Q    Isn't it true that in 2000 -- between
22  December 2000 and March 2001 that you were desperate
23  for references for the Suite 11i custom -- Suite 11i
24  suite?  Excuse me.
25     A    No, I wouldn't characterize us as

248

1  desperate.
2        MR. SOLOMON:  So mark as the next exhibit
3  document produced by the defendants in this
4  litigation with the control numbers 017475 and 76.
5        (Exhibit No. 53 was marked for
6        identification.)
7  BY MR. SOLOMON:
8     Q    Take a look at the document, Mr. Ellison,
9  and let me know if you recognize it.
10     A    I do.
11     Q    All right.  And you will see that it's
12  dated January 5th, 2001, and on the first page, it's
13  from you to George Roberts and Carolyn Balkenhol.
14        Do you see that?
15     A    Yes, I do.
16     Q    And attached is a letter that has been
17  drafted for your signature.
18        You see that?
19     A    I do.
20     Q    Do you know who Mr. Murray Weiss is --
21  excuse me, Morry Weiss?
22     A    I've never met him, but he was, at the
23  time, chairman and CEO of American Greetings.
24     Q    And do you remember at around the time of
25  this communication learning that American Greetings

249

1    was having problems implementing your products?
2        A    Well, again, I'm not sure it was -- depends
3    how you define "problems," but they were certainly
4    having issues with the rate of order management, and
5    I can explain, if you like.
6        Q    Well, let's just -- before you explain,
7    let's just go into the body of the document a little
8    bit.
9        A    Okay.
10       Q    The second paragraph you write: "So, let
11   me restate my offer to American Greetings related to
12   completing a successful benchmark of our 11i Order
13   Management Solution.  Oracle guarantees that our
14   Order Management solution will process four million
15   order lines within a" 24 hour "window by December of
16   2001."
17       A    "20 hour window," yes.
18       Q    Excuse me, "20 hour window by December of
19   2001.  By March 31, our team will be in a position to
20   demonstrate 2.5, 3.5 million order lines with current
21   releases of our software on a hardware configuration
22   that will be specified in writing shortly after the
23   completion of the benchmark."  And it goes on to say,
24   "In the unlikely event that this specified hardware
25   configuration proves not to be sufficient, then

250

1    Oracle will provide American Greetings with up to $10
2    million for additional hardware to reach the four
3    million order line throughput when you go production
4    on 11i."
5            You see all that?
6        A    I do.
7        Q    Do you have any idea how the transaction
8    that's discussed here was accounted for at Oracle?
9        A    What -- you mean did we make the sale to
10   American Greetings and --
11       Q    Do you know what the financial accounting
12   treatment was of any transaction with American
13   Greetings referred to here?
14       A    I'm not sure any transaction even occurred.
15       Q    Okay.  You go on to say, in the next
16   paragraphs -- next paragraph, "If the performance of
17   these servers does not increase by at least 200% and"
18   AGM -- excuse me, "AG.COM elects to keep the software
19   the only charge will be the first year support fees.
20   If the performance does increase by 200% or more,
21   Oracle will provide the software to AG.COM at a
22   50% discount in return for" AG's "agreement to become
23   an Oracle reference."
24           Do you see that?
25       A    I do.

251

1        Q    And do you remember at the time making a
2    financial offer to this customer that if they would
3    be a reference, you would allow them a 50 percent
4    discount?
5        A    Does it say there -- yes.  It says it right
6    here.
7        Q    Yes?
8        A    Yeah.
9        Q    And does that not reflect a effort on your
10   part to increase the number of Oracle customers who
11   would be a reference for the 11i suite?
12           MR. LINDSTROM:  For 11i?
13           MR. SOLOMON:  Excuse me?
14           MR. LINDSTROM:  For 11i?
15           MR. SOLOMON:  Yes.
16           THE WITNESS:  Yes, of course.
17   BY MR. SOLOMON:
18       Q    And this document would have been in your
19   files in January of 2001; is that right?
20       A    I believe so.
21       Q    And it wasn't produced from your files and
22   you don't know why; is that right?
23       A    That's correct.
24       Q    There's a reference at the end of the
25   document to a CEO roundtable.

252

1            Do you see that?
2        A    Yes.
3        Q    Do you recall whether the CEO roundtable
4    referred to here took place?
5        A    I believe it did.
6        Q    And do you recall who was present?
7        A    I do not.
8            MR. SOLOMON:  Have marked as the next
9    exhibit a document with the control numbers 610546 to
10   548.
11           (Exhibit No. 54 was marked for
12           identification.)
13           THE WITNESS:  Okay.
14   BY MR. SOLOMON:
15       Q    Do you recognize this?
16       A    I don't recognize it.  I certainly know
17   what issues it refers to.
18       Q    Okay.  And it's dated January 9th, 2001,
19   and it's an exchange involving yourself, Jeff Henley,
20   Larry Garnick, Jennifer Minton, and Safra Catz.
21           Do you see that?
22       A    Yes.
23       Q    And there is a copy of an e-mail that Larry
24   Garnick wrote which is -- says it's a summary of a
25   call.

253

1      Do you see that?
2      A    Yes.
3      Q    And then above that, it says, "This is very
4  helpful.  Please do this daily."
5      Do you see that?
6      A    Yes.
7      Q    And do you recall seeing this in January of
8  2001?
9      A    I don't recall seeing it.
10     Q    It wasn't produced from your files, but it
11  would have been in your files in January of 2001; is
12  that right?
13     A    That's correct.
14     Q    And you can't tell me why it wasn't
15  produced in from your files?
16     A    That's correct.
17     Q    And there's a reference -- it mentions,
18  "This is very helpful.  Please do this daily."
19     Do you know if this was done daily?
20     A    I do not.
21     MR. SOLOMON:  I've marked as the next
22  exhibit a document produced by the defendants in this
23  litigation with the control numbers 035280 through
24  282.
25     (Exhibit No. 55 was marked for

254

1      identification.)
2  BY MR. SOLOMON:
3      Q    Take a look, and when you have had a chance
4  to view it, let me know, please.
5      A    Okay.
6      Q    Okay.  Have you seen this before,
7  Mr. Ellison?
8      A    Not that I recall.
9      Q    Okay.  You will see that it reflects
10  communications among Safra Catz, Ron Wohl, Mark
11  Barrenechea and yourself?
12     And I'm focusing in just on the first page.
13     A    I'm sorry.  I don't see where I was copied
14  on this.  Maybe I was.
15     Q    You see -- halfway down, you see Mark
16  Barrenechea, and to the right it says your name?
17     A    It says, "Larry, if it's okay with you."
18  Yeah, but I'm not on the distribution list on the
19  top.
20     Q    Got it.
21     MR. LINDSTROM:  I think counsel is
22  referring to the embedded e-mail below.
23     MR. SOLOMON:  That is what I'm referring
24  to.  Thank you.
25     MR. LINDSTROM:  So about halfway down the

255

1  first page, Larry.
2      THE WITNESS:  Oh, I'm sorry.  Okay.  Okay.
3  BY MR. SOLOMON:
4      Q    But you have no recollection of this?
5      A    No, I don't.
6      Q    Okay.  And you will see that Mark
7  Barrenechea writes, in part:  "Larry if it's okay
8  with you, I would like to defer this topic a week.  I
9  need to keep focused on the 11i internal install and
10  would prefer to you skip the meeting tomorrow.  It
11  also need" -- I'm not sure what that says, actually,
12  but something -- "also need key members of my
13  management team to stay similarly focused" --
14     I think that's Ron -- I think that's Ron --
15     Q    I must apologize.  It's Ron Wohl.
16     A    Yeah.
17     Q    Do you recall Ron Wohl expressing that
18  sentiment to you in January 2001?
19     A    I don't.
20     Q    And do you recall Mark Barrenechea making a
21  reference to Ron Wohl still coding?
22     MR. LINDSTROM:  Vague and ambiguous.
23     THE WITNESS:  Yeah, I don't remember -- I
24  don't remember this note.
25  BY MR. SOLOMON:

256

1      Q    Okay.  Where it says, "Mark Barrenechea
2  wrote:  Can you say," and in quotes, "I am still
3  coding."
4      Do you have an understanding what that
5  means?
6      A    That he's still working -- you know,
7  working on things.
8      Q    Okay.  And then there's a reference, and it
9  seems to be from Safra Catz which says, "I am so
10  pissed."
11     Do you see that?
12     A    I do.
13     Q    Do you recall being made aware by Safra
14  Catz that she was pissed, as she says here, with
15  respect to this?
16     A    No.
17     Q    You never had a conversation with her about
18  it?
19     A    No.
20     Q    Now, this would have been in your files in
21  January of 2001?
22     A    That's right.
23     Q    And you can't explain why it wasn't
24  produced from your files?
25     A    That's correct.

257

1     MR. LINDSTROM:  Mark, we may have done this
2  last time, but can we have an understanding that in
3  each of these questions, you are representing to the
4  witness that it has not been produced in the
5  litigation?
6     MR. SOLOMON:  From his files?
7     MR. LINDSTROM:  Correct.
8     MR. SOLOMON:  Correct.
9     And as I said last time, if I'm wrong and
10  you can demonstrate I'm wrong, I apologize.
11     MR. LINDSTROM:  I understand.  I'm just
12  concerned the question, as opposed, assumes a fact
13  about which there's no foundation that he has no
14  knowledge, so I just want to make sure the record
15  reflects that you are representing to him that that's
16  the case.
17     MR. SOLOMON:  Correct.  That's fine.
18     And I've marked as the next exhibit a
19  document with the control numbers 031405 through 407.
20     (Exhibit No. 56 was marked for
21        identification.)
22     THE WITNESS:  Okay.
23  BY MR. SOLOMON:
24     Q   Do you recognize this?
25     A   I don't recognize it.

258

1     Q   You do or don't?
2     A   I do not recognize this specific document.
3     Q   You don't dispute that it would have been
4  in your files in January of 2001?
5     A   I do not.
6     Q   And I'm going to represent to you it wasn't
7  produced from your files and you can't tell me why;
8  correct?
9     A   That's correct.
10     MR. SOLOMON:  Marked as the next exhibit a
11  document produced in this litigation with the control
12  numbers 297774 to 777.
13     (Exhibit No. 57 was marked for
14        identification.)
15     THE WITNESS:  Okay.
16  BY MR. SOLOMON:
17     Q   Okay.  Do you recognize this?
18     A   I do.
19     Q   And you remember seeing it around January
20  30th of 2000 -- excuse me, February 1st of 2001?
21     A   Again, not specifically, but I'm very
22  familiar with the issues involved.
23     Q   Okay.  And one of the issues is the
24  downward revision of the Q3 forecast revision; is
25  that right?

259

1     A   Yeah.  We had put in a custom system called
2  OTA.
3     Q   I just want to know if that was one of the
4  issues that you remember, downward revision?
5     MR. LINDSTROM:  Could we have the question
6  reread, please.
7     (Record read by the Reporter as follows:
8     "QUESTION:  Okay.  And one of the issues is
9     the downward revision of the Q3 forecast;
10     is that right?")
11     THE WITNESS:  Thank you.
12     MR. SOLOMON:  Thank you.
13     Q   And this would have been in your files on
14  February 1, 2001?
15     A   Yes.
16     Q   And you can't explain why it wasn't
17  produced from your files; is that right?
18     A   That's correct.
19     MR. SOLOMON:  So I've marked as the next
20  exhibit a document produced by the defendants in this
21  litigation with the control numbers 175224 and 245.
22     (Exhibit No. 58 was marked for
23        identification.)
24     THE WITNESS:  Okay.
25  BY MR. SOLOMON:

260

1     Q   Okay.  Do you recognize this?
2     A   I do.
3     Q   Okay.  And this represents a list
4  identifying the people who were to attend your CEO
5  roundtable dinner in February of 2001?
6     A   I'm not sure it was a dinner, but, yes.
7     Q   And do you remember whether the people
8  reflected on the first two pages attended the event?
9     A   I don't recall if all of them attended.
10     Q   Okay.  Do you -- if you go down the list,
11  could you tell me, just 1 through 13, who you
12  remember attending?
13     A   I really can't.  I would be guessing.
14     Q   Okay.  You will see that then after those
15  two pages for each company, there is a page of
16  information.
17     Do you see that?
18     A   I do.
19     Q   And the last question for each of them is,
20  "What results do we want to achieve from LJE?"  And
21  then there's a variety of answers to that.
22     Do you see that?
23     A   Yes.
24     Q   And did you review all of these pages in
25  order to address the topic of what these customers

261

1   wanted to achieve?
2       A    I read all the pages, yes.
3       Q    Now, you will see that there's a couple of
4   luminaries or poster boys for securities fraud
5   referenced here.
6       A    I sure do.
7       Q    And do you remember whether -- well, I
8   guess we will name two, shall we?  No. 8 and No. 12
9   are pretty notorious.
10      A    Yeah.
11      Q    Did they attend?
12      A    I think Richard Scrushy did.  I don't
13  remember Jeffrey Skilling attending.
14      Q    Okay.  And, in fact, you discuss with
15  Mr. Scrushy a deal with Health South; is that right?
16          MR. LINDSTROM:  On that occasion?
17          MR. SOLOMON:  On that occasion.
18          THE WITNESS:  Actually, I decided that
19  under no circumstances do we do business with Health
20  South after meeting Richard Scrushy.
21  BY MR. SOLOMON:
22      Q    It was that obvious?
23      A    It was pretty obvious, yes.  Not so with
24  Mr. Skilling, but with Scrushy it was.
25      Q    Okay.  He hadn't perfected his act.

262

1       A    It's extraordinary.
2       Q    And kind of interested.  You say
3   "extraordinary."
4           What was extraordinary about it?
5       A    Oh, I don't -- I think -- I visited Health
6   South, and they had more airplanes than United
7   Airlines, and they had airplanes and helicopters, and
8   it's just not that big a company, so they had an
9   incredible fleet of airplanes.  And then -- I mean,
10  this all sounds funny, but you arrive -- I don't know
11  how to describe it, but they had all of these women
12  dressed in white leather.  It was just a very strange
13  operation.  I've never seen an operation like this in
14  my life.
15          And Scrushy himself was a very smarmy guy.
16  He had committed to creating a digital hospital in
17  Alabama, and, in fact, you got to get per -- if you
18  are closing down a State-run hospital, you have to
19  get permission from the State to close this State-run
20  hospital down, and to get that permission, he
21  committed to get this digital hospital running in a
22  very, very short period of time, and he was now
23  trying to get Oracle to take responsibility for
24  building this digital hospital and all of its
25  liabilities, and in a year, which was technically

263

1   just impossible.  So became very, very clear that
2   this was not -- and it's rare to find someone we just
3   won't entertain getting into contract with at all.
4       Q    Okay.  Is it black leather at Oracle?
5       A    Not a lot of leather at Oracle in general.
6       Q    And Jeff Skilling, have you met Jeff
7   Skilling?
8       A    I don't -- I don't think so.
9       Q    Looking at the Control No. 175247, it says,
10  at the bottom, "What results do we want to achieve
11  from LJE?"  And then it says, "The results that I
12  would like to achieve from LJE is 1) leave Saied with
13  the message that if Oracle can save a billion
14  dollars, that he too can save costs during the
15  initial startup of his business.  2) have Saied's
16  support that purchasing the Oracle," and then there's
17  nothing else.
18      A    Yeah.
19      Q    By the way, who wrote this, do you know?
20      A    I think they are written by the sales
21  executives assigned to those accounts.
22      Q    Okay.  Do you recall having a conversation
23  with Saied, whoever this refers to, along those
24  lines?
25      A    Not specifically.

264

1       Q    Do you recall Saied Nadjafi being there?
2       A    I don't.
3       Q    And you will see, for Health South, "What
4   results do we want to achieve from LJE?"  And it
5   says, "Want Richard Scrushy to look at Oracle as a
6   partner for e-business transformation."
7           I assume after this, that wasn't a
8   possibility?
9       A    That wasn't a possibility, no.
10      Q    Go to Enron, which is the last page --
11      A    Second-to-last page.
12      Q    I apologize.  It is, yes.
13          And it says, "Again, what results do we
14  want to achieve from LJE?"  And it says "Closure to
15  an agenda that both Enron and Oracle's executives
16  support regarding efforts and process."
17          Do you see that?
18      A    I do.
19      Q    Do you know what -- first of all, do you
20  recall any conversation with anyone from Enron
21  Corporation along those lines?
22      A    I don't.  I think -- I think Enron was a
23  database customer, a large database customer, but --
24      Q    The last page, which is GE Power --
25      A    Yeah.

265

1   Q   -- "What results do we want to achieve from
2   LJE?" And it says, "We would like Larry to reinforce
3   Oracle commitment to both the Hungary project and
4   their overall digitalization effort and help close
5   our deal for $18 million."
6       Do you see that?
7   A   I do.
8   Q   And did you have conversation with John
9   Rice along those lines?
10  A   Yeah. I was the corporate sponsor at GE,
11  and I spoke to John all the time.
12  Q   And did you engage in negotiating any
13  transactions with any of the representatives of these
14  customers?
15  MR. LINDSTROM: Vague and ambiguous.
16  BY MR. SOLOMON:
17  Q   Go ahead.
18  A   I don't negotiate deals, business deals. I
19  don't like doing it.
20  Q   Okay. I guess -- and then the last
21  question is: This would have been in your files in
22  February of 2001; is that correct?
23  MR. LINDSTROM: No foundation.
24  THE WITNESS: I think they hand me these
25  documents. They usually give me a folder with these

266

1   documents. Doesn't look like it was sent in e-mail,
2   so they usually give me a folder with these documents
3   in it --
4   MR. SOLOMON: Okay.
5   THE WITNESS: -- prior to me going into the
6   meeting.
7   BY MR. SOLOMON:
8   Q   Okay. So this is slightly different, then.
9   This wasn't produced from your files.
10      Can you explain why this document would not
11  have been produced from your files?
12  A   I normally review these in preparation for
13  the meeting and then dispose of them.
14  Q   That's what you expected to do with this
15  one?
16  A   I really -- I just don't -- I don't know.
17  Yeah, I wouldn't have kept this document unless I
18  thought it would have been useful, of some use later
19  on.
20  MR. SOLOMON: Gotcha.
21      Marked as the next exhibit document
22  produced by the defendants with control numbers
23  101468 through 470.
24      (Exhibit No. 59 was marked for
25      identification.)

267

1   THE WITNESS: Okay.
2   BY MR. SOLOMON:
3   Q   Do you recognize this?
4   A   Again, I don't recognize the specific
5   document, but I'm familiar with the issues to which
6   it refers.
7   Q   Okay. And one of the issues is the upgrade
8   to OKS; is that correct?
9   A   That's right.
10  Q   You write, on the first page -- and, for
11  the record, it's dated 22nd of February 2001 from you
12  to Jennifer Minton, copying a number of people. You
13  say, "I do not understand why we did not hear about
14  all these systems problems until 10 days before
15  quarter close. The system has to be fixed to be sure
16  but we should have" -- I think you meant to say
17  "had"?
18  A   Right.
19  Q   -- "more notice of the problems earlier in
20  the quarter. Larry."
21      Do you see that?
22  A   I do.
23  Q   And do you recall expressing that concern
24  in February of 2001?
25  A   That's correct.

268

1   Q   And you say you should have heard about the
2   problems, but you didn't.
3       Why is it you would have expected to have
4   heard about the problems earlier?
5   A   Jennifer Minton, in charge of -- our
6   running our back office, was having -- had a list of
7   systems problems, and she was escalating those
8   problems, and I just wish when people are having
9   problems, they let us know early -- you know, not
10  wait -- you know, two weeks before the end of the
11  quarter is better than ten days, and a month is
12  better than two weeks, and the more notice we have to
13  fix the problems, the better off we all are.
14  Q   This would have been in your files at
15  around the date of this e-mail; right, February 22nd,
16  2001?
17  A   That's right.
18  Q   And it wasn't produced from your files and
19  you cannot explain why; is that right?
20  A   That's right.
21  MR. SOLOMON: Marked as the next exhibit a
22  document with control number 052637.
23      (Exhibit No. 60 was marked for
24      identification.)
25  THE WITNESS: Okay.

269

1    BY MR. SOLOMON:
2        Q.   And let me know if you recognize this,
3    please.
4        A.   I do.
5        Q.   Okay.  It's dated the 26th of February
6    2001, and it's from you to Gary Reiner?
7        A.   Yes.
8        Q.   Who is Gary Reiner?
9        A.   Gary Reiner is the executive vice president
10   and chief information officer of General Electric.
11       Q.   Okay.  And it reflects, first of all, a
12   message to you from Gary.
13           Do you see that?
14       A.   Yes.
15       Q.   And it says -- first of all, it says,
16   "Thanks for what appears to be a great success so far
17   in the Hungary implementation.  On a different and
18   more difficult note, the Indirect Procurement
19   solution we are rolling out company-wide, where we
20   are upgrading to 11i, has had a number of P1 Tar's,
21   some of which are still outstanding.  It's causing
22   great frustration."
23           Do you see that?
24       A.   I do.
25       Q.   Okay.  And do you recall being made aware

270

1    of that around the date of this e-mail?
2        A.   Again, I'm -- I can't pinpoint the date,
3    but I certainly remember the issues.
4        Q.   Okay.  And, again, this would have been in
5    your file around the 26th of February 2001?
6        A.   That's correct.
7        Q.   And it was not produced from your file and
8    you cannot explain why; is that right?
9        A.   That's right.
10           MR. SOLOMON:  Let's have marked as the next
11   exhibit a document produced by the defendants with a
12   control number 278006 to 009.
13           (Exhibit No. 61 was marked for
14           identification.)
15           THE WITNESS:  Okay.
16   BY MR. SOLOMON:
17       Q.   Okay.  Do you recognize this?
18       A.   I do not.
19       Q.   Okay.  You will see that it's dated
20   March 20th, 2001 from Gary Reiner to you and Naren
21   Gursahaney.
22           Do you know who Naren Gursahaney is?
23       A.   I do not.
24       Q.   And you have no recollection of receiving
25   this around March 20th, 2001?

271

1        A.   I don't.
2        Q.   And there's a message to you from Gary
3    Reiner followed by a communication between Gary
4    Reiner and Naren Gursahaney, and there's, attached,
5    an article entitled "Oracle Simple Products Making
6    Life Tough."
7            Do you see that?
8        A.   I do.
9        Q.   Did you ever read the article?
10       A.   I read part of it now.
11       Q.   Before now?
12       A.   No.
13       Q.   Now, you recall that in -- at the beginning
14   of March 2000, Oracle announced to the market that it
15   wasn't going to meet its forecast?
16       A.   Say that one more time.
17       Q.   Do you recall that at the beginning of
18   March 2001, Oracle announced to the market that it
19   was not going to meet its three key forecasts?
20       A.   That's correct.
21       Q.   And when Oracle made that announcement, did
22   a securities fraud suit spring to mind?
23           MR. LINDSTROM:  Objection; vague and
24   ambiguous.
25   BY MR. SOLOMON:

272

1        Q.   Did the potential for a securities fraud
2    suit spring to mind?
3        A.   I don't recall.
4            MR. LINDSTROM:  Same objection.
5    BY MR. SOLOMON:
6        Q.   All right.  Are you familiar that when
7    there are unexpected significant drops in the stock
8    price of publicly traded companies in America, there
9    often is a securities fraud lawsuit filed?
10       A.   Yes.
11       Q.   And you were familiar with that in 2001?
12       A.   Yes.
13       Q.   And do you recall, shortly after making
14   that announcement, getting an instruction from your
15   in-house lawyers not to destroy any documents?
16       A.   Yes.
17       Q.   And to preserve documents?
18       A.   Yes.
19       Q.   And this would have been in your file on
20   March 20th, 2001; is that right?
21       A.   Yes.
22       Q.   And it wasn't produced from your file and
23   you can't explain why; is that right?
24       A.   That's right.
25           MR. SOLOMON:  Mark as the next exhibit a

273

1 document produced in the litigation with a control
2 number 618418 to 421.
3 (Exhibit No. 62 was marked for
4 identification.)
5 THE WITNESS: Okay.
6 BY MR. SOLOMON:
7 Q. Okay. Have you ever seen this document
8 before?
9 A. Not that I recall.
10 Q. Okay.
11 A. But I am very familiar with the issues to
12 which it refers.
13 Q. Okay. And you would have been familiar
14 with them around this date in March of 2001?
15 A. I believe so.
16 Q. And on the first page at the bottom, it
17 says, "This is excellent. You should continue to
18 publish these every week until they get fixed. When
19 you see all the names of prospects, it's really
20 sickening -- hopefully Larry will get sick as well
21 and put more pressure on getting this fixed."
22 Do you see that?
23 A. Yes.
24 Q. Have you ever seen that message before?
25 A. Not that I recall.

274

1 Q. Okay. Do you recall having a conversation
2 with Jeff Henley discussing this list?
3 MR. LINDSTROM: The list?
4 MR. SOLOMON: Excuse me.
5 Q. Discussing getting this document published
6 every week?
7 A. No, I do not.
8 Q. Do you know if it was?
9 A. No.
10 MR. SOLOMON: Okay. Let's have marked as
11 the next exhibit a document produced by the
12 defendants with the control number 111294.
13 (Exhibit No. 63 was marked for
14 identification.)
15 BY MR. SOLOMON:
16 Q. Let me know if you recognize it.
17 A. I don't.
18 Q. Okay. You see that it's dated Friday,
19 March 23rd, 2001, and it's an e-mail communication
20 among Sergio Giacoletto, Mark Jarvis, yourself, Safra
21 Catz, Mark Barrenechea?
22 A. Yes.
23 Q. And there's a reference -- I'll just start
24 reading through the document.
25 "Mark," and then in parentheses, "(Jarvis),

275

1 we need your help to counter an increasing number of
2 negative comments on the quality of our applications
3 products. The latest is the attached PUBLIC,"
4 capitals, "note from Forrester of March 19th." But
5 "if this continues it will slow down our sales and
6 the migration of existing customers until 11.5.4 or
7 11.5.5." This is just -- "This has just costed us
8 one loss at a client," exclamation mark,
9 "unfortunately many new prospects listen and believe
10 to" our "analysts."
11 Do you see that language?
12 A. I do.
13 Q. And do you have any idea what client is
14 being referred to as the one that's been lost?
15 A. I do not.
16 Q. And this would have been in your file as of
17 March 23rd, 2001?
18 A. Yes.
19 Q. And it wasn't produced from your files and
20 you cannot explain why; is that right?
21 A. That's right.
22 MR. SOLOMON: I've marked as the next
23 exhibit a document produced by the defendants with
24 the control numbers 054074 through 80.
25 (Exhibit No. 64 was marked for

276

1 identification.)
2 THE WITNESS: Okay.
3 BY MR. SOLOMON:
4 Q. Do you recognize these exchanges?
5 A. I don't recognize them. Again, I'm
6 familiar with the issues.
7 Q. Starting on the first page, there's a
8 number of titles with different addressees with the
9 same title "Urgent Action Required." And then at
10 bottom on the first page, it says, "Folks - Larry
11 seems to be getting very upset with all the
12 escalation's. Please make sure we are focussed on
13 all our escalated customers."
14 Do you see that?
15 A. Yes.
16 Q. And do you recall in late March of 2001
17 being very upset with all the escalations?
18 A. Well, I certainly recall us having
19 escalations and wanted to make sure those customers
20 were getting proper attention, and I asked -- you
21 know, I asked to get daily reports on -- you know,
22 for some of the customers until the problems were
23 fixed.
24 Q. Did you get daily reports?
25 A. I don't think so.

277

1   Q   Why not?
2   A   Well, I think sometimes the status can
3   change from day to day, and I think that's -- some
4   time -- I usually got a report when any -- when there
5   was any progress made or any status change.
6   Q   Let me put it another way.
7       Did you get many escalation reports after
8   this e-mail was sent?
9       MR. LINDSTROM: And are you referring to
10  which e-mail in this chain?
11      MR. SOLOMON: The one that I just read.
12      MR. LINDSTROM: March 26?
13      MR. SOLOMON: Correct.
14      THE WITNESS: It depends what you mean by
15  report. I had regular meetings, regular telephone
16  conversations, e-mail exchanges, so the combination
17  of the above, yes, I got regular reports.
18  BY MR. SOLOMON:
19  Q   Okay. You don't know if they have been
20  produced in this litigation; is that fair?
21  A   I do not know.
22  Q   Do you recall how many escalated customers
23  you were concerned about around this time?
24  A   A handful. You know, less than ten.
25  Q   Now, that doesn't mean there are less than

278

1   ten escalated customers; it's just the ones you were
2   personally concerned about; is that right?
3   A   The ones I was personally -- yeah, there
4   was less than ten that I was personally tracking.
5   Q   And were those particularly big customers?
6   A   No. For example, Papa John's, which is
7   referred to here, is a rather small customer.
8   Q   Don't you reserve your best treatment for
9   your largest customers?
10  A   We certainly pay more attention to
11  customers who give us a lot of money than smaller
12  customers. But in the case of Papa John's, we were
13  delivering a brand-new product, so they were
14  getting -- they were one of the first users of a
15  brand-new product and behooves us to pay a lot of
16  attention to the status of that product.
17  Q   What formal documents, if you know, would
18  be created to deal with an escalation?
19      MR. LINDSTROM: Objection; vague.
20  BY MR. SOLOMON:
21  Q   At this time, in March of 2001?
22      MR. LINDSTROM: Vague and ambiguous as to
23  formal document.
24      THE WITNESS: Again, we have a service
25  request system, you know, where people ask for

279

1   service using an Internet-based system that's -- so
2   everyone will ask for service, and we have lots and
3   lots of requests coming in for service, so we
4   maintain a database on that. If the problem gets
5   very serious, customers are not shy about picking up
6   the telephone and calling.
7   BY MR. SOLOMON:
8   Q   Okay. What's the database called?
9   A   The database is called Metal Link.
10  Q   And do you know whether the Metal Link
11  database was -- the information on the -- on that
12  database was preserved when this litigation
13  commenced?
14  A   I don't -- Metal Link was preserved. I
15  don't know.
16  Q   You just don't remember.
17      If you look at the second page, at the very
18  bottom, there's a reference to "Support's ITS
19  system" -- second page of the document at the very
20  bottom just above where it says "6 TARS."
21  A   Right.
22  Q   What is Support's ITS system?
23  A   I think it stands for Incident Tracking
24  System, which is part -- it's also part of Metal
25  Link.

280

1   Q   Okay. And that would track escalated
2   customers?
3   A   It would.
4   Q   And do you know if the information on --
5   contained within that system was preserved?
6   A   I do not.
7   Q   If you go to the page with the control
8   number 054077, do you recognize this exchange? When
9   I say "this exchange," I'm talking to the -- talking
10  about the March 23rd, 2001 e-mail from you to George
11  Roberts, copying Mark Barrenechea?
12  A   I think I do.
13  Q   And with respect to Papa John, did you get
14  the daily reports that you requested?
15  A   I don't -- I really don't remember.
16  Q   Okay. When you say, "I need a list of the
17  other escalated customers and I need it now," do you
18  see that?
19  A   Yes.
20  Q   Hard to believe you didn't get that list.
21      Did you get that list?
22      MR. LINDSTROM: Objection; argumentative.
23      THE WITNESS: I don't recall. I assume I
24  did. I don't recall.
25  BY MR. SOLOMON:

281

1    Q   When you say you want something and you
2  want it now, you typically get it?
3    A   Not always.  Not always.
4    Q   It goes on to say, "And I need support to
5  resurrect the reports grading whether products are
6  within the agreed quality parameters" --
7    A   Right.
8    Q   -- Mark -- sorry.  "Mike R. is responsible
9  for delivering the reports."
10     Was that instruction carried out?
11    A   Yeah.  Again, I believe so.  We routinely
12  grade our products for -- on quality, counting the
13  number of defects that are in the products.
14    Q   You then go on to say, "We will meet on
15  this on Wednesday to review every escalated customers
16  and every product quality rating."
17     Do you see that?
18    A   Yes.
19    Q   Do you know if that meeting took place?
20    A   Yeah.  There is a regularly scheduled
21  applications meeting every Wednesday which I chair.
22    Q   "Until further notice every Thursday
23  applications meeting will begin with a review of all
24  escalated customers and application product quality."
25     Do you see that?

282

1    A   Yes.  I think at that time --
2     MR. LINDSTROM:  The question is, "Do you
3  see that?"
4     Right?
5     MR. SOLOMON:  Yes, it is.
6    Q   And then you can go on to tell me why it's
7  Thursday and not Wednesday.
8    A   These meetings -- I do see it, and the
9  meetings moved around.  I think, at one point, we had
10  ERP applications on Wednesday and CRM applications on
11  Thursday before the two groups were merged.
12    Q   Okay.  You go on to say, "The only allowed
13  topics will be demo status and internal
14  implementation requirements."
15     Do you see that?
16    A   Yes.
17    Q   And were -- did -- is that what occurred?
18    A   I don't recall.  I believe so.
19    Q   Now, if I wanted to go into the ITS system
20  today to look back at what happened in March of 2001
21  or what was there in 2001, could I do that?
22    A   I don't know.
23    Q   Okay.  The same with Metal Link, generally?
24    A   I think ITS is a part of Metal Link.
25    Q   Okay.

283

1    A   And so I don't know.
2    Q   Okay.  And these exchanges would have been
3  in your file as of March 26, 2001 --
4     MR. LINDSTROM:  Objection; compound.
5  BY MR. SOLOMON:
6    Q   -- is that right?
7     Let's take them one by one, then.
8     The exchanges on the first page where --
9     MR. LINDSTROM:  Where he's not copied?
10     MR. SOLOMON:  Where you are not copied, I
11  guess they wouldn't have been in your file; right?
12     Let's go to the third page of the
13  document -- sorry, the fourth page of the document,
14  which is the control number 054077.
15    A   Yes.
16    Q   That e-mail exchange and that -- by "that"
17  I mean the one dated February -- March 23rd, 2001
18  would have been in your files as of that date?
19    A   Yes.
20    Q   And you can't explain why it wasn't
21  produced in your file?
22    A   That's correct.
23     MR. SOLOMON:  I've marked as the next
24  exhibit a document produced by the defendants in this
25  litigation with the control numbers 061815 to 818.

284

1     (Exhibit No. 65 was marked for
2     identification.)
3     THE WITNESS:  Okay.
4  BY MR. SOLOMON:
5    Q   And do you recognize these exchanges?
6    A   I do not.
7    Q   Okay.  You will see that at the top of the
8  first page you are copied.
9     Do you see that?
10    A   Yes, I do.
11    Q   The date is March 29, 2001 on that e-mail
12  exchange.
13     And it's fair to say this would have been
14  in your file as of March 29th, 2001?
15    A   Yes.
16    Q   And you can't explain why that particular
17  communication wasn't produced from your file?
18    A   That's correct.
19    Q   And then below, you will see that there's a
20  reference to a -- what's referred to as a "solid apps
21  opportunity."
22     Do you see that?
23    A   Yes.
24    Q   Okay.  If you go over to the second page,
25  you will see that there's an e-mail to Ron and Leslie

285

1  from Bill Bagshaw.
2      Do you see that?
3   A   I do.
4   Q   Do you know who Bill Bagshaw is?
5   A   I do not.
6   Q   And do you know who Ron and Leslie are?
7   A   I do not.
8   Q   Then in the middle of that paragraph, it
9   says, "I just want to make you aware that these
10  reports are starting to have a tangible negative
11  affect" (sic) "on our pipelines. The customer who
12  wrote this note just got budget approval for ERP &
13  CRM. They are focused 99% on Oracle. This report
14  now has them second guessing."
15     Do you see that?
16  A   I do.
17  Q   Were you aware of that in late March 2001?
18     MR. LINDSTROM: Aware of what? Vague and
19  ambiguous.
20  BY MR. SOLOMON:
21  Q   Aware of the concern that the reports were
22  causing a potential customer to second-guess?
23  A   Not that I recall.
24  Q   Were you aware of a concern that it was
25  having a negative effect on your pipelines?

286

1   A   Not that I recall.
2   Q   And if you go to the bottom of that page,
3   there's an e-mail from Stephen DeFronzo to Philip
4   Carty.
5      Do you see that?
6   A   I do.
7   Q   Do you know either of those people?
8   A   I do not.
9   Q   Okay. And if you go over the page, part of
10  the message that reads I don't -- "I also don't want
11  to be the first company to install major components
12  of the full CRM/ERP suite. I want evidence the
13  components we will implement from 11i are rock
14  solid."
15     Do you see that?
16  A   I do.
17  Q   And, in fact, as of this time, you couldn't
18  cite one happy referenceable 11i suite customer; is
19  that right?
20  A   I don't believe so, no. I don't think
21  that's right.
22  Q   You don't think that's right?
23  A   I don't think --
24  Q   You think I'm wrong?
25  A   I think you are wrong.

287

1   Q   What about the 5,000 patches; were you
2   aware at that time of the 5,000 patches?
3   A   Yeah. Patches are often enhancements.
4   Q   Just talking about the number.
5      Were you aware that around 5,000 --
6   A   Not 5,000 specifically, no.
7   Q   This -- okay. Thank you.
8      Do you know when you first found a happy
9   referenceable customer for the 11i suite?
10     MR. LINDSTROM: Objection; argumentative,
11  vague and ambiguous as to "found."
12     THE WITNESS: I don't know what the
13  first -- when the first referenceable customer was
14  live.
15     MR. SOLOMON: Okay. Marked as the next
16  exhibit a document with the control numbers --
17  produced by the defendants with the control numbers
18  063478 through 480.
19     (Exhibit No. 66 was marked for
20     identification.)
21     THE WITNESS: Okay.
22  BY MR. SOLOMON:
23  Q   Have you seen this before?
24  A   Not that I recall.
25  Q   You will see that it's dated 26th of March

288

1   2001, and there are communications involving, among
2   others, Mark Jarvis, Safra Catz, Mark Barrenechea,
3   Ron Wohl, and Charles Phillips.
4   A   Yes.
5   Q   If we look at the first page, it begins:
6   "We are being hit on all sides by the press on 11i
7   quality - the bugs in the software (generally quoted
8   as more than 5000 bugs) have started a flurry of
9   press articles about how IBM's approach of
10  integration is better than our approach of soup to
11  nuts."
12     "I think there are several ways to deal
13  with this:
14     "1. We get customers implemented faster.
15  This one's out of my hands.
16     "2. We get the unhappy customers help
17  asap. Larry's focus on this should help us along.
18     "3. We find some happy, referenceable
19  customers. I need considerable assistance from sales
20  account management for this. We'll then use these
21  customers in ads, a la BellSouth."
22     Do you see that?
23  A   I do.
24  Q   Were you aware at the end of March 2001
25  that Mark Jarvis was making these recommendations?

289

1     MR. LINDSTROM:  The three you just read or
2  the four detailed in Exhibit 66?
3     MR. SOLOMON:  The three that I just read.
4     THE WITNESS:  Not specifically, no.
5  BY MR. SOLOMON:
6     Q    And wasn't it a fact that as of this date,
7  you had been unable to find any happy, referenceable
8  11i suite customers?
9     A    Absolutely untrue.
10    Q    Okay.  And isn't it a fact that as of this
11  date, there were fundamental integration problems
12  between ERP and CRM?
13    A    There were certainly integration problems,
14  but I wouldn't call them fundamental.  They were
15  fixed.  If they were fundamental, they couldn't be
16  fixed.
17    Q    And although I note your objection to the
18  language, isn't it also true that there were
19  fundamental integration problems not just between ERP
20  and CRM, but within each?
21    A    I would say there were problems.  I mean,
22  connecting all these pieces together there definitely
23  were bugs; there were lots of new code.  But none of
24  the problems were fundamental; all the problems were
25  fixed.

290

1     Q    And when were all the problems fixed?
2     A    Let me be careful.  All the problems are
3  never fixed in software, so let me be cautious about
4  my language.
5        I think -- I think the software just gets
6  progressively more reliable and functionally richer,
7  so we still have integration issues today.  The -- we
8  are never -- yeah, we are never as good as we could
9  be, but we -- the software is working well for -- you
10  know, for a number of customers, and we were able to
11  locate -- have plenty of, you know, happy customers.
12    Q    Okay.  Let me ask -- sorry, go on.
13    A    No, go ahead.
14    Q    I was going to say, When did the
15  fundamental problems go away?
16    A    There were no fundamental problems.
17    Q    Okay.  At the bottom, it says Safra Catz
18  wrote, and I don't see anything that Safra Catz
19  wrote.
20        Do you know -- can you shed any light on
21  that?
22    A    She could -- she could just forward a
23  document with no comments on the forwarding.
24    Q    Below that, it's a -- there's an e-mail
25  from Charles Phillips, and Charles Phillips is now

291

1  employed by you, your company; correct?
2     A    Yes, he is.
3     Q    And is he the No. 2 at the company; is that
4  how you would describe him?
5     A    He and Safra are co-presidents, so they are
6  the co-No. 2 people in the company.
7     Q    And he used to work for Morgan Stanley?
8     A    Yes.
9     Q    And he covered Oracle during this period?
10    A    He was the No. 1 technology analyst, I
11  think, for ten years.
12    Q    And did you have regular conversations with
13  him while he was the analyst?
14       MR. LINDSTROM:  And by "you," you mean
15  Mr. Ellison?
16       MR. SOLOMON:  Mr. Ellison, yeah.
17       THE WITNESS:  Regular.  I probably talked
18  to Charles couple times a year.
19  BY MR. SOLOMON:
20    Q    Okay.  Was there someone who was the
21  regular interface?
22    A    I think Charles made a point of talking to
23  lots of different people, so he got a broad
24  perspective.
25    Q    Okay.  Including Jeff Henley?

292

1     A    I'm sure including Jeff Henley.
2     Q    Charles Phillips writes, in part -- I'm on
3  the second page of the exhibit, and around halfway
4  through his message, he says:  But I'm hearing from
5  multiple sources including the user group members and
6  Oracle employees about the stability of the product.
7  I think it's improved since much of this was written
8  but not many people know that -- know that and all
9  the early adopters have plenty of horror stories they
10  are willing to share with whomever may call.
11       Did you know that around -- at the end of
12  March 2001 that it was Mr. Phillips' view that there
13  were plenty of horror stories being shared by the
14  early adopters?
15    A    What he said was the early adopters had
16  more problems and that the problems are largely
17  behind us, at least that's what he's saying.  But
18  people remember -- people remember the problems and
19  are talking about them.  That's what he said.
20    Q    But he does refer to horror stories,
21  doesn't he?
22    A    I think -- I think that's a metaphorical
23  reference to problems that they had.
24       MR. LINDSTROM:  The question was whether
25  you were aware that he was expressing this viewpoint

293

1 at the time.
2 　　　Right?
3 　　　MR. SOLOMON: That's right.
4 　　　THE WITNESS: I don't recall.
5 BY MR. SOLOMON:
6 　　Q　Okay. It goes on to say: It's worth
7 deploying corporate level consulting resources to get
8 them happy ASAP to turn them into proponents instead
9 of critics. A few of the reps I spoke with don't
10 have the condense to push CRM because of the quality
11 issues in the past.
12 　　　Do you see that?
13 　　A　I do.
14 　　Q　And were you aware at the time that
15 Mr. Phillips was of the view that there were reps who
16 didn't have confidence in CRM and, therefore, weren't
17 purchasing?
18 　　A　I don't recall.
19 　　　MR. SOLOMON: Marked as the next exhibit a
20 document produced by Oracle with the control number
21 094109.
22 　　　(Exhibit No. 67 was marked for
23 　　　identification.)
24 BY MR. SOLOMON:
25 　　Q　Do you recognize this?

294

1 　　A　I don't.
2 　　Q　You see it's dated Monday, the 9th of April
3 2001, and it's to you and some others from Mark
4 Barrenechea?
5 　　A　Yes.
6 　　Q　And it would have been in your file as of
7 that date?
8 　　A　Yes.
9 　　Q　And it wasn't produced from your file and
10 you can't explain why?
11 　　A　That's correct.
12 　　Q　It refers to a very escalated situation
13 with Value Vision.
14 　　　Do you see that?
15 　　A　I do.
16 　　Q　Are you familiar with that?
17 　　A　Not really.
18 　　　MR. SOLOMON: I've marked as the next
19 exhibit another document produced by defendants with
20 the control numbers 094110 to 111.
21 　　　(Exhibit No. 68 was marked for
22 　　　identification.)
23 　　　THE WITNESS: Okay.
24 BY MR. SOLOMON:
25 　　Q　Do you recognize this?

295

1 　　A　Again, I don't recognize it. I remember
2 the issues that it refers to.
3 　　Q　And this would have been in your file
4 around April 13, 2001?
5 　　A　That's right.
6 　　Q　And it wasn't produced from your file and
7 you cannot explain why; is that right?
8 　　A　That's right.
9 　　Q　Did Mr. Rawlings make the call that's
10 referred to at the top of this message?
11 　　A　I don't recall.
12 　　　MR. SOLOMON: Okay. I've marked as the
13 next exhibit a document produced by the defendants
14 with the control numbers 061370 to 372.
15 　　　(Exhibit No. 69 was marked for
16 　　　identification.)
17 　　　THE WITNESS: Okay.
18 BY MR. SOLOMON:
19 　　Q　Okay. Do you recognize this?
20 　　A　I don't, but I'm very familiar with the
21 issues to which it refers.
22 　　Q　Okay. And it would have been in your files
23 around April 19, 2001?
24 　　A　Yes.
25 　　Q　And it wasn't produced from your file and

296

1 you cannot explain why?
2 　　A　That's right.
3 　　　MR. SOLOMON: Okay. Marked as the next
4 exhibit a document produced by the defendants with
5 the control number 062005.
6 　　　(Exhibit No. 70 was marked for
7 　　　identification.)
8 　　　THE WITNESS: Okay.
9 BY MR. SOLOMON:
10 　　Q　And do you recognize this?
11 　　A　I do not.
12 　　Q　Okay. It would have been in your file
13 around April 24, 2001?
14 　　A　Yes.
15 　　Q　And it wasn't produced from your file and
16 you cannot explain why?
17 　　A　That's right.
18 　　Q　And you will see, it says, "We now have,"
19 and then it lists some customers, "Live with 11 i -
20 Mark."
21 　　　Do you see that?
22 　　A　I do.
23 　　Q　So, first of all, was HP live on 11i as of
24 this date?
25 　　A　I don't know.

297

1    Q   Was BellSouth?
2    A   I don't know.
3    Q   Was Toshiba?
4    A   I don't know.
5    Q   Cut this short.
6        Do you know if any of them were?
7    A   No.
8        MR. SOLOMON: Thank you.
9        Have marked as the next exhibit a document
10   produced by the defendants with a control number
11   619342.
12       (Exhibit No. 71 was marked for
13       identification.)
14       THE WITNESS: Okay.
15   BY MR. SOLOMON:
16   Q   Do you recognize this?
17   A   I do not.
18   Q   Okay.  It would have been in your file as
19   of April 26, 2001?
20   A   Yes.
21   Q   And it wasn't produced from your file and
22   you cannot explain why?
23   A   That's right.
24   Q   Did you issue any instruction in the spring
25   of 2001 to the effect that exceptional discounting to

298

1    clients would only be approved if the client agreed
2    to be a reference?
3    A   I don't recall.
4    Q   Are you aware of anyone issuing that
5    instruction?
6    A   Don't recall.
7        MR. LINDSTROM: In the same time frame?
8        MR. SOLOMON: In the same time frame.
9        THE WITNESS: Don't recall.
10   BY MR. SOLOMON:
11   Q   Did -- were you aware in the spring of 2001
12   that problems with 11i had prevented GE from closing
13   its April books?
14       MR. LINDSTROM: Objection; assumes a fact.
15       THE WITNESS: I don't believe that
16   happened.
17       MR. SOLOMON: Let's have marked as the next
18   exhibit a document produced by the defendants with a
19   control number 971508.
20       (Exhibit No. 72 was marked for
21       identification.)
22       THE WITNESS: Okay.
23   BY MR. SOLOMON:
24   Q   Okay.  Do you recognize this?
25   A   I do not.

299

1    Q   Okay.  And do you see that there's a
2    reference at the bottom and a exchange between
3    Kirsten Shaw and Madhu and Anne that GE has not
4    closed the April books?  Do you see that?
5    A   I do.
6    Q   Am I mistaken in reading from this that
7    there was a problem with your product that caused
8    that?
9    A   GE closed their books in April.  There's no
10   way GE didn't close their books in April.
11   Q   Okay.  How is it you know that?
12   A   I think everyone would have known if GE
13   hadn't closed their books.
14   Q   Okay.
15   A   They are a public company.
16   Q   Okay.
17   A   I'm sure Gary Reiner would have called me
18   on the phone.
19   Q   So as far as you know, this is simply a
20   mistake?
21   A   Yeah.  I'm sure there were -- I believe
22   there were problems as described here, but I'm sure
23   General Electric found a way to close the books in
24   spite of the problems.
25       MR. SOLOMON: Okay.  So marked as the next

300

1    exhibit a document produced by the defendants with
2    the control numbers 121542 through 580.
3        (Exhibit No. 73 was marked for
4        identification.)
5        MR. SOLOMON: This is a rather lengthy
6    exhibit.  I don't intend going into detail, so what I
7    would like to know, when you get a chance to look at
8    it, is whether you recognize it before without
9    necessarily going into all the detail.
10   A   Okay.
11       MR. LINDSTROM: And, Mark, the question is,
12   Does he recognize this particular exhibit that's been
13   marked as 73, or is he familiar with the form of the
14   report that's attached, or --
15       MR. SOLOMON: Does he recognize having seen
16   this before.
17       MR. LINDSTROM: The precise document that's
18   before him.
19       MR. SOLOMON: Correct.
20       MR. LINDSTROM: Thank you.
21       THE WITNESS: I've seen reports like this
22   before, but I don't recall seeing this specific
23   report.
24   BY MR. SOLOMON:
25   Q   Okay.  It would have been in your files as

Ellison, Lawrence  9/21/2006  10:57:00 AM

301

1  of May 21, 2001; is that right?
2      A    Yes.
3      Q    Okay.  And it wasn't produced from your
4  files and you cannot explain why?
5      A    That's correct.
6          MR. SOLOMON:  Okay.  Let's go off the
7  record for two minutes while we change tapes.
8          THE VIDEOGRAPHER:  This marks the end of
9  Tape 1 in Volume 2 of the deposition of Larry
10  Ellison.
11          At 11:35, going off the record.
12          (Recess taken.)
13          THE VIDEOGRAPHER:  On record at 11:37.
14  This marks the beginning of Tape 2,
15  Volume 2, in the deposition of Larry Ellison.
16          MR. SOLOMON:  We have marked as the next
17  exhibit a document produced by the defendants with
18  the control numbers 184342 through 360.
19          (Exhibit No. 74 was marked for
20          identification.)
21  BY MR. SOLOMON:
22      Q    And I'm not going to go into much detail,
23  Mr. Ellison.  I just want you to take a look at it
24  and tell me if you recognize this document?
25      A    Okay.

302

1      Q    Okay.  Do you recognize this?
2      A    I do.
3      Q    Okay.  And it's a document that would have
4  been in your files?  "Yes" or "no"?
5      A    I don't see an e-mail associated with this,
6  so I can't -- okay.  There's one -- if there's not an
7  e-mail header on it --
8      Q    Okay.
9      A    -- so I can't really tell.  I mean, it
10  looks like it was sent to me and looks like I
11  responded, but looks like the header is missing.
12      Q    Okay.  And at the top, that's you saying,
13  "I don't want to do this unless GE agrees to us
14  publicly referencing them as a customer and
15  indicating how long the implementation took and how
16  much they saved.  Larry."
17          Do you see that?
18      A    That's what I said.
19      Q    And what happened?
20      A    GE wouldn't agree, and we approved the deal
21  anyway.  GE just never let's -- virtually never let's
22  themselves be used as references for any of their
23  vendors.
24      Q    This wasn't produced from your file.  You
25  don't know why; is that true?

303

1      A    I don't -- again, there's no e-mail header,
2  but, yeah, I don't know.
3          MR. SOLOMON:  I've marked as the next
4  exhibit a document produced by the defendants with
5  the control numbers 121355 through 359.
6          (Exhibit No. 75 was marked for
7          identification.)
8          THE WITNESS:  Okay.
9  BY MR. SOLOMON:
10      Q    Do you recognize this?
11      A    Again, I don't recognize the specific
12  document, but I'm very familiar with the issues it
13  discusses.
14      Q    Okay.  And this would have been in your
15  file on the 3rd of June 2001?
16          I guess I should be more precise.
17          The first exchange on the first page, at
18  the top of the page, would have been in your file as
19  of the 3rd of June of 2001?
20      A    I think I authored this, and I don't know
21  if I sent a copy to myself.
22      Q    Okay.
23      A    So perhaps not.
24      Q    Okay.  And it says that you want a detail
25  postmortem concerning Tropicana.

304

1          Do you see that?
2      A    Yes.
3      Q    And did that detailed postmortem take
4  place?
5      A    Yes, it did.
6      Q    And were any documents created concerning
7  that postmortem?
8      A    I don't recall.
9      Q    And in any event, you can't explain why
10  this particular exchange wasn't produced from your
11  files; is that right?
12          MR. LINDSTROM:  Objection --
13          THE WITNESS:  Well, again, as I --
14          MR. LINDSTROM:  -- mischaracterizes his
15  testimony.
16          THE WITNESS:  -- said earlier, the
17  header -- the header -- it's from me.  Clearly I'm
18  including other stuff.
19  BY MR. SOLOMON:
20      Q    Did you understand as of the 3rd of June
21  2001 that you were under an obligation to preserve
22  exchanges such as this one concerning Tropicana?
23          MR. LINDSTROM:  No foundation, assumes
24  facts.
25          THE WITNESS:  I don't know what date the

305

1  document preservation order came out.
2  BY MR. SOLOMON:
3      Q    Okay.
4      A    And I'm just looking for my name --
5      Q    Okay.
6      A    -- on any of these other than as an author.
7      Q    I don't think -- I think you were only on
8  that first page as the author, as far as I can see.
9      A    And if I didn't send a copy to myself, then
10  it wouldn't be in my file.
11      MR. SOLOMON:  Okay.  Have marked as the
12  next exhibit a document produced by the defendants
13  with a control number 376443.
14      (Exhibit No. 76 was marked for
15      identification.)
16      THE WITNESS:  Okay.
17  BY MR. SOLOMON:
18      Q    Okay.  Do you recognize this?
19      A    I do not.
20      Q    Okay.  And you will see that, at the top,
21  it says, "Stephanie, GE, Honeywell, and Agere are not
22  live yet."
23      Do you see that?
24      A    Yes.
25      Q    Were you aware, as of beginning of June

306

1  2001, that those three customers were not live?
2      A    GE has lots and lots of systems.  I'm not
3  sure what their -- what they mean when they say GE
4  isn't live yet.
5      Q    And Honeywell?
6      A    I'm not familiar with Honeywell or Agere.
7      Q    Okay.
8      A    In fact, down below, it says GE Aircraft --
9      Q    Okay.
10      A    -- as opposed to GE Power or GE Medical.
11      Q    Okay.  Did you know at that time -- I'm
12  talking about June 2001 -- where Alcoa was with their
13  implementation?
14      A    I don't recall.
15      Q    Okay.  And did you know that UPS was live
16  but was experiencing issues and, hence, was not
17  referenceable?
18      MR. LINDSTROM:  Objection; assumes facts.
19      THE WITNESS:  I don't -- no, I did not.
20      MR. SOLOMON:  Okay.  So we have marked as
21  the next exhibit document produced by the defendants
22  with the control numbers 162213 through 16.
23      (Exhibit No. 77 was marked for
24      identification.)
25      THE WITNESS:  Okay.

307

1  BY MR. SOLOMON:
2      Q    Okay.  So this is dated 7th of June 2001
3  from Sergio Giacoletto to Mark Barrenechea, copied a
4  number of people, including yourself?
5      A    Yes.
6      Q    And subject is "CRM Business Update - my
7  feedback."
8      You see that on the first page?
9      A    Yes.
10      Q    And then skipping the second page onto the
11  third page, it begins, at the top, "Mark, I also
12  disappointed by the results," ellipsis, "but,"
13  ellipsis, "as you know, we had six to nine months of
14  product issues which caused loss of confidence by
15  sales, partners, analysts and customers.  Even as of
16  today, R11.5.4, which is the first stable release
17  is," and then in capitals, "NOT AVAILABLE in local
18  language and we will only get it between July and
19  October 2001.  This continued delay between the
20  American English release and the local language is
21  hurting us."
22      Do you see that?
23      A    I do.
24      Q    And were you aware, as of June 2001, that
25  local languages, other than the American English

308

1  release, still were not available?
2      A    Local languages were available; they just
3  weren't available for -- there's a delay -- they
4  weren't available for the latest release.
5      Q    Okay.  But it's your testimony that they
6  were -- they were available for all the prior
7  releases as of that date?
8      A    I don't know offhand about all the prior
9  releases, but there was a delay -- whenever a new
10  release comes out, like 11.5.4, it comes out first in
11  American English which then goes into translation.
12      Q    Okay.  And this would have been in your
13  files as of June 7, 2001?
14      A    Yes.
15      Q    And you cannot -- and it wasn't produced
16  from your file and you cannot explain why; is that
17  right?
18      A    That's correct.
19      MR. SOLOMON:  Have marked as the next two
20  exhibits, the first exhibit document produced by the
21  defendants with the control numbers 121067 through
22  095, and the second exhibit produced by the
23  defendants with the control numbers 121145 through
24  175.
25      (Exhibit Nos. 78 and 79 were marked for

Ellison, Lawrence  9/21/2006  10:57:00 AM

309

1    identification.)
2  BY MR. SOLOMON:
3    Q    Again, Mr. Ellison, these are lengthy
4  exhibits, and I don't intend to examine you in detail
5  about them, but I would like to ask you first if you
6  recognize them.
7    A    Okay.
8    Q    And looking at the first exhibit, it's
9  dated Monday, the 11th of June 2001?
10   A    Yes.
11   Q    Do you see that?
12        And you will see that you are involved in
13 an exchange from you -- excuse me, from Mike Runda to
14 you and to others.
15        You see that?
16   A    I do.
17   Q    Do you know who Mike Runda is?
18   A    I don't.
19   Q    And do you recognize the document?
20   A    I do -- well, I recognize that the -- not
21 the specific instance of the document, but it's a
22 list of escalated customers.
23   Q    And you don't dispute this would have been
24 in your file in mid-June 2001?
25   A    I do not.

310

1    Q    Okay.  And it wasn't produced from your
2  file and you cannot explain why; is that right?
3    A    That's right.
4    Q    And with respect to the second similar
5  exhibit dated Monday, the 18th of June 2001, this
6  would have been in your file as of that date;
7  correct?
8    A    Yes.
9    Q    And it wasn't produced from your file and
10 you cannot explain why; is that correct?
11   A    That's correct.
12   Q    Going to the June 11th --
13        MR. LINDSTROM:  Is that Exhibit 78?
14 BY MR. SOLOMON:
15   Q    Is that June 11th?  Sorry, Mr. Ellison.
16   A    Yes, it is.
17   Q    Thank you very much.
18        You will see, at the bottom of the page,
19 121078.
20   A    Okay.
21   Q    Another reference to a customer not being
22 able to close its books.
23        Do you see that?
24   A    I do.  This time it's AT&T that can't close
25 its books.

311

1    Q    And were you aware of an issue as reflected
2  here concerning AT&T and their inability to close
3  several books?
4    A    I believe -- again, I'm sure -- I'm sure
5  there's a problem that's being logged here.  I'm also
6  quite certain that AT&T was able to close its books.
7    Q    At some stage?
8    A    Certainly in time for public reporting
9  and -- yes.
10   Q    It also says, if you look over the page,
11 that you are negotiating.  It says, "Mr. Larry
12 Ellison will be negotiating with AT&T over the next
13 few days on this matter."
14        Do you see that?
15   A    I do.
16   Q    Did you negotiate with AT&T?
17   A    Oracle is in the process of a $60 to 70
18 million CRM deal with AT&T.  I mean, that's -- we
19 never had a deal remotely like that with AT&T.
20   Q    So is it --
21   A    And I don't remember us ever negotiating a
22 deal remotely like that with AT&T, or anybody else
23 for that matter.
24   Q    Do you remember ever negotiating a deal
25 with AT&T?

312

1    A    I do, actually, but it was probably 30
2  years ago when Oracle was very small.
3    Q    Okay.  Is that what put you off
4  negotiating?
5    A    Not very good at it.
6    Q    Have you ever accessed the ECMS database?
7    A    I'm not even sure what -- what is the ECMS
8  database?
9    Q    It's for escalated customers.
10        MR. LINDSTROM:  Has he ever accessed it
11 himself?
12        THE WITNESS:  Directly, no.  No, I'm not
13 familiar with that term.
14 BY MR. SOLOMON:
15   Q    Okay.  If you look at the middle of the
16 first page on both exhibits, I believe --
17   A    Right.
18   Q    -- there's a reference to -- actually, I
19 apologize.  I'm looking at the one dated June 11th.
20        There's a reference to "Customer Care ECMS
21 System."
22        Do you see that in the middle of the page?
23 It starts: "The URL for this report"?
24   A    Yes.
25   Q    And you are not familiar with Customer Care

313

1 ECMS System?
2   A   I'm not familiar with that term.  Again, I
3 think it's all part of a database that's -- I think
4 they are all reports on a database called Metal Link.
5   Q   Okay.
6   A   I believe, but I'm --
7   Q   Okay.  Is it true that as of the end of
8 August 2001, Oracle was going through a rough patch
9 because the 11i had not been working?
10     MR. LINDSTROM:  Objection; vague and
11 ambiguous.
12     THE WITNESS:  No.  11i worked.  I mean, 11i
13 was a relatively new and very large, complicated
14 product, and we had a number of customers that were
15 experiencing issues.  It had lots of new features.
16     MR. SOLOMON:  Okay.
17     THE WITNESS:  And not lots of new
18 components.
19 BY MR. SOLOMON:
20   Q   Okay.  Would you agree with the following:
21 "We are going through a rough patch because 11i did
22 not work (but it does now), we missed two quarters
23 and we pissed off a lot of customers with the apps
24 upgrade to 11i"?
25   A   I mean, saying 11i does not work certainly

314

1 is not the case.  It certainly had bugs, but --
2   Q   Okay.  Who was Mark Jarvis?
3   A   Mark Jarvis was our head of marketing at
4 the time.
5   Q   Was he familiar with your products, with
6 Oracle's products?
7   A   I mean, he wasn't an engineer; he was --
8 again, he was a marketing guy.
9   Q   Okay.
10   A   So he didn't have the kind of detailed
11 knowledge an engineer might have, but he was familiar
12 in a marketing sense.
13   Q   Did he know if your products worked or not?
14   A   It's just -- I mean, I guess you -- I don't
15 want to go into this.  It's a complicated system --
16 it's a very large, complicated system.  The airplane
17 flew just fine.  Maybe the seat backs got stuck up,
18 but -- I'm sorry to use the metaphor, but the system
19 worked.  We had plenty of happy customers, plenty of
20 live customers.  That's not to say that we didn't
21 have bugs and unhappy customers.  We did happen to
22 have those too.
23     MR. SOLOMON:  Okay.  So marked as the next
24 exhibit a document produced by the defendants with
25 the control numbers 062223 and 24.

315

1     THE WITNESS:  Are we finished with these
2 two exhibits?
3     MR. SOLOMON:  Yes, we are.  Thank you.
4     (Exhibit No. 80 was marked for
5     identification.)
6     THE WITNESS:  Okay.
7 BY MR. SOLOMON:
8   Q   Do you recognize this?
9   A   I don't.
10   Q   And you will see that it's from Mark Jarvis
11 to Benny Souder, copying Andrew Mendelsohn, dated
12 August 30th, 2001?
13   A   Yes.
14   Q   Do you know who Andrew Mendelsohn is?
15   A   I do.
16   Q   Who is he?
17   A   He's head of our database department.
18   Q   And Benny Souder?
19   A   I believe he was an engineer in
20 applications, but I'm not -- he's moved into several
21 different -- I know who he is.  He's moved into
22 several different groups.  I'm not sure what job he
23 had at this time.
24   Q   Okay.  I'm looking at the second paragraph
25 of that e-mail.  It says, "We are going through a

316

1 rough patch because 11i did not work (but it does
2 now), we missed two quarters and we pissed off a lot
3 of customers with the apps upgrade to 11i.  That is
4 what the press like to cover."
5     Do you see that?
6   A   I do.
7   Q   Do you agree with those sentiments?
8   A   Well, no.  I think -- 11i did not work.
9 11i -- if he rewrote it and said, "11i had problems.
10 It has a lot fewer problems now," then I would agree
11 with it.
12     MR. SOLOMON:  Okay.  I'm going to have
13 marked as the next exhibit a document produced by the
14 defendants with the control numbers 397378 through
15 380.
16     (Exhibit No. 81 was marked for
17     identification.)
18     THE WITNESS:  Okay.
19 BY MR. SOLOMON:
20   Q   Have you ever seen this before?
21   A   Never.
22   Q   Do you recognize any of the handwriting?
23   A   No.  No.
24   Q   Okay.  And you have no idea who authored
25 this; is that true?

317

1        MR. LINDSTROM:  I'm sorry.  Could we have
2   the question reread.
3   BY MR. SOLOMON:
4        Q    Who authored it?  Do you have any idea who
5   authored it?
6        A    Yeah, I do.
7        MR. LINDSTROM:  Let me just clarify the
8   question.
9        When you say "authored," you are talking
10  about the typewritten text that appears in
11  Exhibit 81?
12       MR. SOLOMON:  I'm going to ask both
13  questions.
14       MR. LINDSTROM:  All right.
15  BY MR. SOLOMON:
16       Q    The typewritten text, first of all.
17       A    Yeah, I think so.
18       Q    You know who authored it?
19       A    I don't know, but I can make a pretty good
20  guess.
21       Q    Okay.  Who?
22       A    Siebel Systems.
23       Q    And you don't know who authored the
24  handwritten notes?
25       A    No.

318

1        Q    Okay.  And it says --
2        A    Siebel Systems before we bought them.
3        Q    They wouldn't say that now.
4        A    They would not.
5        Q    So it says, at the top, "Oracle announced a
6   total of 12 new and/or live CRM customers following
7   its fiscal year '02 first quarter earnings call."
8        A    Right.
9        Q    "Upon further investigation, Oracle's CRM
10  customer claims fall into four categories," and the
11  first is "Complete Fabrication."
12       A    Right.
13       Q    The second is "Creative Reclassification of
14  Revenue."  The third is "Irrelevant," and the fourth
15  is "Verified."
16       Do you see that?
17       A    Yes.
18       Q    So the first one says, "Oracle CRM Claim:
19  Unisys."
20       Did Oracle claim that Unisys was a 11i
21  customer?
22       A    I don't -- I don't recall.
23       Q    Okay.  Do you recall selling any CRM
24  software to Unisys?
25       A    I do not.  I cannot recall the specifics of

319

1   what systems we sold Unisys.
2        Q    Okay.  How about the next one; "Oracle CRM
3   Claim:  British Telecom"?
4        A    We sell a lot of stuff to Unisys and a lot
5   of stuff to British Telecom.
6        Q    Okay.
7        A    But I can't remember specifically what was
8   sold on what date.
9        Q    Okay.  And just for that reference to
10  British Telecom there, you don't know whether there
11  was a representation by Oracle prior to this document
12  being created that it had sold British Telecom CRM?
13       A    I don't know.
14       Q    Okay.  What about POSCO; it says "Oracle
15  CRM Claim:  POSCO."  Did POSCO purchase Oracle CRM?
16       A    I believe they have, but I just -- I can't
17  tell you what date they purchased CRM --
18       Q    Okay.  So you can't say that they --
19       A    No --
20       Q    -- purchased it as of the date of this
21  document?
22       A    No, I can't.
23       Q    What about the reclassification of revenue;
24  do you have any knowledge of any reclassification of
25  revenue with respect to Pitney Bowes?

320

1        A    Siebel has accused SAP and Oracle of
2   reclassifying revenue to make our CRM sales look
3   larger than they really are, and Oracle certainly
4   doesn't do that.
5        Q    And never did?
6        A    Not to my knowledge.
7        Q    Do you know anything about the "Oracle CRM
8   Claim:  Kyocera"?
9        A    It's a Japanese copier company.  I don't --
10  again, we sell them a lot of things, but I can't tell
11  you what we sold them and when we sold them.
12       Q    Okay.  The Oracle CRM claim relating to
13  Dell, do you know anything about that?
14       A    The same answer.  I just can't tell you.
15  Dell uses some of our CRM, and all of our -- yeah, a
16  lot of our ERP and a lot of our supply chain, but I
17  can't -- and the standardized in our database, but I
18  just can't tell you the dates they bought the stuff.
19       Q    Did you engage in swap transactions with
20  Dell?
21       MR. LINDSTROM:  Objection; calls for a
22  conclusion, vague and ambiguous.
23       THE WITNESS:  Not that I know of.
24  BY MR. SOLOMON:
25       Q    What about Oracle CRM claim with Toshiba

Ellison, Lawrence  9/21/2006  10:57:00 AM

321

1  Medical; do you know anything about that?
2      A    It will be the same answer.  You know,
3  Toshiba is a big customer of ours.  They buy a lot of
4  applications in technology.
5      Q    Okay.
6      A    But I can't tell you the dates that they
7  bought it.
8      Q    Okay.  And would you say -- would it be the
9  same answer with respect to the next customer,
10  Cochlear Limited?
11      A    I'm unfamiliar with Cochlear.
12      Q    Unfamiliar?
13      A    I just don't know that company.
14      Q    And you will see, on the following page,
15  there is a "Verified" deal.
16          Do you know anything about that?
17      A    I'm not familiar -- I'm not familiar with
18  that company.
19          MR. SOLOMON:  Okay.  Thank you.
20          Have marked as next exhibit a document
21  produced by the defendants with the control numbers
22  062376 through 393.
23          (Exhibit No. 82 was marked for
24          identification.)
25          THE WITNESS:  Kind of hard to read.

322

1          MR. SOLOMON:  Okay.
2          THE WITNESS:  I'll stop.
3          MR. SOLOMON:  Okay.  I'll probably be able
4  to get to that bit --
5          THE WITNESS:  Yeah.
6          MR. SOLOMON:  -- but it's narrow.
7      Q    First of all, do you recognize this
8  document?
9      A    I do not.
10      Q    Okay.  It's dated October 23, 2001 on
11  the -- at the top of the first page, and there's an
12  exchange among Mark Jarvis, Julie Gibbs, and some
13  individuals who were copied.
14          And at the bottom, there's an e-mail dated
15  the 18th of September 2001, and it's an exchange from
16  Mark Jarvis to Paul Burrin.
17          Then over the page, there's another
18  exchange -- there are more exchanges, excuse me,
19  dated September 18, 2001.
20          Do you see those exchanges?
21      A    What page are you on?
22      Q    I'm just -- I'm looking at the first page,
23  the second page, and the first half of the third
24  page, pretty much.
25      A    Yes.

323

1      Q    Okay.  I'm on the third page of the
2  exhibit, looking halfway down where it says
3  "Val/Csaba."
4          Do you see that?
5      A    Third page of the exhibit?
6      Q    Third page, yeah.
7      A    Yeah.
8      Q    And it says, "Can you please let me know
9  who you are working with on the Press Releases at GE
10  Power?  I need to know the specific person in case GE
11  in the US brings this up.  There have been concerns
12  in the past that we have used their name without
13  proper approval.  We are in negotiations for a
14  significant deal and we need to be aware of the
15  account activity."
16          Do you see that?
17      A    I do.
18      Q    It said, "Thanks for your help, Keith."
19          Do you know who the Keith is?
20          MR. LINDSTROM:  Keith Garver?
21          THE WITNESS:  Looks like Keith Garver, but
22  I don't know who Keith Garver is.
23  BY MR. SOLOMON:
24      Q    And then further up the page, Val Russell
25  writes:  "Keith, we are cognizant of the restrictions

324

1  in using the GE name and Christine Englund and Corp
2  Pr are in the loop.  Please see my next note."
3          Do you see that?
4      A    I do.
5      Q    Do you know who Val Russell is?
6      A    I do not.
7      Q    And just, again, up to the top of the page,
8  it says, "Thank you for the response.  GE Power has
9  asked that we not use their name as a reference even
10  if we are using previously approved information, so
11  we need to be very careful.  I know you are aware of
12  this, but we cannot send" out -- "send our" -- I
13  think it means out -- "any press release without
14  their approval.  They have been very clear on this
15  issue."
16          Do you see that?
17      A    Yes.
18      Q    Okay.  And then on the second page, in the
19  middle, there's another reference to the reference
20  issue.  It says, "Paul, I continue to receive
21  messages from the GEPS Account Team with request to
22  remove GEPS as a reference from Oracle.com.  Mark
23  Jarvis requested that we retain the reference until
24  we receive a direct request from GEPS."
25          Do you see that?

325

1    A   I do.
2    Q   Now I'm looking at the bottom of the first
3  page and the top of the second, and it says, "Larry's
4  directive was that we would not remove GE as a
5  reference until they stopped using our software."
6        Do you see that?
7    A   Yes.
8    Q   Is that accurate?  Did you issue a
9  directive not to remove GE as a reference until they
10  stopped using Oracle software?
11    A   I did.
12    Q   And was that directive adhered to?
13    A   I think so.
14    Q   Okay.  And why did you issue that
15  directive?
16    A   The -- again, I was the corporate sponsor
17  at GE.  They are a very important customer.  They are
18  arguably the most respected corporation in the United
19  States.
20    Q   Other than Microsoft; right?
21    A   Other than Microsoft.  Even more respected
22  than Microsoft, and Microsoft is not a very big
23  customer of ours.  And it was important -- it was
24  very important -- we made a huge effort in a variety
25  of GE divisions to help them be successful, and we

326

1  thought it was legitimate for us to disclose the fact
2  that we were, you know, the standard -- application
3  standard at GE.  So GE always -- you know, GE didn't
4  like being used as a reference.  Or more precisely,
5  GE would like some quid pro quo in exchange for being
6  used as a reference.
7        So they would say -- so I decided just to
8  put them on Oracle.com and leave them there even if
9  they weren't entirely happy with it.  And I told them
10  that.
11        MR. SOLOMON:  Thank you.
12        Have the next document marked as --
13        What exhibit number are we on, please?
14        THE REPORTER:  We are on Exhibit 83.
15        MR. SOLOMON:  Exhibit 83, and that was
16  produced by the defendants with the control numbers
17  059745 to 47.
18        (Exhibit No. 83 was marked for
19        identification.)
20        THE WITNESS:  Okay.
21  BY MR. SOLOMON:
22    Q   Okay.  Do you recognize this?
23    A   I do.
24    Q   And the second half of the first page
25  reflects an e-mail from you to Jeff Henley, Mark

327

1  Barrenechea, and copying Jeff Henley, Jennifer
2  Minton, and Safra Catz?
3    A   That's correct.
4    Q   And the subject is "RE: IT CRM"?
5    A   Yes.
6    Q   And then you wrote the message at the top
7  of the second page; is that right?
8    A   I did.
9    Q   Okay.  And you say, halfway down, "We
10  cannot remain in denial if we talk with our users
11  every day."
12        Had you been in denial?
13    A   Had I been in denial?  I don't think I had
14  been in denial.
15    Q   Had other people at Oracle been in denial?
16    A   I think some of the engineers were in a
17  competition with Siebel, and Siebel had features we
18  didn't have.  They had been in the business much
19  longer, and sometimes, you know, you love your baby,
20  and they -- you know, they were very proud of what
21  they had done, but they were still missing certain
22  features that our competitors had.
23    Q   And you say, at the top, "Our top priority
24  is to get Oracle users are 'delighted,'" in quotes,
25  "with the quality and functionality our CRM

328

1  products."
2        Do you see that?
3    A   Yes.
4    Q   And then you go on to say, "Until that
5  happens I doubt we will achieve success in the
6  market."
7        Do you see that?
8    A   Yes.
9    Q   And those were your -- that was your view
10  as of March 22nd, 2002; correct?
11    A   Yes.
12    Q   And this would have been in your file, or
13  not, as of March 2002?
14    A   Well, since I -- since I authored it and if
15  I didn't send myself a copy, it wouldn't be.
16    Q   Okay.  And at the time you wrote this, were
17  you aware of any obligation to preserve this document
18  for this litigation?
19        MR. LINDSTROM:  Objection; assumes facts.
20        THE WITNESS:  Yeah.  Again, I certainly --
21  you know, again, I don't know the where -- the date
22  of the document retention order, but I was aware at
23  some point in time that we had to preserve all
24  documents.
25  BY MR. SOLOMON:

329

1    Q    Including a document such as this?
2         MR. LINDSTROM:  Objection; no foundation,
3    calls for speculation.
4         THE WITNESS:  Yes.
5    BY MR. SOLOMON:
6    Q    Okay.  And this was not produced from your
7    files; you don't even know if it was in your files;
8    is that right?
9    A    Yeah.  Again, I think because I authored it
10   and didn't send myself a copy, it was never in my
11   file.
12        MR. SOLOMON:  Marked as the next exhibit a
13   document produced by the defendants with the control
14   number 100146.
15        (Exhibit No. 84 was marked for
16        identification.)
17        THE WITNESS:  Okay.
18   BY MR. SOLOMON:
19   Q    And this is -- first of all, do you
20   recognize it?
21   A    I don't.
22   Q    Okay.  It's from Susan Marks to you,
23   copying Joyce Higashi, dated the 29th of March 2002.
24        Do you see that?
25   A    I do.

330

1    Q    And are you familiar with the customer NCR?
2    A    Very.
3    Q    And were they implementing any 11i modules
4    in 2000 to 2001, do you know?
5         MR. LINDSTROM:  In 2000-2001?
6         MR. SOLOMON:  That's my question.
7         THE WITNESS:  I don't know.
8         MR. SOLOMON:  You don't know.  Okay.
9    Q    And this would have been in your files in
10   March of 2002; is that right?
11   A    Yes.
12   Q    And it wasn't produced from your files and
13   you don't know why?
14   A    That's correct.
15        MR. SOLOMON:  I've have marked as the next
16   document -- next exhibit, excuse me, the document
17   with the control numbers 297895 to 896.
18        (Exhibit No. 85 was marked for
19        identification.)
20        THE WITNESS:  Okay.
21   BY MR. SOLOMON:
22   Q    Do you recognize this?
23   A    I don't.
24   Q    Okay.  On the second page of the
25   Exhibit (sic) 297895, and it reflects, at the top,

331

1    two e-mail exchanges.  The second one I'm looking at
2    is dated March 5th, 2002 from Peter Piascik, I'm
3    going to guess, to Larry Ellison and others.
4         Do you see that?
5    A    I do.
6    Q    Do you know who the sender is?
7    A    I don't.
8    Q    Do you recognize the name of the company,
9    ADT?
10   A    I don't.  No, actually, I remember seeing
11   their advertising on television.
12   Q    Okay.  Were you aware around the date of
13   this e-mail that ADT was holding up payments to
14   Oracle because of concerns with the 11i
15   implementation?
16   A    That's what it says in the e-mail, but I
17   don't recall it.
18   Q    Okay.  And this would have been in your
19   file on March 5th, 2002?
20   A    That's right.
21   Q    And it wasn't produced from your files and
22   you can't explain why; correct?
23   A    That's right.
24        MR. SOLOMON:  We will have marked as the
25   next exhibit a document produced by the defendants

332

1    with the control numbers 062679 and 680.
2         (Exhibit No. 86 was marked for
3         identification.)
4         THE WITNESS:  Okay.
5    BY MR. SOLOMON:
6    Q    Okay.  Do you recognize this?
7    A    Again, not specifically.  I recall the
8    discussion.
9    Q    Okay.  And you will see, at the bottom of
10   the page, you are an addressee, a copy on an e-mail
11   from Safra Catz.
12        Do you see that?
13   A    Yes.
14   Q    And it says, "Let's kill the No. 1 in CRM
15   adv.  Let's discuss."
16        Do you see that?
17   A    I do.
18   Q    What does "adv" mean?
19   A    Advertisement.
20   Q    And over the -- under the second page, it
21   says, "Larry, I know you wanted to skip it.  Let's
22   skip it."
23        Do you see that?
24   A    I do.
25   Q    Do you know what she's referring to?

333

1    A    Yeah. I want to kill the ad. I don't want
2   to advertise something.
3    Q    Okay.
4    A    That we are No. 1 in CRM. Just not true.
5    Q    Okay. And this would have been in your
6   file -- and I'm looking at that exchange, certainly
7   at the bottom. This would have been in your file as
8   of Monday, May 20th, 2002, that exchange?
9    A    That's correct.
10    Q    And it wasn't produced from your files and
11   you cannot explain why?
12    A    That's correct.
13        MR. SOLOMON: Okay. Let's go off the
14   record.
15        THE VIDEOGRAPHER: Off record at 12:30 p.m.
16        (Lunch recess taken.)
17
18
19
20
21
22
23
24
25

334

1   AFTERNOON SESSION              1:10 P.M.
2
3        THE VIDEOGRAPHER: On record at 1:10.
4   BY MR. SOLOMON:
5    Q    Okay. You recall making a claim in the
6   2000-2001 time frame, Mr. Ellison, that by utilizing
7   Suite 11i, Oracle had saved a billion dollars?
8    A    No. I think I said by using our own
9   applications, we had saved over a billion dollars.
10    Q    And is that the distinction you were
11   saying, just using applications and you weren't
12   limiting it to the 11i suite; is that right?
13    A    Yeah. Yes.
14        MR. SOLOMON: Okay. We will have marked as
15   the next exhibit an excerpt from a book entitled
16   "Softwar."
17        (Exhibit No. 87 was marked for
18        identification.)
19   BY MR. SOLOMON:
20    Q    Mr. Ellison, I'm going to be asking you a
21   number of questions about the contents of that book,
22   and so before I start doing that, of course, you are
23   familiar with the book Softwar?
24    A    I am.
25    Q    And can you describe your involvement in

335

1   the publication of that book?
2    A    I -- yes. I was interviewed for the book,
3   extensively interviewed for the book, and I also
4   wrote footnotes where I -- if I disagreed or wanted
5   to clarify something the book said.
6    Q    Okay. I'm looking at what is page 182 of
7   the book, and I'm looking at the bottom paragraph,
8   and it says, in part, "The final qualification about
9   Oracle's story of transforming its efficiency by
10   using its own E-Business Suite is that the claim is
11   only partially true, because the first billion dollars
12   of" saving "was pretty much in the bag before 11i was
13   finished."
14        Do you see that?
15    A    I do.
16    Q    Is that true?
17    A    Yeah. Yeah. Well, let me be clear. The
18   second part is certainly true that we were well on
19   our way -- well on our way to saving a billion
20   dollars before 11i was finished. That's true. So
21   the qualification that -- you know, Oracle
22   transforming itself by using its only business suite,
23   I'm not sure I ever said that. I mean, I don't know
24   how I use the term E-Business. E-Business -- I
25   sometimes use the term "E-Business Suite" to mean all

336

1   of our applications, not our applications beginning
2   at 11i.
3        So I think sometimes I'm not terribly
4   clear, you know. To me, when I say E-Business Suite,
5   I mean our applications.
6    Q    Okay. So you are in agreement with that
7   first sentence; is that fair or not?
8        MR. LINDSTROM: Objection; mischaracterizes
9   his testimony.
10        THE WITNESS: Yeah. I'm in agreement with
11   the second half of the sentence starting "because."
12   BY MR. SOLOMON:
13    Q    Okay. And tell me where you disagree.
14    A    I don't believe I ever made the claim that
15   we transformed ourself with the 11i versions of our
16   applications only.
17    Q    Okay.
18    A    I believe I made the claim we had
19   transformed ourself with our applications and
20   sometimes -- and I sometimes described those
21   applications as E-Business Suite.
22    Q    Okay.
23    A    But that includes Version 11 as well as
24   11i.
25    Q    Okay. You haven't clarified this, have

337

```
1   you?
2      A   No.
3      Q   And why not?
4      A   Well, one, I didn't notice it until you
5   just pointed it out.  But I didn't try to -- I didn't
6   try to rewrite the book.  You know, I thought I had a
7   limited number of footnotes that I could put in, and,
8   you know, I wanted to pick my spots, and I didn't
9   think it was a major issue.
10     Q   Was there an agreement there would be a
11  limited number of footnotes?
12     A   Was there an agreement.  I don't expect --
13  I don't believe you need the footnotes to be larger
14  than the book itself.  Plus it takes a long time to
15  write the footnotes, so I just didn't correct every
16  single thing.  I didn't parse every single paragraph
17  very carefully and write -- write down something I
18  thought, you know, was slightly off or, you know,
19  needed clarification.  I didn't do that every single
20  time.  That would have been --
21     Q   Okay.
22     A   -- that would have required a lot of
23  footnotes.
24     Q   Okay.  It goes on to say, "The software
25  that Oracle used to turn itself into an e-business
```

338

```
1   was, in fact, a combination of modules from Release
2   11.0, which shipped in late" 1988 -- "1998," excuse
3   me, "and a number of customized prototype
4   applications that were global, Internet-based
5   systems."
6          Do you agree with that sentence?
7      A   Yeah.
8      Q   Okay.  It goes on to say, "A key element of
9   the E-Business Suite, however, was missing: the
10  underlying information architecture, including the
11  vital shared data schema that were the basis for
12  Oracle's claims about the tight integration of all
13  the applications."
14         Is that true?
15         MR. LINDSTROM:  Objection; compound.
16         THE WITNESS:  Now, this is referring to in
17  the past, so they are saying the key element was
18  missing prior -- prior to the E-Business Suite.
19         MR. SOLOMON:  Okay.
20         THE WITNESS:  Just as I'm reading this,
21  prior to the E-Business Suite, the data-sharing
22  schema did not exist.  If that's what it's -- I
23  believe that's what I'm agreeing to.  Before the --
24  what the E-Business Suite brought -- excuse me.  Let
25  me stop using the term "E-Business Suite."
```

339

```
1   What Version 11i brought was a much more
2   tightly integrated data schema, and before 11i, we
3   didn't have that tightly integrated data schema.
4   BY MR. SOLOMON:
5      Q   Okay.  And that is called "vital
6   schema" -- it says here that schema was the basis or
7   were the basis for your claims about the tight
8   integration of all the applications; right?
9      A   Yeah, and it existed in 11i, but did not
10  exist in 11o.
11     Q   Okay.  And then it goes on to say, "Ellison
12  says, 'That's absolutely right.  The software that
13  saved Oracle a billion dollars in the first year was
14  a combination of our standard applications product
15  plus prototype applications that had not yet been
16  integrated into the E-Business Suite. . . rewritten
17  and integrated into what would become the E-Business
18  Suite."
19         Do I read that right?
20     A   Yes.
21     Q   And do you agree with that?
22     A   Yes.
23     Q   Okay.  Now, if you go to the bottom of 183,
24  it reads as follows, in part:  "But in one sense, the
25  marketing claims were misleading.  The reassuring
```

340

```
1   message to prospective customers was that Oracle had
2   been successfully running the same E-Business Suite
3   that they would buy for at least a year."
4          Do you agree with that?
5      A   No.
6      Q   But you didn't clarify it, did you?
7      A   No.
8      Q   And you didn't correct it?
9      A   That's correct.
10     Q   That was -- reading on:  "That was very far
11  from the case.  Not for the first time in Oracle's
12  history, early guinea-pig customers would pay a price
13  for taking too much on trust."
14         Do you agree with that?
15     A   The price they paid was more than offset by
16  the benefits, so early adopters of any software
17  product discovered more bugs and had more problems
18  than people who wait.  The advantage of being an
19  early adopter -- and the reason there are early
20  adopters of software products -- is they get the
21  benefit sooner, so it's more costly, but you get the
22  benefits earlier.
23     Q   Okay.  But the question was --
24     A   And the net is you save.
25     Q   The question was:  Do you agree with that
```

341

1   sentence?
2       A    Which sentence?
3       Q    Starting with, "Not for the first time,"
4   ending in "trust"?
5       A    No.
6       Q    Okay.  But you didn't clarify or correct
7   it, did you?
8       A    No.
9           MR. SOLOMON:  Have marked as the next
10  exhibit another excerpt from the book Softwar.
11          (Exhibit No. 88 was marked for
12          identification.)
13  BY MR. SOLOMON:
14      Q    And I'm going to draw your attention to --
15  toward the bottom of the page.
16          MR. LINDSTROM:  Which page?
17          THE WITNESS:  191?
18          MR. SOLOMON:  That's correct, 191.
19      Q    And I'm going to read the following
20  language: "I had already delayed the 11i release
21  date, and that forced our customers to revise their
22  implementation plans.  There was tremendous pressure
23  not to delay again.  Our customers had their
24  resources all lined up and were ready to install our
25  software as soon as we released it.  It was a bit

342

1   like the beginning of World War I:  once the troop
2   mobilizations began, there was no turning back.'"
3           Do you see that?
4       A    I do.
5       Q    Is that your language?
6       A    Yes.
7       Q    Okay.  Would you agree now that it's -- the
8   more appropriate analogy would be with Don Kirk
9   (phonetic) in World War II?
10      A    No.
11          MR. SOLOMON:  Mark as the next exhibit
12  another excerpt from Softwar.
13          (Exhibit No. 89 was marked for
14          identification.)
15  BY MR. SOLOMON:
16      Q    And just while we are having the exhibit
17  marked, Mr. Ellison, the chapter is -- that we are
18  looking at is headed "Ready or Not."
19          Do you have an understanding what "Ready Or
20  Not" refers to?
21      A    I do.
22      Q    And is it 11i?
23      A    Yes.
24      Q    Okay.  I'm looking at page 192, and I'm
25  looking at the language quarter of the way down the

343

1   page where it says, "Ellison says, 'We had just
2   finished a complete rewrite of our order management
3   system.  It was a huge job.'"
4           Do you see -- do you see that?
5       A    I do.
6       Q    And then without going through it all, you
7   talk about five stages.
8           Do you see the reference to five stages?
9           Halfway in, you say, "There were five
10  stages to the order management decision.  Stage one:
11  We have time to put the new order system into the
12  suite; let's do it.  Stage two:  No, too risky; we
13  have to go with the old order system.  Stage three:
14  Let's put them both in; absolutely fantastic idea.
15  Stage four:  Fantastic idea, but we can't make it
16  work.  Stage five:  Well, then, let's put in the new
17  one.'"
18          You see all that?
19      A    I do.
20      Q    Okay.  And is that all accurate?
21      A    I think so.
22      Q    Then you go on to say, "'It was my
23  decision.  It's in my nature to go for the
24  highest-risk/highest-reward option.  That's my cross
25  to bear.'"

344

1           Did you say that?
2       A    I did.
3       Q    It goes on to say, "'We went from having an
4   average order management product to having the
5   premier order management program on the planet.  The
6   only problem was it was brand new and we hadn't done
7   enough testing.'"
8           Do you see that?
9       A    Yes, I do.
10      Q    Was it accurate?
11      A    Yes.
12      Q    And then further down the page, it says,
13  "Ellison had no illusions about how critical the
14  order management system was," and then he quotes you:
15  "'The order management system is the heart of the
16  sell side of our e-business suite.  Order management
17  is the funnel that captures the information about the
18  sale.  The better your order management system, the
19  more information it captures.  Our new system
20  captures. . . the details about the products sold,
21  contractual obligations, payment terms, everything.
22  It manages marketing, promotions, vendor rebates, and
23  tracks what salespeople should be compensated on the
24  deal.  The flexible pricing engine handles complex
25  and arbitrary rules -- like buy two and get the third

345

1    one free.  And the automatic configurator keeps
2    people from buying the wrong combination of
3    products -- like computer components that won't work
4    together.  It's a great system.  But when it first
5    came out, it had a lot of bugs.'"
6        Did I read that accurately?
7    A    Yes.
8    Q    And did you say all that?
9    A    I did.
10        MR. SOLOMON:  Marked as the next exhibit
11   another excerpt from the Softwar book.
12        (Exhibit No. 90 was marked for
13        identification.)
14   BY MR. SOLOMON:
15   Q    Okay.  Looking at -- looking at page 193 --
16   A    196?
17   Q    I'm sorry.  Hold on one second.  We are
18   having a bit of document trouble.
19        Okay.  196.  Third of the way down the
20   page, you are quoted as saying, in part, "'We should
21   have done two things:  installed it in-house first
22   and engaged with the early implementations at an
23   executive development level.  I think if either of
24   those things had happened, we would have rapidly
25   found out that it wasn't done.  As it was, it took us

347

1    A    I think we engaged in early implementations
2    with the teams of people that -- that our customers
3    responsible for that implementation, I think we
4    worked with the right people.
5    Q    Okay.  What about the last sentence -- "'As
6    it was, it took us until November to realize we had
7    issues here and to start to mobilize" -- do you know
8    what that refers to?
9    A    I'm not sure what -- no.
10   Q    Okay.  Now, looking further down the page,
11   two-thirds of the way down, it reads:  "'The next
12   really big push was to get in contracting and order
13   management over New Year's.'"
14        Do you see that?
15   A    I do.
16   Q    And this is referencing Oracle's internal
17   implementation; is that right?
18   A    I don't know.  I would have to --
19   Q    Okay.
20   A    -- I can't really tell.  Give me a second.
21   Q    Okay.
22   A    Okay.
23   Q    Okay?
24   A    Yeah.
25   Q    So this reflects Mark Barrenechea

346

1    until November to realize we had issues here and to
2    start to mobilize.'"
3        Do you see that?
4    A    I do.
5    Q    And is that accurate?
6    A    I didn't say it.
7    Q    Sorry?
8    A    I think -- I think they are quoting George
9    Roberts.
10   Q    Thank you very much.
11        Is the content accurate?  Do you agree, in
12   other words, with George Roberts?
13        MR. LINDSTROM:  Objection; compound.
14   BY MR. SOLOMON:
15   Q    Okay.  Let's start -- or break it down,
16   since the objection's been interposed.
17        Do you agree with the first sentence where
18   it says, "We should have done two things'"?  Then
19   the first thing that he mentions is the installing it
20   in-house and engaging with early implementations at
21   an executive development level.
22        Do you agree with that?
23   A    We did install it in-house.
24   Q    Okay.  And did you engage with early
25   implementations at an executive development level?

348

1    referencing the big push; correct?
2    A    Yes.
3    Q    Okay.  And then he goes on to say, "'What
4    happened was one of the most dramatic moments I'd
5    seen during my five years at Oracle.  Everyone except
6    Ron knew that we could not place an order with the
7    new system.'"
8        And then there's an asterisk, and that's
9    because you entered a clarification; correct?
10   A    Yes.
11   Q    In fact, correction.  You say, "'Nonsense.
12   Of course Ron knew about the problems with our
13   internal order management implementation.  He was
14   personally running the project to put it in and make
15   it work.  We planned to be down for a while, and we
16   were."
17        Is it accurate?
18        MR. LINDSTROM:  Have you read it
19   accurately, or are the statements in there accurate?
20        MR. SOLOMON:  Both.
21   Q    Have I read it accurately?
22   A    I was reading along as you read.
23   Q    Okay.
24   A    But the statements as written here is
25   accurate.

349

```
 1   Q    Okay.  Then it goes on in the text:  "And
 2  Larry, knowing we can't place an order, not knowing
 3  when we would be able to place an order, and knowing
 4  that once we turned off the old bespoke system that
 5  there was no going back. . . 'We are going live
 6  anyway.  I need a forcing function, so off we go.'
 7  So we upgraded, and Oracle went down.  We were down
 8  for fourteen days.  For fourteen days that January,
 9  Oracle could not place a single order."
10        Is it true that for the 14 days he refers
11  to that Oracle could not place a single order?
12   A    I think I said "Nonsense," you know.  No.
13   Q    So your -- your clarification or your
14  asterisk and your "Nonsense" doesn't just refer to
15  the sentence where the asterisk is; it continues,
16  does it?
17   A    Well, I don't think -- I don't think we
18  were down for 14 -- I'm not sure.  I don't recall
19  exactly how many days we were down.  But even when we
20  were down, we had ways to work around the system and
21  place orders.
22        So the -- the sys -- there's no question
23  the system -- you know, when we put the new system
24  in, we were out, and that happens with almost every
25  release:  When you put in a new system, you are out
```

350

```
 1  some number of days, and there were some number of
 2  days we were definitely out of service, putting the
 3  new system in.
 4        But we solved the problems, got the system
 5  up and running, and we were fine.
 6   Q    Okay.  And when you were -- when you were
 7  down, do you know if that was before you sold your
 8  stock at the end of January?
 9   A    I have no recollection.
10   Q    Okay.  It goes on to say, "It was
11  frightening.  But we got it to work.  Larry was
12  right.  It was a great forcing function.  At that
13  point I became acutely aware of the customer
14  dissatisfaction and immediately started drilling down
15  into the implementations we were doing."
16        Do you see that?
17   A    I do.
18   Q    Now, were you aware at that time that Mark
19  had become -- Mark Barrenechea had become acutely
20  aware of customer dissatisfaction?
21   A    I would have hoped he would have been aware
22  before then.  I mean, we were having -- you know, I
23  asked that we go over all of the dissatisfied
24  customers and keep -- you know, keep track of them.
25   Q    Were you acutely aware of customer
```

351

```
 1  dissatisfaction at that time?
 2   A    I think I've said before that we have -- we
 3  had several customers that were having problems, and
 4  we monitored them closely and made them successful.
 5        MR. SOLOMON:  Okay.  We will have marked as
 6  the next exhibit further excerpts from the book
 7  Software.
 8        (Exhibit No. 91 was marked for
 9        identification.)
10  BY MR. SOLOMON:
11   Q    Okay.  On page 193, at the top, Ron Wohl,
12  referring, I believe, to the order management system,
13  is quoted as saying, "'Technically, we really had to
14  include it to fulfill the objective of the E-Business
15  Suite.  If it had the flexibility to meet modern
16  e-business practices, you're in great shape; if it
17  doesn't, you don't really have an E-Business Suite.'"
18        Do you see that?
19   A    I do.
20   Q    Is that factually accurate?
21   A    No.
22   Q    And you didn't clarify or dispute it,
23  though, did you?
24   A    Well, I mean, initially, if you recall our
25  five steps, we were going to include the old version
```

352

```
 1  of the order management system, so I think you had --
 2  you know, certainly you are more competitive if you
 3  have the most modern -- you know, even better version
 4  of order management, you are more competitive than if
 5  you have an older version -- you know, not as capable
 6  version as order management.
 7        But as long as all the pieces are
 8  integrated together -- all E-Business Suite means,
 9  you got all the major functions covered, and they are
10  all integrated out of the box by engineering.
11   Q    Okay.  Down at the bottom of the page, it
12  says, "Even with Oracle's vaunted rapid
13  implementation procedures for installing 11i, it
14  would be at least three or four months before any
15  significant 'go-lives' -- the moment when a business
16  switches its operations to new software."
17        Do you see that?
18   A    I do.
19   Q    And is that factually accurate?
20   A    I believe what it's saying is, from the
21  time someone buys the software, it will take us --
22  even though we have a rapid implementation technique,
23  rapid means we can't get them running in less than
24  three or four months, and that's how I read that, and
25  that's reason -- yeah, that's correct.  Four months
```

353

1   is very fast. Three months is very fast.
2       Q    And if you look at the bottom of the -- of
3   page 193 where you enter a footnote, you write: "Not
4   true. Ron explained the risks, and I understood the
5   uncertainty surrounding release of the new order
6   management system. And I made the decision to
7   release it."
8       A    That's referring to the quote in the middle
9   of the page.
10      Q    Okay.
11      A    You can see the asterisk.
12      Q    Correct.
13      A    That's referring to Mark Barrenechea. If
14  you read that section, it's about Mark Barrenechea
15  saying that Ron would just tell me what I wanted to
16  hear and I would just -- going to take it at face
17  value. So that footnote applies to that. I guess it
18  would be the end of the first paragraph on that page.
19      Q    And this is Ron and Mark's feud almost;
20  right?
21      A    Feud's a good term.
22      Q    And you are taking responsibility; correct?
23      A    Yeah. I don't think Ron deceived me, and I
24  don't think Ron was able to deceive me. I think I
25  gathered all the facts and I made the call.

354

1       Q    Okay. And then -- I'm on page 194, and
2   there's a reference -- about a third of the way down
3   the page, there's a sentence I want to read: "Just
4   as in 1990, he seemed to think that any economic
5   slowdown might pass Oracle by."
6       A    Yeah.
7       Q    That refers to you; right?
8       A    Yes.
9       Q    And is that true? Is that how you felt?
10      A    Well, it's -- no, and it's also hindsight.
11  But, no, I didn't think an economic slowdown, yeah,
12  would pass us by. It was certainly impossible to
13  tell when an economic slowdown would hit us and what
14  the impact might be, but I -- you know, I don't think
15  I believed that we were immune to macroeconomic
16  changes.
17      Q    Okay. But, again, you didn't clarify or
18  dispute that sentence, did you?
19      A    No. Again, I would like to say -- I mean,
20  if I thought it was important, I would clarify it.
21  If not, I would move on.
22      Q    I'm now on page 194 at the bottom. It
23  says, "If Ellison had known what was coming, he might
24  have restrained himself a little more. In October,
25  the first reports from the field described early 11i

355

1   implementations afflicted with more than usual
2   bugginess."
3           Do you agree with that sentence?
4       A    Well, "more than usual bugginess," I mean,
5   it was -- we didn't -- we certainly didn't think so
6   at the time. It was a huge product, and I don't know
7   what his basis for saying that is. It's a huge
8   product. It's a huge amount of code. We expected a
9   good deal of bugginess.
10      Q    But, again, you didn't clarify or dispute
11  that sentence; correct?
12      A    Yeah. I can't -- I would have written a
13  book as long as the book if I tried to --
14      Q    Okay.
15      A    -- you know, say how I would have said it
16  or everything I disagreed with.
17      Q    Okay.
18      A    This is his opinion.
19      Q    Okay. And then it goes on to say, "At the
20  Oracle Applications User Group conference in Honolulu
21  at the end of October, the complaints were legion.
22  Attendees griped about a lack of reliable information
23  concerning the status of applications, malfunctioning
24  modules -- especially CRM and order management. . ."
25          Do you see that?

356

1       A    I do.
2       Q    And do you agree that, first of all -- or
3   are you aware that the Oracle Applications Users
4   Group conference, the complaints were legion?
5       A    Well, Matthew is a very colorful journalist
6   and "legion" is an interesting word, but we certainly
7   had problems. The CRM products were new. The order
8   management module was new. We expected bugs. We had
9   bugs. I wouldn't describe them as legion.
10      Q    Okay. And the sentence, "Attendees griped
11  about a lack of reliable information," etc., do you
12  have any knowledge of that?
13      A    I don't recall. I don't recall them
14  asking, you know -- complaining about no reliable
15  information. I certainly, you know -- you know,
16  remember some of them saying that they were having
17  problems during implementation with CRM and order
18  management.
19      Q    Okay. And I'm now on page 195, halfway
20  down the page, and it says, "Over the next couple of
21  months," customers -- "customer complaints poured in.
22  Instead of working on the planned features and
23  functions to flush out the suite's capabilities as
24  planned, development was increasingly engaged in a
25  feverish attempt to produce patches that would fix

Ellison, Lawrence  9/21/2006 10:57:00 AM

357

1  the bugs that seemed to be flying at them from all
2  sides."
3       Do you agree with that?
4       MR. LINDSTROM:  Objection; compound.
5       MR. SOLOMON:  Okay.  Let's break it down.
6       THE WITNESS:  Well, no --
7       MR. SOLOMON:  Well, we have to, because,
8  otherwise, your lawyer is, perhaps, going to press
9  his objection so --
10      MR. LINDSTROM:  The reason why it's a good
11  objection is we won't understand a "yes" or "no"
12  answer.
13      MR. SOLOMON:  Hey, I've conceded.  I'm
14  going to rephrase it.  Don't worry.
15   Q   "Over the next couple months, customer
16  complaints poured in."
17      Do you agree with that?
18   A   No, I don't think they poured in.  We had
19  some of our customers -- some of our customers had
20  problems.
21   Q   Okay.  And you didn't correct or clarify
22  that sentence; correct?
23   A   That's correct.
24   Q   And then it goes on to say, "Instead of
25  working on the planned features and functions to

358

1  plush out the suite's capabilities as planned,
2  development was increasingly engaged in a feverish
3  attempt to produce patches that would fix the bugs
4  that seemed to be flying at them from all sides."
5       Do you agree with that?
6   A   No.  We certainly spent more time fixing
7  bugs, but we continued to develop new features and
8  functions simultaneously, and we would release a bug
9  fix and a new feature as a patch.  So patches
10  sometimes are bug fixes, sometimes patches are
11  new features, but we did both simultaneously.
12   Q   Okay.  And then further down in that
13  paragraph, you are quoted as saying:  "'I was way too
14  optimistic.  It just kind of got away from us, and
15  that became a very big problem.'"
16      Is that an accurate quote?
17   A   It certainly took -- and what I mean by
18  that, it took longer, you know, to fix the all -- the
19  bugs than I thought.
20   Q   And did you say, "'It just kind of got away
21  from us, and that became a very big problem'"?
22   A   I said it, yeah.
23      MR. SOLOMON:  Okay.  Have marked as the
24  next exhibit another excerpt from the Softwar book.
25      (Exhibit No. 92 was marked for

359

1  identification.)
2  BY MR. SOLOMON:
3   Q   I'm looking at page 199 to start with.  I'm
4  looking at -- towards the bottom of the page, it's --
5  says, "As shareholders chewed over the
6  possibility. . ."
7       Do you see that --
8   A   I do.
9   Q   -- on the bottom?
10      It says, "As shareholders chewed over the
11  possibility that Ellison might have exaggerated the
12  extent of Oracle's immunity to the forces that were
13  blighting other tech companies, Oracle's stock price
14  plunged by 13 percent, to $23.56.  In response,
15  Oracle reiterated that it was standing by its bullish
16  forecast."
17      Do you see that?
18   A   Yes.
19   Q   Did you exaggerate the extent of Oracle's
20  immunity to the forces that were blighting other tech
21  companies?
22   A   I don't think so.
23   Q   Do you remember Oracle's stock price
24  plunging by 13 percent in February of 2001?
25   A   I mean, this refreshes my memory, yeah.

360

1   Q   And did that concern you when that
2  happened?
3   A   Sure.
4   Q   How did you respond?  Strike that.
5       Did you respond by issuing a statement that
6  the bullish forecast was -- was -- that you were
7  standing by your bullish forecast?
8   A   I don't think so.  Not that I recall.
9   Q   Did anybody respond that way?
10   A   Not that I recall.
11   Q   Okay.  Do you remember Chuck Phillips
12  issuing a report in February of 2001 in which doubt
13  was cast on the ability of Oracle to make its 3Q
14  numbers?
15   A   Again, not that I recall.
16   Q   Okay.  Looking at page 199 -- sorry, the
17  bottom of 199, the beginning of 200, and it says, in
18  part, "A few days later in Paris, Ellison seemed
19  unusually nervous and flustered."
20      Were you unusually nervous and flustered in
21  Paris?
22   A   Not that I recall.
23   Q   You remember going to Paris?
24   A   I might have been jet-lagged, but -- say
25  again?

361

1    Q    You remember going to Paris in February of
2  2001?
3    A    Not specifically.
4    Q    It goes on to say, "The main theme of his
5  speech was on the folly of customizing Oracle's
6  software and why it was better to buy a complete
7  suite from Oracle -- in Ellison's analogy, a finished
8  car that you knew would work -- rather than a bundle
9  of kit glued together by mechanics from IBM."
10       Do you see that?
11   A    I do.
12   Q    Is it accurate?
13       MR. LINDSTROM:  Is it accurate that he gave
14  that analysis?
15       MR. SOLOMON:  Correct.  Thank you.
16       THE WITNESS:  Yes, it is.
17  BY MR. SOLOMON:
18   Q    And did you also talk about the folly of
19  customizing Oracle's software?
20   A    I don't think I ever used the word "folly."
21   Q    Okay.  But did you talk about the mistake
22  customers would be making?
23   A    Well, I think I talked about customization
24  is expensive and it's risky, because we are in the
25  business of building software, and we make mistake --

362

1  plenty of mistakes when we are building software.
2  When customers write their own software, they are
3  even more likely to make mistakes when they write
4  their own custom software, so it's expensive, it's
5  time-consuming, and it negatively affects overall
6  quality of your systems.
7    Q    Okay.  Have you since talking in Paris
8  commented that you were imprecise and perhaps not
9  clear in your statements there?
10       MR. LINDSTROM:  Objection; vague and
11  ambiguous.
12       THE WITNESS:  I think I know what you are
13  referring to.
14       Yeah, in terms -- I tried to distinguish
15  customization, meaning changing the code, from
16  customization, if you will, extending the code,
17  adding your own -- you know, so don't -- there's a
18  difference between a module you write, a component
19  you write, and then you connect to Oracle versus
20  actually going into the Oracle written code and
21  changing it.
22       So I tried to clarify myself.  I didn't
23  mean that you shouldn't write -- if you have clever
24  ideas and you want to, you know, implement your own
25  systems and write those systems, that's all well and

363

1  good.  The mistake is usually going into our code,
2  the Oracle written code, and making changes to that.
3  BY MR. SOLOMON:
4    Q    Okay.  And then if you go a little bit
5  further down the page, it says, in your footnote,
6  "Worse than being overzealous in this presentation, I
7  was ambiguous, imprecise, and easily misunderstood.
8  The problem was that I failed to be clear as to what
9  I meant by 'customize.'  Of course customers can
10  tailor our applications to their business processes,
11  but they should never modify our software."
12       And you wrote that; right?
13   A    Yes.
14   Q    And then on page 201 -- let's see if I can
15  find it -- sorry, the bottom of 200 and beginning of
16  201, it says, "The other big," in quotes, "'take-out'
17  from the Paris speech was Ellison's frank recognition
18  that the E-Business Suite didn't yet do everything
19  its customers wanted and maybe never would but that
20  an '80 to 85 percent solution' that could be
21  implemented in five months was better than the
22  100 percent" still "promised by some vendors that"
23  will "take three years to put in and still wouldn't
24  work."
25       Do you see that?

364

1    A    I do.
2    Q    Okay.  Did you recognize at that conference
3  that Oracle was only offering an 80 to 85 percent
4  solution at that time?
5    A    No.  I think -- I think I knew all along
6  that the E-Business Suite would never do everything
7  every company wanted to do, but it would -- should do
8  all of your general ledger, all of your accounts
9  receivable, all of your accounts payable.  So it
10  would be a complete solution in the areas where we
11  had developed product.
12       We didn't, at the time, have product for --
13  if you are a bank, managing savings accounts, your
14  customer savings accounts; manage your customer's
15  checking account or Internet banking, so there were a
16  lot of pieces we didn't have that were industry
17  specific, but where we had pieces, it was a pretty
18  complete solution.
19   Q    Okay.  And it finishes -- the passage
20  finishes with, "Immediately, the chorus went up that
21  Ellison had claimed that the suite was complete and
22  now he was saying that it wasn't."
23       Do you remember that chorus going up?
24   A    No.
25   Q    Okay.  On page 201, I'm looking at the

365

1  language that reads: "Although applications had
2  continued to grow strongly thanks to the buzz that
3  had been generated around 11i, database revenue
4  growth was flat to negative. Ellison explained," and
5  now you are being quoted, "'It's very disappointing.
6  A bunch of deals were approved at the senior vice
7  president level, but once they got to the CFO and CEO
8  level, they were pushed off. We have a lot of
9  nervous executives looking at this economy and being
10  very cautious. They want to wait thirty to sixty
11  days so they can get a better read on this economy.'"
12       Do you see that?
13  A   I do.
14  Q   Is that an accurate quote?
15  A   Yes. I think it might be hindsight, but
16  it's an accurate quote. I said it.
17  Q   Okay. Do you know what deals you are
18  referring to when you are saying they are approved at
19  the senior vice president level?
20  A   We had -- we had a variety of large deals,
21  mainly database deals, that were going through --
22  that had been qualified. And what I mean by
23  "qualified," the customers had said they are going to
24  buy the database. They said they wanted price --
25  they had gone through a price negotiation. We

366

1  completed the price negotiation. We had delivered to
2  them a contract. So it was really awaiting final
3  approval. And in the last couple of days of the
4  quarter, we were having a hard time getting those --
5  you know, the final sign off from the CFO or the CEO
6  or whoever had that approval authority for those
7  larger deals.
8  Q   And can you name the customers involved in
9  those deals?
10  A   I cannot.
11       You mean from memory?
12  Q   Yes.
13  A   No, I cannot.
14  Q   And how would that information be
15  retrieved? Who has that information?
16  A   We had a system for tracking prospects in
17  pipeline, and I believe they are -- I believe it's
18  someplace around.
19  Q   And what's that system called?
20  A   We have a sales -- you know, we have a
21  sales automation -- I'm not sure what we had --
22  again, this was talking about 2001.
23  Q   Correct.
24  A   You know, I'm not sure what system was
25  available in -- you know, was available in 2001, but

367

1  we certainly kept track of our large deals, the
2  contracts we'd, you know -- most of those -- I would
3  think a lot of those deals would be in the form of
4  contracts and proposals at that point.
5  Q   Okay. But back to the system that was
6  available to track these deals, are you talking about
7  Oracle Sales Online?
8  A   Yeah. And I just don't remember its status
9  in early 2001.
10  Q   Do you know anything about Oracle Sales
11  Online being purged in July of 2001?
12  A   No.
13  Q   You never heard that?
14  A   No.
15  Q   Not aware that -- do you know who
16  Mr. Kirbky is?
17  A   No.
18  Q   He's a VP of IT at your company now.
19       Never heard of him?
20  A   Never heard of him.
21  Q   Have you ever read the Special Litigation
22  Committee Report?
23  A   It's very thick. No.
24  Q   Mr. Kirkby, represent to you, indicates
25  that in July of 2001 that OSO was purged.

368

1       MR. LINDSTROM: So you are making this
2  representation that that's true?
3       MR. SOLOMON: I'm making the representation
4  that Mr. Kirkby made the representation in SLC -- to
5  the SLC.
6       MR. LINDSTROM: And so what's the question?
7  BY MR. SOLOMON:
8  Q   Have you ever heard of that?
9  A   No.
10  Q   Would you be concerned that after this
11  litigation was commenced, Oracle sales had been
12  purged?
13       MR. LINDSTROM: Objection; calls for
14  speculation, hypothetical.
15       THE WITNESS: Sure.
16  BY MR. SOLOMON:
17  Q   And are you going to take any action to
18  follow up on that concern?
19       MR. LINDSTROM: Objection; assumes facts.
20       THE WITNESS: I assume that we have had a
21  Special Litigation Committee look into it, and I
22  guess our legal department already knows about it, so
23  I assume that action's already been taken.
24  BY MR. SOLOMON:
25  Q   You know that Delaware Court found

369

1    Professor Grundfest to be nonindependent?
2      A   Yes.
3      Q   So without having OSO available to me, how
4    can I find out what deals you are referring to here?
5      MR. LINDSTROM: Objection; assumes facts.
6      THE WITNESS: I think Safra Catz approved a
7    lot of the deals. I don't -- you know -- the
8    people -- the deals went through -- for final
9    approval went through Safra Catz and Keith Block and
10    George Roberts, and those were the executives that
11    handled them. I think other people in the back
12    office, you know --
13      MR. SOLOMON: Okay.
14      THE WITNESS: -- were -- prepared
15    contracts.
16    BY MR. SOLOMON:
17      Q   And assuming they can't remember and
18    without OSO, is there any way I can get an answer to
19    this?
20      MR. LINDSTROM: Doubly assumes facts.
21      THE WITNESS: I can't think of any.
22    BY MR. SOLOMON:
23      Q   And why would you be concerned if it turns
24    out to be true that OSO was purged after this
25    litigation commenced?

370

1      MR. LINDSTROM: Calls for speculation.
2      THE WITNESS: Well, we tried -- you know,
3    we try to archive all of our information. We try to
4    keep track of it so we can analyze it. So it's -- I
5    believe it's our practice to keep -- to keep our
6    records for, you know, fairly long periods of time.
7    BY MR. SOLOMON:
8      Q   Does your concern -- aside from Oracle's
9    own desire to keep track of historical information,
10    is your concern related to the fact that it -- it's
11    not available in this litigation?
12      MR. LINDSTROM: No foundation.
13      THE WITNESS: Again, I rely on our counsel
14    to deal with that. I'm not an expert.
15    BY MR. SOLOMON:
16      Q   You let them tell you whether you should be
17    concerned or not?
18      A   Yes, I do. In this area, I do.
19      Q   Still on page 2001 (sic), looking at the
20    language that reads: "The real figure had turned out
21    to be only 25 percent. It didn't take a genius to
22    see that not everything that was going on could be
23    explained by the weakening economy and edgy CEOs
24    waiting for 'visibility' to return. For anyone who
25    wanted to see, there was mounting evidence that it

371

1    wasn't only the economy that prospective Oracle
2    applications customers wanted to see stabilize."
3      Do you see that?
4      A   I do.
5      Q   Do you have an understanding what is meant
6    in that last sentence by it wasn't the only -- "it
7    wasn't only the economy that prospective Oracle
8    applications customers wanted to see stabilized"?
9      A   I do.
10      Q   And what's your understanding?
11      A   What does Matthew mean when he says that?
12      Q   Yes.
13      A   I think --
14      MR. LINDSTROM: Objection; calls for
15    speculation.
16    BY MR. SOLOMON:
17      Q   What's your understanding?
18      A   That people -- you know, people are
19    concerned. There have been articles written, and
20    people are concerned about the stability of 11i.
21      Q   And isn't it true that 11i had been sent
22    out to customers in an unfit state?
23      A   No.
24      MR. SOLOMON: So have marked as the next
25    exhibit another excerpt from the book Softwar.

372

1      (Exhibit No. 93 was marked for
2      identification.)
3    BY MR. SOLOMON:
4      Q   If you look at page 202, up at the top,
5    there's a reference to a lawsuit, and it says, "The
6    suit, on behalf of a mall pension fund, accused
7    Ellison of concealing information about the cost of
8    the 'massive technical problems,'" in quotes, "of
9    11i."
10      Do you see that?
11      A   I do.
12      Q   Do you know what suit is being referred to?
13      A   I think this one.
14      Q   Okay. And you are aware that this is a
15    class action?
16      A   I am.
17      Q   And it's not just on behalf of a small
18    pension fund; you are aware of that?
19      A   Yes, I am.
20      Q   And it goes on to say, Oracle says the suit
21    was entirely without merit and would defend it -- and
22    would be defended vigorously.
23      Do you see that?
24      A   I do.
25      Q   I can -- I know it's being defended

373

1   vigorously.
2        Do you still believe it's without merit?
3     A   I do.
4     Q   At the bottom of the page, it says, "The
5   mood at Oracle was bloody but unbowed.  There was an
6   embarrassed realization that it had fallen down badly
7   on execution in sending a hugely important new
8   product out to customers in an unfit state."
9        Do you see that?
10    A   Yes.
11    Q   Do you agree with that?
12    A   I do not.
13    Q   But you didn't qualify or correct it, did
14   you?
15    A   No.  That's Matthew's opinion.
16        MR. SOLOMON:  I have marked as another
17   exhibit another excerpt from the Softwar book.
18        (Exhibit No. 94 was marked for
19        identification.)
20        THE WITNESS:  Okay.
21   BY MR. SOLOMON:
22    Q   Okay.  On page 210, halfway down, looking
23   at the language that reads: "What really happened
24   during the last few days in February at the end of
25   the quarter?  Was it a question of two or three big

374

1   deals falling through at the last moment, as Ellison
2   had earlier appeared to suggest, or was something
3   more fundamental going on?"
4        Do you see that?
5     A   I don't, actually.  Where are you?
6     Q   Let me get it for you.  It is halfway
7   down --
8     A   Page 210?
9     Q   -- page 210, and it starts halfway down on
10   the right-hand side of the page, "What really
11   happened."
12    A   Is it in the last paragraph?
13    Q   No.  It's in the --
14    A   I got it.  I got it.  "What really
15   happened."
16    Q   "What really happened," do you see that?
17    A   I do.
18    Q   Then it goes on.  It would appear to quote
19   you as follows: "No.  It was a lot of deals --
20   dozens, I'd say.  Sometimes a deal was delayed.
21   Sometimes the size of the deal dropped from
22   $6 million to $2 million.  All of a sudden people
23   stopped buying in anticipation of their needs for the
24   next couple of years."
25        Do you see that?

375

1     A   I do.
2     Q   And is that an accurate quote of you?
3     A   I believe so.
4     Q   Okay.  And, again, you cannot identify
5   those deals, can you?
6     A   I think if you keep going, there's even
7   cases where companies that were already using our
8   software were trying to find ways not to pay for it.
9   I'm not going to mention any names, Sprint, but a
10   very large wireless company.  Oh, that's Sprint.
11   That one I remembered because that was particularly
12   annoying.
13    Q   Any others?
14    A   I wouldn't have remembered that either, but
15   this 15, 20 and -- this refreshed my memory.  That's
16   the only one I can think of.  They actually owed us
17   the money by calculation.  They had an annual payment
18   and they just refused to pay.
19    Q   Do you remember why?
20    A   You have to ask Safra.  Basically they
21   didn't like -- they didn't think they would sell that
22   much.  We had so much per wireless subscriber, we
23   were paid by number of wireless subscribers, and they
24   just didn't like the bill.
25    Q   When did you first learn that Sprint was

376

1   taking that position?
2     A   I think about -- I think we were still
3   fighting for the deal I think the last hour of the
4   quarter.  Safra thought we'd get the deal in the last
5   hour of the quarter.
6     Q   Okay.
7        MR. LINDSTROM:  So we are done with
8   Exhibit 94?
9        MR. SOLOMON:  We are.  Thank you.
10        Okay.  Let's have marked as the next
11   exhibit another excerpt from the Softwar book.
12        (Exhibit No. 95 was marked for
13        identification.)
14   BY MR. SOLOMON:
15    Q   Looking at page 213, I'm looking at the
16   language that reads: "A big part of Ellison's 11i
17   campaign has been centered on the idea that systems
18   integration was to be avoided at all cost.  Yet the
19   assumption behind being able to install the software
20   was to manage a particular flow that that it was being
21   integrated at some point with legacy systems.  Didn't
22   that mean he was backtracking on something pretty
23   fundamental?"  And then you are quoted: "'Yeah, the
24   'Just say no to systems integration' slogan was
25   poorly thought out on my part.  It wasn't systems

377

1 integration that had to be avoided; it was code
2 modifying that had to be avoided.  Of course, some
3 systems integration may be necessary.  So wake up!
4 Try a little harder!'"
5         Is that an accurate quote?
6     A   Yes.
7         MR. SOLOMON:  Okay.  Let's go off the
8 record to change tapes.
9         THE VIDEOGRAPHER:  All right.  This marks
10 the end of Tape 2, Volume 2, in the deposition of
11 Larry Ellison.
12         At 2:12, going off the record.
13         (Recess taken.)
14         THE VIDEOGRAPHER:  On record at 2:19.
15         This marks the beginning of Tape 3,
16 Volume 2, in the deposition of Larry Ellison.
17         MR. SOLOMON:  Okay.  I've marked as the
18 next exhibit another excerpt from the book Softwar.
19         (Exhibit No. 96 was marked for
20         identification.)
21         MR. LINDSTROM:  Is this 96?
22         THE REPORTER:  Yes.
23 BY MR. SOLOMON:
24     Q   Okay.  You will see there's reference to
25 George Buckley of Brunswick Corporation --

378

1     A   Yes --
2     Q   -- do you know him?
3     A   -- say again?
4     Q   Do you know him?
5     A   I met him at that one afternoon,
6 roundtable.
7     Q   The meeting that's being referred to here?
8     A   Yes.
9     Q   And then he's quoted as saying, "'Larry,
10 we've spent $250 million on systems in the last few
11 years,' and" we got -- "and we've got jack shit.  I
12 feel like we were led down the primrose path by the
13 IT guys.  It was always jam tomorrow.  We have all
14 the best stuff in the candy store -- PeopleSoft, i2,
15 Oracle -- it's a real hodgepodge of systems.'"
16         Do you see that?
17     A   I do.
18     Q   And then your response is reported to be,
19 "There you are!"' with a kind of smirk on your face.
20 "'That's the absolute archetype of what not to do.'"
21         Is that an accurate quote?
22         MR. LINDSTROM:  Which quote?
23         MR. SOLOMON:  The second quote attributed
24 to Mr. Ellison.
25         MR. LINDSTROM:  The one that says, "'That's

379

1 the absolute archetype of what not to do'"?
2         MR. SOLOMON:  If you -- yes, if that's how
3 you want to pronounce it.
4         THE WITNESS:  "Archetype."
5         MR. LINDSTROM:  I would like a clear
6 record.
7         MR. SOLOMON:  On the pronunciation?
8         MR. LINDSTROM:  On the question.
9 BY MR. SOLOMON:
10     Q   So go ahead.
11     A   So is that quote accurate?
12     Q   Yeah.
13     A   I don't recall.
14     Q   Buckley -- it goes on, "Buckley looks
15 furiously across the table at him: 'Well, I've got
16 to tell you that it was Oracle consultants who, when
17 pressed by my IT people on a perceived deficiency in
18 your software, would say that maybe PeopleSoft or i2
19 might be better.  Well, I'm not going to throw in
20 another $200 million to fix it now.'"
21         Do you recall Mr. Buckley saying that?
22     A   I remember the gist of his commitments.  I
23 don't remember these specific words.
24     Q   And then it says, "IDT's Jim Courter chips
25 in, saying, 'We were fed all kinds of promises that

380

1 it will all work, and it doesn't.'"
2         Do you remember Mr. Courter saying that?
3     A   But keep in mind, they are not -- I don't
4 believe they are complaining about Oracle software.
5     Q   Okay.
6     A   I believe they are complaining kind of
7 about IT in general --
8     Q   Okay.
9     A   -- and I don't remember the specific
10 comments.
11     Q   Okay.  And, "Buckley adds, 'We're in so
12 deep now that spending money is not the way.  We're
13 spending $100 million a year. . . so how do we get
14 out of this mess?'"
15         Do you recall Mr. Buckley saying that?
16     A   Again, not specifically, but the general --
17 the general sense of what -- of their frustration
18 I've heard before.
19     Q   Okay.  And then your footnote, because you
20 do clarify with the footnote here, and you basically
21 say that CEO is getting incredibly pissed off about
22 how much they spend on the systems; right?
23     A   Right.
24         MR. SOLOMON:  Okay.  I've marked as the
25 next exhibit another excerpt from Softwar book.

381

1     (Exhibit No. 97 was marked for
2     identification.)
3   BY MR. SOLOMON:
4     Q     And I'm looking at page 226.
5     A     Okay.
6     Q     And I'm looking at, first of all, the
7   language reading: "Jim Courter helpfully adds that
8   he's trying to do something like that now and 'it's a
9   complete nightmare.'" And then you are quote:
10  "'Absolutely. It might work a little bit some of the
11  time, just enough to tempt you to keep trying. You
12  can put wings on a car, drive very fast, and it will
13  take off... landing safely is another matter.'"
14          Is that an accurate quote?
15    A     It's an accurate quote.
16          MR. LINDSTROM: Well, it has ellipses in
17  it.
18          MR. SOLOMON: Fair enough.
19          MR. LINDSTROM: Which you left out of the
20  description.
21          MR. SOLOMON: Fair enough.
22    Q     Do you know what these ellipses are
23  concealing?
24    A     I don't, and, again, let me emphasize, this
25  is not talking about Oracle software; it's talking

382

1   about big systems integration projects.
2     Q     Continuing from the previous page, the same
3   thing; right?
4     A     Right.
5     Q     Then it says, "The next question turns out
6   to be trickier. The air force's Ron Orr wants to
7   know, reasonably enough, where Oracle has an example
8   of 11i up and running that has stood the test of
9   time. Ellison points out that the suite has been out
10  for only a year but that a few customers had adopted
11  the 'no-modifications' model early on out of poverty.
12  One such is Techtronics in Oregon -- five years ago
13  its business," in quotes, "'fell off a cliff,' so it
14  put in global systems because that was the cheapest
15  way to go. It's an odd example to give. Sensing it,
16  Oracle's Mark Jarvis adds that Cisco is a well-known
17  example using Oracle financials to achieve a daily,"
18  in quotes, "'virtual close.' Somebody points out
19  that it didn't help Cisco from making a hash of its
20  forecasting."
21          Do you see that?
22    A     Yes.
23    Q     First of all, do you know who -- do you
24  remember meeting Ron Orr?
25    A     Vaguely.

383

1     Q     Okay. Do you remember him asking for an
2   example of an 11i implementation that had stood the
3   test of time?
4     A     I -- I don't.
5     Q     Do you -- did you point out the suite had
6   been only out a year but that a few customers had
7   adopted the no-modifications model out of poverty?
8     A     I certainly -- yes. Yeah. Techtronics
9   specifically, yeah.
10    Q     You don't recall Techtronics; is that
11  what --
12    A     No, I said I do vividly recall Techtronics.
13    Q     So is it accurate, then, that as of the
14  date of this -- of the meeting that's being referred
15  to here, the only examples offered by Oracle
16  personnel at the meeting of 11i up and running that
17  had stood the test of time was or were Techtronics
18  and Cisco?
19    A     No.
20    Q     Okay. And what you are saying, then, is --
21    A     They were just specific examples.
22    Q     Right.
23          As Matthew Symonds -- in other words, has
24  Matthew Symonds omitted other examples that were
25  given at that meeting?

384

1     A     I believe so.
2     Q     That's very misleading if he has, isn't it?
3          MR. LINDSTROM: Objection; argumentative.
4          THE WITNESS: No, I don't think so, but --
5   BY MR. SOLOMON:
6     Q     Okay. And then you enter a footnote or
7   clarification which reads: "As I've said before, our
8   forecasting system is not clairvoyant. Our
9   forecasting does statistical extrapolations based on
10  historical trends. If something that's outside our
11  mathematical model of the business changes, like a
12  war in the Middle East, our forecasting becomes
13  inaccurate."
14          Do you see that?
15    A     Yes, I do.
16    Q     Okay. And you stand by that?
17    A     Absolutely.
18    Q     Now, it wouldn't -- a war in the Middle
19  East is just one example. There could be who knows
20  how many examples; right?
21    A     Price of oil goes over a hundred dollars a
22  barrel, lots of things.
23    Q     And the point you are making is that while
24  your forecasting system does extrapolations based on
25  historic trends, if something is happening that would

385

1  suggest that the historical trend is not necessarily
2  reliable, then your forecasting will not be reliable;
3  is that right?
4      A   Right.  Major macroeconomic change;
5  sudden -- sudden growth in the economy or sudden
6  shrinkage in the economy would cause -- you can't
7  extrapolate anymore.
8      MR. SOLOMON:  Okay.  Have marked as the
9  next exhibit another excerpt from the Softwar book.
10      (Exhibit No. 98 was marked for
11      identification.)
12  BY MR. SOLOMON:
13      Q   And you will see that this chapter is
14  called "Hungarian Lessons," and in chapter -- it says
15  Chapter 12, "Hungarian Lessons."  I'm looking at the
16  language, "But the bit of GE he's" -- and it's
17  referring to you -- "improbably declared a model 11i
18  customer is in a far-flung outpost of Jack Welch's
19  sprawling imperium."
20      Do you see that?
21      A   I do.
22      MR. SOLOMON:  Then I'm going to have marked
23  as the next exhibit another excerpt from the Softwar
24  book.
25      (Exhibit No. 99 was marked for

386

1      identification.)
2  BY MR. SOLOMON:
3      Q   When you referenced GE Power's
4  implementation of 11i, were you careful to say that
5  it was the Hungarian operation that was implemented?
6      A   Sometimes I mentioned Hungary specifically
7  as a green field; sometimes not.  It was more than
8  just Hungary, but the very first one we did was in
9  Hungary.
10      Q   And I'm looking at the paragraph on
11  page 229 at the bottom that begins with, "The
12  contract."
13      Do you see that?
14      A   Okay.
15      Q   It says, "The contract was signed in late
16  October with a clear understanding that if Oracle
17  delivered at" -- and I'm not going to try and
18  pronounce the name.
19      Can you pronounce the name of that place?
20      A   I can't.
21      Q   It's V-e-r-e-s-e-g-y-h-a-z with an accent
22  z.
23      I'll continue:  "GE would start rolling out
24  11i across its thirty or so other turbine plants.
25  Within a month, the project was in trouble."

387

1      Just stopping there, is it true that the
2  contract was signed in late October?
3      A   I don't recall.
4      Q   Was the -- was the project in trouble by
5  the end of November 2000?
6      A   I think -- I think the issue was there
7  weren't -- there weren't a lot of experienced
8  computer consultants available in rural Hungary.
9      Q   And then it actually goes on down the page,
10  "Within a week we had thirty to forty Oracle
11  consultants.  It was like a MASH unit arriving."
12      Do you see that?
13      A   Right.
14      Q   And that was in response --
15      A   Response to lack of experience of technical
16  people in that part of the world.
17      Q   Did you visit that site?
18      A   I have not.
19      Q   Do you know -- I'm sorry.  We are back on
20  that exhibit, Mr. Ellison.
21      Do you know who that local -- do you know
22  anything about that local consulting firm, Ejiva?
23      A   No.
24      Q   Do you know who paid for the consulting?
25  Was it GE or was it Oracle?

388

1      A   I assume it was GE.
2      MR. SOLOMON:  Okay.  I've marked as the
3  next exhibit another excerpt from the Softwar book.
4      (Exhibit No. 100 was marked for
5      identification.)
6  BY MR. SOLOMON:
7      Q   I'm looking halfway down the page, almost,
8  and at the language that reads:  "Even though Ellison
9  used the threat of Lane's departure to get another
10  1.5 million options for himself and 1 million for
11  Jeff Henley, he felt increasingly sick about what
12  he'd done," and then there's an ellipses, and I just
13  want to stop there.
14      Did you use the threat of Ray Lane's
15  departure to get another 1.5 million options for
16  yourself?
17      A   No.  We --
18      MR. LINDSTROM:  You have answered the
19  question.
20  BY MR. SOLOMON:
21      Q   And the answer's no, you did not,
22  apparently?
23      A   No.
24      Q   Do you have any idea why Symonds would have
25  said this?