389

1    A   Mr. Symonds? His name is Matthew Symonds.
2    Q   I'm sorry.
3    A   For the record, most people pronounce it
4  "Simmons"; it's written "Symonds." He's a Brit.
5        What happened -- what happened was, Ray had
6  an offer from Novell, and that offered him more
7  compensation than he thought he would get at Oracle,
8  so as part of the deal for him to stay with Oracle,
9  he got more stock. And then the board of directors
10 felt that if they were going to give more stock to
11 one senior executive, that the entire management team
12 should get additional stock.
13   Q   Okay.
14   A   For purposes of equity. So they gave Jeff
15 Henley more stock, and they gave me more stock.
16   Q   Okay. And the two point -- which, in
17 aggregate, amounted to 2.5 million; right?
18   A   Yes.
19   Q   And it was 2.5 million that Mr. Lane was
20 awarded; is that right?
21   A   I don't recall.
22   Q   In fact, do you recall that Mr. Lane had
23 agreed that 2 million would be sufficient to induce
24 him to stay?
25   A   You have refreshed my memory, right. Yeah,

390

1  I think that's right. He asked for 2 million, and I
2  think I went to the board and asked for two and a
3  half.
4    Q   Okay. Did you tell the board that he would
5  be happy with 2 million?
6    A   I don't recall.
7    Q   Would you expect you would have told the
8  board that?
9    A   I -- probably, but I don't -- but I just
10 don't remember.
11   Q   Okay. And what's the equity involved in
12 you and Jeff Henley getting two and a half million
13 more options because Ray Lane did?
14   A   I think the board felt if Ray was going to
15 get a bump in compensation not at the usual time, you
16 know, in the middle of the year, that it wouldn't be
17 fair, you know, not to also review the other members
18 of the senior management team and see if an
19 adjustment there was also required for purposes of
20 equity.
21   Q   Have you ever fired anyone and timed the
22 firing to deprive them of being able to exercise
23 options?
24   A   No. The -- we grant our options at the end
25 of the year. We also fire people at the end of the

391

1  year as a rule. We review their performance at the
2  end of the year. So since -- since we give people
3  stock options and raises, performance -- performance
4  reviews and promotions around the end of the year,
5  there are promotions that are given around the end of
6  the year. Options, raises and terminations all
7  happen about the same time of the year -- around the
8  same time of the year.
9    Q   Okay.
10   A   And that could mean that someone is let go
11 before options vest, but it's all done -- virtually
12 all of our stuff is done right or about May 31st.
13   Q   You fired Mr. Falotti?
14   A   Pier Carlo Falotti, yes.
15   Q   And you fired Randy Baker?
16   A   Yes.
17   Q   And is -- in those instances --
18   A   I was trying to remember if I fired Randy
19 Baker.
20   Q   Okay.
21   A   I really don't remember if I fired Randy
22 Baker or if he left.
23   Q   Okay. Do you remember any issue with
24 respect to those two individuals, any issue
25 concerning their options and their ability to

392

1  exercise it?
2    A   I think there were lawsuits involved in
3  both cases. I think both of them sued to get the
4  right to vest their options.
5    Q   And do you know what the outcome of those
6  lawsuits was?
7    A   I believe we settled the Baker case, and we
8  won the Falotti case.
9    Q   And Falotti is the Swiss -- he was in
10 Switzerland at the time?
11   A   Complicated, yeah. He lived in
12 Switzerland. He paid taxes in Italy, and he was paid
13 in the United States.
14   Q   Do you know what the terms of the Baker
15 settlement were?
16   A   I don't --
17       MR. LINDSTROM: Objection. Before I
18 consider whether or not to allow him to respond to
19 that question, can you tell me what the relevance
20 would be to the Baker settlement to this litigation?
21       MR. SOLOMON: It doesn't matter because
22 Mr. Ellison doesn't know anyway, so I'll move on.
23       MR. LINDSTROM: Yeah, and let me make a
24 statement for the record, if I could. We have passed
25 100 exhibits now in this witness's deposition, which

393

1 is a milestone. As you know, it's the second day of
2 his deposition. It's now 2:30 of the second day of
3 his deposition, and as I've told you off the record,
4 we don't plan to make this witness available for
5 additional days of testimony, so I want to make sure
6 that you use the remaining time that you have to
7 cover the topics that you think you need to cover.
8         MR. SOLOMON: Okay.
9     Q    You exercised stock options in the end of
10 January 2001; correct?
11    A    Yes.
12    Q    Were all of those options awarded in the
13 regular course of business?
14    A    Again, I'm recalling, but I believe they
15 were going to expire. I believe I received them nine
16 and a half years ago, so the timing would be they
17 were going to expire something like June or July,
18 August of that year. So, you know, I think all of
19 those options were in the normal course of business.
20    Q    Okay.
21    A    And about to expire.
22    Q    Okay. And with respect to Mr. Baker and
23 Mr. Falotti, did you in any way irrigate to yourself
24 their options?
25        MR. LINDSTROM: Objection; irrelevant.

394

1         THE WITNESS: Again, there's no notion of
2 an option pool, a finite, you know -- that's not
3 quite accurate. We submit -- every year, we submit
4 option recommendations to the board of directors, and
5 they create a pool based on our recommendations, but
6 there's no matter of -- until that pool is created --
7 that pool is then created and then divided,
8 completely divided and granted. If someone leaves
9 for any reason, those options are then not -- are not
10 reapportioned to anybody else.
11        MR. SOLOMON: Okay. Thank you.
12    Q    Were there any similarities between the
13 roll-out of 11i and the 10 -- 10.7 database?
14    A    I think what you are -- 10.7 was an
15 application release. I think what you are referring
16 to is Database Version 6.
17    Q    Could be.
18    A    The version -- there was --
19        MR. LINDSTROM: The question is 10.7.
20 BY MR. SOLOMON:
21    Q    Go ahead. Just tell me what your answer
22 is.
23    A    We've never had a 10.7 on the database.
24 There's no such thing as 10.7 --
25    Q    Okay.

395

1     A    -- for database.
2     Q    So let me rephrase it, then.
3         What about an application 10.7?
4     A    No.
5     Q    No?
6     A    No.
7         MR. SOLOMON: Okay. Let's have marked as
8 the next exhibit another excerpt from the Softwar
9 book.
10        (Exhibit No. 101 was marked for
11        identification.)
12        THE WITNESS: Okay.
13 BY MR. SOLOMON:
14    Q    Okay. And I'm looking at the language that
15 reads: "The idea that there was a trade-off between
16 getting 10.7."
17        Do you see that language?
18    A    Are you looking at the bottom of the last
19 paragraph, bottom of the page, page 143?
20    Q    I'm on 144. Sorry.
21    A    Okay.
22    Q    And I'm at the -- almost at the top of the
23 page where it says, on the right-hand side, "The idea
24 that there was a trade-off."
25    A    Top paragraph in 144, the last sentence or

396

1 the first full paragraph on 144?
2     Q    If you look at the first full paragraph --
3     A    Okay.
4     Q    -- just under halfway in?
5     A    Yeah.
6     Q    And then the sentence on the right-hand
7 side, "The idea that there was"?
8     A    Okay.
9     Q    That seems to be suggesting that Mr. Lane
10 is saying that this product had been rolled out and
11 represented no improvement on the prior product; is
12 that right?
13    A    I'm not -- can I just have a second --
14    Q    Sure.
15    A    -- I need a second to look at this
16 document.
17    Q    Absolutely.
18    A    Okay.
19    Q    Mr. Lane seems to be saying that the claims
20 with respect to the 10.7 NCA were misleading; is that
21 fair?
22        MR. LINDSTROM: Objection; mischaracterizes
23 the document.
24        THE WITNESS: Where do you have --
25 BY MR. SOLOMON:

397

1  Q   Okay.  Let me just read it into the record.
2  A   Okay.
3  Q   "The idea that there was a trade-off
4 between getting 10.7 Smart Client right and Oracle
5 being first to the Internet is not one that Lane has
6 much time for.  He claims that when the Internet
7 version of 10.7, known as 10.7 NCA," and in parens,
8 "(network computing architecture), came out in early
9 1998, it wasn't any better than the client/server
10 release that had been rolled out five months earlier.
11 He says, 'NCA wasn't what it was sold as.  We said it
12 was browser-based, but you had to have Java code
13 running on the client or it wouldn't work.'"
14     Do you see that?
15  A   I do.
16  Q   Okay.  Do you agree with what Mr. Lane is
17 saying there?
18     MR. LINDSTROM:  The quote?
19     MR. SOLOMON:  Yes.
20     THE WITNESS:  Complete nonsense.
21     MR. SOLOMON:  Okay.  Okay.  That's fine.
22 Mark another excerpt from the book marked
23 as an exhibit.
24     (Exhibit No. 102 was marked for
25     identification.)

398

1 BY MR. SOLOMON:
2  Q   And I'm looking halfway down the page, the
3 language that reads: "Lane's version of the episode
4 is at odds with Ellison's.  He says that the issue of
5 moving away from client/server had not been that
6 important.  'It was the same old story that the
7 applications didn't work and they weren't competitive
8 and how Ron Wohl was a joke.'"
9     Do you see that?
10  A   I do.
11  Q   I assume that you are going to disagree,
12 but tell me if you will:  Do you agree or disagree
13 with the quotation it was the same old story that the
14 applications didn't work and they weren't
15 competitive?
16  A   It's just astonishing to me that people say
17 the applications don't work.  I mean, it's very glib
18 and easy to say -- we are the second-largest
19 applications company in the world.  We were at the
20 time, the second-largest applications company in the
21 world.  It didn't mean our applications were
22 flawless.  They certainly had a lot of bugs.  It's a
23 tough business.  They are complicated -- they are
24 very complicated pieces of engineering, but they did
25 work.  We had lots of happy customers.  The happy

399

1 customers outnumbered the unhappy customers by a huge
2 margin.  Ron Wohl had built those applications.  He
3 was not a joke.  He wasn't perfect.  You know, I
4 mean, but.
5  Q   You took exception to him being called a
6 joke; right?  You entered a footnote here?
7  A   Oh, I did.  There's a whole -- I should
8 just refer to my footnote.
9     MR. LINDSTROM:  You are remarkably
10 consistent.
11 BY MR. SOLOMON:
12  Q   And let me read you footnote --
13  A   But people do use language like that.  They
14 do use, you know, this doesn't work; that doesn't
15 work.  I mean, that kind of hyperbole, you know, is
16 just --
17  Q   And some people say it works; it's
18 integrated; just snap it together?
19  A   It is --
20     MR. LINDSTROM:  Argumentative.
21     THE WITNESS:  The -- that is a
22 simplification, certainly.
23 BY MR. SOLOMON:
24  Q   You say, "calling Ron Wohl a 'joke' is as
25 unprofessional and unfair as it is factually

400

1 inaccurate."
2  A   Yeah.
3  Q   "The applications that Ron Wohl built run
4 nearly fifteen thousand companies around the world,
5 second in success only to SAP."
6     Are you still second in success to SAP?
7  A   Unfortunately, yep.  Yep, after all these
8 years, still second.  But we are a lot closer to them
9 and -- and business is good.
10  Q   Okay.  The book describes -- I'll
11 paraphrase, but it seems to describe that you
12 orchestrated secretly, for quite some time, the
13 firing of Ray Lane; is that fair?
14  A   Well, it's not clear I had the authority to
15 fire Ray Lane, so when someone that senior in the
16 company is being fired -- one of my direct reports
17 is -- leaves -- I really have to go get support of
18 the board of directors or I can't do it.
19  Q   Okay.  But you talked about putting in
20 shadow management team sort of while he was still
21 there, but you had already decided he had to leave,
22 did you not?
23  A   I'm not sure shadow management team.  I
24 certainly started thinking about what it would mean
25 if -- what it would mean if Ray left, and how we

401

1  would organize the company after Ray left. And I
2  started acquainting myself with some of the things
3  that he was doing.
4      Q     Okay.
5      A     And thought about replacing -- you know,
6  new jobs for other people if he were to leave,
7  because I was certainly lobbying the board for him
8  being dismissed, that's right.
9      Q     Okay. And in the context of orchestrating
10  his departure, you described yourself as not
11  confron -- not confrontational but calculating; is
12  that fair, carefully calculating?
13      A     Yeah. I certainly plan -- I certainly
14  think it's my responsibility to plan for what happens
15  after he leaves.
16      Q     Okay.
17      MR. LINDSTROM: Counsel, are you going to
18  be on this topic much longer? Because, again, I
19  don't see the relevance of this to the litigation.
20      MR. SOLOMON: That's fine. It will emerge.
21      Q     Would you describe yourself as carefully
22  calculating generally about business?
23      A     I think I plan in advance.
24      Q     Okay. Would you describe yourself as a
25  hyperquant?

402

1      A     I think I'm rational. I think I'm
2  quantitative. I think I weigh risks and rewards.
3      We are done with this exhibit?
4      MR. SOLOMON: Yes.
5      I've marked as an exhibit another excerpt
6  from Softwar.
7      (Exhibit No. 103 was marked for
8      identification.)
9  BY MR. SOLOMON:
10      Q     Okay. I'm looking at page 180, the first
11  full paragraph, which reads: "Despite his enjoyment
12  of controversy, Ellison doesn't have a great appetite
13  for argument, at least not in a professional context.
14  While he's always prepared to listen to the views of
15  developers when they differ from his and is willing
16  to be persuaded if he's wrong, he doesn't enjoy
17  debates about business issues that depend on hunch
18  and feel."
19      Is that accurate?
20      A     Completely.
21      Q     "Ellison is a self-confessed 'hyperquant'
22  who feels fully in control only when he's processing
23  data."
24      Is that true?
25      A     I think -- I think it's a bit of an

403

1  exaggeration, but I -- yes.
2      Q     Okay. And then it goes on to say, Even
3  when flying a plane or racing "Sayonara," he prefers
4  to be guided by the numbers coming out of the
5  computer systems, etc.
6      Is that accurate?
7      A     Well, no. Again, it's -- it's a bit of an
8  exaggeration and simplification, but, you know,
9  clearly, I look at the computer system when I'm
10  racing the sailboat, but I also pay attention to, you
11  know, puffs on the water and clouds in the sky, so
12  I'm looking around at a lot of things, not just
13  numbers --
14      Q     Okay.
15      A     -- but I know what he's saying.
16      MR. SOLOMON: Okay. All right. I'll have
17  this additional excerpt of Softwar marked as an
18  exhibit, please.
19      (Exhibit No. 104 was marked for
20      identification.)
21  BY MR. SOLOMON:
22      Q     Okay. First, I'm looking at page 177 and
23  the language: "Remarkably, within not much more than
24  a year of Ellison's beginning his campaign to cut
25  costs by turning Oracle into an exemplary e-business,

404

1  the targeted first billion dollars of savings -- a
2  number pretty much plucked from the air to help
3  dramatize the project -- had been secured and
4  Oracle's profit margin had moved from a little under
5  20 percent to more than 30 percent."
6      Do you see that?
7      A     I do.
8      Q     Was the number pretty much plucked from the
9  air?
10      A     It wasn't calculated. That's what's meant
11  by "plucked from the air." It was seen as a -- it
12  was seen as a target. We thought there was a -- we
13  thought there was a lot of efficiency that could be
14  gained, so we picked as a target a billion dollars.
15  It's a round number. We are a big company, so we set
16  a goal of a billion dollars as something everyone
17  could remember.
18      Q     Okay. And then further down the page --
19      A     We didn't -- what I meant by that, we
20  didn't know where it was all going to come from by
21  the time we started the project.
22      Q     Okay. And then if you just go a few lines
23  down, it says, "Ellison decided that Oracle's own
24  Internet-derived efficiencies would be the first
25  reference. Soon, Oracle's $300 million marketing

Ellison, Lawrence  9/21/2006  10:57:00 AM

405

1  budget was pumping out the insistent message," and
2  then, in quotes, "By using our own E-Business Suite,
3  Oracle saved $1 billion in one year.'"
4      Do you see that?
5      A   I do.
6      Q   And is that the representation that you and
7  Oracle were making, in quotes, By using our
8  E-Business Suite, Oracle saved $1 billion in one
9  year?
10     A   Again, I think I answered this earlier.  By
11  using our own applications, by more automation, by
12  using the Internet, by using, you know, modern -- you
13  know, modern systems, modern technologies, we can
14  become much more efficient, and so can other
15  companies.
16     Q   Okay.  And then a few lines down, it says,
17  "Partly because of Ellison's reputation for
18  stretching the truth when it suited him, critics were
19  keen to find explanations for the cost savings that
20  didn't depend on the performance of Oracle's
21  software."
22     Do you see that?
23     A   I do.
24     Q   Do you believe you have a reputation for
25  stretching the truth when it suits you?

406

1      A   I don't -- I don't know.
2      Q   Do you stretch the truth when it suits you?
3      A   No.  I think I'm sometimes guilty of
4  simplification, you know, in a marketing slogan, but,
5  no, I try to be very, very accurate.  In fact, even
6  our marketing campaigns are -- are
7  quantitative-based; try to be based on hard, hard
8  facts.  We have a hard marketing campaign against SAP
9  right now, and it's based on numbers, so we think
10  fact-based, hard, quantitative ads are more
11  effective.
12     Q   And just so the record's clear, do you
13  believe that you have a reputation for stretching the
14  truth when it suits you?
15     A   I don't -- you know, I don't know.
16     Q   Okay.  And then on page -- at the bottom of
17  page 177 -- then it goes on to page 178 -- it says,
18  "An article in the magazine 'InternetWeek' by Mitch
19  Wagner published in March 2001 and entitled 'Oracle
20  Savings Don't Add Up' was fairly representative."
21     Do you see that?
22     A   Yes.
23     Q   Did you ever read that article?
24     A   I didn't.
25     Q   And you will see that it says, in the

407

1  middle, "Much of the savings actually have come from
2  cost-cutting measures that could have been achieved
3  without the Internet, according to experts and an
4  analysis of Oracle's financial statements."
5      Do you agree with that?
6      A   I'm sure there are some -- you know, some
7  of the savings had to do with sometimes you just hire
8  better people or -- but, no, I think the bulk of the
9  savings -- and we saved a lot more than a billion
10  dollars in the end, but the bulk of the savings went
11  from moving to modern automated systems.
12     Q   Okay.  And then it goes on to say, "One
13  such expert, John Puricelli, an analyst with A.G.
14  Edwards & Sons, opined that most of these savings had
15  come from old-fashioned belt-tightening."
16     Do you agree with that?
17     A   What is -- what is old-fashioned
18  belt-tightening?  It's an interesting metaphor.  If
19  everyone can save -- I mean, how is it that we were
20  able to save a billion dollars in such a short period
21  of time and raise our margin so much.  We were able
22  to do more with fewer people.  The only way you can
23  do that is have better automation and better tools.
24  It's really dramatic productive improvement based on
25  computers.

408

1      I mean, old-fashioned -- I mean,
2  old-fashioned belt-tightening, can your -- can your
3  firms save, you know, a lot of money by old-fashioned
4  belt-tightening?  I'm not sure anyone can save -- I
5  don't even know what old-fashioned belt-tightening
6  is.
7      Q   What about the quote that's attributed to
8  Mr. Puricelli:  "'A lot of the cost savings that came
9  were changes in employee behavior, and software
10  doesn't do that'"?
11     A   That's ridiculous.  That's ridiculous.  Of
12  course software changes behavior.  You think the word
13  processor or Microsoft, you know, desktop computers
14  changed human behavior?  It's just idiocy.
15     Q   Let's go to page 178.  And I'm now looking
16  at the language:  "A review of both investigations by
17  the Economist Intelligence Unit concluded, 'These
18  studies provide impressive evidence of a company in
19  the midst of dramatic changes inspired by the
20  Internet -- although as Oracle's senior executives
21  freely concede, many of the efforts of transformation
22  derive as much from old-fashioned sound business
23  practices as they do from Internet-driven
24  innovation.'"
25     Do you agree with that?

409

1    A    Well, not really.  I really think old -- I
2  don't think you want to have old-fashioned business
3  practices if you have -- if you have modern software.
4  I mean, everyone's business should change to take
5  advantage of technology.
6        So, I mean, it sounds interesting, but the
7  fact of the matter is modern tools has made -- you
8  know -- you know, changes our behavior and changes
9  our business practices.
10       MR. SOLOMON:  Okay.  So I've marked as the
11  next exhibit another excerpt from the Softwar book.
12       (Exhibit No. 105 was marked for
13       identification.)
14  BY MR. SOLOMON:
15    Q    Okay.  I'm looking at page 189, and I'm at
16  the bottom of the page.  I'm looking at the language
17  that reads:  "Their caveat was that Ellison's," in
18  quotes, "'change the game' strategy required
19  near-flawless execution."
20        Just stopping there, was it your view in
21  2000 that Oracle's strategy required near-flawless
22  execution?
23    A    If our strategy requires flawless
24  execution, we have no chance at all because we never
25  flawlessly execute.  Nobody ever flawlessly executes.

410

1        I think, you know, the strategy was a good
2  one.  It's paid off for us.  It's paid off for our
3  customers, and it's paid off for our shareholders,
4  but our execution wasn't flawless, but the good news
5  is nobody is -- nobody's is.
6    Q    Now, you say it's paid off for your
7  shareholders --
8    A    Yeah.
9    Q    -- but isn't it true that when you sold
10  your stock at the end of January 2001, the stock
11  price was $30 or more, and now it's under 20?
12    A    Absolutely, but I don't think that was to
13  do -- but our company has more than doubled in sales,
14  more than doubled in profits, more than doubled the
15  number of customers it has, and the fact is that --
16  you know, that we were in the midst now, in
17  hindsight -- we can all look back on those years and
18  say we were in the midst of a stock market bubble.
19  But were other companies in the face of that decline
20  in the bubble are not worth very much.  You know,
21  Oracle has come back very, very strong.
22    Q    It goes on to say, "Oracle was on a roll,
23  but if it became apparent that it had bitten off more
24  than it could chew, the company could expect little
25  mercy."

411

1        Was that an expectation that you had in
2  calendar 2000?
3    A    No.  Again, I think we had -- we had made
4  the right strategic decision, and I think history has
5  borne that out by building E-Business Suite; by going
6  to the Internet and building the E-Business Suite,
7  and it's been a bumpy road, but it's paid off for
8  everybody.
9    Q    But it's true you should have delayed
10  rolling out 11i; isn't that true?
11    A    The -- we did delay.  You know, we
12  delayed -- we probably delayed a couple times before
13  rolling it out.
14    Q    Then you should have delayed even longer?
15    A    Reasonable people can, you know, disagree
16  on that.
17    Q    What's your position?
18    A    I would have rolled it out at the same time
19  that I rolled it out.  I probably would have had our
20  existing customer base move -- migrate to the new
21  software more slowly so we could manage that process
22  a little bit better with -- within the support
23  organization.
24        So for new customers, it worked -- you
25  know, it worked pretty well.  We got it -- we got the

412

1  product out, but I would have -- would have kind of
2  narrowed the funnel so we could manage the process
3  better than we did.
4    Q    Don't you think you should have delayed the
5  release longer than you did?
6    A    No.
7        MR. LINDSTROM:  Objection; asked and
8  answered.
9        THE WITNESS:  No.  No.
10  BY MR. SOLOMON:
11    Q    Okay.  Looking at your footnote, it reads:
12  We are getting a lot of -- excuse me.  "We were
13  getting a lot of pressure from our customers to
14  deliver the 11i applications.  I made a lot of them
15  mad by delaying the release for several months.  I
16  should have delayed it even longer."
17        Is that your footnote?
18    A    Yeah.  Again, in more detail, let me repeat
19  what I said.  I would have released it exactly the
20  same time, but in terms of our existing customer
21  base, who were planning to migrate, I should have
22  slowed that process down.  It's just a little -- a
23  little more meat on the bones here.  Just slowed that
24  process down so we could have done a better job of
25  managing them through the early -- the early versions

413

1    of 11i.
2           MR. SOLOMON: I've marked as the next
3    exhibit another excerpt from the Softwar book.
4           (Exhibit No. 106 was marked for
5           identification.)
6    BY MR. SOLOMON:
7      Q    And I'm looking at page 157, and I'm
8    looking, actually, at your footnote, and it reads:
9    "He takes personal credit for our stock price run-up?
10   Amazing. Oracle rode the Internet wave because our
11   database powered virtually every major Web site on
12   the Net. If you plot the stock price of Cisco,
13   Oracle, and Sun, you will see that all three
14   companies rose and fell together in perfect
15   synchronization as sentiment about the Internet rose
16   and fell."
17          Did you write that footnote?
18     A    I did.
19     Q    Do you recall that in January of 2001,
20   Cisco preannounced that it wasn't going to make its
21   numbers?
22     A    I don't recall.
23     Q    You don't recall that event?
24     A    Well, you are refreshing my memory, so kind
25   of.

414

1      Q    Okay. At the time that Cisco preannounced,
2    do you recall being concerned that Oracle might not
3    make its numbers?
4      A    No, because we -- you know, we had signed
5    the largest -- you know, we had signed the largest
6    deal in our history, and we had a strong pipeline.
7    We were in good shape in the quarter.
8      Q    Okay.
9      A    This was written in hindsight, of course,
10   just looking at the graphs.
11          MR. SOLOMON: Okay. Let's go off the
12   record for a couple seconds to organize some
13   documents.
14          THE VIDEOGRAPHER: Off the record at 3:16.
15          (Recess taken.)
16          THE VIDEOGRAPHER: On record at 3:30.
17          MR. SOLOMON: Have marked as the next
18   exhibit a document produced by the defendants in this
19   litigation with the control numbers 034669 and 670.
20          (Exhibit No. 107 was marked for
21          identification.)
22   BY MR. SOLOMON:
23     Q    When you have had a chance to view it, let
24   me know if you recognize it, please.
25     A    Okay. I've read the whole thing.

415

1      Q    Okay.
2      A    But still not quite sure what it's about.
3    Go ahead.
4      Q    Okay. You will see that it's dated the
5    11th of January 2000 and that you are an addressee?
6      A    Yes.
7      Q    Okay. And it's Larry -- to Larry, Jeff,
8    Ray and Safra. "I wanted to let you know where we
9    are in analyzing the effect of the changes we made
10   yesterday to the conversion ratios and in analyzing
11   the effect of the pricing changes on the Q3
12   pipeline."
13          Do you see that?
14     A    I do.
15     Q    Do you have any idea what the reference is
16   to the changes being made to the conversion ratios?
17     A    A conversion ratio means the number of
18   the -- percentage of the deals in the pipeline that
19   will become sales. That's conversion ratio. And the
20   pricing changes are referring to changing in price in
21   our products. So there are two things.
22     Q    Right.
23     A    -- that will change the forecast. One is
24   if the -- the product -- if we decrease the price of
25   the product, and the other would be if we increased

416

1    or decreased the conversion ratio.
2      Q    Okay.
3      A    But I don't know what it's specifically
4    about.
5      Q    Okay.
6      A    I don't know what price changes they are
7    talking.
8      Q    And you don't know what prompted the
9    changes reflected here in the conversion ratios?
10     A    I would be guessing, but, no, I don't know.
11     Q    Okay. And what is your guess?
12          MR. LINDSTROM: Objection; calls for
13   speculation, no foundation.
14          THE WITNESS: My guess is we were looking
15   at lowering prices. We virtually never raise prices.
16   We were looking at lowering prices and how that would
17   affect -- we tend to test a price change against an
18   existing forecast, and we will take it out several
19   quarters. And sometimes there's an elasticity
20   change, so if the price goes down, people buy more.
21   So they buy more frequently, so the conversion ratio
22   might go up. But, again, I don't know specifically
23   what this experiment was.
24          MR. SOLOMON: Okay. Have marked as the
25   next exhibit another document produced in the

Ellison, Lawrence  9/21/2006  10:57:00 AM

417

1 litigation with the control number 020724 and 725.
2     (Exhibit No. 108 was marked for
3     identification.)
4     THE WITNESS:  Okay.
5 BY MR. SOLOMON:
6   Q   Okay.  Do you recognize this?
7   A   I don't specifically recognize it.
8   Q   Okay.  It's dated the 11th of September
9 2000?
10   A   Right.
11   Q   And it's from Jeff Henley to Jennifer
12 Minton, and you are copied; is that right?
13   A   Yes.  Yes.
14   Q   And this would have been in your files in
15 or around September of 2000?
16   A   Yes.
17   Q   And it wasn't produced from your files and
18 you can't explain why; is that right?
19   A   That's correct.
20   Q   The first sentence reads:  "Thank god there
21 was a disproportionate amount that went to ERP.  Only
22 CRM now looks bad and total apps is at least
23 respectable."
24     Do you see that?
25   A   Yes.

418

1   Q   Do you recall being aware in September of
2 2000 that CRM was looking bad?
3   A   You mean the growth rate --
4   Q   Right.
5   A   -- the growth rate in that quarter --
6   Q   Correct.
7   A   -- most-recently-reported quarter?
8     Yeah, our CRM applications were new.  We
9 had a very formidable competitor that we were behind,
10 Siebel Corporation, and CRM was a new business for
11 us.
12   Q   In fact, it reflects a negative growth
13 rate; is that right?
14   A   Yes, it does.
15   Q   If you turn the page, it says, at the top,
16 "Jeff Henley wrote," and down the page a little bit,
17 it says, "The only apps groups that should" -- "that
18 should" -- I speculate that is meant to say "shows"
19 or "show" -- "showed," but anyway, "the only apps
20 group should strong growth rate were iProcurement,"
21 in parens, "(76%) and HR," in parens, "(110%).  In
22 CRM the huge HP deal ago was just a killer coupled
23 with slow closings on a number of deals or losses."
24     Do you see that?
25   A   I do.

419

1   Q   Do you know what the reference is to the HP
2 deal?
3   A   Yeah.  I think in the same quarter -- at
4 least this is refreshing my memory, so.  In the same
5 quarter last year, we concluded a very large purchase
6 of CRM by Hewlett-Packard.  They bought it.  So
7 growth rate is a comparison between what you did this
8 quarter and the quarter a year ago.  If you had a
9 really big deal, an out-of-the-ordinary big deal a
10 year ago, it makes your comparisons difficult, and
11 it's much harder to show growth if you had a really
12 great quarter a year ago, and that's what this is
13 referring to.
14   Q   Okay.  And is the reference here to an HP
15 deal that was contemplated to close in Q1 but didn't?
16   A   No.  I believe this is referring to an HP
17 deal that actually closed a year before.
18   Q   Got it.  Okay.
19   A   In '99.
20   Q   Okay.
21   A   So this is 2000; right?
22   Q   Yeah.
23   A   Yeah.  So HP deal closed in '99.  So
24 comparing the 2000 -- the results in 2000.  That's
25 what I think this is -- again, I don't know these

420

1 dates offhand.
2   Q   Okay.
3   A   So comparing these had made it hard to show
4 growth this year because the big deal --
5   Q   Okay.
6   A   -- last year.
7   Q   The slow closings on a number of deals or
8 losses, that would refer to the current quarter --
9   A   Current quarter in 2000, right, for CRM.
10   Q   Okay.
11   A   And tools is also down a lot.
12   Q   Okay.  Then it goes on to say, "We'll have
13 our work cut out to explain apps.  We rebounded
14 strongly on database as we promised but apps on the
15 surface looks terrible.  This will be the area of
16 focus on the call."
17     Do you recall Mr. Henley sharing with you
18 around this time that the apps numbers on the surface
19 looked terrible?
20   A   Again, I'd have to go back and look at what
21 growth rate we were expecting for applications,
22 because I think the 45 percent is -- well, actually,
23 he says -- it's kind of funny.  In one part of it, it
24 says "on the surface" -- people aren't always
25 consistent.  "On the surface looks terrible."  Then

421

1  back here, in the same note, he says the "total apps
2  is at least respectable."
3      Q   Right.
4      A   So the note itself is not consistent.
5      Q   Doesn't that reflect, though, that his
6  concern is with CRM more than with ERP?
7      A   No. I think he was talking --
8      MR. LINDSTROM: Calls for speculation.
9      THE WITNESS: This will be -- let's see. I
10  mean, just looking at the two paragraphs, it says,
11  "We'll have our work cut out to explain apps." So I
12  think he's referring to all of applications. It's --
13      MR. SOLOMON: Okay.
14      THE WITNESS: -- just not consistent.
15      MR. SOLOMON: Okay. I've marked as the
16  next exhibit a document produced in the litigation
17  with the control number 036423.
18      (Exhibit No. 109 was marked for
19      identification.)
20      THE WITNESS: Okay.
21  BY MR. SOLOMON:
22      Q   Okay. Do you recognize this?
23      A   I don't recall it specifically.
24      Q   Okay. You see it's dated the 22nd of
25  September 2000, and it's from Lia Burke to you and

422

1  others?
2      A   Yes.
3      Q   Do you know who Lia Burke is?
4      A   I do not.
5      Q   And it says, "Larry, Jeff asked that we
6  provide you with a status on the use of OSO to
7  capture pipeline and forecast data.
8      "The pipeline data in OSO is in very good
9  shape, as the data in OSO is very dynamic, at the
10  time of the forecast submissions earlier this week
11  the pipeline data was in agreement with what is being
12  presented to the EC on Monday. The forecast module
13  is newer and while most of the data is good we
14  continue to work with a few groups to ensure OSO is
15  being kept up to date."
16      Do you see that?
17      A   I do.
18      Q   Is that an issue that you were involved
19  in at that time --
20      A   Yeah.
21      Q   -- what was going into OSO?
22      A   Yeah. Specifically, I wanted to not get
23  forecasts that weren't -- that didn't come out of the
24  system, so our old practice where people -- the sales
25  executives would come into the room and they would

423

1  have their forecasts on spreadsheets or in their
2  heads and you go around the room and get everyone's
3  forecast, and I thought -- and then we would go back
4  and look at OSO and the two might not necessarily
5  agree, so we were trying -- you know, I was trying to
6  get the system to be used at all times.
7      Q   Okay. At around this time, did you want
8  more risk to be put into the forecasts?
9      MR. LINDSTROM: Vague and ambiguous.
10      THE WITNESS: No. I've always wanted the
11  forecast to be accurate. You know, I would say
12  slightly conservative but accurate.
13      MR. SOLOMON: Okay.
14      THE WITNESS: So sometimes -- sometimes
15  people would get so conservative, you get a culture
16  where everyone wants to beat their forecast every
17  time, and then you can get very -- you know,
18  misleadingly low forecasts. So I've always -- I'll
19  stop there.
20      MR. SOLOMON: Okay. So we are having
21  marked as the next exhibit another document produced
22  by the defendants with the control numbers 203681
23  through 683.
24      (Exhibit No. 110 was marked for
25      identification.)

424

1      THE WITNESS: Okay.
2  BY MR. SOLOMON:
3      Q   Do you recognize this?
4      A   I don't.
5      Q   You will see, on the third page of the
6  exhibit -- well, first, on the first page, the
7  subject is "Draft New terminology on Forecasting"?
8      A   Yeah.
9      Q   It's dated October the 6th, 2000; right?
10      A   Right.
11      Q   And then the third page has some text, and
12  it starts, "Hi, Jim, we can talk through the
13  recommendation, let me know your thoughts...
14      "Recently Larry has changed the way that he
15  is interpreting our forecast. He would like us to
16  reflect our numbers as follows," and then there's a
17  "Worst," "Forecast," and a "Best" category.
18      Do you see that?
19      A   I do.
20      Q   Does this reflect the -- a change in
21  forecasting that you directed?
22      A   Yeah. I was trying to accomplish two
23  things. I wanted to -- you know, yeah. Rather than
24  a single number -- rather than getting a single
25  number, I wanted to get three numbers: Worst case,

425

1  most likely case, and best case --
2        THE REPORTER:  Say it one more time.
3        THE WITNESS:  Rather than getting a single
4  forecast number from each of the sales executives, I
5  wanted to get three separate numbers reflecting a
6  worst case, guaranteed we will at least do that well;
7  a most likely case, what you thought you were
8  actually going to do; and a best case, if everything
9  goes really well, how high could it go.
10        And I was also trying to get -- in putting
11  in the new methodology, I was also trying to
12  synchronize the way Europe forecasts with the way
13  Latin America forecasts and Asia Pacific and
14  different groups would have different ways of doing
15  their forecast.  And I was trying to get as much of
16  that variability out of the system as possible.
17        Now, you can't get the personalities out of
18  the system.  I mean, if you have a conservative sales
19  executive, they are going to forecast conservatively.
20  If you have an optimistic sales executive, they are
21  going to forecast less conservatively.
22  BY MR. SOLOMON:
23     Q     What drove you to make this change?
24     A     The -- we were going to put the three
25  numbers in the computer system.  What I wanted to

426

1  see -- I've done -- to get more information, just
2  getting more -- you know, getting more data rather
3  than one number, which usually was someplace between
4  the best case and the most likely -- what they used
5  to call a commit forecast; one we could count on.  I
6  was trying to, you know, get a better idea of what,
7  you know -- get more data -- more data to work with.
8     Q     Okay.  And, at that stage -- and we are
9  talking about October 2000 -- how long had Oracle
10  internally been using OSO?
11     A     I don't recall.
12     Q     Years or months, could you tell me that?
13     A     I think a few years.
14        MR. SOLOMON:  Okay.  Mark as the next
15  exhibit a document produced by the defendants with
16  the control number 6123 -- 612306 and 307.
17        (Exhibit No. 111 was marked for
18        identification.)
19        THE WITNESS:  Okay.
20  BY MR. SOLOMON:
21     Q     Do you recognize having seen this before?
22     A     No, I don't.
23     Q     The e-mail exchange in the bottom half of
24  the page is from David Winton to David Winton, and it
25  appears that went up the chain to George Roberts.

427

1        Do you see that?
2     A     Yes.
3     Q     And it says that David Winton wrote, and
4  then there are a few paragraphs and some numbered
5  paragraphs starting with, "1.  Slow start in FY'00."
6        Just for the record, this is dated 7th of
7  December -- this is dated the 6th of December 2000.
8        "Slow start in FY'00 -- The growth
9  comparisons to last year have been relatively easy in
10  the first two quarters as we did not perform that
11  well a year ago.  The disruption over account moves
12  in Majors last year was the main factor."
13        Were you aware that, as stated here, the
14  growth comparisons for last year had been -- the last
15  year had been relatively easy in the first two
16  quarters because they -- Oracle did not perform well
17  in those quarters in the previous year?
18     A     Don't recall.
19     Q     You don't recall.  Okay.
20        And then No. 2, "More Big Deals this
21  Q1&2 -- As the schedule shows, our results this year
22  have been boosted by big deals in both quarters.
23  Combined, these greater than $5 million deals
24  contributed over $55 million year to date.  Note that
25  we only have one deal over $5 million currently in

428

1  the Q3 Pipe.  Last year we had four deals that netted
2  $28 million."
3        Do you see that?
4     A     I do.
5     Q     Did you know that in December of 2000?
6        MR. LINDSTROM:  Compound.
7        THE WITNESS:  This is -- this is in George
8  Roberts' sales unit.
9        MR. SOLOMON:  Correct.
10        THE WITNESS:  Because we have lots and lots
11  of sales units.
12        MR. SOLOMON:  Correct.
13        THE WITNESS:  But, no, I did not know
14  specifically know the details in his unit.
15  BY MR. SOLOMON:
16     Q     And "3.  Growth comparisons tougher in
17  Q3&4."  It says, "NAS results took off last year in
18  Q3 and continued into Q4.  Growth rates will slow in
19  the second half but we still feel that the annual 31%
20  target is achievable with some potential upside of 2
21  to 3 points if Q3 is strong."
22        Do you see that?
23     A     I do.
24     Q     Were you aware of those facts in December
25  of 2000?

429

1    A    Not specifically that I recall.
2    Q    And then 4 says, "Q3 Pipe not where it
3  needs to be."
4        Were you aware of that in December of 2000?
5    A    Again, I tend not to look at each
6  individual sales unit; I tend to look at the company
7  as a whole.  But, no.  No, I don't recall.
8        MR. SOLOMON:  All right.  I've marked as
9  the next exhibit another document produced by the
10  defendants in this litigation with a control number
11  040617.
12        (Exhibit No. 112 was marked for
13        identification.)
14  BY MR. SOLOMON:
15    Q    And when you have had a chance to review
16  it, let me know if you recognize this.
17    A    I don't recognize it, no.
18    Q    Okay.  And, again, it references a sales
19  unit in the company, sales division?
20    A    I believe this is all of North America,
21  but, again, I'm not -- so this is not a unit, but
22  this is --
23    Q    Okay.
24    A    -- all of North America.
25    Q    Okay.  And that's in contrast to the last

430

1  exhibit which was --
2    A    Which was just George -- yes, exactly
3  right.
4    Q    Is it right that NAS contributes about
5  25 -- at that time, contributed about 25 percent of
6  the company's revenues?
7    A    Over the previous 12 months?  I'm not --
8  that's close.
9    Q    Okay.
10    A    Close.
11    Q    Okay.  Back to this exhibit, it's dated
12  January 11th, 2001.  It's from David Winton to
13  Jennifer Minton, and it starts off saying, "We
14  finished the Ops Reviews this afternoon and I wanted
15  to give you a quick update on the current quarter and
16  full year look," and it says, "Our Q3 forecast of
17  $346 million has not changed but the upside or Best
18  is revised down by $16.8 million to $360 million."
19    A    Right.
20    Q    It says, "Main factors," and it says, "1.
21  The Pipe has not grown as we had anticipated.  We're
22  actually slightly down from December and reporting."
23        Do you see that?
24    A    I do.
25    Q    So you were aware as of December -- excuse

431

1  me, January 11, 2001 the pipe had not grown as
2  anticipated?
3    A    I don't recall.
4    Q    No. 2 says, "Lack of big deals" -- excuse
5  me.  "Lack of big deals.  Unlike Q1 & Q2, we have" a
6  "few big deals in Best case that could drive us past
7  the $360 million" -- "we have few," not "we have a
8  few." "We have few big deals," excuse me.
9        Were you aware that unlike Q1 and Q2, there
10  were few big deals in Q3 that could drive you past
11  360?
12    A    No, I was not aware.
13    Q    "3," Drops in -- "Drop in Technology.  As
14  reflected in the softening Pipe, both GB and Majors
15  see a slow down in both Q3 and Q4.  GB's dot com
16  bubble has burst," and in parens, "(they expect the
17  West to end the year 30 to $40 million behind their
18  original Budget for Technology).  Majors sees a slow
19  down in spend along with smaller deal" size --
20  "sizes.  Also, the change in the ASP model for
21  Generic Tech hosting" 11i's -- lic's coupled with the
22  dot com crash is impacting projected Tech results in
23  that segment."
24        Do you see that?
25    A    I do.

432

1    Q    Were you aware of the issues raised in
2  Point No. 3 in January of 2000 -- January of 2001,
3  excuse me?
4    A    Yes, and I certainly don't agree with all
5  of them.  The ASP model for Generic Tech hosting
6  never happened.
7    Q    Okay.  Do you know why that reference is
8  made there, though?
9    A    At the time, people were talking about no
10  longer buying their own computers, no longer buying
11  their own software but rather renting time from --
12  from hosters, you know, kind of a whole new -- I'm
13  trying to remember the -- some of the names of some
14  of the businesses that were started at the time to do
15  this generic hosting, but they are all gone.
16    Q    Do you think in January 2001 a regular
17  Oracle investor would be interested in knowing that
18  the pipe hadn't grown as anticipated?
19        MR. LINDSTROM:  Objection; calls for
20  speculation, hypothetical, no foundation.
21        THE WITNESS:  I don't know.
22        MR. SOLOMON:  Have marked as the next
23  exhibit a document produced by the defendants in this
24  litigation with the control number 297773.  Actually,
25  it will be 297772 and 3.

433

```
1       (Exhibit No. 113 was marked for
2       identification.)
3    BY MR. SOLOMON:
4       Q    And let me know if you recognize this?
5       A    I don't.
6       Q    You see it's dated the 17th of January
7    2001, and it's from Jim English to Jennifer Minton.
8       Do you see that?
9       A    I do.
10      Q    It says, "When you asked for a forecast
11   summary I should have asked what you were looking
12   for. I hope this helps.
13      "We are holding at $150 million but I'll be
14   a bit more aggressive and say a likely of 150 million
15   to $170 million. If you pull Covisant" -- or
16   "Covisant" -- "from pipe, apply our week 7 FY00
17   coverage rate and then add Covisant back in you get
18   $170 million. We have a lot of pipe at challenging
19   clients."
20      Do you see that?
21      A    I do.
22      Q    Were you aware as of the 17th of January
23   2001 that you had a lot of pipe at challenging
24   clients?
25      A    I was aware we had a lot of pipe.
```

434

```
1       Q    And what about the end bit of that?
2       A    I'm not -- I wouldn't know what he means by
3    "challenging clients." If they are in the pipeline,
4    presumably there's -- you know, they have been
5    qualified.
6       Q    And what's the minimum to get into the
7    pipe?
8       A    The minimum likelihood of close?
9       Q    Correct.
10      A    At this time, I'm not sure.
11      Q    Then there's some bullet points. The first
12   bullet point says, "nearly $30 million at GE.
13   Although they announce pending layoffs our biggest
14   deals are in Capital, Aircraft, Engines and Power
15   which were reported to be doing very well. We will
16   see in coming weeks."
17      Do you see that?
18      A    I do.
19      Q    And it says, "GM with poor earnings and
20   announced poor 1st quarter. They are reviewing all
21   budgets."
22      Do you see that?
23      A    Yes.
24      Q    And, "Gateway. Again poor earnings but we
25   presented very strong ROI analysis."
```

435

```
1       Do you see that?
2       A    Yes.
3       Q    And then the next sentence says, "Our best
4    is at $220 million which is a real stretch as several
5    of these deals will be Q4. One" ADP -- "AVP talked
6    of starting to see indications of client delays on
7    decisions."
8       Do you see that?
9       A    I do.
10      Q    Were you aware on or around January 17,
11   2001 of Oracle -- an Oracle AVP reporting indications
12   of client delays on decisions?
13      A    We have a lot of AVPs, and I was unaware of
14   it.
15      Q    Now, you will see, if you go all the way
16   down to the bottom of the page, it says, "Q3 Forecast
17   coverage is 246%." 340 -- "342% without Covisant,"
18   or "Covisant."
19      Do you see that, the very, very last entry
20   on the page?
21      A    Yes.
22      Q    Yeah.
23      Do you have an understanding what is meant
24   by 246 percent coverage for Q3, 342 percent without
25   Covisant?
```

436

```
1       A    I'm not sure how that -- I'm not sure how
2    they are calculating the pipeline --
3       Q    Okay.
4       A    -- with this. What I think it means -- if
5    you want me to guess, then I'll tell you.
6       MR. LINDSTROM: Objection; calls for
7    speculation.
8       THE WITNESS: It means the size of the
9    weighted pipeline. The pipeline times the
10   probability is roughly two and a half times the
11   forecast.
12   BY MR. SOLOMON:
13      Q    Okay. Do you have an understanding why the
14   calculation was with Covisant and without Covisant?
15      A    "Covisant."
16      Q    "Covisant."
17      A    It doesn't exist anymore --
18      Q    Can just say "Covisant."
19      A    -- it doesn't matter. It doesn't exist.
20      The -- it was such -- it was such a large
21   deal, it kind of throws the numbers off, and there's
22   a statistical technique called "exponential
23   smoothing" that takes it out.
24      Q    And why would you -- why is that being
25   employed?
```

437

1    A    Again, it was -- it was a -- it's a very
2   large -- it's a very, very large deal. It's a
3   standard statistical technique.
4    Q    The standard statistical technique being
5   take out something that is anomalous?
6    A    Just anything that's large.
7    MR. SOLOMON: Okay. Have marked as next
8   exhibit another document produced by the defendants
9   in this litigation with the control number 220022 to
10  24.
11   (Exhibit No. 114 was marked for
12   identification.)
13  BY MR. SOLOMON:
14   Q    And tell me if you recognize this, please?
15   A    I do not.
16   Q    Okay. You see it's dated Thursday,
17  January 18, 2001, and it reflects e-mail exchanges
18  among Jennifer Minton, "Ivgen" or "Ivgen" --
19   A    Ivgen Guner.
20   Q    And copies a number of people. And I'll
21  skip the middle page, and then the third page has
22  some text.
23   Do you see that?
24   A    I do.
25   Q    And a third of the way down, under

438

1   "Budget," it says, "To follow-up on my voice mail
2   from last night -- The field is getting concerned
3   about the targets."
4    Do you know what that refers to?
5    A    Where are you?
6    Q    Okay. Under "Budget."
7    A    Under "Budget." Yeah. We were talking
8   about planning for next year, and I had, according to
9   this note, set a target of 30 percent growth for next
10  year; you know, pretty aggressive growth -- you know,
11  reasonably aggressive growth targets, and that means
12  we have to start hiring people, and I guess this
13  means that they thought perhaps that my 30 percent
14  growth for, you know, this year and next was too
15  aggressive.
16   Q    Okay. Now, isn't it true, though, that if
17  you look at the context of this, what's being
18  expressed here, is concern about targets for the
19  current fiscal period?
20   MR. LINDSTROM: Objection; argumentative.
21   THE WITNESS: It's not how I read it. I
22  mean, I read -- I read the top -- you know, the top
23  line --
24   MR. SOLOMON: Okay.
25   THE WITNESS: -- that Larry Ellison has

439

1   made it clear that this year and next year's targets
2   are 30 percent. So we want to keep the same growth
3   rate not only for this year but for next year --
4    MR. SOLOMON: Okay.
5    THE WITNESS: -- and they were concerned
6   about that being too aggressive a growth target.
7   BY MR. SOLOMON:
8    Q    Okay. It's fair to say -- right? -- that
9   this is half way through Q3, fiscal Q3 of '01; right?
10   A    Yes.
11   Q    And, at that point, this seems to reflect
12  that at a meeting around this time, you had made it
13  clear that the license revenue growth target for
14  fiscal '01 remained at 30 percent; right?
15   A    Again, I don't remember -- I'm just using
16  this -- you know, this document to refresh my memory.
17  I don't remember this document at all.
18   Q    Okay.
19   A    But -- I don't think I've ever seen this
20  document before, but it is our practice to plan; you
21  know, takes a long time to hire people, and when you
22  are growing that rapidly, and so we talk about our
23  targets for this -- the coming year.
24   Q    Okay.
25   A    So I was quite optimistic and thought we

440

1   would keep the growth rate up.
2    MR. SOLOMON: Mark as the next exhibit a
3   document produced by the defendants in this
4   litigation with the control numbers 00540 to 543.
5    (Exhibit No. 115 was marked for
6   identification.)
7    THE WITNESS: Okay.
8   BY MR. SOLOMON:
9    Q    Okay. Do you recognize this document?
10   A    I don't recognize it, but I'm on the
11  distribution list.
12   Q    Okay. Do you -- and when you say that, you
13  don't remember ever seeing this before?
14   A    I don't recall it. Looks like -- I'm sure
15  it was sent to me, but I don't recall seeing it.
16   Q    Okay. And it's dated Wednesday, January
17  17, 2001, and it is sent from Larry Garnick to you
18  and others?
19   A    Right.
20   Q    And this would have been in your file on or
21  around January 17, 2001?
22   A    That's right.
23   Q    And I'll represent to you it wasn't
24  produced from your file and you cannot explain why;
25  is that right?

441

1     A    That's right.
2     Q    Looking at the first bullet point on the
3  first page, it says, in part, "The license revenues
4  growth rate was 35% in USD, 25 points better than the
5  10% growth we experienced in December FY00 over
6  December FY99.  However, excluding the $60 million
7  Covisant" -- "Covisant" -- "license deal, the USD
8  growth rate would have been only 6%."
9         Do you see that?
10    A    I do.
11    Q    And it goes on to say, "Excluding Covisant,
12 OPI license revenue growth would have been" a
13 negative "(85%)."
14        Do you see that?
15    A    I do.
16        MR. LINDSTROM:  I think that
17 mischaracterizes the document, or at least maybe I'm
18 misreading it.  I don't see "a negative 85%."  Maybe
19 you misread it.
20        THE WITNESS:  I think that's what the
21 parentheses mean.
22 BY MR. SOLOMON:
23    Q    The parentheses mean negative, don't they?
24    A    Right.
25    Q    Thank you, Mr. Ellison.

442

1         Do you remember being aware of that at the
2  time?
3     A    Yes.
4     Q    I'm skipping a bullet point to the next --
5  to third bullet point.  "December license results
6  represents 19% of the total forecasts for Q3 FY01.
7  In FY00 and FY99, December represented 16% and 19%,
8  respectively, of the quarter total."
9         Do you see that?
10    A    I do.
11    Q    Were you aware of that at the time?
12    A    Yes.
13    Q    And then the next bullet point reads:
14 "Applications product growth was 216%," and then in
15 brackets, it says "[ERP equals 365%, CRM equals," in
16 parens, "(58%)]."
17        Do you understand that 58 percent to be a
18 negative?
19    A    I do.
20    Q    Yeah.
21        "While database product growth was 17%,
22 and, again, in parens, "[Server equals 21%" -- sorry,
23 in brackets, "[Server equals 21%, Tools equals," in
24 parens, so a negative 26 percent; is that correct?
25    A    That's correct.

443

1     Q    And then it says, "Excluding Covisant,
2  Applications product growth would have been" negative
3  "(46%) and database product growth would have been
4  13%."
5         Do you see that?
6     A    I do.
7     Q    And did you know that at the time?
8     A    Yes.
9     Q    Okay.  And then if you look at the
10 spreadsheet on the second page, you will see that
11 there's a heading "License Organization," and looking
12 at the line for "Nussbaum OSI"?
13    A    Yes.
14    Q    There's a reference to a negative 81
15 percent growth under U.S. dollars.
16        Do you see that?
17    A    I do.
18    Q    And a negative 81 percent growth under
19 constant dollars.
20        Do you see that?
21    A    I do.
22    Q    And did you know that at the time?
23    A    I did.
24    Q    And against NAS for Roberts, in constant --
25 excuse me, in U.S. dollars, it reflects a negative

444

1  growth rate of 24 percent.
2         Do you see that?
3     A    Yes.
4     Q    And in constant dollars, a negative growth
5  rate of 23 percent.
6         Do you see that?
7     A    I do.
8     Q    And you knew that at the time?
9     A    Yes.
10    Q    And have you ever experienced, halfway into
11 the fiscal quarter, negative growth rates in all U.S.
12 divisions?
13        MR. LINDSTROM:  Mischaracterizes the
14 document.
15        THE WITNESS:  We didn't have negative
16 growth rates in all U.S. divisions.
17 BY MR. SOLOMON:
18    Q    That's not what I said.  I said, "Have you
19 ever experienced?"
20    A    All three negative --
21    Q    Yes.
22    A    Well, this was not halfway through.  This
23 was one-third of the way through.
24    Q    Okay.  But --
25    A    So in -- we have no measures for halfway

445

```
1    through a quarter. I'm not trying to be cute here.
2        Q.    Okay.
3        A.    We have -- you know, we have -- after Month
4    1, one-third; after Month 2, two-thirds, and a final,
5    so there's no halfway.
6        Q.    Okay.
7        A.    So have I seen negative growth in all
8    three -- we had three U.S. divisions here that are
9    listed:  OSI, NAS, and OPI.
10       Q.    Correct.
11       A.    Okay.  Two are negative; one is positive.
12           After the first month of the quarter, which
13   is what this is, you know, often, you know -- as I
14   say, the range is 15 to 20 percent of how much
15   business we do in a quarter is done in the first
16   month. Sometimes even lower, you know, 14 percent,
17   13 percent. So I have seen, after the first month,
18   the entire U.S. is negative.
19       Q.    And what about in the third fiscal quarter?
20           MR. LINDSTROM:  After a --
21           THE WITNESS:  So going back historically,
22   you are asking --
23           MR. SOLOMON:  Yes.
24           THE WITNESS:  -- me, historically, have I
25   ever seen --
```

447

```
1        Q.    -- objectively.
2        A.    The truth of the matter is I'm not sure
3    which -- you know, which of our first months is worse
4    again. Typically, our first month of any quarter is
5    not very strong for us.
6        Q.    And if I tell you that the average
7    contribution of December to the third fiscal quarter
8    at Oracle has been 21 percent, would you have a
9    problem with that?
10       A.    No. I think -- I think I said 15 to 20, so
11   21 is not so far off.
12       Q.    Now -- and, again, you note that, in this
13   document, there's Covisant in -- or Covisant in,
14   Covisant out.  Why?
15       A.    Because it was a very -- because it was a
16   very, very large transaction.
17       Q.    Did Oracle's public investors have any
18   information concerning what the growth rates were for
19   Oracle with and without the Covisant deal?
20       A.    We don't announce our growth rates at the
21   end of every month, ever.
22       Q.    And have you ever heard of a rule in
23   connection with stock transactions called "abstain or
24   disclose"?
25       A.    No.
```

446

```
1        Q.    Correct.
2        A.    Yeah.
3           Keep in mind that December is a funny
4    month. You know, December, there's a lot of
5    holidays. It's the first month of our quarter.
6    People often are gone during -- during Chri- -- the
7    Christmas and New Year holiday. And, again, we just
8    started the quarter, so that's -- that's maybe -- you
9    know, one of our weakest months of the year. So it
10   wouldn't be uncommon for us not to do much business
11   in December.
12       Q.    Isn't it true that it's actually -- you got
13   it completely wrong and it's the best first month of
14   the year, typically?
15           MR. LINDSTROM:  Best first month of the
16   year?
17   BY MR. SOLOMON:
18       Q.    Best first month in the quarter.
19       A.    Is it the best first month of the year?
20   That's interesting, because it's the end of other
21   people's -- because it's the end of other people's
22   fiscal years?
23       Q.    That could be the reason. I'm just
24   asking --
25       A.    Other fiscal years --
```

448

```
1        Q.    Have you ever heard of a requirement that
2    if you are in possession of material inside
3    information when you trade stock, you must disclose
4    that information prior to your trade to make it fair
5    to all shareholders?
6        A.    Well, I thought you couldn't trade.
7        Q.    Okay.
8        A.    If you have material insider information.
9    I didn't think you had the choice --
10       Q.    You didn't know that it was --
11       A.    I didn't know you had the choice to
12   disclose.
13       Q.    You did not abstain, did you?
14       A.    No.
15       Q.    And you did not disclose, did you?
16       A.    Disclose what?
17       Q.    Disclose the Covisant-in and the
18   Covisant-out information in terms of the growth rates
19   with the company?
20       A.    We had -- we had never -- we didn't
21   disclose our first -- are you asking me did we
22   disclose where we were after one month --
23       Q.    In connection --
24       A.    -- in the quarter.
25       Q.    Before you traded.
```

449

1     A    We have never disclosed our first month's
2 results.
3     Q    So the answer is you didn't abstain and you
4 didn't disclose?
5     MR. LINDSTROM: Covisant?
6     THE WITNESS: Well, any -- well, any -- I
7 think he's saying did we report our -- you know, our
8 first month's results. People trade a lot, you know,
9 in the middle of quarters. We have never reported
10 our first month's results.
11 BY MR. SOLOMON:
12     Q    Okay. What I'm trying to get at is --
13 partly, at least, is: Do you think that the
14 investing public would have wanted to know what the
15 trends were at Oracle, both accounting for the
16 Covisant deal and without the Covisant deal?
17     MR. LINDSTROM: Calls for speculation, no
18 foundation.
19     THE WITNESS: Yeah, I don't -- I don't
20 know. We don't disclose our first month's results.
21     MR. SOLOMON: Okay. Let's go off the
22 record and change the tape.
23     THE VIDEOGRAPHER: This marks the end of
24 Tape 3, Volume 2, in the deposition of Larry Ellison.
25     At 4:22, going off the record.

450

1     (Recess taken.)
2     THE VIDEOGRAPHER: On record at 4:32.
3     This marks the beginning of Tape 4,
4 Volume 2, in the deposition of Larry Ellison.
5 BY MR. SOLOMON:
6     Q    Was the Covisant deal an outlier?
7     A    It was the largest deal we have ever done
8 in our history. It still is.
9     Q    Isn't it true that taking -- leaving
10 Covisant, or "Covisant," in the calculation in the
11 third quarter of '01 would be misleading in terms of
12 trends?
13     MR. LINDSTROM: Vague and ambiguous.
14     THE WITNESS: I'm not sure what you mean by
15 "trends."
16     MR. SOLOMON: Okay.
17     THE WITNESS: It certainly got us off to a
18 great head start in the quarter.
19 BY MR. SOLOMON:
20     Q    Okay. But does an outlier deal like
21 Covisant give a good indication of what the trends
22 are generally in the business, or did it?
23     A    We are a fairly -- even though it's a very
24 large deal, we are a pretty large company, so it's
25 not going to -- it's not going to affect our results

451

1 wildly. But I'm not sure what you mean by "trend."
2 It's a -- it will -- you know, it contributes
3 significantly to the current -- you know, to the
4 current quarter.
5     Do you mean can someone say -- you know,
6 does it mean -- again, I'm not sure what you mean by
7 "trend."
8     Q    Well, back to why Covisant was taken out of
9 the calculation and it was shown both ways. You say
10 that's a statistical technique.
11     A    Yeah.
12     Q    Right?
13     A    Yeah.
14     Q    But you don't really explain why it's
15 utilized.
16     What's the purpose?
17     A    You mean why do people -- why do people do
18 that?
19     Q    Why was Covisant taken out and why were you
20 privy to information --
21     A    For the same reason -- for the same reason
22 you saw -- you had an earlier document and you saw
23 where HP -- we had an HP deal the previous year in
24 1999, and that made the comparison in the year 2000
25 difficult.

452

1     Remember? You pointed out that our CRM
2 sales had dropped 2 to 3 percent.
3     Q    Yeah.
4     A    And it was useful to know a year before we
5 had a very large -- and I'm guessing. I think about
6 $25 million CRM deal with Hewlett-Packard, so it was
7 useful to know that we had a particularly good
8 quarter because of the large HP deal in the previous
9 quarter, and that made the CRM growth rate a year
10 from then look different, look lower than it would
11 have been.
12     Q    Yeah.
13     A    Okay. So it's useful to know -- you know,
14 to, you know, look at the quarter to know that
15 Covisant happened that quarter so that the next
16 quarter, let's say, or the previous -- or the
17 previous quarter, for that matter, that that large
18 deal contributed -- you know, contributed
19 substantially to the results in Q3; that Covisant
20 helped -- you know, when one deal contributes very
21 substantially to a quarter, helps a quarter, it makes
22 the next year's comparison more difficult.
23     Q    But the information that you received in
24 the January 17, 2001 Flash report that we just saw
25 tells you what the trend is in the current quarter

Ellison, Lawrence  9/21/2006  10:57:00 AM

453

1 without Covisant; is that true?
2 MR. LINDSTROM: Mischaracterizes the
3 document.
4 THE WITNESS: That's not true. It's not a
5 trend. It's not a trend. It's the data -- sorry.
6 Just the way -- it's really telling us what our
7 growth rate is with Covisant and what it is without
8 Covisant.
9 BY MR. SOLOMON:
10 Q And why in the quarter do you not want to
11 know what your growth rate is for that quarter
12 without Covisant?
13 A Why -- you know, why did they show it?
14 Q Yes.
15 A As I said -- as I said before, it -- it
16 shows the -- it's going to make a big difference --
17 it's going to make a big difference to the quarter.
18 I'm not sure I understand your question.
19 Q I think that's okay for the moment.
20 Did you disclose to the investing public
21 when you engaged in your securities transactions at
22 the end of January 2001 that Oracle's pipeline had
23 been reduced by around 20 percent?
24 MR. LINDSTROM: Assumes facts.
25 THE WITNESS: I don't know that fact to be

454

1 true.
2 MR. SOLOMON: Okay.
3 THE WITNESS: And we don't disclose
4 fluctuations. When a deal closes, we don't tell them
5 the deal closes. When a pipeline changes, we
6 don't -- when a forecast changes, we don't -- you
7 know, we don't --
8 BY MR. SOLOMON:
9 Q But you would have -- okay.
10 In the third quarter of -- third fiscal
11 quarter of 2001, you had realtime daily information
12 on what the state of the pipeline was; is that true
13 or false?
14 A No. I didn't look at the -- I didn't look
15 at the pipeline very much. I tended to look at the
16 forecast.
17 Q Okay.
18 A So I reviewed the forecast once a week.
19 Q Okay. Now, when you say you didn't tend to
20 look at the pipeline very much, that means you looked
21 at it sometimes; you looked at it a little bit?
22 A We would talk about coverage ratios in the
23 pipeline. When people would give their forecasts, I
24 would sometimes ask questions, you know, what the
25 coverage was, but not always.

455

1 Q Okay. You told the investing public at the
2 beginning of fiscal Q301 that the pipeline was
3 astounding; is that true?
4 A I think I told them it was very strong. I
5 don't know what word I used, but I believe at the
6 beginning of the quarter it was a very strong
7 pipeline.
8 Q Isn't it true that between December 11,
9 2000 and December 25, 2000, Oracle's best estimate of
10 its pipeline growth for 3Q as -- '01 as opposed to
11 3Q00 decreased from 52 percent to 34 percent?
12 A 34 percent still very, very strong growth.
13 Q I understand, but I'm talking about the
14 decrease.
15 A But I don't -- I don't recall those --
16 those numbers.
17 Q Okay.
18 A So you are -- go ahead.
19 MR. SOLOMON: So we will have marked as the
20 next exhibit Defendants' Response To Plaintiffs'
21 First Set of Requests for Admissions in this
22 litigation.
23 (Exhibit No. 116 was marked for
24 identification.)
25 MR. LINDSTROM: Is there a certain portion

456

1 of the document that you would like to direct the
2 witness's attention to?
3 MR. SOLOMON: Yes. Thank you.
4 Q If you look at Request for Admission No. 1,
5 Mr. Ellison, you will see that we request that
6 defendants admit that between December 11, 2000 and
7 December 25, 2000 --
8 A I'm sorry. What page are you on?
9 Q I'm on page 2 of the document.
10 A Second page.
11 Q Which is the third page in.
12 A Oh, third page in --
13 Q Numbered 2.
14 A -- all right.
15 Q Admit between December 11, 2000 and
16 December 25th, 2000, Oracle's best estimate of its
17 sales pipeline growth for 3Q01 as compared to 3Q00,
18 in parens, decreased from 52 percent to 34 percent.
19 Do you see that?
20 A I do.
21 Q And then there are a bunch of objections,
22 and then after the objections, it says, "Subject to
23 and without waiving these objections, Defendants
24 admit that on December 11, 2000, Oracle sales
25 pipeline growth for 3Q01 was 52% in constant dollars;

457

1 and on December 25th, 2000, Oracle sales pipeline
2 growth at 3Q01 was 34% in constant dollars."
3     Do you see that?
4 A    I do.
5 Q    And you don't dispute that that admission
6 is accurate?
7 A    I do.
8 Q    And do you dispute that you had that
9 information in January of 2001?
10    MR. LINDSTROM: No foundation.
11    THE WITNESS: I don't recall.
12 BY MR. SOLOMON:
13 Q    Do you dispute that you had access to that
14 information?
15 A    I do not.
16 Q    In the third quarter of 2001?
17 A    I do not.
18    MR. SOLOMON: You don't. Okay.
19    Have marked as the next exhibit a document
20 produced by the defendants in the litigation with the
21 control numbers 040638 to 640.
22    (Exhibit No. 117 was marked for
23    identification.)
24    THE WITNESS: Okay.
25 BY MR. SOLOMON:

458

1 Q    Okay. Do you recognize this?
2 A    I don't.
3 Q    You see, on the first page, it's dated
4 October 13, 2000, and it is an e-mail, in the middle
5 of the page, from Mark Barrenechea, and you are one
6 of the recipients. In fact, you are the recipient.
7     Do you see that?
8 A    Yes.
9 Q    And over the page, there's a message from
10 you.
11    Do you see that in the top third?
12 A    I do.
13 Q    And it says "Lawrence J. Ellison" wrote:
14 We will not upgrade unless we are at the 90%
15 confidence level that the new OSO will work better
16 than the current one. We do not want to discourage
17 the field the last month of the quarter. Nor do we
18 want to lose a mission critical system. Larry."
19    Do you see that?
20 A    I do.
21 Q    And do you remember writing that?
22 A    I don't remember writing it, but I'm sure I
23 read it.
24 Q    Okay. And the mission critical system is
25 OSO?

459

1 A    That's right.
2 Q    And did you reach the 90 percent confidence
3 level that you referred to here?
4 A    I don't remember.
5 Q    And what is it about the OSO upgrade that
6 could lead to discourage the field in the last month
7 of the quarter? Could you explain that to me?
8 A    Oh, the users of OSO are the sales people,
9 the field salespeople, and if we put in a system
10 that's problematic, that's causing a lot of problems,
11 they will spend more time just kind of getting -- you
12 know, figuring out how to get their forecast into the
13 system than selling.
14 Q    Okay. Are you a user of OSO?
15 A    I am not.
16    Well, let me clarify that a little. I
17 certainly hold meetings where we look at the output
18 of OSO, so, in that sense, I get information from
19 OSO, but I'm not a user in the sense I don't enter
20 any data into OSO; I just look at the forecast
21 results.
22    MR. SOLOMON: Can you read that answer back
23 to me, please.
24    (Record read by the Reporter as follows;
25    "QUESTION: Okay. Are you a user of OSO?

460

1    ANSWER: I am not.
2    Well, let me clarify that a little. I
3    certainly hold meetings where we look at
4    the output of OSO, so, in that sense, I get
5    information from OSO, but I'm not a user in
6    the sense I don't enter any data into OSO;
7    I just look at the forecast results.")
8    MR. SOLOMON: Thank you.
9    Marked as the next exhibit another excerpt
10 from the book Softwar.
11    (Exhibit No. 118 was marked for
12    identification.)
13 BY MR. SOLOMON:
14 Q    I'm looking at page 286, and at the bottom,
15 and it goes on to 287. It reads: "A typical day for
16 Ellison starts when he gets up at about seven o'clock
17 and checks his overnight e-mails. Unlike many CEOs,
18 Ellison has only one e-mail address. He gets more
19 than a hundred e-mails a day, most of which he
20 answers himself or forwards to the appropriate
21 person."
22    Just stopping there, is that accurate?
23    MR. LINDSTROM: Objection; compound.
24    MR. SOLOMON: Okay. Let's break it down.
25 Q    Does a typical day start for you when you

461

1    get up at 7:00 o'clock and you check your overnight
2    e-mails?
3       A    Close enough.  Sometimes I'm up earlier;
4    sometimes I'm up later.
5       Q    Unlike -- on average.
6       A    Close enough.
7       Q    "Unlike many CEOs, Ellison has only one
8    e-mail address."
9            Is that true?
10      A    That's true.
11      Q    "He gets more than a hundred e-mails a day,
12   most of which he answers himself or forwards to the
13   appropriate person."
14           Is that true?
15      MR. LINDSTROM:  That's compound.
16   BY MR. SOLOMON:
17      Q    Do you get more than a hundred e-mails a
18   day?
19      A    I throw a lot of it away without answering
20   it.  A lot of it is spam --
21      Q    Okay.
22      A    -- and silly stuff.
23      Q    All right.  And then we will skip over the
24   scrambled eggs and bacon, and the paragraph
25   beginning:  "At about nine" -- go down a few lines.

462

1    It says, "Also part of the routine is a visit to
2    Oracle Sales Online, which might prompt him to leave
3    a message questioning the status of a particular
4    sales opportunity."
5            Is that true?
6       A    Not true.
7       Q    Okay.  Now, although you do enter a
8    footnote on this page, you do not clarify or correct
9    that statement, do you?
10      A    No, I don't.
11           We can prove it's not true.
12      Q    How can you prove it?
13      A    We have logs of everyone who's accessed OSO
14   and when they have accessed it.
15      Q    That's excellent.
16           So I can -- you can prove that you didn't
17   log on to OSO in Q301; right?
18      A    I don't know if we have them going back to
19   Q301.
20      Q    Because you destroyed the logons, logon
21   records, didn't you, or someone did at your company?
22      MR. LINDSTROM:  Assumes facts,
23   argumentative.
24   BY MR. SOLOMON:
25      Q    Do you know the SLC references the fact

463

1    that the login records have been destroyed?
2       A    No.
3       Q    So I can't tell whether you have logged
4    into OSO in Q301 or not, can you?
5       MR. LINDSTROM:  Argumentative.
6       THE WITNESS:  Would it be useful for you to
7    find out if I've logged on to OSO anytime in the last
8    three years?
9       MR. SOLOMON:  I'm interested.
10      THE WITNESS:  No, I know, but my practice
11   was never to log in to OSO, and you can show that --
12   I'm getting myself in trouble.  My lawyer is going to
13   smack me.  But -- but, yeah, I think it's fairly easy
14   to demonstrate our practice is just not to look at
15   OSO.
16   BY MR. SOLOMON:
17      Q    Okay.  Why did Mr. Symonds say that that
18   was part of your routine?
19      MR. LINDSTROM:  No foundation, calls for
20   speculation.
21   BY MR. SOLOMON:
22      Q    Do you have any idea?
23      A    I don't know.
24      Q    You did have a login, didn't you, in Q3 for
25   OSO?

464

1       A    I don't know.
2       Q    And you don't know if it's possible for me
3    to verify Q301 and whether or not you logged on;
4    right?
5       A    I do not know.
6       Q    Okay.  How often did you get reports from
7    the OSO system?
8       MR. LINDSTROM:  Objection; vague as to
9    time.
10   BY MR. SOLOMON:
11      Q    In Q301.
12      A    Typically, we would hold forecast meetings
13   on Mondays, so we would look at -- look at --
14   sometimes we put OSO results up on the screen and
15   talk about what was in OSO.
16      Q    So I'm sorry if that wasn't good.
17           What was the frequency?  Was it daily?
18   Once a week?
19      A    I'm sorry, on Mondays.
20      MR. SOLOMON:  Okay.  Marked as the next
21   exhibit another document produced by the defendants
22   in this litigation with the control numbers 028582
23   and 83.
24      (Exhibit No. 119 was marked for
25      identification.)

465

1  BY MR. SOLOMON:
2     Q    Take a look at it and let me know if you
3  have seen it before, please.
4     A    I don't specifically recall it.
5     Q    Okay.
6     A    But I'm on the distribution list.
7     Q    So you don't dispute receiving it?
8     A    No.
9     Q    And receiving the information here?
10    A    I do not.
11       MR. LINDSTROM:  Just so the record's clear,
12  Mark, I think both you and the witness were talking
13  about the embedded e-mail that talks -- that starts
14  halfway --
15       MR. SOLOMON:  Thank you.
16       MR. LINDSTROM:  -- down the page of
17  Exhibit 120.
18       MR. SOLOMON:  Thank you.
19    Q    And that's dated Friday, December the 1st,
20  2000, and it is from Mark Barrenechea to a number of
21  people, and you are copied; is that right?
22    A    That's right.
23    Q    And this would have been in your files in
24  December of 2000?
25    A    Yes.

466

1     Q    And it wasn't produced from your files and
2  you cannot explain why; is that correct?
3     A    That's correct.
4       MR. SOLOMON:  Have marked as the next
5  exhibit a document produced in this litigation with
6  the control numbers 021388 through 390.
7       (Exhibit No. 120 was marked for
8          identification.)
9       (Discussion off the stenographic record.)
10  BY MR. SOLOMON:
11    Q    And let me know if you recognize it when
12  you have had a chance to review it, please.
13    A    I don't recall it.
14    Q    Okay.
15    A    I'm on the list.
16    Q    And, yes, on the first page, the bottom
17  half of that page --
18    A    Right.
19    Q    -- reflects that this was addressed to you?
20    A    Yes.
21    Q    And some others from Mark Barrenechea?
22    A    Yes.
23    Q    And on the second page, there are --
24  there's a reference to "Top 10 Wins" and "Top
25  Apologies."

467

1       Do you see that?
2     A    Yes.
3     Q    And the "Top Apologies," it says "(pushed
4  to Q3)."
5       Do you see that?
6     A    Yes.
7     Q    Do you know what that means, "Top Apologies
8  (pushed to Q3)"?
9     A    I would be guessing.
10    Q    Okay.  Take a guess.
11       MR. LINDSTROM:  Objection; calls for
12  speculation.
13       THE WITNESS:  That he's forecasting that
14  these deals will close in Q3, but I don't know what
15  it means.
16       MR. SOLOMON:  I'm talking about the
17  apologize.
18    Q    What are the apologies and who are they to?
19    A    I don't know.
20    Q    Don't know?  Okay.
21       And it says "Special Highlights" at the
22  bottom.
23       Do you see that?
24    A    Yes.
25    Q    And against "OPI," it says "Without HP, it

468

1  would have been different.  The East did not bring in
2  any business.  Steve M has large Q3 pipeline."
3       Do you see that?
4     A    Yes.
5     Q    What's the reference to "without HP"?  Do
6  you know?
7     A    I think that's what we just talked about.
8  I think -- again, this is right after our Q2 results.
9     Q    Okay.
10    A    It's right after our Q2 results.  And I
11  think what he's referring to is the negative -- you
12  showed me a document earlier of a negative 2 to 3
13  percent --
14    Q    Yeah.
15    A    -- CRM growth.  And I think he's referring
16  to the difficult comparison based on HP, but, again,
17  I don't have the documents in front of me, so I'm
18  speculating just a bit.
19    Q    Okay.  And this would have been in your
20  files around December 4th, 2000?
21    A    Yes.
22    Q    And it wasn't produced from your files and
23  you cannot explain why?
24    A    That's right.
25       MR. SOLOMON:  Have marked as the next

469

1 exhibit a document produced by the defendants with
2 the control numbers 086728 and 729.
3     (Exhibit No. 121 was marked for
4     identification.)
5 BY MR. SOLOMON:
6     Q    If you look at it and let me know if you
7 recognize it, please.
8     A    I don't recognize it.
9     Q    Okay.  You will see that you are a
10 recipient and it's from Jennifer Minton, at the top,
11 and then --
12     A    Yes.
13     Q    -- at the bottom -- I'm on the first
14 page -- the exchanges are among Ron Police or
15 "Police" and Mark Barrenechea and others.
16     Do you see that?
17     A    Yes.
18     Q    And it refers, among other things, to the
19 "go-live" date for OSO; is that right?
20     A    Yes.
21     Q    And this would have been in your files
22 around December 6, 2000; is that right?
23     A    Yes.
24     Q    And it wasn't produced from your files and
25 you cannot explain why?

470

1     A    That's right.
2     MR. SOLOMON:  And then we will have another
3 document produced by the defendants marked as next
4 exhibit with the control number 012384.
5     (Exhibit No. 122 was marked for
6     identification.)
7     MR. SOLOMON:  And I guess -- let me give
8 you a different control number.  It's actually 012385
9 we're looking at.
10     THE WITNESS:  Okay.
11     (Exhibit No. 122 was remarked for
12     identification.)
13 BY MR. SOLOMON:
14     Q    Okay.  Let me know -- do you recognize
15 this?
16     A    I think I remember it.
17     Q    Okay.  And it reflects you saying they can
18 delay the internal implementation of OSO by two weeks
19 but only two weeks; is that right?
20     A    That's right.
21     Q    And it's from you and it's to Ron Wohl and
22 it also copies you?
23     A    Yes.
24     Q    And this would have been in your files as
25 of December 9, 2000?

471

1     A    Yes.
2     Q    And it wasn't produced from your files and
3 you can't explain why; is that right?
4     A    That's right.
5     Q    And just on that question -- because on
6 this occasion, it's from you, but you have copied
7 yourself, but even if you hadn't copied yourself,
8 wouldn't the document be in your outbox unless you
9 deleted it?
10     A    No.  It depends how your e-mail client is
11 set up.
12     Q    Okay.
13     A    Sometimes you can either keep all copies of
14 your e-mail or not.  It's just -- it's a setting on
15 your e-mail system.
16     Q    And do you know what your setting was in
17 2000 and early 2001.
18     A    I don't know what my setting was.
19     Q    And what -- and that would dictate whether
20 or not your outbox was containing outgoing messages
21 or not?
22     A    That's right.
23     Q    Is there any way of finding out?
24     MR. LINDSTROM:  What it was in that time
25 frame?

472

1     MR. SOLOMON:  Yeah.
2     THE WITNESS:  I think -- I don't know.
3     MR. SOLOMON:  Okay.
4     THE WITNESS:  I mean, I don't know if we
5 have retained -- I assume we have retained that
6 computer someplace, but I don't know where it is.
7 BY MR. SOLOMON:
8     Q    And which computer are you talking about?
9     A    My desktop.  Of course, I have several
10 computers.
11     Q    Right.
12     But you assume you have retained them all;
13 right?
14     A    I think we have retained them all.
15     Q    And they exist somewhere?
16     A    Someplace, yeah.  Some lawyer's office.
17     Q    Very hard to get into lawyers' offices.
18     Now, OSO is mission critical; right?
19     A    Yeah.
20     Q    Okay.
21     A    Yeah.
22     Q    You were upgrading OSO; this was an
23 important event?
24     A    Yes.
25     Q    You were given a login -- or you don't know

473

1   that?

2      A   No, I don't know that.

3      Q   But it's your testimony that after it was

4   implemented, you didn't access it in that first

5   quarter and take a look and see if it was working

6   properly?

7      A   Well, I was in meetings where we brought it

8   up. And, again, keep in mind, remember I said, every

9   Monday it was my intention that they would bring up

10  the forecasts and make the forecasts using OSO

11  screens. You know, we have a big display screen, so

12  rather than people telling us what the forecast was,

13  they would actually bring their personal computer to

14  the -- you know, to the conference room like this,

15  and they would log on and show the OSO forecast on

16  our display screen.

17     Q   Okay. And that was the extent to which you

18  accessed the actual OSO database in that fiscal

19  quarter?

20     A   I believe so.

21     Q   And is that the extent to which you have

22  ever used -- utilized OSO?

23     A   I believe so. I mean, I might have -- very

24  early on where they're designing the screens, I

25  might have looked at a user-interface design or

474

1   something like that, but that's right.

2     Q   Was it a major point of OSO that it was

3  realtime?

4     A   Well, it was -- it was realtime if everyone

5  put in the information.

6     Q   Okay. But didn't you promote OSO to your

7  customer base as being realtime in enabling you to

8  know what the financial picture of Oracle was at any

9  one moment in time?

10     A   It was realtime in the sense that every

11  time someone put in a change, you saw it. Anyplace

12  in the world, you know, that -- the change would get

13  registered. So if someone at headquarters, Jennifer

14  Minton, someone who's monitoring all this, would be

15  able to see -- you know, be able to see the changes.

16  So, in that sense, it was realtime, if you will.

17       The flaw of the system is sometimes the

18  sales guys didn't want to put -- you know, wouldn't

19  even -- wouldn't themselves use OSO. They would

20  delegate it to a sales assistant or something like

21  that, and only update it once a week rather than keep

22  it current.

23       But the computer system was realtime. It

24  was global and realtime, but it only works well if

25  the human beings, you know, keep their forecast

475

1   current.

2     Q   Okay. Did someone make a presentation of

3  OSO to you in the -- in December -- November or

4  December of 2000?

5       MR. LINDSTROM: Objection; vague and

6  ambiguous.

7       THE WITNESS: I had lots of presentations

8  on OSO and demonstrations of OSO, but I don't know.

9  BY MR. SOLOMON:

10     Q   Who was responsible -- who was in charge of

11  the upgrade, the OSO upgrade?

12     A   Combination of Mark Barrenechea and Ron --

13  it was distributed. I mean, it would be -- the

14  people who own the system would be Mark Barrenechea

15  and Ron Wohl, and then all of the field executives

16  who were the users of the system, so Sergio

17  Giacoletto in Europe, and all the guys whose names

18  you have seen.

19     Q   Okay. And would they -- would

20  Mr. Barrenechea and Mr. Police update you on the

21  progress at your Monday morning meetings?

22       MR. LINDSTROM: Progress of what?

23  BY MR. SOLOMON:

24     Q   Of the OSO upgrade?

25     A   No. No. That would happen in the

476

1   applications meetings on Wednesday or Thursday.

2     Q   Okay.

3     A   Well, actually, we had Monday afternoon

4  meetings called PDMC meetings where all the product

5  division heads were -- so it's possible -- yeah, it's

6  possible it happened on Monday afternoon.

7     Q   Okay. And would that -- would there be

8  forecasting presentations based on OSO in those

9  Monday afternoon meetings?

10     A   No.

11       MR. LINDSTROM: PDMC meetings?

12       THE WITNESS: No. The forecasting -- the

13  forecasting meetings occurred with the sales

14  executives, the meetings starting at 11:00 a.m. --

15       MR. SOLOMON: Okay.

16       THE WITNESS: -- and technical meetings

17  started at 2:00 p.m.

18       MR. SOLOMON: Thank you. So --

19       THE WITNESS: And we would not do

20  forecasting in the afternoon meeting. The engineers

21  in the afternoon, salespeople in the morning.

22  BY MR. SOLOMON:

23     Q   And would the forecasting presentations on

24  the Monday mornings be based on OSO?

25     A   If OSO was working.

477

1    Q   And was that a big if?

2    A   Well, no. I mean, if we are in a

3  transition with a system -- I'm not sure when we

4  started our presentations. I said -- I think there

5  was an earlier memo where I wanted OSO used for --

6  you know, for the presentation. I wanted the --

7  someplace in this stack there's someplace me asking

8  that the forecast come out of the system rather than

9  come from people in the spreadsheets. I'm not sure

10  of the exact date when we started having the Monday

11  forecast meetings using OSO.

12    Q   Okay. Were you showing slides at the

13  forecast meetings on Monday mornings?

14    MR. LINDSTROM: Vague as to time.

15    THE WITNESS: Slides?

16  BY MR. SOLOMON:

17    Q   Mm-hmm. Screen shots or physical slides.

18  I mean, I'm interested in what the OSO presentation

19  was.

20    Did they print out from OSO?

21    A   What did it look like when you made an OSO

22  present -- when you presented your forecast on OSO?

23    Q   Yeah.

24    A   Yeah, they were screen shots. So,

25  literally, you would see the same thing that was on

478

1  your laptop would be projected on the screen.

2    Q   Were they preserved?

3    A   They were on a computer, the screen. You

4  know, all it is is a dumb television screen.

5    Q   Okay. So wherever it is, it would be

6  within OSO?

7    A   It would be within OSO --

8    Q   In the database?

9    A   In the database.

10    MR. LINDSTROM: Hey, now. I recognize it's

11  getting late, but you guys are starting to talk --

12    MR. SOLOMON: Thank you.

13    MR. LINDSTROM: -- over the top of each

14  other, and you both need to make sure you don't do

15  that, or we won't have a clean record, and you will

16  drive our Reporter crazy.

17    THE WITNESS: Okay.

18    MR. SOLOMON: Thank you.

19    Okay. Let's go off the record for a couple

20  minutes while I organize.

21    THE VIDEOGRAPHER: Off record at 5:10.

22    (Recess taken.)

23    THE VIDEOGRAPHER: On the record at 5:17.

24  BY MR. SOLOMON:

25    Q   Do you know who Joe Lockhart is?

479

1    A   I do.

2    Q   And who is Joe Lockhart?

3    A   He was Bill Clinton's press secretary when

4  Bill Clinton was president, and he worked for Oracle

5  for a short period of time.

6    Q   And --

7    A   And head of PR.

8    Q   Okay. And how did he -- how did it come

9  about that he was employed at Oracle?

10    A   I hired him.

11    Q   Okay. Did you know him before you hired

12  him?

13    A   A little bit.

14    Q   You knew him in a business sense or

15  socially?

16    A   Professionally, I thought he had done a

17  good job for the president.

18    Q   And because he had done a good job for the

19  president, you thought he would be a good employee

20  for you?

21    A   If he would do it. I was always a little

22  bit skeptical that Joe could leave the excitement of

23  Washington for the boredom of Silicon Valley --

24  relative boredom of Silicon Valley.

25    Q   And so did you call him up and ask him?

480

1  How did it come about?

2    A   I don't recall how I first made contact

3  with Joe.

4    Q   Okay. But at some stage you made contact,

5  and did you have a meeting with him?

6    A   Yes.

7    Q   And did you tell him that you were

8  interested in hiring him?

9    A   Yes.

10    Q   And did he express interest in being hired?

11    A   Yes.

12    Q   And by the end of that meeting, had you

13  hired him?

14    A   I don't think so. I think it took a couple

15  of meetings. He had to talk to his family. He had

16  to think about it. It was a big decision for him.

17    Q   Okay. And what did you -- what did you

18  hire -- I know you said head of PR.

19    Was he head of PR for all of Oracle?

20    A   I believe so.

21    Q   Okay. Did he have any special

22  responsibilities or duties owed to you?

23    A   None other than, you know, as head of PR.

24  I mean, at Oracle, I'm part of Oracle, so.

25    Q   And did you have any disputes with him

Ellison, Lawrence  9/21/2006  10:57:00 AM

481

1   while he was employed at Oracle?
2       A    Not that I recall.
3       Q    Did you -- when he left Oracle, do you know
4   why he left?
5       A    I think he left to go back to Washington to
6   form his own -- his own firm, his own consulting
7   firm.
8       Q    And is it true that he was only at Oracle
9   for a few months?
10      A    I believe so.
11      Q    And were you disappointed when he left?
12      A    Well, yes and no.  I mean, I thought it was
13  a bit of a stretch from being the president's press
14  secretary to be -- and being so familiar with what --
15  you know, the business of Washington, D.C.  I think
16  it's a major career change and change in direction to
17  come out to -- to come out to California and work for
18  a company.  So I'm not surprised -- I'm not surprised
19  that that happened.  In fact, I think we decided that
20  he wouldn't relocate until he had worked at Oracle
21  for a bit and fully understood what the job was and
22  then decided whether to commit for a long period of
23  time or not.
24      Q    Okay.  Did you ever discuss your securities
25  transactions with Mr. Lockhart?

482

1           MR. LINDSTROM:  Objection; vague and
2   ambiguous.
3           THE WITNESS:  I don't recall.
4   BY MR. SOLOMON:
5       Q    Okay.  I'm now focusing on the January 2001
6   securities transactions.
7           Did he have any kind of role in providing
8   PR?
9       A    I don't recall.
10      Q    All right.  There came a time in January of
11  2001 when you decided to exercise stock options that
12  were due to expire in August of '01; correct?
13      A    Yes.
14      Q    When did you make that decision?
15      A    I think after we closed the Covisant deal
16  and we were off to a strong -- off to a strong
17  quarter, I decided that would be the safest time for
18  me to sell my stock, when it looked like we had an
19  assured good quarter.
20      Q    And the Covisant deal was closed in the
21  first couple weeks of December 2000; is that right?
22      A    Yes.
23      Q    Okay.  So it was around the middle of
24  December that you made that decision?
25      A    Again, I'm not sure if that's what

483

1   influenced my decision.  I don't know what -- you
2   know, exactly what day.
3       Q    Okay.
4       A    I think I might have also been on holiday
5   in the middle of December, so.
6       Q    Okay.  When you made the decision, who did
7   you communicate that you made the decision to?
8       A    Philip Simon.
9       Q    And what do you remember of that
10  communication?
11      A    That we would sell the options.  I'm
12  trying -- I think it was 22 million shares.  I'm
13  not -- I think that's the right number, 22 million
14  shares of stock.  It turns out the transaction was in
15  the last week of January, and so the transaction, I
16  think, was restricted to the stock had to be above
17  $30 a share.  The stock -- we had to have not more
18  than a certain volume per day and no trading after
19  January -- after the end of January.
20      Q    Okay.
21      A    Were the restrictions.
22      Q    Okay.  And was -- strike.
23           You made a decision after Covisant closed
24  in mid-December?
25      A    Sometime afterwards, yeah.

484

1       Q    You then communicated it to Mr. Simon?
2       A    Yes.
3       Q    And what time elapsed between you telling
4   Mr. Simon and then engaging in the stock sales?
5       A    I don't recall.
6       Q    If it was middle -- if it was the middle of
7   December, would you say it was four or five weeks?
8       A    I really -- I don't know if I told him in
9   the middle of December.
10      Q    So you don't know when you told him?
11      A    I don't know when I told him.
12      Q    Clueless?
13      A    Wouldn't say "clueless."  I said I don't
14  remember.
15           MR. LINDSTROM:  Objection; argumentative.
16  BY MR. SOLOMON:
17      Q    Who else did you communicate that decision
18  to?
19      A    I don't think anybody else.
20      Q    Okay.  And was there a reason why you
21  didn't communicate it to anybody else?
22      A    Philip's responsibilities was to clear it
23  with Dan Cooperman, our general counsel, and Jeff
24  Henley, our chief financial officer, and those were
25  the people that were told.

485

```
1      Q    Okay.  Did you delay -- after you made your
2    decision, do you remember delaying communicating that
3    decision to Mr. Simon?
4      A    I don't recall.
5      Q    Would it make any sense to delay informing
6    Mr. Simon?
7          MR. LINDSTROM:  Calls for speculation.
8          THE WITNESS:  I don't remember.
9    BY MR. SOLOMON:
10     Q    Do you remember the day that you started
11   exercising options and selling?
12     A    Again, I think it was the last week of
13   January.
14     Q    Okay.  And where were you, do you know,
15   when you started exercising and selling?
16     A    I think by then I was back in California,
17   but I don't know for certain.
18     Q    And were you in California for all of the
19   exercises in sales?
20     A    I think so, but I don't recall.
21     Q    Okay.  And if you were in California, were
22   you working?  Were you at the office?
23     A    I believe so.
24     Q    Okay.  And so is it your recollection that
25   while you were engaged in these stock transactions,
```

486

```
1    that, typically, you were in the office?
2      A    I really don't recall.
3      Q    Do you recall considering whether to
4    exercise and sell your stock in January or April or
5    thereafter?
6          MR. LINDSTROM:  Objection; vague and
7    ambiguous.
8          THE WITNESS:  Did I think about selling at
9    some other time?
10         MR. SOLOMON:  Correct.
11         THE WITNESS:  I knew I had to sell it
12   before August.
13         MR. SOLOMON:  Okay.
14         THE WITNESS:  Because they were -- the
15   options were expiring.
16         MR. SOLOMON:  Okay.
17         THE WITNESS:  We had a very strong, you
18   know, start to the quarter, so I thought that would
19   be the safest time to sell.
20   BY MR. SOLOMON:
21     Q    And were you very concerned about your debt
22   at that stage?
23     A    Very concerned.  I certainly wanted to pay
24   down my debt.
25     Q    And Mr. Simon had been calling you to do
```

487

```
1    that for some time?
2      A    Yes.
3      Q    Did you tell anybody within Oracle that you
4    had decided to exercise and sell your options in
5    April of 2001?
6      A    Not that I recall.
7      Q    Do you know who Deb Lange is, or "Lange"?
8      A    Yes, I do.
9      Q    Who is she?
10     A    She was our then head of tax, corporate
11   tax.
12     Q    Okay.  Did you tell her that it was your
13   intention of -- selling and exercising your stock in
14   April of 2001?
15     A    No.
16     Q    Did you discuss your exercise -- your
17   exercise of options and sale of stock with Ms. Lange
18   at any time?
19     A    I don't think I've ever had a private
20   conversation with Deb Lange in my life.
21     Q    What does Deb Lange do?
22     A    She was then head of tax for Oracle.
23     Q    Okay.
24     A    She worked for Jeff Henley.
25         MR. SOLOMON:  I've marked as next exhibit a
```

488

```
1    document produced by Oracle with a Bates range --
2    sorry, Control No. 042760 to 766.
3          (Exhibit No. 123 was marked for
4          identification.)
5    BY MR. SOLOMON:
6      Q    And just let me know if you have seen this
7    before, please.
8      A    I have not.
9      Q    You see that your name's at the top on the
10   first page, and it says "Custom Calendar Report"?
11     A    Yes.
12     Q    Do you recognize the handwriting in this
13   document?
14     A    I don't.
15     Q    If you look at the page with the control
16   number 042762, there's a series of references to
17   Mexico --
18     A    Okay.
19     Q    -- beginning on December 20th.
20         Do you see that?
21     A    I do.
22     Q    And it seems to reflect that you were in
23   Mexico on those days?
24     A    Okay.
25     Q    Do you know where you were in Mexico?
```

489

1    A    I would be guessing, but I was probably in
2  Ixtapa or Zihuatanejo.
3    Q    Okay.  Would you be -- were you in a house
4  or on your boat?
5    A    On my boat.
6    Q    And if you then skip through to Control
7  No. 042764, you see that for Monday, January the
8  25th, it seems to reflect you are in the office;
9  correct?
10    MR. LINDSTROM:  I'm having difficulty
11  reading this.
12    Is that entry on control page 764?
13    MR. SOLOMON:  764, if you look --
14    MR. LINDSTROM:  You said January 25?
15    MR. SOLOMON:  Does it say the 15th?  I
16  can't see it very clearly either.
17    THE WITNESS:  Yeah, I think that's 15th.
18  BY MR. SOLOMON:
19    Q    Okay.  Seems to reflect you are in the
20  office; is that right?
21    A    I think so.
22    Q    Okay.  And then going to the next page,
23  which is 65, Friday, January 19th, reflecting that
24  you are in California; correct, the top of the page?
25    A    Yes.

490

1    Q    And then Saturday, again, reflecting that
2  you are in the country but in Chicago; is that right?
3    A    Yes.
4    Q    And then from Sunday, the 21st, it reflects
5  you are in Mexico again?
6    A    That's what it says.
7    Q    Is that accurate?
8    A    I guess so.
9    Q    Okay.
10    A    I don't recall.
11    Q    And then it was just for three days?
12    A    No.  I think I did the GE Power call
13  from -- I would be surprised if I would go to Mexico
14  for three days.  So, again, I'm guessing a little
15  bit, but I think -- I certainly do GE Power calls --
16  I do a lot of calls on the boat, so I could have done
17  that.
18    Q    Okay.  And then it says GE Power call for
19  what looks to be the 24th; right, Wednesday?
20    A    Wednesday, yes.
21    Q    And then Thursday, it says "personal
22  meeting," but you don't know where you were then;
23  right?
24    A    Yeah.  My guess is I was in Mexico all that
25  week.

491

1    Q    Okay.  And notwithstanding the fact that
2  you were in Mexico, you were on your boat attending
3  to Oracle business; is that right?
4    A    Well, I certainly -- looks like I made the
5  GE Power call.
6    Q    There's no reference to the Friday of that
7  week.
8    Do you know why?
9    A    No.
10    Q    Okay.
11    A    Or Saturday is gone also.
12    Q    You don't know why?
13    A    No.
14    Q    Do you know what those personal meetings
15  were?
16    A    Again, I -- I don't remember ever going
17  down to Mexico for three days.  I would -- looks like
18  I went to Chicago to pick up my family.
19    Q    Okay.
20    A    And then the family -- then we flew to
21  Mexico for the week.  That's my suspicion.
22    Q    And did you have business meetings with
23  anybody on your boat; do you recall?
24    A    In Mexico, no.
25    Q    Okay.  And you don't know what the personal

492

1  meetings there -- that are referred to there?
2    A    I assume that's just an extension of the
3  Mexico trip.
4    Q    Gotcha.
5    Then Monday you are back in -- does that
6  seem to reflect you are back in California?
7    A    Yes.
8    Q    Okay.  Now, you had to request clearance to
9  engage in your stock sales; correct?
10    A    Correct.
11    Q    And who did you request clearance from?
12    MR. LINDSTROM:  Well, when -- we need to be
13  a little bit careful, because I think he testified
14  that he had -- when you say "you," I want to make
15  sure there's no ambiguity as to whether it's him
16  personally or somebody acting on his behalf, because
17  I think -- I think he already told you that he had
18  that done by Philip Simon, but it was on his behalf,
19  so we just need to be careful in this part of the
20  transcript that we distinguish between what he's
21  doing and what's being done for him.
22  BY MR. SOLOMON:
23    Q    Did you request clearance to trade?
24    MR. LINDSTROM:  Vague and ambiguous.
25    THE WITNESS:  I told Philip to go ahead and

493

1  sell the options.
2      MR. SOLOMON: Okay.
3      THE WITNESS: And I -- and it's his
4  practice -- it's required -- he has to talk to both
5  our general counsel and our chief financial officer
6  to get clearance before I can trade.
7  BY MR. SOLOMON:
8      Q   Okay. And did Mr. Simon ask you if you
9  were in possession of any material information?
10     A   No.
11     Q   And did you tell Mr. Simon that you weren't
12  in possession of any material information?
13     A   No.
14     Q   Do you know whether you were in possession
15  of material information?
16     A   I don't believe I was.
17     Q   Okay. You had no conversations with
18  Mr. Simon, Mr. Coopman -- Mr. Cooperman or, in fact,
19  anybody else as to whether or not you were in
20  possession of inside information when you traded; is
21  that right?
22     A   Not that I recall.
23     Q   Do you recall when the issue of trading, of
24  exercising your options and selling stock with
25  respect to the 2001 expiring options, when that was

494

1  first raised?
2      MR. LINDSTROM: Vague and ambiguous.
3      THE WITNESS: Rephrase the question.
4      MR. SOLOMON: Let me rephrase it.
5      Q   In January of 2001, you exercise sale of
6  stock options that were due to expire in August of
7  2001?
8      A   That's right.
9      Q   Do you recall when the issue -- when the
10  fact they were due to expire in August 2001 was first
11  brought to your attention?
12     A   18 months before.
13     Q   Okay. And had you constantly been
14  considering, during that time, when to sell, when to
15  exercise and sell?
16     A   Not constantly. No, not constantly, but
17  certainly from time to time, I thought about it.
18     MR. SOLOMON: Okay. Have marked as the
19  next exhibit a document produced by the defendants
20  with a control number 060974.
21     (Exhibit No. 124 was marked for
22      identification.)
23     THE WITNESS: Okay.
24  BY MR. SOLOMON:
25     Q   Do you recognize this?

495

1      A   No.
2      Q   You will see that it's an e-mail dated
3  January 10, 2001 from Deb Lange to Jeff Henley.
4      Do you see that?
5      A   Yes.
6      Q   The subject is Re: LGA option -- LJE
7  option exercise?
8      A   Right.
9      Q   And Deborah Lange writes: Jeff, we are
10  working with Larry's accountants re the timing of him
11  exercising his options which expire August of this
12  year.  Larry may be willing to exercise in April if
13  it is beneficial to the company."
14     Do you see that?
15     A   I do.
16     Q   Is it true that you were willing to
17  exercise in April if it were beneficial to the
18  company?
19     A   No one ever asked me.
20     Q   Do you know why she said that, though?
21     A   She must have been talking to Philip or
22  someone, you know, about -- yeah, that -- sounds like
23  she wanted me to exercise my options in the current
24  fiscal year rather than waiting until August.
25     Q   Okay.

496

1      A   June, July, or August in the next fiscal
2  year.
3      Q   Okay. And then the second paragraph reads:
4  "The unknown factor is the relative stock price"
5  between "April versus August -- a lower stock price
6  means lower income to Larry but a lesser deduction
7  for the company."
8      Do you see that?
9      A   Yes.
10     Q   Go on to say, "My general recommendation is
11  to ask Larry to do as much as possible in April, but
12  to have the right to modify that advice in April when
13  we have more visibility to FY01 results and the stock
14  market."
15     Do you see that?
16     A   Yeah.
17     Q   And you don't recall hearing a
18  recommendation that you do as much as possible in
19  April of 2001?
20     A   No one ever asked me.
21     MR. SOLOMON: Okay. Let's have marked as
22  the next exhibit another document produced by the
23  defendants with control number 039432.
24     (Exhibit No. 125 was marked for
25      identification.)

Ellison, Lawrence  9/21/2006  10:57:00 AM

497

1      THE WITNESS:  Okay.
2   BY MR. SOLOMON:
3      Q   Do you recognize this?
4      A   No.
5      Q   And you will see that it's an e-mail dated
6   Friday, January 19, 2001 from Safra Catz to Dan
7   Cooperman.
8      Do you see that?
9      A   Yes.
10     Q   And there's a message from Dan Cooperman to
11  Safra Catz concerning her intention to engage in a
12  same-day exercise and sale.
13     Do you see that?
14     A   I do.
15     Q   And then you will see that there's a
16  message at the top:  "I just found out something so I
17  don't think I should trade."
18     Do you see that?
19     A   I do.  I do.
20     Q   Do you have an understanding what Safra
21  Catz is referring to?
22     A   I think she's referring to she found out
23  that I was trading.
24     Q   Okay.  Why would Ms. Catz not want to trade
25  if you were trading?

498

1      MR. LINDSTROM:  Objection; calls for
2   speculation, no foundation.
3      THE WITNESS:  I don't know.
4   BY MR. SOLOMON:
5      Q   Okay.  And why do you suspect that that's
6   what she found out?
7      A   I think that's what my lawyers told me.
8      Q   They are going to punch you now.
9      Now, Ms. Catz would have been a recipient
10  of the January 17 Flash report as well, wouldn't she?
11     A   Yes.
12     Q   Okay.  And she would have learned things in
13  that document, wouldn't she?
14     MR. LINDSTROM:  Objection; no foundation,
15  calls for speculation.
16  BY MR. SOLOMON:
17     Q   She would have learned the information --
18     A   She would have certainly looked at the
19  document, I guess, yeah.
20     MR. SOLOMON:  Marked as the next exhibit --
21  mark as the next exhibit another document produced by
22  the defendants with the control number 035359 and
23  360.
24     (Exhibit No. 126 was marked for
25     identification.)

499

1   BY MR. SOLOMON:
2      Q   Let me know if you recognize this.
3      A   No, I have not.
4      Q   Okay.  Now, this appears to reflect that
5   Safra Catz is saying that she has the forms for
6   exercising, selling her options and she will mail
7   them back.
8      Do you see that at the top?
9      A   Yes.
10     MR. LINDSTROM:  Objection; calls for
11  speculation.
12     THE WITNESS:  Yeah, but I'm not sure what
13  it means, "got them."  I don't know what "them" is.
14  BY MR. SOLOMON:
15     Q   You don't know why Ms. Catz was sending
16  these documents back, having said earlier that she
17  had learned something and she wouldn't trade?
18     MR. LINDSTROM:  Objection; calls for
19  speculation, no foundation.
20     THE WITNESS:  I don't know.
21     (Reporter clarification.)
22  BY MR. SOLOMON:
23     Q   Did you have a conversation with Ms. Catz
24  in which you informed her that you were trading?
25     A   I don't recall.

500

1      MR. SOLOMON:  Marked as the next exhibit a
2   document produced by the defendants with the control
3   number 035365.
4      (Exhibit No. 127 was marked for
5      identification.)
6      THE WITNESS:  Okay.
7   BY MR. SOLOMON:
8      Q   Okay.  Do you recognize this?
9      A   Vaguely.
10     Q   Okay.  And was it you that initiated a
11  request to Mr. Lockhart that he draft a press
12  release?
13     A   I don't recall.
14     Q   Do you recall reviewing the draft press
15  release?
16     A   I believe I did.
17     Q   Okay.  And were you -- did you approve the
18  press release as written by Mr. Lockhart, do you
19  know?
20     A   I don't think we issued the release.
21     Q   Okay.  And was that because in -- some of
22  the news leaked into the market?
23     A   I don't -- I just don't remember.
24     Q   Do you know why the release was being
25  contemplated?

501

1      A   To reassure people, again, that I was
2  selling -- what was a large dollar amount, it was a
3  very, very small percentage of my holdings.  I was
4  still -- whenever I sell stock, I worry that people
5  think I'm losing confidence in the company.  I think
6  it was important that they knew that I was, you
7  know -- 98.5 percent of my stock I was continuing to
8  hold.
9      Q   Okay.  It was your desire, I assume, to get
10 the highest price you could for your stock?
11     A   Sure.
12     Q   And whose idea was it to set a floor of $30
13 per share?
14     A   Mine.
15     Q   And who did you communicate that to?
16     A   Philip Simon.
17     Q   Anybody else?
18     A   Well, I think he talked to -- obviously the
19 people on the trading desk had to know.  So
20 indirectly -- indirectly, the people who were selling
21 the stock had to know what the floor price was.
22     Q   Okay.  Did you discuss it with Jeff Henley?
23     A   I didn't.  I didn't discuss it with Jeff
24 Henley or Dan Cooperman.  I don't know if Philip
25 Simon did.

502

1      Q   Were you aware at the time of your stock
2  sales that earlier that same month Mr. Henley had
3  exercised and sold Oracle securities?
4      A   No, did not know.
5      Q   Are you aware that he also set a floor of
6  $30 per share?
7      A   No.
8      Q   And that would be just a coincidence, as
9  far as you know, if that's true?
10     A   Yes.
11     Q   And after you had exercised the expiring
12 options and sold, isn't it true that you continued to
13 sell?
14     A   Yes.
15     Q   What prompted the decision to continue to
16 sell?
17     A   I don't want to go into the market very
18 often.  Again, whenever I go into the market and sell
19 stock, people begin to speculate that I'm losing
20 confidence in the company.  I own a very large
21 portion of the company.  So I only like to do it once
22 and then not sell again for a very, very long time.
23 I wanted to pay down more of my debt.  I thought, I
24 was in the market that week, I would keep selling
25 that week, you know, given -- you know, within the

503

1  limits of the volume restrictions and the price
2  restrictions, and at the end of that week, I would
3  then stay out of the market for as long as I could.
4      Q   Okay.  And, in total, you realized
5  proceeds -- aggregate proceeds of around $894
6  million; is that right?
7      A   I believe so.
8      Q   And what were the proceeds used for?
9      A   Some of it was used to pay down debt; some
10 of it was retained in cash, largely for investments;
11 other was retaining cash for -- to pay taxes.
12     Q   And is it true that you had a significant
13 multimillion-dollar payment due on the "Rising Sun"
14 in that fiscal quarter?
15     A   I don't recall, but it certainly could be
16 true.
17     Q   Do you know if you paid it?
18     A   If it was due, I paid it.
19     Q   Do you always pay on time?
20     A   Pretty much.
21         MR. SOLOMON:  Have marked as the next
22 exhibit another document produced by the defendants,
23 Control Nos. 005595 to 601.
24         (Exhibit No. 128 was marked for
25         identification.)

504

1         THE WITNESS:  Okay.
2  BY MR. SOLOMON:
3      Q   Okay.  Have you seen this before?
4      A   Yes.
5      Q   And it's Oracle's insider trading policy?
6      A   It's our stock trading policy, yes.
7      Q   And are you familiar with its contents?
8      A   Generally.
9      Q   Okay.  I'm looking at the second page, the
10 second full paragraph, beginning:  "Trading on inside
11 information."
12         Do you see that?
13     A   Second paragraph -- second full paragraph?
14     Q   Yes.
15         Says, "Trading on inside information can
16 include making a single purchase or sale, or engaging
17 in or facilitating a pattern of transactions, which
18 might appear to take advantage of inside information
19 possessed by others at Oracle.  You need not actually
20 use or rely on inside information, but simply possess
21 it at the time of the trade, to be considered trading
22 on inside information."
23         Were you aware of that?
24     A   Yes.
25         MR. SOLOMON:  Have marked as the next

505

1   exhibit a document produced by the defendants in this
2   litigation with the control numbers 028735 and 736.
3         (Exhibit No. 129 was marked for
4         identification.)
5         THE WITNESS: Okay.
6   BY MR. SOLOMON:
7       Q   And do you recognize this?
8       A   Yes.
9       Q   Okay. It's dated the 12th of October 2000,
10  and it's from you -- at least part of the document's
11  from you -- to Michael Rocha.
12        Do you see that?
13      A   Yes.
14      Q   And you say, "Thanks for the update. I
15  will let you know how it goes. Larry." Correct?
16      A   That's right.
17      Q   And that refers to a meeting you were
18  scheduled to have with Carly Fiorina the following
19  day?
20      A   Yes.
21      Q   Now, do you have a recollection of a deal
22  transacted with HP in the second fiscal quarter of
23  2001?
24      A   Second fiscal quarter in 2001. I don't.
25      Q   Okay. You weren't involved?

506

1         MR. LINDSTROM: Objection; vague and
2   ambiguous as to "involved."
3         THE WITNESS: Yeah. Again, I don't -- I'm
4   not sure what you mean by "involved." I'm certainly
5   part -- I certainly helped maintain our relationship
6   with Hewlett-Packard.
7         MR. SOLOMON: Okay.
8         THE WITNESS: But I'm not sure that we had
9   a -- I mean, I'm taking your word for it that we had
10  a transaction in the second fiscal quarter.
11  BY MR. SOLOMON:
12      Q   But you don't remember it?
13      A   I don't remember it. In 1999 -- in other
14  words, in 1999. Second fiscal quarter would be -- of
15  2000 will be in 1999.
16      Q   I'm sorry if I said 2000. I meant second
17  fiscal quarter of 2001.
18      A   2001.
19      Q   Yes.
20      A   So in 2000?
21      Q   Correct.
22      A   I don't know. I don't know when the big --
23  what quarter the big HP deal was in.
24      Q   Okay. Do you recall what the deal was?
25      A   We sold them a lot of CRM software. They

507

1   were going to standardize on our CRM products, or at
2   least make broad use of our CRM products, and we were
3   going to use HP hardware in our engineering
4   organization and our production -- and for our
5   production database servers for -- and in a number of
6   areas.
7       Q   Okay. Was it a swap transaction?
8         MR. LINDSTROM: Objection; asked and
9   answered, calls for a conclusion.
10        THE WITNESS: "Swap transactions" is an
11  accounting term, and I don't know what's -- I don't
12  know -- we looked at -- you know, our accountants
13  looked at this transaction very, very carefully.
14  They were aware that they were -- you know, we were
15  buying hardware; HP was buying software, and we
16  believe we have accounted for it properly.
17        MR. SOLOMON: I've marked as the next
18  exhibit a document produced by the defendants -- I
19  excuse me, produced by Hewlett-Packard with the
20  control numbers 00061263.
21        We will mark this a little later.
22      Q   Okay. So you don't have any recollection
23  right now of the last day of being involved in an HP
24  transaction on the last day of the second fiscal
25  quarter of 2001?

508

1       A   I said I don't remember what day -- what
2   day the HP transaction was.
3       Q   Okay.
4       A   I didn't say I didn't have any recollection
5   of it; I just don't know what the date was.
6       Q   Okay. Regardless of the date, were you
7   involved in closing that deal?
8       A   What do you mean by close? Again, I'm not
9   trying to be cute here, but I certainly had
10  discussions with Hewlett-Packard. You know, I'm the
11  one -- I'm the only one who can commit our company to
12  use Hewlett-Packard gear on the engineering side of
13  our business. I run engineering directly at Oracle,
14  have from the beginning.
15        So in the sense that I said, yes, we would
16  use Hewlett-Packard gear underneath our -- our
17  main -- what's called global single systems, our main
18  production systems, and use it in our development
19  organization, I made those decisions, so certainly
20  involved in making those decisions, but actually, you
21  know, shaking hands, signing the contract, you know,
22  hammering out the terms and conditions, negotiating
23  the terms and conditions, I don't do.
24      Q   Okay. Do you recall whether you felt
25  confident or not on the last day of the fiscal

509

1   quarter of 2000 -- second fiscal quarter of 2001,
2   confident whether or not Oracle would make its
3   numbers?
4         MR. LINDSTROM:  For that quarter?
5         MR. SOLOMON:  For that quarter.
6         THE WITNESS:  I don't recall.
7         MR. SOLOMON:  So mark as the next exhibit a
8   document produced by the defendants with the control
9   number 021378 to 381.
10        (Exhibit No. 130 was marked for
11   identification.)
12        THE WITNESS:  Okay.
13  BY MR. SOLOMON:
14   Q    Okay.  Do you recognize this?
15   A    I do.
16   Q    And is that your signature on the last
17  page?
18   A    It is.
19   Q    And it's dated November 30, 2000?
20   A    Yes.
21   Q    And it's a letter from you to Carly
22  Fiorina?
23   A    Yes.
24   Q    And if you turn the document upside down,
25  you will see it says, "Sent By:  Atherton."

510

1         Do you see that?
2    A    Oh, yes.  Right.
3    Q    Does that reflect the fact that this was
4   sent from your house?
5    A    I guess so.
6    Q    Okay.  And if you turn it the right way up
7   again, then there's a fax line that says:  December
8   '01 00 10:43 Bardwick.
9         Do you see that?
10   A    I do.
11   Q    Do you know what that refers to?
12   A    I do not.
13   Q    And it says -- the letter starts, saying,
14  "Dear Carly:  As we discussed, it is my intention
15  that various Oracle computing environments will be
16  moved to HP as discussed in more detail below," and
17  then there's the detail.
18        Do you see that?
19   A    I do.
20   Q    And had you discussed that intention with
21  Carly as you say here?
22   A    I think we spoke in general terms of -- of
23  using Hewlett-Packard hardware more broadly
24  throughout Oracle.  We had never gone into this level
25  of detail between the two of us.

511

1    Q    Okay.  Now, was the HP deal referred to
2   here the subject of any meetings of the board of
3   directors of Oracle?
4    A    I have no idea.
5         MR. SOLOMON:  So mark as the next exhibit a
6   document produced by the defendants with the control
7   numbers 044428 through 505.
8         (Exhibit No. 131 was marked for
9   identification.)
10        THE WITNESS:  Could you read back his
11  previous question for me, please.
12        (Record read by the Reporter as follows:
13  "QUESTION:  Okay.  Now, was the HP deal
14  referred to here the subject of any
15  meetings of the board of directors of
16  Oracle?")
17        THE WITNESS:  The subject of any meetings.
18  Okay.  Was it ever -- by that do you mean
19  was it ever discussed in any board meetings, or was
20  there a special board meeting about the HP deal?
21  BY MR. SOLOMON:
22   Q    Was there a special board meeting.
23   A    About the HP deal?
24   Q    Yes.
25   A    Not that I know of.

512

1    Q    If you go to the control-numbered page
2   044434 -- and, just for the record, while you are
3   going to that page, this is a document, as I say,
4   produced by the defendants, and it appears to be a
5   collection of board meeting minutes and associated
6   documentation.
7         And looking at that page, Mr. Ellison, you
8   will see that there's a special meeting, at the top
9   of the page, on November 30th, 2000, but that there's
10  a redaction stamp.
11        Do you see that?
12   A    Yes.
13   Q    Do you know what the special meeting on
14  November 30th was about?
15   A    I don't, but it was not a board meeting; it
16  was what's called an Executive Committee meeting.
17   Q    And is that a committee of the board?
18   A    It's a committee of the board, yes.
19   Q    And does your answer change, then, if I ask
20  you was there a special meeting of the Executive
21  Committee with respect to the HP transaction?
22   A    The answer goes to I don't know.
23   Q    Okay.  And you don't know what's redacted;
24  is that right?
25   A    No.

513

1    Q    Okay.  What is the Independent Committee?
2    A    Independent Committee certifies potentially
3  conflicted -- conflicting transactions.  I own a
4  company -- I own a disk drive company called Pillar
5  Data.  If Pillar -- Pillar Data bought Oracle
6  software, so the Independent Committee had to approve
7  the pricing and terms and conditions when we are
8  selling because I own that.
9    Q    Do you know why information with respect to
10  the Independent Committees has been redacted?
11    A    I have no idea.
12    Q    Okay.  Now, if you go into the document
13  further to 044458, you will see there's a reference
14  to a November 30th, 2000 meeting -- special meeting
15  of the Executive Committee.
16        Do you see that?
17    A    Yes.
18    Q    Okay.  And it reflects the fact that you
19  and Mr. Henley were present and a quorum established
20  and Mr. Lucas, the third member of the committee, was
21  not in attendance; right?
22    A    Yes.
23    Q    And also there was Safra Catz and Daniel
24  Cooperman.
25        Do you see that?

514

1    A    I do.
2    Q    Okay.  And it says the meeting was called
3  to order, etc., and then under 2, it says, "Approval
4  of purchase of hardware and services from the," and
5  then we get no more information.
6        Do you see that?
7    A    I do.
8    Q    Do you have any idea what's there or what
9  should have been there, what would be there but for
10  the redaction?
11    A    Want me -- I could guess.
12    Q    If that's all you can do.
13        MR. LINDSTROM:  Objection; calls for
14  speculation.
15        BY MR. SOLOMON:
16    Q    I'll take the guess.
17    A    It's possible that the actual purchase of
18  HP hardware exceeded my purchasing authority, so it
19  was more money, more money than I was authorized to
20  spend, but, again, I'm just --
21    Q    Okay.
22    A    -- making a guess.
23    Q    Okay.  But you don't understand, if that
24  were the case, why the information would be redacted?
25        MR. LINDSTROM:  That calls for speculation,

515

1  no foundation.
2        THE WITNESS:  I have no idea what it's
3  about.  I'm guessing.
4        BY MR. SOLOMON:
5    Q    Do you have any understanding whether this
6  meeting addressed HP?
7    A    No idea.
8        MR. SOLOMON:  I would ask counsel to
9  produce unredacted copies of --
10        THE WITNESS:  Oh, let me -- let me refine
11  that.  Since it is hardware and services, there just
12  aren't that many companies we buy hardware and
13  services from.  It's a very small list.
14        MR. SOLOMON:  So it's probably HP.
15    Q    You think it's HP?
16        MR. LINDSTROM:  Objection; calls for
17  speculation.
18        THE WITNESS:  If you forced me to bet, yes,
19  I would bet it would be HP.
20        BY MR. SOLOMON:
21    Q    Fair to say you believe it's HP?
22    A    No.  I'm still -- I believe I'm making a
23  decent guess.
24    Q    Okay.  That's fair enough.
25        Again, Counsel, we want full production of

516

1  that document, please.
2        MR. LINDSTROM:  We will take your request
3  under advisement.
4        MR. SOLOMON:  Reserve the right to continue
5  questioning Mr. Oracle about the transaction --
6  Mr. Ellison about the transaction.
7        Did I say "Mr. Oracle"?
8        THE WITNESS:  You did.
9        MR. LINDSTROM:  I think that was a
10  compliment.
11        BY MR. SOLOMON:
12    Q    Do you recall receiving any legal advice
13  concerning the transaction with HP at the end of
14  2Q01?
15        MR. LINDSTROM:  You may answer that "yes"
16  or "no."
17        THE WITNESS:  No.
18        THE VIDEOGRAPHER:  20 minutes, Counsel.
19        BY MR. SOLOMON:
20    Q    Do you recall whether HP implemented the
21  software being sold to it by or licensed to it by
22  Oracle?
23    A    I believe they went through the process of
24  implementation.  I believe they had a project and
25  started to -- started to implement.

Ellison, Lawrence  9/21/2006  10:57:00 AM

517

1  Q    And was it successful, do you know?
2  A    I don't believe so.
3     MR. SOLOMON: Okay. Let's go off the
4  record for a couple minutes.
5     THE VIDEOGRAPHER: Off record at 6:15.
6  (Discussion off the record.)
7     THE VIDEOGRAPHER: On record at 6:16.
8  This marks the end of Tape 4, Volume 2, in
9  the deposition of Larry Ellison.
10    At 6:16, going off the record.
11  (Recess taken.)
12  (Record read by the Reporter as follows:
13  "QUESTION: Do you recall whether HP
14  implemented the software being sold to it
15  by or licensed to it by Oracle?
16  ANSWER: I believe they went through the
17  process of implementation. I believe they
18  had a project and started to -- and started
19  to implement.
20  QUESTION: And was it successful, do you
21  know?
22  ANSWER: I don't believe so.")
23    THE VIDEOGRAPHER: And on record at 6:31.
24  This marks the beginning of Tape 5,
25  Volume 2, in the deposition of Larry Ellison.

518

1     MR. SOLOMON: I've marked as the next
2  exhibit a document produced by the defendants with
3  the control number 034883.
4  (Exhibit No. 132 was marked for
5  identification.)
6  BY MR. SOLOMON:
7  Q    Now, the question is: Do you recognize it?
8  A    I do.
9  Q    And this is an e-mail from you dated 21st
10  of April 2000 and it goes to Jay Nussbaum and copies
11  Safra Catz?
12  A    Yes.
13  Q    And it's concerning BellSouth, and at the
14  bottom, it says, "Jay Nussbaum wrote: Safra/Larry, I
15  surrender. I thought you verbally approved this.
16  Why is this becoming" so "painful. This is a great
17  customer and we're quickly losing ground. Please
18  help."
19    Do you see that?
20  A    I do.
21  Q    And do you know what the approval is that
22  Mr. Nussbaum is referring to?
23  A    Well, the one I -- the one I specifically
24  refer to and the one I found unacceptable is -- from
25  reading this note, which refreshes my memory, is

519

1  provision where they -- they want us to develop
2  modifications. Specifically -- they want us to
3  basically enhance the software or change the software
4  so it works perfectly at BellSouth, put in whatever
5  they want us to put in, and then when we are done, we
6  will just make it -- turn it into a standard product.
7     So what's fine for a telephone company,
8  very specific stuff for telephone company, everyone
9  will receive: hospitals, just -- it's just very --
10  it's crazy.
11  Q    And is the technical term for that
12  "wackfuck"?
13  A    That is the technical term.
14  Q    Did you make that one up yourself? I
15  haven't heard of it.
16  A    I think it's British. I think it's
17  British.
18  Q    I should know that. I've been away too
19  long.
20    I'm interested in the e-mail address. It
21  says lellison-vaio-katana.us.oracle.com.
22    Do you see that?
23  A    I'm looking for it.
24    MR. LINDSTROM: At the top.
25    THE WITNESS: See it from -- okay. I don't

520

1  think that's an e-mail address. I'm not sure what
2  that is. That could be a router address.
3  BY MR. SOLOMON:
4  Q    Okay. Would this --
5  A    That doesn't like an e-mail -- that is
6  not -- I'm pretty certain that's not an e-mail
7  address.
8  Q    Okay. Does it indicate that you were on
9  the boat at the time you wrote the e-mail?
10  A    I think so.
11  Q    Okay. And was -- were you on this same
12  boat on your Mexican trips in late 2000, early 2001?
13  A    No.
14  Q    What boat were you on then?
15  A    "Ronin," a boat called "Ronin."
16  Q    Okay. And that would have -- would that
17  have -- well, you are saying it's not an e-mail
18  address.
19    Would it have a similar address, whatever
20  it is, or router address?
21  A    Router address? Yeah. It goes from my
22  e-mail address into a router and a switch, and it
23  passes across several different things before it
24  final gets to the e-mail server.
25  Q    Gotcha.

521

1     So -- okay.  So to the extent you e-mailed
2  in late December 2000 and January 2001 from that
3  boat, those e-mails would disclose the name of the
4  boat as the name of the boat is disclosed here?
5     MR. LINDSTROM:  No foundation, calls for
6  speculation.
7     THE WITNESS:  I don't know.
8     MR. SOLOMON:  Okay.
9     THE WITNESS:  But it is -- from the -- you
10  can see the account, the account is
11  lellison@us.oracle.com, which is our old-fashioned
12  e-mail addresses.
13  BY MR. SOLOMON:
14     Q    Okay.  And, again, somewhere, the computer
15  that was both on the "Katana" and on "Ronin"?
16     A    "Ronin," yes.
17     Q    They still exist, but you don't know where?
18     A    They do still exist, yes.
19     Q    In lawyers' offices?
20     A    Yes.
21     MR. SOLOMON:  Have marked as the next
22  exhibit a document produced by defendants with the
23  control numbers 035682 to 685.
24     (Exhibit No. 133 was marked for
25     identification.)

522

1  BY MR. SOLOMON:
2     Q    When you have had a chance to review it,
3  let me know if you recognize it.
4     A    I don't recognize it.
5     Q    Okay.  You will see that it's dated Monday,
6  January 29, 2001, and it -- on the front page, it's
7  an e-mail exchange from Safra Catz to Scott Little?
8     A    Yes.
9     Q    Do you know who Scott little is?
10     A    I do not.
11     Q    The title is "Forwarded:  Update for LJE's
12  meeting on BMC Software."
13     Do you see that?
14     A    I do.
15     Q    Do you remember having a meeting as
16  reflected here?
17     A    Say again.
18     Q    Did you have that meeting as reflected
19  here?
20     A    I don't recall.
21     Q    And then it says, "Larry ended up out sick
22  all last week."
23     Do you see that?
24     A    Yes.
25     Q    So were you out sick all of the week of

523

1  January 22?
2     A    I think this got -- the -- my calendar said
3  I was in Mexico.
4     Q    Correct.
5     A    Yeah.
6     Q    And so were you sick in Mexico or --
7     A    I don't think so.
8     Q    So you were vacationing in Mexico?
9     A    I think so.
10     MR. SOLOMON:  And we will have marked as
11  the next exhibit a Bloomberg News article dated
12  January 24th, 2001.
13     (Exhibit No. 134 was marked for
14     identification.)
15     THE WITNESS:  Maybe I was sick in Mexico.
16  I don't know.  I don't remember being in Mexico.  I
17  don't remember being sick.  I just don't recall.
18  BY MR. SOLOMON:
19     Q    So you will see that the headline is
20  "Oracle CEO Ellison Loses Voice, Misses 2 Public
21  Talks In A Week."
22     You see that?
23     A    Yeah.
24     Q    And you will see that Ms. Glass is quoted
25  as saying, "He does not have a voice, but he's

524

1  actively working by e-mail."
2     Do you see that?
3     A    Yes.
4     Q    Is it possible that this was a white lie
5  and you were vacationing and it was an excuse?
6     A    What's wrong with saying I'm on holiday --
7     Q    That's what --
8     A    -- on vacation?  So I have no -- maybe I
9  was sick.  I really don't remember.
10     Q    Okay.  And do you have any recollection of
11  the public appearances that you missed that you were
12  scheduled to appear at?
13     A    No.
14     Q    And was it a deliberate -- did you
15  deliberately go on vacation in order to be away from
16  work when you exercised your stock options?
17     A    No.
18     MR. LINDSTROM:  Objection.
19  BY MR. SOLOMON:
20     Q    No connection.
21     A    I'm not even sure I went away.  My calendar
22  said I was in Mexico, but, you know, I don't
23  remember.
24     Q    Okay.
25     A    I assume I was.  According to all this,

525

1  this is saying I'm sick, you know.
2      Q.   Okay.
3      A.   I don't know.
4      MR. SOLOMON:  Okay.  Let's have marked as
5  the next exhibit a document produced by Oracle with
6  control numbers 025020 and 021.
7      (Exhibit No. 135 was marked for
8      identification.)
9      THE WITNESS:  Okay.
10 BY MR. SOLOMON:
11     Q.   Okay.  Do you recognize this?
12     A.   Yes.
13     Q.   And it's dated Thursday, November 30th,
14 2000, and it's from Gary Roberts to you, and it
15 copies others.
16     Do you see that?
17     A.   That's correct.
18     Q.   And it starts off saying, "Larry, I
19 believe" -- "Larry, I believe you'll be discussing
20 discounts with HP today.  Please keep these figures
21 in mind," and then there's a lot of detail.
22     Do you see that?
23     A.   I do.
24     Q.   Now, does this not reflect -- does this not
25 reflect your engaging in negotiating with HP

526

1  concerning the deal?
2      A.   It reflects that Gary Roberts thinks I
3  engage in price negotiations with Carly Fiorina and
4  we're -- argue about how much we can get -- discount
5  we can get on each server.  I guess -- that's what he
6  does, and it's his job.  He was the then head of the
7  data center, and he would -- he and Maria Maskiewicz
8  would negotiate the best possible prices for our
9  hardware, and it's a very important job, but I don't
10 give him much help.
11     MR. SOLOMON:  Okay.  I've marked as the
12 next exhibit a document with the control numbers
13 020835 through 838.  It was produced by the
14 defendants.
15     (Exhibit No. 136 was marked for
16     identification.)
17 BY MR. SOLOMON:
18     Q.   And I'm sorry, Mr. Ellison, just with that
19 last exhibit, this would have been in your files as
20 of November 30th, 2000; correct?
21     A.   Yes.
22     Q.   And it wasn't produced from your files and
23 you can't explain why; is that correct?
24     A.   That's correct.
25     Q.   I'm going to show you a document that has a

527

1  little bit -- just give that back to me.  That's
2  fine.  That has a little bit of highlight on it, but
3  it's going to ease -- it's going to save some time if
4  I do that.
5      So I just marked as the next exhibit --
6  thank you.
7      (Discussion off the stenographic record.)
8  BY MR. SOLOMON:
9      Q.   And, Mr. Ellison, my question is going to
10 be:  Do you recognize the handwriting?
11     MR. LINDSTROM:  While he's looking at the
12 document, just for sake of the record, Mark, can you
13 identify the highlighting and any other marks that
14 are on here that came from your office?
15     MR. SOLOMON:  Sure.
16     Q.   The highlight, I believe, Mr. Ellison, on
17 the document you are looking at is where it says,
18 "Dear Carly" on the front page and that first
19 sentence and the signature, "Best regards, Larry
20 Ellison." I don't believe there's any other
21 highlighting.
22     Correct me if I'm wrong.
23     MR. LINDSTROM:  And then on the copy that
24 has been distributed to counsel, in the upper
25 right-hand corner, it says "Source to Sanderson" and

528

1  somebody else's handwriting.  Looks like a Post-it
2  that's been copied or something like that.
3      MR. SOLOMON:  You -- that is -- with that
4  waiver, I think that's ours.
5      MR. LINDSTROM:  Okay.
6      MR. SOLOMON:  In that corner.  Okay?
7      MR. LINDSTROM:  That's fine.  And it does
8  not appear, for the record, on the version that's
9  been marked as Exhibit 136.
10     MR. SOLOMON:  Correct.  Thank you.  Yeah.
11     MR. SOLOMON:  Oh, Counsel points out --
12     MR. SOLOMON:  I should have just copied it,
13 shouldn't I?
14     MR. LINDSTROM:  No.  Counsel -- counsel
15 points out that the Post-it covered up a little bit
16 of the handwriting that appears on the -- beneath it,
17 starting from -- looks like "Where" -- that -- can
18 you read that first bullet point to us, if you are
19 able to?
20     MR. SOLOMON:  Yes.  Mr. Ellison has it.
21     MR. LINDSTROM:  So you are working with the
22 same copy I am?
23     MR. SOLOMON:  I'm afraid I am.
24     "Where is this the same as committed in
25 the" -- I don't know.

529

1    Q   Can you read that writing?
2    A   I'll try.
3    Q   I guess, is it your writing, is what --
4    A   No, it's not my writing.  I'd have a better
5   chance with my writing.
6    Q   You know, we don't need to dwell on it.  If
7   it's not your writing --
8    A   I think it's "Where in this is the same" --
9   "Where in this is the same as committed" -- sounds
10  like a lawyer, doesn't it?
11   Q   A bit.
12   A   Yeah, a little bit.
13   Q   It looks a little bit like your writing;
14  that's why I was asking --
15   A   No.
16   Q   -- if it's not, we can move on.
17   A   No, it's not my writing.
18   Q   Do you recall a dispute arising with HP
19  concerning the applications sale or lease that Oracle
20  engaged in with them?
21   A   Not offhand.  I know that they were -- they
22  had problems with the software.  They had problems
23  with the software, but -- is that what you were
24  referring to?
25   Q   Yes.

530

1    A   Yeah.
2    Q   And did the outcome cost Oracle money?
3    A   Did we pay HP some -- I think we probably
4   provided HP with some --
5       MR. LINDSTROM:  He doesn't -- don't
6   speculate.
7   BY MR. SOLOMON:
8    Q   You know I'm going to ask anyway, so you
9   may as well.
10      MR. LINDSTROM:  Or at least let's make it
11  be clear that you are speculating.
12      THE WITNESS:  Okay.  I recall we did some
13  pro bono consulting to help them with the
14  implementation.  But in the end, they decided to go
15  with Siebel.
16      MR. SOLOMON:  Gotcha.  Thanks.
17      Have marked as the next document a document
18  produced by the defendants in this litigation with
19  the control numbers 069907 to 939.
20      (Exhibit No. 137 was marked for
21      identification.)
22  BY MR. SOLOMON:
23   Q   And when you have had a chance to review
24  it, let me know if you recognize it.
25   A   I don't recognize seeing the document

531

1   before, but, again, I'm very familiar with the issues
2   that are discussed in the document.
3    Q   Okay.  And you will see that on the third
4   page of the document, you are on the distribution
5   list.
6       Do you see that in the distribution list
7   box, your name is the first name?
8    A   Yes.  Yes.
9    Q   And do you understand -- do you believe you
10  did receive this?
11   A   No, I believe I received it.
12   Q   And it's called, for the record,
13  "E-Business Suite High Level Requirements Document"?
14   A   Right.
15   Q   It's dated April 4th of 2002, is the
16  creation date.  It was last updated on June 6th,
17  2002.  It's Version 1.4, and it has the designation
18  "Oracle Internal & Confidential."
19   A   Yes.
20   Q   And then on the page that has the
21  distribution list, it says, in the middle, "Due to
22  the sensitive nature of the contents outlined, this
23  document is strictly confidential and strictly for
24  Oracle internal use only.  If you are not an Oracle
25  employee, please delete this document immediately."

532

1       Do you see that?
2    A   Yes.
3    Q   Do you have an understanding who created
4   this document?
5    A   Our field engineers -- the people who are
6   responsible for implementing our applications around
7   the world, and we are familiar with their strengths
8   and their weaknesses -- prepared the document.
9    Q   Okay.  If you go to page 7, which has the
10  control number 069913 --
11   A   Okay.
12   Q   -- you will see that there are -- there's
13  an introduction, and then almost halfway down the
14  page, there's a paragraph that says, "These
15  recommendations are not considered enhancements.  We
16  consider them fundamental gaps, inconsistencies or
17  duplication of effort within the E-Business Suite
18  architecture."
19      Do you see that?
20   A   I do.
21   Q   Then it goes on to say, "The competition
22  has been extremely aggressive in pointing out these
23  weaknesses within the R11i architecture.  Some of
24  these issues are so fundamental, that it exposes our
25  development environment as 'best of breed' rather

533

1   than one unified software vendor."
2         See that?
3      A   I do.
4      Q   Do you agree with that?
5      A   No.  No.  I mean, certainly all the pieces
6   did not fit together, you know, as perfectly as they
7   could, but they were engineered to fit together.
8   They were certainly -- you know, there's certainly
9   problems, but it's still a lot better fitting them
10  together than fitting products from several different
11  vendors, the best-of-breed approach.
12     Q   Go down to the next paragraph.  It says,
13  "We believe these 'fundamental gaps' are serious
14  enough and should be prioritized & addressed by
15  development accordingly."
16        Do you see that?
17     A   I do.
18     Q   And did you agree that they were as serious
19  as suggested here?
20     A   Well, I don't -- again, the first sentence
21  of the document said that Oracle embarked on probably
22  one of the greatest achievements in the history of
23  the software industry.  I mean, there's a lot of
24  strong language --
25     Q   Sure.

534

1      A   -- in this, so greatest achievement,
2   fundamental gaps, I'm not sure they go together.
3         It was a new product -- I've said this
4   before.  It was a new product.  There were -- not all
5   the pieces worked together as well as they could
6   have, and we had to constantly make improvements, and
7   we were constantly making improvements, and this
8   document helped us pinpoint some of the things we had
9   to work on.
10     Q   Then I'm now looking at what is control
11  number 069920.
12     A   Almost there.  Okay.
13     Q   And, at the top, it says, "Integration
14  Requirements," and, in quotes, "Best of Breed vs.
15  Suite."
16        Do you see that?
17     A   I do.
18     Q   And it starts off saying, "This section
19  contains all those requirements that are deemed
20  critical to overcome the lack of integration between
21  the E-Business Suite modules (ERP/CRM) as well as the
22  lack of integration within the individual groups of
23  modules."
24        Do you agree that there was the lack of
25  integration that's referred to here?

535

1      A   Well, the pieces were integrated.  I'm
2   not -- let me see if I can explain this.  The pieces
3   fit together, but there might be a function that was
4   present.  Some of the modules were more mature than
5   other modules.  Some of the modules we had been
6   working on for ten years.  Some of the modules we had
7   been working on for two years.  And the modules with
8   more capability, the more mature modules, did things
9   that were yet to be put into some of the other
10  modules.  I don't know if -- I hope I'm making some
11  sense.
12        So, if you will, you would have liked all
13  the modules to be the same level of maturity.  And
14  one of the reasons that -- one of the things they are
15  pointing out is an integration failing.  It's really
16  not an integration failing at all.  It's a -- the
17  fact that a feature is just missing.  Therefore,
18  using that plug analogy, you know, there would be the
19  receptacle but no prong in one of the plugs, just --
20  it was a pretty new product.  You know, the plug
21  wasn't complete.
22        I don't know if I'm making any sense.  It's
23  difficult to speak metaphorically about this.  I can
24  give you specific examples at some point.
25     Q   Let's just see if we can work through some

536

1   more of the document and we will see what comes up.
2         There are -- I'm now looking at Control
3   No. 069921.  There are a number of headings, "Back
4   to" -- the title, "Back to Integration Requirements."
5      A   Yeah.
6      Q   And those headings continue through Control
7   No. 069925.
8      A   Yeah.
9      Q   And I just want to take some examples
10  rather than necessarily going through every single
11  one.
12        For example, on page 069922, at the top,
13  under one of the "Back to Integration Requirements"
14  is a heading, "Cost Rollup For Contracts," and it
15  says, "This is a real business issue for prospects,
16  and damaging for Oracle Sales campaigns to
17  prospects," in parens, "(Unlike Oracle Manufacturing,
18  we cannot identify accrued costs against a Contract
19  over time.  Customers using Oracle Contracts cannot
20  answer simple questions such as:  Are we profitable?
21  unprofitable? should we try to renegotiate?"
22     A   Those are some of the least simple
23  questions there are on the planet.  Understanding
24  whether the profitability of a large consulting
25  engagement is one of the hardest -- is very -- can be

537

1  very, very difficult.
2      Q    Okay.
3      A    Trying to figure out the overhead costs
4  are -- those are not simple questions.
5      Q    Okay.  And then down the page, "Back to
6  Integration Requirements," and there's a reference to
7  "Demand Planner and CRM Integration," and there it
8  says, "The capabilities to perform an integrated
9  planning in the E-Business Suite is broken."
10      Do you agree with that?
11      A    I don't know what they mean by "integrated
12  plan."  We have been -- we certainly can do planning.
13  You know, demand planning is basically a little bit
14  like a sales forecast.  Tells you what people want to
15  buy and how much of it and when they want to buy it.
16  Then that gets sent off into scheduling the factory,
17  if you have to manufacture something.  Did it -- how
18  gracefully the demand -- the demand from the CRM
19  system, you know, flowed into the -- into the demand
20  planning module was the subject of a lot of debate.
21  I mean, it wasn't -- you know, the automation wasn't
22  as complete as it could be.
23      Q    Okay.
24      A    These guys are out there selling and they
25  would like to make it perfect and were trying to make

538

1  it perfect.
2      Q    Okay.  That paragraph goes on to say, in
3  part, "For example, salespeople develop their
4  forecasts in sales online."
5      A    Yeah.
6      Q    "These are aggregated regionally and
7  nationally, yet these are not able to be transmitted
8  to the forecasts used in demand planning, supply
9  chain planning, or manufacturing planning."
10      A    Enormously complex job.
11      Q    Okay.  And then it goes on to say, "This
12  implies that we cannot plan/produce according to
13  forecasts or that customers have to manually" relay
14  "the information entered in CRM into the Forecasting
15  modules of Oracle ERP."
16      MR. LINDSTROM:  I think it says "re-key."
17      (Reporter clarification.)
18  BY MR. SOLOMON:
19      Q    And do you agree with that?
20      A    I agree it's an enormously complicated
21  problem.  You have demand coming from all over the
22  world.  You are trying to figure out where to
23  manufacture based on that demand.  Where you
24  manufacture has to do with your labor costs in that
25  country, your shipping costs, available inventory in

539

1  that plant.
2      So let's say we know we have to produce a
3  million -- simple case:  All we make are widgets.  We
4  have to produce a million of them and then ship them
5  to all these different places.
6      Well, maybe you want to ship the -- if you
7  like to build the widget in Russia -- in Poland and
8  then ship it to Russia, could you save -- you save
9  transportation costs, but your inventory -- your
10  inventory happens to be in Italy, and you can't
11  really move the inventory, so it's actually cheaper
12  to make it in Italy because of inventory rather
13  than -- you know, rather than the labor costs.  These
14  are -- it's an -- ungodly difficult.  Sounds simple.
15      Well, we know what the demand is.  We know
16  where our plants are.  Why can't we simply
17  automatically press a button and figure out where to
18  make all the stuff and ship it and do it in optimal
19  fashion.  It's a really hard problem.
20      Q    Okay.  On Document No. 0699923, towards the
21  top, "Back to Integration Requirements," and then
22  halfway down that page -- or almost halfway down that
23  page, it says, "As there is no integration on the
24  Purchasing Side between a Procurement Contract in
25  Purchasing and a Procurement Contract in the

540

1  'Contracts for Procurement' module, negotiations are
2  only done for the transactionally relevant
3  information of a Procurement Contract and not the
4  extended terms and conditions in a Procurement
5  contract."
6      Do you agree with that?
7      MR. LINDSTROM:  Vague and ambiguous.
8      THE WITNESS:  I don't understand it.  I
9  don't understand what they are saying.
10  BY MR. SOLOMON:
11      Q    Okay.  Now, overall, this document appears
12  to reflect a documented lack of integration within
13  the E-Business Suite.
14      Do you agree with that?
15      A    No.  I think they certainly point out where
16  the integration is imperfect.
17      Q    Okay.
18      A    But they also point out where features are
19  missing.
20      MR. SOLOMON:  Okay.  Have marked as the
21  next exhibit a document produced by Oracle with the
22  control number 114110 to 122.
23      (Exhibit No. 138 was marked for
24      identification.)
25  BY MR. SOLOMON:

Ellison, Lawrence  9/21/2006  10:57:00 AM

541

1    Q    Do you recognize this, Mr. Ellison?
2    A    I sure do.
3    Q    And this is an article that is focused on
4    you?
5    A    Really nasty article that Mark Lebovich
6    wrote, right.
7    Q    And if you go to the second page under the
8    heading, "The Fog of Deceit," there's a lot of -- a
9    lot of information here, but I want to look at the
10   paragraph two-thirds of the way down, beginning:
11   "Deceit is a complicated notion."
12       Do you see that?
13   A    Yes.
14   Q    It says, "Deceit is a complicated notion
15   with Ellison. He's being accused of practicing it in
16   many forms -- exaggerating the capabilities of Oracle
17   products, embellishing the meanness of his boyhood
18   neighborhood and misleading people about which
19   academic degrees he has earned."
20       Do you see that?
21   A    I do.
22   Q    Now, it's true, isn't it, that you have
23   admitted in the past that you lied about having a
24   degree; is that true?
25   A    In order to get a job in Silicon Valley, I

542

1    did, yeah.
2    Q    Okay. And it's not true, though, is it,
3    that you have admitted exaggerating the capabilities
4    of Oracle's products?
5        Have you ever admitted that?
6    A    I don't think I have.
7    Q    Either exaggerated or admitted?
8    A    Well, maybe in the very early day -- you
9    know, in the early days, when there were, you know,
10   five or six people in the company, and we had just
11   come out with a product, maybe I exaggerated the
12   capabilities of our database early on, but I don't
13   think I've, you know, made a habit of it over the
14   years.
15   Q    And let's go further into the document.
16   I'm looking at page 00115 -- excuse me, I'm sorry,
17   116. And there's a reference to one of your former
18   spouses, at the bottom. And apparently she describes
19   you as being a serial liar.
20       Do you see that?
21   MR. LINDSTROM: Can you be more specific
22   with the reference.
23   MR. SOLOMON: Sure.
24   Q    Looking at towards the bottom of the page,
25   reads, in part: "'I cared deeply about Larry,'" says

543

1    Karen Rutzky Back, now of Los Angeles, but he lied to
2    her serially, she says. 'I got tired of being a
3    detective about everything he said.'"
4    A    Speaking about Karen Rutzky? I see that,
5    yes.
6    Q    Yes.
7    A    That's a girl I went out with in high
8    school.
9    Q    No. I understand. I understand.
10   A    I think you said my -- did you say my
11   ex-wife or something?
12   MR. LINDSTROM: Yes, he did.
13   MR. SOLOMON: I apologize. I apologize. I
14   apologize if she's your ex-wife.
15   THE WITNESS: Okay. I think -- she's
16   not -- she's not an ex-wife; she's someone I went out
17   with in high school.
18   MR. SOLOMON: Okay. That's fine.
19   Q    And, anyway, you say the notion that you
20   lied to her is really breathtaking. In other words,
21   you deny that accusation; correct?
22   MR. LINDSTROM: On the next page?
23   MR. SOLOMON: Yes.
24   THE WITNESS: I don't know what she's
25   talking about.

544

1    BY MR. SOLOMON:
2    Q    Okay. Further down the page, there's a
3    reference to you supposedly lying about getting into
4    medical school.
5        Did you lie about getting into medical
6    school?
7    A    I did.
8    Q    Okay. And then further at the bottom of
9    that page, there's a reference to you saying that you
10   graduated from an obscure college in Sheffield,
11   England.
12       Did you ever say that?
13   A    No.
14   Q    And then it goes on to say, "He told me
15   these big, whopping lies, and he stuck to them. He
16   can follow these lies for years."
17       Is that accurate?
18   A    This is Karen Rutzky?
19   Q    Right.
20   A    No.
21       I didn't even -- I didn't even know her
22   after I left -- you know, very well after I left --
23   after my first year, second year college.
24   Q    What about Quinn; who is Quinn?
25   A    Adda Quinn, that's my first wife.

545

1     Q    Actually, I think that this is referring to
2 Ms. Quinn, and I think she's saying, "He told me that
3 he graduated from an obscure college in Sheffield,
4 England."
5        You see that? "Quinn says"?
6     A    I do -- well, actually, I don't.
7      MR. LINDSTROM: It's the very last two
8 lines of the page.
9 BY MR. SOLOMON:
10     Q    And there's -- now that I've told you it
11 was Ms. Quinn who said that, is that true?
12      MR. LINDSTROM: Is what true?
13 BY MR. SOLOMON:
14     Q    Did you tell her that you graduated from a
15 college in Sheffield?
16     A    Not that I recall.
17     Q    And Ms. Quinn says, "He told me these big,
18 whopping lies, and he stuck to them. He can follow
19 these lies for years."
20        Is she right?
21     A    Not that I recall.
22     Q    Okay. And at the bottom of the page with
23 the control number 0141420, says, at bottom -- and it
24 quotes you -- "I used to practice what I jokingly
25 referred to as 'management by ridicule.'"

546

1        Do you see that?
2     A    I do.
3     Q    "People would be terrified to come into
4 meetings."
5        Do you see that? Did you say that?
6     A    I don't. Where are you?
7     Q    Okay. It says, "I used to practice what I
8 jokingly refer to as 'management by ridicule,' he
9 says."
10     A    Right at the bottom of the page.
11     Q    Yeah.
12        "People would be terrified to come into
13 meetings."
14        Did you say that?
15     A    Yes.
16     Q    And as of the time of this article, you
17 changed that practice, had you?
18     A    Long before this article came out. In the
19 first couple years of Oracle.
20     Q    Okay.
21      MR. SOLOMON: Let's go off the record for
22 two minutes, please.
23      THE VIDEOGRAPHER: Off record at 7:16.
24      (Recess taken.)
25      THE VIDEOGRAPHER: On record at 7:20.

547

1      MR. SOLOMON: Okay. I'll have marked as
2 the next exhibit an excerpt from a book called "The
3 Difference between God and Larry Ellison."
4      (Exhibit No. 139 was marked for
5      identification.)
6 BY MR. SOLOMON:
7     Q    Do you know what the difference is,
8 Mr. Ellison?
9     A    It's an old joke. Started out as a golf
10 joke.
11     Q    Really.
12     A    God doesn't think he's Arnold Palmer.
13        You don't want to hear the joke.
14     Q    Go on.
15     A    Jack Nicklaus, Arnold Palmer. It's an old
16 joke. Old-time golfer and daughter are playing golf,
17 and God is playing about 170 -- I don't play golf, so
18 I probably got it wrong. God's about 170 yards from
19 the green, and God turns to Jack and says, "What do
20 you think -- what do you think Arnold would --
21 would -- you know, would hit here?"
22        "Oh, you know, Arnold would probably hit a
23 seven iron from here."
24        And then God, you know, picks up -- anyway,
25 without going into it, the punch line, is: God

548

1 doesn't think he's Arnold Palmer.
2     Q    Got it.
3        So a bit of plagiarism going on here.
4     A    Afraid so.
5     Q    All right. So I want to draw your
6 attention to pages 2005 and 2006.
7     A    Okay.
8     Q    Now, first of all, I want to read the
9 language on page 2005 that says, "Oracle's meeting
10 for analysts yesterday was a very positive briefing
11 and it appears that the company's business has shown
12 no evidence of deterioration due to economic or
13 competitive issues.
14        "The company continues to feel that 60 to
15 70 percent growth in revenues and earnings is
16 achievable for the current fiscal year and" --
17        Do you see that?
18     A    I do.
19     Q    "And that longer term, 50 to 60 percent
20 growth is attainable."
21        Do you see that?
22     A    I do.
23     Q    And that's -- that reflects statements made
24 at January 1990 analyst meeting; correct?
25     A    I believe so.

549

1  Q    Okay.  And then --
2  A    I don't fully trust this book, but, yes.
3  Q    Because unlike the other book, you didn't
4  comment and clarify, did you --
5  A    The other book is written by -- by one of
6  the -- an author -- someone who worked for the
7  "Economist."  This guy worked for a religious
8  newspaper in Florida.
9  Q    Okay.  So let's --
10  A    Big difference.
11  Q    You have a view as to which one is more
12  reliable, I take it?
13  A    I would go with the "Economist."
14  Q    Halfway down the page then says, "When
15  Oracle's predictions turned out to be" flat -- excuse
16  me, "turned out to be wrong, the stock did a half
17  gainer.  According to the lawsuit, the defendants
18  'knew or were reckless in not knowing' that the
19  projections were overly optimistic."
20      Do you see that?
21  A    I do.
22  Q    It goes on to say, "Then came the salacious
23  part."
24      Do you see that?
25  A    I do.

550

1  Q    Then it references some stock sales.
2      Do you see that?
3  A    I do.
4  Q    And then it says, "In other words, they
5  tried to jack up the stock price artificially so
6  their shares would be worth more."
7      Do you see that?
8  A    I do.
9  Q    Then it goes on, "Years later, in an
10  interview, Walker denied doing any such thing.  His
11  personal financial strategy at the time was to
12  diversify his holdings to 'make sure my family was
13  financially secure.'  He wanted to invest in
14  tax-exempt bonds but needed cash to do it.  He said
15  he sold stock only when Oracle's legal department
16  said he could and only when he would not have to pay
17  a huge capital gains tax for doing so.  According to
18  Walker, the fact was that 'I sold at every
19  opportunity.'"
20      Do you see that?
21  A    Yes.
22  Q    And then it goes on to say, "Still, it was
23  also true that Walker sold the stock soon after
24  Imbler started worrying about" -- "about Oracle's
25  finances. Ellison believed that Walker dumped stock

551

1  at least partly," and then you are quoted, "because
2  he was concerned.  He expressed himself pretty
3  clearly with his financial decision.'"
4      Did you say that?
5  A    Not that I recall.
6  Q    So let's be clear about this.
7      You are not saying that you didn't; you
8  just don't recall one way or the other?
9  A    That's correct.
10  Q    Now, if -- if it were true that Mr. Walker
11  expressed himself clearly with his financial
12  decision, isn't it equally true or more true that you
13  expressed yourself clearly with your financial
14  decision in January of 2001?
15  A    No.  My options were expiring.
16  Q    Okay.
17  A    Quite different than Jeff Walker who was --
18  and most people, actually, who sell their options as
19  soon as they vest.  They sell them as soon as
20  possible.  I hold them for as long as possible.
21  Q    I'm glad you -- glad you mentioned that.
22      When did the expire -- August 2001 expiring
23  options initially vest?
24  A    They would have -- they would vest 25
25  percent annually after -- so 2001, it would be 1991,

552

1  you know, 1992 -- I guess 1992 for 25 percent; 1993,
2  1994, 1995.
3  Q    Okay.  And is it a dangerous strategy to
4  hold on to expiring options up to close to the date
5  of the expiration?
6  A    You know, I think most people -- my
7  financial advisors don't recommend that I do, you
8  know, that I hold my options for so long, but I
9  believe in the company and I just hold the options.
10  Q    One potential consequence would be that you
11  may be forced or feel forced into entering into a
12  transaction where you exercise and sell stock while
13  you are in possession of material adverse
14  information; isn't that true?
15  A    No.  No.  I wouldn't do that.
16      MR. SOLOMON:  Okay.  Let's have a time
17  check, if we may.
18      THE VIDEOGRAPHER:  We are -- from one hour,
19  we are about eight and a half minutes away.
20      MR. LINDSTROM:  For what it's worth, I show
21  four.
22      THE VIDEOGRAPHER:  Pardon?
23      MR. LINDSTROM:  I show four, but --
24      THE VIDEOGRAPHER:  Well, that's the tape
25  time.  Yeah, that's the tape time.

553

1      MR. LINDSTROM:  What's our run time today?
2      THE VIDEOGRAPHER:  Well, we're past seven
3  hours.  And I thought we were into the extra hour.
4  With that extra hour, we're, by my clock, about eight
5  minutes away now.
6      MR. SOLOMON:  And then if you total them
7  all up, how many hours?
8      THE VIDEOGRAPHER:  It would -- I have seven
9  hours, 50 minutes now.
10      MR. SOLOMON:  Okay.  In that case, I'm
11  going to take a one-minute break while I organize the
12  last couple of documents that I'll be able to use in
13  this session.
14      THE VIDEOGRAPHER:  Off record at 7:27.
15      (Recess taken.)
16      THE VIDEOGRAPHER:  On record at 7:29.
17  BY MR. SOLOMON:
18      Q   It's true, isn't it, Mr. Ellison that by
19  January 22, 2001, you were aware that the 11i
20  business suite was plagued with implementation
21  problems?
22      MR. LINDSTROM:  Objection; argumentative,
23  vague and ambiguous as to "plagued."
24      THE WITNESS:  I certainly knew that some of
25  our customers were successful and some of our

554

1  customers were less successful in implementing the
2  product, and there were bugs.
3  BY MR. SOLOMON:
4      Q   Okay.  And you knew as of January 22nd,
5  2001, that the pipeline growth for fiscal Q301 was
6  dropping?
7      A   I think it had dropped, showing 34 percent
8  growth, which was still robust growth and certainly
9  enough growth to make our -- make our numbers for the
10  quarter.
11      Q   You had information available to you as of
12  January 22nd, 2001 that demonstrated that using
13  converse -- historical conversion rates you couldn't
14  meet your quarter?
15      A   That is not true.
16      Q   No?
17      A   That is not true.
18      Q   You knew as of January 22, 2001, that the
19  historical use of the historical conversion rates was
20  unrealistic?
21      A   I'm not sure what you are saying.
22      Q   You knew as of January 22nd, 2001, that
23  using historical conversion ratios would yield an
24  inaccurate outcome?
25      A   That's not correct.

555

1      Q   You knew that as of January 22nd, 2001,
2  that NAS was experiencing a decline in its business
3  prospects?
4      A   I think we agreed that the pipeline -- the
5  pipeline had gone down from over 50 percent to 34
6  percent.
7      Q   You knew as of January 22, 2001, that
8  Oracle's internal implementation of the E-Business
9  Suite was resulting in lost revenue?
10      A   That's not correct.  We had a problem with
11  the customs system for education and that caused some
12  education bookings to be lost.  That's the only thing
13  I can recall.
14      Q   You knew as of January 22nd, 2001, that you
15  had engaged in an improper swap transaction with
16  Hewlett-Packard at the end of Q2?
17      A   Absolutely not.
18      Q   Who's paying for your defense costs in this
19  litigation, Mr. Ellison?
20      A   I believe the company is.
21      Q   Do you have insurance?
22      A   Yes, we do.
23      Q   And the insurer's not paying?
24      A   I believe the insurance is paying, paying
25  up to the limit on the policy.

556

1      MR. LINDSTROM:  But -- there's no
2  foundation, speculation.
3      THE WITNESS:  Right.
4  BY MR. SOLOMON:
5      Q   And do you understand that there is a claim
6  in this litigation for insider trading?
7      A   Yes.
8      Q   And do you understand that you are
9  personally liable for that, or do you believe the
10  company is accountable for that?
11      MR. LINDSTROM:  Objection; calls for a
12  legal conclusion, no foundation, speculation.
13      You may answer if you understand.
14      THE WITNESS:  My understanding is that I'm
15  personally liable.
16      MR. SOLOMON:  Okay.  Have marked as the
17  next exhibit a letter dated August 29, 2006 from
18  myself to Mr. Wald.
19      (Exhibit No. 140 was marked for
20      identification.)
21      MR. LINDSTROM:  So we are now down under
22  two minutes.  I assume you don't intend to ask him a
23  lot of questions about correspondence between counsel
24  and pending litigation.
25  BY MR. SOLOMON:

557

1    Q    Have you seen this letter before,
2  Mr. Ellison?
3    A    I have not.
4    Q    Are you aware that we demanded at the end
5  of August of this year, in addition to discussions
6  concerning corporate governance enhancements, the sum
7  of $1,975,000,000 to resolve this litigation?
8    A    There was an e-mail, I think, that went out
9  to all -- certainly went out to me, you know,
10  summarizing this.
11    Q    Okay.  And you are aware that according to
12  the terms of this letter, the offer remains open
13  until November the 28th, unless it's either withdrawn
14  in writing prior to exception -- acceptance or unless
15  Judge Jenkins rules in our favor?
16        You understand that?
17    A    I do now.
18        MR. SOLOMON:  I guess you don't want to
19  write a check.
20        MR. LINDSTROM:  Argumentative.
21        We are done, aren't we?
22        MR. SOLOMON:  We are except for the
23  reservation that, first, I've had to speed through
24  many, many documents to finish, and there are many
25  documents that I would like the opportunity to

558

1  question you about that I haven't been able to, and I
2  reserve the right to ask the Court for more time.
3        In addition, there may be more documents
4  produced in the litigation.  To the extent they
5  implicate you, I'm going to ask for more time for
6  that as well, but thank you in the meantime for your
7  testimony.
8        MR. LINDSTROM:  Off the record.
9        THE VIDEOGRAPHER:  This is the end of
10  Videotape No. 5, Volume 2, in the deposition of Larry
11  Ellison.
12        The original videotapes will be retained by
13  LiveNote World Service.
14        We are going off the record; the time on
15  the monitor is 7:36.
16        (Deposition concluded at 7:36 p.m.)
17  //
18  //
19
20
21
22
23
24
25

559

1                CERTIFICATE OF WITNESS
2
3        I, the undersigned, declare under penalty of
4  perjury that I have read the foregoing transcript,
5  and I have made any corrections, additions, or
6  deletions that I was desirous of making; that the
7  foregoing is a true and correct transcript of my
8  testimony contained therein.
9
10  EXECUTED this _____ day of _____,
11  20___, at _____, _____.
         (City)          (State)
12
13
14
                      _____
15                LAWRENCE ELLISON
16
17
18
19
20
21
22
23
24
25

560

1        CERTIFICATE OF DEPOSITION OFFICER
2        I, RACHEL FERRIER, CSR, CSR No. 6948, duly
3  authorized to administer oaths pursuant to Section
4  8211 of the California Code of Civil Procedure,
5  hereby certify that the witness in the foregoing
6  deposition was by me sworn to testify to the truth,
7  the whole truth and nothing but the truth in the
8  within-entitled cause; that said deposition was taken
9  at the time and place therein stated; that the
10  testimony of said witness was reported by me and was
11  thereafter transcribed by me or under my direction by
12  means of computer-aided transcription; that the
13  foregoing is a full, complete and true record of said
14  testimony; and that the witness was given an
15  opportunity to read and correct said deposition and
16  to subscribe same.
17        I further certify that I am not of counsel or
18  attorney for either or any of the parties in the
19  foregoing deposition and caption named, nor in any
20  way interested in the outcome of the cause named in
21  said caption.
22        IN WITNESS WHEREOF, I have hereunto subscribed
23  by my hand this 28th day of September, 2006.
24
25        RACHEL FERRIER, CSR No. 6948

```
 1              CERTIFICATE OF DEPOSITION OFFICER

 2         I, RACHEL FERRIER, CSR, CSR No. 6948, duly

 3    authorized to administer oaths pursuant to Section

 4    8211 of the California Code of Civil Procedure,

 5    hereby certify that the witness in the foregoing

 6    deposition was by me sworn to testify to the truth,

 7    the whole truth and nothing but the truth in the

 8    within-entitled cause; that said deposition was taken

 9    at the time and place therein stated; that the

10    testimony of said witness was reported by me and was

11    thereafter transcribed by me or under my direction by

12    means of computer-aided transcription; that the

13    foregoing is a full, complete and true record of said

14    testimony; and that the witness was given an

15    opportunity to read and correct said deposition and

16    to subscribe same.

17         I further certify that I am not of counsel or

18    attorney for either or any of the parties in the

19    foregoing deposition and caption named, nor in any

20    way interested in the outcome of the cause named in

21    said caption.

22         IN WITNESS WHEREOF, I have hereunto subscribed

23    by my hand this 28th day of September, 2006.

24    _____

25              RACHEL FERRIER, CSR No. 6948
```

560

Ellison, Lawrence  3/30/2007  12:00:00 AM

561

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                   SAN FRANCISCO DIVISION
 4
 5   IN RE ORACLE CORPORATION
     SECURITIES LITIGATION.
 6              CASE NO.  C-01-0988-MJJ
 7   THIS DOCUMENT RELATES TO:
 8       ALL ACTIONS.
 9   ------------------------------/
10
11              ---oOo---
12              CONFIDENTIAL
13   DEPOSITION OF LAWRENCE ELLISON
14              VOLUME III
15          Friday, March 30, 2007
16          (Pages 561 - 744)
17              ---oOo---
18
19   SHEILA CHASE & ASSOCIATES
     REPORTING FOR:
20   LiveNote World Service
     221 Main Street, Suite 1250
21   San Francisco, California  94105
     Phone: (415) 321-2311
22   Fax: (415) 321-2301
23
24   Reported by:
25   KATHLEEN A. WILKINS, CSR, RPR, CRR
     CSR No. 10068
```

562

```
 1                  INDEX
 2          INDEX OF EXAMINATIONS
 3                              PAGE
 4   RESUMED EXAMINATION BY MR. SOLOMON      570
 5              INDEX OF EXHIBITS
 6   Ellison      Description      Page
 7   Exhibit 141  Letter to Matthew Symonds from     582
 8              Larry Ellison, dated January
 9              10, 2007 - 1 page
10   Exhibit 142  Document entitled, "Matthew     587
11              Symonds Interview with Larry
12              Ellison:  Oracle," Bates
13              stamped 1529283 through 1529322
14              - 40 pages
15   Exhibit 143  Document entitled, "#21      600
16              Interview Memorandum of
17              Lawrence Ellison (Interview 2)
18              09/20/02," Bates stamped 297543
19              through 297559 - 17 pages
20   Exhibit 144  E-mail from Martha Cavanna to      602
21              Stacey Torman, dated March 16,
22              2001, Bates stamped 178069
23              through 178073 - 5 pages
24
25
```

563

```
 1              INDEX OF EXHIBITS (Continued)
 2   Ellison      Description      Page
 3   Exhibit 145  Document entitled, "Transcript     604
 4              from LJE keynote at Oracle Apps
 5              World, New Orleans, February
 6              20, 2001," Bates stamped 099883
 7              through 099928 - 46 pages
 8   Exhibit 146  Forbes magazine article dated     615
 9              August 14, 2006 - 8 pages
10   Exhibit 147  Web page from the Oracle     618
11              Education Foundation - 2 pages
12   Exhibit 148  Web pages from High Tech Mag -     620
13              5 pages
14   Exhibit 149  Web page article from     621
15              Forbes.com - 4 pages
16   Exhibit 150  Article entitled, "Oracle's     622
17              Catz, Ellison Heir, Gets Credit
18              for Growth Strategy" - 4 pages
19   Exhibit 151  Document entitled, "Matthew     636
20              Symonds Interviews, Oracle,
21              Interview with Larry Ellison on
22              January 18th, 2002," Bates
23              stamped 1529157 to 1529180 - 24
24              pages
25
```

564

```
 1              INDEX OF EXHIBITS (Continued)
 2   Ellison      Description      Page
 3   Exhibit 152  Excerpts from Softwar - 18     671
 4              pages
 5   Exhibit 153  Excerpt from Softwar - 4 pages     675
 6   Exhibit 154  Document entitled, "InterLogix     677
 7              Inc. - Customer Satisfaction
 8              Issue," Bates stamped 1056850
 9              and 1056851 - 2 pages
10   Exhibit 155  Document entitled, "Softwar,     691
11              The Rewards of Recklessness: A
12              Portrait of Larry Ellison and
13              Oracle Corporation at War, By
14              Matthew Symonds," Bates stamped
15              1053564 to 1053577 - 14 pages
16   Exhibit 156  Fortune Magazine article dated     698
17              November 13th, 2000, Bates
18              stamped - 8 pages
19   Exhibit 157  E-mail from Dan Cooperman to     703
20              Dorian Daley; Lauren Segal,
21              dated March 29, 2001, Bates
22              stamped 1914926 through 1914934
23              - 9 pages
24   Exhibit 158  Excerpt from Softwar - 4 pages     709
25
```

Ellison, Lawrence  3/30/2007  12:00:00 AM

565

INDEX OF EXHIBITS (Continued)

Ellison          Description          Page

Exhibit 159  Document entitled, "Matthew          712
             Symonds Interviews, Oracle,
             Interview with Larry Ellison,"
             Bates stamped 1529262 through
             1529282 - 21 pages

Exhibit 160  Document entitled, "Oracle          718
             Update," Bates stamped 1529215
             through 15299233 - 19 pages

Exhibit 161  Copy of a Wall Street Journal          721
             article dated August 6th, 2001
             - 4 pages

Exhibit 162  E-mail from Kirsten Shaw dated          728
             December 1, 2000, Bates stamped
             1027516 through 1027521 - 6
             pages

Exhibit 163  E-mail Bates stamped 1026720          733
             through 1026721 - 2 pages

Exhibit 164  String of e-mails beginning          734
             with an e-mail from Salima
             Ceret to Joyce Boland, dated
             March 23, 2001, Bates stamped
             061785 through 061790 - 6 pages

566

INDEX OF EXHIBITS (Continued)

Ellison          Description          Page

Exhibit 165  Article from Vanity Fair called          736
             "Absolutely Excessive" - 7
             pages

EXHIBITS PREVIOUSLY MARKED
AND REFERRED TO IN THIS DEPOSITION

EXHIBIT                    PAGE
Exhibit 10                 619
Exhibit 57                 668

QUESTION WITNESS INSTRUCTED NOT TO ANSWER

          PAGE  LINE
          574   10
          634   11
          635   8
          ---o0o---

567

1  BE IT REMEMBERED that on Friday, March 30,
2  2007, commencing at the hour of 1:01 p.m. thereof,
3  at 100 Pine Street, Suite 2600, San Francisco,
4  California, before me, KATHLEEN A. WILKINS, RPR,
5  CRR, a Certified Shorthand Reporter in and for the
6  State of California, personally appeared
7          LAWRENCE ELLISON,
8  called as a witness by the Plaintiffs herein, who,
9  being by me first duly sworn, was thereupon examined
10 and testified as hereinafter set forth.
11          ---o0o---
12 Appearing as counsel on behalf of Plaintiffs:
13     MARK SOLOMON, Esquire
       STACEY M. KAPLAN, Esquire
14     RYAN GUIBOA, Esquire
       MONIQUE WINKLER, Esquire
15     LERACH, COUGHLIN, STOIA, GELLER,
       RUDMAN & ROBBINS, LLP
16     655 West Broadway, Suite 1900
       San Diego, California 92101-3301
17     marks@lerachlaw.com
18 Appearing as counsel on behalf of Defendants:
19     GREGORY P. LINDSTROM, Esquire
       LATHAM & WATKINS, LLP
20     505 Montgomery Street, Suite 1900
       San Francisco, California 94111-2562
21     gregory.lindstrom@lw.com
22     PATRICK E. GIBBS, Esquire
       LATHAM & WATKINS, LLP
23     140 Scott Drive
       Menlo Park, California 94025-1008
24     patrick.gibbs@lw.com
25

568

1      DORIAN DALEY, Esquire
       ORACLE CORPORATION
2      VICE PRESIDENT, LEGAL; ASSOCIATE GENERAL
       COUNSEL
3      LITIGATION, TRADEMARK & COPYRIGHT GROUP
       500 Oracle Parkway, M/S 5op762
4      Redwood Shores, California 94065
       Dorian.daley@oracle.com
5
       Present via Internet: Keith Mautner, Esq.; Doug
6      Lerach, Esq.; John Mayer
7      Also Present: Gary Brewer, videographer
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

569

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Good afternoon.  We are
3    going on the record.  Here marks the beginning of
4    Videotape No. 1, Volume 3, in the deposition of
5    Lawrence Ellison, in the matter In Re Oracle
6    Corporation Securities Litigation, in the United
7    States District Court, Northern District of
8    California, San Francisco Division, Case Number
9    C-01-0988-MJJ.
10        The video operator today is Gary Brewer,
11    representing LiveNote World Service, located at 221
12    Main Street, Suite 1250, San Francisco, California,
13    94105.  Telephone number (415) 321-2300.
14        The court reporter is Kathleen Wilkins,
15    reporting on behalf of LiveNote World Service.
16        Today's deposition is being taken on
17    behalf of the Plaintiff and is taking place at 100
18    Pine Street, San Francisco, California.
19        Counsel, will you please introduce
20    yourselves and state whom you represent.
21        MR. SOLOMON:  Mark Solomon representing
22    plaintiffs.
23        MS. KAPLAN:  Stacey Kaplan representing
24    plaintiffs.
25        MS. WINKLER:  Monique Winkler representing

570

1    plaintiffs.
2        MR. GUIBOA:  Ryan Guiboa representing
3    plaintiffs.
4        MR. LINDSTROM:  Greg Lindstrom for
5    defendants.
6        MR. GIBBS:  Patrick Gibbs for defendants.
7        MS. DALEY:  Dorian Daley for defendants.
8        THE VIDEOGRAPHER:  Would the court
9    reporter please swear in the witness.
10            LAWRENCE ELLISON,
11        having been duly sworn,
12    was examined and testified as follows:
13            --oOo--
14        THE VIDEOGRAPHER:  Please begin.
15        RESUMED EXAMINATION BY MR. SOLOMON
16        MR. SOLOMON:  Q.  Good afternoon,
17    Mr. Ellison.
18    A.  Good afternoon.
19    Q.  Have you reviewed the transcript of your
20    second day of testimony in this litigation?
21    A.  I have not.
22    Q.  And have you reviewed the complaint in
23    this matter yet?
24    A.  I have not.
25    Q.  You know Mr. Matthew Symonds?

571

1    A.  I do.
2    Q.  When was the last time you spoke with him?
3    A.  Near the end of February this year.
4    Q.  And can you describe for me the
5    conversation?
6    A.  The last -- the last conversation?
7    Q.  Mh-hmm.
8    A.  I think the last conversation was --
9    again, I'm not completely certain, but I think the
10    last conversation was about a charity we're working
11    on together called -- used to be called the Doorstep
12    Educational Trust, and it's now -- it's being
13    renamed Reach and Teach.
14    Q.  And that was the only subject of the
15    conversation?
16    A.  On the last call, I think so.  Again --
17    Q.  Okay.  And when did you call him prior to
18    that?
19        MR. LINDSTROM:  Assumes facts.
20        THE WITNESS:  I didn't -- I didn't call
21    him.  Well, the normal way I -- I communicate with
22    Mr. Symonds by phone is he calls me, and I return
23    his call.
24        MR. SOLOMON:  Q.  Okay.  Well, let's --
25    A.  So he -- in that case, he called me, and I

572

1    returned his call.
2    Q.  I'll just set the context a little bit
3    differently.
4        Did you become aware at any time last year
5    that plaintiffs were moving in this litigation for
6    the production of certain audiotapes and transcripts
7    connected with the book Softwar?
8    A.  I did.
9    Q.  When did you first become aware of that?
10    A.  I think sometime in November.
11    Q.  Okay.  And how did you learn about that?
12        MR. LINDSTROM:  Well, do you mean to
13    exclude conversations with counsel?
14        MR. SOLOMON:  I just want to know how he
15    learned about it.
16        THE WITNESS:  I think my attorneys told
17    me.
18        MR. SOLOMON:  Q.  Okay.  And did you take
19    any action after your attorneys told you?
20    A.  No.
21    Q.  Okay.  Did Mr. Symonds call you at all in
22    November?
23    A.  Yes.
24    Q.  Do you know when?
25    A.  Sometime in November.

573

1      Q.  Okay.  And can you describe that
2   conversation, please.
3      A.  He was upset that plaintiffs were pursuing
4   what he described as his personal notes and files,
5   said he was a journalist and it bothered him.
6      Q.  And what did you say?
7      A.  There's -- again, I'm not certain of the
8   exact words, either mine or his, but I can tell you
9   the gist of it.
10     Q.  Please.
11     A.  There's nothing I can do about it.
12     Q.  And did you make any request of him?
13     A.  No.
14     Q.  Did you give him any instructions?
15     A.  No.
16     Q.  And how did he conclude -- how did the
17  call conclude?
18     A.  I think that was -- that was the gist of
19  it.
20     Q.  That was it?
21     A.  That was the gist of the call.
22     Q.  Okay.  And then when was the next time you
23  heard from Mr. Symonds?
24     A.  It was early January he called.
25     Q.  Okay.  And --

574

1      A.  Oh, no.  Excuse me, I'm mistaken.  I'm
2   mistaken.  Early January, I called him.
3      Q.  Okay.  What date?  Do you know?
4      A.  I don't.
5      Q.  And why did you call him?
6      A.  I was -- I was told that the court had
7   ordered the production of all of the Softwar
8   documents, and I was supposed to tell Mr. Symonds to
9   produce the documents.
10     Q.  Okay.  And you were told by your lawyers?
11         MR. LINDSTROM:  I'm going to object to
12  that as invading the attorney-client privilege.
13  Instruct the witness not to answer.
14         MR. SOLOMON:  Q.  Okay.  So did you reach
15  him?
16     A.  Yes.
17     Q.  What did you say to him?
18     A.  I said I had received a court order and
19  that -- I asked him to produce -- to produce the
20  documents.  I said I had a court order, I have to
21  ask you to produce the documents, and I was going to
22  be sending you a follow-up letter asking that the
23  documents be produced.
24     Q.  Okay.  And what call did you make -- what
25  phone did you make this call from?

575

1      A.  It was my home phone.  But I think my home
2   phone is -- I think there are office lines in my
3   home phone.  So I'm not sure where the -- where the
4   bills go and all that.  But it was --
5      Q.  Okay.  Did you call his home?
6      A.  I -- yeah.  Well, actually, I'm not sure.
7   If I made it in the morning -- if I made the call in
8   the morning, I would have called his home.  If I
9   made the -- made the call late in the evening, I
10  would have called his office.  I'm not sure.
11     Q.  Okay.  And what did he say in response to
12  your request?
13     A.  I think he said -- again, I think he
14  repeated, that, you know, he was a journalist, that
15  these were his private notes and files, he was upset
16  that he had to produce them.  And he said -- again,
17  these are not his exact words.  This is the gist of
18  the conversation.
19         I think he said, I don't know why they
20  want them.  There is -- there is nothing in there
21  that's going to help them.
22     Q.  What did you say?
23     A.  I said, Well, that may be true, Matthew,
24  but they don't know that.
25     Q.  And then what did he say?

576

1      A.  What do you think they're going to do with
2   them?
3         Again, this is not his -- this is not word
4   for word.  This is general.
5         And I said, Well, they'll probably take
6   some of the personal items and try to use them to
7   attack my character.
8      Q.  Did you discuss whether we'd use the
9   substance at all of the materials?
10     A.  No.  The substance --
11         MR. LINDSTROM:  The question -- keep the
12  question in mind in responding.
13         THE WITNESS:  No.
14         MR. SOLOMON:  Q.  Do you take this
15  litigation seriously, Mr. Ellison?
16     A.  Yes, of course.
17     Q.  So after telling Mr. Symonds that we'd
18  probably use it to attack your character and use
19  personal stuff, what did he then say?
20     A.  I'm not sure.
21     Q.  How did the conversation conclude?
22     A.  Again, I think -- I think we discussed --
23  I think he said, What -- you know, What personal
24  stuff?  We kind of went into what the personal stuff
25  was.  I think there were two things that were --

577

1    that were mentioned.
2         Again, I'm not -- I'm not 100 percent
3    certain of this.  The two things that were mentioned
4    were a comment I had made about Ray Lane, after a
5    meeting with Ray Lane and senior sales management,
6    and another was a story -- a story that I had told
7    him when I was -- something happened at a party when
8    I was in my early 20s.
9         Q.   You were concerned that we'd use something
10   that happened at a party when you were in your early
11   20s in this litigation?
12        A.   You already asked me questions about my
13   relationship with my high school girlfriend 46 years
14   ago.
15        Q.   Do you recall that that was because she
16   had suggested you were dishonest?
17        MR. LINDSTROM:  Assumes facts.
18        THE WITNESS:  Yes.
19        MR. SOLOMON:  Q.  Don't you think that's
20   relevant to this lawsuit?
21        A.   My conversations with my high school
22   girlfriend?
23        Q.   No.  Your honesty.
24        A.   Yes, I think my honesty is relevant.
25        Q.   So did Mr. Symonds tell you what he was

578

1    going to do at the end of the conversation?
2         A.   No.
3         Q.   Okay.  And then after that call, did
4    you -- when did you next speak with Mr. Symonds?
5         A.   At some point he called me back, and it
6    was a brief call.  And he said again, Larry, you
7    have to understand, I'm a journalist, and these are
8    my private notes and files.
9         And that call lasted about a minute or
10   less.
11        Q.   And when was that?
12        A.   It was shortly after the first phone call
13   when I asked him to produce the documents.  It might
14   have been hours later; it might have been the next
15   day.  I'm not certain.
16        Q.   And did he indicate one way or another
17   whether he produced them or not?
18        A.   No, he did not.
19        Q.   And what did you do?
20        A.   Said, Okay, thank you for calling,
21   Matthew.
22        Q.   You said, I think, that you told
23   Mr. Symonds that you'd be writing a letter; is that
24   right?
25        A.   Yes.

579

1         Q.   And did you write a letter?
2         A.   I signed a letter that was sent to him,
3    yes.
4         Q.   And do you have that letter with you here?
5         A.   Do I?
6         MR. LINDSTROM:  We -- we have it.
7         MR. SOLOMON:  Are you going to produce it?
8         MR. LINDSTROM:  If you want it.
9         MR. SOLOMON:  Thank you.  I do want it.
10        Q.   When you became aware in November that the
11   plaintiffs were seeking the materials, did you make
12   any efforts, other than calling Mr. Symonds and
13   having a conversation you described with him, to
14   retrieve the materials, the Softwar materials?
15        MR. LINDSTROM:  In responding, I want you
16   to exclude any conversations you may have had with
17   your lawyers in that regard.
18        THE WITNESS:  Are you referring to my --
19   the call that occurred in November, or the call that
20   occurred in January?
21        MR. SOLOMON:  Q.  November.
22        A.   He called -- he called me in November.  I
23   didn't call him.  Yeah, I might have called him
24   back, but he called me in November.
25        I think the only call -- of the calls

580

1    we'll be talking about, the only call where I
2    originated the call was on the -- you know, that
3    call in January --
4         Q.   Got you.
5         A.   -- when I asked him to produce the
6    documents.
7         Q.   Okay.  So let's just go back so we can be
8    clear.
9         In November he called you.  Why did he
10   call you?
11        MR. LINDSTROM:  No foundation.
12        MR. SOLOMON:  Q.  Didn't you just tell me
13   he called you in November?
14        A.   Yes.
15        MR. LINDSTROM:  The question was why
16   did -- the question to which I objected was, "Why
17   did he call you?"
18        MR. SOLOMON:  Q.  Did he tell you why he
19   called you?
20        A.   Yes.
21        Q.   Okay.  What did he say?
22        A.   He said that the plaintiffs were pursuing
23   the Softwar documents.
24        Q.   How did he know that?
25        MR. LINDSTROM:  No foundation.

Ellison, Lawrence  3/30/2007  12:00:00 AM

581

1      THE WITNESS: I assume someone told him.
2      MR. SOLOMON: Q. Do you know who told
3  him?
4      A. I'd be guessing.
5      Q. Give me your best guess, please.
6      MR. LINDSTROM: Objection. Calls for
7  speculation. No foundation.
8      THE WITNESS: I'm supposed to answer?
9      MR. SOLOMON: Q. Mh-hmm.
10     A. Okay. I believe my lawyers have been in
11  contact with Mr. Symonds throughout this entire
12  process.
13     Q. Okay. And do you know which particular
14  lawyers?
15     A. I do not.
16     Q. Have you seen any correspondence from your
17  lawyers to Mr. Symonds concerning the Softwar
18  materials?
19     A. I have not.
20     MR. LINDSTROM: The record should reflect
21  that we have now handed to Mr. Solomon a copy of
22  Mr. Ellison's January 10th, 2007 letter.
23     MR. SOLOMON: Q. Who drafted this letter?
24  First of all, let's mark it as an exhibit.
25     And then you can tell me who drafted it,

583

1      Q. Were you aware that Mr. Symonds submitted
2  a declaration in connection with your opposition?
3      A. No.
4      Q. And you, to this day, have no knowledge of
5  that declaration?
6      A. That's correct.
7      Q. Now, do you know what day the judge
8  ordered that the documents, the Softwar-related
9  documents, be produced?
10     A. No.
11     Q. I'll represent to you that he served the
12  order on the lawyers on January 2nd of 2007.
13     And with that in mind, can you explain why
14  it took eight days for you to write this letter --
15  to sign this letter, I should say?
16     A. No.
17     Q. Did you, in connection with the interviews
18  that Mr. Symonds conducted with you for Softwar,
19  tell any lies to Mr. Symonds?
20     A. I don't think so.
21     Q. Have you seen any of the transcripts of
22  your interviews?
23     MR. LINDSTROM: At any point in time?
24     MR. SOLOMON: Q. At any point in time.
25     A. No.

582

1  Mr. Ellison.
2      (Whereupon, Deposition Exhibit 141
3      was marked for identification.)
4      MR. LINDSTROM: What number?
5      THE REPORTER: 141.
6      MR. LINDSTROM: Thank you.
7      THE WITNESS: Can I read it?
8      MR. SOLOMON: Sure.
9      THE WITNESS: Okay.
10     MR. SOLOMON: Q. Okay. Who drafted this?
11     A. Again, I'm not certain.
12     Q. Okay. Did your lawyers draft this?
13     A. You're asking my best guess?
14     Q. Yes.
15     A. Yes.
16     Q. Okay. Had you, prior to signing this
17  letter, seen plaintiffs' motion to compel the
18  materials?
19     A. No.
20     Q. Had you seen your opposition to the
21  motion?
22     A. No.
23     Q. Were you aware of the contents of the
24  opposition?
25     A. No.

584

1      Q. Are you aware that a few -- from
2  interviews with you in 2002, a few transcripts have
3  been produced?
4      MR. LINDSTROM: Assumes facts.
5  Mischaracterizes.
6      THE WITNESS: Say it again, please.
7      MR. SOLOMON: Q. Are you aware that a few
8  transcripts of interviews conducted with you in 2002
9  have been produced? Are you aware of that?
10     A. I knew -- I knew transcripts had been
11  produced. I didn't know which ones.
12     Q. Now, are you aware that Mr. Symonds
13  apparently has told your lawyers that the computer
14  on which the audio was stored has been destroyed --
15     MR. LINDSTROM: I'm --
16     MR. SOLOMON: Q. -- or disposed of?
17     MR. LINDSTROM: Let me make a statement
18  for the record.
19     Counsel is not entitled to examine you
20  about things that were told to you by your lawyers
21  or things you said to your lawyers. He is obviously
22  entitled to know if you have an independent basis
23  for knowing anything about what happened with this
24  particular computer.
25     So as he's framed this question, it would

585

1   require you to -- it might require you to divulge
2   attorney-client privileged communications. So in
3   responding, I want you to exclude those and answer
4   as to your independent knowledge.
5        Do you understand?
6        THE WITNESS: I do.
7        I have no independent knowledge of what
8   happened to the computer.
9        MR. SOLOMON: Q. Are you aware that
10  Mr. Symonds appeared in London last week, on the
11  19th and the 20th, for his deposition?
12       A. Yes.
13       Q. And are you aware that Mr. Symonds has
14  invoked the Fifth Amendment to almost all the
15  questions I've asked him?
16       MR. LINDSTROM: Same instruction.
17       THE WITNESS: No independent knowledge of
18  what happened at the deposition.
19       MR. SOLOMON: Q. Is that your way of
20  saying whatever knowledge you have came through your
21  lawyers?
22       A. Yes.
23       Q. I'll represent to you that he took -- he
24  invoked the Fifth Amendment and some journalist
25  privilege -- privileges to most of my questions.

586

1        Have you spoken to Mr. Symonds since his
2   deposition in London?
3        A. No.
4        Q. Are you going to?
5        A. I don't think so, no.
6        Q. Is Mr. Symonds a close friend of yours?
7        A. We became friends when he was writing the
8   book.
9        Q. And is he a close friend of yours?
10       A. He's a friend.
11       Q. Is he a close friend?
12       A. I'm not sure what you mean by that.
13       Q. Do you know that he describes his
14  friendship with you as a close -- as a close one?
15       MR. LINDSTROM: Assumes facts.
16       THE WITNESS: That's -- okay.
17       MR. SOLOMON: Q. You're not saying he's
18  lying when he says that?
19       A. No.
20       Q. Do you plan on talking with him again
21  after this litigation is concluded?
22       MR. LINDSTROM: Calls for speculation.
23       THE WITNESS: I don't know.
24       MR. SOLOMON: Q. Did you review any
25  documents in preparation for this deposition

587

1   session?
2        A. I did not.
3        Q. Do you remember what you told Mr. Symonds
4   about your option exercises and sales in January of
5   2001?
6        MR. LINDSTROM: So let me -- let me
7   understand. So you're talking about during the
8   course of the interviews for the book?
9        MR. SOLOMON: Correct.
10       THE WITNESS: No.
11       MR. SOLOMON: Let's have marked as the
12  next exhibit an interview transcript produced in
13  this litigation with the control numbers 1529283
14  through -322.
15       (Whereupon, Deposition Exhibit 142
16       was marked for identification.)
17       THE WITNESS: I assume you don't want me
18  to read this whole thing?
19       MR. SOLOMON: Q. No, I don't.
20       First of all, this is dated, at least
21  there's a handwritten notation on the first page, of
22  June 2002.
23       You don't recognize that handwriting, do
24  you?
25       A. I do not.

588

1        Q. So it starts off saying, "This is Matthew
2   Symonds talking to Larry Ellison. It's June 24th."
3        Do you see that?
4        A. Yes.
5        Q. Can you just describe how Mr. Symonds
6   recorded the conversations?
7        A. He had a digital -- a digital recorder. I
8   think it was a Sony digital recorder. It's kind of
9   small. It's not a tape. I think it had solid state
10  memory. So there was a table microphone about this
11  size. The recorder was about this size but thinner.
12       And he put -- you know, put the recorder
13  down and the microphone down and he'd start -- he'd
14  have some notes, I guess, with pre-prepared
15  questions, and he'd start asking me questions.
16       Q. Could you estimate how many hours of
17  recordings he made of interviews with you?
18       A. I mean, I could. It would be a pretty
19  gross estimate, but ... 30 to 100. Probably 30
20  hours -- I don't -- again, I'm just trying to --
21       Q. Thirty hours to 100 hours --
22       A. Yeah.
23       Q. -- is your range?
24       A. I think. One hundred hours is a lot,
25  but ...

Ellison, Lawrence  3/30/2007  12:00:00 AM

589

1    Q.  And is it fair to say that this --
2    A.  30 to -- let me refine.  30 to 60.  100
3  hours sounds crazy to me.
4    Q.  Was it over a couple of years, the
5  interview process?
6    A.  It was over nearly two years.  And then
7  there -- yeah.  Yeah.  I think it was more than 18
8  months, less than two years, I think.
9    Q.  Okay.  So if you go to the third page of
10  this document, and it has the control number
11  1529285 --
12    A.  Okay.
13    Q.  -- you'll see that it starts at the top
14  with the word "Right."  And then it goes on to say,
15  "Of course, when Oracle stock started to slide last
16  year and around that sort of time you also cashed in
17  those options invested, you were kind of hit ..."
18    Did you see that?
19    A.  Yes.
20    Q.  All right.  And then this apparently is
21  your language.  And you say, "Well, actually, the
22  options were invested long, long ago.  I got those
23  options ten years ago.  They were expiring.  They
24  were months from expiring."
25    Do you see that?

590

1    A.  Yeah.  There's a transcription error in
2  it, but yes.
3    Q.  What's the error?
4    A.  I think the options were not "invested"
5  but "vested," the word "vested."
6    Q.  Got it.
7    And then it goes on to say, "So it was
8  actually the last moment that you could sell them."
9    And then you say, "right."
10    Do you see that?
11    A.  Yes.
12    Q.  Is that an accurate transcription, in your
13  recollection?
14    A.  You mean the word "moment"?
15    Q.  The word "right."
16    MR. LINDSTROM:  The question is whether
17  that's an accurate transcription?
18    MR. SOLOMON:  Mh-hmm.
19    THE WITNESS:  Probably.
20    MR. SOLOMON:  Q.  Okay.  And what about,
21  "So it was actually the last moment you could sell
22  them"?  Do you think that's --
23    A.  Well, it's not precise.
24    Q.  What do you mean, it's not precise?
25    A.  Well, I suppose the last moment would be

591

1  the last minute of the last trading day before the
2  options expired, or even the last moment would be
3  the last fraction of a second in the last trading
4  day.  I don't know how -- how big a moment is.
5    Q.  Okay.  Well, do you think that the moment
6  was basically January 22nd through January 31?
7    A.  No.  I think the options expired -- I
8  don't remember -- August?  Were the options expired
9  in August?
10    Q.  (Nods head.)
11    A.  So I suppose I had up until August to sell
12  them.  So in a ten-year period, I was in my last six
13  months.
14    Q.  All right.  And, in fact, you weren't even
15  in the last trading window, were you?
16    A.  No.
17    Q.  Because there were two more trading
18  windows, weren't there?
19    A.  Well, again, I was in the last six
20  months -- yes.
21    Q.  And so to the extent he says, "So it was
22  actually the last moment you could sell them," let's
23  say he said "window" and you said "right," that
24  would be inaccurate, wouldn't it?
25    A.  I would say it's imprecise.  It should

592

1  have been -- it was nearly -- you were almost -- the
2  question is I was almost out of time.  But I wasn't
3  out of time.
4    Q.  And you know that in his writings he's
5  actually explained your stock sale as saying that it
6  was -- you had to, you had no choice, the options
7  would have expired otherwise?
8    Are you aware that that's what Mr. Symonds
9  had written?
10    MR. LINDSTROM:  Assumes facts.
11  Mischaracterizes his writings.
12    THE WITNESS:  Can I read -- is it here?
13    MR. SOLOMON:  Q.  I'll try to find it a
14  little bit later on.  I just want to know if you
15  recall that that's what he's written.
16    A.  No.
17    Q.  And, in fact, at the moment, because all
18  of this is sealed and confidential, no one knows --
19  the public certainly doesn't know that, in fact, you
20  had additional trading windows, do they?
21    MR. LINDSTROM:  Assumes facts.  No
22  foundation.  Calls for speculation.
23    THE WITNESS:  I don't know how much -- in
24  terms of my options, I think everyone knows my
25  option dates.  So I think whenever I receive an

593

1    option, we're obliged to disclose it in the 10Q or
2    the 10K.  So everyone knows that it is a ten-year
3    option period, because that's -- that's publicly
4    available.
5         Everyone knows what my option date is
6    because that was publicly disclosed also.  You just
7    add ten years to that date.  So anyone who cares to
8    look at the documents would know exactly how much
9    time I had.
10        So when you say the public doesn't know,
11   they could -- anyone could know by looking at the
12   publicly available documents.
13        MR. SOLOMON: Q.  Okay.  And if they
14   simply took you at your word, or Mr. Symonds at his
15   word, they would have thought that your stock
16   options needed to be exercised in January of 2001;
17   otherwise you'd lose them.
18        Do you think that's fair?
19        MR. LINDSTROM:  No foundation.
20   Argumentative.
21        THE WITNESS:  Again, I don't think that's
22   a fair characterization.  I agree with you, this is
23   imprecise, saying it was the last moment, but it
24   was -- I was nearly out of time is more accurate.
25        MR. SOLOMON: Q.  And then it goes on to

594

1    say -- I'm going to skip a couple of lines -- "Sure,
2    but there were quite a lot of shareholder actions to
3    do with that.  Are any of those ongoing still?"
4         And your answer as transcribed here is,
5    "Yes, I think the judges ruled against them,
6    dismissed them a couple of times and they filed
7    amended complaints.  And they've been dismissed and
8    complaints have come in.  We've won one set of
9    complaints and we're" -- there seems to be a gap --
10   "and we're the last set."
11        Do you see that?
12        MR. LINDSTROM:  I think the record should
13   reflect, Mark, that there's some brackets there that
14   suggests whoever transcribed this couldn't -- at
15   least they suggest to me that they couldn't
16   accurately hear what was being said in that portion
17   of the sentence.
18        MR. SOLOMON:  Okay.
19        MR. LINDSTROM:  Your question?
20        MR. SOLOMON: Q.  And just in terms of the
21   gist, do you remember saying to Mr. Symonds around
22   the date of this interview that some of the
23   complaints had been dismissed, but you were on the
24   last set of complaints?
25        MR. LINDSTROM:  That mischaracterizes the

595

1    document.  Compound.
2         THE WITNESS:  Do I remember it
3    specifically?
4         MR. SOLOMON: Q.  Yes.  Do you remember
5    the gist of this answer that you gave Mr. Symonds?
6         A.  Ignoring that this is refreshing my
7    memory?  So do I remember --
8         Q.  I'll allow your memory to be refreshed.
9         A.  Well, I mean, I believe these transcripts
10   are accurate --
11        Q.  Okay.
12        A.  -- so I -- again, insofar as the
13   transcripts are accurate, I believe this is what I
14   said.
15        MR. LINDSTROM:  Well, this is a little bit
16   different.  His question is whether you remember
17   this.
18        THE WITNESS:  Well, I said -- I said I
19   didn't remember this.  I said I specifically -- I'm
20   sorry.  Sorry.  I didn't -- I don't specifically
21   remember this --
22        MR. SOLOMON: Q.  Okay.
23        A.  -- if that's the question.  But -- okay.
24   I'll stop there.
25        Q.  And do you have any concern that there was

596

1    a document preservation or instruction in place
2    while you were collaborating with him concerning
3    this book?
4         MR. LINDSTROM:  That's vague as to time.
5    I assume you're asking him did he have a concern at
6    the time --
7         MR. SOLOMON:  Correct.
8         MR. LINDSTROM:  -- that the tape was
9    made --
10        MR. SOLOMON:  Correct.
11        MR. LINDSTROM:  -- by Symonds.
12        MR. SOLOMON:  Correct.
13        THE WITNESS:  Didn't even think about it.
14        MR. SOLOMON: Q.  Even while you were
15   talking about the lawsuits?
16        MR. LINDSTROM:  It's argumentative.
17        THE WITNESS:  Didn't -- didn't occur to
18   me.
19        MR. SOLOMON: Q.  And can you explain why,
20   after March of 2001, you didn't preserve e-mails
21   that you sent that concerned the facts in this
22   lawsuit?
23        MR. LINDSTROM:  Assumes facts.
24        THE WITNESS:  Say that again.  In
25   March 2001, I didn't preserve e-mails.

597

1      MR. LINDSTROM:  Can we have the question
2  reread?
3      (Record read by the reporter as follows:
4      QUESTION:  And can you explain why,
5  after March of 2001, you didn't preserve
6  e-mails that you sent that concerned the
7  facts in this lawsuit?)
8      THE WITNESS:  The answer is, I don't know
9  if I did or didn't preserve e-mails in March 2001.
10      MR. SOLOMON:  Q.  And how is it that you
11  don't know that?
12      MR. LINDSTROM:  Argumentative.
13      THE WITNESS:  It was a long time ago.  I
14  just don't remember what -- March 2001.
15      MR. SOLOMON:  Q.  Do you know why the
16  letter that you sent to Mr. Symonds on January the
17  10th of this year wasn't produced until now to the
18  plaintiffs?
19      A.  I do not.
20      Q.  What's the status of Larryellison.com?
21      A.  I -- sorry.  I think it's -- I haven't
22  looked at it for years.
23      Q.  When was the last time you looked at it?
24      A.  Five years ago.  More.  I don't know.
25      Q.  And why -- why do you not use it anymore?

598

1      A.  I don't think I ever used it.
2      Q.  Okay.  What was it for?
3      A.  You mean what were my various ideas?  Why
4  did I get Larryellison.com?
5      Q.  Yes.
6      A.  I wanted to reserve the Internet -- I
7  wanted to reserve the Internet name.  People were --
8  those were the days everyone was grabbing Internet
9  names.  I wanted to make sure I had it.  I don't
10  think I've ever used it for anything.
11      Q.  So it was just a bare name?  Nothing
12  there?
13      A.  I don't know.  I haven't been to it for
14  years.  I don't know what's there.
15      Q.  Did you use it for e-mail?
16      A.  No.
17      Q.  So when you told the audience at Apps
18  World in February 2001 that they could e-mail you at
19  Larryellison.com, that wasn't true?
20      A.  I don't believe I ever said that.
21      Q.  Okay.  And when the special litigation
22  committee says that you used Larryellison.com to
23  store transcripts of your speeches and public
24  statements, that's inaccurate, is it?
25      MR. LINDSTROM:  Assumes facts.

599

1  Argumentative.
2      THE WITNESS:  I believe so.
3      MR. SOLOMON:  Q.  The special litigation
4  committee lawyers just made that up?
5      MR. LINDSTROM:  Argumentative.  Assumes
6  facts.
7      THE WITNESS:  No.  I think -- I'm happy to
8  discuss this if you want to discuss it.
9      At one point I thought it would be an
10  interesting idea, because with the advent of the
11  Internet -- and I quoted a lot in the press, and
12  the quotes aren't always accurate.  So I thought it
13  would be very interesting, with the advent of the
14  Internet, that I could take my actual speeches that
15  I gave and exactly what I said, and recordings of my
16  speeches that I gave, and put them up on the
17  Internet.
18      And then if the press quoted me out of
19  context or misquoted me, I would have an actual
20  record of all of my speeches.  It was kind of when I
21  thought it was an interesting idea to do that, but I
22  never did it.
23      MR. SOLOMON:  Okay.  Okay.  Marked as the
24  next exhibit --
25      THE WITNESS:  I'm sorry, we're done with

600

1  this one?
2      MR. SOLOMON:  For the moment.  We'll be
3  looking at it again in a minute, so you might as
4  well keep it close.
5      THE WITNESS:  Okay, I'll just keep it out.
6      MR. SOLOMON:  Marked as the next exhibit,
7  an interview memorandum dated 9/20/02.
8      (Whereupon, Deposition Exhibit 143 was
9      marked for identification.)
10      THE REPORTER:  143.
11      MR. LINDSTROM:  Thank you.
12      MR. SOLOMON:  The control range is
13  297559 -- excuse me.  297543 through -559.
14      Q.  I'm looking at the last page, Mr. Ellison.
15      A.  Okay.  -559?
16      Q.  Yeah.  If you could just read that
17  paragraph.
18      A.  Okay.
19      Okay.
20      Q.  Is that not accurate?
21      Let me focus on the last sentence.
22  "According to Ellison, Q3 FY01, the web site would
23  have consisted of transcripts of his interviews."
24      Is that not true?
25      A.  Well, I think this says it became -- it

Ellison, Lawrence  3/30/2007  12:00:00 AM

601

1   says I had the idea, exactly as I described before,
2   if you read the whole paragraph. The idea behind
3   the web site was to post transcripts of my
4   interviews.
5          And -- and it says, "became too time
6   consuming to maintain the site," which is not quite
7   accurate. It was too time consuming to do at all,
8   and I never did it at all. So this is not
9   completely accurate.
10   Q. Okay. And that last sentence again, is
11   that accurate?
12   A. I'm not even sure what it means. "Q3 FY01
13   the web site would have consisted of transcripts of
14   his interviews."
15          I'm -- I'm having a hard time
16   understanding what that's saying.
17   Q. Okay.
18   A. The web site would have consisted of
19   transcripts of ...
20   Q. You don't think -- you don't even
21   understand it, so you can't say --
22   A. Well, I don't understand it. But I can
23   tell you what is true. What is true is I had the
24   idea to put my interviews up on that web site, on
25   Larryellison.com, for the very reasons stated here.

603

1   Q. Okay. So now it certainly appears that
2   Martha Cavanna believes that your Larryellison.com
3   web site had content, doesn't it?
4   A. I think -- I think at some point, the
5   people in the marketing department at Oracle --
6   people in the marketing department at Oracle were
7   involved with this. I think Oracle obtained
8   the Larryellison.com web address, and I think the
9   marketing people had ideas of what to do with it.
10   But I don't -- frankly, I don't remember what they
11   did.
12   Q. You don't dispute the accuracy of this
13   note though, do you, this message?
14   A. I don't even know who Jennifer and Stacey
15   are, or Martha Cavanna. But let me just read --
16   give me another second to read it.
17          Yeah. Okay.
18   Q. You don't dispute the accuracy of that
19   message, do you?
20   A. No.
21   Q. You know who Jennifer Glass is, don't you?
22   A. Oh, Jennifer. I'm sorry. Yes, I do.
23   Q. Do you know who Stacey Torman is? You
24   don't know?
25   A. I don't.

602

1   And I just never did. I don't think there's a
2   single interview that's ever gone onto that web
3   site.
4   Q. So it's kind of odd, though, isn't it,
5   that the four people who apparently were present
6   interviewing appear to have signed off on the
7   sentence, "According to Ellison, Q3 FY01, the web
8   site would have consisted of transcripts of his
9   interviews"?
10   MR. LINDSTROM: Argumentative. Vague and
11   ambiguous as to "odd."
12   THE WITNESS: I think I was clear about --
13   I think they must have misunderstood that I
14   didn't -- you know, I never put any interviews on
15   there, at least I don't think I did.
16   MR. SOLOMON: Okay. Let's have marked as
17   the next exhibit a document produced by the
18   defendants with the control numbers 178069
19   through -073.
20          (Whereupon, Deposition Exhibit 144
21          was marked for identification.)
22   MR. SOLOMON: And if you just look at
23   that first -- the first two paragraphs under
24   "Jennifer and Stacey."
25   A. Okay.

604

1   MR. SOLOMON: Marked as the next exhibit,
2   a document produced by the defendants in this
3   litigation with the control numbers 099883 through
4   099928.
5          (Whereupon, Deposition Exhibit 145
6          was marked for identification.)
7   MR. SOLOMON: Q. Without looking at the
8   whole document, you'll see that this purports to be
9   a transcript from LJE keynote to Oracle Apps World,
10   New Orleans, February 20th, 2001.
11   A. Yes.
12   Q. Have you seen this before?
13   A. No.
14   Q. This transcript?
15   A. No.
16   MR. LINDSTROM: Why don't you take a
17   moment to familiarize yourself with the document
18   before counsel asks you questions --
19   THE WITNESS: Okay.
20   MR. LINDSTROM: -- since you haven't seen
21   it before.
22   MR. SOLOMON: Q. I'm only going to be
23   asking you about one page, so when you think you are
24   sufficiently familiar, I'll direct you to the page.
25   MR. LINDSTROM: If you want to give him

605

1  the page, maybe he can read that page and what's
2  just before it or behind it. But I leave that to
3  you.
4       MR. SOLOMON: That's fine.
5       Q. Go to page 42 of the document,
6  Mr. Ellison, which has the control number 099924.
7       A. -9924?
8       Q. Yeah.
9       A. Okay.
10       Q. I'm looking at the second box which
11  begins, "In order." I'm looking at the last two
12  sentences in that second box.
13       MR. LINDSTROM: So why don't you read
14  what's in the box and then as much before it or
15  after as you feel is necessary to get the context.
16       THE WITNESS: I've read it. I've read it.
17  It's wrong. My -- my --
18       MR. LINDSTROM: There's no question
19  pending.
20       THE WITNESS: Oh.
21       MR. SOLOMON: Q. So you weren't telling
22  the truth?
23       A. No. The transcription is wrong.
24       Q. Ah. Wow, that's sort of quite a big
25  error, isn't it?

606

1       MR. LINDSTROM: Argumentative.
2       THE WITNESS: My e-mail address is
3  Larry.ellison@oracle.com. I think "e-mail me at
4  Larryellison.com," is -- I don't think that's a huge
5  transcription error.
6       MR. SOLOMON: Q. It says, "I will look
7  into it, and if you e-mail me at Larryellison.com, I
8  will actually have an answer for you by tomorrow."
9       A. I never said that.
10       Q. Do you have a copy of the audio of this
11  anywhere?
12       A. My guess is we have a copy of the video of
13  this.
14       Q. Can you explain why that hasn't been
15  produced to us in this litigation?
16       A. Was it asked for?
17       Q. Sure it was.
18       A. Okay. No, I don't.
19       MR. LINDSTROM: Assumes facts.
20       THE WITNESS: Again --
21       MR. LINDSTROM: No foundation.
22       THE WITNESS: I'm guessing we have a copy
23  of the audio. I'd like to think they keep all of my
24  speeches.
25       MR. SOLOMON: Q. Will you produce it?

607

1       A. If we have it, you can have it. But I
2  frequently say -- I frequently give my e-mail
3  address during speeches. And my e-mail address is
4  Larry.ellison@oracle.com.
5       Q. Right. And if you -- if we got the audio,
6  we'd know, wouldn't we, what you actually said?
7       MR. LINDSTROM: The witness has told
8  you --
9       THE WITNESS: And I -- and I said
10  Larry.ellison@oracle.com. I didn't say
11  Larryellison.com.
12       MR. SOLOMON: Q. Okay. Okay. I'm now
13  going back to the transcript of Mr. Symonds'
14  interview of you.
15       MR. LINDSTROM: So this is Exhibit 142?
16       MR. SOLOMON: Correct.
17       MR. LINDSTROM: From June 2002?
18       MR. SOLOMON: Correct.
19       Q. If you go to control number 1529287. And
20  at the bottom of that page it reads, "And you were
21  telling me about that, about the reasons for that
22  yesterday, that the technical problems with the
23  glass but that turns out to be quite fortuitous in a
24  way from what you were saying about your move and
25  how the world might react to this kind of thing

608

1  being launched ..."
2       Then the following page says "Laughing."
3  And then, "Yes!"
4       And then it says, "Oh, what's this coming
5  down here? I'll just have to hide it! Is this a
6  recession boat?"
7       Just focusing on that sentence, "Oh,
8  what's this coming down here," and the rest of that
9  line, who said that?
10       MR. LINDSTROM: Well, again, if you need
11  to look at more of the document in order to answer
12  counsel's questions or to familiarize yourself with
13  the context, feel free to do that.
14       THE WITNESS: Can I have a couple seconds
15  to look at the document?
16       MR. SOLOMON: Sure.
17       THE WITNESS: Okay.
18       MR. SOLOMON: Q. Okay. So do you know
19  who said that?
20       A. Well, I don't know -- it doesn't --
21       MR. LINDSTROM: Again, for the record,
22  this is, "Oh, what's this coming down here?"
23       THE WITNESS: "... down here? I'll just
24  have to hide it. Is this a recession boat?"
25       MR. SOLOMON: Q. Right.

Ellison, Lawrence  3/30/2007  12:00:00 AM

609

1    A.  I think it's supposed to be Matthew
2  Symonds, but I don't know if it's an accurate
3  transcription.
4    Q.  Then skipping a few lines, I'll read the
5  language into the record.  "Are there any feelings
6  you have as a consequence of the kind of pain that
7  Oracle stockholders or kind of Oracle employees with
8  options feeding as well ..."
9      Now, aside from whether or not that's an
10  accurate transcription, that appears to be
11  Mr. Symonds talking?
12    A.  That's correct.
13    Q.  All right.  And then the seven or eight
14  lines below, that's your response; is that right?
15    A.  Well, I mean, I think Mr. Symonds is in
16  the boldface.
17    Q.  Yeah, okay.
18    A.  Then I'm in the normal type, is the
19  convention.
20    Q.  Okay.  And does -- do those lines, those
21  seven lines accurately reflect your answer?
22    A.  You're referring to?
23    Q.  Beginning "Oh, yes."
24    A.  Beginning "Oh, yes."  Let me just read the
25  question.

610

1    Q.  Sure.
2    A.  So this was discussing the feelings of
3  people after the stock market crash.
4    Q.  Right.
5    A.  And so I'm responding to the -- how people
6  at Oracle felt after the stock market crash.  And --
7    Q.  Okay.
8    A.  Yeah, I think it's pretty accurate.  Yeah.
9    Q.  All right.  Did anybody at the company
10  make any remarks to you about your ability to
11  sell -- exercise and sell the options in January of
12  2001 prior to the stock declining in March?
13    A.  No.  Not that I recall.
14    Q.  And is it true that you used some of the
15  proceeds of your sales in January 2001 to buy a
16  large yacht?
17    A.  No.
18    Q.  No?  Small yacht?  Any yacht?
19    A.  No.  I believe I used the proceeds to pay
20  down my loan.
21    Q.  Which loan?
22    A.  I had a stock margin loan.
23      Well, let me -- let me -- let me correct
24  that.  I think some of the proceeds were used to pay
25  down the loan, and some of the proceeds went into

611

1  cash, and I'm not exactly sure how it was disbursed.
2    Q.  So, in fact, it could be that some of it
3  went to pay for the boat; is that right?
4    A.  It's -- yes.
5    Q.  Have you spoken with Safra Catz about this
6  litigation?
7    A.  About the existence of the litigation,
8  or ...
9    Q.  About the litigation at all.
10      MR. LINDSTROM:  Vague as to time.
11      THE WITNESS:  I mean, I knew she was out
12  last week being deposed.  So ...
13      MR. SOLOMON:  Q.  Have you spoken with her
14  about her deposition?
15    A.  Other than the fact that she had one?
16    Q.  Yes.
17    A.  You mean the context of the deposition?
18    Q.  Yes.
19    A.  No.
20    Q.  And have you discussed the contents of
21  your deposition testimony thus far with Ms. Catz?
22    A.  No.
23    Q.  And have you discussed the litigation
24  generally with Ms. Catz?
25      MR. LINDSTROM:  Vague and ambiguous.

612

1      THE WITNESS:  Yeah, at a high level.
2      MR. SOLOMON:  Q.  And when have you --
3  tell me when you've had those conversations.
4    A.  I told her today that I was -- couldn't go
5  to a meeting because I was on my way to -- I was
6  going to be deposed today.
7    Q.  Okay.  Apart from -- apart from telling
8  her that you were going to be deposed today, have
9  you spoken with her about the substance of the
10  litigation ever?
11      MR. LINDSTROM:  When he says "ever," that
12  means ever.  So all the way back to the point in
13  time when it was first filed.
14      THE WITNESS:  Yes.
15      MR. SOLOMON:  Q.  Okay.  And how many
16  conversations have you had with her about the
17  substance of this litigation?
18    A.  I don't know.
19    Q.  Okay.  What -- describe the conversations
20  you've had with her about the substance of this
21  litigation.
22      MR. LINDSTROM:  All right.  Let me again
23  interpose an objection based on the attorney-client
24  privilege.
25      To the extent that you had conversations

Ellison, Lawrence  3/30/2007  12:00:00 AM

613

1    with Ms. Catz in the presence of your lawyers, I
2    don't want you to divulge that.  If you had
3    independent conversations, for example, you and
4    Ms. Catz talking alone, he's entitled to know about
5    that.
6         THE WITNESS:  Could you repeat the
7    question?
8         MR. SOLOMON:  Yeah.
9         Q.  Please describe the conversations you've
10   had with her about the substance of this litigation.
11        MR. LINDSTROM:  Excluding any in the
12   presence of counsel.
13        THE WITNESS:  That -- again, I can give
14   you a high -- I can't tell you the content.  I can't
15   give you the word for word or, you know, the
16   contents.  But I can tell kind of the gist.  And I
17   can't tell you how many conversations there were,
18   but I can tell you the gist.
19        MR. SOLOMON:  Okay.
20        THE WITNESS:  That the litigation is
21   about -- is about a -- is about an earnings miss in
22   a quarter, and that the plaintiffs allege that
23   problems with the 11i suite caused the earnings
24   miss.  And as far as we can tell, that's just not
25   the case.

614

1         MR. SOLOMON:  Q.  And that's something
2    that you've said to Ms. Catz or something Ms. Catz
3    said to you?
4         A.  Going -- going back and forth.
5         Q.  Okay.  And your insider sales haven't
6    cropped up in your conversations?
7         A.  I'm not sure.  I mean, she -- I mean,
8    she's -- I'm not sure if we discussed that
9    specifically.
10        Q.  In your estimation, does Ms. Catz have a
11   good memory?
12        A.  Yes.
13        Q.  You didn't discuss your sales of stock in
14   January 2001 with Ms. Catz prior to engaging in the
15   sales, did you?
16        MR. LINDSTROM:  So we're now -- we're not
17   talking about conversations at that time?  Not since
18   the litigation?
19        THE WITNESS:  In 2001, I don't recall.
20        MR. SOLOMON:  Okay.  I'll have marked as
21   the next exhibit a Forbes magazine article dated
22   August 14, 2006.
23        THE WITNESS:  Mr. Solomon, are we going to
24   use this transcription document again?
25        MR. SOLOMON:  Yes, we are.

615

1         THE WITNESS:  The others?
2         MR. SOLOMON:  Probably not.
3         THE WITNESS:  Okay.
4         (Whereupon, Deposition Exhibit 146
5         was marked for identification.)
6         MR. SOLOMON:  Q.  Did you read this
7    article, Mr. Ellison, around the time it was
8    published?
9         A.  I think I did.
10        Q.  And looking at what is page 87 -- excuse
11   me.  I'm mistaken.  I may be wrong about that.
12        A.  Page 86, an unnumbered page, then page 91.
13        Q.  Right.  So if you go past 86 to the next
14   page which has, "Interesting Conflicts" in a box, do
15   you see that?
16        A.  Yes.  It's difficult to read, but yes.
17        Q.  I'm looking at the paragraph -- the last
18   paragraph in the body of that.
19        MR. LINDSTROM:  In the body of the box or
20   the article?
21        MR. SOLOMON:  In the body of the article.
22        Q.  And it says, "By the time Lane and Bloom
23   had quit in 2000 Safra Catz had taken control.  A
24   dealmaker at the brokerage Donaldson, Lufkin &
25   Jenrette, she had covered the software industry

616

1    since 1986 and was a close friend of Ellison.  He
2    was enchanted by her intellect," and then in
3    parentheses, "(Larry likes to say she graduated in
4    the top of her class at Harvard Law,)" close parens,
5    "and 13 years later he brought her to Oracle."
6         Do you see that?
7         A.  I do.
8         Q.  Now, did you used to -- did you like to
9    say that Ms. Catz graduated top of her class at
10   Harvard Law?
11        A.  I don't recall ever saying that.
12        Q.  So do you have any idea why that's said
13   here?
14        MR. LINDSTROM:  No foundation.  Calls for
15   speculation.
16        THE WITNESS:  I think she went to Harvard,
17   but -- Harvard Law, but I don't think I ever said
18   she graduated top of her class.
19        MR. SOLOMON:  Q.  And why do you think she
20   went to Harvard?
21        A.  I think she said she went to Harvard.
22        Q.  Do you know she never graduated from
23   Harvard?  Do you know that?
24        A.  No.
25        Q.  Is this the first time you've heard that?

Ellison, Lawrence  3/30/2007  12:00:00 AM

617

1    A.  No.  I think -- I think I knew that.  She
2  graduated from Penn?
3    Q.  She did.
4    A.  Yeah.
5    MR. LINDSTROM:  That's what she testified
6  to.
7    THE WITNESS:  Yeah.
8    MR. LINDSTROM:  Also --
9    MR. SOLOMON:  Q.  Are you aware that all
10  over the web it appears that she graduated from
11  Harvard?
12    MR. LINDSTROM:  Assumes facts.  Calls for
13  a conclusion.  Argumentative.
14    THE WITNESS:  No.
15    MR. SOLOMON:  Q.  Are you aware that alone
16  among the board of directors of Oracle, Safra Catz
17  doesn't list her education?
18    MR. LINDSTROM:  Assumes facts.
19    THE WITNESS:  Do I list mine?  I
20  don't know --
21    MR. SOLOMON:  Q.  You're smiling.  I'm
22  smiling --
23    A.  No, I don't know if I -- I don't know if I
24  list mine.  I don't think I list my education, and
25  I'm on the board.

618

1    Q.  I'm talking about Safra Catz.
2    MR. LINDSTROM:  But I think you said
3  "alone on the board" --
4    THE WITNESS:  You said "alone" --
5    MR. SOLOMON:  Oh, I'm sorry.
6    THE WITNESS:  You said alone amongst the
7  members of the board of directors, she doesn't list
8  her education.  And I just said I don't think I list
9  my education.
10    MR. LINDSTROM:  So, Mark, could you repose
11  the question?
12    MR. SOLOMON:  Q.  So other than you, then,
13  alone among the board of directors.  Let's get this
14  as an exhibit.  Let's mark this, and then we'll have
15  some context.
16    Actually, let me be more accurate.  Alone
17  among the directors of Oracle Education Foundation.
18    THE WITNESS:  Okay.
19    MR. SOLOMON:  Q.  Okay?
20    A.  Okay.
21    MR. SOLOMON:  Let's mark these pages
22  describing the board of directors of Oracle
23  Education Foundation as the next exhibit.
24    (Whereupon, Deposition Exhibit 147
25    was marked for identification.)

619

1    MR. SOLOMON:  Q.  We don't have to dwell
2  on this very long, Mr. Ellison.  I just want to
3  know, do you know why she doesn't list her
4  education?
5    A.  No.
6    MR. SOLOMON:  I'll have marked as the --
7  actually, this is already Exhibit 10 to the
8  deposition of Ms. Catz, so I'll just pass it
9  straight over to you, Mr. Ellison.
10    THE WITNESS:  Okay.  Thank you.
11    MR. LINDSTROM:  Is this 148?
12    THE REPORTER:  Previously marked.
13    MR. SOLOMON:  Exhibit 10.
14    MR. LINDSTROM:  Thank you, Counsel.
15    MR. SOLOMON:  Q.  I just wanted you to
16  look at the second page into the document.
17    A.  Including the cover page?
18    Q.  So the cover page, I want you to look at
19  the next page which just says, "Catz's Background."
20  I just want to point out to you that there,
21  apparently, the special litigation committee was led
22  to believe somehow that she graduated from Harvard
23  Law School with a JD.
24    Do you see that?
25    MR. LINDSTROM:  Is there a question -- I'm

620

1  going to object to the preface of the question as
2  being argumentative, lacking foundation.
3    Do you see that?  You may respond.
4    THE WITNESS:  Do I see it?
5    MR. SOLOMON:  Q.  Yeah.
6    A.  I see it.
7    Q.  And you don't know what would have led the
8  special litigation committee to believe she went to
9  Harvard Law School, do you?
10    A.  I think she did go to Harvard Law School.
11    Q.  Sorry, that she graduated from Harvard Law
12  School.
13    A.  No.
14    MR. SOLOMON:  Let's go off the record for
15  a couple minutes.
16    THE VIDEOGRAPHER:  Off the record.  The
17  time is 2:07 p.m.
18    (Whereupon, a recess was taken.)
19    THE VIDEOGRAPHER:  We are back on the
20  record.  The time is 2:08 p.m.
21    MR. SOLOMON:  I've marked as the next
22  exhibit -- sorry -- a document describing Ms. Catz
23  and her education.
24    (Whereupon, Deposition Exhibit 148
25    was marked for identification.)

Ellison, Lawrence  3/30/2007  12:00:00 AM

621

1     MR. SOLOMON:  Q.  If you look at the third
2  page of the exhibit, Mr. Ellison, you'll see that
3  there's a reference to Ms. Catz having a BS from
4  Wharton School and a JD from Harvard Law School.
5     Do you see that?
6     A.  I do.
7     Q.  You don't know how that got there?
8     A.  No.
9     MR. LINDSTROM:  No foundation.
10     THE WITNESS:  Are we done with --
11     MR. SOLOMON:  Yes.  Thank you.
12     We'll have marked as the next exhibit a
13  document that contains a correction concerning
14  Ms. Catz.
15     (Whereupon, Deposition Exhibit 149
16     was marked for identification.)
17     MR. SOLOMON:  Q.  If you go to the second
18  page, Mr. Ellison, you'll see halfway down that page
19  it says, "Our cover story on Oracle," and then it
20  references the article, "Chief Executive Larry
21  Ellison," in quotes, "'Irreplaceable'," in parens,
22  "(August 14), repeated an Ellison claim that Oracle
23  co-president Safra Catz graduated from the Harvard
24  Law School; her law degree is from the University of
25  Pennsylvania."

622

1     Do you see that?
2     A.  I do.
3     Q.  But, again, it's your testimony you've
4  never claimed that she went to Harvard Law School;
5  is that right?
6     THE WITNESS:  No --
7     MR. LINDSTROM:  Assumes facts.
8  Mischaracterizes his testimony.
9     MR. SOLOMON:  Q.  Sorry.  Start again.
10     It's your testimony that you've never
11  claimed that Ms. Catz graduated top in her class at
12  Harvard Law School?
13     A.  I've never -- I've never said that.
14     Q.  And have you, in the past, said that she
15  graduated from Harvard Law School?
16     A.  I think at one point I thought she had
17  graduated from Harvard Law School.
18     MR. SOLOMON:  Okay.  And we'll have marked
19  as the next exhibit an article entitled, "Oracle's
20  Catz, Ellison Heir, Gets Credit for Growth
21  Strategy."
22     (Whereupon, Deposition Exhibit 150
23     was marked for identification.)
24     MR. SOLOMON:  Q.  I'm looking at the third
25  page of this document.  You'll see halfway down on

623

1  that third page it says, "Catz received her
2  bachelor's degree in business from the Wharton
3  School of the University of Pennsylvania in 1983,
4  earning her law degree from Harvard Law School in
5  1986."
6     Do you see that?
7     A.  I do.
8     Q.  You didn't provide that information for
9  this article, did you?
10     A.  No.  I'm not sure -- what is this article?
11  I can't even tell where it came from.
12     Q.  If you go to the last page, you'll see
13  that there's a reference to the reporter being
14  Rochelle Garner in San Francisco.
15     Do you know who Rochelle Garner is?
16     A.  I don't.  Do you know --
17     Q.  Have you ever heard of the San Jose
18  Mercury News?
19     A.  Of course.  Is this a San Jose Mercury
20  News article?
21     Q.  I believe it is.
22     A.  I don't see where it ...
23     Q.  We'll double-check later on, Mr. Ellison,
24  but I believe this is an article that was published
25  in December of last year in the San Jose Mercury

624

1  News.  And I'll let you know if I'm -- when I find
2  another version of this, whether that's right or
3  wrong.
4     But in any event, have you ever had a
5  discussion with Ms. Catz about her being reported to
6  have earned her law degree from Harvard Law School?
7     A.  No.  I don't think she ever told me --
8     MR. LINDSTROM:  The answer is yes or no.
9     THE WITNESS:  Sorry.
10     MR. LINDSTROM:  And you've answered.
11     MR. SOLOMON:  Q.  Do you know why there's
12  no correction -- there's been no correction of this
13  information?
14     MR. LINDSTROM:  No foundation.
15     THE WITNESS:  No.
16     MR. SOLOMON:  Q.  Are you aware that every
17  document that discusses your exercise of your
18  options in January 2001, to the extent -- prior to
19  your exercising those options, to the extent there
20  was -- there were ever any dates projected for when
21  you would be exercising, they were April 2001 or
22  thereafter?  Are you aware of that?
23     MR. LINDSTROM:  Assumes facts.
24  Mischaracterizes the documents.
25     THE WITNESS:  I'm not -- I'm not sure I

625

1    understood what you just said.
2         MR. SOLOMON: Q. Okay. Prior to your
3    exercising your options in January 2001, there are
4    some e-mails that I'll share with you in a few
5    minutes involving Deborah Lange.
6         Do you know who Deborah Lange is?
7         A. Yes.
8         Q. And some of those discuss when you would
9    be exercising your options. Are you aware of that?
10        MR. LINDSTROM: Assumes facts.
11        THE WITNESS: No.
12        MR. SOLOMON: Q. And there's never any
13   mention of you exercising in January of 2001; only
14   of exercising in April or thereafter. Are you aware
15   of that?
16        MR. LINDSTROM: Assumes facts.
17   Mischaracterizes the document. Documents.
18        THE WITNESS: No.
19        MR. SOLOMON: Q. After we filed our
20   lawsuit in March of 2001, did you ever have any
21   discussion with anybody at Oracle concerning
22   Ms. Lange --
23        A. Now I know what you're talking about --
24        Q. -- stating that --
25        Okay. What am I talking about?

626

1         MR. LINDSTROM: Why don't you let him
2    finish the question.
3         MR. SOLOMON: Q. I did. What am I
4    talking about?
5         MR. LINDSTROM: Calls for speculation.
6    We'll see how good you can read what's in his head.
7         THE WITNESS: I think -- I think I've
8    heard somewhere that Deborah Lange wrote something
9    about the tax treatment of my options and the ideal
10   time for me to exercise as far as Oracle was
11   concerned.
12        MR. SOLOMON: Okay.
13        MR. LINDSTROM: So, Mark, was he right?
14   Was that what you were thinking?
15        MR. SOLOMON: Somewhat. Absolutely.
16        Q. I was also thinking that when we discussed
17   this with your financial adviser, Mr. Simon, he got
18   very upset when I showed him documents that suggest
19   that you were planning on exercising in April.
20        Are you aware of that?
21        MR. LINDSTROM: Assumes facts.
22   Mischaracterizes his testimony.
23        THE WITNESS: That he got very upset? No,
24   I don't know anything about that.
25        MR. SOLOMON: Q. Have you spoken to

627

1    Mr. Symonds about his testimony?
2         A. I didn't even know he had been deposed
3    until now -- no.
4         Q. Have you referred in the past to "software
5    swaps," transactions described as "software swaps"?
6         MR. LINDSTROM: In those exact words?
7         MR. SOLOMON: (Nods head.)
8         THE WITNESS: I don't think I've ever said
9    "software swaps." I know what a swap is, a swap
10   transaction. I don't think I've ever said "software
11   swaps."
12        MR. SOLOMON: Q. Okay. And what is a
13   software swap?
14        MR. LINDSTROM: What is a software --
15        MR. SOLOMON: Sorry. You're right.
16        Q. What is a swap transaction?
17        A. It would be where -- in case of a software
18   swap, it would be where -- hypothetically, where we
19   supplied our database technology to Microsoft in
20   exchange for Microsoft Office, and we -- kind of
21   simultaneously, the transactions have passed in the
22   air.
23        Q. Okay. Does that raise any concern in your
24   mind as to the propriety of that sort of
25   transaction?

628

1         MR. LINDSTROM: The hypothetical he
2    described?
3         MR. SOLOMON: Yeah.
4         THE WITNESS: It depends -- it's all
5    contextual. So if Microsoft had a real need for the
6    database, a legitimate need for the database, and
7    they were going to buy it anyway, and we had a
8    legitimate need for Microsoft Office and we were
9    going to buy it anyway, and those needs had been
10   well established, then the fact that we were
11   buying -- you know, kind of simultaneously buying
12   something of theirs and they were simultaneously
13   buying something of ours is okay in terms of you can
14   actually record the revenue. It was a legitimate
15   sale of technology from us to Microsoft and from
16   Microsoft to us.
17        So as long as it is, if you will,
18   coincidental with their occurring at the same time,
19   then it's legitimate and both companies could record
20   the transaction as revenue, as legitimate sales and
21   legitimate revenue.
22        If they were contrived and there's no
23   legitimate need, then the transaction should not be
24   recorded as revenue.
25        MR. SOLOMON: Q. Okay. And does that --

629

1  where you're talking about contrived, does that
2  accurately describe the deal that you entered into
3  with HP at the end of 2Q01?
4       MR. LINDSTROM:  Was it contrived?
5       THE WITNESS:  No.  It was absolutely not
6  contrived.  It was a legitimate need of HP's and a
7  legitimate need of ours.
8       MR. SOLOMON:  Q.  And do you recall
9  signing a document late on November 30th, 2000 with
10  respect to the HP deal?
11      A.  Not specifically.
12      Q.  Do you recall that it was unclear until
13  the last minute whether or not Oracle would meet
14  guidance for the second fiscal quarter of 2001?
15      MR. LINDSTROM:  Assumes facts.
16      THE WITNESS:  Q2 2001?
17      MR. SOLOMON:  Q.  Q2 -- which is --
18      A.  Fiscal -- yes.  November of 2000.  I don't
19  specifically recall.
20      Q.  Did you discuss the second fiscal quarter
21  of 2001 with Mr. Symonds at all when he was
22  interviewing you for the book?
23      A.  I don't recall.
24      Q.  Back to 142.
25      I'm looking at page 1529302.

630

1       A.  Last three numbers again?
2       Q.  -302?
3       A.  -302.
4       Q.  And then I'm looking at the paragraph
5  beginning exactly halfway down the page.  And I'm
6  looking at, in that paragraph, where it says, "This
7  is hard stuff."
8       If you just read that, I'll ask you a
9  couple of questions about it.
10      A.  -302?  Page -302?
11      Q.  Yes.
12      While you're reading it, I'll read to you.
13      "This is hard stuff, you know, a lot of
14  smart people" --
15      A.  Slow down.  I can't find, "This is hard
16  stuff."
17      MR. LINDSTROM:  I can't either.
18      MR. SOLOMON:  -302 at the bottom.
19      THE WITNESS:  -302.  I can't find it.
20      MR. SOLOMON:  There's handwriting on the
21  left-hand side.
22      MR. LINDSTROM:  Why don't you --
23      MR. SOLOMON:  Wrong document.
24      THE WITNESS:  Oh, 142.  Sorry.  Are we
25  done with this one?

631

1       MR. SOLOMON:  Yes.
2       THE WITNESS:  Sorry.  Accumulating too
3  many of these things.
4       Okay.  -302.
5       MR. LINDSTROM:  Why don't you find that
6  page and then take a moment to familiarize yourself
7  with the passage that counsel's directed your
8  attention to.
9       THE WITNESS:  Okay.  There are a lot of
10  transcription errors in this.  It's hard to read.
11      MR. SOLOMON:  Too bad we don't have the
12  audio.
13      MR. LINDSTROM:  Is that a question?
14      MR. SOLOMON:  Q.  Don't you agree,
15  Mr. Ellison?
16      A.  I do.
17      Q.  Halfway -- well, the last sentence of the
18  paragraph that I'm focusing on says, "There was no
19  reason I should have believed we could do that in
20  the timeframe but I thought we could other than
21  denial."
22      Do you see that?
23      A.  Okay, the last sentence?
24      Q.  Yeah.
25      A.  I do.  But give me a second to read the

632

1  whole thing.
2       Okay.
3       Q.  Okay.  So that last sentence, did you say
4  that?
5       A.  I think so.
6       Q.  Okay.  And you were in denial in terms of
7  the E-Business Suite and how long it would take; is
8  that right?
9       A.  No.  If you read the entire paragraph, I
10  was more optimistic about us getting it done in a
11  certain timeframe than I should have been.
12  Experience -- experience tells us in the software
13  business that big projects are enormously complex
14  and they often slip.  I mean, we've had big projects
15  slip in the past.  Microsoft has huge projects that
16  slip.  Still, we put together dates that are
17  aggressive and goals that are aggressive.  It's not
18  uncommon to miss those dates.
19      Q.  Do you stand by that sentence where you
20  say, "there was no reason I should have believed we
21  could do that in the timeframe"?
22      MR. LINDSTROM:  The entire sentence,
23  right?
24      THE WITNESS:  The -- I still manage
25  engineering today at Oracle, and we still have

Ellison, Lawrence  3/30/2007  12:00:00 AM

633

1  aggressive delivery dates.  And I still think it's a
2  good management technique to have aggressive
3  delivery dates.
4      MR. SOLOMON:  Okay.  Let's take a -- let's
5  take a ten-minute break, if that's okay.
6      THE VIDEOGRAPHER:  We are going off the
7  record.  Here marks the end of Videotape No. 1,
8  Volume 3, in the deposition of Lawrence Ellison.  We
9  are going off the record.  The time is 2:28 p.m.
10      (Whereupon, a recess was taken.)
11      THE VIDEOGRAPHER:  Good afternoon.  We are
12  back on the record.  Here marks the beginning of
13  Videotape No. 2, Volume 3, in the deposition of
14  Larry Ellison.  The time is 2:42 p.m.
15      MR. SOLOMON:  Q.  Mr. Ellison, have you
16  heard it remarked that you have a problem with
17  tenses?
18      A.  Verb tenses?
19      Q.  Tenses.
20      MR. LINDSTROM:  Verb tenses.
21      THE WITNESS:  Have I heard that remark?  I
22  think I made that remark.
23      MR. SOLOMON:  Q.  Okay.  And who did you
24  make that remark to?
25      A.  I'm not sure exactly.

634

1      Q.  Okay.  And why did you say that?
2      A.  I think there was some point in my career
3  where I did not make it plain whether a product was
4  finished or about to be finished.
5      Q.  Okay.  Do you still have a problem with
6  tenses?
7      A.  No.
8      Q.  When did you stop having a problem with
9  tenses?
10      A.  Long time ago.
11      Q.  Would you be willing to submit to a lie
12  detector test for the purposes of this litigation?
13      MR. LINDSTROM:  I'm going to object to
14  that question as being argumentative and beyond the
15  requirements of the Federal Rules of Civil
16  Procedure, and I'm going to instruct him not to
17  respond to that question, unless you can give me
18  some justification for why you have authority to
19  pose that kind of question.
20      MR. SOLOMON:  I think --
21      Q.  Did you respond already by nodding your
22  head yes?
23      A.  Yes.
24      Q.  And --
25      MR. LINDSTROM:  Well, he may be willing to

635

1  do it, but I don't think you can ask that question.
2  You have limited time with this witness.  And, you
3  know, I suggest you move on to things that are
4  properly the subject of discovery.
5      MR. SOLOMON:  So just -- I will withdraw
6  the question for the second, but let's just finish
7  this off.
8      Q.  So after this deposition, you would be
9  willing to enter into an agreement whereby if
10  questions were agreed, you would submit to a lie
11  detector test; is that right?
12      MR. LINDSTROM:  Asked and answered.  It's
13  argumentative.  It's irrelevant.  Improper
14  discovery.  He's told you what he would do, and I'm
15  going to instruct him not to answer any further.
16      MR. SOLOMON:  Q.  And you're going to
17  accept the instruction, I take it?
18      A.  (Nods head.)
19      Yes.
20      MR. LINDSTROM:  Thank you.
21      MR. SOLOMON:  Q.  That's yes, you --
22      A.  Yes, I accept the instruction.
23      Q.  Got you.
24      Let's have marked as the next exhibit
25  another interview transcript with the Bates range

636

1  1529157 to 1529180.
2      (Whereupon, Deposition Exhibit 151
3      was marked for identification.)
4      THE WITNESS:  Are we finished with this
5  transcript?
6      MR. SOLOMON:  Yes, we are.  We're finished
7  with it, yes.
8      Q.  And this is an interview transcript.  It's
9  dated January 18, 2002, and the control range is
10  1529157 -- I may have said this already --
11  through -180.
12      You'll see on the first page in the second
13  paragraph a reference to the phrase "brand damage."
14      Do you see that?
15      A.  I do.
16      Q.  And that's a phrase you say you invented;
17  is that right?
18      A.  Can I have a second just to read the
19  context?
20      MR. LINDSTROM:  While Mr. Ellison is
21  reviewing the document, is this 151 for
22  identification?
23      THE REPORTER:  (Nods head.)
24      MR. LINDSTROM:  Thank you.
25      THE WITNESS:  Are we talking about the

637

1   very first page?
2       MR. SOLOMON: Yes.
3       THE WITNESS: Because this is reverse --
4   this is Mr. Symonds in regular type and me in
5   boldface?
6       MR. SOLOMON: Q.  Appears to be.
7   A.  Just reverse of the other one.
8       Okay.  Go ahead.
9   Q.  Okay.  You coined the phrase "brand
10  damage"?
11  A.  I don't think I coined the phrase "brand
12  damage."  I used the phrase "brand damage" in
13  regards to some of the problems some customers were
14  having with release 11i.  I don't think it had ever
15  been used in Oracle before.
16  Q.  Then if you go to the third page of the
17  document, 1529159, just looking in the middle there
18  at what appears to be your language, "So you have
19  delivered a product that doesn't work very well and
20  you can't support very well, so all I care about is
21  service requests and that's all I measure so that
22  that was a key point in saying by the way service
23  requests must go down 5 percent a month."
24      Do you see that?
25  A.  I do.

638

1   Q.  Are you talking about 11i there?
2   A.  Can I just have a second to look at this?
3   Q.  Sure.
4   A.  No.  I think if you look at the previous
5   paragraph, I think what I'm talking about is the
6   general notion of what you should measure when
7   you're trying to ascertain product quality.
8       And the engine and -- what I had become
9   convinced of was that measuring bugs was a mistake.
10  The programmer says here's a bug.  Instead what you
11  want to measure is customer -- customers reporting
12  problems.  And there's a fundamental -- a
13  fundamental difference.
14      One bug might produce zero or very few
15  customer-reported problems.  There might be a
16  legitimate bug in their product, but either no one
17  cares or it doesn't occur.  One bug might cause very
18  serious problems that hundreds of customers might
19  then come up with service requests.
20      So the impact of that bug is much greater
21  if you measure service requests.  So counting bugs
22  simply was not a very good way of measuring product
23  quality.  The right way to measure product quality
24  was service requests.  And then I had set a goal --
25  and that was true of all of our products, not just

639

1   11i -- the way to measure product quality was
2   measure service requests.  And then the said
3   targets, to reduce -- constantly reduce those number
4   of service requests coming in.
5       It used to be -- it used to be that
6   engineering would measure bugs as their measure of
7   quality, and reducing bugs was showing improved
8   quality.  The support organization would measure
9   service requests.  And they weren't synchronized.
10  They didn't agree what the right measures were.
11      So I was pushing the notion of let's all
12  agree it's just service requests and just get them
13  down.
14  Q.  Was this after March 2001 that you
15  developed this view, or was it something you already
16  held, a view you already held as of March 2001?
17  A.  I'm not sure exactly when I decided we
18  should have a single measure of the quality.
19  Q.  Okay.  If you go to pages 1529167
20  and -168 -- in fact, I'm looking at -168.
21  A.  You're on -168?
22  Q.  Yeah.  Sorry.
23      And I'm just looking at a couple of the
24  lines on that page.  A third of the way down, "So
25  when did you first realize that it wasn't really

640

1   working very well?"
2       And your response appears to be, "Oh, I
3   knew there was a huge risk up front, so I kind of
4   walked into this.  I can't plead ignorance on this,
5   but it took much longer."
6       Do you see that?
7   A.  I do.  Can I have a moment to read around
8   it?  Because I'm not sure what this is about.
9   Q.  Yeah.
10  A.  Okay.  Now I know what it's about.
11  Q.  Okay.  And what is it about?
12  A.  It's about the most complicated component
13  of an ERP system or the application system, which is
14  the order management system.  And we had -- I had
15  made the decision -- it was run on the cusp, whether
16  we should put in a brand-new order management system
17  or kind of upgrade our existing system.
18      And I decided to completely replace the
19  order management system knowing it was an enormously
20  complicated piece of new code, the most complicated
21  piece of the whole system.
22  Q.  Just keep that in front of you for a
23  second.  I just want to touch on some other areas
24  and then come back to this.  I want to go back for a
25  second to Mr. Symonds and the issue of Softwar.

641

```
1          Do you know what spoliation means?
2     A.  Yes.
3     Q.  What's your understanding of spoliation?
4     A.  It's documents that should have been
5   preserved that weren't.
6     Q.  Are you aware that spoliation has become
7   an issue in this case?
8     A.  I understand you've raised it as an issue,
9   yes.
10    Q.  Okay.  And you're aware that the special
11  master magistrate in charge of discovery had
12  indicated this is an issue in this case?
13        MR. LINDSTROM:  I'm going to instruct you
14  not to divulge any communications you may have had
15  with your counsel.  In other words, as before, you
16  need to be answering these questions independent of
17  communications for your counsel.  So, for example,
18  if you've read an order or a transcript or something
19  where the special master made a statement of the
20  type that Mr. Solomon just mentioned, then fine.
21  But I don't want you telling him information that
22  may or may not have been given to you through your
23  lawyers.
24        THE WITNESS:  No.  Excuse me.  No.
25        MR. SOLOMON:  Q.  Okay.  I asked you last
```

642

```
1   time if you knew of a person called Mr. Kirkby and
2   you said you didn't.
3          Do you recall that?
4     A.  Kirkby?
5     Q.  Mh-hmm.
6          MR. LINDSTROM:  Do you recall the
7   testimony; is that the question?
8          MR. SOLOMON:  Yes.
9          THE WITNESS:  I don't recall the
10  testimony.
11         MR. SOLOMON:  Q.  Okay.  Do you know the
12  name Kirkby?
13    A.  No.
14    Q.  Okay.  You said that you wrote to
15  Mr. Symonds on January the 10th of this year.
16         Can you tell me, between January the 10th
17  and the conversation you had with him concerning a
18  charity, did you have any communications with him?
19    A.  I did.  There were -- there were several
20  phone calls.
21    Q.  Okay.  Who initiated the phone calls?
22    A.  In all cases, Mr. Symonds did.
23    Q.  Okay.
24    A.  And, again, the practice was, he would
25  call me, get one of my assistants, and my assistant
```

643

```
1   would locate me and I would call him back.
2     Q.  Did you ever have a discussion with him as
3   to what his story should be?
4          MR. LINDSTROM:  As to what his story
5   should be?
6          MR. SOLOMON:  (Nods head.)
7          THE WITNESS:  What -- what do you mean?
8          MR. SOLOMON:  Q.  Okay.  Do you -- have
9   you heard -- strike that.
10         At one point we -- I'll represent this to
11  you -- we were told by your counsel that Mr. Symonds
12  had told them that he had tried to access the audio.
13  He couldn't.  He took it to a computer repair shop.
14  Apparently, there was a virus, and he just left it
15  at the repair shop and it disappeared forever.
16         Have you ever heard that?
17         MR. LINDSTROM:  All right.  Again, I think
18  it's important -- he can conduct discovery about
19  what you may have heard from Mr. Symonds or anybody
20  else, but not the lawyers.
21         Do you understand?
22         THE WITNESS:  Yes.
23         MR. SOLOMON:  Q.  Have you ever heard that
24  from Mr. Symonds?
25    A.  He told me that he couldn't recover the
```

644

```
1   electronic files, and he -- he had tried to recover
2   the electronic files.  He had taken -- taken it to a
3   store, and he had written transcripts and he could
4   produce -- he had a written transcript but not the
5   electronic files.  He did tell me that.
6          MR. SOLOMON:  Q.  Okay.  And did he tell
7   you why he had left it at the store?
8     A.  He didn't tell me he had left it at the
9   store.
10    Q.  What did he tell you?
11    A.  He just told me he couldn't recover the
12  electronic files because there was a virus.  He
13  tried to get the computer fixed.
14    Q.  When did he tell you that?
15    A.  I think some number of days after my --
16  after my January phone call with him.
17    Q.  Okay.  And what did you say?
18    A.  I said, "Please produce what you have."
19    Q.  Okay.  And what about the computer being
20  at the store; did you say anything to him about
21  that?
22    A.  He didn't say the computer was at the
23  store.
24    Q.  Okay.
25    A.  All he -- all he said was the computer had
```

Ellison, Lawrence 3/30/2007 12:00:00 AM

645

1  a virus and he couldn't recover the electronic
2  files.
3      Q.  Did you ask him to send you the computer,
4  or at least keep the computer?
5      MR. LINDSTROM:  Compound.
6      THE WITNESS:  No.
7      MR. SOLOMON:  Q.  Okay.  And then after he
8  told you that he couldn't access the audio and told
9  you about the transcripts, what did you say then?
10     A.  Please produce -- please produce whatever
11 documentation you have.
12     Q.  And was that the end of the call?
13     A.  Yes.
14     Q.  Okay.  And what about the next call?  When
15 was that?
16     A.  The next call I think was mid February.
17     Q.  Okay.  And describe the conversation,
18 please.
19     A.  He said that a private investigator hired
20 by the plaintiffs had located a -- an ex-employee of
21 the transcription service, a Mr. Wright, and that
22 they had located all of the electronic files on a
23 server.
24     Q.  Okay.  And what did you say?
25     A.  Great.  Give him the files.

646

1      Q.  What -- you said to Mr. Symonds, Great,
2  give him the files?  Mr. Symonds.
3      A.  Mr. Symonds, yes.  You know, Give the
4  investigator the files.  That's fine.
5      Q.  Okay.  And what did he say?
6      A.  Again -- again, I'm not -- all of these
7  things I'm relating I'm not sure word for word.  I'm
8  giving you the gist -- you know, the gist of the
9  conversation.  I'm not sure if he said okay or not.
10 I'm really not sure -- I'm not sure what he said.
11     Q.  Okay.  And how long was that conversation?
12     A.  I don't know.
13     Q.  Were any of these conversations more than
14 a couple of minutes in length?
15     A.  Yeah.  Some of the conversations included,
16 you know, other topics.  There were -- there were --
17 there was a conversation -- in fact, I think I was
18 wrong when you asked me the next time I talked to
19 Mr. Symonds, because I took that as the next time I
20 talked to Mr. Symonds about this litigation.  I
21 think you just asked me what the next time was.
22     Q.  Sure.
23     A.  I think there was a call after -- another
24 call in January where he was trying to synchronize,
25 or get some dates to come to Spain to watch the

647

1  America's Cup sailing.  And, again, I think there
2  other calls about -- there might have been calls
3  about the charity.  And we might have spoken about
4  the charity in this call.  But I think in terms of
5  discussion about the litigation, it was, you know,
6  plaintiff's -- plaintiff's investigator has
7  located -- located the employee.  The employee has
8  found all -- all the files do exist, and they're on
9  a server computer, which I thought was good news,
10 and said, Go ahead and please give everything to the
11 plaintiff.
12     Q.  Okay.
13     A.  I then, by the way, called him back --
14 sorry.
15     MR. LINDSTROM:  If he wants to ask you --
16 I'm sure he will, but it's important we have a clear
17 record here and keep these conversations as distinct
18 as we can.  So counsel will ask you about the next
19 conversation, I'm sure, in a moment.
20     MR. SOLOMON:  Q.  Carry on, please.
21     MR. LINDSTROM:  With the next
22 conversation?
23     MR. SOLOMON:  Q.  You were about to say "I
24 then" -- I think you were about to say you then
25 called him back; is that right?

648

1      A.  Yeah, I think I called him, and I thought
2  that I had -- and said -- it might have been the
3  next day, or might have been two days.  Could have
4  been a few hours later, a day later.  It occurred to
5  me that -- that the documents should have been
6  produced to my lawyers as opposed to the
7  investigator.
8      So I said, Matthew, please, you
9  know -- get the documents from this employee and
10 give them to -- give them to my lawyers.
11     Q.  Okay.
12     A.  And I think he said too late, I had
13 already sent an e-mail to the investigator -- or to
14 Mr. Wright saying that the -- that the investigator
15 could have the files.
16     Q.  So -- just hard to follow.
17     So you're telling me Mr. Symonds told you
18 that the investigator had already got the audio?
19     A.  No.  No.  Mr. Symonds told me that
20 plaintiffs had hired an investigator.  The
21 investigator had located a former employee of -- I
22 think it's called Typing.com -- not certain about
23 that -- the transcription service, the people that
24 produce these documents from the audio files -- that
25 they had located this ex-employee, that the

Ellison, Lawrence  3/30/2007  12:00:00 AM

649

1  ex-employee had located a computer server from
2  Typing.com that had all of the audio files and all
3  of the transcriptions on it.
4       Q.  Okay.
5       A.  And that employee had called Matthew
6  Symonds and asked Matthew what he wanted to do with
7  those documents.
8       Q.  Okay.  Can you explain to me why your
9  lawyers never told us that?
10      MR. LINDSTROM:  No foundation.  Assumes
11  facts.
12      THE WITNESS:  No.
13      MR. SOLOMON:  Q.  Can you explain why your
14  lawyers apparently have done nothing to try and get
15  these materials?
16      MR. LINDSTROM:  Argumentative.  Assumes
17  facts contrary to the record.  No foundation that he
18  knows what the lawyers have done or not done.
19      THE WITNESS:  My understanding is my
20  lawyers have been in continuous contact with Matthew
21  Symonds in trying to recover the documents.
22      MR. SOLOMON:  Q.  Okay.  Did you hire an
23  investigator like plaintiffs did?
24      MR. LINDSTROM:  Assumes facts.  By "you,"
25  you mean him personally?

650

1       MR. SOLOMON:  Q.  You or anybody on your
2  behalf.
3       A.  I don't know.
4       MR. LINDSTROM:  No foundation.
5       THE WITNESS:  I don't know.  I didn't
6  personally.  I don't know.
7       MR. SOLOMON:  Q.  You know that the order
8  of the court is that you produce these materials?
9  You're aware of that?
10      MR. LINDSTROM:  Are you representing that
11  to him?
12      MR. SOLOMON:  Q.  Are you aware of that?
13      MR. LINDSTROM:  No foundation.
14      THE WITNESS:  Other than -- again --
15      MR. LINDSTROM:  I don't think --
16      THE WITNESS:  If it came from my
17  lawyers --
18      MR. LINDSTROM:  Then you're not to divulge
19  it.
20      THE WITNESS:  I have no independent
21  knowledge of what exactly -- what precisely my
22  obligations are, or were, or are.  Both.
23      MR. SOLOMON:  Q.  Have you seen
24  correspondence between your lawyers and Mr. Symonds?
25      MR. LINDSTROM:  You may answer that

651

1  question.
2       THE WITNESS:  No.
3       MR. SOLOMON:  Q.  Do you know if there is
4  any?
5       MR. LINDSTROM:  You -- again, you can't --
6  you have to exclude any communications that you've
7  had with your lawyers from that response.
8       THE WITNESS:  I don't know.
9       MR. SOLOMON:  Q.  Did Mr. Symonds tell you
10  what your lawyers had been saying to him?
11      A.  No.
12      Q.  Did you ask him?
13      A.  No.
14      Q.  Do you know what your lawyers were saying
15  to Mr. Symonds?
16      MR. LINDSTROM:  Again, you -- you can't
17  respond on the basis of anything that the lawyers
18  told you.  If you know independently, you're free to
19  respond.
20      THE WITNESS:  I have no independent
21  knowledge.
22      MR. SOLOMON:  Q.  Okay.  And it's true,
23  isn't it, that you have not, until today, seen any
24  of the transcripts that have been produced?
25      A.  That's correct.

652

1       Q.  Okay.  Does it appear to you so far that
2  these transcripts, to a large extent, touched upon
3  events in this litigation?
4       MR. LINDSTROM:  Calls for a conclusion.
5  Vague and ambiguous.
6       THE WITNESS:  It certainly discusses 11 --
7  yeah, 11i and the products, yes.
8       MR. SOLOMON:  Q.  Do you -- do you believe
9  there's any conflict between you in this litigation
10  and Oracle?
11      A.  No.
12      Q.  Okay.  So after you had the conversation
13  with Mr. Symonds wherein he told you that the
14  investigator had found someone who had the files,
15  did you have another conversation with him about
16  this matter?
17      A.  Yes.  I think some number of days later,
18  he evidently -- he e-mailed Mr. Wright to turn -- to
19  turn the documents over to the investigator.  And
20  then Mr. Wright had vanished.  And Mr. Symonds was
21  very upset.  He said it was entrapment, and the
22  plaintiff was trying to entrap him and all of -- all
23  of this stuff.
24      And I said, Matthew -- again, none of this
25  is word for word.  This is the gist of the

Ellison, Lawrence  3/30/2007  12:00:00 AM

653

1  conversation. I said, Matthew, did you send -- did
2  you send a note saying they could have all the
3  documents? And I said yes -- he said yes. And I
4  said, Well, entrapment failure. Not a problem.
5      Q.  Okay. And do you remember anything else
6  about that conversation?
7      A.  No. I think that was it.
8      Q.  Now, you mentioned earlier that you
9  believed -- I think you may have testified that you
10  told Mr. Symonds that we would try and use personal
11  stuff in the transcripts to get at you, basically,
12  right?
13      MR. LINDSTROM: Mischaracterizes his
14  testimony.
15      MR. SOLOMON: Q. Is that fair?
16      A.  Yes.
17      Q.  And you mentioned a couple of events. And
18  I will tell you that that isn't my -- or our
19  practice, except to the extent there is an issue of
20  honesty or dishonesty.
21      So I want to ask you, when you talk about
22  your party when you were in your 20s, has that got
23  anything to do with your honesty?
24      A.  No.
25      Q.  And is there -- did you believe there's

654

1  anything in the transcripts that go to the issue of
2  your honesty?
3      MR. LINDSTROM: No -- no foundation.
4  Calls for speculation and a conclusion.
5      THE WITNESS: You mean was there
6  anything -- yeah. I think there was a story, a
7  comment I think I made in a meeting, based on a
8  meeting with Ray Lane and his -- his sales
9  management team.
10      MR. SOLOMON: Q. Okay.
11      A.  I made a glib comment which I probably
12  shouldn't have made.
13      Q.  And what was that comment?
14      A.  Should I tell you the whole story, or do
15  you --
16      Q.  I'd like to know the comment, and then
17  I'll tell you if I need to know the whole story.
18      A.  It was contextual. It was a very peculiar
19  situation where I ended up having to say something
20  to the sales management team that I knew was not
21  true. And it was a very bizarre -- I thought it was
22  a very bizarre situation that I should be standing
23  in front of my own people and having -- having -- at
24  the end of an hour and a half of discussion, having
25  to reassure them about something, that I was going

655

1  to do something which I didn't think I was going to
2  do.
3      Q.  Okay. And now you can tell me --
4      A.  And I said -- and I said under these
5  circumstances, I didn't have any problem lying to
6  them about it.
7      Q.  Okay. And what was the lie?
8      A.  Well, the discussion was about -- it was,
9  you know, a while ago, before 11i. It was about a
10  version of our applications immediately preceding
11  called 11o. And there was a huge debate of
12  whether -- well, I wanted -- for release 11o to only
13  work with Internet architecture. I wanted it to be
14  Internet architecture only.
15      The then current computer architecture
16  that was considered the standard architecture was
17  called client/server. I'm not going to go into all
18  of the details. The application program that ends
19  up running on these desktop machines. And the data
20  is on a server. So the app- -- it's called
21  client -- the desktop machine talks -- gets the data
22  off the server. It's called client/server.
23      It was the state of the art prior to the
24  Internet. And our applications version 10, 10.7 of
25  the applications had run in two modes; they would

656

1  run in Internet mode and also run in client/server
2  mode. They had both approaches. And I wanted to
3  drop the client/server version and only do an
4  Internet version.
5      And I was called -- Ray actually called me
6  to -- kind of surprised me, have me stop doing what
7  I was doing, come down and meet with his whole sales
8  management team, because he and the team felt I was
9  making a terrible mistake. That by pushing -- by
10  only doing Internet and not doing client/server, I
11  was going to force our customers to take untried
12  technology, force them to move to a new technology
13  they might not be willing to move to, that I was
14  taking a huge risk by, you know, depending on only
15  this Internet technology as opposed to
16  client/server. They spent several hours trying to
17  convince me that we should do both client/server and
18  Internet technology.
19      I did the best -- I did as good a job as I
20  could trying to persuade them that client/server --
21  by the time we finished 11o, client/server is going
22  to be dead. It's going to be obvious dead. It's
23  obviously going to be dead. We're going to waste
24  all of this time, all of this effort building this
25  client/server system and no one is going to want it.

Ellison, Lawrence  3/30/2007  12:00:00 AM

657

1     We should take 100 percent of our effort
2  and put it behind this Internet architecture.  And I
3  was unable to convince them after several hours of
4  trying.
5     So I was confronted with either saying,
6  Look, I -- I'm right, all of you guys are wrong.  I
7  know.  You don't.  We're doing it my way or -- which
8  I thought would be demoralizing to them.
9     And so what I ended up saying was, at the
10  end of all of this, All right, we'll do Internet
11  first, and if customers really want client/server,
12  we'll then implement client/server afterwards.  And
13  I really had -- I thought that was not going to
14  happen.  I really had no intention of doing
15  client/server.
16     So -- so it struck me -- and the reason it
17  went in the book, it just struck me very odd that
18  here I was saying something to my own people that
19  wasn't true.
20     Q.  Okay.  And the concern you expressed to
21  Mr. Symonds was that with the audio and/or the
22  transcripts, we would seek to take advantage of
23  that; is that right?
24     A.  Well, I'm telling you the story now,
25  so ...

658

1     Q.  I know you are, because you have to.
2     A.  Right.
3     MR. LINDSTROM:  But he's telling you --
4     THE WITNESS:  Also, you know, had to
5  produce -- produce the documents.  I wanted to
6  produce the documents.  I'm -- I'm telling you the
7  story, you know, the story now.
8     MR. LINDSTROM:  But I don't want there to
9  be any confusion in the record.  Mark, you can clear
10  this up if you want.  But whether this long story he
11  just told you was in the conversation with
12  Mr. Symonds or whether it was in a tape-recorded
13  interview earlier.
14     MR. SOLOMON:  Well, I think it's -- I will
15  clear that up.
16     Q.  You're talking about what would have been
17  in the audio or in the transcript, not a
18  conversation you just had with Mr. Symonds a few
19  weeks ago, right?
20     A.  Yes.  Yes.  Yes.
21     Q.  Have you looked at the e-mails that you've
22  been talking about involving Mr. Wright?
23     A.  No.
24     Q.  Are you aware that plaintiffs managed to
25  get copies of them?

659

1     MR. LINDSTROM:  I'm going to ask you again
2  to exclude in your response anything that you may
3  have learned from your lawyers.
4     THE WITNESS:  No.
5     MR. SOLOMON:  Q.  Okay.  Are you aware
6  that on February the 14th, Mr. Symonds e-mailed to
7  Mr. Wright and copied your lawyer, Mr. Gibbs,
8  indicating that Mr. Wright would be hearing from
9  Mr. Gibbs, who would be seeking to retrieve the
10  audio files and transcripts?
11     MR. LINDSTROM:  Again, same instructions.
12  If you have an independent basis, for example, from
13  one of your conversations with Mr. Symonds, then you
14  can respond.  You can't divulge communications with
15  your lawyers.
16     THE WITNESS:  No.
17     MR. SOLOMON:  Q.  Okay.  Are you aware,
18  then, for three weeks, notwithstanding that e-mail
19  exchange, Mr. Gibbs made no effort to retrieve the
20  materials from Mr. Wright?
21     MR. LINDSTROM:  No foundation.  Same
22  instruction.
23     THE WITNESS:  No independent knowledge.
24     MR. LINDSTROM:  Also assumes facts.
25     MR. SOLOMON:  Q.  Do you know what the

660

1  damages are in this litigation, the claimed damages?
2     MR. LINDSTROM:  No foundation.  Calls for
3  speculation.  Oh, claimed damages.  I'm sorry.  I'll
4  withdraw that.
5     Again, other than from counsel, do you
6  know what the claimed damages are?
7     THE WITNESS:  I think so.
8     MR. SOLOMON:  Q.  What do you think they
9  are?
10     A.  The only number I remember is $2 billion.
11     Q.  Right.
12     And that's from the demand letter that
13  plaintiffs sent; is that right?
14     MR. LINDSTROM:  I think you showed it to
15  him in a prior version of --
16     MR. SOLOMON:  Yes.  Yes.  Right.
17     Q.  Do you know that demand has been
18  withdrawn?  We've withdrawn that demand.  Are you
19  aware of that?
20     A.  No.
21     Q.  Do you know that your lawyers represented
22  to a court in Denmark in a deposition that was taken
23  there that the damages may reach $10 billion?
24  $10 billion?
25     MR. LINDSTROM:  No foundation.  Same

Ellison, Lawrence  3/30/2007  12:00:00 AM

661

1    instruction as to independent knowledge.
2          THE WITNESS: No.
3          MR. LINDSTROM: Again, assumes facts.
4          MR. SOLOMON: Q. I'll represent to you,
5    your lawyers in Denmark told the judge in Denmark
6    that.
7          MR. LINDSTROM: That's actually fine. I
8    don't mind you representing stuff to him if that's
9    the way you want to present. I'm just objecting to
10   the form of the question as previously posed.
11         MR. SOLOMON: Q. So after speaking with
12   Mr. Symonds about Mr. Wright, did you have another
13   conversation with him?
14     A.  There were two conversations about
15   Mr. Wright. When he first appeared, and then some
16   number of days later when he -- when he disappeared.
17     Q.  Okay.
18     A.  I think that's where we are, so ...
19     Q.  When you say he disappeared, what makes
20   you think he disappeared?
21     A.  I think Mr. Symonds says he wasn't -- he
22   wasn't responding to Mr. Symonds e-mails.
23     Q.  Did you ask Mr. Symonds for Mr. Wright's
24   e-mail details?
25     A.  No.

662

1      Q.  Telephone number?
2      A.  No.
3      Q.  Other than talking to Mr. Symonds, have
4    you ever made any effort to retrieve the audio or
5    transcripts?
6          MR. LINDSTROM: And, again, "you" means
7    him personally as opposed to through his lawyers or
8    other employees?
9          MR. SOLOMON: Personally, first of all.
10         THE WITNESS: Personally, no.
11         MR. SOLOMON: Q. Through your lawyers?
12     A.  I believe they've been involved from the
13   very beginning trying to obtain the documents.
14     Q.  What steps do you understand they took?
15         MR. LINDSTROM: I'm going to -- as framed,
16   again, if you have an understanding from some source
17   other than your lawyers, you can testify, but you
18   can't divulge privileged communications that you may
19   have had with counsel.
20         THE WITNESS: I have no independent
21   knowledge of what they have done.
22         MR. SOLOMON: Q. Have you ever heard of
23   the crime fraud exception to privilege?
24     A.  Have I ever heard of it?
25     Q.  Yes.

663

1      A.  Yes.
2      Q.  What's your understanding of it?
3      A.  It's used -- I heard about it in context
4    of drug dealers and their lawyers.
5      Q.  Okay. But you are aware that it doesn't
6    just apply to drug dealers?
7      A.  The only -- the only time I've ever heard
8    of it was, you know, in that context.
9      Q.  Okay. Are you aware that Mr. Symonds'
10   lawyers in England have cited a criminal statute
11   with respect to the loss of the privilege and
12   transcripts that they are concerned he may have
13   violated?
14         MR. LINDSTROM: No -- no foundation.
15   Assumes facts. And the same instruction regarding
16   divulging communications with your counsel.
17         THE WITNESS: No independent knowledge of
18   that.
19         MR. SOLOMON: Q. And just for the record,
20   we'll be moving on the basis that the privilege
21   doesn't apply because of the crime fraud exception,
22   and I'll be reserving my rights to asking more
23   questions at the end in any event, but that would
24   include those questions.
25         MR. LINDSTROM: You've made your

664

1    statement. Proceed with the deposition.
2          MR. SOLOMON: Q. So after the two
3    conversations concerning -- with Mr. Symonds
4    concerning Mr. Wright, was there another
5    conversation?
6      A.  Yes. Yes, there was.
7      Q.  Okay. Tell me about that one.
8      A.  Mr. Symonds called me, said he was going
9    to be deposed. And to which I said -- he'd never
10   been deposed before. And I said I'd been deposed a
11   number of times. All you have to do is listen to
12   the questions and answer truthfully.
13         And he said, Well -- he then said he
14   actually had never taken the computer to the store
15   to have it fixed.
16     Q.  Okay.
17     A.  And I became very concerned and said,
18   Matthew, I don't think we should be discussing this
19   any more. And that was the end of the conversation,
20   and I called my lawyers.
21     Q.  Okay. And did he tell you before you
22   ended the conversation what had happened to the
23   computer?
24     A.  No.
25     Q.  And you didn't ask?

665

1      A.  No.
2      Q.  And when was that conversation?
3      A.  Late, late February.
4      Q.  And did you have a conversation with him
5   after that?
6      A.  We might have had another conversation
7   about the charity, but I would not -- at that point,
8   I would not talk about this litigation with him
9   whatsoever.
10      Q.  And without going off too much of a -- on
11   too much of a tangent, you and Mr. Symonds
12   collaborating on some kind of charitable donation,
13   or what's -- what's -- what's it about?
14      A.  What is the charity?
15      Q.  Yeah.
16      A.  The charity is an education -- an
17   educational trust to educate kids in rural India.
18   So it was -- it used to be -- it was a small --
19   small education -- again, a doorstep educational
20   trust, and they would send buses into rural India to
21   educate kids where there were no schools.
22      Q.  Okay. But --
23      MR. LINDSTROM:  Is that --
24      MR. SOLOMON:  Q.  That's interesting, but
25   what I really want to know is, why were you and

666

1   Mr. Symonds talking about it?  What's his
2   involvement, what's your involvement in it?
3      A.  He's on the board of the trust, and I --
4   after I decided not to make $100 million donation to
5   Harvard, you know, I was looking for other -- and
6   most of my -- most of my charitable work has been in
7   healthcare.  I was looking for another -- another
8   place to make donations, decided education was an
9   interesting area.
10      And because we have a huge employee
11   population in India, it seemed this was very
12   interesting.  So for the last year or so, the head
13   of my -- my family -- my family foundation has been
14   visiting India and looking at this.  And we're going
15   through a process of seeing -- you know, kind of
16   restructuring, restructuring this and trying to come
17   up with a -- still educating kids in rural India,
18   but maybe without the buses.
19      Q.  And are you both trustees?
20      A.  I'm not -- I'm not a trustee.  Frankly, I
21   don't know if he's a trustee.
22      Q.  Okay.  Are you going to continue to deal
23   with him in the sense that you're going to continue
24   to work with him on that charity?
25      MR. LINDSTROM:  Calls for speculation.

667

1      THE WITNESS:  I think I'm not going to
2   have any more contact with Mr. Symonds for a while.
3      MR. SOLOMON:  Q.  Until the storm has
4   blown over?
5      MR. LINDSTROM:  Argumentative. Calls for
6   speculation.
7      THE WITNESS:  I'm not going to have any
8   more contact with Mr. Symonds for a while.
9      MR. SOLOMON:  Q.  When you say "a while,"
10   what do you mean?
11      A.  Well, certainly until this litigation is
12   over.
13      Q.  Have you said something like, with respect
14   to software, that last year is like another country?
15   Are you familiar with that expression?
16      A.  Last year is like another country?
17      Q.  Yeah.  Have you ever heard that
18   expression?
19      MR. LINDSTROM:  Has he heard it or has he
20   used it?
21      MR. SOLOMON:  Q.  First of all, have you
22   ever heard it?
23      A.  Last year -- I don't think I've ever heard
24   it.
25      Q.  It's true, isn't it, that in the software

668

1   industry, the pace of development means that events
2   just relatively recently may actually be irrelevant;
3   is that -- is that fair?
4      MR. LINDSTROM:  Vague and ambiguous.
5      THE WITNESS:  Recent events can be
6   irrelevant?
7      MR. SOLOMON:  Q.  Let me give you some
8   context, because I'm not doing very well there.
9   I'll find a document.
10      A.  Okay.
11      Q.  We'll come back to it.  I'm not going to
12   waste time.  Excuse me a second.
13      Okay.  I'll show you what was previously
14   marked Exhibit 57 in your deposition, Mr. Ellison.
15   And I noticed we haven't actually got an answer to a
16   question that I asked about that document.  So if
17   you could please take a look at it.
18      MR. LINDSTROM:  So are you saying,
19   Counsel, that when you posed the question last time,
20   the transcript doesn't reflect an answer?
21      MR. SOLOMON:  Yeah.  Nothing improper.  I
22   just want to get a -- an answer to a question that I
23   posed but somehow got lost.
24      MR. LINDSTROM:  That's fine.  I just
25   wanted to understand the context.

669

1          MR. SOLOMON:  Sure.
2      Q.   Okay.  As I say, it was marked as
3   Exhibit 57 in your last session.  And I asked you,
4   at page --
5      A.   Okay.
6      Q.   I asked you if you recognized it, and your
7   answer was -- well, I'll read the question and
8   answer.  Question,
9          "And do you remember seeing it around
10   January 30th of 2000 -- excuse me --
11   February 1st of 2001?"
12          Your answer was,
13          "Again, not specifically, but I'm very
14   familiar with the issues involved."
15          Then I ask,
16          "Okay.  And one of the issues is a
17   downward revision of the Q3 forecast
18   revision; is that right?"
19          And you answer,
20          "Yeah.  We had put in a custom system,
21   OTA."
22          And then I say, question,
23          "I just want to know if that was one
24   of the issues that you remembered, downward
25   revision."

670

1          And somehow we didn't get that answered.
2   So my question is, is that one of the issues you
3   remember, downward revision?
4      A.   Do I remember because of the order -- that
5   the education order entry -- this is about our
6   education business.
7      Q.   Sure.
8      A.   And we had put a new order entry system
9   for people -- basically, a registration system for
10   taking classes.  And that was a custom -- a
11   custom-made system called OTA.  And because it was a
12   new system, they were having -- they were having
13   difficulties registering for classes, and,
14   therefore, in North America they were -- they had
15   lowered the forecast.
16      Q.   Okay.  And, again, my question was, and
17   that's -- all I want to know is yes or no:  Do you
18   remember that downward revision?
19      A.   Do I remember it specifically at the time
20   as opposed to refreshed by this --
21          MR. SOLOMON:  Yes.  Correct.
22          THE WITNESS:  I don't remember it
23   specifically.
24          MR. SOLOMON:  Q.  Okay.  But you were
25   aware of it around the time of this document; is

671

1   that right?
2          MR. LINDSTROM:  No foundation.
3   Mischaracterizes his testimony.
4          THE WITNESS:  I think in the overall
5   scheme of Oracle, the North American sales education
6   is a relatively small number.
7          MR. SOLOMON:  Q.  I'm not arguing about --
8      A.   No.  I understand that.  I understand
9   that.  All I'm saying is I'm not sure around this
10   time I was paying a lot of attention to this.
11      Q.   Okay.
12      A.   That's the only --
13          MR. SOLOMON:  Okay.  Let's go off the
14   record for a couple of minutes.
15          THE VIDEOGRAPHER:  Off the record.  The
16   time is 3:33 p.m.
17          (Whereupon, a recess was taken.)
18          THE VIDEOGRAPHER:  We are back on the
19   record.  The time is the 2:36 p.m. -- I'm sorry,
20   make that 3:36 p.m.
21          MR. SOLOMON:  We'll have marked as the
22   next exhibit excerpts from the book Softwar.
23          (Whereupon, Deposition Exhibit 152
24          was marked for identification.)
25          MR. SOLOMON:  Q.  If you go to page 226,

672

1   I'm looking at the paragraph that starts the next
2   question.  And I'll just read it into the record.
3          It reads, "The next question turns out to
4   be trickier.  The air force's Ron Orr wants to know,
5   reasonably enough, where Oracle has an example of
6   11i up and running that has stood the test of time.
7   Ellison points out that the suite has been out for
8   only a year but there are a few customers had
9   adopted the 'no-modifications' model early on out of
10   poverty.  One such is Techtronics in Oregon - five
11   years ago its business 'fell off a cliff,' so it
12   puts in global systems because that was the cheapest
13   way to go.  It's an odd example to give.  Sensing
14   it, Oracle's Mark Jarvis adds that Cisco is a
15   well-known example using Oracle financials to
16   achieve a daily 'virtual close.'  Somebody points
17   out that we didn't help Cisco from making a hash of
18   its forecasting."
19          Do you see that?
20      A.   Yes.
21      Q.   Is it true that after we filed the lawsuit
22   in March 2001, that you were unable to identify any
23   companies, other than Techtronics and Cisco here, as
24   being customers that have had 11i up and running
25   that stood the test of time?

Ellison, Lawrence  3/30/2007  12:00:00 AM

673

1 MR. LINDSTROM: Through what point in
2 time? So after the filing of the lawsuit through to
3 today?
4 MR. SOLOMON: Q. When -- when you had the
5 conversation with Mr. Symonds.
6 A. Again, it takes a good deal of time to
7 implement an ERP system.
8 Q. Yeah. But I'm just asking, is it true
9 that you could only identify, or there was only an
10 attempt to identify those two companies?
11 MR. LINDSTROM: It's vague and ambiguous
12 as to the timeframe at which you're asking him,
13 whether it's the time of the quote to Ron -- the
14 purported quote to Ron Orr or whether it was the
15 time of the statement.
16 MR. SOLOMON: Okay. The time of the
17 purported quote to Ron Orr.
18 THE WITNESS: I don't recall. You're
19 asking me at the time Ron Orr asked me the question,
20 was I able, don't I have in my memory a number of
21 companies that were running 11i that have stood the
22 test of time.
23 MR. SOLOMON: Q. Right.
24 A. And I think it was very -- since the
25 product had only been out for a short period of

674

1 time, it takes awhile to implement the product. How
2 long could it have been running to have stood the
3 test of time.
4 So the question, it was -- there weren't a
5 lot of customers -- am I interpreting that
6 correctly -- correctly, Mr. Solomon?
7 Q. Yeah.
8 A. Okay. So -- but, again, I don't know how
9 many companies at that point were running -- were
10 live on 11i.
11 Q. All right. The reason I'm asking is, of
12 course, we don't have all the tapes and transcripts
13 of the audio. So I'm sort of trying to dig in to
14 see whether you agree with some more of the
15 statements that are made in Softwar.
16 Now, you make a footnote, and I want to
17 ask you about your footnotes. How did you write --
18 what was the process by which you wrote these
19 footnotes?
20 MR. LINDSTROM: Asked and answered.
21 MR. SOLOMON: Q. Did you type them into a
22 computer?
23 A. Yes. Yes.
24 Q. Which computer?
25 A. My computer.

675

1 Q. Okay. And where is that computer now?
2 A. 2001, I have no idea.
3 Q. So it's gone?
4 A. I --
5 MR. LINDSTROM: Assumes facts. No
6 foundation. He's told you he has no idea.
7 THE WITNESS: I have no idea.
8 MR. LINDSTROM: Doesn't mean it's gone.
9 MR. SOLOMON: Q. Have you a copy of your
10 footnotes, other than the printed version in the
11 book?
12 A. Not that I know of.
13 Q. And it didn't occur to you as you were
14 writing that you ought to preserve your writings
15 because of this litigation?
16 MR. LINDSTROM: Assumes facts.
17 THE WITNESS: Did not occur to me.
18 MR. LINDSTROM: Marked as the next exhibit,
19 another excerpt from the book Softwar.
20 (Whereupon, Deposition Exhibit 153
21 was marked for identification.)
22 THE WITNESS: Are we done with this one?
23 MR. SOLOMON: Yes. Thank you.
24 THE WITNESS: Okay.
25 MR. SOLOMON: Q. If you go to page 248 --

676

1 sorry. 249. I'm looking in the -- at the fifth or
2 sixth line where it says, "It's difficult to sell
3 without customer references."
4 Do you see that?
5 A. Yes.
6 Q. Okay. So do you recall that as of
7 March 2001, Oracle had great difficulty getting
8 customers to act as references for 11i?
9 MR. LINDSTROM: As of March 2001?
10 MR. SOLOMON: Correct.
11 THE WITNESS: Can I have -- can I have a
12 second to look at this?
13 MR. SOLOMON: Sure.
14 Q. Again, without -- I don't need an
15 explanation. I just want to know if you recall
16 whether or not, as of March 2001, Oracle had great
17 difficulty getting customers to act as references
18 for 11i.
19 A. I don't recall.
20 Q. We talked a little bit last time I think
21 about the practice of not servicing clients'
22 software unless they would agree to act as
23 references.
24 Do you recall --
25 A. No --

Ellison, Lawrence  3/30/2007  12:00:00 AM

677

1      MR. LINDSTROM:  Assumes facts.
2   Mischaracterizes his testimony.
3      MR. SOLOMON:  Q.  Do you recall that
4   testimony?
5      A.  It's just not true.  We have never refused
6   to service clients unless they acted as references.
7      Q.  Okay.  And you've never seen any documents
8   then that suggested that was your practice?
9      A.  That we would refuse service unless they'd
10  act as a reference?
11     Q.  Yes.
12     A.  No.
13     MR. SOLOMON:  Okay.  Let's go off the
14  record for a while.
15     THE VIDEOGRAPHER:  Off the record.  The
16  time is 3:46 p.m.
17     (Whereupon, a recess was taken.)
18     THE VIDEOGRAPHER:  We are back on the
19  record.  The time is 4:01 p.m.
20     MR. SOLOMON:  Q.  Yes.  I've marked as the
21  next exhibit a document produced by the defendants
22  with the control numbers 1056850 and -51.
23     (Whereupon, Deposition Exhibit 154
24  was marked for identification.)
25     MR. SOLOMON:  Q.  Let me know, when you've

679

1      Q.  "Mr. McCarthy told me his company lost 2.4
2   million in cost overruns associated with excessive
3   bug fixes, poorly documented upgrade scripts and
4   scripts that didn't take into consideration
5   integration with other modules.  Mr. McCarthy also
6   mentioned his firm has had to implement costly
7   interim solutions while his business waits for the
8   upgrades to be fully tested and implemented."
9      Do you see that?
10     A.  I do.
11     Q.  And then skipping a few lines, it says,
12  "Note that InterLogix has acquired $2.3 million in
13  Oracle product, $1.3 [sic] million in Oracle
14  services in FYO1."
15     A.  "1.1 million in Oracle services."
16     Q.  Yes.
17  "They are a great Oracle customer that is
18  living through an extremely burdensome upgrade that
19  is affecting employee moral [sic] and the firm's
20  financial health."
21     Do you see that?
22     A.  I do.
23     Q.  Then the recommendation says, "Approve
24  with George's requirement that they sign an [sic]
25  release and agree to be a reference.  Dorian is

678

1   had a chance to familiarize yourself with this, if
2   you recognize this document.
3      A.  I don't.  If you'd just give me a moment.
4      Excuse me.
5      Q.  Sure.
6      A.  Okay.
7      Q.  Okay?
8      A.  Yes.
9      Q.  Do you recognize this?
10     A.  I do not.
11     Q.  Do you recognize the name InterLogix,
12  Inc.?
13     A.  I do not.
14     Q.  It says, "Approved by LJE."
15     That would be you, correct?
16     A.  Yes.
17     Q.  And I'm looking at the bottom of the page.
18  Well, first of all, excuse me.  Let's go to halfway
19  down the page where the sentence begins, "The
20  project."
21     It says, "The project has lost the
22  confidence of the InterLogix Steering Committee and
23  their CEO, Brian McCarthy."
24     Do you know Brian McCarthy?
25     A.  I don't.

680

1   involved."
2      Do you see that?
3      A.  Yes.
4      Q.  Do you see that?
5      A.  I do.
6      Q.  Dorian is Dorian Daley, who is here today?
7      A.  I believe so, yes.
8      Q.  Doesn't this represent Oracle bribing a
9   customer to be a reference?
10     MR. LINDSTROM:  Let me object to the
11  question as argumentative.  Calls for a conclusion.
12     You may respond.
13     THE WITNESS:  Bribing, no.
14     MR. LINDSTROM:  You've answered the
15  question.
16     MR. SOLOMON:  Q.  Do you think that this
17  is an appropriate business practice of only
18  approving if they agree to be a reference?
19     MR. LINDSTROM:  Mischaracterizes the
20  document.
21     THE WITNESS:  The document is -- we have
22  decided to give them a lot of free consulting.  So
23  we said -- I'm not sure -- I think it was $350,000
24  worth of free consulting.
25     MR. SOLOMON:  Q.  So --

Ellison, Lawrence  3/30/2007  12:00:00 AM

681

1      A.  And, I mean, there are a number of quid
2  pro quos.  They'd had -- they've had problems
3  implementing the 11i suite, bugs, that's at least
4  partially our responsibility.  And they've had some
5  cost overruns on their project.  And I think they
6  owed us, what, $1.1 million in consulting fees.
7      And I think we decided to lower their
8  consulting -- their consulting fees by $350,000,
9  which is kind of acknowledging that, yeah, that some
10  of the problems that they had during the
11  implementation of 11i were caused by us, and we're
12  taking that into account.
13      But we will get these problems fixed.
14  We're going to get everything fixed.  We're going to
15  make you a happy customer.  And we're going to pay
16  for the consulting.  Some of the consulting is going
17  to be on our nickel.  We're going to pay for it.
18  But we'd like you -- once you have a successful
19  implementation, we'd like you to be a reference.  I
20  think that's a legitimate quid pro quo, not a -- not
21  a bribe.
22      Q.  So -- but isn't it true you're insisting
23  that a customer that's had an unhappy experience
24  with your product acts as a reference for that
25  product if it wants the concessions?

682

1      MR. LINDSTROM:  Mischaracterizes the
2  document.  Argumentative.
3      MR. SOLOMON:  Q.  Isn't that what this is
4  all about?
5      MR. LINDSTROM:  Same objections.
6      THE WITNESS:  No.  The customer -- it is,
7  again -- it's a quid pro quo.  We are making -- we
8  are making concessions.  I mean, we are
9  definitely -- I just -- I just don't agree with your
10  use of the word "bribe."  So we -- but we are -- you
11  know, we're making concessions.
12      We have a longstanding and good
13  relationship with this customer.  They're
14  implementing one of our products.  The product had
15  bugs in it, no question.  They had problem -- you
16  know, the project took longer than they had
17  intended.  You know, they had some budget overruns.
18  We're taking responsibility for that.
19      You know, we're going to give them -- you
20  know, we're going to reduce their consulting bill.
21  And presumably, if -- you know, they're doing
22  better, if you read the entire document.  They had
23  problems with 11.5.1.  They're now on 11.5.3 and
24  things are going better.  So it's on -- we think
25  we're on our way to a success.

683

1  So that's what it says right here.  The
2  current -- the current attempt to go directly --
3  they said, "Attempt to upgrade to 11.5.1 was a
4  disaster."  Not a great word.  "But things are going
5  better with 11.5.3."  Again, I'll take that as we're
6  on our way to success with 11.5.3.
7      But the fact is there were real costs.
8  They incurred real costs with the 11.5.1 upgrade,
9  and it was partially our responsibility.  So we'll
10  pay for part of that.  We'll reduce your consulting
11  bill.
12      But if things are going well in 11.5.3 --
13  and that's what I take this to mean, things are
14  going well with 11.5.3 -- we'd like you to be a
15  reference.  So I think it's a perfectly legitimate
16  exchange.
17      Q.  Okay.  Let me read this into the record.
18      "The current attempt to go directly from
19  10.7 to 11.5.3 is going better," and this is what
20  you didn't read into the record, "but is slow and is
21  met with extreme difficulties as well.  They have
22  missed several different go-live dates, forcing them
23  to entrench and spend significantly more money each
24  time our consulting services add internal costs."
25  And it goes on to say, "The project has lost the

684

1  confidence."
2      How can you -- how can you spin that as
3  good news?
4      MR. LINDSTROM:  Argumentative.  Vague and
5  ambiguous.
6      THE WITNESS:  It is a significant
7  improvement from 11.5.1, and they say it's going
8  better.  The implementation is going slowly, and
9  they're having difficulties.
10      MR. SOLOMON:  Q.  Extreme difficulties.
11      MR. LINDSTROM:  Argumentative.
12      THE WITNESS:  Again, my take is that
13  things are going better.  And if they're agreeable
14  to be -- and I don't think they would agree to be a
15  reference if they weren't on their way to a success.
16  How can you be a reference?  What can you say as a
17  reference if you can't say you had a good -- you
18  know, that it's up and running.
19      MR. SOLOMON:  Q.  Well, it looks like
20  there's some mutual back scratching being suggested
21  which doesn't lead to any accurate portrayal of the
22  product.
23      MR. LINDSTROM:  Argumentative.
24  Mischaracterizes the document.  Assumes facts.
25  Vague and ambiguous.

Ellison, Lawrence 3/30/2007 12:00:00 AM

685

1      MR. SOLOMON: Let the jury decide.
2      MR. LINDSTROM: Why don't you pose another
3  question.
4      MR. SOLOMON: I will in a second.
5      Q.  Okay.  Now, when you first got the call
6  from Mr. Symonds in November 2006, did you tell
7  anyone -- I'm not asking who -- did you tell anyone
8  that you'd received that call?
9      THE WITNESS: I don't think so.
10     MR. SOLOMON: Q.  Okay.  And when you had
11  your next call with him, whenever that was, did you
12  tell anyone?
13     MR. LINDSTROM: This is -- let me make
14  sure -- I want to make sure that you don't --
15     MR. SOLOMON: I'm not asking who; I'm just
16  asking if he told anyone.  Your concern may become
17  ripe down the road, but it's not ripe right now.
18     MR. LINDSTROM: I agree, as framed.
19     You may respond.
20     THE WITNESS: I don't recall.
21     MR. SOLOMON: Q.  Okay.  What about the
22  third call; did you tell anyone about the third
23  call?
24     A.  I don't recall telling anybody, no.
25     Q.  What about the fourth call?

686

1     A.  I don't know.
2     Q.  What about the fifth call?
3     A.  I'm not sure which call we're on now.
4     Q.  I think in February.
5     A.  The first time I vividly remember telling
6  somebody about a call with Matthew Symonds was when
7  he told me that he had not, in fact, taken the
8  computer to a computer store to have it fixed.
9     Q.  Okay.
10     A.  When he changed his story as to what had
11  happened.
12     Q.  Okay.
13     A.  I may have told someone before that, but I
14  don't remember.
15     Q.  Why didn't you tell anyone?
16     MR. LINDSTROM: Wait.  Why didn't he tell
17  anyone --
18     MR. SOLOMON: Q.  That you were having
19  calls with Mr. Symonds prior to him saying that the
20  computer had a virus or whatever.  Sorry, prior to
21  him changing his story.
22     MR. LINDSTROM: It mischaracterizes his
23  testimony.  Assumes facts.
24     THE WITNESS: Mr. -- I believe my lawyers
25  were in continuous contact with Mr. Symonds during

687

1  this entire process.
2     MR. SOLOMON: Q.  Right.  But why didn't
3  you tell anyone that you were in contact with
4  Mr. Symonds?
5     MR. LINDSTROM: Assumes facts.  I mean,
6  he's told you he doesn't remember whether he told
7  anybody, other than the one vivid conversation that
8  stands out in his mind.  You've translated --
9     MR. SOLOMON: Let's -- this is very
10  important.  So let's be very careful now.  We'll go
11  back over it all again.
12     Q.  The first call, you never told anyone?
13     A.  Not -- the first call, not that I recall.
14     Q.  Okay.
15     A.  I don't know if I told anybody or not.
16     Q.  Okay.  So you may have been telling
17  people, but you just don't remember?
18     A.  I don't recall -- I don't -- I don't think
19  I did, but I may have.
20     Q.  Okay.  Do you know your lawyers have
21  represented to the court that you weren't involved
22  in this at all; you weren't in contact with
23  Mr. Symonds?  Do you know that's a representation
24  that's been made to the court?
25     MR. LINDSTROM: All right.  Assumes facts.

688

1  Argumentative.  No foundation.
2     You may respond based on your independent
3  knowledge, if you have any.
4     THE WITNESS: I have no independent
5  knowledge of that.
6     MR. SOLOMON: Q.  Does it concern you?
7     MR. LINDSTROM: Assumes facts.
8     MR. SOLOMON: Would it concern you if
9  your lawyers are making representations to the court
10  that are flat false?
11     MR. LINDSTROM: Assumes facts.  It's
12  argumentative.  Mischaracterizes the record.
13     THE WITNESS: I have no opinion.
14     MR. SOLOMON: Q.  What telephone number --
15  when you made calls to Mr. Symonds, what telephone
16  number did you use?
17     MR. LINDSTROM: Are you talking about the
18  number that he called to reach Mr. Symonds?
19     MR. SOLOMON: Correct.
20     THE WITNESS: I think -- I think
21  virtually -- my assistants connected me with
22  Mr. Symonds, so I didn't call him directly.
23     MR. SOLOMON: Q.  Ms. Balkenhol?
24     A.  No.
25     Q.  Who?

Ellison, Lawrence  3/30/2007  12:00:00 AM

689

1     A.  I have two assistants, Andrea Nordman and
2  Joyce Hagashi.
3     Q.  And which one of those was contacting or
4  calling -- placing the calls to Mr. Symonds?
5     MR. LINDSTROM:  Compound.  Vague and
6  ambiguous as to time.
7     THE WITNESS:  Probably both.
8     MR. SOLOMON:  Q.  Did they speak to
9  Mr. Symonds at all?
10     MR. LINDSTROM:  No foundation.
11     THE WITNESS:  Yes.
12     MR. SOLOMON:  Q.  And do you know the
13  content of conversations they had with Mr. Symonds?
14     A.  I do not.  I think they just said,
15  Mr. Symonds called them and -- oh, I'm guessing.
16     MR. LINDSTROM:  He doesn't -- you've
17  answered the question.  You don't know the content.
18     MR. SOLOMON:  Q.  So your assistants told
19  you that Mr. Symonds had called them and spoken to
20  them?
21     A.  My assistants told me that Mr. Symonds had
22  called and -- and wanted me to call him back.
23     Q.  Do your assistants know anything about the
24  stories that he supposedly has told about the
25  computer and the materials?

690

1     A.  I don't --
2     MR. LINDSTROM:  No foundation.
3     THE WITNESS:  Doubt it.
4     MR. SOLOMON:  Q.  And in the calls that
5  you've had with Mr. Symonds, have they taken
6  place -- have you been at both the office and at
7  your home when you've had conversations?
8     MR. LINDSTROM:  Vague as to time.
9  Compound.
10     MR. SOLOMON:  Q.  I'm talking about the
11  calls from November to date, 2006 to date.
12     A.  I think -- I think I was at home for most
13  of them.  I think there was one in the car.  There
14  might have been a couple in the car.  I'm not -- I'm
15  not entirely certain.
16     Q.  When was the last time you saw
17  Mr. Symonds, physically?
18     A.  I don't recall.
19     Q.  Have you seen him since October of last
20  year?
21     A.  Since October?  I don't think so.
22     Q.  Where -- where was the last time you
23  saw -- saw him?  Here, or in England, or somewhere
24  else?
25     A.  I think in London.

691

1     Q.  Okay.  And when were you last in London?
2     MR. LINDSTROM:  Well, are you asking him
3  when he was in London --
4     MR. SOLOMON:  Just asking when he was last
5  in London.
6     THE WITNESS:  The answer is I'm not sure
7  the last time I saw Mr. Symonds.  But -- and I'm
8  guessing that it was in London.
9     MR. SOLOMON:  Q.  When were you last in
10  London?
11     A.  Eighteen months -- again, these are all
12  kind of wild guesses.  18 months ago, two years ago.
13     Q.  So your testimony is it would be probably
14  18 months to two years ago that you last saw
15  Mr. Symonds?
16     A.  Again, I'm not sure of this, but yes.  I
17  haven't seen him for a long time.
18     MR. SOLOMON:  I'll have marked as the next
19  exhibit a document produced in this litigation with
20  the control numbers 1053564 to 1053577.
21     (Whereupon, Deposition Exhibit 155
22     was marked for identification.)
23     MR. SOLOMON:  Q.  And just let me know if
24  you recognize this document.
25     And for the record, it's called, "Softwar,

692

1  The Rewards of Recklessness, A Portrait of Larry
2  Ellison and Oracle Corporation at War."
3     A.  I've never seen it before.
4     Q.  No.
5     Have you ever spoken to Mr. Symonds about
6  it?
7     A.  No --
8     MR. LINDSTROM:  About Exhibit 155?
9     MR. SOLOMON:  Correct.
10     THE WITNESS:  No.
11     MR. SOLOMON:  Okay.  Going to page 12.
12     MR. LINDSTROM:  What's the Bates stamp
13  number?
14     MR. SOLOMON:  1053575.  The heading is,
15  "The Collaboration."
16     Q.  And I just want to ask you a few questions
17  about some of the contents.  To start with, it says
18  at the beginning, "I have known Ellison for over
19  three years, since becoming Technology and
20  Communications editor of The Economist."
21     Is that true, that he's known you three
22  years, as of the beginning of 2001?
23     A.  I believe so.
24     Q.  And then the next paragraph starts off
25  saying, "During the writing of the book, I will

Ellison, Lawrence  3/30/2007  12:00:00 AM

693

1    spend at least ten days each month with Ellison and
2    record up to 200 hours of one-to-one interviews."
3           Do you know whether Mr. Symonds spent
4    around ten days each month with you?
5       A.  I don't think so.
6       Q.  It was less?
7       A.  Yes.  Much less.
8       Q.  Says, "I will have office space at Oracle
9    on the same floor as Ellison and will sit in on
10   every kind of business meeting."
11          Did that happen?
12          MR. LINDSTROM:  Compound.
13          MR. SOLOMON:  Q.  Did he share an office
14   on your floor?
15          MR. LINDSTROM:  Mischaracterizes the --
16          THE WITNESS:  Share an office?  He
17   certainly didn't share an office.
18          MR. SOLOMON:  Q.  I didn't mean share with
19   you.  Did he have office space on your floor?
20      A.  I don't know.  I don't think so.
21      Q.  Did he attend business meetings with you?
22      A.  Some -- some meetings, yes.
23      Q.  And he traveled with you?
24      A.  A few times.
25      Q.  It goes on a few lines down, "Wherever

694

1    possible and appropriate, Ellison will help me gain
2    the access I require."
3           Did you help Mr. Symonds gain access, as
4    he states here?
5           MR. LINDSTROM:  In the context he states
6    it?
7           MR. SOLOMON:  Yes.
8           THE WITNESS:  Access to whom?  Or to what?
9    Tell me -- maybe I should just find out.  Where are
10   you reading?
11          MR. SOLOMON:  Q.  It says, "I will
12   seek" -- just over halfway down that second
13   paragraph.  "I will seek meetings with others who
14   may take a different and less positive view, such as
15   business rivals and colleagues whom Ellison fired.
16   Wherever possible and appropriate, Ellison will help
17   me gain the access I require."
18      A.  Okay.
19          MR. LINDSTROM:  What's the question?
20          MR. SOLOMON:  Q.  The question is, did you
21   assist Mr. Symonds with gaining access where he
22   desired it?
23      A.  A few times, yes.
24      Q.  "And Ellison will make available" --
25   excuse me -- "personal documents and photographs as

695

1    well as previously confidential company memoranda
2    and e-mail."
3           Do you see that?
4       A.  I do.
5       Q.  Did you do that?
6       A.  I certainly made available photographs.
7    In terms of personal documents, I can't think of
8    any.
9       Q.  Okay.
10      A.  And company confidential memoranda and
11   e-mail?  Absolutely not.
12      Q.  Okay.  Is there any reason why documents
13   dated 2000/2001 concerning Oracle's business remain
14   confidential today?
15          MR. LINDSTROM:  Objection.  Compound.
16   Calls for speculation.
17          THE WITNESS:  General -- yeah.  I think a
18   lot of -- pertaining to our business?  What aspect
19   of our business?  If one of our businesses would be
20   the health records of one of our employees, that
21   would certainly remain -- that's our business.  That
22   would certainly remain confidential.
23          MR. SOLOMON:  Q.  Sure.
24      A.  That would certainly remain confidential.
25   I mean, it's a very --

696

1       Q.  What if it's --
2       A.  It's a very broad, hypothetical question.
3       Q.  What if it's an e-mail describing the
4    status of an 11i implementation in 2000?  Why would
5    that be confidential now?
6           MR. LINDSTROM:  Calls for speculation.
7    It's hypothetical.
8           THE WITNESS:  I mean, you'd have to tell
9    me more.  What was in the e-mail?  Who it was from?
10   What it revealed, confidential information about a
11   customer?  There are certain -- certain of our
12   customers, we can't even say who they are.  So, I
13   mean, it's a complicated question.
14          MR. SOLOMON:  Q.  Okay.  Let's think of
15   another category of documents.  What about e-mails
16   concerning your trading and plans to trade in that
17   timeframe; why would they be confidential now?
18          MR. LINDSTROM:  Assumes facts.  Calls for
19   speculation.  Compound.
20          THE WITNESS:  I don't think they would be.
21          MR. SOLOMON:  Q.  Okay.  Do you know why
22   your lawyers have stamped such documents
23   confidential?
24          MR. LINDSTROM:  Assumes facts.  No
25   foundation.

Ellison, Lawrence  3/30/2007  12:00:00 AM

697

```
1        THE WITNESS:  No idea.
2        MR. SOLOMON:  Q.  Your lawyers took the
3   position with respect to the Softwar materials we've
4   been discussing that they are irrelevant to this
5   litigation.
6        Do you have any idea why?
7        MR. LINDSTROM:  No foundation.
8   Mischaracterizes the record.
9        And you can answer if you've got an
10  independent basis for knowing what your lawyers did
11  or did not do.
12       THE WITNESS:  No independent knowledge.
13       MR. SOLOMON:  Q.  And is it your testimony
14  that you didn't know until you saw this document
15  today that Mr. Symonds had drafted an article
16  entitled, "The Rewards of Recklessness"?
17       A.  I did not know.
18       Q.  Did you know that in November of 2000,
19  Jeff Henley was extremely angry about the fact that
20  Oracle's stock price had declined?
21       MR. LINDSTROM:  Objection.  Assumes facts.
22  Also calls for a conclusion as vague and ambiguous
23  as to "extremely angry."
24       THE WITNESS:  That's what I was going to
25  say.  I'm not sure what you mean by "extremely
```

698

```
1   angry."  No one was happy about the stock market
2   collapsing.
3        MR. SOLOMON:  Okay.  Let's have marked as
4   the next exhibit a magazine --
5        THE WITNESS:  I'm sorry, are we done with
6   this one?
7        MR. SOLOMON:  Q.  Yes, we are for the
8   moment.
9        -- a magazine -- Fortune magazine article
10  dated November 13th, 2000.
11       (Whereupon, Deposition Exhibit 156
12       was marked for identification.)
13       MR. SOLOMON:  Q.  And if you go to -- by
14  the way, have you ever read this article, do you
15  know?
16       MR. LINDSTROM:  Why don't you give him a
17  minute to look at it.
18       THE WITNESS:  The answer is, I think I
19  have.
20       MR. SOLOMON:  Q.  Okay.  And I'm going to
21  be focusing on some language on page 6.
22       I'll read it into the record.  "It's an
23  early October morning at the Emerald City and Jeff
24  Henley is sputtering mad."
25       Do you see that?
```

699

```
1        A.  Yes.
2        MR. LINDSTROM:  The question is "Do you
3   see that?"
4        THE WITNESS:  Yes, I do see it.
5        MR. SOLOMON:  Q.  So when I say "extremely
6   angry," I mean sputtering mad.
7        Did you know he was sputtering mad at the
8   time?
9        MR. LINDSTROM:  Assumes facts.
10       THE WITNESS:  Can I have a moment to just
11  read this?  I don't remember this part of the
12  article, so ...
13       Okay.
14       MR. SOLOMON:  Q.  Okay.  Does that refresh
15  your recollection as to whether or not you remember
16  Jeff Henley being sputtering mad?
17       A.  Partially.  Again, I don't remember this
18  specific incident.  I know, in general, Jeff was not
19  completely convinced that the stock market analysts
20  understood everything he said.  So I think it's
21  common frustration CFOs have with stock market
22  analysts.
23       Q.  Okay.  Did you know that Mr. Henley was
24  planning, at some stage at least before he sold his
25  stock in January, $30 million worth of stock --
```

700

```
1        Wait a second.
2        -- did you know that he was planning on
3   selling some stock at the time he was sputtering mad
4   about this stock price decline?
5        MR. LINDSTROM:  Assumes facts.
6   Mischaracterizes his testimony.
7        THE WITNESS:  No.
8        MR. SOLOMON:  Q.  And you and he, in
9   January, neither of you knew the other was trading;
10  is that right?
11       MR. LINDSTROM:  Objection.  No foundation,
12  other than as to this witness.
13       THE WITNESS:  I didn't know he was
14  trading.
15       MR. SOLOMON:  Q.  Okay.  Were you aware of
16  the details in January of 2001 of Oracle's stock
17  repurchase program?
18       MR. LINDSTROM:  Vague and ambiguous as to
19  "details."
20       THE WITNESS:  I mean, I knew we had a
21  stock repurchase program, but you mean the exact
22  timing --
23       MR. SOLOMON:  Q.  Yes.  Correct.
24       A.  The timing of it?
25       No.  I didn't know what the exact timing
```

701

1　was. Actually, I don't know if I didn't know. I
2　don't remember.
3　　　Q.　Okay. Do you know if any stock
4　repurchases were timed in order to coincide with the
5　dates you were selling stock?
6　　　A.　They certainly weren't intentionally
7　timed, you know. I mean, I knew I was selling
8　stocks we were going to buy back at the same time.
9　Kind of a single decision, I'm going to sell? No,
10　that did not happen.
11　　　Q.　Okay. If I told you that the repurchases
12　in January 2001 clustered around your stock sales
13　were statistically unlikely to have happened but for
14　coordination, would you be surprised?
15　　　MR. LINDSTROM: No -- no foundation.
16　Assumes facts. Vague and ambiguous.
17　　　THE WITNESS: I have no idea what -- what
18　we were -- what -- if we were --
19　　　MR. LINDSTROM: The question is whether
20　you would be surprised.
21　　　THE WITNESS: I don't know.
22　　　MR. SOLOMON: Q.　For example, if it was
23　like a one in a hundred chance that the sales would
24　be timed around your transactions, would that be --
25　would that surprise you?

702

1　　　MR. LINDSTROM: Assumes facts.
2　　　THE WITNESS: Without getting cute,
3　it's -- you know, it's very unlikely -- almost --
4　statistics are interesting.
5　　　MR. SOLOMON: Q.　I understand that.
6　　　A.　So it depends how you calculate it.
7　　　Q.　Okay. So you can't really answer --
8　　　A.　No.
9　　　Q.　-- with just that information?
10　　　A.　No.
11　　　Q.　Or one in 500, still couldn't answer?
12　　　MR. LINDSTROM: Yeah.
13　　　THE WITNESS: Yeah, no.
14　　　MR. SOLOMON: Q.　One in a thousand?
15　　　A.　What were the odds of my son being 6'2"
16　and my daughter being 5'9"? The odds are very, very
17　unlikely, but they are.
18　　　Q.　Okay. So really what you're saying is it
19　really is up to an expert to determine that; is that
20　right?
21　　　MR. LINDSTROM: Objection.
22　Mischaracterizes his testimony.
23　　　THE WITNESS: No. I'm just saying there's
24　lots of different ways to calculate likelihoods.
25　Plus, I'd like to add, I had no authority to

703

1　initiate buybacks on my own anyway. I had to go
2　through a board process to do it.
3　　　MR. SOLOMON: Q.　That's a useful -- a
4　useful comment.
5　　　What was the process and who was involved?
6　First of all, who was involved?
7　　　A.　Well, a purchase like that is, you know,
8　it requires -- it's a lot of money. It exceeds my
9　authority. I don't have the authority to purchase
10　it. I believe it requires the approval -- I'm not
11　sure. We're back at a different time. So I believe
12　it requires at least the approval of the executive
13　committee of the board of directors, the audit
14　committee of the board of directors, or the full
15　board, one of the three, or multiples thereof.
16　　　MR. SOLOMON: Let's have marked as the
17　next exhibit a document produced in this litigation
18　with the control numbers 1914926 through -934.
19　　　(Whereupon, Deposition Exhibit 157
20　　　was marked for identification.)
21　　　THE WITNESS: Thank you.
22　　　MR. SOLOMON: And while you're looking for
23　it, for the record, this is dated Thursday,
24　March 29th, 2001. And there are some e-mail
25　exchanges among Dan Cooperman, Dorian Daley, Lauren

704

1　Segal concerning LGE option exercise. The first two
2　pages have a redacted stamp. The third page seems
3　to have information concerning Dan Cooperman, and
4　the fourth page. The fifth page is an e-mail from a
5　Deb Lange to Jeff Henley. And the remainder of the
6　exhibit appear to have information concerning --
7　containing information concerning Deborah Lange.
8　　　Have you seen any of this before?
9　　　MR. LINDSTROM: Well, when you say "any of
10　this," are you referring specifically to the Deb
11　Lange, Jeff Henley e-mail or literally any --
12　　　MR. SOLOMON: It's okay. I'll break it
13　down.
14　　　Q.　First page, have you seen this first page
15　before?
16　　　A.　I don't know.
17　　　Q.　Sorry?
18　　　A.　I'm sorry, I don't know. I don't know if
19　I've seen it before. I've heard of the topic that's
20　discussed.
21　　　Q.　Okay. Now, on the first page it says
22　"Redacted."
23　　　Do you know why it says "Redacted"?
24　　　A.　It means stuff has been removed.
25　　　Q.　Do you know what's been removed?

Ellison, Lawrence  3/30/2007  12:00:00 AM

705

1      A.  I have no idea.
2      Q.  And same with the second page.  If you
3  look at the first page, it says 18:40 in terms of
4  the time.
5          Do you see that?
6      A.  I do.
7      Q.  Then the second page says 17:27, and then
8  it says "redacted" again.
9          Again, you don't know what's been
10  redacted; is that right?
11     A.  I do not.
12     Q.  And then if you go to the Deb Lange
13  e-mail, have you seen that before?
14     A.  I may have.  I'm not sure.
15         MR. SOLOMON:  Okay.  Okay.  We're going to
16  change tapes in a minute, so let's go off the record
17  to allow that to happen.
18         THE VIDEOGRAPHER:  I'm sorry.  We are
19  going off the record.  The time is 4:39 p.m.  Here
20  marks the end of Videotape No. 2, Volume 3, in the
21  deposition of Lawrence Ellison.
22         (Whereupon, a recess was taken.)
23         THE VIDEOGRAPHER:  We are back on the
24  record.  The time is 4:48 p.m.  Here marks the
25  beginning of Videotape No. 3, Volume 3, in the

706

1  deposition of Lawrence Ellison.
2          MR. SOLOMON:  Q.  You testified earlier,
3  Mr. Ellison, that it would make no sense, or you
4  didn't know why you would want as a reference a
5  customer that wasn't happy.
6          Do you recall that?
7          MR. LINDSTROM:  Mischaracterizes his
8  testimony.
9          THE WITNESS:  No.  What I said was if
10  someone called on the phone, a customer that wasn't
11  happy, who said we'll be a reference, that would be
12  a negative reference.
13         MR. SOLOMON:  Q.  Right.
14     A.  So if you call someone on the phone, you
15  want them to be a reasonably happy customer.  So I
16  said, it made no sense for someone who is unhappy
17  to -- you know.
18     Q.  So why did you insist then on citing GE as
19  a reference when they were unhappy and told you not
20  to do that?
21         MR. LINDSTROM:  Assumes facts.
22  Mischaracterizes his prior testimony.
23         THE WITNESS:  I don't think I did that.
24         MR. SOLOMON:  Q.  Okay.
25     A.  And I don't think -- give me -- first of

707

1  all, GE is a huge company.  There are a lot of
2  people in GE.  I want to know who was unhappy and
3  who told me not to do it.
4      Q.  And is it your testimony that you don't
5  remember being told not to do it but going ahead and
6  doing it anyway?
7          MR. LINDSTROM:  Mischaracterizes -- this
8  is all asked and answered and previously gone over.
9          THE WITNESS:  I think G -- again, I'm
10  doing this from memory.  But I was the GE corporate
11  sponsor.  There certainly were people -- I think GE
12  had a policy -- well, want me to just launch into
13  this?
14         MR. LINDSTROM:  No.  No.  Why don't we go
15  by question and answer.
16         MR. SOLOMON:  Q.  It's okay.  I think we
17  actually did cover that fairly well last time, but I
18  just wanted to see if you were going to give the
19  same testimony you gave last time.
20         What about HostCentric; were they a
21  reference that were unhappy, HostCentric?
22     A.  HostCentric, I don't know who they are.
23     Q.  Now, if you go back to the exhibit in
24  front of you, The Rewards of Recklessness, if you go
25  to page 1053566.

708

1      A.  -566.  Okay.
2      Q.  Okay.  It says -- it says in part,
3  "Ellison says he's only happy when everyone else
4  thinks he's wrong when he's," in quotes, "'walking
5  way out to the end of the limb and then jumping up
6  and down.'"
7      A.  Yes.
8      Q.  Is that true -- is that an accurate
9  statement of yours -- excuse me.  Is that -- did you
10  say that to Mr. Symonds?
11     A.  I have to explain what I meant -- mean by
12  that.
13     Q.  I don't want an explanation.  I don't have
14  much time.  I want to know, did you say that?
15         MR. LINDSTROM:  The exact words in the
16  sentence that counsel read into the record?
17         THE WITNESS:  I'm not sure.  But something
18  like -- something like that, sure.
19         MR. SOLOMON:  Q.  Okay.  And then the
20  second quote in that paragraph that's attributed to
21  you, "Without reckless" -- "Without recklessness,
22  you can't innovate.  The rewards of recklessness are
23  enormous."
24         Did you say that?
25     A.  I'm not sure I used the word

Ellison, Lawrence  3/30/2007  12:00:00 AM

709

1  "recklessness." I think I've said that
2  innovation -- what is innovation?  Innovation is
3  when other people say -- when you're the first
4  person to figure something out.  So everyone
5  believes the world is flat, and you believe it's
6  round.  So everyone thinks you're wrong and you
7  think you're right, and you turn out to be right.
8      And all great discoveries, all great
9  innovation is actually done by people who believe
10  that conventional wisdom is wrong.  The world isn't
11  flat, it's round.
12      That's what I mean by all of this.  And
13  you have to be -- I'll use the word "reckless,"
14  "brave," whatever you want to use.  If everyone is
15  saying, "The world is flat," and you're saying, "No,
16  it's round," you're going to be ridiculed and have
17  to deal with that.  You have to have a personality
18  that's willing to deal with that.
19      MR. SOLOMON:  Okay.  Let's have marked as
20  the next exhibit another excerpt from Softwar.
21      (Whereupon, Deposition Exhibit 158
22      was marked for identification.)
23      MR. LINDSTROM:  Is this 158?
24      THE REPORTER:  Yes.
25      MR. LINDSTROM:  Thank you.

710

1      MR. SOLOMON:  Q.  So then I'd like you to
2  just look at the bottom of page 142 and the top of
3  page 143 where it says, "Everything they were
4  reading said that Microsoft and client/server would
5  go on forever.  I got the same looks that Galileo
6  got when he told people the earth revolved around
7  the sun.  Sure.  Whatever you say, boss."
8      Right?  See that?
9  A.  No, I don't actually.
10  Q.  The bottom of 142.
11  A.  Can I have a second?
12  Q.  Sure.
13  A.  Thanks.
14      Okay.
15  Q.  Okay.
16  A.  Yeah.  Got the context.
17  Q.  Did you say that?  And when I say "that,"
18  did you say, "Everything they were reading said that
19  Microsoft and client/server would go on forever.  I
20  got the same looks Galileo got when he told people
21  the earth revolved around the sun.  Sure.  Whatever
22  you say, boss."
23  A.  Did I say this?
24  Q.  Yes.
25  A.  In this context of me killing a

711

1  client/server project?
2  Q.  Right.
3  A.  I was in the process of saying we're not
4  going to do any more client/server.  We're killing
5  an existing project.  And people were very mad at me
6  for killing the project, because they thought that
7  client/server would go on forever, and they were
8  wrong.
9  Q.  And you've likened yourself to Galileo on
10  more than one occasion; is that right?
11  A.  No.  No.  In terms of likened myself to
12  Galileo, no.  Galileo is one of the great scientists
13  in history.  I'm saying that all -- every time you
14  have an innovative idea, even a small one, I
15  innovated -- his idea was planetary; mine was a
16  little tiny piece of software.  But every time you
17  challenge conventional wisdom, and you're the
18  first -- and you're in a group of people that
19  believe one thing is true, and you say, "No, I think
20  you're all wrong.  I think this is what's" -- "I
21  think this is true," you find yourself in this very
22  funny situation where you're challenging
23  conventional wisdom and it just makes people --
24  sometimes it makes people angry.
25  Q.  Okay.

712

1  A.  So I was using Galileo as that on a grand
2  scale and me on a very, very small scale, or anyone
3  who does any kind of innovation, or innovative
4  thinking.
5  Q.  Have you ever heard of Icarus?
6  A.  Of course.
7  Q.  Have you ever likened yourself to Icarus?
8  A.  No.
9  Q.  Don't you think that's more appropriate in
10  the context of this litigation?
11      MR. LINDSTROM:  Objection.  Argumentative.
12      MR. SOLOMON:  I've marked as the next
13  exhibit more transcripts of interviews with --
14  another transcript of an interview with Mr. Symonds.
15  And the control numbers are 1529262 through -282.
16      (Whereupon, Deposition Exhibit 159
17      was marked for identification.)
18      THE WITNESS:  Excuse me.
19      MR. SOLOMON:  Q.  And if you turn to page
20  1529276.
21  A.  Okay.
22  Q.  And looking at the top of the page where
23  it says, "Early this year there were a lot of people
24  coming up with this kind of" --
25  A.  Slow down.  -9276?

713

1    Q.  Yes.

2    A.  "Early this year."

3    Q.  Yes.

4    MR. LINDSTROM:  It's at the top of the

5 page.

6    THE WITNESS:  Got it.  Got it.

7    MR. SOLOMON:  Q.  "Early this year there

8 were a lot of people coming up with this kind of

9 accusation if you like that the claim of saving

10 $1 billion through using the E-Business Suite was

11 kind of nonsense, that it was mainly about kind of

12 old fashioned process, re-engineering and old

13 fashioned cost production measures."  I know what

14 the response to that is, but I'd just like to get it

15 on the record from you."

16    Do you see that?

17    A.  Yes.

18    Q.  And isn't it true that in 2001, you cited

19 a Harvard publication saying that that provided

20 support for your claim that the E-Business Suite had

21 saved $1 billion?

22    MR. LINDSTROM:  What point in time?

23    MR. SOLOMON:  In 2001.

24    THE WITNESS:  First of all, I'm not sure I

25 ever claimed the E-Business Suite saved $1 billion.

714

1 I said, using our technology, a combination of the

2 Internet, our applications, a variety of things.

3 But it wasn't just the E-Business Suite.  By using

4 modern Internet technology, including our E-Business

5 Suite, including our applications, we were able to

6 reengineer our business and save a billion dollars.

7    MR. SOLOMON:  Q.  Okay.  And to the extent

8 people thought that you were saying that Oracle had

9 saved $1 billion via the utilization of the

10 E-Business Suite, they were misunderstanding you; is

11 that right?

12    A.  I don't know if they were -- I don't think

13 I ever said that.

14    Q.  I said, to the extent people thought you

15 were saying that.

16    MR. LINDSTROM:  Assumes facts.

17    THE WITNESS:  Yes.

18    MR. SOLOMON:  Q.  And Ray Lane, in fact,

19 has said that your claim was untrue in that respect;

20 is that right?

21    MR. LINDSTROM:  Assumes facts.

22 Mischaracterizes the --

23    THE WITNESS:  Absolutely.  Yes.

24    MR. LINDSTROM:  -- the record.

25    MR. SOLOMON:  Q.  And you presumably think

715

1 that Mr. Lane is lying when he says that?

2    A.  No, not that he's lying.  I just think

3 that his judgement is wrong.  I think he said

4 that -- I think he said a little bit what Matthew

5 framed it, it had -- old fashioned reengineering and

6 cost cutting.

7    And if that were true -- I'll stick with

8 my answer -- why didn't we -- why didn't we save

9 that billion dollars five years ago.  It was as

10 simple as just doing some -- just good management,

11 good management, we should have saved a billion a

12 long time ago.

13    I think it was really was modern -- it was

14 modern technology.  We were able to put our

15 support -- just an example, we were able to put our

16 support center in India.  Prior to the Int- -- prior

17 to the Internet, we couldn't offshore some of our

18 human resources.  We could do programming in India.

19 You need to rethink your entire business in view of

20 modern global technology.

21    Q.  Have you ever heard Safra Catz lie, tell a

22 lie?

23    A.  Not that I know of.

24    Q.  Were you friends with Ms. Catz before she

25 became an employee of Oracle?

716

1    A.  Yes.  Yes.  She was on the --

2    MR. LINDSTROM:  You've answered the

3 question.

4    MR. SOLOMON:  Q.  Tell me the background

5 of the friendship.

6    A.  She was on the team of people from -- on

7 Donaldson, Lufkin & Jenrette that took us public.

8    Q.  Your relationship with him has been purely

9 professional?

10    MR. LINDSTROM:  Him?

11    MR. SOLOMON:  With her.  I'm sorry if I

12 said "him."

13    THE WITNESS:  No.  We were -- we were

14 friends.

15    MR. SOLOMON:  Q.  Platonic?

16    A.  Platonic.

17    Q.  Was she involved in the stock repurchase

18 program in January 2001?

19    MR. LINDSTROM:  No foundation.

20    THE WITNESS:  Trying to say -- was she on

21 the board then?

22    MR. LINDSTROM:  The question is

23 whether she was involved.

24    THE WITNESS:  I'm sorry, I just don't

25 remember it.  I think everyone on the board was --

Ellison, Lawrence  3/30/2007  12:00:00 AM

717

1  you know, in a sense was involved.  But, you know --
2  Jeff Henley was our CFO.  I'm not sure when Safra
3  joined the board.
4      MR. SOLOMON:  Q.  Okay.  Did you know that
5  she had planned a stock sale in January 2001 but
6  then changed her mind?
7      A.  No.
8      MR. LINDSTROM:  Vague as to time.  Did he
9  know when?
10     MR. SOLOMON:  Q.  Is the first time you
11  heard that today?
12     A.  Yes.
13     Q.  Did you and Ms. Catz discuss with each
14  other a litigation update you received six weeks to
15  two months ago?
16     MR. LINDSTROM:  Vague and ambiguous.
17     THE WITNESS:  By "litigation update," you
18  mean -- I think the legal department prepares an
19  e-mail -- actually, the answer is I don't think so.
20     MR. SOLOMON:  Q.  Did you have a
21  discussion with Ms. Catz wherein you decided to ask
22  for a litigation update?
23     MR. LINDSTROM:  This is pertaining to this
24  litigation?
25     MR. SOLOMON:  Correct.

718

1      MR. LINDSTROM:  What timeframe?
2      THE WITNESS:  I don't think so.
3      MR. SOLOMON:  Q.  Within the last two
4  months.
5      A.  Not that I recall.
6      MR. SOLOMON:  Okay.  Let's have marked as
7  the next exhibit another interview transcript.  This
8  bears the date April 18th, 2002.
9      (Whereupon, Deposition Exhibit 160
10     was marked for identification.)
11     MR. SOLOMON:  And the control numbers are
12  1529215 through 1529233.
13     Q.  And if you could turn, Mr. Ellison, to
14  1529225.
15     A.  -225.
16     Q.  Looking at the top of the page on the
17  language, "I think the ERP stuff is in really good
18  shape.  We kind of survey our customers.  We tend to
19  focus on the customers who are having problems.  We
20  find almost wherever Oracle consulting ... one of
21  the reasons we advertise server so much in this last
22  meeting is wherever consulting has been involved, we
23  tended not to have problems.  So we have a terrible
24  irony of some of the most complicated
25  implementations, GE Power or Poscoe, where we are

719

1  just all sweating bullets," in brackets,
2  "[Nagilient] worrying" -- sorry -- "[Nagilient] and
3  worrying, and it is going very smoothly and that's a
4  company we've never heard of is blowing up."
5      Do you see that language?
6      A.  Yes, I do.
7      Q.  Where you reference sweating bullets, why
8  were you sweating bullets?
9      A.  Okay.  I believe what this is saying is
10  that the GE power and the Poscoe implementations
11  were very, very complex, but actually went very
12  well.  By sweating bullets, people were working very
13  hard.  Poscoe is a steel company.  They were, at the
14  time, the largest steel company in the world.
15  They're located in Korea.  And literally, they were
16  doing a big bang switchover to the E-Business Suite.
17      The problem is if you're a steel mill and
18  your system shuts down, the steel cools in the plant
19  and you have to rebuild the plant.  So it was the
20  worst -- it was one of the more stressful moments in
21  terms of putting E-Business Suite in because if it
22  shut the plant down, we were -- it was going to
23  cause a huge number of problems.  So -- so I think
24  that's what it's saying.
25      Q.  What does -- sorry.  I was going to ask

720

1  you, what do you mean by "terrible irony"?
2      A.  Oh, that the complicated -- that the
3  really complicated, big projects were going well,
4  but then we'd have some small company with a fairly
5  simple implementation.  And it would go badly often
6  because the people who were implementing the
7  product, the service people who were putting it in
8  did something wrong.
9      Q.  And given this is 2002, what business did
10  Jeff Henley have saying in early 2001 that 11i had
11  stabilized?
12      A.  Well, again, this had -- again, I'm not
13  sure what we're talking -- this -- what I'm saying
14  here is, 11i is stable.  The proof is it's working
15  at GE, it's working at Poscoe, but it still has to
16  be implemented properly.
17      And if you read the entire -- I think if
18  you read the entire thing, what it's saying is this
19  has nothing to do with the product; this has to do
20  with if consulting is involved.
21      In other words, if you have good people,
22  what it says, "wherever consulting has been
23  involved, we tend not to have problems."
24      So when we have the right service people
25  putting it in, even in a complicated implementation

Ellison, Lawrence  3/30/2007  12:00:00 AM

721

1  it is going well. When we have the wrong people,
2  it's not going well. So this was not product
3  related; it was service related. We didn't have
4  enough trained -- the answer is we didn't have
5  enough trained people doing the implementations.
6      MR. SOLOMON: Have marked as the next
7  exhibit a copy of a Wall Street Journal article
8  dated August 6th, 2001.
9      (Whereupon, Deposition Exhibit 161
10     was marked for identification.)
11     MR. SOLOMON: Q. And have you read this
12 article before? Do you know --
13     MR. LINDSTROM: Why don't you give him a
14 moment to look at it.
15     THE WITNESS: Can I have a second to look
16 at it?
17     Okay.
18     MR. SOLOMON: Q. Okay?
19  A. Okay.
20  Q. Have you read this before?
21  A. I believe so, yes.
22  Q. Okay. I'm looking at the first page.
23     And starting with, "In this last 12
24 months,' Mr. Ellison said, 'we've gotten over 450
25 customers, big customers, General Electric, Ford,

722

1  Alcoa, Hewlett-Packard, live and running their
2  businesses on 11i.'"
3      Do you see that?
4  A. Yes.
5  Q. Did you say that?
6      MR. LINDSTROM: Well --
7      THE WITNESS: Yes.
8      MR. LINDSTROM: Did he say the part in the
9  quotes --
10     THE WITNESS: I think so.
11     MR. LINDSTROM: -- or the whole -- the
12 whole thing?
13     MR. SOLOMON: The part that's in the
14 quotes.
15     MR. LINDSTROM: Okay.
16     THE WITNESS: Something -- I don't know if
17 I said exactly that, but something fairly close.
18     MR. SOLOMON: Q. Okay. And it goes on to
19 say, "It was a welcome disclosure. In the year
20 since its introduction, 11i -- which handles
21 everything from inventory tracking to payroll
22 processing -- has been plagued by reports of slow
23 sales. There was just one problem: It wasn't
24 entirely true. All four companies Mr. Ellison named
25 told a far more restrained version of the story,

723

1  including General Electric Company's power division,
2  which Mr. Ellison made a point of singling out. GE
3  Power said it was using the product only at a small
4  plant in Hungary. 'We are not running our business
5  on 11i,' said a spokesman for the GE unit.
6  Likewise, Alcoa said that it was using 11i at just
7  one overseas location."
8      So is the journalist writing this correct
9  in saying that what you had said was not entirely
10 true?
11  A. I --
12     MR. LINDSTROM: Compound. Calls for
13 speculation. No foundation.
14     THE WITNESS: I didn't say GE is running
15 its entire business on Oracle. I said they are
16 running their business on Oracle, meaning part of
17 their business. GE, four -- these are gigantic
18 corporations. They use products from lots and lots
19 of people. Ford will never run their business
20 entirely on Oracle products.
21     So all I was saying is that GE, we got --
22 you know, a part of their business is live and
23 running. Maybe I can make it clearer by saying "a
24 part." But I didn't say their entire business or
25 all their business. The journalist is assuming I

724

1  mean everything in GE in one year is running on
2  Oracle, which is just -- it's impossible.
3      MR. SOLOMON: Q. Okay.
4  A. Every year more and more of GE runs on
5  Oracle, but even today, many years later, 100
6  percent of GE is not running on Oracle. Never will.
7  Q. Do you know Jeff Henley has described you
8  as a person who runs ahead of reality?
9      MR. LINDSTROM: Mischaracterizes his
10 testimony. Assumes facts.
11     THE WITNESS: I don't know what that
12 means. The answer is no, and I'm not sure what it
13 means.
14     MR. SOLOMON: Q. And if you go to the
15 next page of this article, I'm looking almost
16 halfway down, the language that begins, "Still, it's
17 been hard for Oracle to attract big name," in
18 quotes, "'reference accounts' for 11i. Companies
19 that would testify to the new product's virtues" --
20  A. I'm sorry, how far down the page? Same
21 page?
22  Q. Almost, yes.
23     MR. LINDSTROM: No, he's on the next page.
24     MR. SOLOMON: I'm sorry. On the second
25 page.

725

1        THE WITNESS: Next page. Sorry.
2        MR. SOLOMON: Q.  It's the sentence
3   starting, "Still, it's been hard."
4        A.  Okay. Got it.
5        Q.  Okay. Then it goes on to say -- after
6   "product virtues," it goes on to say, "So Oracle
7   decided to provide its own references. Last year it
8   began buying TV and newspaper ads saying it had
9   saved $1 billion by using the software. Most
10  analysts scoffed at the claim, attributing any such
11  savings to low-tech methods such as layoffs and site
12  closings."
13       Do you see that?
14       A.  Yes.
15       Q.  Then it goes on to say, "Oracle struck
16  back. At a company-sponsored conference for users
17  in New Orleans in February, it distributed hundreds
18  of copies of a Harvard Business School case study
19  that Oracle said proved saved money the way it said
20  it had. In a related news release, the company said
21  the Harvard study, written by Professor Francis
22  Frei," F-R-E-I, "chronicled how Oracle had achieved
23  the savings by using its new software to put," in
24  quotes, "'every aspect of its business,'" end
25  quotes, "on one global network on the Internet,"

726

1   close quotes.
2        Goes on to say, "But Professor Frei, in an
3   interview, says the study did no such thing.
4   Instead, she says, it simply described how a once
5   fast-growing company was being forced to pay more
6   attention to costs."
7        Do you see all that?
8        A.  I do.
9        Q.  Do you remember in February at New Orleans
10  discussing or mentioning the Harvard study?
11       A.  I've never read it. Never -- I don't
12  think I've ever mentioned it.
13       Q.  Okay. Do you recall ever telling Matthew
14  Symonds that Siebel Systems had just finished a
15  quarter in which it engaged in software swaps on a
16  big deal, but that couldn't continue and that they
17  were going to crash because you can't do that two
18  quarters in a row? Does that ring a bell?
19       MR. LINDSTROM: Assumes facts. Compound.
20  The question is did he tell Matthew Symonds all of
21  that?
22       THE WITNESS: Again, I'm not -- again, I'm
23  not sure, but sounds vaguely close.
24       MR. SOLOMON: Q.  Okay. And wouldn't that
25  same comparison be applicable to Oracle in 2Q '01

727

1   and 3Q '01?
2        A.  No.
3        MR. SOLOMON: Have marked as the next
4   exhibit a document produced in this litigation with
5   the control numbers 1027517 through -521.
6        (Whereupon, Deposition Exhibit 162
7        was marked for identification.)
8        MR. SOLOMON: Once you've had a chance
9   to look at it, the question will be, do you
10  recognize it?
11       A.  Give me -- give me a second.
12       Q.  Okay.
13       A.  So far I do not. I don't know what this
14  is about.
15       MR. LINDSTROM: Counsel, is there a first
16  page to this? This looks to be an e-mail exchange
17  that starts partway through the exchange with the
18  word "Okay."
19       MR. SOLOMON: Right.
20       MR. LINDSTROM: It's hard to recognize.
21       MR. SOLOMON: We'll ask -- let's see if we
22  can get the page, control number before that.
23       Could you do that, Brian, do you think?
24       Let's go off the record for a few minutes
25  then, please.

728

1        THE VIDEOGRAPHER: Off the record. The
2   time is 5:20 p.m.
3        (Whereupon, a recess was taken.)
4        THE VIDEOGRAPHER: We are back on the
5   record. The time is 5:38 p.m.
6        MR. SOLOMON: Q.  Okay. So we marked the
7   last exhibit -- we did find the first page. And so
8   what exhibit was it, please?
9        THE REPORTER: The last exhibit was 162.
10       MR. SOLOMON: So 162 now is going to be
11  1027516 through -7521.
12       THE WITNESS: Throw this one away?
13       MR. SOLOMON: Please.
14       (Whereupon, Deposition Exhibit 162 was
15       remarked for identification.)
16       MR. SOLOMON: Q.  And do you recognize
17  this document?
18       A.  I don't.
19       Q.  And I notice that you're not -- you're not
20  on the addressee list, but you were the GE corporate
21  sponsor, correct?
22       A.  Still am.
23       Q.  But that wouldn't mean -- would that mean
24  that you would have probably have seen this at the
25  time, or not?

Ellison, Lawrence  3/30/2007  12:00:00 AM

729

1    A.  Probably not.
2    Q.  I want to go back again to Mr. Symonds.
3        Have you had any e-mail exchanges with
4    Mr. Symonds?
5    A.  As far as I know -- about this litigation,
6    or just a general e-mail?
7    Q.  About this litigation.
8    A.  As far as I know, I haven't had any e-mail
9    about this litigation with Mr. Symonds.
10   Q.  Now, we marked as 141 the letter dated
11   January 10, 2007.
12       How was this transmitted to Mr. -- to
13   Mr. Symonds?
14       MR. LINDSTROM:  No foundation.
15       MR. SOLOMON:  Let me back up.
16   Q.  Was this transmitted to Mr. Symonds?
17   A.  I assume it was.  We're talking about the
18   letter --
19   Q.  Yes.
20   A.  -- my attorneys drafted and I signed?
21   Q.  Yes.
22       MR. LINDSTROM:  And you have it before
23   you?
24       THE WITNESS:  I don't -- I'm sure --
25       MR. SOLOMON:  Q.  It's 141.  It's probably

730

1    at the bottom of your pile somewhere.
2        MR. LINDSTROM:  I think the reporter has
3    the other ones.  You can borrow mine.
4        MR. SOLOMON:  Q.  Well, it says -- first
5    of all, it says it went via e-mail.
6        Do you have e-mail confirmation of that
7    that you can produce?
8    A.  It didn't go via my e-mail.
9    Q.  Okay.  Whose e-mail did it go via?
10   A.  I have no idea.
11   Q.  Okay.  So do you have any objection to
12   finding out and producing the actual e-mail?
13   A.  No.
14   Q.  So you'll do that?
15   A.  Well --
16       MR. LINDSTROM:  We'll take your request
17   under advisement.  I don't see a problem with it.
18       MR. SOLOMON:  Q.  It says "first class
19   mail."
20       You were aware if you send a document to
21   England from the US first class mail, it probably
22   won't get there?
23   A.  No.  No.
24       MR. LINDSTROM:  Assumes facts.
25       MR. SOLOMON:  Q.  No?  You think a first

731

1    class stamp would get it to --
2    A.  Oh, I have no idea.  I haven't mailed
3    anything in a long time.
4    Q.  Now, you say at the bottom here, "Although
5    I understand that my lawyers will be sending you a
6    more formal letter, I wanted to write to you
7    separately to request that you cooperate with my
8    counsel and forward these materials as quickly as
9    you can."
10       Do you see that?
11   A.  I do.
12   Q.  Have you seen any such formal letters from
13   your lawyers to Mr. Symonds?
14   A.  No.
15   Q.  Then halfway through the second paragraph
16   it says, "We oppose this motion because, quite
17   frankly, we believe those materials were yours, not
18   Oracle's or mine."
19       Do you see that?
20   A.  I do.
21   Q.  Have you looked within -- since October of
22   2006 at the agreement between you and Mr. Symonds?
23   A.  No.
24   Q.  No?
25   A.  No.

732

1    Q.  Do you recall its contents?
2    A.  No, I do not.
3    Q.  And you say, "We opposed" -- at least you
4    signed the letter where it says, "We oppose this
5    motion because, quite frankly, we believe those
6    materials were yours."
7        Are you aware that in the brief that was
8    filed, you also contended, or your lawyers
9    contended, that they were simply irrelevant?
10       MR. LINDSTROM:  No foundation.  Asked and
11   answered.
12       THE WITNESS:  No.
13       MR. LINDSTROM:  Calls for speculation.
14       MR. SOLOMON:  Q.  Did you discuss this
15   letter with Daniel Cooperman?
16       MR. LINDSTROM:  I'm going -- I'll permit
17   him.  I think that's generic enough that he can
18   respond to that.
19       THE WITNESS:  No, I did not.
20       MR. SOLOMON:  Q.  Have you discussed it
21   with anyone?
22       MR. LINDSTROM:  When you say "discussed
23   the letter," can you be -- I mean, that's vague.
24       THE WITNESS:  Other than my attorneys?
25       MR. SOLOMON:  Q.  Anyone.  Have you

733

1    discussed it with your attorneys?
2        A.  No.
3        Q.  How did the language in this letter get
4    into your hands?
5        MR. LINDSTROM:  Vague and ambiguous.
6        THE WITNESS:  The letter was written by
7    one of my lawyers.  I signed it.  I signed the
8    letter.
9        MR. SOLOMON:  Q.  When you say one of your
10   lawyers, do you mean one of your in-house or outside
11   counsel?
12       A.  I'm not sure -- I'm not sure who drafted
13   the letter.
14       Q.  Who gave you the letter to sign it?
15       A.  I don't recall.
16       MR. SOLOMON:  I'll have marked as the next
17   exhibit a document produced in this litigation with
18   the control numbers 1026720, -721.
19       (Whereupon, Deposition Exhibit 163
20       was marked for identification.)
21       THE WITNESS:  Thank you.
22       MR. SOLOMON:  Q.  And let me know if you
23   recognize this.
24       A.  Give me -- give me a second.
25       Vaguely.  I knew about the Barclays

734

1    exchange, but I'm not sure I ever saw this.  If it
2    was sent to me, I probably saw the note.
3        Q.  Okay.  And this would have been in your
4    files around December 15th, 2000?
5        A.  Yes.
6        Q.  And it wasn't produced from your files in
7    this litigation, and you cannot explain why; is that
8    right?
9        MR. LINDSTROM:  No foundation.  Assumes
10   facts.
11       THE WITNESS:  Yes.
12       MR. SOLOMON:  Q.  You can't explain why,
13   right?
14       A.  Correct.
15       MR. SOLOMON:  I'll have marked as the next
16   exhibit another document produced in this litigation
17   with the control numbers 061785 through -790.
18       (Whereupon, Deposition Exhibit 164
19       was marked for identification.)
20       MR. SOLOMON:  Q.  Let me know when you've
21   had a chance to look at it, if you recognize any of
22   the exchanges.  Just so you know, I'm just going to
23   focus on the first page.
24       A.  Okay.  Just give me one more second.
25   Okay.  But the context -- it's in reverse

735

1    chronological order.
2        Q.  Okay.  That's fine.
3        A.  So just give me ...
4        MR. LINDSTROM:  Also, Counsel, maybe you
5    can expedite things.  Do you know, is he anywhere in
6    this chain?  Is there an e-mail to him?
7        MR. SOLOMON:  I do not believe so, no.
8        MR. LINDSTROM:  Okay.
9        THE WITNESS:  Okay.
10       MR. SOLOMON:  Q.  Recognize this at all?
11       A.  I do not.
12       Q.  Okay.  And then on the first page, I'm
13   looking just under halfway down where it says,
14   "Yes."
15       It says, "Yes, we plan to have two
16   customers during the April Gartner executive
17   briefing."  And then in parentheses, "(we are
18   approaching HP and Veritas - not sure.)"
19       Just focusing on the language "approaching
20   HP," were you involved in approaching HP with
21   respect to -- asking that they'd be a reference
22   around this time?
23       MR. LINDSTROM:  At the April Gartner
24   executive briefing?
25       MR. SOLOMON:  Correct.  Correct.

736

1        THE WITNESS:  I'm sure I wasn't.
2        MR. SOLOMON:  Q.  Okay.  So you wouldn't
3    have wanted to -- you wouldn't have been exploiting
4    your relationship with Carly Fiorina to try and do
5    that?
6        MR. LINDSTROM:  Assumes facts.
7    Mischaracterizes the testimony.
8        THE WITNESS:  I don't think I'd ask her,
9    at her level, to be a reference.  We'd have to ask
10   someone who was really running the CRM system.
11       MR. SOLOMON:  Q.  So you don't know
12   anything about this?
13       A.  No, I don't.
14       MR. SOLOMON:  Okay.  Let's have marked as
15   the next exhibit an article from Vanity Fair called
16   "Absolutely Excessive."
17       (Whereupon, Deposition Exhibit 165
18       was marked for identification.)
19       THE WITNESS:  Okay.
20       MR. SOLOMON:  Q.  Okay.  Have you read
21   this before?
22       A.  I have.
23       Q.  And who wrote this, do you know?
24       A.  Matthew Symonds.
25       Q.  And that's your modest boat on the front

Ellison, Lawrence  3/30/2007  12:00:00 AM

737

1  page?
2      A.  It's -- I own half of it now.
3      Q.  Okay.  Who owns the other half?
4      A.  David Geffen.
5      Q.  And is it true that this boat was
6  purchased, at least in part, with the proceeds of
7  your sales in January 2001?
8          MR. LINDSTROM:  Asked and answered.
9          THE WITNESS:  Again, the sales went
10  partially to pay down my loans and partially went to
11  cash, and I'm not sure how the cash -- where the
12  cash distributions went.
13          MR. SOLOMON:  Q.  Is there a swimming pool
14  on your boat?
15      A.  No, there's not.  Though there have been
16  numerous newspapers articles talking about swimming
17  pools, chandeliers.  All news to me.  No swimming
18  pool.  No chandeliers.
19      Q.  And there never has been, right?
20      A.  No.
21      Q.  Okay.  That's a lot of money to pay for a
22  boat without a swimming pool, isn't it?
23      A.  Certainly is.
24      Q.  I'm looking at page -- trying to look at,
25  but my eyesight is failing me.  What number is that?

738

1  328, where you're sitting in the cockpit of a
2  fighter jet.
3      A.  Yes.
4      Q.  Okay.  And then on the right-hand side,
5  almost halfway down, there's the following
6  language -- well, excuse me.
7      A.  Don't feel too bad.  It's hard for me to
8  read too, and I've got my glasses on.
9      Q.  In any event, it seems to confirm there,
10  does it not, that some of the proceeds were used --
11      A.  Where are you reading?  Which paragraph?
12      Q.  Hold on one second, Mr. Ellison.  I'm
13  sorry.
14      Q.  Okay.  No problem.
15      Q.  It seems to, almost halfway down, say that
16  money that had been put to use funding the
17  construction of the boat.
18          Do you see that reference?
19      A.  I don't.  First, second, third -- give me
20  a paragraph number.
21      Q.  It's in the second full paragraph?
22      A.  Second full paragraph.
23      Q.  Yeah.
24      A.  Okay.  And the sentence begins, "For
25  months he had been under pressure," is this the

739

1  paragraph -- "For months he had been under pressure
2  because of problems" --
3      Q.  Yes.  Exactly.
4      A.  Okay.
5          Okay.  I read the full paragraph.
6          MR. LINDSTROM:  Is there a pending
7  question?
8          MR. SOLOMON:  Yes.  There will be in a
9  second, as soon as I can focus my eyes a little bit
10  more.
11      Q.  Okay.  Do you see it says, "if he hadn't
12  vested the options then, he would have lost them."
13          Do you see that?
14      A.  Yes.
15      Q.  That's not true, is it?
16      A.  Well, the options had already been vested,
17  so it was -- the sentence makes no sense whatsoever.
18      Q.  Right.
19          And let's assume he meant if you hadn't
20  exercised.
21      A.  Exercised.
22      Q.  That still would be wrong, wouldn't it?
23      A.  No.  If I hadn't exercised -- I had to
24  exercise.  I could have exercised and held or
25  something like that.  But I had to exercise, because

740

1  after ten years, you do lose them.
2      Q.  What I'm saying is you didn't to have
3  exercise in January, did you?
4          MR. LINDSTROM:  But it doesn't say that.
5          THE WITNESS:  It doesn't have a date.
6          MR. SOLOMON:  Right.
7          THE WITNESS:  It says -- if I just reread
8  this, "If he hadn't exercised the options then, he
9  would have lost them."
10          MR. SOLOMON:  Q.  Right.  That's not true,
11  is it?
12      A.  Well, depends what you mean -- I don't
13  mean to be cute, but depends what you mean by
14  "then," "approximately then."
15          Okay.  But no, not that day.  Certainly
16  not that day.  As we said, if I hadn't exercised
17  them at least by August, I would have lost them.
18      Q.  Right.
19      A.  Right.
20          MR. LINDSTROM:  Where are we in time?  We
21  should be -- according to my watch, we're just about
22  done.
23          THE VIDEOGRAPHER:  We have one minute and
24  45 seconds to go.
25          MR. LINDSTROM:  What do you think, Mark?

Ellison, Lawrence  3/30/2007  12:00:00 AM

741

1  This is probably a fitting place to end, don't you
2  think?
3      MR. SOLOMON:  Well, as long as when I ask
4  for more time, you won't say that I didn't use my
5  last minute and a half and, therefore, I've waived
6  it.
7      MR. LINDSTROM:  I will tell you we will
8  not -- we will not take that position.
9      MR. SOLOMON:  In that case, it's very hot
10 in here and I'm ready to go.
11     THE WITNESS:  By the way, the newspapers
12 also reported that I crashed my fighter jet and died
13 when my fighter jet crashed into the Oracle parking
14 lot.  That was also a story that hit the press.  You
15 just reminded me.  It was the single most bizarre --
16 there have been a lot of bizarres, but reading about
17 your own death --
18     MR. LINDSTROM:  Are we still on the
19 record?
20     THE VIDEOGRAPHER:  We are.
21     MR. LINDSTROM:  Off the record and you can
22 finish the story.
23     MR. SOLOMON:  Wait a second.  Before we go
24 off the record, I just want to make sure.  We are
25 reserving our rights.  There are issues of

742

1  privilege.  There are many more materials to go
2  through.  There's the fact that I'm going back,
3  hopefully to take Mr. Symonds' deposition and get
4  some real answers from him.  And so I reserve my
5  rights to talk to you again, Mr. Ellison.  Thank you
6  for your testimony.
7      THE VIDEOGRAPHER:  This adjourns the
8  deposition of Lawrence Ellison.  The number of tapes
9  used today is three.  This is the end of Videotape
10 No. 3, Volume 3.  The original videotapes will be
11 retained by LiveNote World Service.  Going off the
12 record.  The time on the monitor is 5:59 p.m.
13     (Deposition adjourned at 5:59 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

743

1          CERTIFICATE OF WITNESS
2
3      I, the undersigned, declare under penalty of
4  perjury that I have read the foregoing transcript,
5  and I have made any corrections, additions, or
6  deletions that I was desirous of making; that the
7  foregoing is a true and correct transcript of my
8  testimony contained therein.
9
10 EXECUTED this _____ day of _____,
11 20___, at _____, _____.
          (CITY)          (STATE)
12
13
14
15     _____
16     LAWRENCE ELLISON
17
18
19
20
21
22
23
24
25

744

1      CERTIFICATE OF DEPOSITION OFFICER
2      I, KATHLEEN A. WILKINS, RPR, CSR NO. 10068,
3  duly authorized to administer oaths pursuant to
4  Section 8211 of the California Code of Civil
5  Procedure, hereby certify that the witness in the
6  foregoing deposition was by me sworn to testify to
7  the truth, the whole truth and nothing but the truth
8  in the within-entitled cause; that said deposition
9  was taken at the time and place therein stated; that
10 the testimony of said witness was reported by me and
11 was thereafter transcribed by me or under my
12 direction by means of computer-aided
13 transcription; that the foregoing is a full,
14 complete and true record of said testimony; and that
15 the witness was given an opportunity to read and
16 correct said deposition and to subscribe same.
17     I further certify that I am not of counsel or
18 attorney for either or any of the parties in the
19 foregoing deposition and caption named, nor in any
20 way interested in the outcome of the cause named in
21 said caption.
22     IN WITNESS WHEREOF, I have hereunto subscribed
23 by my hand this 2nd day of April, 2007.
24
25     _____

CERTIFICATE OF DEPOSITION OFFICER

1                    CERTIFICATE OF DEPOSITION OFFICER

2         I, KATHLEEN A. WILKINS, RPR, CSR NO. 10068,

3  duly authorized to administer oaths pursuant to

4  Section 8211 of the California Code of Civil

5  Procedure, hereby certify that the witness in the

6  foregoing deposition was by me sworn to testify to

7  the truth, the whole truth and nothing but the truth

8  in the within-entitled cause; that said deposition

9  was taken at the time and place therein stated; that

10  the testimony of said witness was reported by me and

11  was thereafter transcribed by me or under my

12  direction by means of computer-aided

13  transcription; that the foregoing is a full,

14  complete and true record of said testimony; and that

15  the witness was given an opportunity to read and

16  correct said deposition and to subscribe same.

17         I further certify that I am not of counsel or

18  attorney for either or any of the parties in the

19  foregoing deposition and caption named, nor in any

20  way interested in the outcome of the cause named in

21  said caption.

22         IN WITNESS WHEREOF, I have hereunto subscribed

23  by my hand this 2nd day of April, 2007.

24

25                 _Kathleen a. Wilkins_
                  KATHLEEN A. WILKINS, RPR, CSR NO. 10068

744