# EXHIBIT L

Elam, Terry  9/28/2006  9:19:00 AM

1

```
1   page
1           IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3                      ---oOo---
4    In re ORACLE CORPORATION
5    SECURITIES LITIGATION
6                   Master File No.
7    This Document Relates To:   C-01-0988-MJJ
8    ALL ACTIONS.
9    _____/
10
11                     ---oOo---
12                  CONFIDENTIAL
13        30(b)(6) DEPOSITION OF TERRY ELAM
14        Thursday, September 28, 2006
15                   ---oOo---
16
17        SHEILA CHASE & ASSOCIATES
               REPORTING FOR:
18
           LiveNote World Service
19         221 Main Street, Suite 1250
       San Francisco, California  94105
20        Phone: (415) 321-2311
           Fax:  (415) 321-2301
21
22   Reported by:
     COLLEEN M. REDAMONTI
23   CSR No. 7012
24
25
```

2

```
1                   I N D E X
2    DEPOSITION OF TERRY ELAM          PAGE
3    EXAMINATION BY MR. GREENSTEIN       9
        Lunch recess              160
4    EXAMINATION BY MR. KONOVALOV      322
5
6                   ---oOo---
7
8            E X H I B I T S
9    PLAINTIFF'S  DESCRIPTION         PAGE
10   Exhibit 1  Group of documents, with a cover   81
              sheet with the handwritten
11            notation "53-page list of open
              unapplied cash.  This is my
12            copy," Bates stamped
              PLF-ORC 001161 through -001215,
13            55 pages
14   Exhibit 2  Confidential - Account Analysis   82
              Report Source Item, Period:
15            October '00 to December '00, for
              Account 25005, Bates stamped
16            NDCA-ORCL 050356 through -050360,
              five pages
17
18   Exhibit 3  Confidential - Account Analysis   90
              Report With Payables Detail From
19            November 1, 2000 through
              November 30, 2000, for Account
20            25005, Bates stamped
              NDCA-ORCL 144608 and -144609, two
21            pages
22
23
24
25
```

3

```
1                E X H I B I T S  (cont'd)
2    PLAINTIFF'S  DESCRIPTION         PAGE
3
4    Exhibit 4   Confidential - E-mail dated   147
              October 29, 2002, from Greg
5             Myers to Ryan Roberts, Omid
              Fardanesh, and Amy Aves,
6             Subject:  AR Unclaimed Property
              Reporting, with attachment,
7             Bates stamped NDCA-ORCL 827183
              through -827189, seven pages
8    Exhibit 5   Confidential - Computer screen   169
              shot, with attachments, Bates
9             stamped NDCA-ORCL 750068 through
              -750074, seven pages
10
11   Exhibit 6   Confidential - SBC Corporate   200
              Accounts Payable Debit/Credit
12            Memo Summary dated 3-13-2003,
              Bates stamped SBC 00003 through
13            -00007, five pages
14   Exhibit 7   Confidential - SBC Corporate   202
              Accounts Payable Debit/Credit
15            Memo Summary dated 3-13-2003,
              Bates stamped PRG29768 through
16            -29773, six pages
17   Exhibit 8   Confidential - E-mail exchange,   208
              first one dated 9-27-2002, from
18            Cindy Eaton to Cherie Nabeta,
              Subject:  Credit Memos, Bates
19            stamped PLF-ORC 000132 through
              -000136, five pages
20   Exhibit 9   Confidential - E-mail dated   219
              September 3, 2004, from Terry
21            Elam to Robynne Sisco, Subject:
              Refund Detail, Bates stamped
22            NDCA-ORCL 793752, one page
23
24
25
```

4

```
1                E X H I B I T S  (cont'd)
2    PLAINTIFF'S  DESCRIPTION         PAGE
3    Exhibit 10  Confidential - E-mail exchange,   221
              first one dated November 17,
4             2004, from Terry Elam to
              Chandrasekaran Narayanan,
5             Subject:  Monthly Report on
              Credit Memo Rebills, Bates
6             stamped NDCA-ORCL 793683 and
              -793684, two pages
7
8    Exhibit 11  Confidential - E-mail dated   225
              February 8, 2006, from Terry
9             Elam to Greg Myers, Subject:
              12601 Entries, Bates stamped
10            NDCA-ORCL 793754, one page
11
12   Exhibit 12  Confidential - E-mail exchange,   232
              first one dated December 17,
13            2004, from Terry Elam to
              Chandrasekaran Narayanan,
14            Subject:  Reason codes for
              Manual Credit Memos, Bates
15            stamped NDCA-ORCL 793680 through
              -793682, three pages
16   Exhibit 13  Confidential - Document entitled   239
              "Oracle Corporation Account
17            12000 as of May 2001, Prepared
              by Terry Elam," Bates stamped
18            AA 001938, one page
19   Exhibit 14  Confidential - Two copies of a   248
              document entitled
20            "Unapplied/Unidentified/On-
              Account Payments for Current
21            Period:  01-Jan-1900 to
              01-Nov-2000, Bates stamped
22            NDCA-ORCL 664425, two pages
23
24
25
```

5

E X H I B I T S  (cont'd)

PLAINTIFF'S  DESCRIPTION                    PAGE

Exhibit 15  Confidential - Computer screen    259
            shot with attached E-mails,
            first one dated April 2, 2001,
            from Vince Jones to Accounts
            Receivable, Subject: Lockeed
            Missiles & Space Company, Inc.,
            Bates stamped NDCA-ORCL 748719
            through -748723, five pages

Exhibit 16  Confidential - On Account         261
            Reconciliation, Bates stamped
            NDCA-ORCL 831967 and -831968,
            one page

Exhibit 17  Confidential - Spreadsheet and    261
            tabs bates stamped
            NDCA-ORCL 883052 through -883061
            and NDCA-ORCL 883458 through
            -883461 and NDCA-ORCL 883666
            through -883667, 16 pages

Exhibit 18  Letter dated August 11, 2006,     264
            signed by Peter A. Wald, to The
            Honorable Edward A. Infante, Re:
            In re Oracle Corporation
            Securities Litigation, with
            attachments, 32 pages

Exhibit 19  Confidential - Computer screen    317
            shot with attached E-mails,
            first one dated October 7, 2003,
            from Jody Jenkins to
            arinfo_us@oracle.com, Subject:
            Global Credit Memo Template,
            Bates stamped NDCA-ORCL 749429
            through -749448, 20 pages


            --oOo--

6

INDEX OF QUESTIONS INSTRUCTED NOT TO ANSW


                   Page Line

Okay.  When you reviewed documents         93  20
yesterday, did you see any of those
spreadsheets that you created?

Do you know why that's redacted?          149  3

Do you know why that was redacted?        149  8

Do you know what that E-mail was          149  16
referring to?


            --oOo--

7

BE IT REMEMBERED that on Thursday,
September 28, 2006, commencing at the hour of
9:19 a.m. in the Law Offices of LERACH, COUGHLIN,
STOIA, GELLAR, RUDMAN & ROBBINS, 100 Pine Street,
Suite 2900, San Francisco, California, before me,
COLLEEN M. REDAMONTI, a Certified Shorthand Reporte
in and for the State of California, personally
appeared
            TERRY ELAM
called as a witness by the Plaintiffs herein, who,
having been duly sworn, was thereupon examined and
interrogated as hereinafter set forth.
            --oOo--
Appearing as counsel on behalf of Plaintiffs:
    ELI GREENSTEIN, Esquire
    LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
    ROBBINS
    100 Pine Street, Suite 2600
    San Francisco, California  94111
    (415) 288-4545
    E-mail: elig@lerachlaw.com

Appearing as counsel on behalf of Defendants and the
Witness:
    PAUL V. KONOVALOV, Esquire
    BETH COLLINS-BURGARD, Esquire
    LATHAM & WATKINS, LLP
    650 Town Center Drive, 20th Floor
    Costa Mesa, California 92626
    (714)540-1235
    E-mail:  paul.konovalov@lw.com

Also Present:
    Keith Mautner, Lerach, Coughlin
    Cassia Leet, Videotape Operator
    Toni M. Thingvold, Deloitte

8

VIDEOTAPE OPERATOR:  Here marks the beginning
of videotaped deposition of Terry Elam, tape number
one, Volume Number 1 in the matter of In re Oracle
Corporation Securities Litigation in the
United States District Court, Northern District of
California, case Number C-01-0988-MJJ.

Today's date is September 28th, 2006, and the
time on the video monitor is 9:19.  The video
operator today is Cassia Leet, representing LiveNote
World Service, located at 221 Main Street,
Suite 1250, San Francisco, California 94105.  Phone
number, (415) 321-2300.

The court reporter is Colleen M. Redamonti of
Sheila Chase Reporting on behalf of LiveNote World
Service.

Today's deposition is being taken on behalf of
the plaintiff, and is taking place at 100 Pine
Street, Suite 2900, San Francisco, California.

Counsels, please introduce yourselves and
state whom you represent.

MR. GREENSTEIN:  Good morning.  Eli Greenstein
with Lerach, Coughlin, Stoia, Geller, Rudman &
Robbins, representing plaintiffs.

And with me is Keith Mautner, one of our
forensic accountants also with Lerach, Coughlin.

9

1     MR. KONOVALOV:  Good morning.  Paul Konovalov,
2  Latham & Watkins for the defendants and the witness.
3     And also present is Toni Thingvold.
4     MS. COLLINS-BURGARD:  Beth Collins-Burgard,
5  Latham & Watkins, for Oracle.
6     VIDEOTAPE OPERATOR:  Would the court reporter
7  please swear in the witness.
8     (Witness sworn.)
9     EXAMINATION BY MR. GREENSTEIN
10  Q.   Good morning, Mr. Elam.  Is it "Elam"?
11  A.   Yes.
12  Q.   Could you please state your full name and
13  address for the record?
14  A.   Terry Elam, 6316 Galaxy Lane, Rocklin,
15  California, 95677.
16  Q.   And have you ever had your deposition taken
17  before?
18  A.   No.
19  Q.   I'm going to go over some ground rules.  I'm
20  sure you went over them with counsel before today,
21  but just so we get it on the record.
22     The court reporter to your right is going to
23  be taking down everything that's said here today; my
24  questions, your answers, any objections.  So I would
25  ask that you speak verbally, try not to use your hand

10

1  gestures or head nods, and that you speak, you know,
2  loud and as clear as possible.
3     Do you understand that?
4  A.   Yes.
5  Q.   And also, I'll try not to talk over you and
6  I'd ask that you do the same.  Sometimes what happens
7  is that you'll start to answer a question before I'm
8  done, or I'll start to ask another follow-up question
9  before you're done answering.
10     So I would ask that you just let me finish the
11  question and then answer, and we'll try not to talk
12  over one another.
13     Do you understand that?
14  A.   Yes.
15  Q.   Do you understand that the oath you're taking
16  here today is the same oath that you would be taking
17  if you were testifying in court?
18  A.   Yes.
19  Q.   Okay.
20     Now, your attorney, Mr. Konovalov, is probably
21  going to be making some objections to my questions
22  today.  Um, those are to preserve those objections
23  for the record.
24     I would ask that you answer any question
25  that's posed to you, unless your attorneys instruct

11

1  you not to answer.
2     Do you understand that?
3  A.   Yes.
4  Q.   Um, you are allowed to take breaks anytime you
5  feel you need to go to the bathroom or get some
6  water, just clear your thoughts, let me know and we
7  can do that.  Sometimes if I'm in the middle of a
8  question or a line of questioning, I may just ask
9  that we finish that question before we take a break.
10  But if you need, you know, to take a break, just let
11  me know.
12     Also, if you don't understand my questions,
13  you know, tell me and I'll try to rephrase them.  But
14  if you answer a question, I'm going to assume that
15  you understood what I said, what I meant.
16     Do you understand that?
17  A.   Yes.
18  Q.   If you don't remember an answer to a question
19  and later something jogs your memory or, you know,
20  you go to lunch and you remember something, you're
21  always allowed to come back and -- and clarify your
22  previous answers.
23     Do you understand that?
24  A.   Yes.
25  Q.   Okay.

12

1     At the end of the deposition you're going to
2  have the chance to review the transcript.  Um, so
3  don't feel like you have to be absolutely perfect
4  with all the name spelling and, you know, all the
5  words that you use today.
6     Do you understand that?
7  A.   Yes.
8  Q.   And are you under the influence of any
9  medication, drugs, or alcohol that would impair your
10  ability to competently testify here today?
11  A.   No.
12  Q.   When did you first learn that you were going
13  to be deposed in this case?
14  A.   It was about a month ago.
15  Q.   Okay.  And do you know why you're here to
16  testify today?
17  A.   I was asked to depose -- to be here for this
18  case.
19  Q.   Okay.  Do you understand the subject matter of
20  what you're going to be testifying about today?
21  A.   Part of it, yes.
22  Q.   Okay.  What's your understanding?
23     MR. KONOVALOV:  You need to exclude,
24  obviously, conversations you had with counsel.
25     But subject to that, you can answer the

13

1    question.
2        MR. GREENSTEIN:  Right.
3    Q.    And also, you know, I'll ask a lot of
4    questions today, some of which will be about whether
5    you met with your attorneys or not.  I don't want to
6    know anything that you've ever talked about with your
7    attorneys, no communications between you and your
8    attorneys, um, about legal advice.
9        So you can just assume that whatever question
10   I ask, if there was a conversation with an attorney,
11   um, I don't want to know that information.
12       Do you understand that?
13   A.    Uh-huh.
14   Q.    Okay.  So what is your understanding of the
15   subject matter of your testimony here today?
16   A.    Well, I was asked to, um, be present here to
17   testify against or for some of the involvement of
18   my -- involvement in some of the products that we've
19   produced over the last two months.
20   Q.    Okay.  When you say "products" you produced,
21   what do you mean by that?
22   A.    Um, the -- some of the data that was provided.
23   Q.    Are you referring to -- do you know
24   what a "script output" is?
25   A.    Yes, I do.

14

1    Q.    Okay.  What is a script output?
2    A.    That was the output that was provided by
3    Oracle to Latham & Watkins.
4    Q.    Okay.  And you were involved in creating that
5    script output?
6    A.    I was involved in reviewing it.
7    Q.    Okay.  Are you aware that Oracle has produced
8    at least five separate times different versions of
9    what they call the script output?
10       MR. KONOVALOV:  Objection.  Misstates the
11   evidence.  Assumes facts not in evidence.
12       THE WITNESS:  I'm not aware of that.
13   Q.    BY MR. GREENSTEIN:  Okay.  So when you say --
14   so is a script output to you one certain -- one
15   document?
16       MR. KONOVALOV:  Objection.  Vague and
17   ambiguous.
18       THE WITNESS:  Um, can you be more specific?
19   Q.    BY MR. GREENSTEIN:  Well, what exactly is a
20   script output?
21   A.    It was the output provided by -- can you be
22   more specific?
23   Q.    Well, you used the term script output; is that
24   right?
25   A.    Yes, I did.

15

1    Q.    Okay.  So I'm just wondering what you mean by
2    that?
3    A.    It was data provided by Oracle to Deloitte via
4    a spreadsheet format.
5    Q.    Okay.  It was data provided by Oracle to
6    Deloitte & Touche?
7    A.    Yes.
8    Q.    That's an accounting firm?
9    A.    Yes.
10   Q.    Okay.  Well, we'll get back to that.
11       Have you had any discussions with Deloitte &
12   Touche about the script output?
13   A.    I've -- yes.  Yes, I have.
14   Q.    Okay.  What have you talked to them about?
15       MR. KONOVALOV:  Well, objection.
16   Attorney/client privilege.
17       The conversations he had with counsel with
18   counsel's consultants are privileged.
19       MR. GREENSTEIN:  Okay.  Well, we disagree with
20   that, but --
21       MR. KONOVALOV:  Okay.
22       MR. GREENSTEIN:  So you're instructing him not
23   to answer?
24       MR. KONOVALOV:  Well, I assume you're going to
25   dig into this issue, so I'll tell you what.  I would

16

1    like a standing objection to this, but I'm prepared
2    to let him testify about what he did to help prepare
3    the script, subject to your agreement that it doesn't
4    constitute a waiver of the attorney/client privilege.
5        I assume that that's the information you're
6    looking for today.
7        MR. GREENSTEIN:  Okay.  Well, we'll get to
8    that, I guess, when we start asking about it.  I'm
9    not going to agree that it doesn't constitute a
10   waiver of any sort.  But we'll get to that, I guess,
11   at some point.
12   Q.    But I'm just trying to understand, is a script
13   output one document?  Is it an electronic
14   spreadsheet?  What is it?
15   A.    It's in spreadsheet form, yes.
16   Q.    Is it one spreadsheet?
17   A.    I think there were two, that I know of.
18   Q.    Okay.  Only two?
19   A.    There might be more.  I don't know exactly how
20   many were provided.
21   Q.    Okay.  So you're saying it was provided from
22   Oracle to Deloitte & Touche, correct?
23   A.    Yes.
24   Q.    Do you know that it was produced to plaintiffs
25   at any point in time?

Elam, Terry  9/28/2006  9:19:00 AM

17

1  A.   I don't know that.
2  Q.   Okay.  Do you know if Deloitte & Touche ever
3  gave it to anybody else?
4  A.   I don't know.
5  Q.   Okay.  So you were involved in creating the
6  script output?
7  A.   I was involved in reviewing the output.
8  Q.   In reviewing it?
9       So who created it?
10  A.   A person named Tamas Buzasi.
11  Q.   Can you spell that?
12  A.   T-a-m-a-s, B-a-z-u-s-i (sic).
13  Q.   Okay.  And are you aware that the script
14  output involves debit memos?
15       MR. KONOVALOV:  You can answer the question.
16       THE WITNESS:  Yes.
17  Q.   BY MR. GREENSTEIN:  Okay.  What's a debit
18  memo?
19  A.   Debit memos have a couple different kind of
20  scenarios in Oracle business.
21  Q.   Okay.  But how do you know that the script
22  output relates to debit memos?
23  A.   The 550 transactions are considered debit
24  memos.
25  Q.   Okay.  And when you say "550 transactions," do

18

1  you mean invoices with a 550 prefix?
2  A.   They're debit memos.
3  Q.   Right.  So any invoice with a 550 prefix is a
4  debit memo?
5  A.   No.
6  Q.   No.
7       And why do you say that?
8  A.   The transaction in the Oracle system has to
9  specifically state debit memo.
10  Q.   So are you saying that you could see an
11  invoice with a 550 prefix on it and it does not
12  relate to a debit memo?
13  A.   Yes.
14  Q.   Okay.  Have you seen invoices with a 550
15  prefix that don't relate to debit memos?
16  A.   I don't know.
17  Q.   Okay.  How do you know that?
18  A.   How do I know what?
19  Q.   How do you know that there are 550 invoices
20  that don't relate to debit memos?
21  A.   I -- it could be a setup in the Oracle system
22  to use that numbering stream.
23  Q.   Okay.  There could be a setup in the system,
24  what do you mean by that?
25  A.   When you create a source, transaction source,

19

1  you assign a numbering sequence to that source.
2  Q.   Okay.  Are you aware that there -- that
3  Oracle's produced to plaintiffs, invoices that
4  actually have the 550 prefix on them?
5  A.   The printed version or from a spreadsheet
6  version?
7  Q.   No.  Actual physical pieces of paper, invoices
8  that have 550 prefixes on them.
9       MR. KONOVALOV:  I'm not sure exactly what the
10  question is at this point.
11  Q.   BY MR. GREENSTEIN:  Are you aware that Oracle
12  produced to plaintiffs pieces of papers that were
13  invoices that had 550 prefixes on them.
14       MR. KONOVALOV:  Objection.  Misstates the
15  evidence.
16       THE WITNESS:  It's not from our -- my
17  knowledge of the 550 string, they're debit memos.
18  They're not invoices.
19  Q.   BY MR. GREENSTEIN:  Okay.  But are you aware
20  that Oracle produced to plaintiffs pieces of paper
21  that say "invoice" on them that have 550 prefixes for
22  the invoice number?
23       MR. KONOVALOV:  Objection.  Assumes facts not
24  in evidence.
25       THE WITNESS:  I would have to see the

20

1  specific --
2  Q.   BY MR. GREENSTEIN:  Okay.  Have you ever seen
3  a debit memo?
4  A.   I've seen many debit memos, yes.
5  Q.   Okay.  And when have you seen debit memos?
6       When is the first time you've seen a debit
7  memo?
8  A.   When I started working for Oracle in December
9  of 2000.
10  Q.   December 4th, right?
11  A.   Uh-huh.
12  Q.   Okay.  So you said you found out you were
13  being deposed about a month ago, right?
14  A.   Yes.
15  Q.   Did you have any discussions with anybody
16  besides your lawyers about this deposition?
17  A.   My manager, Greg Myers, is aware.
18  Q.   Okay.  And what did you talk to Mr. Myers
19  about?
20  A.   Just about the timing of the deposition.
21  Q.   Okay.  Did you discuss the substance of the
22  deposition?
23  A.   No.
24  Q.   Okay.  Did you have any discussions about
25  debit memos?

21

1   A.   Specifically for this -- in the last month?
2   Q.   Yes.
3   A.   No.
4   Q.   Okay.  So -- and all these questions I'm
5   asking right now are just about from the time you
6   learned of the deposition.
7        So you didn't have any discussions with Greg
8   Myers since the time you learned about the deposition
9   about debit memos?
10  A.   Well, yes, we have.
11  Q.   Okay.  What were those discussions?
12  A.   We had discussions about the latest output
13  that was provided, the recent output.
14  Q.   Okay.  So when you say "recent output," that
15  implies that there was an older output; is that
16  right?
17  A.   Yes.
18  Q.   Okay.  So how many outputs are there?
19  A.   I know of two.
20  Q.   Okay.  And are they --
21       Would you identify them by a date, or how do
22  you know there are two?
23  A.   The -- I know there are two batches.  The
24  original 776 batch, and then there's a batch of 150.
25  Q.   Okay.  And do you know when the -- and would

22

1   you say those are two separate script outputs?
2        MR. KONOVALOV: Objection.  Vague and
3   ambiguous.
4   Q.   BY MR. GREENSTEIN: Right?
5   A.   Pardon?  Say that again.  Repeat.
6   Q.   So would you say there is a script output for
7   each of those, the 776 batch and the 150 batch?
8   A.   They're two separate spreadsheets.
9   Q.   Okay.  But you referred to one as a recent
10  script output, right?
11  A.   Yes.
12  Q.   So the older script output, was that produced
13  before; is that what you're saying?
14  A.   Yes.
15  Q.   Okay.  Do you know when that was produced?
16  A.   2005, early 2006 time frame.
17  Q.   Around February 2006?
18  A.   I don't know the exact time frame.
19  Q.   Are you aware of any script outputs
20  that were produced before January 1st, 2006?
21  A.   I'm not aware of any.
22  Q.   Okay.  Are you aware that Oracle produced
23  script outputs in November of 2005?
24  A.   I'm not aware of any.
25  Q.   Are you aware that Oracle produced script

23

1   outputs related to 46,000 debit memos in May of 2005?
2        MR. KONOVALOV: Objection.  Misstates the
3   evidence.
4        THE WITNESS: No.
5   Q.   BY MR. GREENSTEIN: Okay.  So were you
6   involved in any script outputs -- well, strike that.
7        When was the first time that you were involved
8   in the review of these script outputs?
9   A.   October of 2005.
10  Q.   So what were the substance of your discussions
11  with Greg Myers between the time you were deposed and
12  as you sit here today?
13       Let's start with did you talk to him more than
14  once?
15       MR. KONOVALOV: I think you meant between the
16  time he learned he was going to be deposed?
17       MR. GREENSTEIN: Right.
18       MR. KONOVALOV: Okay.
19       THE WITNESS: Um, I can't state the specific
20  dates that I've talked to him.
21  Q.   BY MR. GREENSTEIN: Okay.  Was it multiple --
22       Did you sit down with him or was it phone
23  conversations?
24  A.   Um, he's my direct manager, so I would -- I
25  sit right outside his office.

24

1   Q.   Okay.  So after you learned you were going to
2   be deposed, did you understand what this case was
3   about?
4   A.   Not completely, no.
5   Q.   Okay.  Are you aware that plaintiffs in this
6   case allege that there was an on-account cleanup
7   conducted in November-December 2000, relating to
8   approximately 46,000-plus debit memos?
9        MR. KONOVALOV: Objection.  Misstates the
10  allegations in the complaint.
11       But you can answer the question.
12       THE WITNESS: Yes, I'm aware of that.
13  Q.   BY MR. GREENSTEIN: Okay.  Have you ever seen
14  the complaint in this action?
15  A.   No.
16  Q.   Okay.  How are you aware that -- are you aware
17  of that because of discussions you have had with Greg
18  Myers?
19  A.   Previous discussions.
20  Q.   Okay.  Previous to today or previous to the
21  time you learned you were going to be deposed?
22  A.   Previous to the time I was being deposed.
23  Q.   Okay.  So when did you first learn about this
24  case?
25  A.   Um, around the October 2005 time frame.

25

1    Q.    October 2005?
2    A.    Uh-huh.
3    Q.    And that was the time that you became involved
4    in reviewing the script output, right?
5    A.    Correct.
6    Q.    And you said you didn't help create the script
7    output, you just reviewed it, right?
8    A.    Correct.
9    Q.    So do you -- and I won't even try to pronounce
10   that name.  So the person who created it --
11   A.    Tamas.
12   Q.    Tamas.
13         How did you become involved in reviewing the
14   script output in October of 2005?
15   A.    Greg Myers directed me that I was going to be
16   involved.
17   Q.    Okay.  And what did he tell you?
18   A.    That we need to review an output of data.
19   Q.    Okay.  Is that all he said?
20   A.    I can't recall the exact conversation.
21   Q.    Well, generally, did he just -- did he come to
22   you and explain what this data was?
23   A.    Yes.
24   Q.    Okay.  And what did he say it was?
25   A.    It was data that has been extracted out of the

26

26   page
1    Oracle database.
2    Q.    Okay.  "The Oracle database," there's only one
3    Oracle database?
4    A.    There could be multiple databases.
5    Q.    And what did he say to you about this
6    litigation?
7    A.    There were -- he didn't really go into the
8    specifics, but we needed to review the data
9    associated with the debit memos.
10   Q.    Okay.  And do you know who worked -- who
11   besides that earlier individual you described --
12   A.    Tamas.
13   Q.    -- Tamas, helped create the script output, if
14   you know?
15   A.    I -- I don't know who else was involved.
16   Q.    Okay.  Was Sanjay Kumar involved?
17   A.    I don't know.
18   Q.    Okay.  But do you think it was just Tamas, or
19   is that a project that one person could create or
20   would it take multiple people?
21         MR. KONOVALOV:  Objection.  Calls for
22   speculation.  Asked and answered.
23         THE WITNESS:  I don't know.
24   Q.    BY MR. GREENSTEIN:  Could you create a script
25   output if you wanted to?

27

1    A.    No.
2    Q.    And why is that?
3    A.    I don't have the knowledge.
4    Q.    What type of knowledge would be
5    needed -- or what kind of knowledge does Tamas have
6    that would allow him to create a script output?
7         MR. KONOVALOV:  Objection.  Calls for
8    speculation.
9         THE WITNESS:  I don't know Tamas' knowledge.
10   Q.    BY MR. GREENSTEIN:  Okay.  But you said you
11   don't have the knowledge.  What did you mean?
12         What knowledge would you need to create a
13   script output?
14   A.    I don't have a personal knowledge of the exact
15   modules and tables that need to be pulled from for
16   this information.
17   Q.    Okay.  You say "the modules."  What do you
18   mean by that?
19   A.    Data stored in modules.
20   Q.    Okay.  And you said you don't have knowledge
21   of the tables that are stored in the modules; is that
22   what you said?
23   A.    Modules contain tables where data is stored.
24   Q.    Okay.  And -- but you have personal knowledge
25   of what's -- you have personal knowledge of the data

28

1    that was in the tables that were used to create the
2    script output, right?
3    A.    Some of it.
4    Q.    Okay.  So did you talk to anybody else, after
5    you learned that you were going to be deposed, about
6    the subject matter of this case?
7    A.    Not the subject matter, no.
8    Q.    Or about this case at all?
9    A.    No.
10   Q.    Okay.  And did you meet with any lawyers after
11   the time you learned you were going to be deposed?
12   A.    Yes.
13   Q.    Okay.  And when was the first time?
14   A.    Yesterday.
15   Q.    Okay.  And approximately how long did you meet
16   for?
17   A.    All day.
18   Q.    All day.
19         And who -- were there any nonlawyers present?
20   A.    Yes.
21   Q.    And who was there?
22   A.    Toni Thingvold and Jerry Fujimoto.
23   Q.    Jerry is from Deloitte & Touche?
24   A.    Deloitte.
25   Q.    Is Toni from Deloitte also?

29

1    MR. KONOVALOV:  Yes.
2    MR. GREENSTEIN:  Oh, okay.
3    MR. KONOVALOV:  They're working as our
4  consultants.
5    MR. GREENSTEIN:  Okay.
6    Q.    And that was the first time you met with
7  lawyers after the time you were going to be
8  deposed -- or you learned you were going to be
9  deposed, right?
10   A.    Yes.
11   Q.    Okay.  Did you review documents yesterday?
12   A.    We did, yes.
13   Q.    Okay.  Approximately how many, a box?
14   A.    There were a handful.  I don't know.
15   Q.    A handful.
16    Okay.  Were there E-mails?
17   A.    Yes.
18   Q.    E-mails from you?
19   A.    I can't recall.
20   Q.    Do you remember the time period of E-mails?
21   A.    No.
22   Q.    Okay.  Were the E-mails 2005 time frame or
23  were some of them -- did some of them go back to
24  2000 --
25   A.    I don't know the exact dates on the E-mails.

30

1    Q.    Okay.  Did any of those documents help you
2  recall events that occurred, you know, 2000-2001 time
3  frame?
4    A.    There was one document, one E-mail.
5    Q.    Okay.  And what was -- what did it help you
6  recall?
7    A.    There's an E-mail regarding approvals that I
8  requested from Mike Quinn.
9    Q.    Are you referring to an E-mail regarding auto
10  adjustments of unapplied cash?
11   A.    No.
12   Q.    Okay.  What are you referring to?  What was
13  the E-mail about?
14   A.    It was auto adjustments for invoices.
15   Q.    Okay.  And what is an "auto adjustment"?
16   A.    It's a program that is run to adjust balances
17  of invoices.
18   Q.    Okay.  And -- okay.  Do you remember the date
19  of that E-mail?
20   A.    No, I don't.
21   Q.    Okay.  Did that E-mail help you remember what
22  was going on at the time?
23   A.    Um, yes.  Yes.
24   Q.    And what do you remember about auto
25  adjustments and approvals?

31

1    A.    In that time, I wanted Mike Quinn's approval
2  to run it for those parameters that are listed on the
3  E-mail.
4    Q.    All right.
5     Now, prior to the time you learned you were
6  going to be deposed, did you have any -- did you ever
7  meet with any lawyers about this case?
8    A.    No.
9    Q.    Okay.  Did you ever meet with any lawyers
10  about debit memos at any time, prior to when you
11  learned you were going to be deposed?
12   A.    No.
13   Q.    Did you ever have any discussions with Greg
14  Myers about debit memos, prior to the time you
15  learned you were going to be deposed?
16   A.    Yes.
17   Q.    Okay.  And did you have any discussions with
18  Greg Myers prior to October 2005 about debit memos?
19   A.    Yes.
20   Q.    Okay.  When was the first time you discussed
21  debit memos with Greg Myers?
22   A.    December of 2000 -- 2000.  I'm sorry.
23   Q.    So the first month that you arrived at Oracle
24  you had discussions with Greg Myers about debit
25  memos?

32

1    A.    Yes.
2    Q.    Okay.  And what did you talk about?
3    A.    He had just explained to me the debit memos
4  and the reason for the debit memos.
5    Q.    Okay.  And why -- how did this discussion come
6  up in your first month at Oracle?
7    A.    I was the AR manager at the time.
8    Q.    All right.  And was that your first -- that
9  was obviously your first position, AR manager?
10   A.    Correct.
11   Q.    Okay.  And how long were you an AR manager?
12   A.    Almost four years, I think.  Three or four
13  years.
14   Q.    So until approximately December 2004?
15   A.    Uh-huh.
16   Q.    And then what was your next position?
17   A.    I was a project manager.
18   Q.    For what department?
19   A.    Um, it was Global Operations.
20   Q.    Is that the formal -- or what's the formal
21  title?
22   A.    At the time it was project manager in the
23  Global Operations Department.
24   Q.    So what -- who hired you at Oracle; do you
25  remember?

33

1    A.    Greg Myers.
2    Q.    He did.
3          Are you friends with Greg Myers?
4    A.    Um, we have a friendly relationship.
5    Q.    Working relationship?
6    A.    Yes.
7    Q.    Were you friends with him before -- or, sorry.
8          Did you know him before he hired you?
9    A.    Yes.
10   Q.    How did you know him?
11   A.    My wife worked at Oracle also.
12   Q.    Okay. What's your wife's name?
13   A.    Jeanine Corn at the time.
14   Q.    So what was Greg Myers' title in
15   December '04 -- or 2000?
16   A.    I think it was just -- I can't recall. I
17   can't recall his exact title.
18   Q.    Okay. When you were an AR manager, who did
19   you report to?
20   A.    Greg.
21   Q.    Okay. And do you know who he reported to?
22   A.    Um, I don't know at that time if he reported
23   directly to Mike Quinn or not.
24   Q.    Do you know what Greg Myers' title was in
25   December of 2000?

34

1    A.    No.
2    Q.    Okay. So did you have any formal -- did you
3    have any training when you arrived at Oracle in
4    December of 2000?
5    A.    "Training"? What do you mean?
6    Q.    Any training at all. Or did you just start,
7    and they threw you right in and you started working?
8    A.    I had the standard HR training, but . . .
9    Q.    What is an AR manager? What were your duties
10   and responsibilities?
11   A.    As the AR manager I was responsible for
12   ensuring that all transactions were created within
13   the current period.
14   Q.    What do you mean by "all transactions were
15   created in the" --
16   A.    All invoices had been generated, all cash
17   receipts had been generated, all credit memos had
18   been processed.
19   Q.    So invoices, cash receipts, credit memos?
20   A.    All refunds had been processed.
21   Q.    And why would a refund occur?
22         MR. KONOVALOV: Objection. Lacks foundation.
23         MR. GREENSTEIN: Strike that.
24   Q.    So you were in charge of invoices, cash
25   receipts, credit memos, refunds.

35

1          Anything else?
2    A.    Adjustments.
3    Q.    Adjustments to what?
4    A.    Invoices.
5    Q.    And invoices can be adjusted via credit memo,
6    right?
7    A.    The adjustment has a specific name, activity
8    in Oracle. Credit memo and adjustments are two
9    different transactions.
10   Q.    Okay. So what does an adjustment mean at
11   Oracle?
12   A.    Adjustment is directly added or subtracted to
13   the header of the invoice.
14   Q.    The header -- okay. What's the "header" of an
15   invoice?
16   A.    So an invoice has a header and a line item.
17   So the header information stores all the receivable
18   information, customer information.
19   Q.    And the line -- what's a "line item"?
20   A.    Is the actual product that the customer is
21   purchasing.
22   Q.    Okay. So the header, does that include the
23   date the invoice was generated?
24   A.    Yes.
25   Q.    Okay. Does it include the payment terms?

36

1    A.    Yes.
2    Q.    What kind -- what other information is under
3    the header umbrella?
4    A.    I would have to look at an invoice. I don't
5    know the exacts, but I know the general.
6    Q.    So you were in charge --
7          Is it fair to say you were in charge of
8    adjustments made to any of the -- any of the data
9    that were under the header of an invoice?
10   A.    I had specific approval limits.
11   Q.    Okay. To approve -- approve what?
12   A.    Approve the adjustments.
13   Q.    Okay. And when you say "header," is that
14   something -- is that something that's within an
15   electronic system at Oracle, or is that something
16   physically kept somewhere?
17         MR. KONOVALOV: Objection. Vague and
18   ambiguous.
19         But if you understand, you can answer the
20   question.
21         THE WITNESS: The header stores many types of
22   data. So there's not just -- you can't say it's
23   just -- that's a general term. "Header" is a general
24   term --
25   Q.    BY MR. GREENSTEIN: Uh-huh.

37

1    A.    -- where it stores many types of data.
2    Q.    Okay. Is -- is that stored in the accounts
3    receivable module at Oracle?
4    A.    Yes.
5    Q.    Okay. And what kind of -- what kind of
6    electronic system was Oracle using? Did it have a
7    name at the time, December of 2000?
8    A.    I don't know. December 2000, no.
9    Q.    Okay. Well, when you got there and you were
10   an AR manager, right, did you have to use any sort of
11   electronic system to get the data that you needed to
12   do your job?
13   A.    Um, I had to receive a user name, yes.
14   Q.    And the user name allowed you to go into some
15   sort of electronic system, right?
16   A.    Correct.
17   Q.    Okay. Then do you know -- did that system
18   have a name?
19   A.    I don't recall, no.
20   Q.    Okay. So you'd log onto it, the electronic
21   system, in order to retrieve data that would help you
22   do your job, right?
23   A.    Yes.
24   Q.    And do you know --
25         And so when you say you were in charge of

38

1    invoices, cash receipts, credit memos, refunds, and
2    adjustments, and invoices, right?
3    A.    Uh-huh.
4    Q.    Anything else?
5    A.    There were many things that I was responsible
6    for. Many, but I can't -- that's -- I can't remember
7    them all.
8    Q.    Okay. So just describe your day-to-day duties
9    with respect to managing these types of areas. Like,
10   what did you do? Like, why would you need to do
11   that?
12   A.    I would ensure that a -- the auto invoice
13   program imported all the orders from the AR interface
14   table. That's one specific job duty that I was
15   actioned with.
16   Q.    Okay. There was an automated process for
17   invoices, right?
18   A.    Correct.
19   Q.    Why don't you take me through that process.
20   From the time an invoice is created for a customer,
21   what happens?
22   A.    From the time it's created?
23   Q.    Yep.
24   A.    It's printed and then mailed to the customer.
25   Q.    But is it kept -- isn't it kept

39

1    electronically?
2    A.    Sure.
3    Q.    All right. So why don't you describe for me
4    how, if a customer says, "I want to buy an Oracle
5    product," and they agree on a deal, and an invoice is
6    generated and then sent to the customer, what
7    happens?
8         Why don't you describe for me from the time
9    the invoice is generated until the time that the
10   invoice is closed out, what happens, as far as you
11   knew, on the Oracle systems?
12        MR. KONOVALOV: Objection. Vague and
13   ambiguous.
14        THE WITNESS: Maybe be more specific to what
15   exactly you're looking for. There's . . .
16   Q.    BY MR. GREENSTEIN: Well, what -- what was
17   your job to do? Once an invoice was generated, what
18   did you have to do?
19   A.    My job was to confirm that the invoice was
20   generated.
21   Q.    And how would you do that?
22   A.    We had a specific interface table, and we can
23   look in and see if there's any data that need to be
24   imported for the current month.
25   Q.    I'm sorry. For the what?

40

1    A.    Current month.
2    Q.    Okay. So you log onto the system to see if
3    that occurred?
4    A.    To view the invoices that were generated, yes.
5    Q.    Okay. So why would you -- why would you --
6    strike that.
7         So if an invoice was generated and sent to a
8    customer, besides finding -- besides confirming that
9    the invoice actually occurred, what else would you
10   have to confirm to do your job?
11   A.    From an invoicing standpoint, nothing.
12   Q.    Okay. From a cash receipts standpoint, what
13   would you have to confirm?
14   A.    We have to confirm that the daily deposits
15   were created in the AR system.
16   Q.    Okay. How is a daily deposit created in the
17   system?
18   A.    Maybe be more specific. There's numerous
19   deposits.
20   Q.    Well, who -- a deposit from who, an Oracle
21   customer?
22   A.    Yes.
23   Q.    Okay. So you mean a payment comes in?
24   A.    Correct.
25   Q.    Okay. And so what were your duties and

41

1  responsibilities with respect to payments coming in
2  from customers?
3  A.   My group was responsible for recording those
4  in the Oracle system.
5  Q.   Okay.  Well, wasn't there a lockbox process
6  that automatically recorded the payments?
7  A.   Yes.
8  Q.   Okay.  So did you have to confirm that the
9  lockbox -- that automated system actually worked?
10  A.   A person in my group actually ran that
11  process.
12       MR. KONOVALOV:  Terry, wait until he's
13  finished asking the question and pause to allow the
14  court reporter to take it down more clearly.
15       THE WITNESS:  Okay.
16  Q.   BY MR. GREENSTEIN:  Who was the person in your
17  group that was in charge of running the lockbox
18  process?
19  A.   There were multiple people within the time
20  frame I was the manager that had the responsibility.
21  Q.   Well, do you remember any of them?
22  A.   Um, specifically, Kim McMurdo.
23  Q.   Okay.  What did she do?  Or what was her role
24  in making sure -- her role in the lockbox payment
25  process?

42

1  A.   It was a concurrent request that she runs.
2  Q.   What does that mean?
3  A.   To import the daily lockbox.
4  Q.   Okay.  I don't understand that.
5       What -- so a payment comes in from a customer
6  through the lockbox, has bank information, right?
7  A.   Uh-huh.
8  Q.   Okay.
9  A.   Yes.
10  Q.   Okay.  So what does Kim McMurdo have to do?
11  A.   She has to import the file from the bank.
12  Q.   Okay.  And then what does that mean, take a --
13  take a data file from the bank and import it into
14  Oracle systems?
15  A.   Correct.
16  Q.   Okay.  She -- once -- once the payment
17  comes in through the lockbox, who's in charge of
18  determining how it's applied to an invoice?
19  A.   There are two pieces to the lockbox process.
20       The lockbox is built to auto apply if it
21  matches by a number of data points.
22       Or, the person, like specifically Kim, if she
23  had unapplied cash receipts that came in, she would
24  do a first audit of the -- or first review of the
25  cash receipts to see if she could make a

43

1  determination of what needed to be applied.
2  Q.   And what happened -- what would happen if she
3  couldn't determine that a payment or part of a
4  payment couldn't be applied to an invoice?
5  A.   It would be an unapplied cash receipt.
6  Q.   Okay.  And do you know what account number it
7  would go into?
8  A.   At that time it was 25005.
9  Q.   At that time, December of 2000, right?
10  A.   Yes.
11  Q.   And did that ever change?
12  A.   It did.
13  Q.   Okay.  And what did it change to?
14  A.   12018.
15  Q.   Okay.  So December 2000 -- strike that.
16       So do you know when it changed?
17  A.   I don't know the exact date.
18  Q.   So when you say it changed, do you mean that
19  when a payment came in that couldn't be applied to an
20  invoice and became unapplied cash, it would be kept
21  in 12018 instead of 25005?
22  A.   Correct.
23  Q.   So was there no longer an Account 25005, once
24  account 12018 started to be used?
25  A.   No, I think it was still active.

44

1  Q.   Okay.  Do you know the -- what's the
2  difference between those two accounts?
3  A.   I don't know the exact difference.
4  Q.   And you don't know when it changed to 12018?
5  A.   I don't know the exact time frame, no.
6  Q.   How do you know it changed?
7  A.   I know it changed.  I just have personal
8  knowledge that it changed.
9  Q.   Okay.  And what does that --
10       When you say "personal knowledge," did someone
11  tell you that it changed?
12  A.   I recall that there was talk of it changing to
13  12018.
14  Q.   Okay.  And when do you recall that occurring?
15  A.   I don't know.
16  Q.   Was it months after you started at
17  Oracle?
18  A.   Oh, yeah.
19  Q.   Years?
20  A.   I don't know.
21  Q.   Okay.  Were you an accounts receivable manager
22  at the time that you had those discussions?
23  A.   I think so.  I don't recall the exact time
24  frame.
25  Q.   Okay.  So there were specific discussions that

45

1    unapplied cash that couldn't be -- well, cash
2    receipts couldn't be applied to invoices that became
3    unapplied cash would go into 12018 versus going into
4    25005.  There were specific discussions about that?
5        MR. KONOVALOV: Objection. Misstates the
6    witness' testimony.
7        THE WITNESS: I don't know if there were
8    specific questions -- answers about that.
9    Q.   BY MR. GREENSTEIN: But there were general
10   discussions that it was changing from 25005 to 12018,
11   right?
12       (To the reporter)  we'll probably use those
13   numbers a lot.
14       There were general discussions that the change
15   was being made, right?
16   A.   Yes.
17   Q.   Do you know why the change was being made?
18   A.   I don't.
19   Q.   How -- did that affect your job at all?
20   A.   Nothing at all.
21   Q.   Okay. Did it affect Kim McMurdo's job?
22       MR. KONOVALOV: Objection. Calls for
23   speculation.
24       THE WITNESS: I don't know.
25   Q.   BY MR. GREENSTEIN: Okay. Was she

46

1    reporting -- she was reporting to you, though, right,
2    at that time?
3    A.   Yes.
4    Q.   Did that -- but that obviously impacted her,
5    the process by which she had to oversee the lockbox?
6        MR. KONOVALOV: Objection. Calls for
7    speculation.
8        Sorry. Objection. Calls for speculation.
9        THE WITNESS: I don't know.
10   Q.   BY MR. GREENSTEIN: Okay. So back to your
11   discussions with Greg Myers.
12       Did you ever discuss an on-account cleanup
13   that occurred in November of 2000?
14   A.   He informed me of -- it was a discussion
15   around when he was explaining the debit memos to me.
16   Q.   All right.
17       And I think you said that occurred about a
18   month after you started, right? Well, the first
19   time.
20   A.   It was in the first month.
21   Q.   Okay. And did he explain what happened in
22   November of 2000 to you?
23   A.   Yes.
24   Q.   Okay. And what did he say?
25   A.   Um, the receipts that had -- had the

47

1    on-account flag were -- the flag was taken off of the
2    receipt, a debit memo created and applied to the
3    receipt.
4    Q.   Okay. Did you understand what he meant at the
5    time he was telling you this?
6    A.   Not specifically at the time.
7    Q.   All right. Did you know what "on-account"
8    was?
9    A.   No.
10   Q.   So why was he explaining this to you?
11       MR. KONOVALOV: Objection. Calls for
12   speculation.
13   Q.   BY MR. GREENSTEIN: It was around January of
14   2001; is that fair to say?
15   A.   Yeah.
16   Q.   Or do you know that it was in 2000?
17   A.   Um, I don't know specifically if it was
18   exactly December 2000, or if it was January 2001, no.
19   Q.   Okay. Do you remember -- do you remember that
20   Oracle missed its forecast in its third quarter of
21   '01, which ends February 28th, 2001?
22       MR. KONOVALOV: Objection. Assumes facts not
23   in evidence.
24   Q.   BY MR. GREENSTEIN: You don't remember that?
25       MR. KONOVALOV: Same objection.

48

1    Q.   BY MR. GREENSTEIN: I'm just trying to figure
2    out, you know, when that discussion took place.
3        So do you know why he was explaining this to
4    you?
5    A.   I don't know why he felt it -- the need.
6    Q.   Okay. Well, was it -- did it come up because
7    of something that you brought to his attention, or
8    did he just sit you down one day and say, "Hey, let
9    me explain what happened in November of 2000"?
10   A.   He explained the reason of the debit memos.
11   Q.   Okay. And why -- why did a discussion
12   involving debit memos come up in your first month at
13   Oracle?
14   A.   I don't know. Maybe he felt it was my -- as
15   AR manager it was part of my job to know.
16   Q.   Uh-huh.
17       But again, did you come to him and ask him a
18   question which resulted in that discussion, or did he
19   just sit you down and out of the blue started
20   explaining this process?
21   A.   He explained to me this process.
22   Q.   Okay. Were you the only one in the room?
23   A.   I don't know at the time.
24   Q.   So it wasn't part of a big meeting or
25   anything, was it?

49

1    A.  I don't remember.
2    Q.  Was it a one-on-one discussion?
3    A.  I don't recall.
4    Q.  Okay.
5        Prior to that discussion, you didn't know what
6  "on-account" meant, right?
7    A.  No.
8    Q.  Okay.  Did you know what a debit memo was
9  before that discussion?
10    A.  No.
11    Q.  Okay.  And why don't you just tell me
12  everything you remember about what he told you about
13  what happened in November of 2000.
14    A.  He basically explained the receipts that were
15  on-account were taken off on-account.  The flag was
16  taken off.  The debit memo created, and the debit
17  memo applied.
18    Q.  You say "debit memo applied."  What do you
19  mean?
20    A.  You have to physically apply the debit memo to
21  the cash receipt.
22    Q.  Okay.  And do you recall --
23        Did you ever have any discussion with anybody
24  else about the November 2000 cleanup, after the
25  discussion with Greg Myers?

50

1    A.  Not that I'm aware of, no.
2    Q.  Did you ever talk to the SEC about what
3  happened in November of 2000?
4    A.  No.
5    Q.  Did you ever talk to the FBI about what
6  happened in November of 2000?
7    A.  No.
8    Q.  Did you ever talk to the SEC about anything
9  that happened at Oracle while you were there?
10    A.  No.
11    Q.  FBI?
12    A.  No.
13    Q.  Okay.  Did you ever talk to what's called a
14  Special Litigation Committee at Oracle?
15    A.  No.
16    Q.  Okay.  Are you aware that any of your
17  colleagues were interviewed by a Special Litigation
18  Committee?
19    A.  No, not aware.
20    Q.  Okay.  Do you know why -- or, strike that.
21        Did Greg Myers explain to you why the debit
22  memos were created in November of 2000?
23    A.  To my knowledge, it was just to remove the
24  on-account flag.
25    Q.  So he told you what happened, right?  And

51

1  that's what he said to you, that it was to remove an
2  on-account flag, right?
3    A.  Yes.
4    Q.  But did he tell you why the on-account flags
5  had to purportedly be removed?
6    A.  If I remember, it was to use the on-account
7  flag for a different use or a specific use.
8    Q.  Okay.  And what did he say about that?
9    A.  I don't remember.
10    Q.  But other than that conver- -- he was telling
11  you this, but other than what he told you, you didn't
12  know why the debit memos were created in November of
13  2000, right?
14    A.  No.
15    Q.  Did you ever come to learn of any additional
16  information regarding the on-account cleanup after
17  you talked to Greg Myers?
18    A.  No.
19    Q.  Did you ever talk to any lawyers from Morrison
20  & Foerster about anything related to debit memos?
21    A.  No.
22    Q.  Did you ever participate in helping Greg Myers
23  with a presentation that he made to the SEC -- or the
24  presentation that Oracle made to the SEC regarding
25  debit memos?

52

1    MR. KONOVALOV:  Well, assumes facts not in
2  evidence.
3        But you can answer the question.
4    THE WITNESS:  No.
5    MR. KONOVALOV:  Try and go a little slower.
6    Q.  BY MR. GREENSTEIN:  Are you aware that --
7        Well, did you ever help Greg Myers research
8  any debit memos, say, in 2002?
9    A.  Yes.
10    Q.  Okay.  And why were you asked to research
11  debit memos?
12    A.  Greg just asked for my help.
13    Q.  Okay.  Do you remember when that occurred?
14    A.  I don't know the exact time.  I know it was
15  2002.
16    Q.  Okay.  Do you remember if it was the first
17  half of 2002 or the second half?
18    A.  I -- October 2002.
19    Q.  Okay.
20    A.  I don't know the exact time frame.
21    Q.  Do you know that there was an amended
22  complaint filed against Oracle in October -- on
23  October 11th, 2002, that had allegations about what
24  happened in November of 2000?
25    A.  No.

53

1    Q.    Okay. Did Greg Myers ever say, "Hey, we've
2    been sued for this -- for these circumstances that
3    occurred in November of 2000 regarding debit memos"?
4    A.    No.
5    Q.    So when he asked you to research debit memos
6    in October of 2002, did he explain why he was asking
7    you to do that?
8    A.    No.
9    Q.    Okay. So what -- what did he -- or did he
10   just tell you to research debit memos or did he tell
11   any other -- anybody else?
12         MR. KONOVALOV: Objection. Calls for
13   speculation.
14         THE WITNESS: I don't know.
15   Q.    BY MR. GREENSTEIN: Okay. Do you remember if
16   it was a one-on-one conversation or was it a big
17   meeting where a team was asked to research debit
18   memos?
19   A.    I don't recall.
20   Q.    So what did you do when you -- or what exactly
21   did you do after you were asked to research debit
22   memos?
23   A.    I received a file from Greg.
24   Q.    What was in the file?
25   A.    A listing of debit memos.

54

1    Q.    Okay. Was that a paper file?
2    A.    No.
3    Q.    Electronic file?
4    A.    Spreadsheet.
5    Q.    Spreadsheet.
6          Was it E-mailed to you?
7    A.    Um, I can't -- I can't remember.
8    Q.    But that would be the only other way -- well,
9    strike that.
10         If it wasn't E-mailed to you, how would you
11   get it from him?
12   A.    We have a shared folder that he could have put
13   the file on.
14   Q.    All right.
15         So he could have just uploaded -- or he could
16   have put the file in a folder somewhere that you had
17   access to; is that what you're saying?
18   A.    Yes.
19   Q.    Okay. But it was either E-mailed to you or
20   put in a folder like that, right?
21   A.    I don't recall.
22   Q.    Okay. Do you remember --
23         So it had a list of debit memos?
24   A.    Yes.
25   Q.    Okay. How many debit memos?

55

1    A.    I don't know.
2    Q.    Okay. Was it more than ten?
3    A.    I don't recall the exact number.
4    Q.    Thinking back to your research, do you
5    remember researching, you know, only a few debit
6    memos, or was it, you know, a one-page spreadsheet,
7    two-page spreadsheet?
8    A.    I don't know the size of the spreadsheet.
9    Q.    Do you remember any specific debit memo
10   customer names?
11   A.    No.
12   Q.    Do you recall if one of the debit memo
13   customers was Household?
14   A.    I don't.
15   Q.    Okay. Eli Lilly?
16   A.    No.
17   Q.    No?
18         MR. KONOVALOV: Are you saying no, you don't
19   know, or no, you don't recall?
20         THE WITNESS: I don't know.
21   Q.    BY MR. GREENSTEIN: Okay. So once you got the
22   spreadsheet from Greg Myers, did you have a
23   discussion about what you were supposed to do?
24   A.    Yes.
25   Q.    Okay. What did he tell you?

56

1    A.    I don't recall the exact conversation that we
2    had. I just know that we had to research debit
3    memos.
4    Q.    And how do you know they were debit memos?
5    Did he tell you they were debit memos, or was there
6    something on the spreadsheet that confirmed that they
7    were debit memos?
8    A.    I think Greg told me they were debit memos.
9    Q.    Okay. So other than specific discussions, you
10   remember generally what he told you to do with the
11   spreadsheets?
12   A.    I don't recall the exact information that I
13   needed.
14   Q.    Okay. Were you ever asked at any time, after
15   this lawsuit was filed in May of 2001 -- or, sorry,
16   March 2001, were you ever asked to preserve any of
17   those documents, the spreadsheets relating to debit
18   memos, or any of the work you did relating to debit
19   memos?
20   A.    No, I was not.
21   Q.    So do you recall -- what do you recall being
22   on the spreadsheets? Was it -- did they have
23   customer names?
24   A.    I think it was just debit memos.
25   Q.    Was it 550 invoice numbers?

57

1   A.   I assume so. I don't know without looking at
2   the exact spreadsheet.
3   Q.   Right. Well, you assume that because all the
4   debit memos had 550 prefixes, right?
5   A.   They could have.
6   Q.   So what do you -- do you remember any of the
7   data that was on the spreadsheets?
8   A.   I don't remember the exact data, no.
9   Q.   Or generally?
10  A.   It was a listing of debit memos.
11  Q.   Did it have dates on it, do you remember?
12  A.   I don't recall.
13  Q.   Okay. So were you asked to research the debit
14  memos and figure out, um -- strike that.
15       What was your -- what was -- did you ever
16  complete the research of the debit memos?
17  A.   Yes.
18  Q.   Okay. And what did you have to do to complete
19  it?
20  A.   Um, we had to query the transactions in the AR
21  subledger.
22  Q.   Okay. And why would a debit memo -- why would
23  you go into the AR subledger to research a debit
24  memo?
25  A.   That's where debit memos are stored and

58

1   created.
2   Q.   Okay. What is an "AR subledger"?
3   A.   The accounting receivable subledger.
4   Q.   Electronic subledger?
5   A.   Correct.
6   Q.   And that rolls up into the general ledger,
7   right?
8        MR. KONOVALOV: Objection. Calls for
9   speculation.
10       THE WITNESS: I don't know where it goes.
11  Q.   BY MR. GREENSTEIN: Okay. But it's a
12  subledger, which implies that it's part of a larger
13  ledger, right?
14       MR. KONOVALOV: Objection. Calls for
15  speculation.
16       THE WITNESS: I don't know.
17  Q.   BY MR. GREENSTEIN: Okay. Why -- why -- why
18  was an AR subledger used at Oracle?
19       MR. KONOVALOV: Objection. Calls for
20  speculation.
21       THE WITNESS: I don't know.
22  Q.   BY MR. GREENSTEIN: Well, what's the function
23  of it; do you know?
24       MR. KONOVALOV: Same objection.
25       THE WITNESS: I don't know.

59

1   Q.   BY MR. GREENSTEIN: Okay. As an AR manager,
2   did you ever have to use the AR subledger?
3   A.   Sure.
4   Q.   Okay. For what purposes?
5   A.   I could query cash receipts, query invoices.
6   Q.   And why would you query a cash receipt?
7   A.   If I wanted to view the cash receipt.
8   Q.   Okay. And why would you want to review a cash
9   receipt?
10  A.   "View" the cash receipt.
11  Q.   Yeah. Why would you want to view one?
12  A.   If there was a specific question related to
13  the cash receipt.
14  Q.   Okay. When you did the research on the debit
15  memos, did you query cash receipts?
16  A.   Yes.
17  Q.   Okay. And how did that help you complete your
18  task with respect to the debit memos?
19  A.   I don't recall exactly how or why.
20  Q.   Did you query invoices when you were doing
21  your research on debit memos?
22  A.   No.
23  Q.   Okay. Did you query credit memos when you did
24  your research on debit memos?
25  A.   No.

60

1   Q.   But in the AR subledger, can you query
2   information on credit memos?
3   A.   Yes.
4   Q.   So if a credit memo was issued to a customer
5   which reduced an invoice, that would be reflected in
6   the AR subledger, right?
7   A.   Yes.
8   Q.   Okay. If there was a refund made to a
9   customer, would that be in the AR subledger as well?
10  A.   The actual payment or the --
11  Q.   If you wanted to find out if Customer A was
12  refunded in connection with a certain invoice or
13  certain cash receipt -- or, sorry. Strike that.
14       If you wanted to find out if a refund was
15  given in connection with a particular invoice, would
16  you be able to go in the AR subledger and find out
17  information on that refund?
18       MR. KONOVALOV: Objection. Vague and
19  ambiguous.
20       THE WITNESS: No.
21  Q.   BY MR. GREENSTEIN: Okay. What information
22  about refunds could you find out about using the AR
23  subledger?
24  A.   Um, the refund is initiated from the AR
25  subledger.

Elam, Terry  9/28/2006  9:19:00 AM

61

1   Q.   Is there an approval process for a refund that
2   occurs in -- within accounts receivable department?
3   A.   Now?
4   Q.   Then.
5   A.   Yes.
6   Q.   There was?
7   A.   Yes.
8   Q.   Okay. And we're talking about, let's say,
9   2000 to 2002. Was the process for approving refunds
10  the same?
11  A.   Um, I believe so.
12  Q.   Okay. Did it ever change?
13  A.   Um, yes.
14  Q.   Okay. When did it change?
15  A.   I don't know.
16  Q.   Okay. How do you know it changed?
17  A.   Um, I know some of the approval limits were
18  changed.
19  Q.   Okay. When you say "approval limits," do you
20  mean that there were certain parameters or dollar
21  amounts for refunds for which there were certain
22  persons who had to approve a refund in that amount,
23  right?
24  A.   Correct.
25  Q.   All right. So did it change in that the

62

1   amounts -- or how did it change with respect to the
2   amounts?
3   A.   I don't know the exact amounts that were
4   changed.
5   Q.   Was it changed after the -- you did the
6   research on the debit memos?
7   A.   I don't recall.
8   Q.   So when you first started at Oracle, let's say
9   2000-2001, what was the approval process for a
10  refund?
11  A.   I don't have exact knowledge of that.
12  Q.   Did you ever approve refunds?
13  A.   No.
14  Q.   Do you know who did?
15  A.   I don't know, no.
16  Q.   Could you look up in the AR -- if you
17  wanted --
18       Doing your job, if you wanted to look up in
19  the AR subledger who approved a refund, could you do
20  that?
21  A.   Yes.
22  Q.   Okay. It would have a name of the person?
23  A.   Yes.
24  Q.   And it would have the reason for refund?
25  A.   I believe so, yes.

63

1   Q.   Okay. And how would that information -- or
2   how would you access that on the AR subledger?
3   A.   We have an attachment functionality that you
4   can attach it to.
5   Q.   Okay. Why don't you explain that.
6   A.   So you requested a refund, your manager with
7   the correct approval limit approved it. When the
8   refund was initiated, we attached that E-mail request
9   or however request it was to the transaction.
10  Q.   Okay. So 2000-2001, if there was a refund
11  process, there would be some sort of electronic
12  documentation that would be attached in the AR
13  module -- in the AR subledger that would show you who
14  approved a refund, right?
15  A.   I don't know specifically about the 2000 time
16  frame.
17  Q.   So that's a process that occurs today; is that
18  what you're saying?
19  A.   Yes.
20  Q.   Okay. Well, when you first started at Oracle,
21  if you had -- if you wanted to research a refund and
22  find out who approved it and why -- why it occurred,
23  did it have that functionality within the AR module?
24  A.   Yes, it did.
25  Q.   Okay. So you can go in and look at the E-mail

64

1   or whatever documentation was related to the approval
2   of a refund in 2000, right?
3   A.   If it was attached, yes.
4   Q.   If it was attached.
5       But it had the ability to be attached in 2000,
6   right?
7   A.   In 2000?
8   Q.   Right.
9   A.   I don't know.
10  Q.   Okay. Well, what time period are you
11  referring to when --
12       I mean, do you know that it wasn't -- you
13  couldn't attach it in 2000, refunds?
14       MR. KONOVALOV: Objection. Misstates the
15  witness' testimony.
16       THE WITNESS: I started late in December 2000.
17  I don't know about functionality that was before.
18  Q.   BY MR. GREENSTEIN: Okay. Right.
19       So after you started, was -- there was
20  functionality, let's say January 2001, if there was a
21  refund initiated within AR, there -- you could go in
22  and view an attachment which would have the approval
23  E-mail if there was one, right?
24  A.   If there was one, yes.
25  Q.   Okay. And you could -- could you do that

65

1  during the entire period you've been employed at
2  Oracle?
3  A.    Yes.
4  Q.    Okay. When you say a refund is initiated in
5  accounts receivable, does that mean that there's some
6  other department that handles the subsequent steps in
7  a refund process?
8  A.    Yes.
9  Q.    Is that accounts payable?
10  A.    Correct.
11  Q.    Okay. So what happens, say -- I'm just going
12  to refer -- when I refer to, you know, 2000, I just
13  mean when you were there.
14        2000-2002 time frame, what happens if a refund
15  is initiated by AR and it gets approved? What
16  happens vis-a-vis accounts payable?
17        MR. KONOVALOV: Objection. Incomplete
18  hypothetical.
19        THE WITNESS: I'm not aware of the AP process.
20  Q.    BY MR. GREENSTEIN: Okay. So you -- AR has
21  to -- does AR --
22        Does somebody within AR have to approve every
23  refund?
24        MR. KONOVALOV: Objection. Calls for
25  speculation.

66

1        THE WITNESS: I don't know.
2  Q.    BY MR. GREENSTEIN: Okay. When you were
3  talking about the parameters for approving refunds,
4  do you remember who the individuals were that could
5  approve refunds?
6  A.    I don't recall.
7  Q.    Could you ever approve refunds?
8        MR. KONOVALOV: Objection. Asked and
9  answered.
10        THE WITNESS: No.
11  Q.    BY MR. GREENSTEIN: So during your entire --
12  during your entire employment at Oracle, you couldn't
13  approve any refunds to customers?
14  A.    No.
15  Q.    Did you ever authorize any unapplied cash to
16  be refunded to Oracle customers?
17  A.    No.
18        MR. GREENSTEIN: Why don't we take about a
19  five-minute break. We've been going about an hour.
20        VIDEOTAPE OPERATOR: Going off the record.
21        The time is 10:22.
22        (Break.)
23        VIDEOTAPE OPERATOR: Back on the record.
24        The time is 10:40.
25  Q.    BY MR. GREENSTEIN: Mr. Elam, earlier we were

67

1  talking about discussions you had with Greg Myers
2  about debit memos.
3        Do you remember that?
4  A.    Yes.
5  Q.    Okay. And I just want to make sure I'm
6  getting all the different discussions.
7        The first discussion you had was in
8  approximately a month after you joined Oracle, right?
9  A.    Yes.
10  Q.    And Greg Myers explained to you what happened
11  in November of 2000, explained to you what debit
12  memos were, explained to you what on-account was,
13  right?
14  A.    He explained to me the on-account and the
15  debit memos, yes.
16  Q.    Right. And then the next discussion was, I
17  think you said in October of 2002. And that was when
18  Greg Myers asked you to research debit memo items,
19  right?
20  A.    Yes.
21  Q.    Okay. Were there any discussions in between
22  then that you had with Greg Myers regarding debit
23  memos?
24  A.    I don't recall.
25  Q.    Okay. Do you recall any discussions with

68

1  anybody else besides Greg Myers about debit memos
2  between those two discussions?
3  A.    I don't know.
4  Q.    And after October 2002, I think you said you
5  became involved in reviewing script output which
6  related to debit memos in October of 2005; is that
7  right?
8  A.    Yes.
9  Q.    Okay. Now, between the time you were asked to
10  research debit memos in October 2002, and when you
11  became involved in reviewing the script output in
12  October 2005, did you have any discussions with Greg
13  Myers about debit memos?
14  A.    I don't recall.
15  Q.    Okay. Do you recall any discussions with
16  anybody else about debit memos between those two time
17  periods?
18  A.    No, I don't.
19  Q.    Did you ever have any discussions with
20  Ernst & Young regarding debit memos?
21  A.    I don't remember.
22  Q.    Okay. Do you recall having any discussions
23  with Ernst & Young about the script output?
24  A.    I don't believe so, no.
25  Q.    Okay. Or any discussions with Ernst & Young

69

1  at all?
2  A.    With Ernst & Young?
3  Q.    Yes.
4  A.    I've had discussions with Ernst & Young, yes.
5  Q.    Okay.  About what?
6  A.    The day-to-day transactions in AR.
7  Q.    Okay.  Is Ernst & Young Oracle's auditor right
8  at the moment?
9  A.    Correct.
10  Q.    Okay.  Do you remember when they became
11  Oracle's auditor?
12  A.    I don't remember the exact date, no.
13  Q.    Okay.  So in your general duties, you'd speak
14  with Ernst & Young about the AR module?
15  A.    I'd speak to Ernst & Young about data in the
16  AR module, yes.
17  Q.    To help them perform audits?
18  A.    Yes.
19  Q.    Okay.  Other than performing audits, have you
20  ever spoken to Ernst & Young about the use of
21  on-account?
22  A.    No.
23  Q.    Okay.  Do you -- today, do you know what
24  on-account means at Oracle as it's used?
25  A.    I don't know.

70

1  Q.    So -- but have you ever had to use the
2  on-account function during your employment?
3  A.    I don't know if I've ever used it.
4  Q.    So the only thing you know about
5  on-account is what Greg Myers told you back in the
6  first month that you were working there about what
7  happened in November of 2000, right?
8        MR. KONOVALOV: Objection.  Misstates the
9  witness' testimony.
10        THE WITNESS: Um, I don't -- I don't know.
11  Q.    BY MR. GREENSTEIN: I think you said that Greg
12  Myers described on-account as a flag, right?
13  A.    Um, yeah, in general terms.  You could say
14  it's a flag, yes.
15  Q.    Okay.  So after he described that to you, did
16  you ever see on-account used at Oracle in the AR
17  module at all?
18        MR. KONOVALOV: Objection.  Vague and
19  ambiguous.
20        THE WITNESS: I can't say specifically, no.
21  Q.    BY MR. GREENSTEIN: So generally, you don't
22  know if on-account was used -- after November of
23  2000, if it was used at Oracle in connection with
24  cash receipts?
25  A.    Specifically, I'm not aware.

71

1  Q.    Okay.  Generally?
2  A.    I don't.
3  Q.    So after the October 2005 discussions
4  regarding your review of the script output, did you
5  have any other discussions about what happened in
6  November of 2000 with Greg Myers?
7  A.    I don't recall, no.
8  Q.    Okay.  Or any discussions with anybody about
9  the on-account cleanup in 2000, November 2000, since
10  the time that you started reviewing the script
11  output?
12  A.    I don't believe so.  I don't -- I don't recall
13  any specifics.
14  Q.    Okay.  Are you aware that there was a -- a
15  program or a script run in November 2000 as part of
16  the on-account cleanup?
17  A.    I'm not aware.  I was not around.
18  Q.    Okay.  Do you know Sanjay Kumar?
19  A.    Yes, I do.
20  Q.    Okay.  Who is Sanjay Kumar?
21  A.    He's an Oracle employee.
22  Q.    Okay.  Did you know him in December of 2000?
23  A.    I don't know when I met Sanjay.
24  Q.    Okay.  Are you aware that he wrote a script
25  that was used as part of the process of the creating

72

1  the 46,000-plus debit memos in November of 2000?
2  A.    I'm not aware.
3  Q.    Okay.  Earlier I think you testified about
4  Kim McMurdo's job, part of her job was to follow,
5  you know, payments that came in through the lockbox
6  and make sure that -- determine which parts of the
7  payments were applied invoices and which weren't,
8  right?
9  A.    Yes.
10  Q.    Okay.  What was your -- did you have any
11  oversight of her doing that?
12  A.    Um, if she had specific questions about
13  certain receipts, she would come to me with
14  questions.
15  Q.    Okay.  And what types of questions -- I'm just
16  trying to understand what your role was.
17        What types of questions would she have on a
18  day-to-day basis regarding cash receipts?
19  A.    Oh, jeez.  I don't know specifics.  I don't
20  know what she would . . .
21  Q.    So would she be the person -- if -- if a
22  payment came in and part of it was applied to an open
23  invoice and another part could not be applied to an
24  open invoice, I think you said that it would go into
25  Account 25005, right?

73

1    A.    At the time, yes.
2    Q.    Okay.  And then what would happen?  So part of
3    the cash receipt would be sitting in unapplied cash
4    Account 25005, right?
5    A.    Yes.
6    Q.    Okay.  And then what -- would Kim McMurdo be
7    responsible for doing -- taking some other further
8    action with respect to a payment that was -- part of
9    a payment that was sitting in unapplied cash?
10   A.    No.
11   Q.    Okay.  What would happen to that item that was
12   sitting in unapplied cash once it was moved there?
13   A.    It was assigned to collections.
14   Q.    Okay.  And do you know what they would do with
15   it?
16   A.    I'm not aware of the collections process.
17   Q.    Okay.  But as far as Kim McMurdo's
18   involvement, she would just make sure that the
19   lockbox process occurred, and then if a part of a
20   payment cash receipt would go into 25005, would she
21   have any other role in dealing with that item?
22   A.    No.
23   Q.    Okay.  So her role was just to make sure that
24   the payment came in and followed that process, the
25   lockbox process, right?

74

1    A.    Correct.
2    Q.    Okay.  Would there be any cash receipts that
3    would come in through other means other than the
4    lockbox?
5         MR. KONOVALOV:  Objection.  Calls for
6    speculation.
7         THE WITNESS:  I don't know the specifics.
8    Q.    BY MR. GREENSTEIN:  Okay.  Have you ever seen
9    a report that lists all the items of unapplied cash
10   at Oracle?
11   A.    Yeah.
12   Q.    And when was the first time you saw --
13   A.    I don't know the exact date.
14   Q.    Okay.  Do you know what -- is there a certain
15   name for a report that compiles all the unapplied
16   cash at Oracle?
17   A.    I think it's called unapplied unidentified
18   receipts.  I don't know the exact name.
19   Q.    Okay.  And that report -- does that report
20   compile every item of unapplied cash at Oracle?
21        MR. KONOVALOV:  Objection.  Calls for
22   speculation.
23        THE WITNESS:  I don't know.
24   Q.    BY MR. GREENSTEIN:  Okay.  But you've seen
25   that report, right?

75

1    A.    Yes.
2    Q.    Okay.  And you don't recall when you first saw
3    an unidentified unapplied -- unapplied unidentified
4    receipts report?
5    A.    No.
6    Q.    Okay.
7    A.    I don't know the date.
8    Q.    Why would you -- or why did you look at the
9    report?  I mean, did that help you perform your
10   duties at Oracle?
11   A.    I can't say why I saw the report.
12   Q.    Did you use the report frequently to do your
13   job?
14   A.    I could run the report, but there was no
15   reason for me to use it in my job, no.
16   Q.    Okay.  So have you ever worked with the
17   report?
18   A.    I can't -- I can't say yes or no.  I don't
19   know.
20   Q.    So you could run it.  And how could you run
21   the unapplied unidentified receipts report?
22        And from now on I'm just going to call it the
23   unapplied cash report for the record.
24        Is that okay?
25        MR. KONOVALOV:  It's up to you.

76

1         Is that understandable to you?
2         THE WITNESS:  That's fine, yes.
3    Q.    BY MR. GREENSTEIN:  So how could you run the
4    unapplied cash report at Oracle?
5    A.    It's assigned -- the report is assigned to a
6    specific profile option.  That if you have -- if you
7    are -- if you're a user name and assigned that
8    profile option, you have access to run the report.
9    It's a concurrent request.
10   Q.    Okay.  And did you have access -- so obviously
11   your user name had access to that report?
12   A.    Correct.
13   Q.    Was that -- in December of 2000, did you have
14   access?
15   A.    I don't know.
16   Q.    Okay.  Do you remember ever using that report
17   to research any debit memo items?
18   A.    I don't recall.
19   Q.    Okay.  Well, was that report something was
20   that was updated daily; do you know?
21   A.    I assume once a receipt was created in AR and
22   it's unapplied, it would show on the report.
23   Q.    Okay.  So a receipt -- a cash receipt comes
24   in, part of it's applied, and say another part that's
25   not applied goes into 25005, right?  That would

77

1   presumably show up on the unapplied cash report,
2   right?
3        MR. KONOVALOV: Objection. Calls for
4   speculation.
5        THE WITNESS: I would have to see.
6   Q.   BY MR. GREENSTEIN: You would have to look at
7   the specific cash receipt?
8   A.   And the report.
9   Q.   And the report.
10       Okay. Do you know what the report was used
11  for, um, at Oracle?
12  A.   I don't.
13  Q.   Okay. Did accounts receivable staff ever use
14  that report for any reason?
15  A.   Not to my knowledge.
16  Q.   So you don't remember working with it
17  frequently or even occasionally at Oracle?
18  A.   I've run the report.
19  Q.   Okay. And why would you as an accounts
20  receivable employee run an unapplied cash report?
21  A.   To find a specific receipt on it.
22  Q.   Okay. Well, why would you -- can't you look
23  up an individual cash receipt on Oracle's system in
24  the AR subledger?
25  A.   Yes, you can, yes.

78

1   Q.   Okay. So why would you look at the unapplied
2   cash report to find out information on a cash
3   receipt?
4        MR. KONOVALOV: Objection. Calls for
5   speculation.
6        THE WITNESS: I would have to know the
7   specific instance.
8   Q.   BY MR. GREENSTEIN: Are you aware -- do you
9   know -- when you started at Oracle, do you know how
10  much unapplied cash there was sitting in 25005?
11  A.   I don't know.
12  Q.   Okay. At any point in time, have you become
13  aware of the amount, the total amount of unapplied
14  cash in 25005?
15  A.   I probably was aware month to month, but I
16  don't know specifically dollar amounts, no.
17  Q.   Okay. Generally, do you know if it was
18  millions of dollars?
19  A.   I don't know.
20  Q.   Okay. So you would know -- so month to month
21  you would be aware of the total amount of unapplied
22  cash that was in 25005?
23  A.   Yes.
24  Q.   And why would you need to know that to do your
25  job?

79

1   A.   As part of the month-end duties of my job,
2   there was a short reconciliation that was processed
3   by myself for specifically 25005.
4   Q.   Okay. So there's a reconciliation at the end
5   of every month related to 25005?
6   A.   Yes.
7   Q.   Okay. Why don't you describe what a
8   "reconciliation" was.
9   A.   It was a spreadsheet that had the beginning
10  and ending balance with the monthly activity.
11  Q.   Okay. And what -- and you said it was you
12  only, right, that had to reconcile that?
13  A.   When I -- that was a duty that was given to
14  me, yes.
15  Q.   Okay. So what -- when you say "reconcile,"
16  what do you mean by that? Reconcile 25005 with what?
17  A.   Just the beginning and ending balance.
18  Q.   Okay. So why don't you describe to me, say --
19       Did you do that in December of 2000, at the
20  end of that month?
21  A.   I don't remember.
22  Q.   Okay. Why don't you just describe the process
23  at the month end of what you would do specifically
24  for -- to reconcile 25005 amounts.
25  A.   I don't remember the exact reports that I ran.

80

1   Q.   But generally, why were you doing it?
2   A.   It was a duty that was given to me.
3   Q.   All right. But do you know why you were asked
4   to perform that duty?
5   A.   I don't.
6   Q.   Okay. What was the -- how did you complete
7   the task? Did you have to come to some sort of --
8   strike that.
9        How would you know that you had completed the
10  reconciliation at the end of each month?
11  A.   I wouldn't know it would be done. I didn't
12  know it was done. I wouldn't know where to stop. So
13  I would run a set of reports, enter the data into the
14  spreadsheet, and that would be -- basically, that's
15  the gist of what I've done, what I did.
16  Q.   Okay. So you would run reports, and then
17  enter the data into a spreadsheet.
18       So what reports would you run?
19  A.   I don't remember the exact reports.
20  Q.   Would the unapplied cash report be one of
21  them?
22  A.   It could have been. I don't recall exactly.
23  Q.   Okay. So you would run some reports, take
24  data from those reports and put them in another
25  spreadsheet?

81

1    A.   Yes.
2    Q.   Okay.  And was that the final product, that
3    other spreadsheet?
4    A.   For me, that is -- when I was done, I was done
5    with that spreadsheet.  I don't know what happened
6    after that.
7    Q.   So your final product, as far as your duties
8    were concerned, were to have -- was it a single
9    spreadsheet?
10   A.   For 25005?
11   Q.   Yeah.
12   A.   Yes.
13        MR. GREENSTEIN:  Okay.  I'm going to mark this
14   as Elam Number 1.
15        (Plaintiff's Exhibit 1 was marked.)
16        MR. GREENSTEIN:  For the record, this is Bates
17   stamped PLF-ORC 0001161 through -001215.
18   Q.   If you could just look through it generally.
19   You don't have to look at every line.
20        Do you recognize this document?
21   A.   I do not.
22   Q.   Okay.  Do you see how -- is that handwriting
23   on the front page yours?
24   A.   No, it is not.
25   Q.   Okay.  Do you know whose it is?

82

1    A.   I do not.
2    Q.   Okay.  See how it says: "53-page list of open
3    unapplied cash"?
4        Do you see that?
5    A.   Yes.
6    Q.   Now, earlier you said you could run the
7    unapplied cash report, right?
8    A.   Yes.
9    Q.   Now, is this what it would look like if you
10   ran it?
11   A.   I don't know.  I'd have to see the output of
12   the exact report.
13   Q.   Have you ever seen this type of a report
14   before?
15        MR. KONOVALOV:  Objection.  Vague and
16   ambiguous.
17        THE WITNESS:  I have no idea what output this
18   is or what format this is.
19   Q.   BY MR. GREENSTEIN:  Okay.  So you've never --
20        Have you seen something -- have you seen a
21   report that looks like this before?
22   A.   I don't -- I can't recall.
23   Q.   Okay.  Put that aside.
24        Mark this as Number 2, please.  Elam Number 2.
25        (Plaintiff's Exhibit 2 was marked.)

83

1        MR. GREENSTEIN:  For the record, this is
2    NDCA-ORCL 050356 through -050360.  And it's an
3    Account Analysis Report from October 2000 to
4    December 2000 for Account 25005.
5    Q.   Mr. Elam, have you seen this document before?
6    A.   No.
7    Q.   Have you seen an Account Analysis Report for
8    Account 25005 before?
9    A.   Yes.
10   Q.   Have you seen this type of document before,
11   this type of report?
12   A.   What do you mean?
13   Q.   Well, you haven't seen this specific document,
14   this Account Analysis Report from October 2000 to
15   December 2000, have you?
16   A.   No.
17   Q.   Okay.  Have you seen a report, an Account
18   Analysis Report for 25005 for any other period?
19   A.   Oh, yeah.
20   Q.   Okay.  Was that one of the reports that you
21   had to run to do your reconciliation of 25005 at the
22   end of each month?
23   A.   Yes.
24   Q.   Okay.  So you said, I think, you ran a bunch
25   of reports and then you put -- you extracted the data

84

1    into another spreadsheet, which was the final product
2    at the end of each month, right?  For you.
3    A.   Final product for me.
4    Q.   Right.
5        Was this -- was Exhibit 2 the final product?
6    A.   Not to my knowledge, no.
7    Q.   Okay.  So you -- but was this --
8        Would this Account Analysis Report be one of
9    the ones that you ran to do your reconciliation at
10   the end of each month?
11   A.   Yes, it was.
12   Q.   Okay.  And what did you do with the data in
13   this report to do your reconciliation?
14   A.   I would take the different types of categories
15   and net the debits and credits, and enter that into
16   the spreadsheet.
17   Q.   Okay.  When you say "categories," do you mean
18   description, source item?  That's the --
19   A.   Source and category.
20   Q.   Oh, I see, okay.
21        And you're referring to the first two columns
22   of this report, right?
23   A.   Yes.
24   Q.   Okay.  Do you know -- do you see the first
25   entry there.  It says "Source, Manual"?

85

1   A.   Uh-huh.
2   Q.   What does that -- do you know what that means?
3   A.   No, I don't.
4   Q.   See "Category, JE"?  Does that refer to
5   journal entry?
6   A.   I don't know.
7   Q.   Do you know what a manual journal entry is?
8        MR. KONOVALOV: Objection.  Vague and
9   ambiguous.
10       THE WITNESS: I don't know.
11  Q.   BY MR. GREENSTEIN: You don't know what a
12  manual journal entry is?
13       MR. KONOVALOV: Same objection.
14       THE WITNESS: I'm not in GL. I don't know.
15  Q.   BY MR. GREENSTEIN: Okay.  So when you were
16  doing a reconciliation, you didn't know what -- if it
17  said "manual JE" on it, you wouldn't know what that
18  meant?
19       MR. KONOVALOV: Objection.  Misstates the
20  witness' testimony.
21       THE WITNESS: I don't know.
22  Q.   BY MR. GREENSTEIN: But you used this report
23  at the end of each month to reconcile 25005, right?
24  A.   One of the reports, yes.
25  Q.   Okay.  Did you ever see "manual JE" on any of

86

1   those reports?
2   A.   I don't recall.
3   Q.   Okay.  So I think you said one of your tasks
4   with respect to reconciling 25005 was to match up the
5   debits and credits; is that fair to say?
6        MR. KONOVALOV: Misstates the witness'
7   testimony.
8        THE WITNESS: No, I said I'd net the debits
9   and credits.
10  Q.   BY MR. GREENSTEIN: You'd net them, okay.  So
11  you'd --
12       What does that mean, "net them"?
13  A.   Take the debits, minus the credits, and that's
14  your net balance.
15  Q.   So you would have the net balance at the end
16  of each month of what was in 25005, right?
17  A.   Of each activity.  By source and category.
18  Q.   Okay.  But isn't one of the categories here
19  "manual JE," right?
20  A.   Yeah.
21  Q.   So would you net -- to the extent there were
22  manual JEs on an Account Analysis Report for 25005,
23  you'd net those items as well, right?
24  A.   There's a spot on the spreadsheet for journal
25  entries.

87

1   Q.   For manual journal entries?
2   A.   I don't know the exact title of the column.
3   Q.   Okay.
4        Now, do you know -- looking at the third
5   category, "Batch Name," do you see that?
6        The third column, I'm sorry.
7   A.   Uh-huh.
8   Q.   Do you know what that means?
9   A.   For receivables, yes.
10  Q.   Okay.  What does it mean?
11  A.   That is the group ID that was posted from AR
12  to GL.
13  Q.   Posted from the accounts receivable subledger
14  to the general ledger?
15  A.   AR posts to an interface table, and it's
16  imported into GL.
17  Q.   Into the Oracle's general ledger, right?
18  A.   I assume.
19  Q.   Okay.  So do you know if once you did the
20  reconciliation and you netted out all the entries for
21  25005, would that then go into the general ledger; do
22  you know?
23       MR. KONOVALOV: Objection.  Misstates the
24  witness' testimony.
25       THE WITNESS: I don't know if it would or not.

88

1   Q.   BY MR. GREENSTEIN: Do you know what -- once
2   you finished your product, the spreadsheet, do you
3   know -- who did you give it to?
4   A.   Um, I don't recall giving it to anyone.
5   Q.   Okay.  Um, so when you finished that
6   reconciliation, did you discuss the results with
7   anybody?
8   A.   Um, probably with Greg.
9   Q.   Greg Myers?
10  A.   (Affirmative nod.)
11  Q.   Do you know if he did anything with the
12  results?  Did he -- was there any step that had to be
13  taken by anybody after you did the reconciliation?
14       MR. KONOVALOV: Objection.  Calls for
15  speculation.
16       THE WITNESS: I don't know.
17  Q.   BY MR. GREENSTEIN: So you would just have the
18  spreadsheet.  Would you put it on the network
19  somewhere or would you print it out and give it to
20  somebody?
21  A.   I don't recall what I did with it at the time.
22  Q.   So thinking back to when you did this, what
23  was your -- did you understand what your goal was in
24  reconciling 25005?
25  A.   No.

89

1    Q.    So you were just doing the calculations and
2    then you didn't know why you were doing it?
3    A.    Correct.
4    Q.    Okay.  Who -- did Greg Myers tell you to do
5    it?
6    A.    Yes.
7    Q.    Did he explain why you were doing it?
8    A.    I don't remember.
9    Q.    Did you ever have any discussions with anybody
10   that the amount of unapplied cash in 25005 was
11   becoming a problem?
12       MR. KONOVALOV:  Objection.  Assumes facts not
13   in evidence.
14       THE WITNESS:  No.
15   Q.    BY MR. GREENSTEIN:  Okay.  Are you aware that
16   the amount of unapplied cash at Oracle exceeded
17   $100 million at certain points in time, from the time
18   that you got to Oracle?
19       MR. KONOVALOV:  Objection.  Assumes facts not
20   in evidence.
21       THE WITNESS:  I don't know.
22   Q.    BY MR. GREENSTEIN:  Would it surprise you to
23   learn that the balance of Account 25005 at a point in
24   time after you came to Oracle was over $100 million?
25       MR. KONOVALOV:  Same objection.  Lacks

90

1    foundation.
2        THE WITNESS:  I don't know.
3    Q.    BY MR. GREENSTEIN:  You don't know if you'd be
4    surprised if it was or you don't know if it was?
5        MR. KONOVALOV:  Same objections.
6        Are you quibbling with the witness?  I mean,
7    he's given you his answer.
8        MR. GREENSTEIN:  No.
9        MR. KONOVALOV:  Objection.  Asked and answered
10   on top of the other objections.
11       THE WITNESS:  It wasn't my responsibility.
12   Q.    BY MR. GREENSTEIN:  Okay.  So did you ever
13   have any discussions with anybody about the amount of
14   unapplied cash that was in 25005?
15   A.    I don't remember.
16   Q.    And what other reports besides this
17   Account Analysis Report did you run to do your
18   reconciliation?
19   A.    I don't remember the exact reports.
20   Q.    Okay.  It's okay if you don't remember.  If
21   you remember generally, like types of reports, that's
22   okay, too.
23       Now, do you know --
24       Well, let me mark this as Elam Number 3.
25       (Plaintiff's Exhibit 3 was marked.)

91

1    Q.    BY MR. GREENSTEIN:  Actually, if you can look
2    back at Elam Number 2 for me.
3        See in the sixth column, you see it has a
4    description, "Source Item"?
5        Do you see that?
6    A.    Uh-huh.
7    Q.    Do you know what that means?
8    A.    I do not.
9    Q.    Okay.  And you see the third one, third line
10   down, it says, "Duplicate P"?
11       Do you see that?  P as in Paul?
12   A.    Yes.
13   Q.    Do you know what that means?
14   A.    I don't.
15   Q.    So in doing your reconciliation at the end of
16   each month, would you analyze any of these items in
17   that column?
18   A.    No, I would not.
19   Q.    Okay.  Now, looking at Elam Number 3, do you
20   see how it's -- for the record it's NDCA-ORCL 144608
21   to -609.
22       See how it says:  "Account Analysis Report
23   With Payables Detail from November 1st, 2000 through
24   November 30th, 2000"?
25       Do you see that?

92

1    A.    Yes.
2    Q.    Did you run -- well, do you know what the
3    difference between this report and Elam Number 2 is?
4    A.    I don't know the difference.
5    Q.    Okay.  Did you run this Account Analysis
6    Report With Payables Detail as part of your
7    reconciliation?
8    A.    I don't -- I don't remember.
9    Q.    So after you ran the reconciliation, you never
10   had an end-of-the-month discussion about it with
11   anybody, did you?
12       MR. KONOVALOV:  Objection.  Misstates the
13   witness' testimony.
14       THE WITNESS:  "Run the reconciliation"?  What
15   do you mean by that?
16   Q.    BY MR. GREENSTEIN:  No, I mean when you --
17   when you had your spreadsheet completed, did you ever
18   have any discussions about it at the end of each
19   month?
20   A.    I would have a discussion with Greg Myers.
21   Q.    Okay.  And what -- do you remember any
22   specific discussions?
23   A.    No, I would not.
24   Q.    Okay.  What kinds of things -- would you
25   discuss the balances in 25005?

93

1   A.   I don't remember the discussions that we've
2   had.
3   Q.   But at the end of each month, would you
4   have -- is it safe to say you would have a discussion
5   with Greg Myers about the results of your
6   spreadsheet?
7   A.   Part of my duty given to me by him was to
8   complete, to my knowledge, the spreadsheet.
9   Q.   And you don't know what he did with it at the
10  end of each month, would you -- did you?
11  A.   I do not, no.
12  Q.   Okay.  At the end of each month, did you have
13  any discussions with anybody else about that
14  spreadsheet that you created?
15  A.   I don't recall.
16  Q.   Okay.  Were those spreadsheets saved anywhere
17  at Oracle?  Were they on the system somewhere?
18  A.   I think they were saved to a shared folder,
19  but I can't state exactly where they were saved.
20  Q.   Okay.  When you reviewed documents yesterday,
21  did you see any of those spreadsheets that you
22  created?
23       MR. KONOVALOV:  Objection.  Attorney/client
24  privilege.  I instruct you not to answer the
25  question.

94

1   Q.   BY MR. GREENSTEIN:  Have you seen -- in the
2   past year, have you seen any of those spreadsheets
3   that you created?
4   A.   I don't remember.
5   Q.   Okay.  And Greg Myers never told you why he
6   asked you to do that reconciliation, right?
7   A.   No.
8   Q.   Um, what's a "shared folder"?
9   A.   It's a -- to my knowledge, it's a data storage
10  facility.
11  Q.   Okay.  That -- is it safe to say that "shared"
12  means that people could access -- other people at
13  Oracle could access the folder?
14  A.   If you were granted access, yes.
15  Q.   Right.
16       Did you ever print out any of those
17  spreadsheets that you created as part of
18  end-of-the-month reconciliation of 25005?
19  A.   I don't recall.
20  Q.   Were you ever asked to preserve any of those
21  spreadsheets by anybody?
22  A.   No.
23       MR. GREENSTEIN:  Let's mark -- actually, this
24  has been previously marked as Quinn Number 5.
25       For the record, this is NDCA-ORCL 140479

95

1   through -140481.
2   Q.   Go ahead and review it.
3       Finished?
4       Have you seen this E-mail before?
5   A.   Yes.
6   Q.   Okay.  And it appears to be an E-mail string
7   regarding auto adjustments, right?
8   A.   Yes.
9   Q.   Okay.  If you turn to the third page, and you
10  see that there's -- the date there is November 18th,
11  2002?
12      It's on the bottom, actually, of the third
13  page.  Sorry.
14  A.   Okay.
15  Q.   Now, do you know, is that the date -- because
16  the date appears to be different than the actual
17  dates of the E-mails.
18      Knowing what you know of Oracle's E-mail, does
19  that appear to be the date that this was printed out?
20      MR. KONOVALOV:  Objection.  Calls for
21  speculation.
22      THE WITNESS:  I don't know.
23  Q.   BY MR. GREENSTEIN:  Turning to the third page,
24  do you see how this is a May 30th, 2001 E-mail from
25  Sara Sanchez to you, right?

96

1   A.   Yes.
2   Q.   And it says New Auto Adjustment -- "Auto Adj."
3   That means adjustment, right?
4   A.   (Affirmative nod.)
5   Q.   Okay.  And you see how it says:
6       "All, Here are the new Auto Adjustment
7   parameters to be run twice a month."
8       Do you see that?
9   A.   Uh-huh.  Yes.
10  Q.   Who is Sara Sanchez?
11  A.   At the time, she was in collections.
12  Q.   Okay.  And why was she writing to you to tell
13  you what the new auto adjustment parameters were?
14  A.   I don't know her role at the time,
15  specifically.
16  Q.   Okay.  What does this mean -- what does "auto
17  adjustment parameters" -- how were those being used
18  at Oracle?
19      Actually, strike that.
20      You see how she says:
21      "Here are the Auto Adjustment parameters to be
22  run twice a month," right?
23  A.   Uh-huh.
24  Q.   Were there old auto adjustment parameters that
25  were run previous to this E-mail?

Elam, Terry  9/28/2006  9:19:00 AM

97

1    A.    I don't remember.
2    Q.    What does it mean here to run an auto
3    adjustment parameter?
4          MR. KONOVALOV:  Objection.  Vague and
5    ambiguous.
6          THE WITNESS:  Can you be more specific to the
7    question?
8    Q.    BY MR. GREENSTEIN:  Well, it says, "Auto
9    Adjustment parameters to be run."  So I'm asking what
10   does it mean to run an auto adjustment?
11   A.    It's basically a concurrent request.
12   Q.    Yeah, but why -- she's writing to you to
13   inform you of the new auto adjustment parameters to
14   be run, right?
15   A.    Uh-huh.
16   Q.    Was that because you ran the auto adjustments?
17   A.    Yes, I did.
18   Q.    Okay.  So prior to this E-mail, what -- do you
19   know what the -- the parameters were that you used
20   before?
21         MR. KONOVALOV:  Objection.  Lacks foundation.
22         THE WITNESS:  I don't know.
23   Q.    BY MR. GREENSTEIN:  Okay.  So when you -- when
24   you ran an auto adjustment, what does that mean?
25   A.    It's a concurrent request that I submitted.

98

1    Q.    Right.  I don't know what concurrent request.
2    That means a request that happens at the same time as
3    something.  So can you explain that?
4    A.    It's -- it's a request that I submit in -- as
5    a report.
6    Q.    Okay.  But what is it?
7          See these amounts here?  Appears to be dollar
8    amounts, right?
9    A.    Yes.
10   Q.    And you see it says "Days" there?
11   A.    Yes.
12   Q.    Okay.  What is the "Days" column?  What does
13   that refer to?
14   A.    I don't know, specifically.
15   Q.    Okay.  Did you know at the time you ran the
16   auto adjustments?
17   A.    Specifically, no.
18   Q.    Well, generally, what did you -- what do you
19   understand, sitting here today, when you ran an auto
20   adjustment, what impact did that have?
21         MR. KONOVALOV:  Objection.  Vague as to time.
22         THE WITNESS:  I -- I don't know.
23   Q.    BY MR. GREENSTEIN:  Okay.  What was the
24   purpose of running an auto adjustment?
25   A.    To my understanding, it was to close small

99

1    balances on open invoices.
2    Q.    Okay.  What does it mean "to close balances on
3    open invoices"?  Do you mean write off?
4    A.    Close.
5    Q.    Okay.  What does it mean "to close an open
6    balance"?
7    A.    An adjustment, like I said before, is an
8    activity on the header of the invoice --
9    Q.    Uh-huh.
10   A.    -- that closes the receivable balance.
11   Q.    So if there's an open receivable balance,
12   this -- if you ran an auto adjustment, that would
13   close that balance?
14   A.    If that invoice fit into these parameters.
15   Q.    So if there's an invoice for 2,000 to $3,000,
16   that would -- the auto adjustment would mean that
17   that would close if there was an open invoice for
18   that amount, right?
19         MR. KONOVALOV:  Objection.  Lacks foundation.
20         THE WITNESS:  You would have to be more
21   specific.
22   Q.    BY MR. GREENSTEIN:  Well, what does it mean --
23   what does --
24         If you look at the bottom of this "Education
25   Specific" portion of this E-mail where it says "270

100

1    days," and has an amount "$2,000.01 to $3,000."
2          Do you see that?
3    A.    Uh-huh.
4    Q.    What do you understand that to mean?
5    A.    That looks like a range of dollar amount
6    from -- to me.
7    Q.    Right.  So when you ran these adjustments,
8    what did you understand -- when you saw this E-mail,
9    what did you understand that to mean; that every open
10   invoice for the amount 2,000 to 3,000 would be
11   adjusted off?
12   A.    Only for education.
13   Q.    Right.  But what does the "270 days" mean?
14   A.    Um, assuming that's days late.  I don't know
15   at this time.
16   Q.    Okay.  "Days late."  What do you mean by that?
17   A.    Past its due date.
18   Q.    Okay.  So "Education Specific," does that mean
19   educational invoices?
20   A.    Education invoices have a specific transaction
21   type.
22   Q.    Right, but why was this -- why were the auto
23   adjustments broken out by education specific and all
24   others?
25   A.    I don't know.

101

1   Q.   So what did you have to do to actually run the
2   auto adjustments?
3   A.   For education?
4   Q.   No, for either one.
5   A.   I had to submit a concurrent request into the
6   system.
7   Q.   Okay. So what exactly did that mean? Did you
8   have to go into the system and type something out?
9   A.   I had to go into the system and fill out a
10  request set.
11  Q.   Okay. And then what would happen?
12  A.   It included certain values.
13  Q.   And then what would happen?
14  A.   The request set would run.
15  Q.   Okay.
16  A.   And then the output would show the invoices
17  that were adjusted.
18  Q.   So there would be some type of output or
19  another spreadsheet that would have invoices that
20  were adjusted via this auto adjustment process,
21  right?
22  A.   It's output.
23  Q.   Right.
24       Now, would that be something that would be
25  printed out?

102

1   A.   You could print it, yes.
2   Q.   Okay. So, again, you don't know why you were
3   asked to run this auto adjustment?
4   A.   No.
5   Q.   Okay.
6        Okay. Looking at the second page, do you see
7   how your writing to Omid Fardanesh. Omid's
8   writing to you. "Fardanesh" is F-a-r-d-a-n-e-s-h.
9   He says:
10       "Terry, it seems that we have obtained the
11  approval from both Adam and" -- and this appears to
12  be cut off. It says: "...and run the below
13  parameters for the Auto Adjustment in the past."
14       Do you see that?
15  A.   Yes.
16  Q.   And then it says:
17       "If you need another approval from Mike to be
18  able to run these parameters, please let me know."
19       Then it says -- it's cut off again, but it
20  appears to say:
21       "Although" -- or "know you usually run the
22  Auto Adjustment when AR closes. Is it possible this
23  one time to run them this Friday? Please let me
24  know."
25       Do you see that?

103

1   A.   Yes.
2   Q.   Okay. What does it mean when he says when AR
3   closes you usually run the auto adjustment? Why
4   would that be the case?
5   A.   As part of the month-end process, that was
6   part of the month-end process.
7   Q.   So you would run the auto adjustments for the
8   certain parameters that were approved by Mike Quinn,
9   right?
10  A.   Correct.
11  Q.   Okay. And so do you know why Omid was telling
12  you that they wanted to run it one time on that
13  Friday?
14  A.   I don't know.
15  Q.   Did Mike Quinn always have to approve all the
16  parameters for auto adjustments?
17  A.   I don't know.
18  Q.   Okay. You see where you wrote in the middle
19  of page 2, it says:
20       "Omid, I need the approval from Mike to run
21  these adjustments. My understanding is that Mike
22  approved the adjustments to be run only in May."
23       Do you see that?
24  A.   Uh-huh. Yes.
25  Q.   Okay. So were you telling him that you

104

1   couldn't run it on that Friday because you were only
2   supposed to run them in May?
3   A.   My understanding was the approval for these
4   parameters was only to be run in May.
5   Q.   And why was that?
6   A.   I don't know at the time.
7   Q.   Well, how did you gain your understanding
8   that -- of that; that they were only supposed to be
9   run in May?
10  A.   I don't know the exact circumstances of that
11  time frame and of the basis of the E-mail.
12  Q.   Okay. You see at the top it says:
13       "Approved through Fiscal Year '02.
14       "Thanks, Mike."
15       The top of page 2, sorry.
16  A.   Yep. Yes.
17  Q.   So Mike Quinn approved -- appears to have
18  approved the new auto adjustment parameters that are
19  listed on page 3, right?
20  A.   Yes.
21  Q.   Okay. You see on the first page you're asking
22  Mike Quinn if he wants to stick with the parameters
23  for '03 or change them.
24       You see that?
25  A.   Yeah.

105

1    Q.   So when he says "Approved through Fiscal Year
2    '02," um, he appears to be saying that he only wants
3    to run those auto adjustment parameters through
4    fiscal year '02, not '03, right?
5         MR. KONOVALOV:  Objection. Lacks foundation.
6         THE WITNESS:  I don't know.
7    Q.   BY MR. GREENSTEIN:  Okay. Did you have to do
8    this -- or did you get new auto adjustment parameters
9    every year; do you recall?
10   A.   I don't remember.
11   Q.   Now, do you know what impact this has on -- on
12   the AR subledger when you run the auto adjustment?
13        MR. KONOVALOV:  Objection. Calls for
14   speculation.
15        THE WITNESS:  I don't know the direct impact.
16   Q.   BY MR. GREENSTEIN:  Okay. Do you know if
17   this -- when you ran the auto adjustment, do you know
18   what impact it had on the line item accounts
19   receivable on Oracle's balance sheet?
20        MR. KONOVALOV:  Same objection.
21        THE WITNESS:  No, I'm not aware.
22   Q.   BY MR. GREENSTEIN:  So after you ran these
23   auto --
24        Did you run these auto adjustments monthly?
25   A.   That was the practice that I remember, yes.

106

1    Q.   Okay. And did you do that at the beginning
2    of, say, January 2001?
3    A.   I don't recall the exact time frame that I
4    picked it up.
5    Q.   Okay. Do you remember having any discussions
6    with anybody about the auto adjustments and why you
7    were doing them?
8    A.   No.
9    Q.   Okay. Do you remember having any discussions
10   about it changing -- or why the parameters were
11   changing?
12        MR. KONOVALOV:  Objection. Lacks foundation.
13        THE WITNESS:  No, I'm not aware.
14        MR. GREENSTEIN:  I think we have to change the
15   tape, right?
16        Let's take two minutes. I'm willing to just
17   stay here, if you guys want, but . . .
18        VIDEOTAPE OPERATOR:  This marks the end of
19   videotape number one, Volume 1, in the deposition of
20   Terry Elam.
21        Going off the record, the time is 11:26.
22        (Break.)
23        VIDEOTAPE OPERATOR:  Here marks the beginning
24   of Volume 1, videotape number two, in the deposition
25   of Terry Elam.

107

1         The time is 11:34. We are back on the record.
2    Q.   BY MR. GREENSTEIN:  Um, Mr. Elam, I just want
3    to get your educational background.
4         Um, did you go to college?
5    A.   Yes.
6    Q.   Okay. Where?
7    A.   Sacramento State University.
8    Q.   Okay. And what kind of degree did you get?
9    A.   It's a general business degree.
10   Q.   Okay. And did you go to grad school at all?
11   A.   No.
12   Q.   Okay. Do you have any formal certificates or,
13   you know, CPAs or anything?
14   A.   No.
15   Q.   Have you ever heard the terminology "adjusting
16   up invoices"?
17   A.   I have, yes.
18   Q.   Okay. What does that mean?
19   A.   In the specific context?
20   Q.   Or generally, what does it mean?
21   A.   Um, adding -- processing an adjustment can add
22   a value to the receivable line on the header of the
23   invoice.
24   Q.   Okay. Um, what happens to an invoice if
25   there's an open invoice and you adjust it up? What

108

1    happens to the balance of the invoice?
2         MR. KONOVALOV:  Objection. Incomplete
3    hypothetical.
4         THE WITNESS:  I wouldn't know.
5    Q.   BY MR. GREENSTEIN:  Well, what do you have to
6    do to adjust up an invoice? Physically, what do you
7    have to do?
8    A.   You have to query the adjustment form.
9    Q.   Okay. Where is that form located?
10   A.   In the AR responsibility.
11   Q.   So you would query that form, and what would
12   you do?
13   A.   You would query the invoice, specific invoice
14   in question, and make sure that it's populated in
15   that form.
16   Q.   Okay. But what does "adjusting up that
17   invoice" mean?
18   A.   "Adjusting up"?
19   Q.   Right.
20   A.   Adding a dollar value to the receivable line
21   of the invoice.
22   Q.   Okay. Why -- why would you --
23        Did you ever adjust up invoices?
24   A.   I believe so, yes.
25   Q.   Okay. And why -- why -- when did you do that?

109

1     A.    I don't recall the exact times.
2     Q.    Okay.  Do you ever recall adjusting up
3  invoices in connection with a reconciliation of
4  Oracle's unapplied cash?
5          MR. KONOVALOV:  Objection.  Vague and
6  ambiguous.
7          THE WITNESS:  No.
8     Q.    BY MR. GREENSTEIN:  Do you recall that Oracle
9  at one point in time decided to clean up its
10  unapplied cash?
11         MR. KONOVALOV:  Objection.  Vague and
12  ambiguous.
13         THE WITNESS:  I don't know.
14    Q.    BY MR. GREENSTEIN:  Okay.  Do you remember in
15  October of 2002, about the time that you were asked
16  to research debit memos, that Oracle had a series of
17  meetings about cleaning up its unapplied cash
18  account?
19         MR. KONOVALOV:  Objection.  Lacks foundation.
20  Assumes facts not in evidence.
21         THE WITNESS:  I don't know.
22    Q.    BY MR. GREENSTEIN:  You're not aware of
23  meetings that were held about cleaning up Oracle's
24  unapplied cash account?
25         MR. KONOVALOV:  The same objections.

110

1          THE WITNESS:  Not specifically, no.
2     Q.    BY MR. GREENSTEIN:  Well, generally, do you
3  know that those meetings occurred?
4          MR. KONOVALOV:  Same objections.
5          THE WITNESS:  I don't.
6     Q.    BY MR. GREENSTEIN:  Okay.  Did you ever have
7  any discussions with Greg Myers in October 2002 about
8  any project trying to reconcile Oracle's unapplied
9  cash?
10    A.    Not specifically, no.
11    Q.    Okay.  Were you aware that was going on, that
12  there was a project whereby Oracle was trying to
13  clean up its unapplied cash?
14         MR. KONOVALOV:  Objection.  Lacks foundation.
15  Assumes facts not in evidence.
16         THE WITNESS:  No, not aware of.
17         MR. GREENSTEIN:  Okay.  I'd like to mark
18  this -- it's actually been previously marked as Chen
19  Number 12.  It's supposed to be Chan, C-h-a-n, but
20  the court reporter misspelled it.
21    Q.    For the record, this is an October 21st, 2002
22  E-mail from Mike Quinn to Ryan Roberts, Greg Myers,
23  and it cc's Thomas Williams.  And it's called -- the
24  subject is:  "Re:  Unapplied Cash Project."
25         Mr. Elam, if you could just read this entire

111

1  E-mail.  Let me know when you're done.
2          Are you done?
3     A.    Yes.
4     Q.    Have you ever seen this E-mail before?
5     A.    No, I have not.
6     Q.    Okay.  Do you know -- you know who Mike Quinn
7  is obviously, right?
8     A.    Yes.
9     Q.    Okay.  Do you know who Ryan Roberts is?
10    A.    Yes.  I do.
11    Q.    Who is Ryan Roberts?
12    A.    At the time he was a collector.
13    Q.    Okay.  And you see this is dated October 21st,
14  2002, right?
15    A.    Yes.
16    Q.    Um, that's around the same time you were asked
17  to research debit memos, right?
18         MR. KONOVALOV:  Objection.  Assumes facts not
19  in evidence.
20         THE WITNESS:  I don't know.
21    Q.    BY MR. GREENSTEIN:  Okay.  But I think you
22  said October 2002 is generally when you recall
23  talking to Greg Myers about researching debit memos,
24  right?
25    A.    Around that time, yes.

112

1     Q.    Okay.  You see how it says:
2          "Ryan, Greg, below is the action plan for
3  addressing the problems surrounding the unapplied
4  cash issues that you guys worked on last week."
5          Do you see that?
6     A.    Yes, I do.
7     Q.    Are you aware what they're talking about here,
8  "the unapplied cash issues"?
9     A.    I'm not aware.
10    Q.    Okay.  At this time were you aware that, um,
11  Ryan Roberts and Greg Myers were working on a project
12  with respect to unapplied cash?
13    A.    I was not aware.
14    Q.    Okay.  You see how it says:
15         "There are three deliverables:
16         "We need to provide an update to the Audit
17  Committee (a subcommittee of Oracle's Board of
18  Directors) in regards to what Revenue Impact this
19  process of taking unapplied cash receipts to the
20  reserve will have on our financial statements."
21         Do you see that?
22    A.    Yes.
23    Q.    Sitting here today, do you know what the
24  process -- are you aware of a process at which
25  unapplied cash receipts were taken to a reserve at

113

1    Oracle?
2    A.    Can you be more specific?
3    Q.    Yeah.
4          Do you understand -- well, do you know --
5          Are you aware of any transfers of unapplied
6    cash to any reserve at Oracle?
7          MR. KONOVALOV: Objection. Vague and
8    ambiguous.
9          THE WITNESS: No, I'm unaware.
10   Q.    BY MR. GREENSTEIN: Okay. Are you aware that
11   anytime while you were at Oracle that certain
12   collections individuals transferred certain unapplied
13   cash items from 25005 to any -- to a reserve at
14   Oracle?
15         MR. KONOVALOV: Objection. Vague and
16   ambiguous.
17         THE WITNESS: I don't know.
18   Q.    BY MR. GREENSTEIN: Okay. Do you know what
19   Account 12601 is?
20   A.    Yes, I do.
21   Q.    Okay. What is that?
22   A.    I think at the time it was bad debt. I think
23   that's part of the name. I don't know the full name.
24   Q.    Bad debt reserve?
25   A.    It could be.

114

1    Q.    Did you know what that account was in
2    January 2001?
3    A.    No.
4    Q.    Okay. Did you ever have to use that account
5    or review that account in connection with your duties
6    as an accounts receivable manager?
7    A.    Um, can you state the question again?
8    Q.    Did you ever have to use or review
9    Account 12601 in conducting your duties, performing
10   your duties in AR?
11   A.    No.
12   Q.    Okay. How do you know what 12601 is?
13   A.    It's an account that I know.
14   Q.    Okay. Did you ever have to use it at all?
15         MR. KONOVALOV: Objection. Asked and
16   answered.
17         You can answer it again.
18         THE WITNESS: Um, I wouldn't -- I would not
19   say specifically "use." Maybe be more specific in
20   the question.
21   Q.    BY MR. GREENSTEIN: Okay. Why don't you
22   explain, if you didn't use it, how do you know about
23   it?
24   A.    It was an account that I know there was some
25   activity in that account that I know of.

115

1    Q.    Okay. What type of activity?
2    A.    If I remember, if I recall right, there was an
3    activity base where collections would move unapplied
4    cash via a specific process, I think to that account.
5    Q.    Okay. But earlier didn't you just say you
6    didn't -- you weren't aware that collections
7    individuals were transferring unapplied cash from
8    25005 to 12601?
9          MR. KONOVALOV: Objection. Misstates the
10   witness' testimony.
11         THE WITNESS: You stated "reserve." You did
12   not state a specific account.
13   Q.    BY MR. GREENSTEIN: Okay. So you were
14   aware -- you became aware at some point in time that
15   Oracle's collections had been transferring unapplied
16   cash items from 25005 to 12601, right?
17   A.    Yes.
18   Q.    All right.
19         When did you first learn that activity was
20   occurring?
21   A.    I don't remember.
22   Q.    Okay. Do you remember if it was during your
23   first six months at Oracle?
24   A.    I don't recall the exact dates.
25   Q.    Okay. And how did you learn about it?

116

1    A.    Probably Greg talked to me.
2    Q.    Greg told you about it?
3    A.    Probably.
4    Q.    Did you talk to anybody else about that --
5    those transfers?
6    A.    I don't recall.
7    Q.    Okay. Did he ask you to do anything with
8    respect to Account 12601?
9    A.    Time frame?
10   Q.    Anytime.
11         MR. KONOVALOV: Objection. Vague and
12   ambiguous.
13         THE WITNESS: I don't know. Be more specific,
14   maybe.
15   Q.    BY MR. GREENSTEIN: No.
16         At any time did Greg Myers ask you to perform
17   any review or any sort of action with respect to
18   unapplied cash in 12601?
19         MR. KONOVALOV: Objection. Vague and
20   ambiguous.
21         THE WITNESS: I don't recall.
22   Q.    BY MR. GREENSTEIN: Do you recall writing any
23   E-mails where you were talking about debit memos and
24   unapplied cash in 12601?
25   A.    I don't recall.

117

1  Q.   Did you ever speak to Oracle's audit committee
2  about any issues with respect to unapplied cash?
3  A.   No.
4  Q.   Have you ever spoken to Oracle's audit
5  committee about anything?
6  A.   Never.
7  Q.   You see in the second bullet point on the
8  first half of the page, it says:
9       "We need to clean up the entire problem prior
10  to the end of October by moving cash receipts to the
11  proper buckets (unapplied, customer overpayments, or
12  on account) as appropriate."
13      Do you see that?
14  A.   Yes.
15  Q.   So were you aware that there was a problem
16  that Mike Quinn, Ryan Roberts, Greg Myers were trying
17  to solve by the end of October of 2002 to put cash
18  receipts in the proper buckets?
19      MR. KONOVALOV:  Objection.  Lacks foundation
20  as to the word "problem."
21      THE WITNESS:  No.
22  Q.   BY MR. GREENSTEIN:  You see how the third
23  bullet point says:
24      "We need to establish new policies and
25  procedures to ensure this never happens again."

118

1       Do you know if Oracle established new policies
2  and procedures to ensure that it never happened
3  again?
4  A.   I don't know.
5  Q.   So you aren't aware of any -- any project
6  during this time where they were trying to -- to move
7  cash receipts to proper -- the proper buckets?
8  A.   At this time, no.
9  Q.   Okay.  At any time were you aware of a project
10  to move cash receipts to the proper buckets?
11  A.   Um, no.
12  Q.   Okay.  Why did you just say -- you said "at
13  this time" you didn't, which means to me that there
14  may have been another time.  Is that not the case?
15  A.   No.
16  Q.   Okay.  So at no time you were aware -- at
17  Oracle, you never became aware of a project where
18  cash receipts were being moved to the proper buckets?
19  A.   I'm not aware.
20  Q.   Did you ever have any discussions with anybody
21  about meetings that were held at the end of October
22  2002 with respect to cleaning up unapplied cash?
23  A.   Be more specific.
24  Q.   Did you ever have any discussions about
25  meetings that were held in October -- end of

119

1  October 2002 regarding unapplied cash?
2  A.   No.  Sorry.
3      MR. KONOVALOV:  Go ahead.
4  Q.   BY MR. GREENSTEIN:  And you see in the second
5  section of bullet points, it says:
6      "What needs to be done:
7      "For items currently 'On Account,' we need to
8  continue to work through each item greater than
9  $10,000 to determine 1) what should have happened to
10  the cash receipt and 2) make the correction to put it
11  in the right place."
12      Do you see that?
13  A.   Yes.
14  Q.   Were you involved at all in researching or
15  reviewing and finding out what should have happened
16  to cash receipts that were greater than $10,000 that
17  were designated on account?
18  A.   Um, no, I was not.
19  Q.   Okay.  Do you understand what it means here
20  when it -- when he says:
21      "We need to continue to work through each item
22  to determine what happened to the cash receipt"?
23  A.   I can't speak to the E-mail.
24  Q.   Okay.  Were you ever involved in any research
25  to put cash receipts in -- on-account cash receipts

120

1  in a different place?
2      MR. KONOVALOV:  Objection.  Vague and
3  ambiguous.
4      THE WITNESS:  No.
5      MR. GREENSTEIN:  Okay.
6  Q.   Didn't Greg Myers -- in November of 2000,
7  didn't he explain to you that as part of the
8  November 2000 on-account cleanup, did he explain to
9  you that the on-account flags were removed via debit
10  memos?
11  A.   He explained the process of how the flag was
12  removed, debit memos created and the debit memos
13  applied in November of 2002.
14  Q.   Right.  And he said that the on-account flags
15  were moved, right?
16  A.   Yes.
17  Q.   So you see where it says:  "For items
18  currently 'On Account'" there?
19  A.   Yes.
20  Q.   So in October of 2002, were you aware that
21  there were items on account, cash receipts that were
22  designated on account?
23      MR. KONOVALOV:  Objection.  Assumes facts not
24  in evidence.
25      THE WITNESS:  No.

121

1       MR. GREENSTEIN:  Okay.
2   Q.   Did you know what on account meant in
3   October 2002, other than what Greg Myers told you
4   your first month at Oracle?
5   A.   No, I did not.
6   Q.   See the second bullet point towards the bottom
7   of the E-mail:
8       "For items in the 'Receipts Write Off All' tab
9   of the spreadsheet titled '12601_Detail,' we need to
10  review each item over 10,000."
11      Do you see that?
12  A.   Yes.
13  Q.   Do you know what the "Receipts Write Off All"
14  tab is?
15  A.   No, I do not.
16  Q.   Okay.  Have you ever seen anything titled
17  "12601_Detail"?
18  A.   I don't recall, no.
19  Q.   And the third bullet point, see where it
20  discusses "Miscellaneous Offset Report"?
21      See that?
22  A.   Yes, I do.
23  Q.   Do you know what the Miscellaneous Offset
24  Report is?
25  A.   I don't know the exact name of that report.

122

1   Q.   Do you know -- I'm not asking if you know the
2   exact name.  I'm just wondering if you know what a
3   Miscellaneous Offset Report is?
4   A.   No, I do not.
5   Q.   Have you ever had to use a Miscellaneous
6   Offset Report in reconciling 25005 at the end of the
7   month?
8   A.   That name does not sound familiar to me.
9   Q.   Okay.  You see at the bottom it says:
10      "Greg, for the Miscellaneous Offset Report, I
11  need you to add the Date the item was moved to 12601.
12  We need to be able to accumulate the error by
13  quarter."
14      Do you see that?
15  A.   Yes, I do.
16  Q.   Did you ever have any discussions about items
17  that were moved to 12601 and what the error was by
18  quarter?
19      MR. KONOVALOV:  Objection.  Assumes facts not
20  in evidence.
21      THE WITNESS:  No.
22  Q.   BY MR. GREENSTEIN:  Do you know what he's
23  referring to here:
24      "We need to be able to accumulate the error by
25  quarter"?

123

1   A.   I do not.
2   Q.   Do you recall when the first time you learned
3   what Account 12601 was?
4   A.   I don't recall.
5   Q.   On the second page, do you see in the second
6   paragraph it says:
7       "Greg, please confirm that all ability to move
8   anything to 12601 via On Account or creating a
9   Miscellaneous receipt write off has been turned off."
10      Do you see that?
11  A.   Yes, I do.
12  Q.   Do you know what a "miscellaneous receipt
13  write off" is?
14  A.   I do not.
15  Q.   Other than what -- how it's written in this
16  E-mail, do you know what a "miscellaneous receipt
17  write off" is at Oracle?
18  A.   I know what a miscellaneous receipt is, but
19  that phrase, I do not know.
20  Q.   Okay.  What's a "miscellaneous receipt"?
21  A.   It's a receipt that you can enter directly
22  into a specific account.
23  Q.   Okay.  How's it different than a regular cash
24  receipt?
25  A.   Cash receipt you can apply invoices to.

124

1   Q.   Uh-huh.
2   A.   Miscellaneous receipt you cannot.
3   Q.   Okay.  So -- but a miscellaneous receipt is
4   cash that comes in, right?
5   A.   Um, it can be, yes.
6   Q.   Or a check from a customer?
7   A.   It can be, yes.
8   Q.   Okay.  What else -- well, it's a receipt from
9   an Oracle customer, right?
10  A.   It can be a form of a receipt from a customer.
11  Q.   Okay.  Besides a check or cash, what else
12  could a miscellaneous receipt be?
13  A.   Um, it could be used to move dollar amount
14  funds from a specific account to another account.
15  Q.   So a miscellaneous receipt can be used -- can
16  it be used to moved an unapplied item from 25005 to
17  12601?
18      MR. KONOVALOV:  Objection.  Calls for
19  speculation.
20      THE WITNESS:  I don't know.
21  Q.   BY MR. GREENSTEIN:  Okay.  See the next
22  paragraph, it says:
23      "Greg, as we discussed this weekend, please
24  look into the ins and outs in Activity Detail in the
25  12601_Detail spreadsheet."

125

1      Do you see that?
2      A.   Yes.
3      Q.   Have you ever seen the 12601_Detail
4   spreadsheet?
5      A.   No, I have not.
6      Q.   Okay.  Did you ever have to look at any --
7      In performing your end-of-the-year
8   reconciliations of 25005, did you ever look at any
9   reports that related to 12601?
10     A.   I don't remember.
11     Q.   Do you remember at the end of each month when
12  you performed the reconciliation of 25005, did you
13  ever have any discussions about any transfers that
14  were made from 25005 to 12601?
15     A.   I don't recall.
16     Q.   Put that aside.
17     Actually, this next exhibit was previously
18  marked as Matuszak Number 4.
19     For the record, it's an interview memo of Tom
20  Williams dated November 12th, 2002, NDCA-ORCL 31377?
21  through -784.
22     I'm going to -- if you could just read the
23  first paragraph to yourself.
24     A.   On page -78?
25     Q.   Yeah, -778.

126

1      Finished?
2      A.   Yes.
3      Q.   Have you ever spoken to any lawyers for
4   Simpson, Thacher & Bartlett?
5      A.   I have not.
6      Q.   Were you aware that Tom Williams was
7   interviewed on November 12, 2002 by Oracle's Special
8   Litigation Committee?
9      A.   No.
10     Q.   Were you aware that anybody was interviewed by
11  Oracle's Special Litigation Committee in
12  November 2002?
13     A.   No.
14     Q.   Okay.  See down at the bottom of the last
15  paragraph, and it's the last full sentence, it says:
16     "He stated that in October 2002, in the
17  process of investigating the debit memo allegations
18  in the Second Amended Class Action Complaint, which
19  Williams characterized as false and baseless, he had
20  learned from Mike Quinn and Greg Myers, who were
21  responsible for conducting the investigation, that
22  certain persons in Oracle's collections department
23  had, apparently on an ad hoc basis over time, moved
24  certain items from Oracle's unapplied cash account to
25  its bad debt reserve account.  He further stated that

127

1   the company is in the process of investigating this
2   past practice."
3      See that?
4      A.   Yes.
5      Q.   Were you aware that this investigation was
6   going on during 2002?
7      A.   I was not, no.
8      Q.   Okay.  I think earlier you said that you
9   knew -- you had become aware that unapplied cash
10  items in 25005 were transferred to 12601, right?
11     A.   Yes.
12     Q.   Okay.  Now, do you remember ever participating
13  in discussions with Mike Quinn or Greg Myers during
14  2002 about those transfers?
15     A.   I don't recall.
16     Q.   Do you recall -- sorry if I asked this
17  already, but do you recall how you learned that those
18  transfers took place?
19     A.   I don't know the exact time when I found that.
20     Q.   Do you remember taking any action when you
21  heard that?
22     A.   No.
23     Q.   Okay.  Have you ever had any discussions with
24  anybody, from the time you got to Oracle until the
25  day you sit here today, about potential counting

128

1   improprieties at Oracle?
2      A.   No.
3      Q.   Have you ever had any discussions with anybody
4   from the time you got to Oracle about potential
5   inaccuracies in Oracle's financial statements?
6      A.   No.
7      Q.   On page 3 of this document, you see how it
8   says -- well, actually, page 4.  It's Bates numbered
9   -313780.  See the heading "Account 12601"?
10     A.   -780 or -781?
11     Q.   -780.
12        MR. KONOVALOV:  It's here.
13        THE WITNESS:  Gotcha.
14        MR. GREENSTEIN:  The heading 12601.
15     Q.   Do you see how it says:
16     "Williams stated that one of the components in
17  calculating Oracle's bad debt reserve was an account
18  entitled Bad Debt Write-Offs, Account 12601."
19     Do you see that?
20     A.   Yes.
21     Q.   Now when he refers to a "bad debt reserve,"
22  what did you understand that to mean as an accounts
23  receivable manager?
24        MR. KONOVALOV:  Objection.  Lacks foundation.
25        THE WITNESS:  I have no clue.

Elam, Terry  9/28/2006  9:19:00 AM

129

1  Q.  BY MR. GREENSTEIN: Okay. Well, are you aware
2  that Oracle would -- at the end of every fiscal
3  period would reserve for accounts receivable that it
4  didn't think it could collect?
5  A.  I did not know.
6  Q.  Okay. So you didn't have any participation in
7  deciding how much of -- how much of Oracle's accounts
8  receivable they felt that they wouldn't be able to
9  collect in any given period, right?
10  A.  No.
11  Q.  Okay. So you see the footnote there, Footnote
12  1?
13  And this footnote follows a statement that
14  says:
15  "Williams explained that during the course of
16  a quarter, there would be debits and credits to this
17  account. Williams explained that a debit to this
18  account could occur when Oracle wrote off a 'small
19  dollar' invoice."
20  See, there's a footnote. See that?
21  MR. KONOVALOV: I'm sorry, Counsel. I was
22  reading the footnote. I'm confused. Where --
23  MR. GREENSTEIN: Oh, sorry.
24  In the paragraph with the heading
25  "Account 12601," the second sentence.

130

1  See that?
2  MR. KONOVALOV: Okay.
3  THE WITNESS: Yes, I do.
4  Q.  BY MR. GREENSTEIN: And it's followed by a
5  footnote.
6  Do you see that?
7  A.  Yeah.
8  Q.  Okay. So where it says:
9  "Williams explained that a debit to this
10  account," and he's referring to Account 12601, "could
11  occur when Oracle wrote off a 'small dollar'
12  invoice."
13  See that?
14  A.  Yes, I do.
15  Q.  Now, back earlier we were talking about auto
16  adjustments of Oracle invoices, right?
17  A.  Yes.
18  Q.  Okay. Do you know what he means when he says
19  "small dollar invoices" -- when he's talking about
20  "writing off small dollar invoices," do you know if
21  that's related to the auto adjustments that you ran?
22  MR. KONOVALOV: Objection. Lacks foundation.
23  THE WITNESS: I wouldn't know.
24  Q.  BY MR. GREENSTEIN: Okay. You see the
25  footnote where it says:

131

1  "Williams explained that larger invoices were
2  written off in a different fashion that involved a
3  debit to revenue instead."
4  Do you see that?
5  A.  Yes, I do.
6  Q.  Do you know what that means?
7  A.  I would be assuming it would be a credit memo.
8  That's the only other transaction I can think of.
9  Q.  Okay. So larger invoices were written off
10  using a credit memo?
11  A.  Yes.
12  Q.  And that would debit revenue?
13  A.  When a credit memo is processed, it debits the
14  original transaction. It reverses the accounting
15  from the original transaction, yes.
16  Q.  So a credit memo has the effect of reversing
17  revenue, right?
18  A.  Yes.
19  Q.  Turn to page -781. Then the second paragraph,
20  first full paragraph, says:
21  "Williams also explained that Oracle had moved
22  certain cash receipts to Account 12601."
23  And then: "These receipts were entered on the
24  credit side of the account."
25  And then if you could just read the second

132

1  paragraph to yourself, or the next paragraph to
2  yourself.
3  See that? I'm sorry.
4  A.  Yes.
5  Q.  You see in the first sentence on that
6  paragraph it says -- it refers to "when Oracle
7  calculates it's reserve."
8  The first sentence of the second full
9  paragraph.
10  A.  Yes.
11  Q.  So did you have any role in calculating
12  Oracle's bad debt reserve?
13  A.  No, I did not.
14  Q.  Okay. If you go to the paragraph starting
15  with "Mr. Kreissman." You see that?
16  "Mr. Kreissman stated that plaintiffs had
17  further alleged that at the end of every month,
18  Oracle would run an 'auto adjustment' that would take
19  money out of the unapplied cash account and would
20  transfer it to the bad debt reserve."
21  See that?
22  A.  Yes.
23  Q.  Are you aware of any auto adjustment where
24  money was taken out of unapplied cash and transferred
25  to the bad debt reserve?

133

1    A.   No, I'm not.
2    Q.   And you see the last full paragraph under the
3  heading "Transfers From Unapplied Cash to 12601," it
4  says:
5        "Williams stated that one of the sources of
6  the credits to 12601 were unapplied cash receipts
7  from Account 25005."
8        See that?
9    A.   Yes, I do.
10    Q.   When you performed your end-of-the-month
11  reconciliation of Account 25005, did you ever take
12  into account any transfers from 25005 to 12601?
13        MR. KONOVALOV: Objection. Lacks foundation.
14        THE WITNESS: No.
15    Q.   BY MR. GREENSTEIN: Okay. You didn't do any
16  research on -- or review or analysis of Account 12601
17  in performing your reconciliation of unapplied cash
18  at the end of each month, right?
19    A.   Correct.
20    Q.   If you'd turn to page -313783. Look at the
21  first full paragraph and read it to yourself, please.
22        See that?
23    A.   Yes.
24    Q.   Okay. See where he says:
25        "Williams stated that it appears" -- or,

134

1  sorry.
2        In the third sentence, it says:
3        "...based on preliminary work, it appeared
4  that 40 percent of the transfers matched written-off
5  invoices."
6        See that?
7    A.   Yes, I do.
8    Q.   Do you know what a written-off invoice is?
9    A.   I would have to see the specifics.
10    Q.   Okay. Well, what types -- are there different
11  types of invoices that are written off?
12    A.   I wouldn't know. I'd have to see it.
13    Q.   Sitting here today, what do you understand
14  when an invoice is written off, what does it mean?
15    A.   Um, I don't know. I don't know.
16    Q.   So sitting here today, you don't know what it
17  means to write off an invoice at Oracle?
18    A.   Based on the circumstances, no.
19    Q.   No, based on any circumstances.
20    A.   No.
21    Q.   Okay. Okay.
22        Towards the bottom, the last full sentence of
23  the page says:
24        Williams said that he had prepared a
25  spreadsheet that he would share with the Committee

135

1  showing the transfers from 25005 to 12601 from
2  August 2000 to August 2002."
3        Do you see that?
4    A.   The last paragraph?
5    Q.   Yeah.
6        It's the last sentence, actually, on the page.
7    A.   Oh.
8        Yes, I see that.
9    Q.   Um, are you aware -- have you ever seen the
10  spreadsheet that he's referring to here?
11        MR. KONOVALOV: Objection. Assumes facts not
12  in evidence. Lacks foundation.
13        THE WITNESS: No.
14        MR. GREENSTEIN: No?
15        THE WITNESS: No.
16    Q.   BY MR. GREENSTEIN: Okay. Have you ever seen
17  a spreadsheet that showed the transfers from 25005 to
18  12601?
19    A.   No, I have not.
20    Q.   Okay.
21        Next exhibit has been previously marked.
22  Venkataramana. You'll have to look at it to spell
23  it.
24        MR. KONOVALOV: Venkataramana.
25        MR. GREENSTEIN: Venkataramana. Right.

136

1        Number 5. It's a one-page document.
2    Q.   If you could just read this and let me know
3  when you're finished, please.
4        MR. KONOVALOV: Could you put the Bates number
5  on the record of the document?
6        MR. GREENSTEIN: Yeah. PLF-ORC 000002.
7    Q.   Finished?
8    A.   Yes.
9    Q.   Have you ever seen this document before?
10    A.   I have not.
11    Q.   Okay. In reading this, does it refresh your
12  recollection about any meetings held in late
13  October 2002, regarding Oracle's cleanup of unapplied
14  cash?
15        MR. KONOVALOV: Objection. Lacks foundation.
16        THE WITNESS: No.
17    Q.   BY MR. GREENSTEIN: Okay. See under the
18  heading "October 22nd, Tuesday." It says:
19        "Quinn sends ss to managers to be cut up
20  amongst management team to resolve items that had
21  been reserved."
22        See that?
23    A.   Yes, I do.
24    Q.   Does that refresh your recollection about, um,
25  any project to resolve items that had been reserved?

137

1    A.    No, it does not.
2    Q.    Okay.  See the last sentence that says:
3          "Collections meets with AR to agree how to
4    adjust up invoices and how to send over details."
5          See that?
6    A.    Yes, I do.
7    Q.    And you worked in AR in October 2002, right?
8    A.    Yes, I did.
9    Q.    Okay.  And that was around the same time that
10   you were asked to research debit memos, right?
11   A.    Around the same time, yes.
12   Q.    Right.  So were you part of a meeting with
13   collections to discuss adjusting up invoices?
14         MR. KONOVALOV:  Objection.  Lacks any
15   foundation.  This is a document from 2002.
16         Assumes facts not in evidence.
17         THE WITNESS:  I don't recall.
18         MR. GREENSTEIN:  Did you say it is a document
19   in 2002?
20         MR. KONOVALOV:  No, I'm saying the document
21   lacks any -- the question lacks foundation that it is
22   a document from 2002.
23         MR. GREENSTEIN:  Got it.
24         MR. KONOVALOV:  Assumes facts not in evidence.
25         But you can answer the question, though.

138

1    Q.    BY MR. GREENSTEIN:  So -- do you want me to
2    ask it again?
3    A.    Please.
4    Q.    Did you ever have any meetings with
5    collections at any time where you discussed how to
6    adjust up invoices?
7    A.    No.
8    Q.    Do you know what it means here where it says,
9    "adjust up invoices and how to send over details"?
10   A.    I understand the adjusting up the invoices
11   piece.
12   Q.    Okay.  What does that mean?
13   A.    Like before, adding a balance to the
14   receivable line on the invoice.
15   Q.    Right.  So how would -- why would adjusting up
16   invoices resolve items that had been previously
17   reserved?
18         MR. KONOVALOV:  Objection.  Lacks foundation.
19         The witness has said he doesn't recognize the
20   document.
21         THE WITNESS:  I don't know.
22   Q.    BY MR. GREENSTEIN:  Well, can adjusting of an
23   invoice have the impact of removing an unapplied cash
24   item that was sitting in 12601?
25         MR. KONOVALOV:  Objection.  Incomplete

139

1    hypothetical.
2          THE WITNESS:  I don't know.
3    Q.    BY MR. GREENSTEIN:  Okay.  You see on
4    October 23rd, the second paragraph under that date,
5    says:
6          "Quinn wants to figure out why the items were
7    reserved and can't tell if the item was a revenue
8    impact or not.  Will not refund any item that impacts
9    revenue, adjust up invoice for revenue-impacting
10   items."
11         See that?
12   A.    Yes, I do.
13   Q.    Do you know what Mike Quinn means when he
14   says, "will not refund any item that impacts
15   revenue"?
16         MR. KONOVALOV:  Objection.  Assumes facts not
17   in evidence.  Lacks foundation.
18         THE WITNESS:  No.
19   Q.    BY MR. GREENSTEIN:  Okay.  Well, do you
20   remember becoming aware that there was a discussion
21   about refunding items -- unapplied cash items that
22   had been sitting in Oracle's bad debt reserve
23   Account 12601?
24         MR KONOVALOV:  Could you read that question
25   back, please?

140

1    (Record read.)
2          MR. KONOVALOV:  Sorry, Eli.
3    Q.    BY MR. GREENSTEIN:  Did you ever become aware
4    of any discussions whereby Mike Quinn or anybody else
5    was discussing refunding unapplied cash items to
6    customers that had been sitting in Account 12601?
7          MR. KONOVALOV:  Objection.  Lacks foundation.
8          THE WITNESS:  No.
9    Q.    BY MR. GREENSTEIN:  Okay.  Were you ever
10   involved in refunding any customers for items --
11   unapplied cash items?
12   A.    Unapplied cash items specifically?
13   Q.    Were you ever involved in refunding Oracle
14   customers for unapplied cash items that were sitting
15   in Account 25005?
16   A.    My group was involved, yes.
17   Q.    Okay.  And how so?
18   A.    The AR department is where the refund was
19   initiated.
20   Q.    Okay.  And when would Oracle refund an
21   unapplied cash item, at what point in time?
22   A.    It was not my process, I don't know.
23   Q.    Okay.  Well, who would know that in your
24   group?
25   A.    No one in my group would know that.

141

1    Q.    Okay. So what was the role of your group in
2    refunding customers for unapplied cash items?
3    A.    Initiate the refund.
4    Q.    Okay. So how would -- how would you determine
5    whether or not a refund needed to be initiated?
6    A.    We would receive the approval E-mail template
7    from the correct approval.
8    Q.    Okay. Are you talking about a refund
9    template?
10   A.    Yes.
11   Q.    Okay. Who would send a refund template to
12   your group?
13   A.    Um, I'm assuming the last member in the chain,
14   approval chain.
15   Q.    Okay. Would that be a member of a different
16   group that would send out a refund template?
17   A.    I assume so, yes.
18   Q.    Okay. If your group was to initiate a refund
19   for an unapplied cash item, would there always be a
20   refund template generated?
21   A.    Um, I don't know in every case.
22   Q.    Okay. But in order to initiate a refund, your
23   group needed some sort of approval or E-mail or
24   something coming from somebody else telling you that
25   it needed to be refunded, right?

142

1    A.    Correct.
2    Q.    Okay. Now, who would send that refund
3    template to you or that E-mail? Was it somebody from
4    AR?
5    A.    No. AR had no involvement in that.
6    Q.    Okay. So someone -- what department would --
7    would initiate or would send you the refund template
8    for items of unapplied cash?
9    A.    I think at the time it would have been
10   collections.
11   Q.    Okay. So if collections determined that a
12   refund needed to be issued for an item of unapplied
13   cash, they would send it to AR, and you guys would do
14   what with it?
15   A.    Make sure the approval had been met for the
16   dollar amount --
17   Q.    Uh-huh.
18   A.    -- and then initiate the refund.
19   Q.    Okay. Would you ever research whether or not
20   the refund was proper?
21   A.    It was not our responsibility.
22   Q.    Okay. Did you ever research any refund of
23   unapplied cash to determine whether or not it was a
24   legitimate refund?
25        MR. KONOVALOV: Objection. Vague and

143

1    ambiguous.
2        THE WITNESS: No.
3    Q.    BY MR. GREENSTEIN: You never did?
4    A.    I don't believe so, no.
5    Q.    You see under the -- in Venkataramana
6    Exhibit 5, October 23rd heading where it says:
7        "Will not refund any item that impacts
8    revenue, adjust up invoice for revenue-impacting
9    items."
10       See that?
11   A.    Yes.
12   Q.    Do you know how you would adjust --
13       Well, did you ever adjust up invoices for
14   revenue-impacting items of unapplied cash?
15       MR. KONOVALOV: Objection. Lacks foundation.
16       THE WITNESS: I don't know.
17   Q.    BY MR. GREENSTEIN: Do you know what it means
18   to adjust up an invoice for a revenue-impacting item?
19       MR. KONOVALOV: Same objection.
20       THE WITNESS: No, I do not.
21   Q.    BY MR. GREENSTEIN: Okay. You see under the
22   October 31st heading, it says:
23       "Managers meet every day to review ss notes
24   and quality to pass to Quinn. Managers consistently
25   need to review notes and clean up so Mike will

144

1    approve refund, adjust up invoice, obtain hard copy
2    from Iron Mountain, rebill revenue impact or none
3    impacting."
4        See that?
5    A.    Uh-huh.
6    Q.    So do you recall that Mike Quinn had the
7    ability to approve refunds during 2002?
8    A.    I don't know the exact approvals of the refund
9    process.
10   Q.    Okay. See where it says:
11       "...adjust up invoice, obtain hard copy from
12   Iron Mountain, rebill revenue impacts"?
13       See that?
14   A.    Yes.
15   Q.    Do you know what it means to adjust up an
16   invoice and then rebill?
17       MR. KONOVALOV: Objection. Lacks foundation.
18       THE WITNESS: No.
19   Q.    BY MR. GREENSTEIN: You don't remember a
20   series of meetings in late 2002 involving a cleanup
21   of Oracle's unapplied cash?
22       MR. KONOVALOV: Same objection.
23       THE WITNESS: No, I do not.
24   Q.    BY MR. GREENSTEIN: When you talked to Greg
25   Myers about researching debit memos, did he discuss

145

1    with you adjusting up invoices?
2    A.    No.
3    Q.    Okay.  Do you know what it means to credit
4    memo a debit memo?
5    A.    Yes.
6    Q.    What does that mean?
7    A.    Processing a credit memo on a debit memo.
8    Q.    Okay.  What is it?  How does that occur?
9    A.    You query the debit memo in the credit
10   transactions form and process the credit memo.
11   Q.    Okay.  Does that reverse the debit memo?
12         MR. KONOVALOV:  Objection.  Vague and
13   ambiguous.
14         THE WITNESS:  I don't know.
15   Q.    BY MR. GREENSTEIN:  Or what impact does that
16   have; do you know?
17         MR. KONOVALOV:  Same objection.
18         THE WITNESS:  I don't.
19   Q.    BY MR. GREENSTEIN:  Why would -- did you ever
20   credit debit memo?
21   A.    I probably have.
22   Q.    Okay.  In what instances would you credit memo
23   a debit memo?
24   A.    I don't know the exact instances.
25   Q.    And what is your understanding of what a debit

146

1    memo is?
2    A.    In what context?
3    Q.    In any -- well, is there certain types of
4    debit memos?
5    A.    There are.
6    Q.    Okay.  What types of debit memos are there?
7    A.    There is on-account debit memo.
8          There is a refund debit memo.
9    Q.    Okay.  What's the difference?
10   A.    Specifically for the on-account debit memos,
11   that's the transaction type associated with the 550
12   debit memos.
13         And a refund debit memo is what my team
14   created to initiate the refund to a customer.
15   Q.    Okay.  So to -- once you got the refund
16   template from -- giving you the approval for a refund
17   of unapplied cash, you'd create a debit memo?
18   A.    Yes.  My group would, yes.
19   Q.    Did it have a 550 prefix on it?
20   A.    No, it did not.
21   Q.    Okay.  Do you know what prefix it would have
22   on it?
23   A.    I don't recall the numbering sequence.
24   Q.    And you call that a refund debit memo; is that
25   what you said?

147

1    A.    Yes.
2    Q.    Are you aware that there were still debit
3    memos on account in 2002?
4          MR. KONOVALOV:  Objection.  Assumes facts not
5    in evidence.
6          THE WITNESS:  I don't know.
7          MR. GREENSTEIN:  Okay.
8          Let's mark this next in line.  I'm not sure
9    what exhibit it is.
10         (Plaintiff's Exhibit 4 was marked.)
11         MR. GREENSTEIN:  For the record, this is Bates
12   stamped NDCA-ORCL 827183 through -827189, and it's an
13   E-mail from Greg Myers to Ron Roberts and other
14   individuals dated October 29, 2002, and it's a
15   forwarded E-mail.
16   Q.    Mr. Elam, if you could just -- the last two
17   pages are just, um, kind of technical documents
18   related to this E-mail, it looks like.
19         But if you could just read the first three
20   pages.  Or first four.
21         Finished?
22   A.    Yes.
23   Q.    Do you know who Amy Aves is?
24   A.    Yes.
25   Q.    Who is she?

148

1    A.    She's a GPO for the payables.
2    Q.    So do you know -- so was she -- she was
3    working in the payables department at Oracle around
4    October 29, 2002?
5    A.    I don't know her exact title at that time.
6    Q.    Okay.  So in reading this E-mail, do you
7    recall the events that are reflected in here?
8    A.    No, I do not.
9    Q.    Okay.  See how there's a -- on page -186, it
10   appears to be an E-mail from you on October 28th,
11   2002 to Heather Lawson.
12         Do you see that?
13   A.    Yes, I do.
14   Q.    Who is Heather Lawson?
15   A.    I know she is an -- was or is an Oracle
16   employee, but I don't know her title at that time.
17   Q.    Okay.  Do you know if you were sending an
18   E-mail to Heather Lawson and cc'ing Amy Aves, do you
19   know, would that indicate to you now that it was a
20   certain type of information contained in the E-mail?
21         MR. KONOVALOV:  Objection.  Calls for
22   speculation.
23         THE WITNESS:  I don't know.
24   Q.    BY MR. GREENSTEIN:  Okay.  Do you see how it
25   says:

Elam, Terry  9/28/2006  9:19:00 AM

149

1       "Heather, Redacted, Terry"?
2   A.   Yes.
3   Q.   Do you know why that's redacted?
4       MR. KONOVALOV: Well, objection. To the
5 extent the question calls for revealing
6 attorney/client or work product information, I'm
7 going to instruct you not to answer the question.
8   Q.   BY MR. GREENSTEIN: Do you know why that was
9 redacted?
10      MR. KONOVALOV: If your question seeks
11 information of that nature, I'm going to instruct him
12 not to answer.
13   Q.   BY MR. GREENSTEIN: Did you redact that?
14      MR. KONOVALOV: You can answer that.
15      THE WITNESS: No.
16   Q.   BY MR. GREENSTEIN: Okay. Do you know what
17 that E-mail was referring to?
18      MR. KONOVALOV: Objection. Attorney/client
19 privilege. I instruct him not to answer the
20 question.
21   Q.   BY MR. GREENSTEIN: On page 2, you see it
22 says:
23      "Heather, I was able to log on to GSIAW..."
24      See that?
25   A.   Yes.

150

1      MR. KONOVALOV: Page 3.
2      MR. GREENSTEIN: Page 3. Sorry.
3   Q.   See that?
4   A.   Yeah.
5   Q.   Do you know what "GSIAW" refers to?
6   A.   At the time it was a test database.
7   Q.   Okay. You see here you're saying you logged
8 onto that test database and did some research, right?
9   A.   That's what it says here, yes.
10   Q.   Okay. And then it says:
11      "The refund check for Lucent was from check
12 number," and then you have a date from 1996.
13      See that?
14   A.   Yes.
15   Q.   So what were you referring to here?
16   A.   I don't know.
17   Q.   Okay. Well, it appears that you're saying
18 that there's a refund check dated in 1996, right?
19      MR. KONOVALOV: Objection. The document
20 speaks for itself.
21      THE WITNESS: That's the date here in the
22 E-mail.
23   Q.   BY MR. GREENSTEIN: Okay. And you see how it
24 says:
25      I noticed that the refund was sent to Avaya

151

1 Communications."
2      You see that?
3   A.   Yes, I do.
4   Q.   So were you saying that a refund check from
5 Lucent, you noticed that the refund was sent to Avaya
6 instead?
7      MR. KONOVALOV: Objection. Lacks foundation.
8      THE WITNESS: I don't know.
9   Q.   BY MR. GREENSTEIN: Okay. Well, since it's
10 your E-mail, you can say what you think that means
11 sitting here today.
12      MR. KONOVALOV: Objection. Unless you want to
13 testify for the witness, you should ask questions.
14   Q.   BY MR. GREENSTEIN: So do you know what you
15 meant when you wrote that?
16   A.   I do not know.
17   Q.   Do you remember, um, being involved in refunds
18 to Lucent back in 2002?
19   A.   I don't know if I was or not.
20   Q.   You see it says:
21      "The refund for Bay Networks was from check
22 number 1132080."
23      And it says an invoice "was credit memoed for
24 Bad Info."
25      Do you see that?

152

1   A.   Yes, I do.
2   Q.   Do you remember that an invoice related to Bay
3 Networks was credit memoed for bad info, back in
4 2002?
5   A.   I do not.
6   Q.   Okay. What does it mean to credit memo an
7 invoice for bad info?
8      MR. KONOVALOV: Objection. Lacks foundation.
9      THE WITNESS: I don't know in this case. I
10 don't know.
11   Q.   BY MR. GREENSTEIN: In general, what does it
12 mean to credit memo an invoice for bad info?
13      MR. KONOVALOV: Same objection.
14      THE WITNESS: I don't.
15   Q.   BY MR. GREENSTEIN: You don't know?
16   A.   I don't know.
17   Q.   Okay. Looking at the second page, see how
18 it's an E-mail from Greg Myers to Ryan Roberts and
19 Omid Fardanesh?
20      See that?
21   A.   Yes, I do.
22   Q.   You see how he's discussing -- he says he
23 needs collector's assistance in calling customers.
24      "We have three large disbursements that were
25 never cashed by the customers. I reviewed these and

153

1    it appears they deserved the credits and the
2    subsequent refund."
3        Do you see that?
4    A.   Yes, I do.
5    Q.   "We just need to find out from the customer if
6    they ever received the refund, and if so, why then
7    did not cash them.  The detail support the refund is
8    in below."
9        See that?
10   A.   Uh-huh.
11   Q.   And he talks about PacBell, Lucent/Avaya,
12   right?
13   A.   Yes.
14   Q.   And then at the bottom he says:
15       "Terry - adjust up invoice," and then he
16   provided two invoices numbers, "to 12602."
17       Do you see that?
18   A.   Yes, I do.
19   Q.   Did you adjust up those invoices to 12602?
20   A.   I don't know if I did or not.
21   Q.   What does it mean to adjust up an invoice to
22   12602?
23   A.   Adjusting up the invoice, like I said before,
24   is adding a receivable balance to the header of the
25   invoice.

154

1    Q.   Okay.  Well, you said earlier that the header
2    contained multiple data fields, right, such as -- or
3    multiple data points such as cash receipt invoice,
4    right?
5    A.   Cash receipt.  It's not stored there, no.
6    Q.   Well, what is stored on the accounts
7    receivable header?
8    A.   The transaction type, order source, customer
9    bill to, ship to, sales rep.
10   Q.   Okay.  Well, where's the cash receipt
11   information, invoice information listed for
12   particular --
13   A.   Cash receipt is a completely separate
14   transaction.
15   Q.   Right, but where is it stored?  I'm asking
16   about where it's stored.
17       Didn't you say earlier there was a place where
18   there were cash receipts, invoice information,
19   refunds, credit memos, stored in the AR subledger?
20   A.   It will be stored in the module in the tables.
21   Q.   Right.  Okay.  Isn't that -- well -- I don't
22   understand what you mean by "header."  I thought the
23   two were related.
24   A.   The header of an invoice stores the order
25   source, transaction type, customer information, sales

155

1    rep.
2       The line item of the invoice is the products
3    that the customer purchased.
4    Q.   Okay.  And where is the cash receipt info and
5    the, you know, credit memo info and any refunds,
6    where is that stored?
7    A.   Those are total separate transactions.
8       Credit memo has its own header.
9       Cash receipt will have its own information.
10   Q.   So you mean header in, like, in a spreadsheet?
11   A.   No.  So that's -- "header" is a word we use in
12   Oracle to explain what part of an invoice, where, how
13   to differentiate the header and footer of an invoice.
14   Q.   Okay.  So where he says, "Terry - adjust up
15   these invoices to 12602," do you know what 12602 is?
16   Is that an accounts receivable account?
17   A.   I do not know what that account is.
18   Q.   At the time you knew, right?
19   A.   I don't know.
20   Q.   Okay.  And it says:
21       "Credit memo the On-Account Debit memo and
22   apply the money to the two invoices."
23       See that?
24   A.   Yes, I do.
25   Q.   Do you know what that means?

156

1    A.   Process a credit memo on the debit memo, take
2    the two invoices and apply them to the cash receipt.
3    Q.   Okay.  So didn't you say earlier that you
4    didn't know what "on-account" was, other than what
5    Greg Myers told you the first month you were at
6    Oracle?
7    A.   Correct.
8    Q.   Okay.  So here where he's saying, "Credit memo
9    the On-Account Debit memo," he was asking you about
10   something on-account, right?
11      MR. KONOVALOV: Objection. Lacks foundation.
12      THE WITNESS: I don't know what he
13   specifically meant.
14   Q.   BY MR. GREENSTEIN: Right.  I'm just wondering
15   why he would be writing you about on-account debit
16   memos in October 2002, if you didn't know what
17   "on-account" meant?
18      MR. KONOVALOV: Objection. Calls for
19   speculation.
20      THE WITNESS: I don't know what Greg meant.
21   Q.   BY MR. GREENSTEIN: Well, did you ever credit
22   on-account debit memos?
23   A.   I don't know specifically.
24   Q.   You could have, though, right?
25      MR. KONOVALOV: Objection. Misstates the

157

1  witness' testimony.
2          THE WITNESS:  I don't know.
3      Q.   BY MR. GREENSTEIN:  You see where he says:
4          "I realize this was before your and my tenure,
5  but in light of the recent problems I think we need
6  to really scrutinize our refunds a little better.
7  Let's discuss."
8          See that?
9      A.   Yes, I do.
10     Q.   Did you discuss that with Greg Myers?
11     A.   I don't remember.
12     Q.   Okay.  Do you know when he says, "we need to
13  really scrutinize our refunds a little better," what
14  he meant by that?
15     A.   I don't know.
16     Q.   Okay.  Did you ever have any discussions with
17  Greg Myers around 2002 about problems with refunds?
18         MR. KONOVALOV:  Objection.  Assumes facts not
19  in evidence.
20         THE WITNESS:  No.
21     Q.   BY MR. GREENSTEIN:  So when he says, "in light
22  of the recent problems," you don't know what he's
23  referring to there?
24     A.   I do not know.
25     Q.   And you never had -- when he says "Let's

158

1  discuss," you don't remember discussing anything with
2  him?
3      A.   I don't recall, no.
4      Q.   What would the process be to credit memo an
5  on-account debit memo and apply it to an invoice?
6  How would you do that?
7      A.   Query the transaction number in the credit
8  transactions form; processing the credit memo;
9  querying up the cash receipt; applying the invoices
10  in the invoice applications form.  Or receipt
11  applications form.
12     Q.   Okay.  Now, when he's referring to "on-account
13  debit memo," I think you said there were two types.
14  There's an on-account debit memo, and then there's a
15  refund debit memo, right?
16     A.   Yes.
17     Q.   I think you said your group used refund debit
18  memos in connection with initiating refunds later in
19  your tenure at Oracle, right?
20     A.   Correct.
21     Q.   So did you ever deal with on-account debit
22  memos in 2002 as an AR manager?
23         MR. KONOVALOV:  Objection.  Vague and
24  ambiguous.
25         THE WITNESS:  Can you be more specific with

159

1  that?
2      Q.   BY MR. GREENSTEIN:  Did you ever have to do
3  anything with respect to on-account debit memos in
4  October of 2002, as opposed to refund debit memos?
5      A.   I don't recall.
6      Q.   Okay.  And didn't you say that the on-account
7  debit memos refer to the debit memos that Greg Myers
8  was talking about in connection with the
9  November 2000 cleanup, right?
10     A.   Um, it could be, yes.
11     Q.   So do you know why he was asking you to credit
12  memo on-account debit memos?
13     A.   I don't know.  In this case, no, I do not
14  know.
15     Q.   Well, do you know in any case why he would be
16  telling you to do that two years after the on-account
17  cleanup?
18     A.   I don't know why, no.
19     Q.   Okay.  In the subject heading, it says: "AR
20  Unclaimed Property Reporting."
21         Do you see that?
22     A.   Where's that at?
23     Q.   The heading on the first page.  "Subject."
24     A.   Yes, I see that.
25     Q.   Is that -- does AR unclaimed property mean

160

1  anything to you?
2      A.   Nothing to me.
3          MR. GREENSTEIN:  Okay.  Okay.  I think we can
4  take a lunch break.
5          VIDEOTAPE OPERATOR:  Going off the record.
6          The time is 12:35.
7  (Lunch recess was taken at 12:35 p.m. to 1:38 p.m.)
8          VIDEOTAPE OPERATOR:  Back on the record.
9          The time is 1:38.
10     Q.   BY MR. GREENSTEIN:  Good afternoon, Mr. Elam.
11  Earlier, we were talking about a refund template.
12         Do you remember that?
13     A.   Yes.
14     Q.   And that is a -- some type of a documentation
15  or E-mail that's generated in the process of
16  refunding items to Oracle's customers, right?
17     A.   Yes.
18     Q.   And do you know -- is that refund template
19  different than what's called a customs refund form?
20     A.   Um, yes, it is.
21     Q.   Okay.  What's the difference?
22     A.   I'm assuming it's a customer refund form?
23     Q.   No, no.  Oh, I'm sorry, I meant customs refund
24  form.  Or custom refund form.
25         MR. KONOVALOV:  Objection.  Lacks foundation.

Elam, Terry  9/28/2006  9:19:00 AM

161

1    THE WITNESS: Yeah, I don't specifically know
2    the -- know by the name that you're -- you're
3    stating.
4    Q.    BY MR. GREENSTEIN: Okay. Is there something
5    called a customer refund form?
6    A.    There -- yeah. There is a form that was used
7    in the past, yes.
8    Q.    Okay. "Used in the past." Did it ever stop
9    being used?
10   A.    Um, I don't know when it was stopped, but yes.
11   Q.    Okay. So is that different than a refund
12   template?
13   A.    Yes.
14   Q.    And was one used before -- was a customer
15   refund form used before a refund template or at the
16   same time or --
17   A.    I don't know when the custom refund form was
18   being used. I don't know that.
19   Q.    Customer refund form you mean, right?
20   A.    Yeah. I'm sorry, yes.
21   Q.    Okay. I mean, is there something called a
22   custom refund form?
23   A.    In the AR module, there was, yes.
24   Q.    Okay. And then is there something different
25   that's called a customer refund form?

162

1    A.    No -- I'm sorry. Um, it -- it has kind of two
2    different names. Customer refund form or custom
3    refund form. It's not -- it's something that's not
4    in use today, so it's kind of -- it depends on who
5    you ask. It could be two different names.
6    Q.    Okay. Do you remember if there was a refund
7    given in the time you started at Oracle in 2000, late
8    2000, would there be -- would you use a customs
9    refund form to process that?
10   MR. KONOVALOV: Objection. Incomplete
11   hypothetical.
12   THE WITNESS: I don't recall.
13   MR. GREENSTEIN: Okay.
14   Um, let me just mark -- well . . .
15   Q.    But at -- at the time you have been at Oracle,
16   there's always been some kind of form that's used to
17   document a refund given to an Oracle customer, right?
18   A.    A specific form? An E-mail? That could be a
19   form of a document.
20   Q.    Right. I just mean something written, a
21   document that memorializes that a refund was made to
22   a customer. Some sort of documentation of that at --
23   during your time at Oracle, there was always some
24   documentation that a refund was given, right?
25   A.    I believe so, yes.

163

1    Q.    Okay. It could be an E-mail or a refund
2    template or a customs refund form, right?
3    A.    Yeah.
4    Q.    Okay. Were there any other types of forms
5    that you remember for refunds?
6    A.    I don't -- I don't recall.
7    Q.    Okay. Were you -- and I think you said you
8    were involved in initiating the refund. Your group
9    was, right?
10   A.    Correct.
11   Q.    Initiating refunds for Oracle customers,
12   correct?
13   A.    Right.
14   Q.    Okay. Did you ever -- you yourself ever
15   approve refunds?
16   MR. KONOVALOV: Objection. Asked and
17   answered.
18   THE WITNESS: I don't know.
19   Q.    BY MR. GREENSTEIN: Okay. Earlier we were
20   talking about on-account debit memos; remember that?
21   A.    Yes.
22   Q.    Were you ever involved in approving or
23   researching refunds made in connection with
24   on-account debit memos that were created on
25   November -- in November 2000?

164

1    A.    I don't remember.
2    Q.    Do you remember being involved in issuing
3    credit memos to customers or in connection with
4    customers?
5    A.    Specifically cus- -- specific customers or
6    just in general?
7    Q.    No, in general.
8    A.    I've created credit memos in AR, yes.
9    Q.    Okay. And let me back up to that previous
10   question.
11   Generally, do you ever recall being involved
12   in approving refunds to customers that were related
13   to on-account items with 550 prefixes that were
14   generated in November 2000?
15   MR. KONOVALOV: Well, objection. Assumes
16   facts not in evidence.
17   THE WITNESS: I don't recall.
18   MR. GREENSTEIN: Let me mark this. I think
19   this is Elam Number 6 -- 5.
20   Actually, no, this was previously marked as
21   Campos Number 8. Campos is C-a-m-p-o-s.
22   Q.    Just let me know when you're finished.
23   See that?
24   A.    Uh-huh. Yes.
25   Q.    See at the top it says: "Refund" --

Elam, Terry  9/28/2006  9:19:00 AM

165

1       Well, have you ever seen this document before?
2   A.   No, I have not.
3   Q.   Okay. You see at the top it says: "Refund
4   Template for Household Finance"?
5   A.   Yes, I've seen that.
6   Q.   And it appears to be an E-mail regarding a
7   refund for Household?
8       MR. KONOVALOV: Objection. Lacks foundation.
9       THE WITNESS: I don't know what this is.
10  Q.   BY MR. GREENSTEIN: Okay. Is this -- when you
11  talked about a refund template earlier, is this the
12  kind of document you were referring to?
13  A.   In general.
14  Q.   Right.
15  A.   Yes.
16  Q.   And you see the date at the top right-hand
17  corner is April 8th, 2002?
18  A.   Yes, I see that.
19  Q.   So does this refresh your recollection that
20  around 2002, these refund templates were being used
21  in connection with refunds given to Oracle customers?
22      MR. KONOVALOV: Objection. Lacks foundation.
23  And calls for speculation.
24      THE WITNESS: I don't know.
25  Q.   BY MR. GREENSTEIN: Okay. But have you seen a

166

1   refund template like this before, an E-mail that
2   looks like this in connection with refunds?
3   A.   In general, yes.
4   Q.   Okay.
5       Now, do you know who Kate Schwermann is?
6   A.   I do not know her.
7   Q.   Okay. I'll represent to you that she was in
8   collections at Oracle.
9       And do you know who Raul Campos is?
10  A.   Yes, I do.
11  Q.   Okay. Who is he?
12  A.   He was in collections.
13  Q.   Okay. Do you know that he was an unapplied
14  cash specialist at Oracle at any time?
15  A.   I did not know his title.
16  Q.   Did you ever work with him in doing your
17  monthly end reconciliations of Account 25005?
18  A.   No, I did not.
19  Q.   Okay. You never spoke to him at the end of
20  the month in connection with your reconciliation of
21  25005?
22  A.   No, I did not.
23  Q.   Okay. Did Greg Myers ever tell you that there
24  was an unapplied cash specialist at Oracle when he
25  told you that -- to do these reconciliations?

167

1   A.   I don't recall.
2   Q.   Do you know any unapplied cash specialists
3   besides Raul Campos that were at Oracle?
4   A.   I don't know if there was an unapplied cash
5   specialist.
6   Q.   Okay. You see in the "Reason" section in the
7   middle? It says:
8       "Customer received information regarding their
9   unapplied cash amount and requested a refund."
10      Do you see that?
11  A.   Yes.
12  Q.   Do you recall during your time at Oracle
13  customers finding out that they had unapplied cash
14  and asking for a refund?
15  A.   I don't know. I'm not aware.
16  Q.   You don't remember doing any research on items
17  of unapplied cash that the customer brought to your
18  attention, and then you initiated a refund in the AR
19  department?
20      MR. KONOVALOV: Objection. Lacks foundation.
21      THE WITNESS: I don't know.
22  Q.   BY MR. GREENSTEIN: Do you remember being
23  involved in any refunds in 2001, 2002, 2003 relating
24  to on-account debit memos?
25      MR. KONOVALOV: Objection. Vague and

168

1   ambiguous.
2       But you can answer the question.
3       THE WITNESS: I don't know.
4   Q.   BY MR. GREENSTEIN: Okay. Do you know if on-account
5   debit memos were used in 2002?
6       MR. KONOVALOV: Same objection.
7       THE WITNESS: I don't recall.
8   Q.   BY MR. GREENSTEIN: Okay. Do you recall when
9   refund debit memos first started being used at
10  Oracle?
11  A.   I think they were in -- they were being used
12  when I joined Oracle in December of 2000. I don't
13  know the exact date.
14  Q.   Okay. So when you joined, there were two
15  types of -- there were on-account debit memos and
16  then refund debit memos, both which were being used
17  at the time you joined Oracle?
18  A.   I know refund debit memos were, but I don't
19  know about on-account debit memos.
20  Q.   Okay. Well, didn't you say the only time you
21  were told or discussed on-account was during that
22  conversation with Greg Myers when -- a month into
23  your employment, right?
24  A.   Correct.
25  Q.   And you discussed on-account debit memos,

169

1 right, as part of the November 2000 cleanup?
2 A.   He explained the on-account debit memos to me,
3 yes.
4 Q.   Okay.  But did you understand at that time the
5 difference between a refund debit memo and an
6 on-account debit memo?
7 A.   He had to explain both to me.
8 Q.   Okay.  And did you then -- strike that.
9     Let's mark this as Elam Number 6 please.
10     MS. REPORTER:  I think it's 5.
11     MR. GREENSTEIN:  That's right.  We didn't mark
12 the last one.  Five.
13     For the record, this is NDCA-ORCL 750068
14 through -750074.
15     (Plaintiff's Exhibit 5 was marked.)
16     MR. GREENSTEIN:  For the record, this is --
17 oh, I just said that.
18     Now, there's a screen -- there's what appears
19 to be a screen shot of some system Oracle, followed
20 by an E-mail.
21     Now, the Bates numbers are in consecutive
22 order.  This is how they were produced to us, so this
23 is how we are marking it here.
24     MR. KONOVALOV:  Was it clear these are -- this
25 is one document or are these, in fact, two documents?

170

1     MR. GREENSTEIN:  Well, Oracle produced these
2 documents.  They produced slip sheets.  And so the
3 only way we can tell is if, you know, there's a slip
4 sheet.
5     But, yeah, it appears that they're part of the
6 same thing.
7     MR. KONOVALOV:  Thank you.
8 Q.   BY MR. GREENSTEIN:  Mr. Elam, if you could
9 read the string.  You might want to read from the
10 back.
11 A.   Okay.  Yes.
12 Q.   Have you seen this document before?
13 A.   I have not.
14 Q.   Okay.  Let's start with the back page -- well,
15 the second-to-the-last page, which appears to be one
16 of the first E-mails in the string.
17     You see there's an E-mail from Janice
18 Herrmann -- two Rs, two Ns -- SBCSI, to you?
19     See that?
20 A.   Yes.
21 Q.   And it's March 12th, 2003.
22     See that?
23 A.   Yes, I do.
24 Q.   So it looks like she is E-mailing you.  Um,
25 she says:

171

1     "I" -- E-mail address.
2     "I thought this would be quicker."  And she
3 gives you her E-mail address.
4     See that?
5 A.   Okay.
6 Q.   Okay.  Do you remember who Janice Herrmann
7 was?
8 A.   I do not know.
9 Q.   Okay.  Do you remember being involved in
10 refunds given to SBC?
11 A.   I do not recall this, no.
12 Q.   Okay.  So you see how on the beginning of page
13 -750072, you write to her:
14     "Jan, I apologize for the delay, I know you're
15 frustrated.  I am very sorry.  Can I call you at 1:00
16 p.m. to discuss the spreadsheet?  Terry."
17     See that?
18 A.   Yes, I do.
19 Q.   Now, do you remember why Janice Herrmann at
20 SBC was frustrated?
21 A.   I don't recall, no.
22 Q.   Okay.  Do you remember where she says "to
23 discuss" -- that you want to call her to discuss the
24 spreadsheet.
25     See that?

172

1 A.   Yes, I do.
2 Q.   Do you remember what spreadsheet you discussed
3 or were going to discuss?
4 A.   I do not recall, no.
5 Q.   Okay.  You don't recall discussing any
6 spreadsheet with her?
7 A.   I don't remember.
8 Q.   That's your E-mail, terry.elam@oracle.com,
9 correct?
10 A.   That's correct.
11 Q.   You see on page -750072, she writes to you:
12     "Terry, Per our conversation, please process a
13 refund check in the amount of 526,476," and change,
14 "per the items noted as 'Open Item, Never Refunded.'"
15     See that?
16 A.   Yes, I do.
17 Q.   Do you remember being involved in processing a
18 refund check for over $526,000 to SBC in 2003?
19 A.   I do not know.
20 Q.   Was this the only refund that you processed
21 for SBC?
22 A.   I don't know.
23 Q.   Okay.  Was that normal as part of your duties,
24 to, um, process refund checks to customers?
25     MR. KONOVALOV:  Objection.  Vague and

Elam, Terry  9/28/2006  9:19:00 AM

173

1   ambiguous.
2        THE WITNESS:  No.
3   Q.   BY MR. GREENSTEIN:  Okay.  Was this a unique
4   situation here?
5        MR. KONOVALOV:  Same objection.
6        THE WITNESS:  I don't know the situation.
7        MR. GREENSTEIN:  Right.
8   Q.   Okay.  Why would SBC be contacting you, um,
9   about processing a refund check?
10       MR. KONOVALOV:  Objection.  Calls for
11  speculation.
12       THE WITNESS:  I don't know.
13  Q.   BY MR. GREENSTEIN:  Okay.  If you look at
14  -750071.  It's a March 14th, 2003 E-mail from you to
15  Raul Campos.
16       See that?
17  A.   Yes.
18  Q.   Raul was the unapplied cash specialist?
19       MR. KONOVALOV:  Are you asking him or --
20       MR. GREENSTEIN:  Yeah.
21  Q.   I'll represent to you that he was the
22  unapplied cash specialist during this time.
23       Now, do you remember sending him an E-mail
24  regarding this refund?
25  A.   I do not remember.

174

1   Q.   Okay.  You see how you say:
2        "Raul, SBC would like the items on the
3   spreadsheet in black to be refunded.  I've already
4   done the research to verify that these have not been
5   refunded in the past.  Can you start the process?  If
6   you have any questions let me know."
7        See that?
8   A.   I see that, yes.
9   Q.   Okay.  So why were you involved in -- well,
10  strike that.
11       Was this normal for you to research items of
12  unapplied cash that had to be refunded to customers?
13       MR. KONOVALOV:  Objection.  Vague and
14  ambiguous.
15       THE WITNESS:  I don't know.
16  Q.   BY MR. GREENSTEIN:  Okay.  Do you know that --
17  as part of your end-of-the-month reconciliation, did
18  you ever get involved with specific -- researching
19  specific items of unapplied cash and determining
20  whether they needed to be refunded or not?
21  A.   No.
22  Q.   You never did that?
23  A.   No.
24  Q.   So other than as part of the monthly end
25  reconciliation, did you ever do that?

175

1   A.   I don't recall.
2   Q.   Um, where you're telling Raul that there is a
3   spreadsheet, and then you said the items in black.
4        Do you know where that spreadsheet is today?
5   A.   No, I do not know.
6   Q.   And when you said you've already done the
7   research to verify that these have not been refunded
8   in the past, do you know what you did to research
9   that?
10  A.   I don't remember what I did.
11  Q.   Okay.  At this time, 2003, if you were going
12  to research items of unapplied cash that had not been
13  refunded so that you could determine whether or not
14  it had or had not, what -- what would you do?
15  A.   I would have to look at the specific cases,
16  the specific cash receipts that are associated with
17  these, with the refund.  I can't speculate on what I
18  would do.
19  Q.   Right.  But as you sit here today, if you
20  wanted to research whether an item of unapplied cash
21  had to be refunded, and you had to look at a cash
22  receipt, what would you -- what would you look for to
23  determine whether it had to be refunded or not?
24  A.   I didn't make that determination if it was --
25  if it needed to be refunded or not.

176

1   Q.   Well, you did research -- based on this
2   E-mail, you did research to determine if this item
3   here was to be refunded to SBC, right?
4        MR. KONOVALOV:  Objection.  Misstates the
5   document.
6        THE WITNESS:  The document does not say that.
7   Q.   BY MR. GREENSTEIN:  Okay.  Well, what does it
8   mean when it says:
9        "I've already done the research to verify that
10  these have not been refunded in the past"?
11       Doesn't that mean that you did some sort of
12  research, and you determined that the items hadn't
13  been refunded before, right?
14       MR. KONOVALOV:  Objection.  Misstates the
15  document.
16       THE WITNESS:  I don't know what research I
17  did.
18  Q.   BY MR. GREENSTEIN:  No, but I'm asking what
19  you meant here when you wrote this.
20  A.   I don't know at this time what I meant in this
21  document.
22  Q.   Okay.  As you sit here today, what do you
23  surmise, when looking at your own E-mail, what you
24  meant when you said that you had to verify that these
25  items hadn't been refunded?

177

1          MR. KONOVALOV: Objection. Asked and answered
2    several times now.
3          You can answer it again.
4          THE WITNESS: I don't know what this is
5    speaking to.
6    Q.    BY MR. GREENSTEIN: So you don't know -- if
7    you were to -- if today you had to go research to see
8    whether an item of unapplied cash had been refunded
9    or not, or needed to be refunded, you don't know what
10   you would -- how you would go about doing that?
11         MR. KONOVALOV: Objection. Misstates the
12   witness' testimony.
13         THE WITNESS: Today, I would know. Speaking
14   to this document, I have no clue what I did at that
15   time.
16   Q.    BY MR. GREENSTEIN: Right. So -- but you said
17   you would look up cash receipts, right?
18   A.    That's where I would start, yes.
19   Q.    Okay. What would you do? How would you
20   determine by looking at cash receipts whether an item
21   had been refunded or had to be refunded?
22   A.    I would look at the cash receipt just to see
23   the history of the cash receipt first.
24   Q.    Okay. And how would you do that?
25   A.    Query up the cash receipt in the AR system.

178

1    Q.    Okay. And what information would come up on
2    the screen?
3    A.    The cash receipt with the customer
4    information, the date of the deposit, cash receipt
5    amount.
6    Q.    Whether it was applied to an invoice or not
7    applied, put into 25005, right?
8    A.    You can't specifically see that from the
9    screen, the original screen you're looking at, but
10   you can get there, yes.
11   Q.    And you can get there how?
12   A.    You would go to the receipt applications form
13   to identify the invoices that have been applied --
14   that are applied.
15   Q.    Okay. So the receipt applications form is
16   another query you would do, right?
17   A.    It's a button on the receipt itself to show
18   you the invoices that have been applied.
19   Q.    Okay. And can you print those out? Can you
20   print those receipt histories or --
21         Yeah, if you hit that button and it popped up
22   on the screen, could you print that out?
23   A.    You could do a screen print.
24   Q.    A screen shot, right?
25   A.    Uh-huh.

179

1    Q.    And you could do that today, right?
2    A.    Sure.
3    Q.    Okay. And you could do it back in 2003,
4    right?
5    A.    Well, if we -- I can't remember the same
6    access, but yes.
7    Q.    Okay. See the reason code -- on page -750071
8    has a reason code. It says:
9          "Reconciliation of Southwestern Bell's
10   unapplied account. Please contact Terry Elam (AR
11   manager) for further details."
12         See that?
13   A.    Yes, I do.
14   Q.    If you turn to the previous page, it's Raul
15   Campos writing to Michael Hernandez, a list of
16   checks, customer -- you know, checks and amounts to
17   be refunded, right?
18         See that?
19   A.    Yes.
20   Q.    And then so where it says:
21         "Reason: Reconciliation of Southwestern
22   Bells's unapplied contact. Please contact Terry Elam
23   for further details."
24         Why is he -- why is he telling Mike Hernandez
25   here that he should contact you for further details

180

1    on these items?
2          MR. KONOVALOV: Objection. Calls for
3    speculation.
4          THE WITNESS: I don't know why he said that.
5    Q.    BY MR. GREENSTEIN: Okay. Did you ever talk
6    to Mike Hernandez about refunds to Oracle customers?
7    A.    I don't know if I ever did or not.
8    Q.    You don't remember having any discussions with
9    Michael Hernandez about refunding Oracle customers at
10   any time?
11   A.    I don't recall. I might have, but I don't
12   recall.
13   Q.    So in the reason code or in the reason heading
14   where it says "Reconciliation of Southwestern Bell's
15   unapplied account," was that part of your monthly end
16   reconciliation of unapplied cash items sitting in
17   25005?
18         MR. KONOVALOV: Objection. Vague and
19   ambiguous.
20         THE WITNESS: No.
21   Q.    BY MR. GREENSTEIN: So this was separate from
22   that, your monthly end process, right?
23   A.    I can't speak to what this document says.
24   Q.    Okay. Well, these are E-mails from you and to
25   you, right?

181

1     MR. KONOVALOV: Actually, not the one you're
2  asking questions about.
3     Q.  BY MR. GREENSTEIN:  Right?
4     A.  This E-mail is not to me.
5     Q.  Right, but it's referring to you.  And then
6  you -- there are E-mails in it that you wrote, right,
7  in the string?
8     A.  It appears to, yes.
9     Q.  Okay.  So I'm asking if that -- if that
10  refreshes your recollection that whether or not this
11  was part of your monthly reconciliation of unapplied
12  cash, or was it something unique and separate from
13  that?
14     A.  That was not part of my monthly
15  reconciliation, but I can't speak to this statement.
16     Q.  And you see how on -750071 it says "Amount To
17  Refund," and then it has "Applied to debit memo #."
18     See that?
19     A.  Yes.
20     Q.  See the debit memo numbers start with 550
21  prefix numbers?
22     A.  Yes.
23     Q.  And that means they're on-account debit memos,
24  right?
25     MR. KONOVALOV: Objection.  Calls for

182

1  speculation.
2     THE WITNESS:  I don't know.
3     Q.  BY MR. GREENSTEIN:  Okay.  Well, didn't you
4  say earlier that all on-account debit memos had 550
5  prefixes?
6     A.  I don't know about all of them.
7     Q.  Okay.  Well, if these are, in fact, debit
8  memos, do you know why -- why debit memos created in
9  2000 were being refunded in 2003?
10     MR. KONOVALOV: Objection.  Assumes facts not
11  in evidence.
12     THE WITNESS:  I don't know.
13     Q.  BY MR. GREENSTEIN:  Do you know who Sam
14  Yohannes was?
15     A.  He was a person in my group.
16     Q.  Okay.  Did he have authority to approve
17  refunds to Oracle customers?
18     A.  No, he did not.
19     Q.  Okay.  You see on the second page of this,
20  he's copied on -- or he's on the first E-mail from
21  Brad Newton?
22     Do you see that?
23     THE REPORTER: Brad Newton?
24     MR. GREENSTEIN:  "Newton," like Isaac.
25     Q.  See that?

183

1     A.  At the bottom of the page?
2     Q.  No, at the top.
3     A.  Yes.
4     MR. KONOVALOV: You had to reach deep for that
5  one, didn't you?
6     MR. GREENSTEIN:  Hit me on the head.
7     Q.  So do you know why he would be on these
8  E-mails regarding refunds to customers?
9     A.  Sam was responsible for initiating the refund
10  request in AR.
11     Q.  Okay.  So he would be the person that all the
12  refund templates or customs refund forms would go to,
13  to initiate the process, right?
14     A.  The refund templates.
15     Q.  Yeah.
16     A.  Yes, he would receive the approved refund
17  templates.
18     Q.  Approved by whom?
19     A.  The person with the appropriate approval
20  matrix --
21     Q.  Okay.
22     A.  -- per the dollar amount.
23     Q.  Are those AR employees?
24     A.  Who?
25     Q.  The people that can approve certain amounts of

184

1  refunds.
2     A.  They're Oracle employees.
3     Q.  Okay.  Do you know -- remember anybody who had
4  the approval authority during this time?
5     A.  I know Mike Quinn had approval authority.
6     I know Brad Nitton had -- Brad Newton had
7  approval authority.
8     What dollar amounts, I do not know.
9     Q.  Right.
10     Okay.  Was there a document that memorialized
11  the matrix that you were talking about?
12     A.  Um, there could have been, but it would have
13  been a collections process.
14     Q.  Okay.  So knowing what you know from working
15  at Oracle from 2000 until today, knowing what
16  you know about the accounts receivable process and
17  seeing these E-mails, do you have any idea why
18  526,000 was being refunded to SBC in connection with
19  debit memos that were generated three years before
20  this E-mail?
21     MR. KONOVALOV: Objection.  Assumes facts not
22  in evidence.  Lacks foundation.
23     THE WITNESS:  I don't know.
24     Q.  BY MR. GREENSTEIN:  You never had any
25  discussions with Greg Myers about debit memo items

185

1   created in November 2000 that had to be refunded
2   years later?
3   A.  No, I don't recall.
4   Q.  Okay.  Do you recall any discussions with
5   anybody about debit memos created around
6   November 2000 having to be refunded two or three
7   years later?
8   A.  No, I don't remember any.
9   Q.  Okay.  Do you remember having any discussions
10   with anybody about debit memo items created in
11   November 2000 that later had to be credit memoed two
12   or three years later?
13   A.  Repeat, please.
14   Q.  Did you ever have any discussions with anybody
15   about debit memos created in November 2000,
16   on-account debit memos, having to be credit memoed in
17   2002, 2003, 2004?
18   A.  Um, yes.
19   Q.  Okay.  Why don't you tell me about what you
20   remember.
21   A.  Is there a specific incident that you want me
22   to talk about or -- what do you want me to speak to?
23   Q.  Was there more than one discussion about that,
24   about on-account debit memos being credit memoed two
25   years after November 17th, 2000?

186

1   A.  I don't recall any -- how many there were.
2   Q.  Okay.  Well, what do you -- just what do you
3   recall about those discussions at all?
4   A.  Um, specifically in the -- from Greg Myers
5   about the process related to pulling out some of the
6   entries into the 12601 account in the
7   October-November of 2002 time frame.
8   Q.  Okay.  So pulling out some of the entries in
9   12601; is that what you said?
10   A.  Yeah.  The associated entries with the debit
11   memos.
12   Q.  So reversing certain entries related to 12601,
13   right?
14   MR. KONOVALOV:  Objection.  Misstates the
15   witness' testimony.
16   THE WITNESS:  Not specifically, no.
17   Q.  BY MR. GREENSTEIN:  Okay.  When you say
18   "entries," what do you mean?
19   A.  There's a miscellaneous receipt entry into
20   12601.
21   Q.  Okay.  So you're aware that -- strike that.
22   So there had previously been a miscellaneous
23   receipt entry into 12601, and you discussed using a
24   credit memo to get that out of 12601; is that right?
25   MR. KONOVALOV:  Objection.  Misstates the

187

1   witness' testimony.
2   THE WITNESS:  No, that is not correct.
3   Q.  BY MR. GREENSTEIN:  Okay.  Why don't you tell
4   me why you were discussing this, and the
5   circumstances surrounding why you were pulling stuff
6   out of 12601.
7   MR. KONOVALOV:  Objection.  Misstates the
8   witness' testimony.
9   But you can answer the question.
10   THE WITNESS:  There -- it's a -- there's a
11   specific process of -- associated with a debit memo
12   that you have to follow to, um, pull -- there's
13   two -- there's a miscellaneous receipt that you need
14   to -- to take out or reverse out of this system, plus
15   unapply a debit memo to actually process the credit
16   memo on it.
17   Q.  Right.  But why were you -- why were you
18   processing credit memos -- or why were you reversing
19   entries into 12601 during 2002?
20   MR. KONOVALOV:  Objection.  Misstates the
21   witness' testimony.
22   You can answer the question.
23   THE WITNESS:  Well, that's part of the
24   spreadsheet that was given to myself, was there was a
25   number of steps needed to credit memo the debit memo.

188

1   And part of that is to reverse out the miscellaneous
2   receipt into 12601.
3   Q.  BY MR. GREENSTEIN:  Okay.  So you're talking
4   about the spreadsheet that Greg Myers gave you with
5   on-account debit memos on it and asked you to
6   research them, right?
7   A.  I don't know if they're specifically
8   on-account debit memos, but it was a spreadsheet of
9   transactions.
10   Q.  Of debit memos?
11   MR. KONOVALOV:  Objection.  Misstates the
12   witness' testimony.
13   THE WITNESS:  Could have been.
14   Q.  BY MR. GREENSTEIN:  Okay.  So part of your
15   research -- I think earlier said you didn't remember
16   what you did to research those items.
17   But now I think you're saying that part of
18   that was creating credit memos related to those debit
19   memos on that spreadsheet, right?
20   MR. KONOVALOV:  Objection.  Misstates the
21   witness' testimony.
22   THE WITNESS:  That did not involve any
23   research.
24   Q.  BY MR. GREENSTEIN:  Okay.  Well, other than
25   research, so when you got that list of debit memos

189

1   from Greg Myers in 2002, what did -- you created
2   credit memos for those -- some of those debit memos,
3   right?
4   A.   To open up the original cash receipt, you had
5   to unapply the debit memo and process a credit memo
6   on it.
7   Q.   Okay.  And why -- what result -- or why were
8   you -- why would that impact 12601?
9   A.   There are two additional entries needed to
10  reverse those entries out of 12601.
11  Q.   Okay.  But why were you reversing entries out
12  of 12601, for what purpose?
13  A.   I don't know the purpose.
14  Q.   Well, did Greg Myers say, "We want you to" --
15  did he tell you why you were doing this?
16  A.   He did not.
17  Q.   Okay.  So how did you know what you had to do
18  once you got the spreadsheet?
19  A.   From the original discussions I had with Greg
20  on the on-account debit memos.
21  Q.   Back in December 2000?
22  A.   Yes.
23  Q.   Okay.  So in October of 2002, two years later,
24  he gave you a spreadsheet, and you knew what to do
25  with it because of a con- -- the conversation you had

190

1   in December 2000?
2        MR. KONOVALOV:  Objection.  Misstates the
3   witness' testimony.
4        THE WITNESS:  I don't know.
5   Q.   BY MR. GREENSTEIN:  Okay.  I'm just trying to
6   figure out what actually happened during that
7   discussion.
8        So did he -- did Greg Myers say anything in
9   2002 about 12601 with respect to what you were
10  supposed to do with respect to these on-account debit
11  memos?
12  A.   There could have been related entries in 12601
13  associated with these debit memos, but he didn't
14  specifically state that.
15  Q.   All right.  But what -- did he say, "I want
16  you to do this, and the result is going to be this"?
17  A.   I don't recall.
18  Q.   Okay.  Did you ever complete that task that he
19  gave you?
20  A.   Yes.
21  Q.   How long did it take?
22  A.   I don't recall how long it took.
23  Q.   Okay.  So was there some sort of work product
24  that was the result of that -- what you did?
25  A.   I don't think I provided anything for it.

191

1   Q.   Did you talk to him about the results of
2   issuing credit memos in connection with on-account
3   debit memos?
4   A.   I probably communicated that they had all been
5   credit memoed.
6   Q.   That they had all been.  Okay.
7        And do you remember how many?
8   A.   No, I don't.
9   Q.   Okay.
10       Okay.  Earlier I asked you if Greg Myers said
11  anything in 2002 about 12601 with respect to what you
12  were supposed to do with the on-account debit memos.
13       And you answered:  "There could have been
14  related entries in 12601 associated with these debit
15  memos, but he didn't specifically state that."
16       What did you mean, "There could have been
17  related entries in 12601 associated with these debit
18  memos"?
19  A.   There -- can you restate that specifically?  I
20  kind of --
21  Q.   Well, you -- I'm just asking what you meant
22  when you said that.
23       MR. KONOVALOV:  Well, I think the witness
24  doesn't understand the question.  Objection.  Vague
25  and ambiguous.

192

1        If you can understand the question, you can
2   answer.
3        THE WITNESS:  I don't really understand the
4   question.
5   Q.   BY MR. GREENSTEIN:  Okay.  Well, do you
6   understand the answer where you said:  "There could
7   have been related entries in 12601 associated with
8   these debit memos"?
9   A.   Yes, I understand that.
10  Q.   Okay.  What does that mean?
11  A.   There could be a matching miscellaneous
12  receipt for the dollar amount that is the same as the
13  debit memo.
14  Q.   Okay.  Sitting in 12601, right?  Sitting in
15  Account 12601?
16  A.   The miscellaneous receipt would have an
17  accounting, yes, to credit 12601.
18  Q.   "Credit 12601" meaning -- strike that.
19       So, in other words, there was an amount
20  sitting in 12601 that you removed using a credit
21  memo, right?
22  A.   Um, no, not specifically to that exact
23  transaction.
24  Q.   Okay.  Why don't you describe the transactions
25  that -- describe for me, for a particular debit memo

193

1  at that time, and you issued a credit memo, what
2  steps did you need to take to do that?
3  A.   Query the debit memo to the original cash
4  receipt, which is linked to the cash receipt.
5       Identify the two miscellaneous receipts
6  created to move the funds into 12601, so you
7  basically now have three transactions.
8       Reverse both miscellaneous receipts.
9       Unapply the debit memo, and credit memo the
10  debit memo.
11  Q.   Okay.  And when you say, I think -- so you
12  mean two miscellaneous receipts that were used to
13  transfer unapplied -- or debit memo items of
14  unapplied cash from 25005 to 12601 previously, right?
15       MR. KONOVALOV:  Objection.  Calls for
16  speculation.
17       THE WITNESS:  Specifically, I don't know.
18  Q.   BY MR. GREENSTEIN:  Well, when you say,
19  "identify the two miscellaneous receipts created to
20  move the funds into 12601," right, move from where?
21       MR. KONOVALOV:  Objection.  Calls for
22  speculation.
23       THE WITNESS:  I don't know the exact
24  accounting on the miscellaneous receipts.
25  Q.   BY MR. GREENSTEIN:  Right, but they were being

194

1  moved --
2       You were reversing, essentially, miscellaneous
3  receipts that were used to move unapplied cash to
4  12601, right?
5  A.   I don't know the accounting of those at this
6  time.
7  Q.   I'm not asking about the accounting.  I'm just
8  asking, you said move -- using miscellaneous receipt
9  items to move something into 12601, right?
10       MR. KONOVALOV:  Well, I'm going to ask you to
11  let him finish his answers.  And if you don't like
12  his answers, you can ask the question again.
13       Why don't we have his answer read back.  And
14  if you want to add to your answer, you can do that
15  before the question is read.
16       (The following was read by the reporter:
17       ANSWER:  I don't know the accounting of those
18       at this time.)
19       MR. KONOVALOV:  Are you done with your answer?
20       THE WITNESS:  I don't know -- yeah.  I don't
21  know the accounting of all of those transactions, no.
22  Q.   BY MR. GREENSTEIN:  You're not an accountant,
23  are you?
24  A.   No, I'm not.
25  Q.   Okay.  I'm not asking you about accounting.

195

1  I'm asking you:
2       When you just said that you were reversing
3  miscellaneous receipts that moved something into
4  12601, I'm asking you moved from where?
5       MR. KONOVALOV:  Objection.  Calls for
6  speculation.
7       THE WITNESS:  I -- I don't know when these --
8  when they were created.  I don't know where they
9  moved from.
10  Q.   BY MR. GREENSTEIN:  Okay.  You were reversing
11  a transaction for something which you didn't even
12  know where it was coming from, right?
13       MR. KONOVALOV:  Objection.  Misstates the
14  witness' testimony.
15       THE WITNESS:  I don't know the reason why it
16  was done in the first place, no.
17  Q.   BY MR. GREENSTEIN:  You don't know the reason
18  why an item was moved to 12601 using a miscellaneous
19  receipt, right?
20  A.   No.
21  Q.   But it was moved, and you don't know where it
22  was moved from, do you?
23  A.   I'd have to look at the specific receipts.
24  Q.   Okay.
25  A.   I don't know.

196

1  Q.   You know it was related to on-account debit
2  memos, right?
3  A.   If it had an on-account debit memo, then, yes,
4  it would have been related to it.
5  Q.   If it had a 550 prefix?
6  A.   And it was an on-account debit memo, yes.
7  Q.   Sorry.
8       And how could you tell it was an on-account
9  debit memo?
10  A.   You create a transaction in AR, and the
11  transaction type would say "on-account."  The type
12  would say "debit memo."
13  Q.   So when you were researching -- so when you
14  were issuing a credit memo related to an item that
15  had been moved using a miscellaneous receipt to
16  12601, you would be able to see if that credit memo
17  was related to an on-account debit memo because it
18  would say "on-account debit memo" on it?
19       MR. KONOVALOV:  Could you read the question
20  back, please?
21       (The following was read by the reporter:
22       QUESTION:  So when you were researching -- so
23       when you were issuing a credit memo related to
24       an item that had been moved using a
25       miscellaneous receipt to 12601, you would be

197

1      able to see if that credit memo was related to
2      an on-account debit memo because it would say
3      "on-account debit memo" on it?)
4          MR. KONOVALOV:  Okay.  Objection.  Vague and
5      ambiguous.
6          THE WITNESS:  Can you be more specific about
7      it?
8      Q.    BY MR. GREENSTEIN:  Well, when you did each
9      one of those transactions where you issued a credit
10     memo related to a miscellaneous receipt that had been
11     moved to 12601, and you were essentially reversing
12     that out of 12601, could you see on the system
13     whether that was related to an on-account debit memo?
14     A.    The debit memo says "on-account."  The credit
15     memo was applied directly to the credit memo.  The
16     other transactions are individual transactions.
17     Q.    Okay.  So when you were -- when you were
18     issuing the credit memo, you could tell whether it
19     was related to an on-account debit memo, right?
20     A.    Specifically, yes.
21     Q.    Okay.  Now, do you remember, did you do this
22     for ten debit memos, a hundred?
23     A.    I don't recall how many we did.
24     Q.    Okay.  Do you remember how long it took you to
25     do it?

198

1      A.    No, I don't recall.
2      Q.    And why -- why were you removing items from
3      12601 using a credit memo?
4          MR. KONOVALOV:  Objection.  Calls for
5      speculation.
6          THE WITNESS:  I don't know.
7      Q.    BY MR. GREENSTEIN:  So were you just pressing
8      the buttons or was it explained to you what was
9      actually happening?
10     A.    It was a process in the AR system that I
11     followed.
12     Q.    Right.  Because Greg Myers --
13         Did Greg Myers tell you to do that or did
14     somebody else tell you to do that?
15     A.    He requested that we do that, yes.
16     Q.    Okay.  Who else was involved in that?
17     A.    My -- a couple members from my group.
18     Q.    Okay.  Who, what are their names?
19     A.    I think Kim -- Kim McMurdo was involved.  Sam
20     Yohannes was involved.  And I don't know -- I don't
21     know everybody that was in my group at that time.
22     Q.    Okay.  And so the record is clear, did Greg
23     Myers tell you why you were doing this in 2002?
24     A.    I don't recall the reason.
25     Q.    What would happen for those transactions where

199

1      a credit memo was issued remove something from 12601?
2      Did that reverse the debit memo?
3      A.    When you process a credit memo on the debit
4      memo, that effectively reverses the accounting for
5      the debit memo.
6      Q.    Reverses the accounting for the debit memo.
7          Okay.  Now, did any of those credit memos that
8      you processed result in refunds to customers?
9          MR. KONOVALOV:  Objection.  Calls for
10     speculation.
11         THE WITNESS:  I don't know.
12     Q.    BY MR. GREENSTEIN:  Okay.  Before that
13     project, how many credit memos would be issued, let's
14     say per week at Oracle?
15     A.    I have no clue.
16     Q.    A lot -- I mean, do you have an estimate?
17     A.    I can't estimate.
18     Q.    Okay.  Are you aware that there were --
19         Are you aware that for over a thousand of the
20     debit memos created on November 17th -- or around
21     November 17th, 2000, for a thousand of those, that
22     there were credit memos issued two or three years
23     later that reversed those on-account debit memos?
24         MR. KONOVALOV:  Objection --
25     Q.    BY MR. GREENSTEIN:  Are you aware of that?

200

1          MR. KONOVALOV:  Objection.  Assumes facts not
2      in evidence.
3          THE WITNESS:  I'm not aware of that, no.
4      Q.    BY MR. GREENSTEIN:  Okay.  Did you process a
5      thousand credit memos related to on-account debit
6      memos in 2002?
7      A.    I don't know.
8      Q.    Okay.  Well, could you have -- when you
9      described the credit memo process, could you have
10     done that for a thousand debit memos?
11         MR. KONOVALOV:  Objection.  Calls for
12     speculation.
13         THE WITNESS:  I don't recall how many, the
14     number.
15     Q.    BY MR. GREENSTEIN:  Okay.  Do you recall if
16     you did -- you know, did you spend eight hours a day
17     doing this, or was it just a two-hour project?  Do
18     you remember, generally?
19     A.    I do not recall the time frame.
20     Q.    Do you know -- have you ever heard of a
21     company called PRG Schultz, an audit recovery firm?
22     A.    No.
23         MR. GREENSTEIN:  I'll mark this as Number 6.
24         (Plaintiff's Exhibit 6 was marked.)
25         MR. GREENSTEIN:  For the record, this is Bates

Elam, Terry  9/28/2006  9:19:00 AM

201

1   stamped SBC -3 through -7.
2   Q.   If you'd just take a look at it.
3        I'll direct your attention to the first page.
4   Have you ever seen this document before?
5   A.   No, I have not.
6   Q.   Okay.  And you've never -- you don't remember
7   ever talking to anybody at PRG, a firm that's hired
8   by companies to research any overpayments they may
9   have made?
10  A.   I don't recall, no.
11  Q.   Okay.  See how it says "Accounts Payable
12  Debit/Credit Memo Summary"?
13       See that --
14  A.   Yes, I do.
15  Q.   -- at the top.
16       And then down in the box there it has
17  "Comments" and "Date."  And one of them -- if you go
18  down to Number 12, it says:
19       "October 22nd, 2002.  Contact Person, Terry
20  Elam."  It says "LVM," left voice mail, and it has
21  seven dates there in late October, early September --
22  or mid-November, sorry.
23       See that?
24  A.   Yes, I do.
25       MR. KONOVALOV:  Objection.  Lacks foundation

202

1   that it says "left voice mail."  It says "LVM."
2        MR. GREENSTEIN:  Right.
3   Q.   Do you know what "LVM" means?
4        MR. KONOVALOV:  Objection.  Lacks foundation.
5   Calls for speculation.
6        THE WITNESS:  No, I don't.
7   Q.   BY MR. GREENSTEIN:  Well, do you remember
8   receiving voice mails from anybody at an audit
9   recovery firm that involved refunds for unapplied
10  cash related to SBC?
11  A.   No, I don't recall.
12  Q.   Okay.  You see the 20th entry dated
13  March 12th, 2003, "Contact Person, Terry"?  It says:
14       "Sent spreadsheet and explained.  There are
15  six items that can be refunded.  Should take 2-3
16  weeks.  Sent E-mail with formal request."
17       See that?
18  A.   I see that, yes.
19  Q.   Do you remember having any conversations with
20  anybody saying there are six items that could be
21  refunded to SBC in connection with their unapplied
22  cash?
23  A.   No, I don't recall.
24       MR. GREENSTEIN:  This is Number 7.
25       (Plaintiff's Exhibit 7 was marked.)

203

1        MR. GREENSTEIN:  We need to change the tapes.
2   Why don't we just take a minute, but I think we
3   should stay here.
4        VIDEOTAPE OPERATOR:  This marks the end of
5   videotape number two, Volume 1, in the deposition of
6   Terry Elam.
7        Going off the record, the time is 2:27.
8        (Break.)
9        VIDEOTAPE OPERATOR:  Here marks the beginning
10  of videotape number three, Volume 1, in the
11  deposition of Terry Elam.
12       The time is 2:30.
13       We are back on the record.
14  Q.   BY MR. GREENSTEIN:  So, Mr. Elam, when you
15  issued credit memos in connection with 12601 and
16  debit memos that you were just describing earlier,
17  what would happen to the debit memo?
18  A.   Once you process the credit memos, the debit
19  memo would have a zero balance.
20  Q.   Okay.  Looking at what I placed before you,
21  which is Exhibit 7, it's Bates stamped PRG29768
22  through -29773.
23       Um, do you see how there's a "PRG Schultz"
24  logo on the top right-hand corner?
25  A.   Yes.

204

1   Q.   And you see how in the "Contact Person," which
2   is on the left-hand side, it says "Terry Elam"?
3   A.   Yes.
4   Q.   Okay.  Does this refresh your recollection at
5   all that you were the contact person for unapplied
6   cash being refunded to SBC in connection with this
7   PRG recovery firm?
8        MR. KONOVALOV:  Objection.  Lacks foundation.
9        THE WITNESS:  I don't know.
10  Q.   BY MR. GREENSTEIN:  Does this refresh your
11  recollection that you ever spoke to anybody from PRG
12  Schultz?
13       MR. KONOVALOV:  Same objection.
14       THE WITNESS:  No.
15       MR. GREENSTEIN:  Okay.
16  Q.   If you turn to -29771, see how in -- on the
17  right-hand side under "Item Number," it has "Action
18  Required," and it says, "3, Process Refund Payment."
19       See that?
20  A.   I see that, yes.
21  Q.   And then you see on the left-hand side, it
22  says, "Recovery Amount Base Currency $521,125."
23       See that?
24  A.   Yes.
25  Q.   And then it says, "Contact Person, Terry

205

1    Elam"?
2    A.   Yes.
3    Q.   Okay. Does that refresh your recollection
4    that you were involved in a $526,000 refund to SBC in
5    2003?
6         MR. KONOVALOV: Objection. Lacks foundation.
7    Assumes facts not in evidence.
8         The document speaks for itself and the witness
9    can read it as easily as you can. You haven't laid a
10   foundation that he's ever seen it before.
11        Subject to that, you can answer the question.
12        THE WITNESS: No.
13   Q.   BY MR. GREENSTEIN: Okay. Have you ever seen
14   this before?
15   A.   No.
16   Q.   Have you ever seen any Accounts Payable
17   Debit/Credit Memo Summaries for any Oracle customers?
18   A.   I don't know.
19   Q.   Okay. Talking about credit memos, can you
20   explain to me the different reasons why a credit memo
21   would be issued for an Oracle customer in, say, 2000
22   to 2002 time frame?
23   A.   I can't speak to the reasons why a credit memo
24   would be processed.
25   Q.   Okay. Was AR in charge of processing credit

206

1    memos, though, right?
2    A.   My group processed credit memos, yes.
3    Q.   Okay. So who decided to issue a credit memo
4    before it was processed?
5    A.   I don't know the person that would be just --
6    make that decision.
7    Q.   Well, was it somebody from AR?
8    A.   I wouldn't know.
9    Q.   Okay. Well, the credit memos you issued in
10   connection with the on-account debit memos that
11   related to 12601, who authorized those?
12        MR. KONOVALOV: Objection. Misstates the
13   witness' testimony.
14        But you can answer the question.
15        THE WITNESS: That was direction from Greg
16   Myers to process the credit memos.
17   Q.   BY MR. GREENSTEIN: Did you ask any questions
18   when he said, you know, to process these credit memos
19   with respect to on-account debit memos?
20   A.   No.
21   Q.   You didn't ask why you were removing items
22   from 12601?
23   A.   No.
24   Q.   Do you know if a credit memo was issued -- or,
25   strike that.

207

1         The credit memos that you processed with
2    respect to the on-account debit memos, were those
3    credit memos -- did you notify the customers that
4    they -- that they -- that a credit memo was issued
5    with respect to them?
6    A.   I don't know.
7    Q.   Okay. Well, when you processed the credit
8    memo, generally, did you ever notify Oracle customers
9    that it occurred?
10   A.   I don't know if it was ever communicated.
11   Q.   But you never did, right?
12   A.   Personally, no.
13   Q.   Okay. Do you know what would happen to an
14   invoice if a credit memo was issued and the customer
15   hadn't paid it yet? What would the --
16        MR. KONOVALOV: Objection -- sorry.
17        MR. GREENSTEIN: Sorry.
18   Q.   What would the impact be on that invoice?
19   Would it reduce it?
20        MR. KONOVALOV: Objection. Incomplete
21   hypothetical.
22        THE WITNESS: I'd have to look at a specific
23   case. I don't know.
24   Q.   BY MR. GREENSTEIN: Well, I'm just -- for
25   example, if there was a $100,000 invoice, and you --

208

1    your group processed a $500,000 credit memo, would
2    that reduce the invoice by 500,000?
3         MR. KONOVALOV: Objection. Incomplete
4    hypothetical.
5         THE WITNESS: I wouldn't know.
6    Q.   BY MR. GREENSTEIN: Okay. Who would know
7    that?
8    A.   I do not know.
9         MR. GREENSTEIN: Mark this as Number 8,
10   please.
11        (Plaintiff's Exhibit 8 was marked.)
12        MR. GREENSTEIN: For the record, it's Bates
13   stamped PLF-ORC -132 through -136.
14   Q.   Actually, I just direct your attention to page
15   -133. And just look at the E-mail string where in
16   the middle, "Cindy Eaton wrote." Just read down to
17   the bottom.
18        MR. KONOVALOV: The middle of the page or
19   towards the bottom of the page?
20        MR. GREENSTEIN: Where it says "Cindy Eaton
21   wrote," in the middle of the page, and then it goes
22   down to Greg Myers' E-mail.
23   Q.   Finished?
24   A.   Okay.
25   Q.   Okay. So do you know who Cindy Eaton is?

209

1    A.    I don't recall who she is.
2    Q.    Okay.  Have you ever seen this E-mail before?
3    A.    No.
4    Q.    Okay.  On the second page, it's part of the
5    string, Cindy -- do you see where Cindy Eaton writes:
6        "Our practice of not sending Credit Memos
7    makes account reconciliation extremely difficult."
8        Do you see that?
9    A.    Yes.
10   Q.    Then it says:
11       "We send the invoice and often send a rebill,
12   but we never send the Credit Memo that clears the
13   original invoice and validates the rebill."
14       See that?
15   A.    Yes, I see that.
16   Q.    Do you know what a credit memo and rebill is?
17   A.    Yes, I do.
18   Q.    What is that?
19   A.    Credit memo is a credit memo to a transaction,
20   and a rebill would be a rebill to a specific
21   transaction.
22   Q.    Okay.  A credit memo was issued, and then
23   Oracle would rebill the customer to reflect the new
24   invoice, right?
25   A.    I wouldn't know the specifics on why it needed

210

1    to be re-billed, but a new invoice would be
2    generated.
3    Q.    Generally, right?  Because a credit memo has
4    an effect of reducing an invoice, generally, correct?
5    A.    Correct.
6    Q.    So does this -- reading this, does this
7    refresh your recollection that credit memos weren't
8    given to customers?
9        MR. KONOVALOV:  Objection.  Lacks foundation.
10       THE WITNESS:  I don't know specifically about
11   this, no.
12   Q.    BY MR. GREENSTEIN:  Okay.  You see towards the
13   bottom, the middle bottom, where it says "Greg Myers
14   wrote"?
15   A.    Yes, I see that.
16   Q.    It says:
17       "We also need this to avoid having negative
18   invoices in AR.
19       "Cherie, could you please involve Terry Elam
20   for California and U.S.?  Greg."
21       See that?
22   A.    Yes, I see that.
23   Q.    Do you know what a "negative invoice in AR"
24   is?
25       MR. KONOVALOV:  Objection.  Lacks foundation.

211

1        THE WITNESS:  I need to see it specifically,
2    no.
3    Q.    BY MR. GREENSTEIN:  You need to see what
4    specifically?
5    A.    If you could provide me an example.
6    Q.    Well, I'm asking if you know what a "negative
7    invoice in AR" means, in general.
8        MR. KONOVALOV:  Objection.
9        MR. GREENSTEIN:  In general.
10       MR. KONOVALOV:  Objection.  Lacks foundation.
11       THE WITNESS:  No, I do not.
12   Q.    BY MR. GREENSTEIN:  But if you were shown a
13   specific example, you would know what a negative
14   invoice in AR means?
15   A.    No, I would not know.
16   Q.    Okay.
17       Do you know why Greg Myers was wanting to
18   involve you in this process?
19   A.    I don't know the exact reason, no.
20   Q.    Okay.  Or did you become involved in this
21   issue that Cindy Eaton is talking about?
22   A.    I don't remember.
23   Q.    You see back on that second page, that full
24   paragraph, Cindy Eaton writes:
25       "We ask our Customers to take our word that we

212

1    issued the Credit Memo" -- "the CM and the original
2    invoice is cleared, but honestly, Customers don't
3    like that and are wary of that business practice."
4        See that?
5    A.    I'm sorry, which --
6    Q.    It's the big, chunky paragraph in the middle.
7    "Cindy Eaton wrote."
8    A.    Yes, I see that.
9    Q.    At the end.
10       So did you ever have any discussions with
11   anybody about customers -- about credit memos not
12   being given to customers?
13   A.    I don't recall any.
14       MR. KONOVALOV:  Can I just note for the record
15   on that second page, you made reference to
16   Greg Myers' E-mail saying -- the reference to
17   California and U.S.  I actually don't believe in
18   Oracle's system that "CA" stands for California.
19       Just so the record is clear.
20   Q.    BY MR. GREENSTEIN:  Do you know who Troy Tand
21   was?
22   A.    He would have been collections.
23   Q.    Okay.  Do you see on the first page at the
24   bottom there's an E-mail where it says "Troy Tandy
25   wrote," the last paragraph?  You see that?

Elam, Terry  9/28/2006  9:19:00 AM

213

1   A.   Uh-huh.
2   Q.   It says:
3        "One big problem with sending the clients
4   copies of the credit memos is that they then end up
5   short paying an invoice..."
6        See that?
7   A.   I see that, yes.
8   Q.   Do you recall any credit memos ever being sent
9   to customers that your group processed where a
10  customer ended up short paying an invoice?
11       MR. KONOVALOV: Objection. Lacks foundation.
12  It's vague and ambiguous.
13       THE WITNESS: I don't know.
14  Q.   BY MR. GREENSTEIN: Down at the bottom where
15  he says:
16       "Technically, we are not giving the client a
17  credit (in most cases), we are writing off a portion
18  or all of an invoice."
19       Do you see that?
20  A.   Yes, I do.
21  Q.   Do you know what that means?
22  A.   Not a clue.
23  Q.   The next exhibit is -- was previously marked
24  Campos number 12.
25       For the record, this is Bates stamp PLF-ORC

214

1   -15 through -16.
2        Go ahead and just read the whole thing if you
3   want.
4   A.   Okay.
5   Q.   Have you ever seen this E-mail before?
6   A.   No, I have not.
7   Q.   Do you ever remember a customer for Oracle,
8   Dupont Photomask, Inc.?
9   A.   I don't, no.
10  Q.   Okay. You see at the bottom of the first
11  page, it's an E-mail from Raul Campos to you on
12  October 1st, 2000, Subject: Dupont Photomask. And
13  it says:
14       "Terry, the debit memo numbers below total
15  $80,871.13. These are the DMs," debit memos, "Susan
16  wants refunded, except I don't see where the funds
17  are located. I entered these numbers below in the
18  account details, then when I go to the receipt" --
19  "go the receipt, nothing is there. Can you provide
20  info? Raul."
21       See that?
22  A.   Yes, I see that.
23  Q.   Do you remember talking to Raul Campos about
24  this Dupont Photomask issue?
25  A.   No, I do not.

215

1   Q.   Okay. Where he says there are debit memos,
2   but he can't see where the funds are located, do you
3   know why he wouldn't be able to see the funds?
4        MR. KONOVALOV: Objection. Calls for
5   speculation.
6        THE WITNESS: I don't know.
7   Q.   BY MR. GREENSTEIN: And you see above that you
8   wrote him on the same day:
9        "All of the debit memos shown below have been
10  credit memoed and the receipts applied to invoices."
11       See that?
12  A.   I see that, yes.
13  Q.   What did you mean by that?
14  A.   I don't know. At this time, I can't speak to
15  what I meant.
16  Q.   Okay. Sitting here today, what does it mean
17  to credit memo a debit memo and the receipt applied
18  to an invoice?
19  A.   I'm assuming that the debit memo was credit
20  memoed, queried in the transactions form, or credit
21  transactions form, and credit memoed. And then the
22  receipts applied to invoices.
23  Q.   Okay. And what does that mean as far as what
24  happens if that process occurs?
25       MR. KONOVALOV: Objection. Vague and

216

1   ambiguous.
2        THE WITNESS: I wouldn't know how to speak to
3   this process at the time.
4   Q.   BY MR. GREENSTEIN: And you see where you
5   write:
6        "I did find two refunds that were processed.
7   If the money is applied incorrectly, then the
8   invoices should be unapplied, but that will create
9   open invoices, which we won't refund the customer if
10  they have past due amounts."
11       Do you see that?
12  A.   I see that, yes.
13  Q.   What did you mean when you said, "If the money
14  is applied incorrectly, then the invoices should be
15  unapplied"?
16  A.   I don't know what I meant.
17  Q.   Sitting here today, what does it mean if money
18  is applied incorrectly and the invoice is then
19  unapplied?
20  A.   You query up the cash receipt and unapply an
21  invoice.
22  Q.   Could you do that?
23  A.   If your profile option allows you right
24  access, then yes, you could.
25  Q.   Okay. Did you ever do that after this E-mail?

217

1    A.    Oh, I don't know.
2    Q.    Do you see for the first E-mail in the string
3    it's you writing to yourself, Raul Campos, and Chris
4    Sprague.
5          Do you see that?
6    A.    I see that, yes.
7    Q.    You cc Ian Hatada.
8          Do you see that?
9    A.    Yes.
10   Q.    Who was Ian Hatada?
11   A.    He was in collections at the time.
12   Q.    Do you know why you were working with him or
13   why you were cc'ing him on this E-mail?
14   A.    I do not know.
15   Q.    Who was Chris Sprague?
16   A.    He was also in collections.
17   Q.    And you see where you say:
18         "These debit memos were credit memoed back in
19   April of 2001"?
20   A.    I see that, yes.
21   Q.    "Why were these sent to the customer?"
22         So do you know -- or do you know why you were
23   asking why a credit memo was sent to a customer?
24   A.    I don't know the preference of that question.
25   Q.    Then you said:

218

1          "If the customer wants a refund, I suggest
2    that the check numbers are provided, plus the
3    invoices they are applied to.  Ask if the
4    applications are correct."
5          See that?
6    A.    Yes.
7    Q.    What do you mean when you say, "Ask if the
8    applications are correct," question mark?
9    A.    I'm assuming when a customer makes a payment,
10   they're paying a specific invoice.
11   Q.    Okay.  And the last sentence says:
12         "We're going around in circles with this
13   customer, provide the details and let the customer
14   make the decision."
15         Do you see that?
16   A.    Yes, I do.
17   Q.    Do you know what decision you were referring
18   to that the customer would have to make?
19   A.    I don't know what decision it was.
20   Q.    All right.  You can put that aside.
21         MR. KONOVALOV:  Can we take a break now?
22         MR. GREENSTEIN:  Yeah.
23         VIDEOTAPE OPERATOR:  Going off the record.
24   The time is 2:48.
25         (Break.)

219

1          VIDEOTAPE OPERATOR:  Back on the record.
2    The time is 3:05.
3    Q.    BY MR. GREENSTEIN:  Mr. Elam, I'm going to
4    mark this as Elam Number 9.
5          (Plaintiff's Exhibit 9 was marked.)
6          MR. GREENSTEIN:  For the record, it's Bates
7    stamped NDCA-ORCL 793752.  September 3rd, 2004 E-ma
8    from Terry Elam to Robynne Sisco, S-i-s-c-o.
9    Q.    Mr. Elam, let me know when you're finished
10   reading it.
11   A.    I'm done.
12   Q.    Okay.  Have you seen this before?
13   A.    I don't know.
14   Q.    Okay.  Do you know who is Robynne Sisco?
15   A.    She's an Oracle employee.
16   Q.    Currently?
17   A.    Currently?
18   Q.    No, at the time of the E-Mail, September 2004.
19   A.    I don't remember.
20   Q.    Okay.  Do you see it says, "Subject:  Refund
21   Detail"?
22   A.    I see that, yes.
23   Q.    And it says:
24         "Attached is the refund detail for August."
25         See that?

220

1    A.    Yes.
2    Q.    So there should be an attachment of some sort
3    that has the refund detail for August, right?
4          MR. KONOVALOV:  Objection.  Calls for
5    speculation.
6          THE WITNESS:  I don't know.
7    Q.    BY MR. GREENSTEIN:  Okay.  Do you know what
8    that means, "refund detail for August"?
9    A.    I can't speak of it, no.
10   Q.    When you say "I've matched" -- so you were
11   sending her a refund detail for August, and then you
12   said:
13         "I've matched the AP payments to the AR
14   refunds on the 'Detail' tab."
15         Do you know what you meant when you said that
16   to her?
17         MR. KONOVALOV:  Objection.  Lacks foundation.
18         THE WITNESS:  No, I do not.
19   Q.    BY MR. GREENSTEIN:  Do you know what matching
20   AP payments to AR refunds on the Detail tab is?
21         MR. KONOVALOV:  Same objections.
22         THE WITNESS:  No, I do not.
23   Q.    BY MR. GREENSTEIN:  So -- but you knew when
24   you wrote this, right?
25   A.    I assume.

Elam, Terry  9/28/2006  9:19:00 AM

221

1    Q.    What are "AR refunds," as you sit here today?
2    A.    Today, it would be a refund initiated out of
3    AR.
4    Q.    Okay.  Why would an -- why would a refund be
5    initiated out of AR?
6    A.    I don't know the reasons.
7    Q.    Could be because there is an item of unapplied
8    cash that was in 25005 that never got refunded,
9    right?
10        MR. KONOVALOV:  Objection.  Calls for
11   speculation.
12        THE WITNESS:  I don't know.
13        MR. GREENSTEIN:  Mark this as Number 10.
14        (Plaintiff's Exhibit 10 was marked.)
15        MR. GREENSTEIN:  For the record, it's
16   NDCA-ORCL 793683 through 793684.  It's an E-mail from
17   Terry Elam to a number of individuals -- actually, to
18   one, Chandrasekaran, C-h-a-n-d-r-a-s-e-k-a-r-a-n,
19   dot, N-a-r-a-y-a-n-a-n, dated November 17th, 2004.
20   Q.    Let me know when you're finished, please.
21   A.    Okay.
22   Q.    On the second page, there's an E-mail which
23   appears to be from Tamas Buzasi to Larry Garnick, and
24   you see that you're copied on it?
25   A.    Yes.

222

1    Q.    Okay.  And you see Tamas is speaking to Larry
2    Garnick about a Global Credit Memo Report.
3        See that?
4    A.    Yes.
5    Q.    Do you know what that is?
6    A.    Um, specifically, no.
7    Q.    Generally, was that a report of all the credit
8    memos that were issued at Oracle during a period of
9    time?
10        MR. KONOVALOV:  Objection.  Calls for
11   speculation.
12        THE WITNESS:  I don't know the exact report,
13   no.
14   Q.    BY MR. GREENSTEIN:  Okay.  Was there a
15   report -- anytime while you worked at Oracle, was
16   there a report that you could see all credit memos
17   generated during a certain period of time?
18   A.    Um, I -- I don't recall if there was one being
19   generated -- this is 2004?  I -- I would be guessing.
20   So I don't know.
21   Q.    Okay.  When you first started at Oracle, was
22   there any report where you could look at all the
23   credit memos that were processed by AR?
24        MR. KONOVALOV:  Well, objection.  Assumes
25   facts not in evidence.

223

1    But you can answer the question.
2        THE WITNESS:  I could run a transaction
3    register to show the reports and to show the credit
4    memos in AR.
5    Q.    BY MR. GREENSTEIN:  All of them?
6        MR. KONOVALOV:  Objection.  Calls for
7    speculation.
8        THE WITNESS:  I don't know if the report would
9    include all.
10   Q.    BY MR. GREENSTEIN:  Okay.  You see Tamas is
11   talking about -- he says:
12        "The second is a bigger issue as the report is
13   not accurate."
14        He says:
15        "When I have reviewed the data for U.S. only,
16   I have found 2 million USD credit memos just for the
17   OKS," all caps, "source that is not shown on this
18   report."
19        And it says:
20        "I'll work with Terry to fix this and come up
21   with the correct numbers."
22        See that?
23   A.    Yes, I do.
24   Q.    Do you remember working with Tomas to fix
25   the -- the inaccuracies in the Global Credit Memo

224

1    Report?
2        MR. KONOVALOV:  Objection.  Lacks foundation.
3        THE WITNESS:  I don't recall.
4    Q.    BY MR. GREENSTEIN:  If you turn back to the
5    first page, you wrote an E-mail to Tamas saying:
6        "You note that there are missing OKS credit
7    memos from this report.  Can you give me an
8    example" --
9        Actually, that's not you.  Well, that's an
10   E-mail it looks like you wrote.
11        Then there's another E-mail to -- well,
12   there's -- the message has a message to Tamas and a
13   message to a Greg.
14        And you see the one that says:
15        "Greg, maybe this is how Chandra is
16   manipulating the data?"
17        Do you see that?
18   A.    I see that, yes.
19   Q.    Do you know what -- what did you mean by
20   "Chandra is manipulating the data"?
21   A.    I don't know.
22   Q.    Who is Chandra?
23   A.    I don't recall.
24   Q.    Do you see her E-mail, it says
25   "chandrasekaran.narayanan" in the E-mail?

225

1          Do you see that?
2     A.    Yes, I see that.
3     Q.    Does that refresh your recollection about who
4     Chandra was?
5     A.    No.
6     Q.    So you don't know what you meant when you're
7     asking if Chandra is manipulating data?
8     A.    No, I have no clue.
9     Q.    Okay.
10         You see at the top where it -- the first
11    E-mail from you says, second paragraph:
12         "The Q1 data seems to be missing from the
13    reporting website.  Can you provide that to Karen" --
14    "that report to Karen."
15         Do you see that?
16    A.    I see that, yes.
17    Q.    What's the "reporting website"?
18    A.    We have an internal website that you can post
19    data to.  So I'm assuming that that could be it.
20    Q.    What kind of data could you post there, any
21    data?
22    A.    Anything I wanted.
23         MR. GREENSTEIN:  Okay.  Number 11.
24         (Plaintiff's Exhibit 11 was marked.)
25         MR. GREENSTEIN:  For the record, it's a

226

1     one-page document, NDCA-ORCL 793754.
2     Q.    Just let me know when you're done.
3     A.    I'm done.
4     Q.    For the record, this is a February 8th, 2006
5     E-mail from Terry Elam to Greg Myers, Subject:  12601
6     Entries.  It's dated February 8th, 2006.
7          Mr. Elam, where it says:
8          "Greg, attached is the data from the master
9     file for the debit memos..."
10         Do you see that?
11    A.    Yes, I see that.
12    Q.    Okay.  What's the "master file for the debit
13    memos"?
14         MR. KONOVALOV:  Objection.  Lacks foundation.
15         THE WITNESS:  I don't recall at the time what
16    the master file was.
17    Q.    BY MR. GREENSTEIN:  Okay.  Well, this is
18    February 8th, 2006.  I think you represented that one
19    of the script outputs was produced in February '06,
20    right?
21         MR. KONOVALOV:  Objection.  Misstates the
22    witness' testimony.
23         THE WITNESS:  I have not stated that, no.
24    Q.    BY MR. GREENSTEIN:  Okay.  Well, you said
25    there were two script outputs that you reviewed,

227

1     right?
2     A.    Yes.
3     Q.    And one of them was in, I think you said
4     November 2005, right?  Or October 2005.
5     A.    Yes.
6     Q.    And the other one was February 2006, right?
7     A.    Um, no.  The second one I'm aware of was
8     August of this year.
9     Q.    August 2006?
10    A.    Yes.
11    Q.    Those are the only two script outputs you were
12    involved with?
13    A.    To my knowledge, yes.
14    Q.    Okay.
15         So this E-mail was less than a year ago, and
16    it says:
17         "Attached is the data from the master file for
18    the debit memos."
19         You don't know -- you don't know what you
20    wrote -- what you meant when you said "the master
21    file for the debit memos"?
22    A.    I don't know the exact file that I was looking
23    at, no.
24    Q.    But when you say "master file," that indicates
25    there's some sort of -- you know, one file, one

228

1     overall file that contains everything for the debit
2     memos, right?
3          MR. KONOVALOV:  Objection.  Assumes facts not
4     in evidence.
5          THE WITNESS:  I don't know.
6     Q.    BY MR. GREENSTEIN:  So where you say:
7          "Attached is the data from the master file for
8     the debit memos that have a credit balance due to
9     cash as of November 2000 in the 12601 account."
10         Do you see that?
11    A.    Yes, I see that.
12    Q.    So there was a credit balance.  So for certain
13    debit memos attached to this file that you gave him,
14    there was a credit balance due to cash that was on
15    hand in November 2000 that was -- existed in the
16    12601 account, right?
17         MR. KONOVALOV:  Objection.  Lacks foundation.
18         THE WITNESS:  Repeat the question.
19         MR. GREENSTEIN:  Yeah.
20         Can you repeat it?
21         (The following was read by the reporter:
22         QUESTION:  So there was a credit balance.  So
23         for certain debit memos attached to this file
24         that you gave him, there was a credit balance
25         due to cash that was on hand in November 2000

229

1        that was -- existed in the 12601 account,
2        right?)
3        MR. KONOVALOV: Objection. Lacks foundation.
4        THE WITNESS: I don't know.
5    Q.  BY MR. GREENSTEIN: Okay. Well, what did you
6    mean when you said "a credit balance due to cash as
7    of November 2000 in the 12601 account"?
8        MR. KONOVALOV: Objection. Lacks foundation.
9    Calls for speculation.
10       THE WITNESS: I don't know at this time.
11   Q.  BY MR. GREENSTEIN: Okay. This was not even a
12   year ago. You don't know what you meant when you
13   wrote this?
14       MR. KONOVALOV: Objection. Asked and
15   answered.
16       You're being argumentative with the witness.
17   He's already testified two times that he doesn't know
18   what it said.
19       You can answer the question again.
20       THE WITNESS: I don't know.
21   Q.  BY MR. GREENSTEIN: Okay. Well, sitting here
22   today, other than what you meant at this time,
23   sitting here today, what does it mean to have a
24   credit balance due to cash as of a certain time
25   period in the 12601 account?

230

1        MR. KONOVALOV: Objection. Vague and
2    ambiguous.
3       THE WITNESS: I don't know.
4   Q.  BY MR. GREENSTEIN: So what -- did you have
5   any basis for --
6       What basis did you have for writing this
7   E-mail on February 8th, 2006?
8       MR. KONOVALOV: Objection. Lacks foundation.
9   Calls for speculation.
10      THE WITNESS: I don't recall.
11  Q.  BY MR. GREENSTEIN: Okay. Was this part of --
12  strike that.
13      Do you know why you're discussing the 12601
14  account as it relates to debit memos in November of
15  2000? Why you're discussing that six years after the
16  debit memos were generated?
17      MR. KONOVALOV: Same objections.
18      THE WITNESS: I don't recall.
19  Q.  BY MR. GREENSTEIN: Was this part of a review
20  for the -- of the script output?
21      MR. KONOVALOV: Same objections.
22      THE WITNESS: I don't know what file this was
23  from.
24      MR. GREENSTEIN: Okay.
25  Q.  Have you seen it before, this E-mail?

231

1  A.  No.
2      MR. GREENSTEIN: Um, I'll mark this as 12.
3      For the record, it's -793755.
4  Q.  Just let me know when you're finished, please.
5      MR. KONOVALOV: You know what, actually, can
6  we go off the record for a quick second? I think
7  there may be an issue of privilege related to the
8  document. I want to explore that before we probe
9  that question.
10      MR. GREENSTEIN: Okay.
11      MR. KONOVALOV: Can we just have two minutes,
12  please?
13      VIDEOTAPE OPERATOR: Going off the record.
14  The time is 3:21.
15      (Break.)
16      VIDEOTAPE OPERATOR: Back on the record.
17  The time is 3:22.
18      MR. KONOVALOV: It turns out that this
19  document, Counsel, I've just learned it actually is a
20  document which was inadvertently produced and
21  actually should have been withheld as privileged
22  because Robert Lane works for Deloitte who is a
23  consultant for us in this case.
24      So I would just ask -- this is the first time
25  it's been marked at the deposition, so it's the first

232

1  time that I've been made aware of the fact that it's
2  out there. So I would ask that you not continue your
3  questioning, and we'll explore and see if there are
4  any others like this.
5      In the meantime, I would ask that you not use
6  the document for examining the witness.
7      Is that acceptable to you?
8      MR. GREENSTEIN: Yes, with the caveat that, of
9  course, if we learn or if we determine that we don't
10  think it is privileged, then we'll reserve the right
11  to question the witness on it in the future.
12      MR. KONOVALOV: That's perfectly acceptable.
13  I just ask that you set it aside and not have others
14  use it in the meantime.
15      MR. GREENSTEIN: Yeah.
16      MR. KONOVALOV: Thank you.
17      This shouldn't be marked, so I guess --
18      MR. GREENSTEIN: Yeah. Why don't we -- that
19  was marked as 12?
20      MS. REPORTER: Uh-huh.
21      MR. GREENSTEIN: So why don't I just mark the
22  next document as 12.
23      (Plaintiff's Exhibit 12 was marked.)
24      MR. GREENSTEIN: For the record, it's 973680
25  (sic) to -682. It's a December 17th, 2004 E-mail

233

1  from Terry Elam to Chandra Sekaran.  Again, same
2  spelling.
3  Q.  Finished?
4  A.  Yes.
5  Q.  So is it reasonable to say this E-mail
6  discusses a certain number of credit memos that were
7  found to not have a reason code associated with them?
8  MR. KONOVALOV:  Objection.  Lacks foundation.
9  THE WITNESS:  I wouldn't know.
10  Q.  BY MR. GREENSTEIN:  Okay.  Well, you see the
11  second page, the bottom E-mail from you to
12  Arun Sethi?
13  See that?
14  A.  Yes.
15  Q.  Who is Arun Sethi?
16  A.  He was an Oracle employee at the time.
17  Q.  December 2004?
18  A.  Yes.
19  Q.  What department?
20  A.  Um, I believe he was the AR manager at the
21  time.
22  Q.  Okay.  And what -- were you still an AR
23  manager?
24  A.  No, I was not.
25  Q.  What were you?

234

1  A.  At that time I was a project manager.
2  Q.  Okay.  You see where you say:
3  "Arun, in researching the November credit
4  memos that were processed by your group, I've found a
5  number of manual credit memos that don't have a
6  reason code selected by the user."
7  See that?
8  A.  Yes, I do.
9  Q.  What does that mean that there are credit
10  memos that don't have a reason code?
11  MR. KONOVALOV:  Objection.  Lacks foundation.
12  THE WITNESS:  When a credit memo is processed,
13  there is a drop-down list of values that the user
14  selects what the appropriate reason code is.
15  Q.  BY MR. GREENSTEIN:  And what are some reason
16  codes?
17  A.  I don't know the reason codes now.
18  Q.  Okay.  So here you found -- you researched
19  November credit memos and found that a number of them
20  didn't have those reason codes, right?
21  A.  From the E-mail, yes.
22  Q.  And why is that a problem?
23  A.  I can't remember at the time.
24  Q.  How is a manual credit memo processed versus a
25  regular credit memo?

235

1  A.  A manual credit memo is processed in the
2  transactions form.
3  A regular credit memo is processed in the
4  credit transactions form.
5  Q.  Okay.  But either way, it's documented
6  somewhere, right, the credit memo?  Either type of
7  credit memo is created, right?
8  A.  They have individual transaction numbers?
9  Q.  Yeah.
10  A.  Yes.
11  Q.  Okay.  On the first page, see where you -- in
12  the middle you write to Greg Myers, you say:
13  "Greg, attached is the analysis for all credit
14  memos from Q2 that were reported as 'Old Reason
15  Code.'  For the quarter there were 838 credit memos
16  reported as Old Reason Code."
17  See that?
18  A.  Yes, I see that.
19  Q.  Are you talking about -- when you say "Q2," do
20  you know what year you're talking about?
21  A.  I do not.
22  Q.  But it appears you're saying that for that --
23  for Q2, whatever year you're talking about, there
24  were 838 credit memos which listed old reason codes,
25  right?

236

1  MR. KONOVALOV:  Objection.  Lacks foundation.
2  THE WITNESS:  I don't know.
3  Q.  BY MR. GREENSTEIN:  So you don't remember
4  taking any action to correct any of these credit
5  memos that had old reason codes?
6  A.  I don't recall.
7  Q.  See at the bottom it says "JB."  It's from
8  Greg Myers to Jennifer Birk.  It says:
9  "JB - I just wanted to give you an update on
10  the credit memo project that Terry is working on for
11  the last few weeks."
12  See that?
13  A.  Yes, I see that.
14  Q.  What was that project?
15  A.  Greg asked me to do an analysis of credit
16  memos.
17  Q.  What -- just all credit memos?
18  A.  I don't remember the specifics of it.
19  Q.  Okay.  Do you know why in December of 2004 he
20  was asking you to look at credit memos?
21  A.  That was a project he asked me to take under.
22  Q.  Right.  Did he say why?
23  A.  I don't recall the reason.
24  Q.  Was this in connection with credit memos
25  created for debit memo items?

237

1  A.  I can't speak to that. I don't know.
2  MR. GREENSTEIN: Okay. Mark the next one
3  as -- actually, this -- it's already been marked as
4  Venkataramana Number 8.
5  For the record, PLF-ORC -122 through -129.
6  Q.  Actually, just look at it generally, and then
7  I'll ask you about certain entries.
8  Have you seen this document before?
9  A.  No, I have not.
10  Q.  Does this type of document look familiar to
11  you?
12  A.  It does not, no.
13  Q.  Okay. If you turn to this -- the second page,
14  and look at the entry for "North Coast Logic."
15  See that?
16  A.  Yes.
17  Q.  And see that the last column says:
18  "Take cash out of RES and have AR adjust up
19  invoices to apply cash."
20  See that?
21  A.  Yes, I see that.
22  Q.  What does it mean for AR to adjust up invoices
23  and apply cash?
24  MR. KONOVALOV: Objection. Lacks foundation
25  and calls for speculation.

238

1  THE WITNESS: I don't know.
2  Q.  BY MR. GREENSTEIN: Do you know what taking
3  cash out of RES means?
4  MR. KONOVALOV: Same objections.
5  THE WITNESS: I don't know.
6  Q.  BY MR. GREENSTEIN: Look at the third page,
7  the next page. You see there's an entry for "Comedy
8  Central" at the top?
9  See that?
10  A.  Yes, I see that.
11  Q.  And it says -- in the second-to-the-last
12  column, it says:
13  "Unapplied amount due to credit memo on
14  invoice number," and it gives an invoice number.
15  "Invoice was sent to third party in October '01,
16  payment was received on 11-01."
17  Then it says: "See OKS CM," then another
18  number -- well, you can just read it to yourself.
19  So you see in the final column it says:
20  "AR needs to adjust up invoice to post the
21  available cash."
22  Do you see that?
23  A.  Yes.
24  Q.  What does it mean to adjust up an invoice and
25  post available cash?

239

1  MR. KONOVALOV: Same objections. Calls for
2  speculation. Lacks foundation.
3  THE WITNESS: I don't recall.
4  Q.  BY MR. GREENSTEIN: Outside the context of
5  this document, what does it mean to adjust up an
6  invoice and post available cash?
7  A.  Adjust up the invoice is like I said before,
8  but I don't know the rest of it.
9  Q.  Okay. You see how there is a date
10  November 26, '01 there, the second column?
11  A.  Yes, I see that.
12  Q.  Actually -- strike that. Put that aside.
13  (To the reporter) Mark this as 13.
14  (Plaintiff's Exhibit 13 was marked.)
15  MR. GREENSTEIN: For the record, it's Bates
16  stamped AA -19381. It says:
17  "Oracle Corporation Account 12000 as of May
18  2001, Prepared by Terry Elam."
19  Q.  Just let me know when you're finished.
20  A.  Finished.
21  Q.  Um, have you seen this document before?
22  A.  No, I have not.
23  Q.  Did you prepare this document or what's --
24  Did you prepare what's reflected in this
25  document?

240

1  A.  No.
2  Q.  Okay. Do you know why it says "Prepared By
3  Terry Elam" in the top left-hand corner?
4  A.  I have done the top part, but I can't speak to
5  the bottom part.
6  Q.  Okay. So "the top part," are you referring to
7  the "AR Agings/Audit Trails"?
8  A.  I would have entered the numbers, and that's
9  all I would have entered into that top piece.
10  MR. KONOVALOV: Counsel, does that say "Audit
11  Trails" or something else? Are you sure about that?
12  MR. GREENSTEIN: You're right.
13  Well, can the witness read it?
14  Do you know what that says?
15  THE WITNESS: I cannot read it.
16  MR. GREENSTEIN: Yeah. I'm not sure.
17  MR. KONOVALOV: I'm not trying to sculp
18  anything. Maybe it's "trans." I'm not sure.
19  MR. GREENSTEIN: Yeah, it could be "trans" or
20  "trails."
21  Q.  Um, so you helped -- you input the data that's
22  on that line?
23  A.  This looks like something that I prepared at
24  my month end.
25  Q.  And would you do this every month?

241

1    A.    Yes, I would.
2    Q.    What does this mean, this "AR Agings" and
3    "Prior Ending Balance," "Updating Balance"?
4          Is this -- is it fair to say that this is
5    showing the amount of accounts receivable aging as of
6    that period?
7    A.    I don't know what those numbers actually mean.
8    Q.    So, but you would input the numbers into this
9    document, right?
10   A.    Correct.
11   Q.    So how would you go about doing that?
12   A.    By running reports.
13   Q.    What type of reports?
14   A.    Account analysis is --
15   Q.    Reports of what -- sorry.
16   A.    Account analysis is one of those reports.
17   Q.    Okay.  Of Account 12000?
18   A.    Correct.
19   Q.    Okay.  Did you do that for any other -- did
20   you do that for Account 25005?
21   A.    Yes, I did.
22   Q.    Okay.  Did you do it for any other accounts?
23   A.    12000, 12008, 12013, 25005, and I don't recall
24   -- remember any others specifically.  There might
25   have been, but I don't recall.

242

1    Q.    Okay.  What about 12018?
2    A.    I said that, didn't I, 12018?
3    Q.    Oh, you did.
4          Okay.  What about 12601?
5    A.    I don't recall.
6    Q.    What about 12008?
7    A.    I think I said that.
8    Q.    So I'm going to represent to you that was
9    produced by Arthur Andersen, Oracle's auditor at one
10   point in time.
11         Do you recall that, that Arthur Andersen was
12   Oracle's auditor?
13   A.    Yes, I recall that.
14   Q.    And do you recall working with Arthur Andersen
15   in preparing these types of documents for those
16   accounts that you just described?
17   A.    No, I do not recall.
18   Q.    So for the accounts you described, what
19   would -- you would input data into these types of
20   documents?
21   A.    Correct.
22   Q.    Using reports that you generated from other
23   sources, right?
24   A.    AR and -- yes.
25   Q.    And what -- would you discuss them with

243

1    Arthur Andersen?
2    A.    I don't recall ever discussing it.
3    Q.    Okay.  Do you know what "AR Agings" means?
4    A.    It's a report I can run out of AR right now.
5    That's what I remember.
6    Q.    But did you just run a report on AR agings and
7    then put the number in, or did you understand what AR
8    agings meant, or what the number meant?
9    A.    It's just a report I ran.
10   Q.    So it was just running a report, taking the
11   data, putting it somewhere else, but you didn't
12   understand what the data meant at the time?
13         MR. KONOVALOV:  Objection.  Misstates the
14   witness' testimony.
15         THE WITNESS:  No, I do not know.
16   Q.    BY MR. GREENSTEIN:  So you see it has a "Prior
17   Ending Balance," right?  And then:
18         "Updated Beginning Balance, Invoices &
19   Deposits, Debit Memos, Manual Je's, Credit Memos,
20   Adjustments, Cash Receipts," and "Ending Balance?"
21   And a couple of other categories.
22         See that?
23   A.    Yes, I see that.
24   Q.    Now, you see how there's a million dollar
25   debit memo entry there in the fifth -- fourth

244

1    column -- fifth column?
2    A.    Yes.
3    Q.    What does that mean with respect to AR Agings;
4    do you know?
5    A.    I don't know.
6    Q.    Okay.  See under credit memo heading it has --
7    there is a negative $117 billion entry?
8    A.    Yes, I see that.
9    Q.    And then you see there's a little A next to
10   it?
11   A.    Yes, I see that.
12   Q.    And then you see at the bottom it's kind of a
13   footnote, the A?
14   A.    Yes.
15   Q.    And then it says:
16         "Per Terry Elam, AR Department, the company
17   booked a $117 billion invoice in error in May."
18         See that?
19   A.    Yes, I see that.
20   Q.    Do you remember discussing with
21   Arthur Andersen a $117 billion invoice that was in
22   error?
23   A.    I don't remember, no.
24   Q.    Have you ever seen a $117 billion invoice?
25   A.    Yes, I do.

245

1  Q. Oh, you have?
2     What do you remember about that invoice?
3  A. Well, in this particular month, there was a
4  $117 billion invoice generated and credit memoed in
5  the same period.
6  Q. Okay. Do you remember how a $117 billion
7  invoice was generated?
8  A. I don't recall.
9  Q. So it was credit memoed in the same period.
10 Do you know why?
11 A. Assuming it was an error.
12 Q. Okay. Do you remember anything about that --
13 A. No, I do not.
14 Q. -- invoice?
15    See where it says:
16    "The net of the new invoices and the credit
17 memo is approximately $810 million, which is a
18 reasonable amount of invoices to be processed into
19 the license trade AR account during the last month of
20 the quarter."
21    See that?
22 A. Yes, I see that.
23 Q. Do you know what that means; that the net of
24 new invoice and the credit memo of 810 million? Do
25 you know what that refers to?

246

1  A. I do not know specifically, no.
2  Q. Okay. Do you know why it says that it's a
3  reasonable amount to be processed into the license
4  trade AR account?
5     MR. KONOVALOV: Objection. Calls for
6  speculation.
7     THE WITNESS: No, I do not.
8  Q. BY MR. GREENSTEIN: Okay. Do you know why you
9  were inputting this data into these documents for
10 those accounts, 12000, 12018, 25005?
11 A. It was part of my duties.
12 Q. All right.
13    Well, just you were told to do it, or did you
14 understand why you were doing it?
15 A. I was told to do it.
16 Q. By whom?
17 A. Greg Myers.
18 Q. Have you ever seen an invoice -- strike that.
19    Did anybody else tell you to perform these
20 duties with respect to those accounts you described
21 earlier?
22 A. No.
23 Q. Just Greg Myers?
24 A. He was my direct manager, yes.
25 Q. Did Greg Myers ever tell you that Oracle was

247

1  being sued by shareholders for accounting fraud
2  related to debit memos?
3  A. Not that I'm aware of, no.
4  Q. Did he ever discuss litigation against Oracle
5  that related to debit memos or 12601?
6  A. Not specifically, no.
7  Q. Generally?
8  A. I don't recall. He might have mentioned, but
9  I don't recall the specific conversation, no.
10 Q. When you were doing the credit memos related
11 to the on-account debit memos in October of 2002, did
12 Greg Myers ever tell you to preserve documents
13 related to what you were doing?
14    MR. KONOVALOV: Objection. Assumes facts not
15 in evidence, but you can answer the question.
16    THE WITNESS: No, he did not.
17 Q. BY MR. GREENSTEIN: Okay. Were there
18 documents -- were there documents that memorialized
19 all the credit memos that you processed that were
20 related to the on-account debit memos?
21    MR. KONOVALOV: Same objection.
22    THE WITNESS: I don't know.
23 Q. BY MR. GREENSTEIN: For the credit memos that
24 you created with -- that related to the on-account
25 debit memos, was there a physical credit memo

248

1  generated, a piece of paper?
2     MR. KONOVALOV: Objection. Assumes facts not
3  in evidence.
4     THE WITNESS: I don't know.
5     MR. GREENSTEIN: Mark this as 14, please.
6     (Plaintiff's Exhibit 14 was marked.)
7     MR. GREENSTEIN: For the record, it's -664425
8  to -664 -- oh, yeah, it's just one page.
9     For the record, the second page was how it was
10 produced to us by Oracle, which is illegible, and
11 unreasonably small. So what we've done is this first
12 page is kind of a -- that blown up.
13    MR. KONOVALOV: Well, I object to the
14 characterization on the record of the documents. If
15 you want to editorialize, you can do that with
16 counsel and not waste a lay witness' time with it.
17    MR. GREENSTEIN: Okay.
18    Well, I would like to request right now
19 that --
20    Well, I would like to ask the witness if he
21 could read the second page.
22    THE WITNESS: There are some values that I
23 cannot read.
24    MR. GREENSTEIN: Right.
25    So I would ask Oracle if they'd agree on the

249

1    record to produce all these documents that have this
2    print on it, there's a lot of them, and I would ask
3    that, as a request, that you produce them so it's
4    readable.
5        Is that acceptable?
6        MR. KONOVALOV:  I will look in and see what we
7    can do.  If you want to give me a range of document
8    numbers, I'm happy to look into it.
9        MR. GREENSTEIN:  Okay.  Thanks.
10   Q.    So I'm going to represent to you on the first
11   page of this document is the data blown up from the
12   second page in a readable form.
13       So if you -- have you ever -- I think earlier
14   you testified about an unapplied unidentified
15   receipts report, right?
16   A.    I don't know if I'm comfortable saying this is
17   this.
18       MR. KONOVALOV:  You know, I think -- we will
19   get to that objection.  But I think first off he was
20   asking you a preliminary question.
21       Is that correct?
22       MR. GREENSTEIN:  Yes.
23   Q.    Earlier you testified about an unidentified
24   unapplied receipts report, right?
25   A.    Yes.

250

1    Q.    And that was the unapplied cash report?
2    A.    You can state that, yeah.
3    Q.    It had lists of all the unapplied cash at
4    Oracle, right?
5    A.    Not -- I don't know that.
6    Q.    Well, it contained unapplied cash items in it,
7    right?
8    A.    Specifically, I don't know.
9    Q.    Okay.  Now, looking at the title of this first
10   page, it says Unapplied/Unidentified/On-Account
11   Payments For Current Period:  January 1st, 1990
12   through November 1st, 2000."
13       It says "1900," but -- well, actually, the
14   original document I can read it, and it says "1900."
15       Do you see that?
16       MR. KONOVALOV:  Are you asking whether he sees
17   it on the page?
18       MR. GREENSTEIN:  Yeah.
19   Q.    Is that what it -- I mean, see where it says
20   that?
21       MR. KONOVALOV:  I mean, he can answer the
22   question, but I guess I just would suggest that if
23   you're asking the witness to testify about a document
24   that's not even produced by Oracle, and yet it's
25   represented as having an Oracle Bates number.

251

1        As I said, I'm happy to explore with you --
2    explore whether there are more reasonable versions of
3    these documents.  I don't know, having got them for
4    the first time today --
5        MR. GREENSTEIN:  Right.
6        MR. KONOVALOV:  -- Having just received them
7    today.  So I think it's unfair to ask the witness to
8    testify about a page that wasn't even produced by
9    Oracle.
10       I take your representation as being true, but
11   I just think that's unfair to the witness.
12       MR. GREENSTEIN:  Okay.
13   Q.    If you look at the second page, the smaller
14   version.
15   A.    Uh-huh.
16   Q.    Can you read the title of that document at the
17   top.  You see how it says:
18   "Unapplied/Unidentified/On-Account Payments For
19   Current Period January '01, 1900 to November 1st,
20   2000"?
21   A.    I can't specifically read that, no.
22   Q.    Okay.  Well, have you ever --
23       Do you know of a report called the
24   Unapplied/Unidentified/On-Account Payments report?
25   A.    I do not know it by that name, no.

252

1    Q.    Okay.  Do you know of any report that tracks
2    or contains on-account -- lists of on-account items
3    at Oracle?
4    A.    I don't.
5    Q.    Okay.  Did you ever have to do any research
6    in -- or, strike that.
7        Did you ever have to look at an
8    Unapplied/Unidentified/On-Account -- strike that.
9        Did you ever have to look at a report
10   containing lists of on-account items when you were
11   reviewing the script output?
12       MR. KONOVALOV:  Well, okay.  We can come back
13   to this issue now.  The steps that Mr. Elam went
14   through in order to review the script were done at
15   the direction of counsel.
16       I'm happy -- because I understand you guys
17   would like to know this information, I'm happy to let
18   him testify about that, subject to your agreement
19   that his testimony on it won't constitute a waiver of
20   the attorney/client privilege.
21       If you're acceptable -- if you're agreeable
22   with that, then I'm happy to let him testify to that.
23       MR. GREENSTEIN:  Okay.  I could agree to that.
24       MR. KONOVALOV:  Okay.
25       THE WITNESS:  Repeat the question.

253

1    Q.    BY MR. GREENSTEIN:  Did you ever have to look
2    at any type of report that contained on-account --
3    lists of on-account items in connection with your
4    review of the script outputs that you testified about
5    earlier?
6    A.    A specific report of just on-account items,
7    no.
8    Q.    Okay.  Was there a report that had on-account
9    items in it?
10   A.    The --
11         MR. KONOVALOV:  At the same time period when
12   he was reviewing the script --
13         MR. GREENSTEIN:  Right.
14         THE WITNESS:  The script output has on-account
15   entries in it.
16   Q.    BY MR. GREENSTEIN:  Okay.  But where did the
17   data in the script output on-account come from?
18   Did it come from another report?
19         MR. KONOVALOV:  Objection.  Calls for
20   speculation.
21         You can answer if you know.
22         THE WITNESS:  I don't know exactly where that
23   data came from.
24   Q.    BY MR. GREENSTEIN:  Okay.  So in reviewing it,
25   did you have to look at the on-account entries?

254

1    A.    That was part of the review.
2    Q.    Okay.  What were you -- what were you required
3    to do or review with respect to on-account entries?
4    A.    Nothing specific to on-account entries.
5    Q.    Okay.  Generally, why were you asked to review
6    the script output, to do what?  What was the
7    deliverable?
8    A.    To provide a complete capture of the
9    accounting entries associated with each debit memo.
10   Q.    Okay.  So when you reviewed the script output,
11   did you also review other reports that contained data
12   that were extracted into the script output?
13   A.    I don't recall any.
14   Q.    Okay.  So you would just look at the actual
15   finished product of the script output, right?
16   A.    I believe so, yes.
17   Q.    And who -- do you remember who was in charge
18   of giving that to you?
19   A.    Tamas Buzasi.
20   Q.    That's the same Tamas that we looked at in one
21   of the earlier exhibits, right?
22   A.    Correct.
23   Q.    T-a-m-a-s.
24         So during the time that you were reviewing
25   script outputs, you never saw an

255

1    Unapplied/Unidentified/On-Account Payment Report?
2    A.    No.
3          MR. GREENSTEIN:  Okay.  I would like to just
4    take five minutes.
5          VIDEOTAPE OPERATOR:  Going off the record.
6    The time is 3:52.
7          (Break.)
8          VIDEOTAPE OPERATOR:  Back on the record.
9    The time is 4:13.
10   Q.    BY MR. GREENSTEIN:  Mr. Elam, I'm going to
11   show you what's already been marked as Myers
12   Number 11.  The deposition of Greg Myers.  And I'll
13   just ask you to take a look at it.
14         For the record, it's -050209 through -255.
15   It's a "Presentation To The SEC Staff On Behalf Of
16   Oracle Corporation," dated October 29th, 2003.
17   Finished?
18   A.    Yes.
19   Q.    Have you seen this document before?
20   A.    I have not.
21   Q.    Okay.  Were you aware before you --
22         Before you saw this document, and before
23   today, were you aware that Oracle made a presentation
24   with Morrison & Foerster lawyers, to the SEC about
25   the debit memo allegations in this lawsuit?

256

1    A.    I was not.
2    Q.    Okay.  Did you ever help Greg Myers prepare
3    any of these slides or screen shots in this
4    presentation?
5    A.    I don't recall.
6    Q.    Okay.  Have you ever had any discussions with
7    David Bayless of Morrison & Foerster?
8    A.    No, I have not.
9    Q.    Any discussions with any lawyers from Morrison
10   & Foerster?
11   A.    No.
12   Q.    Did Greg Myers ever tell you that he was going
13   to talk to the SEC about debit memos?
14   A.    No.
15   Q.    So if Greg Myers testified in this case that
16   you helped him prepare some of the data that's
17   contained -- some of the documents contained on this
18   spreadsheet, would he -- would that be inaccurate?
19         MR. KONOVALOV:  Objection.  Mischaracterizes
20   prior testimony.
21         If you want to put it in front of the witness,
22   that might help.
23         THE WITNESS:  I don't recall.
24   Q.    BY MR. GREENSTEIN:  But I'm asking if Greg
25   Myers testified that you helped him create the

257

1  documents that are reflected in this SEC
2  presentation, would that be inaccurate?
3  MR. KONOVALOV: Same objection.
4  THE WITNESS: I don't know his testimony.
5  MR. GREENSTEIN: No.
6  Q.  What I'm saying is if he testified that
7  "Terry Elam helped me create some of the information
8  that was put in this SEC presentation," would that be
9  accurate or inaccurate?
10  MR. KONOVALOV: Same objection. The witness
11  doesn't have a basis for knowing.
12  THE WITNESS: I don't know.
13  Q.  BY MR. GREENSTEIN: So it could be accurate;
14  it could be inaccurate?
15  MR. KONOVALOV: Same objection. Asked and
16  answered now four times.
17  THE WITNESS: I don't know.
18  Q.  BY MR. GREENSTEIN: Have you ever talked to
19  Greg Myers about a customer Eli Lilly?
20  A.  No, not that I'm aware of.
21  Q.  Okay. Have you ever spoken to Greg Myers
22  about Household, a customer Household?
23  A.  I don't know.
24  Q.  Have you ever spoken to Greg Myers about any
25  investigation done by Ernst & Young with respect to

258

1  debit memos?
2  A.  No.
3  Q.  Do you recall any customer that you spoke to
4  Greg Myers about --
5  Or do you recall speaking to Greg Myers about
6  any specific debit memo customer?
7  A.  No.
8  Q.  If you turn to page 11 of the presentation,
9  which is Bates stamp -050219, you see how it appears
10  to be a screen shot of a refund request?
11  Is that what it appears to be?
12  A.  I can't speak to what this screen shot is of.
13  Q.  Okay. But it's a screen shot, right?
14  MR. KONOVALOV: Objection. Lacks foundation.
15  Calls for speculation.
16  THE WITNESS: I can't tell.
17  Q.  BY MR. GREENSTEIN: Okay. See how it has a
18  little X on there so it looks like it's in front of a
19  computer, like you're looking at a computer? Do you
20  see that? Like an X for a window that's opening on a
21  computer; is that fair to say?
22  A.  Okay.
23  Q.  Well, is this what it looks like if you were
24  to go into Oracle system and view a refund request?
25  Is this what it would look like?

259

1  A.  I wouldn't know where this was from.
2  Q.  Well, I'm not saying where this is from. I'm
3  saying when you look at this, does this look like --
4  If you were to pull up a refund request on
5  Oracle systems, is this what it would look like?
6  A.  I don't know.
7  Q.  Okay. You can put that aside.
8  Mark this next as 15.
9  (Plaintiff's Exhibit 15 was marked.)
10  Q.  BY MR. GREENSTEIN: For the record, this is
11  -748719 through -748723.
12  And if I say a number, it means NDCA-ORCL,
13  unless I otherwise indicate.
14  Finished?
15  A.  Yes.
16  Q.  If you look at the third -- third page, you
17  see there's a March 27, 2001 E-mail from you to Vince
18  Jones regarding Lockeed Missile & Space Company?
19  See that?
20  A.  Yes.
21  Q.  And who's Vince Jones?
22  A.  I don't know.
23  Q.  Okay. You see where Vince Jones -- below
24  that, Vince Jones wrote to you:
25  "Hi Terry, please credit memo OFD short pay

260

1  invoice..."
2  Do you know what that means?
3  A.  No, I do not.
4  Q.  Do you know what "credit memo OFD" means?
5  A.  No, I don't.
6  Q.  Or outside of the context of this document, do
7  you know what "OFD" means?
8  A.  I -- it could mean Oracle Financing Division.
9  Q.  Do you know why he's writing you about credit
10  memo OFD?
11  MR. KONOVALOV: Objection. Calls for
12  speculation.
13  THE WITNESS: No, I don't.
14  Q.  BY MR. GREENSTEIN: You see where you wrote to
15  him:
16  "Vince, I just got off the phone with Jodee
17  regarding OFD credit memos. Please talk to her
18  regarding these E-mails. Thanks."
19  Who's Jodee? Do you know?
20  A.  I don't know.
21  Q.  And you wrote "OFD credit memos," so at one
22  time you knew what OFD credit memos meant, right?
23  A.  I assume so, yes.
24  Q.  But sitting here today, you don't know what
25  that means?

261

1    A.   To this E-mail, no.
2    Q.   No, what that means in general.
3    A.   No.
4        MR. KONOVALOV:  Other than what he's already
5    testified about.
6    Q.   BY MR. GREENSTEIN:  Do you know when you say,
7    "Please talk to her regarding these E-mails," do you
8    remember what you meant by that?
9    A.   No, I do not.
10   Q.   Put that aside.
11       Mark these two in consecutive order.  What is
12   it, 16 and 17?
13       MS. REPORTER:  Yeah.
14       MR. GREENSTEIN:  Here is 16.
15       (Plaintiff's Exhibit 16 was marked.)
16       MR. GREENSTEIN:  For the record, Exhibit --
17   Elam Exhibit 16 is -831967 through -968.
18       (Plaintiff's Exhibit 17 was marked.)
19       And Exhibit 17 is -883052 through -3667.  For
20   the record, on Exhibit 17, -883061 and -883666, these
21   are just excerpts from certain tabs in this
22   spreadsheet.  And they were just excerpted because
23   they were like 900 -- they were hundreds of pages
24   long.
25       But I'll represent to you that this is a

262

1    spreadsheet and the different tabs within the
2    spreadsheet.
3        MR. KONOVALOV:  Is there a reason why within
4    Exhibit 17 you've got separately stapled documents?
5    Is that intentional?
6        MR. GREENSTEIN:  Yes.  That is because each
7    one is a tab within the spreadsheet that was produced
8    to us in electronic form.
9        MS. COLLINS-BURGARD:  There's three staples,
10   and you only said two tabs.
11       MR. GREENSTEIN:  No, I mean it's -- however
12   it's stapled is however many tabs that there were.
13   Q.   Anyway, with respect to Exhibit 16, Mr. Elam,
14   that's a two-pager, do you recognize this?
15   A.   No, I do not.
16   Q.   Have you ever seen -- do you see how it says
17   "On Account Reconciliation" at the top?
18   A.   Yes, I see that.
19   Q.   Have you ever seen an on-account
20   reconciliation report of any kind?
21   A.   No.
22   Q.   Okay.  Is this part of the script output that
23   you reviewed?
24   A.   I don't know.
25   Q.   Do you know if anybody performed an on-account

263

1    reconciliation similar to the one that you performed
2    monthly for Account 25005?
3    A.   I don't know.
4    Q.   Okay.  And looking at Number 17, do you
5    recognize these documents, any of the sheets here?
6    A.   No, I do not.
7    Q.   Is this part of the script output that you
8    reviewed?
9    A.   I don't know.
10   Q.   You have never seen them, right?
11   A.   I have not.
12   Q.   So in reviewing the script outputs, you
13   obviously didn't review these documents, right?
14       MR. KONOVALOV:  In this current form it's
15   difficult for the witness to testify, right?  I
16   mean --
17       MR. GREENSTEIN:  We just printed out what was
18   produced.
19       MR. KONOVALOV:  Well, you asked to be produced
20   in native form, so that's the way the documents were
21   produced.
22       MR. GREENSTEIN:  Right.
23   Q.   So have you ever seen -- in reviewing the
24   script output, have you ever seen these documents or
25   these types of documents?

264

1        MR. KONOVALOV:  Are you representing this is
2    part of the script?
3        MR. GREENSTEIN:  I don't know.  I just said if
4    you -- let me -- if you have an objection, make it.
5    Q.   The question is, when you reviewed the script
6    outputs, which you've testified about, did you see
7    these documents as part of that?
8        MR. KONOVALOV:  Okay.  Well, objection.  Vague
9    and ambiguous.
10       I think it would be in everyone's best
11   interest to not mislead the witness about what this
12   is.  But it's your examination.
13       MR. GREENSTEIN:  Okay.  Well, I disagree that
14   it's misleading.
15   Q.   I'm asking have you ever seen these documents?
16   A.   I have never seen these documents.
17   Q.   Okay.  Have you ever seen this type of
18   document when you were reviewing the script output?
19   A.   I don't know.
20       MR. GREENSTEIN:  Okay.  Mark this as 18,
21   please.
22       (Plaintiff's Exhibit 18 was marked.)
23       MR. GREENSTEIN:  And for the record, this is a
24   letter dated August 11th, 2006, from Latham &
25   Watkins, Peter Wald, to Special Master Judge Infante,

265

```
1    I-n-f-a-n-t-e.
2    Q.    Mr. Elam, if you could just look at -- just
3    read the letter portion of it, and then there's some
4    declarations attached.
5         Have you seen this letter before?
6    A.    I have not.
7    Q.    Okay.  If you could just read the letter and
8    let me know when you're done.
9         MR. KONOVALOV:  Eli, you just want him to read
10   the first three pages of the letter?
11        MR. GREENSTEIN:  Yeah.  Just the first few
12   pages.
13   Q.    Finished?
14   A.    Almost.
15   Q.    Sorry.
16   A.    Okay.
17   Q.    Okay.  So you've never seen this letter
18   before, right?
19   A.    I have not.
20   Q.    Okay.  Are you aware that Oracle submitted a
21   letter brief to the court regarding the script
22   output?
23   A.    I am not.
24   Q.    Okay.  Are you aware -- well, are you aware
25   you signed a sworn declaration in support of this
```

266

```
1    letter?
2    A.    No, I did not.  I am not aware.
3    Q.    Okay.  You see on the second page, it's the
4    second full paragraph where it says:
5         "When Defendants created the original script
6    output, Oracle implemented certain logical parameters
7    around the types of data Defendants gathered and
8    produced," and it says "See declaration of Terry Elam
9    in Support of Defendants' Letter Brief."
10        Do you see that?
11   A.    Yes, I see that.
12   Q.    Were you aware that Oracle made
13   representations to Judge Infante and cited your
14   declaration in support of those representations?
15   A.    I was not aware.
16   Q.    In that paragraph where it says:
17        "When Defendants created the original script
18   output..."
19        Do you see that?
20   A.    Yes, I do.
21   Q.    Do you know what the original script output
22   is?
23   A.    I don't know what that specifically states to.
24   Q.    Okay.  But do you see that that sentence is --
25   it refers to your -- a declaration of Terry Elam,
```

267

```
1    paragraph 3, in support of that statement?
2         See that?
3    A.    Yes, I do see that, yes.
4    Q.    So do you know what the original script
5    output -- that terminology means?
6    A.    It could be speaking to the raw data that was
7    provided.
8    Q.    But what -- do you know --
9         You said there were two script outputs, I
10   think, right, that you reviewed?
11   A.    That I'm aware of.
12   Q.    Okay.  So was one of those the original script
13   output, if you know?
14   A.    We have the first script output.
15   Q.    And I think you said the first script output
16   was -- you reviewed it in October or November 2005?
17   A.    It was October or November of 2005.
18   Q.    And the second was in -- what date, sorry?
19   A.    I think it was August of 2006.
20   Q.    August '06.  Okay.
21        So if you turn to after the letter, there's a
22   Declaration of Alan Fletcher.
23        And then if you keep going there's a
24   declaration of Terry Elam.
25        I'm sorry.  You skipped over it.  It's --
```

268

```
1    A.    Did I?
2         MR. KONOVALOV:  I think you were right.  It's
3    a little deeper in.
4         MR. GREENSTEIN:  It's the sixth -- I think
5    it's before the exhibits, though, isn't it?
6         MR. KONOVALOV:  Not as presented here.
7         Has it been rearranged, perhaps inadvertently?
8         MR. GREENSTEIN:  Where's the one I gave you?
9         Okay.  Yeah.
10        Well, the copy you have is correct.  That's
11   the way it was served on us.
12        MR. KONOVALOV:  You found it?
13        THE WITNESS:  Yeah.
14   Q.    BY MR. GREENSTEIN:  So you got it right.
15        So do you see the Declaration of Terry Elam
16   there?
17   A.    Yes, I do.
18   Q.    Okay.  Do you see in the first paragraph it
19   says:
20        "This declaration is submitted in support of
21   Defendants' Letter Brief Requesting Clarification..."
22        Do you see that?
23   A.    I do see that.
24   Q.    And you said you'd never seen the letter that
25   you just looked at, the first page of this document,
```

Elam, Terry  9/28/2006  9:19:00 AM

269

1   right?
2   A.   Correct.
3   Q.   So when you declared this, did you know
4   what --
5        Well, is that true, that you submitted this
6   declaration in support of Oracle's letter brief?
7   A.   I don't know.
8   Q.   Well, here you're saying -- well, okay.
9        The second page has your signature on it,
10  right?
11  A.   Yes.
12  Q.   Is that your signature?
13  A.   That looks like my signature, yes.
14  Q.   And so did you --
15  A.   If --
16  Q.   Sorry.
17       Did you review this before you signed it?
18  A.   I did review this document, yes.
19       MR. KONOVALOV:  Counsel, I suggest the
20  confusion is not whether he knows this document was
21  submitted, but probably doesn't know the import, you
22  know, how it was used.  That may be a legal question
23  that he can't speak to.
24       MR. GREENSTEIN:  Okay.  Well, I don't -- I
25  don't think that's a proper objection.  I don't know

270

1   what that means.
2        MR. KONOVALOV:  I'm simply trying to assist
3   you in the examination so that you can move things
4   along.
5        MR. GREENSTEIN:  Thank you.  Appreciate that.
6   But -- so I don't think that's a valid objection for
7   the record.
8   Q.   So did you review this before you signed it?
9   A.   Yes, I did.
10  Q.   Okay.  And you signed this document and it
11  says that you declare that it's in support of a
12  letter brief requesting clarification.
13       See that?
14       MR. KONOVALOV:  Objection.  Misstates the
15  document.
16       THE WITNESS:  I didn't know that.
17  Q.   BY MR. GREENSTEIN:  Right.  Because you never
18  saw the letter brief that went to Judge Infante, did
19  you?
20  A.   No, I did not.
21  Q.   Okay.  So when you read that, did you ask --
22       Well, so you signed this without knowing what
23  that terminology meant?
24       MR. KONOVALOV:  Objection.  Misstates the
25  witness' testimony.

271

1        THE WITNESS:  I don't know.
2   Q.   BY MR. GREENSTEIN:  See in the first paragraph
3   it says:
4        "This declaration is based on my personal
5   knowledge and if called to testify, I could and would
6   testify truthfully to the facts set forth below."
7        Do you see that?
8   A.   Yes, I do see that.
9   Q.   So what was your understanding when you --
10  when you signed this declaration of what it was?
11  A.   My understanding was this was a general
12  document around the script output.
13  Q.   And you didn't have any idea it was going to
14  be given to a judge, did you?
15  A.   I did not at the time, no.
16  Q.   So that first paragraph that says that this
17  declaration was submitted in support of the letter
18  brief, is not accurate in the sense that you didn't
19  know you were submitting this declaration in support
20  of anything to the court, right?
21       MR. KONOVALOV:  Objection.  Misstates the
22  witness' testimony.  This is a deliberate distortion
23  of the document.
24       You can answer the question.
25       THE WITNESS:  No, I don't know.

272

1   Q.   BY MR. GREENSTEIN:  Okay.  See in the second
2   paragraph --
3        Well, let's turn back to the letter.  The
4   second page of the letter, the second full paragraph
5   where it says:
6        "When Defendants created the original script
7   output, Oracle implemented certain logical parameters
8   around the types of data Defendants gathered and
9   produced."
10       Do you see that?
11  A.   Yes, I do.
12  Q.   And that refers to your declaration, paragraph
13  3.
14       Do you see that?
15  A.   Correct.
16  Q.   So if you look at paragraph 3, it says:
17       "When Oracle created the original script
18  output for the 776 debit memos, Oracle implemented
19  certain logical parameters around the types of data
20  we gathered and produced."
21       Do you see that?
22  A.   Yes, I do.
23  Q.   So do you have personal knowledge of that
24  first sentence in paragraph 3?
25  A.   I know there were logical parameters

273

1    implemented. I can't speak to those exact
2    parameters.
3    Q.   Right. Well, when you said -- when you
4    declared that Oracle created the original script
5    output for the 776 debit memos, what do you mean "the
6    original script output"? Which one of the two do you
7    mean, the November 2005 one or the August 2006 script
8    output?
9    A.   This is November of 2005.
10   Q.   I'm sorry, where -- where -- oh. Does it say
11   that somewhere or are you just saying that?
12   A.   I'm tying the number of 776 to the original.
13   Q.   Okay. So what -- here what you mean is, when
14   Oracle created the original script output for the 776
15   debit memos, you mean the script output created or
16   that you reviewed in November of 2005, right?
17   A.   Correct.
18   Q.   Are you aware that that was produced to the
19   plaintiffs in this litigation?
20   A.   I am not aware of that.
21   Q.   Okay.
22        Are you aware that before that November 2005
23   script output related to the 776 debit memos, that
24   there was multiple other script outputs produced to
25   plaintiffs in this litigation that related to all

274

1    46,000-plus debit memos that were created in
2    November 2000?
3         MR. KONOVALOV: Objection. Assumes facts not
4    in evidence and misstates the documents.
5         THE WITNESS: No.
6    Q.   BY MR. GREENSTEIN: Okay. And you don't know
7    that -- strike that.
8         The 776 debit memos that you refer to here, do
9    you know why those 776 debit memos -- or why you
10   reviewed the script output limited to 776 debit memos
11   out of the 46,000-plus?
12   A.   I do not know.
13   Q.   So when you say:
14        "When Oracle created the original script
15   output for the 776 debit memos, Oracle implemented
16   certain logical parameters around the types of data
17   we gathered and produced."
18        See that?
19   A.   Yes, I see that.
20   Q.   So how -- what do you mean by "certain logical
21   parameters"?
22   A.   In discussions with Tamas Buzasi, he explained
23   to me how he produced the output.
24   Q.   And did he explain the certain logical
25   parameters to you?

275

1    A.   Not in detail.
2    Q.   Okay. So when you say "logical parameters,"
3    what do you mean by that?
4    A.   I assumed to say meaning the pulling of the
5    appropriate data.
6    Q.   But when you say in a sworn declaration that
7    they were logical parameters, is that something --
8    when you say "logical," do you mean logical to you or
9    to Tamas?
10   A.   In the conversation I had with Tamas, it was
11   logical to me.
12   Q.   Okay. Do you know if there was any sort of
13   document that provided the parameters that were used?
14   A.   I don't know if there was.
15   Q.   Did you look at one that had the logical
16   parameters or the parameters memorialized somewhere?
17   A.   A document?
18   Q.   Yeah.
19   A.   No, I did not.
20   Q.   So it was a conversation with Tamas, right?
21   A.   Yes.
22   Q.   So other than what he told you, you have no
23   personal knowledge of the actual logical parameters
24   used to create the script output for the 776 debit
25   memos, right?

276

1         MR. KONOVALOV: Objection. Misstates the
2    witness' testimony.
3         THE WITNESS: I don't know.
4    Q.   BY MR. GREENSTEIN: Well, other than what he
5    told you, do you have any personal knowledge of what
6    parameters were used?
7    A.   The exact detail, no.
8    Q.   Right. It was just what he told you, right?
9         MR. KONOVALOV: Objection. Misstates the
10   witness' testimony.
11   Q.   BY MR. GREENSTEIN: Right?
12   A.   In the conversation of how he explained the
13   script output.
14   Q.   Okay. Did anybody else talk to you about the
15   parameters used?
16   A.   I don't recall.
17   Q.   Okay. See how it says:
18        "We did this to ensure that Plaintiffs had the
19   information they needed to substantiate their
20   accounting allegations and to limit the amount of
21   extraneous information so that the end product would
22   be not be overly burdensome and unusable."
23        Do you see that?
24        It's in the third paragraph.
25   A.   Yes, I do see that.

277

1    Q.    So according to this paragraph, it says the
2    reason that certain logical parameters were used was
3    that plaintiffs had the information to substantiate
4    their accounting allegations.  Is that right?
5    A.    That's what it says.
6    Q.    So what are plaintiffs' accounting
7    allegations?
8    A.    I do not know.
9    Q.    Okay.  So why did you use the term -- so what
10   did you mean when you signed this declaration saying
11   that the reason you did that was to ensure that
12   plaintiffs had the information they needed to
13   substantiate their accounting allegations?
14          What did you mean?
15   A.    I think I was assuming the accounting
16   allegations that I was aware of was the -- around the
17   creation of the debit memos and the accounting around
18   the creation of the debit memos.
19   Q.    All right.
20          But do you know what plaintiffs' accounting
21   allegations are in the complaint in this case?
22          MR. KONOVALOV:  Objection.  Asked and just
23   answered.
24          You can answer it again.
25          THE WITNESS:  I'm aware of the -- I'm assuming

278

1    it was around the allegations of the creation of the
2    debit memo, an accounting around the creation of the
3    debit memo.
4    Q.    BY MR. GREENSTEIN:  Right.  So you know it
5    relates -- the accounting allegations relate to debit
6    memos, right?
7    A.    Yeah, I assume so, yes.
8    Q.    Do you know any other of the allegations?
9    A.    Not specifically, no.
10   Q.    So when you say what you did was to ensure
11   that plaintiffs had enough information they needed to
12   substantiate their accounting allegations, how did
13   you know what plaintiffs needed to substantiate those
14   allegations?
15          MR. KONOVALOV:  Objection.  The document
16   speaks for itself.  It lays out in detail exactly
17   why.
18          But you can answer the question.
19          THE WITNESS:  Can you repeat the question
20   again?
21   Q.    BY MR. GREENSTEIN:  Well, you said that what
22   you know about the accounting allegations is just
23   that it relates to debit memos, correct?
24   A.    Correct.
25   Q.    So how -- what's your basis for saying that

279

1    what you did -- strike that.
2          So what information would plaintiffs need to
3    substantiate the accounting allegations?
4    A.    I don't know that.
5    Q.    Because you don't know the specific accounting
6    allegations, right?
7          MR. KONOVALOV:  Objection.  Misstates the
8    witness' testimony.
9          THE WITNESS:  I know around the creation of
10   the debit memos and the accounting around the
11   creation of the debit memos.
12   Q.    BY MR. GREENSTEIN:  Right.  Do you know
13   whether plaintiffs allege --
14          Do you know what line items on Oracle's
15   financial statements that plaintiffs allege were
16   false and misleading?
17   A.    No, I do not.
18   Q.    Okay.  In the third paragraph where you say,
19   um, you put logical parameters around the data so
20   that to limit the amount of extraneous information so
21   that the end product would not be overly burdensome
22   and unusable.
23          Do you see that?
24   A.    Yes.
25   Q.    What did you mean when you said:

280

1          "...to limit the amount of extraneous
2    information so that the end product would not be
3    overly burdensome and usable?"
4    A.    The idea of script output was to show a
5    complete picture of the accounting related to each
6    debit memo.
7    Q.    Uh-huh.
8    A.    And there could be data that it's unrelated.
9    Q.    Okay.  When you say "the accounting for each
10   debit memo," what do you mean by that?
11   A.    The actual accounting entries for each debit
12   memo.
13   Q.    Okay.  You mean the ledger entries for each
14   debit memo?
15          MR. KONOVALOV:  Objection.  Vague and
16   ambiguous.
17          THE WITNESS:  I don't know what you're talking
18   about.
19   Q.    BY MR. GREENSTEIN:  Okay.  Well, you said
20   "accounting entries."  And so what do you mean by
21   that?
22   A.    The accounting entries generated by the
23   transaction debit memo.
24   Q.    Okay.  When you said "overly burdensome and
25   unusable," what did you mean by that?

Elam, Terry  9/28/2006  9:19:00 AM

281

1  A.   The data would be tremendous.  It would be
2  hard to work with.
3  Q.   Okay.  So what extraneous information did you
4  limit so that it wouldn't be overly burdensome on
5  plaintiffs?
6  A.   I don't know the exact information that was
7  not pulled.
8  Q.   So you don't know how the information was
9  limited to exclude extraneous information?
10  A.   No, I don't know how.
11  Q.   So when you say, "We did this to ensure that
12  Plaintiffs had the information," what do you mean by
13  "we"?  Do you mean Oracle?
14  A.   I'm assuming Oracle.
15  Q.   Well, you wrote "we" -- you signed this, and
16  it says "we."  Did you mean certain individuals or
17  did you mean the company?
18  A.   Oracle, I'm assuming Oracle.
19  Q.   You didn't write this, did you, this
20  declaration?
21  A.   No, I did not.
22  Q.   See in paragraph 4 it says:
23      "To do this, Oracle focused on the tables
24  owned by four different Oracle modules."
25      Do you see that?

282

1  A.   Yes.
2  Q.   And it has:
3      "Accounts Receivable, General Ledger, Accounts
4  Payable and the Application Object Library."
5      See that?
6  A.   Yes, I do.
7  Q.   What do you mean "tables owned by four
8  different modules"?  Do you mean the tables of data
9  that are within that specific category?
10      MR. KONOVALOV:  Objection.  Vague and
11  ambiguous.
12      THE WITNESS:  Each module contains different
13  data.
14  Q.   BY MR. GREENSTEIN:  So accounts receivable has
15  different tables of data, right, than accounts -- or
16  than accounts payable, for instance, right?
17  A.   Correct.
18  Q.   So you focused on tables with respect to those
19  four areas, right?
20  A.   Correct.
21  Q.   Did you pull data from any other modules in
22  the script output?
23  A.   I don't know.
24  Q.   Okay.  How do you know that Oracle focused on
25  the tables with those four modules?

283

1  A.   From the conversation with Tamas.
2  Q.   Okay.  Because you weren't involved in
3  extracting data from any of these modules yourself,
4  right?
5  A.   Personally, no.
6  Q.   All right.  So he told you to -- Tamas told
7  you that they focused on these four?
8  A.   Yes, that's correct.
9  Q.   Okay.  But that's the only basis you have for
10  your personal knowledge that Oracle focused on those
11  four, right, was based on what Tamas told you?
12  A.   Correct.
13  Q.   It says:
14      "From there, Oracle selected data from
15  approximately 35 different tables and multiple
16  columns within each table."
17      See that?
18  A.   Yes, I see that.
19  Q.   Was that statement that you made based on your
20  conversation with Tamas?
21  A.   Yes.
22  Q.   So do you know how Oracle selected the data
23  from the 35 different tables?
24  A.   No, I do not.
25  Q.   Okay.  You see how it says -- it refers to:

284

1      "Exhibit B," it says, "is a true and correct
2  copy of a spreadsheet that lists the 35 tables used
3  by Oracle in creating the script output."
4      And then if you look at Exhibit B at the end.
5      You see that?
6  A.   Yes, I see that.
7  Q.   So you're saying that to make the script
8  output, Oracle selected data from these 35 tables
9  listed in Exhibit B, right?
10  A.   Yes.
11  Q.   Now, is that the only 35 tables that Oracle
12  selected data from to create the script output?
13  A.   I don't know.
14  Q.   So there could be other tables, right?
15      MR. KONOVALOV:  Objection.  Calls for
16  speculation.
17      THE WITNESS:  I don't know.
18  Q.   BY MR. GREENSTEIN:  Okay.  Well, you said
19  Oracle selected data from those 35 tables, but it
20  doesn't say "only," right?
21      MR. KONOVALOV:  Objection.  The document
22  speaks for itself.
23      THE WITNESS:  I don't know.
24  Q.   BY MR. GREENSTEIN:  Okay.  Where you say:
25  "Exhibit B is a true and correct copy of a

285

1   spreadsheet that lists the 35 tables used by Oracle
2   in creating the script output," are you saying that
3   that Exhibit B is a list of all the tables used by
4   Oracle to create the script output?
5   A.   I don't know.
6   Q.   So there could be other tables, right?
7   A.   I honestly don't know.
8   Q.   And you say that Exhibit B has:
9        "...the number of times data was pulled from
10   each table, the total number of columns of data in
11   each of the tables, the descriptions of the tables
12   and the source of the description."
13       See that?
14   A.   Yes, I see that.
15   Q.   Is that -- so if you look at Exhibit B, is
16   that -- the number of columns, that's the number of
17   times -- or, sorry.
18       The numbers there after the table name, that's
19   the number of times that data was pulled from each of
20   those tables?
21   A.   That's the number that Tamas gave.
22   Q.   Okay.  Did Tamas create this?
23   A.   I don't know who created this.
24   Q.   Okay.  Did you look at this, Exhibit B, before
25   you signed this declaration?

286

1   A.   I did not.
2   Q.   So when you say, "Exhibit B is a true and
3   correct copy of a spreadsheet," you didn't -- you had
4   never looked at Exhibit B, right?
5   A.   Correct.
6   Q.   Do you know -- in paragraph 4, where it
7   says -- second -- well, where it says "From there" on
8   line 22.  You see it says:
9        "From there, Oracle selected data from
10   approximately 35 tables..."
11       Do you see that?
12   A.   I see that.
13   Q.   Do you know how they selected the data from
14   those 35 tables?
15   A.   I don't know how.
16   Q.   Okay.  Paragraph 5 says:
17       "Oracle isolated the data pertaining to (among
18   other things) supplier payments, invoice records and
19   customer call information."
20       See that?
21   A.   Yes, I see that.
22   Q.   How did Oracle isolate data pertaining to
23   supplier payments, invoice records, and customer call
24   information?
25   A.   Tamas would have pulled directly from those --

287

1   the tables that store that data.
2   Q.   So Tamas told you that Oracle isolated the
3   data for those three categories, right?
4   A.   He explained to me he pulled the data from
5   these tables.
6   Q.   Okay.  Are those the only -- but those aren't
7   the only tables that -- or, sorry.  Strike that.
8       Do you know if those three were the only
9   tables that Oracle isolated data from?
10       MR. KONOVALOV:  Objection.  Vague and
11   ambiguous.
12       THE WITNESS:  Don't know.
13   Q.   BY MR. GREENSTEIN:  It just says Oracle
14   isolated the data pertaining to those three tables,
15   but it doesn't say those are the only ones, right?
16       MR. KONOVALOV:  It actually doesn't say
17   "tables."
18       Objection.  Vague and ambiguous.
19       THE WITNESS:  I don't.  I don't know.
20   Q.   BY MR. GREENSTEIN:  Okay.  Then in the next
21   sentence on paragraph 5, it says:
22       "Within these parameters, Oracle gathered
23   information relating to invoices, cash receipts, cash
24   applications, refunds (where applicable), account
25   transfers and the like."

288

1       See that?
2   A.   Yes, I see that.
3   Q.   When you say "within these parameters," what
4   parameters did you mean?
5   A.   The parameters that Tamas pulled the data by.
6   Q.   Do you mean the supplier payments, invoice
7   records, and customer call information?
8   A.   No.
9   Q.   Okay.  What parameters did you mean?
10       Do you mean the logical parameters in
11   paragraph 3 that you talked about?
12   A.   The parameters that Tamas ran the script by.
13   Q.   Okay.  So when you say "within these
14   parameters," it's because Tamas told you it was
15   within those parameters, right?
16   A.   Correct.
17   Q.   You don't have any independent knowledge that
18   it was -- the data was pulled from within those
19   parameters, right?
20   A.   Those specific three?
21   Q.   Or whatever parameters you're referring to
22   here.
23   A.   I don't know the exact parameters he ran it
24   by.
25   Q.   Okay.  Then it says:

289

```
1              "Oracle gathered information relating to
2      invoices..."
3              See that?
4      A.     Yes, I see that.
5      Q.     What information relating to invoices did
6      Oracle gather to create the script output?
7      A.     There was customer information,
8      transaction-type information, invoice number
9      information, order number.
10             I can't recall all of them.
11     Q.     Okay.  Do you know how that information was
12     gathered?
13             MR. KONOVALOV:  Objection.  Vague and
14     ambiguous.
15             THE WITNESS:  I don't know.
16     Q.     BY MR. GREENSTEIN:  Because you didn't gather
17     it, right?
18     A.     Tamas did.
19     Q.     Right.
20             So do you know if information relating to the
21     original invoice amount was gathered?
22     A.     I believe so, yes.
23             MR. GREENSTEIN:  Okay.  We're going to have to
24     change the tape.
25             VIDEOTAPE OPERATOR:  This marks the end of
```

290

```
1      videotape number three, Volume 1, in the deposition
2      of Terry Elam.
3              Going off the record.
4              The time is 4:59.
5              (Break.)
6              VIDEOTAPE OPERATOR:  Here begins Volume 1,
7      videotape number four in the deposition of
8      Terry Elam.
9              Back on the record.
10             The time is 5:10.
11     Q.     BY MR. GREENSTEIN:  Mr. Elam, I'll refer you
12     back to the second page of the Declaration of
13     Terry Elam, which is part of Exhibit Number --
14             MR. KONOVALOV:  Eighteen.
15     Q.     BY MR. GREENSTEIN:  -- 18.  And we were
16     talking about the -- the first paragraph that started
17     on the previous page where it talked about Oracle
18     isolated data pertaining to certain areas.  And then
19     within those parameters, Oracle gathered information
20     relating to invoices.
21             See that?
22     A.     Yes.  I see that.
23     Q.     And I was asking you, did it gather
24     information relating to the original amount of the
25     invoice?
```

291

```
1      A.     I believe it did, yes.
2      Q.     Okay.  Did it gather the -- any adjustments
3      made to that invoice?
4              MR. KONOVALOV:  Objection.  Vague and
5      ambiguous.
6              But you can answer.
7              THE WITNESS:  We provided the data in an
8      effort to provide a complete picture of the
9      transactions associated with the debit memo.
10     Q.     BY MR. GREENSTEIN:  Okay.  But I'm asking when
11     you declare that you gathered information relating to
12     invoices, what information did you gather besides the
13     original invoice?
14             MR. KONOVALOV:  Objection.  Asked and
15     answered.
16             But you can answer it again.
17             THE WITNESS:  Invoice number, order number,
18     customer information, any activity related to those
19     invoices.
20     Q.     BY MR. GREENSTEIN:  Okay.  Let me stop you
21     there.
22             So activity related to invoices?
23     A.     Yes.
24     Q.     If a credit memo was issued that reduced an
25     invoice or reversed an invoice, did you gather that
```

292

```
1      information in preparing the script output?  Or was
2      that information gathered in connection with the
3      script output?
4              MR. KONOVALOV:  Objection.  Vague and
5      ambiguous.
6              THE WITNESS:  If a credit memo was processed
7      on an invoice --
8      Q.     BY MR. GREENSTEIN:  Uh-huh.
9      A.     -- specific invoice number, it was pulled.
10     Q.     And reflected in the script output?
11     A.     I believe so, yes.
12     Q.     So the credit memos that you, um, processed
13     related to 12601 and the on-account debit memos that
14     you described earlier, were those credit memos and
15     that activity, was that reflected on the script
16     output?
17             MR. KONOVALOV:  Objection.  Misstates the
18     witness' testimony.  And assumes facts not in
19     evidence.
20             THE WITNESS:  The credit memo is directly
21     applied to the debit memo.  And if that's an activity
22     on the debit memo, we pull -- it was pulled into the
23     script.
24     Q.     BY MR. GREENSTEIN:  Okay.  And I'm asking you
25     for the -- when you researched certain debit memo
```

Elam, Terry  9/28/2006  9:19:00 AM

293

1    items per Greg Myers' instructions and you created
2    credit memos -- processed credit memos with respect
3    to those on-account debit memos, that activity, would
4    that be reflected in the script output?
5         MR. KONOVALOV: Objection. Misstates the
6    witness' testimony and assumes facts not in evidence.
7         THE WITNESS: If a credit memo was applied to
8    a specific debit memo number, then it would be on the
9    script output.
10        Q.    BY MR. GREENSTEIN: Okay. And the credit
11   memos you processed with respect to 12601, those
12   were, I think you said, applied to the debit memo,
13   right?
14        MR. KONOVALOV: Objection. Misstates the
15   witness' testimony.
16        THE WITNESS: The credit memo was applied
17   directly to the debit memo.
18        Q.    BY MR. GREENSTEIN: It was, right?
19        A.    Yes.
20        Q.    So that would be reflected in the script
21   output?
22        A.    Correct.
23        Q.    So where it says information was gathered
24   related to cash receipts, what kind of information
25   was gathered?

294

1         A.    Receipt number, receipt date, original receipt
2    amount, customer information, and any invoices that
3    had been applied or unapplied from that receipt.
4         Q.    If the receipt came in, part of it was applied,
5    part of it wasn't applied and went into 25005, was
6    that information gathered for the script output?
7         MR. KONOVALOV: Objection. Incomplete
8    hypothetical.
9         THE WITNESS: If the receipt had an accounting
10   entry to 25005, then it would be on the script
11   output.
12        Q.    BY MR. GREENSTEIN: And if there was an entry
13   to 12601 with respect to a debit memo, would that be
14   reflected in the script output?
15        A.    Repeat that question, please.
16        Q.    If a debit memo transaction had some history
17   that whereby 12601 was impacted, would that be
18   reflected in the script output?
19        A.    If the activity around that debit memo
20   included some activity to 12601, it should be on the
21   script output.
22        Q.    Okay. And do you recall when you reviewed the
23   script output seeing activity for certain debit memos
24   that went -- that impacted 12601 account?
25        MR. KONOVALOV: Objection. Vague and

295

1    ambiguous as to "impacted."
2         But you can answer the question.
3         THE WITNESS: There might be some entries to
4    12601. I'd have to look at a specific example.
5         Q.    BY MR. GREENSTEIN: All right. Do you recall
6    generally seeing that, though, when you reviewed the
7    script output?
8         A.    I believe --
9         MR. KONOVALOV: Same objection.
10        THE WITNESS: Sorry.
11        MR. KONOVALOV: Go ahead.
12        THE WITNESS: I believe so.
13        Q.    BY MR. GREENSTEIN: If a credit memo was
14   issued on an invoice and it preceded the debit memo,
15   would that credit memo, that activity be reflected on
16   the script output?
17        MR. KONOVALOV: Objection. Incomplete
18   hypothetical.
19        But you can answer.
20        THE WITNESS: Preceded credit memos processed
21   before the debit memo?
22        MR. GREENSTEIN: Yeah.
23        THE WITNESS: If the invoice was applied to
24   the original cash receipt --
25        Q.    BY MR. GREENSTEIN: Uh-huh.

296

1         A.    -- then that credit memo would be pulled into
2    the script output.
3         Q.    "If the invoice was applied to the original
4    cash receipt."
5         But isn't a cash receipt applied to an
6    invoice; doesn't the invoice come first and then the
7    cash receipt?
8         MR. KONOVALOV: Objection. Vague and
9    ambiguous.
10        But you can answer.
11        THE WITNESS: I can't state in every case the
12   invoice comes before cash receipt.
13        Q.    BY MR. GREENSTEIN: Okay. But if the -- okay.
14        So if a credit memo was issued in connection
15   with an invoice before a debit memo was created, that
16   would be -- that transaction, that credit memo would
17   be reflected in the script output?
18        A.    If the original invoice had been applied to
19   the same cash receipt that the debit memo was applied
20   to.
21        Q.    Okay. So -- okay. Right, because with every
22   debit memo, there's a cash receipt related to it,
23   right?
24        A.    Correct.
25        Q.    So if the credit memo was related to an

297

1  invoice, that was related to a cash receipt, that was
2  related to a debit memo, that would be reflected on
3  the script output, right?
4      MR. KONOVALOV:  I'm sorry.  You got to read
5  that back for me, please.
6      (The following was read by the reporter:
7      QUESTION:  So if the credit memo was related
8      to an invoice, that was related to a cash
9      receipt, that was related to a debit memo,
10     that would be reflected on the script output?)
11     THE WITNESS:  Yes, that's a correct statement.
12  Q.   BY MR. GREENSTEIN:  Okay.  Now, if one of the
13  debit memos had multiple invoices related to the cash
14  receipt, would -- and the cash receipt was applied to
15  different invoices, would that be reflected in the
16  script output?
17  A.   Can you repeat that one more time?
18  Q.   Yeah.
19      If a cash receipt came in from a customer
20  related to a debit memo, and it was applied -- it
21  wasn't just applied to one invoice, but multiple
22  invoices, would that be reflected on the script
23  output?
24  A.   Yes, it would.
25  Q.   And how would you see that?

298

1      MR. KONOVALOV:  Objection.  Vague and
2  ambiguous.
3      You can answer.
4      THE WITNESS:  You would see the invoice
5  application to that original cash receipt.
6  Q.   BY MR. GREENSTEIN:  Okay.  Would it say
7  applied to this invoice -- this piece applied to this
8  invoice on this date, and another piece applied to
9  another invoice on this date?
10  A.   It should show the portions by date, what is
11  applied to an invoice.
12  Q.   Okay.  And when you said in paragraph 5 of
13  your declaration that "Oracle gathered information
14  relating to cash applications," see that?
15  A.   Yes.
16  Q.   What did you mean by that?
17  A.   When an invoice is applied to a cash receipt.
18  Q.   What if the cash receipt is applied to an
19  invoice, would that be on there?
20  A.   Same thing.
21  Q.   So that information was gathered?
22  A.   If an -- if -- yes.
23  Q.   And you only know this because of what Tamas
24  told you, right?
25      MR. KONOVALOV:  Objection.  Misstates the

299

1  witness' testimony.
2      THE WITNESS:  If the invoice was related to
3  the original cash receipt, it was determined that
4  that activity needed to be pulled into the script.
5  Q.   BY MR. GREENSTEIN:  Okay.  And where it says
6  you gathered information on refunds where applicable,
7  did you mean any refund occurring before or after the
8  debit memo was created?
9  A.   Yes.
10  Q.   Okay.
11  A.   The data should be there.
12  Q.   Okay.  Are you aware that -- are you aware
13  that for many of these -- strike that.
14      Are you aware that for multiple debit memos
15  created in November of 2000, that there were millions
16  of dollars of refunds issued for those debit memos
17  two years after November 2000?
18      MR. KONOVALOV:  Objection.  Assumes facts not
19  in evidence.
20      THE WITNESS:  I'm not aware of that.
21  Q.   BY MR. GREENSTEIN:  Okay.  So when you said
22  that you gathered information on refunds for the
23  script output, if there was a refund two years after
24  the creation of the debit memo, would that be
25  reflected in the script output?

300

1  A.   If the refund debit memo was applied to the
2  original cash receipt, that information is pulled
3  into the script, yes.
4  Q.   Okay.  I'm just talking about a transaction
5  where an invoice is generated for a customer --
6  strike that.
7      If a customer overpaid on an invoice and it
8  resulted in an item of unapplied cash, and that item
9  of unapplied cash, that portion of the receipt
10  resulted in a debit memo, and then later it was
11  determined that that receipt -- portion of the
12  receipt had to be refunded, would that be on the
13  script output?
14      MR. KONOVALOV:  You can answer.
15      THE WITNESS:  If the refund was generated from
16  AR, the refund debit memo, if it's applied to that
17  original cash receipt, then yes, it will be on that
18  script output.
19  Q.   BY MR. GREENSTEIN:  Okay.  Is there a way that
20  a refund can be created that's not applied to a cash
21  receipt?
22      MR. KONOVALOV:  Objection.  Incomplete
23  hypothetical.
24      THE WITNESS:  I don't know.
25  Q.   BY MR. GREENSTEIN:  Okay.  So in the second

Elam, Terry  9/28/2006  9:19:00 AM

301

1  line where you say information was gathered about
2  "account transfers and the like."
3       See that?
4  A.   Yes, I see that.
5  Q.   What information was gathered about account
6  transfers?
7  A.   It would be -- account transfers.
8  Q.   Well, let me ask you this:
9       If a cash receipt related to a debit memo
10  resulted in a transfer of unapplied cash from 25005
11  to 12601, would that be reflected on the script
12  output?
13       MR. KONOVALOV: Objection. Asked and
14  answered.
15       But you can answer again.
16       THE WITNESS: I don't know specifically if
17  that's there. But if the -- if it's tied to the
18  original transaction, then the script output will
19  have it.
20  Q.   BY MR. GREENSTEIN: Okay. Are there other --
21  when you say "account transfers," are there any other
22  accounts that you're referring to besides 12601?
23  A.   There are other accounts, yes.
24  Q.   Okay. What other accounts would be --
25  A.   Um, 12015 and 12017 are two I can name.

302

1       There could be others, but I don't know
2  specifically.
3  Q.   Do you know what those accounts are or what
4  the -- are they -- do they have a title?
5  A.   I know only that they're related to OFD
6  process.
7  Q.   What's "OFD process"?
8  A.   Oracle Financing Division.
9  Q.   Okay. And what does that mean vis-a-vis a
10  debit memo? How is it -- how does a debit memo and a
11  cash receipt related to a debit memo relate to OFD?
12  A.   If OFD attributed a portion of a cash receipt
13  to one of their processes, they would request that
14  the cash be moved to 12015 or 12017. And maybe other
15  accounts, but those are two specific accounts I can
16  state.
17  Q.   And that would be reflected on -- any
18  transfers as a result of OFD would be reflected in
19  the script output, right?
20  A.   Correct.
21  Q.   In the last paragraph -- or the last sentence
22  of paragraph 5 says:
23       "At the same time, Oracle excluded other
24  information, such as the social security numbers of
25  Oracle employees that had no bearing on the

303

1  accounting for the debit memos."
2       See that?
3  A.   Yes.
4  Q.   So what other data -- or what data was
5  excluded -- or, sorry. Strike that.
6       What information was excluded besides social
7  security numbers of Oracle employees?
8  A.   I don't know the full information that was
9  excluded from this.
10  Q.   Because -- right, because this is based on --
11  your representation here is only based on what
12  you know from what Tamas told you, right?
13       MR. KONOVALOV: Objection. Misstates the
14  witness' testimony.
15       THE WITNESS: No, that's -- I was part of the
16  discussions about what information should be pulled
17  related to invoices, cash receipts, cash
18  applications, and refunds. I don't know what was
19  excluded.
20  Q.   BY MR. GREENSTEIN: Okay. Who did you discuss
21  that with?
22  A.   It would have been Greg Myers, and some
23  attorneys were present.
24  Q.   So when you're saying that Oracle excluded
25  certain information such as social security numbers,

304

1  you don't know what other information was excluded?
2  A.   I was not present when that information was
3  discussed.
4  Q.   Okay. So what basis do you have for saying
5  that information was excluded?
6       MR. KONOVALOV: Objection. Asked and
7  answered.
8       THE WITNESS: I was not present when that
9  information was discussed, so . . .
10  Q.   BY MR. GREENSTEIN: Okay. So when you signed
11  this declaration, though, under penalty of perjury,
12  did you -- is that accurate that you had personal
13  knowledge that Oracle excluded information such as
14  social security numbers?
15  A.   I was assuming that because of Oracle
16  employees' social security numbers is not related to
17  accounting of a debit memo or accounting of any of
18  the transactions that are associated with that debit
19  memo. If that was brought up, someone could say,
20  "Yes, we have excluded that information from the
21  script output."
22  Q.   Right. But when you said that Oracle excluded
23  other information, what other information did you
24  mean?
25  A.   I don't know the exact information.

305

1    Q.    Right, because you didn't know what the
2    accounting was for the debit memos, right?
3         MR. KONOVALOV: Objection. Misstates the
4    witness' testimony.
5         THE WITNESS: Yes, I do.
6    Q.    BY MR. GREENSTEIN: You do know what the
7    accounting for the debit memos was?
8    A.    Yes, I know the accounting of the debit memo.
9    Q.    Because Greg Myers told you?
10   A.    And personal knowledge.
11   Q.    Well, you weren't at Oracle in November of
12   2000, were you?
13   A.    I was not, no.
14   Q.    Okay. So how do you have personal knowledge
15   of the accounting for the debit memos in
16   November 2000?
17   A.    I can query an individual transaction in the
18   system and look at the accounting distributions on
19   each transaction.
20   Q.    And when you say "accounting distributions,"
21   can you see the debits and credits associated with
22   each debit memo?
23   A.    You can see a credit to -- a debit to 25005
24   and a credit to 25005 for each -- for a debit memo
25   you wanted to look at.

306

1    Q.    Okay. Are you aware that some debit memos --
2    that prior to the debit memo being issued in
3    November, there were certain accounting entries made
4    to other accounts?
5         Is that reflected in the system where you can
6    see the accounting for that?
7         MR. KONOVALOV: Objection. Vague and
8    ambiguous.
9         THE WITNESS: I don't understand your
10   question.
11   Q.    BY MR. GREENSTEIN: Okay. Well, you said you
12   have personal knowledge of the accounting for debit
13   memos, right?
14   A.    The debit memos that I've looked up, yes.
15   Q.    Okay. That you looked up as part of your
16   research that Greg asked you to do, Greg Myers?
17   A.    I could personally log into the system and
18   query one of these transactions.
19   Q.    Okay. You could query a debit memo
20   transaction, right?
21   A.    Correct.
22   Q.    Now, could you tell if it -- before the debit
23   memo was created, you could tell any adjustments made
24   to -- with respect to that debit memo, right?
25   A.    It has to be created to view it.

307

1    Q.    Well, in other words, if -- every debit
2    memo -- some -- has underlying transactions that
3    occurred prior to the debit memo being issued, right?
4    A.    "Underlying transactions"? Associated with
5    the original cash receipt of that debit memo?
6    Q.    No. I'm saying every debit -- a debit memo
7    wasn't created out of thin air. It had an amount
8    based on a cash receipt, right?
9    A.    It was created on the on-account flag for that
10   cash receipt.
11   Q.    Right. But there was an amount for each debit
12   memo. There was never a debit memo with the amount
13   zero on it, right?
14   A.    The net of the debit memo is zero. The
15   accounting entries.
16        MR. KONOVALOV: He's misunderstanding your
17   question, I think.
18        MR. GREENSTEIN: Yeah.
19   Q.    So, again, I'm going to ask you:
20        When you say that Oracle excluded other
21   information that had no bearing on the accounting for
22   the debit memos, what's your basis for that
23   statement?
24   A.    I'm believing that Oracle -- we did not need
25   to produce my social security number, my home

308

1    address. That information is irrelevant to the
2    related associated debit memo.
3    Q.    Okay. What other information besides your
4    address and social security number?
5    A.    I don't know.
6    Q.    And paragraph 6, it says:
7         "As set forth above, Oracle pulled data from
8    approximately 35 tables in creating the script
9    output."
10        See that?
11   A.    Yes.
12   Q.    Did you pull data from those 35 tables to
13   create the script output?
14   A.    I did not.
15   Q.    So that's based on what Tamas told you, right?
16   A.    Tamas, yes.
17   Q.    Okay. Where you say:
18        "To produce all of the data in each of these
19   tables, Oracle would have had to pull more than
20   19,000 columns of information."
21        See that?
22   A.    Yes, I see that.
23   Q.    How did you know that Oracle would have to
24   pull from more than 19,000 columns to produce all of
25   the data in each of those 35 tables?

309

1    A.   That was a conversation between Tamas and I.
2    Q.   Okay. So you have no independent knowledge
3    that to produce the data in all 35 of those tables,
4    that Oracle would have to pull 19,000 columns?
5         MR. KONOVALOV: Objection. Misstates the
6    witness' testimony.
7         THE WITNESS: I don't know.
8         MR. GREENSTEIN: Okay.
9    Q.   Where it says:
10        "This method will result in Oracle producing
11   hundreds of categories of information completely
12   unrelated to the accounting for the debit memos."
13        Do you see that?
14   A.   Yes, I see that.
15   Q.   What's your basis for saying that there were
16   hundreds of categories of information completely
17   unrelated to the accounting for the debit memos?
18   A.   The Oracle database stores a lot of data, like
19   I said. Social security number, stores my home
20   address, stores if I'm married. That's completely
21   unrelated to the debit memos.
22   Q.   Right. But did you go in and do an assessment
23   of those hundred categories of information to
24   determine that they were unrelated?
25   A.   No.

310

1    Q.   Did anybody do that?
2         MR. KONOVALOV: Objection. Calls for
3    speculation.
4         THE WITNESS: I don't know.
5    Q.   BY MR. GREENSTEIN: So you were assuming that
6    there were hundreds of categories, but you didn't
7    know for a fact, right?
8         MR. KONOVALOV: Objection. Misstates the
9    witness' document -- witness' testimony.
10        THE WITNESS: I assume that some of the data
11   there did not need to be pulled associated with the
12   debit memos.
13   Q.   BY MR. GREENSTEIN: You see the last sentence
14   says:
15        "This also would be prohibitively expensive
16   and would contain too much information to include in
17   an Excel spreadsheet."
18        Do you see that?
19   A.   Yes, I see that.
20   Q.   Did you do an assessment of how expensive it
21   would be to pull certain amounts of data related to
22   the script output?
23   A.   I did not, no.
24   Q.   So did someone tell you it would be
25   prohibitively expensive?

311

1    A.   It might have been in a conversation I had
2    with Tamas explaining to me the data that he needed
3    to pull.
4    Q.   Okay. Did he tell you how much it would cost?
5    A.   Not an exact dollar amount, no.
6    Q.   Okay. So he didn't say it would cost
7    $10 million?
8    A.   Dollar amount, no.
9    Q.   So what's the basis -- so "prohibitively
10   expensive," what do you mean by that?
11        MR. KONOVALOV: Objection. Asked and
12   answered.
13        THE WITNESS: Tamas just said it would be a
14   tremendous effort and a tremendous expense.
15   Q.   BY MR. GREENSTEIN: And where you said it
16   "would contain too much information to contain an
17   Excel spreadsheet," is that something that Tamas said
18   also?
19   A.   No, I -- Excel spreadsheet has a limited
20   number of rows.
21   Q.   Right. And you're saying that if you took all
22   the data from 35 tables, it would be too much
23   information to include in an Excel spreadsheet,
24   right?
25   A.   Yes.

312

1    Q.   Okay. Are you aware that the script outputs
2    produced to plaintiffs weren't -- the data that was
3    pulled is not -- cannot fit into a single
4    spreadsheet?
5         MR. KONOVALOV: Objection. Misstates the
6    document.
7         But you can answer the question.
8         THE WITNESS: A single spreadsheet. What do
9    you mean by "spreadsheet"?
10   Q.   BY MR. GREENSTEIN: Well, what do you mean
11   when you say "would contain too much information to
12   include in an Excel spreadsheet"? You mean one Excel
13   spreadsheet?
14   A.   So it would not fit in one Excel spreadsheet?
15   Q.   Right.
16        Are you aware that the data that was produced
17   to plaintiffs doesn't fit on an Excel spreadsheet?
18        MR. KONOVALOV: Objection. Misstates the
19   documents.
20        THE WITNESS: Yeah, I'm aware.
21   Q.   BY MR. GREENSTEIN: Script outputs don't fit
22   on one spreadsheet, do they?
23   A.   Well, it was provided in -- I can't remember
24   the number of tabs it was provided in.
25   Q.   Right. The tabs are a subpart of the

313

1  spreadsheet, right?
2  A.   Yes.
3  Q.   But the script outputs don't fit onto a single
4  spreadsheet --
5  MR. KONOVALOV:  Object --
6  Q.   BY MR. GREENSTEIN:  -- even with multiple
7  tabs, right?
8  MR. KONOVALOV:  Sorry.
9  Objection.  Misstates the document.
10  THE WITNESS:  I don't -- I don't know.  I
11  don't know.
12  Q.   BY MR. GREENSTEIN:  Okay.  Do you know -- the
13  two script outputs that you described, do you know
14  how many columns were --
15  Let's say the first script output, the
16  November 2005 one that you reviewed, do you know how
17  many columns were in that script output?
18  A.   I don't know the exact number of columns, no.
19  Q.   Or rows?
20  A.   I would be guessing to the total number of
21  rows that were provided.
22  Q.   Okay.  Do you know if you printed it out,
23  would it be -- what would it look like?
24  A.   I'm assuming it would be pretty wide.
25  Q.   Have you ever printed it out?

314

1  A.   I don't believe I have.
2  Q.   So you reviewed it online?
3  A.   In electronic form, yes.
4  Q.   Going back to Exhibit B, which is at the end
5  of this document, it says -- you're aware that you
6  referred to this as a true and correct copy, right?
7  Yeah.  If you flip back to your declaration,
8  you said Exhibit B -- sorry.  It's the fourth
9  paragraph.
10  A.   Okay.
11  Q.   It says:
12  "Exhibit B is a true and correct copy of a
13  spreadsheet that lists 35 tables..."
14  Do you see that?
15  A.   Yes, I see that.
16  Q.   "...the number of times data was pulled from
17  each table..."
18  Right?
19  A.   Yes, I see that.
20  Q.   "...and the total number of columns."
21  See that?
22  A.   Yes, I see that.
23  Q.   So looking at the column heading "Number of
24  Times Pulled," and it has some numbers there, right?
25  In Exhibit B.

315

1  A.   Which column?
2  Q.   "Number of Times Pulled."
3  A.   Yes, I see that.
4  Q.   Okay.  So let's take the first one where it
5  says "AP_CHECKS_ALL," that's the name of a table that
6  data was extracted from, right?
7  A.   I believe so, yes.
8  Q.   So where it says "Number of Times Pulled" is
9  two, what does that mean?  Does that mean that data
10  was pulled from that table twice?
11  A.   I don't know.  That number was provided by
12  Tamas, I think.
13  Q.   Okay.  You didn't create this exhibit, right?
14  A.   This exhibit, no.
15  Q.   Because you never saw it before you signed
16  that declaration, right?
17  MR. KONOVALOV:  Objection.  Misstates the
18  witness' testimony.
19  THE WITNESS:  I don't remember if I've ever
20  seen this document.
21  Q.   BY MR. GREENSTEIN:  Okay.  You see where it
22  says "Number of Columns, 134"?
23  A.   Yes.
24  Q.   Do you know what that means with respect to
25  "AP_CHECKS," that table, "AP_CHECKS"?

316

1  A.   No, I do not know.
2  Q.   Okay.  And back to Exhibit B on that document.
3  Is that information in any way contained in
4  the script output?
5  A.   I don't know if it is or not.
6  Q.   If you turn back to page 2 of your declaration
7  where you're talking about Oracle gathered
8  information relating to certain items, right?  One of
9  those is "account transfers and the like."
10  See that?
11  A.   Yes, I see that.
12  Q.   Did Oracle gather any information relating to
13  expense account transfers -- or transfers made to
14  expense accounts?
15  MR. KONOVALOV:  Objection.  Vague and
16  ambiguous.
17  THE WITNESS:  I don't know.
18  Q.   BY MR. GREENSTEIN:  Okay.  Do you know if
19  Oracle gathered information related to revenue
20  accounts?
21  A.   If the original invoice had that information?
22  Then yes, that accounting would be pulled.
23  Q.   If the original invoice -- no, but this is
24  talking about account transfers, right?
25  A.   Oh.  I don't know specifically about account

317

1 transfers.
2 Q. Okay. So you don't know whether information
3 was gathered about any revenue account transfer or
4 transfer that related to a revenue account, right?
5 A. I don't remember.
6 Q. You don't remember if it related to expense
7 accounts, right?
8 A. I would have to look at a specific example.
9 MR. GREENSTEIN: Okay. Last one. Is this
10 Number 14?
11 MS. REPORTER: Nineteen.
12 MR. GREENSTEIN: Oh, 19.
13 (Plaintiff's Exhibit 19 was marked.)
14 MR. GREENSTEIN: For the record, this is
15 -749429 through -749448.
16 Q. And if you could just look at the -- well,
17 it's a huge E-mail string.
18 I'll direct your attention to the -- actually,
19 the second page of the E-mail. The second page of
20 the document. You see how -- can't tell if this is
21 part of an E-mail. This is the way it was produced.
22 But you see at the top, it says: "Subject:
23 Global Credit Memo Template"?
24 A. Can you give me the page number?
25 Q. Yeah, it's -430.

318

1 A. Yes, I see that.
2 Q. Do you know what Global Credit Template Memo
3 is?
4 A. We created a template that users could fill
5 out to request a credit memo.
6 Q. Okay. And when did you create -- this E-mail
7 says October 7th, 2003.
8 Do you know when the Global credit memo
9 template was created?
10 A. I don't recall the time.
11 Q. Do you remember that it was something that
12 didn't exist when you arrived at Oracle?
13 A. I don't remember if it did or didn't.
14 Q. Okay. And you see it says template -- in the
15 middle it says:
16 "Template: Global_AR_Credit_Memo_Template.
17 Owner: Terry Elam?"
18 See that?
19 A. Yes, I see that.
20 Q. What does it mean when it says "Owner:
21 Terry Elam"?
22 A. I created the template.
23 Q. Okay.
24 And then if you look further down, it says:
25 "New Please Read. If you are submitting a

319

1 Non-Discretionary credit memo request for the
2 United States, the approval process has changed."
3 See that?
4 A. Yes, I see that.
5 Q. Do you know when the approval process changed?
6 A. I don't know the time.
7 Q. Okay. Do you know why it was changed?
8 A. I can't recall.
9 Q. See how it says:
10 "Mike Hernandez will be approving all requests
11 up to 100,000."
12 Do you see that?
13 A. I see that.
14 Q. Do you know what it was before -- before that
15 requirement was made?
16 A. I don't know the exact dollar amount.
17 Q. Okay. Do you know why he, Mike Hernandez,
18 would -- why they were implementing this new rule
19 that Mike Hernandez will be approving all requests up
20 to 100,000?
21 A. I do not.
22 Q. Okay. If you look farther down where it says:
23 "If all approvals are not forwarded with this
24 template, the credit memo will be rejected and the
25 template will be returned to you."

320

1 Do you see that?
2 A. Yes, I see that.
3 Q. This was a new process as part of the global
4 credit memo template, right?
5 A. Yes.
6 Q. Well, was there -- what was the process before
7 this?
8 A. I don't know the exact process.
9 Q. Was there a way that a credit memo would be
10 rejected before the global credit memo template was
11 created?
12 MR. KONOVALOV: Objection. Vague and
13 ambiguous.
14 But you can answer.
15 THE WITNESS: There could be reasons.
16 Q. BY MR. GREENSTEIN: What were the reasons?
17 A. I don't know the exact reasons.
18 Q. Well, what's one reason why a credit memo
19 would be rejected before this template was created?
20 A. Maybe the requester did not submit the dollar
21 amount to be credit memoed.
22 Q. Have you seen this document before?
23 A. No, I have not.
24 MR. GREENSTEIN: Okay. I think I'm done for
25 the day.

321

1    I just want to say for the record that we
2 believe there's still some preservation issues with
3 respect to documents that should have been produced
4 or should have been preserved, and we believe that
5 Oracle did not -- either destroyed, did not preserve,
6 or did not produce certain documents related to the
7 accounting allegations that were specifically ordered
8 to be produced in this case.
9    We think we've established that there are some
10 documents that should be produced.  And subject to a
11 motion that we still have pending on spoliation and
12 destruction of evidence, we're just reserving our
13 right to question Mr. Elam again to the extent we get
14 new documents at some point in time.
15    MR. KONOVALOV:  Well, I actually have some
16 questions for Mr. Elam.
17    But we disagree with the position that you
18 just stated on the record.  We think that all the
19 responsive documents have been produced, but we can
20 take that up at another time.
21    Do you want to switch chairs for the purposes
22 of either the videographer --
23    MR. GREENSTEIN:  Up to you.
24    MR. KONOVALOV:  Why don't we go off the record
25 for just a minute.

322

1    VIDEOTAPE OPERATOR:  Going off the record.
2 The time is 5:45.
3    (Discussion.)
4    VIDEOTAPE OPERATOR:  Back on the record.
5 The time is still 5:45.
6    EXAMINATION BY MR. KONOVALOV
7 Q.    Good afternoon, Mr. Elam.  I wanted to just
8 touch upon a couple of things and see if I can get
9 some clarification on a couple of things you
10 testified about here today.
11    The first thing I wanted to do is if you could
12 pull out again Elam Exhibit 18, which contained your
13 declaration about which you gave some testimony
14 today.
15    So if you can get that handy, it would be
16 great.
17 A.    The declaration?
18 Q.    Your declaration, yes.
19 A.    Okay.
20 Q.    This is the document about which you gave
21 testimony earlier today, correct?
22 A.    Correct.
23 Q.    Um, in looking at this document, um, do you
24 believe that the statements contained within it are
25 true and accurate?

323

1    MR. GREENSTEIN:  Objection.  Form.
2    THE WITNESS:  Yes, I do.
3 Q.    BY MR. KONOVALOV:  As part of the preparation
4 of this document, did you review drafts of this
5 declaration?
6 A.    Yes, I did.
7 Q.    Did you discuss it with counsel?
8    And I don't want you to divulge the substance
9 of the communications, I just want a yes or no
10 whether you discussed it with counsel.
11 A.    Yes, I did.
12 Q.    Okay.  If you had believed there was anything
13 inaccurate about the declaration, would you have
14 addressed it with counsel?
15    MR. GREENSTEIN:  Objection.  Form.
16    THE WITNESS:  Yes.
17 Q.    BY MR. KONOVALOV:  As you sit here today and
18 you review the declaration, do you believe that there
19 is anything in here that is inaccurate?
20 A.    No, I do not.
21 Q.    Okay.
22    Directing your attention to paragraph 1,
23 which -- about which you answered some questions, and
24 particularly the purpose for which this declaration
25 was going to be submitted, did you understand that

324

1 that first paragraph, in fact, was setting forth
2 introductory comments about which you weren't
3 required to dig in and understand the details?
4    MR. GREENSTEIN:  Objection.  Form.
5    THE WITNESS:  Yes.
6    MR. KONOVALOV:  Okay.
7 Q.    Towards the end of that first paragraph,
8 beginning at the end of line 6, it says:
9    "This declaration is based upon my personal
10 knowledge and if called to testify, I could and would
11 testify truthfully to the facts set forth below."
12    Do you see that?
13 A.    Yes, I do.
14 Q.    Is that a true statement?
15 A.    Yes, it is.
16 Q.    Okay.  You also testified in the context of
17 paragraphs 3 and 4 about the -- and I'm quoting
18 here -- "logical parameters around the types of data
19 that was gathered and produced."
20    Do you see that?
21 A.    Yes, I do.
22 Q.    Do you recall that testimony?
23 A.    Yes.
24 Q.    Can you tell me who at Oracle was involved in
25 the discussions about what the parameters should be

325

1  in terms of gathering data?
2      MR. GREENSTEIN: Objection. Form.
3      THE WITNESS: Greg Myers. I was present. And
4  I know -- I don't know specifically from, um,
5  counsel, who was present.
6  Q.   BY MR. KONOVALOV: Anyone else -- excluding
7  counsel or consultants working for counsel. Just
8  focusing on Oracle employees. Anyone else
9  besides you and Greg Myers?
10  A.   Danielle Vancorum might have been, but I
11  don't -- I can't remember exactly if she was.
12  Q.   Was the aforementioned Tamas Buzasi involved
13  in that process as well?
14  A.   He might have been.
15  Q.   Okay.
16  A.   I don't recall.
17  Q.   Anyone else as you sit here today that you can
18  recall?
19  A.   No.
20  Q.   I'd like to just direct your attention to
21  Exhibit B again, which is attached to this.
22      And I just -- I think the testimony was
23  unclear, so I just want to make sure I understand.
24      As you sit here today, are you saying that you
25  have never seen Exhibit B before or that you don't

326

1  recall whether you've seen Exhibit B before?
2  A.   I don't remember if I've seen this document.
3  Q.   Presumably, insofar as you have said in this
4  declaration that you were attesting that Exhibit B
5  was a true and accurate copy, that you did see it
6  before you signed this declaration?
7      MR. GREENSTEIN: Objection. Form.
8  Q.   BY MR. KONOVALOV: Is that a safe assumption?
9  A.   Yes.
10  Q.   Okay.
11      Earlier in the day, I think actually a couple
12  of times, you were asked in various contexts whether
13  or not you were ever asked to retain documents in
14  this case.
15      Do you recall that?
16      MR. GREENSTEIN: Objection. Form.
17      THE WITNESS: Yes.
18  Q.   BY MR. KONOVALOV: And I believe you said that
19  you were not affirmatively told by anyone at Oracle
20  to retain documents, correct?
21  A.   That is correct.
22  Q.   Notwithstanding the lack of an express
23  directive, did you, in fact, retain documents related
24  to the issues that we talked about here today?
25      MR. GREENSTEIN: Objection. Form.

327

1      THE WITNESS: Yes. I had a --
2  Q.   BY MR. KONOVALOV: And what types of --
3      (To the reporter) Could you read his answer
4  back?
5      (The following was read by the reporter:
6      QUESTION: Notwithstanding the lack of an
7      express directive, did you, in fact, retain
8      documents related to the issues that we talked
9      about here today?
10      THE REPORTER: There was an objection.
11      (The following was read by the reporter:
12      ANSWER: Yes. I had a --)
13  Q.   BY MR. KONOVALOV: Was that a "yes," you did
14  retain documents?
15  A.   Yes, I retained documents.
16  Q.   Was that because it was a personal practice of
17  yours, or what motivated you to retain documents?
18      MR. GREENSTEIN: Objection. Form.
19      THE WITNESS: It was my personal practice.
20  Q.   BY MR. KONOVALOV: Okay. What types of
21  documents did you retain?
22  A.   E-mails, um, spreadsheets, um, documents,
23  output I could contain in electronic format.
24  Q.   When you referenced "spreadsheets," were those
25  electronically available spreadsheets or hard copy

328

1  spreadsheets?
2  A.   Electronic.
3  Q.   Did you have any hard copy documents?
4  A.   Very minimal.
5  Q.   Okay. To the extent that you had -- well, let
6  me withdraw that.
7      At any time have you -- try it one more time.
8  It's getting late.
9      At any time have you destroyed any of the
10  documents that relate to any of the allegations in
11  this case that you retained?
12      MR. GREENSTEIN: Objection. Form.
13      THE WITNESS: I have not.
14      MR. KONOVALOV: Okay.
15  Q.   Have you made all the documents that relate to
16  the issues in this case available to either your
17  supervisors or internal counsel or outside counsel
18  for Oracle that relate to the allegations in this
19  case?
20      MR. GREENSTEIN: Objection. Form.
21      THE WITNESS: Yes.
22      MR. KONOVALOV: Okay.
23  Q.   Switching gears a little bit.
24      You testified earlier today about a project
25  that Greg asked you to engage in, and I think you

329

1  said October or November of 2002, related to moving
2  certain items from 12601 out of that account into, I
3  think you said, Account 25005, correct?
4      MR. GREENSTEIN: Objection. Misstates
5  testimony. Form.
6  Q.   BY MR. KONOVALOV: Do you recall that
7  testimony?
8  A.   Um, I don't remember the specific accounts.
9  Q.   Okay.
10  A.   But --
11  Q.   But you recall testifying today about a
12  project that Greg asked you to engage in, in sort of
13  doing the mechanics of moving items out of
14  Account 12601, correct?
15      MR. GREENSTEIN: Wait. I want to object to
16  that. It mischaracterized previous testimony. Vague
17  and ambiguous. Lacks foundation.
18  Q.   BY MR. KONOVALOV: I think you also
19  testified -- and I'm not attempting to characterize
20  your testimony here, but just as an introduction to
21  my question.
22      I think you said that you didn't actually
23  perform research with respect to that project, but
24  that you were given a list and told to do something
25  by Greg, and that you went ahead and did that,

330

1  correct?
2      MR. GREENSTEIN: Objection. Mischaracterizes
3  testimony. Form.
4      THE WITNESS: Correct.
5  Q.   BY MR. KONOVALOV: Okay. As you sit here
6  today, do you have an under- -- do you believe that
7  any of the steps you took in that time period,
8  October-November of 2002, changed the original
9  accounting of the on-account debit memos that were
10  created in November of 2000?
11      MR. GREENSTEIN: Objection. Vague and
12  ambiguous. Lacks foundation.
13      THE WITNESS: No, I do not.
14  Q.   BY MR. KONOVALOV: Just a short time ago you
15  testified about the fact that the accounting related
16  to the on-account debit memos involved debits and
17  credits to an account. Correct?
18      MR. GREENSTEIN: Objection. Form.
19      THE WITNESS: Correct.
20  Q.   BY MR. KONOVALOV: Do you know what account
21  that was?
22  A.   25005.
23  Q.   Okay. And that's the unapplied cash account,
24  or what we've colloquially called the unapplied cash
25  account?

331

1  A.   Yes.
2  Q.   Is that an acceptable way for me to refer it
3  to you?
4  A.   Yes.
5  Q.   When a credit memo -- when the credit memo --
6  let me back up.
7      You answered some questions today about credit
8  memos that related to -- withdraw.
9      You testified today about certain credit memos
10  that were, for lack of a better word, linked to or
11  related to debit memos that were -- that followed
12  from or subsequent -- were subsequent to work that
13  was performed in October and November of 2002.
14      MR. GREENSTEIN: Objection. Mischaracterizes
15  the testimony. Vague.
16  Q.   BY MR. KONOVALOV: Do you understand what I'm
17  referencing?
18  A.   Not specifically, no.
19  Q.   Okay. Do you recall testifying today about
20  how certain debit memos were credit memoed?
21      MR. GREENSTEIN: Objection. Form. Vague and
22  ambiguous. Lacks foundation. Mischaracterizes
23  testimony.
24      THE WITNESS: Yes.
25      MR. KONOVALOV: Okay.

332

1  Q.   When a credit memo is created -- when a credit
2  memo was created with respect to those debit memos,
3  weren't there also debits and credits to Account
4  25005?
5      MR. GREENSTEIN: Objection. Same objections.
6      THE WITNESS: Correct.
7  Q.   BY MR. KONOVALOV: So the effect of having a
8  credit memo for that debit memo is that there's no
9  actual accounting impact, correct?
10      MR. GREENSTEIN: Objection. Form.
11      THE WITNESS: That is correct.
12      MR. KONOVALOV: Okay. I think that's all I
13  have, subject to any recross. I would just ask this
14  deposition be marked confidential.
15      MR. GREENSTEIN: Yeah. I have nothing
16  further, and we will agree to the designation.
17      MR. KONOVALOV: Okay.
18      Thanks, Mr. Elam.
19      VIDEOTAPE OPERATOR: This is the end of
20  videotape number four, Volume 1, in the deposition of
21  Terry Elam. The original videotapes will be retained
22  by LiveNote World Service.
23      Going off the record.
24      The time on the monitor is 5:56.
25

Elam, Terry  9/28/2006  9:19:00 AM

333

1      (The deposition adjourned at 5:56 p.m.)
2                      --o0o--
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

335

1          DEPONENT'S CHANGES OR CORRECTIONS
2
3      Note:  If you are adding to your testimony, print the
       exact words you want to add.  If you are deleting
4      from your testimony, print the exact words you want
       to delete.  Specify with "Add" or "Delete" and sign
5      this form.
6      DEPOSITION OF:      TERRY ELAM
       CASE:              ORACLE CORPORATION
7      DATE OF DEPOSITION: Thursday, September 28, 2006
8      I,                    , have the
       following corrections to make to my deposition:
9
       PAGE    LINE      CHANGE/ADD/DELETE
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
       SIGNATURE              DATE
25

334

1          Please be advised that I have read the
2      foregoing deposition.  I hereby state that there are:
3      (check one)         NO CORRECTIONS
4                          CORRECTIONS PER ATTACHED
5
6          TERRY ELAM
7
8          Date Signed
9
10     Case Title:      ORACLE CORPORATION
11     Date of Deposition: Thursday, September 28, 2006
12
13
14
15               --o0o--
16
17
18
19
20
21
22
23
24
25

336

1          REPORTER'S CERTIFICATE
2          I certify that the foregoing proceedings in the
3      within-entitled cause were reported at the time and
4      place therein named; that said proceedings were
5      reported by me, a duly Certified Shorthand Reporter
6      of the State of California, and were thereafter
7      transcribed into typewriting
8          I further certify that I am not of counsel
9      or attorney for either or any of the parties to said
10     cause of action, nor in any way interested in the
11     outcome of the cause named in said cause of action.
12         IN WITNESS WHEREOF, I have hereunto set my
13     hand this    day of        , 2006.
14
15
16         COLLEEN M. REDAMONTI, CSR
           Certified Shorthand Reporter
           Certificate No. 7012
17
18
19
20
21
22
23
24
25

1           REPORTER'S CERTIFICATE

2           I certify that the foregoing proceedings in the

3    within-entitled cause were reported at the time and

4    place therein named; that said proceedings were

5    reported by me, a duly Certified Shorthand Reporter

6    of the State of California, and were thereafter

7    transcribed into typewriting

8           I further certify that I am not of counsel

9    or attorney for either or any of the parties to said

10   cause of action, nor in any way interested in the

11   outcome of the cause named in said cause of action.

12          IN WITNESS WHEREOF, I have hereunto set my

13   hand this 9th day of October , 2006.

14

15

16   for COLLEEN M. REDAMONTI, CSR
         Certified Shorthand Reporter
         Certificate No. 7012

17

18

19

20

21

22

23

24

25