# EXHIBIT P

Matuszak, Gary  8/1/2006  9:14:00 AM

1

```
1          IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                    ---oOo---
4
5
6    In Re ORACLE CORPORATION
     SECURITIES LITIGATION
7                FILE NO. C-01-0988-MJJ
8    This Document Relates To:
9    _____/
10
11                 CONFIDENTIAL
12    VIDEOTAPED DEPOSITION OF GARY MATUSZAK
13          Tuesday, August 1, 2006
14
15        SHEILA CHASE & ASSOCIATES
16            REPORTING FOR:
17          LiveNote World Service
18         221 Main Street, Suite 1250
19        San Francisco, California 94105
20          Phone: (415) 321-2311
21           Fax:  (415) 321-2301
22
23
24    Reported by:
25    ANDREA M. IGNACIO HOWARD, RPR, CSR NO. 9830
```

3

```
1     BE IT REMEMBERED that on Tuesday, August 1, 2006,
2    commencing at the hour of 9:14 a.m., at the offices of
3    Lerach, Coughlin, Stoia, Gellar, Rudman & Robbins,
4    LLP, 100 Pine Street, Suite 2600, San Francisco,
5    California, before me, ANDREA M. IGNACIO HOWARD, CSR,
6    RPR, a Certified Shorthand Reporter for the State of
7    California, personally appeared
8                GARY MATUSZAK,
9    called as a witness by the Plaintiffs herein, who,
10   being by me first duly sworn, was thereupon examined
11   and testified as hereinafter set forth.
12                  ---oOo---
13   Appearing as counsel on behalf of Plaintiffs:
14       LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN &
         ROBBINS LLP
15       BY:  ELI GREENSTEIN, Esq.
             KEITH MAUTNER, CPA, CMA
16           RIVA ELTANAL
         100 Pine Street, Suite 2600
17       San Francisco, California  94111
         (415) 288-4545
18       elig@lerachlaw.com
19
     Appearing as counsel on behalf of Defendants:
20
         LATHAM & WATKINS, LLP
21       BY:  PAUL V. KONOVALOV, Esq.
         650 Town Center Drive, 20th Floor
22       Costa Mesa, California 92626
         (714) 540-1235
23       paul.konovalov@lw.com
24
25
```

2

```
1                 I N D E X
2        DEPOSITION OF GARY MATUSZAK
3                   PAGE
4    EXAMINATION BY MR. GREENSTEIN           6
5    EXAMINATION BY MR. KONOVALOV          365
6                  ---oOo---
7
8                E X H I B I T S
9
10   DESCRIPTION                  PAGE
11   Exhibit  1  Bates NDCA-ORCL 081711 - 814    94
12   Exhibit  2  Bates NDCA-ORCL 050370 - 382   208
13   Exhibit  3  Bates AA 000041 - 1086       289
14   Exhibit  4  Bates NDCA-ORCL 313777 - 784   301
15   Exhibit  5  Bates NDCA-ORCL 055957 - 962   320
16   Exhibit  6  Bates NDCA-ORCL 020844 - 848   320
17   Exhibit  7  Bates NDCA-ORCL 020839 - 843   320
18   Exhibit  8  Bates NDCA-ORCL 025018       320
19   Exhibit  9  Bates NDCA-ORCL 033954 - 978   352
20   Exhibit 10  Bates NDCA-ORCL 068221 - 244   360
21   Exhibit 11  Bates NDCA-ORCL 133613 - 654   360
22
23        REFERENCED EXHIBITS PREVIOUSLY MARKED
24   Chen Exhibit Nos. 2, 3, 4, 12
25
```

4

```
1    (Appearances continued.)
2
     Appearing as counsel on behalf of Gary Matuszak:
3
         CHADBOURNE & PARKE, LLP
4        BY:  ROBERT SIDORSKY, Esq.
         30 Rockefeller Plaza
5        New York, New York 10112
         (212) 408-5100
6        rsidorsky@chadbourne.com
7
     Also present:  Gary Brewer, Videographer.
8
9
                    ---oOo---
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

1  THE VIDEOGRAPHER: Here begins the videotaped
2  deposition of Gary Matuszak, tape one, Volume I, in
3  the matter of In Re Oracle Securities Litigation, in
4  the United States District Court, Northern District of
5  California, Case No. C-01-0988 MJJ.
6  Today's date is August 1st, 2006, and the
7  time is 9:15 a.m.
8  The video operator today is Gary Brewer
9  representing LiveNote World Service, located at
10  221 Main Street, Suite 1250, San Francisco, California
11  94105. Phone number (415) 321-3200.
12  The court reporter is Andrea Howard,
13  reporting on behalf of LiveNote World Service.
14  Today's deposition is being taken on behalf of the
15  plaintiff and is taking place on 100 Pine Street,
16  San Francisco, California.
17  Counsel, would you please introduce
18  yourselves and state whom you represent.
19  MR. GREENSTEIN: Good morning.
20  Eli Greenstein with Lerach, Coughlin, Stoia, Geller,
21  Rudman & Robbins, representing plaintiffs, and with me
22  are Keith Mautner, one of our friend accountants, and
23  Riva Eltanal, who is a law clerk at our firm.
24  MR. SIDORSKY: Robert Sidorsky of
25  Chadbourne & Parke, LLP on behalf of the nonparty,

6

1  Mr. Matuszak.
2  MR. KONOVALOV: Good morning.
3  Paul Konovalov, Latham & Watkins for the defendants.
4  THE VIDEOGRAPHER: Would the court reporter
5  please swear in the witness.
6  GARY MATUSZAK,
7  having been sworn as a witness,
8  by the Certified Shorthand Reporter,
9  testified as follows:
10  THE VIDEOGRAPHER: You may begin.
11
12  EXAMINATION BY MR. GREENSTEIN.
13  MR. GREENSTEIN: Q.  Good morning,
14  Mr. Matuszak.
15  A  Good morning.
16  Q  Could you please state your full name and
17  address for the record.
18  A  Full name is Gary Howard Matuszak.  Address
19  is 4347 Lombard Avenue in Fremont, California.
20  Q  Okay.  Thanks for being here today.  We
21  appreciate your time.
22  Have you ever had your deposition taken
23  before?
24  A  Yes.
25  Q  Approximately how many times?

7

1  A  Twice, to my recollection.
2  Q  Okay.  What kinds of cases were those?
3  A  Securities litigation.
4  Q  Okay.  Were those both securities fraud
5  litigation?
6  A  I don't recall.
7  Q  Okay.
8  A  Class action lawsuits.
9  Q  Okay.  And were those against companies
10  that -- that Arthur Andersen represented or were they
11  against Arthur representatives?
12  MR. SIDORSKY: Objection to form.
13  THE WITNESS: They were cases where the
14  company was charged, and I believe in both situations
15  Andersen was a named defendant as well.
16  MR. GREENSTEIN: Okay.
17  Q  Do you remember the company defendants in
18  those cases?
19  A  I do.
20  Q  Start with the first one.
21  A  The first one was Oracle.
22  Q  Okay.  And when was that litigation?
23  A  Approximately early '90s.
24  Q  And it was a shareholder class action against
25  Oracle; correct?

8

1  A  That's correct.
2  Q  And Arthur Andersen was a named defendant in
3  that case?
4  A  That's correct.
5  Q  Okay.  Do you know if that was a case
6  involving a financial restatement?
7  A  There was a financial restatement on or
8  around the early '90s, so probably was as a result of
9  that.  I don't recall the specifics of the lawsuit.
10  Q  Okay.  Do you know what the resolution of the
11  lawsuit was?  Did it go to trial?
12  A  No.
13  Q  Okay.  Do you know if it settled out of
14  court?
15  A  Yes.
16  Q  Okay.
17  A  It settled out of court.
18  Q  So the case against Andersen wasn't
19  dismissed.  It settled out of court; right?
20  A  I believe that Oracle and Andersen both
21  settled out of court.
22  Q  Okay.  Now, the second litigation that you
23  were deposed in, what company was that involving?
24  A  Digital Microwave.
25  Q  Approximately when was that litigation?

9

1    A   Again, I would say in the mid '90s, early to
2  mid '90s.
3    Q   And Andersen, Arthur Andersen -- from now on
4  I'm going to just refer to it as Andersen, sometimes
5  Arthur Andersen.
6        Was Arthur Andersen a defendant in that case
7  as well?
8    A   Yes.
9    Q   And what was the resolution of that
10  litigation, if you know?
11    A   Again, it was settled out of court for both
12  Digital Microwave and Andersen.
13    Q   Okay.  And the Oracle litigation, were there
14  any other defendants besides Oracle and
15  Arthur Andersen?  Do you recall?
16    A   Don't recall.
17    Q   Okay.  How about Digital Microwave
18  litigation?
19    A   Don't recall.
20    Q   And you were deposed in both of those cases?
21    A   That's correct.
22    Q   Okay.  Were they just one-day depositions?
23    A   One or two days.  I don't -- it's -- I don't
24  recall how long I was there --
25    Q   Okay.

10

1    A   -- to be honest.
2    Q   So you probably are aware of the procedure
3  that occurs during a deposition, but I'm just going to
4  go over some ground rules, just so we get it on the
5  record, just so we understand each other.
6        The court reporter on your right is going to
7  be taking down everything you say here today -- all my
8  questions, and all your answers, and the objections
9  that the attorneys may make.
10        I would ask that you speak verbally.  No head
11  nods, no hand gestures, no "uh-huh," "huh-uhs."  It
12  makes it hard for the court reporter to -- to get
13  everything down.
14        So I'd just ask that you answer audibly, as
15  clearly as you can.
16        I'd also ask that we don't talk over each
17  over.  So let me finish a question before you answer.
18  I'll try to do the same, let you finish your answer
19  before I follow up with a question.  It gets muddled
20  when we talk over each other.
21        Again, for the sake of the court reporter,
22  I'd ask that you don't do that.
23        Do you understand that?
24    A   Yes.
25    Q   Okay.  And you understand that the oath that

11

1  you're taking here today is the same oath that you
2  would be taking if you were sitting in a court of law
3  testifying?
4    A   I do.
5    Q   During the course of the deposition,
6  Mr. Sidorsky, your attorney, will be likely to make
7  objections.  He could object to every question that I
8  ask here.  He could object to one or two.  Those
9  objections are for lawyers to hash out later.
10        I would ask that you answer any question that
11  I ask, unless Mr. Sidorsky instructs you specifically
12  not to answer.
13        Mr. Konovalov represents Oracle.  He's also
14  here.  He might make some objections.  Without getting
15  into the standing that he may or may not have for
16  making objections.  He might do it.
17        Again, though, if I ask a question, I'm going
18  to expect that you answer the question, unless
19  Mr. Sidorsky instructs you not to answer; do you
20  understand that?
21    A   Yes.
22    Q   Okay.  If you don't understand any questions
23  that I ask here today, just tell me, and I'll try to
24  rephrase it.  But if you answer the question, I'm
25  going to assume that you understand what I was asking;

12

1  is that fair?
2    A   Okay.
3    Q   Now, if you don't remember something in
4  response to one of my questions and then later you
5  take a break, something jogs your memory, you're
6  always entitled to come back and clarify an answer
7  that you already made, or say, "You know, I remember
8  something that I didn't remember before.  Something
9  jogged my memory."  You're allowed to do that.
10        Do you understand that?
11    A   Yes.
12    Q   At the end of the deposition, you're going to
13  have a chance to review the transcript, and you can
14  make any slight changes, misspellings, you know, any
15  changes to your testimony.  Not substantive changes
16  but just minor changes, and you can make those
17  corrections and send it back.
18        So don't feel like you have to be absolutely
19  perfect with every spelling or, you know, every word
20  here today; do you understand that?
21    A   Yes.
22        MR. SIDORSKY:  I don't totally agree with
23  your characterization, but okay.  We could deal with
24  that later if there was ever an issue.
25        MR. GREENSTEIN:  Okay.

Matuszak, Gary  8/1/2006  9:14:00 AM

13

```
 1      Q   And this is my favorite question: Are you
 2   under the influence of any alcohol, or drugs, or
 3   medication that would inhibit your ability to
 4   competently testify here today?
 5      A   No.
 6      Q   Okay.  So when did you first learn you were
 7   being deposed in this case?
 8      A   I don't recall the specific date.  It was
 9   some time in early -- early to mid June.  Someone
10   showed up at my home to try to serve a deposition.
11      Q   A subpoena?
12      A   A subpoena.  Excuse me.
13      Q   Okay.
14      A   Yeah.
15      Q   And what did you do after you received the
16   subpoena?  And again, when I ask these questions about
17   the subpoena or any questions for that matter, I don't
18   want to know anything you ever told to your lawyer,
19   any conversation you had with your lawyer.
20          So I might ask you, you know, if you took
21   action, or, you know, when did you -- when did you
22   talk to your lawyer, but I don't want to know any
23   specific communications between you and your lawyer;
24   do you understand that?
25      A   Yes.
```

14

```
 1      Q   So when you received the subpoena, you said
 2   it was around June of this year?
 3      A   Yes.
 4      Q   And what did you do after you received the
 5   subpoena?
 6      A   I actually -- I received a phone call from an
 7   attorney at Andersen first, because I was out of town.
 8   She informed me that --
 9          MR. SIDORSKY:  Again, I don't believe you
10   have to discuss the substance of --
11          THE WITNESS:  Okay.
12          MR. SIDORSKY:  -- what was -- what was told
13   to you by Andersen's lawyer.
14          THE WITNESS:  Okay.
15          MR. GREENSTEIN:  Q.  So you were contacted by
16   an attorney before you got the subpoena?
17      A   Yes, just to notify me that I might be served
18   a subpoena.
19      Q   Okay.  Was that -- was that attorney
20   Mr. Sidorsky?
21      A   No.
22      Q   Do you know -- who was it?
23      A   I don't recall her name.
24      Q   Okay.  And she told you -- well, strike that.
25          And then approximately how long after that
```

15

```
 1   conversation did you receive the subpoena?
 2      A   Two to three days.
 3      Q   Okay.  And once you received the subpoena,
 4   did you call your lawyers?
 5      A   I called the attorney at Andersen and faxed
 6   her a copy of the deposition, and I also left a phone
 7   message for Mr. Cooperman at Oracle notifying him that
 8   I received a subpoena as well, just so he was aware.
 9      Q   Okay.  Why did you -- why did you call
10   Mr. Cooperman?
11      A   Just out of courtesy.
12      Q   Just because it was -- it was involving
13   Oracle?
14      A   Yeah.
15      Q   Okay.  Do you know Mr. Cooperman?
16      A   Well, he was general counsel at the company
17   while I was the audit partner there.
18      Q   Okay.  Well, were you friends with him?
19      A   I knew him professionally.  We were not
20   friends.
21      Q   Okay.
22      A   I haven't spoken to him in quite some time.
23      Q   So did you have his phone number?  Once you
24   got the subpoena, did you have his phone number in
25   your rolodex, or how did you get in touch with him?
```

16

```
 1      A   I believe I had his phone number.  Yeah, I
 2   called the company --
 3      Q   Okay.
 4      A   -- and just left him a message.
 5      Q   And what did you say to him?
 6      A   Just notifying him that I had received a
 7   subpoena in the Oracle class action litigation and
 8   wasn't sure what it related to but wanted him to be
 9   aware that I had received one.
10      Q   Okay.  Did he call you back?
11      A   He left a message for one of his other
12   attorneys who did return the phone call, and I never
13   returned his call.
14      Q   And do you -- do you recall the name of that
15   other attorney?
16      A   No.
17      Q   Okay.  So did you ever talk to Mr. Cooperman
18   from the time you received the subpoena until today?
19      A   No.
20      Q   Okay.  Did you ever talk to any Oracle
21   lawyers after --
22      A   No.
23      Q   -- the time you received the subpoena --
24      A   No.
25      Q   -- until today?
```

17

1      A  No.
2      Q  Okay.  So other than lawyers for Oracle, and
3  other than Mr. Sidorsky, or any lawyers for
4  Mr. Sidorsky's firm, did you speak to anybody about
5  the subpoena from the time you received it until
6  today?
7          MR. SIDORSKY:  Object to the form.
8          I think that's a little confusing and
9  compound, but you can go ahead and answer.
10         MR. GREENSTEIN:  Your objection is noted, and
11  I'm going to ask -- I'm going to ask that when you
12  make an objection, as you know, the rules only entitle
13  you to make your objection saying.
14         Saying it's confusing or trying to coach the
15  witness is not proper under the Federal Rules of Civil
16  Procedure, so I'd just ask that you make your
17  objection.
18         MR. SIDORSKY:  Well, that's not coaching.
19  You're entitled, I think, to briefly state the nature
20  of your objection, but I -- I hear your concerns, so I
21  will --
22         MR. GREENSTEIN:  Okay.  Thank you.
23         MR. SIDORSKY:  -- be careful.
24         THE WITNESS:  The only attorneys I spoke with
25  were the Andersen attorney and Mr. Sidorsky.

18

1          MR. GREENSTEIN:  Okay.
2      Q  And when was the first time you spoke with
3  any Andersen attorney?
4      A  As I mentioned before, I received a voice
5  message prior to receiving the subpoena and then spoke
6  with her briefly within a day or two of that.
7      Q  Okay.  And did you ever -- what was the next
8  conversation you had with an Andersen attorney?  When
9  was it?
10     A  I don't recall.
11     Q  Okay.  Did you --
12     A  After I received the subpoena?
13     Q  Right.
14         Did you ever have any meetings with your
15  attorney regarding the subpoena?
16     A  Which attorneys?
17     Q  Any.
18     A  Mr. Sidorsky.
19     Q  Okay.  And when was the first meeting?
20     A  We met face-to-face yesterday.
21     Q  Okay.  For approximately how long?
22     A  The afternoon, five hours.
23     Q  Okay.  Did you review any documents yesterday
24  with Mr. Sidorsky?
25     A  Yes.

19

1      Q  Okay.  And approximately how -- what was the
2  volume of the documents you reviewed?
3      A  About three inches.
4      Q  Okay.
5      A  Two to three.
6      Q  And did -- did any of those documents that
7  you reviewed refresh your recollection about things
8  that occurred at Oracle during the, let's say, 2000,
9  2001 time frame?
10     A  General recollection.  Not specific
11  recollection.
12     Q  Okay.  And -- so it refreshed your
13  recollection generally.  How did it do that?  How did
14  reviewing the documents help you refresh your
15  recollection generally?
16         MR. SIDORSKY:  Objection to form.
17         THE WITNESS:  It's been five or six years, so
18  just looking at those documents refreshed me on some
19  of the accounts, some of the, you know, ways that
20  Oracle accounted for stuff, so....
21         MR. GREENSTEIN:  Okay.
22     Q  When you say "some of the accounts," what --
23  did it refresh your recollection about any specific
24  accounts at Oracle during that time?
25     A  No, just in going through the -- the work

20

1  papers.  We looked at some of the, you know, accounts
2  that -- receivable accounts, deferred revenue
3  accounts.  So just reading through some of the work
4  papers at Andersen refreshed my memory of what the
5  accounts were.
6      Q  Okay.  Did -- did reviewing any of those
7  documents refresh your recollection about certain ways
8  that Oracle accounted for certain transactions?
9          MR. KONOVALOV:  Objection; vague and
10  ambiguous.
11         MR. SIDORSKY:  Same objection.
12         THE WITNESS:  Yes.
13         MR. GREENSTEIN:  Q.  And how so?
14         MR. SIDORSKY:  Same objection; overly vague
15  and ambiguous.
16         THE WITNESS:  Just the way they accounted for
17  transactions.
18         MR. GREENSTEIN:  Okay.
19     Q  Well, did you look at -- did you look at the
20  work papers and you thought to yourself, "I remember
21  the way they accounted for transactions," or did you
22  look at the work papers and refresh your recollection
23  about, you know, maybe a specific type of accounting,
24  let's say, during 2000, 2001 time period?
25         MR. SIDORSKY:  Same objection; lacks

21

1  foundation.
2      THE WITNESS: It was a recollection of how
3  they accounted for various types of transactions.
4      MR. GREENSTEIN: Okay.
5      Q  Now, can you narrow that down to a category
6  or a type of accounting?
7      A  Well, most of the work papers that I looked
8  at were in the receivable section, and in the deferred
9  revenue section, customer advances and deferred
10  revenue. So, by definition, my recollection would
11  have been refreshed in those two areas.
12      Q  Okay. Now, when you -- you just said, I
13  think, "customer advances and deferred revenue." Did
14  you mean customer advances and unearned revenue?
15      A  Sure.
16      MR. SIDORSKY: Objection to form.
17      MR. GREENSTEIN: Okay.
18      Q  So you looked at some work papers yesterday.
19  Did you look at any other documents, any e-mails that
20  helped refresh your recollection about accounting at
21  Oracle?
22      A  No.
23      Q  Okay. Was it just work papers?
24      A  Just work papers, what, that I reviewed?
25      Q  Yes.

22

1      A  I reviewed the -- certain work papers. I was
2  also provided a copy of the actual complaint that I
3  briefly reviewed and a copy of Mr. Sevier's
4  deposition, which I briefly reviewed.
5      Q  Okay. And who is Mr. Sevier?
6      A  Jason Sevier. He was the manager at Andersen
7  on the Oracle engagement and was deposed on or about
8  June 28th on this matter.
9      Q  Now, did you -- so did you read the whole
10  deposition yesterday?
11      A  No.
12      Q  Okay. Are you aware that that deposition has
13  been marked "Confidential" in this case?
14      A  I guess I saw the -- the -- it did say
15  "Confidential" on it, yes.
16      Q  Okay. Did reading Mr. Sevier's deposition
17  transcript refresh your recollection about any
18  specific topics related to Oracle in the 2000, 2001
19  time frame?
20      A  No more or less than reviewing the work
21  papers.
22      Q  So it was more general. It refreshed your
23  recollection generally more than about specific
24  issues?
25      A  Yeah.

23

1      Q  Okay.
2      A  I didn't read through it in great detail.
3      Q  You said you looked at a complaint in this
4  action yesterday; correct?
5      A  I received a copy of the complaint, and I
6  walked through certain sections of it. Again, I did
7  not review the entire complaint.
8      Q  Okay. Did you walk through the sections on
9  the accounting allegations in this case?
10      A  I did review those.
11      Q  Okay. Did that help you refresh your
12  recollection about the issues raised in the complaint?
13      A  Well, that's the only recollection I've had
14  were the issues raised in the complaint.
15      Q  Okay. So prior to reading the complaint, you
16  were not aware of the allegations that were raised in
17  the complaint?
18      A  No.
19      Q  Okay. Prior to receiving the subpoena in
20  this case, were you aware that this litigation existed
21  at all?
22      A  Yes, I believe I was.
23      Q  Okay. And how did you know about it?
24      A  Well, I believe the litigation started prior
25  to my departure from Andersen. So while I was still

24

1  involved with the Oracle -- Oracle account while at
2  Andersen, so -- but I haven't tracked it.
3      Q  Okay. When did Andersen -- when did --
4  you're the senior part -- you were the senior partner
5  at Arthur Andersen during the 2000, 2001 time frame;
6  correct?
7      MR. SIDORSKY: Objection to form.
8      THE WITNESS: I was the -- the -- the lead
9  audit partner on the engagement. I'm not sure what
10  "senior partner" means.
11      MR. GREENSTEIN: Okay.
12      Q  Well, does lead audit partner mean you were
13  the highest ranking audit partner on the engagement?
14      A  That would be correct.
15      Q  Okay. So what do you recall about -- when
16  you were at Andersen, you said you became aware of
17  this litigation; correct?
18      A  I -- I believe it was this litigation.
19      Q  Okay.
20      A  I don't recall specifically.
21      Q  Okay. Well, I'll represent to you the
22  complaint -- the first complaint filed in this case
23  was March 2001. Were you at Andersen in March 2001?
24      A  Yes.
25      Q  Were you working on an Oracle engagement at

25

1  that time?
2      A  I was.
3      Q  Okay.  And how did you learn about this
4  litigation, if you remember?
5      A  From conversations with the company.
6      Q  Okay.  What conversation -- and without
7  talking -- and -- well, what conversations were those?
8      A  I don't recall the specific conversations.
9      Q  Did someone come in and say, "Hey, Oracle is
10  being sued," and that's it, or do you remember
11  anything about it?
12      A  I don't recall.
13      Q  Okay.  You just remember hearing about a
14  litigation?
15      A  That's correct.
16      Q  Okay.  Do you remember any specific people
17  that you talked to about it?
18      A  I don't recall specific conversations, so....
19      Q  Okay.
20      A  No.
21      Q  Were you -- when did Andersen's engagement
22  with Oracle end?
23      A  We were replaced on or around April of 2002.
24      Q  Okay.  And why were you replaced in April of
25  2002?

26

1      A  Because our firm was going out of business.
2      Q  Okay.  Were you -- were you -- was Andersen
3  fired by Oracle?
4      MR. SIDORSKY:  Objection to form.
5      THE WITNESS:  We were dismissed.  We were
6  replaced.  You can define it any way you want.
7      MR. GREENSTEIN:  Okay.
8      Q  Was that the time of the Enron -- the time
9  that the Enron case was -- was coming to light?
10      A  It was after Andersen --
11      MR. KONOVALOV:  Objection; vague and
12  ambiguous.
13      MR. SIDORSKY:  Yeah, I'll object to that.
14      THE WITNESS:  It was after Andersen was
15  indicted.
16      MR. GREENSTEIN:  Okay.
17      Q  So just to close the loop, have you ever
18  spoken to anybody -- besides your attorneys and
19  besides the general conversations you had while you
20  were at Andersen -- spoken with anybody about this
21  litigation?
22      A  No.
23      Q  Okay.  Now, after April 2002, when Andersen
24  was dismissed, do you recall having any discussions
25  with anybody about accounting allegations against

27

1  Oracle around the 2000, 2001 time frame?
2      MR. SIDORSKY:  Could I hear that question
3  again, I'm sorry.
4      (Whereupon, record read by the Reporter as
5  follows:
6      "Question:  Okay.  Now, after April 2002,
7      when Andersen was dismissed, do you recall
8      having any discussions with anybody about
9      accounting allegations against Oracle around
10      the 2000, 2001 time frame?"
11      MR. GREENSTEIN:  Q.  You can answer.
12      A  No.
13      Q  Okay.  And other than your attorneys, have
14  you spoken to anybody about this deposition, anybody
15  from Oracle?
16      A  No.
17      Q  Okay.  Now, did you write any e-mails, other
18  than to people -- well, strike that.
19      Have you written any e-mails to anyone other
20  than your attorneys about this deposition?
21      A  Nope.
22      Q  Okay.  Have you received any e-mails other
23  than from your attorneys about this deposition?
24      A  No.
25      Q  Okay.  So other than work papers, and the

28

1  complaint, and the Sevier deposition transcript, do
2  you -- what -- did you review any other types of
3  documents yesterday?
4      A  Yes.  We actually briefly reviewed a couple
5  of sections of a couple of their public filings, some
6  of the form 10-Q during a couple of the quarters in
7  fiscal '01.
8      Q  Okay.  Do you remember which quarters?
9      A  Well, we had copies of all three quarters.
10  We actually spent very little time looking at them.
11      Q  Okay.  Did you -- oh, sorry.  You finished?
12      Did you look at any specific line items in
13  the 10-Qs?
14      A  I think all I looked at was the balance sheet
15  and some selected financial data on the income
16  statement.
17      Q  Okay.  So when you looked at a balance sheet,
18  did you just look at the balance sheet generally, or
19  did you look at any specific line items on the balance
20  sheet?
21      MR. SIDORSKY:  I'm going to object to that;
22  objection to form.
23      THE WITNESS:  Generally looked at the balance
24  sheet and then looked at the customer advances and
25  unearned revenue, I think you called it, and then

29

1  looked at the receivable line item.
2      MR. GREENSTEIN:  Okay.
3      Q  So you looked at the line item in the balance
4  sheet in the 10-K, which was called customer advances
5  and unearned revenue; is that right?
6      A  Oh, go ahead.
7      MR. SIDORSKY:  Objection to form.
8      MR. GREENSTEIN:  Q.  Is that right?
9      A  I don't recall if it was the 10-K or 10-Q,
10  but --
11     Q  Okay.
12     A  -- I mean --
13     Q  I'm sorry.
14     A  -- I looked at the balance sheet.  Your eyes
15  focus in on a couple of accounts.
16     Q  So did your eyes just focus on it, or were
17  you -- is that something that you -- that when you saw
18  it, you remembered that specific line item?
19     A  Well --
20     MR. SIDORSKY:  Objection to form.
21     THE WITNESS:  -- those were the work papers
22  that I was asked or that I was given to look at, so --
23     MR. GREENSTEIN:  Okay.
24     Q  So is it fair to say --
25     A  -- that would be the only reason to look at

30

1  those line items.
2      Q  Okay.  So is it fair to say you looked at
3  line items on the balance sheet and the income
4  statement that pertained to the issues that you
5  reviewed in the work papers?
6      A  Those are the two line items that I looked
7  at.
8      Q  Okay.  And the accounts receivable line item,
9  that's the one you looked at on the balance sheet?
10     A  Yeah.
11     Q  Okay.  On the income statement, were there
12  particular line items that you focused in on?
13     A  I don't believe I looked at the income
14  statement.
15     Q  So you just looked at the balance sheet?
16     A  Yes.
17     Q  Okay.  Did you look at the statement of cash
18  flows at all?
19     A  No.
20     Q  Okay.  Now, looking at those line items that
21  helped your recollection about any issues involving
22  those two line items, customer advances, and unearned
23  revenue, or accounts receivable, that occurred at
24  Oracle during 2000, 2001?
25     A  No.

31

1      Q  Okay.  I'm going to switch gears a little
2  bit.  I'd just like to know a little bit about your
3  educational background, so why don't you tell me from
4  high school -- well, from college until now what your
5  education has been.
6      A  Okay.  I graduated from college from the
7  University of Wisconsin at Oshkosh in May of 1979 with
8  a bachelors in business administration with a
9  concentration in accounting, and that was my last
10  formal education.
11     Q  Do you have any -- do you have a CPA?
12     A  I do.
13     Q  Do you?
14         Do you have any other types of licenses or
15  certifications related to accounting?
16     A  No.
17     Q  Okay.  Any other training related to
18  accounting?
19     A  I don't know what you mean by "training."
20     Q  Strike that.
21         Any formal training of any type related to
22  accounting?
23     A  No.
24     Q  Okay.  And when were you first employed by
25  Arthur Andersen?

32

1      A  July of 1979.
2      Q  And what was your position at the time you
3  were hired?
4      A  I was hired as a staff accountant.
5      Q  And were you -- obviously you were promoted
6  at some point; correct?
7      A  Correct.
8      Q  And -- well, let's say, how long were you a
9  staff accountant?
10     A  Well, define -- depends on what you would
11  define as the next promotion.
12     Q  Well, how would you define the next
13  promotion?
14     A  The next formal promotion will be a promotion
15  to manager.
16     Q  Okay.  Is it just called manager or account
17  manager?
18     A  Just audit manager.
19     A  Audit manager.
20         And do you remember what year that was?
21     A  1985.
22     Q  Okay.  And then how long were you a manager?
23     A  Various levels of a manager until I made
24  partner.
25     Q  Okay.  And when did you make partner?

33

1    A  1993.
2    Q  And did you make partner -- you talked about
3  a litigation involving Oracle in the early '90s. At
4  the time of that litigation, were you -- were you a
5  partner, or were you some -- or were you a level of
6  manager?
7    A  At the time of the -- well, define what you
8  mean by time of litigation. The time period for the
9  class period? The time that I was deposed?
10    Q  The time period for the class period.
11    A  I would have been a manager on the
12  engagement.
13    Q  Okay. At the time you were deposed, were you
14  a partner?
15    A  I don't recall. I told you when I made
16  partner, 1993, but I don't recall the date of the
17  deposition.
18    Q  Okay. And are there various levels of
19  partners at Andersen?
20    MR. SIDORSKY: Objection to form.
21    THE WITNESS: Not formally, no.
22    MR. GREENSTEIN: Okay.
23    Q  Well, did you -- once you became partner in
24  1993, did you get promoted after that time?
25    A  Around 2000, I assumed the responsibility of

34

1  the managing partner of the Silicon Valley office.
2  That would have been the only formal promotion.
3    Q  Okay. Do you -- do you recall when Andersen
4  was hired by Oracle?
5    A  Long before I was involved.
6    Q  Okay. Is it fair to say that Andersen was
7  Oracle's auditor from approximately 19 -- early 1990s
8  through the time that they were dismissed in
9  April 2002?
10    A  No, it would not have been early 1990s. It
11  would have been early 1980s, probably.
12    Q  1980s, okay.
13    Now, during that time, early 1980s to
14  April 2002, did Andersen do all of the fiscal year
15  audits for Oracle?
16    A  Since the time we were appointed, whenever
17  that was, up until the time we were dismissed in April
18  of 2002, we were the auditors of record for Oracle.
19  So we would have, you know, signed their audit
20  reports. So we would have -- if that's what you mean,
21  yes.
22    Q  Okay. Well, what I mean is did you conduct
23  the fiscal year audit and sign off on the fiscal year
24  and financial statements?
25    A  Oracle -- I mean, Andersen did, yes.

35

1    Q  Okay. And during that time, did Andersen
2  also conduct all quarterly reviews of Oracle? When I
3  say that, I mean the review of their financials in
4  connection with the filing of their 10-Qs.
5    MR. SIDORSKY: Objection to form.
6    MR. KONOVALOV: Same objection.
7    THE WITNESS: We would have performed
8  quarterly reviews during that time period. You know,
9  if you ask me specifics on early '80s, I -- I have no
10  way to respond.
11    MR. GREENSTEIN: All right.
12    Q  But you don't recall any other audit firm
13  coming in and doing a quarterly review while you were
14  there; do you?
15    A  I don't recall.
16    Q  Okay. And when did you -- when did you first
17  become involved with the Oracle account?
18    A  Late 1989. I'd say late '89 or early '90.
19    Q  So you were a manager on the Oracle account
20  for a number of years; correct?
21    A  I was the manager on the oral -- Oracle
22  account. I don't know what you mean by "a number of
23  years," but I was the manager on the Oracle account
24  for a period of time.
25    Q  So why don't you just describe for me if --

36

1  when you were -- when you were a manager working on
2  Oracle -- the Oracle account. What would you do --
3    MR. SIDORSKY: Objection.
4    MR. GREENSTEIN: Q. -- generally?
5    MR. SIDORSKY: Objection to form.
6    THE WITNESS: That's a very open-ended
7  question. I supervised part of the audit work.
8    MR. GREENSTEIN: Okay.
9    Q  What -- what does that mean, supervise part
10  of the audit work?
11    A  Well, we would divide up the work and
12  people -- certain people would look at certain
13  sections, other people would look at other sections.
14  I don't recall specifically what parts of the work I
15  would have had responsibility for or reviewed, but I
16  was a manager on the engagement.
17    Q  Do you remember being in charge of any
18  particular account during -- you know, let's say from
19  the time you started working on the Oracle account
20  until April 2002, do you ever recall focusing on a
21  specific area with respect to an audit?
22    A  I'm sorry --
23    MR. SIDORSKY: Well, let him finish the
24  question, but are you finished with the question?
25    MR. GREENSTEIN: Yes.

37

1      MR. SIDORSKY:  Okay.  I object to the form.
2  It's -- it's overly broad.  It's vague.  It's
3  ambiguous.
4      MR. GREENSTEIN:  Q.  You can answer.
5      A  Can you -- could you repeat the question or
6  define the time period?
7      Q  Okay.  When you were a manager on the -- on
8  the Oracle account, do you remember focusing on any
9  specific parts or specific issues with respect to
10  Oracle audits?
11     A  Some.
12     MR. SIDORSKY:  Same objection.
13     THE WITNESS:  I -- I don't know about issues.
14  You know, I can't answer with respect to that,
15  specific areas of the work.  I -- I don't recall
16  looking at specific work papers, if that's what
17  you're -- you're asking, but I know that I worked with
18  many areas of the audit, including receivables,
19  revenue.
20     A lot of our, you know, audit tests that were
21  performed in those areas I would have looked at, and
22  there are other areas as well looking at international
23  clearances, looking at the 10-K.  You know, there's a
24  lot of different things we go through.
25     MR. GREENSTEIN:  Okay.

38

1      Q  Well, why don't I back up and just ask you if
2  you could just describe the difference between an
3  audit of Oracle and a quarterly review.  I guess we
4  could start with -- well, why don't you just tell me
5  the difference between those two types of engagements.
6      MR. SIDORSKY:  Objection to form.
7      THE WITNESS:  You're -- you're -- I'm sorry.
8      MR. SIDORSKY:  Objecting -- objection to the
9  form of the question.
10     THE WITNESS:  You're speaking in general,
11  not --
12     MR. GREENSTEIN:  Correct.
13     THE WITNESS:  -- referencing any particular
14  period?
15     MR. GREENSTEIN:  Q.  Actually, yeah.  Why
16  don't we focus on the 2000, 2001 time frame.
17     A  Okay.
18     Q  You -- well, let me back up.
19     Andersen did all the quarterly reviews in the
20  fiscal -- fiscal year 2001; right?
21     A  That's correct.
22     Q  And it conducted the year-end audit in the
23  fiscal 2001; correct?
24     A  Correct.
25     Q  You signed the audit opinion that was

39

1  included with the 10-K for the fiscal year 2001 for
2  Oracle; correct?
3      A  That's correct.
4      Q  Okay.  So focusing on that time period,
5  what's the difference generally between what Andersen
6  did for a quarterly review and what it did for an
7  audit?
8      MR. KONOVALOV:  Objection; vague and
9  ambiguous.
10     MR. SIDORSKY:  Same objection to form.
11     THE WITNESS:  Well, a review is substantially
12  less in scope than an audit.  We don't form an opinion
13  on the financial statements or any portion of the
14  financial statements in a review.
15     Our responsibility is to perform high-level
16  analytical review and some discussions with
17  management.
18     MR. GREENSTEIN:  Okay.
19     Q  When you say you don't form an opinion, you
20  just mean you don't actually sign a formal audit
21  opinion like you do with a -- a year-end audit;
22  correct?
23     MR. SIDORSKY:  Objection to form.
24     THE WITNESS:  No, we -- we do not form an
25  opinion.  We do not issue -- we do not form an audit

40

1  opinion on the financial statements.
2      MR. GREENSTEIN:  Right.
3      Q  And what I'm asking is -- but do you form any
4  opinion at all, informal opinion, about your review?
5      MR. SIDORSKY:  Objection to form.
6      THE WITNESS:  When you say "opinion," to me,
7  I think of an audit opinion.
8      MR. GREENSTEIN:  Okay.
9      Q  What I'm trying to get at, you said you
10  didn't form an opinion for quarterly reviews.
11     A  That's correct.
12     Q  What I'm asking is, do you mean you don't for
13  a -- you don't sign a formal audit opinion during the
14  quarters?  Correct?
15     MR. SIDORSKY:  Objection to form.
16     THE WITNESS:  Correct.  We do not perform an
17  audit and do not issue an audit opinion on the
18  quarters.
19     MR. GREENSTEIN:  Right.
20     Q  But you do form some sort -- you do form
21  opinions about what you reviewed for the quarters;
22  right?
23     MR. KONOVALOV:  Objection; misstates the
24  witness's testimony.
25     MR. SIDORSKY:  Yeah, objection to form.

41

1      THE WITNESS: We have discussions with
2  management, and based on that, we form a view as to
3  whether we become aware of any material adjustments
4  that would need to be made to the financials based on
5  a fairly limited amount of work.
6      MR. GREENSTEIN: Okay.
7      Q  Why don't you just take me through. Let's
8  focus in on, let's say, the second quarter of 2001.
9      Do you remember that time period?
10      A  Generally.
11      Q  Okay. Now, do you remember what Andersen did
12  in connection with the review of that quarter?
13      MR. SIDORSKY: Objection to form.
14      THE WITNESS: Not -- not specifically. We
15  performed a quarterly review.
16      MR. GREENSTEIN: Right.
17      Q  So during a quarterly review, you said you
18  don't form an opinion. You speak with management, and
19  I think you talked about you look at any adjust --
20  adjustments made; is that fair to say?
21      MR. SIDORSKY: Objection; misstates the
22  record, and the record speaks for itself.
23      THE WITNESS: That's not what I said.
24      MR. GREENSTEIN: Okay.
25      Q  What did you say?

42

1      A  Could you repeat what I said?
2      Q  Well, why don't -- why don't you just tell
3  him what you did in -- what Andersen did in the second
4  quarter of 2001 in performing their quarterly review.
5      MR. SIDORSKY: Objection to form.
6      I don't think the witness is obligated to
7  repeat his -- his prior answer. Why don't you -- why
8  don't you --
9      MR. GREENSTEIN: I just asked --
10      MR. SIDORSKY: You got a record.
11      MR. GREENSTEIN: Is that an objection?
12      MR. SIDORSKY: Yes, it's an objection.
13      MR. GREENSTEIN: What's the objection?
14      MR. SIDORSKY: It's asked. It's answered.
15  We're not -- you can't keep asking the same question
16  when a witness has already answered the question,
17  but -- but go ahead.
18      MR. GREENSTEIN: Asked and answered is a
19  proper objection under the Federal Rules. Now,
20  everything you just said after that is not a proper
21  objection. So again, I'd ask that you make your
22  objection, and then let the witness answer.
23      MR. SIDORSKY: I think that's what I'm doing,
24  Eli.
25      MR. GREENSTEIN: So --

43

1      MR. SIDORSKY: It is a proper objection, but
2  go ahead. I'm trying to let you get it out there.
3      Go ahead.
4      MR. GREENSTEIN: Thank you. I appreciate it.
5  I appreciate it.
6      Q  Do you recall what Andersen did in connection
7  with its quarterly review of the second quarter 2001?
8      A  Again, that's a very broad question, and so I
9  find it difficult to define how you want me to answer
10  that.
11      I mean, what did we do? We performed a
12  quarterly review. What does a quarterly review
13  entail? It includes -- entails discussions with
14  management and high-level analytics. Do I recall
15  specifically what we did in that quarter? No.
16      Q  Okay. When you say "high-level analytics,"
17  what do you mean by that?
18      A  We would look at, you know, some of the
19  accounts. We would look at variation analysis in
20  certain areas. Would not look at detail that would
21  support account balances on a quarterly basis, and we
22  would have discussions with management, and at the end
23  of the quarter receive a representation letter from
24  management representing to us, you know, their
25  responsibility for the financial statements.

44

1      Q  Okay. You said you look at "variation
2  analysis in certain areas," but you would not look at
3  "detail that would support account balances on a
4  quarterly basis."
5      What do you mean by that?
6      MR. SIDORSKY: Objection to form. It --
7  it --
8      THE WITNESS: Well, in an audit -- audit
9  testing includes, on certain accounts, testing the
10  detail of the account balances.
11      In a review, we don't test the detail. You
12  look at the top-level financial statement balances or
13  general ledger account balances in some cases and have
14  some discussions with management on those, and that's
15  it.
16      MR. GREENSTEIN: Okay.
17      Q  So correct me if I'm wrong. So if you're
18  looking at a particular account, like a revenue
19  account, you look at the top line. You look at the
20  variations between quarters, but you wouldn't dig down
21  into that particular account and perform an analysis
22  on it; is that fair to say?
23      MR. SIDORSKY: Objection to form.
24      THE WITNESS: It's a -- you're correct in
25  your discussion. I mean, revenue is probably a bad

45

1  example for it.
2      MR. GREENSTEIN:  Okay.
3      Q  Just in general, if you look at an account --
4  what I'm trying to get at is or what I'm asking is, if
5  you look at a particular account, let's say an
6  accounts receivable account, during a quarterly
7  review, what -- what did you mean when you said you
8  look at the top line but you wouldn't look at the
9  detail of the account?
10     MR. SIDORSKY:  Objection to form.
11     THE WITNESS:  Well, if you take a -- I don't
12  know -- any particular line item, a general ledger
13  account balance on an audit, depending upon the nature
14  of the account, the materiality of the account, the
15  risks involved with that particular account, you may
16  look at the detail that supports that account and test
17  it.  You would not do that on a quarterly review.
18     MR. GREENSTEIN:  Okay.
19     Q  So what -- what would you do on a quarterly
20  review?
21     MR. SIDORSKY:  Objection; asked and answered
22  about three times now.
23     THE WITNESS:  I think I've already said we
24  would do variation analysis.
25     MR. GREENSTEIN:  Q.  Again, what does that

46

1  mean?  What does "variation analysis" mean?
2      A  Look at variations between quarters, and
3  based upon our -- you know, our understanding of the
4  company, would explain those variations --
5      Q  Okay.
6      A  -- have discussions with management.
7      Q  Okay.  And when you say "variations between
8  quarters," you mean if you look at a certain account
9  and it went up or down, you would discuss with
10  management why that occurred?
11     MR. SIDORSKY:  Objection to form.  Again,
12  it -- it lacks foundation; hypothetical.
13     THE WITNESS:  Possibly.
14     MR. GREENSTEIN:  Okay.
15     THE WITNESS:  Without having a specific work
16  paper, or schedule, or account balance that you're
17  referencing to, my answer would be hypothetical.
18     MR. GREENSTEIN:  Okay.
19     Q  Well, I'm just asking generally.  I'm trying
20  to get a sense of what the difference between a
21  quarterly review and an audit are.
22     So what I'm asking is, if you -- when you say
23  "variation analysis," what does that mean, generally?
24     MR. SIDORSKY:  He's answered the question
25  generally, I think, a couple of times.

47

1      MR. GREENSTEIN:  Q.  What --
2      MR. SIDORSKY:  You can answer again now.
3      MR. GREENSTEIN:  Q.  -- what kind of
4  discussions do you have with management when you
5  perform a variation analysis.
6      MR. SIDORSKY:  Again, objection to --
7  objection to the form; lacks foundation; calls for
8  speculation.
9      THE WITNESS:  There would be different levels
10  of discussion.  If it was a schedule that was
11  prepared, the staff accountants on the engagement
12  would discuss it with management, levels of
13  management, prepare the schedule, prepare explanations
14  on the schedule that would be reviewed by an
15  engagement senior, an engagement manager, possibly a
16  partner.  So there could be a number of different
17  discussions that occurred.
18     MR. GREENSTEIN:  Q.  So what is it when you
19  say a schedule was prepared?  What do you mean by
20  "schedule"?
21     MR. SIDORSKY:  Objection to form.
22     THE WITNESS:  An audit work paper.
23     MR. GREENSTEIN:  Okay.
24     Q  Well, I didn't know that, that a schedule
25  meant an audit work paper.  I'm not an accountant.

48

1  So you mean a schedule, in general, means a
2  work paper?
3      MR. SIDORSKY:  Objection to form.
4      THE WITNESS:  In the context of my answer,
5  yes.
6      MR. GREENSTEIN:  Okay.
7      Q  What are the different -- does the schedule
8  mean something else in a different context?
9      MR. SIDORSKY:  Objection to the vagueness of
10  the question.
11     THE WITNESS:  It depends on the question you
12  ask and what I'm answering to.
13     MR. GREENSTEIN:  Q.  But what's a schedule?
14  You said -- you said if it was a schedule that was
15  prepared, the staff accountants on the engagement
16  would discuss it with management.  So when you said
17  that, what did you mean by "schedule"?
18     A  Okay.  An audit work paper schedule.
19     Q  Okay.  And that occurs during the quarterly
20  reviews; correct?
21     A  In the context of the question you're asking
22  about a quarterly review, yes.
23     Q  Okay.  Now, were you a senior -- were you the
24  lead auditor or the lead partner on the Oracle
25  engagement in -- in the first quarter fiscal year

49

1   2001?
2   MR. SIDORSKY: Objection to form.
3   THE WITNESS: Yes, I would have been the
4   senior audit partner on the engagement.
5   MR. GREENSTEIN: Okay.
6   Q  And as the senior audit partner, what would
7   your specific duties be when Andersen conducted a
8   quarterly review?
9   A  I would spend time with our team in the field
10  getting at the client.  And as we were performing our
11  work, had various discussions with our team, review
12  selected areas of the work papers, and participate in
13  discussions with management.
14  Q  Okay.  And were you the primary liaison
15  between Oracle's upper management and Andersen, or did
16  everybody speak to or communicate with management?
17  MR. SIDORSKY: Objection --
18  THE WITNESS: Could you--
19  MR. SIDORSKY: -- to form.
20  THE WITNESS: -- define who you mean by
21  "upper management"?
22  MR. GREENSTEIN: Larry Ellison.
23  MR. SIDORSKY: Objection.
24  THE VIDEOGRAPHER: You can continue.
25  THE WITNESS: Okay.  We did not speak with

50

1   Larry Ellison.
2   MR. GREENSTEIN: Q.  Have you ever spoken
3   with Larry Ellison in connection with an engagement?
4   A  An audit engagement?  Review engagement?
5   Which one?
6   Q  Either one.
7   A  What do you mean by "engagement"?
8   Q  Either one.
9   A  No.
10  Q  Have you ever talked to Larry Ellison at all?
11  A  Briefly.
12  Q  Okay.  And when was that?
13  A  I don't recall the specifics, but I attended
14  an event, along with several other people, at his home
15  at one point.
16  Q  Did you ever make presentations to Oracle
17  management while Larry Ellison was there?
18  A  Actually, I take that -- we -- was had one
19  other session I believe Larry was in when management
20  was making a presentation on a particular matter, and
21  we were in attendance, and I believe Larry was in that
22  meeting, but --
23  Q  Okay.
24  A  -- don't ask me the specifics, because I -- I
25  remember being in a room with Ray Lane and others, and

51

1   I believe Larry was in the meeting as well.
2   Q  Okay.  Do you remember when that was?
3   A  No.
4   Q  Do you remember generally what the issue --
5   you said it was an issue.
6   A  I didn't say it was an issue.  I just --
7   well, if I did, I correct myself.  There was -- there
8   was a matter that they were discussing, you know, and
9   I don't recall the specifics of the topic.
10  Q  Okay.  Do you recall generally what the
11  matter was?
12  A  No, I said I don't.
13  Q  Was it an accounting matter?
14  A  Yeah, it would have been something related to
15  accounting, or financial reporting, or else we
16  wouldn't have been there.
17  Q  Okay.  Was that unusual to have such a
18  meeting?
19  MR. SIDORSKY: Objection to form.
20  THE WITNESS: Again, I don't recall the
21  specifics of the meeting.
22  MR. GREENSTEIN: Okay.
23  Q  Well, but how many meetings have you
24  attended, if you know, where Larry Ellison was
25  present?

52

1   A  I believe that was the only one.
2   Q  Right.
3   So what I'm asking, if that's un -- it's
4   obviously unusual to attend a meeting with
5   Larry Ellison --
6   MR. KONOVALOV: Objection --
7   MR. GREENSTEIN: Q.  -- right?
8   MR. KONOVALOV: -- misstates the witness's
9   testimony.
10  MR. SIDORSKY: Yeah, objection to form.
11  THE WITNESS: I wouldn't say it's unusual.  I
12  just -- we -- we've not -- we didn't have occasion to
13  meet with him.
14  MR. GREENSTEIN: Okay.
15  Q  Do you remember anything about -- anything
16  that was discussed in that meeting?
17  A  No.
18  Q  Do you remember approximately even the year
19  that it occurred?
20  A  No.
21  Q  Okay.  Was it when you were a senior audit
22  partner?  Do you remember that?
23  A  I believe I was the audit partner when that
24  was going on, so....
25  Q  Okay.  Do you remember if it was after you

53

1 learned about a lawsuit against Oracle that you
2 described earlier?
3     A  I believe it was before this, the time period
4 of this complaint.
5     Q  Okay.  Well, the complaint was filed in March
6 of 2001, the first complaint.  Do you recall if it was
7 before or after that?
8     A  I believe it was before that.
9     Q  Before that; okay.
10     And you say Ray Lane was there.  Do you
11 remember anybody else that attended?
12     A  Just the finance people, a couple of the
13 finance people that were there.
14     Q  Who was -- oh, sorry.
15     A  I think Jeff Henley was there, Tom Williams
16 was there, Jennifer Minton was there.
17     Q  And do you recall Ray Lane -- who is
18 Ray Lane?
19     A  Ray Lane was the president of the company for
20 a period of time.  I believe he left before this
21 complaint was filed, which is why I think the meeting
22 occurred prior to this complaint being filed.
23     Q  Makes sense.
24     And where do you work now?
25     A  I'm a partner at KPMG.

54

1     Q  Okay.  And when did you -- did you -- did you
2 join KPMG right after Andersen was dismissed, or when
3 did you join KPMG?
4     A  June of 2002.
5     Q  Okay.  So a couple of months after Oracle
6 dismissed Andersen; correct?
7     A  Correct.
8     Q  Okay.  And what's your function now for KPMG?
9     A  I'm the global chair of one of our lines of
10 business.
11     Q  Which line of business?
12     A  We call it ICE, Information Communication and
13 Entertainment.
14     MR. GREENSTEIN:  We've been going about an
15 hour.  Why don't we go off the record.
16     THE VIDEOGRAPHER:  We're going off the
17 record.  The time is 10:07 a.m.
18     (Short break taken.)
19     THE VIDEOGRAPHER:  We are back on the record.
20 The time is 10:21 a.m.
21     MR. GREENSTEIN:  Q.  Mr. Matuszak, earlier we
22 were talking about quarterly reviews and the kinds of
23 things that Andersen does during quarterly reviews.
24     I'm wondering what kind of documentation
25 there is of -- of the quarterly reviews that after a

55

1 quarterly review that you could look at to determine
2 what occurred.
3     MR. SIDORSKY:  Objection to form.
4     THE WITNESS:  Well, we prepared audit --
5 excuse me -- we prepared work papers for audits and
6 quarterly reviews.  So there would have been work
7 papers generically referred to as audit work papers,
8 but there would have been work papers prepared for the
9 quarterly review.
10     MR. GREENSTEIN:  Right.
11     Q  So is it safe to say when you say "audit work
12 papers" you may mean quarterly work papers, as well as
13 year-end work papers?
14     A  I'll try to be clear.
15     Q  Okay.  So once a quarterly review occurs,
16 there is some review work papers that are generated;
17 correct?
18     A  Correct.
19     Q  Okay.  And what do those work papers entail?
20     THE VIDEOGRAPHER:  I'm sorry, Counsel.  You
21 got the microphone on the back of your tie.  If you
22 can put it on your shirt.  Thank you.  Sorry.
23     THE WITNESS:  I'm sorry.
24     Could you repeat your question?
25     MR. GREENSTEIN:  Q.  So for quarterly work --

56

1 I'm trying to get a sense of what quarterly work
2 papers consist of.
3     A  It would have been the -- the documentation
4 of the discussions and work performed during our field
5 work and our representation letters from management,
6 any work we performed on the 10-Q public filing.
7     Q  Okay.  Do the work papers include
8 communications, e-mails that may have been sent or
9 received between Oracle and Andersen?
10     A  Certain of the communications in the work
11 papers could have been via e-mail that were printed
12 out and put in the work papers, but it's not to imply
13 that any and all e-mail communication would be in the
14 work papers.
15     Q  Okay.  And you talked about management
16 representation letters.  What are those?
17     A  There's a representation letter obtained at
18 the end of every quarterly review and one obtained at
19 the end of the audit as well that is signed by senior
20 levels of typically financial management that spells
21 out to the auditor the company's responsibility with
22 respect to the accuracy of the financial statements
23 and representing to us that they told us certain
24 things that, you know, certain account balances are
25 correct, or adequate, accurate, et cetera.

Matuszak, Gary  8/1/2006  9:14:00 AM

57

1    Q  And is that -- what form does that take?  Is
2 that an actual letter that says, you know, Dear
3 Mr. Matuszak, or Dear Andersen, or is it some other
4 form?
5    A  It would be addressed to Arthur Andersen.
6    Q  Okay.  And do you recall if you received
7 those or Andersen received those letters from Oracle
8 management in 2000, 2001?
9    A  We should have.  I haven't looked at the work
10 papers or seen them, but they should be in the work
11 papers.
12    Q  And does it -- so you said that it -- it may
13 represent that certain balances in certain accounts
14 are correct; did you say that?
15    MR. SIDORSKY:  Objection to form.  It's on
16 the record what he said, you know.
17    THE WITNESS:  I -- I don't recall the
18 specifics of what's in the rep letter.  I mean, it's
19 a -- I believe a three- or four-page letter or two- or
20 three-page letter.  So, in general, it would say that
21 the financial statements are accurate, that, you know,
22 they're an accurate reflection of the -- the
23 activities of the company.
24    We typically put in some other special
25 representations on certain areas, depending on, you

58

1 know, what was going on.
2    MR. GREENSTEIN:  Q.  When you say you put
3 them in, you're saying --
4    A  Andersen.
5    Q  -- Andersen puts them in the representation
6 letter?
7    A  Yes.
8    Q  Okay.  So -- but isn't the letter coming from
9 Oracle to Andersen?
10    MR. SIDORSKY:  Objection to form.
11    THE WITNESS:  The -- the letter is a letter
12 from Oracle to Andersen.  The content of the letter by
13 and large is dictated by the AICPA standards and other
14 specific representations that the auditors may request
15 of the company, so the letter is typically drafted.
16 The content of the letter is drafted by the auditor,
17 given to the company, who puts in writing their
18 representation to the auditor.
19    MR. GREENSTEIN:  Okay.
20    Q  And with respect -- the fiscal year 2001,
21 those quarterly reviews, did you participate at all in
22 drafting those participation letters?
23    MR. SIDORSKY:  Objection to form.
24    THE WITNESS:  I most likely would have
25 reviewed those letters either in draft or in final

59

1 form.
2    MR. GREENSTEIN:  Q.  But do you recall
3 actually participating in drafting the language as
4 opposed to review?
5    A  I don't -- I don't recall, no.
6    Q  Okay.  Do you recall who would be -- who
7 drafted those representation letters?
8    A  No.
9    Q  Typically would it be -- what -- what
10 position at Andersen would have the authority to draft
11 those?  Would it be a partner?  A senior manager?
12    A  It would be -- well, let me clarify.
13    The letter doesn't change that significantly
14 from quarter to quarter.  So you'd start with the
15 prior quarter level -- letter and then determine if
16 there were any changes that needed to be made to that
17 letter.
18    Q  Okay.  My question is, do you recall who had
19 the authority to -- to make changes or draft that
20 letter during the fiscal year 2001 for Oracle?
21    A  The -- the changes would have been reviewed
22 and approved by the engagement manager and possibly
23 the partner.
24    Q  Okay.  When you say changes were made --
25    A  Excuse me.

60

1    Q  -- strike that.
2    So in any of these engagement letters, do you
3 draft certain language about particular accounts, or
4 is it more general as to the financial statements and
5 accuracy of the financial statements?
6    MR. SIDORSKY:  Objection to form.  I also
7 think you meant to say representation letter, but --
8 but objection to form.
9    THE WITNESS:  There are representations in
10 the letter that are drafted which would be specific to
11 a particular client, whether it would be Oracle or
12 others.  So there would be things in -- in the Oracle
13 letter that were unique to Oracle.
14    MR. GREENSTEIN:  Okay.
15    Q  And do you recall any specific types of
16 things that were in those representation letters for
17 Oracle?
18    MR. KONOVALOV:  Are we speaking about the
19 2000, 2001 time frame still?
20    MR. GREENSTEIN:  Yeah.
21    MR. KONOVALOV:  Thank you.
22    THE WITNESS:  I don't recall specifically
23 with respect to that time frame what was in there.
24    MR. GREENSTEIN:  Okay.
25    Q  Well, since you worked on Oracle for a long

61

1 period of time, do you recall any specific things that
2 were put in those representation letters that were
3 unique to Oracle?
4     A   They were outside of the standard letter.  I
5 wouldn't -- I don't know if they were unique to
6 Oracle.  They may have been in other client's letters
7 as well, but I do know or my recollection is we had
8 representations in the -- in the Oracle letter as to
9 revenue contracts.  For example, that all contracts
10 were executed prior to the end of the quarter.
11    Q   Okay.  Well, is that something that's in
12 every representation letter for every client of
13 Andersen?
14        MR. SIDORSKY:  Objection; asked and answered.
15        THE WITNESS:  It's not part of the standard
16 representation letter, and it would not be in every
17 letter for every client.
18        MR. GREENSTEIN:  Okay.
19    Q   Why not?
20    A   Because it's not applicable to certain
21 industries, not as applicable.
22    Q   Okay.  So why would -- why would you put that
23 kind of language regarding revenue recognition in the
24 Oracle representation letter versus another company?
25        MR. SIDORSKY:  Objection to form.

62

1        THE WITNESS:  In -- in software companies, so
2 I'll speak more broadly than Oracle, there's a
3 requirement that you have evidence of an arrangement.
4 The evidence of the arrangement/the user contract is a
5 contract that's executed by both parties at the end of
6 the quarter.  So we -- we can't be on site to review
7 every signed contract at the end of the quarter.
8        MR. GREENSTEIN:  Q.  That's an element of
9 SOP 97-2; correct?
10    A   That's correct.
11    Q   Okay.  So is it fair to say that with respect
12 to software clients, you may add language regarding
13 revenue recognition because of the complexity of
14 SOP 97-2?
15        MR. SIDORSKY:  Objection to form.
16        THE WITNESS:  That's -- that's a fair
17 statement, that we would do that more frequently on a
18 software company than in any companies in any other
19 industries.
20        MR. GREENSTEIN:  Right.
21    Q   And do you recall adding that specific
22 language in the representation letters in connection
23 with the quarterly reviews of Oracle during fiscal
24 year 2001?
25    A   I don't recall the -- the specific letters.

63

1 In general, I recall that that was one of the --
2 the -- the specific provisions that was included in
3 the Oracle representation letter.
4     Q   Okay.  Do you recall, was there ever any
5 specific language about a specific transaction or
6 specific deal in a particular quarter?
7         In other words, Oracle is representing that
8 this particular deal was signed, had a signed contract
9 by both parties.
10        MR. SIDORSKY:  Objection to form.
11        THE WITNESS:  I don't believe so.
12        MR. GREENSTEIN:  Q.  Are you not sure of
13 that, or just don't recall it?
14    A   I don't recall ever seeing it.  I don't
15 recall ever putting it in or requesting that we have
16 language as to a specific contract being executed at
17 the end of the quarter.
18    Q   Okay.  Do you recall any -- in any management
19 representation letter Andersen asking Oracle to
20 represent that -- that a specific transaction met all
21 the requirements of revenue recognition?
22        MR. SIDORSKY:  Objection to form.
23        MR. KONOVALOV:  Vague and ambiguous.
24        THE WITNESS:  That's a pretty vague question.
25        MR. GREENSTEIN:  Q.  Well, do you recall any

64

1 specific transaction that was -- that had to be
2 addressed in one of those representation letters with
3 respect to a specific transaction or customer?
4         MR. KONOVALOV:  Same objection.
5         THE WITNESS:  I -- I don't recall.
6         MR. GREENSTEIN:  Okay.
7     Q   Do you recall ever requesting that a
8 transaction with Hewlett-Packard was ever addressed in
9 a representation letter?
10    A   I don't recall that.
11    Q   Okay.
12    A   I don't recall that being added to a rep
13 letter.
14    Q   Okay.  Do you recall whether Andersen ever
15 requested that, with respect to revenue recognition,
16 that all contracts met another element of SOP 97-2
17 other than that there was a signed contract by both
18 parties?
19        MR. KONOVALOV:  Objection; vague and
20 ambiguous.
21        MR. SIDORSKY:  Yeah, objection to form.
22        THE WITNESS:  You know, I -- I -- you asked
23 me for an example, and I gave you an example.  I don't
24 recall all of the provisions in every paragraph that
25 were in the letter.

65

1     MR. GREENSTEIN:  Q.  But generally do you
2  recall ever -- that Andersen ever requested that, say,
3  the delivery element of SOP 97-2, that they represent
4  that the delivery element for every transaction during
5  that quarter was met?
6     MR. SIDORSKY:  Objection to form.
7     THE WITNESS:  I -- I don't recall whether
8  we -- whether that was in the rep letter or not.
9     MR. GREENSTEIN:  Q.  It could have been?
10    MR. KONOVALOV:  Objection; misstates the
11 witness's testimony.
12    THE WITNESS:  I don't recall.
13    MR. GREENSTEIN:  Okay.
14    Q.  Do you recall any of the other elements of
15 97-2 being addressed in a representation letter
16 specifically?
17    MR. SIDORSKY:  Objection to form.
18    THE WITNESS:  Not specific representations as
19 to the requirements of 97-2. I don't -- I don't
20 recall those being specifically in the rep letter.
21    MR. GREENSTEIN:  Q.  But generally you recall
22 anything being in the rep letter with respect to the
23 elements of SOP 97-2?
24    MR. SIDORSKY:  Objection to form.
25    THE WITNESS:  I -- I don't recall it.

66

1     MR. GREENSTEIN:  Okay.
2     Q.  Do you remember ever having issues or
3  problems that led to a specific request by Andersen to
4  -- that Oracle represent certain things with respect
5  to 97-2 in the rep letters?
6     A.  Again, I apologize, but I don't recall.
7     Q.  Well, since we're on 97-2, you talked
8  about -- well, is one of the elements of 97-2 that a
9  arrangement exists?  Correct?
10    A.  That's correct.
11    Q.  Okay.  And what does that mean?
12    A.  That there's a -- a meeting of the minds, an
13 agreement between the customer and the vendor.  In
14 this case, the vendor being Oracle, and that that
15 evidence is documented in the form of whatever their
16 standard business practice is.
17    Q.  Okay.  And if their standard business
18 practice is a contract, would that require that the
19 contract be signed by both parties?  Correct?
20    A.  That's correct.
21    Q.  And do you recall that that was a standard
22 requirement for Oracle in the fiscal year 2001?
23    MR. KONOVALOV:  Objection; lacks foundation;
24 assumes facts not in evidence.
25    THE WITNESS:  That would be part of their

67

1  revenue recognition policy.
2     MR. GREENSTEIN:  Okay.
3     Q.  But do you recall that during the fiscal year
4  2001 for Oracle that there was a requirement, a
5  standard requirement from Oracle to have a signed
6  contract by both parties in order to meet the element,
7  the arrangement element of SOP 97-2?
8     MR. KONOVALOV:  Objection; lacks foundation;
9  assumes facts not in evidence.
10    THE WITNESS:  I think I answered that
11 question.  It was part of the revenue recognition
12 policy which would be the requirements that they would
13 need to meet in order to recognize revenue.
14    MR. GREENSTEIN:  Okay.
15    Q.  Well, did they ever go beyond their policy?
16    MR. KONOVALOV:  Objection; calls for
17 speculation.
18    MR. SIDORSKY:  Yeah, objection to form.
19    MR. GREENSTEIN:  Q.  Well, if it -- if there
20 was a requirement in their policy that required
21 contracts signed by both parties, is it fair to say
22 that all their transactions during a quarter had to
23 meet that requirement?
24    MR. KONOVALOV:  Objection; incomplete
25 hypothetical; assumes facts not in evidence, and calls

68

1  for speculation.
2     MR. SIDORSKY:  Same objection.
3     THE WITNESS:  There -- they would either have
4  to meet all the requirements of the policy or for some
5  reason there would have to have been an approval --
6  approved approval or exception to the policy, so I....
7     MR. GREENSTEIN:  Okay.
8     Q.  So it wasn't required that Oracle has to meet
9  its revenue recognition policy during the fiscal year
10 2001?
11    MR. SIDORSKY:  Objection to form.
12    THE WITNESS:  No, that's not what I said.
13    MR. SIDORSKY:  Thank you.  Let me object.  I
14 think that mischaracterizes the witness's testimony,
15 and it again is -- is completely lacking in any
16 foundation.
17    MR. KONOVALOV:  It's vague and ambiguous.
18    THE WITNESS:  What I said was they have to
19 follow the company policy.  If there was an exception
20 to the policy and there was a reason to approve an
21 exception to the policy, it would need to be approved
22 by senior financial management.
23    MR. GREENSTEIN:  Okay.
24    Q.  Senior -- approved by senior Oracle
25 management?

69

1      A   Senior Oracle management.
2      Q   Did you -- did Andersen have to approve
3   exceptions to the revenue recognition policy?
4          MR. SIDORSKY:   Objection to form.
5          THE WITNESS:   They're not part of management.
6          MR. GREENSTEIN:   Okay.
7      Q   Did Andersen have to approve exceptions to
8   the revenue recognition policy?
9          MR. KONOVALOV:   Objection; lacks foundation;
10  calls for speculation.
11         MR. SIDORSKY:   And just asked and answered.
12         THE WITNESS:   No.
13         MR. GREENSTEIN:   Q.  So management could
14  decide to recognize revenue on a deal that went beyond
15  its revenue recognition policy without talking to
16  Arthur Andersen?
17         MR. SIDORSKY:   Objection to form.  That --
18  you're just, you know, putting words in the witness's
19  mouth.  Objection to form.
20         MR. GREENSTEIN:   Okay.  That's not a proper
21  objection.
22         MR. SIDORSKY:   It is.
23         MR. GREENSTEIN:   "Putting words in the
24  witness's mouth."
25         Well, if you could tell me, what if the --

70

1   where the Federal Rules say that's a proper objection
2   then, you know --
3          MR. SIDORSKY:   Leading is a -- leading --
4   improperly leading and mischaracterizing a witness's
5   testimony is a problem objection.
6          MR. KONOVALOV:   I'll make my proper
7   objection.  Calls for speculation and lacks
8   foundation.
9          MR. GREENSTEIN:   Okay.  Noted.
10     Q   You can answer the question.
11     A   Could you repeat the question?
12         MR. GREENSTEIN:   Could you read it back,
13  please?
14         (Whereupon, record read by the Reporter as
15  follows:
16         "Question:  So management could decide to
17          recognize revenue on a deal that went beyond
18          its revenue recognition policy without
19          talking to Arthur Andersen?")
20         MR. KONOVALOV:   Same objections.
21         THE WITNESS:   That would be correct, unless
22  it was a transaction that either we were -- it was
23  part of our audit testing or one that they chose to
24  talk to us about.
25         MR. GREENSTEIN:   Okay.

71

1      Q   And back to the arrangement element of 97-2.
2      A   Excuse me.
3      Q   Are you aware that Oracle's revenue
4   recognition policy required a signed contract by both
5   parties to meet that element in --
6          MR. KONOVALOV:   Objection; lacks --
7          MR. GREENSTEIN:   Q. -- in fiscal year 2001?
8          MR. KONOVALOV:   Sorry.  Objection; lacks
9   foundation.
10         MR. SIDORSKY:   Objection to form.
11         THE WITNESS:   I believe that's true.
12         MR. GREENSTEIN:   Okay.
13     Q   So if there was a case where on the last day
14  of the quarter Oracle did not have a signed contract
15  from a customer for a software license as of the night
16  on the last day of the quarter, would that preclude
17  revenue recognition under the terms of the policy?
18         MR. KONOVALOV:   Objection; assumes facts not
19  in evidence; incomplete hypothetical.
20         MR. SIDORSKY:   Objection to form.
21         THE WITNESS:   Generally, yes.
22         MR. GREENSTEIN:   Okay.
23     Q   So I think you testified earlier that in
24  April of 2002 Andersen was dismissed by Oracle;
25  correct?

72

1      A   Correct.
2      Q   Now, who took over as auditor for Oracle
3   after that time?
4      A   Ernst & Young.
5      Q   Okay.  Now, was there any sort of transition
6   that occurred between Andersen and Ernst & Young?
7          In other words, what did you have to do or
8   did you have to do anything in order to transition the
9   work to EY?
10     A   There was a transition that occurred.
11     Q   Okay.  And what occurred or -- yeah, what
12  occurred?
13     A   Well, the -- the standard practice is that
14  the auditor being replaced, in this case Andersen,
15  makes available to the -- the new auditor our audit
16  work papers, typically for the last year we audited.
17  So in this year we would have made our work papers
18  available for fiscal 2001, as well as the quarters
19  during fiscal 2001, and they would review those.
20         In this case, since we had also been the
21  auditors of record for the first three quarters of
22  fiscal 2002, we made those records available to
23  Ernst & Young as well, or those work papers available
24  to Ernst & Young as well.
25         However, ultimately Ernst & Young had to take

73

1  responsibility for all of the quarters and the
2  year-end audit in 2002. So I don't know what basis,
3  if any, they placed upon the work we had performed,
4  but -- but at the time the 10-K was filed for '02,
5  Ernst & Young had taken responsibility for the
6  quarterly reviews for 2002.
7    Q  Okay. But you provided the work papers for
8  2002, the first three quarters, at least, to Ernst &
9  Young; right?
10   A  That's correct.
11   Q  Okay. Now, other than providing them with
12  documents, do you have -- did you have any discussions
13  or meetings with Ernst & Young where you had to talk
14  about the transition or any issues with respect to
15  Oracle?
16   A  It is customary for the auditors to meet as
17  part of the transition process. I can tell you that
18  we did meet with representatives of Ernst & Young.
19  They were in our office looking at work papers,
20  various members of our teams had discussions with
21  them, including myself.
22   Q  Okay. So when -- and did that occur roughly
23  April 2002?
24   A  Whenever -- yeah, whenever we were replaced.
25   Q  Okay. How long -- oh, sorry.

74

1        How long after Andersen was dismissed did it
2  take, or how long did it take to transition to Ernst &
3  Young?
4        In other words, when was it that Andersen was
5  officially not Oracle's auditor and Ernst & Young took
6  over, and there were no more discussions, no more
7  exchange of documents?
8    MR. SIDORSKY: Objection to form.
9    THE WITNESS: To my knowledge, it all
10  happened fairly quick. Certainly no later than
11  June 1st, because there was nobody in the Silicon
12  Valley office of Andersen after June 1st.
13   MR. GREENSTEIN: Okay.
14   Q  So you said you -- or Ernst & Young employees
15  would come into your office and discuss work papers;
16  is that right?
17   A  That's correct.
18   Q  Okay. Do you remember who came into your
19  office to look at work papers?
20   A  No.
21   Q  Okay. Do you remember -- know who
22  John Banker is?
23   A  I know John. I know the name. I met him
24  once or twice.
25   Q  Okay. Did you ever talk to him in connection

75

1  with the transition between Andersen and EY?
2    A  To be honest, I don't recall if he was in the
3  meetings or not.
4    Q  Okay. Well, do you recall any discussions
5  with John Banker after April 2002 regarding Oracle?
6    A  I -- I -- I believe I spoke to John once. I
7  believe he may have been on the phone in one of the
8  meetings we held in our office with Ernst & Young, but
9  I don't believe I met him face-to-face during the
10  transition.
11   Q  Okay. What -- what did you -- what was
12  discussed during that meeting that he was on the
13  phone?
14   A  Transition. I mean --
15   Q  Do you recall any other -- anything that was
16  discussed during that meeting?
17   A  I don't recall specifics of the discussion.
18   Q  Okay. Do you -- do you recall discussing --
19  discussing unapplied cash at any time with anyone at
20  Ernst & Young?
21   A  No.
22   Q  Do you recall discussing debit memos at any
23  time with Ernst & Young?
24   A  No.
25   Q  Do you recall discussing this lawsuit at any

76

1  time with Ernst & Young?
2    A  Nope.
3    Q  Do you know if anybody -- well, I'll ask
4  these questions with respect to do you know if anybody
5  spoke to Ernst & Young from Andersen about this
6  lawsuit?
7    A  No.
8    Q  During the quarterly reviews of 2001, the
9  fiscal year 2001 reviews, were there any sort of
10  frequently held meetings between Andersen personnel
11  and Oracle personnel that would occur?
12   MR. SIDORSKY: Objection to form.
13   THE WITNESS: I -- I don't know what you mean
14  by "frequently held meetings."
15   MR. GREENSTEIN: Okay.
16   Q  Were there any meetings that were held on a
17  particular schedule for each quarter? In other words,
18  for the first quarter, there would be a meeting on
19  such and such date, and then another meeting on this
20  date, on another date, and that would happen for each
21  quarter?
22   A  You know, informally there were meetings. I
23  wouldn't say frequently. I would say recurring
24  meetings that would happen each quarter, yes.
25   Q  Okay. And those informal meetings, would

77

1    those be with -- do you recall any informal meetings
2    occurring during the quarters, the fiscal year 2001,
3    any of those quarters?
4        A  Well, it -- it's hard for me to understand
5    and define what you're -- what you're looking for,
6    what you mean.
7        So, for example, every -- you know, every
8    quarter when someone goes to do a discussion of
9    certain accounts, they're going to go talk to someone
10   from Oracle.  So that meeting will happen every
11   quarter.
12       You know, every quarter we're going to review
13   our revenue contracts.  So we're going to have
14   discussions with people in the Oracle group at --
15   revenue group at Oracle.  So, I mean, it -- the
16   question is very broad.
17       There will be meetings that will occur every
18   quarter as part of the either quarterly review or the
19   year-end audit
20       Q  Okay.  But what I'm asking is, were there any
21   regularly held meetings, such as audit and finance
22   committee meetings, things that were regularly held
23   during a quarter that were held every quarter?
24       MR. KONOVALOV:  Objection.
25       MR. SIDORSKY:  Objection to form.

78

1        MR. KONOVALOV:  Vague and ambiguous.
2        THE WITNESS:  Well, you mentioned the audit
3    and finance committee.  The company held an audit and
4    finance committee meeting every quarter.  That is --
5    that is true.
6        We would attend a portion of that meeting.
7    Meaning, representatives from Andersen.  Every quarter
8    we would have a quarterly sign-off meeting with senior
9    financial management on the results of our work either
10   as part of the end of the quarter or part of the end
11   of the year-end audit.
12       MR. GREENSTEIN:  Okay.
13       Q  So those quarterly sign-off meetings, when
14   would those occur?
15       Let's say for the second quarter 2001, which
16   ended November 30, 2000, when would that, quote,
17   "sign-off meeting occur," or when did it occur?
18       MR. SIDORSKY:  Objection to form.
19       THE WITNESS:  I -- I don't know the specific
20   dates.  I can tell you, in general, they occurred
21   prior to the company's quarterly or year-end earnings
22   release.
23       MR. GREENSTEIN:  Okay.
24       Q  Do you recall if it occurred a week before
25   the quarterly earnings -- actually, strike that.

79

1        When you say quarterly earnings release, do
2    you mean the actual press release which usually occurs
3    after the quarter is long past?  Or do you mean before
4    the end of the -- the physical end of the quarter?
5        A  No.  I mean the former, the quarterly
6    earnings release after the end of the quarter.
7        Q  Okay.  So do you recall if it would occur a
8    week prior to that earnings release?
9        A  It would not occur that early.  It would most
10   likely have occurred a day or two before the company's
11   earnings discussion and press release.
12       Q  Okay.  And when you said sign-off meetings,
13   what -- did you mean that Andersen had to sign off on
14   the quarterly earnings statement to the market?
15       MR. SIDORSKY:  Objection to form.
16       THE WITNESS:  Let's call it a -- a conclusion
17   of our work meeting.
18       MR. GREENSTEIN:  Okay.
19       Q  What would occur during that quarterly
20   meeting two days before the earnings release?
21       A  We would meet with financial management and
22   discuss the -- the observations/items we noted during
23   the course of our work.
24       Q  Okay.  Now, focusing on the quarters in
25   fiscal year 2001 with Oracle, who from Oracle would

80

1    attend those sign-off meetings?
2        MR. SIDORSKY:  Objection to form.
3        THE WITNESS:  I can tell you the people who
4    generally attended.  Whether they attended all the
5    meetings, I don't know.
6        MR. GREENSTEIN:  That's fair.
7        THE WITNESS:  But Jeff Henley would attend.
8    Jennifer Minton would attend.  Tom Williams would
9    attend by telephone.  Deborah Lange, who is the VP of
10   tax, would attend, and I believe the assistant
11   controller, Larry Garnick, would attend.  There may be
12   other people, but I think I've captured most of them.
13       MR. GREENSTEIN:  Okay.
14       Q  And those people generally would attend each
15   of the sign-off meetings for the quarters in 2001?
16       A  Generally, yes.
17       Q  Okay.  Now, who from Andersen would attend
18   those meetings?
19       A  Typically myself, the other engagement audit
20   partner, and typically the managers on the engagement.
21   So typically there would have been two managers, one
22   or two managers in attendance, and occasionally the
23   tax partner would attend as well.
24       Q  Do you remember who the other partner would
25   be during that time period?

81

1    A   During fiscal 2001, I believe it was
2   Angelica Caicedo.
3    Q   Now, during those meetings, would Oracle show
4   you a copy of the earnings press release that they
5   were going to achieve through investors?
6    A   No, not as part of that meeting.
7    Q   At any time?
8    A   We would typically look at the financial
9   information, you know, the income statement and
10   balance sheet that was going into the press release
11   for purposes of ensuring that it agreed with the
12   information that was in our work papers.
13       Oftentimes we looked at the verbiage, the
14   accompanying verbiage in the press release, but we
15   typically did not see the last draft of it, so we
16   would have looked at an earlier draft.
17    Q   When you say "the verbiage," what do you mean
18   by that?  What -- what kinds of verbiage did you
19   have -- did you review?
20    A   Well, normally in a press release there's the
21   cover sheet which includes a discussion of the summary
22   financials, you know, that Oracle released earnings
23   through the quarter, and revenues were X compared to
24   Y, and earnings were X compared to Y, and they have a
25   comment in it from some of the executives at the

82

1   company.
2    Q   Okay.  And you'd also make sure that the
3   numbers being published to invest -- to the market
4   were -- comported with the numbers that you concluded
5   as a result of your review in the work papers; right?
6       MR. SIDORSKY:  Objection to form.
7       THE WITNESS:  We would agree the information
8   in the press release to what was included in our
9   quarterly review work papers.
10       MR. GREENSTEIN:  Okay.
11    Q   Did Larry Ellison ever attend any of these
12   sign-off meetings?
13    A   No.
14    Q   Okay.  Did Sandy Sanderson ever attend any of
15   those sign-off meetings?
16    A   No.
17    Q   Okay.  Going back to finance and audit
18   committee meetings, you said you -- that Andersen
19   would come in during certain portions of the meetings;
20   right?
21    A   That's correct.
22    Q   Okay.  And what portions of the meetings
23   would they attend?
24    A   The portion where it was the report of
25   Arthur Andersen would be certainly where we would be

83

1   there.  At times we would be invited to attend other
2   portions of the meeting as well.
3       So, for example, if there was going to be a
4   presentation on tax matters and it was something they
5   wanted us there to provide input on or hear, we may
6   stay.  Sometimes there was presentation by internal
7   audit, and we may stay.
8       So it -- it wasn't necessarily consistent
9   from quarter to quarter other than we were there for
10   the portion where the report of the auditors was on
11   the agenda.
12    Q   Okay.  Did that occur on a regular basis or
13   was there -- during each quarter, how many finance and
14   audit committee meetings were there?
15       MR. KONOVALOV:  Objection; calls for
16   speculation.
17       THE WITNESS:  We -- we were invited to one
18   meeting per quarter.
19       MR. GREENSTEIN:  Q.  And was that after,
20   following the fiscal end of the quarter?
21    A   It was following the end of the quarter, and
22   following the company's earnings or press release.
23    Q   Okay.  And what was discussed?  When -- when
24   Andersen presented, what did they -- what was
25   discussed?

84

1       MR. SIDORSKY:  Objection to form.
2       THE WITNESS:  The -- in general what was
3   discussed was the highlights from the results of our
4   work.
5       MR. GREENSTEIN:  Okay.
6    Q   But why would that occur after the press
7   release already went out and earnings were already
8   published to the market?
9       MR. SIDORSKY:  Objection to form.
10       THE WITNESS:  You'd -- you'd have to ask the
11   company that.
12       MR. GREENSTEIN:  Okay.
13    Q   When you say the highlights, what do you mean
14   by that, the highlights of your work?
15    A   Well, we would have an agenda that we would
16   put together.  It was typically fairly similar to the
17   closing meeting agenda that I referenced earlier, not
18   identical, but some of the stuff was similar, and we
19   would lead a discussion to the audit committee
20   regarding observations during the course of our
21   rework.  I'm not sure what else you're looking for.
22    Q   So who would -- other than -- well, did the
23   same people that attended the -- the quarterly
24   sign-off meetings, did those people also attend the
25   audit and finance committee meetings, that you

85

1    remember, in 2001?  I'm going to be talking about the
2    2001 quarters.
3        A   Not all those people would attend the finance
4    and audit committee meeting, no.
5        Q   Okay.  Well, do you remember who the audit
6    committee was during fiscal year 2001 for Oracle?
7        A   My recollection, Mr. Lucas, Mr. Boskin and
8    Mr. Berg, if I remember right.
9        Q   And they would obviously attend those
10   quarterly -- well, generally they would be attending
11   those finance and auditing committee meetings;
12   correct?
13       A   Generally.
14       Q   Who else would typically attend those
15   meetings from Oracle?
16       A   Generally, again, Jeff Henley, Safra Catz,
17   Dan Cooperman, Jennifer Minton, Deborah Lange.  I
18   believe that the director of internal audit would
19   attend.  I don't -- I think that was Annica Magnusson
20   during that time period.  Those are the people that,
21   quote, "generally attended."
22       Q   Okay.  Did Larry Ellison ever attend any of
23   those meetings?
24       A   Nope.
25       Q   Now, you referenced the internal audit for

86

1    Oracle.  Are you aware that during fiscal year 2001
2    Oracle had an internal auditor?
3        A   They did.
4        Q   Okay.  And was Anna (sic) Magnusson, is
5    that -- was she kind of the head of the internal
6    audit?
7        A   I believe she was during that time period.
8        Q   Okay.  What's the role?  As far as you know,
9    what's the role of the internal auditor, let's say,
10   fiscal year 2001?
11       MR. KONOVALOV:  Objection; calls for
12   speculation.
13       MR. SIDORSKY:  Objection to form.
14       MR. GREENSTEIN:  Q.  Did Andersen ever work
15   with them in conducting their reviews or audit?
16       A   I don't believe that we looked at or relied
17   upon the work of internal audit as part of our work.
18       Q   Okay.  Well, what was the work of the
19   internal audit?
20       MR. KONOVALOV:  Objection; calls for
21   speculation.
22       MR. SIDORSKY:  Objection; form.
23       THE WITNESS:  Again, you'd have to ask the
24   company broadly what -- you know, what their purpose
25   was and what their scope of work was.

87

1        MR. GREENSTEIN:  Right.
2        Q   But I think you just said that you didn't
3    rely upon their work.  I'm just wondering what you
4    meant.  What didn't you rely upon?
5        MR. SIDORSKY:  Well, same objection.
6        MR. KONOVALOV:  Calls for speculation; lacks
7    foundation.
8        THE WITNESS:  The -- the -- there's a
9    question, in order for the auditor to rely on work of
10   internal audit, it would have to be something that was
11   part of the scope of our work, and they would be
12   performing it on our behalf, and we would have to then
13   test their work on a sample basis, and what I'm
14   suggesting or explaining is that we didn't do that on
15   a quarterly basis.  So our year-end audit as part of
16   the Oracle audit.
17       MR. GREENSTEIN:  Okay.
18       Q   Now, during the audit and finance committee
19   meetings, do you recall any specific discussions
20   during 2001, or the fiscal year 2001?  Any specific
21   discussions about revenue recognition issues?
22       MR. SIDORSKY:  Objection to form.
23       MR. KONOVALOV:  Vague and ambiguous.
24       THE WITNESS:  Our quarterly agenda items,
25   quarterly meeting agendas, included certain revenue

88

1    contracts that we would discuss with management.  I
2    don't know what you mean by "revenue issues," but
3    there were revenue contracts that we would typically
4    discuss with management in our closing meeting, and
5    then some of those we would discuss with the audit
6    committee.
7        MR. GREENSTEIN:  Okay.
8        Q   So you would discuss those before the
9    earnings press release went out and also discuss them
10   after the earnings press release went out in the
11   finance and audit committee meetings; right?
12       MR. SIDORSKY:  Objection to form.
13       THE WITNESS:  Yes, there were contracts we
14   would discuss as part of our closing meeting with
15   management.  Some of those may then be -- have been
16   discussed with the audit committee as well.
17       MR. GREENSTEIN:  Okay.
18       Q   Now, do you recall during fiscal year 2001
19   any specific contracts discussed at the quarterly
20   sign-off meetings?
21       A   I don't --
22       MR. SIDORSKY:  Is the terminology sign-off
23   meeting or closing meeting?  I just want to make sure
24   we're consistent.
25       MR. GREENSTEIN:  Okay.  Is that an objection?

89

1      MR. SIDORSKY: Well, I'm trying to understand
2  if we're using the same terminology or not.
3      MR. GREENSTEIN: Okay. Well --
4      MR. SIDORSKY: It's a potential objection.
5  I'm trying to be consistent.
6      MR. GREENSTEIN: I'm sorry to say there is no
7  rule that allows you to make a potential objection,
8  but do you have an objection?
9      MR. SIDORSKY: Well, I'm trying to be clear
10  though. There is -- there is -- there is an
11  understanding and it's important to be clear on the
12  record, and that's what I'm trying to do; okay. If
13  you want, I'll object to the form. I'm suggesting we
14  should be clear.
15      MR. GREENSTEIN: Thank you.
16      MR. SIDORSKY: All right.
17      THE WITNESS: So just to be clear, I would
18  call it a closing meeting.
19      MR. GREENSTEIN: Okay.
20      Q  So during the closing meetings, do you
21  recall -- in fiscal year 2001, do you recall any
22  specific contract being discussed?
23      A  I don't recall the specifics of any
24  particular contract.
25      Q  Okay. But I'm asking if you recall a

90

1  discussion of any contract -- not the specifics of any
2  contract -- of any contract during those closing
3  meetings?
4      A  Okay. Let me answer it this way: When I
5  reviewed yesterday some of the work papers, they
6  contained audit committee agendas, audit and finance
7  committee agendas for Arthur Andersen's presentation.
8  There were contracts that were referenced in there
9  that were part of our agenda.
10      As I was looking at those, I do recall some
11  of those contracts, and I recall that they would have
12  been contracts we would have discussed.
13      Q  Okay. And what contracts were those?
14      MR. SIDORSKY: Objection to form.
15      THE WITNESS: You mentioned HP earlier. I
16  know that was on one of the agendas. I don't recall
17  specifically what other contracts would be on there.
18      MR. GREENSTEIN: Okay.
19      Q  So other than the closing meetings and the
20  audit and audit committee and finance meetings, were
21  there any other regularly scheduled meetings that
22  occurred every quarter during fiscal year 2001?
23      MR. KONOVALOV: Objection; calls for
24  speculation.
25      MR. SIDORSKY: Objection to the extent it's

91

1  already been covered and answered.
2      THE WITNESS: You know, again, I don't know
3  what you mean by regularly scheduled meetings.
4      MR. GREENSTEIN: Q. Yeah. I don't -- I
5  don't mean informal conversations that would happen
6  during the course of a review. I'm just talking
7  about, you know, a meeting that is regularly held like
8  the closing meetings and like the finance and audit
9  committee meetings.
10      MR. KONOVALOV: Involving Andersen?
11      MR. GREENSTEIN: Yes.
12      MR. KONOVALOV: Okay.
13      THE WITNESS: Formal meetings, no. I mean,
14  we would meet with, for example, Jennifer Minton
15  typically and Tom Williams to prepare for the closing
16  meetings. The -- you know, the closing meeting we
17  would have with Jeff.
18      So we would walk through some of the agenda
19  items with them, so we didn't walk into the meeting
20  and them not know what was on our agenda. So, again,
21  that's -- that's why I have difficulty answering your
22  question, because yes, we would meet with people in
23  advance of that. Yes, we would meet with people to go
24  through the results of our revenue or contract
25  testing. It all leads up to the final closing

92

1  meeting.
2      Q  Okay. So when you -- the -- the meetings
3  that you are talking about with Minton and
4  Tom Williams that occurred before you met with
5  Jeff Henley, were those -- were those meetings held
6  each of the quarters in fiscal year 2001?
7      A  There would have been various meetings with
8  Jeff and Tom -- excuse me -- Jennifer and Tom
9  throughout the quarter, yes.
10      Q  Well, meetings --
11      A  Informal meetings.
12      Q  Right.
13      Without Jeff Henley; correct?
14      A  Yes.
15      Q  And is that because the meeting -- is that
16  because Jeff Henley only attended the -- the closing
17  meetings?
18      MR. SIDORSKY: Objection to form.
19      MR. KONOVALOV: Misstates the witness's
20  testimony.
21      THE WITNESS: I don't know.
22      MR. GREENSTEIN: Q. Did you ever have
23  meetings with Jeff Henley of the type that you're
24  talking about with Jennifer Minton and Tom Williams?
25      MR. SIDORSKY: Objection to form.

Matuszak, Gary 8/1/2006 9:14:00 AM

93

1    THE WITNESS: Not that I recall.
2    MR. GREENSTEIN: Okay.
3    Q  So is it fair to say that Jeff Henley
4  attended, or, as far as you know, the only meetings
5  that Jeff Henley would attend would be the closing
6  meetings and the finance and audit committee meetings?
7    MR. SIDORSKY: Objection.
8    MR. GREENSTEIN: Q. Is that fair to say?
9    A  Yeah.
10    MR. KONOVALOV: Misstates the witness's
11  testimony.
12    THE WITNESS: The -- the formal interaction
13  between Andersen and Jeff Henley at Oracle consisted
14  of the quarterly closing meeting and the finance and
15  audit committee meeting; okay. I'm just trying to be
16  clear on, you know, the formal regularly scheduled
17  meetings.
18    MR. GREENSTEIN: That's exactly what I wanted
19  to know.
20    Q  So other than those two meetings, there
21  weren't, as far as you know, regularly scheduled
22  meetings between Andersen and Oracle, other than
23  the -- the informal-type meetings you had with
24  Jennifer Minton?
25    MR. SIDORSKY: Objection to form.

94

1    THE WITNESS: I can't provide any more
2  clarification than I already have.
3    MR. GREENSTEIN: Okay.
4    Q  Were there any other meetings where Andersen
5  would do formal presentations to Oracle?
6    A  Not as part of our normal quarterly review
7  work or year-end audit work.
8    Q  Okay. I'd like to mark this as Matuszak
9  No. 1. For the record -- well....
10    (Document marked Exhibit No. 1
11    for identification.)
12    MR. GREENSTEIN: Q. For the record, this is
13  a January 5th, 2001 -- appears to be a finance and
14  audit committee meeting agenda. It's Bates stamped
15  NDCA-ORCL 081711 through 081814.
16    I'm actually going to direct your attention
17  to certain pages. So you don't have to look through
18  the whole thing. You can thumb through it.
19    The way this was produced, it appears there
20  was tabs attached to this, and all these documents
21  were part of this packet.
22    MR. SIDORSKY: For the record, could you just
23  tell us who produced these documents?
24    MR. GREENSTEIN: Oh, any -- any document that
25  bears the NDCA-ORCL Bates stamp were produced by

95

1  Oracle.
2    Q  So if you can just generally look at the
3  first two pages.
4    A  You're referring to page 12 and 13?
5    Q  Yeah.
6    A  Excuse me. Okay.
7    Q  Looking at page 13, so are these -- does this
8  document -- was this the type -- or have you ever seen
9  this document before?
10    A  I believe I may have seen it yesterday, but
11  prior to that, no.
12    Q  Okay. Did you receive these types of
13  documents before finance and audit committee meetings?
14    A  I did not receive the -- Andersen did not
15  receive the contents and everything went to that audit
16  finance committee.
17    Q  Okay. And if you turn to the Bates stamp
18  ending in 13, see how it says "Finance and Audit
19  Committee Meeting Agenda" at the top?
20    A  Yes.
21    Q  You see it's January 5th, 2001; right?
22    A  Uh-huh.
23    Q  So is it fair to say that this -- since the
24  quarter -- the second quarter fiscal year 2001 ended
25  on November 30th, is this -- is this the agenda for --

96

1  for the presentation on that quarter?
2    MR. KONOVALOV: Objection; lacks foundation.
3    THE WITNESS: Well, it would have been the
4  presentation that we gave for the results of our Q2
5  review. What else was discussed at the meeting, I
6  would be speculating.
7    MR. GREENSTEIN: Okay.
8    Q  Now, do you recall this meeting?
9    A  I don't recall the meeting specifically, no.
10    Q  But is this the type of meeting where you
11  were describing earlier where Andersen would come in
12  and make a presentation and maybe stay for parts of
13  the meeting but wouldn't attend the whole meeting?
14    A  That's correct.
15    Q  Okay. And you see there kind of halfway down
16  the page it says Arthur Andersen LLP Q2 fiscal year
17  '01 review? You see that?
18    A  Yes.
19    Q  And do you see your name there?
20    A  Yes.
21    Q  And it looks like it -- well, it looks like
22  there is a time there. Approximately -- well, a
23  little less than an hour. Maybe 45 minutes; you see
24  that?
25    A  Yes.

97

1   Q.  Okay.  Do you recall -- well, what does the
2   Q2 fiscal year '01 review -- what does that mean?  Do
3   you know?
4   A.  That would have been the results of the
5   review that we perform for the quarter ending
6   November 30th, 2001.
7   Q.  Okay.  Let me back up a little bit.  I'm
8   going to jump around a little bit.
9        The representation letters that you testified
10  about earlier, were those -- did you see any of those
11  in the documents you reviewed yesterday?
12  A.  I did not.
13  Q.  Okay.  Now, looking at this document ending
14  Bates 13, do you recall making a presentation on
15  January 5th, 2001, about the second quarter fiscal
16  year review?
17  A.  If you're asking whether I specifically
18  recall, have recollection of the meeting, no.  If
19  you're asking me whether I attended this meeting, I
20  believe I did.
21  Q.  Okay.  Do you remember making a slide
22  presentation to the attendees of this meeting on or
23  around January 5th, 2001?
24  A.  If I looked at the slide presentation, I
25  could tell you.

98

1   Q.  So without looking at the slide presentation,
2   do you remember any specifics about what you discussed
3   during that presentation?
4   A.  No.
5   Q.  Okay.  You see how there it says "Auditor
6   Independence" under Q2 fiscal '01 review?
7   A.  Yes.
8   Q.  Did you present on a topic regarding "Auditor
9   Independence" on or about January 5th, 2001?
10  A.  I don't recall.
11  Q.  Okay.  You see down there it says internal
12  audit quarter two, fiscal year '01 operations review?
13  A.  Uh-huh.
14  Q.  And the audit schedule progress, and then
15  it's presented -- well, appears to be presented by
16  Annica Magnusson; you see that?
17  A.  Yes.
18  Q.  She was the head of internal audit at Oracle?
19  A.  I believe at the time that's correct.
20  Q.  Okay.  Did you attend this portion of that
21  meeting, this presentation?
22  A.  I don't recall.
23  Q.  But generally it's talking about the audit
24  schedule progress.  So is it fair to say that
25  typically if that was being discussed, Andersen would

99

1   attend?
2        MR. SIDORSKY:  Objection to form.
3        MR. KONOVALOV:  Objection; lacks foundation;
4   calls for speculation; the document speaks for itself.
5        THE WITNESS:  Do I need to answer?
6        MR. SIDORSKY:  You should answer.
7        THE WITNESS:  I believe that what's
8   referenced under here is internal audit.  So they're
9   talking about the internal audit Q2 FY '01 operating
10  review in the internal audit schedule, not the
11  Andersen audit schedule.
12       MR. GREENSTEIN:  Okay.
13       THE WITNESS:  So no, I did not, would not
14  have been there for that.  Would not be required to be
15  there for that.
16       MR. GREENSTEIN:  Okay.
17  Q.  So do you recall in any of these -- in any
18  quarterly finance and audit committee meeting ever
19  listening to a presentation made by Annica Magnusson?
20  A.  I believe that we attended meetings where she
21  presented after us, and we would stay in while she was
22  presenting.
23  Q.  Okay.
24       THE VIDEOGRAPHER:  I need to change the tape.
25       MR. GREENSTEIN:  Oh, he's got to change the

100

1   tape, so take a five-minute break.
2        Go off the record.
3        THE VIDEOGRAPHER:  We are going off the
4   record.  Here marks the end of videotape number one,
5   Volume I, in the deposition of Gary Matuszak.
6        (Short break taken.)
7        THE VIDEOGRAPHER:  We are back on the record.
8   The time is 11:28 a.m. here marks the beginning of
9   videotape number two, Volume I, in the deposition of
10  Gary Matuszak.
11       MR. GREENSTEIN:  Q.  So, Mr. Matuszak, we
12  were looking at what's been marked as Matuszak No. 1,
13  which is a January 5th, 2001, finance and audit
14  committee meeting packet of documents.
15       It looks to be a briefing package, and we
16  were focused on Bates page 081713, and we were talking
17  about the issue there where it said Arthur Andersen
18  LLP Q2 fiscal '01 review; do you see that there?
19  A.  Yes.
20  Q.  Okay.  Do you recall during that second
21  quarter fiscal year '01 review, do you recall ever
22  presenting any issues discussing revenue recognition
23  in the second quarter?
24       MR. KONOVALOV:  Objection; vague and
25  ambiguous.

Matuszak, Gary  8/1/2006  9:14:00 AM

101

1    MR. SIDORSKY: Objection to form.
2    THE WITNESS: I recall discussing -- well,
3  let me rephrase that.
4    We would have normally discussed revenue
5  contracts during our meetings with the audit
6  committee. So if you're asking whether we discussed
7  revenue contracts, the answer would be yes. Again,
8  you -- you used the term "revenue issues," and I'm not
9  sure what that refers to
10    MR. GREENSTEIN: Okay.
11    Q  Well, if you turn to page -- actually turn to
12  page 081715, and actually this appears to be minutes
13  of the previous audit and finance committee meeting
14  from the -- from the first quarter. See how it's
15  dated October 13th, 2000? Do you see that?
16    A  Yes.
17    Q  And if you look down on point number five,
18  you see it says "Arthur Andersen LLP"?
19    A  Yes.
20    Q  It says "Gary Matuszak and Guy Johnson from
21  Arthur Andersen LLP joined the meeting and presented
22  information about the results of their audit of the
23  Company's financial statements for the quarter ended
24  August 31, 2000."
25    Do you see that?

102

1    A  Yes.
2    Q  So this appears to be minutes from a meeting,
3  finance and audit committee meeting, for the first
4  quarter where you and Guy Johnson presented on the
5  results of the first quarter of '01; right?
6    MR. KONOVALOV: Objection; lacks foundation.
7    THE WITNESS: Yes, it -- it would have been.
8  It is what it says. We -- we presented the results of
9  our quarter for the -- it says "results of their audit
10  for the quarter." That's incorrect. It would have
11  been results of the review for the quarter.
12    MR. GREENSTEIN: Okay.
13    Q  So that language where it says "their audit"
14  is not right, because Andersen didn't perform an audit
15  of that quarter; right?
16    A  That's correct.
17    Q  Well, sorry. At this time, there hadn't been
18  done an audit of this quarter, but eventually there
19  would in connection with your fiscal year 2001 audit;
20  right?
21    MR. SIDORSKY: Objection to form.
22    THE WITNESS: That's not technically correct
23  either.
24    MR. GREENSTEIN: Q. Well, as part of the --
25  as part of the year-end fiscal 2001 audit, you looked

103

1  at the first quarter. You audited the first quarter
2  fiscal year 2001; right?
3    MR. KONOVALOV: Objection; assumes facts.
4    MR. SIDORSKY: Objection to form.
5    Yeah, assumes facts not in evidence, and
6  incorrect facts.
7    THE WITNESS: Again, that's not correct.
8    MR. GREENSTEIN: Okay.
9    Q  So as part of the fiscal year 2001 audit of
10  Oracle's financial statements, did Andersen audit the
11  results of the first quarter of 2001?
12    A  No, we did not.
13    Q  Okay. As -- and why is that?
14    MR. SIDORSKY: Objection to form.
15    THE WITNESS: We do not audit the quarters
16  within the year.
17    MR. GREENSTEIN: Okay.
18    Q  So as part of the year-end audit, do you go
19  back and review all of the different quarters?
20    MR. SIDORSKY: Objection to form.
21    THE WITNESS: The -- the quarterly reviews
22  are performed concurrent with the end of the quarter.
23  When that quarter is finished, we're done with the
24  work on that quarter. It's a quarterly review. Not
25  an audit.

104

1    Our audit is for the fiscal year ending, in
2  this case, May 31, 2001. There is never an audit
3  performed on quarters.
4    MR. GREENSTEIN: Right. Understood.
5    Q  What I'm asking is, during the audit, the
6  fiscal year-end audit, is there any analysis? Do you
7  go back and do any analysis of each individual
8  quarter?
9    MR. SIDORSKY: Objection to form.
10    THE WITNESS: No, I don't believe so.
11    MR. GREENSTEIN: Q. So -- so during -- let's
12  take the fiscal year 2001 audit for Oracle.
13    In performing that audit, Andersen didn't go
14  back and review the first quarter, second quarter, or
15  third quarter, or fourth quarter results?
16    MR. SIDORSKY: Objection to form.
17    THE WITNESS: Not as part of the -- the
18  year-end audit.
19    MR. GREENSTEIN: Okay.
20    Q  But you do do an analysis of the fourth
21  quarter, right, because you didn't do a quarterly --
22  it's wrapped up in the audit? That review of the
23  fourth quarter hasn't been done as it was with the
24  three previous quarters; right?
25    MR. SIDORSKY: Objection to form.

105

1    MR. KONOVALOV:  Vague and ambiguous.
2    THE WITNESS:  As -- as part of the audit
3 testing on Q4, auditors will normally perform some
4 type of quarter-to-quarter variation analysis, but
5 we're already looking at the May 31st financials
6 information, the year-end financial information and
7 auditing that information, and so that's more in scope
8 than review, so it becomes somewhat redundant.
9    MR. GREENSTEIN:  Q.  So during the fiscal
10 year 2001 audit, did Andersen review the quarterly
11 work papers as part of that audit?
12    MR. SIDORSKY:  Objection to form.
13    THE WITNESS:  I'm trying to be as clear as I
14 can.  We -- we perform what is called a timely review
15 of the interim financial statements.  Meaning, we
16 perform that review when the quarter ended.
17    So we performed it in September for the
18 August quarter, December for the November quarter.
19 That work is completed, and we -- we do not go back
20 and look at those quarters as part of our audit work.
21    MR. GREENSTEIN:  Okay.
22    Q  But what I was asking was as part of
23 Andersen's audit, year-end audit, fiscal year 2001 of
24 Oracle, did Andersen go back and look at the quarterly
25 review work papers?

106

1    MR. SIDORSKY:  It's been asked about three
2 times now.  Objection; objection to form.
3    THE WITNESS:  Not for purposes of looking at
4 reassessing the results of the quarterly reviews.
5    MR. GREENSTEIN:  Okay.
6    Q  For what purposes would Andersen look at
7 those work papers?
8    MR. SIDORSKY:  Object; objection to form.
9    THE WITNESS:  It is customary practice to
10 have work papers with you in the field, prior
11 quarter's work papers, the prior year's work papers
12 in the event that you want to refer to something from
13 a prior period.
14    So the work papers would have been there.
15 Would someone have referred to them?  I can't tell you
16 that nobody opened up those work papers during the
17 course of our audit, but we would have not formally
18 looked at them for purposes for reassessing the
19 results from prior quarters.
20    THE VIDEOGRAPHER:  Counsel, pardon me.  Your
21 Blackberry is just starting to really -- I'm sorry.  I
22 don't know why.
23    MR. KONOVALOV:  It hasn't moved.
24    THE VIDEOGRAPHER:  It's increased in volume.
25 I'm very sorry, but if I don't, you know --

107

1    MR. KONOVALOV:  Okay.
2    THE VIDEOGRAPHER:  -- correct it.  Sorry.
3    MR. SIDORSKY:  Wouldn't want to do this
4 again.
5    MR. GREENSTEIN:  Q.  So as part of the fiscal
6 year 2001 audit of Oracle, Andersen reviewed the --
7 did an assessment of the quarterly financial
8 statements for the fourth quarter; right?
9    MR. SIDORSKY:  Let me hear that question,
10 please.
11    THE WITNESS:  Yes, I understood --
12    MR. SIDORSKY:  Could I hear that before you
13 answer.  I want to hear the question, yeah.
14    (Whereupon, record read by the Reporter as
15 follows:
16    "Question:  So as part of the fiscal year
17    2001 audit of Oracle, Andersen reviewed
18    the -- did an assessment of the quarterly
19    financial statements for the fourth quarter;
20    right?")
21    MR. SIDORSKY:  Objection to form.
22    THE WITNESS:  There's very limited work or
23 little work that's done actually on the fourth quarter
24 of the fiscal year because of the fact that we're
25 already auditing the balance sheet information as of

108

1 that date, and we've already reviewed the balance
2 sheet and results for the prior quarter.
3    MR. GREENSTEIN:  Q.  For the third quarter;
4 right?
5    A  Yeah.
6    Q  Well, how do you ensure that the earnings
7 results and the income statement, the -- the numbers
8 on the income statement which are not -- which are
9 different than the items on a balance sheet -- how do
10 you ensure that those numbers are accurate for the
11 fourth quarter if you don't do any assessment of them?
12    MR. SIDORSKY:  Objection.
13    MR. KONOVALOV:  Objection; vague and
14 ambiguous.
15    MR. SIDORSKY:  Yeah, objection to form.  It
16 really mischaracterizes the witness's testimony and
17 the --
18    MR. GREENSTEIN:  I'll reask the question.
19    MR. SIDORSKY:  Okay.
20    MR. GREENSTEIN:  Q.  You just talked about
21 the balance sheet, and I'm asking whether during
22 fiscal year 2001 audit of Oracle, did Andersen do any
23 sort of assessment of the earnings of Oracle during
24 the fourth quarter?
25    A  Very limited.

109

1    Q   So -- but in prior quarters, let's say the
2  second quarter, quarterly review fiscal year 2001, did
3  Andersen do an assessment of the earnings in that
4  quarter?
5       MR. SIDORSKY: Objection to form.
6       THE WITNESS: I think I stated we performed
7  timely quarterly reviews. So we would have performed
8  a quarterly review for the August quarter, the
9  November 2000 quarter, and the February 2001 quarter,
10  and we would have performed those reviews prior to the
11  company issuing their earnings press release after the
12  end of the quarter.
13      MR. GREENSTEIN: Q.  So would you perform the
14  same type of timely quarterly review of the fourth
15  quarter prior to the earnings press release coming out
16  for the fourth quarter and fiscal 2001 results?
17      A   We performed an -- an audit of the year-end
18  numbers, okay. So there's really not a lot more to do
19  for the fourth quarter.
20      Q   Okay. But --
21      A   And those numbers don't show up in a -- in a
22  public filing. It's not -- you don't file a 10-Q for
23  your fourth quarter.
24      Q   Right. But --
25      A   You file your audit information for the year

110

1  end.
2      Q   Sorry.
3          But when you issue the earnings press
4  release, doesn't Oracle break out its fourth quarter
5  earnings results, its revenues for that quarter, and
6  its earnings for that quarter? Doesn't it
7      MR. SIDORSKY: Objection to form.
8      MR. KONOVALOV: Lacks foundation.
9      THE WITNESS: You're asking me a factual
10  question. Yes, they break the quarterly results out
11  in their -- in the company's press release, that's
12  correct.
13      MR. GREENSTEIN: Right.
14      Q   For the fourth quarter? And they did that
15  for the fourth quarter 2001; right?
16      A   Presumably, yes.
17      Q   Because they do it every quarter; right?
18      A   That's why I said, "Presumably, yes."
19      Q   All right.
20          So -- and you said before that, before the
21  earnings press releases went out, typically Andersen
22  would meet with Oracle in those closing meetings to
23  discuss the press release and the numbers, the
24  quarterly numbers in it; right?
25      MR. SIDORSKY: Objection to form; asked and

111

1  answered.
2      THE WITNESS: We would meet with management
3  and go over the results of our work. So in May we
4  would meet with management and walk through the
5  results of our audit testing for the fiscal year
6  ending May 31st.
7      MR. GREENSTEIN: Okay.
8      Q   But earlier you said during a particular
9  quarter, say, second quarter 2001, Andersen would meet
10  with Oracle and go over the second quarter results as
11  reflected in a public press release before the press
12  release went out; right?
13      MR. SIDORSKY: Objection to form.
14      THE WITNESS: We -- well, we would meet with
15  management and go through the results of our work,
16  which were testing either through review or audit of
17  the financial statements for that period, yes.
18      MR. GREENSTEIN: Right.
19      Q   But I think you said you also looked at the
20  numbers, the actual results, and made sure that it
21  comported with the testing work that you did and the
22  work paper, the quarterly work papers --
23      MR. KONOVALOV: Objection --
24      MR. GREENSTEIN: Q. -- right?
25      MR. SIDORSKY: -- misstates the witness's

112

1  testimony.
2      MR. SIDORSKY: And objection; the record --
3  the record speaks for itself. You're really trying to
4  now --
5      MR. GREENSTEIN: Q.  Did you --
6      MR. SIDORSKY: -- restate the record.
7      MR. GREENSTEIN: Q. -- did you state that
8  during these closing meetings, Andersen would meet
9  with Oracle and look at the quarterly press release
10  and the numbers in it and make sure that it comported
11  with your testing of the quarter and the work papers?
12      MR. SIDORSKY: It's --
13      MR. GREENSTEIN: Q. -- for that quarter?
14      MR. SIDORSKY: -- not a proper question.
15  Either he did or he didn't. It's reflected on the
16  record.
17      MR. GREENSTEIN: That's not a proper
18  objection. I just asked a question. That has nothing
19  to do with prior questions. I just asked a specific
20  question. So if you have an objection, make it.
21          I didn't refer to a previous question. I
22  asked a specific question.
23          Can you read it back?
24      MR. SIDORSKY: I don't think it's a proper
25  question to ask someone, did you state earlier in the

113

1  deposition this or that? I mean he either did or
2  didn't. You should move on.
3      MR. GREENSTEIN: What's the -- what's the
4  objection?
5      MR. SIDORSKY: Ask a question. Ask a -- ask
6  a -- ask a question.
7      MR. GREENSTEIN: I did. I'm asking you what
8  objection under the Federal Rules of Civil Procedure
9  are you making with respect to that question?
10     MR. SIDORSKY: That it's been asked and
11  answered. It's been asked and answered several times.
12  It's on the record what the test -- the witness's
13  testimony is.
14     MR. GREENSTEIN: Okay. Again, I'm going to
15  ask that you don't make long, speaking objections,
16  because I don't want to have to bring Mr. Matuszak
17  back to the extent that it's wasting time.
18     Can you -- can you read the question back,
19  please.
20     (Whereupon, record read by the Reporter as
21  follows:
22     "Question: Did you state that during these
23      closing meetings Andersen would meet with
24      Oracle and look at the quarterly press
25      release and the numbers in it and make sure

114

1      that it comported with your testing of the
2      quarter and the work papers?")
3     MR. SIDORSKY: All right.
4     So just for the record, I'm objecting to the
5  form. I'm actually suggesting that we move on and
6  make some progress, but you can answer the question
7  certainly.
8     THE WITNESS: Okay. So let me -- let me be
9  clear, because I don't know if what you said is what I
10  said. I don't believe what you said is accurate.
11     We would have our quarterly closing meeting,
12  okay. We didn't, as part of that closing meeting, tie
13  information from the press release into financial
14  data. Separately from that closing meeting, we would
15  receive a copy of the company's press release.
16     Prior to the press release going out, we
17  would take the press release and physically tick
18  information in there to the consolidating or
19  consolidated lead schedules that were in our quarterly
20  review work papers, and so....
21     MR. GREENSTEIN: Q. But wouldn't you discuss
22  the -- the result -- the actual financial results in
23  the press release? Didn't you say -- well, would you
24  discuss, during those closing meetings with Oracle,
25  those numbers and whether they were accurate or not?

115

1     A  We would discuss results for the quarter. We
2  typically didn't bring the financial statements or
3  press release or anything into the meeting with us.
4  We would have our agenda which would include a summary
5  of the results of our work. It would not include
6  sitting down in the, you know, closing session with
7  Jeff and talking about revenues, operating expenses,
8  balance sheet items. No, we would not do that.
9     Q  Okay. Well, when you made those tick marks
10  on the press release, where -- were you making those
11  by nonfinancial statements in the press release
12  or were you making them ticking off the financial --
13  the actual financial information in it, or both?
14     MR. SIDORSKY: Objection to form.
15     MR. KONOVALOV: Vague and ambiguous.
16     THE WITNESS: I don't know what you mean by
17  financial versus nonfinancial, so let me explain to
18  you what we did.
19     MR. GREENSTEIN: Okay.
20     THE WITNESS: Which is the balance sheet and
21  income statement would be tied into our work papers,
22  and if the summary verbiage on the press release
23  included a revenue number, or net income number, or
24  earnings per share number, we would physically check
25  those. It's a clerical check of the press release.

116

1  We would check those into our work papers.
2     MR. GREENSTEIN: Okay.
3     Q  Let's take revenue, for example.
4     If the press release said Oracle earned two
5  billions dollars in revenue for a particular quarter,
6  okay, what -- would you -- would you -- and -- would
7  you tick off that number?
8     A  Typically it would be checked into our work
9  papers, yes.
10     Q  Right.
11     Because you would -- you would -- you would
12  make sure that the number that was actually in the
13  press release comported with the numbers in the
14  quarterly work papers; right?
15     A  Yeah. Agree to the numbers in the company's
16  books and records, a copy of which the consolidating
17  income statement or consolidated income statement -- a
18  copy of which would be in our work papers.
19     Q  Okay. Now, for the fourth quarter, did you
20  do that same -- strike that.
21     Was the process the same for the fourth
22  quarter?
23     A  In the fourth quarter, we would tie in the
24  year-to-date information, and we most likely had a
25  schedule in our work papers that calculated the fourth

117

1  quarter separate earnings release by, you know, a
2  company prepared schedule that would have calculated
3  what the fourth quarter was, or a summary of the four
4  quarters for the year that you could have derived the
5  fourth quarter stand alone earnings.
6      Q  So there was some type of assessment done of
7  the fourth quarter revenues and earnings as part of
8  the audit --
9      MR. SIDORSKY:  Objection.
10     MR. GREENSTEIN:  Q.  -- is that fair to say?
11     MR. SIDORSKY:  Objection to form.
12     THE WITNESS:  I think I stated earlier that
13 was a very high-level assessment of just looking at
14 the fourth quarter, and I don't recall what that would
15 have been, but it's very limited.
16     MR. GREENSTEIN:  Okay.
17     Q  But as part of the audit, you're auditing
18 the -- the 2001 total revenues for the company; right?
19     MR. SIDORSKY:  Objection to form.
20     MR. KONOVALOV:  Objection; vague and
21 ambiguous.
22     THE WITNESS:  Well, we issue an opinion on
23 the financial statements as a whole.  We don't issue
24 an opinion on revenue, or any single line item, or any
25 single footnote in any of the statements.  So our

118

1  opinion is issued on the consolidated financial
2  statements of Oracle.
3      MR. GREENSTEIN:  Right.
4      Q  And the consolidated financial statements --
5  well, the consolidated income statement for the year
6  includes the revenues and earnings from the fourth
7  quarter; right?
8      A  It includes a revenue earnings for all four
9  quarters.  It includes it for the year.  So yes it
10 includes it for the fourth quarter.
11     Q  Right.
12     So?
13     A  Our audit opinion does not cover the fourth
14 quarter earnings.  Our audit opinion covers the
15 consolidated financial statements for the year.
16     Q  Right.
17     So it covers the total revenues and earnings,
18 the total consolidated income statement numbers for
19 the year?
20     A  That's correct.
21     Q  Okay.  And based on your work at Oracle, was
22 the fourth quarter the quarter in which there were --
23 Oracle generated the most revenues for the year?
24     A  Historically, Oracle's revenue in the fourth
25 quarter was larger than it was in the other quarters

119

1  within that fiscal year.
2      Q  Okay.  During -- during the fiscal 2001
3  year-end audit, did Andersen perform any comparison
4  between a balance in an account in the fourth quarter
5  as compared to what it was in the third quarter?
6      MR. SIDORSKY:  Can -- can I hear that
7  question again?  Sorry.
8      (Whereupon, record read by the Reporter as
9  follows:
10     "Question:  Okay.  During -- during the
11     fiscal 2001 year-end audit, did Andersen
12     perform any comparison between a balance in
13     an account in the fourth quarter as compared
14     to what it was in the third quarter?")
15     THE WITNESS:  I don't recall specific
16 schedules.  But, in general, we would have done some
17 comparative analysis that would have looked at Q4
18 versus Q3 or, you know, prior year Q4.
19     MR. GREENSTEIN:  Q.  You know, the variance
20 or the changes between the -- the -- the balance at
21 the end of the third quarter and the balance at the
22 end of the fourth quarter, you do some kind of
23 assessment of that generally; right?
24     MR. SIDORSKY:  Objection to form.
25     THE WITNESS:  I believe some level of review,

120

1  yes.
2      MR. GREENSTEIN:  Q.  And by some level, do
3  you mean high-level review?
4      A  Yes.
5      Q  Okay.  Do you know what account 25005 at
6  Oracle was during that time?
7      A  I recall what it is based upon some review of
8  information I did yesterday.
9      Q  Okay.  Now, did that refresh your
10 recollection about any analysis performed back in --
11 during the audit of 2001, an analysis of the changes
12 in the 25005 account from the third quarter to the
13 fourth quarter?
14     MR. SIDORSKY:  Objection to form.
15     MR. KONOVALOV:  Assumes facts not in
16 evidence.
17     THE WITNESS:  Did not refresh my memory on
18 specifics.
19     MR. GREENSTEIN:  Q.  Did it refresh your
20 memory generally about any analysis performed on --
21 during the audit of the 25005 account and the variance
22 between the third quarter and the fourth quarter?
23     A  No.
24     Q  Okay.  If you turn to -- I'd like to direct
25 your attention to Bates 081752.  And, for the record,

121

1  this appears to be a slide presentation. It has
2  Arthur Andersen on the top. It says "Audit Committee
3  Meeting January 5, 2001."
4       Actually it goes -- it appears that it
5  goes -- well, I'll just direct your attention to that
6  page ended 752, and I'll take you through the pages
7  that I want you to look at.
8       A  Okay.
9       Q  So if you look at the -- well, have you seen
10  this?
11       Well, if you flip through, it appears to be a
12  slide presentation made by Arthur Andersen at the
13  finance and audit committee meeting; am I correct? Is
14  that right?
15       A  Yes.
16       Q  Have you seen this slide presentation before?
17       A  I did.
18       Q  Did you make this slide presentation to
19  Oracle?
20       A  Most likely I did.
21       Q  All right.
22       Is this the -- is this kind of the standard
23  presentation that you would make during each -- during
24  the finance and audit committee meetings in the
25  quarters fiscal year 2001?

122

1       MR. SIDORSKY: Objection to form.
2       THE WITNESS: This looks familiar in terms of
3  the overall format and the content of what we would
4  cover in our quarterly meetings with the audit
5  committee.
6       MR. GREENSTEIN: Okay.
7       Q  And it appears that it was made on
8  January 5th, 2001; right?
9       A  That's correct.
10       Q  So that would be -- well, if you turn to the
11  next page, 081753, see how it says "Results of Second
12  Quarter Review"?
13       A  Yes.
14       Q  And it says "Overall Results. No adjustments
15  proposed"; do you see that?
16       A  Yes.
17       Q  What is -- okay. What does that mean, "No
18  adjustments proposed"?
19       A  That means that as part of our quarterly
20  review, we did not come up with any differences
21  between what the company recorded in the financial
22  statements and what we felt should have been recorded
23  in the quarterly financial statements. So we didn't
24  propose an adjustment to -- to reflect changes in the
25  financial statements.

123

1       Q  So no adjustment was made to the final
2  numbers that Oracle presented as part of their
3  earnings press release at the end of the quarter --
4       MR. SIDORSKY: Objection --
5       MR. GREENSTEIN: Q. -- right?
6       MR. SIDORSKY: -- to form.
7       THE WITNESS: I think that's -- yes, that's
8  correct.
9       MR. GREENSTEIN: Q. So, in other words,
10  the -- does that mean that during those closing
11  meetings when you -- when you're discussing the
12  quarter -- the quarterly results, financial results,
13  that Andersen didn't have any adjustments to those
14  results that were in that press release?
15       MR. SIDORSKY: Objection to form.
16       THE WITNESS: I -- yes, I believe that's
17  correct based on your -- your question.
18       MR. GREENSTEIN: Okay.
19       THE WITNESS: We did not propose adjustments
20  to change the balance sheet or income statement
21  presented in the press release.
22       MR. GREENSTEIN: Q. Well, is that -- is that
23  just the balance sheet and the income statement, or
24  does that mean any -- any information, any financial
25  information in the press release?

124

1       MR. SIDORSKY: Objection to form.
2       THE WITNESS: Well, this review is the result
3  of our quarterly review which entails the balance
4  sheet and the income statement. The information in
5  the press release is the company's information, not
6  ours. We don't have responsibility with respect to
7  the press release.
8       MR. GREENSTEIN: Q. But you tick -- you go
9  through the information and tick it, and you help
10  craft the language/the verbiage, as you said, in the
11  press release before it goes out; right?
12       MR. SIDORSKY: That is not what he said, and
13  I'm going to object to rehashing what has been clearly
14  been stated on the record now several times that you
15  persist in going back over and misstating, so --
16       MR. GREENSTEIN: I'll withdraw the question
17  so you don't continue to talk.
18       MR. SIDORSKY: Yeah.
19       MR. GREENSTEIN: Q. Do you see on 081753,
20  the second -- kind of the second prong of the overall
21  results. You see where it says "Quality of Earnings
22  discussion - no issues"?
23       A  I do see that.
24       Q  What does that mean?
25       A  My recollection is at some point in time

125

1    there became a requirement under the AICPA or some
2    standard for the auditor to discuss with management
3    the overall quality of earnings as part of our
4    discussion with the audit committee.  I don't remember
5    if it was AICPA or who it came from.
6         So that is the intent of this bullet, to
7    address that requirement, to have a general discussion
8    with the audit committee regarding the quality of
9    earnings.
10      Q   And when it says "no issues," does that mean
11    that Andersen is representing that the -- that there
12    are no issues with respect to the quality of earnings?
13      A   What it means is based upon the -- your
14    limited review of that quarter, we did not become
15    aware of any quality of earnings issues.  Doesn't mean
16    there were or weren't any, it just means as a result
17    of our work we didn't become aware of any.
18      Q   Okay.  At this time, after this presentation,
19    did you ever become aware of any issues?
20      MR. SIDORSKY:  Objection to form.
21      THE WITNESS:  On this quarter?  On what?
22      MR. GREENSTEIN:  Q.  On this quarter.
23      A   No.
24      Q   Okay.  On any quarter?
25      A   No.

126

1      Q   Well, why did, when I asked that question,
2    you said, "On this quarter"?  So was there another --
3    was there an issue?  I'm just asking if there was an
4    issue.
5      A   Because your question was vague.
6      Q   Agreed.
7        So was there any issue related to quality of
8    earnings that you learned of after -- with respect to
9    any quarter after this presentation was made?
10      MR. SIDORSKY:  Could you read the question
11    back?  I was distracted by the siren.  I assume we're
12    okay here.
13      THE WITNESS:  It's the noon whistle.
14      (Whereupon, record read by the Reporter as
15    follows:
16      "Question: So was there any issue related to
17      quality of earnings that you learned of
18      after -- with respect to any quarter after
19      this presentation was made?")
20      THE WITNESS:  So our discussion that he's
21    been focussed on, fiscal 2001, so I'll answer with
22    respect to that, and the answer is no.
23      MR. GREENSTEIN:  Okay.
24      Q   So what about any fiscal year?
25      MR. SIDORSKY:  Objection to form.

127

1      THE WITNESS:  I don't recall any issues, no.
2      MR. GREENSTEIN:  Okay.
3      Q   I just want to be clear.  So you don't --
4    after making this presentation, you don't recall any
5    issues relating to the quality of earnings that arose
6    with respect to Oracle at any time?
7      A   With respect to this quarter, no.  With
8    respect to the other quarters in the fiscal year, no.
9      Q   With respect to any quarter in any fiscal
10    year?
11      A   I'm saying I don't -- I don't recall any.
12    So, I mean, it's -- it's a very broad question.
13      Q   Okay.  But why -- it seems like you're trying
14    to distinguish between 2001, the quarters in 2001 and
15    some other period, and so I'm just asking if that --
16    if you're making that distinction for some reason.
17      A   My distinction is I'm trying to -- to -- to
18    draw a distinction between the quarters which appear
19    to be the subject of the litigation versus saying any
20    quarter in the company's history which I have no basis
21    to respond to many of those quarters.
22      I'm just trying to be accurate in my
23    response.  So if you go, you know, into -- you know,
24    outside of those quarters, or outside of quarters
25    where I was involved with the engagement, I'd have no

128

1    basis to respond to most of those.  So I'm just trying
2    to be factually correct, since I'm under oath.
3      Q   I understand that, and I'm not asking about
4    the early '90s or, you know, time periods ten years
5    ago.
6      I'm asking about, let's say, 2000, 2001,
7    2002, did you become aware of any issues with respect
8    to quality of earnings during that period?
9      A   No.
10      Q   Did -- did you become aware of any issues
11    with respect to quality of issues after 2002?
12      A   I wasn't involved with Oracle after April of
13    2002.
14      Q   Right, but I'm asking if you became aware of
15    any issues.
16      MR. SIDORSKY:  Well, objection to form.
17      MR. KONOVALOV:  Calls for speculation.
18      THE WITNESS:  No.
19      MR. GREENSTEIN:  Q.  So after -- after 2002,
20    you did not become aware of any issues with respect to
21    quality of earnings at Oracle from 2002 until today?
22      A   Nope.
23      Q   Are there any issues that you want to testify
24    about that you recall hearing about?
25      MR. KONOVALOV:  Objection; it's overbroad;

129

1  it's vague and ambiguous.
2       THE WITNESS:  No.
3       MR. GREENSTEIN:  All right.
4       THE WITNESS:  I'm --
5       MR. GREENSTEIN:  Q.  Did you have any
6  discussions after you left -- after Andersen was
7  dismissed as Oracle's auditor, did you have any
8  discussions with anybody about quality of earnings
9  issues?
10      A  When you say "anybody," company personnel?
11      Q  No.  I mean anybody.
12      A  "Anybody" is a broad -- no.
13      Q  You didn't have any -- okay.  I'm going to
14  ask the question again, because it's -- it sounds like
15  there may be discussion.  I'm not just getting to
16  them.  I don't know.
17      I'm asking if after Andersen was dismissed
18  from the Oracle -- by Oracle, did you ever have any
19  discussions with anybody about quality of earnings
20  issues at Oracle?
21      MR. KONOVALOV:  Objection; asked and
22  answered.
23      THE WITNESS:  No.
24      MR. GREENSTEIN:  Q.  You didn't have any
25  discussions with anyone?

130

1       MR. KONOVALOV:  Same objection.
2       MR. SIDORSKY:  Yeah.  Come on.  It has really
3  been answered now.  Asked and answered several times.
4       THE WITNESS:  I think I answered this
5  question several times.
6       MR. GREENSTEIN:  Okay.
7       Q  Did you see any document that -- that made
8  you aware of any quality of earnings issues?
9       MR. KONOVALOV:  Objection; assumes facts not
10  in evidence.
11      THE WITNESS:  No.  Understand, that I really
12  have paid little or no attention to Oracle since April
13  of 2002.
14      MR. GREENSTEIN:  Q.  So have you had any
15  discussions at all about Oracle since Andersen left in
16  2002?  Have you had any discussions about quality of
17  earnings issues after that time?
18      A  No.  Other than, you know, than a general
19  discussion of the purpose for this deposition
20  yesterday.
21      Q  Okay.  See in the second bullet point it says
22  "Judgmental Reserves and Accruals"?
23      A  Yes.
24      Q  What does that mean?
25      A  It means that one of the items we would

131

1  routinely discuss with management and with the audit
2  committee, in this case, was discussing some of the --
3  you know, the judgmental reserves and accruals.  I
4  think you'll see this on most of our agendas.
5       Q  Right.  I actually have seen them on most of
6  them.
7       The term "judgmental reserves," does that
8  mean -- is that discussing some sort of judgment made
9  by Oracle with respect to reserves, or does that mean
10  some sort of judgment made by Andersen?
11      A  Oracle.
12      Q  Oracle.
13      And what types of reserves have a judgmental
14  aspect to them, let's say, in 2001, if you remember?
15      MR. SIDORSKY:  Objection to form.
16      MR. KONOVALOV:  Vague and ambiguous.
17      MR. GREENSTEIN:  Actually, in this
18  quarter.  I'll focus in on this quarter.
19      A  Let me -- let me answer more generally,
20  because I don't know that I can answer specifically
21  with this quarter.
22      Q  Okay.
23      A  But there are certain accounts in the
24  financial statements that I'll use accounts payable.
25  If you get an invoice, you book the invoice.  If

132

1  you're talking about an accrual for, you know, a
2  number, if it's a litigation accrual, a warranty
3  accrual, some of those items require more judgment
4  from management because they have to base it on less
5  precise information.
6       The same would be true for a receivable
7  reserve where you're trying to estimate the
8  realizability or recovery of receivables that have
9  been recorded in the books but not yet collected.
10  It's less precise, so there's more judgment involved.
11  That's -- that's what's intended to -- we intend to
12  mean by the -- the caption "Judgmental Reserves and
13  Accruals."
14      Q  Okay.  And you see the bullet point there
15  where it says "Domestic Reserves"?
16      A  Uh-huh.
17      Q  And it has "A/R judgment reserves," "Sales
18  return reserves," and "Accruals."
19      A  Yes.
20      Q  What does "A/R judgment reserves" mean?
21      A  I believe it refers to the account receivable
22  reserve.  And the overall reserve, I believe there was
23  a component of it that required more -- required more
24  judgment.  The whole reserve required judgment, but
25  this would be one that was not identified with

Matuszak, Gary  8/1/2006  9:14:00 AM

133

1  specific accounts.
2      Q.  Okay.  What do you mean by that?
3      MR. SIDORSKY:  Objection to form.
4      MR. GREENSTEIN:  Q.  You said there was a
5  component of it that required more judgment.  The
6  whole reserve required judgment, but this would be one
7  that was not identified with specific accounts, and
8  I'm wondering what was the component of it that
9  required more judgment?
10     A.  Well, wait.  Let me clarify.
11     I don't -- I don't recall the specific
12  discussion on this, but it says "A/R judgment
13  reserve."  It doesn't say A/R reserve, so let me
14  clarify.  I -- I'm implying, guessing, if you will,
15  that this is not related to the entire reserve.
16     Q.  And when you say "entire reserve," what do
17  you mean by that?  What is the entire reserve?
18     A.  Well, the reserve for collectability of
19  receivables would typically entail a portion of the
20  reserve that is very specific customer accounts, a
21  customer in bankruptcy, something along that nature
22  which would be specifically reserved, and then there
23  would be a calculation of reserves to cover items not
24  specifically identified which would typically require
25  more judgment because it's based on less precise

134

1  information.  Estimates in terms of prior history and
2  things like that.
3      Q.  So when you say "estimates," do you mean a
4  reserve?  Say you were taking a reserve for
5  uncollectibles, or Oracle was, and they wanted to
6  determine what percentage of their receivables they
7  would reserve for.
8      Is that -- is that the type of judgment
9  reserve that you're talking about?
10     MR. SIDORSKY:  Objection to form.
11     THE WITNESS:  In general, yes.
12     MR. GREENSTEIN:  Okay.
13     Q.  Well, what are the -- what are -- what are
14  the different types of reserves that you can think of?
15  Actually, withdraw that.
16     You said there was a type of reserve that
17  required more judgment.  There was a component of a
18  reserve that required more judgment.
19     Do you remember any specific reserve that
20  required more judgment?
21     A.  No.  I mean, other than what I'll call
22  nonspecific reserves.  So reserves that aren't for a
23  specific account.  If there would be a reserve -- you
24  know, the overall reserve was based on specific
25  reserves, and then a calculation of what I'll more

135

1  broadly call general reserve, meaning, it does not
2  relate to a specific account, but it's based on prior
3  experience.
4      Q.  Okay.  When you say a reserve, that doesn't
5  -- that doesn't relate to a specific account, what do
6  you mean by that?  What account?  What do you mean by
7  "account"?
8      MR. SIDORSKY:  Objection to form.  Objection
9  to form.
10     THE WITNESS:  Yeah, let me clarify by
11  "account."  I meant customer account or customer
12  invoice.
13     MR. GREENSTEIN:  Q.  Well, can you just
14  explain to me how a reserve is related to a customer
15  account or a customer invoice?
16     MR. SIDORSKY:  That's been asked and
17  answered.
18     THE WITNESS:  In general?
19     MR. GREENSTEIN:  Q.  Yeah.  I just don't
20  understand what that means.
21     MR. SIDORSKY:  Objection to form.
22     THE WITNESS:  Okay.  Do I need to answer?
23  Right?
24     So a company sells a widget.  They book a
25  receivable for the sale of that.  At a later point in

136

1  time, the customer goes bankrupt.  So that invoice,
2  that specific invoice, is deemed uncollectible and is
3  reserved for.  A reserve is set aside in the company's
4  reserve analysis.  That would be an example of a
5  specific reserve.
6      MR. GREENSTEIN:  Okay.
7      Q.  And if that reserve -- and that's a reserve
8  taken to write -- is that a reserve taken to write off
9  an accounts receivable that can no longer be collected
10  because the company went bankrupt?
11     A.  Just to clarify, what I was talking about
12  would be an adjustment made to reserve for potential
13  uncollectible account.  The write-off of the account
14  is a separate entry.
15     Q.  Right.
16     So let's say you are establishing a reserve
17  for uncollectibles in general.  Do you know what the
18  general entries are for that?
19     MR. SIDORSKY:  I'm going to object to the
20  form as -- as overly broad and hypothetical.
21     MR. KONOVALOV:  It's an incomplete
22  hypothetical.
23     THE WITNESS:  Generally I know.  Yes, I know
24  what the entries would be for that.
25     MR. GREENSTEIN:  Okay.

137

1    Q   What are they?
2    A   Typically, if it's a bad debt expense, it's
3 a -- it's a debit, if you will, to what I'll broadly
4 call SGAE, Selling General Administrative Expense.
5 Typically, it's down in the NG&A, and a credit for
6 allowance to doubtful accounts or, quote, "reserve."
7    Q   Okay.  Is it fair to say that the entry --
8 that journal entry would be -- when you say a debit to
9 SGAE, are you talking about bad debt expense?
10   A   Yes.
11   Q   Okay.  So the debit would be bad debt
12 expense, the credit would be allowance for doubtful
13 accounts, which is a contrast for that; right?
14   A   Correct.
15   Q   Okay.  So when that reserve is taken for
16 uncollectible accounts and there's a debit to a bad
17 debt expense, a debit of an expense means it
18 increases; right?
19   A   That's correct.
20   Q   Okay.  Now, the second transaction that you
21 were describing was when you write off a bad debt.
22 And do you know the journal entries that would occur
23 for that type of write-off?
24   A   Yes.
25       MR. SIDORSKY:  Same objection.  Now, we're

138

1 really -- it's not a -- it's -- it's not an
2 appropriate question given the lack of foundation or
3 context.
4       MR. GREENSTEIN:  Q.  Do you know the journal
5 entries to writing -- to write off bad debt at
6 Oracle --
7       MR. KONOVALOV:  Objection.
8       MR. GREENSTEIN:  Q.  -- during 2001?
9    A   I don't -- I don't know the specific journal
10 entries that were made at Oracle, no.
11   Q   Okay.  But, in general, based on what you
12 know with working at Oracle for what, 20 years, do you
13 know typically what a journal entry would be to write
14 off bad debt?
15       MR. KONOVALOV:  Objection; calls for
16 speculation.
17       MR. SIDORSKY:  Objection.
18       MR. GREENSTEIN:  Sorry.  I'll withdraw that.
19   Q   In general, you just gave any general entries
20 for establishing a reserve for uncollectibles; right?
21   A   Uh-huh.
22   Q   So I'm asking generally, what would the
23 journal entries be for writing off a bad debt?
24       MR. SIDORSKY:  Objection to form.
25       THE WITNESS:  Generally, you would debit the

139

1 allowance or reserve account and credit the actual
2 accounts receivable account that whatever the -- the
3 invoice was, whatever account it resided in.
4       MR. GREENSTEIN:  Q.  And that would reduce
5 the receivable; right?
6    A   Well, the -- it -- it would have no impact on
7 the net receivable.
8    Q   Okay.  What do you mean by that?
9    A   There would be -- if you're looking at the
10 financial statement caption accounts receivable, the
11 fiscal journal entry to actually write off an account
12 would normally have no impact on that account balance.
13   Q   Would normally you say?  Would any -- would
14 there be any cases where it would have an impact on
15 that account balance?
16       MR. KONOVALOV:  Objection; calls for
17 speculation.
18       MR. SIDORSKY:  Same objection.
19       THE WITNESS:  Generally, no.  There shouldn't
20 be any, but I -- you know, again, I'm trying to be
21 factual without overstating my answer.
22       MR. GREENSTEIN:  I understand.
23   Q   So focusing on Oracle in 2001, the fiscal
24 year 2001, do you recall what the journal entries were
25 for establishing a reserve for uncollectibles?

140

1    A   Again, just in general what they would be.
2    Q   Well, yeah.  I'm talking about in general
3 with respect to Oracle, how they would establish --
4 what would the journal entries be for Oracle to
5 establish reserve for uncollectibles?
6    A   Well, I've never actually traced the entries
7 in, but -- so I'm speculating, but it would be debit
8 to bad debt expense and credit to the allowance for
9 doubtful accounts.
10   Q   Okay.  And then with respect to write-offs at
11 Oracle, would -- would it be the same journal entries
12 that you described earlier with respect to accounts
13 receivable and allowance for doubtful accounts?
14       MR. KONOVALOV:  Objection; calls for
15 speculation.
16       THE WITNESS:  It should be.
17       MR. GREENSTEIN:  Okay.
18   Q   But was there ever a case where journal
19 entries would be made that would affect revenue with
20 respect to writing off bad debts?
21       MR. KONOVALOV:  Objection; calls for
22 speculation; lacks foundation.
23       THE WITNESS:  You know, again, I -- I don't
24 recall the specifics, but there -- I believe that some
25 of the entries, like if they were going to record

141

1  possibly a sales return because there are sales return
2  reserves that are listed here, a sales return listed
3  would be different than a bad debt allowance. A sales
4  return would normally result in a reduction of revenue
5  and not an increase in bad debt expense.
6      MR. GREENSTEIN: Okay.
7      Q  I'm focusing on reserves for doubtful
8  accounts, or reserves for uncollectible receivables.
9      Would that -- would the journal entries
10 associated for the establishment for those types of
11 reserves ever impact revenue?
12     MR. KONOVALOV: Objection; lacks foundation;
13 calls for speculation.
14     MR. SIDORSKY: Objection to form.
15     THE WITNESS: They should not.
16     MR. GREENSTEIN. Q. They should not?
17     A  They should not. No, I can't answer
18 specifically in terms of looking at every entry Oracle
19 made.
20     Q  That's fair.
21     Now, why should -- why should it not affect
22 revenue?
23     MR. SIDORSKY: Objection to form.
24     THE WITNESS: Because an allowance for
25 doubtful accounts is typically deemed as a credit in

142

1  collection or collectability matters, and common
2  practice is to record that as a bad debt expense.
3      MR. GREENSTEIN. Q. Now, would there ever be
4  a reason -- instead of crediting bad debt expense,
5  would there ever be a reason to reduce revenue? So
6  debit allowance for doubtful accounts and -- sorry --
7  credit for allowance of doubtful accounts and debit
8  revenue?
9      MR. SIDORSKY: Objection to form.
10     MR. KONOVALOV: Objection; vague and
11 ambiguous.
12     THE WITNESS: Would there ever be a reason to
13 do that? I don't know.
14     MR. GREENSTEIN. Q. Do you know if Oracle
15 ever -- in establishing its reserves for doubtful
16 accounts -- ever made entries that impacted revenue
17 during 2001, fiscal year 2001?
18     A  I don't recall.
19     MR. SIDORSKY: Objection to form.
20     THE WITNESS: I don't recall.
21     MR. GREENSTEIN. Q. Do you remember any
22 discussions regarding establishment of reserves or
23 write-offs of bad debt that impacted revenue?
24     MR. SIDORSKY: Objection to form.
25     MR. KONOVALOV: Vague and ambiguous.

143

1      THE WITNESS: I don't recall any
2  conversations to that -- that direct. You know, I
3  mean, I don't recall any conversations about that
4  specific topic.
5      MR. GREENSTEIN: Okay.
6      Q  Do you recall any discussions at all about
7  the impact to revenue of either establishing a bad
8  debt reserve or writing off bad debt?
9      MR. SIDORSKY: Objection to form.
10     THE WITNESS: No, I don't.
11     MR. GREENSTEIN: Okay.
12     Q  From 2000 until this deposition, do you
13 recall ever having any discussions with anybody about
14 potential inaccuracies in Oracle's publicly stated
15 financial statement?
16     MR. KONOVALOV: Objection; assumes facts not
17 in evidence.
18     MR. SIDORSKY: Objection to form.
19     THE WITNESS: No, I don't.
20     MR. GREENSTEIN. Q. Have you ever had any
21 discussions from 2000 until today about potential
22 accounting fraud occurring at Oracle?
23     MR. KONOVALOV: Objection; assumes facts not
24 in evidence.
25     THE WITNESS: I don't know.

144

1      MR. SIDORSKY: Objection to form.
2      THE WITNESS: Excuse me. No, I don't.
3      MR. GREENSTEIN. Q. Do you recall any
4  discussion from 2000 to today about -- that any of
5  Oracle's financial statements were inaccurate?
6      MR. KONOVALOV: Objection; assumes facts not
7  in evidence.
8      THE WITNESS: Any conversations? No.
9      MR. GREENSTEIN: Okay.
10     Q  Anything? Any documents or anything besides
11 conversations about -- from 2000 -- 2000 until today
12 about the inaccuracy of Oracle's financial statements?
13     MR. KONOVALOV: Same objection.
14     THE WITNESS: Yes; I read the complaint
15 yesterday.
16     MR. GREENSTEIN: Okay.
17     Q  Besides --
18     A  That's it.
19     Q  Okay. Anything besides reading the complaint
20 yesterday?
21     A  No.
22     Q  If you turn to the next page, it's Bates
23 stamped 081754. You see the first bullet point. It
24 says "Revenue Review."
25     A  Yes.

Matuszak, Gary  8/1/2006  9:14:00 AM

145

1    Q  And it says "No changes in Scope or
2  Procedures"; do you see that?
3    A  Yes.
4    Q  So what does that mean in the context of the
5  second quarter 2001?
6    A  In the context of the quarter, what it means
7  is that we had a -- standard scope that we would use
8  for reviewing license agreements each quarter, a
9  standard scope that we would have for reviewing
10  consulting agreements each quarter, and we would
11  typically put this in and say, if there were no
12  changes, we would reiterate to the audit committee
13  that we did not change the scope or the procedures we
14  performed, and we'd sometimes then reiterate verbally
15  what those procedures were, but this was to highlight
16  that we didn't change the scope of the work.
17    Q  Okay.  So where it says "License revenue -
18  tested 37%," is that fair to say that Andersen
19  reviewed 37 percent of the license revenue deals
20  during the second quarter of 2001?
21    MR. SIDORSKY:  Objection to form.
22    THE WITNESS:  Let me be -- try to be more
23  factually accurate.
24    We would have reviewed contracts where
25  license revenue recognized under those contracts would

147

1    A  That's correct.
2    Q  Okay.  And how did Andersen go about
3  determining that 37 percent?
4    MR. SIDORSKY:  Asked -- asked and answered,
5  or -- well, objection to form.
6    THE WITNESS:  We had a -- what I'll call a
7  scope that was set as to which contracts we would
8  review.  I don't recall if it was a number of
9  contracts as in the top 20 contracts or whether it was
10  a dollar threshold in -- in terms of all contracts
11  over X million dollars, but that's how our scope was
12  set.
13    So the 37 percent was not the scope.  That
14  percentage would and did vary from quarter to quarter
15  depending upon the significance of those particular
16  contracts that we looked at.
17    MR. GREENSTEIN:  Okay.
18    Q  But how did Andersen determine which license
19  revenue contracts that it would test?  Was it random,
20  or some sort of statistical analysis, or was it by
21  amount of the contract?
22    A  For purposes of this bullet point, the
23  testing of license revenue that we done, you know, on
24  a timely basis during the quarters and at year end,
25  that was a quarterly scope that was -- it was not

146

1  have equated to 37 percent of domestic revenue,
2  domestic license revenue.
3    MR. GREENSTEIN:  Okay.
4    Q  And testing 37 percent, what does -- what --
5  what do you mean by "tested"?  What do you test?
6    A  Well, we had a number of fairly standard
7  audit procedures we would go through with a revenue
8  contract.
9    Q  Okay.  So "audit procedures."
10    Did you mean to say quarterly review
11  procedures?
12    A  No.
13    Q  Okay.  So there were audit procedures you
14  went through to test revenue contracts; right?
15    A  Yeah, so let me clarify.  We performed our
16  revenue testing.  Our audit testing of revenue was
17  performed throughout the year.  So when we tested
18  revenue contracts, instead of coming in and auditing
19  all of the revenue in May of 2001, our process
20  included testing them on a quarterly basis so that we
21  could do them on a -- on a timely basis, so it's not a
22  requirement for a quarterly review.
23    Q  Okay.  So Andersen -- but Andersen performed
24  some sort of testing of 30 percent of the license
25  contracts during Q2 '01; right?

148

1  random.  As I said, it was based either on a specific
2  number of contracts, or a dollar threshold cutoff on
3  contracts, and I don't recall which it was.
4    Q  Okay.  You recall that it was the top 20
5  license revenue contracts during second quarter of
6  '01?
7    MR. SIDORSKY:  Objection to form.
8    THE WITNESS:  I just said I don't recall.
9    MR. GREENSTEIN:  Okay.
10    Q  Did you ever -- did Andersen ever receive,
11  during the second quarter of '01, a -- some
12  documentation regarding the top 20 license contracts
13  during that quarter?
14    A  Again, I'm trying to be clear.  We had a
15  scope.  If that was 20 contracts, we would have
16  received the documentation for 20 contracts.  If it
17  was 15, we would have received it for 15.
18    So, you know, I've already answered the
19  question.  I don't know how many we looked at.  It was
20  whatever our scope was.
21    Q  Okay.  But you recall receiving documentation
22  on whether it was 15 or 20.  You just recall Andersen
23  receiving documentation from Oracle on certain revenue
24  contracts during that quarter that you would test;
25  right?

149

1      A  Yes.  The contracts within our scope, we
2   would have received a package of information from the
3   company on those.
4      Q  Okay.  And how would you go about testing
5   those contracts?
6      A  Let me just pause for one second.  Are we
7   going to break soon for lunch?
8      MR. SIDORSKY:  Yeah, why don't we go off the
9   record for one second.
10      MR. GREENSTEIN:  Well, actually, I just want
11   to finish this one question.
12      MR. SIDORSKY:  Yeah.  Okay.  All right.
13      So there's a question pending, so why don't
14   you answer that, and then we'll -- we'll --
15      MR. GREENSTEIN:  Right.
16      MR. SIDORSKY:  -- pause.
17      MR. GREENSTEIN:  Okay.
18      THE WITNESS:  Sorry to interrupt.
19      MR. GREENSTEIN:  No, it's okay.
20      Q  So during the second quarter of '01 wherein
21   you tested 37 percent of the contract, the license
22   contracts, and you received the documentation with
23   respect to some contracts for that quarter, what did
24   you do to test them?
25      A  Okay.  So there's -- there's a number of

150

1   procedures we would go through.  Whether I accurately
2   recollect and state all those or not, I don't know,
3   but the -- the -- the procedures would include a
4   review of the actual contract itself, a review of the
5   company's extract.  They would prepare a -- a memo
6   that, in their view, summarized the accounting for
7   that agreement, what the license revenue should be,
8   what other components of the revenue would be, and
9   whether that was recognized or deferred during the
10   quarter.
11      So we would look at their analysis of it.  I
12   believe we would trace it to the credit to make sure
13   that the customer was credit approved.  We would trace
14   the entries into, you know, the accounts.  If there
15   were deferred revenue, we would trace them -- that the
16   revenue, they said it was deferred, it was, in fact,
17   deferred.
18      I don't re -- recall what other -- what other
19   we would have done.
20      Q  Okay.  Would you look at whether the
21   contracts, the revenue con -- license contracts met
22   the requirements of SOP 97-2?
23      A  Yes.
24      Q  So you would go through the process of the
25   four elements:  Whether arrangement existed, delivery,

151

1   the fee was fixed and determinable, and whether
2   collectability was reasonably assured?  You'd go
3   through that with respect to whatever amount of deals
4   that you deemed proper during that quarter; right?
5      MR. SIDORSKY:  Objection to form.
6      THE WITNESS:  We -- we would review or
7   conclude each of those four requirements under
8   SOP 97-2.
9      MR. GREENSTEIN:  Q.  And in the second
10   quarter, do you remember doing that with respect to
11   the 37 percent of the license revenue contracts?
12      A  Do I recall specifically?  No.
13      Q  Okay.  Do you recall doing that with respect
14   to a license revenue contract with Hewlett-Packard?
15      MR. SIDORSKY:  Objection to form.
16      THE WITNESS:  I don't recall the specific
17   testing or the documentation on any particular
18   contract.  That's why I'm answering in terms of the
19   general procedures we would perform.
20      MR. GREENSTEIN:  Right.
21      Q  But there was a deal with Hewlett-Packard in
22   the second quarter of '01 that was part of those that
23   were tested in the second quarter; right?
24      MR. KONOVALOV:  Objection; lacks foundation.
25      MR. SIDORSKY:  Objection to form.

152

1      THE WITNESS:  If -- if you're telling me
2   there was in there, then I'm supposing that it was in
3   there.
4      MR. GREENSTEIN:  Q.  And I'm asking if you're
5   aware that during the second quarter of '01 Andersen
6   reviewed the top 20 license revenue contracts for that
7   quarter and that one of them was with Hewlett-Packard?
8      A  I recall, based on the review I did
9   yesterday, one of the audit committee meeting agendas
10   included an HP contract.  Now, I haven't flipped the
11   page on this, so I don't know if HP is in Q2, Q1, Q3.
12      Q  Actually, why don't you flip the page, and
13   for the record, it's Bates 081755, and it says "HP
14   30 million hardware purchase guarantee"; do you see
15   that?
16      A  Yep.
17      Q  Does this refresh your recollection, that in
18   the second quarter of '01, as part of that 37 percent
19   testing of license revenue contracts, Andersen tested
20   this deal with HP?
21      A  It, yes, refreshes my memory that it was in
22   Q2.
23      Q  And Andersen did test this deal with HP in
24   the second quarter of '01, whether it met their
25   requirements of SOP 97-2; right?

153

1       MR. SIDORSKY: Objection to form.
2       THE WITNESS: By virtue of the fact that it's
3   in this audit committee discussion, the answer to that
4   would be yes.
5       MR. GREENSTEIN: Okay.
6       Q   If I show you a document of the top
7   20 license revenue contracts for the second quarter of
8   '01, and it had those 20 contracts and summaries of
9   the deal for the second quarter of '01, is it fair to
10  say that every contract on there was tested by Oracle
11  to see if it was -- met the requirements of SOP 97-2?
12      MR. KONOVALOV: Objection; vague and
13  ambiguous. I think you may have meant Oracle --
14  Andersen, not Oracle.
15      MR. SIDORSKY: Objection to form.
16      MR. GREENSTEIN: Q. I meant Andersen
17  testing.
18      A   Oracle or Andersen?
19      Q   Andersen's testing of the top 20 license
20  contracts in 2Q (sic) '01.
21      A   There should be documentation in there
22  regarding the HP contract.
23      Q   And that -- so if that document, if that
24  documentation exists, that means Andersen reviewed the
25  HP deal and determined that it met the requirements of

154

1   SOP 97-2; right?
2       MR. SIDORSKY: Objection to form.
3       THE WITNESS: That would be correct.
4       MR. GREENSTEIN: Okay. We can take lunch, if
5   you want.
6       THE VIDEOGRAPHER: Off the record. The time
7   is 12:34 p.m.
8       (Lunch break taken.)
9       THE VIDEOGRAPHER: We are back on the record.
10  The time is 1:37 p.m.
11      MR. GREENSTEIN: Q. Good afternoon,
12  Mr. Matuszak. Earlier we were talking about
13  management representation letters that Andersen would
14  help draft and that Oracle would actually send to
15  Andersen in connection with quarterly reviews.
16      Do you recall testifying about that?
17      A   Excuse me. Yes, I recall the conversation.
18      Q   Now, who signed those representation letters
19  for fiscal year 2001 on behalf of Oracle? Do you
20  recall?
21      A   I believe they were signed by Jeff Henley,
22  Jennifer Minton, and Tom Williams, and that's my
23  recollection.
24      Q   Okay. And -- and do you know why
25  Larry Ellison didn't sign those?

155

1       MR. SIDORSKY: Objection to form.
2       THE WITNESS: I -- I believe the -- the
3   letter was typically signed by the chief financial
4   officer and corporate controller. I don't believe
5   there was a requirement that you had the CEO or
6   chairman sign those letters.
7       MR. GREENSTEIN: Okay.
8       Q   Now, you said you read a copy of the
9   complaint in this litigation yesterday in your meeting
10  with Mr. Sidorsky; right?
11      A   We --
12      MR. SIDORSKY: Objection to form.
13      THE WITNESS: We reviewed some portions of
14  the complaint. I did not read the entire complaint.
15      MR. GREENSTEIN: Okay.
16      Q   And forgive me if I've asked -- I've already
17  asked this question, but did reading the complaint
18  refresh your recollection about anything that occurred
19  at Oracle during fiscal year 2001?
20      A   No, not the portions of the complaint that I
21  read.
22      Q   Okay. Did the -- did seeing the complaint at
23  all refresh your recollection about events that
24  occurred at Oracle in fiscal year 2001?
25      A   No.

156

1       Q   Okay. Going back to Matuszak No. 1, I'd like
2   to point you to page 081755.
3       A   Okay.
4       Q   So earlier we were talking about a deal with
5   Hewlett-Packard in the second quarter of 2001, and
6   this appears to be a presentation, or you discuss that
7   deal; is that fair to say?
8       MR. KONOVALOV: I'm just going to make a
9   standing objection here. This is well outside of the
10  scope of what's alleged in the complaint. I've given
11  you substantial latitude. Judge Infante talked about
12  the scope of this deposition.
13      At some point, you know, we're going to have
14  to be reasonable about how much you're going to
15  explore. The periphery is fine, but you've devoted a
16  good deal of time to it, so I want the standing
17  objection on the record.
18      MR. GREENSTEIN: Okay. That's noted.
19      Just for the record -- well, your objection
20  is noted.
21      MR. KONOVALOV: I mean -- I just -- I'm
22  not -- the issue is expressly addressed by
23  Judge Infante at the motion to quash for this
24  particular deposition.
25      MR. GREENSTEIN: Well, I was at that hearing,

Matuszak, Gary  8/1/2006  9:14:00 AM

157

1  and it wasn't.  His order said that we were entitled
2  to take a deposition on the discovery plan which was
3  the accounting issues related to the discovery plan.
4  That includes debit memos.  It includes the
5  November 17, 2000, on account cleanup.
6      MR. SIDORSKY:  But he expressly talked about
7  the issue of the scope --
8      MR. GREENSTEIN:  Hold on.
9      MR. SIDORSKY:  -- of this deposition.
10     MR. GREENSTEIN:  I'm not done.
11     And there are 148 debit memos that are
12 attributed to Hewlett-Packard.  There -- there's also
13 at least one credit memo that we know about that
14 relates to those debit memos, and therefore I think
15 that Hewlett-Packard is -- is reasonably calculated to
16 lead to discovery of admissible evidence related to
17 the scope of Judge Infante's order, so --
18     MR. SIDORSKY:  We disagree.  I understand
19 your position.  We're going to have to agree to
20 disagree.  I just want the objection noted.
21     MR. GREENSTEIN:  Okay.
22     Q  So looking at this first bullet point where
23 it says "30 million hardware guarantee," do you see
24 that?
25     A  Yes.

158

1      Q  Well, let me back up.
2      Why were you -- why in this presentation were
3  you singling out this transaction?
4      A  Most likely because of the -- the purchase
5  commitment, the $30 million purchase commitment, being
6  entered into on or around the same time as the license
7  agreement.
8      Q  Okay.  When you say "purchase commitment," do
9  you mean Oracle was committing to purchase 30 million
10 in hardware from HP in connection with HP's agreement
11 to purchase software licenses from Oracle?  Right?
12     A  Well, I wouldn't say that it was in
13 connection with.  It was on or around the same time.
14     Q  Okay.  So are you testifying that the
15 commitment from Oracle to purchase 30 million in
16 hardware was not related to or not contingent upon
17 HP's -- sorry.  Let me strike that.
18     Are you testifying that Oracle's commitment
19 to purchase 30 million in hardware from
20 Hewlett-Packard was not in any way contingent upon
21 HP's commitment to purchase Oracle software?
22     MR. KONOVALOV:  Objection; assumes facts not
23 in evidence, and vague and ambiguous as to
24 "contingent."
25     MR. SIDORSKY:  Objection to form.

159

1      THE WITNESS:  What I'm suggesting is that I
2  don't think it was explicit that either one of them
3  were contingent upon the other.  Again, I don't have
4  the documents in front of me, but your -- your
5  statement, I believe, indicated that one was
6  contingent upon the other, and I don't know that
7  that's a factually correct statement.
8      There were two agreements that were entered
9  into on or around the same time.  Without the
10 agreements in front of me, it would be speculating to
11 say that one was contingent upon the other.
12     MR. GREENSTEIN:  Okay.
13     THE WITNESS:  I was trying to clarify that.
14     MR. GREENSTEIN:  Okay.
15     Q  You said expressly contingent.  So if there
16 was some implied contingency between the two companies
17 that the purchase by Oracle for 30 million of hardware
18 was contingent upon HP purchasing a certain amount of
19 software -- let me strike that question.
20     Were you aware, during this presentation, of
21 any implied contingency between Oracle's commitment to
22 purchase HP hardware and HP's commitment to purchase
23 Oracle software?
24     MR. KONOVALOV:  Objection; vague and
25 ambiguous as to "implied."  Assumes facts not in

160

1  evidence.
2      MR. SIDORSKY:  Objection to form.
3      THE WITNESS:  Again, I can't testify as to
4  contingency or implied contingency.  What I can
5  testify is to the factual statement that there were
6  two agreements that were entered into on or around the
7  same time.  Whether one was contingent upon the other,
8  I don't recall if it was, nor would I speculate
9  without specific recollection.
10     MR. GREENSTEIN:  Okay.
11     Q  Well, does it matter under SOP 97-2 if the
12 two commitments were contingent upon each other?  Does
13 that affect the analysis at all?
14     MR. SIDORSKY:  Objection to form.
15     MR. KONOVALOV:  Objection; incomplete
16 hypothetical.
17     THE WITNESS:  Without reading the specific
18 contract and reading the wording as to the
19 contingency, and what that contingency said, it would
20 be -- be speculation as to whether or not that would
21 impact the -- the revenue recognition.
22     MR. GREENSTEIN:  Q.  Well, but if -- if
23 Oracle agreed to purchase -- if Oracle agreed to
24 purchase 30 million in hardware from HP because HP
25 agreed to purchase a certain amount of software from

Matuszak, Gary  8/1/2006  9:14:00 AM

161

1    Oracle, would that affect your analysis under 97-2 of
2    whether revenue could be recognized on that
3    transaction?
4        MR. KONOVALOV:  Well, objection.  It's a
5    hypothetical, and it assumes facts not in evidence.
6        THE WITNESS:  We would have reviewed the --
7    the transactions as being concurrent transactions
8    entered into on or about the same time.
9        If there was specific guarantee language in
10   there, would it have impacted it?  I mean, specific,
11   you know, contingent -- one contingent on the other
12   would have impacted it, I don't know.  Possibly not.
13       MR. GREENSTEIN:  Q.  But it could potentially
14   impact it; right?
15       MR. SIDORSKY:  Objection to form.
16       THE WITNESS:  I -- I said possibly not.  So
17   possibly so, possibly not.
18       MR. GREENSTEIN:  Okay.
19       Q  Now, you said looking at the contract.  Now,
20   what if there was -- what if there was a contingent --
21   an agreement that wasn't in the contract that made the
22   purchase from HP contingent upon HP's purchase from
23   Oracle?
24       MR. KONOVALOV:  Objection.
25       MR. GREENSTEIN:  Q.  Would that affect the

162

1    analysis?
2        MR. KONOVALOV:  Sorry.  Objection; incomplete
3    hypothetical; assumes facts not in evidence.
4        MR. SIDORSKY:  Objection to form.
5        MR. KONOVALOV:  Calls for speculation.
6        THE WITNESS:  I'm sorry.  I don't -- I don't
7    understand the question.
8        MR. GREENSTEIN:  Okay.
9        Q  My question is, if -- setting aside the terms
10   of the actual contract, if you --
11       A  The license contract?
12       Q  Yes.
13       If you knew, at that time, that there was
14   some -- there was some agreement between Oracle and HP
15   that wasn't in the contract that made Oracle's
16   purchase of HP's hardware contingent upon HP's
17   purchase of Oracle's software, if you knew that, would
18   that affect your analysis under 97-2?
19       MR. SIDORSKY:  Objection; incomplete
20   hypothetical; assumes facts not in evidence; calls for
21   speculation; lacks foundation.
22       MR. KONOVALOV:  Objection to form.
23       THE WITNESS:  If we're aware that -- of the
24   two agreements, we would have considered the existence
25   of both agreements when we looked at the revenue

163

1    recognition on the contract.
2        The -- the fact that the first bullet under
3    there says $30 million hardware purchase implies that
4    we were aware of it and it factored into our analysis
5    of revenue recognition under that contract in the
6    quarter.
7        MR. GREENSTEIN:  Right.
8        Q  But what I'm asking is a little different.
9    What I'm asking is, if there was an agreement between
10   HP and Oracle outside of the expressed terms of the
11   contract, there was an agreement that made Oracle's
12   purchase of HP hardware contingent upon a certain
13   amount of software being purchased by HP, would that
14   affect your analysis as an auditor or reviewing this
15   quarter under 97-2?
16       MR. KONOVALOV:  Same objections.
17       MR. SIDORSKY:  Same objection.
18       THE WITNESS:  I'm sorry.  Could you repeat
19   that?  Just read back that question.  I want to make
20   sure I clearly understand, because you were talking
21   about a couple of different things.
22       (Whereupon, record read by the Reporter as
23        follows:
24       "Question:  But what I'm asking is a little
25        different.  What I'm asking is, if there was

164

1        an agreement between HP and Oracle outside
2        of the expressed terms of the contract,
3        there was an agreement that made Oracle's
4        purchase of HP hardware contingent upon a
5        certain amount of software being purchased
6        by HP, would that affect your analysis as an
7        auditor or reviewing this quarter under
8        97-2?")
9        MR. KONOVALOV:  Same objections.
10       THE WITNESS:  Purchase of -- excuse me --
11   purchase of HP's hardware contingent upon them
12   licensing Oracle's software.
13       MR. GREENSTEIN:  No, let me -- let me just
14   withdraw that.  What I meant to say --
15       A  That's what I'm trying to clarify.  That's
16   what your question said.
17       Q  Sorry.
18       What I meant to say was, if outside the terms
19   of the contract there was evidence that HP's purchase
20   of Oracle's software was contingent upon Oracle buying
21   hardware from HP, would that affect your analysis in
22   second quarter of '01 under 97-2 as to whether the
23   revenue could be recognized?
24       MR. KONOVALOV:  Incomplete hypothetical;
25   assumes facts not in evidence.

165

1      MR. SIDORSKY: Objection to form.
2      THE WITNESS: I don't -- I don't know. I --
3  certainly we would have considered that factual
4  evidence. You know, being right here, I don't know
5  specifically how that would have impacted it if one
6  was directly contingent on the other.
7      MR. GREENSTEIN: Oh, okay.
8      THE VIDEOGRAPHER: I was hearing tapping. It
9  sounds like a clock.
10      MR. GREENSTEIN: Okay. Sorry.
11      THE WITNESS: Nor do I know whether that's
12  factually correct or not in this case.
13      MR. GREENSTEIN: Okay.
14      THE WITNESS: So I prefer not to -- to
15  speculate on the facts or the answer.
16      MR. GREENSTEIN: Okay.
17      Q  So when -- before you made this presentation
18  where -- this presentation here about this deal, what
19  did -- what did Andersen review to provide you with
20  support to make this presentation?
21      A  You mean what did Oracle present us to
22  review?
23      Q  Yeah.
24      What -- what did Andersen review in
25  connection with this transaction in the second quarter

166

1  of '01?
2      A  Well, my assumption, I don't know
3  specifically what we reviewed, would have been that we
4  would have looked at the license agreement, and we
5  would have looked at whatever agreement evidenced
6  the -- their commitment to purchase hardware.
7      The license agreement between Oracle and
8  Hewlett-Packard, and then whatever the other agreement
9  was that evidenced the commitment to purchase
10  $30 million, Oracle's commitment to purchase
11  $30 million of hardware from Hewlett-Packard.
12      Q  Okay. And if that evidence -- well, strike
13  that.
14      What evidence did you review, do you recall,
15  in the second quarter of '01?
16      A  Well, if you're asking me do I specifically
17  recall the agreements I reviewed, the answer is no, I
18  don't; okay. All I -- all I know is we -- we would
19  have received documents and agreements from Oracle,
20  and we would have reviewed them. I don't recall, you
21  know, five years after the fact what specific
22  documents I reviewed and what they looked like.
23      Q  Okay. But based on your experience, you
24  would review at least the license contract itself;
25  right?

167

1      A  That's correct. We would have reviewed the
2  license agreement.
3      Q  Okay. Now, would you have reviewed any
4  e-mail from Oracle to HP to determine what the
5  contingencies were, if there were any, between the two
6  commitments?
7      MR. KONOVALOV: Objection; incomplete
8  hypothetical.
9      MR. SIDORSKY: Yeah, objection. That --
10  that's really lacking in foundation; hypothetical;
11  calls for speculation.
12      MR. GREENSTEIN: Okay.
13      Q  Did you review any e-mails back in the second
14  quarter of '01 in connection with this transaction?
15      A  I don't recall.
16      Q  Okay. Do you know if anybody reviewed any
17  e-mails between HP and Oracle regarding the
18  commitments involved in this transaction?
19      MR. SIDORSKY: Anyone from Arthur Andersen?
20      MR. KONOVALOV: Objection; vague and
21  ambiguous as to "commitment."
22      THE WITNESS: Again, I don't recall what
23  specific documents were reviewed as a part of this
24  transaction.
25      MR. GREENSTEIN: Okay.

168

1      Q  Do you recall any conversations at all about
2  this deal in the second quarter of '01?
3      A  I recall having discussions regarding this
4  contract. I don't recall specific conversations we
5  had surrounding this contract.
6      Q  Okay. Well, what do you recall even
7  generally about your discussions about this contract?
8      A  Well, I recall trying to obtain an
9  understanding of the commitment to purchase
10  $30 million of hardware, understanding what Oracle's
11  normal procurement budget was for capital equipment,
12  for servers and, you know, other hardware equipment,
13  what they normally purchased from Hewlett-Packard,
14  what the price was on the equipment they purchased
15  from Hewlett-Packard, and how that related to the
16  price that they would purchase equipment under this
17  arrangement; and based upon all of the discussions we
18  had and documents we reviewed, this $30 million
19  purchase was -- you know, other than the fact that it
20  was signed at the same time as the license agreement,
21  it was a normal hardware purchase.
22      They purchased a significant amount of
23  hardware from Hewlett-Packard, and the prices weren't
24  any different. My recollection is the prices weren't
25  any different than any of the other purchases they had

169

1   with Hewlett-Packard.
2       Q   Okay.  So is it fair to say that Andersen's
3   conclusion after reviewing all the evidence and all
4   the documents provided to you regarding this deal --
5   was it Andersen's conclusion that the $30 million
6   hardware purchase -- sorry -- that HP's purchase of
7   Oracle's software was not contingent at all in any way
8   upon Oracle's $30 million hardware purchase from HP?
9       MR. KONOVALOV:  Objection.
10      MR. SIDORSKY:  Objection to form.
11      MR. KONOVALOV:  Vague and ambiguous.
12      THE WITNESS:  So earlier you asked me how I
13  would respond if it was contingent.  I told you I
14  didn't know.  Now you're asking me whether if this is
15  contingent, was it contingent, and how we conclude it?
16      So my answer is, I don't know that it was
17  contingent, but management concluded that it was
18  appropriate to recognize revenue under that license
19  arrangement.  And Andersen, after reviewing all the --
20  the evidence that was provided to us, concurred with
21  management's agreement.
22      MR. GREENSTEIN:  Okay.
23      Q   But I'm asking you if in concurring with
24  management's decision, did you conclude that there was
25  any contingency between HP's purchase of software and

170

1   Oracle's purchase of hardware?
2       MR. SIDORSKY:  Objection to form.
3       THE WITNESS:  And again I -- I think I've
4   responded that I don't know whether one was
5   specifically contingent upon the other.
6       MR. GREENSTEIN:  Q.  But I'm asking what your
7   conclusion was in order to -- to agree with
8   management.
9       In order to agree with management, Oracle's
10  management, to recognize revenue, didn't you have to
11  either conclude -- didn't you have to conclude that
12  they weren't contingent?
13      MR. SIDORSKY:  Objection.
14      MR. GREENSTEIN:  Q.  The purchases weren't
15  contingent under the -- under SOP 97-2?
16      MR. SIDORSKY:  Objection.
17      MR. KONOVALOV:  Objection; vague and
18  ambiguous; it's argumentative.
19      MR. SIDORSKY:  Yeah, objection to form.  It's
20  been asked and answered.  It is calling for
21  speculation.  It's based on facts and evidence.
22  It's -- it's -- it's assuming things that -- without
23  foundation.  Objection to form.
24      THE WITNESS:  I -- I don't know that we had
25  to specifically conclude that they were not

171

1   contingent, because I don't have the documents in
2   front of me.
3       As I said, we -- we reviewed the license
4   agreement in an effort to determine if there was value
5   associated with it.  We reviewed the license -- excuse
6   me -- the purchase commitment to see if there was
7   value associated with it.  We reviewed the license
8   agreement for its compliance under rev -- Oracle's
9   revenue policy.
10      MR. GREENSTEIN:  Okay.
11      Q   Did Andersen ever do a determination or an
12  analysis of whether the licenses sold to
13  Hewlett-Packard were for functionality that existed at
14  the time of the purchase?
15      MR. KONOVALOV:  Objection; vague and
16  ambiguous.
17      MR. SIDORSKY:  Objection to form.
18      THE WITNESS:  I can't answer with respect to
19  this specific agreement, but part of our procedures on
20  the quarterly revenue would be to look at the products
21  that were licensed and shipped under the agreement and
22  to see if they were part of the currently available
23  list of products.
24      MR. GREENSTEIN:  Okay.
25      Q   What if they weren't part of the currently

172

1   available listed product?
2       MR. SIDORSKY:  Objection; incomplete
3   hypothetical.
4       THE WITNESS:  Well, then that would impact
5   their revenue recognition.
6       MR. SIDORSKY:  Objection to form.
7       MR. GREENSTEIN:  Q.  That would preclude it?
8       THE REPORTER:  I'm sorry.  You were double --
9   you said, "Well then," and you said, "Objection"?
10      MR. SIDORSKY:  Objection to form.
11      MR. GREENSTEIN:  Q.  That would preclude
12  revenue recognition; wouldn't it?
13      A   If a product is not available, it can't be
14  shipped.  If a product cannot be shipped, it cannot be
15  recorded as revenue.
16      Q   Okay.  See there on the second bullet point
17  where it says 11th month -- "11 month term
18  license/lease that converts to the perpetual final
19  payment."
20      Do you see that?
21      A   Yes.
22      Q   Now, what does that mean, "License/lease that
23  converts to the perpetual final payment"?
24      THE REPORTER:  I need to change my disc after
25  the answer.

173

1    THE WITNESS:  My recollection of this
2    agreement is that the payment terms were somewhat
3    unique and that it was an 11th -- a 11-month -- the
4    structure of it was in the form of a lease, but at the
5    end of the final payment it converted to a perpetual
6    license.
7        MR. GREENSTEIN:  Okay.
8    Q   So -- I'm sorry.  Go ahead.
9    A   Go ahead.
10   Q   Do you need -- all right.  Should we go off
11   the record?
12       THE VIDEOGRAPHER:  This is a good time to
13   change the tape as well.  So we are going off the
14   record.  Here marks the end of videotape number two,
15   Volume I, in the deposition of Gary Matuszak.  The
16   time is 2:01 p.m.
17       (Short break taken.)
18       THE VIDEOGRAPHER:  We're back on the record.
19   The time is 2:06 p.m.
20       Here marks the beginning of videotape three,
21   Volume I, in the deposition of Gary Matuszak.
22       MR. GREENSTEIN:  Q.  Mr. Matuszak, I'm
23   looking at 081755 again.
24   A   Yes.
25   Q   We were talking about the "11 month term

174

1    license/lease that converts to the perpetual final
2    payment."
3    A   Yes.
4    Q   I think you testified that that was -- it was
5    a lease which at the end of -- which at the end of the
6    lease converted to the actual purchase of a license;
7    right?
8        MR. KONOVALOV:  Objection; misstates the
9    witness's testimony.
10       THE WITNESS:  Well, I'm not sure what you
11   mean by "purchase," so let me clarify what I -- what I
12   said is it was -- the -- the form of the agreement was
13   a lease, but at the end of the 11th payment, is my
14   recollection, the lease automatically -- the license
15   automatically converted into a perpetual license
16   agreement.
17       MR. GREENSTEIN:  Q.  And it converted if the
18   final payment was made; right?
19   A   Correct.
20   Q   So what if a final payment wasn't made?
21       MR. KONOVALOV:  Objection; incomplete
22   hypothetical.
23       MR. SIDORSKY:  Objection to form.
24       MR. KONOVALOV:  Calls for speculation.
25       THE WITNESS:  The license agreement would

175

1    have terminated, or the lease would have terminated.
2        MR. GREENSTEIN:  Okay.
3    Q   So under 97-2 -- well, strike that.
4        So are you aware that Oracle recognized all
5    the revenue with respect to this license/lease in the
6    second quarter of '01?
7        MR. KONOVALOV:  Objection; vague and
8    ambiguous, and assumes facts not in evidence.
9        MR. SIDORSKY:  Objection to form.
10       THE WITNESS:  My recollection is they -- they
11   recognized license revenue under this agreement.  I
12   don't know how much, whether it was all of it,
13   but.....
14       MR. GREENSTEIN:  Q.  Now, if it was just a --
15   if it was just a pure lease transaction, in other
16   words, there was no conversion with the final payment,
17   would Oracle be able to recognize the revenue in the
18   second quarter, or would they have to recognize it
19   ratably over the period of the lease?
20       MR. KONOVALOV:  Objection; incomplete
21   hypothetical.
22       MR. SIDORSKY:  Yeah, objection to form; just
23   hypothetical accounting questions; objection.
24       THE WITNESS:  I don't recall.  I'm not
25   being -- I don't recall how the leases or a lease

176

1    versus a license fit into 97-2 or their revenue
2    policy.
3        MR. GREENSTEIN:  Q.  Weren't you a member of
4    the AICPA task for -- on SOP 97-2 at one point?
5    A   I was, yes.
6    Q   Okay.  So just based on -- on your experience
7    on that task force and your experience, you know, as a
8    senior partner at Andersen, just generally, do you
9    know how a lease -- how the revenue for a lease
10   agreement is recognized?
11       MR. SIDORSKY:  I'm going to object.  The
12   witness is not here as an expert to testify about
13   abstract and hypothetical questions on SOP 97-2 or
14   other accounting issues.  He's really here as a a --
15   a fact witness, so I object, and objection to the
16   form.
17       Do you have the question?
18       THE WITNESS:  Yeah, yeah.  I'm trying to
19   remember.
20       MR. SIDORSKY:  Okay.
21       THE WITNESS:  I'm not sure that the -- that
22   the form of the arrangement is -- is that critical,
23   whether it was a 11-month term agreement or an
24   11-month lease.
25       So it would depend upon the term of the

177

1  arrangement and whether or not -- yeah, it would
2  depend upon the term of the arrangement, because you
3  could recognize license upfront on a term license
4  arrangement. If that was structured in the form of a
5  lease, I'm not sure that it would matter that you're
6  leasing versus licensing for a period of time.
7      Q  Okay. Are you aware that this 11-month
8  license/lease in the second quarter of '01 only
9  converted to a perpetual license if HP paid a
10  $2.1 million final payment?
11         MR. KONOVALOV: Objection; assumes facts not
12  in evidence.
13         THE WITNESS: I don't know what the -- the
14  payment terms were over the 11-month term, so I don't
15  know what the payment -- whether it was two -- I don't
16  know.
17         MR. GREENSTEIN: Okay.
18      Q  Did you know at the time you made this
19  presentation what the terms of the payments were?
20         MR. SIDORSKY: Objection to form.
21         THE WITNESS: The -- the payment terms would
22  have been included in as part of the license
23  arrangement, presumably. So it's speculation that we
24  would have been aware of the payment terms when we
25  reviewed the -- the agreement.

178

1         MR. GREENSTEIN: Okay.
2      Q  So in the context of this deal, if -- if at
3  the end of -- strike that.
4      Are you aware that as part of this 11-month
5  term license lease, that the final payment was -- that
6  would convert it, that would purportedly convert it,
7  was due more than 12 months after the date that the
8  contract was entered into? Do you know that?
9         MR. KONOVALOV: Objection; assumes facts not
10  in evidence; lacks foundation.
11         THE WITNESS: I don't recall the specific
12  payment terms.
13         MR. GREENSTEIN: Okay.
14      Q  If you knew that there was a, what you call,
15  a license/lease that converts to a perpetual with a
16  final payment and that -- that contract was signed on
17  the last day of the quarter, and then the final
18  payment wasn't due until more than 12 months after
19  that, the date that the contract was signed, would
20  that affect your analysis of whether the revenue could
21  be recognized under SOP 97-2?
22         MR. KONOVALOV: Objection; incomplete
23  hypothetical.
24         MR. SIDORSKY: Objection to form.
25         MR. KONOVALOV: It's improperly seeking an

179

1  expert opinion from a lay witness.
2         THE WITNESS: In the -- well, it would depend
3  on if you're -- in the case of Oracle, I believe the
4  answer is no.
5         MR. GREENSTEIN: Q. So that wouldn't -- you
6  wouldn't -- that fact wouldn't be part of your
7  analysis of whether to recognize revenue on a deal
8  with Oracle?
9         MR. SIDORSKY: Objection to form.
10         MR. KONOVALOV: Same objections.
11         THE WITNESS: Well, Oracle had a number of
12  contracts with payment terms beyond 12 months, and the
13  license revenue was recorded on those contracts,
14  assuming they met all the other criteria of 97-2,
15  irrespective of the fact that some of the payments
16  were beyond 12 months.
17         MR. GREENSTEIN: Okay.
18      Q  Were there any license/leases that converted
19  to perpetual that had those terms?
20         MR. KONOVALOV: Objection; calls for
21  speculation.
22         THE WITNESS: I don't recall.
23         MR. GREENSTEIN: Okay.
24      Q  Well, if Oracle recognized -- say the final
25  payment -- the terms of the license agreements said

180

1  that the final payment was 2.1 million, and that HP
2  had the option of either, you know, making that
3  payment or not, now, if they decided not to make that
4  payment, to convert it from a lease to a license
5  agreement, would Oracle be able to recognize that
6  final payment revenue upfront in the second quarter?
7         MR. KONOVALOV: Objection; incomplete
8  hypothetical; assumes facts not in evidence.
9         MR. SIDORSKY: Objection; same objection.
10         THE WITNESS: You know, I -- I don't know. I
11  don't recall. I'm not -- not sure how to answer your
12  question. You're asking me a hypothetical question.
13         MR. GREENSTEIN: Okay.
14      Q  What if I -- well, if at the time you
15  analyzed this deal, if you knew that the contract was
16  signed on November 30th, 2000, and it was a 11-month
17  term license/lease that converted to a perpetual with
18  final payment, and that final payment, the terms of
19  that final payment, were that HP would pay 2.1 million
20  in December 2001, which is more than 12 months after
21  this -- the date that the contract was entered into,
22  if you knew those facts, would that affect your
23  analysis of whether that deal could be booked as
24  revenue in the second quarter of '01?
25         MR. KONOVALOV: Objection; asked and

181

1  answered; assumes facts not in evidence; incomplete
2  hypothetical.
3      MR. SIDORSKY: Same objection.
4      THE WITNESS: If the payment terms were
5  greater than 12 months, it would -- I don't think it
6  would have impacted our conclusion.
7      MR. GREENSTEIN: Q. So the fact that HP
8  could decide not to make the final 2.1 million
9  payment, the fact that they had that ability to do
10 that, that didn't affect whether that 2.1 million
11 could be recognized upfront?
12     MR. KONOVALOV: Objection; assumes facts not
13 in evidence.
14     MR. SIDORSKY: Objection to form; asked and
15 answered as well.
16     THE WITNESS: Well, your question was whether
17 or not the payment terms are greater than 12 months.
18 Now you're asking me the question of what would happen
19 if the final payment terms were contingent. Those are
20 two different questions.
21     MR. GREENSTEIN: Okay.
22   Q  Let's take the latter.
23     MR. KONOVALOV: What's the question? Is
24 there a pending question?
25     MR. GREENSTEIN: Yeah, let me reask it.

182

1      MR. KONOVALOV: Thank you.
2      MR. GREENSTEIN: Q. If you knew at the time
3  that you analyzed this deal that the contract was
4  signed on November 30, 2000, and that it had -- in the
5  terms of the deal it gave HP the right to make a final
6  payment of 2.1 million, more than 12 months later,
7  gave them that right, and that if they didn't purchase
8  it, that it would just -- it would never convert from
9  a lease, would that affect your analysis of revenue
10 recognition under 97-2?
11     MR. KONOVALOV: Objection; incomplete
12 hypothetical; it's improperly seeking an expert
13 witness from this witness who is not here in an expert
14 capacity.
15     MR. SIDORSKY: Objection to the incomplete
16 hypothetical and same continuing objection.
17     THE WITNESS: You know, we certainly would
18 have considered it. I -- I -- you know, sitting here
19 today, I don't know how it would have impacted it.
20 You're asking me, you know, hypothetical questions or
21 questions on transactions.
22     You know, it's been six years since I looked
23 at this. And, you know, I'm no longer signing audit
24 reports, so I haven't even looked at SOP 97-2 in
25 probably two years. I don't want to speculate as to

183

1  an answer on something that I'm not even sure is
2  factual.
3      MR. GREENSTEIN: Okay.
4      THE WITNESS: I just --
5      MR. GREENSTEIN: Q. So prior to this
6  presentation or during the -- during -- during Q2 '01,
7  did you ever -- Andersen ever look at the -- the terms
8  of the final payment of the 2.1 million, the option to
9  purchase -- buy out the lease?
10     MR. KONOVALOV: Well, objection; misstates
11 the evidence.
12     MR. SIDORSKY: Objection to form.
13     THE WITNESS: Well, what I can tell you is we
14 reviewed agreements, license agreement, and presumably
15 there would have been payment terms in the license
16 agreement; management also reviewed it, management
17 concluded that it was appropriate to recognize
18 revenue.
19     We reviewed it and discussed it amongst our
20 team, and we also, I believe, concluded that it was
21 appropriate to recognize the revenue. Beyond that,
22 what the specific terms were and how you would -- how
23 your accounting would change if terms were different
24 is all speculation.
25     MR. GREENSTEIN: Okay.

184

1    Q  Earlier you testified that if the -- under
2  97-2, if the product that was -- license that was
3  sold -- if the functionality was not available, then
4  it couldn't be delivered; do you remember testifying
5  about that?
6      MR. SIDORSKY: Objection to form.
7      THE WITNESS: That was a response to one of
8  your questions, yes.
9      MR. GREENSTEIN: Okay.
10   Q  Now I have a little bit of a different
11 question, which is, if -- if a license is sold by
12 Oracle to a customer and the -- what is sold under
13 that license is available but it doesn't work, would
14 that change the analysis under 97-2, the delivery
15 element?
16     MR. KONOVALOV: Objection; incomplete
17 hypothetical.
18     MR. SIDORSKY: Yeah, I'm going to object to
19 the incomplete hypothetical, and again it really is
20 calling for these abstract expert opinions under 97-2
21 which is not a part of Mr. Matuszak's deposition and
22 outside of the scope.
23     MR. GREENSTEIN: Q. You can answer.
24   A  It's -- it's a hypothetical question. As it
25 related to Oracle, we looked to see whether the

185

1  product was on the currently available product list,
2  which meant that it went through the company's normal
3  QA testing, including beta testing and other testing
4  with customers before it was released in final
5  version.
6      Q.  Okay.  So -- but did you ever perform an
7  analysis with respect to this deal as to whether the
8  functionality promised to Hewlett-Packard actually
9  worked?
10     MR. KONOVALOV:  Same objections.  Also,
11 assumes facts not in evidence.
12     MR. SIDORSKY:  Same objection.
13     THE WITNESS:  That was not within the scope
14 of our work.
15     MR. GREENSTEIN:  Okay.
16     Q.  So you would look to see if it was available,
17 and how would you do that, to see if it was available?
18     A.  We would have a product and price list as of
19 the date that the contract was executed and look to
20 see if whatever products they ordered were on the
21 currently available product list.
22     Q.  Okay.  And -- and that's what you did with
23 respect to this?  You looked at the current product
24 list to make sure that the -- that the license
25 purchase existed, that the functionality that HP

186

1  purchased existed --
2      MR. SIDORSKY:  Objection.
3      MR. GREENSTEIN:  Q.  -- or was currently
4  available; correct?
5      MR. SIDORSKY:  Objection to form.
6      THE WITNESS:  My assumption, based on the
7  testing we normally perform, is that with respect to
8  the HP contract, we would have looked -- checked for
9  product availability.
10     Checking for product availability in the HP
11 contract would have meant that we looked at the -- you
12 know, the list that the company had of currently
13 available products and verified that the license --
14 the products licensed under the HP agreement were on
15 that -- on that list.
16     MR. GREENSTEIN:  Okay.
17     Q.  And you wouldn't perform any analysis of
18 whether the products or the module of that product on
19 that list actually worked or had been developed;
20 right?
21     MR. SIDORSKY:  Objection to form.
22     THE WITNESS:  No.
23     MR. GREENSTEIN:  Okay.
24     Q.  Would it change your analysis at all if you
25 looked -- if the products listed on Oracle's available

187

1  products list, if some of those hadn't even been
2  developed yet, would that change your analysis if you
3  knew that at the time?
4      MR. KONOVALOV:  Objection; assumes facts not
5  in evidence; incomplete hypothetical.
6      MR. SIDORSKY:  Yeah, I'm going to object to
7  the form, too, and also on the scope.
8      THE WITNESS:  If there were unavailable
9  products in the license agreement, that certainly
10 would have been a factor we would have considered.
11     MR. GREENSTEIN:  Okay.
12     Q.  You see the third bullet point on Bates
13 No. 0814755?  It says "Remix/exchange rights on
14 migrated licenses."  Do you know what that means?
15     A.  Generally, yes.
16     Q.  Okay.  What does that mean?
17     A.  Well, remix rights or exchange rights,
18 sometimes they're called, are a provisional license
19 agreement whereby the customer may license a large
20 portfolio of products, but the amount of products they
21 can use are limited to a certain dollar amount based
22 either on list price or some other formula, but the
23 customer has the right to, quote, "remix" what they
24 use within the currently available products that
25 they've licensed under that agreement, but they're not

188

1  allowed to ever exceed the dollar amount of products
2  they've licensed.
3      Q.  Okay.  Did Andersen perform an analysis or
4  did they perform any analysis or assessment of the
5  terms of that remix exchange prior to this or in
6  2Q (sic) prior to Oracle's recognition of revenue on
7  the deal?
8      A.  Well, I'm not sure what you mean by
9  "analysis."
10     Q.  Well, how did you -- why is that -- why did
11 you have that bullet point in this presentation?
12     A.  Remix and exchange rights/remix rights were
13 not uncommon in the software industry.  However, my
14 recollection is that Oracle did not have a significant
15 amount of these, so it was something we hadn't seen
16 much of, so we thought it was worthy to call it to
17 management's attention that they had remix rights in
18 this agreement.
19     Q.  And what did management say?
20     A.  I don't recall.
21     Q.  Don't remember.
22     Do you remember any specific discussions with
23 Oracle management about this deal in the second
24 quarter of '01?
25     MR. SIDORSKY:  Objection to form.

189

1    THE WITNESS: I don't -- I can recall
2  specific comments or conversations. I know we
3  discussed the Hewlett-Packard transaction with
4  management.
5    MR. GREENSTEIN: Okay.
6    Q  Did you ever discuss it with Larry Ellison?
7    A  No.
8    Q  Did you ever discuss it with Jeff Henley?
9    A  This contract would have been on our closing
10 agenda, and the audit committee agenda, both meetings
11 at which Mr. Henley attended.
12    Q  Okay. But do you remember any general
13 discussions you had with him personally about this
14 deal?
15    A  There would have been no personal
16 discussions. It would have been discussions in those
17 meetings, and I don't recall the specifics of the
18 discussions.
19    Q  Okay. You know what, I'd like to go off the
20 record and take a five-minute break.
21    THE VIDEOGRAPHER: Off the record. The time
22 is 2:28 p.m.
23    (Short break taken.)
24    THE VIDEOGRAPHER: We're back on the record.
25 The time is 2:38 p.m.

190

1    MR. GREENSTEIN: Q. Mr. Matuszak, is it --
2  is it typical for Andersen's audit clients to submit
3  management representation letters that are not signed
4  by the CEO?
5    A  Yes.
6    Q  So that's not a unique thing that
7  Larry Ellison didn't sign the representation letter;
8  right?
9    A  No.
10    Q  Okay. Now, earlier you were testifying about
11 we were talking about payment terms under 97-2, and I
12 was asking about what if a payment term or what if a
13 payment was to be made greater than 12 months after
14 the contract was entered into. Do you recall talking
15 about that?
16    A  I do.
17    Q  And I think you said that Oracle had -- was a
18 company where the payment terms under a contract were
19 not always -- the terms -- the payment terms and their
20 contracts weren't always within 12 months; is that
21 fair to say?
22    A  That's correct. They had payment terms at
23 times that extended beyond 12 months.
24    Q  Okay. And my -- under 97-2 -- well, strike
25 that.

191

1  Isn't one of the requirements of SOP 97-2
2  that fees are fixed and determinable? Right?
3    MR. SIDORSKY: Objection to form.
4    THE WITNESS: That's correct.
5    MR. GREENSTEIN: Q. And isn't -- within that
6  umbrella -- within that element, doesn't SOP 97-2
7  require that the payment terms be within 12 months?
8    MR. SIDORSKY: Objection to form.
9    THE WITNESS: The -- I can't quote the
10 literature. But, in general, the requirement is that
11 in order to be fixed and determinable, you have to
12 have a history of collecting, and any payment terms
13 beyond 12 months are -- are presumed to be not fixed
14 or determinable unless a company has a history of
15 entering into contracts with payment terms beyond
16 12 months and collecting those without a history of
17 concessions.
18    MR. GREENSTEIN: Okay.
19    Q  And when you say "history," do you mean with
20 that particular customer that has that extended
21 payment term or in general?
22    MR. SIDORSKY: Objection to form.
23    THE WITNESS: It's not a customer specific
24 requirement.
25    MR. GREENSTEIN: Q. So you're saying if

192

1  Oracle has a history of being able to collect payments
2  that are made beyond 12 months, then that is an
3  exception to the fixed and determinable requirement of
4  SOP 97-2?
5    MR. SIDORSKY: Objection to form; calling for
6  expert testimony.
7    THE WITNESS: No, I wouldn't say it's an
8  exception to the requirement of fixed and
9  determinable, that they still have to have the
10 payments as fixed and determinable, but they -- they
11 could be deemed to be fixed or determinable if the
12 payment terms were -- were beyond 12 months as long as
13 the company had a history of doing those types of
14 arrangements and collecting on them.
15    MR. GREENSTEIN: Okay.
16    Q  Now, what if a payment term went beyond
17 12 months and -- and the customer had the option of
18 paying it or not? Would that meet the fixed and
19 determinable element of SOP 97-t?
20    MR. KONOVALOV: Objection.
21    MR. SIDORSKY: Again, objection; it's -- it's
22 an incomplete hypothetical; it's calling for
23 speculation and really asking for expert-type
24 testimony.
25    MR. KONOVALOV: Join in all those objections.

193

1 THE WITNESS: Beyond 12 months, and they had
2 the option of paying for it, it may impact the revenue
3 recognition, yes.
4 MR. GREENSTEIN: Q. It may preclude it;
5 right?
6 MR. KONOVALOV: Same objections.
7 THE WITNESS: It may impact it and preclude
8 it on that final payment. It may preclude it, yes.
9 MR. GREENSTEIN: Okay.
10 Q Have you ever heard of account 25005 entitled
11 "Customer Overpayments" with respect to Oracle?
12 MR. SIDORSKY: We -- we did touch on that
13 this morning. You did ask that, I believe, Eli, but
14 okay.
15 MR. GREENSTEIN: Okay. So the objection is
16 asked and answered; right?
17 MR. SIDORSKY: Correct.
18 MR. GREENSTEIN: Great. Thank you.
19 THE WITNESS: I'm generally aware of that
20 account, yes.
21 MR. GREENSTEIN: Okay.
22 Q Do you -- and do you know -- how are you
23 aware of that account? Is it because of your
24 experience back in 2001 or -- strike that.
25 How did you become aware of account 25005,

194

1 customer overpayments?
2 MR. SIDORSKY: Objection to form.
3 THE WITNESS: Well, I was -- I was aware of
4 it in 2001, and my memory was refreshed as I reviewed
5 the work papers yesterday as to the account and the
6 general reason for the account.
7 MR. GREENSTEIN: Q. And what do you know
8 about account 25005? What's the purpose of it?
9 MR. SIDORSKY: Objection to form.
10 THE WITNESS: Well, my recollection is that
11 it is used for payments which the company receives
12 from the customer which cannot, at the time the
13 payment is received, be identified with either a
14 particular customer, or possibly a customer but not a
15 specific invoice. So they're -- they're put into this
16 account because it cannot be applied to a particular
17 receivable balance.
18 MR. GREENSTEIN: Okay.
19 Q And how do you know that that's the purpose
20 of the account?
21 MR. SIDORSKY: Objection to form.
22 THE WITNESS: From reviewing the audit
23 papers.
24 MR. GREENSTEIN: Okay.
25 Q I'm sorry. Reviewing them yesterday or

195

1 reviewing them at the time?
2 A Well, I know I reviewed them yesterday, and
3 I'm generally familiar with the nature of -- or was
4 familiar with the nature of the accounts. But, you
5 know, my -- my recollection was refreshed yesterday.
6 Q Okay. Are you aware -- strike that.
7 Is account 25005 rolled up into any line item
8 on Oracle's financial statements?
9 MR. KONOVALOV: Objection; vague and
10 ambiguous.
11 THE WITNESS: Well, it's -- it's the line
12 item that we referred to earlier this morning. I
13 believe it's called customer deposits and unearned
14 revenue.
15 MR. GREENSTEIN: Okay.
16 Q Did you mean customer advances and unearned
17 revenue?
18 A That's probably what it's called.
19 Q Okay. So account 25005, customer
20 overpayments, is part of the line item customer
21 advances and unearned revenue on Oracle's balance
22 sheet? Is that fair?
23 A Yes.
24 Q Okay.
25 A Yes.

196

1 Q Is that an asset or liability?
2 A It's a liability.
3 Q And why is it considered a liability?
4 A Well, because unless or until they can have
5 some reasonable basis to say that it might be a
6 payment of a receivable, they may have to refund the
7 money. So it's -- it's -- it's a liability in terms
8 of they may not have the right to that cash.
9 Q Right.
10 Because until they -- until they're able to
11 figure out an invoice to apply to -- a customer to
12 apply that payment to, it's not Oracle's money yet;
13 right?
14 MR. SIDORSKY: Objection.
15 MR. KONOVALOV: Objection; calls for a legal
16 conclusion.
17 MR. SIDORSKY: Yeah, objection to form.
18 THE WITNESS: Well, I would say that they
19 have to have some basis for whether they classify it
20 as an asset or, excuse me, as a liability or a
21 reduction of an asset in the financial statements, but
22 we're talking about a classification on the balance
23 sheet, just to be clear.
24 MR. GREENSTEIN: Right.
25 Q And I was just asking why -- why it's

197

1   classified as a liability rather than an asset. I
2   think you said because until it's -- well, correct me
3   if I'm wrong -- until it's -- until it can be applied
4   to an invoice or linked to a customer, it's -- it
5   might have to be refunded, because it's not Oracle's
6   money yet; is that right?
7       MR. KONOVALOV:  Objection; misstates the
8   witness's testimony.
9       MR. SIDORSKY:  Yeah, objection. What he said
10  is -- is on the record. You asked, and you got the
11  answer, and you now try and sort of restate the
12  answer, so objection to form.
13      MR. GREENSTEIN: I'll ask the question again.
14      MR. SIDORSKY:  All right.
15      MR. GREENSTEIN: The objection can be asked
16  and answered.
17   Q   But why is 25005 classified as a liability
18  rather than an asset?
19      MR. KONOVALOV:  Objection; asked and
20  answered.
21      THE WITNESS:  Because they receive payment
22  presumably from customers that are making payments to
23  them, and until they can either identify specifically
24  what customer or invoice that relates to or have some
25  other reasonable basis for classification on the

198

1   balance sheet, they would classify it as a customer
2   overpayment.
3       MR. GREENSTEIN:  Okay.
4    Q   And what happens if they can't, if a payment
5   comes into that account, and they can't apply it to an
6   invoice or associate it to a customer?
7       MR. SIDORSKY:  Objection to form.
8       THE WITNESS:  Hypothetical?
9       MR. GREENSTEIN:  Yeah.
10      THE WITNESS:  Well, at some point in time,
11  if -- well, if they're no longer doing business with
12  that customer, presumably at some point in time they
13  would refund them the money.
14      MR. GREENSTEIN:  Okay.
15   Q   Now, why is account 25005 classified as
16  unearned revenue on the balance sheet?
17      MR. KONOVALOV:  Objection; calls for
18  speculation.
19      THE WITNESS:  Well, I think we clarified the
20  caption of the account is customer advances and
21  unearned revenue. So this would presumably be a
22  customer advance if they don't have -- if they can't
23  identify it with a specific invoice or possibly a
24  specific account.
25      MR. GREENSTEIN:  Okay.

199

1    Q   Do you recall ever doing an analysis during
2   the quarterly reviews or the audit -- doing an
3   analysis of the balances in account 25005?
4       MR. SIDORSKY:  Objection to form.
5       THE WITNESS:  I -- I don't recall specific --
6   I don't recall, at the time, doing an analysis of
7   either variations between quarters or an analysis of
8   what's physically in that account. I -- I know that
9   some work was done as part of the year-end audit with
10  the composition of that account.
11      MR. GREENSTEIN:  Okay.
12   Q   What work was done as part of the audit?
13   A   My recollection is we reviewed the detail,
14  some of the detail of that account, and the offsetting
15  contra-asset account that some of it gets classified
16  into.
17   Q   And are you referring to account 12018 called
18  unapplied cash?
19   A   Yes.
20   Q   Okay. And so what analysis did you do as
21  part of the audit in connection with those two
22  accounts?
23      MR. SIDORSKY:  Objection to form.
24      THE WITNESS:  We typically reviewed the
25  detail of 12018, I believe you said, as part of the

200

1   audit, not the quarters, just to see what was in there
2   and make sure that the -- the amount that was in 12018
3   was a reclassification of some of the items in the
4   population of the, you know, customer overpayment
5   account.
6       So we would look at that to make sure that,
7   you know, they were, in fact, in there in terms of
8   what was being reclassified out to a reduction of
9   receivables.
10      MR. GREENSTEIN:  Okay.
11   Q   And you didn't do any analysis of account
12  12018 or 25005 or during the quarterly reviews; is
13  that fair to say?
14      MR. SIDORSKY:  Objection to form.
15      THE WITNESS:  That's correct. We wouldn't
16  look at the components of what was in those accounts
17  on the quarters.
18      MR. GREENSTEIN:  Okay.
19   Q   Now, can you just describe -- I think you
20  called it reclassification from items in 2505 (sic) to
21  12018.
22      Can you just describe what you mean by
23  "reclassification"?
24   A   Sure. The -- the balance in 25005 -- I'm
25  sorry. I don't remember all of the account numbers --

201

1  is a credit balance, and so some of the amounts in
2  there were used.  They were treated as a reduction of
3  that credit balance and were moved over as a
4  contra-receivable, so a credit over on the receivable
5  side.
6      So it had the impact of lowering net
7  liabilities, excuse me, lowering current liabilities
8  and lowering current assets but had no impact on net
9  current assets.
10     Q  Okay.  What -- what does that mean?  Why
11  would it have no impact on net current assets?
12     A  Well, current -- net current assets are
13  current assets less current liabilities or working
14  capital.  Some people call it working capital.
15     Q  Uh-huh.
16     A  If you reduce one side the same as you reduce
17  the other side, the difference between the two is
18  still going to be the same.
19     Q  Okay.  Because 1 -- because 25005 is a
20  liability account and 12018 is an asset account, and
21  the debit and credit cancels out; is that what you're
22  saying?
23     A  That's right.
24     Q  Okay.  Andersen didn't do any analysis of
25  those reclassifications on a quarterly basis; did

203

1  audit where an analysis of the reclassifications was
2  performed?
3      A  No.  Until I looked at the work papers
4  yesterday, I mean, the work papers refreshed my memory
5  on what was there, what work we performed during those
6  time periods.
7      Q  Okay.  Now, as a senior audit partner, would
8  you have been involved in the analysis of those
9  reclassifications at the time of the audit, or was
10  that something you would learn by looking at the work
11  papers?
12     A  I certainly would not have been involved in
13  looking at the detail, performing the testing.  May
14  have been involved in reviewing those particular work
15  papers or the particular explanation for where it was
16  discussed, what work we did.
17     Q  Okay.  Do you recall any issues arising in
18  connection with the customer overpayments account
19  during the quarterly reviews or audit in 2001?
20     MR. KONOVALOV:  Objection; vague and
21  ambiguous.
22     THE WITNESS:  Yeah, I don't -- don't know
23  what you mean by "problems," but I -- I don't recall
24  there being any issues or unusual items related to
25  those.  I don't recall seeing them on our audit

202

1  they?
2      MR. SIDORSKY:  Objection to form.
3      THE WITNESS:  I don't believe we did.
4      MR. GREENSTEIN:  Okay.
5      Q  And -- but did you -- did Andersen do a
6  fiscal year 2001 analysis of those reclassifications?
7      MR. SIDORSKY:  Objection to form.
8      THE WITNESS:  I believe that the testing that
9  I was explaining earlier was the testing performed as
10  part of the May 31, 2001, audit.
11     MR. GREENSTEIN:  Okay.
12     Q  What did you -- what did Andersen conclude as
13  a result of that analysis?
14     MR. SIDORSKY:  Objection to form.
15     THE WITNESS:  I believe we concluded that
16  we -- we believe the reclassification was appropriate.
17     MR. GREENSTEIN:  Okay.
18     Q  And what is that?  Is that based on your
19  review of work papers?
20     A  Yes.
21     Q  Okay.  And based on your review yesterday of
22  work papers?
23     A  Yeah, yes.
24     Q  Okay.  Do you remember -- other than looking
25  at the work papers, do you recall back during the

204

1  committee agenda.
2      MR. GREENSTEIN:  Okay.
3      Q  But, I mean, I'm just asking, as you sit here
4  today, do you recall any -- I said issues.  I didn't
5  say problems, actually -- but any issues or problems
6  with the 25005 account during any of the quarters in
7  2001 or during the audit?
8      A  I don't recall any.
9      MR. SIDORSKY:  Objection to form.
10     THE WITNESS:  Sorry.
11     MR. SIDORSKY:  Asked and answered.
12     MR. GREENSTEIN:  I'm sorry.
13     Q  You said you don't recall any; right?
14     A  That's correct.
15     Q  Do you recall any issues or problems arising
16  with respect to account 12018 during any of the
17  quarterly reviews or the fiscal year 2001 audit?
18     A  I do not.
19     Q  Now, during any of the quarterly reviews, did
20  Andersen ever look at the -- the total amount of
21  unapplied cash that was sitting in 25005?
22     MR. SIDORSKY:  Objection to form.
23     THE WITNESS:  When you say look at the total
24  amount, I don't -- don't know what -- we wouldn't have
25  looked at the detail of the amount.  The account

205

1  balance would have been on a schedule that we were
2  provided by the company, so we would have been aware
3  of what the balance was.
4       MR. GREENSTEIN:  Q.  And would Andersen
5  ever -- I think earlier you -- well, what happens if a
6  payment comes in from a customer and it's put into
7  account 25005 and then it's never reclassified to
8  12018 because they can't apply it to an invoice or
9  they can't apply it to a particular customer because
10 the customer may no longer be in existence?
11      What would -- what would happen to that
12 payment?
13      MR. KONOVALOV:  Objection; calls for
14 speculation.
15      MR. SIDORSKY:  Objection to form.
16      THE WITNESS:  It -- it is a hypothetical
17 question.  I mean, what -- what happened is the
18 payments that went into that account were the
19 responsibility of credit and collections to follow up
20 on where that payment came from, what customer it
21 applied to, and specifically what invoice it applied
22 to.
23      To ask me what they would do specifically
24 with a payment received from a company that went out
25 of business, I -- I'd be speculating.

206

1       MR. GREENSTEIN:  Okay.
2       Q.  I'm just wondering if Andersen ever did any
3  analysis of -- of what collection -- Oracle
4  collections was doing with respect to payments that
5  were put into 25005.
6       MR. SIDORSKY:  Objection to form.
7       THE WITNESS:  I -- I don't recall if we did
8  any testing on that as part of our year-end audit
9  work.
10      MR. GREENSTEIN:  Q.  Well, you certainly
11 didn't do it in the quarterly reviews; right?
12      A  Correct.
13      Q  Because -- okay.
14      Now, have you ever seen a report generated by
15 Oracle which has a complete list of all the items in
16 the 25005 account?
17      MR. SIDORSKY:  Objection to form.
18      THE WITNESS:  I have not.
19      MR. GREENSTEIN:  Okay.
20      Q  Do you know if anybody at Andersen has ever
21 seen such a report?
22      A  It's somewhat speculation, but I -- if we're
23 going to test the balance at the end of the fiscal
24 year, I would believe someone would have had to look
25 at the detail of that account in order to do any

207

1  testing on it.
2       Q  And so as part of the testing for the -- the
3  2001 audit, do you recall who was in charge of doing
4  the testing with respect to account 25005?
5       A  I do not.
6       Q  Okay.  Would that be an account that -- well,
7  strike that.
8       Do you recall any specific testing done on
9  that account during the year-end audit 2001?
10      MR. SIDORSKY:  Objection to form.
11      THE WITNESS:  I don't recall any testing done
12 specifically on that account, no.
13      MR. GREENSTEIN:  Okay.
14      Q  Generally on that account?
15      A  Well, generally would be only the
16 discussion -- the answer I gave before with respect to
17 the reclassification out of that account into
18 the -- the contra-receivable account.
19      Q  Okay.  But as part of the -- of the 2001
20 audit testing, did you ever -- did Andersen ever do an
21 assessment of the items in 25005 and whether those
22 have been sitting there for many years?
23      MR. SIDORSKY:  Objection to form.
24      MR. KONOVALOV:  Objection; assumes facts not
25 in evidence.

208

1       THE WITNESS:  I don't believe so.
2       MR. GREENSTEIN:  Okay.
3       Q  So, in other words, Andersen wouldn't do an
4  assessment of -- wouldn't look at whether the items in
5  25005 were supposed to be there?  They would look at
6  the reclassification from 25005 to 12018; right?
7       MR. SIDORSKY:  Objection to form.
8       MR. KONOVALOV:  Objection; vague and
9  ambiguous.
10      THE WITNESS:  I don't recall, as I said,
11 doing any testing of components of that -- that
12 account balance.
13      MR. GREENSTEIN:  Okay.  I'd like to mark this
14 next as -- I think it's Matuszak No. 2.
15      (Document marked Exhibit No. 2
16       for identification.)
17      THE WITNESS:  Thank you.
18      MR. GREENSTEIN:  Q.  For the record, this is
19 Bates stamped NDCA-ORCL 050370 through 050382.  It's
20 an "Account Analysis Report.  Period:  August 1991 to
21 May 1992."  Just take a look at it.  Let me know when
22 you're finished.
23      A  The entire exhibit?
24      Q  No, the type of report.
25      A  Okay.

209

1    Q  See how it says "Account Analysis Report"?
2    A  Yes.
3    Q  Have you ever seen this document before?
4    A  No.
5    Q  Okay.  Have you ever seen this type of report
6  before, account analysis reports?
7    A  I don't believe I have.
8    Q  Okay.  You see how it says -- it says
9  "Accounts From," and then it has some digits, and then
10  has 25005?  Do you see that?
11    A  Yes.
12    Q  And based on your experience at Oracle, does
13  this -- this appears to be a report, an account
14  analysis report of account 25005; right?
15    MR. KONOVALOV:  Objection; lacks foundation.
16    MR. SIDORSKY:  Objection to form.
17    THE WITNESS:  Yeah, I'm not sure what this
18  is.  I -- I don't know.
19    MR. GREENSTEIN:  Okay.
20    Q  But it appears to be an account analysis
21  report of 25005?
22    MR. KONOVALOV:  Objection; lacks foundation.
23    THE WITNESS:  I don't know.  It says
24  "Accounts From," and underneath that it says "To," so
25  I don't know --

210

1    MR. GREENSTEIN:  Right.
2    THE WITNESS:  -- if this is activity for an
3  account, and 25005 is sitting in amongst a number of
4  different zeros and digits.  So if you're telling me
5  factually that's what it is, okay.  But if you're
6  asking me what it is, I'm going to tell you I don't
7  know.
8    MR. GREENSTEIN:  Okay.
9    Q  You see how it says "Ending Balance," and it
10  has $0.26 there as a debit?
11    A  Yes.
12    Q  Based on your experience, auditing Oracle,
13  does that indicate that the ending balance for this
14  month where it says "Period August '91" the balance
15  was $0.26 in 25005?
16    MR. SIDORSKY:  Objection; lacks foundation;
17  calls for speculation; the document speaks for itself.
18    MR. SIDORSKY:  Same objections.
19    THE WITNESS:  Again, I've already gone on
20  record with saying I don't know what this piece of
21  paper is.
22    MR. GREENSTEIN:  Okay.
23    THE WITNESS:  Now you're asking me to
24  conclude on whether the ending balance represents the
25  ending -- ending GL balance for a particular account,

211

1  so I think my first answer answers that question.
2    MR. GREENSTEIN:  Okay.  Fair enough.
3    Q  So are you aware that -- well, Andersen was
4  Oracle's auditor in the early '90s; right?
5    A  In the early '90s, yes.
6    Q  And it was Oracle's auditor until April 2002;
7  right?
8    A  Correct.
9    Q  Okay.  And are you aware that the balance in
10  the 25005 account in the early '90s was smaller than
11  the balance in, say, 2001?
12    MR. KONOVALOV:  Objection; assumes facts not
13  in evidence.
14    MR. SIDORSKY:  Objection to form.
15    THE WITNESS:  I -- I would have no basis to
16  answer that.
17    MR. GREENSTEIN:  Okay.
18    Q  Were you -- were you aware that the -- the
19  balance in 25005 ever increased drastically during
20  your time at Andersen?
21    MR. SIDORSKY:  Objection to form.
22    THE WITNESS:  I don't recall the specific
23  balances.  The account fluctuated, but it could
24  fluctuate from quarter to quarter, but it would be
25  based on specific payments that came in from

212

1  customers.
2    It could be large payments that came in at
3  the end of the quarter which would cause it to be
4  larger at the end of the quarter.  Certain quarters
5  had more activity than others.
6    MR. GREENSTEIN:  Right.
7    THE WITNESS:  You know, it's not reasonable
8  to -- to answer as to generally a balance going up or
9  down.  Particularly for this account.
10    MR. GREENSTEIN:  I'd like to mark this as
11  Matuszak No. 3.
12    (Document remarked Exhibit No. 3
13    for identification.)
14    THE WITNESS:  Thank you.
15    MR. GREENSTEIN:  Q.  For the record, actually
16  this was previously marked, why don't we stick with
17  that and take off the sticker, and we'll just call it
18  Chen No. 3.
19    MR. SIDORSKY:  Is it 3 or 2?
20    MR. GREENSTEIN:  No. 3.
21    MR. SIDORSKY:  I think it's Chen 2; right?
22    MAUTNER:  I have 2.
23    MR. GREENSTEIN:  Okay.  Well, why don't
24  you -- why don't you put that aside for now, and
25  I'll -- let's see.

213

1    So this, actually we won't mark this at all.
2  This is -- well, they spelled it wrong. It's actually
3  Chan No. 3. It was marked at the deposition of
4  Julie Chan. They spelled her name wrong, and they
5  spelled it Chen.
6    MR. SIDORSKY: It's already been marked.
7    MR. KONOVALOV: Are you going to have these
8  all attached even though they were previously marked?
9    MR. GREENSTEIN: All what?
10    MR. KONOVALOV: Attached to the deposition.
11    MR. GREENSTEIN: Sure. I don't know how that
12  works, but --
13    MR. KONOVALOV: Is that your normal?
14    THE REPORTER: Yes.
15    MR. GREENSTEIN: Yeah. Take a look at it
16  just generally, and I'll refer you to specific areas.
17    Q  For the record, this was marked as Exhibit 4
18  to the deposition of Julie Chan, and it is Bates
19  stamped. It starts AA 15 and the last page is
20  AA 000181.
21    It's not in consecutive -- well, it's in
22  consecutive order, but there are some missing pages,
23  but this is how it was marked in that deposition.
24  Just let me know when you've --
25    A  Oh, I'm ready, unless you want me to look at

214

1  something specific.
2    Q  Okay. Have you seen this document before?
3    A  Not this particular document. I -- I believe
4  this -- the information in here was part of what I
5  reviewed yesterday with counsel, with my counsel.
6    Q  Okay. Do you recognize this type of document
7  as work papers relating to Andersen's quarterly review
8  of Q1 fiscal year 2001?
9    A  In general, they look familiar.
10    Q  Okay. Where it says "Description" of this
11  file, it says Q1 FY 2001 on the first page?
12    A  Correct.
13    Q  So this appears to be a compilation of
14  documentation related to the quarterly review of
15  Q1 fiscal year 2001; right?
16    A  The cover sheet implies that if these are all
17  from that file, then that would be a correct
18  statement.
19    Q  Okay. Well, you see the signature there? It
20  says "Manager approved for filing"; do you see that?
21    A  Yes.
22    Q  Do you know who that is?
23    A  It appears to be the signature of
24  Lance Taylor.
25    Q  Okay. And who is Lance Taylor?

215

1    A  Lance Taylor was the manager on the
2  engagement at that time period.
3    Q  When it says approved for filing, what does
4  that mean? Filing -- what does "filing" mean?
5    A  That meant that the -- from the perspective
6  of Andersen, the work on that particular file was
7  complete and that it was ready to go into our filing
8  system, so no -- no -- no further documentation or
9  work was required on that file.
10    Q  Okay. And you see the date? It says
11  November 2000 there --
12    A  Yes.
13    Q  -- on the signature?
14    A  Yes.
15    Q  So it appears that these work papers or that
16  that signature of these work papers occurred in the
17  Oracle second fiscal quarter 2001; right?
18    A  Yes.
19    Q  Okay. So it was prepared after the actual
20  quarter had ended, when Q1 had ended; right?
21    MR. SIDORSKY: Objection to form.
22    THE WITNESS: Well, the -- the date that it
23  was approved for filing was subsequent. It was during
24  the second quarter which would have been the point in
25  time that all of our work was completed.

216

1    MR. GREENSTEIN: Right. Sorry. Yeah.
2    Q  But the work was actually performed during
3  the first fiscal quarter, right, or shortly
4  thereafter?
5    A  Most likely shortly thereafter.
6    Q  Or concurrently; right?
7    MR. SIDORSKY: Object.
8    MR. GREENSTEIN: Okay. Yeah.
9    MR. SIDORSKY: Objection to form. All right.
10  I don't -- I don't think the --
11    MR. GREENSTEIN: Q. So is this what the
12  quarterly review work papers generally look like?
13    A  This is what the file cover normally looks
14  like.
15    Q  Right. Okay.
16    If you turn to AA 19, which is actually
17  horizontal, it's a variation analysis of the accounts
18  receivable as of August 31st, 2000, and you've seen
19  this before; right?
20    A  Yes.
21    Q  Okay. And you see how in the top left-hand
22  corner it says "Variation Analysis Accounts
23  Receivable; right?
24    A  I'm sorry. Where?
25    Q  In the top left-hand corner.

217

1    A  Yes.
2    Q  What does that mean, "variation analysis"?
3    A  It -- it was a schedule that listed balances
4  from one quarter to the next along with the variances,
5  and then there was a discussion that we held with
6  management on certain of those variances.
7    Q  Okay.  And how do you know there was a
8  discussion with management on certain of those
9  variances?
10    A  Because at the top right-hand corner it says
11  "Per discussion with Julie Chan, Senior -- Senior
12  Revenue Manager."
13    Q  Okay.  Now, do you -- did you ever work --
14  did you work on this work paper at the time?
15    A  I would have reviewed this work paper.
16    Q  Okay.  Do you recall reviewing it?
17    A  I re -- I recognize a couple of my comments
18  on the work paper.
19    Q  Okay.  Which comments are -- do you recognize
20  that are your comments?
21    A  Under comment B, on the right-hand side,
22  "Other receivables tech support," there is a comment
23  at the end that says "and large Q4 renewals."
24    Q  And that's your handwriting that says "and
25  large Q4 renewals"?

218

1    A  I believe that's my handwriting.
2    Q  Now, do you see any other handwriting on this
3  page?
4    A  Down at the bottom, next to the letter H,
5  where the note says "This reduction is based upon
6  relative activity for the second quarter and
7  consistent with," and appears that some comments are
8  dropped off.  I believe that's my handwriting that
9  says "and consistent with" the two words "prior
10  years."
11    Q  Okay.  Down there it says "See further
12  discussion B15"; you see that?
13    A  Yes.
14    Q  Is that your handwriting?
15    A  That is not.
16    Q  Does that appear to be "JM," whoever that
17  initial is, their handwriting?
18    A  I wouldn't know.
19    Q  Okay.  Do you know who JM is?
20    MR. KONOVALOV:  Objection; lacks foundation
21  that it is JM.
22    MR. SIDORSKY:  Yeah, I think there was
23  some -- there was -- all right.  Objection to form.
24  I'm not -- I think that's right.  I'm not sure it is
25  JM.

219

1    THE WITNESS:  I don't know.  I don't know who
2  that is or what that is.
3    MR. GREENSTEIN:  Okay.
4    Q  So since you wrote the term "prior years" on
5  there, you -- is it fair to say you reviewed this "H,"
6  this summary in "H"?
7    A  Yes.
8    Q  Okay.  And do you know when you reviewed it?
9    A  Not specifically.
10    Q  Well, or if you look at -- see the top -- or
11  sorry.  Below there which has a "B" notation on it,
12  and then it has a "PA," it looks like, and a "TM," and
13  then it has 9/01.  Do you see that?
14    MR. SIDORSKY:  Where are you now?
15    MR. GREENSTEIN:  Q.  Right in the bottom
16  right-hand corner, the notation.
17    MR. SIDORSKY:  Okay.
18    THE WITNESS:  Yeah, I see a "PA," and it
19  looks -- it could be a "9/01."  I'm not sure.
20    MR. GREENSTEIN:  Q.  Right.
21    A  But yes.
22    Q  Do you know what that means, the "B" there?
23    A  "B" would be the work paper index, I believe.
24    Q  But does "B" refer to anything?  Does it
25  refer to accounts receivable, or is it associated with

220

1  accounts receivable?
2    A  "B" would be associated with accounts
3  receivable.
4    Q  Do you know what "PA" is, or what that means?
5    A  Well, I can speculate based on the file
6  cover.  It is most likely Pam Arquelada.
7    Q  Okay.  Well, seeing those dates there --
8  well, the signatures that it looks like -- at least
9  one of them looks like to be 9/01, does that help you
10  refresh your recollection about when you reviewed this
11  particular --
12    A  Well --
13    MR. SIDORSKY:  Objection to form.
14    MR. KONOVALOV:  Lacks foundation that it says
15  9/01.
16    MR. GREENSTEIN:  Q.  Well, does it say 9/01?
17  Does it look like that to you?
18    A  I don't know what it says.  It could be 9/01,
19  I mean.
20    Q  Or it could be what else?
21    A  If this is our Q1 review, it is likely that I
22  reviewed this work paper as part of our quarterly
23  review which would have been in September of 2000.  So
24  9/01 wouldn't make sense given that this is the
25  August 31, 2000, quarter.

221

1    Q  So you said it would be in 9/2000 or
2  September 2000?
3    A  Yes.
4    Q  Okay.  Now, did you write this provision "H"
5  here, the typed notes, or was that just your
6  handwriting that said "prior years"?
7    A  That's just my handwriting at the end.
8    Q  Did you type any of these notes on here?
9    A  I did not.
10    Q  Okay.  Do you see any other of your
11  handwriting of yours on this work paper?
12    A  I do not.
13    Q  Okay.  Now, do you see where that -- this
14  subpart H is associated with the account allowance for
15  bad debt/returns?  Do you see that?
16    A  Yes.
17    Q  Okay.  Is that -- is that comment there --
18  does that relate to that line, "Allowance for bad debt
19  returns"?
20    A  It appears it does.
21    Q  Okay.  And do you know what account 12601 is
22  in those parenthesis under the title "Allowance for
23  bad debt returns"?
24    A  I don't know.  I don't know specifically what
25  any of those accounts are for other than it appears

222

1  that they roll up into the total of the allowance for
2  bad debt/returns.
3    Q  Okay.  Well, do you know, sitting here today,
4  what account 12601 is or was at Oracle during that
5  time period?
6    A  No.
7    Q  Okay.  Do you recall any -- any discussions
8  during your quarterly reviews or audit about that
9  account 12601?
10    A  I don't.  I don't know what it relates to,
11  so --
12    Q  Okay.
13    A  -- how could I recall discussions on it.
14    Q  Okay.  So you wrote here "prior years."  So
15  it says "Decreases as a result of the following:
16  Reduction in management judgement from Q4 to Q1 from
17  26 million to 14 million.  This reduction is based
18  upon relative activity for the quarter and consistent
19  with prior years."
20      Do you see that?
21    A  Yes, I do.
22    Q  So why did -- why did you write that "prior
23  years"?  What does that mean "This reduction is based
24  upon relative activity for the quarter and consistent
25  with prior years"?

223

1    A  The fourth quarter was normally the largest
2  quarter for the company's fiscal -- within their
3  fiscal quarters.  So they would normally have the
4  largest receivable balance at the end of the quarter,
5  and the receivable balance at the end of Q1 would
6  typically be less than it was at the end of the fourth
7  quarter, the prior fourth quarter.
8      So you would anticipate or not be -- not find
9  it unusual to have some corresponding reduction in the
10  reserve along with a reduction in receivables.
11    Q  Okay.  Because there's less receivables, it
12  would -- it's fair to say that there would most likely
13  be less allowance for bad debts on those receivables;
14  right?
15    A  It's -- that's -- it -- it would be
16  reasonable to expect that, yes.
17    Q  Okay.  You see at the top where it says right
18  above the part where it says "Per discussion with
19  Julie Chan," it says "Greater than $5 million variance
20  discussion; you see that?
21    A  Yes.
22    Q  Does that mean everything in here relates to
23  items greater than 5 million?
24    MR. SIDORSKY:  Objection to form.
25    MR. GREENSTEIN:  Q.  What does that mean?

224

1    A  I -- I believe it means that either within an
2  account level or a subaccount or account, you know,
3  subtotal, we would have looked at variations greater
4  than 5 million and had some discussion with
5  Julie Chan.
6    Q  Does this mean that you -- that Andersen
7  didn't have any discussions related to items less than
8  5 million?
9    A  Yeah, most likely that's true.
10    Q  Okay.  If you can turn the page, and it's
11  AA 20.
12    A  Okay.
13    Q  You see this is an Arthur Andersen memo dated
14  September 11th, 2000?  Do you see that?
15    A  Yes.
16    Q  And you see it appears to be -- it says "The
17  purpose of this memorandum is to summarize the
18  significant accounts and accounts receivable"; do you
19  see that?
20    A  Yes.
21    Q  And then it has a list of accounts, and they
22  start with "12"; do you see that?
23    A  Yes.
24    Q  Does that refresh your recollection that the
25  accounts related to accounts receivable all had

225

1  prefixes that began with "12"?
2     A  Generally, yes.
3     Q  Okay.  Now, turn the page to AA 21.
4        You see how there's a -- at the bottom it's
5  "Account 12018 unapplied cash"?
6     A  Yes.
7     Q  Do you see that?
8     A  Yes.  Sorry.
9     Q  Okay.  Now, who -- well, who drafts these
10  descriptions?  Is this something that Andersen drafts?
11     A  Well, this is -- this is an Andersen memo.
12  So I believe it would have been prepared by one of the
13  staff people on the engagement.  Most likely a
14  schedule that was carried forward and updated from
15  quarter to quarter.
16     Q  Okay.  And who's -- is Pamela Arquelada --
17  who was she at the time?
18     A  She's on the front file as one of the
19  experienced staff on the engagement.
20     Q  Okay.  So you didn't draft these
21  descriptions, the account descriptions; did you?
22     A  I did not.
23     Q  Okay.  Did you ever in any of the quarterly
24  reviews -- well, have you ever drafted any of these
25  descriptions of Oracle accounts that are -- that's in

226

1  this memo?
2     A  I did not.
3        MR. SIDORSKY:  Objection to form.
4        THE WITNESS:  Sorry.
5        MR. GREENSTEIN:  Q.  Did you ever review them
6  as part of a quarterly review?
7     A  I probably did at some point.  I don't -- I
8  don't know specifically.
9     Q  Okay.  So you don't recall.
10        Well, during any of the quarterly reviews in
11  fiscal year 2001, do you recall ever having any
12  discussions about any of these accounts?
13     A  The account descriptions in this memo?
14     Q  Yeah, or any of the accounts listed in this
15  memo.
16        MR. SIDORSKY:  I'm going to object as overly
17  broad; vague and ambiguous.
18        THE WITNESS:  Well, it's doubtful that I
19  would have had description of the -- you know, the --
20  the discussion or description of the accounts that are
21  included on B-3.  It appears that I reviewed schedule
22  B.  And whether I had specific discussions with any of
23  our staff or managers or other partners on these, I
24  don't recall.
25        MR. GREENSTEIN:  Okay.

227

1     Q  And you said it appears you saw schedule B or
2  reviewed schedule B.  How do you -- why do you think
3  that?
4     A  Well, I think we already substantiated that
5  my handwriting is on it.
6     Q  Well -- oh, on?
7     A  On B, not B-3.  Sorry.
8     Q  Oh, on the -- on the previous page AA 19;
9  right?
10     A  Yes.
11     Q  Okay.  So that means you reviewed AA 20 as
12  well?
13        MR. SIDORSKY:  Objection to form.
14        THE WITNESS:  20, no, no.
15        MR. GREENSTEIN:  Okay.
16     Q  I just want to make sure.  You don't see any
17  handwriting on -- on AA 20 that would indicate that
18  you reviewed this; right?
19     A  I do not.
20     Q  Okay.  Do you recall reviewing these account
21  descriptions in the first quarter of 2001?
22     A  I do not.
23     Q  Okay.  Do you recall -- if you turn to 21,
24  and if you look at 12018 again, unapplied cash, that
25  was the account we talked about earlier; right?

228

1     A  Yes.
2     Q  Okay.
3     A  One of the accounts.
4     Q  One of the accounts, right.
5        And you see where it says "Consistent"?  In
6  the middle of it says "Consistent with the prior
7  periods, when customer overpayments are received, they
8  are posted to account 25005 - Customer Overpayments";
9  do you see that?
10     A  I see that.
11     Q  Is that consistent with your earlier
12  testimony about what you believe to be the reason for
13  account 25005?
14        MR. SIDORSKY:  Objection to form.
15        THE WITNESS:  Well, it says here "Customer
16  Overpayments."  It could just be customer payments
17  that are not yet applied to a particular invoice.
18        MR. GREENSTEIN:  Right.
19     Q  But the account is entitled "Customer
20  Overpayments"; right?
21        MR. KONOVALOV:  Objection; assumes facts not
22  in evidence.
23        THE WITNESS:  It appears as if the account is
24  entitled "Customer Overpayments."
25        MR. GREENSTEIN:  Right.

229

1    Q. Okay. So see at the bottom, last sentence,
2  it says "When a related set of invoices are
3  identified, these overpayments are reclassified to
4  account 12018."
5      Do you see that?
6    A. I do.
7    Q. Now, do you know what it means when it says
8  "a related set of invoices are identified"?
9    A. Well, I think this is consistent with my
10  previous testimony and discussion, that when cash is
11  received for which they cannot identify a specific
12  invoice, it goes into 25005, which is entitled in the
13  GL system "Customer Overpayments."
14      Those payments are then analyzed, and when
15  they are identified with a specific customer or
16  otherwise, the company has a reasonable basis to
17  reclassify them, they're reclassified out of the
18  liability account and into account 12018 which is a
19  contra-asset account.
20    Q. Okay. And what happens if -- it says "When a
21  related set of invoices are identified, those
22  overpayments are reclassified to account 12018"? Do
23  you see that?
24    A. I do.
25    Q. What happens if a related set of invoices are

230

1  not identified? What happens to those overpayments?
2      MR. SIDORSKY: Objection to form.
3      MR. KONOVALOV: Objection; incomplete
4  hypothetical.
5      THE WITNESS: Yeah, this is consistent with
6  the discussion we had before. I -- I don't know what
7  happens if, you know, they would not be reclassified.
8  The payments are investigated by credit and collection
9  to find out what customer they came from and what
10  particular invoice they came from. If they are never
11  identified, I could only speculate on what the company
12  did. Presumably they would refund the money.
13      MR. GREENSTEIN: Okay.
14    Q. And were you aware of any such refunds during
15  your engagements in 2001 with Oracle?
16      MR. SIDORSKY: Objection to form.
17      MR. KONOVALOV: It's vague and ambiguous.
18      THE WITNESS: The -- that was not an area
19  that we -- we focused on during our audit. Meaning,
20  that what went out or what ultimately was the
21  disposition of overpayments or unidentified payments
22  in 25005.
23      MR. GREENSTEIN: Okay.
24    Q. And you said as part of your audit you didn't
25  do that, so I'm assuming you didn't do that as part of

231

1  the quarterly review either?
2    A. That's correct.
3    Q. Okay. If you turn to page AA 23. By the
4  way, the previous document that we were looking at,
5  was that a lead sheet?
6    A. Which?
7    Q. Which is page --
8    A. Which document?
9    Q. Previous page, AA 19.
10    A. I believe this would have been the lead sheet
11  for domestic receivables.
12    Q. Okay. Now, if you look at AA 23, does this
13  appear to be the lead sheet for unearned revenue?
14    A. It does.
15    Q. Okay. And unearned revenue, is that a -- is
16  that the liability line item that we talked about
17  earlier?
18    A. Yes.
19    Q. It doesn't say customer advances on there;
20  does it?
21      MR. SIDORSKY: The document speaks for
22  itself.
23      THE WITNESS: It -- it does not in the -- in
24  the heading for the schedule, no.
25      MR. GREENSTEIN: Okay.

232

1    Q. You see how it has account "25005 Customer
2  Overpayments" there?
3    A. Yes.
4    Q. You see that's underneath "USA Unearned
5  Revenue Accounts"; right?
6    A. That's correct.
7    Q. So why is 25005 classified as an unearned
8  revenue account?
9      MR. KONOVALOV: Objection; lacks foundation.
10      MR. SIDORSKY: Yeah, I think it's --
11  objection, also asked and answered a couple of times,
12  but anyway, objection to form.
13      THE WITNESS: Well, these accounts all rolled
14  up into the same line item in the financial statements
15  which I believe we've clarified was called something
16  like customer advances on unearned revenue.
17      MR. GREENSTEIN: Okay.
18    Q. You see how it has the balances for 53100 and
19  83100?
20    A. Yes.
21    Q. And there's a variance; do you see that?
22    A. Yes.
23    Q. Now, is it fair to say that's the variance or
24  the difference between the balances as of May 31,
25  2000, and 8/31/2000; right?

233

1    A  Yes.  Between 5/31 -- so end of fiscal year
2  -- fiscal year 2000 and the first quarter of fiscal
3  2001.
4    Q  Right.
5      And it appears that 25005 customer
6  overpayments increased by approximately 70 million;
7  right?
8      MR. KONOVALOV:  Objection; misstates the
9  evidence in the case.
10     THE WITNESS:  On this schedule it appears
11 that way.
12     MR. GREENSTEIN:  Okay.
13   Q  Is there any other schedule that would tell
14 you how much 25005 increased by?
15     MR. KONOVALOV:  Objection; calls for
16 speculation.
17     You can put the document in front of the
18 witness.
19     THE WITNESS:  I know that there was a
20 reclassification of approximately $75 million that
21 reduced this, so there was very little variation
22 between quarters.
23     MR. GREENSTEIN:  Q.  And how do -- how do you
24 know that?
25   A  Well, right now I know it because I looked at

234

1  the Q2 work papers yesterday.
2    Q  So that's in the Q2 work paper?
3    A  I believe -- well, let me restate that.  It
4  was in some work papers I reviewed yesterday.
5    Q  Okay.  Do you see any handwriting on here
6  that's yours?
7    A  I do.
8    Q  Where is that?
9    A  Next to explanation D.
10   Q  Okay.
11   A  The dark handwriting.  This is due to the out
12 of balance from Q4 which was reserved in Q1 of '01.
13   Q  Okay.  So -- and that's under the account
14 "25011 Unearned Revenue Education"; right?
15   A  That's right.
16   Q  And the note says, under D, it says "During
17 Q1 reserves were increased by 20 million," and then
18 your handwriting says "This is due to the, quote, 'out
19 of balance,' unquote, from Q4 which was reserved in Q1
20 '01"; is that what it says?
21   A  That's what it appears to say.
22   Q  Okay.  And what does that mean?
23   A  I don't recall the specifics.
24   Q  Well, what does it mean to be "out of balance
25 from Q4 which was reserved in Q1"?

235

1      MR. SIDORSKY:  Objection to form.
2      THE WITNESS:  I'm trying to remember.
3  There -- there would have been something that was,
4  quote, "out of balance," meaning, probably did not
5  reconcile to the detail, general ledger balance not
6  reconciling to the detail.  So when it was noticed, a
7  reserve was set up to -- until it was further
8  investigated and resolved.
9      MR. GREENSTEIN:  Okay.
10   Q  Do you know what the -- was it ever resolved?
11   A  Again, I -- I don't recall this specific
12 comment.
13   Q  Okay.  But to be out of balance to you means
14 what?
15     MR. SIDORSKY:  Objection; asked and answered.
16     MR. GREENSTEIN:  I'll withdraw that.
17   Q  You see above there on -- on the 25005
18 customer overpayments account, you see there's a
19 letter "A"?
20   A  I do.
21   Q  Okay.  Do you -- well, did you type any of
22 these comments here?
23   A  I did not.
24   Q  Okay.  Do you know who did?
25   A  I do not.

236

1    Q  Okay.  See how it says "Increased over Q4 due
2  to greater cash collections from higher Q4 activity
3  which had not been identified to specific accounts
4  receivable balances.  The increase was offset by the
5  adjustment for the accounts receivable out of balance
6  of 11.2 million"?  Do you see that?
7    A  Yes.
8    Q  So it appears that there was an increase in
9  25005 due to greater cash collections which had not
10 been identified to specific error balances; is that
11 right?
12   A  That's what the note says.
13   Q  Okay.  Do you know what that -- what that
14 means?
15   A  Not other than what it says.
16   Q  Well, what does it mean to you, sitting here
17 today, being the senior audit partner on this --
18     MR. SIDORSKY:  Well, I'm going to object to
19 the form.  I mean, it's written in -- in English, and
20 I don't -- I don't -- you know, I don't quite
21 understand what -- what do you mean what does it mean
22 other than what it says, but objection to form.
23     MR. KONOVALOV:  Objection; document speaks
24 for itself.
25     THE WITNESS:  It -- it implies that there

237

1 were greater cash collections in or around the end of
2 Q1 because receivables are higher at the end of Q4,
3 because there are a number of transactions that the
4 company executes near the end of the quarter, near the
5 end of the fiscal year end quarter, so the end of May.
6 So those payments would be received some time in the
7 first quarter of the subsequent fiscal year.
8      MR. GREENSTEIN: Okay.
9      Q Now, do you know -- did -- do you know what
10 Andersen -- what evidence Andersen had to support this
11 statement that is here under letter "A"?
12      MR. SIDORSKY: Objection to form.
13      THE WITNESS: There's -- there's no notation
14 on the schedule as to who these variances were
15 discussed with.
16      MR. GREENSTEIN: Okay.
17      Q Did you discuss this particular letter "A,"
18 this increase in 25005, with anybody at the time?
19      A Well, I don't recall.
20      Q Okay.
21      A But I did not prepare this schedule.
22      Q Okay. You see how it says "The increase was
23 offset by the adjustment for the accounts receivable
24 out of balance for 11.2 million"? Do you see that?
25      A I do.

238

1      Q What does it mean when it says "To address
2 for the A/R out of balance of 11.2 million"?
3      MR. KONOVALOV: Objection; lacks foundation;
4 calls for speculation.
5      THE WITNESS: Again, I believe that the,
6 quote, "A/R out of balance," end quote, refers to the
7 general ledger balance being different than the
8 accounts receivable trial balance to the extent of
9 11.2 million.
10      MR. GREENSTEIN: Okay.
11      Q If you turn to AA 81, which is the next page,
12 you see how it appears to be a slide presentation from
13 Arthur Andersen made at an audit committee meeting?
14 It says "Audit Committee Agenda October 2000"; do you
15 see that?
16      A Yes.
17      Q So it appears -- is this a slide presentation
18 provided to the audit committee for the first quarter
19 of 2001?
20      A Yes. It would have been the Andersen
21 presentation or discussion document that was discussed
22 as part of our meeting with the audit committee
23 meeting for Q1.
24      Q Okay. And this, if you recall, Matuszak
25 No. 1, was a similar presentation with respect to the

239

1 second quarter; do you recall that?
2      A Yes.
3      Q Okay. Is this kind of the similar
4 presentation that you made quarterly?
5      A This would have been, yes, the -- the similar
6 presentation, but in this case done for the first
7 quarter versus the second quarter.
8      Q Okay. And so you see -- the next page is AA
9 82.
10      A Yes.
11      Q And it says "Results of first quarter
12 review," and it says "Overall results. No adjustments
13 proposed. Quality of earnings discussion. No
14 issues"; do you see that?
15      A I do.
16      Q That's the same language that was in the
17 second quarter presentation; right?
18      A That's correct.
19      Q And so it would mean the same thing as you
20 testified about earlier with respect to second
21 quarter; right?
22      A That's correct.
23      Q And again, did you ever have any discussions
24 with anybody about any issues with the quality of
25 earnings in this quarter?

240

1      MR. SIDORSKY: Objection; asked and answered.
2      THE WITNESS: Again, the -- I believe the
3 question was did you have -- did you ever have any
4 discussions with anybody?
5      Well, we would have had discussions with
6 management and certainly with the audit committee
7 because it's on this agenda. If you're asking whether
8 I had discussions with anyone outside of the Andersen
9 engagement team or general discussions, my answer from
10 this morning still stands. The answer is no.
11      MR. GREENSTEIN: Okay.
12      Q This says "Quality of earnings discussion, no
13 issues." What I'm asking is if there was any
14 discussion of actual issues that pertained to the
15 quality of earnings?
16      MR. SIDORSKY: I think that is what we went
17 through this morning, so objection; asked and
18 answered.
19      THE WITNESS: There would not have been any.
20      MR. GREENSTEIN: Okay.
21      Q And you see it says "Judgmental reserves and
22 accruals," that appears to be the same language that
23 was in the second quarter presentation --
24      A Yes.
25      Q -- right?

241

1      So it has the same meaning as you testified
2  about earlier?
3      A  Yes.
4      Q  And looking at AA 83, which is the next page,
5  "Revenue Review --"
6      A  Uh-huh.
7      Q  -- you see it has the same language, "No
8  changes in scope or procedures"?  That was -- that was
9  the same language that was in the quarterly 2 -- or
10  the second quarter '01 presentation; right?
11      A  That's correct.
12      Q  And it appears that it says license revenue
13  tested 32 percent.  That's the similar testing that
14  you described with respect to the second quarter, but
15  in second quarter presentation it said you tested
16  37 percent; right?
17      A  That's correct.
18      Q  Now, what's the reason for testing 32 percent
19  in the first quarter and 37 percent in the second
20  quarter?
21      A  Again, I -- I -- my testimony from this
22  morning indicated that we did not have -- our scope
23  was set to review a certain number of contracts or
24  contracts above a certain dollar amount, so it
25  depended, you know, what percentage those were for

242

1  total domestic license revenue.  So the percentage
2  varied from quarter to quarter.
3      Q  Right.
4          And the number of customers or contracts you
5  may have reviewed per quarter was changed also; right?
6      MR. SIDORSKY:  Objection to form.
7      THE WITNESS:  You know, again, it may or may
8  not.  I just don't recall what our scope was.
9      MR. GREENSTEIN:  Okay.
10      THE WITNESS:  Whether it was set out, you
11  know, as you implied this morning, 20 contracts a
12  quarter, 15 contracts a quarter or whether it was set
13  at all contracts over $5 million.  I -- I don't recall
14  what the scope was.
15      MR. GREENSTEIN:  Okay.
16      Q  But the percentage number here means
17  percentage of what?
18      A  This means percentage of domestic license
19  revenue.
20      Q  Okay.  And that -- the procedures, when it
21  says "tested," that percent, the testing procedures
22  were the same procedures that you testified with
23  respect to Q2 '01; right?
24      A  That's correct.
25      Q  And it says "No change in scope of

243

1  procedure," so -- right?
2      A  That's correct.
3      Q  Have you ever had -- heard of the term "on
4  account" at Oracle?
5      MR. SIDORSKY:  Objection to form.
6      THE WITNESS:  I -- I don't know what you mean
7  by the term "on account."
8      MR. GREENSTEIN:  Q.  Well, do you -- do you
9  have an understanding of what "on account" means at
10  Oracle?
11      A  No, I don't.
12      Q  Have you ever heard the terminology, quote,
13  "on account," unquote, during your quarterly reviews
14  or audits at Oracle?
15      MR. SIDORSKY:  Objection to form.
16      THE WITNESS:  I don't know what context
17  you're asking the question in.  So, I mean, I don't
18  recall specific discussions of anyone saying
19  something, you know, "What is an "on account?"
20      I mean if you said to me, you know, customer
21  ABC made a payment on account, then I would assume
22  they made a payment on their account.  So I don't know
23  that I can testify that no one ever would have said
24  those two words put together in the entire tenure of
25  my engagement at Oracle.

244

1      MR. GREENSTEIN:  Right.
2      Q  But --
3      A  If you're implying it means something
4  specific, I don't know what --
5      Q  Okay.
6      A  -- your question is.
7      Q  Yeah.  I'm not talking about the words "on
8  account" meaning used in the normal course.  I mean a
9  specific terminology used by Oracle that something is
10  designated, quote, "on account."
11      MR. SIDORSKY:  Objection to form.
12      THE WITNESS:  I don't recall that
13  terminology.
14      MR. GREENSTEIN:  Okay.
15      Q  Now, are you aware -- from your experience
16  during the 2001 audit and quarterly reviews, are you
17  aware that any unapplied cash items were designate --
18  designated, quote, "on account"?
19      MR. SIDORSKY:  Objection to form.
20      THE WITNESS:  I -- I don't recall that
21  terminology.
22      MR. GREENSTEIN:  Okay.  Why don't we take
23  five minutes and go off record.
24      THE VIDEOGRAPHER:  This is a good time to
25  change the tape.

245

1      We are going off the record.  The time is
2   3:45 p.m.  Here marks the end of videotape number
3   three, Volume I, in the deposition of Gary Matuszak.
4      (Short break taken.)
5      THE VIDEOGRAPHER:  We are back on the record.
6   The time is 4:00 p.m.  Here marks the beginning of
7   videotape number four, Volume I, in the deposition of
8   Gary Matuszak.
9      MR. GREENSTEIN:  Q.  Mr. Matuszak, we were
10  looking at what's been previously marked as Chen
11  Exhibit No. 3, which is the quarter one fiscal year
12  2001, some work papers related to that quarter.  I'd
13  like to direct your attention to AA 181.  It's the
14  last page of the document.
15     A  Okay.
16     Q  Actually, if you just kind of flip back and
17  look at AA 23, the kind of --
18     A  Okay.
19     Q  You see the note associated with 25005
20  "Customer Overpayments," you know, on the right-hand
21  side, letter "A"; do you see that?
22     A  Yes.
23     Q  And the last sentence says "The increase was
24  offset by the adjustment for the A/R out of balance of
25  11.2M"; do you see that?

246

1      A  Yes.
2      Q  When it says "The increase," does that mean
3   the increase in the level of 25005 was offset by an
4   adjustment to the accounts receivable out of balance
5   of 11.2 million?  That's what the increase means;
6   right?
7      MR. SIDORSKY:  Objection; the document speaks
8   for itself.
9      THE WITNESS:  That's what it appears to say,
10  yes.
11     MR. GREENSTEIN:  Q.  So, in other words, the
12  increase of 74 million there was -- sorry -- the
13  increase from the balance on May 31st, '00, and the
14  balance of 8/31st 2000, that increase was then offset
15  by 11.2 million which resulted in the variance between
16  those quarters; right?
17     MR. KONOVALOV:  Objection; misstates --
18     MR. SIDORSKY:  Objection to form.
19     MR. KONOVALOV:  -- misstates the witness's
20  testimony and the evidence in the case, but --
21     THE WITNESS:  It -- it appears as if the
22  account balance was reduced by 11.2 million.
23     MR. GREENSTEIN:  Q.  That's -- oh, sorry.
24     A  I'm not -- I'm not sure actually what -- what
25  it refers to, whether there was --

247

1      Q  Okay.  Why don't you look at the last page,
2   which is AA181?
3      A  Okay.
4      Q  I think it will provide some clarity of the
5   11.2 million.
6      You see kind of in the middle of the page
7   where it has a letter "A --"
8      A  Yes.
9      Q  -- there?
10     You see it has 11.2, roughly 11.2 million?
11  You see that?
12     A  Yes.
13     Q  And then you see there's another "A" down at
14  the box there, and it says "JE done in August for
15  11.2 million to collect part of the out of balance."
16     You see that?
17     A  Yes.
18     Q  And it says "JE was correcting entry to
19  invoice --" and there's a number, invoice number --
20  and then it says "BAD."  You see that?
21     A  Yes.
22     Q  Do you know what an invoice that has "BAD"
23  after it means?
24     MR. KONOVALOV:  Objection; misstates the
25  document.

248

1      MR. SIDORSKY:  Yeah, objection to form.
2      THE VIDEOGRAPHER:  Counsel, your microphone.
3      THE WITNESS:  I don't know what that means.
4      MR. GREENSTEIN:  Okay.
5      Q  When you say that, you mean what it means
6   when there's an invoice number followed by the -- the
7   word "BAD"?
8      MR. SIDORSKY:  I'm not sure that's the word
9   "bad."  It's -- it's -- you know, it's a number, and
10  then there's letters B-A-D.
11     MR. GREENSTEIN:  Okay.
12     Q  To the extent that it's B-A-D, have you ever
13  seen that before?
14     A  No.
15     Q  If it was B-A-D, would that mean anything to
16  you if it was an invoice number followed by B-A-D?
17     A  No.
18     Q  Okay.  So you didn't type this; did you?
19     A  No.
20     Q  Okay.  Now, you see at the beginning -- well,
21  the beginning sentence says "JE, journal entry"; does
22  that mean that?  Right?
23     A  I'm sorry?
24     Q  The beginning of the sentence in that box
25  says "JE done."

249

1    A  Yes.
2    Q  That means "journal entry"; right?
3    A  I believe it means journal entry.
4    Q  Okay.  So it says "Journal entry done in
5  August for 11.2 million to correct part of the out of
6  balance"; do you see that?
7    A  Yes.
8    Q  And you see how above that it has a
9  description of an A/R agings audit trails account;
10  right?
11    A  Yes.
12    Q  And then a GL balance of account 1210; right?
13    A  1210.
14    Q  10.
15    A  Dash something.  Account 1210-12108.
16    Q  Okay.  I only -- okay.  My copy of it looks
17  like it just says account 1210, offset.  You see that?
18  I'm looking at the far left-hand side under
19  "Description."
20    A  Oh, it appears that that's what it says.
21  It's hard to read the paper.
22    Q  And then at the bottom it says "Out of
23  balance between A/R and GL"; do you see that?
24    A  Yes.
25    Q  So based on what you know of these types of

250

1  work papers or documents, and given that this was
2  produced by Andersen, does that appear that in that --
3  in the box where it says "JE done in August for
4  11.2 million to correct part of the out of balance,"
5  does that refer to the out of balance between the
6  accounts receivable and GL amount that's there,
7  14 million, approximately 14 million?
8    MR. KONOVALOV:  Objection; lacks foundation.
9    MR. SIDORSKY:  Objection to form.
10    THE WITNESS:  It appears that the out of
11  balance is the difference between the A/R aging trial
12  balance and the GL account.
13    MR. GREENSTEIN:  Q.  Well -- sorry.
14    A  What I can't tell, because I can't read the
15  numbers on there, is which one is higher.
16    Q  Right.
17    Now, so the out of balance between A/R and GL
18  appears to be approximately 14.2 million; right?
19    A  That's what it says.
20    Q  And then the entries or the -- in the box it
21  says the journal entry for 11.2 million is then part
22  of the out of balance; right?
23    A  That's what it says.
24    Q  You see how, if you look farther to the
25  right, where it has "A" there, it says manual JEs at

251

1  the top; you see that?
2    A  I do.
3    Q  Does that mean manual journal entries?
4    A  I believe that's what it means.
5    Q  So it appears that this 11.2 million was a
6  manual journal entry made to reduce that out of
7  balance of 14.2 million; right?
8    A  That's what it appears.
9    Q  Because if you go down farther, the
10  difference is at the far right-hand side, it says
11  3.1 million approximately?
12    A  That's correct.
13    Q  Okay.  So you see in the box where it says --
14  after it says -- second sentence says "JE was
15  correcting entry to invoice," a number, "BAD," it
16  appears, and says "DR was to 25005 invoice SOL and D
17  out of A/R but still hit GL."
18    Do you see that?
19    A  It appears that's what it says.  I'm -- I'm
20  having a difficult time actually reading it because
21  it's very small.
22    Q  Right.
23    Do you know what that means, DR was to 25005?
24  Does that mean debit was to the account 25005?
25    A  I would presume that that's what it means,

252

1  yes.
2    Q  And what does "Invoice SOL or SQL and D out
3  of A/R but still hit GL"?  Do you know what that
4  means?
5    A  No, I don't.
6    Q  Okay.  And then the second line of the box
7  says "Original out of balance was in 12019 also"; do
8  you see that?
9    A  Yes.
10    Q  Do you know what 12019 is?
11    A  I don't.
12    Q  But is that an account number, so if you look
13  back to AA19, if you look back, there's an account
14  called 12019.  It says "Deals clearing"; you see that?
15    A  Yes, I do.
16    Q  Going back to the last page, so that appears
17  to be where it says "out of balance" was in that
18  account; right?
19    A  That's what it says.
20    MR. KONOVALOV:  Document speaks for itself.
21    MR. GREENSTEIN:  Okay.
22    Q  So it appears to be that account in accounts
23  receivable?
24    MR. KONOVALOV:  Same objection.
25    THE WITNESS:  That's what it appears to be

253

1 referring to.
2     MR. GREENSTEIN:  Okay.
3     Q  And then it says "However, Dave O processed
4 an entry moving the out of balance to the 25005
5 account"; do you see that?
6     A  I see that.
7     Q  Do you know who Dave O is?
8     A  I do not.
9     Q  Okay.  Now, do you know what it means to
10 process an entry moving the out of balance to the
11 25005 account?
12     A  Well, I -- I don't know specifically what it
13 means.  I'm -- I'm -- it appears as if it means that
14 the -- the one account was out of balance, so they
15 moved that out of balance over into -- to -- to this
16 account or into a different account, so....
17     Q  Into 25005?
18     A  Yeah, that's what it appears, or into 25005.
19     Q  Okay.  What did -- how -- how does that
20 occur?
21     MR. KONOVALOV:  Objection.
22     THE WITNESS:  It appears they recorded a
23 journal entry to move it.
24     MR. GREENSTEIN:  Q.  To move --
25     A  He said he processed an entry, which I would

254

1 assume is a journal entry.
2     Q  Moving the out of balance, so that means the
3 14.2 million to the 25005 account; right?
4     A  Well, I don't know that it's 14.2 million.  I
5 think he might be referring to the 11.2 million that's
6 the reference in the note.
7     Q  Okay.  So moving the 11.2 million out of
8 balance to the 25005 account?
9     A  Right, moving it from one balance sheet
10 account to another.
11     Q  Moving it from 25005 to the out-of-balance
12 amount; right?
13     MR. SIDORSKY:  Objection to form.
14     MR. KONOVALOV:  Vague and ambiguous.
15     THE WITNESS:  Well, moving it from one
16 account, 25005, into that account, which appears to
17 be -- you know, whether it's 1210 or 12008, I'm not
18 sure.
19     MR. GREENSTEIN:  Right.
20     Q  But it's moving 11.2 million from 25005 to
21 the out of balance which was in 12019 deals clearing;
22 right?
23     MR. SIDORSKY:  Objection to form.
24     THE WITNESS:  Well, it appears that there was
25 an out of balance in 12019, and they moved that out of

255

1 balance into the 25005 account.
2     MR. GREENSTEIN:  Q.  No, no.  Is -- well,
3 doesn't it appear that from 11.2 million is -- is
4 coming from the 25005 and applying it to an accounts
5 receivable invoice which is in 1210/12008; right?
6     MR. SIDORSKY:  Objection to form.
7     MR. KONOVALOV:  Mischaracterizes the
8 witness's testimony, and the document speaks for
9 itself.
10     THE WITNESS:  I'm sorry.  Can you -- I'm not
11 sure where we're at.
12     MR. GREENSTEIN:  Q.  Can you see on the top
13 left-hand corner it says "Account 1210-12008"?
14     A  I see that.
15     Q  It says as of Q1 2001; right?
16     A  Yes.
17     Q  And then it has a description of, you know,
18 the A/R agings audit trails and GL balances for
19 account 1210.  And as we said before, it appears that
20 the out of balance from those two accounts is
21 14.2 million, approximately; right?
22     A  Yes.
23     Q  And then it looks like 11.2 million from
24 25005 was applied to that out of balance to reduce it
25 so that it ended as 3.1 million on the right-hand

256

1 side; right?
2     MR. SIDORSKY:  Objection to form.
3     MR. KONOVALOV:  The document speaks for
4 itself.
5     MR. GREENSTEIN:  Q.  In other words, you see
6 where it says "DR was to 25005"?
7     A  Yes.
8     Q  Well, since that's -- that's a liability, so
9 debit would reduce it; right?
10     A  That's correct.
11     Q  Okay.  So, in other words, money was taken
12 from 25005 to offset this out of balance of
13 14 million, right, which -- which ended up then being
14 the difference which is 3.1 million?
15     A  Well, the fact that they -- I mean, the fact
16 that they process the journal entry to move an out of
17 balance out of here and into another account, I mean,
18 they would still have to reconcile the detail in
19 account 25005 to whatever the detail the customer
20 overpayments was.  So I don't know from that what they
21 did.
22     Yes, they processed the journal entry, but I
23 don't know what they did with the balance of account
24 25005, whether that means that the detail -- the
25 journal ledger in that balance was different than the

257

1  detail, or whether they -- they wrote off or refunded
2  some of the detail in -- in just process the entry to
3  net the two down.
4       I don't -- don't -- without understanding the
5  complete trail of the journal entries, I don't know
6  that I can conclude exactly what happened here.
7       Q  Okay.
8       MR. KONOVALOV:  I'm not trying to interfere.
9       Would it help to look at the next couple of
10  lines outside the box?  Would that help the witness?
11      MR. GREENSTEIN:  Yeah.
12      Q  Why don't you look at that.  It says "This
13  entry was done to clean up amounts that had been
14  sitting in account 25005 Customer Overpayments since
15  fiscal year 2000 due to an IT problem"; do you see
16  that?
17      A  Yes.
18      Q  Do you know whose handwriting that is?
19      A  I do not.
20      Q  Okay.  Do you know what that means, that the
21  entry was done to clean up amounts that had been
22  sitting in 25005 since fiscal year 2000?
23      A  Other than what it says there, I don't know.
24      Q  Okay.  Do you know what it is to clean up
25  accounts that reside in 25005?

258

1       A  Well, presumably they're trying to, you know,
2  clean -- clean up or dispose of some of the amounts
3  that had been sitting in an account for quite some
4  time.
5       Q  Right.  So --
6       A  So reconcile it, or -- or somehow dispose of
7  it.  I don't know.
8       Q  Right.
9       But it appears you as an auditor looking at
10  this, it appears that -- so to reduce 25005, they took
11  11.2 million to apply it to this out of balance
12  between those other two receivable accounts; right?
13      MR. SIDORSKY:  Objection to form.
14      MR. KONOVALOV:  The document speaks for
15  itself.
16      THE WITNESS:  Yeah, I -- I really don't know
17  what all this means in terms of what all -- all
18  entries were made.
19      MR. GREENSTEIN:  Okay.
20      Q  Do you know where it says "Due to an IT
21  problem," do you know what that IT problem was?
22      A  No, I don't.
23      Q  Did you ever have any discussions about that
24  IT problem?
25      A  No, I haven't.

259

1       Q  You see in the top left-hand corner it says
2  "Prepared by Greg Myers"; do you see that?
3       A  I do.
4       Q  Do you know who Greg Myers is?
5       A  No, I don't.
6       Q  Have you ever had any discussion with
7  Greg Myers?
8       A  I have not.
9       Q  But it says "Prepared by Greg Myers," so this
10  appears that this -- do you recognize any of the
11  handwriting on here as an Andersen employee?
12      A  I do not.
13      Q  Okay.  Does it appear that this document --
14  well, it was produced by Arthur Andersen.  It has --
15  see in the corner, bottom right-hand corner, it has
16  B60 and has PA9/00?  You see that?
17      A  I do.
18      Q  It appears that Andersen looked at this, and
19  it was part of the work papers for quarter one; right?
20      A  Yes.
21      Q  Okay.
22      A  But Greg Myers is not an Andersen employee.
23      Q  Right.
24      I'll represent to you that he's an Oracle
25  employee.

260

1       A  Okay.
2       Q  But this was -- this appears to be prepared
3  by Greg Myers and then was reviewed by Andersen;
4  right?
5       A  That's correct.
6       Q  Okay.  Now, is there anything -- looking at
7  the 11.2 million that appears to have been taken from
8  25005 to -- to offset this out of balance, do you see
9  any connection, or do you know of any connection
10  between that 11.2 million that was sitting in 25005 in
11  connection between that and this out of balance for
12  these account receivable accounts?
13      MR. KONOVALOV:  Objection; vague and
14  ambiguous.
15      MR. SIDORSKY:  Objection to form.
16      THE WITNESS:  Yeah.  I mean, I -- I really
17  don't know where we're going with this whole
18  discussion.  You know, it -- I'm confused as to what
19  you're trying to get to, or how these accounts worked,
20  or this entry, what they did with the entry.
21      I don't know that I would get any more
22  clarity on it from continuing to ask questions about
23  the two sentences that are in there.
24      MR. GREENSTEIN:  Okay.
25      Q  I'm just wondering if you, just looking at

261

1    this and what is written here, if you understand what
2    occurred?
3        A   I don't understand completely what occurred,
4    no.
5        Q   Well, what is your best --
6        A   I told you I don't understand.
7        Q   Okay.  Put that aside.
8            I want to mark -- actually, I don't want to
9    mark this.  It's been previously marked as Chen No. 4.
10           For the record, this is a packet of work
11   papers related to the second quarter 2001 review.
12   It's Bates stamped AA 24 and the last pages AA 1638.
13           Mr. Matuszak, have you seen these documents
14   before today?
15       A   I believe that -- that these -- these
16   documents appear to be similar to the ones that were
17   provided to me by my counsel.
18       Q   Okay.  And you see on AA 27 -- well, strike
19   that.
20           And it appears that -- that this is -- well,
21   if you look down at the -- there's kind of a bar --
22   there's a bar code there, and then it has at the
23   bottom it says "Q2 FY Review 11/30/2000"; you see
24   that?
25       A   Yes.

262

1        Q   So it appears -- well, at least this page is
2    related to work papers for the Q2 review; right?
3        A   That's right.  It appears that this is the
4    file cover for the 11/30/2000 quarterly review.
5        Q   Right.
6            So if you look at AA 27, which is the fourth
7    page, you see how this appears to be the same slide
8    presentation that we looked at earlier, which is
9    Matuszak -- part of Matuszak No. 1; right?
10       A   Yes.
11       Q   Is there a reason why this presentation is a
12   part of -- well, appears to be a part of the work
13   papers for that quarter?  Do you -- was that typical?
14       A   Yes.
15       Q   Okay.  You see on AA 28, it has the same
16   language in Matuszak 1; right?
17       A   Yes.
18       Q   So it would have the same meaning?
19       A   Yes.
20       Q   You see -- if you turn to page AA 34, and you
21   see how it says "Q4 - Q1 follow-up items"?
22       A   Yes.
23       Q   And you see it says "A/R aging to GL
24   reconciliation"?
25       A   Uh-huh.

263

1        Q   Do you know what that means?
2        A   Well, I'm assuming it means at the end of Q4
3    there was a -- that the A/R aging was out of balance
4    from the GL.  So we followed up on it as part of our
5    Q1 review.  So that Q4/Q1 to me means follow-up items
6    that -- from Q4 that we followed up on in Q1.
7        Q   Okay.  And is that -- is that related to the
8    document we just looked at which had an out of balance
9    from A/R aging?
10       A   Most likely, yes.
11       Q   Okay.  And you see it says "Unearned
12   education revenue reconciliation"?
13       A   Yes.
14       Q   What does that mean?  Do you know?
15       A   Yeah, I could speculate that there's a
16   reconciliation they're doing on the detail of one of
17   the unearned education accounts.
18       Q   Okay.  Do you recall in the second quarter
19   though that -- that there was this analysis done to
20   reconcile unearned education revenue?
21       A   I'm sorry.  Let me -- let me back up one
22   second.
23           This is the results -- this is the audit
24   committee agenda for Q2.
25       Q   Right.

264

1        A   So this Q4/Q1 would have been follow-up items
2    from Q4 or Q1 that we were discussing during Q2 --
3        Q   Right.
4        A   -- or after our Q2, so I misspoke before.
5        Q   Okay.  So do you recall what was done to
6    reconcile unearned education revenue --
7        A   I don't.
8        Q   -- during Q2?
9            Do you recall what was done to -- or was any
10   analysis done with respect to A/R aging to GL
11   reconciliation?
12       A   I don't know.
13       Q   Okay.  Turn to the next page, AA 35, and does
14   this appear to be the accounts receivable lead sheet
15   for the second quarter variation analysis of accounts
16   receivable accounts?
17       A   It does.
18       Q   And it's similar to the one we looked at in
19   the quarter one work papers as far as what the
20   document purports to be; right?
21       A   It appears that way, yes.
22       Q   And do you see any of your handwriting on
23   here?
24       A   I do not.
25       Q   Do you recall reviewing this work paper

265

1   during the second quarter?
2       A  Not specifically.
3       Q  Generally, do you recall reviewing this?
4       A  I would likely have reviewed it.
5       Q  Because that was typical in every quarter to
6   review these types of work papers; right?
7       MR. SIDORSKY:  Objection to form.
8       THE WITNESS:  I -- I would not review all
9   work papers, but normally I would review the
10  receivable lead schedule.
11      MR. GREENSTEIN:  Okay.
12      Q  Why was that?
13      A  Because I would normally review some of the
14  work that was in revenue and receivables.
15      Q  Okay.  Were those critical areas at Oracle?
16      MR. KONOVALOV:  Objection; vague and
17  ambiguous.
18      THE WITNESS:  They were areas --
19      MR. SIDORSKY:  Objection to form.
20      THE WITNESS:  -- of focus.
21      MR. GREENSTEIN:  Q.  Areas of focus; right?
22      A  Areas of focus.
23      Q  Right.
24      Now, you see account 12018 unapplied cash
25  again?  Do you see that?

266

1       A  I do.
2       Q  And you see where it says "Cash payments
3   generally decrease the end of Q2 versus Q1.  As Q4
4   deals have aged 90 days as of the end of Q1 there is a
5   greater influx of cash received compared to collection
6   and receipt of Q1 transactions in Q2"; do you see
7   that?
8       A  I do.
9       Q  Now, do you know what that means?
10      MR. SIDORSKY:  Objection to form.
11      THE WITNESS:  Yes, generally.
12      MR. GREENSTEIN:  Okay.
13      Q  What does -- what does it mean generally?
14      A  Well, I think consistent with the discussion
15  or testimony I gave when we looked at this account for
16  Q1 earlier, you normally expect a larger amount of
17  payments in Q1 versus Q2 because there's -- are larger
18  revenue transactions in Q1 that's typically the
19  company's largest revenue quarter of their fiscal year
20  as contrasted to the August quarter which, for a
21  number of different reasons, is typically a -- a lower
22  revenue quarter, so I believe that's what this note is
23  trying to explain.
24      Q  Okay.  And why does that -- well, it appears,
25  doesn't it, that the balance of 12018 unapplied cash

267

1   went from 86 million to 64 million?
2       A  That's correct.
3       Q  All right.
4       And so what -- does that mean that -- well,
5   why -- why would the -- why would the description
6   there support that -- that decrease, that amount
7   decrease?
8       A  The -- what the description says is cash
9   payments generally decrease at the end of Q2 versus
10  Q1.  So in Q4 there are a number of large transactions
11  done in Q4.  That cash would be collected at the end
12  of Q1, and so there's a greater influx of cash
13  payments in Q1 versus Q2.
14      In Q2, you're collecting much of the revenue
15  from Q1, and there was less revenue in Q1, so there
16  are less receivables to collect.
17      Q  Okay.  You see down at the bottom where it
18  has allowance for bad debt returns, and it has three
19  accounts and one of them is -- says 12, I think, 600,
20  12601, and 12604?  Do you see that?
21      A  I do.
22      Q  Do you see how that -- that balance from the
23  end of the first quarter to the end of the second
24  quarter or -- yeah, the end of the first quarter to
25  the end of the second quarter increased by 26 million?

268

1   Do you see that?
2       A  I do.
3       Q  And then it says "Increase in the allowances
4   primarily result of greater activity from Q2 to Q1,
5   and the number of deals funded in-house or were
6   financed"; do you see that?
7       A  Yes.
8       Q  Do you know what that means?
9       A  Certain of the transactions that were funded
10  in-house, they would reserve for versus if they sold
11  the receivable in a nonrecourse basis, therein
12  transferring the risk of collectability to the finance
13  company.
14      Q  So why would that increase the bad debt --
15  the allowance for bad debt returns accounts?
16      A  Well, it increases their receivable balance
17  on those types of transactions.
18      Q  Okay.  You see there where it says "The
19  reserve for receivables in litigation also increase
20  greater emphasis by the collections group to refer
21  uncollectible receivables to legal and a greater
22  number of emergent companies have experienced
23  financial difficulties"?  Do you see that?
24      A  I do.
25      Q  You know whose hand -- or strike that.

269

1    So does that mean that the increase in the
2  allowance for bad debt was partially a result of a
3  greater number of companies, Oracle's customers,
4  having financial difficulties at that time?
5    A  I don't know about a greater number of
6  Oracle's customers having financial difficulty.
7  Certainly a greater number.  It says a greater number
8  of emerging companies had experienced financial
9  difficulties.
10    Q  Okay.  Oh, sorry.
11    A  Oracle did license their software to a number
12  of companies that were, you know, younger companies.
13    Q  Right.
14    And what this is saying is that there was
15  greater -- an increase in the allowance for bad debt
16  because there was an emphasis by the collections group
17  to -- to refer uncollectible receivables to legal, and
18  there were a greater number of emergent companies that
19  were experiencing financial difficulties, and
20  therefore Oracle couldn't collect on those deals;
21  right?
22    A  That's what it appears, so they appropriately
23  increased their allowance for bad debts.
24    Q  Okay.  Now, do you know if there's any
25  support for that statement there, any evidence that

270

1  Andersen had to support that?
2    A  I wouldn't know without -- no, I don't know.
3    Q  Okay.  You see how it says "See further
4  discussion of reserves at B15"?
5    A  Yes.
6    Q  Do you know -- did you see B15 yesterday when
7  you looked -- when you reviewed the document with
8  counsel?
9    A  I did not.
10    Q  Is that --
11    A  If it wasn't in this group, I likely didn't
12  look at it.
13    Q  Do you recall back during this time, and it
14  appears that this work paper was around December '00,
15  if you look at the bottom right-hand corner --
16    A  Yes.
17    Q  -- do you recall that there were a greater
18  number of emergent companies having experienced
19  financial difficulties such that Oracle had to
20  increase their reserves for uncollectibles?
21    MR. SIDORSKY:  Objection to form.
22    MR. KONOVALOV:  Calls for speculation.
23    THE WITNESS:  I don't recall specifically,
24  no.
25    MR. GREENSTEIN:  Okay.

271

1    Q  And turn to the next page, AA 36, it appears
2  to be a memo dated December 11th, 2000, from
3  Pamela Arquelada, and it says "Accounts receivable
4  account description"; do you see that?
5    A  Yes.
6    Q  Does there appear to be the same type of memo
7  that we looked at the first quarter where it has the
8  descriptions of the various accounts receivable
9  accounts?
10    A  It appears to be a similar memo.
11    Q  Okay.  And if you turn to the next page,
12  AA 37, see how there's an account called "12601 Bad
13  Debt Write-offs"?
14    A  Yes.
15    Q  And it has a number of other accounts, it
16  says "Reserve for Uncollectible Accounts."
17    A  Yes.
18    Q  And it says these are the -- "These accounts
19  are the standard accounts used to write-off and
20  provide for bad debts respectively"; do you see that?
21    A  I see that.
22    Q  Do you recall any issues arising during the
23  quarterly reviews for fiscal year 2001 audit at Oracle
24  that involved the account 12601?
25    A  I do not.

272

1    Q  Or any problems related to account 12601?
2    A  I do not.  Let me just go back to see if it's
3  on here what 12601 is.  That's one of the reserve
4  accounts.  I don't recall anything specifically with
5  that account, no.
6    Q  Or anything general?
7    A  No.
8    Q  Do you recall ever being made aware that
9  Oracle's collection staff had over time transferred
10  customer overpayments from 2505 to account 12601?
11    MR. KONOVALOV:  Objection; assumes facts not
12  in evidence.
13    THE WITNESS:  I don't recall that
14  conversation or ever being told that.
15    MR. GREENSTEIN:  Okay.
16    Q  Do you recall any documents or any evidence
17  during your quarterly reviews and audits of Oracle at
18  any time where you learned that transfers were made
19  from 25005 to 12601?
20    MR. KONOVALOV:  Same objections.
21    MR. SIDORSKY:  Yeah, I'm going to object to
22  the scope of that question.
23    THE WITNESS:  I don't recall any, no.
24    MR. GREENSTEIN:  Okay.
25    Q  If you turn to AA 39, and you see how it's

Matuszak, Gary  8/1/2006  9:14:00 AM

273

1    a -- it's another account 1210 document related to
2    that account and prepared by Greg -- Greg Myers; do
3    you see that?
4       A   I do.
5       Q   It has the similar A/R aging audit trails and
6    GL balances; you see that?
7       A   Yes.
8       Q   It has another out of balance between A/R and
9    GL of 947 -- looks like thousand; do you see that?
10      A   Yes.
11      Q   And then you see on the right-hand side of
12   that amount is 1.8 million?
13      A   Yes.
14      Q   Or approximately 1.9 million?
15      A   Yes.
16      Q   And you see the note under there it says
17   "Unreconciled Difference"? It says "AA LLP." That's
18   Arthur Andersen; right?
19      A   That's correct.
20      Q   "Noted a 1.9 difference between GL and A/R
21   aging as of or on November 30th, 2000"; do you see
22   that?
23      A   I do.
24      Q   "The company has had unreconciled difference
25   in this account since fiscal year '00 due to an IT

274

1    problem"; do you see that?
2       A   I do.
3       Q   Now, is that the same IT problem that we
4    looked at in the last set of work papers which was
5    discussing the out of balance between these two
6    accounts?
7       MR. KONOVALOV: Objection; lacks foundation.
8       THE WITNESS: I don't know specifically, but
9    it would appear that it is since it's the same
10   schedule.
11      MR. GREENSTEIN: Right.
12      Q   Now, did you -- is that your handwriting
13   there?
14      A   Under the note one?
15      Q   Yeah.
16      A   Under note, no, it is not.
17      Q   Okay. Do you know whose it is?
18      A   I do not. The schedule is initial PA which
19   presumably is Pam Arquelada.
20      Q   Okay. Now, were you made aware of this 1.9
21   million difference between the GL and A/R aging that's
22   referred to under this note? Were you made aware of
23   that at the time?
24      MR. SIDORSKY: Can I hear that?
25      MR. GREENSTEIN: I'll ask it again.

275

1       Q   Were you -- around this time, were you --
2    which is the second quarter of '01 -- were you made
3    aware of the issue described by this note here?
4       A   I believe I was aware of that issue.
5       Q   Okay. What do you remember? How did you
6    become aware of it?
7       A   Well, I believe part of this package was the
8    audit committee agenda. On there, there was a item
9    that said Q4/Q1 follow-up items, one of which is A/R
10   aging to GL reconciliation.
11         So presumably we covered it in some form with
12   the audit committee which would imply I was aware of
13   the difference. The company had been working on
14   reconciling that difference, and it was now down to
15   1.9 million.
16      Q   Okay. Why was -- why -- but didn't they
17   recon -- didn't they already work on that in the first
18   quarter?
19      MR. KONOVALOV: Objection; lacks foundation.
20      MR. GREENSTEIN: Q. And they reduced it --
21   they reduced the out of balance of those two accounts
22   by transferring 11.2 million of unapplied cash or of
23   customer overpayments from 25005; right?
24      MR. SIDORSKY: Objection to form.
25      MR. KONOVALOV: Lacks foundation.

276

1       THE WITNESS: They -- they reduced the
2    balance a certain amount in Q1, and it looks like they
3    reduced it further in Q2.
4       MR. GREENSTEIN: Q. So there was still an
5    out of balance in Q2; right?
6       MR. KONOVALOV: Objection; lacks foundation.
7       THE WITNESS: It appears that there was an
8    out of balance of 1.9 million as of November 30th,
9    2000.
10      MR. GREENSTEIN: Q. See how it says "Per
11   discussion," and then a note at the bottom, it says,
12   "Per discussion with Greg Myers A/R manager, the
13   company will focus its efforts to gradually reduce
14   this effort in the future"; do you see that?
15      A   I do.
16      Q   Do you know -- did you discuss this with
17   Greg Myers?
18      A   Nope.
19      Q   Because you never talked with Greg Myers;
20   right?
21      A   That's correct.
22      Q   Do you know who did talk with Greg Myers?
23      A   Again, as I said, the schedule is initialed
24   by PA, which I'm assuming is Pam Arquelada.
25      Q   Okay.

277

1     A   So I would speculate that that is her
2   handwriting, and she's -- therefore, she's the one
3   that discussed it with Greg Myers.
4     Q   Okay.  Did you ever have a discussion with
5   Pam or anybody at Andersen about this issue here?
6     A   I don't recall specific conversations.
7     Q   Okay.  Do you recall general conversations
8   about this issue?
9     A   I recall, in general, that we -- we spoke
10  about the A/R out of balance and about, you know, our
11  concern and our desire for the company to get it
12  reconciled down to a negligible amount.
13    Q   Okay.  Why were you concerned?
14    A   Because the A/R was out of balance with the
15  GL, so you would like for the A/R trial balance to
16  agree to the GL balance.
17    Q   And the AR balance is ultimately disclosed in
18  Oracle's public financial statements; right?
19    A   The A/R --
20    MR. SIDORSKY:  Objection to form.
21    THE WITNESS:  The A/R GL balance, correct,
22  net of any reserves.
23    MR. GREENSTEIN:  Q.  And do you know if the
24  company focused -- if Oracle focused its effort to
25  gradually reduce the difference in the future?

278

1     A   I don't recall as to the future.
2     Q   Okay.  Turn to the next page.
3         Does this appear to be the lead schedule for
4   variation analysis of the unearned revenue accounts as
5   of the end of the second quarter?
6     A   It does.
7     Q   It's similar to the unearned revenue lead
8   sheet that we looked at with quarter one; right?
9     A   I -- I believe it is similar; yes.
10    Q   Okay.  And do you see customer overpayments
11  line, 25005?  You see how it says that the balance
12  went from -- from August 31, 2000, to the end of the
13  second quarter, November 30, 2000, it went from
14  73 million to 125 million?  Do you see that?
15    A   I do.
16    Q   That's a difference variance of 51 million;
17  right?
18    A   That's correct.
19    Q   You see next to that it says "Letter A
20  increase as a result of a 100 million --" looks
21  like "-- wire transfer received by Oracle to Delphi";
22  do you see that?
23    A   I do.
24    Q   Is that your handwriting?
25    A   It is not.

279

1     Q   Do you recall a $100 million wire transfer to
2   Oracle received by Delphi during this quarter?
3     A   I don't specifically, no.
4     Q   Do you remember generally discussing this
5   100 million wire transfer?
6     A   Generally, no, I don't.
7     Q   So you don't remember discussing it at all;
8   right?
9     A   Nope.
10    Q   Okay.  You see where it says "The variance is
11  offset by an 11 million debit booked to this account
12  to correct a reclassification entry between 25005 and
13  1208"?  Do you see that?
14    A   I do.
15    Q   And what does it mean to correct a
16  reclassification entry between 25005 and 1208?
17    A   To correct.  Well, other than what it says
18  there, I don't know.
19    Q   Okay.  And you see how it has handwritten --
20  or it says "The balance was also offset by additional
21  cash applications," and it says in handwriting -- it
22  says "AA LLP notes that last quarter there was a SAJE
23  of 75 million.  As such, the balance was 148 million
24  approximately previous to the CAJE"; is that right?
25    A   Correct.

280

1     Q   Is that what it appears to say?
2     A   Yes.
3     Q   And CAJE is what?
4     A   Client -- client adjusting journal entry.
5     Q   Okay.  So what does this mean, that
6   Arthur Andersen notes that last quarter there was a
7   client or a CAJE of 75 million?
8     A   Well, I believe the purpose of this is to try
9   to tie the prior quarter amounts into the prior
10  quarter work papers.  So if you look at the balance
11  that's labeled 8/31/00, and you go down, and you'll
12  see there's a double tick mark next to most of the
13  numbers, there is not one next to the 73 million,
14  because that balance does not agree to the prior
15  quarters.
16        So I believe this note is explaining that,
17  and you'll see a double tick mark next to the
18  148,616,273, in the handwritten comments.  So it's
19  trying to point out that that balance doesn't tie to
20  the prior work papers because of this closing
21  adjusting entry that was made as part of the Q1 close.
22        So it was -- it was booked subsequent to the
23  client delivering to us the review work papers for Q1.
24    Q   Subsequent to the -- so what do you mean when
25  you say it was booked subsequent to the client

281

1  delivering to us the review of work papers?
2       MR. SIDORSKY: Objection to form.
3       THE WITNESS: Well, at some point the company
4  would do a closing of their books, you know, first
5  pass, second pass, whatever it was, and they would
6  give to us the work papers that we would use for our
7  quarterly review.
8       That doesn't mean that they were necessarily
9  complete with all of their internal analysis and
10  reconciliation. So they would continue to do work,
11  and in this case the results of that work resulted in
12  an adjusting journal entry of $75 million which was
13  not reflected in our work papers because it occurred
14  subsequent to us getting the work papers for the
15  August review.
16       Q  You didn't know about it until Oracle
17  provided you with the information; right?
18       A  That's correct. Now, whether that was in the
19  August quarter or the November quarter, I don't
20  recall.
21       Q  Okay. And you see at the bottom there it has
22  another "A" with a tick mark, and it says "Continued.
23  AA LLP notes that PDW Cynthia Chavez treasury.
24  The 100 million is a loan and should not be classified
25  as unearned revenue. The adjustment will be posted

282

1  before the end of Q3."
2       And then it has a CAJE debit of 100 --
3  revenue of 100 million and credit of intracompany, it
4  looks like, receivable for 100 million; do you see
5  that?
6       A  That's correct.
7       Q  Now, what does that mean, the 100 million is
8  a loan and should not be classified as unearned
9  revenue?
10      A  Well --
11      MR. SIDORSKY: Objection to form.
12      THE WITNESS: I believe that the -- that --
13  that Delphi is a wholly owned subsidiary of Oracle.
14  So they received a payment from Delphi that appears to
15  have been misclassified and should have been treated
16  as an inner-company transaction, an inner-company
17  loan, and therefore they needed to correct that entry.
18  Otherwise, the books of Oracle Corporate and Delphi
19  would not have balanced and eliminating consolidation.
20      MR. GREENSTEIN: Okay.
21      Q  It says "The adjustment will be posted before
22  the end of Q3." Does that mean the adjustment wasn't
23  posted at the end of Q2?
24      MR. KONOVALOV: Objection; lack of
25  foundation.

283

1       MR. GREENSTEIN: Q. In other words, that
2  adjustment, that 100 million debit and credit, was not
3  made before the results of -- 2Q '01 were released;
4  right?
5       MR. KONOVALOV: Same objections.
6       THE WITNESS: I don't believe that's
7  necessarily true.
8       MR. GREENSTEIN: Okay.
9       Q  What does it mean the adjustment will be
10  posted before the end of Q3?
11      A  Well, can we look and see if F-6 is in here?
12      Q  Sure.
13      Is it fair to say you need F-6 to properly
14  analyze this -- these issues here?
15      A  Yes. I -- it appears it's 1638 in this file,
16  in this package of information.
17      Q  Okay. And it says -- on AA 1638, it says
18  under letter "A, Oracle booked an adjustment to
19  decrease cash and increase intracompany receivable by
20  100 million because Delphi did not record a cash
21  required transfer from Delphi to Oracle US in
22  October 2000"; do you see that?
23      A  Yes.
24      Q  It says "Reasonable"; right?
25      A  Yep.

284

1       Q  It was signed off by Andersen; right?
2       A  Yes.
3       So referring back to Schedule DD, which is
4  040, I believe what is meant by this note, and to
5  clarify the word posted, I mean, I believe that the
6  word "posted" means posted to the actual GL account
7  versus recorded in a client adjusting journal entry
8  which may not have been "posted," quote, to the GL,
9  but posted at a top level to accurately reflect it in
10  the consolidated financial statements.
11      That's why I believe that the schedule that
12  we just looked at with the entry was the schedule of
13  adjusting journal entries that were made as -- during
14  the actual final close for the quarter. It's just
15  that it did not get, quote, "posted," end quote, to
16  the GL account
17      Q  Well, if it doesn't get posted to the GL
18  account, how does it actually impact the financial
19  statements that are released?
20      MR. SIDORSKY: Objection to form.
21      MR. KONOVALOV: Yeah, objection; vague and
22  ambiguous.
23      THE WITNESS: You can record an entry without
24  actually recording it and posting it into the general
25  ledger account.

285

1    MR. GREENSTEIN:  Q.  So if you record the
2    entry, does that mean that it's actually changing the
3    publicly issued financial statements?
4    MR. SIDORSKY:  Objection to form.
5    THE WITNESS:  Yes.  I believe that this entry
6    was -- was recorded in the November quarter to
7    accurately reflect the external reported results, but
8    not technically, quote, "posted" to the actual general
9    ledger account.
10    MR. GREENSTEIN:  Okay.
11    Q  Why would it actually need to be posted to
12    the general ledger account later?
13    A  Well, at some point it would have to be
14    posted to the right GL account, or it would continue
15    to be out of balance in perpetuity.
16    Q  Okay.  You can put that -- what section is
17    it?  What is section "F"?  What does that mean?  I
18    think we said "B" refers to accounts receivable.  What
19    does "F" mean?
20    A  In what reference?  I'm sorry.
21    Q  F-6, when you said you need to look at F-6.
22    A  Oh, "F" was typically the section of the
23    audit work papers where we would have the financial
24    reporting.  So that would be the top-level
25    consolidation.  Any client adjusting entries would be

286

1    summarized up there as well.
2    Q  Okay.  I want to mark the next one or
3    actually this is Chan --
4    A  Are we done with this one?
5    Q  Yeah.  Oh, so "Section F" that you just
6    described, that's not -- it's not reflected in those
7    work papers that you just looked at; right?
8    MR. SIDORSKY:  Objection to form.
9    MR. KONOVALOV:  Misstates the witness's
10    testimony.
11    MR. GREENSTEIN:  Q.  Oh.  Is it reflected in
12    those work papers?
13    MR. SIDORSKY:  Same -- same objections.
14    MR. GREENSTEIN:  How much time left?  Time?
15    THE WITNESS:  Well, it's unclear, because
16    we -- we have a scheduling in here.
17    THE VIDEOGRAPHER:  About six hours.
18    MR. GREENSTEIN:  Okay.
19    Q  I'm sorry?
20    A  We have a schedule in here which explains the
21    100 million, but there -- and there is something in
22    the upper right-hand corner, but it's not legible.
23    Presumably that's an index.
24    Q  Okay.
25    A  And I -- you know, I would hope or -- well,

287

1    it might say F-6.
2    Q  Right.
3    But you can't be sure; right?
4    A  Well, I can't see it.
5    Q  Okay.
6    MR. SIDORSKY:  Well, I think that has to do
7    with the photocopying, quite frankly.
8    THE WITNESS:  No, I agree.
9    MR. SIDORSKY:  I mean --
10    THE WITNESS:  What I'm saying --
11    MR. SIDORSKY:  That's right, but I think that
12    the -- I think Mr. Greenstein probably does have a
13    copy where it's more legible.  It's just because it's
14    a series of photocopies.  Maybe it's not showing the
15    number there.
16    MR. GREENSTEIN:  Okay.
17    Q  Yesterday during your meetings with
18    attorneys, did you review all the work papers for the
19    fiscal 2001 audit and quarterly reviews?
20    A  No.
21    Q  Did you have a full set available to you to
22    review, or were you just reviewing parts of it?
23    MR. SIDORSKY:  Objection to form.
24    THE WITNESS:  I'm sorry.  The full set of
25    audit and quarterly work papers from Andersen?

288

1    MR. GREENSTEIN:  Right.
2    THE WITNESS:  No.
3    MR. GREENSTEIN:  Okay.  I want to mark
4    this -- oh, actually, I'm marking this one as Matuszak
5    No. 3.
6    (Document remarked Exhibit No. 3
7    for identification.)
8    MR. GREENSTEIN:  For the record, this is --
9    starts with AA 41, and the last page is AA 1086.
10    Q  Just looking at this, Mr. Matuszak, does
11    there appear to be the -- the quarterly review work
12    papers or parts of them for the third quarter of
13    fiscal year '01?
14    A  That's what it appears, yes.
15    Q  If you turn to AA 49, you see it has a
16    description of -- you see it has a description of
17    12018 again?
18    A  Yes.
19    MR. SIDORSKY:  I think -- I don't want to --
20    I mean, it's your record, Eli, but I think this is
21    maybe your notes or someone's notes on this document.
22    I'm a little --
23    MR. GREENSTEIN:  Yeah.  You know what --
24    MR. SIDORSKY:  You may want to get --
25    MR. GREENSTEIN:  Yeah, I want to get those

289

1  back.
2      THE WITNESS:  I was going to say I don't
3  recall seeing this in our work product.
4      MR. GREENSTEIN:  Why don't we take a
5  five-minute break.
6      THE VIDEOGRAPHER:  Off the record.  The time
7  is 4:55 p.m.
8      (Short break taken.)
9      (Document remarked Exhibit No. 3
10      for identification.)
11      THE VIDEOGRAPHER:  We are back on the record.
12  The time is 5:11 p.m.
13      MR. GREENSTEIN:  Q.  Mr. Matuszak, if you
14  look at what's been marked as Matuszak No. 3, which --
15  just quickly look through it.  It's Bates stamped AA
16  41, and the last page is AA 1086.  Does this appear to
17  be the quarter three '01 work papers?
18      A  It does.
19      Q  Okay.  And the quarterly review work papers
20  similar to the ones we looked at for Q1 and Q2;
21  correct?
22      A  Yes.
23      Q  Okay.  Put that aside.
24      I've also handed you what's been marked as
25  Chen Exhibit No. 2, and it's AA 1, and then it ends

290

1  with AA 1945, and does this appear to be the work
2  papers for the fiscal 2001 year-end audit?
3      A  Yes.  It appears to be sections from that
4  audit, yes.
5      Q  Okay.  And if you turn to -- I want to direct
6  your attention to AA 1925.  It says "Bad debt reserve
7  reconciliation."
8      A  Okay.
9      Q  Now, have you seen this document before?
10      A  I -- I -- I reviewed it yesterday.
11      Q  Okay.  Do you remember -- before you reviewed
12  it yesterday, do you recall seeing this document?
13      A  Not specifically, but I do recall, you know,
14  this.  You know, seeing schedules like this.
15      Q  Okay.  Did you review this particular
16  document during the fiscal year 2001 audit for Oracle?
17      A  I don't -- I don't know.  Don't recall.
18      Q  Okay.  And you see -- is any of the
19  handwriting here yours that you could tell?
20      A  I don't know.  There's a -- there's a little
21  comment between the "B" and the "C" on the side that
22  might be mine.
23      Q  Okay.
24      A  I don't even know what it says.
25      Q  Okay.

291

1      A  But it's possibly my comment.  I don't know.
2      Q  Okay.  And you see this is a bad -- it
3  appears to be a bad debt reserve reconciliation for
4  the fiscal year 2001 audit; right?
5      A  Yes, it's a -- it's a roll forward -- it's a
6  roll forward of the reserve from balances at the end
7  of the third fiscal quarter to the balance as of the
8  end of the fiscal year, so it's a quarterly roll
9  forward.
10      Q  Okay.  And you see how, as part of these
11  accounts on the left-hand side of the box, it has
12  "12/6/01 bad debt write-offs"?
13      A  Yes.
14      Q  Do you see that?
15      And it has a number of other accounts
16  receivable accounts relating to reserves; right?
17      A  Yes.
18      Q  Okay.  And it has a total reserve.
19      Now, looking down in the notes, the
20  handwritten notes, you see where it says "A"?
21      A  Yes.
22      Q  And it says "Account 12601 bad debt
23  write-off"; you see that?
24      A  Yes.
25      Q  And it says "The company reviewed application

292

1  of cash receipts in 25005 customer overpayments and
2  noted that has been aggressive in applying cash to
3  previously written off invoices.  As a result, it
4  reversed 9.5 million of reserves for which the company
5  has collected cash after they had previously written
6  off the balances"; do you see that?
7      A  I do.
8      Q  Now, were you made aware of this at the time
9  that this was written, that Oracle had been aggressive
10  in applying cash to previously written off invoices?
11      MR. SIDORSKY:  Objection to form.
12      THE WITNESS:  I'm not sure what's meant by
13  the word "aggressive."
14      MR. GREENSTEIN:  Q.  Well, it appears that
15  after Andersen reviewed transfers of or application of
16  cash to previously written off invoices, that it
17  reversed 9.5 million of reserves; right?
18      A  Now, so the way I understand this note, the
19  company was -- was actively trying to review the --
20  the accounts or, you know, the invoices in account
21  25005 and tried, to the extent that it could, to apply
22  them to particular invoices; okay.
23      If some of those invoices were invoices that
24  had already been written off, since the write-off
25  would have reduced the reserve, if they're reversing

293

1  the write-off, it would increase the reserve; okay.
2      Q   It would have increased the reserve in 12601;
3  right?
4      A   It would have increased the reserve in 12601;
5  that's correct.
6      Q   So it would increase -- as a result, if you
7  increase the reserve, I think you said you also
8  increase bad debt expense; right?
9      MR. SIDORSKY:  Objection to form.
10     THE WITNESS:  Well, it -- not -- not in this
11  case.  So if I understand this note right, so when
12  they wrote off an invoice, the write-off of the
13  invoice would have reduced the bad debt reserve.
14     After researching account 25005, they found
15  that some of the payments residing in that account
16  actually related to invoices they had written off.  So
17  in order to record that entry, the entry would be to
18  debit account 25005 and credit the allowance for
19  doubtful accounts; okay.
20     Now, that entry increases the reserve by
21  $9.5 million, but there is no reserve requirement for
22  the $9.5 million.  So the only way through the, you
23  know, accounting entries to get that out of the
24  reserve, because it doesn't need to be in the reserve,
25  would be to reverse the reserve for cash that they had

294

1  collected after they had written off the balances.
2      MR. GREENSTEIN:  Okay.
3      Q   And so -- and this says that Oracle had been
4  aggressive in applying customer overpayments from
5  25005 to previously written off invoices, and as a
6  result it reversed 9.5 million, which the companies
7  collected cash after they previously written off the
8  balances; right?
9      A   Right.
10     Q   So -- and you see up at the top, well, up in
11  that box, it has 12601 bad debt write-offs; right?
12     A   Yes.
13     Q   You see that?
14     You see in the darkened shaded box, it has --
15  it appears to say 9.5 million in there?
16     A   Yeah, I can't see what's in the shaded box,
17  but I -- in order for this schedule to roll forward
18  properly, it would have to be roughly 9.9 or
19  9. -- whatever it is -- 9.5.
20     Q   Okay.  So that -- that 9.5 reversal was taken
21  to 12601 bad debt write-offs account; right?
22     MR. KONOVALOV:  Objection; misstates the
23  document.
24     THE WITNESS:  Well, there was a -- there was
25  an adjustment made to the account that resulted in a

295

1  decrease in the reserve, but I -- but I'm -- I'm not
2  suggesting that it's an inappropriate entry.
3      MR. GREENSTEIN:  Okay.
4      Q   What I'm asking is that it appears that the
5  9.5 million of reserves that was reversed related to
6  12601; right?
7      A   Well, what I'm suggesting is that when they
8  collected the cash, it probably increased 12601, or I
9  won't say collected the cash.
10     When they recorded the payments, in order to
11  apply those payments, since they had previously
12  written off the invoices, the entry to record those
13  payments would be to debit 25005 and credit 12601.  So
14  somewhere in the activity for the quarter there's an
15  increase in 12601 of $9.5 million, but it doesn't need
16  to be there as of the end of the quarter, because
17  there are no receivables that require that
18  $9.5 million reserve.
19     So the company appropriately reduced the
20  reserve by $9.5 million to bring it in line with their
21  actual reserve requirements.
22     Q   Reduce 12601 by 9.5 million?
23     A   That's what it occurs.
24     Q   Okay.  So, in other words, during the course
25  of the quarter, they had been aggressive in applying

296

1  money, 25005 customer overpayments, to increase 12601,
2  and then as a result that it was too aggressive --
3      A   No, no.
4      Q   -- they reduced 12601 by 9.5 million?
5      MR. KONOVALOV:  Misstates the witness's
6  testimony.
7      MR. SIDORSKY:  Objection to form.
8      THE WITNESS:  I did not suggest that it was
9  inappropriate.  I don't know what is meant by the word
10  "aggressive," but it does not imply it's
11  inappropriate.
12     MR. GREENSTEIN:  Okay.
13     Q   I'll back up.  I don't think I said
14  inappropriate.
15     What I think I said is what you just
16  testified was that during the course of the quarter,
17  that Oracle had been applying amounts of -- applying
18  cash, it says, from 25005 customer overpayments, and
19  you said that increased in applying it such that it
20  increased 12601; right?
21     MR. KONOVALOV:  Objection; mischaracterizes
22  the witness's testimony.
23     MR. SIDORSKY:  Well, again, I -- I think the
24  question, to the extent you asked that question,
25  that's been answered, so let's try and --

297

1    THE WITNESS: Again --
2    MR. SIDORSKY: -- move to a -- to a question,
3  a new question. Objection; asked and answered.
4    THE WITNESS: I'm not suggesting that what
5  they did was, quote, "aggressive" or incorrect. It
6  doesn't say that they inappropriately applied customer
7  overpayments to previously written off invoices.
8    MR. GREENSTEIN: Right.
9    Q  I'm not --
10   A  It just says that's what they did.
11   Q  I'm not talking --
12   A  I'd rather not focus on the word
13  "aggressive."
14   Q  Okay. Well, setting "aggressive" aside, what
15  I think you just said was they were applying cash from
16  25005 customer overpayments to 12601, thereby
17  increasing that account 12601, and that at the end of
18  it, they decided to reverse that by 9.5 million such
19  that they would reduce 12601 by 9.5 million which is
20  what is in this box up here --
21   MR. KONOVALOV: Objection; vague and
22  ambiguous, but --
23   MR. GREENSTEIN: Q. -- right?
24   A  That's -- that's correct, but --
25   Q  Okay.

298

1    A  -- it's not inappropriate.
2    Q  Okay. Well, that's nonresponsive. I just
3  asked you if that's what happened, and you said that's
4  correct. I didn't ask about the appropriateness of it
5  or not, but somebody appears to think that it was too
6  aggressive; right?
7    MR. KONOVALOV: Objection; mischaracterizes
8  the witness's testimony and the document, and it's
9  argumentative.
10   You're quibbling with the witness now.
11   MR. SIDORSKY: Objection to form.
12   MR. GREENSTEIN: Q. Well, do you know who
13  wrote that, that it was aggressive?
14   A  I don't know.
15   Q  But somebody from Andersen thought that it
16  had been aggressive, and that as a result they
17  reverse -- they forced Oracle to reverse it by
18  9.5 million?
19   MR. KONOVALOV: Objection; misstates the
20  witness's testimony.
21   MR. SIDORSKY: No, that does mischaracterize
22  the witness's testimony.
23   THE WITNESS: You mischaracterized what I
24  said.
25   MR. GREENSTEIN: Okay. Well, I'll withdraw

299

1  that last question.
2    Q  So what does "aggressive" mean to you in the
3  context of applying cash receipts to account 12601?
4    A  This note to me means that they were actively
5  trying to clean up account 25005 and identify those
6  customer overpayments with actual invoices. And some
7  of those invoices, because there was stuff in 25005
8  that may have been in there for quite some time and
9  hadn't been adequately or accurately identified with a
10  particular invoice, those invoices had been --
11  actually been written off by the company.
12   So they're no longer in the accounts
13  receivable trial balance, they're no longer in the
14  accounts receivable balance sheet item. So the only
15  way to get them out of account 25005 is to debit that
16  account, and it would be inappropriate to credit
17  accounts receivable, so they credited account 12601
18  which is where the original write-off went to.
19   Q  Right.
20   When you say "the original write-off," that
21  means it increases 12601; right?
22   A  It increases 12601 as a result of the journal
23  entry they made; that's correct.
24   Q  Okay.
25   A  But that's not to imply that as a result of

300

1  these journal entries that the company's bad debt
2  reserve requirements increased by $9.5 million.
3    Q  Okay. Did you ever have any discussions
4  about -- about this note here that -- that somebody
5  thought that the application of cash receipts in
6  account 25005, applying that cash to previously
7  written off invoices was, quote, "aggressive"? Did
8  you ever have any discussions about that?
9    A  I don't recall.
10   Q  But I think --
11   A  I don't know what you mean by -- again, by
12  the word "aggressive."
13   Q  Well, I'm just wondering if you ever had a
14  discussion about this particular 9.5 million reversal
15  as a result of the type of transactions that occurred
16  here.
17   MR. KONOVALOV: Objection; mischaracterizes
18  the document.
19   THE WITNESS: Well, I don't recall if I had
20  specific comments or specific discussions regarding,
21  you know, items on this schedule.
22   MR. GREENSTEIN: Okay.
23   Q  Generally, do you recall discussing the
24  company's application of cash receipts in account
25  25005 customer overpayments to previously written off

301

1  invoices?  Do you recall discussing that?
2      A   No, not specifically.
3      Q   Generally do you recall?
4      A   No.
5      Q   Okay.  Now, do you -- here -- is there any
6  support -- why was it a 9.5 reversal?  Do you know if
7  there was any evidence that supported that 9.5
8  million?
9      A   I can't tell from this -- from -- from this
10  document what, if any, detail was reviewed in terms of
11  how the 9.5 million was calculated.
12      Q   So you're not aware of any calculation done
13  by Andersen to come up with that 9.5 million; right?
14      A   No.
15      Q   Okay.  I'm going to mark this as Matuszak
16  No. 4; is it?
17          (Document marked Exhibit No. 4
18           for identification.)
19      THE WITNESS:  Thank you.
20      MR. GREENSTEIN:  Q.  For the record, this is
21  Bates stamped NDCA-ORCL 313777 through 313784.
22  Interview No. 1 memo of Thomas Williams dated
23  11/12/02.
24      A   Okay.
25      Q   I'll represent to you this is an interview

302

1  memorandum of a purported interview taken by Oracle's
2  Special Litigation Committee of Tom Williams, and you
3  can see on the second page of this it says "On
4  Tuesday, November 12, 2002, counsel at the Special
5  Litigation Committee of Oracle developed a further
6  follow-up interview of Tom Williams, Vice President of
7  Finance Operations"; you see that?
8      A   Yes.
9      Q   Okay.  Now, this appears to be a
10  memorialization of that interview; is that fair to
11  say?
12      MR. KONOVALOV:  Objection; lacks foundation.
13      THE WITNESS:  Well --
14      MR. SIDORSKY:  Yeah, objection.
15      MR. GREENSTEIN:  I think the document does
16  speak for itself, so --
17      MR. SIDORSKY:  It's all right.  You can
18  represent what the document is.  I mean, as you know.
19      MR. GREENSTEIN:  Q.  I'd like to direct your
20  attention to the last sentence in there where it says
21  "He had learned --" it's the third line up.
22      It says, "He had learned from Mike Quinn and
23  Greg Myers, who were responsible for conducting the
24  investigation, that certain persons in Oracle's
25  Collections Department had, apparently on an ad hoc

303

1  basis over time, moved certain items from Oracle's
2  unapplied cash account to its bad debt reserve
3  account."
4      Do you see that?
5      A   I do.
6      Q   So were you aware of -- when you were -- as a
7  result of your reviews and audit work for Oracle, were
8  you aware that certain persons in Oracle's collection
9  department had, on an ad hoc basis over time, moved
10  certain items from Oracle's unapplied cash account to
11  its bad debt reserve account?
12      A   Nope.
13      Q   You were never aware of that?
14      A   Nope.
15      Q   Do you know if anybody at Andersen was aware
16  of that?
17      A   I have no idea.
18      Q   You had no discussions about that?
19      A   Nope.
20      Q   Would that be something -- well, strike that.
21      If you turn to page 313781, please.
22      A   I'm sorry.  Which page?
23      A   313781.
24      A   313781; okay.
25      Q   And I'm directing your attention to the first

304

1  full paragraph.  Well, it's the small paragraph.  It
2  says "Williams also explained"; do you see that?
3      A   Yes.
4      Q   And you see it says "Williams also explained
5  that Oracle had moved certain cash receipts to Account
6  12601.  These receipts were entered on the credit side
7  of the account"; do you see that?
8      A   I do.
9      Q   Then it says, "These credits potentially
10  decrease bad debt expense when Oracle calculates its
11  reserve.  Thus, Williams explained, if there is a net
12  credit balance in 12601 for the quarter, potentially
13  less bad debt expense will be incurred if Oracle
14  decides it has to increase their reserve.  The less
15  bad debt required the smaller expenses, and therefore
16  income is correspondingly higher.
17      "In this way, Williams explained that the
18  transfers from unapplied cash to 126601 could
19  potentially have the effect from making income larger
20  than it would have been without the transfers."
21      Do you see that?
22      A   I do.
23      Q   Were you aware that there were -- at Oracle,
24  the collection staff had transferred unapplied cash
25  receipts to account 12601 such that it had the effect

305

1    of making income larger than it would have been
2    without the transfers?
3          MR. KONOVALOV: Objection; assumes facts not
4    in evidence and mischaracterizes the record in this
5    case. The witness has testified about the specific
6    document. So it's distorted putting it in front of
7    the witness and then asking him whether or not he
8    agrees with the statements that have been disavowed.
9          Subject to that, you can answer the question.
10         MR. SIDORSKY: Objection to form.
11         THE WITNESS: I'm not aware of any of the
12   activities that you just read to me from the document.
13         MR. GREENSTEIN: Okay.
14    Q   So you never had any discussions about this
15   type of activities that I just read; right?
16    A   No.
17         MR. SIDORSKY: Objection to form.
18         MR. GREENSTEIN: Okay.
19         MR. SIDORSKY: Vague.
20         MR. GREENSTEIN: Q. Earlier you testified
21   that you weren't aware of any transfers made of
22   unapplied cash to 12601 that you recall; right?
23         MR. SIDORSKY: Just objection to form.
24         THE WITNESS: Inappropriate entries, no, I
25   was not aware of any.

306

1          MR. GREENSTEIN: Q. So were you aware of
2    appropriate transfers from 25005 to 12601?
3     A   Well, I think we just spent several minutes
4    discussing an entry that from the documentation in our
5    work papers appears appropriate. Whether it was or
6    not, I mean, we just discussed an entry that was made
7    from those two accounts, and I'm not suggesting that
8    entry was inappropriate.
9     Q   Okay. But wasn't it true that in that
10   document it was talking about transfers that were made
11   of -- from 25005 that were then decided by Andersen
12   that they were -- needed to be reversed; right?
13         MR. SIDORSKY: Objection.
14         MR. KONOVALOV: Objection; misstates the
15   document and the witness's testimony.
16         THE WITNESS: That's not what the note says.
17         MR. GREENSTEIN: Okay.
18    Q   But again, if you're looking at these two
19   paragraphs on 313781, what I just read to you, you
20   weren't aware of this occurring at Oracle?
21         MR. KONOVALOV: Objection; assumes facts not
22   in evidence.
23         MR. SIDORSKY: And mischaracterizes what the
24   witness just testified about. Objection to form.
25         THE WITNESS: I'm -- I'm not aware of any of

307

1    the items or practices that Mr. Williams is discussing
2    in this memorandum.
3          MR. GREENSTEIN: Okay.
4     Q   And if you look down where -- at the bottom
5    where it has the heading "Transfers of unapplied cash
6    to 12601," do you see that?
7     A   Yes.
8     Q   And it says, "As Williams --" second
9    sentence "-- As Williams had noted earlier, he learned
10   of these transfers following the allegations in the
11   SAC."
12         I'll represent to you that the SAC is the
13   second amended complaint filed by plaintiffs in the
14   securities fraud litigation.
15         Did you ever learn after the filing of the
16   SAC that -- of the type of transfers that he was
17   describing on this page?
18    A   No.
19         MR. KONOVALOV: Objection; lacks foundation;
20   calls for speculation; assumes facts not in evidence.
21   The document speaks for itself.
22         MR. GREENSTEIN: Q. I'm sorry. Did you say
23   no?
24         MR. SIDORSKY: Same objection.
25         MR. GREENSTEIN: Q. Did you say no?

308

1     A   I said no.
2     Q   Okay. If you turn the page -- actually, if
3    you just start on the next line, it says -- or the --
4    sorry. The -- last sentence, beginning sentence,
5    where it says "Williams said that the transfers --"
6    and then go to the next page "-- Williams said the
7    transfers were accomplished by designating the cash
8    receipt as 'on account,' then executing a
9    miscellaneous cash receipt to move the funds from
10   25005 to 12601"; do you see that?
11    A   I do see that.
12    Q   Now, were you aware of -- that transfers were
13   accomplished by designating cash receipts as on
14   account and executing a miscellaneous cash receipt to
15   move funds from 25005 to 12601?
16         MR. KONOVALOV: Same objections.
17         MR. SIDORSKY: Objection to form.
18         THE WITNESS: No.
19         MR. GREENSTEIN: Q. And you don't know
20   what -- see where it says "on accounts" in quotes?
21   You don't know what that meant or means?
22    A   I believe I already testified to that earlier
23   today, but I would reiterate that no, I do not know
24   what that means.
25    Q   Okay. If you turn the page to 313783, see

309

1 where it says "Amount of the Transfers"?
2    A  I do.
3    Q  You see down at the -- the second full
4 paragraph after that heading, it says, "Williams
5 stated that he believed that the aggregate amount of
6 the transfers in the two-year period from August 2000
7 to August 2002 was approximately $48 million"; do you
8 see that?
9    A  I do see that.
10   Q  Were you aware that there was an aggregate
11 amount of transfers from 25005 to 12601 during that
12 period of 48 million?
13       MR. KONOVALOV:  Objection; assumes facts not
14 in evidence; lacks foundation.
15       MR. SIDORSKY:  Objection to form.
16       THE WITNESS:  Now, I think I've already
17 stated I wasn't aware of any of the transfers
18 discussed or any activity discussed in this
19 memorandum. So, by definition, I was not aware of
20 quantifying what it would be. I wasn't aware that
21 they happened.
22       MR. GREENSTEIN:  Okay.
23   Q  Was anybody at Andersen aware of this
24 activity that we've just been talking about?
25       MR. KONOVALOV:  Objection; calls for

310

1 speculation.
2       MR. SIDORSKY:  Objection to form.
3       THE WITNESS:  I -- I -- I don't know.
4       MR. GREENSTEIN:  Okay.
5   Q  Well, did you ever discuss it with anybody
6 during the audit or quarterly reviews in 2001?
7    A  I did not.
8    Q  Did you ever discuss it with anybody after
9 you left Andersen?
10   A  I did not.
11   Q  You see -- see there on the last sentence of
12 that second or the last full paragraph, it says
13 "Williams said he had prepared a spreadsheet that he
14 would share with the committee showing the transfers
15 from 25005 to 12601 from August 2000 to August 2002"?
16 Do you see that?
17   A  I do.
18   Q  And have you ever seen that spreadsheet that
19 he refers to there?
20   A  I have not.
21   Q  Okay.
22   A  I just want to point out that the -- the
23 ending period of that spreadsheet is after Andersen
24 was terminated as the auditors for Oracle.
25   Q  Right.

311

1    A  So the schedule was prepared after I left.
2    Q  Okay. But the activity obviously goes from
3 August 2000 through August 2002 at which time --
4 actually, withdraw that.
5       So all of the things I just read to you out
6 of this memorandum, in conducting your audit and
7 quarterly reviews for Oracle in 2001, would you have
8 wanted to know that this was occurring --
9       MR. KONOVALOV:  Objection.
10       MR. GREENSTEIN:  Q.  -- during those reviews?
11       MR. KONOVALOV:  Sorry.  Objection; assumes
12 facts not in evidence.
13       MR. SIDORSKY:  Objection to form.
14       THE WITNESS:  I would have wanted to know,
15 yes.
16       MR. GREENSTEIN:  Okay.  For the record, I'm
17 going to mark this next exhibit.  Well, it's actually
18 already been marked as Chen No. 12.
19   Q  And just to back up, why would you have
20 wanted to know that the activities that were referred
21 to there were occurring?
22       MR. KONOVALOV:  Objection; assumes facts not
23 in evidence.
24       MR. SIDORSKY:  Yeah, objection to the --
25 objection to form.

312

1       MR. GREENSTEIN:  Actually, you know what,
2 I'll withdraw that.
3   Q  Looking at Chen 12, which is a October 21st,
4 2002, e-mail from Michael Quinn to Ryan Roberts and
5 Greg Myers, cc: Tom Williams, if you could just go
6 ahead and read that.
7       Actually, if you could stop by where it says
8 "What needs to be done."
9    A  Okay.
10   Q  You finished?
11   A  Almost. Okay.
12   Q  Have you ever seen this e-mail before?
13   A  No.
14   Q  Do you know who Michael Quinn is?
15   A  I do.
16   Q  And did you ever have any discussions with
17 Michael Quinn about the con -- the -- these three
18 first bullet points in this e-mail?
19   A  No, I did not.
20   Q  Okay. You see how it says "Ryan, Greg, Below
21 is the action plan for addressing the problems
22 surrounding the unapplied cash issues that you guys
23 worked on last week."
24       Do you see that?
25   A  I see that, yes.

313

1    Q   Were you aware during the quarterly reviews
2    or audit of Oracle's 2001 results that there were any
3    problems surrounding unapplied cash?
4    A   I was not.
5    Q   You see it says "There are three
6    deliverables," and it says "We need to provide an
7    update to the Audit Committee (a subcommittee of
8    Oracle's Board of Directors) in regards to what
9    Revenue Impact this process of taking unapplied cash
10   receipts to the reserve will have on our financial
11   statements.  In addition, we need to provide what
12   impact this process has had on revenue in each of the
13   last 8 quarters"; do you see that?
14   A   I do.
15   Q   So the last eight quarters, if you look at
16   the e-mail, it's October 21st, 2002.  So that would
17   take you back approximately two years, if you were
18   looking at the impact of the past eight quarters;
19   correct?
20       MR. KONOVALOV:  Objection; assumes facts not
21   in evidence; lacks foundation.
22       THE WITNESS:  It appears that it would go
23   back into fiscal 2001, yes.
24       MR. GREENSTEIN:  Right.
25   Q   And you see where it says "what Revenue

314

1    Impact this process of taking unapplied cash receipts
2    to the reserve will have on our financial statements"?
3        Now, nobody at Oracle told you during the
4    fiscal 2001 reviews audit or the reviews that there
5    were unapplied cash receipts taken to the reserve
6    which potentially could impact revenue?
7        MR. KONOVALOV:  Objection.
8        MR. GREENSTEIN:  Q.  Were you ever told that?
9        MR. KONOVALOV:  Assumes facts not in
10   evidence; misstates evidence.
11       MR. SIDORSKY:  Objection to form.
12       THE WITNESS:  No, I was not.
13       MR. GREENSTEIN:  Okay.
14   Q   Were you ever told about any of the issues in
15   this first bullet point during your time at Andersen?
16   A   No, I was not.
17       MR. SIDORSKY:  Objection to form.
18       MR. GREENSTEIN:  Q.  You see where it says in
19   the second bullet point -- or sorry -- you see in the
20   first bullet point it says "We need to provide what
21   impact this process has had on the revenue in each of
22   the last eight quarters," and you were never informed
23   that there was any possible impact of taking unapplied
24   cash receipts to the reserve that would impact revenue
25   in the prior eight quarters; right?

315

1        MR. KONOVALOV:  Objection; assumes facts not
2    in evidence.
3        MR. SIDORSKY:  Objection to form.
4        MR. KONOVALOV:  The document -- the witness
5    testified he has never seen the document before.
6    You've got no foundation for any of these questions.
7        MR. GREENSTEIN:  Q.  And what I'm asking is,
8    were you ever made aware that there was a potential
9    impact of a process of taking unapplied cash receipts
10   to the reserve in that it could potentially impact the
11   quarterly financial statements that Andersen
12   audited --
13       MR. KONOVALOV:  Objection; assumes --
14       MR. GREENSTEIN:  Q.  -- and reviewed?
15       MR. KONOVALOV:  -- facts not in evidence.
16       MR. SIDORSKY:  Objection to form.
17       THE WITNESS:  No, I was not aware.
18       MR. GREENSTEIN:  Okay.
19   Q   Were you ever made aware at any time after
20   you left Oracle -- Andersen?
21   A   No.
22   Q   Would you have wanted to know this in
23   conducting your quarterly reviews and audit -- would
24   you have wanted to know if this was, in fact,
25   occurring and it would, in fact, have an impact on

316

1    revenue?
2        MR. KONOVALOV:  Same objection.
3        MR. SIDORSKY:  Objection to form.
4        THE WITNESS:  Yes, I would have liked to have
5    known about it while we were out doing our review and
6    audit work.
7        MR. GREENSTEIN:  Right.
8    Q   You see in the second bullet point where it
9    says "We need to clean up the ENTIRE problem prior to
10   the end of October by moving cash receipts to the
11   proper buckets (unapplied, customer overpayments, or
12   on account) as appropriate.  We need to establish new
13   policies and procedures to ensure this never happens
14   again"?
15       Were you ever made aware of this problem that
16   he's referring to here or that Oracle needed to
17   establish new policies and procedures to ensure that
18   that never happened again?
19   A   No.
20       MR. KONOVALOV:  Same objections.
21       MR. GREENSTEIN:  Q.  You weren't aware of any
22   of this in these two bullet points here; right?
23       MR. KONOVALOV:  Same objections.
24       THE WITNESS:  No.
25       MR. GREENSTEIN:  Q.  But you would have

317

1  wanted to know if Oracle had to change its policies
2  and procedures to ensure that the problem never
3  happened again? That would be something you wanted to
4  know as Oracle's auditor in conducting your audit;
5  right?
6       MR. SIDORSKY: Objection to form.
7       MR. KONOVALOV: Same objection.
8       MR. MERCHANT: I think I already testified on
9  this memo and Mr. Williams' memo that I would like to
10  have known about this practice if it had been
11  occurring.
12       MR. GREENSTEIN: Okay.
13   Q   You see in the last paragraph -- well,
14  sorry -- the fourth bullet point says "What needs to
15  be done," it says "For items currently 'On Account,'
16  we need to continue to work through each item over
17  $10,000 to determine what should have happened to the
18  cash receipt and make the correction and put it in the
19  right place"; do you see that?
20   A   I see that, yes.
21   Q   Were you ever made aware during 2001 or
22  during 2000, 2001 -- were you ever made aware that
23  there were items currently on account at Oracle that
24  needed to be determined where -- what should have
25  happened to the cash receipt?

318

1       MR. KONOVALOV: Same objections.
2       MR. SIDORSKY: Objection to form.
3       THE WITNESS: No.
4       MR. GREENSTEIN: Okay.
5   Q   Do you see the paragraph under those last
6  three bullet points where it says "Greg," and that
7  refers to Myers, "For the Miscellaneous Offset Report,
8  I need you to add the date the item was moved to
9  12601. We need to accumulate the error by quarter."
10       You see that?
11   A   I do.
12   Q   And were you aware -- were you aware that
13  Oracle tried to -- ever -- that Oracle tried to
14  accumulate the error by quarter as it relates to items
15  being moved to 12601?
16       MR. KONOVALOV: Same objections.
17       MR. SIDORSKY: Objection to form.
18       THE WITNESS: I think I've already testified
19  that I wasn't aware of any of the activities in this
20  memo or Mr. Williams' memo.
21       MR. GREENSTEIN: Okay.
22       THE WITNESS: So I was -- you keep asking me
23  the same questions over and over again. I'm not aware
24  of it.
25       MR. GREENSTEIN: Okay.

319

1   Q   If you turn to the second page, the paragraph
2  that says "Greg, Please confirm that ALL ability to
3  move anything to 12601 via On Account or creating a
4  Misc receipt write-off has been turned off."
5       Do you see that?
6   A   I do.
7   Q   Were you ever aware in 2000, 2001, or any
8  time, that there was an ability to move unapplied cash
9  to 12601 via on account?
10       MR. KONOVALOV: Same objections.
11       MR. SIDORSKY: Objection to form.
12       THE WITNESS: No.
13       MR. GREENSTEIN: Okay.
14   Q   Because I think you testified you didn't know
15  what "on account" meant, so you wouldn't know that
16  there was any ability to move anything to 12601 on
17  account; right?
18       MR. SIDORSKY: Objection to form.
19       THE WITNESS: That would be correct.
20       MR. GREENSTEIN: Q. And were you ever aware
21  that this -- that Oracle ever attempted to turn off
22  the ability to move unapplied cash to 12601 via on
23  account?
24       MR. KONOVALOV: Same objections.
25       THE WITNESS: No.

320

1       MR. GREENSTEIN: Put that aside. I think I'm
2  going to take a five-minute break and then finish off.
3       THE VIDEOGRAPHER: Off the record. The time
4  is 5:47 p.m.
5       (Short break taken.)
6       (Documents marked Exhibit Nos. 5 - 8
7        for identification.)
8       THE VIDEOGRAPHER: We are back on the record.
9  The time is 6:05 p.m. This marks the end of videotape
10  number four, Volume I in the deposition of
11  Gary Matuszak.
12       (Short break taken.)
13       THE VIDEOGRAPHER: We are back on the record.
14  The time is 6:09. Here marks the beginning of
15  videotape number five, Volume I, in the deposition of
16  Gary Matuszak.
17       MR. GREENSTEIN: Q. Mr. Matuszak, we just
18  finished talking about two documents, one was a
19  interview memorandum of Thomas Williams and the other
20  was an e-mail from Mike Quinn, and they were
21  discussing certain transfers from -- of unapplied cash
22  to 12601; do you recall talking -- having that
23  discussion?
24   A   In this deposition.
25       MR. SIDORSKY: Objection to form.

321

1    THE WITNESS: I recall the discussion we just
2  had as part of the deposition, yes.
3    MR. GREENSTEIN: Right.
4    Q  Now, I think I asked you if you would have
5  wanted to know if that what was reflected in those two
6  documents was actually occurring during the time that
7  you were auditing and reviewing the -- Oracle's
8  financial statements.  Do you remember me asking that?
9    MR. SIDORSKY: Objection to form.
10    THE WITNESS: Generally, yes.
11    MR. GREENSTEIN: Q.  And you said you would
12  have wanted to know -- you would have liked to know
13  that at the time you were auditing Oracle's financials
14  and reviewing the quarterly financials; right?
15    A  Yes.
16    MR. SIDORSKY: Objection; asked and answered.
17    MR. GREENSTEIN: Q.  And I just wanted to
18  know why you would have wanted to know that if those
19  issues were actually occurring during your audit and
20  quarterly reviews?
21    MR. KONOVALOV: Well, objection; vague, and
22  assumes facts not in evidence.
23    THE WITNESS: Based upon the documents we
24  just went through, it -- it's unclear whether this was
25  appropriate activity or not.  It appears as if some of

322

1  it may have been inappropriate activity, and therefore
2  I would want to be aware of it.
3    MR. GREENSTEIN: Okay.
4    Q  Are you aware of -- that on November 17th
5  Oracle created 46,000 -- well, strike that.
6    Do you know what a debit memo is?
7    MR. SIDORSKY: Objection to form.
8    THE WITNESS: Generally, yes.
9    MR. GREENSTEIN: Okay.
10    Q  Well, with respect to Oracle, do you know
11  what a debit memo was around the 2000 and 2001 time
12  frame?
13    A  Not specifically, no.
14    Q  Generally, what do you know a debit memo to
15  be?
16    A  A credit memo would be a reversal of an
17  invoice.  A credit memo, an invoice.  So a debit memo
18  would be an increase.  I don't know if it was an
19  increase in an invoice or debit to a customer account.
20  I -- I don't know specifically what they meant by a
21  debit memo, how it impacted a particular customer
22  account.
23    Q  Okay.  Are you aware that -- that plaintiffs
24  allege in this lawsuit that there were 46,000 --
25  approximately 46,000 debit memos created on or around

323

1  November 17th, 2000?
2    A  I recall that that was stated in the -- in
3  the complaint, yes.
4    Q  Okay.  So other than seeing that in the
5  complaint, were you ever aware around 2000 -- were you
6  ever made aware, at any time, that there were
7  46,000-plus debit memos created on or around
8  November 17, 2000, at Oracle?
9    A  No.
10    Q  Okay.  Were you ever aware that Oracle
11  conducted a, quote, "on account" clean up for USA data
12  in connection with the creation of those debit memos
13  on or around November 17, 2000?
14    MR. KONOVALOV: Objection; vague and
15  ambiguous.
16    MR. SIDORSKY: Objection to form.
17    THE WITNESS: No.
18    MR. GREENSTEIN: Q.  Were you aware of an on
19  account cleanup at Oracle while you were there?
20    MR. SIDORSKY: Objection to form.
21    THE WITNESS: No.
22    MR. GREENSTEIN: Okay.
23    Q  Do you know if anybody at Andersen was aware
24  of any on account cleanup relating to debit memos
25  while you were at Andersen?

324

1    A  I'm not aware.  I don't know.
2    Q  So other than seeing it in the complaint --
3  strike that.
4    In front of you I've marked a few documents,
5  first of which is Matuszak No. 5, and it's a
6  November 9th, 2000, e-mail from -- the subject is "HP
7  Q2 Execution Plan Update for November 10 Thursday"
8  from Michael DeCesare at Oracle, to Ed Sanderson and
9  Frank Varasano.
10    You've had a chance to review that; right?
11    MR. SIDORSKY: Objection to form.  How has --
12  he hasn't had a chance to review it.
13    MR. GREENSTEIN: Q.  While we were off the
14  record, were you reading this?  You read this?
15    A  I did -- I did not read this --
16    Q  Okay.
17    A  -- no.
18    Q  If you could just go ahead and read the first
19  paragraph there in that first e-mail, and for the
20  record, this is Bates stamped NDCA-ORCL 055957 through
21  055962.
22    Have you had a chance to read the first
23  e-mail in the string?
24    A  Yes.
25    Q  Have you seen this e-mail, by the way?

325

1    A  No.
2    Q  Or any of the string of e-mails?
3    A  No.
4    Q  Okay.  And do you see where it says
5  "Sandy/Frank"?  Do you know who Sandy was?
6    A  I believe Sandy Sanderson was one of the
7  executives in the sales group.
8    Q  Okay.  You see there it says "HP confirmed
9  today that they will try to pull the CRM portion of
10  the order off providing we deliver what we have
11  outlined in Development and Production systems"?  You
12  see that?
13    A  I do.
14    Q  You see where it says "Since they don't need
15  ALL the license users right now they are hedging on
16  how big an order they will do until they see how much
17  production hardware Oracle comes back with.  If this
18  turns out to be a large number we could get the entire
19  order."
20    Do you see that?
21    A  I do.
22    Q  So in reading this, doesn't it appear that --
23  that this deal with HP in the second quarter, that
24  there was a -- a contingency for HP to purchase Oracle
25  products -- was based on -- in part on Oracle's

326

1  agreement to purchase AP -- HP products; right?
2    MR. KONOVALOV:  Objection; misstates the
3  document; document speaks for itself.
4    MR. SIDORSKY:  Objection to form.
5    MR. KONOVALOV:  Lacks foundation as well.
6    THE WITNESS:  It -- it -- it appears they're
7  working concurrently on two transactions.
8    MR. GREENSTEIN:  Q.  Right, but I'm not
9  saying -- well, but it -- it doesn't just appear that
10  these two transactions are occurring -- are occurring
11  concurrently.
12    Doesn't it appear from this e-mail that --
13  that HP is hedging on how big an order they will place
14  with Oracle until they see how much hardware Oracle
15  will purchase from HP?
16    MR. KONOVALOV:  Objection; it's
17  argumentative; it lacks foundation.
18    MR. SIDORSKY:  Yeah.
19    MR. KONOVALOV:  Calls for speculation.
20    MR. SIDORSKY:  Same objections.
21    This is -- this is not a document the witness
22  has seen.  It's not appropriate to ask him to
23  interpret a document he has no involvement with.
24  Objection to form.
25    THE WITNESS:  I -- I -- I read the document

327

1  the same as everyone else here, and it says they're
2  hedging on how big an order they will do until they
3  see how much production hardware we're going to buy,
4  so....
5    MR. GREENSTEIN:  Okay.
6    Q  So if you saw this e-mail at the time you
7  reviewed the Hewlett-Packard deal in the second
8  quarter, and you saw this language about hedging on
9  how big an order HP will do until they see how much
10  Oracle will purchase, would that be something that you
11  would find important in determining whether SOP 97-2
12  was met?
13    MR. SIDORSKY:  Objection to form.
14    MR. KONOVALOV:  Objection; incomplete
15  hypothetical.
16    THE WITNESS:  I don't know.  Possibly.  I
17  mean, both -- both agreements were executed by the end
18  of the quarter.
19    MR. GREENSTEIN:  Right.
20    Q  But that's not what I'm asking.  I'm asking
21  would you have wanted to know if HP was hedging on how
22  big an order they would place from Oracle until they
23  saw how much hardware Oracle would purchase from HP?
24    MR. KONOVALOV:  Objection; assumes facts not
25  in evidence.

328

1    MR. SIDORSKY:  Objection to form; calls for
2  speculation.
3    THE WITNESS:  Possibly.  I mean, it -- it
4  would have been nice to know.  I don't know if or how
5  it would have impacted the ultimate revenue recognized
6  on the transaction.
7    MR. GREENSTEIN:  Right.
8    Q  But why would you say it would have been nice
9  to know this?
10    A  Well, we like to have as much information and
11  background as we can.
12    Q  Right.
13    But this particular e-mail, why would it be
14  nice to know what -- what is --
15    A  I think I just stated it would be nice to
16  have this as background information to understand that
17  they were negotiating a license software to HP at the
18  same time HP was negotiating a purchase of hardware
19  from Oracle.
20    Q  Right.
21    But would you want to know -- do you see
22  where it says "If this turns out to be a large number
23  we can get the entire order"?
24    Now, just on the face of that, doesn't that
25  appear that what he's saying here is that if -- what

329

1  Oracle -- if it turns out that Oracle agrees to buy a
2  large number from HP, then Oracle could get the entire
3  order from HP?  Isn't that -- isn't that what it looks
4  like on the face of this?
5       MR. KONOVALOV:  Objection; I'm not sure who's
6  testifying at this point; the document speaks for
7  itself; the question lacks foundation.
8       MR. SIDORSKY:  Yeah, same objection.  You're
9  trying to interpret a document that -- that the
10  witness has no particular knowledge and has never seen
11  before, so he can't add anything.  Objection to form.
12       THE WITNESS:  Well, you're asking me to -- to
13  read a document and -- and try to interpret what it
14  means.  You know, other than reading the document, I
15  have no basis to do anything other than read the
16  document.
17       MR. GREENSTEIN:  Okay.
18       Q  Well, if you saw this document during the
19  second quarter, when you were analyzing the HP deal
20  and reviewing it for compliance with SOP 97-2, would
21  this e-mail, this document -- would it -- would it
22  have changed your analysis at all that it was proper
23  to recognize that revenue during quarter -- the second
24  quarter?
25       MR. SIDORSKY:  Objection to form.

330

1       MR. KONOVALOV:  Objection; asked and
2  answered; it's also an incomplete hypothetical.
3       THE WITNESS:  I don't know whether it would
4  have impacted our conclusion.  It may have.  It may
5  not have.
6       MR. GREENSTEIN:  Q.  But if there was, in
7  fact, a -- if -- if there was a contingency as part of
8  this deal whereby Oracle or HP's purchase of Oracle
9  product was contingent upon the amount purchased by
10  Oracle of HP hardware, if there was that contingency,
11  would that have precluded revenue recognition under
12  97-2?
13       MR. KONOVALOV:  Q.  I'm going to renew my
14  objection to this entire line of questioning.  It's
15  Judge Infante's rule that this is off limits.
16       In any event, it's asked and answered; it's
17  an incomplete hypothetical; assumes facts not in
18  evidence; the document speaks for itself.
19       MR. SIDORSKY:  Same objection.
20       THE WITNESS:  Again, I'll repeat my answer.
21  I don't know what impact this would have had on our
22  ultimate conclusion.
23       MR. GREENSTEIN:  Q.  But you would have liked
24  to know these facts; right?
25       MR. KONOVALOV:  Objection; asked and

331

1  answered.
2       THE WITNESS:  I believe I've already answered
3  that question.
4       MR. GREENSTEIN:  Q.  And that answer was yes;
5  right?
6       A  I believe it was.
7       Q  Okay.  Now, do you see where it says "Since
8  they don't need ALL of the license users right now"?
9  Do you see that?
10       A  I do see that.
11       Q  Is it proper under SOP 97-2 to recognize
12  revenue on a deal where the purchaser doesn't need all
13  the license users right now --
14       MR. KONOVALOV:  Objection; assumes facts.
15       MR. GREENSTEIN:  Q.  -- or at the time of the
16  purchase?
17       MR. KONOVALOV:  Sorry.  Objection; assumes
18  facts not in evidence.
19       MR. SIDORSKY:  Objection to form.
20       THE WITNESS:  It's not necessarily rel --
21  relevant to revenue recognition on the license
22  arrangement.
23       MR. GREENSTEIN:  Q.  So it's possible to
24  recognize revenue under 97-2 if -- even if the
25  purchaser doesn't need the license users at the time

332

1  they buy the product?
2       MR. SIDORSKY:  Objection to form.
3       THE WITNESS:  Yeah.
4       MR. GREENSTEIN:  Okay.
5       Q  If you look at the next document, which is
6  Matuszak No. -- actually, stay with that one.
7       If you look at the second page, 055958, and
8  I'll just direct your attention to the top portion of
9  that page.  You see where it says "As you'll see in
10  the note below from Kurt Graustein, there is a lot of
11  production data that will eventually reside in Ili
12  that may make the HP sizing effort more complex
13  because of application change."
14       It says "HP confirmed again today they're
15  willing to do a Q2 CRM deal in some amount if we can
16  pull together machine requirements into a binding PO
17  and resolve the development issues we're working on."
18       Then it says "According to Phil May, HP is
19  willing to buy as much CRM from Oracle as we buy in
20  HW --" which I think means hardware "-- Support and
21  other requirements from HP."
22       So my question is, looking at that last
23  sentence I just read, does that -- where it says
24  "According to Phil May, HP is willing to buy as much
25  CRM from Oracle as we buy in HW, Support and other

333

1  requirements from HP," doesn't that indicate that
2  there was some type of contingency between the two,
3  that the purchase from Oracle was -- the purchase from
4  HP was contingent on the -- Oracle's purchase of HP
5  hardware?
6      MR. KONOVALOV:  Objection; misstates the
7  document; lacks foundation.
8      MR. SIDORSKY:  Objection to form.
9      THE WITNESS:  It -- you can read the document
10  the same way I can.  I mean, it says what it says.
11      MR. GREENSTEIN:  Right.
12      Q  But I'm asking you your understanding --
13      A  You're asking --
14      Q  -- reading this, if this, to you, as an
15  auditor, and a -- and a -- and knowledgeable about SOP
16  97-2, if reading this statement leads you to believe
17  that there was some sort of contingency in the deal
18  that occurred between HP and Oracle in the second
19  quarter of 2001?
20      MR. KONOVALOV:  Same objections.
21      MR. SIDORSKY:  Objection to form; asked and
22  answered; same objections.
23      THE WITNESS:  It appears that the
24  contingency, if it -- if it did exist, was that they
25  execute a purchase order to purchase equipment from

334

1  HP.
2      MR. GREENSTEIN:  Okay.
3      Q  If you move to Matuszak No. 6, for the
4  record, this is an e-mail dated November 28th, 2000,
5  and Bates stamped 020844 through 020849 from
6  Mike DeCesare to Larry Ellison, Sandy Sanderson,
7  Safra Catz and CCing other people.
8      If you could just go ahead and read the --
9  read this e-mail, please.
10      Actually, I want to focus your attention on
11  the first page.  You see where it says in the first
12  bullet point "Production Spend - Consistent with
13  Larrys conversations with Carly, HP will expect a
14  purchase order for the following amounts.  They will
15  expect this purchase order to be binding and commit
16  Oracle to using the full amounts by the dates we
17  promise"?
18      Do you see that?
19      A  I do.
20      Q  Now, reading that, does that indicate to
21  you -- well, look at the date November 28th, 2000; do
22  you see that?
23      A  Yes.
24      Q  That was two days before the close of the
25  deal; right?

335

1      A  Yes.
2      Q  And you see where it says "HP expects -- will
3  expect a purchase order for the following amounts"?
4      Now, does that indicate to you that there was
5  some type of contingency between -- whereby Oracle had
6  to agree to purchase certain amounts from HP before HP
7  would agree to the -- to purchase product from Oracle?
8      MR. KONOVALOV:  Objection; lacks foundation;
9  assumes facts not in evidence; the document speaks for
10  itself.
11      MR. SIDORSKY:  Objection to form; same
12  objections.
13      THE WITNESS:  Well, it -- it appears to me to
14  suggest that they were expecting that Oracle would
15  issue a purchase order that would bind them to the
16  purchase of HP equipment.  It does not suggest that
17  once both of those documents are executed, that the
18  payment of the license fee is contingent upon Oracle
19  executing under their obligations under the purchase
20  order.
21      MR. GREENSTEIN:  Okay.
22      Q  Well, if you turn to the next page, you
23  see -- you see where it says in the first bullet
24  "Order to Oracle.  Background - Over the past 8 weeks
25  Oracle (Mike DeCesare) and HP (Phil May --" et

336

1  cetera "-- have been working on a series of
2  concessions that has been requested by HP before they
3  move forward on the purchase of the additional CRM
4  licenses"?
5      Do you see that?
6      A  I see that.
7      Q  It says "It has been understood that this
8  would not been executed until all of the HP
9  deliverables are completed"; do you see that?
10      A  I do see that.
11      Q  So -- so doesn't it indicate that it looks
12  like there have to be concessions made by Oracle that
13  were requested by HP before they moved forward on the
14  purchase of additional CRM licenses?
15      MR. KONOVALOV:  Objection; lacks foundation;
16  assumes facts not in evidence; the document speaks for
17  itself.
18      MR. SIDORSKY:  Objection to form.
19      THE WITNESS:  Well, the -- the e-mail says
20  "concessions," so I guess I don't know what that term
21  means.  But reading the document, that's what it -- it
22  would imply.  There are concessions that have been
23  requested by HP.
24      MR. GREENSTEIN:  Right.
25      Q  Before they purchase Oracle products, there

337

1   have to be concessions made by Oracle to HP; right?
2        MR. SIDORSKY: Objection to form.
3        THE WITNESS: Prior to purchase of the
4   product.
5        MR. GREENSTEIN: Right.
6    Q  So doesn't that indicate that the purchase by
7   HP of Oracle product is contingent on certain
8   concessions made by Oracle to HP --
9        MR. KONOVALOV: Objection; misstates the
10   document.
11        MR. GREENSTEIN: Q. -- right?
12        MR. SIDORSKY: Objection to form.
13        THE WITNESS: Well, it implies that the
14   concessions would be prior to the purchase of the
15   product, not concessions subsequent to the purchase of
16   the product.
17        MR. GREENSTEIN: Q. But what I'm asking is
18   that it appears that the concessions are -- that
19   the -- before HP moves forward on a purchase, that
20   there have to be concessions made. So, in other
21   words, the purchase is contingent on the concessions;
22   is that fair to say?
23        MR. KONOVALOV: Objection; misstates the
24   document; the word "contingency" is nowhere in any of
25   these documents.

338

1        MR. SIDORSKY: Objection to form.
2        THE WITNESS: Yeah, you keep using the word
3   "contingency," but there's a number of negotiations
4   that go on in any business arrangement, any license
5   agreement, any other business arrangement, and those
6   conditions have to be met.
7        So, you know, you can imply that every deal
8   has a contingency, because until the parties have a
9   meeting of the minds and it comes together in a legal
10   contract, you know, there would be a contingency
11   involved in the event that if one didn't agree to the
12   other party's terms and conditions they wouldn't
13   execute the agreement.
14        So I'm struggling with what -- you keep
15   throwing out the word "contingency," and I -- I don't
16   know what you're trying to imply or mean by that.
17   Now, I can read the e-mail the same way you can.
18        MR. GREENSTEIN: Okay.
19    Q  Were you aware of any concessions that were
20   what's written here, that there were concessions that
21   HP was requesting before they move forward on the
22   purchase in Q2?
23    A  I've not seen this memo before and so --
24    Q  But were you aware -- okay. Sorry?
25    A  -- so I'm not aware of these concessions.

339

1    Q  Okay. Were you aware of any concessions that
2   HP was requesting from Oracle that had to be met
3   before HP would agree to make the purchase in Q2?
4        MR. KONOVALOV: Objection; assumes facts not
5   in evidence.
6        THE WITNESS: Not that I recall.
7        MR. GREENSTEIN: Okay.
8    Q  Would you have wanted to know that in
9   reviewing this transaction under SOP 97-2? Would you
10   have wanted to know that there were concessions that
11   HP was requiring from Oracle before they would
12   purchase their product?
13        MR. SIDORSKY: Objection to form.
14        THE WITNESS: I would likely want to be aware
15   of them. I'm not -- it's not clear to me that any of
16   them would impact my conclusion on revenue
17   recognition.
18        MR. GREENSTEIN: Right.
19    Q  But what I was asking is, would you have
20   wanted to know that at the time you were reviewing it
21   under SOP 97-2?
22        MR. KONOVALOV: Objection; vague and
23   ambiguous.
24        MR. SIDORSKY: Objection to form.
25        THE WITNESS: I would like to know the items

340

1   that would impact revenue recognition, and if some of
2   the concessions would impact, yes, I would like that.
3        MR. GREENSTEIN: Q. Some concessions could
4   potentially impact the revenue recognition; right?
5        MR. KONOVALOV: Objection; vague and
6   ambiguous.
7        THE WITNESS: It's unclear whether -- if
8   they -- if HP is requesting them to do something, and
9   they do it prior to executing the license agreement,
10   whether it has any impact on the revenue recognition.
11        MR. GREENSTEIN: Right.
12    Q  But what I'm asking is -- is, would you want
13   to know that in making this determination? And I
14   think you said yes, because it could potentially
15   impact revenue recognition; right?
16        MR. KONOVALOV: Objection; misstates the
17   witness's testimony.
18        MR. SIDORSKY: Objection to form.
19        THE WITNESS: I believe what I said is I
20   would like to understand what concessions may exist
21   that may have an impact on the revenue recognition.
22        MR. GREENSTEIN: Okay.
23    Q  Now, if you look down to the bullet point,
24   it's kind of indented, and there's handwritten notes
25   next to it; you see that?

341

1      It says "The payments have now been moved to
2 the operating lease that will keep the expense for HP
3 out of the current quarter and align the payments and
4 expense recognition of these licenses with when HP
5 will be going live.  This will be offered at no
6 additional expense to AP -- HP"; do you see that?
7     A  I do.
8     Q  Now, based on your understanding of SOP 97-2,
9 is it normal for payments or expenses to be kept out
10 of a current quarter and aligned with actual payments
11 of the licenses in a trans -- software transaction?
12     MR. KONOVALOV: Objection; lacks foundation;
13 assumes facts not in evidence.
14     MR. SIDORSKY: Objection to form.
15     MR. KONOVALOV: The document speaks for
16 itself.
17     THE WITNESS:  You're asking me to testify
18 under oath to something that I have no basis to
19 testify on.
20     MR. GREENSTEIN: Okay.  Fair enough.
21     Q  Would you have wanted to know what's written
22 in this bold paragraph at the time you were analyzing
23 the propriety of the revenue recognition for the HP
24 deal in the second quarter of '01?  Would you have
25 wanted to know what's written here, these facts, if

342

1 they were, in fact, true?
2     MR. SIDORSKY: Objection to form.
3     MR. KONOVALOV: Same objections.
4     THE WITNESS: Not necessarily.
5     MR. GREENSTEIN: Q.  And why is that?
6     A  Because what HP does and how HP accounts for
7 this transaction is not of concern to me.  This is
8 talking about HP.
9     Q  Okay.
10     A  What would be of -- of importance to me is
11 the payment terms contained in the license agreement.
12     Q  Okay.  And this paragraph talks about the
13 payments.  Well, it talks about the timing of the
14 payments vis-a-vis the expense recognition; right?
15     A  Well --
16     MR. SIDORSKY: Objection to form.
17     THE WITNESS: -- it -- it appears to, yes.
18     MR. GREENSTEIN: Okay.
19     Q  And you see down in the last bullet point, it
20 says "CRM development document"?  It says
21 "Background - To incent HP to move on the Oracle Order
22 in November and to get closer to HP as a partner
23 Oracle has committed to move the entirety of our CRM
24 development environment to HP."
25     You see that?

343

1     A  I do.
2     Q  Now, would you have wanted to know -- if
3 that's, in fact, true, would you have wanted to know
4 that fact in doing your determination under SOP 97-2?
5     MR. SIDORSKY: Objection to form.
6     THE WITNESS:  Again, possibly.
7     MR. GREENSTEIN: Q.  And why would you
8 possibly want to know that?
9     A  Well, if -- if -- if -- if Oracle was
10 planning to move their platform to another hardware
11 vendor, and that's something they were planning to do
12 irrespective, that was something they were planning as
13 part of their normal product development and R&D
14 efforts to do, that -- that may not be important to
15 me.
16     Q  But if it was -- if -- if they committed to
17 move the entirety of CRM to -- development to HP in
18 return for HP's purchase of Oracle products, that
19 would potentially be improper; right?
20     MR. KONOVALOV: Objection; mischaracterizes
21 the document.
22     MR. SIDORSKY: Objection to form.
23     THE WITNESS: Not necessarily.
24     MR. GREENSTEIN: Q.  Well, but it could be;
25 right?

344

1     MR. SIDORSKY: Objection to form.
2     MR. KONOVALOV: Objection; argumentative.
3     THE WITNESS:  I just said not necessarily.
4     MR. GREENSTEIN: Okay.
5     Q  Would you have wanted to know -- if Oracle
6 committed to move their entire CRM development to HP,
7 would you have wanted to know, at the time you're
8 reviewing this deal, whether that commitment was in
9 return for a commitment by HP to purchase Oracle
10 products?
11     MR. SIDORSKY: Objection to form.
12     MR. KONOVALOV: Assumes facts not in
13 evidence.
14     THE WITNESS: Not necessarily.
15     MR. GREENSTEIN: Q.  You wouldn't have wanted
16 to know if those commitments were quid pro quo?
17     A  Well --
18     MR. KONOVALOV: Same objection.
19     THE WITNESS: -- you're asking me a bunch of
20 hypothetical questions, and to answer them in a
21 30-second time period is not appropriate; okay.  I
22 mean, normally you take all the facts together, not
23 piecemeal facts, all the written documents, and you'd
24 analyze them in discussions with the company and
25 conclude on the accounting.  You're asking me very

345

1  piecemeal questions --
2      MR. GREENSTEIN: Q. Understood.
3      A  -- at the end of a long day on documents that
4  I can't -- I've never seen before.
5      Q  Okay. What I'm asking is -- so were you ever
6  made aware of this commitment that's talked about here
7  at the time you were reviewing the deal?
8      MR. KONOVALOV: Objection; lacks foundation;
9  assumes facts not in evidence.
10     MR. SIDORSKY: Objection to form.
11     THE WITNESS: I don't recall.
12     MR. GREENSTEIN: Okay.
13     Q  You see in the -- on the first page, going
14  back to the first page, where it says "CRM Functional
15  Issues - There are 14 show stoppers that HP feels are
16  keeping them from being able to achieve their global
17  rollout which is scheduled between April and October"?
18  Do you see this?
19     A  I do.
20     Q  Were you aware, at the time your reviewed the
21  HP deal in the second quarter of '01, that there were
22  14 show stoppers that Hewlett-Packard felt were
23  keeping them from being able to achieve their global
24  rollout?
25     A  I was not.

346

1      Q  Okay. If you look at Exhibit 7, Matuszak
2  Exhibit 7, please.
3          For the record, this is Bates stamped 017624.
4      MR. KONOVALOV: Actually, it's the lower
5  Bates number.
6      MR. GREENSTEIN: Oh, sorry. 020839 through
7  020843.
8      Q  For the record, this appears to be -- well,
9  if you look at 841, you see two signatures there. It
10  appears to be a letter agreement between HP and Oracle
11  on November 30th, 2000.
12         If you could just -- have you ever seen this
13  agreement before?
14     A  I don't recall.
15     Q  Okay. Well, in conducting your analysis of
16  this transaction in the second quarter of '01, do you
17  recall looking at this agreement? If you look on the
18  page 841, it appears to be signed by HP and
19  Safra Catz of Oracle; do you see that?
20     A  I do.
21     Q  And do you see on the first page it says
22  "Letter agreement between Oracle and Hewlett-Packard
23  on November 30th, 2000"? Do you see that?
24     A  I do.
25     Q  And that's the last day of the second quarter

347

1  '01; is that right?
2      A  That's correct.
3      Q  Does that refresh your recollection about --
4  that you reviewed or Andersen reviewed this agreement?
5      A  Yes, we likely reviewed this agreement as
6  part of the HP transaction, yes.
7      Q  Okay. Do you see in the second term there it
8  says "Oracle will schedule delivery dates for these
9  products as follows:  $10.0 million in products; that
10  are not later than January 31, 2001; and $5.0 million
11  of products, that are not later than April 30, 2001"?
12  Do you see that?
13     A  I do.
14     Q  Now, under SOP 97-2, doesn't that -- doesn't
15  the delivery element require that the delivery of the
16  software occur at the time the contract or at the time
17  the revenue is recognized?
18     MR. SIDORSKY: Objection to form.
19     MR. KONOVALOV: Could you read that question
20  back, please?
21         (Whereupon, record read by the Reporter as
22  follows:
23         "Question:  Now, under SOP 97-2, doesn't
24         that -- doesn't the delivery element require
25         that the delivery of the software occur at

348

1          the time the contract or at the time the
2          revenue is recognized?")
3      MR. KONOVALOV: It's vague and ambiguous.
4      THE WITNESS: You know, I -- I may be
5  mistaken, but I believe this is referring to Oracle's
6  scheduling delivery of the HP equipment to Oracle, not
7  the licensed from Oracle to HP.
8      MR. GREENSTEIN: Okay.
9      Q  Well, if this -- if -- if there was a term in
10  the contract which -- which allowed delivery of Oracle
11  products to HP at a time after November 30th, would
12  that -- would that meet the delivery element of SOP
13  97-2?
14     MR. KONOVALOV: Objection; lacks foundation;
15  incomplete hypothetical; assumes facts not in
16  evidence.
17     MR. SIDORSKY: Same objection.
18     THE WITNESS: I'm not sure it's relevant
19  to -- to this agreement. This agreement is
20  referencing delivery of HP hardware to Oracle.
21     MR. GREENSTEIN: Okay.
22     Q  See in point four where it says "If Oracle
23  does not complete the commitments in 1 through 3
24  above, then Oracle will pay a cancellation fee of
25  $15,000,000 (less the invoiced amount of products

349

1  delivered from this blanket purchase order and paid
2  for by June 15, 2001)"?  You see that?
3    A  I do.
4    Q  Do you recall that there was a 15 million --
5  do you recall that $15 million cancellation fee
6  provision in this agreement?
7    A  I don't recall any -- I don't recall the
8  specifics of this letter agreement, no.
9    Q  Well, do you recall that $15 million
10  cancellation fee?
11    A  I don't.  I just said I don't recall the
12  specifics.
13    Q  Okay.  Well, does that -- if there is a
14  cancellation fee that's assessed for 15 million, if
15  Oracle doesn't complete the commitments, does that --
16  strike that.
17    See on the left-hand side of the handwriting.
18  Do you recognize that handwriting?
19    A  I do not.
20    Q  Do you see where it says "Is -- this at the
21  bottom "-- Is this the way we are going to do deals?
22  Each has to buy something."  Do you see that?
23    MR. KONOVALOV:  Objection; lacks foundation.
24    THE WITNESS:  I do.
25    MR. GREENSTEIN:  Q.  So would you have wanted

350

1  to know, at the time you assessed this transaction
2  with HP, would you have wanted to know if the -- the
3  agreement required that each party had to buy
4  something from the other?
5    MR. SIDORSKY:  Objection to form.
6    MR. KONOVALOV:  Assumes facts not in
7  evidence.
8    THE WITNESS:  Well, I think we were aware at
9  the time that there were concurrent transactions
10  between HP and Oracle, so I don't know that there's
11  any further relevance to that comment.
12    We were aware that there was an agreement by
13  Oracle to buy HP equipment and that there was an
14  agreement by HP to license Oracle software.
15    MR. GREENSTEIN:  Okay.
16    Q  Were you aware at the time that Oracle's --
17  that HP's purchase of Oracle software was contingent
18  at all in any way upon Oracle buying a certain amount
19  of hardware from HP?  Were you aware of that?
20    MR. SIDORSKY:  Objection to form; that's
21  about the 20th time this has been answered, and I
22  don't -- you know, to the extent we've been over this
23  and its -- the witness has testified at length about
24  the various issues and that the need for a complete
25  record, I just, you know, object to the form of the

351

1  question.
2    MR. KONOVALOV:  Objection; assumes facts not
3  in evidence, and but for the fact we're now at 6:45 we
4  would have been calling Infante on this.  This is
5  beginning to border on the absurd.
6    MR. SIDORSKY:  Yeah, I mean, it really is
7  beyond the scope.  I mean, we've let it go for a
8  while, but this is getting to be too much.  Objection
9  to form.
10    THE WITNESS:  You keep referencing the word
11  "contingent" without putting it into any perspective
12  or basis.  Again, both of these transactions were
13  executed.  So the fact that one may have been
14  contingent on the other isn't necessarily relevant,
15  because they both have been executed.
16    MR. GREENSTEIN:  Okay.
17    Q  If you look at Matuszak No. 8, for the
18  record, this is a one-page document, 025018, dated
19  November 30th from Safra Catz to Thomas Williams.
20    If you could just read the -- it's one
21  paragraph.  Do you see that?
22    A  Yes, I do.
23    Q  Have you ever seen this e-mail before?
24    A  No.
25    Q  Were you ever aware that -- of what is being

352

1  said here, that -- were you ever aware that
2  Larry Ellison and Carly Fiarone were discussing HP's
3  purchase of Oracle products in second quarter if
4  Oracle committed to purchase 20 to 30 million of HP's
5  products over the next 18 to 24 months?
6    MR. KONOVALOV:  Objection;
7  mischaracterizes --
8    MR. GREENSTEIN:  Q.  Were you aware of that?
9    MR. KONOVALOV:  Sorry.  Objection;
10  mischaracterizes --
11    THE WITNESS:  I don't recall.
12    MR. GREENSTEIN:  Q.  Would that be
13  something -- if, in fact, that discussion occurred,
14  would that be something that you would have wanted to
15  know at the time you analyzed this transaction under
16  SOP 97-2?
17    MR. SIDORSKY:  Objection to form.
18    THE WITNESS:  Possibly, but not necessarily.
19    MR. GREENSTEIN:  Okay.  I'd like to mark
20  this, I think, as the last one, Matuszak No. 9.
21    (Document marked Exhibit No. 9
22    for identification.)
23    THE WITNESS:  Can I ask how long we've been
24  on the record?
25    THE VIDEOGRAPHER:  40 minutes.  Four zero.

353

1  40 minutes.
2       THE WITNESS:  In total?
3       THE VIDEOGRAPHER:  Oh, you mean today?  Seven
4  hours and 20 minutes or something.
5       MR. GREENSTEIN:  I only have a few more
6  minutes.  Again, Rob, I don't -- I think there were a
7  lot of speaking objections which held us up today.
8       MR. SIDORSKY:  Well --
9       MR. GREENSTEIN:  I only have a few more
10  minutes.
11       MR. SIDORSKY:  Listen, I don't agree with
12  that, because, you know, people have to make the
13  objections that are appropriate, and I think that's
14  all we did.
15       I mean, you ran over a little.  I'm not --
16  you know, Mr. Matuszak is -- you know, has been very
17  generous with his time.  If you finish up in the next
18  five or ten minutes --
19       GREENSTEIN:  Okay.
20       MR. SIDORSKY:  -- then let's do it; all
21  right.
22       MR. GREENSTEIN:  I do appreciate that.  I
23  apologize.
24     Q  If you could just take a look at this.  It's
25  been marked as Matuszak No. 10.

354

1       THE REPORTER:  It's 9.
2       MR. KONOVALOV:  Did you say 10 or 9?
3       THE REPORTER:  It's 9.
4       MR. GREENSTEIN:  Oh, sorry.  9.
5     Q  For the record, this is NDCA-ORCL 033954
6  through 033978.  It says "Top 20 License Contracts
7  Revenue Recognition Review."  If you -- actually, I
8  just want to direct your attention to the first page.
9     A  Okay.
10     Q  Okay.  Have you ever seen this document
11  before?
12     A  I -- I can't reference this specific
13  document, but this appears to be the information that
14  we would -- the package we would get from the company
15  for the -- for our revenue review during the quarter.
16     Q  Okay.  And you see how Hewlett-Packard is
17  listed as number three there?
18     A  I do, yes.
19     Q  And you see how it's for revenue recognized
20  18 million there?
21     A  I do.
22     Q  Okay.  If you turn to the fifth page there,
23  it says "Hewlett-Packard."
24     A  Okay.
25     Q  Okay.  You see -- does this appear to be a

355

1  summary provided by Oracle of the Hewlett-Packard deal
2  that was provided to Andersen in -- when they were
3  conducting their second quarter review?
4     A  It most likely is, yes.
5     Q  Okay.  And they -- they draft this language
6  and give it to Andersen; right?
7     A  That's correct.
8     Q  Okay.  See how in the issues it says "Issued
9  and signed concurrently with this transaction was a
10  blanket purchase order and letter agreement between
11  Oracle and HP for the purchase of 30 million in HP
12  hardware for Oracle's production and development
13  environments"?  Do you see that?
14     A  I do.
15     Q  It says "In consideration for this
16  commitment, HP agreed to increase the discounts from
17  our previous purchase agreement from 40 to 50 percent
18  for production hardware and from 12 to 17 percent for
19  certain classes of products within the production and
20  development environment."
21       Do you see that?
22     A  I do.
23     Q  And then the next paragraph says "Also
24  accompanying the transaction was a nonbinding letter
25  of understanding that discussed Oracle's intention to

356

1  move its CRM development environments to HP hardware.
2  The signed agreement and blanket purchase order
3  mentioned above as a result of this letter"; do you
4  see?
5     A  I do.
6     Q  Do you remember reviewing that, those two
7  paragraphs, in doing your assessment of this
8  transaction the second quarter of '01?
9     A  I -- I would have reviewed this, this page,
10  yes.
11     Q  Okay.  But do you remember reviewing that
12  specific language that says that "In consideration for
13  Oracle's commitment, HP agreed to --" what's listed
14  there?
15     A  Not specifically, but I -- I -- I'm sure
16  I would have read it.
17     Q  Okay.  If you just keep that in front of you.
18  I'm going to mark this as Matuszak 11 or 10, sorry.
19       This actually appears to be a copy of the
20  same document, but there's some differences.  These
21  were both produced by Oracle.  And if you can just
22  turn to page four, it's the same summary of the --
23  well, it's the same type of summary for the
24  Hewlett-Packard; do you see that?
25     A  I don't have the document.

357

1    Q  Oh, sorry.
2        MR. KONOVALOV:  Which page, Eli?
3        MR. SIDORSKY:  Page five.
4        THE WITNESS:  Sorry.  Which page?
5        MR. GREENSTEIN:  Q.  Page -- well, it's
6    actually Bates stamped 068225.
7        MR. SIDORSKY:  Page five.
8        MR. GREENSTEIN:  Yeah, five.
9        Q  If you put it next to the other document.
10       You see how -- where it says "Issues" in this
11   -- the -- in Matuszak No. 10?
12       A  Yes.
13       Q  Okay.  And you see how if you just look at
14   those four paragraphs, do you see anywhere in that
15   document the -- the -- the language that talks about
16   the commitments made by Oracle in consideration for
17   HP's agreements?
18       MR. SIDORSKY:  Objection to form; the
19   document speaks for itself.
20       If you want to tell us it's not there, you
21   don't need the witness to -- to compare the two.
22       MR. KONOVALOV:  It lacks foundation.
23       THE WITNESS:  Well, this -- the second
24   document does not have the same language as the first
25   document.  That's a factual statement.

358

1        MR. GREENSTEIN:  Okay.
2        Q  Do you remember which document -- well, did
3    you review the second document in the second quarter
4    when assessing the HP deal?
5        A  I don't know which document I reviewed.  I
6    don't recall reviewing either document specifically.
7    But what I can tell you is, going through the audit
8    committee agenda, there's a discussion in there of the
9    HP purchase.
10       So I think it's fair to say that Andersen was
11   aware of the HP purchase agreement and had reviewed
12   the agreement.  So I would have to speculate as to
13   which one of these is a first draft and which one is a
14   final draft.
15       Q  Okay.  Without speculating, did you know,
16   looking at Matuszak No. 9, the first paragraph, did
17   you -- were you aware of these facts in that first
18   paragraph at the time that you gave that presentation
19   regarding HP to the audit committee?
20       A  Possibly.  I mean, most likely, yes.
21       Q  Well, why would you say "most likely"?
22   Because these two doc -- you're not sure which of
23   these two you read.
24       So I just want to make sure that -- do you
25   recall one way or another whether you were aware of

359

1    these facts in the first paragraph on Matuszak No. 9
2    at the time you gave that presentation in the second
3    quarter?
4        MR. SIDORSKY:  Could I hear that question
5    again?  Sorry.
6        (Whereupon, record read by the Reporter as
7    follows:
8        "Question:  Well, why would you say "most
9        likely"?  Because these two doc -- you're
10       not sure which of these two you read.
11       So I just want to make sure that -- do you
12       recall one way or another whether you were
13       aware of these facts in the first paragraph
14       on Matuszak No. 9 at the time you gave that
15       presentation in the second quarter?")
16       MR. KONOVALOV:  Objection; mischaracterizes
17   the witness's testimony.
18       MR. SIDORSKY:  Objection to form.
19       THE WITNESS:  Yeah, I don't recall.  I'd be
20   speculating.  So if there's a copy of one of these in
21   our work papers and -- you know, I don't know which
22   one it is.
23       MR. GREENSTEIN:  Okay.
24       Q  And one last question.  Earlier we looked at
25   the letter agreement between HP and Oracle, and there

360

1    was a $15 million cancellation provision; do you
2    recall that?
3        A  I do.
4        Q  Now, were you aware at the time you gave that
5    presentation of that 15 million cancellation
6    provision?
7        A  I don't recall.  But again, if it was in the
8    agreement we reviewed, then I would have been aware of
9    it.
10       Q  Okay.  This is actually the last.  I promise.
11   I just want this to be authenticated.  This will be
12   Matuszak No. 11.
13       (Documents marked Exhibit Nos. 10 - 11
14       for identification.)
15       THE WITNESS:  Thank you.
16       MR. GREENSTEIN:  Q.  If you could, just for
17   the record, this is NDCA-ORCL 133613 to 133654.  It
18   says "Software Revenue Recognition International
19   Finance Conference October 13, 1999," and it has
20   Gary H. Matuszak.
21       Now, Mr. Matuszak, I just want to -- have you
22   seen this document before?
23       A  I generally recall the document, yes.
24       Q  Okay.  And this appears to be a presentation
25   made by you on October 13th, 1999, regarding software

361

1 revenue recognition; right?
2    A  That's correct.
3    Q  If you turn to the second page, it says
4 "Update on basic principles of SOP 97-2"; do you see
5 that?
6    A  Yes.
7    Q  And then the next -- the following page has
8 the four elements of SOP 97-2; do you see that?
9    A  Yes.
10   Q  And I think if you flip through it, it
11 appears to have each of the elements and discussions
12 about each of the elements of 97-2; is that fair to
13 say?
14   A  That's correct.
15   Q  Okay.  Do you recall giving this presentation
16 in '99?
17   A  Generally, yes.  I'm trying -- I -- I don't
18 remember this particular -- this specific
19 presentation, but I do recall having been invited to
20 the Oracle International Finance Conference on two or
21 three different occasions as an invited guest, and
22 typically as part of that they would ask me to give
23 a -- a discussion of some of the things that were
24 happening with revenue recognition at the task force.
25   Q  Okay.  Because you were a member of the

362

1 rev -- of the task force on initiatives with SOP 97-2;
2 right?
3    A  The AICPA task force, that's correct.
4    Q  Right.
5       Is that because your knowledge -- extensive
6 knowledge of software revenue recognition and your
7 experience with --
8    A  It -- it would have been as a result of my
9 firm's request that I sit on the task force, which
10 presumably was made because they felt I was qualified
11 to sit on the task force.
12   Q  Okay.  I just have -- so if you look at the
13 third -- if you look at the second, third page here.
14 and you see the third element, it says "The vendor's
15 fee is fixed or determinable."
16   A  I do.
17   Q  All right.
18      Now, when we looked at the letter agreement
19 between HP and Oracle and there was a $15 million
20 cancellation penalty if Oracle didn't fulfill its
21 commitments, doesn't that mean that -- that -- that
22 Oracle's fee from HP in that deal was not fixed and
23 determinable?
24      MR. KONOVALOV:  Objection; mischaracterizes
25 the evidence.

363

1      MR. SIDORSKY:  Yeah, objection to form;
2 misstates the record and lacks foundation.
3      I guess that's the signal.
4      MR. KONOVALOV:  It must be time to leave.
5      MR. SIDORSKY:  Yeah.
6      THE WITNESS:  The -- the fee in the license
7 agreement did not have any contingencies.  The
8 purchase order that was issued for the purchase of the
9 hardware did have a cancellation fee.
10      What I don't recall is how exactly all that
11 was addressed and resolved in the course of our review
12 of the contract.
13      MR. GREENSTEIN:  Okay.
14   Q  But a 15 million cancellation fee would --
15 would that be something you would assess and determine
16 whether Oracle's fee was fixed and determinable?
17      MR. SIDORSKY:  Objection to form.
18      THE WITNESS:  It is not a cancellation fee on
19 the license agreement.  There's no cancellation
20 privileges related to the license agreement.
21      MR. GREENSTEIN:  Okay.
22   Q  What do you mean by that?
23   A  Meaning --
24      MR. SIDORSKY:  I think the witness has made
25 clear what he means by this.  He's answered it very

364

1 clearly a number of times now.  Eli, really --
2      THE VIDEOGRAPHER:  Also, I have to interject.
3 We're having a technical problem.  This light coming
4 through the window is really wrecking the video.  I
5 was anticipating you're going to wrap it up, but if
6 we're going to continue for any length, we'll have to
7 take a break.
8      MR. GREENSTEIN:  Okay.  I just have one last
9 question.
10   Q  Were these slides that we're looking at, the
11 different elements of SOP 97-2, are these accurate
12 slides based on what you believe to be the
13 rules/principles of SOP 97-2 at the time you made this
14 presentation?
15   A  That would be factually correct.
16      MR. GREENSTEIN:  Okay.  I'm done.
17      MR. KONOVALOV:  I actually do have a couple
18 of minutes of questions so --
19      THE VIDEOGRAPHER:  Well, if a couple of
20 minutes is a couple of minutes, we'll be fine.  If
21 we're going to take 15, 20 minutes, we'll have to take
22 a half hour break for me to reset up.
23      MR. SIDORSKY:  Well, we're not going to do
24 that.
25      THE VIDEOGRAPHER:  I can't -- if you look at

365

1  the image, you'll see it is thoroughly ruined by the
2  striations of the light.
3      MR. GREENSTEIN: The light.
4      THE VIDEOGRAPHER: It's not just that. It's
5  the sunlight moving through.
6      MR. KONOVALOV: Let's move forward so we can
7  get Mr. Matuszak on his way.
8      THE VIDEOGRAPHER: Mr. Matuszak, if you can
9  continue to move forward.
10      THE WITNESS: Do you want the light on?
11      THE VIDEOGRAPHER: That would be great. If
12  you can pass him the microphone, that would be
13  wonderful.
14      MR. KONOVALOV: Eli, why don't we switch. If
15  you want to move your papers, and I can face the
16  witness so he's not looking in a different direction.
17      MR. GREENSTEIN: Yeah, that would be fine.
18      THE VIDEOGRAPHER: We're still on the record.
19      MR. KONOVALOV: Yeah, just quickly.
20      MR. GREENSTEIN: I know. I know all the
21  stuff you've probably seen or heard.
22      THE VIDEOGRAPHER: If you'd put that on your
23  tie.
24          EXAMINATION BY MR. KONOVALOV
25      MR. KONOVALOV: Sure.

366

1      Q  Mr. Matuszak, I'm Paul Konovalov.
2      THE VIDEOGRAPHER: Counsel, get it on your
3  tie first.
4      MR. KONOVALOV: Q. Counsel for the
5  defendants. I very much appreciate your time today.
6  I know it's been a long time. I'm going to try to
7  keep this quick, if that's fine with you.
8      A  That's fine.
9      Q  I want to take you back to a couple of
10  documents that were previously marked. The first one
11  I'd like you to pull out is what Chen or Chan, now
12  I'm doing it, Chan Exhibit 2.
13      A  Okay.
14      Q  Okay. If you could turn to the pages Bates
15  No. AA 1925. Just a couple from the back.
16      THE VIDEOGRAPHER: Counsel, you're knocking
17  your documents on the microphone.
18      MR. SIDORSKY: Sorry.
19      THE WITNESS: Okay.
20      MR. KONOVALOV: Q. And you may recall,
21  Mr. Matuszak, we -- you answered a number of questions
22  with respect to the handwritten note that is next to A
23  towards the bottom third of that page.
24      A  Yes.
25      Q  Do you recall that?

367

1      Counsel, through his questions, asked you a
2  number of times about the meaning of the word
3  "aggressive" here, suggesting that it, in fact,
4  suggested it was something nefarious or inappropriate.
5      I just want to understand clearly. Your
6  testimony is not there is anything improper about
7  these -- about this reversal of the reserves; correct?
8      MR. GREENSTEIN: Objection; I don't want to
9  mischaracterize my questions; mischaracterizes the
10  testimony; lacks foundation; calls for speculation;
11  vague and ambiguous.
12      MR. KONOVALOV: Q. You can answer my
13  question.
14      A  That's correct. The -- could you repeat the
15  question.
16      (Whereupon, record read by the Reporter as
17  follows:
18      "Question: Counsel, through his questions,
19      asked you a number of times about the
20      meaning of the word "aggressive" here,
21      suggesting that it, in fact, suggested it
22      was something nefarious or inappropriate.
23      I just want to understand clearly. Your
24      testimony is not there is anything improper
25      about these -- about this reversal of the

368

1      reserves; correct?")
2      THE WITNESS: Okay. Thank you.
3      MR. KONOVALOV: Q. Why don't I try to
4  restate.
5      A  No. That is correct. I stated a number of
6  times that I don't believe there was anything
7  inappropriate with the -- with the activity or the --
8  what they're discussing in this note.
9      Q  Indeed the use of the word "aggressive" could
10  really, instead of being a synonym for something
11  improper, it could be a synonym for just simply
12  suggesting that the company was active or proactive;
13  correct?
14      MR. GREENSTEIN: Objection; form.
15      THE WITNESS: That's correct.
16      MR. KONOVALOV: Q. That's correct?
17      A  That's the way I interpreted the word
18  "aggressive."
19      Q  Okay. Thank you.
20      Then if you could pull out from the pile here
21  what is Matuszak No. 4. It was the interview memo
22  from the Special Litigation Committee's interview of
23  Thomas Williams.
24      A  Thomas Williams, yes.
25      Q  Exactly.

369

1    You've never seen this document before that
2 was shown to you today here as an exhibit; correct?
3    A  That's correct.
4    Q  If you look at the first page of text, so at
5 the end of the first full paragraph, the last sentence
6 towards the end there reads "It is not and does not
7 purport to be a verbatim account of what was said"; do
8 you see that?
9    A  I do.
10    Q  Okay.  Counsel for plaintiffs asked you some
11 questions about whether or not you were aware of
12 certain statements contained in this interview memo;
13 correct?
14    A  That's correct.
15    Q  Have you ever spoken with Tom Williams about
16 any of the information contained in this interview
17 memo?
18    A  I have not.
19    Q  As you sit here today, do you have reason to
20 know one way or the other whether or not any
21 statements contained in here were attributed to
22 Thomas Williams are true?
23    MR. GREENSTEIN:  Objection to form.
24    THE WITNESS:  I do not.
25    MR. KONOVALOV:  Okay.

370

1    Q  Are you aware of the fact that
2 Thomas Williams has given testimony about this
3 document in which he has, in fact, pointed out that
4 there are a number of inaccuracies in the statements
5 that are attributed to him in this document?
6    MR. GREENSTEIN:  Objection; I think that
7 mis -- completely mischaracterizes the document and
8 the testimony.  I think it lacks foundation; calls for
9 speculation; is vague and ambiguous.
10    THE WITNESS:  I am not aware of that.
11    MR. KONOVALOV:  Okay.
12    Q  So as you sit here today -- well, strike
13 that.
14    The last thing I wanted to have you pull out,
15 please, is what is the e-mail.  It's Chan Exhibit 12.
16    A  Yes.
17    Q  Prior to today, you have not seen this
18 document before; correct?
19    A  That's correct.
20    Q  Okay.  As you sit here today, do you have any
21 way to know one way or the other whether or not any of
22 the statements that are contained in here are true?
23    MR. GREENSTEIN:  Objection; form.
24    THE WITNESS:  I do not.
25    MR. KONOVALOV:  Q.  For instance, if you look

371

1 at the middle of the page where it says "What needs to
2 be done," there are various bullets there which
3 identify items, dollar amounts, and the like, you
4 don't know one way or the other whether or not that
5 information is true; correct?
6    MR. GREENSTEIN:  Objection; form.
7    THE WITNESS:  That's correct.
8    MR. KONOVALOV:  That's correct.
9    Q  Do you happen to know to the -- let me back
10 up.
11    To the extent that any of the information or
12 items that are referenced in this document are
13 accurate, do you happen to know how they were
14 ultimately resolved?
15    MR. GREENSTEIN:  Objection; form.
16    THE WITNESS:  I do not.
17    MR. KONOVALOV:  Okay.
18    Q  Are you aware of Oracle having ever restated
19 any of its financial statements for fiscal year 2000?
20    MR. GREENSTEIN:  Objection; form.
21    THE WITNESS:  To my knowledge, they have not.
22    MR. SIDORSKY:  Okay.
23    Q  How about for fiscal year 2001?
24    MR. GREENSTEIN:  Same objection.
25    THE WITNESS:  To my knowledge, they have not.

372

1    MR. KONOVALOV:  Q.  How about fiscal year
2 2002.
3    MR. GREENSTEIN:  Same objection.
4    THE WITNESS:  To my knowledge, they have not.
5    MR. KONOVALOV:  Okay.  I think that's all I
6 have.  Thank you, Mr. Matuszak.  I appreciate it.
7    THE WITNESS:  Thank you.
8    THE VIDEOGRAPHER:  Okay.  We are --
9    MR. SIDORSKY:  I'm sorry.  If we're going to
10 go off the record, I think we should designate this --
11 this deposition transcript confidential.  I assume you
12 have no objections to that.
13    MR. GREENSTEIN:  I don't.
14    MR. SIDORSKY:  And I'd also like to make
15 clear on the record that I -- there is an order in
16 place regarding the scope of this deposition, and it's
17 very difficult during the deposition to -- to object
18 to each question on -- on the grounds of whether or
19 not it exceeds the -- the scope of the deposition, the
20 order, and I tried not to do that.
21    But we do reserve all our rights obviously
22 under the order to the extent that the deposition
23 covered areas or exceeded the scope of Judge Infante's
24 order.
25    MR. GREENSTEIN:  Okay.  That's noted.

373

1   Plaintiffs believe everything covered here was either
2   relevant or reasonably calculated to lead to the
3   discovery of admissible evidence regarding the topics
4   set forth in the order and/or that it was relevant to
5   the subject matter of those topics under Rule 26, and
6   therefore we think it was proper.
7         MR. KONOVALOV:  Okay.  Mr. Matuszak, thank
8   you for your time.
9         MR. GREENSTEIN:  Thank you.
10        THE VIDEOGRAPHER:  This is the end of
11  videotape five, Volume I, in the deposition of
12  Gary Matuszak.  The original videotapes will be
13  retained by LiveNote World Service.
14        Going off the record, the time on the monitor
15  is 7:09.
16        THE REPORTER:  Do you need a copy?
17        MR. SIDORSKY:  No, that's okay.
18        (WHEREUPON, the deposition ended at 7:09 p.m.)
19              ---oOo---
20
21
22
23
24
25

374

1               CERTIFICATE OF WITNESS
2
3         I, GARY MATUSZAK, the undersigned witness,
4   declare under penalty of perjury that I have read the
5   foregoing transcript, and I have made any corrections,
6   additions or deletions I was desirous of making; that
7   the foregoing is a true and correct transcription of
8   my testimony contained therein.
9         EXECUTED this_____day of _____,2006,
10  at _____. _____.
            (City)            (State)
11
12
13
         _____
14            GARY MATUSZAK
15
16
17
18
19
20
21
22
23
24
25

375

1               CERTIFICATE OF REPORTER
2
3         I, ANDREA M. IGNACIO HOWARD, hereby certify
4   that the witness in the foregoing deposition was by me
5   duly sworn to tell the truth, the whole truth, and
6   nothing but the truth in the within-entitled cause;
7
8         That said deposition was taken in shorthand
9   by me, a Certified Shorthand Reporter of the State of
10  California, and was thereafter transcribed into
11  typewriting, and that the foregoing transcript
12  constitutes a full, true and correct report of said
13  deposition and of the proceedings which took place;
14
15        That I am a disinterested person to the said
16  action.
17
18        IN WITNESS WHEREOF, I have hereunto set my
19  hand this    day of August 2006.
20
21        _____
22        ANDREA M. IGNACIO HOWARD RPR, CSR No. 9830
23
24
25

376

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF REPORTER

I, ANDREA M. IGNACIO HOWARD, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings which took place;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I have hereunto set my hand this 14 day of August 2006.

_____

ANDREA M. IGNACIO HOWARD CSR No. 9830

# EXHIBIT Q

NUSSBAUM, JAY  3/23/2004  12:00:00 AM

1

```
 1        IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
 2               IN AND FOR NEW CASTLE COUNTY
 3        · · · · · · · · · · · · · · · · · ·
 4    IN RE ORACLE CORP.        :  CONSOLIDATED
 5    DERIVATIVE LITIGATION     :  C.A. No. 18751
 6        · · · · · · · · · · · · · · · · · ·
 7         SUPERIOR COURT OF THE STATE OF CALIFORNIA
 8               COUNTY OF SAN MATEO
 9        · · · · · · · · · · · · · · · · · ·
10    COORDINATION PROCEEDING    :  JUDICIAL COUNCIL
11    SPECIAL TITLE (RULE 1550 (b)) :  COORDINATION
12    ORACLE CASES           :  PROCEEDING
13                       :  NO. 4180
14        · · · · · · · · · · · · · · · · · ·
15         Videotaped Deposition of JAY NUSSBAUM
16               McLean, Virginia
17               Tuesday, March 23, 2004
18               9:45 a.m.
19    Job No.: 1-32319
20    Pages: 1 through 108
21    Reported by:  Cynthia R. Simmons, RMR, CCR
22    Virginia CCR No. 0313189
```

2

```
 1        Deposition of JAY NUSSBAUM, held at the
 2    offices of:
 3
 4         MORRISON & FOERSTER, LLP
 5         1650 Tysons Boulevard, Suite 300
 6         McLean, Virginia  22102
 7         (703) 760-7700
 8
 9         Pursuant to agreement, before Cynthia R. Simmons,
10    Registered Merit Reporter, Certified Court Reporter
11    and Notary Public of the Commonwealth of Virginia.
12
13
14
15
16
17
18
19
20
21
22
```

3

```
 1        A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFFS:
 3         DARIO DE GHETALDI, ESQUIRE
 4         COREY, LUZAICH, PLISKA,
 5         DE GHETALDI & NASTARI, LLP.
 6         700 El Camino Real
 7         Millbrae, California  94030
 8         (650) 871-5666
 9
10
11    ON BEHALF OF DEFENDANT ORACLE:
12         PAUL H. GOLDSTEIN, ESQUIRE
13         MORRISON & FOERSTER, LLP.
14         755 Page Mill Road
15         Palo Alto, California  94304-1018
16         (650) 813-5818
17
18
19
20
21
22
```

4

```
 1        A P P E A R A N C E S   C O N T I N U E D
 2    ON BEHALF OF INDIVIDUAL DEFENDANTS:
 3         KENNETH J. NACHBAR, ESQUIRE
 4         MORRIS, NICHOLS, ARSHT & TUNNELL
 5         1201 North Market Street
 6         Suite 1800
 7         Wilmington, Delaware  19801
 8         (302) 575-7294
 9
10
11    ALSO PRESENT:
12         SCOTT FORMAN, VIDEOGRAPHER
13
14
15
16
17
18
19
20
21
22
```

5

CONTENTS

EXAMINATION OF JAY NUSSBAUM          PAGE

By Mr. de Ghetaldi              7

EXHIBITS

(Attached to the Transcript)

DEPOSITION EXHIBIT              PAGE

64  E-mail regarding Bell South Deal    71

65  Summary of Testimony To Special    100

Litigation Committee

6

PROCEEDINGS

THE VIDEOGRAPHER:  Here begins tape number

one in the deposition of Jay Harris Nussbaum, in the

matter of the Oracle cases, pending in the Superior

Court of the State of California, Case number 4180,

and all related cases.  Today's date is March 23rd,

2004.  The time is 9:45 a.m.

The video operator is Scott Forman of

Visual Connections, contracted by L.A.D. Reporting.

This video deposition is taking place at the office

of Morrison & Foerster, 1650 Tysons Boulevard,

McLean, Virginia, and was noticed by Dario de

Ghetaldi.  Would the counsel please identify

themselves and state whom they represent.

MR. DE GHETALDI:  Dario de Ghetaldi for

the plaintiffs.

MR. GOLDSTEIN:  Paul Goldstein, Morrison &

Foerster, for Oracle Corporation.

THE VIDEOGRAPHER:  The court reporter

today is Cynthia Simmons of L.A.D. Reporting.  Would

the reporter please swear in the witness.

JAY NUSSBAUM

7

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. DE GHETALDI:

Q  Good morning, Mr. Nussbaum.

A  Good morning.

Q  Have you ever had your deposition taken

before?

A  Yes.

Q  And when was the last time?

A  Last time, 15 or so years ago.

Q  Okay.  Let me go over a couple ground

rules, make sure things come out as well as they can.

First of all, please try and wait until I finish

asking a question before you try and answer, because

even though this deposition is being videotaped, it

will make it much easier for the court reporter to

only have to take down one person talking at a time.

Do you understand?

A  Uh-huh.

Q  I'll also try and do the same thing and

not talk over your answer.  Also, it is important

that you use words to respond to my questions,

8

instead of nods of the head or sounds like uh-huh, so

that makes a better record.  Do you understand?

A  Uh-huh.

Q  Okay.  Let's see, the deposition is going

to be prepared in a booklet form.  You'll be given

the opportunity to review that, that transcript.  And

you'll also have the opportunity to make changes or

corrections to that deposition.

But, if you do make any changes or

corrections to the deposition, and if this case does

go to trial, then I want you to understand that we

would have the opportunity to comment on those

changes or corrections at the time of trial.  Do you

understand that?

A  Yes.

Q  Okay.  Also, please, if at any time today

you don't understand a question that I'm asking,

please let me know and I'll try and ask it again in

English, so that you understand what I'm saying.  And

if you do answer a question that I ask, I'm going to

assume that you've understood it, okay?

A  Sure.

9

1      Q  All right.  Now, also, we've been trying
2  to take breaks about every hour in these depositions,
3  but if you want to take a break at any time, just let
4  me know, and I'll accommodate you on that.  All
5  right?
6          Now, when did you first start working at
7  Oracle Corporation?
8      A  I believe it was February of 2002.  Excuse
9  me, excuse me, of '92.
10     Q  Yeah.
11     A  I'm sorry.
12     Q  That's okay.  I actually understood what
13  you meant.
14     A  I just spoke the wrong date.
15     Q  What was your first job there?
16     A  At Oracle?
17     Q  Yeah.
18     A  I was the senior vice president for the
19  federal government and systems integration.
20     Q  All right.  What was your position at
21  Oracle in Oracle's third quarter of its 2001 fiscal
22  year?

10

1      A  I was the executive vice president of OSI.
2      Q  And OSI stands for?
3      A  Oracle Service Industries.
4      Q  All right.  Can you give me a brief
5  summary of the positions that you held between 1992
6  and the third quarter of fiscal year 2001?
7      A  Well, it actually is rather simple.  I
8  started out running the federal government, and then
9  they asked me to include state and local government.
10  And then they asked us to include telecommunications,
11  health care, financial services made up of banks,
12  brokerage and insurance companies.  And we broke off
13  the higher education market, as well as utilities.
14          And so that's what made up, if you would,
15  the entire OSI marketplace.
16     Q  And so as these different --
17     A  So my -- I'm sorry.
18     Q  Go ahead.
19     A  So my job that I started with just
20  expanded, it wasn't really -- it was incremental
21  responsibility, as opposed to switch to a different
22  kind of world.  I always kept the federal and then

11

1  they added state and local and then they added the
2  telecommunication, and health care, the ones that I
3  just read off to you.
4      Q  Okay.  And when did you leave Oracle?
5      A  I left Oracle January 1 of 2000.  Yeah,
6  January 1 of 2002.  Sorry, I'm slow today.
7      Q  That's all right.
8      A  Just wanted to see if you were paying
9  attention.
10         MR. GOLDSTEIN:  You have our attention.
11     Q  Can you describe for me your
12  responsibilities as the executive vice president of
13  OSI?
14     A  Yes.  I had responsibility for the markets
15  that I had mentioned, for all of the product sales
16  and consulting.
17     Q  Who were your direct reports in fiscal
18  year 2001?
19     A  Direct reports in 2001.  Jim O'Neil had
20  telecommunications, a fellow named Lee Ramsayer,
21  that's R-a-m-s-a-y-e-r, had higher education.  Jose
22  Garcia had state and local.  Tony Femocola had

12

1  financial services, I think it's F-e-r-n-o-c-o-l-a.
2  And I'm not sure who had federal government.  I think
3  federal government was either Mark Johnson, but I do
4  believe there was somebody else, in between Mark and
5  I.  Could have been Kevin -- it might have been Kevin
6  Fitzgerald, but I'm not -- I'd have to be refreshed
7  to see the org chart.
8      Q  Did you have an org chart?
9      A  At the time, I'm sure I did, yeah.
10         MR. DE GHETALDI:  Ken, we just got started
11  so --
12         MR. NACHBAR:  Yeah, sorry I'm late, it was
13  Amtrak's fault.
14  BY MR. DE GHETALDI:
15     Q  Did you meet with anyone in preparation
16  for your deposition today?
17     A  Yes.
18     Q  And who was that?
19     A  Paul.
20     Q  When was that?
21     A  Yesterday.
22     Q  Was anyone else there?

NUSSBAUM, JAY  3/23/2004  12:00:00 AM

13

1      A  No.

2      Q  All right.  How long was the meeting?

3      A  45 minutes.

4      Q  Did you review any documents in

5   preparation for your deposition?

6      A  I had looked at some documents, yes.

7      Q  Do you recall what they were?

8      A  It was the -- what was it, the forecast,

9   it was a forecast sheet, and a note that I had

10  written, and that was it.

11     Q  A note that you had written?

12     A  A memo, e-mail.

13     Q  What was the e-mail about?

14     A  It was a request from me to Larry for a

15  promotion.

16     Q  All right.  What was the date of that

17  e-mail?

18     A  I don't know.

19     Q  Approximately.

20     A  I have no idea, January or something.  I'm

21  sure you have a copy somewhere.

22        MR. GOLDSTEIN:  You do.  You do.

14

1        MR. DE GHETALDI:  I do, okay.

2   BY MR. DE GHETALDI:

3      Q  All right.  Anything else other than the

4   forecast sheet and the e-mail about a promotion?

5      A  Just said to tell the truth and --

6        MR. GOLDSTEIN:  He's not asking you what

7   we talked about.

8        THE WITNESS:  Oh, I'm sorry.

9        MR. GOLDSTEIN:  He's asking what documents

10  you looked at.

11       THE WITNESS:  I think that's about it.

12  BY MR. DE GHETALDI:

13     Q  All right.  I was assuming you were going

14  to tell the truth so --

15     A  That's a big leap of faith.

16     Q  During --

17       MR. GOLDSTEIN:  Oh, this is for me, I'm

18  sorry.  You're getting a fax I think too.  Sorry for

19  the interruption.

20  BY MR. DE GHETALDI:

21     Q  That's all right.  During fiscal year

22  2001, did you -- what kind of financial reports did

15

1   you regularly receive?

2      A  From who?

3      Q  From anyone.

4      A  From anyone.  Well, we generated our own.

5      Q  Okay.

6      A  Sarah Kopp would do that for me.  And we

7   had a sales forecasting program, which is the -- each

8   industry would give us their pipeline.

9      Q  So, and both of these are internal,

10  internally generated reports within OSI?

11     A  Yes.

12     Q  All right.  What sort of reports did Sarah

13  Kopp generate in 2001?

14     A  Well, as my finance person, she would give

15  us the performance of the operating group for the

16  full year, and by the quarter, how we were

17  forecasting our performance and seeing the reality of

18  it.  So if it was the first month, it wouldn't be as

19  accurate as it would be in the third month, because

20  we would track the business that was booked to date

21  and that which we'd have to still do to make our plan

22  or forecast.

16

1      Q  All right.  How often would she generate

2   those performance reports?

3      A  Well, she had a second boss in a way.  She

4   redid it for Jennifer Minton, who was really her

5   boss, although I was her partner.  So I don't know

6   how often Jennifer required it, but we looked at it

7   once a week.

8        And we made sure that our submittal was

9   discussed.  She could send in any number she thought

10  was right and she always wanted to make sure if I

11  believed that it was correct, or I could give her a

12  little bit more data on the actual facts of what is

13  the status of some of the opportunities so she could

14  learn to guess a little bit smarter.

15     Q  Just so I understand, this report would

16  contain historical information as -- how far back?

17     A  Well, we always compared the full year, so

18  it would be a year to date, and then we always looked

19  at the previous quarter from the past year, just to

20  see if we were improving.

21     Q  All right.  And it -- the report included

22  forecast information for each category of business

17

1  within OSI?

2      A  Yes.

3      Q  And it included actual revenue to date

4  within the quarter for each category of business

5  within OSI?

6      A  What it had was, if it was February, and

7  month 1 was already finished of that quarter, we

8  would see exactly how much revenue we booked by line

9  of business for the month of January.  And we would

10  know how much we needed to do to complete our

11  forecast.

12      Q  All right.

13      A  Can you hold on just a second?

14      Q  Sure.

15          THE VIDEOGRAPHER:  We are going off the

16  record.  The time is 10:01 a.m.

17          {Recess.}

18          THE VIDEOGRAPHER:  We are back on the

19  record.  The time is 10:02 a.m.

20  BY MR. DE GHETALDI:

21      Q  Did the weekly performance report that

22  Sarah Kopp generated contain any other information

18

1  other than what we've discussed?

2      A  I don't recall.

3      Q  All right.  You spoke of a sales

4  forecasting program, did the program have a name?

5      A  I don't think it had an official name

6  because we were getting ready to come out with our

7  CRM product.  But there was an old name that we used

8  to refer to it, because we generated it ourselves,

9  but someone would have to refresh my memory.

10      Q  Okay.  Now, this was a program that you

11  could access online?

12      A  Is that the question?

13      Q  Yeah.

14      A  Yes.

15      Q  All right.  Did it give you realtime sort

16  of data?

17          MR. GOLDSTEIN:  Objection to the form.

18      Q  Do you understand what I mean?

19      A  Realtime data, no, it did not.

20      Q  Okay.  What was -- how dated was the

21  material that you were able to view through this

22  program?

19

1      A  Well, I think to answer that you'd have

2  to -- I have to explain to you how orders got booked.

3      Q  Okay.

4      A  If I signed an order today with the

5  Department of Defense for 5 million dollars of

6  software, it would not -- and it was signed, the

7  paperwork was submitted.  We would not note that yet

8  because it has to pass an approval test.  So it would

9  go out to California, I don't know his name, Larry,

10  we always called him Dr. No, Larry Garnick I think it

11  is.

12          And so Dr. No would look at things and

13  say, gee, where's the I on the T and the T is this,

14  and the that is that.  We always had the great

15  fortune of them not understanding federal government

16  business's paperwork.  And they'd want to have the

17  arrogance of telling the government how to change the

18  document.  And we'd have these occasional debates.

19  So it went on and on and on.

20          My point being, until we got it stamped

21  and approved, which could be an hour or two weeks,

22  once it got stamped and approved, we knew it was

20

1  submitted.  And at that point we would check off that

2  5 million dollars is now in the plan.

3          What we did was a reality check.  We knew

4  there was no problem with the creditworthiness of the

5  United States Government, although occasionally they

6  thought there might be.  So we would just wait until

7  we got that approval, but we knew we had that 5 but

8  we didn't put it in the report, because we were

9  waiting for it.  So it would stay in a status of

10  something, waiting for approval.

11          So to answer your question, realtime,

12  realtime to me is you send in an order, you book it.

13  This was not realtime.

14      Q  Okay.  But -- well, could you see the

15  status of given deals by looking --

16      A  Oh, we knew every deal that we sent in,

17  sure, but it was irrelevant.  Because it's like going

18  to a shredder.  You don't know what's going to get

19  approved, or put on, put in reserve, because the

20  terms and conditions were attached to some

21  consulting.  And so there were different rules which

22  we had to abide by, and were gladly willing to abide

21

```
 1   by, but it was a lot more complicated than selling a
 2   box and recording a box, let me put it to you that
 3   way.
 4        Q   All right.  My question was whether you
 5   could see the status of given deals by looking at
 6   this forecasting program?
 7        A   Well, again, I say, yes, that which were
 8   booked.
 9        Q   Okay, just --
10        A   But there's a big difference between what
11   is booked and what's in float.
12        Q   All right.
13        A   What I described to you is the float.  So
14   when it got out of float, out of the land of Oz and
15   into it's been booked and ready to ship, we then took
16   care of it.
17        Q   All right, so this sales forecasting
18   program then showed you booked deals.  How did you
19   keep track, or were you able to electronically keep
20   track through this sales forecasting program of the
21   deals that were in float?
22        A   Oh, sure.
```

22

```
 1        Q   All right.
 2        A   Sure.
 3        Q   So you could see the whole spectrum of
 4   deals then?
 5        A   Let me just -- maybe it's too much
 6   information for you, but if it was the last day of
 7   the quarter, and I submitted a hundred million
 8   dollars worth of paperwork made up of 50 different
 9   deals, I wouldn't know for three days how much of
10   those deals were completed.
11            They've got to get shipped, therefore it
12   has to be an inventory, it has to be done at a
13   certain time.  So we were real sticklers about
14   following the revenue recognition rules.  Revenue
15   recognition rules could be, I'd say more bureaucratic
16   than most obvious ways of running a business.  But it
17   was so critical that we all followed it, therefore we
18   were never sure of what we actually brought in.
19            So we used to say to ourselves, look,
20   it'll go up, we called it the taxation system.  So if
21   you put a dollar in you might get 80 cents, so we
22   factored in 80 cents.  And if it came in at greater
```

23

```
 1   value then we said, fine, because it could be one
 2   that got factored at 60.
 3            So we used to laugh about it in our own
 4   mind, but we were thrilled that we got the business
 5   in and it was moving towards target.  And in that day
 6   or two later, we would know if we made the actual
 7   number that we thought we had submitted without the
 8   shredder.
 9        Q   Okay.
10        A   Shredder being what you actually get the
11   value of.
12        Q   All right.
13        A   So it made the complexity a bit hard, but
14   after doing it for so many quarters, we didn't find
15   it to be difficult at all.
16        Q   All right.  Now, we've talked about
17   reports and information that were generated
18   internally within OSI.  In fiscal year 2001, did you
19   receive financial reports from outside of OSI?
20        A   From where?
21        Q   Outside of OSI?
22        A   Where, from OSI?
```

24

```
 1        Q   Within Oracle, but not from within OSI.
 2        A   Well, the only place that would give us --
 3   so a lot of divisions, they didn't send us any
 4   reports.  So occasionally on a -- Sarah would get the
 5   reporting information that was requested for us to
 6   look at from headquarters, from Jennifer Minton.
 7        Q   What sort of reporting information was
 8   that?
 9        A   Well, Jennifer would do the forecasting
10   for the company, and she would try to validate if our
11   numbers were holding, if we were being overly
12   conservative or too optimistic.
13            So they ran some sort of financial
14   statistical program to see exactly how we were doing,
15   what they -- how they did that kept a few analysts
16   busy, but it was looking at previous years and
17   bookings and where you are.  And it was a good
18   analytical view, but in software one deal can change
19   all the analytics if it's big enough.
20        Q   Okay.  You said Sarah Kopp got these
21   reports?
22        A   Yes, Sarah got them and therefore it was
```

25

1   more for Jennifer and Sarah to stay on the forecast
2   information, because they had a whole process in
3   administration that they used to use to try to
4   validate the doability of the forecast.
5        Q.  Okay.  Did you get these reports as well?
6        A.  I had privilege to them, if I asked.  They
7   were just such useless things for me to look at that
8   I didn't care.
9        Q.  All right.  Any other reports that you got
10   from headquarters or Jennifer Minton on a regular
11   basis?
12        A.  Well, we got -- at the end of the quarter,
13   the final numbers would come back in, and therefore
14   we would know how we did, so that we could give out
15   the appropriate recognition for the sales force and
16   the consulting people.  So, yes, it was a package
17   that we used to get just closing down the quarter,
18   and validating our performance year to date against
19   plan.
20        Q.  When you say plan, what do you mean?
21        A.  Well, we had a quota or a plan.  People
22   refer to it three ways, you could have a budget, a

26

1   plan or a quota.  I just referred to it as a plan.
2        Q.  All right.
3        A.  So it could be any of those three.  So you
4   had a plan to do X hundreds of millions of dollars
5   for the year, and you would see how you were doing
6   against those numbers.  So in the time period we're
7   talking about, the first six months had already gone
8   by, we're now talking about the second six months.
9        And in that second six months, you were
10   trying to figure out how you were going to make the
11   full year in that last six months, were you plus or
12   minus to your quota, plan, budget.  And from that,
13   commissions would flow for all your sales people and
14   your managers.
15        Q.  All right.  How about -- let's talk about
16   meetings.  Did you have any meetings during a given
17   week that were always on your schedule?
18        A.  Once a -- every Monday, we had an
19   executive team meeting, yeah.
20        Q.  Were those something that you attended?
21        A.  I worked out of Washington and the
22   meetings were held in California.

27

1        Q.  Yes.
2        A.  So I did some by phone and then some I
3   went out.
4        Q.  All right.  Were -- did you receive
5   agendas for those meetings?
6        A.  Is this your first one that you've done?
7        Q.  Huh?
8        A.  This must be your first one.
9        Q.  It's not.
10        A.  I'm just teasing.  It didn't matter
11   because the agenda was whatever time Larry would show
12   up and whatever he wanted to talk about.
13        Q.  All right.
14        A.  So if someone attempted to put an agenda
15   together, we paid little or no attention to it,
16   because it was rarely ever followed, with the
17   exception of a few things that he had on his mind
18   which were the constant things, how's it going kind
19   of stuff.
20        Q.  All right.
21        A.  But we never knew what time it would
22   start, not that it wasn't scheduled.

28

1        Q.  But it didn't really start until he showed
2   up?
3        A.  Yeah.
4        Q.  All right.  What were the constant things,
5   as you call them, the things that he always wanted to
6   talk about at these meetings?
7        A.  Wanted to know the status of the business.
8   I think Jeff Henley and Jennifer consistently put
9   that on, especially as we got closer and closer to
10   the end of the quarter, of our forecast.  And then
11   wanted to talk about morale of the people.  Wanted to
12   talk about any and all new product launches, and some
13   feedback on how is the product being received,
14   whatever that might have been for the time.
15        And, oh, maybe an advertising campaign
16   that came up with -- but we're now in the
17   miscellaneous, because what I just said up to the
18   advertising is about the consistency of the way it
19   went.
20        Q.  All right.  Now, going back to the topic
21   of the status of the business, did that, did his
22   questions about the status include both forecast

29

1  numbers and actual revenue numbers as the quarter
2  went on?
3      A   Well, as smart a person as he is, and he's
4  plenty smart, he had his approach to listening.  And
5  his approach to listening was different than what
6  Jennifer Minton and team would want to conduct it,
7  but they couldn't control what he wanted to say.
8      So he did it in his fashion, which was
9  probably more reasonable, took on the facts, the
10  facts were how are we doing to date.  Looked at the
11  big deals that were still out there, and tried to
12  look us in the eye and find out the probability of
13  those happening.  And wanted to know the size of the
14  pipeline.
15      And then like any good CEO, he would say,
16  what's your commitment.  And we would tell him, and
17  occasionally we could have some healthy debate that
18  would go both ways.  Stop holding back, you
19  bullshitter, you're going to get there, you're
20  already there, dah, dah, dah, dah, dah, dah, or you
21  got a long way to go to make that number, are you
22  really sure you can make that number.  And that was

30

1  it.
2      Q   All right.  Did you have a weekly meeting
3  with the OSI folks?
4      A   We had a monthly staff meeting, and then
5  we had one-on-ones with my direct reports, more
6  informal than formal.  Just to see, you know, the
7  status of how things were going and get a sense and a
8  feel for the reality of what's in their forecast.
9      Q   All right.  Were you responsible for OSI's
10  forecast number?
11      A   Yes.
12      Q   All right.  Can you describe to me how you
13  would arrive at that number, and I'm talking about
14  fiscal year 2001, if it was any different than the
15  past.  Otherwise, just in general.
16      A   Well, actually, I've been doing it for --
17  2001, I guess nine years or so.  And came up with a
18  pretty consistent approach of how to do that.  It's a
19  science in the minds of the finance people, it's an
20  art form in the minds of the sales people who have
21  to -- you know, if life was so simple, why don't you
22  just mail in the orders.

31

1      So we had to put some judgment.  And the
2  judgment factors were placed in there.  So we would
3  look at the entire pipeline, which was the volume of
4  deals, and we would come up with a core baseline
5  number for that.  And then from that we would
6  extrapolate the -- not including that core number,
7  what we would call the opportunity accounts that
8  would really help us make or exceed that number.
9      If you didn't have enough of those, then
10  the number might be in jeopardy.  If you had an
11  abundance of them, then you probably had a chance to
12  overachieve.  If you had in there a few, but they
13  were massive deals, well, then you were still
14  concerned because massive deals don't seem to close
15  when you wish that they do.
16      So we would take a look at that and go
17  through the cycle of the sale, and ask the questions
18  of the owner of that opportunity, CIO in a good mood
19  these days, are they going to help us get it through
20  the system, do they have a sense of urgency to get
21  this done, have they done all the paperwork, is the
22  selection process over, are we doing it with

32

1  partners, without partners.  So you'd have a slew of
2  questions that you'd want to ask just to validate
3  that there is a reality that it would happen.
4      So from that you would pull out some deals
5  and put it into the following quarter.  And that
6  which was left was how you would make a judgment.
7  You also can make a judgment based upon what you did
8  the year before, because in our business you can tell
9  if the government's going to spend more or less.
10  Assuming it's less, then we'd say, well, on the
11  government side, last year they had a bonanza of a
12  spending opportunity, and this year there's a
13  continued resolution -- do you know what a continued
14  resolution is?
15      Q   No.
16      A   That's when Congress hasn't signed the
17  bill.
18      Q   Okay.
19      A   And therefore, all funds are frozen with
20  the exception of those things that are in that
21  critical category.  And you could have purchase
22  orders sitting on the desks and people can't sign

33

1  them.
2      So if you take out any of those anomalies
3  and you would now have the experienced person like
4  myself and Sarah Kopp a couple of these vertical
5  guys that report to me, we would be able to take our
6  finger out, put it up into the wind and say this is
7  how the wind is blowing, and we believe we'll do a
8  hundred million, 40 million, 80 million, add it all
9  up, try to always factor out a number that could give
10  us a little more upside, because we weren't in the
11  game of making corporate too excited.
12      We didn't want them to over, get overly
13  zealous about what could happen, because during the
14  course of that 90 day stretch, unexpected things
15  could still occur that we didn't know about. And so
16  we always tried to err on the side of being a little
17  more conservative.
18      Q  All right.
19      A  So that is the art form of the process
20  that I installed. And it worked, and it worked quite
21  well. I would say, how many times did I do it, 9,
22  10, 10, 20, 40 some odd times doing this, I believe

34

1  we've only had probably three to five times when I
2  said, oops, error here in judgment, the deal didn't
3  come in, the deal was half the size, the company was
4  acquired. Things that we couldn't predict.
5      But most times we were, I'd say 80 to 85
6  percent of the time, we were as solid as anyone. And
7  they, in headquarters, referred to us as Jay Inc. and
8  Jay Inc. was -- always delivered that or more than
9  what they had anticipated.
10      Q  Okay. You mentioned pipeline as the total
11  volume of deals, did that include deals that had
12  already been closed?
13      A  Oh, no. Do you understand what the
14  pipeline is?
15      Q  No.
16      A  Okay.
17      Q  Let me put it this way, I've gotten
18  different definitions and so I'm wondering what yours
19  is?
20      A  Well, just remember one.
21      Q  Okay.
22      A  What I'm going to tell you.

35

1      Q  All right.
2      A  The pipeline is that which has not closed,
3  so it would be close to a moron who would include
4  that which has closed in the pipeline. Because you
5  do it this way, you say, this is what's in, booked,
6  and we don't need to do it again. And this is what
7  we need to go. In to go, to go is the pipeline.
8      Q  Okay.
9      A  Now, the pipeline has numbers on it from
10  one, which means it's not even a suspect, as it flies
11  through the system it's ready to close. And the
12  status of those are pretty important because once
13  they get above seven or eight, that means majority of
14  the work, if not all, has been done to satisfy the
15  need to close.
16      That's the pipeline. So if anyone told
17  you that deals that they had already closed were in
18  their pipeline, you better hope that, you know -- I
19  would just, personally, I would never allow them to
20  do it, because that's counting it twice.
21      Q  All right.
22      MR. GOLDSTEIN: Glad we cleared that up.

36

1      MR. DE GHETALDI: Yeah.
2      THE WITNESS: It's so simple, the pipeline
3  isn't a complex thing, it simply is the pipeline of
4  business that's hopeful to close. And if you close
5  30 to 40 percent of your pipeline, you're in good
6  shape.
7  BY MR. DE GHETALDI:
8      Q  All right.
9      A  Sorry for being so exact.
10      Q  That's all right. Well, it's been about
11  an hour, want to take a break?
12      A  I'm fine, I can continue.
13      Q  All right. We'll go for a while. I'm
14  just going to hand you some reports and see if you
15  recognize them and talk about a couple things in
16  them.
17      A  Okay.
18      Q  This is a document that was already marked
19  as Exhibit 133. Have you ever seen a report like
20  Exhibit 133 before?
21      A  Yes.
22      Q  Okay. Were these, was this sort of report

37

1    something that you were a regular recipient of?

2    A  Yes.

3    Q  Okay.  Under what circumstances would you

4    get the type of report like Exhibit 133?

5    A  We'd get these at the end of the quarters,

6    just as I said, to see how you were doing on a year

7    to date basis.

8    Q  Okay.  During the Monday executive

9    committee meetings, were reports handed out and then

10    collected again after the meeting was over?

11    A  Jennifer handed out, I'm not sure -- the

12    answer is I can definitely tell you, yes, the reports

13    were handed out, and reports were collected.  But I

14    don't know if this was one of them or not.

15    Q  All right.  This has been described

16    previously as an upside report, and you can see in

17    the footer, down in the lower right hand corner that

18    it's dated January 15th.

19    A  Uh-huh.

20    Q  All right.  I'll come back to that in a

21    minute, but, first -- and I apologize, I didn't bring

22    my magnifying glass, it's been a tool of mine in some

38

1    of these depositions.

2    A  I can see it.

3    Q  That's good.  Do you recognize the type of

4    report that's exemplified by Exhibit -- I'm sorry,

5    Exhibit 86?

6    A  Yes.

7    Q  Is this one of the weekly financial

8    packages that Sarah Kopp prepared for you?

9    A  I don't recall it being a weekly.  It

10    looks more like a summary of the end of the quarter.

11    Q  All right.

12    A  Because I don't see anything here -- this

13    particular one has all the numbers in, right?

14    Q  Yeah.

15    A  I mean, it's the full year.

16    Q  Yeah.

17    A  So what it is, if it was the -- the year

18    was going on, you would get Q1 completed, you would

19    get Q2, the forecast against whatever actual and

20    depends on the time of the year.

21    Q  Right.

22    A  This particular one has the whole year

39

1    done.

2    Q  Right.

3    A  So you would not get this particular one

4    on a weekly basis.

5    Q  Okay.  Let me hand you a copy of Exhibit

6    87.

7    A  Okay.

8    Q  This one I think is -- Exhibit 87 is dated

9    January 9th, 2001.  Exhibit 86 is dated December 5th,

10    2001.

11    These weren't weekly reports, were they

12    monthly reports?

13    A  I don't know if they were weekly or not.

14    How could I recall that the reporting -- when I look

15    at the document, I could tell you how I would use

16    them.

17    Q  Right.

18    A  So I don't know, if you just picked up a

19    weekly report that has full year numbers in it or

20    not, I don't know.

21    Q  Well, I'm just showing you what we were

22    given, and trying to figure out what they are.  These

40

1    are --

2    A  Okay, well -- so if you look at these with

3    me then maybe we both could discover.

4    Q  Right, yeah.

5    A  In the first quarter, you have actual,

6    right?

7    Q  Yes.

8    A  So that's what the division must have

9    done, 224 million against a budget of 199.9, right?

10    So I see nothing to tell me that I'll see that on a

11    weekly basis.  However, and we go to week two,

12    quarter 2.

13    Q  Yes.

14    A  I see the same thing, right?

15    Q  Yep.

16    A  So now the forecast is in there.

17    Q  Right.

18    A  I'm sorry?

19    Q  Well, you've got September has --

20    A  September has actual numbers.

21    Q  Right.

22    A  And October's forecast and November has a

41

1  forecast. So this would be a report that with four
2  months over, you know, that's what we talked about
3  earlier today.
4      And any time you see forecast, forecast,
5  forecast, you can come back and pin down about when
6  we're talking about it. So if you say this is a
7  January report, I'd say that's unusual because it
8  doesn't look like we even zeroed in on October or
9  November or December's actual yet.
10     Q. Yeah. Well, the one -- the total license
11 number for Q2.
12     A. Yeah.
13     Q. 153.3, it looks like it's pretty darn
14 close to what you guys actually did.
15     A. Well, that's because we're good at
16 forecasting. But that's a forecast, that's not
17 actual.
18     Q. Okay. Is it possible that that column
19 just didn't get renamed, in that?
20     A. Well, I don't know, you'd have to ask the
21 author of it, because if you look back on this
22 report, it says actual, actual, actual, actual in Q1,

42

1  right?
2      Q. Yep.
3      A. And then you have actual in September.
4  And then the rest runs out as forecast. So it seems
5  to me, what little knowledge I would have of reading
6  reports, that this report is accurate for actual
7  performance through the month of September. And
8  after that, we're in a forecasting mode for October,
9  November, and then third quarter and fourth quarter.
10     Q. All right.
11     A. You see it the same way?
12     Q. Well, I see what it says, and I'm just not
13 sure that I have the same trust in the accuracy of
14 the column headings.
15     A. I can only go by --
16     Q. I mean, for one thing, October and
17 November numbers don't change at all. And wouldn't
18 you expect to know what was done in Q2 by the
19 beginning of January, what was actually done?
20     A. Sure, but you've given me a report and I'm
21 responding to how you read reports.
22     Q. Okay.

43

1      A. If we were sitting there at the time, I
2  could have said, well, gee, why isn't that the
3  actual.
4      Q. Yeah.
5      A. But I have no idea what you're talking
6  about in terms of how this report is being used.
7      Q. Right. If you can turn to the last page
8  of Exhibit 87.
9      A. Okay, very last page.
10     Q. Yeah, very last page. You can see the
11 title a little more clearly than you can on the first
12 page, the first page says something similar, it says
13 FY01 weekly forecast.
14     A. Right.
15     Q. And the first page says, Oracle Service
16 Industries, FY01 weekly forecast summary.
17     A. Uh-huh.
18     Q. And that's -- that's why a similar title
19 appears on all of the pages. And that's why I asked
20 you if this was the weekly report that we were
21 talking about earlier that Sarah Kopp prepared?
22     A. This might have been a weekly report that

44

1  Sarah Kopp did for Jennifer Minton.
2      Q. Okay.
3      A. But this is as useless a thing as I've
4  seen.
5      Q. And you get a different weekly report?
6      A. Not different -- what do I care about
7  forecasts in a quarter that I'm not even talking
8  about yet? In other words, you have a forecast there
9  for March, April and May, and you had mentioned that
10 this is a January time frame?
11     Q. Yes.
12     A. Well, what do I care? I only care about
13 the quarter that we're living and that which we've
14 completed. And even on this report, if it's indeed
15 what you're talking about January, we have November
16 as a forecast not actual, right? You have December
17 as a forecast. So if this is January, then this is,
18 someone has to explain to me what the practicality of
19 this is.
20     Q. All right.
21     A. And this seems like, this is titled head
22 count.

NUSSBAUM, JAY  3/23/2004  12:00:00 AM

45

1    Q  Yes.

2    A  So the only reason I care about head count

3  is for consulting.

4    Q  Yes.

5    A  So I don't know, is this a consulting

6  report or is this a license report?

7    Q  It's mixed.  It appears to be mixed.  I

8  mean, the first page shows --

9    A  I don't know.  See, I'm a man of few

10  reports.  Give me reports that I could think of what

11  the heck I'm reading, and understand what I have to

12  do.

13    Q  Right.

14    A  This is good information, but analysts at

15  times have nothing to do but to spend a lot more time

16  creating reports.  People in the field want the

17  reports, want the facts, just give me the facts, tell

18  me where we are and I'm ready to go.

19    But I can't clearly answer anything,

20  because this leaves a lot open in my mind, other than

21  the fact that the actual has occurred and that's

22  factual, and the forecast for the quarter that is

46

1  remaining should be pretty good information.  Doesn't

2  have to be accurate, but it's that pipeline and all

3  that other stuff.  And after that, the other

4  quarters, nobody knows.

5    Q  Okay.  So 86 and 87 weren't reports that

6  you received, is that right?

7    A  Let me say it in my words.

8    Q  Yeah.

9    A  I might have received them, but I did

10  nothing with them, because in this condition without

11  understanding, you know, maybe an attachment to it,

12  they're useless.

13    Q  All right.  The weekly forecasting reports

14  that you did get from Sarah Kopp, do you remember

15  when you got those in relation to the Monday

16  executive committee meeting?

17    A  Well, because the monthly executive

18  committee meeting --

19    Q  I'm sorry, the weekly executive committee.

20    A  Well, the Monday weekly.

21    Q  Yeah.

22    A  Should have started around 1:00, and so we

47

1  in the morning, because living on the East Coast,

2  Sarah would give me an update, that which she had

3  given to Jennifer Minton, so we'd at least have the

4  same set of numbers.

5    Q  Was that update different from the weekly

6  forecasting report that you got from Sarah Kopp?

7    A  No, it would probably be the same.

8    Q  All right.  I'm going to hand you a copy

9  of something that was previously marked as Exhibit

10  74.

11    A  Now we got something.

12    Q  Hey.

13    A  That we're looking at.

14    Q  Finally.  So you recognize the type of

15  report that's --

16    A  Yes.

17    Q  -- shown in Exhibit 74?

18    A  Yes.

19    Q  What can you tell me about this, this

20  report?

21    A  It's a working document, telling us what

22  we have done to date basically would have been

48

1  included, and then what has to happen.  This is an

2  extraction out of, extrapolation of the pipeline with

3  the deals that are most important.  And it gives you

4  a status check of what's going on.  So as you can

5  read, "Customer visits USCG to see an actual

6  implementation.  Final stage before purchase."  See

7  that one?

8    Q  Yes.

9    A  Point 800,000.

10    Q  Yes.

11    A  And if you go down and try to go blind and

12  read every one of them, you will find out the

13  comment.

14    Q  All right.  Is this a partial report?  You

15  said something about actuals and I don't see them on

16  here?

17    A  Well, we would know the actuals -- there

18  would be -- so if it was sitting on my desk, here's

19  what we have actually done to date, and this is now

20  the stuff in the pipe, so this is a pipeline report

21  validating what we think will happen because you can

22  see all the different comments.

NUSSBAUM, JAY  3/23/2004  12:00:00 AM

49

1    Q  All right.  And these are, looks like, are
2  these all of the deals over $500,000 that are in the
3  pipe?
4    A  I'd say it is the majority of the deals.
5  I'd have to look at the pipe to answer that
6  correctly, but it's usually those that we think are
7  most active and that could close.  There could be
8  other $500,000 or greater in there, but they don't
9  appear to close in this quarter.
10    Q  All right.  And there are, let's see,
11  first page has -- looks like it has forecast numbers
12  and the second page looks like it has worst case,
13  most likely forecast scenario, and best case scenario
14  numbers.  Am I reading it correctly?
15    A  I see the word worst case scenario.
16    Q  Yeah.
17    A  But, yes, I see, yes.
18    Q  In 2001, who was it at OSI that put deals
19  into those three categories?
20    A  Sarah.
21    Q  All right.  And so the forecast, most
22  likely forecast scenario number on the second page

50

1  which is 200.9 million is a little bit different than
2  the total forecast number on the first page which is
3  210 million?
4    A  Correct.
5    Q  Is that 210 million your forecast number?
6    A  Yes.
7    Q  Okay.  Now, this is dated January 29th,
8  which was a Monday in 2001.  Would you get these
9  reports before the Monday executive committee
10  meeting?
11    A  Absolutely.
12    Q  So you had this information?
13    A  That's what you had to discuss assuming
14  the meeting went on.  And if it did, this would be a
15  subject that Jeff and Jennifer would want to take you
16  through.
17    Q  All right.
18    A  And they had the same information.
19    MR. GOLDSTEIN:  Dario, I wouldn't mind
20  taking a break now.  If that's all right with you.
21    MR. DE GHETALDI:  Okay.  Yeah, sure.
22    THE VIDEOGRAPHER:  We're going off the

51

1  record.  The time is 10:49 a.m.
2    (Recess.)
3    THE VIDEOGRAPHER:  We are back on the
4  record.  The time is 11:03 a.m.
5  BY MR. DE GHETALDI:
6    Q  I'm going to hand you a copy of a document
7  that was marked as Exhibit 72.  Have you ever seen
8  Exhibit 72 before today?
9    A  Yes.
10    Q  When was that, I mean, was it --
11    A  January 18th, Thursday, at 17:29:09.
12    Q  Well, I'm not trying to be a jerk about
13  it.  I was just wondering really whether this was one
14  of the documents that you reviewed in preparation for
15  your deposition, maybe I should have asked it like
16  that.
17    A  Oh, I'm sorry, no, I didn't see this one.
18    Q  And it's not addressed to you, so I wasn't
19  sure that you had actually ever seen it?
20    A  Well, this is what I was trying -- this is
21  a good document.
22    Q  Yes.

52

1    A  Because it explains to you how Sarah and I
2  have conversations, and she then relays it up to
3  Jennifer.  And then on occasions, I even would sit in
4  on a call to Jennifer because Sarah can't -- Sarah
5  was a little new, but Sarah can't exactly explain the
6  level of detail behind each one as I'm working them.
7  So when she needs help or I think she does,
8  occasionally I'll even explain it to Jennifer.
9    Q  All right.  Now, can you tell me what,
10  what the column SVP commit means?
11    A  Those are my direct reports.
12    Q  All right.  So those are the -- is that
13  senior vice president, is that what that is?
14    A  Yes.
15    Q  And the -- so that shows the numbers that
16  they were actually willing to commit to in terms of
17  their forecast?
18    A  No.  This is where you get into semantics.
19    Q  Okay.
20    A  I want to just clear it up, not that you
21  are.
22    Q  Good.

53

1    A   We go in, talk to each of these people and
2    they say, well, what is the safety net number,
3    therefore that is the commit.  And in doing that, a
4    lot of this 134 million that's in this number is
5    already done.  And then we say, okay, now if we added
6    the big deals to this number, what are we really
7    talking about.  And it can get to a best case number
8    as you see to the right.
9        Now, that doesn't mean in the best case
10   that we said every one of your big deals will close.
11   So if you really -- if you shot them with truth
12   serum, they would probably say my number is something
13   greater than a rollup of 185, up into 300 million,
14   but each one is a deal by deal that I have to figure
15   out if I'm going to get it or not.
16       So if you take higher education, they
17   don't get taxes, they're screwed, okay.  If you take
18   coms, they don't get Lucent, they're screwed.  So
19   that's the kind of variation that these two things
20   are.
21       The commit is like that safety net number
22   that you know you're going to get.  And then you take

54

1    these trophy deals or these big deals, and if you
2    have 10 of them and they add up to some greater
3    number, let's say 10 of them could add up to an
4    additional 150 million dollars, well, you're not
5    going to get 10 for 10, but you should get six out of
6    the 10.
7        Now, it's even trickier because you could
8    get two out of the 10, if they're the right two.  So
9    that's when you have to know really what the nuances
10   of all these are about.
11       So that's how we would look at this.  So
12   then Sarah would say her projection is 205, but Jay's
13   forecast is 225, so we would stop there.
14   Q   All right.  Do you, do you know what the
15   75 percent confidence level handwritten notation
16   under your forecast number refers to?
17   A   Well, that's Sarah.
18   Q   That's Sarah.  So is she 75 percent
19   confident in that or were you 75 percent confident?
20   A   I was 100 percent confident.  Sarah said
21   maybe it's not coming in fast enough, so I'm 75
22   percent confident we'll do that.

55

1    Q   All right.  This second, second sentence
2    of the first paragraph, Sarah says that she's
3    including her projection based upon discussions with,
4    I guess your directs.  Was that something that she
5    did, actually went and talked to your direct reports
6    to work up her own forecast or projection number?
7        A   Her projection is based on a little bit
8    more statistics of, oh, my God, we have -- I'm not
9    going on this date because it's the 18th because we
10   still have an entire month of February.
11       But it just looks really bleak that the
12   business that has been booked to date isn't high
13   enough.  And so it's all pushing out into a huge
14   bonanza of revenues are going to have to flow in
15   February.
16   Q   Okay.
17       A   So that's what she would hopefully do.
18   Q   The second paragraph, first sentence
19   refers to a call from the road, and you going over
20   numbers with Larry.  Do you by any chance have any
21   recollection about that call?
22       A   I can only assume what was said.  He asked

56

1    me, are we holding -- now, this is, this is not, this
2    is just Jay coming up with what the script probably
3    was like.
4    Q   Sure.
5        A   How are the numbers holding, is there
6    anything I could do for you.  Are there any big deals
7    there that we think we'll get.  What do I need to do
8    if anything at Lucent, because that was the make or
9    break deal in this whole thing.
10       And I don't know if he even mentioned that
11   but I'm just saying so those would be the kinds of
12   things.  And are you still confident that your 225 or
13   210, whatever the number that he had in front of him,
14   is doable.
15   Q   Okay.
16       A   And I said, by all means.
17   Q   All right.  Would Lucent show up in -- I
18   don't remember seeing, I don't think I see it in
19   here.  And it might be just because the print's so
20   small, but is that, is Lucent in the Exhibit 74?
21       A   Sure, sure.  Lucent.  It's like an eye
22   test.

57

1    Q  I know.
2    A  Yeah, see the bottom and the handwriting?
3    Q  Yes.
4    A  It looks to me, although blurry, looks
5  like Lucent and then I can't read, 39 to -- 35
6  million.
7    Q  Something like that.  What I actually
8  meant in the, in the typed, Lucent Technologies, it
9  shows as the most likely forecast at 10 on the second
10  page.
11    A  Yeah.
12    Q  Right in the middle.
13    A  Yeah, I see that.  So what we do at these
14  big deals, because you never know what's going to
15  happen, this is just a little bit of trickery, maybe
16  we trick ourselves.  Instead of putting it in for 35
17  million, there's a chance that they might say, look,
18  why don't we do it in two or three bites instead of
19  the whole thing.
20      And so we say, worse case is that you come
21  in for 10 million, if it's going to happen.  Best
22  case they'll do the whole thing.  And so what we do

58

1  is go down and say, okay, let's not be greedy and say
2  Lucent is clear enough of mind to do -- because this
3  place is spinning down the sink.
4      I mean this -- at this time, Lucent is
5  totally out of control.  Their CEO was fired, acting
6  CEO was the guy on the board, 67 years old, Henry
7  something or other, who sleeps at his desk.  Working
8  late.
9    Q  Right.
10    A  He's working these unbearable hours trying
11  to put it back together.
12    Q  Yeah.
13    A  And it was not naive of us to think we
14  could do this, because this would have saved them
15  hundreds of millions of dollars, because the Lucent
16  deal which was something that I thought under no
17  circumstance any company with any financial problems
18  would ever not do, basically they were doing a --
19  maybe this is more information than you need, just
20  tell me.
21    Q  No, it's good.
22    A  They were doing, Lucent was doing an SAP

59

1  update and they were going to have to spend somewhere
2  on SAP, 150 to 200 million dollars, after the
3  geniuses already spent 700 million that didn't work.
4      So if you want to look at, inside of the
5  telecom madness, spend 700 million to implement SAP,
6  it doesn't work, they can't find their inventories,
7  their auditors are all over them, they got red audit
8  reviews.  They can't find about a billion, five to 2
9  billion of inventory.
10      One would think, now call me crazy, that
11  if you went in with a fixed price and said we'll do
12  all this for, I think it was 85 or 90 million
13  dollars, that would be the license and consulting,
14  that they might consider that as opposed to spending
15  almost double that on the same stuff that never
16  worked the first time.
17    Q  Right.
18    A  So we were pretty optimistic.  CIO says,
19  yeah, I'd love to do it.  Ooh, that's interesting.
20  The CEO said, of course I'd like to do that.  The CFO
21  was in the midst of leaving , unbeknownst to us,
22  because she either was terminating or being

60

1  terminated, didn't know that.
2      So we went there the, February, I don't
3  know the date, 26th, 27th-ish, still thought that we
4  had it because the CEO said come on up.  The CIO
5  said, it's done.  What we forgot to do was get the
6  cook, and the chauffeur didn't sign off on it, so we
7  went up there maybe to get the chauffeur and the cook
8  to sign, because Lucent is whacked, only to find out
9  that nobody can sign other than the bankers, because
10  it's in covenance, am I saying it right, when a bank
11  owns -- that they won't allow you to sign up for more
12  debt or to take on any project over a certain size.
13      I don't know the expression, if it's --
14  the bank has a covenance on this, that any deals of
15  any size will come to us, you have no authority to
16  sign anything, so you're just custodians, we run
17  Lucent.  Gee, what a great surprise.
18    Q  Yeah.
19    A  And so we can't get the deal signed.
20    Q  Right.
21    A  Now, it took a lot of wind out of our
22  sails, myself, Jim O'Neil and I went back on the

61

1    train, called Ellison and Safra Catz and said, I
2    guess you're not going to believe this one.  The CEO
3    said yes, the CIO said yes, the division president
4    said yes, the CFO, although missing, said yes.  As I
5    said the chauffeur couldn't, you know, get there in
6    time for his signature nor the chef.  But other than
7    that, it's a fine go.  Larry said I don't like the
8    sarcasm in your voice.
9        I said, well, problem is we've got to go
10   to the banks.  And he said, oh, shit, and we crossed
11   it off the list.  I think was the day to go and it
12   was in there for anywhere between 10 and 35 million
13   dollars.  So that turned out to be ugly.  Now, the
14   following quarter we got Lucent's business, but we
15   didn't get it in the third quarter.  Long story, but
16   one that I remember unfortunately all too well.
17       Q.  Right.  Okay.  This is a document that was
18   marked as Exhibit 75.  Do you remember seeing Exhibit
19   75 before?
20       A.  Oh, absolutely, it's the same as -- this
21   is that format that we talked about.
22       Q.  Right.  She mentions a senior staff

62

1    meeting, would have been on a Tuesday, and there's
2    a -- looks like a PowerPoint attached to the e-mail.
3        A.  Okay.
4        Q.  Do you recall who made that PowerPoint
5    presentation at that --
6        A.  I believe it was Sarah.
7        Q.  All right.  She mentions in the first
8    paragraph on the first page of Exhibit 75, one of the
9    key issues continues to be that reps are just not
10   reflecting deals accurately in OSO, or not reflecting
11   the large ones at all, believing the visibility will
12   somehow commit the deal if it is a long shot or large
13   swing.  There was a fairly lively discussion on the
14   matter but Jay was adamant that the reps be held
15   accountable for putting accurate information in the
16   system.
17       Do you recall that discussion at this
18   February meeting?
19       A.  Sure, yeah.
20       Q.  OSO, Oracle Sales Online, is that right?
21       A.  OSO?
22       Q.  Yeah.

63

1        A.  Yes.
2        Q.  Okay.  Had that been put in place
3    relatively recently in comparison to the date of this
4    e-mail in Exhibit 75?
5        A.  Actually no, we had this, we called it
6    something else and then we made it sound like OSO,
7    because I think they were trying to get this inept
8    CRM system of theirs up.  And they were running into
9    terrible problems with it.  So we kept on a system
10   that worked, and then I'm not sure when we had to
11   convert over to Oracle CRM system.  I don't know the
12   time frames of it, but I'll bet you even today it's
13   not too hot.
14       Q.  Okay.  Is that, is that the same as 11I or
15   something different?
16       A.  It would be in the 11I suite, yeah, sure.
17   So what's the -- what would you like to know about
18   this?
19       Q.  Well, I guess I want to know whether it --
20   what Sarah says here is accurate, that the reps
21   weren't putting --
22       A.  Yes, it was accurate.

64

1        Q.  -- deals in?
2        A.  Yes.  Do you want to know why?
3        Q.  Yeah.  If you know.
4        A.  Of course.  They were beginning to panic
5    to know if you had a 40 million dollar deal in there
6    that it would take your commit and make it be a
7    little bit more relevant to what your potential was.
8    So they were getting a little gun-shy of putting in
9    these big deals, because it would make their pipeline
10   look so much bigger and therefore, from the managers
11   down, it wasn't just the reps, the managers
12   themselves were trying to keep these things not a
13   secret because we all knew of them, because you can't
14   hide big deals.  But trying not to make it look like
15   it was going to happen until it happened.  All right?
16       Q.  All right.
17       A.  So they were a little unsure of how to put
18   it into the system, and then at what number, i.e. do
19   I put Lucent in at 35 million, do I put it in at 10
20   million.  Do I put AT&T in at 10 million or 5
21   million.  We had a big deal at the time with Sprint.
22   Do we put Sprint in or not.  Well, they were very

65

1  nervous about doing these things, because each one of
2  them was a little more difficult to get done than the
3  next. These were not just lay-ups.
4      So that was what we had the conversation
5  about. And I said what difference does it make? If
6  it doesn't close in the quarter and it's a real deal,
7  it'll close in Q4, let's track -- let's track it.
8  And so they eventually started to listen.
9      Q  All right. The columns aren't the same as
10  with the other one that we looked at. Or at least
11  they don't have the same titles. The column that's
12  titled "commit" in Exhibit 75?
13      A  Yes.
14      Q  Is that the senior vice president "commit"
15  or your "commit"?
16      A  I couldn't guess. You know, we have so
17  many words around these things. Let's just say,
18  whether it's SVP commit or it's my commit, I'm
19  responsible, so it's our commit, the SVPs go along
20  with what I commit.
21      Q  All right.
22      A  I don't know why it's not on there. But

66

1  so is -- best cases isn't on there either, my
2  projection -- you know, it's a different -- you know,
3  it's getting closer in, you've got two weeks to go.
4  I think Sarah, who was very competent, is trying to
5  do her very best to keep it more and more simple.
6  And so why do you want to have five different ways
7  you could say the number. I commit if the sun's up.
8  I commit if the sun's down. This is my people's --
9  so we just said, heck, this is our commit, this is
10  our upside.
11      And 180 was our commit, 210 -- excuse me,
12  our upside was 240, and I think at that time the
13  number might have been anywhere between 210 or 225, I
14  don't remember. See, Sarah even says we'll come in
15  between 210 and 220, and she's always a pessimist.
16      Q  In the paragraph just below the chart on
17  the first page of Exhibit 75, she says that there's
18  only 34 million booked as of today. Those were --
19  when she says booked, is that the same thing as what
20  we were talking about earlier today, the deals are
21  closed, closed, closed, the contract's been signed
22  and the stuff's gone out in shipment?

67

1      A  I won't pay you for teaching you this.
2  The answer's yes.
3      Q  Okay.
4      A  34 million is what has been done so we
5  wouldn't put 34 million back in the pipeline because
6  it's already shipped, booked, billed and what have
7  you, which oh, by the way, is a very low number
8  because obviously we're shooting for 200 and some odd
9  million.
10      Q  Right.
11      A  Which is why everybody has great anxiety.
12      Q  Okay. When did that anxiety start here in
13  this quarter?
14      A  In February?
15      Q  No, not in February but in the quarter.
16      A  February.
17      Q  It started in February?
18      A  Sure.
19      Q  Okay. First of the month or --
20      A  Let me say for me.
21      Q  Yeah.
22      A  I would say it probably started after the

68

1  first week in February.
2      Q  After you got the January numbers?
3      A  Yeah.
4      Q  Okay. If you could turn, oh, it's second
5  to last page of Exhibit 75.
6      A  Sure. Okay.
7      Q  Could you explain the comment on the
8  bottom of that page underneath the chart where it
9  says, "margin dollars and percent falling behind plan
10  in prior year due to investment in Bell South."
11      A  Yeah. Do you want the answer?
12      Q  Yes, please.
13      A  Bell South was a pioneer in the CRM
14  product. And what we delivered to them was more of
15  an erector set that hadn't been put together.
16  Because they were so good and generous to us to be an
17  early adopter, we tried to get development, along
18  with our consultants, to try and fix what they had
19  been shipped. To do that, we found ourselves in an
20  embarrassing situation because we couldn't charge
21  them -- it would be as if I shipped you, if you
22  bought a brand new BMW and you got in the car and

69

1 there was no steering wheel.

2    Q   That bad?

3    A   Oh, it's worse.  But if you had a steering

4 wheel that would be -- sounds like me.  One second.

5       MR. DE GHETALDI:  Go off the record.

6       THE VIDEOGRAPHER:  We are going off the

7 record.  The time is 11:30 a.m.

8       (Recess.)

9       THE VIDEOGRAPHER:  We are back on the

10 record.  The time is 11:30 a.m.

11       THE WITNESS:  So if you had your BMW and

12 the steering wheel was missing, you might be a little

13 concerned.  But if you opened up and you didn't have

14 an engine, you'd say whoa, this is getting

15 interesting.  And tires are going to eventually be

16 shipped.  And you'd like to drive the car.

17 BY MR. DE GHETALDI:

18    Q   Yeah.

19    A   And so you get a little bit upset and you

20 say to BMW, I want the mechanics at my house, I want

21 them to fix it.  They say fine, we need to send 17

22 mechanics at $200 an hour.  And you say, I don't get

70

1 it, I bought the car, didn't I expect to have all

2 this working?  And the answer is yes.  Well, why are

3 you charging me for the repair on my, at my house.

4       So maybe I'm trying to make a little humor

5 of it, that's basically what Bell South was telling

6 us.  Well, how do you take a wonderful account like

7 Bell South and burden them with that problem?  In all

8 good faith they bought what we told them what it was.

9 What we told them was, wasn't.

10       And so we had to do that by building it on

11 site with the good help of the developers and my

12 consultants.  Well, that little effort cost me, of

13 unbillable labor, 21 or 22 million dollars, which we

14 didn't get any relief for.  But which really --

15 that's why the comment here is, you could look at

16 these numbers all you want, but if you had shipped us

17 the right product and we didn't have to do this, we

18 would not have had to spend unbillable dollars in the

19 tune of 20 some odd million dollars.

20       Now, we had permission to do it because

21 that's a large amount of money that I wouldn't have

22 done on my own, so we got approval to do it.

71

1    Q   Approval from whom?

2    A   Larry Ellison, his eminence.

3       MR. DE GHETALDI:  Let's mark this one as

4 Exhibit 64, please.

5       (Deposition Exhibit Number 64 was marked

6 for identification and attached to the transcript.)

7       MR. NACHBAR:  Dario, you say it's 64?

8       MR. DE GHETALDI:  64, yeah.

9       THE WITNESS:  Okay.

10 BY MR. DE GHETALDI:

11    Q   Have you seen this before?

12    A   No, but it's typical of the lies of Mark

13 Barrenechea.

14    Q   Okay.

15    A   What?

16    Q   This is about the Bell South deal?

17    A   That is correct.

18    Q   And what in here is not true?

19    A   Everything that Barrenechea wrote is not

20 true.  It's true what he said, Andrew Holsworth is on

21 site, so this is the support that he gave us.  But

22 he's crying a plea, don't burn me.  Don't burn you?

72

1 Barrenechea, you're incompetent because you told us

2 it worked.  So don't burn you?  No problem, why burn

3 you, burn 20 million, it's easier.

4    Q   Right.  Okay.  Did you have problems with

5 the CRM module with other customers other than Bell

6 South?

7    A   Could you rephrase the question and say

8 what customers didn't I have problems with.

9    Q   What customers didn't you have problems

10 with?

11    A   None.

12    Q   That was creating a problem for you

13 selling the thing, was --

14    A   No -- I'm being sarcastic now.  So the

15 answer's, no, it's great to sell what doesn't work.

16    Q   By December 2000, January 2001, had people

17 figured out that the thing didn't work or --

18    A   No, it depended on what they bought.

19    Q   Right.

20    A   Some of it worked.

21    Q   Okay.

22    A   So if you wanted the -- let's take the

73

1 car. If you wanted to drive it 20 miles an hour, we
2 can get you on the road. But if you're going to go
3 cross country, it's a long-ass ride, but the car's
4 specs say you should go 80, 100. That was not
5 working.
6         And it's no different than Siebel. I'm
7 not trying -- in software, everybody tells you when
8 it works and when it doesn't and it gets out a little
9 bit before it's time, customers get too aggressive
10 with what they want. You know, it's like you try to
11 tell them, why don't you start with this that works
12 and then the next thing you know all the crazy
13 developers inside want all the whistles and bells.
14         And so next thing you know you've got
15 yourself a whistles-and-bell project where only the
16 basics work. And that was the bind that we were in.
17 And it happened at AT&T as well.
18     Q. Okay. Back at Exhibit 75, which is that
19 one. You mentioned AT&T. There's a notation in the
20 bottom right hand corner of the chart on the first
21 page, it says "20 million, upside on AT&T" and
22 then --

74

1     A. I'm sorry.
2     Q. Was that a CRM deal?
3     A. No.
4     Q. That's a different --
5     A. None of these are CRM deals.
6     Q. Okay.
7     A. If these were CRM deals, I wouldn't have
8 forecasted them.
9     Q. Why not?
10     A. Well, I think at this point in time people
11 would have wanted to see a little bit more stability
12 and sales reps weren't anxious to sell until they saw
13 a little bit more stability.
14     Q. All right. So these are either database
15 or --
16     A. Applications mainly or database naturally.
17     Q. All right.
18     A. Or financials, applications, or HR
19 applications, or supply chain applications, but not
20 CRM.
21     Q. All right. Under health care --
22     A. Hail Mary.

75

1     Q. The hail Mary remark?
2     A. Yeah.
3     Q. Is that you?
4     A. Yeah.
5     Q. Sounds like you.
6     A. Yes.
7     Q. It says that one is not in the pipeline,
8 is that just because it was so remote?
9     A. Well, it was 23 million dollars that we
10 didn't want to skew, and it's at Health South. The
11 people at Health South -- I don't mean this because
12 of what's happened today, they're pretty squirrelly
13 people. And you don't know if they're bullshitting
14 you and yeah, we're going to do it or for whatever
15 their pride was or they really wanted to do it. So
16 we just said, let's keep it going, keep on seeing
17 what will happen here. And it was in our forecast.
18 It was in our upside on the forecast side.
19     Q. Then the long-shot at Worldcom, what can
20 you tell me about that?
21     A. Oh, yeah, that's easy. Worldcom owed us,
22 I think it was 10 or 15 million dollars, I'm not sure

76

1 exactly how much, for support maintenance that they
2 hadn't paid in over 18 months. And I had, and I had
3 asked that we not shut off their support, I would go
4 pay them a visit because they're right here and see
5 if we could talk some sense into them.
6         And I went over there, met their CIO, his
7 name is Fred Briggs. He was taken back a lot by the
8 fact that we're now supposedly strong arming him into
9 getting paid, or the threat is we're closing off the
10 support.
11         I said, well, Fred, this is interesting.
12 But do you think 18 months is enough patience, well,
13 this is the first time it came to me. Liar. His
14 people who we spoke to prior to getting to see him
15 told him five quarters in a row, Fred, we've got to
16 pay this, Fred we've got to pay it. The only
17 difference is these poor people were getting fired,
18 they were never the same people because they were
19 getting terminated, so we'd have to start all over
20 again.
21         Hey, I know you're new in your job, I know
22 you don't want to piss off Fred, but would someone at

77

1    least tell him that this support is a problem.  Well,
2    it turned out that finally we got through to him and
3    finally we told him and he didn't like it.  And
4    therefore, the deal that we were going to propose for
5    him to save a lot of money, which I think Worldcom
6    would have liked, was an opportunity for us.
7         And we'd been so good to them by keeping
8    the support going, we actually thought we had an
9    opportunity, even though a long shot, for something
10   around 20 million dollars.
11        So I made the call myself and went over
12   there and Briggs was, unbeknownst to me and I'm not
13   smart -- I think I'm pretty smart, but I wasn't smart
14   enough to start to see the picture of
15   telecommunications unwinding in front of my very
16   eyes.  I told you the Lucent story, and I could tell
17   you the same Worldcom story, but I didn't know it at
18   the time.
19        That he wasn't going to buy anything, he
20   just wanted these 15 million dollars of software
21   support to go away.  I told him, either you pay or
22   I'm leaving and telling them to shut it off.  That's

78

1    not a real nice way to then open up an, oh, by the
2    way, would you like to buy this.
3         So he was still miffed by that and the
4    deal died because he wasn't -- he wanted to have it
5    go away.  You can't recognize 20 million dollars and
6    make 15 disappear, seems kind of foolhardy.  So we
7    stayed our course and as you speak today, I spoke to
8    Mike Capellas, who's actually a friend of mine, who
9    runs the place, and they're in the midst of a
10   lawsuit.
11        He thinks it's kind of crazy but -- so
12   that's where, so the deal died.  I guess that's a
13   long way to tell you because these things
14   unfortunately, if I ever wrote my memoirs, all these
15   have such stories to them, I'm trying not to be too
16   crazy by telling you every one of them in
17   excruciating detail, but the Worldcom meeting was one
18   of those.
19        Q   All right.
20        A   So if you notice just here in the telecom
21   space on 75 that you gave me, there's like, what, 50,
22   70.

79

1        Q   85?
2        A   85 million dollars of opportunities that
3    we should get some portion of, right?  And we were 0
4    for.  That's never happened to me before.  Only
5    because I could tell you the detail of every one of
6    those deals.  So that's why we were still so
7    optimistic.  As I said, the Lucent deal didn't end
8    until maybe the day before the end of the quarter or
9    two days before the end of the quarter, how could
10   they have said no to that offer that I shared with
11   you before, how could Worldcom not think about doing
12   what they did.  Qwest, Nachio, promised us the deal
13   and then probably got into problems we didn't know
14   about.
15        And so all of a sudden they stalled and at
16   AT&T we got them in Q4, they wanted us to commit to
17   give them more network business before they would
18   entertain the 20 million.
19        Q   A little tit for tat?
20        A   Oh, yeah, guns for whiskey.
21        Q   All right.
22        A   I'm just trying to show you the picture

80

1    that I'm dealing with here.
2        Q   Yeah.
3        A   How could I not have 85 million dollars.
4    I know that everyone's saying 160 to 190 is a range
5    moving around.  If I get 40 million of this, which
6    could have been any deal, any two deals, right, plus
7    Lucent, even at a smaller deal, I'm basically home
8    free, in the final.
9        Now, the hail Mary, this is how nuts this
10   quarter was, the quarter from hell, of all the deals
11   if you said to me which one will not happen, it was
12   Hell South, and Hell South happened.
13        So I've never -- I've been at this a long,
14   long time and have done a reasonably good job at it.
15   And it would be as if we went to the racetrack and
16   for the first 10 races I couldn't pick one if the
17   jockeys were telling me this was the one.  And in the
18   11th one I just closed my eyes and threw a dart and
19   picked Hell South and it won.  Because I thought that
20   was the longest of all long shots.  So it was that
21   kind of a quarter.  There was so much going on and
22   the time was running out so much.

81

1    Q. Okay. Let's talk about Dr. No for a

2  little bit.

3    A. Sounds like Larry Garnick.

4    Q. This is Exhibit 108.

5    A. And the question is?

6    Q. Well, I'm looking for your name, I thought

7  it was on here.

8    A. I've never seen this document.

9    Q. Really? Okay. Let's go to 110 then.

10   A. All right.

11   Q. That was fast.

12   A. Thank you, Larry. And?

13   Q. Do you remember seeing Exhibit 110 before?

14   A. When I -- I'm familiarizing myself with

15  it, yes.

16   Q. Okay. This, I believe, shows the actual

17  revenue results for December and January combined, is

18  that your understanding?

19   A. It says January actuals in dollars, and I

20  don't see where it says February. Now, I mean --

21  where do you see February, am I missing something?

22   Q. No. I said December and January.

82

1    A. I'm sorry, yes, December and January, yes.

2    Q. Okay. I see that on the second page that

3  both OSI and NAS had negative, negative growth for

4  those two months?

5    A. Correct. Correct.

6    Q. Was that a subject of discussion at the

7  Monday executive committee meetings?

8    A. They don't necessary -- this document

9  probably would provoke a good conversation about,

10  hey, guys, what's going on, we're lagging behind

11  pretty badly, when are we going to get going. And

12  then we flipped to, don't panic, here's a backlog of

13  opportunities, the pipeline, George Roberts, tell

14  them your story, Sandy, Jay, tell them your story.

15  And how comfortable or uncomfortable are you that

16  that backlog will yield blank.

17        In my case, I was unfortunately too

18  comfortable to think that it was going to yield that

19  number that I was shooting for, even though we only

20  had in at that moment that small amount of revenue.

21   Q. About a tenth of what you needed, right?

22   A. Yeah, we needed another 200 million. But,

83

1  you know, it's amazing not to take anything -- I'm

2  just rambling.

3        MR. GOLDSTEIN: Wait until he asks you

4  another question.

5    Q. Well, what were you going to say.

6    A. No, that's all right.

7    Q. Do you recall asking Larry Ellison to

8  authorize a special sales incentive in the third

9  quarter of 2001?

10   A. I did, yes.

11   Q. What, what incentive did you propose?

12   A. Well, I don't recall the exact incentive

13  but let me tell you, we were sitting in a good

14  position for the first six months. And the second

15  six months is the real push to make your quota or

16  plan or what have you.

17        So I thought that with all the deals that

18  I had out there, if I could incent the sales reps for

19  trying a tad bit harder and getting a little bit more

20  out of them, that I would guarantee a strong Q3,

21  potentially, and then put 4 without as much anxiety,

22  because I would have had more revenue booked earlier.

84

1  So that the ramp in Q4 wouldn't have been as great.

2  So I suggested for all of us that maybe a promotion

3  of some sort would be a wise thing.

4    Q. Was that in part because there were

5  problems with the CRM module and sales with that?

6    A. No, no. The CRM module was irrelevant to

7  these numbers because we weren't selling -- if you go

8  through the deals again, few if any were CRM-ish

9  deals. So, no, that wasn't for that reason.

10   Q. Okay. Was that incentive approved by

11  Larry?

12   A. No.

13   Q. Did he say why?

14   A. He didn't think we needed it.

15   Q. Okay. I'm going to hand you a copy of a

16  document that was marked as Exhibit 44, I don't have

17  numbers on the bottoms of these but -- and as you're

18  going through this, let me just tell you what this

19  is. This is a certain page from four upside reports

20  from December 2000 and January 2001. And since

21  there's only five minutes left on the videotape, why

22  don't we go off the record and change tape.

85

1      A  Sure.
2          THE VIDEOGRAPHER:  This marks the end of
3  tape one in the deposition of Mr. Nussbaum.  We're
4  going off the record.  The time is 11:52 a.m.
5          (Recess.)
6          THE VIDEOGRAPHER:  This marks the
7  beginning of tape two in the deposition of
8  Mr. Nussbaum.  We're back on the record.  The time is
9  11:54 a.m.
10  BY MR. DE GHETALDI:
11      Q  As I was saying, these are pages from
12  upside reports, the same page from a report dated
13  December 11th, 2000, which is the first page and
14  January 15th, 2001, the second page, January 29th,
15  2001, and February 5th of 2001.
16          And I'd like to ask you a couple of
17  questions about some of the numbers and the columns
18  on these pages.  Just to the right of the center of
19  the page, there's a column that's called, or titled,
20  "Q3 targeted 30 percent growth."  Do you see that?
21      A  Yes.
22      Q  What --

86

1      A  I'm sorry.
2          MR. DE GHETALDI:  Let's go off the record.
3          THE VIDEOGRAPHER:  We're going off the
4  record, the time is 11:55 a.m.
5          (Recess.)
6          THE VIDEOGRAPHER:  We're back on the
7  record.  The time is 11:56 a.m.
8          THE WITNESS:  Targeted 30 percent.
9  BY MR. DE GHETALDI:
10      Q  Yeah.
11      A  What's the question?
12      Q  What was that?  I mean, what was this
13  target?  Who set the target?
14      A  I have no idea who set it, but, you know,
15  you're thinking of a number beyond what you've done
16  in the previous year.  So 30 percent growth would be
17  a number that is doable.  I guess if I had been able
18  to do 245, I could have done 30 percent growth.
19      Q  Right.
20      A  I was only predicting to do 19 percent
21  growth with the 225.  Why they did that, find the
22  author and -- I mean, he could have made it 50

87

1  percent growth, too, I don't know.  I know there was
2  no magic about it.
3      Q  On December 14th, 2000, Oracle gave
4  guidance during the earnings conference call that it
5  expected to make 30 percent growth in its license
6  business.  Does that fact refresh your memory as to
7  where this targeted 30 percent growth came from?
8      A  No.  Because I was just looking at my own
9  operation and I thought maybe we can get it to 20.
10  Now, I did think that we could perhaps do -- this
11  might sound bizarre, but there was an outside chance
12  I can get to 275, you know, if the deals really start
13  to fall as they have in the past.
14          But at that point in time, I didn't -- I
15  was just more concerned, let me get to my 225 and
16  then if things start to really work, I could call in
17  happiness of each time another deal beyond 225 came.
18  So I never worried about to get to the 30 percent
19  growth.  But then there were others out there who
20  were doing pretty well at the time, which I was
21  unaware of.  And so I figured that was just a
22  corporate goal and I knew I was under it by about 11

88

1  percent.
2      Q  All right.  The -- there is a column
3  called forecast towards the left, where it looks
4  like, that's 225 million?
5      A  Right.
6      Q  Was that your forecast number?
7      A  Yes.
8      Q  Okay.  Then the next column over is
9  upside, is that an additional amount that Jennifer
10  Minton was putting on top of your forecast?
11      A  You'd have to ask Jennifer that.
12      Q  All right.
13      A  I was pretty consistent.  225 was the
14  number for quite a while, because the pipeline was so
15  rich, although days were beginning to run out.  But
16  we still were very optimistic that 225 would occur.
17      Q  At 225, according to this January 18th
18  e-mail from Sarah Kopp, she said you had $91 million
19  in judgment to get to that $225 million number.  Was
20  that a comparatively high or low amount of judgment?
21          MR. GOLDSTEIN:  Objection to form.
22      Q  You can answer.

89

```
1        A  Oh, with the enormity of our backlog, it
2   was not an unusually large judgment.  It was relative
3   to what the deals that were out there, and if you
4   added them all up, and you got your 30 percent of
5   them and you didn't even get the big ones, you just
6   got 30 percent of the total, that there was so much
7   out there that that was not an undoable event.
8        Q  All right.
9        A  And again, if you would, just remember,
10  I'm very confident during the period of this time
11  because of the words coming back from Lucent and the
12  State of New York that those are deals that we're
13  going to do.  So there's 50 million.  So it makes it
14  look a little bit less concerning.
15       Q  All right.  And that 50 million then, that
16  was 50 million that was not included in the senior
17  vice president commit number?
18       A  That's correct.
19       Q  That was part of your management judgment?
20       A  That is correct.
21       Q  All right.  If you would turn to the
22  second page of Exhibit 44, the -- I'm seeing two
```

90

```
1   changes there for OSI total, and that is --
2        A  Well, you're seeing the upside went away
3   and the potential went down.
4        Q  Well, I counted those as one.
5        A  Oh, I'm sorry.
6        Q  Because they go together, but I see the
7   pipeline going down by over a hundred, 110 million?
8        A  Right.
9        Q  Was that a normal way for the pipeline to
10  behave?
11       MR. GOLDSTEIN:  Objection to form.
12       A  Pipeline is a very unusual event, so they
13  don't act and behave the same way quarter after
14  quarter after quarter.  But it was nothing to be
15  concerned about, because the deals were being moved
16  to the fourth quarter and that's why it gets cleansed
17  because you know it's not going to happen.  So as the
18  months go on the pipeline naturally goes down,
19  because the pipeline is that which we think we're
20  going to do in Q4 -- Q3.
21       Q  Okay.
22       A  But 400 was quite a large number if you
```

91

```
1   stay with that.  And if we could do our 40 percent,
2   we were still home free.
3        Q  Well, how about the difference in the
4   forecast growth, as opposed to the pipeline growth.
5        MR. GOLDSTEIN:  Objection to form.
6        A  I don't know what you just asked me.
7        Q  Well, on the second page of Exhibit 44,
8   the forecast growth was 19 percent?
9        A  Yes.
10       Q  And the pipeline growth was 10 percent
11  over the prior year, same quarter?
12       A  One's not really relative to the other.
13       Q  It's not?  How, why not?
14       A  Well, let me say this, the quarter that
15  we're working in, if we deliver the 225, we'd hit 19
16  percent, year over year performance, right?
17       Q  Yes.
18       A  And in the pipeline year over year, we
19  were up, if I'm reading this correctly -- well,
20  that's even better, right?  In other words, you see
21  '00 pipeline was 397, '01 is 436.
22       Q  Yes.
```

92

```
1        A  That's good.
2        Q  Yes.
3        A  Oh, okay.
4        Q  By itself.
5        A  Yeah.
6        Q  But what I was asking about was the
7   relationship between the forecast growth percentage,
8   19 percent, and the pipeline growth percentage, 10
9   percent?
10       A  I've done this for 30 years, no one ever
11  thought that that was relevant.  So I would have to
12  say I don't know the relevance of that.  The only
13  relevance is that the pipeline year over year is
14  greater.  To me the concern would have been if that
15  pipeline was 200 million against the year before at
16  three something.
17       Q  Right.
18       A  But percentages, you know, you could, you
19  could drive yourself crazy on all little percentages,
20  unless they mean something.  What you described to me
21  doesn't register with me.
22       Q  Okay.  Then turning to the third page,
```

93

```
1   there we're at January 29th.  And that shows a
2   decline in the upside of 35 million dollars.  Do you
3   recall why that occurred?
4        MR. GOLDSTEIN:  Objection to form.
5        A   I don't even know why we did it.
6        Q   All right.  Now, if you turn to the last
7   page which is February 5th.  And that's showing the
8   forecast has declined to 210, do you see that?
9        A   Right.
10       Q   Back at Exhibit 74, we also saw the
11  forecast at 210 on January 29th.  And I'm just
12  wondering why, or if you know, why it took a week for
13  that change to appear in the upside report?
14       MR. GOLDSTEIN:  Objection to form.
15       A   I couldn't guess.
16       Q   Okay.  Do you recall during the executive
17  committee meetings discussions about Jennifer
18  Minton's potential numbers?
19       A   Say -- oh, Jennifer's -- yeah, she would
20  talk about what she thought.
21       Q   Yeah.
22       A   Okay.
```

94

```
1        Q   Okay.  How -- do you recall there being
2   any kind of working assumption that Jennifer Minton
3   had a better forecasting ability than the executive
4   vice presidents?
5        MR. GOLDSTEIN:  Objection to form.  I just
6   do that every so often.
7        A   No, I find that an interesting question.
8   Jennifer Minton is a finance person who's doing it
9   with a finance mentality.  And so the concern was
10  getting in her that, my goodness, we haven't booked a
11  lot of business.  And last year at this same time we
12  must have booked more business, how are we going to
13  get to the same number, the days are running out.
14       A veteran of having to have lived through
15  those would say, well, we better just run the table
16  with at least these six or seven deals, you are
17  correct.  She was getting nervous whether that was
18  doable or not.  She always used to find my number a
19  little bit more interesting because we've been
20  conservative most times.  And therefore, we would
21  always surprise them with an extra one or two at the
22  end of the day that were in that run the table list.
```

95

```
1   And so she was getting nervous because mine had gone
2   down quite a bit.
3        So she had a little bit dimmer view of the
4   number than I still did and George and Sandy at the
5   time.  And then anyone else that was on the call.
6   And that's good because you've got to hear it both
7   ways.  But remember, what was the date you just
8   mentioned?
9        Q   Well, I was talking, let's see --
10       A   February 5th, I think you said.
11       Q   Well, when I asked the question I didn't
12  use a particular date.  I was asking in general.
13       A   Well, in general, it's an irrelevant
14  question, because if it's the first day of the new
15  quarter, she wouldn't even say anything.
16       Q   All right.
17       A   If it's December 2nd, the subject doesn't
18  come up.  On December 15th, she has no data to say
19  anything.  By January 15th, a picture's being played
20  that you can now go back and use statistical data.
21  By February 5th, I just threw that out.
22       Q   Right.
```

96

```
1        A   You can come back and it could be more
2   relevant than it was on January 5th.  So it's all a
3   matter of timing when Jennifer is asked these
4   questions or brings these up.
5        Q   Okay.  So --
6        MR. GOLDSTEIN:  I'm going to move to
7   strike that, the answer is not responsive to the
8   question.  Just to note that in the record.  I think
9   we can still do that in Delaware.
10       MR. DE GHETALDI:  That's fine.
11  BY MR. DE GHETALDI:
12       Q   So I understand, one of the themes, if you
13  will, of Jennifer Minton's comments during the
14  executive committee meetings was how well the
15  different divisions were doing based on prior years'
16  actual revenues, is that --
17       MR. GOLDSTEIN:  Objection to form.
18       Q   Is that accurate?
19       A   I can't -- it depended on the quarter.  It
20  wasn't as consistent a behavior.
21       Q   Do you recall those discussions occurring
22  in January 2001?
```

97

1     A  I think January was an interesting quarter
2 because of the degree of business we had not yet
3 booked.  And therefore her information was more
4 relevant.
5     Q  All right.  I think you said January was
6 an interesting quarter, did you mean January --
7     A  I meant, excuse me, the third quarter.
8     Q  Right.  And so do you recall discussions
9 about the degree of business you had not booked
10 occurring during the January 2001 executive committee
11 meetings?
12     MR. GOLDSTEIN:  I'm sorry, could I just --
13 I need to -- I need to look over your shoulder for a
14 second.  It's a do you recall question.
15     MR. DE GHETALDI:  Yes.
16     MR. GOLDSTEIN:  Okay.  Go ahead.
17     THE WITNESS:  I don't recall anything in
18 January as much as I would recall February.
19 BY MR. DE GHETALDI:
20     Q  Okay.  Do you recall anything in January?
21     MR. GOLDSTEIN:  Objection to form.
22     Q  About that subject?

98

1     A  About that subject.  No,
2 nothing -- January we were still optimistic things
3 were going good.
4     Q  All right.
5     A  So January we were in good stead with
6 deals, the pipe, everything was strong, it was not a
7 problem.
8     Q  If you go back to Exhibit 108, I know you
9 didn't see that, but that's the Dr. No's January
10 2001.
11     A  Right.
12     Q  Report for December.
13     A  Yes, what about it?
14     Q  On the second page, like the combined
15 January/December report that came out in early
16 February, this one looks like it's just December
17 dollars.  And it also shows both OSI and NAS being
18 behind the prior year, actual revenues.  Does this
19 refresh your memory as to whether there were
20 discussions about the state of the actual revenues
21 compared to the prior year during the January --
22 during the January executive committee meetings?

99

1     MR. GOLDSTEIN:  Objection to form.
2     A  Let me just say the following:  This
3 quarter in December and January was not in jeopardy,
4 in my mind.  Nor was it in jeopardy in the first two
5 weeks of February.  I had an unusually fine record of
6 being able to forecast business.  And I had intimate
7 knowledge of the large deals that would swing it our
8 way to that 200 plus forecast.
9     And had it took its normal course, not any
10 luck, its normal course, we would have done 225, and
11 we would have done it all in February.  So I was
12 never concerned one bit -- I'm sorry, I'm just
13 waiting for my wife.
14     MR. DE GHETALDI:  Okay.  Go off the
15 record.
16     THE VIDEOGRAPHER:  We're going off the
17 record.  The time is 12:15 p.m.
18     (Recess.)
19     THE VIDEOGRAPHER:  We're back on the
20 record.  The time is 12:18 p.m.
21     MR. GOLDSTEIN:  I think we need a new
22 question, I think.  Unless maybe he wasn't finished

100

1 with an answer.
2 BY MR. DE GHETALDI:
3     Q  Were you finished?
4     A  Yeah.
5     Q  Okay.
6     A  We do need a new question.
7     Q  All right.  I'm happy to supply that,
8 along with a new exhibit.  And this is going to be
9 85.
10     (Deposition Exhibit Number 85 was marked
11 for identification and attached to the transcript.)
12     MR. DE GHETALDI:  Write on mine, so I
13 don't get confused.
14     MR. GOLDSTEIN:  Get one for the court
15 reporter.
16     MR. DE GHETALDI:  And get one for the
17 court reporter.  Okay.
18     THE WITNESS:  What page?
19 BY MR. DE GHETALDI:
20     Q  Have you ever seen this document before?
21     A  Yes.
22     Q  And when did you first see this?

101

1    A  I got a copy of it, I guess, maybe a week

2  or so ago.

3    Q  Okay.  Did you read it?

4    A  Yeah.

5    Q  Okay.  Was it accurate in terms of being

6  an accurate summary of what you told the special

7  litigation committee of lawyers about a year and a

8  half ago?

9    A  I thought it was, yes.

10    Q  All right.  That's it.

11       MR. GOLDSTEIN:  I have no questions.

12       MR. NACHBAR:  No questions.

13       MR. DE GHETALDI:  And we have the same --

14       MR. GOLDSTEIN:  Yes.

15       MR. DE GHETALDI:  -- issue with this

16  deposition as we have had with the others about the

17  documents.

18       MR. GOLDSTEIN:  We will agree to disagree

19  once again.

20       MR. DE GHETALDI:  Yeah, that's right.

21       THE VIDEOGRAPHER:  This marks the end of

22  the deposition of Jay Nussbaum.  The number of tapes

102

1  used was two.  We are going off the record.  The time

2  is 12:20 p.m.

3       (Signature having been not waived, the

4  deposition of JAY NUSSBAUM was concluded at

5  12:20 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

103

1       ACKNOWLEDGMENT OF DEPONENT

2       I, JAY NUSSBAUM, do hereby acknowledge

3  that I read and examined the foregoing testimony,

4  and the same is a true, correct, and complete

5  transcription of the testimony given by me and any

6  corrections appear on the attached Errata sheet

7  signed by me.

8

9  _____     _____

10  (DATE)              (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

104

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2       I, Cynthia R. Simmons, Registered

3  Merit Reporter, Certified Realtime Reporter,

4  the officer before whom the foregoing deposition was

5  taken, do hereby certify that the foregoing

6  transcript is a true and correct record of the

7  testimony given; that said testimony was taken by me

8  stenographically and thereafter reduced to

9  typewriting under my supervision; and that I am

10  neither counsel for or related to, nor employed by

11  any of the parties to this case and have no interest,

12  financial or otherwise, in its outcome.

13       IN WITNESS WHEREOF, I have hereunto

14  set my hand and affixed my notarial seal this

15  31st day of March 2004.

16  My commission expires:

17  November 30, 2004

18  _____

19  NOTARY PUBLIC IN AND FOR

20  THE COMMONWEALTH OF VIRGINIA

21

22

NUSSBAUM, JAY  3/23/2004  12:00:00 AM

105

1           E R R A T A  S H E E T

2      IN RE:   ORACLE CORP. DERIVATIVE LITIGATION

3      RETURN BY:_____

4      PAGE   LINE       CORRECTION AND REASON

5      ____  ____   _____

6      ____  ____   _____

7      ____  ____   _____

8      ____  ____   _____

9      ____  ____   _____

10     ____  ____   _____

11     ____  ____   _____

12     ____  ____   _____

13     ____  ____   _____

14     ____  ____   _____

15     ____  ____   _____

16     ____  ____   _____

17     ____  ____   _____

18     ____  ____   _____

19     ____  ____   _____

20     ____  ____   _____

21     _____   _____

22      (DATE)          (SIGNATURE)


106

1           E R R A T A  S H E E T(CONTINUED)

2      IN RE:   ORACLE CORP. DERIVATIVE LITIGATION

3      RETURN BY:_____

4      PAGE   LINE       CORRECTION AND REASON

5      ____  ____   _____

6      ____  ____   _____

7      ____  ____   _____

8      ____  ____   _____

9      ____  ____   _____

10     ____  ____   _____

11     ____  ____   _____

12     ____  ____   _____

13     ____  ____   _____

14     ____  ____   _____

15     ____  ____   _____

16     ____  ____   _____

17     ____  ____   _____

18     ____  ____   _____

19     ____  ____   _____

20     ____  ____   _____

21     _____   _____

22      (DATE)          (SIGNATURE)