# EXHIBIT S

Yourdon, Edward  7/3/2007  9:07:00 AM

**1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4
 5   In re ORACLE CORPORATION
 6   SECURITIES LITIGATION.
 7            Master File No. C-01-0988-MJJ
 8   This Document Relates To:
 9
10   ALL ACTIONS.
11   _____/
12
13            ---o0o---
14
15   VIDEOTAPED DEPOSITION OF EDWARD YOURDON
16            TUESDAY, JULY 3, 2007
17            ---o0o---
18
19
20       SHEILA CHASE & ASSOCIATES
                REPORTING FOR:
21          LiveNote World Service
            221 Main Street, Suite 1250
22          San Francisco, California 94105
                Phone: (415) 321-2311
23              Fax: (415) 321-2301
24   Reported by:
     DIANA NOBRIGA, CSR, CRR
25   LICENSE NO. 7071
```

**3**

```
 1          BE IT REMEMBERED that on Tuesday, July 3,
 2   2007, commencing at the hour of 9:07 a.m., thereof, at
 3   the LAW OFFICES OF LERACH, COUGHLIN, STOIA, GELLAR,
 4   RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite 2600,
 5   San Francisco, California, before me, DIANA NOBRIGA, a
 6   Certified Shorthand Reporter in and for the State of
 7   California, personally appeared
 8            EDWARD YOURDON,
 9   as a witness by the plaintiffs herein, who, being by me
10   first duly sworn, was thereupon examined and testified
11   as hereinafter set forth.
12            ---o0o---
13   Appearing as counsel on behalf of the Plaintiffs:
14       SHAWN A. WILLIAMS, ESQUIRE
         DANIEL PFEFFERBAUM, ESQUIRE
15       MONIQUE C. WINKLER, ESQ.
         LERACH, COUGHLIN, STOIA, GELLAR,
16       RUDMAN & ROBBINS
         100 Pine Street, Suite 2600
17       San Francisco, CA 94111
         Shawnw@lerachlaw.com
18
19   Appearing as counsel on behalf of Defendants:
20       MATT RAWLINSON, ESQUIRE
         MELANIE BLUNSCHI, ESQUIRE
21       LATHAM & WATKINS
         140 Scott Drive
22       Menlo Park, CA 94025-1008
         matt.rawlinson@lw.com
23
24   Also Present:  Dorian Daley, Oracle; Elizabeth Skye,
25   Oracle; James Terrell, Videographer
```

**2**

```
 1                I N D E X
 2            INDEX OF EXAMINATION
 3                          PAGE
 4   EXAMINATION BY MR. WILLIAMS      5, 242
 5   EXAMINATION BY MR. RAWLINSON      241
 6            ---o0o---
 7            INDEX OF EXHIBITS
 8   DESCRIPTION                    PAGE
 9   Exhibit 1   Confidential Expert Report of
10       Edward Yourdon, dated May 25,
11       2007                  9
12   Exhibit 2   Confidential Expert Report of
13       Edward Yourdon, dated May 25,
14       2007                  244
15   Exhibit 3   Confidential Rebuttal Expert
16       Report of Edward Yourdon,
17       dated June 22, 2007      244
18
19
20
21
22
23
24
25
```

**4**

```
 1          VIDEOGRAPHER:  This begins the videotaped
 2   deposition of Edward Yourdon, tape one, Volume I, in the
 3   matter In Re Oracle Securities Litigation, as filed in
 4   the United States District Court for the Northern
 5   District of California, Master File No. C-01-0988-MJJ.
 6   Today's date is July 3, 2007.  The time on the video
 7   monitor is 9:07.  The video operator today is James
 8   Terrell, representing LiveNote World Service, located at
 9   221 Main Street, Suite 1250, San Francisco, California
10   94105.  The phone number is 415 321-2300.  The court
11   reporter is Diana Nobriga with Sheila Chase and
12   Associates, reporting on behalf of LiveNote World
13   Service.  And today's deposition is being taken on
14   behalf of plaintiff, and is taking place at 100 Pine
15   Street in San Francisco, California.  If counsels will
16   now please introduce yourself and state whom you
17   represent.
18          MR. WILLIAMS:  Shawn Williams, Lerach Coughlin
19   Stoia Geller Rudman and Robbins on behalf of plaintiffs.
20          MR. PFEFFERBAUM:  Daniel Pfefferbaum, Lerach
21   Coughlin on behalf of plaintiffs.
22          MS. WINKLER:  Monique Winkler, Lerach Coughlin
23   on behalf of plaintiffs.
24          MR. RAWLINSON:  Matt Rawlinson, Latham and
25   Watkins on behalf of defendants.
```

5

1     MS. BLUNSCHI: Melanie Blunschi, Latham and
2  Watkins on behalf of the defendants.
3     MS. DALEY: Dorian Daley, Oracle Corporation.
4     MS. SKYE: Elizabeth Skye, Oracle Corporation.
5     VIDEOGRAPHER: Thank you.  You may swear the
6  witness and then begin.
7     EDWARD YOURDON
8  having been duly sworn, testified as follows:
9     EXAMINATION BY MR. WILLIAMS
10     MR. WILLIAMS: Q.  Good morning.  Can you
11  state your full name for the record, please.
12     A.  Yes.  My full name is Edward Yourdon.
13     Q.  And does that include a middle initial?  Is
14  there a middle name there?
15     A.  For a period of time in the early 1980's I
16  used a middle initial, it was never part of my legal
17  name.  It was my wife's surname.
18     Q.  What was that initial?
19     A.  Nash.  N for Nash.
20     Q.  Did you ever publish anything with Edward Nash
21  Yourdon?
22     A.  I believe one of the textbooks that I
23  published in the early 1980s was published as Edward
24  Nash Yourdon.
25     Q.  What is your current address?

6

1     A.  275 West 96th Street in New York City.
2     Q.  You've testified in depositions before?
3     A.  Yes, I have.
4     Q.  So you have a decent idea of what's going to
5  happen here today?
6     A.  I think so, yes.
7     Q.  I'm just going to give you a brief overview.
8  The reporter sitting to your right is going to take down
9  all of the comments here today, my questions, your
10  answers, your lawyer's comments.  Unfortunately, she is
11  unable to record head nods or hand gestures.  So, in
12  response to any of my questions, I'll just ask you to
13  verbalize your responses.  Do you understand that?
14     A.  Yes, I do.
15     Q.  You understand you are also testifying under
16  oath today and the oath that you've taken is the same
17  oath that would apply in a court of law.  You understand
18  that?
19     A.  Yes, I do.
20     Q.  We'll take several breaks today.  We can take
21  them whenever you require or whenever you need.  I plan
22  to take a break maybe every hour, hour and ten minutes.
23  But if you need a break at any time, just let me know,
24  I'll finish my question or a line of questioning, then
25  we can take a break.  It's totally up to you.  Do you

7

1  understand?
2     A.  Yes, I do.
3     Q.  Now, throughout the day it's very likely that
4  Mr. Rawlinson is going to object to my questions, and he
5  has a right to do that.  However, unless he instructs
6  you not to answer a question, you still have to answer
7  the question.  Do you understand that?
8     A.  Yes, I do.
9     Q.  And I'm going to ask you a lot of questions,
10  I'll try to be as clear as I can.  There is no doubt
11  some of them will not come out the way that I want them
12  to.  If you don't understand the question, ask me to
13  repeat it or clarify it, and I will do the best I can to
14  do that.  Do you understand?
15     A.  Yes, I do.
16     Q.  Any reason why you can't testify today?  On
17  any medication that might impact your ability to recall
18  facts?
19     A.  No.  No reason.
20     Q.  There are a couple of comments made before we
21  went on the record regarding your report.  I understand
22  that you found some typographical errors, or they were
23  characterized as typographical errors in your report
24  that you want to correct?
25     A.  Yes, that's correct.

8

1     Q.  I'm not going to have them corrected right now
2  on the record.  If they become apparent during the
3  testimony today, you let me know, and we will deal with
4  them that way.
5     If at some point you think you want to amend
6  the report, if there are significant changes, I guess
7  you can do that, and we'll deal with that later.  But I
8  think trying to go through those changes prior to the
9  testimony will be time consuming and not helpful for me.
10  Do you understand?
11     A.  Yes.
12     Q.  When was the last time you testified in a
13  deposition?
14     A.  In a deposition, last week.
15     Q.  Last week.  And geographically, where was
16  that?
17     A.  That was in Houston, Texas.
18     Q.  And was that in a lawsuit in court or was it
19  in arbitration?
20     A.  That was a lawsuit in court.
21     Q.  And who were the parties to that action?
22     A.  The parties are a company called Fair Isaac,
23  that's two words, F-a-i-r, Isaac, I-s-a-a-c.  The other
24  party is Texas Mutual Insurance Company.
25     Q.  And were you testifying as an expert in that

Yourdon, Edward  7/3/2007  9:07:00 AM

9

1   case?
2        A.   Yes, I was.
3        Q.   Relating to computer programming or computer
4   software?
5        A.   Yes, that's correct.
6        Q.   And you were testifying on behalf of which
7   party?
8        A.   On behalf of Fair Isaac Company.
9        Q.   Now, prior to last week, when was the last
10  time that you testified in a deposition?
11       A.   As best I can recall, it was October of 2006.
12       Q.   About a year ago?  About seven months ago?
13       A.   Yes, that's right.
14       Q.   And who were the parties to that action?
15       A.   The parties were Computer Task Group, three
16  words, and the other party was a company called XPAN,
17  all capital letters, X-P-A-N.
18       Q.   And who were you testifying on behalf of in
19  that action?
20       A.   On behalf of Computer Task Group.
21            (Exhibit 1 marked for
22            identification.)
23            MR. WILLIAMS:  Q.  Actually, let me show you
24  what's been marked as Exhibit No. 1, Yourdon No. 1, and
25  it is your report dated May 25th of 2007.

10

1        Do you recognize that report?
2        A.   Well, I certainly recognize the cover page.
3        Q.   Well, you can just thumb through it, if you
4   like.  I don't think we've done anything to it.  And
5   just let me know if it fairly and accurately depicts the
6   report that you filed in this case.
7        A.   Yes, it appears to, just thumbing through the
8   pages.  I don't see any missing pages.
9        Q.   When is the last time you saw the report?
10       A.   The last time I saw this report, yesterday.
11       Q.   And prior to that, when was the last time you
12  saw it?
13       A.   Probably the day before yesterday.
14       Q.   Okay.  I'm going to ask you to just turn to
15  page 144 of the report.  Are you there?
16       A.   Yes.
17       Q.   You see that's titled the "Appendix B Cases in
18  Which Expert Testimony Provided in the Past Four Years"?
19       A.   Yes, that's correct.
20       Q.   You list approximately 19 different actions or
21  instances in which you provided expert testimony; right?
22       A.   That's correct.
23       Q.   And is that an accurate list, to the best of
24  your knowledge, of all the cases in which you provided
25  testimony in the last four years?

11

1        A.   With the exception of this most recent case
2   you asked me about just a moment ago for which the case
3   has not gone to trial yet, but my deposition took place
4   subsequent to the filing of this report.
5        Q.   Okay.  And none of the -- most of them are
6   arbitrations appearing after number 7 down through 16 or
7   15, did all of those occur within the last four years?
8        A.   Yes, that's correct.
9        Q.   Are you able to tell just based on this list
10  when the earliest testimony is?  Are these in chron
11  order?
12       A.   They are in chronological order with the most
13  recent one first.
14       Q.   On the top?
15       A.   Yes, that's correct.
16       Q.   Now, starting with number 7 down through
17  number 14, it looks like you were a participant in some
18  fashion in multiple lawsuits relating to or with J.D.
19  Edwards.
20       A.   That's correct.
21       Q.   Is that fair?
22       A.   Yes.
23       Q.   And you provided expert testimony in each of
24  those lawsuits?
25       A.   That's correct.  At least to the extent of

12

1   deposition, in some cases the matter was settled before
2   the actual hearing.  But, yes is the short answer to
3   your question.
4        Q.   And in each of those cases, were you
5   testifying on behalf of J.D. Edwards?
6        A.   That's correct.
7        Q.   Did you have -- were you working for J.D.
8   Edwards?
9        A.   No, sir, I was not.
10       Q.   Did you have a relationship with J.D. Edwards
11  that required you to provide testimony on their behalf
12  in lawsuits at all?
13            MR. RAWLINSON:  Objection; vague.
14            THE WITNESS:  No, I did not.
15            MR. WILLIAMS:  Q.  So they just in each of
16  these lawsuits they requested your help and you provided
17  it?
18       A.   I was retained by counsel for J.D. Edwards to
19  provide help, to represent J.D. Edwards, yes.
20       Q.   And was it the same counsel in each one of
21  those cases?
22       A.   Yes, as I recall.  For number 14 there was a
23  transition under way from the counsel that had been
24  representing J.D. Edwards throughout all these cases to
25  a different one; as part of the acquisition by

Yourdon, Edward 7/3/2007 9:07:00 AM

13

1 PeopleSoft of J.D. Edwards a different law firm became
2 involved. As I recall for number 14, the original law
3 firm for whom I had provided the earlier services and
4 the newer law firm were both involved.
5   Q. And in each --
6   A. Excuse me for a moment. I think that may have
7 been true as well for number 13, although number 13 was
8 settled before the hearing. But I believe the new law
9 firm was also becoming involved in the transition period
10 at that point.
11   Q. When you say the hearing, do you mean trial or
12 an arbitration hearing where your testimony might be
13 used?
14   A. An arbitration hearing, as I've indicated, I
15 think with all the cases number 7 through 14, all of
16 them were arbitration hearings.
17   Q. Was J.D. Edwards a defendant in each one of
18 those cases?
19   A. One of, in several cases, one of many
20 defendants, but at least a defendant, yes.
21   Q. And was some issue in each of those cases J.D.
22 Edwards software?
23   MR. RAWLINSON: Objection to the form.
24   THE WITNESS: That was, I believe, in every
25 single case, at least one of the issues, though not

14

1 necessarily the only one, yes.
2   MR. WILLIAMS: Q. Were any of the companies
3 that were suing J.D. Edwards that you list here in 8
4 to -- or 7 through 14, were any of those companies also
5 software companies or were they customers of J.D.
6 Edwards?
7   A. Those two characterizations are not
8 necessarily mutually exclusive. They were all customers
9 of J.D. Edwards. Looking through them, number 11 was a
10 retailer, an online Internet reseller of computer
11 equipment. And I believe they had some software
12 capabilities or some software division. But in this
13 particular matter they functioned as a customer of J.D.
14 Edwards. And I don't believe the other ones could be
15 characterized as software companies at all.
16   Q. Have you ever provided testimony or expert
17 testimony on behalf of a party in a lawsuit against a
18 software vendor?
19   A. Number 19 on the list would fall into that
20 category.
21   Q. So Bsquare was a software vendor?
22   A. Yes, that's correct.
23   Q. And SAGEM --
24   A. Yes, that's correct, I'm sorry.
25   Q. And SAGEM Morpho was what kind of company?

15

1   A. It was the American subsidiary of a French
2 telecommunication company making cell phones for which
3 they required some software that was going to be
4 provided by Bsquare.
5   Q. Okay. But none other than number 19 on that
6 list are cases where you provided expert testimony on
7 behalf of a party that was suing a software vendor?
8   A. That is correct.
9   Q. When were you retained in this case?
10   A. As I recall, approximately January of this
11 year. I don't recall the precise date.
12   Q. I'm assuming that you reviewed documents prior
13 to writing your report?
14   A. Yes, I did.
15   Q. What documents, if you can describe generally
16 in terms of volume, what documents were provided to you
17 and in what form?
18   A. Let me answer the second part of your question
19 first, since it is a little bit easier. I was provided
20 with documents both in printed hard copy form and also
21 in electronic form, either on CD or DVD, or in some
22 cases transmitted to me electronically as PDF files or
23 text files. So those are the two general formats. And
24 the general categories consisted of depositions and
25 exhibits for numerous witnesses in this case, technical

16

1 documentation associated with the Oracle Suite 11i
2 product, a number of analyst reports originally written
3 or published by stock market analysts or technical
4 analysts in the computer field, a number of articles
5 published in trade magazine public cases about the
6 product and some of the circumstances during the
7 relevant time period, a large number of documents
8 consisting of e-mail correspondence between various
9 parties, PowerPoint presentations made at various times
10 by various individuals as well. I'm not sure whether there are other categories
11 as well. I'm not sure whether they are itemized
12 particularly here. Those are the ones that come to mind
13 at the moment.
14   Q. You said you got some hard copy documents.
15 Were those in boxes shipped to you?
16   A. Initially as I recall, several boxes, and then
17 periodically the individual documents or packages of
18 documents that would be sent in a Fed Ex envelope.
19   Q. In terms of boxes, approximately how many
20 boxes of documents, hard copy, did you receive?
21   A. Initially, this is only a very rough estimate,
22 but I would say on the order of eight to ten boxes.
23   Q. And then you got some text files or some CDs?
24   A. Both.
25   Q. Let's start with the CDs. How many CDs did

17

1  you receive?
2  A.  Again, this, is a rough estimate, but I would
3  estimate on the order of a dozen CDs.
4  Q.  Okay.
5  A.  Though I can't recall sitting here which ones
6  were CDs and which ones were DVDs, and there is a
7  significant difference in capacity between the two.  But
8  in terms of something in some computer readable medium,
9  it is on the order of a dozen such things.
10  Q.  That would include both the CDs and the DVDs?
11  A.  That's right.
12  Q.  Approximately 12; all right.  And you said
13  that you received many deposition transcripts?
14  A.  Yes, that's correct.
15  Q.  Did you get those on one of the CDs or DVDs or
16  also get those in hard copy?
17  A.  As I recall, I received them both
18  electronically, in some cases shortly after the
19  deposition had been taken, would be transmitted to me by
20  e-mail.  Many of them were organized en mass, in a batch
21  of depositions sent to me on a single CD.  And I
22  believe, as I recall, that I received some as well in
23  hard copy form, though sitting here at the moment I
24  can't recall the extent of overlap, whether there were
25  any that I received only in hard copy but not in

18

1  electronic form.
2  Q.  Okay.
3  A.  It was more likely to be the opposite, that I
4  would have received electronic versions, which if I
5  found convenient I could print out on my own.
6  Q.  Sure.  With respect to the deposition
7  transcripts that you received in electronic form on CDs,
8  were those among the CDs that we just talked about, 12,
9  or were these additional CDs?
10  A.  No.  They were among the CDs that I mentioned.
11  Q.  Among those; okay.  Do you know how many
12  depositions were taken in this case?
13  A.  I don't.
14  Q.  Do you think or do you believe that you have
15  reviewed them all?
16  A.  No.  I did not ask to nor was I asked to
17  review depositions associated with aspects of this case
18  that are beyond my assignment.  Some of the accounting
19  matters and forecasting matters, as I understand, had
20  depositions involving appropriate witnesses.  So, those
21  I definitely did not review.
22  Q.  All right.  Let me -- well, you did provide
23  some generalized opinion regarding forecasting matters
24  though; didn't you?
25  MR. RAWLINSON:  Objection; mischaracterizes

19

1  the witness's report.
2  THE WITNESS:  I offered opinions in a couple
3  of parts of my reports that had to do with such matters,
4  yes.
5  MR. WILLIAMS:  Q.  Right.  So do you know
6  whether you reviewed all of the depositions concerning
7  or which touched upon forecasting issues in this case?
8  MR. RAWLINSON:  Objection; vague and
9  ambiguous.
10  THE WITNESS:  I don't know.  The ones that I
11  reviewed in that particular area have been itemized and
12  cited in my report.
13  MR. WILLIAMS:  Q.  Okay.  And just going back
14  to my earlier question as to whether or not you reviewed
15  all of the depositions, I think your testimony generally
16  was that you did not review or you don't believe you
17  reviewed depositions relating to other portions of the
18  case that may not be related to your expert testimony;
19  is that fair?
20  A.  Not quite.  As I tried to qualify it, I did
21  not make any attempt to review the brood range of all
22  such depositions in other financial and forecasting and
23  accounting matters.  I was asked to review a limited
24  number of such depositions, which I did, and which are
25  cited in my report.

20

1  Q.  So any deposition that is not cited in your
2  report relating to issues other than computer
3  programming type issues you did not review?
4  A.  I believe that's too narrow.  Because some of
5  the depositions that were relevant to my report involve
6  things beyond just computer programming, per se.  I was
7  trying to characterize the depositions associated with
8  accounting and financial and forecasting things as
9  opposed to anything associated with the product or the
10  implementation of the product or the success of the
11  product in customer implementation.  Those are the ones
12  I concentrated on.
13  Q.  Did you select the depositions you were going
14  to review or did someone else select them for you?
15  MR. RAWLINSON:  Objection; ambiguous.
16  THE WITNESS:  It was a combination.  In some
17  cases counsel suggested to me that they felt certain
18  depositions would be useful.  In other cases either I
19  saw reference to other depositions or references to
20  individuals that I thought were probably important
21  enough that they might have been deposed, so I asked if
22  such depositions had been taken and if I could review
23  them.
24  MR. WILLIAMS:  Q.  With respect to the
25  documents you received, who selected the documents that

21

1  were sent to you, if you know?
2       MR. RAWLINSON:  Same objection.
3       THE WITNESS:  Again, this was a combination.
4  In some cases documents were selected for me by counsel,
5  by various individuals within counsel's firm, in other
6  cases I asked for documents, either based on my general
7  familiarity with the subject matter or my expectation
8  that they probably would be such documents, or based on
9  issues that I saw being raised in the depositions, I
10  would initiate a request.
11      MR. WILLIAMS:  Q.  Did you ever ask whether or
12  not there was some database that you could connect to
13  and have access to all of the documents so that you
14  could do your own independent searches for information?
15      A.  No, I did not.
16      Q.  Why not?
17      A.  I felt that it was as practical and
18  expeditious to simply identify and ask for the documents
19  that I felt were relevant.
20      Q.  And did you think that there was some time
21  pressure between the time that you were retained and the
22  time you had to actually get a report done that impacted
23  that decision?
24      A.  No, not time pressure -- well, not time
25  pressure in a specific sense.  I did have the general

22

1  impression that there was a vast quantity of documents
2  involved so that whether the time issue for my report or
3  trial was five months or seven months or a year, I had
4  the general impression there may well have been a
5  lifetime of reading that I could have done if I had
6  asked to see all the documents.
7       Q.  Sure.  I wasn't talking about until trial.  I
8  was talking about until the time you had to actually
9  submit a report.
10      A.  No.  My decision was not influenced by
11  perception of time pressure.
12      Q.  Okay.  So it's fair to say, isn't it, that
13  there may be some documents that relate to the issues
14  that you're opining on or you've offered an opinion on
15  that you may not have seen or considered?
16      A.  That's possible.
17      Q.  Now, prior to May 25th of 2007 when you
18  submitted this report, had you talked to any current or
19  former Oracle employees concerning the matters raised in
20  this action?
21      A.  Yes, I did.
22      Q.  Which ones?
23      A.  I don't know if I can recall all of them
24  sitting here right now.  I believe I spoke to Mr. Alan
25  Fletcher, I believe I spoke to Mr. Cliff Godwin, and I

23

1  believe there may have been two or three others whose
2  names don't come to mind at the moment.
3       Q.  So at the most is it fair to say that you
4  spoke to five current or former Oracle employees
5  concerning the matters raised in this action?
6       A.  I don't think I would want to be pinned down
7  to a precise number like five.  I think it would be fair
8  to say less than a dozen, but it is somewhere in the
9  range of four to a dozen, as I recall.
10      Q.  Were those people all current employees or
11  were they former employees?
12      A.  Current employees.
13      Q.  All current?
14      A.  Yes.
15      Q.  Okay.  So did you talk to layer Larry Ellison?
16      A.  No, I did not.
17      Q.  Did you talk to Keith Block?
18      A.  I don't recall having spoken to Mr. Block.  I
19  don't think so.  But I would have to check my records to
20  be absolutely certain.
21      Q.  Would that -- withdrawn.
22          I guess it is fair to assume you didn't speak
23  to Mark Barrenechea?
24      A.  That is a fair assumption, yes.  My
25  understanding is that he's no longer employed by Oracle,

24

1  not that that would have prevented me necessarily.  But,
2  no, I did not speak to Mr. Barrenechea.
3       Q.  Exactly.  And you didn't speak to Ron Wohl
4  either?
5       A.  I don't believe I did.  I don't recall having
6  spoken to him.
7       Q.  You understand that Ron Wohl and Mark
8  Barrenechea were the primary developers of the software
9  that's at issue in this action?
10      MR. RAWLINSON:  Objection to form, vague and
11  ambiguous.
12      THE WITNESS:  My understanding is that they
13  were the senior executives in charge of the respective
14  development efforts you've mentioned.  Whether they
15  would be called developers, I don't know whether I would
16  go that far.  They were executive vice-presidents or
17  senior vice-presidents.  But I don't know that they
18  actually wrote code.
19      MR. WILLIAMS:  Q.  I'm not going to quibble
20  over whether or not they were developers.  You
21  understood they were the two people in charge of the
22  development of the software at issue in this case?
23      MR. RAWLINSON:  Same objection.
24      THE WITNESS:  They were in charge of the two
25  main components, the ERP and CRM components of the

25

1   software, which certainly were the major components. I
2   don't know whether it represented exactly 100 percent,
3   but certainly the dominant part, yes.
4        MR. WILLIAMS:  Q.  Have you heard of Don
5   Klaiss?
6        A.  Yes, I have.
7        Q.  Have you talked to him?
8        A.  I don't believe so.  No, I don't believe I
9   have.
10       Q.  How about have you heard of Greg Seiden?
11       A.  Yes, I have.  As I recall, I did speak to
12  Mr. Seiden.
13       Q.  What did you talk to him about?
14       A.  I don't recall the details at this point.  I
15  don't believe that I've cited any conversations or
16  conclusions drawn from that conversation.  So it would
17  have been general issues about the software and how it
18  was developed.
19       Q.  And none of what -- none of the product of
20  that conversation ended up in your report, the May 25th
21  report?
22       A.  Certainly not in the form of citations.  It
23  may well have provided some background information for
24  other documents that I could track down or things of
25  that nature.  So it would have been taken into account,

26

1   but not relied on specifically.
2        Q.  Have you heard of Michael Rocha?
3        A.  Yes, I have.
4        Q.  Have you talked to him?
5        A.  I don't believe I spoke to him, no.
6        Q.  In your preparation for the drafting of your
7   report, did you speak to any current or former Oracle
8   customers?
9        A.  No, I did not.
10       Q.  So, is list would be fair to say that most of your
11  correspondence with Oracle or Oracle representatives
12  have been with the attorneys representing Oracle in this
13  case?
14       MR. RAWLINSON:  Objection; vague.
15       THE WITNESS:  Most of my written
16  correspondence, I assume that's what you mean --
17       MR. WILLIAMS:  Q.  I actually mean
18  correspondence, telephone, oral.
19       A.  Could you rephrase the question just to make
20  sure I answer it accurate.
21       Q.  Is it fair to say that most of your
22  correspondence with Oracle or any of its representatives
23  concerning this case was with the lawyers representing
24  Oracle?
25       MR. RAWLINSON:  Same objection.

27

1        THE WITNESS:  I believe that's a fair
2   characterization.
3        MR. WILLIAMS:  Q.  Okay.
4        A.  Yes.
5        Q.  You list and identify a vast amount of
6   publications in your report?
7        MR. RAWLINSON:  You mean his publications?
8        MR. WILLIAMS:  Q.  Yeah, your own
9   publications.  How much time in the last four years --
10  how much of your time is devoted to writing as opposed
11  to providing expert analysis or testimony for various
12  parties?
13       MR. RAWLINSON:  Objection; vague and
14  ambiguous.
15       THE WITNESS:  I don't think I would be able to
16  give you any precise quantification.  The amount of time
17  that I've spent over the last four years doing writing
18  that has ended up in some of the lists that you have
19  seen has been less than I've spent doing litigation
20  support activity.  But there have been several other
21  forms of writing that are not listed there, entries on
22  my blog, things of that nature.  So if you take that
23  into account, it would be a larger percentage.  But I
24  have never thought about putting it into numerical
25  terms.

28

1        MR. WILLIAMS:  Q.  And someone who writes as
2   much as you do is very likely to also be criticized for
3   some of their views; is that fair?  Or people disagree
4   with some of your views?
5        A.  I imagine there are people somewhere who
6   disagree with some of the views I've expressed.
7        Q.  If you look at paragraph 5 of your report,
8   you -- I'll give you a chance to get there?
9        A.  I've gotten there.
10       Q.  You list several books from 19 -- I would say
11  1994 through 2004.  Are those the only books that you've
12  written in that space of time?
13       A.  No.
14       Q.  Are there any books that you did not include
15  in that paragraph?
16       A.  There are one, perhaps two books about the
17  so-called Y2K phenomenon in that list.  There may be
18  others as well.  Those are the two that I've noticed
19  looking at this list.
20       Q.  What are the titles of those books?
21       A.  One of them is called Time Bomb 2000, and the
22  other one for which I was -- actually, I was a co-author
23  on that one as well, but the other one I believe it was
24  "A Financial Guide to the Y2K Problem," or entitled
25  roughly along those lines, also co-authored.

29

1    Q.  Why did you leave those two off of that list?
2    A.  Because they were of a less technical nature,
3  unlike these books that were aimed at a technical
4  audience, those books were aimed more at the general
5  public.
6    Q.  And were they or were they not relating to
7  anticipated problems that could occur as a result of,
8  you know, speculative Y2K computer glitches?
9    A.  I would disagree with the characterization as
10  speculative.
11    Q.  How would you characterize it?
12    A.  I would characterize it as problems for which
13  the American economy spent roughly 100 billion dollars
14  for real technical problems associated with computer
15  difficulties that would occur both before and after
16  January 1st, 2000.
17    Q.  And what were some of those technical
18  problems?
19    A.  The problems all revolved around the central
20  issue of whether the millions and millions of computer
21  systems around the world would properly recognize the
22  so-called rollover or transition from December 31st,
23  1999 to January 1st, 2000 without either stopping
24  completely or possibly misunderstanding the date to be
25  January 1st of 1900 or various other erroneous decisions

30

1  or actions.
2    Q.  Now, you say, however, that those books were
3  less technical in nature than the others that you
4  included here?
5    A.  That's correct.
6    Q.  And can you describe in what fashion they were
7  less technical?
8    A.  Because they were aimed at an audience of
9  non-technical people to try to explain these computer
10  issues that I've just summarized in language that I
11  hoped non-technical people would understand, along with
12  a discussion of some of the possible consequences that
13  they might see in their day-to-day lives.
14    Q.  And the books that you've cited here were for
15  an audience of primarily technical people, the ones you
16  cited in paragraph number 5?
17    A.  Yes, that's correct.
18    Q.  And so you would not expect generally for --
19  well, let me withdraw that.
20         How would you define or describe technical or
21  non-technical people?
22    A.  In the context of this discussion that we've
23  been having, I would define technical people as being
24  people who had a background and education in the field
25  of computer hardware or software, and most likely people

31

1  who were employed by or somehow directly involved in
2  companies that provide computer products and services,
3  that would be the rough, broad description of technical
4  people.
5         Non-technical people would be basically
6  everybody else, as well as the technical people who
7  might not have thought of some of the broad social and
8  economic consequences of this Y2K problem with regard to
9  the Y2K book that you have been asking about.
10    Q.  Would you agree that the quote, unquote,
11  technical people that you generally described, that that
12  is a much smaller population in numbers of people than
13  the non-technical audience that you were writing the
14  Time Bomb 2000 for?
15    A.  Yes, I think that's a fair characterization,
16  yes.
17    Q.  And do you -- were you wrong in your opinions
18  concerning the Y2K?
19         MR. RAWLINSON:  Objection to form, vague and
20  ambiguous.
21         THE WITNESS:  I think there were some aspects
22  of my predictions that were somewhat inaccurate.  But
23  overall I don't think I was wrong.
24         MR. WILLIAMS:  Q.  What aspects would you
25  characterize as inaccurate, somewhat inaccurate?

32

1    A.  The aspects that turned out to be somewhat
2  inaccurate were primarily the impact of the Y2K problem
3  on developing nations or underdeveloped nations, and the
4  impact as well on so-called embedded systems, that is
5  computers embedded within machinery that runs in many
6  cases without direct human interaction.
7    Q.  And do you know how much -- how much money you
8  made from Time Bomb 2000?
9    A.  From the textbook?
10    Q.  Yes.
11    A.  Only in very rough terms.
12    Q.  That's fine.  I don't need it to be specific.
13    A.  As I recall, on the order of $40,000.
14    Q.  $40,000?
15    A.  Approximately.
16    Q.  Had you ever heard it being criticized as
17  Swami salami verbally?
18    A.  No, no, I had not heard that characterization.
19    Q.  What characterizations have you heard of it?
20    A.  I have heard either characterizations or
21  reviews arguing that I had taken too pessimistic a
22  position with regard to the likely difficulties
23  associated with Y2K.
24    Q.  And that's not -- but that's not why you
25  didn't include it in paragraph 5?

33

1     A.  No.  That is definitely not.  There have been
2  other more technical books, the one that came to mind
3  predated this one, that was technical, but also received
4  criticisms.
5     Q.  Which one is that?
6     A.  Actually, a technical book as well in this --
7  within this same time frame that received some
8  criticisms.
9     Q.  Which one?
10    A.  The first one that immediately came to mind
11  when you raised your question was a book called "Decline
12  and Fall of the American Programmer."
13    Q.  That's not here?
14    A.  That's not here.  It predates these things.
15  It was published in 1992.
16    Q.  Okay.
17    A.  And the other one that does fall into this
18  time period, published, as I recall, in 1996, was called
19  "The Rise and Resurrection of the American Programmer."
20    Q.  And why did you leave that one off, "The Rise
21  and Resurrection of the American Programmer"?
22    A.  I don't recall.  Not for any particular reason
23  that I can recall sitting here.
24    Q.  Do you recall criticisms for any of the books
25  that you did cite here?

34

1     A.  There have been criticisms about the "Death
2  March" book.  That's the only one that I recall in
3  particular.  There may well have been criticisms of
4  other books.  I don't spend much time looking at the
5  Amazon commentaries, but none that come to mind.
6     Q.  Going back quickly to technical people.  You
7  know Brooks Hilliard; right?
8     A.  I know of him.  I've never met him.
9     Q.  You never met him?
10    A.  No.
11    Q.  Ever talk to him?
12    A.  Not to my recollection.  It's possible that he
13  attended a conference where I spoke and introduced
14  himself.  But --
15    Q.  Have you ever read any of -- anything he's
16  written -- well, let me withdraw that.
17       You read his report in this case?
18    A.  Yes, I did.
19    Q.  Have you ever read a report that he's ever
20  provided in any other case?
21    A.  Yes, I have.
22    Q.  Would you describe him generally as a
23  technical person among the audience that you were
24  directing the books in paragraph 5 to?
25    A.  Yes, I would.

35

1     Q.  And have you read how he has depicted his
2  background?
3     A.  Yes, I have.
4     Q.  And you guys attended same school at some
5  point; right?
6     A.  Within the same decade certainly, yes, we did.
7     Q.  And would you consider -- well, withdrawn.
8       Do you have any reason to dispute any of the
9  characterizations of his background that you've read?
10       MR. RAWLINSON:  Objection; vague.
11       THE WITNESS:  I don't know which
12  characterizations you are talking about.  I have no
13  idea.
14       MR. WILLIAMS:  Let me withdraw the question.
15  Maybe it is not a great question.
16    Q.  Do you have any reason to believe that the
17  manner in which he has described his background in the
18  documents that you've read is incorrect or inaccurate?
19       MR. RAWLINSON:  Same objection.
20       THE WITNESS:  I don't, though I must say that
21  was not an area that I was asked to investigate, so I
22  didn't study his stated background in great detail or
23  try to confirm it.
24       MR. WILLIAMS:  Q.  Sure, I understand.
25    A.  I will say for whatever it is worth, as I've

36

1  already told you, I have not met him, the gentleman, and
2  have not encountered him in the various technical
3  computer conferences that I've attended over the last 20
4  years, or seen any of his publications.  Indeed, as I
5  recall from his report, he only lists, I believe, one
6  textbook that's aimed at business, non-technical
7  business people, and I believe only one or two
8  publications.  There may have been others that he's
9  written.  But in order to form an independent opinion of
10  his credentials, background, qualifications, et cetera,
11  I have not had independent exposure to the things that I
12  would normally expect to see.
13    Q.  And would you agree that he is at least an IT
14  professional?
15    A.  With the caveat that I've already expressed,
16  that I have not had any opportunity to confirm that kind
17  of characterization independently.
18    Q.  You wouldn't say that an IT professional -- in
19  order to be an IT professional one would have to have
20  the experience and literary background that you do,
21  would you?
22    A.  Not necessarily.  But in order to have
23  independently formed an opinion before I received those
24  questions, it would make it a lot easier to answer the
25  questions.

37

1    Q.  Sure, understand.
2         Now, in your view, would you consider a
3   technical person that you've described as, you know, the
4   audience for the people that you wrote the books in
5   paragraph 5, to be different from an IT professional?
6    A.  No, I would consider them to be of the same
7   group, same audience, yes.
8    Q.  You testified earlier that you received, you
9   know, approximately 12 CDs with documents relating to
10  this case; is that fair?
11   A.  That's fair.
12   Q.  And did you receive the actual software, 11i
13  software?
14   A.  No, I did not.
15   Q.  Did you ask for it?
16   A.  I don't recall whether I asked for it or was
17  informed in some fashion that the software was not being
18  provided to anyone.  I don't recall which came first.
19   Q.  But both happened?
20      MR. RAWLINSON:  Objection to form.
21      THE WITNESS:  No.  I, as I recall, I did not
22  make a specific request for the software.
23      MR. WILLIAMS:  Q.  Why not?
24   A.  Because I was primarily concerned with
25  investigating the architecture of the software as

38

1   opposed to the actual code of the software.  And for
2   that I was actually more interested in various other
3   forms of documentation.
4    Q.  And no one offered to send it to you either,
5   the software?
6    A.  Not that I recall, no.
7       MR. RAWLINSON:  Objection; vague and
8   ambiguous.
9       MR. WILLIAMS:  Q.  And you understand that
10  there was several versions or several releases of 11i
11  that are at least pertinent to the issues in this case?
12   A.  Yes, I do.
13   Q.  And that's 11i.1, .2, .3 and maybe a couple
14  others; is that fair?
15   A.  That's fair.
16   Q.  And just to be clear, you haven't received any
17  versions of any of the 11i software?
18      MR. RAWLINSON:  Let me interject for a minute.
19  I don't think it matters for your question, but we
20  probably for the record should distinguish between
21  executable and source code.  I don't think it matters
22  for the ultimate answer to your question, but when
23  you're talking about the software, talking about the
24  software that people run?
25      MR. WILLIAMS:  Is there some other software?

39

1   Hold on a second.
2       I just don't know what you're talking about.
3       MR. RAWLINSON:  Well, frame your questions how
4   you want.
5       MR. WILLIAMS:  Is there something you need to
6   clarify with me?
7       MR. RAWLINSON:  Nothing I need to clarify with
8   you, Shawn.
9       MR. WILLIAMS:  Q.  All right.  No one offered
10  to send you the actual software that was sent to
11  customers and at least attempted to be installed in some
12  environment?
13   A.  Okay, I can now appreciate why counsel might
14  have been raising that issue.  I was assuming that you
15  were talking about the source code, the actual computer
16  instructions written by programmers, which would then be
17  compiled and turned into an executable program.  That
18  was not offered to me.  And I would not have wanted
19  that, either.
20      Your most recent question was of a different
21  nature, I believe.  You asked me if I had either asked
22  for or had received the operational software, the
23  executable or binary software.
24   Q.  Okay.
25   A.  I believe that was your most recent question.

40

1    Q.  It wasn't really my question, but I think you
2   tried to clarify it for me.  Did you receive that?
3    A.  I don't believe I did.  I don't think I did.
4   In any case, I did not actually install it or run it, so
5   if by some chance I did, it probably would have been
6   more than the 12 CDs, so I doubt very much that I did.
7   So the answer is no.
8    Q.  I didn't mean to cut you off.  You didn't
9   receive any software, code or other that was executable
10  that you installed on any system?
11   A.  That's correct.
12   Q.  So that also means that you didn't test any of
13  the software, any of the 11i software at issue in this
14  case?
15   A.  I did not test it by running it, that's
16  correct.
17   Q.  All right.  So, you didn't do any of the
18  stress testing that you describe in your report?
19   A.  No, I did not.
20   Q.  You didn't do any of the regression testing?
21   A.  That I described in my report?
22   Q.  No, that's not my question.  Did you do any
23  regression testing?
24   A.  No, I did not.
25   Q.  Do you do any integration testing?

41

1  A. Of the 11i software, no, I did not.
2  Q. You didn't do any of the unit testing either?
3  A. No, I did not. And the reason I'm pausing is
4  that had I been sent the entire software, I don't think
5  that would have been an environment in which I could
6  have done unit testing. That would have required access
7  to the source code so that I could compile and test in
8  isolation one or more units. So the answer is no, I did
9  not.
10  Q. Right. And you didn't do any -- well,
11  withdrawn.
12  There was no reason that you could not request
13  all of the software, code or information you needed to
14  test the software, was there?
15  MR. RAWLINSON: Objection to form.
16  THE WITNESS: With the caveat that I just
17  mentioned, that had I wanted to carry out unit testing,
18  I believe I would have been required to ask for the
19  source code so that I could compile individual units and
20  test them in isolation.
21  MR. WILLIAMS: Q. Sure, but there was nothing
22  limiting you for asking for that information, was there?
23  A. No, I don't believe there was.
24  Q. I mean, you're testifying on behalf of Oracle,
25  defender in this case?

42

1  A. Yes, that's correct.
2  Q. And no doubt they have the source code; right?
3  A. I would assume they have the source code.
4  Someone should have the source code, and I believe they
5  do, yes.
6  Q. You understand also that there are issues
7  pertaining to the demonstration systems or demonstration
8  environments for 11i software during the period that
9  this lawsuit pertains to; right?
10  A. Yes, I am aware of that.
11  Q. Did you at any point between, I guess, January
12  of 2007 to today have access to any of the demonstration
13  systems that were -- are at issue in this case?
14  A. No, I did not.
15  Q. And so you didn't attempt to do a
16  demonstration of any version or release of 11i software
17  on any of the demonstration systems that were in use
18  during the time relevant to this case?
19  A. No, I did not do that.
20  Q. Did you inspect any of the software code,
21  source code, that was used to create or maintain the
22  demonstration systems that were in use during the time
23  frame pertaining to this case?
24  MR. RAWLINSON: By time frame, you mean the
25  last period or something else?

43

1  MR. WILLIAMS: No.
2  Q. Do you have an understanding of the time frame
3  that pertains to this case?
4  A. Well, I've seen different descriptions of the
5  time frame, and I'm not sure which one you're referring
6  to.
7  Q. Why don't we just say from June 2000 to June
8  2001, that's what I mean by pertaining to this case,
9  unless I say otherwise.
10  A. Okay.
11  Q. Did you view -- I forgot my question. Can you
12  read the last question back, please.
13  (Record read as follows: QUESTION: Did you
14  inspect any of the software code, source code,
15  that was used to create or maintain the
16  demonstration systems that were in use during
17  the time frame pertaining to this case?)
18  THE WITNESS: No, I did not.
19  MR. WILLIAMS: Q. And source code actually
20  becomes software at some point; is that fair?
21  A. That's not how most technical people would
22  describe it. Source code through one mechanism or
23  another becomes executable software or executable code
24  or binary code.
25  Q. And just so, I'm not a technical person, just

44

1  so I'm not missing anything, I haven't missed some
2  category of source code, software or any other related
3  information that you may have tested but I simply have
4  not asked the question?
5  A. I don't know what else you may have had in
6  mind.
7  Q. Okay, that's fine. All right. One of the
8  issues pertaining to the allegations in the case relate
9  to representations that 11i software was, you know,
10  preintegrated and interoperable generally; is that fair
11  to say? You understand that?
12  A. Yes, yes, I do.
13  Q. And you provide in paragraph 100 a definition
14  of what you believe an end-user would understand
15  integration to mean?
16  A. Yes, I do.
17  Q. Is that fair?
18  A. Yes.
19  Q. And in your view an end-user is someone who is
20  using the software doing day-to-day activities, someone
21  actually making use of the software; is that fair? Or
22  would you describe that differently?
23  A. Well, in paragraph 100, I also refer to
24  business professionals. But -- let's see whether that's
25  the paragraph where the phrase end-user appears. In

Yourdon, Edward  7/3/2007  9:07:00 AM

45

1  that paragraph I don't believe the phrase end-user does
2  appear.  Indeed it does at the very beginning.  For the
3  end-user of a software system as well as for IT
4  professionals.  So your question was about the nature of
5  an end-user?  I lost track of your question.
6      Q.  That's okay.  You provide a definition of how
7  an end-user would interpret the word integration; is
8  that fair?
9      MR. RAWLINSON:  Objection to form.
10     THE WITNESS:  I believe in paragraph 100 I'm
11  providing such a definition as it would pertain to
12  end-users, but in the second sentence also business
13  professionals.
14     MR. WILLIAMS:  Q.  Okay.
15     A.  Who in this context would be end-users, yes.
16     Q.  Why don't we take a look at what you said.
17  Read the first two sentences of paragraph 100 for me.
18     A.  Okay, for the record the first sentence says,
19  "For the end-user of a software system as well as for IT
20  professionals, integration simply means that the pieces
21  (or components or modules) of the system 'work
22  together.'  Thus when business professionals use a
23  'office' software suite, they expect the word processing
24  program, the spreadsheet program, and the presentation
25  program to 'work together' so that spreadsheet tables

46

1  can be incorporated into a word processing document and
2  so that formatted word processing text can be
3  incorporated into a presentation slide."
4      Q.  Okay, so, in your view, both IT professionals
5  and other business type people would view integration in
6  the very same way, meaning that the system would work
7  together and they would expect that the word processing
8  program, spreadsheet program and presentation program
9  would work together?  Right?
10     A.  Yes, that's what I wrote.
11     Q.  You don't make any differentiation between an
12  end-user's expectations and an IT professional's
13  expectations?
14     MR. RAWLINSON:  Objection to form.
15     MR. WILLIAMS:  Q.  Is that right?
16     A.  Certainly not in the context of this paragraph
17  as illustrated with an office software suite, that is
18  correct.
19     Q.  Is this the definition, that's in paragraph
20  100, the definition that you rely on to conclude that
21  11i was, indeed, at least integrated?
22     A.  Not just this paragraph.  I believe I relied
23  on the full description in this section, as well as the
24  forms of integration that I went on to describe in
25  detail in the following section.  So I meant all of it

47

1  to be taken into context or to be taken into
2  consideration as what I relied upon for my opinion.
3      Q.  Okay.  So, let's exclude the definition that
4  you provide in paragraph 100, just for purposes of this
5  question.  Well, withdrawn.  Let me do it this way.
6      Say, for example, IT professionals and
7  end-users found that the word processing program, the
8  spreadsheet program and the presentation program did not
9  work together, let's assume that for this question, and
10  that's the definition of integration that you provide
11  there.  Would you still conclude that 11i was, indeed,
12  integrated?
13     MR. RAWLINSON:  Objection to form.
14     THE WITNESS:  I'm puzzled as to your
15  connection between this office suite example and 11i.  I
16  don't understand what connection you are trying to ask
17  me to confirm.
18     MR. WILLIAMS:  Q.  Okay.  You say in paragraph
19  100 that IT professionals as well as other people would
20  interpret the term integration to mean what you wrote
21  here; right?
22     A.  That's correct.
23     Q.  So, if, for example, IT professionals and
24  business professionals found that the word processing
25  program, the spreadsheet program and the presentation

48

1  program did not work together in parts of 11i, would 11i
2  still be integrated?
3      A.  I'm still confused, because the word
4  processing program is not part of 11i or anything like
5  11i, so I --
6      Q.  Does that matter, if there are programs within
7  11i that did not work together, would you still find
8  that 11i was integrated?
9      A.  If there were programs within 11i that did not
10  work together in the broad sense of the term work
11  together, and if I understood in detail what we meant by
12  that, then I might draw such a conclusion.
13     Q.  What do you mean by the broad sense of the
14  word?
15     A.  Well, I did not provide all of the details of
16  the manner in which I would expect the word processing
17  document to be -- sorry, the manner in which spreadsheet
18  tables could be incorporated into the word processing
19  document.  I was referring to that in a fairly broad
20  sense.  There might be 1,000 detailed elements of such
21  incorporation, and I did not mean that necessarily to
22  intend that, you know, that all 1,000 necessarily had to
23  be incorporated, but that in the broad sense that if
24  end-users or IT professionals looked at it they would
25  say it appears that spreadsheets and word processing

Yourdon, Edward  7/3/2007  9:07:00 AM

49

1    documents can be incorporated into one another.
2        Q.   Have you ever used 11i?
3        A.   No, I have not used it.  I've used other ERP
4    systems, but not 11i.
5        Q.   Same paragraph, few lines down, you say that,
6    "The same is true for ERP products.  The marketplace
7    expects that an integrated ERP product will have
8    financial modules, human resources modules,
9    manufacturing modules, and other modules that work
10   together so that day-to-day business activities can flow
11   back and forth as needed between different software
12   components."  Right?
13       A.   Yes.
14       Q.   So that's generally your definition of what
15   integrated means with respect to ERP software?
16       A.   In general terms, yes.
17       Q.   And so if someone in the marketplace found
18   that the financial modules and human resource modules
19   did not quote, unquote, work together, allowing them to
20   do day-to-day business activities, would it be correct
21   that 11i was not integrated, or at least an ERP product
22   was not integrated?
23       A.   Not necessarily.  Because as you can see in
24   the very next sentence, there is the statement that how
25   well components work together is often in the eye of the

50

1    beholder.
2        So, in your example, there may be one person
3    or one business user within the marketplace that feels
4    that the components of the ERP product do not work
5    together as they need, that does not necessarily mean
6    that the product as a whole would not be considered
7    integrated.
8        Q.   Okay.  So in your view it's -- it depends on
9    the numbers of people or end-users who may not be able
10   to conduct the business -- day-to-day business
11   activities that would allow one to determine whether or
12   not the product was, indeed, integrated?
13       MR. RAWLINSON:  Objection to form.
14       THE WITNESS:  I think it would depend on the
15   number of users individually, but more importantly the
16   number of end-user organizations, since an ERP product
17   is typically not used by one individual in the manner
18   that you and I use word processing programs.  And it
19   would depend on the degree and extent and pervasiveness
20   of whatever issues such organizations or individuals
21   might have.  It is not, in my opinion, a binary all or
22   nothing, either/or situation.
23       MR. RAWLINSON:  Should we take a break for
24   about ten minutes?  We've been going over an hour.
25       MR. WILLIAMS:  We can take one.  It is 10:19.

51

1    Why don't we take five minutes now.
2        THE WITNESS:  Okay.
3        VIDEOGRAPHER:  Off record at 10:19.
4        (Recess, 10:19 a.m. - 10:32 a.m.)
5        VIDEOGRAPHER:  On record at 10:32.
6        MR. WILLIAMS:  Q.  Just going back to
7    paragraph 100, beginning where -- the sentence starting,
8    "The same is true for ERP products," and then you
9    reference generally financial modules, human resource
10   modules -- manufacturing modules.  Any of those three
11   modules, would they be included in CRM application or an
12   ERP application?
13       A.   In most products today, based on my
14   understanding, those three particular examples would be
15   in -- within the ERP side as opposed to the CRM side.
16       By the way, if I might interject, since you
17   have brought my attention back to this paragraph, I had
18   earlier commented how well components work together is
19   in the eye of the beholder, and one aspect of that that
20   I probably should have mentioned as well is that the eye
21   of the beholder includes, or is focused on not just what
22   this particular set of financial modules and so forth
23   does, but is also a relative term based on what other
24   comparable products or competitive products might be
25   doing in the marketplace, as would be the case with

52

1    Office suites.
2        My perception of the extent or degree with
3    which Microsoft Office is integrated is informed at
4    least partly by what alternatives may or may not be out
5    there and also how well I've managed to install them on
6    my computer.  If I neglected to install Excel, it's
7    going to be pretty hard to make Word talk to it.
8        I didn't mean to interrupt your train of
9    thought; since we saw this sentence again.
10       Q.   So, anyway, you cite there the financial
11   modules, human resource modules, manufacturing modules
12   and other modules.  You didn't include any CRM modules
13   in that specific example.  Any reason why, or just
14   didn't come to mind when you were writing this
15   paragraph?
16       A.   No particular reason.  I was simply trying to
17   provide an introductory framework for the whole
18   discussion.  So it was not for some specific purpose
19   that it was omitted.
20       Q.   Just want to direct your attention to page 53.
21   Referring directly to paragraphs 138 and 139, can you
22   just review them for a moment, if you need to.  Maybe
23   you reviewed them this morning or last night.
24       Is it fair to say your opinion with respect to
25   Suite 11i was integrated and interoperable appears at

53

1    138 and 139 -- actually, 138 through say 141?  You can
2    take some time to look at those two pages, if you like.
3       A.  My opinion in terms of my own independent
4    technical assessment is based on paragraphs 138 through
5    141.  But it was also based upon my observation and
6    review of the actual experiences of customers in the
7    field and, you know, all the other testimony and
8    evidence that we talked about earlier.
9       Q.  I was just asking about your opinion about it.
10   Is it fair to say that your opinion on this one issue is
11   captured for the most part in paragraphs 138 through
12   141, and the other stuff you referred to in terms of
13   experience of people in the field supports the opinion?
14      A.  I think that's a fair characterization.  I
15   felt that it was important to reach my own independent
16   opinion based on the technical materials that were
17   available, and then see whether it was supported by or
18   confirmed by or illustrated by, reinforced by various
19   other sources of information.
20      This particular -- I don't know if you've
21   referred to figure 9 at the top of this page, that was
22   simply one illustrative example of the kind of technical
23   evaluation that I did as described in paragraphs 138
24   through 141.
25      Q.  You agree, however, that even in your opinion,

54

1    that it's almost certain that Oracle developers made
2    some errors implementing the logical data model in 11i?
3       A.  Yes, that is the language that I've used in
4    paragraph 140.  It's possible, in fact, almost certain
5    given the studies that some errors probably would have
6    been made.
7       Q.  Right.  And you also agree that it's almost
8    certain that the developers made errors in creating the
9    database tables in 11i?
10      A.  In the same context, possible, indeed almost
11   certain, yes.
12      Q.  Right.  And you agree that Oracle developers
13   almost certainly made errors in creating the indices in
14   11i?
15      A.  Yes.  I think the significant question is how
16   many such errors, and particularly as compared to the
17   number of errors that one would expect to see in
18   software systems of this size or other comparable
19   software, as opposed to any kind of absolute measure.
20      Q.  And you agree that the software -- withdrawn.
21      You agree that Oracle developers almost
22   certainly made errors when coding the triggers and
23   navigation paths in 11i?
24      A.  Yes, with the same caveats, you know, as
25   indicated in paragraph 140.

55

1      Q.  Okay.  And you agree that -- well, withdrawn.
2      And ultimately you find that 11i, the
3    integration was less than perfect?
4      A.  Not based on my own independent review of the,
5    you know, the technical documents.  I did not personally
6    see errors or defects or imperfections.  But based on my
7    general experience and also based on the other evidence,
8    I would agree that there were imperfections.  I believe
9    that's the term you used.  I'm not sure.
10      Q.  I did.
11      A.  Okay.
12      Q.  And now when a developer makes some of the --
13   or withdrawn.
14      When developers make some of the errors that
15   you described in paragraph 140, for example, is that or
16   is that not part of the engineering process?
17      MR. RAWLINSON:  Objection to form.
18      THE WITNESS:  I don't know what you mean by
19   engineering process.
20      MR. WILLIAMS:  Q.  Okay.  Well, is coding part
21   of the software engineering process?
22      A.  Coding would normally be considered part of
23   the software engineering process, yes.
24      Q.  And is creating the database tables part of
25   the software engineering process?

56

1      A.  Yes.
2      Q.  Okay.
3      A.  Part of an overall software engineering --
4    well, I want to make sure I've used my words properly in
5    communicating with you.  It's part of the overall
6    software engineering process where the phrase software
7    engineering is taken in the context of software
8    development.
9      The reason I'm hesitating here is that in some
10   places of the evidence that I've seen, the word
11   engineering is also used in the context of architecture,
12   as opposed to just development.  So with that caveat, I
13   would agree with you.
14      Q.  Would -- well, want to tell me what the
15   difference is between using the term engineering in the
16   context of architecture and using the term engineering
17   in the context of development?
18      A.  Yes.  Engineering in the context of
19   architecture is normally a description of the work that
20   goes into the so-called design part of the system once
21   the requirements have been known.  You have a group of
22   people whose job is to figure out what the major
23   components are and how they will fit together, what
24   interfaces they will have.
25      The overall process of software engineering is

       

57

1    the term that's often used in our industry to describe
2    the cradle to grave sequence of requirements,
3    design/architecture, coding, which you talked about,
4    creation of database tables, testing, which I imagine
5    we'll be talking about, deployment and so forth.  That
6    whole sequence is a software development sequence whose
7    activities can be formalized and documented as part of
8    the so-called software engineering process.
9        Q.  So all of that is part of the overall software
10   engineering process?
11       A.  Yes.
12       Q.  That's fair?
13       A.  That's fair.  But when you hear people talking
14   about the engineering of a system in the context of such
15   conversations, they may only be referring to the
16   architecture.
17       Q.  Okay.
18       A.  Okay.
19       Q.  All right.  And would you need to be an IT
20   professional or an expert like yourself to understand
21   when someone is using software engineering but only
22   really referring to architecture?
23       A.  Not necessarily, although sometimes the
24   distinction may be a little bit subtle, it may or may
25   not be apparent to a non-IT professional, depending on

58

1    the context of the discussion or the written material.
2    I'll certainly try to make that distinction if I think
3    it is at all unclear.
4        That's why I wanted to raise it to get the
5    issue on the table, so to speak.  And if I hear you use
6    the word engineering in a context that I think might be
7    intended as something else, I will try to make sure that
8    you and I at least are speaking the same language.
9        Q.  Did you talk to anyone at Oracle between May
10   2007 and today that told you -- well, withdrawn.
11       Have you spoken to anyone at Oracle between
12   January 2007 and today that discussed with you what they
13   believed the difference between software engineering and
14   any of the caveats or subset of architecture and
15   development within it?
16       A.  I don't recall having that specific kind of
17   conversation.
18       Q.  Okay.
19       A.  I do recall having conversations with at least
20   one individual, and I'm hesitating because I can't
21   remember now which one, about the process that Oracle
22   went through to translate, so to speak, the architecture
23   which they had represented in various diagrammatic
24   forms, of which there are a couple of examples in my
25   report, into the coding that would provide a system that

59

1    could be tested.
2        Q.  But you don't remember who that individual
3    was?
4        A.  Not sitting here right now.  If my memory gets
5    refreshed during the day, I'll certainly try to bring it
6    to your attention.
7        Q.  All right.  And was it a male or female?
8        A.  It was a male.
9        Q.  And was it a lawyer or was it an Oracle
10   employee?
11       A.  It was an Oracle employee.
12       Q.  A current Oracle employee?
13       A.  To the best of my recollection, yes.
14       Q.  And the only one that you've been able to
15   identify for me today that you recall speaking to, I
16   think, was either Don Klaiss or Mr. Seiden; is that
17   right?
18       MR. RAWLINSON:  Objection; to the extent it
19   mischaracterizes the previous testimony.
20       THE WITNESS:  I think I may have identified
21   Mr. Fletcher as well.
22       MR. WILLIAMS:  Q.  And Mr. Fletcher, that's
23   right.
24       A.  I think it was probably one of those three
25   individuals.  But, as I say, if my memory is refreshed

60

1    during the course of the day, I will let you know.
2        Q.  Now, some of the things that you discuss,
3    again, in paragraph 140 about some of the errors that
4    may be made in the software engineering process, do any
5    of those errors, or would any of those errors impact the
6    quality of software?
7        A.  As you might appreciate, I'd love to have you
8    tell me what you mean by quality.
9        Q.  Well, why don't we do that.  Haven't you
10   defined the term quality as a lack of bugs in your
11   report?
12       A.  I may well have done so.  I don't recall the
13   language I used and whether I describe that as one
14   aspect of quality.  Normally that would be considered
15   just one aspect of quality.  And I must apologize, I
16   can't remember where I would have put that into my
17   report.
18       Q.  I'm going to find it for you.
19       A.  Thank you.  If I had my laptop computer I
20   could help you, but I don't.
21       Q.  Paragraph 41.
22       A.  Yes, I did do so.
23       Q.  Well, why don't we find it and talk about --
24   can you just read that section for me.
25       A.  Yes, I can read that section.  And having done

61

1  so, I would like to change one Latin abbreviation for
2  another. But let me read it for the record now.
3     Paragraph 41 says, "Most segments of the
4  computer software industry are highly competitive, and
5  vendors compete on a number of factors - including
6  price, functionality, interoperability, quality, (i.e.
7  absence of software defects)."
8     Q. That's not what you wrote.
9     A. I apologize. Thank you for correcting me.
10  "(absence of software bugs) ease of use, and time to
11  market."
12     Q. Okay.
13     A. And looking at this now, I believe I should
14  have used the Latin abbreviation e.g., such as, absence
15  of software bugs.
16     Q. So what you're saying is that you're not --
17  your definition of quality here is not "i.e., absence of
18  software bugs," but, "e.g., absence of software bugs"?
19     A. That's correct.
20     Q. Would you -- that's a considerable
21  definitional change; wouldn't you say?
22     A. That depends on the circumstances. In many
23  cases the absence of software bugs is the most important
24  parameter or aspect of quality.
25     But to give you an example, there may be other

62

1  circumstances in which such things as response time or
2  performance are almost as important. All the more so
3  because software bugs, as I have itemized them here, are
4  not all the same. There may well be systems in which I
5  can tolerate a number of relatively minor bugs, but I'm
6  less able to tolerate other aspects of quality, such as
7  performance and response time.
8     Q. Well, let's go back to what we were talking
9  about prior to finding your definition of quality. And
10  that is back to paragraph 140, and my question was
11  whether or not the errors that you agree almost
12  certainly occurred in the development or the engineering
13  process in 11i would impact the quality of the software?
14     A. I will agree they may impact the quality in
15  one or more dimensions for some customers under some
16  circumstances. I would not agree they always would, nor
17  would I agree they always would in the same way for all
18  people or organizations in the marketplace.
19     Q. All right. But the answer that you just
20  provided me is not consistent with the definition, prior
21  to your change, of quality?
22     MR. RAWLINSON: Objection to form. And
23  objection, mischaracterizes prior testimony.
24     THE WITNESS: No, I don't believe the two are
25  consistent. Certainly I did provide a broader

63

1  definition of quality. But even if we were to restrict
2  it to a definition of quality being equal to bugs, the
3  rest of my statement still stands.
4     The presence of some errors of the sort that
5  we've been discussing in paragraph 140 might affect the
6  quality, bugginess, presence of or visibility of bugs
7  for some customers, but not other customers, might
8  affect them under some circumstances but not other
9  circumstances, might affect them in minor ways or major
10  ways.
11     Now, as I said a moment ago, not all bugs are
12  the same in terms of their severity.
13     MR. WILLIAMS: Q. So it may impact quality?
14     A. Yes.
15     Q. All right. Now, you concluded that, you know,
16  11i was integrated. How many errors that you described
17  in paragraph 140 would it take for you to conclude that
18  an ERP system or software suite was not integrated?
19     MR. RAWLINSON: Objection; vague and
20  ambiguous.
21     MR. WILLIAMS: Q. If you can quantify it.
22     MR. RAWLINSON: Same objection.
23     THE WITNESS: Well, first of all, that would
24  only be part of the evaluation of whether 11i or any
25  other system was integrated. The other part would be

64

1  based on this evaluation that I discussed in paragraphs
2  138 to 140.
3     MR. WILLIAMS: Q. Sure, I understand that.
4     A. But if I concluded that the architecture was
5  integrated by virtue of the database -- the data model
6  being integrated, et cetera, then to go to your question
7  about how many bugs would it take to conclude that the
8  integration essentially was not there, that would be
9  based on, in my opinion, a comparative figure of the
10  number of bugs or errors that are normally seen in
11  products of this sort.
12     And I think I did provide some figures for
13  that in the report. It would be further quantified, if
14  I may continue, by the other aspect that I mentioned a
15  little bit earlier, it would be a function of whether
16  the bugs were visible to, or noticeable to a significant
17  number of customers. And it would also be based on
18  whether the bugs were actually in the software as
19  opposed to being blamed on the software, but ultimately
20  demonstrated to be caused by something other than the
21  software.
22     Q. Isn't it true that even if the architecture or
23  design appears to be such that the intent was to have
24  the product be integrated, that the software engineering
25  process, if the errors in that process are numerous or

65

1 reach a certain level that it could impact the ability
2 of the software to function in the manner in which it
3 was designed to function?
4     A.  It could do so again for some customers under
5 some circumstances, assuming that it had been installed
6 and configured correctly, et cetera, et cetera, that is
7 several caveats, but in general, yes, it could.  I'll
8 admit that as a theoretical possibility.
9     Q.  Now, just going back to -- withdrawn.
10     One of the caveats you just indicated was the
11 dependency on what would be ordinary or comparing what
12 would be ordinary to other ERP systems; is that fair?
13     MR. RAWLINSON:  Objection to form.
14     THE WITNESS:  Yes, I think that's fair.
15     MR. WILLIAMS:  Q.  Right.  Would you need to
16 compare what would be ordinary to make a determination
17 as to whether or not the errors rise to a level that the
18 product, in fact, is just not integrated?
19     A.  I would want to compare what was ordinary
20 within this domain of ERP products.
21     Q.  Sure.
22     A.  Yes.
23     Q.  And you didn't do that in this case in your
24 evaluation?
25     MR. RAWLINSON:  Objection to form.

66

1     THE WITNESS:  I believe that I did do so to
2 the extent of demonstrating what is ordinary based on
3 available statistics.  And also based on the published
4 reports of the 5,000 patches as one published indicator
5 of perceived quality problems.
6     MR. WILLIAMS:  Q.  You did not compare
7 Oracle's software to any other software available in the
8 industry in the time frame relevant to this action, June
9 2000 to June 2001; isn't that true?
10     MR. RAWLINSON:  Objection; vague and
11 ambiguous.
12     THE WITNESS:  That is correct, yeah, I did not
13 compare them --
14     MR. WILLIAMS:  Q.  Sure.
15     A.  -- as of that time frame.
16     Q.  Not as of that time frame?
17     MR. RAWLINSON:  You have to let him finish.
18     MR. WILLIAMS:  Q.  Were you finished?  I
19 didn't mean to cut you off.
20     A.  I may have misunderstood your question.  I did
21 not compare them as they were at that time frame between
22 June of 2000 and June 2001.
23     Q.  Sure.  And you didn't have access, did you,
24 for purposes of analysis that you provide here, to the
25 number of bugs, say, in the PeopleSoft application suite

67

1 available say between June of 2000 and June of 2001, did
2 you?
3     A.  No, I did not.
4     Q.  And you didn't have access to, say, a SAP, SAP
5 application suite that was available in June 2000
6 through June 2001, did you, for purposes of doing your
7 analysis here?
8     A.  No, I did not.
9     Q.  All right.  Nor did you have access to any
10 Siebel application suite available in the period from
11 June 2000 to June 2001 for your analysis as it applies
12 to your report here?
13     A.  No, I did not.
14     Q.  So you don't know what those software vendors
15 were experiencing -- withdrawn.
16     You don't know from any internal company
17 material what those software companies were experiencing
18 in terms of functionality or bugs as it relates to their
19 software suites during that period of time?
20     A.  No, I don't.
21     Q.  So you didn't use any of that information to
22 do any comparison for purposes of your report in this
23 case?
24     A.  No, I did not.
25     Q.  And isn't it true that Oracle represented that

68

1 there was no software available that was comparable in
2 terms of scope to 11i in the marketplace in June 2000
3 through June of 2001?
4     MR. RAWLINSON:  Objection; vague.
5     THE WITNESS:  I believe that may be the case.
6 But I would have to see some of the representations with
7 regard to scope, which you have now begun talking about,
8 as distinct from the bugs that we were talking about a
9 moment ago.
10     MR. WILLIAMS:  Q.  That's fine.  Are you aware
11 of any software vendor that was selling a software suite
12 that included ERP and CRM together in the period between
13 June of 2000 and June of 2001?
14     A.  My recollection from that period is that some
15 of the other vendors included a few CRM pieces in their
16 ERP offering, but I'm not aware of any that offered or
17 provided, marketed the extent of CRM and ERP products
18 integrated together into one product during that period
19 of time.
20     Q.  So when you discuss in your report the
21 necessity of doing a comparison to other software to
22 make a determination as to what would be ordinary for an
23 ERP suite comparable to 11i, that was not something you
24 did; right?
25     MR. RAWLINSON:  Objection; vague and

Yourdon, Edward  7/3/2007  9:07:00 AM

69

1 ambiguous, mischaracterizes the report.
2     THE WITNESS: I believe I did so in the
3 context of the industry figures that I've mentioned
4 before.
5     MR. WILLIAMS: Q. Okay, I think I understand
6 that. You didn't do that practically. What you did was
7 you surmised some things from statistics that you drew
8 from Capers Jones books generally; is that fair?
9     MR. RAWLINSON: Objection to form.
10     THE WITNESS: I drew that from industry data
11 of which the one that I cited in detail, that was Capers
12 Jones, yes.
13     MR. WILLIAMS: I'm being told I need to change
14 the tape. So we have to take a short break.
15     VIDEOGRAPHER: This marks the end of tape one
16 in Volume I in the deposition of Edward Yourdon. At
17 11:03, going off the record.
18     (Recess, 11:03 a.m. - 11:11 a.m.)
19     VIDEOGRAPHER: On record at 11:11. This marks
20 the beginning of tape two in Volume I in the deposition
21 of Edward Yourdon.
22     MR. WILLIAMS: Q. One of the things that you
23 stated generally in your report is that you had
24 evaluated the statements that -- made by the company
25 that were at issue in this case and determine or

70

1 concluded that they were true or accurate or
2 fundamentally true. Is that fair?
3     A. I -- mostly fair. I evaluated certain
4 statements. I believe I focused primarily on the ones
5 that were described as false by plaintiffs. I certainly
6 can't claim that I looked at every press release.
7     Q. That's actually what I meant, that you
8 evaluated all the statements that were alleged to be
9 false and misleading and concluded that they were
10 accurate?
11     MR. RAWLINSON: Objection to form.
12     THE WITNESS: I concluded that they were not
13 false.
14     MR. WILLIAMS: Q. Okay, all right.
15     A. I don't know whether I used the word accurate.
16     Q. Let's see if we can clarify it.
17     A. Okay.
18     Q. Why don't you go to page 92. And why don't
19 you take a look at the last bullet point on --
20 withdrawn.
21     You see 92 has section XII on there, your
22 conclusions; right?
23     A. Yes, I do.
24     Q. Why don't you look at the very last bullet
25 point on that page and read it into the record, please.

71

1     A. The last bullet point for the record says,
2 "The specific statements regarding the Suite 11i product
3 that plaintiffs have identified as 'false' were, in fact,
4 accurate."
5     Q. Does that refresh your recollection as to what
6 your conclusions were?
7     A. This does. I believe this summarizes, you
8 know, a much longer discussion elsewhere in the report
9 where I probably used the phrase "accurate" in the
10 context in which they were made.
11     Q. All right. So are you saying that you do not
12 intend to later testify at a trial or some other
13 proceeding in this case that the specific statements
14 regarding the Suite 11i product that plaintiffs
15 identified as false were, in fact, accurate?
16     A. I would like to compare the summary sentences
17 that I wrote here to see whether it is consistent with
18 the longer -- simply to see whether I have been
19 consistent or whether I need to say something in more
20 detail.
21     Q. Well, that's the conclusion. I mean, we can
22 talk more about some other things. But, so you're
23 saying now you don't know whether or not one of your
24 conclusions will be that the specific statements
25 regarding Suite 11i product that plaintiffs have

72

1 identified as false were, in fact, accurate?
2     A. I believe they were accurate. I can imagine
3 possibly adding the caveat that they were accurate
4 within the context in which they were made. I'm not
5 trying to --
6     Q. I understand.
7     A. -- to be tricky here. But, for example, you
8 know, on page 156 where I said this conclusion is based
9 on the context in which the statements were made as well
10 as my understanding of the statements as an industry
11 expert, so that was the context in which I intended this
12 last bullet point on page 92 to be interpreted.
13     Q. Looking at page 7 of the report, which has the
14 summary of your opinions, paragraph 12 is the fourth
15 bullet point down, you actually say the exact same
16 thing; right?
17     A. Yes.
18     Q. The specific statements regarding the Suite
19 11i product that plaintiffs have identified as false and
20 misleading were, in fact, accurate?
21     A. Yes, I do say that.
22     Q. It doesn't say accurate in the context in
23 which they were provided, does it?
24     A. No, it does not.
25     Q. I'm going to ask you turn to page 61 of your

73

1  report and look at paragraph 156.
2      MR. RAWLINSON:  What paragraph?
3      MR. WILLIAMS:  Paragraph 156.
4      THE WITNESS:  Yes.  That is the paragraph in
5  which I quoted a sentence just a moment ago in answer to
6  your earlier question about accuracy.
7      MR. WILLIAMS:  Q.  Right.  156 says, and
8  correct me if I'm incorrect, "After having reviewed the
9  factual record provided to me, it is readily apparent
10  that Oracle's statements about 11i, including the nature
11  of the work required to implement it, were fundamentally
12  true."
13      A.  Yes.
14      Q.  Right?
15      A.  You read that correctly.
16      Q.  And that conclusion is based on the record
17  that was provided to you that we discussed earlier
18  today; right?
19      A.  That's correct.
20      Q.  Didn't include all the depositions?
21      MR. RAWLINSON:  Don't cut him off.
22      MR. WILLIAMS:  He said that's correct.
23      THE WITNESS:  That is correct.
24      MR. WILLIAMS:  Q.  Didn't include all the
25  depositions; right?

74

1      A.  That's correct, it did not include the
2  depositions of accounting people and forecasting people,
3  et cetera, as we discussed earlier today.
4      Q.  Well, I just wanted to clarify that.  Is it
5  your -- is it your testimony that you read every
6  deposition that is related to the product or 11i issues
7  in this case, and that they were provided to you?
8      A.  I believe that to be the case to the best of
9  my knowledge sitting here, yes.
10      Q.  The factual record that was provided to you
11  did not include all of the documents that were produced
12  in the case; right?
13      A.  No, it did not.
14      Q.  And in this sentence you qualify the word true
15  with fundamentally.  What does that mean?
16      MR. RAWLINSON:  Objection to form.
17      THE WITNESS:  That means that there may have
18  been minor inaccuracies or minor errors in the
19  statements that Oracle made, but that in my opinion did
20  not detract from the fundamental truth, the basic truth
21  as would be perceived by, as I went on to say at the end
22  of this sentence, the audience for which they were
23  intended.
24      MR. WILLIAMS:  Q.  So you used the word
25  fundamentally there to convey that there may have been

75

1  some errors in the statements that were made by Oracle?
2      A.  It was meant to say that there might possibly
3  have been, in my opinion, minor errors.  But, yes,
4  possibly.
5      Q.  But you didn't include the fundamentally in
6  your conclusions or in the summary of your conclusions
7  that we looked at just a moment ago; right?
8      A.  That's correct.
9      Q.  Should you have used fundamentally in the
10  summary of conclusions or in the conclusions, meaning
11  that there may, indeed, have been some errors in what
12  Oracle said?
13      A.  No.  The only caveat or qualifier that I would
14  have added to that, which I have done in this
15  discussion, is the qualifier in the context that they
16  were made and for the audience for whom they were
17  intended, as I put at the end of paragraph 156.
18      Q.  Can you just turn to page 168, please.
19      A.  Paragraph 168?
20      Q.  I'm sorry, paragraph 168.
21      A.  I didn't think my report was quite that long.
22      Q.  Just really quickly, the last sentence of that
23  paragraph says, "Your review compels only one
24  conclusion, that plaintiffs' allegations that Suite 11i
25  was not integrated and, therefore, that Oracle's

76

1  statements regarding Suite 11i were false are
2  fundamentally misguided."
3      A.  I see that.
4      Q.  What does fundamentally misguided mean?
5      A.  I believe it means that they were inaccurate
6  or incomplete or misleading in very basic ways, as
7  opposed to possible specific minor ways.
8      Q.  So how does the word fundamentally qualify the
9  word misguided as compared to the way in which you used
10  it to qualify the word true in paragraph 156?
11      A.  In both cases I believe that a synonym for
12  "fundamentally" would be "basically."
13      So Oracle's statements were basically true,
14  except possibly for minor details.  And plaintiffs'
15  allegations were basically misguided, except possibly
16  for minor details.
17      Q.  But if the allegations, plaintiffs'
18  allegations relate to the very statements that you admit
19  that included some errors, how could it be -- how could
20  the allegations be fundamentally misguided, or how do
21  you determine that?  What was your process?
22      MR. RAWLINSON:  Objection; mischaracterizes
23  the prior testimony.
24      THE WITNESS:  My process was to look at the
25  extent of integration that was available on a technical

77

1  basis and also the extent, the number and severity of
2  bugs that were reported during the relevant time period
3  to see whether they were numerous and serious and major
4  in existence or in kind as opposed to limited and minor
5  and nonpervasive.
6      MR. WILLIAMS:  Q.  I thought that you stated
7  that your determination was based on whether or not they
8  were ordinary.
9      A.  That would be a part of such a determination.
10     Q.  But you didn't say ordinary in your previous
11 answer.  You could add it if you intended to include
12 ordinary.
13     A.  I would have to be reminded of how I used the
14 word ordinary in my previous testimony to see whether I
15 was talking about the same thing or a different thing,
16 whether it should be added or not.  I unfortunately
17 can't recall the exact previous testimony.
18     Though I would also say that even with this
19 issue of minor versus major, the reality is that
20 particularly in this marketplace of ERP products, it is
21 ordinary to even have some number of relatively serious
22 bugs, along with a much larger number of minor bugs.
23     Q.  The reason I'm asking these questions is I
24 want to understand exactly what you intend to testify to
25 if and when you testify in front of a jury.  And when

78

1  you used the word ordinary before, I think your
2  testimony was one of the ways in which you determined
3  ordinary was to compare the software to other comparable
4  software available at the time, at least that's how I
5  read your report.  And you did not do that.
6      A.  I would disagree with that.  I did do that in
7  terms of industry comparisons, as we discussed earlier.
8  I did not make specific comparisons with whichever
9  companies you mentioned, PeopleSoft, during that
10 relevant time period with internal data provided by
11 those companies.
12     Q.  Was there any software available between June
13 2000 and June 2001 that you would describe as comparable
14 to Oracle 11i in the same time frame?
15     MR. RAWLINSON:  Objection to form.
16     THE WITNESS:  Not as a single integrated
17 product, no.
18     MR. WILLIAMS:  Q.  And, therefore, you could
19 not -- did you want to say something else?
20     A.  I was about to say something else, that one
21 could make and now can make comparisons based on
22 products that are available or have been available for
23 the last few years after the Class Period, so that if
24 one can see some industry data that shows that the
25 Oracle product as was being marketed in the time period

79

1  had bugs that were roughly comparable in nature to
2  integrated comparable products that appeared a couple of
3  years later, then I think I can make a determination of
4  what's normal and not normal.
5      By which I mean that Oracle introduced a
6  product in 2000 for which the number of bugs, in my
7  opinion, was comparable to the number of bugs in other
8  integrated products that did not even arrive until a
9  year or two later, at which point one might have
10 expected even better or fewer bugs because they had the
11 benefit of additional time and possibly improved
12 technology.
13     Q.  You didn't do that, did you?
14     A.  Yes.  By making these industry comparisons,
15 that's what I've been trying to explain, by looking at
16 the industry data.
17     Q.  Describe that process exactly the way you did
18 in your analysis and how it relates to this case.  Let
19 me withdraw that question.
20     Describe specifically the process that you
21 went through to do the analysis that you just said that
22 you did.
23     A.  I went through the analysis of bugs that I
24 could see being reported by Oracle and bugs that were
25 claimed in the marketplace.  Although they were patches

80

1  rather than necessarily bugs, I had that data available
2  to me, that was part of the evidence in this case, and I
3  compared that, as I've indicated in my report, against
4  the industry data for ERP products in the textbook by
5  Mr. Jones that was published in 2007, and based on data,
6  as best I can determine, from the last few years.  That
7  was the comparison I made.
8      Q.  Is that the entirety of the comparison?
9      A.  I believe so.
10     MR. RAWLINSON:  Objection to form.
11     MR. WILLIAMS:  Q.  Okay.
12     A.  I believe so, certainly with respect to this
13 conversation we're having right now.
14     Q.  You testified a few moments ago with respect
15 to paragraph 156 that Oracle's statements concerning 11i
16 were fundamentally true and the conclusion was based
17 both on the context in which the statements were made as
18 well as your -- "my understanding of these statements as
19 an industry expert, i.e., audience for which they were
20 intended."  Do you see that?
21     A.  Yes, I do.
22     Q.  Did someone tell you that the statements that
23 the plaintiffs in this case allege to be false and
24 misleading were intended for industry experts?
25     A.  No one told me that.  I'm trying to parse your

81

1   question here and my statement simultaneously.
2        It was my intention writing this sentence that
3   industry expert meant somebody like myself, that is, a
4   technical expert.  It is also my understanding that the
5   statements, many of which I've cited here, made by some
6   of the defendants, were made to people that were
7   industry experts, though not necessarily of the same
8   type as me, that is, they were stock market analysts or
9   technical analysts or other forms of experts.
10       But that was not the intent of my statement.
11  I was trying to say that my expertise gives me, I
12  believe, the ability to understand the context in which
13  these statements were made to various audiences,
14  including Wall Street analysts and attendees at Oracle
15  user conferences and so forth.
16       Q.  Is this another one of those sentences that
17  you would rewrite if you had the opportunity?
18       MR. RAWLINSON:  Objection to form.
19       THE WITNESS:  No, I don't think so.  I suppose
20  if I thought you were having difficulty understanding it
21  or that you might interpret it in a manner different
22  than what I intended I would be happy to rewrite it, but
23  I believe the meaning is clear as I wrote it, so I'm
24  happy to leave it as it is.
25       MR. WILLIAMS:  Q.  So is it your opinion or

82

1   your view that the statements that plaintiffs allege to
2   be false and misleading were intended for industry
3   experts and not the public at large?
4        MR. RAWLINSON:  Objection to form, vague.
5        THE WITNESS:  No, that's not my -- that is not
6   my intention as we sit here today, and that was not my
7   intention when I wrote this sentence.
8        MR. WILLIAMS:  Q.  Well, just go back to page
9   52 -- I'm sorry, paragraph 152 and just take a look at
10  paragraph 152 for me, please.
11       A.  Okay.
12       Q.  And if you can look at paragraph 153 as well.
13       A.  Okay.
14       Q.  Now, the block quoted section there is from
15  Oracle's CRM white paper; is that fair?
16       A.  That's correct.
17       Q.  And on the next page you say that "No one in
18  the industry would have adopted any of the
19  interpretations suggested by the plaintiff."  Do you see
20  that?
21       A.  Yes, I see that.
22       Q.  So are you limiting your opinion there as to
23  people in the IT industry, IT professionals?
24       A.  I'm limiting it to people who are involved in,
25  work in or are associated with the IT industry which, in

83

1   my opinion, would include some of these analysts that
2   I've mentioned who, in my opinion, have some degree of
3   expertise with regard to evaluating and assessing
4   products.
5        Q.  So what about institutional investors, for
6   example?  If some of the statements that you evaluated
7   were made to institutional investors, would you still
8   say that the statements were fundamentally accurate or
9   fundamentally true even if the statements were made to
10  people other than those in the IT industry?
11       A.  I believe that to be the case.  If there are
12  specifics you have in mind, I would be happy to look at
13  it.  The comment that you asked me to look at here in
14  paragraph 153 was part of a white paper, and I don't
15  know the audience to whom that was distributed.
16       I focused and I made my sentence statement
17  here based on my understanding of what industry people
18  would have done or how they would have interpreted it.
19       Q.  So if it is later found that the statements
20  were not made to industry people, would you have an
21  opinion as to whether or not the statements could be
22  false or misleading?
23       A.  To people other than people in the IT
24  industry?
25       Q.  Exactly.

84

1        A.  Such as institutional investors?
2        Q.  Or anyone.
3        A.  Or the general public?
4        Q.  General public.
5        A.  I don't think that they would be rendered
6   false by such a thing.  Whether they would be misleading
7   I think would depend on the context of the sentence, for
8   example, the understanding of the word engineering that
9   we had a moment ago.  I am not offering an opinion on
10  that as we sit here today.  I was focusing on the
11  industry people here.
12       Q.  So if it is found, I just want to be clear, if
13  it is found that the IT professional industry is only a
14  small part of the audience to which these statements
15  were made, you would not be offering an opinion as to
16  the -- as to whether or not any of the statements were
17  misleading to any of that broader audience?
18       MR. RAWLINSON:  Objection to form.  Objection
19  to the extent it mischaracterizes prior testimony.
20       THE WITNESS:  Based on the information I've
21  reviewed thus far in this report, I would not be
22  offering an opinion.
23       MR. WILLIAMS:  Q.  Okay.
24       A.  I don't know if I'm going to be exposed to new
25  information between now and trial that might make it

Yourdon, Edward  7/3/2007  9:07:00 AM

85

1   possible for me to offer such an opinion.  But not based
2   on what I've seen so far.
3       Q.  And you haven't done that type of evaluation?
4       A.  No, I have not.
5       Q.  We've talked a little bit about your opinion
6   concerning integrated.  What I did not see in your
7   opinion, and you can point me to it if it's there, was
8   an opinion concerning Oracle's statements that Suite 11i
9   was fully integrated and fully interoperable.  Does the
10  addition of the word "fully" qualifying integrated or
11  interoperable, would that change your opinion at all?
12      A.  No, it does not change my opinion with the
13  caveat that I think I've been using all the way through
14  that there could be bugs or imperfections in the
15  software, including its integration, but as a general
16  proposition, no, I'm not distinguishing between
17  integration and full integration.
18      Q.  In your view is there any difference between
19  integration and full integration?
20      A.  Not in the sense that Oracle was using it.
21      Q.  I'm just asking for the experience that you
22  can draw on, 40 years as an IT professional.  Do you
23  believe that there is a difference between software
24  being integrated or fully integrated?
25      A.  I believe there can be a difference if it is

86

1   consciously articulated and chosen, as has often been
2   the case in this industry, where an ERP vendor will say,
3   "I have fully integrated my package with these three
4   other components or products," and it is fully
5   integrated with respect to them, but it has not been
6   integrated at all with other components, and certainly
7   not with any legacy systems.  So whether the marketplace
8   or a potential customer views their needs as having been
9   met by a fully integrated product from that vendor might
10  not be the same as what the vendor intended.
11      Q.  So you would require an understanding on your
12  part of the intent of a vendor or the person making the
13  statement?
14      A.  Particularly with regard to the question of
15  whether the integration was intended to take place
16  before the customer acquired or licensed the product
17  versus afterwards.
18      Q.  So you're not offering an opinion -- well,
19  withdrawn.
20          So you evaluate Oracle's statements the same
21  way, if they said fully integrated and fully
22  interoperable, in your view it is the same as saying
23  integrated and interoperable?
24      A.  Yes.  And the distinction I think that Oracle
25  made and that I understood, a distinction between

87

1   preintegrated and post integrated, but in the context of
2   what Oracle was saying, I believe they meant the same
3   thing by integrated and fully integrated.
4       Q.  Do you think -- you don't think it's qualified
5   in the way that you've qualified fundamentally true?
6       A.  Not as I've seen the technical literature or
7   the evidence in this case, no, I think not.
8       Q.  So you're prepared as you sit here to say --
9   you're prepared as you sit here today to say that there
10  is no apparent, at least in your view, qualification
11  meant by using the word fully in front of integrated or
12  fully in front of interoperable, but for your own usage
13  you can say that the usage of the word fundamentally
14  prior to true does have meaning?
15          MR. RAWLINSON:  Objection to form.  Objection
16  to the extent it mischaracterizes testimony.
17          THE WITNESS:  Yes, I think that's a fair
18  statement.
19          MR. WILLIAMS:  Q.  I did not see an opinion
20  specified in your report concerning Oracle's statements
21  that Suite 11i was preintegrated, interoperable or fully
22  integrated and interoperable out of the box.
23          Do you intend to offer an opinion as to
24  whether or not Suite 11i was preintegrated and
25  interoperable out of the box?

88

1           MR. RAWLINSON:  Objection to form.
2           THE WITNESS:  Yes, I'm prepared to offer that
3   opinion, because I believe it was preintegrated and
4   interoperable out of the box.
5           MR. WILLIAMS:  Q.  And is that in your report?
6       A.  I would have to look and see.  As I recall,
7   that was a characterization made in statements by
8   Mr. Ellison and others.  I thought I had cited and had
9   indicated that I agreed with.  I would have to look
10  through my report to see.
11      Q.  Maybe we can do that at lunchtime.  Because in
12  your conclusion, again, you say the statements were, you
13  know, accurate.
14      A.  Yes.
15      Q.  And then you qualified that some with respect
16  to the context, but you don't identify which statements
17  you qualify as being only fundamentally true or accurate
18  with a caveat of context.
19      A.  Okay, fair enough.
20      Q.  But I did not see an opinion on that issue in
21  the report.
22          Do you intend -- well, withdrawn.
23          Do you offer an opinion or did you offer an
24  opinion as to whether or not Oracle's Suite 11i could be
25  up and running in months and that purchasers would get

89

1   savings in months?
2      A.  I don't recall -- I don't recall offering my
3   own opinion about the savings in months.  I do believe I
4   expressed the opinion about the ability of customers to
5   get Suite 11i up and running in months.
6      Q.  So if one of the statements that plaintiffs
7   allege to be false and misleading is that Suite 11i
8   is -- can be up and running in months, you get savings
9   in months, it costs you less -- let me back up.  Why
10  don't I just get the statement.  You actually quote it
11  in your report.  How is that?
12     A.  Most of it sounded familiar.
13     Q.  Go to paragraph 150.
14     A.  Also in paragraph 143 to be helpful.
15     Q.  Down at the bottom of page 59.
16     A.  And, yes.
17     Q.  You see where it begins, that last sentence
18  begins, "And a stomach for risk.  Or, you can buy our
19  complete E-Business suite where all the pieces are
20  designed and engineered to fit together and no systems
21  integration is required.  It's up and running in months,
22  you get savings in months, it costs you less and it
23  takes less time to install."  Do you see that?
24     A.  Not quite accurately quoted.  "You get the
25  savings in months."  The penultimate sentence.

90

1      Q.  It says, "You get the savings in months"?
2      A.  I didn't hear you include the word "the."
3      Q.  Maybe I didn't.
4      A.  I think that's significant, because I believe
5   the interpretation that anyone would have made in this
6   context is the savings that would be associated with no
7   systems integration being required.  Whether or not the
8   company begins increasing its revenues or decreasing its
9   costs and achieving overall financial savings, I don't
10  know, and I don't know whether Mr. Ellison intended
11  that.
12     Q.  I'm sorry, were you done?
13     A.  Yes.
14     Q.  Okay.
15     A.  And I think it would be taken in the context
16  of the next sentence which says it costs you less than
17  would be the case if you had to do your own integration
18  and hiring IBM or Anderson Consulting, and because it
19  costs you less, you would get the associated savings.
20     Q.  But it also says it takes less time to
21  install; right?
22     A.  Than would be the case with a best of breed
23  approach using IBM or Anderson Consulting.
24     Q.  Do you intend to offer an opinion as to
25  whether or not that statement is accurate, fundamentally

91

1   true or true in the context within which you interpret
2   it to be given?
3      A.  The latter two opinions I am prepared to
4   testify that that sentence is fundamentally true and
5   that it is accurate in the context in which it was
6   intended to the audience to whom it was being presented.
7      Q.  Do you know what audience that this statement
8   was being presented to?
9      A.  I believe this was an earnings call made to
10  the Wall Street community.  That's the best of my
11  understanding who the audience was.
12     Q.  But if that audience was broader than the Wall
13  Street community, but instead anyone who was, you know,
14  able or wanted to go listen, you would not have an
15  opinion; is that fair?
16     A.  Well, in this particular case, I would have an
17  opinion, because it comes at the end of a rather lengthy
18  explanation, which I believe would be understandable in
19  this particular case, anyway, even to non-technical
20  people.
21     Q.  So do you think that an expert's opinion as to
22  what this says or means would be helpful to a
23  non-technical person?
24     A.  I believe it would, yes.
25     Q.  And you don't -- Larry Ellison didn't tell you

92

1   what he meant, did he?
2      A.  No, he did not tell me what he meant.
3      Q.  But you think your interpretation of what he
4   meant is more fair and accurate than the public at large
5   interpretation of what he meant?
6         MR. RAWLINSON:  Objection to form.  Objection;
7   assumes facts not in evidence.
8         THE WITNESS:  I am not aware of the public's
9   understanding or interpretation of this sentence.
10        MR. WILLIAMS:  Q.  But you would be offering
11  the public an expert opinion on his meaning; right?
12  Isn't that what you said?
13     A.  I would be offering an expert opinion that in
14  the context of this entire sentence and for the primary
15  audience for whom it was intended that this would be a
16  fundamentally true statement.
17     Q.  With -- withdrawn.
18        Did you do an analysis as to whether or not
19  any customers were up and running on Suite 11i in
20  months?
21     A.  What kind of analysis do you mean?
22     Q.  Any expert analysis.
23     A.  My analysis was primarily to see whether such
24  customers existed, that is customers that did get up and
25  running within a matter of months.  And I believe

93

1  several of them are identified in the two reports that
2  I've been provided.
3      Q.  Did you find any customers that were up and
4  running in months on both ERP and CRM together?
5      A.  I did.  I must admit I don't recall now
6  whether we put that into the report -- I put that into
7  the report.  My recollection from looking at the
8  materials is that there were on the order of a dozen
9  such companies, 10 or 12.
10     Q.  As of December 14th of 2000?
11     A.  I -- oh, as of the date this statement was
12  made?
13     Q.  Statement was made; right.
14     A.  I would have to go back and look at the
15  details.  I believe some of them were up and running by
16  December 14th, though I can't tell you from memory which
17  ones.  Others may have been up and running by the end of
18  the so-called Class Period at the end of February 2001.
19     Q.  Just so you know, my question is that you
20  believe that you found evidence that there were
21  customers up and running in months, both CRM and ERP
22  together, as of December 14th of 2000?
23     A.  I believe there were.  I would not be
24  surprised if there is a relatively limited number given
25  that December 14th was only six or seven months after

94

1  the introduction or launch of the product.  But I
2  believe there were.
3      Q.  And that's somewhere in your report or your
4  rebuttal report you think?
5      A.  I think so.  I can't recall exactly from
6  memory.  But I'm fairly certain that I've seen several
7  such companies in my review of the various
8  implementation efforts.
9      Q.  Okay.  And --
10     A.  If I may pause for a moment, I'm fairly
11  certain that in my report there's a list, at least a
12  partial list of companies that were up and running, you
13  know, within months.  As to which of those met your
14  criterion of being both ERP and CRM, I don't recall
15  whether I identified that subset or that additional
16  qualification.  But I do know from looking at some of
17  the data involved that indeed some of them were both.
18  Whether I called them out in such a way in the report,
19  I'd have to look and see.
20     Q.  And did you analyze whether any Oracle
21  customers on Suite 11i as of December 14th, 2000 had
22  gotten any savings due to their implementation of Suite
23  11i?
24     MR. RAWLINSON:  Objection to form.  Vague and
25  ambiguous.

95

1      THE WITNESS:  No, I did not evaluate that or
2  analyze that.  I'm sorry.  No.
3      MR. WILLIAMS:  Q.  Then how is it that you
4  could sit here today and say that you're prepared to
5  provide an expert opinion as to whether or not the
6  statement that it's up and running in months, you get
7  the savings in months, it costs you less and it takes
8  less time to install is true or fundamentally true?
9      A.  I would be prepared to make that statement
10  based on my experience with the cost of implementation
11  as provided by consulting firms such as IBM and Anderson
12  Consulting, which is quoted in the previous paragraph of
13  Mr. Ellison's statement, usually associated with a great
14  deal of integration activity, after-the-fact integration
15  activity, which generally is far more excessive than the
16  cost of the ERP product itself.  Indeed, as someone has
17  indicated here in some material that I've cited, often
18  as much as ten times more expensive.
19     So I would certainly be willing to make such,
20  or offer such an opinion as having been fundamentally
21  true with the understanding that there might be the
22  occasional outlier or anomaly where perhaps the
23  implementation savings was smaller or nonexistent, but
24  it would be an extreme exception, as opposed to the
25  general case.

96

1      Q.  So you would be prepared to make that -- to
2  provide that expert opinion, notwithstanding the fact
3  that you've been provided substantial documents
4  concerning implementations of Suite 11i in the time
5  frame relevant to this case, but you're unable to cite
6  to any customer that got savings in months due to their
7  implementation of Suite 11i as of December 14th of 2000?
8      MR. RAWLINSON:  Objection to form.  Objection
9  to the extent it mischaracterizes prior testimony.
10     THE WITNESS:  It is unlikely if not impossible
11  that I would have the precise accounting data associated
12  with such savings, because the savings are being
13  realized by customers, not by Oracle.  So while I had
14  access, obviously, to a great deal of Oracle
15  information, I didn't have access to the books of, nor
16  the financial records of all the companies that
17  implemented it.  So there may well have been public
18  statements made by some of these customers as to how
19  much they felt they had saved, but not in any detailed
20  financial form that I could analyze.
21     MR. WILLIAMS:  Q.  So, again, based on what
22  you've seen in the evidence in this case, and not seeing
23  any information provided by an Oracle customer
24  concerning whether they got savings in months from their
25  implementation of 11i as of December 14th, 2000, you

97

1 would be prepared to provide an expert opinion as to
2 whether or not that statement is true?
3         MR. RAWLINSON:  Objection to the form.
4         THE WITNESS:  I would be prepared to offer
5 such an opinion with my interpretation and understanding
6 that I mentioned earlier, namely that the savings
7 referred to here by Mr. Ellison are savings in
8 implementation costs as compared to the costs that would
9 exist using consulting firms like IBM or Anderson.  Not
10 savings necessarily associated with the operational use
11 of Suite 11i once it had been put into production.
12         MR. WILLIAMS:  Q.  So would you also be
13 willing to provide an expert opinion on what Larry
14 Ellison or Oracle meant by the statement?
15         MR. RAWLINSON:  Objection; asked and answered.
16         THE WITNESS:  No, I'm not -- I don't claim
17 mind reading amongst my many skills.  I would be
18 prepared to testify that the understanding or
19 interpretation of such a statement by Mr. Ellison by the
20 audience that I think is involved here would be that the
21 savings that are being referred to are the savings
22 associated with implementation costs.  Mr. Ellison
23 obviously will have to speak for himself as to what he
24 meant by those words.
25         MR. WILLIAMS:  Q.  Can you turn to paragraph

98

1 197 for me, please, on page 75.
2         A.  Okay.
3         Q.  You can read that to yourself, if you want.
4         A.  Okay, yes, I've read it.
5         Q.  You see where you write, "It would be
6 incorrect for me to assert that there were no product
7 problems.  During the first year of its release a number
8 of Oracle customers implementing Suite 11i did
9 experience bugs and defects that caused numerous
10 setbacks; however, problems with these early releases of
11 software are common and expected by the industry"?  Do
12 you see that?
13         A.  Yes, I do.
14         Q.  So it's true that Suite 11i experienced
15 certain bugs and defects?  You concede that; right?  Or
16 you agree with that?
17         A.  I agree with that.  I don't consider that a
18 concession.
19         Q.  You agree with that?
20         A.  Yes.
21         Q.  And they did cause numerous setbacks for
22 customers; is that fair?
23         A.  I think that's fair.  Not necessarily
24 permanent or fatal setbacks, but certainly setbacks,
25 yes.

99

1         Q.  Sure.  In the sentence above that, you say,
2 "As noted above, even problems that are reported to
3 Oracle as TARs are more often than not unrelated to
4 software defects."
5         A.  Yes, I see that.
6         Q.  Did you evaluate all of the TARs that were
7 logged at Oracle?
8         A.  No, I did not.
9         MR. RAWLINSON:  During the relevant time
10 period?
11         MR. WILLIAMS:  Sure.
12         Q.  During the relevant time period.
13         A.  No, I did not.
14         Q.  And you didn't do an independent evaluation of
15 whether or not problems reported to Oracle as TARs are
16 more often than not unrelated to software defects?
17         A.  I did from the testimony of several witnesses,
18 several Oracle witnesses that are reported in this
19 report, and I believe also the other report, indicating
20 that approximately two-thirds roughly speaking of the
21 TARs, as they are often called, turned out not to be
22 software defects.
23         Q.  But did you not do an independent analysis of
24 that?
25         MR. RAWLINSON:  Objection to form.

100

1         THE WITNESS:  I did not do an independent
2 analysis of the TARs themselves to see whether they were
3 ultimately classified as software bugs or not.  No, I
4 did not.
5         MR. WILLIAMS:  Q.  Right.  So the more
6 accurate statement here would be after a review of the
7 testimony of certain witnesses, you concluded that based
8 on that testimony.  You didn't make this independent
9 finding?
10         MR. RAWLINSON:  Objection to form.
11         THE WITNESS:  That's not quite true.  I did
12 review several of the bug tracking reports that
13 indicated the number of things that had come into the
14 TAR database, so to speak, the ones that were ultimately
15 categorized and classified as being either software
16 defects or nondefects.  So I did do that level of
17 analysis.
18         MR. WILLIAMS:  Q.  Can you take me to section,
19 what is that, section VIII.2.3 of the report?
20         A.  That may be a cross-referencing error.  It
21 appears there is no section VIII.3.2, Roman numeral
22 VIII.3.2.  So I will have to find you the particular
23 section of the report that does address that topic.
24         Q.  Okay.
25         A.  Would you like me to do that now?

101

1    Q.  No.  That's fine.
2    A.  I apologize for the cross-referencing update
3  or nonupdate.
4    Q.  Just take a look at paragraph 199.
5    A.  Okay.
6    Q.  It looks like you're discussing one of the
7  META group's reports; right?
8    A.  Yes, that's correct.
9    Q.  And the META group says, "Users must approach
10  the newer applications cautiously because many have not
11  been field tested in real world scenarios.  For mission
12  critical applications we recommend that users wait at
13  least six months after the release of 11i to
14  purchase/implement Oracle's newest application."  Do you
15  see that?
16    A.  Yes, I see that.
17    Q.  And why did you think that this was relevant
18  to your analysis?
19    A.  Because it was part of this comment that was
20  preceded in paragraph 198 led by Mr. Kinikin, and going
21  back to paragraph 197 that says it's common for problems
22  to be experienced during the first year of
23  implementation of -- first year of release of a new
24  product, and as a general phenomenon discussed elsewhere
25  in my report, the companies that are most willing to use

102

1  a new product in that early period are often the early
2  adopters, the ones willing to gain the benefits of an
3  early release with the understanding of potential bugs.
4    And I felt that Mr. Bonadio, or however his
5  name is pronounced, was pointing out that if you have
6  mission critical applications, and are, therefore,
7  somewhat perhaps a more conservative customer, it might
8  be a good idea to wait for six months.
9    Q.  Isn't it true that you intend to offer an
10  opinion that you found no customers that were, or
11  potential customers that delayed purchases or
12  implementation due to problems or instability of Oracle
13  11i software?
14    MR. RAWLINSON:  Objection to the form.
15    THE WITNESS:  I believe the language was that
16  there were very few if any.  I would have to recall the
17  or re-examine the language.  But, as I recall, it was
18  something along those lines, very few if any, or very
19  few if any unknown or undisclosed problems, or language
20  somewhere along those lines, yes.
21    MR. WILLIAMS:  Q.  So you found that -- well,
22  withdrawn.
23    Did you not find that potential Oracle
24  customers actually did delay purchases and
25  implementations of 11i software due to undisclosed --

103

1    A.  Unknown or undisclosed.  Not that I recall.
2  Again, I remember addressing that fairly specifically in
3  a later section in my report.  However, I think
4  Mr. Bonadio is saying as a general proposition you might
5  want to consider delaying, without even looking to see
6  if there are specific problems, because newer
7  applications need to be treated cautiously, et cetera,
8  et cetera.
9    Q.  You did find certain customers did delay
10  implementation or purchases of Oracle 11i due to
11  problems with the software; isn't that true?
12    MR. RAWLINSON:  Objection to form.  Objection:
13  mischaracterizes testimony.
14    MR. WILLIAMS:  Q.  If it is not, you can say
15  it is not.
16    A.  Well, again, what I need to do is take a look
17  at the language in my report where I have -- in
18  section XI, Roman numeral XI, I discussed a number of
19  prospects or companies that were in the sales pipeline
20  that were considering 11i.  And again I would have to
21  look at the language here to see whether there are
22  perhaps one or two -- you know, I have seen no evidence
23  that deals failed to close because of problems that
24  undermined Oracle's statements that the product was
25  integrated and operable.

104

1    But I don't see that as being at all related
2  to the paragraph you directed me to look at by
3  Mr. Bonadio.  There may have been customers that delayed
4  implementation because of advice from analysts of this
5  sort without having specifically looked at the product.
6    Q.  So you're saying that, you know, there is a
7  difference between looking at the product and viewing
8  problems and delaying, or hearing that there may be
9  problems and delaying?
10    A.  Yes, I think that is a significant difference.
11    Q.  Okay.  And did you evaluate whether or not any
12  customers or potential customers heard about problems
13  with Suite 11i and delayed purchases or implementations?
14    MR. RAWLINSON:  Objection; form.
15    THE WITNESS:  The only ones that I would have
16  considered are the ones that heard whatever they heard,
17  whether it was good or bad, but then proceeded farther
18  into the discussions with Oracle to consider such
19  things.  And then the question is whether they would
20  have proceeded or not.
21    I did not analyze the presence or absence of
22  potential customers that heard whatever they heard and
23  then decided to go no further and did not pick up the
24  phone to call Oracle.  That community --
25    MR. WILLIAMS:  Q.  So you have no opinion on

Yourdon, Edward  7/3/2007  9:07:00 AM

105

1  whether or not potential customers may have heard about
2  problems with Suite 11i and decided to either delay or
3  just not purchase 11i?
4      MR. RAWLINSON: Objection to form.
5      THE WITNESS: In the case where their decision
6  was made without any contact or interaction with Oracle
7  so that Oracle would know that it was even an issue,
8  that's what I'm trying to identify.
9      MR. WILLIAMS: Q.  I understand that.
10     A.  Okay.
11     Q.  But you're not stating you're aware of every
12  customer that contacted Oracle concerning a possible
13  purchase of 11i during the relevant time period, are
14  you?
15     A.  No, no.  Indeed what I discussed here was the
16  particular subset that I did look at more closely, and
17  that was roughly 100 customers or potential customers, I
18  should say, with particular sales figures above a
19  certain level.  That's what I described in here.
20     Q.  You didn't look at any potential customers
21  beyond the ones that I think you said were -- may
22  purchase applications above $2 million or something like
23  that?
24     A.  That was one or two criteria, yes.  Beyond
25  that category I described in my report --

106

1      Q.  You have no opinion on that issue?
2      A.  No, I'm not -- I don't have an opinion.
3      Q.  Okay.  And so a customer that may have planned
4  to purchase a $500,000, you know, package of Suite 11i
5  software, you have not evaluated whether or not that
6  customer may have viewed the product, saw problems and
7  decided to delay or not to purchase at all?
8      A.  I think there may have been a couple of that
9  sort where they had been identified by plaintiffs.  I
10  seem to recall there were a couple under the $2 million
11  price tag.  As a general proposition, no, I did not.
12     Q.  My question, as a general proposition, you
13  didn't evaluate that universe of potential customers?
14     A.  No, I did not.
15     Q.  In fact, you didn't evaluate the universe of
16  potential customers below that $2 million threshold?
17     A.  Except for the ones identified by plaintiffs,
18  and I forgot what the other categories were.
19     Q.  But you understood that Oracle had thousands
20  of potential customers; isn't that right?
21     A.  Well, they had certainly more than 100.  I
22  don't know what the number was.  I imagine it to be a
23  fairly large number.  Whether it was hundreds or
24  thousands or millions, I'm not prepared to offer an
25  opinion here.

107

1      Q.  Didn't you cite to Oracle's statement that
2  they had 2,500 customers implementing 11i?
3      A.  Yes.
4      Q.  So isn't it fair to say 11i had potentially
5  thousands of customers?
6      A.  Yes.  It may have been 2,501.  I'm not trying
7  to quibble.  But, again, I can't tell you if it was a
8  few thousand or many thousands or tens of thousands or
9  hundreds of thousands.  I didn't try to assess that at
10  all.
11     Q.  Can you take a look at paragraph 201 for me,
12  please, where you write, "Plaintiffs' anecdotal evidence
13  of bugs and a handful of escalated customers that
14  experienced escalated concerns for a host of possible
15  reasons do not indicate anything to me about the overall
16  quality of the software."
17     A.  Yes, I see that.
18     Q.  Is that paragraph only tied to the evidence
19  that plaintiffs had pointed to in their complaint, or
20  are you referring to all the evidence that was provided
21  to you to evaluate?
22     A.  The latter of those two scenarios you've
23  mentioned.
24     Q.  The latter?
25     A.  Yes.

108

1      Q.  So this paragraph is inaccurate by saying
2  plaintiffs' anecdotal evidence?
3      A.  And a handful of escalated customers -- could
4  you go back to your earlier question?
5      Q.  I'm just trying to determine whether or not
6  the evidence that you appear to be referring to here is
7  what you believe is the plaintiffs' evidence.
8      A.  No, it is not just the plaintiffs' evidence.
9  So the plaintiffs' evidence of bugs as illustrative of
10  quality problems and the escalated customers that were
11  allegedly evidence of customer problems was not the only
12  thing I looked at in evaluating the quality of the
13  software.
14         There were either bug reports or deposition
15  testimony or other things describing those incidents or
16  those escalated customers that I took into account --
17  I'm not quite done -- which included information beyond
18  just that provided by the plaintiffs, but also
19  information that I asked for from counsel or from Oracle
20  to help gain a better understanding of what was going on
21  in these circumstances where bugs had been reported or
22  escalated customers were involved.
23     Q.  So this paragraph does not convey what you
24  intended to convey; is that fair?
25     MR. RAWLINSON: Objection to form.

Yourdon, Edward  7/3/2007  9:07:00 AM

109

1      THE WITNESS: It doesn't convey what I
2  intended to convey. I've provided additional
3  elaboration or perhaps clarification based on your
4  question. But I intended what I wrote.
5      MR. WILLIAMS: Q. I don't -- did you intend
6  what you just said to me, or you intended what you
7  actually wrote?
8      MR. RAWLINSON: He said it doesn't convey,
9  then the rest of the paragraph is confusing.
10     He's asking does the sentence convey what you
11  intended?
12     THE WITNESS: I apologize. The sentence
13  conveys what I intended it to convey.
14     I've also conveyed to you additional
15  information about things that I took into consideration
16  along with the plaintiffs' evidence, and I intended to
17  convey that to you as well.
18     MR. WILLIAMS: Q. So someone who reads this
19  sentence to mean that you were referring to the
20  plaintiffs' anecdotal evidence and handful of escalated
21  customers would be misinterpreting it?
22     MR. RAWLINSON: Objection to form. Objection;
23  incomplete hypothetical.
24     THE WITNESS: If they read it as indicating --
25  or if they understood from this sentence that the only

110

1  means by which I achieved this indication was only the
2  plaintiffs' anecdotal evidence, yes, that would be a
3  misinterpretation.
4      MR. WILLIAMS: Q. No. Plaintiffs' anecdotal
5  evidence and a handful of escalated customers.
6      A. You're absolutely right, yeah.
7      Q. And so really by paragraph 2001 (sic), are you
8  really just talking about all of the evidence that you
9  reviewed?
10     MR. RAWLINSON: Objection to form.
11     MR. WILLIAMS: Q. Is that fair?
12     A. No. No. Let me try it again. What I was
13  trying to convey was that I obviously had some anecdotal
14  evidence of bugs provided by plaintiffs and a handful of
15  escalated customers, what I was trying to find out was
16  does this indicate anything to me about the overall
17  quality of software, all right. And I did not try to
18  reach a conclusion or opinion about that by only looking
19  at the anecdotal evidence and the identification or
20  existence of the escalated customers, but the other
21  evidence that was available about those anecdotal bugs
22  and escalated customers.
23     Beyond that there was even more information
24  about the quality of the software that I took into
25  account to form my overall opinion.

111

1      But as to the question of whether my opinion
2  was based on the plaintiffs' evidence of bugs and the
3  escalated customers, and only the information associated
4  with those from the plaintiff, the answer is no.
5      Q. So what you're referring to in 2001 (sic)
6  is --
7      A. 201.
8      Q. I'm sorry, 201, is a relatively small universe
9  of evidence for the purpose of that paragraph?
10     A. That's correct, though you characterized it as
11  small, but as you can see from the footnote associated
12  with that paragraph, it is not trivial.
13     Q. So all of the evidence that you evaluated that
14  relates to paragraph 201 and the footnote that you cite
15  to and all of the evidence in that footnote didn't
16  indicate anything to you about the overall quality of
17  the software?
18     MR. RAWLINSON: Objection to form.
19     MR. WILLIAMS: Q. Right? At least that's
20  what you wrote.
21     A. Yes, that's what I wrote, because it was not
22  indicative, it did not provide a conclusion or form an
23  opinion or allow me to form an opinion by itself.
24     Q. Now, I just want to be clear that your opinion
25  as it relates to paragraph 201, the evidence that you

112

1  reviewed related to that, what is written in that
2  paragraph and the footnote didn't indicate anything to
3  you about the quality of the software?
4      MR. RAWLINSON: Objection to form.
5      MR. WILLIAMS: Q. And I'm focusing on the
6  word anything.
7      A. And I agree with what you've just said, it did
8  not indicate anything.
9      Q. So it is valueless, you don't need this --
10  this evidence is unimportant and irrelevant relating to
11  the quality of the software?
12     MR. RAWLINSON: Objection to form.
13     THE WITNESS: No, I would not say that it was
14  valueless or irrelevant. It's not conclusive, it is not
15  indicative, it doesn't -- it is there and it may be used
16  as a starting point for further investigation. But by
17  itself it does not indicate anything about the overall
18  quality of the software.
19     MR. WILLIAMS: Q. Okay.
20     A. If I can add to that also, since I was looking
21  at the preceding citation, one of the reasons that it
22  does not indicate anything to me is because of the
23  number of bugs and escalated customers as compared to
24  the larger universe of bugs and customers that would
25  actually allow me to form an overall opinion.

113

1    Q.   Okay.  Why don't we look at paragraph 202,
2  just under it.  "Furthermore, plaintiffs' evidence that
3  certain customers were offered discounts for free
4  consulting services including SWAT teams to remedy
5  problems does not indicate anything to me about the
6  quality of the software."  Do you see that?
7    A.   Yes, I do.
8    Q.   In that paragraph are you referring to
9  plaintiffs' evidence there?
10   A.   My intention was similar to what we've just
11  discussed.  I was obviously aware that plaintiffs did
12  provide some evidence that certain customers were
13  offered discounts or free consulting, but that by itself
14  did not indicate anything to me about the quality of the
15  software.
16   Q.   What evidence did plaintiffs provide regarding
17  certain customers being offered discounts on free
18  consulting services?
19   A.   I don't recall sitting here at this moment the
20  exact incidents that were identified in some of the
21  plaintiffs' documents or perhaps in Mr. Hilliard's
22  reports.  All I recall at this point is the general
23  statement or assertion or charge that came from
24  plaintiffs about this phenomenon.
25   Q.   So are you referring -- withdrawn.

114

1        So you don't know whether the plaintiffs
2  provided any evidence concerning software -- certain
3  customers that were offered discounts or free
4  consulting?
5    A.   Oh, I believe they did.  I just can't recall
6  the specifics.  It is possible that I refer to specific
7  examples in my rebuttal report or elsewhere in here.
8  But this was not made in the absence of specific
9  examples.  I don't recall them now.
10   Q.   I understand that.  I'm just wondering whether
11  or not -- it seems there are places you identify
12  plaintiffs' evidence and other places where you don't
13  discuss plaintiffs' evidence, and I'm trying to
14  understand what you believe plaintiffs' evidence to be,
15  since you referred to it -- since you referred to it in
16  paragraph 202.
17   A.   I've referred to it in paragraph 201 or 202,
18  without having identified it.  And I apologize for not
19  being able to recall exactly where it was, whether it
20  was in the initial complaint or some of the subsequent
21  filings by plaintiffs or Mr. Hilliard's report.
22        All I can tell you sitting here right now is I
23  did see such evidence as part of the official record.
24   Q.   And whatever it was that you reviewed relating
25  to paragraph 200 to 202, did not indicate anything to

115

1  you about the quality of the software?
2    A.   That's correct.
3    Q.   Again I'm focusing on "anything," the word
4  anything.
5        MR. RAWLINSON:  As opposed to overall quality?
6  Are you asking him to isolate it from the whole
7  sentence?
8        MR. WILLIAMS:  Q.  I want to be sure that the
9  evidence that he's referring to does not indicate
10  anything at all about --
11       MR. RAWLINSON:  Anything at all -- okay, go
12  ahead.
13       MR. WILLIAMS:  Q.  -- to you about the quality
14  of the software.
15       MR. RAWLINSON:  The quality or the overall
16  quality?
17       MR. WILLIAMS:  It says the quality of the
18  software.
19       MR. RAWLINSON:  Okay.
20       THE WITNESS:  Paragraph 201 says the overall
21  quality.
22       MR. WILLIAMS:  Q.  I'm referring to paragraph
23  202.
24   A.   202.  Okay, I think to be consistent I should
25  insert the adjective "overall" into paragraph 202 to

116

1  make it consistent with paragraph 201.
2    Q.   But, still, that doesn't indicate anything to
3  you?
4    A.   That's correct.
5    Q.   So is it fair to say that if you referred to
6  more evidence than simply just the plaintiffs' evidence
7  concerning concessions that Oracle was providing to
8  customers due to product problems, that would indicate
9  something to you concerning the quality or overall
10  quality of the software?
11   A.   That would give me additional information with
12  which to form an opinion, yes.
13   Q.   I understand it would give you additional
14  information.  I think the information that you referred
15  to here was information that was provided to you that
16  you could use for some purpose; right?
17   A.   Yes.
18   Q.   But if you had information in addition to the
19  plaintiffs' evidence as referred to here relating to
20  concessions that the company was giving to customers for
21  product problems, would that indicate anything to you
22  about the overall quality of the software?
23   A.   Potentially, yes.  If I had a great deal of
24  additional information beyond that provided by
25  plaintiffs and beyond the additional information that I

117

1  pursued about those plaintiff situations, yes, then I
2  would use that to assess the quality of the software.
3      Q.  Did you make an evaluation of -- which
4  includes a review of all of the evidence that was in
5  your possession concerning concessions that Oracle paid
6  to customers due to product problems?
7      A.  No, I did not.
8      Q.  So you have no opinion as to whether or not
9  Oracle concessions given to customers due to problems
10  with Suite 11i impacted -- withdraw that.
11          So you didn't draw any conclusions related to
12  concessions, based on all of the evidence that you
13  reviewed, given to Oracle customers due to problems with
14  11i and its impact on your evaluation of the quality of
15  the software?
16      MR. RAWLINSON:  Objection to form.
17      THE WITNESS:  Beyond the review that I
18  conducted of the plaintiffs' subset of that, no, I did
19  not.  It seems to me you're asking if I did the
20  plaintiffs' job for them.  But in any case --
21      MR. WILLIAMS:  Q.  I'm not asking you that.
22      A.  I'm sorry if I misinterpreted.  But, no, I did
23  not evaluate the totality of all such discounts that may
24  have been offered and/or the reasons for why they were.
25      VIDEOGRAPHER:  This marks the end of tape two

118

1  in Volume I in the deposition of Edward Yourdon at
2  12:34, going off the record.
3          (Recess, 12:34 p.m. - 1:40 p.m.)
4      VIDEOGRAPHER:  On record at 1:40.  This marks
5  the beginning of tape three in Volume I of the
6  deposition of Edward Yourdon.
7      MR. WILLIAMS:  Q.  Mr. Yourdon, if you could
8  turn to paragraph 205 on page 77 of your May 25th
9  report.
10      A.  Yes, I see it.
11      Q.  In here you say, "Based on my review of the
12  factual record and my extensive experience in business
13  enterprise software, however, the growing pains
14  encountered by the massive CRM portion of Oracle's Suite
15  11i were neither undisclosed to the public, nor were
16  they out of the ordinary."
17          What part of your analysis, i.e., your review
18  of the factual record or your extensive experience leads
19  you to conclude that the growing pains you refer to here
20  were disclosed, or were not undisclosed?
21      A.  The factual record that I reviewed included
22  presentations by Oracle executives at Oracle conferences
23  about the new version of the CRM portion of Suite 11i,
24  as well as analyses and reports and evaluations provided
25  by various analysts in the computer industry about the

119

1  CRM portion.  My experience with business enterprise
2  software covers --
3      Q.  Maybe my question wasn't clear.
4      A.  I see.
5      Q.  What about your extensive experience led you
6  to conclude that the growing pains encountered by the
7  CRM were not undisclosed?
8      MR. RAWLINSON:  Objection to form.
9      THE WITNESS:  My experience in the field leads
10  me to believe that growing pains associated with any new
11  software component would be disclosed in a variety of
12  media and a variety of forms, and I felt that those were
13  covered, and, therefore, my experience indicated that
14  problems were not undisclosed.
15      MR. WILLIAMS:  Q.  So you're not relying on
16  any specific evidence to suggest that the -- what you
17  call growing pains with the CRM were disclosed, are you?
18      MR. RAWLINSON:  Objection; mischaracterizes
19  testimony.
20      THE WITNESS:  No.  I think the previous answer
21  I had given you, which you felt didn't respond to your
22  question, my previous answer was that I did see
23  evidence, affirmative evidence of statements about the
24  growing pains of the CRM portion from Oracle executives
25  and from industry analysts that I felt provided

120

1  disclosure.
2      MR. WILLIAMS:  Q.  Maybe I'm not -- I'm not
3  asking the question the right way.
4      A.  Or I'm not understanding.  Sorry.
5      Q.  It looks like you're saying two things in this
6  paragraph.  A, that based on your review of the record
7  and extensive experience, that the growing pains were
8  not undisclosed, nor were they out of the ordinary.
9      A.  That's correct.
10      Q.  Now, based on your experience alone, separate
11  out the factual record, what in your experience led you
12  to conclude that the growing pains that were encountered
13  with the CRM portion of Suite 11i were not undisclosed?
14      MR. RAWLINSON:  Objection; asked and answered.
15      THE WITNESS:  My experience includes
16  introductions and launches of numerous software and
17  business enterprise software products.  And that
18  experience includes previous examples of executives in
19  various computer companies, whether it is IBM or
20  Microsoft, et cetera, making statements as to their
21  assessment of the growing pains or lack of growing
22  pains.  So part of my experience was of that nature
23  where I thought given that that's what corporate
24  executives do about new introductions of software, I
25  would expect Oracle as appropriate to make similar

Yourdon, Edward  7/3/2007  9:07:00 AM

121

1 comments if they were appropriate about CRM.
2         Similarly, when I've seen new product
3 announcements or new product introductions throughout my
4 experience, I would expect to see reports, reviews,
5 analyses, et cetera, in the computer trade publications,
6 magazines and so forth, as well as reviews, analyses and
7 so forth from computer analysts, industry analysts.
8 That's very common and expected.  That led me to believe
9 that one should expect to see similar things with regard
10 to Oracle's CRM.
11         MR. WILLIAMS:  Q.  Right.  But you didn't see
12 that, did you?
13         A.  Yes, I did.
14         Q.  You don't cite to anything, you don't appear
15 to rely on any factual record here.  So can you tell me
16 what you saw in terms of the factual record that the
17 growing pains encountered by CRM were disclosed or not
18 undisclosed?
19         A.  Well, paragraph 208, 209, 210 were examples.
20 I think there were others that I've cited either in this
21 report or in the rebuttal report.  I don't suggest that
22 those four paragraphs are an exhaustive example.  But
23 there is a disclosure in Business Week magazine, which
24 is certainly a widely read --
25         Q.  Where are you looking?

122

1         A.  Paragraph 208 on the following page, page 78.
2 Paragraph 209 is a very brief citation from an industry
3 analyst called GIGA.  Paragraph 210 is an example of
4 obviously Oracle's executive vice-president speaking at
5 an Oracle user group.
6         Q.  Okay.
7         A.  I think there are others in the report as
8 well.
9         Q.  Well, let's take a look at --
10         A.  We missed paragraph 206 also.
11         Q.  Okay.
12         A.  Which is another trade magazine report.
13         Q.  All right, let's take a look at 206 quickly.
14 You are basically talking about the Information Week
15 citation?
16         A.  Yes, in paragraph 206.
17         Q.  And footnote 125 says, "Alorie Gilbert, ERP
18 Vendors Look for Rebound After Slowdown, February 14th,
19 2000"?
20         A.  Yes.
21         Q.  That was about four months before or three
22 months before Suite 11i was shipped?
23         A.  That's correct.
24         Q.  So you couldn't -- are you saying that the
25 problems with Suite 11i were in the public domain before

123

1 it was shipped to the public or people who were buying
2 it?
3         A.  To the extent that either Mr. or Ms. Gilbert
4 is saying that not all of it would be released at the
5 end of the first quarter -- I'm sorry, she says the
6 fully web-enabled application suite will not be released
7 until the end of first quarter, and some parts of it
8 would be shipped even later, I think --
9         Q.  Where are you reading here?
10         A.  The top of page 78, the end of the citation,
11 "Some components, such as CRM and order management, will
12 ship even later."
13         That seems to me to be a public disclosure of
14 growing pains in this particular case, growing pains of
15 the nature that the entire thing was not ready to be
16 shipped with the rest of the ERP package in the public
17 launch date of May, some odd, May of 2000.
18         Q.  Wasn't CRM and order management shipped in May
19 of 2000?
20         A.  As I recall, some of it if not all of it was.
21 But here is a public disclosure there may be problems to
22 watch out for.
23         Q.  Is that what you think -- withdrawn.
24         Is that what you say is a disclosure,
25 concerning growing pains encountered by the CRM portion

124

1 of Oracle's Suite 11i?
2         A.  Yes, I believe it is.
3         Q.  Did you see evidence of any customer, quote,
4 unquote, encountering growing pains in February of 2000
5 as a result of attempts to implement Suite 11i?
6         A.  Certainly not in February of 2000, no.
7         Q.  Looking at paragraph 208, the Business Week
8 article that you quote there, it is your view that this
9 article is a disclosure of the growing pains encountered
10 by the CRM portion of 11i; right?
11         A.  Yes.
12         Q.  And the date of that article is May 8th of
13 2000; right?
14         A.  That's correct.
15         Q.  Again, prior to the public availability of
16 11i?
17         A.  I don't recall which day in May it was that it
18 was actually launched.
19         Q.  How about paragraph 209?
20         A.  Yes.
21         Q.  You say that this GIGA article is a public
22 disclosure of the growing pains encountered by the CRM
23 portion of Oracle's Suite 11i.
24         A.  Yes.
25         Q.  And do you know what the date of that article

Yourdon, Edward  7/3/2007  9:07:00 AM

125

1 is?
2     A.  According to footnote 127, it is March 27 of
3 2000, with a title, I might add, that says, "Oracle
4 Delays (Pieces of) CRM Release - Early Buyers Beware."
5     Q.  Would one have to be an IT professional to
6 understand that this is a disclosure of massive problems
7 encountered by customers trying to use 11i?
8     MR. RAWLINSON:  Objection to form.
9     MR. WILLIAMS:  Q.  Or the CRM portion of 11i?
10     A.  It is not a disclosure of massive problems.  I
11 thought we were looking for examples of factual record
12 or experience associated with the growing pains that I
13 referred to in paragraph 205.
14     Q.  Do you think it is a disclosure of that?
15     A.  Yes, I do.
16     MR. RAWLINSON:  By that, do you mean growing
17 pains?
18     MR. WILLIAMS:  Q.  Yes.
19     A.  Yes, and that's what I was answering, I do
20 believe it shows evidence of the growing pains.
21     Q.  What do you describe -- withdrawn.
22       What is a growing pain?
23     A.  In the context of this discussion or this
24 sentence, it's the initial difficulties experienced by a
25 software vendor from the introduction of the product

126

1 through the first typically six to twelve months of the
2 product.
3     Q.  So you're saying it is the experience of the
4 vendor, not customers?
5     A.  It is experience of the difficulties of the
6 vendor in its attempt to provide products to the
7 customers.  So in this case with things being reported
8 in March, the difficulties or growing pains are those of
9 the vendor trying to get the product out the door.
10 Presumably from May onward they will be problems either
11 on the vendor's part or customers' part, depending on
12 the situation.
13     Q.  Just taking a look at paragraph 211.  You
14 write, "Again these bugs and problems with functionality
15 are typical of such new and massive software.  The fact
16 that CRM was developed by separate applications groups
17 within Oracle and delivered on separate dates has no
18 bearing on whether the product was integrated and
19 interoperable."
20       Are you relying on anything other than Greg
21 Seiden's testimony for that proposition?
22     A.  I'm relying on my experience in the software
23 field.
24     Q.  Okay.  And in your experience, the fact that
25 the software was developed by two separate organizations

127

1 has no bearing whatsoever on whether it was integrated
2 and interoperable?
3     A.  That's correct.
4     Q.  Do you know whether the people that actually
5 developed this software would agree with you on that
6 point?  Meaning Ron Wohl or Mark Barrenechea?
7     A.  I don't believe they actually developed the
8 software.  They -- what I am aware from the record is
9 that there were disagreements at that level of Oracle's
10 executive management, but that the developers who were
11 several levels actually doing the software
12 development have indicated that it did not cause a
13 problem.
14     Q.  If either Ron Wohl or Mark Barrenechea
15 disagreed with the proposition that you articulate in
16 paragraph 211, would they be wrong?
17     A.  They may be wrong.  It would depend on whether
18 they had additional testimony to offer that I haven't
19 seen.
20     Q.  Well, so then you may be wrong as well; isn't
21 that fair?  Because you -- I'm sorry, go ahead?
22     A.  Based on the evidence I have seen so far, I
23 don't think I'm wrong.  As I indicated it is possible
24 there is new testimony or additional testimony I have
25 not seen that would make me reconsider that issue.

128

1     Q.  Just to be clear, you're relying only upon
2 your experience and Greg Seiden's testimony?  I think
3 that's what you testified to, for that proposition?
4     A.  No.  I also believe I testified that I had
5 seen testimony -- I'm not quite sure of the language I
6 used -- from people below the level of Mr. Seiden --
7 excuse me, below the level of Mr. Wohl and
8 Mr. Barrenechea who were asked if the disagreements or
9 conflicts between Mr. Wohl and Mr. Barrenechea had
10 caused them any difficulty with regard to the
11 development of an integrated and interoperable system or
12 product.
13     Q.  And they said?
14     A.  And they said no.
15     Q.  But you didn't cite that here.  Is there a
16 reason you didn't rely on that in paragraph 211?
17     A.  No, there is not a reason.
18     Q.  You don't recall the names of those
19 individuals, do you, that testified the way that you've
20 just described?
21     A.  I don't.  No, I don't.
22     Q.  Looking at paragraph 212.  You write, "Oracle
23 truthfully represented that Suite 11i was integrated and
24 interoperable; the early problems with CRM that were
25 widely publicized prior to the Class Period do not

Yourdon, Edward  7/3/2007  9:07:00 AM

129

1  change of truth of that claim." Do you see that?
2      A. Yes, I do.
3      Q. Do you know when the Class Period is?
4      A. I believe there is still some dispute as to
5  whether the Class Period is December 14th, 2000 to
6  February 26th, or whether it is, as you had suggested
7  earlier, June 1st to June 1st, or May of 2000 to
8  February 26th of 2001.
9      Q. And was there -- during any period in the time
10  frame between June of 2000 and June of 2001, would a
11  statement that 11i was integrated and interoperable been
12  misleading in your view?
13      A. No, I don't believe it would be misleading.
14      Q. If it was true that Suite 11i was designed to
15  be preintegrated or integrated and interoperable, but it
16  didn't work in the field in that fashion, would the
17  statement also be true, nevertheless, in your view?
18      A. I think that would depend largely on what you
19  mean by work, which you usually indicated was surrounded
20  by quotation marks.
21      Q. You raise an interesting point, because I
22  forgot to ask you, and I was going to ask you earlier.
23  There are, I would say, dozens of places in your opening
24  report where you quote or put quotations around words or
25  phrases, but you don't cite to where you're quoting

130

1  from. And I guess generally I wanted to know if there
2  was any reason for that or anything we should understand
3  from that.
4      A. No, not in general.
5      Q. And I think one of the places you did that was
6  when you described what business people or end-users --
7  on paragraph 100 you say, "For the end-user of a
8  software system, as well as for IT professionals
9  'integration'" -- with no citation -- "simply means that
10  the pieces or components or modules of the system 'work
11  together'" also in quotes.
12      So I'm really -- I'm using the term work in
13  the way that you've used it in your report.
14      A. Okay. And as you recall, when we discussed
15  that this morning, we eventually got down to a sentence
16  later in that paragraph where it says, "How well
17  components 'work together' is often in the eye of the
18  beholder," and we had a lengthy discussion about that.
19  And I think that would be the gist of my response to
20  your most recent question.
21      Q. That's fine.
22      A. I think your question was if Suite 11i is
23  shown not to work, quote, unquote, would it still be
24  regarded as integrated. And I think that is in the eye
25  of the beholder. It is a question of degree, a question

131

1  of severity. Does it not work at all or does it not
2  work in one situation out of a million, et cetera. I
3  don't think I can give an absolute universal answer to
4  such a question.
5      Q. So when you say it would be in the eye of the
6  beholder, you're saying it is somewhat subjective?
7      A. That was not my intention. I think it depends
8  on whether the circumstances that caused a beholder to
9  judge that it wasn't working might turn out to be
10  software and it might turn out to be any number of other
11  reasons.
12      Even if it was a software problem, the extent
13  to which it worked or didn't work might also be a
14  question of degree and frequency and so forth, I didn't
15  mean any of those necessarily to be subjective, but
16  merely to suggest that it is not all or nothing.
17      Q. I have to confess, it sounds subjective, but
18  that's okay.
19      So you would have to evaluate every
20  circumstance where one believes that the system was not
21  working in order for you to determine whether it
22  rendered the statement that it was integrated and
23  interoperable to be misleading?
24      A. I believe you would have to at least examine a
25  large enough sample of such occasions to be able to

132

1  detect a pattern or a trend or to be able to make some
2  credible statements about the percentage of
3  circumstances where it didn't work.
4      And also as I said a couple of times, the
5  extent to which it didn't work. If the nonworking
6  nature or aspect of the system was something that
7  occurred only one time out of a million, one transaction
8  out of a million, I would still judge that it's working.
9  So I need to see something about the number of failures
10  or the percentage of transactions that didn't work or
11  some other quantitative indication of the frequency,
12  severity, pervasiveness, et cetera.
13      Q. How large of a sample would you need?
14      A. I don't think I'm prepared as I sit here right
15  now to suggest a particular sample size. But certainly
16  more than one or two. I would say a reasonable number.
17  I couldn't put a figure on that at the moment.
18      Q. But the sample -- the size, at least the
19  evidence that you reviewed, was large enough for you to
20  conclude the opposite, which is that it was integrated
21  and interoperable, regardless of evidence, that at least
22  some evidence that some people felt that it didn't work?
23      MR. RAWLINSON: Objection to form.
24      THE WITNESS: Yes, it was, in terms of the
25  individual problems that were reported, particularly by

133

1  plaintiffs, and also on more of an aggregate basis by
2  the number of companies that had installed the system
3  and gone live with it versus the number that were in
4  some escalated state, I believe that I saw a sufficient
5  sample to draw those conclusions.
6      MR. WILLIAMS:  Q.  And you didn't need -- but
7  would you need a different type of sample or a broader
8  sample to conclude that the statement was false if you
9  had found a broader range of people who felt that the
10  product didn't work?
11      MR. RAWLINSON:  Objection to form.
12      THE WITNESS:  Not necessarily.  If that same
13  sample that I reviewed to conclude that it was working
14  and was integrated, if that same sample size had
15  demonstrated that it was not working and they could not
16  go live and could not operate their business on it, I
17  think that would have been sufficient.
18      MR. WILLIAMS:  Q.  You didn't see that here in
19  your view?
20      A.  No, I did not.
21      Q.  You talked just briefly about customers going
22  live on the software, and that would be some indication
23  to you as to whether or not the software worked.  Is
24  that fair?
25      A.  Yes.

134

1      Q.  And do you know whether all of the
2  customers -- withdrawn.
3          Did you see evidence of customers going live?
4      A.  I saw reports indicating the number of such
5  customers who had gone live.  I don't know if that is
6  responsive to your question.
7      Q.  And what did that indicate to you, if
8  anything?
9      A.  It indicated that there were such customers
10  going live at a relatively early stage in the initial
11  launch of the product, and that that number increased to
12  a fairly substantial quantity over the next six months
13  or so.  In fact, I think I had a month-by-month report
14  or listing of the numbers at some point in my report.
15      Q.  Did you evaluate whether any of those
16  customers that you saw in reports that were going live
17  were using any more than maybe two or three modules of
18  Suite 11i or applications of Suite 11i?
19      A.  I saw various indications about individual
20  customers, including some that implemented virtually all
21  of the components of ERP and CRM.  But I did not
22  enumerate them or quantify them in that regard.
23      Q.  You saw evidence of customers that implemented
24  all of ERP and CRM?
25      A.  I believe I said virtually all.  I don't know

135

1  if it was 100 percent.  I believe that's something you
2  asked me about this morning.
3      Q.  That wasn't quite my question I asked you
4  about this morning?
5      A.  Sorry.  I misunderstood then.  All right.
6      Q.  So you saw customers who had implemented
7  virtually all of ERP and CRM go live and the software
8  was working?
9      A.  That's my understanding, that's my
10  recollection of the information I saw, yeah.
11      Q.  What customers?
12      A.  I don't recall.  I'd have to look at either my
13  report or the information to recall specifically which
14  ones.
15      Q.  Do you think that if you had five minutes to
16  find it in your report that you could?
17      A.  Not necessarily, because I don't recall that
18  in my report I indicated that customer X went live with
19  both ERP and CRM.  I may have done so, but I wasn't
20  focusing on that when I wrote the report.  So I don't
21  know for sure.
22      Q.  But you're sure that that's somewhere in your
23  report?
24      A.  No.  As I just said, I am not sure that in the
25  report itself I indicated that particular customers that

136

1  went live, for which I have mentioned several, whether I
2  indicated in the report whether they went live with all
3  of ERP and CRM or some substantial portion thereof.  I
4  believe I did, but I can't guarantee it.
5      Q.  Just looking at paragraph 213, you write,
6  "Plaintiffs have also asserted that Oracle
7  misrepresented the capabilities of Suite 11i by rigging
8  demonstrations.  I have not seen anything in the
9  evidentiary record in this case suggesting that any
10  salesperson at Oracle misled a customer by rigging a
11  demonstration or misrepresenting Suite 11i's
12  capabilities."  Do you see that?
13      A.  Yes, I do.
14      Q.  Did you see anything in the record suggesting
15  that any person, regardless of whether they are a
16  salesperson at Oracle, rigged any demonstrations?
17      MR. RAWLINSON:  Objection to form.
18      THE WITNESS:  No, not that I can recall.
19      MR. WILLIAMS:  Q.  And did you see anything in
20  the record demonstrating that any Oracle employees used
21  fake data to make it appear that certain functionality
22  was actually occurring when, indeed, it wasn't?
23      MR. RAWLINSON:  Objection to form.
24      THE WITNESS:  I recall some documents, perhaps
25  e-mails, indicating that in order to demonstrate the

137

1  integration capabilities in the demonstration
2  environment where the two major components were
3  operating on different servers, that some data had to be
4  created to show what would happen after one part of the
5  system had done its function and the other part of the
6  system took over.
7     MR. WILLIAMS:  Q.  Did you find anywhere in
8  the record that that type of information was disclosed
9  to customers during demonstrations?
10    A.  I don't recall one way or the other.
11    Q.  But you said -- you wrote that, "I have not
12  seen anything in the evidentiary record in this case
13  suggesting that any salesperson at Oracle misled a
14  customer by rigging a demonstration or misrepresenting
15  Suite 11i's capabilities."  Do you see that?
16    A.  Yes.
17    Q.  Would you say that using fake data in order to
18  demonstrate that certain functionality was occurring
19  when it really wasn't would, indeed, be misrepresenting
20  Suite 11i's capabilities?
21    A.  No, I wouldn't.  Because the demonstration
22  environment is not the actual product environment that
23  was being sold, so I don't think it does misrepresent
24  the capabilities.
25    Q.  So even if one is demonstrating the

138

1  capabilities of Suite 11i to a customer, but using fake
2  information to make it appear as though certain
3  functionality was occurring, you don't think that that
4  would be misleading, if it wasn't disclosed?
5     A.  Not if the actual system was capable of
6  carrying out those operations, no, I don't think that
7  would be misrepresentation.
8     Q.  In your view it wouldn't be until later when a
9  customer recognized that something that was demonstrated
10 to them actually didn't work that it would be -- it
11 would have been a misleading misrepresentation?
12    A.  No.  Certainly I didn't think that's what I
13 just said, certainly not what I intended to say.
14       If the capabilities of the actual system were
15 present and worked properly, but the demonstration
16 environment was not able to fully demonstrate that
17 working capability, particularly because the pieces of
18 the demonstration were operating on different servers,
19 then I don't think such a demonstration would have been
20 a misrepresentation.
21    Q.  And so at some point -- withdrawn.
22       Did you find that -- withdrawn.
23       You didn't inspect the demonstration system at
24 Oracle; right?
25    A.  That's correct, I did not.

139

1     Q.  Did you know that the demonstration
2  environment was controlled -- well, the demonstration
3  environment that was used to demonstrate 11i to
4  customers was controlled by Oracle?
5     A.  The demonstration environment --
6        MR. RAWLINSON:  You mean now or at the time?
7  I'm not sure he understands.
8        THE WITNESS:  I was not asking about the time
9  frame, but I assume you're talking about the same time
10 period.  I was pausing for a different reason.
11       I certainly think that the software was
12 controlled, the demonstration software was controlled by
13 Oracle.  I believe the hardware that was used for the
14 demonstration was controlled by Oracle.  I am not sure
15 whether the telecommunication capabilities were always
16 controlled by Oracle.  And that's why I was hesitating.
17 So I believe that most and possibly all of the
18 demonstration environment was controlled by Oracle.
19       MR. WILLIAMS:  Q.  In paragraph 217 you say
20 that given the -- I'm paraphrasing, given the size and
21 complexity of the software it can only be shown to a
22 customer in a demonstration environment, rather than a
23 fully implemented environment, problems experienced with
24 the demonstration environment do not necessarily reflect
25 problems with the underlying product.  To the contrary,

140

1  the demonstration product may have problems resulting
2  from errors in the demonstration platform environment
3  itself, for example, corrupted data, incorrect
4  configuration, hardware problems, operating system bugs.
5        Did you in your evaluation of any of the
6  evidence find that the Oracle demonstration system
7  incurred problems resulting from corrupted data?
8     A.  I don't recall seeing any examples of that
9  problem.
10    Q.  How about incorrect configuration?
11    A.  That I don't recall.  I'm more confident about
12 the absence of corrupted data.
13    Q.  How about hardware problems?
14    A.  I believe that I did see either e-mails or
15 some evidence indicating that some of the
16 demonstration -- demonstrations had been affected by
17 hardware problems.
18    Q.  What did you see?
19    A.  E-mails indicating that the inability to
20 demonstrate the Suite 11i product successfully to the
21 customer had been caused by crashes in which my
22 assessment, just by reading the information, was that it
23 was probably caused by hardware crashes.
24    Q.  So you didn't evaluate whether it in fact was
25 caused by a hardware problem, but you extrapolated from

141

1   some information that a crash was a result of a hardware
2   problem?
3           MR. RAWLINSON:  Objection to form.
4           THE WITNESS:  I made that assessment from the
5   description of the problem, yes.
6           MR. WILLIAMS:  Q.  What was the description
7   that you recall?
8       A.  Description was language in e-mails or
9   reports.  I don't recall the specific words.
10      Q.  You don't cite to anything or rely on any
11  evidence in this paragraph, do you?
12      A.  No, I do not.
13      Q.  So there is no way for me, for example,
14  without you showing me, to find the document that you
15  are referring to where you have extrapolated that a
16  crash was a result of a hardware problem?
17      A.  Perhaps not.
18      Q.  Did you find any operating system bugs that
19  impacted the demonstration system at Oracle?
20      A.  I don't recall.
21      Q.  Are there any circumstances in your view where
22  problems with a demonstration environment may be the
23  result of problems with the underlying software?
24      A.  Yes.  If the -- if it was a new version of an
25  operating system or an operating system that had just

142

1   been updated with a patch or an upgrade by the vendor,
2   yes, I have seen circumstances where the demonstration
3   environment was affected by that.
4       Q.  Do you know whether in this case the
5   demonstration environment that Oracle was using during
6   the relevant time period was impacted by problems with
7   the 11i software itself?
8       A.  In this case I need to ask for clarification,
9   because my understanding is that aside from these issues
10  we've just been talking about, the hardware and
11  operating system and so forth, my understanding is that
12  the demonstration environment did not always involve the
13  same version of Suite 11i software as the actual product
14  that was being sold.  And I believe that I recall some
15  documents or evidence indicating that problems in the
16  demonstration environment may have been associated with
17  earlier versions of Suite 11i that may have had problems
18  that were no longer reflected or no longer existing in
19  the version that was being sold.
20      Q.  Okay.  So, therefore, you would have to
21  conclude that at least some problems were the result of
22  underlying problems with the software at certain points
23  during the relevant period?
24      A.  No.  What I tried to describe is the
25  likelihood that there were problems being observed by

143

1   the Oracle salespeople and potential customers today
2   that were the result or the consequences of bugs in a
3   previous version of Oracle, which is no longer the one
4   that was going to be sold to that customer.
5       Q.  So, for example, the demonstration system
6   could be using 11i.2, and 11i.2 may have some underlying
7   software problems, but a customer who is planning to
8   purchase, you know, eight months from now may be viewing
9   a demonstration system on 11i.2, but it wouldn't be the
10  same version that they would receive, because in the
11  interim 11i.3 might be released; is that what you're
12  trying to describe?
13      A.  That's close.  What I'm trying to describe is
14  that the software available for sale now, which would be
15  delivered to the customer tomorrow if he signed the
16  order, might be 11i.3, but the demonstration that's
17  being used to present the availability or the
18  capabilities might be 11i.2.  So that in the course of
19  the demonstration, problems might be visible that are no
20  longer associated with the product that actually would
21  be sold to the customer if he signed the order today.
22  That's what I was trying to describe.
23      Q.  But they were previously associated with the
24  software that was being used in the demonstration system
25  at the time it was demonstrated to that customer?

144

1           MR. RAWLINSON:  Objection to form.
2           THE WITNESS:  Yes.  Yes, okay.  If I've
3   understood your question correctly, yes, I believe that
4   would be true.
5           MR. WILLIAMS:  Q.  So you did see evidence
6   where -- withdrawn.
7           Did you see evidence indicating that the 11i
8   demonstration system at times during the relevant period
9   was negatively impacted by problems associated with the
10  underlying software, not problems that you identify in
11  paragraph 217 as corrupted data, incorrect
12  configuration, hardware problems, operating system bugs,
13  et cetera?
14      A.  I saw evidence in the form of e-mails and
15  documents between Oracle people where that was asserted.
16  I did not have a chance to confirm that one way or
17  another.
18          And I don't know the extent to which it would
19  have been confirmed as part of Oracle's normal bug
20  tracking process.
21      Q.  So, you don't have an opinion as to whether or
22  not the Suite 11i system as it was used in the ADS or
23  the demonstration system that Oracle suffered from
24  problems due to underlying problems with the software?
25          MR. RAWLINSON:  Objection to form.

Yourdon, Edward  7/3/2007  9:07:00 AM

145

1    THE WITNESS:  No.  Based on the information
2  available to me now, I don't have an opinion on that.
3        MR. WILLIAMS:  Q.  Looking at paragraph 221,
4  you say or write that, "Any software vendor struggles to
5  secure reference customers early in the lifecycle of an
6  enormous release of business enterprise software.
7  Oracle had the same problem with every one of its
8  releases.  For example, George Roberts testified as
9  follows."  Do you see that?
10       A.  Yes.
11       Q.  When you say that Oracle had the same problem
12  with every one of its releases, what releases are you
13  referring to?
14       A.  In particular, release 11.0 and 10.7, I did
15  not see information prior to those releases.
16       Q.  So are you not really referring to every one
17  of its releases, you're only referring to the ones
18  you've identified today?
19       A.  Yes, I think that's fair.
20       Q.  And did you evaluate the problems, if any,
21  that Oracle had securing reference customers with 10.7?
22       A.  Not in detail, no.
23       Q.  Then how are you able to say that Oracle had
24  the same problem with every one of its releases?
25       A.  Based on my experience in the field and the

146

1  information that I did see about 10.7 and 11.0 and
2  11.1 --
3        Q.  11i?
4        A.  Excuse me, 11i, I apologize, it fits a common
5  and familiar pattern.
6        Q.  But you didn't compare problems with 11i to
7  so-called problems with 11.0 and 10.7, did you?
8        MR. RAWLINSON:  Objection to form.
9        THE WITNESS:  In terms of the effort to secure
10  reference customers, no, I did not.
11       MR. WILLIAMS:  So, other than what is
12  quoted here from George Roberts, what you've written in
13  221 really doesn't have reliable basis?
14       A.  I think it does have the basis of my
15  experience with -- not just the three versions of Oracle
16  software that I mentioned, but other products, other
17  vendors over the course of my career.
18       Q.  You don't refer to any other vendors here
19  though.  You just referred to every one of Oracle's
20  releases.
21       A.  Well, at the beginning of the sentence, it
22  says any software vendor, again, that was based on my
23  general experience, struggles to secure reference
24  customers.
25       Q.  Yeah, but you say Oracle had the same problem

147

1  with every one of its releases.
2        A.  That's correct.  I can -- I only have the
3  basis of making that statement about 10.7 and 11.0 and
4  11i.
5        Q.  In your view you have a basis to offer that
6  opinion comparing 10.7, 11.0 and 11i based on the record
7  in this case?
8        A.  I do, because I'm not trying to compare
9  whether they had more or less, but rather the existence
10  of such a struggle.  That's all I stated here was that
11  it is a struggle.
12       Q.  Okay.  I'll just note you said the same
13  problem.  I guess what you're telling me is the same
14  problem that you're talking about is a struggle?
15       A.  Yes.  They had a struggle, in each of those
16  three instances that I looked at, specifically in my
17  experience has been that every software vendor struggles
18  with any large business enterprise software product.
19       Q.  In paragraph 223 you write, "I have seen no
20  evidence that would support plaintiffs' attempt to
21  distinguish reference problems of Suite 11i with
22  reference issues in any other software release's early
23  stages."  Do you see that?
24       A.  Yes.
25       Q.  Where did you see plaintiffs' attempt to

148

1  distinguish the reference problems with reference issues
2  in any other software release's early stages?
3        A.  I don't recall the specifics of plaintiff
4  complaints distinguishing it quantitatively or
5  comparatively with reference issues on other software
6  release's early stages, but rather just the general
7  statement as I recall by plaintiffs that the reference
8  problems associated with Suite 11i were either
9  extraordinarily large or unacceptably large or language
10  along those lines.  That's what I recall.
11       Q.  What is your understanding, if you have one,
12  of the difference, if there is one, between a live
13  customer and a referenceable customer?
14       A.  My understanding of a live customer is one
15  that is running some part of its business on some number
16  of products, software products, whereas a referenceable
17  customer is one that is live, that has begun using the
18  software product in an operational fashion and is
19  willing to allow its name to be used as a reference,
20  either in public documents and statements or by the
21  vendor's salespeople, to provide to prospective clients
22  in the future.
23       Q.  And did you find any instances where customers
24  that were references for Oracle 11i either threatened to
25  or did withdraw their authority to be a reference

149

1  customer because of problems with the underlying
2  software?
3      A.  I recall seeing some documents where there
4  were, I don't know if I would characterize them as
5  threats, but statements by the customer that they might
6  withdraw their referenceability if problems were not
7  solved.
8      I do recall seeing that much, yes.  I don't
9  recall seeing anywhere they actually were withdrawn.
10      Q.  Okay, if they were withdrawn, would that
11  indicate anything to you?
12      A.  It would depend on the circumstances.  It
13  might indicate a more forceful negotiating position.  It
14  might indicate a number of things.  It might well
15  indicate an unacceptable situation with regard to the
16  use of the product, which might or might not ultimately
17  be the vendor's fault.
18      Q.  Could it indicate an underlying problem with
19  the software?
20      A.  It could.  It could, yeah, as one of many
21  possibilities.
22      Q.  I just want to turn your attention to your
23  conclusions on page 92.
24      With respect to the bullet point number one,
25  you say, "Oracle's Suite 11i product was an exemplar of

150

1  a large, sophisticated, complex ERP system and, as such,
2  it initially experienced many of the well-known problems
3  common to large, sophisticated products in the software
4  industry."
5      What were the problems that you identified?
6      A.  To answer that, we would need to refer back to
7  a discussion in the earlier part of my report where I
8  identify problems that often occur in large-scale
9  software projects, which is section Roman numeral V.3.
10  And then also Roman numeral VI.5 where I talk about
11  historical difficulties with ERP implementations.  So I
12  don't know where you would like to start to see which
13  ones I did see in the Oracle situation.
14      Q.  Okay, so without going to those sections, are
15  all of the problems that you saw identified in your
16  report?
17      A.  I believe they are, yes.
18      Q.  Okay.  I don't need to go to the sections.
19      A.  Okay.
20      Q.  Looking at bullet point number two, if you
21  take a look at that.  You write, "A review of the
22  evidence compels the same conclusion with regard to
23  Suite 11i.  The problems here were not unique, and there
24  is no evidence that they were of any greater magnitude
25  than any other comparable past release of Oracle ERP

151

1  software."
2      Do you see that?
3      A.  Yes.
4      Q.  You didn't compare 11i to past releases,
5  right, of Oracle ERP software?
6      MR. RAWLINSON:  Objection to the form.
7      THE WITNESS:  That's correct.  I looked at
8  evidence of problems of a greater magnitude, but I did
9  not compare the software myself.
10      MR. WILLIAMS:  Q.  Well, you made a comparison
11  as to whether or not the problems in this case were not
12  of any greater magnitude than any other prior release of
13  Oracle ERP software.  Did you make that comparison?
14      MR. RAWLINSON:  Objection to form.
15      THE WITNESS:  I did not make that comparison
16  myself.  I looked for evidence to see if there was any
17  evidence of problems of a greater magnitude or a
18  comparable magnitude.
19      MR. WILLIAMS:  Q.  Do you know whether or not
20  the evidence that was provided to you, or evidence
21  that's, you know, discoverable in this case, relates to
22  problems or the scope of problems with prior releases of
23  Oracle ERP software?
24      A.  Yes, I believe the evidence, among other
25  things, includes deposition testimony about the extent

152

1  of testing and the extent of bugs that were found during
2  the development of previous versions of Oracle ERP
3  software.
4      Q.  So in your view, that evidence was sufficient,
5  whatever you saw was sufficient for you to make that
6  comparison?
7      MR. RAWLINSON:  Objection to form.  Objection
8  to the extent it misstates the conclusion.
9      THE WITNESS:  Yes, I believe it is sufficient.
10      MR. WILLIAMS:  Q.  Did you understand the
11  problems that are alleged here -- withdrawn.
12      Did you understand whether one of the issues
13  in this case was whether the problems alleged concerning
14  11i were unique?
15      A.  I don't have that understanding that the
16  allegation was that they were unique.
17      Q.  Okay.
18      A.  And indeed that's what I said in my
19  conclusion.  But I don't recall such an allegation.
20      Q.  Okay.  You also say in the same bullet point
21  that, "Notwithstanding the initial difficulties, the
22  Suite 11i product did work, and was both a technical
23  success and a marketplace success within a reasonable
24  period of time, and it continues to be a success today."
25  Do you see that?

Yourdon, Edward 7/3/2007 9:07:00 AM

153

1    A.  Yes, I do.
2    Q.  What initial difficulties are you referring
3  to?
4    A.  I'm referring to the bugs that were discovered
5  and that had to be fixed.  Primarily I'm referring to
6  the difficulties that some customers had in configuring
7  and installing the Suite 11i product.  I'm referring to
8  the difficulties they may have had customizing or
9  integrating their Suite 11i product with other best of
10  breed components, notwithstanding the advice to the
11  contrary from Oracle.  Those are the primary ones.
12       I guess I would put several of those within
13  the broader umbrella of implementation difficulties,
14  that is the difficulty of configuring and installing and
15  changing the business processes within an organization
16  to accommodate a large, complex system.
17    Q.  How long did those initial difficulties that
18  you identified last?
19    A.  I believe they lasted with decreasing severity
20  for a period of six to nine months.  That is, it is not
21  something where they remained at a constant level and
22  dropped to zero, but that they decreased over a period
23  of time.  Not only because of fixes to the bugs that
24  were made, but also because as time went on different
25  kinds of customers began implementing the Suite 11i

154

1  product.  That is, instead of early adopters, they
2  became more of the mainstream community.
3    Q.  What does that mean, instead of the early
4  adopters, more of the mainstream community?
5    A.  With regard to Suite 11i and almost any high
6  technology product, the early -- the first customers to
7  acquire the product and implement it are typically a
8  more adventurous breed who are sometimes pursuing more
9  aggressive goals and who are aware that they are dealing
10  with an early version of the product.  Very much, for
11  example, the way the first few customers of Apple's
12  iPhones are trying to cope today with getting service
13  from AT&T to make their phones work.  Within a few
14  months after that it is a different category of
15  customers who are not experimenters, not risk takers,
16  and often not attempting to do such aggressive things
17  with their new product.  That's what I meant.
18    Q.  When you say that it did work, how are you
19  defining work?
20    A.  I am defining it in terms of accomplishing the
21  purpose of providing the features and functions that the
22  vendor intended, and also that the customers needed in
23  order to carry out their day-to-day business.
24    Q.  Did you cite any evidence to support this
25  conclusion that the 11i product did work?

155

1    A.  Certainly not right here.
2    Q.  Sure.  If you can find somewhere in this
3  opening report, you know, that's fine.  Maybe at the
4  next break you can find something.
5    A.  It may not have been in the opening report.
6  It may have been in the next report I wrote where I
7  provided results from some industry surveys of customer
8  reactions to 11i.
9    Q.  So the basis of your conclusion that 11i did
10  work is supported by customer surveys?
11    A.  Yes.  At least partially so.  I believe so,
12  yes.
13    Q.  Is there another part supported by something
14  else?
15    A.  By the increased go-live rate and the
16  increased numbers of customers that continued to
17  implement the system, the Suite 11i product over a
18  period of time.
19    Q.  So the fact that you saw evidence of reports
20  where customers were going live, that's in part the
21  support for your conclusion that 11i worked?
22    A.  Yes.  Particularly the fact that it was
23  increasing numbers at somewhat accelerating rate.
24    Q.  Do you know whether the mere fact that someone
25  or a customer went live actually meant that the product

156

1  worked in the way that the vendor intended it and the
2  customer expected, like you described?
3    A.  I don't know that certainly from any one
4  individual customer.  But when I see that experience
5  replicated and repeated dozens if not hundreds of times
6  over the space of the first 6 to 12 months, I believe
7  that establishes a pattern for a reasonable conclusion
8  that the product worked.
9    Q.  What did you see repeated dozens or hundreds
10  of times?  Reports saying that more customers were live?
11    A.  Not just the reports, but the reports that
12  said there were repeated and growing numbers of
13  customers that had gone live, so that if it was 10 one
14  month, it was 20 the next month, then 40, then 80 and so
15  forth.  So the numbers and the increasing rate of such
16  numbers to me was an indication that it was working.
17    Q.  Okay.  Working in the way that Oracle intended
18  and the customers expected as you described?
19    A.  Yes.
20    Q.  Anything else to support your opinion that
21  Oracle -- that 11i worked?
22    A.  As I recall, though I don't have the precise
23  details in mind that I can give you, I believe there was
24  also evidence indicating that the number of TARs
25  increased for a while as the go-live rate increased, but

157

1 then I believe they stabilized and went down as well.
2 That would be an indication.
3     Q.  When did that happen?
4     A.  As I said, I can't recall the specifics or
5 details on that.
6     Q.  Did it happen before March of 2001?
7     A.  I don't recall the details on that.
8     Q.  Anything else to support your opinion that 11i
9 worked or did work?
10     A.  I would add to that list the reports and
11 assessments from industry analysts that I believe also
12 provided confirmation that it was working.
13     Q.  But as of March of 2001?
14     A.  I can't recall the dates on that.
15     Q.  What if the reports indicating growing numbers
16 of live customers also indicated that, you know, the
17 majority -- withdrawn -- not majority -- that some of
18 those customers were running only financials and human
19 resources, would that support your conclusion that the
20 11i suite worked, meaning, you know, CRM and ERP working
21 together?
22     MR. RAWLINSON:  Objection to form.
23     THE WITNESS:  If they were only using some
24 subset of the financials alone, that by itself would not
25 necessarily support the conclusion that the suite

158

1 consisting of ERP and CRM was working, no.
2     MR. WILLIAMS:  Q.  Okay.  I said financials
3 and human resources.
4     A.  I'm sorry.
5     Q.  Would that change your opinion on that?
6     A.  That would not change my answer to your
7 question.
8     Q.  What if the number of customers going live,
9 the reports you reviewed and the increasing numbers
10 going live indicated that most of those customers were
11 going live on ERP applications, would that support your
12 conclusion that 11i, the 11i suite worked, in that ERP
13 and CRM were working together?
14     MR. RAWLINSON:  Objection to form.
15     MR. WILLIAMS:  Q.  Or worked together?
16     A.  No, not that by itself.  And so to respond
17 perhaps to your question, if I see, as I did see,
18 increasing reports of increasing installations of
19 go-live events of customers who were implementing a
20 reasonable subset of ERP and CRM functions together,
21 that would lead me to believe that the entire integrated
22 suite was working.
23     Q.  But if you only saw growing numbers of
24 go-lives for the ERP side of the suite, what, if
25 anything, would that indicate to you about the entirety

159

1 of the suite containing ERP and CRM?
2     A.  That by itself would probably not indicate
3 very much at all.
4     Q.  But your conclusion in 258, you believe that
5 somewhere you saw evidence of growing numbers of
6 go-lives that included ERP and CRM together?
7     A.  Some components from both, yes.
8     Q.  But you don't know whether or not that
9 occurred or you saw evidence of that occurring prior to
10 March of 2001?
11     A.  I don't recall sitting here right now.
12     Q.  Okay.  As you sit here now, do you intend to
13 offer an opinion on that specific point?
14     A.  If I'm asked to, you know, I will investigate
15 whatever issues or offer opinions on, you know, whatever
16 topics counsel instructs me to offer opinions on, to the
17 extent that I can.  And I would think that that
18 information is available and should be easily findable,
19 so I probably could offer an opinion.
20     Q.  But you didn't rely on that in this opening
21 report, did you, any of those documents?
22     A.  Not that I recall.
23     MR. RAWLINSON:  Objection to form.
24     VIDEOGRAPHER:  Off record at 2:53.
25     (Recess, 2:53 p.m. - 3:08 p.m.)

160

1     VIDEOGRAPHER:  On record at 3:08.  Continue.
2     MR. WILLIAMS:  Q.  Okay, in the same bullet
3 point in paragraph 258, bullet point number two, you
4 state that 11i was both a technical success and a
5 marketplace success within a reasonable period of time
6 and it continues to be a success today.
7     What is a technical success?
8     A.  In my opinion, a technical success is a
9 software system that accomplishes a significant degree
10 of features and functions and achieves technical goals
11 or characteristics that in many cases have not been
12 accomplished before, in this case integration being the
13 primary example.
14     Q.  What do you mean by significant degree?
15     A.  I have forgotten now the context of the
16 sentence.
17     MR. WILLIAMS:  Could you read his answer back?
18     THE WITNESS:  Thank you.
19     (Record read as follows:  ANSWER:  In my
20     opinion, a technical success is a software
21     system that accomplishes a significant degree
22     of features and functions and achieves
23     technical goals or characteristics that in many
24     cases have not been accomplished before, in
25     this case integration being the primary

Yourdon, Edward  7/3/2007  9:07:00 AM

161

1      example.)
2          THE WITNESS:  So what I meant by a significant
3  degree or significant number of features and functions
4  was the list of modules or components of the Suite 11i
5  product as compared to the other ones in comparable
6  products or competitive products that were available at
7  approximately the same time.
8          MR. WILLIAMS:  Q.  By the way, I'm just going
9  to jump back on another issue, is integration in the eye
10  of the beholder?
11         A.  To some extent, yes.  Particularly with regard
12  to business flows or perhaps user interface,
13  integration, different beholders, different end users
14  might have different perceptions of that.
15         Q.  So some people might think it is integrated,
16  other people might not?
17         A.  I don't think that I would agree to that in
18  terms of an all or nothing or absolute characterization.
19  Some people might feel that a product was more
20  integrated than others, or had achieved a greater degree
21  of perfection with regard to integration than others.
22         Q.  And I ask, because in paragraph 100 again, you
23  have integration in quotes as well.  Is there a reason
24  for that, or is that just, you know, you or somebody
25  else put quotes around it?

162

1          MR. RAWLINSON:  Objection to form.
2          THE WITNESS:  No.  I just put quotes around it
3  to draw attention to the fact that that was the main
4  thing that we were discussing in this section of the
5  report, that's all.
6          MR. WILLIAMS:  Q.  Should I assume that
7  throughout the report where there are quotations without
8  citations?
9          MR. RAWLINSON:  Objection; asked and answered.
10         THE WITNESS:  No, not necessarily.  In some
11  cases, for example, I notice at the bottom of page 35
12  where I have -- in the next to the last line, gluing
13  together, I didn't mean to suggest that the whole point
14  of the discussion in here was about gluing together, but
15  rather that that's perhaps not an officially recognized
16  word or phrase, but one whose meaning could probably be
17  understood if, by use of the quotation marks, one called
18  attention to it as a word that you wouldn't find in
19  Webster's dictionary.
20         MR. WILLIAMS:  Q.  But you don't define it or
21  cite to it, you just kind of put quotes around it?
22         A.  That is correct in this case.  I tried in
23  circumstances where I thought the meaning might be
24  particularly important or where it was a reference to a
25  previous phrase or something to provide citations, but I

163

1  did not do so in all cases, certainly.
2          Q.  For example, look at paragraph 137 on page 52.
3  Down to the second to the last line, you say, "The work
4  flow 'crosses the boundary' from CRM to ERP."
5          A.  Yes, I see that.
6          Q.  Why is that in quotes, crosses the boundary?
7          A.  Because I wanted to draw your attention to a
8  phrase that you might not have expected to see in normal
9  language.  This is not a national or geographical
10  boundary, of course, but of course, having had it
11  brought to your attention as something to pay a little
12  more attention to, you might be more easily able to
13  understand what I intended by that in the context of
14  this Figure 9 that is referred to in the beginning of
15  the paragraph.
16         Q.  Going back to your conclusions, you also -- is
17  there an objective definition for technical success, or
18  is the definition you gave me simply your definition of
19  technical success?
20         A.  It is my definition based on my experience in
21  the field.  I did not get this from a dictionary or, you
22  know, a technical reference document.
23         Q.  You say that it was also a marketplace
24  success; right?
25         A.  Yes, I do.

164

1          Q.  And what does that mean?
2          A.  It means that it continued to sell in
3  increasing quantities, as far as I could see, from the
4  number of installations, and it was a success
5  financially to the extent that I could see revenues
6  being associated with the product.
7          Q.  Is it associated with quality at all, whether
8  or not it is a marketplace success?
9          A.  I believe it's associated with it in the sense
10  that the complete absence of quality would have made it
11  difficult to be a marketplace success, although the
12  complete presence of quality wouldn't necessarily
13  guarantee it being a marketplace success.
14         Q.  Kind of an all or nothing analysis?
15         A.  No, no, I didn't mean it in that sense.  I
16  mean we've seen examples in various fields where
17  products were built with a great deal of quality, but
18  were nevertheless unsuccessful in the marketplace for a
19  variety of reasons.
20         Q.  Have you ever seen an ERP -- ERP software that
21  could be described as the complete absence, or having a
22  complete absence of quality?
23         A.  No, I don't think I can.  No.
24         Q.  So what does it mean?
25         A.  I'm sorry, what does what mean?

Yourdon, Edward  7/3/2007  9:07:00 AM

165

1 Q. The complete absence of quality.
2 A. What I mean by that is that if a vendor
3 introduced an ERP product or any product for that matter
4 that had either a complete absence of quality or very
5 little quality at all, I would not expect to see it
6 becoming a marketplace success.
7 Q. Have you ever seen or evaluated software that
8 had very little quality or ERP software that had very
9 little quality?
10 A. No, not that I recall.
11 Q. You say that 11i was a technical success and a
12 marketplace success within a reasonable period of time.
13 What is a reasonable period of time?
14 A. In my opinion it's in the range of 6 to 12
15 months. In the case of 11i I believe it was both a
16 technical success and a marketplace success.
17 Q. Was it a marketplace success within 6 to 12
18 months?
19 A. I believe so.
20 Q. That's your opinion?
21 A. Yes, that's my opinion.
22 Q. That's based on what?
23 A. On the increasing number of go-live reports
24 that we've discussed already indicating to me that it
25 was being accepted in the marketplace.

166

1 Q. Go-lives. Anything else?
2 A. I think we went through a similar list a
3 little while ago. It was a technical success during a
4 period of 6 to 12 months because subsequent versions,
5 11i.2, 11i.3, ultimately 11i.4, so forth, were released
6 with increased functionality, and just improved
7 technical capabilities.
8 Q. And that would -- and one would expect that to
9 be a technical success after 6 to 12 months one would
10 not continue to see showstopper bugs, for example?
11 A. No. One would expect to see fewer showstopper
12 bugs, but they would not necessarily go to zero.
13 Q. Do they ever go to zero? Do showstopper bugs
14 ever go to zero?
15 A. I am not aware of it ever going to zero in an
16 ERP environment. For smaller simpler programs, but not
17 for large software products of any kind. In large
18 business software products; I should be careful about
19 that. Because, as I indicated earlier, in my report
20 there are other large software systems that fall into
21 the safety critical nature where we certainly hope they
22 have no showstopper bugs.
23 Q. Let me show you what's previously been marked
24 as Henley Exhibit 23. Henley Exhibit No. 23 is Bates
25 number NDCA-ORCL 059745 through 747. Let me know when

167

1 you've had a chance to review the document.
2 A. Okay.
3 Q. Have you seen this document before today?
4 A. I'm sorry, it came from Larry Ellison. Okay.
5 I'm sorry -- are you directing my attention to the
6 e-mail further into the chain from Jeff Henley? Which
7 one am I supposed to pay attention to?
8 Q. If you read the whole document, it is only
9 three pages.
10 A. I thought you mentioned Jeff Henley, so I
11 thought perhaps --
12 Q. The reason I said that, because on the front
13 page, first page, there is a stamp on there on the
14 bottom right that says Henley. That's just our
15 identifier of it for this purpose.
16 A. I understand that. But indeed, the first
17 e-mail message in this chain, the one that begins at the
18 top of the second page, is an e-mail from Larry Ellison,
19 I believe.
20 Q. That's right.
21 A. I just wanted to make sure I understood.
22 Q. Have you seen that document before today?
23 A. I don't believe I have, no.
24 Q. It appears to be an e-mail dated March 22nd,
25 2002 from Larry Ellison to Jeff Henley, Mark

168

1 Barrenechea, Jennifer Minton and Safra Catz. Would you
2 agree with that?
3 A. Yes, it does appear to be so.
4 Q. Have you met Safra Catz?
5 A. No, I have not.
6 Q. Have you ever talked to her?
7 A. No.
8 Q. How about Jennifer Minton?
9 A. No.
10 Q. Jeff Henley?
11 A. No.
12 Q. Okay. Can you just read that message written
13 by Larry Ellison into the record for me, please?
14 A. Sure. For the record it begins, "Our top
15 priority is to get Oracle users are 'delighted'" -- I'm
16 not sure if that's what he intended there
17 grammatically -- "with the quality and functionality of
18 our CRM products. Until it happens I doubt we will
19 achieve success in the market. The biggest problem is
20 missing features as opposed to showstopper bugs. (There
21 are a few of those as well, but they are much easier to
22 fix). Every application meeting now centers around
23 representatives from our user community who report back
24 on application quality and set priorities for
25 development. We cannot remain in denial if we talk with

169

1  our users every day.  We need to work very hard to
2  achieve a high degree of customer satisfaction for our
3  sales and marketing products as soon as possible.  We
4  will have major improvements by June, but we are
5  unlikely to deliver all we need until September.  Doing
6  it by September will require unrelenting focus and a
7  Herculean effort.  It can be done, but not unless we
8  change our development and testing process and do a
9  better job listening to our user community."
10      Q.  If you had seen or reviewed this document
11  prior to drafting your May 25th report, would it have
12  impacted any of your opinions?
13      A.  I don't believe it would have.  I certainly
14  see the words and the language, but I don't believe it
15  would have impacted my opinions.
16      Q.  Not a single one of them?
17      A.  No.
18      Q.  Would it indicate anything to you?
19      A.  It would indicate to me that Mr. Ellison is
20  extremely aggressive and that he is using very strong
21  language.  But it would be in that context that I would
22  read his words.
23      Q.  And you realize that this is almost two years
24  after the release of 11i; right?
25      A.  Yes, I do.

170

1      Q.  Is that a document that you would have liked
2  to have seen before you rendered your opinions?
3      A.  Well, in the sense that it would not have,
4  based on my reading it now, changed my opinion, it would
5  have been interesting, but I don't think at all crucial.
6      Q.  Okay.  So it is not something that you needed
7  to review in order to make your conclusions; right?
8      A.  Not as it has been expressed here, no, I don't
9  think so.
10      Q.  Okay.  You have heard of Chuck Phillips?
11      A.  Yes, I have.
12      Q.  How do you know who he is?
13      A.  I first met Mr. Phillips when he was with
14  Morgan Stanley in 1999 when he, too, was concerned about
15  the Y2K problem.  I understand that -- in fact, I have
16  seen some of his analyst reports about Oracle while he
17  was at Morgan Stanley.  And I'm aware that he was then
18  hired by Oracle.  I have forgotten his exact position.
19  I think maybe president or COO.
20      Q.  Have you talked to him before?
21      A.  I spoke to him in 1999 at a conference about
22  Y2K issues.  I've not, to my recollection, spoken to him
23  since then.
24      Q.  Do you find him to be credible, generally?
25      A.  Generally, yes.

171

1      Q.  On computer type issues or -- let me withdraw
2  that -- on issues relating to market analysts or the
3  Wall Street community, and I guess the companies he used
4  to cover, software companies?
5      A.  Yes, I consider him credible.  Of course, I'm
6  not a Wall Street analyst myself, but in his coverage of
7  technical computer companies for the Wall Street
8  community, I find him credible.
9      Q.  Have you seen any e-mails written by him in
10  this case?
11      A.  I may have.  What I recall more, having seen
12  more of are some of the reports and so forth that he
13  wrote prior to joining Oracle.  I don't recall whether
14  I've seen anything after he became an Oracle employee.
15  I may have, but I don't recall.
16      Q.  I'm going to show you what's been previously
17  marked at actually two different depositions, Henley 28
18  and also Wohl 31.
19      A.  Okay.
20      Q.  It's NDCA-ORCL 061302 to 303.  Take a look at
21  it and let me know when you're done reviewing it.
22      A.  Yes, I see this now.
23      Q.  Have you seen this document prior to today?
24      A.  No, I have not.
25      Q.  Do you know Byron Miller at Giga Information

172

1  Group?
2      A.  No, I don't.  And I have been trying to
3  understand whether the so-called "disastrous experience"
4  in Mr. Miller's e-mail represents his own personal
5  experience, which I doubt, as a Giga employee, or rather
6  the transmission of somebody else's experience.
7      Q.  You would expect that it was not his personal
8  experience but the experience of some other user that he
9  has gathered; right?
10      A.  That would be my expectation.  Simply because,
11  from what I know of Giga as a company, they would not
12  normally be considered an Oracle 11i customer.
13      Q.  Right.  You don't have a general issue with
14  information coming out of Giga, do you?  You cited to
15  least one or two of their articles in your report.
16      MR. RAWLINSON:  Objection to form.
17      THE WITNESS:  I don't have a general issue.
18  They are a respected analyst firm.  That doesn't
19  necessarily mean of course that everything they said is
20  correct or accurate.  And I don't recall whether any of
21  the things I cited in my report came from Mr. Miller
22  specifically.
23      MR. WILLIAMS:  Q.  Sure.  Do you see what he
24  writes on the bottom of the page -- on the second half
25  of the page, "Chuck, I saw your very positive review of

173

1　11i. This is what is typical of what I see. They are
2　on 11.5.4. Any reaction?"
3　　　You understand 11.5.4 to be 11i.4; right?
4　　A.　Yes, I do understand.
5　　Q.　Do you know when 11i.4 was released?
6　　A.　I believe it was in the spring of 2001, but
7　that may not be correct. But that's my best
8　recollection at the moment.
9　　Q.　And he writes, "Is our disastrous experience
10　with 11i typical? You have some early -- you have some
11　circa early 2001 research on this, but I was wondering
12　what it's like now that the product is supposed to be a
13　little more mature. Here's our experience. We've
14　recently in October 2001 upgraded from Oracle 10.7 to
15　11i. We use almost all the financials, order
16　management -- OM and manufacturing modules along with
17　the product configurator and iStore, the latter for
18　order status only so far. We have several
19　customizations, mostly focusing on our product
20　serialization, but in most cases our modules are fairly
21　out of the box. While the actual conversion itself went
22　fairly well, we've been extremely disappointed with the
23　quality of the software. We have opened 158 TARs since
24　going live, well over 100 being severity 1 or severity
25　2, and consistently have dozens of TARs open at any one

174

1　time."
2　　　Do you see that?
3　　A.　Yes, I do.
4　　Q.　Did you see evidence consistent with what is
5　related here to Chuck by Byron Miller?
6　　A.　I saw some individual instances that were of
7　this approximate variety, yeah. Particularly with
8　reference to several customizations, which were -- to a
9　computer technical person is an immediate red flag. And
10　also with reference to the 158 TARs, and dozens open at
11　any one time, suggesting, though not necessarily stating
12　the implication that all of those TARs are bugs, when in
13　fact they could have been caused by any number of other
14　things.
15　　Q.　All right, so --
16　　A.　So I've seen this.
17　　Q.　Is this -- is this something you would have
18　liked to have seen in preparing your report, prior to
19　preparing your report?
20　　A.　Well, it certainly would not have hurt. But
21　based on what I've seen here, I do not think that it
22　would have changed my opinion at all, because, as I say,
23　it has some familiar elements to it that I saw in other
24　documents. The only thing different that I've seen here
25　is that some unnamed customer apparently passed

175

1　information on to Mr. Miller, who then passed it on to
2　Mr. Phillips. And that kind of communication -- oh, and
3　Mr. Phillips then passed it on to Mr. Barrenechea and
4　Mr. Wohl. I don't know how many of those kinds of
5　communications paths I saw. But as for the technical
6　issues, I don't feel that I would have needed to see
7　this.
8　　Q.　Would this information indicate anything to
9　you at all about the software and whether or not it
10　worked in the way that Oracle represented that it did?
11　　A.　Not by itself. First of all, because it
12　represents only one experience out of how many ever
13　hundreds or thousands that were either in the midst of
14　implementation or had gone live by that point. But even
15　more fundamentally, it is, unfortunately, and I say that
16　with all sincerity, because this is coming from
17　apparently a very frustrated individual, it is not
18　indicative of problems with the software that could be
19　solved by Oracle fixing a bug. So the answer to your
20　question is no.
21　　Q.　So he writes, "Chuck, I saw your very positive
22　review of 11i. This is what is typical of what I see."
23　　　So apparently Mr. Miller is saying that, you
24　know, this experience depicted here is typical.
25　　　If you saw 25 reports similar or exactly like

176

1　this experience depicted in the one that Byron Miller is
2　communicating to Chuck Phillips, would that impact your
3　opinion at all?
4　　MR. RAWLINSON: Objection to form.
5　　THE WITNESS: I'm hesitating only because I'm
6　trying to remember, unsuccessfully, how many customers
7　had gone live with Suite 11i by December 11th of 2001.
8　If, as I recall it was on the order of 2,500, then to
9　have seen 25 letters like this would not give me
10　concern.
11　　MR. WILLIAMS: Q. I didn't ask you if it
12　would have given you concern. Would it have impacted
13　your opinion at all?
14　　A.　No, it would not, not in that magnitude. If
15　it was 25 out of 25, it would have affected my opinion.
16　But 25 out of the large number, as I recall, that had
17　gone live by this point in time, no, it does not affect
18　my opinion.
19　　Q.　So you have -- going back to what we talked
20　about earlier, you have taken the number of customers
21　that have gone live, so to speak, at face value to mean
22　these customers were running their business on 11i or
23　some version or portion of it without significant
24　problems that are of the type depicted here?
25　　A.　Without problems of the magnitude of these

Yourdon, Edward  7/3/2007  9:07:00 AM

177

1 problems, that would be my conclusion.
2    Q.  But you haven't evaluated that; you just don't
3 know whether or not those customers were actually
4 experiencing problems similar to what's depicted here?
5    A.  I believe I have in at least an indirect
6 fashion, if not direct fashion.  Because customers
7 either in the process of going live or even after having
8 gone live who had problems of this magnitude would
9 sometimes end up in a so-called escalated status, where
10 they had been identified as customers needing attention
11 or having problems of some sort.  And I've seen
12 approximate numbers of that as well.
13    I have no idea whether this individual and his
14 company was one of those.  But the overall number of
15 escalated customers, which generally means customers
16 that have a large number of serious problems either
17 impeding their operation or impeding their ability to go
18 live, that would indicate perhaps something about the
19 quality.  But that number relative to the overall number
20 of go-lives was very small.
21    Q.  So long as go-live meant that the customers
22 were running their business on 11i?
23    A.  Running either all or a significant part,
24 enough of a part so that problems of this description
25 would have been troublesome or difficult, yes.

178

1    Q.  What if the go-lives as we discussed earlier
2 that you looked at, the majority of were customers going
3 live with three or four modules or applications within
4 only ERP?  Would information like this as late as
5 December 13th, 2001 have impacted your opinion at all?
6    A.  No, I don't believe it would have.
7    Q.  Do you know why you were not provided this
8 document?
9    A.  I don't -- it's possible that it was provided
10 to me and that I overlooked it.  That I couldn't say to
11 you.  In fact, it probably was provided to me.  Let me
12 retract that, because I did see Mr. Wohl's deposition
13 and associated exhibits, so perhaps I simply don't
14 remember it.  It is possible that I even did read it.  I
15 believe also that I saw Mr. Henley's deposition, but
16 definitely Mr. Wohl's, so that if it was an exhibit
17 here, it would have been provided to me.
18    Q.  Looking at the Chuck Phillips' message to Mark
19 Barrenechea and Ron Wohl, do you see where he writes,
20 "And this one was worse.  As you know, these market
21 analysts can have significant impact with customers, and
22 two of the most influential analysts at key firms are
23 decidedly negative on the quality of the apps suite.
24 And with this sort of feedback, I can see why"?
25    A.  Yes, I see that.

179

1    Q.  Do you think that Oracle Suite 11i was a
2 marketplace success as of March 2001 or May of 2001?
3    MR. RAWLINSON:  Objection to form.
4    THE WITNESS:  Yes, I do.
5    MR. WILLIAMS:  Why don't you go ahead and
6 change it now.
7    VIDEOGRAPHER:  This marks the end of tape
8 three in Volume I in the deposition of Edward Yourdon at
9 3:43.  Going off the record.
10    (Recess, 3:43 p.m. - 3:54 p.m.)
11    VIDEOGRAPHER:  On record at 3:54.  This marks
12 the beginning of tape four in Volume I in the deposition
13 of Edward Yourdon.
14    MR. WILLIAMS:  Q.  I'm going to show you
15 what's been marked as Exhibit 84.  I don't recall whose
16 deposition it was in.  So it is NDCA-ORCL 061300 through
17 061301.  Take a look at that document and let me know
18 when you're done.
19    A.  Okay.  Okay.
20    Q.  Have you seen this document before today?
21    A.  I believe I have, yes.
22    Q.  And when did you see it?
23    A.  I don't recall.  Sometime during the review of
24 documents during my engagement on this matter.
25    Q.  Did you rely upon the document in your opening

180

1 report?
2    A.  I don't believe I did, no.
3    Q.  Did this impact your analysis of your -- the
4 analysis of what resulted in your opinions in your
5 opening report?
6    A.  No, it did not.  If it had, then I would have
7 cited it in my opening report.
8    Q.  Did it indicate anything to you about the
9 quality of Suite 11i software?
10    A.  No.  It obviously indicated the opinions of
11 one analyst from AMR Research, but not about the overall
12 quality of the software, particularly with regard to an
13 issue we discussed earlier this morning as to whether
14 problems with any software product are out of the
15 ordinary.  And these don't strike me as being out of the
16 ordinary.
17    Q.  When you testified earlier about out of the
18 ordinary, you said out of the ordinary is -- out of the
19 ordinary with respect to comparable software.
20    A.  Yes.
21    Q.  So looking at the middle of the page.  Well,
22 withdrawn.  Do you know Jeffrey Freyermuth?
23    A.  No, I don't.
24    Q.  Have you heard of him?
25    A.  No.  I saw his name when I reviewed this

Yourdon, Edward  7/3/2007  9:07:00 AM

181

1   document, but I had not heard of him independently.
2      Q.  And the subject line of his e-mail to
3   undisclosed recipients, is, "AMR Research, 11i Quality."
4      A.  That's right.
5      Q.  See where it says, "Since its release in May
6   2000 many customers have expressed concern about the
7   quality of Oracle's E-Business Suite 11i.  AMR Research
8   recently interviewed more than 50 large companies
9   implementing or upgrading to 11i and found that these
10   problems still persist."  Do you see that?
11      A.  Yes, I do.
12      Q.  So that didn't mean anything to you as it
13   relates to forming your opinions that they had
14   interviewed more than 50 large companies implementing or
15   upgrading to 11i and found that these problems still
16   persist?
17      A.  No.  Because 50 is still a very small
18   percentage of the companies that had gone live or were
19   in the process of going live.  This 50 is implementing,
20   present tense, or upgrading, present tense.  So it was a
21   small percentage, a small percentage, and specific
22   examples from just a few individual companies.
23      Q.  How many customers were implementing or
24   upgrading to 11i as of March 25th of 2002?
25      A.  I don't recall sitting here.  I believe I have

182

1   referred to such numbers in either one of my reports.
2      Q.  Okay.
3      A.  And I recall it being a number on the range of
4   25 to 100 -- to 3,500, somewhere in that general range.
5      Q.  So, again, this information -- this
6   information wouldn't mean anything to you?
7      MR. RAWLINSON:  Object to the form.
8      THE WITNESS:  It means what it says, that some
9   number of companies have problems that still persist.
10      MR. WILLIAMS:  Q.  Okay.  You see where it
11   says, "Oracle has also damaged its credibility by
12   frequently patching the software and recommending Family
13   Packs of patches that have sometimes introduced
14   additional new problems while resolving the old ones."
15   Do you see that?
16      A.  Yes, I do.
17      Q.  Did that mean anything to you?
18      A.  No.  The statement about damaging its
19   credibility, in my opinion, looking at this, is an
20   opinion which Mr. Freyermuth is certainly entitled to.
21   The reference of patching of software and recommendation
22   of Family Packs of patches that sometimes introduce
23   additional new problems is a very familiar, I don't want
24   to say universal phenomenon, but one that is so common
25   that I didn't regard it and don't regard it as unusual.

183

1      Q.  And just below that, "At AMR Research Strategy
2   21 conference earlier this year, a CIO called Oracle's
3   11i one of the biggest disappointments in 2001."  Do you
4   see that?
5      A.  Yes, I do.
6      Q.  Had you heard or seen evidence that people
7   referred to Oracle's Suite 11i as a disappointment?
8      A.  I don't recall whether I have seen that
9   particular characterization, it's possible, in some of
10   the documents that I've reviewed.
11      Q.  See the next section where it says, "User
12   feedback.  Almost every customer we spoke with expressed
13   disappointment with the quality of Oracle's software
14   releases.  The following represents a sample of the
15   challenges faced by customers upgrading to 11i, 11.5.5
16   and 11.5.6 versions as recently as February of 2002."
17   Do you see that?
18      A.  Yes, I do.
19      Q.  Does the timing of the articulation of those
20   problems and the releases that the problems are relating
21   to impact your opinions on the overall quality of 11i?
22      A.  No.
23      MR. RAWLINSON:  Objection; vague and
24   ambiguous.
25      MR. WILLIAMS:  Q.  No?

184

1      A.  I didn't mean to interrupt your objection.
2      No, it doesn't.  Obviously that is a later
3   pair of releases in February 2002.  But it is also
4   during a period where there were an even larger number
5   of customers implementing the product.
6      Q.  But you don't know what those customers were
7   experiencing, do you?
8      A.  No, I don't.
9      Q.  So, in fact, this would be some sample for
10   you, wouldn't it, of what was occurring in or around
11   March of 2002?
12      A.  It is a small sample, yes, which identifies
13   issues and problems that, as I say, are in my experience
14   are very common and familiar with large software
15   products of any kind.
16      Q.  Right.  But you didn't have any other sample
17   in or around March of 2002, did you, indicating the
18   opposite of the experiences that were reflected -- that
19   are reflected in this document?
20      A.  I don't recall whether I reported on that in
21   my opening report.  It may have been in my second report
22   where I saw evidence of a positive nature from more than
23   one analyst firm, indicating levels of satisfaction and
24   success from other samples of customers.
25      Q.  Down in the conclusion section of this

185

1   document, you see in the middle of the paragraph where
2   it says, "Unfortunately, finding bugs in new
3   functionality is expected, but patches and upgrades
4   should not break working code." Do you see that?
5        A.  Yes, I do.
6        Q.  Do you agree with that?
7        A.  Just like I believe there should be world
8   peace, patches and upgrades should not break working
9   code.
10        But we have roughly 30 or 40 years of
11   experience in the software industry indicating that not
12   only does it happen, but even approximately how
13   frequently it happens. So this is again a very familiar
14   phenomenon. In fact, as I believe I indicated in my
15   opening report, we have general industry data about this
16   phenomenon for ERP systems.
17        Q.  Do you see where it says, "There is some
18   concern about Oracle's decision not to make 11i --
19   11.5.6 a fully tested maintenance release"?
20        A.  Yes, I do.
21        Q.  Do you know whether or not Oracle fully tested
22   11i.2 or .3?
23        MR. RAWLINSON:  Objection to form.
24        THE WITNESS:  It's my understanding from
25   having reviewed the documents that they tested it as

186

1   fully in terms of the integration testing, et cetera, as
2   they had 11.5.1. I don't know what Mr. Freyermuth meant
3   by fully tested in the context of this statement.
4        MR. WILLIAMS:  Q.  Well, do you know whether
5   Oracle did integration testing for 11.1 and .2?
6        A.  Based on the testimony that I've reviewed,
7   yes.
8        Q.  Did you see any other documents other than
9   testimony?
10        A.  Not that I recall, no.
11        Q.  And the testimony was only that they tested a
12   few, what, 20 work flows, wasn't it?
13        A.  Oh, no. No. That was testimony about the
14   so-called auditing, sort of the final sanity test or
15   smoke test that is commonly done by software vendors
16   just before they start manufacturing and shipping the
17   product. But it follows actual integration testing. I
18   have seen testimony in that area.
19        Q.  Did you rely on it in your opening report,
20   cite to it?
21        A.  I don't recall whether I cited to it in my
22   opening report.
23        Q.  Looking at page 92, still on bullet point
24   number four, you write --
25        A.  Sorry, back to my report now?

187

1        Q.  Yep.
2        A.  Okay. Sorry. Okay.
3        MR. RAWLINSON:  Which paragraph?
4        MR. WILLIAMS:  Q.  It is still paragraph 258,
5   bullet point number four.
6        Actually, you know, before I get there, I'm
7   sorry, can we just go back to the document we were just
8   looking at. Go to the second page.
9        See the second paragraph where it says, "There
10   is little doubt that Oracle's 11i quality problems have
11   significantly slowed its momentum in the enterprise
12   application market"?
13        A.  Yes, I see that.
14        Q.  Did you believe that -- withdrawn.
15        Is it your opinion that Oracle had --
16   withdrawn. I'm sorry.
17        Is it your opinion that Oracle 11i had quality
18   problems?
19        MR. RAWLINSON:  Objection to form.
20        MR. WILLIAMS:  Q.  Overall quality problems?
21        A.  It is my opinion that Oracle's 11i did not
22   have overall quality problems of a magnitude or degree
23   of severity greater than beyond that which one would see
24   in other ERP products or other large software
25   applications.

188

1        Q.  That wasn't --
2        A.  Did they have some quality problems? I would
3   agree to that, yes.
4        Q.  In your opinion, did Oracle's 11i suite have
5   quality problems?
6        MR. RAWLINSON:  Objection; asked and answered.
7   Objection; vague and ambiguous.
8        MR. WILLIAMS:  Q.  I am not comparing them to
9   other software ERP offerings.
10        MR. RAWLINSON:  Same objections.
11        THE WITNESS:  My opinion is that they did have
12   some quality problems.
13        MR. WILLIAMS:  Q.  Now, do you have an opinion
14   as to whether or not any of those quality problems had
15   impacted negatively its ability to sell Suite 11i?
16        MR. RAWLINSON:  Objection; asked and answered.
17        THE WITNESS:  My opinion on that is that it
18   did not have an impact as discussed in my opening report
19   in terms of the review that I did of approximately 100
20   pending deals. So, no. My opinion is that it did not
21   affect.
22        MR. WILLIAMS:  Q.  You only reviewed those
23   deals that you cited to though; right?
24        A.  That's correct.
25        Q.  And we talked about this earlier, you didn't

189

1  review the deals that were valued less than $2 million?
2      A.   Other than those that may have been mentioned
3  by plaintiffs.
4      Q.   Right.
5      A.   But, yes, we did discuss that this morning.
6      Q.   So you don't know what your opinion would be
7  if you had reviewed those deals; do you?
8      A.   I don't know. But having seen the evidence
9  from the larger deals where concerns about quality would
10 more likely be a significant risk factor for Oracle, my
11 opinion is that there would likely not be substantially
12 different kinds of problems from reviewing smaller
13 deals.
14     Q.   I wasn't asking if there would be different
15 types of problems. But -- the question is, you don't
16 know what your opinion would be as to whether or not
17 quality problems with 11i had impacted its ability to
18 sell 11i, if you had reviewed deals or potentially lost
19 deals valued at less than $2 million per deal?
20     MR. RAWLINSON: Objection to form.
21     THE WITNESS: I don't know with 100 degree of
22 certainty. But I have a high degree of confidence that
23 my -- I can't remember the rest of your question -- that
24 my opinion would be the same, or that sales would not
25 have been impacted. I'm trying to recollect the exact

190

1  language of your question.
2      But again, the sense of my answer is that the
3  results that I saw in the large deals would be more
4  severe and would have more impact if there had been one
5  than what I would expect to see from the smaller deals.
6      MR. WILLIAMS: Q. Do you think that Oracle
7  has in, terms of volume, more or -- during the period
8  that -- withdrawn.
9      Do you think during the period relevant to
10 this case that Oracle had more smaller deals, meaning
11 deals valued at less than $2 million, than deals valued
12 at more than $2 million, potential deals?
13     MR. RAWLINSON: Objection to form.
14     THE WITNESS: I don't know. I was basing my
15 answer on my experience in the industry as to the risks
16 and reactions of small customers versus large customers
17 when considering quality problems or potential quality
18 problems. I don't have any knowledge that I recall
19 having seen about the number of such deals, big ones
20 versus small ones.
21     MR. WILLIAMS: Q. Say, for example, that
22 Oracle had in any given quarter in your relevant period
23 potentially 100 deals over $2 million, and 1,000 deals
24 valued at approximately $500,000, and that it lost 10
25 deals of the type above $2 million and, you know, 400

191

1  deals valued at $500,000.
2      A.   Four hundred out of how many?
3      Q.   Out of 1,000. Due to 11i quality problems.
4  Would that impact your opinion at all?
5      MR. RAWLINSON: This is the opinion about lost
6  deals or broader?
7      MR. WILLIAMS: No. He said that his --
8      Q.   What you testified to earlier was that you
9  don't think -- you have no opinion concerning whether or
10 not Oracle lost any deals relating to the quality of 11i
11 for deals less than $2 million because you haven't
12 reviewed any of that information?
13     MR. RAWLINSON: Objection, form. Objection to
14 the extent it mischaracterizes prior testimony.
15     THE WITNESS: I don't have any opinion that
16 can be expressed with 100 percent certainty. What I
17 said was I would express an opinion with a fairly high
18 degree of confidence.
19     And in the hypothetical situation that you
20 just posed, if evidence was presented to me that said 10
21 out of 100 large customers deferred or cancelled
22 potential sales because of quality problems, which I
23 don't believe is, based on my recollection, anywhere
24 near the case, but that 40 percent of the small deals
25 cancelled for similar reasons, would that change my

192

1  opinion, perhaps so.
2      But based on my experience, I would find that
3  an extremely unlikely scenario that a larger percentage
4  of small customers would be likely to cancel
5  than -- especially that much larger a percentage.
6      Q.   Why is that?
7      A.   Forty percent? Because the larger customers
8  are usually more demanding, they've got larger
9  installations, more of a mission-critical business, less
10 of an ability to fall back on manual procedures, et
11 cetera, and also more sophisticated and are able to ask
12 more penetrating questions about quality issues.
13     Q.   They got more money, too, though, don't they?
14     A.   Well, they are presumably prepared to spend
15 more money. But a smaller customer would normally be
16 asking, and, therefore getting less detailed information
17 about all that, et cetera, et cetera.
18     Q.   All right, looking back at paragraph 258 of
19 your report, bullet point number four, you write, "Many
20 of the problems attributed to Suite 11i by customers,
21 industry analysts, computer trade journals and
22 plaintiffs were not attributable to Oracle's software."
23 Do you see that?
24     A.   Yes, I do. It is the third bullet point.
25 Yes, I see that.

193

1  Q.  What is the basis of that opinion?
2  A.  The basis of that opinion was my review of
3 such computer trade journals, analyst reports, et
4 cetera, combined with my experience in the field, as
5 illustrated by some of these exhibits that you've just
6 shown me a little bit earlier.
7  Q.  Can you show me where in your report you cite
8 to any support for that conclusion that many of the
9 problems attributed to Suite 11i by customers, industry
10 analysts, computer trade journals and the plaintiffs
11 were not attributable to Oracle software?
12  A.  I believe that there is information -- I have
13 not cited specifically here, I agree, with a footnote or
14 anything.  But --
15  Q.  Can you find it in your report if you have
16 time?
17  A.  If we have time this afternoon.  It's possible
18 that it is not in there.  But I certainly have seen
19 testimony, deposition testimony and exhibits of -- in my
20 review of the documents about problems that were
21 attributed by customers, et cetera, that upon further
22 investigation turned out not to be attributable to
23 Oracle software, but rather to setup problems or
24 configuration problems or customization problems, et
25 cetera.

194

1  One of my difficulties I have to admit, I can
2 no longer remember what I put in my opening report and
3 my second report.
4  Q.  I'm just concerned about the opening report.
5  A.  I understand that.  I'm trying to be
6 responsive.  It does tend to blur sometimes in my mind.
7  Q.  Okay.  Well, are you saying that somewhere in
8 the -- withdrawn.
9  What process did you engage in to identify the
10 problems attributed to Suite 11i by customers, and
11 separating those by industry analysts, others by
12 computer trade journals, and then those by plaintiffs,
13 if you did?
14  A.  I'm sorry, what was the beginning part of the
15 question?
16  Q.  What process, if any, did you use to identify
17 what was -- what problems were identified by customers,
18 industry analysts, computer trade journals or
19 plaintiffs?
20  A.  The process was to review the problems that
21 were identified as such, as either being customer
22 problems or problems attributed by industry analysts, et
23 cetera, that were referenced and testified --
24 referenced, discussed and testified to in various
25 depositions, as well as related documents that were

195

1 provided to me.  So that I did see many industry analyst
2 reports independently of deposition testimony, reviewed
3 it and, if possible, looked to see whether there were
4 responses to those analyst reports and trade journal
5 articles, et cetera.  And not only trade journal
6 articles, but sometimes mainstream newspaper articles,
7 responses by people within Oracle as to whether they
8 were actually software problems or some other problems.
9  Q.  But you don't attach any exhibits supporting
10 this conclusion to this report, do you, this opening
11 report?
12  MR. RAWLINSON:  Objection to form.  Objection
13 to the extent it mischaracterizes prior testimony.
14  THE WITNESS:  As I said earlier, I believe
15 there may be some citations elsewhere in this report, or
16 if not in this report, perhaps the second report I
17 filed.  I can't recall exactly where they are.  I
18 believe they exist.
19  MR. WILLIAMS:  Q.  You go on to say, "Instead,
20 these problems were caused by a wide variety of
21 ancillary factors that are common to large-scale ERP
22 implementations, regardless of vendor, many of which are
23 associated with a combination of decisions, actions and
24 mistakes by customers or third party consultants
25 attempting to implement the product."  Do you see that?

196

1  A.  Yes, I see that.
2  Q.  Where in your report -- and I would like you
3 to identify that for me -- withdrawn.
4  I would like for you to identify for me where
5 in your report you cite the support for that conclusion.
6  A.  My response is the same as I just made a
7 moment ago about the first part of this bullet point,
8 that I believe there are citations in this opening
9 report, or, if not, in the second report that I filed.
10 But I can't recall sitting here right now.  I would have
11 to read through the whole report to find where they are.
12  Q.  Did you find any of the problems that are
13 attributed to Suite 11i to be a result of problems with
14 the underlying software itself?
15  A.  I found them indirectly by virtue of the TARs
16 that were reported in this same context, of which 32
17 percent, roughly speaking, became so-called bugged TARs,
18 that is, problems for which there was not an immediate
19 explanation in terms of mistakes and actions by the
20 customer, and were, therefore, turned over to the
21 software people.
22  So, you know, I certainly feel that some of
23 the problems were attributed in the broadest or most
24 approximate sense, that percentage that I just mentioned
25 a moment ago is indicative of what I was getting at

Yourdon, Edward  7/3/2007  9:07:00 AM

197

1    here, that roughly 32 percent of the problems that were
2    reported to Oracle were of sufficiently persuasive
3    nature that they were sent on to the developers for
4    further investigation.
5        Q.   And that's the basis of your conclusion that
6    only 32 percent of TARs were defects in the software?
7        A.   Oh, no, I didn't try to say that.  What I said
8    was that 32 percent of them, according to evidence that
9    I've seen, and I believe deposition testimony, were of a
10   sufficiently persuasive nature, i.e., they could not be
11   identified with configuration problems or other customer
12   issues.  They were sufficiently persuasive that they
13   were sent on to the development group where more of them
14   were eliminated as not being software problems.
15       I don't know what the final percentage of
16   so-called bugged TARs were actually identified with real
17   software defects.
18       Q.   Do you know that the order management module
19   of Suite 11i was shipped without any testing?
20       A.   I do not believe that to be the case.
21       Q.   What do you believe to be the case with
22   respect to order management, the order management module
23   of Suite 11i?
24       A.   I believe that it did undergo unit testing and
25   integration testing and regression testing, but that,

198

1    according to the comments by Mr. Ellison, it was not --
2    forgotten the phrase -- battle tested, or tested in the
3    heat of the battle.  I believe that was the manner in
4    which he was characterizing the absence of testing.
5        Q.   Where do you -- where did you see that?
6        A.   Either in his deposition testimony or in some
7    other deposition testimony, I believe, is where I saw
8    it.
9        Q.   And did you rely on that -- withdrawn.
10       Did that -- did the information you say that
11   you saw concerning testing of order management, did that
12   impact your opinions at all or your analysis of whether
13   or not Suite 11i worked?
14       A.   No, it did not.
15       Q.   Did it play a part in your analysis at all?
16       A.   I was aware of it.  I considered it.  I did
17   not believe that that was something I needed to rely
18   upon for my opinion, so in that sense it did not affect
19   it.
20       Q.   You did find evidence, didn't you, that order
21   management -- the order management module suffered from
22   substantial defects; isn't that true?
23       A.   I saw evidence that it had -- I don't know
24   what you mean by substantial, but that it did have bugs.
25   Although some of the testimony as I recall about bugs

199

1    and slow operation also with order management actually
2    turned out to be a description about problems in the
3    demo environment, as I recall, not the actual production
4    version of the software that was delivered.
5        Q.   So, is it your opinion that the failure to
6    test 11i in the manner in which the company admitted to
7    or described did not impact your opinion as to whether
8    or not 11i worked?
9        MR. RAWLINSON:  Objection to form, vague.
10       THE WITNESS:  I don't know what you mean by
11   the manner in which the company admitted or described.
12       MR. WILLIAMS:  Q.  You just said you heard
13   some of Mr. Ellison's comments about the testing of 11i.
14   I've characterized that as admission.
15       A.   I see.  And the company also; Mr. Ellison is
16   the company.
17       Q.   Yes.
18       A.   I just wanted to make sure I understood your
19   terms.
20       Q.   Yes.
21       A.   No.  That did not affect my opinion.
22       Q.   Go to page 93, please.  The top bullet point,
23   your conclusion there, you write, "The evidence in this
24   case does not support the conclusion that Suite 11i
25   suffered from undisclosed bugs or other problems that

200

1    were out of the ordinary for a major new release of an
2    ERP product."  Do you see that?
3        A.   Yes, I do.
4        Q.   What did you review to determine whether or
5    not bugs were disclosed?
6        A.   I reviewed deposition testimony about this
7    issue, particularly with regard to the disclosure of
8    bugs through Oracle's, I think, META link mechanism, and
9    the fact that bugs were disclosed to customers by virtue
10   of patches and Family Packs and upgrades, part of whose
11   purpose was to fix bugs.  So that process by itself
12   obviously involved the disclosure of bugs.
13       It was also based on my understanding of
14   Oracle's trouble reporting process in which a customer
15   or customer support representative reports a bug to
16   Oracle and then receives feedback relatively shortly
17   thereafter, indicating the agreement that what has been
18   reported is, indeed, a bug, as opposed to some other
19   kind of a problem.
20       Q.   So there you're not talking about disclosure
21   to the public at large, are you, in this opinion here?
22       A.   That's correct.  I am talking about a
23   disclosure to Oracle customers and to analysts and
24   reporters who may have asked about such things in the
25   articles and reviews that they were writing, as opposed

Yourdon, Edward  7/3/2007  9:07:00 AM

201

1　to the general public.
2　　　I frankly have no opinion about that. I don't
3　know whether Oracle posted information on its website
4　for anyone to look at about the number of bugs that had
5　been identified.
6　　Q.　What's your -- what's your understanding of
7　Oracle's sales forecasting process as it was in the
8　third quarter of fiscal 2001, late 2000, early 2001?
9　　A.　My understanding is relatively limited, and
10　was described in the section of my report about lost
11　deals. And I would have to refer back to that to
12　refresh my memory exactly what my understanding is about
13　that process.
14　　Q.　You didn't do an analysis about that process?
15　　A.　Of the forecasting process itself, no, I did
16　not.
17　　Q.　And so you don't know what the process was for
18　the inclusion or exclusion of potential deals in its
19　sales pipeline?
20　　A.　Not in any detailed formal fashion. In the
21　process of conducting that part of my review for this
22　report, I certainly saw some documents that discussed it
23　or commented about it, about individual prospects or
24　individual potential deals, but not the overall process.
25　　Q.　And you didn't -- you said you didn't read the

202

1　depositions concerning the company's forecasting
2　process; right? You may not have even received them?
3　　A.　I believe that's correct.
4　　Q.　Nor evidence concerning the management of the
5　company's pipeline system?
6　　A.　That's correct.
7　　Q.　And so you don't have any -- you're not
8　offering an expert opinion as to whether or not --
9　withdrawn.
10　　　You don't believe that you're in a position,
11　do you, to offer an expert opinion on the reasons why
12　deals in Oracle's pipeline either closed or did not
13　close in the third quarter of fiscal 2001?
14　　MR. RAWLINSON:　Objection; form.
15　　THE WITNESS:　I believe that I can, and indeed
16　have offered an expert opinion as to the reasons those
17　roughly 100 large deals closed or did not close based on
18　my review of the documents.
19　　MR. WILLIAMS:　Q.　You believe that you're in
20　a position to offer an expert opinion even though you
21　have not reviewed all of the evidence concerning the
22　company's forecasts during the relevant time period?
23　　A.　I believe so, because what I focused on were
24　the large deals in that pipeline. How they got there, I
25　don't know. Whether they should have been there, I

203

1　don't know.
2　　　But once they were there, I saw it as a
3　potential big deal in the pipeline that various
4　salespeople were trying to close by February 26th or
5　whenever the end of the quarter was.
6　　　I did review what I think were the relevant
7　documents indicating the progress or lack of progress
8　they were making in their attempt to do so, and I
9　believe -- well, in most cases I was able to see
10　evidence as to why they did or did not.
11　　　Sometimes it wasn't clear why they made their
12　decision either not to pursue it or to delay it.
13　Sometimes the information didn't become available until
14　the following quarter.
15　　　I don't know if I saw all of that. But I
16　think I did see a substantial part, if not all of the
17　relevant evidence describing at least the perception of
18　the Oracle sales representatives and managers who were
19　pursuing these large deals in the pipeline.
20　　Q.　So you know that you didn't have all the
21　evidence concerning the company's forecasting process;
22　right?
23　　A.　Yes, I agree with that.
24　　Q.　And you know you didn't review all of the
25　deposition concerning the company's forecasting process;

204

1　right?
2　　A.　Yes, I agree with that.
3　　Q.　And you know you did not receive all the
4　evidence concerning the way the company's pipeline
5　system was managed?
6　　MR. RAWLINSON:　Objection to form.
7　　THE WITNESS:　Yes, I would agree with that.
8　　MR. WILLIAMS:　Q.　And you would admit,
9　wouldn't you, that you probably did not receive all of
10　the documents and correspondence concerning specific
11　deals in the pipeline or the reasons why they were there or
12　not there?
13　　MR. RAWLINSON:　Objection to form.
14　　THE WITNESS:　I would agree with that. As to
15　how they got into the pipeline to begin with or why they
16　were there, who put them there, so forth, no. I may
17　have seen some of that as part of the overall
18　information I reviewed.
19　　MR. WILLIAMS:　Q.　And is it your testimony
20　that none of the documents that you did not see did not
21　include facts concerning the sales or potential deals
22　that you referred to in your report as not closing for
23　reasons other than --
24　　A.　I'm sorry, I've been overloaded by nots. I
25　couldn't keep up with the double or triple negatives.

Yourdon, Edward  7/3/2007  9:07:00 AM

205

1    Q.  That's fine.  I'll do it again.
2    A.  Thanks.
3    Q.  Would you agree --
4    A.  Okay.
5    Q.  -- that there is some possibility that among
6  the evidence that you did not see, there is information
7  concerning the very deals that you discuss in your lost
8  deal section of your report?
9         MR. RAWLINSON:  Objection to form.
10        THE WITNESS:  I think it is possible.  I can't
11  guarantee that I saw all of it.  I asked for it, and
12  from what I could see, I got all of the relevant
13  information about why the deal closed or didn't close.
14        But with 100 degree certainty, was there
15  something missing, that I couldn't tell.
16        MR. WILLIAMS:  Q.  You actually thought you
17  received all the documents concerning 11i.2, and I think
18  I have shown you at least one that you have not seen.
19    A.  One of these documents, yes, as I said, I
20  don't recall having seen that or reviewed it, but may
21  have done so.
22        MR. RAWLINSON:  Can we take a short break?
23        MR. WILLIAMS:  Yes.
24        VIDEOGRAPHER:  Off record at 4:38.
25        (Recess, 4:38 p.m. - 4:48 p.m.)

206

1        VIDEOGRAPHER:  On record at 4:48.
2        MR. WILLIAMS:  Q.  Mr. Yourdon, do you have an
3  opinion as to whether or not the demonstration system
4  and problems with it resulted in lost sales for Oracle
5  during the relevant time period?
6    A.  No, I don't have an opinion on that.  I have
7  obviously seen discussions about the demonstration
8  system, but I don't know to what extent, if any, that
9  caused lost sales.
10    Q.  So you do not intend to offer an opinion at
11  all as to whether or not problems with the demonstration
12  system, whether it be the underlying software or not,
13  resulted in lost sales of 11i?
14        MR. RAWLINSON:  Objection to form.
15        THE WITNESS:  I don't intend to offer an
16  opinion based on the material that I've seen so far or
17  based on what I've been asked to investigate.  If I'm
18  provided with additional information between now and
19  trial, and/or instructed to investigate that based on
20  existing information, I would do so.
21        MR. WILLIAMS:  Q.  Can you just turn to page 6
22  of your report, please.  There you in paragraph 10, you
23  discuss your assignment.  Do you see that?
24    A.  Yes, I do.
25    Q.  How did you determine what the assignment

207

1  would be, or how was it determined what your assignment
2  would be?
3    A.  As I recall, that was through a series of
4  discussions with counsel.  I think I probably suggested
5  at least the first item, if not the first two items.
6  And I believe the remaining four were the result of
7  discussions with counsel.
8    Q.  Okay.  With respect to bullet point number
9  four where you say your assignment was to "Address the
10  claim made by plaintiffs that defendants made false
11  statements related to its Suite 11i product by examining
12  the content and meaning of the allegedly false
13  statements," do you see that?
14    A.  Yes, I do.
15    Q.  How does one go about analyzing the meaning of
16  allegedly false statements?
17    A.  In this particular case, I analyzed the
18  meaning of the allegedly false statements within what I
19  felt was the appropriate context, i.e., the entire
20  statement as opposed to perhaps an abbreviated subset,
21  as well as the context in which the statement was made,
22  i.e., whether it was made at a computer conference or in
23  some other form.
24    Q.  But you didn't ask any of the speakers of
25  those statements what they meant by them, did you?

208

1    A.  No, I did not.  I'm trying to recall whether
2  any of the people that I spoke to, as we discussed
3  earlier this morning, at Oracle, whether they themselves
4  were accused of having made false statements.  As best I
5  can recall, even if they were accused of such things,
6  that's not what I asked them about or talked to them
7  about.
8    Q.  Do you think that a reasonable person could
9  disagree with you as to your conclusion of the meaning
10  of the allegedly false statements that you examined?
11        MR. RAWLINSON:  Objection to form.
12        THE WITNESS:  I think a reasonable person, and
13  perhaps unreasonable people, too, could disagree with
14  me.  And it would then be up to the court or the jury or
15  the triers of fact to decide whose interpretation or
16  whose analysis was more accurate or more appropriate.
17        MR. WILLIAMS:  Q.  So you didn't put yourself
18  in the shoes of the speaker of any of the statements and
19  then discuss what that speaker meant by the statement?
20    A.  No, I did not attempt to do so.
21    Q.  Do you have a general understanding of what
22  the issues in dispute are in this case?
23    A.  I believe I do.
24    Q.  Can you tell me what they are, or what you
25  believe they are?

209

1     A.  I believe the issues in dispute are whether --
2  well, let me qualify that statement.  I don't have an
3  understanding of the dispute outside of the so-called
4  product area.  I don't know the details of the dispute
5  with regard to revenues recognition or forecasting or
6  accounting or other financial matters.
7         With regard to the product at issue, my
8  understanding of the dispute is that Oracle allegedly
9  made false statements about the commercial acceptability
10  of its product, about the working nature of the
11  integration of its product, and perhaps other things.  I
12  would have to refer to the summary of product-related
13  statements that I made on page 55 to see if I've left
14  anything out.
15        There are six statements beginning in
16  paragraph 143 that, as I understand, form the basis of
17  the plaintiffs' complaint in the product-related area.
18        Referring to integration and the lack of a
19  need for systems integration, et cetera, I can read all
20  six of these.  But it is the six that are summarized in
21  paragraph 143.  That's my understanding of the dispute.
22     Q.  Can you tell me what, if you can, five, or as
23  many as you can, major ERP releases in the period
24  between 1999 and 2001?
25     A.  ERP releases of what?

210

1     Q.  How about, can you tell me as many as you can
2  major release of ERP products released in the period
3  between 1999 and 2001?
4         MR. RAWLINSON: Objection to form, vague.
5         THE WITNESS: Not just those of Oracle, but --
6         MR. WILLIAMS: Q.  Not Oracle.  Other vendors.
7     A.  Between 1998 and 2001.
8     Q.  You said '99.  But '98 is fine.
9     A.  '99 and 2001.  As I recall, J.D. Edwards had
10  one or more releases during that period.
11     Q.  That you would consider major?
12     A.  That I would consider major.  I'm trying to
13  recall though, I probably can't do so sitting here
14  today, whether that was the period where they moved from
15  their so-called World product, which was an AS 400
16  product, to the One World product, which was a client
17  server product.  But I believe that occurred in that
18  period of time.
19        I believe PeopleSoft and SAP also had major
20  releases during that period of time, but I can't recall
21  sitting here the product versions, product release
22  numbers.
23        I believe Siebel did in the CRM area, I
24  believe Vaughn did also.  But, again, I can't recall the
25  specific version numbers.

211

1     Q.  Okay.  Looking at page 10, the opening report,
2  the second bullet point down where you describe design.
3     A.  Yes, I see that.
4     Q.  You say, "Design which often consists of two
5  or three levels, e.g., high-level architectural design,
6  followed by low-level procedural design."  Then you go
7  on a little bit further.
8         What is architectural design?  What does that
9  mean?
10     A.  The design of the major software components,
11  whether they are identified as modules or subroutines or
12  objects, but it is the building blocks from which the
13  software system is going to be built, what are they,
14  what features and functions will they provide, what
15  interfaces will they have with other such components.
16  That taken together represents the architecture of the
17  system.
18     Q.  So when software engineers or IT professionals
19  like yourself discuss the software architecture, what
20  they are typically referring to is what you've described
21  to me, the building blocks of the software?
22     A.  Yes.  Now, if it turns out that a major
23  component of the design is the database design, then,
24  again, there may be a discussion of architecture with
25  respect to the overall arrangement of tables or files

212

1  and the relationship between them.
2         So one can talk about architectural design in
3  terms of the database, if it's a major component of the
4  system, as well as architecture of the application code.
5         One can talk about even higher levels of
6  architecture involving higher subsystems, such as
7  financials or inventory.
8     Q.  What are integration bugs?
9     A.  Integration bugs, I don't recall whether I've
10  used that term, per se.  But they would be bugs
11  literally in or related to the interface between
12  components of a system, either bugs associated with the
13  interface between application components or between
14  different parts of the database, or between the system
15  that is being developed and external systems that the
16  customer or end-user may wish to combine together with
17  the system that he's acquiring.
18     Q.  Are integration bugs found by doing
19  integration testing?
20     A.  That is where they are most often and most
21  likely to be found.  They may sometimes become apparent
22  or visible at an earlier stage or at a later stage.  But
23  that's the area where one focuses on and specifically
24  tries to find such bugs, yes.
25     Q.  In your review of the evidence, did you

Yourdon, Edward  7/3/2007  9:07:00 AM

213

1    consider documents indicating that Oracle sales
2    personnel were advising customers to wait to purchase
3    and install Oracle Suite 11i because it had so many bugs
4    or defects?
5        A.   I believe I saw some such documents associated
6    with the CRM component.  Perhaps along the lines of the
7    advice that Mr. Ron Wohl offered in a speech in one of
8    the Oracle conferences.
9        Q.   Did that impact your analysis and conclusions
10   about quality of 11i or its functionality during the
11   relevant time period?
12       A.   No, it didn't.  It didn't.  Because the CRM
13   component and order management component were new, as we
14   discussed, and because the customers that may have had
15   that choice represented a spectrum of, as I called them
16   earlier, early adopters, people who may have been
17   willing and able, indeed even anxious to begin
18   implementing and adopting early versions of software,
19   versus others who perhaps were better advised to wait
20   because of their conservative nature.
21       Q.   How does whether a customer is going to
22   implement it impact your assessment of 11i quality after
23   viewing documents that Oracle salespeople were advising
24   customers to wait until all the bugs were ironed out of
25   the software?

214

1        A.   Because all software, in my experience, does
2    have some bugs.  The larger the software, the more bugs
3    that one would have.  And that as a result, individual
4    salespeople working with particular customers or
5    accounts might recommend to them that the prudent thing
6    to do, given that perhaps they are not early adopters,
7    would be to wait.
8        To me that's independent of the quality of the
9    software itself.  All software has bugs, the bugs are
10   eventually removed, the software becomes more mature,
11   and at that point perhaps more appropriately used by
12   customers who are not early adopters.
13       Q.   Wouldn't -- if you saw that type of evidence,
14   wouldn't you then also have to conclude that Oracle very
15   likely did lose deals because of problems with Suite
16   11i?
17       MR. RAWLINSON:  Objection to form.
18       MR. WILLIAMS:  Q.  Or deals were delayed due
19   to problems with Suite 11i?
20       MR. RAWLINSON:  Objection to form, vague.
21       THE WITNESS:  In the context I've made such an
22   opinion here, it was stated in terms of undisclosed or
23   unexpected problems with 11i.  I think that I have
24   indicated in the report here that there were public
25   statements about some problems of an expected nature

215

1    with the early versions, which --
2        MR. WILLIAMS:  Q.  That's not what I'm asking.
3    Maybe I should clarify my question.
4        A.   Okay.
5        Q.   You did see documents indicating that Oracle
6    sales staff was advising or they were advising customers
7    or potential customers to wait before they purchased 11i
8    until some of the bugs were ironed out; isn't that fair?
9        A.   I saw e-mails to that effect.  I think they
10   were one step removed, within Oracle.
11       I don't recall having seen documents or
12   e-mails in which some salesperson said, "I yesterday
13   advised my customer not to implement 11i."
14       I do recall seeing statements from one Oracle
15   executive to another along the lines of what you said.
16       Q.   Okay.  If it is true that Oracle's sales
17   personnel were advising customers to wait before they
18   purchased 11i until some of the bugs were ironed out,
19   wouldn't then one have to conclude that some potential
20   deals for 11i were delayed because of problems with 11i?
21       MR. RAWLINSON:  Objection to the form, vague.
22       THE WITNESS:  Not beyond what I would normally
23   expect to see with any new product.  Were there possibly
24   some, greater than zero?  Yes, I would accept that.
25       MR. WILLIAMS:  Q.  I'm not asking you to

216

1    compare it to what you would have seen -- as compared to
2    other products.
3        I'm just asking if it's reasonable to conclude
4    if, indeed, you did find evidence that Oracle sales
5    personnel were advising customers to wait until the bugs
6    were ironed out of 11i to purchase it, that Oracle did
7    experience delays in deals because of problems with 11i?
8        MR. RAWLINSON:  Same objection; vague.
9        THE WITNESS:  I would agree that would be an
10   indication of some delays and some postponements, yes.
11       MR. WILLIAMS:  Q.  Because of problems with
12   11i?
13       MR. RAWLINSON:  Same objection.
14       THE WITNESS:  Because of the normal and
15   expected bugs and problems in 11i.
16       MR. WILLIAMS:  Q.  Turning to page 32 of your
17   report.
18       A.   Okay.
19       Q.   Looking at footnote 33 where you reference or
20   say, "The nearly infinite number of combinations and
21   permutations of hardware, CPUs, memory disks, printers,
22   telecommunications networks, third-party software and
23   customer data makes it impossible to conduct exhaustive
24   testing."  Do you see that?
25       A.   Yes, I do.

217

1    Q.  What is exhaustive testing?
2    A.  Exhaustive testing is a term that's commonly
3  used in the computer industry.  I put that into quotes
4  also to focus your attention on it, because I did not go
5  into an elaborate description of what it means.  Quite
6  literally what it means is testing every single
7  permutation and combination of possible transactions and
8  test cases, exhaustively, so to speak.
9    Q.  And Oracle didn't do that with 11i?
10    A.  No, Oracle did not do that with 11i, nor as I
11  indicated here does any large vendor do so with any
12  large software product.
13    Q.  You don't cite to any authority for what
14  exhaustive testing means though here; right?
15    A.  No, I don't.
16    Q.  Okay.
17    A.  I don't.  And I apologize for not giving that
18  for your benefit.  But it's a very commonly understood
19  term and concept.
20    Indeed, I think what I did do, I can't recall
21  where it was, in one of my other footnotes, with regard
22  to the discussion about configuration settings, which is
23  just one small part of the overall testing issue, I said
24  that even Microsoft Word, which I used as my example,
25  had a couple dozen different configuration settings, and

218

1  that ERP products had hundreds, if not thousands.  And
2  to construct all the different test cases that one would
3  need to exhaustively, or, that is, to absolute test
4  every single possible combination and permutation, would
5  involve a near infinite number.
6    I can find that for you.  But I know that's in
7  this report.
8    MR. RAWLINSON:  Shawn's question is whether
9  that defines exhaustive.
10    MR. WILLIAMS:  Q.  That's all right; I read
11  the report.  I understand what you mean.
12    A.  Okay.
13    Q.  On paragraph 98, you say, "A small percentage
14  of ERP implementations experience such severe and
15  ongoing problems that they are eventually abandoned by
16  the customer."  Do you see that?
17    A.  Yes, I do.
18    Q.  Did you see evidence of that in your review?
19    A.  I don't recall seeing evidence in that.  I do
20  recall one or two cases where the customer had intended
21  to roll out Suite 11i on several different -- or in
22  several different offices or regions or parts of the
23  country or parts of the world, in which the first one
24  was implemented, but that subsequent ones were
25  postponed.  I don't know whether any were abandoned in

219

1  the ones that I saw.
2    Q.  Okay.
3    A.  So the general answer to your question is no.
4    Q.  All right.  And -- well, withdrawn.
5    In the same paragraph you quote failed
6  implementations.  Is there a reason why?
7    A.  You know, why did I put it in quotes?
8    Q.  Um-hum.
9    A.  In the same manner that I did in other cases.
10  An implementation effort that, at least in the opinion
11  of one of the two parties, if not both, was a financial
12  failure, a technical failure, a business failure, or in
13  some other fashion a failure.
14    Q.  Did you see evidence of failed implementations
15  in your review of the evidence in this case?
16    A.  I don't recall that I did.  I don't believe
17  that I did.  It is quite possible that there were some,
18  and even possible that I saw some and reviewed them.
19  But I can't recall them sitting here right now.
20    Q.  You didn't rely on them for your opening
21  report; right?
22    A.  No.  I would not have relied on them unless
23  there were several high profile failed implementations.
24    Q.  Would they have to be high profile?
25    A.  They would not have to be.  The adjective

220

1  several is the most important thing there.
2    But if there were a few small profile
3  implementations that failed, that's much less likely to
4  have influenced my opinion.
5    Q.  Why is that?
6    A.  Because the smaller -- actually, let me
7  qualify that a bit.  There was a study that I discussed
8  in my second report about the expectations of
9  implementations finishing or being completed on time.
10  And some percentage of customers said that the
11  implementation process had been slower than expected.
12  And it turned out to be the smaller implementations or
13  the smaller customers that were more likely to have that
14  experience.
15    Q.  I guess I understood, when you said high
16  profile, you were -- did you mean large customers?  Or
17  when you don't refer to high profile, does that mean
18  small customers?
19    A.  There is not necessarily a one-to-one
20  relationship between high profile and big or small
21  profile, and small, or -- low profile and small.
22    But generally speaking, the high profile
23  failed implementations tend to be the large ones, where
24  a large amount of money is lost or is associated with a
25  subsequent lawsuit, as illustrated with the example in

221

1  footnote 36 at the bottom of this page.  Something
2  involving or leading to a $500 million lawsuit is high
3  profile and most likely was large.  Now, that footnote,
4  by the way, as you can see, continues on for most of
5  page 34.
6       Q.  Yes, I recall that footnote.
7          Paragraph 115.  In that paragraph you say that
8  redundant data elements in Suite 11i are a product of
9  a conscious and deliberate decision made by Oracle
10  developers.
11       MR. RAWLINSON:  I'm lost.  115?
12       THE WITNESS:  Paragraph 115?
13       MR. WILLIAMS:  Yes.
14       THE WITNESS:  I don't see the reference to
15  Suite 11i.  I see an extraneous sentence at the end of
16  that paragraph, and I apologize for that.
17       MR. WILLIAMS:  Q.  It is the first sentence,
18  as noted -- you're not referring to 11i here, you're
19  just referring to ERP software generally?
20       A.  Not even ERP software generally, but -- well,
21  unless this is within the ERP section.
22       Q.  You're talking about integration and forms of
23  integration, the concept of integration.  I thought your
24  assignment was ERP.  I thought the entire report related
25  to ERP software.

222

1       A.  Well, it did.  But there was a tutorial
2  discussion about software development in general, which
3  then went on to discuss ERP systems in particular.
4          So let me see if I can figure this out.
5  Because, in fact, that discussion about conscious
6  decisions to replicate data is a much broader phenomenon
7  than just ERP systems.
8          But I believe this is embedded within the
9  discussion, Roman numeral VI.5 that begins on page 28.
10  So I will certainly agree that the conversation in --
11       Q.  Well, if it is a much broader topic, I can ask
12  you a more specific question.
13       A.  Okay.
14       Q.  Did you identify any specific instances of
15  redundant elements in your review of 11i?
16       A.  No, I did not.
17       Q.  I'm going to ask you to turn to page 44,
18  paragraph 127.  You write, "These features presented a
19  number of advantages, including faster implementation.
20  Instead of requiring one to three years to integrate a
21  disparate collection of best-of-breed components,
22  companies could expect to implement an integrated ERP
23  like Suite 11i within a few months."  Do you see that?
24       A.  Yes.
25       Q.  And you testified earlier that you saw

223

1  companies that had implemented Suite 11i, including, you
2  know, a number of components of ERP and a number of
3  components of CRM within a few months?
4       A.  I would have to go back and recall the precise
5  testimony.  I'm not sure you got it precisely.
6          But I did see and reported on companies that
7  implemented within a few months.  I don't recall that my
8  report specifically indicates which ones were doing just
9  ERP or parts of ERP and CRM, versus substantially all of
10  both.
11          My recollection from reviewing the documents
12  is that roughly a dozen companies, 10 or 12 companies,
13  had implemented both ERP and CRM within -- I'm not sure
14  how many is a few months -- but within a relatively
15  brief period of time, on the order of 6 to 12 months.
16       Q.  Prior to March of 2001?
17       A.  To the best of my recollection, yes.
18       Q.  But they are not cited in the report, not
19  specifically cited in your opening report?
20       A.  Again, I don't recall which of my two reports
21  lists several examples of relatively fast
22  implementation.  And that list of relatively fast
23  implementation, I don't recall breaking out which ones
24  are only ERP or only CRM or a mixture of the two.
25       Q.  Okay.  Can you define work flow integration?

224

1       A.  Work flow integration is defined in some part
2  of my report.  I would like to make sure I get the words
3  correct.  I think it starts on page 35.
4          I provided a definition on page 36, as one of
5  the bullet points in paragraph 104, where I said it is
6  the ability of one part of the system to talk to other
7  related parts of the system, that is to send information
8  to or interact with other parts of the system in order
9  to carry out a so-called work flow, business work flow
10  of the sort that was shown diagrammatically, I believe,
11  in Figure 9.
12       Q.  Is that the work flow that would be important
13  to an end-user?
14       A.  That would be important to --
15       Q.  I'm sorry, let me withdraw the question.  Is
16  that the integration that would be important to an
17  end-user, work flow integration?
18       A.  I believe that would be important to an
19  end-user, as well as data integration being important to
20  an end-user.
21       Q.  In paragraph 104 that you just directed me to,
22  where you describe work flow, you put talk in quotes.
23  Should that have any meaning different than communicate?
24       A.  No.  It has the meaning of communicate in
25  computer software terms, that is, by sending and

225

1  receiving information, much as you and I send
2  information, you know, by English.
3      Q.   Just going to page 53 on paragraph 138, you
4  say, "To evaluate claims that Suite 11i was integrated
5  and interoperable, we must use the Oracle data model
6  diagrams and business flow diagrams of which Figures 7
7  through 10 are only a few of a large collection to
8  answer three basic questions.  First, do all of the 11i
9  components that interact with a common data entity, for
10  example, a customer or an order or an employee, all
11  refer to the same entity with the same name on the
12  various diagrams?  And, second, do the navigation paths
13  represented by the business flow diagrams support all of
14  the key work flows that might be initiated from various
15  parts of the overall Suite 11i system?  And, third, do
16  the indices and links in the data model diagram support
17  the navigation paths shown in the business flow
18  diagrams, for example, so that the Suite 11i software
19  can navigate from the details of the customer to the
20  details of an order associated with that customer in
21  order carry out an order to cash work flow?"  That's in
22  paragraph 38.
23      In paragraph 39 you say or write, "Providing a
24  complete answer to these two questions for Oracle Suite
25  11i is a complex technical task."

226

1      Which two questions are you referring to
2  there?
3      A.   Sorry, that is a typographical error.  In an
4  earlier draft I had only identified two things in
5  paragraph 138.
6      So it should be "Providing a complete answer
7  to these three questions," apologize for that, the three
8  questions, first, second and third, that were identified
9  in the previous paragraph.
10      Q.   Okay.  All right, "And it requires intimate
11  knowledge of the business requirements for the various
12  Suite 11i components."
13      Did you develop an intimate knowledge of the
14  business requirements for the various Suite 11i
15  components?
16      A.   No.  As I went on to say in the next sentence,
17  that I had examined the data model diagrams for a
18  representative subset, et cetera.
19      Q.   Sure.
20      A.   But I did not acquire an intimate knowledge of
21  the business requirements for the various Suite 11i
22  components.
23      Q.   Which means that you cannot provide a complete
24  answer to the three questions that you posed in
25  paragraph 138?

227

1      A.   That's correct.  Because it would essentially
2  require reviewing the work from an architectural
3  perspective from some 4,000 people over two years.  So I
4  make no pretenses of that level of super-human
5  capability.  No, I did not.
6      Q.   You say that you examined the data model
7  diagrams for a representative subset of common data
8  entities.  Do you see that?
9      A.   Yes, I do.
10      Q.   How did you determine what subset would be
11  representative?
12      A.   By looking to see what data entities would be
13  used by or required by the business flow diagrams, as
14  illustrated in Figure 9.
15      So it was not just a random selection of data
16  entities, but the data entities that, as best I could
17  determine, would be accessed by or used by or updated by
18  the business flows of which Figure 9 is an example.
19      Q.   Did you ask any of the software developers at
20  Oracle what would be the best way to get a
21  representative subset --
22      MR. RAWLINSON:  Objection; vague.
23      MR. WILLIAMS:  Q.  -- of the common data
24  entities.
25      A.   I did not ask any individuals.  Instead, as

228

1  I've indicated on footnote 59 on the next page, I refer
2  to the baseline requirements document that documented 12
3  business flows, which are listed below.
4      Q.   Okay.
5      A.   One of which I think -- the second bullet
6  point of footnote 59 is the one that is shown in Figure
7  9 back on page 53.
8      Q.   But you only examined the model diagrams to
9  answer the first question, which you say is, "Do all of
10  the 11i components that interact with the common data
11  entity all refer to the same entity with the same name
12  on the various diagrams?"
13      MR. RAWLINSON:  Object to the form.  I'm not
14  sure I understand it.
15      THE WITNESS:  I'm trying to find -- are you
16  quoting something from one of these paragraphs?  If so,
17  I've missed it.
18      MR. WILLIAMS:  Q.  You write in paragraph
19  39 --
20      A.   139, okay.
21      Q.   "I have examined the data model diagrams for a
22  representative subset of common data entities (and to
23  address the first question identified immediately
24  above)" which is, "Do all of the 11i components that
25  interact with a common data entity all refer to the same

229

1 entity with the same name on various diagrams?"
2     A.  Yes.  Then that's followed by a statement that
3 I also examined the associated business flow diagrams so
4 that I could address the second and third question.
5     Q.  But I was just talking about the first
6 question.
7     A.  Okay.
8     Q.  So you were able to answer the first question
9 in your view at least by simply looking at what you
10 defined as a representative subset of diagrams?
11     MR. RAWLINSON:  Objection to form.
12     THE WITNESS:  That is correct, yes.
13     MR. WILLIAMS:  Q.  And that's it?
14     A.  Yes, representative set of business flow
15 diagrams and also representative set of the associated
16 or related data model diagrams, which are illustrated in
17 Figures 7 and 8.  That's correct.
18     Q.  And I might need a microscope to see this, on
19 the top of that page, top right-hand corner, it looks
20 like this was copyrighted 1999 -- yeah, it was
21 copyrighted 1999.
22     A.  I believe that's correct.
23     Q.  And one cannot determine, based on the review
24 of the representative subset that you looked at, whether
25 or not the software actually functioned in the way that

231

1     MR. WILLIAMS:  Q.  So you concluded based on
2 failure to see evidence that, what, customers were
3 complaining that the software didn't work as depicted in
4 the diagram you -- diagrams you reviewed in a
5 representative subset form?
6     MR. RAWLINSON:  Objection to form.
7     THE WITNESS:  That's correct.  So I did not
8 see using the examples here that customers said, you
9 know, we expect to see a data entity called an order or
10 an employee, and we don't find any at all, or we find
11 there are two different versions that are different.  I
12 don't recall seeing that.
13     Had there been a few such instances, I would
14 have concluded that that was simply a bug.  If I found
15 many such instances or a complete absence of adherence
16 to these diagrams, then I would have drawn a different
17 conclusion.
18     MR. WILLIAMS:  Q.  What was the representative
19 subset that you reviewed for -- to help you answer
20 question one?
21     A.  The --
22     Q.  The diagrams.
23     A.  Yeah.  The diagrams that I reviewed were the
24 data model diagrams, as illustrated by Figure 7 and 8,
25 associated with the business flows as illustrated by

230

1 the diagrams you reviewed depicted?
2     A.  Could you either reread or repeat that
3 question?
4     Q.  One cannot determine, based on the review of
5 the representative subset that you looked at, whether or
6 not the software actually functioned in the way that the
7 diagrams you reviewed depicted?
8     A.  Not completely and not with precision, you are
9 absolutely right.  I could use this to see the
10 architecture and the design.  And then beyond that point
11 I had to look at actual implementations and reports from
12 customers to see whether it was operating as designed.
13     Q.  And you found customers using Suite 11i --
14 withdrawn.  You found evidence of customers that were
15 using Suite 11i, and that evidence demonstrated that the
16 software was functioning as depicted in the diagrams you
17 reviewed with respect to the first question you pose in
18 paragraph 138?
19     MR. RAWLINSON:  Objection to form.
20     THE WITNESS:  Yes, I found that in the
21 negative sense, i.e., I did not see evidence from
22 operational experience or customer reports indicating
23 that the -- that there was a failure to accomplish the
24 first question about common data elements -- common data
25 entities referring to the same entity.

232

1 Figure 9, in turn associated with these 12 business
2 flows listed in the bullet point of footnote 59.
3     Q.  So how many diagrams did you review to allow
4 you to answer the question that you pose by the first
5 question in paragraph 138?
6     A.  As I recall, several dozen.  I don't recall
7 the precise number.
8     Q.  But you didn't -- did you cite them?  Did you
9 identify which ones you reviewed specifically to answer
10 question one?
11     A.  No, I did not.
12     MR. RAWLINSON:  Objection to form.
13     THE WITNESS:  I did not.
14     MR. WILLIAMS:  Q.  Is there anyone --
15 withdrawn.
16     Is there any way for me to go and find which
17 ones you reviewed in order to answer question one,
18 without your help?
19     A.  I don't think it requires my help.  But you
20 would need to go through the same kind of process that I
21 went through, with help perhaps from somebody.
22     Q.  I wouldn't be able to identify the very same
23 ones you did, would I -- I'm sorry.  Would I be able to
24 determine the very same diagrams that you used to answer
25 question number one?

Yourdon, Edward  7/3/2007  9:07:00 AM

233

1          A.  I believe you could.  Again, you might require
2    some technical assistance, either from me or others, and
3    you would start with the business flows in footnote 59,
4    from that you would retrieve the business flow diagrams,
5    similar to Figure 9, and from that identify the data
6    entities for which the data model diagrams shown or
7    illustrated in Figures 7 and 8 are available in
8    technical reference manuals that are readily available
9    documents that are listed in paragraph 130.
10         Q.  And I could -- 138 or 130?
11         A.  I think paragraph 130.
12         Q.  And I could accurately capture the very same
13   representative subset that you used?
14         A.  I believe you could, yes.  Again, perhaps with
15   technical assistance on your end.  But it certainly is
16   not something that I alone in the universe am capable of
17   doing.
18         Q.  Sure.  Is there a reason why you didn't just
19   cite to those, so that one could go and get those
20   diagrams that you used as the representative subset?
21         MR. RAWLINSON:  For the record, I think he's
22   saying he looked at all the diagrams with respect to
23   those identified functions.
24         THE WITNESS:  Is there an outstanding
25   question?

234

1          MR. RAWLINSON:  I'm just not sure you're not
2    talking past each other here.
3          Maybe there is a disagreement, but it seems to
4    me there is just a misunderstanding.
5          MR. WILLIAMS:  Q.  What I was asking, my last
6    question, is there a reason why you didn't just simply
7    cite to and rely on with exhibits the specific diagrams
8    that you used as your representative subset to answer
9    question number one posed in paragraph 138?
10         A.  There was no fundamental reason, other than my
11   feeling that the information that I provided would be
12   sufficient for anyone else with a technical background
13   to understand what I looked at and how I went about
14   finding it, and that to include all of the data model
15   diagrams, of which again there were several dozen, and
16   all of the business flow diagrams, of which there was a
17   dozen, would have extended the length of this already
18   ponderous document.
19         And since I felt it -- I provided an example
20   and kind of an indication of the source of information
21   for that example, that it would be relatively
22   straightforward for others to go through the same
23   exercise.
24         Q.  So you go on to say in paragraph 139, it's
25   kind of a long sentence, "I've examined the data model

235

1    diagrams for a representative subset of common data
2    entities, i.e., to address the first question identified
3    immediately above and associated business flows
4    diagrams, i.e., to address the second and third question
5    identified immediately above in both the ERP and CRM
6    components of the Suite 11i software -- of Suite 11i."
7    How long did that take?
8          A.  Several hours.  I don't recall precisely how
9    many.  But it was -- it was a time consuming process.
10         Q.  Would you say more than 15 hours?
11         A.  For just this one, or for the --
12         Q.  Basically talking about what you describe in
13   paragraph 139.
14         A.  Okay, what I described in paragraph 139 is not
15   just the individual examples illustrated with the
16   figures but a similar exercise that I went through for
17   approximately a dozen.  And, yes, that was more than 15
18   hours.  I don't recall how many more than that.
19         Q.  Forty?
20         A.  Quite possibly 40.  Somewhere in the range of
21   15 to 40.
22         Q.  Okay.  And in that review, you concluded that
23   the entire Suite 11i system is integrated, at least with
24   respect to its database and business work flows?
25         A.  Yes.

236

1          Q.  And that, you know, wasn't using the software
2    at all; right?
3          A.  I did not use the software; that's correct.
4          Q.  Not experiencing firsthand any of its
5    functionality; right?
6          A.  That's correct.  It says based on this review
7    that we've been talking about, yes.
8          Q.  Based on that review you said you were
9    confident that the entire Suite 11i suite is integrated.
10   Can you describe for me what it means to be integrated
11   with respect to database and business work flows?
12         A.  Those are two of the four different forms of
13   integration, that I think I mentioned there were two
14   others that I identified but did not discuss in detail.
15         Those are functional integration and user
16   interface integration.
17         Q.  That's okay.  Is it fair to say you are not
18   offering an opinion as to whether or not Suite 11i was
19   integrated with respect to user interface integration
20   for functional integration?
21         A.  I have not offered such an opinion in this
22   report.  I can imagine offering such an opinion if asked
23   to or if instructed to by counsel through additional
24   review or investigation.
25         But since I did not see or at least I was not

Yourdon, Edward  7/3/2007  9:07:00 AM

237

1  aware of significant complaints from either plaintiffs
2  or from customers about functional integration or user
3  interface integration, I did not pursue that.
4      Q.  Did you understand statements by the company
5  that Suite 11i was integrated and interoperable to be
6  excluding functional integration or user interface
7  integration?
8      A.  No, I did not.  I did not do so.  But as I
9  explained in footnote 38 at the bottom of page 36, I
10  said that it had very limited relevance to systems
11  integration overall or the market's understanding of
12  whether an ERP was properly described as integrated, et
13  cetera.  And that as I understood the situation at the
14  time, that plaintiffs had not raised issues about those
15  two other aspects or dimensions of integration.
16      Q.  So you cannot -- you cannot provide an opinion
17  that Suite 11i was integrated?
18      MR. RAWLINSON:  Object to the form.
19      THE WITNESS:  I can provide and have provided
20  an opinion with what I understood to be the two most
21  important aspects of integration and the ones about
22  which the complaints were raised.
23      MR. WILLIAMS:  Q.  Isn't it fair to say that
24  you cannot provide an expert opinion as to whether or
25  not Suite 11i was integrated overall?

238

1      MR. RAWLINSON:  Objection to form.
2      THE WITNESS:  I don't believe so for the
3  reasons I've already stated.
4      MR. WILLIAMS:  Q.  You haven't evaluated it?
5      A.  I have not evaluated the functional
6  integration characteristics or capabilities of Suite 11i
7  or the user interface capabilities.
8      MR. WILLIAMS:  Could I take a short break?
9      VIDEOGRAPHER:  Off record at 5:50.
10      (Recess, 5:50 p.m. - 6:17 p.m.)
11      VIDEOGRAPHER:  On record at 6:17.
12      MR. WILLIAMS:  Q.  Do you know Randall Jensen?
13      A.  Yes, I do.
14      Q.  Have you met him before?
15      A.  I have several years ago, but I have.
16      Q.  And who is he?
17      A.  He is a software engineer, I believe the
18  author of a book and some papers in the software field.
19      Q.  Did you read his rebuttal report in this case?
20      A.  Yes, I did.
21      Q.  Did you disagree with his report or the
22  contents of it?
23      A.  In some respects I did, yes.
24      Q.  In what respects were those?
25      A.  I felt that his analysis or his criticisms of

239

1  my estimate of the size of Suite 11i was incorrect.  I
2  felt that he agreed that Suite 11i was very large, and
3  did not offer any disagreement with the estimate that I
4  quoted in my report about ERP systems like Suite 11i
5  being approximately 250,000 function points in size.
6  And I specifically disagreed with an interpretation that
7  he made of one paragraph of my report about urgent bugs
8  being implemented.  I believe it was in paragraph 34 of
9  my report, perhaps it was paragraph 84.
10      There was a paragraph in my report where I
11  said that a decision has to be made about whether to
12  implement patches and bug fixes -- here it is, it is
13  page 13 -- I'm sorry, page 14, paragraph 33, my
14  statement said, "The decision to install 'bug fixes'
15  typically requires careful analysis," et cetera, et
16  cetera, for the remainder of that paragraph.
17      And what I was describing in that paragraph
18  was the decision by customers as to whether or not they
19  would install patches or bug fixes was a decision that
20  required careful analysis.  I believe that the expert,
21  whose name I've now forgotten, at the end of the day --
22      Q.  Randy Jensen?
23      A.  Dr. Jensen interpreted that statement as being
24  the decision by a vendor, i.e., by a company like Oracle
25  to install bug fixes required a careful analysis, and

240

1  that's not what I was talking about at all.
2      Q.  So you're saying that he misinterpreted what
3  you wrote?
4      A.  I believe he did.  And from that drew a
5  conclusion that the 5,000 patches that have been
6  attributed to Oracle 11i were all urgent bugs that had
7  to be implemented.
8      Q.  So had you -- had his interpretation been the
9  correct interpretation, would his conclusion have been
10  correct?
11      A.  I don't believe it would have been, because he
12  used that to conclude that the 5,000 patches, first of
13  all, were all bugs, but equally importantly, that they
14  were priority one or very urgent bugs, and I don't
15  believe that conclusion.
16      Q.  I may have misstated my question.  If you had
17  written or if you intended what he interpreted your
18  comment to be, would his conclusion have been correct?
19      MR. RAWLINSON:  Objection to form, vague.
20      MR. WILLIAMS:  Q.  Do you understand that?
21  You said he misinterpreted what you said; right?
22      A.  Yes.
23      Q.  Based on his interpretation, were his
24  conclusions correct, in your view, based on his
25  interpretation?  Notwithstanding the fact that you

241

1  believe he misinterpreted what you said.  But was there
2  a failure in his analysis or conclusion, or was it
3  simply that he misinterpreted what you wrote?
4        MR. RAWLINSON:  Same objection; vague.
5        THE WITNESS:  I believe that his
6  misinterpretation led to a substantial assumption on his
7  part that changed his opinion, and -- or led to his
8  opinion that I disagreed with.  And if he had
9  interpreted this correctly, I think he would have been
10  using facts that simply were not true.
11        MR. WILLIAMS:  Q.  When you say if he had
12  interpreted it correctly, you mean if he had interpreted
13  it the way you meant it?
14        A.  No.  I meant that if, following your
15  hypothetical scenario, if his interpretation had somehow
16  been correct, if he had assumed that my paragraph about
17  installing bug fixes was something that was pertaining
18  to a vendor installing bug fixes within their base
19  product, that would have led him, as indeed it did lead
20  him, to assumptions that I think were completely
21  incorrect and could not be sustained within this case.
22        MR. WILLIAMS:  I have nothing further.
23        EXAMINATION BY MR. RAWLINSON
24        MR. RAWLINSON:  Q.  Mr. Yourdon, you indicated
25  earlier that you have not examined the user interface

242

1  integration or functional integration with respect to
2  11i; is that correct?
3        A.  That's correct, yeah.
4        Q.  Why did you feel you did not need to examine
5  that for purposes of reaching a conclusion with respect
6  to whether Oracle's statements about integration were
7  true or not?
8        A.  Because, as I explained in my report, in
9  general they are very minor aspects of integration for
10  ERP products, and also because as integration was used,
11  in my understanding, by Oracle in its various
12  representations, it included the two aspects of
13  integration that you measure, more fundamental aspects
14  of integration that I did discuss, that is data
15  integration and work flow integration.
16        Q.  Do you feel that your -- what you reviewed is
17  sufficient for you to opine on whether Oracle's -- the
18  challenged Oracle statements in this case in their use
19  of integration was true or false?
20        A.  Yes, I do, because I think Oracle's
21  representations about integration were based on data
22  integration and work flow integration.
23        MR. RAWLINSON:  No further questions.
24        FURTHER EXAMINATION BY MR. WILLIAMS
25        MR. WILLIAMS:  Q.  You cannot opine, can you,

243

1  as an expert, as to whether or not Suite 11i was
2  integrated overall?
3        MR. RAWLINSON:  Objection; vague.
4        THE WITNESS:  I believe I can opine as to
5  whether Suite 11i was integrated in -- with the meaning
6  or in the context that it was represented by Oracle.
7  Yes, I do.
8        MR. WILLIAMS:  Well, my question was -- well,
9  withdrawn.
10        I think the record is clear.  We're done.
11        VIDEOGRAPHER:  This marks the end of videotape
12  number four, in Volume I in the deposition of Edward
13  Yourdon.  The original videotapes will be retained by
14  LiveNote World Service.  We're going off the record.
15  The time on the monitor is 6:25.
16        (Discussion off the record.)
17        VIDEOGRAPHER:  On record at 6:27.
18        MR. RAWLINSON:  As discussed earlier today,
19  we've offered to plaintiff changes, some corrected
20  examples of Mr. Yourdon's report, primarily
21  typographical errors.  One changed footnote 29, which
22  changes a calculation, but not the fundamental analysis.
23  We want plaintiff to have these.  We offered this to
24  Mr. Williams before the deposition started.
25        Please attach them as the final exhibit to

244

1  Mr. Yourdon's report so they are on the record.
2        (Exhibit 2 marked for
3        identification.)
4        (Exhibit 3 marked for
5        identification.)
6        VIDEOGRAPHER:  This marks the end of tape four
7  at 6:28.  Going off the record.
8        (Whereupon, at 6:28 p.m. the deposition of
9  EDWARD YOURDON was adjourned.)
10
11        I declare under penalty of perjury that the
12  foregoing is true and correct.
13
14  Dated:_____  _____
                EDWARD YOURDON
15
16
17
18
19
20
21
22
23
24
25

Yourdon, Edward  7/3/2007  9:07:00 AM

245

1    STATE OF CALIFORNIA      )
2                             )
3    COUNTY OF ALAMEDA        )
4          I, DIANA NOBRIGA, hereby certify that the
5    witness in the foregoing deposition was by me duly sworn
6    to testify to the truth, the whole truth, and nothing
7    but the truth in the within-entitled cause; that said
8    deposition was taken at the time and place therein
9    stated; that the testimony of said witness was reported
10   by me, a Certified Shorthand Reporter and disinterested
11   person, and was thereafter transcribed into typewriting,
12   and that the pertinent provisions of the applicable code
13   or rules of civil procedure relating to the notification
14   of the witness and counsel for the parties hereto of the
15   availability of the original transcript of the
16   deposition for reading, correcting and signing have been
17   met.
18          And I further certify that I am not of counsel
19   or attorney for either or any of the parties to said
20   deposition, nor in any way interested in the outcome of
21   the cause named in said action.
22       DATED: _____
23
24          _____
25          DIANA  NOBRIGA, CSR NO. 7071

1   STATE OF CALIFORNIA          )

2                                )

3   COUNTY OF ALAMEDA            )

4           I, DIANA NOBRIGA, hereby certify that the

5   witness in the foregoing deposition was by me duly sworn

6   to testify to the truth, the whole truth, and nothing

7   but the truth in the within-entitled cause; that said

8   deposition was taken at the time and place therein

9   stated; that the testimony of said witness was reported

10  by me, a Certified Shorthand Reporter and disinterested

11  person, and was thereafter transcribed into typewriting,

12  and that the pertinent provisions of the applicable code

13  or rules of civil procedure relating to the notification

14  of the witness and counsel for the parties hereto of the

15  availability of the original transcript of the

16  deposition for reading, correcting and signing have been

17  met.

18          And I further certify that I am not of counsel

19  or attorney for either or any of the parties to said

20  deposition, nor in any way interested in the outcome of

21  the cause named in said action.

22          DATED: _July 6, 2007_

23

24

25          DIANA  NOBRIGA, CSR NO. 7071

# EXHIBIT T

This Exhibit Was Intentionally Left Blank

# EXHIBIT U

Hamel, Kenneth   5/22/2006  9:15:00 AM

**1**

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3    Master File Number C-01-0988-MJJ
 4    - - - - - - - - - - - - - - -
 5    IN RE:  ORACLE CORPORATION    :
 6    SECURITIES LITIGATION         :
 7    - - - - - - - - - - - - - - -
 8
 9        VIDEOTAPED DEPOSITION OF KENNETH G. HAMEL, a
10    witness called by and on behalf of the Plaintiffs,
11    taken pursuant to the applicable provisions of the
12    Federal Rules of Civil Procedure, before Sandra L.
13    Bray, Registered Diplomate Reporter, CSR Number
14    103593, and Notary Public in and for Commonwealth of
15    Massachusetts, at the offices of Merrill Corporation,
16    101 Federal Street, Boston, Massachusetts, on Monday,
17    May 22, 2006, commencing at 9:15 a.m.
18
19
20
21
22
23
24
25
```

**2**

```
 1    APPEARANCES:
 2      Representing the Plaintiff:
 3        LERACH COUGHLIN STOIA GELLER RUDMAN &
 4        ROBBINS LLP
 5        100 Pine Street
 6        Suite 2600
 7        San Francisco, California  94111
 8        415-288-4545
 9        swilliams@lerachlaw.com
10        BY:  SHAWN A. WILLIAMS, ESQUIRE
11
12      Representing the Defendants and Kenneth G.
13      Hamel:
14        LATHAM & WATKINS LLP
15        505 Montgomery Street
16        Suite 2000
17        San Francisco, California  94111
18        415-391-0600
19        michele.kyrouz@lw.com
20        kyra.busby@lw.com
21        BY:  MICHELE F. KYROUZ, ESQUIRE and
22           KYRA G. BUSBY, ESQUIRE
23
24    ALSO PRESENT:
25        Richard Mendes, Video Operator
```

**3**

```
 1                    I N D E X
 2    WITNESS:                     PAGE NO.
 3    KENNETH G. HAMEL
 4    BY MR. WILLIAMS                 6
 5
 6
 7                 E X H I B I T S
    NO.       DESCRIPTION            PAGE
 8
    Exhibit 1  Subpoena               47
 9
    Exhibit 2  Second Amended Notice of
10             Videotaped Deposition   48
11    Exhibit 3  Copy of E-mail String   51
12    Exhibit 4  Copy of E-mail String   64
13    Exhibit 5  Copy of E-mail to Mr. Roberts
               from Ms. Fitzpatrick, dated
14             10-8-00              89
15    Exhibit 6  Copy of E-mail String   95
16    Exhibit 7  Copy of E-mail String   97
17    Exhibit 8  Copy of E-mail, dated 2-13-01   99
18    Exhibit 9  Copy of E-mail String   103
19    Exhibit 10  Copy of E-mail String  112
20    Exhibit 11  Copy of E-mail String  122
21    Exhibit 12  Copy of E-mail String  123
22    Exhibit 13  Copy of E-mail String  131
23    Exhibit 14  Copy of E-mail from
               Ms. Fitzpatrick, dated 5-10-01  134
24
    Exhibit 15  Copy of E-mail String  137
25
```

**4**

```
 1             E X H I B I T S, Continued
 2    NO.       DESCRIPTION            PAGE
 3    Exhibit 16  Copy of E-mail String  143
 4    Exhibit 17  Copy of E-mail String  152
 5    Exhibit 18  Copy of E-mail to Mr. Wohl
               from Ms. Fitzpatrick, dated
 6             5-27-01              156
 7    Exhibit 19  Copy of E-mail to Mr. Hamel,
               et al. from Mr. Pike, dated
 8             5-29-01              157
 9    Exhibit 20  Copy of E-mail to Mr. Nugent
               from Mr. Hamel, dated 3-28-01   160
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Hamel, Kenneth   5/22/2006   9:15:00 AM

5

```
1              P R O C E E D I N G S
2       (The Massachusetts driver's license number
3       as identification of the deponent was noted
4       for the record.)
5           THE VIDEO OPERATOR:  Here marks the
6   beginning of Videotape Number 1 in the deposition of
7   Kenneth Hamel, in the matter of Oracle Corporation
8   Securities Litigation, in the United States District
9   Court, Northern District of California, Case Number
10  C-01-0988-MJJ.
11          Today's date is May 22nd, 2006.  The time
12  on the video monitor is 9:15.  The video operator
13  today is Richard Mendes, contracted by LegaLink,
14  Boston, Massachusetts.
15          This video deposition is taking place at
16  101 Federal Street, 21st floor, Boston, Massachusetts.
17          Counsel, please voice-identify yourselves
18  and state whom you represent.
19          MR. WILLIAMS:  Shawn Williams, Lerach
20  Coughlin Stoia Geller Rudman & Robbins, on behalf of
21  the Plaintiffs.
22          MS. KYROUZ:  Michele Kyrouz and Kyra Busby
23  from Latham & Watkins, on behalf of Defendants and the
24  witness.
25          THE VIDEO OPERATOR:  The court reporter
```

6

```
1   today is Sandra Bray of LegaLink, Boston.  Will the
2   reporter please swear in the witness?
3           KENNETH G. HAMEL, having duly sworn or
4   affirmed that his testimony would be the truth, the
5   whole truth, and nothing but the truth, testified as
6   follows:
7                       *  *  *
8           THE VIDEO OPERATOR:  Please begin.
9   EXAMINATION BY MR. WILLIAMS:
10  Q.  Good morning, Mr. Hamel.
11  A.  Good morning.
12  Q.  Can you state your full name and address for the
13      record, please?
14  A.  Sure.  Kenneth Hamel, 20 Risley Road in Newton,
15      Massachusetts 02465.
16  Q.  All right.  And I'm just going to go over some of the
17      ground rules today.  I'm sure Miss Kyrouz has kind of
18      done that with you.  But briefly, the reporter sitting
19      to your right is going to take down everything that is
20      said in this room today, my comments, your answers,
21      counsel's comments or objections.  Do you understand
22      that?
23  A.  Yes.
24  Q.  Because the reporter is not able to record hand
25      gestures or head nods, I'm going to need you to speak
```

7

```
1       audibly in response to my questions.
2   A.  Okay.
3   Q.  And in a loud and clear voice so everyone can hear
4       you.  Is that all right?  Understand?
5   A.  Yes.
6   Q.  I'm going to ask you several questions today.  I'll
7       try to be as clear as I possibly can.  Certainly,
8       there'll be times that you don't understand the
9       question or my question might be a little jumbled, but
10      if you don't understand, I'll just ask you to let me
11      know.  I'll do the best I can to clarify it, and then
12      you can answer the question.  You understand?
13  A.  Okay.  Yes.
14  Q.  Miss Kyrouz may object to my questions today.  She may
15      object to a few.  She may object to them all.  And
16      that's her right.  However, unless she instructs you
17      not to answer a specific question, you will still have
18      to answer the question.  Do you understand that?
19  A.  Yes.
20  Q.  Okay.  We'll take several breaks today, and we can do
21      that whenever you like.  If you let me know, we'll
22      just take a break.  However, if there's a question
23      pending or if I'm in the middle of a line of
24      questions, I may just want to complete that question
25      or that line of questioning before we take a break.
```

8

```
1       Do you understand that?
2   A.  Yes.
3   Q.  Do you understand the oath you've taken today is the
4       same as the oath you would take in a court of law even
5       though we're in somewhat of an informal setting today?
6   A.  I do.
7   Q.  Any reason that you can't give your full and complete
8       testimony today?
9   A.  No.
10  Q.  Are you on any medication that might impact your
11      ability to recall facts?
12  A.  No.
13  Q.  At the end of your testimony, sometime between now and
14      the next 30 days or so, you'll have an opportunity to
15      read your testimony and correct any small mistakes,
16      nothing substantive, but you'll have to opportunity to
17      review for any slight errors, so you don't have to be
18      absolutely perfect.  Do you understand?
19  A.  Yes.
20  Q.  Have you had your deposition taken before?
21  A.  No.
22  Q.  And when was the first time you learned that your
23      deposition would be taken in this case?
24  A.  I'm not sure the exact date.  A few weeks ago.
25  Q.  Okay.  And how did you learn it?  Did you receive
```

Hamel, Kenneth   5/22/2006  9:15:00 AM

9

1     something in the mail or did you talk to someone?
2  A.  No, someone came -- left something in my mail slot at
3     home.
4  Q.  Okay.  And what was it?  Do you know?
5  A.  It was -- was it a summons?
6  Q.  Maybe a subpoena, looked like a subpoena?
7  A.  Excuse me.  Yeah, yeah.
8  Q.  And what did you do with it when you got it?
9  A.  What did I do with it.  Oh, I called -- I called the
10     Oracle attorney that I knew.
11  Q.  Okay.  Do you still work for Oracle?
12  A.  I don't.
13  Q.  And who was that attorney?
14  A.  Jeff Ross.
15  Q.  Jeff Ross.  Is inside counsel for Oracle, general
16     counsel or is he a law firm that represents Oracle?
17  A.  To my understanding, he's internal counsel.
18  Q.  Okay.  And is he the only lawyer that you talked to
19     after the initial receipt of the subpoena?
20  A.  Yes.
21     MS. KYROUZ:  I'm just going to inform the
22     witness that you can reveal if you had a conversation
23     with me or people in my firm.  You can tell him that.
24     You just can't reveal the contents of the
25     communication.

10

1  A.  So immediately within that time frame, I talked to
2     Jeff Ross.
3     THE WITNESS:  And then probably a few weeks
4     later, I heard from someone from your firm.
5  Q.  From Latham & Watkins?
6  A.  Yes.  I don't remember the name of the person.
7  Q.  Okay.  Was it a male or a female?
8  A.  It was a male.
9  Q.  Have you done anything to prepare for your testimony
10     today?
11  A.  Not really.
12  Q.  Okay.  Do you have -- have you ever seen a complaint
13     in this action?
14  A.  Have I seen, like -- what do you mean by a complaint,
15     a description?
16  Q.  Well, a document that kind of describes what the
17     Plaintiff's allegations are?
18  A.  I haven't seen anything that describes it.
19  Q.  Do you know what this case is about?
20  A.  A little bit.
21  Q.  And what's your understanding what the case is about?
22  A.  I guess I understand that they're suing the management
23     of Oracle because they allege that they knew about a
24     particular quarter revenue miss or something and had
25     sold options or stocks or whatever, and they're

11

1     alleging that they had some -- I'm presuming they had
2     some insider information as a result of that and,
3     therefore, it sold and profited, and I believe the
4     stock went south from there.
5  Q.  All right.  And you said that you haven't done much to
6     prepare for your testimony today?
7  A.  Not really.
8  Q.  Did you meet with your lawyers?
9  A.  I did.
10  Q.  And when was that?
11  A.  I met with them last night.
12  Q.  And how long did you meet?
13  A.  A couple hours.
14  Q.  Okay.  And that was Miss Kyrouz and Miss Busby?
15  A.  Yes.
16  Q.  And did you review any documents in preparation for
17     your deposition today?
18  A.  Yes, I saw some documents.
19  Q.  Okay.  And how many documents approximately?
20  A.  Oh, I don't remember.  I mean ten maybe.
21  Q.  Okay.  When did you leave Oracle?
22  A.  In November of 2003.
23  Q.  Okay.  So did any of the documents that you reviewed
24     help you recall any facts that were occurring in the
25     2000-2001 time frame?

12

1     MS. KYROUZ:  Objection, vague.
2  A.  Recall -- recall specific things?
3  Q.  Yes, anything.
4  A.  Yeah, I guess a little bit.
5  Q.  Like what?
6  A.  Well, it's funny because some of the documents I saw I
7     don't even recall writing, so they brought it back to
8     me.
9  Q.  That's okay.  Did they help you recall certain things
10     that were occurring back then?
11     MS. KYROUZ:  Objection, vague.
12  A.  Yes, I guess they would have had me recall a couple of
13     events, sure.
14  Q.  Tell me what events they helped you recall.
15  A.  One of the things that I think I recalled was the
16     challenges we were having with some of the tools that
17     we needed in order to sell the demonstration systems
18     and such.
19  Q.  Okay.  And why did -- well, withdrawn.  Were there any
20     specific documents that helped you recall that,
21     documents that you may have written or someone may
22     have written to you?
23  A.  Not any in particular.
24  Q.  And what were some -- when you say that they helped
25     you recall some of the challenges that you were having

13

1   with the tools needed to make demonstrations, if
2   that's what your testimony was, what do you mean?
3   A.  Well, we have -- in the role I was in, we were
4   called -- I was running a group called Sales
5   Consultants, and during -- just preceding this period,
6   we had introduced a new version of our software.  So
7   it just had me remember some of the difficulty we had
8   with our demonstration systems in showing that to
9   prospective clients.
10  Q.  Okay.  Do you still have friends that work at Oracle?
11        MS. KYROUZ:  Objection, vague.
12  A.  I would characterize I have several acquaintances that
13  work at Oracle.
14  Q.  That's fine.  And do you continue to communicate with
15  them?
16  A.  Not really.
17  Q.  And can you describe for me your educational
18  background after high school?
19  A.  Uh-huh.  I have a bachelor's of science degree in
20  accounting from Bentley College.
21  Q.  I'm sorry?  What college?
22  A.  Bentley --
23  Q.  Bentley.
24  A.  -- College here in Waltham, Massachusetts.
25  Q.  And when did you get that degree?

14

1   A.  1983.
2   Q.  '83.  And did you go directly to work after that?
3   A.  Yes.
4   Q.  Who did you work for?
5   A.  Digital Equipment Corporation.
6   Q.  Here in the Massachusetts area?
7   A.  Here in the Boston -- actually, New Hampshire.
8   Q.  New Hampshire.  And how long were you with Digital
9   Equipment?
10  A.  Ten years.
11  Q.  What kind of work did you do there?
12  A.  Finance and then IT, information technology, kind of
13  things and then eventually sales.
14  Q.  Sales of what type of products?
15  A.  Presales of hardware products, their computer
16  products.
17  Q.  So what was the highest position that you held at
18  Digital Equipment?
19  A.  I was -- I guess the highest, the last role I was in
20  was presales director at Digital.
21  Q.  Okay.  And can you just describe what that entails,
22  presales director?
23  A.  I was managing employees that basically went in and
24  talked to prospective clients about technologies that
25  they could possibly buy to solve business problems

15

1   they might have.
2   Q.  And when did you make the transition from accounting
3   into IT?
4   A.  Well, I was -- so I went from account finance to IT.
5   You know, I had more of a technical interest.  So they
6   realized that I could do -- it was called a business
7   analyst role.  So you were kind of bridging discussion
8   between the technical people in IT and the business
9   people in finance.
10  Q.  I see.
11  A.  And then -- yeah.
12  Q.  And that was while you were at Digital?
13  A.  While I was at Digital.
14  Q.  So when you had the last position, were you using both
15  skills or were you doing more IT and sales?
16  A.  Digital had a program where they were trying to take
17  internal people who were in operational areas, like
18  finance or IT, and put them closer to the customer
19  because they could talk about practical implementation
20  and use of the products, and they'd have their own
21  experience.  They could relate more to the customers.
22  So I had a finance background and IT background; they
23  thought I could talk to the customers about what we
24  had experienced internally.
25  Q.  And how long did you hold that last position?

16

1   A.  Two years.
2   Q.  So you left sometime in '93, Digital Equipment?
3   A.  Yes.
4   Q.  And what did you do after that?
5   A.  I had a brief stint, like six months, at a company
6   called Computron Technology.
7   Q.  Again here in this area?
8   A.  No -- I was here.  The company was headquartered out
9   of New Jersey.
10  Q.  What was your position there?
11  A.  Presales consultant.
12  Q.  Same type of work?
13  A.  Yes, except now they were a software company, so I
14  transitioned from hardware to software.
15  Q.  Can you just describe what you mean by consultant?
16  A.  I would basically work with customers what our
17  software product -- prospective customers would do to
18  support the business problems they might have.  So it
19  was a financial application.  So I did general ledger
20  and accounts receivable and accounts payable, the
21  traditional general ledger financial functions.  So I
22  would basically go in, talk to the customer,
23  understand their business challenges, then say,
24  "Here's how we can solve them with this software."
25  Q.  Okay.  So you weren't doing implementation of any

Hamel, Kenneth  5/22/2006  9:15:00 AM

17

1      software --
2   A.  No.
3   Q.  -- at that time?
4   A.  No, it was a different team that did that.
5   Q.  So you spent about six months at Computron?
6   A.  Yes.
7   Q.  Then you went to Oracle?
8   A.  Yes.
9   Q.  What is that, early '94, mid-'94?
10  A.  Yes, I guess it would have been early '94.  Yes, it
11      would have been about -- I think I was there about
12      nine and a half years.
13  Q.  You were at Oracle nine and a half years?
14  A.  Yeah, yeah, yeah.
15  Q.  So how was it that you ended up going to Oracle?  Were
16      you recruited or did you apply for a job?
17  A.  I had a colleague that was there who had come from the
18      company I was at, and I applied for -- she told me
19      there was a job.  Same job, presales consulting.
20  Q.  And who was that colleague?
21  A.  A woman named Julie Smith.
22  Q.  And so you got the job.  What position did you take?
23  A.  Presales consultant -- we call it sales consultants at
24      Oracle.
25  Q.  And same type of duties --

18

1   A.  Yes.
2   Q.  -- that you had at --
3   A.  Computron.
4   Q.  -- Computron?
5   A.  Yes.
6   Q.  And that was here in the Boston area?
7   A.  Boston area.
8   Q.  Okay.  When you were hired, were you a sales
9       consultant in any particular area of Oracle's
10      business?  And I'm talking about in 1994.
11  A.  Yeah, their -- specifically their finance
12      applications.  So it was in their applications
13      business, specifically around financial, which at the
14      time was the only products they had.
15  Q.  Right.  And -- at least application products?
16  A.  Correct, just application products.
17  Q.  And how about in terms of regional breakdown?  Did you
18      have responsibility for a specific region reporting
19      into some higher business organization within Oracle
20      in '94?
21  A.  So back then, I was in the New England region, so we
22      basically handled the New England states, and we
23      reported in to someone who handled -- I think they ran
24      the U.S., if I recall.  There were a bunch of regions
25      that reported up to the U.S.

19

1   Q.  And at that time in, say, '94, early '95, was the --
2       was Oracle sales and consulting broken down into North
3       American sales, OPI --
4   A.  No.
5   Q.  -- and OSI?
6   A.  No.
7   Q.  No?
8   A.  In fact, I think it was just one U.S. organization for
9       everything, if I recall.  I think that's the way it
10      was structured.
11  Q.  So who did you report to in that kind of 1994, '95
12      time?
13  A.  A guy named Mark Wood.
14  Q.  Was he on the East Coast?
15  A.  Here in Boston.
16  Q.  Here in Boston.  Did you have any people reporting to
17      you?
18  A.  Not in that initial role.
19  Q.  Okay.  At some point, were you promoted?
20  A.  Uh-huh.
21  Q.  And to what position and when was that?
22  A.  I was promoted to a sales consultant manager.  When
23      was that?  So I think it was probably three years.
24  Q.  Okay.  A sales consultant manager?
25  A.  Right, so I had presales -- sales consultants

20

1       reporting to me.
2   Q.  And this was all still presales?
3   A.  Yes.
4   Q.  So all of your duties were prior to the customer
5       actually purchasing --
6   A.  Correct.
7   Q.  -- Oracle products?  So would you also have
8       responsibility for selling to or doing presales to
9       installed base customers?
10  A.  Sure.
11  Q.  Okay.
12  A.  But back then, it was mostly new customers because
13      they had such a small footprint.
14  Q.  So we're into '98 now?  You said you were doing it for
15      three years.
16  A.  Yeah.
17  Q.  Early '98 maybe?
18  A.  Yeah.
19  Q.  Were you still reporting to Mark Wood?
20  A.  I honestly don't remember.
21  Q.  But you had people --
22  A.  I don't remember.
23  Q.  I'm sorry.
24  A.  I can't believe I don't remember.  Actually, I do
25      remember.  So I was reporting to a guy named Bill

Hamel, Kenneth   5/22/2006  9:15:00 AM

21

```
1    Murphy, who ran application sales in the New England
2    area.
3    Q.  Okay.  And your title had changed somewhat to sales
4        consultant manager?
5    A.  Correct.
6    Q.  And do you know who Bill Murphy reported to?
7    A.  John Nugent.
8    Q.  And where was John Nugent located at that time?
9    A.  In Boston.
10   Q.  He was in Boston?
11   A.  Yeah.
12   Q.  Now, were you all working out of the same office?
13   A.  Yes.
14   Q.  Where was the office?
15   A.  222 Berkeley Street.
16   Q.  Is that close to here?
17   A.  Yeah, yeah, just east of here.
18   Q.  How large was that office?
19   A.  As far as --
20   Q.  People.
21   A.  -- number of people?
22   Q.  Not square footage.
23   A.  And specifically salespeople or --
24   Q.  I'm just curious.  Did Oracle have the whole building?
25   A.  No.  We had one floor.  We were probably twenty people
```

22

```
1        or maybe thirty people at the time in the sales
2        organization.
3    Q.  Oh, I see.  Okay.  Now, your presales duties as a
4        sales consultant manager, was a lot of your work done
5        in the field or in the office?
6    A.  Probably 60 percent in the office, 40 percent in the
7        field.
8    Q.  Okay.  And out in the field, you would just do
9        presentations of what --
10   A.  Yes, or watch my people do presentations.
11   Q.  Okay.  And how many people did you have reporting to
12       you at the time?
13   A.  It varied, but anywhere from seven to eight people,
14       you know, six to eight people.
15   Q.  And how long were you a sales consultant manager?
16   A.  I think a couple years, and then I got promoted to a
17       technical -- called a technical director, so the next
18       level up.
19   Q.  So somewhere around 2000?
20   A.  Yeah.  No, so my dates are -- I'm trying to back up.
21       Yeah, so I was maybe a sales consulting manager for a
22       year, and then I was -- I was a sales consulting
23       manager.  Then I got promoted sales manager when Bill
24       Murphy left.  So then I ran salespeople and
25       presalespeople.  And that would have been -- that
```

23

```
1        would have been in 2000.
2    Q.  Okay.  So Bill Murphy left sometime prior to --
3    A.  Yeah.
4    Q.  -- in early 2000 or sometime prior to 2000?
5    A.  Yes, probably prior.
6    Q.  And you became a sales manager as well?
7    A.  Yes.
8    Q.  Can you describe what your duties were as a sales
9        manager?
10   A.  So I had responsibility for the presalespeople.  So I
11       hired a manager to do that, and then I had
12       responsibility for the sales managers that were
13       actually selling to, again, this geography in New
14       England.
15   Q.  Just describe for me the differences there of what
16       your salespeople were doing and what your
17       presalespeople were doing.
18   A.  So salespeople make initial contact with a prospective
19       customer, basically, you know, do most -- they're the
20       front-line-responsible person for selling, you know,
21       the entire sales process, which is from the time they
22       identify there's a potential opportunity with a
23       customer all the way through closure, getting the
24       contract, that sort of thing.  They would bring the
25       presalespeople into the selling process at a point
```

24

```
1        they deemed necessary for the customer to see a
2        demonstration of the product or talk about what the
3        product does.
4    Q.  Okay.  And then once that was done, the salespeople
5        would take over again --
6    A.  Yes.
7    Q.  -- to actually finalize the sale?
8    A.  Close, right, right.
9    Q.  All right.  How were your -- how did your specific
10       duties differ between the two different management
11       roles, managing the salespeople and managing the
12       presalespeople?
13   A.  Well, I mean one of the key things was the different
14       measurement rights.  Now, as a sales manager, I have a
15       quota and responsible for making sure that we get to
16       that quota.  So that was the key thing.
17           The second difference was I managed both
18       salespeople and presalespeople, so I was much more
19       involved in opportunities with customers, in every
20       step of the cycle.  Whereas before, I was involved
21       just really in the demonstration-related,
22       presales-related activities, which are more
23       product-centric activities.
24   Q.  Did you report to different people for the sales
25       side --
```

Hamel, Kenneth   5/22/2006  9:15:00 AM

25

1 A. Yes.
2 Q. -- where you had the quota and the presales side
3   who --
4 A. Yes, different people, who ultimately reported to the
5   same side.
6 Q. Tell me who those people were.
7 A. I reported to Bill Costello when I was the sales
8   manager, and he reported to -- actually, he reported
9   to Ron Bunting out of Baltimore area.
10 Q. Was Bill Costello a vice president, regional?
11 A. He was an area vice president.
12 Q. And what was Bunting?
13 A. Bunting was a group vice president.
14 Q. Group vice president. And during the presales, you
15   were still reporting to --
16 A. Bill Murphy.
17 Q. Bill Murphy left, right?
18 A. Bill Murphy left. I got this new job. I owned both
19   teams, and I reported centrally to Bill Costello.
20 Q. So you no longer had a line up to John Nugent?
21 A. I did not.
22 Q. All right. Was Bill Costello here in Boston as well?
23 A. Yep.
24 Q. And so he also covered the presales responsibilities
25   that you --

26

1 A. He had the overall sales responsibility for
2   applications.
3 Q. Now, you indicated that in presales, your
4   responsibilities were more product-centric. And can
5   you just describe for me what you mean by that?
6 A. Well, again, we're trying to understand what the
7   customers' issues were. So once we understood what
8   they were, we basically worked with the product to
9   understand how does it fit to those business issues,
10   how can we solve them using the product capability.
11   So that's -- I mean as opposed to getting involved in
12   contractual negotiations. Those are traditional sales
13   functions.
14 Q. I see. So you're familiar with 11i, right?
15 A. Uh-huh.
16 Q. And what we've been talking about until now is kind
17   of prior to the release of 11i?
18 A. Right.
19 Q. Is it fair to say 11i was released sometime in May of
20   2000?
21     MS. KYROUZ: Objection, lacks foundation.
22 Q. If you know.
23 A. Yes, I don't recall exactly when it was released.
24 Q. Okay. That's fine. Do you recall anything
25   surrounding the release that might help you recall the

27

1   timing?
2 A. Well, the only thing, I was in a different role, so at
3   that time, I was reporting back -- reporting to John
4   Nugent.
5 Q. So let me --
6 A. So that would have -- if I back up, that was
7   probably -- yeah, so that would have made it around in
8   the 2000 range.
9 Q. Okay. Let me back up a little bit. You said that at
10   some point you started reporting to John Nugent again?
11 A. Right, right.
12 Q. Tell me the circumstances of that.
13 A. So I spent a year doing this thing with Bill, and then
14   John recruited me to run presales. He created -- he
15   inherited a national organization that was selling to
16   the midmarket for Oracle, and they called it general
17   business. And he created a national presales VP role,
18   so pulled all the presalespeople together under one
19   person, and that was the role I stepped into.
20 Q. Okay. And you no longer had a quota?
21 A. Correct. I'm back to the presales.
22 Q. You're back to presales, all presales?
23 A. Yes.
24 Q. So during the time period you were reporting to Bill
25   Costello up to Ron Bunting, is that '99?

28

1 A. Yes, that's what I'm thinking. I'm just trying to go
2   through the dates in my mind here, but it would have
3   been earlier than that.
4 Q. Earlier than '99?
5 A. Yes, I think it would have been '98. So maybe as I
6   talked about initial presales, maybe it went as long.
7 Q. That's fine.
8 A. Because the very last job I was in at Oracle, I was in
9   it for two years. That would have brought me to 2001.
10   Then I was 2001, 2000, '99. So that was probably '99.
11 Q. When you did have the quota and you were responsible
12   for some sales managers, you indicated that, I guess,
13   the sales manager would begin by identifying
14   opportunities, right?
15     (The witness nodded.)
16 Q. Did they have responsibility for informing you about
17   those opportunities?
18 A. Sure.
19 Q. And how was that generally communicated to you?
20     MS. KYROUZ: Objection, vague.
21 A. I mean so -- I guess on a weekly basis, we had a sales
22   call, and we'd talk about what new opportunities came.
23 Q. Okay.
24 A. We call them opportunities, identified something we
25   were going to pursue.

Hamel, Kenneth   5/22/2006  9:15:00 AM

29

1    Q. And when you say a sales call, those people were
2        mostly in the field or were they in the office?
3    A. They were in this geography, but they could be out in
4        the field.
5    Q. I see.
6    A. So they were either present physically or on the
7        telephone.
8    Q. I understand. Were those opportunities input into any
9        system that Oracle had so you could keep track of them
10       after sales calls?
11   A. Not --
12         MS. KYROUZ: Objection, vague.
13   A. No, there was nothing formalized back then.
14   Q. How were you able to keep track of what was -- what
15       the opportunities were during a certain quarter? Sort
16       of write them down during the sales calls?
17   A. Oh, yeah. Had a white board in my office and a list
18       of things we were working on, time frame we thought it
19       was going to close, steps we were undertaking.
20   Q. At some point while you were in that role, the sales
21       manager, did Oracle develop a system where one could
22       track opportunities electronically?
23   A. I don't believe it happened during that time period.
24   Q. Okay.
25   A. In fact, I know it didn't.

31

1        that mean?
2    A. That meant we were selling to commercial customers who
3        had revenues of $500 million annualized or less.
4    Q. And that was considered, I think you said, midmarket?
5    A. Midmarket. That's the more traditional, you know,
6        vernacular for that market.
7    Q. Would you say that that's kind of the largest customer
8        base for the -- for Oracle during that time?
9          MS. KYROUZ: Objection; lacks foundation,
10       vague.
11   A. The largest in terms of revenue, in terms of number of
12       customers?
13   Q. Number of customers.
14         MS. KYROUZ: Same objection.
15   A. Yeah, I don't know the answer to that.
16   Q. Okay.
17   A. I don't know the answer to that.
18   Q. Okay. So once you took the position reporting to John
19       Nugent, do you recall how long after you took that
20       position that Oracle began marketing and selling 11i?
21   A. I don't.
22   Q. Okay.
23   A. Yeah, I don't. It would be pure speculation.
24   Q. That's fine. Do you recall getting initial training
25       on 11i?

30

1    Q. When did it happen, if you know?
2    A. It happened sometime during my tenure working for John
3        Nugent.
4    Q. Okay.
5    A. They developed something called CRM and started to --
6        I mean it was developed well before and Oracle
7        implemented it.
8    Q. So it was kind of closer to 2000?
9    A. Yes, I don't recall. I don't recall specifically.
10   Q. But at that time, you didn't have a quota, so you
11       didn't --
12   A. I mean it was -- I didn't -- yeah, I didn't really
13       interact with it at all. We didn't use it as a
14       vehicle to interact with in the presales function.
15   Q. All right. So at some point, John Nugent had
16       inherited a national organization; is that what you
17       said?
18   A. Yes.
19   Q. And that was general business?
20   A. Yes.
21   Q. And can you put a little better framework around the
22       time for me, if you know?
23   A. I think it's, like, '99 into 2000. It might have been
24       fiscal 2000. Yeah.
25   Q. All right. And what is general business? What did

32

1    A. Yes.
2    Q. Okay. And can you describe what that training was?
3    A. If I'm recalling the right product, we were brought
4        into -- a lot of presalespeople were brought to San
5        Francisco, and we did sort of a U.S.-wide training
6        because it was a very substantial release -- product
7        release for us. So we wanted everyone together so we
8        could give them sort of the standard training on all
9        the functionality of the product.
10   Q. So was it all -- the training that you recall in San
11       Francisco, was it just for presalespeople?
12   A. Just presales, yes.
13   Q. And so there were presalespeople in different regions
14       of the country --
15   A. Different regions of the country.
16   Q. -- different regions of the United States?
17   A. Yes.
18   Q. And the training was in San Francisco?
19   A. Uh-huh.
20   Q. Do you recall who gave the training?
21   A. Oh, several people.
22   Q. Several people.
23   A. Some of them part of the development organization.
24       Yeah, a lot of them were part of the development
25       organization or the product management organization,

33

1   which was part of development as well.
2   Q.   Do you recall anybody who may have given presentations
3        at that presentation?
4   A.   I don't.
5   Q.   Was it one day or two days?
6   A.   Oh, it was a week.
7   Q.   A week?
8   A.   Yeah.
9   Q.   And during that training, what was your understanding
10       of what 11i was?
11       MS. KYROUZ:  Objection, vague.
12  A.   What it was as far as product capability, technology?
13  Q.   In terms of the product, was it a traditional
14       financial applications?  Did it include CRM?  What was
15       your understanding of what 11i was?
16       MS. KYROUZ:  Same objection.
17  A.   So from a functional point of view, I mean it was
18       characterized as a suite of application products.  So
19       it was CRM and something called ERP.
20  Q.   And what types of applications would you describe as
21       being part of ERP?
22  A.   Financial systems, manufacturing, human resources,
23       supply chain management, purchasing, those are the
24       broad topics.
25  Q.   And some of those were applications, I think you

34

1        indicated earlier, that Oracle already had?
2   A.   Sure.
3   Q.   And which ones were those?
4   A.   Most of those.  They had ERP.
5   Q.   They had ERP, a full --
6   A.   ERP is kind of characterized as back office.  They're
7        functions in the back office.  CRM, customer
8        relationship management, is more front office, more
9        customer face in the applications.
10  Q.   Do you remember during that training session being
11       more -- well, withdrawn.  Do you remember during this
12       training session whether or not the training was more
13       focused on the ERP components of 11i or the CRM
14       components of 11i?
15       MS. KYROUZ:  Objection, vague.
16  A.   My recollection is it was pretty equal because we had
17       presalespeople who were focused in specific areas, so
18       the CRM would go to the CRM training, the ERP guys
19       went to the ERP training.
20  Q.   Do you remember which one you went to?
21  A.   Well, I was running the group, so I jumped in all of
22       them.
23  Q.   Now, were there -- let's say in early 2000, did you
24       have peers that had your position in different regions
25       of the country?

35

1   A.   I had a peer that had the large -- I forget what it's
2        called --
3   Q.   Majors?
4   A.   Yes, major accounts.
5   Q.   And who was that?
6   A.   Gayle Fitzpatrick.
7   Q.   Did you have training before the big training for your
8        entire group?
9        MS. KYROUZ:  Objection; vague, lacks
10       foundation.
11  A.   Yes, I don't recall.  I mean I think we were all
12       together at this one training, including Gayle's
13       people.
14  Q.   Now, when you took over this -- can you tell me that
15       title?  It was vice president of?
16  A.   Sales consulting.
17  Q.   Sales consulting.  How many consultants did you have
18       reporting up to you in early 2000?
19  A.   I think there were about three hundred nationwide.
20  Q.   That's right.  You had a nationwide responsibility?
21  A.   Exactly.
22  Q.   Okay.  Do you know how many Gayle had reporting to
23       her?
24  A.   I don't recall.
25  Q.   Was your organization bigger than hers?  Do you know?

36

1   A.   I seem to recall they were similar in size.  Their
2        addressable market was larger, but they had fewer
3        opportunities.
4   Q.   Okay.
5   A.   So --
6   Q.   How would one know that?
7   A.   Well, they're bigger customers, so when they bought,
8        they bought --
9   Q.   Right.
10  A.   -- more stuff, larger revenue --
11  Q.   I see.
12  A.   -- more users.  So their average deal size in the
13       major accounts was larger than it was in the
14       midmarket.
15  Q.   So fewer customers but probably bigger deals?
16  A.   Yes, very likely.
17  Q.   I understand.  Okay.  When you were at the training,
18       did people in development or whoever was running the
19       training, did they do demonstrations of the product?
20  A.   Sure.
21  Q.   And did the training also include teaching you and
22       your organization how to do demonstrations or was this
23       just a training on how the product worked?
24  A.   It was more a training on how the product worked.
25       This was development delivering the training.

Hamel, Kenneth   5/22/2006  9:15:00 AM

37

1   Q.  So once development delivered that training, when
2       did -- well, withdrawn. I'm assuming after
3       development did the training, there was some sort of
4       training on how to demonstrate the product for your --
5       you and your team?
6           MS. KYROUZ: Objection, lacks foundation.
7   A.  Not necessarily.
8   Q.  Okay.
9   A.  People try to figure out how to, you know -- how to
10      deliver it in its best -- you know, in the best way
11      possible to address whatever customer issues there
12      are.
13  Q.  And how do you go about that? Just -- withdrawn. I'm
14      just trying to understand how you get from the
15      training that development provides to going back home
16      and putting together a demonstration for a customer on
17      a new product. So were you given a demonstration
18      package to give to your team?
19  A.  So what happens is development would develop -- would
20      do the training on the product capabilities, and then
21      ultimately, they would roll out these products,
22      implement them in a demo -- demonstration environment.
23      Once we had them in that demonstration environment,
24      we'd have groups of SC's that would get together and
25      say, "What's the best way to take these new

38

1       capabilities, what's important, what's not important
2       from a customer perspective." So it's more
3       individual, an individual interpretation of what's the
4       best way to demonstrate the capabilities.
5           And then, at the time, we were also
6       coaching people on how -- or helping develop people so
7       they could show the entire -- the entire suite.
8       Historically, we had been organized by function area,
9       CRM, finance, HR, so on. We were trying to get people
10      to be able to show the entire flow.
11  Q.  Right. I understand. Now, during the
12      demonstration -- I'm sorry, the training in San
13      Francisco, did that include marketing at all and what
14      the company had marketed the product to be capable of
15      doing?
16          MS. KYROUZ: Objection, vague.
17  A.  Yeah, I don't know -- this was development, right? So
18      they don't really market -- maybe I should say here's
19      what it does. So there wasn't any -- I guess probably
20      at one point in the training -- and I don't recall
21      specifically -- there was probably more -- there was
22      probably a session on positioning, who the industry
23      this is best applicable to and why, but it was a minor
24      part of the marketing.
25  Q.  You indicated in the past I guess demonstrations were

39

1       maybe application specific or CRM, ERP, financials,
2       HR. Do you know why the transition was made into
3       trying to demonstrate the entire suite or all the
4       flows?
5   A.  Because that's what the market wanted.
6   Q.  You mean that's what the customers wanted?
7   A.  Yes.
8   Q.  The customers wanted to see, I guess, the whole suite
9       working together?
10  A.  Yes.
11  Q.  And had that been your experience -- withdrawn. How
12      did you know that that's what the market wanted?
13  A.  Because as you were talking about customers, they were
14      saying, "Great, we do all this back office stuff.
15      Now, we want the ability to interact with our
16      customer. And doing so, we need to -- if we're doing
17      telesales and we're taking an order, it's got to flow
18      through the entire process."
19  Q.  In 2000, do you know whether any other applications
20      provider had offered a suite of software that included
21      CRM and ERP together?
22  A.  I believe so. I can't recall specifically, but I
23      believe so.
24  Q.  So when was it that -- withdrawn. So primarily your
25      organization in 2000, into the spring of 2000 did

40

1       demonstrations?
2   A.  Uh-huh.
3   Q.  Other than demonstrations, can you describe for me
4       what else, if anything, people in presales did?
5   A.  Well, I mean they meet with customers. They spend
6       time understanding their business requirements.
7       They'll go back to them and present what they heard,
8       talk -- they might do things in PowerPoint
9       presentations. And then ultimately, they get to a
10      point where they demonstrate. There might be issues
11      that come out of that and they might go back to the
12      customer and say, "Here's some issues I couldn't
13      address in the presentation. Here's the answers to
14      those" or "Here's some capability you were looking
15      for. Here's how we can address" or "We can't address
16      it," either one or the other.
17  Q.  Would you say the sales consultants doing presales
18      were primarily responsible for demonstrations? The
19      reason why I ask, it sounds like the sales consultants
20      and presales consultants are --
21  A.  No, sales consultants and presales consultants are one
22      and the same. They're called presales in the
23      industry. Oracle's name for them was sales
24      consultants.
25  Q.  I see.

Hamel, Kenneth  5/22/2006  9:15:00 AM

41

1   A. People selling were sales reps.
2   Q. Thank you.
3   A. Sorry about that.
4   Q. So it sounds like the sales reps and the sales
5      consultants, that their jobs really kind of meshed
6      together. What I'm trying to do is to differentiate
7      them if there's a differentiation at all.
8   A. Yes, there's --
9         MS. KYROUZ: Objection; misstates prior
10     testimony and lacks foundation. Go ahead.
11  A. They're completely different roles, so the sales rep
12     is responsible for identifying an opportunity, working
13     on the customer to go through the sales process to
14     evaluate why they would buy Oracle, so on and so
15     forth. The presalesperson is someone who is engaged
16     by a sales rep at some point in the process to talk
17     about the product capabilities, that sort of thing.
18  Q. So the sales reps -- withdrawn. Is it fair to say the
19     sales reps were somewhat dependent upon the sales
20     consultant to help execute the sales by demonstrating
21     the product and showing that it's something that the
22     customer actually wants or needs?
23        MS. KYROUZ: Objection, vague.
24  A. Sure, partly.
25  Q. Okay. Why only partly?

42

1   A. Well, there are cases where customers -- you know, if
2      the sales rep was able to drive a sales process that
3      didn't require demonstrations.
4   Q. Were there circumstances in your experience that were
5      more likely to require demonstrations?
6         MS. KYROUZ: Objection; vague, lacks
7      foundation.
8   A. I'm not sure I understand what you mean. Like what
9      circumstances?
10  Q. I just wonder if there was a way for people in your
11     organization, the sales consultants, to predict when
12     they would likely have to do a demonstration for a
13     customer are they simply waiting around for phone
14     calls from --
15  A. They're kind of waiting for the sales rep to indicate.
16     That was part of the process.
17  Q. Were you -- withdrawn. Did you keep track of how many
18     prospective sales or sales in the -- let me back up
19     and start that again.
20        If the sales reps had 50 possible sales in
21     the pipeline, did you keep track of how many of those
22     required demonstrations?
23        MS. KYROUZ: Objection; vague, lacks
24     foundation.
25  A. So I could go back retrospectively and say how many --

43

1   Q. Right, retrospectively.
2   A. Not well, I guess is the way to characterize it.
3   Q. Well -- so as -- so I think we've established
4      generally that 11i was released somewhere in the
5      spring of 2000; is that fair?
6         MS. KYROUZ: Objection, misstates
7      testimony.
8   A. Yeah, I don't -- again, I don't recall enough. I
9      mean, you know -- I don't recall enough.
10  Q. Well, would you say when it was released, you had
11     about 300 sales consultants reporting up to you?
12  A. Yes, that's fair.
13  Q. And they were across the nation?
14  A. Across the U.S., yes.
15  Q. And how did you communicate with them?
16        MS. KYROUZ: Objection, vague.
17  A. E-mail, telephone?
18  A. All of the above.
19  Q. And would you say one was used more than the other?
20        MS. KYROUZ: Same objection.
21  A. Not really.
22  Q. Okay. At the time, did you have a BlackBerry in 2000?
23  A. No. I wish I did now. Maybe it was good I didn't.
24  Q. Were you traveling a lot during that period?
25  A. Yes.

44

1   Q. Did you have a cell phone at that time?
2   A. Yes.
3   Q. How about a laptop?
4   A. Yes.
5   Q. Do you recall how often Oracle sort of recycled
6      laptops? Like, how long did yours last?
7   A. I think mine --
8         MS. KYROUZ: Objection; vague, calls for
9      speculation.
10  A. I think my laptop was fairly healthy. I think it
11     lasted the entire tenure when I was in that role.
12  Q. Okay. So you left that role -- well, withdrawn. When
13     were you no longer reporting to John Nugent as, what
14     was it, vice president of sales consulting?
15  A. Yes. 2001, about November.
16  Q. And at that point, you gave up that laptop?
17  A. No.
18  Q. When did you give up that laptop?
19  A. I think in the middle of my next tenure job, the
20     laptop -- the technology just got old, so I got a new
21     laptop, and everything was converted from one laptop
22     to the other.
23  Q. What was the new role that you took on?
24  A. Vice president of Oracle University for the Americas.
25  Q. That was here in the Boston area as well?

Hamel, Kenneth  5/22/2006  9:15:00 AM

45

1  A.  Well, I was physically located here, but I ran the
2  business in North and South America.  It was a
3  training business.
4  Q.  Do you remember what your e-mail address was while you
5  were at Oracle?
6  A.  There were two, right?  Early there was
7  KHamel@US.Oracle.com, and then eventually switched
8  over -- I don't remember when -- to
9  Kenneth.Hamel@Oracle.com.
10  Q.  Do you know why it was switched?
11  A.  Upgraded technology.  I don't know.
12  Q.  Now, when you were vice president of sales consulting,
13  did you have a desktop here in your office and a
14  laptop that you carried with you or were you using
15  your laptop for all functions?
16  A.  The latter.
17  Q.  The latter?
18  A.  Yeah.
19  Q.  Did you have a practice of archiving your e-mail or
20  did you delete e-mail as your mailbox got full?
21       MS. KYROUZ:  Objection; vague as to time
22  and calls for speculation.
23  Q.  I'm talking about 2000, early 2001 range, prior to you
24  taking on vice president of Oracle University.
25       MS. KYROUZ:  Same objections.

46

1  A.  Yeah, I mean I saved most everything.  Most everything
2  was still on the laptop, and I believe Oracle was
3  backing up as well, but I'm not sure about that.
4  Q.  Okay.
5  A.  I deleted stuff, you know, when things got full.
6  Q.  Okay.  What do you mean when things got full?
7  A.  Well, they have e-mail quotas and such.
8  Q.  And what was the quota?  Do you know?
9  A.  No, I don't.
10  Q.  How was it --
11  A.  I kept pushing to get more.
12  Q.  You kept pushing to get more?
13  A.  Yes.
14  Q.  How was that defined?  The company said, "Hey, if you
15  have X number of e-mail in your box, start deleting"?
16       MS. KYROUZ:  Objection; vague, calls for
17  speculation.
18  A.  Yes, the way e-mail quota tends to work, at least the
19  way it did there, you have so much disk space you were
20  allocated.  So once that disk space was full, you were
21  disenabled from either receiving and sending e-mails,
22  and you could ask for more space.
23  Q.  Was that difficult to get, more space?
24  A.  It depended by level.  The more senior you were, the
25  more apt you were to be successful.

47

1  Q.  And who did you actually have to make that request to?
2  A.  I don't know.  Someone in IT.
3       MR. WILLIAMS:  I'm just going to ask the
4  reporter to mark this document as Hamel Number 1.
5       (Subpoena was marked Exhibit Number 1 for
6  identification.)
7  Q.  I'm just going to ask you to take a look at what's
8  been previously marked as Hamel Number 1, and just let
9  me know if you recognize it.
10  A.  I do.
11  Q.  And what do you recognize it to be?
12  A.  It's a subpoena for me to come and talk to you guys.
13  Q.  Right.  Does that look like the subpoena that you
14  received at your house a couple months ago?
15  A.  Similar.
16  Q.  Do you recognize anything different on that one from
17  the one that you actually received?
18  A.  The only thing that's different is it talks about
19  Latham & Watkins.
20  Q.  The other one had a different law firm?
21  A.  Just had my name.
22  Q.  Now, once you talked to -- was it Mr. Wood at Oracle?
23  I'm sorry.  I've forgotten the name.
24  A.  Jeff Ross.
25  Q.  Yes, Jeff Ross.  Did you look for or search for any

48

1  documents that may -- that you may have had that
2  related to Oracle?
3  A.  No.
4       MS. KYROUZ:  Objection, misstates
5  testimony --
6  A.  No, I didn't.
7       MS. KYROUZ:  -- calls for speculation.
8  Q.  Was that the only document that you received in the
9  mail or -- withdrawn.  Was that the only document that
10  was delivered to your house or was there another
11  document with that one?
12  A.  This was the only document.
13       MR. WILLIAMS:  I'm going to ask the
14  reporter to mark this document as Hamel Number 2.
15       (Second Amended Notice of Videotaped
16  Deposition was marked Exhibit Number 2 for
17  identification.)
18       MR. WILLIAMS:  Before I ask you about this
19  document, we've been going about an hour.  Probably a
20  good time for a short break.
21       MS. KYROUZ:  Sure.
22       THE VIDEO OPERATOR:  Going off the record.
23  10:13.
24       (Recess)
25       THE VIDEO OPERATOR:  Back on the record.

49

1    10:36.
2    Q. I'm going to come back to Exhibit Number 2, so I'm not
3       going to ask you about that one right now.
4    A. Okay.
5    Q. I just want to ask you about some individuals, see if
6       you know them. Did you know Kirsten Shaw?
7    A. Yes.
8    Q. Do you know what her position was?
9    A. She worked for Ron Wohl, and she was looking after --
10      helping customers that had challenges with
11      implementing the applications.
12   Q. Was she in an escalation group, if you know?
13         MS. KYROUZ: Objection, lacks foundation.
14   A. I don't know if it was a group. She was kind of in a
15      function that was -- yes, it was to function to make
16      sure -- help customers be successful.
17   Q. Did you have to communicate with her during the, you
18      know, 2000, early 2001 time frame for you to do your
19      job?
20         MS. KYROUZ: Objection, vague.
21   A. I did not have to, no.
22   Q. Did you?
23         MS. KYROUZ: Same objection.
24   A. I mean sure, I talked with her a couple times.
25   Q. Well, if she worked for Ron Wohl, that means she was

50

1       in a development type role?
2    A. Yeah -- well, development type role, I'm not sure what
3       that means. She did work for Ron, so she was in,
4       therefore, the development organization. He was
5       development.
6    Q. I understand. Okay. How about Marina Zago?
7    A. Yes, I knew Marina.
8    Q. Do you know what position she held?
9    A. She was responsible for a group called ADS,
10      application demonstration services, and they ran the
11      demonstration systems for applications.
12   Q. And that's the demonstration systems that people on
13      your team were using, right?
14   A. Uh-huh. Yes.
15   Q. All right. So how would your sales consultants learn
16      how to use ADS? How did your organization worked with
17      ADS?
18   A. Basically, ADS provided us what we were -- a
19      demonstration environment. An environment was an
20      implementation of a set of applications.
21   Q. Right.
22   A. And they were given the user name and passwords to go
23      in and, you know, do demonstrations.
24   Q. But Marina was one of those people that, I guess,
25      managed ADS; she wasn't doing demonstrations out in

51

1       the field?
2    A. Correct, correct.
3    Q. Where was ADS geographically located?
4    A. If you mean her and her people --
5    Q. Right, that's what I mean.
6    A. At Redwood Shores, in the headquarters, in the
7       development at Redwood Shores.
8    Q. That's where development was headquartered as well?
9    A. That's where it was headquartered, yes.
10   Q. Do you know -- withdraw that. Do you know if Oracle
11      had people out here in Boston?
12   A. They did. I forget in what area.
13   Q. Let me just ask you --
14         MR. WILLIAMS: Ask the reporter actually to
15      mark this document as Hamel Number 3.
16         (Copy of E-mail String was marked Exhibit
17      Number 3 for identification.)
18         MR. WILLIAMS: Hamel Number 3 is Bates
19      Number NDCA-ORCL 618750 through 618751.
20   Q. I'm just going to ask you to take a look at Hamel
21      Number 3, and let me know when you're done looking at
22      it.
23   A. Okay.
24   Q. Do you recognize Hamel Number 3?
25   A. Recognize as do I remember ever seeing it?

52

1    Q. Yes.
2    A. No.
3    Q. But it's an e-mail from Ron Wohl and several
4       individuals and CCed to you?
5    A. Right, but I don't recall every e-mail I got.
6    Q. That's fine. You don't have to recall all this stuff.
7       It's a long time ago. Before we talk about the
8       document, did you continue to develop your IT
9       experience while you were at Oracle?
10         MS. KYROUZ: Objection; vague, lacks
11      foundation.
12   A. I'm not sure what you mean by that.
13   Q. Well, did you continue to use your IT background while
14      you were at Oracle, especially when you were doing
15      sales consulting or managing the sales consulting
16      organization?
17         MS. KYROUZ: Same objection. Also
18      misstates prior testimony.
19   A. Yeah, I don't know if use -- my background gave me a
20      better understanding sometimes.
21   Q. Okay. That's fine. Well, take a look at Hamel Number
22      3. Do you know who you were CCed on this e-mail?
23   A. Well, because I was one of the presales executives
24      that depended upon the demo environment.
25   Q. And you know who George Roberts is or was, right?

Hamel, Kenneth   5/22/2006 9:15:00 AM

53

1   A. Yes.
2   Q. And do you remember what position he held at this
3      time?
4   A. Yes, I do.
5   Q. What was that? What was that?
6   A. He was the executive vice president of sales for North
7      America.
8   Q. Okay. And you see in the CC line, there's an e-mail
9      address jcaldwell?
10  A. Yes.
11  Q. Do you know who that is?
12  A. Jeff Caldwell. What was Jeff's role? He was in Ron's
13     organization, but I'm not able to recall what he did
14     there.
15  Q. Okay. How about on the next line, you see the e-mail
16     addressed wbergen@CA.Oracle.com?
17  A. Yes.
18  Q. Do you know who that was?
19  A. That was Bill Bergen. He was the president of Oracle
20     Canada.
21  Q. So did Canada also have a sales consulting
22     organization?
23  A. Yes.
24  Q. And you indicated earlier that Gayle Fitzpatrick was
25     your counterpart or peer in the United States for

54

1   majors?
2   A. Uh-huh.
3   Q. How would you describe Bill Bergen's position as it
4      relates to yours or related to yours?
5   A. Okay, it was unrelated to mine. Bill was probably
6      theoretically a peer of my bosses, so he had sales --
7      he ran all of Canada. So he would have had sales
8      under him. He would have had what I did, sales
9      consulting under him. He would have had -- but I'm
10    not sure -- sales implementation under him as well.
11  Q. Did you know Mary Anne Gillespie?
12  A. I did.
13  Q. Who was she and how did you know her?
14  A. She was a peer of my boss', and she ran major
15     accounts.
16  Q. And John Nugent was your boss at the time?
17  A. Yes.
18  Q. All right. Do you know -- you indicated that Marina
19     Zago was running ADS, right?
20  A. Uh-huh.
21  Q. Was she the top person running ADS or was she --
22  A. Yes.
23  Q. She was. Okay. So it would be fair to say that she
24     was one of the people that people in your organization
25     that were doing demonstrations communicated with

55

1   regularly?
2   A. Her or her team, sure.
3   Q. And do you know any -- as you sit here today, do you
4      remember any of the names of people on her team?
5   A. Oh, God. I mean I think the one here John Asheim, I
6      remember, but otherwise, I don't.
7   Q. Okay. All right. Now, do you see where George
8      Roberts writes or wrote, "Great news. However, I'm
9      also hearing that the demo scenarios in 11i appear to
10     be buggy and the field does not think there was any
11     integration testing done"? Do you see that?
12  A. Uh-huh.
13  Q. Do you know -- well, withdrawn. Did people in your
14     organization communicate to you that they didn't
15     believe that integration testing was done?
16        MS. KYROUZ: Objection; vague, misstates
17     the document, lacks foundation.
18  A. They would have -- it's hard for that -- they would
19     have said it doesn't look like integration testing was
20     done within the demo environment.
21  Q. Well, I'm not relying on the document now. I'm just
22     saying, do you recall whether members of your
23     organization communicated to you whether or not they
24     believed that integration testing was done, even if it
25     was within the demo environment?

56

1        MS. KYROUZ: Same objections.
2   A. Yes, so they probably said within the demo
3      environment, you know, it looks like there were some
4      integration challenges in the way they implemented the
5      product in the demo environment. My folks would have
6      had no insight beyond that.
7   Q. Right. They wouldn't have had insight necessarily on
8      development, you're saying?
9   A. Right, right.
10  Q. That's fine. I'm talking about the demo environment.
11  A. Exactly.
12  Q. But my question is, do you recall whether members of
13     your organization actually communicated that to you
14     back in the 2000-2001 time frame?
15        MS. KYROUZ: Objection; vague, calls for
16     speculation.
17  A. I don't recall. I don't recall.
18  Q. Okay. Do you recall whether or not you responded to
19     this e-mail from George, indicating -- saying that,
20     "Well, my team hasn't said that there was no
21     integration testing done"?
22  A. I don't recall.
23  Q. Okay. Going down to the next line of George's e-mail
24     where he says, "Therefore, when the step outside of
25     narrow confines, it breaks," was it your experience in

Hamel, Kenneth   5/22/2006  9:15:00 AM

57

1 2000-2001 time frame that when your sales consultants
2 were doing demonstrations with the ADS software or the
3 ADS environment that the software would break during
4 demonstrations?
5     MS. KYROUZ:  Objection; vague, lacks
6 foundation.
7 A. I mean sure.  Sure.  There were times when with any
8 release, there would have been at times challenges.
9 Q. Okay.  I'm asking about this release and whether or
10 not that was your experience, that people on your team
11 were experiencing -- well, withdrawn.  I'm asking
12 whether people on your team communicated that when
13 they were demonstrating 11i that it would break during
14 demonstrations.
15     MS. KYROUZ:  Same objections.
16 A. Yes, I believe I had heard it a few times.
17 Q. All right.  Did you have direct communication with
18 George Roberts in the 2000-2001 time frame?
19     MS. KYROUZ:  Objection, vague.
20 A. What do you mean by direct communication?
21 Q. Well, did you e-mail him?  Did he e-mail you back?
22 Did you communicate directly with him by telephone or
23 e-mail during that time?
24 A. Well, occasionally, mostly through e-mail.
25 Q. Generally for what purpose would that have been?

58

1     MS. KYROUZ:  Objection, vague.
2 A. I mean any given number of issues about the role I was
3 in.
4 Q. Did you at any time during the 2000-2001 time frame
5 report directly to George?
6 A. No, no.
7 Q. But it's fair to say he would contact you on some
8 instances to discuss demonstrations?
9     MS. KYROUZ:  Objection; misstates
10 testimony, lacks foundation.
11 A. I mean usually he would respond -- he would contact me
12 in response to something I might have sent him.
13 Q. I see.  Did you ever meet with him face to face?
14 A. Sure.
15 Q. For what purpose?
16 A. We used to do operations reviews with him, kind of
17 review our business on a quarterly basis.  Yeah.
18 Q. Okay.  And so it's fair to say that sometime within
19 the spring of 2000 through the spring of 2001 that
20 you'd had at least one or two face-to-face meetings
21 with him?
22 A. Spring of 2000 -- the full year you're talking?
23 Q. Yes, until spring of the next year.
24 A. Yes, we had had a couple.
25 Q. And that would have been to discuss your organization,

59

1 which was sales consulting?
2 A. Yes.
3 Q. And you probably discussed the demos?
4 A. Sure.
5 Q. Do you see where -- the same document, where he
6 writes, "I was told we've lost at least one deal in
7 general business because of problems, and you know we
8 have a large one in majors, 6 to 9 billions at risk
9 because of challenges."  Do you see that?
10 A. Yes.
11 Q. Now, that general business was the organization you
12 were responsible for, correct?
13 A. Correct.
14 Q. And do you know whether in July of 2000 or sometime
15 prior to that you had communicated to George Roberts
16 that because of demonstration problems, the company
17 had lost or was going to lose a deal?
18     MS. KYROUZ:  Objection, vague.
19 A. So a couple things.  So I wasn't -- I was responsible
20 for sales consulting in general business.  I wasn't
21 responsible for general business.
22 Q. I understand.  Right.
23 A. So the question again was did I communicate with
24 George that --
25 Q. I'll ask the question again.  Do you recall or do you

60

1 know whether sometime prior to July 26th of 2000, that
2 you had communicated to George Roberts that due to
3 problems with 11i demos that there was a deal in
4 general business that was lost?
5     MS. KYROUZ:  Same objections.
6 A. It's possible I did.  It's hard for me to have known
7 if things were lost or won as a result because, again,
8 I was in sales consulting, right, so it was the rep
9 who was more responsible.
10 Q. Okay.  So you may not necessarily -- well, withdrawn.
11 Tell me if this is right.  You may know of a problem
12 during a demonstration but may not know if the deal
13 was actually lost due to the problem?
14 A. That's accurate.
15 Q. All right.  Sometimes you would know, though?
16 A. Sure.
17 Q. Is that because sales reps might complain about the
18 demonstrations?
19 A. You know, the problem with -- if you're in enterprise
20 software, right, the demonstration is a discrete
21 event.  So it's a discrete, tangible event.  So it's
22 easy -- this is conjecture on my part.  It's easy for
23 sales reps to point to a discrete; the demo was bad,
24 which is why we lost the deal, but it could have been
25 any number of reasons.

Hamel, Kenneth   5/22/2006  9:15:00 AM

61

1   Q.  But sometimes they would point to the demo and say,
2       "The demo didn't work and that's why we lost the
3       deal"?
4   A.  Yeah, yeah, yeah.
5   Q.  But it was true that at least in the July 2000 time
6       frame, as discussed in this e-mail, there were
7       problems with the demonstrations that are articulated
8       in some form here by George Roberts?
9          MS. KYROUZ:  Objection, vague especially as
10      it relates to the document.
11  A.  Yes, I believe there were problems.
12  Q.  And what George says is that the demo scenarios in 11i
13      appear to be buggy and the field doesn't think there
14      was any integration testing done across different
15      processes, right?
16        MS. KYROUZ:  I'm sorry.  You're asking him
17      to read the document?
18        MR. WILLIAMS:  I'm not asking him to read
19      the document.  I'm confirming with him that the
20      document suggests during this time frame there were
21      certain problems with 11i demonstration scenarios that
22      George is communicating here.
23  A.  That's true.
24  Q.  And one of the people he's communicating that to is
25      you or at least you ultimately got this e-mail via a

62

1      CC?
2        MS. KYROUZ:  Same objections.
3  A.  Yes, it looks like I got this e-mail at the point Ron
4      responded; it's possible before.
5   Q.  You can't tell?
6  A.  Yeah, I can't tell by this.
7   Q.  Okay.  Good.  Were any of your sales consultants doing
8      demo -- I'm sorry, doing integration testing in the
9      field of demonstrations?
10       MS. KYROUZ:  Objection; vague, lacks
11      foundation.
12  A.  Yes, I don't know how to answer that.
13  Q.  Is there a way for sales consultants to do integration
14      testing in the field immediately prior to doing a
15      demonstration?
16       MS. KYROUZ:  Objection, vague as to
17      integration testing.
18  A.  Yes, there isn't a discrete activity they do called
19      integration testing.  Any presalesperson would go
20      through before they're going to present to a customer
21      and run through the scenario -- the process scenario
22      that they would be showing to the customer the next
23      day.  Embedded in that would be when I enter an order
24      in order entry, does it decrement order entry.  So
25      there are natural transactional downstream things that

63

1      happen which integration basically is the foundation
2      of doing those.
3   Q.  Sure.  So prior to a demonstration, if a consulting
4      sales or -- sales consultant is actually kind of going
5      through the process prior to the demonstration, they
6      may encounter a problem that is a result of a lack of
7      integration rather than doing integration testing?
8       MS. KYROUZ:  Objection, vague.
9  A.  Yeah, that's fair.
10  Q.  Do you know what an 11i server is?
11       MS. KYROUZ:  Objection, vague.
12  A.  11i server, it was probably a physical machine.
13      Server is usually a physical piece of hardware,
14      computer hardware, that was probably running 11i -- an
15      instance of 11i.
16  Q.  So the server really isn't an 11i server because 11i
17      is an application, right, but it's any server that's
18      driving it?
19  A.  It's a computer.  So it would be like this machine,
20      and 11i is installed -- the implementation is 11i is
21      installed on that particular machine.
22  Q.  Okay.  I get it.
23  A.  So, therefore, we call it 11i server.
24  Q.  Do you know whether your team or you kept track of
25      deals that were lost due to poorly performing

64

1      demonstrations of 11i during the year we've talked
2      about, the spring of 2000 through the spring of 2001?
3       MS. KYROUZ:  Objection; vague, lacks
4      foundation.
5  A.  You know, again, I didn't -- you know, I probably
6      heard about sales reps communicating to me, "Hey, we
7      lost this deal because it was a demo problem," but I
8      didn't track them any more than I would have tracked
9      them with any other release.
10       MR. WILLIAMS:  I'll ask the reporter to
11      mark this document as Hamel Number 4.
12       (Copy of E-mail String was marked Exhibit
13      Number 4 for identification.)
14       MR. WILLIAMS:  Hamel Number 4 is Bates
15      numbered NDCA-ORCL 617112 through 617114.
16  Q.  I'll just ask you to take a look at that, and let me
17      know when you've had an opportunity to look at.
18       Have you had an opportunity to look at
19      Hamel Number 4?
20  A.  Uh-huh.
21  Q.  And do you recognize it?
22  A.  I do now.
23  Q.  So when is the last time you saw this document?
24  A.  I saw it last night.
25  Q.  And when -- it's an e-mail from you to George Roberts?

Hamel, Kenneth   5/22/2006  9:15:00 AM

65

1   A.  Uh-huh.
2   Q.  In October of 2000?
3   A.  Right.
4   Q.  One of those instances in which you did actually
5       communicate directly with George?
6   A.  Yes.
7   Q.  Then you CCed a bunch of other people too?
8   A.  Uh-huh.
9   Q.  We talked about John Nugent before.  Who is Joe
10      Dibartolomeo?
11  A.  He was an area vice president for the north -- so for
12      the mid-Atlantic area or -- actually, he was from New
13      York to Florida.
14  Q.  And Nic Classick?
15  A.  Nic Classick was an area vice president for the
16      western United States.
17  Q.  How about John Boucher?
18  A.  John Boucher was an area vice president for the
19      northeast U.S.
20  Q.  And how about Ted Bereswill?
21  A.  Ted was an AVP for the central region of the U.S.
22  Q.  AVP, area vice president?
23  A.  Yes.
24  Q.  How about David Handy?
25  A.  David Handy worked for me and ran the presales team in

66

1       the West.
2   Q.  How about Bob Crochetiere?
3   A.  Bob ran the -- he worked for me.  He ran the presales
4       organization in the sort of New York to Florida.
5   Q.  Okay.  Lisa Cometa?
6   A.  She worked for me.  Ran presales in the Northeast.
7   Q.  And Steve Vakulskas?
8   A.  Vakulskas, ran presales in the Central, worked for me.
9   Q.  How about Keith Block?
10  A.  Keith Block ran consulting in the U.S., implementation
11      consulting in the U.S.
12  Q.  Was he vice president or senior vice president?
13  A.  He was an SVP at the time.
14  Q.  Senior vice president?
15  A.  Yes.
16  Q.  Gayle Fitzpatrick, we talked about?
17  A.  That's my peer.
18  Q.  Ron Bunting, we talked about.  We talked about Mary
19      Anne, right?
20  A.  Yes.
21  Q.  Why did you send this e-mail to these AVPs or area
22      vice presidents?
23  A.  I mean this is purely speculation on my part, but I
24      presume George -- I presume a lot of them were
25      probably complaining about demo issues and accounts

67

1       and such, and George or someone -- maybe even John
2       Mitchum might have reached out to me and said can we
3       summarize what problems we're having.
4   Q.  Were these -- Joe Dibartolomeo, Nic Classick, Ted
5       Boucher, Ted Bereswill, were they all in general
6       business?
7   A.  Yes.
8   Q.  So these were all people that were -- their
9       organizations were reliant upon your organization --
10  A.  Correct.
11  Q.  -- to do the demonstrations, right?
12  A.  Correct.
13  Q.  Just going down to the next very quickly, you see
14      where you write, "What's different this time," and
15      there's a paragraph below there?
16  A.  Uh-huh.
17  Q.  If you go about one, two, three, four -- six lines
18      down, you see where you write, "This six-month lag
19      from product release to a promised marginally improved
20      demo environment is shattering our company reputation
21      and the morale of our SC's"?
22  A.  Uh-huh.
23  Q.  So when you write "six-month lag," is it fair to say
24      the 11i was released probably somewhere around six
25      months prior to the date of this e-mail?

68

1           MS. KYROUZ:  Objection; vague, lacks
2       foundation.
3   A.  Yeah.  I mean that's what it sounds like I'm saying
4       there.  I don't recall exactly.
5   Q.  All right.  So April, May time frame?
6   A.  Yeah.
7   Q.  Okay.  I just wanted to see if we could frame that a
8       little bit better, and we'll come back to this page.
9       Actually, before you turn back, do you know what PRP
10      stands for?
11  A.  PRP.  Product review process, program.  I forget.
12      Something in development.
13  Q.  Maybe you'll think of it as we --
14  A.  Yeah, I think it was -- I believe it was a process
15      where, you know, development and services and sales
16      sort of got together and "We're releasing this.  Is it
17      ready?"  I need to think more about it.  I'm trying to
18      remember what they did.
19  Q.  That's fine.  Just going back to the first page, see
20      where you write, "George, this note is a follow-up to
21      our discussion about the ops review around the issue
22      of our applications demonstration environment."  What
23      is an ops review or what was it at Oracle in
24      practicality?
25  A.  An operations review was basically my boss' direct

Hamel, Kenneth   5/22/2006   9:15:00 AM

69

1    report. So myself and these AVPs presented to George
2    the state of the business, how things were going, and
3    would have indicated some issues that were, you
4    know -- that were affecting the business. Yeah.
5    Q.   When you say "my boss and his direct reports," were
6    these AVPs directly reporting to John Nugent at the
7    time?
8    A.   Yes.
9    Q.   So he was a senior vice president?
10   A.   John was.
11   Q.   Okay. Now -- and how often were these ops reviews
12   done?
13   A.   I seem to recall they were quarterly.
14   Q.   So the AVPs and you would sit down with George to talk
15   about things affecting the business?
16   A.   Yeah.
17   Q.   Now, would you prepare along with the AVPs for these
18   ops reviews or did you guys prepare for ops reviews
19   separately?
20   A.   Typically separately. You know, they had a format.
21   They had a formatted sort of template they went
22   through, and then mine was a little more free form.
23   Q.   And did they do theirs together?
24         MS. KYROUZ: Objection, lacks foundation.
25   A.   You know, they each presented. They had a time slot

70

1    they presented. So Nic would get up and present,
2    "Here's the business in the West."
3    Q.   So because they each had a different region, they
4    would each do an overview of their region?
5    A.   Correct.
6    Q.   Were there PowerPoint presentations distributed during
7    these reviews?
8    A.   There might have been.
9    Q.   Were they done in California or were they done over
10   the telephone?
11   A.   They were done in person.
12   Q.   Okay.
13   A.   And they could have been anywhere.
14   Q.   Wherever people happened to be during --
15   A.   They could have been in Boston. They could have been
16   in California. They could have been in Chicago.
17   Could have been anywhere.
18   Q.   All right. So then you write -- you were highlighting
19   for George the issues that you say you've encountered
20   in the last two quarters. Do you know if you're
21   referring here to your organization or referring to
22   something larger than that?
23   A.   My organization.
24   Q.   Okay. And the demos of applications, right?
25   A.   Uh-huh.

71

1    Q.   Okay. You see where you talk about some assumptions
2    there?
3    A.   Uh-huh.
4    Q.   And you write, "There's a surge in the amount of ERP
5    deals in which GB, general business, is engaging which
6    translates into more demo dependency."
7    A.   Right.
8    Q.   What does that mean that more deals that general
9    business is engaging in? How does that translate into
10   more demo dependency?
11   A.   Because there was just more -- sales reps were
12   identifying more customers that were interested in
13   reviewing our software. So as a result, there was a
14   greater dependency on my organizations to do more
15   demonstrations.
16   Q.   That's kind of what I was talking about earlier, that
17   the more prospective deals, the more likely it is that
18   your organization is going to have to do more demos?
19   A.   Yeah.
20   Q.   Is that fair?
21   A.   Absolutely.
22   Q.   And that's what you were experiencing in October of
23   2000, right?
24   A.   Yes.
25   Q.   Number 2, you write, "In all the above deals, the

72

1    prospect has an emphasis on various customer-facing
2    solutions CRM," right? And what does that mean, the
3    customers want to see CRM working?
4    A.   Yes.
5    Q.   Can you just read the next section for me?
6    A.   "Simply put, all of our demo issues have to do with
7    our key marketed strength integration. We will have a
8    great deal showing Oracle's" -- "We still have a great
9    deal of difficulty showing Oracle's integrated suite
10   of applications from CRM through ERP. Additionally,
11   any order management demos also involving ERP are
12   difficult."
13   Q.   So as of October 6th of 2000, you understood that the
14   key marketed strength of 11i was integration?
15         MS. KYROUZ: Objection, vague.
16   A.   That was my perspective on -- at the time I wrote
17   this.
18   Q.   Right. That's all I'm asking. I'm not asking
19   anything more than that.
20   A.   Yeah.
21   Q.   And when you -- you write that, "We still have a great
22   deal of difficulty showing Oracle's integrated suite
23   of applications from CRM through to ERP." Can you
24   tell me what you meant by that?
25   A.   That means in the demo environment that's available to

73

```
1      us --
2  Q.  Right.
3  A.  -- 11i has been implemented but it's not been
4      thoroughly implemented so we could really showcase
5      everything that we do.
6  Q.  Okay. I'm asking, the difficulty showing the
7      integration from CRM through to ERP --
8  A.  Right.
9  Q.  -- that's the question. What do you mean that there I
10     guess the sales consultants are having difficulty
11     showing ERP through to CRM or vice versa?
12         MS. KYROUZ: Same objection, asked and
13     answered.
14  A.  I think I'm saying here -- and again, I don't recall
15     the specifics, but I think we were trying to probably
16     show a business process flow from campaign to cash or
17     something like that. It was difficult to go through
18     all of the steps.
19  Q.  Right. A flow that actually called upon both modules,
20     ERP and CRM, to work together?
21  A.  In some circumstances, yeah. Sitting here, we're
22     having a great deal of difficulty showing -- so I
23     don't think I was saying here we cannot show any
24     integration. I'm saying we're having difficulty
25     showing integration. There's a difference.
```

74

```
1  Q.  I understand. That's fine. What was the
2      functionality generally of order management? What
3      does that application do?
4  A.  So order management basically is mostly used by
5      manufacturing companies that sell tangible products,
6      right. So they'd use order management to basically
7      take an order for a product and ultimately ship that
8      product to an end customer.
9  Q.  Uh-huh. So order management, would that be part of
10     CRM or ERP?
11  A.  That's a subject of great debate. You know, I think
12     in this context, it was part of ERP.
13  Q.  Okay. Is it a module that would call upon
14     functionalities within CRM?
15         MS. KYROUZ: Objection, lacks foundation.
16  A.  CRM would call it, not it would call CRM --
17  Q.  Can you explain -- I'm sorry.
18  A.  -- typically, typically.
19  Q.  Can you describe a flow in which CRM would call upon
20     order management?
21         MS. KYROUZ: Same objection.
22  A.  So call center. You understand what a call center
23     application is? It's basically inbound phone calls.
24     The customer might be calling in, and the call center
25     application basically handles calls in a certain order
```

75

```
1      and routes them to the right agent and that sort of
2      thing. So one of the functions that might happen
3      within the call center is a customer might be ordering
4      something. In that instance, it might bring up order
5      entry or bring up the order entry screen or modem.
6  Q.  An order entry is CRM?
7  A.  Yes. So the customer would say, "I want to buy XYZ.
8      I want to bring up that order screen and place the
9      order."
10  Q.  Okay. Then if order management was, say, functioning
11     in a manufacturing organization, it might check
12     whether there was inventory for product or something
13     like that?
14  A.  Yes, it does -- it could do any given number of
15     things, right. So it could look at something called
16     available to promise, which is what you just
17     described, and it could look down -- available to
18     promise kicks in what is the manufacturing capacity if
19     we don't have it. It can look all the way downstream
20     as to how we make the stuff available.
21  Q.  I see. All right. So I want to just go down a little
22     bit further on the same page. You see where you write
23     under number -- you write there, "Three consistent
24     issues." And down on Number 2, you say, "We cannot
25     show what the customer wants to see when it comes to
```

76

```
1      the combination of CRM and ERP."
2  A.  Uh-huh.
3  Q.  What does that mean?
4          MS. KYROUZ: Objection, vague.
5  A.  I'm not sure I remember exactly what I was talking
6      about there. I think what I meant was, you know, you
7      build these products, and there are cases where
8      customers will have unique requirements that you may
9      not be able to fulfill, right, as part of what they
10     want to see. Yeah. So there are probably cases so --
11     there were cases there were some characteristics or
12     functions that a customer wanted that we couldn't
13     necessarily demonstrate because either, A, it didn't
14     exist, we hadn't built them in the product; B, they
15     weren't configured -- which is a likely one, they
16     weren't configured in a demonstration environment to
17     do that.
18  Q.  But that's the combination of using both ERP modules
19     with the CRM module?
20  A.  Uh-huh.
21          MS. KYROUZ: Objection, vague.
22  Q.  So in the next section, you talk about a scripted
23     flow.
24  A.  Right.
25  Q.  Can you tell me what a scripted flow is?
```

Hamel, Kenneth  5/22/2006  9:15:00 AM

77

```
1              MS. KYROUZ:  Same objection.
2    A.   A scripted flow basically says here's a business
3         process and here are the modules that it flows
4         through.  So campaign or order to cash, let's say.
5         Take an order.  You know, you check inventory.  You
6         know, if it's there, you ship it.  You know, you
7         invoice it.  You decrement inventory.  You update
8         accounts receivable.  You update general ledger.
9         That's an example of a scripted flow.
10   Q.   Okay.  Just going down to just a little bit further,
11        you say, well, here's the exposure, right?
12   A.   Uh-huh.
13   Q.   And you write, "Not only have we lost deals in which
14        we were the new players, many deals have been lost
15        with installed base customers."  What did you mean
16        when you write that -- withdrawn.  What did you mean
17        when you referred to Oracle as the new player?
18             MS. KYROUZ:  Objection, vague.
19   A.   Those are cases where Oracle's not the incumbent in
20        any way, so it was a new customer.
21   Q.   Meaning customers who didn't already have some Oracle
22        applications running?
23   A.   Any Oracle, technology or applications.  New customer.
24   Q.   Totally new to Oracle?
25   A.   Totally new.
```

78

```
1    Q.   When you say technology, you're talking about
2         database?
3    A.   Database applications for that stuff, right.
4    Q.   Now, was there a manner in which you as the person in
5         charge of the demonstrations for general business,
6         that you kept track of when Oracle was losing
7         customers that would have been new customers and
8         installed base customers?
9              MS. KYROUZ:  Objection, lacks foundation.
10   A.   Nothing formal.
11   Q.   Okay.
12   A.   I mean I think the genesis of this is I went back to
13        my guys and said -- they were whining about the demo
14        environment, and I said, "Give us some examples of
15        where it's causing us some potential exposure."
16   Q.   Okay.  And it looks like you have -- later on in this
17        same document, you have a couple of descriptions,
18        right?  Like you have a $200 million manufacturer just
19        under that?
20   A.   Yep.
21   Q.   Now, just based on your reading -- well, withdrawn.
22        Why don't you read what you write about this $200
23        million manufacturer?
24   A.   "When the AVP met the CEO, his words were, 'I want to
25        just buy Oracle.  Please just show me some live
```

79

```
1         software.'  This issue had to do with our
2         sales-oriented suite.  We still cannot show products
3         like Sales, Telesales and until recently, Service.
4         We're losing this deal."
5    Q.   Can you recall what manufacturing company or customer
6         that was?
7    A.   I do not.
8    Q.   Do you know whether or not Oracle actually lost that
9         deal?
10   A.   Well, I don't remember the manufacturer, so I don't.
11   Q.   All right.  That's fine.  And so it looks like some
12        area vice president told you that they had met with
13        the CEO.
14   A.   Yep.
15   Q.   Do you recall which area vice president it was?
16   A.   I don't.
17   Q.   Did you -- withdrawn.  What is the sales oriented
18        suite that you're referring to in that paragraph?
19   A.   So CRM is broken up into a number of areas.  So some
20        of them are sales oriented.  So they tend to be tools
21        for either sales rep, telesales people, specifically
22        for that group of employees in a company.
23   Q.   Okay.  What did you mean -- well, withdrawn.  Did you
24        understand what the meaning of the quote you have here
25        that states, "I want to buy Oracle.  Please just show
```

80

```
1         me live software"?  And I'm specifically referring to
2         "live software."  Do you know what's meant by the
3         quote you wrote here?
4    A.   Yes.  They want us to show them, you know, this
5         particular release, 11i.  We were probably showing
6         screen shots or simulated software, you know,
7         simulated -- showing screens that were extracted out
8         of the software.  And the customer probably said,
9         "Show me the real stuff," and we couldn't.
10   Q.   Well, going down to the next one, the $300 million
11        incubator, CMGI.  Is that the company, CMGI?
12   A.   Yes.
13   Q.   So here you actually identify them as being an Oracle
14        customer?
15   A.   Yep.  They were running database all over the place.
16        They're an incubator.  They were creating all sorts of
17        dot-com companies at the time.
18   Q.   I'm sorry?  They were what?
19   A.   They're an incubator, so they were creating dot-com
20        companies.  This was at the time of the dot com.
21   Q.   Can you read this for me, please?
22   A.   "They are an Oracle customer.  There were two demo
23        challenges faced here.  One was for CRM
24        (sales-oriented).  They finally gave up on Oracle when
25        we couldn't show live software.  Seibel is winning.
```

Hamel, Kenneth   5/22/2006   9:15:00 AM

81

1 The second was an Order Management demo which required
2 showing contracts through to accounts receivable.
3 Businesswise, this should be an easy issue (and is a
4 very sought-after flow) but it took SC's well over a
5 week just to get it to work. We're essentially doing
6 integration work in the field."
7 Q. This kind of goes back to what I was asking you
8 before. When you write, "We're essentially doing
9 integration work in the field," what did you mean by
10 that?
11 A. It means that --
12 MS. KYROUZ: Objection, vague.
13 A. What it means is that the demonstration environment
14 we're utilizing is not configured properly to showcase
15 the product. So we're having to -- my guys were
16 having to do stuff in the demonstration environment to
17 do that.
18 Q. But they were doing it in the field?
19 A. Again, we had to show things working together.
20 Q. Right.
21 A. Because Marina Zago didn't implement the product
22 right, and comprehensively, we had to do some of the
23 stuff on our own. Just wasn't -- you know, it just
24 wasn't -- it just wasn't configured properly.
25 Q. Okay. But it is probably -- this is July, August,

82

1 September, October -- this is three months after that
2 initial communication that we talked about with George
3 Roberts. You'll see it there. I think it was demo
4 number --
5 A. So this was right --
6 Q. Over that three-month period, those issues still
7 hadn't been repaired?
8 A. Right. Three months is not a lot of time.
9 Q. Okay. That's fine. So let's -- when you write that
10 "the second was order management -- was an order
11 management demo which required showing contracts
12 through to accounts receivable," now accounts, is that
13 in ERP or is it in CRM?
14 MS. KYROUZ: Objection, lacks foundation.
15 A. I don't recall. I'm not sure I understand this
16 statement. I'm trying to think about it. Yep.
17 Q. Well, AR is certainly an ERP, right?
18 A. Yes.
19 Q. Okay. The next sentence, you write, "Businesswise,
20 this should be an easy issue and is a very
21 sought-after flow." What does that mean?
22 A. What I was implying is this business process of going
23 from contracts to accounts receivable is something a
24 lot of customers want to do.
25 Q. Okay. Why do you think it's -- why did you think it

83

1 should be an easy issue?
2 A. Probably because in the last release, it was.
3 Q. I see. Okay.
4 A. And I'm in sales. Some of this stuff is for effect,
5 right? The problem is in the hierarchy of things,
6 demonstration systems -- and again, I'm in sales, so
7 this is my perspective -- should get the top priority
8 because they're customer-facing things. They always
9 get the last priority. So what happens is software
10 gets released, customers hear about it, they see it,
11 and there's a huge lag between when we can demonstrate
12 it effectively, you know, versus when, you know,
13 customers want it.
14 Q. Going down to the 250 million -- I guess, I think you
15 meant here 250 million manufacturer; is that correct?
16 A. Yes.
17 Q. You write, "This company recognizes Oracle as a market
18 leader when the sales team first engaged, and when the
19 demo came about, the system crashed, disenabling the
20 SC's to show order management and CRM." What did you
21 mean when you wrote "the system crashed"?
22 A. It could have meant any number of things. I mean the
23 machine -- the screens probably wouldn't advance,
24 which could mean the server went down, the network
25 connection went down, something in the software when

84

1 the configuration went flakey. It could have been a
2 number of things. We couldn't advance from where we
3 were.
4 Q. But you write the SCs couldn't show order management
5 in CRM. Does that at all suggest they were able to
6 show other functionalities, say, ERP functionality?
7 A. I don't recall. This customer may have just been
8 looking at order management CRM, so I don't recall.
9 Q. Do you recall what customer that was?
10 A. I don't.
11 Q. Okay. Then you write, "The customer was stunned at
12 our inability to show even basic functions they
13 needed." Do you know what would be considered basic
14 functions?
15 MS. KYROUZ: Objection; lacks foundation,
16 vague.
17 A. Yeah, again, things like this are written for effect.
18 Q. Sure.
19 A. We're basically standing and saying -- we're standing
20 in front of this customer getting tortured because we
21 can't show this stuff. So "basic" could have been
22 anything.
23 Q. Then you write, "These are three typical examples of
24 demo challenges. There are easily a hundred more,"
25 right?

Hamel, Kenneth  5/22/2006  9:15:00 AM

85

1   A. Uh-huh.
2   Q. But you're saying you didn't keep -- well, withdrawn.
3      Did your organization keep track of demo performance
4      by specific demo?
5      MS. KYROUZ: Objection; lacks foundation,
6      asked and answered.
7   A. At some point, we did track demo quality and
8      performance. I just don't recall when it started.
9   Q. All right. And you write -- well, the next sentence,
10     "The issue continues" -- withdrawn. You write, "The
11     issues continue to be showing integration between CRM,
12     OE, and back office." What's OE?
13   A. Order management. Order management can also be
14     called. Those are synonymous terms.
15   Q. And back office, you're referring to ERP?
16   A. Correct.
17   Q. Later on, a couple paragraphs down where I guess you
18     give a recommendation to George Roberts, you say, "The
19     product is the demo." What did you mean by that?
20      MS. KYROUZ: Objection, vague.
21   A. "The product is the demo." I think what I was just
22     saying -- I was implying as soon as the product is
23     available, you need to be able to demo it.
24   Q. Down a little deeper into the same paragraph, you
25     write, "In addition, they are tasked" -- I think

86

1     you're referring to the SC's here, "they are tasked
2     with doing integration testing of ERP and CRM, a
3     responsibility that requires extensive time and
4     staffing." Kind of going back to what I was asking
5     you before of SC's doing integration testing of both.
6     Does this indicate anything different than what you
7     testified earlier?
8   A. It's integration testing within the demonstration
9     environment.
10   Q. Okay. And so the next thing you write is, "Something
11     is broken on the PRP side when fundamental product and
12     integration testing appears to be incomplete prior to
13     handing code to ADS." What did you mean by that?
14   A. Well, I'm sure --
15      MS. KYROUZ: Objection, vague.
16   A. What I think happened here is, you know, I would whine
17     to ADS, and they would basically say, you know, "Well,
18     this is kind of what we've got." So I'm theorizing
19     here. This statement is pure conjecture on my part.
20   Q. That's fine. But it sounds like the conjecture is
21     that you're saying there's a fundamental product in
22     integration testing that appears to be complete before
23     the ADS demonstration environment was created?
24      MS. KYROUZ: Objection --
25   Q. Isn't that right?

87

1      MS. KYROUZ: -- misstates the document,
2     vague, calls for speculation.
3   A. It's purely my opinion --
4   Q. That's fine. That's okay.
5   A. -- which I, frankly, didn't have the right to have
6     because I don't have -- you know what I mean? It's,
7     like, upstream.
8   Q. That's fine. All I know is what's written here. I
9     wasn't at Oracle. So that was at least your opinion
10     at the time?
11   A. Sort of like saying BMW years go never put cupholders
12     in their car. It would be like me as a sales rep
13     saying they didn't put cupholders in the car because,
14     you know, the engineers didn't want them to spill
15     drinks all over the nice leather. Well, the sales rep
16     has no idea what they were thinking about. You know
17     what I mean? It's the same kind of thing. I had
18     no -- but yeah, what I wrote here, I wrote.
19      MR. WILLIAMS: That's fine. He's got to
20     change the tape, so we ought to take five minutes.
21      THE VIDEO OPERATOR: This marks the end of
22     Tape Number 1. Going off the record. 11:26.
23      (Recess)
24      THE VIDEO OPERATOR: This marks the
25     beginning of Tape Number 2. We are back on the

88

1     record. 11:34.
2   Q. So you indicated that Gayle Fitzpatrick was your
3     counterpart or peer responsible for majors, right?
4   A. Yes.
5   Q. Did you talk to or communicate with Gayle to kind of
6     compare your experiences?
7      MS. KYROUZ: Objection, vague.
8   A. I'm sure. I'm sure I did, yeah.
9   Q. Do you know whether in the fall of 2000 and early 2001
10     the experiences that Gayle was having in majors was
11     similar to the experiences that you were having in
12     general business with respect to problems encountered
13     in demonstrations?
14      MS. KYROUZ: Objection, lacks foundation.
15   A. I don't recall specifically, but I would expect.
16   Q. You would expect they were similar?
17   A. I would expect they were similar. She was using the
18     same environments, sure.
19   Q. Do you know Mary Delaney?
20   A. I do.
21   Q. Who's Mary?
22   A. What was she? I think she worked for Gayle, and I
23     cannot recall in what capacity at the time.
24   Q. Okay. How about Lee Paulino?
25   A. Lee worked for Gayle, and he ran kind of what they

89

1 characterize as Southwest, which is --
2 Q. Which is what?
3 A. I think he ran central U.S. for majors, presales.
4 Q. What did they characterize it as?
5 A. They call it the Southwest, but it's not like -- the
6  southwest to them is Texas.  I don't know why they
7  call Southwest Texas, but it is, Texas.
8 Q. And Grant Franjione?
9 A. Grant Franjione ran major presales in the Northeast.
10 Q. How -- you have an amazing recollection.  How did you
11  know what people ran in other organizations?
12 A. Because I knew where they lived, I knew them.
13 Q. I'm curious.  It's a lot of people.
14 A. But I've worked with these guys for years.  I mean I
15  knew Grant my whole career there.
16 Q. And you were at Oracle for about ten years?
17 A. Yeah, about ten years.
18 Q. Did he ever work for you?
19 A. He did not.
20  MR. WILLIAMS:  Okay.  I'm going to ask the
21 reporter to mark this document as Hamel, I think we're
22 at 5, right?
23  THE STENOGRAPHER:  Yes.
24  (Copy of E-mail to Mr. Roberts from
25  Ms. Fitzpatrick, dated October 8, 2000 was

90

1  marked Exhibit Number 5 for identification.)
2  MR. WILLIAMS:  Hamel Number 5 is
3 Bates-numbered NDCA-ORCL 619062 through 65.
4 Q. I'll just ask you to take a look at Hamel Number 5,
5  and let me know when you've had a chance to review it.
6 A. Okay.
7 Q. Okay.  Do you recognize Hamel Number 5?
8 A. What do you mean by recognize it?  Have I seen it
9  before?
10 Q. Have you seen it before?
11 A. I don't recall.
12 Q. Okay.  It's an e-mail, though, right?
13 A. Yes.
14 Q. And it's from Gayle Fitzpatrick to George Roberts,
15  CCing you among others?
16 A. Uh-huh.  Yes.
17 Q. Dated October 8th of 2000?
18 A. Uh-huh.
19 Q. Okay.  And do you know why -- well, withdrawn.  And
20  the subject matter is majors application demo issues?
21 A. Right.
22 Q. Kind of similar to the e-mail you had sent to George
23  regarding the demo issues you were experiencing in
24  general business, right?
25  MS. KYROUZ:  Objection, lack of foundation.

91

1 A. Right.
2 Q. Not necessarily similar in, like, actual substance,
3  but the topic?
4 A. Uh-huh, sure.
5 Q. And is it fair to say that Gayle probably CCed you
6  because you were her counterpart experiencing -- well,
7  you were her counterpart doing the same applications
8  type demos, right?
9 A. Uh-huh.
10 Q. Do you know if you talked to Gayle prior to her
11  sending out this e-mail?
12 A. I don't recall.
13 Q. Okay.  It's only a couple days after Hamel Number 4,
14  the one you sent to George Roberts.
15 A. Yeah.  My theory is -- I don't remember exactly.  We
16  probably both did ops review, and probably the same
17  issue came out; and George told her and told me
18  probably -- in the context of that discussion told us
19  to summarize the issues.
20 Q. You see in the second paragraph where Gayle writes,
21  "The problems fall into three categories; 1, system
22  stability and performance; 2, product integration and
23  stability; 3, deviation from the ADS scripts"?
24 A. Uh-huh.
25 Q. Do you know there to be a difference between product

92

1  integration and product stability?
2  MS. KYROUZ:  Objection; lacks foundation,
3  vague.
4 A. I mean yeah, there's a difference.  And, again, this
5  is within the demo environment specifically.  So I
6  think maybe -- in some of the newer modules, we were
7  having some challenges -- they hadn't implemented the
8  right patch level or whatever, so it would have caused
9  some of the products not to work as well as others.
10  So that would have talked to the stability issue.
11 Q. That's the product stability issue?
12 A. Yeah, yeah.
13 Q. Okay.
14 A. And then, the other issue of the integration is again
15  tying CRM to PRP or financials to HR or whatever it
16  might be within the demos that we had.
17 Q. You see where she writes, "The system stability and
18  performance issues and our inability to show an
19  integrated demo leaves doubt in our customers' minds
20  that Oracle can show or deliver the e-business
21  solution"?
22 A. Uh-huh.
23 Q. It sounds like in her organization they were having an
24  issue showing the integrated demo as well, correct?
25  MS. KYROUZ:  Objection; lacks foundation,

Hamel, Kenneth   5/22/2006  9:15:00 AM

93

1    calls for speculation.
2    Q.   Looks like that, right?
3    A.   Yeah, again, using the ADS demo environment, I would
4         expect fully, sure.
5    Q.   Was there any other environment used to show demos?
6    A.   No, not to my knowledge.
7    Q.   Okay.  And she's only talking about majors here?  She
8         had nothing to do with general business, right?
9    A.   Correct.
10   Q.   Do you know what is meant generally when someone
11        trying to do a demonstration says that the system,
12        quote, unquote, hangs?
13   A.   Yes, it means that -- it typically means that they
14        can't progress any further.  The screen freezes.  You
15        probably use Microsoft Office.  It's sort of a
16        built-in function that I think Microsoft builds.
17        Everything freezes, and you can't move any further.
18        You have a couple of options.  One is you have to shut
19        down the system and start it up again.
20   Q.   So it's similar to the system crashing as you
21        described earlier?
22        MS. KYROUZ:  Objection, lacks foundation.
23   A.   You know, everyone has different ways of describing.
24        One person might say the system crashed.  One person
25        might say -- again, some of it's for effect, and some

94

1         of it's for --
2    Q.   Okay.  And I just wanted to make sure that at least as
3         we sit here today the difference between crashing and
4         hanging isn't significant for purposes of our
5         discussion here.
6         MS. KYROUZ:  Objection; lacks foundation,
7         misstates prior testimony.
8    A.   It depends on the deliverer of the message.  It could
9         be significant for someone and may not for someone
10        else.  For me, they're two different things.
11   Q.   Okay.
12   A.   For me.
13   Q.   I understand.  And to you, what's the difference?
14   A.   The system crashing means, you know, there's
15        something -- something happened upstream that
16        basically requires us to restart, say, a machine or a
17        server.  Crashes, crashes -- in the order of priority,
18        crash is more significant than hung.  One could be a
19        result of another.  A system could hang because a
20        system crashed, but crash implies that a significant
21        piece of hardware has come down for some reason.
22   Q.   And let me clarify one thing.  When you said that
23        something upstream has occurred, what do you mean
24        upstream?
25   A.   I mean when you work on a laptop, there's a computer

95

1         somewhere else.  That's what I mean by upstream.
2    Q.   Okay.  Great.
3         MR. WILLIAMS:  I'm going to ask the
4         reporter to mark this document as Hamel Number 6.
5         (Copy of E-mail String was marked Exhibit
6         Number 6 for identification.)
7         MR. WILLIAMS:  And Hamel Number 6 is
8         Bates-numbered NDCA-ORCL 013717 through 720.
9    Q.   Just ask you to take a look at Hamel Number 6 for me.
10        You don't have to read it line by line, but just let
11        me know when you've had a chance to peruse it, and
12        I'll ask you a couple questions.
13        Have you had a chance to review Hamel
14        Number 6?
15   A.   Is the attachment the same?  Okay.
16   Q.   Very similar to Hamel Number 5, right?
17   A.   Yeah, it's just a forwarded e-mail.
18   Q.   It looks like it's forwarded to a few people?
19   A.   Yep.
20   Q.   I'm just going to ask you to look at the center of the
21        first page of Hamel Number 6.  That's an e-mail, looks
22        like, from Gayle Fitzpatrick to a number of people,
23        including you, with some commentary from her.  Is that
24        fair to say?
25   A.   No, I don't think it's from Gayle.  I think it's

96

1         George --
2    Q.   I'm sorry.
3    A.   -- forwarding to a bunch of people, or responding to
4         Gayle and copying a bunch of people.
5    Q.   You're absolutely right.  From George to Gayle,
6         copying several people, including you, right?
7    A.   Yes.
8    Q.   And it looks like it's a forward of Gayle's earlier
9         e-mail concerning the applications demos that we
10        talked about --
11   A.   Correct.
12   Q.   -- in Hamel Number 5, right?
13   A.   Yep.
14   Q.   Do you -- did you know who Jay Nussbaum was in or
15        around October 2000?
16   A.   Yes, Jay ran the public sector business for Oracle.
17   Q.   Did he have an organization that was doing demos as
18        well?
19   A.   Yes.
20   Q.   Do you know what that organization was called?
21   A.   You know, I don't.  I wasn't as familiar with how he
22        was structured.
23   Q.   But you didn't do -- withdrawn.  Your organization
24        didn't do demonstrations for public organizations?
25   A.   Correct, just commercial.

Hamel, Kenneth   5/22/2006   9:15:00 AM

97

1  Q. Commercial, 5 billion or under?
2  A. Right.
3  Q. Do you know who R. Police or -- yes, R. Police is, if
4     you look at the top of the e-mail?
5  A. Oh, Ron Police.
6  Q. Oh, Ron Police.
7  A. I think he was an operations guy for Jay at the time.
8        MR. WILLIAMS: I'll ask the reporter to
9     mark this document as Hamel Number 7.
10       (Copy of E-mail String was marked Exhibit
11       Number 7 for identification.)
12       MR. WILLIAMS: Hamel Number 7 is
13    Bates-numbered NDCA-ORCL 617806 through 809.
14 Q. Just take a look at Hamel Number 7 for me.  Let me
15    know when you're done.
16 A. Okay.
17 Q. Do you recognize Hamel Number 7?  Have you seen it
18    before today?
19 A. No, I don't believe so.
20 Q. It's an e-mail from Ron Wohl to George Roberts, CCing
21    you, right?
22 A. Uh-huh.
23 Q. On or about October 11, 2000?
24 A. Yep.
25 Q. Still discussing the applications demo issue?

98

1  A. Yes.
2  Q. Do you know what Vision is or was?
3  A. Vision was the name of the fictitious company that was
4     built within the demonstration environment.  So we
5     tried to simulate, you know, a real-world environment
6     by building scenarios within this thing called Vision.
7     It was Vision Enterprises or something was the name of
8     the company.
9  Q. Okay.  Do you know who Sohaib Abbasi is?
10 A. Sohaib Abbasi ran the tools development organization,
11    tools being Oracle Forms, the application server, so
12    some of the technology that was utilized to build
13    these applications.
14 Q. Can you describe for me what Oracle Forms is?
15 A. It's basically a tool that allows you to create
16    screens for an application.
17 Q. Okay.  Is it part of the e-business suite?
18       MS. KYROUZ: Objection, lacks foundation.
19 A. Was it part of the -- it was in a tool portfolio -- it
20    was sort of in a technology portfolio of Oracle.  The
21    application e-11i business suite used Forms to create
22    the screens.  So runtime version of it was available
23    in the e-business suite.
24 Q. Okay.  Did you have any responsibility for doing
25    demonstrations of Oracle 11.o applications?

99

1  A. I would have expected so, yes.
2  Q. Okay.  Do you know -- and that was before 11i?
3  A. Yes, 11i was -- yes, it predated 11i.
4  Q. So I'm trying to get the time frame within which you
5     began overseeing the general business demonstration or
6     presales, sales consulting division.
7  A. Say it again.  You were trying to get a time frame of?
8  Q. When you were vice president of sales consulting --
9  A. Yep.
10 Q. -- prior to the release of 11i.
11 A. Yes.  I think I was in the job about a year -- I
12    think.  I'm trying to remember.  Yeah.  See, I've been
13    in the applications business the whole time at Oracle,
14    so it's foggy as to the different releases.
15 Q. Who is Julie Cullivan?  Do you know?
16 A. Julie Cullivan was presales -- in presales -- sales
17    consulting management.  I can't remember if she worked
18    for Gayle.  She was on the West Coast.
19       MR. WILLIAMS: I'll just ask the reporter
20    to mark this document as Hamel Number 8.
21       (Copy of E-mail, dated February 13, 2001 was
22       marked Exhibit Number 8 for identification.)
23       MR. WILLIAMS: Hamel Number 8 is
24    Bates-numbered NDCA-ORCL 617993.
25 A. Oh, she ran presales for OPI.

100

1  Q. Are you talking about Julie Cullivan?
2  A. Julie, yes.
3  Q. Presales for OPI?
4  A. Yes, so there was major and general business and
5     Oracle product industries.  So they pulled some of the
6     industries out of majors like aerospace and defense,
7     those kinds.  So they had a separate organization
8     selling to those organizations.
9  Q. Do you know who -- I'm sorry.  I didn't mean to cut
10    you off.  Do you know who ran OPI?
11 A. You know, I don't recall.  I mean it'll probably come
12    back to me, but --
13 Q. Okay.
14 A. It'll probably come back to me.  I want to say Mike
15    Decaesar.
16 Q. Okay.  I'm sorry.  Michael Decaesar?
17 A. But I'm not entirely certain.
18 Q. Who was Mike Decaesar, if you know?
19 A. See, I don't recall now.  Is it Mike Decaesar or --
20    yeah, I don't remember.  He was in the mix there
21    somewhere.  I just don't remember if he ran it or not.
22    He would have been a -- now that I'm thinking about
23    it, he's probably an AVP, an area vice president
24    there.  Yeah.
25 Q. All right.  Take a look at Number 8 for me.

Hamel, Kenneth   5/22/2006  9:15:00 AM

101

1   A. Uh-huh.
2   Q. Have you seen Number -- Exhibit Number 8 prior to
3      today?
4   A. It doesn't ring a bell, no.
5   Q. It's an e-mail from Gayle Fitzpatrick to Ron Wohl,
6      CCing you, right?
7   A. Yes.
8   Q. February 13th of 2001, right?
9   A. Yes, uh-huh.
10  Q. Well, the subject line is field offices with network
11     performance issues. Do you know what that means?
12  A. Yeah. There were a couple -- you know, we had -- it
13     seemed like a bunch of challenges were converging at
14     the same time back then. One of them, we had the
15     demonstration environment challenge, but the other
16     issue we had is we were having network issues, and I
17     think we had an antiquated -- some antiquated network
18     technology. So -- and the architecture of the 11i
19     environment, if I remember correctly, historically
20     more of the processing that happened in the
21     application went on on the laptop. When we moved to
22     11i, now we had a Web-based front end that used a
23     browser. So it required much more network
24     connectivity, much more network traffic, you know,
25     talking back to the servers wherever they were. So it

102

1      required a much more advanced networking capability,
2      which we hadn't upgraded the office. So sometimes --
3      one of the things that happened a lot is people were
4      claiming there were demo issues, and frankly, I think
5      a lot of the time it was network issues within the
6      office, when we talk about systems hanging. The
7      network just wasn't tuned to handle this.
8   Q. And this is just -- well, have you reviewed this
9      document?
10  A. Uh-huh.
11  Q. And this is a list of the offices where there were
12     network issues?
13  A. Where we encountered those kinds of problems.
14  Q. Any of these offices -- well, withdrawn. Were you
15     responsible for any of these offices?
16  A. What do you mean by responsible?
17  Q. Well, I'm guessing that some of these offices were in
18     your region, right?
19  A. Oh, all of my -- these offices are kind of
20     organizationally agnostic. In New Jersey, there could
21     have been general people there, there could have been
22     majors.
23  Q. It was an office?
24  A. Right, right.
25     MR. WILLIAMS: I'll ask the reporter to

103

1      mark this document as Hamel Number 9.
2      (Copy of E-mail String was marked Exhibit
3      Number 9 for identification.)
4      MR. WILLIAMS: Hamel Number 9 is
5      Bates-numbered NDCA-ORCL 063432 through 434.
6   Q. I'll just ask you to take a look at Hamel Number 9.
7      Let me know when you're done.
8   A. Okay.
9   Q. Okay. Do you recognize Hamel Number 9 as being
10     something you've seen before today?
11  A. Yes, I saw it yesterday.
12  Q. And it's, I guess, a couple of e-mails in or around
13     February of 2001, right?
14  A. Uh-huh.
15  Q. And you were either the sender or recipient of these
16     e-mails, right?
17  A. Right.
18  Q. Or forwarded an e-mail, right?
19  A. Yes.
20  Q. Separate and apart from what's in the e-mail, when you
21     reviewed it last night, did it help you to recall any
22     facts surrounding demo system performance or lost
23     deals?
24     MS. KYROUZ: Objection, vague.
25  A. I mean I guess it brought back the memory of how there

104

1      was some challenges with demo environment back then.
2   Q. But nothing specific?
3   A. No.
4   Q. Okay. Do you know who Meghan Ware is?
5   A. Yes, Meghan Ware reported up through my organization
6      to David Handy. She was a sales consulting manager.
7   Q. So she was down a couple of levels?
8   A. Uh-huh.
9   Q. More likely to be in the field?
10  A. Yes.
11  Q. And is it -- why is that? Because of her job, sales
12     consulting manager?
13  A. Yes, she was a front-line manager. So she spent time
14     more in the field with individual SC's that reported
15     to her.
16  Q. Help me understand how that your organization kind of
17     flowed downward. She's a sales consulting manager
18     with sales consultants reporting to her?
19  A. Correct.
20  Q. And among those people, which group is more customer
21     facing -- is the most customer facing?
22     MS. KYROUZ: Objection, vague.
23  A. What do you mean? Which groups?
24  Q. The sales consultants, the managers?
25  A. Oh, I see. Clearly the sales consultants.

Hamel, Kenneth  5/22/2006  9:15:00 AM

105

1  Q.  The sales consultants?
2  A.  Yes.
3  Q.  Are those the individuals that are most likely to have
4      the hands-on experience with the demo environment?
5  A.  Yes.
6  Q.  Because they actually are doing the demonstration?
7  A.  Yes, it's their main tool of choice, for lack of
8      better terms, to do their job.
9  Q.  Is there another level below sales consultant?
10 A.  No.
11 Q.  So it's sales consultant, consultant manager. Then
12     what?
13 A.  Then they called them technical directors. David
14     Handy, the technical director, would have had several
15     sales consulting managers reporting to him, and then
16     he reported to me.
17 Q.  Okay. Was it unusual -- well, withdrawn. You see the
18     bottom or the second half -- bottom half of the first
19     page, 063432 --
20 A.  Uh-huh.
21 Q.  -- and that's an e-mail from Meghan to David Handy and
22     you?
23 A.  Yes.
24 Q.  Was it unusual for consulting managers to e-mail you
25     directly?

106

1          MS. KYROUZ:  Objection; lacks foundation
2      and vague.
3  A.  What's that mean, unusual?
4  Q.  I'll ask the question a different way. Was it typical
5      for sales consultants to communicate directly to you
6      or would they typically communicate with the manager
7      or the technical director, who would then communicate
8      to you or with you?
9          MS. KYROUZ:  Same objections. Also
10     misstates the document as to what Meghan Ware is.
11 A.  I mean it varied. You know, my style with my
12     organization regardless -- even this one or the one
13     I'm in today is it's kind of an open door discussion,
14     policy. So anybody can communicate with me any time.
15 Q.  All right. So can you read what she writes to you on
16     February 16th, the bottom of the page, just the first
17     two sentence?
18 A.  "Another deal lost primarily due to demo system
19     performance. It took 1 1/2 hours to load the applet
20     at REO and the demo performance was so terrible that
21     only we presented reporting and self service."
22 Q.  What is applet?
23 A.  So, again, as I was explaining before, the way a
24     system was architected before 11i was it was a kind of
25     client server architecture, which meant some of the

107

1      processing server occurred on a machine or laptop and
2      some of it happened back at the server. With 11i, the
3      majority of it happened at the server. There was a
4      little bit that happened on the client with a laptop
5      or a PC. However, it didn't have to get maintained.
6      Every time you powered up, went into the application,
7      it would download this little piece of software. They
8      call it an applet. So it would run within the
9      browser.
10 Q.  And the applet -- was the applet part of 11i?
11 A.  Sure.
12 Q.  And REO here was the customer?
13 A.  Customer sounds like, yeah, prospect.
14 Q.  You see where she also writes, "This is our second
15     system performance loss this year"?
16 A.  Uh-huh.
17 Q.  Do you know whether or not in early 2001 you or your
18     organization had begun keeping track of lost deals due
19     to demonstration problems?
20         MS. KYROUZ:  Objection; vague, lacks
21     foundation, calls for speculation.
22 A.  You know, there was probably nothing formal. She was
23     involved in a bunch of stuff, so she knew there were
24     potentially issues around the demo environment and
25     that she felt, you know, it was a challenge.

108

1  Q.  Okay. Did you know that Startek was a deal in general
2      business that was lost in 2001?
3  A.  I have no idea.
4          MS. KYROUZ:  Objection; vague, misstates
5      the document, calls for speculation.
6  A.  Yeah, I have no idea.
7          MR. WILLIAMS:  Can you do me a favor? Can
8      you read that question back to me?
9          (Reporter read back the last question.)
10         MR. WILLIAMS:  Okay. Thanks.
11 Q.  Do you know whether Startek was a deal that was lost
12     in 2001?
13         MS. KYROUZ:  Same objections.
14 A.  I don't.
15 Q.  So if you turn to the next page, it looks like Meghan
16     was actually forwarding another e-mail to you, right?
17 A.  Yes.
18 Q.  Do you know who Terri Sikora is or was?
19 A.  I don't.
20 Q.  I guess it looks like she may have been --
21 A.  According to this, she's an IT manager at a customer.
22 Q.  At REO?
23 A.  Right.
24 Q.  Do you know Michael Nicholls?
25 A.  Michael Nicholls was a sales rep at Oracle.

Hamel, Kenneth   5/22/2006   9:15:00 AM

109

1   Q.  In general business?
2   A.  In general business, yep.
3   Q.  And reporting up to John Nugent?
4   A.  Eventually.
5   Q.  But do you know who he reported directly to?
6   A.  I don't.  He ultimately reported to -- he reported to
7        someone who reported to Nic Classick, and Nic Classick
8        reported to Nugent.
9   Q.  Okay, I see.  But you obviously got this e-mail string
10       somewhere in February --
11   A.  Right.
12   Q.  -- 2001?  Can you read for me Terri Sikora's note
13       beginning with "Michael"?  Just read the first two
14       sentences.
15   A.  "Michael, I really am sorry that we have to do this,
16       but after conversations with the CEO, we decided to
17       not look into our options with Oracle.  This is based
18       on several reasons, one being the demo that never
19       happened, and another is being generated by issues
20       generated at JDS Uniphase."
21   Q.  Did you know of any issues occurring at JDS Uniphase
22       as of the time you got this e-mail?
23   A.  I don't recall.
24   Q.  How about after you got this e-mail, did you learn of
25       issues at JDS Uniphase?

110

1   A.  Yeah, I don't recall.
2   Q.  Okay.  So then you -- after you got this e-mail from
3        Meghan on February 16th, you forwarded it to Ron Wohl,
4        right?
5   A.  Uh-huh.  Yes.
6   Q.  Do you know why you forwarded it to Ron Wohl?
7   A.  You know, I think it's back to my earlier comment,
8        which is we've got to create a demo environment that
9        allows us to really showcase the capability of the
10       product.  So here's another example -- here's a
11       specific example -- I assume what I would have done is
12       here's a customer saying something, documenting
13       something, so I forward it to Ron, and it amplifies
14       the issue.
15   Q.  Understood, because Ron was in charge of development?
16   A.  He was in charge of development, but more importantly,
17       Marina Zago reported to him, who ran the demo
18       environment that we utilized.
19   Q.  Did Marina -- withdrawn.  Can you just read your note
20       to Ron?
21   A.  "Ron, here's a specific situation where the
22       performance issues are actually costing us business.
23       I pass this on to you so you'll have anecdotal data as
24       you continue to improve the environment."
25   Q.  Do you know if Ron responded to you or responded to

111

1        this e-mail?
2   A.  I don't.
3   Q.  You see that -- I guess -- but you sent this e-mail to
4        him on February 16th, 2001, the same day that the
5        information had been forwarded to you, right?
6   A.  Yes.
7   Q.  Do you know whether you were working or on vacation
8        during November 2000, December 2000, January 2001?
9        MS. KYROUZ:  Objection, vague.
10   A.  I have no idea.  I assume I was working.
11   Q.  And do you know -- you didn't stop using e-mail during
12       that period; did you?
13       MS. KYROUZ:  Objection; lacks foundation,
14       vague.
15   A.  No, I wouldn't think so.
16   Q.  Okay.  You see that, I guess, the last e-mail that at
17       least you've been shown here -- well, back, say
18       Exhibit Number 7 -- was October 2000?
19   A.  Uh-huh.
20   Q.  And the next one looks like February of 2001?
21   A.  Uh-huh.
22   Q.  Were you -- withdrawn.  You had testified earlier that
23       you pretty much saved everything until you reached a
24       point where you couldn't save anymore, right?
25       MS. KYROUZ:  Objection, misstates

112

1        testimony.
2   A.  I saved everything until a point where I had -- there
3        were quota issues, which wouldn't allow me to read in
4        or send anything more.
5   Q.  Right.  And when you encountered those quota- type
6        issues, did they ever last for months?
7   A.  Oh, no.  Hours or -- hours at the most.  So I would
8        delete some things to free it up.
9   Q.  To free it up.  Okay.  But there doesn't seem -- well,
10       withdrawn.  There doesn't seem to be -- as you sit
11       here today to be any reason why there'd be that large
12       of a gap in e-mails that you either sent or received?
13   A.  No.
14       MS. KYROUZ:  Objection, lacks foundation.
15   Q.  And you used e-mail every day?
16       MS. KYROUZ:  Objection; lacks foundation,
17       vague.
18   A.  Typically, yes.
19       MR. WILLIAMS:  I'll ask the reporter to
20       mark this document as Hamel Number 9.
21       MS. KYROUZ:  10.
22       MR. WILLIAMS:  I'm sorry.  Are we at 10?
23       THE WITNESS:  Yes.
24       (Copy of E-mail String was marked Exhibit
25       Number 10 for identification.)

Hamel, Kenneth  5/22/2006  9:15:00 AM

113

1      MR. WILLIAMS:  Hamel Number 10 is
2    Bates-numbered NDCA-ORCL 094090 through 093.
3  Q.  Let me know when you've had a chance to take a look at
4    that.
5  A.  Okay.
6  Q.  Do you know Russell Pike?
7  A.  I do.
8  Q.  Who's that?
9  A.  At the time, I think he was working for Marina Zago in
10    ADS.
11  Q.  Did he ever work for you?
12  A.  He did not.
13  Q.  Directing your attention back to Hamel Number 10, do
14    you recognize this document as one you've seen before
15    today?
16  A.  Yes.
17  Q.  And when was the last time you saw it?
18  A.  Yesterday.
19  Q.  Did it help you recall facts that were occurring at
20    Oracle in or around March of 2001?
21      MS. KYROUZ:  Objection, vague.
22  A.  Nothing in particular.
23  Q.  It's, I guess, a series of e-mails, right?
24  A.  Uh-huh.
25  Q.  On which you were either -- well, on which you were

114

1    CCed or forwarded documents or e-mails from other
2    people within Oracle?
3  A.  Yes.
4  Q.  And the latest e-mail is March 20th, 2001, right?
5  A.  Yes.
6  Q.  And it's from Gayle to George Roberts, CCing you and
7    others, right?
8  A.  Yes.
9  Q.  What is a demo rating?
10      MS. KYROUZ:  Objection, lacks foundation.
11  A.  We had an application at the time where we could
12    basically record -- we were recording any demos that
13    we were going to be doing to prospective customers, so
14    we would register.  Register, I think, was the term we
15    used.  It would do two things.  It would alert the ADS
16    environment organization that we were going to be
17    demoing to a particular client so they knew kind of
18    how many demos were going on on any particular day.
19    Once the demo was done, there was a mechanism by which
20    we could rate the overall quality of the
21    demonstration, how the networks performed, how various
22    aspects performed, and then there was an overall
23    scoring system.
24  Q.  Who created the scoring system?
25  A.  I'm not too sure.  I believe ADS did.

115

1  Q.  And you said that there was a system in which the
2    demonstrations were registered prior to their actual
3    occurrence?
4  A.  Uh-huh.
5  Q.  Do you know what that system was called?
6  A.  I don't recall.
7  Q.  Okay.  Was that something -- a system you would just
8    log into?
9  A.  Yes, you would log in and record that you were going
10    to do this demo at XYZ prospect, you know, next
11    Thursday, Friday, for example; you were typically
12    going to show these products, use this particular
13    instance.
14  Q.  Okay.  And the information that George Roberts would
15    get regarding the demonstrations would typically come
16    from your organization, Gayle's organization, and
17    maybe ADS itself; is that fair?
18      MS. KYROUZ:  Objection, lacks foundation as
19    to what George Roberts knew.
20  A.  Sure, those were places he could have gotten that
21    information.
22  Q.  Right.  Because ADS was creating the demos, you guys
23    were doing the demos, right?
24  A.  Right.
25  Q.  I'm just going to ask you to go to the next page.  You

116

1    see the e-mail, I guess, a third of the way down.  It
2    looks like it's from Gayle Fitzpatrick to George
3    Roberts and Mary Anne Gillespie and Michael Cochran,
4    actually.  Correct?
5  A.  Yes.
6  Q.  If you look at the e-mail above that, it looks like
7    it's an e-mail from Michael Henley to George Roberts.
8    Embedded in that is an e-mail from George Roberts.
9    You can't tell who it's to, though, right?
10  A.  Uh-huh.
11  Q.  So looking at the end of the e-mail, it says Sandy and
12    Jay?
13  A.  Uh-huh.
14  Q.  Do you know who the Sandy and Jay may have been?
15  A.  I think it would have been Sandy Sanderson, who now I
16    remember ran OPI -- who he's the one who ran OPI, and
17    Jay Nussbaum, Oracle service industries, which ran
18    public sector.
19  Q.  So looking back at the page ending 091 -- it's the
20    second page there -- and that's an update to George
21    Roberts of the demos, right?
22      MS. KYROUZ:  Objection, lacks foundation.
23  A.  It looks like -- Gayle wrote it, but it looks like.
24  Q.  Well, that's what it says in the subject line, right,
25    for majors?

Hamel, Kenneth  5/22/2006  9:15:00 AM

117

1  A.  Majors demo update, yep.
2  Q.  Do you know what is referred to as a do-over as it
3      relates to demonstrations?
4         MS. KYROUZ:  Objection, lacks foundation.
5  A.  Yes, I would presume what Gayle meant by that was
6      something -- the customer wasn't satisfied with what
7      they saw for any number of reasons and, therefore,
8      wanted us to come back and show them again.
9  Q.  Did you in your organization experience instances
10     where a customer may not have been satisfied with what
11     they saw and wanted a consultant to come back and do
12     another demo?
13 A.  Sure.
14 Q.  Did they call it do-overs in your organization?
15 A.  I don't remember what we called it. I mean that would
16     be a scriptor we could have used.
17 Q.  And it appears as though Gayle is describing do-overs
18     and reasons for them at least in majors here, right?
19        MS. KYROUZ:  Objection, lacks foundation.
20 A.  Yeah, that's what it looks like, uh-huh.
21 Q.  Did you review this e-mail and the substance of
22     Gayle's e-mail when this was forwarded to you on March
23     20th of 2001?
24 A.  I don't recall.
25 Q.  Okay. Do you recall whether or not you responded to

118

1      this e-mail?
2  A.  I don't.
3  Q.  Do you know whether in March of 2001 you had provided
4      a similar update to, say, George Roberts and others?
5  A.  I don't recall.
6  Q.  All right. Well, looking down at page ending 090, the
7      first page, and the e-mail on the bottom of the page
8      where it says, "George Roberts wrote"?
9  A.  Yes.
10 Q.  Can you read that e-mail for me?
11 A.  "Here's the latest on ADS from major. While 11.5.5
12     looks more complete to the field, the field
13     performance does not appear to have improved. This
14     quarter we have to perform flawless to maximize our
15     revenues and margins. If this does not improve, it
16     will continue to impact our conversion rate."
17 Q.  Do you know what the impact of the demonstration
18     performance had on Oracle's conversion rate?
19        MS. KYROUZ:  Objection; lacks foundation,
20     misstates the document, vague, calls for speculation.
21 A.  Yeah, I'd be speculating. I mean there are several
22     customers -- the demonstration is one of several
23     activities that go on in a sales process.
24 Q.  Sure.
25 A.  So it depends on the deal. It depends on the

119

1      customer. It depends on the weight they put on it,
2      but it could have a significant impact on the deal
3      closure, and in some cases, it might not. How often
4      it does, it really varies.
5  Q.  As of March 20th of 2001, did you know what impact the
6      performance of demonstrations had -- had had on
7      Oracle's conversion rate in Q3 of '01?
8         MS. KYROUZ:  Objection; lacks foundation,
9      vague.
10 A.  I did not, nor would I know if anybody did. I think
11     this statement is pure conjecture.
12 Q.  By George?
13 A.  By George. He's a sales guy. Again, they're trying
14     to point to a discrete event. He's trying -- I mean
15     he might have had a bad quarter or something, and he's
16     trying to basically point to something that might have
17     been a contributing factor that's out of his control.
18 Q.  What do you mean "out of his control"?
19 A.  Well, he doesn't work in the demonstration
20     environment. Ron Wohl does, so, you know...
21 Q.  He controlled the sales reps, though, right?
22 A.  Sure, sure, but, again, go back to, like, a car
23     dealership to say, "Why didn't ye sell enough cars
24     this quarter?" "Well, it rained a lot. It's beyond
25     my control. It rained a lot. So, therefore, people

120

1      weren't inclined to come and look at cars and drive
2      them because it rained. When we had nice-weather
3      quarters, we tend to sell more." It's a sales manager
4      pointing to things that are out of their control.
5  Q.  But in your hypothetical, who controls the rain.
6      Here, Oracle is controlling the demonstrations, right?
7  A.  Right.
8  Q.  And it's Oracle's product?
9  A.  And it's Oracle's product.
10 Q.  And they're talking about, you know -- well,
11     withdrawn.
12        MR. WILLIAMS:  Maybe we should take a few
13     minutes and then decide how we want to handle lunch.
14        MS. KYROUZ:  Sure, let's go off the record.
15        THE VIDEO OPERATOR:  Going off the record.
16     12:35.
17        (Discussion off the record)
18        (Luncheon recess)
19        THE VIDEO OPERATOR:  Back on the record.
20     The time is 1:21.
21 Q.  Just going back to Hamel Number 10. It's the one you
22     have right in front of you. And on Page -- I guess
23     it's the second page, 091, referencing do-overs, do
24     you know whether these demonstrations were for deals
25     in the Q3 '01 pipeline?

Hamel, Kenneth  5/22/2006  9:15:00 AM

121

1              MS. KYROUZ:  Objection; vague, lacks
2       foundation.
3       A.  I have no idea.
4       Q.  And going to the very last page, 93 -- withdrawn.  Do
5          you know who Wendell William is?
6       A.  Wendell William.  I don't.
7       Q.  How about Roger Donaldson?
8       A.  Yes, he was someone in ADS.
9       Q.  Okay.  Dennis Jolluck?
10      A.  No.
11      Q.  Carl Griffin?
12      A.  Carl Griffin was head of presales in Canada.
13      Q.  Your peer in Canada?
14      A.  Yes.
15      Q.  Amanda Nicol?
16      A.  No.
17      Q.  Balu Ramasamy?
18      A.  No.
19      Q.  How about Juliette Sultan?
20      A.  Juliette Sultan?
21      Q.  Juliette Sultan.
22      A.  Oh, yes, she was in development.  She works somewhere
23          within Ron Wohl's organization.
24      Q.  Okay.
25      A.  Actually, she worked for Mark Barrenechea.

122

1       Q.  Mark Barrenechea?
2       A.  Yes.
3       Q.  How about Tom Victory?
4       A.  I remember the name.  I don't remember who he was.
5       Q.  Varsha Rai?
6       A.  No.
7       Q.  How about Sherry Karamdashti?
8       A.  No.
9       Q.  Carl Gagnon?
10      A.  No.
11             MR. WILLIAMS:  Well, I'm just going to ask
12          the reporter to mark this document as Hamel Number 11.
13             (Copy of E-mail String was marked Exhibit
14          Number 11 for identification.)
15             MR. WILLIAMS:  Hamel Number 11 is
16          Bates-numbered NDCA-ORCL 618448449.
17      Q.  Okay.
18      Q.  Have you seen Hamel Number 11 before today?
19      A.  I have not.
20      Q.  It's an e-mail from Roger Donaldson to Gayle
21          Fitzpatrick, you, and others, right?
22      A.  Yes.
23      Q.  In March 2001, right?
24      A.  Yes.
25      Q.  And it's concerning demo performance, right?

123

1       A.  Yes.
2       Q.  Do you know -- well, withdrawn.  Do you see where, I
3          guess -- the second paragraph where Roger Donaldson
4          writes, "Below are excerpts of demo memos 91, 92, and
5          93"?
6       A.  I presume that referred to, you know, ADS would
7          communicate to us on a periodic basis about what they
8          were doing and providing to us in the field.
9       Q.  Regarding the demos?
10      A.  Yes, regarding demo.
11      Q.  Do you know that?  Were there these demo memos?
12      Q.  Did I know that there were these demo memos?
13      Q.  Yeah.
14      A.  I seem to recall there were.
15      Q.  What are they?  Are they, like, instructions?
16      A.  They're basically -- I can't remember the frequency
17          they were sent.  I want to say weekly, but I'm not
18          sure of that.  They basically said, "Here's some new
19          stuff coming on line.  Here's some problems we
20          encountered on line.  Here's some issues around
21          proxies and how to address it.  They were kind of tips
22          and tricks to make the demo perform as effective as
23          possible.
24             MR. WILLIAMS:  I'm going to ask the
25          reporter to mark this document as Hamel Number 12.

124

1              (Copy of E-mail String was marked Exhibit
2          Number 12 for identification.)
3              MR. WILLIAMS:  Hamel Number 12 is
4          Bates-numbered NDCA-ORCL 063462 through 464.
5       Q.  Before I ask you about Hamel Number 11 (sic), do you
6          know of demo feedback database?
7       A.  So this is the same thing.  Remember, I talked about
8          registering demos --
9       Q.  Oh, okay.
10      A.  -- and after the demo is done, you can add feedback;
11          you can rate how the demo went.  That's the demo
12          feedback database.
13      Q.  Okay.  So the sales consultants or the consultants in
14          the field would input information about how the
15          demonstrations were performing?
16      A.  Sales consultants.
17      Q.  Sales consultants, I'm sorry.
18      A.  And anything sent below a certain rating would get
19          flagged and sent to ADS about, "Here's some issues."
20      Q.  I see.  Do you recognize Hamel Number 12?
21      A.  I don't.
22      Q.  It's a series of e-mails in March of 2001 in which you
23          were either a recipient or sender; is that fair?
24      A.  Yes.
25      Q.  And the subject matter is ADS demo stats for Q3 in

Hamel, Kenneth   5/22/2006  9:15:00 AM

125

1  general business, right?
2  A. Yes.
3  Q. The organization you had responsibility over
4     demonstrations in, right?
5  A. Yes.
6  Q. So looking at the bottom half of the first page ending
7     in 62, that's an e-mail from you to George Roberts and
8     John Nugent, right?
9  A. Yeah.
10 Q. Can you describe for me what the information that
11    you're transmitting is or summarize it for me?
12 A. Yeah. So we're trying to send -- so I was trying to
13    talk about demos that we were doing for the various
14    products. There was a Version 11.o and there was an
15    11i, essentially talking about the number of demos we
16    did in any given month, what was the summary of
17    performance rating, so how did SC's rate on average
18    those demos, and specifically, we were having -- from
19    what I recall in this, we were having a lot of issues
20    around performance. This gets back to the networking
21    issues in the office and those kinds of things. You
22    know, we were having some significant performance
23    issues, so we called out that in the second column
24    here specifically to show that we were having some
25    challenges there. So --

126

1  Q. So -- I'm sorry.
2  A. And then we were talking about the overall average
3     demo rating.
4  Q. So you were providing John and George with a
5     comparison of 11i with prior experience with 11.o?
6        MS. KYROUZ: Objection, misstates
7     testimony.
8  A. Yes, it wasn't so much a comparison. A lot of demos
9     we were doing, here's how we characterize them. So
10    here's the ones that were related to 11.o, which we
11    were phasing out. Here's all the demos we were doing
12    related to 11.i. Whether they chose to compare the
13    two, I don't know.
14 Q. And you communicate that there are confidence problems
15    with the 11i environment?
16 A. Yes.
17 Q. And this is --
18 A. The 11i demo environment. When I say environment, I
19    mean 11i demonstration environment.
20 Q. Because that's what you had responsibility over, the
21    demo?
22 A. Right.
23 Q. But that's not what you wrote here?
24 A. Sure, it is.
25 Q. Is it?

127

1  A. "As you see, we have some significant confidence
2     problems with the 11i environment." That would imply
3     11i demonstration environment.
4  Q. Understood. Can you read the next sentence for me?
5  A. "As I mentioned yesterday, we are working on a more
6     comprehensive sales impact report that will look at
7     the details and provide more insight into our demo
8     activities. I will have that on Monday."
9  Q. And what comprehensive sales impact report are you
10    referring to there?
11 A. I don't recall exactly. I would have thought it was
12    something similar to what we did early on here in --
13    like, you know, Exhibit 4.
14 Q. 4?
15 A. It isn't 4 specifically because that predates this,
16    but it was probably something of that orientation.
17 Q. Would you say -- and so when you say 4, you're looking
18    at Bates Number 617112?
19 A. Yes.
20 Q. Is that a -- would you characterize that as a
21    comprehensive sales impact report, Number 4?
22 A. I mean that's kind -- yeah. It's not a formalized
23    document or formalized process.
24 Q. I see.
25 A. Again, this is conjecture on my part. As I'm reading

128

1     this, what I was trying to pull together was probably
2     similar in form --
3  Q. Same type of information?
4  A. Yeah, yeah, same type of thing, so what's the
5     impact --
6  Q. On sales?
7  A. -- of some of these continual challenges we're having
8     against some of the key accounts we're working on.
9  Q. All right. Was that something that you personally
10    would have been working on or people in your
11    organization would have worked on and given to you?
12 A. Yes, probably the latter.
13 Q. And then you were -- you said you wrote to George and
14    John, "I will have that on Monday"?
15 A. Yes.
16 Q. Do you recall whether you actually gave them such a
17    report?
18 A. I have no idea.
19 Q. If you did, would that --
20 A. I mean if I said that to George, I probably followed
21    through, since he is my boss' boss.
22 Q. I understand. So is that something you would likely
23    have had on your computer?
24        MS. KYROUZ: Objection; calls for
25    speculation, vague.

Hamel, Kenneth   5/22/2006   9:15:00 AM

129

1  A.  I mean if I wrote it, it's in the e-mail -- it's in my
2     e-mail system somewhere, sure.
3  Q.  Okay.  Going back to the first page where George
4     Roberts forwards your e-mail to him to several
5     individuals?
6  A.  Yep.
7  Q.  Including Larry Ellison, right?
8  A.  Yes.
9  Q.  Safra Catz, right?
10 A.  Yes.
11 Q.  And Mark Barrenechea, right?
12 A.  Yes.
13 Q.  Sandy Sanderson, right?
14 A.  Uh-huh.
15 Q.  Jay Nussbaum and Jeff Henley?
16 A.  Yes.
17 Q.  And those individuals were the most senior officers at
18    Oracle as far as you know, right?
19        MS. KYROUZ:  Objection; calls for
20    generalization.
21 A.  I don't know if they were the most senior officers.
22    Most senior executives.
23 Q.  Most senior executives at Oracle?
24 A.  Right.
25 Q.  And he CCs -- withdrawn.  And he sends it to you too,

130

1     the forward, right?
2  A.  Uh-huh.
3  Q.  And he writes, "Look, it looks like general business
4     is experiencing the same challenges as majors," right?
5  A.  Yes.
6  Q.  And you recall earlier today, I asked you if you had
7     communicated with Gayle Fitzpatrick and talked about
8     the things that you were experiencing in general
9     business, and I asked you whether or not they were
10    similar, right?
11 A.  Yes, you did.
12 Q.  Does this refresh your recollection as to whether or
13    not the experiences in majors as it relates to
14    demonstrations was similar to the experiences that
15    were occurring in general business with respect to
16    majors -- with respect to demonstrations?
17        MS. KYROUZ:  Objection; vague, lacks
18    foundation, calls for speculation.
19 A.  Yes.  I mean this document in itself doesn't suggest
20    that.  This is George's interpretation of what he read
21    from I would assume Gayle and now what he's reading
22    from me.  Gayle and I would have talked about any
23    given number of similar experiences we were having,
24    whether they be demonstration issues, hiring issues.
25 Q.  Sure.

131

1  A.  We were colleagues.
2  Q.  Well, I was just asking if it refreshed your
3     recollection.  Maybe it doesn't.
4  A.  It doesn't.
5        MR. WILLIAMS:  I'll ask the reporter to
6     mark this document as Hamel Number 13.
7        (Copy of E-mail String was marked Exhibit
8     Number 13 for identification.)
9        MR. WILLIAMS:  Hamel 13 is Bates-numbered
10    NDCA-ORCL 618458 through 461.
11 Q.  Just let me know when you've had a chance to take a
12    look at it.
13 A.  Okay.
14 Q.  Okay.  Exhibit Number 13 is -- well, withdrawn.  Do
15    you recognize Exhibit 13 as something you've seen
16    before today?
17 A.  I don't.  I don't.
18 Q.  It's an e-mail -- well, withdrawn.  Who's BeLynda
19    Smith?
20 A.  BeLynda was a sales consulting manager in my
21    organization who reported to Steve Vakulskas, who
22    reported to me.
23 Q.  Okay.  And Exhibit Number 13 is an e-mail from
24    BeLynda -- well, a series of e-mails including an
25    e-mail from BeLynda to you and others, right?

132

1  A.  Yes.
2  Q.  In March 2001?
3  A.  Yes.
4  Q.  Forwarding e-mails from several people, including you,
5     John Nugent, and other executives of Oracle, right?
6  A.  Right.
7  Q.  Who is Chuck Rozwat?
8  A.  Chuck Rozwat was Ron Wohl's counterpart heading
9     database development.
10 Q.  Okay.  And BeLynda, at least on March 23rd, was
11    communicating to you that there were no real
12    improvements in the ADS demos, right?
13 A.  Right.
14 Q.  And sometime prior to that -- looks like may have even
15    been on the same day -- Ron Wohl appears to have
16    written to several executives at Oracle that the
17    combined development network and demo teams have been
18    working nonstop this week to diagnose performance
19    problems that we continue to have on the 11i.3 demo
20    environment.  Do you see that?
21 A.  Yes.
22 Q.  And you understood as of March 31, 2001, there were
23    still performance issues with the 11i.3 demo
24    environment?
25        MS. KYROUZ:  Objection; lacks foundation,

133

1   calls for speculation, and gets the date of the
2   document wrong.
3           MR. WILLIAMS: I'm sorry. What was the
4   last thing?
5           MS. KYROUZ: Gets the date of the document
6   wrong. I think you said March 30th.
7           MR. WILLIAMS: Yes, I meant to say March
8   23rd, 2001.
9   A.  As I read it, this is about -- we're continuing to
10  figure out -- we're trying to figure out is it
11  product specific within the demo environment or is it
12  actually the Oracle network --
13  Q.  Right.
14  A.  -- and the configuration in the building -- buildings,
15  wherever they were, and one of the implications is
16  he's telling us that in Minneapolis, for example, they
17  did something physically to the office; and BeLynda
18  was off testing it because she was based in
19  Minneapolis.
20  Q.  Right. And BeLynda wrote to you that -- well, she
21  writes, "Here's what we're doing in the Minneapolis
22  office to test the changes mentioned in the e-mail
23  below," right?
24  A.  Correct.
25  Q.  And then she says, "The results of those tests are no

134

1   real improvement in ADS demos"?
2           MS. KYROUZ: Objection; misstates the
3   document, lacks foundation.
4   Q.  Isn't that true?
5   A.  She's saying there's no real improvement, right, with
6   the application, within the demo environment.
7           MR. WILLIAMS: I'll ask the reporter to
8   mark this document as Hamel Number 14.
9           (Copy of E-mail from Ms. Fitzpatrick, dated
10          April 10, 2001 was marked Exhibit Number 14
11          for identification.)
12          MR. WILLIAMS: Hamel Number 14 is
13  Bates-numbered NDCA-ORCL 618641.
14  Q.  Ask you to just take a look at that and let me know
15  when you're done.
16  A.  Okay.
17  Q.  Do you recognize Hamel Number 14 as a document that
18  you've seen prior to today?
19  A.  I don't.
20  Q.  But it's an e-mail from Gayle Fitzpatrick to you among
21  other people, correct?
22  A.  Yes.
23  Q.  On April 10th of 2001?
24  A.  Yes.
25  Q.  And what is the subject matter of the e-mail; do you

135

1   know?
2   A.  ERP/CRM Demo Integration Feedback.
3   Q.  Can you read the body of the e-mail for me?
4   A.  "As a follow-up from our discussion on last Friday's
5   conference call, I will be compiling a list of product
6   integration gaps between ERP and CRM in the current
7   demo environment. Please poll your SC's and provide
8   any specific feedback to me by Friday morning so we
9   can discuss it on our next call."
10  Q.  As of April 10th, 2001, the demo environment was
11  11i.3, right?
12          MS. KYROUZ: Objection; lacks foundation.
13  A.  I don't know that specifically.
14  Q.  Well, why don't we go back to Hamel Number 13 and look
15  at 618459, which is the second page? And that's Ron
16  Wohl's e-mail to Larry Ellison, George Roberts, Sandy
17  Sanderson, Jeff Henley, Jay Nussbaum, Charles Rozwat,
18  looks like maybe Sergio Giacoletto, Derek Williams,
19  and Mark Barrenechea, right?
20  A.  Yep.
21  Q.  And there, he writes, "The combined network and demo
22  teams have been working nonstop this week to diagnose
23  the performance problems that we continue to have on
24  the 11i.3 demo environments," right?
25  A.  Yes.

136

1   Q.  Does that suggest then that on April 10th the current
2   demo environment referred to in Hamel Number 14 is
3   11i.3?
4           MS. KYROUZ: Objection; lacks foundation,
5   asked and answered.
6   A.  I don't know the answer to that because I don't
7   remember if the entire environment was on 11.5.3 --
8   11i.3 or 11.5.3. It's possible that some of the
9   servers were on. If you look at this, she talks about
10  a specific instance, and back then, I remember there
11  was still instances still not quite on 11i.3.
12  Q.  So there was a period they were upgrading the
13  environments from .2 to .3?
14  A.  Yes. I think it went from .1 to .3. I think they
15  skipped .2, if I recall.
16  Q.  And as of April 10th, you're just not sure whether or
17  not the environments discussed here were 11i.3?
18  A.  I don't.
19  Q.  Okay. Do you know if you ever received a list of
20  product integration gaps between ERP and CRM from
21  Gayle Fitzpatrick?
22          MS. KYROUZ: Objection, vague.
23  A.  I don't recall.
24          MR. WILLIAMS: I'm going to ask the
25  reporter to mark this document as Hamel Number 15.

137

```
1              (Copy of E-mail String was marked Exhibit
2              Number 15 for identification.)
3              MR. WILLIAMS:  And Hamel Number 15 is
4      Bates-numbered NDCA-ORCL 061370 through 373.
5   A.  Okay.
6   Q.  Do you recognize Hamel Number 15 as a document that
7      you've seen prior to today?
8   A.  I don't.
9   Q.  And it's a series of e-mails on which you were either
10     copied or you wrote.
11  A.  Okay.  Yep.
12  Q.  Is that fair?  And they're in April of 2001?
13  A.  Yes.
14  Q.  Now, if you look at the first page, about a third of
15     the way down the page, you see where it says, "Ken
16     Hamel wrote"?
17  A.  Yes.
18  Q.  Are you able to identify on what day you wrote that
19     e-mail by looking at this e-mail?
20  A.  I am not -- it's going -- I'm going to presume it's
21     after, obviously, the 13th of April.
22  Q.  But -- and are you able to see from this document who
23     you sent the e-mail to?
24  A.  No.
25  Q.  But George Roberts, looks like he responded to your
```

138

```
1      e-mail, right, on the 19th --
2   A.  Yes.
3   Q.  -- of April, 2001?
4   A.  Yes.
5   Q.  It also looks like he sent it to Larry Ellison as
6      well, right?
7   A.  Yes.
8   Q.  And several other people, right?
9   A.  Uh-huh.
10  Q.  Can you -- now, are you able to tell whether --
11     withdrawn.  It looks like George Roberts sends the
12     e-mail to you, but the message is to Larry, right?
13  A.  Yeah, he probably hit reply.  I mean that's the
14     mechanics of e-mail to do that.
15  Q.  So can you read his message to you and all of these
16     other people?
17  A.  "Larry, the scores for the GB demos for last week,
18     they are not heading in the right direction yet.
19     Performance and product issues continue to hinder us
20     every day."
21  Q.  Okay.  So -- and he's forwarding your e-mail to him,
22     right?
23  A.  Yes.
24  Q.  And I guess -- and for the week ending April 13th, you
25     had put together a summary of ADS scores?
```

139

```
1   A.  Yes.
2   Q.  And that's derived from what?
3   A.  That comes from this demo registration system, and it
4      would have been for the -- it looks like it would have
5      been for the demos that were performed that week.
6   Q.  By people only in general business, though, right?
7   A.  Yes.
8   Q.  Can you -- and can you -- well, withdrawn.  In the
9      e-mail that you sent, about, you know, half the way
10     down the page, do you see where it says, "The
11     scoring"?
12  A.  Yes.
13  Q.  And can you read what you wrote there to George
14     Roberts?
15  A.  "The scoring on the overall and performance front are
16     going in the wrong direction.  Judging by the comments
17     seen below, it feels like we're also running into
18     selected product issues as well."
19  Q.  And then you wrote, "Below is an excerpt of comments
20     in the feedback forms," right?
21  A.  Yes.
22  Q.  And the feedback forms are the -- are from the system
23     that you've described to me most recently, right?
24  A.  Yes.
25  Q.  And who had access to or had the ability to put
```

140

```
1      feedback into the system?
2   A.  Any of my sales consultants.
3   Q.  Okay.  Was it a companywide system or was it just
4      something that general business sales consultants had
5      access to or major sales consultants had access to?
6   A.  It was just something that sales consultants had
7      access to, if I recall.
8   Q.  And so what's written below -- I guess where you
9      write, "Below is an excerpt of comments," those aren't
10     your comments, right?
11  A.  No, they're not.
12  Q.  But you just pulled them out of the system?
13  A.  Yeah.
14  Q.  And the comments are from the consultants in the field
15     actually doing the demos, right?
16  A.  The sales consultants, yep.
17  Q.  Do you recall being -- withdrawn.  I'm going to ask
18     you to turn your attention to the third page, which is
19     Bates ending 372.
20  A.  Uh-huh.
21  Q.  About -- like the fourth entry there, where it says,
22     "There seems to be," can you read that for me?
23  A.  "There seems to be more bugs in 11i.5.3 than 11.5.1.
24     Defaulting rules, and lines disappearing in Order
25     Management.  We spent an immense amount of time just
```

Hamel, Kenneth   5/22/2006   9:15:00 AM

141

1    trying to force the system to do things that should be
2    routine."
3    Q.  Now, earlier in the message to George, you said that
4        it seems like -- or you wrote, "It feels like we're
5        also running into selected product issues well."
6        Among -- the section you just read about the 11.5.3
7        bugs, would you consider that a product issue?
8        MS. KYROUZ:  Objection; vague, lacks
9        foundation.
10   A.  Say that again.  Can you ask --
11   Q.  Let me ask the question again.  Okay?  You wrote to
12       George that you felt like -- I guess your organization
13       was running into selected product issues, right?
14   A.  Okay.
15   Q.  Would you consider the comment that you just read to
16       me that there seemed to be more bugs in 11.5.3 than
17       there were in 11.5.1 a description of product issues
18       that the sales consultants were running into?
19       MS. KYROUZ:  Same objections.
20   A.  Within the context of the demo environment.
21   Q.  Okay.
22   A.  So there could have been -- again, it could have
23       been -- see, they were talking about the faulting or
24       there could have been consideration things they didn't
25       do properly that would cause the product not to work

142

1    properly within the demo environment.
2    Q.  I understand that.  So within the demo environment,
3        describe for me the difference between product issues
4        and other issues.
5        MS. KYROUZ:  Objection; vague, lacks
6        foundation.
7    A.  It's hard to determine.  You know, I mean it's
8        virtually -- I mean it's virtually impossible to
9        determine if they're product issues or if they're demo
10       configuration issues.  So an order entry screen
11       doesn't come up properly or doesn't process properly,
12       is that the product issue or is it the way they
13       configured the environment, is it a network -- there's
14       no way -- if any of us are -- for me -- for me or
15       anyone else in here to say these are product issues, I
16       just wouldn't put much merit in it because, you know
17       what I mean, we don't know.
18   Q.  I'm just asking you about what you wrote to see if I
19       can drill down what you meant when you said, "It feels
20       like we're also running into product issues as well."
21   A.  Right, it's --
22       MS. KYROUZ:  Is that a question?
23       MR. WILLIAMS:  Yes, it's a question.
24       MS. KYROUZ:  Objection.  Asked and
25       answered.

143

1    A.  I mean it's purely my opinion.
2    Q.  Okay.
3    A.  And I don't have any -- yeah, it's purely my opinion,
4        and I don't have the technical expertise to be
5        accurate about it.
6        MR. WILLIAMS:  Okay.  I'm going to ask the
7        reporter to mark this document as Hamel Number 16.
8        (Copy of E-mail String was marked Exhibit
9        Number 16 for identification.)
10       MR. WILLIAMS:  Hamel Number 16 is
11       Bates-numbered NDCA-ORCL 619327 through 329.
12   Q.  Have you had an opportunity to take a look at that?
13   A.  I have, yes.
14   Q.  Do you recognize Hamel Number 16 as a document that
15       you've seen prior to today?
16   A.  Yes.
17   Q.  And when is the last time you saw it?
18   A.  Last night.
19   Q.  Okay.  When you reviewed it last night, did it help
20       refresh your recollection regarding demonstration
21       performance of 11i in 2001?
22   A.  Specific to this issue, yes.
23   Q.  Tell me what it helped you recall.
24   A.  At the time, there were two browsers that you could
25       use to run on your PC or your laptop to demonstrate or

144

1    to use our applications.  One was Netscape Navigator,
2    and the other one was Internet Explorer.  This was
3    about the time they were thinking of desupporting
4    Netscape, and up to this point, we had done most of
5    our demonstrating using Netscape because it seemed to
6    perform the best.
7    Q.  And what happened?
8    A.  Well, as you see here, we pushed back and said you've
9        got to keep Netscape, continue to support Netscape.
10       This predates, you know, the whole Microsoft, you
11       know, all those issues that sort of came up with
12       Microsoft, and there was a strong push to move -- to
13       convert as many -- there was a push in the industry to
14       move to Internet Explorer as a browser of choice.
15   Q.  But this document is an e-mail from Gayle Fitzpatrick,
16       at least one of them -- one of the e-mail in this
17       document is an April 26th e-mail from Gayle
18       Fitzpatrick to you, right?
19   A.  Yes.
20   Q.  And another part of it is an e-mail from you to Ron
21       Wohl, Roger Donaldson, John Asheim, and Russ Pike,
22       right?
23   A.  Uh-huh.
24   Q.  And CCing your boss, John Nugent, right?
25   A.  Correct.

145

1   Q.  And that was also April 26th, 2001?

2   A.  Uh-huh.

3   Q.  In the subject line where it says problems with IE,

4      does IE refer to Internet Explorer?

5   A.  It does.

6   Q.  And what does J-initiator refer to?

7   A.  I'm not entirely sure.  I seem to recall J-initiator

8      was sort of like an applet, where we talked about this

9      ability to load software on demand, and I think the

10     J-initiator was that piece of software, but I'm not

11     entirely certain.

12   Q.  Your April 26th e-mail to Ron Wohl and others

13     beginning with, "I polled SC's."  Do you see that?

14   A.  Yes.

15   Q.  Can you read that for me?

16   A.  "I polled SC's around the US and got some of the

17     following responses.  Candidly, it sounds like our

18     problem, after the weekend upgrade, got worse.

19     Minimally, we need to stop the de-support plan for

20     Netscape and secondly, we may want to re-think the

21     current recommendation around IE and Ji.  We need an

22     immediate decision and plan as we're putting several

23     key deals at risk."

24   Q.  Okay.  When you say you polled SC's around the U.S.,

25     you're referring to only those in general business; is

146

1     that fair?

2   A.  Yes.

3   Q.  And how did you poll them?  Was it by e-mail or did

4     you pick up the phone and call sales consultants

5     around the country?

6   A.  I don't recall.

7   Q.  And when you write, "Candidly, it sounds like our

8     problem after the weekend upgrade got worse," what do

9     you mean?

10   A.  Well, apparently we were having problems with Internet

11     Explorer -- I mean this is conjecture on my part.  I

12     don't remember what our problem was, but it looks like

13     based on reading the rest of it that we were trying to

14     move people to Internet Explorer and we were

15     encountering problems in doing so.

16   Q.  In doing demonstrations using Internet Explorer,

17     right?

18   A.  Yes.

19   Q.  And it was your opinion at the time that the company,

20     meaning Oracle, needed an immediate decision and plan

21     as, as you know, we're putting several key deals at

22     risk?

23   A.  What I was saying here is -- yes, so I was saying that

24     we need to rethink migrating people into this other

25     browser environment because the Netscape environment

147

1     seems to work fine.

2   Q.  Right.  How would a decision on this issue or --

3     withdrawn.  Why did you feel that until there was a

4     decision on this issue that key deals would be at

5     risk?

6   A.  I don't think I believed that at all.  I mean I think

7     I write things like this for effect.  To say that

8     something is not going to -- is going to put an entire

9     opportunity at risk because it doesn't support one

10     browser or the other when both of these browsers were

11     completely available as shareware out there, you

12     know -- I probably said something like this for

13     effect.

14   Q.  Okay.  But as of April 26th, 2001, Netscape worked

15     better for demonstrations than Internet Explorer?

16   A.  From what I recall for demos, yes.

17   Q.  Right.  And prior to April 26th, there were, in fact,

18     lost deals due to problems with demonstrations, right?

19        MS. KYROUZ:  Objection; lacks foundation,

20     vague, calls for speculation.

21   A.  I don't think that's -- I don't know if that's

22     accurate.

23   Q.  Even though you wrote that earlier, you don't know if

24     that's accurate?

25        MS. KYROUZ:  Objection, mischaracterizes

148

1     the document.

2        MR. WILLIAMS:  Let me finish my question.

3        MS. KYROUZ:  Well, he was going to answer.

4        MR. WILLIAMS:  Let me finish my question.

5     You'll be able to get your objection on the record.

6   Q.  I'm saying even though you wrote to several

7     individuals, including, you know, your boss, that

8     certain deals had been lost due to problems with

9     demonstrations, you don't know if that's actually

10     accurate?

11        MS. KYROUZ:  Objection; mischaracterizes

12     the proper document, vague as to lost deals, calls for

13     speculation.

14   A.  First of all, I don't know what lost deals mean,

15     right.  That's the first question.  What do you mean

16     by lost deals?

17   Q.  I only -- I'm only referring to what you've written.

18     I don't know what your experience was, so we can go

19     back and find where you wrote it, if you'd like to do

20     that.

21   A.  Like --

22        MS. KYROUZ:  I'm sorry.  Before you answer,

23     object to the characterization of lost deals as a term

24     in the document.

25   A.  So there's any given number of reasons we might not

Hamel, Kenneth  5/22/2006  9:15:00 AM

149

1  close business with a customer we're working with,
2  right?  One of them could be a customer was just
3  kicking tires and never had any intention of buying
4  anything.  Secondly, they made another decision for a
5  competitor, and they just pointed to whatever event
6  they wanted to to say this is why we chose someone
7  over someone else.  And thirdly, they might have made
8  no decision at all.  I mean there's any given number
9  of reasons.
10        It's hard for me to -- again, we were
11  basically -- we were saying we lost deals because of
12  demos.  We were trying to illustrate a point that we
13  felt that we were putting -- we felt that we were --
14  me, not necessarily ACR, but me felt we were putting
15  things at risk.  So the sales cycle was going along.
16  The customer likes it, and all of a sudden, we're
17  having problems in the demos -- we're trying to keep
18  things on an even keel to advance the customers'
19  interest forward.  Our belief was when we had demo
20  problems, certain customers would have reacted more
21  negatively than others.
22  Q.  I understand.
23        MR. WILLIAMS:  I'm sorry.  He's got to
24  change the tape.  So we can take five minutes.
25        THE VIDEO OPERATOR:  This marks the end of

150

1  Tape Number 2.  Going off the record.  2:14.
2        (Recess)
3        THE VIDEO OPERATOR:  This marks the
4  beginning of Tape Number 3.  We're back on the record.
5  2:21.
6  Q.  Still on -- actually, let me just have you take a look
7  at Exhibit 9 really quickly.  And that's the e-mail --
8  at least on the bottom, that's the one from Meghan to
9  you and David Handy, right?
10  A.  Yes.
11  Q.  And Meghan writes to you, "Another deal lost primarily
12  due to demo system performance."  That's what she
13  writes on the first sentence?
14  A.  Yes.
15  Q.  And then you forward that e-mail to Ron Wohl titled
16  "Poor demo system performance cost us another deal,"
17  right?
18  A.  Right.
19  Q.  And in the body of the e-mail, you wrote, "Ron, here's
20  a specific situation where the performance issues are
21  costing us business," right?
22  A.  Right.
23  Q.  That's it.  Looking at 16 again, going to Page 2 at
24  619328, you see how each comment here is followed by a
25  name or a lot of them are followed by names?

151

1  A.  Yes.
2  Q.  Does that indicate the person who input the comment
3  into the system?
4        MS. KYROUZ:  Objection, lacks foundation.
5  Q.  Into the feedback system?
6  A.  I'm not sure they entered this -- I'm not sure they
7  entered this into the feedback system.  This may have
8  been something that I reached out to them and asked
9  them for commentary on specifically issues around --
10  Q.  I see, I see.
11  A.  -- the browsers.
12  Q.  I see.  Because it looks like for some of these, you
13  actually quoted them, right?  Like if you look in the
14  middle of the page where you write or -- at least you
15  attributed comment to Melissa Christman in Houston
16  beginning with, quote, "Yesterday, during the Media
17  Copy demo"?
18  A.  Yes, right.
19  Q.  Others don't appear to be quotes, right?
20  A.  Yeah, I don't know why that would be.  It may be my
21  bad editing.
22  Q.  Who was your assistant in 2000-2001?
23  A.  I believe it was Darlene DiCrescentis, I believe.
24  Q.  DiCrescentis.  Did you at any time have another
25  assistant?

152

1  A.  I did.  And you're going to ask me her name, and I'm
2  not going to remember what it is.  She wasn't that
3  good.
4  Q.  Did it start with a V?
5  A.  A V?
6  Q.  Yes.
7  A.  No.  No, I can't remember.  There was a period that
8  Darlene had left, and it was right around the -- she
9  went and joined a dot com like everybody else did.  It
10  was right around this period, so it might have been
11  this other assistant.
12        MR. WILLIAMS:  I'm going to ask the
13  reporter to mark this document as Hamel Number 17.
14        (Copy of E-mail String was marked Exhibit
15  Number 17 for identification.)
16        MR. WILLIAMS:  Hamel Number 17 is
17  Bates-numbered NDCA-ORCL 619324 through 325.
18  A.  Okay.
19  Q.  Do you recognize Hamel Number 17 as a document you've
20  seen prior to today?
21  A.  I don't.
22  Q.  Okay.  It appears to be an e-mail from Juliette Sultan
23  to Mark Barrenechea, CCing you and several other
24  people, right?
25  A.  Yes.

Hamel, Kenneth   5/22/2006  9:15:00 AM

153

1   Q.   Still talking about ADS demos, right?
2   A.   Yes.
3   Q.   April 26th, 2001, right?
4   A.   Yes.
5   Q.   Were there weekly calls among executives concerning
6        the demos in the spring of 2001?
7   A.   Eventually, but I don't know when they started.
8   Q.   Were there daily calls?
9   A.   There were for -- like this talks about, there were
10       for CRM at one point, and then, eventually, there are
11       for a demo system in general that actually Larry
12       drove.
13  Q.   And what do you mean demos in general that Larry
14       drove?
15  A.   Well, there was a daily one here, as this talks about,
16       for CRM specific because Barrenechea wanted to
17       understand what were issues that were specific to CRM,
18       and then there were weekly calls.  I forget when they
19       started, but it was right around this time they
20       started where all these documents beforehand, Larry
21       was copied on, I think it got to the point where, "All
22       right.  I'm jumping in myself.  I'm going to figure
23       out what the issue is here."  We used to have a Friday
24       call with Ron Wohl, Larry Ellison, myself, Gayle,
25       representatives from, like, OSI and OPI.

154

1   Q.   The CRM calls that you're referring to, people from --
2        at least sales consultants and general business
3        participated in those calls?
4   A.   No, just management, just management.
5   Q.   How about the daily calls with respect to -- well, you
6        indicated they were CRM?
7   A.   Yes, these daily calls this talks about were CRM.
8   Q.   Well, Exhibit Number 17, how can you tell that this is
9        a CRM -- that it's related to CRM calls?
10  A.   Because Juliette works for Mark Barrenechea, and
11       Barrenechea managed CRM development.
12  Q.   Do you see in the body of the top e-mail written by
13       Juliette Sultan, she writes, "We'll hold a daily call
14       at 12 Pacific Standard Time starting tomorrow"?
15  A.   Yes.
16  Q.   "Tom Victory will shortly send the dial information to
17       the following sales point of contacts," and in general
18       business, she cites Eric Schoville, Bob Crochetiere,
19       and Michele Carnisa.  Do you know any of those people?
20  A.   I know Eric Schoville and Crochetiere.  I don't
21       remember who Michele Carnisa was.
22  Q.   Were either of those people in your organization?
23  A.   Yes, Bob Crochetiere reported to me, and Eric
24       Schoville was in my organization, yes.
25  Q.   So these daily calls, as far as you know, even if they

155

1        included people from your organization, they were
2        specifically centered on CRM?
3   A.   Yes, because our CRM application was relatively new,
4        so there were discussions about how that was going in
5        general.
6   Q.   Got it.  Were you familiar with the joint CRM ERP
7        sales calls or -- not sales calls, I guess calls --
8   A.   They were demo review calls.
9   Q.   They were what?  I'm sorry?
10  A.   Demo review calls.
11  Q.   Demo review calls.  And how often were they held?
12  A.   They were infrequent for a while.  Then they became --
13       then they got disciplined, and then they were more --
14       like it talks about here, Ron talks they became daily.
15       We talked about problematic demos, demos that got a
16       score of 8 or less from the prior day.
17  Q.   And you participated in those calls?
18  A.   Most of them, yes, when I could.
19  Q.   And who's John Holte?  Do you know?
20  A.   I don't.  I know the name.  I just can't place who he
21       is.  He must -- he's somewhere in Mark Barrenechea's
22       organization.
23           MR. WILLIAMS:  I'll ask the reporter to
24       mark this document as Hamel Number 18.
25           (Copy of E-mail to Mr. Wohl from

156

1        Ms. Fitzpatrick, dated April 27, 2001 was
2        marked Exhibit Number 18 for
3        identification.)
4           MR. WILLIAMS:  Hamel Number 18 is
5        Bates-numbered NDCA-ORCL 619331 through 619333.
6   Q.   Let me know when you've had an opportunity to take a
7        look at Hamel 18.
8   A.   Okay.
9   Q.   Do you recognize Hamel 18 as a document that you'd
10       seen prior to today?
11  A.   No.
12  Q.   And it's an e-mail from Gayle Fitzpatrick to Ron Wohl,
13       CCed to you and others, right?
14  A.   Yes.
15  Q.   April 27th, 2001, right?
16  A.   Yep.
17  Q.   Do you know who Carl Everhart is?
18  A.   I know the name.  I don't remember who he is.
19  Q.   And the topic or subject matter of this e-mail relates
20       to the J-initiator and Internet Explorer issue that we
21       had talked about moments ago, right?
22  A.   Yes.
23  Q.   It seems as though Gayle did something similar to what
24       you did --
25  A.   Yes.

Hamel, Kenneth   5/22/2006   9:15:00 AM

157

1  Q.  -- as putting together feedback of sales consultants
2      and forwarding it to some senior executive, right?
3  A.  Yes.
4  Q.  Looking at Number 18, are you able to determine
5      whether she pulled these comments from the demo
6      feedback system?  Because I notice that she's got the
7      names of the sales consultants right after the
8      comments as well.
9          MS. KYROUZ:  Objection; lacks foundation,
10     vague.
11 A.  Yeah, I honestly can't tell.
12         MR. WILLIAMS:  I'm going to ask the
13     reporter to mark this document as Hamel Number 19.
14         (Copy of E-mail to Mr. Hamel, et al. from
15         Mr. Pike, dated April 29, 2001 was marked
16         Exhibit Number 19 for identification.)
17         MR. WILLIAMS:  Hamel Number 19 is
18     Bates-number NDCA-ORCL 619362 through 363.
19 Q.  Ready?
20 A.  Sorry.  I'm ready.  Sorry.
21 Q.  Do you recognize Hamel Number 19 as a document you've
22     seen prior to today?
23 A.  I don't.
24 Q.  And it's an e-mail from Russ Pike to you among other
25     several people --

158

1  A.  Right.
2  Q.  -- right, on April 29th of 2001?
3  A.  Yes.
4  Q.  And the subject matter is the application
5      stability/performance update?
6  A.  Yes.
7  Q.  Do you recognize any of the names in the two lines --
8      other then the ones we've talked about already, Gayle
9      Fitzpatrick?
10 A.  Mark Czaja worked in my organization, the first guy on
11     your --
12 Q.  As what?
13 A.  He was an SC.  Andrew Costakis was, I think, a sales
14     consulting manager working for Julie Cullivan.  He was
15     a sales consulting manager or director.  I can't
16     remember which one.  Freddie Reyes was Latin America.
17 Q.  Sales consultant?
18 A.  Sales consulting manager or director, actually.  And
19     that's it.
20 Q.  You don't recognize --
21 A.  I think Bill Wendell was OSI, but I can't remember
22     exactly.
23 Q.  Okay.  Now, is this document or this e-mail from Russ
24     Pike similar to the demo memos that we discussed
25     before?

159

1          MS. KYROUZ:  Objection; lacks foundation,
2      vague.
3  A.  When you say the demo memos, those are the ones that
4      were 91, 92, 93?
5  Q.  Yes.
6  A.  No.
7  Q.  No?
8  A.  This was just sort of a sideline communication
9      specific to, it looks like, this whole browser issue.
10 Q.  I see.
11 A.  So it looks like they listened to our pleas.
12 Q.  Did you know what the memory utilization bug was?
13 A.  The memory utilization.  Memory utilization bug.  Not
14     exactly.  I mean I seem to recall there was a
15     situation where the application didn't release memory,
16     and therefore -- it didn't release memory when it was
17     running, and therefore, as you did more things in the
18     application, the machine would run out of memory.
19 Q.  I see.  Earlier, we talked about who your assistant
20     may have been.  Does Latina Valier --
21 A.  That's her.  That's her, Tina Valier.
22 Q.  That's the one you said you didn't like or you did
23     like?
24 A.  It wasn't like or dislike.  She was least effective.
25 Q.  Her?

160

1  A.  Yeah, she was less effective than Darlene.
2  Q.  Than Darlene.  And which came first?
3  A.  Darlene.
4  Q.  Darlene came first.  Now, did you understand what
5      escalations meant as it relates to 11i, general
6      business?
7          MS. KYROUZ:  Objection; vague, lacks
8      foundation.
9  A.  What escalations meant.
10 Q.  In the time frame of, you know, spring of 2001?
11 A.  It meant that -- at least from what I recall, it meant
12     that customers were facing some challenges in
13     implementation, and we wanted to help address them,
14     we, Oracle.  I was less involved in that part of the
15     business because implementation, right, so that's on
16     the consulting side of the business.
17 Q.  Maybe you'll help me understand this.
18         MR. WILLIAMS:  I'll ask the reporter to
19     mark this document as Hamel Number 20.
20         (Copy of E-mail to Mr. Nugent from
21         Mr. Hamel, dated March 28, 2001 was marked
22         Exhibit Number 20 for identification.)
23         MR. WILLIAMS:  Hamel Number 20 is
24     Bates-numbered NDCA-ORCL 094069 through 070.
25 Q.  Let me know after you've had a chance to review

Hamel, Kenneth   5/22/2006   9:15:00 AM

161

1   Exhibit Number 20.
2   A.   I'm all set.
3   Q.   Do you recognize this document as a document you've
4        seen prior to today?
5   A.   Yes.
6   Q.   When did you see it?
7   A.   Last night.
8   Q.   Okay.  And did it help refresh your recollection as to
9        matters concerning 11i during the spring of 2001?
10       MS. KYROUZ:  Objection, vague.
11  A.   No.
12  Q.   It's an e-mail from you to John Nugent, right?
13  A.   Uh-huh.
14  Q.   March 28th of 2001?
15  A.   Yes.
16  Q.   And you CC several other people?
17  A.   Yes.
18  Q.   Including George Roberts?
19  A.   Uh-huh.
20  Q.   What's the subject matter?
21  A.   GB 11i escalations.
22  Q.   And what did 11i escalations mean in the context of
23       this e-mail?
24       MS. KYROUZ:  Objection; vague, lacks
25       foundation.

162

1   A.   So I had a group of SC's called installed base SC's,
2        and they were SC's that were principally assigned to
3        customers who we had sold our applications to in the
4        last, like, year or so.  And kind of the goal of those
5        guys was to help us to see if there were more -- if
6        there was more opportunity with the account to sell
7        them more products, more capability, that sort of
8        thing.
9   Q.   And that was part of your presales responsibility?
10  A.   So sell is the wrong term probably, but they were
11       there to say is it working with the customers.  They
12       wanted to make sure -- I wanted them to make sure that
13       they -- how they were using their applications and see
14       if there were other models they could benefit from
15       based on the business policies they had in place.  So
16       it was a way to kind of, you now, try to get a better
17       understanding of what customers were doing and if
18       there was a better way we could sell them.
19  Q.   But -- I'm sorry.  Go ahead.
20  A.   But at this phase, we were also involved in kind of
21       hand-holding -- 11i was fairly new, so they wanted to
22       make sure customers were having a good experience with
23       11i.  In this case, they were working with these
24       customers to make sure they were getting -- if there
25       were any implementation issues, that they were getting

163

1        addressed.  So that's kind of what it means by
2        escalation.  This list of customers was experiencing
3        some challenges around implementation, and we wanted
4        to help them -- find a way to help them out if we
5        could.
6   Q.   Now, with respect to the area where you had some SC's
7        out, trying to determine how customers were using the
8        product and whether or not there were other modules
9        that they might be able to benefit from --
10  A.   Yes.
11  Q.   -- did you have -- what did you do when you learned
12       that a customer might have another need that they
13       could benefit from by using another Oracle module?
14  A.   So they would contact the sales rep that's responsible
15       for that particular opportunity.
16  Q.   The SC would?
17  A.   Yes.  The SC would say, "I'm working with V-tech, and,
18       you know, they could probably take advantage of this
19       functional area.  I know they don't own it.  You may
20       want to sniff this out," and the rep would go talk to
21       the customer and maybe start a sales process to do
22       that.
23  Q.   Now, was there anybody in your sales area that was
24       specifically responsibile for overseeing escalations?
25  A.   No.

164

1   Q.   Do you know how you got the information that's
2        depicted in Hamel Number 20?
3        MS. KYROUZ:  Objection, vague.
4   A.   How I came up with this list of customer names, is
5        that what you mean?
6   Q.   Yes.
7   A.   I think I probably went to these ten or so installed
8        base SC's and said kind of, "Give me some insight into
9        customers who are having some challenges implementing
10       our 11i installation right now."
11  Q.   And the SC's, they're the ones doing the
12       implementations?
13  A.   No.  So, again, they're installed base SC's.  So
14       they're working with selected accounts to try to
15       understand how we can incrementally sell them stuff,
16       but in the -- they're kind of assigned to a customer.
17       So in the meantime, they're -- they're able to observe
18       how implementation is going, and these customers are
19       probably saying to them, "Yes, we need to buy X, Y,
20       and Z, but we're having problems with implementation
21       right now.  So before we even think about that, can
22       you help me with some of these issues we're having,
23       these implementation issues?"
24  Q.   Why don't you read your note to John Nugent for me?
25  A.   So, "John, per your request, here's a list of 'hot'

Hamel, Kenneth   5/22/2006   9:15:00 AM

165

1    escalated customers (there are 65) currently
2    implementing 11i in GB. The attached spreadsheet
3    gives more details about each account as well as its
4    geography. This list was derived by Installed Base
5    SC's in the field."
6  Q.  And you see how you have quotes around hot. Why is
7    that?
8  A.  I don't recall.
9  Q.  It appears that there was a spreadsheet attached to
10   this e-mail?
11  A.  It does appear that way, yep.
12  Q.  Do you have any recollection what that spreadsheet
13   looked like?
14  A.  I don't. I mean it's purely conjecture, but I would
15   think it would have the name, what geography they're
16   with, northeast, west, so on and so forth, and maybe a
17   quick summary what the issue was.
18  Q.  And the title of that spreadsheet was 11i Relief March
19   '01, right?
20       MS. KYROUZ: Objection, lacks foundation.
21  A.  I mean that was the attached -- the name of this
22   attachment, yeah.
23  Q.  Do you know why it was titled Relief, what you meant
24   by relief?
25       MS. KYROUZ: Same objection.

166

1  A.  I don't know why I would have called it that. It's
2   possible because they were struggling -- see, again,
3   it would be -- I'm not so sure. We were probably
4   looking since they were struggling a little bit, could
5   we help them out, give them some more education, some
6   more consulting, but I'm speculating.
7  Q.  When you say give them more education or consulting,
8   you mean give that to them at no cost?
9  A.  Yes, some free consulting or free education to help
10   them through it or whatever.
11  Q.  But what is it --
12  A.  I seem to recall that, but I'm not entirely certain.
13  Q.  But if that were the case, is it possible that this
14   spreadsheet, this attachment, could have had that
15   information on it?
16       MS. KYROUZ: Objection, calls for
17   speculation.
18  A.  I guess it's possible, yeah. Yeah, I guess it's
19   possible.
20  Q.  So this list of 65 hot escalated customers are only
21   those customers who were installed base customers, not
22   new players or -- not new customers, right?
23  A.  These are customers. A customer characterize s anyone
24   who bought 11i. So this would have been anyone who
25   bought 11i.

167

1  Q.  Right. But these were being covered by installed
2   based SC's, right?
3  A.  Now that they're a customer, yes, the installed base
4   SC would have covered them.
5  Q.  Looking at the list -- withdrawn. On the face of this
6   document, you can't tell which of these documents were
7   new customers and which were install-based customers?
8  A.  That's true, I cannot.
9       MR. WILLIAMS: Why don't we take five
10   minutes, if that's okay?
11       MS. KYROUZ: Sure.
12       THE VIDEO OPERATOR: Going off the record.
13   2:53.
14     (Recess)
15       THE VIDEO OPERATOR: We're back on the
16   record. 3:03.
17  Q.  Can you tell me when you left Oracle again?
18  A.  October of 2003.
19  Q.  October 2003. And you indicated earlier that you
20   began working for Oracle University sometime in '01?
21  A.  Yeah. It was just about two years that I had been
22   there when I left. So it was October -- September or
23   October of 2001.
24  Q.  Okay. And prior to October of 2001, did your position
25   change at all in 2001?

168

1  A.  No.
2  Q.  And did you at some point in March of 2001 learn that
3   a lawsuit had been filed against Oracle?
4  A.  I had not.
5  Q.  And did anyone at Oracle --
6  A.  I take that back. I mean I think -- was that around
7   the time that Larry had sold his --
8  Q.  Uh-huh.
9  A.  So I think on the wires, I saw there was a bunch of
10   activity around Larry and Jeff.
11  Q.  And during that period of time, did anyone at Oracle
12   ask you to preserve documents on your computer?
13  A.  No.
14  Q.  How about any time thereafter?
15  A.  No.
16  Q.  So -- okay.
17       MR. WILLIAMS: I don't have anything
18   further. We have some outstanding issues between the
19   parties that don't necessarily relate to you, but at
20   some point could possibly require us to talk for
21   another couple hours at some point in the next few
22   months.
23       THE WITNESS: Okay.
24       MR. WILLIAMS: Would that be okay with you?
25       THE WITNESS: Yes, that'd be fine.

Hamel, Kenneth   5/22/2006   9:15:00 AM

169

1        MS. KYROUZ:  You know Defendants object to
2    that.
3        MR. WILLIAMS:  Thank you for your time.
4        THE VIDEO OPERATOR:  This concludes the
5    deposition of Kenneth Hamel.  The number of tapes used
6    was three.  We're now going off the record at 3:05.
7        MS. KYROUZ:  I want to mark the transcript
8    confidential.
9        (Deposition adjourned at 3:05 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

171

1                    CERTIFICATE
2
3    COMMONWEALTH OF MASSACHUSETTS
4    SUFFOLK, SS
5        I, Sandra L. Bray, Registered Diplomate
6    Reporter and Notary Public in and for the Commonwealth
7    of Massachusetts, do hereby certify:
8        That KENNETH G. HAMEL, the witness whose
9    deposition is hereinbefore set forth, was duly sworn
10   by me and that such deposition is a true record of my
11   stenotype notes taken in the foregoing matter, to the
12   best of my knowledge, skill and ability.
13       IN WITNESS WHEREOF, I have hereunto set my
14   hand this 4th day of June, 2006.
15
16       _____
         Sandra L. Bray, RDR
17       Registered Diplomate Reporter
18
19
20
21
22
23
24
25

170

1                  C E R T I F I C A T E
2        I, KENNETH G. HAMEL, do hereby certify that I have
3    read the foregoing transcript of my testimony, given
4    on May 22, 2006, and I further certify that said
5    transcript is a true and accurate record of said
6    testimony (with the exception of the corrections
7    listed below):
8    Page       Line       Correction
9
10
11
12
13
14
15
16
17   Dated at _____, this ____
18   day of _____, 2006.
19
            KENNETH G. HAMEL
20
     SIGNED UNDER THE PAINS AND PENALTIES OF PERJUR`
21
22
23
     slb
24
25

Kenneth G. Hamel                                    05/22/2006
                        CONFIDENTIAL

                                                            171
1                           CERTIFICATE

2

3    COMMONWEALTH OF MASSACHUSETTS

4    SUFFOLK, SS

5           I, Sandra L. Bray, Registered Diplomate

6    Reporter and Notary Public in and for the Commonwealth

7    of Massachusetts, do hereby certify:

8           That KENNETH G. HAMEL, the witness whose

9    deposition is hereinbefore set forth, was duly sworn

10   by me and that such deposition is a true record of my

11   stenotype notes taken in the foregoing matter, to the

12   best of my knowledge, skill and ability.

13          IN WITNESS WHEREOF, I have hereunto set my

14   hand this 4th day of June, 2006.

15

16          _____
            Sandra L. Bray, RDR
17          Registered Diplomate Reporter

18

19

20

21

22

23

24

25