# EXHIBIT Z

Sellers, Richard  2/28/2006  10:41:00 AM

1

```
 1          UNTIED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
 2             SAN FRANCISCO DIVISION
 3
    IN RE: ORACLE CORPORATION
 4      SECURITIES LITIGATION,
 5                        Case No.
    This Document Relates To:    C-01-0988-MJJ
 6                   (Consolidated)
 7  ALL ACTIONS
 8
 9  _____/
10
            CONFIDENTIAL
11
12  VIDEOTAPED
    DEPOSITION OF:   RICHARD SELLERS
13
14  DATE:       February 28, 2006
15  TIME:       10:41 a.m. to 6:47 p.m.
16  PLACE:      17260 Harbour Pointe Dr.
                Ft. Myers, Florida
17  PURSUANT TO:   Notice by counsel for Plaintiffs
                for purposes of discovery, use at
18              trial or such other purposes as
                are permitted under the Federal
19              Rules of Civil Procedure
20  REPORTED BY:   Aaron T. Perkins, RPR
                Notary Public, State of
21              Florida at Large
22              Pages 1 to 279
23
24
25
```

2

```
 1  APPEARANCES:
 2
 3  SHAWN A. WILLIAMS, ESQUIRE
    Lerach, Coughlin, Stoia, Geller, Rudman & Robbins
 4  100 Pine St., Suite 2600
    San Francisco, California  94111
 5  (415) 288-4545
    swilliams@lerachlaw.com
 6      Attorney for Plaintiffs
 7
 8  MATTHEW D. HARRISON, ESQUIRE
    KYRA G. BUSBY, ESQUIRE
 9  Latham & Watkins, LLP
    505 Montgomery St., Suite 1900
10  San Francisco, California  94111
    (415) 391-0600
11  matt.harrison@lw.com
    kyra.busby@lw.com
12      Attorneys for Defendant Oracle and Richard
        Sellers
13
14
15
16  ALSO PRESENT:
17  Rick Spector, videographer
18
19
20
21
22
23
24
25
```

3

```
 1              I N D E X
 2                        PAGE
 3  DIRECT EXAMINATION BY MR. WILLIAMS      7
 4  CERTIFICATE OF OATH              277
 5  REPORTER'S CERTIFICATE              278
 6  SIGNATURE PAGE                  279
 7
 8
 9
10          E X H I B I T S
11                        PAGE
12  Exhibit 1  E-mails Bates stamped      88
                NDCA-ORCL 026981 through
13              026984.
14  Exhibit 2  E-mail and attachments,    105
                Bates No. NDCA-ORCL 158786.
15
16  Exhibit 3  E-mails Bates stamped      113
                NDCA-ORCL 121624.
17  Exhibit 4  E-mails Bates stamped      132
                NDCA-ORCL 054231 through
18              054234.
19  Exhibit 5  E-mails Bates stamped      139
                NDCA-ORCL 121642 through
20              121646.
21  Exhibit 6  An e-mail Bates numbered   154
                NDCA-ORCL 121668.
22
23
24
25  EXHIBIT INDEX CONTINUED:
```

4

```
 1  CONTINUED:
 2
 3
 4  Exhibit 7  E-mails Bates stamped      159
                NDCA-ORCL 121280 through
 5              121294.
 6  Exhibit 8  A four-page document titled  168
                "Q1 R11i Product Issues by
 7              Area" Bates stamped
                NDCA-ORCL 202671 through
 8              202674.
 9  Exhibit 9  E-mails Bates numbered     169
                NDCA-ORCL 156405 through
10              156.407.0003.
11  Exhibit 10  E-mails Bates stamped     170
                NDCA-ORCL 156408 through
12              156414.
13  Exhibit 11  E-mails Bates stamped     196
                NDCA-ORCL 101416 through
14              101423.
15  Exhibit 12  E-mails Bates stamped     202
                NDCA-ORCL 101424 through
16              101431.
17  Exhibit 13  E-mails Bates stamped     207
                NDCA-ORCL 101432 through
18              101440.
19  Exhibit 14  E-mails Bates numbered    214
                NDCA-ORCL 101457 through
20              101459.
21  Exhibit 15  E-mails Bates stamped     223
                NDCA-ORCL 101462 through
22              101470.
23
24
25  EXHIBIT INDEX CONTINUED:
```

5

1 CONTINUED:
2
3
4
   Exhibit 16  E-mails Bates stamped      240
5               NDCA-ORCL 101468 through
                101469.
6
               (Exhibit retained by
7              plaintiff's counsel.)
8  Exhibit 17  E-mails Bates stamped      250
                NDCA-ORCL 119324 through
9               119330.
10              (Exhibit retained by
                plaintiff's counsel.)
11
   Exhibit 18  An e-mail Bates stamped    259
12              NDCA-ORCL 101524.
13 Exhibit 19  E-mails Bates numbered     268
                NDCA-ORCL 223012 through
14              223019.
15
16
17
18
19
20
21
22
23
24
25

6

1       THE VIDEOGRAPHER:  Okay.  Here begins the
2  videotaped deposition of Richard Sellers, Tape
3  No. 1, in the matter of, in re, Oracle Corporation
4  Securities Corporation, before the United States
5  District Court, Northern District of California,
6  San Francisco division.  The case number is
7  C-01-0988-MJJ, consolidated.
8       Today's date is Tuesday, February 28th, 2006,
9  and the time on the video monitor is 10:41 a.m.
10      The video operator today is Rick Spector
11 representing LiveNote World Service, located at 221
12 Main Street, Suite 1250, San Francisco, California
13 94105, phone number (415) 321-2300.
14      The court reporter is Aaron Perkins of
15 Riesdorph Reporting on behalf of LiveNote World
16 Service.
17      Today's deposition is being taken on behalf of
18 the plaintiffs and is taking place at the Sanibel
19 Harbour Resort and Spa, 17260 Harbour Point Drive,
20 Ft. Myers, Florida.
21      At this time, I will ask the attorneys to
22 please introduce themselves stating the parties
23 they represent, after which the court reporter will
24 administer the oath.
25      MR. WILLIAMS:  Shawn Williams, Lerach,

7

1  Coughlin, Stoia, Geller, Rudman & Robbins, on
2  behalf of plaintiffs.
3       MR. HARRISON:  Matthew Harrison and Kyra Busby
4  for the witness, Dick Sellers, as well as the
5  Oracle Corporation and individual defense.
6       RICHARD SELLERS,
7  the witness herein, being first duly sworn on oath, was
8  questioned and testified as follows:
9            DIRECT EXAMINATION
10 BY MR. WILLIAMS:
11      Q.  Good morning, Mr. Sellers.
12      A.  Good morning.
13      Q.  My name is Shawn Williams.  We met just a few
14 minutes ago.
15      A.  Right.
16      Q.  And I'll be asking at least the initial
17 portion of the questioning today.
18      Can you just state your full name and address
19 for the record, please?
20      A.  Yes.  Richard Winston Sellers, Jr., and I live
21 at 3605 Licata Court, Punta Gorda, Florida.
22      Q.  Okay.  And I'm sure your attorney has
23 explained to you what the process will be today, but I'm
24 just going to try to do a quick overview so that we
25 understand each other.  Okay?

8

1       The reporter in this case is sitting to your
2  left and a little bit behind you and is going to take
3  down everything that's said here today:  My questions,
4  your answers, and lawyer's comments.
5       Do you understand that?
6       A.  Uh-huh (Indicates affirmatively).
7       Q.  The reporter, unfortunately, can't record head
8  nods, hand gestures, and things of that nature.  So in
9  response to my questions, I'll just need you to respond
10 verbally.
11      Do you understand that?
12      A.  I do.
13      Q.  Okay.  Throughout the deposition, your
14 attorney may interpose objections.  It's their right to
15 do that.  However, unless you are instructed not to
16 answer the question, you still have to answer the
17 question.
18      Do you understand that?
19      A.  I do.
20      Q.  Okay.  I'm going to take several breaks today,
21 and we'll take a break whenever you would like.  I don't
22 want you to become uncomfortable at all.  So if you ever
23 need a break, just let me know.  I'll probably ask that
24 I just finish the question --
25      A.  Sure.

9

1    Q.  -- that I'm asking you.  You answer that
2  question, and we'll take a break for any period of time.
3       Do you understand?
4    A.  Yes.
5    Q.  Okay.  Do you understand that the oath that
6  you've taken is the same oath that applies in a court of
7  law?
8    A.  I do.
9    Q.  Okay.  Now, I'm going to try to be as clear as
10  I can today, but sometimes the questions that I ask may
11  be a little convoluted.  I may even fumble.  And -- but
12  if you don't understand the question, just ask me, and
13  I'll try to repeat it.  I'll try to be as clear as
14  possible.  Okay?
15    A.  Okay.
16    Q.  Any reason that you can't give your full and
17  complete testimony today?
18    A.  There is not.
19    Q.  Not on any medication that may impact your
20  ability to recall facts, anything like that?
21    A.  No.
22    Q.  Okay.
23    A.  No medication.
24    Q.  Okay.  At the end of your testimony, you'll
25  have an opportunity to look at it and review it, to

10

1  correct minor errors, so don't feel as though you feel
2  you have to be absolutely perfect today.  Although you
3  won't be able to make substantive changes, you will be
4  able to take a look and make small corrections.
5       Do you understand?
6    A.  (Indicates affirmatively).
7    Q.  Have you had your deposition taken before?
8    A.  I have.
9    Q.  When was the last time?
10    A.  Perhaps three years ago.
11    Q.  Okay.  And what type of case was it?
12    A.  It was a wrongful termination suit.
13    Q.  Were you a party in that action?
14    A.  No.  I was a witness for the plaintiff.
15    Q.  Okay.  And how many times have you had your
16  deposition taken?
17    A.  Perhaps twice.
18    Q.  Oh, I see.  And assuming, also, that there was
19  one prior to that --
20    A.  Yes.
21    Q.  -- deposition?
22       All right.  Then when did you learn that you would
23  be testifying in this matter?
24    A.  About 30 days ago or so -- I'm not exactly
25  sure of the date -- I got a call from Oracle counsel

11

1  that informed me that I would be subpoenaed --
2    Q.  Okay.
3    A.  -- and that the -- the nature of the case.
4    Q.  Okay.  And have you seen a complaint in this
5  action?
6    A.  I saw my subpoena.
7    Q.  Okay.  So -- but you've never seen the
8  complaint laying out the allegations?
9    A.  I have not.
10    Q.  Okay.  And do you have an understanding of
11  what the case is about?
12    A.  I have a -- yes, I have a belief of what the
13  case is about.
14    Q.  Okay.
15    A.  I'm not -- I suppose you'll tell me if my
16  understanding is correct.
17    Q.  No, I won't.
18       What is your belief of what the case is about?
19    A.  My belief is the case is brought by
20  stockholders who have sued Oracle for a Q3 2001 budget
21  miss.  And the suit claims that senior Oracle executives
22  knew well in advance that the miss would happen and did
23  not inform the stock-buying public.
24    Q.  Okay.  Had you heard about the case prior to
25  being notified that you would -- you would be

12

1  testifying?
2    A.  You know, I did not.  I did not.
3    Q.  Okay.  And are you still an Oracle employee?
4    A.  I am not.
5    Q.  And when did you leave Oracle?
6    A.  I left Oracle in August of 2001.
7    Q.  And what were the circumstances of you
8  leaving?
9    A.  I retired.
10    Q.  Okay.  Okay.  Now, do you still keep in touch
11  with people that you worked with at Oracle?
12    A.  I e-mail friends at Oracle on occasion and
13  receive e-mails from them on occasion.
14    Q.  People who are still at the company?
15    A.  People who are still at the company.
16    Q.  And who are those people?
17    A.  I occasionally e-mail or talk to Medi Goker,
18  who was a district manager, who reported to me.  I
19  occasionally talk to her counterpart -- I forget his
20  name right now -- but e-mails on occasion, Christmas
21  cards, and that kind of thing.
22    Q.  Okay.  And what have you done to -- withdrawn.
23       What have you done over the last 30 days to
24  prepare for this deposition, if anything?
25    A.  Well, I had -- I had -- I had looked at some

13

1  of my old e-mails.
2      Q.  Okay.  And when did you look at those?
3      A.  Just recently.
4      Q.  Okay.  Well, was it this morning, yesterday,
5  the day before yesterday?
6      A.  Yesterday.
7      Q.  Okay.  And what was the volume of the e-mail
8  that you looked at?
9      A.  Oh, I don't know.  I suspect it was 10 to 15,
10  something in that order.
11      Q.  Okay.  And there were -- I imagine they would
12  be almost -- written almost four years ago or maybe
13  longer than that.
14      A.  The ones -- the ones that I examined were all
15  in the Q3, Q4 2001 time frames.
16      Q.  And since you left Oracle, have you thought
17  about those issues that you saw in those e-mails over
18  the last few years?
19      A.  I have not.  I have not.  I have not.  In
20  fact, I -- what a rush it was to start remembering.
21      Q.  It was a rush?
22      A.  Remembering those times.
23      Q.  Okay.  Did any of those documents help refresh
24  your recollection about the things occurring at Oracle
25  during that time --

14

1      A.  They did.
2      Q.  -- and before?
3      A.  Yes.
4      Q.  What did they help you remember generally?
5      A.  Well, just, generally, the climate and time,
6  the pressure.
7      Q.  Uh-huh (Indicates affirmatively).
8      A.  The, you know, the day-to-day rigors of the
9  job, those -- those kind of things.
10      Q.  Okay.  When you say "the climate and time,"
11  what do you mean?
12      A.  Well, I -- you know, we were under a lot of
13  pressure to make every quarter.  Oracle was continuing
14  to build its reputation as a company that makes its
15  forecasts, and we all were aware of that; that in the
16  far distant past it hadn't, and we were building our
17  reputation.  And we were proud of that reputation and
18  wanted to maintain it.
19      Q.  Okay.
20      A.  So we did not want to miss.
21      Q.  Either one, through Q3 or Q4?
22      A.  Any quarter --
23      Q.  Okay.
24      A.  -- ever.
25      Q.  Well, I was just kind of -- my question was

15

1  sort of framing around what you said you reviewed
2  yesterday.
3      A.  Right.
4      Q.  And so that was kind of Q3 and Q4.
5          And when you mentioned climate, I was getting
6  at that --
7      A.  Okay.
8      Q.  -- those particular quarters.
9      A.  Well, we thought we were going to miss a
10  quarter.
11      Q.  Okay.
12      A.  So we were -- that was new to me.  I hadn't
13  experienced that before.
14      Q.  Right.
15      A.  And so there was a lot of angst --
16      Q.  Okay.
17      A.  -- in and around that time.
18      Q.  Okay.  So when you say "the climate and time,"
19  that includes the pressure that you're talking about --
20      A.  Yes.
21      Q.  -- all --
22      A.  Sure.
23      Q.  Okay.  Anything else that was --
24      A.  Plus, the thing that came back is I was brand
25  new at my job at that time.  I had just taken over the

16

1  Americas.
2      Q.  Okay.
3      A.  So this was like my second forecast.  And one
4  doesn't really treasure missing one's second forecast.
5      Q.  When you say you had just taken over the
6  Americas, what do you mean?
7      A.  My boss had resigned in June, I believe.
8      Q.  Okay.
9      A.  And -- and I was doing his job --
10      Q.  Okay.
11      A.  -- instead of my old job.
12      Q.  I'm going to go back and establish, you know,
13  what positions you held while you were at Oracle.  But
14  since you raised it, why don't you just tell me what
15  your title was in that Q3, Q4 '01 --
16      A.  I was group vice-president --
17      Q.  Okay.
18      A.  -- product support for the Americas.
19      Q.  Okay.  And the boss that had left was who?
20      A.  Al Snyder --
21      Q.  Al Snyder.
22      A.  -- who had been product support Americas.
23      Q.  Okay.  Now, prior to you taking over that
24  position, what were -- what was your position?
25      A.  I was managing all of Oracle's Americas

17

1  support centers.
2      Q.  Okay.  All right.  Anything else that the
3  documents you reviewed yesterday helped you recall?
4      A.  Nothing comes to mind.
5      Q.  Okay.  We'll probably see some of those
6  documents, and we'll talk about them in detail, you
7  know, a little bit later.
8          So you reviewed some documents and e-mails.
9  So you met with your lawyers yesterday?
10     A.  Yes.
11     Q.  I'm assuming it's Matt and Kyra?
12     A.  Yes.
13     Q.  And how long did you guys meet yesterday?
14     A.  Maybe four hours, five hours.
15     Q.  Okay.  And did you talk to anyone aside from
16  your lawyers about the fact that you would be testifying
17  in this action, over the last 30 days?
18     A.  Actually, I did not, but --
19     Q.  So nobody knows that you're testifying in this
20  action?
21     A.  Oh, yes, they do.
22     Q.  Okay.  Who is that?
23     A.  My next door neighbors --
24     Q.  Okay.
25     A.  -- on each side that I know that -- that

18

1  I'm -- and a friend that's visiting from Indiana, and an
2  old friend of mine that worked for me at Digital
3  Equipment Corporation.
4      Q.  Okay.  And let's start with your neighbors,
5  whichever side you want.
6      A.  Okay.
7      Q.  What do -- what do -- what do they know?
8      A.  They're both retired.
9      Q.  Okay.
10     A.  One is a car salesman, and one is an airplane
11  pilot.  And they know that there is a lawsuit at Oracle
12  and I've been subpoenaed.
13     Q.  Okay.  And did you talk about the substance of
14  your experience at -- at Oracle when you told them about
15  the fact that you would have to testify?
16     A.  Neither are too familiar with corporate goings
17  on --
18     Q.  Okay.
19     A.  -- so, no, I didn't find a sympathetic ear
20  there.
21     Q.  Okay.
22     A.  I just told them that I really didn't think I
23  would truly get subpoenaed today, that I didn't think
24  that I had a lot to add to the party.
25     Q.  Okay.  All right.  And so you would say the

19

1  same for both neighbors?
2      A.  Yes.
3      Q.  How about your acquaintance at -- from Digital
4  Equipment?
5          Before you answer, I think the videographer
6  needs you to put that mike on either your lapel or
7  somewhere on your shirt.
8          MR. WILLIAMS:  Is that high enough?
9          THE VIDEOGRAPHER:  Yes.  If you could, put it
10  a little higher.  And it's also on a swivel.  You
11  can swivel it up.  There you go.  Okay.
12         MR. WILLIAMS:  Okay.  We're going to hear you
13  loud and clear now.
14         THE WITNESS:  Really.
15  BY MR. WILLIAMS:
16     Q.  Your friend at Digital Equipment.
17     A.  Yes.  I told him -- he is familiar with
18  business, and I told him it was in regards of a Q3
19  Oracle miss in 2001.
20     Q.  And what did you say?
21     A.  He did not respond to the e-mail yet.  I sent
22  it last night.
23     Q.  Okay.
24     A.  And the reason I sent the e-mail, by the way,
25  is we both have HP stock options.

20

1      Q.  Okay.
2      A.  Because when we worked at Digital, it was
3  bought by Compaq, which was bought by HP.  And I had
4  been corresponding with him about how to sell these
5  stock options, because there is some in the money.
6          He was giving instructions.  And I said, Oh,
7  by the way, you wouldn't believe what happened to me
8  today.
9      Q.  Right.  You've got to testify.
10         All right.  Now, why did you think that you
11  would have little to nothing to add to the parties?
12     A.  Well, the -- the -- in a nutshell, the suit is
13  about Oracle missing its Q3 forecasts --
14     Q.  Generally.
15     A.  -- or street number.  And I'm -- my miss was
16  so small in relationship to the total number that I --
17  didn't -- you know, it's -- it's a tear drop in a
18  barrel, a rain barrel.
19     Q.  Okay.
20     A.  So I got -- I --
21     Q.  Okay.  That's fair.
22         Now, after you reviewed the documents that you
23  reviewed yesterday, did you then think that you maybe
24  could have, you know, something that might be important
25  to one of the parties?

21

1    A.  Perhaps.
2    Q.  Okay.  Well, when -- when were you hired by
3  Oracle?
4    A.  I believe I came aboard in June of '98.
5    Q.  June '98.  And what were you doing prior to
6  being hired in '98?
7    A.  At the -- at the time that the offer was
8  extended to me by Oracle, I was working at Digital
9  Equipment Corporation managing an international desktop
10  outsourcing business.
11    Q.  Okay.  And what does that mean?
12    A.  Well, it's a service that we would sell to
13  customers to come in and manage all of their desktops,
14  all of their personal computers, laptops, PCs, manage
15  the networks that connect them, all the way back to the
16  servers.  If they have a server forum, take over the
17  management of that.
18    And under that management, we would not only
19  manage the day-to-day operation, but we would also
20  manage the replacement and upgrades of the equipment as
21  new equipment came out, so the acquisition of new
22  equipment, and so forth.
23    So it would be kind of just -- instead of
24  having to have an MIS operation that works for you -- it
25  does all of that -- that you have to train, you just

22

1  write me a check on a monthly basis, and I -- and that's
2  your whole operations taken care of.
3    Q.  Okay.  You weren't a salesman?
4    A.  I was not.
5    Q.  And --
6    A.  I had sales working for me.
7    Q.  Okay.
8    A.  But I was not a salesman.
9    Q.  All right.  I'll get to the sales portion of
10  it.
11    Would you -- would that -- would your job or
12  what you did be characterized, in your view, as support?
13    MR. HARRISON:  Objection.  Vague.
14    THE WITNESS:  It was outsourcing.
15  BY MR. WILLIAMS:
16    Q.  Okay.
17    A.  That's how the industry knows it.
18    Q.  Okay.
19    A.  It's a service.
20    Q.  It's a service.
21    Okay.  And what was the sales component of
22  what you do?
23    A.  Well, we had to find customers and sell them
24  on this service and close the deal.  So we had to bid,
25  typically, against other -- write proposals and then bid

23

1  against other companies doing the same business, which
2  were typically consulting firms, like Deloitte,
3  Andersen.  IBM is in that business.  So our sales folks
4  prospected, found leads, and then tried to close.
5    Q.  So you had salespeople reporting to you?
6    A.  Yes, I did.
7    Q.  Okay.  How long were you at Digital Equipment?
8    A.  I was at Digital from '69 to '98.
9    Q.  Okay.  So you were -- you were there for a
10  little while.
11    A.  Thirty years almost.  I think it was 29.
12    Q.  Okay.  And where geographically was it
13  located?
14    A.  Well, I worked in many places.  I started
15  working for Digital in -- as a technician in Washington,
16  D.C. in 1969.  I was transferred to North Carolina --
17  or, excuse me, Virginia, as a remote engineer; to North
18  Carolina as a unit manager; to Louisville, Kentucky, as
19  a branch manager; to Cincinnati, Ohio, as a district
20  manager; to Colorado Springs, Colorado, to start up and
21  manage their remote diagnostic center.  And then I took
22  over management of all software support centers for
23  Digital, eventually managing all -- all North and South
24  America software support centers and then managed all of
25  the functional support for the Americas.

24

1    So the support budgets, and so forth, was more
2  of a staff position.  Then I went on to manage -- in
3  there somewhere I was promoted to vice-president, went
4  on to manage this worldwide outsourcing business.
5    Q.  Uh-huh (Indicates affirmatively).
6    A.  And Compaq was buying Digital, so that gave me
7  a perfect time to retire, since I was 55.  I could take
8  all my stock options with me.  And Mr. Snyder was
9  working over at Oracle and very much wanted a lieutenant
10  that could come in and bring some business acumen --
11    Q.  How -- I'm sorry.
12    A.  -- to the support organization.
13    Q.  How did you know Mr. Snyder?
14    A.  I worked for him at Digital.
15    Q.  Okay.  That's some career path.
16    A.  Thank you.
17    Q.  Can you -- before I forget, can you explain to
18  me, if you can, the difference between the functional
19  support and services?
20    A.  Well, I think we -- I think we typically use
21  support services, that term together.  We say support
22  and services, and we interchange it.  Support,
23  traditionally, has been in the broke-fix part of the
24  business.  So if it was once working, support would make
25  it work again.

25

1 Now, that -- those -- that's a hardware
2 definition, and those lines blur when you get to
3 software, because so much of software is not broken;
4 it's simply advisory. It's telling people how to do
5 things. So I think most people would -- would call,
6 probably, the broke-fix part support, and then above
7 that, the advisory services we would call service or
8 advisory services.
9 Now, depending on which company you're at,
10 those definitions get changed. Oracle chose to call its
11 support organization product support.
12 Q. Okay.
13 A. And our job was to support the software
14 products that Oracle built and sold. In doing that, we
15 also became the customer's first contact into the
16 company after they had -- after their salesman had left
17 them. So they -- if they wanted to talk to Oracle, they
18 came through support to talk to Oracle. So in that
19 role, we took on the role of customer satisfaction,
20 customer happiness, if you will, and were involved in
21 many, many instances that weren't purely broke-fix.
22 Q. Okay. All right.
23 MR. HARRISON: I just -- I didn't want to
24 interrupt the witness -- I'm sorry -- but I wanted
25 to object to that question.

26

1 MR. WILLIAMS: Sure.
2 MR. HARRISON: The grounds are vagueness as to
3 time.
4 BY MR. WILLIAMS:
5 Q. Okay. All right. I'm talking about while you
6 were at Oracle.
7 A. Right.
8 Q. So, now, what is -- while you were at Oracle,
9 I guess from '98 to 2001, how would you describe
10 services or how Oracle described services?
11 MR. HARRISON: Objection. Vague.
12 THE WITNESS: I -- well, we brought in a
13 new -- we -- how would I describe it? We had two
14 components at services. We had telephone support
15 services, which were the support centers for
16 customers who -- who needed help called, and we had
17 on-site services.
18 When I came to Oracle, I managed the support
19 centers on the east coast, and I managed the four
20 regions of on-site services on the east coast,
21 actually from the Mississippi east.
22 And those on-site folks would come on-site and
23 help customers either with their operations or do
24 whatever, training, whatever the customer might
25 need.

27

1 BY MR. WILLIAMS:
2 Q. And that -- is that after the salesperson had
3 left?
4 A. After the sales -- after the salesperson had
5 left --
6 Q. Okay.
7 A. -- and the customer was -- had either
8 installed and was running the software or was attempting
9 to install and run the software.
10 Q. Okay. So -- and correct me if I'm wrong -- it
11 sounds like software services and support were very much
12 related.
13 A. Yes.
14 Q. Okay.
15 A. I think we called it support services.
16 Q. Okay. Do you know if Oracle broke out its
17 financial reporting as support -- with support services
18 separate?
19 A. No. Oracle broke out its -- its financial, to
20 my knowledge, as support services, which would have been
21 me, or what I did, consulting services, and licensed
22 sales.
23 Q. Okay. Now, when I asked you a little bit
24 about your experience at Digital, you talked about being
25 a technician at one point.

28

1 A. Uh-huh (Indicates affirmatively).
2 Q. And doing remote engineering.
3 A. Uh-huh (Indicates affirmatively).
4 Q. With respect to your -- the technician aspect
5 of your duties, can you just explain to me what that
6 was?
7 A. Well, I -- I had spent eight years in the
8 service and was quite versed in electronics and inertial
9 navigation and inertial guidance system. I wanted to
10 terminate my career in the military and hired on to --
11 at Digital as a computer technician doing infield
12 repair.
13 Q. Okay. And so prior to being at Digital, your
14 educational background in technical aspects was with the
15 military?
16 A. Right. I had about -- almost three years of
17 technical training. They claim it's equal to an
18 associate's degree --
19 Q. Okay.
20 A. -- in electronics.
21 Q. Okay. Had you gone to college prior to that?
22 A. I had not.
23 Q. Okay. And did you have any kind of formal
24 educational training after Digital or while you were at
25 Digital?

29

1    A.  Yeah.  When I worked at Digital, Digital sent
2 me to a Harvard summer school.  We went every summer for
3 five years and did case study with Harvard MBA
4 professors.  And at Digital Equipment Corporation, that
5 was -- their take on that was I had an MBA.
6    Q.  Okay.  Going into the remote engineering area,
7 can you explain what that means?
8    A.  Yes.  We were one of the first companies to
9 try to develop a call center where -- when the customer
10 had a problem, a computer problem, instead of calling
11 the local field service office, they would call the call
12 center, and the call center would perform certain
13 diagnostics and/or tests and then inform the local
14 office exactly what part to bring on-site.  So the local
15 office would come out with the specific part to repair
16 the computer, so that you would get out of this two
17 trips, you know.
18    People that are used to getting computers
19 repaired, they call a technician.  He comes out and
20 says, Oh, unfortunately, you need an ABC, and I don't
21 have one.  But I'll go back to the office and bring it
22 out tomorrow, which results in the computer being down
23 additional time, or whatever.
24    Q.  Uh-huh (Indicates affirmatively).
25    A.  So we were attempting to eliminate those

30

1 second trips and to decrease the downtime the customers
2 experience.
3    Q.  Okay.  And what was your background or
4 training in that area?
5    A.  I had -- I had no training in remote
6 diagnosis.  My -- my training was in business, and my
7 training was in -- I had been a district manager
8 doing -- servicing those customers.
9    Q.  Okay.
10    A.  So I had a very good feel for the customer
11 base, a very good feel for on-site technicians, and a
12 very good feel for the technology.
13    Q.  Okay.  Now, while you were at Digital
14 Equipment, did you have any software experience?
15    A.  While I was running the remote diagnosis
16 center, the whole theory of it was that we would shorten
17 the time that it would take to repair our hardware
18 problem.
19    What I discovered there, in collecting the
20 data and the time people spent, so forth and so on,
21 taking an analytical approach to the business, was that,
22 really, the test capability we had wasn't good enough to
23 remotely call out exactly the part that was needed at
24 those -- those times.  This was in '7- -- about '82.
25 But what we would -- could do is eliminate all the

31

1 software problems that customers call.  They would call
2 a hardware repairman, but what they had was a software
3 problem.
4    And by eliminating those, we eliminated a lot
5 of trips.  So the real value in the remoteness was not
6 in repairing the hardware but eliminating the false
7 trips that we made because the customer really had a
8 software problem.
9    At that time, Digital had started a small
10 software center in Colorado Springs and was selling
11 software contracts.  I got involved in that.  They
12 sent -- became the operations manager for both centers
13 and then later ran all centers.
14    Q.  Okay.  So in 1998, how was it that you came to
15 either interview or apply with Oracle?
16    A.  My boss, Allen Snyder, was running the
17 Americas product support for Oracle.
18    Q.  When did he leave Digital?
19    A.  He had left maybe '96 or '97.  I'm not sure.
20 I think '97.  I think he had been over there about a
21 year.
22    Q.  Okay.
23    A.  He told me of his plans to divide the United
24 States and not manage it with one manager but two and
25 asked me if I was interested.  I said I was.  I wasn't

32

1 interested in being a Compaq employee.  So -- and Compaq
2 had already made an offer and -- where they were going
3 to take over Digital.  So when my -- in June I was 55 --
4 or in April I was 55, and I was able to retire.  So I
5 retired and went to work for Al.
6    Q.  Okay.
7    A.  And he had some exciting visions of -- he had
8 been hired -- he told me he had been hired as a change
9 agent to come in and restructure support and bring some
10 business acumen to it and improve customer satisfaction.
11    Q.  Do you -- do you still talk to Al?
12    A.  You know, I haven't talked to Al in two years.
13    Q.  Okay.
14    A.  I sent him a Christmas card this year.
15    Q.  That's good.
16    A.  I think he sent me one, but we haven't -- we
17 haven't conversed.
18    Q.  Now -- so Al hired you?
19    A.  Yes.
20    Q.  Okay.  And what --
21    A.  Well, Al -- Al presented me to Randy Baker --
22    Q.  Okay.
23    A.  -- who ran worldwide support.  And Al couldn't
24 hire me without a second interview.  So I interviewed
25 with Randy Baker, who was the worldwide support manager,

33

1    and he actually extended the offer.
2        Q.    Okay.
3        A.    But I worked for Al.
4        Q.    Okay.  Who ultimately reported to Randy?
5        A.    Who reported to Randy Baker, yes.
6        Q.    And did you have, throughout your tenure --
7    well, withdrawn.
8            Randy Baker left sometime in 2000, right,
9    early 2000?
10       A.    As I recall, it was, perhaps, January,
11   February.  It was -- yeah.  Early 2000.
12       Q.    Yeah.  And do you know -- and during the time
13   that you were at Oracle, did you have to interface with
14   Randy Baker?
15       A.    Occasionally, he came to meetings.
16       Q.    Uh-huh (Indicates affirmatively).
17       A.    Never did any one-on-ones with him, but I've
18   had him at my operations meetings.  When I was reviewing
19   my operations, he would come in on occasion.  And he
20   attended some of Al's meetings.  So I interacted with
21   him in that way.
22       Q.    Okay.  Now, when you hired -- I'm sorry.
23   Withdrawn.
24           When you were hired, what was the position you
25   were hired?

34

1        A.    Vice-president eastern service manager, I
2    think.
3        Q.    And where were you geographically located?
4        A.    I was located in Orlando, Florida.
5        Q.    Okay.  And did you have direct reports, people
6    reporting to you at that time?
7        A.    I did.
8        Q.    Approximately how many?
9        A.    One, two, three, four, seven, eight, nine,
10   ten, maybe.
11       Q.    And do you remember any of the names of those
12   people?
13       A.    I do.  There were some.
14       Q.    Okay.  What are they?  Which ones do you
15   remember?
16       A.    Well, I had four regional managers.  One was
17   Paul Randell.  One was Maria, maybe, Roberts.  I'm not
18   sure of her last name.  It was more of an Italian name.
19   I had -- I had a fellow I hired from up in the
20   Mid-Atlantic.  I don't remember his name.  I fired him
21   in a year.  And I had a fellow in the south.  I don't
22   remember.  I know it was a lady.  I don't remember her
23   name.  I had district managers, Medi Goker, another
24   district manager that ran applications for me.  I
25   couldn't think of his name a minute ago.

35

1        Q.    Okay.
2        A.    I can see his face, but I can't remember his
3    name.
4        Q.    All right.  When you say that you were --
5        A.    I had a finance manager as well.
6        Q.    Okay.  Who was that?
7        A.    Bill Shunk.
8        Q.    Bull Shunk, how do you spell that?
9        A.    S-h-u-n-k, is how I would spell it, but I'm
10   not sure.
11       Q.    Okay.
12       A.    And I had an operations manager named Mike
13   Runda.
14       Q.    Okay.  At that time, did you have
15   responsibility for all of North America with regional
16   managers across the United States?
17       A.    No.  I just had the Mississippi east, with
18   four regional managers and the support centers in the
19   east, which were, really, one in Orlando and then a
20   little small one up in Virginia.
21       Q.    Okay.  So is it fair to say that you had, I
22   guess, peers that did the same job for other --
23       A.    I did.
24       Q.    -- regions of the United States?
25       A.    Yes.

36

1        Q.    Do you know who those people were?
2        A.    The central -- the central and west was Mike
3    Mayfield and -- the west was a fellow named Ron,
4    something or another, Schmidt, maybe, or Smith or -- I
5    can't -- I'm terrible with names.
6        Q.    That's okay.  What I want to do is I don't
7    want to spend a lot of time in '98 and '99.  But if you
8    can tell me if your job title or duties changed between
9    '98 and early 2000, I would appreciate that.
10       A.    Yeah.  They changed twice.  Al was not -- Al
11   was fairly successful in selling his vision to Randy,
12   and we were implementing.  But when -- Randy Baker
13   seemed to be tied to Ray Lane.  So when Ray Lane left
14   Oracle, Randy was soon departed as well.
15           So right after Ray Lane left, Randy Baker
16   left.  Then Al's vision of what support should look like
17   didn't have a lot of support inside the corporation.
18   And engineering had long held the view that we should
19   manage all of telephone support, which is what they
20   dealt with mostly, from one point.  Not have two or
21   three centers, but have it all -- they didn't care where
22   they were physically located, but it should be managed
23   by one person, because they just wanted to have one they
24   could talk to.
25           As I remember, Colorado Springs had some

37

1   issues in trying to implement their support center.
2   They had some bad customer satisfaction. They had some
3   issues dealing with engineering. Myself and my folks
4   had a good reputation with engineering, so Al asked me
5   if I would just take over all the product support, all
6   the telephone support business. And I -- and he gave
7   Mike Mayfield the on-site business.
8        Q.   Okay. Now, that -- when did that happen?
9        A.   Goodness. That probably happened in the
10  spring of 2000.
11       Q.   And that -- did your geographical scope of
12  responsibilities broaden?
13       A.   Well, it did, because then I had all of -- all
14  of telephone support.
15       Q.   Okay.
16       A.   And in -- I didn't have any geographical
17  responsibility, per se, for the on-site piece then --
18       Q.   Okay.
19       A.   -- that I had had before. Mike Mayfield took
20  the on-site piece, and I took the -- the big piece,
21  which was telephone support.
22       Q.   Okay. Now, can you just describe for me what
23  telephone support is?
24       A.   Telephone support is a bank of expertise that
25  are ready and willing, 24 hours a day, seven days a

38

1   week, to answer customer requests. At Oracle, those
2   requests are called T -- T --
3        Q.   T-A-R-s?
4        A.   T-A-R-s, TARs, yes. Technical assistance
5   request. Now, that technical assistant request can be
6   anything from how do you do this, how do I do that, how
7   do I do something else, all the way to essentially the
8   customer having found a bug in the software that can
9   only be repaired by a patch.
10       Q.   Okay.
11       A.   Many of the TARs are simply the customer
12  hasn't installed known patches that are there that they
13  haven't put in yet. So they run the full gamut of
14  advice to, gee, you've actually unearthed a problem with
15  our code that has to be repaired.
16       Q.   Okay. Now -- and this is all over the
17  telephone?
18       A.   This is all over the telephone, yes.
19       Q.   Okay. So are you saying that TARs, or
20  T-A-R-s, would only be communicated over the telephone?
21       A.   Yes. That's how they come in. They come in
22  over the telephone.
23       Q.   Okay.
24       A.   On occasion, when we felt that the customer
25  was not managing their TARs, because they have to be

39

1   managed -- and I'll touch on that in the next
2   sentence -- we would put someone on-site to do that for
3   them. And most of those were occasions when we thought
4   the customers was either not managing or over their
5   head.
6        And, you know, we could take the approach, you
7   know, You should get smarter. That would be one thing
8   we could do. Or we could say, They're never going to
9   get smarter; let's go help them, because we're the one
10  that's suffering the brunt of them not understanding how
11  to operate the equipment.
12       Q.   Okay.
13       A.   And so on occasions that were real brutal or
14  if the customer just gave up in frustration, we would do
15  that. Very common circumstances in those times when we
16  would put somebody on-site, the customer would have
17  employed either Oracle or, many times, another
18  consultant, like Deloitte & Touche or Andersen, to put
19  the software up for them. We call that "going live."
20  They would buy the software, and going live is when it's
21  actually running whatever it's supposed to run.
22       Each one of these consultants will run around
23  calling the support center asking questions. Every one
24  of those calls is a TAR.
25       Q.   All right. So the sales consultants, the

40

1   people who are actually --
2        A.   No. These are not sales consultants.
3        Q.   Okay.
4        A.   These are consultants that are on-site, that
5   are actually doing what is necessary to implement the
6   code. Oracle had a whole consulting group. When I was
7   there, the head of consulting was Sandy Sanderson.
8        Q.   Okay.
9        A.   And that group is paid to go in and implement
10  that software for the customer. Now, every -- there
11  might be 28 consultants on-site. And those consultants
12  will show up on-site, and then they'll go back and do
13  some work wherever they're from. Well, they will put in
14  TARs and then they'll go away. So when we try to answer
15  the TAR, there is no one there at the customer site,
16  which is where we call back to, to give them the answer.
17  So these TARs build and build and build. And, you know,
18  I've seen as many as 150 for an installation.
19       Q.   Okay.
20       A.   So once they get that far out of sight, the
21  consultant, if you haven't reach them, which, of course,
22  we call the customer site and they're not there, then
23  when they miss their deadline, they will tell the
24  customer, Well, I couldn't do it, because this product
25  has all these TARs, and I didn't get those answers.

41

1    So the point I'm making is a TAR is not
2  necessarily and many times is not a problem.  It's a
3  request for information.
4    Q.  Okay.  And -- so you indicated that sometimes
5  the consultants would call support?
6    A.  Many times.
7    Q.  Many times consultants would call support, and
8  that would create a TAR.
9    A.  Yes.
10   Q.  Is that fair?
11   A.  Oh, absolutely.
12   Q.  And --
13     MR. HARRISON:  Objection.  Vague as to time.
14     THE WITNESS:  The entire time I was at Oracle,
15  consultants would call support and create a TAR.
16  BY MR. WILLIAMS:
17   Q.  Okay.  And --
18   A.  All consultants, not just Oracle consultants.
19   Q.  Okay.  You said that sometimes a TAR could be
20  that it can't be fixed unless there is a patch; is that
21  right?
22   A.  That's right.
23   Q.  All right.  Now, did support issue patches, or
24  was that some other organization?
25   A.  No.  Engineering issued patches; support made

42

1  customers aware of those patches --
2    Q.  Okay.
3    A.  Helped and instructed customers how to install
4  those patches.
5    Q.  Okay.
6    A.  Told customers which patches they should
7  install and which ones would fix which problems.
8    Q.  Okay.  Now, I'm directing your attention into,
9  you know, late '99 into 2000, through the spring of
10  2000.
11     Did Oracle have what's called a development
12  organization?
13   A.  Sure.
14   Q.  And what is your knowledge of what the
15  development organization was?
16   A.  Well, the development organization --
17  engineering in development, two things happen.  Patches
18  on existing code are created and new code is created for
19  new versions of the product, and new products are
20  created.
21   Q.  Okay.  So when you say "engineering," are you
22  saying --
23   A.  Development.
24   Q.  Are you using --
25   A.  Engineering development.  The same thing.

43

1    Q.  Oh, okay.
2    A.  In my mind, the same thing.
3    Q.  All right.
4    A.  I think that would be true in most --
5    Q.  Okay.
6    A.  -- Oracle vernacular.
7    Q.  All right.
8      THE COURT REPORTER:  I just need you guys to
9  talk one at a time, if you don't mind.
10     MR. WILLIAMS:  I'm sorry about that.
11     MR. HARRISON:  Make sure you listen to the
12  question.
13     MR. WILLIAMS:  You don't have four hands?
14  BY MR. WILLIAMS:
15   Q.  Okay.  So in 2000, your responsibility was,
16  you know, you had taken over support, as you described?
17   A.  Right.
18   Q.  Al Snyder wanted you to --
19   A.  (Indicates affirmatively).
20   Q.  Now -- and you still reported to Al Snyder?
21   A.  Yes, until he left, I believe, in -- and I'm
22  not sure of the date, but I think it's June --
23   Q.  Okay.
24   A.  -- of that year.
25   Q.  And who did you report to after Al Snyder

44

1  left?
2    A.  I reported to Mike Rocha.
3    Q.  Mike Rocha.  And do you know who he reported
4  to?
5    A.  Larry Ellison.
6    Q.  Okay.  Were you -- where were you physically
7  located?
8    A.  Orlando.
9    Q.  Still in Orlando.
10     Okay.  Do you know where Mike Rocha was?
11   A.  Yes.  Redwood Shores.
12   Q.  And how did --
13   A.  At the Oracle Corporate complex.
14   Q.  Okay.  And how did you typically communicate
15  with Mr. Rocha?  E-mail?  Phone?
16   A.  E-mail, phone, and in-person meetings.
17   Q.  In person.
18     Did you often fly out to the California --
19   A.  Much too often, yes.  It's one of the things
20  that contributed to my desire to retire.  I was spending
21  a great deal of time on airplanes from Orlando to San
22  Francisco.
23   Q.  It's a long flight.
24   A.  If you have made that flight, you know what
25  it's like.  And many times -- many times it would be the

45

1 red eye, just to try to make time management work.
2 So -- so I saw a future of doing that many more times.
3     Q.  Why is that?
4     A.  Well, if I were going to stay in Orlando and
5 they were going to stay in California and we were going
6 to have meetings, I just guessed that it was going to be
7 me flying.
8     Q.  Larry is not going to come to your office?
9     A.  I didn't think so.  Neither was Mike.
10    Q.  Okay.  Now, early in -- well, in the spring of
11 2000 -- well, withdrawn.
12        Have you heard of 11i?
13    A.  Oh, sure.
14    Q.  Okay.  And what is it, if you know?
15    A.  11i is the next iteration of 10.7, which was
16 ERP software.  ERP software is enterprise-wide software.
17 And it's built to totally run the corporation, pick to
18 pay.  Your picking, your packing, your invoices, your
19 accounts receivable, your accounts payable, your
20 employee records, everything.
21    Q.  You said that was 10.7?
22    A.  That's what 10.7 did.
23    Q.  Okay.
24    A.  And that's what 11i --
25    Q.  Okay.

46

1     A.  So 11i was the next iteration of 10.7, with
2 more whistles and bells, more Internet ready.  10.7
3 was -- was the Internet but -- but even more Internet
4 ready.
5     Q.  Okay.  And have you heard of customer
6 relationship management software?
7     A.  CRM, yes.
8     Q.  Right.
9     A.  Uh-huh (Indicates affirmatively).  I don't
10 think it was in the original 11i release, but I believe
11 it was going to be included in, like, the next point
12 release it was.
13    Q.  And what is your recollection of whether it
14 was -- whether it was or was not going to be in the
15 original release generally?
16    A.  I don't know.
17    Q.  Okay.
18    A.  I don't recall.
19    Q.  Okay.
20    A.  I don't recall any conversations about that.
21    Q.  Okay.  And do you -- do you know whether 11i
22 was also referred to as the 11i Suite or the E-Business
23 Suite?
24    A.  Absolutely it was.  Yes, I do recall that.  I
25 recall that our mantra at the time was that 11i would do

47

1 your whole work for you as opposed to buying a piece of
2 software from many different companies and then hiring
3 consultants to wire it all together.
4     Q.  And sew -- and sew it all up together?
5     A.  Right.  And I think that was pretty much known
6 as the best of breed approach, where you buy some from
7 A, some from B, some from C and then latch that whole
8 thing together as opposed to having one suite of
9 software products that do the whole thing.
10    Q.  And throughout -- well, do you know when 11i
11 was released?
12    A.  You know, I don't.  My recollection is dim
13 there.  But I know I had 40 folks trained before the
14 first 11i shift.  And we thought we were in pretty good
15 shape there.  We were working real hard to have the
16 training done before they shipped the first product.  So
17 my guessing is it would be in the, maybe, the late
18 summer of 2001 or summer of 2001.
19    Q.  2001.  Well, you were gone in August of '01,
20 right?
21    A.  Right.
22    Q.  So --
23    A.  So it would have been before that.  So it
24 would have been 2000.
25    Q.  Okay.  All right.  Now, while -- now, was

48

1 that -- was 11i Suite one of the products that your --
2 the people that reported to you supported?
3     A.  Oh, yes.
4     Q.  Okay.  And how -- the people that reported to
5 you in 2000 -- I don't recall if you gave me a number of
6 how many there were.  Do you know?
7     A.  You mean the total number?
8     Q.  Yeah, that reported to you.
9     A.  Well, in my organization, there was -- I don't
10 know -- a thousand.
11    Q.  Okay.  And you all -- and you were at the top
12 of that organization?
13    A.  Right, right.
14    Q.  Okay.  How did you gather information about
15 what was happening in your organization?  Were there
16 certain reports prepared that were ultimately rolled up
17 to you?
18    A.  Yes.
19        MR. HARRISON: Objection.  Vague.
20 BY MR. WILLIAMS:
21    Q.  Okay.  And what type of reports?
22    A.  Well, we looked at -- we looked at many
23 different reports.  You know, we looked at a lot of the
24 deficiency reports, time for problems, number of
25 problems, how long we were spending for a request.

49

1    One of the things we were really hot on in
2  2000 and into 2001 is converting as many calls as
3  possible to electronic calls, so the customer would
4  satisfy their own answer by -- by asking the question
5  electronically and having the computer give them an
6  answer.  And we had -- put a lot of effort into that.
7  So we were getting those reports on -- on a daily basis.
8    I also had some work going on in applications
9  that were looking at the top 20 TARs.  By that, I mean,
10  you know, a TAR doesn't just come in once; it comes in
11  many times.  So -- so what were the top TARs, and what
12  was the -- you know, what could we advise engineering or
13  development to do, or what could we do to keep -- to
14  keep those TARs from coming in?
15    Q.  So you really don't recall what types of --
16  well, the specific types of the reports, but you know
17  you did look at reports.
18    A.  Well, I just described them.
19    Q.  Right.  Okay.  But did they have titles that
20  you remember or --
21    A.  No.
22    Q.  Okay.  Now, did you -- did your organization
23  or did you have a quota or a target number that you were
24  required to meet?
25    MR. HARRISON:  Objection.  Vague.

50

1  BY MR. WILLIAMS:
2    Q.  Same period of time.
3    A.  A what?  A quota of what?
4    Q.  Well, I'm just trying to understand your
5  organization.  Did you have -- you had a budget for your
6  organization, right?
7    A.  I had a budget.
8    Q.  And did that include a -- well, part of it,
9  you had an expense number that you could spend --
10    A.  Right.
11    Q.  -- right?
12    And did you have an earnings requirement for
13  your organization?
14    A.  Yes, I did.
15    MR. HARRISON:  Objection.  Vague, just the
16  term "requirement."
17  BY MR. WILLIAMS:
18    Q.  Okay.  And what -- what was it referred to?
19    A.  I had a revenue goal.
20    Q.  Okay.  That's what I was trying to get at.
21    All right.  And -- and that -- and how was
22  that revenue goal achieved?  And what I'm asking is --
23  it sounds like you were providing a service.  Did
24  customers have to pay for support --
25    A.  Yes.

51

1    Q.  -- when they called in?
2    A.  Yes.
3    MR. HARRISON:  Objection.  Vague.  Just --
4    MR. WILLIAMS:  I'll ask the question.
5    MR. HARRISON:  I don't want to talk over you,
6  so --
7    MR. WILLIAMS:  All right.
8    THE WITNESS:  No.  They didn't pay when they
9  called in.  They paid yearly.
10  BY MR. WILLIAMS:
11    Q.  Okay.
12    A.  And they would renew their service yearly.
13    Q.  Okay.
14    A.  And I would achieve my budget goal three ways.
15  I would achieve my revenue budget by renewing those
16  service contracts.  That was the bulk of the income.
17    Q.  Okay.
18    A.  I would further upsell the customer, so if
19  they had basic service, I would try to sell them more
20  advanced services --
21    Q.  Okay.
22    A.  -- or any service they didn't have.  When they
23  renewed, we tried to upsell them.  And the third way
24  would be new business that sales would go sell that I
25  would start recognizing as part of my annuity stream for

52

1  renewal business.
2    Q.  Okay.  And in your organization, still talking
3  about, you know, the year 2000 and into 2001 at Oracle,
4  did you have a sales staff that also reported to you?
5    A.  We did.  I had a group of people that renewed
6  these contracts, and they worked for a Chris Madsen, who
7  reported to me --
8    Q.  Okay.
9    A.  -- after -- after Al Snyder left.  He reported
10  to Snyder before he left.
11    Q.  Okay.  And he was responsible, aside from you,
12  directly responsible for renewals or upsales?
13    A.  Both.
14    Q.  Both.
15    Okay.  And people that reported to him, that's
16  what they focused on?
17    A.  Exactly.
18    Q.  Now, how was your revenue goal set?  We're
19  still talking 2000, early 2001.  Was it set by Michael
20  Rocha or someone else, or was it something that you
21  created?
22    A.  Well, we all participated.  It was a
23  partnership thing.  But I would -- but I would say that
24  Oracle finance had the lion's share of the -- of the
25  input on that.

53

1   Q.  Okay.  And when you say "finance," who are you
2   referring to?
3       A.  I'm referring to the Henley finance
4   organization.
5       Q.  And that -- so the revenue goal might be
6   communicated from Henley's organization to Rocha down to
7   you and you down to Madsen and --
8       A.  Well, typically, what they would do is they
9   looked at -- you know, it's an annuity stream.  Right?
10  So you can see what you're billing monthly.  So you
11  simply look at that, and then figure a renewal rate;
12  historically, what are you renewing?  So that's money
13  you are going to get, right?  And then you add new
14  business to that and a small component of upsales.
15      Now, typically, they would tell Rocha, Here is
16  what we think service should do.  Rocha would negotiate.
17  Or if he thought it was right, say, Yes, fine, or, We
18  can do some more, or, We think that's too high.  But
19  they would compare their numbers, and Rocha would end up
20  with a number.  Rocha would then bring that back to all
21  of us, me in the Americas, Cadogan in Europe, and Tony
22  Tonyan in the greater international area.
23      Q.  Okay.  Now, you --
24      A.  So it's a process, you know.
25      Q.  Okay.  You mentioned that, you know, with

54

1   renewals, you could just look at what you have and, you
2   know, can assume that you'll get those renewals and then
3   hope to get new business.
4       A.  And some -- and some --
5           MR. HARRISON:  Objection.  Misstates
6   testimony.  Assumes facts not in evidence.  Thank
7   you.
8       Go ahead.
9           THE WITNESS:  You have to make some
10  assumptions.
11  BY MR. WILLIAMS:
12      Q.  Okay.
13      A.  When you look at a revenue stream that's
14  coming in on the support business and then make a
15  renewal rate assumption.
16      Q.  I see.
17      A.  So you're going to assume that you -- will we
18  do 95 percent or 85 percent or 10 percent?
19      Q.  Okay.  There --
20      A.  So -- sorry.  Go ahead.
21      Q.  There are times when a customer that's got a
22  support contract doesn't renew, right?
23      A.  There are times.
24      Q.  And in your experience at Oracle during the
25  same period we've been talking about, what were some of

55

1   the circumstances surrounding when a customer would not
2   renew a support contract?
3           MR. HARRISON:  Objection, vague.
4           THE WITNESS:  Well, there are -- when
5   customers actually don't renew -- not threaten to
6   not renew, but actually don't renew -- it's
7   typically because they've converted to another
8   software or very small customers can no longer
9   afford to pay their support bill or they go out of
10  business.
11  BY MR. WILLIAMS:
12      Q.  Okay.  And what about -- withdrawn.
13      What do you mean when a customer threatens not
14  to renew?  What are you referring to?
15      A.  Well, the -- the ongoing relationship with a
16  customer is highlighted each year at renewal time.  So
17  at renewal time, a large customer might be renewing a
18  million or two million dollars worth of support
19  services.  And a large customer finds that a very
20  advantageous time to get from Oracle whatever they
21  haven't believed they've gotten so far.
22      So they might say, Jeez, I'm not going to
23  renew this contract unless you..., and whatever that
24  might be.  It might be, We're having trouble with going
25  live.  We want more support from Oracle.  We want an

56

1   on-site person.  We don't want to pay for it, by the
2   way.  It might be, We want another consultant to come in
3   and do something.  It might be, We want some free
4   software, because this doesn't do what you said it would
5   do; so we think to make up for it, you should give us
6   some more stuff.
7       Q.  Okay.
8       A.  So it just depends on what situation they're
9   in at renewal time.
10      Now, if things are running smooth and there is
11  nothing to negotiate, then -- then sometimes they
12  negotiate a price.  They will say, Look, we've
13  standardized our whole company on Oracle products, and
14  you're charging us the list price for this support.  We
15  have come and given you testimonies at Oracle World
16  three times.  We're your best advertisement, and you're
17  going to charge us this book price?  I don't think so.
18  And we negotiate.
19      Now, there are companies that will not
20  negotiate that price.  Oracle is not one of those
21  companies.  Oracle will negotiate that price.  All
22  customers know that.  They have negotiated it in the
23  past, and they believe they will again in the future.
24  In my tenure there, Larry was trying very hard to get to
25  a price book mentality:  Look, here is what it costs;

57

1   let's stop all this negotiating.
2       But that was -- that had not been achieved
3   when I left.  Sales could negotiate the price, service
4   could negotiate the price.  So customers understood that
5   and many times tried to avail themselves of that.
6       MR. WILLIAMS:  Okay.  The videographer needs
7   to change his tape, so this might be a good time to
8   take five minutes.
9       MR. HARRISON:  Yes.
10      MR. WILLIAMS:  Okay.
11      THE VIDEOGRAPHER:  This is the end of Tape 1
12  of the deposition of Richard Sellers.  It is 11:37.
13  We are off the record.
14      (Brief recess was taken.)
15      THE VIDEOGRAPHER:  This is the beginning of
16  Tape No. 2 of the deposition of Richard Sellers.
17  It is 11:51.  We are back on the record.
18  BY MR. WILLIAMS:
19      Q.  One of the things you mentioned earlier in our
20  discussion was that you recall that your organization
21  had missed its forecast for the third quarter of '01; is
22  that right?
23      MR. HARRISON:  Objection.  Misstates
24      testimony.
25  BY MR. WILLIAMS:

58

1       Q.  Was that your testimony, generally?
2       A.  No, I don't believe I said that.
3       Q.  Okay.  Well, what -- do you know what I'm
4   talking about, the general subject matter of what I'm
5   referring to -- withdrawn.
6       A.  I don't.
7       Q.  Okay.  You know, correct me if I'm wrong.  I
8   thought you testified that you were -- when you were
9   explaining to me about the reasons why you would be
10  testifying, I thought that you mentioned that the --
11  your miss was such a small miss that you didn't think it
12  was that meaningful.  Or is that fair?
13      A.  Yes, yes.  That's correct.
14      Q.  Okay.  What quarter was that?
15      A.  And I was talking about the Q3 --
16      Q.  Okay.
17      A.  -- 2001.
18      Q.  Right.  Q3 '01.
19      A.  Right.
20      Q.  Right.  Ending March -- I'm sorry, ending
21  February 28th or 29th of --
22      A.  Ending the last day of February.
23      Q.  Ending the last day of February.
24      Okay.  All right.  What -- can you explain to
25  me what you're referring to?  Did your organization

59

1   actually miss its forecast for that quarter?
2       A.  Yes, we did.
3       Q.  And do you know --
4       A.  We missed our budget for that quarter.
5       Q.  Budget.
6       A.  And I --
7       Q.  Sorry.
8       A.  And forecast.
9       Q.  Okay.  Are they different?
10      A.  They can be.
11      Q.  Okay.
12      A.  In this case, they were not.
13      Q.  All right.  Tell me how they can be different.
14      A.  Well, you may be budgeted to -- to do X amount
15  of revenue.  But at the beginning of the quarter, you
16  look at it and then say, No way is this going to happen;
17  it's just not.  So I will change my forecast.  And
18  forecasts not budget but something less than budget.
19      Q.  Okay.  So the budget pretty much remains the
20  same?
21      A.  The budget never changes.
22      Q.  Okay.  But your forecast within that budget or
23  outside of it might change?
24      A.  Could.
25      Q.  Okay.

60

1       A.  Could change.
2       Q.  Okay.  All right.  And in Q3 '01, your -- in
3   that instance, the budget and the forecast were the
4   same?
5       A.  Yes, they were.
6       Q.  And your organization missed that number?
7       A.  Yes, we did.
8       Q.  And was that something -- is that something
9   that you have an independent recollection of, or is that
10  something you remembered yesterday after reviewing some
11  documents?
12      A.  I have an independent recollection of that.
13      Q.  Okay.
14      A.  And I remembered it more vividly yesterday.
15      Q.  Okay.  Well, tell me about your independent
16  recollection of it, what you remember independently.
17      A.  Well, I -- independently, I remember that we
18  were in good shape coming into Q3.  The numbers looked
19  good.
20      Q.  Okay.
21      A.  I forecast budget.  I thought we would easily
22  do it.  And the money that we started posting was short
23  of what we thought it should be.
24      Q.  Okay.  And that was your independent
25  recollection?

61

1    A.  My independent recollection was we -- we --  we
2  had software problems in posting revenue.
3    Q.  Okay.
4    A.  And we ended up very close to budget but
5  slightly missed.
6    Q.  Okay.  Now, when you -- now, the first thing
7  you said was that you recall being in good shape kind of
8  going into Q3.
9    A.  Right.
10    Q.  What did you mean by that?
11    A.  Well, Q2 looked great.  All the numbers
12  stacked up, looked fine.
13    Q.  Okay.
14    A.  The revenue stream, I worked -- the revenue
15  stream looked good.  There was no reason to believe that
16  Q3 would not be good.
17    Q.  Okay.  And when you say "numbers," just so we
18  stay on the same page, are you referring to prospective
19  renewals, prospective new business --
20    A.  Yes.
21    Q.  -- for your organization?
22    A.  Exactly.
23    Q.  Okay.  And -- so when you say that you had
24  software problems for posting revenue, what do you mean?
25    A.  Well, when -- when January was low from the

62

1  annuity base -- that's the renewal base -- was low from
2  what we thought it should be, we started investigating
3  where -- where -- where is the money.
4    Q.  Right.
5    A.  And it wasn't until -- of course, we didn't
6  see a January number until the end of January.
7    Q.  Sure.
8    A.  So -- no.  Excuse me.  December.  December was
9  a little bit low, but not alarming, because the first
10  months of the quarter are always low.  The way the
11  revenue comes in is the first month is low, the next
12  month is a little higher, and the last month is big.
13    Q.  Okay.
14    A.  And that happens because most businesses
15  closed at the end of a quarter.  And since most
16  businesses closed at the end of quarter, one year later
17  when you renew, most renewals happen at the end of the
18  quarter.  So while December was a bit low, it didn't
19  look -- it wasn't too suspicious.  When January was low,
20  we thought something had to be wrong.
21    Q.  Okay.
22    A.  When we started trying to investigate more,
23  you know, deeply, we were unable to receive or get the
24  reports that we needed to get, because we -- finance had
25  put up a new revenue recognition software, and it

63

1  wouldn't run any reports that we wanted.  What we were,
2  of course, after was what was due to be renewed, what
3  was renewed, what was not renewed, so then we could put
4  all of our efforts on bringing in any business that was
5  not yet renewed.  We couldn't get those reports.
6    Q.  Okay.  Now, was it typical for -- withdrawn.
7      You said that, you know, December was a little
8  low but not alarming.  And was it typical for you to
9  look at the numbers after each month of the quarter?
10    A.  Yes.
11    Q.  Okay.  And is that something you would do and
12  report to Mike Rocha -- or Rocha?
13    A.  Yes.  Well, the -- I had a finance manager.
14    Q.  Okay.
15    A.  And the finance manager put all the numbers
16  together, and I would have to submit a forecast to
17  Rocha.
18    Q.  Okay.
19    A.  And my finance manager would put together what
20  we thought was the forecast, to his -- best of his
21  ability.  I would look at it and add any intelligence
22  that I could add, and we would submit a forecast.  In
23  that forecast was a renewal rate, what we were renewing,
24  what we had already renewed, not specifically broken
25  out.  I'm just telling you the intelligence that was in

64

1  that.
2    Q.  Sure, sure.
3    A.  What we were doing and new business we had
4  posted and upsales we had posted.
5    Q.  Okay.
6    A.  And any arrears billing that we were doing,
7  because, of course, every quarter there is some business
8  that doesn't close in the prior quarter.  You bring it
9  forward to the next quarter and close it.  So that's,
10  essentially, the main ingredients of the revenue
11  question.
12    Q.  Who would you -- who was your finance manager
13  in 2000?
14    A.  Bill Shunk.
15    Q.  That was Bill Shunk.  Okay.
16    A.  Bill put all the numbers together.
17    Q.  Okay.
18    A.  At that same time, he would work with -- we
19  had a U.S. finance manager that worked for finance.
20  Bill worked for me.
21    Q.  Who was that?
22    A.  Roberto, something or other.
23    Q.  Fajardo?
24    A.  Ricardo?
25    Q.  Fajardo.

65

1    A.  Oh, maybe.  Yeah, that sounds familiar.  I'm
2  not sure.
3    Q.  Okay.
4    A.  His first name was Roberto.  He only was there
5  for just a few months.
6    Q.  All right.
7    A.  I worked with him through this one crisis.
8  And at the end of the year I left, and I think he left
9  as well.
10    Q.  All right.
11    A.  So we put together a forecast.  I would bless
12  it and say, Yeah, that's -- I'll sign up for that, and
13  we would submit it.
14    Q.  Now, that was -- I just want to be clear.
15  That was every quarter, right?
16    A.  Every month.
17    Q.  Every month?
18    A.  (Indicates affirmatively).
19    Q.  So it could be that your forecast changed from
20  the budget on a monthly basis; sometimes it would,
21  sometimes it wouldn't?
22    MR. HARRISON:  Objection.  Calls for
23  speculation.  Lacks foundation.
24    THE WITNESS:  It could have.  I could change
25  the forecast --

66

1  BY MR. WILLIAMS:
2    Q.  Okay.
3    A.  -- from month to month to month.
4    Q.  Okay.  So what I'm getting at:  Just because
5  you start out with a forecast in the beginning of the
6  quarter doesn't mean that's going to be the forecast
7  throughout the quarter, right?
8    A.  No.  It's rolling.  In fact, we're forecasting
9  ahead, you know, several quarters.
10    Q.  Okay.  That's fine.  So was it after January
11  that you began to look at the numbers with a little bit
12  more concern?
13    MR. HARRISON:  Objection.  Vague as to time.
14  BY MR. WILLIAMS:
15    Q.  January of 2001.
16    MR. HARRISON:  Objection.  Vague.
17    THE WITNESS:  In Q3 of 2001, after we got the
18  January numbers, I was concerned --
19  BY MR. WILLIAMS:
20    Q.  Okay.
21    A.  -- because I thought that something was
22  amiss --
23    Q.  Okay.
24    A.  -- that we were too low in the combination of
25  December and January.  My first thought was we had a ton

67

1  of stuff that hadn't renewed and that I needed to go
2  work the renewal people and solve the problem that way.
3    Q.  And that's Chris Madsen and his crew?
4    A.  Exactly.
5    Q.  Okay.  Do you remember anybody else in
6  renewals under Chris Madsen?
7    A.  She had a -- he had a dynamite lady that was
8  managing one of the renewal groups named Kathleen
9  something or other.
10    Q.  Okay.
11    A.  And that's the only one I remember.  And then
12  I knew a couple of the renewal people just from speaking
13  and being around.
14    Q.  Okay.
15    A.  But I don't even recall their names now.
16    Q.  Okay.  So after January, when you felt
17  concerned, did you go talk to Chris --
18    A.  Oh, yes.
19    Q.  -- about it?
20    A.  Yeah.
21    Q.  And can you tell me about that?
22    A.  Well, that's when we tried to get reports.
23    Q.  Sure.
24    A.  Right?  And that's when I found out that we
25  had put up new software -- I really didn't know before

68

1  then -- and that we weren't able to get reports.
2    Q.  I see.
3    A.  And -- and I think -- you know, we became
4  progressively more concerned as the days ticked by.  At
5  first, I don't think there was a lot of alarm.  We just
6  assumed we had a normal, natural problem that we could
7  solve.  As it got later and later and the revenue didn't
8  come, we got more and more concerned about it.  But one
9  of the things that Chris did early on is he got his
10  folks to start creating spreadsheets off of his data
11  base, not off of the -- I think -- not off the financial
12  data base --
13    Q.  Okay.
14    A.  -- which is probably not a -- well, that's
15  what we had, so that's what we went by.  So he started
16  creating spreadsheets, because we were trying to find
17  the money.  And we couldn't see it out here in stuff
18  still to be done.  So we were concerned, because we are
19  looking at what we had posted, December, January, and
20  what -- if we closed everything in February that we
21  could tell that we had, we still wouldn't be there.
22    Q.  Okay.
23    A.  So that brought a lot of concern for us.
24    Q.  All right.  And is that something that you
25  reported up to Michael Rocha?

69

1    A.  Absolutely, yes.
2    Q.  Okay.  And do you recall what his response
3  was?
4    A.  Yeah.  This was his first quarter.
5    Q.  As?
6    A.  As the manager.  It was his either first or
7  second.  And he said, What in the hell is going on?
8  What are you doing?
9    Q.  He doesn't want to miss his first quarter.
10   A.  What are you doing?
11   Q.  Okay.  So was he angry?
12   A.  No, no.  He was concerned.
13   Q.  Okay.
14   A.  He was like me.  He was concerned.  He wanted
15  to understand what was happening.  And I spent a lot of
16  time trying to educate and get all of the forces at play
17  here on the same page so they would -- you know,
18  everybody was saying it's something different.
19  Everybody had a different story to tell.
20   Q.  Okay.
21   A.  And I tried to get Mike and my direct reports
22  all on this -- singing from the same sheet of music.
23   Q.  Okay.  Now, where was Chris Madsen
24  geographically located?
25   A.  He reported to an office in -- corporate

70

1  Oracle.
2    Q.  So he was -- he was --
3    A.  In San Francisco, yeah.
4    Q.  -- in San Francisco --
5    A.  San Francisco, yeah.
6    Q.  -- or California somewhere?
7    A.  Yeah, California.
8    Q.  And, now, once you developed this concern in
9  January of '01, did you fly out to California?
10   A.  Well, I was out there every week, yeah, so I
11  was there.  We did many things.  We got with finance.
12  We had a finance manager start investigating the revenue
13  recognition program.
14   Q.  Okay.
15   A.  Had everything we sent up and processed.
16   Q.  Okay.
17   A.  We had many meetings like that.  We had the
18  comptroller looking into Rocklin where they processed
19  all of this, what were the processes going on there, you
20  know.  We were trying to be open minded about it and
21  look at every conceivable, possible scenario.
22   Q.  Okay.
23   A.  The reason we believed -- and I think we were
24  borne out -- that it had to be a process problem, that
25  it wasn't a nonrenewal problem, is because for it to be

71

1  a nonrenewal problem, if those numbers stood that we
2  were seeing, the renewal rate would have had to fall to
3  70 percent, or thereabouts.  And that's unheard of.
4  It's unheard of.  I mean, you don't run around at --
5  between 90 and 95, 96 and fall to 70.
6    Q.  Not in renewals?
7    A.  No.  It's -- this is the annuity business.
8    Q.  Okay.  Now, you indicated that there was some
9  sort of revenue recognition software upgrade?
10   A.  Yes.  The revenue recognition software was
11  changed from what I'll call the old processor to the new
12  process.
13   Q.  Okay.  Was that part of 11i?
14   A.  You know, I don't know.  I don't know.  I
15  don't remember every -- ever talking about that.
16   Q.  Okay.  And the old processor, did it have a
17  name?
18   A.  Just one of the things I familiarized myself
19  with.  I believe it was called GSR.
20   Q.  What does that stand --
21   A.  I do not know.
22   Q.  Okay.
23   A.  Global service revenue.
24   Q.  Okay.
25   A.  I don't know.  I'm guessing.

72

1    Q.  Okay.  That's fine.  And the new processor,
2  what was that called?
3    A.  OKS.
4    Q.  Okay.  And was that part of 11i?
5    A.  I don't know.
6    Q.  Okay.  And prior to -- well, withdrawn.
7     You said at some point you learned that there
8  was this upgrade, but you hadn't known about it before.
9    A.  Right.
10   Q.  Do you know when you learned about the
11  upgrade?
12   A.  I don't know the time I learned.  The event
13  that caused me to learn is when I asked for the
14  reports --
15   Q.  Okay.
16   A.  -- that would show me what I had not billed so
17  I could go bill it.
18   Q.  Okay.  So at that time --
19   A.  I was informed we can't run that report.
20   Q.  All right.  Because GSR was no longer running?
21   A.  Right.  We don't have that anymore.
22   Q.  Okay.
23   A.  We don't have that ability anymore.
24   Q.  All right.  And who told you that?
25   A.  Probably one of the finance people.

73

1    Q.  Okay.
2    A.  Probably Bill or one of the folks that was
3  working with finance.
4    Q.  Okay.  Now, you said that you had -- you were
5  in California weekly around that time.  You had several
6  meetings concerning this issue, right?
7    A.  Well, I was in California a great deal.  So,
8  you know, I don't recollect making a trip just to
9  discuss this issue.
10    Q.  All right.
11    A.  Certainly, I discussed this issue quite a bit
12  in person with Mike --
13    Q.  Sure.
14    A.  -- and on the phone almost every day.
15    Q.  Okay.  And did you -- when you had the
16  face-to-face meetings with Mike Rocha, did Jennifer
17  Minton ever attend any of these meetings?
18    A.  No.
19    Q.  How about people from the Rocklin office?
20    A.  I don't recall them being there.
21    Q.  Okay.  You indicated that you -- at one point
22  you had the controller looking into it as well, right?
23    A.  Right.
24    Q.  Who was the controller at that time?
25    A.  I thought that was Jennifer Minton.

74

1    Q.  That was Jennifer Minton.
2    A.  Yeah.
3    Q.  But you didn't meet with her personally?
4    A.  No, I did not.
5    Q.  All right.  Did you communicate -- I'm sorry.
6    A.  I was on a conference call with her several
7  times.
8    Q.  Okay.  On this issue?
9    A.  On this issue.
10    Q.  Okay.  And how about -- withdrawn.
11      Had you ever heard of Tom Williams?
12    A.  Tom Williams?
13    Q.  Uh-huh (Indicates affirmatively).
14    A.  I don't recall that name.
15    Q.  Okay.  Did you go up to Rocklin?
16    A.  I did not.
17    Q.  Do you know what is in Rocklin?
18    A.  I do.
19    Q.  Okay.
20    A.  I --
21    Q.  We're talking about Rocklin, California,
22  right?
23    A.  Yes.
24    Q.  All right.  And that's a city or town, or
25  something like that, right?

75

1    A.  (Indicates affirmatively).
2    Q.  Do you know what's there with respect to
3  Oracle?
4      MR. HARRISON:  Objection.  Vague.
5      THE WITNESS:  I don't know with certainty
6  what's there.  My understanding was that that was
7  the processing place where clerks were taking the
8  POs that I generated and the service contracts that
9  I generated and inputting them into the revenue
10  processing software and that the software cut the
11  invoices and credited me the revenue.
12  BY MR. WILLIAMS:
13    Q.  Okay.  Did you ever see those invoices?
14    A.  I did not.
15    Q.  Did you ever get a spreadsheet identifying the
16  invoices?
17    A.  Yes.
18    Q.  Okay.  And how would that -- withdrawn.
19      That would be sent to you from Rocklin or
20  somebody else?
21    A.  I got -- I got everything like that that I got
22  from Bill Shunk, who attempted to get reports when none
23  were available.  We finally got reports but far too
24  late.  It was -- the quarter was over when we finally
25  got reports.

76

1    Q.  Okay.  But you had actually began kind of
2  investigating the issue in -- at the end of January?
3    A.  At the end of January.
4    Q.  All right.  So it took a month for you to get
5  the reports that you needed?
6    A.  No.  I never got the reports out of the
7  revenue software.
8    Q.  Okay.
9    A.  They didn't make them.  It wouldn't write
10  them.  They had to go in and develop reports.  And my
11  recollection is that once we realized that we had a
12  problem and we suspected the software, then engineering
13  was requested to write some reports that we could use to
14  investigate the problem.
15    Q.  Okay.
16    A.  But those reports were not a standard piece of
17  the new revenue software --
18    Q.  Okay.
19    A.  -- as there had been those kind of reports in
20  the old revenue.
21    Q.  In the GSR?
22    A.  Yeah.
23    Q.  Did you talk to -- withdrawn.
24      Did you converse with Mark Barrenechea or his
25  organization regarding the ability to create these

77

1   reports?
2       A.  I did not.  I was on several conference calls
3   with him or his people while those reports were being
4   described to him or his people in such a way that they
5   could write them.
6       Q.  Write the code to create the reports?
7       A.  Exactly.
8       Q.  So the -- a time came when you realized that,
9   Okay, our sector for or our division missed our number
10  by "X" amount, right?
11      A.  Yes.
12      Q.  And were there any consequences for you
13  related to that miss?
14      A.  No, there were not.  There were not.  The miss
15  was small, not even -- not even two percent of the
16  total.  I believe that in many e-mails I succinctly
17  explained the problem so that it was clear to people
18  exactly what was going on.  And in the end, the miss was
19  even smaller than -- than I was expecting, that they
20  found some software issues and processed some credit
21  rebills.  They had given credits and had not done the
22  rebills.
23      Q.  What does that mean?
24      A.  Well, they -- sometimes to make a contract
25  work, you might give a customer a credit and then rebill

78

1   that amount.  And the credit had been issued.  For
2   instance, if you're combining several different
3   contracts, you issue a credit and then one rebill so
4   it's all on one bill.  So the credits had been issued
5   but the rebills had not.
6       Q.  When -- how does -- how -- withdrawn.
7           How does one know if a credit has been issued?
8       A.  Well, one doesn't --
9           MR. HARRISON:  Objection.  Vague.
10          THE WITNESS:  One doesn't if one doesn't have
11  reports.
12  BY MR. WILLIAMS:
13      Q.  Right.  But you just indicated, I guess, at
14  some point you learned --
15      A.  Yeah.
16      Q.  -- that a credit was issued.
17      A.  I learned after -- in March.
18      Q.  Okay.  And how did you learn that?
19      A.  Well, actually, I learned right at the end of
20  February, because the money came.  I was forecasting a
21  miss, and the miss turned out to be a little bit smaller
22  than I was forecasting because of --
23      Q.  Because credits had been issued?
24      A.  Yeah.
25      Q.  And that's what I'm getting at.  How were you

79

1   able to identify that a credit had been issued to some
2   customers?
3           MR. HARRISON:  Objection.  Calls for
4   speculation.  Lacks foundation.
5           THE WITNESS:  I didn't identify that.  Finance
6   told me that that had happened, and it amounted to
7   several million dollars.
8   BY MR. WILLIAMS:
9       Q.  Okay.  Did they send you reports, or anything
10  like that?
11      A.  I'm sure they did.  I don't recall the
12  reports.
13      Q.  Uh-huh (Indicates affirmatively).  Had you
14  ever had that occur prior to that day?  Withdrawn.  I'm
15  sorry.
16          Had you ever experienced, prior to this
17  occasion, that a credit had been issued to a customer
18  that had not been rebilled?
19      A.  I had not experienced that, and I would not
20  experience that unless I was digging through my revenue
21  trying to find a miss.
22      Q.  Okay.
23      A.  That's not something that I would just see.
24      Q.  Sure.
25      A.  I would see that only if I were trying to

80

1   understand the minutiae of the revenue flow --
2       Q.  Okay.
3       A.  -- all the puts and takes in the revenue
4   stream, which is what we were doing in Q3 because we
5   were short.
6       Q.  Uh-huh (Indicates affirmatively).
7       A.  Typically, we did not examine to that -- to
8   that degree.
9       Q.  That level?
10      A.  Not me.  I didn't.
11      Q.  Not you?
12      A.  No.  I'm sure -- I'm sure Chris or -- Chris
13  was -- Chris Madsen and those sales folks, of course,
14  are -- are gold on closing business.  So they really
15  worry about how much business they get done in a
16  quarter, because it hits them in the paycheck.  So those
17  folks are who would be really looking at that.  I only
18  look at it when I'm about to have a problem with my
19  number.
20      Q.  So those guys, like Chris Madsen, are
21  commissioned?
22      A.  Yes.
23      Q.  And you were not?
24      A.  I was.
25      Q.  Oh, you were?

Sellers, Richard  2/28/2006  10:41:00 AM

81

1    A.  On my total revenue --
2    Q.  Okay.
3    A.  -- for the year.
4    Q.  So you still had a quarter to make it up if
5  you were low?
6    A.  You bet.
7    Q.  All right.  Now, I'm interested in the -- in
8  the customers that had been issued credits, because I
9  just want to make sure that I understand it.
10    A.  Okay.
11    Q.  And -- so what does it mean when a customer
12  was issued a credit?
13    A.  Well, there is a -- in -- in closing business,
14  there is many times when -- for instance, I'll give you
15  one case.  A customer buys a hundred seats of Software
16  A.  Three months later, they buy 100 seats of Software
17  B, and six months later they buy 100 seats of Software
18  C.  When it comes to -- they buy this for a year.
19    Q.  Let me just stop you.  When you say they buy
20  it, I mean, they pay --
21    MR. HARRISON:  Let him finish his answer.  I
22  don't think he was done.
23  BY MR. WILLIAMS:
24    Q.  Please.  Go ahead.
25    A.  They --

82

1    Q.  Go ahead and finish.
2    A.  They write a check and buy the software.
3    Q.  That's what I was talking about.
4    A.  When that -- when that purchase is made,
5  they -- part of that purchase is one year of software
6  support for that software.
7    Q.  Okay.  So they pay for it up front?
8    A.  That's right.
9    Q.  All right.  Go ahead.
10    A.  Now, when that first year comes up to be
11  renewed, I call them up and say, How about renewing the
12  software on A?
13    They say, Sure, but how about making all of
14  this stuff come at the same time instead of sending me
15  three bills a year?
16    Q.  Okay.
17    A.  I need one bill.
18    And we say, Okay.
19    And in the process of combining all of that,
20  we might issue a credit for the unused portion of B and
21  C and then bill the total.  In that particular case, we
22  would have a credit and a rebill.  And what I was told
23  that amounted to some of the money in the miss was a
24  credit-rebill situation where the -- where they should
25  do this at the same time, credit and rebill.

83

1    Q.  Uh-huh (Indicates affirmatively).
2    A.  Somehow in Rocklin, they did credits and
3  didn't do the rebill.
4    Q.  Okay.
5    A.  So what -- the net affect of that was to lower
6  my revenue by the amount of the credit stream.  They
7  caught that, and it didn't get included.  That's why my
8  miss was smaller than I thought it was going to be.
9    Q.  Okay.
10    A.  They -- at the last minute, they realized what
11  had happened several days before the close, and they did
12  the rebills, and the revenue showed up.
13    Q.  So they had money that -- there was money that
14  had already been paid by a customer.
15    A.  It doesn't necessarily -- okay.  I'm sorry.
16    Q.  No.  Judging just -- and you can correct me.
17  The customer writes a check for more than what they were
18  going to receive.  And -- and, typically, there is a
19  rebill to cover the entire amount.  Is that right, or am
20  I mischaracterizing that?
21    A.  Well --
22    MR. HARRISON:  Objection.  Vague.  Sorry.
23    THE WITNESS:  Let me go through it again.
24  BY MR. WILLIAMS:
25    Q.  Okay.

84

1    A.  I'm only describing one credit and rebill.
2    Q.  Yeah, sure.
3    A.  But it's a very typical, similar -- most of
4  them are similar cases.  The customer gets a credit for
5  the unused part of the support that he had not used, and
6  then all of the support is rebilled or billed for the
7  coming year --
8    Q.  Okay.
9    A.  -- at renewal time.  So in that case, it would
10  be a credit, a credit, and a rebill.
11    Now, he may not have paid.  He may have just
12  been billed --
13    Q.  Sure.  Okay.
14    A.  -- because it shows up, you know -- I'm -- it
15  shows up in my business when they send the -- when they
16  send the bill, not when he sends the check.
17    Q.  Okay.
18    A.  The invoice --
19    Q.  So when it's --
20    A.  -- is what I go off of.
21    Q.  Okay.
22    A.  Right.  So when he -- when they issue a
23  credit, if they don't issue a new invoice, then I will
24  get a negative amount, whatever the credit line was, on
25  my revenue flow.  When they issue the bill -- in this

85

1  case I'm calling it a rebill, because it was billed once
2  and then credited, and now we bill again -- that adds to
3  my revenue.
4      Q.  Okay.
5      A.  Okay.
6      Q.  But it didn't -- but these -- the credits
7  which hadn't been rebilled didn't require the customer
8  to pay again, right?
9      A.  No, no.  It's simply -- no, it's not requiring
10 them to pay again.  It's simply consolidating all of his
11 support agreements into one support agreement.
12     Q.  For those credits?
13     A.  I don't know what you mean for credits.
14     Q.  All right.  I'll withdraw that --
15     A.  Okay.
16     Q.  -- because I know -- I'm trying to understand
17 it as well.
18     A.  Okay.  Okay.  Let me try it one more time.
19     Q.  All right.
20     A.  Let's say you lease a car from me.
21     Q.  Okay.
22     A.  And I say, Okay, it's $12,000 a year.  You've
23 got an expensive car.  $12,000 a year.  And six months
24 later your wife wants a car, so you come to me and you
25 lease your wife's car.  It's $12,000 a year.  Now, you

86

1  paid me $12,000 the first time because you paid up
2  front.  Now, when your wife rented, she paid me
3  $12,000 -- okay? -- because you paid up front for her.
4  So you've paid me $24,000.
5          Now it comes time for your anniversary, and I
6  say, Are you going to renew this lease?
7          And you say, Yeah.
8          And I say, Well, okay.
9          And you say, But, you know, why are you
10 waiting six months to bill my wife's lease, because I'm
11 going to keep that one too?
12         And I say, Oh, you just want one bill for both
13 cars?
14         You say, Yeah.
15         Now, how would I do that?  I have to -- you're
16 fine, but your wife still has six months remaining on
17 her lease.  So I give you a credit -- because you paid
18 up front.  So I give you a credit of $6,000,
19 representing six months, and then I rebill you $12,000.
20     Q.  Okay.
21     A.  Now I have done a credit and a rebill.
22     Q.  I understand.  And the credit itself, does it
23 have a document?  Do you know if there is some document
24 that represents that credit?
25     A.  Absolutely.  It's just like an invoice.

87

1      Q.  Okay.
2      A.  To affect that revenue flow inside those
3  accounting black boxes, that has to be input, and it
4  has -- it has a record just like an invoice would have a
5  record.
6      Q.  Okay.  Like a credit memo?
7      A.  Yes.
8      Q.  And -- and that would impact your revenue --
9  the revenue for your organization or --
10     A.  If it were against my revenue stream.  If the
11 credit were against my support stream, of course, it
12 would impact my support --
13     Q.  Like it did in Q3 '01 from what you heard?
14     A.  Well, yes.  And I'm sure it did every quarter,
15 but I wouldn't have known that, because I didn't have a
16 problem every quarter.
17     Q.  Okay.
18     A.  And when I was forecasting Q3, it appeared to
19 me that I was going to be "X" amount of money short.
20 Okay.  But then when it was all said and done, I was X
21 minus seven short.  In other words, I wasn't quite as
22 short as I thought they were going to be, because there
23 were some problems and they did a credit rebill.
24     Q.  Okay.
25     A.  And I hadn't got the rebills yet.  So when I

88

1  got my rebills, it shrank my miss.
2      Q.  Okay.  I think I understand it a little bit
3  better.
4      A.  Okay.
5      Q.  Thank you.  Well, why don't we go through some
6  of those documents.  Maybe I might have some of the same
7  ones that you saw yesterday --
8      A.  Okay.
9      Q.  -- and we can talk about them.  Okay?
10     A.  Sure.
11         MR. WILLIAMS:  I didn't even realize that you
12 moved.
13         I'll ask the reporter to mark this document as
14 Sellers No. 1.
15         Sure.  Go ahead.  Why don't you take your
16 time?
17         (Exhibit No. 1 was marked for identification.)
18         MR. WILLIAMS:  Can you show it to the witness,
19 please?
20 BY MR. WILLIAMS:
21     Q.  Sellers No. NDCA-ORCL 026981 through 984.
22 I'll just ask you to take a look at that document and
23 review it and let me know when you're done, and we'll
24 talk about it.
25         Now, you can read the whole document, if you

89

1  would like, or I can direct your attention to the areas
2  that I'm going to ask you about.
3      A.  Is this another memo, or is there a second
4  memo here, or is this just a copy of the first one?
5      Q.  Some -- some of these are just -- they're an
6  initial memo and then a copy that was -- it looks like
7  it was printed out in just another format.  But we'll go
8  through it just to make sure that there are no --
9      A.  Yeah.  This second one looks like a copy of
10  the first one.
11      Q.  Uh-huh (Indicates affirmatively).
12      A.  Okay.
13      Q.  Okay.  Now, before we talk about the document,
14  I know that you were presented at some point with, you
15  know, a confidentiality agreement that the parties had
16  entered into, and you were asked to sign that.  Right?
17      A.  Uh-huh (Indicates affirmatively).
18      Q.  And I know that you weren't comfortable with
19  signing it.
20      A.  Right.
21      Q.  And that's okay.  But you do understand that
22  the documents that we are going to be discussing here
23  today are to be kept confidential because the documents
24  themselves are covered by a confidentiality order in
25  this case.

90

1      A.  Sure.
2      Q.  All right.  Looking at Sellers No. 1, do you
3  recognize it?
4      A.  I don't recall it.
5      Q.  Does it appear to be an Oracle e-mail?
6      A.  It does, and I recall the subject it's about.
7      Q.  Okay.  Do you know whether you were either the
8  sender, recipient, or copied on the e-mail?
9      A.  It appears that I was copied.
10      Q.  And is it right around January 8th of 2001?
11      A.  The date is -- I don't see it, but, yes, 8
12  January 2001.
13      Q.  Okay.  Do you know who Keith Block is?
14      A.  I do.
15      Q.  Who is that?
16      A.  He's in consulting.
17      Q.  Okay.  Do you know what his position is, or --
18      A.  He was a senior manager in consulting.
19      Q.  Okay.  And that is part of the organization
20  that you had described to me earlier, that actually goes
21  out and tries to put the software in, implement it?
22      A.  Exactly right.
23      Q.  All right.  And how about -- withdrawn.
24      I see Michael Mayfield here.  Is that the
25  person you were saying is in your organization that

91

1  reported to you?
2      A.  Mike is managing all of the on-site piece.
3  And I believe at this time he was reporting to directly
4  to Rocha.
5      Q.  Okay.
6      A.  They had moved the on-site piece, which did
7  report to me when Snyder left, to Rocha.
8      Q.  Okay.  Do you know John Wheeler?
9      A.  Consulting, again, I believe.
10      Q.  Okay.  How about Dennis Privitera?
11      A.  Yes.  Dennis -- I know Dennis.
12      Q.  Okay.  And who is he?
13      A.  Dennis was trying to do some marketing work, I
14  believe, for Mike.
15      Q.  Rocha?
16      A.  No.
17      Q.  For --
18      A.  Mike Mayfield.
19      Q.  Oh, okay.
20      A.  Now, Dennis was down in the organization.  He
21  had worked for Snyder.  And then when Snyder left, I
22  think he was moved below Mayfield.
23      Q.  Okay.  Did Mike Mayfield have marketing
24  responsibilities?
25      A.  He had revenue responsibilities for on-site

92

1  services.
2      Q.  Okay.
3      A.  And he needed to make his revenue goals, so he
4  needed to sell as much on-services as he could in
5  order to, A, complete his compensation, or, B, exceed
6  it.
7      Q.  Okay.  And so I guess he tried to do some
8  marketing?
9      A.  Yes, yes.
10      Q.  Okay.
11      A.  I would more call it sales, but he called it
12  marketing.
13      Q.  All right.  Do you know George Roberts?
14      A.  I do.
15      Q.  And who is that?
16      A.  Consulting, senior manager at consulting.
17      Q.  Okay.  And Sandy Sanderson?
18      A.  Managed all of consulting.
19      Q.  Okay.  And Jay Nussbaum?
20      A.  Jay is a -- was a senior sales vice-president.
21  I believe he managed all the government groups, but I'm
22  not sure --
23      Q.  All right.
24      A.  -- about that.
25      Q.  And how about Linda McFarland?

93

1    A.   I don't recognize that name.
2    Q.   All right.  You indicated that you recalled --
3    withdrawn.
4         You indicated that while you recalled the
5    subject matter of the document, that you didn't recall
6    the document itself?
7    A.   Exactly.
8    Q.   So you didn't see this one yesterday?
9    A.   No, I did not.
10   Q.   All right.  What do you recall about the
11   subject matter of this document?
12   A.   Well, these installations are, many times,
13   very difficult for many reasons.  I think I touched on
14   some of them, but I'm just going to briefly list the
15   reasons.  Twenty consultants get on a site and they
16   start working, and they work for three or four days, and
17   then they go home.  They fly back to wherever.  During
18   that three or four days working, they log countless
19   TARs.  Because -- consulting many times hires very
20   bright people, but they don't train them.  They haven't
21   had extensive training.  Many times not even as much
22   training as my support people have on the product.  So
23   they're asking a lot of questions.  Those questions are
24   all TARs.
25        So as they submit these questions, we're

94

1    working to resolve them.  Sometimes we call back, and we
2    can't find them.  They're not there, so there is nobody
3    to give the answer to.  Other situations are they don't
4    do a good job doing their part, for whatever reason,
5    training, competence, whatever.  They almost always will
6    then blame it on the product.  I mean, they will rarely
7    say, Yes, Mr. Customer, I just didn't get it done in
8    time.  They say, You know, I couldn't get that done
9    because of all of these TARs, or, The product didn't do
10   what it was supposed to do, so it's not my fault.
11   Q.   Sure.
12   A.   Many times there is no consultant; it's the
13   customer trying to do it.  But the customer is not up to
14   the task.  This is extremely complex stuff.  When you
15   think of something like a 10.7 or an 11i, a product that
16   runs your whole business, pick to pay, that is a complex
17   product.  And almost no one ever installs it that way.
18   They don't just come in and install it and now it's
19   running every part of their company.  They integrate it
20   with something or some little piece of software that
21   they just think they have to have.  So all of these
22   installations aren't installations; they're
23   integrations.  And that is what -- you've probably heard
24   Larry, in all of his speeches, talk about that.  They
25   wire things together instead of installing a whole

95

1    product and bringing things up.
2         Many of these consultants are there to change
3    the software so that it will do what the customer wants,
4    because the software says you have to type XYZ to send
5    this bill, but the customer says, We never do XYZ; we
6    always do ABC.  So I can't put the software up because
7    my billing manager can't stand XYZ, so you'll have to
8    change this to ABC.
9    Q.   Uh-huh (Indicates affirmatively).
10   A.   So in the middle of putting in some very
11   complex software, we're changing how it works.  So there
12   is MIS people from the customer site; typically IT
13   people; people from Oracle consulting, if they've been
14   hired to do part of the job; sometimes consulting people
15   from Deloitte & Touche, or someone else who is there, to
16   scope the whole job; then there is Oracle product.  So
17   when the customer gets mad, he gets mad at the Oracle
18   product, yours truly.  I take those calls.
19   Q.   Okay.
20   A.   We have found that if we can get them to
21   buy -- because we don't want to pay for it ourselves --
22   if we can get them to buy what we call the premium
23   services and put it on-site, then we can coordinate all
24   of that.  We have a guy right there who keeps track
25   electronically on the computer of all the TARs, what the

96

1    answers are, which ones are open, which ones are not,
2    which ones are nice to know, which ones are -- actually
3    need to be sent to engineering, which ones are sent to
4    engineering.  They're actually a bug; they're in
5    engineering.  What is the date engineering says we'll
6    have them back?  They keep track of all that.
7    Otherwise, they manage the process.
8    Q.   Sure.
9    A.   That helps many customers get through this,
10   and it helps them meet their go-live date.  Now, we
11   started doing this.  This was one of Al's ideas.
12   Q.   Are you talking about --
13   A.   This on-site piece.
14   Q.   Okay.
15   A.   This was Al's baby.
16   Q.   Is that -- when you say on-site piece, are you
17   talking about the U.S. Premium Support?
18   A.   I am.
19   Q.   Okay.  And just --
20   A.   We built that whole organization.  We started
21   building it in -- they started before I got there in
22   '97.  It was never there before, and I completed
23   building my part of it in '98, '99.
24   Q.   Okay.  What is the subject matter, before we
25   continue, the subject matter of this e-mail?

97

1    MR. HARRISON: Objection. Calls for
2 speculation.
3    THE WITNESS: I --
4 BY MR. WILLIAMS:
5    Q. Well, you see a subject line, right?
6    A. I'm looking.
7    Q. It's about a third of the way down.
8    A. I'm looking. I'm looking. Subject.
9    Q. Uh-huh (Indicates affirmatively).
10    A. "Go live with confidence."
11    Q. Okay. Do you recall the "go live with
12 confidence" topic?
13    A. Yes, I do.
14    Q. Okay.
15    A. Yes, I do.
16    Q. All right.
17    A. This was -- this was Mike's marketing.
18    Q. Mike Mayfield?
19    A. Mike Mayfield's marketing.
20    Q. Okay.
21    A. He wanted to sell more premium services.
22    Q. All right.
23    A. So he thought he needed a catchy title,
24 because just explaining that you need somebody on-site,
25 typically, the customer might say, Well, you ought to

98

1 just supply that. In fact, that was very much what they
2 said. In fact, there were people at Oracle who believed
3 that support should not be selling these premium
4 services, because support should be just doing that
5 because -- for all large customers who need it --
6    Q. Right. Now --
7    A. -- as a course of -- as a matter of course.
8    Q. Now, as far as you knew, Mike -- Mike Mayfield
9 had some experience in this area?
10    A. Yes, he did.
11    Q. And was he, as far as you understood, somebody
12 who was doing some of the consulting or support on-site
13 and off-site?
14    A. He had been his own manager. He had been
15 managing on-site and off-site.
16    Q. Okay.
17    A. When I took over all of the off-site, he took
18 over all of the on-site.
19    Q. Okay. And he was working directly with the
20 CRM and 11i?
21    MR. HARRISON: Objection. Vague.
22    THE WITNESS: No.
23 BY MR. WILLIAMS:
24    Q. No?
25    A. No, he wouldn't have been doing that.

99

1    Q. Okay. I just want to -- what I want to do is
2 kind of talk a little bit about what he wrote in this
3 e-mail and see if you understood the same thing. Okay?
4    A. Okay.
5    Q. Do you see about halfway down the page where
6 it says "Mike Mayfield wrote"?
7    A. Yes, uh-huh (Indicates affirmatively).
8    Q. Okay. And it says -- right under that, it
9 says, "Keith and John."
10    A. Right.
11    Q. Do you know who he's referring to, who the
12 Keith and John he's referring to?
13    A. I think he's referring to Keith Block and
14 probably John Wheeler.
15    Q. Okay. And -- and the subject line is still
16 the same: "U.S. Premium Support, go live with
17 confidence campaign."
18    A. Right.
19    Q. And that's kind of what you've been talking
20 about for the last few minutes, right?
21    A. That's correct.
22    Q. Okay. Can you read the first sentence in that
23 e-mail for me?
24    A. "Consulting and support have both been taxed
25 by crises arising in the final stages of many 11i and

100

1 CRM implementation projects."
2    Q. Okay. And when you were cc'd in this e-mail,
3 did you have an understanding of what that meant at the
4 time?
5    A. Sure.
6    MR. HARRISON: Objection. Misstates the
7    document. I just don't know what e-mail you're
8    talking about. The top e-mail?
9    MR. WILLIAMS: Well, the original.
10    Ultimately, it appears that he received the entire
11    document.
12    MR. HARRISON: Okay.
13    MR. WILLIAMS: He was cc'd on January 8th.
14    MR. HARRISON: Okay.
15 BY MR. WILLIAMS:
16    Q. So when you received this e-mail, did you
17 understand what -- what was meant when Mr. Mayfield
18 wrote "consulting and support have both been taxed by
19 crises arising in the final stages of many of 11i and
20 CRM implementation projects"?
21    A. I did.
22    MR. HARRISON: Objection. Lacks foundation.
23    Calls for speculation.
24 BY MR. WILLIAMS:
25    Q. And what did you understand?

Sellers, Richard  2/28/2006  10:41:00 AM

101

1    A.  I understand it to mean assisting customers
2    installing those products --
3    Q.  Okay.
4    A.  -- to go live.
5    Q.  Okay.  And I'm just going to draw your
6    attention to a little bit further down in the document,
7    the next paragraph.  Do you see where it begins in the
8    middle of the paragraph "our go live customer support
9    bundle"?
10   A.  Let's see.  "Our go live customer support
11   bundle is designed to mitigate project deadline risk by
12   eliminating support related project delays."
13   Q.  Okay.  And just read the next sentence for me.
14   A.  "These delays are frequently due to defects or
15   functional shortcomings in our product suites."
16   Q.  Do you know what product suites Mayfield was
17   writing about?
18   A.  I do not.
19   Q.  Okay.  Could it have been the 11i Suite?
20   MR. HARRISON:  Objection.  Calls for
21   speculation.
22   THE WITNESS:  Sure.
23   BY MR. WILLIAMS:
24   Q.  Okay.  Let me just take you down to the next
25   paragraph.

102

1    A.  I might just point out.
2    Q.  Sure.
3    A.  It could have been -- just as easy have been
4    10.7.
5    Q.  Sure.
6    A.  I mean, these -- these ERPs are tough to
7    install, and --
8    Q.  Okay.  Although, in the -- in this document,
9    he talks about CRM and 11i, though?
10   A.  Right.
11   Q.  So just going down --
12   MR. HARRISON:  Objection to the prologue, but
13   go ahead.
14   BY MR. WILLIAMS:
15   Q.  Okay.  Down to the next paragraph, do you see
16   where in the middle of the next paragraph beginning in
17   each -- I'm sorry, "I found a repeating common thread."
18   A.  Right.
19   Q.  Okay.  Can you just read that, to the end of
20   that --
21   A.  "I found a repeating common thread.  In each
22   are complex patching process and testing failures,
23   coupled with the need for expedited problem resolution
24   has caused go live deadline exposure."
25   Q.  Okay.  Do you know why Mr. Mayfield cc'd you

103

1    on this or -- I'm sorry, why Keith Block cc'd you on --
2    MR. HARRISON:  Objection.
3    BY MR. WILLIAMS:
4    Q.  -- this?
5    MR. HARRISON:  Sorry.  Objection.  Calls for
6    speculation.
7    THE WITNESS:  Yeah.  I have no idea what was
8    in their -- in their head.
9    BY MR. WILLIAMS:
10   Q.  Okay.  But --
11   A.  I managed all of support.
12   Q.  So it might have been --
13   A.  They probably wanted to let me know they were
14   talking about me.
15   Q.  Okay.  Now, was the "go live with confidence
16   campaign" ultimately implemented as far as you know?
17   A.  It was not, I don't -- I don't believe.  I
18   believe -- I think Mikie got himself in a little hot
19   water here.
20   Q.  Okay.  Why?
21   A.  Because I don't believe Oracle, generally,
22   supported this premium piece.  As I said before, I
23   believe engineering and -- in the end, Larry Ellison and
24   Safra Catz believed that this should be part -- what
25   he's describing here should be what we should be doing,

104

1    what support should be doing.
2    Q.  Okay.  Now, was -- was --
3    A.  I mean, should be doing as part of the support
4    agreement --
5    Q.  Right.
6    A.  -- not something sold --
7    Q.  Separately?
8    A.  -- on top.  I mean, the -- these customers are
9    already paying a very attractive rate of dollars for
10   support.
11   Q.  Uh-huh (Indicates affirmatively).
12   A.  Now we're coming back and trying to sell them
13   something on top of that.  And I believe the general
14   feel in the company was that that's not the good thing
15   to do.
16   Q.  Okay.  All right.
17   A.  I would point out one more on this.
18   Q.  All right.
19   A.  When he speaks of our complex patching, he's
20   talking about all of the applications.
21   Q.  Okay.
22   A.  He's not -- all of the applications had a very
23   complex patching arrangement necessitated by the size of
24   the software and the individual groups, cash apps,
25   accounts receivable, employee relations, all of those

105

1 things working together. When you patch one, sometimes
2 you had to go over here and change another thing, which
3 made it very complex, the patching very complex. That's
4 been true since our very first ERP product, and I
5 believe it's true for SAP and all companies who make
6 application software.
7     MR. WILLIAMS: Okay. The reporter -- I'm
8 sorry, the videographer just told me he needs to
9 change the tape, so why don't we do that. Let's
10 take five minutes.
11     (Discussion off the record.)
12     THE VIDEOGRAPHER: It's 12:46. We're off the
13 record. This is the end of Tape No. 2 of the
14 deposition of Mr. Sellers.
15     (A lunch recess was taken at 12:50 p.m.)
16     THE VIDEOGRAPHER: This is the beginning of
17 Tape No. 3 of the deposition of Richard Sellers.
18 It is 1:33. We are back on the record.
19 BY MR. WILLIAMS:
20     Q. I'm just going to ask the reporter to mark
21 this document as Sellers No. 2.
22     (Exhibit No. 2 was marked for identification.)
23     (Discussion off the record.)
24 BY MR. WILLIAMS:
25     Q. Sellers No. 2 is Bates No. NDCA-ORCL -- I'm

106

1 sorry.
2     Sellers No. 2 is Bates No. NDCA-ORCL 158786
3 through 792. I'll just ask you to take a look at the
4 document. And you can review the entire thing, or we
5 can talk about specific sections. It's up to you.
6     A. Well, let me just orientate myself to it.
7     Q. Okay.
8     A. Okay.
9     Q. Okay. Do you recognize what's been marked as
10 Sellers No. 2?
11     A. I don't recall ever seeing this --
12     Q. Uh-huh (Indicates affirmatively).
13     A. -- before.
14     Q. Okay. Bates No. -- the first page ending in
15 786, that's an e-mail from Mike Rocha to you, right?
16     A. Right.
17     Q. And it's attaching several different e-mails
18 or forwarding them to you, right?
19     A. That's correct.
20     Q. Okay. And were you familiar at all with
21 Oracle's implementation of Papa John's -- at Papa John's
22 in the spring of 2001?
23     A. I'm familiar with Papa John's, and we had --
24 we had several problems there, yes.
25     Q. Okay. Did you have any of your support staff

107

1 on-site at Papa John's during that period?
2     A. I did.
3     Q. Do you recall -- well, do you recall what they
4 were doing there?
5     MR. HARRISON: Objection. Vague.
6     THE WITNESS: I don't recall exactly what they
7 were doing there. They do what support does.
8 BY MR. WILLIAMS:
9     Q. Okay. I only -- do you know whether, when
10 your -- when your support staff was there, if the
11 product had already been implemented?
12     A. I don't know that. I -- I recall being there
13 around a performance problem.
14     Q. Okay.
15     A. But my recollection is it didn't process
16 things fast enough. And we eventually got a fix from
17 engineering for that.
18     Q. But the reason I ask is that -- was it typical
19 for the support staff to be on-site at the same time as
20 Oracle Consulting?
21     A. Sure.
22     Q. Okay.
23     A. Oh, yes. Especially if they got in trouble,
24 had a lot of TARs.
25     Q. Okay.

108

1     A. Absolutely. In fact, that's what we just
2 discussed. Instead of selling them a premium support,
3 we did what Larry would have much preferred, which was
4 just put people there and deal with all the issues.
5     Q. And so does that -- is that why you were
6 likely forwarded information --
7     A. Absolutely.
8     Q. -- regarding --
9     MR. HARRISON: Objection.
10 BY MR. WILLIAMS:
11     Q. -- Papa John's?
12     MR. HARRISON: Sorry. Objection. Vague. I'm
13 sorry. Objection. Calls for speculation.
14     THE WITNESS: Of course, I don't know what was
15 in Mike Rocha's mind when he sent it.
16 BY MR. WILLIAMS:
17     Q. Sure.
18     A. However, this is not unlike memos I get.
19     Q. Okay.
20     A. Or got.
21     Q. All right. As you went through Sellers No. 2,
22 do you see any e-mails or correspondence that you had
23 written?
24     A. No, I didn't. I was looking for some response
25 I might have made, but -- but I didn't see that. This

109

1  response by Harmohan Suri, the first page, Harmohan
2  works for me, so I may have asked --
3      Q.  Okay.
4      A.  I may have asked Harmohan to respond.
5      Q.  Okay.
6      A.  Harmohan was managing our CRM support.
7      Q.  Do you know if Harmohan is still at the
8  company?
9      A.  I do not know.  The last I heard, he was in a
10  serious automobile accident, but I don't know.  I assume
11  he's convalesced by now.  That's several years ago.
12      Q.  Okay.  Did you see anyone else in this series
13  of e-mails in this document that was in your
14  organization?
15      A.  No, I have not recognized any other names that
16  were in my organization.
17      Q.  Uh-huh (Indicates affirmatively).  And you --
18  a few minutes ago, you said that there were several
19  problems at that Papa John's, one of which your
20  recollection was that it wasn't processing -- the
21  software wasn't processing things fast enough.
22      A.  There was a performance problem --
23      Q.  Okay.
24      A.  -- to my recollection, that I was involved in
25  at escalation to resolve a performance issue around

110

1  ordering pizza over the Internet and how fast it could
2  be ordered or how fast -- how fast something.
3      Q.  Okay.
4      A.  And we resolved that.
5      Q.  And what do you mean when you say
6  "escalation"?
7      A.  When the customer, typically, requests the
8  service, we provide the service.  If the customer feels
9  we're not providing it fast enough or it's not satisfied
10  with what we have provided, they will escalate it.  By
11  that I mean they call more senior management.
12      Q.  Okay.
13      A.  It could be myself; it could be district
14  manager; it could be Mike Rocha; it could be Larry
15  Ellison.  I mean, Larry got e-mails all the time from
16  customers who wanted to complain about support.
17      Q.  Okay.  And how did you know that?  Was that
18  somehow communicated to you at some point that Larry
19  would also get these types of e-mails?
20      A.  Oh, sure, yeah.  If Larry got one, I got it.
21      Q.  All right.  I'm going to direct your attention
22  to 158791.
23      A.  And that is?
24      Q.  That's on the bottom right.
25      MR. HARRISON:  The Bates number at the bottom.

111

1      THE WITNESS:  Oh, 158791.
2  BY MR. WILLIAMS:
3      Q.  Right.
4      A.  Okay.
5      Q.  Do you see there where it says "current
6  situations"?
7      A.  Uh-huh (Indicates affirmatively).
8      Q.  It says "situation."  I'm sorry.
9      Can you just review that for a minute, and
10  then I'll ask you questions?
11      A.  Okay.  Let me review this history, too.
12      Q.  Okay.
13      A.  Let me get the whole thing.
14      Q.  All right.
15      A.  Okay.
16      Q.  Is it fair to say that the -- that the
17  discussion in the e-mail concerns the speed at which the
18  Oracle software was processing orders at Papa John's?
19      A.  That's certainly mentioned in the e-mail.
20      Q.  Okay.  Is that the issue you were referring to
21  that your team was kind of responding to?
22      A.  I believe it is, yes.
23      Q.  And you see on 791, in that current
24  situation section where it is written, "The customer has
25  withheld payment of about $650,000 in OKS."  Do you see

112

1  that section there?
2      A.  I do.
3      Q.  Do you know whether Papa John's had withheld
4  any support fees from your organization relating to that
5  issue?
6      A.  No.  To my knowledge, they had not.
7      Q.  Uh-huh (Indicates affirmatively).
8      A.  But the way our business worked, it would be
9  difficult for them to do that, because they would have
10  paid all that up front.
11      Q.  Okay.
12      A.  Oracle Consulting, on the other hand, is
13  working and earning their keep as they go.
14      Q.  I see.
15      A.  So they have signed up for $3,000,000, it
16  appears, to make all of this stuff work per a spec that
17  they've agreed to with the customer.  It is not unusual
18  for the customer to say, Here is what we agreed to.
19  We're this far into the project, and it doesn't do that,
20  so, really, you know, I'm going to withhold payment
21  until it does.
22      Q.  Okay.  Do you know Steve Cox?
23      A.  I -- I don't.  I don't recognize the name.
24      Q.  Okay.  I will ask the reporter to mark this
25  document as Sellers No. 3.

Sellers, Richard  2/28/2006  10:41:00 AM

113

1          (Exhibit No. 3 was marked for identification.)
2     BY MR. WILLIAMS:
3        Q.   Sellers No. 3 is Bates No. NDCA-ORCL 121624
4     through 628.  I will just ask you to review Sellers
5     No. 3 for me and let me know when you're done.  It's a
6     relatively long document, so if you want me to direct
7     you to certain portions, I will; otherwise, you just
8     take your time.
9        A.   Okay.  Let me get the feel for it, and then
10    we'll --
11       Q.   Okay.
12       A.   Okay.  I think I've got the flavor.
13       Q.   Okay.  Do you recognize Sellers No. 3?
14       A.   I do not.
15       Q.   Okay.  And not one of the documents that you
16    saw yesterday?
17       A.   It is not.
18       Q.   Okay.  And does it appear to be an e-mail or
19    several e-mails, some of which you were either sent
20    or -- or written by you?
21       A.   It appears to me to be a memo that was written
22    to me.
23       Q.   From whom?
24       A.   Keating, Charles Keating.  I know Charles
25    Keating -- Kendig.  Excuse me.  I know Kendig to be the

114

1     operations manager for Jay Nussbaum in the government
2     group.
3        Q.   Okay.  And there are several other people on
4     this set of e-mails; is that fair to say?
5        A.   Yes.
6        Q.   And it's in April of 2001?
7        A.   Yes.  April 5, 2001, yes.
8        Q.   Who is Ron Wohl, do you know?
9        A.   Yes, I do.  Ron is the development manager for
10    applications, software.
11       Q.   Okay.
12       A.   So all -- all 10.7 and 11i would have come
13    under the -- ERP software would come from Ron Wohl.
14       Q.   Okay.  So he was responsible for the ERP side,
15    not the CRM side?
16       A.   That's right.
17       Q.   Okay.
18       A.   Barrenechea had CRM and Ron Wohl had the rest
19    of it.
20       Q.   Okay.  And --
21       A.   And he reported directly to Larry, of course.
22       Q.   Ron?
23       A.   Yes.
24       Q.   Okay.  And who -- do you know who Joseph Duffy
25    is?

115

1        A.   Joseph Duffy was one of the sales folks in
2     Nussbaum's organization.
3        Q.   Okay.  How about Jose Garcia?
4        A.   I do not.
5        Q.   Okay.  So directing your attention to the
6     middle of the first page of Sellers No. 3, it's an
7     e-mail from Mr. Kendig to you and others, right?
8        A.   Yes.
9        Q.   And what's the subject matter?
10       A.   What -- what he is actually looking for is
11    he's trying to build a case to not force customers to go
12    to 10.7 -- I mean to go to 11i.  If they're currently on
13    10.7, he wants that support date extended.  And he
14    further wants some help for a particular customer, it
15    appears to me.
16       Q.   Okay.  What does the subject line say there?
17    It's just below Jay Nussbaum's name in the center.
18       A.   "Sierra Health, 10.7 upgrade to 11i issues."
19       Q.   Was Sierra Health an Oracle customer at the
20    time?
21       A.   Oh, yes.
22       Q.   Were you familiar with Sierra Health?
23           MR. HARRISON:  Objection.  Vague.
24           THE WITNESS:  I -- no, I'm not.  I don't
25    recall Sierra Health.

116

1     BY MR. WILLIAMS:
2        Q.   Okay.
3        A.   I recall Kendig and Nussbaum beating the drum
4     very loudly to not cause their customers to upgrade to
5     11i until they were ready.
6        Q.   Until the customer was ready?
7        A.   Until the customer was ready.
8        Q.   Okay.
9        A.   In other words, there was a date that 10.7
10    would no longer be supported.
11       Q.   Is that what's referred to as desupport?
12       A.   That's right.  And by that -- software
13    companies, when they're supporting multiple releases,
14    are spreading their resources across more than one
15    product.  So when a new product is introduced, replacing
16    an old product, eventually, the old product has to be
17    desupported so all the new resources can be brought to
18    bear on the new product.  That's a normal evolution of
19    things.
20           In this case, the products are 10.7, which
21    everybody is on, and now we have the new product, 11i,
22    and we want to move those customers to 11i.  The way we
23    do that is by desupporting 10.7.  Now, they can stay on
24    10.7, but they no longer can get support for 10.7, patch
25    support for 10.7.

Sellers, Richard  2/28/2006  10:41:00 AM

117

1    Q.  Right.  Isn't it true that some people at
2    Oracle believed that desupporting 10.7 would encourage
3    customers to upgrade to 11i?
4        MR. HARRISON: Objection. Calls for
5    speculation and lacks foundation.
6        THE WITNESS: I don't know.
7    BY MR. WILLIAMS:
8    Q.  Okay.  Going down to -- do you know why --
9    withdrawn.
10       You said you weren't really familiar with
11   Sierra Health. Do you know why Kendig sent this e-mail
12   directly to you?
13   A.  I'm sure that we were working this issue
14   together.
15   Q.  Okay.
16   A.  I worked a lot of his customers together.
17   This organization was a suborganization in Oracle unlike
18   any others. Nussbaum built this organization where he
19   owned his own consulting. So the consulting under
20   Nussbaum wasn't part of the bigger Oracle Consulting
21   organization. So he both sold the software and then ran
22   the consulting to install it.
23   Q.  Okay.
24   A.  So Kendig was his operations manager, and
25   Kendig would -- would frequently work issues on behalf

118

1    of that organization, the Nussbaum organization, into
2    support, or any other organization.
3    Q.  Okay.
4    A.  But I would have been the one who would have
5    called in support.
6    Q.  Okay. So here he writes to you, "Dick, this
7    is a note" -- "this is an update" -- I'm sorry. "Dick,
8    this note is an update to what I sent you yesterday
9    regarding Sierra Health."
10       I'm assuming you don't recall --
11   A.  I don't.
12   Q.  -- the day before's note, if there was one,
13   right?
14   A.  I don't.
15   Q.  Okay.
16   A.  Take me -- okay. I've got it. I've got it.
17   Q.  That's the first --
18   A.  Yeah.
19   Q.  Yeah. Now, do you see where he writes, "The
20   attachment is an anonymous internal e-mail that I
21   received today"? It's right in that sentence.
22   A.  Right.
23   Q.  Do you see that?
24   A.  I do.
25   Q.  Do you know what he meant by -- when he wrote

119

1    that to you?
2    A.  I have --
3        MR. HARRISON: Objection. Calls for
4    speculation.
5        THE WITNESS: -- no idea. Anonymous internal
6    e-mail. First of all, you can't have an anonymous
7    e-mail. There is no way I can send an e-mail to
8    somebody without my name on it. So my meaning of
9    this is he took the name off and doesn't care to
10   have me know --
11   BY MR. WILLIAMS:
12   Q.  Who wrote it?
13   A.  -- who wrote it, because I don't know a way to
14   write an anonymous e-mail.
15       MR. HARRISON: Let me just --
16       MR. WILLIAMS: Sure.
17       MR. HARRISON: -- try to get it in.
18   Objection. Calls for speculation.
19       Thank you.
20   BY MR. WILLIAMS:
21   Q.  Okay. Just directing your attention down to
22   the next paragraph, about four lines down, do you see
23   where he writes, "Too many customers think we're
24   treating them as early adapters"?
25   A.  I remember reading that, but let me find it.

120

1    We're on the second page.
2    Q.  Same page, next paragraph.
3    A.  Okay. And, yes, I see that.
4    Q.  Uh-huh (Indicates affirmatively).
5    A.  This is his opinion.
6    Q.  Okay. Did you -- did you understand what he
7    meant when he wrote this to you?
8        MR. HARRISON: Objection. Lacks foundation.
9        THE WITNESS: I'm sure I did. Or if I didn't,
10   I would call him up and ask him what he meant.
11   BY MR. WILLIAMS:
12   Q.  Okay. How were --
13   A.  You know, his title, Kendig's title, was --
14   I'm remembering now. He was the quality manager.
15   Q.  Okay.
16   A.  He was the quality manager for this group.
17   Now, that puts him as the only one in the corporation,
18   in the field, so --
19   Q.  And as the quality -- as a quality manager?
20   A.  Yeah. There is no such position at Oracle.
21   Q.  Okay. Take a look at the next page really
22   quick. Do you see where he writes "regards" and his
23   title is there? Is that it?
24   A.  Yeah, yeah.
25   Q.  Vice-president quality customer satisfaction?

121

1   A.  Yeah.  He is the only one.  There is not a
2   position like that.  This was a position that -- that
3   the sales -- he was very powerful at Digital --
4   Nussbaum, Jay Nussbaum, created inside his sales
5   organization.
6       Q.  So was that Oracle Services Industries?
7       A.  That was Oracle government, health care.  And
8   I don't remember the rest of it.
9       Q.  Okay.
10      A.  It was very confined product sales.
11      Q.  I think his title -- it's right under his
12  title there.
13      A.  Let me -- where is it?
14      Q.  It's on the second page, top, where it had
15  Kendig's title.  It's on Bates number ending 625.
16      A.  Right.
17          MR. HARRISON:  Turn to the --
18  BY MR. WILLIAMS:
19      Q.  It's the next page, I think, at the top of the
20  page where Kendig's title is.
21      A.  Yeah, I see Kendig's title.
22      Q.  Oh.
23      A.  I thought you were talking about Nussbaum.
24      Q.  No, no.  I was talking about Kendig.
25      A.  Okay.

123

1       A.  I do remember it being extended, however.
2       Q.  All right.
3       A.  When it was established and there were several
4   complaints by customers, it was extended.
5       Q.  Complaints about what?
6       A.  Not wanting to convert yet or it -- they don't
7   want to convert until next year because it's not in
8   their budget, so they want to wait another year.  And,
9   of course, they want support that whole year, so -- as
10  with many desupport dates.
11      Q.  Okay.
12      A.  You throw one out there, get everybody
13  talking, and if there is a lot of reaction, extend it to
14  one that everybody can live with.
15      Q.  Okay.  All right.  Just going to the next page
16  ending 625.  At the very top, where Kendig writes "I'm a
17  messenger" --
18      A.  Right.
19      Q.  -- do you see that?  Can you just read the
20  first two sentences here?
21      A.  "I'm a messenger with this, so please don't
22  shoot me.  We're just becoming more and more concerned
23  that our customers are having such difficulty with the
24  upgrades and are looking for some alternatives to help
25  them."

122

1       Q.  It said OSI, or Oracle Service Industries,
2   right?
3       A.  Oh, okay.  That's what they called it.
4       Q.  Okay.
5       A.  But what it was, was health care and I think
6   it was insurance and government.
7       Q.  Okay.  All right.  I'm just going to see if I
8   can correct you.  You said Nussbaum was very powerful at
9   Digital, but I think you meant Oracle.
10      A.  I did mean Oracle.
11      Q.  Okay.
12      A.  And by virtue, he did a lot of sales.
13      Q.  He made a lot of money?
14      A.  Made a lot of money.
15      Q.  Okay.
16      A.  Personally and for Oracle.
17      Q.  All right.  Do you know how the dates for
18  desupport were decided?
19      A.  I do not.
20      Q.  Okay.  Was that something that was decided by
21  your organization?
22      A.  It was not.
23      Q.  Okay.
24      A.  It was decided by engineering or development.
25      Q.  All right.  Okay.

124

1       Q.  Okay.  Now, you indicated that -- well,
2   withdrawn.
3           Did you know what difficulty he was referring
4   to when he wrote that to you?
5           MR. HARRISON:  Objection.  Lacks foundation.
6           THE WITNESS:  I had no idea what was in his
7   mind.
8   BY MR. WILLIAMS:
9       Q.  Okay.
10      A.  The subject of the memo was "migration," so --
11      Q.  Okay.  And so just directing your attention
12  down a little further down the page, where it says
13  "anonymous feedback" --
14      A.  Right.
15      Q.  -- that appears to be the anonymous e-mail,
16  right?
17      A.  Right.
18      Q.  Can you just read the first line or two lines
19  of that?
20      A.  Sure.  "Product quality is the primary issue,
21  not product support.  Has been ever" -- "has been ever
22  since 11i, or 10.7SC -- pick a release -- was pushed out
23  the door prematurely.  New product introduction or lack
24  of it is the secondary issue."
25      Q.  Okay.  Do you know what is -- what, you know,

125

1  the writer meant or did you understand what the writer
2  meant when they wrote "new product introduction or lack
3  of it is a secondary issue"?
4      MR. HARRISON: Objection. Lacks foundation
5      and calls for speculation.
6  BY MR. WILLIAMS:
7      Q.  If you know.
8      A.  Well, I --
9      MR. HARRISON: Same.
10     THE WITNESS: I don't know what he meant. I
11     know what "new product introduction" was.
12  BY MR. WILLIAMS:
13     Q.  What is it?
14     A.  It's introducing new products to the
15  marketplace.
16     Q.  Okay. How about where it's written "product
17  quality is the primary issue, not product support"? Do
18  you know what is meant by that?
19     MR. HARRISON: Same objections.
20     THE WITNESS: He is telling me that he's not
21     complaining about support, that he's complaining
22     about the product quality.
23  BY MR. WILLIAMS:
24     Q.  And had -- do you know -- well, withdrawn.
25     Have you heard -- well, withdrawn.

126

1      While you were at Oracle, had you heard people
2  internally at Oracle say that 11i was released
3  prematurely?
4      A.  I had not heard that, no.
5      Q.  Okay.
6      A.  If anything, it was late. We -- we expected
7  it to be there before it was.
8      Let me say something about Mr. Kendig here and
9  what he's talking about.
10     Q.  Okay.
11     A.  Charles -- Charles was not a software engineer
12  by nature. He believed in several -- he was a quality
13  control kind of person. His background was that. And
14  he believed in several Six Sigma kind of quality
15  issues -- which, to my knowledge, no software
16  organization has ever used -- which would require
17  testing software in every condition prior to its
18  shipping.
19     Now, by the very nature of application
20  software, we have -- there is no way to test it in every
21  customer configuration, because as we just talked about,
22  consulting makes millions of dollars implementing this
23  software and changing it with every implementation. So
24  an implementation is not boot it up and start working.
25  It's not like packaged software. It's -- it's much more

127

1  than that.
2      Q.  What do you mean by "packaged software"?
3      A.  It's not like Microsoft Money. You don't boot
4  it up and start inputting your data.
5      Q.  Okay.
6      A.  All customers -- most customers customize it,
7  integrate it, put it working with other software, so
8  forth and so on. So the sheer idea of being able to
9  test this in every possible situation is ludicrous.
10     And, Charles, as you can see here, was also
11  complaining about the 10.7 release. So hearing him
12  complain about the 11i release was like, Okay, Charles,
13  as we know, it's the same issues that you had with 10.7.
14     Q.  Okay.
15     A.  I want all of these subproducts tested with
16  all possible configurations before they ship.
17     Q.  That was his sort of mantra?
18     A.  That was his mantra.
19     Q.  Okay.
20     A.  And the reason he says "don't shoot the
21  messenger" is we kept telling him -- I had engineering
22  call him and tell him. He just -- he had beliefs, and
23  he wasn't about to be dissuaded.
24     Q.  Okay. Well, I'm going to direct -- do you
25  know whether or not Sierra was implementing -- or

128

1  withdrawn.
2      Do you know if Sierra was customizing it's 11i
3  software?
4      A.  I do not know that --
5      Q.  Okay.
6      A.  -- other than what's said here.
7      Q.  Right.
8      A.  And I think it clearly spells out here that
9  there was an integration customization going on.
10     Q.  Okay. Going down another paragraph, beginning
11  with the paragraph that says "I would simply ask."
12     A.  Yeah, I see it.
13     Q.  Uh-huh (Indicates affirmatively).
14     Q.  Do you want me to read it?
15     Q.  No, no, no.
16     A.  Oh.
17     Q.  I just wanted to direct your attention to it.
18     Do you know -- well, were you familiar with an
19  implementation or support services at Sandi Labs during
20  this period?
21     A.  I don't recall. That's Sandi --
22     Q.  Oh, Sandi.
23     A.  And that would be one of his government
24  customers.
25     Q.  Okay.

129

1    A. I do not.
2    Q. How about Wells Fargo?
3    A. I recall doing work for Wells Fargo but no
4  specifics.
5    Q. Okay. Disney?
6    A. I don't -- I don't even remember doing any
7  work for Disney.
8    Q. Okay. How about Ingram-Micro?
9    A. I recall them, yes.
10   Q. What do you recall about them?
11   A. Just that they were a customer.
12   Q. Okay.
13   A. I have done work with them before.
14   Q. And how about Beckman-Coulter?
15   A. Yes, I remember Beckman-Coulter. We -- we had
16  some issues with Beckman, as I recall.
17   Q. Do you know what -- do you recall what the
18  issues were?
19   A. I do not. In and around consulting, I think.
20   Q. Okay.
21   A. If you notice, all of the -- a little comment
22  on my part. All of this -- all of this work we've done,
23  it all involves consulting. We hardly ever see a
24  complaint from a customer who hasn't bought consulting.
25  Just a note.

130

1    Q. Is there any other organization at Oracle that
2  did implementations?
3    A. No, no, except the customer and other
4  consulting organizations --
5    Q. Okay.
6    A. -- like Deloitte & Touche and Andersen.
7    Q. Right. Okay. Do you see the next -- the next
8  sentence? Can you just read the sentence, beginning
9  with "the time has come"?
10   A. Where are we?
11   Q. Same place we were looking before where --
12   A. Okay. I see it, yes. "The time has come to
13  admit that in Oracle applications the king has no
14  clothes. There are in excess of 500 customers on 11i.
15  Can we name one, five, 50, 500 that have successfully
16  implemented ERP and/or CRM in production?"
17   Q. Did you have a reaction to that after you
18  received this e-mail?
19       MR. HARRISON: Objection. Calls for
20  speculation and lacks foundation.
21       THE WITNESS: I think my -- well, I don't know
22  when. I can't --
23  BY MR. WILLIAMS:
24   Q. At the time.
25   A. I can't recall --

131

1    Q. Okay.
2    A. -- what it was.
3    Q. That's fine.
4    A. His next sentence here is, "Does this ring
5  true, or am I smoking again?" Well, I probably told him
6  he was smoking again.
7    Q. Going -- well, hold on a second. Do you know
8  who Matt Francis is?
9    A. I don't. I don't recognize that name.
10   Q. Now, you see on the bottom of 121625, going
11  over to the top of 626, there is several names there,
12  right?
13   A. Right.
14   Q. Do you -- do you recognize any of those names?
15   A. I do not.
16   Q. Do you know whether or not they were Oracle
17  employees or employees of some other company?
18   A. I do not know. My -- my thought is they're
19  some other company, because I don't -- their titles
20  would make me think I would recognize them if they were
21  Oracle.
22   Q. Okay. Do you know what the Oracle Steering
23  Committee is or was?
24   A. A group of customers that meet on a regular
25  basis and input change requests and advice to Oracle

132

1  development on the software.
2    Q. On -- for future development or --
3    A. Yes.
4    Q. Did you ever meet with the Oracle Steering
5  Committee?
6    A. It seems to me I gave a presentation one
7  time --
8    Q. Okay.
9    A. -- in California to them.
10   Q. About support?
11   A. About support. What we were doing to try to
12  make support better, so on and so forth.
13   Q. Do you know what the leaders circle is or was?
14   A. I believe it to be a group of customers, large
15  Oracle customers, again.
16   Q. Okay. I'm going to ask the reporter to mark
17  this document as Sellers No. 4.
18       (Exhibit No. 4 was marked for identification.)
19  BY MR. WILLIAMS:
20   Q. Sellers No. 4 is Bates No. NDCA-ORCL 054231
21  through 234. I'll just ask you to review that document,
22  and I'll ask you some questions about it.
23   A. Okay.
24   Q. Okay. Do you recognize Sellers No. 4?
25   A. I, again, don't recall the specific memo, but

133

1  I do recall Chipotle.
2       Q.  Okay.  What do you recall about Chipotle?
3       A.  Chipotle was one of the first customers in a
4  hosted situation.  It was -- I don't remember the name
5  of the project, but it was directly sponsored by
6  Ellison.  And it's a -- a new service that -- Larry very
7  much believed in the Internet and, essentially, believed
8  that the Internet could be a utility like a telephone,
9  where a customer would not have to have computer
10  equipment and all those kind of things to run these
11  services.
12       So if you think -- let's take accounts
13  payable.  Think of accounts payable like a telephone.
14  It's something you plug your computer into the Internet,
15  log onto accounts payable and use it and pay for that
16  service.  And then if you want -- wanted other
17  applications, you would use those and hook them all
18  together.
19       So it would run somewhere else on a computer
20  that someone else owned and be like a telephone service,
21  if you will.  And he thought -- and as far as I know
22  still thinks -- that's a future of computing, Internet
23  based.
24       So he commissioned a group to start -- buy
25  some computer equipment and start a program whereby

134

1  customers rented the service.  And we ran it on our
2  computers that we owned.  And I believe this is one of
3  the first customers to do that.
4       Q.  Okay.  And did you have support
5  responsibilities related to Chipotle back in --
6       A.  No, not really.  It had its own group of
7  people that were managing the software.  But, of course,
8  if they had a problem, they would call support.  And, I
9  mean, all problems came to Oracle through support.
10  That's why you see consulting coming through support,
11  customers come through support.  Our job was to
12  interface Oracle to a customer if they had a problem,
13  other than sales.  Sales talked to customers, and then
14  customers were supposed to bring problems through us.
15       Q.  Okay.
16       A.  So this group that was managing this would
17  have called us for help if they were having issues.
18       Q.  Okay.
19       A.  Just like a customer would.  They would be
20  like our customer.
21       Q.  Okay.  Is it fair to say that you received
22  this e-mail somewhere around March 28th of 2001?
23       A.  Yeah, I believe that's -- do I see my name on
24  it?
25       Q.  Look in the cc section.

135

1       A.  Yeah, there I am.  Yes, yes.  This fellow
2  here, Karl-Heinz Daday, worked for me.
3       Q.  Karl?
4       A.  The guy --
5       Q.  Oh, Karl-Heinz Daday.
6       A.  Yeah.
7       Q.  Okay.  He's in your organization?
8       A.  Yes, yes.
9       Q.  And reported directly to you?
10       A.  At this time, I don't know if he did.  At one
11  time he did.
12       Q.  Okay.  You see -- I guess he was working with
13  McDonald's and Chipotle, then?
14       A.  Uh-huh (Indicates affirmatively).
15       Q.  Do you see where, I guess -- withdrawn.
16       Is it fair to say that he's generally
17  discussing patches for 11i?
18       A.  I -- my take is he's generally discussing
19  issues at Chipotle.  Part of those issues are patches.
20       Q.  Okay.  Earlier, you talked about, generally,
21  performance problems.
22       A.  Uh-huh (Indicates affirmatively).
23       Q.  Do you know what a performance patch is?
24       A.  Sure.  It's a patch that's put into a piece of
25  software that causes it to perform more rapidly, faster.

136

1       Q.  All right.  Is -- so a performance patch
2  doesn't add new capability, does it?
3       A.  No.
4       Q.  Okay.  And is it simply to make it run faster?
5       A.  Well, run faster, that can mean many things.
6  It's simply to make it perform faster.  It performs
7  better.
8       Let's say it was taking six seconds to get a
9  screen of customer information up, like in the pizza
10  place.  It would take six seconds to place an order, but
11  you've got to place 90 every five minutes.  That won't
12  work.  You've got to have it be one second.  Or let's
13  say it takes six seconds to paint a screen of customer
14  accounts receivable.  Well, that may not be acceptable.
15  The information is good and everything.  If you wanted
16  to wait the six seconds, that's fine.
17       But certain applications the way customers use
18  it, that may not be fast enough.  We had -- I recall one
19  customer who looked at accounts receivable every time he
20  answered the phone.  So they had to paint the screen in
21  two seconds or less.  That was their requirement.  So if
22  it did in six and a customer needed it in two, that
23  would be a performance issue.
24       Q.  Okay.  Do you know what a stability patch is?
25       A.  A stability patch in general; I don't know the

137

1  specific patch. But in general, stability would say
2  that it's a patch to keep the software from not
3  performing or crashing or -- or acting up in some way.
4      Q.  Okay. And is there -- is there a real line
5  that delineates a performance patch from a stability
6  patch?
7      MR. HARRISON: Objection. Lacks foundation.
8      THE WITNESS: My opinion is it's in the eye of
9  the beholder who is writing the memo. One person
10  might say that's stability; the next person might
11  say it's performance. But in general, when we talk
12  and when I talk to software specialists, we talk
13  about performance as far as performance of the
14  software, speed, through put, and stability around
15  having the software not have to reboot or not have
16  to be restarted.
17  BY MR. WILLIAMS:
18      Q.  Okay.
19      A.  Or not losing information off the screen
20  occasionally.
21      Q.  Okay.
22      A.  Memory leaks, those kind of things.
23      Q.  Okay. Do you know how much time -- withdraw
24  that.
25      Was Chipotle one of your organization's

138

1  primary customers during this early spring of 2001?
2      MR. HARRISON: Objection. Lacks foundation
3  and calls for speculation.
4      THE WITNESS: I don't --
5      MR. HARRISON: And it's vague and ambiguous.
6      THE WITNESS: -- understand the term
7  "primary."
8  BY MR. WILLIAMS:
9      Q.  Okay.
10      A.  It certainly wasn't one of our large
11  customers. We would like to think they were all
12  primary. I think this performance issue is spelled out
13  very nicely here under "technical problem."
14      "Although the 11i performance does not stop
15  them from conducting business, it is serious enough that
16  the customer, Chipotle, has removed themselves from the
17  reference program until they -- reality meets the hype."
18      So they're saying, yeah, it works, and, yeah,
19  we can conduct our business on it, but we thought it
20  would be a lot faster than that, so we're not going to
21  give you your reference until you make it faster.
22      Q.  Do you think that --
23      A.  That's performance.
24      Q.  I'm looking at the paragraph that you're
25  reading.

139

1      A.  Yeah.
2      Q.  And I don't -- I don't see anything about
3  speed or -- in that --
4      A.  Performance.
5      MR. HARRISON: Objection. Argumentative.
6  BY MR. WILLIAMS:
7      Q.  So -- and that's -- you're saying performance
8  to you means speed?
9      A.  Absolutely.
10      Q.  All right.
11      Do you want to change the tape?
12      THE VIDEOGRAPHER: It's 2:27. We're off the
13  record. This concludes Tape No. 3 of the
14  deposition of Richard Sellers.
15      (Brief recess was taken.)
16      THE VIDEOGRAPHER: Okay. This is the
17  beginning of Tape No. 4 of the deposition of
18  Richard Sellers. It is 2:39. We are back on the
19  record.
20      MR. WILLIAMS: I'll ask the reporter to mark
21  this document as Sellers No. 5.
22      (Exhibit No. 5 was marked for identification.)
23  BY MR. WILLIAMS:
24      Q.  Sellers No. 5 is Bates number NDCA-ORCL 121642
25  through 646. I'll ask you to just review this document

140

1  and let me know when you're done.
2      A.  Okay.
3      Q.  Do you recognize Sellers No. 5?
4      A.  Well, I don't recall this specific memo, but
5  it looks like it's from me. And it's certainly about a
6  subject that I have some recollection.
7      Q.  Okay. Well, what's the date of the memo?
8      A.  The date is 1 May 2001.
9      Q.  All right. And who did you write the memo to?
10      A.  I wrote the memo to my boss, Michael Rocha.
11      Q.  Did you cc Chris Madsen?
12      A.  I did.
13      Q.  And this is not one of the documents that you
14  looked at yesterday?
15      A.  I don't believe so.
16      Q.  Okay. You said that you -- well, what's in
17  the subject line about a quarter of the way down?
18      A.  "Subject, 11i impact."
19      Q.  All right. And you said that the memo
20  concerns a subject that you have some recollection of?
21      A.  Yes.
22      Q.  Can you tell me what your recollection is?
23      A.  Well, I believe I was writing this memo to
24  inform my boss that we were getting some requests for
25  concessions around the implementation of 11i.

141

1  Q.  What do you mean by "concessions"?
2  A.  Well, the customer requests concession on the
3  support revenue if -- if they take a long time to
4  implement.  Or if the customer is not totally happy with
5  the -- how the implementation is going or they're not
6  happy with consulting or they're not happy with the
7  product for any reason, they request a concession.
8  Q.  And when you say "concessions," does that --
9  does that mean some form of consideration, either
10  reduction in renewal price or something along those
11  lines?
12  A.  Right.  And -- and, typically, they're
13  requested of support.  My approach on these would be to
14  get with sales and consulting if they had been involved
15  and to go over the entire customer and see if we thought
16  they deserved any concession.  And if we did, because of
17  something we had done, then, certainly, we would make a
18  concession.
19  Q.  Okay.  And did you need Safra Catz's
20  permission to give that concession?
21  A.  Typically not, no.  But on large dollar
22  values, we would certainly inform her.
23  Q.  And what would be considered a large dollar
24  value?
25  A.  Oh, $500,000.

142

1  Q.  Okay.  Now, looking at the -- in the first
2  paragraph, you write, "Mike, the known list of customers
3  requesting credit because of 11i issues is still fairly
4  small, but I believe it will be growing over the next
5  week as we get into May."
6  Do you see that?
7  A.  Yes.
8  Q.  Do you know what you meant when you wrote that
9  you believed that it would grow --
10  A.  Yes.
11  Q.  -- over the next --
12  A.  Yes.
13  Q.  -- several weeks?
14  A.  Yes.  I believed, as -- as we brought more and
15  more 11i customers online, there would be a small
16  percentage of them that will have a problem and request
17  a concession, just as I say in the first line:  There is
18  a small number now, but I think it will grow as the next
19  group installs."
20  Q.  Okay.  Now, below that paragraph, you list, I
21  guess, several different customers --
22  A.  Exactly.
23  Q.  -- right?
24  A.  Yes.
25  Q.  With respect to American Trans Air, it looks

143

1  like there they were due to renew in November and had
2  not yet.
3  A.  Right.  Well, I don't know.  I -- is that what
4  it says?
5  Q.  Why don't you read it for me?
6  A.  "American Trans Air, 165K renewal."  That
7  means a year service was only 165K.  "Renewal was due in
8  November.  Indiana Mills, 252K renewal.  Renewal was due
9  in February.  Looking for 126K relief."
10  Q.  Okay.  It looks like that only the first line
11  you read related to American Trans Air.
12  A.  Right.
13  Q.  And you wrote in a parenthetical, "Renewal is
14  due in November."
15  Does that mean that as of May 2001 that they
16  had not yet renewed?
17  A.  They had not renewed.
18  Q.  Okay.  And with respect to Indiana Mills, just
19  below that, you write, "Indiana mills, 252K renewal."
20  And then you write, "Renewal is due in February.
21  Looking for 126K relief."
22  What did you mean by "relief"?
23  A.  They wanted a concession of 126K.
24  Q.  Okay.
25  A.  They were -- they were due in February.

144

1  Q.  Right.
2  A.  It's April.
3  Q.  Right.
4  A.  They're trying to negotiate us to renew their
5  service for one year for 126K.  That's half of the 252.
6  Q.  Okay.  So I guess that was -- that was
7  actually May, though, right?
8  A.  That's right.
9  Q.  And had you been doing some work with Indiana
10  Mills?  Obviously, your organization was, right?
11  A.  Somebody -- I mean, somebody in sales had
12  developed that number.  That's how it got to me.
13  Q.  Okay.  Do you --
14  A.  So -- and renewal sales --
15  Q.  Sure.
16  A.  -- not big sales.
17  Q.  Right.  Do you know what -- what, if any,
18  issue Indiana Mills had with 11i?
19  A.  I don't even recognize the name Indiana Mills.
20  Q.  Okay.  All right.  Let's go to the next one.
21  What's the next one that you wrote about.  Oneok?
22  A.  Oneok, I don't recognize that name -- that
23  name either.
24  Q.  Okay.  Why don't you just read that for me,
25  then.

145

1      A.   "Oneok, Incorporated, $1,406,000 renewal.
2   Looking for 250 to 400K relief."
3      Q.   So that 1.4 million, approximately, that's a
4   number that you --
5      A.   Right.
6      Q.   -- would need to talk to Safra about?
7      A.   Oh, yeah.
8      Q.   Okay.
9      A.   No, no.  See, that's the annual rate.
10     Q.   Oh, the relief --
11     A.   They're only looking for 250 to 400K.
12     Q.   Oh, okay.  I see.
13     A.   I could -- I could do that.
14     Q.   You might be able to do that.  Okay.
15     A.   See, what I'm trying to do here is give him a
16  picture of -- remember, we just came off a quarter where
17  we missed.
18     Q.   Sure.
19     A.   And I'm giving him an idea of the renewals
20  that I think we may have to renew at -- that will affect
21  that revenue stream.
22     Q.   Okay.  We talked a little bit about McDonald's
23  and Chipotle earlier.  What's the next one under
24  McDonald's?
25     A.   General Electric Aircraft Engines.

146

1      Q.   Okay.  Why don't you read that for me?
2      A.   "671,000, Q1 customer, Q1" -- '01.  Oh, that's
3   dollars.
4      "$671,758.  Customer doesn't want to pay for
5   support because the implementation is way behind
6   schedule, and he doesn't want to pay for support on
7   license sitting on the shelf."
8      Now, I do -- there -- a lot of them are like
9   this, where the customer has several things to
10  implement.  He buys it all at one time, and he pays for
11  all the licenses.  If implementing one piece of the
12  software is late, then he says, I shouldn't have been
13  having to pay for support on that because I wasn't using
14  that --
15     Q.   Right.  Okay.
16     A.   -- so you shouldn't charge me support.
17     Now, the terms and conditions that he signed
18  doesn't allow for that.  It says he has to pay that
19  support regardless.  But they always come back -- or
20  many times come back and try to negotiate.
21     Q.   Are you talking generally now, or are you
22  specifically referring to --
23     A.   Both.
24     Q.   -- General Electric?
25     A.   Both, both.

147

1      Q.   Oh, you knew about this particular one?
2      A.   Yeah.  I knew a lot about General Electric.
3      Q.   Okay.
4      A.   I had a -- a -- a large, large General
5   Electric account.
6      Q.   Okay.  Do you know --
7      A.   This is just one piece.
8      Q.   Okay.  Do you know why the implementation of
9   11i was behind schedule?
10     A.   I -- I do not, and I don't know what part of
11  11i they may be trying to install.
12     Q.   Okay.  You actually got this one down to the
13  penny, I see.
14     A.   Yeah.  I noticed that.  $671,658.01.
15     Q.   Okay.  Let's go down to the next one.  @Home.
16     A.   Right.  I don't recall that @Home.  I don't
17  recall a customer like that.
18     Q.   It's -- now -- but with -- you write 1.3
19  million next to it.
20     A.   Right.  I -- that's their annual renew --
21  renewal.
22     Q.   Okay.
23     A.   And then I say, "This is a CRM customer that
24  has not been able to implement.  Chris Drynan was rep
25  and never had it on his forecast."

148

1      Okay.  That would have been the sales renewal
2   rep.
3      Q.   Okay.
4      A.   "He didn't put it on his forecast, since the
5   customer refuses to renew."
6      Q.   All right.
7      A.   "Steve Fox is in" -- "in the AM."  I don't
8   know what that means.
9      So what I'm saying there is he's refusing to
10  renew the 1.3 million because he hasn't implemented it,
11  so he doesn't want to pay his support renewal.
12     Q.   Sure.
13     A.   However, I don't have it in my forecast
14  anyway, so he doesn't have to take that out.
15     Q.   Okay.  So the -- Steve -- the AM -- does
16  "Steve Fox is the AM" means Steve Fox is the account
17  manager?
18     A.   Yes.  And he doesn't have it in his forecast.
19     Q.   Okay.  Let's go down to the next one, Exabyte.
20     A.   Exabyte.  Yes.  There it is, yes.  Okay.
21  Their annual was 549.  "This is a 10.7 customer who
22  wanted to upgrade to 11i and has not been able to.  Both
23  our fault and theirs.  They are requesting concessions,
24  which we have not yet been able to give.  We are still
25  reviewing."

149

1  Q. Okay. Do you understand -- well, withdrawn.
2      MR. HARRISON: I think it continues, actually,
3  just to make it -- that sentence doesn't end there.
4  BY MR. WILLIAMS:
5  Q. Do you just want to --
6  A. Oh, "We are still reviewing this renewal with
7  the account manager, Glenn Seninger, to see what can be
8  done to secure renewal."
9  Q. Okay. Do you know what you meant when you
10  wrote "both our fault and theirs"?
11  A. Yes. I would say that there were things that
12  we did that caused them not to implement and there were
13  things that they did that caused them not to implement.
14  Q. Do you remember Exabyte?
15  A. I do not. I do not.
16  Q. All right. Let's go down to the next one.
17  Franklin Quest. Do you remember Franklin Quest?
18  A. I do not.
19  Q. Okay. Why don't you just read that for me.
20  A. "This customer had an iStore implementation
21  which was not working for a long time. Mike Cosenza has
22  recently told me that the implementation is complete,
23  and he does expect this one to come in. That may
24  change, though, as I have come to expect. We may have
25  already given the following renewal."

150

1  Q. Okay. Now --
2  A. "We have already given the following relief."
3  Q. I guess that -- that last part you read talks
4  about --
5  A. The next page.
6  Q. -- the next page. Right, yeah.
7      And you talk about, on the next page, about
8  Beckman-Coulter and Seagate?
9  A. Right. Those are concessions we had already
10  made.
11  Q. Right. What do you know about the
12  Beckman-Coulter concession?
13  A. You know, I remember Beckman-Coulter. They
14  had a crowd of consultants there, as I recall, and we
15  had a big conference call. I was in Mike's office. We
16  had a conference call and sales was -- and consulting
17  was pushing to get a large concession from support. And
18  I was suggesting that since their claim was that sales
19  sold them -- told them something that wasn't true and
20  consulting had been slow in doing things and support
21  hadn't been doing enough in fixing things, that the
22  three of us get together and decide how to share the --
23  the give back --
24  Q. Okay.
25  A. -- or the concession. And I remember having

151

1  to call. I don't remember how we ended up -- what we
2  ended up conceding or what part of that I took.
3  Q. Okay.
4  A. But it appears here that I took a million of
5  it --
6  Q. What --
7  A. -- which would have been the lion's share. I
8  think that's --
9  Q. What do you remember about Seagate?
10  A. I remember visiting Seagate, and I -- that's
11  all I remember. I remember Seagate, the customer. I
12  think I visited them one time. I do not remember why we
13  were conceding anything.
14  Q. Can you just turn to the next page --
15  A. Yes.
16  Q. -- which is another -- same exhibit but
17  another e-mail from -- written from you to Mike Rocha.
18  A. Right.
19  Q. And the subject line is the "new addition to
20  the 11i impact list," right?
21  A. Right.
22  Q. What did you mean when you wrote that?
23  A. Well, I meant that we were continuing to
24  experience impact on our renewal or concession due to
25  11i installations.

152

1  Q. Okay. And so it looks like you added another
2  customer there, CMGI?
3  A. Yes.
4  Q. Can you read that section for me?
5  A. "CMGI/Ubid, 600K in credits against work
6  already done. Oracle participation in the 1.2 million
7  in monthly out-of-pocket costs for rental warehouses and
8  leasing of Legacy apps and free services runs go live,
9  now targeting for May 18th."
10      So what I've said here is that they're going
11  to go live May 18th, but the customer is complaining
12  that we have delayed their go live in trying to get the
13  implementation done. And because we delayed their go
14  live, they had consequential damages of leasing a Legacy
15  piece of software and warehouse space that they were
16  leasing that will go away when they go live.
17  Q. Right.
18  A. And they were asking us to help pay for part
19  of that. And we had made a 600K concession to do that.
20  Q. Okay. When it says -- when you wrote that
21  they're leasing Legacy applications, what -- can you
22  just explain that for me?
23  A. Well, Legacy is old software. So whatever
24  they were running on, it was probably leased software.
25  It could have been IBM. It could have been Unix. It

Sellers, Richard  2/28/2006  10:41:00 AM

153

1  could have been anybody.  But they were leasing it,
2  probably a computer -- a leased computer with leased
3  software on it.  And they were running their business on
4  that.  And the -- and the notion of the new software was
5  to convert them up to new software off of that old
6  Legacy stuff, probably because the old stuff wouldn't do
7  any of the spiffy new things they wanted to do in their
8  business.
9      Q.  Uh-huh (Indicates affirmatively).
10      A.  So they set a go-live date, and we all agreed
11  that's the go-live date.  And then we missed the go-live
12  date.  They wanted us to pay for --
13      Q.  The leasing?
14      A.  -- the leasing of the warehouse and the
15  leasing of the -- of the apps.
16      Q.  Okay.  A few minutes ago you used the term
17  "give back."  What did you mean?  What is a "give back"?
18      MR. HARRISON:  Objection.  Vague.
19  BY MR. WILLIAMS:
20      Q.  If you want, we can find it on the record so
21  you know the context of what you meant.
22      A.  Well -- yeah, I don't -- "give back"
23  doesn't --
24      MR. WILLIAMS:  Can you find that?
25  (A portion of the record was read by the reporter.)

154

1  BY MR. WILLIAMS:
2      Q.  Okay.  Do you know what you meant when you
3  say -- when you said "give back"?
4      A.  Concession.
5      Q.  Okay.
6      A.  I said "give back concession."
7      Q.  Okay.  But they mean the same thing?
8      A.  Yeah.
9      Q.  Oh, okay.  I want to ask the reporter to mark
10  this document as Sellers No. 6, I think.  We are on 6,
11  right?
12      THE COURT REPORTER:  Yes.
13      (Exhibit No. 6 was marked for identification.)
14  BY MR. WILLIAMS:
15      Q.  Sellers No. 6 is Bates numbered NDCA-ORCL 0 --
16  I'm sorry, 121668.  Just take a look at Sellers No. 6
17  for me, and let me know when you're done.
18      A.  Okay.
19      Q.  Do you recognize Sellers No. 6?
20      A.  No, I don't recall this particular e-mail.  I
21  do recall the subject.
22      Q.  Okay.  And is it -- is it an e-mail either
23  from you or to you?
24      A.  It's -- I'm copied.
25      Q.  Okay.  And who wrote it?

155

1      A.  One of my direct reports, Madsen.
2      Q.  Chris Madsen?
3      A.  Chris Madsen.
4      Q.  And when was it written?
5      A.  24 May 2001.
6      Q.  And who was it written to?  Who is in "to"
7  line?
8      A.  That's HQAPP.  That's the headquarters group
9  that -- as I recall, this group worked -- was a couple
10  of people working for Safra Catz.  And what they did is
11  they approved large support discounts on sales.  So
12  let's say a salesman was going to sell a thousand
13  licenses but he wanted to discount the yearly support by
14  some large number, Safra was the time managing
15  operations, and I think this group would have had to
16  approve that.
17      Q.  Okay.  What's the subject line of the e-mail?
18      A.  "Upset 11i customers."
19      Q.  Now, it appears that you -- you were cc'd on
20  this e-mail, right?
21      A.  Right, uh-huh (Indicates affirmatively).
22      Q.  Can you read the first line -- the first
23  sentence of the text?
24      A.  Sure.  "Rich, we continue to have a subset of
25  customers who are extremely upset because of

156

1  nonperformance of 11i" -- "of 11i product."
2      Q.  Do you know why the e-mail is directed to
3  HQAPP, but the text is written -- it looks like directly
4  to you, right?
5      MR. HARRISON:  Objection.  Calls for
6  speculation.
7      THE WITNESS:  No.
8      MR. HARRISON:  Lacks foundation.
9      THE WITNESS:  Well, let me just say it's not
10  written to me.
11  BY MR. WILLIAMS:
12      Q.  Oh, okay.
13      A.  I've never been called Rich.
14      Q.  Oh, okay.
15      A.  Everybody at Oracle knows me as Dick.
16      Q.  Okay.
17      A.  And you will notice all other e-mails were
18  addressed to Dick.
19      Q.  Okay.
20      A.  So, no, Rich is not me.  Rich is a person in
21  that HQAPP --
22      Q.  Okay.
23      A.  -- group.
24      Q.  Do you know what his last name is?
25      A.  I don't.

157

1    Q. No?
2    A. You know, I had to sit here and think for a
3  while to remember HQAPP.
4    Q. Okay. All right. As of May 24th, 2001, was
5  it your understanding that -- I'm sorry. Was it your
6  understanding that your organization had a subset of
7  customers that were extremely upset about the
8  nonperformance of 11i?
9       MR. HARRISON: Objection. Calls for
10  speculation.
11      THE WITNESS: We always had a subset of
12      customers that were upset by whatever the latest
13      implementations were.
14  BY MR. WILLIAMS:
15    Q. I understand.
16    A. So it was not uncommon for me to have that.
17  The purpose of this memo all comes back to the Q3 miss
18  in keeping Rocha informed of any variation or anything
19  that's going on to the revenue stream. So I give him --
20  make sure he knows about all concessions. Madsen is
21  making sure that he knows that we're saying -- telling
22  these customers that we're not going to support them
23  unless they renew. So that means they may -- they may
24  get mad and not renew.
25    Q. Okay.

158

1    A. They're going to HP -- HQAPP operations. He's
2  asking for their advice, because we're in the early
3  stages of this product. We don't want to develop angry
4  customers. So we have been, as evidenced by my other
5  memo, giving concessions, and we want to make sure that
6  Safra's group understands that and approves it.
7    Q. Okay.
8    A. We don't want to be out there all by
9  ourselves.
10    Q. Okay. So why don't you just read for me
11  beginning -- a few lines down where it says "some
12  customers."
13    A. "Some customers are going ahead and paying the
14  support renewal and others are getting more upset. One
15  customer has mentioned legal action and has brought in
16  Seibel for a demonstration. Do we want to continue on
17  this course with these customers and shut off support?
18  Current customer in question are Emulex -- LJE has
19  already declined this one -- Symantec, Master
20  Protection. Your advice is appreciated."
21    Q. Okay. Do you recall some of these issues?
22    A. I remember Emulex went to LJE, and he talked
23  to them, and then -- no. You know, I do not remember.
24    Q. Okay. LJE is Larry Ellison, right?
25    A. Right.

159

1    Q. All right. Do you -- withdrawn.
2       In the spring of 2000, did you and your
3  organization do some work with San Diego County?
4    A. You know, I don't know.
5    Q. Okay.
6    A. I remember San Diego County for some reason.
7  The name rings a bell, but I don't know why.
8    Q. It was a while ago.
9       Let me ask the reporter to mark this document
10  as Sellers No. 7.
11      (Exhibit No. 7 was marked for identification.)
12  BY MR. WILLIAMS:
13    Q. Sellers No. 7 is Bates NDCA-ORCL 121280
14  through 294. It's a relatively long document, so take
15  your time in reviewing it. Otherwise, I can direct you
16  to the areas that I want to discuss.
17      I should say, as you're reviewing, it looks
18  like Exhibit No. 7 -- there are a series of e-mails
19  here, but it appears they were all ultimately forwarded
20  to you. And there is some repetition in there that you
21  might see.
22    A. Okay. I'm all the way into here.
23    Q. Okay. So we'll -- if there is more that you
24  need to read, we'll just --
25    A. Okay.

160

1    Q. -- kind of get to it. Okay?
2    A. Yeah.
3    Q. All right. So looking at the first page,
4  121280, do you recognize that?
5    A. Do I recognize what?
6    Q. The document.
7    A. No.
8    Q. So it's not one of the documents that you saw
9  yesterday?
10    A. It is not, no.
11    Q. Okay. And what -- what does it appear to be?
12    A. It's a memo to me copying my boss; one of my
13  direct reports, Swen Larsen; and a development manager,
14  Frank Bishop. And they're complaining about the
15  implementation at San Diego County. And it appears that
16  the writer, the initial writer, of the memo is saying
17  that all of the problems are in the Oracle software.
18    Q. Now, does the document refresh your
19  recollection at all about whether or not you had any
20  involvement with implementations at San Diego County?
21      MR. HARRISON: Objection. Vague.
22      THE WITNESS: No, it doesn't.
23  BY MR. WILLIAMS:
24    Q. Okay.
25    A. I mean, my direct reports are involved, so I

Sellers, Richard  2/28/2006  10:41:00 AM

161

1   think it's safe to say I was involved one way or
2   another.
3       Q.  Okay.
4       A.  I would point out to you that this is a
5   special piece of software.  It is not 11i the general
6   release; this is 11i developed for government, which is
7   an entirely different release of 11i.
8       Q.  Is it -- was it called something different?
9       A.  Yeah.  Vision.  It was Vision Software.  It
10  was a government implementation of 11i for governments.
11  Frank Bishop was the developer of that software.
12      Q.  Do you --
13      A.  That's why they're talking to Frank here.
14      Q.  Okay.  Do you know -- do you know whether or
15  not Frank Bishop was responsible for product
16  demonstrations?
17      A.  Well, he may have, in fact, worked -- worked
18  on a product demonstration.  I wouldn't say he's
19  responsible for that.  Sales or consulting typically put
20  those on.  But it's not uncommon for development to
21  assist sales and consulting if they have a large demo to
22  put on.
23      Q.  Did you ever attend sales demonstrations of
24  11i?
25      A.  No.

162

1       Q.  Do you know what the -- well, withdrawn.
2           Do you know if the demonstration software had
3   a name?
4           MR. HARRISON:  Objection.  Vague.  Ambiguous.
5           THE WITNESS:  I don't.
6   BY MR. WILLIAMS:
7       Q.  Okay.
8       A.  I do know that we called them conference room
9   demos.  What we would do was all get in a conference and
10  rig the software up like it was running, so that you
11  could demo in a conference room.
12      Q.  Okay.
13      A.  We called those conference room demos.  I
14  don't know if they had another name or --
15      Q.  Okay.  Just directing your attention back to
16  the first page of this document.  So it looks like
17  Charles Kendig wrote this e-mail to you?
18      A.  Of course.
19      Q.  And it was around May 29th of 2001?
20      A.  Yes.
21      Q.  Was it -- well, withdrawn.
22      A.  He gave me a nice going away present.  I think
23  you should have done --
24      Q.  What did he give you?
25      A.  He gave me -- I think it was a $100 gift

163

1   certificate at Amazon.
2       Q.  That's --
3       A.  Semi nice of him.
4       Q.  Yeah.  Well, it depends on what your work
5   relationship was like.
6       A.  I suppose.
7       Q.  So do you know who Dave Natelson is?
8       A.  I do not.
9       Q.  Okay.  Do you see where -- I guess the third
10  paragraph down -- where Mr. Kendig writes, "As David
11  Natelson mentions in his note, failed implementations
12  are putting our state and local vertical out of
13  business"?  Do you see that?
14      A.  I do see that.
15      Q.  What is the "state and local vertical," do you
16  know?
17      A.  That's the one I told you about.  That's the
18  health care, government, the one that belonged to
19  Nussbaum.
20      Q.  I see.
21      A.  He had his own consulting.  And the -- much of
22  the software was written just for government.
23      Q.  I see.
24      A.  That's the case here.  This version of 11 is
25  written for government.

164

1       Q.  How does one -- how does one know that?  Is
2   that something that you have independent knowledge of
3   but that's not here?
4       A.  Well, yes.
5       Q.  Okay.
6       A.  I have an independent knowledge of it.  But he
7   points out that Frank Bishop is the development manager.
8   Frank Bishop was the development manager for 11i
9   government.
10      Q.  Okay.  Other than through this e-mail, had you
11  heard that failed implementations were putting state and
12  local vertical -- the state and local vertical out of
13  business?
14      A.  I would say that's hyperbole and BS and not
15  uncommon to come from this particular individual.
16      Q.  Okay.
17      A.  I would further point out that this is a
18  typical government deal.  You've got CSC, the consulting
19  group, in there doing the work.  No government -- no
20  Oracle consultants -- stopping by on occasion to hear
21  what CSC is saying, and you've got an implementation
22  that's going poorly with a whole ton of TARs.  No one
23  even knows what they are or which ones have been
24  escalated or which one have not.  And that's why Kendig
25  says to Swen, Maybe you can look at this one TAR and see

Oracle                                                                    Page  161 - 164

165

1    if you can solve that.  Typically, when we get that, we
2    solve them in a matter of days.  So I assume he solved
3    that in a matter of days.
4        Q.  Now, you indicated the -- well, withdrawn.
5            You said that this type of comment was typical
6    of Mr. Kendig.
7        A.  Yes.
8        Q.  Was it, in your opinion, typical of the entire
9    organization or just Mr. Kendig?
10           MR. HARRISON:  Objection.  Calls --
11   BY MR. WILLIAMS:
12       Q.  His -- I'm sorry.  Of his organization, the
13   state and local or government organization.
14           MR. HARRISON:  Objection.  Calls for
15   speculation and lacks foundation.
16           THE WITNESS:  I only worked directly with him.
17   BY MR. WILLIAMS:
18       Q.  Okay.  So you don't -- you indicated you don't
19   know who David Natelson is, right?
20       A.  No.
21       Q.  Did you have much correspondence directly with
22   Jay Nussbaum?
23       A.  No.
24       Q.  Okay.
25       A.  I presented for his group one time.

166

1        Q.  Okay.  How about other people in that
2    organization?
3        A.  Yes.  The government organization was very
4    vocal, in fact, so vocal about support that I put an
5    entire support center staffed with about 16 people in
6    Virginia just to take care of their problems, to try to
7    handle some of their issues.
8        Q.  Their issues went directly to support?
9            MR. HARRISON:  Objection.  Vague.  Ambiguous.
10           THE WITNESS:  Their issues with support went
11   directly to support.
12   BY MR. WILLIAMS:
13       Q.  Okay.  Do you know -- withdrawn.
14           What is CSC?
15       A.  That's the consulting group.
16       Q.  Internally?
17       A.  No.
18       Q.  Oh.
19       A.  It's -- it's like Deloitte & Touche.
20       Q.  Okay.  So it's an outside --
21       A.  It's an outside -- yeah, it's an outside
22   consulting group.
23       Q.  Okay.
24       A.  And these conditions -- you know, I dealt with
25   them.  I don't want to seem cavalier, but I deal with a

167

1    hundred of these a quarter or more.  The customer hires
2    an outside consulting group.  They come in and they do
3    whatever work they do.  They always blame the vendor who
4    sold the software.  The -- then they complain about this
5    long list of TARs, which we've solved half of them, but
6    they haven't got the answer yet because they weren't
7    there to get the answer.
8            So we consistently solved these issues as soon
9    as we put a person just assigned to that account.  Okay.
10   Go look and see what's going on there; figure out what
11   they're doing; which TARs do we need to -- that are
12   really important to them, which ones -- you know, there
13   is a hundred requests for information.  Which ones
14   really are holding them up and which ones are just
15   somebody was reading a manual and wanted to know how
16   does this work?
17       Q.  Okay.
18       A.  See through that, solve the problem.
19   Engineering was very responsive any time I would call
20   and say, Hey, we need these two things solved.  Get them
21   solved, done, we walk away.
22           And the organization -- this organization, you
23   know, it's -- it's like the squeaking wheel gets the
24   grease.  Everybody knows.  Complain, get it to the top,
25   and everything gets fixed faster.

168

1        Q.  Do you know Mary Ann Anthony?
2        A.  I do not.
3        Q.  Okay.  Do you know Mary Aragon-Arachila?
4        A.  I do not.
5        Q.  I'll ask the reporter to mark this document as
6    Sellers Exhibit No. 8.
7            (Exhibit No. 8 was marked for identification.)
8    BY MR. WILLIAMS:
9        Q.  Sellers No. 8 is Bates numbered NDCA-ORCL
10   202871 through 674.  And if you could just take a look
11   at that document and let me know when you're done, I
12   would appreciate it.
13       A.  Okay.
14       Q.  Is Sellers No. 8 a document or report created
15   by your organization?
16       A.  It is not, no.
17       Q.  Okay.  Do you recognize it?  Do you know what
18   it is?
19       A.  I don't recall ever seeing anything that looks
20   like this.
21       Q.  Okay.
22       A.  I'm going to guess -- well, I'm not going to
23   guess.
24       Q.  Okay.  All right.  I'll ask the reporter to
25   mark this document as Sellers No. 9.

169

1    (Exhibit No. 9 was marked for identification.)
2  BY MR. WILLIAMS:
3    Q.  Sellers No. 9 is Bates No. 156405 through 414.
4    THE COURT REPORTER:  44?
5    MR. WILLIAMS:  414.
6  BY MR. WILLIAMS:
7    Q.  It's a relatively long document.  Take your
8  time in reviewing it, or we can go to the areas that I
9  want to ask you about.
10    You know, before we begin, I'm going to
11  separate this document at -- I'm going to separate it at
12  156408.  So Sellers No. 9 will be 156405 through
13  156407.0003.
14    MR. HARRISON:  Do you want to tear -- take it
15  apart?
16    MR. WILLIAMS:  Yeah, you can take it apart.
17    MR. HARRISON:  Okay.
18    MR. WILLIAMS:  Okay.
19    MR. HARRISON:  Hold on to that one there.
20    MR. WILLIAMS:  Yeah.
21  BY MR. WILLIAMS:
22    Q.  And just for the convenience, I'll mark
23  NDCA-ORCL 156408 through 414 as Sellers No. 10.
24    Does that make sense?  We're going to look at
25  No. 9, first.  Okay?

170

1    A.  Yes.  That's --
2    Q.  That's 405.
3    A.  Five through seven, right?
4    Q.  Yeah.
5    (Exhibit No. 10 was marked for
6  identification.)
7    THE WITNESS:  Okay.
8  BY MR. WILLIAMS:
9    Q.  Okay.  Do you recognize Sellers No. 9?
10    A.  I don't recognize the memo, the e-mail.  I do
11  recognize parts of the subject.
12    Q.  Which -- well, which parts of the subject do
13  you recognize?
14    A.  I recognize the 20 million missed, the
15  shortfall.  I'm not sure of what -- that I recall what
16  she's talking about for reporting, other than I was
17  painfully aware that we had no reporting.  We
18  couldn't -- we were in the blind.  All we could tell is
19  we were short for the revenue.  We could see no reports
20  to determine where it was.
21    Q.  Okay.  Well, directing your attention to the
22  first page --
23    A.  Okay.
24    Q.  -- of Exhibit No. 9, does that appear to be an
25  e-mail from Mark Barrenechea to several people?

171

1    A.  Yes.
2    Q.  One of those people is you?
3    A.  Yes.
4    Q.  And it's right around February 15th, 2001?
5    A.  Exactly right.
6    Q.  It looks like it's about 4:30 in the morning.
7    A.  Probably was.  We were busy during that time.
8    Q.  Did you open it at 4:37?
9    A.  I doubt it.
10    Q.  All right.  Well, it would have been 7:30 for
11  you, right, or something like that.
12    A.  That's true.  That might have -- yeah, 4:30,
13  three hours different, so I could have opened it at
14  7:30.
15    Q.  Did you have a Blackberry or handheld device
16  at that time?
17    A.  No.
18    Q.  What -- can you just read the subject line for
19  me?
20    A.  Yes.  Subject is -- no, I don't have a
21  subject.
22    Q.  Okay.
23    A.  Oh, February 12th, "Forecast sensitivity
24  analysis."
25    Q.  All right.  Do you recall generally what that

172

1  analysis was?
2    A.  I don't recognize the term "forecast
3  sensitivity analysis."
4    Q.  Okay.  Who is Graeme Mair?
5    A.  He was in finance.  He worked for Bill
6  Cadogan, I believe, in Europe.  And Mike Rocha was using
7  him -- or maybe it was Jennifer Minton in finance was
8  using him -- to do some financial work in this area and
9  forecasting and trying to help us work this issue.
10    Q.  Who is Matthew Connors?
11    A.  I do not know.
12    Q.  How about Brian Elloy?
13    A.  I do not know.
14    Q.  Nancy Clark?
15    A.  Nancy Clark?  I think Nancy Clark had
16  something to do with the processing over in Rocklin, but
17  I do not know.
18    Q.  Okay.  How about Eric Winkler?
19    A.  I do not know.
20    Q.  Okay.  Now, very early in our conversation
21  this morning, we were talking about this, you know, the
22  miss in your region --
23    A.  Uh-huh (Indicates affirmatively).
24    Q.  -- and the investigation surrounding the lead
25  up to that miss --

173

1    A.  Right.
2    Q.  -- right?
3    A.  Uh-huh (Indicates affirmatively).
4    Q.  And you indicated earlier that you had seen
5    some documents yesterday which kind of helped, refreshed
6    your recollection --
7    A.  Right.
8    Q.  -- of that stuff.
9    A.  Yes.
10   Q.  And this is not one of those?
11   A.  No, it doesn't appear to be.
12       MR. WILLIAMS:  Did you guys bring copies of
13   those documents that you showed him yesterday?
14       MR. HARRISON:  No.
15       MR. WILLIAMS:  Unless I have them here and we
16   go through them, I'll probably ask you for those.
17   They clearly refreshed his recollection on the
18   subject matter that we're going to be talking
19   about.  And you may disagree.
20       MR. HARRISON:  Okay.  Yeah.
21       MR. WILLIAMS:  Okay.
22       MR. HARRISON:  I mean, he didn't indicate that
23   anything specifically refreshed his recollection.
24   I mean, we had a conversation, as far as he said,
25   about four to five hours, and, you know -- but I

174

1    don't think that -- we can talk about this at a
2    future time if you request them --
3        MR. WILLIAMS:  Okay.
4        MR. HARRISON:  -- and get into it then.  But I
5    don't think it's appropriate to provide you with
6    all the documents we reviewed.
7        MR. WILLIAMS:  All right.
8        MR. HARRISON:  There is a work product issue.
9        MR. WILLIAMS:  Sure.  I understand.
10       Why don't you go ahead and change the tape now
11   since you're going to have to do it in a minute or
12   two.
13       THE VIDEOGRAPHER:  This is the end of Tape No.
14   4 of the deposition of Richard Sellers.  It is
15   3:36.  We are off the record.
16       (Brief recess was taken.)
17       THE VIDEOGRAPHER:  This is the beginning of
18   Tape No. 5 of the deposition of Richard Sellers.
19   It is 3:45.  We are back on the record.
20   BY MR. WILLIAMS:
21   Q.  Okay.  Still discussing Sellers No. 9, which
22   was sent on February 15th.
23       You indicated earlier that after you had
24   gotten the January numbers, that you were a little
25   concerned about where the renewal stood for the quarter,

175

1    right?  Is that right?
2    A.  Yes.
3    Q.  Okay.  And --
4    A.  Those come -- those come at the end of
5    January, the 1st of February.
6    Q.  Yeah.  Okay.  So is it fair to say that the
7    concern that you articulated earlier was a couple weeks
8    before this February 15th e-mail?
9        MR. HARRISON:  Objection.  Calls for
10   speculation.  Lacks foundation.
11       THE COURT REPORTER:  What was the last part of
12   the objection?
13       MR. HARRISON:  Lacks foundation.
14       THE WITNESS:  My recollection is early
15   February.
16   BY MR. WILLIAMS:
17   Q.  Okay.  And some of the subject matter in this
18   e-mail relates to the issue you were discussing?
19   A.  It does, indeed.
20   Q.  Okay.  Can you point to or direct me to the
21   areas of this document that --
22   A.  Well, you see in the first paragraph, "I
23   understand that each contract has a sales rep assigned
24   to it and that each sales rep can query their work
25   list."

176

1    This -- this is true.  Our sales renewal folks
2    had a -- had a list that they made.  They were assigned.
3    And they know where they were on that list.  Okay?
4        What we could not get is a report out of the
5    system that said which ones of those that our sales rep
6    thought were closed were actually in the system and
7    closed.  In other words, I had no line of sight between
8    the -- the salesperson's sheet saying, I closed that one
9    two weeks ago, and being able to go to an income
10   statement and saying, There it is on the income
11   statement.
12   Q.  Okay.
13   A.  I have that money.
14   Q.  Okay.
15   A.  So since I can't see that, I don't know coming
16   out of this system how closely it agrees or it agrees at
17   all with what my sales folks say they've done.
18   Q.  Okay.
19   A.  All I have is their word.
20   Q.  All right.  Do you see where he said --
21   Barrenechea writes, "Having said that, I want to get
22   opportunities" -- I think that means -- "with OSO for
23   expiring contracts and/or upsell potentials for selling
24   umbrella contracts."
25       Do you see that?

177

```
1        A.  Uh-huh (Indicates affirmatively).
2        Q.  Do you know what he's referring to when he
3   writes "OSO"?
4        A.  I do not.
5        Q.  Do you know what expiring contracts are?
6        A.  Expiring contracts are what we renew.
7        Q.  Okay.  And how about where he writes upsell
8   potentials, is that what we talked about earlier?
9        A.  Yes, it is.  And our salespeople would try to
10  renew the contract and upsell it to a gold or silver
11  contract if -- if they could.
12       Q.  And what is an umbrella contract?
13       A.  I do not know that term.
14       Q.  Okay.
15       A.  I'm not familiar with the term he uses.
16       Q.  Okay.  Going down to the portion of the
17  document that it appears that Jennifer Minton wrote, do
18  you see that?
19       A.  Yes, I do.
20       Q.  Do you see where she writes, "I just spoke to
21  Graeme about the $20,000,000 shortfall in U.S. support
22  revenues in January and December"?
23       A.  Yes.
24       Q.  Do you know what she's talking about there?
25       A.  Yeah.  She's talking about our -- our
```

178

```
1   forecast, our problem that -- and you see the next
2   sentence.  It says, "Since its OKS doesn't provide any
3   management reporting, the support renewal reps don't
4   have the ability to automatically determine which
5   support contracts need to be renewed."
6        Q.  Right.
7        A.  So we can't -- all we know is we've got 20
8   million less than we think we have.
9        Q.  Okay.
10       A.  Right.
11       Q.  You indicated earlier that December looked
12  okay.
13       A.  Yes.
14       Q.  Was there a shortfall in December?
15       A.  I don't recall one.
16       Q.  Okay.
17       A.  If I -- I know what this says.  But my
18  recollection is that the 20 million was for the quarter.
19  So when we took December and January then added it to
20  our February forecast, it looked like it was 20 million
21  short.  So to say that the 20 million was short out of
22  January and December, that's not how I recall.
23       Q.  Okay.  Now, the OKS that Ms. Minton is
24  referring to, is that the software that you were talking
25  about earlier that wouldn't allow you to --
```

179

```
1        A.  That's the new software that doesn't give us
2   any management reports.
3        Q.  Okay.  And you don't know when that was
4   implemented?
5        A.  Sometime before here.
6        Q.  Sometime before --
7        A.  My -- I don't know.
8        Q.  All right.  Do you see where she writes after
9   the section you just read to me, "Hence, they're
10  manually low compiling data using Excel spreadsheets to
11  determine which contracts need to be renewed"?
12       A.  That's correct.
13       Q.  You mentioned something about that earlier,
14  right?
15       A.  Yeah.
16       Q.  Who -- did you say that it was Chris Madsen
17  that was doing that?
18       A.  His people --
19       Q.  His people.
20       A.  -- were putting that together.
21       Q.  All right.
22       A.  And the problem with that is, when they did
23  that, it looked like we should have more money than we
24  had.  So if I took their spreadsheets and what they say
25  they closed, then I should have had more money.  But
```

180

```
1   Jennifer is only giving me this much money out of the
2   OKS system.  So now what is the problem?  Is it OKS
3   hasn't processed at all?  Is it my sales reps are not
4   truthful?  They're saying they closed things they didn't
5   close, since I have -- since I have an incentive plan,
6   they might have a motivation to do that.  Although, I
7   don't think they would have thought they could have got
8   away with it.  Eventually, we would get reports.  So now
9   you can see the dilemma we have.
10       Q.  I see.
11       A.  And I'm sure that the 20 million was for the
12  quarter, because that's the number we discussed, and I
13  think you'll see documentation.  I don't know if you
14  have it or not.  But you'll -- I think we discussed that
15  number right up to the close of --
16       Q.  Q3?
17       A.  -- Q3.
18       Q.  Okay.  Do you see where in the same section
19  she writes, "We need to address this issue immediately,
20  or else the reported support revenues for Q3 will be
21  significantly lower than currently forecasted."
22       A.  Right.
23       Q.  And so that's the issue that you've been
24  talking about?
25       A.  That's right.  I'm forecasting for the
```

181

1    Americas' budget for Q3. And this looks like I'm going
2    to be 20 million short for Q3.
3         Q.   Okay. Do you see where --
4         A.   By the way -- by the way, that's 20 million
5    over 458 million, just to put it in perspective, the
6    budget for Q3, 458 million.
7         Q.   In renewals?
8         A.   In renewal -- well --
9         Q.   Of support?
10        A.   Total business, 458. We're talking about 20
11   million, so we're under five percent. I just thought I
12   would add that.
13        Q.   20 million is a lot of money to me.
14             MR. HARRISON: Objection to the commentary.
15   Argumentative.
16             MR. WILLIAMS: No, I'm just kidding.
17             MR. HARRISON: I know. I know.
18   BY MR. WILLIAMS:
19        Q.   Do you see under that section where it says
20   "Graeme Mair wrote"?
21        A.   Uh-huh (Indicates affirmatively).
22        Q.   Can you read that?
23        A.   Sure. "Jennifer, Larry. FYI. The breaking
24   news from Rocklin is that the shortfall seems to be in
25   the renewals number. Regards, Graeme."

182

1         Q.   Okay. Now, do you know whether prior to
2    February 15th there was difficulty in determining where
3    the shortfall was and just -- and after this kind of
4    Rocklin investigation determined that it was in
5    renewals?
6         A.   I disagree with this, and I think subsequent
7    reports will bear me out that he is incorrect here.
8         Q.   Okay.
9         A.   However, the problem is this. Let me say it
10   more succinctly. Money is coming in from new business.
11   Money is coming from renewals. Money is coming in from
12   upsales and money is coming in from business that was
13   due in Q2 but we renewed in Q3. So that is the pile of
14   money.
15             There are no reports to say which money is
16   which. All I know is I have this much money. I don't
17   know from whence that money came. I don't know which
18   customers. I don't know how much of it is renewals, how
19   much of it is new business, how much of it is back
20   dated. I don't know any of that information.
21             He has gone to Rocklin and has talked to the
22   people that have said, No, no, no. We have put it
23   all just right, and he has then said, It's not in
24   renewals.
25        Q.   I see. So at this point, the investigation

183

1    was still ongoing and, based on your testimony, Graeme
2    was still trying to figure out what was going on?
3         A.   Well, Graeme and many of us were trying to
4    figure that out, yes.
5         Q.   Okay. Who is John Lederer, do you know?
6         A.   Yes. He was in finance.
7         Q.   Corporate finance or in a division --
8    withdrawn.
9         A.   John was in corporate finance.
10        Q.   Okay.
11        A.   He would have been somewhere under Jennifer,
12   somewhere in Jennifer's organization.
13        Q.   Jennifer's organization.
14             All right. Do you see the -- you know, the
15   same page, Bates No. 156407.0001, the bottom of the
16   page -- an e-mail from John Lederer to Graeme and
17   Roberto Fajardo?
18        A.   Yes.
19        Q.   Is this the Roberto that we were talking about
20   earlier?
21        A.   Yes, uh-huh (Indicates affirmatively).
22        Q.   Okay. Can you read the first two sentences of
23   that message for me?
24        A.   Yes, I can. "I analyzed the revenue by
25   invoice, by source in December, January, and February.

184

1    Clearly, it's the renewal revenue in decline 8 million,
2    and then the January -- in January and 12 million in
3    February. Today, I will work with Chris and, hopefully,
4    Tom, to figure out why."
5         Q.   Do you know who the Chris and Tom they're
6    referring to is?
7         A.   I believe Chris to be Chris Madsen --
8         Q.   Uh-huh (Indicates affirmatively).
9         A.   -- the person in charge of getting renewals
10   done.
11        Q.   How about the Tom?
12        A.   I do not know a Tom.
13        Q.   Okay. But John Lederer was involved in this
14   process as well?
15        A.   Yes.
16        Q.   All right. Did you meet with him at any time
17   during your trips to California?
18        A.   I did not, but I was on several conference
19   calls that he was on.
20        Q.   Okay.
21        A.   And he was working very closely with Bill
22   Shunk, who was my finance guy.
23        Q.   Okay.
24        A.   And I believe that Shunk, in fact, went to
25   Rocklin with Lederer to go through some of this data.

Sellers, Richard  2/28/2006  10:41:00 AM

185

1    Q.  Now, at the time, had you heard some of this?
2    Well, obviously, you did because you were on all these
3    e-mails?
4    A.  Yes, uh-huh (Indicates affirmatively).
5    Q.  Okay.
6    A.  Yes.  I was a lone voice continuing to say, We
7    haven't got all of our renewals.  It's not here.  The
8    money is not here.
9    Q.  Who -- do you know who initiated the
10   investigation of this shortfall?
11   A.  I do not.
12   Q.  It wasn't something that you recognized in
13   your organization and said --
14   A.  Well, I --
15   Q.  -- Hey, where is the money?
16   A.  It all happens at the same time.  I mean, in
17   the first of February, in early February, we're doing a
18   forecast for the last month in the quarter.
19   Q.  Uh-huh (Indicates affirmatively).
20   A.  And we're saying the money doesn't add up.  At
21   the same time, finance is saying, Hey, your money
22   doesn't add up.  Everybody is kind of pointing the
23   finger and saying, Hey, you're in the ditch.  So I don't
24   know who initiated the investigation.  I can tell you
25   that we all seriously wanted one, because it was

186

1    affecting our performance, all of ours.  And we wanted
2    to find the money.
3    Q.  Okay.  Do you know Greg Myers?
4    A.  I do not.
5    Q.  Can you -- just where you left off before,
6    where it says "Tom to figure out why," there is a
7    section under there that begins "also."  Do you see
8    that?
9    A.  "Also, I spoke with Greg Myers, the AR
10   manager."  That would be the accounts receivable
11   manager.  "He reaffirmed it's not the AR system.  He
12   gets what is stuck in the interface table on a daily
13   basis, and support has only about 150K, not millions,
14   that the" -- "not millions, and that number has not
15   changed in the last two weeks."
16   Q.  Okay.  Now, was it ultimately found to be the
17   AR system?
18   A.  No.
19      MR. HARRISON:  Objection.  Calls for
20   speculation.  Lacks foundation.  And it's vague as
21   to time.  Sorry.
22   BY MR. WILLIAMS:
23   Q.  It was ultimately found to be the OKS system
24   that had the issue?
25      MR. HARRISON:  Same objections.

187

1    BY MR. WILLIAMS:
2    Q.  Well --
3    A.  I -- I believe the issues were many, but one
4    of the prominent issues was the process in the system,
5    the way the process was worked into the system and how
6    the system handled those inputs.  It was a new system.
7    People were used to using the old system, and the way
8    they interacted together caused us to have a -- was part
9    of the short fall.
10   Q.  Okay.  Okay.  I'm going to ask you to take a
11   look at Sellers No. 10, which is the document Bates
12   No. 156408 through 414.  That was the one we separated
13   earlier.  There you go.
14   A.  Okay.
15   Q.  Okay.  Do you recognize Exhibit No. 10,
16   Sellers No. 10?
17   A.  I don't recognize the e-mail, but I certainly
18   recognize the subject.
19   Q.  Okay.  And what is the subject?
20   A.  The subject is Jennifer Minton asking Mark
21   Barrenechea for a report which would facilitate and
22   allow us to identify missing revenue so that we could
23   close it.
24   Q.  Okay.  And this -- the document is an e-mail
25   from Jennifer Minton to you among other people, right?

188

1    A.  It's -- it's to Graeme; Barrenechea; my boss,
2    Rocha; Catz; Henley.  So, yes, I'm on there.  Yes.
3    Q.  And that's February 15th, 2001?
4    A.  Yes, it is.
5    Q.  Same subject, the "February 12 forecast
6    sensitivity analysis"?
7    A.  Yes.
8    Q.  Okay.  A little later in the day, right, about
9    9:30 a.m. Mountain Time?
10   A.  Are we talking about --
11   Q.  The time of the e-mail.
12   A.  The time of the e-mail.  9:31 Greenwich Mean
13   Time?
14   Q.  Is that Greenwich -- I'm sorry, that's right.
15   GMT is Greenwich Mean Time.
16   A.  And that's because Graeme was on GMT.  Graeme
17   was from the UK.
18   Q.  Okay.
19   A.  So a lot of the stuff he wrote you would find
20   GMT stamped.
21   Q.  Okay.  Well, then I made a mistake in the last
22   document.  That's 4:36 GMT on No. 9, right?
23   A.  So we would have seven hours, seven and a half
24   hours later.
25   Q.  Seven and a half hours.  Earlier?

Sellers, Richard  2/28/2006  10:41:00 AM

189

1    A.  Yeah.
2    Q.  He is in the UK, so earlier.
3    A.  Well --
4    Q.  We'll figure it out.
5    A.  Okay.  Yeah.
6       MR. HARRISON:  The document says what it says.
7  BY MR. WILLIAMS:
8    Q.  Okay.  So Jennifer is writing to Mark about
9  creating software to generate reports, right?
10   A.  Yes.
11   Q.  And this is what you were discussing earlier?
12   A.  He's talking about writing reports for OKS so
13  that we can see what composes the revenue stream, what
14  contracts have closed and have been -- and are in the
15  revenue stream, and what contracts are not closed in the
16  revenue stream.
17   Q.  And see where she writes, "We can not afford
18  to miss our revenue forecast this quarter" --
19   A.  Right.
20   Q.  -- "and need your urgent attention and
21  cooperation in developing a bookings report."
22   A.  Yes.
23   Q.  Do you know why she believed that the company
24  couldn't afford to miss their forecast -- the revenue
25  forecast that quarter, Q3 '01?

190

1    A.  I have no --
2       MR. HARRISON:  Objection.  Calls for
3  speculation.  Lacks foundation.
4       THE WITNESS:  I have -- I have no ideas.  My
5  belief was the company could never afford to miss a
6  forecast.
7  BY MR. WILLIAMS:
8    Q.  Okay.  Do you see in the next paragraph the
9  reference to GSR?
10   A.  Yes.
11   Q.  That's the -- is that the accounting system
12  that you were discussing earlier?
13   A.  That was the accounting system that we had
14  used up to this point, before OKS, and she has left a
15  copy of the report that we used out of the GSR system,
16  that we used to use and that we would like to have under
17  the OKS system.
18   Q.  All right.  So that was the general format of
19  what she wanted the OKS system to report?
20   A.  Wanted a report that looks like this, yes.
21   Q.  Were you familiar with that report?
22   A.  I didn't personally use that report.  I had
23  people working for me who used that report and summed it
24  up and told me what it says.
25   Q.  Okay.  I'm going to just direct your attention

191

1  to at a little bit further down the page, the paragraph
2  that begins "in addition we're evaluating."
3    A.  "In addition, we are evaluating purchasing."
4    Q.  You can read that out loud, if you want to.
5    A.  "In addition, we are evaluating purchasing
6  Adobe Editor to assist in the formatting of quotes
7  generated from OKS.  This has become a serious
8  productivity issue for the support sales renewal group.
9  Adobe Editor might enable the rush to quickly fix
10  formatting issues and to modify the quotas requested by
11  the customer."
12   Q.  Do you have --
13   A.  Yeah.
14   Q.  I'm sorry.  Go ahead.
15   A.  That was about this new software was extremely
16  slow and difficult to use in getting these quotes out to
17  customers.  And we were hard -- you know, we are
18  pressing these guys to get these closed.
19       And we're saying to them, What can we do to
20  help you get these contracts closed?
21       And they're saying, Hey, make this problem go
22  away.  It's -- we're using all our time up just trying
23  to generate quotes --
24   Q.  Right.
25   A.  -- let alone to talk to the customer to close

192

1  the deal.
2    Q.  Do you know what Adobe Editor is?  Is it
3  software?
4    A.  I -- no, I do not.
5    Q.  Okay.  Do you see the last paragraph where she
6  writes "lastly"?  "Lastly, is it possible to accelerate
7  the patch which will provide CSI merging capability?"
8       Do you see that?
9    A.  Yeah, I do.
10   Q.  Do you know what that meant?
11   A.  No.  Something about the sales rep, the
12  productivity of the sales rep.
13   Q.  Okay.
14   A.  CSI customer -- I don't know.
15   Q.  How about --
16   A.  These are all changes.
17   Q.  Changes?
18   A.  From the problems caused by installing new
19  software.
20   Q.  Okay.  Going down to the bottom of the page,
21  still part of this forward that you ultimately received,
22  but it looks like an e-mail from Chris Madsen to you, or
23  at least you're cc'd on that, right?
24   A.  The one with the headings at the bottom of the
25  page, from Graeme Mair, or are you talking about --

193

1    Q.  No.  We're still at the bottom of the page,
2    and we're --
3    A.  Okay.  Yes, I see.  I see it.  From Chris
4    Madsen to Roberto.  And, yes, I'm copied.
5    Q.  And to you?
6    A.  Right.
7    Q.  Now, I'm sorry, did you say Roberto worked for
8    you as well?
9    A.  Roberto was the U.S. finance manager.  He
10   reported back to finance, but he did -- U.S. finances.
11   So he had like a dotted line to me.  Functionally --
12   Q.  Okay.
13   A.  -- he helped my -- he helped me.
14   Q.  Okay.
15   A.  He reported to finance.
16   Q.  You can just read that first sentence to
17   yourself there from Chris to -- that he wrote to you.
18   A.  Uh-huh (Indicates affirmatively).
19   Q.  It appears that the people in your
20   organization, including Chris, had determined, at least
21   by February 15th, that the issue was with OKS.  The
22   reason why you couldn't get the reports was OKS.
23        MR. HARRISON:  Objection.  Calls for
24   speculation.  Lacks foundation.
25        THE WITNESS:  The problem -- all of these

194

1    problems -- no reports -- these issues that are
2    being pointed out here are all as a result of the
3    implementation of the OKS system --
4    BY MR. WILLIAMS:
5    Q.  Okay.
6    A.  -- replacing the GSR system.
7    Q.  And that's everything on the -- on
8    page 156411?
9    A.  Yes.
10   Q.  Okay.
11   A.  And I might point out that this is a good
12   example of things that happen when you replace software,
13   when you integrate or put up new software.  If it's not
14   done properly, like parallel systems, running both
15   systems at the same time, testing, making sure that your
16   user, the person who uses the system, has all of the
17   reports that they use, those are all things that we used
18   to counsel customers about doing to have a good
19   implementation, that, clearly, we didn't do some of
20   these.
21   Q.  Do you know what a CSI number is?
22   A.  A CSI number.  And where --
23   Q.  You can -- it's in the -- under the section
24   that says "merging contracts" from the same page.  Yeah,
25   right there.

195

1    A.  I don't.  I'm going to get it out of context.
2    Where are you seeing it?
3    Q.  It says -- right under "merging contracts"
4    there.
5    A.  "Oracle customers typically have multiple
6    CSIs."  Okay.  CSIs are -- it's the line item on a
7    customer renewal contract.  It's the customer -- it
8    would be like a certain kind of software, one piece of
9    software.
10   Q.  It's not an identifier for the customer?
11   A.  Well, I think you can call it an identifier.
12   It's -- it's the number of -- just like if I had a
13   hundred seats of Oracle data base and now I have another
14   hundred seats of application, each one of those would
15   have its own CSI.  So I bought them at different times.
16   Remember, I was telling you customers want one bill.
17   They want to merge all those different support contracts
18   on to one contract.  That's what -- that's what merging
19   contracts is.
20   Q.  Okay.
21   A.  You're merging one from here, one from there,
22   all purchased at different times on different software
23   into one -- one contract, sometimes the same software
24   bought at different times.  Like I bought a hundred
25   seats here.  I had it for two years, and then I

196

1    expanded.  I bought another hundred seats.  I bought it
2    at a different time.  Now I've got another support
3    contract.  At renewal time, most customers want that all
4    put into one document.
5    Q.  And when that happens, your organization was
6    able to more clearly see what needed to be renewed or
7    what hadn't been renewed?
8         MR. HARRISON:  Objection.  Calls for
9    speculation and lacks foundation.
10        THE WITNESS:  This was -- I wouldn't connect
11   those two.
12   BY MR. WILLIAMS:
13   Q.  Okay.  I'll ask the reporter to mark this
14   document as Sellers No. 11.
15        (Exhibit No. 11 was marked for
16        identification.)
17   BY MR. WILLIAMS:
18   Q.  Sellers No. 11 is Bates numbered NDCA-ORCL
19   101416 through 423.
20   A.  Okay.
21   Q.  Do you recognize Exhibit No. 12?  I'm sorry,
22   are we at 12 or 11?
23   A.  Eleven.
24   Q.  I'm sorry.
25   A.  I don't recognize the e-mail.

197

1    Q.   Is it an e-mail sent from Jennifer Minton to
2    you among other people?
3    A.   Right.  I'm one of the -- on a long list.
4    Q.   And it's February 15th, 2001?
5    A.   Right.
6    Q.   Discussing the same topic?
7    A.   Yes.
8    Q.   All right.  The February 12th forecast
9    sensitivity analysis?
10   A.   Exactly.
11   Q.   Is it fair to say that as of February 15th,
12   the company hadn't determined what exactly -- well,
13   withdrawn.
14        Is it fair to say that as of February 15th,
15   the company had not determined why support revenues had
16   decreased from Q2?
17        MR. HARRISON:  Objection.  Vague.  Calls for
18   speculation.
19        THE WITNESS:  I don't know that they had
20   decreased from Q2.
21   BY MR. WILLIAMS:
22   Q.   Okay.
23   A.   We were missing the budget.
24   Q.   Okay.  Well, let me --
25   A.   And the budget grows from Q2 to Q3.  Q3 has to

198

1    be higher than Q2.  The problem was not that we were
2    lower than Q2, I don't think.  As I recall, the problem
3    was we were missing -- we were forecasting a $20,000,000
4    problem for the Q3 quarter.
5    Q.   Okay.  Let me restate my question, because I
6    should have restate -- restated or I should have stated
7    it in a different way.
8        Is it fair to say that as of February 15th,
9    the company had not determined why support revenues
10   decreased from Q2 into Q3?
11        MR. HARRISON:  Same objection.
12        THE WITNESS:  I believe it's fair to say that
13   as of February 15th, we were looking for revenue
14   that we thought should be there and had not
15   identified why it was not.
16   BY MR. WILLIAMS:
17   Q.   Okay.  Just directing your attention to the
18   third paragraph on 101416, beginning with "essentially."
19   It's the first page.  Can you read that for me?
20   A.   "Essentially, we need to analyze the Q2
21   support revenue stream to determine the amount of
22   recurring revenue that should be recognized in Q3.  If
23   the Q2 carryover revenue has dropped off in Q3, then we
24   know that we might have a systems problem."
25   Q.   Okay.  Do you know what "recurring revenue"

199

1    is?
2    A.   That's -- that is a -- that is the annual
3    payment on a yearly -- excuse me.  That is a monthly
4    payment on a yearly support contract.
5    Q.   And do you know what "carryover revenue" is?
6    A.   That's revenue that we billed in Q2, monthly
7    revenue we billed in Q2, that should be billed again in
8    Q3.
9    Q.   Under what circumstances would it be billed
10   again?  Withdrawn.
11        What do you mean by "billed again"?
12   A.   You have a -- you have a mortgage.
13   Q.   Okay.
14   A.   You pay that monthly.  It's worth -- let's say
15   you pay a thousand a month.  It's worth $12,000
16   annually, but pay it in 12 monthly payments.  Okay?  If
17   you paid it annually, one payment, then you only pay it
18   once a year.  Customers typically pay this once a year,
19   and then the system divides it by 12, because in
20   accounting parlance I can't take money I haven't worked
21   for yet.  Since this is support revenue, when the
22   customer pays a one-year support agreement, the system
23   says, Okay, support, I'm going to give you one-twelfth
24   of that a month until it's used up, so that we have the
25   revenue occurring at the same time the service expense

200

1    is occurring.
2    Q.   Okay.
3    A.   So if -- if I were -- a revenue equation looks
4    like this.  If you were billing it Q2, then I got -- I
5    would have to bill it again in Q3 or I have to cancel
6    it.
7    Q.   All right.  So is recurring revenue and
8    carryover revenue, are they pretty much the same thing?
9    A.   Well, I don't know what she meant when she
10   said that, or he meant, whoever wrote that.
11   Q.   Okay.
12   A.   I don't know if that's the same thing.
13   Q.   Okay.
14   A.   There is another thing that "carryover" could
15   be.
16   Q.   Okay.
17   A.   Carryover can be renewals you get in Q3
18   that -- that didn't occur in Q2 but should have.  So you
19   get to bill them twice in Q3.  It can be revenue that
20   you billed in Q3 -- 2, that should occur again in Q3.
21   That's the monthly payment I talked about.
22   Q.   Uh-huh (Indicates affirmatively).
23   A.   So I don't know what she meant when she said
24   carryover.
25   Q.   Okay.

Sellers, Richard  2/28/2006  10:41:00 AM

201

1    A.  It could be many things.  But the annuity
2  stream -- it's like having this:  You know, if you're
3  getting paid every month, then that monthly payment is
4  worth so much money, and it should be there every month.
5  Now, you take that -- that's what you start with.  Now,
6  you subtract the cancellations, and you add the new
7  business.  And there is some other little things in
8  there like rebills, but, essentially, that -- that's the
9  revenue equation.
10    Q.  All right.
11    A.  And you can count on that.
12    Q.  So long as the service is being provided or
13  the support is being provided?
14    A.  Yeah.  And that was the dilemma.  There was no
15  place for that money to go.  Where was it?  We couldn't
16  see the cancellations.
17    Q.  Was --
18    A.  If the money wasn't going to be there, we
19  should have seen cancellations --
20    Q.  All right.
21    A.  -- worth enough to amount to 20 million.
22    Q.  And part of that was found through the credits
23  that were communicated to you that occurred earlier?
24    A.  By the end of the quarter, we were only off --
25  we got this 20 to 14, and then we got to 14, and then at

202

1  the end of the quarter, I think we were off by eight.
2    Q.  Okay.
3    A.  So the credit rebill amounted to -- I don't
4  know -- seven or eight.  And that was a credit rebill
5  problem found right at the end -- right at the end of
6  the quarter.
7    Q.  Right.
8    A.  Now, in -- in Oracle, this is -- you know, you
9  -- what you bill -- what you bid the last month, that's
10  your highest month.  Now you're going to get that month
11  the next month, but then it's going to bill, again, to
12  the highest month.  So February would be the highest
13  month in Q3.  December, January would be lower months.
14  February would be the big month.
15    Q.  Now, the -- the credit rebill information that
16  was communicated to you at the end of the quarter, did
17  you see those documents yesterday?
18    A.  I did.
19    Q.  Okay.  Were they e-mails?
20    A.  Yes.  They were e-mails from me to my boss.
21    Q.  To Michael Rocha?
22    A.  Right.
23    Q.  I'll ask the reporter to mark this document as
24  Sellers No. 12.
25        (Exhibit No. 12 was marked for

203

1  identification.)
2  BY MR. WILLIAMS:
3    Q.  Sellers No. 12 is Bates No. NDCA-ORCL 101424
4  through 431.
5    A.  Okay.  I think she's saying the same thing.
6  This is the same e-mail we looked at before to
7  Barrenechea.
8    Q.  Well, directing your attention to the first
9  page of the document, ending in 424 --
10    A.  Yes.
11    Q.  -- we hadn't looked at that before --
12    A.  No.
13    Q.  -- the first part of that, right?
14    A.  Right.
15    Q.  And it's an e-mail from Mike Rocha --
16    A.  Right.
17    Q.  -- to you among other people, right?
18    A.  Right.
19    Q.  And that's February 15th of 2001?
20    A.  Am I copied?  Yeah, I'm copied.
21    Q.  Uh-huh (Indicates affirmatively).
22    A.  It's to Jennifer Minton and copied to a whole
23  host of us.
24    Q.  On the same topic, February 12th forecast
25  sensitivity analysis?

204

1    A.  February 15th?
2    Q.  I think it's the same subject that we've been
3  discussing, the February 12th forecast sensitivity
4  analysis.
5    A.  Okay.  Yeah.  This -- it looks like this was
6  sent on February 15th.
7    Q.  Right.
8    A.  But the first memo was written on the 12th,
9  yes.
10    Q.  Right, right.  You testified earlier today
11  generally about the renewal rate percentages being
12  somewhere in the nineties, and if -- and for the
13  shortfall to really be what it appeared to be, it would
14  mean that you had dropped from the nineties down to the
15  seventies range --
16    A.  Right.
17    Q.  -- right?
18    A.  Right.
19    Q.  Is that -- is that kind of what's being
20  discussed here --
21    A.  Yes.
22    Q.  -- or that topic?
23    A.  That topic is being discussed.
24    Q.  Now, prior to February 15th, is that topic
25  something that you would have discussed personally with

205

1    Michael Rocha?
2        A.  Yes.
3        Q.  Okay.
4        A.  We're trying to make sense of this.
5        Q.  Uh-huh (Indicates affirmatively).
6        A.  We're all trying to search for what is the
7    issue and -- and alleviate it, if possible.
8        Q.  Okay.
9        A.  And since we have no reports that will show us
10   that we had cancellations, we have no reports to show us
11   that revenue didn't get billed, we assume that we're
12   going to renew somewhere around the average.  And let's
13   say it was a terrible quarter.  We have all kinds of
14   software problems, so we renewed below the average.  But
15   70 percent, I mean, that's -- that's just not -- you
16   would have to have a system problem to get down to
17   70 percent.
18       Q.  Okay.
19       A.  It's just not doable.
20       Q.  You -- sorry.
21       A.  So, again, we're trying to figure out, talk
22   about what the -- what can the issue be.
23       Q.  Now, do you see in this e-mail from Michael
24   Rocha where he writes, "The backlog isn't that large"?
25       A.  Uh-huh (Indicates affirmatively).

206

1        Q.  Do you know what was meant by that?
2            MR. HARRISON:  Objection.  Calls for
3        speculation and lacks foundation.
4            THE WITNESS:  I have no idea what he was
5        thinking of when he wrote that.  I can tell you
6        what a backlog is.
7    BY MR. WILLIAMS:
8        Q.  Okay.  But what was the backlog -- withdrawn.
9        I'm not asking what he was thinking at the
10   time.  I'm just wondering if you knew at the time what
11   he was referring to about a backlog?
12       A.  A back log is support agreements that have not
13   yet been renewed but are due.
14       Q.  Okay.
15       A.  So in this context, if you have a large
16   backlog that was due but not yet processed or renewed,
17   that could account for a very low number, because you
18   haven't processed those contracts.  You have not dealt
19   with them.  They have not been renewed.  But as he
20   points out here, the backlog wasn't large enough to
21   account for the dollars.
22       Q.  Okay.  Do you see where under -- right under
23   the subject line, about a third of the way down, it says
24   "references"?
25       A.  References, yeah, uh-huh (Indicates

207

1    affirmatively).
2        Q.  Do you see those numbers there and they look
3    like they're underlined?
4        A.  Yeah.
5        Q.  Are those little icons?  Can you click on
6    those and open up documents?  Do you know?
7            MR. HARRISON:  Objection.  Lacks foundation.
8            THE WITNESS:  I don't know.
9    BY MR. WILLIAMS:
10       Q.  Okay.  I'm sorry.  The Sellers No. 12, was
11   that a document that you reviewed yesterday?
12       A.  This one?
13       Q.  Yeah.
14       A.  No.  No, I don't recall this, reviewing this
15   yesterday.
16       Q.  Okay.  I will ask the reporter to mark this
17   document as Sellers No. 13.
18           (Exhibit No. 13 was marked for
19       identification.)
20   BY MR. WILLIAMS:
21       Q.  Sellers No. 13 is Bates numbered NDCA-ORCL
22   101432 through 440.
23       A.  I'm ready.
24       Q.  Okay.
25       A.  Can I have some of that water there, please?

208

1            MR. HARRISON:  Sure.
2            THE WITNESS:  Thank you.
3            MR. HARRISON:  Yeah.
4    BY MR. WILLIAMS:
5        Q.  All right.  I just want to direct your
6    attention to the first page of Exhibit No. 13.
7        A.  Yes.
8        Q.  Is that an e-mail from Jennifer Minton to you
9    among other people?
10       A.  Yes.
11       Q.  And written on February 15th of 2001?
12       A.  Yes.
13       Q.  Still discussing the same subject, right --
14       A.  For sure.
15       Q.  -- the February 12th forecast sensitivity
16   analysis?
17       A.  Yes.  We had -- we had many of these
18   discussions, as I recall.
19       Q.  See under the "references" line there?
20       A.  Uh-huh (Indicates affirmatively).
21       Q.  It looks like there are three different lines
22   of references, right?
23       A.  Yes, it appears.  And I don't know if those
24   are -- those are references to other documents or if
25   they're attached e-mails.

Sellers, Richard  2/28/2006  10:41:00 AM

209

1    Q.  Okay.
2    A.  I don't know.
3    Q.  All right.  And --
4    A.  I don't remember.  You know, I was on the
5  Oracle system for three years.  I don't remember seeing
6  that on my e-mail, but I probably didn't pay much
7  attention to the headers.
8    Q.  Okay.  Now, this e-mail is to -- directly to
9  your boss, Mike Rocha --
10    A.  Yes.
11    Q.  -- right?
12    A.  Yes.
13    Q.  And can you just read the first two sentences
14  for me?
15    A.  Sure.  "Mark should definitely focus on the
16  bookings report.  I have asked the ERP team to focus on
17  evaluating why we had a 20 million drop off in revenue
18  in the month of January from support renewals."
19    Q.  Okay.  So as of this date, even if it was
20  ultimately resolved later, as of this date, it was
21  believed that there was a 20 million drop off in revenue
22  in January?
23    A.  I don't know --
24    MR. HARRISON:  Object.
25    THE WITNESS:  -- what --

210

1    MR. HARRISON:  Let me object.  Objection.  It
2  calls for speculation, and it lacks foundation.
3    THE WITNESS:  I don't know what Jennifer
4  thought.  I can't say what was in her mind when she
5  wrote this.  But, clearly, there was not a drop off
6  of $20,000,000 in January.  I call your attention
7  to September, October, November, December, January,
8  and February listed below on this particular
9  e-mail.  You'll notice that September was 139;
10  October, 135; November, 133.  That is the
11  conclusion of Q2.  Now we start Q3.
12  BY MR. WILLIAMS:
13    Q.  Right.
14    A.  December, 139.
15    Q.  Right.
16    A.  It's clearly more than September, October, or
17  November.  January, 140.  Clearly more than September
18  October, or November.  February, 119.  We're in
19  February, 119.  We're forecasting February, and we're
20  forecasting a 20 million miss.  Clearly, it was not
21  in --
22    Q.  January.
23    A.  -- January.
24    Q.  Okay.
25    A.  I just -- going by this memo.

211

1    Q.  Sure.  Okay.
2    A.  See, if February would have been about 145,
3  140, boy, everybody would be looking pretty good here.
4    Q.  We wouldn't be here talking about this, right?
5    A.  Probably wouldn't.
6    MR. HARRISON:  Objection.
7    THE WITNESS:  I'm simply saying it came late.
8  BY MR. WILLIAMS:
9    Q.  Sure.
10    A.  The miss is in February.
11    Q.  Okay.
12    A.  I think this clearly indicates that.
13    Q.  The projected miss --
14    A.  The projected --
15    Q.  -- as of this point, right?
16    A.  The projected miss.  I'm sorry, you're right.
17  And the OKS system went into January.
18    Q.  I thought earlier you said you weren't sure
19  when the OKS system --
20    A.  I don't know when.  It went in --
21    Q.  But it was sometime in January?
22    A.  It was prior to me getting this number.
23    Q.  All right.  All right.  Well, do you see in
24  the second paragraph where Jennifer Minton writes, "Each
25  month when we open up a new accounting period in revenue

212

1  accounting, the current month's support revenue is
2  automatically recorded."
3    A.  Where are you?
4    Q.  The second --
5    A.  On the first page?
6    Q.  The first page, second paragraph of Minton's
7  note.
8    A.  "One-twelfth of the revenue is scheduled out
9  over the course of the following year."  Yeah, we talked
10  about that.  "Each month when we open a new accounting
11  period in revenue accounting, the current month's
12  support revenue is automatically reported.  The support
13  finance team has tracked the opening revenue for the
14  last six months, which was as follows."  Okay.
15    Q.  So I guess when February opened, she was
16  looking at a number of 119?
17    MR. HARRISON:  Objection.  Calls for
18  speculation.
19    THE WITNESS:  That's what is on this paper.
20  BY MR. WILLIAMS:
21    Q.  Right.  The videographer has got to change the
22  tape.  So we'll --
23    THE VIDEOGRAPHER:  It's 4:42.  We're off the
24  record.  This is the end of Tape No. 5 of the
25  deposition of Richard Sellers.

213

1      (Brief recess was taken.)
2      THE VIDEOGRAPHER:  This is the beginning of
3  Tape No. 6 of the deposition of Richard Sellers.
4  It is 4:50.  We are back on the record.
5  BY MR. WILLIAMS:
6      Q.  Okay.  Do you know Bret Fuller?
7      A.  I've heard the name.  I don't believe I know
8  him.
9      Q.  He's just cc'd on this -- on No. 13, and I was
10  wondering --
11     A.  I --
12     Q.  -- if you knew why.
13     A.  I don't know him, but I believe him to be in
14  development.  But I'm not -- I'm not sure about that.
15     Q.  Okay.  I'm going to ask you -- still on
16  No. 13, I'll ask you to turn to NDCA-ORCL 101433, top of
17  the page.  Can you just read that for me?
18     A.  "I've asked Bret to write an exception report
19  out of revenue accounting to identify those contracts
20  that were recognized at January but not in February.  If
21  this population of contracts has not expired, then we
22  know that we may have a system problem possibly related
23  to the conversion."
24     Q.  Okay.  Do you know whether she was referring
25  to the conversion from -- what was it? -- GSR to OKS?

214

1      MR. HARRISON:  Objection.  Calls for
2  speculation.
3      THE WITNESS:  That's the way I take it.
4  BY MR. WILLIAMS:
5      Q.  Okay.  I'll ask the reporter to mark this
6  document as Sellers No. 14.
7      (Exhibit No. 14 was marked for
8  identification.)
9  BY MR. WILLIAMS:
10     Q.  Sellers No. 14 is Bates No. NDCA-ORCL 101457
11  to 459.
12     A.  Okay.
13     Q.  Do you recognize Sellers No. 14?
14     A.  I don't recognize the -- the e-mail, but,
15  certainly, I'm familiar with the subject.
16     Q.  Okay.  And it's an e-mail -- well, it's a
17  series of e-mails between you and other Oracle
18  employees.  Is that fair?
19     A.  Yes.
20     Q.  One of them being Michael Rocha, your boss at
21  the time?
22     A.  Yeah.  Rocha writes to myself and Chris, and
23  he copies -- or sends a copy of a memo from Jennifer
24  Minton to Jeff Henley copying himself and Mair, Graeme
25  Mair, and Safra Catz.

215

1      Q.  Okay.  And is this one of the documents that
2  you reviewed yesterday?
3      A.  I do not know if this was one I saw or not.  I
4  saw one on this subject, but I don't know if this is the
5  one.
6      Q.  Okay.  Is this the same -- well, withdrawn.
7      Does the document and the e-mails within it
8  discuss the same subject that we've been talking about
9  over the last, say, hour?
10     A.  I don't understand the question.
11     Q.  Okay.  You said you recognized the subject --
12     A.  Right.
13     Q.  -- as one that you may have -- that the
14  documents that you saw yesterday may have touched upon,
15  right?
16     A.  Right.
17     Q.  And it's the same subject that we've been
18  talking about over the last hour, or so, right, the
19  support renewal status --
20     A.  Exactly, right.
21     Q.  -- and whether or not there was a software
22  problem?
23     A.  Yes, uh-huh (Indicates affirmatively).
24     Q.  Okay.  Let's begin with the bottom half of
25  10457, the e-mail from Jennifer Minton to Henley and

216

1  Michael Rocha, Mair -- or Graeme Mair, and Safra Catz.
2      A.  Right.
3      Q.  So as of February 16th, did you know whether
4  there was truly a shortfall or there would be a
5  shortfall in February of '01 or whether the problem was
6  related to software?
7      MR. HARRISON:  Objection.  Compound.
8      THE WITNESS:  I need that again.
9      MR. HARRISON:  Vague and ambiguous.  Sorry.
10  BY MR. WILLIAMS:
11     Q.  All right.  As of February 16th, did you know
12  whether or not there was, indeed, a renewal shortfall or
13  that there would be a renewal short fall?
14     A.  On February 16th?
15     Q.  Yeah.  As of February 16th.  Or was it just --
16  did you know it was a software issue?
17     MR. WILLIAMS:  Objection.  Vague and
18  ambiguous.
19     THE WITNESS:  I did not know the problem root
20  as of February 16th.
21  BY MR. WILLIAMS:
22     Q.  Okay.
23     A.  I knew I had a $20,000,000 problem.
24     Q.  Okay.  Looking at the -- do you see on the
25  first page of Exhibit 14 the portion that you wrote?  It

Sellers, Richard  2/28/2006  10:41:00 AM

217

1  says, "Dick Sellers wrote."
2      A.  I do, indeed.
3      Q.  Do you see where you write, "We just got a new
4  report capability from CRM that we're testing over the
5  weekend"?
6      A.  Uh-huh (Indicates affirmatively).
7      Q.  What are you referring to there?
8      A.  I don't know.  I don't -- I don't know.
9      Q.  Okay.
10      A.  I would have to guess, assume.
11      Q.  You would have to -- well, withdrawn.
12          As we discussed earlier, Mark Barrenechea had
13  indicated that -- or withdrawn.
14          "Jennifer Minton had asked Mark Barrenechea to
15  see if he could create the reports" --
16      A.  Right.
17      Q.  -- "rather than CRM," right?
18      A.  Right.  And he eventually did that, and he
19  eventually sent those to us.
20      Q.  Uh-huh (Indicates affirmatively).
21      A.  And we eventually used those.  Whether or not
22  that's what I'm referring to here, I -- I just don't
23  know.
24      Q.  Okay.  Do you see where you write, "I believe
25  Jennifer is seeing this the way we are, and what is" --

218

1  "and that is that.  It is most likely that some revenue
2  is less" -- "left out of the January number"?
3      A.  I do.
4      Q.  What does that mean?
5          MR. HARRISON:  Objection.  Calls for
6  speculation.  Lacks foundation.
7          THE WITNESS:  Actually, I remember what that
8  means.
9  BY MR. WILLIAMS:
10      Q.  What does that mean?
11      A.  I'm telling my boss that I think Jennifer
12  believes, as I do, that the February number is short
13  money that should be there that was there in January and
14  should have been there in February but did not make it
15  into the February number yet.
16      Q.  Okay.
17      A.  In other words, remember we talked about an
18  annuity stream?
19      Q.  Uh-huh (Indicates affirmatively).
20      A.  If I bill it in January, it can only do a
21  couple of things.  I either bill it again in February,
22  or it cancels.  It can't just go away.  It has to either
23  cancel or be billed again in February.  Now, it could be
24  renewed in February, in which case it would be there in
25  some other form.  Let's say it merged with some other

219

1  contracts.  So you have to look at that.  But if the
2  money was there in January and it didn't cancel, it
3  should be there again in February.
4      Q.  And at this -- as of at least February --
5  well, February 19th or before, you believe that it was
6  there?
7      A.  My -- what I'm saying here is I believed that
8  the money was there but did not show up in the February
9  report.
10      Q.  Okay.
11      A.  That's what I'm trying to tell people what
12  happened.
13      Q.  Okay.
14      A.  I'm trying to say that February is -- is short
15  money because we lost money in the conversion.  That's
16  what I'm believing at this time.
17      Q.  Okay.
18      A.  I turned out to be wrong, but that's what I'm
19  believing at this time.
20      Q.  Okay.  Because you -- you're saying February,
21  but here it says it's left out of the January number.
22  And then the next sentence you write, "We have found
23  that none of the revenue that we booked" -- "that we
24  have booked in February has made it into the Revenue
25  Manager."

220

1      A.  Right.  Okay.  Here is the deal.  Give me a
2  pen.
3          MR. HARRISON:  We're not going to write stuff.
4  BY MR. WILLIAMS:
5      Q.  Well, if you want -- if you want to
6  demonstrate on paper, you can do that.
7      A.  Well, I just want you to be clear.  You have
8  money in January.  That money should be there in --
9  again in February.
10      Q.  Sure.
11      A.  If it's not, something has happened to it.
12  That's what I'm talking about.
13      Q.  All right.
14      A.  It's missing from February.
15      Q.  Okay.
16      A.  It was there in January; it's not there in
17  February.  Now, I think -- I think -- now, as I read
18  this, I think when Jennifer describes that, she
19  describes it as missing from January.  When I describe
20  that, I describe it as missing from February.  And the
21  reason I describe it that way is I can see it and taste
22  it.  And it was in January, but now I can't see it in
23  February.  She says it's missing from January, because
24  she's saying it was in January, and it's missing when --
25  when it got brought forward to the next month.  So it

221

1 was money missing out of the January report when she
2 looked at it in February.
3     Q.   Okay.  And Revenue Manager is the accounting
4 system?
5     A.   Revenue Manager is the accounting system.
6     Q.   I'm just going to ask you to turn to the next
7 page, 458.
8     A.   Got it.
9     Q.   Do you see where Jennifer Minton kind of lists
10 several different things that may have contributed to
11 this issue?
12     A.   I do.
13     Q.   If you go down one, two, three, four, five,
14 six, seven -- or six asterixes, do you see where she
15 writes "the lack of renewal activity from the dot-com
16 businesses that have gone out of business or will" --
17 "or will be" -- "or will in the immediate future"?  Do
18 you see that?
19     A.   I do.  I see that.
20     Q.   Do you know what that referred to?
21     MR. HARRISON:  Objection.  Calls for
22 speculation.
23     THE WITNESS:  I'm sure I don't know what is in
24 her mind when she wrote this.  However, this is the
25 laundry list that was brainstormed that says, If it

222

1 turns out not to be a system problem, if it turns
2 out to be actual contracts that were billed in
3 January and now have cancelled -- they have left;
4 they're no longer being billed; they didn't not get
5 renewed; customers called up and cancelled -- then
6 here are some of the things that could have
7 attributed to that.  So this is like a laundry list
8 of all the things that could have caused the
9 support renewal revenue to be low if it wasn't just
10 left out.
11 BY MR. WILLIAMS:
12     Q.   Now, were you -- was your organization
13 experiencing a dropoff in renewals from dot-com
14 customers in the third quarter of --
15     A.   No.
16     Q.   -- '01?
17     A.   No.  And the ones that did drop off were
18 small.  The dot-coms weren't big.  I mean, you know,
19 there were a few hundred seats.  You know, we didn't --
20 the big dot-coms like the Orbitz or -- I can't remember;
21 the one that Captain Kirk advertises -- the big ones
22 made it through just fine, the ones that had revenue
23 flow.  You know, the big deal on the dot-coms was all
24 the little ones that were running on startup money that
25 had no -- no good revenue coming in.  Well, they didn't

223

1 buy thousands and thousands of seats.  They weren't --
2 they weren't big hitters for us.
3     Q.   Okay.
4     A.   I imagine the way it's -- the reason it's even
5 on here is that one that we mentioned earlier, Exabyte
6 wanted to --
7     Q.   Exabyte?
8     A.   Exabyte wanted to negotiate their contract
9 down.  They were a dot-com, so they were fresh on
10 everybody's mind.  But, no, dot-coms as a whole weren't
11 big.
12     Q.   What about the one that said @Home?  Didn't we
13 talk about @Home?
14     A.   Well, I don't know.  I can't -- I honestly
15 never remember a customer like that.
16     Q.   Okay.
17     A.   I don't know what they were.  I don't know
18 what they were.
19     Q.   I'll ask the reporter to mark this document as
20 Sellers No. 15.
21     (Exhibit No. 15 was marked for
22 identification.)
23 BY MR. WILLIAMS:
24     Q.   Sellers No. 15 is NDCA-ORCL 101462 through
25 470.

224

1     A.   Okay.  Got your calculator?
2     Q.   I don't, actually.  But we're going to need
3 one.
4     Do you recognize Exhibit No. --
5     A.   Actually, I do.
6     Q.   -- 15?
7     A.   I do.  I even remember writing it.
8     Q.   Okay.  And is it an e-mail from -- well, part
9 of it, at least, is from you to Mike Rocha -- Rocha?
10     A.   All of it is from me to Mike Rocha.
11     Q.   Well, there is a part at the very top of the
12 first page from Mike Rocha to you, right?
13     A.   Right.
14     Q.   Okay.  And --
15     A.   I see what you're saying.
16     Q.   So in February 21st -- or on or around
17 February 21st, 2001, right?
18     A.   Right.
19     Q.   And it's still discussing the Q3 renewals and
20 revenue?
21     A.   Yes.
22     Q.   And is this a document that you reviewed
23 yesterday?
24     A.   I saw it yesterday.
25     Q.   Okay.  And did it help -- well, withdrawn.

Sellers, Richard  2/28/2006  10:41:00 AM

225

1     Did you read it yesterday, or did you just
2   kind of see it?
3     A.  I --
4     MR. HARRISON:  Objection.
5     THE WITNESS:  -- looked at it.
6   BY MR. WILLIAMS:
7     Q.  Okay.  And is it fair to say that as of
8   February 21st, 2001, your organization had not come up
9   with the answer yet as to what was causing the projected
10  shortfall for Q3 '01 renewals?
11    A.  That's -- that's correct.  We had not.
12    Q.  And as of February 21, Mike Rocha writes to
13  you that it appeared that your organization had only
14  done 23 percent of the renewals needed for the month.
15    A.  That's right.
16    Q.  And do you know if you responded to this -- to
17  that part of this e-mail?
18    A.  I believe this is a response to that part of
19  the e-mail.
20    Q.  Actually, I think the last e-mail from Rocha
21  to you is his response to your e-mail.  Correct me if
22  I'm wrong.
23    A.  I don't know.
24    Q.  Okay.
25    A.  I don't know what -- are you talking about --

226

1   "Mike says 168 out of a 1- -- out of 219 still remains
2   to be done in February."
3     Q.  Uh-huh (Indicates affirmatively).
4     A.  "In other words, we have only completed
5   23 percent of the renewals that we need to do this
6   month.  Should I be worried?"
7     Q.  Uh-huh (Indicates affirmatively).
8     A.  So you're looking for the answer there?
9     Q.  Is --
10    MR. HARRISON:  That's not what he asked.
11  BY MR. WILLIAMS:
12    Q.  Is that a response to your e-mail, or is your
13  e-mail that's written below there a response to him?  Do
14  you know?
15    A.  I do not.  I do not.  I mean, that's a logical
16  question, but I don't know.
17    Q.  Every now and then I ask a logical question.
18    A.  No.  I mean, I wasn't even talking about your
19  question.  I was talking about Mike's question.  Sorry.
20    Q.  I don't feel any way about it.
21    All right.  Well, let's look at what you wrote
22  and see if we can --
23    A.  Okay.
24    Q.  -- figure some of this out.
25    I just want to begin where you write "I've

227

1   been digging."
2     A.  Uh-huh (Indicates affirmatively).
3     Q.  "I've been digging" -- you write, "I've been
4   digging through the renewal maze with an eye toward
5   determining if OKS is causing the miss of PSF revenue
6   from the Q3 budget of 458 million."
7     What is the PCF revenue?
8     A.  Product support.
9     MR. HARRISON:  I -- I think you misstated.
10    Did you say PCF?
11  BY MR. WILLIAMS:
12    Q.  I'm sorry.  PSF.  What is PSF revenue?
13    A.  Let me catch up with you here.  It's product
14  support finance revenue, so --
15    Q.  Okay.
16    A.  -- coming out of the financial system, the
17  product support revenue coming out of the financial
18  system.  And it's the miss from the budget of 458
19  million.
20    Q.  That you were -- the miss that you were
21  projecting?
22    A.  Yes.
23    Q.  Okay.
24    A.  The budget was 458.  And at this time, I
25  believe we were forecasting a $20,000,000 -- we had a

228

1   $20,000,000 problem.
2     Q.  Okay.  Do you see where a little bit later you
3   write, "I believe any shortfall in revenue can be
4   explained by examining the renewal rate for the quarter
5   and the new business for the quarter."
6     A.  Right.
7     Q.  What does that mean?
8     A.  That means that I believe the miss was -- the
9   miss that we were going to experience, in the Q3 miss to
10  budget of 458, would be part because of renewal rate
11  dropping in Q3, not renewing enough, and new business
12  cannot come on board as it should.
13    Q.  Okay.  So at this point, February -- on or
14  around February --
15    A.  I believe I'm explaining here that the whole
16  miss cannot be renewals.  It's basically impossible to
17  have a $20,000,000 miss in renewals.
18    Q.  And so part of it would be related to the new
19  business which was the upsell portion of --
20    A.  No.  New business would have been what sales
21  sold that we would have realized some revenue off of
22  that for that quarter.
23    Q.  Okay.
24    A.  When -- remember, when sales software, they
25  sell a one-year service agreement with it.  So if they

Sellers, Richard  2/28/2006  10:41:00 AM

229

1    sold it in February, I would get a month's.  If they
2    sold it in December, I would get three months.
3        Q.  Okay.
4        A.  So January, two months.
5        Q.  I see.  Do you see where you write "368.5
6    represents 98.6 percent renewal rate goal of the
7    available amount to be renewed, plus carry forward from
8    Q2"?
9        A.  Right.
10       Q.  Right?
11       A.  (Indicates affirmatively).
12       Q.  And just -- just briefly explain to me what
13   the carry forward from Q2 is?  I think you did earlier
14   today.
15       A.  Right.
16       Q.  But if you could just briefly --
17       A.  Tell me where we were.  Let me find the right
18   place.
19       Q.  Right about the center of the page.
20       A.  Okay.
21       Q.  368.5.
22       A.  Okay.  Here I'm talking about the 96.8.  If --
23   if we renewed everything that came up in Q3 at
24   96.8 percent, then you added in the money that was
25   already in Q2 that would be brought forward, the monthly

230

1    billing, the annuity stream, that our revenue number
2    would be as stated.
3        Q.  At 368.5?
4        A.  Right.
5        Q.  And that's still below budget, though, right,
6    because the budget was 458 million?
7        A.  Right.  That's right.
8        Q.  Do you know what -- even if you renewed, then,
9    at 98 -- at 96.8, you would still be about
10   $90,000,000 -- I'm sorry.  Yeah, $90,000,000 below
11   budget, right?
12       A.  Yeah.  And that's not what I'm trying to say
13   here, because I was -- only had a $20,000,000 profit.
14   So let me think for a second.
15       Q.  Okay.
16       A.  I don't know.
17       Q.  Okay.
18       A.  I don't know.
19       Q.  Okay.
20       A.  We may be talking -- we may be talking about
21   different things.  I may be talking just about the U.S.
22   revenue as opposed to the U.S., Canada.  I may be
23   talking about just the product support piece of U.S.,
24   Canada, and -- I don't know.
25       Q.  Okay.  Going down to the next line, where you

231

1    say "337.4 represents the forecast of bookings that
2    will" -- "that will be renewed, 88.6 percent renewal
3    rate" --
4        A.  Right.
5        Q.  -- what does that mean?
6        A.  Let's see.  All right.  Okay.  "337.4 of
7    renewed contracts would equate to at least 4.3 million
8    revenue renewed in the Q3 time frame."  So I'm saying if
9    we renewed at 84.3, the number would be 337.
10       Q.  I'm -- all right.  Let me back up a second,
11   because --
12       A.  I don't know.
13       Q.  -- I think we got -- we -- we missed each
14   other there.  I'm talking about where you write "337.4
15   represents the forecast of bookings that will be
16   renewed."  And then you say there that would be an
17   88.6 percent renewal rate, right?
18       A.  I think we can agree this is a terrible memo.
19   But any greater miss must be -- I must have been feeling
20   the pressure when I was writing this.  Okay.  If we make
21   the 337.5 bookings forecast --
22       Q.  .4?
23       A.  Is that where you're talking?
24       Q.  I'm talking -- see where we were talking
25   before about the 368.5?

232

1        A.  Yes.
2        Q.  Two lines below that.
3        A.  337.4.
4        Q.  Right.  That's the line I'm talking about.
5        A.  Okay.  So I'm saying that that represents the
6    bookings at an 88.6 renewal rate.
7        Q.  Okay.  So the forecast of bookings, is that
8    different from what you've discussed before as
9    everything that came up in the quarter?
10       A.  Well, I'm a bit confused, because, typically,
11   I -- I talk about renewals as renewals, and I talk about
12   bookings as new business.  So I'm confused.  I don't --
13   I don't know.  This is not making sense to me in the
14   context that I've written it.
15       Q.  Okay.
16       A.  But --
17       Q.  All right.  Well, let's go down to the next
18   line, then.  It says, "31.1 not renewed, 10 million in
19   migration, plus 21 million cancellations due to out of
20   business, reduced license, etc., contracts not
21   assigned."
22           Can you explain to me what that means?
23       A.  Yeah.  The -- those are all the reasons why a
24   contract on our contract sheet would not have been
25   closed.  And we had about 10 million worth of it.

233

1   Sometimes we have migrations, where the -- software
2   migrates to some other software, like 10.5 to 11.1, 10.7
3   to 11.1. We have cancellations outright. The customer
4   says, I'm not going to do business with you anymore. We
5   have out-of-business category, which says we've called
6   the customer and no one answers the phone anymore. That
7   customer must not be there. We have reduced license
8   reason, where a customer has bought a thousand seats and
9   we go to renew the thousand, and he says, You know what,
10   I don't use these thousand, I only use 500, so I'll
11   renew 500 but I won't renew the thousand. And then we
12   have contracts not assigned. Now, that contracts not
13   assigned is -- it appeared on the GSR. Remember, we're
14   still using --
15       Q.  Uh-huh (Indicates affirmatively).
16       A.  It appeared on the GSR spreadsheet as a
17   contract. But when we looked at it, it really -- it has
18   a value over there. But we didn't even assign it to a
19   sales rep, because it's not a real contract.
20       Q.  Okay.
21       A.  It was part of another one. It was the same.
22   It was a repeat from a previous one, or we know that it
23   was part of a different contract, so we just marked that
24   off, and we just don't attain it. So I'm saying that of
25   all of the things that are out there to renew, 31

234

1   million is not going to get renewed --
2       Q.  Okay. Now --
3       A.  -- due to all of these reasons.
4       Q.  Right. But you specifically identified 21
5   million as related to cancellations; is that right?
6       A.  That's right.
7       Q.  Now, 21 million in cancellations in one
8   quarter, was that an unusually high number?
9       A.  I don't believe it was, no. It doesn't -- it
10   doesn't -- I don't know. It doesn't impress me as an
11   unusually high number. But I don't -- to tell you the
12   truth, I didn't get down to this level every quarter,
13   because I didn't need to.
14       Q.  I see.
15       A.  So this may have been the only -- the only
16   quarter I ever looked at this --
17       Q.  Now --
18       A.  -- at this level of detail.
19       Q.  Now, is there a document that would outline
20   how many cancellations, renewal cancellations, there
21   were in the quarter?
22       MR. HARRISON: Objection. Calls for
23   speculation. Lacks foundation.
24       THE WITNESS: I believe that, surely, now the
25   OKS system generates those -- those documents.

235

1   BY MR. WILLIAMS:
2       Q.  I'm talking about back then. You must have
3   gotten this number from some --
4       A.  Well, back -- back then, there was. There was
5   the GSR.
6       Q.  Right.
7       A.  Right? And it told us all of these things.
8   Then when we went to OKS, we had none of these things.
9   And what I've done here is tried to construct these
10   numbers off of spread sheets and input from the sales
11   organization, and so forth and so on. And that's why up
12   here when I start the memo, I asked finance and Chris to
13   look at this and tell me if -- correct me if they don't
14   agree with my numbers.
15       Q.  Okay. Just going down a few more lines. Do
16   you see where you write "the 31.1 million in nonrenewed
17   contracts equates to negative 7.8 million in revenue,
18   which is lost from Q3"?
19       A.  Right.
20       Q.  Can you explain that to me?
21       A.  Yes. I'm saying that the -- I'm saying that
22   the 31 million that we talked about up here, not
23   renewed, so forth and so on, that's total contract
24   value. That's a year's worth. So it would represent
25   7.8 million just in the quarter that we're talking

236

1   about, in Q3. Okay? So you've got a car leased and
2   you're paying me $1,000 a month. Right?
3       Q.  Uh-huh (Indicates affirmatively).
4       A.  If you cancel that lease, I lose $12,000. But
5   in February or in Q3, I only lose $3,000. So even
6   though we cancelled $31 million worth of contracts,
7   yearly payment, for the time frame of Q3 --
8       Q.  Right.
9       A.  -- I'm only losing 7.8 million.
10       Q.  Okay. So where you have negative 7.8, what,
11   is that a typo?
12       A.  No. It's -- I've lost --
13       Q.  Oh, you know -- it equates to a loss of 7.8
14   million?
15       A.  7.8 million --
16       Q.  I hear you.
17       A.  -- in that quarter.
18       Q.  Okay. Got it.
19       A.  But I'm trying to make the argument here that
20   there is no way that we could -- I'm still trying to
21   argue that there is no way that this could be a renewal
22   miss of 20 million.
23       Q.  Okay. Well, let's go to the next sentence,
24   but I think you say something about it there. See where
25   you write --

237

1    A.  I'm hard-headed, if nothing else, with this
2  memo, I guess.
3    Q.  I guess it's two sentences down.  "Any greater
4  miss must be associated with lack of new business or
5  underperforming the 337.4 bookings forecast."
6    A.  Right.  What I'm saying there is our -- our
7  miss can't be greater than a certain amount due to
8  renewals.  And I've tried to prove that with this data
9  up here.
10    Q.  Right.  And 7.8 is about as large as --
11    A.  Is about as big as it can be.
12    Q.  Okay.
13    A.  With all the worst case scenarios, we could
14  have missed by 7.8 million.  But to get it bigger than
15  that, bigger than 7.8 million, we must have missed new
16  business.  Now, new business -- and that's typically --
17  when I talk about new business, I'm talking about
18  bookings.  I'm saying that we would have to miss -- what
19  I'm saying is the miss in Q3 revenue renewal goal -- we
20  would have to miss the booking goal by 240 million.  So
21  I'm saying if it were all new business, we would have
22  had to missed the booking 240 million worth of licenses
23  that would equate to my number in support, because,
24  remember, every time they sell a license, I get a
25  contract.

238

1    Q.  Sure.
2    A.  So we would have to miss the bookings goal by
3  240 million.  So for me to miss the Q3 revenue renewal
4  goal by $20 million in renewals, we would have to miss
5  the bookings goal by 240 million.
6    Q.  And when you say "bookings goal," are you
7  talking about the license goal --
8    A.  License.
9    Q.  -- for the quarter?
10    A.  Right.  But, you know, this is all search for
11  the guilty.  You know, when you get to the end of this
12  whole thing, we only missed by 8 million.  We found all
13  the rest.
14    Q.  Do you know --
15    A.  You're in the middle of the story here.
16    Q.  No, I understand.
17    A.  As Paul Harvey would say, The rest of the
18  story.  When we got to the end of the quarter, March 1,
19  and we looked back, we were 8 million short.
20    Q.  Do you --
21    A.  And that was -- that was very, very close to
22  the 7 million that I said that we probably --
23    Q.  Right.  Do you -- do you know what the
24  companywide license miss was?
25    A.  I do not.  I do not.  I do not know.  I would

239

1  think it would be public record.
2    Q.  No.  I was just wondering if you know.
3    Let's go down to the next paragraph there,
4  where you say "to explain a miss in the order of
5  20 million."
6    A.  Right.
7    Q.  Can you just read that for me?
8    A.  "To explain a miss in the order of 20 million,
9  we must look to new business shortfall in the current
10  quarter and possible missed new business and/or renewals
11  in the prior quarter; i.e., the 435 million run rate
12  established in Q2 was not adequate to achieve the goal
13  when adjusted for the Q3 miss in renewals."
14    Q.  All right.  That's what you were just talking
15  about --
16    A.  Right.
17    Q.  -- right.
18    A.  Right.
19    MR. WILLIAMS:  Okay.  I'm almost done.  But I
20  need five minutes.
21    MR. HARRISON:  Okay.
22    MR. WILLIAMS:  Let's take five minutes.
23    MR. HARRISON:  All right.
24    THE VIDEOGRAPHER:  It's 5:53.  We're off the
25  record.

240

1    (Brief recess was taken.)
2    THE VIDEOGRAPHER:  This concludes Tape No. 6
3  of the deposition of Richard Sellers.  It is 5:34.
4  We are off the record.
5    (Brief recess was taken.)
6    THE VIDEOGRAPHER:  This is the beginning of
7  Tape No. 7 of the deposition of Richard Sellers.
8  It is 5:45.  We are back on the record.
9  BY MR. WILLIAMS:
10    Q.  I'm going to ask the reporter to mark this
11  document as Sellers No. 16.
12    (Exhibit No. 16 was marked for
13  identification.)
14  BY MR. WILLIAMS:
15    Q.  Sellers No. 16 is NDCA-ORCL 101468 through
16  101469 -- I'm sorry, 101470.  Ready?
17    A.  (Indicates affirmatively.)
18    Q.  Okay.  Do you recognize Sellers No. 16?
19    A.  No.
20    Q.  Okay.
21    A.  Larry didn't usually write me memos.
22    Q.  He wrote you one on February 22nd, though,
23  right?
24    A.  It appears.
25    Q.  He cc'd you on the document, right?

241

1      A.  Right.
2      Q.  The subject line -- what does the subject line
3   say, a third of the way down?
4      A.  "Subject.  Reference status on GSI."
5      Q.  Do you know what "GSI" is?
6      A.  I would think it was -- I don't know.  I don't
7   know.  I was going to say it's GSR, but I don't know
8   that.
9      Q.  Okay.  Did you see this document yesterday?
10     A.  Yes.
11     Q.  Did it help refresh your recollection on any
12  matter?
13     A.  It did not.
14     Q.  Okay.  Is it fair to say that as of February
15  22nd, 2001, you still did not know what was causing the
16  projected shortfall in renewals?
17     A.  That's correct, I did not.
18     Q.  Do you see where Larry -- well, withdrawn.
19         I'm going to direct your attention to the
20  first portion of the text on 101468, the first page.
21     A.  Okay.
22     Q.  See where Larry Ellison writes "I do not
23  understand why we did not hear about all these systems
24  problems until ten days before the quarter closed; the
25  system has to be fixed to be sure, but we should've had

242

1   more notice of the problems earlier in the quarter"?
2      A.  Yes.
3      Q.  When was the first time -- well, withdrawn.
4          When was the first time that you recall any of
5   the renewal issue to be possibly attributed to OKS?
6          MR. HARRISON:  Objection.  Calls for
7      speculation.  Lacks foundation.
8          THE WITNESS:  I began saying that we needed
9      reports to understand the miss when I saw the
10     February revenue.  And that would have been early
11     in February, probably during the first -- well,
12     usually, it came out in the first week.
13  BY MR. WILLIAMS:
14     Q.  Okay.  And that -- you said you started saying
15  that you needed reports.  Who did you say that to?
16     A.  To Jennifer.
17     Q.  Minton?
18     A.  Well, not personally to Jennifer; in my
19  finance organization.  My finance organization, going
20  back to that, that's what started that whole search --
21     Q.  Right.
22     A.  -- with Lederman -- Lederer, at Rocklin.  And
23  all of those previous memos was trying to figure out
24  where the shortfall was.  In that investigation, we
25  asked for reports so that we might ascertain where the

243

1   miss is, and -- and then that generated Jennifer's memos
2   that we have reviewed to Barrenechea, asking for those
3   reports to be written.
4      Q.  So that was your finance organization asking
5   corporate finance --
6      A.  Right.
7      Q.  -- to help figure it out?
8      A.  Yes.  Well, yes, because corporate finance run
9   the revenue accounting black box.  To us, we prepared
10  contracts and sent them off; they were inputted into the
11  box, and we get a revenue statement back.
12     Q.  What do you mean by "box," by a "black box"?
13     A.  It's a technical term.
14     Q.  Okay.
15     A.  We had no -- we had no knowledge of the
16  internal workings of the revenue system nor anyone who
17  worked on it.  We simply sent processed contracts with
18  the PON, then we expected to see that revenue show up on
19  our sheet.
20     Q.  I see.
21     A.  If we didn't get enough revenue, then we had
22  to go find out where it was.  And it could be anywhere
23  between our processing and it posting.  The old system
24  gave us reports to understand that.  When we attempted
25  to look at those reports for the new system to

244

1   understand that, there were no reports.
2      Q.  Okay.  So is it fair to say that if there is
3   such an issue on what is posted that you can view, the
4   only -- the only people that can answer those questions
5   are people in corporate finance?
6          MR. HARRISON:  Objection.  Calls for
7      speculation.
8          THE WITNESS:  I can only say that's who we
9      thought could answer those questions.
10  BY MR. WILLIAMS:
11     Q.  Okay.  Because you --
12     A.  They ran the process.
13     Q.  Right.
14     A.  They had the people who processed the orders
15  when we sent them in.  They generated the reports that
16  would come out that would let us know how we were doing.
17  Those were known as GSR reports.  When I asked for those
18  reports in early February to understand where I was
19  missing money, they were not available.
20     Q.  Okay.  And nobody in your organization was a
21  part of that process?
22     A.  Well, we started that process.
23     Q.  Okay.  By sending something in.
24     A.  Yeah.  We -- we worked with the customer, did
25  the sorts and merges of the contracts, processed the

245

1 contract, got the contract as the customer would accept
2 it, cause the customer to submit a PO. We could not
3 submit anything without a purchase order. We put this
4 all together in a package and sent that to Rocklin.
5 Rocklin then input that, and we would see it on a
6 revenue statement.
7 Now -- so you have the human factor talking
8 over the phone and processing contracts to customers.
9 And it goes through input by more humans into what I
10 call the black box, the revenue box, and out came an
11 income statement.
12 In February -- in early February, what we knew
13 is that this was short. Did we -- we did not know if
14 these people had input everything they should or where
15 they were, if these people had done everything they
16 should or where they were, if this system did everything
17 it should do or where it was. We only knew the money
18 was not here --
19 Q. Okay.
20 A. -- in this report.
21 Q. All right.
22 A. So we had to search.
23 Q. All right.
24 A. The work began.
25 Q. Do you know who Boz Elloy is?

246

1 A. I believe he is a development guru. That name
2 sounds familiar.
3 Q. Okay. Why don't we go to 101469.
4 A. Okay.
5 Q. Do you see the e-mail down on the bottom half
6 of that page, from Boz Elloy to Mark Barrenechea?
7 A. Yes.
8 Q. Do you see the number where Boz Elloy writes
9 under -- I guess what he indicates is No. 2? "GSI was
10 down for two half days in last two days. If this
11 continues, OSS will not be able to process the current
12 renewals." Do you see that?
13 A. Yes, I do.
14 Q. Do you know what that means?
15 MR. HARRISON: Objection. Calls for
16 speculation. Lacks foundation.
17 THE WITNESS: I don't know what that means. I
18 recollect that right in the middle of this whole
19 thing, the system went down for a couple of days.
20 BY MR. WILLIAMS:
21 Q. GSI?
22 A. The revenue processing system.
23 Q. Okay. And --
24 A. I don't know if that's GSI.
25 Q. Okay. All right.

247

1 A. I do remember the revenue processing system
2 went down. I don't recall the reason. But we -- that's
3 the last thing we needed while we were hustling trying
4 to get every contract closed and processed.
5 Q. Now, the revenue system that went down, do you
6 know whether it was a new system or an old system?
7 A. It was the revenue system we were working
8 with, so it had to be a new system.
9 Q. Okay.
10 A. And here is what I'm saying. I'm saying I
11 don't know what GSI is.
12 Q. Sure.
13 A. While we were in the middle trying to close,
14 the OKS system, which processed the revenue, went down
15 for two days.
16 Q. Okay.
17 A. But I don't know what -- if this is referring
18 to that or what this is. I'm not familiar with that
19 term "GSI."
20 Q. Okay.
21 A. I do know we got through it, and it didn't
22 cause us to miss --
23 Q. Okay.
24 A. -- to miss any contracts. We got -- they got
25 it back up; we got all of our stuff processed and got it

248

1 done.
2 Q. Just go to the next page. Do you see where
3 Boz writes "No. 4"?
4 A. Yes, I do. I see it.
5 Q. Can you just read No. 4 for me, please?
6 A. Sure. "No. 4. The only unofficial word from
7 Henley's organization is that all available revenue is
8 being worked but not all of the 20 million will be
9 recovered. This is purely a business issue. Shrinking
10 economy, reduced renewals, change in OSS processes and
11 how support is obtained from licensed deals, etc. Only
12 Jennifer and Chris Madsen can clarify. We're busting
13 our balls here. This should not be a fire drill. These
14 are not systematic issues."
15 Q. Okay. Do you know if there was a change in
16 OSS processes in how support was obtained from licensed
17 deals in or around 3Q '01?
18 A. I do --
19 MR. HARRISON: Objection. Lacks foundation.
20 THE WITNESS: I do not.
21 BY MR. WILLIAMS:
22 Q. Okay.
23 A. How support was obtained from a licensed deal
24 is a function of that system that was installed.
25 Q. And at least as far as you knew on February

249

1    22nd, because I guess Larry Ellison forwarded this --
2    these e-mails to you, among other people, that Henley's
3    organization had indicated that the -- not all the 20
4    million was going to be recovered?
5        A.  Right.
6        Q.  And that it was partly due to shrinking
7    economy and reduced renewals?
8            MR. HARRISON:  Objection.  Calls for
9    speculation.  Sorry.
10           MR. WILLIAMS:  Go ahead.
11           MR. HARRISON:  Assumes facts not in evidence,
12   lacks foundation.
13   BY MR. WILLIAMS:
14       Q.  Is that right?
15       A.  That's what this says.
16       Q.  Right.
17       A.  It says, "The unofficial word is that."  That
18   was never an unofficial word in my shop.  In my shop, we
19   believed we had a $14,000,000 miss, not 20, and we were
20   continuing to look for the 14, because we thought we
21   could x it.  And, in fact, we did.  And in the end, we
22   had something like an $8,000,000 miss.
23       Q.  Okay.
24       A.  So this is all fire drill happening as the
25   quarter gets inevitably closer and the panic rises.

250

1        Q.  Okay.  I'll ask the reporter to mark this
2    document as Sellers No. 17.
3            (Exhibit No. 17 was marked for
4    identification.)
5    BY MR. WILLIAMS:
6        Q.  Sellers No. 17 is NDCA-ORCL 119324 through
7    330.  I ask that you just take a look at that document
8    and let me know when you're done.
9        A.  Okay.
10       Q.  Okay.  Do you recognize what's been marked as
11   Sellers No. 17?
12       A.  I don't recognize the memo.  I vaguely
13   remember some of the issues here.
14       Q.  Did you see this document yesterday?
15       A.  I did not.
16       Q.  Tell me what you remember about the issues.
17       A.  Well, after we closed the quarter in Q3, we
18   continued to work with getting our reports out of OKS
19   and -- and comparing it to what we thought should be
20   there revenue-wise.  And it continued not to report the
21   way we thought it should.  The revenue didn't seem to
22   be -- not as far off as previous but not the way we
23   thought it should be.
24       Q.  Uh-huh (Indicates affirmatively).
25       A.  We had a team of people that sat down and

251

1    hand-over-handed through the system, every one.  And
2    this is a list of things they found.  I don't know if
3    this is an all-inclusive list, but these are issues that
4    they found that OKS was not processing correctly --
5        Q.  Okay.
6        A.  -- and were -- were corrected, of course.
7        Q.  Well -- so Exhibit No. 17 appears to be an
8    e-mail from you to Michael Rocha, right?
9        A.  Right.
10       Q.  And it's on April 16th, 2001, right?
11       A.  Right.
12       Q.  That's about six weeks after the close of the
13   third quarter --
14       A.  Right.
15       Q.  -- of fiscal '01, right?
16       A.  Right.
17       Q.  And the -- and the subject line is "OKS
18   revenue accounting"?
19       A.  Right.
20       Q.  And OKS is the software -- or withdrawn.  OKS
21   is the system that we've been talking about?
22       A.  OKS is the system that we've been talking
23   about that posts the revenue.
24       Q.  Right.  And you write to Mike on the second
25   line.  "It appears that certain revenue is not posting

252

1    correctly."  Right?
2        A.  Right.
3        Q.  You also -- you also say, "The impact to
4    February and March is still not clear, but it appears
5    that we will have to audit all contracts done on OKS,
6    including January."  Do you see that?
7        A.  Yes.
8        Q.  Was an audit done of all the contracts from
9    January, February, and March --
10       A.  I believe.
11       Q.  -- of '01?
12       A.  I believe that it was, yes.
13       Q.  Do you know who conducted that audit?
14       A.  That -- yeah.  Larry.  Larry, the guy that
15   works for Jennifer.
16       Q.  Larry Klein?
17       A.  No.  It --
18       Q.  Garnick?
19       A.  -- starts with a "G."  Garnick.  Yes.  Larry
20   didn't personally do it, I don't think, but he ramrodded
21   it.  He put a team together.  He worked with individuals
22   and -- came up with the impact of this and -- and
23   worked with whoever he needed to work with to correct
24   it.
25       Q.  So the issue -- you indicated earlier that

253

1 toward the end of the quarter it was learned that the
2 miss was not going to be as great as everyone had
3 expected, right?
4    A. Right.
5    Q. And that --
6      MR. HARRISON: Objection. Vague.
7 BY MR. WILLIAMS:
8    Q. And that was because people in Rocklin had, I
9 guess, uncovered some credits -- credit rebills?
10    A. Credit rebills. We had gotten credits with no
11 rebills --
12    Q. Okay. And -- but the --
13    A. -- which they put through.
14    Q. Okay. But there was -- was there or was there
15 not recognized that -- withdrawn.
16      Was it or was it not recognized that OKS was
17 still not working properly --
18      MR. HARRISON: Objection. Calls for
19 speculation.
20 BY MR. WILLIAMS:
21    Q. -- even when they found some of the money?
22      MR. HARRISON: Same objection.
23      THE WITNESS: Clearly, he continued to look at
24 OKS and investigate it.
25 BY MR. WILLIAMS:

254

1    Q. Sure.
2    A. And then that's where this comes from.
3    Q. Okay. So the issue that was creating the --
4 at least the appearance of a shortfall in support was
5 not resolved at the end of Q3?
6      MR. HARRISON: Objection. Vague and
7 ambiguous.
8 BY MR. WILLIAMS:
9    Q. Or withdrawn. Before the end of Q3.
10      MR. HARRISON: Same objection. Assumes facts
11 not in evidence.
12      THE WITNESS: I -- I don't see how you can
13 make that conclusion.
14 BY MR. WILLIAMS:
15    Q. I'm not concluding that. It's just a
16 question.
17    A. Okay. To my knowledge, these are other
18 issues.
19    Q. Oh, okay.
20    A. Although, I would grant that some of them
21 appear that they could have played into the issues we
22 were seeing --
23    Q. Earlier?
24    A. -- earlier.
25    Q. Okay. So who -- who is -- withdrawn.

255

1 Who should we talk to and find out the details
2 about this issue?
3      MR. HARRISON: Objection. Calls for
4 speculation. Lacks foundation.
5      THE WITNESS: I would think that Jennifer
6 would have firsthand knowledge of all of this.
7 BY MR. WILLIAMS:
8    Q. Okay. Do you know what -- well, withdrawn.
9      Later on in the same paragraph, you write, "We
10 probably have to look at anything that had more than one
11 date. For example" -- "e.g., product added after the
12 original start date and shows backdated revenue. The
13 ones in this work were the ten largest in February with
14 backdated revenue."
15      What do you mean -- or what did you mean when
16 you wrote "backdated revenue"?
17    A. Well, any contract that had two different
18 start dates on it and -- and -- and we had received
19 revenue because it hadn't been input until after the
20 start date. Let's say it had two different start dates:
21 One in January, one in February. That's a bad thing.
22      Let's say it had two different start dates:
23 One in October and one in November. We didn't input it
24 until January. So when we input it in January, we would
25 have gotten money all the way back from October on at

256

1 least one of those lines. OKS didn't appear to be
2 handling those kind of contracts correctly, because what
3 it should have done is gone back to the start date in
4 October and November of the two products and grant its
5 revenue from there, and what it appeared to be doing is
6 granting its revenue from the date that we input it,
7 which was January or February.
8      There were also instances where there were two
9 line items. It would just pick the start date on one of
10 the line items and grant all the revenue from that date.
11 So if there were -- one started in October and one
12 started in June, it picked one of the dates and then
13 gave you revenue from that date. You should have only
14 had revenue on one product come through that day.
15      Now, sometimes they were -- you made out; you
16 got more money posted than you should. And other times
17 you got hurt; you got less money than you should.
18    Q. But -- and that, obviously, was existing --
19 well, withdrawn.
20      That issue was still in existence at least as
21 of April 16th of '01?
22    A. Exactly.
23    Q. Now, the spreadsheet that's behind there, I
24 can't really read it. Do you know -- did you create
25 this spreadsheet?

257

1  A. I did not.
2  Q. Do you know who did?
3  A. I -- I do not know who created it. I got my
4  information from Bill Shunk --
5  Q. Uh-huh (Indicates affirmatively).
6  A. -- who was -- did finance for me, worked with
7  Roberto. His job was to talk finance and then explained
8  it to me in such a way that I could understand it and
9  explained it to the support organization, i.e., Mike
10  Rocha and company.
11  Q. Does he still work for the company?
12  A. I don't believe that he does. I don't know
13  that firsthand, but I don't believe that he does. I
14  stopped getting mail from him a couple years ago. My
15  belief is that he went -- he went on.
16  Q. I want to direct your attention to NDCA-ORCL
17  119329, like the second to last page.
18  A. 329?
19  Q. Yeah.
20  A. Okay.
21  Q. Do you -- do you see where it has "findings"
22  on the top of the page there?
23  A. Uh-huh (Indicates affirmatively).
24  Q. Do you know who created that list? Was that
25  you?

259

1  suggested an audit of --
2  A. Now, this is just informative.
3  Q. Okay.
4  A. I'm telling Mike what's going on.
5  Q. Right. Well, you're saying that we may have
6  to do an audit of deals in February and January, right?
7  A. Right.
8  Q. Okay. Let's just go to the very last page.
9  A. Okay.
10  Q. It looks like under "recommendation," No. 6,
11  it says, "Analyze" -- "analyze month-to-month revenue
12  variance starting with January."
13  A. Right.
14  Q. So it looks like whoever is -- whoever it is
15  that wrote the findings represented on 119329 and 330
16  also thought that you probably -- you probably would
17  have to go back and look at January?
18  A. My -- my understanding of this is that all
19  revenue processed on the new OKS system would have to be
20  looked at in respect to those issues that we found that
21  are listed here.
22  Q. Okay. I'll ask the reporter to mark this
23  document as Sellers No. 18.
24  (Exhibit No. 18 was marked for
25  identification.)

258

1  A. It was not me. It was the group, I believe,
2  Larry --
3  Q. Garnick?
4  A. -- Garnick working with Lederman and that
5  whole crew that he had, going through -- and I think
6  Bill probably worked with him on some of these things.
7  Q. Do you see where -- right under the -- where
8  it says, "Findings, contracts that show multiple lines
9  on the line level in OKS with different start dates end
10  up being imported incorrectly into AR"?
11  A. Uh-huh (Indicates affirmatively).
12  Q. Is that kind of what you were referring to --
13  A. Yes.
14  Q. -- a few minutes ago?
15  A. Yeah. It picks one of the start dates. It
16  shouldn't. It should process each one separately. It
17  picks one of the start dates and -- and uses that for
18  everything that's on the contract.
19  Q. Do you know whether it was doing that in
20  January and February of 2001?
21  MR. HARRISON: Objection. Calls for
22  speculation.
23  THE WITNESS: My -- I don't know.
24  BY MR. WILLIAMS:
25  Q. Well, you would actually call for -- or you

260

1  BY MR. WILLIAMS:
2  Q. Sellers No. 18 is Bates numbered NDCA-ORCL
3  101524.
4  A. Okay.
5  Q. Do you recognize Sellers No. 18?
6  A. No. But it appears to be from me to Mike
7  Rocha.
8  Q. Okay. When?
9  A. The date on this is 1 March 2001.
10  Q. Okay. And it's an e-mail?
11  A. It is an e-mail, yes.
12  Q. Did you see this document yesterday?
13  A. I don't believe so. I may have, but I
14  don't -- I don't recall seeing it.
15  Q. Okay. You write, "We renewed 346" --
16  A. Right.
17  Q. -- "bookings."
18  A. Right.
19  Q. What does that mean?
20  A. That means that -- you remember it's -- we
21  renew the customer, and he says that he'll buy the new
22  contract, so we got 346,000,000 of bookings in. We
23  closed those amount of contracts.
24  Q. Okay. I thought -- or I recall your testimony
25  being that bookings was new business.

261

1    A.  It's typically -- I typically refer to
2  bookings as new business.  But, here, I'm clearly
3  talking about renew, because I say "renewed 346" --
4    Q.  Okay.
5    A.  -- and I call that bookings.
6    Q.  Okay.  Okay.  It says, "Renewed 346,000,000
7  bookings in Q3 against my last forecast of 337, and the
8  total available 368."
9    A.  Right.
10    Q.  Right?
11    A.  Yes.
12    Q.  What do you mean by "total available"?
13    A.  That's everything that was expiring in Q3 --
14    Q.  Okay.
15    A.  -- every contract's value that was expiring in
16  Q3.
17    Q.  Okay.  Now, as of March 1 of 2001, had
18  corporate accounting communicated to you that they had
19  found at least some portion of that $20 million
20  shortfall?
21    A.  Yes.
22    Q.  Okay.
23    A.  And -- and they had booked all of this
24  business they hadn't yet booked.  If you'll remember,
25  the whole time we're going through this, You're missing

262

1  20 million; you're missing 20 million; you're missing 20
2  million.  We still had contracts.  And if you remember
3  the one memo, somewhere around 80 percent of the
4  contracts to be renewed in February were not yet
5  processed.  I could only say what the value was if they
6  were renewed, but they weren't renewed yet.  So you
7  count your chickens until they hatch, if you will.
8      So once those got done, we're saying here
9  that -- that available to be renewed was 368, but we did
10  346.
11    Q.  Okay.
12    A.  And I had forecast 337.
13    Q.  You said "last forecast."  Do you know if your
14  forecast had gone down at any point during the quarter?
15    A.  From the -- no, no.  It hadn't gone down from
16  the 20 million that we're staring in the face.  We're
17  still looking at the -- but I don't recall what our
18  forecast started doing in the month of February when we
19  realized we had a problem.  I -- we were working daily
20  with finance.  And, mostly, I was forecasting what we
21  were going to do --
22    MR. HARRISON:  Did it just get darker?
23    THE WITNESS:  They're trying to drive us out.
24    Mostly, I was forecasting what we were going
25  to do on those renewals more than anything, because

263

1  all of the rest of it was in the bank.
2  BY MR. WILLIAMS:
3    Q.  Now, you see where you write, "The renewal
4  rate of 88 percent would be calculated using 346,000,000
5  minus 22,000,000, as 22,000,000 were renewed in Q3, but
6  there were Q4 renewals not included in the 368,000,000
7  available for renewal."
8    A.  Right.
9    Q.  What does that mean?
10    A.  Well, if you're going to count a renewal rate,
11  here is how you do it.  You take the total amount that's
12  available and the total amount that you renewed -- said
13  another way:  If I had a hundred available and I only
14  renewed 80, then the renewal rate would be 80 percent.
15  So if I renew -- if part of the 346 is renewals that are
16  not in the 368 --
17    Q.  Uh-huh (Indicates affirmatively).
18    A.  -- they're in next month's, right?
19    Q.  Uh-huh (Indicates affirmatively).
20    A.  Then I have to subtract those out of the -- of
21  the 346 in order to calculate a true renewal rate.
22    Q.  Was it typical to renew contracts that were
23  not due to expire --
24    A.  Sure.
25    Q.  -- until the next quarter?

264

1    A.  Sure.  We didn't post any revenue.  See,
2  that's why it's called bookings, not revenue, I'm sure,
3  because when we renew a contract that's not yet due,
4  then no money changes hands.
5    Q.  Okay.  So --
6    A.  You don't bill it.
7    Q.  And you don't report it for the quarter?
8    A.  That's right.
9    Q.  So, really, even though you renewed 346, you
10  only reported for your -- your division three hundred
11  and, what, 22, 24?
12    A.  Well, it would be 346 minus what --
13    Q.  Minus 22?
14    A.  Minus 22.  Is that what we carried forward,
15  or --
16    Q.  So you must have reported 324 for that
17  quarter --
18    MR. HARRISON:  Objection.  Calls for
19  speculation.
20  BY MR. WILLIAMS:
21    Q.  -- right?
22    MR. HARRISON:  Assumes facts not in evidence.
23    THE WITNESS:  That's what the math would
24  indicate.
25  BY MR. WILLIAMS:

Sellers, Richard  2/28/2006  10:41:00 AM

265

1  Q.  Right.  So that would be below your forecast
2  of 337?
3  A.  That's true.  Now, these -- again, we're
4  looking at the 337, and this is what was available to do
5  in that quarter, not to bring forward money.
6  Q.  Right.
7  A.  That's where we got screwed up on that other
8  memo.  We're talking available to renew in the quarter,
9  not the total quarter revenue.  Remember when --
10  Q.  Available.  I -- yeah, I think --
11  A.  Yeah.  So this is the -- 337 is the forecast
12  for what we were going to close in the quarter of the
13  three -- of the 368, which was available.
14  Q.  Uh-huh (Indicates affirmatively).
15  A.  And what we did was closed 346 minus whatever
16  it was.
17  Q.  Minus 22.
18  A.  Of the 368, which was 88 percent, I think.
19  Q.  I just got confused there for a minute, but --
20  A.  Okay.
21  MR. HARRISON:  Just wait for a question.
22  BY MR. WILLIAMS:
23  Q.  So based on this, you could only, even
24  though -- withdrawn.
25  Based on this, even though you renewed 346,

266

1  you could only -- or the company could only report 324?
2  A.  That's right.  And we can check that.  If we
3  take 324 and divide that by 368, we should get
4  88 percent.
5  Q.  Uh-huh (Indicates affirmatively).
6  A.  That's why we're using the term "bookings" up
7  there.  It's not revenue.
8  Q.  I think now to --
9  A.  I --
10  Q.  Bookings is not revenue; it's new business, or
11  what?
12  A.  It's what's been booked; it's not been billed,
13  normally.  I'm using this because -- I'm using this off
14  a sales spreadsheet, and they call it the bookings.
15  Q.  All right.
16  A.  Now, 346 would be what they booked or what
17  they closed in that quarter.  That doesn't mean I'm
18  going to bill all of that.  That's why I point out that
19  22,000,000 is not going to be billed.
20  Q.  Okay.  But your renewal rate goal was 96.8 for
21  the quarter --
22  A.  Right.
23  Q.  -- right?
24  A.  That's correct.
25  Q.  So if you renewed at 88, you missed your goal

267

1  for the quarter by ten percent approximately, or
2  eight -- eight, nine percent?
3  A.  Eight.
4  Q.  Okay.
5  A.  Yes.
6  Q.  You had indicated earlier in, actually, in
7  Sellers No. -- gosh, I think it might be 12.  Let's see.
8  Actually, No. 15.  There you go.  That each one percent
9  miss in renewal rate was equal -- I'm sorry.  That each
10  one percent in renewal rate will reduce bookings by 3.8
11  million and revenue in the quarter by 950,000.
12  A.  Right.  See that 337?  That's what we missed
13  the last time.  That's an annual number.
14  Q.  Okay.
15  A.  That's closing the contracts.  That's what's
16  there to be closed.
17  Q.  That's not for the quarter?
18  A.  No.  That's why we were -- when we're looking
19  at it before.  That's what's available to -- that's the
20  total available.  That's why it's called "bookings."  So
21  that's the whole year.  You're not going to get all of
22  that in a quarter to do it.
23  Q.  Okay.
24  A.  That's why you have got a difference of 3.2 or
25  900,000.

268

1  Q.  And so when I see bookings, I should think of
2  the -- of the year rather than a quarter?
3  A.  Bookings is a sales term, right?  Bookings
4  equates to revenue, but it's not always one per one, and
5  it's not always in the quarter that you get the booking.
6  Q.  Okay.
7  A.  It's coming back to me.
8  Q.  All right.  So imagine -- imagine what it's
9  like for me.
10  A.  It's been five years.  It's been five years.
11  Q.  So do we need to go back over this one
12  again --
13  A.  I don't, no.
14  Q.  -- No. 15?
15  A.  I'm happy to if you would like to.  See, I
16  point out here that it will be renewed at 88.6, and I
17  believe down here I'm saying 88, so -- to be consistent.
18  Q.  I'll ask the reporter to mark this document as
19  Sellers No. 19, is it, or is it 20?
20  THE WITNESS:  That would be 19.  The last one
21  I had was 18.
22  MR. WILLIAMS:  Okay.  Nineteen.
23  (Exhibit No. 19 was marked for
24  identification.)
25  BY MR. WILLIAMS:

269

1   Q.  Sellers No. 19 is Bates numbered NDCA-ORCL
2   223012 through 223019.  I've got an extra 19 on the back
3   of that.  I'll just ask you to take a look at Sellers 19
4   and tell me when you're done.
5   A.  Okay.  I don't -- I recognize this first
6   one --
7   Q.  Uh-huh (Indicates affirmatively).
8   A.  -- as being a pretty standard thing that
9   finance sent out every quarter.
10  Q.  That who sent out?
11  A.  Finance.
12  Q.  Oh, finance.  Okay.
13  A.  Yeah.  And -- but I do not recognize these
14  back ones.
15  Q.  Okay.  The ones that say "Dick and Chris"?
16  A.  Yeah.
17  Q.  Okay.  Well, let's just direct -- let me
18  direct your attention to 223017 on the top.  It says
19  "Dick and Chris."
20  A.  Right.
21  Q.  Right.  Did you have a conference call on or
22  around February 15th with John Lederer?
23  A.  Well, probably.  I mean, I had many conference
24  calls with John Lederer.
25  Q.  Okay.

270

1   A.  Many, many, many, many.
2   Q.  All right.  And as you look at this document,
3   is it relating to the topic of the renewals for the
4   third quarter?
5   A.  Yes, it is.
6   Q.  It's the kind of topic we've been
7   discussing --
8   A.  Right.
9   Q.  -- for the last couple of hours, right?
10  A.  Yeah.
11  Q.  Turn to the very last page of the document --
12  I'm sorry, 018.
13  A.  Okay.
14  Q.  See where he writes "actions"?
15  A.  Yes.
16  Q.  Okay.  Did you implement an accelerated
17  payment incentive to the support renewals team in or
18  around February of 2001 to incent them to close all the
19  February Bookings Outlook?
20  A.  I did.
21  Q.  Okay.  Can you describe that for me?
22  A.  I can't.  I don't know.  I don't remember.
23  Q.  Okay.
24  A.  That would have probably been something, a
25  spiff.

271

1   Q.  What's that?
2   A.  A spiff, that's -- in sales jargon, a spiff is
3   like a one-time prize, like you -- if you get all of
4   this done, you get an extra $200.  And it's not a
5   commission.
6   Q.  Uh-huh (Indicates affirmatively).
7   A.  Like, it's something you can do in the middle.
8   If they're geared up to have 20 percent of their salary
9   at risk, they close so much business, like 80 percent,
10  or they get plus -- or closing over that.  Anyway,
11  that's a year's thing.  If you want to get into the
12  middle of that, you just issue a spiff and say, Okay,
13  this quarter if you exceed your renewal, I'll give you
14  whatever you get.
15  Q.  Okay.
16  A.  Typically, it would be a few hundred bucks or
17  a thousand bucks or -- you know, these are not -- these
18  folks, as I remember, are in the 30K range, so --
19  Q.  The support renewals team?
20  A.  Uh-huh (Indicates affirmatively).
21  Q.  Okay.
22  A.  Many junior people.
23  Q.  How do they typically do renewals?  Over the
24  phone or --
25  A.  Uh-huh (Indicates affirmatively).  They're

272

1   phoned in.
2   Q.  Okay.
3   A.  They're calling customers up.
4   Q.  Okay.  And accelerated payment, does that
5   mean, like, you get the money right at the end of
6   quarter, or something?
7   A.  Yeah, yeah.  Instead of having to wait until
8   the end of year --
9   Q.  Okay.
10  A.  -- pay them -- if they exceed or do what you
11  want them in that quarter, reach out and touch them
12  right then.
13  Q.  Do you know --
14  A.  It's more motivating.
15  Q.  Do you know whether or not the accelerated
16  payment incentive was successful for that quarter?
17  A.  Yeah.  Again, I think so.  I believed that it
18  was.  I mean, we -- we brought most of those renewals
19  in.
20  Q.  Okay.
21  A.  The only ones we didn't close under all of
22  the -- Jesus, am I becoming emotional?  Under all that
23  adverse circumstances, systems and screaming and
24  yelling, we sat down with a group of people and said,
25  Now, we have to process all of these renewals, and we

Sellers, Richard  2/28/2006  10:41:00 AM

273

1  have to get them all done.  And we got them all done
2  except the ones that I outlined there.
3       Q.  Okay.
4       A.  I thought they were magnificent.
5       Q.  Do you see where the -- just go down to No. 9,
6  where it says, "Robert Fajardo and Dick Sellers to
7  prepare a similar reconciliation to the above on the Q4
8  '01 revenue outlook to ascertain what the risk is"?
9       A.  Right.
10      Q.  Did you prepare any type of reconciliation
11  to --
12      A.  Q4?
13      Q.  -- for Q4?
14      A.  I did.  And I --
15      Q.  Who did you give it to?
16      A.  My boss, Rocha, and also finance, because
17  Roberto was their finance.  Remember?
18      Q.  Okay.
19      A.  So him and my finance manager worked and put
20  this whole thing together and then ran it by me.  I made
21  whatever suggestions that I thought were appropriate.
22  We discussed it and then submitted it up the chain.
23      Q.  Did you propose incentives to the support
24  renewals team to close all of the 4Q '01 bookings
25  potential?

274

1       A.  I don't recall doing that, no.
2       Q.  Do you know if John Lederer is still at the
3  company?
4       A.  I do not, no.
5       Q.  Do you see where he -- the number one, where
6  it says, "Finance, John Lederer, to perform a detailed
7  review" --
8       A.  Right.
9       Q.  -- "in Rocklin starting February 14th of the
10  117,000,000 of deferred revenue that's recognizable in
11  February"?
12      A.  Right.
13      Q.  Do you see that?
14      A.  Yes, uh-huh (Indicates affirmatively).
15      Q.  Do you know if he's referring to support
16  revenue?
17      A.  Yes.
18      MR. HARRISON:  Objection.  Calls for
19  speculation.  Lacks foundation.
20  BY MR. WILLIAMS:
21      Q.  Okay.
22      A.  The 117 -- my recollection is the 117 was what
23  we flashed February, that opening day.  Opening day --
24  or opening week wasn't always on the first day.
25      Q.  Right.

275

1       A.  You flashed what was in the system for
2  February.
3       Q.  Right.
4       A.  And when they flashed February, it was 117.
5  That was --
6       Q.  One of those documents indicated 119, I think,
7  right?
8       A.  Could have been.  That was the first output
9  out of OKS.
10      Q.  Okay.
11      A.  This was our first peek at things to come.
12      Q.  Well, I think I'm finished.
13      A.  Wow.  All right.
14      MR. WILLIAMS:  Just -- I have a couple things
15  to say.  There may a dispute between the parties as
16  to whether or not certain documents that you
17  reviewed have to be produced.  So to that extent or
18  depending on the resolution of that, I'm going to
19  leave the deposition open for that purpose.  And
20  there may be a time where we have to talk for a
21  short period of time later.
22      THE WITNESS:  Okay.
23      MR. WILLIAMS:  But we'll work it out.
24      MR. HARRISON:  You don't have to worry about
25  that for now.

276

1       THE WITNESS:  Okay.
2       MR. HARRISON:  One more thing.
3  I'm sorry?
4       THE WITNESS:  Oh, go ahead.
5       MR. HARRISON:  One more thing I wanted to note
6  on the record is that we're going to mark this
7  deposition confidential.
8       MR. WILLIAMS:  Okay.
9       MR. HARRISON:  And I'd like to take a couple
10  minutes' break just to see if I have anything to
11  clarify or correct.
12      MR. WILLIAMS:  Sure.  Okay.
13      THE VIDEOGRAPHER:  It is 6:42.  We're off the
14  record.  This is the end of Tape No. 7 of the
15  deposition of Richard Sellers.
16      (Brief recess was taken.)
17      THE VIDEOGRAPHER:  This is an addendum to Tape
18  No. 7.  This is the conclusion of the deposition of
19  Richard Sellers.  It is 6:47 p.m. on Tuesday
20  February 28th, 2006.  We are now off the record.
21      (Deposition concluded at 6:47 p.m.)

Sellers, Richard  2/28/2006  10:41:00 AM

277

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, the undersigned authority, certify that
RICHARD SELLERS, personally appeared before me and was
duly sworn.

WITNESS my hand and official seal this 5th day of
March, 2006.

_____
Aaron T. Perkins, RPR
Notary Public - State of Florida
My Commission Expires:  12/11/2007
Commission No. DD274338

278

REPORTER'S CERTIFICATE

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, Aaron T. Perkins, Registered Professional
Reporter, certify that I was authorized to and did
stenographically report the deposition of
RICHARD SELLERS; that a review of the transcript was
requested; and that the transcript is a true and
complete record of my stenographic notes.

I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.

Dated this 5th day of March, 2006.

_____
Aaron T. Perkins, RPR

279

SIGNATURE PAGE

PLEASE ATTACH TO THE DEPOSITION OF RICHARD SELLE
ON FEBRUARY 28, 2006, IN THE CASE OF ORACLE CORPOI
SECURITIES LITIGATION.

PAGE   LINE   CORRECTION AND REASON THEREFOR

I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR .
CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HE
SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.

_____      _____
RICHARD SELLERS              DATE

_____      _____
WITNESS TO SIGNATURE         DATE

```
 1                     REPORTER'S CERTIFICATE

 2
     STATE OF FLORIDA
 3   COUNTY OF HILLSBOROUGH

 4
          I, Aaron T. Perkins, Registered Professional
 5   Reporter, certify that I was authorized to and did
     stenographically report the deposition of
 6   RICHARD SELLERS; that a review of the transcript was
     requested; and that the transcript is a true and
 7   complete record of my stenographic notes.

 8

 9        I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties,
10   nor am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
11   financially interested in the action.

12

13        Dated this 5th day of March, 2006.

14

15

16

17

18

19

20        _____
          Aaron T. Perkins, RPR
21

22

23

24

25
```

# EXHIBIT AA

James, Christopher  7/17/2007  9:05:00 AM

**1**

```
 1         IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4
 5   In re ORACLE CORPORATION
 6   SECURITIES LITIGATION.
 7            Master File No. C-01-0988-MJJ
 8   This Document Relates To:
 9
10   ALL ACTIONS.
11   _____/
12
13
14              ---o0o---
15   VIDEOTAPED DEPOSITION OF CHRISTOPHER JAMES
16         TUESDAY, JULY 17, 2007
17
18              ---o0o---
19
20        SHEILA CHASE & ASSOCIATES
             REPORTING FOR:
            LiveNote World Service
           221 Main Street, Suite 1250
         San Francisco, California 94105
           Phone: (415) 321-2311
             Fax: (415) 321-2301
22
23
     Reported by:
24   DIANA NOBRIGA, CSR, CRR
     LICENSE NO. 7071
25
```

**2**

```
 1                I N D E X
 2            INDEX OF EXAMINATION
 3                           PAGE
 4   EXAMINATION BY MS. WINKLER        5
 5              ---o0o---
 6            INDEX OF EXHIBITS
 7   DESCRIPTION                  PAGE
 8   Exhibit 1  Expert Report of Christopher M.
 9        James                  26
10   Exhibit 2  Rebuttal Expert Report of
11        Christopher M. James       26
12   Exhibit 3  Five-page document Bates
13        stamped NDCA-ORCL 360337 through
14        360341                 49
15   Exhibit 4  E-mail dated 17 Jan 2001 from
16        Larry Garnick to Jennifer Minton   83
17   Exhibit 5  Defendants' Response to Plaintiffs'
18        First Set of Requests for
19        Admissions             92
20   Exhibit 6  Oracle, Larry Ellison Conference
21        Call                  105
22   Exhibit 7  Document Bates labeled NDCA-ORCL
23        091467 through 091470       165
24
25
```

**3**

```
 1        BE IT REMEMBERED that on Tuesday, July 17,
 2   2007, commencing at the hour of 9:05 a.m., thereof, at
 3   the LAW OFFICES OF LERACH, COUGHLIN, STOIA, GELLAR,
 4   RUDMAN & ROBBINS, LLP, 100 Pine Street, Suite 2600,
 5   San Francisco, California, before me, DIANA NOBRIGA, a
 6   Certified Shorthand Reporter in and for the State of
 7   California, personally appeared
 8              CHRISTOPHER JAMES
 9   as a witness by the plaintiffs herein, who, being by me
10   first duly sworn, was thereupon examined and testified
11   as hereinafter set forth.
12              ---o0o---
13   Appearing as counsel on behalf of the Plaintiffs:
14        MONIQUE C. WINKLER, ESQ., moniquew@lerachlaw.com
            SHAWN WILLIAMS, ESQ.,shawnw@lerachlaw.com
15        LERACH, COUGHLIN, STOIA, GELLAR,
            RUDMAN & ROBBINS
16        100 Pine Street, Suite 2600
           San Francisco, CA 94111
17        (415) 288-4545
18
19   Appearing as counsel on behalf of Defendants:
20        DAVID M. FRIEDMAN, ESQ., david.friedman@lw.com
           PATRICK E. GIBBS, ESQ., patrick.gibbs@lw.com
21        LATHAM & WATKINS
           505 Montgomery Street, Suite 1900
22        San Francisco, CA 94111-2562
           (415) 391-0600
23
24   Also Present:  Andrew Roper, Ph.D. Cornerstone Research;
25   Gary Brewer, Videographer
```

**4**

```
 1        VIDEOGRAPHER:  Good morning.  We're going on
 2   the record.  Here begins the videotaped deposition of
 3   Christopher James, tape one, Volume I, in the matter of
 4   In Re Oracle Securities Litigation, U.S. District Court,
 5   Northern District of California, san francisco Division,
 6   Master File No. C0-01-0988-MJJ.  Today's date is
 7   July 17th, 2007, and the time is 9:05 a.m.  The video
 8   operator is Gary Brewer, representing LiveNote World
 9   Service, located at 221 Main Street, Suite 1250,
10   San Francisco, California 94105, telephone number, 415
11   321-2300.  The court reporter is Diana Nobriga,
12   reporting on behalf of LiveNote World Service.
13        Today's deposition is taking place on behalf
14   of the plaintiff, and is taking place at 100 Pine
15   Street, San Francisco, California.
16        Counsel, could you please introduce yourselves
17   and state whom you represent.
18        MS. WINKLER:  Monica Winkler of Lerach,
19   Coughlin, Stoia, Geller, Rudman, Robbins, on behalf of
20   plaintiffs.
21        MR. FRIEDMAN:  David Friedman of Latham and
22   Watkins on behalf of the defendants.
23        MR. GIBBS:  Patrick Gibbs, Latham and Watkins,
24   for the defendants.
25        MR. ROPER:  Andrew Roper, Cornerstone, on
```

James, Christopher  7/17/2007  9:05:00 AM

---

**5**

1  behalf of defendants.
2       VIDEOGRAPHER:  Would the court reporter please
3  swear in the witness.
4       CHRISTOPHER JAMES,
5  having been duly sworn, testified as follows:
6       EXAMINATION BY MS. WINKLER
7  MS. WINKLER:  Q.  Mr. James, you're not an
8  attorney, are you?
9       A.  No, I'm not.
10      Q.  Are you familiar with the Supreme Court's
11  Decision in Dura Pharmaceuticals?
12      A.  I am.
13      Q.  You're not offering an opinion on whether
14  plaintiffs have adequately pled loss causation under
15  Dura, are you?
16      A.  I'm not offering a legal opinion as to the
17  adequacy of any pleadings.  I am, as my report
18  indicates, providing an opinion as whether the
19  analysis by Mr. Steinholt is consistent with Dura from
20  an economic perspective.
21      Q.  But you're not offering a legal interpretation
22  of Dura, are you?
23      A.  I have not been asked to offer a legal opinion
24  as to Dura, only as to the economic implications of
25  Dura.

---

**6**

1      Q.  And you're not offering an opinion on whether
2  plaintiffs can prove loss causation under Dura, are you?
3       MR. FRIEDMAN:  Objection; vague.
4       THE WITNESS:  Well, I don't -- I'm not sure
5  what you mean by can.  As my report indicates, I don't
6  believe that Mr. Steinholt has demonstrated the causal
7  link as required under Dura.
8       MS. WINKLER:  Q.  That wasn't my question
9  though.
10      My question was whether you're offering an
11  opinion on whether plaintiffs can prove loss causation
12  under Dura.
13      MR. FRIEDMAN:  Same objection.
14      THE WITNESS:  Well, again, other than the
15  analysis that I've reviewed in this case, I haven't seen
16  any analysis that I would consider to be consistent with
17  a demonstration of loss causation, from an economist's
18  perspective as I understand Dura.
19      MS. WINKLER:  Q.  You don't know, do you, what
20  proof would satisfy this court regarding loss causation?
21      MR. FRIEDMAN:  Same objection.
22      THE WITNESS:  I don't know what is in the
23  court's mind, so I don't know what standard the court
24  has.  If the court applies a standard consistent with my
25  interpretation as an economist of the content of Dura,

---

**7**

1  then I would think that the court would find that loss
2  causation hasn't been demonstrated.
3       MS. WINKLER:  Q.  Have you read this court's
4  December 20th, 2006 order regarding the motion for class
5  certification?
6       A.  I don't believe I have.
7       Q.  Are you aware that Judge Jenkins quoted
8  Mr. Steinholt in his opinion?
9       A.  No.
10      Q.  Are you aware that in the opinion the court
11  held that a corrective disclosure is one way in which a
12  10b plaintiff can demonstrate loss causation, Dura does
13  not, however, state that this is the only way to plead
14  and prove loss causation?
15      A.  That certainly would be -- I haven't read
16  that, but that certainly would be consistent with, as I
17  indicate in my report, from an economic perspective the
18  correct way to look at Dura.  So, that certainly would
19  be not inconsistent -- it would be consistent with my
20  interpretation.
21      Q.  Do you have any idea whether loss causation
22  can be established on the allegations and facts in this
23  case?
24      MR. FRIEDMAN:  Objection; vague.
25      THE WITNESS:  I'm not sure what you mean by

---

**8**

1  can be demonstrated.  I haven't seen that demonstration.
2  I mean, if -- I presume that if there was a potential
3  for that demonstration, it would have been shown to
4  date.
5       But about the possibility, I haven't seen
6  anything that would lead me to conclude that that would
7  be the case.
8       MS. WINKLER:  Q.  Have you reviewed any of
9  Oracle's internal documents?
10      A.  Other than the internal documents that have
11  been cited in other expert reports, I have not engaged
12  in an analysis of the internal documents of Oracle.
13      Q.  Did you review the actual documents cited in
14  the other reports or just review the other reports?
15      A.  Some of the documents I reviewed, others I
16  simply noted their existence.
17      Q.  Which documents did you review?
18      A.  As I sit here, I can't recall.
19      Q.  Which other expert reports did you review?
20      A.  Well, I reviewed the expert reports for the
21  plaintiffs in this case, both their original reports and
22  their rebuttal reports.  I reviewed the expert reports
23  for the defendants, and their rebuttal reports
24      Q.  Did you review all the plaintiffs' expert
25  reports?

---

James, Christopher  7/17/2007  9:05:00 AM

**9**

```
1       A.  I believe I did.
2       Q.  How about all of defendants' expert reports?
3       A.  I believe I did.
4       Q.  Do you recall which of the reports you
5   reviewed exhibits that were attached or referenced
6   therein?
7       A.  I certainly recall reviewing the exhibits
8   attached to the Hilliard report.  I'm not sure how you
9   pronounce it, there's been an active debate.  Is it
10  Goedde or Goedde?
11      Q.  Yes.
12      A.  The Goedde report.  I recall reviewing the
13  exhibits in the Regan report.  I reviewed exhibits
14  attached to the O'Bryan report.  Reviewed the exhibits
15  attached to the Steinholt report.  I reviewed the
16  exhibits attached to the Yourdon report.  I reviewed the
17  exhibits attached to the Hubbard report.  As I sit here,
18  that's the list that I recall.
19      Q.  When you say you reviewed the exhibits
20  attached to the reports, is it your testimony that you
21  reviewed all the exhibits attached to those reports or
22  just one or two here and there?
23      MR. FRIEDMAN:  Objection to form.
24      THE WITNESS:  I think I -- I recall
25  reviewing -- because I read all of the reports, all of
```

**10**

```
1   the exhibits that were attached to those reports.
2       MS. WINKLER:  Q.  Have you read the Ninth
3   Circuit's opinion In Re Daou Systems Inc.'s Securities
4   Litigation?
5       A.  Which one?
6       Q.  In Daou Securities Litigation.
7       MR. FRIEDMAN:  Sometimes referred to as Daou.
8       THE WITNESS:  I may have.  I don't have it in
9   mind as I sit here.
10      MS. WINKLER:  Q.  Do you have any
11  understanding of that opinion?
12      A.  I can take a look at it and refresh my memory,
13  but as I sit here I don't have a recollection of it.
14      Q.  What is your understanding of plaintiffs'
15  allegations in this case?
16      A.  The allegations as they are outlined in the
17  complaint are that -- are in several general categories.
18      First category would be with respect to Suite
19  11i, allegations regarding the lack of integration in
20  interoperability associated with 11i; the allegations as
21  it pertains to what I'll refer to as accounting issues,
22  which is another category of allegations pertaining to
23  the unapplied cash, and in particular the on-account
24  characterization of the unapplied cash and the
25  November 17th accounting entries as it pertains to
```

**11**

```
1   unapplied cash; and an allegation that those 48,000 plus
2   accounting entries had the impact of allegedly
3   increasing 2Q earnings; the allegations as it pertains
4   to what I'll call the category of forecasting, that
5   Oracle either knew or should have known, it's alleged, a
6   softening in the economy would adversely impact its
7   ability to meet its 3Q earnings numbers.
8       Q.  And you indicated when you started your
9   response to that question that that was your
10  understanding of plaintiffs' allegations as outlined in
11  the complaint?
12      A.  Right.
13      Q.  Do you have any other understanding of
14  plaintiffs' allegations in this case?
15      A.  Well, as I understand it, in addition to, for
16  example, certain days that plaintiffs allege were
17  associated with material misstatements, they have added
18  additional days as part of a response to the second
19  interrogatory.
20      My understanding is that in the context of
21  certain of the accounting issues as it pertains -- as
22  outlined in the Regan report were issues that were not
23  addressed in the original complaint.  So, I'm not sure
24  whether those are correctly part of the allegations or
25  not.
```

**12**

```
1       Q.  With respect to Suite 11i, you indicated that
2   your understanding was that plaintiffs allege there is a
3   lack of integration in interoperability.  Do you have
4   any other understanding about plaintiffs' allegations
5   with respect to Suite 11i?
6       A.  Yes.  Again, there is -- as I indicated in my
7   report, there is a broader set of allegations as it
8   pertains to issues regarding functionality in the
9   Hilliard report, allegations regarding commercially
10  viable, I think is the term, that 11i would allegedly
11  drive sales, that I think that acceptance was high.
12      So, there are sort of a broader set of less
13  well-specified allegations as it pertains to what I'll
14  call a general area of 11i quality issues.
15      Q.  What is Suite 11i?
16      A.  Suite 11i is a suite of enterprise software
17  applications that range from CRM to ERP to supply chain
18  management.  I think there's over 100 modules in each
19  of -- in both the ERP -- in combination with the ERP and
20  CRM.
21      Q.  Do you know what CRM means?
22      A.  Yes.
23      Q.  What is that?
24      A.  It is the front office part of an enterprise
25  software, so it deals with tracking interactions between
```

James, Christopher  7/17/2007  9:05:00 AM

**13**

1  customers. So it is customer resource management is the
2  anonym.
3        Q.   What about ERP, what does that mean?
4        A.   Enterprise resource program.
5        Q.   And are you aware that Oracle claimed that
6  Suite 11i was fully integrated?
7        A.   I believe that it claimed that it was designed
8  to be integrated, that it was designed so that the
9  integration would occur at the -- in terms of the
10 interaction between the modules, as part of the design
11 process at Oracle.
12       Q.   Do you know what it means to say that Suite
13 11i was fully integrated?
14       A.   I'm not here as a technical expert on
15 integration. As I understand integration, it means that
16 they are designed to use the same database or schema.
17 For example, I think if you take a suite product such as
18 the Microsoft Office suite, those are designed to be
19 integrated and interoperable.
20       Q.   With respect to fully integrated, would it not
21 at a minimum mean that the CRM module was integrated
22 with the ERP module?
23            MR. FRIEDMAN:  Objection to form.
24            THE WITNESS:  I guess -- I think you need to
25 be a little more specific what you mean by fully

**14**

1  integrated. Certainly it is designed to be fully
2  integrated using a common data model or schema. To the
3  extent that you are using, say, the CRM module in
4  connection with a Legacy system, such as Ford does, you
5  are going to have as part of the process of bringing
6  that software online, you're going to have to integrate
7  it with your Legacy software.
8            Likewise, certainly is the case that you can
9  have systems that are designed for integration, like CRM
10 and ERP, yet situations arise in which there may be
11 difficulties in sort of the communication between the
12 two programs, even though the programs are designed to
13 be fully integrated.
14            MS. WINKLER:  Q. What do you mean when you
15 say there may be difficulties in the communication
16 between the two programs, referencing CRM and ERP?
17       A.   Let me give you a simple example. If you
18 tried -- the Microsoft suite is designed, and as
19 indicated, is fully integrated within the various
20 applications. If you try to cut and paste something
21 from, say, take a table from a certain Excel format and
22 put that table into a PowerPoint presentation, that you
23 may have some difficulties in doing that, even though
24 the systems are designed to be fully integrated with one
25 another.

**15**

1        Q.   Would it be important to investors whether
2  Suite 11i was fully integrated?
3        A.   Well, I think certainly the integration
4  aspects of the Suite 11i was important to investors.
5  You see a lot of investor commentary by analysts, as
6  well as, you know, at user conferences and so on,
7  regarding the features of 11i. And, frankly, discussion
8  with the difficulties that customers are having in terms
9  of implementing 11i, and certain issues with respect to
10 the integration of CRM with ERP.
11       Q.   Do you know what a best-of-breed strategy is?
12       A.   Yes.
13       Q.   What is that?
14       A.   A best-of-breed strategy has to do with trying
15 to develop the best software program, say, for call
16 center automation, best strategy with respect to certain
17 modules within an ERP, or, for example, the entire ERP.
18 So you have certain of the enterprise software
19 companies, such as I2, Ariba, focusing in on a
20 best-of-breed strategy.
21       Q.   What was the benefit from a business point of
22 view of purchasing a suite rather than a best-of-breed
23 solution?
24            MR. FRIEDMAN:  Objection to form.
25            THE WITNESS:  Well, I mean, as I understand it

**16**

1  from both my review of the market, the information was
2  in the market, analyst reports and market resources,
3  the -- the advantage of a suite approach as opposed to a
4  best-of-breed was principally in the area of reducing
5  integration costs and the labor involved in getting the
6  CRM program that Siebel has to communicate with the HRM
7  applications that PeopleSoft might have. So if you're
8  thinking about -- you've got two different data models
9  there that have to be integrated with one another, and
10 that is -- both in the materials I reviewed and my
11 experience indicates that it's -- that's a costly
12 process.
13       Q.   What was the benefit of buying Suite 11i if it
14 was not fully integrated and was not best-of-breed?
15       A.   Well, I'm not sure why you're saying that it
16 was not fully integrated. I did not indicate that I
17 didn't believe it was fully integrated. The advantage I
18 believe is that integration costs were substantially
19 less, both as an initial phase and on a going-forward
20 basis.
21            If you were to, say, add a particular module
22 or a set of modules and then subsequently develop
23 those -- add, say, a CRM or a set of CRM modules, that
24 there could be significant costs savings.
25       Q.   I think in response to one of my earlier

17

1  questions you referenced analysts discussing customer
2  issues with Suite 11i; is that fair?
3    A.  Um-hum.
4    Q.  Did you see that prior to the Class Period?
5    A.  Yes.
6    Q.  And you discussed that in your report;
7  correct?
8    A.  I believe that I -- in Exhibit 6, it's about
9  30 pages of -- both in the body of the report and in
10  Exhibit 6, is about 30 pages of I think illustrative
11  quotes from analysts and market participants concerning
12  quality and product characteristics as it pertains to
13  11i.
14    Q.  Right now I'm specifically referencing reports
15  from prior to the Class Period.  Why did you include
16  that commentary in your report?
17    A.  For a couple of reasons.  One is part of the
18  analysis that I undertook, and one of the things that I
19  thought was a significant and, I think, important
20  omission in the Steinholt analysis was a systematic
21  analysis of what the total mix of information was at
22  various points in time, both as of the beginning of the
23  Class Period -- in order to get a fix on what the total
24  mix of information is at the beginning of the Class
25  Period I need to look at sort of what the mix of

18

1  information is prior to the Class Period.  That was one
2  reason.
3    The second reason is as I understand it, there
4  is certain allegations specifically with respect to,
5  say, the Hilliard report where he looks at, I think,
6  May 24th, 2000, and I believe a couple of dates, one in
7  September of 2000, and argues or indicates that those
8  may have been dates in which there were alleged
9  misstatements.
10    Q.  With respect to the Hilliard report, do you
11  know whether the report connects those alleged
12  misstatements you referenced up to statements that were
13  actually made during the Class Period?
14    MR. FRIEDMAN:  Objection to form, vague.
15    THE WITNESS:  I'm not -- I don't understand
16  what you mean.
17    MS. WINKLER:  Q.  You referenced several pre
18  Class Period statements in the Hilliard report; is that
19  fair?
20    A.  Yes.
21    Q.  Do you know whether the Hilliard report
22  actually connects those statements up to statements
23  about Suite 11i that were made during the Class Period?
24    MR. FRIEDMAN:  Same objection.
25    THE WITNESS:  I would have to go back and

19

1  look.  Certainly the -- I would have to go back and take
2  a look as to whether he makes that connection.
3    My understanding is -- I would have to look at
4  the report.
5    MS. WINKLER:  Q.  And were those the only two
6  reasons?  You referenced a mix of information prior to
7  the Class Period in the Hilliard report in response to
8  my question.  Why did you include the pre Class Period
9  commentary in your report?  Do you have any other
10  reasons?
11    A.  I think a basic reason would be simply
12  background information.  You go back to 1999 when the,
13  you know, Oracle application user group meeting where it
14  is announced the suite approach is going to be taken,
15  to, you know, the introduction of the suite product in
16  May of 2000.  I think it's important to look at that in
17  the context of both how people were evaluating the
18  product, how impressions were being formed and what was
19  in the total mix of information.
20    Q.  Do you know which release of suite 11i the pre
21  Class Period reports, specifically the September,
22  October and November 2000 analyst reports referenced?
23    A.  Well, 3i -- 11i.3 is released in January, and
24  I think 4 is released in June.  So they are going to
25  be -- I don't recall if they are 1 or 2, but it would be

20

1  the pre 3 release.  Obviously the May one would be the
2  first release.
3    Q.  Are you aware that Oracle's application number
4  came in -- application numbers came in lower than they
5  were expected to for Oracle's first fiscal quarter for
6  2001?
7    MR. FRIEDMAN:  Objection to form; vague.  I
8  assume you mean revenue.
9    THE WITNESS:  Can I have the question back,
10  please.
11    MS. WINKLER:  Sure.  Would you read my
12  question back, please.
13    (Record read as follows:  QUESTION:  Are you
14  aware that Oracle's application number came
15  in -- application numbers came in lower than
16  they were expected to for Oracle's first fiscal
17  quarter for 2001?)
18    THE WITNESS:  I'm going to presume you mean
19  the revenue numbers?
20    MS. WINKLER:  Q.  Sure.
21    A.  Sure, meaning yes?
22    Q.  Yes, you can presume that.
23    A.  Well, I'm -- I'm aware that the -- I'm not
24  sure that they came in under guidance.  Certainly there
25  is commentary about both the strength of the

James, Christopher  7/17/2007  9:05:00 AM

21

1  applications -- I think they come in at around 42
2  percent. And there were some analysts who registered
3  some disappointment with the 42 percent over what they
4  had been forecasting. Other analysts were very pleased
5  with the apps numbers.
6      Q.  Did you encounter any representations by
7  Oracle that the bugs and the problems with the initial
8  releases that were referenced in the pre Class Period
9  reports had, in fact, been solved?
10     MR. FRIEDMAN: Objection; overbroad.
11     THE WITNESS: I don't know what you mean by
12 the bugs being solved. Clearly there were patches that
13 were put in place. And those patches would be both for,
14 you know -- both in response to TARs -- and those TARs
15 may relate to bugs or other aspects of the program. So
16 in a new program release, it is my understanding, is
17 that there are a number of patches that typically are
18 done. So I'm not --
19     MS. WINKLER: Q. My question was did you
20 encounter any representations by Oracle that -- let's
21 take out bugs -- that the problems with the initial
22 releases that were referenced in the pre Class Period
23 reports that you cite had been solved?
24     A.  I think that that statement is really too
25 broad for me to answer. I'm aware that, certainly,

22

1  there were issues that they were trying to address, say,
2  with respect to release 3 in terms of addressing
3  complaints about -- which were in the marketplace, about
4  system stability issues and other implementation-related
5  issues.
6      Q.  So are you saying that you encountered public
7  statements by Oracle that they had addressed issues with
8  release 3?
9      A.  I think they had tried to address certain
10 issues with release 3. I don't recall any pronouncement
11 by Oracle that says that we -- you know, we have solved
12 all implementation issues and we don't expect to have
13 any more TARs. That would not be a realistic
14 expectation.
15     Q.  Do you recall a representation by Oracle that
16 the question was no longer whether Oracle would be able
17 to deliver the suite, but that Oracle had, in fact,
18 delivered the suite?
19     A.  I remember that. I don't think there is any
20 question that Oracle delivered the suite. I mean, if
21 you look at apps sales in Q2 and Q3 and beyond, you've
22 got literally hundreds of millions of dollars in apps
23 sales. You go from 45 live in November to over 300 in
24 May of 2001. I think that would be an indication that
25 they have delivered a suite.

23

1      Q.  When you say you remember that, when was that
2  statement made with respect to delivering the suite?
3      A.  Well, I believe they began delivering the
4  product in May of 2000.
5      Q.  You're not answering my question. I asked you
6  if you recall the representation by Oracle that the
7  question would no longer be whether Oracle would be able
8  to deliver the suite, but that Oracle had, in fact,
9  delivered the suite. And you said, "I remember that."
10 Is that fair?
11     A.  Yeah, I don't recall the specific date of
12 that -- of that statement.
13     Q.  Do you cite that statement anywhere in your
14 reports?
15     A.  I would have to review my report to determine
16 that.
17     Q.  Did you find any reference to implementation
18 problems or bugs relating to Suite 11i in any analyst
19 reports in December of 2000?
20     A.  Sure.
21     Q.  What were those?
22     A.  Well, I recall one discussion, I believe it
23 was in the context of a Morgan Stanley conference, in
24 which it was a luncheon involving analysts and the
25 some -- a representative from GE power. And the

24

1  questions regarding sort of implementation issues that
2  had been encountered by GE power. There were a number
3  of others that I recall.
4      Q.  Do you cite that Morgan Stanley conference in
5  your report?
6      A.  I believe I do.
7      Q.  And what was the date of that Morgan Stanley
8  conference?
9      MR. FRIEDMAN: Can we mark it and start
10 looking at it?
11     MS. WINKLER: There is no reason. I'm just
12 asking if he recalls.
13     THE WITNESS: You know, there is over 30 pages
14 of references in Exhibit 6, so as I sit here, I don't
15 recall the specific date. I could look at the document
16 and refresh my memory.
17     MS. WINKLER: Q. Is it fair that the majority
18 of those references are pre Class Period?
19     A.  The majority of the --
20     Q.  The reference in the 30 pages are pre Class
21 Period?
22     MR. FRIEDMAN: If you want to flip through it,
23 go right ahead.
24     THE WITNESS: You know, I know that the number
25 of them are pre Class Period, but there are certainly a

James, Christopher  7/17/2007  9:05:00 AM

25

1  number of reports that are with -- during the Class
2  Period, and I believe there's some that are subsequent
3  to the Class Period.
4      But I haven't counted up, nor would I think
5  there would be any reason to, to sort of determine
6  whether it is 30 or 40 percent or 50 percent.
7      MS. WINKLER: Q. Did you find any reference
8  to implementation problems or bugs relating to Suite 11i
9  analysts' reports in January of 2001?
10     A. Yes.
11     Q. And what were those?
12     A. I think, as it indicates here, let's just go
13  to it --
14     MS. WINKLER: Why don't we go ahead and mark
15  your -- I'm going to go ahead and mark your reports.
16     THE WITNESS: Sure.
17     MS. WINKLER: Q. Mr. James, you're looking at
18  a couple things you have in front of you. What are
19  those documents?
20     A. These are -- I anticipated you asking me a
21  question about my report, and these are bound copies of
22  both the original report and the rebuttal report with
23  tabs that make identifying the exhibits a little easier.
24     Q. And other than tabs, are those clean copies of
25  your reports?

26

1      A. I believe so. I don't -- I didn't mark in
2  them, and I don't see any markings in them.
3      MS. WINKLER: I'm going to have the court
4  reporter mark as Exhibits 1 and 2 your opening report
5  and your rebuttal report.
6      MR. FRIEDMAN: I would like him to use the
7  official ones, so if that's going to be the ones --
8      THE WITNESS: I'm happy to donate these to
9  you, if you'd like.
10     MS. WINKLER: I will mark the copies. If you
11  want to look at the copies, that's fine.
12         (Exhibit 1 marked for
13          identification.)
14         (Exhibit 2 marked for
15          identification.)
16     THE WITNESS: So is there a question pending?
17     MS. WINKLER: I'm trying to look back and see.
18     Q. I was asking you about reference to any
19  implementation problems or bugs relating to Suite 11i in
20  analyst reports in January 2001. Did you see any of
21  those?
22     A. There is a number of analysts' reports as it
23  pertains to 11i in January, beginning with January 1 and
24  going through -- the last one that I reference is
25  January the 25th.

27

1      Q. And are you looking at one of the exhibits to
2  your report?
3      A. Yes. As I indicated in response to the
4  question you gave me just a moment ago, Exhibit 6 of my
5  report, which is --
6      Q. That's your opening report?
7      A. It is entitled my expert report.
8      Q. Okay.
9      A. And has been labeled Exhibit 1. Has roughly
10  around 30 pages of quotes from analysts, public press
11  and industry sources.
12     Q. And I think you've just told me that you --
13  your report includes reference to analyst reports
14  ranging from -- in January 2001, ranging from
15  January 1st to January 25th?
16     A. Right.
17     Q. My question was did you encounter any reports
18  referencing problems or bugs with Suite 11i?
19     A. Yeah. I mean, for example, January 17th, I
20  think this is in reference to -- it is around this time
21  that release 3 is out. There is an Interactive Week
22  from ZDWire, "The features are aimed at presenting large
23  companies with fully integrated offerings that can be
24  expanded as they move more of their operations online.
25  The focus on integration is also seen as a step by

28

1  Oracle to stem some of the criticism it has faced over
2  lack of features and functionality in an e-procurement
3  offering as compared to the platform of chief rival
4  Ariba. Oracle's latest product release is clearly aimed
5  at showing it can play the integration game as better
6  than its competitors."
7      Q. Do you view that as referencing implementation
8  problems or bugs with Suite 11i?
9      A. I think it is certainly getting at one of the
10  issues I think, which was the degree -- the comparison
11  between best-of-breed and Oracle and what the relative
12  advantages and disadvantages of best-of-breed versus a
13  suite approach is.
14     Q. And what specifically in that report
15  references implementation problems or bugs with Suite
16  11i?
17     A. Well, this is more to do with -- and I think
18  it is one of the implementation issues that some people
19  addressed, and Ellison addressed this in some of his
20  comments, was the -- not so much -- the question of
21  integration had to do in part with certain gaps within
22  the software in terms of -- and by gaps, I mean certain
23  functionality that when compared to best-in-breed may
24  not be as fully -- what's the right word -- that the
25  product attributes with respect to the suite may not

James, Christopher  7/17/2007  9:05:00 AM

29

1  stack up as well as the product attributes as it
2  pertains to best-of-breed in a particular operating
3  module.
4      Q.  Can you just point me to where you see that in
5  this report?
6      A.  Well, "The focus on integration is also seen
7  as a step by Oracle to stem some of the criticism it has
8  faced over the lack of features and functionality in its
9  e-procurement offering as compared to platform chief
10  rival Ariba and Commerce One."
11      Q.  That sentence you just read me does not
12  reference Suite 11i; does it?
13      A.  Well, I have to look at the whole article.
14  But it says fully integrated offerings that can be
15  expanded as they move more of their operations online,
16  that would be a statement as it pertains to a suite
17  approach.  And the Oracle Applications at this point in
18  time are a suite-based application.  So I don't see in
19  this specific quote a reference to specifically 11i, but
20  clearly the product that is being referenced here is
21  Oracle's product, and its product in the applications
22  area at this point in time is 11i.
23      Q.  Now you switched sentences.  The sentence you
24  initially read me, and about which I asked you whether
25  there was any reference to Suite 11i, was the second

30

1  sentence appearing on page 18 of 30.  In that second
2  sentence there is no reference to Suite 11i; is there?
3      A.  Second sentence?
4      Q.  The sentence beginning with "The focus on
5  integration."
6      A.  Okay.  So you're looking at the second
7  sentence in the quote that I was looking at, not the
8  second sentence on page 18?
9      Q.  That's correct.  The sentence that you had
10  previously read aloud to me in response to my question?
11      A.  And your question is again?
12      Q.  Is there any reference to Suite 11i in that
13  sentence?
14      MR. FRIEDMAN:  Explicitly?
15      THE WITNESS:  Again, I would say that
16  procurement offering, and you're talking about
17  integration and a comparison to its chief rivals, Ariba
18  and Commerce One, their best-of-breed at this point in
19  time, in its application-related offerings, are in the
20  context of 11i.
21      MS. WINKLER:  Q.  And is there a criticism
22  here of Suite 11i, or is there a criticism simply of the
23  e-procurement offering?
24      A.  I'm not sure I understand.  If there is a
25  criticism over lack of features and functionality within

31

1  a particular module of 11i, that would -- I would view
2  that as a potential criticism of an aspect of 11i.
3      Q.  In any other of the reports that you reference
4  from January of 2001, do you find any reference to
5  implementation problems or bugs relating to Suite 11i?
6      A.  Let me take a look.  There is discussion about
7  the product attributes.  I don't see in any of the other
8  reports that I cite to, with respect to the cites,
9  criticisms of 11i.
10      I mean -- I guess the ones that are bracketing
11  January, there's obviously a comment in -- by AMR in
12  December the 26th about they brought the product to the
13  market too soon, they have significant quality issues.
14      Q.  I'm just focusing on January.
15      A.  January; okay.  I'd have to review these
16  articles in their entirety.  My skimming of them as it
17  pertains here is a description of the product quality.
18  I don't see anything that is, other than what I mention,
19  specific criticisms as it pertains to, as you refer to,
20  quality issues.
21      Q.  Is it reasonable to conclude that the absence
22  of such commentary was attributable to the fact that
23  analysts believed the problems, the quality of problems
24  with Suite 11i had been resolved in the new releases?
25      MR. FRIEDMAN:  Objection; vague.

32

1      THE WITNESS:  First, with respect to the lack
2  of any reference other than the one we just talked about
3  with respect to the quotes from these articles, I would
4  have to go back to the articles before -- and review
5  them in their entirety before I would agree with that
6  characterization.
7      But then if you look -- for example, you
8  wanted me to look specifically at January, if we go into
9  February, you will see commentary by analysts regarding
10  the functionality, and product quality issues in
11  January -- in February, which would indicate to me that
12  certainly they believed that the version 3 is now
13  generally available and it's an improvement over the
14  prior versions, which is kind of what I would expect
15  from a new version of a software program.
16      But it doesn't indicate -- I don't think these
17  commentaries indicate to me that the 11i.3 has no
18  residual product quality issues, nor would I expect
19  there to be an absence of product quality issues.
20      MS. WINKLER:  Q.  Who selected --
21      A.  Just again, because it's a new software
22  program that's being implemented by -- I think there
23  were over -- at this point in time, roughly 1,500
24  customers implementing the program at the time.
25      Q.  Who selected the quotes that appear in your

33

1    Exhibit 6?
2        A.  I did.
3        Q.  What is your understanding of plaintiffs'
4    allegations relating to the second quarter fiscal 2001
5    results?
6        A.  Again, as I indicated to you, my understanding
7    is their contention that -- in the complaint it focuses
8    on the unapplied cash and certain accounting entries
9    that occurred around November 17th with respect to the
10   unapplied cash accounts and the -- and particularly
11   those unapplied cash accounts with the on-account flag
12   associated with them.
13       And the original allegation I believe was that
14   the effect of basically I believe it was simultaneously
15   debiting or crediting those accounts was to affect
16   revenues by I think it was $238 million.
17       Q.  Does it matter to you whether Oracle should
18   have reported earnings of 10 cents per share rather than
19   11 cents per share for the second fiscal quarter of
20   2001?
21       A.  Does it matter to me?
22       Q.  Does it matter to your opinion?
23       A.  It matters to my opinion in the sense that I
24   have considered the plaintiffs' allegations as it
25   pertains to the 10 cents versus 11 cents.

34

1        Now you're moving off the complaint; right?
2    Because the complaint contends that the reported number
3    should have been eight and a half -- 8.5 cents or 8.3
4    cents.
5        Q.  I can repeat my question for you.  Does it
6    matter to you or your opinion whether Oracle should have
7    reported earnings of 10 cents per share rather than 11
8    cents per share?
9        A.  Again, I think it is something that I
10   considered in forming my opinion.  I mean, if you're
11   asking -- I see nothing that indicates to me that the
12   miss, for example, on March -- that was announced on
13   March 1st is linked to any of the allegations as it
14   pertains to the Q2 accounting issues.
15       So, for my opinion as it pertains to the
16   causal connection between the price change and the
17   earnings miss, I don't see that if they should have
18   reported 10 versus 11 cents, that that impacts that
19   decision in any way.
20       Q.  So you're saying that the fact that Oracle
21   reported more earnings than it should have for the
22   second fiscal quarter of 2001 doesn't have any impact on
23   your opinion in your report?
24       MR. FRIEDMAN:  Objection to form.
25   Mischaracterizes his testimony.

35

1        THE WITNESS:  That's not what I indicated.
2    You asked:  Does it matter whether Oracle should have
3    reported 10 cents versus 11 cents to your opinion.
4        And I was giving you the response to that, it
5    pertains to my opinion regarding the loss causation.
6    There is no causal link between the 2Q earnings, as I
7    see it, and any curative disclosure as it pertains to
8    3/1.
9        So, while I haven't seen any indication that
10   they should have reported the earnings number as alleged
11   in the complaint or some other earnings number, I also
12   don't see that that's linked in any way to the
13   disclosure that was made.
14       There was no disclosure on 3/1 regarding
15   issues as it pertains to unapplied cash.
16       MS. WINKLER:  Q.  So it doesn't matter to your
17   opinion regarding loss causation?
18       A.  Well, in the context I just answered the
19   question, I think that I've indicated to you with
20   respect to that specific aspect of my opinion, I don't
21   think it does matter.
22       Q.  Does it matter to any other aspects of your
23   opinion?
24       MR. FRIEDMAN:  Objection; form, vague.
25       THE WITNESS:  I don't think it matters as to

36

1    the materiality issue.  So I don't -- I don't see
2    that -- whether there was 10 cents or 11 cents is sort
3    of a fundamental component of the opinions that I'm
4    rendering here.
5        MS. WINKLER:  Q.  So it doesn't matter to the
6    materiality aspect, doesn't matter to the loss causation
7    aspect, doesn't matter to any other aspect of your
8    opinion?
9        MR. FRIEDMAN:  Objection; mischaracterizes his
10   testimony.
11       THE WITNESS:  Other than what I've just
12   described, I don't have anything more to add.
13       MS. WINKLER:  Q.  Do you have an understanding
14   of what earnings investors expected Oracle to report in
15   the second fiscal quarter of 2001?
16       MR. FRIEDMAN:  Objection; vague.
17       THE WITNESS:  What earnings they expected?  I
18   think that there is -- I believe the guidance was at 10
19   cents.  So it would -- I can't answer that question
20   without more specificity.
21       MS. WINKLER:  Q.  Do you know --
22       A.  Certainly at the time that the guidance was
23   provided, 10 cents.  I saw investor -- analyst reports
24   that indicated I think as high as 12 cents and as low as
25   10 cents.  I believe the -- that's my recollection.

James, Christopher  7/17/2007  9:05:00 AM

37

1    Q.  Do you know the difference between
2  expectations and consensus estimates?
3    A.  Without more, no.  Consensus estimates are the
4  mean estimate from analysts.  And oftentimes people look
5  at the consensus estimate as being reflective of the
6  market's estimate.  Certainly there can be analysts that
7  vary from the consensus, and individual investors that
8  may vary from the consensus.
9    Q.  Do you know the term whisper number, referring
10  to -- strike that.
11       Do say you know the term whisper number?
12    A.  It is not one that gets a lot of academic
13  focus.  It is referred to typically as sort of a
14  suggested number that an analyst might reference prior
15  to an earnings release.  So, you know, you may have
16  somebody saying, you know, I think based on what I've
17  seen throughout the quarter that they may do 10 or 12
18  cents, or they may do 10 cents.
19    Q.  Do you know if there was a whisper number with
20  respect to Oracle's second quarter '01?
21    A.  I don't think that -- I think you need to be
22  careful when you're saying a whisper number or the
23  whisper number.  I don't know that there was a whisper
24  number or the whisper number.
25    Q.  Were there any whisper numbers?

38

1    A.  I certainly recall seeing analyst reports that
2  talk about where they think Oracle will come in on.
3  But -- I would have to go back and take a look at the
4  analyst reports in more detail to determine what the
5  distribution of expectations was prior to the earnings
6  announcement
7    Q.  Do you recall any specifics regarding what
8  analysts thought Oracle would come in on?
9    A.  Again, I -- my recollection is a distribution.
10  I think I recall seeing a 12 cent reference, I may have
11  seen a 10 cent reference.
12    Q.  Do you know that Oracle had a history of
13  beating the consensus estimates?
14    A.  I know that --
15      MR. FRIEDMAN:  Let me interpose an objection
16  as to vague.
17      THE WITNESS:  They had a history of beating
18  the consensus estimate?
19      MS. WINKLER:  Q.  Yes.
20    A.  I don't know that they had a history of
21  beating the consensus estimate.  I would have to go back
22  and look.  I mean, I think that, my recollection is that
23  there were occasions in which they beat their guidance
24  estimate.
25      I know that there was I think one occasion

39

1  that I can recall in which they met it.  I recall
2  seeing -- and so there was variability around that.  I
3  think they generally beat their guidance by varying
4  amounts, but not -- that was not always the case.
5    Q.  Would a history of generally beating guidance
6  impact investors' expectations?
7    A.  It would depend on the circumstances and what
8  was in the total mix of information at various points in
9  time.
10      So, for example, wouldn't surprise me to see a
11  company that, say, comes in with 3 or 4 cents better
12  than guidance, and that performance being viewed with
13  disappointment by investors.  It wouldn't also surprise
14  me to see sort of -- and that disappointment being
15  reflected in, say, a negative stock return on the day
16  that the earnings announcement is made, or finding a
17  similar price reaction or even a smaller price reaction
18  on days in which the company just meets expectations.
19      It would again depend on the mix of
20  information at the time, the economic conditions, and,
21  frankly, the nature of the earnings performance.
22    Q.  Looking specifically at Oracle, would Oracle's
23  history of generally beating guidance -- or did Oracle's
24  history of generally beating guidance impact investors'
25  expectations for the second quarter of 2001?

40

1      MR. FRIEDMAN:  Objection; vague.
2      THE WITNESS:  Their expectations regarding --
3  I think investors' expectations were formed by their
4  perceptions of how Oracle in the context of the economy
5  and its competition was doing.
6      I think that if you wanted to sort of look at
7  whether that -- a particular earnings number in the
8  context of what else is disclosed in the context of
9  disclosing that earnings number is significant to
10  investors, simply -- one thing you could look at is the
11  price reaction of the company's stock to that
12  announcement.
13      Can we take a short break?
14      MS. WINKLER:  Sure.
15      VIDEOGRAPHER:  Going off the record.  The time
16  is 10:01 a.m.
17      (Recess, 10:01 a.m. - 10:11 a.m.)
18      VIDEOGRAPHER:  We are back on the record.  The
19  time is 10:11 a.m.
20      MS. WINKLER:  Q.  Before we took a break, in
21  response to one of my questions regarding the January
22  2001 analyst reports, you indicated they had 1,500 live
23  customers at that time.  Do you recall that testimony?
24    A.  That's not what I said.
25      MR. FRIEDMAN:  Objection.

41

1            MS. WINKLER:  Q.  What was your testimony?
2       A.  As I indicated, I believe I said between the
3    fall of 2000 and May of 2001 they went from 45 to
4    somewhere other than 300 live.  I think that there was
5    reference -- I saw a reference to others in the
6    implementation process, and I think that's where the
7    thousand came from.
8       Q.  The 1,500 came from?
9       A.  I'm sorry, 1,500, yes.
10      Q.  What does it mean to be a live customer?
11      A.  My understanding of what it means to be a live
12   customer is to have the software up and running at a
13   point in time.
14      Q.  What do you mean when you say software up and
15   running?
16      A.  I'm not sure how to explain it any better.
17   Live meaning that you are utilizing the software and its
18   business applications.
19      Q.  Did Oracle consider someone to be live if they
20   had one module of Suite 11i up and running?
21      A.  I would have to go back and look.  Certainly
22   that is a possibility.
23      Q.  You don't have any understanding here?
24      A.  I don't think in terms of 11i, just to be
25   clear, I don't think that the reference to live

42

1    customers had to do with customers using every module
2    within 11i.
3       Q.  Did it have to do with customers using more
4    than one module of 11i or simply just one module?
5       A.  My understanding is that the approach was, and
6    what customers were doing, was adopting a particular
7    module or a group of modules over time, and that that
8    reference had to do with customers utilizing one or more
9    modules as it pertains to 11i.
10      Q.  So going back to my prior question, did Oracle
11   consider someone to be live if they were -- if they had
12   implemented and were running a single module of Suite
13   11i?
14          MR. FRIEDMAN:  Objection; asked and answered.
15          THE WITNESS:  I would have to go back and
16   look.  That may be the case.  I don't have that in my
17   head right now.
18          MS. WINKLER:  Q.  Did you see a reference to
19   that in any of the other expert reports you read?
20      A.  Yes.  I recall seeing that.  What I recall
21   most clearly is the discussion both with analysts in the
22   context of conference calls and in certain analyst
23   reports as it pertains to discussions with customers
24   that -- you know, it was not a situation in which the
25   expectation was, is that customers would, or were they

43

1    buying all or most of the modules in ERP and CRM and
2    going live with those, that it was an incremental
3    process of adding modules over time.
4       Q.  Did you see any analyst reports explaining
5    what it meant to be a live customer on Suite 11i?
6       A.  I would have to go back and look.  I don't
7    recall sort of looking at the analyst reports with that
8    terminology in mind.
9       Q.  Do you reference any of those in your report?
10          MR. FRIEDMAN:  Objection; vague.
11          THE WITNESS:  I'm sure I reference some of the
12   analyst reports that talk about live customers.  I know
13   that in the -- and I know that in the conference calls
14   there's discussions of live customers.
15          MS. WINKLER:  Q.  Do you reference any analyst
16   reports that discuss what it means to be a live customer
17   on Suite 11i?
18      A.  I would have to go back --
19          MR. FRIEDMAN:  Objection; asked and answered.
20          THE WITNESS:  -- and review the analyst
21   reports with an eye towards identifying that specific
22   term.
23          MS. WINKLER:  Q.  Has someone explained to you
24   what it means to be a live customer on Suite 11i?
25      A.  Have I sat down with somebody and talked about

44

1    what it means to be live?  No.
2          But, I mean, I've certainly seen reference to
3    that in the materials that I reviewed, and it was my
4    general knowledge of what it means to be live.
5       Q.  So how did you gain your understanding of what
6    it means to be a live customer on Suite 11i?
7       A.  Both by reviewing this and by -- in the
8    context of my normal business relations.
9       Q.  But you can't tell me whether or not Oracle --
10   when Oracle said someone was live on 11i, that meant
11   simply be live on one module or being live on more than
12   one module?
13          MR. FRIEDMAN:  Objection; asked and answered.
14          THE WITNESS:  I can go back and review the
15   documents with an eye towards that.  I have given you
16   what my understanding of what live means, okay.  And
17   again, I can go back and review the documents with an
18   eye towards trying to ascertain in the context of that
19   term what the individual writer means by that.
20          MS. WINKLER:  Q.  But as you sit here today,
21   you can't answer that question.
22      A.  I think I have answered the question.  I have
23   answered the question both in terms of what my
24   understanding of live is and --
25      Q.  Let me pose it one more time then.

45

1      A.   You need to let me finish answering the
2   question before you interrupt me.
3           You've asked me a specific question about what
4   Oracle meant when it said a customer was live, okay.
5           And I don't really recall a specific reference
6   to Oracle defining that term.  But I could go back and
7   look.
8      Q.   So you don't know, yes or no, when Oracle said
9   we have 300 live customers, if those customers may have
10  simply been running one module of Suite 11i?
11      MR. FRIEDMAN:   Asked and answered.
12      THE WITNESS:   I think I have answered that
13  question.  I've indicated to you that that certainly is
14  a possibility, given, as Oracle described both in
15  analyst conference calls and in the context of
16  presentations at AppsWorld and others that they viewed
17  the implementation of Suite 11i as one that was
18  incremental in nature, that you would -- and one of the
19  virtues of 11i was the ability to add modules in an
20  incremental fashion.
21      MS. WINKLER:   Q.   Did you do any analysis to
22  determine what effect Oracle's stock price -- what
23  effect on Oracle's stock price -- what the effect on
24  Oracle's -- strike that.  Let me start over.
25          Did you do any analysis to determine what the

46

1   effect on Oracle's stock price would have been had
2   Oracle reported earnings of only 10 cents per share on
3   December 14th, 2000?
4      A.   Had they -- what impact it would have had on
5   their stock price?  So the hypothesis is that instead of
6   reporting 11 cents, it would have reported 10 cents,
7   what impact it would be?
8           It would depend on the context in which they
9   reported 10 cents.  It certainly -- based on my review
10  of the price reaction to their various earnings
11  announcements, 10 cents would be consistent with no
12  significant stock price reaction, or a similar stock
13  price reaction to what was observed on that day.
14      MS. WINKLER:   I'm going to move to strike that
15  answer.
16      Q.   My question was, did you do any analysis?
17      A.   I just described the analysis to you.
18      Q.   You did you do that in creating your opening
19  report in this matter?
20      A.   Sure.  As I indicated in my report, I examined
21  the price reaction on -- associated with the 12/14
22  announcement.
23      Q.   Show me in your report where -- show me in
24  your report where there's an analysis of what effect on
25  Oracle's stock -- what the effect on Oracle's stock

47

1   price would have been had Oracle reported only 10 cents
2   on December 14th, 2000.
3      A.   I think if you look at footnote 174 there is a
4   discussion here of what impact it would have on the
5   reported earnings, and that the reported earnings -- the
6   effect of a $20 million transfer was being determined
7   improper, that it would have an effect of .0022 or .22
8   cents, that analysts are looking at finer granularity --
9   with finer granularity than whether it's 11 cents or 10
10  cents, okay.  And this really goes to the issue of
11  would, in my opinion, a .22 cent change in the earnings
12  be viewed as material to investors?  Probably not.
13      Q.   What analysis did you perform other than what
14  you state here in footnote 174?
15      A.   Well, I state this, I looked at the price
16  reaction.  I think subsequent to writing this report and
17  really in response to some issues raised by
18  Mr. Steinholt in looking at, say, the Q1 analysis --
19  announcement, I looked back at prior earnings
20  announcements to determine whether there was any sort of
21  identifiable pattern in the price reaction to earnings,
22  being meeting earnings or beating earnings by 1, 2, 3 or
23  4 cents.
24      Q.   You said you looked at the price reaction.
25  What price reaction did you look at?

48

1      A.   I looked at the price reaction on the day the
2   information would have been available to the market
3   participants.
4      Q.   You looked at the hypothetical price reaction
5   if Oracle had --
6      A.   No.  I looked at the actual price reaction
7   associated with various earnings announcements with an
8   eye towards asking -- testing a particular hypothesis,
9   which was, if it is hypothesized that Oracle would
10  report .22 cents less in earnings, would that lead me to
11  conclude with any degree of certainty that the price
12  reaction would be any different than what we observed on
13  the earnings announcement date, or 12/15, when the
14  information was in the market.
15          And my conclusion was based on the historical
16  relationship between earnings releases and price
17  reactions, there was no reason to believe that that
18  price -- that difference in earnings would have been
19  viewed as material to investors.
20      Q.   Which specific earnings --
21      A.   Particularly if you sort of take it in the
22  context of why that earnings change in the hypothetical
23  would have occurred.
24      Q.   Which specific earnings announcements did you
25  look at?

James, Christopher  7/17/2007  9:05:00 AM

49

1     A.  I believe I went back all the way to 1998.
2     Q.  And what was the -- strike that.
3         How many times in which quarters back to 1998
4   did Oracle report earnings less than their guidance?
5     A.  I don't believe that they ever reported
6   earnings less than their guidance.  Now, you recall that
7   the earnings guidance for Q2 was 10 cents.
8     Q.  Are you aware of commentators who believed
9   that even a slight miss by Oracle for its second quarter
10  fiscal 2000 numbers would have caused the stock to
11  decline back to the low to mid 20s?
12    A.  I don't recall a specific commentary.  I would
13  have to look at it.
14    MS. WINKLER:  Have this document marked as
15  Exhibit 3.
16        (Exhibit 3 marked for
17         identification.)
18    MS. WINKLER:  Q.  For the record, this
19  document is Bates labeled NDCA-ORCL 360337 through 41.
20    A.  So you've handed me a document that's --
21    Q.  Have you seen this document before?
22    A.  I may have.  I just -- it would be maybe in
23  some of the press releases.  Remember, there were over
24  3,000 press releases during the Class Period, and
25  commentary.

50

1     Q.  But you're not sure whether you've seen this
2   before?
3     A.  I wish I could say that I could remember -- my
4   memory was as good as to remember each of more than, if
5   you take some of the pre class stuff, more than 3,000.
6   But, I'm sorry, I don't recall specifically.
7     Q.  I want to direct your attention to the bottom
8   of the first page where after "Walberg: CMGI," about
9   the third sentence, the documents states, "As far as
10  Oracle is concerned, Larry Ellison has been basically on
11  the airwaves saying that they are going to meet their
12  numbers.  They are going to show very strong growth.  So
13  that puts a lot of pressure on the company.  If they
14  were to in any way disappoint the street at this point,
15  that stock which had a nice recovery bounce could be
16  back trading into the mid to low 20s within the next
17  week, week and a half."
18        Do you see that?
19    A.  Yes.
20    Q.  Do you recall reading such commentary before?
21    A.  I don't recall seeing that.  But it certainly
22  is not inconsistent with the opinion that I just gave
23  you a moment ago, that it puts a lot of pressure on the
24  company to meet their number.  My understanding is that
25  if they had come in at 10 cents or actually more than 10

51

1   cents, that they would be meeting their number.
2     Q.  So you don't disagree with this statement at
3   the bottom of what's numbered at page 43 that I just
4   read to you?
5     MR. FRIEDMAN:  Objection; vague.  Which part?
6     THE WITNESS:  Well, I think it's -- I mean
7   it's -- it's not -- there's not a great deal of
8   specificity here.  If they were in any way to disappoint
9   the street at this point, the stock which has had a nice
10  recovery could trade back into the mid to low 20s within
11  the next week, week and a half.  Now, this is an opinion
12  of one individual, Mr. Walberg.  And I think that you
13  need to look at this in the context of the mix of
14  information that's available at this time.
15        I think that the market was expecting strong
16  growth and Oracle delivered strong growth.  And it is
17  not -- in the context of had they come in at, say, 10
18  cents would that still constitute strong growth?  Yes, I
19  think it would have constituted strong growth, as I
20  understand the context.
21    MS. WINKLER:  Q.  Going back to my question,
22  my question was, do you disagree with this statement?
23    MR. FRIEDMAN:  Same objections and asked and
24  answered.
25    THE WITNESS:  I think I just described my --

52

1   the context in which I was basically saying that it's
2   certainly consistent with my view and not inconsistent
3   with the company coming in at 10 cents.
4     MS. WINKLER:  Q.  Traditionally wasn't it true
5   that the third quarter came in 1 cent higher than the
6   second quarter for Oracle?
7     A.  I have heard commentary on that.  That's
8   certainly not how Oracle, it is my understanding, of how
9   they went about determining what their earnings would
10  be.  But I think traditionally the third quarter was
11  viewed as stronger than the second quarter.
12    Q.  You told me that you looked at the numbers
13  back to 1998.  Did you see a pattern there, did the
14  third quarter come in 1 cent stronger than the second
15  quarter with respect to the numbers you looked at?
16    A.  I would have to go back and review that.  I
17  don't recall.  I do recall looking at the question of
18  whether 10 cents or 11 cents would be out of trend with
19  respect to prior quarters, and didn't see any indication
20  that 10 cents would have been, say, out of trend with
21  respect to prior quarters.
22    Q.  Is there anything in your report about your
23  analysis of the numbers back to 1998?
24    A.  No.  This was done really in response to what
25  wasn't in any of Mr. Steinholt's reports, which was

53

1  going back to earlier quarters to draw some inference
2  regarding how to interpret, in his case, the
3  announcement on 3/1.
4  Q.  You're saying this was done in response to
5  something Mr. Steinholt did or --
6  MR. FRIEDMAN:  Objection; mischaracterizes.
7  THE WITNESS:  Well, he indicated -- neither in
8  his original report or his rebuttal report is there any
9  analysis of, let's say, Q1.  Yet he discusses that in
10  his deposition.
11  I think in response to that being raised, I
12  looked at both that announcement, as well as prior
13  announcements, to get some sense of -- I mean, I had a
14  general familiarity with this from looking at the 10-Ks
15  which they had done over time, but I hadn't really
16  specified -- gone specifically to trying to look at in
17  the context of, you know, an earnings release what the
18  price reaction was, other than during -- at the
19  beginning of the quarter and the end of the quarter as
20  it pertains to the Class Period.
21  MS. WINKLER:  Q.  So you looked at the numbers
22  going back to 1998 in response to something that
23  Mr. Steinholt said during his deposition.
24  A.  Right.
25  Q.  And you hadn't done that prior to reading

54

1  Mr. Steinholt's deposition or listening to
2  Mr. Steinholt's deposition?
3  A.  No.  I don't recall seeing in his analysis any
4  reference to prior quarters.  By prior quarters, I mean
5  quarters prior to the Class Period.
6  Q.  Do you understand plaintiffs' allegations
7  relating to Oracle's false statements that its results
8  would not be negatively impacted by the slowing economy?
9  A.  Do I understand -- could you restate the
10  question?
11  MS. WINKLER:  Sure.  Could you read the
12  question back for me, please.
13  (Record read as follows:  QUESTION:  Do you
14  understand plaintiffs' allegations relating to
15  Oracle's false statements that its results
16  would not be negatively impacted by the slowing
17  economy?)
18  MR. FRIEDMAN:  Objection; vague.
19  You're asking him to describe plaintiffs'
20  allegations?
21  THE WITNESS:  I'm having trouble with the
22  question.  And the reason I'm having trouble with the
23  question is that while I'm familiar with the
24  allegations, you didn't preface it by allegations.
25  My understanding is, as indicated in my

55

1  report, that Oracle did indicate that were there to be a
2  significant downturn in economic activity it would be
3  impacted, as is clearly indicated in their 10-K.
4  MS. WINKLER:  Q.  You said you were familiar
5  with plaintiffs' allegations.
6  What's your familiarity with plaintiffs'
7  allegations?
8  A.  My familiarity is taken from reading their
9  reports and looking at the complaint.
10  Q.  And what's your understanding from doing that?
11  A.  Plaintiffs allege that Oracle had knowledge
12  that it was going to be adversely impacted by the
13  economy, and either knowingly or recklessly provided a
14  forecast that didn't fully reflect that.  That's my
15  understanding of their allegation.
16  Q.  Do you have any understanding that Oracle made
17  statements that it would not be impacted by the slowing
18  economy?
19  A.  Well, no.  I see -- I saw statements from
20  Oracle indicating that they didn't see an impact of the
21  slowing economy, but that they indicated that were the
22  economy to take a -- deteriorate significantly, which is
23  my understanding it did in the latter part of February
24  and into March and April, that would impact its
25  business.  And it cautioned investors to be aware of

56

1  that risk.  And that certainly was in the total mix of
2  information during the Class Period.
3  Q.  You said it was your understanding that the
4  economy deteriorated significantly in the latter part of
5  February.  What do you base that understanding on?
6  A.  Well, a couple of things.  And I think you
7  want to be very careful here.  By the economy I meant
8  the economy as it impacts enterprise software.  You
9  first -- if you look at what analysts' commentary
10  concerning what caused the miss in -- that was announced
11  on 3/1, they indicate a decision at the C level, CIO
12  level and the CEO level, to not go forward with deals
13  that were in the pipeline.  And that was attributed to
14  concerns by CIOs and CEOs regarding the economic
15  activity at the time.
16  Consistent with that view were analysts'
17  channel checks subsequent to March, indicating that --
18  you know, when they check with the customers and there's
19  this ongoing relationship between analysts who are
20  covering a company or the enterprise software and the
21  customers of those businesses, they indicated that, in
22  fact, that's what was occurring.
23  I think you also look at, as I indicate in my
24  report, you know, what happened to the competitors of
25  Oracle from selling enterprise software, okay, both in

57

1  terms of how the market reacts to Oracle's miss and the
2  implications for its competitors, as well as how they
3  subsequently perform, okay, relative to prior
4  expectations, expectations formed in December and
5  January of 2001.
6      Q.  Let's look at what you did in your report with
7  respect to Oracle's competitors.  I think that's
8  Exhibit 8 of your opening report; is that fair?
9      A.  Well, no.  I think there's a discussion that
10  is broader than Exhibit 8 in my report, but certainly
11  Exhibit 8 is one of the things that touches on how
12  competitors were impacted during this period of February
13  through June of '01.
14      Q.  Looking at Exhibit 8, Microsoft is one of your
15  peer group companies for Oracle; is that correct?
16      A.  That's correct.
17      Q.  Are you aware that Microsoft lowered guidance
18  as a result of the economic slowdown on December 14th of
19  2000?
20      A.  I am aware of -- I'm aware they lowered
21  guidance, and at the time they lowered guidance, they
22  indicated I think it was a 20, 27 percent increase in
23  their enterprise software business.  So they lowered
24  guidance that really had to do with a different sector,
25  the PC sector, and the PC software sector, not as it

58

1  pertains to enterprise software.
2      Q.  What's your understanding of Microsoft's
3  enterprise software business?
4      A.  In terms of what?
5      Q.  What products do they offer?
6      A.  They offer server-related products, primarily
7  SQL-oriented products.  Their server-based business
8  during this period of time was actually improving and
9  beating expectations relative to its PC software
10  business.
11      Q.  Did they offer any product comparable to Suite
12  11i?
13      A.  I don't think that -- you mean comparable in
14  the sense that -- I mean, they were not offering in the
15  enterprise area a fully integrated suite type of
16  product.  They were offering that sort of an integrated
17  product in the PC market, but not in the -- they were
18  principally in the database market segment, but not in
19  the -- they weren't offering an 11i type of product.
20      Q.  So why was it important to you that
21  Microsoft -- you said a part of Microsoft's enterprise
22  software business.  Why do you say that?
23      A.  Well, because, we're really concerned how the
24  economy was impacting the segments of the market in
25  which Oracle operated.  So, for example, you have -- I

59

1  think in November and December, either November or
2  December you have a survey by Morgan Stanley of
3  executives, CIOs, in terms of where they see IT
4  spending, okay.
5          And one of the things you see in that survey
6  is that database and enterprise are at the top of their
7  list of enterprise -- in terms of technology spending.
8  And at the bottom of their list is sort of hardware
9  infrastructure.  People are indicating that IT spending
10  was slowing relative to IT spending that had occurred,
11  say, in the prior year.
12          The key question as it pertains to Oracle in
13  its competitor group was how would that impact of a
14  slowdown in IT spending impact their segment of the
15  market.
16          And I think when you point to Microsoft and
17  say they missed, so that must imply something about the
18  softness of the market in which Oracle operates, I said,
19  no, you really need to look more closely at Microsoft
20  and why it revised its guidance downward to understand
21  whether that would be interpreted as something that
22  would put Oracle or other competitors on notice with
23  respect to their market segment.
24      Q.  Was Microsoft competing for the same customers
25  that Oracle was with respect to Suite 11i?

60

1      A.  Well, again, my recollection is, is that with
2  respect to Microsoft's enterprise products, it is
3  principally in the small to medium, and that is where,
4  at least initially, Oracle was focusing its attention.
5  So Microsoft was identified as a competitor to Oracle in
6  a certain segment of the market.
7      Q.  So the fact that Microsoft lowered their
8  guidance doesn't have any effect at all on your opinion
9  with respect to Oracle and whether they should have --
10      A.  No.  It is something I considered, and to try
11  to understand why they lowered their guidance and what
12  inference one might draw from that particular
13  observation.
14          Certainly in the context of -- you know, if
15  you look at Exhibit 8, you see Microsoft lowering its
16  guidance on 12/15.  In the context of what's going on
17  with the other firms in the enterprise who are more
18  focused on enterprise software -- I mean, you see all
19  the green, Ariba, IBM, I2, Commerce One, Siebel and
20  PeopleSoft.
21      Q.  Does the experience by Microsoft provide any
22  evidence to support your opinion that Oracle's earning
23  miss was the result of a sudden and sharp economic
24  slowdown in the enterprise software industry?
25      A.  I think it is consistent with that.

James, Christopher  7/17/2007  9:05:00 AM

61

1  Particularly given the fact that the Microsoft -- how
2  the various segments of the Microsoft business were
3  performing relative to the business segments that Oracle
4  was in.
5      Q.  Where do you see the consistency?
6      A.  I think I just answered that.  If you look at
7  sort of how -- commentary on the Microsoft miss and
8  where it was observing softness in its business, it was
9  not in the market segments that would be sort of
10 associated with Oracle.  It was more in the PC-oriented
11 business.
12     Q.  Which of the peer group companies listed near
13 Exhibit 8 do you consider to be enterprise software
14 companies?
15     MR. FRIEDMAN:  Objection; vague.
16     THE WITNESS:  I think all of these companies
17 listed are companies that are identified by analysts as
18 being peers or competitors to Oracle.
19     Now, the extent to which their businesses
20 overlap the enterprise business of Oracle is going to
21 vary, right.  So you're going to have Microsoft, which
22 has a strong PC presence, you have IBM, whose overlap
23 with Oracle was principally in the database and systems
24 integration area.  But obviously IBM has other business
25 segments.  Then you have what I'll refer to as

62

1  principally best-of-breed players that are in various
2  aspects of enterprise software, be it CRM, CSM or ERP.
3      MS. WINKLER:  Q.  So do you consider IBM to be
4  an enterprise software company?
5      MR. FRIEDMAN:  Objection; asked and answered.
6      THE WITNESS:  Again, I think I just answered
7  that, that certain aspects of its business are in the
8  enterprise software.
9      MS. WINKLER:  Which aspects of its business?
10     MR. FRIEDMAN:  Objection; asked and answered.
11     THE WITNESS:  I just answered that.  It's in
12 the database -- it's viewed as a major competitor to
13 Oracle in the database.  It certainly is involved in
14 systems integration business through its consulting
15 activities.
16     MS. WINKLER:  Q.  Did IBM offer a product that
17 competed at all or in part with Suite 11i?
18     A.  I don't believe so.  But I would have to go
19 back and look.
20     Q.  Did Siebel miss its earning --
21     A.  Actually, I would say, yes, they did, to be
22 more precise.  Because, again, one of -- IBM was one of
23 the major systems integrators at that point in time, and
24 so it would be competing directly with Oracle in the
25 context of 11i.

63

1      Q.  As a systems integrator?
2      A.  Yeah, in that aspect of the business.
3      Q.  Siebel missed its earning estimates for first
4  quarter of 2001; didn't it?
5      A.  For first quarter 2001?  No, they met; right?
6      Q.  Is it your understanding that they met?
7      A.  My understanding is they met.  And, remember,
8  they met as of -- so we're looking at -- this is an
9  analysis that looks at consensus estimates at a
10 particular point in time relative to actuals, okay.  So
11 my understanding is they met -- met their consensus
12 estimate for two months before the quarter end.
13     Now, it is indicated here, I think it is
14 correct to indicate that Siebel did miss their Q2.
15     Q.  Did PeopleSoft miss its earnings estimate for
16 1Q '01?
17     A.  No, it didn't.  PeopleSoft was one of the few
18 firms that beat.  But remember, PeopleSoft was coming
19 off of just a horrendous year in 2000.  So -- but it is
20 one that it beat expectations.
21     Q.  How about 2Q '01?
22     A.  PeopleSoft beat again, yeah.  I think prior to
23 that, those two -- prior to Q3 2000, I think there were
24 four or five misses of PeopleSoft in the 2000 period.
25 And I think that had an impact on sort of the degree to

64

1  which expectations were formed on PeopleSoft.
2      Q.  Does the experience by Siebel during 1Q '01
3  support your opinion that Oracle's miss was a result of
4  a sudden and sharp economic slowdown in the enterprise
5  software industry?
6      MR. FRIEDMAN:  Objection; vague.
7      THE WITNESS:  Is it consistent?
8      MS. WINKLER:  Q.  Does it support your opinion
9  that Oracle's earning miss was the result of a sudden
10 and sharp economic slowdown in the enterprise software
11 industry?
12     A.  I think it is.  I think it is important -- we
13 could go back to the Siebel analyst reports, and my
14 recollection is there is discussion in the Siebel
15 analyst reports about the impact of a slowing economy on
16 Siebel's business.
17     But I don't think that I would look at
18 Exhibit 8 and go -- by individual firms, look at a
19 specific firm and say whether it met, beat or missed is
20 a test of whether there was a sudden economic downturn
21 that adversely affected business.
22     What I would look for is what's happening
23 within the industry.  And to form an opinion of what's
24 happening in the industry, I think you have to look at
25 that in the context of how firms in the industry

65

1   generally are doing relative to how they have done in
2   the past.
3       Q.  So Siebel's experience during the first
4   quarter of 2001 doesn't support your opinion that
5   Oracle's earning miss was --
6       MR. FRIEDMAN:  Objection; mischaracterizes --
7       MS. WINKLER:  Could I finish my question,
8   please?
9       MR. FRIEDMAN:  I'm sorry.
10      MS. WINKLER:  Q.  So Siebel's experience
11  during the first quarter of 2001 doesn't support your
12  opinion that Oracle's earnings miss was the result of a
13  sudden and sharp economic slowdown in the enterprise
14  software industry?
15      MR. FRIEDMAN:  Objection; mischaracterizes
16  testimony, asked and answered.
17      THE WITNESS:  I think the evidence I've
18  provided in Exhibit 8 and the cite to Siebel is
19  consistent with my view.  And I'm not sure how I could
20  expand on the answer that I gave you just a moment ago.
21      MS. WINKLER:  Q.  How is it consistent with
22  your view?
23      A.  Again, I'm going to refer you back to the
24  testimony that I just gave, is that you look at -- I
25  recall looking at the analyst reports with respect to

66

1   Siebel that discuss the potential slowing economy and
2   its impact.  But I think the point of Exhibit 8 and the
3   point to keep in mind is when looking at whether there
4   is an industry impact of a slowing economy, one looks at
5   the industry.
6       In any given industry at any given point in
7   time there may be a winner or two, okay.  But what one
8   looks at to form -- to inform oneself about whether
9   there has been a change in industry conditions is to
10  look at the industry.
11      Q.  Let's keep looking at the industry.
12      Does PeopleSoft's experience during the first
13  quarter of 2001 support your opinion that Oracle's
14  earnings miss was the result of a sudden and sharp
15  economic slowdown in the enterprise software industry?
16      MR. FRIEDMAN:  Objection; vague.
17      THE WITNESS:  I give you the same answer I
18  gave a moment ago, which is that certainly in and of
19  itself, PeopleSoft met expectations, expectations that
20  had been formed based upon really a history of
21  relatively poor performance in the 2000 period.
22      Now, I would look at this not in the context
23  of an individual firm, but look at it in the context of
24  the industry as a whole to form an impression and form
25  an opinion as to whether the industry is being adversely

67

1   impacted.
2       MR. FRIEDMAN:  When you have a moment, I
3   wouldn't mind taking a break.
4       MS. WINKLER:  I just want to finish this line
5   of questioning.
6       Q.  Did BEA Systems miss their earnings estimate
7   for 1Q '01?
8       A.  For 1Q '01?  No, it did not.
9       Q.  Does the experience by BEA Systems during the
10  first quarter of 2001 support your opinion that Oracle's
11  earnings miss was the result of a sudden and sharp
12  economic slowdown in the enterprise software industry?
13      MR. FRIEDMAN:  Objection; asked and answered.
14      THE WITNESS:  I would give you the same answer
15  I gave you a moment ago with respect to PeopleSoft,
16  Siebel, looking at IBM, Ariba, Commerce One, I2.
17      MS. WINKLER:  Q.  Did SAP miss earnings
18  estimates for 1Q '01?
19      A.  1Q '01, SAP.  In the context of this analysis,
20  I can't tell you, because the consensus estimate that is
21  provided in first call has an obvious error in it.  So I
22  can't look at SAP relative to expectations formed at a
23  particular point in time.
24      Now, what I can tell you is that in reviewing
25  the analysts' reports for SAP, when it says it beat

68

1   expectations, it beat expectations relative to
2   expectations before the earnings announcement.  But
3   those expectations had been revised downward prior to
4   that.  And their beat was principally in not the
5   licensing segment of its business, but in its consulting
6   business.
7       Q.  Does the experience of SAP during the first
8   quarter of 2001 support your opinion that Oracle's
9   earnings miss was the result of a sudden and sharp
10  economic slowdown in the enterprise software industry?
11      A.  Give you the same answer that I gave you with
12  respect to any of the other competitors.  That one looks
13  at the industry and in the context of the industry.
14      Certainly with respect to SAP, the discussion
15  is very clear in the analysts' reports with respect to
16  SAP, that there has been a slowdown in the industry, and
17  it is impacting SAP.
18      Q.  Is that a yes or no?
19      MR. FRIEDMAN:  Objection; asked and answered.
20      THE WITNESS:  I --
21      MR. FRIEDMAN:  And vague.
22      THE WITNESS:  I didn't -- I don't know that
23  you -- you asked me a question, I answered it.
24      MS. WINKLER:  Q.  I asked you a yes or no
25  question.

James, Christopher  7/17/2007  9:05:00 AM

69

```
1       Does the experience by SAP during the first
2  quarter of 2001 support your opinion that Oracle's
3  earnings miss was the result of a sudden and sharp
4  economic slowdown in the enterprise software industry?
5       MR. FRIEDMAN:  Just add the "argumentative"
6  objection to it, now, too.
7       THE WITNESS:  I think I've answered that
8  question.  I would refer you back to my prior testimony.
9       As I indicated to you, the SAP analysis I
10  think is consistent with my -- with this analysis.  I
11  would look at the entire industry in terms of
12  determining whether there's been an industry-wide
13  slowdown.
14       MS. WINKLER:  Q.  So you can't give me a yes
15  or no answer?
16       MR. FRIEDMAN:  Objection; asked and answered,
17  argumentative.
18       THE WITNESS:  I think I have answered your
19  question as well as I can.  I think I've given you a
20  complete and understandable answer.
21       MS. WINKLER:  Q.  Did you know that Ariba
22  declined about 75 percent during the Class Period?
23       A.  Ariba declined in what context?
24       MR. FRIEDMAN:  Objection; vague.
25       MS. WINKLER:  Q.  Ariba's business declined
```

70

```
1  about 75 percent during the Class Period.  Did you know
2  that?
3       MR. FRIEDMAN:  Objection; vague.
4       THE WITNESS:  Its business in terms of its
5  revenue business?
6       MS. WINKLER:  Q.  Yes.
7       A.  I recall seeing that Ariba did relatively
8  poorly during the Class Period.
9       Q.  Did you know that it declined about 75
10  percent?
11       A.  I didn't have a specific number in mind.
12       Q.  Did you know that Commerce One and I2's
13  revenues declined about 50 percent during the Class
14  Period?
15       A.  I don't recall that specific number.  But I do
16  recall the business was off as well.
17       Q.  Wouldn't that be an indication that the
18  economic slowdown or the economic downturn was not as
19  sudden and sharp as suggested by you?
20       A.  No.  I think that what you need to look at
21  here is whether there's new information coming to the
22  marketplace.
23       And I think that as evidence of that
24  information, one looks at, for example, the stock
25  returns of those companies.  Second, how they are doing
```

71

```
1  relative to expectations formed prior to the beginning
2  of the Class Period.
3       Q.  Do you know the answers to those questions
4  with respect to Ariba, Commerce One and I2?
5       A.  I gave you the answer.
6       MR. FRIEDMAN:  Objection; asked and answered.
7       MS. WINKLER:  Q.  How did Ariba do during the
8  Class Period --
9       MR. FRIEDMAN:  Objection; vague --
10       MS. WINKLER:  Q.  -- relative to expectations
11  formed prior to the beginning of Class Period?
12       A.  During the Class Period?  You can look at --
13  what do you mean by during the Class Period?
14       I presume you mean between 12/14 and 3/2?  And
15  if you look at Ariba, this would be during the Class
16  Period, it makes an announcement in Q1 on 1/11/01,
17  beating expectations.
18       MS. WINKLER:  This is probably a good time to
19  take a break now.  We need to change the type.
20       VIDEOGRAPHER:  This is the -- this marks the
21  end of videotape number one, Volume I, in the deposition
22  of Christopher James.  We are going off the record.  The
23  time is 11:00 a.m.
24       (Recess, 11:00 a.m. - 11:12 a.m.)
25       VIDEOGRAPHER:  We are back on the record.
```

72

```
1  This marks the beginning of videotape number two, Volume
2  I, in the deposition of Christopher James.  The time is
3  11:12 a.m.
4       MS. WINKLER:  Q.  How does your analysis
5  address plaintiffs' allegations regarding the issuance
6  of false financial projections?
7       MR. FRIEDMAN:  Objection; vague.
8       THE WITNESS:  I'm not sure what you mean.
9       MS. WINKLER:  Q.  What part of that question
10  don't you understand?
11       A.  There are a number of allegations, as I
12  understand it, in the case.  And I'm not sure which of
13  them you're referring to when you say false financial
14  projections.
15       Q.  Do you not understand what false financial
16  projections means?
17       A.  It could touch on a number of different
18  issues, that's why I'm asking for clarification.
19       Q.  Which issues do you think it could touch on?
20       A.  Certainly, as I understand the allegations, it
21  could touch on the question of whether Oracle -- the
22  impact of a slowing economy on Oracle's business, and it
23  could touch on the fact of whether there was a
24  reasonable basis for the forecast as it pertains to Q3
25  and how -- whether certain statements during the Class
```

James, Christopher  7/17/2007  9:05:00 AM

73

1   Period with respect to Q3 performance were reasonable
2   based on the information that Oracle had.  It could --
3   so it could touch on a number of the issues.
4       Q.   After the end of the third quarter, Oracle
5   declined to give detailed projections or guidance for
6   the fourth quarter; didn't it?
7       A.   That is correct.
8       Q.   Does that fact matter at all to your analysis?
9       A.   It was certainly something I considered.  I
10  think in the context of what had occurred at Oracle,
11  that that's not something that -- that has to do with
12  post class analysis, but it is certainly something I
13  considered in the context of the announcement they made
14  on 3/1.
15      Q.   You say you considered it, but did it play any
16  role in your ultimate decision or ultimate opinion in
17  this case?
18      A.   Well, I think, you know, yes, it did.  It did
19  in the sense that -- my understanding is that the price
20  decline -- my opinion is that the price decline was a
21  result of material new information regarding the
22  economy, and that given sort of the failure of deals to
23  close in the last few days as a result of hesitancy on
24  the part of CIOs, that Oracle believed on a
25  going-forward basis that it lacked sufficient visibility

74

1   with respect to its Q4 results.
2       Now, what the -- so the specific guidance that
3   was provided -- so they did provide an indication on 3/1
4   of where they thought things would be going
5   directionally in Q4, but not specific numbers.
6       Q.   Didn't Oracle state in the 3/1/2001 conference
7   call that deals were simply pushed out 30 to 60 days?
8       A.   Yes.
9       Q.   If deals were really just pushed out 30 to 60
10  days like they said, why would they have not been able
11  to better forecast Q4?
12          MR. FRIEDMAN:  Objection to form.
13          THE WITNESS:  Pardon me?
14          MS. WINKLER:  Could you read my question back,
15  please.
16          (Record read as follows: QUESTION: If deals
17          were really just pushed out 30 to 60 days, why
18          would they have not been able to better
19          forecast Q4?)
20          THE WITNESS:  Well, I mean, I think that
21  you're asking a question of -- in context if -- well,
22  first of all, as of 3/1, okay, that was a preliminary
23  analysis, right.  So you have -- and as they indicate, I
24  think -- you know, Henley is in a car on a conference
25  call in Miami, and they are providing a pre-announcement

75

1   to earnings.  So it didn't strike me as unusual in that
2   context that they had surprises at the end of the
3   quarter that appear to be a result of the economy.  And
4   that in the context of 3/1 they are not comfortable
5   until they better understand the circumstance of
6   providing additional guidance as it pertains to Q4.
7           MS. WINKLER:  Q.   I don't think you answered
8   my question.
9           My question was, if deals were really pushed
10  out just 30 to 60 days, like Oracle said on that
11  conference call, why is that that they would not have been
12  able to better forecast Q4?
13      A.   For the reasons I just gave you, that if you
14  go to the 3/15, which is -- they have had two weeks to
15  analyze what is going on with respect to their product
16  lines.  They do provide an indication that -- in terms
17  of what they expect directionally with respect to Q4.
18      Q.   Did they give detailed guidance with respect
19  to Q4?
20      A.   I think it's important to keep in mind the
21  distinction between detailed guidance and guidance.
22          They did not provide -- I don't recall seeing
23  in the 3/15 call detailed guidance as it pertains to
24  revenue numbers by product category.  But I would have
25  to go back and look.

76

1       Q.   On the March 15th call, did Oracle announce
2   that the deals really had not been pushed out 30 to 60
3   days like they had said on the 3/1 call?
4       A.   No.  They indicated that it was a response to
5   a push-back by CIOs.  Their understanding was that deals
6   were being pushed back that was not a result of losing
7   deals to competitors.
8           I mean, I think in the context, if you have a
9   situation in which customers are postponing deals, you
10  have an indication that it may be 30, 60 days, it may be
11  longer.
12      Q.   Did they say it may be longer?
13      A.   I don't recall.
14      Q.   But even with the additional time to analyze
15  what was going on, Oracle still didn't give detailed
16  guidance on the 3/15 call, did they?
17      A.   I would have to go back and review the
18  guidance they provide.  I would just say with respect
19  to, you know, Q4, I simply don't recall the specificity
20  on the 3/15 call.
21      Q.   Was the guidance on the 3/15 call as detailed
22  as the guidance Oracle had given at the end of Q2 with
23  respect to Q3?
24      A.   I would have to --
25          MR. FRIEDMAN:  Objection; asked and answered.

James, Christopher  7/17/2007  9:05:00 AM

77

1    THE WITNESS: I would have to go back and
2  review the transcripts to compare the degree of detail
3  with respect to the forecasts in the Q&A.
4    MS. WINKLER: Q.  If, in fact, the guidance
5  that Oracle had given for Q4 was much less detailed than
6  what Oracle had given with respect to Q3 prior to the
7  start of Q3, would that have any effect on your opinion?
8    A.  No.  I think that you're looking at trying to
9  forecast what is a substantially different economic
10  environment going forward than you perceive in the end
11  of Q2.
12    Q.  In your opening brief, going back to footnote
13  174, you indicate that you understand some of the bad
14  debt transfers in 2Q '01 were proper; is that fair?
15    A.  What?
16    MR. FRIEDMAN: Objection; mischaracterizes.
17  The document speaks for itself.
18    MS. WINKLER: Could you read the question
19  back, please.
20    THE WITNESS: I simply didn't hear you.
21    MS. WINKLER: She's going to read it back for
22  me.
23    (Record read as follows: QUESTION: In your
24    opening brief, going back to footnote 174, you
25    indicate that you understand some of the bad

78

1    debt transfers in 2Q '01 were proper; is that
2    fair?)
3    THE WITNESS: That's not what 174 says.  It
4  says, "I understand that if the 20.1 million in
5  transfers in 2Q had not been made, then Oracle would
6  have earned 10.38 cents per share."
7    MS. WINKLER: Q.  And what does the next
8  sentence say?
9    A.  "Of course, this presume the full 20.1 in
10  transfers was improper, which I understand not to be the
11  case."
12    Q.  So you understand some of those transfers were
13  proper?
14    A.  I haven't gone to -- my understanding from
15  reviewing the -- and discussing with Mr. O'Bryan that
16  there is -- that he was able to identify certain
17  transactions that in his opinion were proper, okay.
18    And I don't recall specifically the division
19  between the ones that he couldn't determine whether they
20  were proper or improper and ones in which he could
21  affirmatively say they were proper.
22    Q.  So going back to my --
23    A.  So I don't think the inference I would draw
24  from this is that I'm rendering an opinion or providing
25  an opinion about what portion of the 20.1 transfers are

79

1  in my view proper or improper.
2    Q.  But you do indicate that you understand some
3  of the bad debt transfers in Q2 '01 were proper?
4    A.  That's my understanding, yes.
5    Q.  That's what you indicate here in footnote 174?
6    A.  That's right.
7    Q.  And other than your conversation, I think you
8  said, your conversation with Mr. O'Bryan, on what do you
9  base that understanding?
10    A.  Just that, and reviewing his report.
11    Q.  And did you review what Mr. Regan had to say
12  with respect to that issue?
13    A.  Yes.
14    Q.  So, in effect in this footnote you're just
15  repeating what you've been told by Mr. O'Bryan; is that
16  fair?
17    MR. FRIEDMAN: Objection; overbroad.  Which
18  portion?
19    MS. WINKLER: Q.  Let's focus on the sentence,
20  "Of course, this presume that the full $20.1 million in
21  transfers was improper, which I do not understand to be
22  the case."
23    A.  That's correct.
24    Q.  Are you familiar with the Supreme Court's
25  decision in Basic versus Levinson?

80

1    A.  Yes.
2    Q.  What's your understanding of the holding of
3  that case?
4    A.  As it pertains to?
5    Q.  Let's talk about materiality.
6    A.  That the decision as it pertains to --
7  provides sort of a definition of materiality as it
8  pertains to misstatements or omissions that changed the
9  total mix of information within the marketplace.
10    Q.  You're not offering a legal opinion here on
11  whether the false and misleading statements alleged by
12  plaintiffs are material under Basic, are you?
13    A.  As a legal opinion?  No.  I'm saying that if
14  one wants to look from an economic or financial
15  perspective on materiality, one should do certain things
16  that Mr. Steinholt hasn't done.
17    First of all, familiarize yourself with the
18  total -- the information that is available in the
19  marketplace and determine whether certain statements
20  change in a significant way the total mix of
21  information.
22    Q.  Do you disagree that material information is
23  information a reasonable investor would want to consider
24  prior to making an investment decision?
25    A.  I think that you need to look at whether --

81

1  you need to go beyond that, that in order to assess it
2  from an economic perspective, you need to look at
3  whether it changes the mix of information in a
4  significant way by altering the market's expectations
5  regarding expected future cash flows.
6      Q.  So you do disagree with that statement?
7      A.  I disagree with a statement in and of itself,
8  that's right, that you can certainly have a situation in
9  which a reasonable investor might view something as
10  significant, but if it doesn't change in a significant
11  way the market's valuation of a company, then I think
12  that that provides an objective measure as to whether
13  the information has changed the total mix of
14  information.
15      Q.  So do you agree a reasonable investor is
16  interested in information that impacts the value of an
17  investment?
18      A.  That's true.  I mean, I'm saying that a
19  reasonable investor would be interested to know or would
20  find informative are really kinds of definitions of
21  materiality that are inherently subjective.
22      Q.  Do you believe that it's reasonable to define
23  the value of an investment generally as the present
24  value of that investment's future cash flow?
25      A.  I think that the general -- generally we think

82

1  about investments in terms of the value of the present
2  discounted value of the future cash flow; that's
3  correct.
4      Q.  So what is important to investors is
5  information that would impact the future cash flows of
6  that investment; correct?
7      A.  Impact the future cash flows in the investment
8  in a material way.  So I think that you have to take it
9  in the context of having a significant impact on the
10  cash flows on a going-forward basis.
11      Q.  How do you define materiality?
12      A.  As I defined it in my report, you look at
13  whether it has a significant impact on the valuation of
14  the company.
15      Q.  How do you make a determination about whether
16  a misrepresentation is material?
17      A.  Well, I think, again, this is something that I
18  discuss in my report.  You first start off with, if
19  you're talking about a misrepresentation, then you need
20  to have some baseline what the alleged truth is.  So one
21  can look at the statement in the context of what
22  allegedly could or should have been said at various
23  points in time.  That's the first step.
24      The second step would be then to look at
25  whether given an incremental statement relative -- the

83

1  statement and its incremental impact on the mix of
2  information relative to the alleged truth, first off,
3  whether it is new information, and, second, whether it
4  would be expected to have a material impact on value, a
5  significant impacted on value.
6      MS. WINKLER:  I'm going to ask the reporter to
7  mark this document as the next exhibit.
8      (Exhibit 4 marked for
9      identification.)
10      MS. WINKLER:  Q.  This document was previously
11  marked as Roberts Exhibit 9, and is Bates labeled for
12  the record as NDCA-ORCL 013382 through 85.
13      Have you seen this document before?
14      A.  I don't recall seeing it.
15      Q.  Do you see the date on this document on the
16  first page, January 17th, 2001?
17      A.  Yes, I see it.
18      Q.  And do you see the recipients of this e-mail
19  from Larry Garnick?
20      A.  Yes.
21      Q.  Do you know whether any of those recipients
22  are defendants in this case?
23      A.  I believe Mr. Ellison and Mr. Henley are.  And
24  I have to look at the complaint whether Mr. Sanderson
25  is, Ms. Minton.

84

1      Q.  Do you see that it states, "Summarized below
2  are the December fiscal year '01 revenue results for
3  your review.  Please note"?  Do you see that?
4      A.  Please note the following, yeah.
5      Q.  It just says, "Please note," colon?
6      A.  Yes, I see it.
7      Q.  If you could read out loud the first bullet
8  point there.
9      A.  "The license revenue growth was 35 percent in
10  USD, 25 points better than the 10 percent growth we
11  experienced in December FY '00 over December FY '99.
12  However, excluding the $60 million Covisint license
13  deal, the USD growth rate would have been 6 percent.
14  Excluding Covisint, OPI license revenue growth would
15  have been 85 percent."
16      Q.  That's negative 85 percent; is it not?
17      A.  Yes.
18      MR. FRIEDMAN:  Objection to the extent the
19  documents speaks for itself.  It is in parentheses.
20      MS. WINKLER:  Q.  Oracle didn't disclose this
21  information to the market; did it?
22      MR. FRIEDMAN:  Objection as to "this
23  information."  Vague.
24      THE WITNESS:  I don't recall seeing -- well,
25  let's back up.

85

1    It's got the Covisint deal, that's public
2  information, I believe.  I don't believe -- I don't
3  recall seeing a December revenue growth in the public
4  press, but -- I don't believe I recall seeing that.
5    I'm not sure why -- I just don't recall seeing
6  that.
7    MS. WINKLER:  Q.  Do you see on the fourth
8  bullet point down, the second sentence states,
9  "Excluding Covisint, applications product growth would
10  have been negative 46 percent"?
11    A.  I'm not sure why you would exclude Covisint,
12  but --
13    Q.  Have you seen any information that Oracle
14  disclosed this information to the market, to the
15  investors during the Class Period?
16    MR. FRIEDMAN:  Same objections; vague.
17    THE WITNESS:  I don't recall seeing Oracle
18  providing, say, monthly updates in terms of revenue
19  growth.
20    MS. WINKLER:  Q.  Would you consider this
21  information to be material to investors?
22    MR. FRIEDMAN:  Objection; vague.
23    THE WITNESS:  First of all, if it's -- I mean,
24  I don't know whether it was disclosed or not.  Second, I
25  don't know that in the context it would necessarily be

86

1  material.
2    Remember that the context of their forecast,
3  the majority of their revenues are realized in the last
4  month of the quarter, and the lasts few days.  So
5  deviations would not necessarily -- even if one were to
6  assume these are deviations, which it is not clear from
7  this document that they are, that those would be viewed
8  as material.
9    MS. WINKLER:  Q.  In response to my question
10  you first -- about whether you would consider this
11  information to be material, you stated, "I don't know
12  whether it was disclosed or not."
13    What does that have to do with the
14  materiality?
15    A.  Well, if it were disclosed, then I could
16  assess the impact of this -- whether or not it was
17  viewed by the market as being material, okay.
18    My understanding is, is that Oracle was not,
19  as many companies do, provide sort of monthly or
20  weekly updates in terms of their revenue stream.
21    But, you know, again I don't -- I can't look
22  at this document and say that this would lead me or the
23  market to view the prospects for Oracle in the third --
24  in Q3 to be materially different than what the market
25  was believing at the time.

87

1    Q.  But you can't look at this document and say
2  that the market wouldn't have viewed this information as
3  being material; can you?
4    MR. FRIEDMAN:  Objection; vague.
5    THE WITNESS:  In other words, you wanted me to
6  look at this document and based on this document
7  determine whether it would be material to the market or
8  not?  Without knowing more, I don't think I can do that.
9  I mean, I would look to whether on the basis -- based on
10  this document whether Oracle had a reasonable basis for
11  concluding whether it would meet its forecast, whether
12  this would change the expectations of investors going
13  forward.
14    It doesn't appear to me that, for example,
15  that this indicates that they are off track in any way
16  to meet their expectations.  I certainly haven't seen
17  any analysis by, for example, Mr. Goedde that would
18  indicate that this would move the earnings number from a
19  particular, say, 12 cents to 10 cents or something like
20  that.
21    MS. WINKLER:  Q.  So you're saying that you
22  don't think investors would have been concerned about
23  the fact that Oracle's applications growth rates were
24  negative, excluding Covisint in December of 2000?
25    MR. FRIEDMAN:  Objection; argumentative.

88

1    THE WITNESS:  I think they would be -- they
2  are concerned about, as they always were, with Oracle's
3  growth rates, as well as its other aspects of its
4  performance.
5    Oracle did not -- and investors, my
6  recollection is, were not expecting to be provided with
7  monthly updates in terms of Oracle's revenues.  I look
8  at this, and it says that they are 25 points better than
9  the 10 percent experienced in FY 2000.
10    MS. WINKLER:  Q.  Investors' expectations of
11  whether or not they are going to receive monthly updates
12  has nothing to do with whether this information is
13  material though, does it?
14    A.  Oh, sure.  Because you're going to look at it
15  in the context of what your expectations are.
16    Q.  We're talking about expectations of whether or
17  not you get a monthly update, not expectations of
18  financial results.
19    A.  I'm not sure I understand your question.  If
20  I'm an investor looking at Oracle, what I would have to
21  look at here is -- remember, analysts are doing their
22  own channel checks.  They are aware of the business
23  prospects of Oracle on an ongoing basis.
24    If Oracle has a practice of not providing
25  revenue updates on a monthly basis, and recognizing that

James, Christopher  7/17/2007  9:05:00 AM

89

1  their quarter is back-end loaded, it is not clear from
2  looking at this document to me that investors would view
3  this information to be materially positive or materially
4  negative, or have no material impact.
5      Q.  So what you're saying is you can't say either
6  way?
7      A.  No, I can't.
8      Q.  From your prior response, are you indicating
9  that Oracle's practice or lack of practice of providing
10  monthly updates affects whether this information is
11  material?
12      A.  Sure.  I mean, if you had Oracle periodically
13  providing monthly updates, and then you're representing
14  to me that they didn't provide this to the market, would
15  that might be viewed as something that the market might
16  consider important?  Yeah.  But they didn't have a
17  process of or a program of revealing this information,
18  so I don't see that it in and of itself is necessarily
19  material.
20      Q.  So aside from whether they had a practice or
21  not of giving monthly updates, you don't think that it
22  would have been material to -- strike that.
23      Just focusing on the negative applications
24  product growth rates and license growth rates --
25      A.  Why would you just focus on the negative --

90

1      Q.  Can I finish my question, please?
2      A.  I thought you were done.
3      Q.  Did you understand that to be a question?
4      A.  Yes.
5      Q.  Well, it wasn't; and I'm not finished.
6      Just focusing on the negative applications
7  product growth rates and license growth rates, you can't
8  say whether or not that information would be material to
9  investors --
10      MR. FRIEDMAN:  Objection to form.
11      MS. WINKLER:  Q.  -- would have been material
12  to investors as of January 17th, 2001?
13      MR. FRIEDMAN:  Sorry for cutting you off.
14  Objections to form, vague.
15      THE WITNESS:  Just so I'm understanding, you
16  want me to focus just on a part of this document?
17      MS. WINKLER:  Q.  What other part of this
18  document is there?
19      MR. FRIEDMAN:  There's four pages of the
20  document.  Which part --
21      MS. WINKLER:  Q.  Do you see anything in this
22  document about whether or not Oracle provided monthly
23  updates?
24      A.  That's not your question, is it?
25      Q.  That is my question now.

91

1      A.  Well, why don't you tell me what your question
2  is now.
3      Q.  Sure.
4      A.  Because you got two questions on the table.
5      Q.  Do you see anything in this document about
6  whether --
7      MR. GIBBS:  Let him finish his answer before
8  you start your next question.
9      MS. WINKLER:  Q.  -- about Oracle providing
10  monthly updates?
11      A.  That wasn't your prior question.  I don't
12  see anything --
13      Q.  I'm the one who's asking the questions.  That
14  is my question now.
15      MR. GIBBS:  Hey, hey, hey, let him finish.
16      MR. WILLIAMS:  He's going to defend the
17  deposition.  And nothing improper is happening here.
18  She's clarifying the question and --
19      MS. WINKLER:  I can change my question when I
20  want to change my question.
21      MR. WILLIAMS:  -- he's trying to answer.
22      MR. GIBBS:  She's cutting him off repeatedly
23  and she's --
24      MR. WILLIAMS:  You almost jumped out of your
25  chair, Patrick; come on.

92

1      MR. GIBBS:  -- taking a completely
2  inappropriate tone.  She's taking a completely
3  inappropriate tone, and she's cutting him off.
4      MR. WILLIAMS:  I think when we listen to the
5  audio, the only person that's taking an inappropriate
6  tone is you.  And if the video was on you, you almost
7  climbed up on the table.  It is not that serious.
8      MR. FRIEDMAN:  Why don't you ask the current
9  question.
10      MS. WINKLER:  Q.  My question is, do you see
11  anything in this document about whether or not Oracle
12  provided monthly updates?
13      A.  Let me take a look at the document in its
14  entirety.  And I presume by your question you mean
15  monthly updates to the market?
16      Q.  That's correct.
17      A.  There is no indication to me that Oracle
18  provided this information to the market, or whether it
19  was Oracle's practice of providing monthly updates to
20  the market.
21      MS. WINKLER:  I want to have marked as the
22  next exhibit, Exhibit 5.
23      (Exhibit 5 marked for
24  identification.)
25      MS. WINKLER:  Q.  Have you seen this document

93

1  before?
2      A.  I don't recall.
3      Q.  For the record, this document is Defendants'
4  Response to Plaintiffs' First Set of Requests for
5  Admissions.  I want to direct your attention to the
6  third page of the document, which is numbered 2 at the
7  bottom.  And I will ask you to --
8      A.  I don't mean to -- I'm not interrupting you.
9  I can't hear what you said.  Response to Request No. 2?
10     Q.  I was just indicating the title to the
11 document.
12         I want to direct your attention to the page
13 that's numbered 2 at the bottom.
14     A.  Okay.
15     Q.  And if you will see at the top of that page,
16 it appears, "Request for Admission No. 1."  Do you see
17 that?
18     A.  Yes.
19     Q.  Do you see at the end of the response to
20 Request No. 1 the response states, "Defendants admit
21 that on December 11th, 2000 Oracle's sales pipeline
22 growth for 3Q '01 was 52 percent in constant dollars;
23 and on December 25th, 2000, Oracle's sales pipeline
24 growth for 3Q '01 was 34 percent in constant dollars"?
25     A.  Right.

94

1      Q.  Did Oracle disclose this information to the
2  market?
3      A.  My understanding is that Oracle -- I don't
4  recall seeing anything that indicated that Oracle
5  provided monthly pipeline sales -- sales pipeline growth
6  numbers to the marketplace.
7      Q.  Was this information -- would you consider
8  this information to be material?
9      A.  Its monthly sales pipeline?
10     Q.  Yes.
11     A.  That would depend.
12     Q.  The decrease in the pipeline that's
13 represented by the response to Request No. 1?
14     A.  Not necessarily.
15     Q.  Can you explain what you mean by not
16 necessarily?
17     A.  Sure.  Given, if -- as is my understanding,
18 given the pipeline growth at this point in time, and
19 given the nature of the revenue streams, was Oracle in a
20 position to -- would it have changed expectations
21 materially concerning the 3Q results.  If at that point
22 in time given the mix of information it wouldn't change
23 materially the 3Q results or results going forward, then
24 I wouldn't view it as material.
25     Q.  And do you know the answer to that question?

95

1      A.  My understanding from reviewing Mr. or
2  Dr. Hubbard's report is that based on this information,
3  the upside report on which the forecasts were based was
4  indicating that Oracle would still make the forecasted
5  12 cent number.
6          I know we've been at it for less than an hour,
7  but I need to take a short break.  I apologize.
8      MS. WINKLER:  Sure.
9      VIDEOGRAPHER:  Off the record.  The time is
10 11:46 a.m.
11         (Recess, 11:46 a.m. - 11:56 a.m.)
12     VIDEOGRAPHER:  We are back on the record.  The
13 time is 11:56 a.m.
14     MS. WINKLER:  Q.  Going back to defendants'
15 admission that Oracle's sales pipeline growth for 3Q '01
16 declined from 52 percent to 34 percent from December
17 11th, 2000 to December 25th, 2000, are you saying that
18 if Oracle had known its pipeline declined by this amount
19 in January of 2001, that that would not have been
20 material?
21     MR. FRIEDMAN:  Objection; mischaracterizes
22 testimony.
23     THE WITNESS:  As I indicated when I answered
24 that question, is that -- I mean, I think the question
25 for purposes of determining materiality would be, would

96

1  this have impacted investors' valuations.
2          In the context as I understand it that the
3  forecasts plus upside at this point in time was such
4  that Oracle believed it could -- would meet its
5  expectation -- the guidance that it provided of 12
6  cents, and that, you know, whether this particular piece
7  of internal information would be material to investors
8  would be, I think, dependent upon how it would change
9  their expectations regarding future cash flows.
10         I've seen evidence that indicates that with
11 respect to the reasonableness of the 12 cent forecast at
12 this point in time, given what was in the pipeline, that
13 that was a reasonable forecast.
14         So based on that, I don't see that this would
15 necessarily be material.
16     MS. WINKLER:  Q.  You're aware that after
17 that, within 3Q '01, Oracle told investors that the
18 pipeline had never been stronger; aren't you?
19     A.  I recall seeing that, yes.
20     Q.  Given that representation, does that change
21 your view on materiality of the negative pipeline growth
22 in December?
23     A.  No.
24     Q.  Going back to Exhibit 4, are you saying that
25 if in January of 2001 Oracle knew that but for this one

97

1 unusual deal, applications products growth would have
2 been negative 46 percent, that would not have been
3 material?
4        MR. FRIEDMAN:  Objection; mischaracterizes
5 testimony, asked and answered.
6        THE WITNESS:  Well, you're characterizing this
7 as an unusual deal.  And, I mean, the market is aware of
8 this deal and has taken the deal in the context -- into
9 consideration in the context of looking at coming up
10 with a forecast of what market participants think Oracle
11 can do.
12        MS. WINKLER:  Q.  What do you know about the
13 Covisint deal?
14     A.  Covisint deal was a $60 million licensing deal
15 designed basically to provide enterprise software to
16 integrate with I believe it is the motor vehicle
17 industry.
18     Q.  Do you know when that deal closed?
19     A.  I believe it closed in the third quarter.
20     Q.  Do you know when in the third quarter that
21 deal closed?
22     A.  At the very beginning; my understanding.
23     Q.  Do you know whether Covisint ever actually
24 used Oracle's Suite 11i?
25     A.  I haven't gone back to look at that.

98

1     Q.  Do you know whether anyone within Oracle ever
2 characterized the Covisint deal as an unusual or outlier
3 deal?
4     A.  I think -- I don't know that they've
5 characterized it as an outlier or -- unusual deal?  It's
6 certainly a large deal.  I think that's correct.
7     Q.  Do you know whether anyone at Oracle advocated
8 that Covisint should be removed when considering the
9 growth rates?
10     A.  I don't know.  My recollection is they
11 considered the Covisint transaction in the context of
12 providing guidance.
13     Q.  But you haven't seen any document indicating
14 that certain individuals within Oracle thought that
15 Covisint shouldn't be considered?
16        MR. FRIEDMAN:  Objection; asked and answered.
17        THE WITNESS:  It would depend on what context
18 they were trying to determine whether to include or
19 exclude the Covisint deal.
20        MS. WINKLER:  Q.  My question was, had you
21 seen any documents that reflected that?
22     A.  I don't recall seeing any.
23     Q.  If a misrepresentation results in a stock
24 price that is higher than if the truth was disclosed,
25 does that not mean that the misrepresentation was

99

1 material?
2     A.  I think that you need to be more precise and
3 expand on the characterization before I would say --
4     Q.  Can you answer the question?  I'm sorry, I
5 didn't mean to interrupt.
6     A.  I think that it would depend on the
7 circumstances, but I think you need more than that
8 before I could determine whether it was, in fact,
9 material or not.
10     Q.  If investors expect a company to report
11 earnings of $1 per share, but earnings were only 50
12 cents per share, would falsely reporting $1 per share be
13 a material misrepresentation?
14     A.  It potentially could be.  It would again
15 depend on the circumstances.  But that certainly could
16 potentially be material.
17     Q.  How would you go about determining whether
18 that was material?
19     A.  In a couple of ways.  One is to look at share
20 price reaction when the -- a similar difference is
21 observed in a similar set of context.
22        So, in other words, you asked the question of
23 whether a 50 cent change in earnings expectations would
24 have a material impact on the value of the stock.  One
25 would look at if there is at some point in time a

100

1 curative disclosure, that, you know, we're not at a
2 dollar, we're at 50 cents, that is linked in a causal
3 way to the prior misstatement, then that would be
4 another way.
5     Q.  If on March 1st, 2001 Oracle had falsely
6 prenounced (sic) results in line with investors'
7 expectations so that there was not a significant price
8 movement following the announcement, would that false
9 representation have been material?
10     A.  Could I have the recorder read that back?
11 It's a detailed question.
12        MS. WINKLER:  Sure.
13        (Record read as follows: QUESTION: If on
14        March 1st, 2001 Oracle had falsely preannounced
15        results in line with investors' expectations so
16        that there was not a significant price movement
17        following the announcement, would that false
18        representation have been material?)
19        MS. WINKLER:  I think that should have been
20 "falsely prenounced results."
21        THE WITNESS:  I'm sorry, could -- why don't
22 you ask the question again.
23        MS. WINKLER:  Q.  If on March 1st, 2001,
24 Oracle had falsely prenounced results in line with
25 investors' expectations so that there was not a

James, Christopher  7/17/2007  9:05:00 AM

101

1 significant price movement following that announcement,
2 would that false misrepresentation have been material?
3     A.  So had Oracle done something different in the
4 exact environment in which it had a -- that existed as
5 of 3/1, then I would say that -- I mean, it is my
6 opinion that the price decline on 3/2 is a result of
7 Oracle's announcing that it missed its earnings number
8 because of a deterioration in the economy.
9         If what Oracle was saying is everything,
10 except that instead of missing, we meet, then I would
11 need to know how they are meeting before I could
12 determine whether the market would view that as
13 materially different than what was being announced.
14        Certainly if you're holding everything else
15 constant, okay, and you're just changing or meeting, as
16 opposed to not meeting, and you're saying the same
17 economic conditions, that seems to be a hypothetical
18 that's internally inconsistent.  Because you couldn't be
19 disclosing the market conditions and their impact on you
20 without also disclosing what impact it has on your
21 earnings.
22        But certainly would I view a 2 cent -- meeting
23 expectations versus missing expectations by 2 cents
24 potentially material?  Certainly I would.  But I would
25 have to do the kinds of analysis that I've just

102

1 described to you about what's changing in the nature of
2 the announcement, what implications does it have for how
3 investors view cash flows on a going-forward basis.
4     Q.  The first event that you analyzed for
5 materiality was December 5th, 2000, regarding Ellison's
6 comments about the cost benefits of Suite 11i; is that
7 correct?
8     A.  I believe that is -- if I could turn to
9 Exhibit 7.  It is not one of the first complaint days --
10 I don't recall whether it is one of the first -- yes, it
11 is.  It is the first day in the plaintiffs' contention
12 responses.
13    Q.  And you concluded that that information was
14 either not new or not material; is that correct?
15    A.  Well, yes, that's correct.
16    Q.  In formulating that opinion, did you consider
17 any previous comments by Ellison regarding the cost
18 benefits of Suite 11i or the benefits of Suite 11i
19 general?
20    A.  Yes.
21    Q.  What comments?
22    A.  Well, as we talked about earlier when we were
23 referring to Exhibit 6, and you had asked why did you
24 look at information prior to the class, and I indicated,
25 well, I was trying to understand both the background as

103

1 well as determining whether certain information was into
2 the market prior to particular points in time in the
3 Class Period.  So one of the things I did was look at
4 press releases and analyst reports in the pre Class
5 Period.
6     Q.  And my question was specifically directed at
7 comments by Larry Ellison.  Do you recall reviewing any
8 of those?
9     A.  Yes, I did.
10    Q.  What comments were those?
11    A.  Well, I recall reviewing the comments he had
12 at the Credit Suisse, comments that were made in the
13 summer and comments that were made at OAUG conferences,
14 that's O-A-U-G.
15    Q.  You stated you recalled reviewing the comments
16 he had at the Credit Suisse.  What are you referring to?
17    A.  There's -- it was reported in Bloomberg, his
18 comments at a Credit Suisse conference, I believe it was
19 on the 29th of November.
20    Q.  Have you listened to those comments?
21    A.  I have.
22    Q.  Are you aware that at the November 29th, 2000
23 CSFB investor conference, Ellison claimed that Suite 11i
24 was complete and integrated and could support any large
25 company?

104

1     A.  I think -- my recollection, he said it is
2 designed to be integrated.  I don't recall him using the
3 word interoperable, but certainly indicated that the
4 design features were such that it would require no
5 additional systems integration as it pertained to the
6 suite modules.
7     Q.  Do you recall that he said the suite was
8 complete and integrated?
9     A.  I believe he said it was designed to be
10 complete and integrated, is my recollection of what he
11 said.
12    Q.  When did you listen to that investor
13 conference?
14    A.  Yesterday.
15    Q.  Had you listened to it previously?
16    A.  No.  I had seen commentary and discussion of
17 it, but I hadn't listened to it.
18    Q.  So you hadn't considered that Ellison's
19 comments made during that conference in formulating your
20 opinions in this case, other than how they had been
21 reported?
22    A.  And discussed in the financial press, yes.
23    Q.  When were those discussions in the financial
24 press?
25    A.  At -- there is a Bloomberg article, I believe,

James, Christopher  7/17/2007  9:05:00 AM

105

1   on 11/30.  There is a Credit Suisse analyst report on
2   11/30.
3        Q.  Do you reference those in your report?
4        A.  I don't know that -- I reference what I've
5   relied on.  My understanding is the focus on 11/30
6   really has -- while I reviewed that, the focus on 11/30
7   was really in response to some comments made by
8   Mr. Steinholt that were not in his report or his
9   rebuttal report, that he referred to in his deposition.
10       Q.  So my question was, did you reference the
11  Bloomberg or Credit Suisse analyst reports in your
12  report?
13       A.  I believe the Bloomberg I did.  Credit Suisse,
14  I looked at it.  I don't recall -- I don't know that
15  it's listed in terms of relied upon.  Certainly
16  something I considered.  With respect to the Bloomberg,
17  I'd have to go back and look.
18       Q.  Let me know when you've had an opportunity to
19  look and see if you've referenced those.
20       A.  I'm not -- I don't see it referenced in the
21  materials relied upon.
22       MS. WINKLER:  I'm going to have the court
23  reporter mark this as Exhibit 6.
24            (Exhibit 6 marked for
25            identification.)

106

1        MS. WINKLER:  Actually I'm going to append
2   something to the back of that, if I could.
3        Q.  Showing you what's been marked as Exhibit 6.
4   And I'll represent to you that this is a certified
5   transcript of the November 30th, 2000 Ellison talk at
6   the CSFB investor conference.
7        A.  Okay.
8        Q.  Do you recall whether Mr. Ellison discussed
9   GE?
10       A.  Yes.
11       Q.  What do you recall about Mr. Ellison's
12  discussion of GE?
13       A.  I believe he had indicated that GE in one of
14  the divisions, I believe -- I don't know that he
15  referred to GE power in particular, but he referred to
16  GE, was in the process of implementing certain modules
17  with respect to Suite 11i.
18       He talks about GE in the context of they are
19  the type of organization which would find the aspects,
20  the design aspects of Suite 11i particularly attractive.
21       I also think he makes reference to his
22  admiration for Jack Welch, he believes it is a well-run
23  organization.
24       Q.  Do you know whether any new information was
25  disclosed by defendants during this November 29th, 2000

107

1   investor conference?
2        MR. FRIEDMAN:  Objection; overbroad.
3        THE WITNESS:  You know, as I reviewed it, it
4   didn't strike me that in terms of the aspects of the
5   product that there was new information -- information
6   that was substantially different from what I had seen in
7   prior press reports.
8        Certainly there is an enthusiasm and a
9   salesmanship of Ellison that, you know, is apparent in
10  the audio version that one wouldn't see on the written
11  version.
12       MS. WINKLER:  Q.  In your opening rebuttal
13  reports, which are Exhibit 1 and 2 here, you don't have
14  any indication that you analyzed the price increase in
15  Oracle's stock following this presentation; do you?
16       A.  No.  It was not identified either in the
17  plaintiffs' original complaint or in the context of the
18  interrogatories as the date that they viewed as
19  material.
20       Q.  Are you aware that any of the key
21  representations plaintiffs allege were false were made
22  during this November 29th, 2000 investor conference?
23       A.  Well, I think if you're looking at the
24  allegations in the complaint, and since the complaint
25  doesn't look at this as a date in which there is a

108

1   material misstatement, then the complaint -- the
2   allegations in the complaint must rely on other dates,
3   not this date.
4        Q.  And my question was whether you were aware if
5   any of the key representations plaintiffs allege were
6   false were made during this November 29th, 2000 investor
7   conference?
8        A.  And I believe I answered the question, is that
9   certainly it references issues that plaintiffs allege
10  are false in the complaint, but the complaint is relying
11  on other statements and not the statements on 11/29.
12       Q.  Isn't it true that on November 29th, Ellison
13  and/or Mr. Henley signaled to investors that the second
14  quarter fiscal 2001 would be strong?
15       A.  I don't know that they signaled to investors
16  that -- that is an inference that I've seen in an
17  analyst report, signaling that Q2 would be strong.  But
18  I don't recall any indication from reviewing
19  Mr. Ellison's comments, Mr. Henley's comments that they
20  provided additional guidance with respect to Q2.
21       Q.  Would you consider this day to be an important
22  one to analyze the stock price increase following?
23       MR. FRIEDMAN:  Objection; vague.
24       THE WITNESS:  I would just note that
25  plaintiffs haven't in part of their reports viewed it as

109

1   a date that was significant for determining materiality.
2   It is prior to the Class Period.  I don't -- it
3   doesn't -- it is not apparent to me that that, just on
4   the face of it, that that would be a date that would be
5   important for determining the materiality of alleged
6   misstatements.
7         MS. WINKLER:  Q.  So your answer is, no, you
8   would not consider this to be an important date to
9   analyze?
10        MR. FRIEDMAN:  Objection; asked and answered,
11  argumentative.
12        THE WITNESS:  I'll stand by my answer.
13        MS. WINKLER:  Q.  You indicated that you
14  listened to this conference call; correct?
15        A.  Yes.
16        Q.  What, if any, additional information would you
17  need to know to know whether this would be an important
18  date to analyze the stock increase following?
19        MR. FRIEDMAN:  Objection; vague.
20        THE WITNESS:  For what purpose?  I mean, I
21  looked at dates during the Class Period and before,
22  which have been identified by plaintiffs as alleging
23  certain statements were false or misleading at various
24  points in time.  And that was the focus of my analysis
25  on the basis of arguing that -- on the basis of the

111

1         MS. WINKLER:  Q.  Have you been asked to
2   analyze the stock price increase following this analyst
3   conference?
4         A.  I have looked at the price change on 11/30.
5         Q.  What was your conclusion?
6         A.  That the price is based on utilizing, say, the
7   model suggested by Steinholt, that the price increase is
8   statistically significant.
9         Q.  Earlier I think you testified that you looked
10  at information going back to 1998.  Why wouldn't you
11  have looked at the stock price increase following this
12  investor conference?
13        A.  For the reasons I've just given you, that --
14  remember what I'm doing, is that you have made
15  allegations regarding certain material misstatements.
16  This is not one of the allegations that you have made.
17        Q.  And we haven't made any allegations going back
18  to 1998, but you looked at that information?
19        A.  Because I did so in the context of responding
20  to a particular -- something again that was not in the
21  complaint or the interrogatories, with respect to the
22  similarity or lack thereof between prior earnings
23  announcements and the earnings announcements that were
24  identified in the complaint.
25        MR. FRIEDMAN:  I'm just going to interpose an

110

1   plaintiffs' contention that certain days were days in
2   which there was material information provided to the
3   market that was false or misleading.
4         MS. WINKLER:  Q.  And I understand that you
5   didn't analyze the stock price increase following this
6   analyst conference.  But my question was directed at
7   whether you would need any additional information to
8   determine whether it would be important to analyze the
9   stock price following the conference.
10        MR. FRIEDMAN:  Objection to form and asked and
11  answered.
12        THE WITNESS:  I mean, I would -- I would
13  analyze it in the context of the allegations as they
14  pertain to this litigation.  My understanding is that
15  plaintiffs have alleged certain statements were made
16  that were false and misleading and have identified dates
17  in which those statements were made.  As part of my
18  analysis I've looked at whether on those dates there is
19  a significant price movement or whether it changed the
20  total mix of information.
21        Now, if you're -- if you're suggesting that
22  there is, as apparently Mr. Steinholt does, that there
23  are additional dates that they may want to consider,
24  then I would take that into consideration in forming
25  whatever testimony I might provide at trial.

112

1   objection, a little belated, argumentative and asked and
2   answered.
3         MS. WINKLER:  Q.  Is it your opinion that the
4   new information disclosed after the market closed on
5   December 14th, 2000 did not cause the price increase in
6   Oracle's stock price on December 15th, 2001?
7         MR. FRIEDMAN:  Objection; vague.
8         THE WITNESS:  You mean -- there is no, as I
9   indicated in my report, no statistically significant
10  price increase using conventional methods of assessing
11  statistical significance.
12        MS. WINKLER:  Q.  Do you believe Mr.
13  Steinholt's event analysis that demonstrates that this
14  price increase was statistically significant is
15  incorrect?
16        A.  I don't think he has the proper scientific
17  basis for doing that.  I mean he -- in order to utilize
18  a one-tailed test one has to have a prior, prior to
19  looking at the returns, for using a one-tail as opposed
20  to a more conventional statistical test, which is a
21  two-tail test.
22        Based upon -- as I understand his deposition
23  testimony, that the 11/30 discussion provided the market
24  with an update as to what might be expected on 12/14, it
25  seems to me like there is no reason to believe that I

113

1  would -- should -- based on sort of the historical
2  relationship between earnings announcements and stock
3  returns, there is no reason that I would a priori
4  utilize a one-tailed test.
5       And if you use a one-tailed test, okay, and I
6  think use of a more appropriate model, as I believe mine
7  is, I don't see statistical significance. I won't
8  debate the fact that there is statistical significance
9  as measured by a one-tailed test using the Steinholt
10  model. I mean, that's a calculation.
11       Q.  Other than your criticism of the fact that
12  he -- is that your only criticism that he used a
13  one-tailed test?
14       A.  I think my criticism is really two fold.
15  First is, he hasn't tried to isolate certain -- the
16  impact of certain allegations -- back up.
17       My first criticism is really one of the lack
18  of any discussion as to priors concerning why a
19  one-tailed test might be appropriate.
20       A second criticism is, even putting that
21  aside, there is -- when you look at -- there is a number
22  of things that were announced and information conveyed
23  to the market on 12/14. And as part of that, there were
24  earnings, there was revenue growth, there were cost
25  savings. And he hasn't attempted to parse out the

114

1  various aspects of that announcement in trying to
2  identify, if he assumes there is a price increase, what
3  that price increase is attributable to.
4       Q.  Do you have an opinion as to what caused
5  Oracle's stock price to increases on December 15th?
6       A.  I think there is evidence that indicates that
7  Oracle did much better than expected with respect to its
8  expense savings. Its revenue growth was, you know,
9  within the bounds that analysts had expected and what
10  the company was guiding to at the beginning of the
11  quarter.
12       Q.  So is it your opinion that it was attributable
13  to the expense savings?
14       A.  I think that that is certainly one factor that
15  contributed to it. And I would note that Mr. Steinholt
16  hasn't done an analysis to try to isolate the parts of
17  the announcement that are attributable to what he
18  alleges to be misstatements, and done that kind of
19  parsing out, but in particular relative to parsing it
20  out relative to what could or should have been said at
21  that point in time.
22       Q.  Are you aware that plaintiffs allege that
23  operating margins were inflated as a result of the --
24       A.  I understand. But operating margin inflated
25  as a result of the unapplied cash, that's not going to

115

1  affect the expense number.
2       Q.  My question, which you didn't let me finish
3  was, whether you were aware of that. And I take it you
4  were?
5       A.  Yes. I'm sorry if I interrupted you. I
6  wasn't aware that I was.
7       MR. FRIEDMAN: Nor was I, for what it's worth.
8       MS. WINKLER: Q.  Going back to your
9  statistical analysis versus Mr. Steinholt's analysis
10  with respect to the December 15th price increase, what
11  objective criteria would you use to assess which
12  statistical analysis was a better one?
13       A.  By --
14       MR. FRIEDMAN: Objection; vague.
15       THE WITNESS: By formulating -- I mean, there
16  is an active debate within the statistics, academia
17  within practitioners within -- within the science of
18  statistical analysis as to the appropriateness of a
19  one-tailed test as opposed to a two-tailed test. And if
20  you have a strong prior as to what you expect the
21  outcome to be, and you formulate the test based on that
22  prior, then it may be appropriate to use a one-tailed
23  test.
24       And if you're hypothesizing that Superman is
25  stronger than the average person, okay, then that may

116

1  lend itself to a one-tailed test, as opposed to
2  Superman's strength is no different than the average
3  person.
4       Now, some classical statisticians would say,
5  yeah, but the hypothesis that you have formulated that
6  Superman is stronger than the average person is
7  presupposing the outcome; right. So there is no reason
8  that I see to have a prior as to what the price reaction
9  would be on a particular day, and, in particular, what
10  the price reaction would be given the plaintiffs'
11  contentions regarding the significance of the 11/30
12  conference call.
13       MS. WINKLER: Q.  My question was regarding
14  objective criteria that one would use to assess the
15  statistical analysis. My understanding of your answer
16  is that you've given me none.
17       MR. FRIEDMAN: I think that he answered the
18  question.
19       THE WITNESS: I think you misunderstood my
20  answer, because I think I gave you both the
21  conceptual --
22       MS. WINKLER: Q.  I wasn't asking for the
23  conceptual.
24       A.  You need to let me finish. -- the conceptual
25  basis for determining scientifically whether to use a

James, Christopher  7/17/2007  9:05:00 AM

117

1  one- or a two-tailed test.  And, second, in the context
2  of evaluating 12/14, 12/15, whether there was any reason
3  to apply that conceptual base.  And I concluded there
4  was none.
5      Q.  Do you disagree that the application growth
6  was the key metric that investors were looking at --
7      MR. FRIEDMAN:  Objection; vague.
8      THE WITNESS:  I'm not sure --
9      MS. WINKLER:  Let me finish that question.
10      MR. FRIEDMAN:  I apologize.
11      MS. WINKLER:  Q.  Wasn't the application
12  growth -- strike that.
13      Do you disagree that the real reason for the
14  increase in Oracle's stock price on December 15th, 2000
15  was that Oracle reported significantly higher
16  application growth for the second fiscal quarter 2001?
17      MR. FRIEDMAN:  Objection; vague and assumes
18  facts.
19      THE WITNESS:  I think that has not been
20  established for the reasons I gave you just a moment
21  ago, that in the context of -- first of all, there was
22  not, based on what I would say a standard statistical
23  test, a significant price increase.
24      Putting aside that, if one were to employ the
25  Steinholt model and the one-tailed test, and conclude

118

1  based on that a statistically significant increase, then
2  the second step hasn't been -- the third steps haven't
3  been done, and the first -- and the second and third
4  step would be to parse out what is new information with
5  respect to, say, the earnings announcement, okay.  And
6  then, third, in terms of determining materiality of
7  statements as it pertains to, say, forecast, one would
8  have to look at what is being alleged could or should
9  have been said at that point in time.
10      MS. WINKLER:  Q.  And my question was whether
11  you disagree the real reason for the price increase on
12  December 15th, 2000 was that Oracle reported
13  significantly higher applications growth for the second
14  fiscal quarter.
15      MR. FRIEDMAN:  Objection; asked and answered,
16  and now getting argumentative.
17      THE WITNESS:  I think my response was directed
18  at there's been no scientific evidence that indicates
19  that that was the reason why, for the reasons that I
20  gave you.  And there certainly is other information
21  coming to the market at that point in time in terms of
22  expense savings and profitability arising from expense
23  savings that could also -- could be responsible for the
24  price change, if one were to determine that it was
25  statistically significant.

119

1      MS. WINKLER:  Q.  So what you're telling me is
2  you can't answer my question?
3      A.  I think I've answered your question now twice
4  in a thorough and complete way.
5      Q.  It was, in fact, a simple yes or no question,
6  which was, and I will repeat it one more time, do you
7  disagree that the real reason for the increase in
8  Oracle's stock price on December 15th, 2000 was the fact
9  that Oracle reported significantly higher applications
10  growth for the second fiscal quarter?
11      MR. FRIEDMAN:  I'm going to interpose the same
12  objections; argumentative, assumes facts.  And he's
13  answered it twice now.
14      If he wants to give an answer.
15      THE WITNESS:  I think that a reasonable read
16  of the last two answers that I've given you say that
17  there is no scientific basis for that conclusion, okay.
18  Which means that I cannot agree with that, okay.  And
19  I'm not sure that one could, based on the answers that
20  I've given you, draw any other inference than the
21  inference I've just explained to you.
22      MS. WINKLER:  Q.  Are you familiar with
23  Oracle's results for the first fiscal quarter of 2001?
24      A.  I am.
25      Q.  Are you aware that database was strong that

120

1  quarter, operation margins expanded and applications
2  were down?
3      A.  I don't believe applications were down.
4      Q.  Did applications meet the expected growth
5  rate?
6      A.  I recall various analyst commentaries, I
7  believe some thought that the number would come in more
8  than 42 percent, others believed it was at 42 percent.
9      Q.  So did applications meet the expected growth
10  rate?
11      MR. FRIEDMAN:  Objection; vague.
12      THE WITNESS:  Again, I think with respect to
13  whose expectations?
14      I have to go back and take a look at the
15  specific analyst expectations before I can answer that
16  question.
17      MS. WINKLER:  Q.  So you don't know whether
18  the applications number met the expected growth rate?
19      A.  You're saying the expected growth rate.  And
20  I've given you my recollection, is that the applications
21  number came in slightly below certain analysts'
22  expectations, but was viewed strong by other analysts.
23      Q.  Oracle's stock price went down after those
24  results were announced; didn't it?
25      A.  I don't believe that Oracle's stock price was

James, Christopher  7/17/2007  9:05:00 AM

121

1    down in a statistically significant way.
2         Q.  Have you performed that analysis?
3         A.  I have looked at that, yes.
4         Q.  And why did you look at that when you didn't
5    look -- when you didn't do an analysis after the
6    November 30th -- the November 29th investor conference?
7         MR. FRIEDMAN:  Objection; mischaracterizes the
8    testimony.
9         THE WITNESS:  Well, I have indicated that I've
10   done that, and it is in response, to again, if you read
11   Mr. Steinholt's reports and your pleadings in this case,
12   there is no reference to the first quarter earnings
13   announcement, okay.  And I analyzed the stock price
14   performance in the context of the allegations in the
15   complaint and the second interrogatory response.
16        MS. WINKLER:  Q.  When did you analyze the
17   stock price decrease after the first quarter?
18        A.  Well, there is no statistically significant
19   stock price decrease using traditional measures of
20   statistical significance.  And I did that after the
21   Steinholt deposition in response to new information that
22   he was considering, although he indicated in his
23   deposition that it was not important for the formulation
24   of his opinion.
25        MS. WINKLER:  Now is probably a good time to

122

1    take a lunch break.
2         VIDEOGRAPHER:  We are going off the record.
3    The time is 12:37 p.m.  This marks the end of videotape
4    number two, Volume I, in the deposition of Christopher
5    James.
6         (Lunch recess, 12:37 p.m. - 1:46 p.m.)
7         VIDEOGRAPHER:  We are back on the record.  The
8    time is 1:46 p.m.  Here marks the beginning of videotape
9    number three, Volume I, in the deposition of Christopher
10   James.
11        MS. WINKLER:  Q.  Are you familiar with the
12   out-of-pocket measure of damages?
13        A.  Yes.
14        Q.  Can you explain what that is?
15        A.  An out-of-pocket measure of damages looks at
16   whether -- looks at the price at purchase relative to
17   the price at sale.
18        So one of the requirements in terms of, as I
19   understand it, from the PSLRA, is that an investor
20   experienced an out-of-pocket loss, the price at sale was
21   lower than the price at purchase.
22        Q.  Do you have any criticisms regarding using the
23   out-of-pocket measure of damages in this case?
24        A.  In this case?  Well, I think that, as I
25   understand Mr. Steinholt, who is looking at a measure of

123

1    damages which is inflation at purchase relative to
2    inflation at sale, using a constant band, and as I
3    indicate in my report, I think that's inconsistent with
4    the direction in Dura to isolate and remove industry and
5    market-wide factors.
6         Q.  Do you have an alternative methodology other
7    than the out-of-pocket measure of damages to calculate
8    damages here?
9         A.  I don't -- I would disagree with your notion
10   that he's -- I mean, I think that an alternative measure
11   of damages would be to look at the price drop on the day
12   of the announcement, isolating out the nonfraud-related
13   price changes from the alleged fraud-related price
14   changes and to use that as a measure, again, limiting it
15   to those investors who had suffered an out-of-pocket
16   loss in the sense that their purchase price was greater
17   than the sales price.
18        Q.  This morning you briefly touched upon some
19   work that you had done since your rebuttal report, which
20   I believe you testified was in response to
21   Mr. Steinholt's testimony; is that fair?
22        A.  Just to be clear, the work I did is in
23   response to his deposition testimony, yes.
24        Q.  Have you performed any other work since your
25   rebuttal report?

124

1         MR. FRIEDMAN:  Objection; vague.
2         THE WITNESS:  I don't believe -- well, I've
3    reviewed the transcript of Mr. Steinholt's deposition
4    and did analyses -- as I sit here, the two analyses that
5    I can recall -- three, actually, analyses.
6         One is to look at and review the audio of the
7    November 30th and the analysts' commentary around that
8    particular day to -- he does refer to the Q1 earnings
9    announcement.  And so I reviewed that, as well as
10   analysts' discussion around that.
11        I looked at prior earnings announcements and
12   price reactions to prior earnings announcements.
13        And as I sit here, I think that's the only
14   other work that I have done in the context of -- only
15   new analyses that I've done since I wrote my rebuttal
16   report.
17        MS. WINKLER:  Q.  I think this morning you
18   mentioned that in the context of the November 29th CSFB
19   investor conference, you had reviewed a Bloomberg report
20   and a CSFB report; is that fair?
21        A.  I reviewed a number of reports, and I may have
22   reviewed -- I recall reviewing some of those, but not
23   relying on them.  So the materials that I've cited in my
24   report I relied on in forming my opinion, not all the
25   materials that I reviewed.

James, Christopher  7/17/2007  9:05:00 AM

125

1    Q.   What I'm primarily focusing on now is the work
2  that you've just described to me that you've done since
3  your rebuttal report.
4        What I would like to know is what analyst
5  reports you reviewed in connection with looking at the
6  November 29th CSFB conference.
7    A.   Well, I remember seeing the CF First Boston.
8  I may have reviewed a Goldman Sachs report.  But I
9  really don't have -- those are the ones that I recall.
10  I reviewed a number of analysts' reports.  There may be
11  others, but those are the ones I can recall as I sit
12  here.
13    Q.   Do you recall the date of the Goldman Sachs
14  report you reviewed?
15    A.   I don't, I'm sorry.
16    Q.   Was that report cited in either your opening
17  report or rebuttal report?
18    A.   It wouldn't have been cited as relied upon,
19  because, again, I was responding to analyses done by
20  Mr. Steinholt or statements identified in the complaint
21  or interrogatories.  And my recollection is November
22  29th/30th was not one of those days.
23    Q.   But you did testify this morning that you
24  analyzed the mix of information in the market prior to
25  the Class Period; didn't you?

126

1    A.   Oh, yeah.  And I may have looked at those in
2  the context of that review, but I didn't rely on them
3  for the reasons I gave you.
4    Q.   You also said that you looked at the Q1
5  earnings announcement in your work that you did after
6  your rebuttal report.
7    A.   Right.
8    Q.   What analyst reports did you review in
9  connection with doing that?
10    A.   I know there was one Goldman Sachs report.
11  There may have been others.  I just -- I recall
12  specifically a Goldman and Sachs.  But there were
13  others, I just can't recall what they were.
14    Q.   Do you recall any of the earnings
15  announcements -- I mean, strike that.
16        Do you recall any of the analyst reports you
17  looked at in connection with looking at prior earnings
18  announcements?
19    MR. FRIEDMAN:  Objection; vague.
20    THE WITNESS:  I don't have a specific analyst
21  report in mind in the context of those -- I'm answering
22  that with respect to earnings announcements other than
23  the Q1 and the earnings announcements in the Class
24  Period.
25    MS. WINKLER:  Q.  Based upon the work that

127

1  you've performed since your rebuttal, have you changed
2  any of your opinions stated in your initial rebuttal
3  report?
4    A.   No.
5    Q.   Have you documented the work that you
6  performed since your rebuttal in any way?
7    MR. FRIEDMAN:  Objection; vague.
8    THE WITNESS:  I haven't drafted, for example,
9  a supplemental rebuttal report.
10    MS. WINKLER:  Q.  Have you documented, for
11  example, the analysts' reports you reviewed in any way?
12    A.   I haven't -- I mean, I have access to them.  I
13  haven't written -- I don't have a log of the analyst
14  reports.
15    Q.   Would you be able to recreate the analyst
16  reports you looked at, if you needed to?
17    A.   Sure, yeah.
18    Q.   Has the work that you performed since your
19  rebuttal report been communicated to your attorneys in
20  any manner, other than verbally?
21    MR. FRIEDMAN:  Objection; it calls for
22  documents and things outside the scope of the
23  stipulation.
24        I mean, do you want to ask that question?  Do
25  you want to read it back?

128

1    MS. WINKLER:  It is a yes or no question.
2    MR. FRIEDMAN:  You can answer the question.  I
3  make the objection based on the stip.
4    THE WITNESS:  I have communicated my findings
5  and results to --
6    MS. WINKLER:  Q.  In any way other than
7  verbally?  Yes or no?
8    MR. FRIEDMAN:  I think she's asking if you
9  have written anything to me, yes or no, since after the
10  rebuttal.
11    THE WITNESS:  No.
12    MS. WINKLER:  Q.  Based on the work you
13  performed since your rebuttal reports, do you have
14  anything more you want to add to your opening or
15  rebuttal reports sitting here today?
16    A.   No.  Although I guess I would reserve the
17  right to, if there is another -- if there is additional
18  analysis that is provided by Mr. Steinholt, or if he's
19  going to use that in the analyses that he conducted for
20  purposes of his opinion, I imagine I would want to be in
21  a position to respond to that.  But beyond that, no.
22    Q.   Have you determined that there was any
23  information disclosed on December 14th, 2000 that was
24  unrelated to the alleged fraud that was material?
25    A.   I think I've answered that question when you

James, Christopher  7/17/2007  9:05:00 AM

129

1 asked me about my opinion as to whether the -- meeting
2 the -- or the 11 cent earnings number was material new
3 information and whether the growth in apps came in -- it
4 was associated with a price change.
5        First of all, let me be clear, I don't -- I
6 think if you use accepted statistical methodology, I
7 don't think you can reject the hypothesis that there was
8 no price change.
9        But, second, I think that there is certainly
10 other information that is not part of the allegations
11 that was potentially material to investors, including
12 the expense material that I talked about in my report
13 and described in the context of the answer that I gave
14 you before.
15   Q.   Have you made a determination that the expense
16 material that you referred to was material?
17   A.   I think it's potentially material. Again, I
18 think one of the problems I have in terms of measuring
19 the materiality in the context of plaintiffs' allegation
20 is that plaintiffs haven't specified what they believe
21 to be the truth as of that particular point in time.
22        So when you're looking at materiality of a
23 particular alleged misstatement or statement, one needs
24 to look at the statement in the context of what could or
25 should have been said at that particular point in time.

130

1   Q.   Going back to my prior question, is there
2 anything other than the expense that you believe was
3 unrelated to the alleged fraud that was disclosed on
4 December 14th, 2000?
5   A.   Oh, I think that certainly the earnings that
6 were reported and the guidance provided could be
7 unrelated to the alleged fraud.
8   Q.   Do you think the earnings and the guidance
9 were material?
10   A.   Again --
11        MR. FRIEDMAN:  Objection; asked and answered.
12        THE WITNESS:  As I indicated before, and I
13 refer you to my prior testimony, that I don't see
14 evidence that they were material in terms of a change in
15 the stock price or changing the total mix of
16 information.
17        I would say that what is lacking in Mr.
18 Steinholt's -- he basically ignores the materiality
19 issue by failing to formulate a hypothesis with respect
20 to what the alleged -- what should have or could have
21 been said at that particular point in time relative to
22 what was conveyed to the market.
23        MS. WINKLER:  Q.  What's more important to
24 investors, operating margins or operating expenses?
25   A.   I would think that the expense number is --

131

1 margin is just a percentage number.
2        I think what investors care about is cash
3 flows. And I think cash flows are more directly linked
4 to operating expense number than a margin number.
5   Q.   How do you define loss causation?
6   A.   As I indicated today, earlier, I look at loss
7 causation by a loss caused or connected to the curative
8 disclosure as it pertains to the alleged fraud.
9        So, for example, I would look at a loss caused
10 by, say, an earnings miss that is linked to a particular
11 allegation. I would not, say, look at losses caused by
12 industry or market factors or factors unrelated to
13 allegation or allegations.
14   Q.   Is there not loss causation simply if there is
15 a loss that would not have occurred absent the alleged
16 fraud?
17   A.   I think that -- no. I think that in terms
18 of -- as I understand loss causation, one needs to
19 isolate and identify a loss that is caused in some way
20 by a curative disclosure, either a direct or indirect
21 curative disclosure.
22        And by indirect, I would mean a disclosure
23 that is related to and causally linked to the alleged
24 fraud.
25   Q.   If a company represents that it is close to

132

1 obtaining a significant new customer who would be
2 expected to double earnings in the future, the stock
3 price then increases to reflect this information,
4 insider sells stock, then the company announces the
5 customer changed its mind and the stock plummets, is
6 there loss causation even though there is no disclosure
7 that the initial representation was false?
8   A.   Well, I mean, certainly that's not a fact
9 scenario that applies to this case. You're saying that
10 the market forms an expectation regarding a sale to a
11 particular customer, and the -- then subsequently the
12 company indicates that it is not going to sell the
13 product to that customer, and that's associated with a
14 significant price drop, and it is ascertained that no
15 intervening economic or other factors other than the
16 fact that the company knew at the time that it made the
17 statement that it would never sell to that particular
18 customer?
19        I would think that that would be something
20 that would be linked to -- if you could establish the
21 materiality of the statement at the time it was made,
22 and demonstrate that it was false at the time that it
23 was made, and that the reason for the lack of sale to
24 the customer has nothing to do with intervening events,
25 but is simply a playing out of that false

133

1  misrepresentation, then I would say that that would be
2  something that I would consider in the context of a loss
3  causation.
4      Q.   What do you mean when you say you would
5  consider it in the context of a loss causation?
6      A.   You are giving me a hypothetical that -- I
7  need to study it in more depth than 30 seconds.  But
8  certainly that would be something that in my mind would
9  touch on the fraud either directly or indirectly.
10     Q.   How about if a company starts to report twice
11 its actual earnings, increasing investors' expectations
12 regarding future earnings, the stock price then
13 increases and insiders sell stock, then the company
14 starts to report its actual earnings, causing the stock
15 price to decline, is there loss causation even though
16 there is no disclosure that the previous earnings were
17 false?
18     MR. FRIEDMAN:  Objection; vague and ambiguous,
19 confusing.
20     THE WITNESS:  I'm not sure why -- I'm not sure
21 I understand your hypothetical.  I don't know that there
22 is -- in terms of determining loss causation whether
23 there's -- it is not -- I'm not sure that it's relevant
24 to have an intervening insider sale or purchase.
25     So your hypothetical is one in which the

134

1  company is providing expectations about earnings growth,
2  and it subsequently reports lower earnings than the
3  market expected based upon its previous statements?
4  That may or may not be a loss causation.  If, for
5  example, a loss causally linked to the fraud.  For
6  example, if the company were to miss its earning --
7  its -- the expected earnings of the market and the price
8  were to decline for reasons that were unrelated to the
9  alleged fraud, then I don't think that that would be a
10 curative disclosure as to the fraud.
11     MS. WINKLER:  Q.   What if a company introduces
12 new software and falsely claims that the software has
13 significant benefits over existing software that would
14 generate substantial sales, the stock price then
15 increases, insiders sell stock, then the company later
16 reveals that the sales were far below prior
17 representations, is there loss causation there even
18 though there is no disclosure that the software did not
19 have the claimed benefits and, therefore, should not
20 have been expected to generate substantial sales growth?
21     MR. FRIEDMAN:  Objection; incomplete
22 hypothetical.
23     THE WITNESS:  Again, I think I would have to
24 go back -- that certainly is not a hypothetical that
25 fits the current case.

135

1      And, again, it would be -- so you're
2  hypothesizing that a company has a software product that
3  it is enthusiastic about and -- I guess at the first
4  level lots of companies are enthusiastic about their
5  products as they are introduced.
6      One of the roles of analysts in the
7  marketplace is to look at the characteristics and
8  attributes of the product and interview customers and to
9  determine the functionality of that product for purposes
10 of whether it's reasonable to assume that the product
11 will be successful.
12     Lots of products -- lots of companies may miss
13 their earnings guidance for reasons that -- I don't know
14 that I would say that an earnings miss in that context
15 would necessarily be causally linked to the product
16 quality claims without knowing more.
17     MS. WINKLER:  Q.   What if a company makes
18 false and misleading statements that inflate the stock
19 price, and then to eliminate the inflation simply
20 reduces guidance without disclosing that any of the
21 prior representations were false and misleading, is
22 there a loss causation there?
23     MR. FRIEDMAN:  Same objection; incomplete
24 hypothetical.
25     THE WITNESS:  First of all, I don't think

136

1  that's a hypothetical that's consistent with the facts
2  in this case as I understand it.
3      I think you need more than that.  There is
4  lots of reasons why companies, again, may not have
5  earnings consistent with prior market expectations, that
6  earnings miss may be totally unrelated to the
7  allegations.
8      I mean, I think what you need to do is to
9  first establish that the allegations were material, that
10 they changed the total mix of information, by
11 establishing, you know, what should or could have been
12 said at various points in time and compare it to what
13 was said, and then to look at and analyze the reasons
14 for the subsequent performance and to determine whether
15 that subsequent performance is linked in a causal way to
16 the prior allegations.
17     MS. WINKLER:  Q.   Is it your opinion that the
18 March 1st earnings miss was the result of a sudden and
19 sharp economic slowdown in the enterprise software
20 industry?
21     A.   Yes.
22     Q.   Did the March 1st announcement provide the
23 market with any new material information regarding
24 Oracle's applications?
25     A.   Well, sure.  I mean, it provided information

137

1 to the market regarding Oracle's applications in the
2 context of the then current economic conditions.
3    Q.   What was that information?
4    A.   Well, you have -- I'm sorry.
5        MR. FRIEDMAN: I didn't say anything. I don't
6 think I did.
7        Do you want to read the question back?
8        THE WITNESS: Yeah, why don't you.
9        (Record read as follows: QUESTION: Did the
10       March 1st announcement provide the market with
11       any new material information regarding Oracle's
12       applications?  What was that information?)
13       THE WITNESS: Well, I think the announcement
14 required -- provided the market with what I would view
15 material new information regarding both the applications
16 business as well as Oracle's other businesses and how
17 they were faring in the then current economic
18 environment.
19       MS. WINKLER: Q.  And what was the new
20 information regarding how the applications business was
21 faring in the then current economic environment?
22    A.   Well, I think it is clear to me that the
23 market and market participants were concerned about the
24 earnings miss and what it conveyed in terms of future
25 business prospects in the then current economic

138

1 environment.
2        If you look at analysts' commentary at this
3 point in time, they understood that the quarter was
4 back-end loaded, and more back-end loaded than was --
5 might previously have been the case.
6        Oracle is reporting the results, okay, for
7 that quarter. It's telling the market what -- how their
8 products perform, both database and apps, in the context
9 of what's new information regarding economic conditions
10 and how they are affecting enterprise software
11 companies. And it is that -- and I arrive at that
12 conclusion for the reasons I gave in my report by
13 looking at such things as the competitors' response, how
14 analysts revise their estimates for both Oracle and
15 competitors, how competitors subsequently did in the
16 context of the changed economic environment.
17    Q.   Are you aware that in a December 15th, 2000
18 Bloomberg interview, Ellison stated, "The economic
19 slowdown isn't hurting Oracle because the company has
20 spent the past three years updating its product line to
21 focus on software that helps companies use the Internet
22 to cut costs and boost efficiency"?
23    A.   I recall seeing that Bloomberg, I don't recall
24 those specific words. If you have it, I can review it
25 to refresh my recollection.

139

1    Q.   With respect to that statement, did Oracle's
2 March 1st, 2001 announcement reveal any new information?
3    A.   With respect to that statement?
4    Q.   I can read the statement again, if you'd like.
5    A.   My understanding of what the statement says is
6 as you've relayed it to me, and if you had a copy of it,
7 I could review it. But the statement as I understood
8 you to say it was we don't see the impact of the economy
9 on our business as of -- what was it?  January?
10   Q.   Why don't I -- I will read the statement again
11 for you. December 15th, 2000, "The economic slowdown
12 isn't hurting Oracle because the company has spent the
13 past three years updating its product line to focus on
14 software that helps companies use the internet to cut
15 costs and boost efficiency."
16   A.   Right.
17   Q.   My question is, did Oracle's March 1st, 2001
18 announcement reveal any new information relating to that
19 statement?
20   A.   Yes. I think as it relates to that statement,
21 the economic environment was different in February --
22 late February and March than it was in December, number
23 one.
24       Number two, that statement was made in the
25 context of Oracle's statements that it was not immune to

140

1 the economy, okay.
2        As a result, there is a disclosure of a risk,
3 a known risk at that point time, in December. And I
4 view what is occurring in March as the outcome, okay, of
5 a known risk.
6        In other words, there was uncertainty as to
7 whether Oracle would be impacted or not, and Oracle's
8 statements, as I understand that statement in context
9 was: We don't see that we're being impacted currently.
10       It is not a statement that: We would never be
11 impacted.
12       And certainly the statements that Oracle made
13 were to the contrary, that they would be impacted if
14 there were a sudden and severe decline in economic
15 activity.
16   Q.   Are you aware of any statements that Oracle
17 made prior to March 1st, 2001 indicating that it would
18 not be impacted by a sudden decline in the economy?
19   A.   Am I aware of any statements that Oracle made
20 that said they were not going to be impacted by a
21 decline in economic activity?
22   Q.   By a sudden decline in the economy.
23   A.   I don't recall them saying that. I don't
24 recall any specific statements. I recall statements
25 indicating that like any business there were risks of

James, Christopher  7/17/2007  9:05:00 AM

141

1 their business associated with a slowdown in economic
2 activity.
3     And that's not only statements that were in
4 their 10-K, but statements that were reiterated by and
5 discussed by analysts as late as late February.
6     Q.  Are you aware that during a December 15th,
7 2000 radio Wall Street interview, Defendant Henley
8 stated that, "If they" -- referring to Oracle's
9 customers -- "have to slow down on discretionary
10 spending, it's not going to be on E-Business"?
11     A.  When was this?
12     Q.  December 15th, 2000.
13     A.  You know, I recall again something to the
14 effect -- I don't recall the specific Henley statements.
15 I recall commentary, and it may be the Henley
16 statements, that while there was a slowdown in IT
17 spending -- and this comes out in the Morgan Stanley
18 survey and other surveys that were done at the time --
19 the impact was not expected to be substantial in the
20 enterprise software business given the fact that it was
21 perceived to be a high ROA -- ROI business at the time.
22     Q.  Did the March 1st, 2001 announcement reveal
23 any new information relating to the statement that I
24 read to you, which was, "If they" -- referring to
25 Oracle's customers -- "have to slow down on

142

1 discretionary spending, it's not going to be on
2 E-Business"?
3     A.  I think it did by looking at both Oracle and
4 its competitors, that, first of all, the magnitude of
5 the slowdown, I think, was unanticipated.  And, second,
6 that -- and there is analyst reports in February, I
7 believe in January, and coincident with December,
8 talking about, well, you know, we understand that that's
9 a view, that it's a high ROA.  But then again, there is
10 the notion that when you're talking about a, for
11 example, a suite approach versus a best-in-breed, you're
12 thinking -- you can think in terms of, you know, do I
13 want to do that implementation now, or is that something
14 that I can push off into subsequent quarters given the
15 economic slowdown.
16     So that was a risk that was known.  And while
17 it had a high ROI associated with it, it also had a
18 significant up-front investment that was potentially
19 postponable.
20     Q.  I'm going to ask you that question again, and
21 perhaps it's simply I didn't understand what you thought
22 was new there.
23     But what new information was revealed by the
24 March 1st, 2001 announcement as it related to that
25 statement?

143

1     MR. FRIEDMAN:  It's been asked and answered.
2     THE WITNESS:  I thought I answered the
3 question.  I was trying to make a distinction between a
4 view of the likely benefits and costs associated with a
5 new investment in an economic environment of December
6 and what the prospective impact of, say, a slowdown
7 would be, and the realization of, first of all, a more
8 significant slowdown, okay, in the context of the
9 enterprise software.
10     So the statements in December about it may be
11 an attractive proposition to invest in enterprise
12 software given it has a high, relatively high ROA --
13 ROI, I'm sorry.  And that's certainly consistent with
14 what CIOs and other senior executives were saying about
15 their perception of enterprise software in the context
16 of a slowing environment.
17     When the environment slows more quickly than
18 anticipated, then you get the realization of the risk
19 that Oracle had conveyed to the market in December,
20 okay, and had been discussed by analysts, that is in the
21 total mix of information, which is, you know, even a
22 high ROI investment isn't immune to economic downturns.
23 And that's what you're observing.
24     MS. WINKLER:  Q.  Are you aware that during
25 the December 14th, 2000 conference call, defendant

144

1 Ellison stated with respect to Suite 11i that it was up
2 and running in months, you get the savings in months, it
3 costs you less, and it takes you less time to install?
4     A.  Than best-of-breed?
5     Q.  Is that your understanding of the context in
6 which that statement was designated?
7     A.  As I understand the context of his statement,
8 is that he's looking at the suite concept relative to
9 best-of-breed and saying, given it is designed to be
10 integrated that it is -- while there are implementation
11 costs and significant implementation costs, okay, the
12 integration associated with that product is likely to be
13 less expensive than best-of-breed.
14     Q.  Let's focus on the first two sentence there,
15 where Ellison says, "It is up and running in months, you
16 get the savings in months," do you take that to be a
17 comparison with best-of-breed?
18     A.  Yes.
19     Q.  What about that indicates to you that he's
20 comparing it to best-of-breed?
21     A.  Well, again, I think if you look at it in the
22 context of his other statements, and he's -- you know,
23 he's consistent, at least in my view, in his description
24 of the attributes and the potential drawbacks of his
25 product relative to other competitive products in the

145

1  marketplace.
2        His -- his view is, and he indicates this,
3  actually in the November 29th discussion as well, is
4  that, you know, "I might be wrong, okay, I might be --
5  people might have a different view, but in my view it
6  is -- has significant cost savings relative to
7  best-of-breed, integration costs are going to be lower,
8  okay."
9        He's not representing there are no
10  implementation costs or implementation may not be a very
11  costly process.
12        But I think his comparison is with respect to
13  the competitor products, which are best-of-breed.
14        Q.  When he says it is up and running in months,
15  where do you get that there's a comparison there?
16        A.  Well, I was referring to the latter part of
17  the statement, not the --
18        Q.  And I specifically asked you about the first
19  two sentences, "It is up and running in months, you get
20  the savings in months."  Where do you see a comparison
21  in those two sentence with respect to best-of-breed?
22        A.  I see with respect to the savings, with
23  respect to best-of-breed, and the attributes of the
24  software.  With respect to up and running in months,
25  okay, I mean, I think in -- my understanding is in the

146

1  context of the implementation process vis-a-vis having
2  to integrate with new software, that's in the context
3  which he said it before, with respect to that statement
4  I would have to look at the entire transcript to
5  determine what, in fact, he's saying it with respect to
6  best-of-breed.
7        Q.  When Ellison says the Suite 11i software is up
8  and running in months, do you think that's somehow
9  dependent upon how best-of-breed software functions?
10        MR. FRIEDMAN:  Objection to the form.
11        THE WITNESS:  I think it would be evaluated by
12  market participants, as it was, looking at the analysts'
13  reports and market commentary in the context of the
14  product and in the process by which products like that
15  are implemented.
16        MS. WINKLER:  Q.  And so you think that that
17  means that the statement it is up and running in months
18  is dependent upon how best-of-breed software functions?
19        MR. FRIEDMAN:  Objection; asked and answered.
20        THE WITNESS:  I think it is in the context of
21  what the implementation process for products like Suite
22  11i and the competitors, what it takes to get them up
23  and running.
24        And, you know, there is -- there is a lot of
25  discussion by market participants, analysts, in talking

147

1  with customers, in trying to understand the relative
2  advantages and disadvantages of Suite 11i relative to
3  the competitive products.
4        And one of the things that was being focused
5  on was the relative advantage of Suite 11i as it
6  pertains to integration costs, implementation process
7  and the like.
8        MS. WINKLER:  Q.  So is it your testimony that
9  investors couldn't rely upon Ellison's statement that
10  Suite 11i would be up and running in months?
11        A.  That they could?
12        Q.  Could not.
13        MR. FRIEDMAN:  Objection; argumentative.
14        THE WITNESS:  I think investors would
15  certainly take that in the context of other things they
16  understood about the product and factor it in as part of
17  the total mix of information.
18        MS. WINKLER:  Q.  Do you think the March 1st,
19  2001 announcement revealed any new information relating
20  to Ellison's statements, "It is up and running in
21  months, you get the savings in months"?
22        A.  I don't believe the market reaction to 3/2 was
23  in any way related to the allegations regarding the
24  functionality or quality of the product.
25        You don't see any change in analysts'

148

1  assessments with respect to the product quality relative
2  to the competitive products in the marketplace,
3  coincident with the earnings announcement.
4        Q.  My specific question was, did the announcement
5  reveal any new information relating to that statement?
6        A.  I don't think the announcement had conveyed
7  any new information as it pertains to that statement.  I
8  don't recall seeing in the announcement or in the
9  subsequent conference call any discussion about that
10  statement.
11        Q.  Would you have to, in order to have loss
12  causation here?
13        A.  Well, I think you would have to -- if you're
14  going to argue that a statement was material, when the
15  statement is -- you'd first want to know, again, and I
16  indicated this another time, what is the truth at
17  various points in time relative to what's being said.
18  And, second, look at what happens to the value when the
19  truth is revealed.
20        Now, the March 1st announcement as it pertains
21  to third quarter results didn't provide any information
22  as it pertains to that aspect of quality, nor did the
23  announcement of the earnings disappointment lead
24  investors to conclude something different about product
25  quality relative to what they believed prior to that.

149

1    I don't see any analyst saying this puts us on
2  notice there are substantial product quality issues
3  where the implementation process is much longer than
4  hitherto expected.
5    Q.  Have you spoken to any investors regarding
6  what they understood from the March 1st, 2000
7  announcement?
8    A.  No.  I relied on the commentary of analysts
9  and -- of market analysts and news commentary.
10    Q.  Did you rely on the company's explanation?
11    A.  That's one of the things I considered.
12    Q.  Do you think the market believes everything
13  that the company tells it?
14    A.  No.  To the contrary.  And the evidence is
15  fairly clear here that the analysts and market
16  participants did their own independent research to
17  determine and assess both quality of the product,
18  traction in the marketplace and the like.
19    Q.  If plaintiffs can prove that Oracle was behind
20  plan, behind their forecast as of January 2001, would
21  that affect your opinion in any way?
22    MR. FRIEDMAN:  Objection; vague.
23    THE WITNESS:  Behind their forecast as of
24  when?
25    MS. WINKLER:  Q.  As of January 2001.

150

1    A.  Would it affect my opinion?  I would need to
2  know more before I could determine whether it affected
3  my opinion or not.
4    Q.  What more would you need to know to make that
5  determination?
6    A.  As I understand, there is a forecast and
7  potential.  The potential is what guidance is provided
8  on.  I think there is a great deal of uncertainty as
9  to -- as was recognized in the market about Oracle or
10  any company's ability to make its forecast.
11    If there is evidence that indicates -- say,
12  for example, an internal report that would say, you
13  know, we think we might be at 11.4 as opposed to 12
14  cents, but if the company believed that and there was
15  reason to believe that they would still be able to make
16  their numbers, that may not -- that would not
17  necessarily impact my opinion at all.
18    Q.  So if plaintiffs could prove that Oracle was
19  behind plan both with respect to the potential and the
20  forecast as of January 2001, would that change your
21  opinion?
22    A.  Without knowing more, not necessarily.
23    Q.  Do you need a restatement or an explicit
24  disclosure of accounting fraud in order to have damages
25  in this case?

151

1    A.  Well, there has been no restatement.  So your
2  question is?
3    Q.  Do you need a restatement or an explicit
4  disclosure of accounting fraud in order to have damages
5  in this case?
6    A.  No, I don't think you need a restatement -- I
7  mean, you need a curative disclosure that touches on the
8  accounting allegations.  And I haven't seen that
9  connection.
10    But I don't -- it is not my view that in a
11  case in which there is accounting allegations, that
12  accounting wasn't done in accordance to GAAP or
13  whatever, that necessarily requires a restatement to be
14  the curative disclosure.
15    Q.  In what form do you think that curative
16  disclosure needs to take, if not in the form of a
17  restatement?
18    A.  As I described to you when you asked a similar
19  question, it would have to be -- I will give you a
20  hypothetical.
21    If, for example, there is an allegation that
22  revenue wasn't recognized in accordance with GAAP, and
23  the allegation is that revenue was moved into Q1 of this
24  hypothetical company and it should have been in Q2, and
25  but for the revenue that was moved there is no change in

152

1  economic conditions, there is no other aspects of the
2  company's business that has changed, there is a miss in
3  Q2 that wouldn't have occurred but for the revenue
4  recognition issue, then that might be something that is
5  causally linked to the accounting allegations that might
6  lead me to conclude, and I would need to investigate it
7  further, a loss caused by the alleged fraud.
8    Q.  Even though there may have been no restatement
9  in your hypothetical?
10    A.  Even though there had not been any restatement
11  in my hypothetical.
12    Now, obviously, that hypothetical is not one
13  that reflects the facts and circumstances of this case.
14    Q.  If a company lies when it makes a so-called
15  corrective disclosure, in other words, it lies about the
16  reasons for a stock price decline or decline in
17  revenues, do you need a subsequent admission by the
18  company that it was not being truthful in its corrective
19  disclosure in order for it to be damaged under the
20  federal securities laws?
21    A.  It would depend what the allegation of fraud
22  is.
23    MR. FRIEDMAN:  I'm going to object on the
24  grounds it calls for a legal conclusion.
25    MS. WINKLER:  Q.  Do you know what the legal

James, Christopher  7/17/2007  9:05:00 AM

153

1  standard is for a truth of the market defense?
2      MR. FRIEDMAN:  Same thing, same objection.
3      THE WITNESS:  I have a layman's understanding
4  of it.
5      MS. WINKLER:  Q.  So you're not offering an
6  opinion here whether defendants are able to satisfy the
7  legal standard?
8      A.  I think that was one of the first questions
9  you asked me today.
10     Q.  It actually wasn't with respect to the truth
11 of the market defense.
12     A.  I was going to finish the answer by saying,
13 I'm not here to provide you with legal conclusions, or a
14 legal opinion as to what the pleading standards are.
15         When you get to a convenient breaking point.
16     MS. WINKLER:  We could probably do that now.
17 That would be fine.
18     VIDEOGRAPHER:  Going off the record.  The time
19 is 2:37 p.m.
20         (Recess, 2:37 p.m. - 2:53 p.m.)
21     VIDEOGRAPHER:  We are back on the record.  The
22 time is 5:53 p.m. -- I'm sorry, 2:53 p.m.
23     MS. WINKLER:  Q.  Was the information
24 disclosed on March 1st that the database revenue growth
25 was estimated to be flat to slightly negative new

154

1  information?
2      A.  Yes.  I think that my recollection is that the
3  analysts' forecasts and guidance were at above that
4  number.
5      Q.  Did you review the reports submitted by
6  defendants' other experts before they were finalized?
7      MR. FRIEDMAN:  I'm going to just interpose an
8  objection to the extent it calls for information
9  protected by the stipulation.
10     THE WITNESS:  I had discussions.  I don't
11 recall -- I don't recall.  I had discussions, I may have
12 reviewed one.
13     MS. WINKLER:  Q.  You mentioned this morning
14 or earlier today discussions with Mr. O'Bryan.  Did you
15 talk to any of the other experts?
16     A.  Yes.
17     MR. FRIEDMAN:  Same objections.
18     MS. WINKLER:  Q.  Have you been qualified by a
19 court as a damages expert before?
20     A.  Yes.
21     Q.  How many times?
22     A.  In securities cases, I'm going to presume
23 that -- I have never been disqualified, and I'm not sure
24 how the process of qualification goes.  I have
25 testified, and my testimony has been accepted by a court

155

1  in securities cases in trials, I believe, one, two,
2  three, four -- six or seven times.
3      Q.  If you will turn to Exhibit 2 of your opening
4  report, which I think is Exhibit 1.  Can you just direct
5  me to those cases?
6      A.  KA Investments versus Number Nine Visual
7  Technologies.
8      Q.  And that was not a class action case, was it?
9      A.  I'm not sure.
10     Q.  Any additional cases?
11     A.  In terms of courtroom testimony?
12     Q.  Yes.
13     A.  Texas First National Bank versus Kenneth Wu.
14 In the WorldCom Securities Litigation, I did not testify
15 at trial, although I was -- the case I believe settled
16 the day before I was to testify.
17         In terms of securities cases, in terms of the
18 last four years, those are the only two that are on the
19 list.
20     Q.  Was Texas First National Bank a class action
21 case?
22     A.  I don't believe it was.
23     Q.  Has your opinion ever been excluded by a court
24 on any grounds?
25     A.  Not that I'm aware of.

156

1      Q.  Did you testify in a trial last week?
2      A.  I did.
3      Q.  What case was that?
4      A.  Sterling Savings.
5      Q.  The first one that appears on Exhibit 2?
6      A.  Yes.  In Spokane, Washington.  A securities
7  case.
8      Q.  Who did you testify on behalf of in that case?
9      A.  Sterling Savings, the plaintiff.
10     Q.  And what was your area of expertise that was
11 the focus of that testimony?
12     A.  Financial economics, corporate finance,
13 management of commercial banks and thrift institutions.
14     Q.  Were there any damages issues in that case?
15     A.  Yes.
16     Q.  Did you testify with respect to the damages
17 issues?
18     A.  I did.
19     Q.  Has that trial been completed?
20     A.  I hope so.
21     Q.  Do you know whether it has been?
22     A.  I believe -- I'm not sure.
23     Q.  Was it a jury trial?
24     A.  No.  It was a bench trial.  Court of Federal
25 Claims.

157

1        The reason I'm not sure it's been completed is
2    that I believe there's final oral arguments and some
3    other things.  So I don't know that the trial is
4    completed.
5        Q.   So to your knowledge, the court hasn't issued
6    a verdict in that case?
7        A.   No.  My understanding is that one is not
8    expected for quite awhile.
9        Q.   Have you published any papers concerning
10   damages in securities cases?
11       A.   I've published a number of papers that sort of
12   use methodologies that have been -- are used in damage
13   calculations, and -- but I have not published an article
14   as it pertains to damages.
15       Q.   Which of the articles that you published use
16   methodologies?
17       A.   A number of my published papers look at the
18   information content of certain either corporate
19   financials or the impact of information disclosures on
20   the valuation of the firm and its securities.
21       Q.   Can you point me to any of those papers that
22   appear in your CV --
23       A.   Sure.
24       Q.   -- attached to your report.
25       A.   Probably the first one would be An Analysis of

158

1    Intra-Industry Differences in the Effect of Regulation.
2    An Analysis of the Impact of Deposit Rate Ceilings on
3    the Market Values of Thrift Institutions, Journal of
4    Finance, 1982.
5        Certainly the Market Evidence on the Effective
6    Maturity of Assets and Liabilities, Journal of Money,
7    Credit and Banking.
8        Journal of Finance, 1984, The Effects of
9    Interest Rate Changes on Common Stock Returns.
10       1987, Returns to Acquirers and Competition in
11   the Acquisition Market, Journal of Political Economy.
12       Sort of -- I think A VARMA Analysis of Causal
13   Relations Between Stock Returns, Real Output and Nominal
14   Interest Rates.
15       The information -- 1983, The Information
16   Content of Distressed Restructurings Involving Public
17   and Private Debt Claims, that's Journal of Financial
18   Economics.
19       Journal of Corporate Financial, Asset Sales by
20   Financially Distressed Firms.
21       Journal of Finance, 1996, Bank Debit
22   Restructuring and the Composition of Exchange Offers in
23   Financial Distress.
24       Where Do Merger Gains Come From?  Bank Mergers
25   from the Perspective of Insiders and Outsiders, General

159

1    Financial Economics, May 2001.
2        Do Banks Provide Financial Slack, Journal of
3    Finance, 2002.
4        Journal of Financial Economics, 2006, The
5    Strength of Analyst Coverage Following IPOs.
6        The paper under current research, which is now
7    in revision, which is The Information Content of Bank
8    Loan Covenants.
9        Q.   Okay.
10       A.   I can go through the other papers and
11   publications.
12       Q.   That's probably sufficient.
13       A.   Okay.
14       Q.   Do you have any other cases where you're
15   currently expected to testify at trial?
16       A.   Yes.
17       Q.   Which cases?  Are those listed in your report?
18       MR. FRIEDMAN:  You can answer to the extent
19   you've been disclosed.
20       THE WITNESS:  I will limit it to the cases for
21   which I have been designated as an expert and been
22   disclosed.
23       What's not listed here would be WR Grace,
24   ERISA litigation.
25       MS. WINKLER:  Q.   Why is that not listed on

160

1    your --
2        A.   I haven't been deposed.
3        Q.   You haven't even been deposed.  My question
4    was, are there any cases on here in which you're
5    currently expected to testify?
6        A.   Oh, on here.  I thought you meant any other
7    cases in general.
8        I believe Barry Van Roden, et al. versus
9    Genzyme Corporation.  There is a number of AOL Time
10   Warner -- no.  I believe those -- the ones listed have
11   settled.  I don't know what the status of Adams Golf is
12   or the Enron Securities Litigation.
13       Q.   Forgive me if I'm -- you're now talking about
14   cases that appear on this list?
15       A.   That's what I thought you asked me.
16       Q.   Yes.  So do you have any dates scheduled in
17   any of those cases where you're actually set to testify
18   at trial?
19       A.   No.
20       Q.   Did anyone assist you in writing your reports?
21       A.   Yes.
22       Q.   Who was that?
23       A.   Well, I was assisted in producing my report by
24   certain individuals at Cornerstone Research.
25       Q.   Is that true of your opening report and your

James, Christopher  7/17/2007  9:05:00 AM

161

1  rebuttal report?
2       A.  Yes.
3       Q.  And who were those individuals that assisted
4  you?
5       A.  Andrew Roper, Dan Garrett, Cindy Zollinger,
6  Hermann Tribukait.  Pardon the mispronunciation.  I'm
7  not sure how to pronounce it.
8       Q.  Any other people at Cornerstone other than the
9  four individuals you just named?
10      A.  No.  I think that's -- the group that assisted
11  me.
12      Q.  What role did they take in assisting you in
13  writing your report?
14      MR. FRIEDMAN:  I'm going to just interpose an
15  objection to the extent it calls for information limited
16  by the stipulation.
17      THE WITNESS:  There was a large amount of
18  information that needed to be compiled and organized so
19  that I could draft my report, and they assisted me in
20  both compiling and assembling that information and
21  analyzing the data.
22      So I would give them, for example, a specific
23  task, which is, give you an example, what are the firms
24  that are identified in analyst reports over a particular
25  period of time who are designated as peers or

162

1  competitors to Oracle, that type of thing.
2       MS. WINKLER:  Q.  Did they assist you in any
3  of the work that you've done since issuing your rebuttal
4  report?
5       A.  Yes.  But in the same kind of context.  For
6  example, I wanted to listen to the Ellison conference
7  call, so was assisted in getting the Bloomberg terminal
8  and listening to it, that type of thing.
9       Q.  Has any court ever criticized any of your
10  opinions?
11      MR. FRIEDMAN:  Objection; vague.
12      THE WITNESS:  I certainly -- I don't know
13  that -- there are certain -- in the Court of Federal
14  Claims there have been certain cases in which the courts
15  have -- have not accepted my opinion because of the
16  method for evaluating damages that are viewed to be
17  appropriate in the context of a breach of contract.
18      So, for example, in the Winstar litigation,
19  and I was working for the plaintiffs, there were several
20  measures of damages that -- expectancy, restitution,
21  reliance, lost profits.  And early on in those cases we
22  provided -- I provided certain reports that touched on
23  all of those measures.
24      I think the court has now focused on one or
25  two measures within that group that is the preferred

163

1  measure of damage for this type of breach, which is the
2  damage measure that I proposed and testified to in the
3  LaSalle Talman case, and recently testified to in the
4  Spokane litigation, which is a cost of -- actual cost of
5  replacement.
6       MS. WINKLER:  Q.  You mentioned the Winstar
7  litigation.  Are there any other cases where the court
8  criticized your opinions?
9       A.  No.
10      Q.  Have you been retained by Oracle either
11  directly or through its lawyers in any other litigation?
12      A.  No.
13      Q.  Have you been retained by the Latham and
14  Watkins firm in any other litigation?
15      A.  Yes.
16      Q.  Are those cases listed on your Exhibit 2?
17      A.  No.
18      Q.  Is that current work that you're performing
19  for Latham and Watkins?
20      A.  I performing it for a particular client for
21  Latham and Watkins.  I don't know that I've been
22  retained by Latham and Watkins.  I believe I was
23  retained by the client.
24      Q.  Are you able to disclose those clients?
25      MR. FRIEDMAN:  Objection to the extent it

164

1  mischaracterizes testimony.
2       THE WITNESS:  I believe my -- that it is
3  subject to a protective order, but I'm not certain.
4       MS. WINKLER:  Q.  How many other cases have
5  you been retained by Latham and Watkins or a client of
6  Latham and Watkins?
7       MR. FRIEDMAN:  Objection; vague.
8       THE WITNESS:  I --
9       MR. FRIEDMAN:  There's a lot of clients of
10  Latham.
11      THE WITNESS:  Pardon me?
12      MR. FRIEDMAN:  No worries.
13      THE WITNESS:  As I sit here, I don't recall
14  another retention.
15      MS. WINKLER:  Q.  I'm sorry?
16      A.  I don't recall any other instances as I sit
17  here.
18      MS. WINKLER:  I'm going to take a short break.
19  I think I will probably be able to wrap up after this
20  break, but I'll have a few more questions.
21      VIDEOGRAPHER:  Off the record.  The time is
22  3:11 p.m.
23      (Recess, 3:11 p.m. - 3:22 p.m.)
24      VIDEOGRAPHER:  We're back on the record.  The
25  time is 3:22 p.m.

James, Christopher  7/17/2007  9:05:00 AM

165

1      MS. WINKLER:  Q.  Do you intend to offer any
2   opinions at trial that you haven't testified to here
3   today or that are not included in either of your
4   reports?
5      MR. FRIEDMAN:  Objection to the extent it was
6   already asked and answered.
7      THE WITNESS:  My reports and I think there are
8   areas that you've covered in my deposition are the areas
9   that I expect, if asked, to testify to at court.
10     MS. WINKLER:  Q.  And at this point you don't
11  expect to testify to any other areas?
12     MR. FRIEDMAN:  Same objection.
13     THE WITNESS:  I don't believe so.
14     MS. WINKLER:  Q.  You testified earlier that
15  Oracle had indicated that it was not immune to an
16  economic downturn; correct?
17     A.  That's correct.
18     MS. WINKLER:  I'm going to ask the court
19  reporter to mark this document as the next exhibit.  For
20  the record the document is Bates labeled NDCA-ORCL
21  091467 through 70.
22          (Exhibit 7 marked for
23           identification.)
24     MS. WINKLER:  Q.  Have you seen this document
25  before?

166

1      MR. FRIEDMAN:  Take a while to familiarize
2   yourself with it.
3      THE WITNESS:  Have I seen this document
4   before?
5      MS. WINKLER:  Q.  Yes.
6      A.  I believe so.  Let me just check something.  I
7   believe I've seen it.
8      Q.  Did you rely on it in either of your reports?
9      A.  That's what I'm looking at, is whether it is
10  listed as one of the reports I relied on.
11     It is not listed in the set of reports that I
12  relied on.  There is other Robbie Stephens reports, but
13  I don't -- I didn't cite to this one.
14     Q.  Isn't it true that on February 21st, 2001,
15  Defendant Henley told the market that he does not expect
16  the slowing economy, barring a serious rescission, to
17  significantly impact results over the near term?
18     A.  On what day?
19     Q.  February 21st, 2001.
20     MR. FRIEDMAN:  Are you asking what the
21  document says?
22     THE WITNESS:  Did he say that on the 21st?
23     MS. WINKLER:  Q.  That was my question.
24     A.  I don't believe he said it on the 21st.
25     Q.  When did you believe he said it?

167

1      A.  I don't know that he said it.  It says here,
2   "At an analyst briefing on Tuesday evening, CFO Jeff
3   Henley maintained his positive outlook and guidance of
4   75 percent year-over-year growth in apps and 15 to 20
5   percent growth in database.  Henley does not expect the
6   slowing economy, barring a serious recession, to
7   significantly impact the results over the near-term."
8      Q.  And that statement appears in this document,
9   which is Exhibit 7; correct?
10     A.  That's right.
11     Q.  And what do you understand Exhibit 7 to be?
12     A.  It is -- appears to be an analyst report
13  talking about the Oracle AppsWorld User Conference.
14     Q.  And that report is dated February 21st, 2001;
15  correct?
16     A.  That's correct.
17     Q.  And that report is issued by Robinson
18  Stephens?
19     A.  It appears to be.
20     Q.  And you didn't cite this report in your -- in
21  either of your reports in this matter; did you?
22     A.  No.  I don't believe it's in the reports
23  referenced, although from my review, it doesn't appear
24  to be different, substantially different from -- and it
25  wouldn't cause me to change my view as to the analyst

168

1   commentary at the time.
2      Q.  How do you interpret the phrase near-term?
3      A.  How do I interpret it?  In the -- typically
4   near-term is the six-month to one-year time frame.
5      Q.  Did you see any evidence in the record that
6   the economy suddenly retracted in the last week of
7   February of 2001?
8      A.  Pardon me?
9      Q.  Did you see any evidence in the record that
10  the economy suddenly retracted in the last week of
11  February 2001?
12     MR. FRIEDMAN:  Objection; vague.
13     THE WITNESS:  Did I see in the record evidence
14  that the economy contracted?  Yes.
15     If one looks at, for example, the analyst
16  commentary on that particular point in time, if one
17  looks at the revision of forecasts that analysts made at
18  that particular point in time, based on my discussion
19  and review of the Hubbard report and the dating of the
20  recession, all of that would be consistent with a
21  decline in the economic activity that was around the end
22  of February, first part of March.
23     MS. WINKLER:  Analyst commentary you
24  referred to, is that commentary on only Oracle or on
25  other companies?

James, Christopher  7/17/2007  9:05:00 AM

169

1    A.  Oh, it is on Oracle and other companies.  You
2  take a look, for example, B of A, in the context of its
3  reports in early March, it lowers its estimates for all
4  of the firms that it is covering in the enterprise
5  software.
6         So CIBC, I believe, Credit Suisse, a number of
7  analysts made changes in their estimates of earnings for
8  firms within this industry right around the first part
9  of March.
10    Q.  Is that evidenced in the record in this case?
11    A.  Is that evidence in the record?  Yes.
12    Q.  Where is that evidenced in the record?
13    A.  Where is it in the record?
14    MR. FRIEDMAN:  I assume you're referring to
15  his report?
16    MS. WINKLER:  Yes.
17    THE WITNESS:  I have extensive discussion of
18  analyst commentary as of the -- turn to page 40, 41.  I
19  will actually -- if you look at from pages -- certainly
20  awareness of vulnerability to economic factors and the
21  back-end loaded characteristic of Oracle's business is
22  discussed prior to page 29.  And then in section 9 of
23  the report, which is a discussion of the information
24  content of the March 1st announcement and its March 2nd
25  price reaction.  And following through to page roughly

170

1  45, actually, and beyond, are all a discussion and
2  analysis of the implications of a slowing economy to
3  both Oracle's business and its competitors' business.
4    MS. WINKLER:  Q.  Is any of that information
5  dated in the last week of February 2001?
6    A.  The information in the last week of --
7  February of 2001, there is -- I know that there is a
8  number of comments in the last week in February as it
9  pertains to the analysts' interactions with customers as
10  part of the AppsWorld conference.
11         I think there was a couple of comments that I
12  recall with respect to, you know, the degree of
13  uncertainty that existed, which was substantial.  And
14  the idea that that uncertainty would resolve by looking
15  at the last several days of the quarter, the last week
16  of the quarter in terms of how much business was booked.
17    Q.  But didn't Henley say that Oracle wouldn't be
18  impacted by that in the near-term?
19    A.  Well, I think what he says is --
20    MR. FRIEDMAN:  Objection to the extent it
21  mischaracterizes the document and prior testimony.
22    THE WITNESS:  "Henley does not expect that the
23  slowing economy, barring a serious recession, to
24  significantly impact results over the near-term."
25         That's what's been communicated in the Robbie

171

1  Stephens report.
2    MS. WINKLER:  Q.  Is it your testimony a
3  serious recession happened after February 21st, 2001?
4    A.  I think as it pertains to Oracle's and its
5  competitors' business, yes, that there was a
6  significant, unexpected drop in business in the last
7  part of the quarter.
8    MS. WINKLER:  I think that's all the questions
9  that I have.
10    THE WITNESS:  Thank you.
11    MR. FRIEDMAN:  We're done.
12    MS. WINKLER:  Thank you.
13    VIDEOGRAPHER:  This is the end of videotape
14  number three, Volume I, in the deposition of Christopher
15  James.  The original videotapes will be retained by
16  LiveNote World Service.  Going off the record, the time
17  on the monitor is 3:34 p.m.
18         (Whereupon, at 3:34 p.m. the deposition of
19  CHRISTOPHER JAMES was adjourned.)
20
21         I declare under penalty of perjury that the
22  foregoing is true and correct.
23
24  Dated:_____   _____
              CHRISTOPHER JAMES
25

172

1  STATE OF CALIFORNIA    )
2                         )
3  COUNTY OF ALAMEDA      )
4    I, DIANA NOBRIGA, hereby certify that the
5  witness in the foregoing deposition was by me duly sworn
6  to testify to the truth, the whole truth, and nothing
7  but the truth in the within-entitled cause; that said
8  deposition was taken at the time and place therein
9  stated; that the testimony of said witness was reported
10  by me, a Certified Shorthand Reporter and disinterested
11  person, and was thereafter transcribed into typewriting,
12  and that the pertinent provisions of the applicable code
13  or rules of civil procedure relating to the notification
14  of the witness and counsel for the parties hereto of the
15  availability of the original transcript of the
16  deposition for reading, correcting and signing have been
17  met.
18         And I further certify that I am not of counsel
19  or attorney for either or any of the parties to said
20  deposition, nor in any way interested in the outcome of
21  the cause named in said action.
22    DATED: _____
23
24    _____
25    DIANA NOBRIGA, CSR NO. 7071

```
 1   STATE OF CALIFORNIA       )

 2                             )

 3   COUNTY OF ALAMEDA         )

 4            I, DIANA NOBRIGA, hereby certify that the

 5   witness in the foregoing deposition was by me duly sworn

 6   to testify to the truth, the whole truth, and nothing

 7   but the truth in the within-entitled cause; that said

 8   deposition was taken at the time and place therein

 9   stated; that the testimony of said witness was reported

10   by me, a Certified Shorthand Reporter and disinterested

11   person, and was thereafter transcribed into typewriting,

12   and that the pertinent provisions of the applicable code

13   or rules of civil procedure relating to the notification

14   of the witness and counsel for the parties hereto of the

15   availability of the original transcript of the

16   deposition for reading, correcting and signing have been

17   met.

18            And I further certify that I am not of counsel

19   or attorney for either or any of the parties to said

20   deposition, nor in any way interested in the outcome of

21   the cause named in said action.

22            DATED:    7·19·07

23

24

25                         DIANA   NOBRIGA, CSR NO. 7071
```

172