# EXHIBIT BB

Bender, Alexander  9/21/2006  9:04:00 AM

**Page 1**

1    page

1        UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF CALIFORNIA
3                - - -
4    In re ORACLE CORPORATION  )
      SECURITIES LITIGATION,   )
5                              )
          No. C-01-0988-MJJ    )
6    This Document Relates To: }    Volume I
                               )
7    ALL ACTIONS.             )
     _____)
8
9
10
11           CONFIDENTIAL
12    VIDEOTAPED DEPOSITION OF
13    ALEXANDER BENDER, III, CPA
14    SAN FRANCISCO, CALIFORNIA
15        September 22, 2006
16
17
18
19
       SHEILA CHASE & ASSOCIATES
20          REPORTING FOR:
          LiveNote World Service
21     221 Main Street, Suite 1250
        San Francisco, California 94105
22       Phone: (415) 321-2311
          Fax: (415) 321-2301
23
24   REPORTED BY:
25   RICHARD M. RAKER, CSR NO. 3445

**Page 2**

1    BE IT REMEMBERED that, pursuant to Notice,
2    and on September 22, 2006, thereof, at Lerach
3    Coughlin Stoia Geller Rudman & Robbins, LLP, 100 Pine
4    Street, San Francisco, California, 94111 before me,
5    RICHARD M. RAKER, a Certified Shorthand Reporter,
6    personally appeared
7        ALEXANDER BENDER, III, CPA,
8    called as a witness by the Plaintiffs for, who,
9    having been duly sworn, was examined and testified as
10   follows:
11                --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    A P P E A R A N C E S
2    FOR THE PLAINTIFFS:
3      LERACH COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
4      BY:  WILLOW E. RADCLIFFE, ESQ.
        100 Pine Street
5      Suite 2600
        San Francisco, California 94111
6      willowr@lerachlaw.com
7    FOR THE DEFENDANTS:
8      LATHAM & WATKINS
        BY:  PAUL V. KONOVALOV, ESQ.
9      650 Town Center Drive
        20th Floor
10     Costa Mesa, California 92626
11     paul.konovalov@lw.com
12
     ALSO PRESENT:  CASSIA LEET, VIDEO OPERATOR
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1            I N D E X

2    WITNESS    ALEXANDER BENDER, III, CPA

3    EXAMINATION               PAGE

4      BY MS. RADCLIFFE        6, 234

5      BY MR. KONOVALOV        230

6

7

8    EXHIBITS:

9            PLAINTIFF'S

10   NUMBER    DESCRIPTION        PAGE

11   Exhibit 1   Subpoena           40

12   Exhibit 2   Audit File         52

13   Exhibit 3   Document dated September 14, 2005   52

14   Exhibit 4   Document dated June 2, 2005    60

15   Exhibit 5   Supplemental LOG of Privileged   60

16             Documents

17   Exhibit 6   Bates stamped NDCA-ORCL 144608    108

18   Exhibit 7   Subpoena          145

19   Exhibit 8   Bates stamped NDCA-ORCL 298428    181

20   Exhibit 9   Final Judgment      210

21   Exhibit 10  Bates stamped NDCA-ORCL 313777    211

22   Exhibit 11  Bates stamped NDCA-ORCL 104764    214

23

24

25

**Page 4**

1            MORNING SESSION

2

3        THE VIDEO OPERATOR:  Here begins the videotaped

4    deposition of Alex Bender, Tape 1, Volume I, in the

5    matter of In Re Oracle Corporation Securities Litigation,

6    in the United States District Court, Northern District of

7    California, Case No. C-01-0988-MJJ.  Today's date is

8    September 21st, and the time on the video monitor is

9    9:04.

10       The video operator today is Cassia Leet

11   representing LiveNote World Service located at 221 Main

12   Street, Suite 1250, San Francisco, California 94105.

13   Phone number, (415) 321-2300.  The court reporter is

14   Richard Raker of Sheila Chase Reporting on behalf of

15   LiveNote World Service.  Today's deposition is being

16   taken on behalf of the plaintiff and is taking place at

17   100 Pine Street, Suite 3200, San Francisco, California.

18       Counsels, please introduce yourselves and state

19   whom you represent.

20       MS. RADCLIFFE:  Willow Radcliffe of Lerach

21   Coughlin on behalf of the plaintiff.  And with me is

22   Keith Maunter, our forensic accountant with our law firm.

23       MR. KONOVALOV:  Good morning.  Paul Konovalov,

24   Latham & Watkins, for the defendants.

25       THE VIDEO OPERATOR:  Would the court reporter

Bender, Alexander  9/21/2006  9:04:00 AM

5

1  please swear in the witness.

2

3  ALEX BENDER, CPA,

4  having first been duly sworn, was

5  examined and testified as follows:

6

7  EXAMINATION

8

9  BY MS. RADCLIFFE:

10  Q.  Good morning.  Could you please state your

11  full name for the record?

12  A.  Alexander Bender, III.

13  Q.  And could you spell your last name, please?

14  A.  B, as in boy, e-n-d-e-r.

15  Q.  And are you represented by counsel in this

16  deposition today?

17  A.  I'm representing Latham & Watkins here on

18  behalf of the defendants.  I have -- my counsel is not

19  here, Steven Young.

20  MR. KONOVALOV:  Just to clarify, we're not

21  representing the witness in the deposition.

22  MS. RADCLIFFE:  Thank you for the clarification.

23  Q.  And could you state your business address,

24  please, Mr. Bender?

25  A.  560 Mission Street in San Francisco.  I

6

1  actually don't have the zip code memorized, but I can

2  get my business card out if you'd like.

3  Q.  And your home address, please.

4  A.  201 -- two words.  First word is just E-l.

5  Second word is spelled T-o-y-o-n-a-l.  And it's not a

6  road or a street or anything.  That's in Orinda,

7  California 94563.

8  Q.  And have you ever been deposed, Mr. Bender,

9  before?

10  A.  No, I have not.

11  Q.  Have you ever provided testimony at a trial

12  before?

13  A.  Not that I recall, no.

14  Q.  Have you ever provided any testimony at an

15  arbitration?

16  (Interruption)

17  THE WITNESS:  Not that I recall, no.

18  BY MS. RADCLIFFE:

19  Q.  We're going to start out with a few ground

20  rules since you haven't been deposed before, and

21  hopefully it will make it a little easier for the court

22  reporter and for us to get through this fairly quickly

23  and efficiently today.

24  When you respond to a question today, you need

25  to respond out loud because the court reporter cannot

7

1  take down head nods or gestures.  Do you understand that?

2  A.  Yes.

3  Q.  If you don't understand a question that I've

4  asked, please let me know, and I'll try to rephrase it

5  or clarify the question so that we're on the same page.

6  Do you understand?

7  A.  Yes.

8  Q.  Mr. Konovalov may object to some questions

9  that I ask today.  You still, however, need to answer

10  the question.  Do you understand that?

11  A.  Yes.

12  Q.  And the court reporter just noted this, but if

13  we talk over each other, it's very difficult for the

14  court reporter to take down what the question is and

15  what the answer is.  So if you can try to wait until I

16  finish the question to respond, and I'll try to wait

17  until you finish your answer to ask the next question,

18  it will make it a lot easier for the court reporter to

19  take it down.

20  At any time if you need a break, let me know,

21  and we'll finish the question that's currently pending,

22  and then we'll take a break.

23  A.  Yes.

24  Q.  Is there any reason that you cannot give full

25  and complete testimony here today?

8

1  A.  No.

2  Q.  Are you under the influence of any medication

3  or other substance that would affect your testimony

4  today?

5  A.  No.

6  Q.  Where are you currently employed, Mr. Bender?

7  A.  Ernst & Young.

8  Q.  And is your current employment at the

9  San Francisco office of Ernst & Young?

10  A.  Yes.

11  Q.  Did you attend college?

12  A.  Yes.

13  Q.  And where did you attend college?

14  A.  University of Southern California.

15  Q.  And did you receive a degree from the

16  University of Southern California?

17  A.  Yes.

18  Q.  And what was that degree?

19  A.  Bachelor of science in accounting.

20  Q.  And when did you receive that degree?

21  A.  1994.

22  Q.  Did you attend graduate school?

23  A.  No.

24  Q.  Have you attended any continuing education

25  requirements with respect to accounting?

Bender, Alexander  9/21/2006  9:04:00 AM

9

```
1         A.  Yes.  As a CPA, I'm required to do mandatory
2    continuing education.
3         Q.  And how often is that required?
4         A.  It's annual.  I don't recall the actual hours
5    but it is annual.
6         Q.  And what type of education do you receive?
7         A.  It depends.  It's on accounting matters,
8    auditing matters, and also on ethics and fraud.
9         Q.  And are you a currently licensed CPA?
10        A.  Yes.
11        Q.  And when did you receive your CPA license?
12        A.  1997.
13        Q.  And after college, did you obtain employment
14   from someone other than Ernst & Young?
15        A.  No.
16        Q.  And -- so forgive me if I have the date wrong,
17   but in 1994, were you hired by Ernst & Young?
18        A.  I was hired by Ernst & Young -- I started to
19   work at Ernst & Young 1994.  I was hired by Ernst &
20   Young -- I was offered a job by Ernst & Young in 1993
21   while I was still in college.
22        Q.  And what was the first position you held at
23   Ernst & Young in 1994?
24        A.  Staff accounting in auditing.
25        Q.  And do you recall which client you -- account
```

10

```
1    you worked on in 1994?
2         A.  I'd have to look at my old records.
3         Q.  At some point at Ernst & Young, did you
4    receive a promotion from staff accountant?
5         A.  Yes.
6         Q.  And when was that?
7         A.  In 1996, I was promoted to senior accountant.
8         Q.  And do you recall the specific clients that
9    you were working for in 1996?
10        A.  Not the complete list, no.  I'd have to look.
11        Q.  Do you recall any of the clients who you were
12   performing services for in 1996?
13        A.  Any client?
14        Q.  Yes.
15        A.  Yes.  I was doing work for Jacobs Engineering.
16   And I'd have to go back and look at my time sheets.
17   I'm not sure -- that's the only one I can definitely
18   tell you I've worked on.
19        Q.  And how long did you hold the position as
20   senior accountant at Ernst & Young?
21        A.  Three years.
22        Q.  So through 1999; is that correct?
23        A.  Yes.
24        Q.  And what were your duties and responsibilities
25   as a senior accountant at Ernst & Young?
```

11

```
1         A.  Generally I was the senior accountant on
2    several audit clients.  I don't know the actual number.
3    I would manage between one and four individuals on an
4    audit engagement.  And primarily responsible for doing
5    detailed review of specific account-balance work.
6         Q.  And that would be a review of account-balance
7    work at the clients who Ernst & Young was providing
8    professional services?
9         A.  Yes.
10        Q.  And in 1999, did you take a new position at
11   Ernst & Young?
12        A.  Yes.
13        Q.  And were you promoted?
14        A.  Yes.
15        Q.  And what was that position?
16        A.  Manager.
17        Q.  And how long did you hold the position of
18   manager at Ernst & Young?
19        A.  Two years.
20        Q.  So would it be accurate to say from 1999 to
21   2001?
22        A.  Yes.
23        Q.  And do you recall the specific clients who you
24   were performing professional services for during that
25   period?
```

12

```
1         A.  I don't recall the list of all my clients, no.
2         Q.  Do you recall any of them?
3         A.  I -- in that period, I worked on Silicon
4    Graphics, or SGI, and Autodesk and Gilead Sciences.
5         Q.  And what were your responsibilities and duties
6    as a manager at Ernst & Young during that 1999 to 2001
7    time frame?
8         A.  I would manage the audit engagements,
9    generally managing between three and six senior and
10   staff accountants, and would perform detailed or
11   general reviews of specific account balances at my
12   clients for which Ernst & Young was providing
13   professional services.
14        Q.  And were there any other responsibilities you
15   had with respect to managing audit engagements?
16        A.  I'm sorry.  I don't understand the question.
17        Q.  Certainly.  You indicated that you managed
18   audit engagements as a manager, and I'm just trying to
19   understand.  Besides providing detailed review and a
20   general review of the account balances of the clients,
21   was there anything else involved?
22        A.  I would manage the engagement economics.  So
23   the billings and the collections of our fees.
24        Q.  And did you have any interaction with the
25   audit partners at Ernst & Young while manager?
```

13

1       A.  On my accounts, yes.

2       Q.  And what would that interaction be?

3       A.  That interaction would be several meetings and

4   interaction with them in terms of the audit scope, the

5   result of our audit procedures and our conclusions.

6       Q.  And did you have a responsibility for

7   providing -- excuse me.  Strike that.

8           Did you have responsibility for preparing work

9   papers while you were a manager?

10      A.  Yes.  In limited circumstances, I would have,

11  yes.

12      Q.  Were you promoted in 2001 to a different

13  position at Ernst & Young?

14      A.  Yes.

15      Q.  And what was that position?

16      A.  Senior manager.

17      Q.  And how did your duties and responsibilities

18  change as a senior manager from previously being a

19  manager at Ernst & Young?

20      A.  Generally I would manage more people.  I would

21  be managing managers, senior accountants, and staff

22  accountants.  My responsibilities would be performing

23  general reviews of specific account-balance work as

24  well as managing the engagement economics of each of my

25  clients.

14

1       Q.  And how long did you hold that particular

2   position at Ernst & Young?

3       A.  Through 2006.  June 2006.

4       Q.  So is it fair to say that you held that

5   position from 2001 to mid-2006?

6       A.  Yes.

7       Q.  And do you recall when you obtained that

8   position in 2001?

9       A.  I think -- I think officially it was

10  October 1, 2001.

11      Q.  And do you recall which clients you were

12  providing professional services for as a senior manager

13  while you were at Ernst & Young?

14      A.  During the five years?

15      Q.  Yes.  Let's start with the 2001-2002 time

16  frame.

17      A.  2001-2002 I was working on Oracle Corporation,

18  Autodesk, Intertrust Technologies, Gilead Sciences.

19  Those are the ones that I recall.

20      Q.  And from 2002 to mid-2006, did any of those

21  clients change?

22      A.  Yes.

23      Q.  And which ones?

24      A.  I continued to work on Oracle Corporation.  I

25  stopped working on Autodesk in 2003, I believe,

15

1   although I don't recall exactly.  And I stopped serving

2   Gilead Sciences and Intertrust Technologies in 2003.  I

3   don't recall the exact dates.  It may have been 2004.

4       Q.  Did you take on responsibilities for any new

5   clients between 2002 and 2006?

6       A.  Yes.

7       Q.  And which clients were those?

8       A.  Salesforce.com and Riverbed Technology.

9       Q.  And did you take on responsibility for

10  Salesforce.com prior to it becoming a public company?

11      A.  Yes.

12      Q.  And so when would you have taken on that

13  responsibility?

14      A.  I don't recall.  I believe it was

15  October 2002.

16      Q.  And did you take on responsibility for

17  Salesforce.com at the same time that Ernst & Young was

18  engaged to provide professional services by

19  Salesforce.com?

20      A.  Yes.

21      Q.  And with respect to Riverbed.com, did you take

22  on the role of senior manager with respect to

23  Riverbed.com at the same time Ernst & Young was

24  initially engaged to provide professional services for

25  Riverbed.com?

16

1       A.  It's Riverbed Technology.

2       Q.  Right.

3       A.  And the answer is yes.

4       Q.  Apologize for that.

5           With respect to Gilead Sciences, did you

6   understand the reason why you were no longer providing

7   professional services as a senior manager for Gilead

8   Sciences?

9       A.  Yes.

10      Q.  And what was your understanding?

11      A.  I had scheduling issues with having too many

12  clients, and the firm wanted to make sure that I had

13  enough time to spend on my accounts to do thorough

14  audits, and so I was taken off of Gilead Sciences to

15  focus on software.

16      Q.  So I should ask you this question:  Is

17  Riverbed Technologies a software company?

18      A.  Yes.

19      Q.  And what product does it sell?

20      A.  It sells -- it's similar to Juniper products

21  where its -- its products speed up the flow of

22  information in wide-area networks.

23      Q.  And with respect to Intra Trust, do you have

24  an understanding of why as a senior manager you were no

25  longer assigned to provide professional services to

17

1   that client?

2   A.  Yes.  Intertrust.

3   Q.  Intertrust.

4   A.  Yes.

5   Q.  And what is your understanding?

6   A.  They were acquired.

7   Q.  And who acquired them?

8   A.  It was a joint venture between Sony and

9   Phillips, I believe.  I do not recall the name of the

10   joint venture.

11   Q.  And as a result of the joint venture acquiring

12   Intertrust, did Ernst & Young cease providing

13   professional services to Intertrust?

14   A.  Yes.

15   Q.  In mid-2006, did you receive a promotion?

16   A.  Yes.

17   Q.  And what was that promotion?

18   A.  Partner.

19   Q.  And would that be partner in the San Francisco

20   office of Ernst & Young?

21   A.  Yes.

22   Q.  And between 2001 to mid-2006, did you change

23   offices of Ernst & Young?

24   A.  Yes.

25   Q.  And could you explain that change?

18

1   A.  Sure.  I don't recall the exact dates.  I

2   transferred from the Palo Alto, California, office.

3   And the reason why I said I don't recall the dates is

4   because the official transfer dates may be different

5   than what I recall.  But I transferred from Palo Alto,

6   California, to our Walnut Creek, California, office.

7   And I transferred in 2005, I believe, from the Walnut

8   Creek office to the San Francisco office.

9   Q.  And do you recall approximately when you

10   transferred from the Palo Alto office to the Walnut

11   Creek office?

12   A.  2001.  Probably in May or June of that year.

13   Q.  And do you recall the reason for that

14   transfer?

15   A.  Yes.

16   Q.  And what was that reason?

17   A.  My wife and I bought a house in Orinda.

18   Q.  And the transfer in 2005 from Walnut Creek to

19   the San Francisco office, do you recall the reason for

20   that transfer?

21   A.  Yes.

22   Q.  And what was that reason?

23   A.  There were two reasons.  One, the firm

24   leadership wanted to continue to build our technology

25   practice in the San Francisco office, and a decision

19

1   had been made to close the Walnut Creek office.

2   Q.  And are you currently a partner at Ernst &

3   Young assigned to the Oracle account?

4   A.  Yes.

5   Q.  And what are your duties and responsibilities

6   in that role?

7   A.  My duties and responsibilities as a partner

8   generally are to manage the account as a partner.  I'm

9   also responsible -- there are three partners on the

10   account.  We each have our own responsibilities.  My

11   responsibilities primarily regard revenue recognition,

12   international coordination and planning, SEC reporting

13   responsibilities, acquisition, accounting, engagement,

14   economics, and stock compensation.

15   Q.  And did you have an understanding of the

16   duties and responsibilities of the two other partners

17   assigned to the Oracle account?

18   A.  Yes.

19   Q.  And why don't we start with their names?  What

20   are the names of those two individuals?

21   A.  Sure.  The coordinating partner or the partner

22   in charge is Andrew Cotton.

23   Q.  And the --

24   A.  And the other engagement partner is Guy

25   Wanger, W-a-n-g-e-r.

20

1   Q.  And do you know when Mr. Cotton took on the

2   position as the partner in charge?

3   A.  Andrew took on the position as the partner in

4   charge as part of the fiscal 2004 audit.

5   Q.  And prior to the fiscal 2004-year audit, do

6   you know who the partner in charge was?

7   A.  Yes.

8   Q.  And who was that?

9   A.  John Banker.

10   Q.  And do you have an understanding of why

11   Mr. Cotton took over Mr. Banker's position?

12   A.  Yes.

13   Q.  And what is your understanding?

14   A.  John retired.

15   Q.  Did Mr. Cotton previously work on the Oracle

16   account prior to fiscal 2004?

17   A.  Yes.

18   Q.  And in what position did he work on the Oracle

19   account?

20   A.  He was the engagement partner.  To specify, he

21   was the engagement partner for the fiscal 2002 and 2003

22   audits.  Fiscal 2002 was the first year that Ernst &

23   Young was engaged to audit Oracle.

24   Q.  And with respect to Mr. -- Wagner, is it?

25   A.  Wanger.

21

1    Q.  Wanger.  I should know that.  He's like a
2    judge:  Mr. Wanger.
3         For what years, if you know, was he coordinating
4    partner on the Oracle account?
5    A.  Guy Wanger's never been a coordinating partner
6    on the Oracle account.
7    Q.  All right.  Misstated it.  My apologies.
8         For what years was Mr. Wanger a partner on the
9    Oracle account?
10   A.  Guy's been an engagement partner on the
11   account for the fiscal 2005 and fiscal 2006 audits.
12   Q.  Prior to the fiscal year 2005, did Mr. Wanger
13   have another role with respect to the Oracle account?
14   A.  No, he did not.
15   Q.  For the fiscal 2002, 2003, and 2004 audits,
16   did Ernst & Young have an engagement partner assigned
17   to the account?
18   A.  Yes.
19   Q.  And who would that person or persons be?
20   A.  Andrew Cotton.  Andrew was the engagement
21   partner -- I think officially in fiscal 2002 and 2003
22   Andrew Cotton was the engagement partner and John was
23   the coordinating partner -- John Banker was a
24   coordinating partner.  For fiscal 2004, Andrew Cotton
25   was the coordinating partner and John Banker was

22

1    designated as the engagement partner because he was
2    planning to retire that year.
3    Q.  And can you tell me what the duties and
4    responsibilities of the coordinating partner are?
5    A.  The duties and responsibilities of the
6    coordinating partner are to coordinate the worldwide
7    audit of the consolidated financial statements of
8    Oracle Corporation.  He's responsible to understand all
9    the significant accounting and auditing matters and
10   conclusions reached by his team and to review all
11   significant accounting and auditing matters and
12   conclusions reached by the team.
13   Q.  And with respect to the engagement partner,
14   what were their duties and responsibilities at Oracle?
15   A.  Generally they would be providing partner
16   reviews on certain account-balance work and assisted
17   the coordinating partner in reviewing significant
18   accounting and auditing matters and conclusions.
19   Q.  And based on your understanding of working on
20   the Oracle account, did the duties and responsibilities
21   of the engagement partner change from 2002 to the
22   present?
23   A.  Generally, no.  In terms of the roles of the
24   engagement partners, the difference between fiscal 2004
25   and 2005 and 2006 to now is we went from one engagement

23

1    partner to two engagement partners.  So for the fiscal
2    2007 audit, I would expect there to be differences as
3    we would divide the responsibilities of the engagement
4    partner from one person to two.  But that role has not
5    changed in terms of any audit that we've executed.
6    Q.  And who is the second engagement partner?
7    A.  Guy Wanger.
8    Q.  And with respect to the coordinating partner,
9    did the duties and responsibilities of the coordinating
10   partner change at all from the fiscal 2002 audit to the
11   present fiscal audit?
12   A.  No.
13   Q.  And with respect to your duties as a senior
14   manager, did those duties change at all with respect to
15   the Oracle account from the fiscal 2002 audit to the
16   present audit?
17   A.  To the May 31, 2006, audit?
18   Q.  Yes.
19   A.  Yes.
20   Q.  How did the duties and responsibilities of the
21   senior manager change?
22   A.  The role -- my role changed in terms of the
23   accounts that I was -- there were accounts in areas
24   that I was responsible to manage and review.
25   Q.  And can you explain how those changed?

24

1    A.  I was -- from fiscal 2002 through fiscal 2005,
2    I was primarily responsible for the auditing of the
3    shared service center located in Rocklin, California,
4    as well as the revenue recognition auditing.
5         In fiscal 2006, I was responsible for
6    coordinating the international locations, including the
7    international locations' testing of revenue recognition,
8    and I became responsible to audit the accounts at the
9    corporate office and not at the Rocklin shared service
10   center audit, which included acquisition, accounting, and
11   tax and SEC reporting.
12   Q.  And who do you currently report to?
13   A.  On the Oracle engagement?
14   Q.  Yes.
15   A.  Andrew Cotton.
16   Q.  And do you have any direct reports --
17   A.  Yes.
18   Q.  -- on the Oracle account?
19   A.  Yes.
20   Q.  So we can clarify here, I'm going to ask --
21   we're talking about the Oracle account unless I tell
22   you differently.  Okay?
23   A.  Okay.
24   Q.  And who are those direct reports?
25   A.  Remco Bartman is the senior manager.

25

```
 1      Q.  Can you spell that?
 2      A.  R-e-m-c-o is his first name.  Last name is
 3   B-a-r-t-m-a-n.  Natalie Zimmer, Z-i-m-m-e-r, is a
 4   senior manager, Tim Wilcox is a senior manager.  They
 5   all report to me directly in some fashion, not
 6   exclusively.
 7      Q.  And with respect to Mr. Bartman, how long has
 8   he been assigned to the Oracle account, if you know?
 9      A.  He has been on the Oracle account since
10   January of 2005.
11      Q.  Do you know who held his position prior to
12   January 2005?
13      A.  Yes.
14      Q.  And who was that?
15      A.  Me.
16      Q.  With respect to Natalie Zimmer, do you know
17   how long she's been assigned to the Oracle account?
18      A.  She has been on the Oracle account commencing
19   November 2004.
20      Q.  Do you know who held her position prior to
21   November 2004?
22      A.  Yes.
23      Q.  And who was that?
24      A.  It was a mix between a woman, Megan Birkler,
25   Katarina -- and I forget how to spell her last name.
```

26

```
26   page



25
```

27

```
     page
 1   She's in EY Munich now -- and Matt Banks.
 2      Q.  And when you say there was a mix, is that
 3   because there was a change over time, or was that
 4   because there were three different people who held the
 5   functions that Ms. Zimmer now holds?
 6      A.  There were different people that held it.
 7   They -- responsibility was transferred due to
 8   resignations of people and the way that Oracle manages
 9   its business.
10      Q.  And Ms. Birkler, do you know how long she was
11   assigned to the Oracle account?
12      A.  I don't recall exactly how long.  I know she
13   was -- she was on the fiscal 2002 and 2003 audit.
14      Q.  And Katarina, do you recall how long she was
15   assigned to the Oracle account?
16      A.  She was on the account for the fiscal 2002
17   audit and I believe for a period of time during the
18   fiscal 2003 audit, but I don't recall if she was there
19   through the end.
20      Q.  And Matt Banks, do you recall how long he was
21   assigned the Oracle audit?
22      A.  He was on the Oracle audit from -- for the
23   fiscal 2002, 2003, 2004, and 2005 audit.
24      Q.  And Tim Wilcox, do you know who held his
25   position prior to Mr. Wilcox assuming the senior
```

28

```
 1   manager position at the Oracle account?
 2      A.  Yes.
 3      Q.  And who was that?
 4      A.  The -- in fiscal 2002 and fiscal 2003, that
 5   position was held by Paul Charron, C-h-a-r-r-o-n.  In
 6   fiscal 2005, it was held by Rebecca Carlson.
 7      Q.  And is there currently a manager from Ernst &
 8   Young assigned to the Oracle account?
 9      A.  Yes.
10      Q.  And who is that person?
11      A.  There are -- to clarify, Natalie Zimmer was
12   promoted to senior manager or will be promoted to
13   senior manager on October 1st.  So she was the manager
14   for the audits that we've executed.
15          Tim Wilcox was promoted to senior manager on
16   October 1, 2005.  So he was the manager on the account.
17   Matt Banks was a manager on the account for the fiscal
18   2002 -- I'm sorry -- for the 2004 and 2005 audits.
19          Katarina was a manager for the fiscal 2002 and
20   for some portion of the 2003 audits.  There was a manager
21   on the account, Mareikke, M-a-r-e-i-k-k-e, Weideman,
22   W-e-i-d-e-m-a-n, I believe, for the fiscal 2006 audit.
23          There was a manager, Tara, T-a-r-a, Murphree,
24   M-u-r-p-h-r-e-e, that was on the account for the fiscal
25   2004 and 2005 audits, all with distinct responsibilities.
```

29

1    Q.  Other than speaking with your attorney,

2    Mr. Young, have you talked to anyone else about your

3    deposition here today?

4    A.  Yes.

5    Q.  And who did you speak with?

6    A.  Andrew Cotton.

7    Q.  And how many times did you speak with

8    Mr. Cotton?

9    A.  I don't recall.

10    Q.  Do you recall if it was more than once?

11    A.  No.

12    Q.  Was anyone else present besides you and

13    Mr. Cotton?

14    A.  No.

15    Q.  And what did you discuss?

16    A.  I informed him that I was scheduled to be

17    deposed.

18    Q.  Did you speak about the substance of your

19    deposition?

20    A.  No.

21    Q.  And about how long did the conversation last?

22    A.  I don't recall.

23    Q.  Was it less than fifteen minutes?

24    A.  Yes.

25    Q.  Did you speak with anyone else besides

30

1    Mr. Cotton regarding -- and your counsel regarding your

2    deposition here today?

3    A.  At any point?  John Banker, yes.

4    Q.  And when did you speak with Mr. Banker?

5    A.  I don't recall.  Prior to his retirement.  I'm

6    sorry.  Let me rephrase that.  I did not talk to John

7    about my deposition, only about the matter.

8    Q.  Thank you for the clarification.

9    And I believe you indicated that Mr. Banker

10    retired prior to the fiscal 2004 audit.  Is that right?

11    A.  He retired, I believe -- you'd have to

12    check -- I'd have to check the actual HR records, but I

13    believe he actually officially retired after the fiscal

14    2004 audit.

15    Q.  So sometime in 2005?

16    A.  Actually, it was probably in calendar 2004.

17    Q.  And do you recall how many times you spoke to

18    Mr. Banker regarding this matter?

19    A.  No.

20    Q.  Do you recall the substance of your

21    conversation?

22    A.  About this matter or my deposition?

23    Q.  About this matter.

24    MR. KONOVALOV:  Can I?  Is "this matter" the

25    litigation or engagement?

31

1    THE WITNESS:  Right.

2    BY MS. RADCLIFFE:

3    Q.  Why don't we clarify?  You indicated "this

4    matter," and I'm not sure what you indicated either.

5    And Mr. Konovalov is correct to seek clarification on

6    that.  When you were indicating "this matter," were you

7    talking about the engagement?

8    A.  When I answered your question about if I'd had

9    conversation about the litigation, I answered that

10    question in terms of had I spoken to John about the

11    litigation.

12    Q.  And so are -- am I correct to say that you had

13    a conversation with Mr. Banker about the litigation?

14    A.  Yes.

15    Q.  And do you recall when you spoke to Mr. Banker

16    about the litigation?

17    A.  No.

18    Q.  Do you recall whether it was before Mr. Banker

19    retired?

20    A.  I don't recall.

21    Q.  Do you recall if the conversation was

22    face-to-face or telephonic?

23    A.  Telephonic.

24    Q.  And do you recall the substance of your

25    conversation regarding the litigation?

32

1    A.  No, I do not.

2    Q.  Do you recall generally what was discussed

3    between you and Mr. Banker?

4    A.  Can you define "generally"?

5    Q.  In other words -- taking you back to the

6    conversation, do you recall what Mr. Banker said about

7    the litigation?

8    A.  No, I do not.

9    Q.  Do you recall what you said about the

10    litigation?

11    A.  No, I do not.

12    Q.  Do you recall anything about the conversation

13    other than the fact that it was about the litigation?

14    A.  I recall that we spoke briefly on the

15    matters -- the procedures that we did that were

16    documented in a memorandum and to obtain all the work

17    papers that had been subpoenaed.

18    Q.  And do you recall that there was a memo --

19    memorandum -- excuse me -- that set forth the

20    procedures related to the engagement that you believe

21    pertained to the litigation?

22    MR. KONOVALOV:  Objection; vague and ambiguous.

23    BY MS. RADCLIFFE:

24    Q.  You can go ahead and answer.  He'll do that a

25    lot.

33

1  A.  I am -- I know there is a memo that detailed
2  the procedures that we performed.
3  Q.  Do you know where that memo is?
4  A.  I don't know exactly where that memo is right
5  now, no.
6  Q.  Did you review that memo prior to this
7  deposition?
8  A.  Yes.
9  Q.  And approximately when did you review the
10  memo?
11  A.  I've reviewed the memorandum within the last
12  month, and I have reviewed the memo before that
13  certainly as part of the procedures and when it was
14  subpoenaed.
15  Q.  Do you know if that memo was part of Ernst &
16  Young's production of documents with respect to this
17  litigation?
18  A.  I don't know.  I'd have to refer you to
19  general counsel's office.
20  Q.  Did you speak with your attorney about this
21  deposition prior to coming here today?
22  A.  Is that client privilege?
23  Q.  The fact that -- I can't advise you.  I'm not
24  your lawyer.  But I'm asking you a yes-or-no question
25  of whether or not you talked to him, and I don't

34

1  believe that's privileged, but I'm not giving you legal
2  advice.
3  A.  Yes, I have spoken to him.
4  MR. KONOVALOV:  She said -- I think she's
5  looking for whether or not it happened as opposed to the
6  substance of the communication.
7  Is that correct?
8  MS. RADCLIFFE:  Correct.
9  THE WITNESS:  Yes, I've spoken to him.
10  BY MS. RADCLIFFE:
11  Q.  How many times?
12  A.  I don't recall.
13  Q.  Was it more than once?
14  A.  Yes.
15  Q.  Do you recall when that first conversation
16  was?
17  A.  No.
18  Q.  Do you recall if it was in the last year?
19  A.  Yes.
20  Q.  Did you speak with him within the last month?
21  A.  Yes.
22  Q.  Do you recall how many times within the last
23  month?
24  A.  No.
25  Q.  And so we can just clarify:  When we're

35

1  speaking about your attorney, are we speaking about
2  Mr. Young?
3  A.  Yes.
4  Q.  Are there any other attorneys that you have
5  representing you with respect to this matter?
6  A.  No.
7  Q.  And did you speak with Mr. Young this week
8  regarding your deposition?
9  A.  Not this week, no.
10  Q.  When was the last time you spoke with
11  Mr. Young?
12  A.  Last Friday.
13  Q.  And about how long was that conversation?
14  A.  I don't recall.
15  Q.  Was it less than an hour?
16  A.  Yes.
17  Q.  Less than fifteen minutes?
18  A.  I don't recall.
19  Q.  Was anyone else present when you spoke with
20  Mr. Young?
21  A.  Yes.
22  Q.  And who else?
23  A.  Andrew Cotton.
24  Q.  Anyone else besides Mr. Cotton?
25  A.  No.

36

1  Q.  In preparing for your deposition today, did
2  you review any documents?
3  A.  Yes.
4  Q.  And did you review those documents in presence
5  of counsel?
6  A.  No.
7  Q.  And what documents did you review?
8  A.  I reviewed our memorandum on the procedures
9  that we performed.
10  Q.  Any other documents?
11  A.  No.
12  Q.  The memorandum with respect to the procedures
13  that you performed, do you know who prepared that
14  document?
15  A.  I don't recall who actually prepared it.
16  Q.  Was it someone at Ernst & Young?
17  A.  Yes.
18  Q.  Did you help prepare that document?
19  A.  Yes.
20  Q.  And do you recall when the document was
21  prepared?
22  A.  I don't recall exactly when the document was
23  prepared, no.
24  Q.  Do you recall approximately when it was
25  prepared?

37

1    A.  It was prepared approximately in October 2002.

2    Q.  And can you explain your understanding of the

3  procedures that Ernst & Young performed as set forth in

4  that document?

5    A.  I don't recall the specific procedures.  I'd

6  have to look at the memo.  All the procedures that we

7  performed are documented in the memo.

8    Q.  Are there any other procedures that were

9  performed by Ernst & Young that are not documented in

10  that memo?

11    A.  Not that I recall.

12    Q.  And to your knowledge, does a copy of this

13  memo still exist today?

14    A.  Yes, to my knowledge.

15    Q.  And is the memo a handwritten document?

16    A.  No.

17    Q.  Is it a typed document?

18    A.  No.

19    Q.  Is it a computer-generated document?

20    A.  Yes.

21    Q.  And do you know what software program it was

22  generated by?

23    A.  Yes.

24    Q.  And what would that be?

25    A.  Microsoft Word.

38

1    Q.  Besides yourself, do you know who helped

2  prepare the memorandum?

3    A.  Yes.

4    Q.  And who would that be?

5    A.  Megan Birkler and John Banker.

6    Q.  Can you spell that last name?

7    Which last name?

8    Q.  Banker.

9    A.  Birkler?

10    Q.  I'm sorry.  You said John Banker; is that

11  correct?

12    A.  Yes.

13    Q.  And at the time the memorandum was prepared,

14  were you a senior manager assigned to the Oracle

15  account?

16    A.  Yes.

17    Q.  And at the time the memorandum was prepared,

18  was Ms. Birkler the manager assigned to the account?

19    A.  No.

20    Q.  What was her title?

21    A.  Supervising senior.

22    Q.  And at the time the memorandum was prepared,

23  was Mr. Banker assigned to the Oracle account?

24    A.  Yes.

25    Q.  And what was his title at that time?

39

1    A.  Coordinating partner.

2    Q.  Was anyone at Oracle consulted about the

3  procedures set forth in the memorandum?

4    MR. KONOVALOV:  Objection; vague and ambiguous.

5    THE WITNESS:  I don't know.

6  BY MS. RADCLIFFE:

7    Q.  Did you speak with anyone at Oracle regarding

8  the preparation of the memorandum?

9    A.  No.

10    Q.  Do you know if Mr. Banker spoke with anyone at

11  Oracle regarding the preparation of the memorandum?

12    A.  I don't know.

13    Q.  Do you know if Ms. Birkler spoke to anyone at

14  Oracle regarding the preparation of the memorandum?

15    A.  I don't know.

16    Q.  Who was the manager assigned to the Oracle

17  account at the time this memorandum was prepared?

18    A.  I don't recall exactly which managers were

19  assigned.  I'd have to look at the staffing at that

20  particular point in time.

21    Q.  Do you know if Ernst & Young's national office

22  was consulted with respect to the procedures set forth

23  in the memorandum?

24    A.  I don't know.

25    Q.  Do you know generally if Ernst & Young's

40

1  national office is consulted with respect to the

2  procedures set forth in an engagement?

3    MR. KONOVALOV:  Could you read that question

4  back, please.  I'm sorry.

5    (The record was read back as follows:

6    "Q.  Do you know generally if Ernst & Young's

7    national office is consulted with respect to

8    the procedures set forth in an engagement?")

9    MR. KONOVALOV:  Objection; lacks foundation,

10  calls for speculation.

11  BY MS. RADCLIFFE:

12    Q.  You can answer.

13    A.  I don't know.

14    Q.  Do you know if a copy of the memorandum was

15  ever provided to anyone at Oracle?

16    A.  I don't know.

17    Q.  Do you know who would know that?

18    A.  I don't know who would know that if there was

19  a copy provided.

20    MS. RADCLIFFE:  I'm going to mark an exhibit.

21  For the record, we're going to mark as Exhibit 1.

22    (Exhibit No. 1 was marked for identification by

23  the reporter.)

24  BY MS. RADCLIFFE:

25    Q.  If you could just take a minute to familiarize

41

1   yourself with that document.
2       A.  (The witness reviews the document.)
3       MS. RADCLIFFE:  For the record, what's been
4   marked as Exhibit 1 is a subpoena in the Oracle
5   Corporation securities litigation to Ernst & Young.
6       THE WITNESS:  (The witness reviews the
7   document.)
8       MS. RADCLIFFE:  If you want to go off the record
9   for a minute while Mr. Bender reviews it, we can.
10      (There is a pause in proceedings.)
11  BY MS. RADCLIFFE:
12      Q.  Mr. Bender, have you seen this document
13  before?
14      A.  I've seen the memo that's attached in the
15  back.
16      Q.  Have you seen the subject matters listed as 1
17  through 15 on pages 1 through 4 of the attachment?
18      A.  I have not seen this before, no.
19      Q.  Do you have an understanding that you're
20  testifying as a representative of Ernst & Young today
21  in this deposition?
22      A.  Yes.
23      Q.  Do you have an understanding that you're
24  testifying as the person most knowledgeable as to the
25  subject matters listed in Items 1 through 15 of the

42

1   attachment to the document before you?
2       A.  Yes.
3       Q.  And have you -- strike that.
4       Do you believe that you're the most -- strike
5   that.
6       Do you believe that you're the most qualified
7   person to talk about each of the subject matters listed
8   at 1 through 15 in this document?
9       A.  I believe I'm the most qualified person to
10  talk about it that's currently employed at Ernst &
11  Young.
12      Q.  With respect to Item -- or Subject Matter
13  No. 1 of this particular document, there is a reference
14  in this subject matter to an engagement.  Do you see
15  that?
16      A.  Yes.
17      Q.  Are you familiar with that engagement?
18      A.  Yes.
19      Q.  Do you know if there was an engagement letter
20  prepared with respect to that engagement?
21      A.  I don't recall, no.
22      Q.  Do you recall if there is any documentation
23  setting forth the scope of the engagement?
24      A.  I don't recall, no.
25      Q.  What is your understanding of the scope of the

43

1   engagement as a representative of Ernst & Young?
2       A.  My understanding was that Ernst & Young was
3   asked to perform certain procedures related to 46,000
4   debit memos that were created by Oracle in
5   November 2000.
6       Q.  And do you know who asked Ernst & Young to
7   perform these procedures?
8       A.  There was a special committee of the board of
9   directors.
10      Q.  And do you know who conveyed that request to
11  Ernst & Young?
12      A.  No.
13      Q.  Do you know when that request was conveyed?
14      A.  I don't know exactly when the request was
15  conveyed, no.
16      Q.  Do you know approximately when it was
17  conveyed?
18      A.  Approximately September or October 2002.
19      Q.  Do you know what form that request came in?
20      A.  No.
21      Q.  How did you learn of that request?
22      A.  John Banker informed me.
23      Q.  John Banker informed you.
24      And how did Mr. Banker inform you?  By telephone
25  or in person?

44

1       A.  In person.
2       Q.  And what did Mr. Banker specifically say to
3   you?
4       A.  I don't recall what he specifically told me.
5       Q.  Do you recall generally what he told you?
6       A.  Generally he told me that we were asked to go
7   and perform certain procedures on the 46,000 debit
8   memos.
9       Q.  And what is your understanding of those
10  procedures?
11      A.  My understanding of those procedures were to
12  review a sample of the debit memos that were created
13  and to review what the actual accounting was as part of
14  those debit memos.
15      Q.  And were these procedures performed by Ernst &
16  Young?
17      A.  Yes.
18      Q.  And over what time period were they performed?
19      A.  I don't recall the exact time period.  It was
20  in October 2002.
21      Q.  Do you recall approximately how long it took
22  to perform these procedures?
23      A.  I don't recall, no.
24      Q.  And were the procedures that Ernst & Young set
25  out to perform concluded?

Bender, Alexander  9/21/2006  9:04:00 AM

45

1      A.  Yes.  Concluded in the sense they were
2   finished, yes.
3      Q.  Beside yourself, Ms. Birkler, and Mr. Banker,
4   was there anyone else assigned to this engagement?
5      A.  Yes.
6      Q.  Who was that?
7      A.  Ashley Gemma, G-e-m-m-a.
8      Q.  And what was her title?
9      A.  Senior.
10      Q.  Anyone else that you recall?
11      A.  Not that I recall, no.
12      Q.  Were there other people assigned to the
13   engagement that you don't recall at this time?
14      A.  I'm sorry.  I don't understand the question.
15      Q.  Certainly.  I'll rephrase it.  Were there
16   other people at Ernst & Young assigned to this
17   engagement who you don't recall as you sit here today?
18      A.  I don't know.  I don't remember.
19      Q.  If you needed to find out, do you know where
20   you would look?
21      A.  Yes.
22      Q.  And where would that be?
23      A.  We would have time-sheet records.
24      Q.  And are those accessible to you now?  Not as
25   you sit here, but as you're employed at Ernst & Young.

46

1      A.  I don't know how long we hold those records.
2      Q.  Did you make an effort to review those
3   time-sheet records before your deposition here today?
4      A.  No.
5      Q.  Do you know if anyone else at Ernst & Young
6   made the effort to look at those time-sheet records --
7         (Interruption)
8         THE REPORTER:  "Do you know if anyone else at
9   Ernst & young made the effort" --
10   BY MS. RADCLIFFE:
11      Q.  -- to review those time-sheet records in
12   preparation for your deposition today.
13      A.  I don't know.
14      Q.  So is it accurate to say that sitting here
15   today you're not able to identify all of the people who
16   were assigned to this engagement?
17         MR. KONOVALOV:  Objection; mischaracterizes the
18   witness's testimony.
19         THE WITNESS:  I don't recall absolutely who was
20   assigned to the engagement.
21   BY MS. RADCLIFFE:
22      Q.  Were your duties as a senior manager at the
23   time -- is that correct?
24      A.  Yes.
25      Q.  -- with respect to this engagement different

47

1   than we discussed previously today?
2      A.  Yes.
3      Q.  And how are they different?
4      A.  This was a -- this was not an audit.  This was
5   a -- there were certain procedures that were performed
6   on a period that we did not audit.
7      Q.  And so what were your duties and
8   responsibilities with respect to this engagement?
9      A.  My duties and responsibilities for this
10   engagement were to help the team prepare and plan our
11   work steps around what we were going to do and review
12   the results of those procedures and prepare this
13   memorandum.
14      Q.  And when you say "prepare this memorandum,"
15   what are your referring to?
16      A.  I'm sorry.  The memorandum prepared by Ernst &
17   Young that is attached to Exhibit 1.
18      Q.  You indicated that you would have helped the
19   team prepare work steps.  Would those work steps be
20   documented?
21      A.  They're documented in the memo.
22      Q.  In the memo attached?
23      A.  Attached to Exhibit 1.
24      Q.  Anywhere else are they documented?
25      A.  Not that I recall.

48

1      Q.  Are there any other duties and
2   responsibilities you had with respect to this
3   particular engagement?
4      A.  No.
5      Q.  You mentioned Mr. Banker was assigned to this
6   engagement.  Do you know what his duties and
7   responsibilities were with respect to this engagement?
8      A.  I don't know what all of his duties and
9   responsibilities were on this engagement.
10      Q.  Do you know what any of them were?
11      A.  I do know that he reviewed the results of our
12   procedures and he reviewed the memorandum attached to
13   Exhibit 1.
14      Q.  Do you know who had drafted the memorandum
15   attached to Exhibit 1?
16      A.  Who initially drafted it?  Megan Birkler
17   initially drafted it.  I was also part of drafting of
18   the memorandum.
19      Q.  Anyone else?
20      A.  John Banker would have had input into the
21   memorandum.
22      Q.  Are the results of the procedures you
23   performed documented anywhere else besides the
24   memorandum attached to Exhibit 1?
25      A.  Not that I'm aware of.

49

1    Q.   And so we can clarify just for the record:
2    When we're referring to the memorandum -- attached as
3    Exhibit 1 -- is it the document with the little numbers
4    at the bottom of the right-hand corner at the Bates
5    stamp EY 000010 through -112?
6    A.   I actually have EY 00143, 000144, 000145,
7    000146, and 000232.
8    Q.   That's why we had to clarify.
9    MR. KONOVALOV:  Counsel, when it's a good
10   time -- I don't want to interrupt your flow -- let's take
11   a short break.
12   MS. RADCLIFFE:  I just have one little follow-up
13   question.
14   Q.   With respect to Ms. Birkler, do you know what
15   her duties and responsibilities were with respect to
16   this particular engagement?
17   A.   Yes.
18   Q.   And what were they?
19   A.   Her duties and responsibilities were to
20   perform a detailed review of the work performed by
21   Ashley Gemma on the procedures detailed in the
22   memorandum.
23   Q.   And with respect to Ms. Gemma, what were her
24   duties and responsibilities with respect to this
25   engagement?

50

1    A.   Her duties and responsibilities were to
2    perform the procedures, prepare the work papers, and
3    document the initial result of those procedures as
4    documented in Exhibit 1 -- in the attachment to
5    Exhibit 1.  I'm sorry.
6    Q.   Is that 143 to 146?
7    A.   Yes.
8    Q.   And 232?
9    MS. RADCLIFFE:  Why don't we go ahead and go off
10   the record and take a break?
11   THE VIDEO OPERATOR:  Going off the record, the
12   time is 10:11.
13   (A break was taken.)
14   THE VIDEO OPERATOR:  Back on the record, the
15   time is 10:25.
16   BY MS. RADCLIFFE:
17   Q.   Prior to the break, we were discussing a
18   memorandum attached to Exhibit 1 before you, starting
19   at EY 000143.  And I believe you mentioned that
20   Mr. Banker reviewed the results of the procedures
21   related to the engagement and also the memo attached to
22   Exhibit 1, starting at EY 143?  Is that correct?
23   A.   What I said was that John reviewed the memo at
24   EY 00143.  I don't know if he reviewed the document
25   before.

51

1    Q.   Okay.  Do you know if there are other results
2    of the procedures performed that are documented that's
3    described in the document starting at EY 00143 through
4    -146?
5    A.   Not that I recall, no.
6    Q.   You mentioned that Ms. Gemma documented the
7    initial results of the procedures performed in the
8    document attached to Exhibit 1, starting at EY 143.  Do
9    you know if there were subsequent results of the
10   procedures performed by Ernst & Young that are not
11   documented in this exhibit, starting at EY 00143 to
12   -146?
13   A.   Not that I recall, no.
14   Q.   So just so I have this clear:  Based on your
15   recollection, the totality of the results of the
16   procedures performed by Ernst & Young with respect to
17   this engagement are documented at EY 00143 through
18   -146?
19   A.   Yes.
20   Q.   And is there any other documentation that was
21   created with respect to the procedures performed by
22   Ernst & Young with respect to this engagement?
23   A.   There would be specific work papers that would
24   be -- that would have been prepared.  I do not recall
25   what those were exactly.

52

1    Q.   Do you recall reviewing those work papers?
2    A.   I recall reviewing certain of those work
3    papers, yes.
4    Q.   Which ones do you recall reviewing?
5    A.   I recall reviewing a sample of the actual
6    journal entry that was recorded on certain of the
7    samples that we selected.  I recall reviewing the
8    analytical review that we performed on the deferred
9    revenue balances between the first quarter and second
10   quarter of fiscal 2001.  Outside of that, I don't
11   recall specifically what work papers I reviewed.
12   MS. RADCLIFFE:  Okay.  I think this might make
13   things a little easier, so I'm going to mark as Exhibit 2
14   the next document.
15   (Exhibit No. 2 was marked for identification by
16   the reporter.)
17   MS. RADCLIFFE:  At the same time, I'm also going
18   to mark as Exhibit 3 because we may need to reference it.
19   (Exhibit No. 3 was marked for identification by
20   the reporter.)
21   MS. RADCLIFFE:  And for the record, I'll
22   represent that Exhibit 2 consists of all of the documents
23   provided to plaintiffs in this litigation by Ernst &
24   Young.  And Exhibit 3 consists of some excerpts of
25   documents also produced by Ernst & Young that are

53

1  represented to be the best copies that Ernst & Young
2  possesses with respect to these documents.
3      Q.  Mr. Bender, you can take off the binder clip
4  if that's easier.  And I'm going to go ahead and ask
5  you a couple more questions.  And you may need to refer
6  to Exhibit 2, so if you can go ahead and take your time
7  to familiarize yourself with that exhibit.
8      A.  (The witness reviews the document.)
9      Q.  I'm going to -- you might want to use tags to
10  make marks where you want to make breaks.  Make it
11  easier to go through these.  Go ahead.
12      Did you have an opportunity to review what's
13  been marked as Exhibit 2?
14      A.  Yeah.  Quickly I have, yes.
15      Q.  And does that refresh your recollection of
16  which work papers you reviewed with respect to this
17  engagement?
18      A.  Yes.
19      Q.  And besides those that you mentioned earlier,
20  the sample journal entry and the analytical review of
21  deferred revenue balances, what other work papers did
22  you review in connection with this engagement?
23      A.  I reviewed a work paper that is the
24  reconciliation of Account 25005 for the period in
25  question.

54

1      Q.  And could you -- you're referencing a
2  document.  Could you provide the record with the little
3  number at the corner, of the Bates number of that
4  document?
5      A.  Sure.  000150, 000151.  There is a copy of the
6  complaint filed, starting with 000162 through -229,
7  that I had read.
8      Q.  Is the copy of the complaint part of the work
9  paper?
10      A.  I would have to go back and look at our
11  binder, but I believe it was, yes.
12      On EY 000231, there is a reconciliation --
13  another reconciliation of the 25005 account for
14  November 2000, which we were -- which we reviewed.  And I
15  reviewed this work paper as well as the supporting
16  journal entries at 000234, -235, -238, and -237.
17      And there is a memo that was written -- EY
18  000261 that was written by a -- one of our IT specialists
19  that actually reviewed the script that was used to
20  effectively eliminate these debit memos from the system,
21  and I had reviewed the memo.
22      Q.  And who was that IT specialist?
23      A.  That was David Roque.
24      Q.  And is he --
25      A.  R-o-q-u-e.

55

1      Q.  Was he employed at Ernst & Young during the
2  engagement?
3      A.  Yes.
4      Q.  And do you recall what his title was?
5      A.  At that point in time, he was a senior
6  manager.  We call it TSRS.  Unfortunately, I don't know
7  what that stands for because it changes all the time,
8  but it's effectively IT auditor.
9      Q.  And do you know if he had any specialized
10  training with respect to IT?
11      A.  He is -- he was a specialized IT auditor, yes.
12  I can't comment on his particular skill set on this
13  particular script, but he would have been the
14  appropriate person at the time that we felt to use.
15      Q.  And was he also assigned to this engagement to
16  perform the review of the computer script?
17      A.  Yes.
18      Q.  Do you know if he's currently employed at
19  Ernst & Young?
20      A.  He is.
21      Q.  Do you know what his current title is?
22      A.  He's a partner in San Francisco.
23      Q.  Do you know if he still performs professional
24  services for Oracle on behalf of Ernst & Young?
25      A.  He does.

56

1      Q.  Do you know in what capacity?
2      A.  He is the partner in charge of the auditing
3  aspects related to the company's information technology
4  and IT general controls.
5      Q.  You mentioned that one of the work papers you
6  recalled reviewing was a sample of the journal entry
7  created.  In your review of Exhibit 2, did you locate
8  that work paper?
9      A.  No.  What I had -- what I -- the journal entry
10  that I recall reviewing that's in there, that has to do
11  with specific -- specific journal entry that was part
12  of our review of the reconciliation of Account 25005.
13      Q.  And the sample of the journal entry created,
14  do you know if that was documented by Ernst & Young?
15      A.  It's in our memorandum, yes.
16      Q.  Other than the reference in the memorandum,
17  was there other documentation kept of that sample of
18  the journal entry?
19      A.  I don't know.  I don't recall.
20      Q.  Do you recall reviewing the sample of the
21  journal entry in another form besides what is depicted
22  in the memorandum at EY 143 to 146?
23      MR. KONOVALOV:  Objection; vague and ambiguous.
24      THE WITNESS:  I recall reviewing journal entries
25  that are discussed in the memorandum.  Those journal

57

1   entries may not have been kept in our final work papers.
2   They would not be required to be in the final work
3   papers.
4   BY MS. RADCLIFFE:
5       Q.  Do you know if those journal entries were kept
6   by Ernst & Young, whether in the work papers or in
7   another location within Ernst & Young?
8       A.  I don't know.
9       Q.  Do you know who would know?
10      A.  No.
11      Q.  Do you know where -- strike that.
12          Do you know who you would ask to find out?
13      A.  I would have to -- I would probably ask the
14  file room if they have any records of it.  But I don't
15  know who specifically I would ask, no.
16      Q.  Is there a location within Ernst & Young that
17  you would look for these documents?
18      A.  There is a file room, yes.
19      Q.  Do you know how long the file room maintains
20  documents related to engagements?
21      A.  I don't know, but I believe it's seven years.
22      Q.  Did you ask anyone in the file room to search
23  for these documents prior to your deposition here
24  today?
25      A.  Yes.

58

1       Q.  And who was that person?
2       A.  I don't recall who was managing the file room
3   at the time I made the request as part of the subpoena
4   of all the documents.
5       Q.  And maybe we should make the record clear.  Is
6   it your understanding that the subpoena for documents
7   is separate from the subpoena to appear here for
8   deposition today?
9       A.  I don't understand the distinction.  I can
10  clarify my answer.  I was instructed to send everything
11  related to this investigation to general counsel's
12  office, which is what I did.
13      Q.  And do you recall what the response was from
14  the file room with respect to your request to search
15  for everything related to this investigation?
16      A.  The response was "Okay," and they pulled
17  everything out, and I went and reviewed all the files
18  in the Oracle section to ensure that we had everything.
19      Q.  So is it your understanding that there are no
20  other documents, related to this investigation, in the
21  file room?
22      A.  That's my understanding, yes.
23      Q.  You also mentioned that you reviewed a work
24  paper regarding the analytical review of deferred
25  revenue balances?

59

1       A.  Yes.
2       Q.  And did you locate that work paper in your
3   review of Exhibit 2?
4       A.  I did, yes.  EY 000147, -148, -149.
5       Q.  And do you recall reviewing any other
6   documentation with respect to this investigation that
7   we haven't discussed that is not contained within
8   Exhibit 2?
9       A.  I do not recall, no.
10      Q.  You mentioned before that -- a binder.  What
11  were you referring to?
12      A.  There is a binder that looks exactly like this
13  front page, which is Exhibit 00001, and included in
14  that binder would be work papers related to this -- the
15  procedures.
16      Q.  And is it your understanding that Exhibit 2
17  consists of copies of that binder?
18      A.  Yes.
19      Q.  And is it your understanding that Ernst &
20  Young maintains that binder in the ordinary course of
21  its business?
22      A.  Yes.
23      Q.  And do you -- I'm actually going to do it this
24  way because -- this is not meant to trick you, so I'm
25  going to mark next as Exhibits 4 and 5 two documents.

60

1       MR. KONOVALOV:  Which one is 4, Exhibit 4?
2       MS. RADCLIFFE:  Exhibit 4 appears to be the
3   letter.
4       (Exhibit Nos. 4 and 5 were marked for
5   identification by the reporter.)
6   BY MS. RADCLIFFE:
7       Q.  And Mr. Bender, the reason I'm showing you
8   these is Exhibit 4 appears to be a letter from Ernst &
9   Young's office, paralegal there, indicating that there
10  are certain documents being withheld and referencing
11  Bates numbers that are being withheld on certain
12  grounds.
13      And then if you turn to Exhibit 5, this
14  document I'll represent to you was actually received by
15  counsel for Oracle, the defendants in this action.  And
16  it also references some Ernst & Young Bates numbers
17  that are being withheld on certain grounds.
18      And so the reason why I'm going to show you
19  Exhibits 4 and 5 was to ask you whether you believed
20  Exhibit 2 contained a complete set of the documents
21  related to the investigation with the caveat that the
22  documents referenced in Exhibit 4 and 5 are missing from
23  that set.
24      MR. KONOVALOV:  Objection.  It calls for a legal
25  conclusion from a lay witness, but --

61

1      THE WITNESS:  I would have to see the binder to
2  definitively tell you the answer to that question.
3      BY MS. RADCLIFFE:
4      Q.   Do you know if desk files were kept with
5  respect to this engagement?
6      A.   Can you please define a desk file?
7      Q.   Certainly.  Do you know if any documents were
8  kept by anyone on the engagement, outside the work
9  papers, related to this investigation?
10     A.   I am not aware of any, no.
11     Q.   Do you know if you kept any documents, related
12  to this investigation, that are not contained within
13  Exhibit 2?
14     A.   I'm not aware.  I don't recall.
15     Q.   If you could turn briefly to Exhibit 5 again.
16  The first line on Exhibit 5, the first row, indicates a
17  description of a document, a confidential memorandum
18  from Oracle's general counsel to Oracle board members
19  and senior executives, analyzing and providing legal
20  advice regarding the Oracle Corporation securities
21  litigation.
22     Do you know if Ernst & Young ever reviewed a
23  memorandum from Oracle's general counsel to Oracle board
24  members relating to this litigation?
25     MR. KONOVALOV:  Objection; lacks foundation.  I

62

1  don't think we've established the witness has ever seen
2  this document before.
3      MS. RADCLIFFE:  I'm just asking if he knew.
4      Q.   Do you know if Ernst & Young ever reviewed the
5  memorandum from Oracle's general counsel to Oracle
6  board members relating to this litigation?
7      A.   I don't recall definitively.
8      Q.   Do you recall reviewing any documents from
9  Oracle relating to this litigation?
10     A.   I recall reviewing a memorandum that
11  documented the background of --
12     MR. KONOVALOV:  Well, can I just stop here.  I'm
13  not sure if you're seeking to get to the substance of a
14  document that's been withheld by the company on the basis
15  of privilege, and I wouldn't want the witness to describe
16  the substance of it.  That's not what you're looking for.
17  And I would assert the privilege that -- as we have in
18  the log on behalf of the company, of the documents.
19     So you're not allowed to testify about the
20  substance of the document.
21     THE WITNESS:  Okay.
22     MR. KONOVALOV:  She is just asking, first of
23  all, if you have ever received the document.
24     BY MS. RADCLIFFE:
25     Q.   Let's start with -- in the course of your

63

1  investigation, did you receive any documents from
2  Oracle that assisted Ernst & Young in performing its
3  procedures?
4      A.   Yes.
5      Q.   And do you recall what those documents are?
6      A.   I recall them being memorandums prepared by
7  the company.
8      Q.   Any other documents?
9      A.   No.
10     Q.   And maybe I should make my question clearer.
11  Do you recall receiving any other documents from the
12  company that assisted Ernst & Young in performing its
13  procedures?  For example, general ledgers, account
14  analysis reports, anything of that nature, from the
15  company.
16     A.   Yes.  We would have received a general ledger.
17  We would have -- all of our requests to do our testing
18  would have come from the company, specifically the
19  journal entries themselves.  We received a copy of the
20  complaint.
21     Q.   And do you know who at Oracle provided Ernst &
22  Young this documentation?
23     A.   No, I don't recall.
24     Q.   Do you know who at Oracle Ernst & Young would
25  have made those requests for documentation to?

64

1      A.   I don't recall specifically, no.
2      Q.   Do you recall generally there being a subset
3  of people at Oracle that Ernst & Young would have
4  requested these documents from?
5      A.   Yes.
6      Q.   And who were those people?
7      A.   Greg Meyers would -- Greg Meyers would have
8  helped us with the journal entries related to the debit
9  memos, and I actually don't recall who would have
10  provided us other documents in here.
11     Q.   Do you know if Ernst & Young communicated with
12  other individuals at Oracle related to this
13  investigation besides Greg Meyers?
14     A.   Yes.
15     Q.   And who would those individuals be?
16     A.   I don't know who the individuals were
17  specifically.  There would have been -- there is
18  somebody that was referenced in the script-review memo,
19  I believe.  I believe his name is Sanjay Kumar.
20  Outside of Sanjay Kumar, I don't recall anyone else.
21     Q.   Do you know if the results of Ernst & Young's
22  engagement were ever conveyed to Oracle?
23     A.   I don't know.
24     Q.   Do you know if they were conveyed to anyone
25  else?

65

1  A. I don't know.

2  Q. Did Ernst & Young ever discuss the results of

3  its investigation, the investigation we've been

4  discussing, with respect to the Securities and Exchange

5  Commission?

6  MR. KONOVALOV: Objection; calls for

7  speculation.

8  THE WITNESS: I don't know.

9  BY MS. RADCLIFFE:

10  Q. Do you know who would know that?

11  A. No.

12  Q. Do you know if there were work papers that

13  were created during the course of the investigation

14  that are not contained within Exhibit 2 that you've

15  reviewed today?

16  A. I'm not aware of any, no.

17  Q. Do you know who has the authority to remove

18  work papers from Ernst & Young's binders?

19  MR. KONOVALOV: Objection; lacks foundation,

20  assumes facts not in evidence.

21  THE WITNESS: No.

22  BY MS. RADCLIFFE:

23  Q. Is it generally Ernst & Young's policy that

24  work papers are not to be removed from binders?

25  A. Absolutely.

66

1  Q. And is that a documented policy?

2  A. I don't know. I believe so, yes.

3  Q. If you look at Exhibit 1 and if you look at

4  the very first page of what says "Schedule A" at the

5  top, which is the third page of the document.

6  A. Um-hmm.

7  Q. And if you'd look at what is 2-D. And are you

8  the person most knowledgeable with respect to

9  communications with the United States Securities and

10  Exchange Commission concerning any aspect of the

11  investigation Ernst & Young performed?

12  A. No.

13  Q. And who would be the person most knowledgeable

14  at Ernst & Young?

15  A. I don't know.

16  Q. Do you know who would know?

17  A. I don't know who would know.

18  Q. Who would you ask if you wanted to find out?

19  A. I'd ask John Banker.

20  Q. With respect to what is Item 2-E, are you the

21  person most knowledgeable with respect to the existence

22  of documents obtained or prepared in connection with

23  the engagement that were not part of the original work

24  papers?

25  A. That's still at Ernst & Young, I would be the

67

1  only person.

2  Q. Is Ms. Birkler no longer with Ernst & Young?

3  A. No. Neither is Ashley Gemma.

4  Q. Do you know where Ms. Birkler is currently?

5  A. Oracle.

6  Q. And Ms. Gemma?

7  A. Oracle.

8  Q. And do you know what positions they hold at

9  Oracle?

10  A. Both Ashley Gemma and Megan Birkler left

11  Ernst & Young to go work at PeopleSoft and were --

12  PeopleSoft was acquired by Oracle, and they are now

13  working in the Oracle revenue recognition group.

14  Q. And do you know approximately when Ms. Birkler

15  left to become employed at PeopleSoft?

16  A. I don't remember the exact date, no.

17  Q. And do you know approximately when Ms. Gemma

18  left to become employed at PeopleSoft?

19  A. I don't remember the exact date. Ashley Gemma

20  actually left to go work for BMC Software and then went

21  to PeopleSoft and then consequently Oracle. I do not

22  recall the exact date, no.

23  Q. Do you recall the year?

24  A. Megan Birkler left in 2003.

25  Q. And --

68

1  A. And Ashley Gemma left in 2004.

2  Q. And in the course of your duties with respect

3  to the audit of Oracle's fiscal years, did you have the

4  opportunity to correspond with Ms. Birkler and

5  Ms. Gemma?

6  A. Yes.

7  Q. And just generally what do those

8  communications entail?

9  A. The results of our review of revenue contracts

10  and the company's conclusion on the accounting as well

11  as testing of certain internal controls related to

12  Sarbanes-Oxley 404.

13  Q. And is there anyone else who performed

14  engagements for Oracle while at Ernst & Young that is

15  now employed at Oracle, to your knowledge?

16  MR. KONOVALOV: Objection; vague and ambiguous

17  as to "engagement." Are you speaking about the

18  procedures?

19  BY MS. RADCLIFFE:

20  Q. Any engagement, fiscal audit review, the

21  particular investigation engagement.

22  A. Not that I'm aware of, no.

23  Q. Do you have an understanding of how Ernst &

24  Young became Oracle's independent auditors?

25  A. I do, yes.

69

1     Q. And what's that understanding?

2     A. Arthur Andersen -- at the time of our

3 appointment, Arthur Andersen was -- I don't know

4 exactly legally what was happening with Arthur

5 Andersen, but there was significant concern as to their

6 ability to continue as an independent public accounting

7 firm, and Oracle had requested the other -- certain

8 other firms -- I don't recall exactly who -- to come

9 in, bid on the work for the May 2002 audit.

10     Q. And do you recall when that bidding process

11 occurred?

12     A. It was in -- I believe it was in March of

13 2002.

14     Q. And do you know approximately when Ernst &

15 Young was informed that it would be Oracle's

16 independent auditor?

17     A. Approximately?

18     Q. Yes.

19     A. April 2002.

20     Q. And do you know if anyone formerly with Arthur

21 Andersen that worked on the Oracle engagement is now

22 employed at Ernst & Young and works on the Oracle

23 account?

24     A. No, there is nobody.

25     Q. Do you know of anybody who was formerly with

70

1 Arthur Andersen that worked on the Oracle account who

2 is now currently employed at Oracle?

3     A. That previously had worked on the Oracle

4 engagement? Yes.

5     Q. And who is that person?

6     A. Tom Olinger is the corporate controller.

7     Q. And do you know when Mr. Olinger became

8 employed at Oracle?

9     A. I don't know.

10     Q. Do you know approximately when?

11     A. Approximately 2002.

12     Q. Do you know who Mr. Paul Yoo is? Y-o-o.

13     A. The name is familiar.  I don't recall who that

14 is.

15     Q. Did Ernst & Young review Arthur Andersen's

16 work papers for the quarterly reviews of fiscal 2001?

17     A. Yes.

18     Q. Do you know when that review took place?

19     A. Approximately April 2002.

20     Q. Do you know if Ernst & Young reviewed Arthur

21 Andersen's work papers for the fiscal 2001 audit of

22 Oracle?

23     A. Yes.  We are required to.

24     Q. And do you know when that was?

25     A. Same time.

71

1     Q. Do you know if Ernst & Young maintained copies

2 of the quarterly reviews for fiscal 2001 Andersen work

3 papers?

4     A. I do not recall Ernst & Young retaining copies

5 of quarterly work papers for fiscal 2001.

6     Q. Do you recall if Ernst & Young maintains --

7 I'm going to strike that because I've gone over my five

8 minutes of tape time. We're going to go off the

9 record.

10     THE VIDEO OPERATOR:  This marks the end of

11 Videotape No. 1, Volume I, in the deposition of Alex

12 Bender.  Going off the record, the time is 11:09.

13     (A break was taken.)

14     THE VIDEO OPERATOR:  This marks the beginning of

15 Videotape No. 2, Volume I, in the deposition of Alex

16 Bender.  The time is 11:26.  We're back on the record.

17 BY MS. RADCLIFFE:

18     Q. Do you recall if Ernst & Young retained copies

19 of Arthur Andersen's fiscal 2001-year audit?

20     A. There were copies that were made available to

21 us.

22     Q. And do you recall what copies were made

23 available to Ernst & Young?

24     A. There is a list.  Not off the top of my head,

25 no.

72

1     Q. And where's that list maintained?

2     A. We have a work paper.  We have a binder that

3 will have -- that would have -- or binders perhaps that

4 would have all of them.

5     Q. And did Ernst & Young review any of these work

6 papers in connection with its investigation related to

7 the debit memorandums?

8     A. No.

9     Q. Do you know if Ernst & Young reviewed any of

10 Arthur Andersen's documentation when it performed its

11 procedures related to the investigation of the debit

12 memos?

13     A. We did not.

14     Q. Do you know if Ernst & Young discussed with

15 anyone at Andersen any of the work that Andersen

16 performed for Oracle when Ernst & Young was

17 investigating the debit memos?

18     A. No, we did not.

19     Q. I believe you mentioned Mr. Olinger is now the

20 controller at Oracle.  Do you know what position he

21 held at Arthur Andersen?

22     A. I believe he was a partner.

23     Q. And is that partner assigned to the Oracle

24 account while he was at Andersen, to your knowledge?

25     A. To my knowledge he was, yes.

73

```
 1        Q.  And do you know if Mr. Olinger was assigned to
 2   the Oracle account during Andersen's fiscal 2001-year
 3   audit?
 4        A.  I don't know definitively.
 5        Q.  Do you have an understanding?
 6        A.  I believe he was, yes.
 7        Q.  Going back to the -- what's titled the
 8   Schedule A and No. 2-D.  You mentioned with respect to
 9   the item listed there that you might inquire of John
10   Banker regarding the -- any communication Ernst & Young
11   might have had with the United States Securities and
12   Exchange Commission concerning any aspect of the
13   engagement related to the debit memos.
14           Is there anyone currently at Ernst & Young who
15   you might discuss whether such communications took place?
16        A.  Not at Ernst & Young, no.
17        Q.  Do you know if Ernst & Young's counsel might
18   have that information?
19        A.  I don't know.
20        Q.  Do you know if Mr. Cotton might have that
21   information?
22        A.  I don't know.
23        Q.  Did you ask Mr. Cotton if he had that
24   information?
25        A.  No.
```

74

```
 1        Q.  If you look at Item 2-F there, it indicates
 2   "originals or copies of any engagement documents
 3   provided by Ernst & Young to Oracle or its
 4   representatives."  Are you the person most
 5   knowledgeable with respect to that topic?
 6        A.  No.
 7        Q.  And who would be the person most
 8   knowledgeable?
 9        A.  John Banker.
10        Q.  And is there anyone else currently at Ernst &
11   Young who would have more knowledge than you regarding
12   the topics set forth in 2-F of the schedule?
13        A.  Currently at Ernst & Young?
14        Q.  Yes.
15        A.  No.
16        Q.  Do you know if there is any documentation at
17   Ernst & Young that would reflect whether or not
18   engagement documents were provided by Ernst & Young to
19   Oracle's representatives?
20        A.  I'm not aware of any, no.
21        Q.  Do you know if a review of email might reflect
22   whether or not there were -- let me strike that.
23           Do you know whether a review of email was done
24   to ascertain whether or not engagement documents were
25   provided by -- in any way to Oracle or its
```

75

```
 1   representatives?
 2        A.  I'm not aware of that, no.
 3        Q.  Do you know if Ernst & Young communicated with
 4   Oracle by email?
 5        A.  I don't know.
 6        Q.  Do you know if you personally communicated
 7   with Oracle by email?
 8        A.  Not that I recall.
 9        Q.  While you were performing the engagement with
10   respect to the debit memos, did you communicate
11   internally at Ernst & Young with other members of the
12   engagement team by email?
13        A.  Yes.
14        Q.  And do you recall what subject matters you
15   would communicate by email?
16        A.  No.
17        Q.  Did you review your email regarding the
18   engagement prior to being deposed today?
19        A.  No.
20        Q.  Do you know if it still exists?
21        A.  No.
22        Q.  Do you know who you would ask to find out if
23   it still exists?
24        A.  No.
25        Q.  Do you know where it would be maintained at
```

76

```
 1   Ernst & Young?
 2        A.  No.
 3        Q.  Is there any policy or practice at Ernst &
 4   Young that requires that copies of email communications
 5   regarding engagements be printed in hard copy and
 6   placed in a file?
 7           MR. KONOVALOV:  Objection; calls for
 8   speculation.
 9           THE WITNESS:  I don't know.
10   BY MS. RADCLIFFE:
11        Q.  Do you know who would?
12        A.  General counsel's office would, probably.
13        Q.  If you turn the page of that schedule, and if
14   you look at Item No. 4, which states, "E&Y's retention
15   by Oracle for the engagement or for all accounting and
16   related engagements with respect to Oracle debit memos,
17   customer overpayments, funds 'on account' or unapplied
18   cash, including any agreed-upon procedures."
19        A.  Um-hmm.
20        Q.  Are you the person most knowledgeable at
21   Ernst & Young with respect to Subject Matter 4?
22        A.  At Ernst & Young, yes.
23        Q.  Would Mr. Banker be the person that would be
24   more knowledgeable than you with respect to Item No. 4?
25        A.  I don't know if he would or wouldn't.  I
```

77

1    believe he would, though, yeah.

2        Q.  I guess I'd like to try to clarify something.

3    Do you know if Ernst & Young was retained by Oracle

4    itself with respect to the investigation and engagement

5    related to debit memos or whether it was obtained by

6    Oracle's special litigation committee?

7        A.  My understanding, it was a special litigation

8    committee.

9        Q.  And how did you come to that understanding?

10       A.  I believe it's in our memo.

11       Q.  When you say the memo, are you referring to

12   the one that starts at page 143, EY 00143?

13       A.  Yes.  Actually, it doesn't.  So I honestly

14   don't know it being absolutely.

15       Q.  If you'd turn to Subject Matter 5, which says,

16   "The scope and content of E&Y's professional services

17   performed for Oracle relating to the engagement," which

18   was defined earlier.

19           Are you the person most knowledgeable at Ernst &

20   Young with respect to Subject Matter 5 --

21       A.  Yes.

22       Q.  -- that portion that I just read?

23       A.  Um-hmm.

24       Q.  Other than the document -- that memo starting

25   at page 143 that is attached to the schedule, is there

78

1    any other documentation of the scope and content of

2    E&Y's professional services relating to Oracle with

3    respect to the debit memo investigation?

4        A.  Not that I'm aware of.

5        Q.  Do you have any understanding of the scope and

6    content of E&Y's professional services performed that

7    is not contained within the memo starting at 143?

8        A.  As it relates to the debit memos?

9        Q.  Yes.

10       A.  The only other thing that I'm familiar with

11   outside of the memo attached at 000143 is the memo

12   referred to in the script review that is EY 000264 and

13   -285.

14       Q.  And was the review of the script referenced at

15   EY 000264 to 00265 a separate engagement?

16       A.  No.

17       Q.  And if I understand, your testimony is that

18   the memo at EY 00264 to -285 is not part of the initial

19   agreed-upon procedures.  Is that correct?

20           MR. KONOVALOV:  Objection; misstates the

21   witness's testimony.

22           THE WITNESS:  That's not correct, no.

23   BY MS. RADCLIFFE:

24       Q.  So --

25       A.  It's just documented in a separate place.

79

1        Q.  So if we turn to what -- the memo that starts

2    at EY 00143.  And that continues through -146.

3        A.  Um-hmm.

4        Q.  This memo accurately reflects the scope of the

5    procedures performed by Ernst & Young with the addition

6    of the memo referenced at EY 00264 to -285?

7        A.  Yes.

8        Q.  So there are no other procedures that were

9    performed by Ernst & Young with respect to the

10   investigation of the debit memo engagement; is that

11   correct?

12       A.  Not that I'm aware of.

13       Q.  Do you know if anyone at Ernst & Young would

14   be aware of any other procedures performed besides

15   yourself?

16       A.  No.

17       Q.  Do you know if Mr. Banker would be aware of

18   any other procedures performed?

19       A.  I don't know if he would be.

20       Q.  Do you know if there are any other procedures

21   performed that were documented by Ernst & Young with

22   respect to the investigation of the debit memo

23   engagement?

24       A.  In addition to the two memos?

25       Q.  Correct.

80

1        A.  No.

2        Q.  Do you know when Ernst & Young reviewed the

3    script referenced at EY 00264 and -285?

4        A.  No.

5        Q.  Do you know who would know?

6        A.  David Roque might know.  We would probably

7    have to review time-sheet records, if they still exist,

8    to determine that.

9        Q.  Do you know approximately when it was

10   reviewed?

11       A.  October or November 2002.

12       Q.  If you turn to -- back to Schedule A, and it's

13   No. 5-A and on page 2 of that schedule, and it says:

14   The identification by debit memo number, customer name,

15   and amount of debit for the 195 debit memos referenced

16   in EY 000011 and EY 000092, which are attached to this

17   schedule.

18       A.  Where are they attached?

19       Q.  If you keep flipping pages, it's probably

20   about the sixth page in.  It's EY 00011.

21       A.  Okay.

22       Q.  And then if you flip three more pages, it's

23   EY 00092.

24       A.  Okay.

25       Q.  And you can go ahead and take a minute to look

81

1  at those.  But on each of those documents, you see a
2  reference to "195 items"?
3      A.  Um-hmm.
4      Q.  And I guess the first question I should ask
5  you is, do you understand EY 00011 and EY 00092 to be
6  discussing the same 195 items?
7      A.  Yes, they are.
8      Q.  And do you know -- can you identify by debit
9  memo number the 195 items that Ernst & Young reviewed?
10     A.  No.
11     Q.  Do you know if there was a list --
12     A.  I don't --
13     Q.  -- by Ernst & Young of the 195 items reviewed?
14     A.  I don't recall.
15     Q.  Do you know if it's documented anywhere by
16  Ernst & Young the 195 items that Ernst & Young
17  reviewed?
18     A.  I don't recall.
19     Q.  Is there anywhere within Ernst & Young
20  presently that you could obtain that information?
21     A.  Not that I'm aware of, no.
22     Q.  At the time of the investigation in
23  October-November 2002, were you aware of which 195
24  items Ernst & Young had reviewed?
25     A.  I don't recall.

82

1      Q.  Do you recall any of the customer names
2  related to the debit memos that Ernst & Young reviewed?
3      A.  No.
4      Q.  Do you know if the customer names were
5  documented by Ernst & Young?
6      A.  I don't remember.
7      Q.  Do you recall any of the amounts of debit for
8  any of the 195 items reviewed by Ernst & Young?
9      A.  Individually, no.
10     Q.  In the aggregate, do you recall the debit memo
11  amount?
12     A.  As stated in the memo starting with 00014
13  through -144 -- I'm sorry -- 1 -- yeah, -144, we had a
14  145 with a total debit memo value of $398,731.34.  And
15  the additional 50, we didn't document the total.
16     Q.  And going back to the schedule -- and this is
17  in reference to Item 5-B -- do you know who selected
18  the debit memos to be reviewed by Ernst & Young?
19     A.  Ernst & Young selected the debit memos.
20     Q.  Do you recall how Ernst & Young set about
21  selecting debit memos?
22     A.  In our memo starting at EY 000144, we selected
23  every debit memo that was generated on December 17,
24  2000, greater than $500,000, and we selected an
25  arbitrary sample of an additional 50 between a thousand

83

1  and 499,000.
2      Q.  And do you know how that sample set was agreed
3  upon by Ernst & Young as the proper set to review?
4      MR. KONOVALOV:  Objection; vague and ambiguous
5  as to "agreed upon."
6      THE WITNESS:  I don't recall exactly.  I do
7  recall the team discussing the process we were going to
8  take to test the debit memos, and this is what we felt
9  was the best approach.
10  BY MS. RADCLIFFE:
11     Q.  Do you know if Oracle had any input in the
12  process which Ernst & Young was going to take with
13  respect to testing the debit memos?
14     A.  I don't recall, no.
15     Q.  Do you know who would know?
16     A.  I wouldn't know who would know.
17     Q.  Do you know if the 195 debit memos selected is
18  a statistically significant sample?
19     A.  I don't know what the statistical conclusion
20  would be.
21     Q.  Do you know if that analysis was done by
22  Ernst & Young?
23     A.  We didn't take a statistical sample approach
24  to this testing.
25     Q.  Can you explain the approach you did take?

84

1      A.  We took an approach of testing the larger
2  items to get what we considered was coverage of the
3  total amounts in question.  And the arbitrary sample
4  was to take a reasonable representation of the balance
5  that wasn't included in our testing of large items or
6  what we had defined as large items.
7      Q.  And who determined whether or not -- let me
8  strike that.
9      Who determined what a reasonable representation
10  of the balance would be?
11     A.  Our team.
12     Q.  And do you recall who on your team made that
13  decision?
14     A.  It would have been John Banker, Megan Birkler,
15  Ashley Gemma, and me.
16     Q.  And do you recall if the method by which that
17  determination was made was documented?
18     A.  It's documented in this memo.
19     Q.  Other than the conclusions of what was
20  reviewed, is there any other documentation?
21     A.  No.
22     Q.  If you look at Item 5-C, the "agreed-upon
23  procedures with respect to the engagement and/or
24  Account No. 25005."
25     Absent the memo that starts at EY 00143 and the

85

1 script memo that we also talked about, are there any
2 other agreed-upon procedures with respect to the
3 engagement?
4   A.   Not that I'm aware of, no.
5   Q.   And were there any other procedures done with
6 respect to Account 25005 that are not documented in the
7 memo at EY 00143 and the script memo?
8     MR. KONOVALOV:   Would you read that question
9 back, please.
10     (The record was read back as follows:
11     "Q.   And were there any other procedures done
12     with respect to Account 25005 that are not
13     documented in the memo at EY 00143 and the
14     script memo?")
15     THE WITNESS:   No.
16 BY MS. RADCLIFFE:
17   Q.   If you look at Item 5-D, other than the memo
18 in EY 00143 and the script memo, were there any other
19 procedures performed by Ernst & Young with respect to
20 accounting fraud allegations?
21   A.   As relates to the debit memos?
22   Q.   Correct.
23   A.   No.
24   Q.   Has Ernst & Young performed any other analysis
25 of accounting fraud allegations besides the debit memo

86

1 allegations?
2     MR. KONOVALOV:   Objection; vague, ambiguous as
3 to time.
4     THE WITNESS:   Accounting fraud allegations?  Not
5 that I'm aware of, no.
6 BY MS. RADCLIFFE:
7   Q.   Has Ernst & Young performed any other analysis
8 of inquiries regarding fraud besides the debit memo
9 allegations?
10   A.   We're required to under SAS 99.
11   Q.   And is --
12     (Interruption)
13     THE WITNESS:   We are required to under SAS 99.
14 BY MS. RADCLIFFE:
15   Q.   And is that in connection with the year-end
16 fiscal audits of Oracle?
17   A.   Yes.
18   Q.   And has Ernst & Young uncovered any critical
19 matters with respect to its analysis required under
20 SAS 99?
21     MR. KONOVALOV:   Objection: vague and ambiguous.
22     THE WITNESS:   No.
23 BY MS. RADCLIFFE:
24   Q.   Did you understand what I refer to when I mean
25 "critical matter"?

87

1   A.   I interpret it as a material matter.
2   Q.   If you look at Item 5-E, which is "the
3 accounting and customer refund processes at Oracle," do
4 you have an understanding of what the accounting and
5 customer refund processes at Oracle were in fiscal
6 2001?
7   A.   Generally, no.  We were not the auditors.
8   Q.   In connection with the debit memo engagement,
9 did Ernst & Young obtain an understanding of what the
10 accounting and customer refund processes were at
11 Oracle?
12   A.   Yes.
13   Q.   And what is Ernst & Young's understanding of
14 what those processes were?
15   A.   I would have to review their policy again.
16 And they had -- they had documented it.  I believe it
17 was in a policy.  And I don't recollect exactly where
18 it was documented but it was documented.
19   Q.   And did Ernst & Young maintain a copy of that
20 documentation in its work papers?
21   A.   I don't recall.
22   Q.   In your review of Exhibit 2, did you see a
23 copy of that policy?
24   A.   There was a policy with regards to unapplied
25 cash.  That doesn't necessarily relate to customer

88

1 refunds, although it could.  But outside of that --
2   Q.   And which EY number is that?
3   A.   I'm sorry.  EY 000250 through -251 and -252
4 and -253.
5   Q.   Do you recall reviewing any other Oracle
6 written documentation with respect to Oracle's customer
7 refund processes in connection with the debit memo
8 engagement?
9   A.   I vaguely remember reading a document -- I
10 don't recall what the document was -- specifically that
11 gave a brief description as to the general process that
12 Oracle would apply as it related to customer refunds.
13   Q.   And do you have a recollection of what your
14 understanding is with respect to that process?
15   A.   Not specifically, no.
16   Q.   Generally?
17   A.   I generally don't know that I could give you
18 an accurate description of the process as it was in
19 November 2000.
20   Q.   And I guess my question is:  What is your best
21 recollection of that process?
22   A.   My best recollection of the process at that
23 point in time was that Oracle would receive a -- would
24 upload lockbox information from a bank -- I don't
25 recall what bank it was -- and it would initially be a

89

1    debit to cash, a credit to the 25005 account, and as
2    that cash would be applied to outstanding accounts
3    receivable balances, it would debit the 25005 account
4    and it would credit accounts receivable.
5         If the cash wasn't applied for whatever reason,
6    it would be either categorized as unapplied cash or a
7    description of "on account," both of which were recorded
8    in Account 25005.
9         Q.   And did you understand Oracle to have changed
10   this process after fiscal 2001?
11        A.   I generally believe they changed this process
12   as part of their implementation of Oracle 11i.
13        Q.   And do you know when that was?
14        A.   No.
15        Q.   Do you know when it was generally?
16        A.   No.
17        Q.   Do you recall the year?
18        A.   No.
19        Q.   And do you have an understanding of what the
20   refund process is currently at Oracle?
21        A.   I don't off the top of my head.  I'd have to
22   review our work papers.
23        Q.   And the -- the refund process that you just
24   described starting with the lockbox and going forward,
25   do you know if Ernst & Young documented that process

90

1    anywhere?
2         A.   No, we did not.
3         Q.   Do you know if Ernst & Young discussed that
4    process with anyone at Oracle?
5         A.   I don't recall.
6         Q.   Do you know who would know?
7         A.   I don't know who would know.
8         Q.   If you'd look at what is Item 5-F on the
9    Schedule A.  And it's Exhibit 1 for the record.  It
10   says, "The methodology that Oracle employed to
11   redesignate the 'on account' items on November 17,
12   2000."
13        Do you have an understanding of what methodology
14   Oracle employed to redesignate the "on account" items on
15   November 17, 2000?
16        MR. KONOVALOV:  Objection: vague and ambiguous
17   as to "redesignate."  Assumes facts not in evidence.
18        THE WITNESS:  In our memo on 000144, we state
19   that in November 2000, in an effort to remove these "on
20   account" transactions from company's subledgers, the
21   company wrote an SQL script that completed the following
22   steps:  One, unapply the cash from the "on account"
23   status, which was a debit and credit to Account 25005.
24        Two, generate a debit memo for the amount
25   previously applied as "on account" with a debit to 25005

91

1    and a credit to 25005, and then apply the cash to a debit
2    memo, which was also a debit and a credit to 25005.
3    BY MS. RADCLIFFE:
4         Q.   And do you have an understanding of how
5    Ernst & Young learned of that methodology that you just
6    described?
7         A.   The company told us.
8         Q.   Do you know who at the company?
9         A.   I don't recall who it was at the company.
10        Q.   Are there a set of individuals who come to
11   mind that might have conveyed that information to
12   Ernst & Young?
13        A.   Greg Meyers is one person that I would look
14   to.
15        Q.   And do you know what Greg Meyers' title was at
16   Oracle?
17        A.   At that time, he was senior manager accounts
18   receivable, global process owner.
19        Q.   And other than what you read from in the memo
20   at EY 00144, do you know if there is any other
21   documentation of Ernst & Young's understanding of the
22   methodology that Oracle employed to redesignate the "on
23   account" items on November 17, 2000?
24        MR. KONOVALOV:  Objection: vague and ambiguous.
25        THE WITNESS:  Not that's documented in this memo

92

1    or the memo that is discussed in the SQL script.
2    BY MS. RADCLIFFE:
3         Q.   And would there be any other documentation
4    besides the memo starting at EY 00143 and the SQL
5    script that we've been referencing?
6         A.   Not that I'm familiar with, no.
7         Q.   And if you look at Item 5-G, which is,
8    "Changes in Oracle's customer advances, unapplied cash,
9    funds 'on account,' and unearned revenue accounts for
10   the second-quarter fiscal year 2001."
11        Do you know if Ernst & Young reviewed the
12   changes in those accounts?
13        A.   Yes.  As I previously stated, we did do
14   analytical reviews on the unearned revenue account in
15   that quarter, as well as Account 25005, which
16   encompasses customer advances, unapplied cash, and
17   funds "on account."
18        Q.   And in Exhibit 2 -- and for the record, could
19   you indicate where that is documented?
20        A.   Yes.  EY 000147 is our analytical review of
21   unearned revenue.  And EY 00230, -231, -232, -233,
22   -234, -235, -236, -237 would be part of our analytical
23   review on Account 25005.  If you give me a second, I'll
24   find the other one.  And EY 000151, that's also the
25   analysis of Account 25005.

93

1      Q. And do you know if there was any other
2 analysis of the items listed at 5-G besides those
3 documents that you just referenced?
4      A. No.
5      Q. And do you know if there is any other
6 documentation of the review of those items listed in
7 5-G besides the ones you just mentioned?
8      A. No.
9      Q. If you look at Item 5-H, "Oracle's refunds of
10 customer overpayments." Did Ernst & Young do an
11 analysis of Oracle's refunds of customer overpayments?
12      A. Not in addition to the analysis that we
13 previously spoke about.
14      Q. Do you know if Or- -- excuse me -- if Ernst &
15 Young ever did a reconciliation of Oracle's refunds of
16 customer overpayments in connection with its debit memo
17 engagement?
18      A. Well, we did -- what's documented on EY 000145
19 was that we obtained the company -- from the company
20 the domestic general ledger account analysis report for
21 Account 25005, made inquiries as to the nature of the
22 transactions as part of that analysis report.
23      We noted that all debits to 25005 were
24 recorded with a corresponding credit to Account 25005.
25 That's to a financial statement impact or to a

94

1 different nonrevenue account.
2      We also reviewed large transactions, and we
3 obtained the domestic reconciliation for Account 25005
4 for November 2000 and August 2000.
5      Q. And are any of those reviews that you just
6 mentioned referenced in EY 00145 -- are those
7 documented anywhere in Ernst & Young's work papers?
8      A. In addition to the memo?
9      Q. In addition to the memo.
10      A. They are part of EY 000150 and I believe -151,
11 although it's hard to read, and EY 00231, -232, -233,
12 -234, -235, -236, and -237.
13      Q. Other than those references to EY 000150 to
14 -151 and EY 00231 through -236, was there any other
15 documentation by Ernst & Young?
16      A. No.
17      Q. And you indicated that the company reviewed
18 the domestic general ledger account analysis report?
19      A. The company provided us the domestic general
20 ledger account analysis report.
21      Q. And is a copy of that report in what has been
22 marked as Exhibit 2?
23      A. Yes, it starts at 000231 and it goes through
24 -234 -- -3 -- I'm sorry -- -233.
25      Q. And is that document the totality of what

95

1 Ernst & Young reviewed with respect to Oracle's
2 domestic general ledger account analysis reports in
3 connection with the debit memo engagement?
4      A. I believe so, yes.
5      Q. You also indicated that Ernst & Young made
6 inquiries to the nature of the transactions as part of
7 its review. And are you referring specifically to the
8 inquiries referenced in the tick marks on the analysis
9 report?
10      A. Yes, I believe so.
11      Q. And do you know what I mean when I refer to
12 "tick marks"?
13      A. Yes, I do.
14      Q. And why don't you just explain for the record
15 what your understanding of tick marks is so there is no
16 confusion by anyone reading it later on?
17      A. Sure. We generally use tick marks to identify
18 an item that we will be performing some procedures on.
19 The tick mark will define what it is we did.
20      Q. And besides the notations after the tick marks
21 on the general ledger account analysis report starting
22 at EY 00231 through -234, is there any other
23 documentation of what Ernst & Young did with respect to
24 its inquiries of the nature of the transactions?
25      A. Not that I recall, no.

96

1      Q. If you look at EY 00231 and you look at the
2 title of it, do you see where it says "Account Analysis
3 Report with Payables Detail" at the top?
4      A. Um-hmm.
5      Q. Is it your understanding that that is a
6 reconciliation report?
7      MR. KONOVALOV: Objection; vague and ambiguous.
8      THE WITNESS: My understanding is that this
9 details the activity that went through this account for
10 that period, not necessarily the reconciliations, because
11 I don't see a reconciliation to the general ledger on
12 here.
13 BY MS. RADCLIFFE:
14      Q. So do you know if there is any separate
15 documentation that would reflect a reconciliation to
16 the general ledger?
17      MR. KONOVALOV: Objection; calls for
18 speculation.
19      THE WITNESS: I don't remember we put that --
20 the note "the ending balance properly agreed to the
21 general ledger."
22 BY MS. RADCLIFFE:
23      Q. I'm just going to ask you, when you say
24 "ending balance," what are you referring to?
25      A. The balance as of the end of the month for

97

1    November 2000 and August 2000.

2    Q.  The -- and so I just want to clarify.  The

3    balance of each debit memo or --

4    A.  The subtotal, the general ledger.

5    Q.  Do you know where -- I'm going to strike that.

6    Do you know if there is any documentation of

7    the reconciliation to the general ledger?

8    A.  In addition to the memo?

9    Q.  Besides -- in addition to the memo.

10   A.  I don't recall.  On -- it's hard to read.  On

11   150 and 151, these are also what seem to be

12   reconciliations of that account, as well, that shows

13   the ending balance.  It doesn't indicate on here

14   specifically that we agreed with the general ledger,

15   but we did in our memo.

16   Q.  So is the reference in your memo the only

17   documentation with respect to the reconciliation to the

18   general ledger?

19   A.  Yes.

20   Q.  Do you know who performed that analysis at

21   Ernst & Young?

22   A.  I don't recall who did it, no.

23   Q.  Do you know if you performed that analysis?

24   A.  I believe I reviewed it.

25   Q.  Of the subset of people who were performing

98

1    work on the engagement for Ernst & Young, which people,

2    to the best of your knowledge, would have prepared that

3    reconciliation?

4    A.  Megan Birkler or Ashley Gemma.  They wouldn't

5    have prepared the reconciliation.  They would have

6    reviewed the reconciliation prepared by Oracle.

7    Q.  Do you know if Ernst & Young did an

8    independent reconciliation to the general ledger?

9    A.  We did not perform a separate reconciliation,

10   no.  We obtained the reconciliation and verified that

11   it did, in fact, agree to the general ledger.

12   Q.  Do you know what procedures were done to

13   verify that it agreed to the general ledger?

14   A.  I don't know specifically what we did, no.

15   Q.  Do you know if there is any documentation of

16   that verification besides the sentence in the memo you

17   just read?

18   A.  No.

19   Q.  Do you know who would have performed that

20   verification?

21   A.  Either Ashley Gemma or Megan Birkler.

22   Q.  Do you know if there would have been any

23   discussions with Oracle about the reconciliation?

24   A.  I don't recall there being a discussion with

25   Oracle.

99

1    Q.  Do you know if Oracle maintained a detail of

2    Account 25005?

3    MR. KONOVALOV:  Objection; vague and ambiguous.

4    THE WITNESS:  I don't know.

5    BY MS. RADCLIFFE:

6    Q.  Do you know if Ernst & Young ever reviewed a

7    detail of Account 25005?

8    MR. KONOVALOV:  Same objection.

9    THE WITNESS:  You mean in addition to the

10   account analysis that we referenced?

11   BY MS. RADCLIFFE:

12   Q.  Yes.

13   A.  No.

14   Q.  Do you see on EY 000150 there is a -- I don't

15   know what you call it, sort of a Post-it appears on

16   this document that says:  To Alex Bender, From Julie

17   Chan?

18   A.  Yeah, I saw that.

19   Q.  Do you recall who Julie Chan is?

20   A.  I don't recall her title, but Julie Chan

21   worked at Oracle in the revenue recognition group.

22   Actually -- strike that.

23   I don't know if she was in that group at that

24   point in time, but she was working for Oracle in

25   Rocklin, California, and she was apparently assisting

100

1    pulling information for us.

2    Q.  And when you say assisting and pulling

3    information for Ernst & Young, are you referring to in

4    connection with the debit memo investigation?

5    A.  Yes.

6    Q.  Did you ever discuss the debit memo

7    investigation with -- in terms of Ernst & Young's

8    conclusions with Ms. Chan?

9    A.  No.

10   Q.  Other than the document referenced at EY

11   00150, and it appears to also go to -151, do you know

12   if Ms. Chan provided other documents to Ernst & Young

13   in connection with its investigation of the debit

14   memos?

15   A.  I don't recall.

16   Q.  Do you know who Ms. Chan's supervisor was?

17   A.  At that time I don't remember.

18   Q.  Do you know who her supervisor is currently?

19   A.  I don't know officially who she reports to,

20   no.

21   Q.  With respect to Greg Meyers, do you know who

22   his supervisor was at the time of the debit memo

23   investigation?

24   A.  I don't know the reporting lines for Greg

25   Meyers at that time.

101

1    Q.  If you look at what is 5-I back on Exhibit 1.

2    And it says:  Any conclusions reached as to whether

3    Oracle's debit memo transactions on or about

4    November 17, 2000, had any impact on Oracle's financial

5    statements, revenue, or balance sheet for fiscal --

6    strike that -- revenue or balance sheet for

7    second-quarter fiscal year 2001 or fiscal year 2001.

8    Are you the person at Ernst & Young most

9    knowledgeable regarding the conclusions that it reached

10   regarding that matter?

11    A.  Yes.

12    Q.  And other than the memo starting at EY 000143

13  and the script memo we discussed, is there any other

14  documentation of those conclusions?

15    A.  No.

16    Q.  Are there any other conclusions reached by

17  Ernst & Young that are not documented?

18    A.  Not that I'm aware of, no.

19    Q.  If you look at item 5-J, which is the

20  preparation, existence, maintenance, location,

21  organization -- I'll let you read it.

22    A.  Okay.

23    Q.  Are you the person most knowledgeable with

24  respect to that topic?

25    A.  At Ernst & Young?

102

1    Q.  At Ernst & Young.

2    A.  Yes.

3    Q.  And did you do anything prior to your

4  deposition to prepare yourself as a representative of

5  Ernst & Young to respond to that subject matter?

6    A.  No.

7    Q.  Other than what you've testified regarding the

8  maintenance of the documents related to the engagement,

9  is there any other location within Ernst & Young that

10  documents related to the engagement would be currently

11  located?

12    MR. KONOVALOV:  Objection; asked and answered

13  several times.

14    But you can answer it again.

15    THE WITNESS:  Not that I'm aware of.

16  BY MS. RADCLIFFE:

17    Q.  Do you know what Ernst & Young's destruction

18  and retention policy is with respect to its

19  engagements?

20    A.  I don't know specifically.  We did receive --

21  I recall receiving an email from our general counsel's

22  office --

23    Q.  I'm just going to stop you because that's a

24  communication from your general counsel.  That's most

25  likely privileged and we don't want to elicit that --

103

1    A.  So I was informed in what to do and what not

2  to do.

3    Q.  And was it your understanding that the

4  documents related to this engagement were maintained in

5  accordance with Ernst & Young's document-retention

6  policy?

7    A.  They were, yes.

8    Q.  And do you know when you were advised to

9  retain documents related to this investigation?

10    A.  I don't recall the date, no.

11    Q.  Do you recall the year?

12    A.  No.

13    Q.  Do you recall if it was prior to 2003?

14    A.  Calendar 2003, yes.

15    Q.  Do you recall if it was during the winter of

16  2002?

17    A.  I don't remember.

18    Q.  Can you recall if it was your understanding

19  that notes related to the debit memo engagement were to

20  be preserved?

21    A.  Yes.

22    Q.  Did you preserve those notes?

23    A.  I preserved everything that was required of

24  me.

25    Q.  Did you have any notes related to the debit

104

1  memo investigation at the time that you were instructed

2  to preserve all documents related to the engagement?

3    A.  I don't recall.

4    Q.  If you had those notes, would they still be

5  located at Ernst & Young?

6    MR. KONOVALOV:  Objection; incomplete

7  hypothetical, assumes facts not in evidence.

8    THE WITNESS:  I don't remember having notes.  If

9  I did have notes, I would expect them to be in my office.

10  But I'm not aware of any.

11  BY MS. RADCLIFFE:

12    Q.  Did you look in your office to ascertain

13  whether or not you had any notes related to this

14  engagement?

15    A.  At the time that I was instructed to retain

16  documents?  Yes.

17    Q.  At any time since the -- since the time you

18  were told to retain documents related to the

19  engagement.

20    MR. KONOVALOV:  Would you read the question

21  back, please.

22    (The record was read back as follows:

23    "Q.  Did you look in your office to ascertain

24    whether or not you had any notes related to

25    this engagement at any time since the --

Bender, Alexander  9/21/2006  9:04:00 AM

105

1        since the time you were told to retain

2        documents related to the engagement?")

3        THE WITNESS: I don't recall, no.

4    BY MS. RADCLIFFE:

5        Q.  You don't recall looking?

6        A.  I don't recall looking after I initially had

7    been told to look and retain all of our information

8    related to this investigation -- related to this

9    matter.

10       Q.  Do you recall looking at the time that you

11    were told to retain documents related to the

12    engagement?

13       A.  I generally recall making sure that our team

14    had all of the work papers preserved and maintained in

15    one spot.

16       Q.  Beyond the work papers, do you recall making

17    efforts to retain notes or other documents that were

18    not contained within the work papers?

19       A.  I don't recall there being any at that time.

20       Q.  Are you familiar with the term "discard

21    files"?

22       A.  Discard files?

23       Q.  Yes.

24       A.  I am understanding what it means, but I'm not

25    sure I understand the question.

106

1        Q.  I'm just asking if you have ever heard the

2    term "discard files."

3       A.  No.

4       Q.  In the course of your engagement -- or Ernst &

5    Young's engagement with respect to the debit memos,

6    are -- let me strike that -- were there documents that

7    were generated during that engagement that no longer

8    exist today?

9       MR. KONOVALOV:  Objection: calls for

10    speculation.

11       THE WITNESS:  I don't recall if there were or

12    were not.

13    BY MS. RADCLIFFE:

14       Q.  Do you know who at Ernst & Young would know?

15       A.  Me.

16       Q.  Do you know if a review of your computer files

17    would reflect whether or not there were documents

18    related to the engagement that existed at the time of

19    the engagement but no longer exist?

20       A.  I don't know.

21       Q.  Do you know if a review of Ernst & Young's

22    computer files was conducted with respect to preserving

23    or retaining documents related to the engagement with

24    respect to Oracle's debit memos?

25       A.  Not that I'm aware of, no.

107

1        Q.  Do you know who would know?

2       A.  I don't know who would know.

3       Q.  Do you know if there was a review of Ernst &

4    Young's email servers with respect to preserving

5    documents related to Ernst & Young's investigation of

6    the debit memos?

7       A.  I don't know.

8       Q.  Do you know who would know?

9       A.  I don't know.

10       Q.  If you look at what's item subject matter 5-K

11    of the Schedule A to Exhibit 1.  Other than the

12    individuals who we've discussed related to the

13    engagement earlier today, are there any other

14    individuals that you recall who performed professional

15    services for Ernst & Young related to the debit memo

16    transactions at Oracle?

17       A.  Not that I recall, no.

18       Q.  If you turn to EY 00232 -- or also attached to

19    the schedule, an Item L of Subject Matter 5 is

20    Comment B at EY 00232.  And if you look at Item B,

21    there appears to be a number that was highlighted

22    that's unreadable, at least on my copy, of EY 00232.

23    Do you see that?

24       A.  Oh, for B?  Yes.

25       Q.  Yes.  And Item B says, "Entry relates

108

1    primarily to miscellaneous receipts which have been

2    either refunded or applied to a separate expense

3    account"?

4       A.  Um-hmm.

5       Q.  "Oracle World, for example.  We reviewed a

6    sample of ten entries noting no entry made to" --

7       A.  Revenue.

8       Q.  -- "revenue."  Is that your handwriting?

9       A.  Yes.

10       Q.  And the handwriting on EY 00232, is that

11    anyone else's handwriting besides yours?

12       A.  I don't think so, no.

13       MS. RADCLIFFE:  I'm going to mark as the next

14    exhibit, which is Exhibit 6.

15       THE VIDEO OPERATOR:  Going off the record, the

16    time is 12:32.

17

18    AFTERNOON SESSION

19

20       THE VIDEO OPERATOR:  Back on the record, the

21    time is 1:18.

22       MS. RADCLIFFE:  I'm going to mark for the record

23    what I believe is Exhibit 6 next in order.

24       (Exhibit No. 6 was marked for identification by

25    the reporter.)

109

```
1    BY MS. RADCLIFFE:
2        Q.  If you could just take a minute, Mr. Bender,
3    to review Exhibit 6.
4        A.  (The witness reviews the document.)
5        Q.  And specifically I'm going to ask you to
6    compare it to Ernst & Young's work paper with the same
7    title.
8        A.  Okay.
9        Q.  And the reason why I'm asking you to compare
10   them is it appears that the document that is marked
11   Exhibit 6 is the same document that's contained within
12   Ernst & Young's work papers with the exception of the
13   handwritten notes that we've established are actually
14   your notes.
15       MR. KONOVALOV:  Objection: lacks --
16   BY MS. RADCLIFFE:
17       Q.  I just want you to compare the two to see if
18   that is your understanding.
19       MR. KONOVALOV:  Objection: lacks foundation
20   unless you're asking the witness to go line by line
21   through the document.  Are you representing that they're
22   the same but for the handwriting?
23       MS. RADCLIFFE:  I do not know that they're the
24   same.  I'm not making that representation.
25       Q.  But if you look at the report date at the
```

110

```
1    right hand of Exhibit 2, at 00231, and if you look at
2    the report date at what's been marked as Exhibit 6, it
3    appears to be the same date and time.
4        And if you look at the title of the document,
5    it also appears to be the same title.  They both read
6    "Account Analysis Report with Payables Detail from 01
7    NOV-00 through 30 NOV-00."
8        And if you want to familiarize yourself with
9    the documents, you can certainly take the time to do
10   that.
11       MR. KONOVALOV:  I don't mean to quibble.  When
12   you say exclusively the handwritten comments, you mean on
13   all three of the pages, correct?
14       MS. RADCLIFFE:  Yes, all of the handwritten
15   notations on EY 00231 through EY 000233.
16       A.  (The witness reviews the document.)
17   BY MS. RADCLIFFE:
18       Q.  Did you have an opportunity to review the two
19   documents, Mr. Bender?
20       A.  Yes.  I can't tell what's blacked out on
21   what's EY 000232 to compare those -- one, two, three,
22   four, five -- six amounts that are probably black
23   highlighted but come over as blacked out.  But other
24   than that, the totals are the same.
25       Q.  And precisely why on Exhibit 6, which at page
```

111

```
1    NDCA-ORCL 144609 -- if you take a look at the items
2    that are, for lack of a better word, blacked out on the
3    Ernst & Young work paper -- so, for example, where
4    there is a tick mark B, above that is the number
5    690,250 -- well, far more than that, but
6    692,415,514.97.
7        A.  Right.
8        Q.  And then below that on the Ernst & Young work
9    paper, it appears to be blacked out.  And then on the
10   document that's been marked as Exhibit 6, that number
11   reads $16,708,409.19?
12       A.  Um-hmm.
13       Q.  Do you have a recollection of whether this
14   approximately $16.7 million is the number that is
15   referenced in the Ernst & Young work paper with respect
16   to tick mark B?
17       MR. KONOVALOV:  Objection: calls for
18   speculation.  The document speaks for itself.
19       THE WITNESS:  I'd have to see the original work
20   paper.
21   BY MS. RADCLIFFE:
22       Q.  And do you believe that that information is
23   contained in the original work paper --
24       A.  Yes.
25       Q.  -- in readable form?
```

112

```
1        A.  Yes.
2        Q.  And if we make the assumption that the
3    $16.7 million referenced in Exhibit 6 is the same
4    number that's in the Ernst & Young work paper, and you
5    look at tick mark B and it says, "Entry relates
6    primarily to miscellaneous receipts which have been
7    either refunded or applied to a separate expense
8    account.  Oracle World, for example.  We reviewed a
9    sample of ten entries noting no entry made to revenue."
10       I believe we established that that's your
11   handwriting; is that correct?
12       A.  Right.
13       Q.  Do you know what ten entries Ernst & Young
14   reviewed?
15       A.  I don't recall, no.
16       Q.  Do you know where that's documented?
17       A.  I don't know.
18       Q.  Do you know if it was documented?
19       A.  I don't remember.
20       Q.  Do you recall any discussion about documenting
21   those entries?
22       A.  I don't recall, no.
23       Q.  Did anyone tell you not to document those
24   entries?
25       A.  No.
```

Bender, Alexander  9/21/2006  9:04:00 AM

113

```
1          Q.  And if we make the assumption that it's the
2     approximately 16.7 million number, do you know how many
3     items -- how many cash receipts added up to the 16.7
4     million?
5          MR. KONOVALOV:  Objection; incomplete
6     hypothetical and assumes facts not in evidence.
7          THE WITNESS:  I don't know.
8     BY MS. RADCLIFFE:
9          Q.  Do you know if on EY 000232 -- if the entries
10    on the column which is marked "debits" --
11         A.  Yes.
12         Q.  -- consists of single-item entries or if they
13    are multiple items consolidated into a single entry?
14         MR. KONOVALOV:  Objection; vague and ambiguous.
15         THE WITNESS:  I don't know.
16    BY MS. RADCLIFFE:
17         Q.  With respect to tick mark B -- and it
18    indicates the entry relates primarily to miscellaneous
19    receipts?
20         A.  Um-hmm.
21         Q.  And it goes on to say, "Reviewed a sample of
22    ten entries."  Would that indicate to you that that
23    entry was made up of multiple items?
24         A.  Yes.
25         Q.  And do you recall with respect to tick mark B
```

114

```
1     how many items that entry consisted of?
2          A.  I do not, no.
3          Q.  Do you know if it is documented anywhere in
4     Oracle's -- I mean -- excuse me -- Ernst & Young's work
5     papers?
6          A.  Not that I'm aware of, no.
7          Q.  Do you know if tick mark B was more than a
8     thousand items?
9          A.  I do not know.
10         Q.  Do you know how the sample of ten entries was
11    determined?
12         A.  It was not documented here how we did it.
13    That's why I'm not sure how we did it.  I don't recall.
14         Q.  Do you know if you performed the review of the
15    ten entries?
16         A.  I don't recall.  But because I wrote the tick
17    mark, I would presume that I did, yes.
18         Q.  And do you have a recollection of what that
19    review entailed?
20         A.  Other than what's documented here, I don't
21    recall specific, no.
22         Q.  So the entry -- the tick mark B to the right
23    of it, it could have been more than a thousand entries;
24    you just can't determine from this work paper.  Is that
25    correct?
```

115

```
1          MR. KONOVALOV:  Objection; mischaracterizes the
2     witness's testimony.
3          THE WITNESS:  I don't know how many items there
4     were.
5     BY MS. RADCLIFFE:
6          Q.  If you turn to EY 00234, -235, and -236 and
7     -237, which appear -- and correct me if I'm wrong -- to
8     be supporting documentation with respect to the tick
9     marks; is that correct?
10         A.  Yes.
11         Q.  Do any of those documents refresh your
12    recollection as to how many entries the number
13    designated at tick mark B consisted of?
14         A.  No.
15         Q.  And I'm actually -- actually -- I believe some
16    of these documents are also produced at Exhibit 3,
17    which was Ernst & Young's --
18         A.  Okay.
19         Q.  -- production of the best copies that it had
20    of these documents.  And if you'd also look at those
21    because they're a little more readable than the ones
22    contained in Exhibit 2.
23         MR. KONOVALOV:  You're again referring to 234
24    through 237, right?
25         MS. RADCLIFFE:  Correct.
```

116

```
1          THE WITNESS:  I'm sorry.  Did you ask me a
2     question?
3     BY MS. RADCLIFFE:
4          Q.  Sure.  Did that assist you at all in
5     determining whether the number of items -- that the
6     number which is blacked out next to tick mark B refers
7     to?
8          A.  No.
9          Q.  And do any of the documents at 235 -- excuse
10    me -- 234 to 237 document the ten entries that were
11    reviewed by Ernst & Young as referenced at tick mark B?
12         A.  I can't tell by these copies which tick mark
13    they relate to.
14         Q.  Do you know if there was a determination of
15    the items at tick mark B with respect to whether these
16    items were refunded?
17         A.  I'm sorry.  Rephrase the question.
18         Q.  Do you know if the items -- the debits which
19    would consist of the number next to tick mark B which
20    we can't read, do you know if those -- if Ernst & Young
21    did an analysis of which of those items had been
22    refunded to customers?
23         A.  I don't recall doing that, no.
24         Q.  Do you know if there is any documentation
25    regarding any analysis by Ernst & Young with respect to
```

117

1  miscellaneous receipts being refunded to Oracle
2  customers?
3      A.  Not that's documented here, no.
4      Q.  Do you know if there was any analysis with
5  respect to the items next to tick mark B with respect
6  to whether miscellaneous receipts were applied to a
7  separate expense account as referenced in tick mark B?
8      A.  I'm sorry.  Rephrase the question.
9      Q.  Sure.  Do you know if there is any analysis by
10  Ernst & Young with respect to whether the items -- the
11  debits which consist of the number in tick mark B that
12  we can't read were applied to a separate expense
13  account?
14      A.  I don't recall doing a separate analysis, no.
15  I only recall what's documented here.
16      Q.  Do you know what the -- do you know where the
17  debits which are referenced next to tick mark B -- do
18  you know which accounts that those debits related to?
19      A.  Other than what's documented on this
20  EY 000232, I don't know.
21      Q.  And do you know -- I guess I -- strike that.
22      Do you know the approximate percentage of the
23  dollar value that would have been -- item next to tick
24  mark B, the ten entries that were sampled consisted of?
25      A.  No.

118

1      Q.  Do you know how you would find that out?
2      A.  Do I know how I would find that out?  I don't
3  know.
4      Q.  Did you know at the time that you performed
5  the engagement?
6      A.  I don't know if we did analysis on how much --
7  what percentage it was or not.
8      Q.  Do you know who was involved in identifying
9  the sample of ten entries?
10      A.  I don't recall.
11      Q.  Do you see under tick mark C?
12      A.  Um-hmm.
13      Q.  And we'll establish that's your handwriting,
14  correct?
15      A.  Yes.
16      Q.  Sorry.
17      A.  Sorry.
18      Q.  Under which looks like a number 2, there is a
19  reference to an additional discussion in the company
20  memo.
21      A.  Okay.  Yeah, I see that.
22      Q.  Do you know what the reference to "the company
23  memo" refers to?
24      A.  I don't recall specifically which memo it is.
25      Q.  And when it says "company memo," is that an

119

1  Ernst & Young memo or an Oracle memo?
2      A.  Oracle.
3      Q.  Do you recall if there were more than one
4  Oracle memos that Ernst & Young reviewed?
5      A.  I don't recall there being more than one memo
6  that was talking about the $692 million debit memos.
7      Q.  Do you know who provided Ernst & Young that
8  memo?
9      A.  I do not know.
10      Q.  Did you receive that memo?
11      A.  I don't recall, although this tick mark
12  implies that we did.
13      Q.  Do you know if anyone else at Ernst & Young
14  reviewed that memo?
15      A.  I don't know.
16      Q.  Did you rely on the memo in -- strike that.
17      Did Ernst & Young rely on that memo in its
18  analysis of the debit memo transactions at Oracle?
19      MR. KONOVALOV:  Objection:  calls for
20  speculation.
21      THE WITNESS:  Can you expand on "rely"?
22  BY MS. RADCLIFFE:
23      Q.  Sure.  The note here says, "The remaining 700
24  million relates to" -- and I think it says "normal
25  processing of cash receipts during month.  See

120

1  additional discussion in company memo."
2      A.  Okay.
3      Q.  Would the company memo be part of Ernst &
4  Young's documentation of the procedures that it
5  performed?
6      MR. KONOVALOV:  Objection:  incomplete
7  hypothetical, assumes facts not in evidence.
8      THE WITNESS:  I don't recall.  When we refer to
9  it in a tick mark, generally it is.
10  BY MS. RADCLIFFE:
11      Q.  And on the first part of No. 2, it says --
12  under C-2, I should say -- it says, "Apply cash to
13  debit memo.  See memo from Oracle for further
14  discussion."
15      Do you know if that's separate from the memo
16  that's described below?
17      A.  I don't know.
18      Q.  Is it your understanding that Ernst & Young's
19  review of the debits at tick mark C consisted of a
20  review of memos from Oracle based on this notation?
21      A.  I'm sorry.  Can you rephrase the question?
22      Q.  Sure.  Is it your understanding that Ernst &
23  Young's review of the debits at tick mark C consisted
24  of a review of the memos provided by Oracle?
25      MR. KONOVALOV:  Objection:  lacks foundation.

121

1   The document speaks for itself.

2        THE WITNESS:  To answer your question, the way I

3   read it, the memo discusses $692 million of debit memos.

4   And what we looked at was noting that since they made

5   that entry twice in this particular line item, that 1.4

6   billion that is discussed in the company memo.

7   BY MS. RADCLIFFE:

8        Q.   You see below it says that, "We further

9   reviewed a sample of ten other entries noting

10   allocation of cash receipt and that no amount was

11   recorded as revenue"?

12       A.   I see that, yes.

13       Q.   Do you recall reviewing a sample of ten

14   additional entries as described in this tick mark?

15       A.   I don't recall -- I don't recall right now.

16   But if we said we did it, we did it.

17       Q.   Do you know if there is any documentation with

18   respect to the review of ten additional entries as

19   noted in this tick mark?

20       A.   Other than what's documented here, no.

21       Q.   Do you know who would have performed that

22   review?

23       A.   I don't know who performed it.  But it's my

24   tick mark, so I may have.

25       Q.   Do you recall which customers the debit memos

122

1   that were reviewed related to?

2        A.   No.

3        Q.   Do you recall if there was a minimum threshold

4   that was used as a sample for the ten entries?

5        A.   No.

6        Q.   Do you know if that review of the sample of

7   the ten entries was discussed with Oracle?

8        A.   It would not have been discussed with Oracle.

9        Q.   Do you know if it was discussed internally at

10   Ernst & Young?

11       A.   I don't know.

12       Q.   Do you know who would know?

13       A.   At Ernst & Young?

14       Q.   Yes.

15       A.   Me.

16       Q.   And do you know who would know outside of

17   Ernst & Young?

18       A.   I don't know if the members of the team would

19   remember that, no.

20       Q.   If you'd review Exhibit 2, can you tell me if

21   the company memo referenced in tick mark C is part of

22   the documents contained within Exhibit 2?

23       A.   I don't believe it is, no.

24       Q.   Do you recall reviewing a copy of that memo

25   when you drafted tick mark C?

123

1        MR. KONOVALOV:  Objection; asked and answered.

2        THE WITNESS:  I don't recall, no.

3   BY MS. RADCLIFFE:

4        Q.   Do you recall with respect to tick mark B how

5   you determined what the entry related to?

6        A.   I don't recall, no.

7        Q.   Do you recall the entry related to

8   miscellaneous receipts?

9        A.   I'm sorry?

10       Q.   Do you recall the entry at tick mark B, the

11   number, relating to miscellaneous receipts?

12       A.   I don't recall the specifics of any of the

13   items.

14       Q.   Do you recall discussing the issue of

15   miscellaneous receipts with anyone at Oracle?

16       A.   I don't recall, no.

17       Q.   Do you recall issuing the -- do you recall

18   discussing the issue of miscellaneous receipts with

19   anyone at Ernst & Young related to the debit memos?

20       A.   I don't recall, no.

21       Q.   With respect to the debits on this report, do

22   you know if E&Y determined how old each of these items

23   were?

24       A.   I don't recall.  It's not a document that we

25   did.

124

1        Q.   If Ernst & Young had made that determination,

2   would it be documented?

3        MR. KONOVALOV:  Objection; incomplete

4   hypothetical.

5        THE WITNESS:  If we decided that it was an

6   important procedure in this matter, we would have

7   documented it, yes.

8   BY MS. RADCLIFFE:

9        Q.   Do you know if that determination was made?

10       MR. KONOVALOV:  Same objection; assumes facts

11   not in evidence.

12       THE WITNESS:  I don't recall making that

13   determination, no.

14   BY MS. RADCLIFFE:

15       Q.   Do you recall any discussion with anyone about

16   how old the debits were?

17       A.   No.

18       Q.   Tick mark B, do you recall the source from

19   which the ten entries were selected?

20       MR. KONOVALOV:  Objection; vague and ambiguous

21   as to "source."

22       THE WITNESS:  I don't recall, no.

23   BY MS. RADCLIFFE:

24       Q.   Do you recall if they were selected from

25   Oracle's general ledger reports?

125

1      A.  I don't recall exactly where they came from,
2  no.
3      Q.  Do you know if it is documented anywhere where
4  those items came from?
5      A.  I don't recall.
6      Q.  Do you know why the source of those ten
7  entries was not documented?
8      MR. KONOVALOV: Objection; vague and ambiguous.
9      THE WITNESS: I don't know why we didn't
10  document where they came from.
11  BY MS. RADCLIFFE:
12      Q.  Do you recall with respect to the item at tick
13  mark B, the one we can't read -- but the other
14  document, Exhibit 6, refers to it as 8.7 million. And
15  you've indicated that the original work papers -- that
16  you probably could review that number. Would that be
17  correct?
18      MR. KONOVALOV: Objection; assumes facts not in
19  evidence.
20      Sorry. Go ahead.
21      THE WITNESS: The tick mark B number?
22  BY MS. RADCLIFFE:
23      Q.  Yes.
24      A.  I think we could, yes.
25      MR. KONOVALOV: Just for the record, I think the

126

1  number is 16.7, not 8.7.
2      MS. RADCLIFFE: Thank you for the clarification.
3  16.7 million.
4      Q.  Do you recall whether the entry next to tick
5  mark B was routine with respect to Oracle?
6      MR. KONOVALOV: Could you read that question
7  back, please.
8      (The record was read back as follows:
9      "Q.  Do you recall whether the entry next to
10      tick mark B was routine with respect to
11      Oracle?")
12      MR. KONOVALOV: Objection; lacks foundation and
13  calls for speculation.
14      THE WITNESS: I don't recall having a
15  conversation about whether or not those were routine.
16  BY MS. RADCLIFFE:
17      Q.  Do you recall whether there was any analysis
18  by Ernst & Young of whether or not the debits next to
19  tick mark B were routine?
20      A.  No.
21      Q.  Do you recall whether there was any analysis
22  by Ernst & Young with respect to whether any of the
23  debits listed on EY 00232 were routine?
24      A.  No.
25      Q.  With respect to the account analysis report at

127

1  EY 00231 to -233, do you know if Ernst & Young reviewed
2  the corresponding credit entries to the debits listed
3  on these pages?
4      A.  We didn't do anything on 231, and the
5  procedures that we performed on 232 are noted.
6      Q.  And is there any reference in those procedures
7  that Ernst & Young reviewed the corresponding credit
8  entries?
9      A.  Tick mark C indicates that no amount was
10  recorded as revenue, which would indicate that we
11  looked at debits and credits. We were looking at the
12  journal entries, and tick mark B has the same note
13  noting no entry made to revenue.
14      Q.  And do you know if Ernst & Young documented
15  the review of the corresponding credit entries?
16      A.  You mean in addition to the documentation
17  here?
18      Q.  Correct.
19      A.  No.
20      Q.  Do you know if Ernst & Young reviewed Oracle's
21  board minutes in 2Q '01 in performing its engagement
22  with respect to the debit memos?
23      A.  Not that I recall, no.
24      Q.  If Ernst & Young had reviewed the board
25  minutes, would that be something that would typically

128

1  be maintained in Ernst & Young's work papers?
2      MR. KONOVALOV: Objection; incomplete
3  hypothetical.
4      THE WITNESS: Yes.
5  BY MS. RADCLIFFE:
6      Q.  And can you explain Ernst & Young's practice
7  with respect to maintaining board minutes in its work
8  papers in its engagement that it has been hired to
9  perform professional services?
10      A.  When we perform audits or quarterly reviews,
11  the professional standards require that we look at
12  minutes of the board of directors or committees of the
13  board of directors, and we generally retain those
14  minutes in our work papers.
15      Q.  And with respect to this engagement, was this
16  an agreed-upon procedure, this engagement?
17      A.  Not in a technical sense, no.
18      Q.  Could you explain what you mean by "not in a
19  technical sense"?
20      A.  We were engaged to perform specific
21  procedures. We didn't issue any report or any findings
22  to the company in writing, is my recollection.
23      Q.  Do you know if there was any oral report to
24  the company of findings or conclusions?
25      A.  Not that I was part of, no.

129

1    Q.  Do you know if anyone else at Ernst & Young
2  was part of an oral report conveyed to Oracle?
3    A.  I don't know.
4    Q.  Do you know who would know?
5    A.  John Banker.
6    Q.  Do you know if Mr. Cotton would know?
7    A.  I don't know.
8    Q.  Did you ask Mr. Cotton?
9    A.  No.
10    Q.  Are you familiar with the AICPA attestation
11  standards?
12    A.  Yes.
13    Q.  Do you know if E&Y conducted this engagement
14  in accordance with the AICPA attestation standards?
15    A.  I would have to go back and look at our work
16  papers to what exactly we had agreed to do in terms of
17  this procedure.
18    Q.  And other than what has been marked as
19  Exhibit 2, are there additional work papers that are
20  not contained in Exhibit 2 that would provide you that
21  information?
22    A.  Not that I'm aware of, no.
23    Q.  So is there anything in Exhibit 2 that would
24  indicate to you that Ernst & Young conducted this
25  engagement in accordance with the AICPA attestation

130

1  standards?
2    A.  I believe that we did, yes.
3    Q.  And what leads you to believe that Ernst &
4  Young did?
5    A.  I would have to review the actual attestation
6  standards to determine which -- how these procedures
7  would fit into those models.
8    Q.  And which portions of the attestation
9  standards would you have to review?
10    A.  I'd have to look at the listing. I don't know
11  it off the top of my head.
12    Q.  Do you know if Ernst & Young obtained an
13  engagement letter or obtained a written agreement from
14  Oracle defining the terms in the scope of the
15  engagement?
16    A.  As I indicated earlier, I'm not aware of it.
17    Q.  Do you know if Ernst & Young obtained an
18  assertion from Oracle which E&Y agreed to report on?
19    A.  I'm not aware of that, no.
20    Q.  Do you know what the purpose of the engagement
21  was?
22    A.  Other than --
23    MR. KONOVALOV: Objection; calls for
24  speculation.
25    MS. RADCLIFFE: I asked him if he knew.

131

1    MR. KONOVALOV:  Same objection.
2    THE WITNESS:  Other than what's documented in
3  our memo.
4  BY MS. RADCLIFFE:
5    Q.  And the memo beginning at 143.
6    A.  Yes.  At 143, yes.
7    Q.  And did you have an understanding of why
8  Oracle engaged Ernst & Young to perform this
9  engagement?
10    A.  I don't know specifically why they asked
11  Ernst & Young, no, other than the fact that we were
12  their current existing independent auditors.
13    Q.  And do you know if Ernst & Young issued a
14  report to Oracle concerning its procedures that it
15  would perform with respect to this engagement?
16    MR. KONOVALOV:  Could you read that back,
17  please.
18    (The record was read back as follows:
19    "Q.  And do you know if Ernst & Young issued a
20    report to Oracle concerning its procedures
21    that it would perform with respect to this
22    engagement?")
23    MR. KONOVALOV:  Well, vague as to time.
24  You can answer the question.
25    THE WITNESS:  Not that I'm aware of.

132

1  BY MS. RADCLIFFE:
2    Q.  Do you know if E&Y provided any assurance to
3  Oracle concerning the work performed in connection with
4  the engagement?
5    MR. KONOVALOV:  I'm sorry.  Was it "assurance"
6  or "insurance"?
7    MS. RADCLIFFE:  Assurance.
8    THE WITNESS:  Not that I am aware of, no.
9  BY MS. RADCLIFFE:
10    Q.  Do you know if there were any communications
11  between E&Y and Oracle's audit committee in connection
12  with this engagement?
13    A.  I was not part of any, no.
14    Q.  Do you know if anyone else at Ernst & Young
15  was part of any communication with the Oracle's audit
16  committee with respect to this engagement?
17    A.  Not that I'm aware of.
18    Q.  Did you ask Mr. Cotton if he was -- if he
19  participated in communication with Oracle's audit
20  committee?
21    A.  I did not, no.
22    Q.  I believe you testified earlier -- and please
23  correct me if I'm wrong -- that the engagement team at
24  Ernst & Young determined what procedures E&Y would
25  perform with respect to this engagement.  Is that

133

1    correct?

2        A.  A subset of total engagement team.

3        (Interruption)

4        THE WITNESS:  A subset of the entire Oracle

5    engagement team.

6    BY MS. RADCLIFFE:

7        Q.  And that was Mr. Banker, yourself, and --

8        A.  Megan Birkler and Ashley Gemma and David Roque

9    on the script review.

10       Q.  And is there anyone else on the engagement

11   team that we missed?

12       A.  No.

13       Q.  So you said there was a subset, and I'm just

14   trying to understand if it's a subset -- if there was

15   anyone else beyond the individuals you just mentioned

16   who were part of that determination.

17       A.  The only individuals that worked on this

18   engagement were John Banker, Ashley Gemma, Megan

19   Birkler, David Roque, and myself, to the best of my

20   knowledge.

21       Q.  So the entire engagement team participated in

22   determining what procedures Ernst & Young would perform

23   with respect to this engagement?

24       A.  No.  Just the people associated with this

25   matter.  The five people I just noted to you.

134

1        Q.  Okay.  I just -- we're probably going to have

2    to clarify something.  When you say -- when we refer to

3    "Oracle's engagement team," are you also considering

4    Oracle's engagement team with respect to its reviews,

5    accounting reviews quarterly and fiscal 2001?

6        A.  Yes.

7        MS. RADCLIFFE:  Okay.  And so we're just going

8    to change the tape, and we'll go with that further.

9        THE WITNESS:  Okay.

10       THE VIDEO OPERATOR:  This marks the end of

11   Videotape No. 2, Volume I, in the deposition of Alex

12   Bender.  Going off the record, the time is 1:57.

13       (A break was taken.)

14       THE VIDEO OPERATOR:  This marks the beginning of

15   Videotape No. 3, Volume I, in the deposition of Alex

16   Bender.  The time is 2:09.  We are back on the record.

17   BY MS. RADCLIFFE:

18       Q.  Before the break, we were discussing

19   Oracle's -- I apologize -- Ernst & Young's -- the

20   members of Ernst & Young who were performing work on

21   this particular engagement regarding debit memos.  Do

22   you recall that?

23       A.  I do.

24       Q.  And do you know if Ernst & Young was ever

25   asked to determine whether any of the debit memos

135

1    related to customer overpayments?

2        A.  I don't recall that request, no.

3        Q.  Do you recall whether Ernst & Young ever

4    performed any analysis with respect to whether any of

5    the debit memos related to customer overpayments?

6        A.  I don't recall that specifically, no.

7        Q.  Do you know if that is documented anywhere in

8    Ernst & Young's work papers?

9        A.  The only documentation that it -- I don't

10   think we documented anything as it relates to an

11   analysis of customer overpayments, no.

12       Q.  Do you know if there was any review of -- with

13   respect to customer overpayments by Ernst & Young?

14       A.  Not specifically, no.

15       Q.  Was there generally a review with respect to

16   over- -- customer overpayments by Ernst & Young?

17       MR. KONOVALOV:  In connection with this

18   engagement or --

19       MS. RADCLIFFE:  Yes.

20       THE WITNESS:  In connection with this

21   engagement?

22   BY MS. RADCLIFFE:

23       Q.  Yes.

24       A.  No.  But when you look at Account 25005,

25   customer overpayments would be part of that.  But we

136

1    didn't specifically test or review anything related to

2    customer overpayments specifically.

3        Q.  Did you ever look at any remittances?

4        A.  I don't recall looking at remittances, no.

5        Q.  Do you know if Oracle provided Ernst & Young

6    with any information regarding customer overpayments?

7        A.  No.  On EY 000236, there is something noted as

8    "Refund to Ford," but I don't know if that was for a

9    customer repayment or not.

10       Q.  And do you know, based on the materials that

11   Oracle provided Ernst & Young, if Ernst & Young could

12   make the assessment whether any of the cash receipts

13   that had been applied to the debit memos were actually

14   customer overpayments?

15       A.  I don't recall that, no.

16       Q.  Do you recall any discussion with respect to

17   Ernst & Young increasing the scope of its procedures?

18       A.  In general?

19       Q.  With respect to this particular engagement.

20       A.  No.

21       Q.  Do you know when the procedures were defined

22   by Ernst & Young with respect to this engagement?

23       A.  I don't remember the specific time frame, no.

24       Q.  Were the procedures defined before Ernst &

25   Young began work with respect to this particular

137

1  engagement?
2  A.  Yes.
3  Q.  And do you recall the length of time between
4  when the procedures were finalized and when Ernst &
5  Young began work with respect to this particular
6  engagement?
7  A.  I don't recall a specific time frame, no.
8  Q.  Do you recall if it was more than a week?
9  A.  It wouldn't have been more than a week, no.
10  Q.  Do you recall if it was more than a day?
11  A.  I think -- my recollection is that we talked
12  about what we were going to do in an afternoon and we
13  went to the company the next day.
14  Q.  When you say you went to the company the next
15  day, you're referring to Oracle, right?
16  A.  I'm sorry.  Yes.  Went to their shared service
17  center in Rocklin, California.
18  Q.  Do you know why Ernst & Young began their
19  procedures at the shared service center in Rocklin?
20  A.  That's where the information was.
21  Q.  And what information are you referring to?
22  A.  The information that we needed to do the
23  procedures as outlined in our memo at Exhibit 143.
24  Q.  And do you recall what form that information
25  that you reviewed at the shared service center in

138

1  Rocklin came in?
2  A.  Uh.
3  Q.  In other words --
4  A.  I don't recall any more than what's documented
5  in our memo.
6  Q.  Do you know if Ernst & Young ever made any
7  determination that the debit memos related to customer
8  overpayments?
9  A.  No.
10  Q.  With respect to Item No. 6 on Exhibit 1, the
11  Schedule A --
12  A.  Okay.
13  Q.  -- are you the person most knowledgeable at
14  Ernst & Young to testify about Item 6?
15  A.  Yes.
16  Q.  Do you know if Ernst & Young performed work
17  for Oracle relating to internal controls in Oracle's
18  fiscal year 2001?
19  A.  We did not.
20  Q.  Do you know if Ernst & Young performed any
21  professional services related to Oracle's accounting
22  systems in Oracle's fiscal year 2001?
23  A.  Not that I'm aware of, no.
24  Q.  Do you know if E&Y performed any work related
25  to Oracle's fiscal year 2001 with respect to Oracle's

139

1  accounting policies and procedures?
2  A.  We did not, no.
3  Q.  Do you know if E&Y provided any accounting
4  advice or recommendations with respect to Oracle's
5  fiscal year 2001 or its quarterly filings?
6  A.  Not that I recall, no.
7  Q.  With respect to Item No. 7 on Schedule A, "Any
8  consultations or communications between E&Y's audit or
9  review personnel assigned to engagement and E&Y's
10  department of professional practice," are you the
11  person most knowledgeable at Ernst & Young to discuss
12  that topic?
13  A.  At Ernst & Young I would be, yes.
14  Q.  Is there anyone besides yourself who would be
15  more knowledgeable?
16  A.  John Banker would.
17  Q.  Do you recall if there were any consultations
18  or communications between E&Y's audit or review
19  personnel assigned to the debit memo engagement and
20  E&Y's department of professional practice?
21  A.  Regarding the debit memo procedures?
22  Q.  Yes.
23  A.  I don't know.
24  Q.  If there was such a communication, would it be
25  documented at Ernst & Young?

140

1  MR. KONOVALOV:  Objection; incomplete
2  hypothetical.
3  THE WITNESS:  It depends on the -- it depends on
4  the consultation.
5  BY MS. RADCLIFFE:
6  Q.  If you needed to determine whether or not
7  there was a consultation with respect to this
8  engagement, do you know how you would go about
9  obtaining that information at Ernst & Young?
10  A.  I don't know that I could at Ernst & Young.
11  Q.  Is this something that Ernst & Young's
12  department of professional practice could be consultant
13  related?
14  A.  In terms of whether or not we did consult with
15  them?
16  Q.  Yes.
17  A.  The only way I would believe you could do that
18  would be to look at time-sheet records to see if
19  someone had noted it on their time sheet.
20  Q.  And do you know if the time-sheet records for
21  this engagement, related to the debit memos, were
22  reviewed prior to this deposition?
23  MR. KONOVALOV:  Objection; asked and answered.
24  THE WITNESS:  I do not know.  I did not, no.
25  BY MS. RADCLIFFE:

141

1   Q.  With respect to Item No. 8 on Schedule A, were
2   there any communications, relating to the engagement,
3   between Ernst & Young and Arthur Andersen or
4   individuals formerly at Arthur Andersen?
5   A.  Not that I'm aware of, no.
6   Q.  Do you know if there were any communications,
7   relating to this engagement, between Ernst & Young and
8   the SEC?
9   A.  Not that I'm aware of, no.
10   Q.  Do you know if there were any communications,
11   related to this engagement, between Ernst & Young and
12   the AICPA?
13   A.  No, I don't know.
14   Q.  Do you know if there were any communications,
15   relating to the engagement, between Ernst & Young and
16   the Department of Justice?
17   A.  Not that I recall, no.
18   Q.  Do you know if there were any communications,
19   relating to the engagement, between Ernst & Young and
20   the Federal Bureau of Investigation?
21   A.  No.
22   Q.  Has Ernst & Young ever been consulted, with
23   respect to its services performed for Oracle, by the
24   Federal Bureau of Investigation?
25   MR. KONOVALOV:  I think you may want to rephrase

142

1   that. I think things got a little turned around there.
2   BY MS. RADCLIFFE:
3   Q.  Sure. Has Ernst & Young ever been consulted
4   by the Federal Bureau of Investigation with respect to
5   Oracle?
6   A.  Not that I'm aware of.
7   Q.  Are you aware of any communications, relating
8   to this engagement, between Ernst & Young and Oracle's
9   attorneys?
10   A.  No.
11   Q.  Are you aware of any communications, relating
12   to this engagement, between Ernst & Young and Oracle
13   other than the communications we discussed earlier
14   today?
15   A.  No, not that I'm aware of.
16   Q.  Are you aware of any communications, relating
17   to the engagement, between Ernst & Young and Larry
18   Ellison?
19   A.  No, not that I'm aware of.
20   Q.  Are you aware of any communications, relating
21   to this engagement, between Ernst & Young and Jeff
22   Henley?
23   A.  Not that I'm aware of, no.
24   Q.  Do you know if Mr. Henley was consulted at all
25   with respect to the conclusions that Ernst & Young

143

1   reached with respect to this engagement?
2   A.  Not that I was a part of, no.
3   Q.  Do you know if Mr. Cotton might know if there
4   were communications with Mr. Henley regarding this
5   engagement?
6   A.  I don't know.
7   Q.  Did you ask Mr. Cotton if there were
8   communications with Mr. Henley regarding this
9   engagement?
10   A.  No.
11   Q.  Do you know if there were any communications,
12   relating to this engagement, between Ernst & Young and
13   Edward "Sandy" Sanderson?
14   A.  No, I'm not aware of any.
15   Q.  And with respect to the communications we just
16   went over, A through J -- and feel free to reference
17   those -- are you the person most knowledgeable at
18   Ernst & Young with respect to those communications?
19   A.  I don't know.
20   Q.  Do you know who would know?
21   A.  John Banker would know.
22   Q.  Would Mr. Cotton know?
23   A.  Maybe.  I don't know.
24   Q.  Do you know if Ernst & Young's counsel would
25   know?

144

1   A.  I don't know.
2   Q.  Did you do anything, prior to this deposition,
3   to inquire as to communications, relating to this
4   engagement, with those entities and individuals listed
5   in A through J in the schedule?
6   A.  No.
7   Q.  With respect to Item No. 9 on the schedule,
8   "The identification and content of all communications
9   between E&Y and Oracle or its representatives regarding
10   the production of documents responsive to the subpoena
11   issued to E&Y on December 8, 2004," are you the person
12   most knowledgeable at Ernst & Young with respect to
13   that topic?
14   A.  I don't know.
15   Q.  Do you know who would know?
16   A.  I believe John Banker would know.  I'm not
17   sure if Andrew Cotton would know.
18   Q.  Do you know if Ernst & Young's counsel would
19   know?
20   A.  I don't know.
21   Q.  Did you do anything, prior to this deposition,
22   to inquire about these communications, if any?
23   A.  No.
24   Q.  Have you seen the subpoena issued to Ernst &
25   Young on or about December 8, 2004, regarding

145

1    documents?

2       A.   No.

3          MS. RADCLIFFE:  I'm just going to mark the next

4    exhibit in order, which I believe is Exhibit 7.

5          (Exhibit No. 7 was marked for identification by

6    the reporter.)

7    BY MS. RADCLIFFE:

8       Q.   If you could just take a minute, Mr. Bender,

9    to review that document.

10      A.   Okay.

11      Q.   Were you ever asked to preserve the documents

12   that are requested in Items 1 through 12 of this

13   document?

14         MR. KONOVALOV:  Well, I feel like, out of

15   respect for the witness, who doesn't have counsel

16   present, he should at least be advised the scope of the

17   subpoena was significantly limited by the discovery plan

18   in the case.  If you want to represent that to him, that

19   might be helpful.

20         MS. RADCLIFFE:  I'm just asking him if he was

21   ever asked to preserve the documents listed on Items 1

22   through 12.

23         MR. KONOVALOV:  That would suggest he had a

24   legal obligation to do that when, in fact, he didn't

25   since it was narrowed in scope, but --

146

1          MS. RADCLIFFE:  Well, we can disagree between

2    production and preservation, but I'm just asking if he

3    was ever requested to preserve the documents listed on

4    Items 1 through 12.

5          THE WITNESS:  I was requested to keep all the

6    documents that we had related to this matter, yes.

7    BY MS. RADCLIFFE:

8       Q.   And do you recall when that request was made?

9       A.   I don't recall, no.

10      Q.   Do you recall what year it was made?

11      A.   No, I'm sorry, I don't know.

12      Q.   Do you recall if it was prior to December of

13   2004?

14      A.   I really don't remember.

15      Q.   And when I asked you previously if you knew

16   about communications between E&Y and Oracle regarding

17   the production of documents responsive to the subpoena

18   issued on December 8, 2004, this is the subpoena I was

19   referring to.  In reviewing this subpoena, does that

20   change your response in any way?

21      A.   No.

22      Q.   If you could turn the page of the schedule

23   which is attached to Exhibit 1.

24      A.   In the subpoena?

25      Q.   Yes.  We have two subpoenas now, so you're

147

1    going to want Exhibit 1 instead of Exhibit 7.

2       A.   Okay.  I'm sorry.  What page?

3       Q.   It's page 4 of the Schedule A.

4       A.   Starting with 10?

5       Q.   Correct.

6       A.   Okay.

7       Q.   Are you the person most knowledgeable at

8    Ernst & Young with respect to documents provided to

9    Ernst & Young by Oracle in connection with the

10   engagement related to the debit memos?

11      A.   Yes.

12      Q.   And are you the person most knowledgeable at

13   Ernst & Young with respect to any online access to

14   Oracle's general ledger or accounting modules provided

15   to Ernst & Young?

16      A.   Yes.

17      Q.   And with respect to the documents provided to

18   Ernst & Young by Oracle in connection with the debit

19   memo engagement, are there any other documents beyond

20   those that we discussed today that were provided by

21   Oracle to Ernst & Young?

22      A.   Not that I recall.

23      Q.   And we haven't discussed this previously, but

24   did Ernst & Young have any access to Oracle's general

25   ledger or accounting modules via computer?

148

1       A.   Yes.

2       Q.   And could you explain that access?

3       A.   We were granted access -- I don't recall

4    specifically -- I don't recall specifically.

5          In our memo on page 000144, we note:  We

6    obtained online access to the company's, Oracle,

7    applications, and in parentheses, its online GL or

8    GSIAP, end parens, and reviewed the accounting

9    distribution lines for all debit memos issued on

10   November 17, 2000, greater than.  Then it goes into

11   what our population was that we tested.

12      Q.   And to your knowledge, is that the extent of

13   the access that Ernst & Young was provided to Oracle's

14   general ledger or accounting modules?

15      A.   Yes.

16      Q.   And was it that access that required Ernst &

17   Young to be on-site at Oracle?

18      A.   Yes.

19      Q.   And was Ernst & Young supervised when it was

20   provided access to Oracle's general ledger and

21   accounting modules?

22      A.   I don't recall.

23      Q.   Do you know who at Ernst & Young reviewed

24   Oracle's information electronically?

25      A.   Ashley Gemma and Megan Birkler.

149

1    Q.  Did you yourself?

2    A.  I don't recall.  But I was out there, and I

3    wouldn't be surprised if I had been shown how they were

4    doing it.

5    Q.  And you mentioned -- I think it was GSIAP.  Is

6    that a correct reference in 144?

7    A.  Yes.

8    Q.  Do you know what that refers to?

9    A.  I don't know exactly what it refers to, no.

10   Q.  Do you know if that's documented anywhere else

11   besides page 144 of Ernst & Young's documents that are

12   in Exhibit 2?

13   A.  No.

14   Q.  Do you know who would know?

15   A.  I believe anyone in the accounting department

16   at Oracle would know.

17   Q.  Do you recall whether Ernst & Young requested

18   of Oracle online access to the company's applications?

19   A.  I don't recall how we got access, no.

20   Q.  Do you recall if Ernst & Young required access

21   to the company's applications in order to perform its

22   procedures?

23   A.  I don't believe it was required.  The company

24   could have generated screen-shot prints of every

25   selection that we had if that would have been requested

150

1    by Ernst & Young.

2    Q.  Do you know if Ernst & Young had requested

3    screen-shot prints?

4    A.  I don't recall, no.

5    Q.  Do you know specifically what data Ernst &

6    Young looked at with respect to Oracle's applications

7    online?

8    A.  I don't recall exactly what data we were

9    looking at other than what's documented in our memo,

10   which is the data -- the accounting distribution lines.

11   Q.  Do you know what that refers to?

12   A.  That refers to the debits and the credits of

13   journal entries.

14   Q.  Do you know if Ernst & Young looked at the

15   debits and credits for all 46,000 -- approximately

16   46,000 debit notes?

17   A.  No.  Our memo specifically states we did a

18   sample.

19   Q.  And it also indicates in EY 00144 that Ernst &

20   Young reviewed the online GL.  Do you know what that

21   refers to?

22   A.  General ledger.

23   Q.  And do you know why Ernst & Young reviewed

24   Oracle's online general ledger?

25   A.  I don't recall why, no.  As I previously

151

1    mentioned, it may have been a way for us to -- it may

2    have been facilitation of our testing.

3    Q.  Do you know what the purpose of reviewing the

4    general ledger was?

5    A.  Yes.

6    Q.  Ernst & Young.  And what was that?

7    A.  To look at the accounting distribution lines

8    for the sample -- the journal entries that we had

9    selected.

10   Q.  And other than this memo, starting EY 00143,

11   is there anything else that documents what Ernst &

12   Young did with respect to reviewing Oracle's online

13   applications?

14   A.  No, not that I'm aware of.

15   Q.  With respect to Item 11 of Exhibit 1, the

16   Schedule A, do you know how many hours Ernst & Young

17   spent on the engagement with respect to the debit

18   memos?

19   A.  I don't know.

20   Q.  Do you know the compensation that Ernst &

21   Young received with respect to the engagement related

22   to the debit memos?

23   A.  I don't know.

24   Q.  Do you know how you would obtain that

25   information?

152

1    A.  I would have to go back to our time-sheet

2    information for the hours spent, and I would look to

3    see if we have records of our internal billing system

4    that go back that far to see what -- and I'd have to

5    pull up a sample of invoices to see which invoices we

6    had submitted for compensation.

7    Q.  And did you or anyone at Ernst & Young

8    undertake that task prior to your deposition here

9    today?

10   A.  No, not that I'm aware of.

11   Q.  Were you asked?

12   A.  No.

13   Q.  With respect to Item No. 12, the

14   "identification of the hard-copy and electronic files

15   searched for production of documents responsive to

16   plaintiffs' December 8, 2004, subpoena issued to

17   Ernst & Young."

18   And so the record's clear, that that subpoena's

19   been previously marked as Exhibit 7.  So if you need to

20   refer to it, go ahead.

21   Do you know which hard-copy files were searched

22   at Ernst & Young for documents responsive to that

23   subpoena?

24   A.  I don't know.

25   MR. KONOVALOV:  Once again, I think we -- since

153

1  the witness isn't represented by counsel, I think we have
2  an obligation to inform him that the scope of that
3  subpoena has been narrowed.  This question is now going
4  beyond just preservation.  You're asking for now his
5  search for responsive documents.  So I would just suggest
6  that if you're going to state the question as you are,
7  it's misstating the record.
8  BY MS. RADCLIFFE:
9      Q.  Do you know if hard-copy files -- which
10  hard-copy files were searched for documents to be
11  produced by Ernst & Young to plaintiffs in this
12  litigation?
13     A.  I don't know.
14     Q.  Do you know which electronic files, if any,
15  were searched for production of documents to plaintiffs
16  in this litigation?
17     A.  I don't know.
18     Q.  Do you know who would know?
19     A.  I don't know who would know.
20     Q.  Who would you ask if you wanted to find out?
21     A.  General counsel's office.
22     Q.  Do you know who would undertake the task of
23  physically looking at hard-copy or electronic files in
24  response to a document request or subpoena in a
25  litigation?

154

1      A.  I'm not aware of that person, no.
2      Q.  Do you know who -- I should ask you first,
3  where are the -- where is the engagement work papers
4  and binder related to this engagement currently kept?
5  In which Ernst & Young office?
6      A.  To the best of my knowledge, it's in the
7  Los Angeles office, in our general counsel's office.
8      Q.  And do you know where it was kept prior to it
9  being moved to the Los Angeles office?
10     A.  Yes.  It would have been in a locked file
11  cabinet in the Walnut Creek office.
12     Q.  And I think you mentioned the Walnut Creek
13  office no longer exists.  Is that correct?
14     A.  That's correct.
15     Q.  So was it -- do you know if it was moved --
16  these files were moved prior to the closure of the
17  Walnut Creek office?
18     A.  They were.
19     Q.  And you indicated that they would have been
20  maintained in a locked file cabinet.  Do you know who
21  had access to that file cabinet?
22     A.  I do know who had access to it.
23     Q.  Who was it?
24     A.  Me and one other senior manager.
25     Q.  And who would that be?

155

1      A.  Paul Charron.
2      Q.  And is Mr. Charron involved at all with the
3  Oracle account?
4      A.  Not anymore.
5      Q.  Was he at one time?
6      A.  He was, yes.
7      Q.  And what was his involvement with the Oracle
8  account?
9      A.  As I previously mentioned, he was one of the
10  senior managers on the fiscal 2002 and 2003 audits.
11     Q.  And was he consulted at all with respect to
12  the engagement related to the debit memos?
13     A.  He was not.
14     Q.  Did you ever discuss the engagement related to
15  the debit memos with Mr. Charron?
16     A.  No.
17     Q.  Do you know who physically took the documents
18  from the locked file cabinet and provided them to the
19  general counsel's office in Los Angeles?
20     A.  I did.
21     Q.  And do you recall when that happened?
22     A.  I don't.
23     Q.  Do you recall approximately when it was?
24     A.  I'm sorry.  I don't.
25     Q.  But it was prior to the closure of the Walnut

156

1  Creek office, correct?
2      A.  Absolutely.  Yes.
3      Q.  With respect to Item No. 13 of Schedule A,
4  "The addition of all communications relating to or with
5  Oracle's special litigation committee."
6          Are you the person most knowledgeable at Ernst &
7  Young with respect to communications Ernst & Young had
8  with Oracle's special litigation committee?
9      A.  No.
10     Q.  Who would be the most knowledgeable?
11     A.  John Banker would be the most knowledgeable.
12     Q.  Anyone else?
13     A.  I don't know.
14     Q.  If you wanted to find out, who would you ask
15  at Ernst & Young?
16     A.  I would ask Andrew Cotton or general counsel's
17  office.
18     Q.  Did you ever have any communications while you
19  were at Oracle --
20     A.  At Ernst & Young?
21     Q.  Thank you.
22         Did you ever have any communications at Ernst &
23  Young with anyone about Oracle's special litigation
24  committee?
25     A.  No, other than people on the engagement team

Bender, Alexander  9/21/2006  9:04:00 AM

157

1 related to this matter.

2     Q. And who on the engagement team did you have

3 conversations with related to this matter?

4     A. John Banker, Megan Birkler, and Ashley Gemma.

5     Q. And do you recall any of those communications?

6     A. Not specifically, no. They would have all

7 been about the procedures that we were performing and

8 our findings.

9     Q. Did you have any conversations with Mr. Banker

10 about his interview with the special litigation

11 committee?

12     A. No.

13     Q. Did you have any conversations with

14 Ms. Birkler about the -- about Mr. Banker's interview

15 with the special litigation committee?

16     A. No, I wouldn't know anything about it.

17     Q. Did you know that Mr. Banker was interviewed

18 by the special litigation committee?

19     A. I don't know that he was. We never talked

20 about if and when he was or what was discussed at the

21 special litigation committee.

22     Q. Do you have an understanding that Mr. Banker

23 was interviewed?

24     A. My understanding was that he was, yes.

25     Q. And how did you come to that understanding?

158

1     A. I honestly don't know. Probably through

2 discussions with general counsel's office.

3     Q. And with respect to Mr. Banker, do you recall

4 generally any communications you had with him related

5 the Oracle's special litigation committee?

6     A. No.

7     Q. And with respect to Ms. Birkler, did you

8 recall -- do you recall any communications that you had

9 with her related to Oracle's special litigation

10 committee?

11     A. I don't recall ever having a communication

12 with her about the special litigation committee.

13     Q. What about Ms. Gemma?

14     A. Ms. Gemma is the same. I do not recall having

15 a conversation with her about it.

16     Q. With respect to Item No. 14, which is "The

17 identification of all documents exchanged between E&Y

18 and its representatives and Oracle's special litigation

19 committee," are you the person most knowledgeable at

20 Ernst & Young with respect to the identification of

21 those documents?

22     A. No.

23     Q. Who would be?

24     A. John Banker.

25     Q. Anyone else?

159

1     A. I don't know.

2     Q. Did you inquire of anyone at Ernst & Young

3 regarding the identification of documents exchanged

4 between Ernst & Young and its representatives and

5 Oracle's special litigation committee prior to your

6 deposition here today?

7     A. No.

8     Q. Did you review any documents related to the

9 exchange of documents between Ernst & Young and its

10 representatives and Oracle's special litigation

11 committee prior to your deposition here today?

12     A. No, I'm not aware of any.

13     Q. Did you see Subject Matter 15?

14     A. Yes.

15     Q. John Banker's interview with the Oracle's

16 special litigation committee and any changes to the

17 memorandum at -- and it references EY 00010 to EY 0012,

18 which is attached to the schedule as well.

19     A. Oh, okay.

20     Q. Prior to today, did you review the documents

21 at EY 00010 to EY 00012?

22     A. No, I did not.

23     Q. Were you aware that the Oracle special

24 litigation committee had submitted a report related to

25 Oracle's debit memo transactions in the second quarter

160

1 of Oracle's fiscal year 2001?

2     MR. KONOVALOV: Objection; mischaracterizes the

3 evidence.

4     THE WITNESS: No.

5 BY MS. RADCLIFFE:

6     Q. With respect to Item No. 15, are you the

7 person most knowledgeable with respect to John Banker's

8 interview with Oracle's special litigation committee?

9     A. No.

10     Q. And is your answer the same with respect to

11 the changes reflected on EY 10 through 12?

12     A. Yes.

13     Q. And do you know if anyone else at Ernst &

14 Young would be more knowledgeable than yourself?

15     A. I don't know.

16     Q. Did you inquire of anyone whether or not they

17 had information related to Mr. Banker's interview

18 and/or changes to the memorandum at 10 to 12 prior to

19 your deposition here today?

20     A. No.

21     Q. Were you asked to inquire with anyone at

22 Ernst & Young prior to your deposition today with

23 respect to these matters in Subject Matter 15?

24     A. No.

25     Q. If you could turn to EY -- actually, we're

161

1   going to mark the next document in order, which I think
2   we're on Exhibit 8.
3       (Exhibit No. 8 was marked for identification by
4   the reporter.)
5   BY MS. RADCLIFFE:
6       Q.  If you could take a minute to review that
7   document, Mr. Bender.
8       A.  Okay.
9       Q.  Did you have an opportunity to review what's
10  been marked as Exhibit 8?
11      A.  Yes.
12      Q.  And I think we can make the safe assumption
13  based on your testimony earlier that you have not seen
14  that document before.  Is that correct?
15      A.  That's correct.
16      Q.  And for the record, the document is the
17  interview of John Banker by the special litigation
18  committee of Oracle Corporation.
19      MR. KONOVALOV:  Counsel, is the handwriting on
20  the first page on the original document, or is that
21  something that's been added to it?
22      MS. RADCLIFFE:  I believe that that's on the
23  original copy that we have.
24      MR. KONOVALOV:  Okay.
25      MS. RADCLIFFE:  And that the Bates numbers are

162

1   NDCA-ORCL 296428 through 296434.  And so that the record
2   is clear, it's a summary of the interview and not an
3   actual verbatim transcript.
4       THE WITNESS:  Okay.
5   BY MS. RADCLIFFE:
6       Q.  And I'm going to ask you a series of questions
7   about the information in this document.  And I know you
8   haven't seen it before, so if you don't know the
9   answer, let us know.  Okay?
10      Under the heading "E&Y's General Relationship to
11  Oracle," which is on page 2 of the document, at the third
12  and fourth sentences, it says, "As a standard part of the
13  initial audit of a new client, E&Y reviewed the work
14  papers of the prior auditor.  Banker stated that this
15  review was limited to ensuring that beginning balances of
16  accounts for FY 2001 appeared reasonable."
17      Is that your understanding of Ernst & Young's
18  review -- the scope of its review of Arthur Andersen's
19  work papers?
20      A.  I would agree with the requirement and the
21  purpose for the review of the Andersen work papers,
22  although it would have been the beginning balances for
23  the fiscal 2002 audit.  It would have been the ending
24  balances for fiscal 2001.
25      Q.  And so you disagree with this document to the

163

1   extent it says, "Banker stated that this review was
2   limited to ensuring that the beginning balances of
3   accounts for FY 2001 appeared reasonable"?  And you
4   would make the modification that it would be for FY
5   2002?
6       A.  What I would do is just clarify that.  What
7   we're doing is looking at work papers for fiscal 2001
8   such that the beginning balances of fiscal 2002 or the
9   day after the end of fiscal 2001 were appropriate -- or
10  were reasonable.
11      Q.  And do you recall what Ernst & Young did to
12  determine whether the beginning balances for fiscal
13  2002 were reasonable?
14      A.  Do I remember what we did?
15      Q.  Yes.
16      A.  We reviewed Arthur Andersen's work papers.  We
17  did what John said we did here.
18      Q.  And with respect to Andersen's work papers,
19  what did you look at within those work papers to
20  determine that the beginning balances for FY 2002
21  appeared reasonable?
22      A.  We looked at their audit work papers for
23  fiscal 2001, and we would have looked at their
24  internal-control work papers, their planning work
25  papers, the conclusion work papers to the degree they

164

1   made them available, their information technology work
2   papers, and all of their work papers related to the
3   account-balance testing and the conclusions reached.
4       Q.  And you mentioned before that some of
5   Andersen's work papers for fiscal 2001 may have been
6   retained by Ernst & Young, hard copies.  Is that
7   correct?
8       A.  Yes.
9       Q.  And of the work papers that you just
10  mentioned, do you recall if any of those were retained
11  by Ernst & Young?
12      A.  They -- there would be a subset of work papers
13  regarding all of the categories that I mentioned with
14  the exception of their planning documents.  They
15  probably wouldn't share that with us.
16      Q.  Do you recall the volume of the work papers
17  that was provided by Andersen to Ernst & Young for its
18  review?
19      A.  Not specifically, but generally it's two to
20  four audit binders.
21      Q.  Do you recall if there were any electronic
22  work papers?
23      A.  I don't recall there being electronic work
24  papers.
25      Q.  And do you know if E&Y documented what it did

165

1   to determine if the beginning balances for FY 2002
2   appeared reasonable?
3       A.   We had a memorandum in our work papers as part
4   of the fiscal 2002 audit.
5       Q.   If you turn to the top of the next page, and
6   it reads, "Banker's primary contacts at Oracle are
7   Jennifer Minton," and then it provides her title, "Tom
8   Williams," provides his title, and "Mike Quinn"?
9       A.   Yes.
10      Q.   Do you recall, besides the individuals you
11  mentioned earlier today, Greg Meyers and Julie Chan, if
12  there were any other contacts Ernst & Young had at
13  Oracle?
14      A.   No.
15      Q.   Do you know if these individuals listed on
16  this document, Jennifer Minton, Tom Williams, and Mike
17  Quinn, were Ernst & Young's contacts related to the
18  debit memo engagement?
19      A.   This document indicates that they were John's
20  primary contacts, yes.  And Mike Quinn was located in
21  Rocklin.  I believe he was -- he was part of getting us
22  documentation as part of these procedures, yes.
23      Q.   And do you know how Ernst & Young communicated
24  with these individuals, Jennifer Minton, Tom Williams,
25  and Mike Quinn, whether it was face-to-face, email, in

166

1   person, telephone?
2       A.   I don't know specifically.  Mike Quinn -- I
3   interacted with Mike Quinn face-to-face and via
4   telephone.  I don't recall communicating with him via
5   email.
6       Q.   Do you recall what your conversations were
7   with Mr. Quinn?
8       A.   Not specifically, no.
9       Q.   Do you recall generally?
10      A.   Generally it would have been about the
11  procedures we were performing in getting the
12  appropriate information.
13      Q.   Did you ever have any difficulty obtaining the
14  information that you were requesting from Oracle?
15      A.   No.
16      Q.   If you go to the next section, under
17  "Accounting Fraud Allegation in Second Amended
18  Class-Action Complaint."  First, have you ever read the
19  second amended class-action complaint filed in the
20  northern district of California?
21      A.   I did, yes.
22      Q.   And do you see the portion that says:  The
23  committee summarized for Banker the accounting fraud
24  allegations in the second amended complaint,
25  specifically with regard to the November 17, 2000,

167

1   debit memos and the alleged 228 million increase to
2   revenue?
3       A.   Um-hmm.
4       Q.   Do you know if that summary was in written
5   form?
6       A.   I don't know.
7       Q.   Did Mr. Banker ever convey to you that he was
8   provided a summary of the allegations in the second
9   amended complaint by the special litigation committee?
10      A.   No.
11      Q.   Did you ever have an understanding that the
12  special litigation committee had provided Ernst & Young
13  a summary of the accounting fraud allegations in the
14  second amended complaint?
15      A.   I don't recall that, no.
16      Q.   The next section says, "The committee and
17  Banker also discussed the general background of the
18  Oracle accounting processes that caused the
19  accumulation of the 'on account' items, as well as the
20  use of the debit memos to redesignate the 'on account'
21  flags."
22           Do you know what Ernst & Young's understanding
23  was of the accounting processes that caused the
24  accumulation of "on account" items at Oracle?
25      A.   I don't recall other than what's documented in

168

1   our memos.
2       Q.   Other than what's documented in Exhibit 2, is
3   there any other documentation of those processes by
4   Ernst & Young?
5       A.   No, not by Ernst & Young.
6       Q.   Do you know why Mr. Banker would not have
7   documented his communications with Oracle's special
8   litigation committee?
9            MR. KONOVALOV:  Objection; assumes facts not in
10  evidence, calls for speculation.
11           THE WITNESS:  I don't know.
12  BY MS. RADCLIFFE:
13      Q.   Do you know if documentation exists with
14  respect to Mr. Banker's communications with the
15  Oracle's special litigation committee?
16      A.   I don't know.
17      Q.   Prior to your deposition here today, did you
18  consult with anyone at Ernst & Young whether or not
19  Mr. Banker had communications with anyone at Oracle
20  related to the debit memos?
21      A.   No.
22      Q.   And just so the record is clear, which
23  documents in Ernst & Young's work papers reflect its
24  understanding of Oracle's accounting processes that
25  cause the accumulation of the "on account" items?

169

1      A.  I'm sorry.  Rephrase the question.
2      Q.  Sure.  If you could identify which documents
3  in Ernst & Young's work papers reflect Oracle's
4  accounting processes that cause the accumulation of "on
5  account" items?
6      A.  In what you provided me here in Exhibit 2, I
7  don't see anything other than the company's policy as
8  it relates to unapplied cash, starting with 000250
9  through -259 in our memo.
10     Q.  And did Ernst & Young have an understanding
11  that Oracle used debit memos to redesignate "on
12  account" items?
13     A.  We knew they did this in this particular
14  matter.  Yes, we did know that.
15     Q.  And how did Oracle come to that understanding?
16     A.  As part of our testing and interaction with
17  the client.
18     Q.  And where is that documented?
19     A.  In our memo.
20     Q.  Is there anywhere else it's documented?  And
21  the memo is starting at 143.
22     A.  No.  Well, the script review clearly shows
23  that's what they are doing as well.
24     Q.  Do you know if there was any analysis of
25  whether the script that Oracle ran altered historical

170

1  data with respect to the debit memos?
2      MR. KONOVALOV:  Objection; assumes facts not in
3  evidence.
4      THE WITNESS:  I'm not aware of it altering
5  historical data, no.
6  BY MS. RADCLIFFE:
7      Q.  If you move down this memo, it says, "The
8  committee reviewed with Banker its conclusions."  And
9  it goes on into the first, second, third, and fourth
10  conclusions.
11     Were you aware that Mr. Banker had reviewed the
12  special litigation committee of Oracle's conclusions with
13  respect to the second amended complaint as of what
14  appears to be an interview on November 13th and
15  November 18th?
16     A.  No.
17     Q.  Do you know if Ernst & Young's engagement with
18  respect to the debit memos began prior to November 13,
19  2002?
20     A.  It did.
21     Q.  And how do you know that?
22     A.  Our memo's dated October 22, 2002.
23     Q.  And would that be the date that the engagement
24  ended or the date the engagement started?
25     A.  It may not be indicative of either.  It's

171

1  indicative of when the memo was written.  So it's --
2  generally speaking, we would have certainly started by
3  this point.  Whether or not we were absolutely done --
4  it probably wasn't.  I see John's signature on 11/02,
5  so it wouldn't have been completed by then.
6      Q.  It wouldn't have been completed by
7  November 13th?
8      A.  I don't know if it was completed by
9  November 13th or not.  It was completed in November at
10  some point.
11     Q.  Do you recall -- only because it's kind of a
12  landmark -- if it was completed by Thanksgiving of
13  November 2002?
14     A.  I don't recall specifically, no.
15     Q.  Did Ernst & Young, to your knowledge, have an
16  understanding that it was the special litigation
17  committee's position that Oracle had refunded customer
18  overpayments, including those items identified in the
19  second amended complaint, prior to November 17, 2000?
20     MR. KONOVALOV:  Objection; assumes facts not in
21  evidence, mischaracterizes the document.
22     THE WITNESS:  I'm not aware of that, no.
23  BY MS. RADCLIFFE:
24     Q.  Do you know if there was any analysis or
25  testing done by Ernst & Young whether Oracle had

172

1  refunded customer overpayments with respect to the
2  debit memos prior to November 17, 2000?
3      A.  Not that I recall, unless they were part of
4  the samples that we had selected that were referenced
5  in Exhibit 000232.
6      Q.  And based on your review of Ernst & Young's
7  work papers, which I believe 00232 then references back
8  to -234 to -237, is there any indication from that
9  documentation that Oracle had refunded customer
10  overpayments prior to November 17, 2000?
11     A.  I can't tell from looking at these documents,
12  no.
13     Q.  Other than the documents you just mentioned,
14  is there any other documentation that would reflect
15  Ernst & Young reviewed or tested whether Oracle had
16  refunded customer overpayments related to the debit
17  memos prior to November 17, 2000?
18     A.  Not that I'm aware of, no.
19     Q.  Do you know if in the course of Ernst &
20  Young's engagement with respect to the debit memos
21  whether it had reviewed Oracle's daily revenue for 2Q
22  '01?  Second quarter of '01.
23     A.  If we reviewed the daily revenue?
24     Q.  Yes.
25     A.  I don't recall reviewing daily revenue, no.

173

1   Q.  Do you know if -- with respect to Ernst &
2   Young's engagement with respect to the debit memos
3   whether E&Y ever reviewed the variance between the
4   first quarter of fiscal '01 and the second quarter of
5   fiscal '01 with respect to Oracle's unapplied cash?
6        MR. KONOVALOV:  Objection; lacks foundation.
7        THE WITNESS:  What we had reviewed was a
8   roll-forward of the Account 25005 for November of 2000 as
9   well as August 2000.
10  BY MS. RADCLIFFE:
11   Q.  And is that documented in Ernst & Young's work
12  papers?
13   A.  It's hard to read, but I believe it's 000150
14  and -151.
15   Q.  Do you know if there is any other
16  documentation?
17   A.  Our memo is the only one I can refer to.  It
18  has memo 143.
19   Q.  If you look at the -- what's been marked as
20  Exhibit 3.  There is also copies of 150 and 151, and
21  that might be easier to read, though I'm not making any
22  promises.
23   A.  It's hard to read.  It doesn't clarify it for
24  me, no.
25   Q.  Do you believe it would be easier to read on

174

1   the original work papers?
2   A.  Unless I look at them, I can't definitively
3   answer that, but --
4   Q.  That's a fair answer.
5        Do you know if E&Y ever reviewed a list of items
6   that comprised the 25005 account balance?
7   A.  I'm sorry.  Rephrase the question.
8   Q.  Sure.  Do you know if E&Y ever reviewed a list
9   of items that comprised the 25005 account balance?
10   A.  I believe, if you look at the account analysis
11  of 25005 as shown in 231, it showed the listing of all
12  the different entries during the month of November with
13  the ending balance that we've previously discussed.
14   Q.  And it is that -- do you know if that's a
15  complete list of the items that comprise the 25005
16  account balance?
17   A.  This is what was provided to us and this is
18  what -- this is the document that I believe was agreed
19  to the general ledger.  So I do believe it's complete.
20   Q.  Do you know if Ernst & Young ever performed
21  any reviews or tests of the committee's conclusions as
22  set forth in Exhibit 8?
23   A.  I'm not sure how to answer that question other
24  than we did perform separate, independent procedures as
25  documented in our memorandum that relate to certain of

175

1   those conclusions.
2   Q.  I guess I should clarify the question.  Do you
3   know if Ernst & Young was ever asked to test or review
4   the conclusions that the special litigation committee
5   made with respect to the second amended complaint, as
6   set forth on page 2, on that third paragraph down in
7   Exhibit 8?
8   A.  I don't recall, no.
9   Q.  Do you know who would know?
10   A.  If anyone would know, it would be John Banker.
11   Q.  And if you go down, there is -- on Roman
12  numeral -- or No. 1 there -- actually No. 1, it says,
13  "November 17, 2000, Debit Memos and the 'On Account'
14  Items."  And it says, "Banker noted that he was
15  initially skeptical because Oracle had allowed the 'on
16  account' items to accumulate for so long."
17        Do you know if Ernst & Young had an
18  understanding of how long the "on account" items had
19  accumulated?
20   A.  I'm not aware of that, no.
21   Q.  Do you know if there was any testing done or
22  review done by Ernst & Young with respect to how long
23  the items had accumulated?
24   A.  No.  As I mentioned earlier, we did not.  I
25  don't recall doing that, no.

176

1   Q.  Were you aware that Mr. Banker had expressed
2   some skepticism regarding the accumulation of the "on
3   account" items?
4        MR. KONOVALOV:  Objection; mischaracterizes the
5   document.  You might want to encourage the witness to
6   read the entire paragraph in context.
7   BY MS. RADCLIFFE:
8   Q.  You can go ahead and answer the question.
9        MR. KONOVALOV:  And the objection is it
10  misstates the document.
11        THE WITNESS:  I'm sorry.  Can you rephrase the
12  question?
13  BY MS. RADCLIFFE:
14   Q.  Sure.  Were you aware that Mr. Banker had
15  noted some skepticism regarding Oracle allowing the "on
16  account" items to accumulate?
17   A.  I don't recall John having skepticism, no.
18   Q.  Did he ever express any skepticism to you?
19   A.  No.
20   Q.  Were you aware that Mr. Banker had -- if
21  Mr. Banker had discussed the accumulation of the "on
22  account" items with Tom Williams of Oracle?
23   A.  Other than what's noted in this memo, no.
24   Q.  And prior to reading this memo, were you aware
25  that Mr. Banker had a communication with Mr. Williams

177

1　regarding the accumulation of the "on account" items?

2　　　A.  Not that I recall, no.

3　　　Q.  Do you know who at Oracle -- excuse me.  Do

4　you know who at Ernst & Young would know?

5　　　A.  John Banker.

6　　　Q.  Anyone currently at Ernst & Young would have

7　more knowledge than yourself?

8　　　A.  I don't know.

9　　　Q.  Do you know who you would ask to find out?

10　　　A.  Andrew Cotton or general counsel's office.

11　　　Q.  As you see on the next page, page 3, on the

12　first full paragraph, it says, "Banker informed the

13　committee that, pursuant to principles agreed to with

14　Oracle, E&Y has performed its own testing of the

15　November 7, 2000, debit memos to observe their effect

16　on General Ledger Account 25005 and Oracle's revenue."

17　　　Does that refresh your recollection whether or

18　not there were any principles with respect to Ernst &

19　Young's engagement that were agreed to with Oracle?

20　　　A.  No.

21　　　Q.  Do you know if there is any documentation

22　regarding principles agreed to with Oracle regarding

23　its debit memo engagement?

24　　　A.  Not that I recall, no.

25　　　Q.  Do you believe that sentence to be inaccurate?

178

1　　　A.  I have no reason to believe it's inaccurate.

2　　　Q.  Do you have any reason to believe it's

3　accurate?

4　　　A.  Just from reading this, no, I have no

5　recollection of any discussion between John and the

6　committee.

7　　　Q.  See the next sentence.  It says, "E&Y reviewed

8　a set of debit memos selected from the November 17,

9　2000, debit memos.  The set comprised 200 items."

10　　　Now, if you turn to EY 00023 --

11　　　A.  143?

12　　　Q.  143.

13　　　A.  144?

14　　　Q.  143 and 144 -- there is a reference in this

15　particular document to what appears to be 195 debit

16　memos.

17　　　A.  There's 195.  Yes.

18　　　Q.  Do you know if there were any debit memos

19　which Ernst & Young reviewed but could not reconcile

20　the debit and credits as offsetting?

21　　　A.  No.

22　　　Q.  Do you believe this statement that Ernst &

23　Young reviewed a set of debit memos comprising of 200

24　items is inaccurate?

25　　　A.  It's 195 items.  Yes.

179

1　　　Q.  Do you know if Ernst & Young in the course of

2　its engagement related to the debit memos -- whether it

3　looked at the increase in miscellaneous receipts from

4　2000 to 2001?

5　　　MR. KONOVALOV:  Objection; assumes facts not in

6　evidence.

7　　　THE WITNESS:  I don't recall doing that

8　specifically.

9　BY MS. RADCLIFFE:

10　　　Q.  Do you recall whether there was an increase in

11　the miscellaneous receipts from 2000 to 2001?

12　　　A.  I don't recall that, no.

13　　　Q.  Do you know if that is documented at all in

14　Oracle's work papers?

15　　　A.  In Ernst & Young's work papers?

16　　　Q.  Ernst & Young.  Thank you.

17　　　A.  Not that I -- not that I recall, no.

18　　　Q.  Do you know if Ernst & Young in the course of

19　its review or engagement related to the debit memo

20　transactions ever looked at the transfers to

21　Account 12601?

22　　　A.  No, I don't recall that specifically.  No.

23　　　Q.  Do you recall if they looked at the transfers

24　to the bad-debt reserve?

25　　　A.  For which period?

180

1　　　Q.  All.

2　　　A.  I don't recall, no.

3　　　Q.  Do you know if Ernst & Young would have

4　documented any review of transfers to the bad-debt

5　reserve with respect to its engagement related to the

6　debit memos?

7　　　MR. KONOVALOV:  Objection; incomplete

8　hypothetical, assumes facts not in evidence.

9　　　THE WITNESS:  If we would have done something, I

10　believe we would have documented it, yes.

11　BY MS. RADCLIFFE:

12　　　Q.  And I believe earlier you testified that if

13　Ernst & Young believed something was important, it

14　would be documented.  Is that correct?

15　　　A.  It's generally true, yes.

16　　　Q.  Do you know if Ernst & Young did any analysis

17　with respect to the debit memo engagement where -- I'm

18　sorry -- which account the miscellaneous receipts came

19　from?

20　　　A.  No, I don't recall us doing that.

21　　　Q.  Do you know if that is documented anywhere in

22　Ernst & Young's work papers?

23　　　A.  EY 000150 and -151 shows the rule for 25005.

24　It appears to indicate miscellaneous receipts, refunds,

25　trade receivables, and journal entries to roll forward

Bender, Alexander  9/21/2006  9:04:00 AM

181

1  the balance for those two months.  So that's when we
2  would have reviewed it, I would believe.
3  Q.  And is there any supporting documentation in
4  Ernst & Young's work papers regarding that review?
5  A.  There's a paragraph on page 000145 and the
6  beginning of page starting at "We further obtained"
7  that would document that we looked at the items that
8  were part of the beginning and ending balances for
9  November 2000 and August 2000 and looking at the
10  similarity of those items.
11  Q.  And was that for each specific item or -- it
12  appears here to be looking at the balance.
13  A.  It looks like the roll-forward of the
14  Account 25005.
15  Q.  And if you go back to what's been marked
16  Exhibit 8, I believe -- and this is in the part that
17  E&Y reviewed a set of debit memos selected from the
18  November 17, 2000, debit memos.  Does that comprise 200
19  items, 145 of them greater than 500,000 and the
20  remainder randomly selected?  And I believe we've
21  established that that's 195 items.
22      And the document goes on to say, "E&Y observed
23  that all of the debit memos tested had equal and
24  offsetting debits and credits with zero effect on
25  Account 25005.  In addition, E&Y observed that the debit

182

1  memos had no effect upon Oracle's revenues."
2      Do you know if Ernst & Young reviewed the
3  underlying transactions related to the debit memos?
4  A.  Can you be more specific.
5  Q.  Do you know if it reviewed the receipts
6  related to the debit memos?
7  A.  I don't believe we looked at that.  We looked
8  at the journal entries to process the debit memos
9  referred to here.
10  THE VIDEO OPERATOR:  This marks the end of
11  Videotape No. 3, Volume I, in the deposition of Alex
12  Bender.  The time is 3:26.  We are off the record.
13  (A break was taken.)
14  THE VIDEO OPERATOR:  This marks the beginning of
15  Videotape No. 4, Volume I, in the deposition of Alex
16  Bender.  The time is 3:35.  We're back on the record.
17  BY MS. RADCLIFFE:
18  Q.  Before the break, we were -- I was asking you
19  whether Ernst & Young ever looked at the underlying
20  transactions related to the general -- related to the
21  debit memos, and we started with receipts, whether
22  Ernst & Young ever looked at the receipts related to
23  the debit memos.
24      I also asked you if Ernst & Young ever looked at
25  the general ledger activity with respect to each of the

183

1  debit memos that it reviewed.
2  A.  When you say "general ledger activity," we did
3  look at the journal entries to remove these items from
4  the "on account" status --
5  Q.  And --
6  A.  -- which would be reviewed in the general
7  ledger.
8  Q.  Is there anything else that you looked at?
9  A.  Nothing that I recall, no.
10  Q.  And is there any documentation of Ernst &
11  Young ever looking at anything else besides the journal
12  entries?
13  A.  On Exhibit 232 we talked about looking at ten
14  other entries for both tick marks B and C.  That would
15  have included that as well.
16  Q.  And I think we discussed earlier that there is
17  no documentation with respect to the review of those
18  ten entries identified in B and C beyond what is on
19  those tick marks; is that correct?
20  A.  I don't recall if there is, no.
21  Q.  Do you recall if the sample of 195 items that
22  Ernst & Young looked at was the number that Ernst &
23  Young initially sought to review when it began to
24  undertake the procedures related to its engagement?
25  A.  Yes.

184

1  Q.  And I asked a slightly different question
2  earlier, but do you know if Ernst & Young looked at the
3  remittance invoices for each of the cash receipts
4  related to the debit memo that it reviewed?
5  A.  We didn't look at their remittances for each
6  debit memo, no.
7  (Interruption)
8  THE WITNESS:  We did not look at their
9  remittance advices for the debit memos, no, not that I
10  recall.
11  BY MS. RADCLIFFE:
12  Q.  Do you know if Ernst & Young looked at any
13  general activity preceding the debit memos to determine
14  why specific items were put "on account"?
15  MR. KONOVALOV:  Was that proceeding?
16  THE WITNESS:  Preceding?
17  MS. RADCLIFFE:  Preceding.
18  THE WITNESS:  No.  Not that I recall, no.
19  BY MS. RADCLIFFE:
20  Q.  Do you know if there is any documentation of
21  Ernst & Young undertaking that effort?
22  A.  I'm not -- I am not familiar with that, no.
23  Q.  Do you know why Ernst & Young did not
24  undertake that effort with respect to the debit memo
25  transactions?

185

1    A. I don't know why specifically, no.

2    Q. Do you know why generally?

3    A. I don't think we were requested to do so.

4    Q. And who would have made that request?

5    A. Based on what I've read here, I presume the

6    special committee -- the special litigation committee.

7    Q. And do you have any understanding that it was

8    a special litigation committee who set forth the

9    parameters of Ernst & Young's review of the debit

10   memos?

11   A. As I mentioned before, only through reading

12   this memo that -- and talking with general counsel that

13   that's how it came about.  But I was not part of those

14   conversations, no.

15   Q. Do you know in Ernst & Young's review of the

16   debit memos whether the debit memo transactions had any

17   effect on Oracle's income for fiscal quarter 2001?

18   A. Based on procedures performed, it did not.

19   Q. And are those procedures the ones set forth in

20   the memo at EY 00143 and the script?

21   A. Yes.

22   Q. Do you know if there was any evidence that

23   Ernst & Young uncovered in its review that the

24   underlying debit memo transactions had any effect on

25   income?

186

1    A. Say it one more time.  I'm sorry.

2    Q. Sure.  Do you know if Ernst & Young ever

3    learned in its review that the underlying debit memo

4    transactions had any effect on income?

5    A. Based on our procedures, they did not have any

6    impact on income.

7    Q. And do you know where that's documented in the

8    work papers?

9    A. On page 144.  Just give me one second.  I'll

10   read this.

11   Q. Certainly.  Take your time.

12   A. So on page 144, in the middle of the page, it

13   says, "The accounting distribution lines for all items

14   tested show the debit to Account 25005 and a

15   corresponding credit to Account 25005."  And in

16   parentheses, "We note no financial statement impact."

17   Q. And is it your understanding that that means

18   no impact on the income?

19   A. Yes, income part of the financial statements.

20   Q. And I just want to clarify.

21   A. And I was going to finish my answer.

22   Q. Go ahead.

23   A. On page 145, "In the review of Account 25005,

24   we note, based upon our review and testing, it appears

25   that no revenue was booked as a result of reversing

187

1    amounts from Account 25005."

2    And then under the deferred revenue analysis,

3    "Based upon our review of the company's deferred

4    revenue balances in Q2 '01, the changes in the balance

5    appeared reasonable and consistent with similar

6    quarters of previous and subsequent years, indicating

7    no inappropriate activity with revenue."

8    Q. Let me see if I can clarify two things.

9    A. Sure.

10   Q. Is there a difference between an impact on

11   income and impact on revenue?

12   A. Sure.

13   Q. And so can there be an impact on income but

14   not an impact on revenue?

15   A. There could, yes.

16   Q. Do you know if Ernst & Young specifically

17   tested whether or not there was an impact on Oracle's

18   income in the second quarter of fiscal 2001?

19   A. Yes.  We looked at the credits, and the

20   credits were always the balance sheet -- the same

21   balance-sheet account.

22   Q. And other than this memo, is there any other

23   documentation of that?

24   A. No, not that I'm aware of.

25   Q. And when I say "memo," EY 00143, just so the

188

1    record's clear.

2    A. Right.

3    Q. And I think I asked you two different questions,

4    and I want to make sure your answer is the same for

5    both.  I first asked with respect to whether there was

6    any impact on income with respect to the debit memo

7    transactions that Ernst & Young tested.

8    The second question is whether or not there

9    was any -- if Ernst & Young learned whether or not

10   there was any impact from the underlying transactions

11   to the debit memos on income.

12   MR. KONOVALOV: Objection; vague and ambiguous.

13   THE WITNESS:  To answer the first question, we

14   did not note any items that impacted income as part of

15   our testing.  And the answer to your second question, we

16   did not become aware of any items in the underlying

17   transactions that had an impact on income.

18   BY MS. RADCLIFFE:

19   Q. And did you -- did Ernst & Young test those

20   underlying transactions, the invoices, the receipts for

21   each of the debit memos?

22   A. No.  I'd already answered that.  No, we did

23   not.

24   Q. And if you could look back to the Banker memo,

25   which is Exhibit 8, there is a portion that says -- and

189

1  it starts on page 3, third -- or second full paragraph
2  down.
3      It says, "In addition, E&Y examined transfers
4  from Account 25005 to see whether there was a single
5  large entry that would be consistent with the
6  accounting fraud allegations claim that Account 25005
7  was the source of $228 million in revenue on
8  November 17th.
9      "Banker stated that E&Y found nothing to
10  indicate any such transfer.  Banker also stated that
11  there was nothing in the materials that E&Y reviewed
12  that indicated to E&Y that plaintiffs' claims about the
13  November 17, 2000, debit memos had any veracity."
14      Do you see that?
15  A.  I do.
16  Q.  If you turn to E -- what is attached to
17  Schedule A or you can look at Exhibit 2, EY 0010 to --
18  to -12.  Exhibit 1, the subpoena, it's attached to that
19  document.
20  A.  Okay.
21  Q.  And EY 00010.
22  A.  Okay.
23  Q.  And this particular document in Ernst &
24  Young's work papers, EY 00010 to EY 0012, do you know
25  whose files this document came from?

190

1  A.  I do not know.
2  Q.  If you turn to EY 00011.  At the bottom of the
3  first paragraph there, the full paragraph -- it goes
4  almost to the bottom of the page -- do you see where
5  it's crossed out?
6      It says, "Banker stated that E&Y found nothing
7  to indicate any such transfer.  Banker also stated that
8  there's nothing in the materials that E&Y reviewed
9  that indicated to E&Y that plaintiffs' claim about the
10  November 17, 2000, debit memos had any veracity."
11  A.  Are we back in the memo or this document?
12  Q.  Well, it's the same language in both
13  Exhibit 8, the memo, and --
14  A.  Yeah.  I read it in the memo, yes.
15  Q.  -- EY 0011.  Do you see where it's crossed out
16  in EY 0011, that -- those particular sentences?
17  A.  I see that, yes.
18  Q.  Do you know why it was crossed out?
19  A.  I don't know.
20  Q.  Do you know who crossed off that?
21  A.  No.
22  Q.  Do you know who you would ask in Ernst & Young
23  to find out why it was crossed out?
24  A.  I don't know who I'd ask.
25  Q.  Do you know if Ernst & Young performed any

191

1  testing to indicate whether or not there was a large
2  entry debiting Account 25005 and crediting revenue in
3  the amount of 228 million on November 17, 2000?
4      MR. KONOVALOV:  Objection; assumes facts not in
5  evidence.
6      THE WITNESS:  We performed an analysis -- the
7  account analysis on 25005 in November 2000 as well as the
8  account roll-forward in August and November of 2000.
9  BY MS. RADCLIFFE:
10  Q.  And do you recall what Ernst & Young's
11  conclusions were with respect to any such transfer
12  based on that analysis?
13  A.  Based on that analysis, we didn't find any --
14  we didn't note any inappropriate activity in those
15  accounts.
16  Q.  And is that based solely on the documentation
17  in Ernst & Young's work papers?
18  A.  To my recollection, yes.
19  Q.  Do you know -- if you turn to EY 00011, the
20  sentence that said -- that is crossed out that says,
21  "Banker also informed the committee that E&Y had no
22  material questions that remain unanswered by Oracle on
23  this issue."
24  A.  I see that's crossed out.
25  Q.  And you see down at the bottom, there is a

192

1  date stamp on EY 00011.
2  A.  Um-hmm.
3  Q.  And it appears that this document has three
4  different date/time stamps on it, and that the last one
5  on this document is 10-16-03, 4:42 p.m.?
6  A.  Um-hmm.
7  Q.  And based on your understanding of Ernst &
8  Young's accounting -- I mean -- I'm sorry -- software
9  systems, does that reflect the date in which the
10  document was modified?
11      MR. KONOVALOV:  Objection; lacks foundation and
12  calls for speculation.
13      THE WITNESS:  I don't know.
14  BY MS. RADCLIFFE:
15  Q.  Do you know who you would ask to find out?
16  A.  No.
17  Q.  Do you know if Ernst & Young's analysis of the
18  roll-forwards in August 2000 and November 2000 included
19  September 2000?
20  A.  I'd have to go back and look at our memo.
21  Based on our memo, it indicates that we did not.
22  Q.  Do you know if it included October 2000?
23  A.  I don't believe it did.  I believe what we
24  were trying to do was look at the third month of a
25  quarter for consistency.

193

1     Q.   And what leads you to believe that as you sit

2  here today?

3     A.   Most of their activity as it relates to

4  revenue, specifically license revenue but also

5  maintenance revenue due to maintenance renewals

6  associated with license contracts, generally occurs in

7  the third month of a quarter in a software company.

8     Q.   And I guess because the transactions you were

9  looking at actually occurred in the second quarter of

10  the fiscal year 2001, did you take that into

11  consideration when you looked at the roll-forward

12  relating to the third month of each quarter?

13     A.   What we were looking at was the most recent

14  quarter.  That was the third month of the quarter.

15  That would have been August.

16     Q.   And so you didn't -- Ernst & Young didn't

17  actually review the quarter in which it was reviewing

18  the debit memo transactions; is that correct?

19     A.   Every transaction in the quarter?

20     Q.   Of fiscal 2001, the second quarter.

21     A.   No.

22       MR. KONOVALOV:  Objection; vague and ambiguous.

23  You can answer.

24       THE WITNESS:  Sorry.  No.

25  BY MS. RADCLIFFE:

194

1     Q.   If you look at Exhibit 8 again, which is the

2  Banker memo, the one without the cross-outs, if you go

3  on, it says to that same full paragraph -- second

4  paragraph down, it says, "Banker also stated that E&Y

5  found nothing to indicate any such transfer.

6       "Banker also stated there was nothing in the

7  materials that E&Y had reviewed that indicated to E&Y

8  that plaintiffs' claims about the November 17, 2000,

9  debit memos had any veracity."

10     Do you know if there were any other documents

11  that Ernst & Young reviewed with respect to the debit

12  memos other than what's contained in its work papers

13  found here at Exhibit 2?

14     A.   Not that I'm aware of, no.

15     Q.   The next paragraph down says, "Banker

16  described the additional testing procedures that E&Y

17  also performed on the debit memos," and then he goes on

18  to describe those.  It says that "Ernst & Young

19  obtained a complete set of the approximately 46,000

20  debit memos created on November 17th."

21     Is it your understanding that Ernst & Young

22  received a complete set of the 400 -- and approximately

23  460 --

24     A.   46,000.

25     Q.   -- 46,000 debit memos created on

195

1  November 17th?

2     A.   Yes.  In our memo on 000144, it says, "We

3  obtained a download detail of 46,876 debit memos issued

4  on November 17, 2000."  So I do believe that's true.

5     Q.   Do you know what that download detail

6  consisted of?

7     A.   I'd have to -- I don't know specifically, but

8  by reading that, I would believe that we got a listing

9  of all of the debit memos.

10     Q.   And do you know if that listing was documented

11  in Ernst & Young's work papers?

12     A.   Outside of this memo?

13     Q.   Correct.

14     A.   I don't recall, no.

15     Q.   Do you know what happened to that list?

16     A.   No.

17     Q.   Do you know when Ernst & Young received this

18  complete -- this list of the approximately 46,000 debit

19  memos?

20     A.   I don't know a specific date, no.

21     Q.   Do you believe it to be in

22  October-November 2002?

23     A.   I do.

24     Q.   It says here in this document -- and I know

25  this is not an Ernst & Young document per se -- it

196

1  says, "a complete set."  Did that include the invoices

2  and receipts for each of the 46,000 debit memos?

3     A.   I don't believe it did, no.

4     Q.   Do you know which summary trial balances

5  Ernst & Young reviewed in connection with its review of

6  the debit memos?

7     A.   On Exhibit 238, 239, 240 through 248 is a

8  summary trial balance that shows the beginning balance

9  and the ending balance for November 2000.

10     Q.   And is that the totality of the summary and

11  trial balances Ernst & Young reviewed in connection

12  with the debit memos?

13     A.   To my recollection.

14     Q.   And with respect to the download detail that

15  you received with respect to the 46,000 debit memos, do

16  you recall who you received that from at Oracle?

17     A.   I don't recall, no.

18     Q.   And do you recall how reviewing that download

19  detail of the 46,000 debit memos provided Ernst & Young

20  with comfort that the debit memos did not have any

21  impact on Oracle's revenue?

22     A.   We took a sample from that complete listing to

23  test the individual underlying journal entry to show

24  that the debit and the credit was accounted for --

25  well, the debit and credit went to Account 25005.

197

1    Q.   And this is the same offsetting of the debit
2    and credits that we discussed earlier today; is that
3    correct?
4    A.   Yes, that's correct.
5    Q.   Going down to the next page.  On top of
6    page 4, it goes on to say, "Based upon E&Y's review of
7    the summary trial balances, E&Y has requested that
8    Oracle review certain monthly balances and provide an
9    explanation for the increases and decreases in them."
10       Do you know if Ernst & Young ever received an
11   explanation for the increases and decreases in the -- in
12   monthly balances?
13       MR. KONOVALOV:  Objection; lacks foundation.
14       THE WITNESS:  I don't recall specifically what
15   we got -- in what specific context the request was made.
16   BY MS. RADCLIFFE:
17   Q.   Do you recall why the request was made?
18   A.   I wasn't there.  I don't know why.
19   Q.   Do you recall whether the information was
20   obtained by Oracle?
21   A.   I don't recall, no.
22   Q.   Do you know if the request was documented?
23   A.   I don't recall.  I don't know.
24   Q.   Do you know who would know?
25   A.   I don't know who would know.

198

1    Q.   Typically, if a request is made for additional
2    information from a client at Ernst & Young, is that
3    request documented?
4    A.   Depends on the request.
5    Q.   Would a request of this nature regarding an
6    explanation for increases and decreases in monthly
7    balances be the type of request that would be
8    documented by Ernst & Young?
9        MR. KONOVALOV:  Objection; incomplete
10   hypothetical.
11       THE WITNESS:  As I mentioned before, I'm not
12   exactly sure the context of this request.  I'm not sure
13   if it's indicating that Ernst & Young felt it was
14   appropriate for Oracle to perform monthly balances and
15   provide explanation to the special litigation committee
16   or to provide an explanation to Ernst & Young.  It's not
17   clear to me.
18   BY MS. RADCLIFFE:
19   Q.   Do you know if Ernst & Young ever -- Ernst &
20   Young ever reviewed Oracle's monthly trial balances to
21   ascertain explanations for the increases and decreases
22   in those balances?
23   A.   We reviewed the summary trial balance that
24   shows the debits and the credits with the beginning
25   balance and the ending balance.

199

1    Q.   And could you identify that by Bates number?
2    A.   I'm sorry.  It's 000238.
3    Q.   And is there any other documentation?
4    A.   Monthly changes would also be reflected in our
5    review.  Since it isn't specific which accounts, it
6    also would be part of our review of the deferred
7    revenue balances starting at 148 through 149 as well as
8    the account balance roll-forward for 25005 as noted on
9    150 and 151.
10       We also reviewed the account analysis on 231
11   that would show monthly increases and decreases in that
12   account.
13   Q.   Do you know if there were any conclusions
14   reached by Ernst & Young with respect to the increases
15   and decreases in Account 25005?
16   A.   In our memo starting at 143 where we have a
17   section called "Review of Account 25005," we note that
18   we did not note any nonstandard or unusual reconciling
19   items.  We also note that we noted no revenue was
20   booked as a result of reversing amounts from Account
21   25005.
22   Q.   And --
23   A.   And -- I'm sorry -- the deferred revenue
24   analysis has the same -- the conclusion that based upon
25   our review of the company's deferred revenue balances

200

1    in Q2 '01, the changes in the balance appeared
2    reasonable and consistent with similar quarters of
3    previous and subsequent years.
4        MR. KONOVALOV:  Mr. Bender, I think you
5    misspoke.  I think you said 143, but I believe it's 145
6    is the page you're referencing.
7        THE WITNESS:  I'm sorry.  You're right.  It's
8    145.  And the last sentence that I just read is on
9    page 146.  Thank you.
10   BY MS. RADCLIFFE:
11   Q.   And I just want to clarify for the record.
12   Ernst & Young, however, did not look at the changes in
13   account balances for September 2000 and October 2000;
14   is that correct?
15   A.   That is correct.
16   Q.   Do you know why not?
17   A.   We were looking at November 2000 because that
18   was the month in which the alleged debit memo activity
19   took place, and that's why we selected November to
20   review.  And it was also the month that was, I believe,
21   specified in the complaint.  And as I mentioned
22   earlier, we were looking at August because we felt
23   August was a more representative -- or I should say a
24   more comparative month than September or October.
25   Q.   And do you know if the methodology which

201

1 Ernst & Young employed in determining which month's
2 account balances that it would review is documented in
3 Ernst & Young's work papers?
4     A.  The methodology?
5     Q.  Yes.
6     A.  I don't know that we documented that, no.  I
7 don't see where we did.
8     Q.  If you go on in Exhibit 8, a little further
9 down, it says, "Other testing" -- it's the second
10 paragraph -- "E&Y is currently performing includes a
11 review of the account analysis report provided by
12 Oracle.  E&Y is still waiting for additional supporting
13 documentation, but Banker expressed that this area was
14 not a matter of concern."
15         Other than what we looked at, at EY 00231 to --
16 I believe it's -234 and the documents that follow that,
17 -237, which I believe is the supporting documentation, do
18 you know if Ernst & Young requested any other supporting
19 documentation with respect to the account analysis report
20 provided by Oracle?
21     A.  Not that I'm aware of, no.
22     Q.  Do you know if anyone else at Ernst & Young
23 would have more information regarding additional
24 requests to Oracle other than yourself?
25     A.  No.

202

1     Q.  If you look down a little farther, it says,
2 "Also, Banker informed the committee that they are
3 performing testing on customer refunds.  This includes
4 reviewing Oracle's refund policy for customer
5 overpayments in addition to examining specific customer
6 refunds.  These procedures are still in progress."
7         Other than what we discussed earlier today about
8 customer refunds, is there any other analysis that
9 Ernst & Young performed with respect to customer refunds
10 related to the debit memos?
11     A.  Not that I can recall, no.  I don't know.
12     Q.  Do you know when the transfers to
13 Account 12601 happened?
14     MR. KONOVALOV:  Objection; assumes facts not in
15 evidence, lacks foundation.
16     THE WITNESS:  I'm not familiar with the account
17 balance you just referenced and the transfers to that
18 account.
19 BY MS. RADCLIFFE:
20     Q.  We can follow that up in just a minute.  I
21 think it will become clearer.
22         Do you know who authorized the debit memo
23 transactions at Oracle on or about November 2000?
24     A.  I don't know.  I don't recall.
25     Q.  Do you know if Ernst & Young ever inquired who

203

1 authorized the debit memo transactions at Oracle?
2     A.  No.
3     Q.  If you go a little further in the -- in
4 Exhibit 8, starting at page 5 of Exhibit 8, which is
5 296433.  And I'm looking at the first full paragraph
6 there.
7     A.  Um-hmm.
8     Q.  Do you know if Ernst & Young was asked to look
9 at any of the claims made in the Keatly declaration
10 referenced in this paragraph?
11     A.  No, I don't know.
12     Q.  Do you know if -- strike that.
13         Did you ever have any discussions regarding the
14 Keatly declaration referenced in this paragraph?
15     A.  Not that I recall, no.
16     Q.  Do you recall reviewing the Keatly
17 declaration?
18     A.  No.
19     Q.  Do you recall that Oracle made transfers from
20 unapplied cash to its bad-debt reserve in Q3 of fiscal
21 2001?
22     MR. KONOVALOV:  Objection; assumes facts not in
23 evidence.
24     THE WITNESS:  I don't recall that, no.
25 BY MS. RADCLIFFE:

204

1     Q.  Do you know if Oracle transferred unapplied
2 cash to its bad-debt reserve in the third quarter of
3 fiscal 2001?
4     A.  I don't know.
5     Q.  Would you want to -- would you have wanted to
6 know that information when you were performing the
7 analysis of the debit memos related to the second
8 quarter of fiscal 2001?
9     A.  No.
10     MR. KONOVALOV:  Objection; incomplete
11 hypothetical.  Sorry.
12     THE WITNESS:  No.
13 BY MS. RADCLIFFE:
14     Q.  And why is that?
15     A.  Generally $5 million is immaterial to Oracle,
16 for one; and, two, I'm not sure that there was -- by
17 reading this, I'm not sure there is relevance between
18 the two.
19     Q.  If you go on to that second paragraph where
20 "Banker noted that it would be a useful test to compare
21 the written-off accounts receivable debt against the
22 written-off unapplied cash, even if the write-offs
23 occurred in different periods."
24         And then it goes on to say, "Banker explained
25 that this could be a potentially useful exercise that

205

1  Oracle could demonstrate the certain cash receipts
2  written off were actually unmatched customer payments for
3  accounts receivable items that also were eventually
4  written off."
5      Do you know if Ernst & Young ever performed
6  these tests with respect to the transfers referenced in
7  this document in Q3 of fiscal 2001?
8      MR. KONOVALOV:  Objection; vague and ambiguous
9  as to "tests."
10     THE WITNESS:  I don't recall seeing anything in
11 this regard.
12 BY MS. RADCLIFFE:
13     Q.  And with respect to what I just read where
14 Mr. Banker noted it would be useful to test -- a useful
15 test to compare the written-off accounts receivable
16 debts against the written-off unapplied cash, do you
17 know if there were any -- there was testing done by
18 Ernst & Young with respect to a comparison of the
19 written-off accounts receivable debts against the
20 written-off unapplied cash in Q2 of fiscal 2001?
21     A.  Not that I'm aware of, no.
22     Q.  Do you know why not?
23     A.  I don't know why not, no.  I don't recall
24 being requested to do so.
25     Q.  And do you know if Ernst & Young was ever

206

1  requested to do so?
2      A.  I don't know.  I don't recall that, no.
3      Q.  Who at Ernst & Young had the ultimate
4  authority with respect to what procedures would be
5  performed in connection with the engagement related to
6  the debit memos?
7      MR. KONOVALOV:  Objection; vague and ambiguous.
8      You can answer the question.
9      THE WITNESS:  John Banker.
10 BY MS. RADCLIFFE:
11     Q.  Do you know what it means to write off
12 unapplied cash?
13     A.  Yes.  I mean, it depends on the circumstance.
14 It could be several things.  To write it off would
15 be -- sometimes you have sheet issues, that if you do
16 write off unapplied cash, you have to give certain
17 monies to Delaware.  It's actually a legal term.  That
18 could happen.
19     It could result in -- in the company just
20 having cash on hand and not knowing what it relates to,
21 and so you write it off generally.  I've seen it happen
22 too often now.
23     Q.  Have you ever seen it happen at Oracle?
24     A.  I've seen them clean up their unapplied cash
25 balance, yeah.  I don't know if it would be a

207

1  write-off, but I've seen them go through and spend a
2  significant amount of time trying to reconcile the
3  unapplied cash.  And when things are certainly -- or
4  were absolutely determined to be uneven in terms of
5  where the cash came, I've seen them distribute that to
6  the State of Delaware from a sheetment perspective.
7      Q.  And do you know when that occurred?
8      A.  I don't recall which year.
9      Q.  Do you know if that occurred in 2002?
10     A.  I don't recall.
11     Q.  Do you know how the write-off of the unapplied
12 cash would affect the financial statements?
13     A.  Generally speaking, it would impact cash --
14 generally speaking, it would impact accounts receivable
15 and cash.  It generally wouldn't impact credit because
16 they wouldn't take a credit for the P & L forward.  It
17 would just be additional cash.
18     Q.  Do you know what an accrual account is?
19     A.  Yes.
20     Q.  Could you explain what it is?
21     A.  An accrual account is generally an account
22 that's set up for a liability, an incurred liability.
23     Q.  And do you know if Oracle's Account 25005 is
24 an accrual account?
25     A.  The account that they've set up is a liability

208

1  account.  Yes, it is an accrual account.  The 2000 is
2  generally what they have as their liability accounts,
3  yes.
4      Q.  And I just want to reference you back to
5  EY 00010.  And at the very end of EY 0012, the last
6  sentence, see where it says -- and there is some
7  cross-outs, so this is not verbatim -- "Banker, who has
8  reviewed this language and approved its inclusion in
9  this report, believes that it accurately reflects the
10 substance of the discussions described in the second
11 preceding paragraph."
12     A.  Okay.
13     Q.  And if you look at Exhibit -- what's been
14 marked Exhibit 8, do you see any language in Exhibit 8
15 that Mr. Banker has reviewed the language in Exhibit 8
16 and believes that accurately reflects the substance of
17 discussions?
18     A.  Sorry.  I'm trying to figure out where you are
19 on this document.
20     Q.  Take your time.
21     A.  I don't see it, no.
22     Q.  Do you know if Mr. Banker ever reviewed
23 Exhibit 8?
24     A.  I don't know.
25     Q.  And prior to today, I think you previously had

209

1  testified you never reviewed Exhibit 8.

2      A.   That's correct.

3      Q.   Did you ever review any drafts of an interview

4  with John Banker?

5      A.   No.

6      Q.   Do you know if E&Y had an understanding based

7  on its debit memo engagement of how Oracle recorded

8  customer overpayments in fiscal 2001?

9      A.   Not really, no.  We understood that customer

10  repayments would be one of the items that would

11  potentially go into the "on account" status as part of

12  25005.  But since we didn't audit that period, I

13  wouldn't know.

14      Q.   Do you know if -- how Oracle records

15  customer overpayments currently in its financials

16  differs from how they were reported in fiscal

17  2001?

18      A.   I don't know.  I'd have to look at our work

19  papers.

20      Q.   Do you know that Oracle is under a consent

21  decree with respect to retaining certain accounting

22  documents?

23      A.   I did not know that.

24      MS. RADCLIFFE:  I'm going to mark the next

25  exhibit in order, Exhibit 9.

210

1      (Exhibit No. 9 was marked for identification by

2  the reporter.)

3  BY MS. RADCLIFFE:

4      Q.   And I'll just actually ask you to briefly

5  review this because I know we're going to let you out.

6  If you've ever seen this document before.

7      A.   I've never seen this document.

8      MS. RADCLIFFE:  You can go ahead and put that

9  aside.  I'm going to take a break, and then we can see if

10  we can wrap things up.

11      THE VIDEO OPERATOR:  Going off the record, the

12  time is 4:20.

13      (A break was taken.)

14      THE VIDEO OPERATOR:  Back on the record, the

15  time is 4:29.

16  BY MS. RADCLIFFE:

17      Q.   We discussed a little bit earlier about the

18  effect of the debit memo transactions on income, and I

19  just wanted to clarify with respect to debit memo

20  transactions with the understanding that a debit memo

21  transaction equals -- or is equal to the transaction

22  underlying the debit memo which would also contain the

23  receipt history and all related general ledger

24  activity.

25      With that understanding, do you know if

211

1  Ernst & Young determined whether the debit memo

2  transactions had no impact on income?

3      MR. KONOVALOV:  Objection; vague and ambiguous

4  and incredibly compound.

5      But if you understand the question, answer it.

6  BY MS. RADCLIFFE:

7      Q.   And I will clarify that it is.  I am referring

8  to 2Q of 2001.

9      A.   Based on the procedures we performed -- based

10  on the testing we did on these debit memos, I do not

11  believe it had an impact on income.

12      I wasn't clear if your question was when they

13  initially had received cash at some point of over the

14  past ten years if that ever had an impact on income.

15  In that particular year, I don't know.  But as it

16  relates to what they did in November 2000, I do not

17  believe that it had an impact on income.

18      Q.   Do you know if Ernst & Young reviewed anything

19  else besides the November 17, 2000, transactions?

20      A.   Other than what's documented in this memo, no.

21      MS. RADCLIFFE:  I'm going to mark as the next

22  exhibit in order.

23      (Exhibit No. 10 was marked for identification by

24  the reporter.)

25  BY MS. RADCLIFFE:

212

1      Q.   And in the interest of brevity, I'm going to

2  ask you about something on page 4 --

3      A.   Okay.

4      Q.   -- which is NDCA-ORCL.  And for the record,

5  this document is entitled "#1 Interview Memorandum of

6  Thomas Williams, Interview 3, 11/12/02."  And if you'd

7  look at the section entitled "Transfers from Unapplied

8  Cash to 12601."  And it also goes to the next page.

9      A.   Okay.

10      Q.   Okay.  And I don't know if you've read all the

11  way through to the end of what's Bate-stamped 313783.

12      A.   Um-hmm.  I have.

13      Q.   Including in the section regarding the amount

14  of transfers.  Do you know if Ernst & Young was aware

15  of the information attributed to Mr. Williams in the

16  section that you just read relating to "Transfers from

17  Unapplied Cash to 12601" -- and the next section is

18  "Amount of the Transfers," and that's listed on

19  NDCA-ORCL 313783 -- when it performed its analysis of

20  the debit memo transactions?

21      A.   I don't recall specifically.  I'd have to look

22  at our work papers -- our audit work papers.

23      Q.   Do you know if that is documented anywhere in

24  the audit work papers?

25      A.   In these work papers?

213

1  Q.  Yes.
2  A.  No.  I was referring to the fiscal 2002 and
3  2003 audit work papers.  I don't see it documented in
4  these work papers.
5  Q.  And if you look at the last paragraph, it's
6  313783, and it says, "Williams stated that he believes
7  the aggregate amount of the transfers in the two-year
8  period from August 2000 to August 2002 was
9  approximately 48 million."
10  Do you know if Ernst & Young was aware of those
11  transfers when it performed its analysis of the debit
12  transactions?
13  MR. KONOVALOV:  Well, objection; assumes facts
14  not in evidence.
15  THE WITNESS:  I don't recall.
16  BY MS. RADCLIFFE:
17  Q.  Is that information that Ernst & Young would
18  have wanted to consider when it was analyzing the debit
19  memo transactions in -- related to November 2000?
20  A.  From my reading of this one page, I'm not sure
21  that there is a relevance between the two.  Depending
22  on the amount that would have impacted fiscal 2002, we
23  would have wanted to know for our audit.  And I'm not
24  saying we didn't know.  I just don't remember.
25  Q.  If E&Y knew about these transfers when it

214

1  performed its debit memo engagement, would they be
2  documented in the work papers related to the
3  engagement?
4  A.  If we did specific work on this as it related
5  to the debit memos, I believe they would be, yes.
6  MS. RADCLIFFE:  I'm going to mark next in order.
7  (Exhibit No. 11 was marked for identification by
8  the reporter.)
9  MS. RADCLIFFE:  And for the record, this is a
10  document with multiple pages, and it's Bate-stamped
11  NDCA-ORCL 14 -- 104764 to 104765, and it's entitled at
12  the top "12601 Reserve Activity."
13  THE WITNESS:  Okay.
14  BY MS. RADCLIFFE:
15  Q.  If I could just direct your attention to the
16  top row, and the second item down says miscellaneous
17  receipt, or m-i-s-c receipt.  And if you look at
18  August 2000, it appears to be approximately 3.5
19  million?
20  A.  Um-hmm.
21  Q.  And then if you look at October 2000,
22  approximately 15.8 million.
23  A.  Um-hmm.
24  Q.  Do you know what attributed to the increase in
25  the transfers -- I'm sorry -- attributed to the

215

1  increase in the miscellaneous receipt item listed on
2  this document?
3  MR. KONOVALOV:  Objection; lacks any semblance
4  of foundation.
5  THE WITNESS:  No.
6  BY MS. RADCLIFFE:
7  Q.  Were you aware of the transfers into this
8  account when Ernst & Young performed its analysis of
9  the debit memos?
10  MR. KONOVALOV:  Objection; assumes facts not in
11  evidence that there were any transfers into any account.
12  THE WITNESS:  I guess I would reiterate the
13  question.  Are you indicating that the miscellaneous
14  receipts is a transfer?  Because I don't see that it is.
15  BY MS. RADCLIFFE:
16  Q.  If you look back at what was the Tom Williams
17  interview memo, and at page 6 of that, which is 313783,
18  at the bottom, it indicates -- and that's under the
19  amount of the transfers, it says, "Williams said he had
20  prepared a spreadsheet that he would share with the
21  committee showing the transfers from 25005 to 12601
22  from August 2000 to August 2002."
23  A.  Okay.
24  Q.  And do you know if the transfers to 12601 --
25  first of all, we'll start off:  Do you know that there

216

1  were transfers from Account 25005 to 12601 by Oracle
2  from August 2000 to August 2002?
3  A.  As I indicated previously, I don't recall.
4  I'd have to look at our work papers from the fiscal
5  2002 audit.
6  Q.  Do you know in connection with Ernst & Young's
7  debit memo engagement whether or not it looked at
8  transfers from Account 25005 to Account 12601?
9  A.  As I indicated earlier, I don't recall doing
10  that, no.
11  Q.  Do you recall ever seeing this document that
12  has been marked as Exhibit 10?
13  MR. KONOVALOV:  Ten or eleven?
14  MS. RADCLIFFE:  I apologize.  Eleven.
15  Q.  The reserve-activity document.
16  A.  I don't recall.
17  Q.  If -- hypothetically, if Oracle had moved
18  unapplied cash to its bad-debt reserve, would that be
19  characterized as writing off the unapplied cash?
20  MR. KONOVALOV:  Objection; incomplete
21  hypothetical.
22  THE WITNESS:  I don't know.  I'd have to really
23  understand what they did and why they did it to know if
24  that's what you would do to write off unapplied cash.  I
25  mean, in a general sense, that's not what you would do

217

1   absolutely.  So I'd have to know more and understand a
2   bit more around it as to why they would do that.
3   BY MS. RADCLIFFE:
4       Q.   And did you know -- or did Ernst & Young know
5   at the time it was doing its review of subsequent
6   conclusions related to the debit memo transactions that
7   Oracle had transferred unapplied cash to its bad-debt
8   reserve?
9       A.   I didn't know.  I don't recall knowing.  But
10  as I mentioned, I would want to go back and look at our
11  fiscal 2002 work papers because we may have looked at
12  it for the fiscal 2002 audit for the impact in fiscal
13  2002, so I can't definitively tell you we didn't know.
14      Q.   Is that something you would have wanted to
15  know in looking at the debit memo transactions?
16      MR. KONOVALOV:  Objection: asked and answered
17  several times.
18      THE WITNESS:  Yeah.  It depends on the relation.
19  I don't -- by looking at these two documents, I don't
20  know that there is a relation between the two.
21  BY MS. RADCLIFFE:
22      Q.   Do you know if Ernst & Young inquired of
23  Oracle whether or not there was a relation between the
24  two?
25      A.   I don't recall, no.

218

1       Q.   If Ernst & Young had inquired of Oracle in
2   connection with Ernst & Young's engagement related to
3   the debit memo transactions, would that be documented?
4       A.   Would the inquiry be documented or the results
5   of the inquiry be documented?
6       Q.   We can start with the inquiry.
7       A.   Probably not.
8       Q.   Would the results of the inquiry be
9   documented?
10      A.   Generally.  Yes.
11      Q.   And do you believe that those are documented
12  in Ernst & Young's work papers related to the debit
13  memo engagement?
14      A.   I don't believe that there -- that any
15  procedures we may have done or questions we may have
16  asked as it relates to what Tom Williams is referring
17  to in this memo is documented in the matters in the
18  debit memo, but I'm not saying it may not be documented
19  elsewhere.
20      Q.   And where would you believe that it might be
21  documented?
22      A.   In our audit work papers.
23      Q.   For fiscal 2002?
24      A.   In 2003.  And/or 2003.
25      Q.   And I'm just going to state for the record

219

1   because it's something that we're going to have to
2   address with your counsel, but we would request any
3   reference to those to the extent they exist in the
4   fiscal 2002 and 2003 audits.
5       MR. KONOVALOV:  Judge Onfontes recently ruled on
6   that very request, but you can revisit it.
7   BY MS. RADCLIFFE:
8       Q.   If you could turn -- and it's Exhibit 2 -- and
9   it's E -- the big stack of Ernst & Young's work papers.
10      A.   I have it sort of scattered, so it depends on
11  what document you want.
12      Q.   It's EY 000250.
13      A.   Okay.
14      Q.   And at the bottom of EY 00250, I just want to
15  know if you recognize that handwriting.
16      A.   Looks like mine.
17      Q.   Do you see -- it's the second sentence.  It
18  says: Per discussion with -- I believe it says Mike
19  Quinn -- it is not the company policy to not contact
20  customer if payment is considered a refund, as alleged
21  in paragraph 36-D of the complaint.
22      A.   (The witness nods his head.)
23      Q.   Do you recall having a conversation with Mike
24  Quinn about the company's policies related to
25  contacting customers regarding refunds?

220

1       A.   Not specifically, no.
2       Q.   Do you understand that it was the company's
3   policy to contact customers regarding refunds?
4       A.   Yes, that was their policy as I understood it.
5       Q.   And you understood -- Ernst & Young understood
6   that when it reached its conclusions regarding the
7   debit memo engagement; is that accurate?
8       A.   Based upon this inquiry, yes.
9       Q.   And now I'm going to start -- sorry we're
10  bouncing around here, but I just want to finish up.
11  It's EY 000144, which is part of Exhibit 2.
12      A.   Okay.
13      Q.   And going to the second -- it's actually the
14  first subheading there, "Procedures With Respect to
15  Debit Memos," and I believe we've discussed this
16  paragraph before.  And at the bottom, it says, "We
17  noted no exceptions in our testing."  What is the
18  meaning of "exceptions" with respect to this document?
19      A.   We didn't note any items in our testing that
20  didn't have a debit and a credit to 25005.
21      Q.   And where is your understanding that the term
22  "exception" is defined in Ernst & Young's work papers?
23      A.   In this memo.
24      Q.   And it's your understanding of the definition
25  based on reading the sentences preceding that sentence;

Bender, Alexander  9/21/2006  9:04:00 AM

221

1    is that correct?

2        A.  That's correct, yes.

3        Q.  If you wanted to reperform the work that

4    Ernst & Young did with respect to this debit memo

5    engagement today, would you be able to undertake that

6    performance?

7        MR. KONOVALOV:  Objection; incomplete

8    hypothetical.

9    BY MS. RADCLIFFE:

10       Q.  And I guess I can narrow it a bit to

11   specifically the 195 items that Ernst & Young tested as

12   set forth at EY 00144.

13       MR. KONOVALOV:  Same objection.

14       THE WITNESS:  I believe if we got a detail, a

15   download detail of the 46,876 debit memos, we could

16   certainly test 145 greater than 500,000.  I'd have to see

17   if we have the listing of the other 45 -- or the 50 --

18   I'm sorry -- that we tested; otherwise, I think we could

19   test an additional 50.

20   BY MS. RADCLIFFE:

21       Q.  I believe we established that to the best of

22   your knowledge no written or oral report was ever

23   provided to Oracle regarding E&Y's conclusions.

24       A.  Not that I was aware of, no.

25       Q.  And do you know if E&Y determined how many of

222

1    the debit memos, those transactions, related to

2    customer overpayments that were kept by Oracle?

3        A.  No, I don't recall doing that.

4        Q.  And do you know as to the procedures performed

5    by Ernst & Young whether these procedures would have

6    provided that information to Ernst & Young?

7        A.  Sorry.  Can you rephrase the question?

8        Q.  Certainly.  Based on the procedures E&Y set

9    forth with respect to this engagement, would those

10   procedures have elicited how many debit memos were

11   related to customer overpayments that were kept by

12   Oracle?

13       MR. KONOVALOV:  Objection; incomplete

14   hypothetical, assumes facts not in evidence.

15       THE WITNESS:  I'm a little bit confused by the

16   question, so -- are you asking based on procedures we

17   performed can we determine how many were related to

18   customer repayments?

19   BY MS. RADCLIFFE:

20       Q.  That were kept by Oracle, correct.

21       A.  No.

22       MR. KONOVALOV:  Objection; assumes facts not in

23   evidence.

24   BY MS. RADCLIFFE:

25       Q.  And do you know if E&Y determined the dollar

223

1    value of the debit memos related to customer

2    overpayments that were kept by Oracle?

3        MR. KONOVALOV:  Same objection; assumes facts

4    not in evidence.

5        THE WITNESS:  Not specific to customer

6    repayments, no.

7    BY MS. RADCLIFFE:

8        Q.  Do you know if the procedures set forth in

9    Ernst & Young's work papers -- let me strike that.

10       Do you know if Ernst & Young ever tested whether

11   the dollar value of the debit memos related to customer

12   overpayments that were kept by Oracle?

13       MR. KONOVALOV:  Same objection; assumes facts

14   not in evidence.

15       THE WITNESS:  Not that I recall, no.

16   BY MS. RADCLIFFE:

17       Q.  Do you know whether Oracle ever kept customer

18   overpayments?

19       A.  Do I know if they ever kept them?  I don't

20   know.

21       Q.  Do you know with respect to the procedures

22   that E&Y performed with respect to this engagement --

23   do you know if those procedures elicited any

24   information with respect to whether Oracle kept

25   customer overpayments?

224

1        MR. KONOVALOV:  Objection; assumes facts not in

2    evidence.  It's also vague and ambiguous.

3        THE WITNESS:  Yeah, I don't -- I don't know.

4    BY MS. RADCLIFFE:

5        Q.  Do you know if E&Y ever concluded that the

6    debit memos did not relate to customer overpayments

7    that were kept by Oracle?

8        MR. KONOVALOV:  Same objections.

9        THE WITNESS:  Not specifically.  Not that I'm

10   aware of.

11   BY MS. RADCLIFFE:

12       Q.  Do you know if Ernst & Young ever inquired of

13   Oracle whether or not it kept customer overpayments

14   related to the debit memos?

15       A.  The only thing I'm aware of is that this tick

16   mark you just referred me to, that they make every

17   effort to contact the customer.  That's the only

18   knowledge that I recall.

19       Q.  Do you know if the procedures performed by E&Y

20   would have uncovered whether or not the transactions

21   underlying the debit memos did not increase Oracle's

22   income?

23       MR. KONOVALOV:  Objection; incomplete

24   hypothetical, assumes facts not in evidence.

25       THE WITNESS:  Can you please rephrase the

225

1  question.  I'm not sure I understood the question.
2  BY MS. RADCLIFFE:
3      Q.  Sure.  Let me start with:  Do you know if
4  Ernst & Young -- let me strike that.
5          Do you know if Ernst & Young ever determined
6  whether or not there were debit memo transactions with
7  dates other than November 17, 2000?
8          MR. KONOVALOV:  Objection; vague and ambiguous.
9          THE WITNESS:  As it relates to this matter?
10  BY MS. RADCLIFFE:
11      Q.  Yes.
12      A.  This matter, we were specifically looking at
13  those dates, and then we were looking at other activity
14  in those account balances and roll-forwards.  But I
15  don't know -- I can't specifically tell you if there
16  were debit memos at different dates.
17      Q.  Do you know if there were debit memos with
18  other dates in Q2 of 2001?
19      A.  Not that I recall, no.
20      Q.  Do you know if Oracle created debit memos in
21  connection with an "on account" cleanup in December of
22  2000?
23      A.  In December of 2000?
24      Q.  Correct.
25      A.  The only one I'm familiar with is the one in

226

1  November of 2000.
2      Q.  Do you know if Ernst & Young performed any
3  review for engagement with respect to debit memos
4  created in connection with an "on account" cleanup
5  apart from the November 17, 2000, debit memos?
6          MR. KONOVALOV:  Objection; vague and ambiguous.
7          THE WITNESS:  Not that I'm familiar with, no.
8  BY MS. RADCLIFFE:
9      Q.  Do you know if Oracle ever asked E&Y to
10  conclude or report whether transactions underlying the
11  debit memos did not increase Oracle's income in Q2 of
12  2001?
13      A.  Not that I'm aware of.
14      Q.  Any other period?
15      A.  Not that I'm aware of.
16      Q.  If -- do you know, if Ernst & Young had been
17  asked to report on whether transactions underlying the
18  debit memos increased Oracle's income, whether E&Y
19  would have been willing to do this?
20          MR. KONOVALOV:  Objection; assumes facts not in
21  evidence.
22          THE WITNESS:  I don't know and I don't recall.
23  BY MS. RADCLIFFE:
24      Q.  Do you know if Ernst & Young performed any
25  procedures to determine whether Oracle properly

227

1  recognized revenue in Q2 '01?
2      A.  Analytical procedures on the changes in
3  unearned revenue would have been the only procedures we
4  would have done that would have had any relation to
5  revenue.
6      Q.  And where would those be documented?
7      A.  000148 and 000149, and in our memo, 000145 and
8  -46 -- -146.
9      Q.  And do you know if Ernst & Young performed any
10  procedures to determine whether Oracle properly
11  recognized revenue in fiscal 2001?
12      A.  Outside of what I just mentioned, no, we
13  wouldn't have.  We weren't the auditors.
14      Q.  Do you know if Ernst & Young in connection
15  with the debit memo engagement reviewed any of Oracle's
16  fiscal 2001 sales transactions?
17      A.  We did not, no.
18      Q.  Do you know if those were reviewed in
19  connection with the 2002 audit?
20      A.  Fiscal 2001 transactions?
21      Q.  Yes, sales transactions.
22      A.  Not that I'm aware of, no.
23      Q.  Do you know if Ernst & Young ever reviewed any
24  agreements entered into with Hewlett-Packard on or
25  about November of 2000?

228

1      A.  I don't recall reviewing that, no.
2      Q.  Do you know if Ernst & Young ever reviewed any
3  agreements with Hewlett-Packard since it's been brought
4  on as Oracle's independent auditors in 2002?
5      A.  Ever?
6      Q.  Yeah.
7      A.  Yes.  We've reviewed a contract with HP in Q4
8  of '06.
9      Q.  Do you recall the dollar amount of that
10  transaction?
11      A.  Approximately $70 million.
12      Q.  And do you recall why it was reviewed?
13      A.  It was a material contract under our audit
14  period.
15      Q.  Do you recall whether there were any
16  conclusions reached by Ernst & Young with respect to
17  whether the contract was proper?
18          MR. KONOVALOV:  Objection.  You're way beyond
19  the scope of the discovery plan at this point.  You can
20  ask -- I'm not going to block him from answering the
21  question, but you're way far afield at this point.  I've
22  given you a little latitude and you've exploited it, but
23  you're fishing now.
24          THE WITNESS:  We did not find any errors in the
25  company's accounting for its revenue contracts as part of

Bender, Alexander  9/21/2006  9:04:00 AM

229

1  our fiscal 2008 audit.
2  BY MS. RADCLIFFE:
3    Q.  Do you know if Ernst & Young ever reviewed
4  Oracle's 2001 quarterly financial statements?
5    A.  I don't recall reviewing the quarters in
6  fiscal 2001.
7    Q.  And does that include the second quarter of
8  2001?
9    A.  These are Andersen's work papers?
10   Q.  No.  Actually, if you've ever reviewed
11  Oracle's quarterly financial statements.
12   A.  No, we did not.  I'm sorry.  I thought you
13  meant Andersen's work papers.  No, we did not.
14   Q.  Thank you for clarifying.  And promise it's
15  very short.
16      Is Ernst & Young able to provide any assurance
17  with respect to whether Oracle's quarterly financial
18  statements in fiscal 2001 were materially misstated?
19   A.  No, we would not be able to do that.
20   Q.  Do you know if Ernst & Young ever attempted to
21  determine whether the receipts underlying the debit
22  memos belonged to Oracle?
23      MR. KONOVALOV:  Objection; calls for a legal
24  conclusion, assumes facts not in evidence.
25      THE WITNESS:  No, I don't believe we did.  I

230

1  don't recall.
2  BY MS. RADCLIFFE:
3    Q.  If you did, would it be documented in the
4  engagement work papers related to the debit memos?
5      MR. KONOVALOV:  Objection; incomplete
6  hypothetical.
7      THE WITNESS:  Not necessarily.
8  BY MS. RADCLIFFE:
9    Q.  Where else would it be documented?
10   A.  I don't know that it is.  I don't know where
11  else it would be documented.  I don't know that we did
12  anything like that.
13   Q.  Do you know who would know?
14   A.  John Banker.  Andrew Cotton might know if we
15  did.
16      MS. RADCLIFFE:  I don't have any further
17  questions on direct right now.  I may have one or two
18  after Mr. Konovalov is finished, but this part usually
19  goes really quick.
20      MR. KONOVALOV:  I will keep you very brief here
21  just to be clear.
22
23          EXAMINATION
24
25  BY MR. KONOVALOV:

231

1    Q.  Two issues I wanted to just clarify with you.
2  A couple of times during the questioning today, counsel
3  has referred to the November 17th debit memos as "debit
4  memo transactions," and I won't purport to represent to
5  you that it's not contained anywhere in your summary
6  memo, which is 143 through 146, but I didn't see
7  anywhere that you'd referred to them as "debit memo
8  transactions."
9      My question for you is:  Did you understand that
10  the November -- the creation of the November 17th debit
11  memo was a transaction, or was it something else?
12      MS. RADCLIFFE:  Objection; leading.
13      THE WITNESS:  My understanding was that it
14  was --
15      MR. KONOVALOV:  I can lead.  It's not my
16  witness.
17   Q.  Go ahead and answer the question.
18   A.  My understanding was that the debit memo
19  cleanup or the "on account" balance cleanup was a -- I
20  wouldn't go so far as call it a "transaction" per se.
21  I typically define a transaction as some actual
22  accounting event between Oracle and a separate third
23  party.  This was an internal accounting cleanup
24  exercise.
25   Q.  So to be clear, because it didn't -- it was an

232

1  internal bookkeeping -- internal -- how did it go,
2  record-keeping?
3    A.  Right.
4    Q.  Is that the words you used?  Record-keeping
5  exercise as opposed to some transaction with a third
6  party --
7    A.  Right.
8    Q.  -- it wouldn't be a, quote, unquote,
9  transaction as you would colloquially use the word,
10  correct?
11   A.  That's correct.
12   Q.  The other thing that I wanted to just -- to
13  see if we could get clarification is a couple of times
14  today I think you testified that you understood that
15  E&Y with respect to this debit memo engagement was
16  retained by the special litigation committee, and then
17  I think at one point you also said that you weren't
18  sure if that was true.
19      And I wanted to direct you to two different
20  exhibits and see if we can get clarification.  And if
21  we can, that's great; and if we can't, that's fine,
22  too.
23      If you take a look at Exhibit 2, the
24  Bates-numbered document EY 143.  It's the memo that
25  you've testified about at length today.  If you look at

233

1    the -- towards the bottom half of the page, it says
2    "Discussion."
3        A.  Yes.
4        Q.  And then there is a paragraph that begins, "In
5    October 2002"?
6        A.  Yes.
7        Q.  If you look at the end of the second line
8    there, it says, "At the request of the company, E&Y
9    performed the following procedures that were agreed to
10   with the company."
11       Does that provide you any clarification or
12   confirmation in your mind as to whether or not E&Y was
13   retained by the company as opposed to by the special
14   litigation committee?
15       A.  I'm not sure who engaged us specifically.
16       Q.  And just to see if anything further reinforces
17   your recollection or otherwise, if you look at
18   Exhibit 8, which was the interview memo of John Banker,
19   and if you take a look at what is at the top right
20   "page 3," which the bottom right, the Bates number is
21   296431.
22       In that first full paragraph, it says, "Banker
23   informed the committee that pursuant to principles agreed
24   to with Oracle, E&Y performed its own testing," blah,
25   blah, blah, blah.

234

1        Again, does that -- as you read that, does that
2    clarify in your mind at all whether or not you were
3    retained by the SLC versus the company versus some other
4    entity in performing this debit memo analysis?
5        A.  In performing this -- I was not present or
6    part of the conversation.  But if I read this, I would
7    interpret that to mean Oracle and not the special
8    litigation committee.
9        MR. KONOVALOV:  Okay.  That's all I have.
10
11               FURTHER EXAMINATION
12
13   BY MS. RADCLIFFE:
14       Q.  This will be real quick.  With respect to the
15   last answer you just provided, I believe that you
16   testified that prior to today you had never seen
17   Exhibit 8.  Is that correct?
18       A.  That's correct.
19       Q.  And you didn't have any knowledge with respect
20   to Exhibit 8 prior to today; is that correct?
21       A.  That's correct.
22       Q.  And then just quickly to follow up on one
23   other point, did Ernst & Young understand that there
24   was general ledger activity prior to November 17, 2000,
25   that related to the debit memos when it performed its

235

1    engagement?
2        MR. KONOVALOV:  Objection; vague and ambiguous.
3        THE WITNESS:  Did we know there were debit
4    memo -- that Oracle would issue debit memos prior to
5    November 17th or that there were transactions -- that
6    these transactions were recorded prior to November 17th?
7    BY MS. RADCLIFFE:
8        Q.  That there was general ledger activity related
9    to these transactions prior to November 17, 2000.
10       MR. KONOVALOV:  Same objection.
11       THE WITNESS:  I'm not sure specifically we
12   talked about it, but you generally wouldn't have an
13   account unapplied or on account if it wasn't part of the
14   general ledger before when you tried to clean it up.
15   BY MS. RADCLIFFE:
16       Q.  So there would be a history of that debit
17   memo?
18       A.  It wouldn't be a debit memo per se.  It would
19   be a transaction that was accounted for.  And there was
20   an entry that was in 25005 that they applied a debit
21   memo against.  It won't have been a debit memo
22   transaction.  It would have been a transaction.
23       Q.  And did Ernst & Young's procedures with
24   respect to this engagement intend to include a review
25   of that prior activity related to the debit memo?

236

1        A.  No.  As I mentioned earlier, our procedures as
2    documented in our memo were to look at the journal
3    entries that were used to clean up the "on account"
4    balance.  They were -- it was journal entries related
5    to the 46,000 debit memos.
6        Q.  So would it be accurate to say that if that
7    prior activity, related to the debit memos, improperly
8    increased income, E&Y would not have uncovered that in
9    its procedures performed with respect to this
10   engagement?
11       MR. KONOVALOV:  Objection; incomplete
12   hypothetical and assumes facts not in evidence.
13       THE WITNESS:  Not necessarily, no.
14   BY MS. RADCLIFFE:
15       Q.  And I just want to clarify.  I believe you
16   previously stated Ernst & Young did not look at
17   activity in September or October 2000 related to these
18   debit memo transactions; is that correct?
19       MR. KONOVALOV:  Objection; vague and ambiguous.
20       THE WITNESS:  These -- I'm sorry.  These debit
21   memos were in November.  So did we look at Account 25005
22   in September and October?  The answer is no.
23       MS. RADCLIFFE:  I don't have any further
24   questions of this witness.
25       I just want to state for the record that we

237

1   believe that Ernst & Young has not satisfied its
2   obligations under the subpoena, but we'll take that up
3   with your counsel.
4           MR. KONOVALOV:  And then why don't we just go
5   ahead and stipulate on the record we're designating the
6   transcript as confidential?
7           MS. RADCLIFFE:  I can agree to temporarily
8   designate it as confidential until counsel for the
9   defendants and counsel for Ernst & Young have had an
10  opportunity to review it.  And I think that we can agree
11  that you can have that same 30-day window, and then you
12  can inform us whether it's your intent to designate the
13  transcript confidential on a permanent basis.
14          MR. KONOVALOV:  That's fine.  I just -- and
15  we're happy to do that.  I don't want to belabor the
16  witness's time.  I mean, given that the examination has
17  been almost exclusively about work papers, I can't
18  imagine we wouldn't not designate the majority of this
19  transcript as confidential, but we'll be happy to review
20  it.
21          MS. RADCLIFFE:  I note your statement for the
22  record.
23          We can go off the record.
24          THE VIDEO OPERATOR:  This is the end of
25  Videotape No. 4, Volume I, in the deposition of Alex

238

1   Bender.  The original videotapes will be retained by
2   LiveNote World Service.  Going off the record, the time
3   on the monitor is 5:09.
4           (Deposition concluded at 5:09 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

239

1   STATE OF CALIFORNIA    )
2                          ) ss.
3   COUNTY OF SAN FRANCISCO )
4
5
6
7           I, the undersigned, declare under penalty of
8   perjury that I have read the foregoing transcript,
9   and I have made any corrections, additions, or
10  deletions that I was desirous of making; that the
11  foregoing is a true and correct transcript of my
12  testimony contained therein.
13          EXECUTED this _____ day of _____,
14  2006, at _____, _____.
15          (City)        (State)
16
17
18
19
20
21          _____
22
23
24
25          ALEXANDER BENDER, III, CPA

240

1               REPORTER'S CERTIFICATE
2
3           I, RICHARD M. RAKER, CSR #3445, Certified
4   Shorthand Reporter, certify:
5           That the foregoing proceedings were taken before
6   me at the time and place therein set forth, at which
7   time the witness was put under oath by me;
8           That the testimony of the witness and all
9   objections made at the time of the examination were
10  recorded stenographically by me and were thereafter
11  transcribed;
12          That the foregoing is a true and correct
13  transcript of my shorthand notes so taken.
14          I further certify that I am not a relative or
15  employee of any attorney or of any of the parties,
16  nor financially interested in the action.
17          I declare under penalty of perjury under the laws
18  of the State of California that the foregoing is true
19  and correct.
20          Dated this 26th day of September, 2006.
21
22
23          _____
24
25          RICHARD M. RAKER, C.S.R. No. 3445

## REPORTER'S CERTIFICATE

I, RICHARD M. RAKER, CSR #3445, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this _____ day of _____, 2006.


_____
RICHARD M. RAKER, C.S.R. No. 3445

1

# EXHIBIT CC

Donnelly, Peter  11/30/2005  3:44:00 PM

1

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE:
 5   ORACLE CORPORATION SECURITIES  )
     LITIGATION              )
 6                           )
                             )
                             ) No.  C-01-0988-MJJ
 7                           )
 8   THIS DOCUMENT RELATES TO:     )
                             )
 9        ALL ACTIONS       )
     _____)
10
11
12
13
14
15        VIDEOTAPED DEPOSITION
16        OF PETER DONNELLY
17        San Francisco, California
18        Wednesday, November 30, 2005
19
20
21
     Reported by:
22   TRACY L. PERRY
     CSR No. 9577
23   JOB No. 66437
24
25
```

2

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE:
 5   ORACLE CORPORATION SECURITIES  )
     LITIGATION              )
 6                           )
                             )
                             ) No.  C-01-0988-MJJ
 7                           )
 8   THIS DOCUMENT RELATES TO:     )
                             )
 9        ALL ACTIONS       )
     _____)
10
11
12
13
14
15        Videotaped deposition of PETER DONNELLY, taken
16   on behalf of Defendants, at 3000 El Camino Real,
17   2 Palo Alto Square, Palo Alto, California, beginning
18   at 9:34 a.m. and ending at 3:32 p.m., on Wednesday,
19   November 30, 2005, before TRACY L. PERRY, Certified
20   Shorthand Reporter No. 9577.
21
22
23
24
25
```

3

```
 1   APPEARANCES:
 2
     For Plaintiffs:
 3
         LERACH, COUGHLIN, STOIA, GELLER, RUDMAN, ROBBINS
 4       BY:  MONIQUE C. WINKLER
         Attorney at Law
 5       100 Pine Street, Suite 2600
         San Francisco, California  94111
 6       415-288-4545
 7   For Defendants:
 8       MAYER, BROWN, ROWE & MAW LLP
         BY:  LEE H. RUBIN
 9           SHIRISH GUPTA
         Attorneys at Law
10       2 Palo Alto Square, Suite 300
         Palo Alto, California  94306-2112
11       650-331-2000
12   For the witness:
13       BUSHNELL, CAPLAN & FIELDING, LLP
         BY:  ALAN M. CAPLAN
14       Attorney at Law
         221 Pine Street, Suite 800
15       San Francisco, California  94104-2715
         415-217-3800
16
     There also being present:
17
         Marty Majdoub, Videographer
18
19
20
21
22
23
24
25
```

4

```
 1            INDEX
 2   WITNESS:              EXAMINATION
 3   PETER DONNELLY
 4     BY MR. RUBIN              6, 186
 5     BY MS. WINKLER            129, 198
 6
 7
 8            EXHIBITS
 9   DEPOSITION               PAGE
10   1  Deposition subpoena for Peter N. Donnelly;    58
        10 pages
11
        2  E-mail dated 2/10/01 from Jeff Henley to    84
12        Jennifer Minton; 3 pages
13      3  E-mail string, the top e-mail dated 12/5/00    72
           from Graeme Mair to Lia Burke; 2 pages
14
        4  E-mail string, the top e-mail dated 11/15/00    77
15         from Ivgen Guner to Peter Donnelly; 4 pages
16      5  E-mail dated 9/13/00 from Peter Donnelly to    131
           Thomas Williams with attached support
17         presentation; 40 pages
18      6  E-mail dated 8/18/00 from Peter Donnelly to    142
           J. Minton with attached update on 2261
19         reconciliation; 15 pages
20      7  E-mail dated 8/21/00 from Jennifer Minton to    171
           J. Henley with attached update on 2261
21         reconciliation; 17 pages
22      8  Document titled "Education LOB, Quarterly    173
           Financial Briefing," dated 9/13/00; 19 pages
23
        9  E-mail dated 12/7/00 from John L. Hall to    176
24         Sohaib Abbasi with attached Q2 status document;
           6 pages
25
```

Donnelly, Peter  11/30/2005  3:44:00 PM

5

1      Palo Alto, California
2          Wednesday, November 30, 2005
3          9:34 a.m. - 3:32 p.m.
4
5          PROCEEDINGS
6      THE VIDEOGRAPHER:  Good morning.  Here begins
7  Videotape Number 1, Volume 1 in the deposition of
8  Peter Donnelly in the matter of Oracle Corporation
9  Securities Litigation in the United States District Court,
10  Northern District of California, Case Number
11  C-01-0988-MJJ.  Today's date is November 30th, 2005.  The
12  time is 9:34 a.m.
13      This deposition is being taken at 3000 El Camino
14  Real, 2 Palo Alto Square, Palo Alto, California.  The
15  videographer is Marty Majdoub, here on behalf of Esquire
16  Deposition Services, 505 Sansome, Suite 502,
17  San Francisco, California.
18      Would all counsel present please identify
19  yourselves and state whom you represent?
20      MR. RUBIN:  Lee Rubin on behalf of the defendants,
21  and from the law firm of Mayor, Brown, Rowe & Maw, and
22  with me today is Shirish Gupta, also from Mayor, Brown,
23  representing Defendants.
24      MS. WINKLER:  Monique Winkler of Lerach, Coughlin,
25  Stoia, Geller, Rudman & Robbins, on behalf of Plaintiffs.

6

1      MR. GREENSTEIN:  Eli Greenstein from Lerach,
2  Coughlin, also on behalf of Plaintiffs.
3      MR. CAPLAN:  Alan Caplan, Bushnell, Caplan &
4  Fielding, representing the witness.
5      THE VIDEOGRAPHER:  Would the -- sorry.  Would the
6  court reporter please swear in the witness?
7
8          PETER DONNELLY,
9  having been first duly sworn, was examined and testified
10  as follows:
11
12          EXAMINATION
13  BY MR. RUBIN:
14      Q  Good morning.
15      A  'Morning.
16      Q  Could you please state your name for the record?
17      A  Peter Donnelly.
18      Q  Where do you live, Mr. Donnelly?
19      A  107 Vista Del Monte, Los Gatos, California.
20      Q  How long have you lived at that address?
21      A  Approximately two years.
22      Q  Where did you live before that address?
23      A  1584 Oyana Drive, San Jose, California.
24      Q  And how long did you live there?
25      A  About 13 years.

7

1      Q  Okay.  Are you currently employed?
2      A  Yes, I am.
3      Q  Where do you work?
4      A  Symantec Corporation.
5      Q  What do you do for Symantec?
6      A  I'm the vice president of worldwide pricing and
7  licensing.
8      Q  Prior to your being employed at Symantec, had
9  you been employed as Veritas?
10      A  Yes.  Veritas has recently merged with Symantec,
11  and I was employed at Veritas.
12      Q  Prior to the merger?
13      A  Correct.
14      Q  And what was your position at Veritas?
15      A  My last position was the same title.
16      Q  Okay.  And who was your direct -- who did you
17  directly report to at Veritas before the merger?
18      A  Immediately before the merger?  Will -- Bill
19  Robins, William Robins, Bill Robins.
20      Q  Are you on -- still at the Ellis Street --
21      A  Correct.
22      Q  -- building?
23      A  Correct.
24      Q  And who is your direct supervisor now?
25      A  Gary Bloom.

8

1      Q  And what is Gary's position now at Symantec?
2      A  He's the vice chairman and president of Symantec
3  Corporation.
4      Q  And you had worked with Gary at Oracle; is that
5  right?
6      A  That's correct.
7      Q  Okay.  Let me go through a few housekeeping
8  issues, and then we can talk about some of your work at
9  Oracle.
10      Have you ever been deposed before?
11      A  One time.
12      Q  Okay.  And what -- when was that?
13      A  It was in a case involving Oracle and Randy
14  Baker.
15      Q  Randy Baker?
16      A  Baker, yes.
17      Q  Okay.  What was the nature of the case?
18      A  Unfair dismissal.
19      Q  Unfair dismissal?
20      A  I believe.
21      Q  Was Mr. Baker a direct report to you?
22      A  No.
23      Q  Okay.  What was your involvement in the case?
24      A  I was -- I held a finance position at Oracle.  I
25  guess I was assumed to have knowledge of circumstances

9

```
 1    surrounding his dismissal.
 2        Q   Was he in the finance organization?
 3        A   No.  I served an organization -- I served the
 4    organization that he ran.
 5        Q   Which was that?
 6        A   The support organization.
 7        Q   Okay.
 8        A   That was one of my responsibilities.
 9        Q   And when was he dismissed from the company, do
10    you recall?
11        A   I don't recall.
12        Q   When was the deposition?
13        A   I don't recall.
14        Q   Was it --
15        A   Five years ago.
16        Q   Well, you left Oracle in December of 2000,
17    right?
18        A   Again, I don't recall specifically.
19        Q   I'm just wondering, like from December 2000, do
20    you remember, was it a year before you left Oracle, two
21    years?  Do you have any sense?
22        A   I don't recall.
23        Q   All right.  So -- so you have at least
24    some familiarity with the deposition process?
25        A   Yes.
```

10

```
 1        Q   So just to summarize, as you can already see,
 2    I'll be asking you questions related to your background,
 3    your work at Oracle, some other information related to
 4    the issues in this case.  If you have any questions or
 5    you have -- there's any confusion or any need for
 6    clarification on your part based on my questions, please
 7    let me know and I'll do the best I can to clarify.
 8        A   Thank you.
 9        Q   Okay?  And if you don't ask to clarify or don't
10    indicate to me you don't understand my question, I'll
11    assume you do when you -- when you answer.
12        A   Okay.
13        Q   Okay?  Also, we have a -- as you can see, we
14    have a videographer and a court reporter.  So because of
15    the court reporter, it's important for you to audibly
16    answer, as well as -- as well as indicate by any other
17    means that -- what your answer is.
18            So sometimes people fall into the habit,
19    including me, of nodding or just going "uh-huh."  So to
20    the extent that you can remember, if you can answer yes
21    or no, make sure that it's audibly understood.
22        A   I will.
23        Q   Okay.  Thanks.
24            Tell me, if you would, what did you do to
25    prepare for this deposition this morning, if anything?
```

11

```
 1        A   I read the complaint about three weeks ago prior
 2    to a meeting with my attorney, and that was it.
 3        Q   And your attorney is?
 4        A   Alan Caplan.
 5        Q   Okay.  Prior to your reading of the complaint
 6    three weeks ago, had you read the complaint prior to
 7    that?
 8        A   No.
 9        Q   Okay.  Had you ever received a copy of the
10    complaint before reading it three weeks ago?
11        A   No.  Can I correct that?  I had not read the
12    copy prior to three weeks ago.  I received a copy from
13    Alan a few weeks before that, but I hadn't read it.
14    Sorry.  Just to clarify.
15        Q   Okay.  Thank you.
16            Before receiving a copy from Mr. Caplan, had you
17    received a copy of any version of the complaint anytime
18    before that?
19        A   No.
20        Q   What is your understanding of who the parties
21    are in this case, who is the plaintiff and who is the
22    defendant?
23        A   The defendant is Larry Ellison, Jeff Henley, and
24    Sandy Sanderson, I believe are the three people that are
25    named, and the shareholders are the -- the plaintiff.
```

12

```
 1        Q   Okay.
 2        A   If I got my terms right.  Defendant and
 3    plaintiff.
 4        Q   And it's --
 5        A   I'm not a lawyer.
 6        Q   It's not a test.  It's not a test.  I just
 7    wanted to get a sense of what your understanding was.
 8        A   I'm not a lawyer.
 9        Q   At any time before today -- well, strike that.
10            At any time before Mr. Caplan gave you a copy of
11    the complaint, do you recall ever being contacted by
12    anybody that you understood to represent -- you know,
13    lawyers who are representing shareholders?
14        A   Yes.
15        Q   And -- tell me about that contact.
16        A   Sometime in 2001, I believe -- I can't recall
17    the specific timing, but it was after I left Oracle, I
18    was either made aware of or come across some information
19    in regards to this pending lawsuit, and there was a
20    number to call.  And I made an inquiry through that
21    number as to whether or not I could be considered a
22    shareholder in the context of this pending lawsuit.
23        Q   Mm-hmm.
24        A   And I asked my questions and got a response back
25    of no.  So --
```

13

1    Q   Tell me what questions you recall asking.
2    A   My questions were based around the fact whether
3    I could be considered a shareholder, given I held stock
4    options as opposed to stock.
5    Q   Mm-hmm.
6    A   And it was explained to me that that didn't
7    count, unfortunately.
8    Q   Okay.  So you were interested in becoming a
9    member of the class?
10   A   Yes.
11   Q   And at the time you left Oracle, you still held
12   a lot of stock options in Oracle stock, correct?
13   A   That's correct.
14   Q   Unexercised stock options?
15   A   That's correct.
16   Q   And do you still hold those?
17   A   No.
18   Q   Did they expire at some point?
19   A   Ninety days after my last day at Oracle.
20   Q   Okay.  And at the time that you left Oracle, did
21   you actually own any stock at all in Oracle?
22   A   I don't believe so.  If I did, it would be a
23   very small amount of ESPP, which is employee stock
24   purchase program, but I don't recall.
25   Q   Okay.  Do you own any Oracle stock today?

14

1    A   No.
2    Q   Okay.  So you -- you called a number that was
3    listed in some publication; is that right?
4    A   It was either a publication or a correspondence
5    that I received, I don't recall, but there was a number
6    presented to me.  It might have been on a website.  It
7    was a number presented to me and I proactively called it.
8    Q   And do you remember who you spoke to?
9    A   I don't recall the gentleman's name, but it was
10   a man.
11   Q   Okay.  And was it somebody at a law firm?
12   A   My un-- my recollection was it was an
13   investigator representing a law firm.
14   Q   You indicated you do not remember his name?
15   A   I don't recall.
16   Q   Male?
17   A   I seem to recall speaking to a gentleman, yes.
18   Q   Okay.  All right.  And you indicated that you
19   asked him whether the holding stock options would qualify
20   you as being a member of the class?
21   A   Correct.
22   Q   And he indicated that it would not?
23   A   Correct; at the end of the conversation he did.
24   Q   Okay.  Other than communications or conversation
25   about whether you would qualify as a class member, was

15

1    anything else discussed during that conversation?
2    A   Yes.
3    Q   Okay.  What else?
4    A   There were a number of questions asked as to
5    what role I played at Oracle, whether I had opinions on
6    certain items, and I expressed those opinions.  I don't
7    recall specifically every question that was asked and
8    answered.
9    Q   Mm-hmm.
10   A   But the general -- general recollection around
11   what did I do and what was my thought on a few things.
12   Q   When questions were asked of you about your
13   opinions about Oracle, did you at any time during the
14   conversation indicate to him when you had left the
15   company?
16   A   Yes.
17   Q   Okay.  And --
18   A   Yes, I believe I did.
19   Q   Yes.
20   A   I think it came up in conversation.
21   Q   And again, for the record, you left
22   approximately December 18th, 19th of 2000?
23   A   That's correct.
24   Q   And -- and you recall communicating that to the
25   investigator?

16

1    A   I recall letting him know that I wasn't at the
2    company.  I don't recall a specific date or time or
3    circumstance around my departure.  So just that I left
4    Oracle, I was holding stock options at the time, and I'd
5    lost some money.
6    Q   Did you understand at the time that you were
7    talking to the investigator that the -- that the -- that
8    the lawsuit related to Oracle's performance in the third
9    quarter of 2001?
10   A   I don't recall the specifics of the lawsuit.  I
11   just remember the number and calling to see if there was
12   an opportunity to recover some of my losses.
13   Q   You indicated that you had said that he had
14   asked you about your opinion about certain things?
15   A   Mm-hmm.
16   Q   Did you indicate to him that the -- that what
17   you were telling him was your -- was your opinion was
18   based -- was based upon what you personally believed or
19   thought?
20   MS. WINKLER:  Objection to form.
21   THE WITNESS:  I believe --
22   BY MR. RUBIN:
23   Q   Oh, I'm sorry.  That was one housekeeping matter
24   that I did not cover.
25   MS. WINKLER:  You guys seem to like to forget that

17

1    one.
2    BY MR. RUBIN:
3        Q   From time to time -- not on purpose -- from time
4    to time lawyers, perhaps your own and sometimes the
5    lawyers for the plaintiffs, will object, and they have --
6    they're fully within their rights to do so.
7        A   Mm-hmm.
8        Q   And if they ask you questions, I may do the same
9    thing.  And as a general matter, after giving them the
10   appropriate time to object, then you have an obligation
11   to go ahead and answer the question --
12       A   Okay.
13       Q   -- to the extent that you understand the
14   question.
15           Now, there could be certain -- there are
16   circumstances where you're directed not to answer the
17   question.  That would be by your own lawyer.  And in
18   those circumstances, obviously, you know, you're entitled
19   to follow your lawyer's direction.  But aside from those
20   narrow circumstances, you can go ahead and answer.
21       A   Just keep going.  Okay.
22       Q   Without attempting to avoid talking over people.
23           So, with that, so Ms. Winkler objected, and
24   now you can answer the question.
25       A   If you could repeat the question.

18

1        Q   Did you -- I think my question was, did you
2    indicate to the investigator that what you conveyed about
3    Oracle was your own personal opinion?
4        A   I believe I did.
5        Q   Okay.  Did you indicate to him that to the
6    extent there were -- that he was asking you questions
7    about how Oracle was performing or any information about
8    Oracle's financial performance after December 19th, 2000,
9    that you didn't have any personal information?
10       MS. WINKLER:  Objection; form.
11       THE WITNESS:  I had no access to information
12   subsequent to December 18th.
13   BY MR. RUBIN:
14       Q   And did you make that clear to the investigator?
15       A   I -- I don't know if I specifically made it
16   clear, but I know I didn't.  So I know I didn't have
17   access to information.  I would not have represented that
18   I did.
19       Q   That's really my question.  You wouldn't have
20   told an investigator that you had access to information
21   that you didn't have?
22       A   Not at all.
23       Q   Right.  And you wouldn't have indicated that you
24   were privy to some internal information about Oracle
25   after you had left the company?

19

1        A   Not at all.
2        Q   And -- and just to confirm that point, after you
3    left Oracle in December -- mid-December of 2000, you did
4    not acquire any information from any Oracle employee
5    after you had left concerning Oracle's financial
6    performance during the rest of that quarter?
7        MS. WINKLER:  Objection; form.
8        THE WITNESS:  That's correct.  That's correct.
9    BY MR. RUBIN:
10       Q   How long did this conversation last with the
11   investigator?
12       A   I'm estimating 10 to 15 minutes.
13       Q   To the extent that there were questions asked of
14   you about what was happening at Oracle during the third
15   quarter, so -- so from December -- to the extent that
16   there were questions asked about Oracle's performance
17   from December 18th or 19th and onward, would it be fair
18   to say that any information that you were conveying about
19   Oracle's financial performance or what people knew and
20   when would be fairly described as speculation on your
21   part?
22       MS. WINKLER:  Objection; form.
23       THE WITNESS:  Again, I would call it opinion as
24   opposed to speculation.
25   BY MR. RUBIN:

20

1        Q   Okay.  Something that was based upon your own
2    opinion, not based upon any data that you had about the
3    third quarter, correct?
4        A   I would say based upon my eight and a half years
5    at Oracle.
6        Q   But it wasn't based on anything that you were
7    looking at about third quarter performance, correct?
8        A   That's correct.
9        MR. CAPLAN:  Objection as to time.  If you're
10   talking about information he got after he left --
11       MR. RUBIN:  It -- right.
12       Q   And specifically I'm talking about, you did not
13   have -- you were not privy to any information after
14   December 19th of 2000, correct?
15       A   That's correct.
16       Q   You didn't have any forecasting data?
17       A   That's correct.
18       Q   You didn't have any actual sales data?
19       A   Correct.
20       Q   You didn't have any information at all about
21   Oracle's financial condition or performance?
22       A   Correct.
23       MS. WINKLER:  Objection; form.
24   BY MR. RUBIN:
25       Q   Now, let me -- let me turn to your history at

21

1  Oracle. You began working at Oracle in 1992?
2      A  As a full-time employee in '92 and as a -- as an
3  outside auditor in 1991. I subsequently joined the
4  company afterwards.
5      Q  When you were serving as an outside auditor, who
6  were you working for?
7      A  KPMG.
8      Q  What was your position at KPMG during that time?
9      A  I was a -- a manager, senior manager. It's a
10  long time ago, I'm afraid. Senior manager.
11     Q  How long had you been at KPMG before leaving for
12  Oracle?
13     A  Five and a half years.
14     Q  Was Oracle -- you had worked for Oracle you said
15  for a year as senior manager before joining the company?
16     A  I worked at Oracle for approximately seven
17  months as part of a long-term engagement at Oracle.
18     Q  But you were an employee with KPMG at the time?
19     A  That's correct.
20     Q  But you were working on site at Oracle?
21     A  That's correct, for seven months.
22     Q  Had you been on the audit team prior to that?
23     A  I was actually part of the restatement team that
24  was working on restating Oracle's books.
25     Q  In 1991-'92?

22

1      A  Correct.
2      Q  And then how -- how did it come to pass that you
3  ended up moving over to Oracle?
4      A  I was asked by the then director of the
5  organization that I was working for inside Oracle, "Now
6  you've cleaned it up, why don't you come and work for me
7  to manage it?" basically.
8      Q  And who was that?
9      A  Kevin Wion, W-I-O-N.
10     Q  And what was your initial position at Oracle
11  when you were hired in '92?
12     A  I believe it was either manager or senior
13  manager.
14     Q  In what -- in what organization?
15     A  It was in the finance and operations
16  organization supporting channels business, our indirect
17  business.
18     Q  And how long did you stay in that position?
19     A  I recall it's about two and a half years.
20     Q  Okay. And what did you do next at Oracle?
21     A  I became the director of corporate financial
22  planning and analysis.
23     Q  Also known as FP&A?
24     A  Correct.
25     Q  Okay. And who did you directly report to in

23

1  that position?
2      A  Jennifer Minton, M-I-N-T-O-N.
3      Q  So that would have been approximately '94-'95,
4  that time frame?
5      A  Approximately, yeah.
6      Q  And what -- describe your role in that position.
7      A  I was responsible for forecasting, budgeting,
8  financial performance, reporting and analysis, and all
9  internal reporting inside the company.
10     Q  Were there others at your level who also
11  directly reported to Jennifer?
12     A  Yes.
13     Q  Who were those people, to the extent you can
14  recall?
15     A  I don't recall names, but the functions were
16  things like the general ledger accounting organization --
17     Q  Mm-hmm.
18     A  -- accounts payable organization, accounts
19  receivable organization. A lot of the accounting
20  controllership functions reported to Jennifer.
21     Q  Okay. And did -- was it your -- was part of
22  your responsibility at the time to aggregate data from
23  different parts of the company and assist in -- Jennifer
24  Minton in the forecasting process?
25     A  Yes.

24

1      Q  And you held that position for how long?
2      A  Approximately two years.
3      Q  Now, at the time, ninety -- so that would have
4  been '95-'96 to '97-'98; is that about right?
5      A  Approximately.
6      Q  Did Oracle announce guidance to the market
7  during that time period?
8      A  I don't recall.
9      Q  Do you recall the accuracy of the forecasts that
10  you worked on during that time period in terms of the
11  forecast at the beginning of the quarter and how it
12  compared to the results at the end of the quarter?
13     MS. WINKLER: Objection; form.
14     THE WITNESS: I have some -- I have some
15  recollection of that type of work.
16  BY MR. RUBIN:
17     Q  Okay. And what do you remember?
18     A  There were relatively -- I'll take that back.
19        There was a process to map performance of
20  forecast against actual results that took place on a
21  quarterly basis, and that information was aggregated over
22  time to create a projected view of the quarter.
23        So as you built up, you look at forecasts to
24  actual accuracy and how much is in -- within a given
25  quarter. You get a sense of using that information for

25

1   looking forward to future quarters.  You take history of
2   Q1 and how did that look for the last five years:  How
3   are we tracking in the quarter from an actual standpoint,
4   how are we tracking against forecast, and how much of
5   that forecast do we typically get in in the unknown
6   period.
7       Q   In that -- and you would help make these
8   assessments; is that right?
9       A   People -- people on my team did.  I -- I didn't
10  do a lot of the detailed work in my group.  I was
11  responsible for my organization running effectively.
12      Q   So how would -- how would you describe your role
13  compared to what you just described in terms of looking
14  at historical data, trying to see patterns?
15      A   Review.
16      Q   Review.  Okay.
17          Did you -- did you consult and confer with
18  Ms. Minton about the data that was being provided or that
19  was being analyzed?
20      A   Jennifer had an operating style that she
21  communicated directly with people in my group if needed
22  to.  So you'll have to ask her that question.
23      Q   Well, I'm asking from your perspective.  Did you
24  confer or consult with her?
25      A   I don't recall.

26

1       Q   So -- well, let me take a step back.  Did you
2   have regular meetings with Jennifer?
3       A   I had regular meetings with Jennifer, yes.
4       Q   Okay.
5       A   And we talked about a lot of different
6   financial-related matters, project-related matters, and
7   personnel/management-related matters during the course of
8   my time in her group.
9       Q   What would --
10      A   I don't recall any specific meetings or
11  conversations regarding specific data in a forecast
12  analysis.
13      Q   Do you recall observing any patterns with
14  respect to Oracle's license sales during a particular
15  quarter?  That is, was there any -- could you distill or
16  determine, after looking at some period of previous
17  quarters, when there was an up-tic or a downturn in
18  sales, you know, during any particular quarter or any
19  particular months during a quarter?
20      MS. WINKLER:  Objection; form.
21      THE WITNESS:  Yes.
22  BY MR. RUBIN:
23      Q   Okay.  And what do you recall about -- for
24  example, whether there was any discernable or observable
25  tendency during the third month of a quarter?

27

1       A   There's something commonly known as the hockey
2   stick effect in the software industry.
3       Q   And what is that?
4       A   Essentially customers know a software vendor
5   needs to report their earnings for -- on a quarterly
6   basis -- public software company needs to report earnings
7   on a quarterly basis.  They -- vendors -- customers use
8   this as an opportunity to extract a better price for
9   software.  And therefore, deals can be pushed further and
10  further back into the quarter, making -- making the final
11  number difficult to determine exactly.
12          So there was -- but -- but over time -- Oracle's
13  been in this business for 25 years.  You create patterns,
14  and the forecast analysis that I gave you, mentioned to
15  you tracked these patterns.  So there's a different
16  pattern in Q1 then there was in Q4.
17      Q   And that had something to do with seasonality?
18      A   Seasonality.  And again, the larger hockey stick
19  effect, the big quarter for most software companies is
20  their fourth quarter.  There's a bigger hockey stick
21  effect in that quarter.  We know that because we tracked
22  that for the last X number of years, possibly 25.
23      Q   Were there -- did you also see the hockey stick
24  phenomenon in quarters 1 through 3?
25      A   There's a hockey stick effect every quarter.

28

1       Q   Right.  And that was observed over time,
2   correct?
3       A   That's correct.
4       Q   You indicated that this was a phenomenon in the
5   software industry generally?
6       A   Correct.
7       Q   And was Oracle a part of that?
8       A   Given they're the second largest software
9   company in the world, yes.
10      Q   So Oracle in that sense was no different than
11  the industry-wide phenomenon?
12      A   It was an industry phenomenon, of which Oracle
13  participates in the industry, yes.
14      Q   Do you remember any specific data on average
15  during the time that you were working in this area in
16  '90 -- I'm just going to use -- say '95 to '97, but I
17  understand that's not a precise term.  We're estimating.
18      A   Sure.
19      Q   What percentage of Oracle sales occurred in the
20  last couple weeks of a quarter over time?
21      MS. WINKLER:  Objection.
22  BY MR. RUBIN:
23      Q   Do you remember any percentage, like, you know,
24  of the total amount of license sales, how much occurred
25  in the last two weeks of the quarter?

29

1    MS. WINKLER: Objection; form.
2    THE WITNESS: Okay. I don't recall specific
3    numbers. I'm just aware that the last two weeks was a
4    very important period. If I had access to analysis, I
5    could better recall it, but I don't have access to that.
6    BY MR. RUBIN:
7    Q  And when you say "important period," important
8    meaning that Oracle could miss or make its quarter based
9    upon performance in the last two weeks?
10   MS. WINKLER: Objection; form.
11   THE WITNESS: It has a significant impact on the end
12   results of -- of the company, yes.
13   BY MR. RUBIN:
14   Q  So would -- would it be fair to say that it
15   could -- that based upon the performance of the last two
16   weeks, it could make or miss its quarter?
17   MS. WINKLER: Objection; form.
18   THE WITNESS: I think that's a fair statement, yes.
19   BY MR. RUBIN:
20   Q  Within the forecasting group, did this -- did
21   you ever observe any anxiety that came from this hockey
22   stick phenomenon where people -- did people become
23   increasingly nervous as the quarter went on, as these
24   deals drag farther and farther into the quarter, in
25   connection with whether Oracle was going to make its

30

1    internal forecast?
2    MS. WINKLER: Objection; form.
3    THE WITNESS: Well, let me restate your question.
4    Was there anxiety near the end of a quarter? Yes.
5    BY MR. RUBIN:
6    Q  Yeah. And why was that?
7    A  A desire to meet a specific target number for
8    the street.
9    Q  And sometimes it was unclear right up to the
10   last days, right?
11   MS. WINKLER: Objection; form.
12   THE WITNESS: Can you ask me that question again? I
13   don't really understand exactly --
14   BY MR. RUBIN:
15   Q  I said and sometimes during the time -- again,
16   during the time that you were in forecasting, it was
17   unclear whether Oracle would make its quarter until the
18   final days of the quarter?
19   MS. WINKLER: Objection; form.
20   THE WITNESS: So I don't think that people held
21   their breath for two weeks and said, "Let's just wait
22   till the end of the two weeks and then we'll
23   see." There's a constant daily process whereby forecasts
24   were collected from the field, actuals were reported from
25   assistants, and a gap analysis was done. So if that gap

31

1    was large two days before the end of the quarter, then
2    absolutely.
3    BY MR. RUBIN:
4    Q  Right.
5    A  If that gap had narrowed, as it often did, then
6    there wouldn't be as much anxiety.
7    So -- so it's not a cut and dried the last
8    couple of days always counted.
9    BY MR. RUBIN:
10   Q  Sure. But when in those situations where you're
11   up to the last few days, last week of the quarter, there
12   are a lot of deals in that are -- that are what I'll call
13   in the pipeline. We haven't used that term, but you
14   understand what that term means?
15   A  Yes.
16   Q  There are a lot of deals in the pipeline but
17   have not yet closed. That's where the anxiety is most
18   pronounced, correct?
19   MS. WINKLER: Objection; form.
20   THE WITNESS: Correct. And there is detailed
21   knowledge of every single one of these material
22   transactions that has closed, will close, and may not
23   close.
24   BY MR. RUBIN:
25   Q  And, in fact, the forecast, during the time that

32

1    you were working on it, it's being updated by the sales
2    organization, correct?
3    A  Yeah, constantly.
4    Q  So if they get an indication that somebody is
5    given some negative feedback about whether they plan
6    to -- whether they plan to actually purchase the software
7    during that quarter, then there would be a change in the
8    percentage assigned to the likelihood that that deal
9    would close in the quarter, correct?
10   A  Correct.
11   MS. WINKLER: Objection to form.
12   BY MR. RUBIN:
13   Q  And that information -- and that information is
14   then taken into account, as you say, on a daily basis in
15   looking at the numbers?
16   A  Correct.
17   Q  During your time at Oracle, did you -- did
18   the -- did that system appear to be working as intended,
19   that as information would come in from the sales
20   organization that would -- that would change or impact
21   the likelihood that a deal would close, did that appear
22   to be integrated into the numbers?
23   MS. WINKLER: Objection; form.
24   THE WITNESS: I would say it was a reasonably good
25   system at the time that I was in that organization.

33

BY MR. RUBIN:

2  Q  Is your sense -- did you ever encounter any
3  phenomenon or any perceived phenomenon that the people at
4  Oracle referred to as "sandbagging" by a sales
5  organization?

6  A  I'm familiar with the term.  I did not support
7  the sales force directly.  So the level of sandbagging,
8  you know, I wasn't involved in that on a day-to-day
9  basis.  Sandbagging is a natural tendency for -- for
10  sales reps to do.

11  Q  Why is that?

12  A  Well, a forecast is a statement of obligation
13  for the sales rep to deliver a number.  And when you put
14  something in the forecast, it's like in blood.  And if
15  you don't put it on the forecast and you come in and
16  bring it in later, you're a hero.  That's -- that's the
17  concept of sandbagging.  Why put your neck out too far.
18  So -- so sandbagging was something that occurred.

19  Q  And did -- were any steps taken within the --
20  within your organization to account for that in any way?
21  If to the extent that you had a belief that some
22  sandbagging was occurring and people were not reporting
23  the -- giving an accurate assessment of what the real
24  potential pipeline was, what the real potential revenue
25  was from sales, did you do anything to account for that?

34

1  MS. WINKLER:  Objection; form.
2  THE WITNESS:  So -- sorry.
3  So that wasn't done by my organization.  The
4  content of the -- or the size of the sandbagging wasn't
5  something performed by my group.  It was performed by the
6  geographic leaders within the sales force, and it was
7  done through something called management judgment.
8  So you add up all the bits coming from your
9  people, and you either lower it because you think they're
10  being overly aggressive or you increase it because you
11  think they're sandbagging.  And that management judgment
12  line was culled out in the reports that went to senior
13  management.

14  BY MR. RUBIN:

15  Q  Okay.  Now, at the time that you were in
16  Jennifer Minton's organization, did Jennifer Minton
17  herself provide any -- make any adjustment to the sales
18  forecast based upon her own judgment, whether based upon
19  sandbagging or some other information or indication?  Did
20  she add her own -- did she make any changes on her own,
21  whether up or down, to any numbers?

22  A  I don't recall.

23  Q  Would you have been privy to that had she been
24  doing that?

25  A  No.

35

1  Q  And why is that?

2  A  Jennifer managed the relationships up to the
3  executive group directly.

4  Q  So to the extent that Jennifer made any
5  adjustments to -- to the forecast, you would not have
6  actually been privy or seen the document that she made
7  the adjustment to?

8  A  Again, I don't recall seeing any adjustments
9  made specifically by Jennifer Minton to the forecast.

10  Q  Okay.

11  A  They may have occurred; they may not have
12  occurred.  I don't recall seeing any.

13  Q  Okay.  Did you get a copy of the forecast that
14  was distributed or circulated to the executive committee?

15  A  Yes.

16  Q  Okay.  During that period of time?

17  A  Yes.

18  Q  Okay.  Did you take part in any executive
19  committee meetings?

20  A  No.  Sorry.  Not on the forecast.  Not
21  specifically related to the forecast.

22  Q  Right; to the forecast.

23  Did you take part in any executive committee
24  meetings generally?

25  A  Yes; budgets, analysis.

36

1  Q  And -- and distinguish, if you would, at Oracle
2  between budgets and forecasting.  What's the difference?

3  A  So a budget -- the budget process sets out a
4  target number, both on the revenue and spend side, at the
5  beginning of a year, expense side.  And that lays out the
6  targets for the year, and they remain fixed in stone as a
7  baseline for the year.

8  A forecast is a representation of, well, what
9  actually is going to happen.  How much revenue do you
10  think we're actually going to get in this quarter.  How
11  much expense do you think we're going to have in this
12  quarter.  And those will change as you progress through
13  the quarter.  You rachet back expense, you increase
14  revenue.  Those forecasts will adjust.

15  So forecast is really a real-time measure of
16  performance, whereas a budget is a prediction of future
17  performance at the beginning of a fiscal year.

18  Q  And budget does not change once it's set for the
19  year?

20  A  Very rarely changes.  You would have to go
21  through a re-budgeting process specifically because there
22  had been a material change in the business.

23  Q  Is budget largely for the expense side of the
24  business?

25  A  Both revenue and expense so you can create

37

```
1    earnings projections.
2        Q  And during your period of time when you were in
3    the -- Jennifer Minton's organization, what was the
4    relationship between budget and forecasting?  Did
5    forecasting typically exceed the budget during the years
6    that you were there?  Was it -- was it on target?  Was it
7    lower?
8        MS. WINKLER:  Objection; form.
9        THE WITNESS:  I don't recall specifically.
10   BY MR. RUBIN:
11       Q  Do you remember any pattern or trend?
12       A  People generally kept to the expense budget,
13   generally.  On the revenue side, I don't recall
14   specifics.
15       Q  Did you have -- you said I think earlier that
16   you were not specifically in the sales organization.
17       A  Mm-hmm.
18       Q  So explain, if you would, when you were in
19   Jennifer Minton's organization, what role, if any, you
20   had in analyzing or preparing or working on the sales
21   forecast.
22       A  Okay.  So the sales forecast was managed by the
23   sales organization, and the sales organization had a
24   sale -- sales finance support group that did the -- that
25   helped support the organization.
```

38

```
1        My responsibility was for the systems and the
2    processes for aggregating forecasts across the company.
3    So I had relatively -- well, I had no inherent interest
4    in the data.  It was just numbers to me.
5        Q  I see.
6        A  Okay?
7        Q  So substantively you were not providing feedback
8    or why is this too high, this seems too low?
9        A  Just at a macro level.  When you bring billions
10   of dollars worth of revenue and expense together, what
11   does it look like.
12       Q  Mm-hmm.  And you were primarily oriented toward
13   the process side?
14       MS. WINKLER:  Objection; form.
15       THE WITNESS:  I had the system -- I had
16   responsibility for the system that aggregated the
17   forecast and for the process of aggregating it and for
18   the corporate-level analytics associated with the
19   forecast.  We ran a report and did comparisons.
20   BY MR. RUBIN:
21       Q  Mm-hmm.  And your responsibility was to make
22   sure that the data runs were as they were intended to be?
23       A  Correct.  We had a forecast due every Monday
24   morning.
25       Q  A forecast --
```

39

```
1        A  -- due every Monday morning or every other
2    Monday morning, depending where we were in the quarter.
3        Q  Okay.
4        A  So...
5        Q  Was it every other Monday for the first couple
6    months, and then every Monday after -- for the last --
7        A  That's why I paused in my response.  At the end
8    of the quarter, it was every -- every week and sometimes
9    interims, but other times I think it was every two weeks,
10   I believe.
11       Q  Okay.  And your job was to make sure that the
12   forecast data was correctly prepared and distributed?
13       MS. WINKLER:  Objection; form.
14       THE WITNESS:  I was responsible for aggregating the
15   information and presenting it to the management team with
16   some commentary.
17   BY MR. RUBIN:
18       Q  And -- and did you personally provide the
19   commentary?
20       A  I did not provide it verbally.  I provided
21   comments to the forecast that went with the forecast
22   package.
23       Q  And what would be examples of the kind of
24   commentary you would provide?
25       A  Expenses are up, run rates higher, revenue is
```

40

```
1    doing well, those types of things.
2        Q  Other than the sales organization, what other
3    organizations fed into the forecast that you were
4    aggregating?
5        A  The whole company.
6        Q  So what were the other -- do you remember how it
7    was divided at the time?
8        A  So we have a services organization, consulting,
9    education, support.  There were all of the expenses
10   associated with both sales and the service organizations.
11   It was R&D, marketing --
12       Q  Mm-hmm.
13       A  -- IT, and F&A.  So legal, finance, HR, those
14   types of expenses.
15       Q  Service organizations, what would that be?
16       A  So support and maintenance.
17       Q  Oh, okay.
18       A  Consulting.
19       Q  So there -- service organization is a
20   broad umbrella under which support --
21       A  Correct.
22       Q  -- consulting.
23       A  Correct.
24       Q  Education also fell under service orgs?
25       A  Correct.
```

41

1    Q   Okay. And would it be fair to say that your
2    role with respect to any of the other organizations was
3    the same as it was with the sales organization?
4        MS. WINKLER: Objection; form.
5    BY MR. RUBIN:
6        Q   That is, that you were aggregating data that was
7    provided by them, and then your job was to make sure that
8    it was being collated and processed and presented in a
9    way that the company -- that the executive committee
10   sought?
11       MS. WINKLER: Objection; form.
12       THE WITNESS: At that time, yes.
13   BY MR. RUBIN:
14       Q   At that time?
15       A   Yes.
16       Q   Okay. Why don't we move to another time.
17       So after you left, after -- at some point you
18   left Jennifer Minton's organization, correct?
19       A   Correct.
20       Q   And where did you go next in Oracle?
21       A   I became the senior director of finance and
22   operations for Gary Bloom, working for Gary Bloom.
23       Q   Do you remember approximately when that took
24   place, that change?
25       A   I'm struggling a bit, but '96-'97, somewhere in

42

1    that time frame.
2        Q   Okay. And describe, if you would,
3    organizationally what your new role entailed.
4        A   Okay. So I was responsible for supporting the
5    finance and operations needs for the groups that Gary was
6    running. At that time, he was running a portion of the
7    R&D group and the alliances organization, which is our
8    partner relationships. And quickly thereafter, he
9    started accumulating other parts of the company. He was
10   a rising star at that time.
11       Q   Gary?
12       A   Gary.
13       Q   Right.
14       A   Correct. And my responsibilities grew as his
15   did.
16       Q   Okay. So -- and how long did you serve in that
17   role?
18       A   Until I left the company. Actually, until Gary
19   Bloom left the company.
20       Q   And when was that?
21       A   The fourth quarter, calendar quarter of 2000.
22   So I'm guessing --
23       Q   The calendar year?
24       A   October. I'm guessing October.
25       Q   And he left to become CEO of Veritas; is that

43

1    right?
2        A   That's correct.
3        Q   There was -- was there a short period of time
4    after Gary left and before you left where you were -- had
5    been placed back under Jennifer Minton's organization?
6        A   That's correct.
7        Q   And that was a short period of time?
8        A   Very short.
9        Q   What, month or --
10       A   Couple of months, few months.
11       Q   All right. So if you could, explain for me how
12   Gary's responsibilities or Gary's sphere of -- or
13   organizational sphere, how it intersected with -- with
14   other groups at Oracle. Like did it overlap or was it
15   separate from sales? How did it -- and did you have
16   support or marketing within your division? If you could
17   just connect the two for me.
18       MS. WINKLER: Objection; form.
19       THE WITNESS: Probably the easiest thing to do is
20   explain where it ended up because it changed over time.
21   If you take away the sales organization, which is the
22   license sales organization, if you take away consulting,
23   and you take away our applications R&D area, Gary was
24   responsible for the rest of the company. So that would
25   include the support organization, which is a technical

44

1    support, support and maintenance, education, the balance
2    of R&D, which is around our -- Oracle's premier products,
3    such as the database and --
4        Q   Technology?
5        A   -- tools. The technology side of the business.
6        Q   Mm-hmm.
7        A   Marketing, IT, alliances, and I think that's it.
8    And my responsibility -- in my sphere of influence, I was
9    responsible for the finance and operations for those
10   groups, plus the finance and operations responsibility
11   for applications R&D.
12       Q   I see.
13       A   Which reported to a different executive in the
14   company.
15       Q   Okay. And from the time that you joined
16   Gary Bloom's organization to the time that Gary left, was
17   he your -- did you directly report to him?
18       A   Yes, I did.
19       Q   Was it -- did you ever have any other
20   individuals who you directly reported to during that time
21   period?
22       A   No.
23       Q   To what extent, if any, did you interface with
24   the finance organization for sales?
25       A   With -- for sales? Very limited.

45

1  Q  Okay.
2  A  Direct -- directly. I was -- I was -- I knew
3  the people in the organization, but on a professional
4  capacity, very limited.
5  Q  Yeah. I was asking to the extent that did you
6  have to interact with them in order to do your job?
7  A  No.
8  Q  Okay. Who was the -- who was your position --
9  who filled your role in the sales organization?
10  A  This is where my memory gets a little bit vague,
11  but I believe Graeme Smith was still at the company at
12  the time I took my role, and Graeme was responsible for
13  finance for the sales organization.  He may have left by
14  that point in time, but I believe it was still Graeme.
15  Q  Okay. Now, during that time period, did -- for
16  those organizations that were within your sphere, did you
17  play any role in the forecasting process?
18  A  Directly?  No.
19  Q  Directly.
20  A  No.
21  Q  Okay. Who was responsible for forecasting for
22  these -- for the organizations that you were working on?
23  A  So I had either director-level or vice-president
24  level people responsible for each of the different
25  organizations.

46

1  Q  So for support, for example, do you remember who
2  it was?
3  A  At the time it was Priscilla Morgan.
4  Q  And education?
5  A  Dan Sharpley.
6  Q  Mm-hmm. And consulting is under you?
7  A  Consulting was not under me.
8  Q  Consulting was outside of you, right.  So -- and
9  then you said marketing.  Marketing didn't -- did
10  marketing have a forecasting component?
11  A  Yes.
12  Q  Okay.
13  A  I can't recall who was -- at that time.
14  Q  Okay.
15  A  I'll remember it in a minute.
16  Q  R&D database, do you remember?
17  A  There were a number of people that reported to
18  an individual called Kelie Ginastet.
19  Q  And for -- so let's take Priscilla Morgan just
20  as an example.
21  A  Mm-hmm.
22  Q  So Priscilla Morgan was -- what was her position
23  within support?
24  A  She was the vice president of finance for
25  technical support, and she was the business partner to

47

1  the executive for technical support.
2  Q  Business partner to?
3  A  Randy Baker at the time.
4  Q  Oh, okay.
5  A  That's the connection to the earlier
6  conversation.
7  Q  Gotcha.
8     So now -- so what -- what did Priscilla Morgan
9  do in connection with the forecast?  What was her
10  responsibility?
11  A  She was responsible for helping Randy Baker
12  create a forecast.  So the ultimate responsibility for
13  the forecast data resided with the business executive.
14  The creation and collation of the information necessary
15  to do that was managed by Priscilla.
16  Q  And -- and did you have any oversight or
17  supervisory role in the preparation of the forecast
18  during the time that you were working with Gary?
19  A  I -- again, I managed people. I had about 130
20  people in my group, and they did the stuff and I managed
21  them.
22  Q  Okay.
23  A  So...
24  Q  So -- so, again, taking a concrete example for
25  support, after Priscilla Morgan worked with the business

48

1  side to create a support forecast for any particular
2  quarter between '98 to 2000, was there ever a time that
3  you would intervene and say, "No, I think that's too
4  low." "I think that's too high." "You need to revisit
5  those numbers"?
6     MS. WINKLER:  Objection; form.
7     THE WITNESS:  Again, the forecast data, the actual
8  numbers were the responsibility of the business
9  executive.
10  BY MR. RUBIN:
11  Q  So you didn't play any role in that?
12  A  So I got visibility to this, I was aware of
13  trends and differences, but at no point in time did I
14  make changes to the forecast.
15  Q  During -- during the time that you were working
16  for Gary, did you ever see any sales forecasts
17  personally?
18  A  No.
19  Q  No?
20  A  No.  Not forecasts.
21  Q  Did you ever see any consulting forecasts?
22  A  No.
23  Q  Did anyone in your organization?
24  MS. WINKLER:  Objection; form.
25  THE WITNESS:  I -- I --

Donnelly, Peter  11/30/2005  3:44:00 PM

49

1  BY MR. RUBIN:

2      Q  Well, did any -- let me restate my question.

3  That's a -- you can't answer that.  I understand.

4      But did anybody in your organization need that

5  data for their responsibilities or their jobs, as far as

6  you understand?

7      A  As far as I understand, there wasn't a need

8  except perhaps in the marketing side, but even then I

9  think it would be very tenuous.  It was a pretty closely

10  guarded set of data that was given to those that need to

11  know.

12      Q  That was -- that was the policy as Oracle of not

13  spreading the forecast data beyond those people that

14  specifically --

15      A  Correct.

16      Q  -- needed it?

17      A  Correct.  As it is in almost any company.

18      Q  All right.  That's not unusual for Oracle?

19      A  That's not unusual.

20      Q  To Oracle.  Excuse me.

21      A  It's not unusual, based upon my experience.  I

22  just want to clarify.  You met -- you stated forecast a

23  number of times.  There was -- I had access to

24  non-forecast information.  So actuals --

25      Q  Sure.

50

1      A  -- analysis for analytical purposes across a

2  much broader range of information.

3      Q  So when you say "actuals," actual booked

4  licenses?

5      A  How much we sold in a given period and what the

6  trends were and what products we sold and what ratios

7  and -- which is more relevant to our R&D teams so they

8  could determine how successful they were being.

9      Q  And did you have access to that information on

10  an aggregate monthly basis or some other time period?

11      A  I got reports from my old team, from the

12  corporate FP&A.  I had access to analytical tools that

13  were available to us during non-closed months because

14  they also contained forecast data.

15      Q  So explain that to me.  I'm not clear what

16  you're saying.

17      A  There's an online analytical tool that gives you

18  access to actual results.  That's available to you in

19  month 1 and in month 2, but in month 3 your access gets

20  limited to only historical information.  So you're not

21  getting visibility to the actuals to date in a quarter

22  and what the -- any forecast projections, which were also

23  in the same system.  So you didn't get access to that

24  data.

25      Q  So for the third month of the quarter, you did

51

1  not get access to the actual performance during those

2  final weeks?

3      A  Correct.

4      Q  And you did not get any access to the

5  forecasting data?

6      A  No.

7      Q  And -- but that was true during the entire --

8      A  That was true, but for other people that may get

9  access to it, their access got switched off, as well,

10  because they're -- again, a need-to-know basis.

11      Q  But for you, there was no access to forecast

12  information --

13      MR. CAPLAN:  Excuse me.  You guys are talking over

14  one another, for the court reporter.

15      MR. RUBIN:  Sorry.

16      THE WITNESS:  Sorry.

17  BY MR. RUBIN:

18      Q  For you personally.

19      A  I had no access to license and consulting

20  forecast information in my role working for Gary.  I did

21  have access to forecast information for expenses for my

22  team, for the groups that I supported, and forecast

23  information for the support and education organizations

24  that were both revenue-generating.

25      Q  Right.

52

1      Okay.  Now, you indicated that your memory is

2  Gary left October/November of 2000.

3      A  Around -- around about that time.

4      Q  Okay.  Now, you -- and then you were transferred

5  back into Jennifer Minton's organization at that point?

6      A  That's correct.

7      Q  Was there an effort at Oracle to consolidate the

8  finance organization after Gary left the company?

9      A  That's correct.

10      Q  Okay.  Did you have a position in Jennifer

11  Minton's organization during that short period of time

12  that you were there?

13      A  Yes.

14      Q  What was it?

15      A  Same position.

16      MR. CAPLAN:  Do you want to take a break?

17      MR. RUBIN:  Why don't we -- yeah, why don't -- we've

18  been going for like an hour.  So want to take like a

19  ten-minute break?

20      THE VIDEOGRAPHER:  We are now going off the video

21  record.  The time is 10:34 a.m.

22      ( Recess taken:  10:34 until 10:50 a.m.)

23      THE VIDEOGRAPHER:  We are now back on the video

24  record.  The time is 10:50 a.m.

25  BY MR. RUBIN:

53

1    Q   Okay. Mr. Donnelly, I think we had left off, I
2    was asking you about your transition over to Jennifer
3    Minton's organization shortly before you left the
4    company.
5    A   Yeah.
6    Q   You said you essentially carried the same title.
7    A   That's correct.
8    Q   What -- what happened during that period of time
9    that led to your departure from the company?
10   A   Okay. Well, probably -- probably there's two
11   things. One is some philosophical differences between my
12   opinion on how financial -- the financial support team
13   should be managed and those of Jennifer's. That's one
14   aspect.
15       Second aspect, in my capacity working for Gary,
16   I was asked to get things done. And in the course of
17   that, you know, it ruffled a few feathers. But it was
18   what I was asked to do and proved valuable. I had a very
19   effective finance organization. It was well liked by the
20   business teams, the business units that it supported, and
21   in order to achieve that, I had to go head to head
22   against some established ways of thinking.
23       And when -- when Gary left, I was left staring
24   the dragon in the face, to coin a phrase, and it created
25   a problem.

54

1    Q   So -- so I gather from your response that
2    some -- that there was some tension or some friction
3    between you and Jennifer's organization before you were
4    placed in her organization?
5    A   That's correct. No, let me correct that. It's
6    between myself and Jennifer, not Jennifer's organization.
7    I was well-regarded and well-liked through the vast
8    majority of Oracle's finance organization.
9    Q   So it was between the two of you personally?
10   A   Correct.
11   Q   And had there been clashes or tensions while you
12   were working in Gary's organization between you and
13   Jennifer personally?
14   A   Yes, and while I was working for Jennifer.
15   Q   Okay. And am I correct that there was -- before
16   you left there, you had spoken to somebody in another
17   organization to attempt to transfer out of Jennifer's
18   organization to work with -- work with him?
19   A   I was offered an opportunity, yes.
20   Q   And who was that?
21   A   Mark Jarvis.
22   Q   And what organization was he in?
23   A   He was the CMO, chief marketing officer.
24   Q   And what -- what position had he offered you?
25   A   An operational role. So head of operations for

55

1    marketing.
2    Q   Let me go back, and I want to ask you a little
3    bit more about that, but before our break we spoke a lot
4    about the distinction between the -- your -- the units or
5    the groups that you had responsibility for -- support --
6    support, education, marketing, R&D -- and then what was
7    outside of your sphere, which was -- and I think I
8    referred to it as "sales consulting," or maybe each of us
9    did.
10   A   License sales and consulting.
11   Q   Right. So I just wanted to clarify, when we
12   spoke about sales, both of us, you were speaking about
13   license sales, correct?
14   A   Correct.
15   Q   And that includes database sales and
16   applications sales?
17   A   Correct.
18   Q   Okay. So what happened that -- that didn't
19   allow you to take that position that Mr. Jarvis offered
20   you?
21   A   I was asked to leave the company and was told I
22   didn't have an opportunity to look elsewhere.
23   Q   Was it Jennifer who asked you to leave the
24   company?
25   A   Correct.

56

1    Q   And that was right around December 18th?
2    A   I believe it was December 18th.
3    Q   Did you believe that you had -- you were being
4    treated unfairly at the time that Jennifer asked you to
5    leave?
6    A   Yes.
7    Q   Did you believe that it was basically just about
8    a personality conflict?
9    A   Yes.
10   Q   Was there any litigation that arose over your
11   dismissal?
12   A   No.
13   Q   Was there any threat to litigate over your
14   dismissal?
15   A   In the course of the time after I was asked to
16   leave, there was some dialogue around my exit payment and
17   the terms of that exit payment. And during that time I
18   mentioned that I may seek legal action because I think it
19   was unfair dismissal.
20   Q   Did -- did the company respond in any way to
21   that?
22   A   I -- can you clarify your question?
23   Q   Well, did -- did there come a point in time
24   where some agreement was reached about the terms of your
25   dismissal where you were provided some additional

57

1  compensation or severance and you, in turn, agreed not to
2  pursue any legal actions?  Did that ever come about?
3      A  Yes, it did.
4      Q  Okay.  And what do you remember generally about
5  that?
6      A  So I was paid a certain amount of money and I
7  was allowed to resign from the company and I signed a
8  full release.
9      Q  Do you recall in that release whether there was
10  any language about providing any information to those who
11  were -- have a legal dispute with Oracle or cooperating
12  with those who have a legal dispute with Oracle?
13      MS. WINKLER:  Objection.
14      MR. CAPLAN:  Objection to the extent it calls for a
15  legal opinion or legal conclusion about terms in an
16  agreement.
17      MR. CAPLAN:  With that, he can answer.
18      THE WITNESS:  So I don't recall.  It was something I
19  was asked to sign, and then I got my money and I left and
20  have had a fantastic career since, so...
21  BY MR. RUBIN:
22      Q  Do you -- do you have a copy of that settlement
23  agreement?
24      A  I may have it somewhere, somewhere in the depths
25  of my useless past paperwork, but it serves no purpose to

58

1  me.
2      Q  Yeah, you had received a subpoena in connection
3  with the deposition today, correct?
4      A  Correct.
5      Q  And let me just go ahead and mark that.
6      A  I received two, actually.
7      Q  One from Oracle and one from the plaintiffs,
8  correct?
9      A  Correct.
10      Q  Okay.  I'm going to mark the one that you
11  received from us.
12      A  Okay.
13      (Deposition Exhibit 1 was marked.)
14      (Discussion off the record.)
15  BY MR. RUBIN:
16      Q  Okay.  I've handed you what we've marked as
17  Exhibit 1 for this deposition, and do you recognize this
18  document?
19      A  It looks similar to the front page of the
20  document that I received.
21      Q  Okay.
22      A  I did not read the document.
23      Q  You did not read the document at all?
24      A  I did not.
25      Q  Okay.  Well, if you could, turn to page -- let's

59

1  see.  First -- first look at the front page, and there's
2  a little check mark in the middle of the page.  You can
3  see two check marks actually.  One, you were commanded to
4  appear at the place, date, and time specified below --
5      A  Mm-hmm.
6      Q  -- to testify to the taking of a deposition.  Do
7  you see that?
8      A  Yep.
9      Q  That's checked, right?
10      A  Yes.
11      Q  And then the second check is your command to
12  produce and permit inspection and copying of the
13  following documents or objects.  And it says, "See
14  attached Schedule A."
15      A  Okay.
16      Q  Okay.  So if you could, turn to Schedule A,
17  which is page 3 of the numbered pages.
18      A  Okay.
19      Q  Now, is it your testimony you had not -- until
20  looking at this right now, you had not actually reviewed
21  this Schedule A?
22      A  No, I had not.
23      Q  Okay.  Were you aware that there -- that this
24  subpoena asks you for -- to search and produce, if
25  available, documents related to the items listed in

60

1  Schedule A?
2      A  So I received two subpoenas and I received a
3  phone call offering legal assistance.  After that I've
4  done nothing.
5      Q  Okay.  Well, probably what we should do then is
6  we can -- we can take a break before you answer this
7  question, but I'd like you to take a look at Schedule A.
8      A  Okay.
9      Q  You don't have to do it right this second, but
10  before -- maybe we'll take a break after I'm done with
11  questions otherwise.  Take a look at Schedule A and
12  then --
13      A  Is it in here?
14      Q  Yeah, that's -- that's the page 3.
15      A  Okay.
16      Q  And then I'll ask you about any of the items.
17  And we may have to determine whether it's appropriate for
18  you to go back and search for documents that --
19      A  I can read it now if you would like.  It won't
20  take long.
21      Q  Yeah.  Why don't we wait, and then we'll come
22  back to it.  But -- but other than what you described,
23  you haven't taken any steps to search or look for
24  documents that might be sought after in this schedule?
25      A  No.  So I would not have put my departure

Donnelly, Peter  11/30/2005  3:44:00 PM

61

1 document as something relevant to this -- this case.
2     Q   No, I'm not speaking specifically about the
3 departure document. I'm just asking you generally, you
4 haven't done any search in connection with the request?
5     A   I have absolutely no documentation from Oracle
6 Corporation or my time during the eight and a half years
7 I was there. I took nothing. I wasn't allowed to take
8 anything. I didn't take anything. I have nothing that's
9 relevant to what you may be asking me questions about.
10    Q   Okay.
11    A   If that's what Schedule A is asking for, I don't
12 have any.
13    Q   Okay. Well, what I'll ask you to do is, again,
14 just at a short break, read it over and then we'll come
15 back on the record and you'll confirm that.
16    A   Sure. Okay.
17    Q   All right. What -- what, if anything, do you
18 remember, Mr. Donnelly, about the second quarter of 2001,
19 the second quarter fiscal year of 2001 at Oracle? So
20 that would have been -- I'll represent to you that that
21 would have been September, October, November of 2000.
22    A   In what regard?
23    Q   Do you remember whether -- first of all, do you
24 remember whether Oracle made its global forecast or not?
25    A   Can't remember.

62

1     Q   Okay. Do you remember whether there were any --
2 whether you observed any slow-down or economic issues
3 affecting the company in the second quarter?
4     A   I don't recall.
5     Q   Do you remember any unusual hockey-stick-effect
6 activity at the -- phenomenon in that quarter even
7 compared to other quarters?
8     MS. WINKLER: Objection: form.
9     THE WITNESS: No.
10 BY MR. RUBIN:
11    Q   Going back to our original -- not original --
12 earlier conversation, do you remember any anxiety in the
13 company about whether the company was going to make its
14 quarter or not in the second quarter of 2001?
15    MS. WINKLER: Objection: form.
16    THE WITNESS: I think I stated there was anxiety
17 every single quarter, as there is for any publicly traded
18 software company.
19 BY MR. RUBIN:
20    Q   I had thought -- and maybe I misunderstood. I
21 thought you had said sometimes, you know, a few weeks
22 out, because as the gap between the forecast and the
23 actual performance starts to close, it becomes clear then
24 in other quarters where the company is. Whereas in other
25 quarters, because of the hockey stick phenomenon and

63

1 other reasons, there are really still a lot of open sales
2 in the pipeline right at the end.
3     So I'm asking you do you have any specific
4 memory whether second quarter fell on one end of the
5 spectrum or the other?
6     MS. WINKLER: Objection to form.
7     THE WITNESS: I don't recall if the anxiety levels
8 were higher or more sustained in Q2 than they were in any
9 other period.
10 BY MR. RUBIN:
11    Q   Do you recall having any conversations at Oracle
12 during the second quarter of 2001 about to what extent,
13 if any, the economics -- the economic -- any economic
14 downturn in the economy generally was affecting Oracle's
15 performance?
16    MS. WINKLER: Objection; form.
17    THE WITNESS: Not at a professional level, no.
18 BY MR. RUBIN:
19    Q   When you say "not at a professional level" --
20    A   Sorry. Not in the course of my responsibilities
21 at Oracle, but as an employee, as a holder of stock
22 options, as a monitor of stock price, as a monitor of the
23 NASDAQ and monitor of the economy, yeah. I mean we were
24 doing great.
25    Q   As of the second quarter?

64

1     A   That's correct. Yeah, we --
2     Q   Okay. All right. And so your -- in that role,
3 your memory is you were very bullish about Oracle?
4     A   We seemed to be immune from the circumstances
5 affecting other companies. And there were lots of good
6 reasons.
7     Q   And what were those?
8     A   Long-established company, product that's
9 required by everybody, information needs gather -- you
10 know, continuing to grow. You know, this was why we were
11 protected.
12    Q   And that was your view, as well?
13    A   After working eight and a half years at Oracle,
14 you get to absorb the -- you get to be -- be a believer.
15    Q   Okay. And did you -- okay. Let me have the...
16 Yeah, this one. Okay. I'm going to mark another
17 document as Exhibit 2.
18    (Deposition Exhibit 2 was marked.)
19    THE WITNESS: Do I read this?
20 BY MR. RUBIN:
21    Q   Yes. So what I've marked as Exhibit 2 is a
22 document with Bates stamp range -- with a Bates stamp
23 range of NDCA-ORCL 503837 through 503839.
24    So, yeah, why don't you take a minute to look at
25 this, and I'll just have a few questions for you.

65

1    A  Okay.
2    Q  Okay.
3    A  Mm-hmm.
4    Q  Now, this is an e-mail from you to Jeff Henley;
5  is that right?
6    A  Correct.
7    Q  Do you recognize the e-mail?
8    A  Yeah.  Yes.
9    Q  Yeah, yes, that's okay.
10       Now, as I understand it, this actually relates
11  back to our earlier exchange about when you had called
12  the class plaintiffs because you said you had some stock
13  options but they hadn't been exercised, correct?
14    A  Correct.
15    Q  So at the beginning of the e-mail, is it
16  accurate or is my understanding accurate -- excuse me --
17  that when you left the company, you had vested stock
18  options that were going to expire on March 19th, which
19  was 90 days after you left the company?
20    A  Correct.
21    Q  Right.  Now, so I gather that at the time you
22  left the company on approximately December 18th or 19th,
23  you did not immediately exercise your stock options?
24    A  Not on that day, no.
25    Q  No.  But -- and that soon after that, you sat

66

1  down with a broker, investment advisor to set out a plan
2  for --
3    A  Correct.
4    MS. WINKLER:  Objection to form.
5  BY MR. RUBIN:
6    Q  -- for exercising the options in the first
7  instance and then selling them?
8    A  Could you --
9    Q  For exercising your options?
10    A  Correct.
11    Q  You exercise your option at a strike price,
12  correct?
13    A  Correct.
14    Q  And then you were going to sell the -- sell the
15  stock once you exercised it?
16    A  Correct.
17    Q  That was going to be immediate?
18    A  Correct.
19    Q  Okay.  And when you say that -- and in the -- in
20  your e-mail to Jeff, you say that, "At the time, I did
21  not anticipate this to be a problem and sat down with my
22  broker to establish a reasonable price target in the mid
23  30s and a schedule to exercise my stock through
24  March 19th."  Is that accurate?
25    A  Correct.

67

1    Q  So you had sat down with your broker to come up
2  with a schedule from the time you left through March 19th
3  to sell your options?
4    A  I don't know if it --
5    MS. WINKLER:  Objection to form.
6    THE WITNESS:  I don't know if it was through that
7  particular date, but it was some date between the day
8  that I met him and the end date of disposition.  So it
9  wasn't necessarily March 19th was the last date, but that
10  was --
11  BY MR. RUBIN:
12    Q  And you -- and you -- right.  But at some
13  point --
14    A  Some point before they expired, I would have
15  sold all of them.
16    Q  And did you have a particular date in mind about
17  when you wanted to sell all of them before March 19th?
18    A  I had no date in mind.  My broker advised me to
19  average cost selling -- whatever that term is, basically
20  to even out the ups and downs.
21    Q  And you say you had a reasonable price target in
22  the mid-30s?
23    A  Correct.
24    Q  So it would be fair to say when you were leaving
25  Oracle, you did not expect any significant price change

68

1  in the stock between the time you left and March 19th?
2    A  Absolutely not.
3    Q  And am I correct that March 1st or February 28th
4  or 29th, depending on the year, would have been the end
5  of a third quarter of a fiscal year for Oracle?
6    A  Correct.
7    Q  So it would also be fair to say that you did not
8  expect any big price drop as of that date at the time you
9  left the company?
10    A  There was no anticipation of the stock going
11  down, if that's -- if that's your question.
12    Q  Yeah, that's my question.  You did not
13  anticipate at the time you left the company that as of
14  March 1st, the stock would -- the stock would drop?
15    A  No.  Business was good and there was a positive
16  buzz around how we were responding to the economy.  So my
17  assumption was things were going to continue that way.
18    Q  And you didn't have any reason to anticipate
19  that Oracle would miss its projected -- projected market
20  guidance for the quarter?
21    MS. WINKLER:  Objection; form.
22  BY MR. RUBIN:
23    Q  As of the time you left?
24    A  As of the time I left, I had no specific
25  knowledge as to why they might miss.  And subsequent to

69

1  leaving, I carefully followed the press and analyst
2  discussions and statements by the company as to how
3  business was going.
4      Q   Right.
5      A   I was a shareholder.
6      Q   But as of the time you left -- I'm speaking
7  about December 19th -- you had no anticipation that
8  Oracle would be unable to meet its guidance as of March
9  1st?
10     MS. WINKLER:  Objection to form.
11     THE WITNESS:  No.  Too early in the quarter.
12  BY MR. RUBIN:
13     Q   And based upon everything else you said, you
14  were bullish about the company based on everything you
15  knew as of December 19th?
16     MS. WINKLER:  Objection to form.
17     THE WITNESS:  Yes.
18  BY MR. RUBIN:
19     Q   Now, did this actually -- were you able to get
20  the extension?
21     A   No.
22     Q   And you didn't end up vesting any of your -- you
23  had not -- I assume -- this is dated February 10th.  So
24  as of this e-mail, you had not exercised any of your
25  options?

70

1      A   So this is --
2      MS. WINKLER:  Can I just -- Lee, just as a formality
3  here, this e-mail on the front page that you're basing
4  this on, February 10th, is an e-mail from Jeff Henley to
5  Jennifer Minton.  It's not Mr. Donnelly's --
6      MR. RUBIN:  Oh, I'm sorry.  You're right.  You're
7  right.
8      MR. CAPLAN:  Excuse me.  You guys to have talk one
9  at a time.
10  BY MR. RUBIN:
11     Q   Go ahead.
12     A   My comment was going to be I don't know the date
13  that I sent this to him, and the date on this note is
14  when Jeff sent this to Jennifer.  And the response -- his
15  comments are actually on the last page, 503839.  So there
16  seems to be some disconnection in the paperwork.
17     Q   Right.  This is the response you received back
18  from Jeff?
19     A   I received no response back from Jeff, and I
20  don't believe I received response back from Jeff in
21  writing.  I think I may have spoken to him in person.
22     Q   I see.  Okay.  So you don't know the date.  I
23  understand what you're saying.  You don't know the date
24  that you actually sent the e-mail?
25     A   Correct.

71

1      Q   But whatever the date is, it's fair to -- is
2  it -- is it -- is it accurate that you had not exercised
3  any of the options as of the date of the e-mail?
4      A   I had not exercised all of my options as of the
5  date of the -- I may have exercised some under the
6  structured selling program advised by my financial
7  advisor.
8      Q   And you say later in the e-mail that this
9  constituted a significant portion of your family's
10  savings?
11     A   Yes.
12     Q   With that, I don't want you to -- I don't need
13  to know, as with companies, how much that was in actual
14  terms, but was there a percentage, like how much of your
15  savings this constituted?
16     A   Like, all of it.
17     Q   All of it?
18     A   Well, I may be being a bit facetious.  I mean we
19  had a house, and -- but from a cash reserve -- but we
20  didn't have an awful lot of money.  So this was our nest
21  egg.
22     Q   So it would be fair to say that, based upon your
23  reading of the market or other information that you had
24  about Oracle, that if you thought that the price was
25  going to drop materially, you would have -- you would

72

1  have tried to sell earlier, correct?
2      MS. WINKLER:  Objection; form.
3      THE WITNESS:  Yes.
4  BY MR. RUBIN:
5      Q   Do you -- at the -- oh, let me have that e-mail
6  about support.
7      ( Deposition Exhibit 3 was marked.)
8      THE WITNESS:  Okay.
9  BY MR. RUBIN:
10     Q   So I've handed you what we've marked as
11  Exhibit 3; is that right?
12     A   Correct.
13     Q   Okay.  And this is -- this is a document Bates
14  stamped range of NDCA-ORCL 097810 to 097811.  And this is
15  an e-mail traffic between Lia Burke and Graeme Mair; is
16  that correct?
17     A   Correct.
18     Q   And you're cc'd on the e-mails?  At least one of
19  them?
20     A   I'm cc'd on the response from Graeme to Lia.
21     Q   Okay.  And who was Lia Burke?  Who is Lia Burke
22  and what did she do at Oracle?  I'm not suggesting she no
23  longer exists.
24     A   I believe Lia is still alive, and at this time
25  she was the director of FP&A.  So she had my old role,

73

1    although it had changed in substance a little bit, but
2    essentially the aggregation part of my role.
3        Q   And this is an e-mail exchange with -- with
4    Graeme Mair; is that right?
5        A   Correct.
6        Q   And Mr. Mair served what function within the
7    support group?
8        A   He took over from Priscilla Morgan as the head
9    of finance.  I believe he was a VP, head of finance for
10   the support organization.
11       Q   Okay.  And the -- and the chart that is
12   contained in this e-mail purports to be the Q3 '01
13   forecast for support, is that right, as of November 30th?
14       A   Correct.
15       Q   And -- now, it refers to OFA.  Is that one of
16   the tools that you were talking about earlier?
17       A   Oracle financial analyzer.
18       Q   Right.
19       A   That's the tool.
20       Q   Right.  That's the tool you described earlier?
21       A   Correct.
22       Q   Where you had access to actuals but not
23   forecasts?
24       A   In my capacity, yes.
25       Q   Personally, yeah.

74

1        A   But in FP&A, in my FP&A capacity, I had access
2    to all information.
3        Q   When you worked directly with Jennifer?
4        A   That's correct.
5        Q   In the '95-'97 period?
6        A   Correct.
7        Q   Right.  Okay.  So this is -- this chart that
8    contains the forecast, did you provide any input into
9    this particular -- these particular forecasted numbers?
10       A   I don't believe so.
11       Q   Okay.  Do you recall whether you had any view
12   one way or the other whether these numbers were too high
13   or too low or about right?
14       MS. WINKLER:  Objection; form.
15       THE WITNESS:  I don't recall, but if I read this
16   e-mail correctly -- I want to make sure I'm getting this
17   right -- Jeff was probably preparing to report Q2
18   results and he was wanting to get an initial estimate of
19   what Q3 was looking like.  So it would be right at the
20   very beginning of the quarter.  And in a lot of cases,
21   the expense forecast directly mirrored the budget, and
22   the revenue forecast was a -- you know, an adjustment to
23   budget based upon what the pipeline was looking like.  It
24   wasn't a rigorous or scientific analysis that early in
25   the quarter.

75

1        So the discipline around the accuracy of the
2    forecast, as it got more accurate, the closer it got to
3    the end of a quarter.
4        Q   Mm-hmm.
5        A   So this would be one of the hundred e-mails a
6    day I get cc'd on.  So, no.
7        Q   Right.  So no, meaning you didn't have any
8    direct input?
9        A   I had no cause to have it.  It was a very
10   preliminary number for a coming quarter.
11       Q   Okay.  Were there -- were there ever occasions
12   in your role -- this -- well, let me strike that.
13       This was a time you had already transferred over
14   to Jennifer's organization, correct?
15       A   Yes.
16       Q   Okay.  But during your time working with Gary,
17   was there ever a time where -- you said this was typical
18   for you to get e-mails like this at the end of a quarter,
19   beginning of a quarter, correct?
20       A   Correct.
21       Q   Were there ever occasions in which you reviewed
22   the data and said, "I just can't believe this would be --
23   this is right," whether too low -- too high or too low?
24       A   So I have to believe in my three and a half
25   years with Gary I made comments about the accuracy of

76

1    information.  Does anything come to my mind specifically?
2    No.
3        Q   Okay.
4        A   But yes.  I had a management and review
5    responsibility.
6        Q   And if you thought something was materially too
7    low, you would have made a comment to Gary?
8        A   Yes.
9        Q   Okay.
10       A   Or the appropriate business leader.
11       Q   And you don't have any memory one way or the
12   other making a comment about this particular -- this
13   particular set of data?
14       A   I don't believe so.  And, in fact, I think I was
15   actually out of the country at the time.
16       Q   Yeah.  I was going to ask you about that.  You --
17   you left December 19th.  Had you been in Denmark or
18   Scandinavia somewhere before that?
19       A   I'd been around the world.  I had a global
20   finance organization, and I was out doing a trip.
21       Q   And when was that trip?
22       A   I don't remember exactly, but I believe it was
23   for somewhere between ten days and 14 days, and I arrived
24   back on the 17th, I believe.  And I might have actually,
25   in fact, arrived back on the 18th.

77

1  Q  Of December?

2  A  Yeah. It's a little fuzzy, but --

3  Q  So you have a general memory that ten days or

4  two weeks prior to being asked to leave the company, you

5  were out of the country?

6  A  Correct.

7  (Deposition Exhibit 4 was marked.)

8  THE WITNESS: Okay.

9  BY MR. RUBIN:

10  Q  Okay.  Did you have a chance to look at this

11  document?

12  A  Yep.

13  Q  Okay.  What I've marked as Exhibit 4 is a

14  document Bates stamped range NDCA-ORCL 503840 to 503843.

15  And Mr. Donnelly, this is -- this document

16  reflects an e-mail series of exchanges between you and

17  Ivgen Guner; is that right?

18  A  Correct.

19  Q  And who is Ivgen Guner?

20  A  She held a finance position under

21  Jennifer Minton.  Again, not sure how she fit in exactly,

22  but, again, in the FP&A arena.

23  Q  Okay.  And the e-mail traffic is dated around --

24  at least one of the e-mails from you to Ivgen is on

25  page 503841, the second page of the composite --

78

1  A  Yep.

2  Q  -- is dated November 6th, 2000, correct?

3  Does that refresh your memory that would have

4  been right about the time that you were transferring back

5  over to Jennifer's group after Gary had left?

6  A  About that time frame, yes.

7  Q  Okay.  And you wrote to Ivgen, "Since being in

8  my new role, I have had license LOB access to actuals and

9  forecasts.  Are you saying I'm going to have this taken

10  away?  My question to Carrie related to license pipeline

11  information, which I had the distributions for but didn't

12  have any data for."  Is that right?  I mean, did I read

13  it accurately?

14  A  Yes.  Sorry.  You read it accurately, yes.

15  Q  Right.  So -- and -- and now, just to summarize,

16  this is an e-mail in which you're seeking to obtain

17  access to certain information on OFA; is that right?

18  A  It appears to be, yes.

19  Q  Okay.  And as I had understood it, you had --

20  are you indicating here that you had access to forecasts

21  when you had previously been with Jennifer?

22  A  It certainly indicates that, but to the best of

23  my knowledge, I did not have -- I personally did not have

24  access to forecast information.

25  Q  That's your memory?

79

1  A  That's -- that's my memory.

2  Q  Okay.  All right.  And -- but you asked to get

3  access as of November 6th?

4  A  Apparently so, yes.

5  Q  And they turned you down?

6  A  Then yes, definitely.

7  Q  And it says at the top "Yes, I have

8  discussed" -- "I have and discussed it with Jennifer and

9  Larry as well."

10  A  Mm-hmm.

11  Q  "I cannot provide you visibility to WW license

12  LOB for security reasons."

13  A  Correct.

14  Q  Is that worldwide license LOB?

15  A  Correct.

16  Q  So?

17  A  Larry, by the way, it's Larry Garnick as opposed

18  to Larry Ellison.

19  Q  Larry Ellison.  Okay.  Thank you for that

20  clarification.

21  LOB is line of business?

22  A  Correct.

23  Q  And so what would be the worldwide license line

24  of businesses?

25  A  That would be the license sales.

80

1  Q  OPI?  Is that one of them, or do you remember?

2  A  Basically all of the geographies, license sales

3  business.

4  Q  Okay.  So then to summarize, your memory is you

5  didn't have access to it before you came over to Jen --

6  back to Jennifer's group, right?

7  MS. WINKLER: Objection; form.

8  THE WITNESS: My memory is I did not have access to

9  license forecast information.

10  BY MR. RUBIN:

11  Q  While you were working for Gary?

12  A  While I was working for Gary.

13  Q  And then is this also consistent with your

14  memory that after coming back to Jennifer's group in

15  November 2000, you continued not to have access, correct?

16  Again, it seems like I'm asking for it here, so yes,

17  that's my recollection.

18  BY MR. RUBIN:

19  Q  Right.  I'm asking you separate from the

20  document, is it your recollection that you continued not

21  to have access, you did not have any access to license

22  forecast -- to worldwide license line of business

23  forecasts from November of 2000 until the time you left

24  the company?

25  MS. WINKLER: Objection; form.

81

```
1        THE WITNESS:  So since leaving my role as director
2   of corporate FP&A, my access to the license side of
3   business from a forecast standpoint, I don't believe I
4   had that access.
5   BY MR. RUBIN:
6        Q   Right.
7        A   I had no reason to have it for my job.  I didn't
8   support those organizations.  I didn't access the
9   database for that information, and therefore it was my
10  assumption that I didn't have it.
11       Q   Okay.  So if -- given that, if -- if the
12  investigator indicated -- the investigator who you spoke
13  to when you called about your stock options -- if the
14  investigator indicated that you had stated that as of
15  mid-December the sales forecasts looked really bad, did
16  he just simply misunderstand you --
17       MS. WINKLER:  Objection to form.
18  BY MR. RUBIN:
19       Q   -- about your access to -- to that information?
20       MS. WINKLER:  Objection to form.
21       THE WITNESS:  You need to state -- you need to state
22  your question more specifically.
23  BY MR. RUBIN:
24       Q   So if the investigator indicated to the public
25  at large that you had said in that conversation that
```

82

```
1   you -- that you had stated to him that the sales forecast
2   in mid-December of 2000 -- that the sales forecast looked
3   bad, was that the product of a misunderstanding?
4        MS. WINKLER:  Objection; form.
5        THE WITNESS:  It must be.
6   BY MR. RUBIN:
7        Q   Because you wouldn't have said that?
8        A   I wouldn't have said that.  If it had been that
9   bad, I would have kept my stock -- sorry -- not kept my
10  stock.
11       Q   Right.
12       A   I'm not stupid.  So it must be a result of a
13  misinterpretation.
14       Q   But you didn't tell him that?
15       A   I don't recall nor would I have a reason to say
16  that.
17       Q   Okay.  And do you recall providing the
18  investigator with your opinion or providing any
19  observations about the database forecast for the third
20  quarter of 2001?
21       A   I don't recall any specific comments regarding
22  database or applications or other parts of the business.
23  I do recall making comments that the management team
24  should have known where they were from a performance
25  standpoint that close to the end of the quarter.
```

83

```
1        Q   When you say "that close," meaning?
2        A   You know, as -- as you progress through the --
3   through the quarter, you get -- again, remember back to
4   my earlier comments about trends and the access to
5   pipeline and the analysis of pipeline, there are people
6   employed on a day-to-day basis to look at those
7   relationships and provide feedback to management.  I mean
8   I think Larry makes public statements about having
9   immediate access to every license sales rep's forecast.
10       Q   And you I think had testified earlier that in
11  some quarters, as the quarter progresses, the actual
12  sales and the -- and the forecast becomes closer and
13  closer because deals are closing?
14       A   Correct.
15       Q   And in other quarters it doesn't -- the gap
16  doesn't necessarily close until the last few days; is
17  that right?
18       A   Correct.
19       Q   Right.  And so you're saying that you told the
20  investigator that Oracle management should have known
21  what time period you're talking about?  They should have
22  known?
23       A   So in the last two weeks, they should have known
24  that the -- a miss was possible.
25       Q   Mm-hmm.
```

84

```
1        A   And at a minimum, shouldn't have been out there
2   making statements to the fact that everything is
3   fantastic.
4        Q   And do you know of any particular statements in
5   the last two weeks that were made?
6        A   So Sandy Sanderson made some comments at a -- in
7   a public forum.
8        Q   Do you know what date?
9        A   I don't.
10       Q   Okay.
11       A   Larry Ellison made some comments about, you
12  know, we're -- we're immune to the economic problems of
13  the other companies and have visibility into -- you know,
14  into the forecast.
15       Q   And do you know what date that was, those
16  comments?
17       A   I don't recall.
18       Q   So if those comments were made in December, that
19  would be different from your vantage point than if they
20  were made in late February?
21       MS. WINKLER:  Objection; form.
22       THE WITNESS:  I think they would have a different
23  impact on that quarter's results, yes.
24  BY MR. RUBIN:
25       Q   Well, no.  What I'm asking is in terms of your
```

85

1 suggesting about what knowledge people would have. And
2 I'm -- I gather from what you're saying, that somebody
3 making that statement in December or January, earlier in
4 the quarter, is different than making it in the last week
5 of the quarter?
6        MS. WINKLER: Objection to form.
7 BY MR. RUBIN:
8        Q  Because you have more information in the last
9 week of the quarter?
10       A  You have more information in the last two
11 weeks -- and I want to get the periods right.
12       Q  Uh-huh.  Last two weeks is what you're focusing
13 on?
14       A  There's more information in that period than you
15 would at the beginning of a quarter.  So if somebody made
16 those comments on December 1 about a February 28th period
17 end, they would be less accurate.  As you get closer and
18 closer to that February 28th period end, one would assume
19 they were based upon more accurate information.
20       Q  When you say "less accurate," you mean you have
21 less information to go on when you're making the
22 statements?
23       A  Yeah.  You have basically no idea apart from
24 your collation of early forecast data.
25       Q  Well, it's -- it's not quite accurate to say you

86

1 have no idea.  I mean, as you said, Oracle has a
2 forecasting system that had been honed and developed over
3 many years, correct?
4        MS. WINKLER: Objection to form.
5        THE WITNESS: I wouldn't bet on a forecast that's
6 delivered on the first week of a new quarter.
7 BY MR. RUBIN:
8        Q  Isn't it true that Oracle had made its earnings
9 forecasts for 11 straight quarters before the third
10 quarter of '01?
11       A  I don't recall.
12       Q  Do you know whether that's true or not?
13       MS. WINKLER: Objection to form.
14       THE WITNESS: Again, I don't recall.
15 BY MR. RUBIN:
16       Q  Okay.  But you -- but during the time that you
17 were working on the forecast, you believe that the
18 forecast for what it was had integrity; is that correct?
19       A  There was a process and an analytical component
20 that looked at trends and compared them to forecasts, and
21 from what I can recall, we met numbers pretty
22 consistently.  Whether we met every one for the last
23 eleven quarters, I don't know the answer to that.
24       Q  And, in fact, do you recall in the second
25 quarter of 2001, it was not clear that the company was

87

1 going to make its quarter till the last couple days?
2        MS. WINKLER: Objection to form.
3        THE WITNESS: Yeah, I don't recall.
4 BY MR. RUBIN:
5        Q  Okay.  And what you just described, talking
6 about sort of this last two weeks as having more
7 information, having a better sense of information than
8 before because of the progress of the quarter, do you
9 recall conveying that to the investigator?
10       A  Yes.
11       Q  Do you recall ever using the benchmark of six
12 weeks out?
13       MS. WINKLER: Objection to form.
14       THE WITNESS: I don't remember using the benchmark
15 of six weeks out.
16 BY MR. RUBIN:
17       Q  And six weeks out, in fact, based upon your
18 experience and knowledge, would be a long time out in
19 terms of having reliable information, correct?
20       THE WITNESS: It would be --
21       MS. WINKLER: Objection to form.
22       THE WITNESS: It would be more accurate than the
23 beginning of the quarter, less accurate than the end of
24 the quarter.
25 BY MR. RUBIN:

88

1        Q  But would -- is it your testimony here today
2 that in any particular quarter in which you worked at
3 Oracle, the Oracle executives would have known six weeks
4 out whether they were going to miss or make their
5 quarter?
6        MS. WINKLER: Objection; form.
7        THE WITNESS: I don't think any company executive
8 would know six weeks out to a -- to a, you know, hundred
9 percent certainty.
10 BY MR. RUBIN:
11       Q  Right.
12       A  I mean, it's impossible.
13       Q  And, in fact, as you said, two weeks out you may
14 know that a miss is possible, but you don't know -- there
15 could be certain quarters you still don't know, given the
16 amount of the pipeline and how close you are to the
17 forecast, whether you're going to miss or make the
18 quarter even two weeks out; is that correct?
19       MS. WINKLER: Objection; form.
20       THE WITNESS: So, again, I want to make sure I'm
21 clear here.  At some point in time in a quarter, you know
22 you're going to miss.
23 BY MR. RUBIN:
24       Q  Sometimes that's not until the last two days,
25 correct?

89

1    MS. WINKLER: Objection to form.
2    THE WITNESS: Sometimes it's not then. Sometimes it
3    could be earlier.
4    BY MR. RUBIN:
5    Q  Right.
6    A  If you take a look at your actuals and your
7    pipeline and they don't add up to a hundred percent, then
8    you're going to miss.
9    Q  Can you --
10   A  And you can do that arithmetic on day one and
11   say, "Okay. I'm going to have to re -- I'm going to have
12   to change guidance." And the earnings call for the
13   previous quarter. You will guide down. You will say,
14   "My revenues will be lower."
15       So there's enough evidence at the beginning of a
16   quarter to make a judgment call as to where you are going
17   to be at the end.
18       As you progress through the quarter and you look
19   at deals and you look at actuals and you look at
20   pipeline, you will get closer and closer.
21   Q  Now, one of the things that -- that Oracle uses
22   is something called a conversion ratio, correct?
23   A  Correct.
24   Q  And what is that?
25   A  I don't know the specific measures, but based

90

1    upon the assessment by the sales rep of the state of a
2    deal in its life cycle, it's assigned a certain
3    percentage. I believe there are -- and this is where my
4    knowledge is a little limited. There's, you know, 25
5    percent, 50 percent, 90 percent, you know, and 100
6    percent. And those ratios have been used for years to
7    assign probabilities of a particular transaction being
8    closed.
9        And depending on the methodology used, items
10   below a certain percentage were excluded; items above a
11   certain percentage, you include it on that percentage
12   basis, and items above another percentage were included
13   entirely.
14   Q  And so did the company try to do some kind of
15   weighted average?
16   A  A weighted average would be a simple way of
17   putting it, yes.
18   Q  Right. And so the conversion ratio was useful,
19   am I correct, and as the quarter progressed and you
20   looked at the amount of pipeline left, you would
21   historically take the conversion ratio to try to get a
22   sense of, as you pointed out, how much of the pipeline is
23   left and how much we expect to convert into actual
24   revenue before the end of the quarter, correct?
25   MS. WINKLER: Objection to form.

91

1    THE WITNESS: That was a way -- that was an
2    empirical way used to determine the gap between projected
3    revenue and actual revenue.
4        In addition, there were other things such as
5    management judgment that were put in there to say I think
6    they're underestimating or overestimating or it doesn't
7    feel quite right.
8    BY MR. RUBIN:
9    Q  And in terms of management judgment, is it your
10   understanding that one of the things that Jennifer Minton
11   did was she would talk to all the license sales
12   organization heads about this -- trying to elicit this
13   kind of information about their view of the numbers that
14   were being produced by their organizations?
15   MS. WINKLER: Objection to form.
16   THE WITNESS: There was a process by which
17   management judgment was collected. You'll have to ask
18   Jennifer on what her direct involvement was in collecting
19   this.
20   BY MR. RUBIN:
21   Q  But did you understand that was one of the
22   things that she did?
23   MS. WINKLER: Objection to form.
24   BY MR. RUBIN:
25   Q  Speak directly to the heads of the license sales

92

1    organizations about their sense of the numbers, whether
2    any adjustment needs to be made?
3    MS. WINKLER: Objection --
4    THE WITNESS: Again, that's a question you should
5    probably forward to Jennifer.
6    BY MR. RUBIN:
7    Q  Well, I'm just asking you do you have any
8    personal knowledge one way or the other of any
9    communications between her and the sales -- license sales
10   organization?
11   A  I have no --
12   MS. WINKLER: Objection; asked and answered.
13   THE WITNESS: I have no direct knowledge of her
14   involvement on the communications with the license
15   leaders, sales leaders. There may have been some, there
16   may not have been some. Her group was responsible for
17   collecting the data elements that were put into the
18   forecast.
19   BY MR. RUBIN:
20   Q  So back to the conversion ratio, if you're
21   coming toward the end of a quarter and have an amount of
22   pipeline that, if you multiply it by the conversion
23   ratio, would allow you to make your quarter, would you
24   agree that that would be -- that at least one data point
25   that would indicate that making the quarter is still a

93

1  reasonable possibility?
2  MS. WINKLER: Objection; form.
3  THE WITNESS: It's a data point.
4  BY MR. RUBIN:
5  Q  Right.
6  A  But again, there's no exact sciences here.  You
7  can't --
8  Q  It's an art, right?
9  A  It's interpretation, yes.
10  Q  Right.
11  A  There's an interpretation element that -- and
12  you have to look at the -- as you get closer and closer,
13  looking at something that has a 90 percent probability
14  but the guy who signs the PO is on vacation, don't
15  include it.  That's a judgment -- that becomes a judgment
16  thing.  You can have an empirical answer that says
17  include it, but then you just know that you can't find
18  the guy.
19  Q  Right.  And that's the kind of information that
20  rises up from the -- from the sales reps themselves,
21  correct?
22  A  Each of these deals tracked individually.  Each
23  material deal is tracked individually.
24  Q  And so your methodology depends or relies to
25  some extent on the accurate information flow coming from

94

1  the sales reps who have the most direct contact with the
2  customers?
3  MS. WINKLER: Objection; form.
4  THE WITNESS: Correct.
5  BY MR. RUBIN:
6  Q  Is that right?
7  A  Correct.
8  Q  Right.  But going back to the -- this issue of a
9  conversion rate, as -- I think you said as a data point,
10  you would agree that if you had a couple weeks left in
11  the quarter and you took the pipeline number and you
12  multiplied it by the conversion ratio that historically
13  had been in place for the company, and that number
14  exceeded the amount of your earnings guidance, then that
15  would be one indication that you were still on track to
16  make your quarter?
17  MS. WINKLER: Objection; form.
18  THE WITNESS: That would be an indication, yes.
19  BY MR. RUBIN:
20  Q  Right.  And so -- and so the -- and the question
21  of whether a conversion ratio -- you don't know whether
22  you're going to sustain that conversion ratio or be above
23  it or below it until the quarter ends, correct?
24  MS. WINKLER: Objection form.
25  THE WITNESS: Correct.  You have historical trends

95

1  by which to make those judgments.
2  BY MR. RUBIN:
3  Q  And is it reasonable for Oracle to rely on those
4  historical conversion trends as part of its analysis of
5  where it stands in the quarter?
6  MS. WINKLER: Objection; form.
7  THE WITNESS: I think it's reasonable to use those
8  as a measure of their estimate.
9  BY MR. RUBIN:
10  Q  All right.  And you don't personally -- you did
11  not have any knowledge, personal knowledge of any of the
12  forecast reports that were being developed and circulated
13  through the third quarter of 2001?
14  A  No.
15  Q  And so when you told the investigator that two
16  weeks out, you know, executives would have a sense of
17  whether it's going to make its quarter or not, that was a
18  comment in the abstract, not about the third quarter of
19  2001 in particular?
20  MS. WINKLER: Objection; form.
21  THE WITNESS: I believe my comment was two weeks
22  out, they should have a pretty good idea as to how the
23  quarter is looking.
24  BY MR. RUBIN:
25  Q  In general?

96

1  A  In general.
2  Q  Right.  Because you didn't have any specific
3  information about they should have known in the third
4  quarter of 2001, two weeks out?
5  MS. WINKLER: Objection; form.
6  THE WITNESS: That would be a comment that would
7  apply to any questioner.
8  BY MR. RUBIN:
9  Q  And you had said earlier that there can be
10  particular quarters where -- where, because of the amount
11  of pipeline out there and the historical conversion
12  ratio, it's still possible to make a quarter and you just
13  don't know two weeks out, correct?
14  MS. WINKLER: Objection; form.
15  THE WITNESS: It's still possible, but again, as you
16  get closer --
17  BY MR. RUBIN:
18  Q  As each day passes --
19  MR. CAPLAN: Excuse me, Lee.  Can he finish his
20  answer?
21  MR. RUBIN: Oh, sure.
22  THE WITNESS: As you get closer, whether it be the
23  beginning of the quarter, the middle of the quarter, two
24  weeks, one week, you get a feeling -- and you can do all
25  the math you want -- that shows you a possible answer,

97

1  but you get a feeling as to where this is heading.
2  BY MR. RUBIN:
3      Q  Right.  And so you're essentially stating a
4  truism:  As each day passes and you get closer and closer
5  to the end of the quarter, you acquire more information
6  about where you're likely to end up?
7      A  Correct.
8      Q  And two weeks is sort of the beginning of that
9  time period you think that there's some sense of that?
10      MS. WINKLER:  Objection; form, misstates prior
11  testimony.
12      THE WITNESS:  As I stated earlier, I think at two
13  weeks out, the company executives would have a pretty
14  good idea as to where they're going to land.
15  BY MR. RUBIN:
16      Q  And again, in the second quarter of 2001, do you
17  have any recollection of where things stood for the --
18  for Oracle two weeks out?
19      A  I don't recall.  Again, I was traveling and
20  going through a job change and not involved in the
21  license business.
22      Q  Mm-hmm.  So if I told you that there was a
23  enormous, record amount of sales that occurred in the
24  last couple days of the quarter, the second quarter of
25  2001, does that refresh your memory at all?

98

1      A  No.
2      Q  If that happened and would -- would that be a
3  quarter in which you would say that might be an exception
4  to your general rule about having a good sense two weeks
5  out?
6      MS. WINKLER:  Objection; form.
7      THE WITNESS:  Can you ask me the question again?
8  BY MR. RUBIN:
9      Q  Yeah.  If you had -- if you had a substantial
10  amount of pipeline but they were not closed, and you
11  add -- but you applied a conversion ratio to that that
12  would have allowed you to make the quarter, if converted,
13  and then on the last day or two of the quarter you
14  actually get a disproportionate amount of the sales that
15  allow you to make your quarter or that put you over the
16  top, would that be a situation in which, looking back two
17  weeks out wouldn't necessarily have given you a
18  particular good indication one way or the other?
19      MS. WINKLER:  Objection to form.
20      THE WITNESS:  So given I wasn't privy to any of the
21  specifics, I can only go on what I know.  As trends were
22  analyzed through quarters, some of which there was a lot
23  of money in the last few days and there was some where
24  they made the quarter early --
25  BY MR. RUBIN:

99

1      Q  Right.  Both occurred.
2      A  Both occurred and they were trended over a
3  number of years as doing business and they were used for
4  analytical purposes.
5      Q  Do you remember any difference on that -- on
6  that spectrum between the second quarter and the third
7  quarter?
8      A  I'm -- I'm trying not to mix up my companies now
9  because I'm with Symantec and previously Veritas and then
10  with Oracle.
11      Q  Sure.
12      A  The -- the best quarter for Oracle was Q4.  The
13  worst quarter was Q1.  And I believe the government
14  quarter ended in Q2.  So Q3 was kind of a -- a
15  nondescript quarter.
16      Q  Did that make Q3 a little bit harder to predict
17  than the other quarters?
18      MS. WINKLER:  Objection; form.
19      THE WITNESS:  No.  It just wasn't a quarter that was
20  renowned for any specific reason.  Q2 was a government
21  quarter.  Q1 was the first quarter of a year, which is
22  typically bad for any software company, and Q4 is
23  typically the best quarter for any software company.
24  BY MR. RUBIN:
25      Q  Do you remember any ratio between Q2 and Q3 in

100

1  terms of how much additional earnings typically were --
2  were made in Q3 compared to the quarter before?
3      A  I don't recall.
4      Q  Okay.  And earnings guidance is typically -- at
5  least in terms of the earnings guidance offered to the
6  public, is usually a year-over-year guidance; is that
7  correct?
8      A  It's typically year over year, but companies
9  sometimes incorporate quarter-over-quarter trends.  And I
10  believe Oracle has some of those comments in its
11  earnings forecasts.
12      Q  Do you know -- remember whether it did at the
13  time that you were at Oracle?
14      A  I don't recall.
15      Q  Okay.  All right.  He has to change tapes, and
16  then why don't we just use this occasion for you to spend
17  five minutes looking at that Schedule A, and then we'll
18  come back on the record after looking at the documents.
19      THE VIDEOGRAPHER:  This is the end of Videotape
20  Number 1.  We are now going off the video record.  The
21  time is 11:48 a.m.
22      ( Recess taken:  11:48 until 11:56 a.m.)
23      THE VIDEOGRAPHER:  This is the beginning of
24  Videotape Number 2.  We are now back on the video record.
25  The time is 11:56 a.m.

Donnelly, Peter  11/30/2005  3:44:00 PM

101

1  BY MR. RUBIN:
2  Q. Okay. Mr. Donnelly, at the break I had asked
3  you to review Donnelly Exhibit 1, and in particular, the
4  schedule, Schedule A that's attached to it that requested
5  that you produce documents, certain documents that are
6  described in the -- in the request, and I believe the
7  specific requests are on page 5.
8  A. Yes.
9  Q. Did you have a chance to review that?
10  A. Yes, I did.
11  Q. Okay. And you had indicated you had not looked
12  at this particular request before today, correct?
13  A. That's correct.
14  Q. And now you've had a chance to look at it?
15  A. Yep.
16  Q. Okay. And reviewing the requests, do you
17  believe, sitting here today, you have any documents that
18  are responsive to the requests on page 5?
19  A. No.
20  Q. Okay. And your -- I believe your prior
21  testimony was that you don't have any Oracle documents in
22  your possession at your home?
23  A. Relevant to this case, yes.
24  Q. Well, any -- well --
25  A. Relevant to any of the matters listed.

102

1  Q. Relevant to any of the items?
2  A. Sorry. Relevant to any of the items listed on
3  here.
4  Q. Or I should say responsive or that would be
5  called for in any of the items?
6  A. Correct.
7  Q. Okay. Now, and is it -- and do you know within
8  a reasonable degree of certainty whether that would be
9  true for your electric -- any computer or laptop or any
10  other electronic information that you have?
11  A. That's correct.
12  Q. So did you ever use your computer at home for
13  work purposes?
14  A. Yes, I did.
15  Q. Okay. And did you -- and was any Oracle
16  information on the computer the day after you were
17  dismissed from the company?
18  A. I had a laptop that I used at work and at home.
19  Q. Mm-hmm.
20  A. So there wasn't another computer at home.
21  Q. I see. So there was no separate home computer
22  that had Oracle information on it?
23  A. No.
24  Q. Okay. Okay. And so your testimony here today
25  is you don't have any documents responsive to the

103

1  subpoena?
2  A. Correct.
3  Q. Okay. And Mr. Donnelly, back -- if I had -- if
4  I had touched upon this already, I apologize. I just
5  can't remember.
6  A. That's okay.
7  Q. But for the -- for the third quarter of '01, do
8  you remember having any opinion about the projection for
9  database growth that Oracle had indicated they expected
10  to achieve as of -- for the third quarter of '01? And
11  when I say that Oracle said they expected to achieve, in
12  their December 14th market guidance announcement, do you
13  remember having any knowledge of what their estimate for
14  database growth was?
15  MS. WINKLER: Objection; form.
16  THE WITNESS: So I don't have any specific
17  recollection of growth rates. I have a recollection that
18  the management team was pretty positive on the outlook
19  for the third quarter.
20  BY MR. RUBIN:
21  Q. How about with respect to database in
22  particular?
23  A. I believe both the applications and database
24  business were communicated as being healthy, and that's
25  what they were communicated as.

104

1  Q. And did you have any information concerning
2  database growth that contradicted that or in any way
3  caused you to doubt that estimation?
4  A. So, again, I didn't have access to forecasts,
5  but working in a company for a period of time, you have
6  conversations and you form opinions. And both seemed to
7  be very pos- -- surprisingly positive given the economic
8  conditions. We were -- I believe we were projecting
9  growth in both the applications and database business.
10  Q. Did you indicate to anyone that you thought that
11  those projections were incorrect?
12  MS. WINKLER: Objection; form.
13  THE WITNESS: I believe I mentioned to the
14  inspector -- the inspector? -- the investigator --
15  BY MR. RUBIN:
16  Q. Clouseau.
17  A. Yeah, Mr. Clouseau.
18  -- the investigator that they were surprisingly
19  high and probably exaggerated.
20  Q. The --
21  A. I don't know the specific words I -- words I
22  used.
23  Q. The -- the -- going back to your stock options,
24  though, those numbers did not cause you to believe that
25  as of March 1st, Oracle would miss its quarter as a

105

```
1   company, though, correct?
2       MS. WINKLER:  Objection; form.
3       THE WITNESS:  As of March 1st?
4   BY MR. RUBIN:
5       Q  In other words, when you left, December 19th,
6   right?  You left on December 19th?
7       A  I left on December the 19th, correct.
8       Q  Right.  As of that date, did you have a belief
9   about whether the database projections were high or
10  low -- high or --
11      A  So let me put this into perspective.  I had just
12  gotten fired after coming back on a worldwide trip.
13  The -- the forecast projections of various parts of
14  Oracle's business was not front and center in my mind.
15      Q  Okay.  So would it be fair to say that then --
16  so do you -- what is your testimony today of what your
17  view was as of -- to the extent you had any -- and maybe
18  your testimony is because of other things that were
19  occupying you, you didn't have one.  But did you have a
20  view as of December 14th, approximately December 14th,
21  when Oracle issued its market guidance, whether the
22  database numbers were high, about right, low?
23      MS. WINKLER:  Objection; form, asked and answered.
24      THE WITNESS:  I -- I think I already responded to
25  this.  I thought that they were very positive, perhaps
```

106

```
1   overly positive.  But the company's got a pretty good
2   track record of delivering what it says it's going to do.
3   I wasn't involved in those sides of the business, so
4   therefore I assumed that that was accurate.
5   BY MR. RUBIN:
6       Q  And you --
7       A  I had no reason to believe it was inaccurate,
8   apart from general buzz around the company that said,
9   "Man, these are pretty aggressive."  And I didn't put two
10  and two together around that earnings release and my
11  disposition of the stock.
12      Q  Because you didn't have any reason to think that
13  Oracle -- well, you had -- you did not have any reason to
14  believe that Oracle was not going to perform as -- as the
15  market guidance provided?
16      A  I had no specific evidence of this data being
17  incorrect, apart from, again, the comments that they were
18  aggressive or overly, you know, positive.  And again, I
19  think I mentioned earlier, I started looking as an
20  outsider, as a shareholder, and listening to analyst
21  comments, public comment by executives, et cetera.
22      Q  And as you said earlier --
23      MR. CAPLAN:  Excuse me, Lee.  I don't think he's
24  finished.
25      MR. RUBIN:  Oh, I'm sorry.
```

107

```
1       THE WITNESS:  And message boards.
2   BY MR. RUBIN:
3       Q  Right.
4       A  Typical things.
5       Q  And as you said I believe earlier, that as of
6   December 19th, had you believed that Oracle was not going
7   to make its market guidance, you're not stupid and you
8   would have tried to sell earlier, correct?
9       MS. WINKLER:  Objection; form.
10      THE WITNESS:  If I known something specific on the
11  19th, if I'd had evidence on the 19th, then I -- given
12  that I wasn't an employee, it wouldn't be inside
13  information and I could go off and do what I want to do.
14  I had no specific information that would guide my change
15  of selling the stock on the 19th of December.
16  BY MR. RUBIN:
17      Q  And, in fact, based upon your e-mail to
18  Mr. Henley, you believed that the mid-30s was a
19  reasonable price for the stock all the way through --
20  through March 1st and thereafter?
21      MS. WINKLER:  Objection; form.
22      THE WITNESS:  That's what the analysts, the
23  financial advisor, the market data, and the public
24  comment would lead me to believe.
25  BY MR. RUBIN:
```

108

```
1       Q  And again, I'm focusing on the time that you
2   left the company.  As of the time that you left, you
3   didn't have any reason to believe that the mid-30s was an
4   inaccurate target for the company?
5       MS. WINKLER:  Objection; form.
6       THE WITNESS:  On the day that I left, I wasn't
7   thinking about the stock price of the company.
8   BY MR. RUBIN:
9       Q  Or the days that you left, you know, in the days
10  following when you left --
11      A  So in early January, once I'd gotten through
12  that time period, the holidays, I set up a time in early
13  January to start thinking about disposing of the stock.
14  Then started looking at the market price, the
15  projections, the public comments, all of the pieces of
16  information a normal shareholder might look at.  All of
17  the publicly available information.
18      Q  And you didn't have any information from your
19  time at Oracle that caused you to believe that the
20  mid-30s target was unreasonable?
21      MS. WINKLER:  Objection; form.
22      THE WITNESS:  There was nothing that -- sorry.
23  There was nothing that I added to my analysis that would
24  make me go sell that immediately.
25  BY MR. RUBIN:
```

109

1    Q  From what you knew while you were at Oracle?
2    MS. WINKLER:  Objection; form.
3    THE WITNESS:  Correct.
4    BY MR. RUBIN:
5    Q  Okay.  Now, did the -- are you aware that or
6    have you become aware that at some point Mr. Ellison made
7    a comment about some savings that had occurred as a
8    result of the implementation of Suite 11i, some savings
9    that occurred internally at the company?
10   A  Yes.
11   Q  Okay.  And were you ever personally privy to any
12   data analysis or examination of -- internally of any
13   savings that had resulted from Suite 11i's
14   implementation?
15   A  I was involved in providing data to help support
16   that analysis.
17   Q  Okay.  And tell me specifically what data you
18   provided and who --
19   A  I don't recall specifically what I provided, but
20   I do recall being part of the conversations around
21   supporting that number.
22   Q  And were you providing any information related
23   to particular organizational units or particular parts of
24   the company?
25   A  Yes.

110

1    Q  Which ones?
2    A  The ones that I supported.
3    Q  Okay.  And was there a Suite 11i implementation
4    that related to the ones you supported?
5    A  Well, 11i is an umbrella name for a suite of
6    applications that cover many different aspects of the
7    business, whether it be the general -- general ledger and
8    accounting systems, all the way through sales force
9    automation.
10   Q  And were there any particular modules or
11   applications that were implemented during the period of
12   time you were working at Oracle?
13   A  General ledger was -- the whole accounting suite
14   was implemented during that time period.  I believe there
15   are some marketing suites, marketing automation, program
16   automation that was implemented --
17   Q  Okay.
18   A  -- in the areas that I'm familiar with.
19   Q  And did you -- and what did you do to provide
20   any data or analysis to support, you know, the --
21   Oracle's estimation of cost savings from Suite 11i?
22   A  I was asked numerous questions and gave certain
23   pieces of information.
24   Q  Do you remember what the pieces of information
25   you gave --

111

1    A  No, I don't recall specifically.
2    Q  Do you remember providing any information that
3    indicated there had been some efficiencies or cost
4    savings that had come from the implementation?
5    A  I remember providing responses to the requests I
6    gave.
7    Q  Do you remember one way or the other whether
8    they indicated that there were some savings or
9    efficiencies that had been -- that had been obtained?
10   A  There -- what's the best way to put this?  You
11   can make numbers say many different things.  I've been
12   around numbers most of my life, and you can make analysis
13   communicate whatever you want it to communicate.
14   Q  Well, were you providing the best data that you
15   had available in terms of any efficiencies or savings
16   that had resulted?
17   A  Again, I was providing responses to questions
18   that I was asked about.
19   Q  Okay.
20   A  And one could use that information to support or
21   refute a position on savings related to 11i.
22   Q  But do you remember which way your numbers would
23   have cut; that is, would they have supported the notion
24   that they -- that Suite 11i resulted in cost savings, or
25   would they have resulted in undermining or refuting the

112

1    notion that it did?
2    A  So I guess it -- I want to make sure I get this
3    communicated properly.  You can attribute whatever you
4    want to a particular goal.  Whether or not it's truly
5    attributable is a -- is a different question.
6    Q  Your -- your -- is it -- is it your testimony
7    that you're saying that the causative or the causal link
8    is what's subject to interpretation?
9    A  Correct.
10   Q  Okay.  So -- so with that qualification
11   understood, did the numbers that you provided about the
12   modules or the applications that you were personally
13   working with, did they indicate that there had been some
14   savings or efficiencies?
15   MS. WINKLER:  Objection; form.  Are you asking him
16   to assume the causal link, or what are you asking him to
17   tell you?
18   BY MR. RUBIN:
19   Q  No.  I'm asking you whether, just based upon
20   data -- you're saying you responded to questions.
21   A  Correct.
22   Q  Somebody who was putting together this analysis
23   or this report asked you certain questions, and you
24   provided it.  What I'm asking you, without getting into
25   whether you -- I understand your qualification that --

113

1  you know, so your responses were driven by their
2  questions, I think is what you're saying, correct?
3      A  So, an example --
4      Q  Yes.  Maybe give me a concrete example.
5      A  So one could -- one could look at the past
6  relationship between revenue and expense at the beginning
7  of an exercise, and then at the end of the exercise, look
8  at that relationship once again.  And if there's been an
9  improvement in the ratio of expense to revenue, you could
10 use that and say, well, that was entirely 11i-related,
11 and I believe that's what happened, as opposed to turning
12 around and say we put this module in and it saved us a
13 specific amount of money.
14          Second thing to consider is this billion-dollar
15 savings was being projected as, you know, what other
16 companies might reasonably go save -- that they might
17 reasonably save proportionately similar amounts of money.
18          Well, we got our software for free.  We
19 implemented it essentially for free because it was part
20 of the, you know, R&D cycle.  And implementation like
21 that could have cost hundreds of millions of dollars for
22 someone to implement.
23      Q  Is that -- when you say hundreds of millions, is
24 that based on any particular implementation that you're
25 talking about?

114

1      A  Size of the company and the cost of the software
2  and the cost of the consulting services.  An ERP
3  implementation for Oracle could cost 50 million dollars.
4      Q  Are you including the purchase of the license
5  itself?
6      A  Correct.
7      Q  Oh, I see.  You're not talking about just the
8  consulting side?
9      A  No.  The cost to implement the whole thing might
10 be 50 million dollars, I'm guessing.
11     Q  At a big company with lots of --
12     A  Correct.
13     Q  -- CAPPLICATIONS, et cetera?
14     A  That wasn't factored into the way this was
15 presented by Larry Ellison as a, you know, component part
16 of the savings.
17     Q  Did you -- once you -- so going back then, when
18 you provided the data, is it fair then to assume that
19 you -- that putting aside, again, the causative effect,
20 the causation conclusion that -- that Oracle determined
21 to be present, did your numbers indicate that for a
22 certain period of time, the ratio between revenue and
23 expenses had been -- had positive movement after the
24 implementation of Suite 11i?
25          MS. WINKLER:  Objection; form.

115

1          THE WITNESS:  In some cases it did, in some cases it
2  didn't.
3  BY MR. RUBIN:
4      Q  And you provided that data?
5      A  Correct.
6      Q  Right.  And your understanding was this -- there
7  was an internal -- this was part of an internal analysis
8  being done, correct?
9      A  Correct.
10     Q  Right.  And now, did you ever see the actual
11 final product of that analysis?
12     A  I seem to recall some discussions with Jeff and
13 other members of the finance community around this topic,
14 but I can't recall a specific document or a specific time
15 or a specific number.  Clearly, it was a billion dollars,
16 but that's what the analysis stated.
17     Q  Did you ever have -- did you ever have in your
18 hands a report or a document that -- that provided the
19 underlying analysis?
20     A  I may have, but I don't recall specifically when
21 or the content.
22     Q  You don't have any details --
23     A  No.
24     Q  -- about it?
25          Now -- and when you talked to the investigator,

116

1  did you describe the -- Ellison's claim of the
2  billion-dollar savings as a marketing gimmick?
3      A  Yes.
4      Q  As a Wall Street marketing gimmick?
5      A  Yes.
6      Q  Those were the terms, that was the phrase that
7  you used?
8          MS. WINKLER:  Objection; asked and answered.
9          THE WITNESS:  I believe I used those terms.
10 BY MR. RUBIN:
11     Q  And when you say "gimmick," what do you mean by
12 that?
13     A  Larry's a flamboyant guy who likes to make wild,
14 you know, broad statements.  I find that to be gimmicky.
15     Q  And do you think a customer in the marketplace
16 would think that Oracle purchases its own software when
17 it implements it internally?
18     A  I -- I don't believe they would -- looking at
19 this marketing material, I don't think that would
20 necessarily be the first thing that they'd think about.
21     Q  No.  But I'm asking you -- an I -- an I -- a
22 sophisticated IT customer who is purchasing a
23 20-million-dollar license, Oracle license, do you think
24 they would believe that Oracle purchases its own
25 software?

117

1    A  No.
2    Q  All right.  So it would be fair to say that
3  anybody who is a customer of Oracle would understand
4  that Oracle uses its own software for free, right?
5    MS. WINKLER:  Objection; form.
6    THE WITNESS:  If -- if -- so ask me the question one
7  more time, please.
8  BY MR. RUBIN:
9    Q  Would -- would an IT procurement officer, a
10  purchaser of Oracle software for a Fortune 500 company,
11  would he believe that Oracle purchases its own software
12  to use internally?
13    MS. WINKLER:  Objection; form.
14    THE WITNESS:  I'm not sure why they'd have an
15  opinion on it, but if they did, I would assume that the
16  answer would be no.
17  BY MR. RUBIN:
18    Q  Right.  Because they're sophisticated enough to
19  know that companies wouldn't charge themselves internally
20  for the software they make, right?
21    MS. WINKLER:  Objection to form.
22    THE WITNESS:  That's correct.
23  BY MR. RUBIN:
24    Q  Right.
25    A  But in the context of a marketing statement,

118

1  that was something that wasn't factored into that
2  billion-dollar savings.
3    Q  Right.  And I'm asking you -- all I'm asking you
4  is when a company -- when an IT officer hears that a
5  company internally saves some money from using its own
6  software, do you believe that they would think that they
7  had -- that that included any money that they had to pay
8  for the software themselves to use their own software?
9    MS. WINKLER:  Objection; form.
10    THE WITNESS:  I -- I don't know what they might be
11  thinking.
12  BY MR. RUBIN:
13    Q  Well, would you think that if you were
14  purchasing something for Symantec, that if somebody
15  advertised that they achieved some cost savings from
16  their own software, would you assume that they had to pay
17  for it?
18    MS. WINKLER:  Objection; form.
19    THE WITNESS:  The way the --
20  BY MR. RUBIN:
21    Q  Well, if you could just answer that question
22  first.
23    MR. CAPLAN:  I think he is answering, Lee, and
24  you're interrupting him.
25    MR. RUBIN:  No, I don't think --

119

1    MS. WINKLER:  You just don't like his answer.  Will
2  you let him answer the question?
3    MR. RUBIN:  No, I don't.  I just -- "the way" didn't
4  sound like an answer to my question.
5    Q  But go ahead.
6    A  The way the marketing message was presented was
7  to allude to the fact that you could save a similar
8  amount of money by implementing this software, just like
9  we did.  We saved a billion dollars.  You could save the
10  same amount.
11    Q  Right.
12    A  It didn't say you could save 880 million dollars
13  after you factor in the cost of the software.
14    Q  Right.  And that's -- that's really -- I think
15  that was nonresponsive.  So, but what I'm trying to --
16  what I'm trying to ask you -- I understand your position
17  on what the marketing -- what the -- what -- your belief
18  about the marketing representation, but what I'm asking
19  you is that if Symantec was advertising -- representing a
20  product and indicated "We've used this Veritas storage
21  net backup and have achieved particular cost savings or
22  in terms of costs that are needed to retrieve backup
23  information," for example -- if you made that
24  representation to a customer, would you assume that the
25  customer thought that when you talked about those

120

1  savings, that you actually had to purchase the software?
2    MS. WINKLER:  Objection; form.
3  BY MR. RUBIN:
4    Q  Just it's a yes or no.  What do you think what a
5  Symantec customer would think?
6    A  So if -- I'm going to be unresponsive again.
7    Q  Right.  I can see that.
8    A  If -- if it was projected as you could save 30
9  percent on your storage costs by using our software,
10  that's a reasonable statement.
11    Q  No, no.  But I'm asking you a different
12  question, with all due respect.  I'm asking you if you
13  indicated -- and I don't have any reason to think
14  Symantec ever has -- but if you indicated that "we saved
15  X percent from implementing our net backup," would an
16  I -- would the average IT customer believe that you
17  didn't -- that you paid for that software and that was
18  part of your formulation?
19    MS. WINKLER:  Objection; form.
20    THE WITNESS:  If they -- if they stated, "We saved X
21  percent," then I don't think the cost of the software is
22  relevant to the analysis.
23  BY MR. RUBIN:
24    Q  Okay.
25    A  If they turn around and said, "We saved 500

121

1  million dollars using our backup software," I would say a
2  reasonable IT person would ask, "Does that include the
3  cost of the software or not?" or, "Is that true benefit?"
4  So going --
5      Q  Do you have any reason -- do you have any
6  knowledge of whether, when -- to the extent customers
7  asked about the savings that came from Suite 11i, whether
8  they asked the exact question that you just asked?
9      MS. WINKLER: Objection; form.
10     THE WITNESS: I have no specific knowledge of
11  questions asked by customers in relation to this matter.
12  BY MR. RUBIN:
13     Q  And some customers have sophisticated IT
14  purchasers, correct?
15     A  You obviously know more than I do.
16     A  Well, I mean, based upon your experience at
17  Oracle and Symantec, do people who purchase 10, 20
18  million dollars' worth of license software -- are they
19  typically sophisticated in the world of information
20  technology?
21     MS. WINKLER: Objection; form.
22     THE WITNESS: I'm probably not the best person to be
23  answering that question. I don't deal directly with
24  customers who buy stuff from us.
25  BY MR. RUBIN:

122

1      Q  Well --
2      MR. CAPLAN: I think that's a speculation objection.
3      THE WITNESS: That's my point. Yeah, I don't know.
4  BY MR. RUBIN:
5      Q  Were -- would you consider Oracle -- purchases
6  of Oracle software big ticket items for companies that
7  were purchase -- for its IT department? Was it a large
8  portion of their IT sale -- spending --
9      MS. WINKLER: Objection --
10  BY MR. RUBIN:
11     Q  -- when they purchased the Oracle software?
12     MS. WINKLER: Objection; form. He's already said
13  that he doesn't -- didn't deal with customers.
14  BY MR. RUBIN:
15     Q  Go ahead. You can answer.
16     A  As a percentage of their IT sale, I would say
17  it's not a major component. As a dollar amount of a
18  company sale, it's significant.
19     Q  I'm sorry. As a dollar amount of the company
20  sale, did you say?
21     A  Yeah, of purchasing. So -- so it might be five
22  percent of a -- of a vendor's wallet, but that five
23  percent -- of a customer's wallet, but it's still a lot
24  of money, because they buy other things like network
25  routers and servers and, you know, all that stuff.

123

1      Q  Right.
2      A  So as a percent, no, it's not necessarily the
3  largest line item.
4      Q  For IT?
5      A  Correct.
6      Q  Did -- other than the conversation that you
7  indicated that you had with the investigator in which you
8  had called about your stock options, did you have any
9  subsequent conversation with any investigator?
10     A  I want to try and get the timing right here. I
11  received two subpoenas.
12     Q  Recently?
13     A  I received two subpoenas recently. Whether I
14  received a phone call at that point in time or I had a
15  conversation --
16     Q  Okay. So I want to ask you about that in a
17  second. But before receiving the subpoenas indicating
18  that you were going to need to sit for a deposition, so
19  between the time that you spoke to him initially and
20  called him about the stock options and you had your 10-
21  or 15-minute conversation -- so after that time but
22  before you received the subpoenas, did you have any
23  conversation with -- with that or any other investigator?
24     A  So I don't recall any other specific
25  conversation. But having said that, there could have

124

1  been a second time that we spoke, but the same response
2  would have been given at that point. I can't remember.
3  I mean, this is five years ago. I don't remember every
4  single conversation I have. I remember speaking to an
5  investigator. It may have been on one occasion or two
6  occasions, but it was around about the same time, and the
7  content of those conversations were the same. So, you
8  know, if you have a record of another conversation --
9      Q  I don't. I mean they may, but I don't. So I'm
10  really asking -- I'm completely asking you for your best
11  memory.
12     A  I'm not aware of a separate conversation, but
13  there could quite well have been one around about the
14  same time.
15     Q  But you don't have any memory of it?
16     A  No.
17     Q  Okay. Then you said that other than what may
18  have been a second conversation but you have no memory
19  of, specific memory of, the next time you talked to an
20  investigator was in connection with the service of the
21  subpoenas?
22     A  I received two subpoenas, didn't really have a
23  clue what to do, and then a guardian angel calls me and
24  says, "Hey, do you want some help with this?"
25     Q  Who was the guardian angel?

125

1    A  Representing one side or the other, I don't know
2  which side.
3    Q  Did the person identify themselves to you?
4    A  I'm sure they did, but I -- you know, I don't
5  know what their name was.
6    Q  And did the person offer you legal assistance,
7  offer to retain a lawyer for you?
8    A  Correct.
9    Q  And did you accept?
10    A  Yes.
11    Q  Okay.  And then what happened next in terms of
12  the lawyer?
13    A  I corresponded with Alan.
14    MR. CAPLAN:  You don't have to say anything about
15  our correspondence.  That's a sufficient answer.
16    THE WITNESS:  Okay.
17  BY MR. RUBIN:
18    Q  Did the individual -- when this individual
19  offered you legal assistance, did -- did you -- did they
20  give you Mr. Caplan's name?
21    A  They said I could pick the attorney of my
22  choice, "Or if you don't have one, we can make -- we can
23  suggest one to you."
24    Q  Okay.  And you said what?
25    A  I don't have a need for an attorney, so sounds

126

1  good to me.
2    Q  And they suggested then Mr. Caplan?
3    A  Correct.
4    Q  Or he -- I should say he suggested.  This is one
5  person who you were talking to, correct?
6    A  I believe it was one person.  There may have
7  been two different people in the course of the
8  discussions.  I don't recall.
9    Q  And now, are you paying Mr. Caplan his legal
10  fees?
11    MR. CAPLAN:  Excuse me.  Don't answer that question.
12  BY MR. RUBIN:
13    Q  I'm just asking you if -- are you?
14    MR. CAPLAN:  It's an improper question.
15    MR. RUBIN:  You've allowed that question before,
16  Mr. Caplan.
17    MR. CAPLAN:  Well, I shouldn't have.
18  BY MR. RUBIN:
19    Q  Do you know if someone else is paying
20  Mr. Caplan's legal fees?
21    MR. CAPLAN:  Objection.
22  BY MR. RUBIN:
23    Q  Go ahead.  You can answer.
24    A  Oh.  I can answer that one?
25    MR. CAPLAN:  Yeah.

127

1    THE WITNESS:  Yes.
2  BY MR. RUBIN:
3    Q  And who is?
4    A  The plaintiff lawyers.
5    Q  Okay.  Now, you had said that Mr. Caplan sent
6  you the complaint.  That was the first time you had read
7  the complaint, correct?
8    A  Yes.
9    Q  So I gather that that was the first time you had
10  learned that you had been identified as a confidential
11  witness in the complaint?
12    MR. CAPLAN:  I'll object to that to the extent it
13  calls for communications between Mr. Donnelly and myself,
14  and I don't know how he can answer that, so I'm going to
15  instruct him not to answer.
16    MR. RUBIN:  Well, I asked him whether it was the
17  first time he had learned, not what you said to him.  I
18  mean, we've already established that he got the document
19  at that time, so I don't think there's any privileged
20  communication in asking him, "Was that the first time you
21  learned?"
22    MR. CAPLAN:  Well, you're asking him if that's when
23  he learned.  I'll allow that question, but I don't want
24  that to be considered a waiver --
25    MR. RUBIN:  Yeah, I understand.

128

1    MR. CAPLAN:  -- of the privilege.
2    THE WITNESS:  Yes.
3  BY MR. RUBIN:
4    Q  Okay.  So is it -- is it fair to assume then
5  that at the time that you spoke to the investigator, he
6  did not indicate to you that you -- that any statements
7  you made would be part of a complaint?
8    MS. WINKLER:  Objection; form.
9    THE WITNESS:  I -- I don't recall.
10  BY MR. RUBIN:
11    Q  Okay.  Did you ask for any confidentiality in
12  connection with the information you were providing him?
13    A  I don't recall.  I don't recall.  I called the
14  number to see if I could get some of the money back that
15  I lost and found out I couldn't and there was a
16  conversation end.
17    Q  Right.  And I'm asking you if -- do you have a
18  memory of asking him to be -- asking him for an assurance
19  of confidentiality concerning the information that you
20  were providing him about the questions he was asking
21  about the company?
22    MS. WINKLER:  Objection; asked and answered.
23    THE WITNESS:  I don't recall.
24    MR. RUBIN:  Hold on one sec.  Give me one minute.
25    Okay.  I don't have anything further at this

129

1  point.
2
3       MS. WINKLER: We should probably take a lunch break.
4       THE VIDEOGRAPHER: Okay. We are now going off the
5  video record. The time is 12:28 p.m.
6       ( Recess taken:  12:28 until 1:27 p.m.)
7       THE VIDEOGRAPHER: We are now back on the video
8  record. The time is 1:27 p.m.
9
10           EXAMINATION
11  BY MS. WINKLER:
12      Q  Mr. Donnelly, this morning you testified about
13  philosophical differences you had with certain people in
14  the company, and I believe you specifically mentioned
15  Jennifer Minton?
16      A  It was -- it was only Jennifer Minton.
17      Q  Only Jennifer Minton.
18         Could you elaborate on what you meant when you
19  said "philosophical differences"?
20      A  In the context of how you support -- how you
21  support a large corporation, we had different opinions on
22  organizational structure, we had different opinions on
23  the manner in which you talk to individuals, the manner
24  in which you develop individuals, the manner in which you
25  develop talent inside your organization. Basically we

130

1  just didn't see eye to eye on a number of things.
2      Q  What do you mean when you say the manner in
3  which you talk to individuals?
4      A  Well, put it bluntly, she's an absolute
5  nightmare and she's rude to her staff, she's
6  inconsiderate, and just it's not how I am.
7      Q  Do you recall having any specific incidents
8  where you -- you clashed with Ms. Minton?
9      A  Yes.
10      Q  Anything specific other than -- what you just
11  told me seemed to be kind of general areas about the
12  manner in which you talked to people, the manner in which
13  you developed people. But any specific incident over
14  some way that the business was run?
15      A  Not specifically the business. How the finance
16  organization was structured, yes, we had differences.
17      Q  What were your differences about how the finance
18  organization was structured?
19      A  Well, I principally believe finance is there to
20  support the business and to be a business partner. She
21  had a different opinion.
22      Q  And what was her opinion?
23      A  That -- that they were there to count numbers,
24  to be an accountant, to make sure the numbers were
25  accurate. And I had a different opinion.

131

1      Q  Was it your opinion that she tried to limit the
2  role of finance?
3      A  I think she had a narrow -- narrower view of
4  finance. Whether she took actions to purposefully limit
5  it, I don't know.
6      Q  Okay. You also testified that when you were
7  working for Gary you had ruffled a few feathers. Did you
8  mean anyone other than Ms. Minton when you said that?
9      A  In addition to some people that represented her
10  organization.
11      Q  Do you recall any specific individuals?
12      A  One individual was -- I'm going to -- I forgot
13  his name now, as soon as you said this. He was a VP of
14  finance for Asia Pacific. I think it was Greg Davies, I
15  believe. It was one individual that I didn't see eye to
16  eye to. But the vast majority of people in the finance
17  arena I got along with very well.
18      Q  Anyone other than Mr. Davies that you recall
19  specifically?
20      A  Not -- not specifically.
21      Q  Okay. Let's mark that as 5.
22         (Deposition Exhibit 5 was marked.)
23      THE WITNESS: I thought this was a list of people.
24  BY MS. WINKLER:
25      Q  Sorry. It's not.

132

1      A  You got me worried there: "Well, what about all
2  these people?" Sorry.
3      Q  Mr. Donnelly, you've just been handed what's
4  been marked as Exhibit 5, which is NDCA-ORCL 503848
5  through 503887, although I believe the actual Bates
6  numbers don't appear on the spreadsheet portion of the
7  document. And I'll represent to you that Oracle produced
8  this document and described it as having come from your
9  files. Could you --
10      A  Okay.
11      Q  -- just take a minute to flip through there?
12      A  Okay.
13      Q  Can you tell me what this document is?
14      A  It's a document that we produced to provide a
15  summary status of the business on a line-of-business
16  basis. So this one specifically here was for the support
17  line of business, which is one of the groups that I was
18  responsible for. It was produced by Graeme Mair, who
19  replaced Priscilla Morgan as the head of finance and
20  operations for that group. And it's something that's
21  typically -- sorry -- typically done every quarter.
22      Q  Okay. And did Graeme Mair report to you?
23      A  Yes, he did.
24      Q  Okay. And if you'll look at the first page of
25  the document, which is 503848, can you identify what that

133

1  describes?
2      A  5038 --
3      Q  The very top page where the sticker --
4      A  This one?
5      Q  Yes.  Yes.
6      A  It looks like I'm addressing this from myself to
7  Tom Williams, who's the -- who was at the time the
8  corporate controller.  I believe he was still a corporate
9  controller at that time.  Actually, I take that back.  I
10  think he still with the company but used to be the
11  corporate controller.  I'm not sure when the time change
12  happened.
13      Q  And when you say that change -- what was his --
14  what other position did Mr. Williams have with the
15  company?
16      A  At some point in time, I don't remember the
17  exact timing, he -- the controllership position moved to
18  Jennifer Minton, who used to report to Tom, and Tom
19  became an advisor to Jennifer.
20      Q  And did that happen while you were still with
21  the company?
22      A  I believe so, yeah.  I'm just recalling that.
23      Q  When you say he became an adviser to Jennifer,
24  would you call that a promotion or a demotion?
25      A  He moved to more of a part-time status and

134

1  decided -- and agreed to stay on for a period of time to
2  transfer knowledge to Jennifer.
3      Q  Okay.  And what is the date on that e-mail?
4      A  Wednesday, the 13th of September, 2000.
5      Q  And why did you send this document to
6  Mr. Williams?
7      A  I'm assuming he asked for it.
8      Q  Was this something that you did on a regular
9  basis, send these type documents to Mr. Williams?
10      A  I would not say on a regular basis, but the way
11  I introduced this e-mail, "As promised, please find
12  attached," I'm assuming he asked for a copy of this and I
13  sent it to him.
14      Q  Okay.  But you don't recall having sent these to
15  him on a quarterly or regular basis?
16      A  In his position as controller, he may have
17  received these on a more regular basis.  In his position
18  as an advisor, I don't recall sending them on a regular
19  basis.
20      Q  Okay.  And who is Dan who is mentioned in your
21  e-mail?
22      A  That's Dan Sharpley.  He was the vice president
23  of finance and operations for the education line of
24  business.
25      Q  And Dan also reported to you; is that correct?

135

1      A  Correct.
2      Q  Do you recall the meeting that you mentioned in
3  the text of the e-mail?
4      A  I don't.
5      Q  Did you have any type of regular meetings with
6  Mr. Williams?
7      A  Not -- not in his position as an advisor.
8      Q  What about in his position as corporate
9  controller?
10      A  Well, at the point I worked in the controller's
11  organization for Jennifer, I had a regular meeting with
12  Tom.  And subsequent to moving to Gary's organization, I
13  continued a professional relationship with him.  So we
14  may consult on -- may have consulted on matters
15  periodically.  There wasn't a recurring one-on-one
16  meeting.
17      Q  And that's when you were in Gary's organization?
18      A  That's correct.
19      Q  Would you turn to page 2 of the PowerPoint
20  presentation?  I believe there are page numbers on the
21  bottom right corner.
22      A  Okay.
23      Q  And is it correct that this is a document that
24  was -- type document that was produced every quarter?
25      A  Yes.

136

1      Q  Please turn to page 8 next.  If you'll take a
2  look at the first bullet point that says, "Significant
3  increase in iTAR activity compared to Q400 and
4  accelerating."  What does "iTAR" stand for?
5      A  Okay.  When somebody calls in for a problem with
6  a software, they're recorded in something called a
7  Technical Assistance Request, TAR.  And iTAR we put "i"
8  in front of everything or at the end of everything.  It
9  was part of our naming.  So 11i, you know, type of --
10      Q  Mm-hmm.  Was there a point in time when it was
11  called just a TAR and then it became an iTAR?
12      A  Yes.
13      Q  And why did that happen?
14      A  I'm recalling it may have something to do with
15  the name it was given inside the 11i application.
16      Q  Okay.  Do you recall why there was a significant
17  increase in iTAR activity in Q1 '01?
18      A  No.
19      Q  Do you know why this type of information would
20  have been relevant or why Tom Williams would have wanted
21  this type of information?
22      MR. RUBIN:  Objection; form, foundation.
23  BY MS. WINKLER:
24      Q  I think you need to answer out loud.
25      A  I'm sorry.  No.  I mean, he was a professional

137

1  colleague and he asked for it, and I gave it to him.
2  Q  I'll ask you to turn to page 15 next.  And if
3  you'll take a look at the third bullet point and read
4  that, please.
5  A  The third major bullet point?
6  Q  Yes.  Yes.
7  A  "Increase in escalations from customers
8  migrating from 10.7 to 11i and from 7.34 to 8.X.  ERP
9  study" --
10  Q  I think you can stop there.
11  A  Oh, okay.
12  Q  What -- do you recall the increase in
13  escalations from customers migrating from 10.7 to 11i?
14  A  Without you asking the question, it wasn't
15  forefront in my mind, but yes.
16  Q  And can you explain what you recall about that?
17  A  That there were increased escalations around
18  that time.
19  Q  Do you know what those escal- -- increased
20  escalations were attribute -- attributed to?
21  A  Well, most escalations relate to -- well, in
22  fact, all escalations relate to technical or performance
23  problems related to our software.
24  Q  And do you recall that there were technical and
25  performance problems related to 11i?

138

1  A  Yes, but there are also technical and
2  performance issues related to any piece of software.
3  Q  Do you recall that the technical and performance
4  issues related to 11i were any different from other
5  previous software released by Oracle?
6  A  Based on this information, yes.  But again, it
7  wasn't something forefront in my mind if you'd asked me
8  that separately.
9  Q  Mm-hmm.  And what -- what do you recall about
10  that, if anything?
11  A  Well, we were trying to put together an
12  integrated suite of products that all seamlessly, you
13  know, matched.  And it doesn't work that easily.
14  Q  Okay.
15  A  It's not -- it's not as easy as it sounds.
16  Q  And if you'll read the last line or the last
17  sentence under that bullet point.
18  A  "Lack of ERP/CRM integration is becoming a key
19  customer concern."
20  Q  What -- do you know what that sentence means?
21  A  It wasn't working the way it was supposed to
22  work.
23  Q  Specifically, with the ERP and CRM integration.
24  A  So, again, the company was promoting the
25  11i suite of applications, which covered a broad range of

139

1  ERP and CRM-related products, and it was being presented
2  as an integrated suite.  And the reality was it wasn't as
3  integrated as the marketing message might have intimated.
4  Q  Do you recall that there were customer
5  complaints about that?
6  A  Again, there were customer complaints about --
7  Q  I'm asking specifically about the lack of
8  integration.
9  A  -- any piece of software.
10  I wasn't in a position to be listening to those
11  complaints.  Was I aware that we had some integration
12  challenges?  Yes.  Did I have any specific customer
13  statements or speak to customers?  No.
14  Q  Do you know what "ERP" or "CRM" stand for?
15  A  Enterprise resource planning and customer
16  resource management.
17  Q  Again, I'm assuming from your prior testimony
18  you don't know specifically why Tom Williams wanted this
19  information.  Is that correct?
20  A  No, I have no idea.
21  Q  If you'll turn to page 19, and take a look at
22  the third bullet point that says, "iTAR volume up by 121
23  percent on Q400."
24  A  That would be Q4 --
25  Q  I'm sorry.  Q4 2000.

140

1  Do you recall whether that was a significant
2  increase with respect -- as it related to other quarters?
3  A  Well, any increase in activity of triple-digit
4  percentage is significant.  Bear in mind this is in the
5  context of EMEA as opposed to the company as a whole.
6  EMEA is a small portion of our business, so therefore its
7  impact on the total company, I don't know if it's
8  material or not without having looked at more data.
9  Q  Are these types of numbers that Graeme Mair
10  tracked on a regular basis?
11  A  Yes.
12  I should -- I should clarify one thing.  Graeme
13  was the finance and operations lead our EMEA division of
14  support.
15  Q  Mm-hmm.
16  A  He got promoted to the global position and
17  started doing these things at that point in time.
18  Q  Do you know -- I'm sorry.  You were going to say
19  something else?
20  A  Prior to that, I don't recall if the work
21  Priscilla did was exactly the same as this, but there was
22  a similar performance package.  So whether the same
23  statistics were covered in the same way, I can't tell
24  you.
25  Q  Okay.

141

1     A  I don't remember.
2     Q  Do you recall when Graeme Mair assumed that
3   position, the global position?
4     A  I knew that was going to be your question.  I
5   don't, I'm afraid.
6     Q  But at least as of -- we know he was in that
7   position at least as of September 13th, 2000 --
8     A  Correct.
9     Q  -- is that correct?
10    A  Correct.
11    Q  Did any of the work that you did in the latter
12  half of 2000 involve 11i?
13    A  You have to ask the question --
14    Q  Did you use 11i in your work?
15    A  Yes.
16    Q  What parts or subsets of 11i did you use?
17    A  So, I mean, 11i was the system to record all
18  expenses, you know, online expense reporting.  So I used
19  it in that context.  The data that came out of it fed our
20  data warehouse.  So the results of the 11i work came out
21  of that.  The marketing organization support ran its
22  programs using a component of 11i.  The support system
23  that ran the support organization used a component of the
24  11i.  So me personally, did I use it?  Well, yeah,
25  online, you know, web expense, web reporting.  Did the

142

1   groups that I was responsible for use it?  Yes.
2     Q  Do you recall if the groups that you were
3   responsible for encountered problems using 11i?
4     A  Yes, they did, but I'll caveat that with I was
5   there eight and a half years and there wasn't a single
6   instance when we didn't experience a problem with
7   software.  It's the nature of the game.
8     Q  Did they experience problems implementing 11i?
9     A  Again, the same, same answer.
10    Q  Okay.  You can set that one aside.
11       (Deposition Exhibit 8 was marked.)
12  BY MR. RUBIN:
13    Q  Mr. Donnelly, the court reporter has just handed
14  you what's been marked Exhibit 8, which is NDCA-ORCL
15  200032 through 200046.  And I apologize.  Although it's a
16  long document, I'm going to ask you to take a pretty
17  thorough look at it, particularly the e-mail in the back,
18  because I'm going to have quite a few questions about it.
19    A  Okay.  All right.
20       Okay.  I've read the e-mail, but I'm sorry, I'm
21  a slow reader.
22    Q  That's all right.  Take as much time as you
23  need.  I'll let you -- you can take a look at the
24  presentation.  I'll have questions about it.  If you want
25  to wait until I have questions, or if you want to just

143

1   flip through.
2        Have you had a chance to take a look at the
3   document?
4     A  Yes.
5     Q  First I'm going to ask you, if you would, just
6   explain to me in layman's terms what was going on here.
7     A  Okay.  So when a customer buys some education
8   classes, they will get an invoice for that from our
9   general accounting system.  Let's say it's for $5,000
10  worth of classes.  They get 5,000 credits.  They'll get
11  an invoice for $5,000.  And a $5,000 entry will be posted
12  to a completely separate system that keeps track of paid
13  hours.  So for that $5,000, you get a certain number of
14  class hours.
15       The two systems were not connected except for
16  the one-way push of data when an invoice was recorded.
17  If for some reason the customer came back and said,
18  "There was an error on my invoice," the process on the
19  accounting side would be to credit the invoice and rebill
20  it in the correct way.  So you'd have it taken out of
21  that balance, and then a new one created.  So it's like
22  wiping out the original invoice.
23       Well, in wiping out the original invoice in the
24  accounting system, it did not go back to this other
25  system and say, "Hey, that's not real money, so take it

144

1   out."  It left it there.
2        When the second invoice came in, the
3   correction -- the corrected invoice came in, it would
4   also post an entry over to this separate unintegrated
5   system.  So now you've -- the customer's paid $5,000, but
6   they have two lots of $5,000 credited to their bank of
7   usable hours.
8        In the normal course of duty, if we'd found that
9   out before the customer had used it, we can take them
10  away and say, "Hey, that was a mistake.  No harm, no
11  foul."  If the customer uses them, then we spend more
12  money on that customer than we ought to.  They get more
13  value for money.  The worst thing that could happen is
14  they expire and we record revenue for them.
15       Now, let's assume the customer only took $2,500
16  worth of classes during the year that they had these
17  credits.  $2,500 would have been recorded as of when they
18  took the class, and $2,500 would have been recorded at
19  the end.  Well, if they had this unknown balance of
20  $5,000 and it was undiscovered by Oracle, another $5,000
21  would have been recorded as revenue.  Make sense?
22    Q  Basically, yeah.  But I think I'm going to ask
23  you some more -- more specific questions.
24    MR. CAPLAN:  She's got it.
25  BY MS. WINKLER:

145

1      Q  If you'll take a look at the original e-mail, I
2  think it's the one from Jim Stein to Dan Sharpley --
3      A  Yep.
4      Q  -- dated August 3rd, 2000.
5         First I'm going to ask you, we've already
6  discussed Dan, but what was Jim Stein's position at
7  Oracle?
8      A  So Jim Stein was responsible for Americas
9  Education.  So the education business, finance and
10  operations support for a work -- working for Dan.  So Dan
11  had three geographic leaders of which Jim was one of
12  them.
13      Q  And who were the other two?
14      A  I don't recall.
15      Q  Okay.  In the subject line of the e-mail, it
16  says, "Recon comments."  What is "recon" referring to?
17      A  It's an abbreviation for reconciliation.
18      Q  And what was the reconciliation that was going
19  on at that time?
20      A  So this was reconciling how much did we bill and
21  how much hours were on the other side.  So if we
22  billed -- using the example that I had, if we billed
23  5,000, one would hope to see 5,000 or less on this side
24  because they'd used some hours.  So the hours used plus
25  the remaining balance should equal the amount that they

146

1  were invoiced.  And they didn't.
2      Q  And what brought about this reconciliation
3  process?
4      A  Well, in layman's terms, it's like writing
5  checks.  Okay.  I've got plenty of checks.  Everything's
6  good.  And then suddenly the bank calls and says, "Well,
7  you don't have any money left."
8         So in the context of this, there was a -- you
9  know, a piece of analytics that said why is our education
10  balance growing disproportionately to the revenue being
11  recorded?  So there was -- some alert went up.  The bank
12  manager called and said this doesn't add up.
13      Q  And do you know who first noticed that within
14  Oracle?
15      A  I don't.  I think it was some -- I think it was
16  an ongoing conversation -- it was an ongoing
17  conversational part of the review when we showed or Dan
18  showed the increasing education pool and relative to the
19  number of -- you know, the revenue and the bookings and
20  billings for the education business, someone said, "Well,
21  that doesn't seem to make sense.  Can you go away and
22  look at it?"
23      Q  When you say -- what are you referring to when
24  you say, "education pool"?
25      A  So this is the number of hours that have been

147

1  put in this separate non-integrated off-line system --
2      Q  Okay.
3      A  -- that's then used to -- as a basis from which
4  customers can draw down, like a prepaid card.
5      Q  Okay.  What is ERS that's referred to in this
6  e-mail?
7      A  I don't know.  It's probably something like
8  education resource system or education resource services.
9  It's -- it's an acronym related to education.
10      Q  Was it -- what was it?  Was it a separate
11  computer system?  What was ERS?
12      A  It was a separate application that again was not
13  integrated with the general ledger system, the accounting
14  system.  It was an old application which was being
15  replaced as part of the 11i suite.  So it was a necessary
16  evil until the new product came -- came along.
17      Q  As an aside, other than ERS, were there other
18  applications that weren't integrated with the general
19  ledger?
20      A  Yes.
21      Q  And which -- what were those applications?
22      A  I don't know, but there are plenty.
23      Q  And you don't recall any specific ones?
24      A  No.
25      Q  Do you recall any reconciliations going on with

148

1  respect to other applications?
2      A  There were reconciliations around the balance
3  sheet being out of balance.  That was a normal one.
4  Balance sheets are supposed to balance, and sometimes
5  they get out of balance and you have to figure out why.
6      Q  Was that due to a specific application that
7  wasn't tied in properly with the general ledger?
8      A  Could be a million and one different reasons.
9      Q  Okay.
10         Going back to Jim's e-mail, the first point
11  number 1 that he makes there, sub A, he talks about the
12  credit memo issue.  What is a credit memo?
13      A  So going back to my example, if the customer
14  says you've sent the invoice to the wrong site or it has
15  the wrong billing name on it, the process of a credit
16  memo essentially is the reversal of an invoice.  So I'm
17  going to remove that invoice from the system.  So you
18  have a plus 5,000 and a minus 5,000 equals zero.
19  Fantastic.  We're all cleaned up.  So the credit memo
20  process, the customer would have gotten back a minus
21  $5,000 invoice.  Their account is now clear.  They get a
22  new invoice for the -- corrected in a way that needed to
23  be corrected.  You can correct for many different
24  reasons.
25      Q  And can you explain more specifically what he's

149

1  talking about here when he talks about the credit memo
2  issue, 1, sub A?
3      A  So I believe he's referring to the example that
4  I gave you where on a number of occasions, an original
5  invoice was credit memo'd and rebilled, resulting in
6  double balances being recorded in a separate system.
7      Q  What does he mean when he says, "These must be
8  manually posted to ERS"?
9      A  Again, because they're not connected, if a -- if
10  an invoice flows through but a credit memo doesn't flow
11  through, you have to manually go in and remove that
12  original balance.
13      Q  And I apologize if these questions seem overly
14  simple, but what happened -- so what happened when a
15  credit memo was not posted to ERS?
16      A  Then you would have two balances.
17      Q  Okay.  And what was the greater financial impact
18  of that?
19      MR. RUBIN:  Objection; form.
20      THE WITNESS:  Based upon reading through this
21  e-mail, there may have been an overstatement of education
22  revenues to the tune of 20 million dollars.
23  BY MS. WINKLER:
24      Q  Okay.
25      A  But again, I'm not the accountant.  I'm a

150

1  finance person.  There is a difference.
2      Q  Do you know who the two customers were that he
3  referenced in this e-mail?
4      A  No.
5      Q  And then going on down to 1, sub B in the same
6  e-mail where he talks about new sale holds, can you
7  explain that issue more in layman's terms?
8      A  So it's not something I'm familiar with, but
9  what I -- what I conclude from this is if an item entered
10  into OOE, which is Oracle order entry, was somehow not
11  posting correctly to the separate education system, then
12  there would be a need to put it on hold and have someone
13  investigate why it wasn't posting correctly.
14      Q  And what were the consequences of something not
15  posting correctly?
16      A  So this would understate the amount of hours
17  available to a customer.  So in the example I gave you,
18  if it was a $5,000 transaction that for some reason did
19  not post correctly, the customer would come in and say,
20  "I'd like to take a class."  And they'd say, "Well, you
21  have no hours."  So it would be an understatement of
22  hours, whereas the first one was an overstatement of
23  hours.
24      Q  Mm-hmm.  Okay.  And then the same question about
25  1, sub C, the T-R-U-N-I-T payments.  Could you explain

151

1  that issue in layman's terms?
2      A  I -- I can't.  Sorry.
3      Q  Do you know what T-R-U-N-I-T stands for?
4      A  No.
5      Q  Do you know what --
6      A  Probably training unit.
7      Q  Okay.  And when Mr. Stein says, "This refers to
8  situations where units are used to pay off an invoice
9  that has already been generated," what units are -- is he
10  referring to?
11      A  Again, unfortunately, I can't explain any better
12  than how it's been written.
13      Q  Okay.  Do you see on the third line of
14  page 200046 he references someone named Mina.  Do you
15  know who -- do you recall --
16      A  No.
17      Q  With respect to 2, sub A, "Duplicate items
18  appearing on ERS," do you have any specific recollection
19  about that issue?
20      A  So it's referring to the same issue as the
21  credit memo one, where two balances were showing up on
22  the report.
23      Q  Okay.  Then what about 2, sub B, "Items that
24  show up on ending balance of month A but do not show up
25  in the beginning balance of month B"?  Do you recall that

152

1  issue?
2      A  Vaguely.  There was some issues with the
3  reporting module of this product -- this application that
4  created some discrepancies when looking at monthly
5  reporting.
6      Q  And by "this application," you're referring to
7  the ERS --
8      A  ERS.
9      Q  -- application?
10      A  It wasn't a -- it didn't have very good
11  reporting capabilities.  This was a weakness.
12      Q  And finally, sub 3, "GL entries."  Can you
13  explain what Mr. Stein is talking about there?
14      A  So specific to these two items, I can't add any
15  more information, but a general ledger entry is
16  essentially an entry in the accounting system that
17  involves a debit and a credit.  So there was a posting in
18  the amount of 260 and 250 respectively that was made that
19  they couldn't account for.  They didn't know what they
20  related to.
21      Q  But other than that, you don't have any specific
22  recollection --
23      A  No.
24      Q  -- of this issue?
25      A  No.

153

1  Q. Okay. And from this e-mail, it sounds like you
2  and Mr. Stein were going to have a meeting. Do you
3  recall meeting with Mr. Stein about this issue?
4      A. Only based upon reading this -- this note. And
5  I think he gave me a briefing of what was included in
6  here.
7      Q. And moving up to the second e-mail in this
8  string chronologically, which appears to be
9  Dan Sharpley's August 11th, 2000 e-mail to you and a
10  J.L. Hall.
11     A. Mm-hmm.
12     Q. Who is J.L. Hall referred to there?
13     A. John Hall is the senior vice president of the
14  education organization. So essentially his business
15  partner, Dan's business partner.
16     Q. Okay. And then what about the cc's? We've
17  already talked about James Stein. Who is Dennis Bonilla?
18     A. Dennis Bonilla was the counterpart business
19  partner of Jim Stein. He worked -- he worked for
20  John Hall as the head of the Americas Education
21  organization, and Jim was his business partner.
22     Q. Okay. And this e-mail appears to be titled,
23  "Forward: 2261 reconciliation update." What does the
24  2261 in that subject refer to?
25     A. That's the balance sheet account, I believe.

154

1      Q. Can you explain that in more detail? The
2  balance sheet account relating to what?
3      A. Okay. So back to -- back to the accounting. If
4  you take an invoice for something, record revenue for
5  something for which you don't deliver the goods, you have
6  a -- it's not a deferred -- is it -- it's -- you have to
7  maintain it as a liability on your -- on your balance
8  sheet. It's something -- you owe that money back to
9  those customers if you don't deliver the services. And
10  as you deliver the services, you can reduce that
11  liability.
12        So account 2261 I believe was a liability
13  account on the balance sheet.
14     Q. Was account 2261 specifically related to
15  education or was it a general --
16     A. It was I believe specifically related to
17  education.
18     Q. Do you know whether there were other accounts
19  like 2261 for other divisions of the company?
20     A. I believe there were.
21     Q. Do you know any of those by name or number?
22     A. No.
23     Q. Take a look at the bottom of page 200043,
24  starting with, "The bad news," and read that -- you don't
25  have to read it out loud. Read it to yourself on through

155

1  to the next page, ending with, "revenue should not have
2  been created in the first place."
3      A. Where is that?
4      Q. It's on the next page, down about 12 lines.
5         Is this simply another explanation of the credit
6  memo issue that you explained previously?
7      A. Yes.
8      Q. And what does it mean where it says it could be
9  used by the customer for classroom registrations?
10     A. So once again, in the example I gave you, a
11  customer is invoiced $5,000. They get a $5,000 credit in
12  this separate system in addition to the $5,000 liability
13  in the balance sheet. A credit memo happens, that wipes
14  out everything in the accounting system. So now that's
15  zero, but you've still got this $5,000 credit in
16  classroom hours over here.
17        You re-book the $5,000 -- it creates the $5,000
18  entries, including the liability, and another $5,000 back
19  over here. So now you've got $5,000 liability over here,
20  $10,000 class hours.
21     Q. Okay.
22     A. So they're available to the customer unless we
23  go correct it. They may not know it's available. They
24  may never, ever use it. We may correct it, but it's
25  there. And if a customer went aggressively and wanted to

156

1  train a bunch of people and they saw they had credit
2  hours, they could use that.
3      Q. And again, if they didn't use it and it expired,
4  then what happened?
5      A. It would be released as revenue. But then there
6  becomes the accounting difference. You can't make two
7  lots of revenue. So an alarm bell goes off at some point
8  in time when it gets big enough to notice.
9      Q. And at that point the customer is not billed
10  again --
11     A. No.
12     Q. No.
13        This e-mail discusses people working on
14  analyzing and researching the discrepancies. Do you
15  recall who specifically worked on doing that?
16     A. I don't recall every name, but there were --
17  Carrie Fitzpatrick was somebody who worked on this, I
18  believe, Jim Stein worked on it, and people in Jim's
19  organization worked on it. There was probably I'm
20  guessing three or four people that were involved with
21  this. It was quite a fire drill.
22     Q. And when you say they worked on it, were they
23  basically working on a full-time basis for some
24  period of time?
25     A. Yes.

157

1    Q  And who was in charge of that, analyzing and
2  researching the discrepancies?
3    A  So Jim Stein was in charge of the analytics
4  because it was a problem inside the Americas system.
5    Q  Mm-hmm.  And who -- who is Carrie Fitzgerald?
6    A  Carrie Fitzpatrick.
7    Q  I'm sorry.  Fitzpatrick.
8    A  Carrie was somebody that worked for Jim Stein at
9  that point in time.
10    Q  Do you know how long it took them to do this
11  research and analysis?
12    A  I don't recall how long it took to solve the
13  whole problem, but I do know it took approximately a week
14  per month to -- to figure out how to do this.
15    Q  Do you know if they had completed this at the
16  time you left the company?
17    A  I don't know.
18    Q  So you don't know when the project was finished?
19    A  No.
20    Q  Do you know the result of the project?
21    A  No.
22    Q  And who was the senior finance manager that
23  was super -- I'm sorry -- supervising the effort as
24  discussed on page 200045?
25    A  Can you point me to that, please?  Oh, I see.

158

1      I believe, and you'd have to get Dan to answer
2  this, but that was Carrie Fitzpatrick.
3    Q  Okay.  And she was someone under Dan?
4    A  Yeah, either under Dan or under Jim.  I can't
5  remember the exact reporting structure, but she was in
6  that organization.
7    Q  And do you know who the person in corporate
8  accounting or person or persons in corporate accounting
9  who were dealing with this issue were?
10    A  No, I don't.
11    Q  Do you know who was responsible for forecasting
12  the placeholder revenue adjustment of 20 million as
13  discussed on that same page?
14    A  I don't, but I would have to believe it was a
15  combination of Dan, Jim, and the corporate accounting
16  team.  It would not have been a unilateral number.
17    Q  Do you know what, if any, adjustment was
18  actually made for the purpose of the Q1 2000 results?
19    A  No, I don't.
20    Q  Same question for Q2 2000?
21    A  No, I don't.
22    Q  And then turning to your e-mail, which is on
23  page 200043.
24    A  Okay.
25    Q  And it appears -- I apologize for the order of

159

1  these, but this is how they were produced to us.  But it
2  appears from the very first page of that document that
3  you sent that e-mail to Jennifer Minton on August 18th,
4  2000, with a copy to Dan Sharpley?
5    A  Mm-hmm.
6    Q  Who are Jeff, Tom, and Gary to whom you refer to
7  in this e-mail?
8    A  That would be Jeff Henley, H-E-N-L-E-Y, Tom
9  Williams, and Gary Bloom.
10    Q  Do you recall having discussions with Jeff, Tom,
11  and/or Gary about this issue?
12    A  I recall having discussions.  I don't recall
13  exactly whether they were all in the same room at the
14  same time, but I had discussions with one -- at least one
15  of them on this topic and possibly all of them.
16    Q  Do you recall any specific conversation with Tom
17  Williams on this topic?
18    A  There was -- there was a discussion around the
19  fact we needed to figure this stuff out.  That's
20  basically it.
21    Q  Was that basically a directive from Tom to you?
22    A  Well, I don't know if it was like specifically a
23  directive, go -- go figure this out.  But it's like, we
24  need to go figure this out together.  So I did my side,
25  he was working on his side, and we figured it out.  It

160

1  was -- it was an issue that needed to be resolved.  It
2  wasn't like --
3    Q  Do you know anyone in Tom's division who was
4  working with Tom on this issue?
5    A  Again, I don't recall the names of the people in
6  the general accounting group.
7    Q  Do you recall how Jeff Henley became involved in
8  this issue?
9    A  He was like the CFO, so he get's to hear about
10  these things.
11    Q  Do you know who involved Jeff in this?
12    A  I don't know.
13    Q  Would it have been something that you would have
14  taken directly to Jeff?
15    A  I would have no reason to take this directly to
16  Jeff.  It may have come up in a conversation with Dan, it
17  may have come up with a conversation with Tom, but I
18  believe I spoke to him about this at one point.
19    Q  You believe you spoke to Jeff about this at one
20  point?
21    A  I believe so.
22    Q  Okay.  Then if you'll go down about seven or
23  eight lines where you say, "Also Dan and I spoke with Tom
24  on Wednesday to get his input on what to do with the
25  placeholder of 20 million dollars that Tom requested be

161

1  included as a corporate adjustment in the current
2  education forecast."
3    A  Mm-hmm.
4    Q  Do you know why that became a corporate
5  adjustment as opposed to something else in the education
6  forecast?
7    MR. RUBIN:  Objection; form.
8    THE WITNESS:  It's -- it's an adjustment against the
9  corporate number as opposed to, you know, any particular
10  line.  It's -- corporate adjustment is like a high-level
11  adjustment.  It would be put in as a placeholder so that
12  the aggregate numbers look right, as opposed to
13  necessarily going into the Americas forecast, making a
14  whole bunch of detailed changes that sum up to 20 million
15  dollars, and then have that aggregate up.  It's a simple
16  way of putting a placeholder amount in.
17  BY MS. WINKLER:
18    Q  And when you say "placeholder amount," that was
19  because no one had determined yet at that point how much
20  it was actually going to be; is that correct?
21    A  Correct.  And a forecast is to guide, you know,
22  to get an idea as to where we're going to end up.  So put
23  it in.  It will raise people's attention to this matter
24  and they won't forget it.
25    Q  And again, you don't know where it ended up, if

162

1  20 million was correct or not?
2    A  I don't recall.
3    Q  And do you recall any specific discussions you
4  had with Gary about this issue?
5    A  It was most likely part of a normal one-on-one
6  update on what was happening inside his organization.
7    Q  Later on in that e-mail you say, "We also
8  discussed at a high level some of the content of the
9  attached presentation, specifically the identified
10  deficiencies."  Who are you referring to when you say,
11  "we"?
12    A  I'd have to read this again, if you'd bear with
13  me.
14    Q  Sure.  Take as much time as you need.
15    A  I would be referring to Dan and Tom.  Dan
16  Sharpley and Tom Williams.
17    Q  Did you ever discuss this issue directly with
18  Ms. Minton?
19    A  I don't recall.  Obviously I included
20  communication-wise to her.  I didn't report to her at
21  that time.  I didn't have reason to deal with her at that
22  time, so -- but I may have.
23    Q  You don't recall any specific conversation?
24    A  No.  I was dealing with Tom on this one.
25    Q  Do you know if Ms. Minton ever responded to you,

163

1  to this e-mail?
2    A  I have no way of telling.
3    Q  Do you recall what your involvement was in this
4  process after you sent this e-mail?
5    A  Just making sure Dan kept doing the work.
6    Q  And then if you'll turn to the -- what looks
7  like a PowerPoint presentation that starts on 20034.
8    A  Mm-hmm.
9    Q  In the sequence of events on page 200036, you
10  say the issue was raised to you by Tom Williams.  Does
11  that refresh your recollection about how this issue was
12  raised initially?
13    A  Again, if this is what it says, then yeah,
14  that's the way it was.
15    Q  And is this a presentation that you prepared?
16    A  It looks like my style, yeah.
17    Q  Do you know what you're referring to when
18  it's -- when you say, "Press release prep meeting"?
19    A  Sure.  At the -- at the end of every quarter
20  you've got to report your results to the financial
21  community and the public.  There's a process to get
22  prepared for that, both on a -- you know, accounting and
23  records perspective, but also looking at the state of the
24  business.
25    So there was always a regular communication

164

1  between Jeff's office, either Jeff or people on his team,
2  to say, "Give us an update on what's happening in your
3  business so that we're aware of it and can present it to
4  the public if need be."
5    Q  Did you regularly have meetings with Jeff before
6  each one of these press release occurrences?
7    A  I don't know if we regularly had meetings, but
8  if he asked for information on -- "give me an update on
9  the state of the support business," then I would send in
10  the latest and greatest report.  If he had a specific
11  question about a specific issue, then I would respond to
12  that.  I think it would be incorrect to say we had a
13  regularly scheduled meeting.
14    Q  Okay.  And when you talk about work plan at the
15  end of this sequence of events, are you referring to what
16  was going to be done to analyze and research what was
17  going on?
18    A  Correct.  It was our plan of attack to solve
19  this problem.
20    Q  Turning to the next page under "Actions Taken,"
21  what do you mean when you say, "System reports reviewed
22  and updated.  Improvements made but still flawed"?
23    A  So I mentioned to you that there was some
24  reporting deficiencies in the ERS system.
25    Q  Mm-hmm.

165

1   A  Well, some work was done to try and improve the
2   effectiveness of those reports, and whilst they got
3   better, they still had identified problems.
4   Q  Given that you were still -- the group was still
5   using ERS at this time, can one assume that you had
6   not -- that 11i hadn't been implemented yet?
7   A  I think that's reasonable to assume.
8   Q  Turning to the next page, 200038, what are you
9   referring to when you say, "Timing differences exist and
10  are difficult to keep track of"?
11      A  So this is where one part of the transaction
12  happens in one accounting period and another part of it
13  happens in another accounting period.  So an example
14  might be the credit memo -- the invoice happening on the
15  30th of a month, and the credit memo happening on a --
16  you know, the 5th of the next month.
17      So you typically run reports on a monthly basis.
18  Well, you'd only have half the picture here and half the
19  picture here, and trying to marry those timing
20  differences together is just hard to do in a
21  reconciliation.
22      Q  So is that something that was unique to people
23  using the ERS system, or did that happen in other areas
24  of the company?
25      A  The concept of timing differences is a common

166

1   challenge in any type of financial reconciliation.
2   Q  What are you referring to when you say,
3   "Postings to the GL that appear incorrect"?
4   A  I believe that's referring to the two items that
5   were previously mentioned in the e-mail that needed to be
6   looked into further.
7   Q  Do you know if any changes were ever actually
8   made to the GL as a result of the investigation that took
9   place?
10      A  I don't know.
11      Q  On the next page under, "Identify Deficiencies,"
12  you mention "No backward integrity."  Do you recall what
13  you were referring to here?
14      A  So there was a one-way posting for an invoice.
15  There was no -- if that invoice was removed, there was no
16  backward integrity to ensure it was removed from the
17  other system.
18      Q  And what is the alert mechanism -- mechanism
19  that you refer to?
20      A  Based upon my recollection, there was a manual
21  process that took place when a credit memo was issued
22  that sent an alert, which was a -- usually an
23  e-mail-based message to a catcher somewhere in the
24  organization to say this has happened.  There was an
25  inconsistent process to manage those manual alerts.  And

167

1   oftentimes, again, through timing differences or work
2   loads, things weren't done correctly.  So it wasn't done
3   systematically, and the manual work-around processes to
4   try and patch this hole were not perfect.
5   Q  And by "catcher," you're meaning some specific
6   individual was --
7   A  Correct.
8   Q  -- supposed to do this?
9   A  Somebody in the education group should have
10  gotten these alerts and done something with them.  Maybe
11  they didn't get them.  Maybe they got them and didn't
12  have time to deal with them.  Maybe they got them and
13  didn't deal with them correctly.  So there were a number
14  of flaws in that alert process.
15      Q  And then on the next page you discuss the
16  reconciliation process.
17      A  Mm-hmm.
18      Q  Prior to the investigation that's the subject of
19  these e-mails, what was the reconciliation process?
20      A  My understanding is there was a process that was
21  transacted once a year to look at the general ledger
22  balances, look at the education balances, and make sure
23  they were reasonably in sync.  In theory, there should
24  only be as much liability as there is credit hours left.
25      Q  And do you know whether they had been reasonably

168

1   in sync in prior years?
2   A  My understanding is they were materially
3   consistent.  Again, there are lots of little things that
4   could happen, including timing differences, et cetera,
5   but typically the reconciliation process would be to a
6   degree of materiality, not an exact measure.
7   Q  And so what was it that triggered this new way
8   of reconciling, this actual investigation of what was
9   happening?
10      A  Well, somewhere between the last reconciliation
11  and the point in time that it got out of whack, something
12  didn't work right.  Now, what it was, I can't tell you.
13  I can't tell you what prompted it, but, you know.
14      Q  What do you mean when you say, "Internal audit
15  doesn't perform audit work in U.S."?
16      A  Well, there is an internal audit team whose
17  charter was to audit the operations of geographic
18  businesses.  So they didn't actually perform any audit
19  work in the U.S. and they performed it in the U.K.,
20  Germany, France, et cetera.
21      Q  And this internal audit, are you talking about
22  the company's internal audit team?
23      A  Correct.
24      Q  Do you know why they didn't perform any internal
25  audits in the U.S.?

169

1    A  You'll have to ask the head of internal audit.

2    Q  Who was the head of internal audit at the time

3  that you left?

4    A  I knew you were going to ask me that.  I think

5  it was Anika, and I don't want to say Sorensen because

6  she's the golfer.  It was Anika somebody, so... But

7  there's been a number of changes since then.

8    Q  Did you have any understanding of -- strike

9  that.  Let me start over.

10    Did you have any understanding of the

11  relationship between internal audit and external audit?

12    A  Very limited.

13    Q  How did you conclude that the external audit

14  process didn't pick it up, other than the fact that it

15  hadn't been flagged or raised before as an issue?

16    A  That was the only --

17    Q  That was the only reason?

18    A  Yeah.

19    Q  I apologize if I asked you this already, but do

20  you know why internal audit didn't do any work in the

21  U.S.?

22    MR. RUBIN:  Asked and answered.

23    MS. WINKLER:  Thanks, Lee.

24    MR. CAPLAN:  Somebody remembered.

25    THE WITNESS:  It just wasn't part of their charter.

170

1  The only financial operations in the U.S. were at

2  headquarters, and I guess they felt they did everything

3  right, so...

4    BY MS. WINKLER:

5    Q  On the last page, 200041, the last line, you

6  have an entry that says, "Adjust financial records as

7  necessary.  Estimated 30 million to 45 million."

8    A  Mm-hmm.

9    Q  Do you know why that figure is 30 million to

10  45 million, but in the e-mails you discuss a placeholder

11  of 20 million?  Why the discrepancy?

12    A  So the placeholder was designed to raise

13  visibility.  It wasn't designed to make an accounting

14  entry.  It was Tom wanted a big red flag added to the

15  forecast so management knew about this.

16    Based upon an extrapolation of the work that had

17  been done against subsequent months, we said it could be

18  anywhere in this range.  The 20 million dollars was as

19  good a guess as the 30- to 45-million-dollar guess.

20    Q  And when you say "this," you're referring to the

21  revenue could have been overstated by this amount; is

22  that correct?

23    A  Correct.

24    Q  And once again, you don't know what the ultimate

25  determination was with respect to how much revenue had

171

1  been overstated?

2    A  No.

3    Q  And do you know whether that was because it

4  hadn't been completed yet when you left, or did you

5  somehow become detached from the project?

6    MR. RUBIN:  Objection; form.

7    THE WITNESS:  I don't recall.

8    MS. WINKLER:  Let's take a short break.  Maybe a

9  five-, ten-minute break.  Does anyone need a break now?

10  I can go a little longer.

11    MR. RUBIN:  I can keep going.

12    THE REPORTER:  I actually do need a break.

13    THE VIDEOGRAPHER:  This is the end of Videotape

14  Number 2.  We are now going off the video record.  The

15  time is 2:37 p.m.

16    (Recess taken:  2:37 until 2:44 p.m.)

17    THE VIDEOGRAPHER:  This is the beginning of

18  Videotape Number 3.  We are now back on the video record.

19  The time is 2:44 p.m.

20    BY MS. WINKLER:

21    Q  Mr. Donnelly, the court reporter has just handed

22  you what's been marked as Exhibit 7.

23    (Deposition Exhibit 7 was marked.)

24    BY MS. WINKLER:

25    Q  And I just wanted you to take a look at the

172

1  first page of that.  You'll see it's an e-mail from

2  Jennifer Minton to Jeff Henley dated August 21st, 2000?

3    A  Mm-hmm, yes.

4    Q  And I'll represent to you that the remainder of

5  this until the last page is the same as the document we

6  just discussed.

7    A  That's correct.

8    Q  If you'll take a look at the last page -- and

9  the document, for the record, is NDCA-ORCL 2000 -- I'm

10  sorry -- 200189 through 200205.  If you'll take a look at

11  200205, which is Minton's message to Henley, do you have

12  any understanding of why she would have sent this

13  message?

14    A  No.

15    Q  Do you know why she would have been concerned

16  that you were spending time focusing on who knew what

17  when?

18    A  No.

19    Q  Do you know what she's referring to when she

20  says, "especially given Gary's last response"?

21    A  No.

22    Q  Do you recall Gary ever having any specific

23  opinions on the issue with respect to the 2261 account?

24    A  I don't recall.

25    Q  We discussed credit memos briefly.  Do you know

173

1   what a debit memo is?
2      A   In what context?
3      Q   In any context of work that you did at Oracle.
4      A   Work that I did?  No.
5      Q   Do you have any knowledge of debit memos being
6   used at Oracle?
7      A   I have no specific knowledge of debit memos
8   being used.
9      Q   Do you have any general knowledge of debit memos
10   being used at Oracle?
11      MR. RUBIN:  Objection; form.  I don't know what
12   "general knowledge" means.
13      THE WITNESS:  The term is not an uncommon term, but
14   again, I was not involved in the accounting side.
15   Whenever you hear the term "debit memo" or "credit memo,"
16   it's an accounting term.  I'm not an -- I am an
17   accountant, but I'm not an accountant anymore.
18   BY MS. WINKLER:
19      Q   Do you recall any issues surrounding or with the
20   use of debit memos in November of 2000?
21      A   I don't recall anything specific.
22      (Deposition Exhibit 8 was marked.)
23   BY MS. WINKLER:
24      Q   Mr. Donnelly, the court reporter has just handed
25   you Exhibit 8, which is NDCA-ORCL 085149 through 085167.

174

1   Do you recognize this document?
2      A   This looks like a similar document that we
3   looked at from the support line of business.  It's a
4   briefing on the financial and business status of the
5   education line of business.
6      Q   And is this something that Dan Sharpley prepared
7   when he worked for you at Oracle?
8      A   That's correct.
9      Q   Take a look at the second page of this document,
10   085150, and at the bottom line that says, "Revenue
11   includes 19 million dollars in adjustments, 20 million
12   2261, and one million other."  I'm sorry.  It looks like
13   it's minus 20 million 2261, and one million other."
14      A   Mm-hmm.
15      Q   Do you recall whether the review process was
16   complete at this time?
17      A   I don't believe the review process was complete
18   at this time.
19      Q   Do you know how Dan derived the
20   19-million-dollar -- I'm sorry -- the 20-million-dollar
21   2261 figure?
22      A   This is, again, referring back to the previous
23   document that stated 20 million dollars as the accounting
24   estimate.
25      Q   So it was simply the placeholder --

175

1      A   Correct.
2      Q   -- that he's using in this document?
3      Do you know whether anyone directed Dan
4   specifically to use that number in this document?
5      A   If this is a -- no.  So I do not know if anyone
6   specifically asked him to put this in there.
7      Q   Take a look at the -- starting on page 11,
8   there's a Q2 fiscal year '01 forecast, fiscal year 2001
9   forecast.  I'll represent to you that for the remainder
10   of this document in the Q2 forecast there doesn't appear
11   to be any reference to the 2261.  Do you know why it
12   would have been included as a placeholder in the Q1
13   slides but nothing in the Q2 slides?
14      A   My assumption is the 20 million dollars is a
15   good-faith estimate of solving that problem.  That was
16   used as a placeholder to fix that problem and forever put
17   it to bed.
18      The Q2 forecast is a forward-looking projection
19   as to what the business looked like in the future.  If we
20   assume that this problem is done, there should be no need
21   to make a further adjustment.
22      Q   Do you recall whether people believed that they
23   were going to resolve this issue before the beginning of
24   Q2?
25      A   I don't recall.

176

1      (Deposition Exhibit 9 was marked.)
2   BY MS. WINKLER:
3      Q   Mr. Donnelly, the court reporter has just handed
4   you Exhibit -- 9?  Is that it?
5      A   9.
6      Q   Which is NDCA-ORCL 154007 through 154012.  Can
7   you identify this document?
8      A   So this appears to be an e-mail note from --
9   well, something -- the order of this is kind of funky.
10      Q   Yeah.  Again, I apologize.  This is the way they
11   are provided to us.
12      A   It's okay.
13      Q   It's not in the expected order.
14      A   So this is a note from John Hall to
15   Sohaib Abbasi forwarding on a note that was sent from
16   Dan Sharpley to myself and John.
17      Q   And it's -- John's e-mail is dated December 7th,
18   2000; is that correct?
19      A   Correct.
20      Q   And who was Sohaib Abbasi?
21      A   Sohaib Abbasi was the senior vice president or
22   executive vice president of the tools group that at this
23   point in time took over responsibility for the education
24   organization.  And I believe Sohaib at the time reported
25   to Gary Bloom.  Actually, sorry.  I take that back.  Gary

177

```
1   had left, so this was the reorganization, and Sohaib
2   picked up education. My apologies.
3        Q   Prior to the reorganization, do you recall
4   Sohaib's position?
5        A   It was the senior vice president or executive
6   vice president of the tools division.
7        Q   And then -- I'm sorry.
8        A   Which is part of the R&D group.
9        Q   And at that point, did he report to Gary Bloom?
10       A   I'm a bit vague about this because there was
11   some strange reporting relationships that occurred. I
12   believe he did, but I may be -- I may be wrong. He may
13   still have reported to Larry Ellison. I provided
14   financial support to his group, so to me it was seamless.
15       Q   Okay. Take a look at the actual e-mail,
16   154000 -- 154009. What is the 11-million-dollar revenue
17   offset referred to in the second line?
18       A   I don't know.
19       Q   Do you know whether that relates to the 2281
20   issue?
21       A   I don't know.
22       Q   Is it possible that that does?
23       A   I -- I don't know. If I could read the rest of
24   the e-mail, I'll be a bit more --
25       Q   Sure. Take your time, please.
```

178

```
1        A   Again, I -- unfortunately, I don't know.
2        Q   Okay. When we were initially discussing the
3   2281 account issues, you talked about how certain
4   registrations might expire, classroom registrations might
5   expire if they weren't used at the end of the year?
6        A   Mm-hmm.
7        Q   Were certain of those customers government
8   customers?
9        A   I don't know. I'd have to see them. Some of
10   them might have been.
11       Q   Do you know if Oracle had any issues with the
12   way they billed government customers with respect to
13   these -- these corporate training issues?
14       A   I don't know.
15       Q   Was it Oracle's practice to invoice or bill all
16   of their customers prior to them actually using the
17   training so they were pre-billed or it was prepaid for?
18       A   Well, everything had to be billed before it was
19   used. There were some customers that bought credits in
20   advance, and there were some customers that bought a
21   class at a time. But in every case, you get billed for
22   it before you can use it.
23       Q   And in every case, if it wasn't used, did it
24   expire?
25       A   There were expiration rules around the use of a
```

179

```
1   class -- prepaid classes.
2        Q   And do you have any particular understanding of
3   how that worked with respect to the federal government or
4   the general services administration?
5        A   I have no specific knowledge.
6        Q   Do you know if any refunds were ever made of
7   credits, prepaid credits that had actually -- that had
8   expired, if that money was ever refunded to customers?
9        MR. RUBIN: Objection; form.
10       THE WITNESS: I'm not aware.
11   BY MS. WINKLER:
12       Q   Have you ever talked to Defendants' counsel
13   about this case?
14       A   No.
15       Q   Have you ever been interviewed by any federal
16   agency such as the FBI or the SEC about this case?
17       A   No.
18       Q   Have any of them ever attempted to contact you?
19       A   I don't know if they've attempted.
20       Q   Have -- have they contacted you and you refused
21   to be interviewed?
22       MR. RUBIN: If a tree falls in the woods...
23       MR. CAPLAN: That's a good objection.
24       MR. RUBIN: It is. It's excellent. You can go now.
25       THE WITNESS: I don't believe anybody has tried to
```

180

```
1   contact me.
2   BY MS. WINKLER:
3        Q   Thank you.
4        Earlier, whenever Mr. Rubin was asking you
5   questions, you discussed a process that was used to
6   historically map how the forecasts matched up with the
7   actuals.
8        A   Mm-hmm.
9        Q   Do you recall that testimony?
10       A   Yes.
11       Q   If I wanted to see the result of that process,
12   see those documents, what would I -- what would I ask for
13   or what would I want to look at?
14       A   I don't know if they had specific names, but you
15   would be asking for the forecast actual trends for
16   license sales. And then you'd also be asking for
17   conversion trends of the pipeline. So again, you're
18   mapping the known to the unknown and trying to make the
19   unknown a good estimate. Those are the two things. And
20   then there was the management judgment, which was a line
21   item in the forecast.
22       Q   Now, when you -- so it's my understanding from
23   your testimony that there was some -- some document that
24   actually compared the historical forecast with the
25   actuals. Is that correct?
```

181

1   A  So there were analytics that were prepared.  I
2   don't know if it -- I don't think it's correct to say
3   there was a formal document that was presented, though
4   that information was available in our systems.
5   Q  And then was there a formal document that
6   demonstrated the use of that information to make future
7   forecasts?
8   A  Again, I don't know if there was a formal
9   document on any of this.  There was a lot of information
10  available that was drawn together that -- based on past
11  trends and current situation, to come up with a -- an
12  estimate of where we're going to end up.
13  Q  And if I wanted to see that information, for
14  example, with respect to the third quarter, what would I
15  ask for to see how that information was used to come up
16  with a forecast?
17  A  So, again, I'm not sure if there's a specific
18  document that you'd ask for, but you'd specifically ask
19  for the actual trends and the forecast trends within a
20  given time period.
21     Now, there are date stamps of all of this
22  information.  A forecast is done in week -- you know,
23  week zero, week two, week four, week six, week eight, and
24  then in the last month it's every week -- the last month
25  of a quarter it's every week.  So those are documents

182

1   that you could gather and do your own trending analysis.
2   And we -- there were people that did this trending
3   analysis and figured that out.  I don't know what the
4   document was that you put it in.  It wasn't anything
5   published.
6   Q  How far back did the trending analysis go
7   whenever you were working with it?
8   A  I don't recall.
9   Q  Was it more than five years?
10  A  I would -- I would say five years would be a
11  reasonable estimate.
12  Q  Do you know whether Ivgen Guner was a direct
13  report of Jennifer Minton's?
14  A  Yes.
15  Q  She was?
16  A  Yes.  Actually, I'm going to take that back.
17  She was at one point in time, but I think she ended up
18  working for Larry Garnick, who was a direct report of --
19  again, strange organization.
20  Q  So at some point in time Larry and Ivgen were on
21  the same level, and then -- is that correct?
22  A  At one point in time they were both VPs, vice
23  presidents.  I don't know if they both reported in to
24  Jennifer at that time, but they were at the same level.
25  Q  Okay.  And also you testified this morning about

183

1   what management was saying about the third quarter,
2   correct?
3   A  Mm-hmm.
4   Q  Do you recall what your coworkers were saying
5   about the third quarter?
6   A  So I didn't have any coworkers.
7   Q  I'm talking about the period shortly before you
8   left.  Let's say December 2000.
9   A  So we were 18 days into that quarter, of which I
10  spent about two weeks on the road.  So I didn't really
11  have many conversations about the third quarter.  It was
12  more anticipation of the second quarter's results, if I'd
13  had any conversations about performance.
14  Q  What about conversations about the third quarter
15  forecasts?
16  A  Be more specific.
17  Q  What were any comments that your coworkers or
18  people you came into contact with when you were traveling
19  in December 2000 made about the company's third quarter
20  forecasts?
21  A  The general sort of buzz out there is, how are
22  we so immune from these economic downturns?  How can our
23  numbers still be in line with expectations?  You know, it
24  seems almost too good, but hey, we're delivering.  That
25  type of commentary, but nothing specific to a forecast.

184

1   I didn't have access to forecasts and have a desire to
2   talk about forecasts.  I didn't know I was leaving the
3   company at that time.  It wasn't part and parcel of my
4   normal responsibilities.  So nothing specifically about a
5   specific forecast.
6   Q  And when you say "the economy," what was going
7   on in the economy at that time?
8   A  It's like the tumbling of the NASDAQ.  I think
9   it was pretty prominent around that time.  Companies
10  missing their results, that type of thing.
11  Q  Do you recall whether you talked about the
12  economy with the investigator?
13  A  I don't recall one way or the other.
14  Q  Did you attend any, like, Oracle holiday events
15  in that December -- in December 2000 before you left the
16  company when you were traveling or -- or back at home?
17  A  I'm trying to think.  I don't believe I did.
18  Q  Do you recall any buzz among the -- your
19  coworkers, anyone else at the company along the lines of
20  "Santa won't be coming to Oracle next year"?
21  MR. RUBIN:  Objection; form.  I don't know what the
22  term "buzz" means.
23  MS. WINKLER:  It's a term that he used in his prior
24  testimony.
25  MR. RUBIN:  I'm just making the objection.

185

1      THE WITNESS: I don't recall anyone saying Santa's
2  not coming this Christmas, or next Christmas, to be
3  specific.
4      BY MS. WINKLER:
5      Q  Okay.  After you left the company, did you keep
6  in touch with any of your former coworkers, colleagues?
7      A  A small number of them.
8      Q  Did you talk to them about how the company was
9  doing, forecasts, things like that?
10      A  Don't recall.
11      Q  And you testified earlier that you don't recall
12  anything that you talked about with the investigator; is
13  that correct?
14      A  Again, this was five years ago.  The reason why
15  I called was answered in a way that was unfavorable to
16  the reason why I was calling, so it was more being polite
17  than anything else.
18      MS. WINKLER: Let's take a -- just a very short,
19  five-minute break, and I might be close to being done.
20      THE VIDEOGRAPHER: We are now going off the video
21  record.  The time is 3:06 p.m.
22      ( Recess taken:  3:06 until 3:13 p.m.)
23      THE VIDEOGRAPHER: We are now back on the video
24  record.  The time is 3:13 p.m.
25      MS. WINKLER: Mr. Donnelly, I think I am done with

186

1  my questioning.  I thank you for your time today.  And
2  Mr. Rubin may have --
3      MR. RUBIN: Just a couple.
4      MS. WINKLER: -- a few more questions.
5      THE VIDEOGRAPHER: Do you want to go off the record
6  to switch?
7      MR. RUBIN: I can do that from here.
8      (Discussion off the record.)
9      MR. RUBIN: That's fine.  Let's go ahead and switch.
10  It only takes one minute.
11
12          EXAMINATION (Further)
13      BY MR. RUBIN:
14      Q  Mr. Donnelly, just a few follow-up questions in
15  connection with some -- some of the areas that
16  Ms. Winkler asked you about.
17      In terms of this -- Ms. Winkler showed you a lot
18  of documents related to the issue that had arisen in
19  connection with the education revenue, correct?
20      A  Yes.
21      Q  Now, would it be fair to characterize Oracle's
22  efforts as essentially just trying to get to the right
23  answer?
24      A  That was certainly my approach, yes.
25      Q  And did you -- was it your understanding

187

1  that that was -- that was the approach of your colleagues
2  at Oracle?
3      A  Seemingly most of them, until today.
4      Q  Until today, meaning who?
5      A  The comment that was referenced in one of the
6  exhibits from Jennifer Minton.
7      Q  Oh, I see.
8      A  Seemed surprising to me when I read it.
9      Q  But in terms of Dan Sharpley's work, for
10  example, was he making an effort to try to get to the
11  bottom of what had happened?
12      A  Yes.
13      Q  And Mr. -- or Ms. Fitzpatrick's work?
14      A  Yes.
15      Q  Would you character it in the same way?
16      A  Yes.
17      Q  Yes.  And this was an issue that had arisen.
18  Everyone was trying to figure out how much of an
19  adjustment should be made and then make it, correct?
20      MS. WINKLER: Objection; form.
21      THE WITNESS: Again, yes, except with the one caveat
22  that I learned about today.  It didn't seem to be as
23  important to one person.
24      BY MR. RUBIN:
25      Q  You're talking about Ms. Minton's comment?

188

1      A  Correct.
2      Q  But at the time that you were working on it, did
3  you have any sense that anybody -- did you have any sense
4  that anybody was attempting to try to push this under the
5  rug?
6      A  Not anybody in my group, no.
7      Q  Anybody trying to conceal it in any way?
8      A  Not that I'm aware of.
9      Q  Did you have any -- at the -- based upon your
10  knowledge of the ERS issue, did you -- was there any
11  indication based on any of the information that you
12  became privy to that the original error was the result of
13  any intentional misconduct?
14      A  No.
15      Q  This was a systems error?
16      A  It was a systems and a process reconciliation
17  error, yes.
18      Q  Right.  And when the -- at some point in time,
19  was a Suite 11i module implemented to replace the ERS
20  system?
21      A  I believe so, but the timing is a bit fuzzy.
22  I'm not sure whether that happened in the second half of
23  2000 or whether it happened -- was being planned for at
24  that time and happened subsequent to my departure.  I
25  can't remember.  But certainly there was dialogue around

189

1    replacing the system with part of the 11i suite.
2        Q   And do you have any memory sitting here today of
3    whether that improved the processes?  And when I say
4    "improved," I mean address some of the deficiencies that
5    have been identified because of a separate system that
6    didn't link into the general ledger.
7        MS. WINKLER:  Objection; form.
8        THE WITNESS:  I don't have any specific memories.
9    BY MR. RUBIN:
10       Q   Do you have any general memory --
11       A   No.
12       Q   -- of it being improved?
13       A   No.
14       MS. WINKLER:  Objection; "general memory."
15       MR. RUBIN:  Okay.  Goose, gander.
16       THE WITNESS:  Is this a game you guys play here?
17   BY MR. RUBIN:
18       Q   Now, you had indicated that -- I believe
19   Ms. Winkler asked you a few questions about Suite 11i.
20       A   Yes.
21       Q   And I think specifically she showed you some
22   bullet points in a PowerPoint presentation?
23       A   Yes.
24       Q   And specifically, I think she drew your
25   attention to some items relating to customer concerns or

190

1    customer feedback about integration.  Do you remember
2    that?
3        A   Yes.
4        Q   Now, did you play any role in designing
5    Suite 11i from a computer --
6        A   Any role or --
7        Q   Did you play any -- did you play any role in
8    terms of the software, writing of the code, or any of the
9    software production?
10       A   So I did not -- I was not involved in any of the
11   software production.  However, as part of the process of
12   developing an application, they typically ask business
13   users around the type of functionality they would like to
14   see in these products.  And I believe I provided some
15   input to -- to that process, but I was not involved in
16   the building, testing, release of that product.
17       Q   And do you remember which particular modules or
18   functions you were asked to provide feedback about?
19       A   I don't recall.
20       Q   Okay.  Do you remember when that was?
21       A   I provided input to the general ledger
22   application when I was in corporate FP&A group at that
23   time.  I believe I provided some input for the marketing
24   application.  Beyond that, I don't remember any of the
25   specific comments from me personally.  But my team were

191

1    also asked to input on this.  So I have to believe Dan
2    would make comments on the education system, et cetera.
3        Q   And did you understand that the -- that -- what
4    did you understand the term "integration" to mean from a
5    design vantage point for Suite 11i?  What did you
6    understand Oracle's design integration to be or to relate
7    to?
8        MS. WINKLER:  Objection; form.
9        THE WITNESS:  So a couple of things.  One is you
10   could plug and play.  So if -- you didn't have to buy the
11   whole thing; you could buy modules and they would work.
12       And the second thing is they would talk to each
13   other.  So when you required a transaction to move from
14   one part of the suite to another, it did so in a
15   seamless, integrated way.
16   BY MR. RUBIN:
17       Q   Now, do you have any knowledge about how -- how
18   the code was written with respect to business processes
19   or business flows?  And when I ask that, I mean did it --
20   did the software as -- as produced and as sold, did it
21   have a finite number of business flows?  Did it have an
22   infinite amount of business flows, do you know?
23       MS. WINKLER:  Objection; form.
24       THE WITNESS:  I don't know.  I don't know.
25   BY MR. RUBIN:

192

1        Q   Do you know as you're sitting here today whether
2    any particular software could -- before being
3    implemented, could it anticipate or be able to
4    immediately communicate with any system that's in place
5    in a particular company or customer?
6        A   So I -- I think I understand your question.
7    Could you put in a piece of software and expect it to be
8    able to communicate with any other unrelated piece of
9    software?
10       Q   Yeah.
11       A   No.
12       Q   Okay.
13       A   But if it was part of a integrated suite, then
14   yes.  As an example, Microsoft Excel and Microsoft Word
15   have compatibilities with each other.  You can copy and
16   paste from one to the other; they work.
17       Q   Now, in terms of Suite 11i, like, let's take,
18   for example, the order management module.  Do you know
19   whether that module was built with some sort of default
20   settings?  I'll use "default" for lack of a better word.
21   That is, that it assumed -- so without doing anything
22   more, just based upon the code as written, that there
23   were a certain number of business flows within order
24   management that it was written to integrate with or to
25   deal with?

193

1    MS. WINKLER: Objection; form.
2    THE WITNESS: So based upon my understanding of the
3    applications, they all required some level of
4    configuration.
5    BY MR. RUBIN:
6    Q   So -- so -- and when you say "configuration,"
7    that could be configuration either by the customer or of
8    the Oracle software itself, correct?
9    A   I don't understand the difference between the
10   two.
11   Q   Well, so if you have -- let me give you an
12   example. So if you had a customer that had six fields in
13   their order management.
14   A   Mm-hmm.
15   Q   And the Suite 11i software had a default setting
16   of four, when you say "configuration," are you talking
17   about the customer configuring so that they convert their
18   business flows to four fields, or are you talking about
19   Oracle converting to six or either/or?
20   MS. WINKLER: Objection; form.
21   THE WITNESS: So what I meant in my comment was in
22   order to use the software, the customer needed to make
23   certain decisions around how they wanted to integrate the
24   software. As an example, the accounting flex fields. I
25   probably got the term wrong. Sorry. Standard chart of

194

1    accounts. My apologies.
2        The standard chart of accounts for a company
3    could be 1 through N in length. There was probably a --
4    an end parameter for the 11i system. I don't know, 64
5    characters, whatever it may be. There was a finite
6    number of characters. However, within that, a customer
7    could choose to have 2, 10, 15 or 20. But they would
8    have to choose to have those. The product did not come
9    with a quote/unquote standard chart of accounts.
10   BY MR. RUBIN:
11   Q   Is that your understanding?
12   A   That's my understanding.
13   Q   So you don't have an understanding that if they
14   happened to have the range that Suite 11i had a default
15   setting to, then it would actually not need to be
16   configured for that particular customer?
17   MS. WINKLER: Objection; form.
18   THE WITNESS: So, again, in the example that I gave
19   you, I don't believe the standard Oracle general ledger
20   came with a standard chart of accounts to start with.
21   And if it did, it would be of no use to 99.999 percent of
22   the companies because they all have their own.
23   BY MR. RUBIN:
24   Q   Right.
25   A   It's a customizable part of the application.

195

1    Q   And anybody in GL would understand that there is
2    almost an infinite array of alternatives within that
3    range, correct?
4    A   Correct.
5    Q   So now, do you -- is it your understanding that
6    Suite 11i was built essentially on a common language?
7    A   My understanding is it was built on a common
8    language. However, I want to clarify one thing. We've
9    used the term "Suite 11i." There's really two components
10   to that. There was the ERP component and the CRM
11   component. I think there was a tenuous link between the
12   two, bringing the two together as one suite, fully
13   integrated.
14   Q   But they were -- they were all modules that
15   would -- that had the same common language within both
16   ERP and CRM?
17   A   So they -- they were sold as modules of a common
18   suite. I don't know if they each had common code.
19   Q   Do you know one way or the other whether they
20   each had common code?
21   A   No.
22   Q   Do you know whether they had common language?
23   A   No.
24   Q   You don't know one way or the other?
25   A   I'm not a technical person so I can't tell you

196

1    whether every one of both pools of products had the same
2    structure and language and code.
3    Q   And I gather from your testimony just now and
4    previously that you were not in any way involved in
5    responding to customer escalations regarding
6    implementation?
7    A   No.
8    Q   You did not specifically respond to any TARs?
9    A   No.
10   Q   And you don't have any personal knowledge of
11   whether, in response to a particular customer concern,
12   that -- whether there was any code -- there were any
13   changes in the code or whether the customer was making a
14   user error? You don't know one way or the other?
15   A   So I was aware of the -- what's called the bug
16   database, which is when a customer calls -- actually,
17   let's take about -- when a product is released, a product
18   is typically released with known bugs, of which -- of a
19   lower classification. It's rare for a product to be
20   released with a priority 1 bug, which means it don't
21   work. But it may be released with a priority 2 or 3 or 4
22   bug, a lower-level bug, a known problem. The screen
23   twitches when you move to this screen; that's a bug. We
24   don't know why. Can't fix it. Let's get the code out.
25   So products are released with bugs. Those bugs are

197

1    tracked in something called the bug database.

2         When technical assistance requests come in, when

3    TARs come in, they are -- a lot of questions are asked

4    about the thing.  In some cases they may be user error.

5    In some case they may be instructional error in the

6    instructions that were given.  In some case it may be a

7    bug with the product.  If it's a bug with the product, it

8    will get added to the bug database.

9         So if you wanted to see how many bugs a

10   particular product has, you would run a report from the

11   bug database.

12        Q  And did you monitor or use that in any fashion

13   during your time at Oracle?

14        A  I did not.  I was aware of the existence of

15   this.  It was used by the groups that I supported, and

16   hence, the comment.

17        Q  And do you -- so it would also be safe to say to

18   the extent a complaint or a report labeled internally

19   at Oracle as an integration-related bug, do you know the

20   factors that went into categorizing it as an integration

21   related bug as opposed to another kind of bug?

22        MS. WINKLER:  Objection; form.

23        THE WITNESS:  Again, I'm not technical, so I would

24   just assume that this is the ability for one application

25   to work in unison with another application or a module.

198

1    BY MR. RUBIN:

2         Q  Were you ware of customers, quote, "going live"

3    with one or more Suite 11i modules after the product was

4    rolled out?

5         A  I'm not aware of specific customers, but a lot

6    of people bought the stuff.

7         Q  As far as you knew, did people start to use it?

8         A  One would hope they did.

9         Q  Was it your understanding that they were using

10   it?

11        A  Yes.

12        Q  Yeah.  And in -- I think you answered that

13   question.

14        Okay.  Did you ever have any -- you personally

15   ever have any conversations with customers about concerns

16   about Suite 11i?

17        A  No.

18        MR. RUBIN:  All right.  I don't have anything

19   further.  Thank you.

20        THE WITNESS:  Thank you.

21        MR. RUBIN:  Thank you for your time.

22

23            EXAMINATION (Further)

24   BY MS. WINKLER:

25        Q  I just have a couple follow-up questions, and

199

1    I'll do it from here because I won't have that many.

2         MR. CAPLAN:  You've heard that before.

3    BY MS. WINKLER:

4         Q  In the -- in Graeme Maher's support

5    presentation, are you aware of who would have provided

6    him the information about 11i that went into that

7    presentation?

8         MR. CAPLAN:  Which number exhibit is it?

9         MS. WINKLER:  It is the one that starts out with

10   document number 503848.

11        THE WITNESS:  Yep.  Who would have provided him with

12   what information?

13   BY MS. WINKLER:

14        Q  The information related to 11i.  And first of

15   all, just the information related to 11i.

16        A  So the system that tracks the technical

17   assistant -- technical assistance requests would have

18   that information in there.

19        Q  So he would have -- the information with --

20   specifically with respect to the iTARs he would have

21   gotten from that system?

22        A  Correct.

23        Q  Do you know whether 11i was released with any

24   priority 1 bugs?

25        A  I don't know.

200

1         Q  What about the information regarding the

2    customer complaints about the lack of integration that is

3    contained within this document?  Where would Graeme have

4    obtained that information?

5         A  Again, the most likely place he would have got

6    it would have been from the records of the conversations

7    with the customers, and that would -- that would have

8    been included in the notes section of the iTARs.

9         MS. WINKLER:  That's all I have.

10        MR. RUBIN:  Thank you, Mr. Donnelly.

11        THE VIDEOGRAPHER:  This concludes today's

12   proceedings.  The number of videotapes used was three.

13   We are now off the video record.  The time is 3:31 p.m.

14        THE REPORTER:  For the written record, Counsel,

15   would you like a copy of the transcript with an ASCII,

16   mini, and rough ASCII?

17        MR. RUBIN:  We have a standard order.  Yes.

18        MR. CAPLAN:  We'd also like a 30-day chance to

19   review that, so --

20        THE REPORTER:  Counsel, for you?  Copy, ASCII, mini,

21   and rough ASCII?

22        MS. WINKLER:  Yes.

23        THE REPORTER:  Are there any time constraints on

24   this transcript?

25        MR. RUBIN:  No.

Donnelly, Peter  11/30/2005  3:44:00 PM

201

9  I, PETER DONNELLY, do hereby declare under
10  penalty of perjury that I have read the foregoing
11  transcript of my deposition, consisting of page 1 to 200,
12  inclusive; that I have made such corrections as noted
13  on any errata sheet(s) attached hereto; that my testimony
14  as contained herein, as corrected, is true and correct.
15       EXECUTED this _____ day of _____,
16  20___, at _____, _____.
17       (City)          (State)

20       PETER DONNELLY

202

1  STATE OF CALIFORNIA   )
                         : ss
2  COUNTY OF CONTRA COSTA)

4       I, the undersigned, a Certified Shorthand
5  Reporter of the State of California, do hereby
6  certify:
7       That the foregoing proceedings were taken
8  before me at the time and place herein set forth; that
9  any witnesses in the foregoing proceedings, prior to
10  testifying, were placed under oath; that a verbatim
11  record of the proceedings was made by me using machine
12  shorthand which was thereafter transcribed under my
13  direction; further, that the foregoing is an accurate
14  transcription thereof.
15       I further certify that I am neither
16  financially interested in the action nor a relative or
17  employee of any attorney of any of the parties.
18       IN WITNESS WHEREOF, I have this date
19  subscribed my name.

21  Dated: December 16, 2005

24       TRACY L. PERRY
         CSR No. 9577

PETER DONNELLY, NOVEMBER 30, 2005

1        STATE OF CALIFORNIA    )
                       :  ss
2        COUNTY OF CONTRA COSTA)

3

4            I, the undersigned, a Certified Shorthand

5        Reporter of the State of California, do hereby

6    certify:

7            That the foregoing proceedings were taken

8    before me at the time and place herein set forth; that

9    any witnesses in the foregoing proceedings, prior to

10   testifying, were placed under oath; that a verbatim

11   record of the proceedings was made by me using machine

12   shorthand which was thereafter transcribed under my

13   direction; further, that the foregoing is an accurate

14   transcription thereof.

15           I further certify that I am neither

16   financially interested in the action nor a relative or

17   employee of any attorney of any of the parties.

18           IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21       Dated: December 16, 2005

22

23

24       _____
         TRACY L. PERRY
         CSR NO. 9577

25