# EXHIBIT JJ

**275**

```
 1  00275:01   IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2      02        IN AND FOR THE COUNTY OF SAN MATEO
 3      03               ---o0o---
 4      04  COORDINATION PROCEEDING
 5      05
 6      06
 7      07            PROCEEDING NO. 4180
 8      08  THIS DOCUMENT RELATES TO:
 9      09  ALL ACTIONS
10      10
11      11
12      12        DEPOSITION OF JEFFREY O. HENLEY
13      13          Wednesday, March 3, 2004
14      14          Volume II (Pages 275 - 363)
15      15
16      16  CONFIDENTIAL: THIS TRANSCRIPT IS DESIGNATED AS
17      17  THE COURT ON JUNE 21, 2002, CONTAINS DOCUMENTS MARK
18      18  EXCEPT PURSUANT TO THE TERMS OF THE PROTECTIVE ORD
19      19
20      20  REPORTED BY:
21      21  HOLLY MOOSE, RDR-CRR-CRP
22      22
23      23
24      24        Certified Shorthand Reporters
25      25        San Francisco, California  94102
```

**276**

```
 1  00276:01   IN THE COURT OF CHANCERY OF THE STATE OF DELAW/
 2      02        IN AND FOR NEW CASTLE COUNTY
 3      03
 4      04  IN RE ORACLE CORPORATION
 5      05  DERIVATIVE LITIGATION
 6      06  _____/
 7      07
 8      08
 9      09
10      10
11      11
12      12
13      13
14      14
15      15
16      16
17      17
18      18
19      19
20      20
21      21
22      22
23      23
24      24
25      25
```

**277**

```
 1  00277:01        A P P E A R A N C E S
 2      02
 3      03  FOR CALIFORNIA PLAINTIFFS:
 4      04      BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO
 5      05        ELIZABETH GUARNIERI, ESQ.
 6      06      San Francisco, CA  94104
 7      07
 8      08
 9      09  BY:  DAVID PEREZ, LAW CLERK
10      10      Suite 1000, Tenth Floor
11      11
12      12
13      13  BY:  DARIO DE GHETALDI, ESQ.
14      14      Millbrae, CA  94030
15      15
16      16
17      17
18      18  BY:  KAREN MORRIS, ESQ.
19      19      Wilmington, DE  19801
20      20
21      21
22      22  BY:  DOUGLAS WILENS, ESQ.
23      23      Boca Raton, FL  33432
24      24
25      25
```

**278**

```
 1  00278:01        A P P E A R A N C E S (continued)
 2      02
 3      03  FOR INDIVIDUAL DEFENDANTS ELLISON AND HENLEY:
 4      04      MAYER, BROWN, ROWE & MAW
 5      05        JAVIER H. RUBINSTEIN, ESQ.
 6      06      Chicago, IL  60603
 7      07
 8      08
 9      09
10      10  BY:  ANNA ERICKSON WHITE, ESQ.
11      11      Palo Alto, CA  94304
12      12
13      13  AND
14      14      ORACLE CORPORATION
15      15      500 Oracle Parkway
16      16      (650)506-9221
17      17
18      18  ALSO PRESENT:  Joanna Lenn, Videographer
19      19
20      20
21      21
22      22      425 California Street, Suite 2025
23      23      (415)433-3200
24      24
25      25
```

279

```
1    00279:01          I N D E X
2    02
3    03  DEPOSITION OF JEFFREY O. HENLEY
4    04
5    05  EXAMINATION BY:                    PAGE
6    06    MS. LAVALLEE              282
7    07
8    08  DC EXHIBITS
9    09
10   10
11   11
12   12      Support Of Motion For Summary
13   13
14   14      Month (FY01), 1 page              319
15   15  149 Chart 8: Comparison Of Henley's
16   16      Earnings Call With December 11, 2000
17   17
18   18
19   19
20   20          ---o0o---
21   21
22   22
23   23
24   24
25   25
```

280

```
1    00280:01      BE IT REMEMBERED that, pursuant to
2    02  Continuation and on Wednesday, March 3, 2004, commencing
3    03  at the hour of 8:09 a.m., before me, HOLLY MOOSE, CSR
4    04  No. 6438, a Certified Shorthand Reporter in the State of
5    05  California, there personally appeared
6    06
7    07          JEFFREY O. HENLEY,
8    08
9    09  called as a witness by the Plaintiffs, who, having been
10   10  previously duly sworn, was examined and testified as
11   11  hereinafter set forth:
12   12
13   13
14   14
15   15          ---o0o---
16   16
17   17
18   18
19   19
20   20
21   21
22   22
23   23
24   24
25   25
```

281

```
1    00281:01  PROCEEDINGS                    8:09 A.M.
2    02
3    03          THE VIDEOGRAPHER:  This marks the beginning of
4    04  Volume II, videotape number 1 in the continuing
5    05  deposition of Jeffrey Henley in the matters of
6    06  Coordination Proceeding Special Title Oracle Cases, in
7    07  the superior court of California, county of San Mateo,
8    08  Judicial Council Coordination Proceeding Number 4180,
9    09  and In Re Oracle Corp Derivative Litigation, in the
10   10  court of Chancery of the state of Delaware, in and for
11   11  New Castle County, consolidated case number 18751.
12   12          Today's date is March 3rd, 2004, and the
13   13  time is 8:09.  The location of this deposition is 425
14   14  California Street, 21st Floor, San Francisco,
15   15  California.  The video operator is Joanna Lenn, a
16   16  California notary public for the county of San
17   17  Francisco, employed by Dan Mottaz Video Productions.
18   18  The court reporter is Holly Moose with Robert Barnes.
19   19          Would any counsel new to this deposition
20   20  please identify themselves and state whom they
21   21  represent.
22   22          MR. DE GHETALDI:  That would be me.  Dario de
23   23  Ghetaldi on behalf of the California plaintiffs.
24   24          THE VIDEOGRAPHER:  All other aspects as
25   25  indicated on Volume I, tape 1 remain the same.  We are
```

282

```
1    00282:01  back on the record.
2    02          EXAMINATION RESUMED BY
3    03      MS. LAVALLEE:  Q.  Good morning, Mr. Henley.
4    04      A.  Morning.
5    05      Q.  Welcome back.  I'd ask that you take a look
6    06  again at Exhibits 132, 133 and 134.  We were making --
7    07  we were taking a look at these documents yesterday, and
8    08  I'd like to touch on a few different aspects there.
9    09      A.  Okay, I have them.
10   10      Q.  And in particular, I'd ask you to turn your
11   11  attention to the -- in Exhibit 132 to the page
12   12  Bates-stamped 3007.
13   13      A.  Okay.
14   14      Q.  And in Exhibit 133, page 3345.
15   15      A.  3345, yes.
16   16      Q.  And Exhibit 134, 3612.
17   17      A.  Yes, okay.
18   18      Q.  Okay.  I'd like to draw your attention in
19   19  particular to the second to last column.  And we had
20   20  talked -- from the right, second to last column from the
21   21  right -- or second to last column, which is on the
22   22  right -- which is titled "Pipeline Conversion Ratio
23   23  Forecast."
24   24          And we had discussed what that is before.  I'd
25   25  just like you to compare the figure from the
```

283

```
1   00283:01  December 8th pipeline report to the January 15th
2        02  pipeline report.
3        03      A.  Okay.
4        04      Q.  Or actually, I should say upside reports. And
5        05  do you see that the figure has increased from 41 percent
6        06  to 52 percent?
7        07      A.  This is the last column?  This is based on the
8        08  potential?
9        09      Q.  I'm sorry, I'm looking, actually, at the
10       10  number for the ...
11       11      A.  I thought you were talking about the second to
12       12  last column.
13       13      Q.  Yes.
14       14      A.  That's 42 versus 47.  I think 48 to 51 is the
15       15  final column.
16       16      Q.  Correct.  Correct.  I apologize.  You're
17       17  correct.
18       18      A.  So which column do you want?
19       19      Q.  The — you have the right column, 42 to --
20       20      A.  Okay, the forecast, 42 versus 47.
21       21      Q.  Right.
22       22      A.  Uh-huh.
23       23      Q.  And you see that figure increasing?
24       24      A.  Yes.
25       25      Q.  And can you tell me what that increase
```

284

```
1   00284:01  signified to you?
2        02      A.  Well, again, as you go through a quarter, your
3        03  pipeline is reducing, the aggregate pipeline, because
4        04  deals are slipping.  So as you go along in the quarter,
5        05  typically your conversion ratio would go up.  So could
6        06  be nothing more than that, that your aggregate pipeline
7        07  is just diminishing because the less probable things
8        08  have actually slipped out of the pipeline.
9        09      Q.  Okay.  So is it your view that was typical for
10       10  the pipeline conversion rate to increase throughout the
11       11  quarter?
12       12      A.  I don't really remember.  But I do know that
13       13  usually as you go — as you go through a quarter,
14       14  usually the pipeline is going down.  So the deals that
15       15  were less probable do slip out.  So I think there is —
16       16  there is a — that's typical that you would have —
17       17  it's — I'm not sure it's typical.  I haven't gone back
18       18  and studied it.  But it makes sense to me that the less
19       19  probable things are the first things to slip.
20       20          And so what you're left with is the stuff that
21       21  is still seemingly still alive and kicking and so forth,
22       22  so the percentage would go up.
23       23      Q.  Okay.  Does this percentage increase signify
24       24  to you that it means that you need to close a larger
25       25  percentage of your pipeline to actually meet your
```

285

```
1   00285:01  forecast number?
2        02      A.  That's correct.  And that percentage does
3        03  imply that of the remaining pipeline that you have left,
4        04  obviously you've got to get five percent more, in this
5        05  case, finished.
6        06      Q.  Okay.  And when you looked at these
7        07  comparisons, would you then be comparing the pipeline
8        08  conversion rate — ratio forecast here to historical
9        09  pipeline conversion ratios?
10       10      A.  Again, I don't really do that.  We typically
11       11  look at these conversion ratios early on when I give my
12       12  initial guidance.  I don't pay a lot of attention, you
13       13  know, as I go through this.
14       14          But I am clearly interested in, you know, do
15       15  we have enough pipeline to convert, do we have enough
16       16  stuff out there and — you know, so I don't get down to
17       17  percentages.  But we're clearly very interested in
18       18  making sure we have enough coverage.  It's the same kind
19       19  of concept.
20       20      Q.  Okay.  And to the extent that you are aware
21       21  that there was a deviation, that the pipeline conversion
22       22  ratio for a particular period was higher than —
23       23  significantly higher than it had been in your prior
24       24  years, would that be something that would be of concern
25       25  to you?
```

286

```
1   00286:01      A.  It may or may not be.  It would depend upon
2        02  quality of the pipeline.
3        03      Q.  Okay.
4        04      A.  If you had a pipeline that everybody felt much
5        05  better about, much higher probability of the deals that
6        06  were in that pipeline, you might have a lower — you
7        07  might have a higher conversion ratio.
8        08          Conversely, you might have a low number, and
9        09  that could be worse.  It really — it really gets
10       10  down — again, it's one of the tools you use.  But in
11       11  the end, what you really have to get down is get the
12       12  sales force to examine all — all these deals in the
13       13  pipeline to try to figure out each one, you know, what's
14       14  the probability that that particular one will close.
15       15      Q.  Okay.  So if you saw a discrepancy, you would
16       16  actually go to the field --
17       17      A.  Sure.
18       18      Q.  -- to people — let me finish my question, I'm
19       19  sorry — to actually ask them, you know, "Why are we
20       20  seeing this discrepancy" and try to figure out what the
21       21  purpose is, to make a determination as to whether or not
22       22  it's significant to you; is that what you're saying?
23       23      A.  Sure.  I don't — again, I — I relied in
24       24  particular in this quarter on going back to these guys
25       25  repeatedly, as I've previously testified, to make sure
```

**287**

```
1   00287:01 they were comfortable with their forecast.
2      02      They know these deals. They know -- they go
3      03   through them ad neuseam through their management teams
4      04   to try to figure out, you know, what's the chance of
5      05   different things closing, knowing that they're not all
6      06   going to close, but ... so that's what I go through. I
7      07   rely heavily on them to tell me.
8      08      But we have a lot of different tools, as I've
9      09   previously testified yesterday, to kind of try to just
10     10   look at different cuts and keep finding ways to go at
11     11   people to try to make sure they're giving us their best
12     12   judgments as to what -- the range of possibilities.
13     13      Q. Okay. And focusing still on this pipeline
14     14   conversion ratio, do you recall in Q3 2001 whether or
15     15   not you actually spoke to anybody or questioned them on
16     16   the fact that there might have been an increase in the
17     17   pipeline conversion ratio over historical rates?
18     18      A. I don't recollect that.
19     19      Q. Okay. And in terms of -- you mentioned
20     20   yesterday that you receive a document, and you
21     21   weren't -- couldn't recall whether or not it was
22     22   something you received in Q3 2001, but you may have, you
23     23   may not have; you just didn't remember.
24     24      A. Mm-hm.
25     25      Q. But you had stated that there was a document
```

**288**

```
1   00288:01 that you received at the beginning of the quarter or at
2      02   the beginning of each year where it had historical
3      03   conversion rates and data like that. Do you recall that
4      04   testimony?
5      05      A. Mm-hm.
6      06      Q. Can you tell me -- can you tell me what type
7      07   of conversion ratios [sic] figures appeared on that
8      08   chart? If you don't understand my question, just let me
9      09   know.
10     10      A. Well, when you say what type, I'm not sure --
11     11   we covered how you calculate the conversion ratios
12     12   yesterday. So I don't know what -- beyond that --
13     13      Q. Okay, let me ask a different question.
14     14      A. -- what "type" means.
15     15      Q. Sure, that's understandable. We had talked
16     16   about the conversion ratio here, for example, as one
17     17   where you're comparing the pipeline at a particular
18     18   point in the quarter versus a forecast at a particular
19     19   point.
20     20      Is that the type of figure that would appear
21     21   on a week-by-week basis or a month --
22     22      A. Yes. We covered all that yesterday.
23     23      Q. Okay. I'm talking specifically about that
24     24   report that included all the historical data.
25     25      A. Pipe -- these conversion rates are always
```

**289**

```
1   00289:01 calculated the same, best of my knowledge, so sure.
2      02      Q. Okay. So -- okay. And did it include the
3      03   actual historical data by division of the company as
4      04   well for the conversion rates, or did it include simply
5      05   a total license figure, for example?
6      06      A. No -- you mean do we break down the conversion
7      07   rates by organization like on this report?
8      08      Q. Correct.
9      09      A. Sure.
10     10      Q. And does it break it down -- I think you
11     11   testified it broke it down by week; is that correct? I
12     12   just want to be clear. Or is it something that it broke
13     13   it down by -- by month?
14     14      A. I -- I don't recall. Usually when I've looked
15     15   at -- to start out a quarter, we typically looked at
16     16   comparable periods at the start of a quarter as to what
17     17   conversion rates were.
18     18      But we've done calculations historically, you
19     19   know, what were conversion rates starting a quarter,
20     20   what were conversion rates sitting towards the end of a
21     21   quarter. So we analyze different periods, if that's
22     22   what you're saying.
23     23      Q. Okay. But you don't recall whether that
24     24   particular report actually broke it down on a
25     25   week-by-week basis or a month --
```

**290**

```
1   00290:01      A. I don't. I don't. I know we've done that.
2      02   Whether that particular report did, I don't remember.
3      03      Q. Okay. And you say you've done it. Do you
4      04   know if it appeared in a different report? Was there a
5      05   type of report that you received that actually had these
6      06   calculations or historical data?
7      07      A. I believe so. Either it's been prepared for
8      08   me or I've done it. But, I mean, I clearly recognize
9      09   that there are -- because the way the pipeline works --
10     10   I described this. The pipeline changes over the course
11     11   of a quarter --
12     12      Q. Right.
13     13      A. The conversion rates even within a quarter,
14     14   based upon the forecasts, can vary.
15     15      Q. Okay, thank you. If I could turn your
16     16   attention to Exhibit 132 to the second page of the
17     17   document, which is Bates-stamped 3004. Actually, let me
18     18   turn your attention to 3005 instead, which is the next
19     19   page.
20     20      A. Okay.
21     21      Q. Okay. And the second column over is the
22     22   forecast number, correct?
23     23      A. Yes.
24     24      Q. And we talked briefly about what that was
25     25   yesterday. I'd like to actually explore that a little
```

Henley, Jeffrey O. (Vol. 02) - 03/03/2004  3/3/2004  10:15:00 AM

---

291

```
 1   00291:01 more and ask additional questions on that.
 2   02        In terms of the deals that are actually
 3   03   included in the forecast by the particular divisions, is
 4   04   there a benchmark by which the field or the management
 5   05   decides whether a deal should be included in the
 6   06   forecast?
 7   07     A.  I know of no official benchmark, some
 8   08   corporate standard that we hold people to. There's a
 9   09   lot of judgment that goes into the part of individual
10   10   salespeople. Ultimately senior management above them
11   11   may override what their -- what their managers say.
12   12        And as I indicated many times yesterday, at a
13   13   corporate level Jennifer Minton goes in and puts her
14   14   judgment on top of all this.
15   15     Q.  Right. Okay. I'm focusing right now on the
16   16   forecast number --
17   17     A.  Mm-hm.
18   18     Q.  -- which is without Ms. Minton's judgment.
19   19     A.  Mm-hm, mm-hm, mm-hm.
20   20     Q.  In that -- on that number, do you expect that
21   21   the field would include in the forecast all the deals
22   22   that they believe would close that quarter?
23   23     A.  As I say, I don't know exactly how everyone
24   24   does it. They go through a long -- a long list of large
25   25   deals. I believe they have a whole pipeline -- they
```

292

```
 1   00292:01 don't go every deal, smaller deals. They sort of
 2   02   statistically say "Based on history, I'll probably get a
 3   03   certain amount."
 4   04        So there's a variety of things they do to sort
 5   05   of get -- I suspect -- I'm almost confident any
 6   06   particular person has a little different judgment or a
 7   07   little different technique they use.
 8   08     Q.  Okay. With respect to the potential number,
 9   09   is it your understanding that when Ms. Minton and her
10   10   group looks at the forecast number, they -- they include
11   11   their -- when they include their judgment, they include
12   12   in the potential all the deals that they would
13   13   anticipate actually close -- will -- actually will close
14   14   or could close in that quarter?
15   15     A.  There's a variety of ways, I think, that
16   16   Jennifer Minton does it too. She looks at historical
17   17   conversion rates; she looks at large deals that they
18   18   may -- that she may be aware they're not counting on
19   19   that she might have some issue; she looks at, as I
20   20   testified yesterday, history, their track record of
21   21   underachieving or overachieving.
22   22        So there's a variety of things that she does
23   23   to try to figure out what she really believes ought to
24   24   be modified based on what the aggregate forecast is,
25   25   plus or minus.
```

293

```
 1   00293:01     Q.  In terms of the big deals that may be -- as
 2   02   you move closer towards the middle of a quarter, for
 3   03   example, and with respect to the big deals in
 4   04   particular, do you expect that all the big deals that
 5   05   are being contemplated as possible closures for that
 6   06   quarter would be included in the potential number?  Do
 7   07   you know?
 8   08     A.  I don't know for sure, but I can't imagine she
 9   09   would get down to that level. There's lots of different
10   10   transactions out there.
11   11     Q.  Okay. Mr. Henley, has Oracle ever studied
12   12   the -- whether or not -- let me actually rephrase that.
13   13        Has Oracle ever studied how much pipeline
14   14   growth typically converts into revenue?
15   15     A.  Oh, I think I've testified to this earlier.
16   16   I've told you we've gone back and looked at history;
17   17   we've looked at different years. So if that's -- that's
18   18   what I would call studying pipeline conversion rates.
19   19   And I've testified that they vary, unfortunately.  There
20   20   is not a perfect correlation.
21   21     Q.  Okay.
22   22     A.  There's a variety.
23   23     Q.  Okay.  I guess what I'm asking is whether
24   24   there's a particular study to determine whether or not
25   25   there was a correlation between the pipeline growth
```

294

```
 1   00294:01 converting into revenue, and if there is any study that
 2   02   particularly addressed that issue. And I'm not sure if
 3   03   your question [sic] answers that.
 4   04     A.  I think it does.  I mean, I testified
 5   05   yesterday that we have looked at historical trends and
 6   06   the reality that there is no one percentage.  You can't
 7   07   count on a certain percentage.  There is a range of
 8   08   possibilities, but ... so there is variety because the
 9   09   pipeline quality varies. I mean, it's -- it's a tool,
10   10   but it's a less than perfect tool, unfortunately, in
11   11   terms of predicting things.
12   12     Q.  Okay.  Are you aware of any report that
13   13   actually tracks that particular type of statistic or
14   14   historical analysis?
15   15     A.  Again, I think you showed me something
16   16   yesterday even that showed some history.  So if
17   17   that's -- I would call that a report.
18   18        But I mean, Ivgen Guner, Jennifer have
19   19   produced historical analysis from time to time,
20   20   absolutely. We're always interested in understanding
21   21   what the history is. The different divisions are well
22   22   aware of their history and so forth.
23   23        This is one of the several tools they use to
24   24   try to figure out -- some of the memos or e-mails you
25   25   produced yesterday talked about that. So it's
```

Henley, Jeffrey O. (Vol. 02) - 03/03/2004  3/3/2004  10:15:00 AM

---

**295**

```
 1  00295:01 definitely something we all are mindful of.  But it but
 2      02 it is -- you know, it's not perfect.  But it is
 3      03 definitely one tool we use to try to figure out how good
 4      04 our forecast is.
 5      05    Q.  Okay.
 6      06    A.  And I'll cut to the chase going forward.  As
 7      07 you well know, after studying all the documents, the
 8      08 reason we missed the end of the quarter was the
 9      09 conversion rate was absolutely horrific.  It was -- it
10      10 was way, below historical norms.
11      11         We had very significant pipeline, we had
12      12 plenty of pipeline, to make our forecast.  We didn't
13      13 because the conversion rate for the quarter just didn't
14      14 materialize, and it all fell apart, as I've told you
15      15 yesterday, in the last couple days of the quarter.
16      16    Q.  Okay.  So if I'm understanding you correctly,
17      17 you're saying that the conversion rate was healthy
18      18 throughout the quarter and it only fell apart in the
19      19 last couple days?
20      20    A.  We had plenty of pipeline, best of my
21      21 knowledge, based on everything I've ever looked at then
22      22 and now, refreshing my memory looking at this stuff.
23      23         Had we converted that pipeline up to the last
24      24 couple days even, at historical -- within historical
25      25 ranges, we would have made our forecast.
```

**296**

```
 1  00296:01    Q.  Okay.
 2      02    A.  Yeah, we -- we -- the conversion rate was
 3      03 dramatically lower than we had witnessed, and it was
 4      04 because there was a dramatic change in business
 5      05 sentiment, in my opinion, that happened in that, you
 6      06 know, February/March thing.
 7      07         And as I testified yesterday, the same thing
 8      08 happened to all of our -- the same thing happened to all
 9      09 of our competitors.  They were just equally shocked when
10      10 they missed their numbers and they all, you know, missed
11      11 their -- missed their estimates in the March quarter.
12      12         The same thing happened to them.  They -- they
13      13 relied, same way I do, on history.  And history didn't
14      14 repeat itself because there was a dramatic change in
15      15 business sentiment and people began to push out signing
16      16 contracts.
17      17    Q.  Okay, thank you.  Okay.  We also talked
18      18 briefly yesterday about -- in looking at several of the
19      19 e-mails, about some techniques or methods that both
20      20 Mr. Garnick and Mr. English used to adjust for the
21      21 Covisint deal in calculating growth rates and projected
22      22 revenues.
23      23         And you indicated there was -- that what they
24      24 were trying to do was not to compare apples to oranges,
25      25 but basically to make sure the comparison was a fair
```

**297**

```
 1  00297:01 comparison.
 2      02         And you indicated that -- I believe you
 3      03 indicated that there was, you know, maybe other methods
 4      04 of adjusting for Covisint to ensure that you're getting
 5      05 the right comparisons for growth rates.
 6      06    A.  Again, I testified completely on this subject
 7      07 in several different comments yesterday, including that
 8      08 you have to count it somewhere.  So if you pull it out
 9      09 of the first quarter, it falls in the third quarter.
10      10    Q.  Okay.  And I guess my question to you is are
11      11 there other methods that you can explain for me about
12      12 how to adjust for Covisint to -- that you would think
13      13 would fairly characterize --
14      14    A.  I don't think I have anything more to add than
15      15 what I thought I pretty thoroughly explained in several
16      16 conversations yesterday.
17      17    Q.  Okay.  So you can't think of any other methods
18      18 to adjust for Covisint?
19      19    A.  No.
20      20    Q.  Okay.
21      21         MR. SALPETER:  I notice he said "first month,
22      22 third month."  I think he meant "first week, third
23      23 quarter."
24      24         MS. SEGAL:  First quarter.
25      25         MR. SALPETER:  First quarter.
```

**298**

```
 1  00298:01         MS. LAVALLEE:  Let me just --
 2      02         MS. SEGAL:  Said "quarter," meant "month."
 3      03         MR. SALPETER:  He said "quarter" and meant
 4      04 "month," right.
 5      05         THE WITNESS:  I'm sorry.  I meant first month
 6      06 versus third month.  Did I misspeak?  I'm sorry.
 7      07         MR. SALPETER:  Yeah, your LiveNote reads --
 8      08 it's all right.  See line 16, see where it says "fall of
 9      09 first quarter"?  I think that means first month.
10      10         THE WITNESS:  Yes.
11      11         MS. LAVALLEE:  Okay.
12      12         THE WITNESS:  All within that fiscal third
13      13 quarter, but I did definitely mean first month, third
14      14 month.
15      15         MR. SALPETER:  Understood.
16      16         MS. LAVALLEE:  Okay.  Well, actually, that
17      17 brings me to my next question.
18      18    Q.  Was there ever any analysis done at Oracle or
19      19 any thought given to -- over one fiscal year period,
20      20 what each -- what percentage of the actual total year
21      21 results -- and I'm talking now of total license
22      22 results -- each of the quarters represented?
23      23    A.  Yes, definitely.  A lot of the -- I'm sure the
24      24 divisions do it as well, but we've done it at corporate.
25      25 There is, as I testified yesterday, a definite
```

**299**

```
1   00299:01 seasonality to our business.  There's -- for our
2      02  planning purposes, we always assume history's going to
3      03  repeat itself.  And there -- so our planning is --
4      04  'cause we don't have a full pipeline for a year, but we
5      05  rely on history.  We know that our first quarter for
6      06  license revenue is our smallest, our fourth quarter is
7      07  by far our largest, and the second and third are
8      08  fairly -- fairly similar.
9      09      Q.  Do the figures 18 percent for the first
10     10  quarter, 22 for the second, 22 for the third and the
11     11  balance in the fourth sound about right to you?
12     12      A.  They're never exact, but those are in the
13     13  range, absolutely.  I think those are definitely kind of
14     14  in the range of what's typical.
15     15      Q.  Okay.  Mr. Henley, do you recall what license
16     16  revenue Oracle had projected for Q1 fiscal year '01?
17     17      A.  Do I remember the absolute number?
18     18      Q.  Yes.
19     19      A.  No, I don't remember the absolute numbers.
20     20      Q.  Okay.  Do you remember that Oracle had
21     21  actually projected growth for that quarter?
22     22      A.  For license revenue?
23     23      Q.  For license revenue.
24     24      A.  License revenue?  I believe we did.  I'm
25     25  trying to remember.  I don't remember the actual
```

**300**

```
1   00300:01 numbers, no, gone back and studying that period.
2      02      Q.  Okay.  Do you recall whether or not you
3      03  actually did achieve your license revenue growth in
4      04  fiscal 2001, the first quarter?
5      05      A.  I don't.
6      06      Q.  Okay.
7      07      A.  I don't.
8      08      Q.  What about fiscal year 2001, but the second
9      09  quarter; do you recall whether or not the company
10     10  projected and actually achieved license revenue growth
11     11  in that quarter?
12     12      A.  Are you talking about the absolute numbers we
13     13  reported, or we met our internal forecasts, or ...
14     14      Q.  What I'm talking about is actually your --
15     15  well, let me step back.
16     16          Did you actually provide guidance in Q1, 2001?
17     17      A.  I can't remember.  As I testified yesterday, I
18     18  know after Reg -- after -- we started officially.  I
19     19  can't remember when we did, when we started that
20     20  guidance.
21     21      Q.  Is it your understanding that you actually
22     22  achieved growth -- license revenue growth in Q1 over Q
23     23  '00 -- Q1 '00?
24     24      A.  Again, I just testified I don't remember
25     25  precisely.  I assume we did, but I really can't
```

**301**

```
1   00301:01 remember.
2      02      MS. LAVALLEE:  All right.  Okay.  I'd like to
3      03  mark as the next Exhibit, which is 145, a document
4      04  Bates-stamped CA-ORCL 025738 through 40.
5      05          (DC Exhibit No. 145
6      06          marked for identification).
7      07      MS. LAVALLEE:  Mr. Henley, can you take a
8      08  moment to look at this document.  And when you've had a
9      09  chance to review it, please identify it for the record.
10     10      A.  This is an e-mail that I wrote -- looking for
11     11  the date -- December 14th, which had been right around
12     12  the time I think we did our earnings announcement, our
13     13  second quarter earnings announcement.
14     14          And this is -- this is a document that I
15     15  actually testified to yesterday where I'd done a study
16     16  several years ago, previous to this one, where we looked
17     17  at the technology drag coming from apps.
18     18          And at that -- I said at that time my
19     19  recollection was about -- was about 50 percent.  So
20     20  this -- this note is -- we did something similar, then,
21     21  at this point in time over some period of time.
22     22          And this is -- this was -- we analyzed the Q2
23     23  deals, okay, see what the technology drag -- and here I
24     24  said that it was now down to 30 cents on the dollar
25     25  rather than 50 cents on the dollar.
```

**302**

```
1   00302:01      Q.  Okay.  And can you explain what you mean in
2      02  the second paragraph.  And it reads,
3      03          "Assuming this relationship is true,
4      04      for total WW apps sales, the impact on our
5      05      WW technology number is about ten percent
6      06      of the total technology revenue."
7      07      A.  Well, first of all, the analysis was done in
8      08  the United States.  So I, you know, didn't analyze the
9      09  rest of the world, so ... it could be higher, could be
10     10  lower.  I don't know, but ... so it was a limited
11     11  sample, if you will.  But the U.S. is, you know, a
12     12  significant part of our business.
13     13          So that was the first point I made.  And so --
14     14  but I said if it is down -- if it was 30 percent
15     15  worldwide, then the impact on our worldwide technology
16     16  is about ten percent of the total technology revenue.
17     17          So I think -- I think what I meant -- and I
18     18  have to go back and remind myself, I guess -- but I
19     19  think what I meant was that the drag would have
20     20  represented about ten percent of our tech license
21     21  revenue.
22     22      Q.  Can you explain for me what you mean by "the
23     23  drag would have represented ten percent."  I'm not sure
24     24  I understand what that -- how that -- what that really
25     25  means.
```

303

1 00303:01 A. Well, I think what -- I think what I was
2 02 saying was that if you -- if it was true it was ten
3 03 percent of our total worldwide number, calculate that
4 04 ten -- what that 30 cents on the dollar would be, that
5 05 would -- and then divide that into our total technology
6 06 revenue reported for that quarter, it would have
7 07 represented about ten percent of our total database or
8 08 technology, the way we report it publicly, number.
9 09 Q. Okay. And -- well, what is the ten percent
10 10 impact? How does that affect your numbers, I guess is
11 11 what I'm asking?
12 12 A. Again, I think what I was saying was that it
13 13 was ten percent -- would have been represented -- ten
14 14 percent of all of our technology revenue would have come
15 15 from apps deals that dragged along database, so forth.
16 16 Q. Okay, thank you.
17 17 A. So it certainly -- as I said, it's -- the --
18 18 it's significant, ten percent, but it's not huge.
19 19 And so I can't remember exactly why I did
20 20 this. Maybe somebody had raised the question how much
21 21 is the apps business helping our technology numbers,
22 22 something like that. I don't remember exactly, but ...
23 23 Q. And was the change from -- looking now at the
24 24 first paragraph where you're speaking solely about the
25 25 U.S., was the change from 50 percent to 30 percent

304

1 00304:01 significant in any way to you?
2 02 A. Certainly 30 -- 50 to 30. But it wasn't
3 03 shocking to me because of the way the industry worked,
4 04 the way we were pricing, so forth. So the previous
5 05 study I'd done, as I've testified yesterday was done
6 06 several years earlier, would have nothing to do with our
7 07 forecast because, you know, a forecast contemplates
8 08 whatever the technology drag is --
9 09 Q. Okay.
10 10 A. -- at the time. By the way, I should also
11 11 note I just read the second -- the second part of her --
12 12 Loren's note. And this actually wasn't all the U.S.
13 13 deals; this was only U.S. apps deals that were over
14 14 500K.
15 15 So when I said if it were true for the -- all
16 16 deals, that would have included deals in the U.S. under
17 17 500K, plus all international deals.
18 18 Q. Okay. Implicit in what you're stating here is
19 19 that certain deals are classified as apps and certain
20 20 deals are not. Can you tell me when is a deal
21 21 characterized as an apps deal?
22 22 A. Yes. Anytime we sell certain products that
23 23 are classified as applications products -- we sell some
24 24 financial production, human resource products,
25 25 manufacturing. These are specific separately-priced

305

1 00305:01 products. Those are classified as applications revenue.
2 02 Many cases, those applications sales carry
3 03 with it a database 'cause the customer doesn't have
4 04 enough seats; they need to buy additional database. And
5 05 that's this technology drag.
6 06 Those technology sales associated with
7 07 applications are classified as technology. They
8 08 actually are separately priced on the contract as
9 09 technology. That's collected in our revenue system and
10 10 actually gets reported internally and externally as
11 11 technology, if you will.
12 12 Q. Okay. I guess I'm not sure if you've answered
13 13 my question, but the -- you talk about a deal that might
14 14 include both an applications component and a tech
15 15 component.
16 16 A. Mm-hm.
17 17 Q. And obviously there must be a cutoff at which
18 18 point the deal is characterized as applications as
19 19 opposed to technology -- a tech deal.
20 20 A. I think I did answer it. I can try again.
21 21 Q. Okay, please do.
22 22 A. Again, there are separately-priced products.
23 23 So we give a quote to a customer. It says "You're
24 24 buying a set of financial modules for $100,000," to give
25 25 you an example, "you're buying HR modules for $50,000,

306

1 00306:01 and you're buying database seats for $50,000." So the
2 02 total contract is 200, I think, if I did the math right,
3 03 okay. Maybe there's tax, maybe there's not tax,
4 04 depending upon their -- their situation.
5 05 And so that gets booked into the company's
6 06 financial systems as 150 of apps and 50 of databases.
7 07 Q. I see. Okay, thank you.
8 08 Okay, I'd like to mark as Exhibit 146 a
9 09 document Bates-stamped CA-ORCL 031395 through 397.
10 10 (DC Exhibit No. 146
11 11 marked for identification).
12 12 THE WITNESS: Okay, did you want me to
13 13 describe this or something?
14 14 MS. LAVALLEE: Actually, before we do that, I
15 15 have one follow-up question on the last document.
16 16 Q. And that is, we've talked about the decline
17 17 from 50 cents to 30 cents on the dollar in U.S. And you
18 18 clarified that that was for big deals over 500,000.
19 19 A. In the U.S.
20 20 Q. In the U.S. Do you know to what -- why there
21 21 was this decline from 30 to -- 50 to 30 cents, what
22 22 caused that decline?
23 23 A. I would be speculating. I don't know exactly.
24 24 We never went back and tried to analyze it in total.
25 25 But the pricing changed, for one reason, over time,

Henley, Jeffrey O. (Vol. 02) - 03/03/2004  3/3/2004  10:15:00 AM

307

```
 1   00307:01 prices of our database, what we were charging for --
 2        02 versus applications. It could be nothing more than
 3        03 that.
 4        04        It could be that some customers had enough
 5        05 database seats so they didn't need to purchase
 6        06 additional seats when they bought additional
 7        07 applications or new applications.
 8        08        So there's a -- there's a variety of things
 9        09 that could account for that.
10        10    Q.  Do you have any understanding as to whether
11        11 economic factors -- macroeconomic factors had any impact
12        12 on this?
13        13    A.  I don't believe that -- macro -- I don't
14        14 believe macroeconomic would have had anything to do with
15        15 that.
16        16    Q.  Okay. Or market factors at all?
17        17    A.  Well, when you say "market factors," there's
18        18 competition that affects pricing for database versus
19        19 apps, and that sort of thing, so ...
20        20    Q.  How about the -- the economic situation of
21        21 your clients, customers?
22        22    A.  Again, I don't think that affects it. I mean,
23        23 if you buy our applications -- and they have to have an
24        24 Oracle database. So it's simply a question of whether
25        25 you have enough licenses or you don't. And then it gets
```

308

```
 1   00308:01 down to what the license pricing is at that time versus
 2        02 several years earlier when I did this study.
 3        03    Q.  Okay. All right. Now we can go back to the
 4        04 new Exhibit, 146. And if you can identify this
 5        05 document.
 6        06    A.  Sure. This is an e-mail again from me, dated
 7        07 Tuesday, January 30th. And I'm forwarding an e-mail
 8        08 to Safra Catz that had been sent to me by George
 9        09 Roberts.
10        10        And he copied -- well, he actually sent it to
11        11 me, Jennifer Minton and David Winton, who probably
12        12 prepared this for him. It was his finance guy. You
13        13 showed me one of David's e-mails yesterday. And yes, it
14        14 does actually -- was originated -- the second page of
15        15 this analysis was done by David.
16        16        And in there, David was analyzing the effect
17        17 of the dot-com decline on -- versus the prior year and
18        18 showing that it was -- it was -- we were going -- it was
19        19 having a negative effect year over year, particularly in
20        20 the second half, in this note.
21        21    Q.  Okay. So there was a difference between the
22        22 first half of Q1 -- pardon me. There was a difference
23        23 between the first half of fiscal year '01 and the second
24        24 half of fiscal year '01?
25        25    A.  In the year-over-year change, yes.
```

309

```
 1   00309:01    Q.  Okay.
 2        02    A.  Based on this -- based on this note at the
 3        03 time he did this analysis. So again, I think the first
 4        04 half would have been actuals. So that's fact. And the
 5        05 second half would be his latest forecast, I guess, for
 6        06 what he was projecting for that quarter -- that third
 7        07 quarter when he wrote this, and then the fourth quarter
 8        08 as well.
 9        09    Q.  Okay. And I assume, Mr. Henley, that you did
10        10 indeed receive this document and forward it to Ms. Catz,
11        11 correct?
12        12    A.  Absolutely.
13        13    Q.  Can you tell me why Mr. Winton actually did
14        14 this analysis in the first place?
15        15    A.  Well, I think -- you know, we were all
16        16 concerned about the dot-com erosion that had started
17        17 several quarters earlier. And so -- and I had talked
18        18 publicly in our analyst days that we were seeing a big
19        19 change in that part of our business and, you know,
20        20 warned them that would be a comparison problem for us
21        21 for the coming quarters. And I think this went back to
22        22 that summer when I did our semiannual analyst day.
23        23        So we were -- my recollection is we were
24        24 looking at these numbers on several different occasions.
25        25 So this would have been his latest view to George as to
```

310

```
 1   00310:01 what that's -- effect that's having on his forecast, and
 2        02 that sort of thing.
 3        03    Q.  Okay.
 4        04    A.  George, obviously very interested and thought
 5        05 I might be interested, and I thought Safra Catz might be
 6        06 interested as well. It was a very -- topic -- you know,
 7        07 topic which I had discussed lots of times with the
 8        08 Street.
 9        09    Q.  Okay.
10        10    A.  Had actually done charts in my analyst days
11        11 kind of breaking out the dot-com effect and pointing out
12        12 that it was affecting a particular database business.
13        13    Q.  You say in your analyst days. I'm not sure I
14        14 understand what you mean by that.
15        15    A.  We have an analyst day twice a year typically.
16        16 And in the analyst days, I make a financial
17        17 presentation; Larry Ellison speaks to them; different
18        18 members of management make presentations.
19        19        And so this was a topic of discussion because
20        20 everybody was feeling the effect of this in our
21        21 industry. And I went so far as to actually do charts,
22        22 at the time, showing what -- the effect it was having on
23        23 us and so forth, because clearly it had a negative
24        24 comparison effect on us.
25        25    Q.  Okay. And was this comparison, this negative
```

311

```
 1  00311:01 impact, different in Q2 and Q3?
 2     02    A.  Well, according to this note, it is.  I can't
 3     03  recollect.  But, I mean, it -- it -- it started -- my
 4     04  recollection was it started before Q1 and Q2 of this
 5     05  year even.
 6     06       So what was happening was it was building.  It
 7     07  was -- we were having this enormously positive
 8     08  year-over-year change, and then it turned around and
 9     09  started becoming progressively more negative.
10     10    Q.  Okay.  Turning to page 31396, in the third
11     11  sentence, Mr. Winton states,
12     12       "Next I isolated the drop in dot-com
13     13  and ASP revenue with the associated change
14     14  in revenue and growth.  As you can see, it
15     15  really picks up in Q3 and 4.  Finally, I
16     16  backed out the dot-com and ASP from both
17     17  fiscal years to get an idea on how our
18     18  brick and mortar tech business compares."
19     19       Can you explain for me what precisely his
20     20  analysis was there.
21     21    A.  I believe what he was trying to say was that,
22     22  you know, we all knew that this dot-com implosion, as it
23     23  was referred to in the industry, was having a negative
24     24  effect on us in terms of our comparisons.
25     25       And so what he -- what he here was trying to
```

312

```
 1  00312:01 do was figure out, you know, how widespread is the
 2     02  problem.  I mean, is this affecting the rest of our
 3     03  business in some way.
 4     04       And he -- after backing out this, he was
 5     05  suggesting -- he was saying that after you pull out the
 6     06  effect of this stuff, we're -- we're projecting the rest
 7     07  of our business to grow pretty -- to grow reasonably
 8     08  well.  So that's, I believe, what he was trying to say.
 9     09    Q.  We're finished with that document.
10     10    A.  We are finished?
11     11    Q.  Yes.
12     12    A.  Okay.
13     13    Q.  Okay.  I'd like to show you a document that
14     14  has been previously marked as Exhibit 131.  Mr. Henley,
15     15  can you take a look at this document and then tell me
16     16  whether you've ever seen it before.
17     17    A.  I can't honestly testify whether I've seen it
18     18  before; I get so many research reports.  But I know
19     19  Chuck Phillips well, known him since I joined Oracle.
20     20  He was an analyst in several firms.  Now works for
21     21  Oracle, as you probably know.  And many times read his
22     22  documents.  But whether I read this particular one or
23     23  not, I just can't remember.
24     24    Q.  Okay.  Do you --
25     25    A.  He's considered to be one of the better
```

313

```
 1  00313:01 analyst, to be honest with you.
 2     02    Q.  Okay.  And he's now president of --
 3     03  copresident of Oracle?
 4     04    A.  That's correct.
 5     05    Q.  Do you have any understanding as to -- I
 6     06  assume that you don't, since you don't recall this
 7     07  specific document.  But tell me if you have any
 8     08  understanding as to whether or not this analyst report
 9     09  actually had an impact on the market price of the
10     10  company.
11     11    A.  I have no idea.
12     12    Q.  Okay.  Well, let me tell you that following
13     13  this -- the release of this analyst report, there was a
14     14  drop of approximately 13 percent in the stock price.
15     15       And if you could take a moment and actually
16     16  look at this document and let me know whether or not you
17     17  would have any understanding as to what in this document
18     18  might have caused that -- the market to react in that
19     19  way.
20     20       MR. SALPETER:  Object to the form of the
21     21  question --
22     22       THE WITNESS:  Wow, that's really --
23     23       MR. SALPETER:  -- as to lack of foundation.
24     24       THE WITNESS:  You know, I -- you want me to
25     25  read the whole report or what?  I mean, I think what he
```

314

```
 1  00314:01 said was that the applications momentum continues,
 2     02  Oracle got the message right, people are responding to
 3     03  one stop, the integrated suite message that we talked
 4     04  about, for several quarters leading up to this quarter,
 5     05  talked a lot about it in the Q2 actuals.
 6     06       He talked about the impact of dot-coms as
 7     07  primarily a database problem, which I actually mentioned
 8     08  a minute ago.  Startups tended to be long but didn't get
 9     09  around.
10     10       So this whole dot-com implosion I spoke to was
11     11  having an effect.  But again, you showed me something
12     12  here from David Winton that suggested that the business
13     13  was still going to grow 43 percent if you take out the
14     14  effect of dot-coms.
15     15       So on this page, at least, I would have no
16     16  idea.  Maybe there's other things buried in all the text
17     17  that would have some effect.
18     18       You know, I will say generally the Street is
19     19  always trying to anticipate the future.  I've seen
20     20  reactions, positive, negative sometimes, to analyst
21     21  reports.  And sometimes they make sense to me; sometimes
22     22  I'm kind of puzzled, so ...
23     23       Many times our stock tracks what's going on in
24     24  NASDAQ.  So I don't know if NASDAQ had a big sell-off
25     25  that week.  There's a lot of things that affect our
```

315

```
 1   00315:01 stock. But I would -- based on this first page, I would
 2      02 have no idea why -- why our stock would have dropped.
 3      03      MS. LAVALLEE:  Okay, that's -- that's fair.
 4      04      Q.  Let me draw your attention, then, to the page
 5      05 marked 16.  It's on the bottom right-hand.
 6      06      A.  16, okay.
 7      07      Q.  Yeah.  And if I could draw your attention to
 8      08 the first -- third full paragraph -- actually, both to
 9      09 the first full paragraph and then the third as well.
10      10      If you could just read through that for
11      11 yourself.
12      12      A.  This is "our earnings number this quarter"?
13      13      Q.  Correct.
14      14      A.  Okay.  "Our earnings number this quarter
15      15 remains unchanged at 12 cents a share."  Want me to keep
16      16 reading?
17      17      Q.  You can read to yourself, those two
18      18 paragraphs, please.
19      19      A.  All right.  So those two paragraphs, okay.
20      20      Q.  The -- that and the third.  The second as
21      21 well.
22      22      A.  I read -- "our total license revenue," that
23      23 one too?
24      24      Q.  Correct.
25      25      A.  Okay.  Okay, I read those three paragraphs.
```

316

```
 1   00316:01      Q.  Okay.  Based on your reading, is it your
 2      02 understanding that he was actually reducing Oracle's
 3      03 revenues estimates but yet maintaining the 12 cents EPS
 4      04 target?
 5      05      A.  I think that's what he said.  Our earnings --
 6      06 his model kept the earnings at 12, but he took away
 7      07 40 million in license revenue out of the quarter.
 8      08 That's what he said.
 9      09      Q.  Okay.
10      10      A.  So I -- apparently that's what his model did,
11      11 took 40 million out of it.
12      12      Q.  Okay.  And -- well, first of all, let me ask
13      13 you, do you have any idea what Mr. Chuck -- Mr. Phillips
14      14 actually based his estimates on?  Let me ask a different
15      15 question.
16      16      Do you have any idea where he obtained his
17      17 information to create the models that he created here on
18      18 the estimates?
19      19      A.  I'm not sure.  I mean, we have a analyst call
20      20 that we did.  We usually have an analyst day sometime in
21      21 the winter.  So I think I went to a Morgan Stanley
22      22 conference.  I think I testified to that earlier.
23      23      Again, I make, you know, a bunch of
24      24 PowerPoints, so he saw that presentation along as [sic]
25      25 all the other investors.  I can't remember if we had an
```

317

```
 1   00317:01 analyst day in that period of time.  So there's a
 2      02 variety of things.
 3      03      Most of these analysts, they obviously listen
 4      04 to what we say.  They also go out and talk to customers.
 5      05 They look at what other competitors are saying.  There's
 6      06 all sorts of ways that they try to get information to
 7      07 build their model.
 8      08      And during the course of the quarter,
 9      09 sometimes they tweak their models.  They'll change their
10      10 models.  He apparently changed his model.  But I'm not
11      11 sure exactly why.
12      12      Q.  Okay.  And do you think that the information
13      13 contained in here would be relevant to the investors, if
14      14 accurate?
15      15      MR. SALPETER:  Objection to form, foundation.
16      16      MS. LAVALLEE:  Q.  And what I mean by that, to
17      17 the extent that he was saying that the revenues would be
18      18 reduced even though the earnings-per-share target would
19      19 be met.
20      20      MR. SALPETER:  Same objection.
21      21      THE WITNESS:  Again, everyone looks at data.
22      22 And if you lowered 40, that's -- if somebody was relying
23      23 on his model, then that might concern them.
24      24      He said the reduction probably takes away any
25      25 earnings upside.  Maybe there were certain people that
```

318

```
 1   00318:01 thought we were going to beat our numbers, beat the 12
 2      02 cents.  So in their mind, "Gee, that's not good.  I
 3      03 was -- I would kind of figure they would beat their
 4      04 numbers."
 5      05      There's all sorts of people that will, you
 6      06 know, read the report.  Some are -- some -- some say
 7      07 "That's fine, no problem."  Others get concerned.  I
 8      08 have no idea.
 9      09      MS. LAVALLEE:  Okay.  We've been going for an
10      10 hour, so I think I'd like to take a break at this point.
11      11      THE VIDEOGRAPHER:  We're going off the record.
12      12 The time is 9:01.
13      13      (Recess taken).
14      14      THE VIDEOGRAPHER:  We're back on the record.
15      15 The time is 9:28.
16      16      MS. LAVALLEE:  Morning, Mr. Henley.  I have a
17      17 copy of the affidavit that you executed in connection
18      18 with the motion for summary judgment which is pending in
19      19 the Delaware action here.  And I'd like that to mark --
20      20 I'd like to mark that as the next exhibit, 147.
21      21      (DC Exhibit No. 147
22      22      marked for identification).
23      23      MS. LAVALLEE:  Q.  Mr. Henley, if you could
24      24 take a moment just to look at it and confirm for me that
25      25 that is indeed the affidavit that you executed.
```

Henley, Jeffrey O. (Vol. 02) - 03/03/2004  3/3/2004  10:15:00 AM

319

```
1   00319:01  A.  I assume it is.  Got my signature at the end.
2      02  Q.  Okay.  I'd just like to draw your attention to
3      03  just a couple paragraphs in here, specifically
4      04  paragraphs 8 and 9.  If you could read those to
5      05  yourself, please.
6      06  A.  8 and 9, yes.  I've read them.
7      07  MS. LAVALLEE:  Okay.  And actually, what I'm
8      08  going to do is mark as 148 the chart that is referred to
9      09  in paragraph 9.
10     10  (DC Exhibit No. 148
11     11  marked for identification).
12     12  THE WITNESS:  So is this chart in here as
13     13  well, or you're --
14     14  MS. LAVALLEE:  It's actually not.  It was
15     15  not --
16     16  THE WITNESS:  So you're just going to provide
17     17  that now?
18     18  MS. LAVALLEE:  Correct.  It was not attached
19     19  to the affidavit.  It was attached to a compendium of
20     20  charts.  So it is a separate document.
21     21  And I'll represent that this is indeed what
22     22  was provided to us in the compendium of charts.
23     23  Q.  Mr. Henley, you've testified earlier that a
24     24  lot of the comparisons you do are year over year as
25     25  opposed to sequentially from one quarter to the next.
```

320

```
1   00320:01  And I'm curious as to why for this particular
2      02  issue you chose to do this sequentially, if you can
3      03  answer that.
4      04  A.  Well, I have to think back here.  First of
5      05  all, we're showing the -- I guess the -- all the four
6      06  months of actual experience in fiscal '01, right?
7      07  Q.  Uh-huh.
8      08  A.  And what we're showing is that there is a
9      09  large -- in the license business only, in particular,
10     10  there's an enormous hockey stick.  A significant
11     11  percentage of our license revenue happens in the final
12     12  month of the year.
13     13  So I don't believe this has anything to do
14     14  with year over year.  This is meant to explain that
15     15  there is always a large hockey stick, as I use the word,
16     16  hockey stick effect.  And that's kind of a common term
17     17  referred to in the industry.
18     18  And this just shows that it ranged from 60 --
19     19  a low of 61 percent to a high of 74 percent.  But, I
20     20  mean, it's very pronounced as a percentage of the total
21     21  license revenue in any one of these four quarters.
22     22  Q.  Okay.  And you indicated earlier that there is
23     23  seasonality in the company's business; is that correct?
24     24  A.  That's a different issue.  That's a different
25     25  point.  I don't think it relates to this hockey stick
```

321

```
1   00321:01  effect.
2      02  But yes, I definitely said that in our license
3      03  business, we have a smaller -- significantly smaller
4      04  amount of license revenue in the first quarter.  Then it
5      05  builds up to the second, third, which are fairly close
6      06  usually -- varies a little bit, but they're fairly in
7      07  the range -- and then a much, much significanter [sic]
8      08  crescendo to the year in the fourth quarter.  And that
9      09  has always been the pattern.
10     10  The percentages have changed a little bit over
11     11  the years, but we've always had that seasonal effect.
12     12  First quarter the lowest, fourth -- by a large measure,
13     13  the fourth quarter's the higher -- highest, by a large
14     14  measure.
15     15  Q.  Okay.  And does the seasonality always -- also
16     16  change from quarter to quarter, so that there may be a
17     17  difference in how the first month in the third quarter
18     18  behaves from the first month of, say, the first quarter?
19     19  A.  Again, my recollection is that no, it's pretty
20     20  much the same.  And I think I said that earlier, that
21     21  usually we start out slow after the big hockey stick
22     22  effect in the previous quarter.  So the first month is
23     23  usually the least significant part of our quarter.  The
24     24  second month builds up a bit, and then typically the
25     25  third month, as this chart shows, is disproportionately
```

322

```
1   00322:01  the big, big part of the quarter.  And a lot of that
2      02  revenue happens in the last few days of the quarter,
3      03  actually.
4      04  Q.  Okay.
5      05  A.  This chart, you know, definitely shows that,
6      06  both the month-to-month effect and the quarterly effect,
7      07  the fact that license revenue in the first quarter was
8      08  785, then it went to a million-ninety-nine, 11 -- you
9      09  know, virtually the same number the next quarter, and
10     10  then it grew to a billion-six-one-nine in the fourth
11     11  quarter.
12     12  Q.  Okay.  If I could turn your attention to
13     13  paragraph 23, please.
14     14  A.  Yes.
15     15  MS. LAVALLEE:  And I will mark as Exhibit No.
16     16  149 the chart that is referenced in this paragraph,
17     17  which is chart number 8.
18     18  (DC Exhibit No. 149
19     19  marked for identification).
20     20  MS. LAVALLEE:  Okay.  I have a couple of
21     21  questions.  The first is the footnote 2.  And my
22     22  question relates to the behavior of the five-percent
23     23  change from constant dollar versus actual results.
24     24  And can you tell me, reading that, whether or
25     25  not that footnote stating that constant dollar results
```

Henley, Jeffrey O. (Vol. 02) - 03/03/2004  3/3/2004  10:15:00 AM

323

```
1    00323:01 were expected to be approximately five percent higher
2         02   than actual results because of the strong U.S. dollar is
3         03   your understanding.
4         04   A.  Yes.
5         05   Q.  So the next paragraph -- sentence reads,
6         06       "Accordingly, Oracle's constant dollar
7         07   projections were decreased by five
8         08   percentage points to convert them to U.S.
9         09   dollar projections for the purposes of the
10        10   above table."
11        11   A.  Well, let me read this.  "Accordingly,
12        12   Oracle's were decreased by" -- yeah.  So the point is
13        13   that -- that in this particular quarter -- and we're
14        14   never certain, but at least we always -- we always
15        15   disclose this on the call, what our assumption is for
16        16   currency.
17        17       And we say it's based on the current exchange
18        18   rate, which could obviously vary three months later, two
19        19   and a half months later by the time we end our quarter.
20        20   But we always say based on the latest exchange rates
21        21   versus last year, there's some currency effect.
22        22       So for this quarter, we were projecting a
23        23   negative five-percent impact because of currency.  So if
24        24   the constant dollar were X, then the U.S. reported
25        25   dollar would be X minus five percentage points.
```

324

```
1    00324:01  Q.  Okay.
2         02   A.  That's what that's meant to describe.
3         03   Q.  Okay, thank you.  In paragraph 23 of your
4         04   affidavit, which is Exhibit 147 --
5         05   A.  Paragraph which?
6         06   Q.  23.
7         07   A.  Yes.
8         08   Q.  Page 9.
9         09   A.  Yes.
10        10   Q.  It's -- this references the December 14th,
11        11   2000 conference call --
12        12   A.  Yes.
13        13   Q.  -- which we discussed yesterday.  And it notes
14        14   that you announced that the 3Q '01 EPS target was 12
15        15   cents.
16        16       Can you tell me, when -- we spoke briefly that
17        17   you relied on figures in the upside reports to come up
18        18   with the 12 cents figure; is that correct?
19        19   A.  I think I covered this a lot yesterday.  We
20        20   went through this, and I explained to you that, first of
21        21   all, I didn't agree with the term "upside."  It's really
22        22   a management judgment.  But I said that I wanted to be
23        23   more conservative.  I -- I was concerned that
24        24   sequentially, for a lot of reasons, that was maybe too
25        25   optimistic.
```

325

```
1    00325:01       And so I override her judgment, if you will,
2         02   brought down the guidance on the license growth and the
3         03   EPS 25 percent, as I think we talked about
4         04   yesterday --
5         05   Q.  Yes.
6         06   A.  -- and 12 cents a share.
7         07   Q.  Okay.  And I guess my question is, looking at
8         08   the forecast number, which I understand to be the number
9         09   proposed by the field and their management, versus the
10        10   potential number, which is the one that includes Ms.
11        11   Minton's judgment, did you choose to use the forecast
12        12   number as opposed to the potential number --
13        13   A.  No.
14        14   Q.  -- or did you -- pardon me -- or did you look
15        15   at it and make some analysis on your own?
16        16   A.  Yeah, I looked at both.  But in the end -- and
17        17   I can't remember -- I can't remember the sequence, or
18        18   whatever, but I'm sure I discussed it with Larry and
19        19   said, you know, "I agree with what is being said.  I
20        20   feel more comfortable going with 25-percent license
21        21   growth and 12 cents a share."
22        22   Q.  Okay.  And was your analysis the same with
23        23   respect to the expenses?
24        24   A.  Sure.
25        25   Q.  Okay.
```

326

```
1    00326:01  A.  The 12 cents would be some judgment onto
2         02   revenue and expense and so forth.
3         03       MS. LAVALLEE:  Okay.  I'd like to mark as
4         04   Exhibit No. 150 a document Bates-stamped CA-ORCL 022254
5         05   through 55.
6         06       (DC Exhibit No. 150
7         07   marked for identification).
8         08       MS. LAVALLEE:  Q.  Mr. Henley, can you take a
9         09   moment to take a look at this document and tell me what
10        10   it is.
11        11   A.  It's an e-mail from myself to Larry Ellison,
12        12   carbon copy Jennifer Minton, Safra Catz and Stephanie
13        13   Aas, who was the then head of our investor relations
14        14   people.  Subject was the upcoming earnings call that we
15        15   were doing that Thursday -- or -- yeah, this was done
16        16   Tuesday.  Probably it was that Thursday -- that same
17        17   week.
18        18       And so these were some of the summary points
19        19   that I intended to cover on the call.
20        20   Q.  And if I could draw your attention
21        21   specifically to the second page, the paragraph which is
22        22   numbered 6.  In that paragraph, the third sentence
23        23   reads,
24        24       "Due to holidays, Q3 is usually not
25        25   much different than Q2, and then there is a
```

327

```
1   00327:01   spike in Q4."
2   02          You testified earlier that there was some
3   03   pattern at the company that the company had noticed in
4   04   terms of the division between how much each quarter
5   05   represented of the total license figure for the full
6   06   year. And I think you testified that Q3 and Q2 were
7   07   generally the same.
8   08      A.   There was variety. In some years, Q3 has been
9   09   a bit higher, but -- but reasonably similar. I'd say
10  10   the bias has been for Q3 to usually be a little bit
11  11   higher. And this is on license revenue.
12  12      Q.   Okay. And I'd just like to ask, then, in
13  13   terms of the -- the actual results for Q2, which were
14  14   1.1 billion, the guidance provided for Q3 was
15  15   1.3 billion.
16  16          And I guess my question to you is whether or
17  17   not that seemed consistent or whether or not the fact
18  18   that you were projecting a fair amount more than Q2 was
19  19   something of concern to you.
20  20      A.   Well, there were -- there with two things. As
21  21   I said, if you go back and study the history, we have
22  22   had, you know, I would say between zero and ten percent
23  23   better numbers, even some years, I guess, maybe slightly
24  24   less. But generally there's been a bias to being
25  25   slightly better, as much as up to, I think, memory,
```

328

```
1   00328:01   maybe ten percent, but certainly not huge.
2   02          We also had Covisint, which we knew was a bit
3   03   of an unusual item, that was also helping to, you know,
4   04   make Q3 larger, so ...
5   05          Again, we do a lot of things, and we look at
6   06   our numbers. We look at our pipeline. I've covered all
7   07   this. And we look at the history. And so, you know,
8   08   you look at sequential; we do all that stuff. But the
9   09   Covisint clearly added several points of growth in its
10  10   own right.
11  11      Q.   Okay. So that was -- those factors that you
12  12   just identified were the factors that made you
13  13   comfortable in projecting a higher growth rate for Q3
14  14   than for Q2, then?
15  15      A.   I didn't say a higher growth rate. I said a
16  16   higher absolute number.
17  17      Q.   Yes. And thank you for that clarification.
18  18      A.   Right.
19  19      Q.   You're correct. Okay.
20  20          Were there any other factors other than what
21  21   you've discussed already today or yesterday about what
22  22   was the basis for your comfort in these guidance
23  23   figures?
24  24      A.   I don't believe so. I think I've covered all
25  25   the different things that I go through, the thought
```

329

```
1   00329:01   processes when I try to, you know, set the guidance.
2   02      Q.   Sure. Okay.
3   03      A.   And again, out of 52 quarters, we've missed
4   04   them on the downside three times, and we met them many
5   05   times and exceeded them, you know, probably more than
6   06   three times, but ... we've been reasonably good. Not
7   07   always. We don't bat a hundred, but we bat pretty high
8   08   percentages.
9   09      Q.   Okay. Thank you.
10  10          I'd like to mark as Exhibit 151 -- oh,
11  11   actually, I apologize. This has actually been
12  12   previously marked as Exhibit 104. And it is a document
13  13   Bates-stamped ORCL 0081613 through 629.
14  14          Mr. Henley, if you could take a moment to look
15  15   at the document and then identify for me what it is.
16  16      A.   This is a transcript of a conference call we
17  17   did the first day after our fiscal third quarter, March
18  18   1st. And both Larry and I got on and we -- what's
19  19   used, the term, "preannounced" to the analyst community
20  20   and to the public that we were going to miss our
21  21   earnings from what we had felt -- the 12 cents we'd
22  22   previously guided the people to.
23  23      Q.   Okay. And I'd like to turn your attention to
24  24   the page Bates-stamped ORCL 0081620. And in particular,
25  25   if I can draw your attention to the question by
```

330

```
1   00330:01   Mr. Charles Phillips at the very bottom of the page.
2   02          And if you can read through that testimony
3   03   through Mr. Ellison's response to that question on the
4   04   next page.
5   05      A.   You mean read what he said?
6   06      Q.   Yes, but you can read it to yourself.
7   07      A.   Okay, fine.
8   08          Yes, I've read Larry's answer "yes" -- where
9   09   he said yes to Chuck's question at the top.
10  10      Q.   Right. And then I think it -- Larry continues
11  11   to give a further response.
12  12      A.   Okay. Okay. How far do you want me to read?
13  13      Q.   Through the end of Mr. Ellison's response at
14  14   the middle of the page.
15  15      A.   Okay. "We had tremendous impact as we" --
16  16      Q.   Right.
17  17      A.   -- "just demonstrated"?
18  18      Q.   Right.
19  19      A.   Okay.
20  20      Q.   And Mr. Phillips, if I'm correctly reading
21  21   this, is asking whether or not -- as the company entered
22  22   the third month of the quarter whether or not they were
23  23   ahead. He says,
24  24          "Were you counting on more than normal
25  25   for the third month of the quarter?"
```

331

```
1   00331:01      And my question to you is whether or not --
2       02   what was your understanding as what [sic] the situation
3       03   was for the -- in terms of expectations for the third
4       04   month?  Were you actually expecting more than -- more
5       05   than historically you would expect for the third month?
6       06          You seem a little perplexed.
7       07   A.  Well, we've gone through all kinds of analysis
8       08   here, so I'm not sure what you want me to add to it.
9       09   Q.  Okay.  I guess I would --
10      10   A.  Here -- let me put this in context.  Larry and
11      11   I were both in a state of shock, okay.  I'm in a
12      12   conference down in Orlando or -- Orlando -- or Miami, I
13      13   guess, right?  I would have clearly not gone to the
14      14   conference and planned it if I'd known we were going to
15      15   miss our quarter, right.
16      16          So we're both sitting here without a lot of
17      17   information, immediately trying to be responsible and
18      18   get this news out that we'd missed our quarter.  We're
19      19   giving people very off-the-cuff reactions without really
20      20   looking at all the data for the quarter, by month or
21      21   anything else.
22      22          And what we did say, I think -- and I don't
23      23   remember reading this transcript, again, but I think "We
24      24   said we need to get this out.  And obviously when we
25      25   have our formal earnings call, we'll give you a lot more
```

332

```
1   00332:01   information and we'll do some more study," and so forth.
2       02          So I think that, you know, in Larry's mind, as
3       03   he's answering this, he's answering it as truthfully as
4       04   he recalls, or whatever.
5       05   Q.  No, your answer actually raises a very good
6       06   point.  And I guess my question wasn't as clear as it
7       07   could be.  And I do understand that what was being
8       08   stated here -- you went back subsequently and looked at
9       09   all the data and analyzed it.
10      10          And my question to you is, having -- after you
11      11   had done that analysis and looked at it, was it your
12      12   understanding -- what was your understanding as to what
13      13   the response to Mr. Phillips' question was?
14      14   A.  I -- again, there's a lot of statements he
15      15   made.  So what particular sentence or what are you
16      16   asking me to comment on?
17      17   Q.  Okay.  As you entered the third month of the
18      18   quarter, do you think -- were you ahead of where you
19      19   normally are or were you counting on more than normal
20      20   for the third month of the quarter?
21      21   MR. SALPETER:  I want to object to the form of
22      22   the question.  Are you asking him after he -- after he
23      23   had a chance to analyze everything, or at the time of
24      24   this conference?
25      25   MS. LAVALLEE:  I'm asking him what his
```

333

```
1   00333:01   understanding here today is.
2       02          THE WITNESS:  Today is.  I don't think -- I
3       03   think Larry was wrong.  I think -- I think he believed
4       04   this when he said it.  But I don't think, based on the
5       05   data we reviewed with you, that we could -- that Larry
6       06   was right to say that we were ahead of the quarter after
7       07   the first two months.
8       08   MS. LAVALLEE:  Okay.
9       09          THE WITNESS:  But we clearly had plenty of
10      10   pipeline to make the quarter.  And all the internal
11      11   forecasts, until the last couple of weeks, I think, out
12      12   of memory, were saying we could make the quarter.
13      13          And even in the last week, I had a
14      14   conversation with him, 27th, 28th and he was still
15      15   saying, "You know, if we convert enough of this
16      16   pipeline, I still think we can get there."
17      17          I said "Gee, I'm not sure, but we'll find
18      18   out."
19      19          And we literally found out that literally the
20      20   last day that we just -- the whole thing blew up on us.
21      21   But clearly that last week it was clear there was more
22      22   slippage occurring, and each day it got worse.
23      23   MS. LAVALLEE:  Thank you.
24      24   Q.  If I could turn your attention to the page
25      25   Bates-stamped ORCL 0081628 through 629.  And if I could
```

334

```
1   00334:01   ask that you read the question at the very bottom of the
2       02   page, two lines, which starts a question by Drew
3       03   Brosseau.
4       04   A.  So this is 28.
5       05   Q.  Correct.
6       06   A.  Okay, go ahead.
7       07   Q.  And the question stated is,
8       08          "I'm wondering whether the pipeline
9       09   building rate has continued at the same
10      10   pace or whether or not it's changed at
11      11   all."
12      12          And then Mr. Ellison on the next page
13      13   responds,
14      14          "No, I think the pipeline building
15      15   looks normal."
16      16          And then you stated, "Well, I don't --
17      17   you know, we just don't know, Drew.  I
18      18   would really rather make more comments on
19      19   the conference call when we've had more
20      20   notice.  We made a call here today to kind
21      21   of give people the best quick" -- and it
22      22   says "flex," in paren, "about what happened
23      23   this quarter.  And once we know a little
24      24   more, we can share that with you."
25      25          So I understand that you were qualifying here
```

Henley, Jeffrey O. (Vol. 02) - 03/03/2004  3/3/2004  10:15:00 AM

335

```
1  00335:01 that you hadn't analyzed all the data --
2  02    A.  Mm-hm.
3  03    Q.  -- as you indicated earlier.
4  04    A.  Mm-hm.
5  05    Q.  My question to you is, as you sit here today,
6  06 what is your understanding -- what is your -- what is
7  07 your understanding of the response to Mr. Brosseau's
8  08 question whether or not the pipeline building rate
9  09 continued at the same pace or whether it changed?
10  10    A.  I'm assuming -- again, I'm assuming that he
11  11 meant -- he was trying to get a sense for "Do you think
12  12 this is just an aberration, or is there something more
13  13 fundamentally going on here?  Is your -- is your --
14  14 things in your pipeline still looking good, are there
15  15 changes in your pipeline," you know.
16  16        And clearly -- I mean, my position was that we
17  17 didn't have enough data to know yet.  We clearly had a
18  18 major miss.  The conversion rate was way below norm.  So
19  19 my view was "Give us a week or two; we'll tell you more
20  20 once we've really thought through and tried to
21  21 understand what the hell's really going on to this
22  22 business."
23  23        MS. LAVALLEE:  Let's go off the record for a
24  24 moment.
25  25        THE VIDEOGRAPHER:  We're going off the record.
```

336

```
1  00336:01 The time is 9:54.
2  02        (Brief interruption).
3  03        THE VIDEOGRAPHER:  We're back on the record.
4  04 The time is 9:57.
5  05        MS. LAVALLEE:  Q.  Mr. Henley, I'd just like
6  06 to return to follow up on some questions on some of the
7  07 testimony from early yesterday where we talked about the
8  08 trading policies of the company.
9  09        When we talked specifically about Exhibit No.
10  10 1, which was the executive trading policy, can you tell
11  11 me whether or not the company had retained outside
12  12 counsel to draft that document initially.
13  13    A.  I don't know.
14  14    Q.  Okay.  Was it a document that was in effect
15  15 when you actually joined the company?
16  16    A.  I believe we had a written trading policy.  We
17  17 certainly had a policy.  Whether we had a written one or
18  18 not, I assume we did.  I just can't remember.
19  19    Q.  Okay.  And do you recall whether or not there
20  20 were revisions made to that policy during the time that
21  21 you were at the company up until Q3 2001?
22  22    A.  I just don't know.  It wouldn't surprise me.
23  23 We regularly evolve all of our policies, review them,
24  24 modify them, change them.
25  25    Q.  Okay.  And do you know -- and you might not.
```

337

```
1  00337:01 But can you tell me whether or not you know if the
2  02 company retained outside counsel in connection with any
3  03 of -- any revisions to that --
4  04    A.  Again, I --
5  05    Q.  -- inside policy -- inside trading policy?
6  06 Pardon me.
7  07    A.  Again, I said I don't know.
8  08    Q.  Okay.  Also, in connection with the trading
9  09 policy and your role in the clearance -- clearance
10  10 process, you indicated that over the years, you have
11  11 consulted on occasion with general counsel about
12  12 the concept of what might be material.  Is that fair?
13  13    A.  I said that I've been the CFO for 25 years in
14  14 several public companies.  And I've gone -- you know,
15  15 I've read materials by outside lawyers.  I've talked to
16  16 my various general counsels.  I don't remember if I've
17  17 ever had direct discussions with, but, I mean, I've
18  18 clearly at least read materials written by other
19  19 lawyers.
20  20        You know, I think I have a fairly good
21  21 understanding of the general intention of -- of -- why
22  22 these laws were enacted and so forth.
23  23    Q.  Okay.  And in terms of the articles that you
24  24 read, do you recall any of them specifically or who may
25  25 have -- which firms may have provided those articles?
```

338

```
1  00338:01    A.  No.
2  02        MS. LAVALLEE:  Okay.  I think, actually, if we
3  03 break for five minutes, I can just double-check because
4  04 I think we're pretty close to done.
5  05        MR. SALPETER:  Okay.
6  06        THE VIDEOGRAPHER:  We're going off the record.
7  07 The time is 10:00.
8  08        (Recess taken).
9  09        THE VIDEOGRAPHER:  We're back on the record.
10  10 The time is 10:24.
11  11        MS. LAVALLEE:  Q.  Mr. Henley, I just have a
12  12 couple more questions for you.  Now, I'm going to ask a
13  13 question regarding your interview with the SLC, which we
14  14 discussed briefly yesterday.
15  15        Do you -- isn't it true that you told the SLC
16  16 that you did not recall actually learning -- that you
17  17 first learned of Mr. Ellison's trades in January 2001
18  18 when you first saw or heard of the lawsuits?
19  19    A.  I think so.  I think I said yesterday I -- I'm
20  20 certain I got the e-mail and probably should have known
21  21 then, but I don't -- I don't recall reading it, so ...
22  22 but that -- that was -- and I gave the -- that interview
23  23 some months ago.  So I'm sure I had much better recall
24  24 then than I do today, so ...
25  25    Q.  Okay.  So it's your understanding that that
```

Henley, Jeffrey O. (Vol. 02) - 03/03/2004   3/3/2004   10:15:00 AM

339

00339:01 was really when you first learned of Mr. Ellison's
02 trades?
03     A. I think so. And clearly -- clearly I did --
04 I'm sure I received the copy of Dan's e-mail, but ...
05     Q. Okay. In terms of the deals that actually --
06 I'd actually like to switch topics now.
07         Is it your understanding that some
08 determination is made as to whether or not a deal should
09 qualify for inclusion in the upside and forecast
10 numbers?
11     A. Sometimes, sometimes not, I think. Again,
12 you'd have -- you'd have to talk to Jennifer Minton. I
13 think you intend to. It's something you can ask her,
14 how she does it.
15         My impression is -- 'cause we discussed this
16 sometimes. Sometimes early in a quarter she'll make
17 some sort of statistical analysis based upon trends, all
18 these things I've talked about.
19         Other times there may be deals where she'll
20 put a negative in as opposed to a positive, right.
21 That's why I say judgment, where she's knowing -- knows
22 that they have put something in and we're getting --
23 going on later in the quarter and she'll have the
24 concern that maybe that's just not going to happen, so
25 she'll pull it out, in her judgment column, so ...

340

00340:01         There are some -- there are some deal-by-deal
02 sort of analysis, but I think there's also sometimes
03 just statistical analysis.
04     Q. Okay. Is it your understanding that the deals
05 that are likely to close in the quarter are included in
06 the potential number?
07     A. Again, I'm not quite sure -- you're talking
08 about the Jennifer Minton's judgment number?
09     Q. Well, the judgment she applies to the forecast
10 to create the number that -- the ultimate number she
11 refers to as a potential.
12     A. I'm not sure what the question is. I mean, I
13 think I've spent a lot of time trying to explain how the
14 forecast is derived, the field, and there's judgments,
15 and all that sort of thing. And then she puts judgment
16 in her number, but -- so I'm at a loss to try to figure
17 out what you mean.
18     Q. Okay. And -- let me ask a different question,
19 then.
20         Is it your understanding that in applying her
21 judgment, once she gets past the first few weeks of the
22 quarter, she is placing her best judgment as to which
23 deals will close to determine what the potential number
24 will be?
25     A. Again, I think it's the combination. I will

341

00341:01 agree that as you get closer to the end, I think she
02 tends to look more when we get more clarity into what
03 remains in the pipeline, and that sort of thing. I say
04 that the deal-by-deal thing becomes more prominent.
05         But whether that's totally, or whether there's
06 still some degree of statistical analysis, I don't -- I
07 don't know, you know, always what goes in her -- goes --
08 goes in her mind.
09     Q. Okay. I'd like to ask you to turn back to
10 Exhibit No. 134.
11         (Discussion off the record).
12         MS. LAVALLEE:  Q. All right. We went over
13 this document briefly yesterday. And I'd just like to
14 go over a couple numbers. The -- we're looking now --
15 I'd ask you to look at the page Bates-stamped 3612 --
16     A. Yes.
17     Q. -- which includes the numbers in budget rates.
18     A. Yes.
19     Q. Okay. The seventh column is the targeted
20 30-percent growth.
21     A. The which column?
22     Q. I believe it's the seventh.
23     A. Yes, right.
24     Q. Okay. That 30-percent growth rate, is it your
25 understanding that that is the guidance number in budget

342

00342:01 rates?
02     A. I -- I don't believe so. As I testified
03 earlier, I -- Larry's been on different campaigns.
04 Different years, we've had different themes. I think we
05 were sort of trying to challenge these guys during the
06 year to kind of see if they couldn't do 30 percent.
07         We felt like that was a reasonable number. So
08 I don't think it had to do with anything pertaining
09 particularly to the third quarter. That's my
10 recollection.
11     Q. Okay. So --
12     A. Let me add, I -- my recollection also is that
13 everybody didn't have a formal budget for the year of
14 30 percent. This was sort of like, you know, he was
15 kind of trying to goad them a little bit to say, you
16 know, "What you guys ought to be, you know, trying to --
17 based on our assessment of what we think the market'll
18 be this year, and that sort of thing, grow at a pretty
19 healthy rate."
20         So it was kind of a way to keep their eye
21 that, you know, we -- "If you guys aren't doing 30, you
22 know, you ought to be working on adding salespeople or
23 doing other things, 'cause we think the market's -- we
24 thing the market's pretty strong this year."
25         I think this -- my recollection was this went

343

```
1    00343:01 back to sort of the first part of the year where we had
2       02 this. And we don't -- this is not a column that you
3       03 would find in most of our years.
4       04    Q. Okay. If I could ask you to turn back, then,
5       05 to the document that was marked as -- what's this marked
6       06 as, Betsy? The -- I'm looking now at the
7       07 December 14th -- transcript of the December 14th
8       08 call, which I'll give you the exhibit number in a
9       09 moment.
10      10    A. I've got it already.
11      11    Q. The transcript from the conference call?
12      12    A. Oh, the one you had me read parts of it?
13      13    Q. Yeah --
14      14    A. Yeah.
15      15    Q. -- we looked at it yesterday.
16      16       MS. GUARNIERI: It's DC-140.
17      17       MS. LAVALLEE: It's marked as DC-140.
18      18       MS. GUARNIERI: It's the twelfth or thirteenth
19      19 exhibit that we used yesterday, tenth maybe.
20      20       THE WITNESS: Okay.
21      21       MS. LAVALLEE: All right. And if I --
22      22       THE WITNESS: This is what we called the Q2
23      23 forecast call.
24      24       MS. LAVALLEE: Correct.
25      25       THE WITNESS: December 14th, right.
```

344

```
1    00344:01    MS. LAVALLEE: Q. And it was where you were
2       02 providing guidance to the market as to your estimates
3       03 for Q3 '01 as well?
4       04    A. Yes.
5       05    Q. If I could turn your attention to page CA-ORCL
6       06 010716.
7       07    A. Yes.
8       08    Q. If you look at the third full paragraph, it
9       09 starts,
10      10       "The total license growth will be
11      11    about 25 percent in, again, reported
12      12    dollars, or add five to that, 30 percent
13      13    constant dollars."
14      14       Now, we talked about constant dollars and
15      15 budget dollars. Is it your understanding that -- that
16      16 in budget dollars the guidance was 30 percent for this
17      17 total license growth figure?
18      18    A. I don't know. You're -- when you said "budget
19      19 dollars," I don't know what that means. This is a
20      20 conference call. We never talk about budget on our
21      21 conference calls.
22      22    Q. Okay. Yesterday we discussed what the
23      23 company -- the company's use of the terms "budget rates"
24      24 as well as "constant" --
25      25    A. Oh, budget rates?
```

345

```
1    00345:01    Q. Yes.
2       02    A. This has nothing to do with budget rates.
3       03    Q. Okay, that's fair.
4       04    A. And I said yesterday we never use budget rates
5       05 when we talk to the Street. We talk to them either in
6       06 actual dollar or we talk to them in constant dollars.
7       07    Q. Yes.
8       08    A. And we always disclose both because we think
9       09 contant is a better indication of the real trend 'cause
10      10 some years currency can be favorable, some years it can
11      11 be unfavorable. In this case, based on the rates on the
12      12 day of this call, we were forecasting five percent of
13      13 unfavorable currency effect.
14      14    Q. Okay. And correct me if I'm wrong, but I
15      15 believe you testified also that constant dollars
16      16 generally track the budget rates.
17      17    A. They're not the same, and therefore -- I said
18      18 yes, in many cases they are, but not always. And so I
19      19 don't think it's worth -- worth -- I don't recall
20      20 exactly the differences. And so I just don't want to
21      21 speculate.
22      22       I think what we talk about publicly -- we
23      23 never talk about budget rates. Internally the way we've
24      24 used the budget rates is because people have budgets.
25      25 And so they're always interested in talking about how
```

346

```
1    00346:01 they're doing to their budget. That's another way we
2       02 look at our business internally.
3       03       And so we use -- we keep the budget -- and if
4       04 we're going to keep the budget at a certain rate -- we
5       05 either got to adjust the budget to a new rate or we've
6       06 got to adjust the actuals back to a budget.
7       07       So that's why internally we have certain
8       08 exhibits that we talk about budget rates but never
9       09 discuss that publicly. We just use these two ways of
10      10 analyzing our numbers, as most companies do.
11      11    Q. Okay. And when you analyzed your guidance in
12      12 terms of the budget rates for your internal purposes,
13      13 what figure were you applying for the Q3 license growth
14      14 rate?
15      15    A. I don't remember.
16      16    Q. Okay.
17      17    A. But again, I -- I -- it is a way for us to
18      18 compare something to budget. I never think in budget
19      19 terms -- in budget rate terms. I think in terms of
20      20 reported, just like internally, when I'm looking at our
21      21 business, or I think in terms of constant dollars.
22      22       Most of the exhibits in our forecast package,
23      23 I think, are basically either in reported or constant.
24      24 There are a few. You've shown them to me.
25      25    Q. Right.
```

Henley, Jeffrey O. (Vol. 02) - 03/03/2004  3/3/2004  10:15:00 AM

347

```
1   00347:01    A.  Because we are interested in looking at
2   02   budgets, comparison to budget.  But in general, that's
3   03   not a term I care about.  I care about what is the real
4   04   growth in constant dollars and what is the reported
5   05   growth, because those are the two measures the Street's
6   06   interested in and the two relevant things that -- how we
7   07   have to report.
8   08       MS. LAVALLEE:  Okay.  Let's just go off the
9   09   record a moment.  I just need to find a different
10  10   document.
11  11       THE VIDEOGRAPHER:  We're going off the record.
12  12   The time is 10:36.
13  13       (Recess taken).
14  14       THE VIDEOGRAPHER:  This marks the beginning of
15  15   videotape number 2 in Volume II in the deposition of
16  16   Jeffrey Henley on March 3rd, 2004.  We're going back
17  17   on the record.  The time is 10:48.
18  18       MS. LAVALLEE:  Q.  Mr. Henley, I'd ask you to
19  19   take a look again at Exhibit No. 1 --
20  20       A.  134.  I think that --
21  21       MR. SALPETER:  I'm sorry, which one?  134?
22  22       MS. LAVALLEE:  Correct.
23  23       THE WITNESS:  Yes.
24  24       MS. LAVALLEE:  Q.  And I draw your attention
25  25   actually, now, to the first page, which is in constant
```

348

```
1   00348:01   dollars.
2   02       A.  Yes.
3   03       Q.  Looking back at the guidance that was
4   04   provided, I understand that the guidance was provided in
5   05   constant dollars as well here.
6   06       A.  Yes.  We provided the guidance, then we made
7   07   note of the fact that it included negative five points
8   08   of currency.
9   09       Q.  Okay.  Looking at the first page of Exhibit
10  10   No. 134, I'd like to compare the constant dollar figures
11  11   to the budget figures on page 612.  So if I could draw
12  12   your attention to the -- in the first column for the
13  13   first page --
14  14       A.  Yes.
15  15       Q.  -- the total license revenue growth figure is
16  16   23 percent.  Do you see that?
17  17       A.  Yes, I do.
18  18       Q.  If you can turn to page 3612.
19  19       A.  3612, okay.
20  20       Q.  And do you see the forecast percentage growth
21  21   for license -- total license revenue, which is the
22  22   fourth -- no, I'm sorry -- the fifth column --
23  23       A.  Yes.
24  24       Q.  -- which is 23 percent?
25  25       A.  Yes.
```

349

```
1   00349:01    Q.  Okay.  That is the same figure?
2   02       A.  It is.  I'll go back to what I said yesterday.
3   03   I'm not certain that the way we calculate budget rates
4   04   is precisely the way that constant dollars is
5   05   calculated, although it's close.  And it may be the
6   06   same.  I'm just not certain.
7   07       Q.  Sure.
8   08       A.  So I don't -- I don't talk in terms of budget
9   09   rates to the Street.  Our accounting department creates
10  10   all of these charts.  But I talk in two terms:
11  11   translated real dollar rates and constant dollars.
12  12       But I acknowledged yesterday, I think they're
13  13   very similar, if not the same.  I'm just not sure if
14  14   they're exactly the same.
15  15       Q.  Okay.  Well, let's look at --
16  16       A.  In this case, they round to 23 percent, so
17  17   they are the same.  And I agree with that.
18  18       Q.  Okay.  Let's just look at a couple other
19  19   numbers --
20  20       A.  Okay.
21  21       Q.  -- to make sure that you're comfortable with
22  22   that.  The second column on the first page is the margin
23  23   percentage number.  And for total rev -- total license,
24  24   that number is 56 percent.
25  25       A.  Yes.
```

350

```
1   00350:01    Q.  And if you turn to page 3613.
2   02       A.  3613.  Yes.
3   03       Q.  The second column at the very bottom
4   04   represents a total margin figure of 56 percent as well.
5   05   Do you see that?
6   06       A.  Yes, I --
7   07       Q.  And that is in budget rates there.
8   08       A.  Yes.
9   09       Q.  So it's your understanding that the figure
10  10   there is the same as well?
11  11       A.  That's correct.
12  12       Q.  Okay.  The next column is the margin growth
13  13   percentage.  For total license, 20 percent?
14  14       A.  Yes.
15  15       Q.  And then if you turn to 3613, the fifth
16  16   column has, for Q3, the margin there at 20 percent.
17  17       A.  Yes.
18  18       Q.  The margin over -- year over year.
19  19       A.  Yes.
20  20       Q.  Okay.  So that number is the same as well?
21  21       A.  Yes, it is.
22  22       Q.  All right.  The next figure is the pipeline
23  23   growth percentage at 31 percent on the first page.
24  24       A.  Yes.
25  25       Q.  If you could turn to page 3612 and compare
```

Henley, Jeffrey O. (Vol. 02) - 03/03/2004  3/3/2004  10:15:00 AM

351

```
 1   00351:01  that to the third to last column, and the figure there
 2       02  is 31 percent, and that represents the same number for
 3       03  the same figure?
 4       04   A.  Yes, it does.
 5       05   Q.  Okay.  The next column over is the revenue
 6       06  growth figure for total license, the potential figure,
 7       07  that is the 27 percent figure, which is the third to
 8       08  last column on the first page.  And do you see that
 9       09  corresponds --
10       10   A.  Yes, I do see that on that -- on that first
11       11  page, 08, yes.
12       12   Q.  And then if you look at the page that has the
13       13  budget rates, it is the same, 27 percent, which is the
14       14  column that's marked -- or titled "Q3 potential growth
15       15  percentage."
16       16   A.  Yes.
17       17   Q.  So that figure is also the same?
18       18   A.  Yes.
19       19   Q.  The --
20       20   A.  These are our reports.  We use them to run our
21       21  business.  I totally agree that these -- they
22       22  interrelate.
23       23   Q.  Okay.
24       24   A.  I'm not sure what your point is, but I -- I --
25       25  I -- I told you earlier, I'm just not exactly certain
```

352

```
 1   00352:01  that the calculation of constant and budget are done
 2       02  precisely the same.  They may well be.  In this case,
 3       03  they may well be.  I just don't want to speculate on
 4       04  things that I'm absolutely not certain about.
 5       05   Q.  Okay.
 6       06   A.  But I am certain that constant dollars and
 7       07  reported dollars are both ways we try to run our
 8       08  business and the way we've consistently reported our
 9       09  actuals and the way we do our forecasting to the public
10       10  markets.
11       11   Q.  Okay.  Are you comfortable that the numbers,
12       12  as they're reflected in this particular report, have the
13       13  constant dollar figures and the budget rate figures
14       14  being the same?
15       15   A.  Yes.  We've just gone through it all.
16       16   Q.  Okay.
17       17   A.  Yes.
18       18   Q.  If I could turn your attention back, then, to
19       19  the page stamped 3612.
20       20   A.  Okay.
21       21   Q.  And again, I'd turn your attention to the
22       22  eighth column, I believe it is -- seventh column --
23       23  which we discussed earlier, the target 30-percent growth
24       24  figure.
25       25   A.  Yes.
```

353

```
 1   00353:01   Q.  Now, you indicated that that is not
 2       02  necessarily -- that does not represent what you
 3       03  reported to be the guidance for that quarter, but it was
 4       04  some other figure.
 5       05   A.  That is my recollection.
 6       06   Q.  Okay.
 7       07   A.  I'm quite sure that we didn't manufacture this
 8       08  column and this percentage for this quarter.  I think
 9       09  this was a program Larry had talked about, going back to
10       10  the budget.  I mean, that's my recollection, yes.
11       11   Q.  Okay.  It is, however, targeting 30 percent
12       12  budget -- growth and budget rates, correct?
13       13   A.  Yeah, I think it would be consistent with all
14       14  the other stuff.  So if the rest of it were in budget
15       15  rates, this would also be in budget rates, yes.
16       16   Q.  Okay.  And now, that is the same percentage
17       17  growth that your license -- total license growth that
18       18  you were anticipating in your guidance in constant
19       19  dollars; is that not correct?
20       20   A.  Yes, and I think it's basically what we
21       21  reported in the second quarter as well.
22       22   Q.  Okay.  So basically this figure, although it
23       23  doesn't purport to be the guidance, actually is the same
24       24  in this report as the guidance?
25       25   A.  Yes.
```

354

```
 1   00354:01   Q.  Okay.
 2       02   A.  Again, I've tried to explain to you, I don't
 3       03  believe it has any relevance to the guidance that I gave
 4       04  for that quarter.
 5       05   Q.  Okay.  I'd like to turn your attention now to
 6       06  the fourth column, which represents the potential
 7       07  figure, and particularly the line that represents total
 8       08  license potential number in budget rates.  Do you see
 9       09  that figure --
10       10   A.  Yes.
11       11   Q.  -- as 1,308,007?
12       12   A.  Yes.
13       13   Q.  And is that below or above the target
14       14  30 percent figure?
15       15   A.  That's below by approximately $30 million.
16       16   Q.  Okay.  Is it your understanding that basically
17       17  at this point in time -- and this document relates to
18       18  the January 29th period -- that the company needed to
19       19  close all the deals that were in the potential to make
20       20  its quarterly -- or to make its number?
21       21   A.  Again, I've testified before that I don't
22       22  think anyone could give you the list of deals that made
23       23  up the billion-three.  There was a pipeline that was
24       24  significantly higher, and we had to convert some amount
25       25  of deals.
```

Henley, Jeffrey O. (Vol. 02) - 03/03/2004  3/3/2004  10:15:00 AM

355

```
1   00355:01      And we never convert every deal that people
2   02  are certain of. They have certain probabilities. We
3   03  sometimes backfill them, to use the term you used
4   04  yesterday, with other deals.
5   05          So there is no detailed listing of a group of
6   06  deals that would add up to a billion-three, to the best
7   07  of my -- 308 -- to the best of my knowledge.
8   08      Q.  Okay. Is it your belief that --
9   09      A.  But there is a pipeline of deals that is
10  10  significantly higher, and we'll have to get -- to beat
11  11  that, we'd have to get some percentage of -- a certain
12  12  percentage that you can back into of that pipeline
13  13  divided into that forecast to be able to make that
14  14  number, that's correct.
15  15      Q.  Okay. But that means you would have to be
16  16  going into the pipeline to include deals that were not
17  17  actually included in the potential number as of this
18  18  date; is that correct?
19  19      A.  Again, I --
20  20          MR. SALPETER:  Objection to form.
21  21          THE WITNESS:  Again, I have no idea what deals
22  22  were included in this forecast. So I don't -- I don't
23  23  know how to answer that question.
24  24          I think perhaps I've been unclear. The best
25  25  of my knowledge, there is no one in Oracle that has a
```

356

```
1   00356:01  list of the deals that are in our pipeline that you can
2   02  go through and say those are all the deals that people
3   03  included in the forecast to add up to a billion-308. I
4   04  don't think that exists.
5   05          MS. LAVALLEE:  Q.  Okay. Yesterday we
6   06  discussed the concept of the sales cycle. And you
7   07  testified about that and indicated that generally the
8   08  sales cycle is several months long.
9   09          Do you have any understanding as to how likely
10  10  it was for deals that had not yet made it into the
11  11  pipeline to be actually closed within that quarter at
12  12  this point in the quarter, January 29th, 2001?
13  13      A.  Let me see. This point was ...
14  14      Q.  January 29th?
15  15      A.  January 29th. Did I have any idea of which
16  16  again?
17  17      Q.  Of whether or not it was likely that deals
18  18  that had not been included in the pipeline as of that
19  19  date would be closed within that quarter.
20  20      A.  So you're saying there were -- were there
21  21  deals that weren't in our pipeline, but they might have
22  22  been in the pipeline projected for other quarters or
23  23  something? Or these were deals that weren't in our
24  24  pipeline no matter when they were supposed to close?
25  25  I'm not sure of your question.
```

357

```
1   00357:01      Q.  Okay. Well, let's start that -- deals that
2   02  were not projected to close in this quarter.
3   03      A.  Okay. So they were in the pipeline, but they
4   04  weren't included in the third quarter pipeline. They
5   05  would have been in fourth quarter or beyond. Is that
6   06  the question?
7   07      Q.  Let me see what you just said.
8   08      A.  'Cause you're right, there's actually two
9   09  possibilities. First of all, something could be in our
10  10  aggregate pipeline but not in this third quarter report
11  11  because it had a target close -- decision date or
12  12  closing date beyond the third quarter. So that's one
13  13  type of an example.
14  14          And then there's obviously deals that aren't
15  15  in the pipeline anywhere but end up being put in. And
16  16  that's happened. That's much more rare, but that's
17  17  possible too.
18  18          So I'm assuming that's what you mean, deals
19  19  that either weren't in the pipeline anywhere or deals
20  20  that were in our pipeline report but not -- not in the
21  21  third quarter report, right?
22  22      Q.  Correct.
23  23      A.  Right. So there's two types of possibilities.
24  24      Q.  Okay.
25  25      A.  That's the more common, okay. So now you're
```

358

```
1   00358:01  saying of those deals that weren't in our third quarter
2   02  report at this point with a month to go, were there some
3   03  of these deals that in the last month came in, were
4   04  added back into the report because they -- the dates
5   05  moved up or something?
6   06      Q.  Would you expect that to be a likely event?
7   07      A.  Likely. There's -- no. It does happen, but
8   08  there's certainly deals sometimes that people are able
9   09  to what we call pull up, where decisions get made and
10  10  deals get pulled in. But that's less likely to happen
11  11  than deals slip. Clearly there's more slippage than
12  12  things that are pulled up. And I certainly -- those are
13  13  just really helpful if they happen, but I don't rely on
14  14  that.
15  15          We had, as I testified earlier, plenty of
16  16  pipeline with a month to go, based upon normal
17  17  conversion rates, to make our quarter, to make the
18  18  25 percent.
19  19          And what happened is we had an abnormally low
20  20  conversion rate, drastically low conversion rate. And
21  21  that's why we significantly missed our license revenue
22  22  number and our earnings forecast for the quarter.
23  23          MS. LAVALLEE:  All right. I think we're
24  24  pretty close to done. We're just going to take one
25  25  moment to speak.
```

359

```
1   00359:01     MR. DE GHETALDI:  Truly one moment.
2   02      THE VIDEOGRAPHER:  We're going off the record.
3   03  The time is 11:01.
4   04      (Recess taken).
5   05      THE VIDEOGRAPHER:  We're back on the record.
6   06  The time is 11:05.
7   07      MS. LAVALLEE:  Mr. Henley, we have no further
8   08  questions for you today.  And I'd like to just make the
9   09  same reservation we've been making at the end of all the
10  10  depositions, that it is plaintiffs' position that there
11  11  are outstanding discovery documents that we should be --
12  12  we are entitled to and that we should be able to have
13  13  all these witnesses come back, including Mr. Henley,
14  14  after we receive those documents.
15  15      And I understand that you have a contrary
16  16  position on that.  But we are complete -- we have
17  17  completed the deposition for today.
18  18      MR. SALPETER:  All right.  Well, we consider
19  19  the deposition completed, and we reserve our questions
20  20  for the time of trial.  Okay.  Thank you.
21  21      THE VIDEOGRAPHER:  This marks the end of
22  22  videotape number 2, and this concludes Volume II in the
23  23  deposition of Jeffrey Henley.  The original videotapes
24  24  will be retained by Dan Mottaz Video Productions LLC,
25  25  182 Second Street, Suite 202, San Francisco, California.
```

360

```
1   00360:01  94105, 415-624-1300.
2   02      The time is 11:07, and we're off the record.
3   03      (Deposition adjourned at 11:07 a.m.)
4   04
5   05      ---oOo---
6   06
7   07
8   08
9   09
10  10
11  11
12  12
13  13
14  14
15  15
16  16
17  17
18  18
19  19
20  20
21  21
22  22
23  23
24  24
25  25
```

361

```
1   00361:01      CERTIFICATE OF WITNESS
2   02
3   03
4   04
5   05      I, the undersigned, declare under penalty of
6   06  perjury that I have read the foregoing transcript and I
7   07  have made any corrections, additions or deletions that I
8   08  was desirous of making; that the foregoing is a true and
9   09  correct transcript of my testimony contained therein.
10  10      EXECUTED this _____ day of _____,
11  11  200_, at _____, _____.
12  12
13  13
14  14
15  15
16  16
17  17      _____
18  18      Signature of Witness
19  19
20  20
21  21
22  22
23  23
24  24
25  25
```

362

```
1   00362:01      REPORTER CERTIFICATE
2   02      I hereby certify that the witness in the
3   03  foregoing deposition was by me duly sworn to testify to
4   04  the truth, the whole truth and nothing but the truth in
5   05  the within-entitled cause; that said deposition was
6   06  taken at the time and place herein named; that the
7   07  deposition is a true record of the witness's testimony
8   08  as reported to the best of my ability by me, a duly
9   09  certified shorthand reporter and a disinterested person,
10  10  and was thereafter transcribed under my direction into
11  11  typewriting by computer; that the witness was given an
12  12  opportunity to read and correct said deposition and to
13  13  subscribe the same.  Should the signature of the witness
14  14  not be affixed to the deposition, the witness shall not
15  15  have availed himself or herself of the opportunity to
16  16  sign or the signature has been waived.
17  17      I further certify that I am not interested in
18  18  the outcome of said action, nor connected with, nor
19  19  related to any of the parties in said action, nor to
20  20  their respective counsel.
21  21      IN WITNESS WHEREOF, I have hereunto set my
22  22  hand this 15th day of March, 2004.
23  23
24  24      _____
25  25
```

Henley, Jeffrey O. (Vol. 02) - 03/03/2004  3/3/2004  10:15:00 AM

```
                                                              363
 1   00363:01         ROBERT BARNES ASSOCIATES
 2      02         San Francisco, California  94102
 3      03
 4      04            Date:  3/15/04
 5      05 TO: JEFFREY O. HENLEY
 6      06    ALAN N. SALPETER, ESQ.
 7      07    Chicago, IL  60603
 8      08
 9      09 SPECIAL TITLE (RULE 1550(B))
10      10    Deposition taken March 3, 2004
11      11
12      12
13      13 above-entitled action has been prepared and is available
14      14 In the alternative, you may wish to review counsel's
15      15 writing of any changes you wish to make to your
16      16
17      17 contained in the code.  Unless otherwise directed, your
18      18 accordance with the code.
19      19 If you wish to make arrangements to review the original
20      20 office during office hours, 9 to 5, Monday through
21      21
22      22         Sincerely,
23      23
24      24         CSR No. 6438
25      25 cc: All counsel
```

# EXHIBIT KK

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00001:01   IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2      02          IN AND FOR THE COUNTY OF SAN MATEO
 3      03
 4      04   COORDINATION PROCEEDING
 5      05   (RULE 1550(b)),
 6      06          ORACLE CASES
 7      07                   PROCEEDING NO. 4180
 8      08   THIS DOCUMENT RELATES TO:
 9      09   ALL ACTIONS
10      10
11      11
12      12          Videotaped Deposition of
13      13          EDWARD J. SANDERSON, JR.
14      14            Tuesday, March 9, 2004
15      15
16      16
17      17
18      18   Reported by
19      19   CSR 6862
20      20
21      21
22      22
23      23          ROBERT BARNES ASSOCIATES
24      24          760 Market Street, Suite 844
25      25          Phone (415) 788-7191
```

Oracle Related Cases                                    Page 1

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00002:01   IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
 2      02          IN AND FOR NEW CASTLE COUNTY
 3      03
 4      04
 5      05   IN RE ORACLE CORP.       CONSOLIDATED C.A.
 6      06   _____ /
 7      07
 8      08
 9      09
10      10          Videotaped Deposition of
11      11          EDWARD J. SANDERSON, JR.
12      12            Tuesday, March 9, 2004
13      13
14      14
15      15
16      16
17      17
18      18   Reported by
19      19   CSR 6862
20      20
21      21
22      22
23      23          ROBERT BARNES ASSOCIATES
24      24          760 Market Street, Suite 844
25      25          Phone (415) 788-7191
```

Oracle Related Cases                                    Page 2

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00003:01          APPEARANCES
 2      02
 3      03   For California Plaintiffs:
 4      04   COREY, LUZAICH, PLISKA, DE GHETALDI &
 5      05   BY: DARIO DE GHETALDI
 6      06   700 El Camino Real
 7      07   Millbrae, California  94030
 8      08
 9      09   PUCILLO
10      10   425 California Street, Suite 2025
11      11   (415) 433-3200
12      12   McMANIS FAULKNER & MORGAN
13      13   50 West San Fernando Street
14      14   San Jose, California  95113
15      15
16      16   For the Individual Defendants Ellison and Henley:
17      17   MAYER, BROWN, ROWE & MAW LLP
18      18   350 South Grand Avenue, 25th Floor
19      19   (213) 229-9500
20      20
21      21
22      22   BY: PAUL H. GOLDSTEIN
23      23   Palo Alto, California  94304-1018
24      24
25      25
```

Oracle Related Cases                                    Page 3

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00004:01   LAUREN SEGAL, Managing Counsel
 2      02   500 Oracle Parkway
 3      03   Redwood Shores, California  94065
 4      04
 5      05   The Videographer:
 6      06   JOANNA LENN
 7      07
 8      08
 9      09
10      10
11      11
12      12
13      13
14      14
15      15
16      16
17      17
18      18
19      19
20      20
21      21
22      22
23      23
24      24
25      25
```

Oracle Related Cases                                    Page 4

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00005:01          I N D E X
 2      02                         Page
 3      03
 4      04
 5      05
 6      06
 7      07
 8      08   Q3Week6b (CA-ORCL012626 through
 9      09
10      10   Q3Week7 (CA-ORCL012651 through
11      11
12      12   and attachments (ORCL0003548-ORCL0003564)
13      13  154  Q3 FY01 Week 6, January 15, 2001, Oracle   140
14      14   ORCL0107578)
15      15  155  Email, Lane to lellison@us.oracle.com,   145
16      16   CA-ORCL031317)
17      17  156  Email thread, Sanderson to Gunningham,   150
18      18   CA-ORCL026235)
19      19  157  Email thread, Sanderson to Thimot,   153
20      20
21      21   12/1/00, and attachment (CA-ORCL024971
22      22
23      23   (CA-ORCL032294 through CA-ORCL032295)
24      24  160  Email, Thimot to esanders@us.oracle.com,   162
25      25
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00006:01  161  Email, Sanderson to opi_us@oracle.com,   163
 2      02
 3      03
 4      04
 5      05
 6      06
 7      07
 8      08
 9      09
10      10
11      11
12      12
13      13
14      14
15      15
16      16
17      17
18      18
19      19
20      20
21      21
22      22
23      23
24      24
25      25
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00007:01       BE IT REMEMBERED that, pursuant to the laws
 2      02   governing the taking and use of depositions, and on
 3      03   Tuesday, March 9, 2004, commencing at 9:55 a.m.,
 4      04   thereof, at the law offices of Berman DeValerio
 5      05   Pease Tabacco Burt & Pucillo, 425 California Street,
 6      06   Suite 2025, San Francisco, California, before me,
 7      07   JOHN WISSENBACH, a Certified Shorthand Reporter in
 8      08   the State of California, personally appeared
 9      09        EDWARD J. SANDERSON, JR.,
10      10   called as a witness by the Plaintiffs, who, being by
11      11   me first duly sworn, was examined and testified as
12      12   is hereinafter set forth.
13      13            —oOo—
14      14
15      15
16      16
17      17
18      18
19      19
20      20
21      21
22      22
23      23
24      24
25      25
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00008:01       THE VIDEOGRAPHER: Good morning. This
 2      02   marks the beginning of Volume I in Video — and
 3      03   Videotape Number 1 in the deposition of Edward J.
 4      04   Sanderson, Jr. in the matter of — in the matters of
 5      05   Coordination Proceeding Special Title, Oracle Cases,
 6      06   in the Superior Court of the State of California,
 7      07   County of San Mateo, Judicial Council Coordination
 8      08   Proceeding Number 4180, and In Re Oracle Corp.
 9      09   Derivative Litigation, in the Court of Chancery of
10      10   the State of Delaware, in and for New Castle County,
11      11   Consolidated Case Number 18751.
12      12       Today's date is March 9th, 2004, and the
13      13   time is 9:55. The location of this deposition is
14      14   425 California Street, Suite 2025, San Francisco,
15      15   California. The deposition was noticed by counsel
16      16   for plaintiffs, and the videotape is being produced
17      17   on behalf of same. The video operator is Joanna
18      18   Lenn, a California notary public for the County of
19      19   San Francisco, employed by Dan Mottaz Video
20      20   Productions LLC, 182 Second Street, Suite 202, San
21      21   Francisco, California 94105, (415) 624-1300. The
22      22   court reporter is John Wissenbach, with Robert
23      23   Barnes Associates.
24      24       Would counsel present please identify
25      25   themselves and state whom they represent.
```

00009:01    MR. DE GHETALDI: I'm Dario de Ghetaldi,
02  representing the California plaintiffs.
03      MS. LAVALLEE: Nicole Lavallee, of Berman,
04  DeValerio, representing the California plaintiffs.
05      MS. RIDDLE: Amanda Riddle, representing
06  California plaintiffs.
07      MS. KAUSHIK: Tara Kaushik, McManis
08  Faulkner & Morgan, representing the California
09  plaintiffs.
10      MR. NADOLENCO: John Nadolenco, of Mayer,
11  Brown, Rowe & Maw, representing individual
12  defendants Larry Ellison and Jeff Henley.
13      MS. SEGAL: Lauren Segal, from Oracle
14  Corporation, for Oracle Corporation.
15      MR. GOLDSTEIN: Paul Goldstein, Morrison &
16  Foerster, for Oracle Corporation.
17      THE VIDEOGRAPHER: If there are no
18  stipulations, the court reporter may administer the
19  oath.
20      EDWARD J. SANDERSON, JR.,
21  having been first duly sworn, testified as follows:
22      EXAMINATION BY MR. DE GHETALDI
23  Q. Good morning, Mr. Sanderson.
24  A. Good morning.
25  Q. Have you ever had your deposition taken

00010:01  before?
02  A. One time.
03  Q. Okay. When was that?
04  A. About nine or ten years ago.
05  Q. All right. I'm going to go over a couple
06  of ground rules, to -- just to make sure that you
07  understand the process and we get --
08  A. That would be great.
09  Q. -- the best record possible. The first
10  thing that I would ask that you do is, even though
11  this is being videotaped, for the sake of the court
12  reporter try and wait until I've finished my
13  question before you answer. I'll try and do the
14  same with my questions and your answers. And I'd
15  also ask that instead of using nods of the head or
16  sounds to indicate yes or no, to -- that you
17  actually use those words. Is --
18  A. Right.
19  Q. Okay? And then this deposition is going to
20  be prepared or transcribed into a booklet form.
21  You'll be given that booklet to review, and you will
22  be able to make corrections or additions to your
23  testimony. But I want you to understand that if you
24  do do that and if this case goes to trial, then
25  the -- the lawyers will be able to comment on those

00011:01  changes or corrections that you've made. Do you
02  understand?
03  A. Sure. Sure.
04  Q. Okay. This -- we try and go, in these
05  depositions, for about an hour at a time, and we'll
06  take a break. If, at any time, you want to take a
07  break, just let me know. And there's no problem
08  with that. We can -- you know, we're happy to
09  accommodate you there.
10      If, at any time during the deposition, I
11  ask a question that you don't understand, please let
12  me know, and I will be happy to ask it again.
13  A. I will.
14  Q. All right. And if you do answer a
15  question, I'm going to assume that you did
16  understand it. Okay?
17  A. That's correct.
18  Q. All right. Now, are you represented by an
19  attorney at this deposition?
20  A. Yes.
21  Q. Who is that?
22  A. Paul Goldstein, sitting to my left.
23  Q. All right. Have you had discussions with
24  anyone in preparation for this deposition?
25  A. Yes.

00012:01  Q. How many discussions?
02  A. One.
03  Q. When was that?
04  A. Yesterday.
05  Q. And how long was that?
06  A. Probably about four hours.
07  Q. Who was present?
08  A. The two to my left, Lauren Segal and Paul
09  Goldstein.
10  Q. All right. Did you review any documents in
11  preparation for this deposition?
12  A. Yes.
13  Q. What did you review?
14  A. My special litigation committee write-up,
15  testimony, and the attachments that came with that,
16  and a few other exhibits in that -- from that
17  special testimony, as well. That's what I recall at
18  this point from yesterday.
19  Q. All right. Do you recall any specific
20  documents that you looked at?
21  A. I recall one that was a summary, I think,
22  of the December 2000 quarter-to-date results for
23  license. I saw one that Jim English had written to
24  Jennifer Minton, that I'd not seen before. I saw a
25  memo that I'd written about some programs that we

1   00013:01 were launching within the Oracle Product Industries,
2   02 OPI. At this point that's what I recall.
3   03    Q. All right. I'm just curious. When you
4   04 reviewed the summary of your interview with the SLC,
5   05 did you review it in a -- a volume with other
6   06 interview summaries, or was it provided to you
7   07 separate?
8   08    A. It was separate.
9   09    Q. All right. When did you first start
10  10 working at Oracle?
11  11    A. In July of 1995.
12  12    Q. You -- and prior to Oracle, where had you
13  13 worked?
14  14    A. In what time period?
15  15    Q. The prior ten years.
16  16    A. Prior ten years. Prior to Oracle I worked
17  17 at Unisys Corporation for about a year and a half.
18  18 Prior to that I worked at McKinsey & Company for six
19  19 years. And prior to that I was with a small
20  20 start-up known as the Information Consulting Group,
21  21 that was ultimately acquired by McKinsey about six
22  22 months after we started. And prior to that I was
23  23 with what then was Arthur Andersen and Company. I
24  24 was on the consulting side.
25  25    Q. Were you a partner at Arthur Andersen?

1   00014:01    A. Yes, I was.
2   02    Q. Okay. Was your first job at Oracle?
3   03    A. I --
4   04    MR. GOLDSTEIN: Sorry.
5   05    THE WITNESS: I was the senior vice
6   06 president for Americas consulting.
7   07 BY MR. DE GHETALDI:
8   08    Q. Can you describe your job responsibilities
9   09 in that position.
10  10    A. I had -- I had responsibility for the
11  11 United States and Canada consulting for all
12  12 industries except for federal and state and local.
13  13    Q. So in other words, excluding
14  14 governmental consulting?
15  15    A. Yes. That's correct.
16  16    Q. All right. And you were responsible for
17  17 consulting within Oracle's various Americas
18  18 divisions? Is that a fair way of saying it?
19  19    A. When you say --
20  20    Q. Or was --
21  21    A. -- "America's divisions," what does that
22  22 mean?
23  23    Q. Or was consulting -- okay. Americas
24  24 divisions, I mean OSI, NAS, and OPI.
25  25    A. At that point we did not have OPI.

1   00015:01    Q. All right.
2   02    A. We had not verticalized. And so I had --
3   03 and so OSI/OPI did not exist.
4   04    Q. All right.
5   05    A. And I assume when you say OSI, you mean
6   06 Oracle Services Industries.
7   07    Q. Yes.
8   08    A. So that -- they didn't exist. So I had
9   09 consulting responsibilities for all industries other
10  10 than federal and state and local government.
11  11    Q. All right. When did the Americas
12  12 verticalize?
13  13    A. I don't recall specifically.
14  14    Q. Can you give me an estimate, approximation?
15  15    A. I would say approximately -- July '95 --
16  16 probably around the -- June of '97. But that would
17  17 be a guess.
18  18    Q. Okay. What was your next position after
19  19 senior VP of Americas Consulting?
20  20    A. I continued to be responsible for -- as
21  21 senior vice president for Americas Consulting. And
22  22 I took on -- actually, my responsibilities changed.
23  23 They diminished, theoretically. Or they diminished.
24  24 I no longer had responsibility for OPI consulting
25  25 when -- when we created that vertical, but I also

1   00016:01 picked up, probably in -- my guess is a year later,
2   02 July of '98 -- June of '98 -- and, again, that's an
3   03 approximization -- approximation -- I picked up
4   04 responsibility for Latin America sales.
5   05    Q. Okay. How long did you continue with that
6   06 group of responsibilities?
7   07    A. Until I left Oracle.
8   08    Q. Okay. Did you acquire any additional
9   09 responsibilities at any point?
10  10    A. Yes. In July of 2000, I took -- Larry
11  11 asked me to take responsibility for Oracle Product
12  12 Industries sales and consulting, or OPI.
13  13    Q. Were you also responsible for NAS
14  14 consulting at that --
15  15    A. Yes.
16  16    Q. -- time? All right.
17  17    When did you become responsible for NAS
18  18 consulting, or had you been all along?
19  19    A. I had been all along.
20  20    Q. All right. And you left in September of
21  21 2001?
22  22    A. September 7th, 2001 was my last day as an
23  23 active employee. I -- as an active employee.
24  24    Q. Okay. Why did you leave?
25  25    A. For personal reasons.

```
00017:01    Q. Was it your decision to leave?
02          A. Yes, it was.
03          Q. Okay.
04          A. I had a medical issue.
05          Q. Okay.
06          A. I had a heart problem.
07          Q. Oh. Yeah, I -- okay. Thank you.
08             Tell me about OPI. What -- you said it
09          was a -- it was verticalized at some point in the
10          late nineties. What did you mean by that?
11          A. Well, the Americas was verticalized in the
12          late nineteen nineties. And it was divided up into
13          two major industry groups. I'd actually chunk it up
14          into four pieces: Oracle Services Industries,
15          Oracle Product Industries, major accounts, and
16          general business.
17          Q. Okay.
18          A. That's how we reorganized it. So some of
19          it was industry, and some of it was size of account.
20          Q. All right. Okay. What industry did OPI
21          cover?
22          A. It was a sector, is the way we thought
23          about it, Dario, and a sector would -- meaning
24          multiple industries.
25          Q. Okay.
```

```
00018:01    A. So it included high-tech, automotive,
02          process manufacturing, consumer packaged goods
03          industries, were probably the major industries
04          there.
05          Q. Okay.
06          A. It also included aerospace and defense.
07          Q. How would you describe the relative size of
08          deals in OPI compared to either OSI or NAS within
09          the -- oh, the 2000 to 2001 time frame?
10             MR. NADOLENCO: Object to the form.
11             THE WITNESS: What do you -- what do you
12          mean by "size of the deals"?
13          BY MR. DE GHETALDI:
14          Q. Dollar amount.
15          A. In -- I'm going to chunk it up into two
16          pieces.
17          Q. Okay.
18          A. Contrasting it against major accounts and
19          general business and then compared to OSI.
20          Q. All right.
21          A. And you're asking specifically about OPI --
22          Q. Right.
23          A. -- is that correct?
24             And when you're saying 2000, also, I did
25          not take responsibility for OPI until July of 2000,
```

```
00019:01    so I can only speak from that point on --
02          Q. That's fair.
03          A. -- until I left.
04             Against general business and major
05          accounts, the deals tended to be larger --
06          Q. Okay.
07          A. -- frequently.
08          Q. And -- and I asked about deals, and maybe I
09          should have specified license deals. Is that the
10          way you understood the question?
11          A. Yes, that's correct.
12          Q. Okay. And so that would exclude services,
13          like consulting.
14          A. Correct.
15          Q. All right. How about -- how would you
16          describe the comparison of the size of OPI license
17          deals in, let's say, fiscal year 2001 to the size of
18          license deals in OSI during that same period?
19          A. I would say they were approximately
20          equivalent, with the exception of one deal.
21          Q. All right. And that one deal was?
22          A. Covisint.
23          Q. All right. And you say "Covisint"? I'm
24          not -- we -- it's been hard to get an agreement
25          on -- on how you say that word, and I'm just
```

```
00020:01    wondering how you say it.
02          A. You mean "Covisint" versus "Covisint"?
03          Q. Right, yeah.
04          A. I -- I -- I would call it "Covisint,"
05          but --
06          Q. Okay.
07          A. I'm not sure --
08          Q. That's --
09          A. -- it's ultimately that important.
10          Q. I don't know either. All right.
11             Now, in fiscal year 2001, was OPI divided
12          up into subgroups in any way?
13          A. The answer is yes. But if you could be
14          more specific in your question, I'd be glad to
15          answer it.
16          Q. Okay. Well, how was it divided up?
17          A. Are you talking about by industry? Are you
18          talking about sales support? Or would -- is the
19          answer yes?
20          Q. All right. All right. Was it divided up
21          by industry?
22          A. Yeah.
23          Q. Okay. How?
24          A. Yes.
25             We had -- we chunked it up in some cases by
```

00021:01 industry and then in some cases by account and then
02 in some cases several industries. Let me give you
03 an example. For example, we had all automotive, all
04 automotive accounts, together. And that tended to
05 work well, because most of the automotive accounts
06 were located in the Detroit area. So it kind of had
07 a geographic focus as well as an industry focus. So
08 that would be an example where we had people
09 selling. And I'm talking just now sales
10 organization.
11   Q. Right.
12   A. Focused on automotive.
13     The second example that we might segment it
14 by is, General Electric was a very major customer,
15 and as you probably know, General Electric is really
16 a portfolio of companies, all the way from financial
17 services to automotive and electric engines and
18 things of that nature. So we had one team focused
19 on General Electric.
20     And then other areas where we would have an
21 amalgam of industries -- for example, in the Bay
22 Area we certainly have, as you know, a high presence
23 of high-tech. The Gap is also here. And, by the
24 way, one of the other industries that we had
25 within -- within OPI is retail, going back to an

---

00022:01 earlier question.
02     So the sales organization would tend to be
03 divided into those three kinds of segments that I
04 just described.
05   Q. Okay. So amalgam -- just -- just to
06 summarize, GE was one of the --
07   A. One sales group.
08   Q. One sales group. Then automotive was
09 another sales group.
10   A. Correct.
11   Q. And then sort of everything else, that you
12 called an amalgam of industries, was in the third?
13   A. Yeah. And it was more based on geography.
14 You -- you would have people, for example, in -- in
15 the Bay Area. Some would focus exclusively on
16 high-tech. But because you had Gap here, as well,
17 using that client as an example, we would have
18 people focusing on that industry as well.
19     The -- and if they had Gap, they might
20 focus, for example, on Safeway as well. But you --
21 we didn't divide the Bay Area OPI office into
22 subindustries. We basically served it as a
23 geographic area focusing on those industries that I
24 just mentioned. In Texas, for example, in Houston,
25 there -- that was where we had our oil and gas

---

00023:01 practice, which would be another industry you
02 could add on --
03   Q. Okay.
04   A. -- to OPI.
05     So in some cases -- that third example,
06 Dario, is largely driven by geographic -- geography
07 and the industries that tend to center in those --
08 in that area.
09   Q. Okay. Well, how many geographic centers
10 did you have, then, during fiscal year 2001?
11   A. I don't recall.
12   Q. Okay. Well, there's Bay Area.
13   A. Right.
14   Q. Texas.
15   A. Right. Seattle.
16   Q. Seattle. Okay.
17   A. L.A. Chicago. Detroit. I would say New
18 England. And I'd probably say Southeast.
19   Q. Okay.
20   A. But all very industry focused.
21   Q. Based on whatever industry was in the
22 particular geographic region?
23   A. Yes, as long as it fell in the definition
24 of OPI.
25   Q. Okay.

---

00024:01   A. The named accounts for OPI.
02   Q. Okay. Now, did you have persons in charge
03 of those geographic centers?
04   A. Yes.
05   Q. Okay. Do you recall who those persons were
06 in -- in fiscal year 2001?
07   A. We had three areas that these offices would
08 roll up to --
09   Q. Okay.
10   A. -- within OPI: East, Central, and West.
11   Q. All right.
12   A. And the answer's yes.
13   Q. Okay. In -- and -- and the heads of those
14 geographic regions reported to you?
15   A. Correct.
16   Q. All right. Now, who in --
17   A. In the period -- in the period from July
18 2000 until the end of Q3 FY '01, I made a change in
19 Q4 --
20   Q. All right.
21   A. -- FY '01.
22   Q. So during the first three quarters, then,
23 of fiscal year 2001?
24   A. Correct.
25   Q. Less one month in the first?

**Page 25**

```
1   00025:01   A. (Witness nods head.)
2   02    Q. Okay. So -- so who was in charge of the
3   03 East during that time?
4   04    A. Steve McLaughlin.
5   05    Q. Who was in charge of the Central during
6   06 that time?
7   07    A. Tom Thirnot.
8   08    Q. And who was in charge of the West during
9   09 that time?
10  10    A. Mike DeCesare.
11  11       Now, to answer the question completely,
12  12 Thirnot left during this period of time, so I made a
13  13 change in Central upon his departure.
14  14    Q. Okay. Did you replace him with somebody in
15  15 Q3?
16  16    A. I don't recall specifically when he left.
17  17 But when he did leave, I put two people in charge.
18  18    Q. Okay. Do you recall why he left?
19  19    A. Yes, I do.
20  20    Q. Why?
21  21    A. Tom was very entrepreneurial, and was --
22  22 had aspirations to be a CEO of a company, regardless
23  23 of the size. And at that point, when he left, there
24  24 were a number of start-ups being created, and he was
25  25 attracted by one and left the company.
```

**Page 26**

```
1   00026:01   Q. Okay. Now, we've been talking about --
2   02 we've been talking about the license business and
3   03 how that was structured. Can you explain to me the
4   04 structure of the consulting business that you had
5   05 charge of?
6   06    A. Yes. During what period of time?
7   07    Q. Well, during the first three quarters of
8   08 fiscal year 2001.
9   09    A. We had East, Central, and West, Canada,
10  10 Latin America, and I also had a service line group.
11  11 And I think that was it.
12  12    Q. All right. By the way, going back to Steve
13  13 McLaughlin and --
14  14    A. could I go back for a second? I --
15  15    Q. Sure.
16  16    A. -- apologize. And also OPI consulting.
17  17    Q. Oh, okay. So within consulting there was
18  18 East, Central, West, Canada, Latin America, and OPI
19  19 consulting?
20  20    A. Yes, under my responsibility. East,
21  21 Central, West focused on major accounts and general
22  22 business consulting. OPI consulting focused on OPI.
23  23 And as you might imagine, Canada and Latin America
24  24 focused on their respective geographies.
25  25    Q. Right. And -- and when you say majors and
```

**Page 27**

```
1   00027:01 general business, those were subgroups of NAS at the
2   02 time, right?
3   03    A. They were parallel organizations to the NAS
4   04 sales organization.
5   05    Q. Okay. Parallel consulting organizations?
6   06    A. Correct.
7   07    Q. All right. You said a service line group.
8   08 What's -- can you explain what that was?
9   09    A. In consulting, you have organizations that
10  10 are focused on geographies or industry -- accounts
11  11 within those geographies or industries, but you also
12  12 want to have a strong practice, for example, around
13  13 applications, technology. It could be even
14  14 something as specific as systems performance. And
15  15 so -- and it might be, also, methodology, how we
16  16 actually do our work, that would apply to all these
17  17 other practices. It was much more efficient to have
18  18 a service line practice, a small group that had
19  19 responsibility for developing, for example, the
20  20 methodology that would be used by all those other
21  21 operational practices. And that was the scope of
22  22 service lines.
23  23    Q. Okay. Do you recall who was in charge of
24  24 the various consulting groups during the first three
25  25 quarters of fiscal year 2001?
```

**Page 28**

```
1   00028:01   A. I believe so.
2   02    Q. Okay. How about starting with East?
3   03    A. Keith Block.
4   04    Q. Okay. And Central?
5   05    A. Brad Scott.
6   06    Q. West?
7   07    A. Gary Simler.
8   08    Q. Canada?
9   09    A. Michel Lozeau. L-O-Z-E-A-U. He -- Dario,
10  10 he did leave at some point, and I don't recall
11  11 exactly when. But he was the -- the one that I
12  12 recall that was there.
13  13    Q. Okay. That's fine. And Latin America?
14  14    A. Luis Meisler. L-U-I-S, M-E-I-S-L-E-R.
15  15    Q. And how about OPI consulting?
16  16    A. Chuck Linn, L-I-N-N.
17  17    Q. And the service line group?
18  18    A. Valerie Borthwick. That's my best -- to
19  19 the best of my recollection, that's who was
20  20 responsible.
21  21    Q. Okay.
22  22    A. I made some changes along the way, but I
23  23 think that's pretty representative.
24  24    Q. All right. That's helpful. Now, during
25  25 the first three quarters of 2001, did -- did you
```

1  00029:01  have any responsibility for the forecasting process?

2  02  A. Yes.

3  03  Q. Can you identify for me what -- what you

4  04  felt to be the most important source of data in --

5  05  in creating a forecast.

6  06  A. Source of data?

7  07  Q. Yeah.

8  08  A. Data?

9  09  It would be the account managers and the

10  10  regional managers in the field.

11  11  Q. Okay. And what type of data did you

12  12  consider to be the most important to you in your

13  13  forecasting?

14  14  A. They would -- the most important was the

15  15  information around account, what the opportunity

16  16  was, whether it was applications or technology, or

17  17  both, and what -- the dollar amount that was

18  18  associated with that, that deal.

19  19  Q. Okay.

20  20  A. And I'm talking strictly license right now,

21  21  which I believe is what you're asking.

22  22  Q. Right. It is. Because you didn't

23  23  really -- or did you do forecasting in the same way

24  24  for consulting as you did for license?

25  25  A. Absolutely, yes.

---

1  00030:01  Q. Okay. So then let's concentrate on -- on

2  02  license, and then we'll get to consulting later.

3  03  A. Okay.

4  04  Q. So there were the -- the deals, then, or

5  05  the -- the opportunities, I think you called them,

6  06  and within the opportunities there were two

7  07  important pieces of data: what type of deal it was

8  08  going to be and the amount? Is that --

9  09  A. That's correct.

10  10  Q. -- fair?

11  11  A. That's correct.

12  12  Q. Okay. Did -- did you look at the -- the

13  13  account manager's estimation of the strength of the

14  14  deal; that is, the likelihood that the deal would

15  15  close?

16  16  A. Yes.

17  17  MR. GOLDSTEIN: Objection to form.

18  18  BY MR. DE GHETALDI:

19  19  Q. And how -- how did those sorts of criteria

20  20  fit into -- into your forecasting model?

21  21  MR. GOLDSTEIN: Objection to form.

22  22  MR. NADOLENCO: Join.

23  23  BY MR. DE GHETALDI:

24  24  Q. Could --

25  25  MR. NADOLENCO: Dario, I'm sorry. Can we

---

1  00031:01  just have the regular stipulation, that the

2  02  individual defendants are deemed to join in all the

3  03  objections with Oracle's counsel?

4  04  MR. DE GHETALDI: Oh, sure.

5  05  MR. GOLDSTEIN: Thank you.

6  06  MS. SEGAL: So agreeable.

7  07  THE WITNESS: Could -- could we also get

8  08  clarity, for me, obviously, not for the other folks

9  09  in the room, that when there is an objection to

10  10  form -- what does that change for me?

11  11  BY MR. DE GHETALDI:

12  12  Q. It changes nothing for you. You -- you go

13  13  ahead and answer the question. The only time that

14  14  you don't answer a question is if you're instructed

15  15  not to answer, by -- by your lawyer. Okay?

16  16  A. Okay.

17  17  MR. GOLDSTEIN: That's correct.

18  18  THE WITNESS: Thank you.

19  19  BY MR. DE GHETALDI:

20  20  Q. All right.

21  21  A. If you'll repeat the question.

22  22  Q. Okay. I'll try. It was one of those that

23  23  kind of --

24  24  MR. GOLDSTEIN: It was objectionable.

25  25  BY MR. DE GHETALDI:

---

1  00032:01  Q. -- fell out of my mouth and --

2  02  MR. GOLDSTEIN: It was objectionable as to

3  03  form.

4  04  BY MR. DE GHETALDI:

5  05  Q. -- landed on the table and flopped around,

6  06  and people laughed at it. You know, that happens.

7  07  All right.

8  08  My question was, how did those sorts of

9  09  criteria fit into your forecasting model. And by --

10  10  what I meant by that was, how did you evaluate the

11  11  account manager's estimations of the likelihood that

12  12  certain deals would close?

13  13  A. I would look -- one, we would segment the

14  14  deals into three categories: worst case, most

15  15  likely, and best case. So I would look to see where

16  16  the account manager and the regional manager, and

17  17  subsequently the AVP, the assistant vice president,

18  18  would put those deals. That was one basis.

19  19  Secondly, it would be through discussions with the

20  20  account manager on some deals. It would be similar

21  21  kind of discussion that I may or may not have with

22  22  the regional manager or the assistant vice president

23  23  on those deals, as well. It may also, third, be

24  24  just from my discussions personally with the client.

25  25  Q. All right. Now, you mentioned a couple of

**Page 33**

```
1   00033:01 terms. Let me ask you about them, just before we --
2   02   A. Sure.
3   03   Q. -- go on. You mentioned account manager,
4   04   that -- and I was using that term. What exactly was
5   05   an account manager in OPI during the first three
6   06   quarters of 2001?
7   07   A. The account manager was a -- a -- an
8   08   individual who had responsibility for a specific
9   09   account. And an account would be Hewlett-Packard --
10  10   Q. Okay. All right.
11  11   A. -- for example.
12  12   Q. And -- now, how about a regional manager?
13  13   A. Regional manager would be the manager
14  14   responsible for a set of account managers.
15  15   Q. All right. And -- and they would be the
16  16   persons in charge of those various regional offices
17  17   that you identified earlier?
18  18   A. Correct.
19  19   Q. Okay. And then the assistant vice
20  20   president, the AVP, I think, right?
21  21   A. Correct.
22  22   Q. Can you describe the responsibilities of
23  23   those -- those folks?
24  24   A. They would have responsibilities for a
25  25   group of regional managers underneath them.
```

**Page 34**

```
1   00034:01   Q. All right. And so Steve McLaughlin and
2   02   Mr. -- and Tom Thimot --
3   03   A. "Thimot."
4   04   Q. -- "Thimot" --
5   05   A. The T is silent.
6   06   Q. -- and Mike DeCesare, those -- those were
7   07   assistant vice presidents?
8   08   A. That's correct.
9   09   Q. All right. And the same for Keith Block
10  10   and Brad Scott and Gary Simler, than -- that list?
11  11   A. Yeah. Correct. And I believe I misspoke.
12  12   I believe AVP -- it's been three years --
13  13   Q. Yeah.
14  14   A. -- now. I believe AVP actually stood for
15  15   "area," not "assistant."
16  16   Q. Okay.
17  17   A. Area vice president.
18  18   Q. Okay.
19  19   A. And could you repeat your question again on
20  20   the consulting side?
21  21   Q. Right. So my question was, were Keith
22  22   Block, Brad Scott, Gary Simler, Michel Lozeau, Luis
23  23   Meister, Chuck Linn, and Valerie Borthwick all area
24  24   vice presidents?
25  25   A. I would have to look. I did make, I
```

**Page 35**

```
1   00035:01   believe at that point, Valerie Borthwick responsible
2   02   for the service lines, and at some point I made
3   03   Keith Block responsibility -- responsible for North
4   04   America consulting. And when he took that over,
5   05   meaning that he had responsibility for East,
6   06   Central, West, and Canada, he became a senior -- I
7   07   promoted him to senior vice president as well.
8   08   Q. Okay. So, getting back to the -- the
9   09   forecasting process, an account manager would talk
10  10   to a customer and get a lead on a possible deal,
11  11   begin discussions with a customer about a possible
12  12   deal, okay? Is that -- that's --
13  13   A. That was not always the case. But that was
14  14   typically the case.
15  15   Q. All right. Now, at -- at what point would
16  16   the account manager -- or would the opportunity,
17  17   that is, get to a point where the account manager
18  18   put the deal into the system, so to speak?
19  19   A. And when you say "the system," what
20  20   system --
21  21   Q. Well --
22  22   A. -- are you referring to?
23  23   Q. I'm not referring to a specific computer
24  24   system. But at what point would an account manager
25  25   report to someone else that "Here's a potential deal
```

**Page 36**

```
1   00036:01   that -- that we're looking at?
2   02       MR. GOLDSTEIN: Objection to form.
3   03       THE WITNESS: It -- the account manager
4   04   would introduce a deal based on their experience
5   05   when they felt that it was -- there was some
6   06   legitimacy to the opportunity.
7   07 BY MR. DE GHETALDI:
8   08   Q. Okay.
9   09   A. But that was an individual judgment -- an
10  10   individual judgment, but fairly consistent.
11  11   Q. Did you have meetings of these account
12  12   managers to discuss when an opportunity gained
13  13   sufficient legitimacy to be reported as a potential
14  14   deal?
15  15   A. Yes.
16  16   Q. Okay. Did you have written standards for
17  17   that?
18  18   A. Yes.
19  19   Q. Okay. Where -- where did those standards
20  20   appear?
21  21   A. I recalled -- recall writing an email at
22  22   one point, as an example, that said I wanted all
23  23   opportunities to be put into our sales tracking
24  24   system, known as OSO, Oracle Sales Online.
25  25   Q. All right. Regardless of the legitimacy,
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

1   00037:01  degree of legitimacy, or --

2   02      A. I would say regardless of where it was in

3   03   the sales process.

4   04      Q. Okay. Now, how did an opportunity --

5   05   please help me understand the -- the classification

6   06   method of these opportunities into this worst, most

7   07   likely, and -- and best-case categories.

8   08         MR. NADOLENCO: Objection to form.

9   09         MR. GOLDSTEIN: Join.

10  10         THE WITNESS: Are you asking what's the

11  11   definition of those three terms you just mentioned?

12  12   BY MR. DE GHETALDI:

13  13      Q. Okay. That -- I'll start with that

14  14   question.

15  15      A. Worst case meant that there's a very high

16  16   probability that we were going to get that. It

17  17   typically -- that deal. It typically meant that we

18  18   were very far along in the negotiation process with

19  19   the customer. It wouldn't be unusual that it was --

20  20   we were in contract negotiations or in fact had

21  21   signed the contract.

22  22         Most likely is -- well, let me put -- go to

23  23   best case next. In best case, it was an opportunity

24  24   that we were pursuing that may or may not happen

25  25   this quarter, and -- but we felt that the

Oracle Related Cases                                        Page 37

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

1   00038:01  discussions with the customer were such that -- that

2   02   it had some chance of happening that quarter.

3   03         And then the most likely are the deals that

4   04   would fall in between those two categories.

5   05      Q. Were all opportunities classified as either

6   06   worst, most likely, or best case?

7   07         MR. GOLDSTEIN: Object to form.

8   08         THE WITNESS: No.

9   09   BY MR. DE GHETALDI:

10  10      Q. So there were other opportunities that --

11  11   that didn't reach this particular level of

12  12   confidence?

13  13      A. Yes. An example of that would be that it

14  14   would be a deal that most likely -- that was out

15  15   there but was probably a future-quarter opportunity.

16  16      Q. Okay. Now, you -- just going back for a

17  17   second, this -- this email -- well, we'll get to --

18  18   I'll get to that later.

19  19         In your forecasting process in -- in 2001,

20  20   that is, Oracle's fiscal year 2001, did you look at

21  21   any historical data to -- to help you in -- in

22  22   arriving at -- at a forecast?

23  23      A. I think you're asking two questions.

24  24      Q. Right.

25  25      A. Did I look at historical data?

Oracle Related Cases                                        Page 38

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

1   00039:01         MR. NADOLENCO: Objection; compound.

2   02         MR. GOLDSTEIN: Lawyers sometimes have to

3   03   amuse themselves.

4   04         THE WITNESS: Did I look at historical

5   05   data? Yes. Did I use the historical data to -- to

6   06   arrive on a forecast? Did I use it? Very little.

7   07   BY MR. DE GHETALDI:

8   08      Q. All right. Is there a reason why you --

9   09   you did not use historical data any more than very

10  10   little in -- in your forecasting?

11  11      A. Yes. Because I had real information, or I

12  12   felt much more reliable information than a

13  13   historical, statistical data point or what we did

14  14   last year, for example. I had information about

15  15   this year, this quarter.

16  16      Q. All right. All right. Well, you said that

17  17   you did look at historical data. What historical

18  18   data did you look at?

19  19      A. As an example, what the license sales were

20  20   same quarter the prior -- year prior.

21  21      Q. All right. Total quarter?

22  22      A. Yes.

23  23      Q. Okay. Did you look at actual license sales

24  24   in the prior quarter for particular months?

25  25      A. Yes.

Oracle Related Cases                                        Page 39

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

1   00040:01      Q. Okay. Did you look at actual license sales

2   02   in the previous quarter? So, for example, in Q3 did

3   03   you look at how Q1 did in Q2?

4   04      A. To the best of my recollection, I -- I

5   05   might look at it. But I didn't feel that it was a

6   06   point that was particularly relevant.

7   07      Q. All right. In -- in looking at actual

8   08   results within a quarter, that is, actual closed

9   09   deals, where did you find that information?

10  10      A. I hesitate because it was so obvious that

11  11   we won a deal. The account manager would send an

12  12   email, you know, indicating that we had won. I

13  13   might see the signed contract of the deal. I may

14  14   have talked to the customer and learned that the

15  15   deal was signed.

16  16      Q. Okay. Did you have a process for toting

17  17   those deals up?

18  18      A. Yes.

19  19      Q. Where was that information available to

20  20   you, or how did you obtain that information?

21  21      A. The finance organization, that supported my

22  22   business, was the recipient of all contracts, and

23  23   they were the ones that noted whether a deal was

24  24   closed or not --

25  25      Q. All right.

Oracle Related Cases                                        Page 40

```
1   00041:01   A. -- and would give me that information.
2       02   Q. How often would they give you that
3       03   information?
4       04   A. When -- when are you talking about?
5       05   Q. Well, I'm talking about the first three
6       06   quarters of fiscal year 2001.
7       07   A. You know, they gave it to me as I needed
8       08   it. It -- at the beginning of the quarter it might
9       09   be as a deal was signed. Because of the way the
10      10   quarter worked, we tended to be back-end loaded.
11      11   And towards the end of the quarter, I would get a --
12      12   I might get a call or a report that showed -- was
13      13   telling me all the deals that had closed that week
14      14   or that day.  So it depended on the timing of the
15      15   quarter, when I saw that information.
16      16   Q. All right.  Well, was there a regular
17      17   reporting pattern on -- on closed license deals in
18      18   the first month of a quarter?
19      19   A. Yes.
20      20   Q. Okay.  What was that pattern?
21      21   A. It was part of our -- of our forecasting
22      22   package, that -- that I would get.  It would note in
23      23   there the closed deals.
24      24   Q. All right.  Did -- did you have access to
25      25   any electronic sources for that data?
```

```
1   00042:01   MR. GOLDSTEIN: Objection to form.
2       02   THE WITNESS: When you say "electronic,"
3       03   what does that mean?
4       04   BY MR. DE GHETALDI:
5       05   Q. I mean you log into Oracle's server, or one
6       06   of Oracle's servers or one of Oracle's databases,
7       07   to -- to find out how you're doing at a particular
8       08   time.  Were you able to do that?
9       09   A. Yes, I could go into OSO and get that
10      10   information.
11      11   Q. Okay.  Did you?
12      12   A. Infrequently.
13      13   Q. All right.  Was that -- other than OSO,
14      14   were you able to go anywhere else to -- to get that
15      15   information?
16      16   MR. NADOLENCO: Objection; form.
17      17   BY MR. DE GHETALDI:
18      18   Q. In electronic form.
19      19   A. In electronic form?
20      20   I might get an email with an attachment
21      21   that would have the forecast package.  So that's
22      22   electronic.
23      23   Q. Okay.  That's --
24      24   A. And I could access it that way.
25      25   Q. All right.  Any other databases?
```

```
1   00043:01   A. None that I recall.
2       02   Q. OFA, or Oracle Financial Analyzer?
3       03   A. No, I didn't use that product.
4       04   Q. All right.  Did you use any data warehouse
5       05   products?
6       06   A. None that I recall.
7       07   Q. In -- in the process of forecasting, during
8       08   this same time period, these -- the first three
9       09   quarters of 2001, did you look at any trends,
10      10   intraquarter trends?
11      11   MR. GOLDSTEIN: Objection to the form.
12      12   THE WITNESS: It's a -- it's a fairly broad
13      13   question.  I -- what I would specific -- as an
14      14   example, it was very important to me -- trends
15      15   were -- what our pipeline looked like for the
16      16   quarter, that was a trend I watched pretty closely.
17      17   BY MR. DE GHETALDI:
18      18   Q. Okay.  So in other words, you watched how
19      19   the pipeline numbers developed throughout the
20      20   quarter?
21      21   A. Right, how it changed throughout the
22      22   quarter.
23      23   Q. Okay.  Did you also look at your own
24      24   license growth forecasts, to see how they'd been
25      25   changing over the quarter?
```

```
1   00044:01   A. Yes.  And -- and just -- you'd used the
2       02   word "license."  In the questions right now we're
3       03   talking only license, right?
4       04   Q. Yes.  Yes.
5       05   A. Yes, I would -- well, ask that to me again.
6       06   just to make sure I answer it correctly.
7       07   Q. I asked did you also look at your own
8       08   license growth forecasts, to see how they had been
9       09   changing over the quarter?
10      10   A. Yes.
11      11   Q. Did you also look at those figures
12      12   together, that is, how the -- the license growth and
13      13   the pipeline growth numbers were behaving compared
14      14   to each other?
15      15   A. Yes.
16      16   Q. Okay.  And can you tell me about that
17      17   comparison, what you did there.
18      18   A. I would look at whether the pipeline was
19      19   growing, staying the same, or declining, and I would
20      20   look what our license forecast was.  And there was a
21      21   broad-based association between the two, and -- in
22      22   the sense that you would like to make sure that your
23      23   license forecast was covered by your pipeline.
24      24   Q. Okay.
25      25   A. As an example, I would look at that.
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
1   00045:01   Q.  Okay.  The -- the -- the -- I guess I was
2   02   asking about something slightly different.  You're
3   03   talking about the -- a more static relationship
4   04   between -- or it seems like you were talking about a
5   05   more static relationship; that is, how the pipeline
6   06   number compares to the forecast number at a given
7   07   point in time.  What I was asking about was more
8   08   trends, intraquarter, to see how the pipeline trends
9   09   were comparing to the forecasting trends.
10  10       MR. NADOLENCO:  Objection to form.
11  11       MR. GOLDSTEIN:  Join.
12  12       THE WITNESS:  I'm not sure my answer would
13  13   be any different, Dario.  I --
14  14   BY MR. DE GHETALDI:
15  15   Q.  Okay.
16  16   A.  I would watch the pipe, for example,
17  17   pipeline, to see how it changed during the course of
18  18   the quarter.  It was not unusual, for example, that
19  19   after the quarter started the pipeline would
20  20   increase, and then as you start to substantiate
21  21   deals, the pipeline might decrease somewhat.  For
22  22   example, a deal might move out of this quarter to
23  23   the next quarter.
24  24   Q.  Okay.
25  25   A.  I would look at that.  I would look at
```

Oracle Related Cases                                  Page 45

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
1   00046:01   license trends with the expectation -- and I think I
2   02   delivered it every quarter -- that -- that we would
3   03   deliver against the forecast for that quarter, based
4   04   on my experience.
5   05   Q.  All right.
6   06   A.  And based on my experience and the input,
7   07   of course, that I got from finance and my field
8   08   sales organization.
9   09   Q.  Right.  When a deal closed, did that deal
10  10   come out of the pipeline?
11  11       MR. GOLDSTEIN:  Objection to form.
12  12       THE WITNESS:  I smile because I -- I don't
13  13   remember.  I don't remember specifically.
14  14       MR. DE GHETALDI:  Okay.  We've been going
15  15   over an hour.  Why don't we take a break.
16  16       MR. GOLDSTEIN:  Sure.
17  17       THE WITNESS:  Sure.
18  18       THE VIDEOGRAPHER:  We're going off the
19  19   record.  The time is 10:51.
20  20       (Recess taken.)
21  21       THE VIDEOGRAPHER:  We're back on the
22  22   record.  The time is 11:05.
23  23       THE WITNESS:  I'm very sorry.
24  24       (Discussion off the record.)
25  25       THE WITNESS:  I'm sorry, Dario.
```

Oracle Related Cases                                  Page 46

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
1   00047:01   BY MR. DE GHETALDI:
2   02   Q.  No problem.  That's all right.  Okay.  Now
3   03   we'll start.
4   04       In the first three quarters of 2001, were
5   05   big deals included in OPI's pipeline, license
6   06   pipeline?
7   07   A.  And what was the time frame, again?
8   08   Q.  The first three quarters of fiscal year
9   09   2001.
10  10   A.  Yes.
11  11   Q.  Okay.  So essentially everything went into
12  12   the pipeline, but you're not sure whether --
13  13   A.  Thank you very much.
14  14   Q.  -- closed deals came out, right?
15  15   A.  All deals went into the pipeline.  And I
16  16   can't remember the technical detail of whether a
17  17   closed deal went out of the pipeline or not.
18  18   Q.  Okay.  When we were talking about the
19  19   classification of some of the pipeline deals as
20  20   either worst, most likely, or best, I asked you what
21  21   type of deals were not classified as one -- in one
22  22   of those three categories, and you said, well, one
23  23   example is if a deal was going to close in a later
24  24   quarter.  Can you think of any other examples of
25  25   types of deals that would be in the pipeline but
```

Oracle Related Cases                                  Page 47

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
1   00048:01   would not be in one of the worst, most likely, or
2   02   best-case categories?
3   03   A.  Other than future quarter?
4   04   Q.  Right.
5   05   A.  No.
6   06   Q.  Okay.
7   07   A.  Not that I recall.
8   08   Q.  Okay.  Before the break, we were talking
9   09   about relationships between license forecast and
10  10   pipeline numbers.
11  11   A.  Yes.
12  12   Q.  And there was actually a specific ratio
13  13   that was -- that appears in -- in a lot of Oracle's
14  14   forecasting documents, something called a coverage
15  15   ratio.  Are you familiar with that term?
16  16   A.  Yes.
17  17   Q.  And sometimes there's something that's
18  18   called a conversion rate.  Are you familiar with
19  19   that term?
20  20   A.  Yes.
21  21   Q.  Which term -- or which of those two ratios
22  22   did you tend to use personally?
23  23   A.  Coverage.
24  24   Q.  Coverage.  And so if I recall, that's the
25  25   license forecast divided by the pipeline, right,
```

Oracle Related Cases                                  Page 48

00049:01 expressed as a percentage?

02   A. Yes.

03   Q. How -- how did you use that coverage ratio

04 in your forecasting? What significance did it have?

05   A. I -- I used it as a broad measure to see

06 did we have the -- the license forecast covered. It

07 tended to be a more important number, for example,

08 in the beginning of the quarter than the end.

09   Q. Why?

10   A. Because at the beginning of the quarter,

11 you -- less deals were solid, so you might use

12 coverage to see do we really have enough in the

13 pipeline to cover what our forecast is. For

14 example, you might have more management judgment at

15 the beginning of the quarter. Towards the end I

16 would rely much more on the specific deals and pay

17 less attention to the pipeline -- less attention to

18 the pipeline at that point, and coverage.

19   Q. Okay. Did these coverage ratios tend to

20 increase or decrease as the quarter progressed?

21   A. What I recall, not to a specific quarter,

22 but during the period of time we're talking about,

23 as well as running Latin Americas sales, so kind of

24 a broader data point, what would happen is you would

25 have a pipeline, measured in dollar amount, and it

---

00050:01 would tend to increase after the quarter started,

02 for example in the first month, because new deals

03 might come into the pipeline, and it might be deals

04 that didn't happen in the previous quarter that you

05 move over to the next quarter.

06      And then, as the quarter continued, then

07 there would -- the pipeline -- it was not unusual

08 for the pipeline to decrease over time, because, as

09 an example, as you -- as we worked different deals,

10 you would see that some deals might fall out.

11 They're not legitimate deals at all. I mean, in

12 other words, there's not the deal there that we had

13 hoped; or there -- it was very -- you know, whether

14 it was a deal -- we may think there's a deal with

15 the customer; in fact there wasn't, or that there

16 was a deal, potential deal, with the customer but it

17 was not going to happen this quarter, and so you'd

18 move it out of the pipe for this quarter and move it

19 into the next quarter.

20   Q. Okay. And so the pipeline would tend to

21 decrease, in general, towards the end of the

22 quarter, after a little spike at the beginning? Is

23 that the way you're recalling?

24   A. As I recall. As I recall.

25   Q. Okay. And so that would have the effect of

---

00051:01 increasing the conversion rate?

02      MR. GOLDSTEIN: Objection to form. Did you

03 mean coverage ratio?

04      THE WITNESS: Do you mean --

05 BY MR. DE GHETALDI:

06   Q. Or coverage -- coverage ratio.

07      MR. GOLDSTEIN: I think I still object to

08 the form.

09      MR. NADOLENCO: Yeah, I do --

10      MR. GOLDSTEIN: But --

11      MR. NADOLENCO: -- too. Objection; form.

12 When?

13 BY MR. DE GHETALDI:

14   Q. To the extent that the end of the

15 quarter -- toward -- as the quarter progressed the

16 pipeline number is decreasing --

17   A. Correct, as I recall.

18   Q. -- as you recall, that -- am I -- am I

19 correct in -- in believing that that would have a

20 tendency to increase the percentage number that

21 results from the division of the forecast by the

22 pipeline?

23   A. As I understand the question, Dario, I

24 don't know that it's as scientific as you're

25 implying. Forecasting really is an art in many

---

00052:01 ways. But if -- you know, on one hand you could say

02 as -- as the quarter went along and your -- and your

03 pipe declined, theoretically the coverage --

04 coverage factor would decline; or you could argue

05 that it might go up, because your forecast could go

06 down. And if your -- if your coverage stays high

07 and your forecast goes down, then that coverage

08 factor could go up.

09      So I'm not sure I'm answering your

10 question, but there's -- there's different things

11 that could happen during the -- you know, the

12 numbers could -- you know, both coverage and your

13 forecast in the end are two different numbers.

14 And -- and so that coverage factor can vary during

15 the course of the quarter.

16   Q. Okay. No, and you -- you were answering my

17 question. Thanks.

18      Did -- did you ever look at historical

19 coverage ratios in -- in your forecasting?

20   A. To some extent.

21   Q. Okay. Why?

22   A. I might look anecdotally at what our

23 coverage is this quarter versus what our coverage

24 was same quarter last year or what it was previous

25 quarter, or something like that, but nothing more

00053:01 than that.

02    02    Q. Okay. When -- when you looked at

03    03 prior-year or prior-quarter coverage ratios, did --

04    04 did you look at what I would call the forecasted

05    05 coverage ratio at a certain point or a comparable

06    06 point within the quarter of -- the prior year or the

07    07 prior quarter, or did you look at a different

08    08 number?

09    09    A. Typically I would look -- if I did look at

10    10 it, which I said was very infrequent, it would be

11    11 what was it for this quarter and what was it for

12    12 this same quarter a year ago. I don't recall ever

13    13 looking at a specific point in time.

14    14    Q. Well, when you say what was it for the same

15    15 quarter a year ago, I'm not clear on how that

16    16 calculation would be done.

17    17    A. I might take the same quarter a year ago,

18    18 what the revenue was and what the pipe was at the

19    19 end of the quarter, look then, and -- and then I'm

20    20 now in the current quarter, and I'll look at, you

21    21 know, where we are in the coverage versus our

22    22 forecast.

23    23    Q. Okay. So, just so I understand, when --

24    24 when you would look at coverage ratios in prior

25    25 quarters or -- you would look at the actual revenue

---

00054:01 for the quarter and the pipeline at the end of the

02    02 quarter? Is that a fair statement?

03    03    A. I -- I don't recall specifically, Darlo.

04    04 I -- I would be interested -- you know, as an

05    05 example, in the first quarter of the new year, when

06    06 we typically have had a very good fourth quarter of

07    07 the previous year -- when you start up the new year,

08    08 it's not unusual that your -- in that first quarter

09    09 your pipe is smaller. And I might go back and say,

10    10 "What was our pipe, you know, a year ago, our

11    11 coverage a year ago?" And I -- I'm not sure I was

12    12 as scientific as you're -- as you're implying.

13    13    Q. Okay.

14    14    A. Or you're asking.

15    15    Q. Okay. What was the source -- when you did

16    16 go back and look, do you recall what the source

17    17 of -- of the historical data was where you looked?

18    18    A. I believe it was OSO or the pipeline

19    19 tracking system that we were using prior to OSO.

20    20    Q. And when you did go back and look, did you

21    21 just go back one year, or did you go back and look

22    22 multiple years?

23    23    A. At most one year.

24    24    Q. Is there some reason why you didn't go back

25    25 further?

---

00055:01    A. I'm not sure what the relevance of that

02    02 information would be. Again, I was very fact-based

03    03 in my business, and I had information from the

04    04 account managers and the RMs and the AVPs, as well

05    05 as my own discussions with the -- the clients, in

06    06 many cases. And I was -- because I don't get --

07    07 Oracle's success was not around coverage; Oracle's

08    08 success was around the revenue and the profitability

09    09 of the company. And that's what I focused on for my

10    10 business.

11    11    Q. Okay. Now, you mentioned management

12    12 judgment, I believe.

13    13    A. Yes.

14    14    Q. What part does management judgment play in

15    15 this forecasting process, or did, that is, during

16    16 those first three quarters of fiscal year 2001?

17    17    A. Management judgment was a number that I

18    18 used to -- that was the difference between what my

19    19 forecast was and what deals I felt comfortable at

20    20 that point in time that we would deliver.

21    21    Q. Okay. Is there a chicken-and-egg thing

22    22 happening with the forecast and the management

23    23 judgment? In other words, what comes first,

24    24 forecast or management judgment?

25    25    A. It typically -- typically an RM, or, more

---

00056:01 specifically for me, an AVP, would submit a

02    02 forecast. And it would be based on deals that they

03    03 could articulate. And I'm talking -- and management

04    04 judgment played a -- in my -- for my businesses,

05    05 license business, a much more important role at the

06    06 beginning of the quarter than at the end of the

07    07 quarter. At the beginning of the quarter they might

08    08 have some deals listed, but, based on their

09    09 general -- an AVPs general feel for their business,

10    10 they're saying, "I may be at X, but I'm going to

11    11 deliver 1.5X for the quarter." So they may actually

12    12 put that amount of judgment in there.

13    13    That would all roll up to me. And then I

14    14 would look at the judgment that they put in. And

15    15 sometimes I might adjust it up, management judgment,

16    16 if I felt my experience with that AVP was they're

17    17 conservative, overly conservative, and in some cases

18    18 I might adjust the management judgment down, if I

19    19 felt that they were aggressive. But it was a

20    20 experiential number, on management judgment, based

21    21 on the pipeline and based on the deals, that fell

22    22 into worst case, most likely, and best case.

23    23    Q. In fiscal year 2001, in the first three

24    24 quarters of that time period, which of your AVPs did

25    25 you consider to be overly conservative, if any?

1  00057:01   A. As I best recall, Mike DeCesare was
2  02  probably a little more conservative.
3  03   Q. All right.  And were any of your AVPs
4  04  during that period overly aggressive, in your -- in
5  05  your opinion?
6  06   A. Yes.  I -- I -- as I recall, Steve
7  07  McLaughlin was somewhat aggressive, and Tom Thimot
8  08  could be aggressive at times.
9  09   Q. Okay.  In -- in the third -- in the first
10  10  three quarters of fiscal year 2001, did Oracle's
11  11  finance department have somebody who was assigned to
12  12  OPI?
13  13   A. Yes.
14  14   Q. Who was that?
15  15   A. It started with Ivgen Guner.  G-U-N-E-R.
16  16   Q. Okay.  And at some point did that change?
17  17   A. Yes, it did.
18  18   Q. And who was next?
19  19   A. Jim English.
20  20   Q. Okay.  When did Mr. English become assigned
21  21  to OPI?
22  22   A. I don't recall specifically.
23  23   Q. Do you recall whether it was before the
24  24  third quarter of fiscal year 2001?
25  25   A. I believe he was the -- was the financial

1  00058:01   director that I had for OPI by the third quarter, as
2  02  I best recall.
3  03   Q. Okay.  Now, who did Ivgen Guner and Jim
4  04  English report to?
5  05   A. They reported in to the finance
6  06  organization.
7  07   Q. Okay.  Were -- were they there as a
8  08  resource for -- for you, or -- what was their role?
9  09   A. They were a resource for me.  They were --
10  10  in that role they were specifically dedicated to OPI
11  11  and would support me from a financial aspect of the
12  12  business.
13  13   Q. So when you wanted to know a financial
14  14  question, you went to them?
15  15   A. Correct.
16  16   Q. How would you use them?  What -- give me
17  17  some examples of how you would use them, their
18  18  expertise.
19  19   A. Examples would be to have them give me a
20  20  list of the closed deals, to give me the forecast
21  21  for that period, whether it was a weekly forecast or
22  22  biweekly forecast, depending on the time frame and
23  23  the quarter.  I might ask them to -- based on their
24  24  knowledge of the deals, did they have any questions
25  25  about deals that they felt were important to ask the

1  00059:01   AVPs or the RMs, for example, that I may be missing.
2  02  I treated them as a business partner.
3  03   Q. Okay.  During the first three quarters of
4  04  fiscal year 2001, did you have regular meetings
5  05  with -- with your staff, with your reports?
6  06   A. Yes.
7  07   Q. Okay.
8  08   A. Wait.  What do you mean by "meeting"?
9  09   Q. Well, either a -- I -- I asked about
10  10  "regular" meetings, okay.  And I meant either a
11  11  situation where a bunch of people gather around a
12  12  table or where they're on a conference call, on a
13  13  regular basis.
14  14   A. Yes.
15  15   Q. Okay.  Now, what sorts of meetings were
16  16  those; that is, did you have different meetings with
17  17  different -- regular meetings with different parts
18  18  of your organization or one meeting for license,
19  19  another meeting for consulting?  How did it work?
20  20   A. I tended to have separate meetings for
21  21  consulting from sales, or I'd have a separate
22  22  meeting from sales from consulting, although
23  23  sometimes I would have joint meetings or invite one
24  24  from one organization to the other.  And we'd do
25  25  these on either a periodic or as-needed basis.

1  00060:01   Q. Okay.  In terms of the -- the sales
2  02  organization, did you have regular meetings or calls
3  03  during those first three quarters of fiscal year
4  04  2001?
5  05   A. Yes.
6  06   Q. When did -- and what was it -- or what were
7  07  they?  Were they meetings or -- or calls, or -- or
8  08  what?
9  09   A. It could be a -- oh, "meetings or calls."
10  10   They were mostly calls.
11  11   Q. Okay.  Were these video conferences or were
12  12  they speakerphone?
13  13   A. Speakerphone.
14  14   Q. All right.  And so people in the sales
15  15  organization from around the country would all call
16  16  in, and you'd all talk, right?
17  17   A. Correct.
18  18   Q. Okay.  Did you have --
19  19   A. When you say we "all talk," I mean, there
20  20  was typically an agenda, and not -- typically not
21  21  everybody talked.
22  22   Q. Okay.  Were there typically written
23  23  agendas?
24  24   A. It might be -- to answer your question, we
25  25  might have a written agenda around programs that I

```
1   00061:01 would want to drive -- sales programs I'd want to
2   02 drive in OPI, or I might do that in an email, and
3   03 say this is the purpose of the call.
4   04    Q. All right.
5   05    A. The forecast was a very typical reason why
6   06 we called, and the agenda would be that, you know,
7   07 from 8:00 to 8:30 I'm going to talk with Central,
8   08 and 8:30 to 9:00 I'm going to talk with Central,
9   09 and, you know, et cetera. I mean, I would lay out
10  10 time frames where I would want to go through their
11  11 forecasts, using our forecast package for OPI.
12  12    Q. Okay.
13  13    A. Talking about OPI specifically, sales.
14  14    Q. Did -- did you typically circulate those
15  15 agendas, or were those something that -- that you
16  16 generated for your own personal use?
17  17    A. It might -- it would be an email that just
18  18 simply -- and, in fact, I'm not even sure I would
19  19 sent it out. It might be from -- from -- Jim
20  20 English, for example, would just say, "Steve
21  21 McLaughlin, you're on from 8:00 to 8:30," and it
22  22 might be a simple e-mail saying simply -- saying
23  23 that. The -- the substance was in the forecast
24  24 package.
25  25    Q. Okay. So I'm getting the picture that
```

```
1   00062:01 there was a regular forecast call for OPI during
2   02 these first three quarters of 2001. Yes?
3   03    A. Correct.
4   04    Q. Okay. Was there a particular day of the
5   05 week when those calls took place?
6   06    A. I -- I don't recall now, Dario. I believe
7   07 it was either Tuesday or Wednesday, because we would
8   08 have the executive committee meetings on Monday, and
9   09 then we would have the Americas forecast calls on
10  10 Thursday; so Tuesday or Wednesday morning.
11  11    Q. It's your recollection, then, that the OPI
12  12 forecast calls were not on either Monday or
13  13 Thursday; is that fair?
14  14    A. To the best of my recollection, yes.
15  15    Q. Okay. And did these forecast calls
16  16 include -- or -- were they joint sales and
17  17 consulting calls or -- are we talking about just the
18  18 sales? You talked about --
19  19    A. Typically the call, if it was OPI, was --
20  20 tended to be OPI sales only, to the best of my
21  21 recollection.
22  22    Q. All right.
23  23    A. To be -- what I recall was, I believe at
24  24 the beginning, when I first took over OPI, I had OPI
25  25 consulting participate and report as part of the
```

```
1   00063:01 OPI -- OPI sales forecast -- you know, of the OPI
2   02 forecast call. I believe later on, as Keith Block
3   03 took over responsibility for the Americas and OPI
4   04 consulting, that I got the OPI consulting forecast
5   05 through him, and so it was not part -- later on it
6   06 was not part of the OPI sales forecast call.
7   07    Q. All right. Generally how long did these
8   08 sales forecast calls last?
9   09    A. They could run an hour and a half to two
10  10 hours; sometimes shorter.
11  11    Q. All right. And your -- your main topic of
12  12 discussion was the information that was contained in
13  13 something that you called a forecast pack or
14  14 package?
15  15    A. Correct.
16  16    Q. Okay. What -- where did these forecast
17  17 packages come from?
18  18    A. From Ivgen Guner, and then subsequently Jim
19  19 English's organization.
20  20    Q. All right. Do you recall what was
21  21 contained in these forecast packages?
22  22    A. Generally speaking, yes. If you wanted to
23  23 show me one, I could be more specific.
24  24    Q. Okay. Well, generally speaking did they
25  25 include forecasts for the various regions?
```

```
1   00064:01    A. Yes.
2   02    Q. Okay. Did they include closed --
3   03    A. Correction. What I recall specifically,
4   04 Dario, is that it had forecasts by area. And -- and
5   05 within the package it would provide worst case,
6   06 best -- the most likely, and best case by region.
7   07    Q. Okay.
8   08    A. By regional manager, in fact.
9   09    Q. Okay. Did it include closed-deal figures?
10  10    A. Yes.
11  11    Q. Okay. And also by area?
12  12    A. Yes.
13  13    Q. Did they tend to include forecasts for the
14  14 subsequent quarter as well?
15  15    A. Just to be clear here, "subsequent" is
16  16 which quarter?
17  17    Q. The next one.
18  18    A. The next one. Typically not.
19  19    Q. Okay.
20  20    A. I -- I don't recall a time when it included
21  21 a forecast for the next quarter.
22  22    Q. All right. Was that something that you
23  23 tended to do, look ahead a quarter in your
24  24 forecasting?
25  25    MR. GOLDSTEIN: Objection to form.
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

**Page 65**

00065:01   THE WITNESS: Marginally. The focus was on
02   the quarter at hand.
03   BY MR. DE GHETALDI:
04      Q. Okay. Were any other documents generally
05   circulated for these forecast calls?
06      A. Any other documents --
07      Q. Yeah.
08      A. -- other than the forecast package?
09      Q. Right.
10      A. No, not that I recall.
11      Q. Okay.
12      A. Someone might -- as a correction, someone
13   might send me some information on a specific deal,
14   like Motorola.
15      Q. Okay.
16      A. You know, some detail on that. In -- but
17   it typically is not around the forecast information.
18   It might be "Here's a summary of our latest
19   discussion with the customer" or "Would you call
20   this customer," something like that.
21      Q. Okay. I was asking about more regularly
22   produced sorts of things, rather than the --
23      A. No.
24      Q. No. Now --
25      A. Not that I recall.

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

**Page 66**

00066:01      Q. We've been talking about the process for
02   forecasting license sales. Did you find the
03   forecasting process for license more or less
04   difficult than the forecasting process for
05   consulting?
06      A. More difficult.
07      Q. Okay. And why is that?
08      A. Because in consulting, you recognize
09   revenue as it's earned. So even if you, for
10   example, in consulting win a $2 million consulting
11   deal, you can't recognize that revenue until it's
12   been earned. And so in any given month, you -- if
13   it's a 24-month project, you get to recognize one
14   24th of that revenue, generally speaking, in any
15   given month.
16      On the license side, if you book a deal at
17   11:59 p.m. on the last day of the quarter for
18   $2 million, you get to recognize that $2 million for
19   that quarter, as long as the product's shipped.
20      Q. What is support? There -- there's a -- a
21   revenue category for support. Did OPI take in
22   revenue for support services?
23      A. What do you mean, "take in revenue"?
24      Q. Well, did -- did -- did -- did OPI
25   recognize revenue for providing support services?

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

**Page 67**

00067:01      A. And you asked what is support?
02      Q. Yeah.
03      A. I mean, which -- what question would you
04   like me to answer first, Dario?
05      Q. Well, take your pick. I mean, I'm trying
06   to figure out -- and maybe this will help you. I'm
07   trying to understand what support is --
08      A. Okay.
09      Q. -- and how that differs from consulting or
10   license sales.
11      A. Okay. Got it.
12      Support was another profit center in the
13   company, or is another profit center in the company.
14   Support really involves two things: maintenance to
15   the existing product that a customer may have bought
16   and upgrades to that product. Maintenance might be
17   that if their -- if the customer has a question,
18   they could call -- about their product that they
19   have installed, they could call support and get a
20   question answered.
21      If there is a patch for a product, the
22   support organization provides that to the customer.
23   If the customer has a support contract and a new
24   update to the software comes out -- we may have a
25   new release, or whatever -- then that release would

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

**Page 68**

00068:01   go to that customer. So it was a support
02   organization handling both applications and
03   technology.
04      Q. Okay. Okay. In your Tuesday or Wednesday
05   license forecast calls, did -- did somebody take
06   minutes?
07      A. The minutes, Dario, that I recall were
08   typically a revised forecast package. It might be
09   that, based on the discussion, something's gone from
10   best case to most likely, or some adjustment like
11   that, as an example. And I would either get an
12   adjustment -- I mean, I'd get that report after the
13   call, or if we were down to weekly calls, I might
14   not get that until the next week.
15      Q. Okay.
16      A. But that's typically how, as I recall,
17   minutes were taken.
18      Q. Okay.
19      A. That -- that I'm aware of. I mean, you
20   would have to talk to Jim English and others as to
21   whether they took minutes.
22      Q. These license forecast calls, did you have
23   them every two weeks during the first two months of
24   the quarter and then every week during the third
25   month of the quarter?

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

**Page 69**

1   00069:01   A. That's my recollection.
2   02   Q. Okay. Now, have -- have we gone through
3   03   the entire process of arriving at your forecast from
4   04   the -- the account representatives through the AVPs
5   05   and you, to arrive at a number?
6   06   MR. GOLDSTEIN: Are you done?
7   07   BY MR. DE GHETALDI:
8   08   Q. Is there something we haven't covered?
9   09   MR. GOLDSTEIN: Objection to form.
10   10   THE WITNESS: It's a -- in all respects,
11   11   it's a fairly broad question. I --
12   12   BY MR. DE GHETALDI:
13   13   Q. Sure.
14   14   A. I can't think of anything, Dario, that I've
15   15   left out.
16   16   Q. Okay.
17   17   A. I mean, it really was based on feedback
18   18   from the field, up to me, and -- looking at that and
19   19   then applying judgment overall to it. And that was
20   20   the forecast I would submit.
21   21   Q. Okay. And so you would submit the forecast
22   22   sometime after this Tuesday or Wednesday forecast
23   23   call?
24   24   A. Correct. I -- I wouldn't. I believe Jim
25   25   English did.

**Page 70**

1   00070:01   Q. Okay. Do you know where that -- who got
2   02   that forecast number from Mr. English?
3   03   A. I believe it was Jennifer Minton.
4   04   Q. Okay.
5   05   A. I don't know if it was Jennifer
6   06   specifically, but it was somebody in Jennifer's
7   07   organization.
8   08   Q. Okay. But that's not something that you
9   09   have actual knowledge of, how that occurred? Or is
10   10   it?
11   11   A. Through deduction, I can use it; because
12   12   the forecast package would come out on Thursday for
13   13   the Americas, and it would have my information in
14   14   it. So, through deduction, it was provided and --
15   15   Q. All right.
16   16   A. -- incorporated.
17   17   Q. Okay. So then there was -- sometime after
18   18   your Tuesday or Wednesday OPI license forecast call,
19   19   there would be another call on Thursday, right?
20   20   A. As I recall, it was on Thursdays, yes.
21   21   Q. All right. And was that a -- a forecast
22   22   call for just Americas, or was it company wide? Or
23   23   who -- who participated in those calls?
24   24   A. It was just the Americas. Just the
25   25   Americas. I don't recall it ever being anything

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

**Page 71**

1   00071:01   other than that. And to be clear on "Americas,"
2   02   that's OSI, OPI, major accounts and general
3   03   business, sales and consulting, and Latin America.
4   04   Q. And Latin America. Okay. Was there a
5   05   regular time for these Thursday calls?
6   06   A. I seem to remember they were typically
7   07   early afternoon on Thursday. I -- I can't be
8   08   specific as to -- I don't specifically recall
9   09   whether it was always the same time or not.
10   10   Q. Okay. Typically how long did those calls
11   11   last?
12   12   A. I don't -- to the best of my recollection,
13   13   I would say an hour. At times I would participate
14   14   in the call and after I've covered OPI would hang
15   15   up. I'd not continue on the call.
16   16   Q. Okay. Who were the regular participants in
17   17   those calls?
18   18   A. Jay Nussbaum, George Roberts, myself. I
19   19   believe our respective finance directors would
20   20   participate as well. Jennifer. And it was not
21   21   unusual that Jeff Henley, Safra Catz, and sometimes
22   22   Larry would participate in those calls. There may
23   23   be others on the call that I wasn't aware of, but
24   24   those are the people I recall.
25   25   Q. Okay. Were there agendas circulated for

**Page 72**

1   00072:01   these Thursday forecast calls?
2   02   A. What do you mean by "agenda"?
3   03   Q. Well, I'm talking about a formal agenda,
4   04   where you review old -- certain items of old
5   05   business, and they're listed, and certain items of
6   06   new business, and they're listed.
7   07   A. What I recall was, it was the -- the
8   08   Americas forecast package that was sent, and that's
9   09   what was reviewed.
10   10   Q. All right.
11   11   A. I don't recall a specific agenda.
12   12   Q. Were these weekly calls?
13   13   A. To the best of my recollection, they
14   14   parallel the calls that we had in OPI. So I believe
15   15   they -- my -- to the best of my recollection, they
16   16   were biweekly at the beginning of the quarter, for
17   17   the first couple of months, and then were weekly for
18   18   the final month.
19   19   Q. Okay. Do you know whether anyone took
20   20   minutes at -- at these -- for these calls?
21   21   A. No, I don't.
22   22   Q. Okay.
23   23   A. Not that I recall.
24   24   Q. And other than the -- the Americas forecast
25   25   package, were you provided with any other reports

00073:01 that were regularly discussed at these meeting -- or
02 these calls?
03   A. On the Thursday calls?
04   Q. Yeah.
05   A. Something other than the Americas?
06   Q. Right.
07   A. What would be an example?
08   Q. Big-deal reports.
09   A. There would, as -- part of the forecast
10 package would list big deals.
11   Q. Okay.
12   A. For the Americas.
13       MR. DE GHETALDI: All right. It's time to
14 change the tape, and it's probably as good a time as
15 any to have lunch and take a walk around.
16       THE WITNESS: Okay. Thank you.
17       THE VIDEOGRAPHER: This marks the end of
18 Videotape Number 1 in Volume I in the deposition of
19 Edward J. Sanderson on March 9th, 2004. We're going
20 off the record. The time is 11:47.
21       (Whereupon, a lunch recess was taken.)
22
23               AFTERNOON PROCEEDINGS
24       THE VIDEOGRAPHER: This marks the beginning
25 of Videotape Number 2 in Volume I in the deposition

00074:01 of Edward J. Sanderson, Jr. on March 9th, 2004.
02 We're going back on the record. The time is 1:10.
03 BY MR. DE GHETALDI:
04   Q. I think we left off talking about the
05 Thursday forecast calls. And now I'd like to move
06 on to the -- the Monday executive committee calls.
07   A. Okay.
08   Q. Do you recall participating in those Monday
09 executive committee calls in fiscal year 2001?
10   A. Yes.
11   Q. Did you participate on a regular basis
12 during that --
13   A. Yes, I did.
14   Q. -- time?
15       And what was the schedule of those calls?
16 Were they every Monday, or did they follow the --
17 the other -- the biweekly in the first two months
18 and then weekly in the third month schedule?
19   A. To the best of my recollection is they
20 were -- they tended to be every Monday. So they
21 didn't follow the forecasting pattern. But it
22 wasn't religious, in the sense that it was every
23 Monday; but it was pretty routinely every Monday.
24   Q. Okay. For -- for those executive committee
25 meetings, there were packets handed out for those

00075:01 meetings; am I right?
02   A. In what -- what kind of packets are you
03 referring to?
04   Q. Well, I'm asking -- I guess were there any
05 packets handed out for the executive committee
06 meetings?
07   A. What I routinely remember being handed out
08 was a forecast package for Oracle. And periodically
09 there may be something else, relative to a
10 particular sales program or something of that
11 nature.
12   Q. Okay. Were these Oracle forecast
13 packages -- did these Oracle forecast packages
14 contain the upside figures?
15   A. As I recall, there was a column that said
16 "upside."
17   Q. All right. Is it your recollection that
18 you got -- or that -- that one of these forecast
19 packages for Oracle was handed out every week at the
20 Monday executive committee meetings?
21   A. I can't say specifically that it was. But
22 it was routinely the case.
23   Q. Okay. For those weeks in the first two
24 months where there hadn't been a Thursday forecast
25 call the week before, because of the biweekly

00076:01 schedule of those calls in the first two months, was
02 there any difference in the -- the matters discussed
03 at the executive committee meeting; that is,
04 different from the weeks that had followed a -- a
05 forecast call, a Thursday forecast call?
06       Do you understand what I'm asking?
07   A. Yeah, I do. And I'm thinking. I don't
08 recall that they were different. Maybe we spent
09 less time on the forecasts on those, quote, "off"
10 weeks, just because there's not -- had not been an
11 update.
12   Q. All right.
13   A. That's -- to my best -- my best
14 recollection --
15   Q. Okay.
16   A. -- that's what we did.
17   Q. Do you recall when the executive committee
18 meetings were started?
19   A. It was -- typically, as I remember, we
20 targeted around 11:00. But they actually started
21 when Larry -- Larry typically started his mornings,
22 it is my understanding, not in the office, and we
23 would get a call from his assistant saying that he
24 was on his way in. And so it could be 11:00. It
25 could be sometimes a little bit earlier, sometimes a

1  00077:01  little bit later.

2  02   Q.  Okay.  About how long did those executive

3  03   committee meetings tend to last?

4  04   A.  My guess is they could range from one hour

5  05  to three hours, and would vary week to week.

6  06   Q.  Did you stick around for the whole meeting

7  07  there, or did you tend to drop off once OPI had been

8  08  discussed?

9  09   A.  No, I stayed.  When you're sitting with

10  10  Larry, he doesn't appreciate you getting up and

11  11  saying, "I have other things to do."

12  12   Q.  Okay.

13  13   A.  No, no, I stayed there the whole time.

14  14   Q.  All right.  What was typically discussed at

15  15  those executive management committee meetings?

16  16   A.  It would be -- the forecast was typically

17  17  discussed for some period of time.  I mean some part

18  18  of the meeting.  It would -- we would also talk --

19  19  sometimes we might talk about a particular deal.  We

20  20  would talk about a sales program that we were

21  21  launching as a company.  I mean, it would be those

22  22  kinds of things.  We might talk about a product --

23  23  product launch or a product, you know, schedule

24  24  around the development of a product, where it stood.

25  25  We might even get a demonstration of that product.

---

1  00078:01   Q.  Okay.  Did -- did you -- you talked about

2  02  forecasts, I assume, right?

3  03   A.  Yes.

4  04   Q.  All right.  And you said you talked

5  05  sometimes about particular deals.  Did you talk

6  06  about the status of these particular deals, or -- or

7  07  what?

8  08   A.  One that I recall specifically was at

9  09  Sun --

10  10   Q.  Okay.

11  11   A.  --Microsystems.  And we were -- and it was

12  12  one -- it was one of my accounts.  And we were in --

13  13  in the selling cycle for a particular portion of

14  14  CRM, Customer Relationship Management, which was one

15  15  of the application modules.  And it was going to be

16  16  a important customer.  I mean, when you launch a new

17  17  product, it's nice to have a big name associated

18  18  with that as an early adopter.  And I remember, for

19  19  example, specifically talking about Sun -- in one

20  20  of those meetings with Larry.

21  21   Q.  Did you -- were actual results a regular

22  22  topic of discussion at those meetings?

23  23   A.  Actual results?

24  24   Q.  Yeah.

25  25   A.  To my recollection, typically not.

---

1  00079:01   Q.  Okay.  So there were no reports of, say,

2  02  how -- how much had come in, in December?

3  03   MR. NADOLENCO:  Object to the form.

4  04  BY MR. DE GHETALDI:

5  05   Q.  Just as an example.

6  06   A.  Yeah, let me be clear on my answer, and

7  07  then answer.

8  08   When you say "actual results," I -- I,

9  09  probably falsely, assumed you meant like actual

10  10  results for a quarter.

11  11   Q.  Oh, no.  I meant cumulative numbers on

12  12  closed deals, as -- as a means of tracking how --

13  13  how you were doing as the quarter progressed in

14  14  terms of revenue.  We talked earlier today about how

15  15  your forecast package contained information about

16  16  closed deals, and I'm wondering whether that

17  17  information was -- that sort of information was

18  18  discussed at these executive committee meetings.

19  19   MR. NADOLENCO:  Object to the form.

20  20   THE WITNESS:  If -- if I saw a package, a

21  21  forecast package, I could look at it and answer your

22  22  question better.  My recollection is, in the

23  23  forecast package it did not have closed deals.  I --

24  24  I could be wrong, but I don't believe that it had

25  25  closed deals.

---

1  00080:01  it had, I believe -- what I do recall --

2  02  and it's been several years now, and I did not keep

3  03  those packages; they were collected during the

4  04  meeting -- that it had forecasts, for example, for

5  05  OPI, and it might have an upside number in there

6  06  that finance had put in.  But I don't recall that

7  07  any of those reports showed what was sold to date.

8  08  BY MR. DE GHETALDI:

9  09   Q.  Okay.  Well, assuming that the reports that

10  10  were handed out at those executive committee

11  11  meetings did not contain closed-deal figures, my

12  12  question is really whether that subject was

13  13  discussed, whether or not it was a part of the

14  14  report.

15  15   A.  I don't recall specific discussions.  But

16  16  it -- it wouldn't -- I can't say that there weren't

17  17  times that -- I mean, notionally it seems like we

18  18  might say, "Here's where we stand this quarter in

19  19  OPI" or NAS or -- or EMEA, which is Europe, Middle

20  20  East, Africa, to just kind of gauge how we're doing

21  21  on the quarter.  But I -- I don't -- I don't recall

22  22  that as a standard practice.  It may have come up in

23  23  an ad hoc way.

24  24   Q.  Hmm.  Okay.

25  25   MR. GOLDSTEIN:  Can I just interrupt for --

1  00081:01    MR. DE GHETALDI: Yeah.

2    02    MR. GOLDSTEIN: -- one minute?  We -- we

3    03  need to take a very short break to consult with

4    04  Mr. Sanderson about his flight back.

5    05    MR. DE GHETALDI: Oh, sure.

6    06    MR. GOLDSTEIN: This will just take two

7    07  minutes.

8    08    MR. DE GHETALDI: No problem.  Let's go off

9    09  the record.

10    10    THE VIDEOGRAPHER: We're going off the

11    11  record.  The time is 1:20.

12    12    (Discussion off the record.)

13    13    THE VIDEOGRAPHER: We're back on the

14    14  record.  The time is 1:21.

15    15  BY MR. DE GHETALDI:

16    16    Q. All right.  In -- in these executive

17    17  committee meetings, Monday meetings, did the subject

18    18  of trends come up; that is, trends in -- in forecast

19    19  numbers, trends in pipeline numbers?

20    20    A. What do you -- how do you define "trend" --

21    21    Q. Okay.

22    22    A. -- so I can answer better?

23    23    Q. That's a fair question.  Behavior -- for

24    24  example, behavior of pipeline over the quarter.  If

25    25  you were in week six of the quarter and the pipeline

---

1  00082:01  had been growing steadily or declining steadily, was

2    02  that something that was likely to be a subject of

3    03  discussion at these meetings?

4    04    MR. GOLDSTEIN: Objection to form.

5    05    THE WITNESS: It would be -- I don't recall

6    06  any time that that -- it was discussed, but it may

7    07  be just the time lapse.  It was not a normal course

8    08  of discussion.  The -- the focus during the forecast

9    09  discussions, typically led by Larry, or led by

10    10  Larry, was around revenue.  And -- I mean

11    11  specifically around revenue.  And that was a -- that

12    12  was the primary focus.  So, you know, the -- the

13    13  pipeline for a particular business, I can't say that

14    14  it was discussed, but my recollection is -- is if it

15    15  was, it was just done in -- in passing.

16    16  BY MR. DE GHETALDI:

17    17    Q. Okay.  I -- I just want to make sure that

18    18  we're -- we're talking about the same thing, because

19    19  there -- there seems to be a disconnect, in my mind,

20    20  with -- with what you just said about Larry's

21    21  primary focus being revenue at these meetings and an

22    22  apparent lack of discussion, or at least regular

23    23  discussion, about actual results through the

24    24  quarter.  And -- and just --

25    25    MR. GOLDSTEIN: Wait.  Wait.  I don't hear

---

1  00083:01  a question yet.  Let him ask you a question.

2    02  BY MR. DE GHETALDI:

3    03    Q. And I'm trying to -- I guess I -- I don't

4    04  understand what you mean when you say Larry's

5    05  primary focus at these meetings was revenue.  And if

6    06  you could explain that, that would be helpful.

7    07    A. He was focused on the forecasted revenue

8    08  for the quarter.

9    09    Q. Forecasted revenue?

10    10    A. (Witness nods head.)

11    11    Q. All right.  Were the discussions, then,

12    12  focused on what the numbers were for the forecast or

13    13  how the forecast was going to be met?

14    14    MR. GOLDSTEIN: Objection to form.

15    15    THE WITNESS: It was what the forecast was.

16    16    One thing, Dario, and to make sure I answer

17    17  your question --

18    18  BY MR. DE GHETALDI:

19    19    Q. Right.

20    20    A. -- it was what the forecast was.  If -- I

21    21  don't recall specifically, but as an example, if

22    22  there was a fair amount of judgment, for example, in

23    23  my forecast, Larry might say "What's your judgment"

24    24  and -- and want to talk a little bit about the basis

25    25  for -- for that number.  So -- I mean, that's the

---

1  00084:01  kind of discussion that would take place.

2    02    Q. Okay.  So Mr. Ellison would see a forecast

3    03  number from an executive vice president like

4    04  yourself and ask, "Well, what part of that is

5    05  judgment, and what part of that is from the field,"

6    06  or --

7    07    A. No, typically he would say -- he'd see

8    08  OPI --

9    09    Q. Right.

10    10    A. -- and he'd see a forecasted number.

11    11    Q. Right.

12    12    A. 150 million.  And -- and he would -- and --

13    13  and next to that, if I recall, it would have like

14    14  what's the growth over the prior year.  And so he

15    15  may comment on that.  If it was low or high, I mean,

16    16  he -- that may spawn a question from him.  And --

17    17  I'm not sure I answered your question, but, I mean,

18    18  that's the kind of thing that we would discuss in

19    19  the meetings.

20    20    He typically wouldn't get in and say,

21    21  "Well, what's your judgment in this?"  He viewed, as

22    22  his executive vice presidents running our business,

23    23  this is our forecast, and he typically wasn't into

24    24  dissecting what the components of that were: "How

25    25  much is sold" and "How much do you think is likely,"

**Page 85**

```
1   00085:01  "How much do you think is management judgment?"
2   02   That was unusual, for him to ask those kinds of
3   03   questions.
4   04       Q.  Okay.  Did you typically discuss challenges
5   05   that -- that you might be facing in meeting a
6   06   forecast?
7   07       A.  We might be talking about challenge around
8   08   a particular customer, as an example.
9   09       Q.  Okay.  Any other examples that you can
10  10   think of?
11  11       A.  "Challenges."
12  12           I don't recall any.  Because your forecast
13  13   was your forecast.  And if it was challenging, you
14  14   know, Larry might -- I mean, I don't recall this
15  15   discussion, but he'd say, "Well, then what is your
16  16   real forecast?"  And, frankly, you didn't want to
17  17   have that discussion with Larry.  You gave him what
18  18   your forecast was, and that's what you -- you know,
19  19   that's what you felt, and -- and that's the one that
20  20   you presented.
21  21           So you may have in there saying, "I've got
22  22   General Electric in this forecast."  And within
23  23   Oracle, as I think many companies have found,
24  24   General Electric is a challenging company in closing
25  25   deals.  And so I might say, "It's included in the
```

**Page 86**

```
1   00086:01  forecast, and here's where we are in negotiation of
2   02   that particular contract."  And I might let Larry
3   03   know that.  He was also personally interested in GE,
4   04   so we would talk about that; not, again, routinely.
5   05   I mean, that's just an example.
6   06       Q.  Okay.  You say that the packages were
7   07   collected at the end of the meeting?
8   08       A.  What I recall was we got a fairly complete
9   09   package, complete in the sense that it covered all
10  10   the different parts of Oracle business.  And after
11  11   the discussion on forecast, it would be -- I mean, I
12  12   typically put mine in the middle of the table, and
13  13   it would be -- and that's what I recall many people
14  14   did.  And they would get collected, potentially -- I
15  15   mean sometimes during the meeting, and -- by
16  16   Jennifer, or -- or I assume after, when the meeting
17  17   was over.
18  18       Q.  Do you know why these were collected?
19  19       A.  Yeah.  It was very sensitive information.
20  20   And we had a fairly large executive committee.  And
21  21   I think in the interest of the shareholders and the
22  22   interests of the company, that because of the
23  23   sensitivity of the information, it was collected.
24  24       Q.  What in particular about the information
25  25   was sensitive?
```

**Page 87**

```
1   00087:01  A.  One, it was a total look of Oracle, for
2   02   Oracle.  You asked about support earlier.  For
3   03   example, support numbers were in there, all the
4   04   financial numbers; you know, all the financial
5   05   numbers from around the world.  And I recall that
6   06   there was a summary page or cover page that actually
7   07   showed what the earnings per share were, as an
8   08   example.  I mean, it was a cover page that showed
9   09   what revenue and profitability and earnings per
10  10   share was.  And, you know, that's very sensitive
11  11   information.  And that, to me, was some of the most
12  12   sensitive; plus it was a point in time.  Because, as
13  13   we talked earlier, sales is much more dynamic than
14  14   consulting.  And so what the outlook was for one
15  15   week could be different than the next week.
16  16       Q.  Okay.  Was there anything else that -- that
17  17   was sensitive about this information?
18  18       MR. NADOLENCO:  Object to the form.
19  19       THE WITNESS:  I know I'm not supposed to
20  20   ask questions.  Did -- doesn't it seem like -- I
21  21   mean, if you -- if you've got all the financial
22  22   information about a $10 billion company and it's the
23  23   forecast at that point of time, for that quarter,
24  24   that is very sensitive information.
25  25   BY MR. DE GHETALDI:
```

**Page 88**

```
1   00088:01  Q.  Okay.
2   02       A.  There -- there's nothing to hide; I mean,
3   03   from -- from an executive committee standpoint.  I
4   04   mean, it was all financial data.
5   05       Q.  All right.  Did these executive committee
6   06   meetings include discussions of macroeconomic
7   07   issues?
8   08       MR. NADOLENCO:  Object to the form.
9   09       THE WITNESS:  Typically not.  But -- you
10  10   know, there -- I -- I would imagine, during the --
11  11   the dotcom falloff, as an example, that there -- and
12  12   we had a discussion -- I mean some level of
13  13   discussion at the board.  I don't recall it being an
14  14   organized discussion or, quote, an -- an agenda
15  15   item, anything like that.  It was -- but, I mean,
16  16   that kind of, you know, major macroeconomic event
17  17   you might discuss a little bit.
18  18   BY MR. DE GHETALDI:
19  19       Q.  Were dotcom companies a major element of
20  20   OPI's customer base?
21  21       A.  No.
22  22       Q.  What do you recall the macroeconomic
23  23   climate was in the United States in Oracle's 2001
24  24   fiscal year?
25  25       MR. NADOLENCO:  Object.
```

**Page 89**

```
1   00089:01      MR. GOLDSTEIN: Objection to form.
2      02       THE WITNESS: I don't recall specifically
3      03   when, but clearly the economic environment was
4      04   changing. I think some of the -- I mean dotcoms
5      05   were starting to stumble, that kind of thing.
6      06   That's an example. I mean, I don't recall others
7      07   specifically, but -- I mean, it was a -- I do recall
8      08   it was becoming more challenging for -- on a total
9      09   economy basis for companies in the technology
10     10   business and companies outside the technology
11     11   business.
12     12 BY MR. DE GHETALDI:
13     13      Q. Okay. Did that include Oracle?
14     14      A. I can't speak for Oracle. I can only speak
15     15   for OPI. And in OPI, as I -- to the best of my
16     16   recollection, during those first three quarters
17     17   we -- we had very strong pipe -- pipeline, including
18     18   in -- and -- in Q3 of FY '01, very strong.
19     19      Q. Okay. During your time at Oracle -- I'm
20     20   talking about your entire time there -- had you
21     21   ever -- or -- or had there ever been an economic
22     22   downturn?
23     23      MR. GOLDSTEIN: Objection to form.
24     24 BY MR. DE GHETALDI:
25     25      Q. Macroeconomic downturn?
```

**Page 90**

```
1   00090:01      MR. NADOLENCO: Objection to form.
2      02       THE WITNESS: I -- I don't know. And, you
3      03   know, clearly, you can get economic evidence of that
4      04   somewhere else.
5      05 BY MR. DE GHETALDI:
6      06      Q. Well, I -- I'm not looking for economic
7      07   evidence from you. What I'm wondering about is
8      08   whether you had experience at Oracle to compare to
9      09   when you were in the third quarter of fiscal year
10     10   2001; that is, experience at Oracle in an economy
11     11   that was going downhill.
12     12      MR. GOLDSTEIN: Objection to form.
13     13      MR. NADOLENCO: Assuming that there's even
14     14   a question in there.
15     15      MR. DE GHETALDI: Well, there is. I'll put
16     16   a question mark at the end.
17     17      MR. GOLDSTEIN: His voice went up a little
18     18   bit.
19     19      THE WITNESS: I can't speak for all of
20     20   Oracle at that time. I mean, I was -- I -- again,
21     21   at OPI I remember there was concern about the
22     22   economic environment. I mean, within the company
23     23   there was concern about the economic environment.
24     24   But it translates to fact-based numbers about your
25     25   business.
```

**Page 91**

```
1   00091:01 BY MR. DE GHETALDI:
2      02      Q. Sure.
3      03      A. And the fact base was that in OPI, as an
4      04   example, I had a revenue number. As I recall, it
5      05   showed significant growth over the prior year,
6      06   and -- both in forecast and in what was delivered,
7      07   as well as I had a very strong pipeline, to the best
8      08   of my recollection. So, you know, you have to think
9      09   about the macroeconomic environment, but in the end
10     10   it's -- it's about the deals and the probability and
11     11   what's worst case, most likely, and best case.
12     12      Q. Okay. Let me get back to my -- my
13     13   question. I -- and the question that some people
14     14   didn't consider to be a question; but I'll try and
15     15   actually make it into one.
16     16      Did you have any -- by the third quarter of
17     17   2001, did you have any experience, within any part
18     18   of Oracle, where there was a -- where the U.S.
19     19   economy was in a down cycle?
20     20      MR. GOLDSTEIN: Objection to form.
21     21      THE WITNESS: I -- I know we were start --
22     22   as I recall, we were starting to feel the impact on
23     23   the dotcom business, which would -- would have been
24     24   George's -- George Roberts' business.
25     25 BY MR. DE GHETALDI:
```

**Page 92**

```
1   00092:01      Q. Okay. But I'm talking about before that.
2      02   I'm -- I'm not --
3      03      A. Before the third quarter '01?
4      04      Q. Yeah. I'm not making myself clear. And
5      05   this is what I tried to explain, and it didn't come
6      06   out as a question, and there was some concern about
7      07   that. But I'll try it again anyway.
8      08      A. Okay.
9      09      Q. What I'm -- what I'm trying to get a sense
10     10   of is, you know, whether you had been at Oracle
11     11   during a complete economic cycle; that is, where the
12     12   economy had dipped and then come back up again or
13     13   had -- had gone up and then dipped. And -- and in
14     14   particular, I'm wondering whether -- or what you had
15     15   in your experience to compare the effect of the
16     16   downturning economy on OPI in Q3 '01.
17     17      MR. GOLDSTEIN: Objection to form.
18     18      THE WITNESS: Clearly, in Q4 '01 and Q1 of
19     19   FY '02 --
20     20 BY MR. DE GHETALDI:
21     21      Q. Well, later on, right?
22     22      A. Yeah. We -- we had experience -- I mean,
23     23   we started to see that even more so. In the third
24     24   quarter it is my recollection that, you know, we --
25     25   there was this macroeconomic change. But as far as
```

00093:01 having previous experience to compare it to, my
02 previous experience was my pipe was -- pipeline was
03 X during Q3 FY '01, for example, and I'm -- to the
04 best of my recollection, it was a substantial growth
05 over the pipe the same quarter the previous year.
06    Q. Okay.
07    A. So while there was this economic
08 environment issue out there, I was actually still
09 experiencing good pipeline growth in the -- in the
10 license business for OPI.
11    Q. Let me -- let me try again. You started at
12 Oracle in July of '95.
13    A. Correct.
14    Q. Right. Between July of '95 and February of
15 2001, do you recall there being a -- an economic
16 downturn at any point in the --
17       MR. GOLDSTEIN: Objection to form.
18 BY MR. DE GHETALDI:
19    Q. -- in the American economy?
20    A. Sometime in FY '01, and I don't recall
21 specifically, that -- you knew that there -- I mean,
22 you got a sense that there was an economic downturn.
23 You were starting to hear about dotcoms, as an
24 example, going belly up or not getting the -- I
25 mean, the same thing: not getting the funding that

00094:01 they were after. I don't remember a specific point
02 in time. I -- I know you've asked this several
03 times.
04    Q. Yeah.
05    A. I'm not trying to avoid the question. I'm
06 not sure I know the answer --
07    Q. Yeah.
08    A. -- to the question you're asking.
09    Q. I -- yeah, and I appreciate that. And I --
10 I know that you're trying. And -- and, believe me,
11 I'm trying to ask a clear question. I -- and -- and
12 I'm actually focusing on the period between July '95
13 and, let's say, January 2000. Do you -- I'm trying
14 to push you back farther in time --
15    A. Yeah.
16    Q. -- to see if you recall there being a
17 downturn in the American economy during -- or was it
18 all boom?
19       MR. GOLDSTEIN: Objection to form.
20       THE WITNESS: I don't -- I don't recall --
21 BY MR. DE GHETALDI:
22    Q. Okay.
23    A. -- any. But, also, I -- I don't mean --
24 I'm -- not to be flip, the way -- the way it may
25 come across, I'm not a macroeconomics person. When

00095:01 I'm managing a business at Oracle, you're focusing
02 on your customer base and those deals and that kind
03 of thing; I mean, facts that are relevant to that.
04 I -- I'm not a student of the -- of the macro
05 economy. And it, you know, is interesting at a
06 conceptual level, but I was running a business, and
07 I wasn't being -- I mean, I was focused on my deals,
08 not concept.
09    Q. Okay. In -- within the first three
10 quarters of fiscal year 2001, did you notice any
11 changes in OPI's deal cycle?
12       MR. GOLDSTEIN: Objection to form.
13       THE WITNESS: What does "deal cycle" mean?
14 BY MR. DE GHETALDI:
15    Q. Well, from the time -- the time -- the way
16 I understand it is, the time between when a deal is
17 put into OSO as a potential deal or as a deal in the
18 pipeline and the -- the time -- and the date that it
19 closes, that --
20    A. To the length of the -- the sales cycle
21 with --
22    Q. Right.
23    A. -- with customers?
24    Q. Right.
25    A. I don't think I noticed -- I don't recall

00096:01 any until the very end of Q3 FY '01. And there were
02 several deals that I had that didn't close. But
03 I -- I can't point to it was an economic issue, a
04 macroeconomic issue, that caused it. There were --
05 there were several deals that I had that I, quite
06 frankly, thought all the way up until the last day
07 were going to happen, and that didn't.
08    Q. Okay.
09    A. All the way up to the last day of that
10 quarter, Q3 FY '01.
11    Q. Right. Did you have a sense in Q3 '01 that
12 you had less visibility than you had in the previous
13 quarters?
14       MR. GOLDSTEIN: Objection to form.
15       THE WITNESS: Less visibility to?
16 BY MR. DE GHETALDI:
17    Q. In terms of your ability to forecast.
18    A. No, you know, I -- we had the same
19 organization, the same systems, the same process.
20 And -- I mean, I had -- I had -- I don't recall
21 feeling like I was lacking in information or
22 something was less clear.
23    Q. Okay. Do you recall seeing or noticing
24 changes in the types of products that were included
25 in -- in deals in Q3 '01? And -- and by "types of

**Page 97**

```
1   00097:01  products," I mean whether you noticed a different
2      02  mix between technology and applications.
3      03      A.  I -- I don't recall anything specifically,
4      04  other than when we did the Covisint deal in Q3 FY
5      05  '01, which was a very large deal, it was
6      06  significantly weighted to technology, in a -- so,
7      07  potentially because of that, it -- it may have
8      08  overall indicated we had greater growth in
9      09  technology than applications that quarter.  But
10     10  other than that, I don't know of anything that --
11     11  that showed that.
12     12      Q.  I've got to say you asked for it.
13     13  Hopefully this won't be too painful.
14     14      MR. GOLDSTEIN:  It will be painful to
15     15  someone who has to lift the transcript.
16     16      MR. DE GHETALDI:  Yes.  Well, we'll just do
17     17  it one by one.
18     18      MR. GOLDSTEIN:  Oh.  Oh, I thought that was
19     19  all one document.
20     20  BY MR. DE GHETALDI:
21     21      Q.  I'm going to hand you a document that was
22     22  previously marked Exhibit 60.  Sorry we don't have
23     23  the official copy, but --
24     24      A.  I'm showing the spelling of DeCesare.
25     25      Q.  No way.
```

---

**Page 98**

```
1   00098:01      MR. GOLDSTEIN:  Do you want him to review
2      02  the whole thing, Dario?
3      03      MR. DE GHETALDI:  No, I -- I would like him
4      04  to just flip through it, to see if he -- just to see
5      05  if he recognizes it.
6      06      THE WITNESS:  I don't remember this one
7      07  specifically.  But it's the -- it was a package that
8      08  we had for -- reporting package we had for OPI.
9      09  BY MR. DE GHETALDI:
10     10      Q.  Okay.
11     11      MR. GOLDSTEIN:  There's an extra one.
12     12      MR. DE GHETALDI:  Oh, thanks.
13     13      Q.  Was this -- or how was this reporting
14     14  package used?
15     15      MR. GOLDSTEIN:  Objection to form.
16     16  BY MR. DE GHETALDI:
17     17      Q.  Or this form of reporting package used, if
18     18  you don't remember the particular one.
19     19      A.  Give me just a minute, if you don't mind.
20     20      Q.  Sure.
21     21      A.  Let me just look through here.
22     22      How was it used?  We used it in my biweekly
23     23  or weekly forecasts that we had for OPI.
24     24      Q.  All right.  Does -- does it look -- does
25     25  this one look complete to you?  And it's not a trick
```

---

**Page 99**

```
1   00099:01  question.  I ask you because we have a number of
2      02  similar-looking packages that are not exactly the
3      03  same in terms of content.
4      04      A.  One thing I see, that I typically used,
5      05  that I don't see in here, is the worst case, most
6      06  likely, and best case report that I had, which was
7      07  an Excel spreadsheet --
8      08      Q.  Okay.
9      09      A.  -- that was prepared for me by the finance
10     10  people.
11     11      Q.  And if you can turn to the third page,
12     12  with -- with the Bates number 36908.
13     13      A.  Yes.
14     14      MR. GOLDSTEIN:  Yeah, you're there.  You're
15     15  there.
16     16  BY MR. DE GHETALDI:
17     17      Q.  Right.  Oh, you actually probably have my
18     18  copy, the one that's highlighted.
19     19      A.  Yeah.  Do you want to switch?
20     20      Q.  No, that's fine, because it just highlights
21     21  what I -- I wanted you to look at, which is that
22     22  column on the left, first column on the left, with
23     23  the title "Closed."
24     24      A.  Yes.
25     25      Q.  Can you tell me what that column
```

---

**Page 100**

```
1   00100:01  represents?
2      02      A.  I don't recall today.  I don't know if
3      03  that's number of deals or revenue.  It -- it says
4      04  "Total License Revenue" up top, and it looks like it
5      05  goes over to there.  So maybe that was revenue.
6      06      Q.  And if it's revenue, would that be millions
7      07  of dollars?
8      08      A.  Yeah.
9      09      Q.  Okay.
10     10      A.  Yeah.
11     11      Q.  The -- in the -- in the center of that
12     12  page, there -- there's something called a -- or
13     13  there's a column with the title "30 Percent Revenue
14     14  Target."  Do you see that?
15     15      A.  "30 Percent Revenue Target"?
16     16      Q.  Right in the center.
17     17      A.  Yeah, I do.  Yeah, I do.
18     18      Q.  Do you know what that represents?
19     19      MR. GOLDSTEIN:  Objection to form.
20     20      THE WITNESS:  I don't recall specifically.
21     21  I -- I could guess, but I -- I don't know what
22     22  it is.
23     23  BY MR. DE GHETALDI:
24     24      Q.  All right.  I don't want you to guess.
25     25  Now, if you turn to the next page, which is 4 of 16,
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
1   00101:01  with the Bates number 36909 --
2       02   A.  Okay.
3       03   Q.  -- it -- it looks like this is the -- or a
4       04   forecast summary for the subsequent quarter, Q4 '01.
5       05   A.  Yes, it is.
6       06   Q.  We -- when we were talking earlier, you
7       07   didn't remember that -- that -- I think that -- that
8       08   this was done.
9       09   A.  I stand corrected.
10      10   Q.  Yeah.  Well, no, I'm wondering about the
11      11   process, how you would -- or whether the process for
12      12   forecasting the subsequent quarter was any different
13      13   than -- than the process for forecasting the -- the
14      14   current quarter.
15      15   A.  Yes, it was.
16      16   Q.  And how; how so?
17      17   A.  The -- to my best recollection, we had a
18      18   lot of detail around the current quarter; again, the
19      19   sheets that I've mentioned several times now, the
20      20   worst case, most likely, best case.  And I had that
21      21   for the current quarter.  I did not have that
22      22   information or ask for that information for the
23      23   subsequent quarter.
24      24   Q.  All right.  So there -- there would be --
25      25   is one of the effects, then, less management
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
1   00102:01  judgment in these numbers?
2       02   A.  In the Q4 numbers --
3       03   Q.  Yes.
4       04   A.  -- or the Q3 numbers?
5       05   Q.  In the Q4 numbers.
6       06   A.  Less -- no, there would probably be more
7       07   management judgment.
8       08   Q.  Okay.  Was it -- what was the source of the
9       09   management judgment in -- in this case for the Q4
10      10   forecast?
11      11       MR. GOLDSTEIN:  Objection to form.
12      12       THE WITNESS:  It was probably a decision --
13      13   I don't recall specifically, but it was probably
14      14   some joint decision between me working with -- with
15      15   Jim English and putting that in.
16      16   BY MR. DE GHETALDI:
17      17   Q.  All right.
18      18   A.  Correction.  As I think about it, my -- my
19      19   bet is a lot of that judgment was what was submitted
20      20   from the field, and that was an aggregate of theirs,
21      21   and then I may have adjusted it slightly up or down.
22      22   But my -- I would say the primary source for that
23      23   judgment would have come from the field AVPs.
24      24   Q.  All right.  And those would be the persons
25      25   named on the left-hand side of the page, correct?
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
1   00103:01  A.  That's -- that's correct.
2       02   Q.  Okay.  Then if you could turn to page 7 of
3       03   16, which is -- which has the Bates number 36912.
4       04   A.  Uh-huh.
5       05   Q.  Can you tell me how you used the
6       06   information on this page.
7       07       MR. GOLDSTEIN:  Objection to form.
8       08       THE WITNESS:  I had asked that we start to
9       09   look -- at one point I had asked that we start to
10      10   look at the quarter on a monthly basis, and with the
11      11   intent to -- the objective to try to smooth out the
12      12   revenue; in other words, get less of a hockey stick.
13      13   I'd been able to do it to some extent in Latin
14      14   America, and -- and I was attempting to do it here,
15      15   and -- I think, so I was probably the source of this
16      16   format, or using this format so we could see what
17      17   the deals were.
18      18       There is -- the way that I would use it
19      19   was -- as you might imagine, it would tell me what
20      20   the total dollars were, sold, for example, in
21      21   December, which was 2 million at this point.  And
22      22   since it's dated December 17th, the fields are
23      23   blank, obviously, for January and February.  And
24      24   then it showed me a comparison that we had sold
25      25   around $18 million in the same month in the prior
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
1   00104:01  year -- for the same quarter of the prior year.
2       02       So I would use this as a gauge of how we're
3       03   doing, but -- one piece; and the second thing was
4       04   trying to move more of the revenue out of the last
5       05   month of the -- of the quarter, more into the first
6       06   couple of months of the quarter.
7       07   BY MR. DE GHETALDI:
8       08   Q.  And the --
9       09   A.  And to provide -- use this as a tool to
10      10   help provide focus on that.
11      11   Q.  Okay.  What -- what was the purpose behind
12      12   trying to move revenue out of the last month of the
13      13   quarter into one of the two earlier months?
14      14   A.  To -- I smile because I think of things to
15      15   say that probably were inappropriate.  And to help
16      16   the sanity of the process is what's going through my
17      17   head.  So I'm trying to think of something more
18      18   eloquent.
19      19       MR. GOLDSTEIN:  That's eloquent.
20      20       THE WITNESS:  Just to help, you know, not
21      21   be sitting there in the last month of the quarter
22      22   and hope that you're going to deliver the number.
23      23   The more we put in the front -- I mean during the
24      24   quarter -- you know, during the entire quarter, the
25      25   more comfort you'd have going into the last month
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004 1:13:00 PM

```
00105:01  that you're going to deliver the number you're
02  forecasting.
03  BY MR. DE GHETALDI:
04     Q.  Okay.  Now, if you could turn to page -- or
05  the section that begins at page 9 of 16.  And it
06  looks like it continues to the end.
07     A.  Sure.
08     Q.  And that has the Bates number 36914.
09     A.  Uh-huh.
10     Q.  Can you tell me what -- what this part of
11  the package represents?
12     A.  It's the -- I believe it's the reports that
13  are presented -- printed out of OSO.  And this was
14  showing -- it -- depending on -- it depends on the
15  criteria that were used for the -- for the report,
16  in -- in the sense that it's like a report writer.
17  and so you can specify date -- you know, so "Let me
18  see all dates that are going to happen during this
19  quarter," for example.  And I'd have to study this
20  report to see if it focuses just on Q3, or it might
21  look at all deals that are out there.  Scanning this
22  list here, the dates all fall within Q3, so that's
23  what my guess was:  that was the parameter that was
24  put in.
25        I would use it to help get a sense -- if I
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004 1:13:00 PM

```
00106:01  was talking about a particular deal, I could -- it
02  would let me see the distribution of the -- the
03  revenue across the different products, as you see:
04  "CRM," "Database," "ERP," and "Tools."  It helped me
05  see that.  I could see -- I mean, I might focus on
06  "Win Probability" and "Close Date."  I would refer
07  to this report on an ad hoc basis.  Because, again,
08  I used the now often referred to report of my worst
09  case, most likely, and best case to -- as a
10  management tool, which that report that I'm
11  referring to was based on what was in here.
12     Q.  All right.
13     A.  It was just a nice way to synthesize it.
14     Q.  Can you help me understand the relationship
15  between the "Win Probability" column and the "Total
16  Selected" column?  And in particular, I -- I see the
17  "Win Probability" percentage going anywhere from
18  zero to 100.
19     A.  Right.
20     Q.  And is there -- yet in -- I guess it looks
21  like "BF Goodrich Aircraft Wheels & Brake," about
22  six or seven deals down from the top --
23     A.  Yes.
24     Q.  -- there --
25     A.  Yes.
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004 1:13:00 PM

```
00107:01     Q.  -- has a win probability of zero --
02     A.  Right.
03     Q.  -- but it looks like that deal shows up in
04  the "Total Selected."  So can you tell me what those
05  terms mean and -- and how they relate to each other?
06        MR. GOLDSTEIN:  Objection to form.
07        THE WITNESS:  I'm -- I'm not sure they
08  relate to each other.  "Win Probability" was the
09  assessment of the account manager and the RM with
10  input from the AVP on what the win probability was.
11  And the "Total Selected" column is simply a -- as I
12  understand it and recall, and it seems here, is that
13  it's simply a total of all the products added
14  across.
15  BY MR. DE GHETALDI:
16     Q.  Does -- does this section of the package
17  represent OPI's pipeline or a portion of OPI's
18  pipeline?
19        MR. GOLDSTEIN:  Objection to form.
20        THE WITNESS:  I -- I can't -- I mean, I'd
21  have to go back for that particular period and see.
22  My understanding was it represented the pipeline.
23  BY MR. DE GHETALDI:
24     Q.  Okay.  So you -- do -- you recall, then,
25  receiving reports that listed all deals in OPI's
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004 1:13:00 PM

```
00108:01  pipeline?
02     A.  Yes.
03     Q.  Okay.  And as best you can recall, they
04  looked something like --
05     A.  Yeah.
06     Q.  -- these pages here in Exhibit 60?
07     A.  That's correct.
08     Q.  Okay.  And I notice that the "Forecast"
09  column is blank.  I think that there's some that
10  we'll look at later that actually have that filled
11  in, and maybe that will help explain some things.
12  All right.
13     A.  Was there a question?
14     Q.  No, no.  No, I'm just -- just telling you.
15  I'm not trying to hide something from you.  But I'm
16  just -- okay.  This would be, then, the next exhibit
17  in --
18     A.  Should I hold onto that?
19     Q.  Yeah, hold on, just in case we have to go
20  back to it.
21        (Deposition Exhibit 151 was marked for
22  identification.)
23        THE WITNESS:  Did I need an exhibit on this
24  one?
25        MR. GOLDSTEIN:  No.
```

```
1   00109:01 BY MR. DE GHETALDI:
2   02      Q.  No.
3   03      A.  Okay.
4   04      Q.  Please look at the document that's been
5   05   marked as Exhibit 151.  And let me know if you
6   06   recognize this document.
7   07      A.  I don't recognize this document
8   08   specifically for this date of January 6, 2001.  But,
9   09   again, it's the standard document that -- or very
10  10   similar to the standard document that we used in
11  11   OPI.
12  12          MR. DE GHETALDI:  Okay.  Can we go off the
13  13   record for one second?
14  14          THE VIDEOGRAPHER:  We're going off the
15  15   record.  The time is 2:05.
16  16          (Recess taken.)
17  17          THE VIDEOGRAPHER:  We're back on the
18  18   record.  The time is 2:26.
19  19          MR. DE GHETALDI:  Okay.  Paul, do you want
20  20   to --
21  21          MR. GOLDSTEIN:  Yeah.  We -- just
22  22   confirming what we said off the record, Dario has
23  23   pointed out that there's a page in Exhibit 151
24  24   that -- page 1 -- 012640 -- at the bottom has a box
25  25   called "Legal Accounts Receivable Summary."  And
```

```
1   00110:01 Dario tells me, and I'm sure he's right, that we had
2   02   earlier produced a version of this same document
3   03   with that material redacted out.
4   04          MR. DE GHETALDI:  Later produced.
5   05          MR. GOLDSTEIN:  Oh, later produced redacted
6   06   out.  I see.
7   07          MR. DE GHETALDI:  Right.
8   08          MR. GOLDSTEIN:  I'm sorry.  But this was an
9   09   earlier -- the exhibit reflects an earlier
10  10   production that we made which -- which included
11  11   descriptions of certain legal matters, that was
12  12   erroneously produced, without the redaction.  And so
13  13   we would like to go ahead and -- and re-produce this
14  14   document in redacted form.  You're welcome to use it
15  15   as an exhibit today, of course.
16  16          MR. DE GHETALDI:  Okay.  And we will
17  17   have -- we'll ask the court reporter to redact the
18  18   portion on the page that's Bates numbered 12640, the
19  19   box at the bottom of the page.
20  20          MR. GOLDSTEIN:  Right.
21  21          MR. DE GHETALDI:  And if it's okay with you
22  22   guys, if you could just give us a new version with
23  23   the same Bates number --
24  24          MR. GOLDSTEIN:  We will do that.
25  25          MR. DE GHETALDI:  -- but with the page --
```

```
1   00111:01 the single page redacted, we'll just destroy what --
2   02   those single pages and -- and substitute that.
3   03          MR. GOLDSTEIN:  That's fine.  We'll --
4   04          MR. DE GHETALDI:  Okay.
5   05          MR. GOLDSTEIN:  We'll do that.  And thank
6   06   you for bringing that to our attention.
7   07          MR. DE GHETALDI:  Yeah, you're welcome.  I
8   08   know how that happens sometimes.
9   09          I'm sorry.  Can we go off the record,
10  10   because my -- I'm not getting the feed, and that's
11  11   why it was bonking at me.
12  12          THE VIDEOGRAPHER:  We're going off the
13  13   record.  The time is 2:28.
14  14          (Discussion off the record.)
15  15          THE VIDEOGRAPHER:  We're back on the
16  16   record.  The time is 2:31.
17  17 BY MR. DE GHETALDI:
18  18      Q.  All right.  Now, back to Exhibit 151.  And
19  19   before we had the break -- or have you had a chance
20  20   to look at Exhibit 151 by -- by now?
21  21      A.  I've glanced at it briefly.  I wasn't sure
22  22   what you wanted me to look at specifically, so I
23  23   scanned through it.
24  24      Q.  Okay.  Do you recognize this document.
25  25   Exhibit 151?
```

```
1   00112:01      A.  Again, it's a document that's the -- the
2   02   kind of document we used frequently.  I don't
3   03   remember a January 6, 2001 document specifically.
4   04      Q.  All right.  This document has additional
5   05   parts; that is, more parts than Exhibit 60.  Do
6   06   you -- and let's see if we can look at a couple of
7   07   them.  In particular -- oh, gee.  It looks like --
8   08   I'm not sure where Bates number 12632 came from.  It
9   09   looks like it says 25 of 28 and -- up at the top
10  10   right-hand corner.  And there are three pages at the
11  11   end in the same format.
12  12          Without trying to sort out, you know, if a
13  13   particular page belongs with the report or not, can
14  14   you tell me whether you recognize the format of --
15  15   of those pages?
16  16      A.  Yes, I do.
17  17      Q.  Can you tell -- and are -- are these the --
18  18   the worst and best case and most likely categories
19  19   that we were talking about earlier today?
20  20      A.  Yes, it is.
21  21      Q.  And --
22  22      A.  Yes, they are.
23  23      Q.  And I see that there's really no column
24  24   titled "Most Likely," but there is one titled
25  25   "Forecast."  Are they equivalent in your mind?
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004 1:13:00 PM

1   00113:01   A. Yes, they are.

2   02   Q. All right. And just so that I understand

3   03   the format, am I correct in believing that every

4   04   deal that appears in the worst case column also

5   05   appears -- or also should appear in the forecast and

6   06   best case columns?

7   07   A. Generally, yes. If I recall correctly,

8   08   we -- you may see a change in the value of the deal

9   09   in forecast and best case, because you may --

10   10   Q. Well --

11   11   A. -- have a deal that we're sure we're going

12   12   to get a million; we may get -- we're forecasting

13   13   1.5, but we may -- best case is two. So you might

14   14   see a variance like that.

15   15   Q. All right. All right. Now if I could ask

16   16   you to the page that is Bates numbered 16237.

17   17   A. 16 --

18   18   MR. GOLDSTEIN: 126 you mean?

19   19 BY MR. DE GHETALDI:

20   20   Q. I mean 12637. A little afternoon dyslexia.

21   21   Thank you. And this is the same format as one of

22   22   the pages that we looked at in Exhibit 60, but now

23   23   we're a couple weeks farther into the quarter. And

24   24   am I correct in reading this page as showing that as

25   25   of January 6, 2001 there were $64 million in total

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004 1:13:00 PM

1   00114:01   license closed deals for OPI?

2   02   A. Correct.

3   03   Q. Okay. And I'm assuming that a big chunk of

4   04   that is the Covisint case. Is that right?

5   05   A. That's correct.

6   06   Q. One of the things that you were not certain

7   07   of earlier in the day was whether or not the

8   08   pipeline contained closed deals. Is there some way

9   09   to -- to check between Exhibit 60 and Exhibit 151 to

10   10   settle that question?

11   11   A. Well, if I look at 151, Exhibit 151, and I

12   12   look on page 12637 --

13   13   Q. Yes.

14   14   A. -- and then I also look on 12641, and if

15   15   you see here Covisint -- it's about 60 percent of

16   16   the way down -- it's "Central." "Won" is the

17   17   status. Fikany, John Fikany, "JFIKANY."

18   18   "Covisint." Description. And if you follow it over

19   19   to the right, where it says "Forecast," it's

20   20   55.8 million. And you go back to the earlier page

21   21   that I mentioned, 12637, and you see 55 million is

22   22   there. So to answer your question, based on this,

23   23   it looks like the pipeline included closed deals as

24   24   well.

25   25   Q. Okay. Now if you'll turn, please, to pages

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004 1:13:00 PM

1   00115:01   with the Bates numbers 12638 and 12639. This is a

2   02   new sort of format, or at least a format that does

3   03   not appear in Exhibit 60. And can you tell me what

4   04   the purpose of this -- of these two pages of the

5   05   report --

6   06   A. Well, as I mentioned --

7   07   Q. -- is?

8   08   A. -- earlier, what I did is I had

9   09   responsibility for OPI, and as you think more about

10   10   the business and ways to make it better, one of the

11   11   things I did was introduce trying to track revenue

12   12   earlier in the quarter, than waiting until the last

13   13   month and oftentimes the last couple of weeks of the

14   14   quarter. And this is similar to the report that we

15   15   had. Is this Exhibit 60, the first one that you

16   16   asked me in the case?

17   17   Q. Yes. Yes.

18   18   A. I think you'll see that on page 36912 of

19   19   Exhibit 60, where it breaks out revenue by month,

20   20   that this is a enhanced version, or we've expanded

21   21   it to where we break it down by not only just the

22   22   raw number for each area but down to the regional

23   23   manager level and then the particular customer and

24   24   deal and show that information.

25   25   Q. Okay. And if I'm understanding it

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004 1:13:00 PM

1   00116:01   correctly, on page 12639 it -- it looks like the

2   02   forecast, at least as of early January 2001, was to

3   03   get about $65 million in December, $50 million in

4   04   January, and $20.6 million in February in license

5   05   revenue. Is that right?

6   06   A. Two comments, in answering your question.

7   07   First is, I believe December actually shows what was

8   08   sold. So it wasn't what was forecast; it was what

9   09   was sold.

10   10   Q. Okay.

11   11   A. Since the date of this document is January

12   12   6.

13   13   And secondly was, in my effort to implement

14   14   this new practice, because it was new to OPI, was to

15   15   allocate -- I asked the AVPs to allocate the -- the

16   16   remaining revenue for the quarter between January

17   17   and February. And this was their guess at that

18   18   point. But, again, it was a brand-new practice we

19   19   put in place. It was not something that had become

20   20   routine or institutionalized.

21   21   Q. Okay. All right. The next one I'm going

22   22   to hand you is a document that's already been marked

23   23   as Exhibit 61.

24   24   A. Okay.

25   25   Q. All right. Do you recognize Exhibit 61?

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

00117:01   A. I -- it is consistent with a format that
02   continued to evolve for my forecasting.  And I
03   don't, again, remember this specific one, but I'm
04   sure that it -- for this date, but it's very
05   consistent with the kind of forecasting packages we
06   had --
07   Q. Okay.
08   A. -- in OPI.
09   Q. It -- it's -- it has an email on the front
10   of it.  And it looks like it -- the email notes that
11   there are three attachments in PDF form.  One is an
12   OPI license and one is for consulting, and one is
13   for Latin America.  You see that, on the second page
14   there?
15   A. Yes, I do.
16   Q. Also, the -- the date is Wednesday, January
17   17th.  And it says that it's a script for -- in the
18   text on the first page, it says it's a "script for
19   tomorrow's forecast call."  Did -- did you get an
20   updated package for use with the Thursday forecast
21   calls that was different from the package that you
22   got for the Tuesday or Wednesday OPI call?
23   A. I don't recall specifically.  Is there a
24   specific area that you're asking about?
25   Q. Well, it's just that the format of this

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

00118:01   report is so different than Exhibits 151 and --
02   A. And 60.
03   Q. -- and 60.  And it -- it appears that it --
04   it's being given to you for use with the Thursday
05   forecast call.
06   A. Right.
07   Q. And -- and so my inference is that you --
08   you might have received a different sort of package
09   for the Thursday call.  And I'm just trying to find
10   out if my --
11   A. Okay.
12   Q. -- inference is correct.
13   A. If I understand your -- your -- okay.
14   This -- looking -- for example, Exhibit 151 is the
15   format that I would use for the Tuesday/Wednesday
16   calls.  And that was for OPI.  I would also, during
17   that time, have separate forecast calls for Latin
18   America and a separate forecast call for consulting.
19   What this package, Exhibit 61, represents, the --
20   all three of those, since those are the three
21   businesses that I had responsibility for, and this
22   was the package that I would use for the Thursday
23   calls.
24   Q. Okay.
25   A. So in that regard it is different, in a

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/8/2004  1:13:00 PM

00119:01   couple ways.
02   Q. All right.  Well -- okay.  Let's -- let's
03   look at a couple of specific pages.  Could you
04   please turn to the page that has the Bates number
05   22086.
06   A. Okay.
07   Q. And here again, we've got a Q4 forecast
08   summary.  Were the forecasts for Q4 a subject of
09   discussion at the -- the Thursday calls?  And this
10   is not one of the pages that's different.
11   A. To my -- my recollection is that we spent
12   little or no time on the subsequent quarter.  I
13   Q. Okay.
14   A. The focus was on the current quarter.
15   Q. Okay.  Did you usually get a -- a script
16   such as the -- the email text that's at the
17   beginning of Exhibit 61 in advance of the Thursday
18   forecast calls?
19   A. As I mentioned earlier, the approach and
20   tools that I used for forecasting evolved.  I
21   obviously -- I mean not obviously; what I tried to
22   do was make them easier and better to use.  And at
23   some point I recall asking that I get a summary
24   prepared for me, to show me the different businesses
25   and the key facts about that business, so that I

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

00120:01   could use that to have the discussion -- you know,
02   to present the business I -- businesses I was
03   responsible for in the Thursday call.
04   Q. Okay.  But you don't recall when -- or at
05   what point you -- you asked for these summaries to
06   be provided?
07   A. No, I don't.  I don't.
08   Q. Do you recall whether it was prior to Q3
09   '01?
10   A. No, I -- I don't.
11   Q. All right.  Now let's look at some of the
12   pages --
13   A. Okay.
14   Q. -- that are a little bit different.  If
15   you'll turn to the one with Bates number 22019,
16   I mean -- through 22093.  I'm sorry.
17   A. Sorry.
18   Q. 91.  There's that --
19   MR. NADOLENCO:  Dyslexia.
20   MR. GOLDSTEIN:  What did you have for
21   lunch?
22   MR. DE GHETALDI:  You know, it happens to
23   me at soccer games when I'm refereeing.  In the
24   second half I always make a mistake on direction at
25   least once, and -- you switch sides, you know.

1  00121:01  THE WITNESS: Okay. So 91 through 93?

2  02 BY MR. DE GHETALDI:

3  03  Q. Yes. This appears to be a summary of

4  04 something called large deals. You see that in the

5  05 upper left-hand corner?

6  06  A. Yes, I do.

7  07  Q. Can you tell me what the purpose of this

8  08 part of the package was?

9  09  A. As you can see from the three different

10  10 packages we've discussed, is they've evolved and

11  11 they've changed and become more comprehensive as

12  12 we've moved forward in the calendar.

13  13  There — as we also discussed earlier, we

14  14 tended to have larger deals in OPI, for example,

15  15 versus GB — general business and major accounts.

16  16 And it was important for me — to me to track those.

17  17 And this is a report that finance began to prepare

18  18 documenting — it looks like what they were doing --

19  19 and I don't recall specifically, but what it looks

20  20 like doing is taking the worst, most likely, or

21  21 forecast, as were used in best, and try to

22  22 consolidate it onto this page with some comments

23  23 regarding that -- those same deals. So it was

24  24 another tool to help us in tracking the forecast for

25  25 the quarter.

1  00122:01  Q. On page 22091, Covisint is the second deal.

2  02 And it has a rather cryptic comment.

3  03  A. Yes.

4  04  Q. Can you help me out and tell me what you

5  05 understand that to mean, in — in any part?

6  06  A. Yeah. What my — under "Comments"?

7  07  Q. Yeah.

8  08  A. Yeah. What my recollection is, is OE, I

9  09 think that is the order entry number. So that was

10  10 actually, my guess is, either the contract number or

11  11 a number that was associated with the contract. And

12  12 then there is a journal entry of 4.2 million that —

13  13 I assume that was JE'd to our ISD department, which

14  14 was our telesales organization, who had participated

15  15 in the deal. And at that point, as I recall, we had

16  16 a separate HR sales organization, and we JE'd $2,000

17  17 to that HR organization, that didn't report to me.

18  18  Q. And "HR" is "human resources"?

19  19  A. Yeah, I'm sorry, human resources, correct.

20  20 Human resource sales organization -- sales support

21  21 organization.

22  22  Q. Okay. Who was responsible for entering the

23  23 comments that are shown on — on these three pages

24  24 beginning with 22091?

25  25  A. These were comments that were captured, in

1  00123:01 most cases, I — most cases from our

2  02 Tuesday/Wednesday forecast call for OPI. And

3  03 finance captured it and put them in here.

4  04  Q. Okay. Now if you could turn, please, to

5  05 the page with Bates number 22094. And tell me —

6  06  A. Okay.

7  07  Q. — what this page represents.

8  08  A. This is a consulting forecast page.

9  09  Q. Okay. And consulting only?

10  10  A. Correct.

11  11  Q. All right. And if you can turn to the next

12  12 page, the one with Bates number 22096.

13  13  A. Okay.

14  14  Q. And if you could tell me what this page

15  15 represents.

16  16  A. This is a consulting forecast page as well.

17  17  Q. Okay. And can you explain what the terms

18  18 "bookings" and "utilization" mean in the — the

19  19 column titles.

20  20  A. Sure. Bookings is the — when you sign a

21  21 consulting contract — or this was the forecast for

22  22 the quarter. For example, under "Northeast," and

23  23 you see Q3 '01 forecast of 37 million, that was

24  24 their forecasted consulting bookings for the

25  25 quarter.

1  00124:01  Q. Okay. And —

2  02  A. Bookings being a new consulting contract.

3  03  Q. All right. And "Target," what's that

4  04 column there refer to?

5  05  A. That may have been budget. I don't recall

6  06 specifically. But I think most likely that is what

7  07 we had for — as a budget for that quarter.

8  08  Q. We looked at a page on another report

9  09 earlier today that had a 30 percent growth target.

10  10 Do you think – do you know if there's any

11  11 connection between that 30 percent growth target and

12  12 this target?

13  13  A. No, I think the 30 percent growth target we

14  14 saw earlier was on a license — OPI sales target;

15  15 and this is referring to consulting target. So I

16  16 don't think the numbers would be -- the percentages

17  17 would be the same. I mean, they could be.

18  18  Q. Okay.

19  19  A. But it would just be circumstance if they

20  20 were.

21  21  Q. All right. What about "utilization"? What

22  22 is that phrase?

23  23  A. Utilization is something that is very

24  24 important to track in consulting. And it's the

25  25 actual billability; in other words, the hours that

**Page 125**

1  00125:01  could be charged to a customer of the consulting

2  02  organization, and, again, using Northeast as an

3  03  example, where it says Q3 '01 forecast, 64.1

4  04  percent.  So that was saying that that would be

5  05  their -- their billability or utilization for that

6  06  quarter --

7  07  Q.  Okay.

8  08  A.  -- forecasted.

9  09  Q.  In other words, if you had a hundred

10  10  consultants, this -- this means that 64.1 percent of

11  11  their total possible billable hours were actually

12  12  being billed?

13  13  A.  If you had a hundred -- you could think of

14  14  it a couple ways.  One unlikely way, but just to

15  15  make -- it brings it to life a bit, is you could

16  16  have a hundred consultants, and that means that 64

17  17  of them are billable, and the balance are not.

18  18  Q.  Okay.

19  19  A.  The other way to think about it is, of that

20  20  hundred consultants, they're actually billable at a

21  21  client 64 percent of their time.

22  22  Q.  Okay.  Now if you could turn to the next

23  23  page, the one with the Bates number 22096.  And tell

24  24  me what this portion of the packet refers to,

25  25  please.

---

**Page 126**

1  00126:01  A.  This is a consulting report.  And -- I -- I

2  02  don't recall it specifically, but what it appears to

3  03  do is talk about the -- to my recollection, it -- it

4  04  talks about the variance -- change in -- in revenue

5  05  since the last forecast.

6  06  Q.  With some kind of explanation?

7  07  A.  With some -- in some cases with some kind

8  08  of explanation, correct.

9  09  MR. DE GHETALDI:  Okay.  If we could mark

10  10  this the next in order, please.

11  11  (Deposition Exhibit 152 was marked for

12  12  identification.)

13  13  MR. GOLDSTEIN:  Thanks.

14  14  THE WITNESS:  Okay.

15  15  BY MR. DE GHETALDI:

16  16  Q.  All right.  This is -- do you recognize

17  17  this document?

18  18  A.  I recognize the document.  As other

19  19  documents, it's very consistent with the forecasting

20  20  package we used.  I don't recall it for a package

21  21  specific to January 13th, 2001.

22  22  Q.  All right.  Exhibit 151, it looks like

23  23  there's a copy of a file tab on -- on the first

24  24  page.  And it says "Sanderson, Q3 '01 Oracle Product

25  25  Industries, Q3Week6b."  And this one has a similar

---

**Page 127**

1  00127:01  heading, except it says "Q3Week7."  Does that --

2  02  A.  I see "Q3Week7."  I don't know where you --

3  03  Q.  Exhibit 151.  You have to look at the first

4  04  page of Exhibit 151.

5  05  A.  Okay.

6  06  Q.  It looks like these two reports are a week

7  07  apart.  Do you -- do you recall whether you got --

8  08  in Q3 '01 whether you got this form of report every

9  09  week?

10  10  A.  I -- I don't remember.

11  11  Q.  Okay.

12  12  A.  I don't recall.

13  13  Q.  All right.  Now, this one was previously

14  14  marked as Exhibit 62.

15  15  A.  Okay.

16  16  Q.  The -- well, do you recognize this form of

17  17  report?

18  18  A.  It's similar to the other packages we've

19  19  seen.  It -- there's some slight change in

20  20  presentation at the beginning of the report.  Again,

21  21  we continue to involve and instill processes and --

22  22  new processes or tightening the process, making it

23  23  more effective.  And here, I think, shows another

24  24  evolution of the -- of the forecasting package.

25  25  Q.  Okay.  Now, the -- this is dated January

---

**Page 128**

1  00128:01  26th, which was -- well, it says January 26, 2000.

2  02  That's probably a typo.

3  03  A.  What page are you looking at?

4  04  Q.  I'm looking at the first page.

5  05  A.  Mine says January 27, 2001.

6  06  Q.  I'm looking at the -- on the title section.

7  07  A.  Uh-huh.  Okay.

8  08  Q.  Would you agree that that's probably --

9  09  that -- that the year there is probably a typo?

10  10  A.  I agree.

11  11  Q.  Okay.  And there is a date and time -- it

12  12  looks like it's probably a footer -- on the lower

13  13  right-hand corner of the page, which is January

14  14  27th, which was a Saturday.  Would this report have

15  15  been prepared in advance of the -- I don't know

16  16  what -- the Monday executive committee meeting?

17  17  A.  Yeah, I -- I don't recall, or I'm not even

18  18  sure I even know or knew why it would have been done

19  19  on a Saturday.

20  20  Q.  Oh.  Okay.  I'm just trying to get a sense

21  21  of the timing of these reports in connection with

22  22  the various -- the Monday or the Tuesday/Wednesday

23  23  or the Thursday meetings and when the reports were

24  24  produced in relation to those.  So --

25  25  A.  Yeah, I'm not sure it's as scientific as

1  00129:01  you might be implying. We had a finance department
2  02  that worked very hard, and sometimes they'd get the
3  03  week -- work done during the week; and if they need
4  04  to go over the weekend, they did. The fact that
5  05  there's a new couple of pages on page 998 and 999,
6  06  it may have been something that was implemented new,
7  07  and they ended up doing it over the weekend.
8  08  Q. Okay.
9  09  A. I don't know of any significance about
10  10  January 27th.
11  11  Q. On the second page, with Bates number
12  12  36998, there's a -- a section down towards the
13  13  bottom with the monthly forecast numbers. Do you
14  14  see that?
15  15  A. I believe so.
16  16  Q. Okay. And it says -- one of the columns
17  17  there is titled "Q3 Forecast Per OSO." Do you see
18  18  that?
19  19  A. "Q3 Forecast Per OSO."
20  20  Q. Right.
21  21  A. Okay.
22  22  Q. And then to the right of that, there's a
23  23  section that says -- or a column that's titled
24  24  "Without Covisint."
25  25  A. Right.

1  00130:01  Q. Is -- why, if you know, were those
2  02  figures -- they're apparently revenue figures,
3  03  monthly, but with the Covisint deal subtracted.
4  04  Why -- why is that a part of this report?
5  05  A. As I recall, somebody in finance thought it
6  06  would be interesting to subtract out Covisint.
7  07  Q. Okay.
8  08  A. Because it was such a large deal. And I
9  09  also remember getting very unhappy about it.
10  10  Because I think there was another report that was
11  11  produced by finance that did the same thing.
12  12  Q. Uh-huh.
13  13  A. And I -- I didn't understand the logic.
14  14  The logic that was presented to me: "It was such a
15  15  large deal we should look at it -- your numbers
16  16  without it in." And I, frankly, got quite unhappy
17  17  that somebody had decided to manipulate my numbers
18  18  in -- in that way, manipulate in the sense that they
19  19  would -- somebody would arbitrarily decide to pull
20  20  that out. That clearly was not something I asked
21  21  for. And my bet is that Jim English would tell you
22  22  that I got quite unhappy when somebody decided to do
23  23  that. And it was not anybody in the line
24  24  organization; it was some staff person in finance
25  25  that thought that would be interesting.

1  00131:01  Q. Okay. All right. Have we -- any of the
2  02  documents that we looked at here, are they documents
3  03  that you looked at yesterday in preparation for your
4  04  deposition?
5  05  A. Let me look. This one, no.
6  06  Q. That is, Exhibit 62 no?
7  07  A. Yes, I'm sorry, Exhibit 62. I don't
8  08  remember seeing that. I -- I believe that I saw
9  09  Exhibit 61.
10  10  Q. All right.
11  11  A. Now, I don't -- to complete your question,
12  12  I -- answering your question, I don't -- I don't
13  13  recall seeing the others. I may be wrong, but I
14  14  don't think I saw the others.
15  15  Q. All right. Now, if you could turn, please,
16  16  to pages 37012 and 37013 of Exhibit 62.
17  17  A. Okay. I've got those pages.
18  18  Q. And I'd like to contrast those numbers with
19  19  the comparable pages in Exhibit 152, which are 12668
20  20  and 12669.
21  21  A. I -- I don't know that I -- oh, okay.
22  22  I'm -- I see what you're doing. Okay. Okay.
23  23  Q. And actually, if you'd just turn to the
24  24  second -- oh, I'm sorry. I'm -- I'm looking at --
25  25  A. So 12669?

1  00132:01  Q. 12669 and 37013. Let's focus on those two
2  02  specific pages.
3  03  A. 37013. Okay.
4  04  Q. All right. And it looks like there's been
5  05  a shift in the neighborhood of $50 million --
6  06  A. In January.
7  07  Q. -- out of January and into February between
8  08  January 13th and January 27th. Do you see that?
9  09  A. Yes, I do.
10  10  Q. Okay. Do you recall at the time noticing
11  11  that shift?
12  12  A. I don't recall that specific time; I mean,
13  13  a specific event, as I'd commented earlier on the
14  14  Covisint -- subtracting out Covisint. I -- I don't
15  15  remember this. I mean, I -- I remember this
16  16  phenomenon happening.
17  17  Q. Okay. What do you remember about the
18  18  phenomenon?
19  19  A. I remember that I couldn't -- I found that
20  20  I was not very effective in changing 20 years of
21  21  legacy at Oracle with my sales reps and my
22  22  customers, from moving revenue from the last month
23  23  of the quarter and oftentimes the last two weeks of
24  24  the quarter.
25  25  Q. Okay. Do you recall discussions about what

00133:01 happened here, you know, why $63 million was
02 forecast, in mid-January, to -- to close in January,
03 and then by the end of the month we're down to 13?
04     A.  I'm not sure that I would characterize it
05 as forecasting.  I asked the AVPs to work with their
06 RMs and their account managers to distribute the
07 revenue over the quarter.  This was a new practice
08 which we implemented, as you have seen in the
09 evolution of the reports.  And I'm sure that I had
10 some discussion on why it moved.  But in the end, it
11 was -- the fundamental issue was, I couldn't change
12 the sales organization like that overnight.
13         And, frankly, many of the customers that we
14 have in OPI, as you probably notice by the names,
15 are large customers, and many of them have been
16 long-term customers, and they know that they get a
17 bigger discount from Oracle by waiting until the end
18 of the quarter than Oracle would provide in the
19 middle of the quarter.  So that's the problem, and
20 that's why the revenue move to the last month, which
21 is very consistent with any other quarter within OPI
22 on a historical basis, at least during the time that
23 I had responsibility for it.
24         MR. DE GHETALDI:  All right.  I think we're
25 at about an hour.  How about a break?

00134:01         MR. GOLDSTEIN:  Sure.
02         MR. DE GHETALDI:  She needs to change the
03 tape.
04         THE WITNESS:  What's your prognosis?
05         MR. GOLDSTEIN:  We can be off the record.
06         THE VIDEOGRAPHER:  This marks the end of
07 Videotape Number 2 in Volume I in the deposition of
08 Edward J. Sanderson.  We're going off the record.
09 The time is 3:11.
10         (Recess taken.)
11         THE VIDEOGRAPHER:  This marks the beginning
12 of Videotape Number 3 in Volume I in the deposition
13 of Edward J. Sanderson.  We're going back on the
14 record.  The time is 3:31.
15         MR. DE GHETALDI:  All right.  This will be
16 the next in order.
17         (Deposition Exhibit 153 was marked for
18 identification.)
19         THE WITNESS:  I'm -- I'm sorry.
20 BY MR. DE GHETALDI:
21     Q.  Okay.
22     A.  I -- I've looked at it.
23     Q.  All right.  Can you tell me what the
24 document that's been marked as Exhibit 153 is?
25     A.  It looks consistent with a document that

00135:01 was handed out at the executive committee meetings
02 on the forecast for the company.
03     Q.  All right.  And this is the one that was
04 collected again at the end of the meeting?
05     A.  Yes, that's correct.
06     Q.  All right.
07     A.  Or sometime during the meeting; but no
08 later than by the end of the meeting.
09     Q.  Okay.  Now, I'd like to ask you to turn to
10 page that's Bates numbered 3552.
11     A.  Okay.
12     Q.  And there are some footnotes there
13 underneath the boxed chart.  Do you see that?
14     A.  Yes, I do.
15     Q.  Do you know what -- the source of those
16 footnotes about OPI's -- or the effect of the
17 Covisint deal on OPI's revenue forecast figures?
18     A.  You mean -- what do you mean by "source"?
19     Q.  Do you know who -- who wrote those?
20     A.  I -- I don't know.  I would suggest you
21 talk to Jennifer Minton.
22     Q.  Okay.
23     A.  It certainly wasn't something I put in.
24     Q.  Okay.  Now, if we could turn back just
25 briefly to Exhibits 60 and 62.

00136:01     A.  Okay.  So I should have three exhibits in
02 front of me right now?
03     Q.  No, actually just two.  We're, I think,
04 done with 153.
05     A.  Okay.
06     Q.  It's a one-question exhibit.  It's sort of
07 like a one-horse town.
08     A.  Okay.  I like those exhibits.
09     Q.  That's good.  If you'll turn in Exhibit 60
10 to the page with the Bates number 36909.
11     A.  Okay.
12     Q.  And in Exhibit 62, please turn to the page
13 with Bates number 37002.
14     A.  Okay.
15     Q.  All right.  And it looks like, in terms of
16 the -- and tell me if I'm reading this correctly.
17 It looks like, in terms of the license revenue
18 forecast for Q4, there was no change between
19 mid-December and late January.
20     A.  That appears to me the case as well.
21     Q.  Okay.  And --
22     A.  The numbers are the same.
23     Q.  All right.  And it looks like those numbers
24 would -- that is, the forecast of 167 million, was
25 negative 16 percent -- or would be negative 16

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
00137:01 percent growth over Q4 '00.  Is that right?
   02   A.  According to this -- these documents,
   03 that's what it says.
   04   Q.  Okay.  Was -- was that something that was
   05 of any concern to you in -- January of 2001, the
   06 fact that -- that is, the fact that the Q4 forecast
   07 had not changed over the past month and it was
   08 showing negative growth over the prior-year quarter?
   09   A.  I think it's indicative that not a lot of
   10 effort was put into that forecast, and -- the fact
   11 that it didn't change at all, not only at the
   12 summary -- you know, the total license level, but by
   13 area, you know, it being specifically McLaughlin,
   14 Thimot, DeCesare, and even -- or by area, the -- or
   15 the 167.  The -- in fact, not only the 167 but the
   16 worst, most likely, and best did not change.
   17   Q.  Right.
   18   A.  And, you know, the minus 16 percent growth,
   19 this was before we had any focus on Q4.  And,
   20 frankly, it's not surprising.  That was fairly
   21 typical of quarters where maybe -- I mean, I -- it
   22 was not unusual, let me put it that way, for me to
   23 have a quarter in Latin America, OPI where, if it's
   24 looking at a quarter ahead, that it's actually
   25 showing a decline in revenue.  That's not surprising
```

Oracle Related Cases                                    Page 137

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
00138:01 to me; let me put it that way.
   02   Q.  All right.  Let me make sure that your
   03 testimony is clear.  As I'm reading it, it's --
   04   A.  What testimony are you referring to?
   05   Q.  The one that you just gave.
   06   A.  Okay.
   07   Q.  Because you ran two things --
   08   A.  Yeah.
   09   Q.  -- together, maybe.  You said for you "to
   10 have a quarter in Latin America, OPI" --
   11     MR. GOLDSTEIN: I think he said "or OPI."
   12     MR. DE GHETALDI:
   13   Q.  It's not showing up, and so I want to make
   14 sure.
   15   A.  So you're seeing the same thing he's
   16 typing?
   17   Q.  Yeah.
   18   A.  Okay.  I didn't know that.
   19   Q.  Yeah.  So was your testimony when you're
   20 looking a quarter ahead in Latin America or OPI?
   21   A.  I would say -- let me repeat it.
   22     In Latin America and/or OPI, it would not
   23 be surprising to me that when they're projecting a
   24 quarter ahead, that that forecast is showing up as a
   25 negative growth.
```

Oracle Related Cases                                    Page 138

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
00139:01   Q.  All right.  All right.  Now, going back to
   02 page 3702 of Exhibit 62 --
   03   A.  Exhibit 62?
   04   Q.  You have -- it's one of the pages that you
   05 have there.
   06   A.  Okay.  And -- okay, 3700?
   07   Q.  Right.
   08   A.  Okay.
   09   Q.  This one has a little bit more information
   10 on management judgment than the earlier one does.
   11 And there's actually a column that seems to indicate
   12 that -- well, it -- it has the same numbers for
   13 management judgment as in the most likely column.
   14 And can you explain that to me?
   15     MR. GOLDSTEIN: Objection to form.
   16     THE WITNESS: I think it's, once again,
   17 indicative that not a lot of effort was put into
   18 that forecast of a future quarter, not the current
   19 quarter but of the future quarter, and the AVP's put
   20 in, based -- looking at their overall pipe, a best
   21 guess at that point of what it would be, and they
   22 put it under "management judgment."
   23 BY MR. DE GHETALDI:
   24   Q.  Okay.  Do you recall prior -- or quarters
   25 prior to Q3 '01 where you forecast a quarter ahead
```

Oracle Related Cases                                    Page 139

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
00140:01 and that forecast was for negative growth?
   02   A.  Now --
   03   Q.  You said it wouldn't be unusual.  And I'm
   04 just wondering whether you --
   05   A.  It wouldn't be surprising to me.  I -- I
   06 don't have any specific -- to answer your question,
   07 do I have a specific example in mind, no.
   08   Q.  Okay.
   09   A.  I'm just -- we didn't put -- the field is
   10 all about the current quarter.  They -- they only
   11 make money when they sell a product.  And -- and
   12 that was talking about their current quarter.  I
   13 mean -- I'm talking about the current quarter.
   14     There was not a lot of focus on a future
   15 quarter, and, again, explaining why there's -- it's
   16 under "Management Judgment" there.
   17     MR. DE GHETALDI: Okay.  Let's mark this
   18 one next in order, please.
   19     (Deposition Exhibit 154 was marked for
   20 identification.)
   21 BY MR. DE GHETALDI:
   22   Q.  For the record, Exhibit 154 is a --
   23 actually a repeat of Exhibit 73.  And it looks like
   24 somebody had tried to bring out the contrast, in
   25 order to make the handwritten notes more easy to
```

Oracle Related Cases                                    Page 140

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

1   00141:01  read. And they were illegible in Exhibit 73, so --

02  have -- have you ever seen a report in the form of

03  Exhibit 154 before today?

04      A.  I don't recall it specifically. I may have

05  seen it, but I don't recall specifically.

06      Q.  Okay. There are -- there are hand -- do

07  you recognize the handwriting on the bottom of the

08  first page of Exhibit 154?

09      A.  No, I don't.

10      Q.  There's a -- one of the -- you see over on

11  the left-hand side, where it says "Sandy said"?

12      A.  Yes, I do.

13      Q.  Two lines below that, it looks like it says

14  "Concern in East"?

15      A.  Uh-huh.

16      Q.  Do you recall any particular concern in the

17  East in OPI in mid-January 2001?

18      A.  I recall three concerns. One is where it

19  refers to -- you see it a little bit lower. It says

20  "Ingersoll-Rand is unraveling"?

21      Q.  Right.

22      A.  I found that -- as I recall, Steve

23  McLaughlin was driving that deal. Are you

24  comfortable with the word "driving"?

25      Q.  Yes.

Oracle Related Cases                                    Page 141

---

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

1   00142:01      A.  Driving that deal, and he -- I found out

02  that he -- his relationship with the client wasn't

03  as strong -- it wasn't strong, and in fact it was

04  somewhat contentious. And I believe it was around a

05  prior support bill, or something like that. It was

06  unrelated, as I recall, to that deal. So that

07  caused some concern.

08          Secondly, we had some deals in the pipe

09  from GE, and Steve had responsibility for GE. And

10  so I had some concerns around GE.

11          And my third concern was Steve as an AVP.

12  I felt like this was a challenging job for him.

13  And so I had some concerns in the East. And this is

14  probably a comment I made on a Thursday call, would

15  be my guess. And I probably chose there not to be

16  specific on a name.

17      Q.  Okay. It looks like there -- there's --

18  underneath "Ingersoll-Rand is unraveling," there's

19  three deals listed: Gap, U.S. Filter, and Motorola.

20  And it says "slipped from Q2."

21      A.  Uh-huh.

22      Q.  "Possible for this quarter."

23      A.  Yes.

24      Q.  Do you recall a discussion about those

25  particular deals in mid-January of 2001 at -- at one

Oracle Related Cases                                    Page 142

---

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

1   00143:01  of the either executive committee meetings or one of

02  the Thursday forecast calls?

03      A.  I -- I don't -- I know it was during the

04  quarter. I don't remember specifically it was

05  January. But Gap and Motorola were discussed

06  several times. Today I don't remember any

07  discussion about U.S. Filter. But I do remember

08  discussions during the quarter about Gap and

09  Motorola.

10      Q.  Okay. The phrase "slipped from Q2" --

11      A.  Right.

12      Q.  -- do you recall there being an unusual

13  number of deals that slipped from Q2 into Q3?

14      A.  No. But I would also tell you it's a

15  definition of "slipped." It could be that, for

16  example, it was on our upside list in Q2 and moved

17  over to our upside -- either forecasted or upside

18  list in Q3, and somebody within finance could,

19  quote -- you know, decide that that was, quote,

20  "slipped," it had slipped. It was not a branded,

21  you know, business term in Oracle, what "slipped"

22  means. So we could -- you know, it's all the

23  definition of "slipped." It is not unusual that

24  deals move from one quarter to the next.

25      Q.  Okay. I'm handing you a document that was

Oracle Related Cases                                    Page 143

---

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

1   00144:01  previously marked as Exhibit 108.

02      A.  Okay.

03      Q.  Have you seen Exhibit 108 before?

04      A.  I saw it yesterday.

05      Q.  Okay. Was that for the first time?

06      A.  I don't remember specifically seeing it 38

07  months ago. But I remember a -- one aspect of it.

08      Q.  Okay. And what was that?

09      A.  That's where the -- the growth for OPI --

10  I'm sorry. This is -- I have not seen this report.

11  I apologize. I've not seen this.

12      Q.  All right. I -- and I don't want this to

13  come as a surprise to you, but I do want to point

14  out that you are listed as one of the recipients of

15  the email. So it may -- may be something that you

16  don't remember, or something like that, but --

17      A.  Yeah, I -- I'm sorry. I don't remember it.

18  I would get, on average, 150 to 200 emails a day.

19      Q.  Okay. And you just don't remember seeing

20  this before?

21      A.  No, in fact, I don't -- I don't remember

22  this one specifically. I don't.

23      Q.  Okay.

24      A.  And I've not seen this one before.

25      Q.  All right. Do you remember seeing this

Oracle Related Cases                                    Page 144

**Page 145**

```
1   00145:01  type of document --
2   02    A. Yes.
3   03    Q. -- before?
4   04       All right. Was this type of document the
5   05    subject of discussions during the Monday executive
6   06    committee meetings?
7   07    A. I -- I don't remember, Dario, this -- this
8   08    document being discussed on Monday. I can't say
9   09    that it was, but I don't ever remember that it -- I
10  10    don't remember that it was.
11  11       MR. DE GHETALDI: Okay. Can you mark this
12  12    as next in order, please.
13  13       (Deposition Exhibit 155 was marked for
14  14    identification.)
15  15       THE WITNESS: Okay.
16  16    BY MR. DE GHETALDI:
17  17    Q. Do you recall seeing this particular email
18  18    before today?
19  19    A. I don't remember the email, but I remember
20  20    the topic.
21  21    Q. Okay. What do you recall about the topic?
22  22    A. That -- and as a reminder, I did not have
23  23    responsibility for OPI at this point.
24  24    Q. Right.
25  25    A. As Larry became more engaged in the
```

**Page 146**

```
1   00146:01  business, more engaged in a sense of playing a more
2   02    active role in contract approval, either through
3   03    himself or through Safra Catz -- are you familiar
4   04    with -- familiar with that name?
5   05    Q. Yes.
6   06    A. -- with Safra, there was a decision on the
7   07    part of -- Larry made a decision to -- to clear more
8   08    contract terms through Safra, and basically not
9   09    authorizing the -- taking some of the -- taking some
10  10    of the responsibility away from the field in -- on
11  11    some of the contracts. And I say "responsibility."
12  12    That's probably an unfair way to put it, or an
13  13    incorrect way to put it; that -- more drawing a
14  14    line, that no contract terms get introduced -- new
15  15    contract terms get introduced to the client before
16  16    they've been approved in the headquarters. Prior to
17  17    this, there was probably a little more flexibility
18  18    that the field might -- might introduce a term and
19  19    then go back to corporate and get approval.
20  20    Q. Okay.
21  21    A. And it was designed to -- to help minimize
22  22    the complexity of contracts, and in some cases, you
23  23    know, potentially more onerous conditions with
24  24    contracts.
25  25    Q. All right. And -- and did that new process
```

**Page 147**

```
1   00147:01  have an effect on the pipeline, as expressed in
2   02    this --
3   03    A. It would have no --
4   04    Q. -- Exhibit 155?
5   05    A. would have no effect on pipeline.
6   06    Q. Okay.
7   07    A. Well -- well, what do you mean by
8   08    "pipeline"?
9   09    Q. Well, in the second paragraph, or -- well,
10  10    it's not actually the second paragraph, but towards
11  11    the middle of this email, Mr. Lane says that the --
12  12    "they feel" -- I guess that's all four EVPs -- "feel
13  13    our new process is an improvement and they do not
14  14    want to go backwards, but our forecast and the
15  15    underlying volumes in the last month of Q4 are not
16  16    factored for the length and number of turnarounds
17  17    required in big deals, and the pipeline is starting
18  18    to back up."
19  19    A. I think the pipeline there is -- is a
20  20    different definition --
21  21    Q. Okay.
22  22    A. -- and the pipeline here means the deals
23  23    that are flowing into corporate for approval.
24  24    Q. All right. And so the -- the approval
25  25    process is lengthening. Was that a concern in Q4
```

**Page 148**

```
1   00148:01  '00?
2   02    A. It was a concern at this point.  But I
3   03    remember discussing it specifically after Q4, and I
4   04    don't recall a single deal that did not get through
5   05    the approval process.  And I don't know of any
6   06    deal -- and certainly in my business -- that was
7   07    held up because of the approval process.
8   08    Q. All right.
9   09    A. They added the additional horsepower to
10  10    make sure the deals got approved.
11  11       MR. DE GHETALDI: All right.  This will be
12  12    156.
13  13       MR. NADOLENCO: Is this previously marked,
14  14    Dario, as Exhibit 55?
15  15       MR. DE GHETALDI: Oh, I'm sorry. It was.
16  16    Thanks, John.  Good eye. Can we unmark it?
17  17       THE WITNESS: So this goes off?
18  18       (Discussion off the record.)
19  19       MR. DE GHETALDI: Thank you.  I'm sorry.
20  20    Thanks, John.
21  21       (Discussion off the record.)
22  22       MR. GOLDSTEIN: So what was this marked as?
23  23       MR. DE GHETALDI: 55.
24  24       MR. GOLDSTEIN: Thank you.  Oh, it's right
25  25    there on the page.
```

1  00149:01    MR. DE GHETALDI: Yeah. That's how he
2  02 knew.
3  03    MR. GOLDSTEIN: Oh.
4  04    MS. RIDDLE: He doesn't have all 153
5  05 exhibits memorized.
6  06    MS. LAVALLEE: He was getting a lot of good
7  07 credit for that.
8  08    MR. GOLDSTEIN: Right. Right. Okay.
9  09    THE WITNESS: Okay.
10  10 BY MR. DE GHETALDI:
11  11    Q. Unfortunately, we don't have the
12  12 corresponding forecast package that you were
13  13 apparently looking at here, so I can't decipher this
14  14 email by looking at that. And so I'm going to ask
15  15 you whether you recall the circumstances that are
16  16 described in this email.
17  17    A. I -- I don't recall this specifically.
18  18 This is clearly part of my effort to spread the
19  19 revenue over the quarter and try to introduce that
20  20 notion --
21  21    Q. All right.
22  22    A. -- and break this 20-year legacy at Oracle.
23  23    Q. Okay. And there -- is -- is the third
24  24 paragraph a partial reflection of -- of your
25  25 previous observation, that Mr. McLaughlin tended to

1  00150:01 be aggressive?
2  02    A. That was an indicator, yes. I mean,
3  03 this -- this is -- something like this. And I don't
4  04 remember it specifically. But this would be an
5  05 example of the kind of concern that I had.
6  06    MR. DE GHETALDI: Okay. Now, this is
7  07 Exhibit 156, I hope.
8  08    (Deposition Exhibit 156 was marked for
9  09 identification.)
10  10    THE WITNESS: Thank you.
11  11    Okay.
12  12 BY MR. DE GHETALDI:
13  13    Q. Do you recall receiving the email that is a
14  14 part of Exhibit 156?
15  15    A. Vaguely. Vaguely.
16  16    Q. Do you --
17  17    A. I -- I recall the subject.
18  18    Q. Okay. What do you recall of this subject?
19  19    A. There was a concern on Larry's part, as I
20  20 indicated here in this email, that we were being too
21  21 conservative in our forecast, and that -- and that's
22  22 what some of the historical data shows in the back.
23  23 If you notice, for example, the -- the -- page 25233
24  24 shows actual versus what the final forecast was.
25  25 And generally speaking, it was coming in, I

1  00151:01 believe -- it says down here somewhere -- around 84
2  02 to 89 percent accurate. So Larry was asking people
3  03 to try to be more accurate in their forecast, versus
4  04 the final number.
5  05    As I said here -- and I -- you know, I can
6  06 only imagine how I felt. Because I don't like
7  07 giving a direction and not giving some guidance on
8  08 how to achieve it. And if you notice here, I said
9  09 but I'm not -- I'm not sure -- "How, I am not sure."
10  10 Do you see that --
11  11    Q. Sure.
12  12    A. -- in that sentence? Or that sentence?
13  13    I mentioned at one point forecasting is an
14  14 art, number one. And as I indicated, you could go
15  15 at 11:59 on the last day of the quarter and book a
16  16 deal, a $50 million deal or a $1 million deal, or
17  17 whatever, and -- and you'd get -- a license -- if
18  18 it's a license deal, you'd get credit for it. So
19  19 it's a very hard thing to predict. And -- number
20  20 one.
21  21    Number two is, what you learned at Oracle,
22  22 as a practice, was to be accurate in your
23  23 forecasting, and if you miss, that you miss it in
24  24 the sense that you understated what your forecast
25  25 was. You did not want to be, quote, "guilty" of

1  00152:01 providing a forecast and then coming under,
2  02 ultimately delivering a number less than that.
3  03 So -- and that -- you know, you -- and I think that
4  04 started, frankly, with Larry. You know, Larry on
5  05 one hand is telling us to be more accurate in our
6  06 forecasting, but on the other hand kind of the
7  07 message was also "Don't give me a forecast that
8  08 you're not going to deliver."
9  09    Q. Right.
10  10    A. And I believe the first quarter that I took
11  11 over OPI, we missed our forecast. We came in under.
12  12 And it was not a very good feeling.
13  13    Q. Oh. Okay.
14  14    A. A great feeling was to deliver your number
15  15 or to exceed your number.
16  16    Q. Right. Okay. Was this subject a matter of
17  17 discussion at the executive committee meetings in Q2
18  18 and Q3 of fiscal year '01?
19  19    MR. GOLDSTEIN: Objection to form.
20  20    THE WITNESS: I don't ever remember it
21  21 being discussed. I -- I don't recall it being
22  22 discussed in Q2 or Q3. What I do recall, it was a
23  23 one-time statement from Larry.
24  24    MR. DE GHETALDI: All right. This will be
25  25 Exhibit 157, I believe.

**Page 153**

```
 1   00153:01     (Deposition Exhibit 157 was marked for
 2   02 identification.)
 3   03      THE WITNESS: Thank you.
 4   04      Okay.
 5   05 BY MR. DE GHETALDI:
 6   06     Q. Do you recall the email that is in Exhibit
 7   07 157?
 8   08     A. No, I do not.
 9   09     Q. Do you recall the subject matter of that
10   10 email?
11   11     A. I don't recall -- I -- I don't recall. I
12   12 don't recall the discussion around the analyst
13   13 conference. I attended a number of those. I don't
14   14 recall that. I don't recall apparently where an
15   15 analyst was talking about Ariba and i2 losing an
16   16 exchange and IBM --
17   17     (Discussion off the record.)
18   18      THE WITNESS: I don't recall -- I'm
19   19 quoting --
20   20     MR. GOLDSTEIN: He just --
21   21     THE WITNESS: I'm --
22   22     MR. GOLDSTEIN: -- needs you to repeat --
23   23     THE WITNESS: I --
24   24     MR. GOLDSTEIN: -- what you said.
25   25     THE WITNESS: I -- right. I know. I'm
```

**Page 154**

```
 1   00154:01 quoting from the email. And it's a sentence I wrote
 2   02 that's not particularly clear. But it said "that
 3   03 sed" -- "that," T-H -- T-H-A-T; "lied," T-I-E-D --
 4   04 "to Ariba/i2 losing" exchange -- "an exchange"; and
 5   05 the rest of that sentence. I don't recall that.
 6   06 And I don't recall having the discussion with Jeff.
 7   07 This was -- you know, this was 40 months ago.
 8   08     Q. Sure. Oh, yeah. That's -- the -- the
 9   09 subject is "Why would we warn the market about
10   10 technology revenue?" Does that help your memory at
11   11 all?
12   12     A. No. "Is there an overall weakness." No.
13   13     Q. All right.
14   14     A. I don't recall this at all.
15   15     MR. DE GHETALDI: Okay. 158.
16   16     (Deposition Exhibit 158 was marked for
17   17 identification.)
18   18      THE WITNESS: Okay.
19   19 BY MR. DE GHETALDI:
20   20     Q. Do you recall receiving the email in
21   21 Exhibit 158 from Mr. Blotner?
22   22     A. No. I don't recall it specifically.
23   23     Q. Okay. He talks about the Q3 pipe looking
24   24 great and -- and all three areas being over two
25   25 times. Do you have any idea what he's referring to
```

**Page 155**

```
 1   00155:01 when he says "all three areas are over two times,
 2   02 even without GM enterprise deal?
 3   03     A. Yeah, "enterprise deal." Yeah, it's a
 4   04 typo.
 5   05     Q. Yeah.
 6   06     A. Yes, he's talking about -- if you see the
 7   07 previous bullet, "pipe shows 2.75 times coverage of
 8   08 budget" and three point time -- or "3.8 times
 9   09 compared to last year" -- so keeping -- referring
10   10 first to the "2.75x coverage of budget," what he's
11   11 saying here is when you disaggregate that down into
12   12 the three areas, each of the three areas are at
13   13 least -- have at least two times coverage for their
14   14 projected revenue for the quarter.
15   15     Q. Okay. Was there a -- a coverage ratio
16   16 that -- that you liked to see --
17   17     MR. GOLDSTEIN: Objection to form.
18   18 BY MR. DE GHETALDI:
19   19     Q. -- at a particular point in the quarter,
20   20 recognizing that that might change as the quarter
21   21 went on?
22   22     A. Well, it -- it depends on the part of
23   23 the -- I mean, which part of the quarter that you're
24   24 in. For example, at the front end of the quarter I
25   25 would like to see good coverage, good coverage of
```

**Page 156**

```
 1   00156:01 1.5 revenue or greater. Two made me comfortable,
 2   02 very comfortable. Or I don't know if it made me
 3   03 comfortable. It made me feel better. And then as
 4   04 the quarter went on, and towards the end, I paid
 5   05 less attention to coverage, because no matter what
 6   06 your coverage is, revenue is only signed contracts.
 7   07 And so that's where my focus would move towards the
 8   08 end of the quarter, where I would not pay attention
 9   09 to coverage at all. I'm focused on deals and where
10   10 those contracts are and are we going to close them
11   11 or not.
12   12     Q. Okay. Okay. Mr. Blotner's last bullet point is
13   13 "Q4 will still be a big challenge to show growth."
14   14 Do you see that?
15   15     A. Yes, I do.
16   16     Q. Had that been a subject of -- of
17   17 discussion?
18   18     A. It's a subject of discussion every year,
19   19 because Oracle traditionally has a blowout fourth
20   20 quarter. And it was very typical that, going into
21   21 Q4, it was going to be a tough quarter to achieve.
22   22     Q. Okay.
23   23     A. The -- the compensation for the sales reps
24   24 would have -- I mean, their compensation was
25   25 dependent on deals sold. And we had the tradition
```

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

| | |
|---|---|
| 1 | 00157:01 of selling a lot of business in Q4, which was |
| 2 | 02 wonderful that Q4 and would have made it challenging |
| 3 | 03 the next Q4. |
| 4 | 04    Q.  Right. |
| 5 | 05    A.  Year after year. |
| 6 | 06    Q.  Right.  Okay.  Had you ever seen -- had you |
| 7 | 07 seen this Exhibit 158 recently, or -- |
| 8 | 08    A.  I believe I saw it yesterday.  But I'm not |
| 9 | 09 sure.  I may have.  I -- I saw a number of things |
| 10 | 10 yesterday.  But I'm fairly certain I did see this |
| 11 | 11 one. |
| 12 | 12       MR. DE GHETALDI:  All right.  If we take a |
| 13 | 13 ten-minute break, I think we'll still be able to |
| 14 | 14 finish by 5:00. |
| 15 | 15       THE WITNESS:  Great. |
| 16 | 16       THE VIDEOGRAPHER:  We're going off the |
| 17 | 17 record.  The time is 4:14. |
| 18 | 18       (Recess taken.) |
| 19 | 19       THE VIDEOGRAPHER:  We're going back on the |
| 20 | 20 record.  The time is 4:28. |
| 21 | 21       MR. DE GHETALDI:  All right.  Home stretch |
| 22 | 22 here. |
| 23 | 23       Let's start with Exhibit 159. |
| 24 | 24       (Deposition Exhibit 159 was marked for |
| 25 | 25 identification.) |

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

| | |
|---|---|
| 1 | 00158:01       THE WITNESS:  Thank you. |
| 2 | 02       Okay. |
| 3 | 03 BY MR. DE GHETALDI: |
| 4 | 04    Q.  This is actually a couple of emails -- |
| 5 | 05    A.  I see that. |
| 6 | 06    Q.  -- clipped together. |
| 7 | 07       Do you recall sending the email that's a |
| 8 | 08 part of the first page of Exhibit 159 to Safra Catz? |
| 9 | 09    A.  Vaguely. |
| 10 | 10    Q.  Okay. |
| 11 | 11    A.  Vaguely. |
| 12 | 12    Q.  Do you recall the subject of that email? |
| 13 | 13    A.  Jay Nussbaum had proposed a -- a special |
| 14 | 14 sales incentive for Q3.  And as I indicated here, he |
| 15 | 15 copied George Roberts and me on it.  And I responded |
| 16 | 16 that with the pipeline that we had in Q3, that I |
| 17 | 17 felt very good about where we were, and that I |
| 18 | 18 didn't feel that it was necessary. |
| 19 | 19    Q.  Do you recall why Mr. Nussbaum was |
| 20 | 20 proposing an incentive in Q3 2001? |
| 21 | 21    A.  No.  You should -- you should ask him.  I |
| 22 | 22 don't. |
| 23 | 23    Q.  Well, you say here, in your email, "a |
| 24 | 24 special...incentive to drive license business." |
| 25 | 25 What -- what does that mean? |

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

| | |
|---|---|
| 1 | 00159:01    A.  The term? |
| 2 | 02    Q.  Yeah.  What did you mean by that term? |
| 3 | 03    A.  What I meant by that was Jay was proposing |
| 4 | 04 a special Q3 incentive to drive the license |
| 5 | 05 business, which means that on top of the commission |
| 6 | 06 that a sales rep would be paid on a deal, he was |
| 7 | 07 proposing some form of additional money.  And I |
| 8 | 08 don't -- I don't recall what it was.  I mean, it |
| 9 | 09 could have been a percentage -- I mean, increasing |
| 10 | 10 the percentage slightly or some lump sum dollar |
| 11 | 11 amount, something like that per deal.  I don't know. |
| 12 | 12 But it's a -- it's a incremental dollar amount that |
| 13 | 13 would go to the sales rep. |
| 14 | 14    Q.  Okay.  Well, how -- how does that drive the |
| 15 | 15 license business? |
| 16 | 16    A.  A sales rep is very motivated by money they |
| 17 | 17 make.  And this would be more money in their pocket. |
| 18 | 18    Q.  Do you know if Mr. Nussbaum felt there was |
| 19 | 19 a special need to give extra incentives to -- to |
| 20 | 20 sales personnel in Q3 '01 in order to drive license |
| 21 | 21 business? |
| 22 | 22    A.  I don't recall what the specifics -- why |
| 23 | 23 Jay would suggest it.  And, again, you know, you |
| 24 | 24 should -- you should talk to Jay on it.  I don't. |
| 25 | 25 I -- I again, looking at my business, I didn't feel it |

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

| | |
|---|---|
| 1 | 00160:01 was something I needed to consider. |
| 2 | 02    Q.  Okay.  You say, "I may want to revisit this |
| 3 | 03 in Q4, but unlikely."  Why would that -- why would |
| 4 | 04 you -- why did you think, in January 2001, that you |
| 5 | 05 might want to revisit this idea in Q4? |
| 6 | 06    A.  Because I knew that we had had a -- a |
| 7 | 07 blowout Q4 the previous year and it was going to be |
| 8 | 08 a tough number to exceed this year -- |
| 9 | 09    Q.  All right. |
| 10 | 10    A.  -- for OPI. |
| 11 | 11    Q.  Okay.  This has already been marked as |
| 12 | 12 Exhibit 56. |
| 13 | 13       MR. GOLDSTEIN:  "How do you know?" |
| 14 | 14       MR. DE GHETALDI:  John taught me his trick. |
| 15 | 15       MS. RIDDLE:  We have so much to learn from |
| 16 | 16 John. |
| 17 | 17       THE WITNESS:  Okay. |
| 18 | 18 BY MR. DE GHETALDI: |
| 19 | 19    Q.  Have you seen Exhibit 56 before today? |
| 20 | 20    A.  I saw it yesterday.  And I -- I can't |
| 21 | 21 remember.  It may have been in my special litigation |
| 22 | 22 committee testimony package.  I can't recall at this |
| 23 | 23 point. |
| 24 | 24    Q.  I think it was -- |
| 25 | 25    A.  Okay. |

00161:01   Q. -- actually, yeah.

02   But you never saw this document, to the

03   best of your recollection, in January 2001?

04   A. The first time I put my eyes on it was

05   yesterday, on the airplane up here, since it was

06   included in that package. I saw it then. That was

07   the first time I saw it.

08   Q. Okay. Well, Mr. English says to Jennifer

09   Minton, in the second paragraph, that "We have a lot

10   of pipe at challenging clients." Would you agree

11   with that assessment, as of the time that it was

12   written?

13   A. Well, I think it's -- I -- I don't know

14   what Jim meant by this, because I -- I didn't write

15   it, and I -- nor was I a party to it. What I do

16   know is OPI had many challenging clients. I've

17   mentioned GE. Intel. HP. When you're dealing with

18   companies like that, they're all very challenging.

19   You may have done that, as well, in your legal work.

20   And they're -- they -- at OPI, when we -- and we

21   verticalized. We took a set of named accounts into

22   OPI. And they were the major accounts in the

23   different industries that we talked about at the --

24   towards the beginning of the deposition. And the

25   sheer fact that they're large alone makes them

---

00162:01   challenging.

02   Q. Okay. Mr. English also said that "One AVP"

03   started -- or "talked of starting to see indications

04   of client delays on decisions." Do you see? That's

05   right towards the middle.

06   A. Yes, I do; in the middle.

07   Q. Yeah. Do you recall being told that by any

08   of your AVPs in Q3 '01?

09   A. I don't recall that statement, or an AVP

10   saying that.

11   MR. DE GHETALDI: All right. Where are we,

12   160?

13   THE COURT REPORTER: Correct.

14   (Deposition Exhibit 160 was marked for

15   identification.)

16   THE WITNESS: Thank you.

17   Okay. I've glanced through it.

18 BY MR. DE GHETALDI:

19   Q. Do you recall receiving the email that's

20   contained in Exhibit 160?

21   A. I -- I remember getting a note from Tom.

22   It wasn't until I saw this yesterday that I saw the

23   specifics, since I received it back in February of

24   2001.

25   Q. Okay. This is dated February 3rd, 2001.

---

00163:01   When did Mr. Thimot actually resign; do you recall?

02   A. It was during the quarter. And I don't

03   recall specifically. It was obviously before the

04   3rd of February 2001.

05   Q. Do you recall approximately how long before

06   that?

07   A. No, I don't. My guess is that it wasn't

08   too much before this; within -- I would say it was

09   probably within a week before this.

10   Q. Okay.

11   A. I -- actually, I'm -- I -- I don't -- in

12   the end, I don't know.

13   Q. That's --

14   A. I'm speculating. And I probably shouldn't

15   speculate.

16   Q. That's fair. That's fair.

17   All right. 161.

18   (Deposition Exhibit 161 was marked for

19   identification.)

20   THE WITNESS: Thank you.

21   Okay. And I believe mine is missing a

22   page.

23 BY MR. DE GHETALDI:

24   Q. Oh.

25   MR. NADOLENCO: Mine, too.

---

00164:01   MS. LAVALLEE: Mine, too. Sorry.

02   THE WITNESS: I recall what it was. It was

03   a listing of programs and people assigned to them.

04 BY MR. DE GHETALDI:

05   Q. Okay. Well, we'll -- we'll just get

06   another --

07   A. Okay.

08   Q. -- another copy. And --

09   A. Okay.

10   Q. -- I'll ask you about some other things

11   here.

12   The man named Simler -- what was his first

13   name?

14   A. Gary Simler.

15   Q. Gary, Gary Simler. He -- was he head of

16   one of your consulting practice groups?

17   A. West consulting.

18   Q. West consulting. Do you recall any effect

19   of the dotcom bubble burst being felt in -- in the

20   West consulting group in the third quarter of 2001?

21   A. Not specifically. No.

22   Q. Okay. Do you recall any consulting

23   projects in -- in the Western region disappearing in

24   the third quarter of 2001?

25   A. Consulting projects disappearing?

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00165:01    Q. Right.
 2      02    A. What is -- what do you mean by
 3      03  "disappearing"?
 4      04    Q. Well, companies going out of business.
 5      05    A. Not specifically, no.
 6      06    Q. Do you recall the eToys project?
 7      07    A. Very vaguely. Very vaguely. And more
 8      08  because eToys was -- got such big press. It was
 9      09  going to be the New World.
10      10    Q. Right.
11      11    A. It died.
12      12    Q. It turned out -- it turned out it didn't.
13      13    A. Right.
14      14    Q. Okay. And did Mr. Gage run another of your
15      15  consulting practice groups?
16      16    A. I -- I recognize that name. He didn't
17      17  report to me. He -- it's -- he may well have been
18      18  in one of my organizations. I had responsibility
19      19  for about 7,000 people --
20      20    Q. Sure.
21      21    A. -- so I don't remember them all.
22      22    Q. Sure.
23      23       Okay. Hopefully we got all the pages to
24      24  this one.
25      25    A. Okay.
```

Oracle Related Cases                                     Page 165

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00166:01    Q. Didn't copy the exhibits. This is 162.
 2      02       (Deposition Exhibit 162 was marked for
 3      03  identification.)
 4      04    MR. DE GHETALDI: I finally figured out why
 5      05  Nicole is standing up all the time; because I'm not
 6      06  giving enough copies over there.
 7      07    MR. GOLDSTEIN: Oh, I've already --
 8      08    MR. NADOLENCO: That's the first you've
 9      09  actually --
10      10    MR. GOLDSTEIN: I've already got one,
11      11  actually.
12      12    MR. NADOLENCO: -- figured that out now.
13      13    MR. DE GHETALDI: It took me to the end of
14      14  the day.
15      15    MR. NADOLENCO: That's what I mean.
16      16    THE WITNESS: Okay. I've had a chance to
17      17  review this, yesterday.
18      18  BY MR. DE GHETALDI:
19      19    Q. All right. Was yesterday the first time
20      20  that you saw Exhibit 162?
21      21    A. Yes. To be completely accurate, it was
22      22  FedEx'd to me in the last three to five days, is
23      23  what I would guess. But I didn't do anything -- I
24      24  didn't read it until I was on the airplane
25      25  yesterday.
```

Oracle Related Cases                                     Page 166

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00167:01    Q. All right. But --
 2      02    A. So yesterday was the first time I saw it.
 3      03    Q. Okay. Does Exhibit 162 accurately
 4      04  summarize what you told the special litigation
 5      05  committee in October of 2002?
 6      06    MR. GOLDSTEIN: Objection to form.
 7      07    THE WITNESS: I saw two changes that needed
 8      08  to be made.
 9      09  BY MR. DE GHETALDI:
10      10    Q. Okay. Can you show me?
11      11    A. Yes. On page -- the first page, the last
12      12  paragraph, third line, where it mentions "SEIC,"
13      13  that's actually SAIC. It's about a $6 billion
14      14  company based in San Diego. I don't recall -- I
15      15  believe it was referred to one other time as well,
16      16  and it was also the same error.
17      17    Q. The last line on that first page, I think.
18      18    A. Yeah, I think that may be it.
19      19       And then on page 12, last line, where it
20      20  says "the CEO of Solectron," that should say "the
21      21  CIO of Solectron."
22      22    Q. Okay.
23      23    A. And to the best of my recollection, those
24      24  are the only two changes.
25      25    Q. All right. But otherwise you think that it
```

Oracle Related Cases                                     Page 167

Sanderson, Edward J. (Vol. 01) - 03/09/2004  3/9/2004  1:13:00 PM

```
 1   00168:01  accurately reflects what -- what you told the SLC?
 2      02    A. Yes.
 3      03    Q. All right. I just have a couple of
 4      04  questions about -- on page 15, at the bottom --
 5      05    A. Okay.
 6      06    Q. -- it says -- and it continues onto
 7      07  page 16. It says, "During the Committee's interview
 8      08  of Jennifer Minton, Minton mentioned that she was
 9      09  contemplating a stock sale in January 2001 and
10      10  recalled discussing it with Sanderson, who,
11      11  according to Minton, was also contemplating such a
12      12  sale. Sanderson did not recall any such discussion
13      13  with Minton."
14      14       I guess what I didn't understand about --
15      15  from the summary, from reading it, was whether this
16      16  was a case where you didn't recall the conversation
17      17  that might have taken place or you didn't recall a
18      18  conversation because to the best of your knowledge
19      19  it never took place.
20      20    A. I don't recall having that discussion with
21      21  Jennifer. And I feel pretty confident of that,
22      22  because I had sold my vested options. When -- when
23      23  was this recorded?
24      24    Q. Well, the -- the interview --
25      25    A. It was October -- okay, so on October 2,
```

Oracle Related Cases                                     Page 168

00169:01  2002.  But in July -- I -- I don't recall correct --
02  I mean specifically, but I think I sold my options
03  in the summer of 2000.
04   Q.  Okay.
05   A.  So I had no vested options, or very few
06  vested options, at that point to sell, to even
07  consider selling.  So I don't know where this would
08  come out; I mean, Jennifer would conclude that I was
09  considering selling options as well.  I didn't -- I
10  may be wrong, but I don't believe I had any options,
11  or a very modest amount, that I could sell.
12   Q.  All right.  Do you -- do you recall a
13  conversation with Jennifer Minton in which you
14  expressed concern over the effect of the economy on
15  either Oracle's or OPI's business prospects?
16   A.  I don't -- I don't recall a discussion like
17  that.
18   Q.  Okay.  And, again, just so that I
19  understand, is that a -- you don't recall because --
20  but it might have happened or you don't recall and
21  you don't think that such a conversation occurred?
22   A.  I -- I -- that's probably a -- a -- more
23  specificity than I could provide.  I -- I don't -- I
24  don't remember ever having that discussion with
25  Jennifer.  So I'm not sure that it -- it could have

---

00170:01  happened.  I mean, I don't recall even well enough
02  to speculate whether I may have or not.
03   Q.  Okay.  That's fair.  Now, if you could turn
04  to page 6, please.
05   A.  Okay.
06   Q.  And towards the bottom of the page, the
07  last sentence, just above the -- the heading "Monday
08  Executive Management Committee Calls," says, "For
09  example, he stated that George Roberts, head of NAS,
10  had a reputation for sandbagging his numbers in
11  order to exceed his forecasts every quarter."
12   A.  Okay.
13   Q.  Is -- was that your understanding of
14  Mr. Roberts' reputation?
15   A.  As I indicated, that with my managers that
16  reported to me in OPI, some were more aggressive in
17  their forecasts and others were more conservative.
18  George, I would describe, was a more conservative
19  forecaster.  And I used the term "sandbagging" here,
20  in -- and I said, as a quote, as it says here:
21  quote, "had a reputation for sandbagging."  I never
22  had gone back and looked at the numbers to see what
23  George's forecast was versus what it actually was.
24  But he had that reputation of being conservative.
25   Q.  Okay.  Did Mr. Nussbaum have a reputation

---

00171:01  in fiscal year 2001 for being conservative or
02  aggressive in his forecasting?
03   A.  You know, having a reputation, to answer
04  that is speculating.  I mean, it's --
05   Q.  Okay.
06   A.  To me it's not -- I mean, the answer is --
07  is it can be very factually answered by looking at
08  the -- the numbers.  In fact, one of the exhibits we
09  have here we could go to and look at that.
10   Q.  Right.
11   A.  I would say that, that said -- and I am
12  speculating -- that he probably had a reputation of
13  being slightly aggressive.
14   Q.  Okay.  Did -- did Jennifer Minton have a
15  reputation for being either conservative or
16  aggressive in her forecasting?
17   A.  I never looked at Jennifer as being a
18  forecaster.  I looked at George, Jay, and me in the
19  U.S. as the forecasters.  So I didn't have an
20  opinion about Jennifer in that regard.  I never -- I
21  never considered her a forecaster.  I viewed her as
22  a -- the controller of the company and producing
23  financial reports.
24   Q.  All right.  If you could turn to page 7.
25   A.  Okay.

---

00172:01   Q.  The section with -- under the heading "Q3
02  of FY 2001 Forecasting" says, "Sanderson stated that
03  forecasting license sales in an uncertain economy is
04  nearly impossible and he equated Oracle's
05  forecasting visibility during Q3 of FY 2001 to a
06  plane flying in cloud cover.  The pilots must rely
07  on their instrument panel to navigate through the
08  clouds just like Oracle must rely on:  number one,
09  its pipeline reports; number two, historical
10  conversion rates; number three, knowledge of the
11  customer; and, four, knowledge of the deal to guide
12  it through the quarter."
13   Was -- was Q3 of 2001 actually more cloudy
14  than -- than quarters you had experienced in the
15  past, in terms of visibility?
16   MR. NADOLENCO:  Objection; form.
17   THE WITNESS:  There was an argument that
18  because the economy was growing uncertain, that -- I
19  mean -- that it was difficult -- in a good economy
20  it's -- it's difficult to forecast.  In a -- in a,
21  quote, "uncertain economy," that was emerging, it's
22  difficult.  And that's why I commented here that
23  you -- you can't -- you can't, in the end, get
24  caught up about the, quote, "uncertain economy."
25  You have to rely on the facts that you have, which

**Page 173**

```
1   00173:01 are the facts that I mention here, to be able to
2   02  forecast.
3   03  BY MR. DE GHETALDI:
4   04     Q.  Well -- well, did you tell the SLC that --
5   05  that forecasting license sales in Q3 '01 was nearly
6   06  impossible?
7   07        MR. GOLDSTEIN:  Objection to the form.
8   08        THE WITNESS:  I don't recall that statement
9   09  specifically.  It's contained in the document.
10  10  And -- so I assume that it was translated correctly.
11  11  I -- I -- as I read it, I -- "forecasting license
12  12  sales," there's not a reference to OPI.  It is a
13  13  general statement that it is -- "forecasting license
14  14  sales in" -- "in an uncertain economy
15  15  is...impossible."  So, just as -- it's saying so
16  16  what you have to do is rely on your instruments if
17  17  you're flying.  And those instruments are the things
18  18  that I outlined in the next sentence.
19  19  BY MR. DE GHETALDI:
20  20     Q.  Right.  Okay.
21  21     A.  And I believe, if you look, I came within
22  22  one percent of my forecasts for the quarter.
23  23     Q.  You were the best.
24  24     A.  On forecasting.
25  25     Q.  On forecasting.
```

**Page 174**

```
1   00174:01     Now we're going to -- now we're going to
2   02  try 161 again.
3   03     A.  Okay.
4   04     Q.  Hopefully this is --
5   05     A.  So we can -- we can -- I'm just going to
6   06  throw that one -- that's the one that was missing a
7   07  page.
8   08     Q.  That's the used pile.  And here's the --
9   09  the replacement for 161.
10  10     A.  Thank you.
11  11        Okay.
12  12     Q.  Do you -- do you recall sending this email
13  13  that's contained in Exhibit 161 out in early
14  14  February 2001?
15  15     A.  I recall the subject matter that this is
16  16  about.  I don't recall that it was specifically in
17  17  February 2001.
18  18     Q.  Okay.  And what do you recall of the -- the
19  19  subject matter?
20  20     A.  We had -- in consulting, we had been very
21  21  successful in -- I used the term "service lines"
22  22  earlier, if you recall.  That was like applications
23  23  or system performance, things of that nature.  And
24  24  we focused intellectual capital around those -- some
25  25  specific service lines and consulting, to help drive
```

**Page 175**

```
1   00175:01 the business.  And it had been very successful for
2   02  us.
3   03        And when I took over OPI, there had been
4   04  some effort around some programs, service line -- I
5   05  mean, same notion as service line: specific
6   06  program -- solutions to sell to a customer.  But as
7   07  I looked at what was being done before I -- when I
8   08  took over OPI, I felt they were too complex, and I
9   09  didn't feel that sales could relate to them.
10  10        So I launched a joint effort between sales
11  11  and some specific people in sales, our sales
12  12  consulting organization, that support salespeople on
13  13  deals, and folks out of consulting, to come up with
14  14  a set of programs that were very simple and that
15  15  drove product revenue.  And I created virtual teams
16  16  from sales and consulting, from telesales, to
17  17  jointly define what these major programs were, so
18  18  that we could be -- we could have programs that were
19  19  more programmatic, so that we could leverage reuse
20  20  and -- and use sales tools again and again to drive
21  21  business.  And I launched that in OPI, to -- to
22  22  drive more business for the company -- I mean to --
23  23  for OPI.
24  24        MR. DE GHETALDI:  Okay.  Okay, good.  Well,
25  25  it's 4:58.
```

**Page 176**

```
1   00176:01     MR. GOLDSTEIN:  Yeah.
2   02        MR. DE GHETALDI:  And that's -- that's all
3   03  the questions I have.  But like with all the other
4   04  depositions, we -- we have a continuing issue about
5   05  the -- the production of documents.  And the -- the
6   06  plaintiffs and the defendants have differing views
7   07  on that.  And so with -- with that qualification,
8   08  that's all the questions that I have.
9   09        MR. GOLDSTEIN:  We have no questions today.
10  10  Thank you.  Thank you very much.
11  11        MR. NADOLENCO:  Thank you.
12  12        THE VIDEOGRAPHER:  This marks the end of
13  13  Videotape Number 3 and Volume I in the deposition of
14  14  Edward J. Sanderson.  The original videotapes will
15  15  be retained by Dan Mottaz Video Productions LLC, 182
16  16  Second Street, Suite 202, San Francisco, California
17  17  94105, (415) 624-1300.  The time is 5:02.  We're off
18  18  the record.
19  19        (Deposition concluded at 5:02 p.m.)
20  20            ---o0o---
```

00177:01     CERTIFICATE OF WITNESS
02
03
04
05      I, the undersigned, declare under penalty
06  of perjury that I have read the foregoing transcript
07  and I have made any corrections, additions, or
08  deletions that I was desirous of making; that the
09  foregoing is a true and correct transcript of my
10  testimony contained therein.
11      EXECUTED at _____, California,
12  this _____ day of _____, 2004.
13
14      _____
15      Signature of the witness
16
17
18
19
20
21
22
23
24
25

00178:01     CERTIFICATE OF REPORTER
02
03      I, JOHN WISSENBACH, hereby certify that the
04  witness in the foregoing deposition was by me duly
05  sworn to testify the truth, the whole truth, and
06  nothing but the truth in the within-entitled cause;
07  that said deposition was taken at the time and place
08  therein stated; that the testimony of said witness
09  was reported by me, a Certified Shorthand Reporter
10  and disinterested person, and was thereafter
11  transcribed into typewriting, and that the pertinent
12  provisions of the applicable code or rules of civil
13  procedure relating to the notification of the
14  witness and counsel for the parties hereto of the
15  availability of the original transcript of the
16  deposition for reading, correcting, and signing have
17  been met.
18      And I further certify that I am not of
19  counsel or attorney for either or any of the parties
20  to said deposition, nor in any way interested in the
21  outcome of the cause named in said caption.
22      DATED:
23
24      JOHN WISSENBACH, CSR No. 6862
25

00179:01     ROBERT BARNES ASSOCIATES
02      San Francisco, California  94102
03
04  TO:  MR. EDWARD J. SANDERSON, JR.
05      Morrison & Foerster LLP
06      Palo Alto, California  94304-1018
07  RE:  ORACLE COORDINATION PROCEEDING JUDICIAL COUNCIL
08      ACTION NO. 18751
09      Deposition taken March 9, 2004
10
11
12  taken in the above-entitled action has been prepared
13  correcting, and signing.  In the alternative, you
14  this office and all counsel in writing of any
15  transcript.
16      Your rights regarding signature of this
17  otherwise directed, your original deposition
18  code.
19      If you wish to make arrangements to review
20  contact this office during office hours, 9 to 5,
21
22
23
24          CSR No. 6862
25  cc:  All counsel

# EXHIBIT LL

```
1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
2         IN AND FOR THE COUNTY OF SAN MATEO
3              —oOo—
4    COORDINATION PROCEEDING
5    SPECIAL TITLE (RULE 1550(b)),
6
7    ORACLE CASES
8
9         JUDICIAL COUNCIL COORDINATION
10            PROCEEDING NO. 4180
11   THIS DOCUMENT RELATES TO:
12   ALL ACTIONS
13   _____/
14
15
16        DEPOSITION OF PHILIP B. SIMON
17          Tuesday, March 16, 2004
18
19
20   CONFIDENTIAL: THIS TRANSCRIPT IS DESIGNATED AS
21   CONFIDENTIAL PURSUANT TO A PROTECTIVE ORDER APPROVED BY
22   THE COURT ON JUNE 21, 2002, CONTAINS DOCUMENTS MARKED
23   CONFIDENTIAL, AND THE CONTENTS ARE NOT TO BE REVEALED
24   EXCEPT PURSUANT TO THE TERMS OF THE PROTECTIVE ORDER, BY
25   ORDER OF THE COURT OR BY AGREEMENT OF THE PARTIES
26
27   REPORTED BY:
28   HOLLY MOOSE, RDR-CRR-CRP
29   CSR NO. 6438
30
31
32        ROBERT BARNES ASSOCIATES
33        Certified Shorthand Reporters
34        760 Market Street, Suite 844
35        San Francisco, California  94102
36        Phone: (415)788-7191      1
37             C O N F I D E N T I A L
```

```
1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
2         IN AND FOR NEW CASTLE COUNTY
3
4    IN RE ORACLE CORPORATION
5              Consolidated C.A. No. 18751
6    DERIVATIVE LITIGATION
7    _____/
8
9
10
11
12
13
14
15
16
17
18
19
20
21        •
22
23
24
25
26
```

```
1         A P P E A R A N C E S
2
3    FOR CALIFORNIA PLAINTIFFS:
4    BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO
5    BY: NICOLE LAVALLEE, ESQ.
6        JOSEPH TABACCO, ESQ.
7    425 California Street, Suite 2025
8    San Francisco, CA  94104
9    (415)433-3200
10
11   AND
12
13   McMANIS, FAULKNER & MORGAN
14   BY: MATTHEW SCHECHTER, ESQ.
15       PAUL YANG, ESQ.
16   50 West San Fernando Street
17   Suite 1000, Tenth Floor
18   San Jose, CA  95113
19   AND
20   COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI
21   BY: JERRY E. NASTARI, ESQ.
22   700 El Camino Real
23   Millbrae, CA  94030
24   (650)871-5666
25
26   FOR ORACLE CORPORATION:
27   MORRISON & FOERSTER
28   BY: KATHLEEN DUROUSSEAU, ESQ.
29   425 Market Street
30   San Francisco, CA  94105
31   (415)268-7126
32   AND
33   ORACLE CORPORATION
34   BY: LAUREN SEGAL, MANAGING COUNSEL
35   500 Oracle Parkway
36   Redwood Shores, CA  94065
37   (650)506-9221
38
```

```
1         A P P E A R A N C E S (continued)
2
3    FOR INDIVIDUAL DEFENDANTS ELLISON AND HENLEY:
4    MAYER, BROWN, ROWE & MAW
5    BY: JOHN NADOLENCO, ESQ.
6    350 South Grand Avenue, 25th Floor
7    Los Angeles, CA  90071
8    (213)229-9500
9
10   FOR THE WITNESS:
11   BARTKO, ZANKEL, TARRANT & MILLER
12   BY: GLENN P. ZWANG, ESQ.
13   900 Front Street, Suite 300
14   San Francisco, CA  94111
15   (415)956-1900
16
17   ALSO PRESENT:  Trudi Aemett, Videographer
18        (415)624-1300
19
20
21   TAKEN AT:
22   BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO
23   425 California Street, Suite 2025
24   San Francisco, CA  94104
25   (415)433-3200
26
27
28
29        —oOo—
30
31
32
```

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

```
1           I N D E X
2
3     DEPOSITION OF PHILIP B. SIMON
4
5     EXAMINATION BY:              PAGE
6       MS. LAVALLEE              10
7       AFTERNOON SESSION           133
8
9     DC EXHIBITS
10    186  Interview Of Philip Simon, 20 pages      68
11    187  E-mail to Ellison from Simon,
12         PS0001, 1 page          90
13
14    188  E-mails, PS0002-3, 2 pages      93
15
16    189  E-mails, PS0004-8, 5 pages      97
17
18    190  E-mails, PS0013-14, 2 pages      105
19
20    191  E-mail to Ellison from Simon,
21         PS0018, 1 page          108
22    192  Lawrence J. Ellison Libor Contracts,
23         PS0019, 1 page          115
24
25    193  E-mails, ORCL 0093843, 1 page      133
26
27    194  E-mails, SP0020, 1 page      145
28
29    195  E-mails, PS0021-22, 2 pages      146
30
31    196  E-mails, CD-I 03234, 1 page      148
32
33    197  Yahoo Finance, Stocks Of Interest,
34         PS0345-46, 2 page        154
35    198  E-mails, CD-I 03231, 1 page      162
36    199  E-mail to Balkenhol from Simon,
37         PS0033, 1 page          165
38
```

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

```
1     DC EXHIBITS (continued0)          PAGE
2
3     200  Handwritten notes titled "Larry
4          Ellison," 1/22/01, PS0517, 1 page      172
5     201  E-mails, CD-I 03235-36, 2 pages      173
6     202  E-mails, CD-I 03061-62, 2 pages      173
7     203  E-mails, CD-I 03241-42, 2 pages      174
8     204  E-mails, CD-I 03240, 1 page      175
9     205  E-mails, ORCLA 0023691-93, 3 pages      176
10    206  E-mails, CD-I 03250-51, 2 pages      189
11    207  Bloomberg headline, CD-I 03094-95,
12
13    208  Handwritten note titled "Ellison,"
14         PS0506, 1 page          191
15    209  E-mails, CA-ORCL 010493-94, 2 pages      192
16    210  E-mails, ORCLA 0023494, 1 page      194
17    211  E-mails, CA-ORCL 010496-97, 2 pages      195
18    212  E-mails, CA-ORCL 010499, 1 page      197
19    213  E-mails, CA-ORCL 010496, 1 page      200
20    214  E-mails, CD-I 03267, 1 page      205
21    215  E-mails, CD-I 03263, 2 pages      205
22    216  E-mails, CA-ORCL 010501-02      207
23    217  E-mails, CA-ORCL 010503, 1 page      208
24    218  E-mails, PS0063-64, 2 pages      214
25    219  E-mails, PS0060-62, 3 pages      215
26    220  E-mails, CD-I 03095-97, 3 pages      218
27    221  E-mails, PS0074-75, 2 pages      223
```

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

```
1     DC EXHIBITS (continued)          PAGE
2
3     222  E-mails, ORCLA 0023479-82, 4 pages      223
4
5     223  E-mails, ORCLA 0023515-16, 2 pages      236
6
7     224  Group of documents beginning with
8          "Lawrence J. Ellison - 2000 Stock
9          Option Exercise," PS0300, 40 pages      250
10
11
12
13
14          ---oOo---
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
```

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

```
1           BE IT REMEMBERED that, pursuant to Notice and
2     on Tuesday, March 16, 2004, commencing at the hour of
3     9:35 a.m., before me, HOLLY MOOSE, CSR No. 6438, a
4     Certified Shorthand Reporter in the State of California,
5     there personally appeared
6
7                PHILIP B. SIMON,
8
9     called as a witness by the Plaintiffs, who, having been
10    first duly sworn, was examined and testified as
11    hereinafter set forth:
12
13
14
15          ---oOo---
16
17
18
19
20
21
22
23
24
25
```

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

```
1    PROCEEDINGS              9:35 A.M.
2         THE VIDEOGRAPHER: Good morning. This marks
3    the beginning of videotape Volume I, tape 1 in the
4    deposition of Phillip B. Simon in the matter of the
5    Coordination Proceedings Special Title, Oracle Cases, in
6    the superior court of the state of California, for the
7    county of San Mateo, Judicial Council Coordination
8    Proceeding number 4180, In Re Oracle Corporation
9    Derivative Litigation, in the court of Chancery of the
10   state of Delaware, in and for New Castle County,
11   consolidated CA number 18751.
12        Today's date is March 16th, 2004, and the
13   time is 9:35 a.m. The location of this deposition is at
14   the Law Offices of Berman, DeValerio, et al., 425
15   California Street, San Francisco, California. The
16   deposition was noticed by attorneys for plaintiff, and
17   the videotape is being produced on behalf of the same.
18        The video operator is Trudy Asmelt, a
19   California notary public for the county of Alameda,
20   employed by Dan Mottaz Video Productions LLC, 162 Second
21   Street, Suite 202, San Francisco, California, 94105,
22   415-624-1300. The court reporter today is Holly Moose
23   of Robert Barnes Associates.
24        Would counsel present please identify
25   themselves and state whom they represent.
```

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

```
1         MS. LAVALLEE: Nicole Lavallee of Berman,
2    DeValerio on behalf of the California plaintiffs.
3         MR. SCHECHTER: Matthew Schechter with
4    McManis, Faulkner & Morgan on behalf of the California
5    plaintiffs.
6         MR. NADOLENCO: John Nadolenco of Mayer,
7    Brown, Rowe & Maw on behalf of individual defendants
8    Larry Ellison and Jeff Henley.
9         MS. SEGAL: Lauren Segal from Oracle
10   Corporation on behalf of Oracle Corporation.
11        MR. ZWANG: Glenn Zwang for Phillip Simon.
12        THE VIDEOGRAPHER: If there are no
13   stipulations, the reporter may administer the oath.
14        (Brief interruption.)
15        MS. LAVALLEE: Let's go off the record.
16        THE VIDEOGRAPHER: We are off the record. The
17   time is 9:37.
18        (Discussion off the record).
19        THE VIDEOGRAPHER: We are back on the record.
20   The time is 9:38.
21        (Witness sworn.)
22             PHILIP B. SIMON,
23   having been first duly sworn, testified as follows:
24             EXAMINATION BY
25   MS. LAVALLEE: Q. Good morning, Mr. Simon.
```

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

```
1    My name's Nicole Lavallee and I represent the California
2    plaintiffs. Can you state your full name and address
3    for the record. Your business address will be fine.
4         A. My full name is Philip Bernard Simon. My
5    business address is 101 Ygnacio Valley Road, Suite 310,
6    Walnut Creek, California.
7         Q. Okay. Mr. Simon, have you ever been deposed
8    before?
9         A. I don't believe so, but maybe once a long time
10   ago.
11        Q. Okay. And do you -- why do you think you may
12   have been deposed at one point in time?
13        A. I believe I was prepped once as an expert
14   witness, but I don't believe it happened. But my
15   recollection of what happened a long time ago is vague.
16        Q. Okay, great. Before we start, then, I'd just
17   like to make a couple preliminary statements about some
18   of the ground rules in terms of how we can proceed most
19   effectively.
20        First thing is, to the extent I ask a question
21   that you don't understand, please let me know 'cause I
22   don't want you to assume or misassume what I'm saying.
23   So I'm more than happy to rephrase my question if it's
24   not clear to you.
25        The other thing to remember is that it's
```

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

```
1    really important to let me finish my question before you
2    commence your answer, and I'll try to do the same and
3    let you finish your answer before I start my next
4    question. Does that make sense?
5         A. Yes.
6         Q. The other point to make is that to the extent
7    you want to take a break at any point in time, just let
8    me know. That's not a problem. I would simply ask that
9    if there's a question pending, that you answer the
10   question fully before we take a break.
11        Does that make sense?
12        A. Mm-hm.
13        Q. Okay.
14        A. I have my cell phone on for urgent calls, so I
15   may need to take a break, but I don't think so. I've
16   asked people not to call me, but there's a possibility.
17   So I might not be able to let you complete questions if
18   that happens.
19        Q. Okay. We'll play it by ear and see what
20   happens. Thank you for letting me know that ahead of
21   time.
22        Mr. Simon, can you tell me what your
23   educational background is in terms of college education?
24        A. Undergraduate degree from Yale University in
25   Russian studies, 1975; JD from Stanford Law School,
```

1 1978; almost completed my master's in taxation at Golden

2 Gate.

3 Q. Okay. And when was that that you did your

4 portion of your master's for taxation at Golden Gate?

5 A. '78 to '81, let's say.

6 Q. Okay. Now, when you went to Stanford, was Dan

7 Cooperman in your class?

8 A. I don't -- I don't know.

9 Q. Do you know who Dan Cooperman is?

10 A. Yes.

11 Q. Do you know if he went to Stanford around the

12 same time as you?

13 A. I didn't know he went to Stanford. I

14 assume -- there's an assumption in your question that he

15 did go to Stanford. I didn't know he went to Stanford.

16 Q. Okay. Have you ever heard of a man named

17 Joseph Grundfest?

18 A. Yes.

19 Q. Did you go to school with Mr. Grundfest?

20 A. Yes, he was in my class.

21 Q. Do you know where Mr. Grundfest's currently

22 employed?

23 A. I believe he's a professor at Stanford.

24 Q. Okay. Were you friendly with Mr. Grundfest in

25 law school?

1 A. No.

2 Q. Have you kept in touch with Mr. Grundfest at

3 all since law school?

4 A. Could you explain what you mean by keeping in

5 touch.

6 Q. Have you ever communicated with him since law

7 school?

8 A. I believe when I was interviewed as part of

9 the Special Litigation Committee investigation, I think

10 Joe was there.

11 Q. Okay.

12 A. I bumped into him at a reunion for the law

13 school, a reunion dinner, six months ago. And I may

14 have seen him at a tenth reunion or twentieth reunion.

15 Joe became an SEC commissioner, so everybody in the

16 class, even if you didn't know him, remembered him.

17 Q. During those prior reunions that you just

18 referenced, did you speak to him at all at those

19 reunions?

20 A. Probably.

21 Q. Okay. And other than the context -- or the

22 situations that you've just discussed, have you

23 communicated with Mr. Grundfest since graduating from

24 law school?

25 A. It's possible. I have no recollection, but I

1 don't know who I met, I mean. It's possible.

2 Q. Okay. Is it fair to say that you don't

3 socialize with him?

4 A. Correct.

5 Q. You mentioned the Special Litigation

6 Committee. And you mentioned that you were interviewed

7 by them, correct?

8 A. Correct.

9 Q. Okay. Do you recall when your interview took

10 place?

11 A. No.

12 Q. Did you ever review a copy of the summary of

13 the interview that was done?

14 A. No.

15 Q. Okay. Prior to this deposition -- actually,

16 let me step back a moment.

17 You're represented by counsel here today,

18 correct?

19 A. Correct.

20 Q. Okay. And who is your counsel?

21 A. Glenn Zwang.

22 Q. Okay. Did you have an opportunity to meet

23 with anybody in preparation of this deposition prior to

24 today?

25 A. Yes.

1 Q. And who did you meet with?

2 A. I met with Glenn Zwang.

3 Q. And did you meet with anybody else?

4 A. I met with people in my office who went

5 through the files to pull documents pursuant to the

6 subpoena.

7 Q. Okay. Going back to -- anybody else?

8 A. No.

9 Q. Okay. And going back to your meeting with

10 Mr. Zwang, was that in person or by some other means?

11 A. We met in person.

12 Q. Okay. And did you meet on more than one

13 occasion?

14 A. For that purpose or for other purposes?

15 Q. For the purpose of this deposition.

16 A. That was the only meeting.

17 Q. Okay. Have you met with Mr. Zwang in

18 connection with any other matter related to this action

19 or the Delaware action or any litigation involving the

20 trades by Mr. Ellison or Mr. Henley during --

21 A. Do you define "meeting" in person, or is

22 meeting a communication?

23 Q. I mean any communication.

24 MR. NADOLENCO: Object to form.

25 MS. LAVALLEE: Q. You can answer the

1  question.
2      A.  Yes, we sent e-mails back and forth trying to
3  schedule the deposition and schedule a time to meet to
4  prepare for the -- this deposition.
5      Q.  Okay.  And when did you meet with Mr. Zwang in
6  connection with this deposition?
7      A.  A few days ago.
8      Q.  And how long did that meeting last?
9      A.  Two to three hours.
10     Q.  And was anybody else present?
11     A.  Part of the time, yes.
12     Q.  And who was present?
13     A.  Catherine Ong, who's a CPA in my office, who
14  works with me, who did a lot of the legwork in pulling
15  together the subpoenaed documents.  O-N-G is how you
16  spell her last name.
17     Q.  Thank you.  Anybody else?
18     A.  I don't believe so.
19     Q.  Okay.  And you mentioned in connection with
20  this deposition you searched your files to produce
21  certain documents; is that correct?
22     A.  Yes.
23     Q.  Okay.  Prior to the time of this deposition --
24  or prior to the time you received the subpoena in
25  connection with this deposition, had you ever been asked

1  to search your files to produce documents in connection
2  with this litigation or related litigation?
3      A.  I don't think so, but I don't recall.
4      Q.  Okay.  And when you searched your files, did
5  you search your personal files for responsive documents?
6      A.  When you refer to "you," do you mean me
7  personally or do you mean the people who I had doing
8  this for me?
9      Q.  Okay, that's a good point.  The -- either you
10  or anybody who was searching the files on your behalf to
11  respond to this subpoena or in connection with this
12  deposition, did you search your personal files in your
13  office, or did you search another location?  Can you
14  explain that to me.
15     MR. NADOLENCO:  I apologize.  Object to the
16  form.  Nicole, you keep referring to it as subpoena.
17     MS. LAVALLEE:  Okay, that's a fair point.
18     MR. NADOLENCO:  Yeah, I mean, I don't know if
19  you issued a subpoena, but I thought it was a notice.
20     MS. LAVALLEE:  Okay, that's fine.
21     MR. ZWANG:  I'm going to object to the
22  question as vague.  Are you asking him whether he
23  searched his office or outside of the office?  Is that
24  the point of --
25     MS. LAVALLEE:  Okay.  And let me clarify and

1  ask a better question.
2      Q.  In connection with producing documents for
3  today's deposition or in anticipation of today's
4  deposition, did you or anybody acting on your behalf
5  search -- let me ask a different question.
6      Where did the people search to search for
7  documents that are responsive to the documents we asked
8  for in connection with this deposition?
9      A.  They searched the files in my office that we
10  thought were pertinent to the document request.  We also
11  searched my current computer files.  And I had an old
12  laptop, and we searched the old laptop.
13     Q.  Okay.  And were those the two computers that
14  were -- you were using in the period of time from
15  December 2000 to January 31st, 2001?
16     A.  Yes and no.
17     Q.  Okay.  And can you explain your answer?
18     A.  The laptop was being used at that point in
19  time.  My current desktop was not.
20     Q.  Okay.  And were you using any other period --
21  any other computer during that period other than the
22  laptop?
23     A.  I'll take your question to mean was I using
24  any other computer at work while engaged in matters
25  relevant to the question -- this litigation.  The answer

1  is no.  But I do have a computer at home that I use for
2  personal purposes, as do my wife and children.
3      Q.  And I assume none of those computers are used
4  for any matters related to this litigation?
5      A.  That is correct.
6      Q.  And in searching for documents, was a search
7  made for documents that may have been communications
8  between members of your office, but not you personally,
9  and Mr. Ellison or any other third party related to Mr.
10  Ellison's trades?
11     A.  I believe so, but I don't know for certain.
12     Q.  Okay.  In connection -- or -- connection of
13  preparing for this deposition, did you review any
14  documents prior to today?
15     A.  Yes.
16     Q.  Can you tell me what documents you reviewed.
17     A.  I reviewed the -- a file that we call -- that
18  dealt with -- that we just kept a separate file for the
19  stock trades during that period.  And then I reviewed a
20  bunch of e-mails that had been pulled off my computer
21  that the people that pulled it went through my computer
22  and said were relevant to the document request.
23     Q.  Okay.  Anything else?
24     A.  No.
25     Q.  You didn't read any deposition transcripts

1   prior to today?

2       A.  No.

3       Q.  Okay.  And I assume you didn't read anything

4   today --

5       A.  No.

6       Q.  -- for -- okay.  Who was it at your office who

7   pulled the documents that you produced to respond to

8   the -- our request?

9       A.  There were two people, Catherine Ong, who I

10  referred to before, and who was a CPA who has worked

11  with me handling Larry's tax records for the last

12  decade, and my administrative assistant did the copying.

13      Q.  And what is his or her name?

14      A.  Gina Alvarado.

15      Q.  Thank you.

16      A.  A-L-V-A-R-A-D-O.

17      Q.  And you've never done this before.

18  Can you tell me where you're employed

19  currently.

20      A.  I'm employed in the accounting firm Howson &

21  Simon CPAs, LP.

22      Q.  Okay.

23      A.  As -- I really have two jobs.  That's one job.

24  I'm a partner there.  And I'm also a member of a

25  partnership called Lawrence Investments.  I'm president

1   of Lawrence Investments.

2       Q.  Okay.  And is Lawrence Investments a

3   partnership?

4       A.  It's a limited -- it's a California limited

5   liability company.

6       Q.  Okay.

7       A.  So technically I'm a member.  I shouldn't have

8   said a partnership.

9       Q.  And what is your role in connection with that

10  limited liability company?

11      A.  On behalf of Lawrence Investments, it's how I

12  receive compensation for providing financial services to

13  Larry Ellison.

14      Q.  And what is the purpose of Lawrence

15  Investments?

16      A.  The purpose of Lawrence Investments is -- it's

17  a separate entity that compensates me separate from the

18  firm and also handles -- it also is a conduit through

19  which many of Larry's private equity investments and

20  other investments are made.

21      Q.  Are any of his equity investments included in

22  that?

23      MS. SEGAL:  Object to the form.

24      MR. NADOLENCO:  Object to the form.

25      MS. LAVALLEE:  You can answer the question,

1   unless you don't understand it.

2       THE WITNESS:  The answer's yes.  I said yes,

3   his private equity investments.

4       MS. LAVALLEE:  Oh, I'm sorry, thank you.

5       THE WITNESS:  And there's -- there are some

6   publicly-traded securities held indirectly by Lawrence

7   Investments.

8       MS. LAVALLEE:  Okay.

9       Q.  And does Mr. Ellison hold any Oracle

10  securities through the -- or strike that.  Let me ask

11  another question.

12  Lawrence Investments, does it hold any Oracle

13  securities?

14      A.  Directly, indirectly, the answer's no.

15      Q.  Okay.

16      (Brief interruption).

17      MS. LAVALLEE:  Q.  And who are the other

18  members of Lawrence Investments?

19      A.  The other members of Lawrence Investments are

20  Steven P. Fink, F-I-N-K, and the Lawrence J. Ellison

21  Revocable Trust.

22      Q.  Any others?

23      A.  No.

24      Q.  And who is Mr. Fink?

25      A.  He is a financial advisor.

1       Q.  Okay.  And is he a member of your -- Howson &

2   Simon?

3       A.  No, he's not.  He's based in Los Angeles.

4       Q.  You indicated that you have two positions or

5   two employments, one was the -- as a member of Lawrence

6   Investments and one was as a member of Howson & Simon,

7   correct?

8       A.  As a partner.

9       Q.  As a partner?

10      A.  Howson & Simon's a partnership.

11      Q.  All right.  In connection with your Lawrence

12  Investments membership role, what portion of your work

13  time is devoted to that aspect of your work?

14      A.  Ninety-plus percent.

15      Q.  All right.  And as a partner in Howson &

16  Simon, what is -- what is your role there?  What is your

17  day-to-day business like?

18      A.  My day-to-day role is -- are you asking about

19  the current time, or at the time in question when the

20  trades were taking place?

21      Q.  Okay, well, that's a good point.  Let's go

22  back to the period of 2000 and 2001.

23      A.  My responsibility then was I was responsible

24  for Larry's tax return in related entities and a few

25  other clients' tax returns, as well as rendering

1  financial advice to one other individual, unrelated to

2  Oracle and this litigation.

3  Q.  Okay.  And are any of your other clients,

4  people for whom you prepare tax returns, employed by

5  Oracle Corporation?

6  A.  I believe the answer is no, none that I work

7  on directly.  And I do not believe there are any in the

8  office.

9  Q.  Okay.  When did you first come to work for Mr.

10  Ellison?

11  A.  Approximately 1983.  Actually, '93, excuse me.

12  Q.  Okay.  And what were you initially retained to

13  do?

14  A.  To prepare his tax return.

15  Q.  And was that under the -- the -- guise of

16  Howson & Simon, through Howson & Simon?

17  A.  Correct.

18  Q.  Okay.  And did your role -- since that time,

19  have you worked consistently for Mr. Ellison?

20  A.  In addition to working for other clients?

21  Q.  Yes.

22  A.  By "consistently," I mean there's --

23  Q.  What I mean is consistently in terms of time

24  frame, since '93 to the present.

25  A.  Correct.

1  Q.  Have you been working for Mr. Ellison?

2  A.  Yes, but not exclusively.

3  Q.  Okay.  Was there ever a period of time that

4  you worked exclusively for Mr. Ellison?

5  A.  No.

6  Q.  And has your role in your work for Mr. Ellison

7  changed since 1993?

8  A.  Yes.

9  Q.  Can you tell me how it has developed over the

10  time.

11  A.  I was initially hired just to prepare his tax

12  return.  And over time, my role as an advisor has

13  increased.  My responsibilities have increased, and I've

14  taken on increased responsibility and involvement in his

15  personal financial matters.

16  Q.  Okay.  And when did that -- has it been a

17  consistent increase of your role -- in your role, or was

18  there a period of time at which it changed?

19  A.  It increased consistently, but there was a

20  dramatic change probably around seven years ago when

21  Lawrence Investments was formed, maybe eight years ago.

22  Q.  Okay.  And at that time, Lawrence Investments

23  was actually formed?

24  A.  Correct.

25  Q.  Okay.

1  A.  And at that point in time, I agreed to commit

2  a fixed minimum amount of time to work on Larry's

3  affairs.  And I resigned from working on all my other

4  clients but for one or two other clients.

5  Q.  Okay.  During the 19 -- 1999 time frame, can

6  you tell me what portion of your time you devoted to Mr.

7  Ellison's affairs.

8  A.  Somewhere around 80 to 90 percent.

9  Q.  Okay.  And in 19 -- in 2000, was it the same?

10  A.  Approximately.

11  Q.  In 2002?

12  A.  Approximately.

13  Q.  2001?

14  A.  It's approximately the same throughout.

15  Depends on how you measure.

16  Q.  What do you mean by that?

17  A.  Do you measure by time; do you measure by

18  effort; do you measure by thought when you're at home,

19  your dreams?

20  Q.  Let's start with actual time.

21  A.  But if you measure by time, what is -- I'm not

22  trying to be facetious, but I don't know what is time,

23  'cause I don't bill by the hour --

24  Q.  Right.

25  A.  -- anymore.  So when you're responsible for

1  affecting a result and you think about it on the

2  weekends and you worry about that, is that time or not?

3  Q.  All right.  Let's exclude that, but actual

4  time when you sit at your desk to devote to it.

5  A.  What?  So ask the question again.  What is the

6  question?  I've forgotten what the question is.

7  Q.  The question is what portion of your time,

8  when you're actually devoted to working and not just

9  randomly thinking about it, but --

10  A.  It's not random.

11  Q.  All right, maybe it's not random.

12  A.  (inaudible).

13  Q.  We can all relate to this.

14  MR. ZWANG:  What portion of your working

15  time --

16  THE WITNESS:  I've said 80 to 90 percent.

17  MR. ZWANG:  -- however you define it --

18  THE WITNESS:  Eighty to 90 percent.  I've said

19  that --

20  MR. ZWANG:  There you go.

21  THE WITNESS:  -- repeatedly.

22  MS. LAVALLEE:  Q.  Perfect.  Just wanted to be

23  clear.  You've started to sort of say, well, it might be

24  more or less, depending on what you wanted to include in

25  there.

1   A.  Well, depending -- well, that's true.

2   Q.  Okay, that's fair.  It sounds like it's fair

3  to say that Mr. Ellison's an important client to you and

4  that you spend a serious amount of time thinking about

5  his affairs.

6   A.  Absolutely.

7   Q.  How do you generally communicate with Mr.

8  Ellison?

9   A.  It has varied over time.

10   Q.  Okay.  How do you currently communicate with

11  Mr. Ellison?

12   A.  Now I communicate in three ways: by e-mail to

13  his assistants, who I ask to communicate things to him;

14  e-mail to Larry directly; and on rare occasion when I

15  want to speak with him, I call the assistants and ask

16  them to put me on the call list to have Larry call me.

17  And then on occasion, Larry may call me.

18   Q.  Okay.  Now, going back to the 1999/2000 time

19  frame, same question:  How did you communicate with Mr.

20  Ellison?

21   A.  I have no clear recollection because -- I was

22  surprised when I went through the e-mails because I

23  would have thought I was communicating the same way.

24  And when I had my files searched, we first did a search

25  for e-mails to Larry, and it's readily apparent that at

1  that point in time I primarily communicated through his

2  assistants.  There were an occasional e-mail to Larry,

3  but most of them were to Carolyn Balkenhol, his

4  assistant.

5   Q.  Okay.  And other than those e-mails in the

6  1999 -- or actually, in the 2000 and 2001 time frame,

7  how else did you communicate with Mr. Ellison?

8   A.  The occasional phone call.

9   Q.  And did you ever meet with Mr. Ellison during

10  that time frame?

11   A.  Possibly.

12   Q.  Generally during that time frame, did you have

13  a -- meet with him on a -- you know, semiannually or

14  quarterly?  Did you have a routine in that way?

15   A.  No, no routine.  The meetings were infrequent.

16  I remember going once for over a year, year and a half

17  without a one-on-one meeting.

18   Q.  Okay.  You had indicated -- maybe I'm wrong.

19   A.  Excuse me for one second. I want to clarify.

20  That was the one and only meeting.  There are times when

21  I meet with Larry when we have agreements or documents

22  that need to be signed with third parties, and I will be

23  there for -- with other people.  But it was never a

24  meeting where we were communicating.  It was a meeting

25  where there was a group.

1   Q.  Okay.  Where are your la -- offices located?

2   A.  In Walnut Creek.

3     MR. ZWANG:  Excuse me.

4     MS. SEGAL:  Object.

5     MR. ZWANG:  The question -- listen to the

6  question she asked.  Where are your law offices located?

7     MS. LAVALLEE:  Oh, I'm sorry.

8     MR. ZWANG:  I don't think he's testified that

9  he's practicing law.

10     THE WITNESS:  I don't have law offices.

11     MS. LAVALLEE:  Okay.  And that's fine.  I

12  didn't realize I asked that question.

13     MR. NADOLENCO:  Neither did the court

14  reporter.

15     MS. LAVALLEE:  Neither did the court reporter,

16  looking at the transcript.  I apologize.

17     THE REPORTER:  We'll have to play the audio on

18  that one.  I'm sure you guys are right.

19     MR. ZWANG:  I could be hearing things.

20     MS. SEGAL:  No, I heard it too.

21     MS. LAVALLEE:  Q.  Okay.  Where are your

22  offices located?

23   A.  Walnut Creek, California.

24   Q.  And I -- have they been located there since

25  the '99 to present time frame?

1   A.  Correct.

2   Q.  Are you an attorney?

3   A.  I don't --

4   Q.  Let me ask a different question.  You seem --

5   A.  I don't know how to answer that question.

6   Q.  Okay.  Are you admitted to any Bar?

7   A.  No.

8   Q.  Okay.  Have you ever been admitted to any Bar?

9   A.  Yes.

10   Q.  Okay and what Bar were you admitted to?

11   A.  State of California.

12   Q.  Okay.  And during what period of time?

13   A.  Approximately 1978, when I graduated law

14  school and passed the Bar in the fall, until when they

15  enacted continuing minimum legal education.

16   Q.  Generally what time frame was that?

17   A.  Mid '80s.  I'm speculating.  I don't know.

18   Q.  Can you describe for me in general the types

19  of tasks that you perform for Mr. Ellison.

20     MR. ZWANG:  Object to the form.

21     MS. LAVALLEE:  Actually, let me rephrase my

22  question.

23   Q.  Can you describe for me generally the types of

24  tasks that you performed for Mr. Ellison during the 2000

25  and 2001 time frame.

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

**Page 33**

1    A.   I was responsible for handling the tax filings
2   for Larry and his related entities. I was responsible
3   for cash management, cash flow, managing bank
4   relationships, brokerage relationships, private equity
5   investments. Essentially everything financial in
6   Larry's life outside of Oracle.
7    Q.   Okay. And you referred to his -- his
8   entities.
9    A.   Mm-hm.
10    Q.   What entities were those during that time
11   frame?
12    A.   I can't be certain because entities have been
13   added and subtracted. But the entities primarily
14   consist of legal entities that would hold his airplanes,
15   that would hold homes, that would hold investments.
16   Larry's limited liability companies and corporations.
17    Q.   Okay. Can you tell me which entities held his
18   securities in Oracle Corporation during the 1996 through
19   2001 time frame.
20     MR. ZWANG: Object to the form.
21     THE WITNESS: Am I supposed to answer it when
22   he objects?
23     MS. LAVALLEE: Yes, actually, maybe --
24   basically the rule is that if -- they can raise
25   objections. But unless your counsel specifically

**Page 34**

1   advises you not to respond to the question, you should
2   answer the question.
3     THE WITNESS: Okay. Thank you.
4     MR. ZWANG: The lawyers talk for the judges.
5     THE WITNESS: Okay. Ask the question again.
6     MS. LAVALLEE: Yes.
7     MR. ZWANG: It was what entity or entities --
8     MS. LAVALLEE: Actually, could I just have the
9   question read back, please.
10     MR. ZWANG: Sure, go ahead.
11     (Record read as follows:
12    Q.   Can you tell me which entities held
13   his securities in Oracle Corporation during
14   the 1996 through 2001 time frame.)
15     MR. NADOLENCO: Same objection.
16     THE WITNESS: Larry's Oracle shares were
17   originally held in his own name, Lawrence J. Ellison.
18   Sometime during this time frame they were transferred
19   from his own name to the name of the Lawrence J. Ellison
20   Revocable Trust. His options were not transferred;
21   they're -- because they are employee options, they are
22   still registered in his own name.
23     MS. LAVALLEE: Thank you.
24    Q.   And do you know when the change from ownership
25   in his own name to the Lawrence J. Ellison Trust for the

**Page 35**

1   shares occurred?
2    A.   Yes.
3    Q.   Generally do you believe it was prior to or
4   after December 2000?
5    A.   Prior to, definitively.
6    Q.   Are you a trustee of the Lawrence J. Ellison
7   Trust?
8    A.   Yes, I am.
9    Q.   And who else is a trustee?
10    A.   Lawrence J. Ellison.
11    Q.   Do you have a power of attorney on behalf of
12   Mr. Ellison?
13    A.   Yes. I --
14     MR. NADOLENCO: Object to the form.
15     THE WITNESS: Yes, I do.
16     MS. LAVALLEE: Q. And is it a general or a
17   limited?
18    A.   General power of attorney, nondurable.
19    Q.   Generally when you sign documents as -- in
20   your capacity as power of attorney for Mr. Ellison, how
21   do you actually sign?
22    A.   Pursuant to the power of attorney, I sign
23   "Lawrence J. Ellison by Philip B. Simon," comma, "his
24   attorney in fact."
25     THE REPORTER: In effect or in fact?

**Page 36**

1     THE WITNESS: In fact.
2     THE REPORTER: Thank you.
3     MS. LAVALLEE: Q. And that's your general
4   practice?
5    A.   Generally.
6    Q.   Do you deviate from that any?
7    A.   I may. I try not to.
8    Q.   And is it fair to say that in your capacity as
9   power of attorney, you have the ability to trade Oracle
10   securities on behalf of Mr. Ellison?
11    A.   I have the legal authority, yes.
12    Q.   And you seem to hesitate there in making a
13   distinction as to legal authority. Does -- in practice,
14   do you really have that authority or you -- just your
15   use of the term "legal authority" indicates to me that
16   you might be qualifying that some way. Am I incorrect?
17    A.   No. I have the legal authority to sell all of
18   Larry's Oracle shares, to do anything I want with all of
19   Larry's assets. But I work for Larry and I generally
20   follow his instructions, and I hold myself as a
21   fiduciary.
22    Q.   Okay. And generally is it Mr. Ellison who
23   makes the decisions as to whether or not to purchase or
24   sell his securities in Oracle Corporation?
25    A.   Correct. Excuse me, I'd like to modify that

Oracle Related Cases     Page 33
Oracle Related Cases     Page 34
Oracle Related Cases     Page 35
Oracle Related Cases     Page 36

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1   that is generally the case except for exercising stock

2   options at year-end.

3   Q.   Okay.  And why is there an exception in that

4   instance?

5   (Mr. Nastari entered the room).

6   THE WITNESS:  We -- we've evolved the practice

7   over the years that you -- for tax planning purposes,

8   when you want to bring in more income for his tax

9   return, to exercise options.  And if you were merely

10  exercising options but not doing -- disposing of the

11  underlying shares, there's no change in the economic

12  ownership interest in the company.

13  And over time, since it's gotten to be a

14  recognized tax planning strategy, I've basically evolved

15  to the authority position, since I have the legal

16  authority where I exercise the options to trigger the

17  income.  And I frequently now sometimes do it and e-mail

18  Larry after the fact --

19  MS. LAVALLEE:  Okay.

20  THE WITNESS:  -- rather than getting okay

21  before.  But I do not sell the underlying shares.

22  MS. LAVALLEE:  Okay, thank you.

23  (Mr. Nastari and Ms. Lavallee confer

24  privately).

25  MS. LAVALLEE:  I apologize for that.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1   MR. NADOLENCO:  Nicole, I'm hopeful that

2   that's not something that's going to keep happening

3   today.

4   MS. SEGAL:  Or more specifically that he's not

5   reporting on testimony of Chuck Phillips to impact your

6   questioning of Philip Simon.

7   MS. LAVALLEE:  No.  The purpose of --

8   (Ms. Durousseau entered the room).

9   MS. LAVALLEE:  -- our discussion really

10  related to the timing of what's going on in there.

11  MS. SEGAL:  Okay.

12  MS. LAVALLEE:  Just so you know.

13  MS. SEGAL:  Thanks.

14  MS. LAVALLEE:  I just need to read back here.

15  Q.   Mr. Simon, can you tell me when you started

16  the practice -- or you and Mr. Ellison started the

17  practice of -- that you discussed just a few minutes ago

18  regarding tax planning at year-end?

19  A.   Probably the first year he -- Larry became a

20  client.

21  Q.   And when was it that you started to execute

22  this practice and alert Mr. Ellison after the fact?

23  A.   Recent years.

24  Q.   And by "recent years," do you -- can you be

25  more specific.  Was it before or after 2001?

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1   A.   I -- I don't recall.  It just gradually became

2   a nonevent because there was no change in economic

3   ownership when you convert from an option to an equity.

4   And if you were just making the exercise to trigger the

5   unrealized gain as taxable income, it really is just a

6   tax planning exercise.  And I have the authority to

7   optimize tax planning strategy.  And so it just happened

8   over time.

9   Q.   Okay.  Mr. Simon, do you have a cell phone

10  currently?

11  A.   Yes.

12  Q.   Okay.  And did you have a cell phone in the

13  2000/2001 time frame?

14  A.   Yes.

15  Q.   Okay.  And do you carry a Palm Pilot?

16  A.   No.

17  Q.   Or some variation of a PDA?

18  A.   No.

19  Q.   Okay.  Lucky you.  Do you -- I assume you have

20  access to e-mail because we've been talking about

21  e-mails.

22  A.   Correct.

23  Q.   And that was the case also in 2001/2002?

24  A.   Correct.

25  Q.   You also indicated that you have a laptop and

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1   that the laptop was something that was in use in the

2   December 2000 to January 2001 time frame.

3   A.   It was my sole computer at that -- during that

4   time frame.

5   Q.   Okay.  Okay.  If Mr. Ellison wants to reach

6   you, how does he communicate with you?  Does he have all

7   your phone numbers, or does he have a certain practice

8   that he calls one in particular or does one type of

9   thing to communicate with you?

10  MR. ZWANG:  I'm going to object.  He's already

11  told you how he communicates with Mr. Ellison.

12  MS. LAVALLEE:  Well, let me step back and

13  actually ask a different question that might resolve

14  your concern.

15  Q.   Does Mr. Ellison have all your phone numbers?

16  MR. NADOLENCO:  Objection.  Lacks foundation.

17  THE WITNESS:  I don't know.

18  MS. LAVALLEE:  Okay.

19  Q.   Do you know if Mr. Ellison has your cell phone

20  number?

21  A.   I don't know.

22  Q.   Do you know if his assistant has your cell

23  phone number?

24  A.   Yes, I do.

25  Q.   Okay.  And does she --

1    A. Yes.

2    Q. Okay. And who was Mr. Ellison's assistant or

3    assistants during the December 2000 January 2001 time

4    frame?

5    A. Carolyn Balkenhol, B-A-L-K-E-N-H-O-L. And

6    there were -- Joyce Higashi was probably there,

7    H-I-G-A-S-H-I. And maybe there were others. I don't

8    know.

9    Q. Okay. And generally who did you communicate

10    with?

11    A. Carolyn.

12    Q. Did you ever communicate with Joyce Higashi?

13    A. Possibly, but unlikely.

14    Q. Prior to December of 2000, when was the last

15    time Mr. Ellison had sold any securities of Oracle

16    Corporation?

17    A. I don't know without looking at the documents

18    that were provided you.

19    Q. Okay. And do you recall generally whether or

20    not that had occurred between 1997 and 2000; do you

21    know?

22    A. I do not know.

23    Q. Do you recall that in December of 2000, Mr.

24    Ellison had a series of options that were about to

25    expire -- or that were going to expire in August of

1    2001?

2    A. I did not recall that until I reviewed the

3    e-mails and documents that you requested and prepared

4    for the deposition.

5    Q. Okay. Is it your understanding that he had

6    some options at that time that were going to expire in

7    August of 2001?

8    A. Based on my review of the documents, yes.

9    Q. Can you tell me whether -- or strike that.

10    Can you tell me when you first had a

11    communication with Mr. Ellison regarding those specific

12    options that were going to expire in August of 2001.

13    A. I don't recall.

14    Q. Do you recall discussing those options any

15    time prior to December of 2000?

16    A. Based on e-mail communication that I reviewed

17    as part of preparing data for your document request,

18    those e-mails indicate that yes, I did.

19    Q. Okay. And do you have any recollection beyond

20    what you saw in those e-mails?

21    A. No specific recollection, though I was aware

22    of these. And it was my job to bring expiring options

23    to Larry's attention.

24    Q. Okay. And generally what was -- in terms of

25    your -- you talked about your task to bring it to his

1    attention. What was it that you did to do this, to

2    bring it to his attention?

3    A. Twelve, 18 months out, when it was an

4    appropriate time, I'd mention that "There are expiring

5    options, and you don't want to let your options expire,

6    and we have to plan" --

7    Q. Okay.

8    A. -- "the timing for exercise."

9    Q. And generally after mentioning the fact that

10    these options exist and they're going to expire, did you

11    have a practice as to make recommendations?

12    A. Yes.

13    Q. And generally what were your recommendations?

14    Did it depend?

15    A. My general recommendation to Larry was to

16    exercise and sell your stock options, to diversify and

17    to reduce debt.

18    Q. Was that consistently your recommendation

19    during the 1999 -- or 1998 to 2001 time frame?

20    A. No. As the option got closer to expiring, the

21    urgency or the strength with which I felt "you have to

22    do something" rose. And as Larry's debt level rose,

23    my -- and cash spending rose and liquidity needs

24    increased, I spoke up more strongly.

25    MS. SEGAL: "Liquidity," I think, was the

1    word.

2    THE WITNESS: What? Liquidity?

3    MS. SEGAL: The court reporter.

4    THE WITNESS: You okay?

5    MS. LAVALLEE: She got it.

6    THE WITNESS: Okay.

7    MS. LAVALLEE: Q. You mentioned that Larry's

8    debt level rose. When did that occur?

9    A. Incrementally over time.

10    Q. Okay. And his cash spending rose. Was that

11    also an incremental increase over time?

12    A. Incrementally, but if -- yes. Your debt level

13    rises, but it grows at an ever-increasing rate over this

14    period of time as commitments were made to invest in

15    companies and to purchase assets. And you also have the

16    accrual of interest on the debt.

17    Q. And when did the commitments increase as a

18    result of investments in companies?

19    A. Continuously, 'cause Larry's continuously been

20    investing in companies since I've been working with

21    Larry.

22    Q. You indicated -- indicated -- and correct me

23    if I'm wrong -- that generally -- you know, in the

24    general period of, say, 1997 through 2001, you would

25    recommend that he sell -- exercise his options and sell

1  them to diversify and reduce debt; is that correct?

2  A. I wouldn't -- I don't think I said "1997."

3  Q. Okay.

4  A. You were asking within the 12- to 18-month

5  time frame preceding the stock sales --

6  Q. Okay.

7  A. -- in question.

8  Q. So what period of time, then, are we talking

9  about?

10  A. Twelve to 18 months.

11  Q. So we're talking, then, about June of 1999,

12  roughly, through --

13  A. I would assume so. I don't have an exact

14  cutoff or an exact date for you.

15  Q. Okay.

16  A. It's just trying to recall an approximation.

17  Q. Okay. And prior to that time, did you have

18  discussions with Mr. Ellison regarding expiring options,

19  or his options in Oracle securities?

20  A. I probably did, but I don't know if there were

21  expiring options -- significant expiring options before

22  that time.

23  Q. Okay. That's a fair question. Prior -- so

24  let me clarify my question to say prior to the June '99

25  time frame, or roughly then, did you have discussions

1  with Mr. Ellison about selling some -- or exercising and

2  selling some of his options in Oracle Corporation?

3  A. I assume some, you know, throughout the period

4  that I've worked for Larry that I have periodically

5  brought up the concept of diversification. I do not

6  know if I specifically brought up the concept of

7  diversification via exercising and selling options,

8  because I believe in the earlier years, the options were

9  not expiring.

10  So you generally have an option. The longer

11  you hold it, you get a better economic benefit by riding

12  the option. So I would suspect then you -- you know,

13  before that 18-month time frame, referring to options,

14  it's unlikely, other than the year-end -- what I would

15  call -- it's a large dollar amount, but relative to

16  Larry's holdings in Oracle, very minor option exercises

17  at year-end for tax planning purposes.

18  Q. Okay. So if I understand you correctly,

19  generally you would recommend -- barring any external

20  considerations like reducing debt or diversification,

21  you would recommend that he generally hold on to his

22  options for a certain period of time because there was

23  advantages to doing that; is that correct?

24  A. Correct, yes.

25  Q. Okay. And then now going back to the

1  June 1999 or roughly thereabout time frame, going

2  forward to the time of the trades in question in

3  December and January 2001, is it correct to say that you

4  testified -- I just want to be clear on the record that

5  generally your recommendations were that Mr. Ellison

6  should sell -- exercise and sell -- exercise his option

7  and sell the shares he acquires from the exercise in

8  order to diversify, and then to reduce debt as well; is

9  that correct?

10  A. And primarily, which you're not -- I may have

11  not stated, is the options expire. My recommendation

12  was indeed that you exercise the options and extract the

13  economic value rather than letting them expire.

14  Q. Okay.

15  A. That's the first consideration.

16  Q. Okay. And --

17  A. The second consideration, yes, is it does

18  achieve diversification and raise cash to pay down debt.

19  Q. Okay. And in terms of the expiring options,

20  what choices did Mr. Ellison have in terms -- just

21  generally when he had expiring options in Oracle

22  securities, what were his options in terms of what to do

23  with those options in --

24  A. You're asking, really, what are your

25  alternatives with expiring options?

1  Q. Correct.

2  A. 'Cause you used the word "options" with

3  "options." Just to make it clear --

4  Q. Yes.

5  A. -- we'll refer to one's investment

6  alternatives with respect to expiring options.

7  As I see it, you basically have two

8  alternatives: You can exercise the options and sell

9  them to extract the gain, or you can let them expire

10  unused and forgo the economic benefit to you and also

11  cause an injury to Oracle Corporation by not -- because

12  you're not giving rise to a tax deduction.

13  I'm -- you know, when you exercise stock

14  options, the employee picks up compensation income for

15  the built-in gain, but the corporation also gets a

16  deduction that reduces its tax liability.

17  Q. Okay. Any other alternatives?

18  A. Basically -- that I raised with Larry?

19  Q. No, generally.

20  A. You could also -- if you have the cash to pay

21  the strike price and the income tax withholding and the

22  tax liability, you could exercise and hold the option.

23  So basically there are three alternatives.

24  Q. And is there any other alternative?

25  A. Not that I'm aware of.

1    Q.  Okay.

2    A.  Let me just clarify that.  I don't believe

3    there's any other alternative.  But at one point in time

4    when I reviewed my e-mails, someone from Morgan Stanley

5    contacted me about some sort of derivative that

6    supposedly would enable you to exercise the option but

7    somehow enter into a derivative transaction that would

8    somehow allow you to synthetically extend the option out

9    for a longer period of time.

10    I don't understand that.  I don't know if it

11    really exists.

12    MS. LAVALLEE:  Okay.  Actually, we've been

13    going for about 55 minutes.  I'd like to take a break at

14    this point for five minutes, if that's good.

15    THE WITNESS:  Okay.

16    MS. LAVALLEE:  Thanks.

17    THE VIDEOGRAPHER:  We are off the record.  The

18    time is 10:26.

19    (Recess taken).

20    THE VIDEOGRAPHER:  We are back on the record.

21    The time is 10:37.

22    MS. LAVALLEE:  Q.  Hi, Mr. Simon.  We were

23    just talking before the break regarding various

24    alternatives that Mr. Ellison would have when he has

25    options that are expiring.  And you covered four

---

1    options, I believe -- or alternatives.  Can you think of

2    anything else?

3    A.  Nothing comes to my mind right now.

4    Q.  Okay.  And prior to that, we were actually

5    discussing conversations that you had with Mr. Ellison

6    between the general time frame of roughly around

7    June 1999 through December of 2000 with respect to the

8    options that he had in Oracle securities that were to

9    expire in August of 2001.  You recall that?

10    A.  That we were discussing this?

11    Q.  Yes.

12    A.  Yes.

13    Q.  Okay.  Do you recall when was the first time

14    that you had any such discussion with Mr. Ellison?

15    A.  No.

16    Q.  Do you recall any of the discussions that you

17    had with Mr. Ellison in that time frame?

18    A.  No.

19    Q.  Okay.  Stepping back again, we -- we talked

20    about your general practice when -- during that time

21    frame to recommend that Mr. Ellison, one, exercise the

22    options, and then two, sell them in order to diversify

23    as well as to reduce debt; is that correct?

24    A.  Correct.

25    Q.  Okay.  Can you tell me what Mr. Ellison's

---

1    reaction or response to those recommendations were

2    during that June 1999 to December --

3    A.  I --

4    Q.  -- 2000 time frame?  Thanks.

5    A.  From June '99 through ...

6    Q.  Through December of 2000.

7    A.  I don't recall having those conversations

8    myself, so I don't recall any response.

9    Q.  Okay.  But you -- based on your reading of the

10    documents or e-mails that you produced, it's your

11    understanding that generally those types of discussions

12    took place during that time frame; is that correct?

13    A.  There was e-mail, and there was also notes in

14    the documents of a meeting with Larry documenting that

15    we discussed this.

16    Q.  Okay.  Were those handwritten notes?

17    A.  Yes.

18    Q.  And can you -- do you recall now whether -- or

19    when that meeting took place?

20    A.  No.

21    Q.  Okay.

22    A.  If it would help you when you search the

23    documents chronologically, I would suspect in the

24    March 2000 to June 2000 time frame there might be some

25    handwritten -- there's a one-page handwritten note.

---

1    Q.  Okay.

2    A.  Somehow the date March 27th, 2000 sticks in

3    my mind, but I don't know if that's correct.

4    Q.  Okay.  That's helpful, thank you.  Is it fair

5    to say that Mr. Ellison, during the time frame of

6    June 1999 and, say, November of 2000, did not adopt your

7    recommendation to sell and -- or exercise and sell those

8    options?

9    A.  No, because my recommendation was to exercise

10    and sell the options, but we never discussed the timing

11    of when to exercise and sell.  And since he did exercise

12    and sell in January, I could conclude that he did follow

13    my recommendation.  I just don't know.

14    Q.  Okay.

15    A.  There's multiple variables in the

16    determination of when to make it -- when and how to make

17    a decision.

18    Q.  Okay.  And what would those variables be?

19    A.  Should you exercise the option, and when

20    should you exercise the option.

21    Q.  Okay.  I think I misunderstood your

22    question -- your answer, then.

23    A.  Well, you were asking did he follow my

24    recommendation, and the answer is yes and no.  I don't

25    know what the question -- he did follow a recommendation

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  'cause he did exercise and sell the options.

2  Q.  But you don't know, actually -- do you know

3  whether or not it was because he wanted to follow your

4  recommendation?

5  A.  I would like to believe that my

6  recommendations had some influence.

7  Q.  All right.  But you actually don't

8  specifically know.  You're not Mr. Ellison, right?

9  A.  No.

10  Q.  Okay.  Do you recall generally any response or

11  reaction that Mr. Ellison had to those recommendations

12  during that general time frame of June 1999 through

13  November of 2000?

14  A.  No.  I would have to look at the documents

15  provided and see what's noted there and draw some

16  conclusions from the notes or the e-mails.

17  Q.  Okay.  All right.  During that same time frame

18  of June 1999 through the end of, let's say, November of

19  2000, did you have any discussions with anybody other

20  than Mr. Ellison regarding the options that were going

21  to expire in August of 2001?

22  A.  I have no clear recollection, but I suspect

23  within my office we had discussions for tax planning

24  purposes about trying to plan -- how to deal with the

25  exercise of this large option grant.

Oracle Related Cases                                            Page 53

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  And there may have also been communications

2  with Oracle's tax department.  I'm not certain if

3  there's communications in the specific time frame you

4  referred to.  But you will see, I believe, in the e-mail

5  packet there's a e-mail dated January 10, 2001 from Deb

6  Lange, Oracle's tax department, talking about Oracle's

7  preferences for the timing of the option exercise.

8  Q.  Okay.  And why is it that you were

9  communicating with Oracle's tax department regarding the

10  issue of the timing of Mr. Ellison's exercise of the

11  options?

12  A.  You're communicating with the tax department

13  and with Oracle's budgeting because we would be

14  contacted, because when Oracle's putting together its

15  budget, what Larry does personally affects Oracle's

16  budget and planning for these years.

17  They would ask us -- or ask me, representing

18  Larry, what our plans were.  It would affect the budget

19  because the option grant had such a large amount of

20  built-in gain that, from a budgeting standpoint, the

21  executive -- the cost center would have to bear the

22  Medicare tax of 1.45 percent, which is a very large

23  dollar amount.  So they were concerned about when to

24  budget that in their budgeting for fiscal years.

25  And from the corporate tax perspective, as I

Oracle Related Cases                                            Page 54

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  alluded to before, when you exercise a nonqualified

2  stock option, the built-in gain is taxable income to the

3  employee.  It's compensation income.  But the

4  corporation gets an offsetting tax deduction, which

5  reduces their corporate income tax liability.

6  And I believe Oracle was -- Oracle legal --

7  Oracle tax department was contacting me, as Larry's

8  representative, to find out what our -- what Larry's

9  plans were so they could plan their tax strategy for

10  Oracle Corporation on both cash flow, as well as

11  maximizing their (inaudible), a whole range of issues.

12  THE REPORTER:  I'm sorry, I missed that.  Cash

13  flow, as well as what -- maximizing their what?

14  THE WITNESS:  Tax strategies and, for example,

15  possibly creating a net operating loss and carrying back

16  a net operating loss.

17  You will see that referenced in the

18  January 10, 2001 e-mail.

19  MS. LAVALLEE:  Q.  Okay.  And did you ever

20  have any discussions with Mr. Ellison regarding -- at

21  any point in time regarding the tax consequences for

22  Oracle Corporation?

23  A.  I don't recall.

24  Q.  Okay.  Do you have any understanding as to

25  whether or not Mr. Ellison was aware of those issues?

Oracle Related Cases                                            Page 55

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  A.  I have no way of knowing.

2  Q.  Okay.

3  A.  It's possible I raised them, but I don't

4  recall.

5  Q.  And with respect to the budgeting concerns for

6  Oracle Corporation, do you -- did you have any

7  discussions with Mr. Ellison regarding that particular

8  issue at any point in time?

9  A.  I doubt it.  I don't recall.

10  Q.  Okay.  And do you know whether or not Mr.

11  Ellison was aware of those particular issues?

12  A.  I have no way of knowing.

13  Q.  But you did indicate that the tax department

14  at Oracle contacted you regarding their concerns in

15  terms of the tax implications of when Mr. Ellison

16  exercised his options?

17  A.  They were doing their planning and they wanted

18  to know what we were planning on doing so they could do

19  effective planning for Oracle Corporation.

20  Q.  Okay.  So I guess it's fair to say that they

21  would want to know, as soon as a decision is made, what

22  the decision was, to sort of take that into account on

23  their planning?

24  A.  Or they would want to affect the decision,

25  because if we could benefit Oracle Corporation, our

Oracle Related Cases                                            Page 56

1  planning, our general policy is to benefit Oracle
2  Corporation. So if we can do something that would work
3  for the benefit of the corporation -- so basically you
4  want to -- you want to basically integrate the planning
5  to a limited extent.
6      Q.  And when you say "we," who are you referring
7  to?
8      A.  We, me. I take responsibility for managing
9  Larry's tax liability optimization strategy and cash
10 flow.
11     Q.  Okay.
12     A.  And when I -- if I can accomplish those
13 objectives while benefiting Oracle Corporation, I always
14 do that.
15     Q.  Okay. Do you know if that's a factor that Mr.
16 Ellison took into account in his decision-making as to
17 when to exercise his options?
18     A.  I do not know.
19     Q.  Do you recall any discussions during the same
20 June 1999 to the end of November of 2000 time frame --
21 any discussions regarding the possibility of donating
22 the shares -- the options that were expiring in
23 August 2001?
24     A.  I have no recollection, but when I reviewed
25 e-mail in preparation for the deposition today, I saw an

1  e-mail referring to a possible thought, could the
2  options possibly be donated to charity.
3      Q.  Okay. And do you recall any discussions with
4  Mr. Ellison regarding that matter?
5      A.  No.
6      Q.  Okay. Do you know whether or not you had any
7  such discussions with Mr. Ellison?
8      A.  Since I don't recall, there's no way for me to
9  know whether I did or did not. I think it's unlikely,
10 but I do not recall.
11     Q.  Okay. I just wanted to clarify that. Thanks.
12         And why was it that you wanted -- that you
13 were making recommendations to Mr. Ellison to diversify
14 during that time frame?
15     A.  Prudence. The -- during that time frame, the
16 stock market had risen significantly. There was a stock
17 market -- in hindsight, there was a stock market bubble
18 that peaked at the end of March, I think, 2000, and
19 stocks had risen significantly.
20         So on general macroanalysis, and it made sense
21 to diversify out of a stock that had appreciated to a
22 significant amount, and Larry's debt level had also been
23 increasing rapidly.
24     Q.  Okay. Focusing now on the diversification,
25 were there any issues particular to his financial

1  situation that caused you to want him to diversify?
2      A.  Yes.
3      Q.  And what were those?
4      A.  Single stock position and large amount of
5  debt.
6      Q.  Now, in terms of the debt level, I think you
7  indicated that it was generally increasing during this
8  time frame.
9      A.  At an increasing rate.
10     Q.  Okay.
11     A.  It was accelerating.
12     Q.  Okay. All right. We'll come back to that
13 issue a little bit later.
14     A.  Okay.
15     Q.  When was it that you first learned that Mr.
16 Ellison had made a decision to exercise his options that
17 were expiring in August of 2001?
18     A.  My recollection is sometime in January, I
19 believe the Friday afternoon before the -- or Friday
20 morning before the stock trades began.
21     Q.  Okay. And do you recall whether that was
22 January 19, 2001?
23     A.  What was the first day of the trading; do you
24 know?
25     Q.  January 22nd.

1      A.  That'd be the Monday? Was that a Monday.
2      Q.  Yes, I believe so.
3      A.  If January 22nd was a Monday, then
4  January 19th would be the date.
5      Q.  Okay.
6      A.  It would be Friday.
7      Q.  And why do you -- why is it that you recall
8  specifically that date?
9      A.  I was just getting home from a vacation. I
10 just got home the day before, and I was off work.
11     Q.  Okay. Had you gone back to the office on the
12 19th?
13     A.  No, I was called at home.
14     Q.  Okay. And who called you?
15     A.  I suspect it was Carolyn. I don't know.
16     Q.  Okay. And where were you on vacation?
17     A.  I think I was in New Zealand at that time.
18     Q.  Okay. How long had you been gone for?
19     A.  Two weeks, 13 days, something like that.
20     Q.  Okay. Actually, I'd like to step back and go
21 back to the December time frame.
22         Had you had any discussions with Mr. Ellison
23 in December of 2000, do you recall, regarding his
24 exercise -- or his options that were expiring in August
25 of 2001?

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

1   A.  I have no recollection.  However, when I
2   reviewed the documents and the e-mails in preparation
3   for this deposition, I saw that we — that we, I,
4   exercised some stock options in December for tax
5   planning purposes.
6       So as I told you is my pattern, I either
7   checked with Larry first or gave an e-mail while I was
8   doing it.  So clearly there was some form of
9   communication from me to Larry about the options.  And
10  no doubt, while I did that, I would probably have
11  e-mailed or communicated that there are also a whole
12  bunch of expiring options that have to be dealt with in
13  the very near future.
14      Q.  Okay.  And based on your review of the
15  documents and your recollection, do you have any
16  understanding as to whether or not Mr. Ellison responded
17  to your suggestions at that time?
18      A.  I have no recollection.
19      Q.  And what was discussed — or what were your
20  communications on the Friday, January 19th?
21      A.  I was — I — I'm — I'm speculating.  I can
22  only try to guess my recall.  But it was that Larry said
23  let's go, we should exercise the options and I should
24  get it set up.
25      Q.  Okay.  And I don't want you to guess, just —

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

1   but to the extent you have — can make a reasonable —
2   respond reasonably, based on your understanding of what
3   might have occurred or what did occur —
4       A.  It would be all speculation —
5       Q.  Okay.
6       A.  — 'cause I have no recollection of what —
7   who — I don't know who called me —
8       Q.  Okay.
9       A.  — or what was said, other than that I know I
10  got the instruction to set up —
11      Q.  Okay.
12      A.  — to get the — get going, to get ready to do
13  the stock option exercise and trading.
14      Q.  Okay.  And prior to that time, had you made
15  any decision as to which brokerage firm you would use if
16  Ellison actually exercised those options?
17      A.  I don't know if I did.  That's generally my
18  decision.  I don't know if I — clearly I probably
19  thought about it.  But I don't know if I had made a firm
20  decision before that date.
21      Q.  Okay.  And did you use — you indicated
22  earlier that you did your annual exercise of options at
23  year-end, a calendar year-end in December of 2000.  And
24  did you use Merrill Lynch at that time?
25      A.  You don't use a broker when you exercise and

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

1   hold options at year-end.
2       Q.  Okay.
3       A.  That is just a form you file with Oracle to
4   exercise your options.  You pay the wage withholding and
5   the strike price, and the certificate is delivered from
6   Equiserve, on behalf of Oracle's transfer agent, to the
7   employee.
8       Q.  Okay, perfect.  So sitting here, you don't
9   have any recollection that you actually communicated
10  with Merrill Lynch any time prior to receiving the
11  instruction to trade on January 19th?
12      A.  That is correct.
13      Q.  Do you recall what your instructions were in
14  terms of the actual trades?
15      A.  No, I do not.
16      Q.  Okay.  Do you recall generally whether or not
17  they were instructions to exercise all the expiring
18  options?
19      A.  I'm relying on the documents that are provided
20  to you pursuant to the document request.  And based on
21  that document request and my review of the documents, it
22  appears that my instruction was to exercise and sell all
23  the options, if possible.
24      Q.  Okay.  And did you have any understanding
25  whether there was an intent to sell shares that were

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

1   acquired prior — previously?
2       A.  Based — again, based on my review of the
3   documents and my e-mail communications, which — copies
4   of which you have, they lead me to conclude that yes,
5   there was a discussion about trying to get the debt paid
6   down to $400 million.  And that was roughly a paydown of
7   like $825 million.
8       And I saw an e-mail calculating the amount —
9   the number of shares that would need to be sold, I think
10  it's 40.7 million shares, to generate enough after-tax
11  proceeds to do the debt paydown.
12      Q.  Okay.  But you have no specific recollections
13  regarding any communications about that?
14      A.  I have the e-mail document from me to Carolyn
15  or to Larry that's in the document packet that sets
16  forth — sets this forth.  But prior to my reviewing, if
17  you had asked me, I have no recollection.
18      Q.  Okay.  And in turn, do you have any
19  recollection regarding the specific terms or conditions
20  placed on the actual execution of the trades?
21      A.  I had no recollection.  However, when I
22  reviewed my notes better and the e-mails that have been
23  provided to you, it appears there was, at one point in
24  time during part of the trading process, a $30-per-share
25  floor limit.

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    Q.  Okay.  And do you know whether or not there

2    had actually ever been a $32 floor limit?

3    A.  No, I do not recall.

4    Q.  Okay.  And who was it who initially raised the

5    issue of a price floor limit?

6    A.  It would be me probably, or Larry, because

7    when I would — I don't have any recollection, but —

8    I'm just speculating here.  But when I ask for an

9    instruction and request an instruction, I need clear

10   instructions.  And I would raise the issue.  If you tell

11   me to sell something, I would say "At what price, what

12   terms, when?  Let's discuss the parameters."

13   Q.  Okay.  And do you recall anything regarding a

14   limit or conditions on the volume of shares to be traded

15   on a particular day?

16   A.  I have a vague recollection that I was

17   concerned about — there's a general rule of thumb that

18   you don't want to sell more than ten percent of the

19   trading volume in any one day.  This was information I

20   received from Merrill Lynch and other brokers.

21        And if you sell more than ten percent, you can

22   have a negative effect, potentially, on the stock price

23   and on — so therefore, I know there was — I know I had

24   discussions at least with Merrill Lynch about trying to

25   keep our volume within the set limits.

Oracle Related Cases                                Page 65

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    Q.  Okay.  And do you recall whether or not you

2    had any such discussions with Mr. Ellison?

3    A.  No, but it would not — I would probably pass

4    along that information to Larry when I tried to explain

5    how long it would take to sell the number of shares that

6    we wanted to sell, 'cause you're mapping out a plan.

7    And I would set out "This is the number of days it would

8    take."

9        So I assume I communicated in some fashion,

10   but I have no recollection.

11   Q.  Okay.  Is it your understanding, though, that

12   you had these discussions initially with Merrill Lynch

13   and spoke to them in terms of what the volume limit

14   should be?

15   A.  Correct.

16   Q.  Okay.

17   A.  Not with Merrill Lynch, but from other people

18   who would provide financial advice to me.  And I would

19   act to interpret it and make decisions based on the

20   advice I'd been given.

21   Q.  Okay.  And you indicated that the purpose in

22   that was to ensure that you weren't affecting the market

23   price —

24   A.  In an adverse way, yes.

25   Q.  And why is —

Oracle Related Cases                                Page 66

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    THE REPORTER:  What was that answer?

2    THE WITNESS:  In an adverse way.

3    MS. LAVALLEE:  Q.  And can you tell me why

4    that was a concern.

5    A.  I can tell you why it would be a concern for

6    me.  I don't know why it would be a concern for Merrill

7    Lynch or for Larry.  But it would be a concern for me

8    because when I am executing a trade, I am trying to do

9    it properly, ethically and maximize the price at which I

10   execute the trade.

11        And so you want to do that without tipping

12   your hand to the buyers.  If the buyer, let's say, is a

13   Fidelity fund, if they pick up the idea that there's

14   large volume coming, they will stop bidding and the

15   price will drop.

16        You'd rather do it more intelligently to get a

17   better price.

18   Q.  Okay.  Any other reason?

19   A.  No.

20   Q.  Mr. Simon, I believe that you indicated you

21   had never seen the written summary of your interview

22   with the SLC's —

23   A.  I don't recall whether — I — just to make it

24   clear, for all questions I've answered today, I have

25   limited recollection of whatever I have said or done in

Oracle Related Cases                                Page 67

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    the past.  All statements are based on belief and vague

2    recall.

3    Q.  Okay.

4    A.  So I have no recall ever having seen my notes

5    of the Special Litigation Committee.  It does not mean

6    that they — maybe they provided them to me.  I don't

7    know.

8    MS. LAVALLEE:  Okay.  I'm going to mark as

9    Exhibit 186 a document titled "Interview of Philip

10   Simon."

11        (DC Exhibit No. 186

12        marked for identification).

13   MS. LAVALLEE:  And the court reporter will

14   give you the original.

15   THE WITNESS:  Thank you.

16   MS. LAVALLEE:  Q.  Mr. Simon, I'm just going

17   to ask you to take a quick look at this.  You don't have

18   to read all of the document.  I'm going to refer you

19   specifically to certain excerpts of the document.

20   A.  Okay.

21   Q.  And I'll represent to you that this is a copy

22   of the summary of the — of your interview that was

23   submitted by the Special Litigation Committee to the

24   court —

25   A.  Okay.

Oracle Related Cases                                Page 68

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

1    Q.  -- in the Delaware derivative action.

2    MR. NADOLENCO:  I don't think we stipulated at

3   the beginning of the deposition on the record that the

4   transcript would be marked confidential pursuant to the

5   protective order.

6    MS. LAVALLEE:  Yeah, that's fine.  And

7   obviously plaintiffs reserve the right to seek to have

8   any portion undesignated.

9    Q.  And I'm going to refer you specifically to the

10   section -- and I'm just looking for it here.  Actually,

11   I'll refer you to page 7.

12    A.  Mm-hm.

13    Q.  The -- under the paragraph heading

14   "Discussions Preceding Ellison's Q3 FY '01 stock sales."

15   The section reads,

16    "Simon initiated discussions with

17   Ellison about Ellison's expiring options

18   approximately two years prior to their

19   expiration, summer of 1999, because of the

20   limited windows available for trading."

21    And then it continues.  You can read that

22   paragraph to yourself.

23    A.  I read it.

24    Q.  Okay.  Can you tell me if that accurately

25   summarizes what you told the SLC.

Oracle Related Cases           Page 69

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

1    A.  I have no recollection.

2    Q.  Okay.  Do you believe that that accurately

3   summarizes what you -- your understanding of your

4   position?

5    A.  It seems reasonable --

6    Q.  Okay.

7    A.  -- that that's what I would have told the S --

8   is it SLC?

9    Q.  Yes.

10    A.  Yes, SLC.

11    Q.  Just for the record so we're clear between

12   both of us, when I refer to SLC, I mean the Special

13   Litigation Committee.

14    A.  Okay.

15    Q.  All right.  And then I'd like to refer your

16   attention specifically to the third full paragraph on

17   page 8.

18    A.  Mm-hm.

19    Q.  And it reads in part, starting at the second

20   line,

21    "Simon was anxious for Ellison to pay

22   down some of his debt towards end of

23   calendar year 2000.  At that time, Ellison

24   did not have enough remaining credit in his

25   bank lines to meet his cash needs for the

Oracle Related Cases           Page 70

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

1   coming year.  Simon did not want to ask for

2   a covenant waiver from the banks.  He

3   preferred Ellison to start paying off the

4   debts."

5    I assume you don't recall this testimony.

6    A.  (Shakes head).

7    Q.  Okay.  Does that seem --

8    A.  It seems right.

9    Q.  -- consistent?

10    A.  Yes.

11    Q.  Can you identify for me what debts you were

12   referring to there.

13    A.  There were bank debts totaling, from -- a

14   group of banks, totaling around $1.2 billion.

15    Q.  Okay.  And do you recall what banks these were

16   with?

17    A.  There's a document in the material provided to

18   you.  I don't recall exactly which banks because banks

19   that are currently -- different banks are -- participate

20   in lending at different points in time.  There's been a

21   lot of merger and acquisition.  So I can't recall back

22   in 2000 exactly which banks were lending, without

23   looking at the documents that I've provided to you.

24    Q.  Okay.  Well, we'll take a look at them a

25   little later, then.

Oracle Related Cases           Page 71

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004 12:00:00 AM

1    A.  Then I can give you specifics.  'Cause we have

2   schedules, I know, and there's a schedule detailing the

3   banks and the exact amount.

4    Q.  Okay.

5    A.  I can go over that with you then.

6    Q.  Okay.  And were these loans, though -- is it

7   your understanding that these loans were loans that --

8   were these new loans or were they loans that were in

9   existence for a period of time?

10    A.  These were bank loans that had grown since I

11   started working for Larry and had grown over time and

12   kept increasing.

13    Q.  Okay.  And do you recall the terms of any of

14   the specific loans?

15    A.  They vary over time.  But I know the

16   critical -- I know some of the critical terms, yes.

17    Q.  Okay.  Can you tell me what you know about any

18   of those loans.

19    A.  They were generally -- they were secured by

20   Oracle shares.  They were generally Libor, L-I-B-O-R,

21   Libor-based financing, priced at a spread over Libor.

22    Q.  What does Libor stand for?

23    A.  London interbank offerage rate.  The terms of

24   the loans, they were generally, at that point in time,

25   for two-year terms.  There were probably four or five

Oracle Related Cases           Page 72

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  banks in the group. The lines expired at different
2  points in time. There were covenants restricting the
3  aggregate amount of debt that Larry could have.
4      Q. Anything else?
5      A. Those are basic key terms.
6      Q. Okay. In the passage that we read – well,
7  actually, let me ask you this: Do you have any
8  understanding that – of – that there were debts owing
9  to Merrill Lynch?
10     A. Yes.
11     Q. Okay. And do you have any specific
12  recollection regarding those, other than what you just
13  testified to?
14     A. Other than Merrill Lynch?
15     Q. No, any terms other than the terms you've just
16  talked about with respect to the loans to Merrill Lynch
17  or from Merrill Lynch.
18     A. We had financial covenants, had to provide
19  financial information on a regular basis. I can't
20  recall, without looking at the loan documents that were
21  in existence then – and there were different banks; and
22  the documents were similar, but not identical – to know
23  what the covenants were or the representations were and
24  the limitations.
25     Q. Okay.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1      A. But I'm not sure any of the others are really
2  that critical. If you have specific questions, I'll
3  answer them for you.
4      Q. Oh. You mean any other terms?
5      A. Any other terms are that critical.
6      Q. Okay. Do you remember the interest rates on
7  any of these?
8      A. They were variable. They were – Libor is a
9  floating rate. And you pay a spread over Libor to the
10  banks.
11     Q. Okay. And do you remember any more details
12  other than that?
13     A. I do know the spread, but I'd like to keep
14  that confidential.
15     Q. Well, this transcript is marked confidential,
16  so ...
17     A. I would prefer not to disclose that. I'd ask
18  my attorney to raise that. And if the judge orders
19  that, I will disclose that. But this is my negotiating
20  advantage with banks.
21     MS. SEGAL: I don't know how it's relevant.
22     THE WITNESS: It's a very good spread.
23     MR. TABACCO: You can leave a blank in the
24  transcript for now, and then if it becomes an issue –
25     THE WITNESS: It is a hundred basis points

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  over Libor.
2      MS. LAVALLEE: Q. Actually, maybe this
3  will – you indicate in your SLC – to the SLC that he
4  gets a better rate – that Ellison gets a better rate
5  than GE.
6      A. Yeah, I think that's an overstatement. We
7  have a very good rate.
8      Q. Okay.
9      A. We have an extraordinarily good rate. And I
10  don't want to undermine my rate, but yes, we have a very
11  good rate.
12     MS. SEGAL: I don't think you need to say any
13  more now. If it becomes an issue, we'll address it
14  then.
15     MS. LAVALLEE: Q. Was there a lead bank on
16  these loans?
17     A. It varies. Depends what you mean by a "lead
18  bank." Can you explain what you mean by a "lead bank."
19     Q. Well – well, what is your understanding of
20  lead bank in this context?
21     A. Well, lead bank can – in my –
22     MR. NADOLENCO: Objection to form.
23     MS. LAVALLEE: You can answer.
24     THE WITNESS: Okay.
25     MR. ZWANG: Well, it's your question.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1      MR. NADOLENCO: Right, it's your question.
2      MS. LAVALLEE: Q. Okay. Let me ask a
3  different question. Do you have any understanding of
4  the term "lead bank" in connection with loans?
5      A. Okay, yes.
6      Q. And what is your understanding?
7      A. A lead bank generally, I think, is if you have
8  a syndicate, you have a lead bank that you get your
9  financing with the lead bank, and the lead bank
10  syndicates it among a group of banks and that you do
11  negotiations with one bank, and they set the terms.
12     We do not have a lead bank, in that
13  definition, because when you do that, you lose your
14  flexibility in negotiation. So I do not syndicate.
15  Rather, I get the loans directly by going to the banks.
16     And what you do is you can basically set up a
17  competition among the banks. So you can control the
18  terms and get as borrower-friendly terms as possible.
19     And so basically we have five different
20  agreements with five different banks – or four
21  different banks. I don't know how many banks there were
22  then. And I negotiated the terms. And I had them
23  staggering on maturity dates so we had more control and
24  more leverage to effectively negotiate and maintain
25  control over the borrowing.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1    So -- and in my vein, I did use -- we did have

2    a lead bank at one point in time -- probably BankAmerica

3    back then, but then we moved to J.P. Morgan Chase --

4    that handled most of the transaction activity for Larry.

5        So in that sense, we had a lead bank that we

6    relied on for most transaction activity, but we never

7    had a lead bank in the sense of a syndication where one

8    bank controled the terms and negotiated on behalf of

9    the group.

10    Q.   Okay.  And when did the changeover from

11    BankAmerica to J.P. take place?

12    A.   Shortly after NationsBank acquired Bank of

13    America.

14    Q.   Okay.  Do you recall generally when that was?

15    A.   No.

16    Q.   Okay.

17    THE WITNESS:  '90, '99?  Anybody know it?

18    MR. TABACCO:  '98.

19    THE WITNESS:  '98?  Then maybe I moved --

20    maybe J.P. Morgan was my main transaction bank by then.

21    MS. LAVALLEE:  Okay.

22    Q.   Were there any changes in the terms of any of

23    these loans from the -- say from September of 2000

24    through January/February of 2001?

25    A.   I don't recall.  The amount or the borrowings

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1    increased.

2    Q.   And other than that, you don't have any

3    specific recollection?

4    A.   I would have to go through old files and read

5    the agreements.  But we did have -- just so you know,

6    there's -- aggregate debt cap is one of the covenants.

7    So as your debt rises, you get closer to breaching a

8    covenant.

9    Q.   And had you received any communications from

10    any of the banks in terms of the issue of debt -- of

11    the -- the aggregate debt cap?

12    A.   Yes.  As -- I don't recall when, but as

13    Larry's debt increased and broke over a billion dollars,

14    some of the banks were more nervous and they were

15    concerned about Larry's plan to pay down the debt.

16    Q.   And do you recall when that took place?

17    A.   That happens.  No, I do not know.

18    Q.   Okay.  Do you recall, beyond that, any

19    specific communications with any of those banks?

20    A.   No, but these communications took place, but I

21    don't know specific communications.

22    Q.   Okay.  And do you know whether or not that

23    took place prior to or after the trades?

24    A.   It would be prior to because after the trades,

25    we paid down the debt.

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1    Q.   Okay.  That's fair.  Do you recall whether it

2    was more than one bank that had made such

3    communications?

4    A.   Yes.

5    Q.   Okay.  And do you recall whether it was all or

6    how many, roughly?

7    A.   Most every bank officer was calling me as the

8    debt kept increasing.

9    Q.   Okay.  And you indicated to the SLC, going

10    back to that same passage we talked about on page 8 --

11    A.   Page 8, okay.

12    Q.   -- that you did not want to ask for a covenant

13    waiver from the banks.  What were you referring to

14    there?

15    A.   I assume that was the aggregate debt

16    limitation, that the banks had caps on how much debt

17    Larry could have outstanding, because, as I mentioned to

18    you, we did not have a syndicate; we had independent

19    bank loans.  And the banks knew about each other's

20    loans.

21        So therefore, to have control over the

22    aggregate amount of debt and the number of Oracle shares

23    pledged to secure that debt, they had a covenant

24    restricting the aggregate amount of debt that Larry

25    could have outstanding at any one point in time.

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1    Q.   Okay.  And did you communicate with any of the

2    banks about getting a covenant waiver, as you indicate

3    here?

4    A.   I don't recall.

5    Q.   Do you recall what the debt-to-asset ratio

6    Mr. Ellison had at that point in time?

7    A.   I could roughly calculate it.

8    Q.   What's your rough estimate at this time?

9    A.   His debt then was around a billion-three,

10    let's say a billion-two, billion-three.  And when the

11    Oracle shares were sold, they were trading around 30.

12    And he has -- with options around 1.4 billion.

13    1.4 billion times 30 is roughly 42 -- I think that's 42

14    billion, if I do the math right.  So let's say

15    1.3 billion divided by 42 billion, that's around four

16    percent, three, four percent.

17    Q.   Okay.  And --

18    A.   Am I doing the math right?  Fourteen, 28, 42,

19    yeah, okay.  That's pretax.

20    Q.   You're faster than me on that.

21    A.   That's pretax.

22    Q.   Okay.  We're talking about debt-to-asset

23    ratio.  You referred specifically to his Oracle

24    holdings.  What portion of Mr. Ellison's assets were

25    comprised of Oracle securities?

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1    A.   At that point in time – it depends upon how

2    you value private equity investments, 'cause they have a

3    range of values.  During the peak of the bubble, private

4    equity values looked very good, but then they dropped by

5    90 percent.  But realistically those other assets,

6    including his homes and other personal assets, probably

7    represented around two percent of his total net worth.

8    Q.   So am I to understand that roughly at the

9    time – time period of December/January 2001, roughly

10   98 percent of Mr. Ellison's assets were in Oracle

11   securities?

12   (Mr. Yang entered the room).

13   THE WITNESS:  Yes.  Maybe a tad more.

14   MS. LAVALLEE:  Give or take a little.  All

15   right.

16   Q.   Going back to the bank loans, were any of

17   those bank loans that you discussed actually maturing or

18   becoming due?

19   A.   I had them staggered.  And at that point in

20   time, they were on two-year terms.  So if I had five

21   bank lines maturing over two years, I would assume

22   there'd be a bank line maturing every four to six

23   months.

24   Q.   Okay.

25   A.   But I don't have – I don't know if they

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1    were – I tried to have them perfectly staggered, but

2    you can't always control that.

3    Q.   Right.  When you first communicated with

4    either Mr. Ellison or his representative in the

5    January 18th time frame just prior to commencing the

6    trades, were there – was there some discussion of where

7    the money would – that was generated from these trades

8    be used for, what it would be used for?

9    A.   I don't recall.  But on issues like that, I'm

10   normally given, and I assume, free authority to apply

11   the cash proceeds as intelligently as possible to

12   maximize the economic benefit to Larry.  So in that

13   vein, I may or may not have raised it.  I doubt I did

14   because it was clear what had to be done.

15   Q.   Okay.  So it was probably you got – you were

16   told "We're going to sell this," and then you –

17   A.   I ran with the ball.

18   Q.   You ran with the ball and did it?

19   A.   And paid down the bank debt, yes.

20   Q.   So it wasn't a situation where Mr. Ellison

21   said "I want this amount of the sale proceeds to go here

22   and this amount to go here"?

23   A.   No.  We don't talk.  That's all within my –

24   that's cash management.  I handle that.

25   Q.   Okay.  I think you mentioned earlier how

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1    much – based on your reading of the documents – how

2    much you indicated – how much – actually, let me ask a

3    different question.

4    Going back to your trip to New Zealand, do you

5    recall precisely the dates you were gone?

6    A.   No, but reading the Special Litigation

7    Committee, it said I came back on the 19th.  I don't

8    know if I came back – I probably came back the 18th

9    at night.  I don't know.

10   Q.   And it was generally a two-week trip?

11   A.   I think it was 13 days, is my recollection.

12   It was the first time we were away from our children for

13   that long.  So I think it's the longest time we've ever

14   been away.  So that's my recollection

15   Q.   Sounds like a nice break.

16   A.   Mm-hm.

17   Q.   Were you visiting cities?  Where did you go in

18   New Zealand?

19   A.   Went to Auckland, went to the south island,

20   went kayaking, hiking.

21   Q.   Okay.  Prior to leaving, did you actually

22   contact Mr. Ellison and indicate you'd be traveling,

23   either Mr. Ellison or his assistants?

24   A.   I always left Carolyn – let Carolyn know

25   where I was so she could reach me at any point in time

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1    anywhere.

2    Q.   You were reachable during that time frame?

3    A.   Not really.  I was probably reachable at

4    certain points in time while I was there.

5    Q.   Okay.

6    A.   And if I had hotel reservations at certain

7    places, normally I would set forth an itinerary for my

8    office to be able to contact me.  I would normally

9    e-mail a copy to Carolyn.

10   Q.   And did you actually clear the time frame with

11   Mr. Ellison's office prior to leaving?

12   A.   I let Carolyn know when I was going away.

13   Q.   Okay.  And was it a situation where she said

14   "Oh, that might not be a good time," or basically you

15   had authority over your own schedule?

16   A.   I have authority over my own schedule.

17   MS. LAVALLEE:  Okay.  Actually, I think this

18   is probably a good time for a short break.  And we'll

19   resume and then have lunch maybe in an hour or so, or 40

20   minutes.

21   THE VIDEOGRAPHER:  This marks the end of

22   videotape Volume I, tape 1 in the deposition of Philip

23   Simon.  The time is 11:23 a.m.  We are off the record.

24   (Recess taken).

25   THE VIDEOGRAPHER:  This marks the beginning of

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  videotape Volume I, tape 2 in the deposition of Philip
2  Simon. The time is 11:40 a.m. We are back on the
3  record.
4      MS. LAVALLEE: Q. Hi, Mr. Simon. I just want
5  to follow up on a couple of matters that we discussed a
6  little earlier today. First thing is we talked briefly
7  about the fact that there were certain limits or --
8  yeah, limits placed on the trades for the January 2001
9  time frame. And in particular, we talked about the
10 price floor. Do you recall that?
11     A. Yes.
12     Q. Okay. Can you tell me why that particular
13 price was chosen.
14     MR. ZWANG: This is the $30 price?
15     MS. LAVALLEE: Yes.
16     MR. NADOLENCO: Objection. Asked and
17 answered.
18     THE WITNESS: I don't recall, but I also see
19 on page 10 of the Special Litigation Committee report
20 that you handed to me a discussion of this price floor.
21 As I noted -- I noticed that the Special
22 Litigation Committee interview was on July 22nd, 2002.
23 That was much closer to the events than today. So I
24 think there's some conclusions that could or could not
25 be drawn from the -- my testimony there.

Oracle Related Cases                                      Page 85

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1      MS. LAVALLEE: Okay. And having read that,
2  can you answer my question.
3      MR. ZWANG: Does it refresh your recollection
4  at all? Does it give you any independent recollection?
5      THE WITNESS: No, I can only repeat back
6  what's in there. And this seems like it's a reasonable
7  statement of what happened. But I have no recollection.
8      MS. LAVALLEE: Q. Okay. And what is your
9  understanding of what's in the report summary?
10     A. I'm looking. I can read it to you. It says,
11 "According to Simon, Ellison's initial
12 parameters were to sell options at no less
13 than $32 per share. However, as of Monday,
14 January 22nd, Oracle shares were trading
15 at the $30 per share. Simon sought and
16 received authority from Ellison to drop the
17 floor to $30 per share so that selling
18 could begin."
19     Q. Okay. And why is it that a particular price
20 floor is selected when you make the trades, generally?
21     A. A person could pick a price floor for a number
22 of reasons. The most obvious -- I'm speculating. I
23 don't know why -- why I would? Normally when I sell
24 shares of stock myself, I want to limit the broker's
25 discretion just to ram it through and take a spread,

Oracle Related Cases                                      Page 86

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  'cause they'll trade -- I mean, they're not supposed to
2  front-run, but people have different incentives. So I
3  want to limit the broker's ability to take advantage of
4  me.
5      Q. Okay. And do you have any specific of Mr. --
6  or general understanding of Mr. Ellison's intent?
7      A. No, I do not.
8      Q. Okay. Was the price floor something that you
9  discussed and -- discussed with the Merrill Lynch
10 broker?
11     A. Yes, I would set the floor. I'm giving
12 them -- I'm giving the Merrill Lynch broker trading
13 parameters and setting standards on how to trade so I
14 could judge their execution.
15     Q. And do you have an understanding as to -- let
16 me step back.
17 In the passage that you referred to in the SLC
18 report on page -- or SLC summary on page 10, it
19 indicates that the price floor was initially 32 and then
20 dropped to 30 on the first day of trading; is that
21 correct?
22     A. That's what it says, yes.
23     Q. Okay. Do you have any understanding as to why
24 the drop was done?
25     A. It says that Oracle shares were trading at 30.

Oracle Related Cases                                      Page 87

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  And if the floor was 32, you cannot trade any shares.
2  And you have expiring options, and you have a debt
3  that's increasing with potential to breach a bank
4  covenant and have -- oh, I did not mention one term in
5  our loan agreements.
6  They have what's called cross-default
7  language. So if you have a default on one bank line,
8  you have a default on all bank lines, causing immediate
9  acceleration and demand for payment of 1.2 billion in
10 cash, which you don't have.
11 So therefore, you -- the reason I suspect they
12 went back to Larry was that you can't sell any stock if
13 you have a floor price above the trading range.
14     Q. Just back to that additional term you just
15 described, is that something that's fairly standard in
16 loans?
17     A. Cross-default?
18     Q. Yeah.
19     A. Yes.
20     Q. Okay. Do you recall whether or not after this
21 initial setting of the floor price on January 22nd,
22 whether or not there was any further discussions
23 regarding the price floor?
24     A. No, I have no recollection.
25     Q. You have no recollection one way or another?

Oracle Related Cases                                      Page 88

## Page 89

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    A. Correct.

2    Q. Can you tell me who Dan Scott is.

3    A. Dan Scott.

4    Q. Scott. Do you know?

5    A. No.

6    Q. Okay. Don Scott maybe?

7    A. Doesn't ring a bell. Can you --

8    Q. Okay, that's fine.

9    A. -- give me a reference and I'll try and answer

10   it for you.

11   Q. We'll come back to that.

12   A. Okay.

13   Q. How about Steve Edmundson?

14   A. (Shakes head).

15   Q. Okay. Did he -- somebody who worked for

16   Barbara Wallace?

17   A. (Shakes head).

18   Q. Okay. Do you know who Barbara Wallace is?

19   A. Yes.

20   Q. And who is she?

21   A. I believe she's the person at Oracle -- I

22   don't know her title, but I think she handles employee

23   stock transfer.

24   Q. At Oracle?

25   A. At Oracle.

## Page 90

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    MS. LAVALLEE:  I'd like to mark as Exhibit 187

2    a document that is Bates-stamped PS0001.

3    (DC Exhibit No. 187

4    marked for identification).

5    MS. SEGAL:  We're still doing DC, right?

6    MS. LAVALLEE:  Yes.

7    THE WITNESS:  Okay.

8    MS. LAVALLEE:  Q. Mr. Simon, if you could

9    take a moment and look at the document.  And when you've

10   had a chance to review it, please identify what it is

11   for the record.

12   A. This is an e-mail from me to Larry.

13   Q. Okay. And is it your understanding that this

14   is an e-mail that you actually sent to Mr. Ellison on or

15   about January 17th -- and I actually cannot, for the

16   life of me, figure out what the date is.

17   A. I think that was a Y2K problem when they

18   rolled over. I think it -- from the context, I think

19   it's December 17th, 1999 is my guess.

20   Q. That was my guess as well, but I wouldn't want

21   to --

22   A. That would be my guess. Yes, it's referring

23   to 1999 taxable income, so I assume it's

24   December 17th, 1999.

25   Q. Okay. And there is a discussion here of the

## Page 91

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    tax benefit to exercising some options.  Is that the tax

2    situation that you discussed earlier today?

3    A. Correct. That is basically recognizing

4    nonqualified stock option income, triggering taxable

5    income to offset losses that you would otherwise have on

6    your tax return.

7    Q. Can you tell me why it is that Mr. Ellison was

8    going to recognize a loss for that particular tax year?

9    A. Yes. He has -- in calculating taxable income,

10   you basically take into account on your tax return a

11   whole variety of items of income and expense and

12   deduction, such as interest expense that is accruing on

13   your bank loans, charitable deductions, losses from

14   trades or businesses or partnerships that you're in,

15   offset by your salary income and your option income.

16   And so based on this, there's a large -- it

17   looks like I had a $50 million tax loss in 1999

18   projected in December. And as this e-mail says, you

19   would lose half of that loss as a tax benefit for

20   California purposes because California only has a

21   50-percent-of-net-operating-loss carryover. So you'd

22   lose half -- the benefit of half the tax loss.

23   So I was e-mailing to let Larry know that I

24   would be triggering -- I would like to exercise options

25   to trigger taxable income. And as you can see in the

## Page 92

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1    next to last paragraph, I say "I would take this action

2    even if you failed to reply." It shows that I felt I

3    have this authority.

4    Q. Okay. All right. And do you have any

5    understanding as to what income Mr. Ellison was drawing

6    from Oracle Corporation in this time frame?

7    A. There was a period of time when Larry Drew no

8    salary. I don't know if 1999 was one of those years. I

9    think it was a four-year period. My best guess is 1999

10   might have been a year where he was taking, I think, one

11   dollar of salary a year from Oracle.

12   Q. Oracle. Was it your understanding that in

13   lieu of a salary or bonus, he was actually obtaining

14   options in Oracle Corporation?

15   A. I believe that's -- I do not know if that's a

16   fact, but that was -- I believe there was a large option

17   grant in lieu of salary.

18   Q. Okay. Do you know if that's still the case

19   today?

20   A. That there's -- that he's not drawing a

21   salary?

22   Q. Correct.

23   A. No, I believe the four years have run and the

24   salary has commenced again.

25   Q. Okay.

1   MS. LAVALLEE: I'd like to mark as Exhibit No.
2   188 a document Bates-stamped PS0002 through 0003.
3   (DC Exhibit No. 188
4   marked for identification).
5   THE WITNESS: Thank you.
6   MS. LAVALLEE: Q. Mr. Simon, if you could
7   take a moment and look at this letter -- or this
8   document, and then please identify it for the record.
9   A. This is an e-mail that I sent to Larry on
10   February 27th, 2000, forwarding him an e-mail I had
11   sent earlier in the day.
12   MR. ZWANG: Let me stop you. I note that at
13   the top of the page, it says "3/27/200" [sic].
14   THE WITNESS: Uh-huh.
15   MR. ZWANG: I think you just said -- did you
16   say February?
17   THE WITNESS: I said -- no, I meant -- I'm
18   sorry, March 27th, 2000. If I said February, I was
19   mistaken. It was March 27th, 2000. It appears I sent
20   this e-mail to Larry, forwarding on an e-mail that I'd
21   sent to Carolyn.
22   MS. LAVALLEE: Q. Okay. And is it your
23   understanding that you actually did indeed send this
24   e-mail to Mr. Ellison on or about March 27th, 2000?
25   A. I don't know for certain whether I hit the

1   send button, but that would be -- I would assume most
2   likely, yes.
3   Q. Okay. You indicate in the third paragraph
4   that you're becoming increasingly concerned about stock
5   market valuations and believe that this would be a good
6   time to take some money off the table. Consulting --
7   pardon me --
8   "Counting options both vested and
9   unvested, you control 714.5 million shares.
10   I'd initiate a half-of-one-percent
11   quarterly sale program."
12   Do you remember actually communicating with
13   Mr. Ellison regarding this matter?
14   A. I -- I see this e-mail. And this e-mail's a
15   communication. And I believe I sent it. So yes, I
16   believe I communicated this to --
17   Q. And beyond this particular e-mail, do you have
18   any recollection of your discussion?
19   A. About selling?
20   Q. About what you discuss here about initiating a
21   one-half-of-one-percent quarterly sale program.
22   A. I know I frequently spoke to Larry about
23   different ways to try to appeal to him to sell stock.
24   Q. And what was Mr. Ellison's reaction to those
25   appeals?

1   A. I don't know.
2   Q. Did he ever indicate to you that prior to
3   December or January of 2001 that he wanted you to
4   actually proceed with any of those suggestions?
5   A. I have no recollection now. But you'll find
6   further on in the material there's that handwritten note
7   that I had a meeting with Larry talking about this. And
8   he had some -- I wrote a note about a comment about it.
9   Q. Okay. And do you recall what that comment
10   was?
11   A. I only -- I read it Sunday night in
12   preparation.
13   Q. Sure, that's fine.
14   A. But I don't remember -- I don't remember what
15   I read Sunday night, let alone what happened three years
16   ago. But I know there's a piece of paper with a note,
17   and you'll find it somewhere.
18   Q. Okay. That's fine. It's not -- you know,
19   this isn't a memory game or a test in any way.
20   A. No, but I don't remember.
21   Q. Okay.
22   A. I just want to point out for the record,
23   though, however, that March 27th, 2000 was the peak of
24   the bubble. It was a very good call. And if we all
25   followed my advice, we'd be in Tahiti now and very

1   wealthy.
2   (Discussion off the record).
3   MS. LAVALLEE: Q. Mr. Simon, to the best of
4   your knowledge, was a one-half-of-one-percent quarterly
5   sale program or any other sale program initiated prior
6   to January 2001?
7   A. No. And I would just like to state this is me
8   coming up with ideas, just proposals, food for thought.
9   Q. Okay. Why were you doing that?
10   A. That's my job.
11   Q. Okay. But what was the goal, in your mind?
12   A. The goal was to sell Oracle shares to raise
13   cash to pay down debt, to minimize risk, and -- and
14   basically take advantage of what in hindsight clearly
15   was an irrational, exuberant stock market.
16   You'll also notice that this e-mail contains
17   the reference to budgeting for Oracle's planning.
18   Q. Okay.
19   A. That's in there as well. And that's what
20   triggered this e-mail, was Oracle trying to budget for
21   themselves. And that's what triggered this.
22   Q. So this was triggered by a request --
23   A. So they could plan their own budget for the
24   fiscal year '01.
25   Q. And do you recall, subsequent to this e-mail,

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  how you responded to their inquiries?

2      A.  No.

3      Q.  Would you have responded by e-mail?

4      A.  I think this was my reply.

5      Q.  This was your reply?

6      A.  You see my -- if you look at this e-mail

7  chain, there's an e-mail from Carolyn to me --

8      Q.  Yeah.

9      A.  -- talking about their budget meeting and how

10 many options they were going to exercise in 2000, in

11 fiscal year, so they could budget.

12      I then reply to Carolyn what he owns and what

13 I think he should be doing.  And then I forward it on to

14 Larry to remind him and nudge him.

15      Q.  Okay.  But you didn't specifically then

16 communicate back to anybody at Oracle, other than

17 Mr. Ellison or his representative?

18      A.  Carolyn, yes.

19      MS. LAVALLEE:  Okay.  I'm going to mark as

20 Exhibit 189 a document Bates-stamped PS0004 through

21 0008.

22      (DC Exhibit No. 189

23      marked for identification).

24      MS. LAVALLEE:  Q.  Mr. Simon, if you could

25 take a moment and review the document and then tell me

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  what it is.

2      A.  It's an e-mail -- chain of an e-mail to me --

3  from me to Larry, dated March 29, 2000, and forwarding

4  on.  It's replying to his March 29, 2000 e-mail to me

5  responding to the e-mail I forwarded on to him referred

6  to as DC-188.  So it's Larry's reply to my e-mail to

7  him, DC-188, and my reply to Larry.  And it also

8  contains another copy of DC-188, showing the entire

9  e-mail chain.

10      Q.  Okay.  And there's an attached -- there's a

11 chart or a document at the end -- well, actually,

12 there's two pages at the end of this exhibit.  Can you

13 tell me whether these pages relate to the substance of

14 the e-mail.

15      A.  Yes.

16      Q.  Okay.  And can you just explain for me in the

17 last e-mail, responding to Mr. Ellison's question, what

18 you were trying to explain to him here.

19      A.  Yes.  What I was trying to explain was that

20 for income tax purposes in the United States, we have

21 two parallel tax systems, what we call the regular tax

22 and the alternative minimum tax, also known as the AMT.

23      A tax -- a taxpayer pays the greater of these

24 two taxes annually.  And under the -- you pay the

25 great -- you pay two taxes, and you pay the greater of

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  the two.  And you have different tax rates that apply to

2  different types of income for different purposes on

3  these two tax rates.  Some deductions are allowed for

4  other tax purposes, some for AMT purposes.

5      And what I was trying to explain to Larry --

6  the goal, from a tax optimization strategy, is to blend

7  ordinary income and capital gains.  So for example, if

8  you did an option exercise, like these expiring options,

9  that would trigger a lot of ordinary income taxed at a

10 high rate for regular tax purposes but a lower rate for

11 AMT purposes.  But would also yield a state income tax

12 deduction which is deductible for regular tax purposes

13 but not for AMT purposes.

14      So you need a greater amount of income taxed

15 at a lower rate for AMT purposes and a smaller amount of

16 income taxed at a higher rate for regular tax purposes.

17 If you blend in capital gains, which is taxed at the

18 same rate for both purposes, you can effectively get a

19 greater after-tax return on the capital gains when you

20 trigger capital gains income at a certain ratio -- at

21 the same time you're triggering option income.

22      So from a tax strategy standpoint and an

23 economic after-tax maximization standpoint, you want to

24 blend option exercises with the sale of already-owned

25 Oracle stock to generate the capital gain.

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  So basically -- and I was explaining to him

2  the ratio.  And I think I refer to a two-to-one ratio

3  between capital gain income and option income.

4      Q.  Okay.

5      A.  I can get into the specifics, but the math

6  below --

7      MR. NADOLENCO:  That wasn't specific?

8      THE WITNESS:  Okay.  Anyway, there's an

9  example below -- I'm sorry.

10      MS. LAVALLEE:  No, that was funny.  The taxes

11 went over -- way over everybody else's head.

12      THE WITNESS:  Okay.

13      MS. LAVALLEE:  But that's okay.  No, that's

14 fine.  I don't need you to go into more specifics.

15      THE WITNESS:  Okay.  But the basic thing this

16 is a -- it basically works out to a higher sale price

17 when you sell Oracle shares that are already owned.  And

18 it calculates to 5 point --

19      THE REPORTER:  It basically works out to a

20 higher price ...

21      THE WITNESS:  On the sale of Oracle shares

22 already owned, I mathematically calculated it to be the

23 equivalent of a 5.2 percent greater share price or sale

24 price.

25      So therefore, if you exercised options, you

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 then want to blend some -- the sale of some founder

2 shares to trigger capital gain to optimize your taxes.

3 MS. LAVALLEE: Q. Okay. And just for the

4 record and so I'm clear, what were you really

5 recommending to Mr. Ellison in this context?

6 A. That in addition to exercising stock options

7 and sell them same day to raise the cash to pay the

8 withholding tax and your income tax liability on the

9 option, you also sell some of your founder stock and

10 other shares already owned to generate capital gains to

11 maximize your tax strategy.

12 Q. Okay. and you -- at this point in time -- this

13 is March 29th, 2000 -- do you recall whether or not

14 there were any further communications between you and

15 Mr. Ellison or anybody on Mr. Ellison's behalf regarding

16 this particular recommendation?

17 A. I would have to look in my e-mails that you're

18 going through chronologically to see what the next

19 response is. We tried to print out every e-mail we

20 could find for you.

21 And my recollection today is based solely on

22 the e-mails that we've printed out for you, also as

23 refreshed by the Special Litigation Committee report,

24 which was closer to the date of the transaction and is

25 probably a better recollection of what happened than my

Oracle Related Cases                    Page 101

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 recollection today.

2 MS. LAVALLEE: Okay. I'm going to mark as

3 Exhibit 190 a document Bates -- actually, I'm not going

4 to mark this document. It has been previously marked in

5 this case. And it is DC-101. Okay.

6 (Discussion off the record).

7 MS. LAVALLEE: Q. Mr. Simon, if you could

8 take a moment and review the document and then identify

9 it for the record, please.

10 A. Okay.

11 Q. Can you identify the document, please.

12 A. It appears to me to be a chain of e-mail from

13 me to Safra Catz at Oracle, dated Monday, April 10, 2000

14 is the latest, with e-mail going back and forth -- all

15 the e-mail exchanges that day.

16 Q. Okay. And do you regularly -- did you

17 regularly communicate with Safra Catz?

18 A. No.

19 Q. Okay. Who is Jeff Detwiler?

20 A. Jeff Detwiler is our tax attorney.

21 Q. At your -- by your tax attorney, what do you

22 mean?

23 A. No, it's a tax -- for much of Larry's work, we

24 use a small law firm in San Francisco currently named

25 Dudnick, Detwiler, Rivin & Stikker. And we farm out

Oracle Related Cases                    Page 102

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 special litigation -- special securities work to other

2 firms. But Jeff Detwiler's a tax partner, a very good

3 tax attorney at that firm. So when I have tricky tax

4 questions, I would bounce the e-mail to him for his

5 input.

6 Q. Okay. And Mary Jo Lloyd?

7 A. She's a elapsed [sic] CPA, works for me in our

8 offices as sort of -- I call her the controller,

9 handling Larry's cash.

10 Q. And Catherine Ong is the person you identified

11 earlier?

12 A. Yes, a CPA in my office, handling Larry's

13 affairs.

14 Q. And Andrew Dudnick?

15 A. He's the attorney at Dudnick, Detwiler, Rivin

16 & Stikker who takes the lead in handling Larry's general

17 corporate work.

18 Q. So he does corporate, and his partner at

19 Detwiler does the tax?

20 A. Tax work, yes.

21 Q. In here there is reference to Mr. Ellison

22 possibly making a $1 billion donation to charity and the

23 use of stock options for this purpose.

24 A. Mm-hm.

25 Q. Do you recall discussions regarding this

Oracle Related Cases                    Page 103

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 subject?

2 A. Not until I looked at this e-mail.

3 Q. Okay.

4 A. When I prepared for the depo, I looked at this

5 on Sunday, is when I saw it.

6 Q. Do you -- so you don't recall considering

7 making such a donation -- or having Larry make such a

8 donation at any point in time?

9 A. Well, based on this e-mail, I obviously sent

10 e-mail out to Jeff Detwiler for his input on it. I

11 don't recall how Jeff Detwiler responded. But my tax

12 question, I was being kind in my response. I think

13 there's a serious assignability of income problem with

14 the assigning of stock option income.

15 The concept of the assignability of income is

16 basically you have the right to assign income. The mere

17 assignment of income triggers the recognition of income

18 in your hands.

19 So if someone told me you could donate stock

20 options to charity, I'd be very skeptical 'cause I want

21 to know how they get around the concept of assignment of

22 income, and I'd never seen it done. However, since it

23 was raised, I wanted to talk to other people who I

24 respect to see if they have heard of this. And since I

25 have no recollection, my guess is this died.

Oracle Related Cases                    Page 104

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  Q.  Okay.  But you don't have any recollection one

2  way or another?

3  A.  No.

4  Q.  Okay.  And you don't have any recollection of

5  actually discussing it with Mr. Ellison personally?

6  A.  No.  No.

7  Should I be keeping these that you're labeling

8  separate from this pile so you can get them back in an

9  organized way from me?

10  Q.  That would be wonderful, if you can.

11  Obviously --

12  A.  Okay.  I will keep the things that are labeled

13  on one side and these on the other side.

14  Q.  That's very kind.  Thank you.

15  I'd like to mark as Exhibit 190 a document

16  Bates-stamped PS0013 through 14.

17  (DC Exhibit No. 190

18  marked for identification).

19  MS. LAVALLEE:  Q.  Mr. Simon, if I could ask

20  you to take a look at the document and then please

21  identify it for the record.

22  A.  It's an e-mail from me to Larry, dated

23  April 7, 2000, cc to Carolyn Balkenhol, with a few

24  paragraphs to Larry forwarding on an e-mail from Deborah

25  Lange.  This is the -- okay.

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  Q.  There are a couple issues raised in here that

2  I'd like to draw your attention to.  And the e-mail from

3  Deborah Lange to Daniel Cooperman and a couple of others

4  discusses a possibility of Larry selling directly to

5  Oracle.

6  And I believe the con -- from the context,

7  that they're talking about -- actually, let me ask you,

8  do you have any understanding of what they're talking

9  about there?

10  A.  Mm-hm.

11  Q.  And what is your understanding?

12  A.  Based on my e-mail to Larry, when Deb Lange

13  called me about tax planning for Oracle to coordinate

14  Oracle's tax planning with Larry's, I raised the issue

15  about the options.  And it's a same-day exercise and

16  sale.

17  And I believe -- I don't know for a fact --

18  that probably Oracle has a share repurchase program

19  going on.  And being ever-frugal, I would hate to have

20  Oracle buying stock on the market and paying a

21  commission and Larry selling stock in the market, paying

22  a commission and having someone make a spread.

23  So I posed the idea maybe instead of having

24  the brokers make a spread, we just exercise the option

25  and sell them to Oracle.

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  Q.  Okay.

2  A.  And that apparently was -- anyway, we'll get

3  to it.  But it was rejected for the appearance of a

4  potential conflict of interest.  And it was better to

5  pay the commission expense to do the right thing, to

6  appear to do the right thing and keep it completely

7  aboveboard.

8  Q.  And you based -- the last portion of it in

9  terms of what was decided -- it's not something that

10  appears in this e-mail.  You're basing your --

11  A.  There's another e-mail that will come up that

12  talks about this, I believe, that I saw on Sunday.  And

13  I also raised to Larry the basic issue if he picks up a

14  billion dollars of option income, Oracle gets a

15  billion-dollar deduction.

16  And that's why there's tax planning on the

17  Oracle side, 'cause that's a big deduction.

18  Q.  And were you at this point in time making a

19  recommendation to Mr. Ellison as to whether or not to

20  actually exercise options?

21  A.  I have -- I suspect my -- I don't know.  I'd

22  be speculating.  I was just reminding him that he had

23  these options that were expiring.

24  Q.  Okay.  And do you know -- other than the other

25  e-mail that you just referred to with respect to the

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  decision being made not to go the route of selling

2  directly to Oracle, do you have any other recollection

3  regarding that particular subject?

4  A.  No.

5  Q.  You mentioned something, a "sherri purchase"?

6  What was that?  I'm not sure I heard you correctly

7  earlier, your response.

8  A.  I think Oracle Corporation has a share

9  repurchase -- had at one point in time a share

10  repurchase going on.

11  THE REPORTER:  Gotcha.

12  MS. LAVALLEE:  I had a feeling that one sort

13  of slipped out into the radar there.

14  Q.  All right.  And how are you spelling that?

15  Just so we have it clear on the record.

16  A.  Share, S-H-A-R-E, repurchase,

17  R-E-P-U-R-C-H-A-S-E, program.

18  Q.  It was showing up on the record a little

19  strange, so I wanted to clarify that.

20  MR. ZWANG:  Purchasing people named Sherri?

21  THE REPORTER:  Or the drink.  I don't know.

22  MS. LAVALLEE:  I'm going to be marking as

23  Exhibit No. 191 a document Bates-stamped PS0018.

24  (DC Exhibit No. 191

25  marked for identification).

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   MS. LAVALLEE:  Q.  Mr. Simon, if you could
2   take a moment to look at this document and identify it
3   for the record, please.
4       A.  It is an e-mail from me to Larry, dated
5   June 5, 2000.
6       Q.  All right.  And can you tell me the -- in the
7   third paragraph, you state -- well, actually, let me
8   step back.
9       Is this an e-mail that you indeed, to the best
10  of your understanding, sent to Mr. Ellison on or about
11  June 5th, 2000?
12      A.  It would appear so.
13      Q.  Thank you.  In the third paragraph of the
14  text, you state,
15      "Also, as discussed, Morgan Stanley
16  put together a proposal for me, which I'm
17  having them refine to show you, whereby you
18  can in effect extend the option out for a
19  number of years with a prepaid forward.
20  You could raise cash to pay the taxes on
21  exercise of the options next August, have
22  downside protection and retain a portion of
23  future appreciation."
24      You're talking there specifically about which
25  options?

Oracle Related Cases                          Page  109

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1       A.  I am talking about the options that are
2   expiring on August 1, 2001.
3       Q.  Okay.  And who was it -- Morgan Stanley, what
4   was their role in Mr. Ellison's affairs at this time?
5       A.  Salesmen.
6       Q.  And was it -- were they a brokerage firm that
7   Mr. Ellison, or you on behalf of Mr. Ellison, had
8   retained?
9       A.  No, we -- we work with most every brokerage
10  house and firm in -- in the United States and western
11  Europe.  And they are always approaching me with ideas
12  to sell product.
13      Q.  Okay.  And was this particular proposal that's
14  discussed in this paragraph a proposal that Morgan
15  Stanley approached you with?
16      A.  Correct.
17      Q.  And can you -- I believe you referred
18  to this earlier --
19      A.  Correct.
20      Q.  -- in the testimony.  Okay.  Can you tell me
21  what your understanding is of the proposal they were
22  making.
23      MR. ZWANG:  Do you want to the details?
24      MS. LAVALLEE:  Q.  You can explain it as
25  simply as you can for the rest of us to understand.

Oracle Related Cases                          Page  110

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1       A.  I will do my best to synthesize and talk
2   slowly.  As we discussed previously, you had asked me
3   what the alternatives were to deal with expiring
4   options.  And I mentioned the alternatives --
5   theoretical alternatives are let them expire and just
6   throw away your money, exercise and hold, exercise and
7   sell, which is my preferred mode, and then I said
8   there's also -- my recollection from reviewing e-mail,
9   there was a proposal put together by Morgan Stanley to
10  do what I then called a synthetic extension of the
11  option.
12      And as I look at this e-mail, what I believe
13  Morgan Stanley was proposing was that instead of
14  exercising and selling to raise the cash proceeds to pay
15  the taxes and the withholding and the strike price when
16  he exercises the option, they would propose a -- they
17  had a product, a prepaid forward product whereby in lieu
18  of you selling, you would exercise the shares; and in
19  lieu of you selling the shares, you would enter it into
20  a prepaid forward contract, which is a derivative
21  transaction, with Morgan Stanley where you would -- they
22  would lend you money against that prepaid forward that
23  would give you the cash to pay down -- pay your
24  withholding taxes and your strike price.
25      And then -- and then you would share -- they

Oracle Related Cases                          Page  111

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   would give you downside protection if the stock dropped,
2   and you would share in some of the future appreciation.
3       Now, I think it's very important that you
4   understand what a prepaid forward is and what this
5   derivative is because superficially it might look, to
6   the uninitiated person, that it's a mechanism not to
7   sell the stock.
8       What you are really doing, though, is when you
9   enter into a prepaid forward with a counterparty, let's
10  say with Glenn, Glenn lends me the money, but then
11  Glenn goes into the market and sells the Oracle shares
12  to raise the cash to lend to me the money.  They then
13  also -- they do what's called dynamic hedging.  And your
14  downside protection and your upside protection are
15  generally offset by what you would do as a collar.
16      Q.  Right.
17      A.  And you have a collar both on the ups and the
18  downs.  The spread -- the amount of appreciation you
19  want -- you can do a zero cost collar or you pay for the
20  collar.  But the important thing is, is the broker is
21  going in, and they actually short the stock that you
22  are -- would otherwise sell -- I think it's up to
23  85 percent.
24      So if Larry had, let's say here, 22 million
25  option shares, they would actually go into the market

Oracle Related Cases                          Page  112

1  and probably short 19 million shares. So your effect on

2  the overall market would be selling 19 million shares up

3  front versus 22, so you're still going to have the same

4  negative market impact.

5      You also then have a derivative transaction,

6  which are very opaque. I personally would never advise

7  doing a derivative transaction because the reason the

8  brokers sell them, they want the product, is because

9  they're opaque and you need a physicist to understand

10  them, to understand the mathematical modeling.

11      And if I was going to do one, I would hire

12  someone on my side to analyze the math. But basically I

13  avoid and recommend against all derivative transactions.

14      You also have -- with the derivative

15  transactions, you have very complex tax reporting

16  issues. You have very complex securities issues dealing

17  with, I believe, compliance with Section 16, whether you

18  have a short swing profit. And the question is when you

19  close the transaction, are you blocked out?

20      So you have bad -- so you have bad pricing,

21  you have bad tax consequences, you have opaque, very

22  expensive product that everybody wants to sell to you

23  'cause if they can fool you, they can make a lot of

24  money off of you.

25      But as a fiduciary for Larry, I have a duty to

---

1  present to him alternatives that I reject. So this is a

2  theoretical -- this is a theoretical alternative which

3  no one should do unless you want to enrich the broker.

4      Q.  Okay. I assume, based on that, that you

5  actually recommended against this product?

6      A.  Correct.

7      Q.  Okay. And do you recall --

8      A.  So that's why I want to be clear that your

9  options really are let the option expire, exercise and

10  hold if you have enough money, or exercise and sell.

11      Q.  Okay. And do you recall discussing this

12  particular option with Mr. Ellison, other than what's in

13  this particular e-mail?

14      A.  No.

15      Q.  Okay. So you don't know his reaction to this

16  proposal?

17      A.  Not this specific proposal. But Larry, in the

18  past, has always told me he likes to keep things simple,

19  which mirrors my desire to understand what I own and

20  what I'm buying.

21      And so in the past when derivative

22  transactions have been presented to me and I passed

23  along the idea to Larry with a recommendation that we

24  not pursue it, he would always get back and respond

25  "Yes, let's keep things simple."

---

1      Q.  Okay. But you don't know whether or not he

2  specifically responded to this proposal?

3      A.  No, I do not. Actually, could I add one

4  thing. If you look at my last paragraph to Larry, it

5  says "I'm not sure it's worth fussing with the prepaid

6  forward."

7      So basically I'm telling him my

8  recommendation --

9      Q.  Right.

10      A.  -- is to ignore it.

11      Q.  Right.

12      A.  Which is probably what he did.

13      MS. LAVALLEE:  I'm going to mark as Exhibit

14  No. 192 a document Bates-stamped PS0019.

15      (DC Exhibit No. 192

16      marked for identification).

17      MS. LAVALLEE:  Q.  Mr. Simon, can you identify

18  for the record what this document is.

19      A.  This appears to be a schedule I prepared for a

20  meeting with Larry and it indicates that I presented to

21  Larry on July 13, 2000 to discuss his increasing

22  indebtedness and the bank lines.

23      And this is the schedule I was referring to

24  that had my handwritten note earlier. So that had --

25  this is the note that says "7/13/2000." This is the

---

1  note I was referring to earlier.

2      Q.  Okay. Thank you. Can you actually -- is this

3  handwriting on here yours?

4      A.  Yes, it is.

5      Q.  Okay. And was this particular document that's

6  typed up something that you prepared?

7      A.  Me or Mary Jo.

8      Q.  Can you tell me what your handwriting reads,

9  starting at the top. This is a little difficult to

10  always understand other people's handwriting.

11      A.  Okay. The first -- top says "LJE

12  correspondence file." That's me routing a copy of this

13  to our file.

14      Q.  Okay. Let me stop you right there and ask,

15  what is your filing system with respect to all

16  correspondence or materials regarding Mr. Ellison's

17  financial matters?

18      A.  We have a very complex and evolving filing

19  system. For each of the legal entities, we have the

20  traditional files for a tax client, which would be a tax

21  return file, a financial statement file, a permanent

22  file and a correspondence file per entity.

23      For each investment that we make, we have a

24  permanent file, a correspondence file and a financial

25  statement file.

1  Q. By "investment," are you referring to each

2  actual trade or --

3  A. No, no.

4  Q. -- each type of equity or --

5  A. Let's say Larry, through one of the entities,

6  makes an investment in XYZ private company. And let's

7  say we buy $2 million worth of preferred stock. We'll

8  have a separate file set up just for that investment

9  under that investment company's name.

10  Q. Okay.

11  A. So you're segregating your types of files by

12  investment. We would also have for Larry a general

13  correspondence file for matters relating to Larry

14  personally. And this appears to have been routed to

15  Larry's general correspondence file as opposed to XYZ

16  company.

17  Q. Is that it in terms of the filing system?

18  A. We also have special project files. So we

19  sort based by taxable entity, we sort by investment, and

20  we sort by special project files. And for example, in

21  connection -- we had a file labeled "January 2001 stock

22  trades correspondence file." And that's the file we

23  went -- the first file we went to when we -- to produce

24  the documents that you requested that had all the notes.

25  And there's -- somewhere in your documents

---

1  there'll be a complete set of what may look like

2  random -- we've organized documents that were just from

3  that file in the chronological order they were placed

4  in.

5  Q. Okay. And other than that, were there any

6  other files that you can think of?

7  A. We also have bank statement files for all the

8  bank accounts for all the entities that are separate.

9  Q. Anything else?

10  A. I keep files in my drawer that are just

11  working files. Mary Jo keeps files in her drawers. We

12  have files for stuff -- projects you're working on but

13  aren't yet complete.

14  Q. Okay. And how long do you maintain your

15  personal files in your drawers for?

16  A. You mean my desk?

17  Q. Yeah.

18  A. As quickly as I can move them off my desk, I

19  move them off my desk 'cause there's like a foot of

20  paper.

21  Q. And where do you have them routed?

22  A. They go to the file room.

23  Q. Okay. So you don't actually maintain a

24  separate file system in your office?

25  A. No.

---

1  Q. Okay. Does any of your associates or partners

2  or people in your office maintain separate file systems?

3  A. No.

4  Q. Okay. I interrupted you as you were going

5  through and listing the -- explaining the handwriting

6  on the document. If you can continue with that, please.

7  A. Would you like me to explain the document so I

8  can explain the handwriting in context, or you just want

9  me to read the handwriting?

10  Q. Okay. Why don't -- why don't you do the

11  former.

12  A. Okay. This is a schedule detailing Larry's

13  Libor contracts dated as of July 14, 2000. It -- and it

14  lists by bank -- I said we had five banks. And it lists

15  the five banks we were working with at the time.

16  It shows the principal balance outstanding at

17  that date, the line limit, the maturity -- that is not

18  the maturity date of the line; that is the maturity date

19  of the Libor contract.

20  Q. Right.

21  A. And Libor contracts you can do 30, 60, 90, 180

22  days, you can do shorter periods. And we generally do

23  30-day Libor contracts. So that's why you're seeing

24  them all mature. It's the contract roll, not the

25  maturity date of the underlying loan agreement.

---

1  Q. Okay.

2  A. And then it has the number of days, and each

3  bank has its own policy on how many days' advance notice

4  you have to give to book a Libor contract.

5  Q. I'm not sure I followed that last piece. How

6  many days you had to book a Libor contract?

7  A. How many days in advance you have to call the

8  bank to book a Libor contract. Under floating rate

9  loans based on Libor, technically all bank agreements

10  are written where you can either borrow at prime or at

11  Libor with a spread over Libor at your election.

12  Q. Right.

13  A. You have to book these contracts and you have

14  to notify the bank so many days in advance. And I

15  suspect this dates back to when they were originally

16  done off-shore borrowing in London and has so many days

17  in advance notice for them to do matching 'cause they

18  would borrow the money on the interbank market to match

19  your contract.

20  Q. And when you're saying the number of days in

21  advance, you're talking in advance of the maturity date?

22  A. Of the -- of the Libor -- of the 30-day

23  rolling Libor contracts. So this was prepared by Mary

24  Jo, and she controls this. For example, UBS is Union

25  Bank of Switzerland. Or it may have been after they

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  merged with Swiss Bankcorp. It may be UBSAG.

2      But you have to contact UBS two days prior to

3  the maturity of the contract to renew your -- to tell

4  them whether you want a 30-, 60- or 90-day roll on the

5  contract. Otherwise the loan would go to prime.

6  Q. Okay.

7  A. So this is just data for us.

8  Q. And in connection with -- if I were to -- or

9  if you were to want to try to find out what the actual

10  contract maturity dates on any of these loans are, where

11  would you go to find that information in your office?

12  A. There are schedules kept in my office, or you

13  can go to the underlying loan agreement. I am fairly

14  certain you're going to find a schedule, as we go

15  through my documents, detailing the maturity dates of

16  the contracts --

17  Q. Okay.

18  A. -- okay, in here, was presented to you.

19      What you will note on the line limit, Larry's

20  aggregate limit was 1,350,000,000. At that point in

21  time, his drawings were 1,022,000,000. We had available

22  $327 million.

23  Q. Right. And this is July of 2000; is that

24  correct?

25  A. Yes.

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  Q. You were continuing to explain the document

2  and proceeding with the handwriting.

3  A. And I was clearly detailing to Larry

4  likely expenditures over the next six to 12 months. I

5  would suspect I was meeting with Larry to say "There's

6  going to be a cash issue coming up; the debt's reaching

7  its lending limit; we have to start paying down debt."

8      And this is listing out for Larry expenditures

9  that I see. And I'll just read the ones circled first.

10  "Expenditures," 1 is "lifestyle, annual 20 million";

11  number 2, "interest accrual." That's accruing of

12  interest at around six and a half percent annual is at

13  75 million. He was thinking, at the time, of buying a

14  villa in Japan. That was 25 million.

15      He had entered into a contract to build a new

16  yacht budgeted at 194 million over three years. He was

17  contemplating the Americas Cup campaign that was held in

18  New Zealand in 2003, budgeted at 80 million.

19  Q. Over three years?

20  A. Yes.

21  Q. Okay.

22  A. And then it says -- number 6 is UAD.

23  12 million over three years. UAD was underwater

24  archeology development. It was a project that did not

25  go forward.

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  Q. What kind of project was it, just so I'm

2  clear?

3  A. Doing archeology -- funding archeology digs

4  somewhere. I'm not sure where in the world.

5  Q. Okay. And when did that fall --

6  A. Underwater. That's all ...

7  Q. In many ways, right. When did that fall

8  through?

9  A. Sometime during this period it fell through.

10  I don't know.

11  Q. Okay. You believe it fell through sometime in

12  the summer of 2000?

13  A. I don't recall. I was basically -- my job on

14  these things is to try to protect Larry and be very

15  pleasant with these people and keep the project moving

16  while discouraging it from happening.

17  Q. Very valuable, I'm sure.

18  A. I shouldn't say that to Larry. He's going to

19  read my deposition now. But basically this was -- this

20  was one of them.

21  Q. Okay. I mean, do you have any understanding

22  as to whether or not it was something that Mr. Ellison

23  decided not to proceed with before September of 2000?

24  A. There's undoubtedly [sic] a UAD file in my

25  office somewhere under special projects. I would have

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  to go search. But I have no recollection.

2  Q. Okay. But it's something that did not go

3  forward?

4  A. I know it did not go forward.

5  Q. Okay. Do you know if it didn't go forward by

6  the January 2001 time frame?

7  A. I suspect it did not, but I don't know.

8  Q. Why do you say you suspect it did not?

9  A. Because you can only keep people being

10  pleasant and string -- and negotiating for a certain

11  period of time. This is July. This was hard to keep --

12  and it was underwater archeology and summer digs. It's

13  hard to keep the discussions going being pleasant for

14  six months into winter, but I don't recall.

15  Q. Okay, thanks. And the third item that you

16  referred to as the villa in Japan. At what point -- you

17  indicated that Mr. Ellison did not actually purchase a

18  villa in Japan.

19  A. He did not, yes.

20  Q. And when was the decision made not to purchase

21  the villa?

22  A. Sometime during this year. I suspect that

23  also went on for three to six months.

24  Q. Okay. Was this -- do you have any time frame

25  as to when the discussions started and when they might

1  have ended?

2  A.  I would have to look at my vita subject

3  matter file, which I did not copy for you because I

4  didn't think it was directly relevant to your document

5  request.

6  Q.  Okay.  Do you -- I'm sorry.

7  A.  Above it says "Also nCUBE-Chase 44 million,

8  38.5 million drawn."  That's another debt -- nCUBE is a

9  company Larry owns most of.  He has guaranteed up to

10  $44 million of debt.  And that also counts toward our

11  aggregate debt limit.  And that was just another debt I

12  was flagging for Larry in addition to the numbers above.

13  Q.  Okay.  And -- oh, this -- is this a number --

14  okay.  What do you mean by "guaranteed up to 44 million

15  of debt"?

16  A.  A corporation wants to borrow money, wants to

17  go to the bank.  It has terrible credit rating, can't

18  borrow.  I'd guarantee the debt to the bank.  The bank

19  says, gee, I look creditworthy.  They will lend money to

20  the corporation.  When you're the guarantor, you put a

21  limit on the maximum amount that you want to guarantee.

22  Q.  Okay.  And do you have any understanding of

23  whether or not the bank actually sought to have Mr.

24  Ellison make any payments as the guarantor for that

25  company prior to, say, February of 2001?

1  A.  I negotiated the loan for this company with

2  the bank.  So this is treated by the bank as if it's a

3  part of Larry's line.  And the answer is they would

4  never ask Larry to guarantee it -- I mean to make a

5  payment because we are guaranteeing it.  And it's part

6  of our aggregate debt limit.  So it's really a piece

7  broken off from Larry's line for a special purpose.

8  Q.  Okay.  And I guess my question's slightly

9  different.  What is -- what is the role of a guarantor?

10  Can you explain that --

11  A.  What is the role --

12  Q.  -- just so it's clear for the record?  I mean,

13  what was Mr. Ellison doing when he was providing that

14  $44 million guarantee?

15  A.  I structured this.  It's a very complicated

16  transaction.  Do you really want the explanation?

17  Q.  Can you explain in just sort of -- simply

18  explain what the concept of the guarantor -- guarantee

19  is.

20  A.  Correct.  NGUBE was a company that Larry owned

21  99 percent of.  It merged sometime in '98 or '99 -- in

22  fact, in '99, from prior e-mails -- with a company

23  called SkyConnect.  As part of my negotiations of the

24  merger with the seller of SkyConnect, nCUBE had a lot of

25  money owed to Larry.  We were able to get the lender --

1  the SkyConnect owner to agree to keep certain kept

2  outstanding as part of nCUBE's liability rather than

3  forcing Larry to absorb that at the time of the

4  negotiations.

5  Q.  Right.

6  A.  Larry's going to get the same percentage of

7  the merged company whether I can keep the debt on the

8  books or not.  I was able to persuade the guy that this

9  is a proper level of debt on the books.  So we didn't --

10  Larry did not have to pay off the debt.

11  So therefore, Larry got around, let's say, two

12  thirds of the merged company, yet I shifted 44 million

13  of debt -- or 40 million of debt -- actually, 38.5 --

14  onto nCUBE's books.  But nobody would lend to nCUBE

15  'cause it was cash-flow negative.

16  So to accomplish that, I then arranged with, I

17  think, originally Bank of America, then it was moved to

18  J.P. Morgan Chase, to lend directly to nCUBE secured by

19  Larry's guarantee and Larry's Oracle shares as part of

20  our line to nCUBE.  And basically I got the debt on the

21  books of the corporation.  And since we only owned two

22  thirds of it, I effectively shifted one third of the

23  debt obligation onto the shareholders of SkyConnect.

24  Q.  Okay.  And do you have any understanding as to

25  whether or not this loan -- nCUBE loan was in good

1  standing throughout 2000?

2  A.  Yeah, it's still in good standing.  It's part

3  of Larry's line.

4  Q.  Okay.

5  A.  I mean, I fund money.  I mean, it's -- yes.

6  Q.  Okay.

7  A.  When nCUBE needs money to pay the interest, I

8  fund the money to nCUBE from Larry.

9  Q.  Okay.  There's a couple more handwriting

10  notations.

11  A.  "7/13/00, per Larry, we will sell Oracle to

12  raise cash for these expenditures."

13  Q.  Okay.  And you have a date on that.  Was that

14  the date that Mr. Ellison gave you that instruction?

15  A.  That is not an instruction.

16  Q.  Okay.  Tell me what it is, then.

17  A.  Larry likes -- understands when I raise

18  problems and issues, and he likes to give me the answers

19  that will solve the problems and that will, in a sense,

20  please me and make me go away, to come back every

21  quarter to raise the same issue.

22  So he's basically telling me "Okay, you've

23  told me we're running up against -- we have 200" -- if

24  you look at this, we have $320 million of operating

25  room, okay.  I'm budgeting expenditures of 400 million

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  or 500 million.

2  Q.  Over the course of three years?

3  A.  Yeah, but things -- you know, the world --

4  things are front-loaded.  This is over three years, but

5  things are front-loaded.

6  Q.  Right.

7  A.  Interest accrual is just one year.  So even if

8  you take one year budgeting a couple hundred million

9  dollars -- and this does not even include his investing

10  in private equity companies.

11  So Larry's basically telling me -- it's like

12  a -- it's like a train running into a stone wall.  I'm

13  saying "Look, we have a freight train going down a track

14  hitting a debt wall.  You have options that are also

15  expiring.  We have to deal with the expiring options in

16  a tax-efficient way and deal with the debt before the

17  freight train hits the wall."

18  And Larry's telling me "Okay, you're right.  I

19  see it."

20  And that's -- that's what this says.  It's not

21  an instruction to sell.  It's Larry acknowledging in

22  advance that there's an issue here that needs to be

23  dealt with.

24  Q.  Okay.  And after that acknowledgment, when did

25  he actually provide you with the instructions to execute

Oracle Related Cases                                    Page 129

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  this --

2  A.  Per prior e-mails and the Special Litigation

3  Committee, January 19th, 2001.

4  Q.  Okay.  And during the period of time between

5  this July 14, 2000 meeting -- or July 13th, I think is

6  what your handwritten notes say -- and that January 19,

7  2001, would -- did you have further discussions, that

8  you can recall, regarding this particular issue?

9  MS. SEGAL:  I object to the form of the

10  question.

11  MS. LAVALLEE:  You can answer.

12  THE WITNESS:  I don't recall.  I think we

13  should just move forward into the e-mail and see what

14  the e-mail tells us.

15  MS. LAVALLEE:  Q.  Okay.  But you have no

16  specific recollection?

17  A.  No.

18  MS. LAVALLEE:  Okay, great.  You know what;

19  it's 20 to 1.  What do you say we break for lunch?

20  THE VIDEOGRAPHER:  We are off the record.  The

21  time is 12 --

22  MR. NADOLENCO:  Hold on, hold on, hold on.  I

23  just wanted to put on my record my offer that I made to

24  you, Nicole, before the deposition still stands.  As I

25  told you, we withheld from the production certain

Oracle Related Cases                                    Page 130

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  documents that related to the '95 to '99 time frame.

2  You had indicated that you thought we should produce

3  them pursuant to one of the prior court orders or

4  agreements.  I asked you to get that for me.  I'm happy

5  to review it.

6  If you could do that, I'd review it and

7  reevaluate whether we should go ahead and produce them.

8  I do have the documents here with me.  But I would have

9  to see what you were talking about.

10  MS. LAVALLEE:  Okay.  And I'd just like to

11  state for the record that we were produced roughly --

12  well, documents Bates-stamped up from 1 to 580, in that

13  range, with some documents missing, which is the

14  documents you're talking about, just late yesterday

15  after the close of business.

16  So clearly it's something that we haven't

17  actually had a chance to look at what's been provided.

18  I'll consider --

19  MR. NADOLENCO:  (Inaudible) Number of them.

20  MS. LAVALLEE:  Well, that's true.  But I

21  haven't had a chance to study them.  Nobody else has.

22  So what we'll do is I'll consider your suggestion, but I

23  may not be in a position today to do that.

24  We can go off the record.

25  THE VIDEOGRAPHER:  We are off the record.  The

Oracle Related Cases                                    Page 131

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  time is 12:42.

2  (Lunch recess from 12:43 to 1:43).

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Oracle Related Cases                                    Page 132

1   AFTERNOON SESSION      1:54 P.M.

2       EXAMINATION RESUMED BY

3      THE VIDEOGRAPHER: We are back on the record.

4   The time is 1:54.

5      MS. LAVALLEE: Q. Welcome, Mr. Simon. I

6   believe that we were -- we had nearly completed

7   discussion of, actually, Exhibit -- I didn't make a

8   note -- the last exhibit.

9      A. 192.

10     Q. 192, exactly. And I think we covered that.

11   So what I'd like to do is actually mark a new exhibit,

12   which is 193, and which is a document Bates-stamped ORCL

13   0093843.

14     (DC Exhibit No. 193

15     marked for identification).

16     MS. LAVALLEE: Q. And Mr. Simon, if you could

17   take a moment to look at the document and identify it

18   for the record.

19     MR. ZWANG: Let me note first that this isn't

20   one of the documents that Mr. Simon produced 'cause it

21   doesn't have his Bates stamp number, so ...

22     MS. LAVALLEE: That's correct.

23     MR. ZWANG: And he's not shown as a party to

24   the e-mail, to either -- and I don't see his name as a

25   party to the e-mail. So he may not be able to identify

---

1   it for you.

2     MS. LAVALLEE: Okay. I'd just like to let you

3   know, we're functioning under Delaware law for these

4   depositions, and objections should be limited to making

5   an objection, period, no speaking objections.

6     But I appreciate your comments. And you are

7   correct, he is not actually -- he's not listed as a

8   recipient or sender on either one of these e-mails.

9     MR. ZWANG: Well, while I want to comply with

10   whatever rules you've chosen to govern yourselves by as

11   parties, Mr. Simon is a California resident and has all

12   the rights of a deponent in California and -- including

13   the right to counsel, so ...

14     MS. LAVALLEE: Don't dispute his right to

15   counsel.

16     Q. All right, Mr. Simon --

17     A. I'm still reading it --

18     Q. Sure.

19     A. -- 'cause I've never seen this before.

20     Q. Okay. Please, take your time, then, and let

21   me know when you're done reading it.

22     MR. ZWANG: Actually, I think that answers

23   your first question, which was "Can you identify it?"

24   And I think the answer was no, he's never seen it

25   before.

---

1     MS. LAVALLEE: Okay. Well, he's going to

2   testify, not you.

3     MR. ZWANG: I believe that's what he just

4   said.

5     MS. LAVALLEE: Okay, that's fine.

6     MR. NASTARI: You have to acknowledge the

7   rules of a deposition, and they are Delaware rules.

8   It's not just --

9     MR. ZWANG: I'm going to do my best --

10   frankly, I don't know Delaware rules, but I'm going to

11   do my best to comply with whatever rules you've chosen

12   to conduct the deposition by.

13     MS. LAVALLEE: Thank you.

14     THE WITNESS: Okay, I'm ready.

15     MS. LAVALLEE: Okay.

16     Q. Mr. Simon, this appears to be an e-mail trail

17   from somebody named Chris to Catherine Ong and -- back

18   and forth, a series of e-mails; is that correct?

19     A. Correct.

20     Q. Catherine Ong is the person you identified

21   earlier who works in your office; is that correct?

22     A. She's a person who's worked with me on Larry's

23   tax matters since Larry became a client of Howson &

24   Simon, handles and manages Larry's tax compliance, and

25   did the document search. As I told you before, I guess

---

1   we didn't search her computer, and I apologize for that.

2     Q. All right. We would actually ask --

3   plaintiffs would ask that a search be made of all

4   computers. And to the extent that wasn't done, if you

5   could advise us whether or not there are additional

6   documents in light of that search, that would be --

7     A. Sure. I'll have her do a search and get ...

8     Q. Thank you.

9     A. Excuse me a second. I just want to write a

10   note to remind myself.

11     Q. Sure.

12     MR. NADOLENCO: Nicole, maybe this is a good

13   time for me to say that over the lunch break, we decided

14   to go ahead and produce to plaintiffs the documents that

15   we previously had withheld from the '95 to '99 time

16   frame.

17     At this point, the only document we have

18   withheld from the production are related to tax

19   withholdings for Mr. Ellison. And we're asserting a tax

20   privilege for those, as well as those that are

21   completely irrelevant. So I've withheld those. And the

22   ones we produced, plaintiffs' counsel is currently

23   copying.

24     MS. LAVALLEE: Okay. And I appreciate that

25   production. And as I indicated to counsel, obviously we

1   haven't had a chance to fully review the documents. And
2   particularly I believe you gave me a stack that was a
3   fairly large stack just a few minutes before we
4   commenced after the lunch break. So we haven't had a
5   chance to review that. So obviously we can't indicate
6   whether or not there remains a dispute or not. But we
7   will try to do that.
8       MR. NADOLENCO: And I apologize. There is one
9   other document that we withheld, and it's a part of a
10   Schedule D from Mr. Ellison's tax return. We're
11   asserting the same privilege on that, but that's just a
12   single page.
13       MS. LAVALLEE: Okay, thank you.
14       THE WITNESS: Might I add one thing about
15   searching Catherine's computer. Up until a year ago, we
16   did not have a central server. Our offices in Walnut
17   Creek are right below Morrison & Foerster's offices.
18   Morrison & Foerster's offices were broken into around a
19   year and a half ago, and all of their computers were
20   stolen. And so were many of our computers. And my —
21   Catherine's may have been one stolen.
22       And we now have a server with backup and
23   everything, but we may not have anything for Catherine.
24   But I will check her computer and see what we have.
25       MS. LAVALLEE: Okay. I appreciate that.

1       THE WITNESS: But there may not be — there
2   may be nothing for that reason.
3       MS. LAVALLEE: Okay.
4     Q. Generally is it the practice of your firm to
5   print and keep hard copies of e-mails?
6     A. No. You print some really critical ones, but
7   as the volume of e-mail has gone up in recent years, I
8   don't think anybody prints every — ten years ago, yes.
9   Now, forget it.
10       The answer is we try to print critical ones
11   that give authorization or something like that. But you
12   can't print everything nowadays.
13     Q. Okay.
14     A. And anything that was printed has been
15   searched and provided to you.
16     Q. Okay.
17     A. We hope.
18     Q. I appreciate the explanation. I take it
19   you've never seen this document before?
20     A. No.
21     Q. Are you familiar with the subject matter
22   discussed in this e-mail?
23     A. Yes, it's the same subject matter alluded to
24   in other e-mails that I've actually had with Deb Lange
25   that I alluded to earlier in my — in the questioning.

1     Q. Okay. And I'd just like to draw your
2   attention to one sentence, and that is on the actual
3   middle of the document where there's an e-mail from
4   Catherine to Chris, the second sentence.
5     "Given the amount of the options, I'm
6   talking about hundreds of millions of
7   taxable income, we may have him exercise
8   some in December 2000 and the remainder in
9   August of 2001. But that will depend on
10   our year-end tax planning after review of
11   the 2000 transactions."
12     Do you have any understanding of her reference
13   to the possible exercise in December as well as then a
14   subsequent exercise in August of 2001?
15     A. Yes, I do.
16       MS. SEGAL: I'm going to object to the form of
17   the question first because you said some "in December"
18   and it says "by December."
19       MS. LAVALLEE: Oh, I apologize and appreciate
20   that. Thank you.
21     Q. I'm sorry, please respond.
22     A. Okay. The reference to "exercise some by
23   December" actually was probably Catherine's reference to
24   exercise some in December for year-end tax planning,
25   'cause Catherine does Larry's tax projection, does the

1   planning.
2     So Lauren raised the precise question. It was
3   Catherine's inartful use of a word, a preposition. So
4   you got it right. You understood what Catherine
5   intended. So that was the normal stock option exercise
6   at year-end.
7     With respect to the remainder —
8       THE REPORTER: I've got to slow you down.
9       THE WITNESS: Okay. With respect to the
10   remainder in August of 2001, that is Catherine just
11   speculating. Catherine has never spoken to Larry or
12   e-mailed with Larry, and in fact, she's not aware of the
13   securities issues that govern trading by insiders.
14     In fact, you cannot trade in August because
15   the window's closed on sales.
16     (To Ms. Segal) Isn't August — I think it's
17   August.
18       MR. ZWANG: You're not allowed to ask
19   questions.
20       THE WITNESS: I can't ask, so let me count.
21   May, June, July, August. You can't trade in August
22   'cause the window on insider trading is closed.
23       MS. LAVALLEE: Q. Okay. And are you
24   referring to the close — closing the window in the
25   third month of a quarter?

1   A.  Yeah.  And more importantly, the options

2   expire on August 1, so you couldn't trade in August

3   anyway because the options were expired.

4        So what Catherine was basically referring to

5   is probably exercise some in December for tax-planning

6   purposes.  And of course, the options expire on

7   August 1st, so something has to be done before then.

8   Q.  Okay.

9   A.  That's the most likely interpretation.

10  Q.  Okay.  You say "most likely," you haven't

11  actually discussed this with her, so ...

12  A.  First time I've seen this e-mail.

13  Q.  Okay.  And going back to the third month of

14  the quarter, is it your understanding that Oracle had a

15  practice whereby they prohibited trading in the third

16  month of the quarter or discouraged trading in the third

17  month of the quarter?

18  A.  No.  Back then, my understanding, though I

19  recommend, first of all, you check with Oracle legal;

20  they would have a better understanding of the rules.

21       My recollection, though, is at that point in

22  time, Oracle insiders -- the window generally opened, I

23  think, on the third trading day after earnings are

24  announced for the preceding quarter and closed sometime

25  in the middle of the month on the third month of the

1   quarter.  I think it was the 15th, or two or three

2   weeks before the end of the quarter.

3        The rule has since changed, I believe, for

4   certain insiders so the entire third month is blocked

5   out.  But during the relevant period, I believe you

6   could trade into February.  In fact, you'll see some

7   e-mails -- there's a e-mail from Dan Cooperman giving

8   clearance to sell through February 2nd.

9        We only sold into the -- through the second

10  month of the quarter, primarily, I suspect, to be very

11  proper.  But trading was allowed into the third month.

12  Q.  Okay.  But do you have any understanding as to

13  whether or not Mr. Cooperman actually discouraged

14  trading in the third month during that time frame?

15  A.  I have a recollection of Dan telling me -- and

16  this is a paraphrase, so it's not accurate -- but

17  something like "You can trade into the third month of

18  the quarter."  He's been in the software business long

19  enough now that he realizes that nobody knows what

20  earnings are going to be for the quarter until the last

21  week of the quarter.  "But from a cosmetic perspective

22  and a market perception perspective, it would probably

23  be better to sell only into the second month of the

24  quarter.  But you're clear to sell into the third

25  month."

1   Q.  Okay.  If I could turn your attention now to

2   the document we marked as 186 --

3   A.  Mm-hm.

4   Q.  -- which is the summary of the interview.

5   A.  Yes.

6   Q.  And page 9 in particular.

7   A.  Mm-hm.

8   Q.  In the second full paragraph, it states,

9        "Simon stated that Cooperman

10  reiterated Oracle's unofficial practice of

11  not selling during the last month of the

12  quarter.  Cooperman stated that Ellison and

13  Oracle maintain a better appearance of

14  propriety by not trading during February,

15  even though Oracle's formal policy allows

16  trading to continue to the final two weeks

17  of the quarter."

18       Do you have any understanding as to whether or

19  not this accurately summarizes what you told the SLC?

20  A.  I think that's exactly -- in other words,

21  that's identical to what I just told you two minutes

22  ago.

23  Q.  Okay.  So you think --

24  A.  Thirty seconds.  So I think it's consistent.

25  Q.  So you believe that Cooperman did reiterate

1   Oracle's unofficial practice of not selling during the

2   last month?

3   A.  I don't know if I would say it's Oracle's

4   unofficial practice.  That might be a summary of what I

5   said.  What I recalled was what I told you, is that you

6   can sell into the third month of the quarter, but --

7   it's proper, but it would look -- it's better not to

8   'cause we live in a very -- I'm -- I don't want to say

9   his words, but basically --

10  Q.  Okay.

11  A.  -- "You can sell, but it's preferred -- it's

12  better not to."

13  Q.  Okay.  Thank you.

14  A.  And any inconsistency between my prior

15  statement and the statement in the SLC should be read as

16  duplicative and saying the same thing in different

17  words.

18  Q.  Okay.  And I'm not suggesting there's an

19  inconsistency.  I just wanted to be clear 'cause this

20  said a little bit more, so ...

21  A.  I would take my recollection of this as being

22  consistent and identical.

23  Q.  Okay, that's fine.

24       I'd like to mark as Exhibit 194 a document

25  Bates-stamped PS0020.

1    (DC Exhibit No. 194

2    marked for identification).

3    MS. LAVALLEE:  Q.  Mr. Simon, if I could ask

4    you to take a moment to look at the document.  And when

5    you've had a chance to review it, just identify it for

6    the record.  And I'll have just one question for you

7    with respect to this document.

8    A.  Okay.

9    Q.  Okay.  Is this -- does this document reflect a

10    series of e-mails between you and Andrew Dudnick?

11    A.  Correct.

12    Q.  And do you believe that this was a series of

13    e-mails that were actually sent and received?

14    A.  Most likely.

15    Q.  Okay.  There's just two names on here that I'm

16    not familiar with.  And I draw your attention to roughly

17    a little -- nearly two thirds down the page.

18    "It might not be a bad idea to send

19    updates to SEB himself via e-mail and

20    possibly Carolyn and Steve."

21    Who is Steve?

22    A.  Steve is Steve, Steven P. Fink, who I referred

23    to earlier as one of the members of Lawrence

24    Investments.

25    Q.  Okay.  And who is SEB?

---

1    A.  SEB, that goes back from years ago.  That's a

2    nickname for Larry in e-mail for confidentiality, that

3    we don't -- that is just used occasionally still.

4    Q.  Okay, thank you.

5    I'd like to mark as Exhibit No. 195 a document

6    Bates-stamped PS0021-22.

7    (DC Exhibit No. 195

8    marked for identification).

9    MS. LAVALLEE:  Q.  When you've had a chance to

10    review it, just identify it for the record.

11    A.  Okay, I'm ready.

12    Q.  Can you tell me what this is.

13    A.  This was an e-mail from me to Carolyn

14    Balkenhol, dated December 18, 2000, referring to Larry's

15    year-end tax projection and my desire to trigger

16    $20 million of option income to offset tax losses, and

17    giving Carolyn a heads-up to alert the people at Oracle

18    so we can do quick action, given you have to wait till

19    the Oracle window opens after the announcement and you

20    need to get legal clearance and get everybody on board,

21    and you have the Christmas holidays.

22    So this is a preliminary notification that we

23    have a rough projection showing a $20 million loss and

24    we wanted to fine-tune it, wanted people to be ready

25    once we were ready to execute.

---

1    Q.  Okay.  And is it your understanding there were

2    shares that were -- or options that were exercised to

3    actually effectuate this tax planning that you referred

4    to?

5    A.  I believe that's what we talked about this

6    morning, yes, every December.

7    Q.  At this time of year?

8    A.  Yeah.  This is the end of December.  And I

9    assume -- I don't have -- we'll get to it later on in

10    the documents I presented to you.  I don't know exactly

11    what was exercised, but I do believe, subject to looking

12    at the documents, that we did exercise options in late

13    December 2000.

14    Q.  Okay.  I'm going to show you a document that's

15    been previously marked as DC-113, which is Bates-stamped

16    CA-ORCL 7291 through 95.  Just a moment.  Actually,

17    we're not marking ...

18    A.  Thanks.

19    Q.  Mr. Simon, could you take a look at and

20    identify for the record [sic].

21    A.  This appears to be a fax from Catherine Ong,

22    in my office, to Barbara Wallace and Steve Edmundson.

23    Q.  Okay.  And have you ever seen the document

24    attached, titled "Oracle Corporation Stock Option

25    Exercise Form" and then "Oracle Corporation Stock Option

---

1    Exercise Notice and Agreement" and "Stock Option

2    Exercise Supplement"?

3    A.  I may -- I've seen the basic Oracle stock

4    option forms in the past.  I don't know if I've seen

5    this one, this specific one.  I may have; I may not

6    have.

7    Q.  Okay.  Can you tell me whether any of the

8    handwriting or signatures on this document are yours.

9    A.  No.  Just to be clear, I'm not saying I can't

10    tell you, 'cause you asked the question can I tell you.

11    I'm telling you yes, I can tell you, but no, they're not

12    mine.

13    Q.  Okay, thank you.  I assumed that that was your

14    response, but I appreciate the clarification for the

15    record.  Thank you.

16    (Discussion off the record).

17    MS. LAVALLEE:  I'd like to mark as Exhibit No.

18    196 a document Bates-stamped CD-I 03234.

19    (DC Exhibit No. 196

20    marked for identification).

21    MS. LAVALLEE:  Q.  If you could take a look at

22    this document and identify it for the record.

23    A.  This is an e-mail from Deb Lange to me and

24    from me back to Deb Lange.

25    Q.  Okay.  And this is actually an e-mail that you

1  believe was sent and received, correct?

2  A.  Most likely.  I believe there's a copy of this

3  one in my e-mail set as well.

4  Q.  Okay.

5  A.  I saw this when I reviewed the e-mails on

6  Sunday night.

7  Q.  Okay.  And I gather from this that Deborah

8  Lange was responding to an inquiry on -- oh, actually, I

9  apologize.  So on January 10, you wrote --

10  A.  No, on January 10th -- on January 10th,

11  Deb Lange wrote to me -- this is when I was in New

12  Zealand, but she sent an e-mail to me telling me, with

13  respect to Larry's options, Oracle would prefer that the

14  options be exercised earlier rather than later 'cause

15  they would like to get the offsetting deduction in their

16  fiscal year ending May 31, 20.

17  So since there were only two or three windows

18  left to exercise the options, it was Oracle's preference

19  that Larry exercise them earlier.

20  Q.  Okay.

21  And I was replying back to her on my first day

22  back in the office, "Got it.  Understood."

23  Q.  Okay.  And you -- I'm sorry.  Do you have any

24  understanding as to whether she was responding to a

25  particular inquiry that you had made or somebody in your

1  office had made?

2  A.  No, but we went through e-mail earlier today

3  where they started this discussion -- there's an e-mail

4  you showed earlier -- I'm not sure which number it

5  is -- talking about Oracle's utilization of foreign tax

6  credits and their subsidiaries.

7  And I suspect it relates to -- you don't want

8  me to go into the technicalities, but to utilize and

9  maximize the foreign tax credit utilization, NOL

10  utilization, at the corporate level, it depends upon --

11  THE REPORTER:  Wait, wait, wait.  "You don't

12  want me to go into the technicalities, but to utilize

13  and maximize the foreign" ...

14  THE WITNESS:  Tax credits and net operating

15  losses when you deal with offshore subsidiaries, you

16  have to take into consideration the repatriation of

17  subsidiary earnings.

18  And there was an earlier e-mail you showed me

19  discussing these issues that Oracle is addressing.  And

20  Deb was apparently contacting us.  And I don't know what

21  Deb was thinking, but my impression would be, and

22  inference from this is, if possible, they would like to

23  nudge us to nudge Larry to basically exercise his

24  options in the January -- before May 31st 'cause it

25  was to Oracle's benefit.

1  MS. LAVALLEE:  Right, yeah.

2  THE WITNESS:  And I was saying from a tax

3  perspective -- and this was a continuing dialogue that

4  had been going on from prior e-mails.

5  MS. LAVALLEE:  Q.  Right.  And her concern was

6  fiscal year '01 versus fiscal year '02, she indicates?

7  A.  Correct.  And Larry's options expired on

8  August 1.  So in theory, you could wait until after

9  earnings are announced for May 31st, which would be

10  around, let's say, June 15th.

11  And you could sell June 15th through the end

12  of July if you weren't worried about having another

13  transaction which would close the window.

14  It's a very high-risk thing to do.  So I would

15  normally recommend exercising well before the expiration

16  date.  And Deb is giving us -- explaining that Oracle,

17  in its interest, was -- indirectly was requesting that

18  Larry exercise his options.  And she was e-mailing me on

19  the 10th.

20  Q.  Right.  And she's saying fiscal year '01 April

21  versus fiscal year '02?

22  A.  Correct.

23  Q.  And you mentioned that there was a window in

24  the June time frame.  Is it your understanding also that

25  there was a window to trade in the March/April time

1  frame as well?

2  A.  Not March/April.  End of February/March time

3  frame.

4  Q.  Okay.

5  A.  The answer is yes, if you want to go down to

6  the wire.  See, when you have options, they're normally

7  ten-year options, and so you want to let your options

8  run to get the maximum appreciation.  But as you get

9  closer to the separation date, you have to exercise them

10  before they expire.

11  When you're not an insider, you have a lot of

12  flexibility, but when you're an insider, you have -- the

13  trading window opens at a certain point.

14  Q.  Right.

15  A.  That's just the general rule.  If there's a --

16  as you well know since you're in this business, if

17  there's a material transaction going on, the window

18  would be closed.  So as an insider, you would never want

19  to wait until the last theoretical window 'cause that

20  theoretical --

21  THE REPORTER:  You would never want to

22  wait ...

23  THE WITNESS:  To that last theoretical open

24  window because that open window may not open.

25  MS. LAVALLEE:  Q.  Right.  And --

1   A.  So you would never — in my mind, it's almost

2  irrational to wait until that point in time.

3   Q.  Okay.  And that sort of goes along with the

4  theory of why you were constantly bugging, for lack of a

5  better word, Mr. Ellison to trade in the prior periods

6  in the e-mails we saw in the spring of 2000?

7   A.  It was suggesting that we not trade in

8  prior periods; it was suggesting that we establish a

9  plan to trade.  And in my mind, a good plan would be to

10  trade two or three — three, four windows before —

11  ideally three windows — before — I mean, quite

12  honestly trading in this January time frame was an ideal

13  matching of the risks of the option terminating.

14   Q.  Okay.  Is it also fair to say, though, that in

15  your prior recommendations — I think you testified

16  earlier that you'd made a series of recommendations from

17  June '99 period going forward, and you also were

18  recommending that those options be exercised because

19  they were expiring.

20     So that's sort of consistent with your theory

21  that you don't want to wait till the last minute; is

22  that correct?

23     MS. SEGAL:  Objection to the form.

24     THE WITNESS:  Okay.  What I was — in the

25  prior things, I was flagging the issue that you had to

---

1  address it.  I was not recommending or advising when to

2  exercise.  I was just raising the issue so Larry would

3  have time to think about it.

4     And yes, I think diversifying and paying down

5  debt is sensible.  But I wasn't necessarily recommending

6  exercising the options of this window versus that

7  window, other than that you should exercise them in

8  advance, well in advance, of when they might expire.

9     MS. LAVALLEE:  Right.

10     THE WITNESS:  And that from a tax planning

11  perspective, I'd want to blend selling already-owned

12  stock with options to get the maximum tax benefit.

13     MS. LAVALLEE:  Q.  If I can draw your

14  attention again to Exhibit 186 and to page 5 of that

15  document.

16   A.  Mm-hm.

17   Q.  Actually, you know what; we'll come back to

18  that.

19   A.  Okay.

20   Q.  We'll come back to that in a moment.

21     I'm going to mark as Exhibit No. 197 a

22  document that is Bates-stamped PS0345.

23     (DC Exhibit No. 197

24     marked for identification).

25     (Discussion off the record).

---

1     MS. LAVALLEE:  Q.  Mr. Simon, if you could

2  take a moment to just look at this document and then

3  tell me what it is.

4   A.  Okay.

5   Q.  All right.  Can you tell me what it is.

6   A.  This appears to be a printout from Yahoo!,

7  dated Thursday, January 4, 2001.  And if you flip to

8  page 2, it appears to be getting the — it's giving the

9  market price for Oracle as of that — at the close as of

10  that date.

11   Q.  Okay.  And did you conduct the search to print

12  this out or ask somebody to do that?

13   A.  This looks like it's printed by me because if

14  you look at it, it's called "portfolio for PBS."  Those

15  are my initials.  I have — at Yahoo, where I just

16  click on my home page and it pops up stocks that I

17  follow, gives me the quotes throughout the day.

18     And it's also my handwriting at the top

19  referencing where to route this printout to.  It says

20  "CHO" at the top, which is Catherine H. Ong.  And then

21  it's going the Ellison 2001 tax return file.  And this

22  is my handwriting.

23   Q.  Okay.  And why were you — just tell me why

24  you ran that search, if you know.

25   A.  My guess is, based on page 2, is the

---

1  following:  I believe — at first I was surprised —

2  could not figure it out.  So it's a clue — I would have

3  to look at the tax return files to confirm, but my

4  educated guess, with a 95-percent degree of reliability,

5  is that I am pricing Oracle stock, getting the average

6  of the high and low on January 4th because we did a

7  charitable donation of shares.  It appears to be 300,000

8  shares to one entity and 31,200 to another entity.

9     And I was pricing the charitable deduction to

10  know how much was given away.

11   Q.  Okay.

12   A.  And for income tax purposes, it's the average

13  of the high and the low of the stock on the day of the

14  charitable donation and the day you effect the transfer.

15   Q.  Okay. thank you.  Okay.  I'm going to show you

16  a document that has been previously marked as DC-10.  If

17  I could ask you to take a look at the document and then

18  identify it for the record.

19   A.  This appears to be an e-mail from Dan

20  Cooperman to me, dated January 19, 2001, with a cc to

21  Matt Ng, Barbara Wallace and Jeff Henley, basically

22  giving me — giving Oracle legal department's clearance

23  to exercise and do same-day sale of Larry's stock

24  options starting on Monday — I didn't read it that

25  closely, but it's giving the trading authority for

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  probably the first week of trading.

2     Q.  Okay.  And this is dated January 19th.  And

3  this indeed is something you received, I assume, on that

4  date?

5     A.  I believe it was received by my computer on

6  that date.  Remember I'd just come back from New

7  Zealand.  I was at home making the phone calls.

8     Q.  Okay.

9     A.  I probably received this Monday morning.  So I

10  got oral confirmation 'cause I'm compulsive.  I'm sure I

11  had a phone call confirming it was sent out.

12     Q.  Okay.  So did you -- was this in response to a

13  request that you made to the legal department at Oracle

14  for clearance for Mr. Ellison's trades?

15     A.  I have no recollection of what actually

16  happened, but based on the documents that we provided

17  you in the e-mail chain and what we've discussed today,

18  it appears that Carolyn Balkenhol called me Friday.

19  Friday I made phone calls to people to get this set up.

20     And one of the things I would normally do

21  before I exercise any Oracle options or do any trade

22  involving Oracle shares, I always contact Oracle legal

23  department and get clearance to implement the trade.

24     Q.  Okay.  And do you have any recollection of

25  what you told the legal department in order to obtain

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  the authorization?

2     A.  No.

3     Q.  Okay.  What is your general practice?  Do you

4  provide details regarding the amount of shares at issue

5  and that type of detail, or do you know?

6     A.  I generally try to provide complete, full and

7  comprehensive disclosure to enable Oracle legal

8  department to make an intelligent evaluation.

9     Q.  And what do you think is the criteria that you

10  would have given for that purpose?

11     A.  I would have explained that Larry has options

12  that are expiring, 22-some-odd million, he wants

13  exercised into a same-day sale.  We also had what I call

14  some high-basis-tax lots from previous exercises and

15  hold at year-end, December 31, 2000, December 1999, and

16  so on, that we'd want to sell.  And probably I'd also

17  discuss that we have, obviously, Larry's founder stock

18  that he may want to be sold.

19     And I do not know at this time, you know, what

20  I had been told about how much to sell or what the plan

21  was, but I probably said the plan -- I know there's an

22  e-mail that you've -- will get to or will show me where

23  it says that Larry wants to pay down 800 million of

24  debt.  That equates to 1.2 billion of sales, and

25  mathematically it's 40.7 million of Oracle shares had to

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  be sold.

2     There were 22 point, I don't know, 8 or

3  9 million of options, around 3 to 4 million of

4  high-tax-basis slots.  So that would imply, I think,

5  around 12 to 13 million of founders shares being sold.

6     So given that, I probably would have laid this

7  all out to Dan or to Matt.  I may not have spoken to Dan

8  Cooperman; I may have spoken to Matt Ng.

9     MS. LAVALLEE:  Okay.  We have a minute left on

10  the tape, so we need to take a break just --

11     THE WITNESS:  Okay.

12     MS. LAVALLEE:  -- to allow the tapes to be

13  changed.

14     THE VIDEOGRAPHER:  This marks the end of

15  videotape Volume I, tape 2 in the deposition of Philip

16  Simon.  The time is 2:32 p.m.  We are off the record.

17     (Recess taken).

18     THE VIDEOGRAPHER:  This marks the beginning of

19  videotape Volume I, tape 3 in the deposition of Philip

20  Simon.  The time is 2:38 p.m.  We are back on the

21  record.

22     MS. LAVALLEE:  Q.  Welcome back.

23     A.  Thank you.

24     Q.  The document that we were just looking at,

25  Exhibit 10; is that correct?

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1     A.  Yes.

2     Q.  The clearance.  Can you tell me whether or not

3  you made any efforts to determine whether or not Mr.

4  Ellison was in possession of adverse material nonpublic

5  information at this time.

6     MR. NADOLENCO:  Object to the form.

7     MS. LAVALLEE:  Q.  It may not have been within

8  the scope of your duties, but if you could just --

9     A.  I don't recall.  I generally do not.

10     Q.  Okay.

11     A.  I don't know what I did then.  But I have no

12  recollection.

13     I just wanted to clarify my response to the

14  other question, the prior question.  It was all based on

15  what I think I said.  I have no recollection of what I

16  really told Matt Ng.

17     Q.  Okay.

18     A.  It was just telling you that I try to be

19  comprehensive and clear.

20     Q.  Okay.

21     A.  But I have no recollection of exactly what

22  happened.

23     Q.  Okay.  But when you were actually instructed

24  by Carol Balkenhol to execute these trades, you then did

25  contact somebody --

1    A. Yes.

2    Q. — at the legal department?

3    A. Yes.

4    Q. Okay. Did you also contact anybody at the tax

5    department when you actually made — when you actually

6    informed them that Mr. Ellison wanted to execute trades?

7    A. I have no recollection of what happened, but I

8    would say in response to your prior question about did I

9    contact Larry about whether he had any material inside

10   information, when Carolyn — since we now know that

11   Carolyn probably contacted me on Friday, I'm certain in

12   discussion with Carolyn I would have probably raised the

13   issue and assumed that she had discussed it with Larry.

14   Q. So it would have been part of your practice to

15   just raise that with —

16   A. Possibly. But basically everybody knows the

17   rules. We've been through this routine so many times.

18   Q. Right.

19   A. Oracle checks with Dan Cooperman. Dan

20   Cooperman checks with Jeff Henley. Jeff Henley knows

21   what's going on. They check with Larry.

22   So no one initiates a trade if they have

23   material inside information, is the general operating

24   procedure, because we're trying to comply with the

25   rules.

1    Q. Right.

2    A. Okay. Now, in response to your second

3    question dealing with the tax department, I have no

4    recollection of contacting the tax department.

5    However, these were same-day option exercise

6    and sales. To exercise options, you have to complete

7    the forms, the stock option forms you showed me earlier.

8    You have to pay the strike price. You have to deal with

9    the withholding.

10   And most likely, I — I had Catherine Ong

11   coordinate with Deb Lange, as you saw before, and

12   communicate and get all this taken care of for me.

13   Q. Okay.

14   A. I may have been involved in some of the phone

15   calls or communications, but I have no recollection.

16   MS. LAVALLEE: All right. I'm going to mark

17   Exhibit No. 198, a document Bates-stamped CD-I 0 — I

18   got it here — 3231.

19   (DC Exhibit No. 198

20   marked for identification).

21   THE WITNESS: Thank you.

22   MS. LAVALLEE: Q. Okay. Can you take a look

23   at this document and identify it for the record, please.

24   A. This appears to be an e-mail from me to

25   Carolyn Balkenhol, dated Monday, January 22nd, 2001.

1    And it shows a date of August 16th, 2002 above, from

2    me to me.

3    In case you're confused about this is —

4    I'm — I was always on Eudora. I then switched to

5    Outlook.

6    Q. Okay.

7    A. And to move your files, I think our computer

8    person had to basically send the e-mails from me to me

9    to move my old folder on. That's why on a lot of

10   e-mails you'll see to me from me with different dates.

11   You have to look down below to see the real e-mail.

12   Q. Okay. And what is the substance of what you

13   were telling Carolyn right there?

14   A. I was reporting to Carolyn on how many options

15   were exercised and sold apparently on the first day of

16   trading.

17   Q. I'd like to show you a document that was

18   previously marked as Exhibit 121. If you could take a

19   moment to look at the document and then identify it for

20   the record.

21   A. Okay.

22   Q. Okay. Was this indeed a series of e-mails

23   that you sent to — or it's actually just one e-mail —

24   that you sent to Carolyn?

25   A. It looks like that, yes.

1    Q. On January 22nd, 2001?

2    A. Correct.

3    Q. Okay. It refers to some PR issues. Do you

4    recall there being any issues as to when Mr. Ellison or

5    how Mr. Ellison would disclose to the public his

6    exercise of options?

7    MS. SEGAL: Object to the form.

8    MR. NADOLENCO: Join.

9    THE WITNESS: Until I saw this e-mail when I

10   reviewed the e-mails for preparation on Sunday, I had no

11   recollection.

12   MS. LAVALLEE: Q. Okay. Do you know who Joe

13   Lockhart is?

14   A. Yes, I do.

15   Q. Can you tell me who he is.

16   A. He was Bill Clinton's press secretary.

17   Q. Okay, fair enough. Do you have any

18   recollection whether or not he ever did any work for

19   Oracle or for Mr. Ellison?

20   A. I believe he worked for Oracle for a short

21   period of time.

22   Q. And did you have any dealings with him?

23   A. I don't believe I ever spoke with him, but I

24   have no recollection.

25   Q. Okay. And do you have any understanding as to

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  what period of time he worked for Oracle?

2      A.  Nothing clear.  However, when I reviewed the

3  e-mails that you have, there were some reference [sic]

4  someplace to Joe Lockhart.  So I would assume that his

5  presence at Oracle somehow overlapped this period of

6  time.  But I would refer you to the e-mails that I

7  provided you.

8      Q.  You indicate in here that "I would" -- "I'd be

9  of a mind not to mention the debt with respect to the

10  options."

11      What -- was there a reason you felt that

12  that may not be necessary to disclose?

13      A.  I'd -- I have no direct recollection.

14      Q.  Okay.

15      A.  But I can --

16      Q.  Don't speculate.  We just want your accurate

17  recollection.

18      A.  Well, it's embarrassing -- it's embarrassing

19  and also affects my ability to obtain financing from

20  banks.  You want to keep your personal matters as

21  private as possible.

22      MS. LAVALLEE:  Okay.  I'd like to mark as

23  Exhibit 199 a document that is Bates-stamped PS0033.

24      (DC Exhibit No. 199

25      marked for identification).

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1      MS. LAVALLEE:  Q.  Before you actually look at

2  the document, let me ask you a different question.  Do

3  you know what a Form 144 is?

4      A.  Yes.

5      Q.  Okay.  Can you tell me what it is.

6      A.  It's a form you file, I suspect, with the

7  SEC -- I'm not certain where -- that an insider files

8  within a certain time period after he or she starts

9  trading shares in the company.

10      Q.  Okay.  Is it your understanding that it's

11  something you file after you start trading, or is it

12  something that you file it to indicate your intention to

13  trade?  Do you have any understanding?

14      A.  I believe it has to be filed -- I'm not

15  certain what the rules were then.  The time frame for

16  filing changes.  It may be an indication of intent.  But

17  you file -- I think you have to -- by then you had to

18  file within -- on the day you initiated trading or the

19  second or third day after you did the trade.

20      Q.  Okay.        *

21      A.  I don't know the exact rules back then.

22      Q.  Okay.  And it wasn't your role, I gather,

23  then, to oversee the -- Mr. Ellison's filing of these

24  forms?

25      A.  No, it was.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1      Q.  It was, okay.

2      A.  But the rules have changed.  And basically

3  Merrill Lynch handled the Form 144 filings for us.

4      Q.  Okay.  So you -- you had them handle the

5  filing?

6      A.  Correct.

7      Q.  Okay.  Do you have any understanding what a

8  Form 4 is?

9      A.  Yes.

10      Q.  Okay.  And what's your understanding with

11  respect to a Form 4?

12      A.  It's a filing showing your holdings in the

13  corporation in which you're an insider.

14      Q.  Okay.  And is that after the fact, after the

15  trades?

16      A.  Are you asking about the rules on the current

17  legislation --

18      Q.  No.

19      A.  -- or back then?

20      Q.  Let's focus on back then.

21      A.  Okay.  I'm not a securities law expert, but my

22  recollection back then is that Form 4s were, I think,

23  filed at the end of the calendar quarter, or maybe at

24  the end of the calendar month.  And you reported the

25  trade that happened in the preceding calendar quarter or

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  the preceding calendar month.

2      Q.  Okay.

3      A.  The rules have since changed requiring

4  accelerated filing.

5      Q.  Okay.  If you could take a look at this

6  document now and tell me what it is.

7      A.  It's an e-mail from me to Carolyn Balkenhol

8  talking about the timing of the filing of the Rule 144

9  form.

10      Q.  Okay.  And you indicate in here -- there was

11  some discussion as to when the announcement regarding

12  Mr. Ellison's trades would become public, and there was

13  some back-and-forth as to people's views as to how

14  quickly that would hit the press or the public.  Why was

15  that of concern?

16      A.  It -- I have no recollection.  I could

17  speculate why it was a concern to me, but I don't know.

18      Q.  Okay.  I --

19      A.  This is three years ago.

20      Q.  Yeah, I would ask that you not speculate.

21      Okay.  Then you -- further down, you indicate

22  that,

23      "We mailed out the first filing late

24  this afternoon regular mail.  We filed for

25  5 million shares, though we sold only 3.1.

1　The thought is that we'd file for 5 million

2　tomorrow as well, assuming we get off a

3　significant number of shares tomorrow."

4　　Do you have any understanding as to why the

5　decision was made to indicate 5 million shares?

6　　A. My recollection is that Merrill Lynch advised

7　that the best way to file was as you were trading. And

8　this implies that you have to file by the close of

9　business on the date you execute the trade. And so they

10　were filing as you were trading.

11　　Q. Okay. Was there any discussion as to whether

12　or not to file a Form 4 beginning -- indicating the

13　intent to trade the entire amount Mr. Ellison intended

14　to trade?

15　　A. You referred to Form 4. I assume you meant

16　Form 144.

17　　Q. I did, and I apologize. Thank you for -- I

18　assume your answer was based on the assumption I was

19　talking about a Form 144?

20　　A. So far, yes.

21　　Q. I appreciate that. Thank you for bringing

22　that up.

23　　A. I believe we discussed it with Merrill Lynch.

24　And I never -- this is my first time doing -- managing a

25　large trade for an insider. And I spoke with Merrill

1　Lynch, and they advised me on how insiders regularly

2　file their Form 4s and how they recommend it be done.

3　And I followed their advice 'cause it seemed to make

4　sense to me.

5　　Q. Okay. And did you have any discussions with

6　Mr. Ellison about this particular matter?

7　　A. I have no recollection. Unlikely.

8　　Q. Okay. I'm going to show you a series of

9　documents that were marked Exhibit 113 through 119.

10　　(Inaudible discussion).

11　　MS. LAVALLEE: And actually, on 113 I appear

12　to only have one copy, so ... they all are Form 144s

13　that were previously filed.

14　　Q. Could I ask you to take a look at these.

15　　A. Mm-hm.

16　　Q. They were previously produced. Could you tell

17　me whether or not you recognize these documents.

18　And just, again, for everybody, I did not

19　circulate 113 because I only had one copy of that one.

20　But it's the earlier version. It's in one of the 144s.

21　　(Discussion off the record).

22　　THE WITNESS: These look like a series of Form

23　144 forms.

24　　MS. LAVALLEE: Q. And do they appear to

25　relate to the trades in December and January 2001?

1　　A. They do.

2　　Q. Okay. Do you recognize any of the signatures

3　on there?

4　　A. Mm-hm. There's some signed by me.

5　　Q. Can you tell me which ones were signed by you,

6　please.

7　　A. The ones that say "Philip B. Simon, attorney

8　in fact" and the ones that say "Philip B. Simon,

9　attorney in fact." And I think there's some that say

10　"Philip B. Simon, trustee."

11　　Q. Okay. And can -- just for the record, can you

12　identify which exhibits you're referring to.

13　　A. Okay. 16 -- 116, 117, 118, 119 are signed by

14　me.

15　　Q. Okay. What about 113, 114, 115; you don't

16　believe that those are your signatures?

17　　A. No, those -- nope.

18　　Q. Okay. Do you have any idea whose signatures

19　they are?

20　　A. They say "Larry."

21　　Q. Okay. So it's your assumption, but you don't

22　know whether or not those are actually Mr. Ellison's

23　signatures, do you? And I can --

24　　A. I wasn't there.

25　　Q. Yeah, okay. That's fine.

1　I'd like to mark as Exhibit No. 110 --

2　　THE REPORTER: 200.

3　　MS. LAVALLEE: Oh, I'm sorry, 200. Not even

4　close -- a document Bates-stamped PS0517.

5　　THE WITNESS: What number are we on?

6　　MS. LAVALLEE: It's a new exhibit.

7　　THE WITNESS: Out of sequence?

8　　MS. LAVALLEE: No, some of those -- I think

9　you said --

10　　(Discussion off the record).

11　　MS. LAVALLEE: Q. Mr. Simon, can you take a

12　moment and look at this document and then tell me

13　whether or not you recognize it.

14　　(DC Exhibit No. 200

15　marked for identification).

16　　THE WITNESS: It's my handwriting.

17　　MS. LAVALLEE: Q. And can you tell me what

18　you were doing here in this document.

19　　A. I believe the first day of trading was Monday,

20　the 22nd. And this is my hand calculations of the net

21　cash proceeds to Larry.

22　　MS. LAVALLEE: Okay. That's all I have on

23　that document.

24　　I'm going to mark as Exhibit 201 a document

25　Bates-stamped CD-I 03235.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 (DC Exhibit No. 201

2 marked for identification).

3 MS. LAVALLEE: Q. Can you take a look and

4 identify it for the record, please.

5 A. Mm-hm.

6 Q. Do you recognize this document?

7 A. I don't -- I don't remember it, but it appears

8 to be an e-mail from me to Carolyn.

9 Q. Okay. And you don't have any reason to

10 believe that that wasn't actually sent and received?

11 A. No.

12 MS. LAVALLEE: All right. Okay. I'd like to

13 mark as Exhibit No. 1 -- 202 a document Bates-stamped

14 CD-I 03061 through 62.

15 (DC Exhibit No. 202

16 marked for identification).

17 MS. LAVALLEE: Q. If you could take a moment

18 and look at the document and then identify it for the

19 record.

20 A. This appears to be an e-mail exchange between

21 me and Dan Cooperman, dated January 26, 2001.

22 Q. Okay. And does this appear to relate to

23 clearance?

24 A. Correct, extends trading clearance for another

25 seven days, for the next trading week.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 Q. Okay. And you were discussing with

2 Mr. Cooperman — you were indicating what the intent was

3 with respect to further trades; is that correct?

4 A. That is correct.

5 MS. LAVALLEE: Okay. I actually went out of

6 order in terms of chronology, so we're going to go back

7 a couple of days here. It'll just be a moment.

8 I'd like to mark as Exhibit ... 212?

9 THE REPORTER: 203.

10 MS. LAVALLEE: 203. I'm having a difficult

11 time with these document numbers.

12 THE WITNESS: So it's not just me.

13 MS. LAVALLEE: No, no, not at all.

14 (DC Exhibit No. 203

15 marked for identification).

16 MS. LAVALLEE: Q. And if you could take a

17 look at it, identify it for the record, and then I'll

18 just briefly ask you what the purpose of sending this

19 e-mail was.

20 A. Okay.

21 Q. Was this an e-mail that you sent to Carolyn?

22 A. Yes, it is.

23 Q. And what was the purpose of sending this

24 e-mail, just generally?

25 A. It appears to be to update Carolyn and Larry

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 on trading activity for the day.

2 Q. Okay. And you sent these e-mails to Carolyn.

3 Did you have any understanding as to whether or not she

4 was forwarding these to Mr. Ellison?

5 A. I assumed she was communicating with Larry,

6 but I don't know for certain.

7 Q. Okay. Was it your understanding that Mr.

8 Ellison was aware of the trades that were going on in

9 this period, though?

10 A. Yes.

11 Q. Okay. And he'd instructed you to make the

12 trades, and you were authorized by him to make the

13 trades, correct?

14 A. I believe I was authorized. But I get

15 instructions from Carolyn —

16 Q. Okay.

17 A. — and Larry. And when I get instructions

18 from Carolyn, I take it to mean from Larry.

19 Q. Right. Okay.

20 I'd like to mark as Exhibit No. 204 a document

21 Bates-stamped CD-I 03240.

22 (DC Exhibit No. 204

23 marked for identification).

24 THE WITNESS: Mm-hm.

25 MS. LAVALLEE: Q. Can you identify this

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 document for me.

2 A. Yes. This is the same e-mail as part of

3 Exhibit No. 203.

4 Q. Right. Okay.

5 A. Reporting to Carolyn on Tuesday's trading.

6 And then she wrote back. "Thanks, what happened

7 yesterday?"

8 And then I replied "This is what happened

9 yesterday," 'cause she forgot what I e-mailed her the

10 prior day.

11 Q. Okay.

12 A. In 203.

13 MS. LAVALLEE: All right. I'd like to mark as

14 Exhibit No. 205 a document Bates-stamped ORCLA 0023691

15 through 93.

16 (DC Exhibit No. 205

17 marked for identification).

18 THE WITNESS: Okay.

19 MS. LAVALLEE: Q. I'm going to -- do you

20 recognize this document?

21 A. It appears to be -- I don't recognize it or

22 remember it, but it appears to be an e-mail exchange

23 between me and Carolyn with a forwarded e-mail from

24 Safra to Joe Lockhart and Carolyn -- or maybe from Joe

25 Lockhart. Actually, I thought it was from Joe Lockhart,

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1   but it looks like it's from Safra to Joe and Carolyn and
2   then forwarded on to me for my input.
3       Q.   Okay.  And if I could draw your attention down
4   to sort of through nearly the bottom of the page, there
5   is -- the portion of -- first page I'm talking about --
6   there's two points there.  First one states -- and this
7   is the portion of the e-mail from you to Carolyn.  It
8   states that.
9           "We already spoke about selling his
10      high-basis previously-exercised option
11      shares, 5.2 million, from '98, '99, 2000
12      exercise."
13      A.   Mm-hm.
14      A.   "Though I think we may have trouble
15      getting even the 22.232 million current
16      options sold in today's market."
17          What were you talking about in terms of the
18  trouble in getting them sold?
19      A.   I have no recollection, but drawing
20  conclusions from the e-mail, it appears there was a $30
21  floor price that I -- was the authorization I'd been
22  given.  And if the stock traded below 30, I didn't have
23  authorization to sell.
24      Q.   Okay.  And do you have any understanding as to
25  whether or not you could go back to Mr. Ellison and

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1   discuss the matter further with him?
2       A.   You can always go back and discuss anything
3   with anybody.
4       Q.   Okay.  Did you have any understanding in terms
5   of why there would be difficulty trading the amount of
6   shares in today's market, as you state, for any other
7   reason other than the price?
8       A.   No.  Trading volume.  It's just the more you
9   sell, you know, you put trading pressure on the share
10  price.  No, that's -- it was just the price.
11      Q.   Okay.
12      A.   How can you move -- how much volume can you
13  move at a price without material -- driving the market
14  down with your own trading.
15      Q.   Right.  And do you have any understanding as
16  to whether or not Mr. Ellison did not want to drive the
17  price of the stock down?
18      A.   I don't believe we ever discussed it.  But I
19  assumed, within my ambit, my job was to sell at a
20  better -- a higher price rather than a lower price.  So
21  I take as within my authority to try to do it
22  sensibly --
23      Q.   Right.
24      A.   -- and prudently and economically efficiently.
25      Q.   Okay.  So, I mean, basically you're saying

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1   that you want to sell at the market price 'cause you
2   don't want to lose money by selling below?  I'm not sure
3   I understand your response.
4           MS. SEGAL:  I object to form.
5           MS. LAVALLEE:  Q.   Can you just clarify for
6   me.  I'm not sure I understood your response.
7       A.   I had been given authorization to sell at the
8   floor price.
9       Q.   Right.
10      A.   Within that constraint, I try to give
11  instructions to Merrill Lynch to sell subject to that
12  floor price in an intelligent fashion as they advise me.
13      Q.   Right.
14      A.   And I judged them based on their execution
15  price and what we call the volume weighted average
16  price, otherwise known as VWAP.
17          And when you want to hold a broker responsible
18  for their execution, you have to give them clear
19  instructions, let them know in advance how you're going
20  to judge them, and then you want to hold them
21  accountable.
22      Q.   Okay.
23      A.   So within that, they will give you feedback on
24  how much they feel they can trade, because each broker
25  has -- is trading volume at Oracle.  And each firm --

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1   Merrill Lynch, Goldman Sachs, Morgan Stanley or any of
2   the other brokers -- have a percentage of that volume.
3           And it's -- if you want to trade, you try to
4   trade intelligently.  And I was relying on the advice
5   given to me by Merrill Lynch in how to effectively
6   execute a trade.
7       Q.   Okay.  And I guess my -- not confusion, but I
8   guess what I'm trying to understand is what the volume
9   of the shares sold -- how that relates to their ability
10  to actually sell shares.  I mean, what is the connection
11  there?
12      A.   Okay.  The general rule that had been
13  explained to me by Merrill Lynch and other brokers is
14  that you can generally trade up to ten to 15 percent of
15  average trading volume without materially affecting the
16  price of the stock being sold.
17      Q.   Okay.
18      A.   So therefore, we tried to sell within that
19  constraint.
20      Q.   Okay.  Now I get it.
21      A.   Okay.  I'm sorry, I wasn't being clear.  My
22  mistake.
23      Q.   No, no, you -- that's perfectly clear now for
24  the record.  Thanks.
25          I'd like to show you a document that was

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  previously marked as Exhibit 122.

2  A. Thank you.

3  Q. Okay. Can you tell me what this is.

4  A. This appears to be an e-mail from me to Larry,

5  dated Wednesday, January 24th, 2001.

6  Q. Okay. And this was an e-mail from you to Mr.

7  Ellison; is that correct?

8  A. Correct.

9  Q. Okay. And in here, you were referring to a

10  conversation that you had with Mr. Ellison earlier that

11  day regarding where the money from the shares sold would

12  be allotted; is that correct?

13  A. Correct.

14  Q. Okay. Now, just for the — so I'm clear, you

15  had indicated earlier that when you were called on

16  January 19th, that was the first time you were told to

17  trade and that Mr. Ellison had made a decision he wanted

18  to exercise shares, sell them, and also sell additional

19  shares. Is that your — accurate?

20  A. What I said was I was — I had — obviously,

21  as we know, I've had communications for months before

22  alerting Larry to the fact that his options were

23  expiring and that the debt was increasing.

24  Q. Right.

25  A. We did an option exercise at the end of

Oracle Related Cases                                    Page 181

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  December for tax purposes. I then went — then we did a

2  donation of shares, per prior e-mail, in January of the

3  following year, January 2001 —

4  Q. Right.

5  A. — to get the tax deduction for the charitable

6  contribution in 2001 versus 2000. That was tax

7  planning.

8  Q. Right.

9  A. And then I went off on vacation. And when I

10  got back from vacation is when I was notified that Larry

11  wanted to execute and exercise his options and sell some

12  Oracle shares to pay down the debt.

13  Q. Okay. And I just want to be clear. I think

14  you indicated that the specific allotment of where the

15  money from the sale of the shares that were exercised,

16  as well as the additional shares, was something that you

17  decided, where specifically the money would be

18  allocated; is that right?

19  MR. NADOLENCO: Objection. Misstates the

20  testimony.

21  MS. LAVALLE: Q. Can you answer — tell me

22  if I'm correct in that or if I'm mischaracterizing it.

23  MR. ZWANG: Before you answer, is the question

24  who made the decision as to how the proceeds should be

25  allocated?

Oracle Related Cases                                    Page 182

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  MS. LAVALLE: Yeah, basically.

2  THE WITNESS: Larry clearly controls his own

3  money. If he tells me to send $5 million and give it to

4  you, and I believe him, I follow his instructions, okay.

5  But within him making an investment or

6  alternative, dealing with, as this e-mail refers to,

7  $600 million of after-tax proceeds, and even more 'cause

8  you have a tax reserve, Larry and I would never discuss

9  what to do with the cash management 'cause that is just

10  a administerial [sic] administrative activity, where the

11  obvious goal is to maximize the economic return.

12  And I can hold cash or I could pay a bank —

13  pay down a bank line. And there's a negative carry on e

14  bank line. I am borrowing at a spread over Libor. So

15  when I hold cash, I'm the equivalent of a money market

16  fund and I am lending to the bank, who makes a spread to

17  lend back to me.

18  So within that, when cash comes in, I just

19  handle it and manage it intelligently. We never discuss

20  it.

21  MS. LAVALLE: Okay, thanks. I just wanted to

22  clarify that for the record. Thank you.

23  How long have we been going for? Do we want

24  to take a short break?

25  (Discussion off the record.)

Oracle Related Cases                                    Page 183

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  THE VIDEOGRAPHER: We are off the record. The

2  time is 3:16.

3  (Recess taken.)

4  THE VIDEOGRAPHER: We are back on the record.

5  The time is 3:35.

6  MS. LAVALLE: Q. Okay. Mr. Simon, I'd like

7  to show you a document that has been previously marked

8  as Exhibit 123. It is a document Bates-stamped CA-ORCL

9  010491. If you could take a moment to look at the

10  document and then identify it for the record.

11  A. Okay.

12  Q. Can you tell me whether or not — can you tell

13  me what the document is.

14  A. It appears to be an e-mail from me to Carolyn

15  Balkenhol, dated Wednesday, January 24th, 2001.

16  Q. Okay. And you believe that this is actually

17  an e-mail that you did indeed send to Ms. Balkenhol?

18  A. It appears to be the case.

19  Q. And in here you were giving an update for that

20  particular date, which is January 24th, 2001?

21  A. Correct.

22  Q. And it's indicated that, "Not a good

23  trading day. Stock traded down closing at

24  $30. 65 million total trading volume. ML

25  was aggressive at the end of the day trying

Oracle Related Cases                                    Page 184

1   to get to the 5 million total.  So average
2   price is below daily weight average trading
3   price of 30.85 per share.  I was asked if
4   any change in instructions.  I said no, to
5   proceed as previously instructed unless I
6   call back.  ML expressed concern about
7   getting the whole piece done by the end of
8   this week in this trading environment
9   unless we get really aggressive, which they
10   don't recommend.  Carolyn, please update
11   Larry."
12      Do you have any recollection, other than
13   looking at this document, of these discussions?
14   A.  No.
15   Q.  Okay.  Do you have any understanding of why
16   ML -- does that represent Merrill Lynch?
17   A.  Correct.
18   Q.  -- Merrill Lynch expressed concern about
19   getting the whole piece done by the end of this week in
20   this trading environment?  Do you have any understanding
21   what they were talking about, this trading environment?
22   A.  I think they're talking about -- it's talking
23   about how the market is trading, the volume and the
24   feel, the stock, the soft -- whether it's a rising
25   market, declining market, the softness.

1      And they want to sell -- you -- basically it's
2   ideal to sell when someone wants to buy --
3   Q.  Right.
4   A.  -- rather than to sell when no one wants to
5   buy.  And I think they're talking about the market
6   environment and how many buyers are out there.
7   Q.  Okay.  And then the sentence continues,
8   "Unless get really aggressive, which they don't
9   recommend."  The "they" there is Merrill Lynch?
10   A.  Merrill Lynch.
11   Q.  And why is it that Merrill Lynch wasn't
12   recommending getting more aggressive about trading at
13   that time?
14   A.  You're asking me to speculate about their
15   ideas, but I think it's that they believe the best way
16   to sell, to get the best price, is to participate in the
17   market, not sell too large a percentage of the daily
18   volume, and if the market isn't absorbing the volume,
19   you want to sell readily.
20      The only way to do that is to get more
21   aggressive and to try to force it into the market.  And
22   that would have -- that would be -- that's not what they
23   recommend.
24   Q.  Okay.  And -- okay.  And do you have any
25   understanding as to why they wouldn't recommend that?

1   A.  It comes down to I'm balancing buyers and
2   sellers, supply and demand.  And you're trying -- when
3   you're selling stock, you're putting out supply.  I
4   mean, it's just like basic economics supply/demand
5   curves, and they have to intersect.  And so you want to
6   meet demand.  If you -- anyway, that's basically what
7   they're talking about.
8   Q.  Okay.  And I gather here that -- well, let me
9   ask this:  It says,
10   "I was asked if there was any change
11   in instruction.  I said no, to proceed as
12   previously instructed unless I call back."
13   Can you tell from this, if you recall now
14   having read this, whether or not you received the call
15   from Merrill Lynch and then gave them an answer right
16   away or whether you went back to Mr. Ellison to ask him
17   whether to change the instructions?
18   A.  The way I read this is Merrill Lynch reports
19   to me every day.  They want to know -- they said it was
20   hard to get things done, "Can we do -- you want to
21   change instructions?"  And I told them no.
22   Q.  Okay.  So it wasn't something where you
23   conferred with Mr. Ellison on that particular --
24   A.  No.  In fact, I was updating Carolyn to update
25   Larry to let him know what instructions I said -- I

1   gave.
2   Q.  Right.
3   A.  And if there was any change, let me know.  It
4   was more like "I took care of it, but this is what I
5   did."
6   Q.  Okay.  And who was your contact at Merril
7   Lynch at this time for these trades?
8   A.  My general broker was a guy named Richard
9   Gadbois, but I think Richard was on vacation.  And I
10   think the main contacts were an associate working with
11   Richard, named Tom Blanchfield, and his assistant, named
12   Kimberly Clarke.
13   Q.  Okay.  And do you recall any discussions that
14   you specifically had with Mr. Blanchfield in this time
15   frame regarding these trades?
16   A.  No.
17   Q.  Mr. Blanchfield told the SLC that he recalls a
18   conversation where Mr. Ellison was patched in from his
19   boat on phone with -- three-way conversation with you,
20   Mr. Ellison and Mr. Blanchfield, where Mr. Ellison was
21   on his boat.
22   And it was sometime during the trading period.
23   And you discussed the impact of Mr. Ellison's trade on
24   the market.  And Mr. Ellison indicated that he did not
25   want to be too aggressive and adversely impact Oracle

1  stock price. Do you recall anything about that?

2  A. No, I don't.

3  Q. Okay. So that doesn't refresh your

4  recollection, hearing that he spoke about that? Okay.

5  A. It's not inconceivable. I just don't recall.

6  Q. Okay. That's okay.

7  A. And I'm surprised that Larry was still on his

8  boat at that point in time. He may have been.

9  Q. Okay. But he was -- if he was on his boat or

10  one of his boats, he would have been reachable by phone?

11  That sounds conceivable to you?

12  A. Yeah, there are sat-coms.

13  THE REPORTER: There are what?

14  THE WITNESS: Sat-coms, satellite

15  communications.

16  MS. LAVALLEE: All right. I'm going mark as

17  the next Exhibit CD-I 03250 through 51.

18  (DC Exhibit No. 206

19  marked for identification).

20  MS. LAVALLEE: Q. Mr. Simon, if you could

21  take a moment, look at the document and then identify it

22  for the record.

23  A. This appears to be an e-mail from me to

24  Carolyn updating Carolyn on trading on January 25th,

25  '01, which is, I believe, the fourth day of trading, and

1  updates for the day and cumulative.

2  Q. Okay. Thank you. And you indeed did send

3  this to Ms. Balkenhol, to the best of your knowledge --

4  understanding?

5  A. It would appear so.

6  MS. LAVALLEE: I'm going to mark the next

7  Exhibit, 207, a document Bates-stamped CD-I 03084.

8  (DC Exhibit No. 207

9  marked for identification).

10  MS. LAVALLEE: Q. Mr. Simon, if you could

11  take a moment and tell me whether you've ever seen this

12  document before.

13  A. I have no recollection.

14  Q. Okay.

15  A. But I may have seen it. It looks like I

16  may -- looks like it was addressed to me.

17  Q. Okay. And actually, I believe there was a

18  similar copy but just different Bates range that was

19  produced in your documents last night. But ...

20  A. Mm-hm.

21  Q. I believe that's the case. Do you recall ever

22  learning of the announcement -- this is a bulletin board

23  printout -- but a public announcement regarding Mr.

24  Ellison's trades in or about January 25, 2001?

25  A. Could you restate the question, please.

1  Q. Do you recall learning in January - in or

2  about January 25th, 2001 about the press release or

3  the announcement or public announcement of Mr. Ellison's

4  trades?

5  A. I have no recollection.

6  MS. LAVALLEE: Okay. I'm going to mark as

7  Exhibit No. 208 a document Bates-stamped CD-I 03063.

8  (Discussion off the record).

9  MS. LAVALLEE: I'm actually going to mark a

10  different document as 208. This document is the same

11  document but a different Bates stamp, PS0505.

12  (DC Exhibit No. 208

13  marked for identification).

14  MS. LAVALLEE: Q. Mr. Simon, is this your

15  handwriting?

16  A. It appears to be the case.

17  Q. Okay. Can you read for me the notes.

18  A. It says, "Ellison, phone call with Dan

19  Cooperman, 1/26/01." Point 1, "He'll clear

20  Larry for sales all through next week.

21  Will send e-mail confirming so. Recommends

22  we not trade past 1/31. Perception better

23  if not trade into last month of Q, but will

24  clear through February 2nd."

25  Q. Okay. And that's consistent with your earlier

1  testimony about what occurred in your conversations with

2  Mr. Cooperman, right?

3  A. Correct.

4  Q. Okay. And do you recall whether or not you

5  did indeed receive clearance from Mr. -- written

6  clearance in -- by way of a written document from

7  Mr. Cooperman?

8  A. I believe it's one of the exhibits that you

9  gave to me that we've already reviewed. I may be

10  mistaken. I'll go back and search what we've already

11  gone over.

12  Q. No, that's fine. That could very well be.

13  A. Please look at document 202.

14  Q. Okay, thank you. Okay.

15  I'd like to mark as the next document in order

16  a document Bates-stamped CA-ORCL 010493 through 494.

17  (DC Exhibit No. 209

18  marked for identification).

19  MS. LAVALLEE: Q. Can you take a moment, and

20  when you've had a chance to look at it, then please tell

21  me for the record what it is.

22  A. It appears to be an e-mail from me to Kimberly

23  Clarke at Merrill Lynch, dated Friday, January 26, 2001.

24  Q. Okay. And in this -- you indeed sent this

25  e-mail to Ms. Balkenhol, to the best -- or to Kimberly

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 Clarke, to the best of your knowledge?

2 A. That would appear to be the case.

3 Q. Okay. At the very end on the second page, it

4 says,

5 "Finally, when you start to sell these

6 shares, please start with the December 27,

7 2000, 815,000-share lot, highest basis,

8 then move to the 2,852,000 December 29, '99

9 lot, next highest cost basis, and then

10 finally move on to the 1998 lot."

11 You were referring to different -- what were

12 you referring to there?

13 A. I was referring to different lot -- tax lots.

14 Q. Okay. But you were referring to different

15 shares specifically that you would want -- wanted sold

16 and in what order you wanted them sold; is that correct?

17 A. Specific lots of stock, which were represented

18 by specific certificates. And I was giving instructions

19 on the ordering of selling these specific certificates,

20 yes.

21 Q. And these were shares that were actually

22 previously owned by Mr. Ellison, and these dates relate

23 to when he actually acquired those particular shares; is

24 that correct?

25 A. These are what I call the option shares that

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 were previously exercised for tax purposes in late

2 December of each year, if you look at the lot date.

3 And when you exercise options, you get a tax

4 basis equal to fair market value on date of exercise.

5 And I was setting the structure of the sale to sell the

6 highest tax basis shares first to minimize the amount of

7 capital gain recognized.

8 Q. Okay. And was -- is it your understanding

9 that the shares that were sold in January actually

10 followed this order?

11 A. Absolutely.

12 Q. Okay, thank you.

13 I'm going to mark as the next document in

14 order a document that's Bates-stamped ORCLA 00294.

15 (DC Exhibit No. 210

16 marked for identification).

17 THE WITNESS: Okay.

18 MS. LAVALLEE: Q. Mr. Simon, can you tell me

19 what this document is.

20 A. This appears to be an e-mail from me to

21 Carolyn, dated Friday, January 26, 2001, reporting on

22 the results of trading for that date.

23 Q. Okay. And you indeed -- you believe that you

24 indeed sent this out to Ms. --

25 A. I would assume, yes.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 Q. Okay. The -- one of the sentences states,

2 "Trading instructions remain unchanged."

3 Do you have any understanding as to what you

4 were referring to there?

5 A. It appears to me, interpreting my own wording,

6 that I am reporting to Carolyn that my instructions to

7 Merrill Lynch have remained unchanged.

8 Q. Okay. And do you have any understanding as to

9 whether you had any further communications with

10 Ms. Balkenhol, other than what we've seen already about

11 that issue?

12 A. No.

13 MS. LAVALLEE: I'd like to mark as the next

14 Exhibit, which is 211, a document Bates-stamped CA-ORCL

15 010496 to 497.

16 (DC Exhibit No. 211

17 marked for identification).

18 MS. LAVALLEE: Q. Mr. Simon, if you could

19 take a moment and look at the document and then identify

20 it for me, please.

21 A. Okay.

22 Q. Can you tell me generally what the reference

23 to is -- well, generally what the document is.

24 A. It's an e-mail exchange with history between

25 me and Carolyn forwarding on an e-mail that Barbara

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1 Wallace sent to Carolyn.

2 Q. Okay. And what was the substance of this,

3 just briefly?

4 A. How to fill out the stock option exercise

5 forms.

6 Q. Okay. And in here, in the PS at the middle of

7 the first page, it indicates that -- I believe that

8 there was a conversation -- you had a conversation with

9 Mr. Ellison. Is that my correct understanding of the

10 reading of the sentence.

11 "When I last spoke with Merrill Lynch

12 15 minutes ago right after Larry called,

13 they had sold 750,000 so far today, leaving

14 only 332,000 to go on the 22.232 million

15 option tranche."

16 Is that a correct reading --

17 THE REPORTER: Option what?

18 THE WITNESS: Tranche.

19 MS. LAVALLEE: Tranche, T-R-A-N-C-H-E.

20 THE WITNESS: That is the correct reading.

21 That is the correct reading.

22 MS. LAVALLEE: Q. Okay. So you -- based on

23 this, you probably -- it appears you had a conversation

24 with Mr. Ellison that day. Does that --

25 A. That would be the conclusion I would probably

1   draw from this e-mail.

2       Q.   Okay.  And can you -- do you have any

3   independent recollection, or does this e-mail refresh

4   your recollection, as to what the substance of your

5   conversation was?

6       A.   I suspect it's about the trading, but I have

7   no other recollection.

8       Q.   Okay.  That's fine.  He didn't tell you to

9   stop trading, did he?

10      A.   Doesn't look like it.  I don't know.

11      Q.   Do you have any understanding as to whether or

12  not the exercise form was signed at that -- on that date

13  or at a later date?

14      A.   I don't know.  That's something that Barbara

15  Wallace and -- that's an internal Oracle matter.

16      Q.   Okay.

17      A.   And ... I don't know.

18      Q.   It wasn't a document that you personally

19  signed?

20      A.   I don't know.  I may have.

21      MS. LAVALLEE:  I'm going to mark as the next

22  exhibit a document Bates-stamped CA-ORCL 010499.

23      (DC Exhibit No. 212

24      marked for identification).

25      MS. LAVALLEE:  Q.  Can you take a moment and

1   look at the document.  Then when you've had a chance to

2   review it, please identify it for the record.

3       A.   This appears to be a document -- it appears to

4   be an e-mail from me to Carolyn Balkenhol, dated Monday,

5   January 29th, 2001, reporting on trading during the

6   day.

7       Q.   Okay.  And to the best of your knowledge, this

8   is an e-mail that you actually did send to

9   Ms. Balkenhol; is that correct?

10      A.   It would appear that I would have.

11      Q.   Yeah, on the date listed on this e-mail, which

12  is January 29th, 2001?

13      A.   Actually, since you're using an Oracle copy of

14  it versus my copy, and it's from Carolyn's machine,

15  there would be some evidence on this e-mail that she

16  actually received it.

17      Q.   Okay.

18      A.   If you look at the different font -- there's

19  different font between my font and her font.

20      Q.   So the e-mails that have this appearance

21  appear to be e-mails that are printed from Oracle

22  computers, not yours?

23      A.   Correct.  And you'll see duplicate copies in

24  my sent -- that I've printed out of my sent file.

25      Q.   Right.  The very last sentence of the text

1   reads, "Per Tom, the stock's trading slow today."

2       Tom, is that Tom Blanchfield?

3       A.   Correct.

4       Q.   Okay.  And do you have any understanding, as

5   you sit here today, as to what he was referring to by

6   that sentence, or what you were referring to by that

7   sentence?

8       A.   I believe I was quoting what Tom told me.

9       Q.   And do you have any understanding as to why

10  the market was slow at that time?

11      A.   Because it was slow.

12      Q.   Excellent answer.  Do you have any

13  understanding as to what he meant by saying the market

14  was slow?

15      A.   I think it means --

16      MR. NADOLENCO:  Objection.  Misstates the

17  document.

18      MS. LAVALLEE:  Thank you.

19      Q.   Do you have any understanding as to what he

20  means by saying the -- or what you meant by saying that

21  the stock -- actually, let me rephrase that.

22      You were relaying what Mr. Blanchfield was

23  saying.  And he said that the stock trading slow today,

24  or something to that effect.  Do you have any

25  understanding as to what the phrase "the stock trading

1   slow today" means?

2       A.   I could only give you my interpretation today.

3   I don't recall what I inferred before, 'cause I was

4   repeating what Tom told me.  But I think it means stock

5   is trading slowly and that it means there's slow volume,

6   less volume, that day.

7       Q.   Okay.  So that makes it more difficult, then,

8   for him, Mr. Blanchfield, to actually execute the trades

9   that Mr. Ellison wanted to trade; is that correct?

10      MR. NADOLENCO:  Objection.

11      THE WITNESS:  That would be a reasonable

12  inference.

13      MS. LAVALLEE:  Q.  Okay.  Was it -- okay.

14      I'd like to mark as the next document, which

15  is Exhibit No. 213, a document Bates-stamped CA-ORCL

16  010498.

17      (DC Exhibit No. 213

18      marked for identification).

19      MS. LAVALLEE:  Q.  Mr. Simon, if you could

20  take a moment and look at this document and then tell me

21  what it is.

22      A.   This appears to be an e-mail from me to

23  Carolyn Balkenhol and Sue Bachman, updating Carolyn and

24  Sue on trading activity on Monday, January 29th, 2001.

25      Q.   Okay.  And it's your understanding that this

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1    e-mail was indeed received by either -- or received by
2    Ms. Balkenhol and Sue Bachman?
3        A.  It would appear to be, since this is a
4    printout from the Oracle receipt side of it.  I don't
5    know whether it's Sue Bachman's or Carolyn's printout,
6    but yes.
7        Q.  Okay.  And who is Sue Bachman?
8        A.  Sue is one of Larry's administrative
9    assistants who worked with Carolyn.
10       Q.  Okay.  And do you know what -- was she have --
11   strike that.
12           Did she have any involvement in the issue of
13   Mr. Ellison's trading in the third quarter of 2001?
14       MS. SEGAL:  Object to the form of the
15   question.
16       MS. LAVALLEE:  And actually, let me rephrase
17   the question because we haven't been talking
18   specifically about third quarter.
19       THE WITNESS:  If you can do it in calendar
20   quarters, it would be easier for me, that convert to
21   Oracle fiscal quarters.
22       MS. LAVALLEE:  Right.
23       Q.  Did she have any involvement in the issue of
24   Mr. Ellison's trade in December 2000 or January 2001?
25       MR. NADOLENCO:  Objection.  Lacks foundation.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1        THE WITNESS:  I don't recall.  It appears that
2    I copied Sue on this.  Sue sometimes filled in when
3    Carolyn was out or doing something else.  So maybe
4    Carolyn was out so I copied Sue so I knew the message --
5    so the message might get relayed to Larry.
6        MS. LAVALLEE:  Okay.
7        THE WITNESS:  But I don't know -- I really
8    don't -- I'm just speculating based on this e-mail.
9        MS. LAVALLEE:  Q.  So you don't specifically
10   recall any communications with Ms. Bachman, other than
11   this particular e-mail?
12       A.  Correct.
13       Q.  The second line -- I'm sorry -- the last
14   sentence of the text of the e-mail reads,
15           "We're continuing on with the trading
16   tomorrow, as per Larry's instruction."
17           I assume that that term "Larry" refers to Mr.
18   Ellison, correct?
19       A.  That's correct.
20       Q.  Okay.  And you refer specifically to Mr.
21   Ellison's instructions.  Do you have any understanding
22   as to whether or not you received further instructions
23   from Mr. Ellison on that day or just prior to that day
24   specifically about the trading on January 30th?
25       A.  I have no specific recollection, but my

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1    general recollection is I got some authority and I just
2    kept running with it until I was told to stop.  And so I
3    kept running.  And every day when I updated them, I said
4    "I'm continuing."
5        Q.  Okay.  So you --
6        A.  So the heads-up to say "if you want me to
7    stop, you better tell me."
8        Q.  Okay.  And is this -- does -- this particular
9    sentence doesn't refresh your recollection as to whether
10   or not you actually got a response on that date or just
11   prior to that date regarding trading on January 30th,
12   2001?
13       A.  No.
14       Q.  When did you receive instructions to cease
15   trading?
16       A.  I don't recall.
17       Q.  Okay.  But you did indeed receive instructions
18   at some point in time to cease trading in that period,
19   right?
20       A.  Based on when I reviewed the documents in
21   preparation for my questioning today, we ceased trading,
22   I believe, on January 31st.  And since I ceased
23   trading on that date, I must have gotten instructions to
24   stop trading on that date.
25       Q.  Okay.  Do you recall anything else about cease

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1    trading, other than that?
2        A.  No.  I'm just deducing that from the facts
3    that we stopped trading.
4        Q.  All right.  I'm going to show you a document
5    that is -- was previously marked, I believe, as Exhibit
6    127.  And it is Bates-stamped CA-ORCL 010500.
7        A.  Okay.
8        Q.  Can you identify this document for me, please.
9        A.  It appears to be an e-mail from me to Larry,
10   dated Monday, January 29th, 2001.
11       Q.  All right.  And it's your understanding that
12   you did indeed send this to Mr. Ellison on or about
13   January 29, 2001?
14       A.  I have no recollection, but that would be a
15   reasonable conclusion to draw from the e-mail.
16       Q.  Okay.  And you're updating him on the activity
17   of that day, correct?
18       A.  That is correct.
19       Q.  The final sentence of the text indicates --
20   states, "ML will continue trading tomorrow as
21   instructed."
22           And I guess my question is similar to what I
23   asked you in the last document, and that is, looking at
24   this document, or based on your own recollection, do you
25   have any understanding as to whether you had a specific

1  conversation with Mr. Ellison on or about January 29th

2  about trading on January 30th?

3  A.  No, I believe this is just me saying, as I

4  said before, "I'm continuing to run with the ball.  Let

5  me know if instructions have changed."

6  MS. LAVALLEE:  Okay.  Next document in order,

7  214, which is Bates-stamped CD-I 03267.

8  (DC Exhibit No. 214

9  marked for identification).

10  MS. LAVALLEE:  I'm going to also mark another

11  document the next in order, which is a document

12  Bates-stamped CD-I 03263 through 64.

13  (DC Exhibit No. 215

14  marked for identification).

15  MS. LAVALLEE:  Q.  And they're actually a

16  e-mail trail, so the next document actually has a little

17  more detail.  So I'll ask you simply to look at that

18  one.

19  A.  Okay.

20  Q.  Actually, I'll ask you to look at them in

21  conjunction 'cause one of them is partially redacted.

22  You know what; let's take them one at a time 'cause I

23  was thinking I was looking at something different.  So

24  let's start with the first document.

25  A.  214.

---

1  Q.  Correct.  And can you tell me what this

2  document is.

3  A.  This appears to be an e-mail from me to

4  Carolyn Balkenhol, dated Monday, January 29th, 2001.

5  Q.  And this is actually on the different format

6  from the ones we looked at a little earlier -- some of

7  the ones we looked at a little earlier.  And it appears

8  to be printed from your computer; is that correct?

9  A.  That appears to be the case.

10  Q.  Okay.  Is it nevertheless your understanding

11  that you did indeed send this document -- e-mail to Ms.

12  Balkenhol on or about January 29, 2001?

13  A.  With a cc to Sue Bachman.  That would be a

14  reasonable conclusion.

15  Q.  Okay.  In the second paragraph of the text,

16  you indicate that "I'm concerned about publicity as more

17  Rule 144 filings go public."

18  What was your concern at that time regarding

19  this issue?

20  A.  I have no recollection.  If you'd like me to

21  speculate, I'm happy to speculate.

22  Q.  Please don't speculate.

23  A.  Okay.  By the way, this explains why I was

24  copying Sue Bachman, 'cause Carolyn was apparently sick,

25  'cause I'm copying Sue in case Carolyn was out sick.

---

1  That's why I started copying Sue on the other e-mails.

2  Q.  Thank you.  And the next document which we'll

3  mark ... 215?

4  (Discussion off the record).

5  THE WITNESS:  That is a copy of document 212.

6  MS. LAVALLEE:  Okay.  Indeed it is.  Okay.

7  (DC Exhibit No. 216

8  marked for identification).

9  MS. LAVALLEE:  Q.  Mr. Simon, can you take a

10  look at this document, and then when you've had a chance

11  to review it, identify for the record what it is.

12  A.  It's an e-mail from me -- it appears to be an

13  e-mail from me to Kimberly Clarke at Merrill Lynch with

14  a cc to Carolyn Balkenhol and Catherine Ong, dated

15  Tuesday, January 30, 2001.

16  Q.  Okay.  And it refers to -- well, let me step

17  back.

18  Is it your understanding that this -- you did

19  indeed send this e-mail to Kimberly Clarke with cc to

20  several people on or about January 30th, 2001?

21  A.  That would appear to be the case.

22  Q.  Okay.  And in the first paragraph of the text,

23  you state -- you refer to something called Integral

24  Capital Partners.  And Integral -- actually, Integral

25  Capital Partners distribution lot.  Can you explain for

---

1  me what that is.

2  A.  Integral Capital Partners is an investment

3  partnership that invests -- invested in high-technology

4  companies.  When the partnership wound down, it

5  distributed out shares in stock it had acquired.  As

6  part of the distribution, Larry received shares in

7  Oracle Corporation.

8  Q.  Okay.

9  A.  These shares had a high tax basis lot.  And

10  this was me identifying the specific lots being sold to

11  identify, for income tax purposes, the high tax basis

12  lots that were being sold.

13  Q.  Thank you.

14  All right.  We'll mark as Exhibit No. 217 a

15  document Bates-stamped CA-ORCL 010503.

16  (DC Exhibit No. 217

17  marked for identification).

18  MS. LAVALLEE:  Q.  Mr. Simon, if you can take

19  a moment to look at the document and then identify for

20  the record what it is.

21  A.  This appears to be an e-mail from me to

22  Carolyn Balkenhol and Sue Bachman, dated Tuesday,

23  January 30, 2001, reporting on the trading for that

24  date.

25  Q.  Okay.  And indeed, you believe that you sent

1  this e-mail on or about January 30th, 2001 to Carolyn

2  Balkenhol, Sue Bachman and cc'ed -- no cc's.

3    A.  That would appear to be the case, since this

4  is Oracle font.  So this looks like it was printed off

5  an Oracle computer.

6    Q.  Okay.  And you refer in here to the fact that

7  you've sold all the high basis -- high tax basis shares

8  and have sold 300,000 of the old zero-basis shares.  And

9  can you explain briefly what "old zero-basis shares"

10  refers to.

11    A.  Yes.  That refers to what is also known as

12  founders -- Larry's founder stock, the stock he acquired

13  when Oracle was originally formed.  It has -- does not

14  have a zero, but has a very small fraction of a penny

15  tax basis.

16      And when we were selling stock after

17  exercising the options, remember I went in reverse

18  order, first all the option shares, then the highest tax

19  basis lots, down to the lowest tax basis lots.  And this

20  is saying that we're getting into the lowest tax basis

21  lot.

22    Q.  Okay, great.  Thank you.  I'm going to show

23  you now a document that was previously marked as Exhibit

24  128.  And it is a document Bates-stamped CA-ORCL 010504.

25  Can you take a moment, look at the document, and then

1  identify for me what it is.

2    A.  This appears to be an e-mail from me to Larry

3  Ellison, dated Wednesday, January 31, 2001, reporting on

4  trading on that date and cumulative to date trading.

5    Q.  Okay.  And can you read for me your PS,

6  please.

7    A.  "The U.S. capital markets are pretty amazing,

8  raising almost 1 billion in eight days."

9    Q.  Okay.  And what did you mean by that?

10    A.  That the U.S. capital markets were pretty

11  amazing.

12    Q.  Anything more than that?  Why is it amazing to

13  sell -- to -- what was amazing about it?  Please tell

14  me.

15    A.  The number of shares that Larry sold as a

16  percentage of his holdings are very small.  And it was a

17  very modest diversification.  But in absolute dollars,

18  it's a large number.

19      And we had very liquid capital markets.  The

20  U.S. is an amazing,free market capitalist system that is

21  very productive and an engine for the world.  And I was

22  just commenting that this is one example of the U.S.

23  free market system effectively deploying capital.

24    Q.  Okay.  Were you certain that you would be able

25  to accomplish all the trades that you accomplished at

1  the time, or was there some question in your mind as to

2  whether or not you'd be able to sell as much as you

3  wanted to sell?

4    MR. ZWANG:  Were you certain at what point?

5    MS. LAVALLEE:  At any point during this period

6  of time in January 2001.

7    MR. NADOLENCO:  Object to the form.

8    THE WITNESS:  I was hopeful.  You -- whenever

9  you're trying to do a trade and you set limit orders and

10  constraints on the traders, you always have to worry

11  about the market and exogenous events.

12      We had the bombings in Madrid a few days ago,

13  an exogenous event which affects the capital markets.

14  So I'm a very conservative, risk-averse person who takes

15  my job seriously.  So yes, I worry about everything all

16  the time.

17    MS. LAVALLEE:  Q.  Okay.  Do you think that

18  Mr. Ellison would have been able to trade 50 percent of

19  his holdings in the same eight-day period that he --

20    A.  Fifty percent?

21    MR. NADOLENCO:  Objection.  Incomplete

22  hypothetical, calls for speculation.

23    MS. LAVALLEE:  Q.  You can answer the

24  question.

25    A.  The answer is you can sell anything you want.

1  The question is price and terms.

2    Q.  Okay.  And if he had attempted to do that, do

3  you have any understanding what that might have done to

4  the market?

5    A.  Fifty percent --

6    MR. NADOLENCO:  Same objection and calls for

7  speculation.

8    MS. LAVALLEE:  Q.  You can answer.

9    A.  I'm not an expert on the capital markets, but

10  I do understand supply/demand curves.  And as you

11  increase supply, price drops to have intersection of the

12  supply and demand curves.  So applying classical

13  economic thinking, the more you sell, the lower the

14  price.

15    Q.  Okay.  And 50 percent of Mr. Ellison's holding

16  would have represented what portion of Oracle's

17  outstanding stocks at that time?  Do you have any

18  understanding?

19    A.  Actually, 11 percent.

20    Q.  Okay.

21    A.  A relatively modest amount, actually.

22    Q.  And you think that's a modest amount of stock

23  to trade in a period of time?

24    MR. NADOLENCO:  Objection.  Calls for

25  speculation, incomplete hypothetical.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1     THE WITNESS: The answer is -- the question is
2     in a period of time, absolutely it's not an unreasonable
3     amount. The question is the period of time and the
4     terms.
5         MS. LAVALLEE: Okay.
6         THE WITNESS: Let me just raise an anecdote.
7     I once spoke with someone about -- the question is, can
8     you sell something. I always said it just depends upon
9     the price. And the gentlemen said "No, it's not just
10    the price; it's the terms. I will buy anything from you
11    at any price on a nonrecourse basis with payments due
12    2,000 years out."
13        So the question is terms and price.
14    Everything is negotiable.
15        MS. LAVALLEE: All right. Fair enough. Thank
16    you very much.
17        Can we just go off the record a moment just so
18    I can check something.
19        THE WITNESS: Sure.
20        THE VIDEOGRAPHER: We are off the record. The
21    time is 4:21.
22        (Recess taken.)
23        THE VIDEOGRAPHER: We are back on the record.
24    The time is 4:23. This marks the end of videotape
25    Volume I, tape 3 in the deposition of Philip Simon. The

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1     time is 4:23 p.m. We are off the record.
2         (Recess taken).
3         THE VIDEOGRAPHER: This marks the beginning of
4     videotape Volume I, tape 4 in the deposition of Philip
5     Simon. The time is 4:34 p.m. Where back on the record.
6         MS. LAVALLEE: I'd like to mark as Exhibit
7     214 --
8         THE WITNESS: 218.
9         MS. LAVALLEE: -- 218 a document Bates-stamped
10    PS0063-64.
11        (DC Exhibit No. 218
12        marked for identification).
13        MS. LAVALLEE: Q. Mr. Simon, if you could
14    take a moment and look at the document and then identify
15    it for me, please.
16        A. Okay. This is an e-mail exchange between --
17    this appears to be an e-mail exchange between me and
18    Mary Jo Lloyd in my office, dated January 31, 2001 from
19    Mary Jo to me and me responding to Mary Jo on
20    February 1, 2001. And there appears to be attached
21    unrelated e-mail.
22        Q. Okay. Focusing now on the first page of this
23    document, it indicates -- she's asking the question
24    whether or not you know if Mr. Ellison will be selling
25    any more Oracle sales [sic] between now and the end of

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1     February; is that accurate?
2         A. That's what Mary Jo appears to be telling me,
3     correct.
4         Q. Okay. And then you say that you're done, no
5     more share -- trades; is that correct?
6         A. No.
7         Q. Okay. What is --
8         A. I think "done, thanks" means I'm telling Mary
9     Jo I got the message, I took care of it --
10        Q. Okay.
11        A. -- thanks. Though it may also mean your
12    interpretation. I don't know.
13        Q. Okay.
14        A. But evidence indicates we stopped trading, so
15    both interpretations are probably right.
16        MS. LAVALLEE: I'd like to mark as the next
17    exhibit a number [sic] Bates-stamped PS0060.
18        (DC Exhibit No. 219
19        marked for identification).
20        MS. LAVALLEE: Q. Can you take a moment and
21    look at the document and then identify what it is for
22    me.
23        A. Okay.
24        Q. Do you recognize this -- or can you tell me
25    what the document is.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1     A. This is -- this appears to be an e-mail
2     exchange between me and Carolyn Balkenhol with history
3     of e-mail exchanges attached.
4         Q. Okay. And if I could refer your attention
5     specifically to page 2.
6         A. Mm-hm.
7         Q. At the very top, this is a portion of an
8     e-mail from you to Ms. Balkenhol, I believe. And it
9     states:
10        "Re Merrill Lynch, the stock traded
11        above 30 today. But since Larry never
12        called me, we did not trade any shares, as
13        instructed. As I see it, I think we're
14        done for this quarter, though I don't know
15        for sure until tomorrow passes without a
16        call from Larry."
17        Was it your -- well, do you see that?
18        A. Yes.
19        Q. Did I generally accurately --
20        A. You've read what it said clearly.
21        Q. Okay. Do you have -- does this refresh your
22    recollection as to whether or not -- or as to what
23    instructions you received about termination of -- or
24    ceasing to trade in the January time frame?
25        A. No, I have no recollection whatsoever.

1   However, I can interpret what this says and make
2   inferences. But I have no -- no independent
3   recollection, other than this e-mail.
4       Q. Okay. Do you have any understanding of what
5   you were trying to convey there?
6       A. I -- I believe I can interpret it and give you
7   my today's interpretation of what I was saying, which is
8   not necessarily the same as my interpret -- what I meant
9   back then, which is likely to be the case.
10      Q. Okay. If you think it was a reasonable
11  interpretation of what you were saying, I'll take that.
12      A. I think it says that stock traded above 30.
13  Larry never called me, so we didn't trade anything, as I
14  was instructed. I have Oracle clearance to trade
15  through February 2nd. This was February 1st. So I
16  can only trade tomorrow. If I'm not called and given
17  authorization to trade tomorrow, then I'm not going to
18  be trading the next day 'cause I don't have any Oracle
19  clearance.
20      Q. Okay. Prior to this, you'd been -- you had --
21  it was your understanding that you had a standing
22  authorization to trade unless told otherwise. This
23  seems to imply differently; am I correct?
24      A. That is -- your interpretation appears to be
25  correct, particularly since I stopped trading on

1   January 31st, so --
2       Q. Okay.
3       A. The impression would be that I was instructed
4   to stop trading.
5           MS. LAVALLEE: Okay. I would like to mark as
6   the next exhibit a document Bates-stamped CD-I 03095
7   through 97.
8           (DC Exhibit No. 220
9           marked for identification).
10          MS. LAVALLEE: And this is No. what?
11          THE REPORTER: 220.
12          MS. LAVALLEE: 220.
13          THE WITNESS: Okay.
14          MS. LAVALLEE: Q. Can you identify this
15  document for me, please.
16      A. This appears to be an e-mail exchange between
17  Barbara Wallace -- Kimberly Clarke and Barbara Wallace,
18  dated February -- Monday, February 5, 2001.
19      Q. Okay. Do you see yourself as a recipient of
20  this e-mail?
21      A. I was copied on it.
22      Q. Okay. Or actually, it was actually sent to
23  you directly.
24      A. Actually, it was -- actually, I was one of the
25  recipients on the "to" line.

1       Q. Do you have -- is it your understanding that
2   you -- do you have any understanding that you did not
3   receive this document on or about February 5th, 2001?
4       A. It's normal to assume I received the document.
5   And if you look on page 3 of the exhibit, there's a
6   schedule attached that apparently came with it. And you
7   see the handwriting on that schedule, which is my
8   handwriting, which further evidences that I received the
9   e-mail and the attachment.
10      Q. Okay. Do you believe that this document --
11  the third page of this document actually constitutes the
12  attachment that was sent with this e-mail?
13      A. I have no way of knowing. It seems -- it's a
14  logical assumption, but I don't know.
15      Q. Okay. Can you tell me what this -- well,
16  first let me ask a different question.
17          The handwriting on the third page of this
18  document, is that your handwriting?
19      A. Yes, it is.
20      Q. Okay. I believe you may have testified as to
21  this earlier. Is this a document you prepared, the
22  third page?
23      A. I have no recollection. And let's read the
24  e-mail. Let me see. It looks like this is a Barbara
25  Wallace attachment 'cause it says.

1   "To Kim from Barbara, I've attached a
2   spreadsheet of Larry's transactions in
3   January."
4       Q. Okay.
5       A. And then further, I am ticking, showing
6   whether it ties to my records. If you look at my first
7   note on the bottom of the third page, it says "Ties to
8   H&S records." That's ties to Howson & Simon records, my
9   records.
10          So based on that, that I'm tying it to my
11  records, and that Barbara's telling Kim that a schedule
12  is attached, I would conclude, though not conclusively,
13  that this schedule was prepared by Barbara Wallace.
14      Q. Okay. And can you then read for me the
15  remaining handwritten notes that you have here.
16      A. The first one says "Ties to Howson & Simon
17  records." The next tick mark, the little W with the
18  slash-through --
19      Q. Yeah.
20      A. -- referencing the last C138880, says,
21  "No H&S record to tie to, though
22  9,968,800 share certificate reconciles to
23  10 million share certificate list, 3" --
24  "less 31,200 share donation on 1/4/01 to
25  UCD."

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  Q.  Okay.  And can you explain to me what that
2  refers to.
3  A.  Until today, I would have not had a clue.  But
4  earlier on today, one of the documents you had with the
5  Yahoo! schedule where I had the pricing, that listed the
6  stock price, the average of the high and low, on
7  January 4, 2001.
8  I conclude it probably referred to stock
9  donations to charity and referred to a 300,000-share lot
10 and a 31,200-share lot.  And I was not certain to which
11 charity the 31,200 shares were donated.
12 This refers to a January 4, '01 donation to
13 UCD, which is University of California at Davis.
14 Q.  Okay.  And the annotations on the top right of
15 the document, what does that say?
16 A.  That is a little squiggle mark looking at the
17 difference between the 32,232 number and the 29 million
18 number, which is a delta of 3,147,424.  And it says
19 "Room left on Rule 144 filing made 1/30/01."
20 And I'm reconciling how many shares had been
21 filed for, less how many have been sold, and the
22 difference that is available.
23 Q.  Okay.  And am I to understand from this that
24 brokers -- this "rep" line refers to the number of
25 shares actually sold in this January time frame, the

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  29,984,576?
2  A.  I believe that's the case.  I would have to
3  look at my records and the documents I previously --
4  that I've provided to you to verify if that's the right
5  number.  But it seems correct.
6  Q.  Okay.  And what -- I know we talked about this
7  earlier.  What was the number of shares that you
8  actually were hoping to sell in this time frame; do you
9  recall?
10 A.  At one point -- I was hoping to sell as many
11 as possible to pay down the debt, 'cause that's my
12 personal desire.  There were indications from Larry, a
13 communication earlier we saw, where the hope was to pay
14 down the debt by 600 million.
15 Then I e-mailed Larry explaining to Larry how
16 many shares that would represent so you would have
17 enough after-tax proceeds to reduce the debt to
18 400 million.  But I can only give you what I would have
19 liked to have sold.
20 Q.  Okay.  Do you recall what your instructions
21 were from Mr. Ellison regarding the total number of
22 shares to attempt to sell?
23 A.  No, I do not.
24 MS. LAVALLEE:  Okay.  I'd like to mark as the
25 next document in order a document Bates-stamped

---

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  PS0074-75.
2  (DC Exhibit No. 221
3  marked for identification).
4  THE WITNESS:  Okay.
5  MS. LAVALLEE:  Q.  Can you identify this
6  document for me.
7  A.  This appears to be an e-mail exchange from me
8  to Carolyn on -- about a trip I'm planning to take to
9  New York to meet with Merrill Lynch.  The e-mail to
10 Carolyn is dated -- I can't tell.  She's replying to me
11 on February 27th, 2001, and I reply to her on
12 February 27th, 2001.  So I don't know the date of the
13 first e-mail.
14 Q.  Okay.  In the e-mail that you wrote -- and by
15 "the first e-mail," you're referring to -- well, let me
16 direct your attention to the header on the document.
17 Does that appear to be the date of the top e-mail from
18 you to Carolyn?
19 A.  I don't know the date of the first one.  I
20 would assume the header on the top is probably my -- I
21 wrote to Carolyn, she replied, wrote back to her.
22 Q.  Right.
23 A.  She replied to me on February 27th,
24 11:30 a.m.  And I apparently responded to her at
25 2:09 p.m. on the same date.  I don't know what the date

---

Simon, Philip B. (Vol. 01) - 03/16/2004 12:00:00 AM

1  of my first e-mail to her is.
2  Q.  Okay.
3  A.  But it was probably -- to make it easy, it was
4  probably the same date.
5  Q.  Okay.  No, I see.
6  A.  I'm just looking at the e-mail train.
7  Q.  Right.
8  A.  The reply doesn't always copy the date of the
9  first e-mail on the history.
10 Q.  Right.  In the first e-mail, the very first
11 one, you indicate that,
12 "I am -- "was not fully satisfied
13 (maybe wrongfully so, but I'll learn more
14 in New York) with the way the trading went
15 when we sold the 29 million shares."
16 Can you tell me what your understanding of
17 what you were trying to convey there.
18 A.  Yes, I remember this quite clearly.  Remember
19 earlier on in our discussion we talked about VWAP,
20 volume weighted average price.
21 That's the mechanism by which you can trade
22 (sic) the execution of the trader when you give them an
23 order to sell a large volume of stock.  What you want to
24 judge, the performance, is what gross price you are
25 getting before your commission relative to VWAP.

1 And the difference -- you can look at the high
2 and the lows of the day. And if you take the mean, that
3 is just the average between the high and the low, the
4 volume weighted average price is the weighted mean
5 price.
6 So for example, if you had 99 percent of the
7 stock selling at $32 a share and one percent selling at
8 28, the mean is 30, but the volume weighted average is
9 probably 31.98 per share.
10 So you're looking at VWAP to compare the
11 performance they were -- they provided and what I was --
12 and what we got.
13 Q. Okay. And were you initially just unsatisfied
14 with the performance?
15 A. Yep.
16 Q. Okay. And then at the bottom you say,
17 "Note that there were many reasons,
18 some quite legitimate, for not matching the
19 daily weighted average sale price. The
20 main one is volume. There's a trade-off
21 between the number of shares sold, i.e.,
22 how aggressive we are, and the price
23 received."
24 I believe this relates to matters we've been
25 discussing earlier. What is your understanding of what

1 you're referring to there?
2 A. I was being kind. I was going to Merrill
3 Lynch 'cause I was unhappy with the execution price. In
4 New York, they obfuscated and covered up. And when I
5 finally met with the trader, the truth came out they
6 tacked on a commission that was not agreed to. And we
7 had negotiations and settlement talks.
8 Q. Okay. And you look like you're still angry
9 about it.
10 A. I am. You can price and charge, but you have
11 to do it honorably and tell the truth. You don't say
12 one thing and then layer on a commission.
13 Q. Okay. And when you talk about many reasons
14 for not matching up the daily weighted average sale
15 price, what are the other types of reasons that you're
16 referring to?
17 A. Other than charging commissions?
18 Q. Mm-hm.
19 A. You can have a floor price. Now, what's
20 interesting is if you have a floor and the stock drops
21 below the floor, your should actually get a better volume
22 weight -- your average price should be better than VWAP.
23 Q. Right.
24 A. Other reasons are let's say you hit the
25 floor -- and this did not happen in this case -- then

1 you change your instructions midday. But if you -- and
2 the lesson is that you have to give very explicit
3 instructions up front, tell them explicitly how you're
4 going to judge them and what standard, request daily
5 reporting of VWAP with daily -- with cumulative totals
6 and immediately yank the trade if they fail to perform.
7 Basically it's keeping the brokers and the
8 traders honest and setting objective yardsticks by which
9 they can be measured.
10 MS. LAVALLEE: Okay. Can I have that answer
11 read back, 'cause my feed isn't working here.
12 (Record read as follows:
13 A. Other reasons are let's say you hit
14 the floor -- and this did not happen in
15 this case -- then you change your
16 instructions midday. But if you -- and the
17 lesson is that you have to give very
18 explicit instructions up front, tell them
19 explicitly how you're going to judge them
20 and what standard, request daily reporting
21 of VWAP with daily -- with cumulative
22 totals and immediately yank the trade if
23 they fail to perform.
24 Basically it's keeping the brokers and
25 the traders honest and setting objective

1 yardsticks by which they can be measured.)
2 MS. LAVALLEE: Okay.
3 Q. You indicated you can hit the floor, but that
4 didn't happen here. What did you mean by that?
5 A. Well, what I meant is -- actually, let me
6 restate. That is not a hundred percent accurate.
7 On certain days I believe we had -- I'm not --
8 I don't recall this, but based on reading e-mails and
9 our conversation today, it appears that we had -- at
10 least at some point in time there was a $30-per-share
11 floor price.
12 If Oracle traded below 30 on a particular day,
13 the trader was not authorized to trade. Therefore, to
14 the extent that Oracle traded below 30, the average
15 price that we should have gotten should be higher than
16 VWAP because you have trades below our floor, which
17 bring down the average.
18 That would be a reason why you should expect a
19 higher average selling price than VWAP.
20 Q. Okay.
21 A. And also, what I didn't explain -- this is a
22 little wrinkle -- when you're dealing with VWAP -- and
23 it has changed today. But when they moved from fraction
24 to decimalization -- and the bid offer spread has
25 narrowed. And before, there used to be an inside market

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  and the brokers did not charge inside commission -- they
2  did not charge an explicit commission; they worked off
3  the bid offer spread.  And there was both a retail and
4  a -- retail spread and a wholesale spread.
5       Today, in today's market, basically we moved
6  to decimalization.  There was no bid offer spread, just
7  trades at less than a penny per share.  So you can
8  actually get VWAP.
9       But see, if someone is buying -- there's a bid
10  offer spread, you have the right --
11       THE REPORTER:  I've got to slow you down.  "If
12  someone is buying" ...
13       THE WITNESS:  Buying and selling, and you're
14  looking at VWAP and there's a bid offer, VWAP is an
15  average of all trades.  VWAP will be right in the middle
16  of the bid -- an offer.  If you're selling your
17  offering, you're always going to be off VWAP, a little
18  bit below VWAP, if you're selling.
19       MS. LAVALLEE:  Okay.  Can I have my last
20  question and then the answer read back, when you have a
21  moment.
22       Actually, why don't we go off the record for a
23  few minutes.  I just want to get something.
24       THE VIDEOGRAPHER:  We're going off the record.
25  the time is 4:58.

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1       (Recess taken).
2       THE VIDEOGRAPHER:  We are back on the record.
3  The time is 5:06.
4       MS. LAVALLEE:  Q.  Hi, Mr. Simon.  We were
5  talking earlier about the fact that Mr. Ellison intended
6  to trade not only expiring options, but, as well, some
7  of his low-basis and zero-basis shares.
8       Do you have any understanding as to whether or
9  not he sold as many as he intended to sell during that
10  time period, or that you discussed selling?
11       MS. SEGAL:  Object to the form of the
12  question.
13       MR. NADOLENCO:  And asked and answered.
14       THE WITNESS:  Repeat your question
15  specifically 'cause I got confused by the objections, if
16  you would, please.
17       MS. LAVALLEE:  Q.  Okay.  My question was, is
18  it your -- do you have any understanding as to whether
19  or not all the trade -- all the shares that Mr. Ellison
20  had intended or instructed to be sold were actually sold
21  in the January time frame?
22       A.  I do not know for certain, but per prior
23  e-mail that we discussed referring to -- that indicated
24  Larry's desire to pay down 800 million of the debt and
25  my calculations, after he said that, to pay down

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  40.7 million shares -- now, I quantified that for Larry,
2  but I do not know whether Larry appreciated that it was
3  that number of shares to pay down that amount of debt
4  when he raised the 800 million number with me.
5       Q.  Okay.
6       A.  So I do not know how many shares he expected.
7  I know what my goal was 'cause I wanted to, remember,
8  blend option income with capital gains and to sell -- I
9  would have liked to reduce debt to zero.
10       Q.  Okay.  Can I refer you to Exhibit No. 186 that
11  we started with.
12       A.  Mm-hm.
13       Q.  And specifically to page 11.
14       A.  Mm-hm.
15       Q.  At the very bottom, I'll read a portion of the
16  text here.
17       "Simon stated that the target of selling 340
18  million was" -- hold on.  Let me start above, 'cause
19  it's not the first reference.  Okay.
20       "Simon stated that he received implicit
21  authority" -- this is a little higher --
22       A.  Mm-hm.
23       Q.  -- "to continue selling to achieve the
24  goal of reducing Ellison's debt to 40
25  million -- "400 million, which would

Simon, Philip B. (Vol. 01) - 03/16/2004 3/16/2004 12:00:00 AM

1  require the sale of approximately
2  40 million shares."
3       A.  Mm-hm.
4       Q.  And then below it says, "Ellison" --
5       "Simon stated," pardon me, "that the
6  target of selling 40 million shares was
7  within the Rule 144 limit for legal
8  trading.  Ultimately Ellison sold
9  approximately 29 million shares, far short
10  of the goal of 40 million."
11       Do you see where I'm reading?
12       A.  Yes.
13       Q.  Okay.  Is that basically -- does that
14  accurately summarize your general understanding of what
15  occurred during that time frame?
16       A.  I have no current recollection, but this seems
17  like this was -- this -- my -- my -- my interview by the
18  Special Litigation Committee was much closer to the date
19  of the relevant transaction.  It is more likely to be a
20  better and more accurate recitation of the facts than
21  any recollection today.
22       And all I could say is this seems accurate,
23  does not appear inconsistent with any e-mails or other
24  documents we reviewed today.  So I would say this is
25  indeed a reliable -- this is as reliable a record of the

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   facts as possible -- as I think we can have today.

2   Q.  Do you have any understanding why the

3   40 million goal was not achieved?

4   A.  Mm-hm.

5   Q.  And why is that?

6   A.  I would think it's because we had a volume --

7   we didn't want to affect the volume.  We had a $30

8   floor, so you couldn't trade when the stock traded below

9   the floor.  And I'm reciting only based on e-mails that

10  I've seen today that I have -- and I have no

11  recollection.

12  Q.  Okay.

13  A.  But Tom Blanchfield said at one point, and you

14  asked what it meant, that the stock is trading slow.  I

15  take that to mean that there was light trading volume.

16  So therefore, you can only -- the amount you could sell

17  was limited.

18  Q.  Okay.

19  A.  If you don't want to have an adverse effect on

20  the market, you're limited.

21  MS. LAVALLEE:  Okay.  I'd just like to mark a

22  document Bates-stamped ORCLA 0023479 and 480 [sic].

23  (DC Exhibit No. 222

24  marked for identification).

25  MS. LAVALLEE:  Q.  If you could just review

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   the document and then tell me generally what the -- what

2   it is.

3   A.  This appears to be an e-mail from me to Larry

4   with a cc to Carolyn Balkenhol, dated Tuesday, March 5,

5   2002.

6   Q.  And do you believe that you actually did

7   indeed send this document or e-mail to Mr. Ellison on or

8   about March 5th, 2002?

9   A.  I have no recollection whether I hit the send

10  button after writing the e-mail.  But this is a printout

11  apparently from the Oracle server, which would evidence

12  that it was received at the Oracle -- by Oracle.

13  MR. ZWANG:  Let's go off a second.  Let's go

14  off the record for a second.  Let me talk to you for a

15  second.

16  MS. SEGAL:  It's about the document, not about

17  his testimony.

18  MS. LAVALLEE:  Glenn, no, we --

19  MR. ZWANG:  There's no question pending, as

20  far as I know.

21  MS. LAVALLEE:  No, but under Delaware rules,

22  you can't talk to the witness during the course of the

23  deposition about the deposition.

24  MS. SEGAL:  Well, then we can do it publicly.

25  MS. LAVALLEE:  If you want to publicly tell me

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   what you want to talk to him about ...

2   MR. ZWANG:  I'll talk to him about the

3   document and then I'll talk to you.

4   MS. LAVALLEE:  No, I'm sorry.  You can't do

5   that under Delaware rules.

6   (Inaudible).

7   MR. ZWANG:  I can talk to my client anytime I

8   want.

9   MR. NASTARI:  He's produced pursuant to

10  Delaware rules.

11  (Inaudible).

12  MS. LAVALLEE:  This is the understanding.  He

13  was produced under the understanding that this was --

14  MR. NADOLENCO:  We can avoid the issue, I

15  think.

16  MS. LAVALLEE:  Just tell us --

17  MR. ZWANG:  Maybe we can -- I mean, you can

18  have whatever rules you want, but Mr. Simon is a citizen

19  of the state of California being deposed in California.

20  He's not waiving his right to counsel or anything else.

21  MR. NASTARI:  We're not talking about waiving.

22  MS. LAVALLEE:  Are we off the record?

23  THE REPORTER:  No.  Do you want to go off the

24  record?

25  MS. LAVALLEE:  Yes.

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   THE VIDEOGRAPHER:  We are off the record.  The

2   time is 5:13.

3   (Discussion off the record).

4   MS. LAVALLEE:  We can go back on the record.

5   THE VIDEOGRAPHER:  We are back on the record.

6   The time is 5:16.

7   MS. LAVALLEE:  All right.  I'm just checking

8   for my question here.  All right.  We can move on to the

9   next document.

10  THE WITNESS:  We're done with this one?

11  MS. LAVALLEE:  We are done with this one.

12  All right.  I'd like to mark as the next

13  document in order a document Bates-stamped ORCLA 0023515

14  through 516.

15  (DC Exhibit No. 223

16  marked for identification).

17  THE WITNESS:  Thank you.

18  MS. LAVALLEE:  Q.  Mr. Simon, would you take a

19  moment and look at the document and then identify it for

20  the record, please.

21  A.  All right.

22  Q.  Is this an e-mail that you sent to Mr. Ellison

23  on or about May 3rd, 2002?

24  A.  Yes.

25  Q.  Okay.  Is this another effort on your, I

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  guess, very regular efforts to have Mr. -- to recommend

2  to Mr. Ellison to diversify?

3      A.  There's an assumption in your question that

4  it's very regular efforts.

5      Q.  Oh, okay, I'm sorry.  We talked earlier --

6      A.  But I do, on a periodic basis, raise the

7  issues of diversification with Larry.  And this is

8  apparently one of my more humorous efforts.

9      Q.  Okay.  And you say -- I think the language you

10  used was "periodic."  You're referring now to the topics

11  we discussed earlier --

12      A.  Mm-hm.

13      Q.  -- when you said regularly or periodically you

14  would refer to him to the fact that you would like him

15  to diversify?

16      A.  Mm-hm.

17      Q.  And he didn't always follow that

18  recommendation, did he?

19      A.  Larry and I have very different risk profiles.

20  I'm more a conservative person who went to law school

21  and became an accountant, while Larry became an

22  entrepreneur.

23      Q.  And I guess the answer to my question is ...

24      A.  My job is to raise the issues that Larry's

25  confronting, make certain he sees them in advance, try

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1  to help him -- steer him to the decisions that I believe

2  are proper but respect his independent judgment and

3  decision-making and execute on the instructions

4  provided.

5      Q.  Okay.  And does he regularly -- when you

6  routinely tell him to diversify, does he do it every

7  time?

8      MR. NADOLENCO:  Objection.  Misstates the

9  testimony.  Oh, I'm sorry.

10      MS. LAVALLEE:  Q.  When you periodically tell

11  him to diversify, does he always diversify in response

12  to your recommendation?

13      A.  When I bring to Larry's attention a situation

14  where we have expiring stock options and the debt is

15  reaching our lending limit and we have a serious problem

16  with the amount of debt and expiring options, in my

17  experience, the answer is yes, he regularly heeds my

18  advice --

19      Q.  Okay.  Can I --

20      A.  -- when we confront those issues.

21      MS. LAVALLEE:  Can I have my question read

22  back.

23      'Cause I believe you're not responding to the

24  specific question posed.

25      (Record read as follows:

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1      Q.  When you periodically tell him to

2  diversify, does he always diversify in

3  response to your recommendation?)

4      THE WITNESS:  And my answer, as I said, is --

5  the answer is yes, when I present him with persuasive

6  evidence on the rationale to diversify, he has always

7  responded, to date.

8      MS. LAVALLEE:  Q.  Okay.  Can you -- are

9  you -- and does he always respond immediately?

10      A.  No.

11      Q.  Okay.  I believe we talked about some

12  instances in 2000, including a conversation you had in

13  July of 2000, when you asked him to diversify, exercise

14  and sell his expiring options; his options were expiring

15  in August of 2001.  When did he actually exercise them?

16  Regardless of why he actually did it, when did he

17  actually do that?

18      MS. SEGAL:  Object to the form of the

19  question.

20      THE WITNESS:  I want to be very careful and

21  respond accurately to you --

22      MS. LAVALLEE:  Okay.

23      THE WITNESS:  -- and honestly, I never -- the

24  reference you're referring to is me raising a potential

25  issue that we have to deal with.

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1      MS. LAVALLEE:  Okay.

2      THE WITNESS:  I never in that -- there's no

3  documentation about when you diversify.  I was raising

4  the issue in mid 2000 that the debt level was

5  increasing, we had spending commitments and he had

6  expiring options.  And I was recommending that a plan be

7  adopted to deal with this.

8      MS. LAVALLEE:  Okay.

9      Q.  And what was the next action that took place

10  after that, regarding his trading, that you recall?

11      A.  Larry apparently, on the note that we saw,

12  acknowledged there would be a plan to sell the Oracle

13  shares.

14      Q.  Right.

15      A.  And one was implemented and executed in

16  January 2001.

17      MS. LAVALLEE:  Okay.  Okay.  If we want to

18  take five minutes, I can figure out what I need to do to

19  wrap up, and then we can probably finish --

20      MR. ZWANG:  Sure.

21      MS. LAVALLEE:  -- within a half-hour or so.

22      THE VIDEOGRAPHER:  We are off record.  The

23  time is 5:25.

24      (Recess taken.)

25      THE VIDEOGRAPHER:  We are back on the record.

1  The time is 5:39.

2  MS. LAVALLEE: Q. All right. I just have a

3  few more questions, and then we'll be done for the day.

4  A. That's no problem.

5  Q. Thanks. You've been very patient.

6  Can you tell me whether or not you had any

7  discussions with any persons other than the people we've

8  seen in the e-mails or that we've discussed today

9  with -- about Mr. Ellison's trade -- trades in the

10  January -- month of January 2001?

11  MS. SEGAL: Object to the form of the

12  question.

13  MR. NADOLENCO: Join.

14  THE WITNESS: Let me think.

15  MS. LAVALLEE: Sure, take your time.

16  THE WITNESS: Let me say who I think I spoke

17  with, and then you can check them off.

18  MS. LAVALLEE: Okay.

19  THE WITNESS: Obviously I communicated with

20  Carolyn. There was an e-mail copied to Sue Bachman.

21  There are e-mails to Larry. I spoke with the people at

22  Merrill Lynch that we discussed. When I was back in New

23  York, I met with some of the Merrill Lynch -- additional

24  Merrill Lynch personnel. I brought a consultant with me

25  when I went to New York, a gentleman named J.D. Jenson,

1  who's referred to in one of the e-mails.

2  There are other people in my office who were

3  dealing with the tax implications of it. And there were

4  probably communications with -- there was e-mails going

5  to Andy Dudnick, Larry's attorney.

6  And without doubt, I kept -- I probably kept

7  the other banks informed, maybe after the fact because I

8  wanted to be discrete. But there's always -- I always

9  try to maintain a free flow of information between me

10  and the various banks that are lending to Larry to --

11  and I'm sure at some point I communicated with them to

12  them what was going on.

13  MS. LAVALLEE: Q. Okay. Did you have any

14  communications with anybody other than the people you

15  just identified at Oracle, somebody who was employed at

16  Oracle, regarding Mr. Ellison's trades -- and actually,

17  let me step back and say I believe Safra Catz's name

18  appears on some of the e-mails. Do you recall that?

19  A. Her name, yes.

20  Q. Okay. Other than what appeared in the

21  e-mails, did you have any recollection of speaking with

22  Ms. Catz about Mr. Ellison's trades at any point in

23  time?

24  A. I don't have any recollection.

25  Q. Okay. And do you know who Mike Hanlon is?

1  A. No, I do not know.

2  Q. Did you have any communications with

3  Mr. Henley, Jeffrey Henley, regarding Mr. Ellison's

4  trades in January 2001?

5  MS. SEGAL: Object to the form of the

6  question.

7  MR. NADOLENCO: Join.

8  THE WITNESS: I don't know if I ever

9  communicated with Jeff. I may have spoken to him on the

10  phone once or had an e-mail exchange with him. My basic

11  communication with Jeff, or see him, is when I receive

12  clearance from Don Cooperman and Jeff is copied.

13  MS. LAVALLEE: Q. Okay. Do you know who

14  Mr. Henley is?

15  A. Yes, I do.

16  Q. Okay. And who is he?

17  A. He then was the CFO at Oracle. He's currently

18  chairman of Oracle and may still be CFO.

19  Q. Okay. All right. When you say you may have

20  spoken to him on the phone or had an e-mail exchange

21  with him, do you have any recollection generally when

22  that would have taken place?

23  A. Sometime in the last 11 years.

24  Q. Can we narrow that?

25  A. I don't know -- I don't know if I've ever

1  spoken with him or e-mailed with him directly. But

2  there are issues that arise at times where you interface

3  between Larry's personal issues and Oracle issues. And

4  at times Jeff is copied on the e-mail communication.

5  But I don't know if there's any direct e-mail between me

6  and Jeff.

7  Q. Okay. And can you explain for me what type of

8  circumstances you're talking about when there may be an

9  interaction between his -- Mr. Ellison's personal issues

10  and Oracle issues.

11  A. A simple example is if Larry conducts business

12  at his home and provides meals at his home at his own

13  expense for meetings related to Oracle, a question

14  arises to what extent, if at all, should Larry seek

15  reimbursement from Oracle for business expenses that

16  he's incurred to benefit Oracle.

17  The disbursements for these costs, since

18  they're Larry personal -- run through Larry's personal

19  checking account, an area over which I have

20  responsibility, and then when you want to discuss with

21  Oracle the mechanics for discussing expense

22  reimbursement, how to calculate this because there would

23  be interface between what I view the area that I'm

24  responsible for, which is Larry's personal finances, and

25  Oracle's.

1     That's just one example, but there are other

2     instances.

3     Q.  Can you -- is that something you would have

4     went -- spoken with Mr. Henley about?

5     A.  No, but it's an example of things that would

6     go up, maybe, to the tax department.  And Jeff might be

7     copied on something when you're trying to establish --

8     and this would not be establishing does this meal for

9     $20 -- expense reimbursement mechanism.  You're trying

10    to establish a policy that can be implemented in a clear

11    way.  And the tax department at Oracle might just copy

12    him or copy someone in his staff on it.

13    Q.  Okay.  But you don't have any specific

14    recollection of talking with Mr. Henley?

15    A.  I don't believe -- I don't know.  But it is

16    possible.

17    Q.  Okay.

18    A.  But we -- but with respect to these specific

19    trades, I'm fairly certain I never spoke to Jeff --

20    Q.  Okay.

21    A.  -- about these trades.

22    Q.  Do you actually do any investment advising or

23    investment work for any other clients other than

24    Mr. Ellison?

25    A.  In my capacity as a CPA, I do help other

---

1     people handle their financial affairs.

2     Q.  Okay.  And -- well, how many other

3     customers -- clients do you have other than Mr. Ellison?

4     A.  Me personally or the office?

5     Q.  You personally.

6     A.  At this point in time, I really -- I primarily

7     work on Larry's affairs and the affairs of one other

8     individual, who I was handling before I took Larry on as

9     a client.  And I continue to help him manage his wealth.

10    He sold his company.

11    Q.  Okay.

12    A.  And I have a few other clients that my office

13    still does tax work for where I've become sort of like

14    an adopted son, a trustee.  And I meet with these people

15    twice a year for dinner and discuss their finances.

16    Q.  All right.  You have a sister who works for

17    Oracle, right?

18    A.  That is correct.

19    Q.  Okay.  And what is her position at Oracle

20    currently?

21    A.  I really don't know.

22    Q.  Okay.  Do you have a general idea of what

23    level -- is she in management?

24    A.  I believe so, yes.

25    Q.  Okay.  And do you know generally what area she

---

1     works in?

2     A.  Marketing.

3     Q.  Okay.  Do you know what her position title is?

4     A.  I think so, but I'm not certain.

5     Q.  What's your understanding?

6     A.  I think she's a SVP.

7     Q.  Okay.  And how long, from the first time she

8     was employed at Oracle -- when was she first employed at

9     Oracle; do you know?

10    A.  She's been at Oracle a long time.  I believe

11    when I first went to work for Larry in '93, she was not

12    at Oracle, had left, and then she came back.

13    Q.  Okay.

14    A.  And so she was at Oracle, then left, then came

15    back.  She was there full time for a period of -- for a

16    long period of time.  She since has had two children.

17    And my older sister has metastatic breast cancer, and

18    Sheri's taking care of her.  So she's working --

19    Q.  I'm sorry.

20    A.  -- on a limited basis.

21    Q.  Do you want to go off the record for a moment?

22    A.  That's okay.

23    Q.  I'm sorry.  Didn't mean to get into anything

24    personal like that.

25    The -- do you know if she was employed at

---

1     Oracle during Q3 2001?

2     A.  I suspect so.

3     Q.  Okay.  Let me ask you a different question.  I

4     assume that you're not copied on Oracle documents; is

5     that correct?

6     MS. SEGAL:  Object to the form of the

7     question.

8     MS. LAVALLEE:  Well, let me ask a different

9     question.

10    Q.  I assume that you don't receive financial or

11    internal Oracle documents in your duties?

12    A.  No.

13    Q.  Okay.  And is Oracle's financial situation or

14    events at Oracle something that you would ever discuss

15    with Mr. Ellison or anybody else at Oracle?

16    MS. SEGAL:  Objection to the form of the

17    question.

18    THE WITNESS:  I never talk to Larry or really

19    anybody at Oracle about Oracle's financial matters.

20    Every once in a while when I see Sheri, I'll say "How

21    are things going?"

22    MS. LAVALLEE:  Right, in general.

23    THE WITNESS:  But I don't -- I have

24    enough on my plate to deal with Larry's personal

25    affairs.  And I'd like to go home and see my children

Simon, Philip B. (Vol. 01) · 03/16/2004 3/16/2004 12:00:00 AM

1  and my wife.
2  So I don't really -- I don't really understand
3  Oracle's business. I don't try to get involved because
4  it's good -- the less I know the better. So this is one
5  thing I tell you: I don't know what's going on at
6  Oracle. I don't talk, I don't listen, and I'm too busy.
7  MS. LAVALLEE: Okay. I can -- that makes
8  complete sense.
9  THE WITNESS: And I personally have never
10  owned a share of Oracle stock.
11  MS. LAVALLEE: Okay. I'm going to just mark
12  as an exhibit a series of some of the documents that
13  were produced last night and just generally have you
14  identify a couple of them for me.
15  THE WITNESS: Okay.
16  MS. LAVALLEE: They're in no particular order.
17  They're generally in the order in which they were
18  produced. But there's gaps because different types of
19  documents were removed.
20  THE WITNESS: Okay.
21  MS. LAVALLEE: And this is 224.
22  MR. NADOLENCO: Removed by you.
23  MS. LAVALLEE: Yes, and actually withheld, I
24  believe, but ...
25  MR. ZWANG: Do you want him to authenticate a

Oracle Related Cases                                    Page 249

Simon, Philip B. (Vol. 01) · 03/16/2004 3/16/2004 12:00:00 AM

1  stack of documents?
2  MS. LAVALLEE: I'm going to point him to
3  specific ...
4  THE REPORTER: 224.
5  MS. LAVALLEE: This will be Exhibit 224.
6  PS03002 -- well, it's actually an inconsistent -- it's a
7  series of documents. I won't run through the Bates
8  range.
9  (DC Exhibit No. 224
10  marked for identification).
11  THE WITNESS: Do you want me to flip through
12  it all or do you want to go item by item, page by page,
13  and I'll look at it?
14  MS. LAVALLEE: Could you just take a glance at
15  each page.
16  THE WITNESS: Okay.
17  MS. LAVALLEE: Q. What I'm going to actually
18  do is ask you if these all came from your files -- these
19  are all documents that you generated or somebody on your
20  behalf generated. And to the extent it is, and if you
21  see a document that isn't, could you just identify that
22  document.
23  A. And to expedite the process, may I just state
24  up front that I am -- I have no recollection of these
25  documents. I've never seen them until they were

Oracle Related Cases                                    Page 260

Simon, Philip B. (Vol. 01) · 03/16/2004 3/16/2004 12:00:00 AM

1  produced -- I may have seen them, but I have no
2  recollection of having seen them. And everything I am
3  saying about whether these documents came from my files
4  and whether they are accurate is really an
5  interpretation of what I'm seeing based on my general
6  understanding, but it really is not confirmation that I
7  really know if these are genuine or real --
8  Q. Oh, okay.
9  A. -- from memory. But I will tell you -- that's
10  what I've been saying throughout the whole thing --
11  Q. Sure.
12  A. -- 'cause I have no recollection. But I can
13  tell you what I think they are.
14  Q. Okay. And --
15  A. And then we'll just go quickly --
16  THE REPORTER: Slow down.
17  THE WITNESS: Then I'll go through, quickly,
18  each one, but we should assume that each statement I
19  make about every document has the caveat that I have no
20  recollection.
21  MS. LAVALLEE: Okay.
22  Q. And actually, let me just -- and I don't want
23  you to identify each of the documents. What I'd like
24  you to do is tell me if you, as you go through them,
25  believe that any of the particular documents are

Oracle Related Cases                                    Page 251

Simon, Philip B. (Vol. 01) · 03/16/2004 3/16/2004 12:00:00 AM

1  documents that you did not generate from your -- and you
2  can tell me that you don't understand any of them to be
3  something that was generated from your office, or maybe
4  just some. If you could just tell me that.
5  A. Okay. You want me to flip through or do you
6  want --
7  Q. Just -- no, just -- why don't you just flip
8  through it. And if you see any that --
9  A. Were not from my office?
10  Q. -- were not from your office, if you could
11  just identify those.
12  A. PS0428 --
13  Q. Okay.
14  A. -- looks like a report from Oracle that was
15  sent to us.
16  Q. Okay.
17  A. It was produced by Delphi Asset Management,
18  which I believe is a Oracle subsidiary based in Nevada
19  under -- and that's where Barbara Wallace works.
20  MR. ZWANG: The way you're interpreting the
21  question, just so that we're clear, is you're -- all of
22  these documents that have a PS number came from
23  Mr. Simon's files. But what he's doing is he's going
24  through this and telling you what he thinks his office
25  didn't generate as original work product.

Oracle Related Cases                                    Page 252

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   MS. LAVALLEE: Is that what you're --

2   THE WITNESS: That's what I thought I was

3   saying.

4   MS. LAVALLEE: Yeah, okay. And that was my

5   question.

6   MR. ZWANG: I thought that was your question,

7   but I wanted to be clear.

8   THE WITNESS: It's actually easier for me if I

9   might just say "This is our office, this is not our

10   office." Can I just do each one?

11   MS. LAVALLEE: Sure.

12   THE WITNESS: PS0300 looks like our office

13   generated this schedule.

14   PS0427, subject to all my caveats, looks like

15   our -- my office generated this.

16   MS. LAVALLEE: Q. Does that look like your

17   handwriting on that document?

18   A. No, that's not my handwriting.

19   Q. Okay.

20   A. PS0426, 0429 look like they were an

21   Oracle-generated schedule.

22   PS0430 is a schedule prepared by my office,

23   most likely prepared by me. It has some of my

24   handwriting and the squiggles and somebody else's

25   handwriting elsewhere.

Oracle Related Cases                                    Page 253

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   Q. Okay.

2   A. PS0433 appears to be a memo I wrote, dated

3   January 31, 2001, doing a lot designation for tax

4   purposes. We talked about the Integral Capital share

5   lots before.

6   PS0492 appears to be another schedule prepared

7   by me or my office tracking the sales.

8   PS0493 is the same, prepared by my office.

9   0494 is another schedule that is -- I marked

10   "superseded" because when I prepared it, I did not

11   realize that the SEC fee is one third of one basis point

12   of gross proceeds. And I had to redo my calculations

13   when I got the trade slips from Merrill Lynch.

14   PS0495 looks like my office, probably me

15   preparing.

16   PS0496 seems like another version of a similar

17   schedule prepared by my office.

18   PS0497 is a superseded version of schedules

19   that appear to be prepared by my office.

20   PS0498 appears to be a summary schedule

21   prepared by my office on the trades. PS0501, the same

22   thing. PS0506, same thing, my office.

23   PS0511 appears to be a schedule prepared by

24   Merrill Lynch.

25   Q. Or a cover sheet attaching --

Oracle Related Cases                                    Page 254

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   A. With a fax which probably came from Merrill

2   Lynch. Does not look like something prepared by my

3   office.

4   Q. Okay.

5   A. Maybe it was prepared by Oracle Corporation,

6   went to Merrill Lynch, and then forwarded it on to me.

7   Q. Okay.

8   A. PS0513 appears to be a fax from me to Kim

9   Clarke at Merrill Lynch. And that is -- that is -- that

10   appears to be my signature.

11   PS0514 appears to be a fax cover sheet from

12   Kim Clarke to me.

13   PS0515 appears to be a schedule that was faxed

14   to me. It has my handwriting on it saying that it

15   agrees to my records. I do not know who generated this

16   schedule. It says "Oracle Corporation" in the upper

17   left-hand corner, but then I look at the fax number

18   coming from area code (714)955-6079, and that's Merrill

19   Lynch's fax number in the Newport Beach office.

20   Q. Do you have any understanding as to whether or

21   not document 514 and 515 appear to be the fax cover

22   sheet with the actual account reconciliation attached?

23   A. Just because it's ordered that way, and the

24   cover sheet refers to a January 23, 2001 transaction

25   report from Oracle Corporation, and the attached page

Oracle Related Cases                                    Page 255

---

Simon, Philip B. (Vol. 01) - 03/16/2004  3/16/2004  12:00:00 AM

1   below appears to be it.

2   Q. And also the header on the -- well, the fax

3   transmittal line?

4   A. Yeah, it says page "01 of 2" and seems to be

5   from the same phone number. And then if you look at the

6   time stamping, they're both at 10:44 p.m. -- or

7   10:44 a.m. So it would indicate they're the same.

8   PS0518 appears to be a fax from me to Kim

9   Clarke with a cc to Carolyn. I used Merrill Lynch's

10   cover sheet to make it quickly with a handwritten note

11   by me.

12   PS0522 is a schedule prepared by my office.

13   Same thing for PS0523.

14   PS0530 is a schedule prepared by my office

15   reconciling Larry's share holdings and has my notes on

16   the bottom.

17   Q. Okay.

18   A. PS0531 appears to be a schedule prepared by my

19   office. I recognize the font, but I don't think I

20   prepared this, though I may have.

21   PS0533 appears to be a schedule prepared by my

22   office.

23   PS0536 is a fax sheet from -- appears to be a

24   fax sheet from Kim Clarke to me.

25   Q. Does the next page appear to be the second

Oracle Related Cases                                    Page 256

1  page of that fax?

2  A.  That's a reasonable conclusion based on the

3  referred schedule, and on the date and time stamp and

4  the fax number from Merrill Lynch.

5  PS0538 and 0539 appear to be the same.  I

6  can't confirm whether it's the same schedule that's

7  referred to as attached, but I would assume it is

8  because the date-stamp did not copy completely.

9  Actually, maybe it did, 11/28.  It looks like it's the

10  same time, so I'd assume they're -- it's a reasonable

11  assumption to assume they're the same.

12  PS0549 and PS0550, I would say they appear to

13  be a fax with an attached schedule from Merrill Lynch.

14  PS0561 is a copy of the schedule that is

15  another document that we've previously reviewed here.

16  Q.  Right.

17  A.  I don't know what document number it is.

18  Q.  Right.

19  A.  That appears to be -- that we thought -- we

20  concluded came from Merrill Lynch.

21  PS0562 is a schedule prepared by Merrill

22  Lynch.  This is the first cut at dealing with VWAP and

23  the discrepancy that I noticed.

24  Q.  Okay.

25  A.  And PS0563, 0564 and 0565 are the same.

1  Q.  The same as the prior exhibit?

2  A.  Schedules prepared by Merrill Lynch trying to

3  deal with the, it looks like -- the volume -- VWAP,

4  number of shares traded and trying to establish how they

5  performed.

6  PS0558 appears to be a schedule maintained in

7  my office by Catherine Ong detailing Larry's Oracle

8  shares and the tax basis in all the shares.  And that

9  carries on to PS0570.

10  PS0580 appears to be a schedule prepared by

11  Merrill Lynch.  And we see on the Merrill Lynch contact

12  name above John Ebey at Merrill Lynch, who is another

13  person I work with at Merrill Lynch, who I called for

14  assistance when I was concerned about the discrepancy.

15  Q.  Okay.  And what is Mr. Ebey's position at

16  Merrill Lynch; do you know?

17  A.  He is -- I guess they called him financial

18  consultant these days.

19  Q.  Okay.  And did he have any role in the actual

20  execution or -- actual execution of Mr. Ellison's trades

21  in the January 2001 time frame?

22  A.  Very tangentially.  He was the person I had a

23  relationship with and introduced me to Merrill Lynch.

24  And he -- his specialty is not dealing with inside --

25  affiliate stock.  So he referred the business on to a

1  group that specializes in Rule 144 stock.  But he wanted

2  to maintain an aspect of the relationship.

3  MS. LAVALLEE:  Okay.  Those are the only

4  questions I have for today.  And there is a dispute

5  among the parties in terms of, you know, the document

6  production and the like.  And I understand that you

7  take -- the parties disagree on that.

8  And also, we did talk about the document

9  production from last night and at lunch.  Obviously we

10  didn't have the time to go through that and review those

11  documents.  But we're finished for today.

12  MR. ZWANG:  Are you done with your deposition?

13  MS. LAVALLEE:  We're done for today, yeah.

14  MR. ZWANG:  You say "for today."  As far as we

15  know, we're done.

16  MS. LAVALLEE:  There's a disagreement with the

17  parties.  There was an issue with the documents.

18  Obviously there's a disagreement as to whether we're

19  completely done.  That is not to say that we necessarily

20  will ask for Mr. Simon back.

21  MR. ZWANG:  I understand.  You have -- you and

22  Ellison are fighting over whether certain documents are

23  going to be produced.

24  MS. LAVALLEE:  That's the issue essentially.

25  MR. ZWANG:  I understand.

1  MR. NADOLENCO:  Well, is that the issue?  My

2  understanding was the timing of the production.  We're

3  not in dispute about any documents that were not

4  produced, are we?

5  MS. LAVALLEE:  Well, I haven't reviewed the

6  documents that you've produced.  So, I mean, I got a

7  thick pile, an inch or half an inch to three quarters of

8  an inch thick, at lunchtime.  So we haven't reviewed

9  those documents.  So there may not be a dispute.

10  However, I cannot speak to that issue.

11  MR. NADOLENCO:  All I will say for the

12  record -- I'm sorry to cut you off.  If you wanted them

13  earlier, you should have not noticed them for the day of

14  the deposition.

15  MR. ZWANG:  Well, actually, you know, we

16  tried -- I'll tell you -- I don't know if we're on the

17  record or not, but we tried to get these things out to

18  you ahead of time.

19  MS. LAVALLEE:  Okay.

20  MR. ZWANG:  And it just so happened that in

21  pulling these things together, we didn't get them over

22  to John until, I think, the Friday --

23  MS. LAVALLEE:  Okay.

24  MR. NADOLENCO:  It was Saturday.  And they

25  actually came to my house, and I reviewed them over the

1 weekend.

2     MS. LAVALLEE: And I --

3     MR. ZWANG: An effort was made to get these to

4 you.

5     MS. LAVALLEE: No, I understand. And I'm not

6 suggesting that we have a disagreement. I'm just

7 reserving our rights to raise it at a later date. And

8 there may simply be no disagreement. We just don't know

9 at this stage.

10     And I appreciate your time. Thank you so

11 much.

12     THE WITNESS: You're welcome.

13     THE VIDEOGRAPHER: This marks the end of

14 videotape Volume I, tape 4 in the deposition of Philip

15 Simon. The number of tapes used today is four. The

16 original videotapes will be retained by Dan Mottaz Video

17 Productions. The time is 6:04 p.m. We are off the

18 record.

19     (Deposition concluded at 6:04 p.m.)

20

21     ---o0o---

22

23

24

25

1     CERTIFICATE OF WITNESS

2

3

4

5     I, the undersigned, declare under penalty of

6 perjury that I have read the foregoing transcript and I

7 have made any corrections, additions or deletions that I

8 was desirous of making; that the foregoing is a true and

9 correct transcript of my testimony contained therein.

10     EXECUTED this _____ day of _____,

11 200_, at _____, _____.

12

13

14

15

16

17     _____

18     Signature of Witness

19

20

21

22

23

24

25

1     REPORTER CERTIFICATE

2     I hereby certify that the witness in the

3 foregoing deposition was by me duly sworn to testify to

4 the truth, the whole truth and nothing but the truth in

5 the within-entitled cause; that said deposition was

6 taken at the time and place herein named; that the

7 deposition is a true record of the witness's testimony

8 as reported to the best of my ability by me, a duly

9 certified shorthand reporter and a disinterested person,

10 and was thereafter transcribed under my direction into

11 typewriting by computer; that the witness was given an

12 opportunity to read and correct said deposition and to

13 subscribe the same. Should the signature of the witness

14 not be affixed to the deposition, the witness shall not

15 have availed himself or herself of the opportunity to

16 sign or the signature has been waived.

17     I further certify that I am not interested in

18 the outcome of said action, nor connected with, nor

19 related to any of the parties in said action, nor to

20 their respective counsel.

21     IN WITNESS WHEREOF, I have hereunto set my

22 hand this 29th day of March, 2004.

23

24     _____

25     HOLLY MOOSE, CSR NO. 6438

26

1     ROBERT BARNES ASSOCIATES

2     760 Market Street, Suite 844

3     San Francisco, California 94102

4     Phone: (415)788-7191

5

6     Date: 3/29/04

7 TO: PHILIP B. SIMON

8     C/O: Howson &Simon

9     101 Ygnacio Valley Road, Suite 310

10     Walnut Creek, CA 94596

11     (925)977-9060

12 RE: COORDINATION PROCEEDING

13     SPECIAL TITLE (RULE 1550(B))

14

15     Deposition taken March 16, 2004

16

17 Dear PHILIP B. SIMON:

18

19 The original transcript of your deposition taken in the

20 above-entitled action has been prepared and is available

21 at this office for your reading, correcting and signing.

22 In the alternative, you may wish to review counsel's

23 copy. Please notify this office and all counsel in

24 writing of any changes you wish to make to your

25 deposition transcript.

26

27 Your rights regarding signature of this deposition are

28 contained in the code. Unless otherwise directed, your

29 original deposition transcript will be sealed in

30 accordance with the code.

31 If you wish to make arrangements to review the original

32 transcript of your deposition, please contact this

33 office during office hours, 9 to 5, Monday through

34 Friday, to make an appointment.

35

36     Sincerely,

37

38     Holly Moose

39     CSR No. 6438

40 cc: All counsel

41