# EXHIBIT MM

| | | |
|---|---|---|
| 1 | 00120:01 | IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA |
| 2 | 02 | IN AND FOR THE COUNTY OF SAN MATEO |
| 3 | 03 | ---o0o--- |
| 4 | 04 | COORDINATION PROCEEDING |
| 5 | 05 | |
| 6 | 06 | |
| 7 | 07 | PROCEEDING NO. 4180 |
| 8 | 08 | THIS DOCUMENT RELATES TO: |
| 9 | 09 | ALL ACTIONS |
| 10 | 10 | |
| 11 | 11 | |
| 12 | 12 | DEPOSITION OF JENNIFER L. MINTON |
| 13 | 13 | Thursday, April 1, 2004 |
| 14 | 14 | Volume II (Pages 120 - 231) |
| 15 | 15 | |
| 16 | 16 | CONFIDENTIAL PURSUANT TO A PROTECTIVE ORDER APPROVED BY |
| 17 | 17 | CONFIDENTIAL, AND THE CONTENTS ARE NOT TO BE REVEALED |
| 18 | 18 | ORDER OF THE COURT OR BY AGREEMENT OF THE PARTIES |
| 19 | 19 | |
| 20 | 20 | |
| 21 | 21 | CSR NO. 6458 |
| 22 | 22 | |
| 23 | 23 | ROBERT BARNES ASSOCIATES |
| 24 | 24 | 760 Market Street, Suite 844 |
| 25 | 25 | Phone: (415)788-7191 |

| | | |
|---|---|---|
| 1 | 00121:01 | IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE |
| 2 | 02 | IN AND FOR NEW CASTLE COUNTY |
| 3 | 03 | |
| 4 | 04 | IN RE ORACLE CORPORATION |
| 5 | 05 | DERIVATIVE LITIGATION |
| 6 | 06 | _____/ |
| 7 | 07 | |
| 8 | 08 | |
| 9 | 09 | |
| 10 | 10 | |
| 11 | 11 | |
| 12 | 12 | |
| 13 | 13 | |
| 14 | 14 | |
| 15 | 15 | |
| 16 | 16 | |
| 17 | 17 | |
| 18 | 18 | |
| 19 | 19 | |
| 20 | 20 | |
| 21 | 21 | |
| 22 | 22 | |
| 23 | 23 | |
| 24 | 24 | |
| 25 | 25 | |

| | | |
|---|---|---|
| 1 | 00122:01 | APPEARANCES |
| 2 | 02 | |
| 3 | 03 | FOR CALIFORNIA PLAINTIFFS: |
| 4 | 04 | BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO |
| 5 | 05 | 425 California Street, Suite 2025 |
| 6 | 06 | (415)433-3200 |
| 7 | 07 | AND |
| 8 | 08 | McMANIS, FAULKNER & MORGAN |
| 9 | 09 | 50 West San Fernando Street |
| 10 | 10 | San Jose, CA 95113 |
| 11 | 11 | AND |
| 12 | 12 | COREY, LUZAICH, PLISKA, DE GHETALDI & NASTARI |
| 13 | 13 | 700 El Camino Real |
| 14 | 14 | (650)871-5666 |
| 15 | 15 | |
| 16 | 16 | FOR THE DELAWARE PLAINTIFFS: |
| 17 | 17 | SCHIFFRIN & BARROWAY |
| 18 | 18 | Three Bala Plaza East, Suite 400 |
| 19 | 19 | (610)667-7706 |
| 20 | 20 | |
| 21 | 21 | |
| 22 | 22 | |
| 23 | 23 | |
| 24 | 24 | |
| 25 | 25 | |

| | | |
|---|---|---|
| 1 | 00123:01 | APPEARANCES (continued) |
| 2 | 02 | |
| 3 | 03 | FOR ORACLE CORPORATION AND THE WITNESS: |
| 4 | 04 | MORRISON & FOERSTER |
| 5 | 05 | 425 Market Street |
| 6 | 06 | (415)268-7126 |
| 7 | 07 | |
| 8 | 08 | FOR ORACLE CORPORATION: |
| 9 | 09 | ORACLE CORPORATION |
| 10 | 10 | 500 Oracle Parkway |
| 11 | 11 | (650)506-9221 |
| 12 | 12 | |
| 13 | 13 | FOR INDIVIDUAL DEFENDANTS ELLISON AND HENLEY: |
| 14 | 14 | MAYER, BROWN, ROWE & MAW |
| 15 | 15 | 350 South Grand Avenue, 25th Floor |
| 16 | 16 | (213)229-9500 |
| 17 | 17 | |
| 18 | 18 | ALSO PRESENT: Andrew Martin, Videographer |
| 19 | 19 | |
| 20 | 20 | |
| 21 | 21 | TAKEN AT: |
| 22 | 22 | BERMAN, DEVALERIO, PEASE, TABACCO, BURT & PUCILLO |
| 23 | 23 | San Francisco, CA 94104 |
| 24 | 24 | |
| 25 | 25 | ---o0o--- |

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1  00124:01              I N D E X
2      02
3      03  DEPOSITION OF JENNIFER L. MINTON
4      04
5      05  EXAMINATION BY:                    PAGE
6      06    MR. DE GHETALDI (Resumed)         126
7      07    AFTERNOON SESSION                 183
8      08
9      09  DC EXHIBITS
10     10  238  E-mails, CA-ORCL 032260-63, 4 pages    126
11     11  239  Interview Of Jennifer Minton, 13 pages  178
12     12  240  Oracle Q3 FY01 Management Summary -
13     13       CA-ORCL 004802-10, 9 pages        204
14     14  241  Oracle Q3 FY01 Management Summary -
15     15       Week 6, CA-ORCL 030883-904, 23 pages   205
16     16  242  Oracle Q3 FY01 Management Summary -
17     17       CA-ORCL 004780-801, 22 pages       206
18     18  243  Affidavit Of Jennifer Minton In
19     19       Judgment, 16 pages            210
20     20
21     21            ---o0o---
22     22
23     23
24     24
25     25
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1  00125:01       BE IT REMEMBERED that, pursuant to
2      02  Continuation and on Thursday, April 1, 2004, commencing
3      03  at the hour of 9:09 a.m., before me, HOLLY MOOSE, CSR
4      04  No. 6438, a Certified Shorthand Reporter in the State of
5      05  California, there personally appeared
6      06
7      07           JENNIFER L. MINTON,
8      08
9      09  called as a witness by the Plaintiffs, who, having been
10     10  previously sworn, was examined and testified as
11     11  hereinafter set forth:
12     12
13     13
14     14
15     15            ---o0o---
16     16
17     17
18     18
19     19
20     20
21     21
22     22
23     23
24     24
25     25
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1  00126:01  PROCEEDINGS               9:09 A.M.
2      02
3      03        THE VIDEOGRAPHER:  This is the beginning of
4      04  Volume II, videotape 1 in the continuing deposition of
5      05  Jennifer Minton in the matter of Coordination Proceeding
6      06  Special Title Oracle Cases and In Re Oracle Cases.
7      07  Today's date is April 1, 2004.  The time is 9:09 a.m.
8      08        There being no new counsels present and unless
9      09  there are objections, we'll go on the record.
10     10  Everything remains the same as stated on Volume I, tape
11     11  1.  We're on the record.
12     12        MR. DE GHETALDI:  Thank you.
13     13        Good morning.
14     14        THE WITNESS:  Good morning.
15     15        MR. DE GHETALDI:  I'd like to have this
16     16  document marked as next in order.
17     17        MS. LAVALLEE:  238.
18     18        MR. DE GHETALDI:  238.
19     19        (DC Exhibit No. 238
20     20        marked for identification).
21     21        EXAMINATION RESUMED BY
22     22        MR. DE GHETALDI:  Q.  Have you had a chance to
23     23  review Exhibit 238?
24     24     A.  Yes.
25     25     Q.  Do you recall the issues that were under
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1  00127:01  discussion in the e-mail string that makes up Exhibit
2      02  238?
3      03     A.  Not entirely.  Partially.
4      04     Q.  Can you tell me what you do recall about those
5      05  issues.
6      06     A.  There was a SWAT team that was headed up by
7      07  this -- I think it was -- let me find the name in here
8      08  again -- by Rosser.  And he reported in to Mark
9      09  Barrenechea, who was a CRM development product VP --
10     10  or -- I think he was a VP.  He could have been an EVP.
11     11     Q.  What is a SWAT team?
12     12     A.  It was a special team focused on selling and
13     13  marketing the CRM suite of applications.
14     14        THE REPORTER:  CRM what?
15     15        THE WITNESS:  CRM suite of applications.  And
16     16  what they were trying to do is issue comp plans for this
17     17  group that was tied to the CRM revenue.
18     18        MR. DE GHETALDI:  Okay.
19     19     Q.  What are the -- do you recall anything about
20     20  the quotas that are being discussed in these e-mails?
21     21  CRM quotas, that is.
22     22     A.  It was the target that they were trying to get
23     23  their folks to deliver on.
24     24     Q.  All right.  Do you recall why Mr. Barrenechea
25     25  was apparently targeting a quota that was well under the
```

```
1    00128:01 corporate budget number?

2    02         MR. ETH: Objection. Vague, misstates the

3    03 document.

4    04         MR. DE GHETALDI: Q. I'm looking at the first

5    05 sentence in Christian Facey's e-mail to you on the first

6    06 page of Exhibit 238 when I ask that question.

7    07    A. Can you repeat the question.

8    08    Q. Yes. Do you recall why Mr. Barrenechea was

9    09 apparently targeting a quota that was well under the

10   10 corporate budget number?

11   11    A. No.

12   12    Q. I'm handing you a document that was previously

13   13 marked as Exhibit 48. Do you recall receiving Exhibit

14   14 48?

15   15    A. Yes.

16   16    Q. Is Exhibit 48 one of the documents that you

17   17 reviewed in preparation for your deposition?

18   18    A. I believe I reviewed this in connection with

19   19 my affidavit.

20   20    Q. This e-mail relates to the NAS division,

21   21 correct?

22   22    A. Correct.

23   23    Q. And do you know what Mr. Winton was referring

24   24 to when he said "We finished the ops reviews this

25   25 afternoon"?
```

```
1    00129:01    A. Organizations tend to have operation reviews.

2    02 So in an operations review, it's not uncommon for them

3    03 to review the forecast. So I think that's what he was

4    04 referring to.

5    05    Q. He makes three numbered points. The first one

6    06 was that,

7    07       "The pipe had not grown as we had

8    08 anticipated. We're actually slightly down

9    09 from December end reporting."

10   10    Did you discuss that issue with Mr. Winton at

11   11 all after receiving this e-mail?

12   12    A. I don't recall.

13   13    Q. Was that issue discussed at any of the EMC

14   14 meetings in January of 2001?

15   15    A. I don't recall.

16   16    Q. Is that the type of issue that would be

17   17 discussed at an EMC meeting?

18   18    A. Yes.

19   19    Q. The second point that he makes is,

20   20       "Lack of big deals. Unlike Q1 and Q2,

21   21 we have few big deals in best case that

22   22 could drive us past the 360 million line."

23   23    Did you discuss that point with Mr. Winton

24   24 after receiving this e-mail?

25   25    A. Not that I recall.
```

```
1    00130:01    Q. Did you discuss point 1 or point 2 with

2    02 Mr. Roberts after receiving this e-mail?

3    03    A. Not that I recall.

4    04    Q. Do you recall whether Mr. Winton's second

5    05 point was discussed at any of the EMC meetings in

6    06 January 2001?

7    07    A. Not that I recall.

8    08    Q. is point number 2 the type of issue that would

9    09 have been discussed at an EMC meeting?

10   10    A. Yes.

11   11    Q. Then in point number 3 he says,

12   12       "Drop in technology. As reflected in

13   13 the softening pipe, both general business

14   14 and majors see a slowdown in both Q3 and

15   15 Q4."

16   16    Did you discuss that point with Mr. Winton

17   17 after receiving this e-mail?

18   18    A. I don't recall if I discussed this meeting at

19   19 all with Mr. Winton.

20   20    Q. Did you discuss that point with Mr. Roberts

21   21 after receiving this e-mail?

22   22    A. I do not remember if I discussed this e-mail

23   23 with George Roberts.

24   24    Q. Okay. Do you recall whether the point that

25   25 both general business and majors see a slowdown in
```

```
1    00131:01 technology in both Q3 and Q4 was an issue that was

2    02 discussed at any of the EMC meetings in January of 2001?

3    03    A. I honestly do not recall.

4    04    Q. Would that be the type of issue that would be

5    05 discussed at an EMC meeting?

6    06    A. Yes.

7    07    Q. Mr. Winton continues,

8    08       "General business's dot-com bubble has

9    09 burst. They expect the west to end the

10   10 year 30 or 40 million below" -- "or behind

11   11 their original budget for technology."

12   12    Do you recall discussing that issue with

13   13 Mr. Roberts after receiving this e-mail?

14   14    A. I do not recall discussing this e-mail with

15   15 Mr. Roberts or with Mr. Winton.

16   16    Q. Okay. I'm asking about the issue --

17   17    A. Any -- any content in this e-mail.

18   18    Q. Okay. Do you recall whether the fact that

19   19 general business's dot-com bubble has burst was

20   20 discussed at any of the EMC meetings in January of 2001?

21   21       MR. NADOLENCO: Objection. Asked and

22   22 answered.

23   23       MR. ETH: Well, and objection -- objection to

24   24 form.

25   25       THE WITNESS: I do not recall if this was
```

```
00132:01 discussed at an EMC meeting during January of 2001.
   02        MR. DE GHETALDI: Q. Is that the type of
   03 issue that would have been discussed at an executive
   04 committee meeting?
   05     A. Yes.
   06     Q. Then Mr. Winton continues,
   07        "Majors sees a slowdown in spending
   08        along with smaller deal sizes."
   09        MR. ETH: Objection. Says "spend."
   10        MR. DE GHETALDI: You're right.
   11        MR. ETH: Okay.
   12        MR. DE GHETALDI: Q. Did you discuss that
   13 point with either Mr. Winton or Mr. Roberts after
   14 receiving this e-mail?
   15     A. I do not recall discussing this e-mail with
   16 Mr. Roberts or with Mr. Winton.
   17     Q. Do you recall whether the fact that NAS's
   18 majors division was seeing a slowdown in spending along
   19 with smaller deal sizes was discussed at any of the
   20 executive committee meetings in January 2001?
   21        MR. ETH: Objection. Lack of foundation.
   22        THE WITNESS: I do not recall.
   23        MR. DE GHETALDI: Q. Is that the type of
   24 issue that would commonly be discussed at an executive
   25 committee meeting?
```

```
00133:01     A. We would commonly discuss forecast issues at
   02 an EMC meeting.
   03     Q. Such as slowdown seen by an executive vice
   04 president?
   05        MR. ETH: Objection. Lack of foundation.
   06        THE WITNESS: As I said, we would have
   07 discussed issues relating to the forecast at an EC
   08 meeting.
   09        MR. DE GHETALDI: Q. Okay. Then Mr. Winton
   10 continues that "the change in the ASP model for generic
   11 tech hosting licenses."
   12        Do you know what the ASP model for generic
   13 tech hosting licenses Mr. Winton is referring to is?
   14     A. I don't recall.
   15     Q. Do you know what ASP stands for?
   16     A. I'm sorry, I don't recall.
   17     Q. Mr. Winton says that,
   18        "The change in the ASP model for
   19        generic tech hosting licenses coupled with
   20        the dot-com crash is impacting the
   21        projected tech results in that segment."
   22        Did you discuss that issue with Mr. Winton or
   23 Mr. Roberts after receiving this e-mail?
   24        MR. ETH: Objection. Asked and answered.
   25        THE WITNESS: I do not recall.
```

```
00134:01        MR. DE GHETALDI: Q. Do you recall whether
   02 that issue was discussed at any of the EMC meetings in
   03 January of 2001?
   04     A. I do not recall.
   05     Q. And again, that would be the type of issue
   06 that would commonly be discussed at an EMC meeting?
   07     A. Forecasting issues would be commonly discussed
   08 at an EC meeting.
   09     Q. I'm going to hand you a document that was
   10 previously marked as Exhibit 56. Have you had a chance
   11 to review Exhibit 56?
   12     A. I've reviewed this.
   13     Q. Is Exhibit 56 one of the documents that you
   14 reviewed in preparation for your deposition?
   15     A. Yes.
   16     Q. Do you recall asking Mr. English for a
   17 forecast summary for OPI in mid January 2001?
   18     A. I had frequently asked both Jim English, Sarah
   19 Kopp and David Winton to provide me their own
   20 independent assessment of the forecast. I did not want
   21 to have them repeat to me what they thought -- what the
   22 EVPs were reporting to Larry in the EMC; I wanted them
   23 to give me their own unbiased independent view as to
   24 what the forecast results were. And this is the type of
   25 e-mail that I would get back with their independent
```

```
00135:01 thinking.
   02     Q. How often did you ask them for the source of
   03 summaries?
   04     A. I don't recall how frequently.
   05     Q. Can you approximate for me how many times in a
   06 quarter?
   07     A. I'm sorry, I do not recall.
   08        MR. DE GHETALDI: Time out.
   09        THE VIDEOGRAPHER: Off the record, 9:26 a.m.
   10        (Recess taken).
   11        THE VIDEOGRAPHER: On the record, 9:28 a.m.
   12        MR. DE GHETALDI: Q. Let's try this: You
   13 said that you had frequently asked Mr. English and
   14 Ms. Kopp and Mr. Winton to provide you with independent
   15 assessments of the forecast. What did you mean by
   16 "frequently"?
   17     A. When they started to report in to me, which I
   18 believe was somewhere, you know, around this time period
   19 within a 12-month band, they -- they had originally
   20 worked with the sales organization and reported to the
   21 sales EVPs. And I wanted them to become more
   22 independent and more mindful of the forecast and making
   23 sure that they weren't just parroting whatever was being
   24 said.
   25        So, you know, once they started reporting to
```

1   00136:01 me, after that point in time, even up through current

2   02 day, I have them provide me with their own independent

3   03 assessment of what they think the forecast is.

4   04       So as an example, Sarah Kopp once or twice a

5   05 quarter even today will send me an e-mail note with her

6   06 own views as to what we think -- or what she thinks the

7   07 organization will deliver in a given quarter.

8   08    Q.  All right.  So do you think that that -- a

9   09 similar schedule was followed back in the third quarter

10  10 of 2001?

11  11    A.  I was very interested in hearing their own

12  12 independent views, so it would be reasonable to presume

13  13 that I asked them to provide me more than once what

14  14 their thoughts were on the forecast.

15  15    Q.  Mr. Winton testified that he sent you monthly

16  16 reports.  Does that sound about right?

17  17    A.  I don't recall the frequency.

18  18    Q.  When Ms. Kopp wrote in Exhibit 56, "We have a

19  19 lot of pipe at challenging clients" --

20  20    A.  Where is that exhibit?

21  21       MR. ETH:  You're mixing it up.  It's English.

22  22 You said "Kopp."

23  23       MR. DE GHETALDI:  I'm sorry, Mr. English.

24  24 Thanks.

25  25    Q.  Mr. English said that OPI had a lot of pipe at

1   00137:01 challenging clients.  Did you discuss that statement

2   02 with him?

3   03    A.  I don't recall if I discussed this e-mail note

4   04 with him.

5   05    Q.  Do you recall whether you discussed it with

6   06 Mr. Sanderson?

7   07    A.  I do not recall if I discussed it with

8   08 Mr. Sanderson.

9   09    Q.  Do you recall whether the contents of this

10  10 e-mail, Exhibit 56, were discussed at any executive

11  11 committee meetings in the third quarter of 2001?

12  12    A.  I do not recall whether this was discussed at

13  13 any EC meeting.

14  14    Q.  When Mr. English says "One AVP talked of

15  15 starting to see indications of client delays on

16  16 decisions," did you make an effort to determine which

17  17 AVP he was talking about?

18  18    A.  Not that I recall.

19  19    Q.  Mr. English says that he analyzed upside deals

20  20 by win probability.  Do you see that section about three

21  21 quarters of the way down?

22  22    A.  Mm-hm.

23  23    Q.  Was there a program that allowed that type of

24  24 analysis to be done, an automated program of some kind?

25  25    A.  Do you recall the reports that we looked at

1   00138:01 yesterday that came out of OSO?

2   02    Q.  Yes.

3   03    A.  I -- he would be looking at that type of

4   04 information.

5   05    Q.  All right.  Was there a query that could be

6   06 run in OSO to sort to -- for deals with upsides of

7   07 40 percent probability or greater?

8   08    A.  I believe that they were doing was downloading

9   09 data from OSO into Excel.  And in Excel, they could sort

10  10 it in any fashion they so desired.

11  11    Q.  I see.  Now I'm going to hand you a document

12  12 that was marked as Exhibit 78.

13  13       Have you had a chance to review Exhibit --

14  14    A.  Yes.

15  15    Q.  -- 78?

16  16    A.  Yes.

17  17    Q.  You say at the beginning that Mr. Ellison made

18  18 it clear to everyone at the EMC meeting this week that

19  19 the license revenue growth target for this year and next

20  20 is 30 percent.  What sort of target was that?  I'm not

21  21 sure that I -- can you explain to me what Mr. Ellison

22  22 was talking about when he said this.

23  23    A.  He was --

24  24       MR. NADOLENCO:  Objection -- I apologize.

25  25 Objection.  Lacks foundation.

1   00139:01       THE WITNESS:  He's establishing a goal for the

2   02 sales organization to work towards.

3   03       MR. DE GHETALDI:  Q.  Was that 30 percent in

4   04 constant dollars or actual rates?

5   05       MR. NADOLENCO:  Same objection.

6   06       THE WITNESS:  It would have been in constant

7   07 dollars.

8   08       MR. DE GHETALDI:  Q.  That was the same amount

9   09 of growth that Oracle had given guidance for for license

10  10 revenue in December of 2000, correct?

11  11       MR. ETH:  Objection.  Misstates the record.

12  12       THE WITNESS:  I'd have to look back at the

13  13 actual document.  I thought it was 25 percent.

14  14       MR. DE GHETALDI:  Q.  For U.S. I think it's

15  15 30 --

16  16    A.  No.  Well, we don't -- we don't -- we

17  17 don't give guidance by division.

18  18    Q.  I meant U.S. dollars -- or actual rates and

19  19 30 percent in constant dollars.  I think was the guidance

20  20 that was given.

21  21       Now I'm going to hand you a document that was

22  22 previously marked as Exhibit 77.

23  23    A.  Is there a second page to this?

24  24    Q.  That was going to be one of my questions.

25  25    A.  Says "1 of 2."

00140:01   Q.  I understand.  And this is the way that we
02   received it.  And so one of the questions that I would
03   have is where would you look to try and find the second
04   page of this e-mail?
05   A.  Where would I look?
06   Q.  Yeah.
07   A.  I've already provided everything to legal that
08   I had.
09   Q.  So it's your belief that -- do you recognize
10   the handwriting on this document?
11   A.  Yes.
12   Q.  Is it yours?
13   A.  Yes.
14   Q.  And it would be your belief that you provided
15   both pages of this document to legal?
16   A.  Well, it could have been that I only kept the
17   first page since it had all the key data that I needed.
18   Q.  How do you know that there was nothing on the
19   second page in terms of key data?
20   A.  Well, all the key data that I would look for
21   is right here on the first page.
22   Q.  Where you wrote "75 percent confidence level"
23   under Mr. Nussbaum's forecast number, what did you mean
24   by that?
25   A.  These look to be notes that I had taken.  I

00141:01   don't know.  I do not recall.
02   Q.  It appears that there is $91 million in
03   management judgment contained in the $225 million
04   forecast.  Is that the way that you read this document's
05   contents?
06   A.  Yes.
07   MR. ETH:  Object -- well--
08   THE WITNESS:  Sorry.
09   MR. ETH:  Object.  That's not what it says,
10   but ...
11   Go ahead.
12   MR. DE GHETALDI:  Q.  Is that your
13   understanding of what this document says?
14   A.  Yes.
15   Q.  Okay.  Is 91 million out of 225 million a
16   relatively high level of management judgment to be
17   included in a forecast?
18   MR. NADOLENCO:  Object to form.
19   THE WITNESS:  Not considering the amount of
20   large deals that they had in play.
21   MR. DE GHETALDI:  Q.  Would the amount of
22   large deals that OSI had in play indicate a greater risk
23   for achieving their forecast?
24   MR. NADOLENCO:  Same objection.
25   THE WITNESS:  The amount of deals that they

00142:01   had in play would not indicate a greater risk.
02   MR. DE GHETALDI:  Q.  Do you know what
03   Ms. Kopp meant when she said that Mr. Nussbaum was still
04   confident in the $225 million forecast as long as none
05   of the very large opportunities dropped out?
06   A.  He believed that he would meet his forecast,
07   assuming that he would be able to close a number of the
08   large deals that he had in his pipeline.
09   Q.  Was she saying that he needed to close all of
10   the large deals in the pipeline?
11   MR. NADOLENCO:  Objection.  Lacks foundation.
12   THE WITNESS:  No.  She summarized here some of
13   the deals that they needed to have close in order to
14   achieve the forecast.
15   MR. DE GHETALDI:  I don't know if you can find
16   Exhibit 150 in that stack you have there.
17   THE WITNESS:  Do you have a picture of ...
18   MR. DE GHETALDI:  Yeah, it's the
19   December 12th e-mail from Mr. Henley.
20   (Inaudible discussion).
21   MR. DE GHETALDI:  Q.  In the middle of the
22   first paragraph, Mr. Henley says,
23   "Based on strong applications
24   momentum, 30 percent constant dollar total
25   license growth seems like a reasonable

00143:01   target for the second half."
02   Do you see that?
03   A.  Yes, I do.
04   Q.  So do you -- does that refresh your memory as
05   to whether Oracle gave guidance of 30 percent license
06   revenue growth in constant dollars for Q3 2001?
07   A.  We give revenue growth estimates in U.S.
08   dollars, but we also indicate what currency effect that
09   there may be.
10   Q.  My question was does that refresh your
11   recollection as to the guidance that Oracle gave for
12   license revenue growth in constant dollars?
13   A.  We gave Q3 current exchange rates, it looks
14   like negative five percent.  So if we had given a 25
15   percent in U.S. dollars and the currency was negative,
16   then that would have been 30 percent constant.
17   Q.  All right.  Now I'm going to hand you a copy
18   of Exhibit 49.  Do you recall receiving Exhibit 49?
19   A.  Yes.
20   Q.  Is Exhibit 49 one of the documents that you
21   reviewed in preparation for your deposition?
22   A.  Yes.
23   Q.  All right.  Do you recall whether the contents
24   of Exhibit 49 were discussed at the January 29th, 2001
25   executive committee meeting?

1  00144:01  A.  I do not recall.

2  02  Q.  Is the contents of Exhibit 49 the type of

3  03  material that would have been discussed at an executive

4  04  committee meeting?

5  05  A.  Yes.

6  06  Q.  Technology that is -- or what is -- what

7  07  products make up the tech business that Mr. Winton is

8  08  discussing?

9  09  MR. NADOLENCO:  Objection to the extent it

10  10  lacks foundation.

11  11  THE WITNESS:  We break out our license revenue

12  12  between applications and technology.  So technology

13  13  includes, as an example, database and application

14  14  server, any nonapplication-based revenues.

15  15  MR. DE GHETALDI:  Q.  As a percentage of NAS's

16  16  license business, can you estimate for me what the split

17  17  between technology and applications was in fiscal year

18  18  2001, just on average?

19  19  A.  I don't recall.

20  20  Q.  Do you recall whether NAS -- NAS's license

21  21  business was predominantly technology as opposed to

22  22  applications?

23  23  A.  I don't recall.

24  24  Q.  Going back to the one-page Exhibit 77, which

25  25  is the Sarah Kopp e-mail, do you have a practice of

1  00145:01  saving e-mails that you receive, or do you have a

2  02  practice of deleting them?

3  03  MR. NADOLENCO:  Objection.  Compound.

4  04  THE WITNESS:  I save some and I delete others.

5  05  MR. DE GHETALDI:  Q.  Do you know whether

6  06  Exhibit 77 is the type of e-mail that you would have a

7  07  tendency to save or delete?

8  08  A.  I cannot characterize what type of e-mails I

9  09  might have save or delete.  It would be a decision that

10  10  I would make at that point in time.

11  11  Q.  Do you still have e-mails on any of your

12  12  computers dating back to 2001?

13  13  MS. SEGAL:  Object to form.

14  14  THE WITNESS:  All of my e-mails that I had

15  15  have been provided to legal.

16  16  MR. DE GHETALDI:  Q.  In electronic form or in

17  17  paper form or both?

18  18  A.  I believe they took electronic.  And if I had

19  19  any hard copies, it would have taken hard copy -- hard

20  20  copy e-mails as well.

21  21  Q.  Okay.  Now I'm going to hand you a document

22  22  that was previously marked as Exhibit 73.  Do you

23  23  recognize the handwriting on Exhibit 73?

24  24  A.  I would be speculating, but I do believe it

25  25  would be Roberta Ronsse's.  But I can't be certain.

1  00146:01  Q.  In the center of the first page of Exhibit 73

2  02  down towards the bottom, there's a handwritten note that

3  03  says "Footnote pipeline without Covisint."

4  04  Do you see that?

5  05  A.  Mm-hm.

6  06  Q.  Do you recall discussions in the third quarter

7  07  of 2001 on how to treat the Covisint deal in the

8  08  forecast?

9  09  A.  I don't understand precisely what you're

10  10  getting at.

11  11  Q.  Well, do you recall discussions about taking

12  12  Covisint out of a particular pipeline number?

13  13  A.  As indicated in Jim English's e-mail -- and

14  14  I -- you know, they did take it out in trying to come up

15  15  with the projected license revenues when applying the

16  16  historical conversion rates.

17  17  Q.  Do you know why they did that?

18  18  A.  I would think to be more conservative.  If I

19  19  may give an example ...

20  20  Q.  Yes.

21  21  A.  If you have a pipeline of a hundred and your

22  22  historical conversion rate was 50, then you would

23  23  predict your license revenues to be 50.

24  24  So if you included pipeline of -- if you

25  25  included Covisint in your pipeline and multiplied it by

1  00147:01  the same amount, it would have given you a higher

2  02  pipeline number.  So because it was such a large and --

3  03  unusually large -- largest deal we've ever done, I

4  04  believe they took it out in coming up with their

5  05  predictions of the license revenues for the quarter.

6  06  Q.  All right.

7  07  A.  Otherwise it would have overstated their

8  08  predictive results.

9  09  Q.  Okay.  Now I'm going to hand you a document

10  10  that was previously marked as Exhibit 142.  Does Exhibit

11  11  140 -- or do you recognize Exhibit 142?

12  12  A.  Yes.

13  13  Q.  Can you tell me what it is, please.

14  14  A.  It is an upside analysis.  Based on the date,

15  15  it was the upside analysis prepared on December 11th.

16  16  Q.  Was this Exhibit 142 the upside analysis that

17  17  was used to arrive at Oracle's guidance figures that

18  18  were given on December 14th?

19  19  A.  As I stated yesterday, investor relations

20  20  would come up with their own model and we would come up

21  21  with ours.  So I do not know if we relied more heavily

22  22  on this one versus the investor relations ones.  They

23  23  may have been a little bit different.

24  24  Q.  But it was used in the process?

25  25  A.  It was considered -- it was considered.

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00148:01    Q.  All right.  Is -- can you tell whether Exhibit
2   02  142 is a complete upside report?
3   03    A.  Yes.
4   04    Q.  That is, it is complete?
5   05    A.  Yes.
6   06    Q.  Okay.  If you can find Exhibit 232 in -- in
7   07  that stack.  It was probably --
8   08    A.  Can you show me what it looks like.
9   09    Q.  It was one of the first things that we looked
10  10  at yesterday.  It's the e-mail with the upside report
11  11  attached.
12  12      (Inaudible discussion).
13  13      MR. DE GHETALDI: Q.  And if you can turn
14  14  towards the back -- in fact, the second to last page,
15  15  with Bates number 25540.
16  16    A.  Mm-hm.
17  17    Q.  It's the page titled "External Product
18  18  Revenues."
19  19    A.  Mm-hm.
20  20    Q.  I don't see that -- or a comparable page in
21  21  Exhibit 142.
22  22    A.  If you please go to 22 -- 2990.
23  23    Q.  Yes.
24  24    A.  See how we have technology and total
25  25  applications?
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00149:01    Q.  Yes.
2   02    A.  That would be similar to the one that you're
3   03  pointing to, which is in a different format.
4   04    Q.  All right.  Do you know -- do you recall there
5   05  being a decision to stop including breakouts for ERP and
6   06  CRM and server and tools in the upside reports and
7   07  simply separate them between technology and
8   08  applications?
9   09    A.  I don't recall a specific event.
10  10    Q.  Okay.  Now, these upside reports, the one with
11  11  Exhibit 232 was -- was e-mailed.  And I think you said
12  12  yesterday that that was not something that you usually
13  13  did.
14  14    A.  Correct.
15  15    Q.  All right.  And they were usually handed out
16  16  at the EMC meetings themselves or distributed just prior
17  17  to the EMC meetings?
18  18    A.  We generally distributed them at the EC
19  19  meetings, as best as I recall.
20  20    Q.  Okay.  Did anybody get advance copies before
21  21  the meetings?
22  22    A.  At times I would provide Jeff Henley with a
23  23  copy of the upside report before the EC meeting.
24  24    Q.  Did -- or were different versions of the
25  25  upside report distributed to different persons at the
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00150:01  executive committee meeting?  In other words, did some
2   02  people get some of the pages but not others?
3   03    A.  I don't recall what we were doing back then,
4   04  but I can tell you today we do not give the entire
5   05  package to anybody other than Larry Ellison, Safra Catz,
6   06  Chuck Phillips, Jeff Henley and myself.  And sales, if
7   07  they're even there.  They're generally participating via
8   08  telephone.
9   09      But the development guys only get the license
10  10  page that shows their product revenues forecast and the
11  11  license expense and margin.
12  12      Q.  Okay.
13  13    A.  We had a practice of not wanting everybody to
14  14  see our total revenues and earnings estimates at the EC
15  15  meetings.
16  16    Q.  What was the reason for that practice?
17  17    A.  They didn't --
18  18      MR. NADOLENCO: Objection -- I apologize.
19  19  Objection to the extent it lacks foundation.
20  20      THE WITNESS: We felt that they didn't have a
21  21  need to know.
22  22      MR. DE GHETALDI: Q.  Did you not trust the
23  23  participants at these executive committee meetings?
24  24      MR. ETH: Objection.  Vague, argumentative.
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00151:01      MR. NADOLENCO: And compound.  There's more
2   02  than one participant, right?
3   03      THE WITNESS: It's not a matter of trust.  It
4   04  in essence protects them.  What they don't know won't
5   05  hurt them.
6   06      MR. DE GHETALDI: Q.  How could knowing the
7   07  contents of an upside report hurt any of the
8   08  participants at an executive committee meeting?
9   09    A.  You would not want them to have information
10  10  that they might inadvertently tell somebody else about.
11  11  That's what I mean about what they don't know won't hurt
12  12  them.  So for example, somebody in charge of marketing
13  13  does not need to see what the financial results are
14  14  forecasted to be for the entire quarter.
15  15    Q.  What would -- well, I guess I'm not
16  16  understanding the problem with sharing this information
17  17  among the highest level of Oracle's management.  I --
18  18  I -- can you explain what the problem is with sharing
19  19  that information?  I mean, I assume that the people that
20  20  attend these meetings are the highest levels of Oracle's
21  21  management.  Am I right?
22  22      MR. ETH: Is that the question?
23  23      MR. DE GHETALDI: Yeah.
24  24      MR. ETH: Okay.
25  25      THE WITNESS: Yes, they are the executive --
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00152:01 or executive officers of the company. But some may only
02 be senior vice presidents.
03       MR. DE GHETALDI: Q. Was it your belief that
04 information in these upside reports can be misused?
05       MR. ETH: Objection. Asked and answered.
06       THE WITNESS: No. Let me rephrase that.
07 Intentionally misused? Can you ask the question again.
08 I want to make sure I respond correctly.
09       MR. DE GHETALDI: Q. Right. My question was
10 whether it was your belief that information in these
11 upside reports could be misused by any of the
12 participants at the executive committee meetings.
13       A. Unintentionally misused was a concern, yes.
14       Q. And --
15       A. On my behalf.
16       Q. Right, that's fine. How did you feel that
17 this information could be unintentionally misused?
18       MR. NADOLENCO: Objection. Asked and
19 answered.
20       THE WITNESS: In the event they inadvertently
21 shared the financial forecast with somebody who should
22 not have had any reason to be apprised of it.
23       MR. DE GHETALDI: Okay. Why don't we take a
24 break.
25       THE WITNESS: Sure.

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00153:01       THE VIDEOGRAPHER: Off the record, 10:04 a.m.
02       (Recess taken).
03       THE VIDEOGRAPHER: On the record, 10:24 a.m.
04       MR. DE GHETALDI: Q. If you could turn to the
05 fifth page of Exhibit 142, with Bates number 2990,
06 please.
07       (Discussion off the record).
08       THE WITNESS: Here we go.
09       MR. DE GHETALDI: Q. The upside -- I'd like
10 to talk about the upside numbers there in that column.
11       A. What page are you on? I'm sorry.
12       Q. It's Bates number 2990.
13       A. Okay.
14       Q. Now, do you consider the upside numbers for
15 the -- that are shown in that column there as within the
16 normal range as compared to the forecast numbers?
17       A. I would not make that analysis. I don't know
18 how you define a normal range. I would never view it in
19 those terms.
20       Q. All right. Well, I -- I -- I would be asking
21 about what you would consider to be a normal range, not
22 what -- not how I would define it.
23       MS. SEGAL: So what's the question?
24       MR. DE GHETALDI: Q. Do you consider the
25 upside numbers that are shown in that column within the

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00154:01 normal range as compared to the forecast numbers? Are
02 they high or low historically, or do you have any sense
03 of that?
04       A. I don't have a sense of that. I look at each
05 quarter on its own.
06       Q. Except to the extent that you look at
07 historical conversion rates.
08       A. What's your question?
09       Q. Well, you say that you look at each quarter on
10 its own. Is that completely true?
11       A. I don't look at my upside numbers in one
12 quarter and compare them to my upside numbers in another
13 quarter. That is what I'm trying to convey.
14       Q. All right. As the quarter progresses, would
15 you expect that your potential number and the field's
16 forecast numbers would tend to come together?
17       A. Towards the end of the quarter, yes.
18       Q. All right. And as a quarter progresses, would
19 you expect --
20       A. Can I step back. I would expect the final
21 results to approximate my upside amounts, the potential
22 amounts, that is.
23       Q. The final results?
24       A. Mm-hm.
25       Q. The actual results?

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00155:01       A. Correct.
02       Q. Okay. But I was asking about the field
03 forecast numbers. My question was would you expect your
04 potential numbers and the field forecast numbers to come
05 together as a quarter progresses?
06       A. If the field was increasing their forecast
07 throughout the quarter, I would likely decrease the
08 upside amounts during the quarter so that net -- I guess
09 I don't really understand your question.
10       Q. I'm trying to get a sense of your recollection
11 of historical trends, in particular the behavior of the
12 field's forecast numbers and your potential numbers as a
13 quarter progresses, and whether you recall those numbers
14 tending to come together as a quarter progresses.
15       A. What do you mean, come together?
16       Q. Become closer numerically.
17       A. There -- there could be times when the field
18 would increase their forecast during the quarter. I
19 would consider any increases in a forecast when arriving
20 at my upside adjustment at that stage of the quarter.
21 So my upside adjustments could go down as a consequence
22 if they increase their forecast. So, you know, it just
23 depended quarter to quarter and how the field revised
24 their adjustments.
25       Q. On this particular page, NAS is showing a

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1   00156:01 pipeline growth for total license of 97 percent. Do you
2   02 see that?
3   03   A. Yes.
4   04   Q. But they're only forecasting a 12-percent
5   05 increase in revenue. Do you see that?
6   06   A. Yes.
7   07   Q. Was that a dis -- were those numbers
8   08 disproportionate, in your opinion?
9   09       MR. ETH: Objection. Vague.
10  10       THE WITNESS: The pipeline growth does not --
11  11 is not necessarily tied to the forecast growth.
12  12       MR. DE GHETALDI: Q. Do you recall your
13  13 analysis of those two growth figures at the time --
14  14   A. I would have --
15  15   Q. -- that you prepared --
16  16   A. My analysis would have been applying the
17  17 historical conversion rate to the current quarter
18  18 pipeline to arrive at an estimated license number.
19  19       Again, it was our common practice to evaluate
20  20 historical conversion rates and apply it to current
21  21 quarter pipeline rates -- or current quarter pipeline
22  22 amounts to determine what we felt the license revenues
23  23 might be for the quarter.
24  24   Q. Do you recall discussions at the
25  25 December 11th EMC meeting about the fact that both OSI

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1   00157:01 and NAS were forecasting 11 and 18 percent below the
2   02 targeted 13 -- or 30 percent growth figure?
3   03   A. Where are you getting your numbers?
4   04   Q. Well, the targeted license revenue growth
5   05 figure was 30 percent, correct?
6   06   A. That was Larry's targeted 30 percent growth.
7   07   Q. And that was also the --
8   08   A. That was the goal he established for the
9   09 field.
10  10   Q. Yes. And that was also the guidance that was
11  11 given to the public, correct?
12  12       MR. ETH: Objection. Vague.
13  13       THE WITNESS: The guidance given to the public
14  14 was 25 percent in reported dollars with an estimated
15  15 conversion rate -- negative -- sorry -- currency effect
16  16 of five points.
17  17       MR. DE GHETALDI: Q. Thirty percent, right?
18  18   A. Correct.
19  19   Q. And the numbers here on this page that we're
20  20 looking at are constant dollars numbers, right?
21  21   A. Correct.
22  22   Q. So my question was do you recall discussions
23  23 at the December 11th, 2000 executive committee meeting
24  24 about the fact that OSI was forecasting only 19 percent
25  25 growth?

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1   00158:01   A. I do not recall any specific discussions;
2   02 however, it would be reasonable to assume that we
3   03 discussed the forecast.
4   04   Q. And would the same be true for the fact that
5   05 NAS only was forecasting a 12-percent growth?
6   06   A. Again. I do not recall any details of the
7   07 discussions that were held at the EMC meeting; however,
8   08 we would clearly discuss the forecast 'cause that's a
9   09 standing agenda item.
10  10   Q. In arriving at an upside number, would it be
11  11 unusual for you to review particular deal information
12  12 from the spreadsheets with the best and the worst case
13  13 scenarios and include a particular deal in your upside
14  14 number that an executive vice president had not included
15  15 in a forecast?
16  16   A. It would be possible that we would have
17  17 included a deal in the upside numbers that was not
18  18 included in the executive's underlying commit forecast.
19  19   Q. All right. Do you recall doing that in the
20  20 third quarter of 2001?
21  21   A. I do not recall the specifics as to how I
22  22 arrived at the upside amounts in Q3 FY '01.
23  23   Q. All right. Now I'm going to hand you a
24  24 document that was previously marked as Exhibit 1 --
25  25   A. Sorry.

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

1   00159:01   Q. -- 133. Do you recognize Exhibit 133?
2   02   A. This is a upside report. Based on the date,
3   03 the file name was as of January 15th.
4   04   Q. 2001?
5   05   A. Yes.
6   06   Q. If you could compare the first pages of
7   07 Exhibit 142 and 133, please. It appears that -- I want
8   08 to make sure that I'm reading this correctly -- the
9   09 pipeline growth percentages had declined from 52 percent
10  10 as of December 11th to 34 percent as of
11  11 January 15th.
12  12   A. That is correct.
13  13   Q. Would that fact have been something that would
14  14 have been discussed at an executive committee meeting,
15  15 that sort of trend?
16  16       MR. ETH: Objection. Vague.
17  17       THE WITNESS: That trend I don't recall being
18  18 discussed at an executive committee meeting.
19  19       MR. DE GHETALDI: Q. Would trends through --
20  20 trends in pipeline growth percentages as a quarter
21  21 progressed have -- be the type of subject that would be
22  22 discussed at an EMC meeting?
23  23   A. I do not recall discussing the trends of
24  24 pipeline -- of pipeline growth rates throughout a
25  25 quarter at an EC meeting.

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00160:01   Q.  If you could turn, please, to the page with
2   02 Bates number 3345 in Exhibit 133.  And at the same time,
3   03 turn to the same page that we were looking at at Bates
4   04 number 2990 in Exhibit 142.
5   05        It appears as though there were reductions in
6   06 your upside numbers for both OSI and NAS in total
7   07 license technology and applications.  Am I reading these
8   08 charts correctly?
9   09   A.  Can you repeat the question.  You see what?  I
10  10 was looking at the first section --
11  11   Q.  Well, let's take it one by one.
12  12   A.  Can I just take a moment to explain to you how
13  13 this works?
14  14   Q.  Yes.
15  15   A.  Okay.  The numbers up here where it's got the
16  16 upside amounts --
17  17   Q.  Yes.
18  18   A.  -- those are allocated to technology and to
19  19 applications pro rata, based on the underlying forecast
20  20 that was submitted by the field.  So those are
21  21 calculated numbers, the splits.
22  22   Q.  They're calculated?
23  23   A.  Correct.
24  24   Q.  Can you explain how the calculation was made.
25  25   A.  Well, generally speaking, what we would do
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00161:01 is -- although it doesn't look like that's -- well,
2   02 normally what we would do is we would take the
3   03 technology number as a percentage of the total --
4   04   Q.  Mm-hm.
5   05   A.  -- this is the forecast as a percentage of
6   06 their forecast -- and multiply it by the upside amount
7   07 to arrive at the split of the upside between the two
8   08 license revenue components: technology and applications.
9   09   Q.  So in other words, you didn't do a specific
10  10 analysis down to -- for deriving an upside number for
11  11 technology and then do a separate analysis in order to
12  12 arrive at an upside number for applications?
13  13   A.  Well, we could have.  There was a point in
14  14 time when we did try and do it along those lines.
15  15   Q.  Mm-hm.
16  16   A.  And actually, as I look at this, it doesn't
17  17 look like it's allocating the revenue in proration to
18  18 the forecast.  So that may have indeed been the case at
19  19 that point in time.
20  20   Q.  All right.
21  21   A.  I can tell you today we just take the upside
22  22 amount and allocate it based on the submitted forecast
23  23 by product.
24  24   Q.  Okay.  Do you recall why you dropped your
25  25 upside number for OSI total license from 25 million to
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00162:01 zero between December 11th and January 15th?
2   02   A.  I don't recall specifically why I dropped it.
3   03 But it could have been based on a revised upside
4   04 analysis, given that the pipeline went down from the
5   05 beginning of the quarter.
6   06        Again, when we derived our upside amounts, it
7   07 was based on our conversion rate analyses, as well as
8   08 any information that I may have come by, either through
9   09 discussions at EC meetings or through discussions with
10  10 staff or through e-mails.
11  11        But I do not recall how and what the rationale
12  12 was as to how I came up with the upside amounts at one
13  13 point versus another point in the quarter.
14  14   Q.  It does look like the pipeline for OSI total
15  15 license declined by about $120 million over that span.
16  16   A.  That is correct.
17  17   Q.  So do you think that that would be -- or would
18  18 have been at least part of the reason for the decline in
19  19 the upside number?
20  20   A.  It would have been a consideration.  But it's
21  21 also very normal for the pipeline to decline during the
22  22 course of the quarter.
23  23   Q.  All right.  Is it normal for pipeline to
24  24 consistently decline from day one to quarter end?
25  25   A.  We take pictures of the pipeline when we do
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00163:01 our regular forecast.  And it's a very consistent trend
2   02 that the pipeline would go down because as you work on
3   03 your deals throughout the course of the quarter, some of
4   04 deals solidify and others do not, or they -- and they
5   05 might get pushed out into a subsequent quarter.  So it's
6   06 not uncommon for pipeline to go down during the course
7   07 of a quarter.
8   08   Q.  Well, my question was whether it was common
9   09 for pipeline to decrease throughout the entire quarter,
10  10 from day one to the final day, as opposed to showing an
11  11 increase at the beginning of a quarter followed by a
12  12 decline to the end.
13  13   A.  It depended.  It was not necessarily --
14  14 generally speaking, it would decline.  However, there
15  15 have been situations where the sales organization met
16  16 with their team and reviewed the pipeline, reviewed the
17  17 detailed deals that made up the pipeline.  And they
18  18 could have increased or decreased their pipeline as a
19  19 result of those reviews.
20  20   Q.  If we look at the numbers for NAS, it looks
21  21 like license -- total license revenue upside number
22  22 declined from $50 million on December 11th to
23  23 $14 million on January 15th.  Am I reading that
24  24 correctly?
25  25   A.  Correct.
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00164:01   Q.  Okay.  The pipeline, however, declined only
02   $17 million or so, $16 million.  Am I reading that
03   correctly?
04   A.  It declined from 842 to 825, I think it says
05   here.  It's difficult to read.
06   Q.  Yeah.  So much -- so there's a decline there,
07   but it's not as great as the decline that we looked at
08   for OSI's pipeline for the same period.
09      I'm just trying to get a sense of the relative
10   importance of declining pipeline for -- in your upside
11   analysis.  And it looks like there was a much greater
12   decline in the OSI pipeline than NAS, but the NAS
13   pipe -- or the NAS upside declined much more
14   significantly than the OSI.
15   A.  It declined less.
16   Q.  Declined less?
17   A.  The NAS?
18   Q.  Yeah.
19   A.  Declined less than OSI.
20   Q.  $36 million as opposed to 26, the upside?
21   A.  Oh, you're referring to the upside.
22   Q.  Yeah.
23   A.  Again, you can't look at one organization
24   versus another.
25   Q.  You have to just look at the individual

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00165:01   organizations?
02   A.  Correct.
03   Q.  Prior to Q3 2001, do you recall your upsides
04   ever being negative?
05   A.  My upside numbers have been positive and
06   negative over the course of several years.
07   Q.  The upside reports that you turned over to the
08   legal department, how far back in time did those go; do
09   you recall?
10   A.  I don't recall.
11   Q.  Well, was it back to the time when you started
12   doing upside reports?
13   A.  I provided whatever was requested.  I do not
14   recall the dates.
15   Q.  Do you recall whether you provided them back
16   five years in time?
17   A.  I do not recall.  I provided whatever was
18   requested.
19   Q.  Do you still have copies of historical upside
20   reports?
21   A.  I personally don't have copies.
22   Q.  Are they available electronically?
23   A.  All copies of the upside reports were provided
24   to legal.  Hard copies would -- I just don't have any
25   more hard copies.

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00166:01   Q.  I asked about electronic copies.
02   A.  I don't know where the electronic copies would
03   be other than within legal.  They might be on the
04   corpfin server.
05   Q.  And what is that?
06   A.  As we discussed yesterday, it's the server
07   that the corporate finance group uses.
08   Q.  In the third quarter of 2001, did you have a
09   belief that the executive vice presidents of the U.S.
10   divisions had a tendency to sandbag?
11   A.  I believe -- I believe that the U.S. EVPs had
12   a tendency to sandbag not just in Q3, but in prior
13   quarters as well.
14   Q.  Was one worse than the others?
15   MS. SEGAL:  Object to form.
16   THE WITNESS:  In my opinion -- and I don't
17   know if this is fact, but my impression was that Jay
18   Nussbaum was worse than the others.
19   MR. DE GHETALDI:  Can we go off the record.
20   THE VIDEOGRAPHER:  Off the record, 10:52 a.m.
21   (Brief interruption).
22   THE VIDEOGRAPHER:  On the record, 11:08 a.m.
23   MR. DE GHETALDI:  Q.  I think before the break
24   that we were talking about the EVPs having a tendency to
25   sandbag.  And I'm wondering whether you factored that

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00167:01   tendency into your upside analysis.
02   A.  One of the reasons why we had the upside
03   analysis was because they forecasted below the actual
04   results that they delivered.
05   Q.  Do you know whether there was a reason for
06   that tendency?
07   A.  My impression is that they felt that they were
08   a hero if they delivered revenue in excess of their
09   committed forecast.
10   Q.  Did you have any impression that they were
11   fearful of what might happen if they did not deliver
12   revenue at the level of their committed forecast?
13   A.  No.
14   Q.  Although this isn't a marked copy, I'll put
15   the number on.  This is a copy of a document that was
16   marked as Exhibit 153.
17   A.  Do you want me to go to a certain page?
18   Q.  Well, before we do that, I'd like to go back
19   and just ask one more question about -- about the
20   sandbagging and how that -- how you analyzed that or
21   factored that into your upside analysis.
22      Do you have a particular methodology for that,
23   or how did you do it?
24   A.  Again, I would evaluate the historical
25   conversion trends, apply those to the pipeline, and that

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00168:01  would be one data point. I would also get other data

02  points in through discussions with the finance

03  individuals that supported the sales organization.  I

04  would also hear discussions at EC meetings.

05      And all of that information together helped me

06  to form my judgment in terms of deciding what upside

07  amounts I would include in an upside report. It's an

08  art, not a science.

09      Q.  Okay.  If you could turn to the same page that

10  we've been talking about, that is -- in this Exhibit 153

11  you'll find it as Bates number 3352.

12      A.  Mm-hm.

13      Q.  It looks to me like there were no changes in

14  the upside numbers here.  Am I reading that correctly?

15      MR. ETH:  Objection.  Vague.  Changes from

16  what --

17      MR. DE GHETALDI:  Well, changes from

18  January 15th.

19      MR. ETH:  Okay.

20      THE WITNESS:  That would be correct.

21      MR. DE GHETALDI:  Q.  These reports are only a

22  week apart, yet they are in the second month of Q3.  Do

23  you recall a reason for the deviation from the normal

24  schedule that we talked about yesterday?

25      A.  Well --

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00169:01      MR. ETH:  Objection -- hold on.  Objection.

02  Misstates testimony, vague.

03      THE WITNESS:  The forecast process -- the

04  process was to submit every two weeks in the first two

05  months of a quarter and then every week in the third

06  month of a quarter.

07      If there was an EC meeting held in between the

08  forecast weeks, we would print out the previous week's

09  forecast and bring that to the EC meeting.  So for

10  example, if the 15th was a forecast week and the

11  22nd was not, it would be reasonable to assume that we

12  would just print out the prior week's upside report and

13  bring that to an EC meeting.

14      And if there was any information that was

15  provided to us in that week since the EC meeting through

16  the next EC meeting, any changes would have been

17  reflected in that report.

18      MR. DE GHETALDI:  Q.  So for example, the

19  pipeline numbers show some decline between

20  January 15th and January 22nd; is that correct?

21      A.  In total, the pipeline declined from 2,000,691

22  to 2,000,649.

23      Q.  So there was some decline, right?

24      A.  Correct.

25      Q.  So that would be an example of the type of new

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00170:01  information that would be included in this -- the upside

02  report for the executive committee meeting that there

03  was not a forecast week?

04      A.  Yes, it would be an example.

05      Q.  I also notice that there are footnotes in

06  the -- on this page on the January 22nd upside report

07  that deal with the Covisint transaction and what OPI's

08  numbers would be like if you took out the Covisint

09  numbers.

10      A.  That is correct.

11      Q.  Do you recall why those footnotes were added

12  to this upside report?

13      A.  Because we wanted to see -- I believe it was

14  because we wanted to see how OPI or Sandy Sanderson's

15  business was performing without the Covisint deal.  It

16  was very well known that Safra Catz was very involved

17  with the Covisint deal, more so than the sales

18  organization within OPI.

19      Q.  So is it your recollection that this is

20  something that Safra Catz wanted to see?

21      A.  No, I didn't say that.

22      Q.  Oh.  Do you recall discussions at the

23  January 22nd executive committee meeting about OPI's

24  numbers without the Covisint transaction?

25      A.  I do not recall any specific discussions at

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00171:01  any of the EC meetings.  We did, however, always discuss

02  the forecast.  It was a standing agenda item.

03      Q.  Why did you want to see how OPI -- OPI's

04  business was doing without the Covisint transaction?

05      A.  The OPI business was very large-deal centric.

06  And it was -- they also had a number of people in that

07  sales organization.  And they did not have enough volume

08  of smaller deals to support the size of their

09  organization.

10      So I believe at this point in time we were

11  trying to evaluate whether or not they needed to resize

12  the sales -- the number of salespeople that was in the

13  OPI organization.

14      Q.  On the second page of Exhibit 153 is the page

15  with Bates -- Bates -- Bates number 3549.  The row for

16  total operating expenses, do you see that?

17      A.  Mm-hm.

18      Q.  I want to make sure that I'm reading this

19  correctly.  Is this chart showing that there was a

20  forecast that expenses were going to grow 13 percent

21  over Q3 '00?

22      A.  Yes.

23      Q.  And the potential number was showing a

24  14-percent growth in expenses over Q3 '00?

25      A.  That's correct.

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00172:01   Q.   And in the upside column, I also see that
2   02   there are upside numbers for expenses.   Did -- did you
3   03   prepare those expense upside numbers using the same
4   04   methodology that you prepared the revenue upside
5   05   numbers?
6   06   A.   The license upside number, if I recall
7   07   correctly, is 15 percent of the upside number for
8   08   license, which was our estimate of the incremental
9   09   amount of sales commissions expenses that would be paid.
10  10   Q.   So the license expense upside number is simply
11  11   a percentage of the license revenue upside number.
12  12   A.   Generally speaking, it was a percentage.
13  13   There could have been additional input.   If I had a
14  14   calculator, I could recalculate for you and let you know
15  15   if it was 15 percent.   But I don't have one.
16  16   Q.   It looks close to 15.
17  17   A.   It looks close, right.
18  18   MR. DE GHETALDI:   All right.   I think we only
19  19   have a short time on the tape, so let's take a quick
20  20   break to switch tapes.
21  21   THE VIDEOGRAPHER:   This is the end of Volume
22  22   II, tape 1 in the deposition of Jennifer Minton on
23  23   April 1, 2004, the time 11:21 a.m.   We're off the
24  24   record.
25  25   (Recess taken).
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00173:01   THE VIDEOGRAPHER:   This is the beginning of
2   02   tape 2 in the deposition of Jennifer Minton
3   03   on April 1, 2004, the time 11:26 a.m.   We are on the
4   04   record.
5   05   MR. DE GHETALDI:   Q.   I'd like to go back just
6   06   a little bit when we were talking about these footnotes
7   07   on the page with Bates number 3552 in Exhibit 153.
8   08   I believe that there -- you were saying that
9   09   there was discussion about whether OPI needed to reduce
10  10   the number of salespeople that it had because the
11  11   number -- or the volume of deals didn't seem to support
12  12   the number of salespeople at that time.
13  13   Had the number of OPI's deals been greater in
14  14   the past than they were in Q3 '01?
15  15   A.   Can I clarify my earlier statement?
16  16   Q.   Sure.   Sure.
17  17   A.   What I meant to say was the volume of smaller
18  18   transactions.   So -- and I think it's best if I could
19  19   illustrate through an example.
20  20   Q.   Year.
21  21   A.   So let's assume that OPI had ten deals that
22  22   under $500,000, ten deals that were large deals
23  23   that made up 80 percent of their forecast.   That in
24  24   total would be -- did I say ten and ten?
25  25   Q.   Yes.
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00174:01   A.   -- 20 deals, right?   But if they had a sales
2   02   force of 40 people, then clearly not all 40 sales reps
3   03   were producing deals, right?
4   04   So the large deals tended to mask the fact
5   05   that not all of their sales reps were productive.   So
6   06   when I spoke about volume, I meant volume of smaller
7   07   deals.
8   08   Q.   Okay.
9   09   A.   Does that make sense?
10  10   Q.   Yes, it does.
11  11   A.   Okay.
12  12   Q.   And that's helpful.   Was the number of smaller
13  13   deals in OPI greater in the past than it was in Q3 '01?
14  14   A.   I don't recall the specifics, but I do recall
15  15   that there was conversation that their large deals
16  16   masked the fact that they did not have -- that they had
17  17   too many -- it masked the fact that they did not have
18  18   very productive sales reps in that organization.
19  19   In other words, their margins could have been
20  20   even higher if they reduced their headcount because the
21  21   number of heads that they had did not support the number
22  22   of deals they were transacting.
23  23   Q.   I see.   On page with Bates number 3553 and
24  24   3554, there are also footnotes about --
25  25   A.   This is 153?
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1   00175:01   Q.   Yes.
2   02   A.   Okay.
3   03   Q.   There are also footnotes that detail OPI's
4   04   numbers without the $60 million Covisint deal.
5   05   A.   That is correct.
6   06   Q.   Were those included for the same reason as the
7   07   three footnotes on page 3552?
8   08   A.   Yes.   One is showing the quarter to date.   So
9   09   3553 is showing the quarter to date and 3554 is showing
10  10   the year to date license revenue growth rates without
11  11   the Covisint deal.
12  12   Q.   Do you recall whose idea it was to include
13  13   those footnotes?
14  14   A.   No, I do not.
15  15   Q.   Now I'm going to hand you a copy of a document
16  16   that was previously marked as Exhibit 134.
17  17   A.   Was there a particular page?
18  18   Q.   Yeah, if you could turn to page 3612, that's
19  19   similar to the pages that we've been looking at.
20  20   Now, there are changes here in the upside
21  21   numbers on January 29th from the upside numbers on
22  22   January 22nd.   And just so that I'm clear about
23  23   January 22nd, were you saying that when you prepared
24  24   the upside report for January 22nd, you didn't do a
25  25   new upside analysis but included financial information
```

1  00176:01  that had — hard financial data that had changed, such
2  02  as the pipeline data?
3  03  A.  What I was trying to say was that if it wasn't
4  04  a forecast week, that we would print out the same upside
5  05  analysis that was presented in the following — or in
6  06  the preceding week, excuse me.
7  07  Q.  Yes.
8  08  A.  And if there was any information that came to
9  09  our attention, we would have reflected that in the most
10  10  current — in that week's upside analysis.
11  11  Q.  I see.  Now, contrasting the upside numbers on
12  12  January 29th and the upside numbers on January 22nd,
13  13  there — am I reading it correctly for OSI's total
14  14  license number, there was a negative 35 million upside
15  15  number?
16  16  A.  That is correct.
17  17  Q.  Do you recall the reason for — the reason
18  18  that you arrived at that negative $35 million upside
19  19  number?
20  20  A.  I do not recall the specifics.
21  21  Q.  In general do you recall anything?
22  22  A.  I do not recall.
23  23  Q.  There's also a decline in the NAS upside
24  24  number for total license from $14 million to zero; is
25  25  that correct?

1  00177:01  A.  That is correct.
2  02  Q.  Do you recall anything about the reasons for
3  03  your decision to reduce that upside number?
4  04  A.  No, I do not.
5  05  Q.  Do you recall whether the e-mails from mid
6  06  January 2001 that we looked at earlier from the finance
7  07  people had anything to do with the — these declining
8  08  upside numbers?
9  09  MR. NADOLENCO:  Objection.  Asked and
10  10  answered.
11  11  THE WITNESS:  I do not recall.
12  12  MR. DE GHETALDI:  Q.  Do you recall any
13  13  discussions at the executive committee meeting about the
14  14  fact that by January 29th, the potential growth
15  15  percentage was only one percent?
16  16  MR. ETH:  Wait a minute.
17  17  MR. DE GHETALDI:  For — I'm sorry, for OSI
18  18  total license.
19  19  MR. ETH:  Okay.
20  20  THE WITNESS:  I do not recall the specifics of
21  21  any EC meetings held on January 29th.
22  22  MR. DE GHETALDI:  Q.  Do you recall any
23  23  discussions at any executive committee meeting in
24  24  December or January of Q3 '01 regarding the fact that
25  25  the forecasts for OSI and NAS total license were less

1  00178:01  than the targeted 30 percent growth number?
2  02  A.  I do not recall the specifics of any
3  03  discussion at any EC meeting.  As I stated before, the
4  04  forecast was a standing agenda item at every EC meeting.
5  05  So we clearly discussed the forecast, but I do not
6  06  recall any of the specifics.
7  07  MR. DE GHETALDI:  I'd like to have this marked
8  08  as next in order, please.
9  09  (DC Exhibit No. 239
10  10  marked for identification).
11  11  MR. DE GHETALDI:  Q.  Have you seen Exhibit
12  12  239 before today?
13  13  A.  Yes, I have.
14  14  Q.  Is this one of the documents that you reviewed
15  15  in preparation for your deposition?
16  16  A.  Yes, it is.
17  17  Q.  When was the first time you saw Exhibit 239?
18  18  A.  I don't recall exactly.
19  19  Q.  Well, was it within the last month?
20  20  A.  I saw this document yesterday — not
21  21  yesterday, but the day before — as an example.  But I
22  22  don't recall if I saw it before then.
23  23  Q.  In reviewing Exhibit 239 — I assume that you
24  24  did read the whole thing, correct —
25  25  A.  Yes, I did.

1  00179:01  Q.  — did you notice anything that did not
2  02  accurately reflect what you told the Special Litigation
3  03  Committee in June of 2002?
4  04  A.  Yes, I did.
5  05  Q.  And can you point out those areas, if there's
6  06  more than one.
7  07  MR. ETH:  Well, objection.  Calls for a
8  08  narrative.  I mean, do you want her —
9  09  MR. DE GHETALDI:  Maybe.
10  10  MR. ETH:  Do you want to lead her through
11  11  various things?
12  12  MR. DE GHETALDI:  Well, no, I —
13  13  MR. ETH:  Okay.  The ones she can remember
14  14  right now.
15  15  MR. DE GHETALDI:  Yeah.
16  16  THE WITNESS:  Well, off the top of my head, I
17  17  was not an account manager.
18  18  MR. DE GHETALDI:  Q.  All right.  Anything
19  19  else?
20  20  A.  I'd have to read the document again.
21  21  Q.  All right.  If you could turn to page 4,
22  22  please.  At the top of the page, the first paragraph
23  23  looks like there's a discussion about the forecasting
24  24  process and the methodology.  And it said,
25  25  "For examples, Minton noted," number

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00180:01   one, "licensing forecasts have always
02   relied on weighted pipeline data and
03   historical conversion rate information."
04   Where -- can you tell me what weighted
05   pipeline data is.
06   A.  Do you recall the report that we looked at
07   yesterday --
08   Q.  The --
09   A.  -- where there were deals and there were ...
10   Q.  Yes.
11   A.  That is what we're referring to, when you take
12   the summation of all of your deals, the total dollar
13   value, and you weight it by the estimated probability
14   that that deal will close.
15   Q.  Just so that I confirm that my memory is
16   accurate, as an example, I'm showing you page Bates
17   number 25220 from Exhibit 21 and ask if that's the type
18   of report that you were just referring to.
19   A.  It is a -- yes, it's the type of report.
20   Q.  All right.  And as to the historical
21   conversion rate information, where -- what would the
22   source of that information be?
23   A.  Do you remember the license pipeline analysis?
24   Q.  Yes.  Just let me see if I can find that.  I'm
25   showing -- are you referring to the document -- the type

Oracle Related Cases                                Page 180

---

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00181:01   of document shown in Exhibit 112 that's titled "Pipeline
02   Reporting Package"?
03   A.  Yes, I am.
04   Q.  Okay.  In the second paragraph on page 4, the
05   summary says,
06           "Generally Minton spends approximately
07   three to four hours per week on
08   forecasting, with the exception of the last
09   week of any given quarter."
10   Does that accurately reflect what you told the
11   Special Litigation Committee about how much time you
12   spend per week on forecasting?
13           MR. NADOLENCO:  Object to the form.
14           THE WITNESS:  Can you repeat the question.
15           MR. DE GHETALDI:  Q.  Does that accurately
16   reflect what you told the Special Litigation Committee
17   about how much time you spend per week on forecasting?
18   A.  I'm not sure if the total hours are correct,
19   but more or less the process and the description of the
20   conference calls and so forth is correct.
21   Q.  What about the total hours is incorrect?
22   A.  I said I don't recall if that is what I said.
23   Q.  Did you spend approximately three to four
24   weeks -- or three to four hours per week on forecasting
25   in fiscal year 2001?

Oracle Related Cases                                Page 181

---

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00182:01   A.  I would spend on Thursdays roughly, let's say,
02   an hour on a forecast call.  I would spend roughly, you
03   know, anywhere from half-hour to an hour on the forecast
04   call.  I would spend some time analyzing upside reports
05   and making -- having discussions with folks.
06           It's hard for me to say that it was always
07   three to four hours, but it's not out of line.  It could
08   have been less.
09   Q.  Okay.  I'm just asking whether that
10   approximation was -- appears accurate to you.
11   A.  It could have been less, could have been a
12   little more.
13   Q.  Did you regularly have discussion with
14   particular folks in deriving your upside numbers?
15   A.  Again, I would speak with all the sales
16   individuals, the sales executives on the forecast calls,
17   along with their finance representatives.  I would speak
18   with Ivgen Guner.  At times I would discuss it with Jeff
19   Henley.  There were -- more or less the same individuals
20   that I've already told you about.
21   Q.  All right.  If you could turn to page 5,
22   please.
23           Can we go off the record.
24           THE VIDEOGRAPHER:  Off the record, 11:47 a.m.
25           (Lunch recess from 11:47 to 12:47).

Oracle Related Cases                                Page 182

---

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

00183:01   AFTERNOON SESSION                    12:58 P.M.
02           THE VIDEOGRAPHER:  On the record, 12:58 p.m.
03           EXAMINATION RESUMED BY
04           MR. DE GHETALDI:  Q.  If you could turn to
05   page 5 of Exhibit 239, please.  In the first full
06   paragraph there that talks about sources of information
07   for adjustments to the upside report, do you see that
08   paragraph?
09   A.  Yes.
10   Q.  Is that an accurate summary of what you told
11   the SLC about that particular topic, that paragraph
12   there?
13   A.  The big deal reports from Loren Mahan are not
14   used for preparing information for the upside report,
15   nor are the flash reports used.
16           Again, as I've stated before, the primary
17   sources of information that I would use were the
18   pipeline trend analyses and conversations with my staff
19   or on forecast calls and the like.
20   Q.  All right.  Is that an accurate summary,
21   though, of what you told the Special Litigation
22   Committee?
23   A.  I don't recall precisely what I told the
24   litigation committee.  This is their interpretation of
25   the discussion.

Oracle Related Cases                                Page 183

1  00184:01    Q.  Okay.  Was this one of the inaccuracies that
2  02  you had noticed, that is, the inclusion of flash reports
3  03  and big deal reports and the sources of information to
4  04  your adjustments to the upside reports?
5  05    A.  Yes.
6  06    Q.  Point number 3 says trend analyses conducted
7  07  by your staff.  What trend analyses were you referring
8  08  to there?
9  09    A.  Conversion trend analyses.
10 10    Q.  Pipeline conversion?
11 11    A.  Yeah.
12 12    Q.  All right.  Any other trends analyses other
13 13  than that?
14 14    A.  No.
15 15    Q.  No, okay.  If you could turn to page 6, the
16 16  last full paragraph, the second to last sentence of that
17 17  paragraph reads,
18 18      "At the end of each month, she
19 19    incorporates the actual results from these
20 20    areas into her calculations for the
21 21    remaining forecast for the quarter."
22 22    Is that an accurate summary of what you told
23 23  the Special Litigation Committee?
24 24    A.  May I explain what I told the litigation
25 25  committee?

1  00185:01    Q.  Sure.
2  02    A.  So at the beginning of a quarter, you start
3  03  with a forecast.  At the conclusion of the first month
4  04  of a quarter -- and we -- and by the way, we forecast
5  05  month 1, month 2, month 3.  At the beginning of a
6  06  quarter, each of those months are forecast.  At the end
7  07  of month 1, when you're -- when you've finalized your
8  08  financial results for that period, we would replace the
9  09  forecast for that month with the actuals.  So you would
10 10  have one month of actuals, two months of forecast.
11 11      And at the end of month 2, we would replace
12 12  month 2's forecast with month 2 actuals.  So you would
13 13  have two months of actuals, one month of forecast.
14 14    Q.  Did you do that for consulting, support and
15 15  education revenue?
16 16    A.  That was for all revenue and expenses.
17 17    Q.  Including license?
18 18    A.  Including license.
19 19    Q.  Okay.  Where did -- were reports prepared that
20 20  showed the monthly forecast and the monthly actuals?
21 21    A.  We didn't look at the reports, but they were
22 22  contained within OFA, the Oracle Financial Analyzer
23 23  system.
24 24    Q.  So that was information that you considered in
25 25  preparing your upside reports?

1  00186:01    MR. ETH:  Objection.  Asked and answered.
2  02    THE WITNESS:  I evaluate what I think the
3  03  license forecast is going to be, based on the
4  04  discussions that I have and all the analyses that are
5  05  performed, as previously discussed.  The difference
6  06  between what I think it's going to be versus what the
7  07  forecast is, as submitted by the field, would be the net
8  08  upside adjustment.
9  09    MR. DE GHETALDI:  Q.  All right.  Part of the
10 10  information that you considered, then, was the actual
11 11  monthly results?
12 12    A.  No, I considered the forecast.  I did not look
13 13  at what the individual actual results were in a given
14 14  quarter.  I looked at the forecast.
15 15    Q.  I guess I'm confused.  In OFA, the forecasts
16 16  are broken down by month for license, consulting,
17 17  support and education, correct?
18 18    A.  In OFA, the forecast is broken down by month
19 19  for all lines of businesses, both revenue and expenses.
20 20    Q.  Okay.  Are the forecasts also broken down by
21 21  month by organization, sales organization?
22 22    A.  Every sales organization submits their
23 23  forecast by month.
24 24    Q.  And then when the actual results come in for a
25 25  month, OFA -- or the information in OFA shows the actual

1  00187:01  results for the month instead of the forecast?
2  02    A.  We replace month 1 forecast with month 1
3  03  actual results.  The reports that we get out of the
4  04  system for purposes of doing our quarterly forecasting
5  05  is quarterly information; it is not monthly information.
6  06    Q.  In the third quarter of 2001, did you consider
7  07  the actual results that were shown in OFA in arriving at
8  08  an upside number?
9  09    MR. ETH:  Objection.  Asked and answered.
10 10    THE WITNESS:  I will state it for the record
11 11  one more time.  I looked at the forecast.  The forecast
12 12  may have included, after month 1 was completed, month 1
13 13  actual results.  So it's -- month 1 and month 2 and
14 14  month 3 are forecasted at the beginning of a quarter.
15 15    MR. DE GHETALDI:  Yes.
16 16    THE WITNESS:  The forecast is revised
17 17  throughout the course of the quarter to copy actuals.
18 18  It into month 1 when month 1 is complete.  It's then copied
19 19  into month 2 when month 2 is complete.
20 20    The sales organization will adjust any month
21 21  that has not yet been adjusted -- that has not yet been
22 22  reported as actuals to include their total forecast for
23 23  the quarter.
24 24    I derive what I think is going to be the
25 25  license forecast.  I back out their forecast to come up

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00188:01 with the upside amount. And I'm always looking at

02 quarterly totals; I'm not looking at individual monthly

03 results.

04       MR. DE GHETALDI: Q. If you could turn to

05 page 8, please. In that first paragraph, the first

06 sentence reads,

07       "Minton noted that she was a bit

08       nervous entering into Q3 FY '01 because Q2

09       FY '01, while very successful, had been

10       even more back-end-loaded than usual."

11       Is that an accurate reflection of what you

12 told the SLC?

13    A. Yes.

14    Q. What did you mean by Q2 being even more

15 back-end-loaded than usual?

16    A. We had a significant number of large deals

17 that were closed on the very last day of the quarter.

18    Q. So were you nervous in Q2 itself about being

19 able to meet your numbers?

20    A. In Q2 there were a number of large deals at

21 play. And it wasn't until the very end of the quarter

22 that we had any certainty that we were going to make the

23 quarter -- quarterly predicted results. We refer to

24 that as the cardiac close.

25    Q. That particular quarter?

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00189:01    A. No, just the fact that when it's so

02 back-end-loaded and they have large deals, it's very

03 difficult to know whether or not you're going to make

04 the forecast until the very last day of the quarter.

05 That's that hockey stick effect I was telling you about.

06    Q. Yes. The last sentence of that particular

07 paragraph on page 8 says,

08       "Minton further noted that the holiday

09       season that falls in Q3 of Oracle's fiscal

10       year is not good for its business."

11       Is that an accurate summary of what you told

12 the Special Litigation Committee?

13    A. I would have told them that the December

14 time period for Christmas and New Year's is generally not our

15 strongest month within that quarter.

16    Q. Have you ever conducted an analysis to

17 determine whether or not there was factual support for

18 the belief that you just expressed?

19    A. I do not recall conducting an analysis on

20 December results itself. However, I do recall you

21 showing me an analysis that we did which made me --

22 refreshed my memory of a long gone -- long-standing

23 analysis that we did that did show the monthly

24 distribution within a quarter.

25    Q. Would it surprise you if I told you that

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00190:01 December, as the first month of the quarter, had a

02 higher average contribution to the total quarterly

03 revenue than any other first month of Oracle's quarters?

04    A. Given that we closed the Covisint deal, which

05 was a $60 million transaction, if that is factually

06 correct, it would not surprise me.

07    Q. Well, I'm not talking about just the third

08 quarter of 2001. I'm talking about the six years prior

09 to that, the historical averages show that December

10 contributed 21 percent, on average, to the quarter's

11 revenue, which was significantly higher than any other

12 first month of the other three quarters' contribution.

13       MR. ETH: Objection. Lack of foundation,

14 vague.

15       MR. DE GHETALDI: Q. Does that surprise you?

16    A. I don't know if it does or not.

17    Q. Well --

18    A. I haven't studied those numbers. It's more of

19 an impression that I'm giving you is that the holiday

20 season would -- would impact people's productivity.

21    Q. Well, do you have any impression of -- of how

22 the fiscal years used by Oracle's customers might impact

23 the -- Oracle's revenues in December?

24    A. No.

25    Q. In other words, if a significant percentage of

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

00191:01 Oracle's customers used calendar years for their fiscal

02 years, would you not expect those customers to tend to

03 make purchases in the last month of their year if they

04 were going to be making them?

05       MR. ETH: Objection. Calls for speculation.

06       THE WITNESS: I have no basis for a comment on

07 that.

08       MR. DE GHETALDI: All right, that's fine.

09    Q. Were you aware in Q2 fiscal year 2001 that

10 September's revenues showed a negative growth over the

11 September in the prior year?

12    A. I don't recall.

13    Q. Were you aware that October's revenues showed

14 negative growth over October of the prior year?

15    A. I don't recall if it showed negative growth. I

16 do recall it was a very slow start month 1 and 2.

17 That's why it was back-end-loaded.

18    Q. If you could turn -- well, if you could turn

19 to page 9. The paragraph in the middle of the page

20 underneath the title "Minton's View Of Q3 Fiscal Year

21 '01," the last sentence of that paragraph reads,

22       "In fact, Minton stated that at this

23       time the sales executives were very bullish

24       and reported that they were not seeing any

25       adverse impact from the economy."

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00192:01      Is that an accurate summary of what you told
2   02 the Special Litigation Committee?
3   03      A.  I remember that during this time period that
4   04 there was a lot of press reports, news articles, what
5   05 have you, regarding the overall macroeconomic
6   06 environment.  And both Jeff and I were continuously
7   07 challenging the sales organization as to whether or not
8   08 they were seeing any impact of the economy on our Q3
9   09 financial forecast.
10  10      And, you know, they did not change their
11  11 forecasts significantly throughout the course of the
12  12 quarter until the very end of February.
13  13      Q.  Well, didn't -- didn't you observe that
14  14 Mr. Sanderson was hesitant on -- in the January calls?
15  15      A.  I don't recall.
16  16      Q.  What about Mr. Winton's January 2001 e-mail
17  17 that we looked at; didn't you -- or did you associate
18  18 the trends that he was discussing in that e-mail to you
19  19 with the macroeconomic climate?
20  20      MR. ETH:  Objection.  Vague.
21  21      THE WITNESS:  Again, they did not revise their
22  22 forecast.
23  23      MR. DE GHETALDI:  Q.  I understand.  My
24  24 question was whether you associated Mr. Winton's
25  25 January 11th, 2001 e-mail and the points that it
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00193:01 raised with the macroeconomic downturn that you were
2   02 talking about.
3   03      A.  I don't recall.  We continuously challenged
4   04 the sales executives, and they weren't -- they were not
5   05 bringing down their sales forecast.
6   06      Q.  Do you recall challenging Mr. Roberts with the
7   07 points that Mr. Winton raised?
8   08      A.  I don't recall.
9   09      Q.  Well, do you recall how you were challenging
10  10 them?
11  11      A.  By asking the sales guy -- the finance guys
12  12 that were supporting the sales folks -- the sales force
13  13 to provide me with their own independent views of the
14  14 forecast.
15  15      I was trying to get another data point to
16  16 ensure that they concurred with the forecasts that were
17  17 being put forth by the sales executives.
18  18      And there was a lot of discussion in general
19  19 about, you know, the overall economic environment.
20  20 There was a belief that the tech sector, while there was
21  21 pressure in the tech sector, it was more in the hardware
22  22 side versus the software side.
23  23      Q.  By January 29th, with Mr. Winton's dot-com
24  24 analysis, did you observe pressure in the software side?
25  25      MR. ETH:  Objection.  Compound.
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00194:01      THE WITNESS:  Mr. Winton's analysis pointed to
2   02 the fact that there was a slowdown in the dot-com sector
3   03 of the -- of the general business market.
4   04      MR. DE GHETALDI:  Q.  That was pretty severely
5   05 cutting into general business's revenues, right?
6   06      MR. NADOLENCO:  Object.
7   07      MR. ETH:  Objection to form.
8   08      THE WITNESS:  If I -- can I look at his
9   09 analysis?
10  10      MR. DE GHETALDI:  Sure.  Sure.
11  11      THE WITNESS:  I think his analysis showed the
12  12 Q3 and the Q4 forecast.
13  13      MR. DE GHETALDI:  Q.  Might want to look at
14  14 it.
15  15      A.  Yeah, he was showing that they still had the
16  16 forecast of 234 for the full year and that there was a
17  17 slowdown in the dot-com space.  I don't know how much of
18  18 this was -- 234 -- it's 234 out of -- or I should say
19  19 there was 51 in Q3 in the dot-com space out of 241.
20  20      Q.  Well, the -- if you could pass that back,
21  21 please.  Thank you.
22  22      A.  Which one is it?
23  23      Q.  49.  I think this is actually for all of NAS.
24  24 And you can confirm that by looking at the upside --
25  25      A.  This is technology and not applications.
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00195:01      Q.  Yes, but for all of NAS, not just general
2   02 business.
3   03      A.  That would be correct.
4   04      Q.  Okay.  And that was showing negative growth
5   05 over the prior year.
6   06      A.  That is correct.
7   07      Q.  And --
8   08      A.  In the dot-com space.
9   09      Q.  In the dot-com space.  And -- no, for the --
10  10 all of technology.  It was negative 54 percent growth
11  11 for dot-com, negative six percent for all of technology
12  12 in NAS.
13  13      MR. ETH:  Objection.  Vague.
14  14      MS. SEGAL:  What's your question, Dario?
15  15      MR. DE GHETALDI:  We're talking about what the
16  16 numbers show and trying to establish that before we go
17  17 on.
18  18      MR. ETH:  The document speaks for itself.
19  19      MS. SEGAL:  I don't think there is a question
20  20 pending.  I think you're reading from the document.
21  21      MR. DE GHETALDI:  Well, I said that was
22  22 showing negative growth over the prior year, and
23  23 Ms. Minton said in the dot-com space, and I was trying
24  24 to determine whether it was just in the dot-com or
25  25 whether it was also in technology in all of NAS.
```

1  00196:01       THE WITNESS: It was in technology as well.

2  02 So it was minus six percent.

3  03       MR. DE GHETALDI: Right.

4  04    Q. Did you associate that negative growth with

5  05 macroeconomic trends?

6  06    A. I don't recall.

7  07    Q. Do you recall --

8  08    A. It's interesting to see, though, if you notice

9  09 their applications revenue is growing 103 percent and

10 10 their total -- -- their total revenue was still growing

11 11 12 percent.

12 12    Q. Yes. And 12 percent was less than the

13 13 30 percent that guidance was given for, right?

14 14    A. But that's one division out of the entire

15 15 company.

16 16    Q. Do you recall telling the Special Litigation

17 17 Committee that you remember -- that you recalled

18 18 Mr. Sanderson being hesitant on the January calls?

19 19    A. I don't recall at the moment.

20 20    Q. If you could turn to page 12, please. Under

21 21 the section "stock sales," it said -- this reads,

22 22       "Minton has not sold any stock,"

23 23 quote, "for a long time," end quote. "She

24 24 did not sell any stock in 2001. She

25 25 recalls that in early January, she was

---

1  00197:01 sufficiently nervous about the economy that

2  02 she wanted to sell some Oracle stock."

3  03       Is that an accurate reflection of what you

4  04 told the Special Litigation Committee?   .

5  05    A. They have it a little bit wrong in that it was

6  06 my husband who was sufficiently nervous. He was the one

7  07 who insisted that I sell stock.

8  08    Q. Do you recall telling that to the Special

9  09 Litigation Committee?

10 10    A. Yes, I do.

11 11    Q. The paragraph continues, "She recalls

12 12 sending an e-mail to Henley for clearance

13 13 to trade sometime in early January, but she

14 14 did not recall receiving a response to her

15 15 request; therefore, she never traded."

16 16       Is that an accurate reflection of what you

17 17 told the Special Litigation Committee?

18 18    A. Yes, it is.

19 19    Q. Okay.  Have you searched for that -- a copy of

20 20 that e-mail?

21 21    A. I did, and I did not find it.

22 22    Q. It says --

23 23    A. I did not copy myself on it was the reason why

24 24 I did not find it.

25 25    Q. What e-mail program were you using in Q3 2001?

---

1  00198:01    A. Oracle's.

2  02    Q. Well, was it based on Netscape or Outlook; do

3  03 you recall?

4  04    A. Netscape.

5  05    Q. Didn't it automatically save e-mails that you

6  06 had sent to a sent folder?

7  07    A. Yes, but I would periodically clean the sent

8  08 folder out.

9  09    Q. Do you recall cleaning the sent folder out

10 10 between January of 2001 and March of 2001?

11 11    A. If I recall correctly, the sent folder had a

12 12 number of days where it automatically cleansed itself.

13 13    Q. Do you recall how many days that was?

14 14    A. No, I don't.

15 15    Q. The paragraph continues, "She recalls

16 16 Sanderson wanting to trade in the same time

17 17 frame. Minton interpreted this as

18 18 Sanderson sharing her concerns about the

19 19 macroeconomic climate."

20 20       Is that an accurate reflection of what you

21 21 told the Special Litigation Committee?

22 22    A. It's here. I don't recall saying it, but it's

23 23 here.  I do -- I do remember thinking that he was going

24 24 to sell shares around that time period.

25 25    Q. When you learned that Mr. Ellison was going to

---

1  00199:01 sell shares, did you interpret that as him sharing your

2  02 concerns about the macroeconomic climate?

3  03       MR. NADOLENCO: Objection.

4  04       THE WITNESS: Not at all.

5  05       MR. NADOLENCO: I'm sorry.  Objection.

6  06 Assumes facts not in evidence.

7  07       MR. ETH: Lack of foundation.

8  08       MR. DE GHETALDI: Q. And the paragraph end,

9  09       "She said that she would have been

10 10 comfortable selling in January because she

11 11 had no material inside information about

12 12 the company and its Q3 prospects."

13 13       Is that an accurate reflection of what you

14 14 told the Special Litigation Committee?

15 15    A. I'm sorry, where are you?

16 16    Q. The last sentence of the first full paragraph

17 17 of page 12 of Exhibit 239.

18 18    A. I don't see what you just read there, sorry.

19 19 Can you please read what you read again.

20 20    Q. "She said that she would have been

21 21 comfortable selling in January because she

22 22 had no material inside information about

23 23 the company and its Q3 prospects."

24 24    A. That is correct.

25 25    Q. Is that an accurate reflection of what you

1   00200:01 told the Special Litigation Committee?

2   02   A.  Yes.

3   03   Q.  In January of 2001, you were privy to all of

4   04  the information in the upside reports, correct?

5   05   A.  Correct.

6   06   Q.  And you did not believe that there was

7   07  anything in those upside reports that was material

8   08  inside information; is that right?

9   09   A.  That's correct.

10  10   Q.  If that's the case, then I -- I still don't

11  11  understand the concern about sharing that information

12  12  with people at the executive committee meetings.

13  13        MR. ETH:  Objection.  Asked and answered

14  14  several times.

15  15        MR. NADOLENCO:  And form.

16  16        MS. SEGAL:  What is the question?

17  17        MR. NADOLENCO:  Yeah, is it your lack of

18  18  understanding?  You want her to confirm that?

19  19        MR. DE GHETALDI:  Maybe I should rephrase the

20  20  question.  My wife confirms that all the time and I

21  21  don't need additional confirmation, trust me.

22  22   Q.  Why was it not a problem for you to have that

23  23  information and a problem for other people who attended

24  24  the executive committee to have that information?

25  25        MR. ETH:  Objection.  Asked and answered.

---

1   00201:01        THE WITNESS:  I am the chief accounting

2   02  officer and I was responsible for pulling together the

3   03  forecast.  So obviously I would need to have access to

4   04  that financial information.  Other individuals did not

5   05  have a need to know.

6   06        MR. DE GHETALDI:  Q.  Do you recall telling

7   07  the Special Litigation Committee that at the end of

8   08  January 2001 you were nervous about the microeconomic

9   09  environment?

10  10        MR. ETH:  Are you looking at a page or --

11  11        MR. DE GHETALDI:  No.

12  12        MR. ETH:  Are you looking at a page?

13  13        MR. DE GHETALDI:  No.

14  14        MR. ETH:  Oh, okay, I'm sorry.

15  15        THE WITNESS:  Can you repeat the question.

16  16        MR. DE GHETALDI:  Q.  Do you recall telling

17  17  the Special Litigation Committee that at the end of

18  18  January 2001 you were nervous about the microeconomic

19  19  environment?

20  20   A.  I probably told them that I was -- had

21  21  concerns about the macroeconomic environment.

22  22   Q.  I said micro.

23  23   A.  Oh, micro.  Sorry.  No.  It would have been

24  24  macro.

25  25        MR. ETH:  Dario, can we just take one minute.

---

1   00202:01        MR. DE GHETALDI:  Yes.

2   02        MR. ETH:  I had too much iced tea.  I'll be

3   03  right back.

4   04        MR. DE GHETALDI:  All right.

5   05        THE VIDEOGRAPHER:  Off the record, 1:31 p.m.

6   06        (Recess taken).

7   07        THE VIDEOGRAPHER:  On the record, 1:41 p.m.

8   08        MR. DE GHETALDI:  Q.  What are run rates?

9   09   A.  Run rates?

10  10   Q.  Yeah.

11  11   A.  Can you put it in context for me, please.

12  12   Q.  Well, are run rates of an organization

13  13  something that you look at during the forecasting

14  14  process?

15  15   A.  I'm having a hard time putting the term "run

16  16  rate" -- defining it.  Sounds familiar, but I can't

17  17  quite put my finger on it.

18  18   Q.  Well, did you tell the Special Litigation

19  19  Committee that you look at run rates of an organization

20  20  so -- to see if there is any cushion in the forecast?

21  21   A.  It still is not intuitive to me.

22  22   Q.  Okay.  If you could dig out Exhibits 110 and

23  23  108, please.  Those are the two Garnick flash reports.

24  24        MR. ETH:  Are those from yesterday?

25  25        MR. DE GHETALDI:  Yeah.

---

1   00203:01        THE WITNESS:  108 and ...

2   02        MR. DE GHETALDI:  110.

3   03        THE WITNESS:  110.  Yep.

4   04        MR. DE GHETALDI:  Q.  It looks like the

5   05  recipients of these flash reports are the executive vice

6   06  presidents, is that right, for the most part?

7   07   A.  I believe they're missing a few.  But they

8   08  would be members of the EC meeting -- of the executive

9   09  management committee.

10  10   Q.  Was there a time when these monthly revenue

11  11  results were not distributed to such a wide audience?

12  12   A.  Yes.

13  13   Q.  Do you recall when the audience was expanded?

14  14   A.  I thought you were asking a different

15  15  question.  So we would share this in month 1 and month

16  16  2, but month 3 we would not share with them the actual

17  17  monthly results.  So maybe I misunderstood your

18  18  question.

19  19   Q.  Do you recall a time when Mr. Ellison

20  20  wanted -- do you recall a time when the recipients of

21  21  these monthly results were limited to you and Mr. Henley

22  22  and Safra Catz and Mr. Ellison?

23  23   A.  Yes.

24  24   Q.  Okay.  Do you recall when that audience was

25  25  expanded?

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

| | |
|---|---|
| 1 | 00204:01   A. I don't recall precisely when Larry wanted us |
| 2 | 02 to expand it, but he did ask that we do that. |
| 3 | 03   Q. Do you recall whether it was in fiscal year |
| 4 | 04 2001? |
| 5 | 05   A. I don't recall when. |
| 6 | 06   Q. Do you recall him saying why he wanted the |
| 7 | 07 audience expanded? |
| 8 | 08   A. He was attempting to generate competition. |
| 9 | 09   Q. Do you recall him saying how he thought that |
| 10 | 10 would result from sharing the numbers in these reports? |
| 11 | 11   A. Waiting for an objection. Figured I'd wait a |
| 12 | 12 few minutes. |
| 13 | 13       He -- he felt that if they -- that it would be |
| 14 | 14 healthy competition for them to see each other's revenue |
| 15 | 15 performance. |
| 16 | 16       MR. DE GHETALDI: I'd like to have this |
| 17 | 17 document marked as next in order, which I believe is |
| 18 | 18 240. |
| 19 | 19       (DC Exhibit No. 240 |
| 20 | 20       marked for identification). |
| 21 | 21       MR. DE GHETALDI: Q. Have you ever seen |
| 22 | 22 Exhibit 240 before today? |
| 23 | 23   A. I'm sure I've seen a report similar to this. |
| 24 | 24 Not sure if I've seen this exact one. |
| 25 | 25   Q. Okay. Who prepares this kind of report? |

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

| | |
|---|---|
| 1 | 00205:01   A. It would come out of the corporate financial |
| 2 | 02 planning and analysis group. |
| 3 | 03   Q. Do you know who within that group was |
| 4 | 04 responsible for preparing this type of report? |
| 5 | 05   A. Ivgen Guner was responsible for that |
| 6 | 06 organization. So somebody, more likely than not, that |
| 7 | 07 reported to her would have prepared it. |
| 8 | 08   Q. All right. Do you know the persons to whom |
| 9 | 09 this type of report was distributed in fiscal year 2001? |
| 10 | 10   A. I'm not certain that we actually distributed |
| 11 | 11 it, quite frankly. We may have distributed it at an EMC |
| 12 | 12 meeting, but I really don't recall. |
| 13 | 13       MR. DE GHETALDI: I'd like to have this |
| 14 | 14 document marked as next in order, which I believe is |
| 15 | 15 241. |
| 16 | 16       (DC Exhibit No. 241 |
| 17 | 17       marked for identification). |
| 18 | 18       MR. DE GHETALDI: Q. Have you ever seen the |
| 19 | 19 type of report exemplified by Exhibit 241 before today? |
| 20 | 20   A. Yes. |
| 21 | 21   Q. Would this be a type of report that was |
| 22 | 22 prepared by Ivgen Guner's group? |
| 23 | 23   A. This is the management summary downloaded |
| 24 | 24 directly from Oracle Financial Analyzer. That would |
| 25 | 25 have been prepared by somebody in Ivgen Guner's group. |

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

| | |
|---|---|
| 1 | 00206:01   Q. Do you know to whom types of reports |
| 2 | 02 exemplified by Exhibit 241 were distributed? |
| 3 | 03   A. These reports were generally used to assist in |
| 4 | 04 the preparation of these upside reports. |
| 5 | 05   Q. I see. |
| 6 | 06   A. I really -- if I recall correctly, I don't |
| 7 | 07 believe that this report or the headcount report was |
| 8 | 08 actually distributed. It was generally the upside |
| 9 | 09 reports that were brought to the EC meetings and |
| 10 | 10 distributed. |
| 11 | 11       MR. DE GHETALDI: And if I could have this one |
| 12 | 12 marked as the next in order, which I believe is 242. |
| 13 | 13       (DC Exhibit No. 242 |
| 14 | 14       marked for identification). |
| 15 | 15       MR. DE GHETALDI: Q. Have you ever seen the |
| 16 | 16 type of report exemplified by Exhibit 242 before? |
| 17 | 17   A. Yes. |
| 18 | 18   Q. Is this a report that's similar to Exhibit |
| 19 | 19 241, with the difference being that one is in U.S. |
| 20 | 20 dollars and one is in constant dollars? |
| 21 | 21   A. Yes. |
| 22 | 22   Q. Okay. And 242 is, again, something that you |
| 23 | 23 used to assist you in the preparation of the upside |
| 24 | 24 reports? |
| 25 | 25   A. Yes. |

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

| | |
|---|---|
| 1 | 00207:01   Q. Do you know the production schedule for the |
| 2 | 02 types of reports that are exemplified by Exhibit 240, |
| 3 | 03 241 and 242; that is, how often were they prepared? |
| 4 | 04   A. These reports would have been printed out to |
| 5 | 05 prepare the upside analysis. |
| 6 | 06   Q. Well, I note that each of these three were -- |
| 7 | 07 are dated January 22nd. |
| 8 | 08   A. Mm-hm. |
| 9 | 09   Q. And we looked at an upside report that was |
| 10 | 10 also dated January 22nd. So were these something -- |
| 11 | 11 did these have the most current information as of the |
| 12 | 12 morning of the executive meetings? |
| 13 | 13   A. Yeah. May I show you how they tie into one |
| 14 | 14 another? |
| 15 | 15   Q. Yes. |
| 16 | 16   A. Okay. If you go to Exhibit 153 and go to the |
| 17 | 17 very -- the second page. |
| 18 | 18   Q. 153. |
| 19 | 19   A. It's the upside analysis for 1/22. |
| 20 | 20   Q. Got it. |
| 21 | 21   A. All right. I'll just use one number. |
| 22 | 22   Q. Yes. |
| 23 | 23   A. Our favorite topic, license revenues. If you |
| 24 | 24 look at the forecast in the Exhibit 242 -- |
| 25 | 25   Q. Yes. |

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00208:01    A.  -- you see a forecast of 1,253,433.
2        02    Q.  Yes.
3        03    A.  If you go to the upside analysis -- and this
4        04    is, again, the forecast at actual rates or reported
5        05    rates -- you see the same number there under "forecast"?
6        06    Q.  Yes.
7        07    A.  Okay.  Now, your upside analysis, if you go to
8        08    the very next page, and then if you go to the Exhibit
9        09    No. 241, which is the management summary in constant
10       10    dollars, you see the license forecast of 1,264,597?
11       11    Q.  Yes.
12       12    A.  Is that the same number that you see on the
13       13    upside analysis on page -- on the third page in,
14       14    referring to page 3550?
15       15    Q.  Yes.
16       16    A.  So these were the source reports coming out of
17       17    OFA.
18       18    Q.  Well, do you know why the numbers for
19       19    consulting and support -- or the numbers for consulting,
20       20    at least, are different?  Consulting revenue, forecast.
21       21    A.  No, I don't.  Appears to be a typo.
22       22    Q.  They should be the same; is that your
23       23    understanding?
24       24    A.  I think they should be the same.
25       25    Q.  Okay.  I'm going to hand you a copy of a
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00209:01    document that was previously marked as Exhibit 31.  I
2        02    don't have a copy of the marked --
3        03    A.  Do you want to keep all these separate?
4        04    Q.  Oh, no, that's fine.  I don't have a copy of
5        05    the marked exhibit, but that ... have you seen Exhibit
6        06    31 before today?
7        07    A.  Yes, I have.
8        08    Q.  Was this one of the documents that you
9        09    reviewed in preparation for your deposition?
10       10    A.  Yes, it was.
11       11    Q.  Do you recall noting any inaccuracies in
12       12    Exhibit 32 [sic]?
13       13    A.  I did not review this in its entirety, so ...
14       14    I'd have to do that.
15       15    Q.  Do you recall when the first time you saw
16       16    Exhibit 32 was?
17       17        MR. NADOLENCO:  31?
18       18        MR. DE GHETALDI:  31.  Thank you.
19       19        THE WITNESS:  I definitely remember seeing it
20       20    a couple of days ago.  I don't recall if I saw it before
21       21    then.
22       22        MR. DE GHETALDI:  Q.  If you could turn to
23       23    page 12, please.  At the bottom of the page, there's a
24       24    section on -- that's titled "Minton's Contemplated Stock
25       25    Sale in January 2001."
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00210:01    Skipping the first sentence of that paragraph,
2        02    the summary reads,
3        03        "When asked about clearance for this
4        04    contemplated stock sale, Minton stated that
5        05    she had sent an e-mail to Henley requesting
6        06    clearance for her planned trades.  She
7        07    vaguely recalled receiving her clearance
8        08    from Cooperman."
9        09        Do you recall sending Mr. Cooperman an e-mail
10       10    asking for clearance?
11       11    A.  I did not send Dan Cooperman an e-mail asking
12       12    for clearance.  I waited until -- I was -- I waited -- I
13       13    was going to wait until I got clearance from Jeff, but I
14       14    never got clearance from Jeff.
15       15    Q.  So as you sit here today, it's your
16       16    recollection that you did not ask Mr. Cooperman for
17       17    clearance?
18       18    A.  That's correct.
19       19        MR. DE GHETALDI:  Now I'd like this next
20       20    document marked as next in order, which I believe is
21       21    243.
22       22        (DC Exhibit No. 243
23       23        marked for identification).
24       24        MR. DE GHETALDI:  Q.  Have you seen Exhibit
25       25    243 before today?
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00211:01    A.  Yes.
2        02    Q.  Is this one of the documents that you reviewed
3        03    prior to your deposition?
4        04    A.  Yes.
5        05    Q.  If you could turn, please, to page 9,
6        06    paragraph 25.  It begins -- or it reads,
7        07        "During Q3 '01, upside adjustments,
8        08    included information based on e-mails
9        09    received from David Winton on
10       10    January 11th, 2001, James English on
11       11    January 17th, 2001, Larry Garnick on
12       12    January 17th, 2001, and Sarah Kopp on
13       13    January 18th, 2001, among many other
14       14    e-mails and reports I received throughout
15       15    the quarter."
16       16        Is that an accurate statement?
17       17    A.  Yes.
18       18    Q.  If you can find Exhibit 108, which is
19       19    Mr. Garnick's January 17th, 2001 e-mail which was
20       20    marked as Exhibit 108.  Is that the e-mail that you were
21       21    referring to in paragraph 25?
22       22    A.  Yes, Wednesday, January 17th.
23       23    Q.  What in this particular e-mail -- what
24       24    information in this particular e-mail did you use to
25       25    base your upside adjustments in Q3 '01?
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00212:01    A.  It was just data point.  But I don't recall
2    02 the specifics of how I determined my upside adjustments.
3    03    Q.  If you can locate Exhibits 48, 56 and 77.
4    04 They're all one-page e-mails, if that helps.
5    05    A.  It won't.
6    06       MR. ETH:  Are they from today or yesterday?
7    07       MR. DE GHETALDI:  Yesterday, I believe.
8    08       MR. ETH:  I don't know -- I don't know if
9    09 yesterday's are in this pile.
10   10       MR. DE GHETALDI:  They are.
11   11       MR. ETH:  They are?
12   12       MR. DE GHETALDI:  Yeah.
13   13       MR. ETH:  Okay.
14   14       MR. DE GHETALDI:  Or they should be.  There's
15   15 one.
16   16       MR. NADOLENCO:  You have them?
17   17       THE WITNESS:  Yeah I do.
18   18       MR. DE GHETALDI:  Okay, good.
19   19    Q.  Let's start with Exhibit 48.  Is that the
20   20 e-mail from David Winton dated January 11th, 2001 that
21   21 you were referring to in paragraph 25 of Exhibit 243?
22   22    A.  Yes.
23   23    Q.  Do you know what information included in
24   24 Exhibit 48 you used to generate your upside adjustments
25   25 in Q3 '01?
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00213:01    A.  Are you -- which particular upside report?
2    02    Q.  Well, I mean, it -- I don't know.  You say
3    03 here "upside adjustments -- during Q3 '01, upside
4    04 adjustments included information based on these
5    05 particular e-mails.  Which upside adjustments did you
6    06 mean?
7    07    A.  Obviously anything that happened after the
8    08 date of the e-mail --
9    09    Q.  Okay.
10   10    A.  -- versus prior thereto.
11   11    Q.  Okay.  Do you recall in any more detail which
12   12 particular upside adjustments you were referring to in
13   13 your affidavit?
14   14    A.  No, I do not.
15   15    Q.  Do you know which information contained in
16   16 Exhibit 48 you used to make the upside adjustments that
17   17 you were referring to in paragraph 25?
18   18    A.  Again, I do not recall the specifics of how I
19   19 arrived at the upside amounts.
20   20    Q.  If you could turn to Exhibit 56.  It's the
21   21 English e-mail.
22   22    A.  Mm-hm.
23   23    Q.  Is Exhibit 56 the English e-mail dated
24   24 January 17th, 2001 that you were referring to in
25   25 paragraph 25?
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00214:01    A.  Yes, it is.
2    02    Q.  Okay.  Do you recall what information
3    03 contained in Exhibit 56 you used to derive your upside
4    04 adjustments that you were referring to in paragraph 25?
5    05    A.  In this e-mail, as well as this e-mail, as
6    06 well as -- well, these first two e-mails, since it's the
7    07 ones that we talked about, I would have looked at the
8    08 forecast that they had said that they were going to
9    09 stick with, as well as their upside, as well as their
10   10 downside.  I would have evaluated it all.
11   11    Q.  And if you could turn to Exhibit 77, which is
12   12 the Sarah Kopp e-mail.
13   13    A.  Mm-hm.
14   14    Q.  Is Exhibit 77 the Sarah Kopp e-mail dated
15   15 January 18th, 2001 that you were referring to in
16   16 paragraph 25?
17   17    A.  Yes.
18   18    Q.  And do you recall what information contained
19   19 in that e-mail you were basing your upside adjustments
20   20 that you referred to in paragraph 25?
21   21    A.  I would have considered all of it.
22   22    Q.  If you could look at paragraph 28 at the
23   23 bottom of page 9 of Exhibit 243.
24   24    A.  Mm-hm.
25   25    Q.  You say, "As a historical matter,
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00215:01    before Q3 '01 the potential forecast, which
2    02    include [sic] upside adjustments, proved to
3    03    be our most accurate forecast."
4    04       I'd just like you to clarify me -- clarify for
5    05    me, please, which potential forecast were you talking
6    06    about there?  Are you talking about the potential
7    07    forecast for total revenue?
8    08    A.  In the upside analysis, there's the column
9    09    "forecast," "upside" and "potential,"
10   10    Q.  Yes.
11   11    A.  It's that column, "potential."
12   12    Q.  All right.  For all of the figures within that
13   13    column?  That is, for --
14   14    A.  For revenue.
15   15    Q.  For revenue.
16   16    A.  For license revenues is what I'm referring to
17   17 here.
18   18    Q.  License revenues, okay.  Thank you.  That's --
19   19    I just wanted that clarified.
20   20       And where you say "As a historical matter,
21   21    before Q3 '01" in paragraph 28, how long a historical
22   22    period are you talking about there?
23   23    A.  As discussed yesterday, I don't recall
24   24    exactly, but clearly in the 12 to 24 months -- and I'm
25   25    guessing on the latter part, 24 months -- prior -- or I
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00216:01  should say -- put it in terms of quarters -- or a
2      02   year -- the last year, as well as probably in the last
3      03   two years prior to this point, our forecasts were far
4      04   more predictive of the actual outcome of the quarter.
5      05   That is my recollection.
6      06      Q.  Okay.  And you say that they are far more
7      07   accurate than the unadjusted forecasts submitted by the
8      08   senior sales personnel when compared to the actual
9      09   results for the quarter.
10     10      A.  Mm-hm.
11     11      Q.  Are you talking about the cumulative forecasts
12     12   submitted by the senior sales personnel, or are you
13     13   talking about comparison of your potential forecast
14     14   compared to the unadjusted forecasts submitted by
15     15   individual senior sales personnel?
16     16      A.  In total, on a consolidated basis, my upside
17     17   numbers generally were more accurate than the numbers
18     18   that were presented -- or provided by the senior sales
19     19   folk.
20     20         THE REPORTER:  Senior sales what?
21     21         THE WITNESS:  Folk.  EVPs, sorry.
22     22         MR. DE GHETALDI:  Q.  If you could turn to
23     23   page 7, please.  In the middle of paragraph 20, it says,
24     24         "Upside reports are regularly prepared
25     25   each Friday and circulated weekly to
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00217:01  certain members of the executive management
2      02   committee, including Ellison, Henley and
3      03   Catz, on Monday mornings."
4      04         Is that an accurate statement?
5      05      A.  Yes.
6      06      Q.  So upside reports are prepared every week?
7      07      A.  If we -- as I explained to you before, if
8      08   there wasn't a forecast week, we would print out the
9      09   previous week's upside report and bring it to the EC
10     10   meeting.  And if by chance there were any known
11     11   adjustments to the forecast that were not -- you know,
12     12   that came in between the submitted forecast, then we
13     13   would reflect them in those reports.
14     14      Q.  And the types of changes that would be
15     15   reflected in those reports would include changes in
16     16   pipeline as well as forecast, correct?
17     17      A.  If we were advised that there was a change.
18     18      Q.  Would those reports receive new dates or would
19     19   they simply carry over the last upside report's dates
20     20   and have different numbers?
21     21      A.  We had a practice of saving the file based on
22     22   the date.  So they would have had a different date if
23     23   they were adjusted.
24     24      Q.  Okay.  And that sentence that I read says that
25     25   these reports were circulated to certain members of the
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00218:01  executive management committee on Monday mornings.
2      02   Those executive management committee meetings took place
3      03   in the afternoons on Mondays, right?
4      04      A.  They started whenever Larry got there.  So he
5      05   would sometimes show up at 11; he would sometimes show
6      06   up at 11:30; he could show up at noon, or he could show
7      07   up not at all.  11 is still in the morning.
8      08      Q.  Yes, it is.  When were they -- did they have a
9      09   regularly scheduled start time?  I mean, given that Mr.
10     10   Ellison --
11     11      A.  On my calendar I believe I have it from 11 to
12     12   3.
13     13      Q.  Okay.  Did Mr. Ellison appear to you, during
14     14   the executive committee meetings, to pay much attention
15     15   to your upside reports?
16     16         MR. NADOLENCO:  Objection to form.
17     17         THE WITNESS:  Larry had a practice of wanting
18     18   to hear directly from the sales EVPs themselves as to
19     19   what their forecast was.  He felt that they should be
20     20   able to speak to their own forecast.  So he would
21     21   occasionally refer to the hard copy report, but
22     22   generally speaking, he has a dialogue every EC meeting
23     23   with the sales EVPs on their forecast.
24     24         MR. DE GHETALDI:  Q.  Did he generally have a
25     25   dialogue with you on your upside adjustments at these
```

Minton, Jennifer (Vol. 02) - 04/01/2004 4/1/2004 11:50:00 AM

```
1    00219:01  executive committee meetings?
2      02      A.  We may have discussed them during the meeting
3      03   at certain times.  But I cannot recall a specific
4      04   meeting when we did.
5      05      Q.  Okay.  My question was whether he generally
6      06   had a dialogue with you about your numbers the way he
7      07   did with the executive vice presidents about their
8      08   numbers.
9      09      A.  No.  He generally speaks directly to the
10     10   executive sales VPs.
11     11      Q.  At any -- well ... in -- if you could look in
12     12   Exhibit 243, still on page 7, but up in paragraph 19,
13     13   in the middle of that paragraph, it -- the affidavit
14     14   says,
15     15         "In all of this time, I've never known
16     16   of or relied on a", quote, "comfort gap,"
17     17   end quote, "between license revenue growth
18     18   percentages and pipeline growth
19     19   percentages, as defined by plaintiffs in
20     20   paragraph 58 of their second amended
21     21   complaint, as an indicator of Oracle's
22     22   financial performance."
23     23         Do you see that there?
24     24      A.  Mm-hm.
25     25      Q.  Have you ever heard of something called a
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

| | |
|---|---|
| 1 | 00220:01 revenue gap? |
| 2 | 02      MR. NADOLENCO: Objection to form. Vague. |
| 3 | 03      THE WITNESS: I don't recall hearing of |
| 4 | 04 anything called a revenue gap. |
| 5 | 05      MR. DE GHETALDI: Q. Do you recall seeing |
| 6 | 06 revenue gap as a part of Oracle's pipeline reporting |
| 7 | 07 packages? |
| 8 | 08      A. I don't understand the question. |
| 9 | 09      Q. Do you recall that Oracle's pipeline reporting |
| 10 | 10 packages contained a page titled "Revenue Gap" that |
| 11 | 11 analyzed the difference between the license revenue |
| 12 | 12 growth percentages and the pipeline growth |
| 13 | 13 percentages -- |
| 14 | 14      A. May I refer to the document? |
| 15 | 15      Q. -- in fiscal year -- in fiscal year 2001? |
| 16 | 16      A. May I refer to the document? |
| 17 | 17      Q. Yes. It's not on this one, but I can find one |
| 18 | 18 for you. Take a break and we'll find one for you. It's |
| 19 | 19 a different -- it's a different one. |
| 20 | 20      A. I don't recall one. We have -- this is the |
| 21 | 21 report that my group would produce. And there is no |
| 22 | 22 revenue gap on this report. |
| 23 | 23      Q. That's true. And I'll -- we'll take a break |
| 24 | 24 and I'll find one for you when we take a break. Just a |
| 25 | 25 couple minutes. And we're still going to meet our 3:00 |

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

| | |
|---|---|
| 1 | 00221:01 time. |
| 2 | 02      If you could turn, please, to page 11 in |
| 3 | 03 Exhibit 243. In the second sentence of paragraph 32, it |
| 4 | 04 reads. |
| 5 | 05      "Pipeline data represents the total |
| 6 | 06 value of license deals that the sales |
| 7 | 07 organization reasonably believes will close |
| 8 | 08 in a given quarter." |
| 9 | 09      Is that an accurate definition of what the |
| 10 | 10 pipeline includes? |
| 11 | 11      A. It could be better. |
| 12 | 12      Q. Okay. How? How would you improve it? |
| 13 | 13      A. I would say that the sales organization is |
| 14 | 14 working on in a given quarter. |
| 15 | 15      Q. Right. This sentence is a little too strong, |
| 16 | 16 I think, would you agree, in use of the phrase |
| 17 | 17 "reasonably believes will close"? |
| 18 | 18      A. I agree. |
| 19 | 19      Q. Okay. |
| 20 | 20      MR. NADOLENCO: Dario? |
| 21 | 21      MR. DE GHETALDI: Yes. |
| 22 | 22      MR. NADOLENCO: I notice that the word |
| 23 | 23 "decline" is written on here. Is that something your -- |
| 24 | 24 your team did? |
| 25 | 25      MR. DE GHETALDI: I have no idea. |

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

| | |
|---|---|
| 1 | 00222:01      MR. NADOLENCO: Okay. |
| 2 | 02      MR. DE GHETALDI: I really don't. I saw that |
| 3 | 03 too. It just shows that there is a decline. |
| 4 | 04      Q. Then if you could turn, please, to the next |
| 5 | 05 page, 12, in paragraph 33. Right in the middle of the |
| 6 | 06 page there's a sentence that reads. |
| 7 | 07      "Ultimately, Oracle's conversion rate |
| 8 | 08 for Q3 '01 proved to be dramatically lower |
| 9 | 09 than it had been in previous years" -- or |
| 10 | 10 "in prior periods." I'm sorry. |
| 11 | 11      Do you see that? |
| 12 | 12      A. Yes, I do. |
| 13 | 13      Q. Can you explain for me how the conversion rate |
| 14 | 14 that you are referring to here would be calculated. We |
| 15 | 15 talked about several conversion rates over the last two |
| 16 | 16 days, and I'm just wondering if this is one of those or |
| 17 | 17 a different one. |
| 18 | 18      A. It's the pipeline conversion rate. |
| 19 | 19      Q. At what point in time? |
| 20 | 20      A. I'd have to go back and look at the data, but |
| 21 | 21 I presume that it would be through the entire period, |
| 22 | 22 based on the next statement. |
| 23 | 23      MR. DE GHETALDI: All right. Well, we have |
| 24 | 24 just a few minutes left on the tape. Why don't we take |
| 25 | 25 the opportunity to take our last break of the day, and |

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

| | |
|---|---|
| 1 | 00223:01 we'll come back and finish. |
| 2 | 02      THE VIDEOGRAPHER: This is the end of Volume |
| 3 | 03 II, tape 2 in the deposition of Jennifer Minton on |
| 4 | 04 April 1, 2004, the time, 2:25 p.m. We're off the |
| 5 | 05 record. |
| 6 | 06      (Recess taken). |
| 7 | 07      THE VIDEOGRAPHER: This marks the beginning of |
| 8 | 08 Volume II, tape 3 in the deposition of Jennifer Minton |
| 9 | 09 on April 1, 2004, the time, 2:36 p.m. We are on the |
| 10 | 10 record. |
| 11 | 11      MR. DE GHETALDI: Q. I've handed you a copy |
| 12 | 12 of Exhibit 138. And during the break I asked you to |
| 13 | 13 turn to page 11 there. |
| 14 | 14      Do you recognize the type of calculation that |
| 15 | 15 is being made on this page to derive the numbers in the |
| 16 | 16 column on the far right-hand side that are titled |
| 17 | 17 "Growth Cap"? |
| 18 | 18      A. I don't recognize this page at all. I do not |
| 19 | 19 recall that we ever did this. Obviously it was in the |
| 20 | 20 package, but I just don't remember seeing it. |
| 21 | 21      Q. Okay. Going back to Exhibit 243. And please |
| 22 | 22 turn to page 15. The second sentence reads, "Throughout |
| 23 | 23 January 2001, however" -- |
| 24 | 24      A. Which paragraph? |
| 25 | 25      Q. Oh, I'm sorry, paragraph 44. |

1  00224:01  A.  Okay.

2  02  Q.  The second sentence reads, "Throughout

3  03  January 2001, however, our forecast

4  04  consistently showed that we would achieve

5  05  our public projections."

6  06  Do you see that?

7  07  A.  Mm-hm.

8  08  Q.  What forecast are you referring to in that

9  09  sentence?

10  10  A.  I believe I was referring to our EPS.

11  11  Q.  And similarly, then, the public projections

12  12  would be the public projections for EPS only?

13  13  A.  That's what I believe I was referring to, yes.

14  14  Q.  It is true, is it not, that the forecast for

15  15  license by January 29th were below the 30 percent

16  16  constant dollar guidance?

17  17  MR. ETH:  Objection to form.

18  18  THE WITNESS:  The actuals, as you can see on

19  19  page 11, the license revenue was 24 percent, just one

20  20  point away from 25 percent.

21  21  MR. DE GHETALDI:  The --

22  22  THE WITNESS:  But again, this did not give me

23  23  any rise for concern, given that we have very

24  24  back-ended-loaded -- or back-end-loaded quarters.

25  25  MR. DE GHETALDI:  Q.  According to the

---

1  00225:01  January 29th upside report that's Exhibit 134, the

2  02  forecast for license revenue was 23 percent, and the

3  03  potential forecast --

4  04  A.  No, that's not correct.  If you look here on

5  05  the actuals, license was 24 percent.

6  06  Q.  I was talking about the budget rate, the

7  07  constant dollar numbers.  That was what my question was

8  08  about.

9  09  A.  What is your question?

10  10  MR. ETH:  Where are you reading?

11  11  MR. DE GHETALDI:  I'm looking at the upside

12  12  report for January 29th, which is Exhibit 134.  And

13  13  I'm looking at page with Bates number 3610.

14  14  Q.  And it shows that the forecast growth for

15  15  license revenue was 23 percent and the potential growth

16  16  for license revenue was 27 percent as of that date,

17  17  correct?

18  18  A.  That is correct.

19  19  Q.  And you were not referring to those numbers,

20  20  then, in paragraph 44 of Exhibit 243; is that correct?

21  21  A.  Correct.  I was referring to the actuals.

22  22  Q.  Just for EPS?

23  23  A.  We only calculate EPS in actuals.

24  24  Q.  I just want to make sure that the record is

25  25  clear that in the second sentence of Exhibit 40 --

---

1  00226:01  paragraph 44 of Exhibit 243 that the forecast that you

2  02  are referring to was only the forecast for EPS and not

3  03  the forecast for license revenue.

4  04  A.  Correct.

5  05  Q.  Did the implementation of OSO have an effect

6  06  on the number of deals that appeared in Oracle's

7  07  pipeline figures?

8  08  A.  The implementation of OSO.

9  09  Q.  Yeah.

10  10  A.  No, it's not the implementation of OSO that

11  11  impacts the way that the pipeline figures are shown.

12  12  Q.  What was it, if anything?

13  13  A.  Well, it's what data is put into OSO by the

14  14  sales organization.

15  15  Q.  I see.  Did -- are you aware of any study that

16  16  was done to determine whether the method of data

17  17  inputting -- or the method of putting data into OSO

18  18  affected the pipeline figures?

19  19  A.  From time to time, there would be instances

20  20  where salesmen -- or sales reps would not properly

21  21  characterize their opportunities in OSO.

22  22  Q.  Okay.  My question was whether there was

23  23  any -- whether you're aware of any study that quantified

24  24  the effect of the use of OSO on the pipeline numbers.

25  25  A.  I'm not aware of a study.

---

1  00227:01  Q.  I know you're confused by the question.  Let

2  02  me just see if I can find my reason for asking it.  If

3  03  you could locate Exhibit 239, which is your initial

4  04  interview.

5  05  A.  Page number, please.

6  06  Q.  Bottom of page 8 and continuing on to the top

7  07  of page 9, where it says,

8  08  "Minton explained that an accurate

9  09  comparison of the pipeline between Q3 FY

10  10  '01 and Q3 FY '00 was not possible because

11  11  OSO was not used consistently across time

12  12  in FY '00.  She explained that OSO rolled

13  13  out slowly worldwide, but that by Q3 FY '01

14  14  it was almost complete.  She noted that as

15  15  a result of more deals being captured

16  16  electronically in the pipeline, the

17  17  conversion ratio numbers were dropping

18  18  slightly."

19  19  And my question referred to this section of

20  20  your interview summary and caused me to ask whether

21  21  you're aware of any studies that had been done that

22  22  quantified the difference between the way that deals

23  23  were entered in -- prior to the implementation of OSO

24  24  and after the implementation of OSO.

25  25  A.  I'm not aware of a study that analyzed that.

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00228:01    Q.  Is it your understanding that the effect on
2        02    the conversion ratio numbers was only slight?
3        03      A.  I don't recall. But if we're capturing more
4        04    of the pipeline and your pipeline value goes up, then
5        05    your conversion ratio would go down if your forecast was
6        06    held steady. It's a simple mathematical calculation.
7        07      Q.  Yes. And my question went to the degree of
8        08    the effect on the conversion ratio. And I understand
9        09    the mathematics of it. I'm just wondering what your
10       10    sense of the degree of that effect was.
11       11      A.  I don't recall.
12       12         MR. DE GHETALDI: All right. Well, that'll do
13       13    it, with the usual understanding that the parties have
14       14    differing views on whether we'll be back or not.
15       15         MR. ETH: That's fine.
16       16         THE VIDEOGRAPHER: At the end of Volume II,
17       17    tape 3, this concludes today's deposition of Jennifer
18       18    Minton. The original videotapes will be retained by Dan
19       19    Motiaz Video Productions LLC at 182 Second Street, Suite
20       20    202, San Francisco, California, 94105, telephone
21       21    415-624-1300. The time is 2:49 p.m. We're off the
22       22    record.
23       23         (Deposition concluded at 2:49 p.m.)
24       24
25       25         ---oOo---
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00229:01         CERTIFICATE OF WITNESS
2        02
3        03
4        04
5        05         I, the undersigned, declare under penalty of
6        06    perjury that I have read the foregoing transcript and I
7        07    have made any corrections, additions or deletions that I
8        08    was desirous of making; that the foregoing is a true and
9        09    correct transcript of my testimony contained therein.
10       10         EXECUTED this _____ day of _____,
11       11    200_, at _____.
12       12
13       13
14       14
15       15
16       16
17       17         _____
18       18              Signature of Witness
19       19
20       20
21       21
22       22
23       23
24       24
25       25
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00230:01         REPORTER CERTIFICATE
2        02         I hereby certify that the witness in the
3        03    foregoing deposition was by me duly sworn to testify to
4        04    the truth, the whole truth and nothing but the truth in
5        05    the within-entitled cause; that said deposition was
6        06    taken at the time and place herein named; that the
7        07    deposition is a true record of the witness's testimony
8        08    as reported to the best of my ability by me, a duly
9        09    certified shorthand reporter and a disinterested person,
10       10    and was thereafter transcribed under my direction into
11       11    typewriting by computer; that the witness was given an
12       12    opportunity to read and correct said deposition and to
13       13    subscribe the same. Should the signature of the witness
14       14    not be affixed to the deposition, the witness shall not
15       15    have availed himself or herself of the opportunity to
16       16    sign or the signature has been waived.
17       17         I further certify that I am not interested in
18       18    the outcome of said action, nor connected with, nor
19       19    related to any of the parties in said action, nor to
20       20    their respective counsel.
21       21         IN WITNESS WHEREOF, I have hereunto set my
22       22    hand this 16th day of April, 2004.
23       23
24       24         _____
25       25
```

Minton, Jennifer (Vol. 02) - 04/01/2004  4/1/2004  11:50:00 AM

```
1   00231:01         ROBERT BARNES ASSOCIATES
2        02         San Francisco, California  94102
3        03
4        04              Date: 4/17/04
5        05    TO: JENNIFER L. MINTON
6        06       JORDAN ETH, ESQ.
7        07       San Francisco, CA  94105
8        08
9        09    SPECIAL TITLE (RULE 1550(B))
10       10    Deposition taken April 1, 2004
11       11    Dear JENNIFER L. MINTON:
12       12    The original transcript of your deposition taken in the
13       13    at this office for your reading, correcting and signing.
14       14    copy. Please notify this office and all counsel in
15       15    deposition transcript.
16       16    Your rights regarding signature of this deposition are
17       17    original deposition transcript will be sealed in
18       18
19       19    transcript of your deposition, please contact this
20       20    Friday, to make an appointment.
21       21
22       22         Sincerely,
23       23
24       24         CSR No. 6438
25       25    cc: All counsel
```

# EXHIBIT NN

**Page 1**

```
 1           IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3
 4    In re ORACLE CORPORATION
      SECURITIES LITIGATION,
 5
 6    vs.              Master File No.: C-01-0988-MJJ
 7    This Document Relates To:,
 8      ALL ACTIONS.
 9    _____/
10
11           ---o0o---
12            CONFIDENTIAL
13      DEPOSITION OF NICHOLAS CLASSICK
14         Wednesday, April 12, 2006
15           ---o0o---
16
17        SHEILA CHASE & ASSOCIATES
           REPORTING FOR
18         LiveNote World Service
           221 Main Street, Suite 1250
19         San Francisco, California 94105
           Phone: (415) 321-2311
20         Fax: (415) 321-2301
21
22    Reported by
      APRIL DAWN HEVEROH, CSR
23    CSR No. 8759
24
25
```

**Page 2**

```
 1      DEPOSITION OF NICHOLAS CLASSICK, 4/12/06
 2
 3            I N D E X
           INDEX OF EXAMINATION
 4                          PAGE
      EXAMINATION BY MR. BRITTON          5
 5
            ---o0o---
 6
            INDEX OF EXHIBITS
 7
      DESCRIPTION                    PAGE
 8
      Exhibit 1   General Business FY01 Planning Summary,    41
 9         15 pages
10    Exhibit 2   Quota Modeling Summary, 8 pages       69
11    Exhibit 3   Business (OPS) Review, Q2 FY01, 24 pages  115
12    Exhibit 4   E-mail from Mark J. Barrenechea dated     142
           December 4, 2000, 2 pages
13
      Exhibit 5   E-mail from Karen Werner dated December 4,  143
14         2000, one page
15    Exhibit 6   Document entitled Q3 Forecast, 5 pages    145
16    Exhibit 7   Forecast Worksheet dated 12/4/2000,      147
           16 pages
17
      Exhibit 8   Printout of slide presentation, 28 pages  158
18
      Exhibit 9   Forecast Worksheet dated 1/4/2001,      174
19         17 pages
20    Exhibit 10  Forecast Worksheet dated 1/10/2001,      179
           13 pages
21
      Exhibit 11  Forecast Worksheet dated 1/31/2001,      186
22         9 pages
23    Exhibit 12  E-mail dated January 29, 2001 regarding    191
           US Commercial License Summary, one page
24
      Exhibit 13  E-mail dated March 3, 2001 re: What I     193
25         need from you, 6 pages
26    Exhibit 14  14-26, Forecast Summary Reports in binder  199
           separated by tabs
27
```

**Page 3**

```
 1      DEPOSITION OF NICHOLAS CLASSICK, 4/12/06
 2
      Exhibit 27  Approval Request for Veritas Corporation,  212
 3         4 pages
 4    Exhibit 28  E-mail correspondence dated October 19,   222
           2000, 5 pages
 5
      Exhibit 29  Deposition transcript of Nicholas Classick, 231
 6         279 pages
 7
            ---o0o---
 8
 9
      SECTIONS OF TRANSCRIPT MARKED BY COUNSEL:
10
      Page 19, Line 2
11
      Page 19, Line 15
12
            ---o0o---
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1           BE IT REMEMBERED that on Wednesday, April 12,
 2    2006, commencing at the hour of 9:02 A.M. thereof, at
 3    the offices of Lerach, Coughlin, Stoia, Gellar, Rudman &
 4    Robbins, LLP, 100 Pine Street, Suite 2600, San
 5    Francisco, California, before me, APRIL DAWN HEVEROH,
 6    CSR, a Certified Shorthand Reporter for the State of
 7    California, personally appeared
 8           NICHOLAS CLASSICK,
 9    called as a witness by the Plaintiffs herein, who, being
10    by me first duly sworn, was thereupon examined and
11    testified as hereinafter set forth.
12           ---o0o---
13    Appearing as counsel on behalf of Plaintiffs:
14      DOUGLAS R. BRITTON, Esquire
        GAVIN M. BOWIE, Esquire
15      LERACH, COUGHLIN, STOIA, GELLAR, RUDMAN & ROBBINS
        100 Pine Street, Suite 2600
16      San Francisco, California 94111
        (415) 288-4545
17      E-mail: dbritton@lerachlaw.com
18    Appearing as counsel on behalf of Defendants:
19      MICHELE F. KYROUZ, Esquire
        KYRA G. BUSBY, Esquire
20      LATHAM & WATKINS
        505 Montgomery Street, Suite 1900
21      San Francisco, California 94111-2562
        (415) 391-0600
22      E-mail: michele.kyrouz@lw.com
          kyra.busby@lw.com
23
24    Also present: James Terrell, Videographer
25
```

5

1      ---o0o---

2      P R O C E E D I N G S

3      ---o0o---

4      THE VIDEOGRAPHER:  This begins the videotaped

5   deposition of Nick Classick, Tape 1, Volume 1, in the

6   matter in re Oracle Corporation Securities Litigation as

7   filed in the United States District Court for the

8   Northern District of California, master file

9   No. C010988MJJ.

10      Today's date is April 12, 2006.  The time on

11   the video monitor is 9:12.  The video operator today is

12   James Terrell representing LiveNote World Service

13   located at 221 Main Street, Suite 1250, San Francisco,

14   California, 94105.  The phone number is (415) 321-2300.

15   The court reporter is April Heveroh of Sheila Chase &

16   Associates reporting on behalf of LiveNote World

17   Service.

18      Today's deposition is being taken on behalf of

19   the plaintiff and is taking place at -- defendant --

20      The deposition is noticed by Defendants'

21   counsel?

22      MR. BRITTON:  No, by Plaintiffs'.

23      THE VIDEOGRAPHER:  Plaintiffs' counsel.  I

24   apologize.

25      -- by plaintiff's counsel and is taking place

6

1   at 100 Pine Street in San Francisco, California.

2      If counsel will now please introduce yourself

3   and state whom you represent.

4      MR. BRITTON:  Doug Britton with Lerach

5   Coughlin on behalf of Plaintiffs.

6      MR. BOWIE:  Gavin Bowie with Lerach Coughlin

7   on behalf of Plaintiffs.

8      MS. KYROUZ:  Michelle Kyrouz and Kyra Busby

9   from Latham & Watkins on behalf of the defendants and

10   the witness.

11      THE VIDEOGRAPHER:  Thank you.  Now the

12   reporter may swear the witness in before we begin.

13      (Whereupon, the witness was sworn by the

14      Certified Shorthand Reporter.)

15      ---o0o---

16      EXAMINATION BY BRITTON

17      ---o0o---

18      MR. BRITTON:  Q.  Good morning, Mr. Classick.

19      A.  Good morning.

20      Q.  We met off the record, and I'll introduce

21   myself again on the record.  My make is Doug Britton

22   with Lerach Coughlin, and I represent the plaintiffs in

23   this class action lawsuit against Oracle and several of

24   its officers.

25      You've had your deposition taken before; is

7

1   that right?

2      A.  Yes.

3      Q.  So you realize, sitting here today, that

4   you're under oath, and that your testimony has the same

5   seriousness as if it was given in a court of law?

6      A.  Yes.

7      Q.  Subject to the same penalties of perjury?

8      A.  Yes.

9      Q.  Throughout this deposition I may be asking you

10   questions and your counsel may object.

11      Do you understand that you're obligated to

12   answer my questions unless your counsel specifically

13   instructs you not to?

14      A.  I do.

15      Q.  What did you do to prepare for your deposition

16   today?

17      A.  I flew into San Francisco yesterday and met

18   with counsel yesterday afternoon.

19      Q.  And who did you meet with?

20      A.  The two attorneys that are representing or

21   defending us.

22      Q.  Sitting here today?

23      A.  Yes.

24      Q.  Did you meet with anybody else?

25      A.  No.

8

1      Q.  Okay.  And when did you start your meeting?

2      A.  Approximately 11:30.

3      Q.  When did you finish?

4      A.  Around 5:00 o'clock.

5      Q.  Did you do anything else to prepare for your

6   deposition today?

7      A.  No.

8      Q.  Did you speak to anybody prior to your

9   meetings yesterday with counsel?

10      A.  No.

11      Q.  Did you review any documents in preparation

12   for your deposition today?

13      A.  Yes.

14      Q.  Okay.  Can you describe what documents those

15   were?

16      A.  It was a number of reports, e-mails,

17   presentations.

18      Q.  How many documents would you say, in total?

19      A.  It's hard to say.

20      Q.  You can give me an estimate.

21      A.  Six or eight.

22      Q.  Did any of these documents refresh your

23   recollection about events that happened back in the

24   2000/2001 time period?

25      A.  One of them did, yes.

9

1　Q.　Okay. Can you describe how it did that?
2　A.　It helped -- it helped clarify some of the
3　numbers during that time frame.
4　Q.　Okay. And what numbers are you talking about?
5　A.　Forecast numbers, hiring numbers, staffing,
6　head count, budgets.
7　Q.　Okay. And does the document that you're
8　referring to have a name?
9　A.　It was the quarterly business review from
10　October.
11　Q.　And when you say "quarterly business review",
12　what do you mean by that?
13　A.　Every quarter we would have a business review
14　with some of our managers.
15　Q.　Okay. So it was a business review --
16　withdrawn.
17　　　Did you prepare the document that you're
18　referring to?
19　A.　Yes, I did.
20　Q.　You did. Okay.
21　　　And when did you prepare that document?
22　A.　Prior to the meeting. I don't know
23　specifically what days.
24　Q.　What was the date of the quarterly review?
25　A.　I don't have -- I don't know for sure what the

10

1　date was.
2　Q.　But it was in October?
3　A.　It looked like it, yes.
4　Q.　October of 2000?
5　A.　Yes.
6　Q.　Okay. From the second quarter of 2001?
7　A.　Say that again, please.
8　Q.　Withdrawn.
9　　　What is your understanding of Oracle's fiscal
10　quarters? When do they start; when do they end?
11　A.　Our fiscal year starts in June and ends in
12　May.
13　Q.　Okay. So when would the second quarter of
14　2001 have started and ended?
15　A.　Second quarter would be September, October,
16　November would be our second quarter fiscal year '01.
17　Q.　So the document that we're referring to, the
18　quarterly business review, that was prepared in the
19　second quarter of 2001; is that right?
20　A.　That's calendar year. Second quarter, fiscal
21　year '01.
22　Q.　Right.
23　A.　Right. Fiscal.
24　Q.　Let's set some ground rules. When I'm
25　referring to quarter and fiscal, or quarter and year,

11

1　I'll be referring to the fiscal year, unless I say
2　otherwise.
3　　　Is that okay?
4　A.　Sure.
5　Q.　Now, the quarterly business review, how often
6　did you prepare a document like that?
7　A.　We normally presented it twice a year.
8　Q.　Okay. So that's the Q2 and Q4 operations
9　reviews that you used to have with George Roberts?
10　A.　Yes.
11　Q.　So it was the operations review that you
12　participated in the second quarter of 2001 with George
13　Roberts?
14　A.　Yes.
15　Q.　And you prepared -- at least participated in
16　preparing that review; is that right?
17　A.　Yes.
18　Q.　Okay. And did you use that document to
19　present any information during the reviews? During the
20　second quarter of review.
21　A.　I'm sorry. Ask the question again.
22　Q.　Let me start again.
23　　　Did you use that document to present
24　information to anybody at the second quarter operations
25　review with George Roberts?

12

1　A.　Yes.
2　Q.　Okay.
3　　　Counsel, we would like to have that
4　document produced, if we can.
5　　　MS. KYROUZ: Oh, it's been produced.
6　　　MR. BRITTON: Well, the Bates range.
7　　　MS. KYROUZ: Do you not know what he's talking
8　about?
9　　　MR. BRITTON: Well, I haven't seen it, so --
10　　　MS. KYROUZ: Oh, you haven't?
11　　　MR. BRITTON: Q. Okay. So while they're
12　getting that out, did you -- did any of the other
13　documents that you saw refresh your recollection about
14　events that happened in the 2000/2001 time period?
15　A.　No.
16　Q.　Did you author any of the reports that you saw
17　in preparation for your deposition today?
18　A.　No.
19　Q.　Were you ever asked to --
20　　　Now, this question doesn't relate to your
21　deposition today. Were you ever asked to collect and
22　produce documents in connection with this litigation or
23　with any litigation in either Delaware or in California?
24　A.　Yes.
25　Q.　Okay. When were you asked to do that?

13

1    A. I'm not clear on the date.
2    Q. Can you give me the year?
3    A. Prior to that, I'm sure.
4    Q. Okay.
5    A. I'm not clear on the date.
6    Q. Was it -- can you give me -- was it in 2001?
7    A. I can't even give you a year.
8    Q. Not even a year.
9    A. No.
10   Q. It's been a while since you looked through
11   those documents.
12   A. Yeah.
13   Q. And what did you do to look for and collect
14   documents?
15   A. I went through my file -- my written files,
16   hard copy files, and my electronic files on my computer.
17   Q. And what types of documents were you searching
18   for?
19   A. Mostly forecasting and business communications
20   to management regarding -- regarding the forecast.
21   Q. Did you have any -- a list of types of
22   documentation that you were looking for, anything
23   guiding you?
24      MS. KYROUZ: Objection. Vague.
25      THE WITNESS: Not that I remember.

14

1       MR. BRITTON: Q. Okay. How did you know what
2    to look for?
3       MS. KYROUZ: Objection. I'll ask counsel to
4    exclude from his answer any specific communications with
5    lawyers.
6       MR. BRITTON: Q. You can tell me if you had a
7    communication with a lawyer, but don't tell me what it
8    was about. I'm trying to get an idea of what you had in
9    front of you and what you were using to say, "Okay.
10   This document I should produce, this document I don't
11   need to."
12      Will you give me an explanation on that?
13   A. I was -- what I was looking for was during the
14   time frame, so there was no particular document. It was
15   more of a range of dates.
16   Q. So did you produce everything that you had in
17   that range of dates?
18   A. I did.
19   Q. So any piece of document, any scrap of paper,
20   whether it related to forecasting or not, you produced
21   during that period of time?
22   A. Yes.
23   Q. And what was the range of dates you were
24   looking for?
25   A. The second quarter '01.

15

1    Q. How about the third quarter of '01?
2    A. Not that I remember.
3       Could I make a comment?
4    Q. Sure.
5    A. I don't even know if it was that specific a
6    date, that window. I just really can't even remember
7    what, exactly, I was looking for. It wasn't -- I don't
8    think it was that fine line of a box. It really wasn't
9    a -- to my knowledge or recollection, it wasn't really a
10   90-day window.
11      MS. KYROUZ: Do you have any idea of what
12   range of dates?
13      THE WITNESS: I really don't.
14      MS. KYROUZ: Okay. Because you just said that
15   you thought that the range of dates was the second
16   quarter of '01. Do you --
17      THE WITNESS: Thinking back --
18      MR. BRITTON: Counsel --
19      MS. KYROUZ: I just want the testimony --
20      MR. BRITTON: I know, but I'll ask the
21   questions. You can redirect it.
22      THE WITNESS: Thinking through to that last
23   question, I don't really remember it being that finite a
24   window.
25      MR. BRITTON: Q. Okay. Can you give me how

16

1    many months it was or what you were looking for?
2    A. I really can't remember.
3    Q. How much time did you spend looking for and
4    collecting documents?
5    A. I don't -- half a day. Again, I just -- I
6    would have to guess on that.
7       MS. KYROUZ: He's not asking you to guess, so
8    if you don't recall, you should just say that you don't
9    recall.
10      THE WITNESS: Okay.
11      MR. BRITTON: Q. Yeah, but I am entitled to
12   an estimate, so if it's an estimate, an educated guess,
13   if you will, then you can.
14   A. I would estimate half a day.
15   Q. Now, when you said you looked for electronic
16   documents, what did you do?
17      Can we go off the record?
18      (Brief pause taken.)
19      MR. BRITTON: Q. Okay. How did you search
20   for and collect your electronic records?
21   A. I just -- I went through my files that were on
22   my laptop.
23   Q. Now, did that include the hard drive, things
24   that were saved to your hard drive and things that were
25   saved to the server or a network?

Classick, Nicholas  4/12/2006  9:02:00 AM

17

1   A.  Yes.
2   Q.  So both.
3   A.  Yes.
4   Q.  When you were looking for documents relating
5   to forecasting issues, did that include documents that
6   you may have had discussions about particular deals that
7   were going on during that period of time in which you
8   were searching?
9       MS. KYROUZ:  Objection.  Vague.
10      THE WITNESS:  Not that I remember.
11      MR. BRITTON:  Q.  So if you had a -- this is
12  just an example, just a hypothetical:  If you had a
13  document or an e-mail from somebody that said, "We
14  weren't able to close Veritas this quarter," would that
15  have been a document that you would have produced?
16      MS. KYROUZ:  Objection.  Misstates testimony.
17  He's already said he gave you a date range, not specific
18  topics.
19      MR. BRITTON:  Counsel, enough of the speeches,
20  please.  Really over the top.
21      MS. KYROUZ:  He's not going to answer
22  hypothetical questions, either, so --
23      MR. BRITTON:  Well, you can instruct him not
24  to answer it, but that's my hypothetical.
25      MS. KYROUZ:  Do you understand what he's

18

1   asking you?
2       MR. BRITTON:  Counsel, if you're not going to
3   instruct him not to answer, let me ask my question and
4   let him give a response.  If you want to clean it up
5   later, you can, but your interjecting yourself into the
6   deposition process like this is improper.
7       MS. KYROUZ:  Do you understand the question?
8       THE WITNESS:  If you could reword it again.
9       MR. BRITTON:  Q.  Yes.  I'm giving you an
10  example.  I'm trying to get an idea of the type of
11  documents that you pulled and produced for this
12  litigation.  If you had an e-mail exchange with one of
13  your managers during the period of time in which you
14  worked that said, "We're working on Veritas but it
15  doesn't look like Veritas is going to close this
16  quarter," is that a document that you would have pulled
17  and produced for this litigation?
18      MS. KYROUZ:  Objection.  Lacks foundation,
19  calls for speculation, improper hypothetical, misstates
20  prior testimony.
21      MR. BRITTON:  You can answer.
22      MS. KYROUZ:  You can answer if you can.
23      MR. BRITTON:  Counsel, I'm going to have to
24  call the court if you keep doing this, even for these
25  basic foundation questions.

19

1       MS. KYROUZ:  Counsel, ask a proper question.
2   If you want to go to the court on a hypothetical, go for
3   it.
4       MR. BRITTON:  Fine.
5       Can you mark that part of the record, please?
6       Q.  I'm just trying to get an idea, sir, of what
7   you pulled.  In this hypothetical, I'm not saying that
8   happened.  It's a purely hypothetical.  I'm just trying
9   to get an idea of the scope of what you produced for
10  this case.
11      MS. KYROUZ:  If you recall.
12      THE WITNESS:  Yeah, I don't recall.
13      MR. BRITTON:  Counsel, you don't have to tell
14  him, "If you recall."  You are really out of line right
15  now.
16      MS. KYROUZ:  Counsel, ask your question.  He's
17  giving you his best answer.
18      MR. BRITTON:  Can you mark that for the
19  record, please?
20      THE WITNESS:  I don't remember specific
21  documents at this point.
22      MR. BRITTON:  Q.  I'm trying to get an idea of
23  the subject matter of what you were pulling.
24      MS. KYROUZ:  Objection.  Asked and answered.
25      THE WITNESS:  Again, I was looking at -- I was

20

1   looking for documents for some period of time.  I can't
2   remember the specific time, and it was relating to the
3   business, you know, what was -- what we were working on,
4   what we were trying to close.  So -- and -- put those in
5   a pile and forward them to people that requested them.
6       MR. BRITTON:  Q.  Now, you had forecasting
7   reports that listed deals; is that right?
8       MS. KYROUZ:  Objection.  Vague.
9       MR. BRITTON:  Q.  Did you have any type of
10  forecasting reports that listed deals that your division
11  was working on --
12      MS. KYROUZ:  Same objection.  Lacks foundation
13  as to time frame when he had the documents.
14      THE WITNESS:  We have a forecast report that
15  lists the deals we're working on.
16      MR. BRITTON:  Q.  Okay.  And did you collect
17  any of those and produce those forecasting reports?
18      A.  To the best of -- the ones I could find, to
19  the best of my ability, I did.
20      Q.  Okay.  So you produced forecasting reports.
21      What about e-mails discussing individual
22  deals?  Forget about the hypothetical I gave you
23  earlier.  E-mails with anybody discussing individual
24  deals.
25      MS. KYROUZ:  Objection.  Vague.

21

1    THE WITNESS: I don't remember finding any.
2    MR. BRITTON: Q. Okay. Did you search for
3    those?
4    A. I assumed I did.
5    Q. Okay. But you can't sit here and tell me that
6    you actually did?
7    A. I can't say I didn't, either.
8    Q. Now, when you say you searched your files on
9    your laptop, what files are you talking about?
10   A. I would have files. Forecast would be a file.
11   I would have a file for a region, so going and looking
12   for those. Just the different files that you
13   electronically store stuff, store information.
14   Q. What about e-mails; did you search
15   electronically for any e-mails that you had sent or
16   received?
17   MS. KYROUZ: Objection. Asked and answered.
18   THE WITNESS: I normally delete my e-mails
19   daily.
20   MR. BRITTON: Q. That's not the question I'm
21   asking.
22   Did you search for them? Did you go into your
23   e-mail accounts and search for any e-mails during that
24   particular time period?
25   A. I do not remember.

22

1    Q. In connection with searching for and
2    collecting documents to produce in connection with the
3    litigations involving Oracle, did you speak to any of
4    your assistants -- withdrawn.
5    During that period of time, the fiscal
6    2000/fiscal 2001, were you working with any
7    assistants on a daily basis?
8    A. Would you clarify "assistants"? Like
9    administrative assistants?
10   Q. Yes. Did you have a secretary?
11   A. Yes.
12   Q. And what's your secretary's name? Withdrawn.
13   What was your secretary's name during that
14   time period?
15   A. I believe it was Julie Krebs.
16   Q. Did you have any other administrative
17   assistants that you worked with?
18   A. No.
19   Q. No.
20   Now, when you were looking to collect
21   documents and produce documents, did you speak to Julie
22   Krebs at all about anything she may have relating to the
23   time period in question?
24   A. No.
25   Q. Did Ms. Krebs assist you at all in terms of

23

1    sending out letters or sending out any other types of
2    correspondence during this period of time?
3    MS. KYROUZ: Objection. Vague.
4    THE WITNESS: We worked together on
5    correspondence.
6    MR. BRITTON: Q. Okay. How else did she help
7    you perform your job during the fiscal 2000/2001 time
8    period?
9    A. She would handle my schedule. She would
10   arrange all of our conference calls, all the travel, she
11   would put together -- I would write up presentations,
12   she would put in PowerPoint or -- I would handwrite
13   letters to customers; she would type those.
14   Q. Any other ways that you can think of?
15   A. No.
16   Q. The presentations that she helped you with,
17   did she type those in on her own?
18   MS. KYROUZ: Objection. Vague.
19   THE WITNESS: Yes.
20   MR. BRITTON: Q. The letters that you would
21   handwrite, did she type those into her own computer?
22   A. Yes.
23   Q. Okay. So she would type them in and then
24   bring you the letter to sign, essentially?
25   A. Yes.

24

1    Q. But the presentation she would type in and
2    hand you the draft and you would mark it up and give it
3    back; is that kind of the process?
4    A. Yes.
5    Q. Is Ms. Krebs still your secretary?
6    A. No.
7    Q. No.
8    When did she leave? When did she stop being
9    your secretary?
10   A. Years ago. I don't know, specifically.
11   Q. Was she your secretary during the time period
12   that you were searching for documents to produce?
13   MS. KYROUZ: Objection. Vague.
14   THE WITNESS: I believe so.
15   MR. BRITTON: Q. Who was your secretary after
16   Ms. Krebs left?
17   A. Lisa Johnson.
18   Q. Is she still your secretary?
19   A. Yes.
20   Q. How long has she been your secretary for?
21   Just an estimate.
22   A. Three years.
23   Q. Okay. You joined Oracle in 1995; is that
24   right?
25   A. Yes.

25

1    Q.   And you started as a regional manager?

2    A.   Yes.

3    Q.   Okay.  For Denver and Salt Lake?

4    A.   Yes.

5    Q.   And how long did you occupy that position for?

6    A.   About -- approximately 18 months.

7    Q.   Okay.  So '95 to '97, about that time period?

8    A.   I started in September of '95 till June of

9    '97, yes.

10   Q.   Okay.  Then you were promoted to group VP; is

11   that right?

12   A.   At that time it was Area Vice-President.

13   Q.   Area Vice-President.  Pardon me.

14        And you worked under Maryann Gillespie?

15   A.   Yes.

16   Q.   And that was in June of '97 you started that?

17   A.   Yes.

18   Q.   Can you describe the corporate structure for

19   me at that point in time in terms of majors versus

20   General Business, North American sales?  I'm just trying

21   to get an idea of the division you worked in under

22   Maryann Gillespie.

23   A.   Okay.  Maryann Gillespie, she had the General

24   Business for the western part of the United States, and

25   that was deemed to be Chicago west, and General Business

26

1    was classified as companies with revenues less than

2    $500 million.

3    Q.   Okay.

4    A.   You also -- we had no public sector business.

5    That was a separate sales force, calling on state,

6    federal, local.  So we had commercial business less than

7    500 million.

8    Q.   And that was under Maryann Gillespie?

9    A.   Yes.

10   Q.   At some point in time did that transfer to

11   John Nugent?

12   A.   Correct.

13   Q.   Okay.  When is that?  Withdrawn.

14        When was that?

15   A.   Probably -- potentially, it was in 12 months.

16   Q.   Okay.

17   A.   I'm not clear on exact dates.

18   Q.   So then you became -- after that transfer you

19   became -- withdrawn.

20        You were the AVP for the same region under

21   John Nugent?

22   A.   Yes.

23   Q.   So your job didn't change, just the person

24   above you changed?

25   A.   Correct.

27

1    Q.   Okay.  And you occupied that position till

2    about 2003; is that right?

3    A.   I basically have had the same job for the last

4    nine years.

5    Q.   Okay.  Just changed titles?

6    A.   Titles, and they modified the number of -- the

7    accounts and what products you sell.

8    Q.   Did the region -- withdrawn.

9        Did your region change at all in terms of

10   the states you covered from --

11   A.   When?

12   Q.   From the time that you worked under Maryann

13   Gillespie to the time you were working under John

14   Nugent?

15   A.   No.

16   Q.   No.  Okay.

17        Now, in 2003 you were AVP of sales for

18   West Technology; is that right?

19   A.   Yes.

20   Q.   Okay.  Is that still your title today?

21   A.   Yeah, I'm a group vice-president.

22   Q.   You're a group vice-president.

23        So it changed from AVP to group

24   vice-president?

25   A.   Yes.

28

1    Q.   Any change in the substance?

2    A.   No.

3    Q.   You've been based out of Englewood, Colorado

4    the entire time?

5    A.   Yes.

6    Q.   You've got to commend the stability.  My

7    brother's in sales, and he's all over the country, so...

8        Okay.  Let's talk about the 2000/2001 time

9    period.  So fiscal year 2000/fiscal year 2001.

10       Okay.  You worked in the NAS division,

11   North American sales; is that right?

12   A.   Yes.

13   Q.   And you worked in the General Business

14   division of NAS; is that right?

15   A.   Yes.

16   Q.   Okay.  And you were responsible for the west

17   region of the General Business division; is that right?

18   A.   Correct.

19   Q.   Okay.  General business called on customers

20   $500 million or more in revenue; is that right?

21   A.   5 million below.

22   Q.   And less.

23   A.   Yes.

24   Q.   And majors handled $500 million and more in

25   revenue?

29

1    A. Yes.
2    Q. And then there was a distinction at Oracle
3 between OPI and majors; is that right?
4    A. Correct.
5    Q. Okay. OPI is Oracle Product Industries?
6    A. It was our vertical group, so it might have
7 been for process of industries or -- I'm not clear what
8 the acronyms.
9    Q. What do you mean by "vertical group"?
10    A. Particular industry they would focus on.
11    Q. Okay. So essentially, NAS majors was calling
12 on the same size of customers as OPI; is that right?
13      MS. KYROUZ: Objection. Vague.
14      MR. BRITTON: Q. In terms of revenue.
15    A. As an example, OPI might have had, like, 200
16 named accounts, and then all other accounts greater than
17 500 million would go to majors.
18    Q. Okay. And those 200 named accounts were
19 pulled out because they were -- they fell within some
20 sort of industry; is that fair?
21    A. There was some type of criteria why they were
22 selected, yes.
23    Q. Now, you mentioned earlier that the product --
24 the products that you offered changed over time; is that
25 right?

30

1      MS. KYROUZ: Objection. Vague.
2      THE WITNESS: I would say the products I was
3 responsible for changed over time.
4      MR. BRITTON: Q. And when you say the
5 products that you were responsible for, you meant the
6 products that you were selling?
7    A. Correct.
8    Q. Okay. And in the 2000/2001 time period, what
9 products were you selling?
10    A. I had both -- I had all of our application
11 products, as well as our technology products.
12    Q. The technology products with your databases?
13    A. And tools, yes.
14    Q. What version of database were you running
15 during that period of time; do you recall?
16    A. I can't remember.
17    Q. What types of products fall under the tools
18 umbrella?
19    A. It would be our development tools.
20    Q. Can you give me an example?
21    A. A developer is a product.
22    Q. And what did that product allow a customer to
23 do?
24    A. Develop custom apps or reports.
25    Q. Okay. And during the 2000 -- let's start with

31

1 2000. During the 2000 time period, what percentage of
2 the products that you sold were tech-type products?
3      MS. KYROUZ: Objection. Vague.
4      THE WITNESS: I would have to estimate.
5      MR. BRITTON: Q. What would be your estimate?
6    A. 80 percent technology, 20 percent
7 applications.
8    Q. Okay. Did that change into 2001?
9    A. Not significantly.
10    Q. Okay.
11      Now, do you recall Oracle developing a new
12 type of application in the -- withdrawn.
13      Do you recall Oracle offering a new type
14 of applications product in fiscal year 2000?
15      MS. KYROUZ: Objection. Vague.
16      THE WITNESS: I'm not clear on the dates.
17      MR. BRITTON: Q. Okay. How about the years
18 2000/2001?
19    A. Not -- I can't remember specific dates.
20    Q. Okay. Are you familiar with the Suite 11i,
21 the E-Business suite?
22    A. I'm familiar with it, yes.
23    Q. And were you selling that suite in the
24 2000/2001 time period?
25      MS. KYROUZ: Objection. Vague.

32

1      THE WITNESS: I can't remember the release
2 levels of our products.
3      MR. BRITTON: Q. Okay.
4    A. During those time frames.
5    Q. And your region was the -- the General
6 Business West region was the largest region of General
7 Business; is that right?
8    A. For what time frame?
9    Q. Let's start with 2000.
10    A. Yes.
11    Q. Okay. And what percentage of your business
12 contributed to the General Business as a whole?
13      MS. KYROUZ: Objection. Lacks foundation.
14      THE WITNESS: I would estimate 35 percent.
15      MR. BRITTON: Q. Okay. And what about fiscal
16 year 2001?
17    A. I would estimate the same percent.
18    Q. Okay. 35 percent.
19      Now, would you -- withdrawn.
20      I'll represent to you that in a
21 deposition, John Nugent stated that, "As General
22 Business West went, so went General Business."
23      Would you agree with that statement during
24 the fiscal year 2000 time period?
25      MS. KYROUZ: Objection. Lacks foundation.

33

1    THE WITNESS: I would agree that we were an
2  important -- "we" being the west -- were an important
3  part of his business.
4    MR. BRITTON: Q. Okay. And what makes you
5  believe that?
6    A. Because we represented approximately a third
7  of his business.
8    Q. Any other reasons? That was primarily it?
9    A. Yes.
10   Q. Okay. I want to talk a little bit about the
11  regions that you covered and who you reported to and who
12  reported to you.
13    Let's start with the regions. What regions
14  did General Business West cover during the fiscal year
15  2000/2001 time period?
16    A. If I could specify the cities where we had
17  sales, again, the actual regions' names and all that,
18  I'm not --
19    Q. Let's talk about the cities.
20    A. So the west consisted of the geographic
21  territories west of Denver; we had sales offices in
22  Seattle, Portland, San Francisco, Southern California,
23  Phoenix, Salt Lake and Denver.
24    Q. Did you cover any more states than where these
25  cities fell into?

34

1    A. Yes. We would have states that -- low
2  population, like Alaska, Hawaii, Montana, Idaho, New
3  Mexico.
4    Q. Nevada?
5    A. Yes.
6    Q. Okay. Now, during this time period 2000/2001,
7  you reported to John Nugent; is that right?
8    A. Yes.
9    Q. You reported to George Roberts.
10    A. Yes.
11    Q. And George Roberts was the head of NAS.
12    A. Yes.
13    Q. Now, you had a number of different people
14  reporting to you during that time period; is that right?
15    A. Yes.
16    Q. Okay. And what were the titles of those
17  people? Would you call them regional managers, sales
18  managers? How did you refer to them?
19    A. There would be -- the business was divided up.
20  We would have the sales teams that were selling
21  technology only, those regional managers would be direct
22  reports to me.
23    Q. Okay. So you refer to them as regional
24  managers?
25    A. Yes.

35

1    Q. Okay.
2    A. And then I had a regional vice-president who
3  reports to me that had all of the application business,
4  and then he had regional managers reporting to him. So
5  you could have a regional manager for applications would
6  report to an RVP, or regional vice-president, who would
7  report to myself.
8    Q. Okay. So how many regional vice-presidents
9  reported to you during the 2000/2001 time period?
10    A. Just one.
11    Q. That was Mike Arntz; is that right?
12    A. Yes, the applications. And he was responsible
13  for the applications business.
14    Q. Okay. But it wasn't structured the same for
15  technology?
16    A. No.
17    Q. So the regional managers would report directly
18  to you for technology?
19    A. Correct.
20    Q. Did you deal directly with the regional
21  managers in the applications area?
22    MS. KYROUZ: Objection. Vague.
23    THE WITNESS: Usually not.
24    MR. BRITTON: Q. So you would go directly to
25  the regional VP; he would deal with his people below

36

1  him?
2    A. Yes.
3    Q. Okay. I -- instead of asking you to recall
4  names so long ago, I'm going to give you a list of names
5  and see if that refreshes your memory about who reported
6  to you on the technology side. Is that fair? Or can
7  you tell me who reported to you --
8    A. No, I can tell you who did. The dates, again,
9  are -- I'll probably recognize the names.
10    Q. Right.
11    A. Sometimes the names and the dates for those --
12  that particular window I might --
13    Well, let's try it that way. That would be
14  fine.
15    Q. Okay. So during the 2000 -- let's pull it
16  back. Let's go to the quarter. During fiscal third
17  quarter of 2001, so we're talking December 2000 to
18  February 28, 2001, okay, Mark Fazio, he reported to you
19  in the northwest region?
20    A. Yes.
21    Q. Okay. And he would have been based out of
22  Seattle?
23    A. Yes.
24    Q. Then you had Jim Frasier reporting to you from
25  the west area?

37

1    A.  Yes.

2    Q.  Okay.

3    A.  West San Francisco area.

4    Q.  West San Francisco area.  Okay.  Good.

5        And then Mike or -- withdrawn.

6        Mark Moran from the south?

7    A.  Mark reported to me.  I'm not clear on the

8    dates.

9    Q.  Okay.  And then Leslie Ponzini out of Denver?

10   A.  Yes.

11   Q.  Now, who is Kevin Kern?

12   A.  Kevin also reported to me.

13   Q.  Okay.  Now, he was based out of San Francisco,

14   as well; is that right?

15   A.  Correct.

16   Q.  Okay.  What was the difference between Kevin

17   Kern and Jim Frasier?

18   A.  Jim Frasier had commercial business, so he

19   would have geographic coverage, ZIP codes, et cetera.

20   Kevin Kern was managing -- we had a dot-com business

21   unit.

22   Q.  Okay.

23   A.  And he was managing that.

24   Q.  Okay.  He was the dot-coms.

25       And then Scott Miller, he, at some point,

38

1    replaced Mike Arntz as the VP of apps; is that

2    right?

3    A.  Vice versa.

4    Q.  Vice versa.  Okay.

5        So Mike Arntz replaced Scott Miller as the VP

6    of apps?

7    A.  Yes.

8    Q.  Okay.  Now, in the apps area, the regional

9    managers in applications, if I gave you a list of names,

10   do you think you'd be able to recall whether those

11   people were actually the managers during that period of

12   time?

13   A.  I will try.

14   Q.  All right.  Tim O'Toole.

15   A.  Yes.

16   Q.  Out of the northwest, Seattle --

17   A.  Northwest.  Portland.

18   Q.  Portland.

19       David Bonnette?

20   A.  Yes.  San Francisco.

21   Q.  San Francisco.

22       Jim Priestly?

23   A.  Yes, San Francisco.

24   Q.  And then Don Amichi in the south?

25   A.  Yes.

39

1    Q.  And Glen Senniger out of Denver.

2    A.  He lives in Salt Lake City.

3    Q.  He lives in Salt Lake.  Okay.

4        Do you remember Alec Hog?

5    A.  Alec worked for me in Southern California.

6    Q.  In Southern California.

7    A.  Yes.

8    Q.  And what was the difference between Alec Hog

9    and Mark Moran?  Did they cover different areas?

10   A.  Different time frames.

11   Q.  Different time frames.  Okay.

12       Do you remember which one was the third

13   quarter of 2001?

14   A.  I do not.

15   Q.  Okay.  Let's talk a little bit about your

16   customer composition for -- and when I say "yours", I'm

17   talking about General Business West.

18       You had called on dot-com companies; is

19   that right?

20   MS. KYROUZ:  Objection.  Vague.

21   THE WITNESS:  We did, yes.

22   MR. BRITTON:  Q.  Okay.  And dot-com companies

23   would be any company that sold products over the

24   Internet or generated revenue from the Internet; is that

25   right?

40

1    A.  Yes.

2    Q.  Okay.  What other types of companies did

3    General Business West call on?

4    A.  Any commercial business with revenues less

5    than 500 million.

6    Q.  Any.  Okay.

7        Did you categorize them back during that

8    period of time?

9    MS. KYROUZ:  Objection.  Vague.

10   MR. BRITTON:  Q.  Manufacturing, brick and

11   mortar?

12   A.  We would refer to, you know, ones that had

13   been around for a while as brick and mortar.

14   Q.  What about manufacturing?

15   A.  You -- we did more of the breakouts on the

16   application side versus the technology side.

17   Q.  So would the manufacturing be considered a

18   breakout, which would be attributed to the application

19   side?

20   A.  Potentially could be, yes.

21   Q.  And the dot-com companies, those were the

22   largest component of the companies that you called on at

23   General Business West; is that right?

24   A.  That's not true.

25   MS. KYROUZ:  Objection.

41

1    MR. BRITTON: Q. It's not. Who was --
2  withdrawn.
3        The largest in terms of producing sales
4  revenues for General Business West, were those the
5  dot-com companies?
6        MS. KYROUZ: Objection. Vague. Lacks
7  foundation.
8        THE WITNESS: I don't remember the breakout.
9        MR. BRITTON: Q. You don't remember that the
10  dot-coms were -- represented almost two-thirds of your
11  business during 2000/2001?
12    A. Again, I don't remember the breakout.
13    Q. Okay. What do you recall of how much business
14  the dot-com companies generated for General Business
15  West?
16    MS. KYROUZ: Objection. Vague.
17    THE WITNESS: I know it was a high growth
18  area. I don't remember the percents or the dollar
19  amounts.
20    MR. BRITTON: Q. Okay. Let's get the first
21  exhibit.
22        (Whereupon, Plaintiff's Exhibit 1 was marked
23        for identification.)
24    MR. BRITTON: Q. Okay. I've placed in front
25  of you what has been marked as Classick Exhibit 1. Can

42

1  you take a moment to look at this document and tell me
2  if you recognize it?
3        For the record, this exhibit starts at Bates
4  NDCA-ORCL 104828 and ends at 104843.
5    A. Okay.
6    Q. Okay. Do you recognize Exhibit 1?
7    A. I do.
8    Q. And what is Exhibit 1?
9    A. It was information that was provided to us in
10  a FY01 planning meeting.
11    Q. Presented to you by John Nugent?
12    A. Yes.
13    Q. When did that planning meeting take place?
14    A. It was in April.
15    Q. Okay. Did you have any hand in preparing any
16  part of this exhibit?
17    A. I did not.
18    Q. But you received this during the planning
19  meeting?
20    A. I did.
21    Q. Okay. Did you look at every page?
22    A. Yes.
23    Q. Okay. Now, if you take a look at the third
24  page of this exhibit, it ends with 104830.
25    A. Yes.

43

1    Q. If you look down three rows, it says "Dot-com
2  Analysis." There's four different regions listed there
3  on the left-hand side.
4        Do you see that?
5    A. Yes.
6    Q. Do you know what those regions are?
7    A. Yes. Those are areas; they're not regions.
8    Q. Okay. Areas.
9    A. And the west is the area I ran, and General
10  Business had three peers. So the country was divided
11  into the northeast, mid Atlantic, central and west.
12    Q. And mid Atlantic, what area did that cover?
13    A. It was based out of New York City and went
14  south through Virginia and Florida.
15    Q. All right. Now, if you look to the --
16  withdrawn.
17        Do you understand what the numbers in
18  these columns mean under the dot-com analysis?
19    MS. KYROUZ: Objection. Vague.
20    THE WITNESS: I believe I do, yes.
21    MR. BRITTON: Q. Okay. And that's based on
22  your history at Oracle and reviewing this document
23  during the fiscal year '01 planning meeting; is that
24  right?
25    A. Yes.

44

1    Q. Okay. If you look at the second column over,
2  there's FY00 dot-com/ASP percentage, and down below
3  parallel to the west it says "66 percent". Now, that's
4  the percentage of revenue that came from dot-coms and
5  ASP in fiscal year 2000, isn't it?
6    MS. KYROUZ: Objection. Lacks foundation.
7    THE WITNESS: I have no idea what the 66
8  percent -- I mean, I think that's not true.
9    MR. BRITTON: Q. That's not true.
10        Do you know what the numbers on the very left
11  column mean? Fiscal year 2000, there's 124.1 next to
12  "West". Do you know what that represents?
13    A. I believe it would be the estimated actuals
14  for FY00.
15    Q. So it's estimated actual revenues generated
16  from dot-coms, or total revenue?
17    MS. KYROUZ: Objection. Misstates testimony.
18    THE WITNESS: Dot-coms/ASPs.
19    MR. BRITTON: Q. Do you have any
20  understanding of what the second column means where it
21  says "66 percent"?
22    A. It could mean the percent of revenue from the
23  west as dot-com, it could be the percent of dot-com -- I
24  don't know exactly what John was putting -- what that
25  percentage meant.

45

1   Q.  Okay.  If you look to the previous page, it's
2   a General Business FY00 technology breakout.
3       Can you tell me what this page represents?
4       MS. KYROUZ: Objection. Lacks foundation,
5   vague.
6       THE WITNESS: I'm sorry.  Your question is on
7   the first page --
8       MR. BRITTON: Q.  No, the second page.
9       A.  I'm sorry.  I'm on the wrong page.  I'm sorry.
10      Q.  It says "Fiscal year 2000 Technology
11  Breakout."
12      A.  I'm sorry.  What was your question --
13      Q.  What is this page?
14      MS. KYROUZ: Same objection.
15      THE WITNESS: It looks like a financial
16  breakout by market segment by quarter for the
17  four areas.
18      MR. BRITTON: Q.  And what do you mean by
19  "market segment"?
20      A.  Well, it looks like it's dot-com, B&M, I
21  assume, would be brick and mortar, you have ASP; I'm not
22  clear what the other two would be.
23      Q.  Okay.  If you look all the way down -- so it's
24  essentially the revenues that were generated by these
25  different areas during fiscal year 2000; is that right?

46

1       MS. KYROUZ: Objection. Misstates testimony,
2   lacks foundation.
3       THE WITNESS: It appears to be, yes.
4       MR. BRITTON: Q.  Okay.  So you look down all
5   the way to the bottom left-hand column, it says, "Fiscal
6   year 2000 actual/estimate."  Okay?
7       Now, would you agree with me that these were
8   the revenues generated by the different market segments
9   for the entire fiscal year 2000?
10      MS. KYROUZ: Objection. Lacks foundation.
11      THE WITNESS: That's incorrect.
12      MR. BRITTON: Q.  Okay.  So it represents --
13  am I right to say that it represents the revenues
14  generated -- the actual revenues generated for the first
15  three quarters of fiscal year 2000 and an estimate of
16  what is coming in for the fourth quarter of 2000?
17      MS. KYROUZ: Same objection.
18      THE WITNESS: Correct.
19      MR. BRITTON: Q.  Now, if you look at the
20  dot-com column for the west and the ASPs, you have
21  $90 million for dot-coms and $34.2 million for ASPs.
22      Do you see that?
23      A.  Yes.
24      Q.  Okay.  And that total adds up to 124.2; is
25  that right?

47

1       A.  Those two, yes.
2       Q.  Okay.  Now, if you look to the next page under
3   the dot-com analysis, you have, on the far left column,
4   the 124.1.
5       Do you see that?
6       A.  I do.
7       Q.  Is it fair to say that that's the same number,
8   the revenue, that actual and an estimate for the west
9   for 2000?
10      MS. KYROUZ: Objection. Lacks foundation.
11      Are you asking him to read the document?
12      THE WITNESS: It appears to be.
13      MR. BRITTON: Q.  Okay.  Now, on the
14  technology breakout page, the second page, it has 188.1
15  under the total column.
16      What is that -- what do you understand that
17  total to mean?
18      MS. KYROUZ: Objection. Lacks foundation,
19  vague.
20      THE WITNESS: It appears to be our estimated
21  technology business for FY00.
22      MR. BRITTON: Q.  Okay.  Now, so if you have
23  the 90 plus the 34.2, that's going to be the amount of
24  revenue that came from dot-coms and ASP of the total
25  technology revenue, which is 188.1; is that right?

48

1       A.  That's what they were estimating.
2       Q.  All right.  So that was the estimate.
3       Now, I want to ask you to do the calculations,
4   but I'll tell you that if you take 124 divided by 188.1,
5   you get 66 percent.
6       A.  Okay.
7       Q.  Does that refresh your recollection about how
8   big the dot-coms and the ASPs were of General Business
9   West technology revenue?
10      MS. KYROUZ: Objection. Lacks foundation.
11      THE WITNESS: Those numbers add up to
12  66 percent.  That's --
13      MR. BRITTON: Q.  So does that refresh your
14  recollection on how big dot-coms and ASPs were of your
15  division of fiscal year 2000?
16      MS. KYROUZ: Same objection.
17      THE WITNESS: Not really, because this is just
18  technologies.  There's nothing on applications and --
19  again, I had multiple products.
20      MR. BRITTON: Q.  Okay.  Can you give me an
21  estimate of how big the dot-com and the ASP -- looking
22  at this document, if this will help you, how big
23  dot-coms and ASPs were of your region for all product?
24      MS. KYROUZ: Objection. Vague as to time.
25      THE WITNESS: It does not help because it

49

1    doesn't break it out.
2        MR. BRITTON: Q. Well, will you agree with me
3    that it was a large percentage of your business during
4    that period of time?
5        MS. KYROUZ: Objection. Vague, calls for
6    speculation.
7        THE WITNESS: It was a significant part of our
8    technology business.
9        MR. BRITTON: Q. Of your technology business.
10   Okay.
11       And will you agree with me that of the
12   technology business, that there was an expectation
13   that the dot-coms and ASPs would become an even
14   larger percentage of the whole, the technology whole
15   in fiscal year 2001?
16       MS. KYROUZ: Objection. Lacks foundation,
17   vague.
18       THE WITNESS: Yes.
19       MR. BRITTON: Q. And why would you agree with
20   that? Do you remember that sitting here, or does this
21   document refresh your recollection about it?
22       A. Reading this document, it appeared -- they are
23   putting -- this document has a higher growth on
24   dot-coms.
25       Q. Okay. Now, if you look at the dot-com

50

1    analysis, the fourth column over next to "West", it has
2    69 percent. So would you agree with me that, say, John
3    Nugent, since he was presenting this, expected
4    69 percent of the technology revenues to come from
5    dot-coms and ASPs?
6        MS. KYROUZ: Objection. Lacks foundation.
7        THE WITNESS: That's not correct. That
8    statement's not correct.
9        MR. BRITTON: Q. Why not?
10       A. That's just for the west. John Nugent managed
11   all of the United States.
12       Q. Right. That's what I'm talking about. His
13   expectation for the west is that it would become --
14   dot-coms and ASPs would become a larger part of the
15   technology --
16       A. It's worded differently than --
17       MS. KYROUZ: Same objections.
18       MR. BRITTON: Q. Let me withdraw the
19   one before.
20       Would you agree with me that John Nugent was
21   expecting a larger percentage of the revenue for your
22   division, General Business West, to come from dot-coms
23   and ASPs in 2001 than he was in 2000?
24       MS. KYROUZ: Objection. Lacks foundation.
25       THE WITNESS: Based on this report, it's very

51

1    similar, 66 to 69. So I would say about the same.
2        MR. BRITTON: Q. Okay. You remember that
3    being the case when you were at the planning meeting?
4        A. Not specifically, no.
5        Q. Okay.
6        A. Again, you focus there, but then there's a
7    management judgment of minus $4 million.
8        Q. Right.
9        A. So he's saying that he took that off, that
10   actual estimated revenue off dot-com. So it might have
11   been pretty similar year to year.
12       Q. Okay. The dot-com companies that your
13   division called on, what percentage of those businesses
14   would you characterize as start-up companies?
15       MS. KYROUZ: Objection. Vague, lacks
16   foundation.
17       THE WITNESS: Estimate, I would have to
18   estimate.
19       MR. BRITTON: Q. Sure, estimate.
20       A. 80 percent.
21       Q. 80 percent of them are start-ups. Okay.
22       A. During that time frame -- during the time
23   frame you're talking about.
24       Q. Right. Fiscal 2000 and fiscal 2001.
25       A. Yes.

52

1        Q. Now, we focused on dot-coms in the technology
2    sector. Is there any reason that there wasn't a dot-com
3    focus in the applications part of your business?
4        MS. KYROUZ: Objection --
5        MR. BRITTON: Withdrawn.
6        Q. Let me say it a different way. Was there a
7    focus on selling to dot-com companies in the
8    applications part of your business?
9        MS. KYROUZ: Objection. Vague, lacks
10   foundation.
11       THE WITNESS: Yes, there was.
12       MR. BRITTON: Q. Okay. Was it -- what -- if
13   you can tell me, what percentage of the applications
14   business were sales to dot-coms?
15       MS. KYROUZ: Objection. Vague as to time.
16       THE WITNESS: The estimate was very small.
17       MR. BRITTON: Q. Very small. So dot-coms
18   were more technology-based customers than they were
19   applications-based customers?
20       MS. KYROUZ: Same objection.
21       THE WITNESS: Again, that's not true.
22       MR. BRITTON: Q. Okay. Tell me how it's
23   wrong.
24       A. They had requirements for both. They just
25   didn't have the number of employees to justify large

53

1  application spends or investment, versus building
2  infrastructure and putting product out on the Internet.
3  That drove a lot of technology.
4      Q.  So that drove a lot of your database
5  businesses, your tools, that type of product?
6      A.  Yes.  But as far as importance, they had
7  requirements for both.
8      Q.  Okay.  But in terms of the money that they
9  were spending, they were spending much more money on
10  technology than they were on applications?
11     A.  True.
12     Q.  Okay.  Now, in the 2000/2001 time period,
13  where, in a company's life cycle, were these dot-com
14  companies?  Business plan to business approval to
15  getting funding from venture capitols, can you tell me
16  where most of these companies fell in terms of that
17  business plan, that life cycle?
18         MS. KYROUZ:  Objection.  Vague, calls for a
19  generalization, speculation.
20         THE WITNESS:  Very hard question to answer.
21  You took a very broad group of people over a very long
22  period of time.
23         MR. BRITTON:  Q.  Now, you were selling -- you
24  were selling technology products to these dot-com
25  companies pre-revenues on occasions; is that right?

54

1          MS. KYROUZ:  Objection.  Vague.
2          THE WITNESS:  Yes, on occasions.
3          MR. BRITTON:  Q.  Okay.  Did you ever sell any
4  products to these dot-com companies pre-product, before
5  the product development?
6          MS. KYROUZ:  Objection.  Vague, calls for
7  speculation.
8          THE WITNESS:  Not that I recall.
9          MR. BRITTON:  Q.  We'll get back to the
10  dot-coms later on.
11         MS. KYROUZ:  If this is a convenient point,
12  maybe we can take a quick break.
13         MR. BRITTON:  Sure.
14         (Recess taken from 10:21 to 10:35 A.M.)
15         MR. BRITTON:  Q.  Let's talk a little bit
16  about your responsibilities as Area Vice-President of
17  General Business West during the fiscal 2000/2001 time
18  period.  You had budgeting and forecasting
19  responsibilities?
20     A.  Yes.
21     Q.  Okay.  Staffing, personnel, hiring, those
22  responsibilities?
23     A.  Yes.
24     Q.  Okay.  What about sales responsibilities?
25  What were your sales responsibilities?

55

1          MS. KYROUZ:  Objection.  Vague.
2          THE WITNESS:  To sell Oracle products and
3  services.
4          MR. BRITTON:  Q.  Okay.  A little bit more in
5  detail.  Were you responsible personally for calling on
6  customers and generating sales for your division?
7          MS. KYROUZ:  Objection.  Vague.
8          THE WITNESS:  Part of my job I met with
9  customers.
10         MR. BRITTON:  Q.  Right.  But the question I'm
11  having is -- the question I have is:  Were you making
12  the initial call and calling on customers trying to sell
13  the products, or would you come in after initial contact
14  had been made by the various sales managers or
15  salespeople?
16         MS. KYROUZ:  Same objection.
17         THE WITNESS:  A variety, a variety of times I
18  would meet with customers, so -- but for me to go out
19  and generate a cold call on my own, no.
20         MR. BRITTON:  Q.  No.  You don't do that.
21  Now, what would be the circumstances that
22  would bring you into a deal?
23     A.  If a regional manager had asked me to go meet
24  with a customer, I would.
25     Q.  Okay.  Any other circumstances that would get

56

1  you involved in the sales process?
2          MS. KYROUZ:  Objection.  Vague.
3          THE WITNESS:  No, I usually took the lead from
4  the regional managers.
5          MR. BRITTON:  Q.  And then what would be your
6  involvement?  What would you do when you would call on
7  the customer?
8          MS. KYROUZ:  Objection.  Vague.
9          THE WITNESS:  Again, wide variety of things.
10  I mean, it could be from initial call explaining who
11  Oracle is to final negotiations, so a very large gamut
12  of why I would meet with a customer.
13         MR. BRITTON:  Q.  Did you ever do product
14  demos?
15     A.  No.
16     Q.  Okay.  Now, from a percentage basis, how much
17  of your time on the sales calls that you were handling
18  was devoted to negotiations, versus explaining who
19  Oracle is and trying to get the product sold?
20         MS. KYROUZ:  Objection.  Vague.  Calls for a
21  generalization.
22         THE WITNESS:  Really very different throughout
23  a quarter.  So the first part of the quarter, not much.
24  The last part, a lot more.
25         MR. BRITTON:  Q.  Okay.  What -- I'm just

57

1　trying to get a better idea.  What different things did
2　you -- other than explaining who Oracle is, being
3　involved in the negotiations, what other types of roles
4　would you play in the sales process?
5　　　MS. KYROUZ:  Same objection.
6　　　THE WITNESS:  Those would be the key roles.
7　　　MR. BRITTON:  Q.  Okay.  And in the -- let's
8　break it down by quarters.  Let's talk about the third
9　quarter of 2000, which would be December '99 to the end
10　of February 2000.  How many -- how many sales
11　opportunities or sales deals were you personally
12　involved in during that quarter?
13　　　A.  I do not recall.
14　　　Q.  Can you give me an estimate?
15　　　A.  No.
16　　　Q.  Okay.  What about the third quarter of 2001;
17　how many deals were you involved in during that quarter?
18　　　A.  Same reply.  A certain number of accounts or
19　even an estimate would be -- I couldn't even do it
20　justice.
21　　　Q.  Okay.  Were you working on more deals in the
22　third quarter of 2000 than you were in the third quarter
23　of 2001?
24　　　MS. KYROUZ:  Objection.  Vague.
25　　　THE WITNESS:  Probably.

58

1　　　MR. BRITTON:  Q.  Okay.  And why do you say
2　"probably"?
3　　　A.  Because our business was still growing.
4　　　Q.  Okay.  The question was:  Were you involved in
5　more deals in the third quarter of 2000 than you were in
6　the third quarter of 2001?
7　　　A.  Right.
8　　　Q.  So what makes you think that your involvement
9　was more in 2000 than it was in 2001, in terms of
10　numbers of customers?
11　　　MS. KYROUZ:  Objection.  Vague.  Lacks
12　foundation.
13　　　THE WITNESS:  Because we were working on more
14　deals, so I assume I was involved in more deals.  So, I
15　mean, it's -- I really -- I don't recall.  I mean, it
16　would be unfair for me to say yes or no.
17　　　MR. BRITTON:  Q.  Okay.  Let's talk about the
18　budgeting process at Oracle and your involvement in it.
19　I know we took a look at Exhibit 1, but can you explain
20　the budgeting process from your perspective?  Let's say
21　for fiscal year 2001.
22　　　A.  I would receive a number from John Nugent for
23　applications and for technology, and then I would have a
24　period of time, days or a week, to divide that among the
25　regions and then resubmit it back to him.

59

1　　　Q.  Okay.  And when did you get this number from
2　John?
3　　　A.  It would be sometime after the close, so it
4　would probably be in the June time frame.
5　　　Q.  And then you would have -- you said you would
6　have a week or so to distribute the numbers to your
7　various regions; is that right?
8　　　A.  No.
9　　　Q.  Okay.  Explain it again.
10　　　A.  I would get a number from John, and then I
11　would have a period of time to divide it up, resubmit it
12　back to him and corporate for approval before it would
13　go out to the field.
14　　　Q.  Okay.  And then what would you do during
15　this -- between the time that you divided it up and
16　resubmitted it?  Would you make changes?  What was the
17　purpose of the resubmission?
18　　　MS. KYROUZ:  Objection.  Vague.
19　　　THE WITNESS:  There wasn't a resubmission.  I
20　mean, I got the number from John, I divided it and gave
21　it back to him saying, "Here's how I would recommend we
22　divide it."
23　　　THE VIDEOGRAPHER:  Q.  Okay.  So you weren't
24　changing anything; you distributed it and gave it back
25　so he'd know what the different regions were working on?

60

1　　　A.  Yes.  He was looking for highs or lows or
2　exceptions, or whatever.
3　　　Q.  What do you mean, he was looking for highs or
4　lows or exceptions?
5　　　A.  He wouldn't want me to assign -- if I had
6　$100 million, you 98 and you 2, so that would be high
7　and low.  So are the numbers divided fairly, and what
8　was your logic?
9　　　Q.  So from the time that you got the number in
10　June to the time that you resubmitted it, did you have
11　any meetings with any of your regional managers to
12　discuss the division?
13　　　A.  No.
14　　　Q.  Okay.  So it was totally in your discretion on
15　how you were going to divide it up?
16　　　A.  Yes, it was.
17　　　Q.  Okay.  And how did you divide it up?
18　　　MS. KYROUZ:  Objection.  Vague.
19　　　THE WITNESS:  How did I divide it up?
20　　　MR. BRITTON:  Q.  Yeah.  What factors went
21　into --
22　　　A.  Multiple factors, lots of factors went into
23　deciding a budget.
24　　　Q.  So give me the ones you can think of.
25　　　A.  Actuals for the previous year, number of

Classick, Nicholas 4/12/2006 9:02:00 AM

61

1 accounts within a region, number of existing head count,
2 projected additional head count, industries, financial
3 conditions for that geographic territory.
4 Q. Okay. What do you mean by "financial
5 conditions for that given territory"?
6 A. For example, if I was assigning quotas up in
7 the northwest and, say, lumber was real down, I probably
8 would give them less of a growth based on that industry.
9 Q. Okay. And then you would -- after you would
10 divide it up, you would resubmit it to John, who then
11 said it would have to be approved by corporate on how
12 you divided it up?
13 MS. KYROUZ: Objection. Misstates testimony.
14 THE WITNESS: I believe so, yes.
15 MR. BRITTON: Q. Okay. And do you have an
16 understanding of who, in corporate, was approving what
17 you did?
18 A. No.
19 Q. Okay. Let's talk a little bit about the
20 process before you would get the number from John,
21 starting from the beginning. Can you describe the
22 budgeting process from the time that you started with it
23 to the time that you received the number from John?
24 MS. KYROUZ: Objection. Lacks foundation.
25 THE WITNESS: I'm not clear. I'm sorry.

62

1 MR. BRITTON: Q. Did you have any involvement
2 in the budgeting process from the time before John
3 Nugent gave you a number?
4 A. No.
5 Q. Nothing at all?
6 A. No.
7 Q. Okay. Now, you mentioned a preplanning
8 meeting in April with John where you looked at this
9 number, this document, okay? And I'm having a hard time
10 figuring out your testimony that you had no involvement
11 in the budgeting process before John gave you a number
12 in June, yet we talked about a preplanning meeting in
13 April.
14 A. Yes.
15 Q. Can you explain?
16 A. This information was given to us at this
17 meeting, explained that here's what the budget will be
18 based on. So I had no input, no feedback. He reviewed
19 it with us, here was his logic, so this was in April,
20 early April, or, you know, sometime in April, I would
21 say. At that point we understood what his logic was,
22 what he was going to do, then once the year was over and
23 we had actuals, he would plug those in and give us a
24 number. So as far as feedback, direction and all that,
25 we had none.

63

1 Q. You had none.
2 Did you have any input whatsoever into the
3 numbers that went into this document?
4 MS. KYROUZ: Objection. Vague.
5 MR. BRITTON: Q. Exhibit 1.
6 A. No.
7 Q. Okay.
8 A. I had none.
9 Q. Did you do any type of planning with your
10 managers prior to your meeting with John in April?
11 A. I did not.
12 Q. Take a look at Exhibit 1 real quick, the first
13 page. Do you recognize the handwriting that's there?
14 A. It looks like mine.
15 Q. Okay. It has "Apps 64.4 okay," and then if
16 you look up at fiscal year 01 it has apps at 64.3,
17 and then it says tech at 211.
18 Can you tell me what that 211 number is?
19 A. I cannot.
20 Q. Okay. If you take a look at the page that
21 ends in Bates 104840.
22 A. 840?
23 Q. Uh-huh.
24 A. Okay.
25 Q. There's the 211.8 number. It says, "GB West

64

1 FY01 plans, Technology Revenue," and it has 211.8.
2 Does that help refresh your recollection on
3 what that 211 number is?
4 MS. KYROUZ: Objection. Lacks foundation.
5 THE WITNESS: Not specifically, no.
6 MR. BRITTON: Q. Can you tell me why you have
7 a physical year 01 plan for technology revenue for 211.8
8 on this page, 104840, and on the front you're looking at
9 fiscal year 01 plan for technology at 238.4, so it went
10 up somewhere $20 million?
11 MS. KYROUZ: Objection. Lacks foundation,
12 misstates the document.
13 THE WITNESS: No. I can't tie them together.
14 MR. BRITTON: Q. Okay. Now, we talked about
15 the plan for the annual budget. Can you explain how --
16 withdrawn.
17 Was there a quarterly budget? Was the
18 annual budget distributed into the various quarters
19 for the year?
20 A. Yes, it was.
21 Q. And how was it done?
22 A. Every year they would determine a quarterly
23 ramp on how they would want the business to flow, so it
24 would be, you know, lower ramp in Q1 and a very high
25 ramp in Q4.

65

1    Q. Now, you said "how they wanted the business to
2    flow." Did they assign a ramp to a particular quarter,
3    or was it based upon historical factors?
4        MS. KYROUZ: Objection. Lacks foundation.
5        MR. BRITTON: Q. Let me ask it a different
6    way. What did you mean by "they would want a particular
7    flow"? Withdraw.
8        Could you read back his answer?
9        THE REPORTER: "Question: Every year they
10       would determine a quarterly ramp on how they
11       would want the business to flow, so it would
12       be, you know, lower ramp in Q1 and a very high
13       ramp in Q4."
14       MR. BRITTON: Q. Right. So what did you mean
15   by "how they wanted the business to flow"?
16       A. It was based on -- the ramps were based on
17   historical, how revenue came in. So we would have maybe
18   a 10 percent, 11 percent ramp on our annual number for
19   Q1, and it would go as high as a 41, 42, 43, in that
20   range percent, for Q4.
21       Q. Okay. So Q4 was much busier than Q1?
22       A. Yes, it was.
23       Q. Now, did it go gradually higher, incrementally
24   higher, so Q2 was bigger than Q1, Q3 was bigger than Q2?
25       A. Q2 and Q3 were very similar, so -- the big

66

1    delta was Q1 and Q4. That would be the biggest swing.
2        Q. Okay. Let's take a look at the actual numbers
3    for the annual budget in Exhibit 1 here.
4        Can you tell me, based on this exhibit, what
5    your plan was for fiscal year '01 for technology?
6        A. No.
7        Q. Why not?
8        A. Because my plan was based on your actuals, and
9    this document was prepared in April.
10       Q. Okay. So this isn't the final numbers; this
11   is the plan, and then you were assigned a final number
12   later and then distributed it?
13       A. In June, yes.
14       Q. Okay. Did they change very much based on your
15   recollection between what John Nugent had presented to
16   you here and the final numbers?
17       MS. KYROUZ: Objection. Lacks foundation.
18       THE WITNESS: I think we overachieved what
19   they estimated, the last 45 days. So that would be the
20   only adjustment.
21       MR. BRITTON: Q. Okay. Did the growth
22   numbers change at all or very much?
23       A. Not that I remember.
24       Q. Not that you remember. Okay.
25       So let's take a look -- at least John's

67

1    idea of what was going to happen for the fiscal year
2    '01 plan.
3        Can you tell me, based upon your review of
4    this document, what he had planned for you for your
5    region for 2001?
6        MS. KYROUZ: Objection. Vague. Lacks
7    foundation.
8        THE WITNESS: Well, the first page looks like
9    he is looking at 238 million for technology, and
10   potentially 62.3 for applications.
11       MR. BRITTON: Q. Okay.
12       A. So a total license revenue of around
13   $300.8 million.
14       Q. Okay. And then the 25 percent growth rate is
15   all the way to the far right; is that right?
16       A. Correct.
17       Q. So do you recall if that was the actual growth
18   rate that you were assigned in June?
19       MS. KYROUZ: Objection. Lacks foundation.
20       THE WITNESS: I do not recall.
21       MR. BRITTON: Q. Okay. But you don't recall
22   it changing much from what he had presented?
23       A. I don't -- yeah. I don't recall.
24       Q. All right. If you look to the third page,
25   does this refresh your recollection about what John had

68

1    budgeted your growth for for technology?
2        A. I'm sorry. What was your question?
3        Q. Does this refresh your recollection about what
4    John had forecasted your growth to be for fiscal year
5    2001?
6        MS. KYROUZ: Objection. Lacks foundation,
7    misstates the document.
8        THE WITNESS: The planning document, yes.
9        MR. BRITTON: Q. Okay. And what was that?
10   What was the growth for the planning document?
11       A. For which area?
12       Q. For technology for 2001.
13       MS. KYROUZ: Objection. Lacks foundation.
14       THE WITNESS: According to this document, it
15   looks like it would be 32 percent for dot-com and a
16   16 percent growth for brick and mortar.
17       MR. BRITTON: Q. Okay. Now, the top, it has
18   a technology spread analysis, and on the far right it
19   has a growth rate of 27 percent for your division.
20       Is that the total growth rate that John had
21   planned for fiscal year '01?
22       MS. KYROUZ: Objection. Lacks foundation.
23       THE WITNESS: I don't know.
24       MR. BRITTON: Q. You don't know. Okay.
25       Now, you testified that you had received this

69

1  document and you read it and you understood it in April
2  of 2001, but you don't seem to recall what these things
3  mean.
4      Can you explain why you're having a tough
5  time interpreting what these documents mean if you
6  received it and read it and understood it when you
7  went through it with John?
8      A.  Because the time, six years ago, it's just a
9  time factor.
10     Q.  So the time has eliminated your ability to
11  understand what the different figures in this plan mean?
12     MS. KYROUZ:  Objection.  Mischaracterizes his
13  testimony.
14     MR. BRITTON:  Q.  Is that right?
15     A.  That's not exactly true.
16     Q.  Okay.  So how am I wrong?
17     A.  I mean, I understand some of these numbers.
18  Where they came from and what John meant by them, I
19  cannot address those.  I don't know.
20     Q.  Okay.  Let's talk about your -- withdrawn.
21     Let me show you another exhibit.
22     A.  What should I do with this one?
23     Q.  Just put it aside for a second.  I'll come
24  back to it.
25     (Whereupon, Plaintiff's Exhibit 2 was marked

70

1      for identification.)
2      MR. BRITTON:  Q.  I've placed in front of you
3  what has been marked as Exhibit 2.  Take a moment to
4  look at this document, and let me know if you recognize
5  it or not.  And Exhibit 2 starts with Bates NDCA-ORCL
6  275574 and ends at 275581.
7      Just for your reference, Mr. Classick, your
8  name shows up on the page that's 275579.
9      A.  Okay.
10     Q.  Do you recognize this exhibit?
11     A.  I do not.
12     Q.  Do you have any idea what this document is
13  used for, or was used for?
14     A.  From the title, it would appear that it is
15  the -- all of the folks in General Business across the
16  United States, the quota models.
17     Q.  Now, do you have an understanding of what a
18  quota model is?
19     A.  Yes.
20     Q.  And what is a quota model?
21     A.  It's the number for your license and your
22  support that you assign to your individuals, when you
23  add it up, that's the total.  That's your quota model.
24     Q.  Okay.  So could you determine what the quota
25  was?  Because this was dated June 5th.  Could you

71

1  determine from this document what your quota was for
2  fiscal year 2001?
3      MS. KYROUZ:  Objection.  Lacks foundation.
4      THE WITNESS:  If this was the official quota
5  model, yes, I could.
6      MR. BRITTON:  Q.  Okay.  Where would you look
7  to for this, for that information?
8      A.  On page -- it ends in 579, under my name with
9  field license, where it says 324,833,000.
10     Q.  Okay.  Now, on the far right, two or three columns
11  in from the far right, it says "Assigned Quota."
12     A.  Yes.
13     Q.  Do you have an understanding what an assigned
14  quota means?
15     A.  I do.
16     Q.  What is that?
17     A.  That is your field license and first year
18  support.
19     Q.  Okay.
20     A.  And first year support is 22 percent of the
21  net license.
22     Q.  Okay.
23     A.  So your quota is license and support.
24     Q.  License and support.
25     And what does first year support mean?

72

1      A.  The dollar amount that a customer pays to have
2  the product supported for the first 12 months.  So when
3  they buy a product, we assign a 12-month support bill.
4      Q.  Oh, okay.  And that assigned percentage is
5  22 percent?
6      A.  Correct.
7      Q.  Okay.  And that would be your assigned quota.
8      A.  Correct.
9      Q.  Now, is that your total quota for -- would
10  that be your total quota for the year?
11     MS. KYROUZ:  Objection.  Vague.
12     THE WITNESS:  Yes.
13     MR. BRITTON:  Q.  Okay.  And then that would
14  be the number that would be broken down based upon the
15  ramp:  First quarter, second quarter, third quarter,
16  fourth quarter; is that right?
17     MS. KYROUZ:  Objection.  Lacks foundation.
18     THE WITNESS:  Correct.
19     MR. BRITTON:  Q.  Now, if you look to the far
20  right, one column over from that it says "Plan status",
21  and then it has "Submitted, generated, submitted."
22     Based on your history with Oracle, do you have
23  any idea what that column represents?
24     A.  That would be the status of their compensation
25  plan.  So once the quotas are submitted and approved,

---

73

1   then a compensation plan is generated. So it's either
2   been submitted, generated, different stages of where
3   that's at.
4       Q.  Okay. And describe the compensation plan for
5   me. How did that work?
6       MS. KYROUZ: Objection. Vague, lacks
7   foundation.
8       THE WITNESS: At what level?
9       MR. BRITTON: Q. Your level.
10      A.  My level?
11      Q.  Yeah.
12      A.  My compensation is based -- I have
13  two components, a fixed and a variable. The fixed would
14  be salary and a car allowance. The variable would be a
15  dollar amount based upon achieving 100 percent of quota
16  or budget.
17      Q.  Okay. So the plan is different for each
18  person, and this is what has been submitted or
19  generated, and that's what that's telling you in this
20  column?
21      A.  Yes. Yes.
22      I'm sorry. Were you referring to the
23  assigned quota column?
24      Q.  The plan status.
25      A.  The plan status would be, yes, something

---

74

1   that's been submitted or generated, as far as a
2   compensation plan.
3       Q.  As far as a compensation plan.
4       A.  Correct.
5       Q.  Okay. You can put that document aside.
6       A.  Okay.
7       Q.  Okay. Let's talk a little bit about the
8   forecasting process for fiscal year 2001. Was that the
9   same as the budget, as the budgeting process? You were
10  assigned a number and then --
11      A.  Totally different.
12      Q.  Totally different.
13      Explain how it was different.
14      A.  The budget is a number that is established in
15  the beginning of the year, in June. That's our targets
16  for the year.
17      The forecast is a summary of the deals that we
18  are working on, so the budget really comes from the top
19  and comes down to the salespeople. So John Nugent would
20  get a budget number, he would divide it among his
21  four areas, I would divide it among mine and that.
22      Forecasting, just opposite; that is, comes
23  from the salespeople to the regional manager. Here are
24  the deals we're working on and the potential dollar
25  amounts, and when do I think they will close. And then

---

75

1   the regional manager would summarize those and give them
2   to myself and I would take those up to John Nugent.
3       Q.  So -- and it was different each quarter, so
4   you would start each quarter with the number of deals
5   that you had that you were working on that period of
6   time?
7       A.  Yes.
8       Q.  Is that right? Okay.
9       Okay. Did you -- you used a program
10  called OSO to manage the process?
11      A.  Yes.
12      Q.  Okay. What is OSO?
13      A.  I think it was Oracle Sales Online.
14      Q.  Okay. How did Oracle Sales Online -- how
15  was that used in the forecasting process?
16      MS. KYROUZ: Objection. Vague.
17      THE WITNESS: Salespeople would enter a deal,
18  so they would have the account name, the potential
19  dollar value, and then they would break it off by
20  product, so whether it's database or applications and
21  all that. And then they would have also a potential
22  date that it would close. So that's what a salesperson
23  would do.
24      Then a regional manager would -- he would have
25  view to those deals within his region.

---

76

1       MR. BRITTON: Q. Okay. And he would only be
2   able to see what was in his region; is that right?
3       A.  Correct.
4       Q.  And you were only able to see what was in your
5   region?
6       A.  In our area, yes.
7       Q.  In your area.
8       A.  Correct.
9       Q.  Okay. The information that -- withdrawn.
10      OSO, did you access that electronically --
11  or withdrawn.
12      Could you access Oracle Sales Online
13  electronically?
14      A.  Yes.
15      MS. KYROUZ: Objection. Vague.
16      MR. BRITTON: Q. Did you access, during
17  fiscal year 2001, did you access Oracle Sales Online
18  electronically?
19      MS. KYROUZ: Objection. Vague.
20      THE WITNESS: I did not.
21      MS. KYROUZ: Q. You did not. Okay.
22      Now, the -- so you would use a hard copy
23  printout of OSO for a particular time period; is
24  that right?
25      MS. KYROUZ: Objection. Lacks foundation.

---

77

```
1        THE WITNESS: Yes.
2        MR. BRITTON: Q. And that hard copy would
3   allow you to see where the forecast was for your region
4   for that particular time period that you were looking
5   at?
6        MS. KYROUZ: Objection. Vague, lacks
7   foundation.
8        THE WITNESS: Yes.
9        MR. BRITTON: Q. Okay. Now, anybody that had
10  access to OSO in your region would be able to see what
11  the forecasts were for the particular time period that
12  they were looking at?
13       MS. KYROUZ: Objection. Vague, misstates
14  testimony.
15       THE WITNESS: Could you reword that, please?
16       MR. BRITTON: Q. Yeah. So if John Nugent
17  wanted to see what your forecast was on a particular
18  day, could he see that if he accessed OSO
19  electronically?
20       MS. KYROUZ: Objection. Lacks foundation.
21       THE WITNESS: Yes.
22       MR. BRITTON: Q. Okay. And the same for
23  George Roberts?
24       A. Yes.
25       MS. KYROUZ: Objection. Lacks foundation.
```

78

```
1        MR. BRITTON: Q. You mentioned that the
2   salespeople would put in the client name, the
3   opportunity amount, the estimated close date.
4        Would they also assign a win probability
5   percentage to the deal?
6        A. Yes.
7        Q. Okay. And what did the win probability
8   percentage mean? What did you understand it to mean?
9        A. It oftentimes reflected where they were at in
10  the sales cycle and the probability they thought of
11  getting the deal closed.
12       Q. Okay. So the probability the individual sales
13  guy thought of getting the deal closed in the quarter
14  that you were working at the particular time?
15       MS. KYROUZ: Objection. Misstates —
16       MR. BRITTON: Q. Let me use an example. If
17  you're looking at a deal in the third quarter of 2001
18  and it has a win probability percentage, that means that
19  that's the salesperson's view of what — his view of the
20  probability percentage of getting that deal closed in
21  that quarter, in the third quarter?
22       A. Correct.
23       Q. Okay. Were there assigned meanings to the
24  different win probability percentages used in OSO?
25       MS. KYROUZ: Objection. Vague.
```

79

```
1        THE WITNESS: Yes.
2        MR. BRITTON: Q. There was. Okay.
3        And where were those assigned definitions
4   located?
5        A. Most people had a hard copy of it, or it was
6   on the system, and it would be in 10 percent increments,
7   so it would be 10 percent means this, 20 percent means
8   this.
9        Q. All the way up to 90 percent, 100 percent, or
10  did it end at, like, 99 percent?
11       A. I can't remember, yeah. 100 percent would be
12  closed, or a deal that had been won.
13       Q. Did the regional managers have any input into
14  what the win probability percentages were for particular
15  deals?
16       MS. KYROUZ: Objection. Lacks foundation.
17       THE WITNESS: I assume they would, yes.
18       MR. BRITTON: Q. Okay. Do you know if they
19  did, if they would confer with the salespeople to say,
20  "Okay. Let's assign this a certain win probability"?
21       A. I'm sure it was discussed, but I don't know if
22  they influenced to change it or anything like that.
23  Regional managers sit down with the sales reps and go
24  over their forecast.
25       Q. Okay. Now, did you have any input about what
```

80

```
1   the win probability percentages were going to be?
2        MS. KYROUZ: Objection. Vague.
3        THE WITNESS: I did not.
4        MR. BRITTON: Q. You did not. Okay.
5        In the -- you said on the -- you could see
6   what the win probability percentage definitions were
7   on the system. Is that like a drop-down menu so you
8   could click a button and see what the win
9   probability percentages were?
10       A. I don't know. I did not use a tool online.
11       Q. Okay. So you never used it online.
12       A. Nope.
13       Q. Okay. What is your understanding of what a
14  10 percent win probability meant?
15       MS. KYROUZ: Objection. Vague.
16       MR. BRITTON: Q. If you looked at -- let me
17  ask it a different way.
18       If you looked at a report in the third quarter
19  of 2001 and you saw a 10 percent win probability, what
20  did that mean to you?
21       MS. KYROUZ: Same objection.
22       THE WITNESS: It meant that we had a lot of
23  work to do to get it closed within that time frame.
24       MR. BRITTON: Q. Anything more than "We have
25  a lot of work to do"?
```

81

1    A.  That was about it.

2    Q.  Okay.  Did you know -- could you gauge whether

3    a deal would close or not based upon the win probability

4    percentage?

5    A.  No.

6    Q.  So let's say, for example, in -- you know,

7    with three weeks to go in the quarter, if it has a win

8    probability of 10 percent, that didn't tell you that the

9    chances of it closing were unlikely?

10    A.  No.

11    Q.  But it would tell you that the salesperson

12    thought that the chances of it closing were 10 percent

13    in that quarter.

14    A.  Or that he hadn't updated it.

15    Q.  Or that he hadn't updated it.  Okay.

16    A.  I mean, one meeting the percentages go from

17    10 percent to 80 percent.

18    Q.  Okay.  Did the salespeople also -- in OSO, the

19    salespeople also categorized the deals by worst forecast

20    and best; am I right?

21    MS. KYROUZ:  Objection.  Vague.

22    THE WITNESS:  Yes.

23    MR. BRITTON:  Q.  Okay.  What did "worst"

24    mean?  What did that "worst" column mean?

25    MS. KYROUZ:  Same objection.

82

1    THE WITNESS:  There was not a standard within

2    our area or the company on that.

3    MR. BRITTON:  Q.  Okay.  So if you looked at

4    the report and you saw a worst -- a value assigned in

5    the worst column, what did that mean to you?

6    A.  That if we got that deal, the minimum amount

7    would be that amount.

8    Q.  Okay.  So it's a minimum amount --

9    A.  The deals forecasted for a minimum of that.

10    Q.  Okay.  The deals forecasted for a minimum

11    of --

12    A.  So I could have a deal forecast for $2.  I

13    could have a worst case of $1 and they only decided to

14    buy half of the project, or a best case of $3 where I'm

15    going to try to get them to buy forward or -- but I'm

16    going to forecast two; the worst case could be they're

17    going to shrink the project or not do all of it, or

18    whatever.

19    Q.  And then the forecast column, what did that

20    represent?

21    A.  That's most likely what I think I'll sell this

22    for.

23    Q.  So the most likely outcomes?

24    A.  Yes.

25    Q.  And then the best column, what did that

83

1    represent?

2    A.  There's some upside to this.  If I could get

3    them to buy out for another six months, if I could get

4    them to consolidate some projects, that type of -- you

5    know, it could go as high as --

6    Q.  So if everything goes well, it could go as

7    high as this?

8    A.  Yes.

9    Q.  And the worst is if everything goes wrong, it

10    will be this?

11    MS. KYROUZ:  Objection.  Misstates the

12    testimony.

13    MR. BRITTON:  Q.  Is that right?

14    A.  No, the worst is zero.  I mean, you know, we

15    don't get a deal.  So worst is we can get the deal, it

16    could be as low as this amount.  So when you have a

17    dollar amount, the worst forecast best, you are

18    forecasting a deal, and the forecast amount is here.

19    There is some risk; it could be as low as this.  There's

20    some upside; it could be as high as this.

21    Q.  Okay.  But if it's in that worst forecast best

22    category, then that deal is forecasted for the quarter?

23    A.  Yeah, forecast is -- if it's in the forecast

24    column, it's forecasted for the quarter.

25    Q.  What if it's in the worst column only but not

84

1    in the forecast, not in the best?

2    A.  You couldn't do a worst only.

3    Q.  Oh, you couldn't.

4    A.  No, it would be worst would generate a

5    forecast.

6    Q.  Okay.  So if you put it in worst, it

7    automatically would assign something to a forecast?

8    A.  Yes.

9    MS. KYROUZ:  Objection.

10    MR. BRITTON:  Why don't we go off the record.

11    (Recess taken from 11:17 to 11:25 A.M.)

12    MR. BRITTON:  Q.  Going back to the worst

13    forecast best categories, what would it mean to you if

14    you had a number in the forecast column but a zero in

15    the worst case column?

16    MS. KYROUZ:  Objection.  Lacks foundation.

17    THE WITNESS:  What it would mean to me is

18    somebody has not -- has not entered the data properly.

19    MR. BRITTON:  Q.  Okay.  Now, the OSO was --

20    also told you what -- withdrawn.

21    You're familiar with the term "pipeline" at

22    Oracle, aren't you?

23    A.  Yes.

24    MS. KYROUZ:  Objection.  Vague.

25    MR. BRITTON:  Q.  What does that mean to you?

85

1      MS. KYROUZ: Same objection.

2      THE WITNESS: It means the total amount of

3  opportunity that a person or a business unit is working

4  on within a specific period of time.

5      MR. BRITTON: Q. It's just an accumulated

6  total of the deals that are in the pipeline, the deals

7  that you're working on?

8      A. Correct.

9      Q. And that would be your total pipeline.

10     Now, that showed up in OSO, as well,

11  right? Withdrawn.

12     One of the purposes of OSO was to track

13  the pipeline at Oracle; is that right?

14     A. Yes.

15     Q. Now, the pipeline would grow in a particular

16  quarter as salespeople added new opportunities, or as

17  existing opportunities became more valuable; is that

18  right?

19     MS. KYROUZ: Objection. Vague.

20     THE WITNESS: If there was no reductions in

21  other opportunities.

22     MR. BRITTON: Q. Okay. But if a pipeline was

23  growing, it's going from, say, a dollar to $2, that

24  means that it's either an existing opportunity has

25  become more valuable, or somebody has added in a new

86

1  opportunity for a dollar; is that right?

2      A. Yes.

3      Q. Now, what would cause the pipeline to drop

4  during a particular quarter?

5      MS. KYROUZ: Objection. Vague.

6      THE WITNESS: A number of things.

7      MR. BRITTON: Q. Okay. What could cause it

8  to drop?

9      A. A deal that was shrunk in size, a deal that

10  moved out of the quarter, a deal that was lost, a deal

11  where there was no decision.

12     Q. Okay. "No decision" meaning either it didn't

13  move out into the quarter, or somebody's sitting on it?

14     A. The customer just said we're freezing it or —

15  we just made no decision on this project or to spend

16  money.

17     Q. And that's similar to a lost deal?

18     A. It's not.

19     Q. How is it different?

20     A. No decision could be we're going to wait 90

21  days and see what's happening. Lost is we bought

22  somebody else's project. We're going to go with this

23  project, but not with you.

24     Q. Okay. Now, is there anything else that would

25  cause the pipeline to drop, other than what you just

87

1  listed?

2      MS. KYROUZ: Objection. Vague.

3      THE WITNESS: There might be other areas.

4  Nothing sticks out.

5      MR. BRITTON: Q. What if a deal was closed,

6  they actually signed the deal; would that stay in the

7  pipeline, or would that fall out of the pipeline?

8      MS. KYROUZ: Objection. Vague.

9      THE WITNESS: It would show up in the

10  pipeline.

11     MR. BRITTON: Q. It would show up as

12  one deal?

13     A. Yes.

14     Q. Now, were deals categorized in your division

15  as big deals, not big deals?

16     MS. KYROUZ: Objection. Vague.

17     THE WITNESS: If a deal was larger than

18  $500,000, it went on a separate page.

19     MR. BRITTON: Q. It went on the front page of

20  the printout you were using?

21     A. Yes.

22     Q. Now, is that — do you know if that was the

23  same definition for General Business as a whole, or NAS

24  as a whole, big deals were 500,000 or above?

25     MS. KYROUZ: Lacks foundation.

88

1      THE WITNESS: To my knowledge, General

2  Business, I don't know about majors or OPI or any other

3  business units.

4      MR. BRITTON: Q. Okay. But in General

5  Business, it was 500,000 or above was considered a big

6  deal?

7      A. I believe so, yes.

8      Q. And how do you have that understanding?

9      A. I believe John was consistent on how he looked

10  at the — you know, that type of data. The reason I

11  don't know for sure is that we did not participate in

12  each other's forecast calls, my peers. Those were all

13  sessions with John and just us.

14     Q. Okay. I want to take you back to the

15  1998/1999 time period.

16     Can you describe the strength of your business

17  during that time period?

18     MS. KYROUZ: Objection. Vague, lacks

19  foundation.

20     THE WITNESS: I guess I'm not real clear what

21  you mean by "strength".

22     MR. BRITTON: Q. Was it growing, were sales

23  easy to make, was your business growing or contracting?

24     A. Business was growing.

25     Q. It was growing.

89

1     Was it growing considerably?
2         MS. KYROUZ: Same objection.
3         THE WITNESS: Parts of it were very robust,
4     yes.
5         MR. BRITTON: Q. And what parts were very
6     robust?
7     A. Selling technology in California.
8     Q. In particular to the dot-coms?
9     A. Just overall, it was very healthy.
10    Q. So you wouldn't single out the dot-coms?
11    A. That was the highest growth.
12    Q. Now, you mentioned in California. Was it
13    growing as well, do you know, in the other areas within
14    General Business?
15        MS. KYROUZ: Objection. Lacks foundation.
16        THE WITNESS: My area or nation --
17        MR. BRITTON: Q. The other areas in the
18    1998/1999 time period, was the General Business growing
19    in the other areas?
20    A. Nationally?
21    Q. Nationally.
22        MS. KYROUZ: Same objection.
23        THE WITNESS: It was growing. I can't
24    remember -- I don't know the percents.
25        MR. BRITTON: Q. Okay. Was -- but growth in

90

1     California was a lot larger than it was in other parts
2     of the country; is that fair?
3         MS. KYROUZ: Objection. Lacks foundation.
4         THE WITNESS: Yeah, I don't know what Boston
5     was doing or Austin or Chicago or --
6         MR. BRITTON: Q. Okay. Did you have a sense
7     at all during that period of time that your growth was
8     bigger than the growth in other parts of the country?
9     A. That was our sense, yes.
10    Q. That was your sense.
11        And where did you get that sense from?
12    A. It just seemed like we were producing more for
13    the same amount of people than other parts of the
14    country.
15    Q. And how did you get an idea of what other
16    parts of the country were producing?
17    A. As an example, you go to a planning document
18    or something like that, you can see estimated actuals
19    and things like that.
20    Q. So you were a lot bigger and growing a lot
21    faster?
22    A. And again, I would talk to my peers. I mean,
23    it's not like we were shielded.
24    Q. Okay. Now, did the growth continue in the
25    1999 to 2000 period?

91

1         MS. KYROUZ: Objection. Vague.
2         THE WITNESS: There was growth, yes.
3         MR. BRITTON: Q. There was growth.
4         Was it as strong as it was in the 1998/99 time
5     period?
6         MS. KYROUZ: Same objection.
7         THE WITNESS: I can't remember, specifically.
8         MR. BRITTON: Q. Do you know what your growth
9     was in the 1998 to '99 time period?
10    A. Not specifically, no.
11    Q. Over 100 percent, lower than 100 percent?
12    A. High. Once again, I don't know what -- what
13    your definition of "high" is. We had excellent growth
14    during those time frames.
15    Q. Okay. Did you ever hear of the concept of
16    backfilling?
17    A. Yes.
18    Q. Okay. What does that mean to you?
19    A. It's when a deal falls out of your forecast,
20    you can backfill it. Do you have another deal that's
21    not forecasted that you can cover that revenue amount?
22    Q. And was it easy to backfill deals in the 1998
23    to '99 time period?
24        MS. KYROUZ: Objection. Vague.
25        THE WITNESS: It depends on what you

92

1     forecasted.
2         MR. BRITTON: Q. Right.
3     A. If you gave a fair forecast, yes, I mean, you
4     could backfill deals that slipped out.
5     Q. Right. Okay.
6         Now, let's go back to the '99 to 2000 time
7     period. Were you having the same type of robust
8     growth in that time period as you were in the '98 to
9     '99 time period?
10        MS. KYROUZ: Objection. Vague. Asked and
11    answered.
12        THE WITNESS: We were having growth, but our
13    baseline was a lot different.
14        MR. BRITTON: Q. Okay. What do you mean by
15    the "baseline was a lot different"?
16    A. Well, to measure growth you have to have a
17    baseline, and so the previous year we had had success.
18    So the baseline to figure growth on was higher.
19    Q. Okay. So it was higher.
20        So was your -- was your growth rate higher in
21    the '99 to 2000 time period than it was in '98 to '99?
22    A. I don't know, but I doubt it.
23    Q. You doubt it. Why is that?
24    A. Because the baseline was so much higher.
25    Q. Okay. Okay.

---

93

1        Now, let's talk — let's separate out
2    technology and applications. We talked about robust
3    growth in '98 to '99. In that time period did you have,
4    as products, technology and applications?
5        A.   Yes.
6        Q.   You did.
7        Was the growth in the '98 to '99 time period
8    the same for technology as it was for applications?
9        A.   Probably not.
10       Q.   Probably not.
11       What was more?
12       A.   It was probably higher for applications.
13       Q.   Higher for applications and lower for
14   technology?
15       A.   Probably, yes.
16       Q.   And why is that?
17       A.   Y2K.
18       Q.   Okay. Now let's move to the '99 to 2000 time
19   period. Was the growth rate for technology the same as
20   it was for applications?
21       A.   Again, probably not.
22       Q.   Why not?
23       A.   Two different products, two different people
24   buying.
25       Q.   Okay.

---

94

1        A.   Two different business functions that we were
2    trying to resolve, business problems.
3        Q.   What was a stronger growth in the '99 to 2000
4    time period?
5        MS. KYROUZ:   Objection. Vague.
6        THE WITNESS:   I don't know for sure. I assume
7    probably applications had a higher percent, again,
8    because they had a much lower baseline.
9        MR. BRITTON:   Q.   Okay. Let's take a look
10   back at Exhibit 1.
11       Okay. If you look at the third page of
12   Exhibit 1 —
13       A.   Yes.
14       Q.   — it gives you some '99 numbers; '99 budget,
15   '99 actuals. Okay. And then it gives you fiscal year
16   2000 budget, and then fiscal year 2000 actuals. And
17   again, that's an estimate because the fourth quarter
18   hadn't closed, right?
19       A.   Okay.
20       Q.   Okay. If you look — and this is for
21   technology.
22       MS. KYROUZ:   Objection. Misstates the
23   document.
24       MR. BRITTON:   Q.   Am I right? This is for
25   technology?

---

95

1        A.   That's what it says.
2        Q.   Okay. The actuals for 1999 were 86.9 million,
3    and then the estimated actual for 2000 is 188.1. So am
4    I over 100 percent there, gross?
5        MS. KYROUZ:   Objection. Lacks foundation.
6        Are you asking him to do the math?
7        THE WITNESS:   If the numbers for FY99 are
8    86.9, and it looks like FY00 actuals are 188, yes —
9        MR. BRITTON:   Q.   That's over 100 percent
10   growth.
11       A.   Right.
12       Q.   Does that refresh your recollection about how
13   high the growth rate was for your division between '99
14   and 2000?
15       A.   Not specific percentages. I said we had good
16   growth, but not specific percents. I don't remember if
17   it was 100, 105, 63. I mean —
18       Q.   Right.
19       Is there any reason to doubt that these
20   numbers are accurate?
21       MS. KYROUZ:   Objection.
22       THE WITNESS:   I wouldn't. I mean, I have no
23   reason to doubt them.
24       MR. BRITTON:   Q.   Because based on this
25   document, it's fair to say that you had over 100 percent

---

96

1    growth in technology from '99 to 2000?
2        A.   Based on this data, yes.
3        Q.   All right. If you turn to the next page —
4        A.   Page 4?
5        Q.   Yes. This is the analysis for applications.
6        A.   Okay.
7        Q.   Now, if you go down, it gives you — the third
8    row or the third column down, spread analysis.
9        A.   Yes.
10       Q.   It gives you numbers for '99 and budgeted and
11   actuals, and then it gives you numbers for 2000 budgeted
12   and actuals. Again, with the caveat that fiscal year
13   2000 actual was an estimate based upon the fact that the
14   fourth quarter hadn't closed yet. So this shows that
15   the '99 actuals were — for applications were
16   36.3 million.
17       Would you agree with me?
18       MS. KYROUZ:   Objection. Lacks foundation.
19       THE WITNESS:   It looks like it was, yes.
20       MR. BRITTON:   Q.   And then the actuals for
21   fiscal year 2000 were 51.6. So you had less than 100
22   percent growth on the applications; is that right?
23       A.   Yep. If those are the numbers, yes.
24       Q.   So it's still very good growth, but technology
25   was growing faster than application was.

---

97

1          MS. KYROUZ: Objection. Lacks foundation.
2          MR. BRITTON: Q. Is that fair?
3      A. Based on this data, yes.
4      Q. Does that refresh your recollection on what
5  was going on during that time period?
6      A. Kind of. Not specifically. We had high
7  growth. I mean, we were growing our business
8  applications and technology very high.
9      Q. Okay. Now, do you recall how much of the
10  technology growth came from dot-com companies?
11          MS. KYROUZ: Objection. Vague.
12          THE WITNESS: I do not remember the specifics
13  of that, no.
14          MR. BRITTON: Q. Was it a high percentage?
15          MS. KYROUZ: Same objection.
16          THE WITNESS: Of our growth, yes.
17          MR. BRITTON: Q. Yeah, high percentage of
18  growth.
19          Is it fair to say that at least half came
20  from dot-com companies?
21          MS. KYROUZ: Same objection.
22          THE WITNESS: It would be speculation.
23          MR. BRITTON: Q. It would. You can't even
24  give me an estimate?
25          MS. KYROUZ: Same objection.

98

1          THE WITNESS: It was a high percentage of our
2  growth. On technology.
3          MR. BRITTON: Q. On technology.
4      A. Right.
5      Q. But not on applications.
6          Okay. Now, you're familiar with the
7  dot-com bubble, aren't you?
8          MS. KYROUZ: Objection. Vague.
9          MR. BRITTON: Q. Do you know what that term
10  means?
11      A. I do.
12      Q. What does that term mean to you?
13      A. It was a market that was a very high-emerging
14  market, and then it just slowed dramatically.
15      Q. Based on your experience at Oracle selling to
16  dot-com customers, when was the pinnacle of the dot-com
17  era, if you will? When was it the strongest, sales to
18  the dot-coms?
19          MS. KYROUZ: Objection. Vague.
20          THE WITNESS: In calendar years '98 and '99.
21          MR. BRITTON: Q. Those were the strongest?
22      A. If I remember correctly, yes.
23      Q. And then you started to see it slow beginning
24  of the end of fiscal year 2000, beginning of the fiscal
25  year 2001?

99

1          MS. KYROUZ: Objection. Vague, misstates
2  testimony.
3          THE WITNESS: It just wasn't as robust.
4          MR. BRITTON: Q. It was starting to slow
5  during that period of time?
6          MS. KYROUZ: Same objection. Asked and
7  answered.
8          THE WITNESS: I guess "slow" is the word you
9  want to use. Probably not what I would use, but it was
10  just not as robust.
11          MR. BRITTON: Q. Now, did you have any
12  conversations with John Nugent during the planning
13  process about the dot-com segment of your business
14  slowing down?
15          MS. KYROUZ: Objection. Vague.
16          THE WITNESS: I did.
17          MR. BRITTON: Q. You did. Okay.
18          Can you describe those conversations for me?
19      A. In the playing process I pointed out that I
20  thought that putting a high growth, continued high
21  growth on dot-com might not be what we wanted to do.
22      Q. Okay. And what did he say to you in response?
23      A. "I'll take that into consideration."
24      Q. Okay. Now, he reduced -- we looked at
25  Exhibit 1, and you pointed out that there was a

100

1  4-million-dollar reduction. Was that because of your
2  comment about the dot-coms -- you may not want to put
3  such a high growth rate on dot-coms?
4          MS. KYROUZ: Objection. Lacks foundation.
5          THE WITNESS: No, that number was before our
6  discussion, so John had put that in already.
7          MR. BRITTON: Q. He had put that in already.
8      A. Yes.
9      Q. Now, had you had conversations with John prior
10  to this planning meeting about the dot-com segment of
11  your business?
12          MS. KYROUZ: Objection. Vague.
13          THE WITNESS: Not that I recall.
14          MR. BRITTON: Q. You spoke with him on a
15  weekly basis?
16      A. Yeah.
17      Q. He didn't mention anything about dot-coms
18  slowing down or growth wasn't as robust?
19      A. Not that I recall.
20      Q. Now, is it fair to say that you were --
21  withdrawn.
22          George Roberts and John Nugent were in
23  Waltham, Massachusetts; is that right?
24      A. No.
25      Q. Where were they?

Classick, Nicholas  4/12/2006  9:02:00 AM

101

1    A.  John was in Massachusetts and George lived in
2    Milwaukee.
3    Q.  In Milwaukee.
4    But were they based out of the same offices,
5    or no?
6    A.  No.
7    Q.  Okay.  They were both on the east coast?
8    MS. KYROUZ:  Objection.  Misstates testimony.
9    THE WITNESS:  Milwaukee is not on the east
10   coast.
11   MR. BRITTON:  Maybe I can withdraw that
12   question.
13   Q.  Were you the source of -- withdrawn.
14   Were you a source of information for John
15   Nugent about the dot-com segment of his business?
16   MS. KYROUZ:  Objection.  Vague, lacks
17   foundation.
18   THE WITNESS:  I assume I was a source.
19   MR. BRITTON:  Q.  You were a source.
20   And what makes you assume that?
21   A.  Because I ran part of his business unit that
22   was selling to dot-coms.
23   Q.  And it was the largest part of his business
24   that sold dot-coms?
25   MS. KYROUZ:  Objection.  Last foundation.

102

1    THE WITNESS:  Based on his data, yes.
2    MR. BRITTON:  Q.  Based on your recollection,
3    it was.
4    A.  Yes.  There are other parts of the country
5    that were selling dot-coms.
6    Q.  Right.  You were not the only one selling
7    dot-coms, but you were the largest one selling dot-coms.
8    So if he gets information about dot-coms, it's
9    gonna come from you as well as the other people in the
10   country; is that right?
11   MS. KYROUZ:  Objection.  Lacks foundation.
12   THE WITNESS:  I could be one source.
13   THE VIDEOGRAPHER:  Q.  Okay.  Do you know of
14   any other sources that he would use to get dot-com
15   information, other than you and his other regional
16   managers or area vice-presidents?
17   MS. KYROUZ:  Objection.  Lacks foundation,
18   vague.
19   THE WITNESS:  I assume he would be talking to
20   the sales consulting management.  He was a well read
21   person, so he would be reading industry periodicals, and
22   he lived in Boston and that was a dot-com, so lots of
23   different places I'm sure he got information.
24   MR. BRITTON:  Q.  Did it surprise you that he
25   had reduced the dot-com number by $4 million in the

103

1    planning?
2    MS. KYROUZ:  Objection.  Misstates the
3    document.  Lacks foundation.
4    THE WITNESS:  No.
5    MR. BRITTON:  Q.  Why not?
6    A.  Again, I think it was because a big baseline,
7    he thought -- when you put a growth on a big baseline,
8    that's when you're going to start looking at is that
9    feasible?
10   Q.  Now, why did you raise the issue of not
11   putting such a high growth rate on the dot-coms during
12   the planning meeting that you had with John Nugent?
13   MS. KYROUZ:  Objection.  Vague.
14   THE WITNESS:  I didn't know if we could
15   sustain that growth.
16   MR. BRITTON:  Q.  Okay.  Now, you testified
17   earlier you had no input into the budgeting -- the
18   planning here.
19   Did you have any input into the budget that
20   was assigned to you at all?
21   A.  No.
22   Q.  No.  Okay.
23   Were you attempting to have John Nugent
24   reduce your budget because of what was going on in
25   the dot-com area?

104

1    MS. KYROUZ:  Objection.  Vague.
2    THE WITNESS:  I mean, I just was -- again, I
3    was planning going into there, and I just raised -- you
4    know, raised a flag and said, "I think that this might
5    be a little bit," you know, "a little aggressive."  Was
6    I -- you know, every salesperson is looking to get their
7    quota reduced, so it's staying alive.  That was my
8    story.
9    MR. BRITTON:  Q.  Right.
10   Not every salesperson has a big part of their
11   business slow down.  Would you agree with that?
12   A.  Say that again.
13   Q.  Not every salesperson has a big part of their
14   business slow down.  Do you agree with that?
15   MS. KYROUZ:  Objection.  Misstates testimony,
16   lacks foundation.
17   THE WITNESS:  Every salesperson is a pretty
18   broad area, yeah.
19   MR. BRITTON:  Q.  So every salesperson would
20   be faced with the similar drop in a very large segment
21   of their business; is that what you're saying?
22   MS. KYROUZ:  Objection.  Misstates testimony.
23   THE WITNESS:  No, it's not what I'm saying at
24   all.  I'm sorry.
25   MR. BRITTON:  Q.  Did John Nugent --

105

1      Now, you mentioned that -- you mentioned to
2   him that you may not want to put such a high growth rate
3   on dot-coms, and he said, "I'll take it into
4   consideration."
5      Did he take it into consideration?
6      MS. KYROUZ: Objection. Lacks foundation.
7      THE WITNESS: I don't know.
8      MR. BRITTON: Q. You don't remember?
9      A.  I know my number -- I got a number 45 days --
10  60 days from this.
11     Q.  And do you remember him taking that into
12  consideration in reducing your number?
13     MS. KYROUZ: Objection. Lacks foundation,
14  asked and answered.
15     THE WITNESS: I did not see another one of
16  these, so I don't know where he got the final number.
17     MR. BRITTON: Q. Do you -- withdrawn.
18     In fiscal 2001, did you believe that you
19  should have had input into your budget?
20     MS. KYROUZ: Objection. Vague.
21     THE WITNESS: No different than any other time
22  with Oracle. I never have.
23     MR. BRITTON: Q. Did you find it odd that you
24  didn't have input into the budget that was being set for
25  you?

106

1      MS. KYROUZ: Same objection.
2      THE WITNESS: As mentioned, I didn't the first
3   five years. I don't know why I would think I would have
4   it for that one.
5      MR. BRITTON: Q. Well, it's a number you're
6   expected to achieve, right?
7      A.  That's true.
8      Q.  And you would think that you would want to
9   have some input into a number that you were expected to
10  achieve.
11     A.  As I mentioned, I didn't have any input the
12  first five years I was there, so it didn't surprise me
13  that I didn't have it for years 2000 and 2001.
14     Q.  If you had your preference, would you have had
15  an influence or input into the budget that was being set
16  for you for the year?
17     MS. KYROUZ: Objection. Calls for
18  speculation.
19     THE WITNESS: I assume somebody would like to
20  have some type of input, but it didn't surprise me and I
21  wasn't upset by it.
22     MR. BRITTON: Q. Now, what did it mean for
23  you, personally, to achieve your budget for the year?
24     MS. KYROUZ: Objection. Vague.
25     MR. BRITTON: Q. What benefits did you get by

107

1   achieving the budget that was assigned to you for the
2   year?
3      A.  When you achieve your budgets, you achieve
4   your target earnings, so it would be a W-2 impact. You
5   achieve clubs, so you have a trip for you and your
6   spouse, and probably some job security.
7      Q.  Okay. Now, the inverse, if you've missed your
8   forecast, what is the downside -- what was the downside
9   for you at Oracle?
10     MS. KYROUZ: Objection. Misstates testimony,
11  lacks foundation, use of forecast versus budgets.
12     MR. BRITTON: Okay. Withdrawn.
13     Q.  What was the downside risk for you if you
14  didn't make the budget that was assigned to you at
15  Oracle?
16     A.  Well, initially it would be your W-2 being
17  impacted because your target earnings were based upon
18  your budget. As far as -- and you would not be eligible
19  for a club trip unless they wanted to make exceptions,
20  which they had in the past. And then, again, it's -- I
21  suppose some people worry about their jobs. I did not
22  worry about job security on that type of stuff. It
23  was -- we were, you know, doing the best we could, and
24  if that was not satisfactory, that's what it was.
25     Q.  Now, what were the concerns, or what were the

108

1   factors that you were seeing that caused you to raise
2   this issue with the dot-coms with John?
3      MS. KYROUZ: Objection. Vague.
4      MR. BRITTON: Q. What were you seeing in the
5   market?
6      A.  We were just seeing a -- some of the money was
7   taking a little longer to get. A few more questions on
8   acquisition, purchases. Again, it wasn't a -- it wasn't
9   a major disaster; we just were saying it just seems like
10  things are -- people were starting to ask for
11  profitability, something they had not asked for from
12  some of these companies in '98 and '99.
13     Q.  And what do you mean "people were asking for
14  profitability"? What do you mean by that?
15     A.  Board of directors or investors were asking
16  companies to show a profit.
17     Q.  To show a profit before they spent any more
18  money on technology?
19     A.  Spent more money, period.
20     Q.  Including technology.
21     A.  Yes.
22     Q.  Okay. You said that there were more questions
23  on the purchases. What do you mean by that? Where were
24  those questions coming from?
25     A.  Oftentimes board of directors or investors.

109

1    Q.  Okay.  And what were you experiencing with
2  that?
3    A.  Additional questions meantime, additional
4  justification.
5    Q.  Okay.  And then the money that was taking
6  longer to get, was that the venture funding capital that
7  you were talking about?
8    A.  Two.  That could be one.  It could also be
9  internal funds could be harder to get.
10    Q.  Okay.  What do you mean by "internal funds"?
11    A.  If a company has X number of dollars
12  available, cash, it might take longer to free up part of
13  that.
14    Q.  Now, with the venture capital funding, were
15  you experiencing -- you mentioned it was taking longer
16  to get.
17    Were you also experiencing a reduction in the
18  amount that was available?
19    MS. KYROUZ:  Objection.  Vague.
20    THE WITNESS:  That seemed to be the trend,
21  yes.
22    MR. BRITTON:  Q.  And you saw this prior to
23  your meeting with John Nugent; is that right?
24    MS. KYROUZ:  Objection.  Vague.  Lacks
25  foundation.

110

1    MR. BRITTON:  Withdrawn.
2    Q.  You saw this prior to your preplanning meeting
3  with John Nugent in April of 2000?
4    MS. KYROUZ:  Same objections.
5    THE WITNESS:  We were seeing it, yes.
6    MR. BRITTON:  Q.  And that's what caused you
7  to raise the issue with John in the first place during
8  the preplanning meeting?
9    A.  We pointed it out, yes.
10    Q.  Was this having an effect on your pipeline
11  during the -- withdrawn.
12    Did you see any effect of this on your
13  pipeline at the end of fiscal 2000?
14    MS. KYROUZ:  Objection.  Vague, lacks
15  foundation.
16    THE WITNESS:  Not that I recall.
17    MR. BRITTON:  Q.  So if there was no effect on
18  your pipeline, what was giving you the concern?
19    MS. KYROUZ:  Same objection?
20    THE WITNESS:  Just discussions with my
21  managers.
22    MR. BRITTON:  Q.  Where were you seeing it,
23  though?  If it wasn't affecting your pipeline, what was
24  causing you to see additional justification needed,
25  calls for profitability needed, less funding from

111

1  venture capitalists; where were you seeing that if it
2  wasn't being reflected in your pipeline?
3    MS. KYROUZ:  Same objection.
4    THE WITNESS:  I was getting feedback from my
5  sales managers.  We would be talking about their
6  business, and that's the information they got.  We're
7  not -- you asked if I saw changes in the pipeline; not
8  really, but also maybe that was a bad thing.  Maybe it
9  wasn't growing.  So staying where it was at, consistent.
10    MR. BRITTON:  Q.  So it could have an effect
11  on the pipeline, just not an adverse effect on the
12  pipeline.  It could be staying the same; is that what
13  you were seeing?
14    A.  If I recall, yes.
15    Q.  Did you question your ability to make your
16  budget for fiscal year 2001?
17    MS. KYROUZ:  Objection.  Vague, lacks
18  foundation.
19    THE WITNESS:  When?
20    MR. BRITTON:  Q.  During the time that it came
21  out.
22    A.  Not at all.
23    Q.  Not at all.
24    You thought that you were going to make your
25  forecast.

112

1    MS. KYROUZ:  Objection.
2    MR. BRITTON:  Withdrawn.
3    Q.  You thought that you were going to make your
4  budget?
5    A.  Yes.
6    Q.  You weren't concerned with it at all?
7    A.  No.
8    Q.  But if you were concerned that they were
9  putting too large of a growth rate on the dot-coms, how
10  could that not influence or cause you concern about
11  making your budget for the year?
12    A.  I had lots of other places to sell, I had lots
13  of products to sell, we had made our number for every
14  day that I had been with Oracle for five or six -- for
15  five years.  I started in '95.  So when you get a number
16  in June, every June it looks big.  And you're like, "Oh,
17  no."  So that had been the case for six straight years.
18  Okay.  Let's go make it happen.  That's what I was paid
19  to do and that's the team I had.
20    Q.  Is it fair to say that you didn't think you
21  were going to get the same growth rate from dot-coms
22  that you got in the prior year?
23    MS. KYROUZ:  Objection.  Vague.
24    THE WITNESS:  Probably fair.  I mean, again,
25  it's -- going back to the beginning of '01, and by a

113

1  market segment and growth rate, I don't have a very good
2  recall of all of that. It was details.
3      MR. BRITTON: Q. You had over 100 percent
4  growth rate in technology. Were you expecting to
5  achieve over 100 percent growth rate in technology in
6  2001?
7      A. The 100 percent was two years prior. You
8  pointed out that was '99 to 2000. So, yeah, I'm sure I
9  didn't have 100 percent baked into my plan. That
10  probably was -- the prior to '98 there really
11  wasn't a dot-com. So 100 percent growth rate on a small
12  baseline for dot-com business in '97 might not have been
13  a big dollar amount. It was a big part of the business.
14      Q. You had over 100 percent growth rate from '99
15  to 2000.
16      A. Okay.
17      Q. Were you expecting that same growth rate from
18  2000 to 2001, or a lower growth rate?
19      MS. KYROUZ: Objection. Lacks foundation.
20      THE WITNESS: That was in technology dot-com.
21  I had a big business unit that sold to lots of
22  commercial businesses as well as applications. So was I
23  expecting 100 percent? The answer is no.
24      MR. BRITTON: Can we go off the record for a
25  second?

114

1      (Recess taken from 12:02 to 1:06 P.M.)
2      MR. BRITTON: Q. Welcome back, Mr. Classick.
3      A. Thank you.
4      Q. We were talking about dot-coms and what the
5  market was doing, and we talked about your discussions
6  with Mr. Nugent during the planning meeting, and I want
7  to ask you whether you told George Roberts about your
8  views of the dot-com market during that planning time
9  period, April, May, June.
10      A. I do not believe I did. The planning meeting
11  in April was just with John Nugent and his direct
12  reports.
13      Q. So at some point in time you did tell George
14  Roberts about your concerns about the dot-com market; is
15  that right?
16      MS. KYROUZ: Objection. Lacks foundation.
17  Vague.
18      THE WITNESS: Yes.
19      MR. BRITTON: Q. Yes. And that was in
20  October of 2000?
21      A. Yes.
22      Q. Okay. During an operations review meeting?
23      A. Yes.
24      Q. Okay. Why don't we go ahead and mark this as
25  an exhibit.

115

1      (Whereupon, Plaintiff's Exhibit 3 was marked
2  for identification.)
3      MR. BRITTON: Q. Okay. We've placed in front
4  of you what has been marked --
5      MS. KYROUZ: Do you want to do the Bates
6  numbers?
7      MR. BRITTON: Yeah, why don't we do that.
8      For the record, the copy that we have with the
9  Bates numbers on it is not very legible, so we have a
10  clean copy that does not have Bates numbers. So what
11  we'll do is we'll read the Bates numbers from the
12  illegible copy and attribute them to the legible copy.
13      So Exhibit 3 will start at Bates NDCA-ORCL
14  260754 through 777.
15      Q. Take a moment to look at Exhibit 3, and let me
16  know if you recognize it.
17      A. I do recognize it.
18      Q. Okay. This is the document you were talking
19  about earlier today that refreshed your recollection
20  about things that happened back in 2000?
21      A. Yes.
22      Q. And this was your presentation during the Q2
23  fiscal year '01 operations review; is that right?
24      A. Yes.
25      Q. Who was your audience?

116

1      A. It would be my peers, John Nugent, George
2  Roberts, and then they would have various staff people,
3  maybe human resources or finance people.
4      Q. Okay. Did each of your peers give a
5  presentation similar to the one you gave?
6      A. Yes.
7      Q. And where was this operations review?
8      A. I don't recall. They scheduled them in
9  different locations across the country.
10      Q. How long did the review last for?
11      A. Normally, it was a full day.
12      Q. Full day?
13      A. Yes.
14      Q. And how long did your presentation last?
15      A. Probably approximately two hours. 90 minutes
16  or two hours.
17      Q. Okay. I don't know if I asked you this:
18  Exhibit 3, what is Exhibit 3? I may have asked you this
19  already. I'm just drawing a blank.
20      A. Exhibit 3 is a hard copy of a presentation
21  that I gave at our business ops review at the second
22  quarter of FY01.
23      Q. Did you prepare the presentation?
24      A. Yes.
25      Q. When did you prepare the presentation?

**117**

1   A.   Probably worked on it for two or three weeks
2   prior to presenting it.
3   Q.   Okay.  It's part of your job to prepare
4   presentations like this?
5   A.   Yes.
6   Q.   Is this a true and accurate copy of the
7   presentation that you gave at the operations review in
8   Q2 '01?
9   A.   To the best of my knowledge, yes.
10   Q.   Okay.  Do you remember the date of the
11   presentation?
12   A.   I do not.
13   Q.   Okay.  So during the presentation, you're
14   telling your peers George Roberts, John Nugent many
15   different things, but included in that is that the
16   dot-com market is slowing down; is that right?
17   A.   Yes.
18   Q.   Okay.  And that is specifically on page 10 of
19   this --
20   A.   Yes.
21   Q.   Okay.
22        Now, how long did you spend on this part of
23   the presentation?
24   A.   I don't think there was any significant period
25   of time spent on any -- nothing stands out like we spent

**118**

1   a lot of time on this.
2   Q.   Okay.  Was there a question and answer
3   period -- withdrawn.
4        During your presentations, were the
5   audience allowed to ask questions about what you're
6   presenting?
7   A.   Yes.  It's very proactive.
8   Q.   Proactive.
9        Did John Nugent have any comments in
10   response to your comments about the slowdown in the
11   dot-com space?
12   MS. KYROUZ:  Objection.  Vague.
13   THE WITNESS:  Not that I recall.
14   MR. BRITTON:  Q.  What about George Roberts?
15   MS. KYROUZ:  Same objection.
16   THE WITNESS:  Nothing specific that I
17   remember.
18   MR. BRITTON:  Q.  Now, the -- we talked about
19   several different things that gave you the impression
20   about the dot-com market leveling off, if you will, in
21   the April 2000 time period.
22        Do you remember that discussion that we had?
23   A.   Yes, this morning, I do.
24   Q.   Now, this is talking about a slowdown in
25   dot-com space.  Dot-coms were getting worse by this

**119**

1   period of time, weren't they?
2   MS. KYROUZ:  Objection.  Misstates the
3   document and his testimony.
4   THE WITNESS:  Worse in comparison to --
5   MR. BRITTON:  Q.  April of 2000.
6   MS. KYROUZ:  Same objection.
7   THE WITNESS:  Hard to say.  I mean, it says --
8   it's a slowdown, but it appeared that, you know, looking
9   at this data, we still had a very good first quarter,
10   high growth.  So I don't think it had taken a big dip
11   compared to April; I think it just was continuing to see
12   there was a slowdown in dot-com space.
13   MR. BRITTON:  Q.  Okay.  So there was a
14   slowdown.
15        Is it your opinion that the slowdown in the
16   dot-com space was worse in October of 2000 than it was
17   in April of 2000?
18   MS. KYROUZ:  Same objection.  Asked and
19   answered.
20   THE WITNESS:  I don't think that was the case.
21   I think I was outlooking the rest of the year.
22   MR. BRITTON:  Q.  Now, you had requested a
23   reduction in your quota around this time, didn't you?
24   MS. KYROUZ:  Objection.  Misstates the
25   testimony.

**120**

1   THE WITNESS:  That's not true.
2   MR. BRITTON:  Q.  It's not true?
3   A.   No.
4   Q.   Okay.  Had you ever asked for a reduction in
5   your quota during fiscal year 2001?
6   MS. KYROUZ:  Objection.  Vague.
7   THE WITNESS:  Again, that's not true.
8   THE VIDEOGRAPHER:  Q.  No, my question was:
9   Did you ask for a reduction at any time during fiscal
10   year 2001?
11   A.   I did not ask for a quota reduction for
12   myself, no.
13   Q.   Did you ask for a quota reduction for your
14   division at any time during fiscal year --
15   A.   Not for my division.
16   Q.   Okay.  For anybody?
17   A.   For some of my salespeople.
18   Q.   Okay.  And did you ask that during October, or
19   around October of 2000?
20   A.   I can't remember exactly when I -- we brought
21   it up.
22   Q.   Was there any discussion during the ops
23   review, or any time around that, about a reduction in
24   the quota?
25   A.   Not that I remember.

121

1    Q. Do you remember talking to John Nugent about
2  his conversation with George Roberts about the fact that
3  he didn't increase your quota when times were good, so
4  therefore, he was not going to decrease your quota when
5  times were getting worse?
6        MS. KYROUZ: Objection. Vague.
7        THE WITNESS: I do remember that.
8        MR. BRITTON: Q. Okay. And when was that
9  conversation?
10    A. I don't remember specifically when it was.
11    Q. Okay. Was it around the Q2 operations review?
12    A. I don't think it was. I think it was after
13  that, but I don't know for sure.
14    Q. Okay. When do you -- what do you recall about
15  that conversation?
16    A. That John said that he had talked to George
17  and determined that we would not do any type of quota
18  reductions; that in the past couple of years when we had
19  high growth, we did not adjust quotas, and to be
20  consistent, we're not going to adjust them now.
21    Q. So did John Nugent raise this topic with you,
22  or was this in response to a request from you to reduce
23  your quota?
24        MS. KYROUZ: Objection. Lacks foundation.
25        THE WITNESS: Again, I did not ask for my

122

1  quota to be reduced.
2        MR. BRITTON: Q. Okay. So John was
3  essentially asking for your quota to be reduced, and
4  Roberts said no?
5        MS. KYROUZ: Objection. Misstates the
6  testimony.
7        THE WITNESS: That's not what I said. I never
8  asked for my quota, or John didn't ask for my quota to
9  be reduced.
10        MR. BRITTON: Q. Do you have any idea what
11  created the discussion between George Roberts and John
12  Nugent about, "We're not going to decrease the quota
13  when times are bad because we didn't increase the quota
14  when times were good"?
15    A. I don't know, specifically. I can make an
16  assumption, that it was based about certain individual
17  sales reps that were having a tough year.
18    Q. Okay. And were they sales reps in your
19  division?
20    A. Some of them.
21    Q. Okay. Do you remember which ones they were?
22    A. No. Individually, you mean?
23    Q. Yeah.
24    A. I do not.
25    Q. Okay. Let's take a look at page 10 of

123

1  Exhibit 3. The first heading is "VC Funding getting" --
2  or "VC Funding tougher." And if you look down -- before
3  we get to "VC Funding tougher," you have an asterisk by
4  "slowdown in dot-com space." And then you have a note
5  here that says, "Discussed during April 10th manager's
6  meeting."
7        Is that the meeting that you had with John
8  Nugent?
9    A. Yes.
10    Q. Okay. Was there anybody else present at that
11  meeting?
12    A. Yes, my peers. That was the planning meeting.
13    Q. Okay. So everybody was there. Okay.
14        Why don't you tell me who was at the planning
15  meeting.
16    A. It would have been my three peers, the manager
17  for northeast, mid Atlantic, central, John's finance
18  person, and probably the SC manager.
19    Q. Which manager?
20    A. Our sales consultants. I'm sorry. Sales
21  consulting manager.
22    Q. Now, when you raised the topic at the
23  April 10th manager's meeting about the slowdown in the
24  dot-com space, did any of your peers say anything about
25  similar effects in their areas?

124

1    A. Not that I recall.
2    Q. Okay. Now, under the "VC Funding tougher"
3  heading, we have "Refocus on profitability," and we
4  talked about that. You saw that during the -- or prior
5  to the April 10th manager's meeting.
6        You have in here "cost sensitive IPOs."
7        What do you mean by that?
8    A. I'm not -- there's a lot of IPO -- I don't
9  remember what the cost sensitive -- what point I was
10  trying to make with that.
11    Q. Okay. You have here "soft market". What do
12  you mean by that?
13    A. The market was not as robust as it had been.
14    Q. Okay. And then you have "increased
15  selectivity." What do you mean by that?
16    A. It was harder for start-ups to get funding.
17  The VCs were increasing their selectivity, their
18  requirements for who they would loan money to or give
19  money to.
20    Q. And that was having an effect on your business
21  during this period of time?
22        MS. KYROUZ: Objection. Misstates the
23  document and his testimony.
24        THE WITNESS: We were looking at the future to
25  see where we were starting to slow down.

125

1      MR. BRITTON: Q.  Was this having any effect
2  on your business at the time?
3      MS. KYROUZ:  Objection.  Vague.
4      THE WITNESS:  Not much.
5      MR. BRITTON: Q.  Sales weren't getting
6  tougher?
7      A.  We just came off a great first quarter.  We
8  did 55 percent growth the first quarter, so that ended
9  in September, ended in August, so in August we saw -- we
10  saw a 53 percent growth in total revenue, 123 percent
11  growth in applications, and 41 percent in technology.
12  So it wasn't -- we were still worried about it, but it
13  wasn't crippling our business.
14      MR. BRITTON: Q.  Okay.  What effect at all
15  was it having on your business?
16      MS. KYROUZ:  Objection.  Vague, lacks
17  foundation.
18      THE WITNESS:  We were out looking for the rest
19  of the year.  It was going to be more and more difficult
20  to hit our numbers.
21      MR. BRITTON: Q.  Okay.  The next heading down
22  you have, "Mergers/Acquisitions," and it says,
23  "Consolidation."  What do you mean by that?
24      A.  We were seeing dot-com companies buy other
25  dot-com companies, we were seeing brick and mortar

126

1  companies buy a dot-com company.
2      Q.  And what was your expectation of the effect on
3  your business from the consolidation, if any?
4      A.  Rather than having two customers to sell to, I
5  only had one.
6      Q.  Okay.  So it narrowed your customer base?
7      A.  Yes.
8      Q.  And were you seeing that as of October of
9  2000?  Were you seeing that as of October of 2000?
10      MS. KYROUZ:  Objection.  Vague, lacks
11  foundation.
12      THE WITNESS:  I assume I was.  I mean, this
13  presentation was in October.  I had a talk about it.
14      MR. BRITTON: Q.  Now, you have "business
15  failures" here.  What did you mean by that?
16      A.  Companies were going out of business, locking
17  up their doors.
18      Q.  So you have the consolidation that's narrowing
19  your customer base, and then you also have companies
20  that are going out of business at this time.  That's
21  narrowing your customer base, as well?
22      A.  Yes.
23      Q.  And then layoffs, I'm assuming that means
24  dot-com companies were laying people off.
25      A.  Yes.

127

1      Q.  And what effect did you see that having on
2  your business?
3      MS. KYROUZ:  Objection.  Lacks foundation.
4      MR. BRITTON: Q.  If any.
5      A.  You know, when they start laying people off,
6  that's usually the last thing that a desperate company
7  does, so if they were laying people off, they're not
8  buying hardware, software and office space.
9      Q.  So is that an expectation that there would be
10  a further reduction in the potential customer base; you
11  have companies that were consolidating, companies that
12  had gone out of business, and then companies that were
13  laying people off, so they were on the cusp of going out
14  of business weren't buying technology?
15      MS. KYROUZ:  Objection.  Vague, lacks
16  foundation.
17      THE WITNESS:  This was just more of an
18  observation that we were pointing out.  The industry was
19  starting to lose some jobs.  This market segment was
20  losing jobs.
21      MR. BRITTON: Q.  Now, you have "fire sales"
22  here.  What do you mean by that?
23      A.  You would have competition that was trying to
24  survive that would potentially discount product; you
25  would have -- when companies went out of business, they

128

1  would have -- selling their hardware, office space, just
2  things were on sale.
3      Q.  Okay.  Now, what potential effect would that
4  have on your business, if any?
5      MS. KYROUZ:  Objection.  Vague, lacks
6  foundation.
7      THE WITNESS:  We were always competing for
8  capital within these accounts, so if they determined
9  there was other places to spend it, that's where they
10  would go.
11      MR. BRITTON: Q.  Then the next one down is
12  "software rental".  Why don't you tell me about what
13  this part of the slide was meant to convey.
14      A.  That companies were starting to look at,
15  rather than acquiring, purchasing software, an unlimited
16  perpetual, they could rent it for 12 months, 24 months
17  to reduce their cash, conserve their cash.
18      Q.  And you were seeing that in the marketplace?
19      A.  Yes.
20      Q.  Now, that's the rent versus buy.  Now, there's
21  also the buy as you grow portion of this presentation.
22  What does that mean?
23      A.  Customers were, again, going back to
24  profitability.  They were not allowed to acquire product
25  or people until -- so you can buy stuff as you grow or

129

1  as you're profitable.
2      Q.  Okay.  And you have "ASP/hosting" next.  What
3  is that?
4      A.  There was a market out there of ASPs, recovery
5  of service bureaus, basically, that dot-coms could host,
6  they could put their -- run their systems on these third
7  parties, these third parties had the software, so there
8  was no software required to buy.  They could rent it
9  from that ASP.
10     Q.  Okay.  Now, you had in one of the documents we
11 saw, the planning document we saw an ASP segment of your
12 business.  So is that similar to what you're talking
13 about here, the same type of market, same type of
14 customer, the ASPs?
15         MS. KYROUZ:  Objection.  Vague.
16         THE WITNESS:  Yes.
17         MR. BRITTON:  Q.  So the one planning this is
18 you're selling products to ASPs, and this one you're
19 talking about how ASPs are hosting services for a
20 company, so they're not buying directly from Oracle; is
21 that fair?
22     A.  Fair.
23     Q.  Now, you say down here, "the smaller deal
24 size."  What do you mean by that?
25     A.  Rather than forward buying, they were buying

130

1  as they needed it, buy as you grow.  When you rent, you
2  would only recognize a much smaller piece, versus a
3  perpetual, so the deals were getting much smaller.
4      Q.  And then "Stock prices, 52 week lows, below
5  IPO price."  What impact did you see that having on your
6  business, if any?
7          MS. KYROUZ:  Objection.  Vague, lacks
8  foundation.
9          THE WITNESS:  Dot-com companies that were
10 below IPO prices usually were not very aggressive in
11 their spending.
12         MR. BRITTON:  Q.  And did you sit -- at the
13 operations review did you sit through the presentations
14 by your peers?
15     A.  Yes.
16     Q.  Did you hear any of your peers talking about a
17 slowdown in the dot-com space?
18     A.  Not that I recall.
19     Q.  Okay.  You can put that document aside.
20         Okay.  I want to talk a little bit about
21 your forecast for the third quarter of 2001, but
22 before I do that, I want to talk about the system
23 that Oracle had in place to notify management of
24 what was happening in its business.
25         So you personally, you would have calls

131

1  with your direct reports during each quarter; is
2  that right?
3          MS. KYROUZ:  Objection.  Vague.
4          THE WITNESS:  Yes.
5          MR. BRITTON:  Q.  Okay.  And those calls were
6  daily?
7      A.  No.
8      Q.  You didn't have daily calls with your
9  salespeople?
10     A.  No.
11     Q.  Talked about forecasting or not, just daily
12 calls?
13     A.  No.
14     Q.  Did you have one-hour calls with managers once
15 a month?
16         MS. KYROUZ:  Objection.  Vague.
17         THE WITNESS:  That's -- calls talking about
18 what?  I mean, I talked to my managers a lot.
19         MR. BRITTON:  Q.  Anything.
20     A.  I did not have a set one-hour call with my
21 manager every month.
22     Q.  I'm not asking about set calls; I'm talking
23 about just calls with your managers.
24         Let's step back to the daily calls.
25     A.  Okay.

132

1      Q.  Were you talking with your direct reports on a
2  daily basis?
3          MS. KYROUZ:  Objection.  Vague, lacks
4  foundation.
5          THE WITNESS:  I usually talked to my managers
6  daily.
7          MR. BRITTON:  Q.  And how long did those
8  conversations last, or did they last, during this period
9  of time?
10         MS. KYROUZ:  Objection.  Vague.
11         THE WITNESS:  30 seconds to 20 minutes.  It
12 depends on what we had to go over.
13         MR. BRITTON:  Q.  What types of topics would
14 you go over during these calls that happened daily?
15         MS. KYROUZ:  Same objections.
16         THE WITNESS:  It could be personnel issues, it
17 could be marketing events, it could be holidays, it
18 could be personal; wide variety.
19         MR. BRITTON:  Q.  Could it be deals that they
20 were working on?
21     A.  It could be.  It could be about one deal.
22     Q.  "Nick, I need you to come help me negotiate
23 this deal," that could happen?
24     A.  Sure.
25     Q.  So you got an idea of what was going on with

133

1  your business through those calls, fair?
2       MS. KYROUZ: Objection. Vague.
3       THE WITNESS: It helped.
4       MR. BRITTON: Q.  Just one of the data points
5  that you had.
6       A.  Yes.
7       Q.  Now, did you have calls with your managers
8  once a month?
9       MS. KYROUZ: Objection. Vague.
10      THE WITNESS: I had a forecast call with my
11  managers twice a month, the first two months of the
12  quarter, and then once a week the last month of a
13  quarter.
14      MR. BRITTON: Q.  Okay.  We'll get back to the
15  forecasting calls, but other than the forecasting calls,
16  the question is:  Did you have a one-hour sale call,
17  one call per month with your managers?
18      A.  No.
19      Q.  No.  Okay.
20      Now, you also corresponded with your
21  direct reports on a daily basis, right, by e-mail?
22      MS. KYROUZ: Objection. Vague, lacks
23  foundation.
24      THE WITNESS: We usually touched base every
25  day.

134

1       MR. BRITTON: Q.  And the topics of those
2  e-mails would include what?
3       MS. KYROUZ: Same objection.
4       THE WITNESS: Same topics we talked about.  It
5  could be personal, it could be vacation, it could be
6  marketing events, it could be a deal, it could be an
7  approval, a wide variety of stuff.
8       MR. BRITTON: Q.  Okay.  And that was one of
9  your data points to help you keep informed of what was
10  going on in your business?
11      MS. KYROUZ: Objection. Vague.
12      THE WITNESS: It kept me current.
13      MR. BRITTON: Q.  It kept you current.  All
14  right.
15      Now let's talk about these forecasting calls.
16  So you would have calls two times a week in months 1 and
17  2, and then every week in month 3 of a quarter?
18      MS. KYROUZ: Objection. Misstates testimony.
19      THE WITNESS: No.
20      MR. BRITTON: Q.  No.  All right.
21      Well, tell me how I'm wrong.
22      A.  It's every other week.  The first two months
23  of the quarter would be one call every two weeks.
24      Q.  Okay.
25      A.  And then the last month of the quarter it

135

1  would be weekly.
2       Q.  Okay.  And you would have those calls on
3  Thursday and Fridays of the week that you were having
4  the calls on; is that right?
5       A.  Towards the end of the week, yes.
6       Q.  Okay.  And tell me about how those calls were
7  structured.  Was it everybody on the phone at one time,
8  or was it individual calls?
9       A.  Individual calls.  Myself with the regional
10  manager.  Unless it was applications, then it would be
11  just with the regional vice-president.
12      Q.  Okay.  And then in month 3, it would still be
13  on Thursday and Friday, but it would be every week?
14      A.  Yes.
15      Q.  Okay.  Now, the topics that you would cover on
16  the forecasting calls, I want you to describe what those
17  forecasting calls, how they -- how you discussed issues
18  during those forecasting calls.
19      A.  We would go over what their forecast amount
20  is, both field and ISD; those are our telesales.  And so
21  then we would spend more time on the field forecast, and
22  I would ask specific details on transactions greater
23  than $500,000.  And then on the back page deals were all
24  the transactions less than 500,000.  It was more just a
25  general discussion, "How many do you have back there?

136

1  Do you have enough activity?  Do you have enough
2  coverage?"  Those type of discussions.
3       Q.  Okay.  Did you discuss whether they had enough
4  volume to achieve their forecast?
5       MS. KYROUZ: Objection. Vague.
6       THE WITNESS: Yes.
7       MR. BRITTON: Q.  Okay.  Did you ask them
8  about the number of deals?
9       A.  Yes.
10      Q.  The size of deals?
11      A.  Yes.
12      Q.  So number and size were both important.
13      A.  Right.
14      Q.  Did you ask them where they were in the sales
15  cycle?
16      MS. KYROUZ: Objection. Vague.
17      THE WITNESS: Not individually on the back
18  page.
19      MR. BRITTON: Q.  But on the big deals on the
20  front page?
21      A.  Yes.
22      Q.  You asked where they were on the sales side?
23      A.  We asked more details.
24      Q.  Did you ask them where they were in the
25  approval process for the big deals?  Let's start with

137

1    the big deals.
2        A. Again, different sets of questions throughout
3    the quarter. So the first month or two, we would spend
4    very little time on that. The last month we get into
5    more specifics, like do you have the approval in or a
6    contract drafted.
7        Q. All trying to engage whether these deals were
8    going to come in by quarter end; is that right?
9        A. Yes.
10       Q. You would ask them where they saw risk in
11   their forecast; is that right?
12       A. Yes.
13       Q. Now, is that for both the big deals and the
14   deals under 500,000?
15       MS. KYROUZ: Objection. Vague.
16       THE WITNESS: Yes.
17       MR. BRITTON: Q. Okay. And you would ask
18   them where they saw the upside?
19       A. Yes.
20       Q. Okay. Now, you would get yourself informed
21   with that information, talking and direct reports,
22   getting e-mails, and then you would have a meeting with
23   John Nugent; is that right, or you would have at least
24   one meeting a quarter with John Nugent; is that right?
25       MS. KYROUZ: Objection. Vague.

138

1        THE WITNESS: No.
2        MR. BRITTON: Q. No?
3        A. I would have a phone call.
4        Q. You would have a phone call, a meeting,
5    whether by phone or in person.
6        A. I'm sorry. Yes.
7        Q. So you would have a phone call with John
8    Nugent, you would do that two times a quarter?
9        A. Are you talking forecasting meetings –
10       Q. No, outside of forecasting. You would have
11   set calls with John Nugent two times a quarter.
12       A. No.
13       Q. Okay. Now let's talk about the forecasting
14   schedule. The same schedule, every other month – or
15   every other week in months 1 and 2, and every week in
16   month 3, right? You would have a meeting with John
17   Nugent about the forecast.
18       MS. KYROUZ: Objection. Vague, lacks
19   foundation.
20       THE WITNESS: I would have a phone call with
21   John.
22       MR. BRITTON: Q. Or a phone call with John.
23   And that would be the Monday following the
24   Thursday/Friday calls that you had with your direct
25   reports.

139

1        MS. KYROUZ: Is that a question?
2        THE WITNESS: It was after those calls. I
3    mean, I can't remember if it was a Thursday/Friday or
4    Wednesday/Thursday and call John on Monday, but --
5        MR. BRITTON: Q. But you would have your
6    calls with your direct reports, and then shortly after
7    that you would talk to John Nugent?
8        A. Yes.
9        Q. And it was the same in months 1 and 2 as it
10   was in month 3; is that right?
11       A. Yes.
12       Q. And you would tell him the things that you
13   thought were important from what you learned from your
14   calls with your direct reports; is that right?
15       MS. KYROUZ: Objection. Vague, lacks
16   foundation.
17       THE WITNESS: Yes.
18       MR. BRITTON: So that kept John Nugent
19   informed of what was going on in your segment of the
20   business.
21       MS. KYROUZ: Objection. Calls for
22   speculation.
23       MR. BRITTON: Q. Is that fair?
24       A. In reference to our forecast, yes.
25       Q. And then do you know if John Nugent would meet

140

1    with George Roberts at any time during the quarter to
2    tell him what was going on with his forecast?
3        MS. KYROUZ: Objection. Calls for
4    speculation, lacks foundation.
5        THE WITNESS: I assume he rolled his number
6    up, but I don't know how frequently or how it was
7    communicated.
8        MR. BRITTON: Q. Okay. Did he ever tell you,
9    in any of your time in General Business, that, "I talked
10   to George Roberts about the forecast"?
11       MS. KYROUZ: Objection. Vague.
12       THE WITNESS: Nothing really stands out.
13       MR. BRITTON: Q. Okay. Now, you would have a
14   call with George Roberts and others the last two weeks
15   of the quarter; is that right?
16       MS. KYROUZ: Objection. Lacks foundation.
17       THE WITNESS: We would have a call with George
18   Roberts, we would have, like, two calls in the last
19   week, or two in the quarter.
20       MR. BRITTON: Q. And tell me about those
21   calls. What topics were discussed?
22       MS. KYROUZ: Objection. Vague.
23       MR. BRITTON: Q. What was on the call, that
24   type of thing.
25       A. He would ask -- I don't know who was all on

141

1   the call. There wasn't an inventory or attendance
2   wasn't taken. We would -- they would last probably five
3   minutes. He would ask what your number was, how much
4   you've gotten closed, what your risk would be and what
5   your upside.
6       Q.  So he would use that to get himself informed
7   of what was going on with his business; is that fair?
8       A.  Yes.
9           MS. KYROUZ: Objection. Calls for
10  speculation.
11          MR. BRITTON: Q.  Okay. Now, going back to
12  you personally informing yourself of what's going on in
13  your area of the business, you would get a report from
14  OSO and you would use that report to help keep yourself
15  informed; is that right?
16          MS. KYROUZ: Objection. Lacks foundation,
17  vague.
18          THE WITNESS: I would take the report from OSO
19  and I would use it as a baseline to do a forecast review
20  with my managers.
21          MR. BRITTON: Q.  Okay. Good.
22          Okay. Let's talk about the third quarter
23  of 2001. Do you recall any sense of urgency to get
24  the pipeline up to date as quickly as possible at
25  the beginning of that quarter?

142

1           MS. KYROUZ: Objection. Vague.
2           THE WITNESS: Nothing specific, no.
3           MR. BRITTON: Q.  Nothing specific.
4       A.  No.
5       Q.  Do you recall Oracle implementing 11i or
6   software which would have created the need to update
7   your pipeline sooner than would otherwise be?
8           MS. KYROUZ: Objection. Lacks foundation,
9   vague.
10          THE WITNESS: I don't recall that.
11          (Whereupon, Plaintiff's Exhibit 4 was marked
12          for identification.)
13          MR. BRITTON: Q.  I've handed you Exhibit 4.
14  If you could take a moment to look at that, I appreciate
15  it. And Exhibit 4 starts with Bates NDCA-ORCL 040604.
16          Have you had a chance to read Exhibit 4?
17      A.  I have. I'm sorry.
18      Q.  Do you recognize it?
19      A.  I do not.
20      Q.  Okay. There appears to be two e-mails in
21  Exhibit 4. Would you agree with me?
22      A.  The second one doesn't have anything.
23      Q.  There's one at the top and then one right
24  below it.
25      A.  Oh, I see what you're saying. Yes. I'm

143

1   sorry.
2       Q.  Okay. The one at the top is from George
3   Roberts, and then it's to a number of different e-mail
4   addresses. One is NAGVP, and then the next one is to
5   naavp@us.oracle.com. Would you have been included in
6   any of these groups?
7           MS. KYROUZ: Objection. Lacks foundation.
8           THE WITNESS: I was in AVP, but again, I don't
9   know -- I don't know who all NAAVP was.
10          MR. BRITTON: Q.  Is it fair to conclude that
11  NAAVP is North America AVPs, area vice-presidents?
12          MS. KYROUZ: Objection. Lacks foundation.
13          THE WITNESS: It could be. It could be -- he
14  might have that NAAVP to be presales or have NASAVP for
15  the sales of area vice-presidents. A lot of different
16  acronyms.
17          MR. BRITTON: Q.  But this doesn't refresh
18  your recollection about an upgrade to 11i requiring an
19  update to your pipeline?
20      A.  It does not.
21      Q.  All right. You can put that document aside.
22          The next one.
23          (Whereupon, Plaintiff's Exhibit 5 was marked
24          for identification.)
25          MR. BRITTON: Q.  I've placed in front of you

144

1   what's been marked as Exhibit 5. If you could take a
2   moment to look at this exhibit. And for the record,
3   Exhibit 5 is NDCA-ORCL 040606. Let me know when you've
4   had a chance to look at it.
5       A.  Okay. I'm sorry.
6       Q.  Do you recognize it?
7       A.  I do not.
8       Q.  It appears to be an e-mail from Karen Werner
9   to David Winton, William Roselli, Alan Brown and Elaine
10  Gebhard. You're not a recipient on this, but it
11  indicates that your pipeline on various days is in the
12  29 to 35 million-dollar range.
13          Do you recall that being the case on
14  December 4th of 2000?
15          MS. KYROUZ: Objection. Lacks foundation,
16  misstates the document.
17          THE WITNESS: I do not.
18          MR. BRITTON: Q.  Do you remember what your
19  pipeline was in the beginning of the quarter?
20          MS. KYROUZ: Objection. Vague.
21          THE WITNESS: I do not, but I know it wasn't
22  that.
23          MR. BRITTON: Q.  It was probably a lot higher
24  than this.
25      A.  Right.

145

1    Q.  Could this have been the carryover from the
2    pipeline from the prior quarter?
3        MS. KYROUZ:  Objection.  Lacks foundation.
4        THE WITNESS:  Based on the information below,
5    none of this ties off.  I really do not know what this
6    is.
7        MR. BRITTON:  Q.  Okay.  That aside.
8        Do you remember what your forecast was for
9    the third quarter of 2001?
10       MS. KYROUZ:  Objection.  Vague as to time.
11       THE WITNESS:  Not specifically.
12       MR. BRITTON:  Q.  Let's step back.  Do you
13   remember what your forecast was for the third quarter of
14   2001 in the beginning of the quarter?
15       A.  Not specifically.
16       Q.  Okay.  Do you remember what your pipeline was
17   at the beginning of the quarter, the third quarter of
18   2001?
19       A.  No.
20       MS. KYROUZ:  Objection.  Vague.
21       (Whereupon, Plaintiff's Exhibit 6 was marked
22       for identification.)
23       MR. BRITTON:  Q.  I've placed in front of you
24   what's been marked as Exhibit 6, and for the record,
25   this exhibit is Bates CA-ORCL 036289 through 293.

146

1    A.  Okay.
2    Q.  Do you recognize this exhibit?
3    A.  I do not.
4    Q.  Does this exhibit refresh your recollection
5    about what your forecast was in the beginning of the
6    quarter for the third quarter of 2001?
7    A.  It has a forecast for the west.
8    Q.  Okay.  And that's 64,600,000?
9    A.  Yep.
10   Q.  Does that sound like your forecast for the
11   third quarter of 2001?
12       MS. KYROUZ:  Objection.  Lacks foundation.
13       THE WITNESS:  It sounds like it could be in
14   that range, yes.
15       MR. BRITTON:  Q.  Now, the pipeline here for
16   your region is 149,433,000.
17       Am I right, that's what it says?
18       MS. KYROUZ:  Objection.  Lacks foundation.
19       Are you asking him to read the document?
20       THE WITNESS:  Where does it say that?  I'm
21   sorry.
22       MR. BRITTON:  Q.  There's "Deal Summary," the
23   second column to the right, "total pipeline," go down.
24   A.  Okay.  What I'm not clear of, that's field and
25   telesales.

147

1    Q.  Okay.  So you're not clear if that's field and
2    telesales?
3    A.  Correct.
4    Q.  Do you – can you tell me why, on
5    December 4th, there's a note of $39 million for your
6    pipeline, or December 3rd, and then the following – or
7    two days later it says 149 million?
8        MS. KYROUZ:  Objection.  Lacks foundation, and
9    it's not clear what document Counsel's referring to.
10       MR. BRITTON:  Exhibit 5.  Or Exhibit 6.
11       THE WITNESS:  I've never mentioned a '05 made
12   no sense to me at all.
13       MR. BRITTON:  Q.  Okay.  Does that sound –
14   149 million, does that sound like your forecast for
15   the – or withdrawn.
16       Does that sound like your pipeline at the
17   beginning of the quarter for the third quarter of
18   2001?
19       MS. KYROUZ:  Objection.  Lacks foundation,
20   calls for speculation.
21       THE WITNESS:  The only thing I don't know is
22   if that is field and telesales.
23       MR. BRITTON:  Q.  Field and telesales.  Okay.
24   Okay.  You can put that document aside.
25       (Whereupon, Plaintiff's Exhibit 7 was marked

148

1    for identification.)
2        MR. BRITTON:  Q.  I've placed in front of you
3    what's been marked as plaintiff's Exhibit 7.  Can you
4    take a moment to take a look at this exhibit.
5        And for the record, Exhibit 7 starts with
6    Bates NDCA-ORCL 078677 through 078692.
7    A.  Okay.
8    Q.  Okay.  Do you recognize Exhibit 7?
9    A.  I do.
10   Q.  Okay.  What is Exhibit 7?
11   A.  It's a hard copy of a forecast for my area
12   dated December 14th, 2000.
13   Q.  Is this one of the documents you looked at in
14   preparation for your deposition?
15   A.  I looked at a number of forecasts.  It might
16   have been.
17   Q.  A number of forecasts at your level?
18   A.  Similar to this.
19   Q.  The first page, you said earlier that the –
20   withdrawn.
21       Is this an example of the OSO forecast
22   report that you would use on the forecast schedule
23   that you testified about earlier?
24   A.  This is what I would use for my forecast calls
25   with my regional managers, yes.

## 149

1  Q.  Okay.  Now, the -- you testified earlier that
2  the front page would have deals that were over $500,000.
3  Do you remember that?
4  A.  Yes.
5  Q.  If you look up on the left-hand side of this,
6  it has "12/14/2000" and then "less than 500,000."  Is
7  that a typo?
8  A.  It must be 'cause all these deals are all
9  greater than 500,000.  See the middle of the page?
10  Q.  Yeah.  But over on the left-hand side that
11  can't be right.
12  A.  No, that has to apply to all of these back
13  here.  So pages 3 through the end would be all deals
14  less than 500.
15  Q.  Okay.  And the first two pages -- well, the
16  first page deals with deals over 500,000, and then it
17  looks like the summaries, the "closed by region, worst,
18  forecast and best," that has both information for deals
19  over and under 500,000; is that right?
20  A.  Yes.
21  Q.  All right.  If we come down to the "Total Won"
22  category, that's beneath all the 500 deals that are over
23  500,000, then you have "Won Field Only, Won ISD Only,"
24  and then "Total Won."
25  A.  Okay.

## 150

1  Q.  What does the "Total Won" row represent?
2  A.  How much revenue you've closed so far.
3  Q.  Okay.
4  MS. KYROUZ:  Counsel, if I could ask you to
5  use page numbers when you're referring to the exhibit.
6  I'm afraid your record is going to have a lot of this
7  document in it without being clear which column you're
8  pointing to.
9  MR. BRITTON:  Q.  So on page 1 of Exhibit 7,
10  which was dated December 14th, 2000, your region had
11  closed $1,497,519?
12  MS. KYROUZ:  Objection.  Lacks foundation,
13  misstates the document and his testimony.
14  THE WITNESS:  That's what it says, yes.
15  MR. BRITTON:  Q.  Okay.  Do you have any
16  reason to believe that that's not accurate?
17  A.  No.
18  Q.  Okay.
19  A.  The only thing that I would question is that
20  two weeks into the quarter you have a "Won ISD Only."
21  That's telesales.  I usually do transactions on a
22  pretty -- that's all smaller stuff, so they obviously
23  had not reported, yet, anything.
24  Q.  So this would be the field only.  So the
25  1.5 million would be field only closed deals as of

## 151

1  September 14th, 2000?
2  MS. KYROUZ:  Same objection.
3  THE WITNESS:  That's what it says, yep.
4  MR. BRITTON:  Q.  All right.  And then your
5  forecast as of that date was $64,605,645; is that right?
6  A.  Yes, it was.
7  Q.  Okay.  And that's for field and ISD?
8  A.  Yes, it is.
9  Q.  Okay.  And your worst case column was
10  $56,239,245; is that right?
11  A.  Yes.
12  Q.  Okay.  So what that's telling me is that your
13  forecast is 64 million and some change, and the low end
14  of those forecasts is 56 million; is that right?
15  A.  Yes.
16  Q.  Okay.  And then the best case is 76,643,845;
17  is that right?
18  A.  Yes.
19  Q.  So that's saying that the upside potential is
20  about $12 million more than the forecast; is that right?
21  A.  Correct.
22  Q.  Okay.  Now, when I asked you earlier about
23  having a number in the forecast column but not in the
24  worst case column, if you look at the first page, you
25  have a number of situations where you have a forecast,

## 152

1  you have a best case, but there's nothing in the worst
2  case column.  Is that simply because they hadn't entered
3  the information?
4  MS. KYROUZ:  Objection.  Calls for
5  speculation.
6  THE WITNESS:  It was worst case -- you can't
7  have a number in worst case and not have it in forecast.
8  MR. BRITTON:  Q.  Okay.
9  A.  You can have a number in forecast and not have
10  it in worst.
11  Q.  So what is that -- let's talk about the second
12  deal here to Gensler & Associates.  So what's this
13  telling me?  You've got a forecast of 1.7 million for
14  this deal.
15  A.  Yes.
16  Q.  But nothing in worst case.  What is that
17  telling you?
18  A.  That they still think that there might be a
19  potential it might not close.
20  Q.  So if there's a number in forecast but nothing
21  in worst case, then there's a potential that it might
22  not close?
23  A.  Potential, right.
24  Q.  So as of December 14th, 2000, with the
25  exception of Real Networks, there was a potential that

153

1  none of these deals would close; is that fair?
2      MS. KYROUZ: Objection. Calls for
3  speculation, misstates testimony.
4      THE WITNESS: There's potential, sure.
5      MR. BRITTON: Q. And then if you have, with
6  Real Networks, you've got the same number in forecasts
7  and same number in worst case, the sales rep is pretty
8  confident that it's going to close in the quarter?
9      MS. KYROUZ: Objection. Lacks foundation.
10     THE WITNESS: They have finalized -- if you
11  have the same number in worst, forecast and best, you've
12  come usually to an agreement with the client as to what
13  this is going to be.
14     MR. BRITTON: Q. Okay. Then if you look in
15  the box that has the totals on page 1, there's, "Total
16  deals above 500,000, Total deals below 500,000, Total
17  field, Total ISD and Total West."
18     A. Yes.
19     Q. Under "Total deals, 500,000," if you look at
20  worst case, forecast and best case, it's the same
21  numbers as the cumulative total from the $500,000 deals;
22  is that right?
23     MS. KYROUZ: Objection. Vague, misstates the
24  document.
25     THE WITNESS: I apologize. Could you re --

154

1      MR. BRITTON: Q. Yeah, I'm just trying to
2  figure out, in terms of the document creation, if the
3  numbers -- if the numbers in the "total deals above
4  500,000, worst case, forecast and best case" are the
5  same as the sum total of all the deals listed above it.
6      A. It looks like it is, yes.
7      Q. Okay. Is that usually the case with these
8  reports?
9      A. Yes.
10     Q. Okay. And then the one below it, "Total deals
11  below 500,000" should be the sum total of all those
12  deals below 500,000?
13     A. Yes.
14     Q. If you look at -- turn to the back page of
15  Exhibit 7, page 16.
16     A. Yes.
17     Q. It gives you "worst case, forecast, best
18  case," and it looks like worst case is 41 million some
19  change, forecast is 56 million, and best case is
20  63 million.
21     Do you see where I'm looking at?
22     A. I do.
23     Q. If you flip back to the summary page --
24     A. The first page?
25     Q. Yeah, the first page.

155

1      A. All right.
2      Q. You've got different numbers. Worst case
3  you've got 46 million, as opposed to 41 million on the
4  back page of Exhibit 7, and forecast and best are
5  different numbers, as well.
6      Can you tell me what the difference is?
7      A. I cannot. As a manager, you would go off this
8  front page.
9      Q. Was there a management judgment that could be
10  added into that, or --
11     MS. KYROUZ: Objection. Vague.
12     MR. BRITTON: Q. Can you explain the
13  difference?
14     A. I don't see where there's any line item for
15  management judgment. If you look on page 2, the middle
16  box, totals, "Subtotal Tech, Subtotal Apps," there's
17  "HQ", there's "Judgment", so it's zero. So I don't
18  think there's any management judgment in there.
19     Q. Right.
20     Do you have any idea why there's a discrepancy
21  between those numbers?
22     A. I do not.
23     Q. And then your total pipeline for
24  December 14th, 2000, was 154,320,028; is that right?
25     MS. KYROUZ: I'm sorry. What page are you on,

156

1  Counsel?
2      MR. BRITTON: Page 1 of Exhibit 7.
3      THE WITNESS: Yes.
4      MR. BRITTON: Q. Okay. Now, your results for
5  the month of December, you brought in roughly $6 million
6  that month; do you recall?
7      A. I do not recall.
8      Q. Okay. Do you recall it being a slow month in
9  terms of closing deals?
10     MS. KYROUZ: Objection. Lacks foundation.
11     THE WITNESS: I don't remember month by month
12  that -- normally, December's a very tough month.
13     MR. BRITTON: Q. Now, in terms of the
14  dot-coms, it was getting -- it was getting tougher and
15  tougher each month as you got into the third quarter; is
16  that right?
17     MS. KYROUZ: Objection. Lacks foundation,
18  vague.
19     THE WITNESS: I can't say that.
20     MR. BRITTON: Q. Okay. At the beginning of
21  the third quarter 2000, you hadn't felt any effects from
22  the dot-coms?
23     A. I couldn't say that, either.
24     Q. Why couldn't you say the latter?
25     A. Because I was feeling an impact, but it

157

1  wasn't -- the way you had it worded was not correct. I
2  mean -- I'm not trying to be smart, I'm just trying to
3  say -- you know.
4        Q.  Were you feeling an impact from the dot-coms
5  as of the first month of the third quarter of 2001?
6        MS. KYROUZ:  Objection.  Vague, lacks
7  foundation.
8        THE WITNESS:  Not that I was aware of.  Again,
9  the first month of the quarter we do very little
10  business.
11       MR. BRITTON:  Q.  Was the sale to dot-com
12  companies getting tougher each month towards the end of
13  calendar year 2000?
14       MS. KYROUZ:  Objection.  Lacks foundation,
15  asked and answered.
16       THE WITNESS:  The calendar year 2000.  Not
17  that I recall.
18       MR. BRITTON:  Q.  So October/November/December
19  wasn't getting any worse?
20       MS. KYROUZ:  Same objections.
21       THE WITNESS:  Not that I recall.
22       MR. BRITTON:  Q.  Do you recall it not
23  happening, or sitting here, you just can't recall
24  one way or the other?
25       A.  I just can't recall if it was really bad or

158

1  really good.  So --
2        MR. BRITTON:  Okay.  Would this be a good time
3  to take a short break and go off the record?
4        MS. KYROUZ:  Yeah.
5        (Recess taken from 2:10 to 2:18 P.M.)
6        MR. BRITTON:  Q.  Do you remember having any
7  conversations with John Nugent in December of 2000 about
8  the estate of your -- the dot-com part of your business?
9        MS. KYROUZ:  Objection.  Vague.
10       THE WITNESS:  I do not.
11       MR. BRITTON:  Q.  Okay.  Do you not recall
12  doing that, or do you recall not having any
13  conversations?
14       A.  I recall not having a conversation with John.
15       (Whereupon, Plaintiff's Exhibit 8 was marked
16       for identification.)
17       MR. BRITTON:  Q.  Before we get to Exhibit 8,
18  how many conversations did you have with John in
19  December 2000?
20       MS. KYROUZ:  Objection.  Vague.  Lacks
21  foundation.
22       THE WITNESS:  I have no idea.  How many
23  discussions I had with my boss in December?  I do not
24  know.
25       MR. BRITTON:  Q.  Okay.  How many forecasting

159

1  calls did you have with John Nugent in December of 2000?
2        A.  I assume we had two.
3        Q.  You had two.  Okay.
4        And in those forecasting calls, you discussed
5  your forecast with John?
6        A.  Yes.
7        Q.  Okay.  You discussed your pipeline?
8        A.  Forecast, pipeline, yes.
9        Q.  Okay.  You discussed your worst case and your
10  best case?
11       MS. KYROUZ:  Objection.  Lacks foundation.
12       THE WITNESS:  Yes.
13       MR. BRITTON:  Q.  Okay.  If you'll take a
14  moment and look at Exhibit 8, let me know if you
15  recognize it.
16       For the record, Exhibit 8 starts with Bates
17  NDCA-ORCL 609310 and ends at 337.
18       A.  Okay.
19       Q.  Do you recognize Exhibit 8?
20       A.  I have seen it before, yes.
21       Q.  Okay.  When did you see it before?
22       A.  Years ago.
23       Q.  Okay.  And what context did you see it?
24       A.  I know I saw it in the last deposition I had.
25       Q.  Okay.

160

1        A.  I'm trying to think if I saw it beforehand.
2  John Nugent might have sent this out after his meeting.
3        Q.  After his meeting?
4        A.  He might have.  I mean, I don't remember,
5  specifically.
6        Q.  Okay.  This appears to be a presentation that
7  John Nugent gave at the Q3 ops review?
8        A.  Yes.
9        Q.  Okay.  Were you aware that he was --
10  withdrawn.
11       Do you know if that meeting was with
12  George Roberts?
13       MS. KYROUZ:  Objection.  Lacks foundation.
14       THE WITNESS:  I assume.  I assume it was, yes.
15       MR. BRITTON:  Q.  Is there typically an
16  operations review in Q3 with George Roberts?
17       MS. KYROUZ:  Objection.  Vague.
18       THE WITNESS:  There usually was a quarterly
19  business review, you know.
20       MR. BRITTON:  Q.  A quarterly business review?
21       A.  Quarterly.
22       Q.  Were you invited to that?
23       A.  Not this one.
24       Q.  Okay.  And it appears to have been on
25  January 9, 2001, which would have been shortly after the

161

1   close of December 2000; is that right?
2       A.  Yes.
3       Q.  Okay.  I want you to take a look at page 9 of
4   this document, which has Bates 609318.  And the page
5   before that says "General Business U.S. 2nd Half
6   Outlook, Market Observations."  And what I'd like to do
7   is look at the first tab on page 9 and look at the
8   headings.  It says, "Sluggish Economic Outlook," and
9   then below that it says, "Focus in on profits."
10      Were you experiencing, in your business, an
11  effect from a sluggish economic outlook?
12      MS. KYROUZ:  Objection.  Lacks foundation,
13  vague.
14      THE WITNESS:  You know, our -- we were still
15  forecasting to do good things.
16      MR. BRITTON:  Q.  That's not my question.  My
17  question was:  Were you seeing a sluggish economic
18  outlook in the third quarter of 2001, early January?
19      MS. KYROUZ:  Same objections.
20      THE WITNESS:  Maybe a little bit.
21      MR. BRITTON:  Q.  Okay.  Now, the next heading
22  says "Focus in on profits."  That's what you had
23  presented in October that the dot-com companies were
24  doing; is that right?
25      MS. KYROUZ:  Objection.  Lacks foundation.

162

1       THE WITNESS:  I did present that verbiage.
2       MR. BRITTON:  Q.  And you were seeing that in
3   the market, that the dot-coms were focusing in on
4   profits?
5       MS. KYROUZ:  Objection.  Vague as to "market."
6       THE WITNESS:  I don't know what he was
7   referring to.
8       MR. BRITTON:  Q.  No, I'm using this as a
9   basis to see if you were seeing the same things that
10  Mr. Nugent apparently was presenting.
11      MS. KYROUZ:  Objection.  Vague as to "seeing
12  the same things."
13      THE WITNESS:  Focus on -- again, by market
14  segment and geographic -- every business unit was a
15  little bit different.
16      MR. BRITTON:  Q.  But for dot-coms, they were
17  focusing in on profits.  You had presented that earlier,
18  right?
19      A.  Yes.  This does not refer to dot-coms, right?
20      Q.  No, I know, but I'm saying that is something
21  that you saw in the dot-com segment of your business; is
22  that right?
23      MS. KYROUZ:  Objection.  Vague as to "dot-com
24  segment of your business."
25      THE WITNESS:  Yes.

163

1       MR. BRITTON:  Q.  Okay.  If you turn to the
2   next page, page 10, it says, "Market observations, CIOs
3   on shorter leash."
4       Do you have any idea what Mr. Nugent meant by
5   that?
6       MS. KYROUZ:  Objection.  Lacks foundation.
7       THE WITNESS:  It looked like he had the
8   descriptions below why he thought that.
9       MR. BRITTON:  Q.  Right.  And let's look at
10  the second heading.  "CEOs more involved in technology
11  and business application decisions."
12      Were you seeing that in your business as of
13  January 2001?
14      MS. KYROUZ:  Objection.  Vague, lacks
15  foundation.
16      THE WITNESS:  We were seeing parts of that,
17  yes.
18      MR. BRITTON:  Q.  Okay.
19      A.  And these were marker observations on a
20  national scale.
21      Q.  Right.  That's why I'm just asking if you were
22  seeing it in your business.
23      Okay.  If you look at page 12, it says,
24  "The dot-com fishing hole is drying" --
25      Are you there?

164

1       A.  Yes.
2       Q.  Page 12, it has Bates 609321, it says,
3   "Dot-com fishing hole drying up, VC Funding
4   nonexistent."
5       Were you seeing that by January 2001?
6       MS. KYROUZ:  Objection.  Vague.
7       THE WITNESS:  Not to that extent.
8       MR. BRITTON:  Q.  Not to that extent, but you
9   were seeing a reduction in the VC funding?
10      MS. KYROUZ:  Objection, vague as to "you were
11  seeing".
12      THE WITNESS:  We were seeing additional steps
13  required to get the funding.
14      MR. BRITTON:  Q.  Okay.  Longer time for them
15  to get the money?
16      A.  Yes.
17      Q.  Okay.  Less money available?
18      A.  There was still money available.
19      Q.  But there was less than there was a year
20  earlier; is that right?
21      MS. KYROUZ:  Objection.  Calls for a
22  generalization.
23      THE WITNESS:  That, I don't know.  I mean, I
24  just know it was harder for companies to get VC funding.
25      MR. BRITTON:  Q.  Okay.  "Development license

165

1    only."

2         Do you know what he meant by that?

3         MS. KYROUZ: Objection. Lacks foundation.

4         THE WITNESS: I can speculate.

5         MR. BRITTON: Q. Well, do you know what a

6    development license is in Oracle's business?

7      A. I do.

8      Q. Okay. What is your understanding of what a

9    development license is?

10      A. A customer will acquire products just to

11    develop other products with it, and when they put it

12    into production, they have to re-license -- it's a new

13    license type.

14      Q. Okay. So were you seeing -- as of

15    January 2001, were you seeing more of your dot-com

16    customers purchase only development licenses?

17         MS. KYROUZ: Objection. Lacks foundation.

18         THE WITNESS: Some.

19         MR. BRITTON: Some.

20         Would you agree that your dot-com customers

21    were in survival mode for calendar year 2001?

22         MS. KYROUZ: Objection. Vague, calls for a

23    generalization.

24         THE WITNESS: From what point? I mean, as of

25    January?

166

1         MR. BRITTON: Q. As of January 2000.

2         MS. KYROUZ: Same objection.

3         THE WITNESS: I think they were looking at

4    calendar year 2001 was going to be a challenge.

5         MR. BRITTON: Q. Okay.

6      A. It was only three days into the year.

7      Q. Right.

8      A. Or nine days into the year.

9      Q. Right. But you had known, based on your

10    experience of what was happening, that dot-coms were

11    going out of business. We talked about that earlier,

12    right?

13         MS. KYROUZ: Objection. Misstates testimony.

14         THE WITNESS: Some are going out. I mean, if

15    you look back at some of the other documents, like

16    December 14th, the forecast, the biggest forecast was

17    our dot-com business unit, who closed the most business

18    in dot-com. So on September 14th it still looked pretty

19    darned good, the forecast and what we were calling for

20    in dot-com. So I don't think anything really changed

21    from December 14th to January 8th or 9th. I'm sorry.

22         MR. BRITTON: Move to strike as nonresponsive.

23      Q. My question, sir, was: Did you notice that

24    your dot-com customers were in survival mode for 2001?

25    Did they lay any people off, were they going out of

167

1    business, were they filing bankruptcy? Were you seeing

2    those things in the market as of January 2001?

3         MS. KYROUZ: Objection. Vague, lacks

4    foundation, calls for speculation, and gross

5    generalization.

6         THE WITNESS: I was seeing all those

7    conditions for all business.

8         MR. BRITTON: Q. For all business, not just

9    dot-coms?

10      A. Right. We were seeing that there was a

11    general slowdown in American economy.

12      Q. So you were seeing that, and was that

13    affecting your business by January 2001?

14         MS. KYROUZ: Objection. Lacks foundation,

15    vague as to "affecting your business."

16         THE WITNESS: I suppose it had a little

17    impact, yes.

18         MR. BRITTON: Q. Okay. If you turn to page

19    15, it has, General Business U.S., 2nd half

20    adjustments," and the first one under it is "consolidate

21    dot-com territories."

22         Had you had any discussions with John

23    Nugent about consolidating any of the dot-com

24    territories?

25      A. To my knowledge, I had not.

168

1      Q. You had not.

2         Had you thought about consolidating any of the

3    dot-com territories as of January 2001?

4      A. We were probably considering, if somebody

5    left, not replacing him.

6      Q. That's more of -- that's more of an individual

7    representative basis. And I think -- withdrawn.

8         I'm talking about the various territories

9    and consolidating territories. Did you -- did you

10    think about doing that at any time prior to January

11    of 2001?

12         MS. KYROUZ: Objection. Vague.

13         THE WITNESS: I do not think so. Like I said,

14    when somebody left, if they were calling a dot-com, I

15    think at this point we were probably not hiring

16    replacements, so we would consolidate that territory.

17         MR. BRITTON: Q. Okay. That makes sense.

18         Okay. If you turn to page 27 of this

19    exhibit, it says -- the first slide says, "2nd half

20    & Fiscal Year '02," it says, "Mid teen technology

21    growth rate."

22         Were you forecasting technology growth

23    rates in the mid-teens starting in January of 2001?

24         MS. KYROUZ: Objection. Lacks foundation,

25    misstates the document.

Classick, Nicholas  4/12/2006  9:02:00 AM

---

169

1    THE WITNESS: I can't recall what my forecast
2  was.
3    MR. BRITTON: Q. Okay. Did you have any
4  million-dollar dot-com deals in the pipeline as of
5  January 2001?
6    A. I can't remember specific line items in my
7  forecast at that point.
8    Q. Okay.
9    A. Do you want me to look at --
10   Q. Yeah.
11   A. Well, dot-com and ASPs. So Appshops was an
12  ASP, and Exodus was an ASP.
13   Q. Exodus was an ASP?
14   A. Yes, as well as Appshops.
15   Q. Are there any dot-com deals on the first page
16  here?
17   A. Real Networks is a dot-com.
18   Q. And that was 500,000. So you had no
19  million-dollar dot-com deals in the pipeline, at least
20  as of December 14th, 2000?
21   A. True.
22   Q. All right. The next slide down talks about a
23  dramatic decline in the dot-com business.
24     Is that something that you had seen by
25  January 2001?

---

170

1    MS. KYROUZ: Objection. Vague, misstates the
2  document.
3    THE WITNESS: We were -- we were seeing --
4  again, there was a slowdown. It wasn't -- again, I
5  don't know where John is getting all his data because he
6  lived in Boston. Everybody in the country had different
7  phases of this dot-com meltdown. We still had a lot of
8  very successful business in the west; he does specify
9  here the shortfall in the west.
10   MR. BRITTON: Q. Yeah, $40 million database
11  shortfall in the west, and you don't remember having any
12  conversations with him about that?
13   A. No.
14   Q. No.
15     And is that a big deal, a $40 million
16  shortfall in database --
17   MS. KYROUZ: Objection. Vague as to what the
18  shortfall is to.
19   THE WITNESS: I do not remember having
20  specific discussions with him about that.
21   MR. BRITTON: Q. Do you remember expecting to
22  miss your budget, your database budget by $40 million?
23   A. I do not remember missing it by $40 million.
24  I know we were forecasting to be short of budget for
25  technology for the second half of the year. That was

---

171

1  highlighted in one of these documents.
2    Q. And here he proposes a dot-com quota reduction
3  at the bottom, the action item. And you had testified a
4  little bit earlier that you remember having a
5  conversation with John about a quota reduction and
6  George Roberts saying no.
7      It's in response to this that you think you
8  had that conversation with John?
9    A. I assume, yes.
10   Q. Okay. Have you looked at the next page?
11  There's a number of different criteria; the assumptions
12  for the dot-com quota reduction, and then there's
13  regional managers below it.
14     And which of those regional managers were
15  under your division?
16   A. Kern, Leahy, McDonald, Frazier, Stone,
17  Priestley and Arntz.
18   Q. Okay. So over half of the regional managers
19  that John was putting up for a quota reduction were
20  under your umbrella; is that right?
21   A. Based on this, yes.
22   Q. And you don't remember having any
23  conversations with him about it?
24   A. I did have a discussion with him on it.
25   Q. About reducing the quota for your

---

172

1  individual -- or your regional managers?
2    A. Yes, we talked about quota reductions. Never
3  for myself.
4    Q. Okay.
5    A. I never talked about a quota reduction for
6  myself.
7    Q. Okay. But for your regional managers?
8    A. Yes.
9    Q. Okay. When did you talk to him?
10   A. Prior to this. I don't know specifically
11  when.
12   Q. Okay. And that was -- was that a different
13  conversation than the one where he conveyed that George
14  Roberts said, "NO, we're not reducing the quota"?
15   A. It would be a different discussion, yes.
16   Q. Different discussion.
17     So it took place at some point prior to
18  January 9th, 2001?
19   A. Yes.
20   Q. Okay. And tell me what you remember about
21  that conversation. Who initiated it?
22   A. I don't remember.
23   Q. Okay. Well, tell me, what did you say and
24  what did he say?
25   A. I don't know, specifically. There was

---

Oracle                                        Page  169 - 172

173

1  probably a discussion about just this, doing the quota
2  reduction for the dot-com managers.
3  Q. Okay. And what was the reason expressed for
4  doing so?
5  A. That they had lost some head count, and we
6  weren't going to hire additional salespeople.
7  Q. Okay. And that was one of the reasons for the
8  quota reduction?
9  A. That was probably the biggest reason.
10  Q. That was the biggest reason. Okay.
11  Any other reasons expressed for why you
12  were proposing a quota reduction for these regional
13  managers?
14  A. Probably the biggest thing is just -- they had
15  large quotas, they had some turnover, people were -- we
16  had hired a lot, we had lost some people, and so that
17  was probably the driving force. That's how I would
18  approach it.
19  Q. During this conversation, you don't remember
20  having any discussions about a decline in the dot-com
21  business?
22  A. I don't specifically remember the discussion.
23  Q. Oh, you don't.
24  A. No.
25  Q. So you remember having the discussion, but you

174

1  don't remember what was said during the discussion?
2  A. I assume that we discussed it. I mean, you
3  know --
4  You know what, I just made a big assumption
5  here that I did on this. I do not particularly remember
6  going to John Nugent and asking for quota reductions for
7  any of my regional managers or salespeople. I might
8  have. If I did, I don't remember.
9  Q. Okay.
10  A. I apologize.
11  Q. Okay. You can put that document aside.
12  (Whereupon, Plaintiff's Exhibit 9 was marked
13  for identification.)
14  MR. BRITTON: Q. Okay. I've placed in front
15  of you what's been marked as Plaintiff's Exhibit 9.
16  Take a moment to look at this exhibit.
17  A. Okay.
18  Q. Okay. Do you recognize Exhibit 9?
19  A. I do. It's a -- it's the -- it's a hard copy
20  of our forecast dated January 4th of 2001.
21  Q. This would be the first forecast after the new
22  year?
23  MS. KYROUZ: Objection. Lacks foundation.
24  THE WITNESS: I would assume so, yes.
25  MR. BRITTON: Q. Okay. Now, if you look at

175

1  the "Total Won" column on page 1, the $6.1 million, is
2  that the amount of business that General Business West
3  had generated as of January 4th, 2001?
4  MS. KYROUZ: Objection. Lacks foundation.
5  THE WITNESS: That's what it looks like, yes.
6  MR. BRITTON: Q. Tough month?
7  A. What?
8  Q. Tough month. You had a $65 million forecast
9  and you brought in $6 million in the month of December?
10  A. Historically, we usually do 10 percent of our
11  quarterly business in the first quarter, so a normal
12  month.
13  Q. Okay. Now, the total west pipeline is 158.5
14  million, roughly. Is that right?
15  A. Yes.
16  Q. Your forecast was 64,615,938, and your worst
17  case was 56.3 million, roughly, and your best case was
18  77.7 million, roughly; is that right?
19  A. Yes.
20  Q. Did I accurately describe the document?
21  A. You did.
22  Q. Okay.
23  Now, if you turn to the second page, you have
24  your forecast box, and it says the headquarter judgment
25  is zero. So does that mean that you didn't apply any

176

1  management judgment to the forecast?
2  A. True.
3  MS. KYROUZ: Objection. Lacks foundation.
4  MR. BRITTON: Q. Okay. Now on the "Worst"
5  category up above, there appears to be a $12.7 million
6  worst case headquarter judgment.
7  Can you tell me why that was? Withdrawn.
8  What circumstances would cause to you add
9  in a value to a worst case number?
10  MS. KYROUZ: Objection. Lacks foundation.
11  THE WITNESS: Probably based on historical
12  conversion rates of pipeline.
13  MR. BRITTON: Q. And was there anything on
14  here that told you what the historical conversion rates
15  were?
16  A. Not on this report, no.
17  Q. Okay. Where would you get that information?
18  A. I would have that from working with each of
19  the RMs over the past two or three years.
20  Q. They had the numbers available, what they had
21  done in the prior year?
22  A. Would they have had those numbers?
23  Q. Uh-huh.
24  A. I assume they would, yes.
25  Q. Okay. Do you remember actually doing that for

177

1   this January 4th -- let me back up.
2       This headquarter judgment, 12.7 million,
3   is that from you?
4   A.  Yes.
5   Q.  That's from you.
6       Do you remember where you got that number
7   from?
8   A.  Not specifically, no.
9   Q.  Okay.  Now, why did you put a management
10  judgment into the worst case box but not into either of
11  the forecast or best case boxes?
12  A.  I would assume that I thought that we would do
13  better than what the regional managers thought our worst
14  case would be.
15  Q.  Do you remember why you thought that?
16  A.  I probably looked at the pipeline and the
17  historical conversion rates that the areas closed.
18  Q.  Okay.  Now, if you look to the very back, this
19  is the sum total of all the deals that were less than
20  500,000; is that right?
21  A.  I'm sorry.
22  Q.  This is the sum total of all of the deals in
23  your division that are less than $500,000; is that
24  right?
25  A.  Starting from page 3?

178

1   Q.  The last page of Exhibit 9, page 17.
2   A.  There's totals here.
3   Q.  So you got 145.6 million in the pipeline for
4   deals under 500 grand?
5   A.  Once again, these numbers don't tie to the
6   front page.
7   Q.  Right.  Do you know why that is?
8   A.  I do not.
9   Q.  Well, they do, don't they?  If you look at the
10  pipeline, 145-6, and you look at the front page and you
11  add the total deals under 500 grand to the total ISD, it
12  gets you that number, doesn't it?
13  A.  The total has to be 158,496, so it's off by
14  13 million.
15  Q.  No, no, no, this is for deals under 500 grand,
16  right?  So you got 145.6 in deals under 500,000.
17  A.  Okay.  So you take under 5 plus the OD.
18  Q.  Plus the ISD?
19  A.  Yes, ISD.  I'm sorry.
20  Q.  And that gives you the combined total of the
21  total pipeline, right?
22  A.  That's the same number as -- yes.
23  Q.  That's because all the ISD deals are
24  necessarily below 500,000, right?
25  A.  Yes, they are.

179

1   Q.  Okay.  So it does tie back.
2   A.  Yes.  So that's what it would be; it would be
3   your total pipe for deals less than 500,000.
4   Q.  Okay.
5   A.  It's kind of a weird report.
6   Q.  Okay.  Now -- but if you look at the "worst"
7   column, that does not tie back; is that right?
8   A.  It doesn't look like it does, no.
9   Q.  Can you explain why?
10  A.  I cannot.
11  Q.  Does it have anything to do with the
12  management judgment that you added in?
13  A.  It could be because it looks like the
14  forecast, taking that same -- if you go over one column
15  to the forecast, if you take less than 500 plus OD, it
16  adds up to this 58.
17  Q.  Right.
18  A.  So it looks like the pipe -- that logic works
19  for the pipe, that logic works for the forecast.  It
20  does not work for worst case, so it probably is a
21  management judgment.
22  Q.  A management judgment issue?
23  A.  Could be, yes.
24      MR. BRITTON:  Okay.  What's the next in order?
25      (Whereupon, Plaintiff's Exhibit 10 was marked

180

1   for identification.)
2       MR. BRITTON:  Q.  Okay.  I placed in front of
3   you what's been marked as Plaintiff's Exhibit 10.  Take
4   a moment to look at this exhibit.
5       For the record, Exhibit 10 is NDCA-0RCL
6   078602, and it ends at 078614.
7   A.  Okay.
8   Q.  Okay.  So as of January 10th, your division
9   had closed $6.1 million in business; is that right?
10      MS. KYROUZ:  Objection.  Vague.
11      THE WITNESS:  According to this report, yes.
12      MR. BRITTON:  Q.  Okay.  And that's relatively
13  unchanged, only by, what, $64,000 from the previous
14  report; is that right?
15  A.  That's what it looks like, yes.
16  Q.  But your pipeline dropped from 158 million to
17  141 million.  Can you tell me why?
18  A.  I assume when the reps got back, the sales
19  manager sat down with them and talked about the deals in
20  their pipe, and if there were some deals that needed to
21  be taken out of the pipe, they removed them.
22  Q.  You lost about 140 deals between January 4th
23  and January 10th; isn't that right?  Do you remember
24  losing a large number of deals at the beginning of
25  January?

181

1   A.  No.

2   Q.  You don't?

3   A.  No.

4   Q.  Okay.  Now, if you look at the last page of

5   Exhibit 10 and your last page of Exhibit 9, your worst

6   case forecast drops from 43 million to $24 million.

7       Do you remember that happening?

8   A.  Not specifically.

9   Q.  Do you know what that's attributed to?

10      MS. KYROUZ:  Objection.  Vague.

11      THE WITNESS:  Something must have -- there

12  must have been a system error.  If you go to page 2 on

13  Exhibit 10, if you go to breakouts on worst case, you

14  can see where all of a sudden the field forecast for

15  worst case are 428,629, so --

16      MR. BRITTON:  Q.  Where are you at on that?

17  A.  I'm sorry.  I'm on the top of that, the top of

18  the section where you have the forecast --

19  Q.  What page?

20  A.  Second page.  I'm sorry.

21  Q.  Page 2.

22  A.  Yeah, "Worst by Region, Total Field," so there

23  must have been some type of data input or data

24  corruption error that you would have a group in Jim

25  Frazier of San Francisco, his field forecast went from

182

1   3.2 million to 428,000; Priestley, 629,000.  So you can

2   see the management judgment went to 29 million or

3   something.  So there was something -- there was some

4   error or something happened in this data.

5   Q.  Couldn't it be he just lost that many deals?

6   A.  No.

7   Q.  Why not?

8   A.  He did not lose -- if you were to take and go

9   back to his page on the details --

10  Q.  Of Exhibit 10?

11  A.  Yes.

12  Q.  What page is that?

13  A.  Page 6.  So on page 6 and 7 for Jim Frazier it

14  shows forecasted deals by line item.

15  Q.  Okay.

16  A.  At the bottom you'll have a summary,

17  4.127 million, right?

18  Q.  Right.

19  A.  Okay.  So that's what his forecast was.

20  Q.  His worst case was 427,000.

21  A.  Correct.  Correct.  So I'm saying what

22  happened is that they moved and must have changed

23  systems or something -- he would not -- not that many

24  deals moved from out of worst case to forecast.  I mean,

25  that's just -- that is not -- that's just not -- there's

183

1   some -- there was some error made on that.

2   Q.  Well, it wasn't moved from worst case to

3   forecast because his forecast dropped, as well, from

4   5.1 million on January 4th to 4.1 million on

5   January 10th.  So he collapsed all the way around,

6   didn't he?

7       MS. KYROUZ:  What page are you referring to?

8       MR. BRITTON:  Q.  It's Exhibit, I think, 9,

9   Exhibit 9, page --

10  A.  2.

11  Q.  No, I'm going to the summary section.  Jim

12  Frazier, page 8, and then compare that with page -- or

13  Exhibit 10, page 7, and it shows you that his sum totals

14  have dropped pretty significantly across the board.  And

15  I'll represent to you that we have counted up these

16  deals, and it looks like in this period of time your

17  division lost 140 deals.

18  A.  Okay.

19  Q.  And it could be that they came out of his -- I

20  didn't count them up individually, but it looks like

21  they came out of his.

22  A.  I do not think that they did for the fact that

23  if you look on Exhibit 10, page 2, Jim Frazier's

24  forecast is now at 5.128 million, total field.

25  Q.  Total field, 5.128.

184

1   A.  Yes.

2   Q.  Okay.

3   A.  On Exhibit 9, the previous week, his forecast

4   was 5.121.  So his forecast went down, but he

5   changed is that his less than 500K went down, but he

6   added a million-dollar deal a week later.  So one of his

7   deals grew, so his forecast from week to week went up

8   $7,000.  He might have lost deals, I agree with that,

9   but he also had a deal, it looks like, that grew.

10  Q.  Okay.  But if you look at page 7 of

11  Exhibit 10, it shows his forecast is 4.127 million.

12  A.  That's for deals less than 500K, then you add

13  the million dollars for a million-dollar deal on the

14  front page takes his forecast to 5.128.

15  Q.  Okay.  So he added a million-dollar deal.

16  A.  Or he shifted a smaller deal and it grew to a

17  larger one, or something like that.  So week to week,

18  his forecast was relatively the same.

19  Q.  But he lost a lot of deals; you can agree with

20  that?

21  A.  I could count them up, but if you say he did,

22  he did.

23  Q.  Now, why would his worst case forecast go down

24  so dramatically?

25  A.  I don't know.  That's something I have not

185

1   seen before -- I mean, I don't recognize -- I mean, this
2   is very, very abnormal that you would have a 30-million
3   dollar management -- I mean, it's ridiculous. And you
4   would have a worst case -- you would have a forecast of
5   5 million and a worst case of 428,000. So, in fact, he
6   had closed 428,000. If you go to the page before that,
7   he had already closed $428,000.
8       Q.  Right. That's a pretty small number.
9       A.  So there's something -- I don't know, to
10  answer your question.
11      Q.  Why do you say that a $29 million management
12  judgment is ridiculous? Why do you say that?
13      A.  I'm saying from week to week this is too big a
14  change in normal business.
15      Q.  Okay. Let's go with the next number. The
16  fact that your pipeline, total pipeline went from
17  158 million down to 141 million, that didn't concern you
18  at all?
19      MS. KYROUZ:  Objection. Vague.
20      THE WITNESS:  How we managed our business is
21  the first quarter he wanted to have the -- the first
22  month you had a volume, the second month you started
23  pruning that out and working on what is more qualified.
24  So that was common to have pipeline decreased around a
25  quarter.

186

1       MR. BRITTON:  Q.  Okay. Was it common to have
2   it decreased that much, $15 million in less than a week?
3       A.  It could be based upon the timing, coming back
4   after the new year.
5       Q.  Okay.
6       A.  You know, and we probably had a number of
7   salespeople that took off December 22nd and had not
8   touched OSO, so it might be a reflection of, like,
9   three weeks over the holidays.
10      Q.  The next would be January 31st.
11      (Whereupon, Plaintiffs' Exhibit 11 was marked
12  for identification.)
13      MR. BRITTON:  Q.  Okay. I've put in front of
14  you what's been marked as Exhibit 11. Take a moment to
15  look at this exhibit, sir.
16      For the record, Exhibit 11 starts with
17  NDCA-ORCL 078545 and ends at 078553.
18      A.  Okay.
19      Q.  Could you recognize Exhibit 11?
20      A.  Yes.
21      Q.  And what is Exhibit 11?
22      A.  Exhibit 11 is a hard copy of the west forecast
23  dated January 31st, 2001.
24      Q.  Okay. Is this the forecasting report that you
25  used in your forecasting calls with your direct reports?

187

1       A.  Yes, it is.
2       Q.  Okay. Is this a true and authentic copy of
3   the original?
4       A.  I believe it is, yes.
5       Q.  Now, the first page, again, we have a "Total
6   Won" of $14 million. So as of the last day of January,
7   you had closed a combined total of 14 million?
8       A.  Yes.
9       Q.  Is that what that is?
10      A.  Uh-huh.
11      Q.  So we saw you closed 6 million in December and
12  then 7 million in January.
13      MS. KYROUZ:  Objection. Misstates the
14  document, lacks foundation.
15      MR. BRITTON:  Q.  Is that right?
16      A.  6 and 7, sure, so 6 and 8.
17      Q.  Okay. So let me start over again.
18      In December you had closed $6 million in
19  business, and by the end of January you had closed an
20  additional $8 million in business?
21      A.  Yes.
22      Q.  Okay. If you look down to the pipeline,
23  again, you're down from 158 down to 114 by the end of
24  the month, which is about a $44 million reduction in
25  your pipeline.

188

1       Am I reading that accurately?
2       A.  Oh, yeah, from January --
3       Q.  From January 4th.
4       A.  Yes.
5       Q.  Did that drop in that pipeline concern you?
6       A.  Again, that's very common. You want to go
7   into the last month of a quarter with the most qualified
8   deals you have.
9       Q.  And I'll represent to you that we've counted
10  them up, and by the end of January you had lost
11  330 million -- withdrawn.
12      By the end of January you had lost 330
13  deals. Do you remember that happening?
14      A.  I do not. There was 330 deals that moved out
15  of the pipeline.
16      Q.  Right. Right.
17      A.  But our forecast had not changed.
18      Q.  Right, and I had noticed that, it really
19  didn't change at all at any prior time -- even though
20  the pipeline is dropping.
21      And can you tell me why that was the case?
22      A.  The deals that people were working on were
23  firming up, and so the forecast remained solid.
24      Q.  And now you had testified in the derivative
25  case that your practice was to not change your forecast

189

1   until the last two weeks of the quarter.
2       Do you remember testifying about that?
3       MS. KYROUZ: Objection. Lacks foundation.
4       THE WITNESS: Not specifically, but --
5       MR. BRITTON: Q. Is that accurate?
6       MS. KYROUZ: Objection. Lacks foundation.
7       THE WITNESS: Unless there were wild swings,
8   the forecast stayed pretty current, pretty -- wherever
9   it was at.
10      MR. BRITTON: Q. So unless there was a
11  drastic drop?
12      A. Or a large deal fell in or closed, or
13  something like that.
14      Q. So the fact that your pipeline is dropping and
15  we're seeing that the dot-com business is falling, you
16  weren't concerned about changing your forecast, though?
17      A. I was not.
18      Q. Okay. But the economy was affecting your
19  business in terms of the pipeline and --
20      MS. KYROUZ: Objection. Lacks foundation,
21  calls for speculation.
22      THE WITNESS: I assume there was some impact,
23  but we were working off of our forecast.
24      MR. BRITTON: Q. Right. Well, you lost 330
25  deals and your pipeline fell $40 million, so the economy

190

1   had some effect on it; is that right?
2       MS. KYROUZ: Assumes facts not in evidence,
3   vague, lacks foundation.
4       THE WITNESS: We had deals, it sounds like,
5   that moved. I can't tell you if they lost or if they
6   moved into the next quarter. So that would be
7   two different issues. As mentioned, it's very common to
8   have our pipeline go down as you go deeper into the
9   quarter.
10      MR. BRITTON: Q. This dramatically?
11      A. Yes.
12      Q. Yeah?
13      A. Yes.
14      Q. Okay. So if you look back at your prior
15  quarters and you look back at your prior years, you
16  would find that kind of drop in your pipeline?
17      A. I don't know exactly. It's very common to
18  have the -- the pipeline goes down throughout the
19  quarter. What percent, I cannot recall.
20      Q. My question was -- is you were sticking to
21  your forecast, but the economy had an effect on your
22  business in terms of a drop in your pipeline, lost
23  deals; is that right?
24      MS. KYROUZ: Same objection. Asked and
25  answered.

191

1       THE WITNESS: Yes, but it was not impacting
2   our forecast. We were keeping our forecast the same.
3       MR. BRITTON: Q. Okay. Do you have any idea
4   what was happening with the other areas within General
5   Business by the end of January 2000, in terms of the
6   business that they had closed, or the forecast?
7       MS. KYROUZ: Objection. Vague.
8       THE WITNESS: I did not. All of our forecasts
9   were one-on-one with John Nugent.
10      (Whereupon, Plaintiff's Exhibit 12 was marked
11      for identification.)
12      MR. BRITTON: Q. Okay. I've placed in front
13  of you what's been marked as Plaintiff's Exhibit 12.
14  Take a moment to look at this exhibit. Let me know when
15  you've had a chance to say it.
16      A. Okay.
17      Q. For the record, Exhibit 12 is a one-page
18  e-mail with Bates NDCA-ORCL 040627, and it's from
19  rvmgrhlp@us.oracle.com to a number of recipients.
20      Do you recognize this exhibit?
21      A. I do not.
22      Q. The reason I'm showing you this, 'cause your
23  name's not on it, but I wanted to see if, based on your
24  experience at Oracle and having been there at the time,
25  if you can explain to me why, under General Business for

192

1   January 2001, it shows license of 559,000, support of
2   200,000, for a total of 759,000, yet we saw that your
3   business closed $8 million worth of business in January.
4   Can you tell me why --
5       A. I cannot.
6       Q. You have no idea?
7       MS. KYROUZ: Objection. Lacks foundation.
8   It's not his document.
9       THE WITNESS: Not at all.
10      MR. BRITTON: Q. You missed your forecast for
11  the third quarter of 2001, right?
12      MS. KYROUZ: Objection. Vague.
13      THE WITNESS: I missed my forecast for third
14  quarter -- yes, I did.
15      MR. BRITTON: Q. Okay. Do you remember by
16  how much?
17      A. It was a significant miss.
18      Q. Can you give a ballpark for me?
19      A. Forecast was probably, estimate, 15,
20  $18 million on forecast.
21      Q. On the miss on the forecast?
22      A. On forecast.
23      Q. So your forecast was about 65, and you came in
24  18 million below that, about?
25      A. Estimating, right.

193

1    MR. BRITTON:  Next in order.

2        (Whereupon, Plaintiff's Exhibit 13 was marked

3    for identification.)

4        MR. BRITTON:  Q.  Now, because of the miss in

5    the third quarter of 2001 -- withdrawn.

6        Were you aware that you were not the only

7    area at Oracle, or region at Oracle, to miss its

8    forecast?

9        MS. KYROUZ:  Objection.  Vague.

10       THE WITNESS:  When?

11       MR. BRITTON:  Q.  For the third quarter of

12   2001.

13       MS. KYROUZ:  Same objection.

14       MR. BRITTON:  Q.  Let's say at any time in

15   fiscal year 2001.

16       Withdrawn.  Let me ask it a different way.

17       Did you ever become aware that divisions

18   outside of your own had missed their forecast, as

19   well, for the third quarter of 2001?

20       A.  After the quarter closed, yes.

21       Q.  After the quarter --

22       When did you find that out?

23       A.  The next day.

24       Q.  The next day?

25       A.  Right.

194

1        Q.  And how did you find that out?

2        A.  Again, talking to your peers, how the quarter

3    went.  At that point -- I know there was a lot of talk,

4    formal stuff.  I did not talk to other businesses, just

5    the GB managers.

6        Q.  Were you aware of Oracle's forecast to Wall

7    Street for the third quarter of 2001?

8        MS. KYROUZ:  Objection.  Vague.

9        THE WITNESS:  No.

10       MR. BRITTON:  Q.  Did you ever become aware

11   that Oracle missed the forecast that it gave to Wall

12   Street for the third quarter of 2001?

13       MS. KYROUZ:  Objection.  Vague, asked and

14   answered.

15       THE WITNESS:  Not until the earnings call.

16       MR. BRITTON:  Q.  So you did find out, but it

17   wasn't until the earnings call?

18       A.  Yeah, it was publicly released.

19       Q.  Do you remember when that was, how long after

20   the quarter closed?

21       A.  Not -- usually within two to three weeks, 14

22   to 20 days.

23       Q.  So you had received, did you not, inquiries

24   from John Nugent about what went wrong in the quarter;

25   is that right?

195

1        MS. KYROUZ:  Objection.  Vague.

2        THE WITNESS:  I believe I received -- yes.

3        MR. BRITTON:  Q.  Did you have to write up

4    anything explaining what happened and what you learned

5    from the third quarter of 2001?

6        A.  There was discussions.  I don't remember

7    particularly what we had to do or justify or --

8        Q.  Okay.  Take a look at Exhibit 13.

9        A.  Okay.

10       Q.  Take a look, and let me know if you recognize

11   it.

12       For the record, Exhibit 13 starts with Bates

13   NDCA-ORCL 394826 and ends at 394831.

14       A.  I'm sorry.  Do you want me to read all this

15   or --

16       Q.  Just see if you recognize it.  You can flip

17   through it.

18       MS. KYROUZ:  You should feel free to take time

19   to read --

20       MR. BRITTON:  Yeah, if you want to read the

21   whole thing, feel free.

22       THE WITNESS:  Okay.

23       MR. BRITTON:  Q.  Okay.  Have you had a chance

24   to look at Exhibit 13?

25       A.  I have.

196

1        Q.  Do you recognize it?

2        A.  I know I'm copied on it, but I really -- parts

3    of it I do, but, you know, not all of it, I guess.

4        Q.  Okay.  This is a request -- it includes a

5    request by George Roberts for managers to get individual

6    contributors to send the three lessons that they learned

7    in Q3.

8        Do you recall that type of request?

9        A.  Yes, I had asked for the -- to get those from

10   the regional managers.

11       Q.  Okay.  Did you send any similar type of

12   explanation, what you had learned in the third quarter

13   of 2001?

14       MS. KYROUZ:  Objection.  Vague.

15       THE WITNESS:  Not that I can specifically

16   remember.

17       MR. BRITTON:  Q.  Okay.  This e-mail, it's an

18   e-mail from John Nugent, and it's to George Roberts and

19   it cc's you and it looks like your peers; is that right?

20       A.  Yes.

21       Q.  Okay.  Do you remember receiving this e-mail?

22       A.  Not specifically.

23       Q.  Okay.  I'd like you to take a look at the

24   second page of Exhibit 13.  It is Bates 394827.

25       A.  Yes.

197

1    Q.  And it says, the first line --
2       Do you remember reading this explanation when
3   you received it in March of '01?
4    A.  Not particularly, no.
5    Q.  Okay.  Do you remember thinking what John
6   Nugent is listing in here is the very thing that you
7   told him about in October?
8       MS. KYROUZ:  Objection.  Lacks foundation.
9       THE WITNESS:  Not specifically, no.
10      MR. BRITTON:  Q.  Okay.  It says that,
11  "One very important lesson learned is that we are no
12  longer selling in a boom emerging company market.  Let
13  me say that over again.
14      It says, "One very important lesson learned is
15  that we are no longer selling in a boom emerging
16  company, dot-com, infrastructure, content, networking
17  market."
18      Now, you knew that back in October of 2001,
19  didn't you?
20      MS. KYROUZ:  Objection.  Lacks foundation,
21  misstates prior testimony.  I think you meant to say
22  October 2000.
23      MR. BRITTON:  Q.  Yes, that's the period of
24  time I'm referring to.
25   A.  I talked about the dot-com.  I did not talk

198

1   about the other three, infrastructure, content and
2   networking.
3    Q.  So you learned that through dot-com, but you
4   knew that back in October of 2003?
5    A.  Part of that, yes.
6    Q.  The next -- the two sentences down says, "The
7   boom period mantra was 'get big fast.'"  You knew that
8   back in October of 2000, right?
9       MS. KYROUZ:  Objection.  Misstates prior
10  testimony, lacks foundation.
11      THE WITNESS:  Did I know that?  Yes, everybody
12  knew that.
13      MR. BRITTON:  Q.  Okay.  Then a couple
14  sentences down it says, "The post boom mantra is",
15  quote, "It's all about profitability," closed quote.
16  You had told John about that in October of 2000, didn't
17  you?
18      MS. KYROUZ:  Same objections.
19      THE WITNESS:  I talked about profitability in
20  the dot-coms.
21      MR. BRITTON:  Q.  And the next sentence says,
22  "Today emerging companies are only willing to part with
23  the necessary dollars to purchase the development
24  licenses and maybe six months of production licenses,"
25  and you had told them that in October of 2000.

199

1       MS. KYROUZ:  Same objections.
2       THE WITNESS:  Again, for that market, for that
3   specific market space.
4       MR. BRITTON:  Q.  So this wasn't news to you
5   for the dot-coms, anyway.
6       MS. KYROUZ:  Same objections.
7       THE WITNESS:  For the dot-coms, yes.
8       MR. BRITTON:  Q.  Okay.  You can put that
9   document aside.
10      MR. BRITTON:  Can we take a five-minute break?
11      MS. KYROUZ:  Sure.
12      (Recess taken from 3:26 to 3:38 P.M.)
13      (Whereupon, Plaintiff's Exhibits 14 to 26
14      were marked for identification.)
15      MR. BRITTON:  Q.  Okay.  Mr. Classick, I've
16  placed in front of you a bunch of different exhibits in
17  a binder.
18   A.  Yes.
19   Q.  And we're marking them separately Exhibits 14
20  through 26, and what these are, they appear to be
21  various forecast summary reports and big deal reports or
22  scenarios from January 8, 2001, through March 1st, 2001.
23      So if you would take a moment to go through
24  and see if you recognize any of them.  I know you've
25  been doing that before we started, so I don't know if

200

1   you're --
2       MS. KYROUZ:  Do you want to just do one at a
3   time and ask him about each one?
4       MR. BRITTON:  Yeah, we can do that.
5       MS. KYROUZ:  It might be a little easier.
6       MR. BRITTON:  Q.  Okay.  Let's go to
7   Exhibit 14.
8    A.  14, I do not recognize.
9    Q.  Do you recognize the form of document?
10   A.  I do not.
11   Q.  Have you ever seen a document similar to this?
12   A.  No, I have not.
13   Q.  Anything that tracked individual deals with
14  win probabilities, the information that's in here?  Have
15  you seen anything like this?
16      MS. KYROUZ:  Objection.  Vague.
17      THE WITNESS:  I have not seen -- other than --
18  no, I have not seen this type of information at a NAS
19  level.
20      MR. BRITTON:  Q.  Okay.  So you've only seen
21  this type of information in the reports that we were
22  looking at earlier?
23   A.  Correct.
24   Q.  All right.  For the record, Exhibit 14 starts
25  with NDCA-ORCL 219689 and ends at 219691.

201

1    Okay.  The next one, 15, do you recognize
2  this exhibit?
3    A.  I do not.
4    Q.  Okay.  Exhibit 15 starts at Bates 221649 and
5  ends at 651.  It's a forecast summary report by product
6  category dated January 29th, 2001.
7    How about No. 16?
8    A.  Again, I have not seen anything like this
9  before.
10    Q.  Okay.  Exhibit 16 starts with Bates NDCA-ORCL
11  221584 and ends at 587.
12    Exhibit 17, do you recognize this document?
13    A.  I do not.
14    Q.  Okay.  For the record, Exhibit 17 is a NAS
15  forecast summary report by product category dated
16  February 5th, 2001, it starts at Bates 084738 and ends
17  at 084740.
18    How about Exhibit 18?
19    A.  Again, I have not seen this.
20    Q.  Okay.  Exhibit 18 starts at Bates NDCA-ORCL
21  222181 and ends at 184.
22    Okay.  Exhibit 19, I am expecting you to
23  say you do not recognize.
24    A.  I do not.
25    Q.  Okay.  And Exhibit 19 starts at 078865 and

202

1  ends at 68.
2    Exhibit 20, same answer?
3    A.  Give me one second, please.
4    Q.  Exhibit 20 is a forecast summary report by
5  product category dated February 12th, 2001, it starts
6  with Bates 223253 and ends at 254.
7    A.  I have not seen a report like this before.
8    Q.  Okay.  Next Exhibit 21 --
9    A.  I have not.
10    Q.  Okay.  This Exhibit 21 starts with 079151 and
11  ends at 079154.
12    How about Exhibit 22?
13    A.  No.
14    Q.  No.  Okay.
15    Exhibit 22 is a forecast summary report by
16  product category dated February 19th, 2001, it
17  starts at 223972 and ends at 974.
18    What about Exhibit 23?
19    A.  No.
20    Q.  Okay.  There's actually two different
21  reports --
22    A.  Okay.
23    Q.  -- in Exhibit 23.  The first one starts at --
24  it appears to be a big deal report, it starts at
25  NDCA-ORCL 223843 and ends at 645.

203

1    The next document starts at 224133 and ends at
2  134.  You don't recognize either of them?
3    A.  I do not.
4    Q.  Exhibit 24 is, again, a couple different
5  documents in the same exhibit, and the reason they're
6  grouped together like this is they're the same date.
7    A.  Okay.
8    Q.  Exhibit 24, the first document starts with
9  225438 and ends at 39; the next one starts at 224812 and
10  ends at 13, and then the last document starts at 079452
11  and ends at 53.
12    Do you recognize either of these three?
13    A.  I do not.
14    Q.  All right.  How about Exhibit 25?  And
15  Exhibit 25 starts at 078453 and ends at 455.
16    And then -- do you recognize that one,
17  Exhibit 25?
18    A.  No, I do not.
19    Q.  Okay.  And then finally, Exhibit 26 starts at
20  080186, and it's a multiple-page document, it starts at
21  080186; the first document ends at 190.
22    The next document starts at 225441 and ends at
23  444.
24    Do you recognize any of those?
25    A.  I do not.

204

1    Q.  Okay.  What I have done is I have highlighted
2  the various deals that appear to have been handled by
3  your area, General Business West.  So I wanted to point
4  to them, and tell me if you remember anything about
5  these deals.
6    So let me start with 24/7 Media.  Do you
7  remember anything about 24/7 Media, a deal in the
8  third quarter of 2001?
9    A.  I do not.
10    Q.  Okay.  If you take a look at Exhibit 20 and
11  21, 24/7 Media on page 20 is about halfway down the
12  page.
13    A.  Yes.
14    Q.  Do you see it?
15    A.  Yes.
16    Q.  It has a total opportunity amount of 450,000.
17    A.  Okay.
18    Q.  Close date of February 23rd, 2001.  It has a
19  30 percent win probability.
20    What does the 30 percent win probability mean
21  to you?
22    MS. KYROUZ:  Objection.  Lacks foundation.
23  He's already said he hasn't seen this document.
24    THE WITNESS:  Well, I mean, if it's accurate,
25  that means that they've got additional steps to get

205

1  closed.
2      MR. BRITTON: Q. Is that essentially a
3  30 percent chance of getting it closed in the quarter?
4      MS. KYROUZ: Same objection.
5      THE WITNESS: I assume it would be that
6  quarter. The wild card there, it's an indirect deal, so
7  you have a partner working it, so you might be out of
8  sync from one of the direct people and the partners.
9      MR. BRITTON: Q. Okay. Now, Mr. Classick,
10  when you were at Oracle, did you have experience with
11  reviewing win probabilities and deals and close dates
12  and worst case forecast and best case type of
13  information?
14      MS. KYROUZ: Objection. Vague, lacks
15  foundation, misstates this document.
16      MR. BRITTON: Q. Do you have an understanding
17  as to what those terms mean at Oracle?
18      MS. KYROUZ: Same objection.
19      THE WITNESS: Close date and probability is
20  used very seldom by the field.
21      MR. BRITTON: Q. Do you know when it's used,
22  the win probability and close dates?
23      MS. KYROUZ: Same objections.
24      THE WITNESS: It's something I don't use. I
25  very rarely use it.

206

1      MR. BRITTON: Q. You very rarely use it?
2      A. Correct.
3      Q. Now, if you look over on Exhibit 22, the worst
4  case, forecast, best case columns.
5      MS. KYROUZ: I'm sorry. Exhibit 22?
6      MR. BRITTON: Pardon me. Exhibit 20. I think
7  I said Exhibit 20 to the far right columns, worst case,
8  forecast, best case?
9      THE WITNESS: I apologize. Are we on --
10      MR. BRITTON: Q. On Exhibit 20, the 24/7
11  Media deal, it has forecasted a million dollars, but
12  nothing in the worst case column, and what does that
13  column mean? What does that mean to you?
14      MS. KYROUZ: Objection. Lacks foundation.
15  He's already said this isn't his document.
16      MR. BRITTON: Counsel, I'll stipulate that you
17  can have that objection for every single document in
18  this binder, but your outward disdain over use of a
19  document that shows deals that were in his -- that were
20  in his division not only unprofessional, it's
21  unnecessary.
22      MS. KYROUZ: Counsel, you're asking him to
23  interpret a document he's already said isn't his and he
24  doesn't understand.
25      MR. BRITTON: Right, but he has substantial

207

1  experience with what win probabilities mean, due dates
2  mean, best case means, worst case means, forecasts
3  means, so I'm asking him what this information means to
4  him.
5      MS. KYROUZ: Same objections.
6      THE WITNESS: To me, it looks like there is a
7  deal forecast for a million dollars.
8      THE VIDEOGRAPHER: Q. Now, we talked about,
9  earlier, that if there's a zero in the worst case
10  column, it means -- I think you said that it's unlikely
11  that it's going to close, or there's not an expectation
12  that it's going to close?
13      MS. KYROUZ: Objection. Lacks foundation,
14  misstates testimony.
15      THE WITNESS: I didn't say that at all.
16      MR. BRITTON: Q. Okay. Well, what does that
17  mean to you when there's a number in the forecast column
18  but nothing in the worst case column?
19      MS. KYROUZ: Object to the question to the
20  extent you're referring to this document.
21      THE WITNESS: Forecast means that the
22  salesperson and manager think they're going to close
23  this deal for a million dollars, okay? Worst case, it
24  could fall out.
25      MR. BRITTON: Q. It could fall.

208

1      A. They don't have -- worst case, it's zero.
2      Q. Right.
3      A. It's pretty self-explanatory. It could be
4  zero.
5      Q. It could be zero.
6      A. That would be the worst case.
7      Q. And if you saw a 30 percent win probability
8  with a zero in the worst case column, what would that
9  tell you about that deal?
10      MS. KYROUZ: Same objections. Also calls for
11  speculation.
12      THE WITNESS: There's not enough data on this
13  report to tell me yea, nay, good, bad, high risk,
14  whatever.
15      MR. BRITTON: Q. Okay. Now, if you looked to
16  the next page or the next exhibit, Exhibit 21, it says,
17  "24/7 Media," then it has the million-dollar opportunity
18  amounts, and in the notes column it says "sign on
19  Friday." And of course this isn't your document.
20      What would it mean to you if this deal
21  didn't show up at any point after February 12th,
22  2001 report that's sitting here?
23      MS. KYROUZ: Objection. Lacks foundation,
24  calls for speculation.
25      THE WITNESS: Could you read that again?

209

1      MR. BRITTON: Q. Yeah, I'm trying to figure
2   out, 'cause this deal 24/7 doesn't show up at any point
3   in any of the reports after February 19th. So I get an
4   idea, does that mean to you that the deal has fallen out
5   and it's not going to close in the quarter, or that it's
6   closed, or do you have an understanding at all?
7      MS. KYROUZ: Objection. Lacks foundation.
8      THE WITNESS: I don't know at all. It could
9   have closed for less than a million.
10     MR. BRITTON: Q. It could have closed for
11  less than a million --
12     A. It could have moved to Q4. This example is
13  under a reseller, the license could have been sold
14  through the reseller and then booked under the reseller
15  name. So really, these reports don't tell me anything
16  what happened to this deal.
17     Q. Okay. If you go to Exhibit 20 again.
18     A. Yes.
19     Q. There is -- BroadVision is the first deal that
20  is listed that's highlighted.
21     A. Okay.
22     Q. And that's attributable to your division,
23  General Business West?
24     A. Yes.
25     Q. Okay. JC -- is that Frazier?

210

1      A. Yes.
2      Q. Okay. Does this refresh your recollection at
3   all about a deal with BroadVision?
4      A. No.
5      Q. No, in your area? Okay.
6      And again, if this deal stopped showing up
7   in these reports, you wouldn't know what happened to
8   it; is that right?
9      MS. KYROUZ: Objection. Lacks foundation,
10  misstates prior testimony.
11     THE WITNESS: True.
12     MR. BRITTON: Q. Okay. Let's go to
13  Exhibit 20 again, Lexicon Marketing, which is directly
14  underneath the 24/7 Media deal.
15     A. Yep.
16     Q. Okay. That's attributable to your division?
17     A. It is.
18     Q. Okay. Who is the person in the sales group
19  column; do you know?
20     A. That's John Yoneda. He is the manager, and
21  the sales rep is Siobhan Ryan.
22     Q. Okay. Do you have any knowledge about what
23  happened with the Lexicon Marketing deal?
24     MS. KYROUZ: Objection. Vague.
25     THE WITNESS: I do not, again, it's a -- no, I

211

1   do not. It's an applications deal, CRM.
2      MR. BRITTON: Q. Right.
3      A. So I do not have any recollection of it.
4      Q. Okay. If you go to Exhibit 15.
5      A. Yes.
6      Q. McGhan Medical is on the second page of
7   Exhibit 15.
8      Okay. This is attributable to your division?
9      A. It is, yes.
10     Q. Okay. And is it Mr. Or Mrs. Yoneda? John
11  Yoneda?
12     A. John. It's Mr.
13     Q. Okay. He was one of your regional managers?
14     A. He was, in the application, so he reported up
15  to Mark Amtz.
16     Q. Do you have any knowledge of what happened
17  with the McGhan Medical deal?
18     A. I do not. It was ERPCRM. I do not.
19     Q. Okay. How about Veritas software?
20     A. Okay.
21     Q. Do you have any idea what happened with the
22  Veritas software deal?
23     MS. KYROUZ: Objection. Vague.
24     THE WITNESS: No.
25     MR. BRITTON: Q. D. Bonnette is one of your

212

1   regional managers?
2      A. He's a manager, yes.
3      Q. And did you have any involvement in the
4   Veritas software deal?
5      A. No.
6      (Whereupon, Plaintiff's Exhibit 27 was marked
7      for identification.)
8      MR. BRITTON: Q. I have placed in front of
9   you what has been marked as Classick Exhibit 27. Take a
10  moment to look at this Exhibit, and let me know if you
11  recognize it.
12     And for the record it starts at NDCA-ORCL
13  120356 through 359.
14     A. Okay.
15     Q. Okay. Do you recognize Exhibit 27?
16     A. It's an approval request.
17     Q. Okay. Now, it's an approval request for
18  Veritas Corporation?
19     A. Yes, it is.
20     Q. Okay. And have you ever seen this document
21  before?
22     A. It doesn't -- I don't remember specifically
23  seeing it.
24     Q. Okay. Have you seen approval requests like
25  this at your time at Oracle?

213

1    A. Yes, many.
2    Q. Many. Okay.
3       If you look to the second to last page,
4    page 3 of Exhibit 27, it has "submitted by" and then
5    it has your name down there, along with others.
6    A. Yes.
7    Q. Now, you said that you did not participate in
8    this deal, but your name shows up.
9       Can you tell me why?
10   A. That's the approval process, so a salesperson
11   would submit to a regional manager who would submit it
12   to myself, I would submit it to John Nugent, who would
13   submit it to George Roberts, who would submit it up to
14   headquarters.
15   Q. Okay. And can you tell from looking at this
16   document who the sales rep was responsible for the
17   Veritas deal?
18   A. Scott Parson for the applications piece. It
19   also looks like on this one what they did was they kept
20   the applications and technology together and submitted
21   one approval. So rather than splitting it up, because
22   we had two different sales forces, they opted to do that
23   under one. So Scott submitted it to Dave Keller.
24   Q. Okay. Who submitted it to you, and then you
25   submitted it to John Nugent, and he submitted it to

214

1    George Roberts?
2    A. Yes.
3    Q. Okay.
4    A. And it looks like this -- George would have to
5    send it up to HQ app, headquarter approvals, 'cause the
6    approver is LJE, so there were some terms and conditions
7    or concessions that required HQ app approval.
8    Q. All right. Now, if you'd look back at
9    Exhibit 14,
10   A. Yep.
11   Q. And I don't know if that was the one we were
12   looking at before, but let's turn to Exhibit 14. It has
13   "Veritas Software", and then "Configurator".
14   A. Yes.
15   Q. What type of product is the Configurator
16   product?
17   A. Application product.
18   Q. So that's in applications.
19   A. Yes, David Bonnette was an applications
20   manager.
21   Q. Okay. If you go to the next exhibit.
22   Exhibit 15, you have Veritas again, the first one, and
23   then there's a human resources description.
24   A. Okay.
25   Q. And is that a CRM product, applications

215

1    product also?
2    A. It would be an application, not CRM.
3    Q. Not CRM. Okay.
4    A. Human resources is its own stand-alone
5    application product.
6    Q. That's right. Okay.
7       If you turn to the next page of this
8    Exhibit --
9    A. 16?
10   Q. 15.
11   A. Oh, I'm sorry. Okay.
12   Q. This is the Veritas, the second highlighted
13   one.
14   A. Yes.
15   Q. Under "additional users".
16   A. Okay.
17   Q. Do you know what that is? Is that a tech
18   product or an applications product, or how it's
19   characterized?
20       MS. KYROUZ: Objection. Lacks foundation.
21       THE WITNESS: It would be applications because
22   it's under CRM and ERP.
23       MR. BRITTON: Q. Okay. Do you remember a
24   deal with Myriad in your region for the third quarter?
25   A. I know we did a deal with Myriad, but I don't

216

1    remember specifically what month or quarter it was.
2    Q. Okay.
3    A. Out of Salt Lake City.
4    Q. Okay. If you look at Exhibit 15 --
5    A. Pardon?
6    Q. Exhibit 15.
7    A. Exhibit 15, okay.
8    Q. Okay. It has on the last page, it has "Myriad
9    Genetics" --
10   A. Yes.
11   Q. -- highlighted.
12   A. Yes.
13   Q. Does this refresh your recollection about when
14   you had a deal with Myriad?
15       MS. KYROUZ: Objection. Lacks foundation.
16       THE WITNESS: We have done multiple deals with
17   Myriad over time, so again, not a specific line item
18   within a quarter.
19       MR. BRITTON: Q. Were you involved at all in
20   the Myriad deal?
21       MS. KYROUZ: Objection. Vague.
22       THE WITNESS: Somewhat.
23       MR. BRITTON: Q. Really? And what was your
24   role in that deal? At least the deal for the third
25   quarter of 2001.

217

1   A.  I don't know exactly what the deal was.
2   Myriad -- the initial order was a -- an equity -- we
3   were taking an equity position, so we were working with
4   corporate on -- we would invest our money, and then they
5   would buy some Oracle software and that type of stuff.
6   So I did not meet with any of the executives at Myriad.
7   Q.  Okay.  You did not.
8   A.  No.
9   Q.  So how were you involved with it?
10   A.  On the internal piece putting together the
11   justification for the equity position.
12   Q.  Okay.  Now, if you look at Exhibit 16 and the
13   second to last page down at the bottom, the bottom
14   highlighted deal that says "Myraid"
15   A.  Myriad.
16   Q.  But it's spelled differently.  I just wanted
17   to see if you knew if this was the same deal that
18   earlier was referred to as "Myriad Genetics".
19   A.  I would assume it is.  I don't know.  It's not
20   my report.
21   Q.  If you look at the description to the right,
22   isn't that the description you just gave of the Myriad
23   deal?
24   A.  Yes, but there was other equity.  I assume it
25   would be because it's so close.

218

1   Q.  Okay.  Do you remember a deal with Nacio
2   Systems?
3   A.  Nacio, like Joe Nacio?
4   Q.  Yeah, N-A-C-I-O.
5   A.  It doesn't ring a bell.
6   Q.  Were you involved in that deal at all?
7   A.  Is it in here someplace?
8   Q.  Yeah, let me refer you to Exhibit 17.  It
9   would be the second page, the second highlighted deal.
10   A.  I am not familiar with that.
11   Q.  Okay.  That's attributed to your division.
12   A.  Yep.
13   Q.  And who is under the sales group?  I can't
14   read that.  Is that Priestley?
15   A.  Yes, Jim Priestley.
16   Q.  Okay.  And it says "datacenter".  Does that
17   fall under the tech products or the applications
18   products?
19   A.  Datacenter would not tell you what the product
20   type would be.
21   Q.  Okay.
22   A.  You go over under the Opportunity by Product
23   Category, that would be -- so you would have -- CRM
24   would be the first one, and then the second one, I
25   think, is database, it looks like.

219

1   Q.  Yeah.
2   A.  So this transaction would fall under database
3   for 144,000.
4   Q.  Okay.
5   All right.  You talked a little bit about
6   an indirect seller earlier.  What is that?  What is
7   an indirect seller?
8   A.  We have partners or a channel that resells
9   Oracle licenses.
10   Q.  Okay.
11   A.  So if I was to -- if you were to work with us
12   directly, that would be a direct relationship.  You
13   could work through a partner to buy a product.
14   Q.  Okay.  If you would go back to Exhibit 14, the
15   second page, the first highlighted deal.
16   A.  Real Networks.
17   Q.  Real Networks.  Do you recall a deal with Real
18   Networks in the third quarter of 2001?
19   A.  I do not.  I remember seeing it on the front
20   page of the previous ones we had gone over, but I don't
21   remember the specifics of that transaction.
22   Q.  Okay.  Now, you mentioned that the field
23   doesn't use win probabilities, and I think you said you
24   didn't use win probabilities during the --
25   A.  I said I didn't use win probabilities very

220

1   often.
2   Q.  Okay.  And I thought you mentioned the field
3   didn't.
4   A.  Again, it's -- each regional manager and reps.
5   I mean, they're -- I don't know exactly how they used
6   it.  I'll just tell you I did not use the probability as
7   diligently as I probably should have.
8   Q.  Okay.  And why was that?
9   A.  Because I felt like it -- by the time I talked
10   to the managers, sometimes the reps may have entered the
11   probability in a week ago, things had changed, and I
12   prefer to get my data directly from the managers.  My
13   feedback, you know.
14   Q.  Okay.  If you turn to Exhibit 17, the second
15   page, the first highlighted deal is Technicolor
16   Entertainment Services.
17   A.  Okay.
18   Q.  That's attributed to your division.
19   A.  Yes, it is.
20   Q.  And did you have any involvement in that deal?
21   A.  Not that I remember.
22   Q.  Do you remember the deal at all?
23   A.  I do not.  It's an applications deal under
24   John Yoneda.
25   Q.  All right.  And then lastly, if you go to

Classick, Nicholas  4/12/2006  9:02:00 AM

221

1  Exhibit 20, if you go to the second page, the top
2  highlighted deal, it's attributed to your division?
3  A. Website Results?
4  Q. Yep.
5  A. Okay.
6  Q. And who is the sales group?
7  A. Mike Stone, he's in Southern California.
8  Salesperson was Suzanne Lynch.
9  Q. And that's for database back end website?
10  A. It was.
11  Q. Did you have any involvement in this deal?
12  A. I did not. It was an indirect deal.
13  Q. Okay. You can put those exhibits away.
14  How involved were you in problematic
15  installations at customers for deals that you had
16  sold or anybody in your division had sold?
17  MS. KYROUZ: Objection. Vague, lacks
18  foundation.
19  THE WITNESS: We had customer problems. I
20  mean, the salespeople would try and resolve it, the
21  sales consultants, the regional managers, regional VPs.
22  You know, I would go see a customer on occasion that had
23  problems.
24  MR. BRITTON: Q. Okay. What would cause
25  somebody at your level -- withdrawn.

222

1  In your division, what would cause you to
2  get involved with a problematic installation?
3  MS. KYROUZ: Objection. Vague. Calls for
4  speculation.
5  THE WITNESS: If the regional manager or the
6  regional vice-president asked me to.
7  MR. BRITTON: Q. Okay. They would have to
8  ask you for it?
9  A. Yes.
10  Q. Do you remember a -- an installation at
11  Amazon.com?
12  MS. KYROUZ: Objection. Vague.
13  THE WITNESS: Not specifically, no.
14  MR. BRITTON: Q. Do you remember any problems
15  with an implementation at Amazon.com?
16  MS. KYROUZ: Same objection.
17  THE WITNESS: Not specifically, no.
18  (Whereupon, Plaintiff's Exhibit 28 was marked
19  for identification.)
20  MR. BRITTON: Q. Take a look at Exhibit 28,
21  and let me know if you recognize it. Exhibit 28 starts
22  at Bates NDCA-ORCL 059791 and ends at 795.
23  A. Okay.
24  Q. Okay. Do you recognize Exhibit 28?
25  A. Not specifically. I know I was copied on it,

223

1  but it doesn't --
2  Q. It's the forwarded one that was sent directly
3  to you, right, from Mike Arntz?
4  A. Yes.
5  Q. Were you involved at all with the Amazon
6  implementation, other than receiving updates?
7  A. I was not.
8  Q. Okay. Did you speak to the customer, ever?
9  A. I did not.
10  Q. Did you speak to George Roberts, ever, about
11  the deal, or the implementation?
12  MS. KYROUZ: Objection. Vague.
13  THE WITNESS: Potentially, not that I remember
14  specifically.
15  MR. BRITTON: Q. Do you know how the
16  Amazon.com implementation was ultimately resolved?
17  A. I do not remember, no.
18  Q. All right. Put that document aside.
19  Were you involved with an implementation
20  with Rockford in the third quarter of 2001?
21  MS. KYROUZ: Objection. Vague.
22  THE WITNESS: Not that I'm aware of.
23  MR. BRITTON: Q. Now, did you ever get
24  involved in any problematic implementations, other than
25  just to be updated on what's going on in the third

224

1  quarter of 2001?
2  MS. KYROUZ: Objection. Vague.
3  THE WITNESS: That was about it, was I was
4  getting updates from my managers.
5  MR. BRITTON: Q. You would get updates, and
6  did you ever do anything with those updates in terms of
7  talking to George Roberts or anybody else at Oracle to
8  resolve the problem?
9  MS. KYROUZ: Objection. Vague.
10  THE WITNESS: Not that I recall, no.
11  MR. BRITTON: Okay. Why don't we take a short
12  break. I'm getting close.
13  (Recess taken from 4:16 to 4:23 P.M.)
14  MR. BRITTON: Q. Okay. Mr. Classick, actual
15  results for each month for your division, did you ever
16  receive anything telling you what you had received --
17  withdrawn.
18  -- what you had generated in revenue each
19  month?
20  MS. KYROUZ: Objection. Vague.
21  THE WITNESS: No, we would look at the one,
22  you know, that we had talked about on previous
23  documents.
24  MR. BRITTON: Q. Okay.
25  A. So that was --

225

1    Q.  That would be the signal for months 1 and 2?

2    A.  Right.  And, you know, what we filed was what

3  we would close.  Sometimes it would be two or three days

4  before the order got entered in or booked, or something

5  like that.  So all I tracked was the salesperson said,

6  "Yeah, we got the deal closed," and they changed it to

7  one.  And often -- sometimes that would be outdated.  We

8  had closed more business, salespeople hadn't gone in and

9  closed out on one deal.  So it was -- that was close.

10  It wasn't always -- very rarely was it 100 percent

11  accurate.

12    Q.  But you didn't receive a report that says this

13  is how much revenue General Business West generated in

14  December?

15    A.  No.

16    Q.  Okay.  What about at the end of a quarter,

17  would you get your actual results?

18    A.  I would.

19    Q.  And what form did that take?

20    A.  We would get a booklet from finance people,

21  but again, it would be several weeks after the quarter

22  was publicly closed out.

23    Q.  Okay.

24    A.  So probably, let's say, roughly 30 days after

25  a quarter close.

226

1    Q.  And when you say "from the finance people,"

2  who are you talking about?

3    A.  It would be John's finance people --

4    Q.  David Winton?

5    A.  Well, Winton, I think, worked for George.  It

6  would be more like Bill Rizelli, and he had some people.

7  So it would be a report that would show the actual

8  revenues by region, by product, number of transactions,

9  that type of information.

10    Q.  Were there any reports that showed you which

11  deals had closed, versus which deals had either fallen

12  out or moved to the next quarter?

13    A.  We did not have that.

14    Q.  Okay.  I'd like you to go back to Exhibit 9

15  real quick.

16    A.  9 in the book, or 9 in here?

17    Q.  No, Exhibit 9.

18    A.  Okay.  Got it.

19    Q.  Okay.  If you turn to page 2 of Exhibit 9.

20    A.  Yes.

21    Q.  In the forecast box.

22    A.  Yes.

23    Q.  There's headquarter judgment, and that's where

24  you would put your judgment if you had it, right?

25    A.  Yes.

227

1    Q.  Okay.  And since there's zeros across the

2  board there, that means that you didn't add any

3  management judgment to this forecast as of January 4th,

4  2001.

5    A.  True.

6    Q.  Okay.

7    Now, if you'll go to Exhibit 10, and look at

8  page 2 of Exhibit 10 --

9    A.  Yes.

10    Q.  The -- for the forecast box, you had added "no

11  management judgment" to these numbers; is that right?

12    A.  Correct.

13    Q.  Now, would there be any other place that

14  management judgment would show up from the time that

15  went from this forecast box to the summary on the first

16  page?

17    MS. KYROUZ:  Objection.  Vague.  Lacks

18  foundation.

19    MR. BRITTON:  Q.  I'm talking about your

20  management judgment, not management judgment for others.

21  I'm talking about your management judgment from the time

22  you got the numbers from the field to the time you had

23  an end forecast for that period.

24    A.  I was just looking to see if there was some

25  column or line item in the back.  I don't see one there.

228

1  I don't see any other -- on the front page in the

2  summary, where there's a line item for management

3  judgment.

4    So on this report, the only place I see

5  management judgment is on page 2.

6    Q.  Right.  So there's no management judgment

7  there.

8    A.  For the forecast, no.

9    Q.  Right.  So you -- in other words, you wouldn't

10  add management judgment into the totals that you're

11  seeing across from the individual managers.  Am I right?

12    A.  On this report, I did not.  I had zero

13  management judgment.

14    Q.  Okay.  Now, at any time -- I'm not saying on

15  this report; at any time did you do it that way, or did

16  you actually have a line like you did with worst case

17  that said this is what my management judgment's going to

18  be?

19    A.  You know, again, for over the last 10 years,

20  I've had judgment in there.

21    As an example, when would you do that?  Say I

22  had a couple $5 million deals.  I don't have any of them

23  forecasted, but I know -- I think we're going to get

24  one of them, or something like that.  So I would not ask

25  a regional manager to forecast a large deal that he

229

1  could not back up, but I might have three or four of
2  them, something like that.
3      Q.  Would that show up in the headquarter judgment
4  column?
5      A.  If I was putting that in, yes, it would.
6      Q.  All right.
7          Now, if you go to January 26, which is --
8  oops, wrong one.
9          Exhibit 11, January 31st --
10     A.  Okay.  Yes.
11     Q.  I'm looking for that -- there it is.  Yeah,
12  this is page 2, headquarter judgment.
13         For this forecast, you didn't add any
14  management judgment, did you?
15     A.  It does not look like it, no.
16     Q.  Okay.
17     A.  It's hard to read the totals.  I'm sorry.
18     Q.  Yeah, it looks like, under "Forecast", the
19  total is 63,409, and if you go to the front page
20  summary, total forecast is 63,409.
21     A.  Yeah, 'cause there's 12.1 of that is telesales
22  or ISD.
23     Q.  Right.
24     A.  Yeah.
25     Q.  Okay.  Good.  Good.

230

1          Okay.  I've got one more exhibit to mark.
2          Let me go back real quick to Exhibit 1.
3      A.  Yes.
4      Q.  You testified earlier that you weren't
5  concerned about making your budget number in the
6  beginning of fiscal year 2001.
7          Do you recall that testimony?
8      A.  I do.
9      Q.  Okay.  Now, if you look to page 2 -- pardon
10 me.
11         Yes, page 3 of Exhibit 1, with Bates 104830,
12 there's the dot-com analysis, and it looks, am I
13 right, the fifth column over shows fiscal year 2000 to
14 2001 has 35 percent growth?
15         MS. KYROUZ:  Objection.  Lacks foundation.
16         THE WITNESS:  For the west?
17         MR. BRITTON:  Q.  Yeah.
18     A.  Yes.
19     Q.  For the west.  And then after John's judgment
20 down to -- subtracting out 4 million, the adjusted
21 growth was 32 percent?
22         MS. KYROUZ:  Same objection.
23         THE WITNESS:  That's what it looks like, yes.
24         MR. BRITTON:  Q.  Do you have any concern
25 about reaching the 32 percent budgeted growth that John

231

1  had listed here for fiscal year 2001?
2          MS. KYROUZ:  Same objection.
3          THE WITNESS:  Probably not for the fact that
4  he had 31 percent was -- 31 percent was the total for
5  General Business.  We were right in line with that.  The
6  only challenge we would have is that we had a fairly
7  large baseline to grow off that 32 percent.
8          MR. BRITTON:  Okay.  Let me mark this exhibit.
9          (Whereupon, Plaintiff's Exhibit 29 was marked
10 for identification.)
11         MR. BRITTON:  Q.  I want you to take a
12 look and review this entire document.
13     A.  We'll see you next Friday.
14     Q.  Yeah, exactly.
15         Exhibit 29 is the deposition transcript of
16 your deposition in the Delaware derivative case, and
17 it goes from Bates NDCA-ORCL 604458 through 604736.
18         Now, I'd like you to take a look at pages
19 153 and 154.  Are you there yet?
20     A.  Almost.  153, yes.
21     Q.  If you look down to line 21 on 153,
22 plaintiff's counsel in that case asked you, "Do you
23 think -- did you think the dot-com could grow 31 percent
24 overall during fiscal year 2001 based on your sense of
25 what was happening in the dot-com sector right at this

232

1  point in time?"
2          If you turn the page, your answer was, "I
3  guess I was probably nervous is the way to word that."
4          Do you recall giving that testimony in
5  this case?
6          MS. KYROUZ:  I'll object that the question, as
7  read, is incomplete as to "at this point in time" since
8  it's not clear what "at this point in time" is being
9  referred to.
10         MR. BRITTON:  Q.  Can you tell me what made
11 you nervous at that point in time, and while we're
12 talking today, you didn't have any concern about making
13 your dot-com growth budget?
14         MS. KYROUZ:  Same objection.
15         THE WITNESS:  Well, two things; nervous and
16 concern.  Any time you get a number at the beginning of
17 the year, you get a little nervous, how am I going to
18 get this, you do move around.  So you look at the data,
19 they were consistent with all General Business, so the
20 west was 32 percent, the east, northeast 31 overall.  So
21 was it a concern?  No.  Was I nervous?  I was nervous
22 with the whole number.  You're always nervous about when
23 you get a new budget at the beginning of the year how
24 you're going to do it.
25         MR. BRITTON:  Very good.  No further

Classick, Nicholas  4/12/2006  9:02:00 AM

233

1  questions.

2       Actually, I do have one thing to add.  Because

3  of the discovery issues that are outstanding in this

4  case, we are reserving our rights to call Mr. Classick

5  back in the event that discovery orders and additional

6  production, if any, warrants doing so.  So we're just

7  reserving the rights.

8       MS. KYROUZ:  That's an argument you can make

9  to the judge.

10      We want to mark the transcript confidential,

11 please.

12            --o0o--

13          (Whereupon, the deposition was

14           concluded at 4:36 P.M.)

15

16 Dated: _____ Signed: _____

17

18

19

20

21

22

23

24

25

234

1

2            REPORTER'S CERTIFICATE

3

4       I hereby certify that the foregoing is a true

5  record of the testimony as reported to the best of my

6  ability by me, a Certified Shorthand Reporter and a

7  disinterested person, and was thereafter transcribed

8  under my direction into typewriting by computer.

9

10      I FURTHER CERTIFY that I am not interested in

11 the outcome of the said action and not connected with

12 nor related to any of the parties in said action or

13 their respective counsel.

14 Dated: _____

              APRIL DAWN HEVEROH, CSR

15               CSR NO. 8759

16

17

18

19

20

21

22

23

24

25

## REPORTER'S CERTIFICATE

I hereby certify that the foregoing is a true record of the testimony as reported to the best of my ability by me, a Certified Shorthand Reporter and a disinterested person, and was thereafter transcribed under my direction into typewriting by computer.

I FURTHER CERTIFY that I am not interested in the outcome of the said action and not connected with nor related to any of the parties in said action or their respective counsel.

Dated: _4-25-06_   _APRIL DAWN HEVEROH_

APRIL DAWN HEVEROH, CSR
CSR NO. 8759

# EXHIBIT OO

Nugent, John J. 5/19/2004 3:12:00 PM

```
1
            IN THE COURT OF CHANCERY
2            OF THE STATE OF DELAWARE
            IN AND FOR NEW CASTLE COUNTY
3
                 - - -
4
   IN RE:
5
     ORACLE CORPORATION : CONSOL. C.A.
6    DERIVATIVE LITIGATION : No. 18751
7
     _____
8
9     IN THE SUPERIOR COURT
      OF THE STATE OF CALIFORNIA
10    FOR THE COUNTY OF SAN MATEO
11           - - -
12
   COORDINATION PROCEEDINGS: Judicial Counsel
13  SPECIAL TITLE    : Coordination
            (Rule 1550(b))  : Proceeding
14               : No. 4180
15
16           - - -
17   Wednesday, May 19, 2004
18           - - -
19   EXAMINATION OF JOHN J. NUGENT
20           - - -
21   ESQUIRE DEPOSITION SERVICES
            15th Floor
22   1880 John F. Kennedy Boulevard
     Philadelphia, Pennsylvania 19103
23       (215) '-9191
24
```

Oracle Related Cases                                        Page 1

Nugent, John J. 5/19/2004 3:12:00 PM

```
1
2
3
4       Videotape deposition of JOHN
5    J. NUGENT, taken pursuant to
6    notice, was held at the law
7    offices of SCHIFFRIN & BARROWAY,
8    LLP, Three Bala Plaza East, Suite
9    400, Bala Cynwyd, Pennsylvania,
10   beginning at 12:30 p.m., on the
11   above date, before MARIA NOELLE
12   DAMIANI, A Registered Merit
13   Reporter, Certified Shorthand
14   Reporter, and Notary Public.
15
16           - - -
17
18
19
20
21
22
23
24
```

Oracle Related Cases                                        Page 2

Nugent, John J. 5/19/2004 3:12:00 PM

```
1  A P P E A R A N C E S :
2
3    COREY, LUZAICH, PLISKA,
     de GHETALDI & NASTARI, LLP
4    BY: Dario de Ghetaldi, ESQUIRE
     700 El Camino Real
5    P.O. Box 669
     Millbrae, California 94030
6    (650) 871-5666
     Representing the Plaintiff
7    (California action)
8
     SCHIFFRIN & BARROWAY, LLP
9    BY: ROBERT B. WEISER, ESQUIRE
     Three Bala Plaza East
10   Suite 400
     Bala Cynwyd, Pennsylvania 19004
11   (610) 822-2236
     Representing the Plaintiff
12   (Delaware action)
13
     MORRISON & FOERSTER, LLP
14   BY: PAUL H. GOLDSTEIN, ESQUIRE
     755 Page Mill Road
15   Palo Alto, California 94304-1018
     (650) 813-5818
16   Representing the Defendant,
     Oracle Corporation
17
18   MAYER, BROWN, ROWE & MAW
     BY: GERMAIN LABAT, ESQUIRE
19   (via telephone)
     350 South Gerald Avenue
20   25th Floor
     Los Angeles, California 90071
21   (213) 229-9500
     Representing the Defendants,
22   Larry Ellison and Jeffrey Henley
23
   ALSO PRESENT:
24   Jason Hoffman, Videographer
```

Oracle Related Cases                                        Page 3

Nugent, John J. 5/19/2004 3:12:00 PM

```
1
2           - - -
3        I N D E X
4           - - -
5   Testimony of:    JOHN J. NUGENT
6                PAGE NO.
7   By Mr. De Ghetaldi......8
8
9           - - -
10        E X H I B I T S
           - - -
11  NO.    DESCRIPTION       PAGE
12  265  Q3YFY01 Revenue      107
        Forecast Summary, Q3FY1
13      General Business
14  266  General Business     115
        Performance Summary Q3FY00
15
    267  General Business     115
16      Performance Summary Q400FY00
17  268  General Business     115
        Performance Summary Q101
18
    269  General Business     115
19      Performance Summary
        Q2 & First Half FY01
20
    270  Interview of John    123
21      Nugent
22
23
24
```

Oracle Related Cases                                        Page 4

Nugent, John J. 5/19/2004 3:12:00 PM

1          - - -

2          DEPOSITION SUPPORT INDEX

3          - - -

4

5    Direction to Witness Not to Answer

6    Page Line      Page Line      Page Line

7    None

8

9

10   Request for Production of Documents

11   Page Line      Page Line      Page Line

12   None

13

14

15   Stipulations

16   Page Line      Page Line      Page Line

17   None

18

19

20   Question Marked

21   Page Line      Page Line      Page Line

22   None

23

24

---

Nugent, John J. 5/19/2004 3:12:00 PM

1          - - -

[Nugentv1_t1.MPG]

2          THE VIDEOGRAPHER:  Stand by.

3    Good afternoon.  Here begins

4    Videotape Number 1 in the

5    deposition of John Nugent.  In the

6    Court of Chancery in the State of

7    Delaware in and for New Castle

8    County, in re, Oracle Corporation,

9    Derivative Litigation, Consol. C.

10   A. No. 16751, and, also, in the

11   Superior Court of the State of

12   California for the County of San

13   Mateo, Coordination Proceeding,

14   Special Title (Rule 1550(b)),

15   Judicial Counsel Coordination

16   Proceeding No. 4180.

17        Today's date is May 19th,

18   2004.  The time is 1:33 p.m.

19        This deposition is being

20   taken at Three Bala Plaza on the

21   Fourth Floor, Bala Cynwyd,

22   Pennsylvania.

23        The videographer is Jason

24   Hoffman, here on behalf of Esquire

---

Nugent, John J. 5/19/2004 3:12:00 PM

1    Deposition Services located in

2    Philadelphia, Pennsylvania.

3         All counsel present today

4    will be noted on the stenographic

5    record, and the court reporter

6    will now swear in the witness.

7          - - -

8         JOHN J. NUGENT, after having

9    been duly sworn, was examined and

10   testified as follows:

11        MR. De GHETALDI:  All right.

12   Good afternoon, Mr. Nugent.

13   My name is Dario de Ghetaldi and I

14   am going to be asking you

15   questions today on behalf of the

16   plaintiffs, yeah, so we are going

17   to do some appearances I -- I'm

18   told.  Might be a good idea.

19        I'm Dario de Ghetaldi on

20   behalf of the plaintiffs.

21        MR. LABAT:  I'm Robert

22   Weiser, Schiffrin & Barroway,

23   L.L.P., on behalf of the

24   plaintiffs.

---

Nugent, John J. 5/19/2004 3:12:00 PM

1         MR. GOLDSTEIN:  Paul

2    Goldstein, for Oracle Corporation.

3         MR. LABAT:  This is Germain

4    Labat with Mayer, Brown, Rowe &

5    Shaw on behalf of the individual

6    defendants, Jeff Henley and Larry

7    Ellison.

8         MR. De GHETALDI:  Good work

9    on the mute button.

10         - - -

11        EXAMINATION

12         - - -

13   BY MR. De GHETALDI:

14        Q.   Mr. Nugent, have you ever

15   had your deposition taken before?

16        A.   No.

17        Q.   Okay.  Let me go over a few

18   ground rules and, uhm, try and

19   familiarize you a little bit with what we

20   are going to do today and some of the

21   better ways to do it.

22        First of all, it's important

23   that you answer my questions with words

24   instead of sounds.  Even though the

Nugent, John J. 5/19/2004 3:12:00 PM

1  deposition is being videotaped, uhm, it

2  will greatly help the court reporter.  Do

3  you understand that?

4      A.  Yes.

5      Q.  Secondly, uhm, the court

6  reporter will be preparing a transcript

7  of this deposition in a booklet form.

8  You'll be given the opportunity to review

9  that transcript and you will be given the

10  opportunity to make changes or

11  corrections to that.  What I want you to

12  understand is that if this matter does go

13  to trial, that the plaintiffs will have

14  the opportunity to comment on any changes

15  or corrections you make to the — your

16  answers, your testimony.

17      Do you understand that?

18      A.  Yes.

19      Q.  Okay.  Next, if at any time

20  you do not understand one of my

21  questions, and that's highly likely to

22  happen today, given the fact that I came

23  in on the red-eye this morning, and I may

24  fall asleep in the middle of a question,

Nugent, John J. 5/19/2004 3:12:00 PM

1  so, uhm, Rob will wake me up and just let

2  me know if you don't understand what I

3  have asked you and I would be happy to

4  try again.

5      MR. WEISER:  That depends on

6  how you're doing.  If you are not

7  doing that well, I will probably

8  let you sleep and then I

9  will start in.

10      MR. LABAT:  Before you

11  begin, I just want to offer, can

12  we get a stipulation that we will

13  join in Oracle's objections unless

14  otherwise noted just so we don't

15  have to be parenting each other?

16      MR. GOLDSTEIN:  Yes.

17      MR. WEISER:  Germain, can

18  you hear Dario at the level which

19  he was speaking right now?

20      MR. LABAT:  I can.  It

21  intermittently falls off, so if

22  you can keep your voice up or put

23  the phone a little closer, that

24  might be helpful.

Nugent, John J. 5/19/2004 3:12:00 PM

1      MR. De GHETALDI:  Let's see

2  if we can do that because you're

3  at the other end of the room for

4  me.

5      MR. LABAT:  What happens is

6  the microphone sort of cuts in and

7  out sometimes where it's not

8  totally hearing you.

9      MR. WEISER:  I'm going to

10  see if I can't dig up a longer

11  extension cord so that we can get

12  better placement with this phone.

13      MR. De GHETALDI:  Why don't

14  we go off the record so that we

15  can get this technical stuff taken

16  care of.

17      THE VIDEOGRAPHER:  Off tape,

18  1:37.

19      (Whereupon, there was a

20  discussion held off the record at

21  this time.)

22      THE VIDEOGRAPHER:  Stand by.

23  Back on the record, 1:39.

24  BY MR. De GHETALDI:

Nugent, John J. 5/19/2004 3:12:00 PM

1      Q.  The final thing I was going

2  to say was that we try and take breaks

3  every hour or so, but if at any time you

4  want to take a break, just let me know

5  and we can accommodate you.  Let's try

6  and make this is as pleasant an

7  experience as possible.

8      Okay.  Now, are you

9  represented by counsel here today?

10      A.  Yes.

11      Q.  And is that Mr. Goldstein?

12      A.  Yes.

13      Q.  Did you discuss your

14  deposition with anyone prior to today or

15  prior to right now?

16      A.  No.

17      Q.  And so you did not meet with

18  Mr. Goldstein to talk about your

19  deposition?

20      A.  Oh, with Mr. — oh, yes.

21      Q.  Okay.

22      A.  Oh, yes, this morning.

23      Q.  This morning?

24      A.  Yes.

Nugent, John J. 5/19/2004 3:12:00 PM

1    Q.   For about how long?

2    A.   Uhm, maybe about two hours.

3    Q.   All right.  Did you review

4    any documents in preparation for your

5    deposition?

6    A.   Uhm, yes.

7    Q.   What were those?

8    A.   Uhm, I had a compilation of

9    documents that came from his office and I

10   had an opportunity to this morning scan

11   through the opening statements, I guess

12   part of the discovery that was done, I

13   don't know, maybe about a year ago.

14   There's a description of that interview.

15   And looked at a -- at a presentation I

16   had written when I was with Oracle, I

17   guess several years ago, and there was a

18   document, uhm, a letter from David

19   Winton, an E-mail from David Winton, to

20   somebody regarding a particular quarter's

21   financial performance or forecast.

22   Q.   Okay.  Do you remember

23   anything else, any other documents?

24   A.   No, those are the documents

Nugent, John J. 5/19/2004 3:12:00 PM

1    I looked at.

2    Q.   Where are you currently

3    employed?

4    A.   At SAP.

5    Q.   When did you start working

6    at SAP?

7    A.   I started working with them

8    the end of March of '03.

9    Q.   What is your position?

10   A.   I'm an executive

11   vice-president of sales for the United

12   States.

13   Q.   Before going to SAP, where

14   were you employed?

15   A.   At Oracle.

16   Q.   Okay.  When did you leave

17   Oracle?

18   A.   It must have been February

19   of '03, beginning of March, '03.

20   Q.   Did you leave Oracle because

21   you got a better job opportunity?

22   A.   Yes.

23   Q.   Okay.  How long had you been

24   at Oracle?

Nugent, John J. 5/19/2004 3:12:00 PM

1    A.   17 years.

2    Q.   What was the last position

3    that you held at Oracle?

4    A.   Senior vice-president of

5    eastern sales.  I'm not sure of the exact

6    responsibility.  I had half -- I had

7    responsibility over half the U.S.

8    Q.   Do you recall what your

9    position at Oracle was in Oracle's fiscal

10   year of 2000?

11   A.   Yes, SVP General Business.

12   Q.   Was that also the position

13   that you held in Fiscal Year 2001?

14   A.   Yes.

15   Q.   What were your

16   responsibilities as senior vice-president

17   of General Business?

18   A.   I had responsibility for

19   technology sales and application sales

20   for the U.S., for, uhm, companies less

21   than, at that time, I believe, 500

22   million.

23   Q.   When you say, "companies

24   less than 500 million," is that 500

Nugent, John J. 5/19/2004 3:12:00 PM

1    million dollars in market capitalization?

2    A.   That would be 500 million in

3    revenue sales.

4    Q.   In revenue sales.

5    One other thing I forgot to

6    mention, and we are doing okay so far,

7    but we came close there, I will try not

8    to talk over you by asking you a question

9    before you finish answering, and you --

10   I'd ask that you also do the same, try to

11   let me finish my question before you

12   start answering.

13   A.   Yes.

14   Q.   Now, General Business was a

15   division of North America sales at that

16   time?

17   A.   Yes.

18   Q.   Do you recall who the

19   executive vice-president that you

20   reported to in NAS was?

21   A.   George Roberts.

22   Q.   Who were your direct reports

23   in Fiscal Year 2000 and 2001?

24   A.   Uhm, I don't recall them

1  all. I recall John Boucher, Nic

2  Classick, Joe DiBartolomeo.

3     Q.  Ted Bereswill?

4     A.  Ted Bereswill.

5     Q.  Ken Hamel?

6     A.  Ken Hamel, yes.

7     Q.  Mark Wood?

8     A.  Yes.

9     Q.  That's all I know.  Can you

10  think of any others?

11     A.  Uhm, I -- I don't recall any

12  others.  I'm going through the geography

13  of the country.  That's all -- that's --

14  that's who I recall.

15     Q.  And Mr. Boucher was the area

16  vice-president for Northeast; is that

17  correct?

18     A.  Yes.

19     Q.  And Mr. DiBartolomeo was the

20  area vice-president for Mid-Atlantic?

21     A.  Mid-Atlantic, yes.

22     Q.  And Mr. Bereswill was area

23  vice-president for Central?

24     A.  Yes.

1     Q.  And Mr. Classick was the

2  area vice-president for West?

3     A.  Yes.

4     Q.  Okay.  I had to do that the

5  hard way.  I only had one of these.

6       I'm going to hand you a

7  document that's been previously marked as

8  Exhibit 53.

9       MR. De GHETALDI:  You got

10  that, Germain?

11       MR. LABAT:  Yeah, was that

12  53?

13       MR. De GHETALDI:  53,

14  correct.

15       MR. LABAT:  Okay.  Thanks.

16  BY MR. De GHETALDI:

17     Q.  Have you ever seen Exhibit

18  53 before today?

19     A.  No -- I don't recall.  This

20  says General Business here.  I don't

21  recall seeing it.

22     Q.  Have you had a chance to

23  look through the whole thing?

24     A.  Have I had a chance to look

1  through this whole thing?

2     Q.  Yes.

3     A.  Not since today.  Let me

4  look through it.

5     Q.  I mean, I'm just hoping that

6  maybe looking at it might trigger some

7  memory.

8     A.  Uhm, is there a title?  It

9  -- it -- it looks like -- it appears to

10  be an FY01 planning document.  It's to

11  help put together the quotas for the

12  different regions for the upcoming year

13  and the -- it looks like a planning

14  document that was designed to discern the

15  quotas for each one of the regions based

16  upon last year and some growth numbers

17  and some other logic, and it looks like I

18  provided some metrics to my direct

19  reports to help show them the new numbers

20  that I was coming up with for '01 for

21  them that were going to be assigned to

22  them.

23     Q.  Does Exhibit 53 look like

24  the sort of document that you would have

1  prepared?

2     A.  Yes.

3     Q.  Now, you said at one point

4  that it was to help put together the

5  quotas for the different regions for the

6  upcoming year.  Would that be the

7  upcoming fiscal year of 2001?

8     A.  Uhm, yes.  '01 planning, so

9  I -- I'm surmising, yes.

10     Q.  What do you mean when you

11  use the phrase quotas?

12     A.  Coming up with the sales

13  quotas for each one of the regions.

14     Q.  Okay.  How do you define

15  quota?

16     A.  Quota would be last year's

17  actuals times a growth factor would equal

18  the next year's quota.

19     Q.  Would the quota be something

20  -- a goal that the various regions were

21  required to meet?

22     A.  It would be -- it was a

23  budget number for them that, yes, they

24  were assigned that number and they were

Nugent, John J. 5/19/2004 3:12:00 PM

1  driven to hit that number and that also
2  dictated the level of expenses that they
3  would have and so that would also factor
4  into the number of hires that they could
5  have, how many sales reps they could
6  have.
7       Q.  Uh-huh.  What sort of
8  process did you use to come up with these
9  quotas?
10      MR. GOLDSTEIN:  Objection
11  to form.
12      THE WITNESS:  It was -- it
13  was primarily last year's actuals,
14  a growth rate that was passed down
15  from George Roberts, and then it
16  was up to me to discern how to
17  disseminate that across to the
18  different geographies.  The
19  primary factor was their actuals
20  of the previous year.
21  BY MR. De GHETALDI:
22      Q.  So, in other words, if I can
23  extrapolate from what you said, it looks
24  like on the first page of Exhibit 53

Nugent, John J. 5/19/2004 3:12:00 PM

1  there on the far right-hand side --
2       A.  I sunk.  I don't know how
3  that happened.  I'd like to join the rest
4  of you, if I could.
5       Q.  I think you have to stand up
6  or something like that and then --
7       MR. GOLDSTEIN:  There you
8  go.
9       THE WITNESS:  Did it come
10 up?
11      MR. GOLDSTEIN:  Wrong
12 lever.
13      THE WITNESS:  There you go.
14 I'm back.
15      MR. GOLDSTEIN:  Okay.
16 That's good.
17      MR. De GHETALDI:  That's
18 good.  I don't want to lose you.
19 BY MR. De GHETALDI:
20      Q.  Let me try again here.
21      Over on the right-hand side
22 there's a column that says, growth FY00
23 slash 01?
24      A.  Yes.

Nugent, John J. 5/19/2004 3:12:00 PM

1       Q.  Are those the growth figures
2  for the various divisions and for General
3  Business as a whole?
4       A.  Uhm, I would -- it's been --
5  I would say -- I would say, yes, a
6  qualified yes, I haven't gone through the
7  whole document, but I would say yes.
8       Q.  All right.  The 24 percent
9  figure doesn't say General Business, but
10 logically it -- I surmise that that is
11 what that figure relates to.  Would that
12 -- if that's the case, would that have
13 been the figure that Mr. Roberts gave you
14 as the figure that he expected General
15 Business to meet?
16      MR. GOLDSTEIN:  Objection
17 to form.
18      THE WITNESS:  I can't -- I
19 can't recall whether that was the
20 exact number George gave me.
21 I don't know if I put an
22 overassignment in there or not,
23 but typically, my growth number
24 would be -- would come down from

Nugent, John J. 5/19/2004 3:12:00 PM

1  George, but I can't say that was
2  the exact number that George gave
3  me.
4  BY MR. De GHETALDI:
5       Q.  The first page of Exhibit 53
6  has some handwriting on it.  Do you
7  recognize that handwriting right in the
8  middle?
9       A.  No, I don't.
10      Q.  How did you communicate the
11 quotas for each of the divisions to the
12 area vice-presidents for those divisions?
13      A.  I believe that this was the
14 planning document that we used and this
15 document here was disseminated out to
16 each one of the regional vice-presidents.
17      Q.  Were the -- the regional
18 vice-presidents involved in setting the
19 quotas for their own divisions in any
20 way, did they have input, in other words?
21      A.  They had -- they had some
22 input how the quota would be disseminated
23 down.
24      Q.  Okay.  Do you recall

1   conversations with any of the area
2   vice-presidents in or around the end of
3   Q4FY2000, which is about the time that
4   this document indicates it was prepared,
5   about the quotas that were -- that appear
6   in Exhibit 63?
7          MR. GOLDSTEIN:  Objection
8   to form.
9          MR. De GHETALDI:  Do you
10  follow me?
11         THE WITNESS:  No.
12  BY MR. De GHETALDI:
13     Q.  Do you recall any of the
14  conversations that you had about setting
15  these quotas?
16     A.  I -- I don't recall any
17  conversations.  I'm sure we had some
18  discussions about the quotas, but I don't
19  recall any specific conversation.
20     Q.  Do you recall any of the
21  area vice-presidents objecting to the
22  level of the quotas that you set?
23     A.  Uhm, as form, they all
24  object to quotas, but I don't think

1   anybody overly objected -- I don't recall
2   anybody overly objecting to their quota.
3      Q.  Do you recall any
4   conversations with Nic Classick in which
5   he told you that he thought that the
6   quota that you had set for General
7   Business West was too high?
8      A.  Uhm, no, not -- not in
9   particular, not with any of the guys.
10     Q.  Do you recall any
11  conversation with Nic Classick about the
12  quota for General Business West for
13  Fiscal Year 2001 in which he told you
14  that he thought the quota was too high
15  because General Business West dot com
16  business would not support it?
17     A.  I recall conversations --
18  similar conversations with all the guys
19  with Nic, I have a vague recollection of
20  that, but I can't recall any specific
21  conversation about it, but I have a vague
22  recollection of Nic with -- I could say
23  he could say something like that.
24     Q.  Uh-huh.  You said that you

1   recall similar conversations with all the
2   guys.  You mean the other three or all
3   four area vice-presidents?
4      A.  Yeah.  I think typically, as
5   you disseminate the quota down, even to
6   this day myself when I receive a quota I
7   make various arguments as to why it
8   should be less and negotiate and see if I
9   can't get my quota down a little bit, and
10  so no doubt that there was some of that
11  bantering going back and forth, various
12  reasonings on why they said, well, maybe
13  I should have a little less and somebody
14  might have a little more, because they
15  all received these documents, they can
16  see what the other folks had gotten for
17  quotas.
18     Q.  Do you recall those
19  conversations about the quotas that -- do
20  you recall whether those conversations
21  about the quotas in the fourth quarter of
22  Oracle's Fiscal Year 2000 included
23  justifications offered for lowering the
24  quotas based on a slow-down in the dot

1   com market?
2      A.  Again, I have a vague
3   recollection of that with Nic.
4      Q.  Do you have a recollection
5   of that with -- with the other three area
6   vice-presidents as well?
7      A.  No.  They were giving
8   different reasons why they thought their
9   quotas ought to be lower, primarily
10  because most of dot com was coming from
11  the West.
12     Q.  If you can turn to the page
13  that's Bates numbered ORCL 0128213.  It's
14  about five pages in.
15     A.  Okay.
16     Q.  That's the one.
17     A.  Okay.
18     Q.  I -- I would like to get an
19  understanding of some of the terminology
20  that's being used in the tables that
21  appear on that particular page.
22         Starting with the second
23  row, I'm sorry, the second column where
24  there's a title CA tech, do you see that?

1     A.   Okay. Right. Uhm, I can --

2     this does not look familiar to me.  I

3     don't believe this is my document.

4     Q.   Okay.

5     A.   As I'm looking, I'm -- this

6     isn't familiar with me, and this would

7     not be familiar GB terminology, but I

8     would imagine CA is CA -- California

9     Tech.

10        Oh, all right. Now I'm

11    recalling something. I'm familiar with

12    this document. CA Tech, I guess, must

13    have been the State of California

14    Technology.

15    Q.   And MT Tech, Mountain?

16    A.   Maybe -- I would surmise

17    that might have been it.

18        MR. GOLDSTEIN: Yeah, don't

19    speculate, John, but if you have

20    some knowledge, you certainly can

21    share it.

22        THE WITNESS: MT, I -- I

23    don't know.

24    BY MR. De GHETALDI:

1     Q.   All right. B & M, the first

2     column?

3     A.   Brick & Mortar.

4     Q.   What is your understanding

5     of what that phrase means?

6         MR. GOLDSTEIN: Objection to

7     form.

8         You're asking him in general

9     what Brick & Mortar means?

10        MR. De GHETALDI: Well, in

11    -- specific to his job at Oracle.

12        MR. GOLDSTEIN: Right, but

13    not necessarily specific to this

14    document?

15        MR. De GHETALDI: No.

16        THE WITNESS: Non-dot com

17    businesses.

18        MR. De GHETALDI: Okay.

19    BY MR. De GHETALDI:

20    Q.   Then the next row in that

21    same first column says ISP/ASP, do you

22    know what that refers to?

23    A.   Right. Those are -- uhm,

24    the ASP is the application serve --

1     service provider, I believe, and ISP is

2     something similar. It's a service

3     provider. I can't remember what the I

4     stands for. Internet Service Provider, I

5     believe.

6     Q.   Okay. And how about DMD?

7     A.   That's the telesales

8     organization.

9     Q.   Do you know what the

10    abbreviation stands for?

11    A.   Direct marketing division.

12    Q.   Good. Then if you can, turn

13    to the very last page of Exhibit 53.

14    That's it.

15    A.   Okay.

16    Q.   There's some handwriting on

17    this page. Do you recognize that

18    handwriting?

19    A.   No.

20    Q.   Now, I'm going to hand you a

21    set of three documents that had been

22    previously marked as Exhibits 33, 34, and

23    35.

24        MR. De GHETALDI: Did you

1     get that, Germain?

2         MR. LABAT: Yeah, 34 and 35.

3         MR. WEISER: 33, 34 and 35,

4     previously marked at the Winton

5     depo.

6         MR. LABAT: Okay. Thanks.

7     BY MR. De GHETALDI:

8     Q.   Do you recognize these

9     documents, Mr. Nugent?

10    A.   Only by virtue of the fact

11    that it says Winton, I believe it's a

12    forecast or -- in the title of the report

13    it's a forecast document that was put

14    together by Winton. It's not my forecast

15    documents.

16    Q.   Just so that you know, the

17    sticker that says Winton is a sticker

18    that is applied at a deposition --

19    A.   Okay.

20    Q.   -- and it was not on the

21    original document.

22    A.   I --

23    Q.   So do you -- was this the

24    type of document that you regularly

1    received in Oracle's Fiscal Years 2000

2    and 2001?

3         MR. GOLDSTEIN: Objection to

4    form.

5         THE WITNESS: Yeah. I don't

6    -- I don't recall.

7    BY MR. De GHETALDI:

8         Q.  Are Exhibits 33, 34 and 35

9    documents that you reviewed in

10   preparation for your deposition today?

11        A.  No.

12        Q.  Now, I'm going to hand you a

13   document that was previously marked as

14   Exhibit 47.

15        A.  Okay.

16        MR. De GHETALDI: Germain?

17        MR. LABAT: Yeah, got it.

18   BY MR. De GHETALDI:

19        Q.  Have you ever seen Exhibit

20   47 before today?

21        A.  Before today, no.

22        Q.  Is this a document that you

23   reviewed in preparation for your

24   deposition?

1         A.  I have -- I saw it today.

2         Q.  For the first time?

3         A.  Yeah.

4         Q.  Okay. Did it bring back any

5    fond memories?

6         A.  No, I never saw it before

7    then.

8         Q.  No. No. I mean, did it

9    bring back any memories about Oracle's

10   Fiscal Year 2000 and 2001?

11        A.  Uhm, yes.

12        Q.  Okay. And what?

13        A.  That it was a very difficult

14   quarter.

15        Q.  Okay. I was asking about

16   fiscal years. What quarter were you

17   referring to?

18        A.  Oh, fiscal -- uhm, from what

19   would have been our Q3.

20        Q.  Of 2001?

21        A.  I believe so.

22        Q.  Okay. Mr. Winton says in

23   his point number one that the growth

24   comparisons to last year have been

1    relatively easy in the first two quarters

2    as we did not perform that well a year

3    ago.

4         Do you recall that as being

5    the case with General Business?

6         MR. GOLDSTEIN: I'm going to

7    object to form and remind the

8    witness that you're not to

9    speculate about what David Winton

10   may have meant by this.

11        If you have an independent

12   recollection, uhm, of what Mr.

13   Winton seems to be talking there,

14   you can talk about that, but this

15   is getting very close to the sort

16   of thing that Judge Strine told

17   you not to do.

18        MR. De GHETALDI: Well, that

19   is exactly what I asked, Paul, and

20   the question was phrased

21   precisely. I said, do you recall

22   that being the case with General

23   Business.

24        MR. GOLDSTEIN: Okay.

1         Okay. It's hovering very close to

2    the line.

3         THE WITNESS: Well, I don't

4    recall.

5         MR. De GHETALDI: You don't

6    recall Q3 Fiscal Year 2001 being a

7    tough comparison to Q3, 2000?

8         MR. GOLDSTEIN: Objection to

9    form.

10        THE WITNESS: Multiple

11   context.

12        MR. GOLDSTEIN: Wait.

13   Wait. Wait. Objection to form.

14   I mean, that's not even what it

15   looks like it might say.

16        MR. De GHETALDI: I'm not

17   implying that it does.

18        MR. GOLDSTEIN: In that

19   case, let's put the document aside

20   and you can ask him a question.

21        MR. De GHETALDI: No, let me

22   -- let me conduct the deposition

23   the way that I want to. Please do

24   not take documents away from the

1    witness.

2    MR. GOLDSTEIN: Within

3    reason, Dario, yes.

4    MR. De GHETALDI: Please do

5    not do that.

6    MR. GOLDSTEIN: Okay. You

7    finish what you have to say and

8    then I'm going to say something.

9    MR. De GHETALDI: And I'm

10   going to hand the document back to

11   the witness.

12   I'm going to ask again, do

13   you recall Q3 Fiscal Year 2001

14   being a tough comparison to Q3

15   Fiscal Year 2000?

16   MR. GOLDSTEIN: Okay. And I

17   am going to object to form and I

18   am going to inform the witness and

19   instruct the witness that that

20   question has nothing whatsoever to

21   do with this document.

22   If you feel like you know

23   what tough comparison means and

24   you can otherwise answer that

1    question, then by all means, go

2    right ahead.

3    THE WITNESS: I can't answer

4    the question.

5    MR. De GHETALDI: And, Paul,

6    I would ask you, please, to

7    refrain from speaking objections.

8    MR. GOLDSTEIN: We are

9    going to contact the court if you

10   go any further in this regard,

11   Dario, because this is exactly why

12   I raised the issue with the court

13   and this is exactly what the court

14   commented on.

15   MR. De GHETALDI: I have no

16   idea what you're talking about

17   because I was not there.

18   MR. GOLDSTEIN: Let me read

19   it to you.

20   It sounds like you have not

21   read this transcript. You need a

22   little bit of context to

23   understand this.

24   But I had explained to the

1    court during this hearing what Mr.

2    Weiser's tactics had been with Nic

3    Classick as part of our argument

4    for why you shouldn't get to take

5    Mr. Nugent's deposition, and the

6    court allowed the deposition over

7    that argument; however, he did

8    issue some cautions as to how the

9    deposition should go.

10   And in attempting to clarify

11   what Judge Strine meant by some of

12   his remarks, your colleague,

13   Nicole Lavallee, said, trying to

14   justify what had happened at Nic

15   Classick's deposition, she asked

16   for a quick point of

17   clarification, and I am on Page 44

18   now of the transcript, and she

19   goes on to say, my understanding

20   of what occurred at Mr. Classick's

21   deposition, I believe I sat in on

22   that one, I didn't take it, my

23   recollection was what was asked,

24   they were talking about the

1    pipeline has not grown. Do you

2    know about that? It was that type

3    of question.

4    And the court then says, in

5    trial, I find that sort of a

6    knowing way. Why do you need the

7    document then? Ask your question.

8    To put something before them, it's

9    putting a lay witness who is not

10   comfortable with testimony. They

11   are seeing some documents like,

12   should I know about this, they

13   keep asking me all these

14   questions. You know, ask him a

15   question. Write it down. You

16   don't need the document that they

17   have never seen before. If the

18   witness says they have never seen

19   it before, unless you have some

20   real evidence that they have, ask

21   your questions. I think it

22   creates a distraction. You might

23   have to prove it out by another

24   means.

Nugent, John J. 5/19/2004 3:12:00 PM

1    That, what you just did, is
2    exactly what Judge Strine was
3    instructing you not to do, and I
4    am going to object and we will
5    call Judge Strine if you persist.
6        You showed him a document.
7    The document is something that he
8    has already said he has never seen
9    before.  You then refer him to
10   some language and then you ask him
11   a question about whether something
12   that that language suggests to you
13   is something that he remembers.
14       That is exactly what Judge
15   Strine told you not to do.
16       MR. De GHETALDI:  Well, you
17   showed him the document in
18   preparation for his deposition.
19       MR. GOLDSTEIN:  Excuse me,
20   can I just interrupt you?
21       MR. De GHETALDI:  Yes.
22       MR. GOLDSTEIN:  The witness
23   is wrong about that.  I did not
24   show him this document.

Nugent, John J. 5/19/2004 3:12:00 PM

1        MR. De GHETALDI:  Well --
2        MR. GOLDSTEIN:  I can tell
3    you.
4        MR. De GHETALDI:  That's his
5    testimony.
6        MR. GOLDSTEIN:  I understand
7    that.
8        MR. De GHETALDI:  That's his
9    testimony, and I think that I am
10   allowed to ask questions on this
11   document.
12       MR. GOLDSTEIN:  We will take
13   this up with the court and he's
14   wrong about that.  It's a
15   different Winton E-mail that I
16   showed him.  He's understandably
17   confused about that.
18       That makes no difference,
19   though, Dario.  What Judge Strine
20   said squarely applies.  Whether I
21   have prepared the witness for your
22   invalid questions or not has
23   nothing to do with it.
24       THE WITNESS:  No.

Nugent, John J. 5/19/2004 3:12:00 PM

1        MR. De GHETALDI:  My
2    question has not been answered.
3    Mr. Nugent said he didn't
4    understand it so I will try and
5    help.
6    BY MR. De GHETALDI:
7        Q.  Going into the third quarter
8    of Oracle's Fiscal Year 2001, did you
9    believe that the revenue figures that
10   General Business had achieved in Q3 2000
11   would be -- that you would be able to
12   duplicate that level of sales?
13       A.  I don't recall.
14       Q.  All right.  Do you recall
15   whether at the beginning of Q3 2001 there
16   were -- whether there were more or less
17   big deals in your pipeline than there had
18   been in Q3 2000?
19       A.  No.  I don't recall that.
20       Q.  Okay.  Did you have any
21   discussions with Mr. Winton at the very
22   beginning of Q3 2001 about how you
23   expected General Business to perform in
24   that quarter?

Nugent, John J. 5/19/2004 3:12:00 PM

1        A.  Q1 of 2000?
2        Q.  Q3, I'm sorry.  I tried to
3    say Q3.  Going into the third quarter --
4        A.  Oh, okay.
5        Q.  -- of 2001.
6        A.  I don't recall discussions
7    with him.  It might have happened, but I
8    don't recall discussions with -- with
9    him.
10       Q.  Okay.  Was that something
11   that would have been unusual for you to
12   do?
13       A.  I would have submitted a
14   forecast to him, well, to George, and my
15   forecast for -- for -- for Q3 '01 and
16   certainly felt that I was going to do
17   that number.
18       Q.  What form would that
19   forecast take?
20       A.  We had biweekly and then the
21   last month of each quarter we had a
22   weekly forecast session and I would
23   discuss it with George, I'm sure, and
24   potentially Winton, being the finance

1  individual, might have been on the phone
2  as well.
3      Q. Did you have regular
4  meetings with Mr. Roberts, uhm, during
5  the -- the quarter?
6      A. Other than the biweeklies
7  and the weeklies?
8      Q. Well, I mean, I'm including
9  those in my question, if you had regular
10 weekly and biweekly meetings, yes.
11     A. I had the regular biweeklies
12 and the weeklies, and the biweekly is the
13 first two months of the quarter, the
14 weekly is the last month of the quarter.
15     Q. All right. Who else
16 participated in those meetings?
17     A. They -- they were conference
18 calls, and when it was my turn, I would
19 get on and George was there. I'm
20 assuming David Winton was on the line.
21 And that's -- that's all I recall.
22     Q. Mary Ann Gillespie?
23     A. She would be waiting her
24 turn with everybody else, but not

1  necessarily on the call at that time. We
2  had different times we would call in on.
3      Q. So it wasn't a group call,
4  these were individual calls --
5      A. Yes.
6      Q. -- for each division head
7  with Mr. Roberts and Mr. Winton?
8      A. Yes.
9      Q. Okay. Now I'm going to hand
10 you a document that's been previously
11 marked as Exhibit 48.
12     MR. De GHETALDI: Germain?
13     MR. LABAT: Yeah, I'm sorry,
14 can you say that again?
15     MR. De GHETALDI: 48.
16     MR. LABAT: 38?
17     MR. De GHETALDI: 48.
18     MR. LABAT: 48, okay.
19     Great.
20 BY MR. De GHETALDI:
21     Q. Have you ever seen Exhibit
22 48 before today?
23     A. Oh, this is where confusion
24 is. I believe this is the one that I

1  saw. I saw one single document from
2  David Winton, just a quick perusal. This
3  looks more like the one I saw from David
4  Winton.
5      Q. Today?
6      A. Today, I saw one single one,
7  so the other one did not -- I only saw
8  one.
9      Q. All right. Mr. Winton says
10 in this E-mail that the pipe has not
11 grown as we had anticipated.
12     Was that true for General
13 Business as of January 11th, 2001?
14     MR. GOLDSTEIN: Objection to
15 form, and -- and if that's the
16 only one you're going to do on
17 this document, Dario, I will let
18 it pass, but if there's any more
19 we will have to call the court.
20 This is exactly what Strine said
21 you may not do, and Rob Weiser was
22 there and he knows it.
23     MR. De GHETALDI: Well --
24     MR. GOLDSTEIN: It's not a

1  proper technique of questioning
2  and Judge Strine specifically
3  addressed it in the clearest
4  possible terms.
5  BY MR. De GHETALDI:
6      Q. Mr. Nugent, did you attend
7  an operations review in early January
8  2001?
9      A. Yes.
10     Q. Okay. And was Mr. Winton
11 present at that meeting?
12     A. Yes.
13     Q. And was Mr. Roberts present
14 at that meeting?
15     A. Yes.
16     Q. And was Mary Ann Gillespie
17 present at that meeting?
18     A. Yes.
19     Q. Okay. Was the subject of
20 the pipeline growth addressed at that
21 meeting for NAS?
22     A. I don't recall.
23     Q. Okay. Does reading point
24 number 1 from Mr. Winton's E-mail, which

1    is Exhibit Number 48, refresh your

2    recollection as to whether that topic was

3    discussed?

4         MR. GOLDSTEIN: Objection to

5    form.

6         THE WITNESS: I don't recall

7    the specifics, whether we talked

8    about the pipeline.

9         MR. De GHETALDI: Okay.

10   BY MR. De GHETALDI:

11        Q. Do you recall what was

12   discussed at that meeting?

13        A. The operations review

14   meeting.

15        Q. In Q3 2001.

16        A. Yes.

17        Q. January 9, I believe it was.

18        A. Yeah. Based upon the

19   presentation that I had to give for that

20   meeting, I recall what I presented based

21   upon the presentation that I saw, and any

22   aspects with regard to Mary Anne's

23   presentation or conversations other than

24   what I gave, and I can only recollect

1    based upon the document that I saw is, I

2    said, oh, I remember that document, that

3    looks like the presentation that I gave,

4    I recall aspects of that presentation,

5    those aspects of the meeting.

6         Q. Okay. Do you recall whether

7    Mary Ann Gillespie gave a PowerPoint

8    Presentation at that meeting?

9         A. I don't recall, but I'm

10   assuming she did.

11        Q. All right. Do you recall

12   any of the topics that Mary Ann Gillespie

13   covered during her presentation, whether

14   it was by Power Point or not?

15        A. No. No.

16        Q. Okay. In point number 3 Mr.

17   Winton says, majors as reflected in the

18   softening pipe, both GB and majors see a

19   slow-down in both Q3 and Q4. Do you see

20   that?

21        A. In point number 3?

22        Q. Yes. It says, drop in

23   technology as reflected in the softening

24   pipe, both GB and majors see a slow-down

1    in both Q3 and Q4.

2         A. Okay.

3         Q. Okay? Does that refresh

4    your recollection as to, uhm, whether the

5    topic of the softening pipe in technology

6    was discussed at the January 9th, 2001,

7    operations review?

8         A. No.

9         Q. Okay. One sentence later,

10   Mr. Winton says, major sees a slow-down

11   in spending along with smaller deal

12   sizes. Do you see that?

13        A. Yes.

14        Q. Okay. Does that refresh

15   your recollection as to whether a

16   slow-down in spending along with smaller

17   deal sizes in majors was a topic of

18   discussion at the January 9th, 2001,

19   operations review meeting?

20        A. No. I -- I don't remember

21   those. I -- I potentially could say it

22   potentially was discussed, but I don't

23   recall.

24        Q. That's fine. I think we

1    have been going for an hour, so why don't

2    we take a quick break.

3         A. Sure.

4         THE VIDEOGRAPHER: Off tape,

5    2:27.

6         (Whereupon, there was a

7    recess held at this time, 2:27 to

8    2:42 p.m.)

9         THE VIDEOGRAPHER: Stand by.

10   Back on the record, 2:43.

11   BY MR. De GHETALDI:

12        Q. Mr. Nugent, I have handed

13   you a document that was previously marked

14   as Exhibit 54, and can you tell me,

15   please, whether you recognize this

16   document?

17        A. Yes.

18        Q. Okay. Is this a document

19   that you prepared?

20        A. Yes.

21        Q. And is this the PowerPoint

22   Presentation that you gave at the January

23   9th, 2001, ops review?

24        A. Yes.

1    Q.  How often did NAS hold ops

2    reviews?

3    A.  Uhm, I think -- I will go

4    ahead and speak.

5    Q.  Hang up.

6    MR. De GHETALDI:  Hey,

7    Germain.

8    MR. GOLDSTEIN:  Germain?

9    MR. De GHETALDI:  Germain?

10   He can't hear us, he's wrestling

11   papers so much.

12   MR. WEISER:  Let me turn

13   that down,

14   MR. GOLDSTEIN:  Yeah, maybe

15   turn it down a little bit.  He may

16   not have gotten back from his

17   little stroll down the hall or

18   something.

19   MR. De GHETALDI:  I think he

20   was shuffling papers right by the

21   phone.

22   MR. GOLDSTEIN:  That's

23   possible, too.

24   MR. De GHETALDI:  Okay.

1    BY MR. De GHETALDI:

2    Q.  Sorry for the interruption.

3    You were going to say?

4    A.  About -- about two times a

5    year, maybe -- maybe three times.

6    Q.  Was there a regular schedule

7    for these ops reviews?

8    A.  Uhm, there could have been.

9    I don't recall.  I know we did them

10   periodically.  I'm not sure if they were

11   -- if they were, uhm, built into the

12   schedule.

13   Q.  Do you recall having one in

14   Q2 2001?

15   A.  No, I don't recall.

16   Q.  If you can turn to the page

17   with the Bates number 0120238, please.

18   It's about four pages in.

19   Yes.  The slide on the top

20   half of the page has, uhm,

21   accomplishments that you spoke about that

22   General Business had achieved as of that

23   date in January of 2001; is that right?

24   A.  Yes.

1    Q.  Is that --

2    A.  Yes.

3    Q.  Okay.  The fourth point

4    there under customers, and you say,

5    worked with OCS and support to, quote,

6    weather the 11i storm, unquote.

7    First of all, what is OCS?

8    A.  Oracle Consulting Services.

9    Q.  All right.  What did you

10   mean by working with OCS in support to

11   weather the 11i storm?

12   A.  The 11i refers to Oracle's

13   applications at that time, version 11i.

14   It had numerous quality issues and we

15   were working with the consulting

16   organization and the sales organization

17   to help our customers to fix their issues

18   with the software.

19   Q.  Were salespeople in General

20   Business actively selling 11i, the --

21   it's a suite of applications; is that

22   correct?

23   A.  Yes

24   Q.  Were salespersons in General

1    Business actively selling 11i in Q3 2001?

2    MR. GOLDSTEIN:  Objection to

3    form.

4    THE WITNESS:  Yes.

5    BY MR. De GHETALDI:

6    Q.  You say that 11i had

7    numerous quality issues.  What do you

8    mean by that?

9    A.  There were program bugs.

10   Q.  Well, what sort of bugs?

11   MR. GOLDSTEIN:  Objection to

12   form.

13   THE WITNESS:  Just code

14   bugs.  There was -- there was

15   quality issues with the -- with

16   the code.

17   BY MR. De GHETALDI:

18   Q.  Well, was this product, to

19   your knowledge, more buggy than -- than

20   normal?

21   MR. GOLDSTEIN:  Objection to

22   form.

23   THE WITNESS:  Uhm, more

24   buggy than normal?

Nugent, John J. 5/19/2004 3:12:00 PM

1   All I can say is we had

2   issues with 11i.

3   BY MR. De GHETALDI:

4       Q.  Well, isn't it true that --

5   that, uhm, it would even function for

6   a number of the customers who bought it?

7           MR. GOLDSTEIN:  Objection to

8   form.

9           THE WITNESS:  My -- my

10  recollection is we worked with our

11  -- with the OCS Group to go ahead

12  and fix these customer issues and

13  if there was -- if it was

14  determined that the customer did

15  not want to continue to proceed,

16  we negotiated a settlement

17  agreement with them.

18  BY MR. De GHETALDI:

19      Q.  Well, did what you describe

20  as customer issues arise more frequently

21  with sales of 11i than with sales of

22  other Oracle products in Fiscal Year

23  2001?

24      A.  Uhm, I would say if you

---

Nugent, John J. 5/19/2004 3:12:00 PM

1   compared it against the database, for

2   example, the database that we sold and

3   the applications, the applications -- we

4   experienced more quality issues with the

5   applications than we did with the

6   technology, the database product.

7       Q.  Were portions of the 11i

8   suite not completed at the time the

9   product was sold to Oracle's customers in

10  Fiscal Year 2001?

11          MR. GOLDSTEIN:  Objection to

12  form.

13          THE WITNESS:  It was

14  production software that was

15  released.  It was completed.  By

16  definition, it was production

17  software, and, uhm, but by the

18  nature of software it had some

19  quality issues associated with it.

20          So we had plenty of

21  customers that were up and running

22  on the software.  We had many that

23  were struggling with the software

24  due to quality issues.

---

Nugent, John J. 5/19/2004 3:12:00 PM

1   BY MR. De GHETALDI:

2       Q.  Do you recall Mr. Ellison

3   saying in February of 2001 that 85

4   percent of 11i worked?

5       A.  I don't recall that.

6       Q.  Okay.  Do you recall Mr.

7   Ellison saying in February 2001 that 11i

8   only did 85 percent of what the customers

9   expected it to do?

10      A.  I don't recall that.

11      Q.  Do you recall any customers

12  with whom a settlement agreement was

13  negotiated relating to 11i, their

14  purchase of 11i?

15      A.  I'm sorry, could you repeat

16  the question again?

17      Q.  Yeah.  Do you recall any

18  customers with whom a settlement

19  agreement was negotiated relating to

20  their purchase of 11i?

21      A.  Yes.

22          MR. LABAT:  Hello, is anyone

23  there?

24          MR. GOLDSTEIN:  We are here.

---

Nugent, John J. 5/19/2004 3:12:00 PM

1           MR. WEISER:  Germain, we are

2   here, but we had a lot of paper

3   wrestling on your end so we turned

4   you down for a minute.

5           He just dropped off.  Why

6   don't we go off the record for a

7   second.

8           THE VIDEOGRAPHER:  Off tape,

9   2:53.

10          (Whereupon, there was a

11  discussion held off the record at

12  this time.)

13          THE VIDEOGRAPHER:  Stand by.

14  Back on the record, 2:54.

15          MR. GOLDSTEIN:  I think you

16  had a question pending.

17          MR. De GHETALDI:  I think

18  so, too.

19          Can the court reporter read

20  it back?

21          (Whereupon, the pertinent

22  portion of the record was read by

23  the court stenographer.)

24          THE WITNESS:  Yes.

1  BY MR. De GHETALDI:

2  Q.  Who?

3  A.  I can't recall a specific

4  customer, but there were several

5  customers.

6  Q.  When you say "several," how

7  many are you -- can you give me an

8  estimate?

9  A.  It was probably -- I was

10  probably involved in maybe ten to

11  fifteen.

12  Q.  The third bullet point on

13  the page with Bates number 120238 of

14  Exhibit 54 says, negotiated numerous

15  settlement agreements.

16  A.  Uh-huh.

17  Q.  Is that the equivalent of

18  ten to fifteen?

19  A.  Well, ten to fifteen is

20  pretty -- pretty numerous, and my team

21  might have been also negotiating several

22  of these as well.  I was involved in

23  about ten to fifteen.  My team might have

24  been -- was involved in several and some

---

1  of the VPs were involved in several, so

2  if you aggregated them up, it was pretty

3  numerous.

4  Q.  All right.  Did the quality

5  issues with suite 11i affect sales in

6  General Business in Fiscal Year 2001?

7  MR. GOLDSTEIN:  Objection to

8  form.

9  THE WITNESS:  I can't really

10  say yes or no to that.  It -- I

11  would say no.  We were -- no.

12  BY MR. De GHETALDI:

13  Q.  Did you or anyone else at

14  Oracle, to your knowledge, undertake an

15  analysis to see whether the quality

16  issues with 11i affected sales of that

17  product?

18  A.  I don't -- I don't recall

19  any analysis.

20  Q.  If you could, turn, please,

21  to the page with Bates number 0120242.

22  MR. De GHETALDI:  We are on

23  Exhibit 54, Germain.

24  MR. LABAT:  Thanks.  I was

---

1  just about to ask.

2  BY MR. De GHETALDI:

3  Q.  Are these two slides --

4  A.  Yes.

5  Q.  -- meant to indicate that

6  you were about to talk about a general

7  topic of what you felt the outlook for

8  the second half of Fiscal Year 2001 would

9  be, and within that topic, what your

10  observations of the -- the market were?

11  A.  That's fair to say, yes.

12  Q.  So if you turn to the next

13  page, uhm, which has Bates number 120243,

14  under market observations, the first

15  point is sluggish economic outlook?

16  A.  Uh-huh.

17  Q.  What did you mean by that?

18  A.  Uhm, as I -- as I look at

19  this, this is -- I'm not an economist, so

20  I go to different documents and different

21  reports that I see and I share that -- I

22  share that with -- with the team at the

23  meeting, and this is what was -- not my

24  personal observation, but these are some

---

1  observations that various pundits had

2  written and I took them from those

3  various documents, different economic

4  reports, and said, hey, this is what they

5  are -- this is what they're seeing out in

6  the marketplace.

7  Q.  Do you recall what reports

8  of which pundits you relied on to make

9  these observations?

10  A.  We used to be -- I used to

11  be able to get a Morgan Stanley report.

12  I used to get that a lot.  It would come

13  online.  I'd take information off of

14  them.  Other -- other outlooks from

15  various other -- other pundits, so it

16  could be -- definitely Morgan Stanley, I

17  remember getting the Morgan Stanley

18  report and I am sure there was one or two

19  others.

20  Q.  You say, just below sluggish

21  economic outlook, focus in on profits.

22  What did you mean by that?

23  A.  The focus in on profits was

24  as opposed to most of the -- most of the

1 marketplace was looking towards growth,
2 there was a shift towards focusing on
3 profits instead.
4     Q.   Then the two bullet points
5 under that first one is reduce IT costs.
6 What did you mean by that?
7     A.   Uhm, reduce costs of doing
8 business?
9     Q.   No, the one right above
10 that.
11     A.   Yeah, reduce IT costs?
12     Q.   Yes.
13     A.   So the idea here is that the
14 J.P. Morgans, et cetera, the pundits were
15 saying, hey, companies now are going to
16 be looking to reduce IT costs. That's
17 something we ought to be -- we ought to
18 be thinking about, how are we -- how are
19 we going to address that.
20     Q.   Okay. Then the -- the
21 second major bullet point on that same
22 slide says, entering post PC era. What
23 did you mean by that?
24     A.   Uh-huh. Well, the pundits

1 were saying that the companies were no
2 longer going to be turning over their PCs
3 once a year, they were going to be paying
4 off -- living with their PCs -- typically
5 the PCs would turn over once a year and
6 now they were going to turn over their
7 PCs every three to four years.
8     Q.   How would that have an
9 effect on Oracle's business?
10     A.   I'm not sure it would have
11 much of an effect at all. I was just
12 pulling information from -- from a
13 report.
14     Q.   Okay. The second slide on
15 that same page, the bullet point is
16 shifting IT budgets from PC and MF, SW,
17 to, and then you have five subpoints
18 there, what do your abbreviations stand
19 for there, specifically, PC, MF and SW?
20     A.   PC, I would just imagine
21 personal computers.
22          MF, I don't know. I can
23 only surmise. Maybe that's main frame
24 software. That doesn't make a lot of

1 sense.
2          SW might be software.
3          MF, I'm not sure.
4     Q.   Okay. Now, as of January of
5 2001, you knew that the pundits were
6 saying that the economic outlook was
7 sluggish?
8     A.   Uh-huh.
9     Q.   Was that something that you
10 had observed yourself?
11     A.   Uhm, I mean, I don't recall
12 being back then -- this was sort of
13 looking forward a little bit, uhm, but
14 certainly we could have -- we could have
15 felt like that, but I don't remember this
16 overwhelming thought that, oh, my gosh,
17 there's an economy issue here. I didn't
18 feel that way at all.
19     Q.   Well, did you disagree that
20 the economic outlook was sluggish?
21     A.   No.
22     Q.   Had you seen anything in the
23 past three months in General Business
24 that would lead you to believe that the

1 economic outlook was not sluggish?
2          MR. GOLDSTEIN: Objection to
3 form.
4          THE WITNESS: At -- at that
5 time, and -- I felt -- I felt -- I
6 felt okay where we were. I felt
7 fine where we were.
8 BY MR. De GHETALDI:
9     Q.   You felt fine where you
10 were, but you didn't disagree that the
11 economic outlook was sluggish? Can you
12 -- those statements seem to be somewhat
13 contradictory. Can you help me
14 understand what you mean?
15     A.   Yeah, you can help me to --
16          MR. GOLDSTEIN: Wait. Wait.
17 Let me just object to the form.
18          MR. De GHETALDI: Go ahead.
19          THE WITNESS: Uhm, what we
20 have here was information that we
21 got -- I got from various pundits,
22 giving their observations of the
23 marketplace.
24          As I was running the

1    business for that particular

2    quarter, I felt fine for that

3    quarter.  I felt fine for the --

4    our overall health of our -- of

5    our business.  Sure, there's

6    always lots of different areas,

7    but I felt -- I felt okay.

8    BY MR. De GHETALDI:

9        Q.   When you say "there's lots

10   of different areas," you made some hand

11   signs.  Can you explain what you meant by

12   -- by that?

13            MR. GOLDSTEIN:  Objection to

14   form.

15            THE WITNESS:  There's so

16   many -- so many different factors

17   that can -- that come in, whether

18   they are economic, whether they

19   are competitive, whether they are

20   -- all these different issues that

21   can come into play, and I felt --

22   I felt fine.

23   BY MR. De GHETALDI:

24       Q.   As of January 9, 2001, you

1    hadn't noticed any slowing in general --

2    in any area of General Business?

3            MR. GOLDSTEIN:  Objection to

4    form.

5            THE WITNESS:  In -- uhm, I

6    -- I don't recall.

7            In any area of General

8    Business?  I don't recall.  I just

9    know that the -- the numbers that

10   I was presenting at that time I

11   felt good about.

12   BY MR. De GHETALDI:

13       Q.   If you can turn to the next

14   page, please, which is -- has a Bates

15   number 120244.

16       A.   Yes.

17       Q.   The first slide has a bullet

18   point, reduced use of outside

19   consultants.  Do you see that?

20       A.   Uh-huh.

21       Q.   What did you mean by that

22   point?

23       A.   That the pundits were saying

24   that consult -- that, uhm, firms were

1    going to reduce their dependency on

2    outside consultants.

3        Q.   The second slide has a

4    bullet point that says, CIOs on shorter

5    leash.  What did you mean by that?

6        A.   The pundits were saying that

7    their CIOs would not have the same

8    freedom that they had in the past of

9    investing in technology and that the

10   technology that they invested in, they

11   better get a return on that technology.

12       Q.   Was that something that you

13   had observed in General Business over the

14   six months prior to January, 2001?

15       A.   Uhm, it's -- I can't recall.

16       Q.   As of January 9, 2001, did

17   you have any reason to doubt that CIOs

18   were on a shorter leash?

19       A.   Six months before?

20       Q.   No, as of January 9, 2001,

21   did you have any reason to doubt that

22   CIOs were on a shorter leash?

23       A.   No.

24       Q.   If you could, go back to

1    Bates number 120238.  The first subpoint

2    under customer says, met with numerous

3    customers' CEOs.  Are you -- are you

4    referring to meetings that you personally

5    had there?

6        A.   Uh-huh, yes.

7        Q.   Okay.  And approximately how

8    many CEOs had you met with in the first

9    six months of Fiscal Year 2001?

10       A.   I have no idea.

11       Q.   Can you give me any kind of

12   approximation?

13       A.   I would say, based upon the

14   settlement -- settlement agreements of

15   ten to fifteen, maybe some -- maybe

16   fifteen to twenty.

17       Q.   Okay.  Did anything that you

18   learned in those meetings with fifteen to

19   twenty customer CEOs indicate to you that

20   the economy was going to be sluggish

21   going forward?

22       A.   No.

23       Q.   Did any -- did you learn

24   anything in those meetings that indicated

1   to you that the CIOs of those companies

2   would be on a shorter leash in the

3   future?

4        A.   Possibly.

5        Q.   Do you recall any specifics

6   about that topic coming up in any of

7   those meetings?

8        A.   I don't recall any

9   specifics, but a CEO mentioning that they

10  would have to prove the ROI of the

11  technology.  There would be more rigor

12  around proving the return on the

13  investment on the technology.

14       Q.   And was it your observation

15  that CEOs wanted to become more involved

16  in that process?

17       A.   They were now asking for the

18  ROI on technology sales, something that

19  -- that wasn't as pronounced before.  You

20  started to see a little bit more of that

21  happening.

22       Q.   When you say "ROI," can

23  you --

24       A.   Return on investment.

1        Q.   That's what I thought.  I

2   just wanted to make sure.

3        A.   Yeah.

4        Q.   Going back, or going

5   forward, to the page with the Bates

6   number 120245, the second bullet point on

7   the top slide says, best of breed versus

8   suite approach, then underneath that you

9   say, suite approach is preferable, but

10  market believes no one company can

11  deliver.

12            Can you tell me what you

13  meant by that statement?

14       A.   Well, the pundits at that

15  time were saying that though the suite is

16  a preferable option, they don't think

17  that the suite is going to be -- to be

18  able to answer all of your operational

19  issues.  There's still a need for a best

20  of breed solution.

21       Q.   And that is the -- according

22  to the pundits, that's something that the

23  market believed?

24       A.   Yeah, that's the way that --

1   yes.

2        Q.   Okay.  And at that time

3   Oracle was taking the suite approach as

4   opposed to the best-of-breed approach?

5        A.   Yes.

6        Q.   So was that an indication to

7   you that Oracle's suite approach would be

8   facing resistance in the market in the

9   coming months?

10       A.   No.  It was actually

11  preferable.  It was -- it was a

12  preferable option, but the pundits were

13  saying there's still room for the

14  best-of-breed players.

15       Q.   All right.  Well, what did

16  you mean when you said "the market

17  believes no one company can deliver,"

18  were you referring to the suite?

19       A.   Yes, that if you have -- the

20  idea here is we have the suite and -- but

21  there's still best-of-breed vendors at

22  that time.  This was the beginning of the

23  suite marketplace.  And the pundits were

24  saying that they didn't believe that the

1   best of breeds would be out of business,

2   there's still a play for the best of

3   breed here, so yes, preferable, most

4   companies would prefer to go with a

5   suite, no doubt about it, and we

6   certainly saw that the suite was a very

7   powerful, powerful message.  Companies

8   loved the suite, dealing with one -- with

9   one company, but sometimes they would

10  still buy niche products from some of the

11  best-of-breed vendors.

12       Q.   In -- when did 11i go on the

13  market?

14       A.   Not -- I don't recall.

15       Q.   Was it prior to Fiscal Year

16  2001?

17       A.   Yeah, it must have -- must

18  be.  Probably 2000 maybe.

19       Q.   Do you recall in Fiscal Year

20  2000 through Fiscal Year 2001 how long it

21  took on the average for an 11i suite to

22  be installed, debugged, and become

23  functional?

24       A.   Uhm, there -- it was across

1  the spectrum in terms of time, but

2  there's so many variables, how big the

3  company was, the complexity of the their

4  operation, the amount of transactions, so

5  we had some that were less than a year,

6  some less than six months, especially in

7  mid-market. In others, certainly greater

8  than a year.

9      Q. Going back to the page with

10  Bates number 120245, the second slide on

11  that page has a bullet point that says,

12  market concern with ASP model. What did

13  you mean by that?

14      A. The market was concerned —

15  there was some concern regarding IT

16  security issues, vendor viability, et

17  cetera, giving your applications to a

18  third-party company who would house those

19  applications and run those applications

20  for you.

21      Q. Were ASP companies a strong

22  customer base for General Business in

23  Fiscal Year 2001?

24      MR. GOLDSTEIN: Objection to

1  form.

2      THE WITNESS: I — I don't

3  have the total number, but it

4  wasn't — it wasn't a significant

5  piece of the overall business.

6  BY MR. De GHETALDI:

7      Q. Where you say loss of,

8  quote, low hanging dot com, unquote,

9  fruit, do you see that towards the bottom

10  of Page 120245?

11      A. Uh-huh.

12      Q. What did you mean by that?

13      A. I believe I meant by that

14  that the bigger dot coms had acquired the

15  Oracle database, that now we were going

16  after second-tier, if you will,

17  third-tier, dot coms, to sell the

18  database technology.

19      Q. You would pick the

20  easy-to-reach fruit off the tree?

21      A. Yes.

22      Q. Okay. And — and so that

23  meant that other sales were going to be

24  more difficult to dot com companies?

1      A. Yes.

2      Q. If you would turn to the

3  next page, please, with Bates number

4  120246, and this bullet point says, dot

5  com fishing hole drying up?

6      A. Uh-huh.

7      Q. Is that something that the

8  pundits were saying?

9      A. Yes. There's various VC

10  magazines, pundits might come out with VC

11  funding, the level of VC funding at that

12  time.

13      Q. And were these pundits

14  saying that venture capital funding for

15  dot com companies was going to become

16  nonexistent?

17      A. Uhm, there was VC funding at

18  that time, but I was just pulling that

19  off of the report.

20      Q. Okay. Do you know whether

21  VC funding was becoming more difficult

22  for dot com companies to get by January

23  2001 than it had been?

24      A. Yeah. Yes. Yes.

1      Q. Okay. Uhm, you say,

2  development license only, what do you

3  mean by that?

4      A. That a dot com would acquire

5  some development license — a small

6  amount of licenses to begin the project,

7  to develop the application that they

8  needed, and once the application was

9  developed, then they would come back to

10  us to buy the production licenses,

11  whereas before, they would buy the

12  development and the production licenses

13  at the same time.

14      Q. All right. So that was a

15  phenomenon that you had observed by

16  January of 2001?

17      A. We observed some of that.

18      Q. Okay. Then you say,

19  e-commerce and incubator companies listed

20  on endangered species list?

21      A. I wish I could write this —

22  I wish I could write this well.

23      The idea here is that they

24  were saying that incubator companies are

1　companies that existed at that time that

2　would help incubate, start up, these new

3　start-ups. They'd provide them with

4　legal help, accounting help, financial

5　help, et cetera, and incubate them. Once

6　they become a company, they receive more

7　funding, they let them go. And these

8　companies came up and then they went

9　down.

10　　Q. Were e-commerce and

11　incubator companies part of General

12　Business' market?

13　　A. We didn't sell much to

14　incubator companies. We might have had a

15　few deals, but it wasn't a place where we

16　generated significant revenue.

17　　Q. Then you say, 41,515 layoffs

18　in Calendar Year 2000; am I reading that

19　correctly?

20　　A. It's amazing I can remember

21　this. That was a number that the dot com

22　companies had laid off, I believe.

23　　Q. And then you say, survival

24　mode for calendar year 2001?

1　　A. Yes.

2　　Q. What did you mean by that?

3　　A. Well, they were talking

4　about how the dot com companies were,

5　quote/unquote, in survival mode, buying

6　development licenses, not as many

7　production licenses.

8　　Q. Okay. By January of 2001,

9　had you observed any of General Business'

10　customers, dot com customers,

11　disappearing?

12　　A. Beginning of 2001?

13　　Q. Yeah, as of January of 2001.

14　　A. No. We had a nice -- if I

15　recall, we had a nice Q1. We had a very

16　nice Q2 in '01. We were doing very, very

17　well, as we did the previous four, five,

18　six quarters before that.

19　　Q. You don't recall there being

20　a dramatic drop-off in the sales to dot

21　com companies in Q1 and Q2 of 2001?

22　　A. I don't recall that.

23　　Q. If you turn to -- well,

24　let's see, the slide -- don't turn yet,

1　uhm, the second slide on that same page,

2　120246, and it says, General Business

3　U.S. Second Half Financial Outlook.

4　　A. Uh-huh.

5　　Q. Is the section that comes

6　next what your view of what the second

7　half of Fiscal Year 2001 would -- was

8　going to be, or was this somebody else's

9　view?

10　　A. No, this would be -- this

11　would be my view. This was a slide that

12　George would include in the -- in the

13　presentation. This presentation was the

14　January 9th presentation I'm still

15　looking at, right?

16　　Q. Uh-huh.

17　　A. And so he would act -- he

18　would ask for, so what does the outlook

19　look like for the second half, and this

20　would be my outlook.

21　　Q. All right. On the next

22　page, the one with Bates number 120247,

23　uhm, there are two tables, two slides

24　with tables on them --

1　　A. Uh-huh.

2　　Q. -- that look similar, but

3　have somewhat different numbers.

4　　A. Okay.

5　　Q. The top one is called, Q3

6　and FY01 outlook versus budget, and the

7　bottom one is called Q3 and FY01 outlook

8　versus replan.

9　　　Can you tell me what the

10　difference between budget and replan is?

11　　A. I don't know. I'm trying to

12　remember. What was replan?

13　　　I can't see the numbers, but

14　what was --

15　　Q. And I didn't bring my

16　magnifying glass.

17　　A. Yeah. The only thing I

18　can -- can think of on a replan, a replan

19　would mean something along the lines of a

20　-- of a change in the number.

21　　Q. Uh-huh. Well, I can read

22　some of the numbers and it looks to me

23　like the replan chart numbers are

24　generally higher than the budget numbers.

Nugent, John J. 5/19/2004 3:12:00 PM

1    A.   Well, they went up, huh?

2    Q.   Yeah.

3    A.   Ouch.

4    Q.   Does that refresh your

5    recollection as to what happened with the

6    budget, whether it was replanned in a way

7    that might not be favorably viewed by the

8    salespeople?

9    A.   I don't know what -- I don't

10   know what replan is. I don't recall

11   replan.

12   Q.   All right. You could turn

13   to the next page, please, which has Bates

14   number 120248, and the top slide is

15   titled pipeline analysis. Do you see

16   that?

17   A.   Yep.

18   Q.   What sort of pipeline is

19   that?

20   A.   Re -- pipeline. Pipeline

21   analysis. Well, I'm looking at a field

22   budget. I'm looking at a pipeline. So

23   it -- it -- it's a licensed pipeline. I

24   will assume that it's applications and

Nugent, John J. 5/19/2004 3:12:00 PM

1    database against budget.

2    Q.   Okay. Do you know what the

3    source of these pipeline numbers would --

4    or was?

5    A.   No.

6    Q.   And you're assuming that

7    it's pipeline for license, including

8    technology and applications?

9    A.   Right, yes.

10   Q.   Okay. If you could turn to

11   the next page, please, which has Bates

12   number 120249, uhm, and the top slide

13   says, General Business U.S. Second Half

14   Adjustments?

15   A.   Yes.

16   Q.   What do you mean by that?

17   A.   Looking at the slide below

18   it, I believe that has to do with some

19   adjustments and our go-to-market strategy

20   that we were considering making.

21   Q.   The first bullet point on

22   the lower slide says, consolidate dot com

23   territories. What did you mean by that?

24   A.   That we were going to

Nugent, John J. 5/19/2004 3:12:00 PM

1    consolidate some existing dot com

2    territories, turn two territories into

3    one, so we took -- we took a few of the

4    different territories and consolidated

5    them.

6    Q.   What results when you

7    consolidate territories in terms of sales

8    force?

9    A.   What results?

10   Q.   I mean, do --

11   A.   Uhm, it could be, A, higher

12   focus; uhm, B, I believe that we were

13   consolidating here based on, uhm, --

14   based on the plethora of dot com reps

15   that we had flooded that marketplace with

16   and that we were consolidating a few of

17   those to trim them down a little bit.

18   Q.   Okay. So you're talking

19   about trimming the sales force for dot

20   coms?

21   A.   Yeah, we didn't -- I'm

22   trying to recall. We were consolidating

23   -- we were -- we were consolidating the

24   number of territories that we had out

Nugent, John J. 5/19/2004 3:12:00 PM

1    there for dot coms, because we had added

2    so many reps to that -- to that space,

3    and now it was we were consolidating

4    several of these territories.

5    Q.   Did that mean that you were

6    going to end up with fewer sales reps in

7    fewer territories or --

8    A.   I guess by definition it

9    would mean that, but I don't recall if we

10   ever laid anybody off or -- I think we

11   used them in other areas.

12   Q.   If you can turn to the next

13   page, please, 120250 Bates number. The

14   top slide says, selling landscape has

15   changed, and then you have a number of

16   different descriptions of the selling

17   landscape for different periods of time?

18   A.   Uh-huh.

19   Q.   What do you mean by the --

20   the last one, 2000, transformation-basis

21   selling?

22   A.   As I recall, this line had

23   to do with applications and how we sold

24   our applications into companies.

Nugent, John J. 5/19/2004 3:12:00 PM

1    You could not just sell
2    product for product's sake, solution for
3    solution's sake. You -- you sold and had
4    to help the customer see how the software
5    had actually transformed their business,
6    how they could improved ROIs and bring
7    down total cost of ownership and improve
8    the efficiency of their operation and the
9    ability to transform their business,
10   extend their business to customers and
11   extend their business to suppliers. That
12   was the notion of transforming their
13   business, getting outside of themselves
14   to suppliers and customers, and that was
15   a go-to-market strategy that we started
16   to implement at that time.
17       Q.   And that strategy was
18   implemented in -- in response to the
19   changing market conditions that you had
20   observed?
21       A.   Yes, for -- you -- you --
22   again, just going in and selling a
23   product was a difficult sale. You had to
24   be able to show how the product could

Nugent, John J. 5/19/2004 3:12:00 PM

1    help transform their business --
2    business, get closer to their customers,
3    how they could get closer to their
4    suppliers, what would that mean to their
5    overall business model.
6        Q.   All right. If you can turn
7    now, close to the end, the page with
8    Bates number 120260. The first slide on
9    that page has a title, Issues,
10   Challenges, Recommendations.
11       Is this sort of your
12   summary?
13       MR. GOLDSTEIN: Objection to
14   form.
15       THE WITNESS: Issue --
16   uhm --
17       MR. De GHETALDI: Some --
18       THE WITNESS: I -- I'm not
19   sure if it's my summary as much as
20   it's issues and challenges that I
21   wanted to bring to George's
22   attention.
23       MR. De GHETALDI: All right.
24   BY MR. De GHETALDI:

Nugent, John J. 5/19/2004 3:12:00 PM

1        Q.   Uhm, the second slide on
2    that page says, Second Half and Fiscal
3    Year 2002. You're referring there to the
4    second half, that is, the third and
5    fourth quarters of Fiscal Year 2001?
6        A.   Yes.
7        Q.   Okay. The first bullet
8    point there says, disparity between
9    General Business and other sales
10   organizations. What did you mean by
11   that?
12       A.   I don't know. Let me look
13   at the bullets. And I believe I was -- I
14   -- when I look at LS quota differential,
15   LS means license and support, and every
16   sales rep had a license and support
17   quota.
18       I can only infer that I
19   thought at that time my team was carrying
20   higher LS quotas than some of the other
21   sales organizations. That's just an
22   inference that I am making.
23       Q.   Uh-huh. How about comp.
24   plan inequity, the next point, what does

Nugent, John J. 5/19/2004 3:12:00 PM

1    that refer to?
2        A.   First of all, it's a
3    spelling error. Other than that, I
4    don't, uhm -- I think I was referring to,
5    I believe, the -- I believe some other --
6    some other divisions, their managers were
7    paid more than my team's managers.
8        Uhm, my team had smaller
9    overall quotas, and I would make the case
10   that it doesn't matter, if they have
11   eight people, they have eight people,
12   they should make the same. And I think
13   at that time they were looking at the
14   amount of quota that they were carrying
15   and saying no, because they were only
16   carrying a smaller amount of quota, they
17   will make a little bit less.
18       Q.   Uh-huh. The second bullet
19   point says, revenue share model, and
20   underneath that it says, 30 percent of
21   tech is revenue shared, loss of
22   transactional focus, bad behavior. What
23   did that refer to?
24       A.   Revenue share model? I

1    don't know. Revenue share -- I don't

2    know.

3        Q.   I'm guessing, but are you

4    talking about sharing commissions, how

5    commissions are shared?

6        A.   No. We must have been

7    splitting revenues with another division

8    and -- and because we were splitting

9    revenue with other divisions, some people

10   would try to hang on to the revenue

11   creating bad behavior, no, I am not going

12   to give up the revenue.

13       Q.   This -- these would be other

14   divisions within NAS?

15       A.   Yes. Maybe it was between

16   myself and majors, for example.

17       Q.   If you could turn to the

18   next page, please, which as Bates number

19   120261, the first -- and the top slide

20   says, second half in fiscal year '02

21   again, and the bullet point there is, or

22   says, mid-teen technology growth rate.

23   What does that refer to?

24       A.   That -- I mean, I know what

1    mid-teen technology growth rate means.  I

2    don't know for what period, whether it

3    was for this year or for the second half

4    or for -- but the -- but the --

5    potentially here I was forecasting

6    mid-teen technology growth rates.

7        Q.   All right. Underneath that

8    you say, no million dollar dot com deals;

9    am I reading that correctly?

10       A.   Right.

11       Q.   What did you mean by that?

12       A.   That we were doing -- that

13   we didn't have as many of these big

14   million dollar dot com deals. We had --

15   I don't recall -- I don't know if we had

16   zero in the second half. I just -- I'm

17   sure we didn't have as many as we had in

18   the -- in the first half.

19       Q.   You do say no million dollar

20   dot com deals?

21       A.   Uh-huh.

22       Q.   But you're not sure whether

23   that means only a few or none?

24       A.   Yeah.

1        Q.   Okay. The next point I

2    think says, average transaction lower

3    than fiscal year 1999 average; am I

4    translating that correctly?

5        A.   Average transaction --

6        Q.   Or less or lower than?

7        A.   I don't know. Average

8    transaction potentially could be lower

9    than. I don't know whether there's an L

10   there, but -- for lower than, but, uhm,

11   the notion that our average transaction

12   wasn't as large, is not going to be as

13   large in the second half as it is in the

14   first half.

15       Q.   Going back to the point

16   about no million dollar dot com deals --

17       A.   Uh-huh.

18       Q.   -- what -- where would you

19   look to determine how many million dollar

20   dot com deals you had by that point in

21   General Business in early January 2001?

22       A.   I'm sure I could have looked

23   at, uhm, -- I don't recall, but I'm sure

24   I could have looked at a pipeline report

1    for Q3 and, uhm -- or, I'm sorry, that

2    was in Q3 -- oh, this was in January, so

3    beginning of Q3, I probably looked at

4    what I had going in Q3, saw fewer million

5    dollar deals there, and potentially I

6    could have looked at Q4, the pipeline,

7    and noticed fewer million dollar dot com

8    deals.

9        Q.   Then there are four action

10   items in the top slide on the second page

11   with Bates number 120261. The first one

12   is, alert corporate.

13       A.   Okay.

14       Q.   What did you mean by that?

15       A.   The only thing I can surmise

16   is that mid-teen technology growth rates

17   is where we would be at. I don't know,

18   but potentially maybe they were thinking

19   they were going to be higher, so I'm

20   saying, hey, we have mid-teen technology

21   growth rates planned.

22       Q.   Do you recall that Jeff

23   Henley and Larry Ellison gave guidance to

24   the market on December 14th, 2000, that

1  they expected Oracle to achieve 25

2  percent growth in license measured in

3  U.S. dollars?

4      A.  I don't recall that.

5      Q.  The second action item on

6  Page 120261 says, sell more options?

7      A.  Uh-huh, database options.

8  There were various optional products that

9  you could acquire with the database.

10     Q.  The third action item says,

11  E-bus infrastructure sale.

12     A.  What is an E-business

13  infrastructure sale?  Uhm, I -- I can

14  surmise that that was selling not only

15  our database, but selling our application

16  server, let's sell more application

17  servers at that time.  That's part of an

18  infrastructure, not just database, but

19  options, and let's also sell our

20  applications server product as well, all

21  add up to a technology infrastructure.

22     Q.  Okay.  Then the fourth --

23  fourth action item says, reduce tech

24  quota.  What did you mean by that?

1      A.  Uhm, probably asking for a

2  reduction in the technology quota.

3      Q.  And this would be something

4  that corporate would approve?

5      A.  No.  George, this would --

6  George.

7      Q.  George Roberts?

8      A.  Right.

9      Q.  Where you say, alert

10  corporate, is there a department or a

11  person that you were referring to there?

12     A.  Uhm, no.  My conversations

13  are with George and so it would be, hey,

14  we are going to be doing mid-teens and

15  technologies.

16     Q.  You should tell someone?

17     A.  Uhm, alert corporate would

18  be, yeah, let them know.

19     Q.  Okay.  And am I right in --

20  in believing that the reason that they

21  should -- that corporate should be

22  alerted was because this mid-teen

23  technology growth rate was lower than

24  what was expected?

1      A.  I can only surmise that.  I

2  don't know what was expected.

3      Q.  All right.  In the second

4  slide on page with Bates number 120261

5  there are two bullet points.  The first

6  one says, quality and stability of 11i

7  action build 11i reference base.

8          What did you mean by quality

9  and stability of 11i?

10     A.  This refers back to my

11  comment about the overall quality and

12  stability of the code.  We had good

13  references at the time, and we wanted to

14  make sure that we were building up our

15  reference base of 11i to dispel the

16  competition from constantly going out to

17  the marketplace saying, hey, there's

18  issues with your 11i quality, so we had

19  plenty of references that were very happy

20  on 11i and we wanted to build up that

21  base.

22     Q.  The next bullet point says,

23  dramatic decline in dot com business.

24  Was that something that you had observed

1  as of January 9th, 2001?

2      A.  I'm not sure.  I don't

3  believe I had observed it at that time.

4  I think on January 9th I'm starting to

5  talk about how our dot com business,

6  which is the technology business, which

7  is the mid-teen business, uhm, that there

8  was going to be -- there was going to be

9  a decline in that business.

10     Q.  Well, the first subpoint

11  under that bullet says, 30 percent of

12  named dot coms out of business.  Were you

13  saying there that you had, as of January

14  9, 2001, observed that 30 percent of the

15  -- of some dot com businesses were out of

16  business?

17     A.  Yes.

18     Q.  What did you mean by named

19  dot coms?

20     A.  Named dot com would have

21  been an account that a sales rep has as

22  part of their quota, part of their

23  territory, I mean.

24     Q.  All right.  So as of January

Nugent, John J. 5/19/2004 3:12:00 PM

1    9, 2001, the dot com – potential dot com

2    marketplace had shrunk by a third?

3        A.   No.

4            MR. GOLDSTEIN:  Objection to

5        form.

6            THE WITNESS:  The – the

7        number of named accounts, focused

8        accounts, that we gave, I'm not

9        sure how large that list was, it

10       certainly wasn't the list of all

11       the dot coms out there, it was

12       just those that we wanted to focus

13       on.

14           MR. De GHETALDI:  All right.

15           THE WITNESS:  We created a

16       list of focused dot com accounts,

17       and what we are saying here, named

18       dot com accounts, what we are

19       saying is out of that focus list

20       that we assembled, 30 percent went

21       out of business, and what would

22       happen is we'd replace them with

23       other dot com accounts.

24   BY MR. De GHETALDI:

Oracle Related Cases                              Page 101

Nugent, John J. 5/19/2004 3:12:00 PM

1        Q.   The second subpoint under

2    that bullet says, 21 million in first

3    half RMAs versus 4 million.  What did you

4    mean by that?

5        A.   RMAs are the settlements,

6    the returns, so when we would negotiate a

7    settlement agreement and they would

8    return the software, this would be the P

9    & L or revenue hit that we would have to

10   take on our P & L statement.

11       Q.   Uh-huh.  All right.  So

12   there was 21 million dollars worth of

13   returns in the first half of Fiscal Year

14   2001; is that what you're saying?

15       A.   21 million first half RMAs.

16           Yes, in the first half 21

17   millions worth of RMAs versus 4.  Could

18   have been 4 in the first half of the

19   previous fiscal year, doing a

20   year-over-year compare.

21       Q.   All right.  Then in the next

22   subpoint there you say, 40 million dollar

23   database shortfall in West.  What did you

24   mean by that?

Oracle Related Cases                              Page 102

Nugent, John J. 5/19/2004 3:12:00 PM

1        A.   Probably looking at the West

2    forecast for the – for the second half,

3    thinking that maybe he might be 40

4    million dollars under his number.

5        Q.   Because of the decline in

6    the dot com business?

7        A.   Yes.

8        Q.   And then the fourth subpoint

9    there is 35 dot com reps at risk.

10       A.   Well, they go hand in hand.

11       Q.   Okay.  That is, if the

12   market is not there or the potential

13   market is not there --

14       A.   The potential market is not

15   there.

16       Q.   – there's no reason to have

17   the sales force to try and sell then to a

18   market that doesn't exist?

19       A.   Well, not a market that

20   doesn't exist, but it looks like we had

21   35 dot com reps in that space, and if the

22   business is – if the business is

23   starting to shrink, there's 35 folks at

24   risk, hey, what do we – you know, what

Oracle Related Cases                              Page 103

Nugent, John J. 5/19/2004 3:12:00 PM

1    are we going to do with these folks?  We

2    need to give them more dot coms.  We need

3    to lower their numbers.  We need to do

4    something for them.

5        Q.   Then the action number there

6    is dot com only quota reduction?

7        A.   Yeah, so why don't we

8    potentially consider giving these folks a

9    quota reduction because that business is

10   – is – has been diminished a bit, let's

11   go ahead and give these guys a quota

12   reduction.

13       Q.   All right.  Then if you turn

14   to the final page of exhibit --

15           MR. De GHETALDI:  Okay.  We

16       need to change the tape.

17           THE VIDEOGRAPHER:  That

18       concludes Videotape Number 1.  The

19       time is 3:51.

20           (Whereupon, there was a

21       discussion held off the record at

22       this time.)

23           (Whereupon, there was a

24       recess held at this time, 3:51 to

Oracle Related Cases                              Page 104

Nugent, John J. 5/19/2004 3:12:00 PM

1      4:05 p.m.)

[Nugentv1_t2.MPG]

2              THE VIDEOGRAPHER: Stand by.

3      We are back on the record. This

4      is the beginning of Tape Number 2.

5      The time is 4:06.

6      BY MR. De GHETALDI:

7          Q.   All right. Mr. Nugent,

8      let's try again with the last page of

9      exhibit, what was it, 54, and --

10         A.   Wait a minute. Okay, yes.

11     I'm there. Okay.

12         Q.   And both the slides on this

13     page are titled, dot com quota reduction,

14     right?

15         A.   Yes.

16         Q.   Do these slides, uhm,

17     describe the quota reduction that you

18     were proposing to Mr. Roberts?

19         A.   Yes, I believe so.

20         Q.   All right. On the bottom

21     slide, I just want to know whether or not

22     I'm reading this correctly, it looks like

23     you were talking about a reduction of

24     head count of 47?

Nugent, John J. 5/19/2004 3:12:00 PM

1          A.   Eligible -- no. That's

2      eligible head count, those that were

3      eligible to receive the quota reduction.

4          Q.   I see. And so 47 total were

5      eligible for the quota reduction; is that

6      right?

7          A.   Correct.

8          Q.   Okay. And it looks like out

9      of the 47, 39 of them were from Mr.

10     Classick's division --

11         A.   Correct.

12         Q.   -- in the West?

13         A.   Correct.

14         Q.   And that's because that's

15     where most of the dot com companies were?

16         A.   Yes. Yes.

17         Q.   All right.

18             MR. De GHETALDI: I would

19     like this marked as next in order,

20     please.

21             Germain, I'm virtually

22     handing you a copy of the newly

23     marked Exhibit 265, which is a

24     copy of Exhibit B to the special

Nugent, John J. 5/19/2004 3:12:00 PM

1      litigation committee's interview

2      of Mr. Nugent, and it has pages

3      Bates numbered ORCL 0123717

4      through 0123495. That doesn't --

5             MR. LABAT: Okay. Thank

6      you.

7             MR. De GHETALDI: It's

8      actually a collection of about six

9      two-page reports, and that's why

10     it appears that they are not

11     really otherwise in sequential

12     order.

13             (Whereupon, Exhibit 265

14     marked for identification.)

15     BY MR. De GHETALDI:

16         Q.   Do you recognize the

17     documents that are compiled in Exhibit

18     265?

19         A.   Yes, I recognize the first

20     page.

21         Q.   All right.

22         A.   I recognize these.

23         Q.   Am I correct in believing

24     that what we have here is a group of

Nugent, John J. 5/19/2004 3:12:00 PM

1      two-page reports starting in December

2      18th, 2000, and running through February

3      18th, 2001?

4          A.   Yes.

5          Q.   February 19th, I'm sorry.

6          A.   Uh-huh.

7          Q.   Is this the type of report

8      that you regularly received in Fiscal

9      Year 2001?

10         A.   Yes.

11         Q.   And with what frequency?

12         A.   I believe every two weeks

13     the first two months of the quarter and

14     every week the last month of the quarter.

15         Q.   And who prepared these

16     reports?

17         A.   Uhm, somebody in finance.

18         Q.   Do you know who?

19         A.   Uhm, I can't remember who my

20     finance person was.

21         Q.   Now, drawing your attention

22     to the top of the first page of the

23     exhibit, there are several tables there

24     at the top of the page I'm marking --

1   highlighting them to show you --

2       A.   Yes.  Okay.

3       Q.   -- the ones that I am going

4   to ask you about.

5           The second box to the right

6   is titled, commit/worst, and the third

7   box over is titled, new

8   forecast/realistic, and the third box

9   over is titled best?

10      A.   Yes.

11      Q.   What do those boxes, the

12  data in those boxes, represent?

13      A.   As part of our forecasting

14  methodology, we had to give our commit,

15  which was in reference to our worst, what

16  was the worst you could do, what was the

17  commit that you were going to do for the

18  company.

19          And then realistic is, I see

20  your commit, what realistically do you

21  think you might be able to get to over

22  and above what you're committing.

23          And then best is, if

24  everything was to line up for you, what

1   do you think -- what's the absolute best

2   case you could do?

3       Q.   And -- and so these figures

4   in those boxes in these reports contained

5   in Exhibit 265 represent your judgment of

6   where the numbers should be within those

7   three categories?

8       A.   Yes.

9       Q.   Okay.  And I'm -- I'm saying

10  your judgment, and it's not anybody

11  else's judgment, right?

12      A.   That's correct.

13      Q.   Okay.  Now, if you can turn

14  to the second page -- I'm sorry, let's

15  stay -- let's stay with the first page.

16  I got a couple more questions there.

17          In the middle of the page,

18  there's a long box titled, GB Field Deals

19  Summary.  What does that box signify?

20      A.   It looks like a series of

21  current forecast statistics, number of

22  deals, just as it's said here, various

23  headings and various statistical

24  categories and the specified amounts per

1   category.

2       Q.   Okay.  Uhm, then on the next

3   page, the second page of Exhibit 265, in

4   the upper-hand corner there is a box

5   titled, closed.  Do you see that?

6       A.   Yes.

7       Q.   Uhm, what do the -- do the

8   figures in that box represent?

9       A.   I'm assuming business closed

10  to date, quarter to date.

11      Q.   All right.  So if I am

12  reading this correctly, uhm, as of

13  December 18th, 2000, the total deals

14  closed would have been 1.977 million

15  dollars?

16      A.   Correct.  Correct.

17      Q.   It looks like these numbers

18  are expressed in thousands, right?

19      A.   Yes.

20      Q.   Okay.  All right.  And then

21  within that same box titled closed on the

22  second page of Exhibit 265, there are

23  three columns, one is entitled field and

24  one is entitled ISD.

1           Can you tell me what the --

2   the difference between those two

3   categories is?

4       A.   Yes.  The -- the difference

5   in the field were actually field reps.

6   ISD is the international sales division

7   or the telesales rep, the inside

8   telesales organization, previously

9   described as DMD.  They changed their

10  name.

11      Q.   Okay.  Then it looks like

12  there are similar boxes for commit/worst,

13  forecast/realistic, and best, but these

14  are titled or -- AVPs commit/worst and

15  AVP forecast/realistic and AVP best.

16      A.   Uh-huh.

17      Q.   Were -- were those the --

18  the judgments of the area vice-presidents

19  as to where the numbers should be within

20  those categories or forecasts?

21      A.   Yes, and I -- and I might --

22  I might either have subtracted or plussed

23  (ph) up.

24      Q.   To get to yours that are on

Nugent, John J. 5/19/2004 3:12:00 PM

1   the first page or -- or do you --
2       A.  No, just from my
3   understanding of their business, where I
4   thought -- they would give me a number
5   and my understanding of their business, I
6   would plus that up or minus it.
7       Q.  I see. Uhm, would that be
8   done here on the second page of this
9   report or would it be done on the first
10  page and these numbers I'm not sure if
11  it's coincidence or not but they look
12  like they are exactly the same.
13      A.  Yeah, it's -- it looks like
14  you have got the AVP numbers that I would
15  get, they would give me their numbers,
16  and then there's a potential that I might
17  have plussed up, minused down, come up
18  with a total, and then carried that
19  forward.
20      Q.  Okay. Would that show up in
21  the management/headquarters row?
22      A.  Oh, that's interesting.
23  Management/headquarters?  I see.
24  Management headquarters.

Nugent, John J. 5/19/2004 3:12:00 PM

1       So this could have been --
2   oh, no.  No.  Management headquarters,
3   that's two lines.  Management
4   headquarters and AVP.
5       It could have been I just
6   took their numbers and then put my own
7   judgment and then threw it into
8   management headquarters, so I took their
9   numbers that they gave me and then did a
10  management HQ judgment on it.
11      Q.  Okay. The -- if you turn to
12  the third and fourth pages and compare
13  the SVP forecast row at the top with the
14  AVP forecast row at the top, the third
15  and fourth pages, it looks like now the
16  numbers are slightly different in the
17  best-case scenario.  I'm just drawing
18  your attention to that fact to try and
19  see if that refreshes your recollection
20  as to how these numbers were derived.
21      A.  Because of the management
22  headquarter column, I believe that they
23  were derived by taking the best number
24  that they gave me and then I plussed it

Nugent, John J. 5/19/2004 3:12:00 PM

1   or minused it down and put that figure in
2   the management HQ column.
3       Q.  Uh-huh. Okay.
4       Next I'm going to hand you a
5   document that was marked as Exhibit 49.
6       MR. GOLDSTEIN:  Thank you.
7       MR. De GHETALDI:  Did you
8   hear me, Germain?
9       MR. LABAT:  I did.  49?
10      MR. De GHETALDI:  Yep.
11  BY MR. De GHETALDI:
12      Q.  Have you ever seen Exhibit
13  49 before?
14      A.  No.
15      MR. De GHETALDI:  I would
16  like this one marked as -- four of
17  them at once, actually.  That will
18  save some time.
19      (Whereupon, Exhibits 266
20  through 269 were marked for
21  identification.)
22      MR. De GHETALDI:  Paul, this
23  is 266.
24      Germain, I will tell you

Nugent, John J. 5/19/2004 3:12:00 PM

1   what I am doing here after I get
2   all done.  Okay?
3       MR. LABAT:  Okay.
4       MR. De GHETALDI:  Generally,
5   these are the first few pages from
6   four, uhm, General Business
7   performance summaries.
8       267, Paul.
9       Okay, Germain, what I have
10  done now is marked four exhibits
11  starting with 266, and it has
12  Bates numbers CA-ORCL 014515
13  through 518.
14      MR. LABAT:  Okay.
15      MR. De GHETALDI:  Exhibit
16  267 is CA-ORCL 035479 through 482.
17      The third one is Exhibit 268
18  and that has Bates numbers CA-ORCL
19  023776 through 778.
20      And then the fourth one is
21  Exhibit 269 with Bates numbers
22  CA-ORCL 035404 through 407.
23      MR. LABAT:  Great.  Thanks.
24      MR. De GHETALDI:  Okay.

Nugent, John J.  5/19/2004  3:12:00 PM

1    BY MR. De GHETALDI:

2         Q.   Now, Mr. Nugent, these are

3    just the first pages of -- of a report

4    that's considerably longer.  Uhm, do you

5    recall receiving this report as

6    exemplified by these four exhibits in

7    Fiscal Year 2001?

8         A.   Yes.

9         Q.   Okay.  Do you know who was

10   on the distribution list for this report?

11        A.   No.  I'm sure myself,

12   potentially my regional managers, my

13   regional vice-presidents, but other than

14   that, I can't say.  Probably George.

15        Q.   All right.  Now, if you

16   would turn to the second page of Exhibit

17   266, please, the third italicized heading

18   says, applications highlights.  Do you

19   see that?  The first bullet point there

20   says, apps and apps drag accounted for 28

21   percent in Q3.  What is apps drag?

22        A.   It is technology, licenses,

23   that are sold with the applications,

24   hence, dragged with the application.

Nugent, John J.  5/19/2004  3:12:00 PM

1         Q.   Where a transaction included

2    both applications and technology, how is

3    that categorized in -- in -- in General

4    Business?  Was it categorized as -- as an

5    applications deal or were there

6    components separated?

7         A.   No.

8              MR. GOLDSTEIN:  Before you

9         answer, I'm going to object to

10        form.

11             THE WITNESS:  The components

12        were segmented.  We had

13        applications and technology.

14             MR. De GHETALDI:  Okay.

15   BY MR. De GHETALDI:

16        Q.   In your experience in

17   General Business, which quarter of

18   Oracle's fiscal year generally

19   contributed the lowest percentage of the

20   total year's revenue?

21             MR. GOLDSTEIN:  Objection to

22        form.

23             THE WITNESS:  I assume Q1,

24        because it was the smallest

Nugent, John J.  5/19/2004  3:12:00 PM

1         percentage of our overall quota.

2              MR. De GHETALDI:  Okay.

3    BY MR. De GHETALDI:

4         Q.   Do you know which

5    contributed the largest percentage?

6              MR. GOLDSTEIN:  Same

7         objection.

8              THE WITNESS:  Q4.

9    BY MR. De GHETALDI:

10        Q.   In -- in your experience,

11   did Q2 and Q3 tend to contribute similar

12   amounts to the total year's revenue?

13             MR. GOLDSTEIN:  Objection to

14        form.

15             MR. De GHETALDI:  For

16        license business?

17             THE WITNESS:  Yes.

18             MR. De GHETALDI:  Okay.

19   BY MR. De GHETALDI:

20        Q.   Now, if you -- you keep open

21   Exhibit 266 to that second page, you

22   already have it, you're already there.

23        A.   Oh.

24        Q.   Don't -- just the second

Nugent, John J.  5/18/2004  3:12:00 PM

1    page, not the third, and if you can turn

2    to the second page of Exhibit 269, I'd

3    like to compare the reported revenue for

4    dot com for Q3FY00 as reflected in

5    Exhibit 266 with reported revenue for dot

6    com for Q2FY01 as reported in Exhibit

7    269.  Do you see where that is, the

8    second bullet point under other

9    highlights?

10        A.   Yes.

11        Q.   Okay.  It looks like, and

12   tell me if I am reading this correctly,

13   the dot com revenue for Q3FY00 was 91.2

14   million dollars and for Q2FY01 it was 52

15   million dollars; am I reading that

16   correctly?

17             MR. GOLDSTEIN:  Objection to

18        form.

19             THE WITNESS:  Yes.

20   BY MR. De GHETALDI:

21        Q.   The, uhm, -- in Q3FY00, the

22   second page of Exhibit 266 says that dot

23   com revenue for Q3FY00 was 91.2 million

24   dollars or which equates to 79 percent of

Nugent, John J. 5/19/2004 3:12:00 PM

1 technology revenue, and 111.4 million

2 dollars, which equates to 75 percent of

3 total revenue respectively.

4 Is the 20 million dollar

5 difference there, uhm, applications?

6 MR. GOLDSTEIN: Objection

7 to form.

8 THE WITNESS: Well, it,

9 appears that the 111 was the total

10 technology of which 91 million was

11 dot com, hence, the 79 percent,

12 and, therefore, the 70 percent,

13 the 111, I believe, might be

14 referring to, again, the total

15 technology which was 75 percent of

16 a total revenue, which I would

17 guess would be the applications

18 piece.

19 MR. De GHETALDI: I just

20 want to make sure I understood the

21 answer.

22 THE WITNESS: So in other

23 words, 75 percent of the total

24 revenue was technology, leaving 25

Nugent, John J. 5/19/2004 3:12:00 PM

1 percent for applications for the

2 quarter.

3 MR. De GHETALDI: Okay.

4 THE WITNESS: That sounds

5 about right.

6 BY MR. De GHETALDI:

7 Q. Does your interpretation of

8 that sentence also apply if you look at

9 the similar sentence on the second page

10 of Exhibit 269? I'm just not sure that

11 the -- the math works and that's why I am

12 asking.

13 MR. GOLDSTEIN: Objection

14 to form. I don't think you have

15 laid any foundation that -- to

16 indicate that he's doing anything

17 other than speculating about the

18 meaning of this memo.

19 MR. De GHETALDI: Can you

20 still believe that -- that the way

21 you were reading the second page

22 of Q -- I'm sorry, of Exhibit 266,

23 uhm, also applies to the second

24 page of Exhibit 269?

Nugent, John J. 5/19/2004 3:12:00 PM

1 THE WITNESS: Again, I'm --

2 I can't interpret it for you. I

3 didn't write the memo.

4 MR. De GHETALDI: Right.

5 THE WITNESS: Uhm, I'm

6 assuming that 51 percent

7 technology represented, for that

8 particular quarter, 51 percent of

9 the total revenue and, therefore,

10 49 percent was applications.

11 MR. De GHETALDI: All right.

12 This will be Exhibit 270

13 and, Germain, this is a copy of

14 the SLC interview without the

15 attached exhibits.

16 MR. LABAT: Is this 270?

17 MR. De GHETALDI: Yes.

18 (Whereupon, Exhibit 270

19 marked for identification.)

20 BY MR. De GHETALDI:

21 Q. Mr. Nugent, uhm, when --

22 when was the first time you saw Exhibit

23 270?

24 A. I saw this when I received

Nugent, John J. 5/19/2004 3:12:00 PM

1 my packet of information from the law

2 firm.

3 Q. About how long ago?

4 A. Uhm, I'm not sure when they

5 sent it. Maybe -- maybe three weeks ago,

6 four weeks ago.

7 Q. Okay. Between the time you

8 received it and today, did you have a

9 chance to read the entire interview

10 summary?

11 A. I didn't read it at the time

12 I received it this morning. I perused

13 it.

14 Q. Okay. And in your perusal,

15 did you notice anything that appeared to

16 be inaccurate?

17 A. No.

18 Q. All right. If you'll turn

19 to Page 3, there's a long paragraph in

20 the middle under the heading impact of

21 emerging market sector on GB generally.

22 Do you see that?

23 A. Yes.

24 Q. Okay. Towards the end of

Nugent, John J. 5/19/2004 3:12:00 PM

1   that paragraph, it reads, Nugent
2   indicated that at the height of the dot
3   com market approximately 70 percent of
4   General Business' business came from the
5   dot com or emerging market sector while
6   the remaining 30 percent was from
7   traditional bricks and mortar businesses.
8       Nugent stated that the dot
9   com market continued to grow through
10  2000. Uhm, is that through the end of
11  2000?
12      MR. GOLDSTEIN: Objection to
13  form.
14      THE WITNESS: You can look
15  at the -- look at the numbers in
16  our fiscal 2000, the answer is
17  yes, we had a fabulous 2000.
18  BY MR. De GHETALDI:
19      Q.  Okay. So you're talking --
20  is it your recollection that when you
21  were speaking to the Special Litigation
22  Committee, you were speaking about --
23      A.  Fiscal years.
24      Q.  -- Fiscal Year 2000?

Nugent, John J. 5/19/2004 3:12:00 PM

1       A.  Yes.
2       Q.  Not Calendar Year 2000?
3       A.  Correct.
4       Q.  Okay. The next paragraph on
5   Page 3 of Exhibit 270 reads. Nugent noted
6   that GB not only sold to pure dot com
7   companies, but a variety of companies
8   in what he referred to as emerging market
9   sector, which included dot coms, B to Bs,
10  and small telecommunications companies.
11      Nugent also stated that GB
12  West was the biggest component of GB's
13  business.  He added, quote, as GB West
14  went, so went GB, unquote.
15      He attributed the Q3 FY2001
16  miss not only to a dot com fall-off, but
17  also to a decline in the entire emerging
18  market sector.
19      Is that an accurate
20  statement?
21      A.  Yes.
22      Q.  Okay. Uhm, you had noticed
23  the -- the decline in the dot com
24  companies by January 9th, 2001?

Nugent, John J. 5/19/2004 3:12:00 PM

1       A.  Uh-huh.
2       MR. GOLDSTEIN: Objection to
3   form.  That's a question?
4       MR. De GHETALDI: Is that
5   correct?
6       THE WITNESS: Yes.
7       MR. De GHETALDI: Okay.
8   BY MR. De GHETALDI:
9       Q.  Do you know when, uhm, you
10  noticed a decline for small
11  telecommunications companies?
12      MR. GOLDSTEIN: Objection to
13  form.
14      THE WITNESS: Uhm, I mean,
15  business to business would be in
16  the same category as the dot coms,
17  the small telecommunications
18  companies.  No, I don't.
19      MR. De GHETALDI: Okay.
20  BY MR. De GHETALDI:
21      Q.  If you can turn to Page 6,
22  please. The first full paragraph reads,
23  Nugent then stated that typically as GB's
24  likely performance becomes clearer during

Nugent, John J. 5/19/2004 3:12:00 PM

1   the third month of a quarter, GB sales
2   representatives and managers typically
3   ratchet up their forecast.  He explained
4   that in applying his management judgment,
5   he would start with the 85 percent figure
6   in mind and then perform a variety of
7   statistical trending analyses and look at
8   historical conversion rates to ratchet up
9   his number.
10      Uhm, well, first of all, is
11  -- is that an accurate summary of what
12  you told the Special Litigation
13  Committee?
14      A.  Yes.
15      Q.  Okay. And is that an
16  accurate statement?
17      A.  Yes.
18      Q.  All right. What -- tell me
19  what the 85 percent figure represents.
20      A.  The 85 percent figure
21  represents my forecast, which I would
22  open up the start of each quarter 85
23  percent of my budget.
24      Q.  Okay. Then the paragraph --

Nugent, John J. 5/19/2004 3:12:00 PM

1 the phrase in the paragraph, where it
2 says, you would then perform a variety of
3 statistical trending analyses --
4     A.   Yes.
5     Q.   -- can you tell me what
6 sort?
7     A.   Uhm, I would look at
8 conversion rates of prior quarters, of
9 year-over-year quarter, conversion rates.
10 Uhm, I would look at the ISD, or the
11 telesales business, was a pretty
12 significant piece of my business, and I
13 would also look at -- they did not report
14 to me, but we would look at their typical
15 conversion rates to figure out how they
16 might end a quarter.
17     Q.   All right. I want to make
18 sure I understand your -- your use of the
19 phrase conversion rates because, believe
20 me, there have been several definitions.
21     Uhm, can you tell me what
22 you mean by historical conversion rate?
23     A.   Sure. The actual closed
24 business to pipeline.

Oracle Related Cases                Page 129

---

Nugent, John J. 5/19/2004 3:12:00 PM

1     Q.   Okay. Pipeline at what
2 point in time?
3     A.   Typically, the third week of
4 the first month of a quarter.
5     Q.   Did you -- did you compare
6 the actual closed business to the
7 pipeline at any other point during a
8 quarter to get a different conversion
9 rate?
10     A.   No.
11     Q.   Okay. Uhm, Footnote 4, on
12 the same page, 6, says, Mr. Kreissman
13 during Nugent's supplemental interview
14 showed Nugent a presentation that Nugent
15 prepared for a January 9th, 2001,
16 operations review that he gave to George
17 Roberts, the executive in charge of NAS.
18     Do you see that?
19     A.   Yes.
20     Q.   Now, if we can go back,
21 please, to Exhibit 54, uhm, I want to try
22 and find that page, uhm, 13, which I
23 believe has the Bates number 120247, the
24 footnote continues on Page 13 of the

Oracle Related Cases                Page 130

---

Nugent, John J. 5/19/2004 3:12:00 PM

1 presentation, I skipped a sentence --
2 uhm, on Page 13 of the presentation,
3 Nugent provided Roberts with his, quote,
4 outlook, unquote, for Q3 of Fiscal Year
5 2001 as opposed to a more formal forecast
6 which reflected 85 percent of Nugent's
7 expectations for the quarter. The
8 outlook provided Nugent's real
9 expectation for the quarter.
10     Nugent stated that he
11 provided his best estimate of GB's real
12 revenue number to Roberts because while
13 Roberts knew that he always underreported
14 his forecasts, he would have looked
15 foolish if he had not provided his best
16 estimate for the purposes of the
17 operations review.
18     The estimate Nugent provided
19 to Roberts on January 9th, 2001 was 208
20 million dollars, 40 million dollars
21 higher than GB's then current forecast of
22 168 million dollars and 74 million
23 dollars higher than GB's ultimate revenue
24 for the quarter of 134 million dollars.

Oracle Related Cases                Page 131

---

Nugent, John J. 5/19/2004 3:12:00 PM

1 Do you see that?
2     A.   Yes.
3     Q.   Okay. Here's where I am
4 confused and, hopefully, you can help.
5     If we go back to Exhibit 265
6 and turn to -- turn to page -- well, it's
7 the third page, the one with the Bates
8 number 123674. Do you see that?
9     A.   Yes.
10     MR. WEISER: Excuse me, did
11 you say Exhibit 265?
12     MR. De GHETALDI: Yes.
13     MR. WEISER: What was the
14 Bates number?
15     MR. De GHETALDI: It's
16 123674.
17     MR. WEISER: 674.
18     MR. De GHETALDI: It's the
19 third page.
20     MR. WEISER: I think ours
21 weren't numbered sequentially.
22     MR. De GHETALDI: Yeah, they
23 are not.
24 BY MR. De GHETALDI:

Oracle Related Cases                Page 132

1      Q. Now we have got three pages

2 in front of us, unfortunately.

3      A. That's okay.

4      Q. The -- in Exhibit 265 it

5 looks like as of January 8th, 2001, your

6 forecast/realistic number was 168.8

7 million dollars, right?

8      A. Yes.

9      Q. And your best case, which I

10 thought you said was the -- what would

11 happen if everything went completely

12 right --

13      A. Uh-huh.

14      Q. -- was 203.7 million

15 dollars, right?

16      A. Uh-huh.

17      Q. You have to --

18      A. Yeah, a hundred percent of

19 budget.

20      Q. So --

21      A. And --

22        MR. GOLDSTEIN: Wait. He

23 didn't ask you a question yet.

24        THE WITNESS: Okay.

1        MR. De GHETALDI: Am I

2 reading it correctly so far?

3        THE WITNESS: Yes. Yes.

4        MR. De GHETALDI: All right.

5 BY MR. De GHETALDI:

6      Q. My question is, which one of

7 those two numbers was your best estimate

8 of -- of what General Business should

9 expect to -- to achieve?

10        MR. GOLDSTEIN: Objection to

11 form.

12        THE WITNESS: The forecast

13 used the Classick 85 percent I

14 talked about earlier, opening up

15 with that forecast, and to George,

16 I said, I fully believe I will be

17 able to do my budget. I will be

18 able to do my budget at a hundred

19 percent, hence, the 203.

20 BY MR. De GHETALDI:

21      Q. But everything had to go

22 right in order to achieve that?

23      A. Not everything had to go

24 right. I would factor that down. That

1 had a lot of the deals that the --

2 that -- many deals that the -- the VPs

3 had not forecasted at this point, but I

4 knew that they were good deals.

5      Q. Okay. If you could turn to

6 Page 7, please.

7        By the way, where did the

8 operations review, the January 9th, 2001,

9 operations review, take place?

10      A. In Boston.

11      Q. At the Ritz-Carlton?

12      A. Yeah.

13      Q. Okay. The last paragraph on

14 Page 7, uhm, says, Nugent discussed a

15 meeting with Roberts that Nugent believes

16 took place in late January 2001. Nugent

17 was not certain of the date of the

18 meeting, but recalled that it took place

19 after he returned to work from knee

20 surgery and, most likely, at the

21 Ritz-Carlton in Boston.

22        Are you talking about the

23 January 9th, 2001, operations review?

24      A. Uhm, could have been, yes.

1      Q. Well, was there -- was there

2 another meeting that you had with Mr.

3 Roberts in late January at the

4 Ritz-Carlton?

5      A. At the Ritz-Carlton, Boston,

6 could have been.

7      Q. So the only possibility

8 would have been --

9      A. Yes.

10      Q. So the only possibility

11 would be the January 9th, 2001,

12 operations review?

13      A. Yes. Yes.

14        MR. GOLDSTEIN: It's good

15 that you can do that.

16 BY MR. De GHETALDI:

17      Q. The interview summary

18 continues, at the meeting, Nugent

19 informed Roberts that he had a vague

20 sense that business was slowing down

21 slightly and that Nugent was hedging his

22 bets for the quarter.

23        Do you remember telling Mr.

24 Roberts that you were hedging your bets

1 for the quarter at the January 9th, 2001,

2 operations review?

3   A. No. Per this, a vague

4 recollection of that, but I don't

5 remember that. I see how it's written

6 here.

7   Q. Yeah, it's -- I'm just

8 trying to figure out what got lost in

9 translation, because this is a summary of

10 what you told --

11   A. I can only speculate.

12   Q. Yeah. Yeah. I don't want

13 you to do that.

14   A. Okay.

15   Q. Uhm. But I did want to know

16 whether you recalled telling Mr. Roberts

17 at the operations review that you were

18 hedging your bets for the quarter?

19   A. No.

20   Q. All right. Uhm, the

21 interview summary then continues and

22 says, Nugent speculated that he might

23 have told Roberts that General Business'

24 14 -- I'm sorry, 172 million dollar

1 formal forecast based on 85 percent of

2 Nugent's best estimate of his performance

3 might be closer to General Business'

4 actual results than the 208 million

5 dollars Nugent provided to Roberts as his

6 outlook at the January 9th operations

7 review meeting.

8   Uhm, is this summary

9 incorrect in leading one to believe that

10 there were two meetings with Mr. Roberts

11 at the -- at the Ritz-Carlton in Boston?

12 Do you see my confusion?

13   A. No. I -- I believe there's

14 only one meeting and, therefore, this is

15 referring to that same meeting.

16   Q. Okay. Do you recall telling

17 Mr. Roberts at the January 9th operations

18 review meeting that the 172 million

19 dollar forecast might be closer to

20 General Business' actual results than the

21 208 million dollar outlook?

22   MR. GOLDSTEIN: Objection to

23 form.

24   THE WITNESS: No.

1 BY MR. De GHETALDI:

2   Q. If you can, turn, please, to

3 Page 14, and at the top of the page, the

4 first full sentence reads, however, he

5 stated that even with this happening,

6 Oracle's dot com sales remain strong

7 through Q2 of Fiscal Year 2001.

8   Do you recall saying that to

9 the Special Litigation Committee?

10   MR. GOLDSTEIN: Objection to

11 form.

12   THE WITNESS: I don't know

13 what context it is.

14   MR. De GHETALDI: Yeah, I --

15 I didn't mean to take it out of

16 context. The --

17   THE WITNESS: Oh, yes, I

18 could have -- I mean, I don't

19 explicitly remember, but that

20 would -- that would be consistent

21 with what I was thinking about,

22 you know, we had a very good Q1,

23 very good Q2, and I thought for

24 sure we were going to have a very

1 good Q3.

2 BY MR. De GHETALDI:

3   Q. Well, hadn't you seen the

4 decline in dot com sales as early as Q2

5 of Fiscal Year 2001?

6   MR. GOLDSTEIN: Objection to

7 form.

8   THE WITNESS: Nothing that I

9 had seen gave me cause to reduce

10 my forecast.

11 BY MR. De GHETALDI:

12   Q. I think you might be

13 answering a -- a question that's

14 different than what I asked.

15   A. Okay.

16   Q. Uhm, my question was, had

17 you seen a decline in dot com sales as

18 early as Q2 of Fiscal Year 2001?

19   MR. GOLDSTEIN: Objection to

20 form.

21   THE WITNESS: Q1?

22   MR. De GHETALDI: 2.

23   THE WITNESS: Q2? I don't

24 believe so. I believe we had a

1    great quarter.

2    BY MR. De GHETALDI:

3        Q.   You recall that, uhm, and we

4    can go back to the -- to the exhibit, but

5    you recall that in Q2FY01 the dot com

6    sales were 52 million dollars?

7        A.   Okay.

8        Q.   Compared to 91 million

9    dollars in Q3 of 2000?

10       A.   Yes.

11       Q.   Is that indicative of a

12   great quarter in the dot com sector?

13       A.   You're comparing --

14       MR. GOLDSTEIN:  Objection

15   to form. Excuse me.

16       THE WITNESS:  I can't answer

17   that, the context. You are

18   comparing an apple and an orange,

19   one particular quarter in one

20   fiscal year and a different

21   quarter in another fiscal year.

22       MR. De GHETALDI:

23   Unfortunately, I don't have the

24   earlier periods, so I'm not trying

1        to --

2        THE WITNESS:  No problem.

3    No problem.

4    BY MR. De GHETALDI:

5        Q.   If you'll look at then the

6    last sentence on Page 14 of Exhibit 270

7    -- at the last sentence of the first full

8    paragraph on Page 14, where it says,

9    given that suite 11i had only been

10   released six months prior to Q3 Fiscal

11   Year 2001, together with the long

12   implementation period, Nugent believed

13   that none of General Business' suite 11i

14   customers were fully up and running

15   during Q3 Fiscal Year 2001.

16       Is that an accurate

17   statement?

18       A.   That would be an accurate

19   statement. If the product had just come

20   out six months earlier, it takes longer

21   than six months to put up the product, to

22   go live on the product.

23       Q.   Okay. If you could, turn to

24   Page 19, please, and the first full

1    paragraph there, and it says, Nugent

2    recalled that he prepared a one-page

3    document after Q3 Fiscal Year 2001,

4    illustrating the effect of the dot com

5    fall-off on General Business. A slide

6    included a bar graph and may have been

7    titled the Dot Com bust. The Special

8    Litigation Committee has requested a copy

9    of this slide.

10       Do you recall whether or not

11   you gave a copy of that slide to the

12   Special Litigation Committee?

13       A.   I don't recall that.

14       Q.   Okay. If you could turn to

15   Page 20, please, and the second paragraph

16   under Oracle or internal Oracle reports,

17   do you see that?

18       A.   Yes.

19       Q.   It says, Nugent reviewed the

20   business on-line pipe reports for

21   November and December of 2000. He

22   indicated that he received these reports,

23   but did not use them. Nugent stated that

24   for the purposes of managing his business

1    he uses only the GB forecast.

2        Now, your -- your interview

3    summary had a number of exhibits attached

4    to it, but none titled or indicated

5    within the text of the interview summary

6    as being business on-line pipe reports.

7        Do you know what -- what

8    sort of -- or did you receive business

9    on-line pipe reports?

10       A.   Not that I am aware of. I

11   don't know what a business on-line pipe

12   report is.

13       Q.   Okay. All right.

14       MR. De GHETALDI:  Let's go

15   off the record and take a couple

16   minutes with Rob and see if

17   there's anything else I want

18   to ask.

19       THE WITNESS:  Okay.

20       THE VIDEOGRAPHER:  Off tape,

21   5:02.

22       (Whereupon, there was a

23   discussion held off the record at

24   this time.)

Nugent, John J. 5/19/2004 3:12:00 PM

1    (Whereupon, there was a
2    recess held at this time. 5:02 to
3    5:08 p.m.)
4         THE VIDEOGRAPHER: Stand by.
5    Back on the record, 5:10.
6         MR. De GHETALDI: That's all
7    the questions that I have.
8         THE WITNESS: Okay.
9         MR. GOLDSTEIN: We have no
10   questions.
11        MR. De GHETALDI: Germain,
12   you have no questions, right?
13        MR. LABAT: No questions.
14        THE VIDEOGRAPHER: That
15   concludes today's videotape
16   deposition. The time is 5:10.
17        THE REPORTER: Mr. Labat,
18   would you like a copy of the
19   transcript?
20        MR. LABAT: Yes, please,
21   minuscript and also a rough disk
22   tonight would be great.
23        THE REPORTER: I will E-mail
24   everyone a rough within a few

Oracle Related Cases                    Page 145

Nugent, John J. 5/19/2004 3:12:00 PM

1    hours.
2         (Witness excused.)
3         (Deposition concluded at
4    approximately 5:11 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Oracle Related Cases                    Page 146

Nugent, John J. 5/19/2004 3:12:00 PM

1
2         CERTIFICATE
3
4
5         I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.
7
          It was requested before
8    completion of the deposition that the
     witness, JOHN J. NUGENT, have the
9    opportunity to read and sign the
     deposition transcript.
10
11
         ———————————————
12        Maria N. Damiani,
          Registered Merit Reporter,
13        Certified Shorthand Reporter
          Dated: May 29, 2004
14
15
16
17
18        (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

Oracle Related Cases                    Page 147

Nugent, John J. 5/19/2004 3:12:00 PM

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition
4    over carefully and make any necessary
5    corrections. You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8         After doing so, please sign
9    the errata sheet and date it.
10        You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14        It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you. If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Oracle Related Cases                    Page 148

Nugent, John J. 5/19/2004 3:12:00 PM

1          - - - - - -

           ERRATA

2          - - - - - -

3     PAGE LINE CHANGE

4     ___ ___ _____

5     ___ ___ _____

6     ___ ___ _____

7     ___ ___ _____

8     ___ ___ _____

9     ___ ___ _____

10    ___ ___ _____

11    ___ ___ _____

12    ___ ___ _____

13    ___ ___ _____

14    ___ ___ _____

15    ___ ___ _____

16    ___ ___ _____

17    ___ ___ _____

18    ___ ___ _____

19    ___ ___ _____

20    ___ ___ _____

21    ___ ___ _____

22    ___ ___ _____

23    ___ ___ _____

24    ___ ___ _____

Nugent, John J. 5/19/2004 3:12:00 PM

1          ACKNOWLEDGMENT OF DEPONENT

2

3          I,_____, do

4     hereby certify that I have read the

5     foregoing pages, 1 - 145, and that the

6     same is a correct transcription of the

7     answers given by me to the questions

8     therein propounded, except for the

9     corrections or changes in form or

10    substance, if any, noted in the attached

11    Errata Sheet.

12

13

14    _____

15    WITNESS NAME              DATE

16

17

18

19    Subscribed and sworn

      to before me this

20    _____ day of _____, 20____.

21    My commission expires:_____

22

23    _____

23    Notary Public

24

Nugent, John J. 5/19/2004 3:12:00 PM

1          LAWYER'S NOTES

2     PAGE LINE

3     ___ ___ _____

4     ___ ___ _____

5     ___ ___ _____

6     ___ ___ _____

7     ___ ___ _____

8     ___ ___ _____

9     ___ ___ _____

10    ___ ___ _____

11    ___ ___ _____

12    ___ ___ _____

13    ___ ___ _____

14    ___ ___ _____

15    ___ ___ _____

16    ___ ___ _____

17    ___ ___ _____

18    ___ ___ _____

19    ___ ___ _____

20    ___ ___ _____

21    ___ ___ _____

22    ___ ___ _____

23    ___ ___ _____

24    ___ ___ _____